ORIGINAL




UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

TZVI WEISS, LEIB WEISS, MALKA WEISS, YITZCHK WEISS, YERUCHAIM WEISS, and ESTHER DEUTSCH,

Plaintiffs,

-against-

NATIONAL WESTMINSTER BANK PLC,

Defendant.

**COMPLAINT**
**JURY TRIAL DEMANDED**

MATSUMOTO
FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y
★ SEP 29 2005 ★
BROOKLYN OFFICE

Plaintiffs Tzvi Weiss, Leib Weiss, Malka Weiss, Yitzchk Weiss, Yeruchaim Weiss, and Esther Deutsch, by their attorneys, allege the following upon information and belief:

## NATURE OF THE ACTION

1. This is a complaint for damages arising out of the conduct of defendant National Westminster Bank Plc (Hereinafter: "NatWest"). The Defendant is a financial institution headquartered in the United Kingdom that has knowingly collected, provided, and transmitted money and financial services to HAMAS[1], a Foreign Terrorist Organization (as that term is defined in 8 U.S.C. § 1189 of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA")). NatWest has thereby substantially aided and abetted the commission of acts of international terrorism, as defined by 18 U.S.C. § 2331, including the terrorist attack that injured the plaintiffs, and has violated the prohibitions on providing material support for acts of

[1] HAMAS is an acronym for "Harakat al-Muqawama al-Islamiyya" also known as the "the Islamic Resistance Movement."

international terrorism (18 U.S.C. § 2339B) and on financing acts of international terrorism (18 U.S.C. § 2339C), set forth in the Anti-Terrorism Act ("ATA") as amended by the AEDPA. Defendant is therefore civilly liable under § 2333(a) of the ATA to the plaintiffs who have been injured in their person by reason of an act of international terrorism.

## JURISDICTION AND VENUE

2. This Court has subject matter jurisdiction over this action pursuant to 18 U.S.C. §§ 2333 and 2334, as a civil action brought by nationals of the United States, who have been killed or injured by reason of acts of international terrorism, and/or their estates, survivors, and heirs. This Court also has subject matter jurisdiction over this action based on diversity of citizenship pursuant to 28 U.S.C. § 1332(a)(2). The matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

3. Venue is proper in this district pursuant to 18 U.S.C. § 2334(a) and 28 U.S.C. § 1391(d).

4. NatWest is subject to personal jurisdiction in the United States pursuant to Fed.R.Civ.P. 4(k) because, among other things, it continuously and systematically does business in the United States. The defendant is also subject to personal jurisdiction in the United States pursuant to 18 U.S.C. § 2339B(d)(1)(D) because it has committed tortious acts within the United States by transferring funds through the United States for the benefit of HAMAS, and has purposefully availed itself of United States jurisdiction in the course of committing the wrongful acts alleged herein.

## THE PARTIES

### A. The Plaintiffs

5. Plaintiff Tzvi Weiss, age 20, is a citizen of the United States and a resident of the State of New York and Kings County.

6. Mr. Weiss was in Israel studying at a rabbinical college in 2003 and was planning to return to the United States on August 21, 2003.

7. On the evening of August 19, 2003, he boarded Egged bus No. 2 in Jerusalem after having visited the Kotel (also known as the "Western Wall" or "Wailing Wall") to pray. He was on his way to a friend's wedding.

8. As the bus arrived at Shmuel Hanavi Street he heard a terrible explosion. Everything went black, and he could not hear anything but a deafening ringing in his ears.

9. Raed Abdul Hamid Misk, a HAMAS suicide bomber, had detonated explosives on the bus. HAMAS claimed responsibility for the attack.

10. In the panicked aftermath of the explosion, Mr. Weiss jumped out of a window of the bus and began to run, stumbling over dead bodies and body parts as he fled the scene.

11. Mr. Weiss was covered with blood and his hand had been cut. His body was shaking from the shock of the experience and he had a constant terrible ringing in his ears.[2]

12. Once he got his bearings, Mr. Weiss telephoned his brother, plaintiff Yitzchk Weiss, and waited for his brother to arrive to accompany him to the hospital.

13. An ambulance transported Tzvi to Bikur Cholim Hospital where he underwent tests. He later learned that both of his eardrums were shattered and torn as a result of the explosion.

