Defendant National Westminster Bank Plc ("NatWest") respectfully submits this memorandum of law in support of its motion to dismiss the complaint ("complaint" or "Compl.") of plaintiffs Tzvi Weiss, Leib Weiss, Malka Weiss, Yitzchk Weiss, Yeruchaim Weiss and Esther Deutsch ("plaintiffs") for failure to state a claim upon which relief can be granted, pursuant to Federal Rule of Civil Procedure Rule 12(b)(6).

## PRELIMINARY STATEMENT

Tzvi Weiss, who was injured in a suicide bomber attack in Israel on August 19, 2003, for which responsibility was claimed by HAMAS, seeks a treble damage civil recovery for this injury from NatWest, a British bank. Plaintiffs allege that by simply maintaining one or more deposit accounts at a NatWest branch in London for Interpal, a British-based charity that the United States government has accused of supporting HAMAS, NatWest aided and abetted the commission of acts of international terrorism by HAMAS under 18 U.S.C. § 2333(a), and violated the criminal prohibitions against providing material support to a designated foreign terrorist organization ("FTO") under 18 U.S.C. § 2339B and against financing acts of terrorism under 18 U.S.C. § 2339C. Tzvi Weiss's injuries are tragic, but plaintiffs have no legal basis to attribute responsibility for these injuries to NatWest, a British bank whose British customer Interpal – as determined in the very decisions the complaint selectively cites – has been found by the British government not to be affiliated with HAMAS.

The complaint obscures the chronology of relevant events, and unsurprisingly so, because that chronology undermines plaintiffs' untenable allegations. While plaintiffs allege NatWest should have known of Interpal's alleged HAMAS affiliation because the United States government named Interpal a Specially Designated Global Terrorist ("SDGT"), this designation was made after the August 19, 2003 attack in which Tzvi Weiss was injured. Plaintiffs also

obscure the fact that the handful of transactions they identify as transferring funds to and from Interpal through a NatWest branch in London all occurred <u>before</u> the U.S. designation of Interpal as an SDGT.

And while they allege that in 1996, seven years before the August 19, 2003 attack, Interpal's accounts at NatWest in London were frozen by the British authorities, plaintiffs misleadingly omit from the complaint that Interpal's accounts were unfrozen later that year, after the British government concluded that the evidence it had reviewed concerning Interpal did not support a continued freeze.  Plaintiffs also fail to disclose that, after the August 19, 2003 attack that injured Tzvi Weiss, the accounts were again frozen by the British authorities in response to the U.S. government's designation, but that within less than two months, the British Government, based upon its review of the evidence concerning Interpal presented to it by the U.S. government, <u>again</u> determined that there was no basis for a continued freeze and therefore unfroze the Interpal accounts at NatWest.  Further, plaintiffs do not allege – because they cannot allege – that the British government has ever placed Interpal on a terrorist watch list.

Plaintiffs thus seek to hold NatWest liable for complicity in HAMAS-sponsored terrorism merely because a NatWest branch in London maintained an account for a British customer that NatWest's own home government, which is combating terrorism at home in Great Britain, twice was found not to be associated with HAMAS.

Even apart from the fundamental incongruity and unfairness of this attempt, plaintiffs have not pleaded facts sufficient to show actionable misconduct by NatWest under any of the statutory provisions they purport to invoke.  When Congress enacted 18 U.S.C. § 2333(a), the civil remedy provision of the Antiterrorism Act ("ATA"), it sought to extend civil liability to those who had committed criminal acts of international terrorism under the statute, and did not

intend to create a separate cause of action against persons who had not committed a predicate criminal act.  Accordingly, plaintiffs must plead facts sufficient to show NatWest's underlying criminal liability as a prerequisite to triggering civil liability under Section 2333(a).  They have failed to do so:  their complaint is devoid of allegations of fact sufficient to establish that the routine banking services NatWest provided to Interpal could possibly constitute "providing material support" to HAMAS under 18 U.S.C. § 2339B or "financing" HAMAS-sponsored terrorism under 18 U.S.C. § 2339C, with the intent or actual knowledge that funds would be used to carry out a terrorist act.  The complaint is replete with allegations concerning HAMAS's terrorist activities and its supposed links to Interpal, but these allegations do not establish that NatWest's mere maintenance of one or more accounts for Interpal at a branch in London constitutes a criminal violation of either Section 2339B or Section 2339C.

   Nor can plaintiffs' claim that NatWest is secondarily liable for HAMAS's terrorism under an aiding and abetting theory survive dismissal.  As a threshold matter, applying the principles of <u>Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.</u>, 511 U.S. 164, 166 (1994), this Court should not recognize such a claim under 18 U.S.C. § 2333(a). However, assuming that aiding and abetting is actionable under Section 2333(a), plaintiffs have not stated such a claim because they have not pleaded facts sufficient to satisfy the criminal aiding and abetting standards under 18 U.S.C. § 2, which apply here because civil claims under Section 2333(a) must be based on conduct that is a violation of criminal law.  The complaint does not allege – because it cannot allege – that NatWest knew of criminal conduct by Interpal, and that NatWest acted with the specific intent to bring about the underlying crime.  Plaintiffs fare no better under the <u>civil</u> aiding and abetting standard of Section 876 of the Restatement (Second) of Torts:  there are no allegations sufficient to show that NatWest knew of any criminal

activity by Interpal, and substantially assisted or encouraged that activity by simply maintaining one or more bank accounts for Interpal at NatWest.

Finally, and fatally to their complaint, even if the alleged acts of NatWest could support a claim that it violated the substantive criminal prohibitions against "act[s] of international terrorism" for purposes of Section 2333(a), plaintiffs have not pleaded facts sufficient to establish a proximate causal link between NatWest's alleged actionable conduct and their injury, which is a fundamental prerequisite for establishing civil liability under the statute. The notion that plaintiffs could allege a direct causal link between NatWest's maintenance of accounts in London to plaintiffs' injuries at the hands of a HAMAS suicide bomber in Israel is absurd.  Under the well-established tort doctrine of proximate causation, which Section 2333(a) necessarily incorporates, this does not suffice to state a claim.

In sum, while the complaint is rife with accusatory and conclusory rhetoric, and while NatWest has deep sympathy for plaintiffs' tragedy, the only allegation that plaintiffs have adequately pleaded is that NatWest maintained one or more deposit accounts for Interpal at a branch in London.  This allegation is insufficient to establish predicate criminal liability under Section 2339B or Section 2339C, and is also insufficient to support aiding and abetting liability under Section 2333(a), assuming secondary liability of this kind exists at all under this statute. Allowing plaintiffs to proceed on the basis of this allegation would expose nearly all financial institutions to liability for every act of international terrorism by anyone with any claimed connection, however remote, to any deposit account on their books.  This Court, like the Manhattan federal court that dismissed similar complaints under Section 2333(a) against several financial institutions in In re Terrorist Attacks on September 11, 2001, 349 F. Supp. 2d 765

(S.D.N.Y.), <u>on reconsideration in part</u>, 392 F. Supp. 2d 539 (S.D.N.Y. 2005), should decline plaintiffs' invitation to permit this result.

**<u>FACTS ALLEGED IN THE COMPLAINT</u>**[1]

**A.**     **<u>Background</u>**

     **<u>The Plaintiffs</u>**.  Tzvi Weiss, a citizen of the United States and resident of New York, was injured in a suicide bomber attack which was carried out by Raed Abdul Hamid Misk on a bus in Jerusalem on August 19, 2003.  Compl. ¶¶ 5-9, 13-22, 82.  HAMAS claimed responsibility for the attack.  Compl. ¶ 9.  The other plaintiffs, all members of Tzvi Weiss's family, experienced great anxiety, severe mental anguish, and extreme emotional distress as a result of the attack on him.  Compl. ¶¶ 23-29.

     **<u>The Defendant</u>**.  Plaintiffs do <u>not</u> seek damages from the estate of Raed Abdul Hamid Misk, the suicide bomber, or HAMAS, the terrorist organization that claimed responsibility for the attack, or Interpal.  Instead, they allege that NatWest, a bank headquartered in London, is civilly liable for Tzvi Weiss's injuries resulting from the HAMAS suicide bombing.  Compl. ¶¶ 1, 30.

     The allegation against NatWest on which plaintiffs seek to base such liability can be distilled to the following:

> HAMAS receives a majority of its financing through donations coordinated by prominent Saudi and Gulf State charities and the global network of charities known as the Union of Good, operated by the Muslim brotherhood.  The Union of Good, in turn, raises funds that are channeled through an entity know as the Palestine Relief and Development Fund and/or Interpal . . ., which maintains several accounts with [NatWest].

Compl. ¶ 51.  In other words, the <u>only</u> allegation pertaining to the actions of NatWest is that Interpal has several bank accounts at NatWest in London.

---

[1]    For purposes of the present motion only, plaintiffs' allegations are taken to be true.

5

**B.**     **Allegations About HAMAS And Interpal**

  **Allegations About HAMAS**.  As might be expected, much of the complaint does not address the activities of NatWest, or even of Interpal, but is devoted instead to the terrorist actions of HAMAS.  See Compl. ¶¶ 33-34, 36-40.  The complaint notes that in 1989, Israel declared HAMAS a terrorist organization and an "unlawful organization."  Compl. ¶ 35.  On January 23, 1995, the United States named HAMAS a "Specially Designated Terrorist" ("SDT") and on October 8, 1997, the United States designated HAMAS an FTO pursuant to Section 219 of the Immigration and Nationality Act and the Antiterrorism and Effective Death Penalty Act of 1996.  Compl. ¶¶ 41-43.  This later designation has been renewed every two years.  Compl. ¶ 43.  Following the terrorist attacks of September 11, 2001, in the United States, HAMAS was designated by the United States as an SDGT.  Compl. ¶ 44.

  **Allegations About Interpal**.  The complaint then asserts a connection between the terrorist activities of HAMAS and Interpal, alleging that:  (1) HAMAS receives most of its money through donations coordinated by Saudi and Gulf State charities and the Union of Good, a global network of charities operated by the Muslim Brotherhood; and (2) the Union of Good raises funds which are channeled through Interpal,[2] which maintains several accounts at

---

[2] While plaintiffs allege that Interpal provides funds for a number of institutions that belong to HAMAS's financial infrastructure, including the Orphan Care Society of Bethlehem, Al-Islah Charitable Society in Ramallah-Al-Bireh, the Ramallah-Al-Bireh Charitable Society, the Jenin Charity Committee, the Hebron Islamic Association, Tulkarem Charity Committee, Al-Mujama al-Islami, the Islamic Charitable Society in the Gaza Strip, and the Muslim Youth Association of Hebron, Compl. ¶¶ 66-71, they do not allege – nor can they - that any of these specific organizations had been placed on any official U.S. terrorist list prior to the attack on Tzvi Weiss.  Those lists include the FTO, SDGT, SDN, and "Specially Designated Nationals and Blocked Persons" designations.  If even the U.S. government had not determined that these charities were controlled by HAMAS, the allegations concerning "public" information about the organizations' alleged ties to HAMAS cannot establish that NatWest knew these organizations were HAMAS agents.

