Not Reported in F.Supp.2d                                                                                                                Page 1
Not Reported in F.Supp.2d, 1998 WL 782024 (S.D.N.Y.)
**(Cite as: 1998 WL 782024 (S.D.N.Y.))**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Stanley COHEN Plaintiff,
v.
STANDARD BANK INVESTMENT CORPORATION (JERSEY) LIMITED, Rosehouse Ltd., Tellerstock, Inc., Christopher Carajohn, Richard Prichard-Jones, Thomas N. Telegades, Investor Relations, Inc., and Peter C. Tosto Defendants.
**No. 97 Civ. 3802(SAS).**

Nov. 6, 1998.

Jerome M. Leitner, Leitner & Getz, LLP, New York, New York, for Plaintiffs.

Lisa Klein Wager, Morgan, Lewis & Bockius LLP, New York, New York, for Defendant Standard Bank (Jersey) Limited.

Steven M. Kaplan, Loselle, Greenawalt, Kaplan, Blair & Adler, New York, New York, for Defendant Tellerstock, Inc.

Christopher Carajohn, New York, New York, for Defendant Christopher Carajohn.

Alan S. Sexter, Ed Finkelstein, Sexter & Warmflash, P.C., New York, New York, for Defendants American Third Market Corp. and Israel Englander.

*OPINION AND ORDER*
SCHEINDLIN, J.

**\*1** Plaintiff Stanley Cohen ("Cohen"), brought this action against all defendants, alleging (1) violations of Section 10(b) of the Securities and Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5; (2) common law fraud; and (3) negligence and bad faith. By opinion dated April 27, 1998, the motion of defendant Standard Bank Investment Corporation (Jersey) Ltd. ("Standard Bank" or the "Bank") to dismiss all claims pursuant to Fed.R.Civ.P. 9(b) and 12(b)(6) was granted with leave to amend.

Plaintiff filed an amended complaint on June 1, 1998, in an attempt to cure the defects in the original complaint. On August 14, 1998, Standard Bank again moved to dismiss all claims pursuant to Fed.R.Civ.P. 9(b) and 12(b)(6). At a pre-motion conference on August 20, 1998, plaintiff withdrew the federal securities claims against Standard Bank. On September 18, 1998, Standard Bank filed revised papers, now moving to dismiss the common law fraud and the negligence and bad faith claims pursuant to Fed.R.Civ.P. 9(b) and 12(b)(6). For the reasons stated below, Standard Bank's motion is granted in its entirety.

I. Jurisdiction

Despite Cohen's withdrawal of the federal securities claims against Standard Bank, this Court has supplemental jurisdiction over the remaining state law claims against Standard Bank pursuant to 28 U.S.C. § 1367. Section 1367(c)(3) requires that all claims over which the court has original jurisdiction be dismissed before the state law claims can be dismissed. If a defendant faces only state claims but other defendants in the same action continue to face federal claims, the court must exercise its supplemental jurisdiction over the remaining state claims. *See* 16 James W. Moore, et al., Moore's Federal Practice § 106.66[1] (3d ed.1998). Because federal claims are pending against the other defendants, the Court must exercise its supplemental jurisdiction over the claims against Standard Bank.

II. Factual Background

Familiarity with the facts of this case as set forth in this Court's April 27, 1998 opinion is presumed. *See Scone v. American Third Market Corp., et al, 97 Civ. 3802, 1998 WL 205338 (S.D.N.Y. April 28, 1998).* Only the facts specifically relevant to Standard Bank's current motion to dismiss and those pled for the first time in the First Amended Complaint ("FAC") will be reviewed. For the purposes of this motion, these facts are assumed to be true.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d  
Not Reported in F.Supp.2d, 1998 WL 782024 (S.D.N.Y.)  
**(Cite as: 1998 WL 782024 (S.D.N.Y.))**

