Not Reported in F.Supp.2d                                                                                                    Page 1
Not Reported in F.Supp.2d, 1999 WL 558141 (S.D.N.Y.)
**(Cite as: 1999 WL 558141 (S.D.N.Y.))**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
NIGERIAN NATIONAL PETROLEUM CORPORATION,
Plaintiff,
v.
CITIBANK, N.A., Citibank, Federal Savings Bank; Citicorp
Banking Corporation;
Citicorp; Citibank (New York State); and John Does Inc. 1
to 100, Defendants.
**No. 98 Civ. 4960(MBM).**

July 30, 1999.
Robert D. Owen, Henry G. Burnett, Owen & Davis, New York, NY, for Plaintiff.

Mark G. Hanchet, Noelle M. Kurtin, Zeichner Ellman & Krause, New York, NY, for Defendants.

OPINION AND ORDER
MUKASEY, J.

**\*1** Nigerian National Petroleum Corporation ("NNPC"), a Nigerian corporation that sells crude oil on behalf of the Nigerian government (Compl.¶ 6), [FN1] sues Citibank, N.A.; Citibank, Federal Savings Bank; Citicorp Banking Corp.; Citicorp; Citibank (New York State) (collectively, "Citibank"); and John Does, 1 to 100, seeking to recover approximately $15.1 million that it lost as a result of fraud by a third-party named Alberto Vadra, who used Citibank accounts. Citibank moves to dismiss plaintiff's amended complaint pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim. For the reasons stated below, Citibank's motion is granted, and the amended complaint is dismissed with respect to Citibank.

> FN1. "Compl." refers to the amended complaint dated September 14, 1998.

I.

The following relevant facts are assumed to be true for the purposes of this motion. In 1993, Alberto Vadra, a United States citizen who was born in Argentina, formed two corporations under the laws of Nevada, one called Ministry of Petroleum Resources ("MPR"), the other National Petroleum Resources ("National Petroleum"). (Compl.¶¶ 15, 19) Vadra registered both corporations using his home address in Las Vegas, Nevada, and, at least as to MPR, named as directors two persons with addresses in Lagos, Nigeria. (*Id.* ¶ ¶ 15, 18-19) In subsequent filings, however, Vadra replaced these directors with directors from Miami, Florida, and changed his own address to one in Miami. (*Id.* ¶¶ 16-18)

In August 1993, Vadra opened three bank accounts at Citibank: (1) account number 71118209, in the name of MPR (the "First MPR Account"); (2) account number 71118233, in the name of National Petroleum (the "National Petroleum Account"); and (3) account number 3200106121, also in the name of MPR (the "Second MPR Account"). (*Id.* ¶¶ 21, 23-24) In July 1994, Vadra opened an additional Citibank account in the name of MPR, numbered 46816814 (the "Third MPR Account"). (*Id.* ¶ 25) For nine months, there was minimal activity in the three Citibank accounts opened in 1993. (*Id.* ¶ 26) However, in June 1994, Vadra induced Bank Indosuez, banker for one of NNPC's customers, to wire transfer $15,144,307.75 intended for NNPC to the First MPR Account instead (the "First Fraudulent Transfer"). (*Id.* ¶¶ 27, 35) [FN2] Although the documents submitted to Citibank to verify the transfer were allegedly "riddled with inconsistencies and other badges of fraud," such as typographical errors and incomplete addresses (*id* . ¶¶ 31-34), on June 28, 1994, Citibank "swiftly processed" the transfer. (*Id.* ¶ 28)

> FN2. The amended complaint is ambiguous with respect to whether the money was diverted from NNPC's account at the Central Bank of Nigeria or from the Nigerian government's account at the Federal Reserve Bank in New York. (*Compare id.* ¶ 27, *with id* . ¶ 35) This ambiguity is immaterial for present purposes.
> The amended complaint is ambiguous also with respect to the precise amount that was diverted from NNPC. (*Compare* Compl. ¶ 37 ($15,144,325.25), *with id.* ¶ 51 ($15,144,309), *and*

Not Reported in F.Supp.2d  
Not Reported in F.Supp.2d, 1999 WL 558141 (S.D.N.Y.)  
**(Cite as: 1999 WL 558141 (S.D.N.Y.))**

Page 2

> *id.* at p. 24 ($15,144,307.75)) I have accepted the figure in NNPC's prayer for relief, although the precise figure is immaterial for present purposes.