---

[2] The medical term for the condition is tinnitus.

14. His left eardrum had been completely torn, and his hearing was severely impaired. continued to experience severe pain in his hand and was unable to bend his fingers.

16. Tzvi decided to return home to the United States to be near his family while he began recovering from the injuries and the effects of having been a victim of a terrorist attack. He returned to the United States the following day and visited an ear specialist within hours of his arrival. He underwent tests and was advised to have surgery on his left ear to attempt to regain some of his hearing loss in that ear. Tzvi obtained a second opinion from another doctor who agreed with the diagnosis.

17. After a number of examinations by the initial physician, and after treatment with antibiotics, Tzvi underwent surgery on his left ear. After the surgery, the incessant ringing in his ears became louder and worse than before.

18. Tzvi also visited another physician for treatment of the severe pain in his hand. He was told the injuries might require surgery.

19. Tzvi continued to visit doctors on numerous occasions to assess his ears, and underwent many tests, but the agonizing ringing continued. Eventually, it was determined that the surgery on Tzvi's left ear had not been successful. Tzvi suffered numerous panic attacks because of his injuries and the symptoms that continued to affect him.

20. As a result of the injuries he sustained in the attack, combined with the memories of the attack itself, Tzvi's mental health deteriorated. The suffering that Tzvi has endured as a result of the injuries he sustained in the attack is ongoing and relentless. It has impacted every aspect of his life in a negative way.

21. Tzvi enrolled in rabbinical college upon his return to the United States, but the injuries and their symptoms prevented him from concentrating on his schoolwork, and he could

no longer achieve the academic success he had achieved prior to the attack.

22. As a result of the attack, plaintiff Tzvi Weiss has suffered severe physical and mental anguish and extreme emotional distress.

23. Plaintiffs Leib and Malka Weiss are citizens of the United States and residents of the State of New York and Kings County. They are the parents of plaintiff Tzvi Weiss.

24. Plaintiff Yitzchk Weiss is a citizen of the United States. He is a brother of plaintiff Tzvi Weiss and a resident of the State of Israel.

25. Plaintiff Yeruchaim Weiss is a citizen of the United States and a resident of the State of Israel. He is a brother of plaintiff Tzvi Weiss.

26. Plaintiff Esther Deutsch is a citizen of the United States and a resident of the State of New York and Kings County. She is the sister of plaintiff Tzvi Weiss.

27. The parents and siblings of Tzvi Weiss experienced great anxiety after learning of the attack that injured Tzvi.

28. They have also experienced great anxiety as they have observed the suffering that Tzvi has endured as a result of his injuries.

29. As a result of the attack, plaintiffs Leib Weiss, Malka Weiss, Yitzchk Weiss, Esther Deutsch and Yeruchaim Weiss have suffered severe mental anguish and extreme emotional distress.

**B. <u>The Defendant</u>**

30. National Westminster Bank, PLC ("NatWest") is a British financial institution with its principal place of business in London, United Kingdom.

31. NatWest conducts business in the United States and in New York, both directly and through its agents, at a number of locations including 101 Park Avenue, New York, New

York 10178, and 600 Steamboat Road, Greenwich, Connecticut 06830, which it also lists in its annual report as one of its "principal offices."

32. NatWest has also been registered to conduct business within the State of Texas since 1999, and state records list its address as 600 Travis Street in Houston, Texas.

## FACTUAL ALLEGATIONS

### The Islamic Resistance Movement ("HAMAS")

#### A. The Founding of HAMAS

33. In December of 1987, Sheik Ahmed Yassin formed the Palestinian Islamic Resistance Movement ("HAMAS") as an offshoot of the Muslim Brotherhood, a radical Islamic group founded in Egypt before World War II.

34. Pursuant to its charter, HAMAS and its operatives plan, assist, and conduct acts of international terrorism in Israel and the Gaza Strip, including the attack that injured the plaintiffs.

#### B. Formal Designations of HAMAS as a Terrorist Organization

35. In 1989, the Government of Israel declared HAMAS a terrorist organization and also declared it an "unlawful organization" because of its terrorist acts. Notice of the designation was placed in the official Government of Israel publication, the *Announcements and Advertisements Gazette*.