The complaint does allege that the "Jenin Charity Committee and Tulkarem Charity Committee are specifically identified as HAMAS controlled organizations by the United States [g]overnment in the criminal indictment of Holy Land Foundation for Relief and [D]evelopment in the Northern District of Texas."  Compl. ¶ 67 n.7.  But this indictment was returned on January 26, 2004, months after the attack that injured Tzvi Weiss, and it mentions neither NatWest, or Interpal.  Declaration of Lawrence B. Friedman, dated December 19, 2005, ("Friedman Decl."), Ex. A, Holy Land Foundation Indictment, filed July 26, 2004.

NatWest.  Compl. ¶ 51; see also Compl. ¶¶ 52-53, 60, 87.  Critically, however, while "[s]everal"
of the organizations under the umbrella of the Union of Good have been designated SDGTs,
including the Al-Aqsa Foundation on May 29, 2003, and Interpal on August 22, 2003, Compl.
¶¶ 53-54, 79 n.9, 84, the Al-Aqsa designation occurred after Interpal's alleged transfers of funds
to or from that organization, and Interpal's designation by the U.S. government occurred after
the attack on Tzvi Weiss.

Moreover, while plaintiffs seek to link Interpal with HAMAS through citations to
various news articles,[3] the complaint both fails to allege facts sufficient to establish that NatWest
knew of these alleged connections, and it ignores the undisputed findings by the British
government regarding Interpal, which diverged sharply from those of the U.S. government, and
which the Court may properly consider on this motion because they are partly alleged in the
complaint and relied upon by plaintiffs.

Thus, the complaint alleges that in March 1996, the U.K. Charity Commission,
established under U.K. law as regulator and registrar for charities in England and Wales, froze
Interpal's assets as a precautionary measure based on allegations it had channeled money to
HAMAS.  Compl. ¶¶ 63-65.  But the very news articles on which plaintiffs selectively rely show
that the Charity Commission ultimately found no evidence of inappropriate activity by Interpal,

---

[3]    While not germane to the instant motion, it is notable that many of these citations are seriously out of context, if
not outright misleading.  For example, the complaint purports to quote the Chairman of Interpal, Ibrahim
Hewitt, as stating it was "possible that some of Interpal's beneficiaries in the Palestinian territories had been
established by HAMAS" and that Interpal "deal[s] with people whether they are HAMAS or whether they are
Fatah," Compl. ¶¶ 64 n.6, 85, when in fact Mr. Hewitt also said "that Hamas runs a large social welfare and
religious network separate from its military wing, Izz el-Deen al-Qassam," explaining "[i]t's like the difference
between Sinn Fein and the IRA," and also stated that "[Interpal's] money goes to the poor and needy in the
occupied territories.  We don't want to get sucked into politics."  See Friedman Decl. Ex. B, Julian Borger,
Close Trust, Israel Pleads; Britain is being asked to clamp down on Palestinian fundraisers ("Close Trust"), The
Guardian, Aug. 7, 1997.

and therefore lifted the freeze on Interpal's assets.  Compl. ¶¶ 64 n.5, 65 n.6.[4]  See Friedman

Decl., Ex. C, U.K. Charity Commission Report, dated Sept. 24, 2003 ("2003 Charity

Commission Report"); Ex. D, Extract from U.K. Charity Commission Annual Report of 1996

("1996 Charity Commission Extract").

> Similarly, the complaint alleges that on August 22, 2003, after the suicide

bombing that injured Tzvi Weiss, Interpal was designated an SDGT by the U.S. government.

Compl. ¶ 83-84, and that in light of the SDGT designation, the U.K. Charity Commission

immediately launched a second investigation and froze Interpal's assets on August 26, 2003.

Compl. ¶ 85.[5]  In addition to the fact that the U.S. government's SDGT designation occurred

only after the attack on Tzvi Weiss, plaintiffs again fail to tell the full story:  namely, the

undisputed fact that after an extensive renewed investigation, the U.K. Charity Commission

closed its inquiry, found no wrongdoing, unfroze Interpal's accounts and noted that the U.S.

authorities had been unable to provide evidence to support their allegations against Interpal.

Friedman Decl., Ex. C, 2003 Charity Commission Report; Ex. G, U.K. Charity Commission

Order unfreezing Interpal's accounts held at NatWest, dated Sept. 24, 2003 ("2003 Charity

Commission Unfreezing Order").  Tellingly, plaintiffs do not allege – because they cannot allege

– that the British government ever placed Interpal on a terrorist watch list.

---

[4]   See Compl. ¶ 64 n.5; Friedman Decl. Ex. B, Close Trust (Interpal's "British accounts were temporarily frozen, but after a two-month investigation, the Charity Commission gave Interpal a clean bill of health in May 1996. 'They were well organized and we found no evidence of any donation that could not be accounted for, or that had been given for political reasons,' the commission's 1996 annual report said, adding that Interpal's trustees and staff appeared to be 'motivated by faith and altruism rather than fanaticism.'"); see also Compl. ¶ 85; Friedman Decl. Ex. E, 'Hamas-linked' relief funds frozen – British Muslims furious over charity commission's decision to follow US in closing accounts of the UK-based Interpal ("'Hamas-linked' relief funds frozen"), The Guardian, Aug. 28, 2003 (same).

[5]   Friedman Decl. Ex. E, 'Hamas-linked' relief funds frozen, (also noting that while the Charity Commission opened a formal investigation in 2003, "[t]he charity can still transfer funds to Palestine, where money is channeled to schools, hospitals and bereaved families, but must ask permission from the charity commission"). See also Friedman Decl., Ex. C, 2003 Charity Commission Report; Ex. F, U.K. Charity Commission Order freezing Interpal's accounts held at NatWest, dated Aug. 28, 2003.

Finally, the complaint alleges that Interpal was declared an "unlawful organization" by the government of Israel in May of 1997 and a "terrorist organization" by the government of Israel in January 1998.  Compl. ¶¶ 72, 74.  However, the complaint does not, and cannot, allege that NatWest was aware of these actions of a foreign government, nor does it allege any reason why NatWest must abide by the government of Israel's views rather than those of NatWest's own government in the United Kingdom, which twice found Interpal does not have terrorist connections, and which never included Interpal on any terrorist watch list.

## C.    Allegations About NatWest

In striking contrast to its multitude of allegations about HAMAS, other organizations and the purported activities of Interpal, the complaint alleges only a handful of facts about NatWest.

Plaintiffs' essential allegation pertaining to NatWest's conduct is that "[o]n or before January 1, 1996, Interpal opened one or more accounts with [Defendant]," Compl. ¶ 62, which it thereafter maintained for more than nine years.  Compl. ¶¶ 88-89.  Plaintiffs assert that, in maintaining these accounts, NatWest accepted transactions on behalf of Interpal for three organizations: (1) a deposit of $60,000 for Interpal from the Holy Land Foundation for Relief and Development in April 2000;[6] (2) a deposit of $70,000 on behalf of Interpal from the Al-Aqsa organization in Yemen on or about January 2001;[7] and (3) at least two payments totaling

---

[6]    While plaintiffs allege that on May 6, 1997, the government of Israel declared the Holy Land Foundation a "HAMAS front organization," Compl. ¶ 77 n.8, they do not allege that this organization has been designated or placed on a U.S. terrorist list, nor do they plead that NatWest had knowledge of the Israeli designation. Moreover, the news article plaintiffs cite also states that U.S. State Department officials "knew about the Israeli decree but could not comment on whether the government might take any action in this country against Holy Land Foundation" and that the State Department spokesman stated "the Treasury department investigated Holy Land Foundation two years ago and decided against placing it on a list of terrorist organizations."  Friedman Decl. Ex. H, Steve McGonigle, Israel bans Richardson foundation[,] Muslim group denies ties to Hamas militants, The Dallas Morning News, June 21, 1997.

[7]    The complaint also alleges that in January 2003, German authorities arrested the head of the Al-Aqsa Foundation, Sheik Mohammed Al-Moayad who prior to his arrest, had allegedly "proffered proof of his prior

€295,000 to the Dutch branch of the Al-Aqsa Foundation on March 27, 2003. [8]  Compl. ¶¶ 76-77, 79-80.

Based on these minimal allegations, selectively quoted British press reports about Interpal's ties to HAMAS that are belied by the U.K. Charity Commission's two investigations, Interpal's after-the-fact designation as an SDGT by the U.S. government and the Israeli government's designation of Interpal as an "unlawful" or "terrorist" organization, plaintiffs seek to hold NatWest civilly liable for Tzvi Weiss's injury at the hands of a HAMAS suicide bomber, asserting that NatWest's deposit account for Interpal "violates both the criminal provisions of 18 U.S.C. § 2339B and 2339C and gives rise to civil liability under 18 U.S.C. § 2333(a)." Compl. ¶¶ 90.  This legal conclusion is meritless:  NatWest is not a terrorist or a supporter of the terrorists who injured Tzvi Weiss.  Plaintiffs have fallen markedly short of alleging facts that could support findings of criminal liability, or consequent civil liability, under the ATA.

## ARGUMENT

### POINT I

### PLAINTIFFS HAVE NOT STATED A CLAIM AGAINST NATWEST UNDER SECTION 2339B (SECOND CLAIM FOR RELIEF) OR 2339C (THIRD CLAIM FOR RELIEF)

Although the well-pleaded facts of the complaint must be taken as true on a motion to dismiss, a plaintiff cannot simply plead legal conclusions.  <u>First Nationwide Bank v.</u>

---

fundraising on behalf of HAMAS by tendering to the undercover government informant" a receipt from Interpal confirming a $70,000 donation from the Al-Aqsa organization in Yemen.  Al-Moayad was later convicted of providing material support to HAMAS in violation of 18 U.S.C. § 2339B.  Compl. ¶ 80 n.10.  Again, this information only became public approximately two years <u>after</u> NatWest accepted a deposit of $70,000 on behalf of Interpal from the Al-Aqsa organization in Yemen, and the Al-Aqsa Charitable Foundation was not designated an SDGT until May 29, 2003, over two years after the alleged deposit.  <u>See</u> Compl. ¶ 54.

[8]    The U.K. Charity Commission had specifically investigated funds Interpal allegedly received from the Al-Aqsa Foundation in the Netherlands and concluded that "the funds received were in respect of humanitarian work already carried out by Interpal" and which were "then invoiced to [t]he Al-Aqsa Foundation."  Friedman Decl. Ex. C, 2003 Charity Commission Report.

Gelt Funding Corp., 27 F.3d 763, 771 (2d Cir. 1994) ("conclusions of law or unwarranted deductions of facts are not admitted"), cert. denied, 513 U.S. 1079 (1995) (citations omitted); Dillon v. Militano, 731 F. Supp. 634, 639 (S.D.N.Y. 1990) (mere conclusions do not suffice). Moreover, where, as here, a plaintiff makes allegations based upon portions of published documents, he cannot allege facts inconsistent with the totality and context of these documents, or prevent the Court from reviewing these documents in their entirety in connection with a motion to dismiss.  Broder v. Cablevision Sys. Corp., 418 F.3d 187, 196 (2d Cir. 2005); Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 46-48 (2d Cir. 1991), cert. denied, 503 U.S. 960 (1992).

Here, when stripped of its rhetoric, conclusory statements and unwarranted deductions, the complaint simply alleges that plaintiffs were injured by HAMAS, and that NatWest maintained one or more deposit accounts for Interpal, an organization that was never designated as an FTO, was designated by the U.S. government as an SDGT only after the attack on Tzvi Weiss, and was both previously and thereafter found by NatWest's own government to have no ties to HAMAS.[9]  These facts closely resemble those alleged in Terrorist Attacks, 349 F. Supp. 2d at 833-35, where the court dismissed various complaints under Section 2333(a) against several financial institutions, holding that the provision of routine banking services could not subject the banks to ATA liability.  The same ruling should follow here.