Page 2

A. *The Parties*

Plaintiff Cohen is a resident of the State of New York maintaining an office in Manhattan. See FAC at ¶ 1. Defendant Standard Bank is a corporation organized pursuant to the laws of the Island of Jersey, Channel Islands, with an office located in Jersey. *See id.* at ¶ 2. Defendant Christopher Carajohn ("Carajohn") was the principal equity holder of defendant Rosehouse Ltd. ("Rosehouse"), a Bermuda corporation that traded securities of U.S. corporations (collectively, "Rosehouse defendants"). *See id.* at ¶¶ 3-4. Defendant Tellerstock, Inc. is a Delaware corporation engaged in trading securities of U.S. companies ("Tellerstock"). *See id.* at ¶ 6. Defendant Investor Relations, Inc. is a Utah company that traded securities of U.S. companies ("Investor Relations"). *See id.* at ¶ 8.

B. *The Alleged Manipulative Scheme*

**\*2** This action concerns a scheme to manipulate the market prices of certain publicly issued securities and the misrepresentations which allegedly induced plaintiff to purchase large quantities of these securities.

The scheme sought to artificially inflate the price of certain thinly traded "penny stocks" by creating the appearance of demand for those securities. The Rosehouse defendants agreed to purchase these securities from Tellerstock and Investor Relations, to hold the securities for a limited period, and then to resell those securities to Tellerstock and Investor Relations for a minimum guaranteed price or "floor," thereby creating the appearance that the value of the stock had risen. *See id.* at ¶ 23.

As compensation for making these purchases and resales, the Rosehouse defendants were to receive substantial monetary sums from Tellerstock and Investor Relations. *See id.* at ¶ 24. In addition, the Rosehouse defendants agreed to rebate back to Tellerstock and Investor Relations twenty percent of any profits on the resales above the guaranteed price floor. *See id.*

C. *Standard Bank's Alleged Role in the Scheme*

Prior to the transaction at issue, Standard Bank had financed Rosehouse business activities, sustaining a loss of approximately eight million dollars. *See id.* at ¶ 19. As a consequence, Standard Bank refused to finance further Rosehouse transactions until Standard Bank recouped those losses. *See id.* On August 1, 1995, in furtherance of that effort, Standard Bank extended a two million dollar mortgage to the Rosehouse defendants using Carajohn's home in Bridgehampton, New York as collateral. *See id.* at ¶ 20.

In a further effort to help Standard Bank recoup its losses, sometime in or after January 1996, Rosehouse offered the Bank the opportunity to participate in a transaction involving Market Basket Enterprises, Inc. ("MKTB"), a penny stock, and realize the "guaranteed" profit. *See id.* at ¶ 25. The Bank advanced money to Carajohn to buy 4.8 million shares of MKTB, on its behalf, from Tellerstock and Investor Relations, who agreed to repurchase the shares within three months at a higher price than that paid by the Bank. *See id.* at ¶ 26. The plaintiff claims that the transaction was structured to make Standard Bank appear to be acting solely as lender to Carajohn or Rosehouse, rather than as a principal. *See id.* The plaintiff further alleges that Standard Bank conducted a due diligence investigation into MKTB, from which Standard Bank knew, or should have known, that MKTB originally traded on public markets for much less than the purchase price of the stock. *See id.* at ¶¶ 28-29.

In April and May 1996, Tellerstock and Investor Relations repurchased 850,000 MKTB shares from Standard Bank, but by June 1996, the Bank became worried that Tellerstock and Investor Relations would not be able to repurchase the remaining MKTB shares, and that the Bank would sustain significant losses. *See id.* at ¶¶ 31, 38. On June 18, 1996, two Standard Bank directors met with Rosehouse, Tellerstock, and Investor Relations concerning the liquidation of the MKTB stock. *See id.* at ¶¶ 39-40. Tellerstock and Investor Relations reassured Standard Bank that they would honor their commitment to repurchase the stock.