The next day, Vadra faxed a letter, on letterhead from an entity called Transportes Aereos Internacionales S.R.L. ("TAI"), to Donna Harrington, an employee of Citibank in New York City. (*Id.* ¶ 39) The letter, which provided the same address for TAI as Vadra earlier had provided Citibank for MPR, instructed Harrington in typescript to wire transfer the following sums from the First MPR Account: (1) $1 million to Key Biscayne Bank; (2) $3 million to Bank of America; and (3) $11 million to a Citibank account in Vadra's name, numbered 3100170206 ("Vadra's Personal Account"). (*Id.* ¶ 39) In handwriting, the first and third amounts were changed to $2 million and $5 million, respectively. (*Id.*)

**\*2** On the same day, Vadra faxed Harrington another letter--this one on letterhead of an entity called Alneva Enterprises Inc., albeit at the same address as TAI--providing an address for MPR, National Petroleum and an entity called National Maritime Authority ("NMA"). (*Id.* ¶ 40) That address, in Miami, Florida, was Vadra's home address, and above each listing "c/o Alberto Vadra" was written by hand. (*Id.*)

On July 1, 1994, presumably pursuant to Vadra's instructions, Citibank wire transferred the following amounts from the First MPR Account: (1) $2 million to an account at Towerbank in the name of NMA; (2) approximately $3 million to an account at Bank of America in the name of NMA; (3) $5 million to the Third MPR Account; and (4) $5 million to Vadra's Personal Account. (*Id.* ¶ 41) [FN3] In turn, on July 6, 1994, $5 million was wire transferred from Vadra's Personal Account to two banks in Lagos, Nigeria (*id.* ¶ 43); on July 7, 1994, $4 million was wire transferred from the Third MPR Account to the Second MPR Account (*id.* ¶ 48); and between July 11 and 15, 1994, that money was transferred again from the Second MPR Account to four other accounts, including $600,000 to Vadra's Personal Account and $1.9 million to an account in MPR's name at Barnett Bank of South Florida. (*Id.* ¶ 50)

FN3. The discrepancies between Citibank's transfers on July 1, 1994 and Vadra's instructions on June 29, 1994, are unexplained in the amended complaint.

In the meantime, on July 6, 1994 also, Towerbank returned to Citibank the $2 million that had been wire transferred to NMA's account on July 1, 1994, apparently because NMA had not informed Towerbank that it was expecting to receive a large transfer, as required by the bank's rules. (*Id.* ¶ 45) However, Citibank did not redeposit the $2 million into the First MPR Account from which it had been transferred. (*Id.* ¶ 47) Instead, on July 11, 1994, Thomas A. Gallo, Assistant Vice President of Citibank, ordered the money deposited into the National Petroleum Account. (*Id.*) Later the same day, Gallo ordered the money transferred again to Vadra's Personal Account. (*Id.*)

On July 12, 1994, only days after the First Fraudulent Transfer, Vadra effected a second fraudulent transfer at NNPC's expense, diverting $15,543,710 intended for the Nigerian government's account at the Federal Reserve Bank in New York to the First MPR Account (the "Second Fraudulent Transfer"). (*Id.* ¶ 52) However, this time, the fraudulent transfer did not escape NNPC's or the transferring bank's notice. Thus, on July 19 and 20, 1994, respectively, NNPC and the transferring bank notified Gallo, the Assistant Vice President of Citibank, about the fraud. (*Id.* ¶¶ 53-55) On July 27, 1994, having traced some of the Second Fraudulent Transfer to the Third MPR Account, where it had been re-transferred, Citibank remitted $15,543,710 to NNPC's account at the Federal Reserve Bank. (*Id.* ¶ 56)