36. Initially, HAMAS specialized in kidnapping and executing people suspected of cooperating with Israel. It quickly evolved and broadened its operations so that by the early 1990s, it specialized primarily in murdering civilians in Israel.

37. For example, on April 6, 1994, a HAMAS suicide bomber blew up a bus in Afula, killing eight (8) people.

38. On April 13, 1994, a HAMAS suicide bomber blew up a bus in Hadera killing

five (5) people.

39. On October 19, 1994, a HAMAS suicide bomber killed twenty-two (22) people on the No. 5 bus in Tel-Aviv.

40. On February 25, 1996, a HAMAS suicide bomber blew himself up on the No. 18 Egged bus in Jerusalem. Twenty six (26) people, including three (3) U.S. citizens, were murdered and eighty (80) people were injured, including three (3) U.S. citizens. HAMAS claimed responsibility for the bombing.

41. On January 23, 1995, President Clinton issued Executive Order 12947. President Clinton found that "grave acts of violence committed by foreign terrorists that threaten to disrupt the Middle East peace process constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States."

42. Executive Order 12947 designated HAMAS as a "Specially Designated Terrorist" (SDT). Executive Order 12947 blocked all property and interests in property of the terrorist organizations and persons designated in the Order, including HAMAS.

43. On October 8, 1997, by publication in the Federal Register, the United States Secretary of State designated HAMAS as a Foreign Terrorist Organization pursuant to Section 219 of the Immigration and Nationality Act and the AEDPA. The designation of HAMAS as a Foreign Terrorist Organization has been renewed every two years since 1997.

44. After the September 11, 2001 terrorist attacks on the United States, President Bush issued Executive Order 13224, declaring a national emergency with respect to the "grave acts of terrorism ... and the continuing and immediate threat of further attacks on United States nationals or the United States." Executive Order 13224 designated HAMAS as a Specially Designated Global Terrorist ("SDGT"). Executive Order 13224 blocks all property and interests

in property of the SDGTs, including HAMAS.

### C. HAMAS's Organizational Structure

45. HAMAS's terrorist operations depend upon its religious and social activities to recruit, educate and train terrorists and to collect material and aid. Its terrorist operations and social activities operate side-by-side and support each other.

#### 1. The "Dawa"

46. HAMAS's infrastructure in Palestinian Authority-controlled territory ("the PACT") is comprised of two interwoven components: its terrorist apparatus and its religious and social infrastructure, which is responsible for recruiting and training terrorists. This patchwork of charitable and social institutions is commonly referred to by HAMAS as the "Dawa."

47. For the purpose of raising funds for its operations, HAMAS has established "charity" committees across the PACT and abroad, including committees in Ramallah, Jenin, and Tulkarem, that are controlled by HAMAS agents and collect and distribute their funds on behalf of HAMAS.[3]

48. An important aspect of the charity associations and committees is their role as a means for the channeling of funds to pay expenses and assist the families of terrorist operatives who are arrested, injured, or killed, and for providing housing subsidies to the families of suicide bombers whose homes are often demolished by the Israeli army after the bomber's identity has been confirmed.

49. The network of these committees and other "charitable" associations not only helps raise funds for HAMAS's terrorist operations, but also helps it to identify and recruit potential terrorists. The network also assists recruitment in part by funneling money to pay

[3] There are approximately 80 such "charitable" committees in the West Bank and Gaza Strip nominally supervised by the Palestinian Authority's Ministry of Waqf and Religious Affairs.

benefits to the families of terrorist operatives who are arrested, injured, or killed.

**2. Terrorism Financing**

50. Funds raised by or on behalf of HAMAS for "charitable purposes" are used to finance its terrorist activities. As Congress found when passing the AEDPA: "Foreign organizations that engage in terrorist activity are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct." Antiterrorism Act of 1996, Pub. L. No. 104-132, sec. 301(a)(7), 110 Stat. 1247.

51. HAMAS receives a majority of its financing through donations coordinated by prominent Saudi and Gulf State charities and the global network of charities known as the Union of Good, operated by the Muslim Brotherhood. The Union of Good, in turn, raises funds that are channeled through an entity known as the Palestine Relief and Development Fund and/or Interpal (Hereinafter: "Interpal"), which maintains several accounts with defendant NatWest.