Conversely, these facts are dramatically different from those found sufficient to withstand dismissal motions in prior Section 2333(a) cases.  In Boim v. Quranic Literacy Institute & Holy Land Foundation for Relief & Development, 291 F.3d 1000 (7th Cir. 2002), the

---

[9]   Besides being reflected in documents referred in the complaint, the U.K. Charity Commission's official investigations of Interpal and its orders to unfreeze Interpal's accounts are properly the subject of judicial notice.  See Tempel v. United States, 248 U.S. 121, 130 (1918) (taking judicial notice of reports of the Secretary of War); Nat'l Labor Relations Bd. v. E.C. Atkins & Co., 331 U.S. 398, 406 n.2 (1947) (taking judicial notice of circular issued by military authorities).

first appellate Section 2333(a) decision, the defendants were themselves alleged HAMAS front organizations which provided funds to "pa[y] for the vehicle, machine guns and ammunition used to kill [Plaintiff] David Boim, . . . [and] the training of . . . Hamas operatives involved in the attack on David Boim," and those funds "were also used to provide a stipend for [the] family" of one of the alleged perpetrators, who was subsequently killed when he later staged a suicide bomber attack.  Id. at 1004.  In Linde v. Arab Bank, PLC, 384 F. Supp. 2d 571 (E.D.N.Y. 2005), the defendant Jordanian bank, in addition to providing financial services to charitable organizations with alleged ties to terrorist organizations, held an account for HAMAS itself, and also was the exclusive administrator of the "death and dismemberment benefit plan" that provides money to families of Palestinian terrorists killed in perpetrating acts of terrorism, and as such, "create[s] an incentive to engage in terrorist acts . . . ."  Id. at 576-77.

These facts are sharply distinguishable from what is pleaded here, which is a British bank's maintenance of a British deposit account for a British organization that was not identified as an SDGT by the U.S. government until after the events complained of, and received a clean bill from the British government authorities both before and after those events.

## A.    The Statutory Framework

In their complaint, plaintiffs bring suit against NatWest on the basis of Section 2333(a) of the ATA.  It provides as follows:

> (a)  Action and jurisdiction. -- Any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees.

"[I]nternational terrorism" in turn "means activities that . . . involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any

State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State," and appear intended to coerce civilian populations or affect government actions, and are transnational in scope.  18 U.S.C. § 2331(1).  <u>As these provisions make clear, civil liability under Section 2333(a) is premised on the commission of predicate criminal acts involving violent terrorism</u>.

Plaintiffs base their Section 2333(a) claim, in turn, on violations of two specific criminal provisions of the ATA, Section 2339B(a)(1) (Second Claim for Relief), which prohibits the provision of material support to terrorists, and Section 2339C (Third Claim for Relief), which prohibits the financing of terrorist activities, and on general aiding and abetting liability (First Claim for Relief).  For the reasons stated below, the facts plaintiffs have alleged cannot support a claim for criminal liability under either of these specific criminal ATA provisions, and the Second and Third Claims for Relief must be dismissed.  Plaintiffs also fail to state a claim for general "aiding and abetting" liability under Section 2333(a) (First Claim for Relief), which for the reasons discussed in Point II below should be dismissed as well.[10]

**B.    The Complaint Does Not Plead Facts Sufficient To Establish That NatWest Knowingly Provided Material Support Or Resources To A Foreign Terrorist Organization Under Section 2339B**

Plaintiffs' second claim for relief must be dismissed because they have failed to plead facts sufficient to establish under Section 2339B that NatWest "knowingly provide[d] material support or resources to a foreign terrorist organization."  18 U.S.C. § 2339B(a)(1). While the complaint alleges in conclusory terms that "[b]y knowingly transferring funds from and to Interpal, and transferring funds for the benefit of HAMAS, the defendant has provided material support to a designated Foreign Terrorist Organization," Compl. ¶ 101, it does not

---

[10]    Because the Second and Third Claims attempt, albeit inadequately, to allege specific predicate violations by NatWest, we address them first in this Point I, and then turn to the vaguer "aiding and abetting" allegations of the First Claim in Point II.

adequately plead any of the requirements of Section 2339B(a)(1).  This claim should also be dismissed because plaintiffs have alleged no facts that support the exercise of extraterritorial jurisdiction under Section 2339B.

> ### 1. The Complaint Does Not Plead Adequate Facts Concerning The Requisite FTO Designation Under Section 2339B

  As a threshold matter, the complaint fails to and cannot allege that Interpal is an FTO.  The statute defines "terrorist organization" as "an organization designated as a terrorist organization under section 219 of the Immigration and Nationality Act," 8 U.S.C. § 1189.  18 U.S.C. § 2339B(g)(6).[11]  While plaintiffs allege that HAMAS was designated a "Foreign Terrorist Organization pursuant to Section 219 of the Immigration and Nationality act and the AEDPA" in 1997, Compl. ¶ 43, they have not alleged – nor can they allege – that Interpal, NatWest's customer, was ever designated an FTO.  Plaintiffs merely allege that Interpal was designated an SDGT, Compl. ¶¶ 83-84, a designation distinct from an FTO designation, and one that occurred after the attack on Tzvi Weiss.

  It is not sufficient for plaintiffs to allege under Section 2339B that NatWest indirectly provided material support to an FTO (i.e., HAMAS) by maintaining one or more deposit accounts for Interpal.  United States v. Khan, 309 F. Supp. 2d 789, 821 (E.D. Va. 2004) (noting that Section 2339B only prohibits "material support or resources directly to" the FTO) (emphasis added and citations and internal quotation marks omitted).  Nor is it sufficient for plaintiffs to conclude that because NatWest accepted deposits on behalf of Interpal from

---

[11] In December 2004, Congress amended Section 2339B to include the following language: "To violate this paragraph, a person must have knowledge that the organization is a designated terrorist organization (as defined in subsection (g)(6)), that the organization has engaged or engages in terrorist activity (as defined in section 212(a)(3)(B) of the Immigration and Nationality Act), or that the organization has engaged or engages in terrorism (as defined in section 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989)."  18 U.S.C. § 2339B.  Notwithstanding the fact that this language was enacted after the attack on Tzvi Weiss, and therefore is not determinative, the only prong under which plaintiffs purport to plead a claim is alleged support to an FTO under subsection (g)(6).  Compl. ¶¶ 89, 101, 103.

organizations with alleged ties to terrorist organizations, Compl. ¶ 76, NatWest has provided financial services to an FTO.  Compl. ¶¶ 81, 88, 96, 97, 101.  NatWest's customer was Interpal, and no one else.

Plaintiffs also have not alleged that Interpal is an alias of HAMAS or that HAMAS "so dominates and controls [Interpal] that they must be considered principal and agent."  Nat'l Council of Resistance of Iran v. Dep't of State, 373 F.3d 152, 157 (D.C. Cir. 2004).  Interpal's alleged indirect ties to HAMAS, Compl. ¶¶ 56-59, 64 n.6, 85, do not suffice to establish that Interpal was or is acting as an agent of HAMAS.  Cf. Nat'l Council of Resistance of Iran, 373 F.3d at 159 (The two organizations commingled "bank records, signed black checks, . . . propaganda, . . . publications, travel documents, and letterhead" and "the two organizations shared an essentially unitary leadership structure."); see also p. 6, n.2 supra.  This is especially true because U.K. regulators have twice concluded that Interpal has no demonstrated ties to HAMAS.  Friedman Decl., Ex. D, 1996 Charity Commission Extract; Ex. C, 2003 Charity Commission Report; Ex. G, 2003 Charity Commission Unfreezing Order.  "Given the stringent requirements that must be met before a group is designated a foreign terrorist organization," Boim, 291 F.3d at 1027, plaintiffs cannot bring a Section 2339B claim based on alleged support to any entity that does not meet those requirements.

   2.   **The Complaint Does Not Adequately Plead That NatWest's Actions Constituted Material Support Under Section 2339B**

Perhaps more important than the fact that Interpal is not an FTO is the complaint's failure to allege facts showing that NatWest provided material support or resources to an FTO.[12]  Plaintiffs simply assert in conclusory fashion that by accepting deposits on behalf

---

[12]   As amended in December 2004, material support or resources are defined under the statute as "any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification,

of Interpal and holding one or more accounts for Interpal in London, Compl. ¶¶ 62, 76-77, 79-80, 88-89, NatWest provided "financial services" and hence "material support" to HAMAS.  Compl. ¶¶ 89-90, 101, 103.  This allegation is insufficient as a matter of law.

In this respect, as well as others, Plaintiffs' complaint resembles the dismissed allegations in In re Terrorist Attacks on September 11, 2001, 349 F. Supp. 2d 765 (S.D.N.Y.), on reconsideration in part, 392 F. Supp. 2d 539 (S.D.N.Y. 2005) where the plaintiffs claimed that the defendants "provided material support to the al Qaeda terrorists who perpetrated the attack on September 11, 2001," by alleging, among other things, that:

(1) the banking defendants "provided essential support to the al Qaeda organization and operations" and "acted as instruments of terror, in raising, facilitating and transferring money to terrorist organizations";

(2) Al Rajhi Bank is "the primary bank for a number of charities that serve as al Qaeda front groups, including Al Haramain, MWL, WAMY, SJRC, and IIRO";

(3) "Al Rajhi continues to maintain Al Haramain's accounts despite Al Haramain's designation on March 11, 2002 as terrorist organizations by both the United States and Saudi Arabian Authorities";

(4) "Al Rajhi Bank knew or had to know that its depositors, Defendant charities WAMY, MWL, IIRC, and SJRC were material supporters of terrorism";

(5) one of the hijackers held an account at Al Rajhi Bank and another hijacker made a transfer to this account;

(6) "[m]embers of the Al Rajhi family, which owns and controls Al Rajhi Bank, are alleged to have ties to Osama bin Laden's personal secretary"; and

(7) Al Rajhi family members are "closely associated with wealthy donors to Osama bin Laden."

---

communications equipment, facilities, weapons, lethal substances, explosives, personnel . . ., and transportation, except medicine or religious materials."  18 U.S.C. § 2339A(b); see 18 U.S.C. § 2339B(g)(4) (incorporating the definition of "material support or resources" used in Section 2339A).  The prior versions of the statute also included the term "financial services," which is the form of material support purportedly invoked by plaintiffs here.

Id. at 825, 831-32 (citations and internal quotation marks omitted and emphasis added).[13]

Notwithstanding these allegations, Judge Casey dismissed the complaint in its entirety as against

Al Rajhi Bank, holding that there exists "no basis for a bank's liability for injuries funded by

money passing through it on routine banking business."[14] Id. at 833.

       The same result obtains here, where the claims are based on allegations that are

even more insubstantial than those dismissed in the Terrorist Attacks case.  At best, the

complaint here alleges that NatWest provided Interpal with routine banking services at a branch

in London.  But the mere maintenance of one or more deposit accounts in London by NatWest

for Interpal does not constitute "material support" within the meaning of the statute.  Terrorist

Attacks, 349 F. Supp. 2d at 833-36.