**\*3** However, Carajohn knew at the time of the meeting that Tellerstock and Investor Relations did not have the funds to repurchase shares, in spite of the representations they made to the Bank. *See id.* at ¶ 40. When Carajohn told Standard

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                                                Page 3
Not Reported in F.Supp.2d, 1998 WL 782024 (S.D.N.Y.)
**(Cite as: 1998 WL 782024 (S.D.N.Y.))**

Bank that Tellerstock and Investor Relations could not repurchase the shares, the Bank demanded that Carajohn liquidate the MKTB stock. *See id.*

In February 1996, Cohen authorized Carajohn to execute securities transactions for his account. *See id.* at ¶ 36. On June 21, 1996, Carajohn transferred the remaining 1.5 million MKTB shares to Cohen's account; the proceeds from the sale were immediately credited to Standard Bank. *See id.* at ¶ 41.

When Cohen learned of the transfer, he initially refused to accept the trade. *See id.* at ¶ 45. Carajohn told Cohen that he should accept the trade because Carajohn already had most of the shares sold at a profit, and only needed Cohen to accept the trade before he effected delivery to those purchasers. *See id.* at ¶ 45. In fact, Carajohn had no investors committed to purchasing the MKTB shares. *See id.* at ¶ 47. Relying on Carajohn's misrepresentations, Cohen authorized the transfer of the MKTB securities into his account. *See id.* at ¶ 49. The market price of MKTB stock collapsed and Cohen was unable to sell the shares at anything approaching the purchase price. *See id.* at ¶ 51. Cohen liquidated his MKTB shares in December 1996, accruing a net loss of $1.5 million. *See id.*

Plaintiff now seeks to recover at least $1.645 million which he allegedly lost as a result of the precipitous decline in the price of MKTB securities.

III. Standard of Review Under Rule 12(b)(6)

Dismissal of a complaint pursuant to Rule 12(b)(6) is proper "only where it appears beyond doubt that the plaintiff can prove no set of facts in support of the claim which would entitle him to relief." Scotto v. Almenas, 143 F.3d 105, 109-10 (2d Cir.1998) (quoting Branham v. Meachum, 77 F.3d 626, 628 (2d Cir.1996)) (internal quotations omitted). "The task of the court in ruling on a Rule 12(b)(6) motion 'is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." ' Cooper v. Parsky, 140 F.3d 433, 440 (2d Cir.1998) (quoting Ryder Energy Distribution Corp. v. Merrill Lynch Commodities, Inc., 748 F.2d 774, 779 (2d Cir.1984)). Thus, in deciding such a motion, the court must accept as true all material facts alleged in the complaint and draw all reasonable inferences in the nonmovant's favor. *See* Thomas v. City of New York, 143 F.3d 31, 36 (2d Cir.1998).

IV. Agency Relationship

Plaintiff seeks to hold Standard Bank vicariously liable for the misrepresentations and fraudulent behavior of Carajohn, who plaintiff claims is Standard Bank's agent. *See* FAC at ¶ 53.

A. *Definition of an Agency Relationship*

**\*4** An agent is a person who consents to a fiduciary relationship resulting from another's consent to allow the person to act on the other's behalf and subject to the other's control. The agent is a person who acts for or in the place of the principal by authority from the principal....

2A N.Y. Jurisprudence 2d, Agency and Independent Contractors § 1 (1998).

B. *Plaintiff's Allegations Regarding Carajohn's Relationship with Standard Bank*

Plaintiff alleges that "[u]pon information and belief, Standard Bank was apprised of the transaction by the Rosehouse Defendants and authorized the 1.5 million MKTB shares to be sold and conveyed to plaintiff's account through its subsidiary, Standard Stockbrokers." FAC at ¶ 41. Standard Bank's knowledge of the transaction, even if true, does not suggest that it had sufficient control over Carajohn to create a fiduciary relationship. Neither does it suggest that Standard Bank knew that Carajohn made misrepresentations to plaintiff to induce that transaction. Further, Cohen's allegation that Carajohn apprised Standard Bank of the transaction was made upon information and belief, with no specific factual allegations, such as when and with whom Carajohn spoke at Standard Bank, or the substance of the conversation.