Notwithstanding discovery of the Second Fraudulent Transfer, however, Citibank did not freeze the First MPR Account. Instead, on July 29, 1994, the bank permitted transfer to the First MPR Account of approximately $1 million from the Third MPR Account. (*Id.* ¶ 60) On the same day, Citibank permitted another $1.1 million to be withdrawn from the Third MPR Account, money which was deposited in an account bearing NMA's name at Bank of America. (*Id.*)

**\*3** Whether, or to what extent, Citibank investigated the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                              Page 3
Not Reported in F.Supp.2d, 1999 WL 558141 (S.D.N.Y.)
**(Cite as: 1999 WL 558141 (S.D.N.Y.))**

First MPR Account after these events is not apparent. (*Id.* ¶ 58) According to the amended complaint, Citibank "failed to conduct any further inquiry into the [First MPR Account], or if it did conduct an inquiry, recklessly failed to take notice that $15.1 million had been received just two weeks earlier." (*Id.*) Whatever Citibank's knowledge, however, NNPC did not learn of the First Fraudulent Transfer until May 1995, when it finally discovered that the $15,144,307.75 due from Bank Indosuez was never received. (*Id.* ¶ 61-62) NNPC "immediately advised Gallo at Citibank ... by letter dated June 1, 1995 of the newly discovered fraud, and demanded repayment." (*Id.* ¶ 63) Nevertheless, "[n]either Gallo [n]or anyone else at Citibank ... ever replied to NNPC's letter or repaid the $15.1 million in fraudulently transferred funds ." (*Id.* ¶ 64)

Moreover, according to the complaint, Citibank "stonewalled and otherwise impeded subsequent attempts by NNPC to investigate the [First Fraudulent Transfer]." (*Id.;* *see id.* ¶ 5) Specifically, Citibank refused to release signature cards and photographs of the holders of the First MPR Account, refused to disclose the names or numbers of the accounts to which the First Fraudulent Transfer had been disbursed and refused to disclose the name of the "operator" of the First MPR Account. (*Id.* ¶ 65) After receiving pressure from the U.S. Department of Justice, Citibank did finally release "some relevant documentation." (*Id.* ¶ 66) Allegedly, however, "even this production was plainly inadequate." (*Id.*) According to the complaint, "it was only in May 1998 that NNPC received certain documents revealing Citibank's role in ... permitting Vadra to perpetrate his fraudulent activities." (*Id.*)

On July 10, 1998, NNPC commenced this action. NNPC's amended complaint states five claims: (1) that Citibank was "negligent in permitting and/or failing to prevent the fraud perpetrated by Vadra" (*id.* ¶ 70); (2) that citibank "acted in a commercially unreasonable manner," in violation of the New York Uniform Commercial Code ("NYUCC") (*id.* ¶ 72); (3) that Citibank "negligently and/or recklessly failed to disclose and therefore concealed Vadra's fraudulent and criminal activities" (*id.* ¶ 74); (4) that Citibank "aided and abetted Vadra in the fraud" (*id.* ¶ 76); and (5) that Citibank "acted in commercial bad faith." (*Id.* ¶ 78) NNPC seeks "an amount not to exceed the sum of $15,144,307.75 plus interest from June 1994, compensatory and punitive damages in an amount to be determined, and such other and further relief as the Court deems proper." (*Id.* at p. 24)

II.

On a motion to dismiss for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6), the court should dismiss the complaint if it appears " 'beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " *Northrop v. Hoffman of Simsbury, Inc.,* 134 F.3d 41, 44 (2d Cir.1997) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)). It is not the court's function to weigh the evidence that might be presented at trial; instead, the court must merely determine whether the complaint itself is legally sufficient. *See Goldman v. Belden,* 754 F.2d 1059, 1067 (2d Cir.1985). In doing so, the court must accept the material facts alleged in the complaint as true, and draw all reasonable inferences in favor of the plaintiff. *See Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995). The issue before the court on a Rule 12(b)(6) motion "is not whether a plaintiff is likely to prevail ultimately, 'but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleading that a recovery is very remote and unlikely but that is not the test." ' *Id.* (quoting *Weisman v. LeLandais,* 532 F.2d 308, 311 (2d Cir.1976) (per curiam)).