**a. The Union of Good**

52. The Union of Good is an umbrella organization established by the Muslim Brotherhood in October of 2000, immediately following the outbreak of the ongoing violent Palestinian-Israeli confrontation commonly termed the "Second Intifada". The Union of Good's primary "charitable" purpose is to provide HAMAS and its agents in the PACT financial support for HAMAS.

53. The Union of Good is comprised of more than fifty (50) Islamic charitable foundations worldwide. The U.S. Government has designated several of these foundations, including Interpal and the Al-Aqsa Charitable Foundation as Specially Designated Global Terrorists ("SDGT").

54. The U.S. Government designated Interpal an SDGT on August 22, 2003, and

designated the Al-Aqsa Charitable Foundation an SDGT on May 29, 2003.

55. The Union of Good is thus a principal fundraising mechanism for HAMAS.

56. The Union of Good is headed by Dr. Yussuf al-Qardawi, an extremist Sunni Muslim scholar based in Qatar. He has issued an Islamic religious edict (*fatwa*) authorizing suicide bombing attacks against Israel.[4]

57. The operational head (Vice Chairman and Managing Trustee) of the Union of Good is Issam Yusuf a/k/a Essam Yussef a/k/a Issam Yusuf Mustafa, a HAMAS agent and the former vice chairman of Interpal.

58. The board of directors of the Union of Good includes three senior HAMAS figures: Sheikh Hamid al-Bitawi, Dr. Essam Salhoub, and Bassam Jarrar.

59. In 2001, Union of Good head al-Qardawi publicly described the activities of the Islamic charitable societies sustaining the Intifada against Israel as a "new type of *jihad*, financial *jihad*, through which financial support is guaranteed to the martyrs' families, Palestinian prisoners and detainees, and every Palestinian whose property is damaged during the conflict."

**b. Interpal**

60. Charitable donations to the Union of Good are collected and distributed through Interpal.

61. Interpal was founded in 1981 as the Palestine and Lebanon Relief Fund and was reincorporated as Interpal in November 1994.

62. On or before January 1, 1996, Interpal opened one or more accounts with

[4] Qardawi was also the first scholar who authorized women to commit suicide attacks (March 2002) in the context of the second Intifada, as cited in HAMAS's official website: http://www.palestine-info.info/arabic/fatawa/alamaliyat/qaradawi1.htm.

NatWest.

63. The Charity Commission, established by law as a regulator and registrar for charities in England and Wales, froze Interpal's accounts at Natwest in March of 1996 based upon evidence that it channelled money to HAMAS.

64. The allegations of links between Interpal and HAMAS were published in numerous British newspapers at the time, including *The Guardian* newspaper and *The Times of London*.[5]

65. A spokesman for the Charity Commission told *The Guardian* that Interpal's bank account had been frozen "as a precautionary measure." Following the widely published reports of Interpal's links to HAMAS, NatWest took no action to terminate its relationship with Interpal.[6]

66. Interpal provides funds for institutions that belong to HAMAS's financial infrastructure in the PACT, including many entities declared unlawful by the Government of Israel. The Palestinian Authority has also recognized several of these entities as sources of HAMAS financing.

67. These institutions include, but are not limited to: the Orphan Care Society of Bethlehem, Al-Islah Charitable Society in Ramallah-Al-Bireh, the Ramallah-Al-Bireh Charitable Society, the Jenin Charity Committee, the Hebron Islamic Association, Tulkarem Charity

---

[5] Richard Norton-Taylor and Ian Black, *Palestinian Charity Funds Frozen Over 'Hamas Link,'* The Guardian, Mar. 9, 1996; Richard Norton-Taylor, *News in Brief: Palestinian Group Cleared*, The Guardian, Mar. 13, 1996; Julian Borger, *Close Trust, Israel Pleads; Britain is being asked to clamp down on Palestinian fundraisers,* Sept. 7, 1997; Stewart Tendler and Christopher Walker, *MI5 study 'charity cash linked to Hamas,'* The Times, Mar. 6, 1996; Stewart Tendler, *Charity's funds are frozen over alleged Hamas link,* The Times, Mar. 9, 1996; Adrian Lee and Michael Evans, *MI5 traces network of Hamas funding,* The Times, Mar. 11, 1996.