### 3. The Complaint Does Not Adequately Plead The Requisite Knowledge And Intent Under Section 2339B

       Finally, and most important, plaintiffs never plead that NatWest knowingly

provided material support to an FTO, and plaintiffs cannot plead facts sufficient to support such

an allegation.  Plaintiffs summarize the gist of their allegations as follows:  "By knowingly

transferring funds from and to Interpal, and transferring funds for the benefit of HAMAS, the

defendant has provided material support to a designated Foreign Terrorist Organization."

Compl. ¶ 101.  But that NatWest knowingly provided one or more deposit accounts for Interpal

in London, which plaintiffs do not allege has been designated an FTO, and transferred funds to

other charitable organizations, which plaintiffs also do not allege have been designated FTOs, is

simply not an allegation that NatWest knowingly provided material support to HAMAS.

---

[13]   While the claims in Terrorist Attacks appear to have been brought under Section 2339A, Section 2339A and Section 2339B include the identical definition of "material support."

[14]   The court also granted motions to dismiss by the Saudi American Bank, the Arab Bank and Al Baraka Investment & Development Corporation for similar reasons.  Id. at 834-36.

Section 2339B must be read to require plaintiffs to allege that NatWest specifically intended to further the terrorist activities of the foreign terrorist organization.  United States v. Al-Arian, 308 F. Supp. 2d 1322, 1338-39 (M.D. Fla.), modification denied by, 329 F. Supp. 2d 1294 (M.D. Fla. 2004).  This requirement of a showing of intent to further terrorist activities is essential to avoid criminalizing the provision of routine, innocent services and guilt by association.  As the Al-Arian court put it, without this requirement "a cab driver could be guilty for giving a ride to a FTO member to the UN, if he knows that the person is a member of the FTO" and "a hotel clerk in New York could be committing a crime by providing lodging to that same FTO member under similar circumstances as the cab driver."[15]  Al-Arian, 308 F. Supp. 2d at 1337-38.[16]

The same concerns are equally implicated by plaintiffs' attempt to hold a bank liable for providing routine banking services to a charitable organization that allegedly provides funds to "front" organizations that in turn fund HAMAS, without an allegation that the bank specifically intended to further HAMAS's terrorist activities, or that the bank was even aware that its customer funded HAMAS.  This specific intent requirement is consistent with the Seventh Circuit's decision in Boim, where the court held that to succeed under Section 2333(a), the plaintiff must show the defendant knew about the unlawful activities and intended to bring about those unlawful activities.  Boim, 291 F.3d at 1023-24; see also Terrorist Attacks, 349 F.

---

[15]  "Other examples of innocent conduct that could be prohibited include the same person allowing the FTO member to spend the night at his house, cashing a check, loaning the member a cell phone for use during the stay, or allowing the member to use the fax machine or laptop computer in preparing the petition."  Al-Arian, 308 F. Supp. 2d at 1338 n.31.

[16]  While a court in the Ninth Circuit declined to apply this mens rea requirement, it noted that "the circumstances of the hotel clerk and cab driver" in Al-Arian "[were] not before this Court."  Humanitarian Law Project v. Gonzales, 380 F. Supp. 2d 1134, 1147 n.15 (C.D. Cal. 2005).  Although at least one court in the Second Circuit has held that Section 2339B requires plaintiffs to plead knowledge and not intent, here plaintiffs have failed to plead facts sufficient even to establish that NatWest knowingly provided material support to HAMAS.  See United States v. Sattar, 314 F. Supp. 2d 279, 301 (S.D.N.Y. 2004).

Supp. 2d at 828.  Here, plaintiffs have failed to plead <u>any</u> facts that support even an inference that NatWest intended to support the activities of an FTO, let alone to bring about the suicide attack that injured Tzvi Weiss.  Accordingly, plaintiffs' attempt to hold NatWest liable for that attack under Section 2339B simply because it maintained bank accounts for Interpal must fail.

    **4.**        **The Provisions Of Section 2339B Specifically Addressing Financial Institutions Further Establish That Plaintiffs Cannot Allege That NatWest Provided Material Support Under Section 2339B**

The reporting provisions in Section 2339B(a)(2)[17] and the civil penalty provisions in Section 2339B(b),[18] specifically relating to financial institutions that learn they are in possession of funds in which a foreign terrorist organization has an interest, also strongly suggest that Congress did not intend to make a bank's mere maintenance of an account for a customer grounds for criminal prosecution of the bank (and hence civil liability under Section 2333(a)) for providing "material support" to terrorist organizations that may have received payments from that account.  Congress would hardly have enacted these civil reporting provisions in Sections 2339B(a)(2) and 2339B(b), and certainly would not have imposed civil penalties for a violation of these provisions, if the mere maintenance of such accounts was a criminal violation under Section 2339B(a)(1).

---

[17]   "Except as authorized by the Secretary, any financial institution that becomes aware that it has possession of, or control over, any funds in which a foreign terrorist organization, or its agent, has an interest, shall -- (A) retain possession of, or maintain control over, such funds; and (B) report to the Secretary the existence of such funds in accordance with regulations issued by the Secretary."  18 U.S.C. § 2339B(a)(2).

[18]   "Any financial institution that knowingly fails to comply with subsection (a)(2) shall be subject to a civil penalty in an amount that is the greater of -- (A) $50,000 per violation; or (B) twice the amount of which the financial institution was required under subsection (a)(2) to retain possession or control."  18 U.S.C. § 2339B(b).

5.     **The Complaint Fails To Plead Any Facts To Support The
        Exercise Of Extraterritorial Jurisdiction Under Section 2339B**

Finally, the facts alleged do not support the exercise of extraterritorial jurisdiction under Section 2339B.  The only jurisdictional ground that plaintiffs can conceivably allege under Section 2339B is that the alleged offense "occurs in or affects interstate or foreign commerce." 18 U.S.C. § 2339B(d)(1)(E).  However, plaintiffs plead no facts establishing that a British bank maintaining one or more accounts in Britain for Interpal, a British customer, affects interstate or foreign commerce of the United States.  Nor does plaintiffs' conclusory allegation that NatWest "continuously and systematically does business in the United States," Compl. ¶ 4, even if true (which it is not, see p. 44 n.38, infra), establish that NatWest's maintenance of one or more deposit accounts in Britain for a British customer affects United States foreign or interstate commerce.  For this reason too, plaintiffs' claim for relief under Section 2339B must be dismissed.

C.     **The Complaint Does Not Plead Facts Sufficient To Establish That
        NatWest Provided Or Collected Funds In Violation Of Section 2339C**

Plaintiffs' third claim for relief must be dismissed because plaintiffs have failed to plead facts sufficient to establish under Section 2339C that NatWest "unlawfully and willfully provide[d] or collect[ed] funds with the intention that such funds be used, or with the knowledge that such funds are to be used, in full or in part, in order to carry out" a proscribed act.  18 U.S.C. § 2339C(a)(1).

The complaint alleges in conclusory terms that "[NatWest] willfully and unlawfully provides financial services to Interpal, for the benefit of HAMAS, including collecting, receiving, transmitting, and providing funds, with the knowledge that such funds have been and will be used, in part, to facilitate acts intended to cause death or serious bodily injury to civilians such as the victims of the terrorist acts described in this complaint."  Compl. ¶ 106.

20

However, the only specific facts Plaintiffs allege for this legal conclusion are that Interpal has

one or more accounts at a NatWest branch in London that were opened on or before January 1,

1996, Compl. ¶¶ 62, 65, 73, 75, 81, and that on a handful of occasions NatWest accepted specific

transactions on behalf of Interpal pertaining to three organizations.  Compl. ¶¶ 76-80.  These

allegations amount to nothing more than the provision of routine banking services, and as such

they manifestly fail to allege that NatWest committed the crime of intentionally or knowingly

providing financing for terrorism, as required for criminal liability under Section 2339C, and

consequent civil liability under Section 2333(a).

### 1.  The Complaint Does Not Adequately Plead That NatWest Committed The Requisite *Actus Reus* Under Section 2339C

As defined in Section 2339C(e)(4), the term "'provides' includes giving,

donating, and transmitting," and under Section 2339C(e)(5) the term "'collects' includes raising

and receiving."  The plain meaning of the statute makes clear that the words "collects" and

"provides" cannot encompass a bank's maintenance of a deposit account, and the routine

acceptance by a bank of deposits and withdrawals to and from such accounts.  This is especially

true in light of the fundamental rule of statutory construction that "[a] statute should be

interpreted in a way that avoids absurd results."  United States v. Dauray, 215 F.3d 257, 264

(2d Cir. 2000).

This statute is plainly directed toward capturing the providing of funds for

criminal conduct, or raising funds for such conduct.  It is inconceivable that Congress intended to

hold liable for terrorist acts every bank that could be sued in the United States, simply because,

in the ordinary course of business, funds passed through the banks' customers' accounts and

ultimately found their way into the hands of a terrorist organization, especially without any

knowledge by the bank that this would occur.  To ascribe such an intent to Congress would be as

untenable as claiming that the United States Postal Service should be liable under Section 2339C every time someone sends a check through the U.S. mail system, because the funds are alleged to have been used to carry out an act of terrorism.

That the statutory terms "provides" and "collects" cannot encompass the mere maintenance of a deposit account for a customer, from which the customer makes deposits and withdrawals, is also consistent with the heading of Section 2339C, entitled "[p]rohibitions against the financing of terrorism" (emphasis added). The dictionary definition of to "finance" is "to raise or provide funds or capital for." Merriam-Webster OnLine, http://www.m-w.com (last visited Nov. 28, 2005). The purpose of the statute plainly is to prohibit financing of terrorism, and not to prohibit a bank from maintaining deposit accounts for customers.

It is also a well-established principle of statutory construction that a grouping of words marks an intention that they be understood in the same general sense, that the meaning of a word can be gathered from the context or by reference to the meaning of words associated with it, and that where specific words follow a general term or where general terms follow a specific word, the more general terms are to be construed to cover objects similar in nature to those covered by the more specific terms.[19] Based on these principles, the term "transmit" in Section 2339C(e)(4) must be understood to have a similar meaning as "give"[20] and "donate,"[21] and those words should guide the meaning of the term "provide" in that section. The obvious

---

[19] These principles are so old and well established as to have Latin names attached to them: *noscitur a sociis* ("it is known from its associates") and *ejusdem generis* ("of the same kind"). See Washington State Dep't of Soc. & Health Servs. v. Guardianship Estate of Keffeler, 537 U.S. 371, 384-85 (2003) ("The maxim *noscitur a sociis* . . . is often wisely applied where a word is capable of many meanings in order to avoid the giving of unintended breadth to the Acts of Congress.") (citation and internal quotation marks omitted); Dauray, 215 F.3d at 262.

[20] The word "give," while subject to various meanings, is best understood in this context as "to make a present of." Merriam-Webster OnLine, http://www.m-w.com (last visited Nov. 28, 2005).

[21] The word "donate" is defined as "to make a gift of." Merriam-Webster OnLine, http://www.m-w.com (last visited Nov. 28, 2005).

intent is to penalize persons who donate funds to pay for terrorist activities, not to prosecute banks that merely permit withdrawals from a deposit account at the behest of a customer.

For similar reasons, the statutory term "collecting" in Section 2339C(e)(5) cannot be interpreted to include the maintenance of a bank account and the acceptance of deposits. The term "receiving" should be construed with its companion term "raising,"[22] and the meaning of the word "collects" should be construed to reflect this meaning. These terms imply that the person or entity must <u>actively raise</u> funds, and that the entity must do something more than <u>passively receive</u> funds. This is again consistent with the title of this provision, which proscribes "financing." <u>See</u> 18 U.S.C. § 2339C. Again, the intent of the statute is to criminalize fund-raising for terrorist organizations, not the provision of routine banking services by a depository institution.