Plaintiff also alleges that "... Carajohn, at the direction, and with the approval and consent and for the benefit, of Standard Bank ... conveyed 1.5 million of Standard Bank's shares to plaintiff's account...." *Id.* at ¶ 41. This allegation is misleading. It bases the phrase "at the direction, and with

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-04622-DLI-RML   Document 18-2   Filed 12/19/05   Page 4 of 6 PageID #: 383

Not Reported in F.Supp.2d                                                                                                Page 4
Not Reported in F.Supp.2d, 1998 WL 782024 (S.D.N.Y.)
**(Cite as: 1998 WL 782024 (S.D.N.Y.))**

the approval and consent" of Standard Bank on the alleged demands Standard Bank placed upon Carajohn to sell the MKTB stock. However, those allegations were made upon information and belief. Plaintiff pled, in particular, "upon information and belief" that two Standard Bank directors traveled to New York and Bermuda to meet with the Rosehouse defendants to demand that the Bank's MKTB shares be sold. *Id.* at ¶ 39. Plaintiff also pled "upon information and belief" that the Bank instructed the Rosehouse defendants to "undertake all avenues available" to liquidate the stock. *Id.* at ¶ 40.

Two cases are helpful in analyzing whether Cohen has sufficiently pleaded facts from which a reasonable person could conclude that Standard Bank and Carajohn had a principal-agent relationship.

In *Fogel v. Hertz International, Ltd,* 38 A.D.2d 1002, 329 N.Y.S.2d 484 (1st Dep't 1988), several American tourists, encouraged by Hertz advertisements in the United States touting car availability and rental rates in Europe, rented a car in Italy from Hertz. The counter, personnel uniforms, and rental agreement of the Italian agency all bore the Hertz logo. When the car was involved in an accident, Hertz International claimed that Hertz Italiana, not Hertz International, owned the car and therefore Hertz International was not responsible.

Hertz International owned 75 percent of Hertz Italiana stock, shared a common board member with Hertz Italiana, and required that Hertz Italiana name Hertz International as an additional insured. The court denied Hertz International's motion for summary judgment because there were "triable issues" regarding whether the relationship between Hertz International and Hertz Italiana was a principal-agent relationship, and because there were questions regarding Hertz International's degree of control over Hertz Italiana.

**\*5** In *Heredia v. United States,* 887 F.Supp. 77 (S.D.N.Y.1995), plaintiff sued the United States for severe damages sustained in an automobile accident. Plaintiff alleged that the United States was liable for the negligent acts of its agent, Velasco, a young military recruit acting on the orders of a superior officer. Velasco, a high school student, was enrolled in the Marine Corps' "Delayed Entry Program," in which a student's application for the Corps was accepted but his recruitment training departure was delayed. During the period of delay the applicant enlisted in the Marine Corps Reserves but performed no official duties and received no pay or benefits. Delayed Entry Program students are called "poolees."

Velasco was assigned to assist a Sergeant Feliz with recruiting activities. Feliz gave Velasco the keys to his personal automobile--in violation of Marine Corps regulations--to run a recruiting errand. With Feliz's knowledge, Velasco was accompanied by Heredia, another poolee. An accident occurred in which Heredia was severely injured. Heredia sued the United States on the grounds that the United States was liable for the poolees and for Sergeant Feliz's supervision of them.

The government argued that both Heredia and Velasco were agents or employees of the federal government, and thus fell under the Federal Tort Claims Act ("FTCA"). [FN1] The court held that although Velasco could not be considered a federal employee, he was nevertheless Feliz's agent because Feliz had instructed him to run the errand. Further, Velasco was acting within the Sergeant's scope of employment, even though Feliz gave his private automobile to Velasco in violation of Marine Corps regulations. Heredia, on the other hand, was not an agent of Sergeant Feliz because Feliz had not asked Heredia to run the errand. Therefore, Heredia could sue the United States, and his claim would not fall under the Federal Employees' Compensation Act ("FECA"). [FN2]

> FN1. The FTCA confers exclusive jurisdiction upon the federal courts for civil actions involving personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.
> 28 U.S.C. § 1346(b). The FTCA defines "employees" of the United States as "officers or employees of any federal agency, ... and persons acting on behalf of a federal agency in an official

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                                     Page 5
Not Reported in F.Supp.2d, 1998 WL 782024 (S.D.N.Y.)
**(Cite as: 1998 WL 782024 (S.D.N.Y.))**

> capacity, temporarily or permanently in the service of the United States, whether with or without compensation." 28 U.S.C. § 2671.
>
> FN2. The FECA is a federal workers compensation under which federal employees receive immediate, fixed benefits regardless of fault, and without litigation, in exchange for relinquishing the right to sue the Government. *See* 5 U.S.C. § 8101 et seq.