III.

**\*4** Citibank argues that NNPC's first, second, third and fifth claims are time barred. Because the relevant issues vary to some extent depending on the particular claim, I will consider each claim more or less individually.

Under New York law, which applies in this diversity case, NNPC's first and third claims--for negligence and/or recklessness--are governed by a three-year statute of limitations. *See* N.Y. C.P.L.R. ("CPLR") § 214(4) (McKinney 1990). Because the First Fraudulent Transfer occurred in June 1994, and NNPC did not commence this action until July 10, 1998, it would appear that these claims are barred.

Read liberally, NNPC's memorandum of law makes two

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                           Page 4
Not Reported in F.Supp.2d, 1999 WL 558141 (S.D.N.Y.)
**(Cite as: 1999 WL 558141 (S.D.N.Y.))**

arguments to the contrary, neither of which has merit. First, NNPC contends that although the First Fraudulent Transfer occurred in June 1994, its claims against Citibank did not accrue until May 1998, when it finally "received certain documents revealing Citibank's role." (Compl.¶ 67) However, under New York law, the statute of limitations for negligence and/or recklessness "begins to run when the injury first occurs." *Iacobelli Constr., Inc. v. County of Monroe,* 32 F.3d 19, 27 (2d Cir.1994); *see Triangle Underwriters, Inc. v. Honeywell, Inc.,* 604 F.2d 737, 744 (2d Cir.1979) ("A cause of action accrues when acts or omissions constituting negligence produce injury."); *Snyder v. Town Insulation, Inc.,* 81 N.Y.2d 429, 432-33, 599 N.Y.S.2d 515, 516-17 (1993) ("[A]ccrual occurs when the claim becomes enforceable, i.e., when all elements of the tort can be truthfully alleged in a complaint."). Indeed, " 'the statutory period of limitations begins to run from the time when liability for wrong has arisen *even though the injured party may be ignorant of the existence of the wrong or injury.*' " *Evans v. Visual Tech. Inc.,* 953 F.Supp. 453, 456 (N.D.N.Y.1997) (emphasis added) (quoting *Schmidt v. Merchants Despatch Transp. Co.,* 270 N.Y. 287, 300 (1936)); *see Kronos, Inc. v. AVX Corp.,* 81 N.Y.2d 90, 94, 595 N.Y.S.2d 931, 934 (1993) (stating that the date of injury, "rather than the wrongful act of defendant or discovery of the injury by plaintiff, is the relevant date for marking accrual"). Thus, even accepting as true NNPC's assertion that it remained ignorant of Citibank's alleged complicity until 1998--an assertion that is hard to believe in light of the fact that NNPC wrote to Citibank as early as June 1, 1995 demanding repayment of the money (Compl.¶ 63)--its argument fails.

Second, NNPC contends that the statute of limitations should be equitably tolled because "Citibank itself stymied NNPC's investigation of its role in the fraud for almost four years." (Pl. Mem. in Opp'n at 18) Under New York law, a defendant "may be estopped to plead the Statute of Limitations where [the] plaintiff was induced by fraud, misrepresentations or deception to refrain from filing a timely action." *Simcuski v. Saeli,* 44 N.Y.2d 442, 448-49, 406 N.Y.S.2d 259, 262 (1978); *see also Farkas v. Farkas,* 168 F.3d 638, 642 (2d Cir.1999). [FN4] However, unless the defendant and the plaintiff were in a fiduciary relationship--which Citibank and NNPC were not--the doctrine of equitable estoppel does not apply without "actual misrepresentation" by the defendant. *Gleason v. Spota,* 194 A.D.2d 764, 765, 599 N.Y.S.2d 297, 299 (2d Dep't 1993) (citing cases); *see General Stencils, Inc. v. Chiappa,* 18 N.Y.2d 125, 128, 272 N.Y.S.2d 337, 340 (1966) (noting that courts may bar assertion of a statute of limitations defense when the defendant's "affirmative wrongdoing" produced the plaintiff's delay). In the present case, NNPC alleges no such misrepresentation.