[6] In an interview reported in *The Guardian* newspaper on August 7, 1997, Mr. Ibrahim Hewitt, Chairman of Interpal, publicly acknowledged that it was possible that some of Interpal's beneficiaries in the Palestinian territories had been established by HAMAS.

Committee, Al-Mujama al-Islami, the Islamic Charitable Society in the Gaza Strip, and the Muslim Youth Association of Hebron.[7]

68. The Orphan Care Society of Bethlehem was outlawed by the Government of Israel in February of 2002. Most of its chief functionaries, including its director, Dr. Ghassan Harmass, are HAMAS terrorists. The Orphan Care Society pays subsidies to the children of HAMAS "martyrs" and imprisoned HAMAS members.

69. The Al-Islah Charitable Society in Ramallah-Al-Bireh was founded in 1997. The Government of Israel declared the Al-Islah Charitable Society an "unlawful organization" in February of 2002. The Al-Islah Charitable Society regularly transfers money for the benefit of the families of HAMAS "martyrs," and subsidizes the renovation of homes that belong to the families of suicide bombers and were destroyed by Israel. The Al-Islah Charitable Society supports the families of "martyrs", HAMAS prisoners in Israeli jails, and deported HAMAS members.

70. The Jenin Charity Committee was declared an "unlawful organization" in February of 2002. This "charity" is run by HAMAS terrorists, and it provides aid to HAMAS terrorists, to the families of "martyrs" as well as Palestinians wounded or imprisoned as a result of violent confrontations with Israel.

71. The Tulkarem Charity Committee was founded in 1981. The Government of Israel declared the Tulkarem Charity Committee an "unlawful organization" in February of 2002. The committee is headed by a HAMAS terrorist.

72. Interpal was declared an "unlawful organization" by the Government of Israel in

---

[7] The Jenin Charity Committee and Tulkarem Charity Committee are specifically identified as HAMAS controlled organizations by the United States Government in the criminal indictment of Holy Land Foundation for Relief and development in the Northern District of Texas.

May of 1997 because of its fundraising activities on behalf of HAMAS. Notice of the designation was placed in the official publication, the *Announcements and Advertisements Gazette*.

73. Despite this designation, NatWest did not cease providing financial services to Interpal.

74. Interpal was further designated as a terrorist organization in January of 1998 by the Government of Israel. Notice of the designation was placed in the official publication, the *Announcements and Advertisements Gazette*.

75. Despite this declaration and the knowledge that it was providing financial services to a foreign terrorist organization, NatWest did not cease providing financial services to Interpal.

76. On at least three separate occasions NatWest accepted deposits on behalf of Interpal from organizations and entities whose terrorist connections are a matter of public record.

77. In April of 2000, NatWest accepted a deposit of $66,000 for Interpal from the Holy Land Foundation for Relief and Development.[8]

78. Like Interpal, the Al-Aqsa Charitable Foundation is a critical part of HAMAS's transnational terrorist support infrastructure. The Al-Aqsa Foundation also maintained branch offices in The Netherlands, Denmark, Belgium, Sweden, Pakistan, South Africa, Yemen and elsewhere.

79. On March 27, 2003, NatWest deposited at least two payments to Interpal totalling

---

[8] On May 6, 1997, the Government of Israel designated the Holy Land Foundation for Relief and Development ("HLF") as a HAMAS front organization and declared that HLF "deals in the practice of transferring monies to families of HAMAS activists, who carried out deadly attacks . . . ."

295,000 Euros from the Dutch branch of the Al-Aqsa Foundation.[9]

80. On or about January of 2001, NatWest accepted a deposit of $70,000 on behalf of Interpal from the Al-Aqsa organization in Yemen.[10]

81. Notwithstanding all of this publicly available information, NatWest continues to collect and transmit funds on behalf of Interpal and hence provides material support to HAMAS.

82. On August 19, 2003, a HAMAS suicide bomber blew up the Egged bus No. 2, killing twenty-three (23) people, including seven (7) children and injuring more than one hundred thirty (130) people, including plaintiff Tzvi Weiss.