The legislative history of Section 2339C substantiates the conclusion that it is not directed at the mere maintenance of bank deposit accounts. The purpose of Section 2339C was to implement the International Convention for the Suppression of the Financing of Terrorism (the "Convention") and to criminalize fund raising for terrorism. H.R. Rep. No. 107-307, at 6-7 (2001), <u>see also</u> 147 Cong. Rec. E2397 (daily ed. Dec. 19, 2001) (statement of Rep. Sheila Jackson Lee) ("H.R. 3275 implements the International Convention for the Suppression of the Financing of Terrorism, which requires signatories to prosecute or extradite <u>people who contribute to, or collect money for</u>, terrorist groups.") (emphasis added); <u>Implementation of the International Convention for the Suppression of Terrorist Bombings and the International Convention for the Suppression of the Financing of Terrorism: Hearing on H.R. 3275 Before the Subcomm. on Crime of the H. Comm. on the Judiciary</u>, 107th Cong. 10 (2001), (statement of

---

[22]    The word "raise," while subject to various meanings, is best defined as in this context as "to get together for a purpose."  Merriam-Webster OnLine, http://www.m-w.com (last visited Nov. 28, 2005).

Samuel M. Witten, Acting Deputy Legal Adviser, Dep't of State) ("[T]he Convention will obligate States to criminalize conduct related to the <u>raising of money</u> and other assets to support terrorist activities.") (emphasis added).  The focus of the Convention, and consequently of Section 2339C that implements the Convention, is on "front" organizations or other groups that allegedly fund terrorist activities, not on financial institutions that provide routine banking services.

       If Interpal, as plaintiffs believe, is a fundraiser for terrorists in HAMAS, plaintiffs could properly sue Interpal under Section 2339C, although plaintiffs have not done this.  But NatWest is not liable under Section 2339C simply for holding a deposit account of Interpal, an entity that has been twice investigated by the British authorities in the jurisdiction where NatWest principally does business, and where the Interpal accounts are held, and twice found <u>not</u> to be involved in terrorism.

    **2.**    **The Complaint Does Not Adequately Allege That NatWest Possessed The Requisite *Mens Rea* Under Section 2339C**

       Even if the mere maintenance of a deposit account constituted "providing" or "collecting" funds by the depository bank within the meaning of Section 2339C, plaintiffs have fallen far short of alleging facts establishing that NatWest had the required mental state for liability under that statute.  Under Section 2339C, plaintiffs must allege facts showing that NatWest "unlawfully and willfully provides or collects funds with the <u>intention that such funds are to be used</u>, or with the <u>knowledge that such funds are to be used</u>" for a terrorist act.  18 U.S.C. § 2339C(a)(1) (emphasis added).  They have failed to do so.

       The *mens rea* requirement of Section 2339C dictates that plaintiffs allege facts sufficient to establish that NatWest <u>specifically intended</u> or <u>actually knew</u> that the funds would be used in a terrorist act.  This specific intent or actual knowledge requirement is consistent with

the Seventh Circuit's decision in <u>Boim</u>, where the court held that to succeed under Section

2333(a), the plaintiff must show the defendant knew about the unlawful activities and <u>intended</u> to

bring about those unlawful activities; otherwise the court would be imposing strict liability.

<u>Boim v. Quranic Literacy Inst. & Holy Land Found. For Relief & Dev.</u>, 291 F.3d 1000, 1023-24

(7th Cir. 2002); <u>see also</u> <u>Terrorist Attacks</u>, 349 F. Supp. 2d at 828.  Here, the factual allegations

of the complaint establish, at most, nothing more than the existence of unsubstantiated reports of

connections between Interpal and HAMAS that fall woefully short of establishing specific intent

or actual knowledge on the part of NatWest that any funds in Interpal's NatWest accounts would

be used for terrorist acts.

Indeed, the undisputed facts in the documents that the Court may consider on this

motion refute any such intent or knowledge.  While the complaint alleges that NatWest

continued to maintain the Interpal accounts after they were frozen by the U.K. Charity

Commission in 1996 and despite reports of links between Interpal and HAMAS in British

newspapers, Compl. ¶ 63-65, it is indisputable that the U.K. Charity Commission ultimately

found <u>no</u> evidence of inappropriate activity, and thus lifted the freeze on Interpal's assets.

Friedman Decl., Ex. D, 1996 Charity Commission Extract; Ex. C, 2003 Charity Commission

Report.

The Complaint also neglects to state that the U.K. Charity Commission again

determined in 2003, <u>after</u> the U.S. SDGT designation, that Interpal has no illicit ties to HAMAS.

Friedman Decl., Ex. C, 2003 Charity Commission Report; Ex. G, 2003 Charity Commission

Unfreezing Order.  Following the U.K. Charity Commission's findings, NatWest could

reasonably conclude that funds deposited in and withdrawn from Interpal's accounts <u>would not</u>

be used to carry out terrorist acts.  Notably, the complaint does not allege that any U.K.

regulatory or governmental authority ever placed Interpal on a terrorist watch list, even after the U.S. designation in August 2003.

Nor does Interpal's designation by Israel as an unlawful organization in May 1997 and a terrorist organization in January 1998, and the publication of these designations in the Israeli <u>Announcements and Advertisements Gazette</u>, Compl. ¶¶ 72-75, translate to specific intent or actual knowledge on the part of NatWest.  There is no allegation that NatWest was even aware of the Israeli designations, nor any reason why it would have been, since it does not do business in Israel.  Nor is there any allegation that NatWest, a British bank, would or should have accepted Israel's views on the status of a British-based depositor that was investigated and cleared of any ties to HAMAS by the British government.

The claim that NatWest accepted deposits on behalf of Interpal for the Holy Land Foundation for Relief and Development in April 2000, and on behalf of the Al-Aqsa Charitable Foundation in January 2001 and March 2003, Compl. ¶¶ 76-81, is similarly insufficient to impute specific intent or actual knowledge to NatWest.  The Al-Aqsa Charitable Foundation was designated as an SDGT in May 2003, Compl. ¶ 79 n.9, <u>after</u> both of the alleged transactions with that entity occurred.  Plaintiffs' allegation that Israel designated the Holy Land Foundation for Relief and Development a "HAMAS front organization," Compl. ¶ 77 n.8, fails to plead that NatWest knew of such a designation.  And as discussed above, even if NatWest knew about this designation, that does not establish NatWest had actual knowledge of the Holy Land Foundation's alleged terrorist activities.

Finally, Interpal's designation as an SDGT by the U.S. government on August 22, 2003, Compl. ¶¶ 83-84, occurred three days <u>after</u> Tzvi Weiss was injured.  This designation, therefore, cannot – as a matter of law and common sense – establish that, at or before the time of

Tzvi Weiss's injury, NatWest provided funds with the intention or knowledge that they would be used in a terrorist attack.

In sum, none of the facts alleged in the complaint show that NatWest <u>specifically intended</u> or <u>actually knew</u> that the funds held in Interpal's accounts, or the funds deposited into or withdrawn from the accounts, would be used for an act of terrorism.  Essentially, all that plaintiffs have alleged is that Interpal had a bank account at NatWest from which Interpal made certain withdrawals that allegedly resulted in transfers to organizations connected with HAMAS.  This is manifestly inadequate to show that the routine banking services provided by NatWest fell within the criminal provisions of Section 2339C, much less that NatWest acted with the specific intent or actual knowledge to further terrorist acts necessary for liability under that section.  Plaintiffs' claim for relief under Section 2339C must be dismissed.

## POINT II

### PLAINTIFFS CANNOT IMPOSE GENERAL <u>AIDING AND ABETTING LIABILITY ON NATWEST</u>

Unable to plead facts satisfying the requirements for liability under Section 2339B and Section 2339C, plaintiffs apparently seek to allege general secondary liability under Section 2333(a) by relying on the inherently questionable assumption that general aiding and abetting liability exists under Section 2333(a).  Their theory for this claim appears to be that the HAMAS suicide bombing was an attempt to murder or cause serious bodily injury to a national of the United States outside the United States in violation of 18 U.S.C. § 2332, and that even though plaintiffs know that no responsible prosecutor would ever bring such a charge, NatWest somehow is criminally responsible (and therefore civilly liable under Section 2332(a)) for aiding and abetting this act of attempted murder.

However, Section 2333(a) contains no reference to secondary liability for aiding and abetting, and the structure of the ATA, read in light of the Supreme Court's decision in Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 166 (1994), indicates that there is no implied claim for aiding and abetting under that statute. This is especially true because Congress specifically provided a basis for addressing the conduct of secondary actors under Section 2339B and Section 2339C, violations of which trigger civil liability under Section 2333(a), without providing anything in Section 2333(a) about more general secondary liability. While the Seventh Circuit in Boim and Judge Gershon in Linde (who relied on the Seventh Circuit's decision without an independent analysis), have previously allowed certain aiding and abetting claims to survive a dismissal motion under Section 2333(a), this Court is not bound by those decisions, and should hold instead that Section 2333(a) does not provide for general aiding and abetting claims.[23]

## A.     Secondary Liability Should Not Be Implied At All Under Section 2333(a)

While Central Bank addressed the existence of civil aiding and abetting liability under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder, its rationale is clearly not so limited. Pennsylvania Ass'n of Edwards Heirs v. Rightenour, 235 F.3d 839, 843 (3d Cir. 2000), cert. denied, 534 U.S. 816 (2001) ("nothing in Central Bank indicates that its reasoning is specific to the particular statute presented in that case"). Under the teaching of Central Bank, there is no general presumption of aiding and abetting in a civil private action under Section 2333(a). Cent. Bank, 511 U.S. at 182; see also Dep't of Econ. Dev. v. Arthur

---

[23]    As discussed above, in In re Terrorist Attacks on September 11, 2001, 349 F. Supp. 2d 765 (S.D.N.Y. 2005), the court dismissed complaints and claims against various defendants, including banks similarly situated to NatWest, but did not independently analyze implied aiding and abetting liability under Section 2333(a). See also In re Terrorist Attacks on Sept. 11, 2001, 392 F. Supp. 2d 539 (S.D.N.Y. 2005) (dismissing additional claims and complaints).

Anderson & Co., 924 F. Supp. 449, 476 (S.D.N.Y. 1996).  Rather, in order to determine whether Section 2333(a) specifically incorporates aiding and abetting liability, the Court must look to the explicit statutory language.  Cent. Bank, 511 U.S. at 173, 175, 182; Dep't of Econ. Dev., 924 F. Supp. at 475; see also Goldfine v. Sichenzia, 118 F. Supp. 2d 392, 399 (S.D.N.Y. 2000).

The language of Section 2333(a) is unambiguous, and does not mention general secondary liability at all.[24]  Because "Congress knew how to impose aiding and abetting liability when it chose to do so," Cent. Bank, 511 U.S. at 176 (citations omitted), and because Congress did not explicitly provide for aiding and abetting liability under Section 2333(a), this Court should not read such a claim into that statute.  See also Kidder Peabody & Co. v. Unigestion Int'l, Ltd., 903 F. Supp. 479, 496 (S.D.N.Y. 1995).  Nor can it be said that in enacting Section 2333(a), Congress "legislated with an understanding . . . that aiding and abetting liability was well established in both civil and criminal actions" because, as the Supreme Court explained in Central Bank, while aiding and abetting "is an ancient criminal law doctrine" its civil application under the Restatement of Torts "has been at best uncertain."  Cent. Bank, 511 U.S. at 181-82 (citation and internal quotation marks omitted).