The facts presented here are a far cry from those in *Hertz* or *Heredia,* where courts found agency relationships. Here, Cohen alleges virtually no facts demonstrating an agency relationship. Plaintiff made no allegation that Standard Bank knew that Carajohn told Cohen, let alone that the Bank had control over those misrepresentations. Plaintiff alleged no facts that could demonstrate that Standard Bank and Carajohn had a fiduciary relationship. The few factual allegations Cohen does plead, even if true, cannot establish either a fiduciary or an agency relationship between Carajohn and Standard Bank. [FN3]

> FN3. Plaintiff relies on cases discussing the scope of an existing agency relationship, rather than whether such an agency relationship existed in the first place: *O'Boyle v. Avis Rent-A-Car System, Inc.,* 78 A.D.2d 431, 435 N.Y.S.2d 296, 302 (2d Dep't 1981) ("the focus of our own inquiry must be upon the foreseeability of [plaintiff's] conduct in [committing the tortious act]"); and *First Interregional Equity Corp. v. Haughton,* 805 F.Supp. 196 (S.D.N.Y.1992) (addressing the principal's ability to foresee an agent's damaging conduct).

In contrast to *Heredia*--in which Sergeant Feliz knew before the poolees set out on their errand that Heredia was accompanying Velasco, and violated Marine Corps regulations by giving the poolees his private automobile, thus contributing to the accident--here, Cohen does not allege facts which demonstrate that Standard Bank contributed to (or even subsequently ratified) Carajohn's fraudulent activity. Although Standard Bank may have been "apprised" of Carajohn's transfer of the shares to plaintiff's account, there is no allegation that Standard Bank knew of, or was under any obligation to know of, Carajohn's misrepresentations.

C. *Undisclosed Principal*

**\*6** The liability of an undisclosed principal has been described in the following terms:

> Where the principal is not disclosed at the time the agent makes a contract, but it is subsequently ascertained that the agent was acting as agent for another, then the third party may look either to the principal or agent, but in order to hold the principal liable under such circumstances, the third party must show that the agent acted according to his or her authority, or that the agent's acts had been subsequently confirmed and ratified.

2A N.Y. Jurisprudence 2d, Agency and Independent Contractors § 348 (1998). *See also Antar v. Trans World Airlines, Inc.,* 66 Misc.2d 93, 320 N.Y.S.2d 355, 357 (1970). An undisclosed principal is one who controls the agent's actions without the third party's knowledge. *See, e.g., National Bank of North America v. Newmark,* 20 B.R. 842, 857 (E.D.N.Y.1982) (builder's agent sought mortgage without disclosing that the mortgage was sought on behalf of builder's alter ego company).

Standard Bank speculates that plaintiff may be attempting to prove that the Bank should be liable as an undisclosed principal. This theory is just as futile as the agency theory explicitly urged by plaintiff. Plaintiff pleads that "[a]t no time did Carajohn ... ever advise plaintiff Cohen that the[ ] 1.5 million MKTB shares were being conveyed to plaintiff's account from Standard Bank." FAC at ¶ 45. Although Carajohn failed to inform plaintiff that he was transferring MKTB shares owned by Standard Bank, plaintiff has still failed to plead any facts demonstrating that Carajohn was Standard Bank's agent, or that Standard Bank ratified or confirmed Carajohn's fraudulent behavior. Plaintiff has not alleged facts demonstrating that Carajohn acted as the Bank's agent, or that the Bank acted as an undisclosed principal, joining with Carajohn to hide its own involvement.