> FN4. Strictly speaking, NNPC invokes the federal doctrine of equitable tolling. However, equitable tolling applies only to federal claims. *See, e.g., Department of Econ. Dev.* v. *Arthur Andersen & Co.,* 747 F.Supp. 922, 943 (S.D.N.Y.1990). Equitable estoppel is the comparable doctrine under New York law.

**\*5** Further, equitable estoppel does not apply when a plaintiff "possesse [d] 'timely knowledge' sufficient to place him or her under a duty to make inquiry and ascertain all the relevant facts prior to expiration of the applicable Statute of Limitations." *Gleason,* 194 A.D.2d at 765, 599 N.Y.S.2d at 299 (internal quotation marks and citation omitted). Here, whatever knowledge NNPC had on June 1, 1995--when it wrote to Citibank demanding repayment of the lost money (Compl.¶ 63)--was more than sufficient to place it under such a duty. Accordingly, Citibank is not estopped to raise its statute of limitations defense. NNPC's first and third claims therefore are barred.

IV.

The principal dispute with respect to NNPC's second claim--for violation of the NYUCC--pertains to the relevant limitations period. Article 4A of the NYUCC, which governs wire transfers, *see* NYUCC § 4-A-102, off. cmt. (McKinney 1991), does not provide an express statute of limitations. Citibank argues, therefore, that the claim is governed by CPLR § 214(2), which establishes a three-year limitations period for an action "to recover upon a liability ... created or imposed by statute." NNPC counters that its claim has a common law antecedent and, thus, is not one "created or imposed by statute." *See, e.g., Aetna Life & Cas. Co. v. Nelson,* 67 N.Y.2d 169, 174, 501 N.Y.S.2d 313, 315

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                           Page 5
Not Reported in F.Supp.2d, 1999 WL 558141 (S.D.N.Y.)
**(Cite as: 1999 WL 558141 (S.D.N.Y.))**

(1986) ("[CPLR § 214(2) ] only governs liabilities which would not exist but for a statute. It does not apply to liabilities existing at common law which have been recognized or implemented by statute. Thus, if the [statute imposing liability] merely codifies or implements an existing liability, the three-year statute would be inapplicable." (citations omitted)). Instead, NNPC contends, the claim is governed by CPLR § 213(1), which provides a six-year statute of limitations for any action "for which no limitation is specifically prescribed by law." Following the Second Circuit's recent decision in *Banca Commerciale Italiana v. Northern Trust International Banking Corp.,* 160 F.3d 90 (2d Cir.1998), I agree with Citibank.

In *Banca Commerciale,* the plaintiff sued for return of funds involved in a wire transfer under NYUCC § 4-A-211(6), which provides in relevant part that if a receiving bank, "after accepting a payment order, agrees to cancellation or amendment of the order by the sender ..., the sender ... is liable to the bank for any loss and expenses ... incurred by the bank as a result." *See Banca Commerciale,* 160 F.3d at 93. As here, the defendant argued that the claim was "created or imposed by statute," and therefore governed by the three-year statute of limitations in CPLR § 214(2); the plaintiff contended that its claim had a common law antecedent and, thus, was governed by the six-year limitations period in CPLR § 213(1). *See id.* at 93-94.