83. Following this atrocity, President George W. Bush stated:

> At my direction, the Treasury Department has moved today to block and freeze the assets of six top HAMAS leaders and five non-governmental organizations that I am advised provide financial support to HAMAS. By claiming responsibility for the despicable act of terror on August 19, HAMAS has reaffirmed that it is a terrorist organization committed to violence against Israelis and to undermining progress toward peace between Israel and the Palestinian people.

84. Thereafter, Interpal, as one of the five non-governmental organizations, was designated as an SDGT on August 22, 2003.

---

[9] On July 31, 2002, German authorities closed the Al-Aqsa Foundation in Germany because of its support for HAMAS. On January 1, 2003, the Danish government charged three Al-Aqsa Foundation officials in Denmark with supporting terrorism. In April of 2003, Dutch authorities blocked Al-Aqsa Foundation assets in The Netherlands based on information that funds were provided to organizations supporting terrorism in the Middle East. On May 29, 2003, the United States Department of the Treasury Office of Foreign Asset Control formally designated the Al-Aqsa Foundation a Specially Designated Global Terrorist.

[10] On January 10, 2003, German authorities arrested the head of the Al-Aqsa organization in Yemen, Sheik Mohammed Ali Hasan Al-Moayad, at the request of the U.S. Department of Justice and the Federal Bureau of Investigation after a year-long investigation and undercover operation by the FBI's Joint Terrorism Task Force of Al-Moayad for knowingly and intentionally conspiring to provide material support and resources for Al-Qaeda and HAMAS. Prior to his arrest in Germany, Sheik Al-Moayad had met with an undercover government informant and proffered proof of his prior fundraising on behalf of HAMAS by tendering to the undercover government informant a receipt from Interpal confirming a $70,000 donation from the Sheik's Al-Aqsa organization in Yemen. Sheik Al-Moayad was subsequently convicted of providing material support to HAMAS in violation of 18 U.S.C. § 2339B and sentenced to 75 years in prison in 2005.

85. In an interview reported in *The Guardian* on August 28, 2003, after the U.S. Government designation, Mr. Hewitt, Chairman of Interpal, was publicly quoted as saying: "We deal with people whether they are HAMAS or whether they are Fatah."

86. Even after Interpal's designation as a Specially Designated Global Terrorist organization and its Chairman's public admission of its relationship to the previously designated Foreign Terrorist Organization, HAMAS, NatWest again took no action to cease its relationships with Interpal and has taken no action to this day.

**THE DEFENDANT'S CONDUCT**

87. Interpal is a pivotal part of HAMAS's fundraising infrastructure and a significant source of HAMAS's financing.

88. For more than nine (9) years, defendant NatWest has knowingly maintained numerous accounts for Interpal and has collected, received, transmitted, and provided millions of dollars on behalf of Interpal, the largest HAMAS fundraising organization in Europe.

89. Since March of 1996, defendant NatWest has known that it has been providing financial services to Interpal and that Interpal collects money for, and transmits money to, HAMAS, a Foreign Terrorist Organization (as that term is defined in 8 U.S.C. § 1189 of the AEDPA.)

90. The provision of financial services to Interpal and HAMAS violates both the criminal provisions of 18 U.S.C. §§ 2339B and 2339C and gives rise to civil liability under 18 U.S.C. § 2333(a) as set forth below.

91. Even after the U.S. Government officially designated Interpal as a Specially Designated Global Terrorist in August of 2003, defendant NatWest continued (and still continues) to provide financial services and material support to Interpal and HAMAS.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

## AIDING AND ABETTING THE MURDER, ATTEMPTED MURDER OR PHYSICAL VIOLENCE TO UNITED STATES CITIZENS IN VIOLATION OF 18 U.S.C. § 2332(a); 18 U.S.C. § 2332(b); 18 U.S.C. § 2332(c) AND 18 U.S.C. § 2333(a)

92. Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

93. The plaintiffs have been injured in their person by reason of an act committed by HAMAS that involves violence and is dangerous to human life and that violates the criminal laws of the United States, including the prohibition on killing, attempting to kill, causing serious bodily injury, or attempting to cause serious bodily injury to U.S. citizens as set forth in 18 U.S.C. § 2332.