In Boim, where the Seventh Circuit permitted an aiding and abetting claim under Section 2333(a) in a case in which two charitable front organizations were alleged to have directly supplied money to buy the weapons used to injure the plaintiffs, train the shooters, and compensate the families of the attackers, the court sought to distinguish Central Bank by stating that "Central Bank addressed extending aiding and abetting liability to an implied right of action, not an express right of action as we have here in section 2333."  Boim, 291 F.3d at 1019. However, courts in the Second Circuit have reached precisely the opposite conclusion, holding

---

[24]   While the Supreme Court acknowledged that "aiding and abetting a wrongdoer ought to be actionable in certain instances," such liability is limited to those situations where "aiding and abetting is covered by the statute." Cent. Bank, 511 U.S. at 177.  Here, the ATA is silent on aiding and abetting liability.

that arguments against inferring secondary liability with respect to a civil action that is expressly created by a statute are <u>stronger</u> than where the cause of action is only implied.  <u>See</u> <u>Hayden v. Paul, Weiss, Rifkind, Wharton & Garrison</u>, 955 F. Supp. 248, 256-57 (S.D.N.Y. 1997); <u>see also</u> <u>Dep't of Econ. Dev.</u>, 924 F. Supp. at 476.  This approach, which undercuts one of the principal rationales of <u>Boim</u>, makes eminent sense:  unlike with implied causes of action, where courts must speculate about congressional intent, here Congress clearly and explicitly provided for a private civil right of action under Section 2333(a), but just as clearly did not make explicit provision for secondary liability.

        In addition, in the wake of the seminal <u>Central Bank</u> decision, courts have expressly refused to infer aiding and abetting liability in statutes with statutory language analogous to the ATA.  Thus, the Third Circuit has held there is no civil aiding and abetting liability under the civil RICO provision, which contains nearly identical language to the civil remedy provision of Section 2333(a).[25]  <u>See</u> <u>Pennsylvania Ass'n of Edwards Heirs</u>, 235 F.3d at 840; <u>Rolo v. City Investing Co. Liquidating Trust</u>, 155 F.3d 644, 657 (3d Cir. 1998), <u>abrogation on other grounds recognized by</u> <u>Forbes v. Eagleson</u>, 228 F.3d 471 (3d Cir. 2000).  Similarly, district courts in the Second Circuit have held there exists no civil private right of action for aiding and abetting a RICO violation.  <u>See</u> <u>Hayden</u>, 955 F. Supp. at 253, 256; <u>Dep't of Econ. Dev.</u>, 924 F. Supp. at 477.[26]  Likewise, there exists no secondary liability for aiding and abetting

---

[25]    The RICO civil remedies provision states that "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee . . . ."  18 U.S.C. § 1964(c).

[26]    <u>See also</u> <u>Goldfine</u>, 118 F. Supp. 2d at 406; <u>LaSalle Nat'l Bank v. Duff & Phelps Credit Rating Co.</u>, 951 F. Supp. 1071, 1089 (S.D.N.Y. 1996); <u>Rosenheck v. Rieber</u>, 932 F. Supp. 626, 628 n.1 (S.D.N.Y. 1996).

under the Sherman Act.  <u>MCI Telecomm. Corp. v. Graphnet, Inc.</u>, 881 F. Supp. 126, 129 (D.N.J. 1995).[27]

     The Court should follow this precedent, and should decline to infer a claim for aiding and abetting liability under Section 2333(a).

**B.    When Congress Intended To Create Liability For Secondary Actors Under Section 2333(a), It Did So <u>Expressly In Section 2339B And Section 2339C</u>**

     The absence of general secondary liability under Section 2333(a) does not excuse secondary actors of all civil liability under the ATA.  On the contrary, by enacting Sections 2339B and 2339C, the violation of which gives rise to civil liability under Section 2333(a), Congress expressly established the circumstances under which secondary civil liability is warranted for persons who do not themselves commit terrorist acts.  In doing so, it also demonstrated that generalized civil aiding and abetting liability is not within the ambit of Section 2333(a).  <u>See</u> <u>Cent. Bank</u>, 511 U.S. at 184 ("The fact that Congress chose to impose some forms of secondary liability, but not others, indicates a deliberate congressional choice with which the courts should not interfere."); <u>see also</u> <u>Dep't of Econ. Dev.</u>, 924 F. Supp. at 476.

     Indeed, if Congress believed there was general civil aiding and abetting liability under Section 2333(a), there would have been no reason for it to enact Section 2339B and Section 2339C.  The specific liability for providing material support to a designated foreign terrorist organization under Section 2339B, and for financing terrorism under Section 2339C, would be superfluous if the same conduct could also be actionable under a general aiding and

---

[27]   In addition, simply because criminal aiding and abetting liability exists under 18 U.S.C. § 2 does not mean that civil aiding and abetting liability exists as a matter of law.  <u>Dep't of Econ. Dev.</u>, 924 F. Supp. at 476 (quoting Jed S. Rakoff, <u>Aiding and Abetting Under Civil RICO</u>, N.Y.L.J., May 12, 1994, at 3) ("[T]here is no suggestion that [18 U.S.C. § 2 ], enacted in 1909, was intended to authorize civil liability for aiding and abetting in any situation in which Congress thereafter combined civil and criminal penalties in one statute, whether in RICO (enacted in 1970), the Securities Exchange Act (enacted in 1934), or elsewhere.").

abetting theory.  Mackey v. Lanier Collection Agency & Serv., Inc., 486 U.S. 825, 837 (1988) ("[W]e are hesitant to adopt an interpretation of a congressional enactment which renders superfluous another portion of that same law.").

Accordingly, the fact that Congress expressly provided for secondary liability in Sections 2339B and 2339C when it wished to do so provides yet another reason why the Court should not find a basis for alleging secondary liability in Section 2333(a).

**C.    If There Is General Secondary Liability Under Section 2333(a), The Pleaded Facts Must Satisfy Criminal Aiding And Abetting Standards Under 18 U.S.C. § 2, As They Indisputably Do Not Here**

If the Court nonetheless concludes that a civil recovery for aiding and abetting liability can be had under Section 2333(a), independent of legally sufficient allegations of violations of Section 2339B and Section 2339C, plaintiffs would need to satisfy the criminal standards of aiding and abetting liability under 18 U.S.C. § 2,[28] because all civil liability under Section 2333(a) requires a predicate criminal violation.[29]  Boim itself inferred aiding and abetting liability under Section 2333(a) based, in part, on the applicable criminal standards. Boim, 291 F.3d at 1020-21.  To the extent courts have allowed aiding and abetting claims under the civil RICO provisions prior to Central Bank, they also have applied the criminal aiding and abetting standard.  United States v. Local 1804-1 Int'l Longshoremen's Ass'n, 812 F. Supp. 1303, 1327, 1346-47 (S.D.N.Y. 1993) ("In a civil RICO suit, the Court applies the criminal standard in determining aiding and abetting liability."); see also United States v. Local 560 of the

---

[28]   "Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."  18 U.S.C. § 2.

[29]   Under Section 2333(a), civil liability arises where injury is caused "by reason of an act of international terrorism,"18 U.S.C. § 2333(a), which is defined, under Section 2331, as activities that "involve violent acts or acts dangerous to human like that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State."  18 U.S.C. § 2331.  See pp. 12-13, supra; see also Linde v. Arab Bank, PLC, 353 F. Supp. 2d 327, 331 (E.D.N.Y. 2004).

Int'l Bd. of Teamsters, Chauffeurs, Warehousemen, & Helpers of Am., 780 F.2d 267, 284 (3d Cir. 1985), cert. denied, 476 U.S. 1140 (1986).

Plaintiffs' complaint fails to satisfy the standard for criminal aiding and abetting liability, which requires plaintiffs to plead facts showing that NatWest associated itself with the terrorist act committed against Tzvi Weiss, thereby knowing about the crime, and specifically sought to bring it about and make it succeed.  Nye & Nissen v. United States, 336 U.S. 613, 619 (1949); United States v. Medina, 32 F.3d 40, 45 (2d Cir. 1994).  To the contrary, the complaint makes no reference at all to (1) NatWest's knowledge of the HAMAS suicide bomber attack, (2) NatWest's specific intent to further that attack, or even (3) NatWest's specific intent to further HAMAS' terrorist acts more generally.  See United States v. Samaria, 239 F.3d 228, 234-35 (2d Cir. 2001).[30]

Accordingly, even if the Court concludes that plaintiffs could theoretically allege general aiding and abetting liability under Section 2333(a), they have failed to adequately allege any such liability here.  Plaintiffs' attempt to assert an aiding and abetting claim therefore fails as a matter of law.

**D.      Alternatively, The Pleaded Facts Must Satisfy Aiding And Abetting Standards Under The Restatement (Second) Of Torts § 876(b), Which They Also Fail To Do**

Finally, even if the Court determines that plaintiffs' pleadings need not satisfy the criminal aiding and abetting standards, at a minimum, plaintiffs must plead facts sufficient to satisfy the Restatement (Second) of Torts, § 876(b).  This section provides that "[f]or harm resulting to a third person from the tortious conduct of another, one is subject to liability if he . . . knows that the other's conduct constitutes a breach of duty and gives substantial assistance or

---

[30]   Even if plaintiffs had alleged that NatWest knew that "some crime would be committed," which they have not and cannot, that is insufficient to establish criminal liability for aiding and abetting.  United States v. Friedman, 300 F.3d 111, 124 (2d Cir. 2002), cert. denied, 538 U.S. 981 (2003).

encouragement to the other so to conduct himself" (emphasis added).  Plaintiffs have failed to do this, even under the most liberal pleading standards.[31]

### 1.   The Complaint Does Not Allege Facts Sufficient To Establish That NatWest Had Actual Knowledge Of The Alleged Terrorist Activities

First, plaintiffs have not alleged facts sufficient to establish that NatWest <u>knew</u> Interpal was directly connected to the alleged terrorist activities of HAMAS[32] or that NatWest knew of the alleged terrorist activity that Interpal was supposedly supporting, much less the specific attack which injured Tzvi Weiss.  <u>Cf.</u> <u>Boim</u>, 291 F.3d at 1023.  Courts within the Second Circuit have adopted precisely such an <u>actual knowledge</u> standard for aiding and abetting liability.  <u>Fundacion Museo de Arte Contemporaneo de Caracas – Sofia Imber v. CBI-TDB Union Bancaire Privee</u>, 996 F. Supp. 277, 293 (S.D.N.Y.), <u>aff'd</u>, 160 F.3d 146 (2d Cir. 1998); <u>Kolbeck v. LIT. Am., Inc.</u>, 939 F. Supp. 240, 246-47 (S.D.N.Y. 1996), <u>aff'd</u>, 152 F.3d 918 (2d Cir. 1998); <u>Renner v. Chase Manhattan Bank</u>, No. 98 Civ. 926 (CSH), 1999 WL 47239, at *12 (S.D.N.Y. Feb. 3, 1999);[33] <u>Williams v. Bank Leumi Trust Co. of N.Y.</u>, No. 96 Civ. 6695 (LMM),

---

[31]   The Second Circuit has held that the three prerequisites to civil aiding and abetting liability, outside the context of a statute such as the ATA that requires predicate criminal acts, are: (1) a primary violation by someone other than the aider and abettor; (2) knowledge of the primary violation; and (3) substantial assistance of the violation.  <u>Armstrong v. McAlpin</u>, 699 F.2d 79, 91 (2d Cir. 1983), <u>abrogation recognized on other grounds</u>, <u>Rabin v. Fivzar Assocs.</u>, 801 F. Supp. 1045 (S.D.N.Y. 1992); <u>IIT, An Int'l Inv. Trust v. Cornfeld</u>, 619 F.2d 909, 922 (2d Cir. 1980).  <u>See also</u> <u>Dillon v. Militano</u>, 731 F. Supp. 634, 638 (S.D.N.Y. 1990); <u>Ross v. Bolton</u>, 639 F. Supp. 323, 326 (S.D.N.Y. 1986); <u>Dickens v. Chem. Bank</u>, 573 F. Supp. 1129, 1131 (S.D.N.Y. 1983); <u>Edwards & Hanly v. Wells Fargo Secs., Clearance Corp.</u>, 602 F.2d 478, 483 n.5 (2d Cir. 1979) (referencing Restatement (Second) of Torts § 876), <u>cert. denied</u>, 444 U.S. 1045 (1980).