D. *Conclusion*

Based on the facts alleged in the FAC, Carajohn might best

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d  
Not Reported in F.Supp.2d, 1998 WL 782024 (S.D.N.Y.)  
**(Cite as: 1998 WL 782024 (S.D.N.Y.))**

Page 6

be characterized as an independent contractor of Standard Bank:

> The theory usually adopted to differentiate between an agent and an independent contractor is that a person is regarded as an agent or an independent contractor according to whether the person is subject to, or free from, the control of the employer with respect to the details of the work. Thus, an independent contractor may be distinguished from an agent in that the independent contractor is a person who contracts with another to do something for the employer, but who is not controlled or subject to the control of the employer in the performance of this contract; the employer controls only the result.

2A N.Y. Jurisprudence 2d, Agency and Independent Contractors § 12 (1998). Reading plaintiff's allegations most charitably, Standard Bank exercised no control over Carajohn, but did direct the result--that the stock be sold.

V. Fraud, Negligence and Bad Faith Claims

A. *Fraud*

Because plaintiff has failed to plead enough facts to establish an agency relationship between Carajohn and Standard Bank, there is no need to analyze the fraud claim under Rule 9(b). Plaintiff has not pled sufficient facts to hold Standard Bank liable for Carajohn's alleged fraudulent misrepresentations.

B. *Negligence and Bad Faith*

**\*7** Plaintiff asserts a claim for negligence and bad faith against Standard Bank for failing to ascertain the accuracy of Carajohn's representations concerning the MKTB securities. To state a claim for negligence, a plaintiff must allege that defendant owed her a cognizable duty of care, that the defendant breached that duty, and that the plaintiff was injured as a proximate result of the breach. *See Donohue v. Copiague Union Free School Dist.,* 64 A.D.2d 29, 407 N.Y.S.2d 874, 877 (2d Dep't), *aff'd,* 47 N.Y.2d 440, 418 N.Y.S.2d 375, 391 N.E.2d 1352 (1978). A defendant who owes plaintiff no duty cannot be liable for negligence, even if defendant is negligent. *See Bonnie & Co. Fashions, Inc. v. Bankers Trust Co.,* 945 F.Supp. 693, 713 (S.D.N.Y.1996) (citing *Livingston v. Gribetz,* 549 F.Supp. 238, 242 (S.D.N.Y.1982)). Similarly, a claim for bad faith depends on the existence of a duty owed by defendant to plaintiff. *Cf. Scavo v. Allstate Ins. Co.,* 238 A.D.2d 571, 657 N.Y.S.2d 193, 193 (2d Dep't 1997). Because plaintiff has failed to plead sufficient facts to infer that Standard Bank owed plaintiff any duty of care, the claim for negligence and bad faith against the Bank are dismissed.

VI. Leave to Amend

Fed.R.Civ.P. 15(a) provides that the court should grant leave to amend "freely ... when justice so requires." The Second Circuit has noted that "[w]hen a motion to dismiss is granted, 'the usual practice is to grant leave to amend the complaint.' ... Although the decision whether to grant leave to amend is within this discretion of the district court, refusal to grant leave must be based on a valid ground." *Oliver Schools, Inc. v. Foley,* 930 F.2d 248, 253 (2d Cir.1991) (quotations omitted) (quoting *Ronzani v. Sanofi S.A.,* 899 F.2d 195, 198 (2d Cir.1990)). Where the possibility exists that the defect can be cured, leave to amend should be granted unless doing so would prejudice the defendant. *See Oliver Schools,* 930 F.2d at 253.

Plaintiff has still failed to plead facts sufficient to defeat defendant's motion to dismiss. This Court has twice considered plaintiff's allegations and twice found them to be insufficient. Defendant has spent considerable resources in attacking two versions of the complaint. It would be patently unfair, both to the defendant and to the court to permit plaintiff to amend the complaint again. Therefore, leave to amend is denied.

VI. Conclusion

For the foregoing reasons, plaintiff's claims against Standard Bank are dismissed. A conference with all remaining parties will be held on November 25 at 2:30 p.m.

Not Reported in F.Supp.2d, 1998 WL 782024 (S.D.N.Y.)

**Motions, Pleadings and Filings (Back to top)**

• 1:97cv03802 (Docket) (May. 23, 1997)

END OF DOCUMENT