The Second Circuit agreed with the defendant, concluding that imposition of liability under § 4-A-211(6) "does not require any showing of the elements required to establish common law fraud or unjust enrichment." *Id.* at 94. More significant for present purposes, the Court stated further:

> ***6** [I]t is widely recognized that Article 4-A was enacted to correct the perceived inadequacy of " 'attempt[ing] to define rights and obligations in funds transfers by general principles [of common law] or by analogy to rights and obligations in negotiable instruments law or the law of check collection." ' *Bangue Worms [v. BankAmerica Int'l,* 77 N.Y.2d 362, 369, 568 N.Y.S.2d 541, 545 (1991) (quoting N.Y.U.C.C. § 4-A-102, cmt. ].... The Official Comment to Article 4-A states that the drafters made "a deliberate decision ... to write on a clean slate and to treat a funds transfer as a unique method of payment to be governed by unique rules that address the particular issues raised by this method of payment." N.Y.U.C.C. § 4-A-102, cmt. *This lends powerful support to the application of CPLR § 214(2) to claims brought under Article 4-A.*
> Finally, any lingering doubts we might have about imposing a three-year statute of limitations are removed by the New York Court of Appeals' observation in *Bangue Worms* that "[e]stablishing *finality* in electronic fund wire transactions was considered a singularly important policy goal" to be served by Article 4-A. 77 N.Y.2d at 372, 568 N.Y.S.2d [at 547] (emphasis added). This goal is better served by requiring claimants to assert their claims concerning electronic funds transfers within a limitations period of three years rather than six years.

*Id.* at 95 (emphasis added).

Although NNPC fails to identify the NYUCC provision on which its second claim is based, that provision plainly is not § 4-A-211(6). [FN5] Nevertheless, NNPC has not identified any particular common law antecedent to its claim. Further, the Second Circuit's reasoning in *Banca Commerciale* was not limited to § 4-A-211(6). To the contrary, the Court declared broadly that CPLR § 214(2) should be applied to all "claims brought under Article 4A." Accordingly, the three-year statute of limitations from CPLR § 214(2) applies, and NNPC's second claim is barred for the same reasons that its first and third claims were barred.

> FN5. NNPC's second claim states in full: "The defendants acted in a commercially unreasonable manner, in violation of the N.Y.U.C.C. and their duty to provide commercially reasonable security, in permitting and/or failing to prevent the fraud perpetrated by Vadra on NNPC." (Compl.¶ 72) NYUCC § 4-A-202, pertaining to "authorized and verified payment orders," utilizes the phrase "commercially reasonable method of providing security," although it is otherwise not apparent that NNPC's third claim is based on that provision.

V.

The parties disagree also about the statute of limitations applicable to NNPC's fifth claim, for commercial bad faith. Citibank argues that, in its "essence," the claim is for

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-04622-DLI-RML   Document 18-3   Filed 12/19/05   Page 6 of 7 PageID #: 342

Not Reported in F.Supp.2d                                                                                                                   Page 6
Not Reported in F.Supp.2d, 1999 WL 558141 (S.D.N.Y.)
**(Cite as: 1999 WL 558141 (S.D.N.Y.))**

negligence, so the three-year limitations period from CPLR § 214 applies. NNPC contends that the claim is "based upon fraud," CPLR § 213(2), which would make the limitations period six years. Although New York courts have not addressed which limitations period applies to claims of commercial bad faith, either way NNPC's claim fails.

Under New York law, a claim for commercial bad faith "requires allegations of a scheme or acts of wrongdoing, together with allegations of the bank's actual knowledge of the scheme or wrongdoing that amounts to bad faith or allegations of complicity by bank principals in alleged confederation with the wrongdoers." Peck v. Chase Manhattan Bank, N.A., 190 A.D.2d 547, 548-49, 593 N.Y.S.2d 509, 510-11 (1st Dep't 1993) (citing Prudential-Bache Sec., Inc. v. Citibank, N.A., 73 N.Y.2d 263, 275-77, 539 N.Y.S .2d 699, 705-07 (1989)); accord Williams v. Bank Leumi Trust Co., No. 96 Civ. 6695(LMM), 1998 WL 397887, at *9 (S.D.N .Y. July 15, 1998). Therefore, a bank is liable for commercial bad faith only where it "acts dishonestly--where it has actual knowledge of facts and circumstances that amount to bad faith, thus itself becoming a participant in a fraudulent scheme." Prudential-Bache, 73 N.Y.2d at 275, 539 N.Y.S.2d at 706. Allegations charging a bank with a "lapse of wary vigilance," with "disregard of suspicious circumstances which might have well induced a prudent banker to investigate," even with "gross negligence," are insufficient to state a claim. Getty Petroleum Corp. v. American Express Travel Related Servs. Co., 90 N.Y.2d 322, 331, 660 N.Y.S.2d 689, 694-95 (1997); accord Prudential-Bache, 73 N.Y.2d at 276, 539 N.Y.S.2d at 706-07; Retail Shoe Health Comm'n v. Manufacturers Hanover Trust Co., 160 A.D.2d 47, 51, 558 N.Y.S.2d 949, 952 (1st Dep't 1990); Calisch Assocs., Inc. v. Manufacturers Hanover Trust Co., 151 A.D.2d 446, 448, 542 N.Y.S.2d 644, 646 (1st Dep't 1989).