94. The acts of HAMAS in killing and attempting to kill U.S. nationals and other persons were and are intended to: (a) intimidate or coerce the civilian population of Israel; (b) influence the policy of the Government of Israel by intimidation or coercion; and (c) affect the conduct of the Government of Israel by mass destruction and murder.

95. The act of terrorism set forth herein is extreme and outrageous and was committed with the knowledge of, and intention to, cause extreme physical pain and suffering to any and all persons within close proximity of the attack, and extreme emotional distress to the family members of those who were killed or injured by reason of the act.

96. The financial services which defendant provides to Interpal, with the knowledge that Interpal collects and transmits funds on behalf of HAMAS, substantially assist HAMAS in its recruiting, rewarding, and providing incentives to suicide bombers and other terrorists. These

financial services facilitate acts of terrorism in violation of 18 U.S.C. § 2332 that have caused injuries to the plaintiffs.

97. The defendant knows that it provides material support to a Foreign Terrorist Organization.

98. Throughout the period in which it has provided financial services for the benefit of HAMAS, the defendant was, and to this date remains, aware that Interpal collects, receives, transmits, and provides funds for the benefit of HAMAS, which has committed numerous criminal acts, including the suicide bombing that injured the plaintiffs.

99. By aiding and abetting violations of 18 U.S.C. § 2332 that have caused each of the plaintiffs to be injured in his or her person and property, the defendant is liable pursuant to 18 U.S.C.

§ 2333(a) for any and all damages that plaintiffs have sustained as a result of such injuries.

## SECOND CLAIM FOR RELIEF

## COMMITTING ACTS OF INTERNATIONAL TERRORISM IN VIOLATION OF 18 U.S.C. § 2339B(a)(1) AND 18 U.S.C. § 2333(a)

100. Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

101. By knowingly transferring funds from and to Interpal, and transferring funds for the benefit of HAMAS, the defendant has provided material support to a designated Foreign Terrorist Organization under the Anti-Terrorism and Effective Death Penalty Act of 1996 in violation of 18 U.S.C. §§ 2339B(a)(1).

102. Defendant knows of HAMAS's terrorist activities.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray that this Court:

(a) Enter judgment against the defendant and in favor of each plaintiff for compensatory damages in amounts to be determined at trial;

(b) Enter judgment against the defendant and in favor of each plaintiff for treble damages pursuant to 18 U.S.C. § 2333(a);

(c) Enter judgment against the defendant and in favor of each plaintiff for any and all costs sustained in connection with the prosecution of this action, including attorneys' fees, pursuant to 18 U.S.C. § 2333(a);

(d) Enter an Order declaring that the defendant has violated, and is continuing to violate, the Anti-Terrorism Act, 18 U.S.C. § 2331 *et seq*.; and

(e) Grant such other and further relief as justice requires.

PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

Dated: September 29, 2005
Oradell, New Jersey

OSEN & ASSOCIATE, LLC

By ______________________

Gary M. Osen, Esq. (GO-5790)
Peter Raven-Hansen, Esq., Of Counsel
*(pro hac vice motion to be filed)*
700 Kinderkamack Road
Oradell, New Jersey 07649
Telephone: (201) 265-6400
Facsimile: (201) 265-0303

Attorneys for Plaintiffs

WECHSLER HARWOOD LLP
Andrew D. Friedman, Esq. (AF-6222)
Joshua D. Glatter, Esq. (JG-0184)
488 Madison Avenue
New York, New York 10022
(212) 935-7400

KOHN, SWIFT & GRAF, P.C.
Robert A. Swift, Esq.
Steven M. Steingard, Esq.
One South Broad Street
Philadelphia, PA 19107
(215) 238-1700

McINTYRE, TATE, LYNCH & HOLT, LLC
David J. Strachman, Esq.
321 South Main Street, Suite 400
Providence, Rhode Island 02903
(401) 351-7700

NITSANA DARSHAN-LEITNER & ASSOCIATES
Nitsana Darshan-Leitner, Esq.
11 Havatikim Street
Petah Tikva, 49389 Israel
(Israel Tel. (972) 3-933-4472)