[32]   Given that NatWest is not alleged to have directly provided substantial assistance to HAMAS, it is not enough for plaintiffs to establish that NatWest knew about <u>HAMAS's</u> terrorist activities generally; rather plaintiffs must plead facts sufficient to establish that NatWest knew of <u>Interpal's</u> alleged ties to HAMAS's terrorist activities.

[33]   For the Court's convenience, copies of unreported decisions cited in the brief are attached hereto in alphabetical order.

1997 WL 289865, at *5 (S.D.N.Y. May 30, 1997).[34]  None of plaintiffs' allegations rises to the level of actual knowledge.

Plaintiffs' conclusory statement that NatWest "[knows] that Interpal collects and transmits fund on behalf of HAMAS," Compl. ¶ 96, does not suffice to establish that NatWest had actual knowledge that the funds withdrawn from Interpal's accounts were being used for terrorist acts.  See also Ryan, PRD, Corp. v. Hunton & Williams, No. 99-CV-5938 (JG), 2000 WL 1375265, at *9 (E.D.N.Y. Sept. 20, 2000) (authorizing the transfers between one account and another and approving wire transfers "do not create an inference of knowledge of the scheme").  Likewise, plaintiffs' allegations of Interpal's indirect ties to HAMAS do not establish that NatWest actually knew that Interpal was either an agent of HAMAS or acting on behalf of HAMAS, see p. 15, supra, and therefore cannot establish the requisite level of knowledge.  To the contrary, what NatWest specifically knew was that Interpal had twice been investigated by British regulators, and twice cleared of any alleged ties to HAMAS.  See pp. 7-8, supra.

Moreover, in order to impose liability on NatWest for allegedly aiding and abetting acts of international terrorism, plaintiffs must also allege facts establishing that NatWest specifically intended to further HAMAS's terrorist activities.  Boim v. Quranic Literacy Inst. & Holy Land Found. For Relief & Dev., 291 F.3d 1000, 1015, 1021-25 (7th Cir. 2002) (defendant must know about the terrorist activity and provide aid with the specific intent to further that illegal activity); Laro, Inc. v. Chase Manhattan Bank (Nat'l Ass'n), 866 F. Supp. 132, 139 n.3 (S.D.N.Y. 1994) (noting that the aiding and abetting standard in the Restatement (Second) of Torts § 876(b), like the criminal standard articulated in 18 U.S.C. § 2, requires conscious

---

[34]   While the Seventh Circuit has stated that general awareness of the defendant's role in the illegal activities suffices, the court also noted that this element can be articulated differently.  Halberstam v. Welch, 705 F.2d 472, 477, 478 n.8 (D.C. Cir. 1983).  To the extent Judge Gershon in Linde v. Arab Bank, PLC, 384 F. Supp. 2d 571, 583-84 (E.D.N.Y. 2005), accepted the general awareness standard laid out in Halberstam, that decision is inconsistent with the actual knowledge requirement in the Second Circuit.

assistance), aff'd, 60 F.3d 810 (2d Cir. 1995).  See also Edwards & Hanly v. Wells Fargo Secs.,

Clearance Corp., 602 F.2d 478, 485 (2d Cir. 1979) ("Finding a person liable for aiding and

abetting . . . requires something closer to an actual intent to aid in a fraud."), cert. denied, 444

U.S. 1045 (1980); IIT, An Int'l Inv. Trust, 619 F.2d at 925 (when no duty is owed, "an alleged

aider-abettor should be found liable only if scienter of the high 'conscious intent' variety can be

proved."); Dickens, 573 F. Supp. at 1132 (heightened scienter requirement of aider and abettor

where defendant does not owe a fiduciary duty to plaintiff).  Here, plaintiffs have not alleged –

nor can they allege – that NatWest owed them any special duty,[35] and they have not pleaded a

single fact to establish that NatWest specifically intended to facilitate HAMAS's terrorist

activities, much less the suicide attack that injured Tzvi Weiss.

> ### 2.      The Complaint Does Not Allege Facts Sufficient To Establish That NatWest Provided Substantial Assistance Or Encouragement To The Alleged Terrorist Activities

Finally, the complaint does not plead facts sufficient to establish that NatWest's

conduct constituted substantial assistance or encouragement of the alleged terrorist activities.  It

is well-established that a bank's maintenance of a routine deposit account for a customer – which

is all plaintiffs have pleaded – does not constitute substantial assistance to allegedly illegal

activity relating to the passage of funds in and out of the account.  Williams, 1997 WL 289865 at

*5 ("[T]he mere fact that all the participants in the alleged scheme used accounts at [a bank] to

perpetrate it, without more, does not rise to the level of substantial assistance necessary to state a

---

[35]   See Tzaras v. Evergreen Int'l Spot Trading, Inc., No. 01 Civ. 10726 (LAP), 2003 WL 470611, at **5-6 (S.D.N.Y. Feb. 25, 2003) (bank owed no duty of care to non-customer and no duty to prevent its customer from defrauding non-customer); Renner, 1999 WL 47239, at *13 ("[Plaintiff argues] that [bank] owed him a duty to prevent [bank's] customer . . . from defrauding [Plaintiff].  But it is well settled that a bank owes no such duty to a non-customer third-party."); Cohen v. Standard Bank Inv. Corp. (Jersey) Ltd., No. 97 Civ. 3802 (SAS), 1998 WL 782024, at *7 (S.D.N.Y. Nov. 6, 1998) (no duty of care owed by bank to investor in allegedly fraudulent scheme perpetrated by bank's borrower); see also Linde, 384 F. Supp. 2d at 582 n.8 (Finding "no statutory basis for plaintiffs' argument that recklessness would be sufficient to meet the statutory requirements.").

claim for aiding and abetting liability."); Nigerian Nat'l Petroleum Corp. v. Citibank, N.A., No. 98 Civ. 4960 (MBM), 1999 WL 558141, at *8 (S.D.N.Y. July 30, 1999) (bank did not give substantial assistance by repeatedly executing wire transfers for millions of dollars); Renner v. Chase Manhattan Bank, No. 98 Civ. 926 (CSH), 2000 WL 781081, at *12 (S.D.N.Y. June 16, 2000) (simply because participants used accounts held at bank did not establish substantial assistance of the participants of a prime bank guarantee scam); Ryan, 2000 WL 1375265, at *9 ("The affirmative acts of opening accounts, approving various transfers, and then closing the accounts on the basis of suspected fraud, without more, do not constitute substantial assistance," notwithstanding allegation that bank was on notice of various red flags.); Dickens, 573 F. Supp. at 1132 ("the simple act of maintaining a checking account" cannot subject "bank to aider and abettor liability"); see also Edwards, 602 F.2d at 485 (a bank is not an aider and abettor where it "lends money to a customer who then uses it to perpetrate a fraudulent scheme."); Armstrong, 699 F.2d at 91 ("[W]e are not prepared to hold that a broker who merely executes an investment manager's orders for improper purchases or sales can be held liable as an aider and abettor of the investment manager."). Similarly, simply acting as depository for funds cannot constitute providing substantial assistance to an underlying criminal act. Ross, 639 F. Supp. at 327 (dismissing complaint against clearing agent).

        Judge Casey applied these principles in the Terrorist Attacks case, when he dismissed Section 2333(a) claims against a Saudi bank for making funds transfers and engaging in other routine banking transactions for various charities that allegedly supported terrorism. In re Terrorist Attacks on Sept. 11, 2001, 349 F. Supp. 2d 765, 833 (S.D.N.Y.), on reconsideration in part, 392 F. Supp. 2d 539 (S.D.N.Y. 2005). This Court should do likewise. Plaintiffs' conclusory statement that NatWest has "substantially aided and abetted the commission of acts

of international terrorism," Compl. ¶ 1, without any supporting factual allegations, cannot suffice to state a claim under Section 2333(a), and should be dismissed.  Armstrong, 699 F.2d at 93 ("Conclusory allegations that the bank aided and abetted are not enough.") (citation omitted); Dillon, 731 F. Supp. at 639 ("mere conclusions of the pleader of substantial assistance do not suffice."); Dickens, 573 F. Supp. at 1134 (same) (citation omitted).[36]

## POINT III

### PLAINTIFFS HAVE NOT PLEADED FACTS SUFFICIENT TO ESTABLISH THE REQUISITE PROXIMATE CAUSAL LINK BETWEEN NATWEST'S ALLEGED CONDUCT AND ANY INJURY PLAINTIFFS SUSTAINED

Wholly apart from their failure to allege facts sufficient to support any claim for predicate violations of either Section 2339B(a)(1) or Section 2339C, or aiding and abetting liability, plaintiffs have entirely failed to plead facts sufficient to establish the requisite proximate causal link between NatWest's maintenance of one or more deposit accounts for Interpal, and the injuries plaintiffs sustained as a result of the HAMAS suicide bomber attack on Tzvi Weiss.  This case therefore stands in stark contrast to Boim, where the plaintiffs alleged that the funds supplied by the defendant terrorist front organizations were used to buy the weapons and train the men who killed Mr. Boim, as well as to compensate the families of the murderers. Boim, 291 F.3d at 1023-24.  It also stands in stark contrast to Linde, where the plaintiffs alleged

---

[36]   "Substantial assistance" overlaps to a degree with the requirement of pleading proximate cause.  See Bloor v. Carro, Spanbock, Londin, Rodman & Fass, 754 F.2d 57, 62 (2d Cir. 1985) ("In alleging the requisite 'substantial assistance' by the aider and abettor, the complaint must allege that the acts of the aider and abettor proximately caused the harm to the corporation on which the primary liability is predicated.") (citations omitted); Edwards, 602 F.2d at 484 (the alleged conduct of the aider and abettor must be the proximate cause of the injury); Armstrong, 699 F.2d at 92.  As set forth in Point III of this brief, plaintiffs have also pleaded no facts to support the existence of a proximate causal link between NatWest's maintenance of one or more deposit accounts for Interpal and the suicide bomber attack that injured Tzvi Weiss.