**\*7** A commercial bad faith claim is subject to the requirement of Fed.R.Civ.P. 9(b) that the circumstances of an alleged fraud be alleged with particularity. See Williams, 1998 WL 397887, at *9. However, Rule 9(b) allows knowledge to be averred generally. Nevertheless, the Second Circuit has cautioned that this relaxation of the rule's specificity requirement "must not be mistaken for license to base claims of fraud on speculation and conclusory allegations." Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir.1994) (internal quotation marks and citations omitted). Thus, a plaintiff is required "to allege facts that give rise to a strong inference of fraudulent intent." Id.; accord Powers v. British Vita, P.L.C., 57 F.3d 176, 184 (2d Cir.1995) (stating that a plaintiff must "provide some minimal factual basis for conclusory allegations of scienter that give rise to a strong inference of fraudulent intent" (internal quotation marks and citation omitted)). This may be accomplished in either of two ways. First, the plaintiff may allege a motive for committing fraud and a clear opportunity for doing so. See Powers, 57 F .3d at 184; Shields, 25 F.3d at 1128. Second, "[w]here motive is not apparent," the plaintiff may "identify[ ] circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater." Powers, 57 F.3d at 184 (quoting Beck v. Manufacturers Hanover Trust Co., 820 F.2d 46, 50 (2d Cir.1987), overruled in part on other grounds, United States v. Indelicato, 865 F.2d 1370, 1383-84 (2d Cir.1989) (en banc) (citations omitted)).

In the present case, NNPC does not allege that Citibank had any motive to assist Vadra in perpetrating fraud. Instead, NNPC argues that the circumstances indicate "conscious behavior" by Citibank. Thus, for example, NNPC alleges that Citibank knowingly or recklessly disregarded several "badges of fraud," including irregularities in the opening of Vadra's accounts and in the documents he submitted to verify the wire transfers; that the assistant bank manager who approved Vadra's application for the First MPR Account in New York had lived on the same street in Miami as one of Vadra's companies, and returned to that address after opening the account; and that the rejection by Towerbank of the $2 million wire transfer "alerted, or ought to have alerted, Citibank to the probability of fraud." (*Id.* ¶ 46) However, none of these allegations, or any other allegation in NNPC's amended complaint, gives rise to an inference, let alone a "strong inference," that Citibank actually knew of, and participated in, Vadra's fraud. See Retail Shoe Health Comm'n, 160 A.D.2d at 51, 558 N.Y.S.2d at 951 (stating that a claim for commercial bad

Case 1:05-cv-04622-DLI-RML   Document 18-3   Filed 12/19/05   Page 7 of 7 PageID #: 343

Not Reported in F.Supp.2d                                                                                                    Page 7
Not Reported in F.Supp.2d, 1999 WL 558141 (S.D.N.Y.)
**(Cite as: 1999 WL 558141 (S.D.N.Y.))**

faith can survive a motion to dismiss "only if the plaintiff has alleged facts inculpating the principals of the bank as *actual participants* in unlawful activity" (emphasis added)). In fact, NNPC's amended complaint leads inexorably to the exact opposite conclusion: that Citibank knew nothing about Vadra's fraud. (*See, e.g.,* Compl. ¶ 58 ("Citibank NA *failed to conduct any further inquiry* into the [First MPR Account], or if it did conduct an inquiry, recklessly *failed to take notice* that $15.1 million had been received just two weeks earlier ...." (emphasis added)).