Again, Judge Gershon in Linde misconstrued the applicable standards under the Restatement (Second) Torts § 876 in the Second Circuit by adopting a general awareness standard, rather than an actual knowledge standard, by disregarding the specific intent requirement which courts in this Circuit have adopted, by stripping the substantial assistance requirement of the requisite proximate causal link, and by deeming the provision of routine banking services alone sufficient to constitute substantial assistance.  Linde, 384 F. Supp. 2d at 583-85.

38

that the defendant bank actually held an account for HAMAS which was used to fund terrorist activities and administered a "death and dismemberment benefit plan" that created an incentive and reward for suicide attacks.  Linde, 384 F. Supp. 2d 576-77.

Here, plaintiffs have alleged no proximate causal connection between NatWest's alleged conduct (*i.e.* the routine maintenance of one or more bank accounts for a charitable organization in Britain) and the injury directly caused by the HAMAS-affiliated suicide bomber attack in Israel on August 19, 2003.

Section 2333(a) provides that "[a]ny national of the United States injured in his or her person, property, or business by reason of an act of international terrorism" may bring a civil suit.  18 U.S.C. § 2333(a) (emphasis added).  As the court in Boim noted, the "Supreme Court has interpreted identical ["by reason of"] language to require a showing of proximate cause." Boim, 291 F.3d at 1011.  See also Terrorist Attacks, 349 F. Supp. 2d at 825-26 ("Plaintiffs will have to present a sufficient causal connection between the support and injuries suffered by Plaintiffs . . . .  Proximate cause will support this connection.") (citations omitted).  The Supreme Court decision referenced in Boim is Holmes v. Securities Investor Protection, 503 U.S. 258 (1992), the landmark ruling in which the Supreme Court held that under the RICO civil remedy provision, 18 U.S.C. § 1964(c), which applies to persons injured "by reason of" the defendant's predicate acts, the defendant's tortious conduct must be both the factual and proximate cause of the alleged injury.  Holmes, 503 U.S. at 268.

The Second Circuit has explained that proximate cause requires a direct relationship between the plaintiff's injury and the defendant's tortious conduct, and is intended to limit a defendant's liability to those acts of the defendant that are a substantial factor in the chain of causation and are reasonably foreseeable.  Lerner v. Fleet Bank, N.A., 318 F.3d 113, 122-24

(2d Cir.) (finding investors failed to show that banks' violations of state escrow fund reporting requirements proximately caused investors' loss of money through lawyer's Ponzi scheme), cert. denied, 540 U.S. 1012, 123 (2003); First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 769-70, 772 (2d Cir. 1994) (finding that alleged misrepresentations concerning value of secured property were not proximate cause of injuries), cert. denied, 513 U.S. 1079 (1995); Hecht v. Commerce Clearing House, 897 F.2d 21, 23-25 (2d Cir. 1990) (finding former employee's injury was not proximately caused by alleged RICO violation); see also In re Gas Reclamation, Inc. Secs. Litig., 663 F. Supp. 1123, 1124-26 (S.D.N.Y. 1987) (finding investment group did not plead proximate causal link between alleged injury and alleged predicate acts).  The same direct causal link is also required under Section 4 of the Clayton Act, which also uses – and is the original source for – the "by reason of" language.  15 U.S.C. § 15(a); See Billy Baxter, Inc. v. Coca-Cola Co., 431 F.2d 183, 187 (2d Cir. 1970).

Because Congress used the same words, "by reason of," in Section 2333(a), the Court "can only assume it intended them to have the same meaning that courts had already given them."  Holmes, 503 U.S. at 268.  Accordingly, plaintiffs must allege that NatWest's maintenance of one or more deposit accounts for Interpal at a branch in London, and the alleged withdrawals and deposits to and from the accounts, proximately caused the injuries to plaintiffs.  Plaintiffs have failed to do so.

Giving it the most generous possible reading, the complaint suggests a remote, indirect and unforeseeable connection (if any connection at all) between NatWest's alleged conduct – the routine maintenance of one or more deposit accounts for Interpal in London – and plaintiffs' alleged injuries, which were directly caused by a HAMAS-affiliated suicide bomber on August 19, 2003 in Israel.  See First Nationwide Bank, 27 F.3d at 769 ("[W]hen factors other

40

than the defendant's [conduct] are an intervening direct cause of a plaintiff's injury, that same injury cannot be said to have occurred by reason of the defendant's actions.").

Indeed, the few specific account transactions plaintiffs identify, Compl. ¶¶ 76-77, 79-80, either occurred many years <u>before</u> the attack on Tzvi Weiss, <u>see</u> <u>First Nationwide Bank</u>, 27 F.3d at 772 ("When a significant period of time has elapsed between the defendant's actions and the plaintiff's injury, there is a greater likelihood that the loss is attributable to events occurring in the interim."), or were sent to the Dutch branch of the Al-Aqsa Foundation, whose connection with Interpal had been investigated by the U.K. Charity Commission, without finding any evidence of wrongdoing.  <u>See</u> p. 10, n.8, <u>supra</u>.

But even if there had been no investigation, none of these allegations rises to the level of showing any causal connection between NatWest's conduct and HAMAS's terrorist acts generally.  <u>A</u> <u>fortiori</u>, the complaint fails to allege a single fact sufficient to proximately link NatWest's conduct to the specific terrorist attack that injured Tzvi Weiss.  Plaintiffs' failure to plead facts showing that NatWest's allegedly tortious conduct proximately caused plaintiffs' injuries is manifest.[37]

Congress's desire that the ATA and the civil remedy provision of Section 2333(a) should be construed liberally does not relieve plaintiffs of their obligation to plead facts sufficient to show the requisite proximate causal link any more than the liberal construction afforded the RICO statute.  <u>Holmes</u>, 503 U.S. at 274; <u>First Nationwide Bank</u>, 27 F.3d at 769 ("Although we are mindful of the admonition that RICO is to be liberally construed, the

---

[37]   The court in <u>Linde</u> entirely misconstrued the proximate cause requirement.  <u>Linde</u>, 384 F. Supp. 2d at 581-82. Judge Gershon concluded that the plaintiffs need only plead that their injuries were caused by an act of international terrorism, and not that their injuries were proximately caused by a defendant's conduct.  Judge Gershon's interpretation ignores the plain meaning ascribed by Congress, the U.S. Supreme Court and the Second Circuit to the words "by reason of," which are specifically used in Section 2333(a), and is therefore wrong as a matter of law.

foregoing holds true in a RICO setting because proximate cause, a common law concept, exists

independently of the statute.").

      <u>Holmes's</u> teachings apply here with equal force; absent some indication from

Congress that it intended to dispense with standard principles of proximate causation in

providing a civil remedy for victims of terrorism – which is virtually impossible in light of

Congress's use of the time-honored "by reason of" language of Section 2333(a) – civil recovery

under the ATA requires pleading and proof of proximate cause.  Here, there is no such pleading

with respect to any of the claims in the complaint.  Because of this failure, the complaint must be

dismissed:  the mere maintenance of accounts for Interpal in London is no basis for subjecting

NatWest to treble damages for the terrorist acts of HAMAS in Israel.

**POINT IV**

**PRINCIPLES OF INTERNATIONAL COMITY LEND FURTHER
<u>SUPPORT TO DISMISSAL OF PLAINTIFFS' COMPLAINT</u>**

      International comity is the "recognition which one nation allows within its

territory to the legislative, executive or judicial acts of another nation."  <u>Hilton v. Guyot</u>, 159

U.S. 113, 163 (1895).  Such recognition "is neither a matter of absolute obligation, on the one

hand, nor of mere courtesy and good will, upon the other."  <u>Id.</u> at 163-64.  Here, considerations

of international comity militate strongly against the Court stretching the statutory provisions

plaintiffs purport to invoke beyond any reasonable construction, to find that plaintiffs'

conclusory allegations state actionable claims under Section 2333(a).

      As the allegations of the complaint make clear, this lawsuit involves an effort to

impose liability on a British bank, regulated by British banking authorities, and based on

allegations surrounding a British customer and its British accounts.  The substance of plaintiffs'

claims are that NatWest engaged in criminal support of terrorists by holding one or more

42

accounts for Interpal, an organization that has <u>twice</u> been investigated and found not to be

affiliated with terrorists by the U.K. Charity Commission, the British government agency

responsible under British law for such investigations.  <u>See</u> Friedman Decl., Ex. D, 1996 Charity

Commission Extract; Ex. C, 2003 Charity Commission Report.  Essentially, plaintiffs are

asserting that NatWest should pay them treble damages (and attorneys' fees) for heeding the

findings of its own governmental authorities in the United Kingdom, and that instead it should

have relied on newspaper articles and Israeli government reports, as well as somehow foreseeing,

after all the relevant events had occurred, that the United States government would designate

Interpal as an SDGT.  To state this position is to demonstrate its infirmity.

It is noteworthy on this issue that even the U.S. government's designation of

Interpal as an SDGT does not purport to freeze any Interpal accounts outside the United States

such as the NatWest accounts at issue here.  Friedman Decl., Ex. I, Exec. Order No. 13224, 66

Fed. Reg. 49,079 (Sept. 25, 2001).  Executive Order 13224 provides that "all property and

interests in property of the following persons that are <u>in the United States</u> or that hereafter come

<u>within the United States</u>, or that hereafter come <u>within the possession or control of United States</u>

<u>persons</u> are blocked."  Exec. Order No. 13224 § 1 (emphasis added).  In addition, "any

transaction or dealing <u>by United States persons or within the United States</u> in property blocked

pursuant to this order is prohibited" and "any transaction <u>by any United States person or within</u>

<u>the United States</u> that evades or avoids, or has the purpose of evading or avoiding, or attempts to

violate, any of the prohibitions set forth in this order is prohibited."  <u>Id.</u> §§ 2(a), (b) (emphasis

added).[38]

---

[38]   Additionally, the only provision of the ATA that specifically regulates financial institutions, Section
2339B(a)(2) (requiring financial institutions to report the existence of any funds of a foreign terrorist
organization to the Secretary of the Treasury), does not apply to NatWest, a foreign bank that has no active
presence in the United States.  <u>See</u> Friedman Decl., Ex. J, The Federal Reserve Board Structure Data Report For

And, of course, in its own 2003 investigation, the U.K. Charity Commission specifically rejected evidence presented by U.S. authorities in support of Interpal's designation as an SDGT.  See Friedman Decl., Ex. C, 2003 Charity Commission Report; Ex. G, 2003 Charity Commission Unfreezing Order.  Plaintiffs thus seek to penalize NatWest civilly for not closing an account that even the U.S. government did not order frozen, and that the U.K. authorities specifically found should not be frozen, and held by a customer that has never been placed on a terrorist watch list by the U.K. government.

NatWest should not be liable for following the regulatory and anti-terror enforcement policies of its own government in the United Kingdom.

---

U.S. Offices Of Foreign Banks, as of June 30, 2005 (indicating NatWest has no agency or branch in the United States).

## CONCLUSION

For the foregoing reasons, the Court should grant NatWest's motion to dismiss the complaint.

Dated:  New York, New York
        December 19, 2005

Respectfully submitted,

CLEARY GOTTLIEB STEEN & HAMILTON LLP


By:_____/s/ Lawrence B. Friedman_____
     Jonathan I. Blackman (JB 3846)
     Lawrence B. Friedman (LF 9978)
     Members of the Firm

     One Liberty Plaza
     New York, New York 10006
     (212) 225-2000

     Attorneys for Defendant
     National Westminster Bank Plc

Of Counsel:
     Isabelle A. Young