**\*8** To be sure, NNPC might be correct in contending that there were several red flags that should have alerted Citibank to Vadra's fraud or at least prompted it to investigate, and that Citibank acted negligently in allowing Vadra to make additional wire transfers even after the Second Fraudulent Transfer was uncovered. However, allegations that a bank "disregard[ed] ... suspicious circumstances which might have well induced a prudent banker to investigate" do not suffice to state a claim for commercial bad faith. *Getty Petroleum,* 90 N.Y.2d at 331, 660 N.Y.S.2d at 694-95. Citibank's actions may well have been "lamentable, ... even grossly negligent." *Id.* at 332, 660 N.Y.S.2d at 695. But the amended complaint falls short of alleging that Citibank "had actual knowledge of [the] wrongdoing or was somehow a participant in [the] fraudulent scheme." *Id.* Thus, NNPC's commercial bad faith claim fails.

### VI.

NNPC's final claim--technically, its fourth--is for aiding and abetting Vadra's fraud. To state a claim for aiding and abetting under New York law, a plaintiff must allege: (1) the existence of an underlying fraud; (2) "knowledge" of this fraud on the part of the aider and abettor; and (3) "substantial assistance" by the aider and abettor in achievement of the fraud. See *Oei* v. *Citibank, N.A.,* 957 F.Supp. 492, 520 (S.D.N.Y.1997) (citing *Morin* v. *Trupin,* 711 F.Supp. 97, 112 (S.D.N.Y.1989)); *cf* . *Kolbeck* v. *Lit America, Inc.,* 939 F.Supp. 240, 245-47 (S .D.N.Y.1996) (discussing the elements, under New York law, of aiding and abetting a breach of fiduciary duty), *aff'd without opinion,* 152 F.3d 918 (2d Cir.1998). Thus, as with a claim for commercial bad faith, liability for aiding and abetting "require[s] actual knowledge of the primary wrong" by the defendant. *Williams,* 1998 WL 397887, at \*8; *accord Kolbeck,* 939 F.Supp. at 246; *cf. Wight* v. *BankAmerica Corp.,* No. 98 CIV.2010(RPP), 1999 WL 199021, at \*7 (S.D.N.Y. Apr. 8, 1999) (noting that the elements of commercial bad faith and aiding and abetting are "similar"). Accordingly, for the reasons stated in the previous section, NNPC's aiding and abetting claim fails.

Further, even if Citibank had known of Vadra's fraud, NNPC's aiding and abetting claim would still fail because Citibank did not provide "substantial assistance" in the achievement of the fraud, within the meaning of aiding and abetting jurisprudence. A defendant provides substantial assistance only if it "affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables [the fraud] to proceed." *Diduck* v. *Kaszycki & Sons Contractors, Inc.,* 974 F.2d 270, 284 (2d Cir.1992); *see Kolbeck,* 939 F.Supp. at 247. The mere fact that participants in a fraudulent scheme "use accounts at [a bank] to perpetrate it, without more, does not rise to the level of substantial assistance necessary to state a claim for aiding and abetting liability." *Williams* v. *Bank Leumi Trust Co.,* No. 96 CIV. 6695(LMM), 1997 WL 289865, at \*5 (S.D.N.Y. May 30, 1997) (citing *DePinto* v. *Ashley Scott, Inc.,* 222 A.D.2d 288, 290, 635 N.Y.S.2d 215, 217 (1st Dep't 1995)).

\* \* \*

**\*9** For the reasons stated above, Citibank's motion to dismiss is granted, and plaintiff's amended complaint is dismissed with respect to Citibank.

Not Reported in F.Supp.2d, 1999 WL 558141 (S.D.N.Y.)

**Motions, Pleadings and Filings (Back to top)**

• 1:98cv04960 (Docket) (Jul. 10, 1998)

END OF DOCUMENT