Not Reported in F.Supp.2d                                                                                    Page 1
Not Reported in F.Supp.2d, 2000 WL 781081 (S.D.N.Y.)
**(Cite as: 2000 WL 781081 (S.D.N.Y.))**

▷

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Klaus RENNER, Plaintiff
v.
CHASE MANHATTAN BANK, Michelino Morelli,
Townsend Financial Services Corp.,
Townsend Investment Fund, LLC, Gerald Townsend, and
Rabon Wolford, Defendants.
**No. 98 CIV. 926(CSH).**

June 16, 2000.

MEMORANDUM OPINION AND ORDER
HAIGHT, Senior District J.

**\*1** Plaintiff brought this diversity action after allegedly being defrauded out of $3 million, a "prime bank guarantee scam" engineered by Defendants. After the original complaint was dismissed in its entirety against Defendant Chase Manhattan Bank ("Chase"), Plaintiff filed an amended complaint, in which he asserted common law claims for fraud, commercial bad faith, breach of contract, breach of the covenant of good faith, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and negligence. Defendants Chase and Michelino Morelli, and Defendants Townsend Financial Services Corp., Townsend Investment Fund, LLC, and Gerald Townsend (collectively "Townsend") now move to dismiss the amended complaint pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a cause of action upon which relief can be granted, and pursuant to Fed.R.Civ.P. 9(b) for failure to plead fraud with particularity.

I. BACKGROUND

The facts of this case are set out at length in my prior opinion. *See* Renner v. Chase Manhattan Bank, 1999 WL 47239 (S.D.N.Y.1999) ("*Renner I* "). However, as resolution of the present motions are dependent largely on the pleadings, and since those pleadings have been amended, I revisit the facts of the case and summarize them below.

Plaintiff alleges the following facts in his amended complaint:

"Renner was swindled out of $3 million by an organized band of international confidence men affiliated with a claimed charitable organization known as the 'Knights of Malta OSJ'....The scheme that defrauded Renner was a variation on a 'prime bank guarantee' scam, under which victims are promised enormous returns based upon low-risk 'trading' of non-existent financial instruments, such as bank debentures, letters of credit or other 'instruments' supposedly issued by leading world banks on a highly secretive basis." (Amended Complaint, ¶¶ 1, 2).

In or about December 1994, Dr. Gustav Susse, not a party to this action, opened an account at Chase through Morelli, manager of Chase's Mount Vernon branch, on behalf of Hampstead Trust Ltd. ("Hampstead"), an entity he controlled with Defendant Rabon Wolford. Morelli, Susse and Wolford were all members of the Knights of Malta, a sham charitable organization, which they used as a vehicle for fraudulent transactions. The Hampstead account was closed in early 1995 because of irregularities, specifically related to fraudulent Taiwanese letters of credit against which Hampstead sought to establish a line of credit. Nevertheless, Susse continued to transact business at Chase through other entities, including the Knights of Malta, Prime Trade Investment Ltd. ("PTI"), and Defendant Townsend Financial Services Corp. ("Townsend Financial"), all of which opened Chase accounts through Morelli.

In or about August 1995, Townsend entered into an "Asset Management Contract" with Hampstead pursuant to which Townsend would handle Hampstead's financial transactions in exchange for a 0.5% commission per transaction, a $50,000 annual retainer and a loan of capital. Although Townsend questioned Hampstead's "trading mechanism," and suspected possible fraud, he disregarded those suspicions and went forward with the agreement.

**\*2** In or about November 1995, Hampstead obtained $5 million from Gulf Capital Resources to fund a nonexistent letter of credit. Approximately half of the money was moved through Townsend's Chase account and diverted to Townsend, Hampstead, the Knights of Malta and Susse's

Not Reported in F.Supp.2d                                                                                 Page 2
Not Reported in F.Supp.2d, 2000 WL 781081 (S.D.N.Y.)
**(Cite as: 2000 WL 781081 (S.D.N.Y.))**

brother. The money diverted to the Knights of Malta was subsequently withdrawn at casino ATMs and by checks made out to "cash." During the same time period, Chase could not verify and, thus, refused to hold on behalf of Hampstead treasury bonds supposedly issued by the Republic of Central Africa.

In February 1996, Plaintiff, who had invented a snow-removing machine, was seeking capital to manufacture and sell the invention. After Plaintiff was introduced to Hampstead, Susse explained to Plaintiff that Hampstead engaged in "transactions in 'medium term bank debentures' from the 'top 25 West-European issuing banks," ' (Amended Complaint, ¶ 30), and promised a 120% annual return on Renner's investments. In order to legitimate the scheme, Susse further explained that the transactions were completed through Townsend, Hampstead's U.S. securities house; that the funds invested would be placed in a sub-account at Chase; and when withdrawn, the funds would be secured by a bank note or treasury bill of higher value. Susse told Renner that Morelli and Hampstead had a history of working together on such transactions, and that Hampstead invested money in a similar fashion for the Knights of Malta, which was involved in humanitarian projects funded by the Vatican.

Induced by Susse's blandishments, Renner signed a "Management Agreement" (hereinafter the "Renner-Hampstead Agreement") pursuant to which he agreed to invest $3 million with Hampstead. The funds were to be transferred to the Townsend Investment Funds, LLC ("Townsend Fund") account at Chase, which would issue a custody receipt confirmation. Before the funds were transferred, Gerald Townsend and Morelli allegedly discussed the fact that Renner was a client of Hampstead, that Hampstead intended to use Renner's money to purchase bonds for other clients in violation of the Renner-Hampstead Agreement, and that Townsend wanted to deal directly with Morelli. In addition, they also mentioned that "Chase, Morelli and Townsend could be 'held accountable' if problems developed." (Amended Complaint, ¶ 35). Morelli was apparently uneasy about the proposed transactions. Upon Townsend's urging, a series of phone calls between Wolford, Townsend and Morelli

followed.

On or about February 13, 1996, Chase received Plaintiff's funds and issued two Wire Transfer Advices to Townsend, confirming receipt of the $3 million, that the funds were received for Renner's "benefit" and in his "favour," and that Renner was a client of Hampstead. On February 15, 1996, Morelli faxed a letter to Townsend on Chase letterhead confirming that Renner's money had been deposited in the Townsend Fund account. Townsend then faxed the Morelli confirmation to Renner with a letter entitled Custody Receipt Confirmation "which deceptively stated that the $3 million had been received in accounts designated as 'Chase 404-1-1-129638, Hampstead 240-280, and sub-account 240-280-Renner." ' (Amended Complaint, ¶ 40).

**\*3** On or about February 15, 1996 Townsend sent a letter to Chase outlining the proposed use of Plaintiff's investment to fund a letter of credit supporting a $181.5 million "performance bond" for the benefit of Apex Air/Senkale along with instructions on how to carry out the transaction. Morelli, in turn, showed the proposal to several other Chase employees. Due to questions regarding the transaction, including the possibility that it was fraudulent, Chase refused to approve the transaction. Chase also questioned Townsend's proposal to use Renner's funds to establish a letter of credit as part of a real estate transaction in Italy.

Nevertheless, when Townsend, on Susse's instruction, directed Chase to wire $718,000 from the Townsend Fund account to an account in an Italian bank, Chase complied. On February 23, 1996, Townsend instructed Morelli to wire an additional $2.7 million of Renner's funds to a Monaco bank account belonging to Gloria Russo, Susse's common law wife. The money was then used by Susse and Russo to purchase a mansion in France. On or about February 27, 1996, Townsend arranged for Morelli to wire yet another $100,000 out of the Townsend Fund account to an Arab bank account in Geneva belonging to Alexander Penly, a director of Hampstead.

On or about March 4, 1996, in response to inquiries from Renner's bank in Switzerland, Townsend confirmed that Plaintiff's money was safe and continued to be held in a sub-account at Chase. Townsend did not disclose that, in

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 3
Not Reported in F.Supp.2d, 2000 WL 781081 (S.D.N.Y.)
**(Cite as: 2000 WL 781081 (S.D.N.Y.))**

fact, most of the money had been withdrawn and diverted for purposes other than those stated in the Renner-Hampstead Agreement. On or about April 3, 1996, Townsend wired $80,000 to Renner in response to Plaintiff's queries regarding the failure of Hampstead and Townsend to meet the schedule of profit payments set out in the Renner-Hampstead Agreement.

Supposedly after a Swiss customer registered a complaint with Chase against Townsend and Hampstead, on or about April 9, 1996, Morelli informed Townsend by letter that after having " 'carefully reviewed your banking transactions' and concluding that 'the pattern of your account activity is not consistent with our knowledge of your business or personal affairs as noted on your account documentation," ' Chase was closing the Townsend Financial and Townsend Fund accounts. (Amended Complaint, ¶ 63). The remaining balance was to be delivered to Townsend by official check, and no further wire transfers, in or out of the account, would be accepted. Chase also closed the accounts of PTI, the attorney for Hampstead and PTI, and the Knights of Malta.

Unaware that his funds had been diverted, and upon Susse's request, Renner wrote to Morelli assuring him that he had not complained and that he expected that Hampstead would honor their agreement. He also invited Chase to contact him with any questions. Susse led Plaintiff to believe that such a letter would help resolve any legal problems.

On April 16, 1996, Susse told Renner that Chase had closed the Townsend Fund account, but that the money would be relocated to Banker's Trust. Soon thereafter, Susse advised Renner that the SEC had frozen Townsend's funds, but that this would not affect Plaintiff's investment program.

**\*4** On or about April 24, 1996, Townsend was informed that the SEC was investigating Hampstead and Townsend for prime bank fraud. Although Townsend was concerned by the investigation and seriously questioned the Hampstead-related transactions, Susse convinced Townsend to continue to work for Hampstead.

On or about May 21, 1996, in response to continued inquiries by Renner's representative, Townsend stated that the funds were being used for a performance bond relating

to a letter of credit from Dubai Bank, and had been wired to Monaco per Susse's direction. On June 27, 1996, Renner wrote to Susse and copied Morelli, demanding the return of his money. A representative of Renner also contacted Morelli directly, but Morelli disavowed all knowledge about Townsend, Hampstead, Susse and the Renner investment. Morelli again refused to provide information upon further inquiry in August 1996.

On February 9, 1998, Renner commenced the instant action. In *Renner I,* I granted Defendant Chase's motion to dismiss the complaint with leave to amend. Thereafter Plaintiff filed the present amended complaint. Plaintiff asserts eight claims for relief:

   Claim 1 (against all defendants): common law fraud.
   Claim 2 (against Chase only): commercial bad faith.
   Claim 3 (against the Townsend Defendants): breach of contract.
   Claim 4 (against the Townsend Defendants): breach of the covenant of good faith.
   Claim 5 (against the Townsend Defendants): breach of fiduciary duty.
   Claim 6 (against Chase only): aiding and abetting breach of fiduciary duty.
   Claim 7 (against the Townsend Defendants): negligence.
   Claim 8 (against the Townsend Defendants): commercial bad faith.

The various Defendants, with the exception of Wolford, who has not appeared in the action, now move to dismiss the amended complaint in its entirety. I will examine each claim in turn.

## II. STANDARD OF REVIEW

On a motion to dismiss under Rule 12(b)(6), the trial court's function "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Geisler v. Petrocelli,* 616 F.2d 636, 639 (2nd Cir.1980); *see Ricciuti v. N.Y.C. Transit Authority,* 941 F.2d 119, 124 (2nd Cir.1991)*.* "[T]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974)*.* The district court should grant a Rule 12(b)(6) motion "only if it is clear that no relief could be granted under any set of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                                Page 4
Not Reported in F.Supp.2d, 2000 WL 781081 (S.D.N.Y.)
**(Cite as: 2000 WL 781081 (S.D.N.Y.))**

facts that could be proved consistent with the allegations." *Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984) (*citing Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)).

Consideration of a motion to dismiss a complaint ordinarily focuses on the allegations contained on the face of the complaint. *See Cortec Industries, Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2nd Cir.1991), *cert. denied,* 112 S.Ct. 1561 (1992); *Kramer v.. Time Warner Inc.,* 937 F.2d 767, 773 (2nd Cir.1991). On a motion to dismiss, a district court must accept plaintiff's well-pleaded factual allegations as true, *Papasan v. Allain,* 478 U.S. 265, 283 (1986), and the allegations must be "construed favorably to the plaintiff." *LaBounty v. Adler,* 933 F.2d 121, 123 (2nd Cir.1991). "[A] Rule 12(b)(6) motion to dismiss need not be granted nor denied in toto but may be granted as to part of a complaint and denied as to the remainder." *Decker v. Massey-Ferguson, Ltd.,* 681 F.2d 111, 115 (2nd Cir.1982).

### III. DISCUSSION
### A. *Claim One--Common Law Fraud*
***5** Fed.R.Civ.P. 9(b) provides "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." Accordingly, a complaint alleging fraud must (1) specify the statements, oral, or written, that the plaintiff contends were fraudulent, either as misrepresentations or containing fraudulent omissions; (2) identify the speaker or the writer; (3) state where, when and to whom the statements were made; and (4) explain why the statements were fraudulent. *Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 51 (2nd Cir.1995). In cases with multiple defendants, Rule 9(b) requires that the complaint allege facts specifying each defendant's contribution to the fraud. Although the rule does not require a plaintiff to allege scienter with great specificity, it does require the plaintiff to plead a factual basis which gives rise to a strong inference of fraudulent intent. *Wexner v. First Manhattan Co.,* 902 F.2d 169, 172 (2nd Cir.1990). "The requisite 'strong inference' of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or

recklessness." *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2nd Cir.1994).

"Under New York law, the elements of common law fraud are "a material, false representation, an intent to defraud thereby, and reasonable reliance on the representation, causing damage to the plaintiff." *Chanayil v. Gulati,* 169 F.3d 168, 171 (2nd Cir.1999) (quoting *Katara v. D.E. Jones Commodities, Inc.,* 835 F.2d 966, 970-71 (2nd Cir.1987)). As to Defendants Chase, Morelli and Wolford, Plaintiff alleges only that they aided and abetted the perpetrators of the fraud, namely the Townsend defendants, and Susse and Penly (neither of whom are parties to this action). "The general requirements for establishing aiding and abetting liability are well settled in this Circuit. Plaintiffs must prove (1) a...violation by a primary wrongdoer, (2) knowledge of the violation by the person sought to be charged, and (3) proof that the person sought to be charged substantially assisted in the primary wrongdoing." *Armstrong v. McAlpin,* 699 F.2d 79, 91 (2nd Cir.1983). Rule 9(b)'s requisite pleading with particularity applies equally to claims for fraud and aiding and abetting fraud. *See Williams v. Bank Leumi Trust Company,* 1997 WL 289865 at 5 (S.D.N.Y.1997); *ABF Capital Management v. Askin Capital Management, L.P.,* 957 F.Supp. 1308, 1328 (S.D.N.Y.1997).

### 1. *Defendant Michael Morelli*
Plaintiff claims that Morelli aided and abetted Susse, Penly and Townsend in their scheme to defraud Renner out of $3 million.

Before assessing the sufficiency of the pleadings with respect to the requisite elements of an aiding and abetting claim, I must first address Morelli's argument that most of the allegations against him are made upon information and belief. Morelli correctly points out that "[a]llegations of fraud cannot ordinarily be based upon information and belief, except as to matters peculiarly within the opposing party's knowledge." *Campaniello Imports, Ltd. v. Saporiti Italia S.p.A.,* 117 F.3d 655, 664 (2nd Cir.1997) (internal quotations and citations omitted). However, Morelli suggests that numerous allegations, although not explicitly labeled as having been made on information and belief, are, in fact, pleaded in just such a manner. Morelli fastens upon

Not Reported in F.Supp.2d                                                                        Page 5
Not Reported in F.Supp.2d, 2000 WL 781081 (S.D.N.Y.)
**(Cite as: 2000 WL 781081 (S.D.N.Y.))**

a statement in *Renner I* that "although plaintiff does not characterize the allegations of ¶ 25 as having been made 'upon information and belief,' it is difficult to see how it could be otherwise." 1999 WL 47239 at 12. This statement was made in reference to an alleged conversation between Morelli and Townsend. Plaintiff was not present, nor did he allege any basis for the information. In the amended complaint, Renner reiterates that allegation, but asserts that the conversation is documented by a contemporaneous memorandum. (Amended Complaint, ¶ 35). Morelli similarly refers to other allegations that are now made on the basis of telephone records and contemporaneous documents.

**\*6** Morelli calls the Plaintiff to task for not attaching to the complaint the underlying documents that support his allegations and even questions whether the documents exist. However, as Plaintiff notes, this is a motion to dismiss and not a motion for summary judgment, and, therefore, decision is based on the pleadings and not additional affidavits, depositions and other evidence. Plaintiff need not prove his claim, but rather only show that he is entitled to present it. Morelli is correct that a court may consider documents integral to plaintiff's allegations, even if they are not attached to the pleading or incorporated by reference therein, without converting the motion into one for summary judgment. *See Cortec Industries, Inc., 949 F.2d at 47; see also, I. Meyer Pincus & Associates, P.C. v. Oppenheimer & Co., Inc., 936 F.2d 759, 762 (2nd Cir.1991)* (quoting 5 C. Wright & A. Miller, Federal Practice & Procedure § 1327, at 762-763 and n. 6 (1990)) ("when 'plaintiff fails to introduce a pertinent document as part of his pleading, defendant may introduce the exhibit as part of his motion attacking the pleading.' "). However, the pleading is not deficient merely because the plaintiff did not include the supporting evidence for the allegations with the complaint. *See Artco, Inc. v. Kidde, Inc., 1989 WL 140284 at 5 (S.D.N.Y.1989)* (quoting 5 C. Wright & A. Miller, Federal Practice and Procedure § 1327, at 762 and n. 5 (1990)) ("The provision for incorporation of exhibits is permissive only, and there is no requirement that the pleader attach a copy of the writing on which his action ... is based.").

Nevertheless, this does not mean that Renner's complaint as to Morelli can withstand further scrutiny. As noted, a viable claim for aiding and abetting includes three elements. Assuming for the purposes of this motion that Renner was the victim of a fraudulent scheme hatched by Susse, the amended complaint must sufficiently allege that Morelli, as aider and abettor, knew about the primary wrongdoer's fraud and substantially assisted in the primary wrongdoing. Plaintiff's pleadings are deficient on both counts. Failure to sufficiently plead either element is fatal to Renner's claim.

With respect to the knowledge element for aiding and abetting liability, "New York courts and federal courts in this district have required actual knowledge." *Kolbeck v. LIT America, Inc., 939 F.Supp. 240, 246 (S.D.N.Y.1996); see also, Wight v. Bankamerica Corp., 219F.3d79, 2000 WL 728964 at 13 (2nd Cir.2000)* ("a claim for aiding and abetting fraud requires plaintiff to plead facts showing the existence of a fraud, defendant's knowledge of the fraud, and that the defendant provided substantial assistance to advance the fraud's commission.") (citations and internal quotation marks omitted); *Williams, 1997 WL 289865 at 5.* Although Renner argues that Morelli knew that Renner had wired money to the Townsend Fund account pursuant to the Renner-Hampstead Agreement, Plaintiff does not allege that Morelli had actual knowledge of the fraud. In *Renner I,* I discussed the allegations concerning Morelli's knowledge, or, more precisely, the lack thereof. 1999 WL 47239 at 12-13. Although the complaint has been amended, the allegations relevant to establishing Morelli's actual knowledge are virtually the same, and so is my conclusion. [FN1]

> FN1. The Second Circuit has very recently stated that "knowledge of the underlying wrong" is a "required element" under New York law on claims of aiding and abetting fraud, aiding and abetting breach of fiduciary duty, and commercial bad faith. *Wight, 2000 WL 728964 at 13,* a decision handed down on May 25, 2000. This holding is applicable to a number of the Plaintiff's claims discussed in text.

**\*7** In ¶ 35 of the amended complaint, Renner alleges that Morelli had a conversation with Townsend during which

Not Reported in F.Supp.2d                                                                    Page 6
Not Reported in F.Supp.2d, 2000 WL 781081 (S.D.N.Y.)
**(Cite as: 2000 WL 781081 (S.D.N.Y.))**

they discussed that Renner was a client of Hampstead, that Hampstead intended to use the Plaintiff's funds to purchase a performance bond for another Hampstead customer, that Renner wanted confirmation by Chase of the receipt of his money in the Townsend Fund account, and the merits of using a custodial versus a commercial account. With respect to these allegations, I previously held that, "[a]t the very most, these allegations raise the possibility of constructive knowledge on Morelli's part, namely, that Townsend might not be dealing with Renner in a wholly forthright manner, consistent with Renner's instructions and expectations. But the allegations fall well short of imparting to Morelli actual knowledge that, as soon as the Renner funds were received, they would be diverted to conspirators in Monaco, as the complaint alleges did occur." *Renner I,* 1999 WL 47239 at 12. Whereas no factual basis for these allegations was asserted in the initial complaint, Plaintiff now makes these allegations on the basis of a contemporaneous memorandum prepared by Townsend. While this may cure the concern I previously expressed, namely, that if the allegations were made on information and belief they would be insufficient under the heightened pleading requirements for fraud, Plaintiff has not alleged any additional facts that suggest that Morelli had actual knowledge of the scheme to divert Renner's money.

Morelli was allegedly " 'uneasy' about the proposed use of the Renner's (sic) funds" after the discussion with Townsend. As a result, Townsend urged Susse and/or Wolford to speak with him, which Wolford apparently did. (Amended Complaint, ¶ 36). But without more, this only shows that Morelli was suspicious or had questions regarding the account. The phone calls that followed may have resolved any lingering doubts held by Morelli [FN2] or they may have substantiated Plaintiff's allegation that Morelli was party to the fraud. However, Plaintiff only speculates about the topic of the telephone discussions. I cannot assume that simply because Morelli questioned the way in which the money would be used means that he actually knew that a fraudulent scheme was in place.

> FN2. *See* Amended Complaint, ¶ 45, referring to a subsequent letter from Townsend to Chase in which he stated, among other things, that it was

"Townsend's understanding that Wolford and Morelli had spoken since February 12 and that Wolford had 'clarified' some of Morelli's questions about the letter of credit and the use of the Renner funds."

Renner also alleges that Morelli was on the line during a conversation between Townsend and other Chase employees, who refused to approve certain questionable transactions relating to the proposed purchase of a performance bond and the establishment of documentary letters of credit for a real estate transaction. (Amended Complaint, ¶ 49). Although Renner now makes these allegations on the basis of contemporaneous documents and has provided more detail, as compared with the initial complaint, he still fails to explain how Morelli's knowledge of this conversation amounts to any more than knowledge that these particular transactions were rejected. Similarly, Morelli's knowledge that a portion of the funds transferred were wired to the account of Susse's common law wife, (Amended Complaint, ¶¶ 52, 55), is not equivalent to actual knowledge of fraud.

**\*8** The amended complaint also includes allegations regarding Morelli's handling of Hampstead accounts that were closed due to irregularities. (Amended Complaint, ¶¶ 16-18). However, the allegations concerning the nature of the "irregularities" and Morelli's involvement are made on information and belief. Moreover, these older accounts and transactions did not involve Plaintiff or the Townsend Defendants; they do not constitute actual knowledge of a fraud perpetrated years later merely because Hampstead was involved. At most, Renner is entitled to the inference that Morelli should have known that there was the possibility of fraud. But what Morelli should have known is irrelevant. The law is only interested in what he actually knew, and Plaintiff has failed to demonstrate that the amended complaint adequately alleges that Morelli knew about the fraudulent scheme.

Plaintiff's amended complaint is deficient as to allegations of substantial assistance as well. Morelli played no part in inducing Renner to invest his money with Hampstead. [FN3] However, Plaintiff argues that Morelli facilitated the fraud once the money was wired to the Townsend Fund

Not Reported in F.Supp.2d                                                                                Page 7
Not Reported in F.Supp.2d, 2000 WL 781081 (S.D.N.Y.)
**(Cite as: 2000 WL 781081 (S.D.N.Y.))**

account at Chase. Specifically, Renner alleges that Morelli sent a letter to Townsend on February 15, 1996 confirming receipt of Plaintiff's funds. (Morelli Notice of Motion, Exh. D.). Apparently, Townsend then forwarded this letter, along with a "Certificate of Custody & Receipt of Funds," prepared by Townsend, to Renner. (Morelli Notice of Motion, Exh. I.). Even according to the facts alleged in the amended complaint, the information recited in the Morelli letter regarding the funds was accurate at that time. Nevertheless, Renner concludes that "[u]pon information and belief, the sole purpose of the Morelli letter reciting the source of the funds was so that it could be provided to Renner, together with the Townsend 'Custody Receipt Confirmation', to convey the false impression that the representations made to Renner by Hampstead regarding the custody of funds at Chase were accurate. At the same time as Morelli was assisting Hampstead's fraud, he hoped to avoid personal liability by issuing a substitute for the 'Custody Receipt Confirmation' he knew was set forth in the Hampstead-Renner Management Agreement." (Amended Complaint, ¶ 41).

> FN3. Plaintiff does allege that Susse and Penly emphasized their ongoing working relationship with Morelli as part of their pitch to convince Renner to invest. (Amended Complaint, ¶¶ 31-32). However, there are no allegations that Morelli approved, let alone was aware of, the making of such representations.

Not only is this allegation made solely on information and belief, but it is entirely conclusory. Following factual statements, such as the fact that Morelli sent the letter to Townsend, by an unsupported conclusion, such as Plaintiff's speculation that "the sole purpose of the Morelli letter" was to assist in the fraud, is not the proper method of pleading under Rule 9(b). *See Shields,* 25 F.3d at 1129. Furthermore, it was Townsend who forwarded the letter to Renner. Plaintiff does not allege that Morelli knew or approved of Townsend's decision to do so. Lastly the letter does not promise, guarantee, or otherwise imply that the money would remain in the Townsend Fund account, but rather only that the initial investment had been received.

**\*9** The next step Morelli took with respect to the Townsend

Fund account was to pass on Townsend's proposal to fund a letter of credit supporting a performance bond for the benefit of Apex Air/Senkale to Charles Jagielski, another Chase employee. Jagielski then showed it to Jo Morrision, who specialized in letters of credit, who, in turn, discussed it with Jim Cahill. Confused by the proposal, Chase sought clarification from Townsend. However, unsatisfied with his response, Chase rejected the proposal. "One provides substantial assistance if he affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enable it [the fraud] to proceed." *Kolbeck,* 939 F.Supp. at 247 (internal quotations and citation omitted). Far from concealing or assisting in the fraud, in this instance, Morelli sought approval of Townsend's proposal from other Chase employees more familiar with letter of credit transactions. There are no allegations in the amended complaint that Morelli even advocated the proposal or that he attempted to persuade Chase to reconsider its decision to reject the transaction. The same can be said with respect to the proposed real estate transaction which also would have involved a letter of credit.

Although Morelli did follow Townsend's instructions with respect to the subsequent transfers of money out of the Townsend Fund account, there is no allegation that Morelli intended to divert Renner's funds for unauthorized purposes. Perhaps Morelli should have investigated the purpose of the transfers, especially in light of Townsend's rejected proposals for the use of the funds which immediately preceded the transfers. However, "inaction, or a failure to investigate, constitutes actionable participation only when a defendant owes a fiduciary duty directly to the plaintiff; that the primary violator owes a fiduciary duty to the plaintiff is not enough." *Id.* The amended complaint does not include any allegation that Morelli had a duty to Plaintiff.

For this same reason, Morelli cannot be held accountable for his failure to respond to Renner's letters and inquiries regarding Hampstead, Townsend and Susse. In addition, "a bank should keep its own customers' affairs confidential." *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, Nat. Ass'n,* 731 F.2d 112, 123 (2nd Cir.1984); *see also Graney Development Corp. v. Taksen,* 400 N.Y.S.2d 717, 719 (N.Y.Sup.Ct.1978), *aff'd,* 411 N.Y.S.2d 756

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-04622-DLI-RML Document 18-5 Filed 12/19/05 Page 8 of 21 PageID #: 366

Westlaw.

Not Reported in F.Supp.2d                                                                            Page 8
Not Reported in F.Supp.2d, 2000 WL 781081 (S.D.N.Y.)
**(Cite as: 2000 WL 781081 (S.D.N.Y.))**

(N.Y.App.Div.1978) ("It is implicit in the contract of the bank with its customer or depositor that no information may be disclosed by the bank or its employees concerning the customer's or depositor's account.") (internal quotations and citations omitted); 9 N.Y. Jur.2d Banks and Financial Institutions § 195 (1999). [FN4] To state a claim for fraud based on non-disclosure, "there must be a showing that a duty of disclosure existed." *Aaron Ferer,* 731 F.2d at 123. Renner has not made the requisite showing. [FN5]

> FN4. Renner points out that Morelli spoke with Wolford about the account in breach of the confidentiality it now uses as a defense. However, Morelli spoke to Wolford only upon Townsend's, the customer's, request. Thus the communication was sanctioned by the customer. Moreover, even had Chase breached its duty not to disclose information without the consent of the customer to someone other than Renner, it would hardly entitle Renner to such information or authorize Chase to commit the breach again.

> FN5. Plaintiff argues that a duty of disclosure may arise "where: (1) one party has superior knowledge of certain information; (2) that information is not readily available to the other party; and (3) the first party knows that the second party is acting on the basis of mistaken knowledge." *Banque Arabe et Internationale D'Investissement v. Maryland National Bank,* 57 F.3d 146, 155 (2nd Cir.1995). This duty has been found only in the context of negotiations between parties to a business transaction. *See id.; see also, Aaron Ferer,* 731 F.2d at 123; *Ray Larsen Associates, Inc. v. Nikko America, Inc.,* 1996 WL 442799 at 5 (S.D.N.Y.1996). Renner was not conducting business or negotiating a contract with Morelli or Chase, and, therefore, I question whether this basis for a duty of disclosure would even apply in this case. *See Williams v. Bank Leumi Trust Company of New York,* 1998 WL 397887 at 8 (S.D.N.Y.1998) However, even if it did, Plaintiff has not adequately alleged facts demonstrating that Morelli or other Chase employees knew that

Renner was acting or relying on erroneous information.

**\*10** Rule 9(b) also requires that the pleadings give rise to a strong inference of fraudulent intent. With respect to Morelli, this element is completely lacking. As noted, scienter may be inferred from motive or recklessness on the part of the defendant. "Motive would entail concrete benefits that could be realized" as a result of the fraud. *Shields,* 25 F.3d at 1130. However, "Plaintiff acknowledges "that he cannot now prove that Morelli received money or other benefits from his participation." (Plaintiff's Memorandum in Opposition, p. 43, n. 11). This concession explains the absence from the amended complaint of allegations of motive. In his brief, Renner speculates that "[p]lausible motives would include his [Morelli's] interest in helping the Knights of Malta or his long-time friend, Wolford, or his desire to induce the huge transactions Hampstead had always promised to deliver to the Mount Vernon Branch." *Id.* These suggested motives for participation in the fraud are mere conjectures and do not appear in the complaint, but rather only in Plaintiff's brief. That aside, such allegations do not give rise to the requisite inference of fraud.

The mere fact that Morelli was manager of the Mount Vernon Branch, and would likely seek to attract business is not enough. A "plaintiff must do more than merely charge that executives aim to prolong the benefits of the positions they hold," whether it be compensation or prestige. *Shields,* 25 F.3d at 1130- 1131; *see also, Laro, Inc. v. Chase Manhattan Bank,* 866 F.Supp. 132 (S.D.N.Y.1994) (refusing to draw inference of fraud based on bank's alleged attempt "to cultivate favorable banking relationship" with customer). In addition, the fact alone that Morelli allegedly had an ongoing relationship with the perpetrators of the fraud does not translate into motive. Plaintiff must, but has not, allege that Morelli stood to gain something from his participation in the fraud.

Renner also claims that Morelli was reckless in the manner in which he handled the Townsend Fund account. The Second Circuit has held that a plaintiff faces a "significant burden...in stating a fraud claim based on recklessness." *Chill v. General Electric Company,* 101 F.3d 263, 270 (2nd

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                   Page 9
Not Reported in F.Supp.2d, 2000 WL 781081 (S.D.N.Y.)
**(Cite as: 2000 WL 781081 (S.D.N.Y.))**

Cir.1996). "[R]eckless conduct is, at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care." *Id.* at 269 (internal quotations and citations omitted). The facts alleged in the amended complaint fall short of this demanding standard.

When Townsend proposed the letter of credit transactions, Morelli passed the information onto other Chase employees for further review. As a result, those transactions were rejected.

In April 1996, Plaintiff sent a letter to Morelli stating that Renner had not complained to Chase regarding Hampstead, and that he was "happy with Hampstead Trusts and with Dr. Susse's help." (Morelli Notice of Motion, Exh. G). The letter from Renner followed immediately after the Townsend Fund account was closed. Renner alleges that he was unaware of the closing of the account at that time, or the fact that his funds had been transferred. Consequently, he reasons, Morelli participated in a coverup by not responding to Renner's letter.

**\*11** However, there is nothing in Plaintiff's letter that would alert Morelli to the fact that Renner had been misled. On the contrary, the fact that Renner wrote such a letter indicates that he knew there had been complaints about Hampstead. Nevertheless, in light of that knowledge, he assured Morelli that he was satisfied with Hampstead and Susse. Although Renner was informed that the accounts were closed shortly thereafter, he did not contact Morelli or Chase, until late June 1996, indicating any change in position or dissatisfaction with Hampstead and Townsend. Even when drawing all inferences in Renner's favor, under such circumstances, Morelli's failure to respond to Plaintiff's letter does not constitute conscious misbehavior suggesting participation in the fraud.

Morelli did allow the transfers of the funds to be processed. Perhaps his failure to investigate the purpose of the transfers in light of the recently rejected transactions constituted poor judgment. However, it was not until approximately one month after the transfers were made that alleged improprieties on the part of Hampstead and Townsend were reported to Chase. Moreover, Renner unfairly equates the rejected

transactions, which involved establishing letters of credit in the amounts of $181.5 million and $10 million, with direct transfers of funds totaling some $3.5 million. Even if Morelli should have been more curious, alert, skeptical or concerned, his conduct in honoring a transfer request on the part of Townsend, who was responsible for facilitating transactions for Hampstead customers, does not rise to a level of recklessness that would support an inference of fraudulent intent. *See Chill, 101 F.3d at 270; see also Shields, 25 F.3d at 1129.*

For the reasons stated above, Plaintiff has failed to adequately plead fraud with respect to Defendant Morelli. As that is the only claim asserted against Morelli, the amended complaint is dismissed as to him. I will not grant Plaintiff leave to file a further amended pleading.

### 2. *Defendant Chase Manhattan Bank*

As with Morelli, Plaintiff alleges that Chase aided and abetted in the fraud. Since, according to the amended complaint, Chase acted primarily through Morelli, the aiding and abetting claim against Chase stands or falls, in large part, with the claim against Morelli. Having dismissed the aiding and abetting claim against Morelli, I must also dismiss a derivative claim against Chase. However, some comment is required.

Renner and Chase dispute whether Chase can be held vicariously liable for any wrongdoing on the part of its employee, Morelli. Chase cites several cases for the proposition that an employer will not be held vicariously liable for the fraudulent acts of its employee in circumstances analogous to the case at bar. *See, e.g. Schmidt v. Fleet Bank, 1998 WL 47827 (S.D.N.Y.1998); Qatar National Navigation & Transportation Co., Ltd. v. Citibank, N.A., 1992 WL 276565 (S.D.N.Y.1992).* However, Plaintiff correctly points out that although the cases cited by Chase revolve around fraud claims, they all arise specifically in the context of RICO actions. In *Qatar* this Court explained that "[d]ecisions in this district generally hold that corporations may not be held vicariously liable for the actions of their employees in violation of the RICO statute....Essentially, vicarious liability has been held to be at odds with Congressional intent in enacting RICO since the statute was designed to protect corporations from criminal infiltration

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 10
Not Reported in F.Supp.2d, 2000 WL 781081 (S.D.N.Y.)
**(Cite as: 2000 WL 781081 (S.D.N.Y.))**

rather than hold them liable." *Qatar, 1992 WL 276565 at 7* (citations omitted). There is nothing in the Court's reasoning in *Qatar* to suggest that its holding extends beyond RICO actions or that it should be treated as anything but a narrow exception to the general principle of respondeat superior.

**\*12** This Court has stated in the context of a common law fraud claim that "[u]nder the law of agency, a principal is liable to third parties for the acts of an agent operating within the scope of his real or apparent authority." *Cosmos Import & Export Ltd. v. Merrill Lynch,* 1997 328068 (S.D.N.Y.1997) (collecting cases); *see also, Prudential-Bache Securities, Inc. v. Citibank, N.A.,* 73 N.Y.2d 263 (N.Y.1989); 9 N.Y. Jur.2d Banks and Financial Institutions § 165 (1999) ("the general rule is that a bank is liable for the fraudulent acts or representations of an officer or employee acting within the course and apparent scope of his employment or authority."). Although the initial complaint contained claims brought under RICO, those causes of action have been dismissed. *See Renner,* 1999 WL 47239. Accordingly, the cases cited by Chase are inapplicable. Nonetheless, although vicarious liability is not precluded, given Plaintiff's repeated failure to plead fraud on the part of Morelli with particularity, there is no basis to impose vicarious liability upon Chase.

However, this does not completely dispose of the fraud claim against Chase. Plaintiff makes several allegations against Chase that extend beyond Morelli's role. But as with Morelli, Chase had at most a constructive knowledge of the fraud, and no more. Renner makes much of the fact that there had been alerts issued by regulatory officials, including the Securities and Exchange Commission and the Federal Reserve, warning banks about schemes like the one which defrauded Plaintiff. On the basis of such warnings, Plaintiff assumes that Chase "knew that the scheme was afoot when it received...a copy of" the Renner-Hampstead Agreement. (Amended Complaint, ¶ 3, 38). However, Renner provides no factual basis for his conclusion. Perhaps Chase should have been on notice, but constructive knowledge will not satisfy the demanding pleading requirement of Rule 9(b).

Plaintiff also argues that other Chase officials, including Charles Jagielski and Jo Morrison, knew about the fraud

when they rejected Townsend's proposals involving letters of credit. Although they rejected the transactions on the basis that they were potential vehicles for fraud, there is no factual basis for the assertion that Chase officials actually knew that the fraud was, in fact, occurring.

Even if actual knowledge could be attributed to Chase, it did not substantially assist in the fraud. "The mere fact that all the participants in the alleged scheme used accounts at [Chase] to perpetrate it, without more, does not rise to the level of substantial assistance necessary to state a claim for aiding and abetting liability." *Williams,* 1997 WL 289865 at 5. Plaintiff claims that Chase "did not take any of the steps a prudent banker would take when confronted with questionable activity, e.g., freezing the Renner funds, reporting this suspicious activity to law enforcement authorities, obtaining authorization from Renner or relieving Morelli of responsibility." (Plaintiff Memorandum of Law, p. 18). This conclusory allegation is not supported by any allegation that other Chase officials had any reason to believe Morelli was engaged in questionable conduct. Nor was there a duty on the part of Chase to obtain authorization from Renner, a non-customer, before approving transactions for the Townsend Fund account. Moreover, as stated previously, absent a fiduciary duty, inaction does not constitute substantial assistance. *See Kolbeck,* 939 F.Supp. at 247. Further investigation was prompted once Chase received a complaint against Townsend and Hampstead alleging numerous improprieties. Promptly thereafter Chase closed the Townsend Fund account. Although Chase might be faulted for not acting more quickly, its actions do not amount in law to active participation or assistance in perpetrating the fraud.

**\*13** Plaintiff purports to find a duty on the part of Chase to Renner by characterizing the deposit on his behalf as a "special deposit." As explained by the Court of Appeals in *Peoples Westchester Savings Bank v. F.D.I.C.,* 961 F.2d 327, 330 (2nd Cir.1992), "[a]ll deposits made with bankers may be divided into two classes, namely those in which the bank becomes a bailee of the depositor, the title of the thing deposited remaining with the latter; and that other kind of deposit of money peculiar to the banking business, in which the depositor, for his own convenience, parts with the title to

Not Reported in F.Supp.2d                                                                    Page 11
Not Reported in F.Supp.2d, 2000 WL 781081 (S.D.N.Y.)
**(Cite as: 2000 WL 781081 (S.D.N.Y.))**

his money, and loans it to the banker." (internal quotations and citations omitted). In the parlance of banking, deposits in the former class are characterized as "special," and those in the latter class as "general." Plaintiff claims Chase knew the funds deposited by Townsend belonged to Renner and were intended to be used for his benefit. However, "a deposit made in the ordinary course of business is presumed to be general, and the burden of proof is on the depositor to overcome such presumption." *Id.* (internal quotations and citations omitted).

In *Peoples,* a lawyer deposited funds on behalf of a client. Although the bank was aware that the funds belonged to a third party, this knowledge alone was not sufficient to create a special deposit. The Court of Appeals stated, "absent clear evidence of intent to create a special deposit, or an explicit agreement between an attorney and a bank to segregate funds, the same relation of trust exists between the attorney and the bank as between the bank and any other general depositor; the relation of trust between the attorney and his client does not pass to or charge the bank as trustee of the client in respect to the money deposited." Id. at 331 (internal citations and quotations omitted). "[T]he lawyer, not the bank, is charged with a fiduciary duty to the client. Indeed, the bank has no greater obligation under the statute than to follow the instructions of the legal signatory--the lawyer." *Id.* at 332. In the case at bar, Townsend is the analogue of the lawyer and Renner that of the client. Although Townsend may have had a special duty with respect to Renner's funds, *see* discussion *infra* Part III.E., that duty did not pass to Chase. Plaintiff has failed to allege any facts that would support an intention on Chase's behalf to create a special deposit or to assume some duty to monitor the funds on behalf of Renner.

As with Morelli, Plaintiff has failed to allege any facts that would give rise to a strong inference of fraudulent intent on the part of Chase. Renner is unable and has not alleged any motive or identified any benefit that would accrue to Chase for participating in the fraud. Recognizing this missing element, Plaintiff argues that "proof of motive is not required where (as here) a strong inference of conscious wrongdoing exists." (Plaintiff Memorandum of Law, p. 24). In support of this statement, Renner cites *Local 875 I.B.T.*

*Pension Fund v. Pollack,* 992 F.Supp. 545, 562 (E.D.N.Y.1998): "That...the evidence of motive is limited to commissions is not a reason to dismiss the Amended Complaint where conscious fraudulent behavior is so clearly alleged." However, in that case, a defendant employee of the defendant investment firm was an active participant in the fraud and had made at least four misrepresentations. No such involvement on the part of Morelli or Chase is alleged here. "[A] plaintiff need not allege facts which show a defendant had a motive for committing fraud, so long as plaintiff adequately identifies circumstances indicating conscious behavior by the defendant from which an intent to defraud may fairly be inferred. However, where a particular defendant's nature to defraud is not apparent, the strength of the circumstantial allegations must be correspondingly greater." *Qatar,* 1992 WL 276565 at 6 (internal quotations and citations omitted). As a result, Plaintiff must allege more than Chase's interest in bank fees and deposits in order to create a reasonable inference of fraudulent intent. *See Chill,* 101 F.2d at 268 ("such a generalized motive, one which could be imputed to any publicly-owned, for-profit endeavor, is not sufficiently concrete for purposes of inferring scienter."); *see also,* *Schmidt,* 1998 WL 47827 at 10 ("logic defeats the inference that Fleet would expose itself to substantial financial liability and reputational harm by participating in Schick's scheme simply for the short-term benefit of having access to additional deposits.").

**\*14** Nor can Renner satisfy the requisite element of scienter by claiming that Chase was reckless or willfully blind to the fraudulent scheme. When Townsend proposed questionable transactions, several different levels of Chase officials reviewed the proposals, sought clarification from Townsend, and when still unsatisfied, refused to approve the transactions. When Chase was notified that complaints regarding Townsend and Hampstead had been received, it immediately investigated and chose to close the Townsend Fund account. Once made aware of alleged improprieties, Chase refused to authorize any further wire transfers in or out of this account. Such actions do not bespeak recklessness.

With respect to the transfers that Chase did allow, "a depository bank is mandated to obey the commands of an

Not Reported in F.Supp.2d                                                                 Page 12
Not Reported in F.Supp.2d, 2000 WL 781081 (S.D.N.Y.)
**(Cite as: 2000 WL 781081 (S.D.N.Y.))**

authorized depositor." *Latallo Establissement v. Morgan Guaranty Trust Company of New York,* 553 N.Y.S.2d 686, 689 (N.Y.App.Div. 1st Dept.1990) In *Latallo,* the Court held that the bank was not liable for the transfer of funds to personal accounts by an authorized signatory, stating that "[t]he fact that he may not have exercised his authority in the manner in which his parents [who made him an authorized signatory] would have preferred is hardly the concern of Morgan Guaranty." *Id.* at 688. Townsend was authorized by Renner to deposit his funds in the Townsend Fund account and to direct the investment of those funds. Townsend was Chase's customer, not Plaintiff.

Furthermore, when Chase honored the wire transfers in the instant case, the Renner funds had only been on deposit for a short time. This is not a case where an ongoing fraud is alleged of which the bank could not help but be aware. Rather, the scheme alleged involved Townsend making deposits on behalf of Hampstead clients, and then almost immediately wiring that money out of the Chase accounts. Although Renner alleges that the same fraud was perpetrated on Gulf Capital Resources three months earlier, there is no allegation suggesting that Chase had been alerted to the fraud. Once complaints were registered, Chase acted immediately to close the accounts. Renner's claims that Chase should have detected the fraud sooner and acted more quickly may suggest a short term lack of vigilance, but that is insufficient to demonstrate an intent to assist in fraud. *See Chill,* 101 F.3d at 270; *see also Shields,* 25 F.3d at 1129.

For the reasons stated above, Plaintiff's cause of action for aiding and abetting fraud against Defendant Chase is dismissed.

### 3. *Townsend Defendants*
Unlike Morelli and Chase, Renner claims that Townsend participated directly in the fraud.

Townsend argues that the fraud claim against it is based on two alleged misrepresentations. The first communication occurred on February 15, 1996. Townsend sent to Renner Morelli's letter confirming receipt of Plaintiff's funds and a Certificate of Custody & Receipt of Funds issued by Townsend. The Certificate stated that the funds were placed in Chase Account # 404-1- 129638, and credited within the

Fund to the Hampstead Account # 240-280, sub-account # 240-280-Renner. (Townsend Notice of Motion, Exh. B.). Although Renner claims that the designation that his funds were placed in a sub-account was misleading, Townsend maintains that this was not a false representation. The funds were received and placed in the named accounts. This is confirmed by the Wire Transfer Advices issued by Chase. (*Id.*). A false representation is essential to a viable fraud claim. As a result, Plaintiff's allegations are deficient with respect to this communication.

**\*15** The second communication addressed by Townsend occurred on May 21, 1996. On that day, a Renner representative called Townsend to inquire as to the status of Plaintiff's funds. "Townsend falsely replied that the funds had been used for a performance bond relating to a letter of credit from Dubai Bank." (Amended Complaint, ¶ 74). In fact, the funds had been wired to an Italian bank account belonging to a company called Verbena S.R.L., which was involved in the proposed real estate transaction, to a Monaco bank account belonging to Gloria Russo, Susse's common-law wife, and to an account at Arab Bank in Switzerland belonging to Alexander Penly, Susse's partner in Hampstead.

Townsend focuses on a letter he sent to Renner memorializing the May 21, 1996 conversation. In it he stated that "[t]he Fund transferred $2.7 million on February 23, 1996 to the following coordinates: Credit Foncier de Monaco, banker-Tedesco, account 97020. The transfer was per the specific written instruction of [Susse], who informed us that the purpose of the transfer was for Hampstead to utilize the funds in the acquisition of a performance bond relating to a letter of credit from Dubai Bank. We do not know the present status of this transaction." (Amended Complaint, ¶ 75). Townsend argues that he only communicated what Susse told him, implying that Townsend, like Renner, was mislead.

But Townsend's letter reflects a careful choice of words. Townsend does not explicitly argue that he believed the funds were actually being used to fund the performance bond, nor could he. Having directed the transfers, Townsend knew the money in the Townsend Fund account had been wired to three separate accounts, two of which were

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 13
Not Reported in F.Supp.2d, 2000 WL 781081 (S.D.N.Y.)
**(Cite as: 2000 WL 781081 (S.D.N.Y.))**

personal accounts, in three different countries. He knew Penly was a director of Hampstead and that Gloria Russo was Susse's common-law wife. He also knew that Chase had closed the Townsend Fund account and that Hampstead, Townsend Financial and the Townsend Fund were under investigation by the SEC for the manner in which they handled customer accounts. Given that Renner had inquired about the location of his funds and expressed concern about their safety, Townsend's response was completely inadequate. Townsend gave Renner the erroneous impression that his funds were being invested according to Plaintiff's agreement with Hampstead. Therefore, even if the affirmative statement by Townsend was not a falsehood, Townsend omitted material information that qualified that statement. This is especially true in light of the fact that Townsend "professed to know nothing more," (Amended Complaint, ¶ 75), when a Renner representative called back for more information after receiving Townsend's letter. *See* 60 N.Y. Jur. Fraud and Deceit § 92 ("Telling half a truth has been declared to be equivalent to concealing the other half. Even though one is under no obligation to speak as to a matter, if he undertakes to do so, either voluntarily or in response to inquiries, he is bound not only to state truly what he tells, but also not to suppress or conceal any facts within his knowledge which will materially qualify those stated....Although every word one says may be true, if something is left out which absolutely qualifies the words they may amount to a false statement.").

**\*16** In *Local 875 I.B.T. Pension Fund v. Pollack,* the defendant made a similar argument, claiming that he too was a victim. He claimed he had no intent to spread false information, and was tricked into making the misleading statements answering plaintiffs' concerns after plaintiffs' funds had already been misappropriated. The Court rejected a motion to dismiss, reasoning that "[w]here, as here, it is at least equally plausible to view Gevers' statements as being motivated by perfidy or shame, the court must, on this motion, opt for perfidy." *Pollack,* 992 F.Supp. at 558. In the case at bar, given Townsend's alleged knowledge regarding the transfers of Renner's funds at the time of the May 21, 1996 statement, Plaintiff is also entitled to such an inference.

Nonetheless, Townsend argues that Plaintiff could not have relied on his statement. Although the statement did not induce Renner to invest the fundshe had done so months earlierTownsend's statement gave Renner the false impression that his money was being invested, and, therefore, there was no cause for concern or to demand an immediate return of the funds. As such, the statement perpetuated the fraud. According to the amended complaint, Plaintiff did not take further action to recover his money until over a month later, which would suggest that Townsend had temporarily put Renner's fears to rest. Accordingly, on a motion to dismiss, Renner is entitled to the reasonable inference that he did rely on Townsend's information and that had Townsend provided full disclosure, Renner would have taken more immediate and effective action to recover his funds.

Townsend ignores a third communication which provides a basis for Plaintiff's fraud claim. On or about March 4, 1996, Renner's bank in Switzerland contacted Townsend on behalf of Renner "seeking assurances that the money invested was safe." (Amended Complaint, ¶ 58). Although virtually all of the money had been wired out of the Chase account by Townsend, he "reiterated his certification that the funds had been received by Chase and were held in a subaccount for Renner." (*Id.*). According to the facts alleged, this was a blatant fabrication.

This misrepresentation was compounded shortly thereafter. On or about April 3, 1996, Townsend wired $80,000 to Renner in response to Plaintiff's questions concerning the failure to pay scheduled profits on his investment. The money actually represented the little that was left in the Chase account after the misappropriations. Knowing that Plaintiff would perceive the payment as a return on his investment, Townsend did not inform Renner that the payment was drawn from the principal, thus obviating the need to explain why Renner's money had not been invested as agreed and that it was no longer safe in the Chase account.

Plaintiff does not allege a false statement in this instance. Nevertheless, although mere silence is not actionable as fraud, silence can be distinguished from concealment. "Concealment becomes a fraud where there is any act which

Not Reported in F.Supp.2d                                                    Page 14
Not Reported in F.Supp.2d, 2000 WL 781081 (S.D.N.Y.)
**(Cite as: 2000 WL 781081 (S.D.N.Y.))**

affirmatively tends to a suppression or disguise of the truth or to a withdrawal or distraction from the real facts. Under such circumstances, fraud springs from the overt act of misconduct relied upon with the same force and effect as an actual verbal misrepresentation." 60 N.Y. Jur. Fraud and Deceit § 89. By wiring the money in direct response to Plaintiff's inquiry about profits, Townsend concealed the fact that there were no profits and that almost all of the principal had been misappropriated. Townsend does not address this allegation.

**\*17** The allegations in the amended complaint are also sufficient to give rise to a strong inference of fraudulent intent on the part of Townsend. Townsend had both motive and opportunity to commit the fraud against Renner. Pursuant to the Renner-Hampstead Agreement, Renner deposited $3 million in the Townsend Fund account. As such, Townsend had control over Plaintiff's funds and, as is clear from the amended complaint, exercised that control to wire transfer nearly all of Renner's money to his alleged coconspirators. With respect to motive, Townsend received a $50,000 annual retainer from Hampstead, as well as a 0.5 percent commission on each Hampstead transaction. In addition, Hampstead loaned Townsend, in return for his participation in the fraud, $500,000 to supplement Townsend's lack of capital. Although, as stated, regular profits and commissions do not constitute motive, the amended complaint contains allegations that Townsend knew the transactions contemplated by Hampstead were a fraud from the start; and, in contrast to Morelli and Chase, sufficient specific facts are alleged as to Townsend to support that conclusion. On Plaintiff's theory of the case, these funds were not earnings from the ordinary course of business but payments for Townsend's participation in the fraud. Part of the payments or an additional payment was appropriated from funds provided by another Hampstead client, Gulf Capital Resources.

Townsend was responsible for the many wire transfers which diverted funds from the accounts of Hampstead clients, including Plaintiff, placing him in the center of the scheme to defraud. In light of the analysis above, Renner has met the pleading requirement with respect to Townsend. Accordingly, the motion to dismiss the fraud claim against the Townsend Defendants is denied.

#### B. *Claim Two--Commercial Bad Faith (Against Defendant Chase)*

As defined by the New York Court of Appeals, a claim for commercial bad faith lies "[w]here a depositary bank acts dishonestly--where it has actual knowledge of facts and circumstances that amount to bad faith, thus itself becoming a participant in a fraudulent scheme." *Prudential-Bache Securities, Inc. v. Citibank, N.A., 73 N.Y.2d 263, 275 (N.Y.1989).* Since I have already held that Chase did not have actual knowledge of the fraudulent scheme, this claim must fail. Although Chase may have had suspicions and may have been negligent in its response, such allegations are not sufficient to state a claim for commercial bad faith. Plaintiff must plead more than "merely a lapse of wary vigilance or even suspicious circumstances which might well have induced a prudent banker to investigate. Such assertions of bank negligence by a drawer would be insufficient to state a cause of action against a depositary bank." Id. at 276 (internal quotations and citations omitted); *see also, Nigerian National Petroleum Corp. v. Citibank, N.A., 1999 WL 558141 at 8 (S.D.N.Y.1999)* ("NNPC might be correct in contending that there were several red flags that should have alerted Citibank to Vadra's fraud or at least prompted it to investigate, and that Citibank acted negligently in allowing Vadra to make additional wire transfers even after the Second Fraudulent Transfer was uncovered. However allegations that a bank disregard[ed]... suspicious circumstances which might have well induced a prudent banker to investigate do not suffice to state a claim for commercial bad faith.") (internal quotations and citations omitted); *Calisch Associates, Inc. v. Manufacturers Hanover Trust Company, 542 N.Y.S.2d 644, 646 (N.Y.App.Div. 1st Dept.1989)* ("At most, these allegations amount to a claim that defendant bank was negligent in not being sufficiently vigilant and/or not providing satisfactory instruction to its staff. The third cause of action should, consequently have been dismissed.").

**\*18** As Chase correctly points out, courts have generally required that a member of the bank be an active participant in the fraud. *See, e.g, Prudential-Bache Securities, 73 N.Y.2d 263* (two bank employees accepted bribes in return

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 15
Not Reported in F.Supp.2d, 2000 WL 781081 (S.D.N.Y.)
**(Cite as: 2000 WL 781081 (S.D.N.Y.))**

for setting up accounts to facilitate fraud); *Peck v. Chase Manhattan Bank, N.A., 593 N.Y.S .2d 509 (N.Y.App.Div. 1st Dept.1993)* (bank alleged to have knowingly permitted forgeries and established accounts to facilitate fraud); *Retail Shoe Health Com'n v. Manufacturers Hanover Trust Company, 558 N.Y.S.2d 949, 951 (N.Y.App.Div.1990)* (plaintiff must plead "facts inculpating the principals of the bank as actual participants in unlawful activity."). In the case at bar, Morelli is the only branch employee Plaintiff seeks to cast in the role of fraudsman. However, given my findings regarding Morelli's knowledge and participation, and in the absence of allegations that other Chase employees actively promoted the fraud, the cause of action for commercial bad faith against Defendant Chase is dismissed.

### C. Claim Three--Breach of Contract

Plaintiff also claims that the Townsend Defendants breached their alleged contract with Renner. "The elements required to state a valid claim for breach of contract are: (1) the existence of a contract; (2) due performance of the contract by the plaintiff; (3) breach of contract by the defendant; and, (4) damages resulting from the breach." *K. Bell & Associates, Inc. v. Lloyd's Underwriters, 827 F.Supp. 985, 988 (S.D.N.Y.1993); see also, Pits, Ltd. v. American Express Bank International, 911 F.Supp. 710, 719 (S.D.N.Y.1996)*. Although a cause of action for breach of contract need not be pleaded with particularity, Renner's allegations are legally insufficient.

Townsend managed Plaintiff's money as a client of Hampstead and pursuant to Townsend's agreement with Hampstead. Plaintiff does not allege that he was a third-party beneficiary of that contract. Nor was Townsend a party to the Plaintiff's agreement with Hampstead. As such, Plaintiff alleges neither a written nor an oral contract between Renner and Townsend.

However, this is not necessarily fatal to his claim. In the absence of an express agreement, "[a] contract implied in fact [may be] inferred from the facts and circumstances of the case and from the conduct of the parties." *Portugal Trade Corp. v. Spirit Transport, Inc., 1987 WL 6436 at 7 (S.D.N.Y.1987)*. Plaintiff argues that "[b]y accepting the Renner money as the designated 'security house' for

Hampstead, purportedly creating a sub-account, and communicating with Renner with respect to the custody of his funds, Townsend, Townsend Financial and Townsend Fund agreed to keep the Renner money safe and secure, to communicate fully and promptly with Renner in accordance with the account instructions between Hampstead and Renner and regularly to remit trading proceeds." (Amended Complaint, ¶ 94).

"As with an express contract, a key element of a contract implied in fact is that there be mutual agreement between the parties." *Portugal Trade Corp., 1987 WL 6436 at 7*. Plaintiff alleges no facts supporting Townsend's intention to be bound to Plaintiff. Renner agreed with Hampstead that Hampstead would invest Plaintiff's money and be responsible for remitting the promised returns, as well as the principal after one year. The fact that Hampstead conducted transactions through Townsend does not create a contract between Townsend and Renner. Although Townsend confirmed receipt of the Renner funds and responded to Plaintiff's inquiries on other occasions, Townsend made no promises to Plaintiff regarding how the money would be handled. In fact, Townsend indicated that he transferred the money pursuant to Susse's instructions, indicating that Townsend was not making investment decisions on behalf of Plaintiff. Renner does not adequately allege a mutual understanding of contractual obligations between Plaintiff and Townsend such that a contract can be inferred from their conduct. Furthermore, Plaintiff does not allege any consideration for the supposed contract. Renner concedes that Townsend was compensated for his services by Hampstead.

**\*19** "Without agreement there can be no contract, and, of course, without a contract there can be no breach." *Kleinschmidt Division of SCM Corp., v. Futuronics Corp., 395 N.Y.S.2d 151, 152 (N.Y.1977)*. Accordingly, Plaintiff's claim for breach of contract is dismissed.

### D. *Claim Four--Breach of Covenant of Good Faith*

Plaintiff brings this cause of action against the Townsend Defendants. Plaintiff concedes that the covenant of good faith arises out of and is inherent in a contract. "[A]bsent a contract there is no covenant of good faith and fair dealing." *Industrial Acoustics Company, Inc. v. Energy Services, Inc.,*

Not Reported in F.Supp.2d                                                                                     Page 16
Not Reported in F.Supp.2d, 2000 WL 781081 (S.D.N.Y.)
**(Cite as: 2000 WL 781081 (S.D.N.Y.))**

1995 WL 274432 at 8 (S.D.N.Y.1995); *see also, Geler v. National Westminster Bank USA*, 770 F.Supp. 210, 215 (S.D.N.Y.1991). Having found that Plaintiff has failed to adequately plead that there was a contract between Renner and Townsend, there is no basis for a covenant of good faith, and, thus, no cognizable claim for the breach of that covenant. Therefore, claim four is dismissed.

### E. Claim Five--Breach of Fiduciary Duty

As his fifth cause of action, Plaintiff asserts a claim of breach of fiduciary duty against the Townsend Defendants. "A fiduciary relationship exists under New York law when one person is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." *Flickinger v. Harold C. Brown & Co., Inc.*, 947 F.2d 595, 599 (2nd Cir.1991) (internal quotations and citations omitted); *see also, Press v. Chemical Investment Services Corp.*, 988 F.Supp. 375, 386 (S.D.N.Y.1997) ("The crucial factor in determining whether a broker has been 'entrusted' with particular matters such that a fiduciary obligation attaches, appears to be whether the broker exercises discretion over those matters. In other words, '[i]n the absence of discretionary trading authority delegated by the customer to the broker...a broker does not owe a general fiduciary duty to his client." ') (quoting *Bissell v. Merrill Lynch & Co., Inc.*, 937 F.Supp. 237, 246 (S.D.N.Y.1988).

Plaintiff contends that "[b]y inducing Renner to part with money by claiming that they were engaged in customer transaction (sic) and that Renner's funds would be kept safe and secure and in 'custody,' Townsend, Townsend Financial and Townsend Fund stood in a fiduciary relationship toward Renner and owed him a higher duty of honor and care." (Amended Complaint, ¶ 103). However, these allegations support a fiduciary relationship no more than they supported a contractual relationship between Renner and Townsend.

The facts in *Flickinger v. Harold C. Brown & Co., Inc.*, 947 F .2d 595, are similar to those in the case at bar. Flickinger was a long time client of defendant Brown, a securities broker. Brown, in turn, had an agreement with defendant Bradford Broker Settlement, Inc. ("BBSI"), who served as a clearing agent for Brown. Pursuant to the agreement between Brown and BBSI, BBSI would execute and clear transactions for Brown's clients. Flickinger brought an action against both Brown and BBSI after BBSI failed to deliver certain shares of stock purchased by Flickinger through Brown. Although the Court of Appeals held that a fiduciary relationship existed between Flickinger and Brown, the Court found that no such relationship existed between the investor and the clearing agent.

**\*20** In the instant case, Renner, like Flickinger, invested money with one party, Hampstead, who, in turn, contracted with another party, Townsend, to facilitate transactions on Hampstead's clients' behalf. As with Flickinger and BBSI, there was no agreement between Renner and Townsend. Townsend, like BBSI, merely followed Hampstead's instructions regarding Hampstead's client's funds. Plaintiff attempts to distinguish *Flickinger* by noting that Flickinger and BBSI never had any direct contact. Although there were some communications between Renner and Townsend, mere contact, standing alone, does not create a fiduciary duty. In *Flickinger*, the reason the Court of Appeals held that there was a fiduciary duty between Flickinger and Brown was the longstanding arrangement under which Brown provided investment advice. *Id.* In the case at bar, Townsend and Renner knew one another for only a short time. Moreover, Townsend did not provide or offer investment advice; nor did he have any discretion over how Renner's funds were to be invested. (See Townsend Notice of Motion, Exh. C., Asset Management Contract between Hampstead and Townsend, p. 2, stating that "[Townsend] shall only act for and on behalf of [Hampstead] and can not be made responsible and/or liable for any losses or damages caused by [Hampstead's] instructions. [Townsend] shall not cause any transactions without the written approval or/and instructions given by [Hampstead]."). The fact that Townsend confirmed receipt of the Renner funds also does not give rise to a fiduciary duty. BBSI sent periodic activity statements to Flickinger, but did not incur a duty thereby. *Flickinger*, 947 F.2d at 597. "That plaintiffs may have regarded defendants as their fiduciaries is not enough to establish a fiduciary duty when that duty otherwise would not exist. *Kolbeck v. LIT America, Inc.*, 923 F.Supp. 557, 572 (S.D.N.Y.1996). Consequently, Townsend did not owe a fiduciary duty to Renner.

Plaintiff argues, in the alternative, that "Townsend is liable

Not Reported in F.Supp.2d                                                                                 Page 17
Not Reported in F.Supp.2d, 2000 WL 781081 (S.D.N.Y.)
**(Cite as: 2000 WL 781081 (S.D.N.Y.))**

for aiding and abetting Hampstead's breach of fiduciary duty." (Plaintiff Memorandum of Law, p. 39). However, Plaintiff did not state a cause of action against Townsend for aiding and abetting breach of fiduciary duty in the amended complaint, *see* Kolbeck, 923 F.Supp. at 573 ("In their brief, plaintiffs' claim for breach of fiduciary duty has been transformed into a claim for participating in another's breach of fiduciary duty....Because plaintiffs' belated claim does not appear anywhere in the complaint, even under the most generous reading, it is inappropriate to address that claim."); nor is there reason to believe that what Plaintiff really intended was an aiding and abetting claim, since Plaintiff separately stated such a cause of action against Defendant Chase.

For these reasons, the cause of action for breach of fiduciary duty against the Townsend Defendants is dismissed.

F. *Claim Six--Aiding and Abetting Breach of Fiduciary Duty*
**\*21** Plaintiff has stated a cause of action against Defendant Chase for aiding and abetting a breach of fiduciary duty. The elements of such a claim are similar to those for aiding and abetting fraud. "The claimant must prove (1) a breach by a fiduciary of obligations to another, (2) that the defendant knowingly induced or participated in the breach, and (3) that the plaintiff suffered damages as a result of the breach." S & K Sales Co. v. Nike, Inc., 816 F.2d 843, 847-848 (2nd Cir.1987).

With respect to the first element, Plaintiff claims that Townsend breached its fiduciary duty to Renner. Having found that the Townsend Defendants did not owe a fiduciary duty to Renner, the cause of action against Chase for aiding and abetting that breach necessarily fails.

In addition, even assuming arguendo that Townsend did have a fiduciary duty to Renner, and that it breached that duty, Plaintiff must still plead actual knowledge of the breach on the part of the aider and abettor. *See* Kolbeck, 939 F.Supp. at 246-247 (collecting cases). However, Plaintiff does not allege that Chase had actual knowledge of Townsend's alleged wrongdoing, or that Chase provided that substantial assistance necessary to establish aiding and abetting liability. *See* discussion *supra* Part III.A.2.

Accordingly, Plaintiff's cause of action against Chase for aiding and abetting Townsend's breach of its fiduciary duty is dismissed.

G. *Negligence*
Plaintiff's seventh claim alleges negligence against the Townsend Defendants. "In order to establish a prima facie case of negligence under New York law, a claimant must show: 1) the existence of a duty flowing from defendant to plaintiff; 2) a breach of this duty; 3) a reasonably close causal connection between the contact and the resulting injury; and 4) actual loss, harm or damage." *Integrated Waste Services, Inc. v. Akzo Nobel Salt, Inc., 113 F.3d 296, 299 (2nd Cir.1997)* (internal quotations and citations omitted). Plaintiff alleges that "by accepting the Renner money, issuing a notification and confirmation of sub-account, issuing a 'Certificate of Custody & Receipt of Funds,' leading Renner to believe that his funds were being kept in a Chase sub-account, promising to invest the Renner funds in accordance with the account instructions so that Hampstead could engage in trading transactions and promising to remit trading proceeds, Townsend, Townsend Financial and Townsend Fund assumed a duty to Renner." (Amended Complaint, ¶ 113). However, Plaintiff has failed to direct this Court to any case or law supporting his conclusion that these facts give rise to a duty of care.

In *Kolbeck v. LIT America, Inc., 113 F.3d 296,* on facts similar to the case at bar, the negligence claim was dismissed. In *Kolbeck,* Christian Schindler perpetrated a scheme in which he solicited millions of dollars from international investors to invest in American commodities markets by promising large returns with little to no risk. In order to lend credibility to the scheme, Schindler engaged several brokerage firms who cleared the commodity futures trades for Schindler. Schindler ultimately diverted the funds received from his customers for his own use. Although plaintiffs alleged that members of the brokerage firms participated in soliciting their money by leading tours of the New York Futures Exchange and of their offices, and that they did not correct Schindler when he told prospective investors that Schindler and the brokerage firms were trading partners, the investors would have individual accounts with the brokerage firm, and that the brokerage

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                                    Page 18
Not Reported in F.Supp.2d, 2000 WL 781081 (S.D.N.Y.)
**(Cite as: 2000 WL 781081 (S.D.N.Y.))**

firm "would be looking out for the best interests of the clients," *id.* at 561-562, the Court held that the defendant brokerage firms had not assumed a duty of care. *Id.* at 572.

**\*22** In the case at bar, Townsend played no role in soliciting Renner's funds. Townsend merely confirmed receipt of the funds pursuant to its agreement with Hampstead. Renner was not a client of Townsend's, but rather of Hampstead. Townsend had no discretion over how Renner's funds were to be invested, and it was with Hampstead, not Townsend, that Renner had entered a profit sharing agreement. It is completely unclear how Plaintiff derives a duty on the part of Townsend to ensure Plaintiff's funds were used in a manner consistent with the Renner-Hampstead Agreement. In his brief, Plaintiff does not put forth any theory upon which this Court might find a duty of care. Instead, Renner recites the allegations in the amended complaint and baldly asserts that such facts create a duty of care without explaining why.

These facts fell short of establishing a contractual relationship and a fiduciary relationship between Townsend and Renner. *See* discussion *supra* Parts III.C. and E. Similarly, they do not give rise to a duty of care. Therefore, Plaintiff's negligence claim against the Townsend Defendants is dismissed.

### H. *Commercial Bad Faith (Against the Townsend Defendants)*

As its final claim, Plaintiff alleges commercial bad faith against the Townsend Defendants. Plaintiff asserted the same cause of action against Defendant Chase. *See* discussion *supra* Part III.B.

Townsend argues that a claim of commercial bad faith must be brought against a bank. Since none of the Townsend Defendants are banks, Townsend concludes that this claim cannot lie. However, case law makes it clear that a defendant need not be a bank in order for a plaintiff to assert a claim of commercial bad faith. *See, e.g., Federal Insurance Company v. Charles Schwab & Co., Inc., 986 F.Supp. 837 (S.D.N.Y.1997)* (considering commercial bad faith claim brought against brokerage firm, but dismissing claim for failure to plead actual knowledge on part of the defendant of fraudulent scheme); *Getty Petroleum Corp. v.*

*American Express Travel Related Services Co., 660 N.Y.S.2d 689 (N.Y.1997)* (commercial bad faith claim brought against credit card company viable, but dismissed for lack of evidence of actual knowledge of fraud); *Stockton v. Gristedes Supermarkets, Inc., 576 N.Y.S.2d 267 (N.Y.App.Div. 1st Dept.1991)* ("court properly sustained the cause of action for commercial bad faith" against defendant supermarket); *National Union Fire Insurance Co. of Pittsburgh, Pa. v. Glass Check Cashing Corp., 576 N.Y.S.2d 260 (N.Y.App.Div.1991)* (cause of action for commercial bad faith against non-bank defendant sufficiently stated, but summary judgment in favor of defendant appropriately granted where plaintiff failed to show defendant's "out-and-out dishonesty").

But Townsend argues that such cases are distinguishable. In the cases in which a viable commercial bad faith claim was asserted against non-bank entities, Townsend contends that, unlike the case at bar, the defendants had, in effect, assumed the role of a bank and were involved in a fraudulent check-cashing scheme. Townsend is correct that in each commercial bad faith case involving a non-bank defendant, the defendant acted as a depositary. *See Federal Insurance Company, 986 F.Supp. 837* (brokerage firm, which accepted fraudulently signed stolen checks to open up brokerage accounts, treated as non-bank depositary); *Getty Petroleum Corp., 660 N.Y.S.2d 689* (credit card company, which accepted stolen checks with forged indorsements to pay off wrongdoer's credit card debt, treated as non-bank depositary); *Stockton, 576 N.Y.S.2d 267* (store, which cashed checks for customers, treated as non-bank depositary); *National Union Fire Insurance Company of Pittsburgh, Pa., 576 N.Y.S.2d 260* (same). However, I do not agree that Townsend cannot be characterized in the same manner, that is as a non-bank transferee or depositary. Townsend, like Charles Schwab in *Federal Insurance Company,* opened an investment account with Renner's money, allegedly knowing that Hampstead intended to misappropriate the funds.

**\*23** However, unlike in these other cases, the case at bar does not involve either stolen checks or forged indorsements. Commercial bad faith was recognized as a cause of action by New York courts as an "exception to the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                      Page 19
Not Reported in F.Supp.2d, 2000 WL 781081 (S.D.N.Y.)
**(Cite as: 2000 WL 781081 (S.D.N.Y.))**

general principle that a drawer does not have a cause of action against a depository, but must instead look to the drawee bank for recovery when a fraudulently signed check has been paid." *Federal Insurance Company,* 986 F.Supp. at 840; *see also, Getty Petroleum,* 660 N.Y.S.2d at 695 ("there is a 'commercial bad faith' exception to UCC 3-405"). The rule that gives rise to the exception is N.Y. U.C.C. § 3-405 (McKinney 1999), also known as the "fictitious payee" or "padded payroll" provision. Although, Townsend does not explicitly argue as much, it seems logical that if § 3-405 does not apply to the case at bar, neither can the exception to that section, namely a cause of action for commercial bad faith.

The logical appeal of such an argument notwithstanding, the applicability of § 3-405 is not a prerequisite to a commercial bad faith claim. In *Rose Lee Mfg. Inc. v. Chemical Bank,* 563 N.Y.S.2d 965, 967 (N.Y.Sup.Ct.1990), *aff'd,* 588 N.Y.S.2d 408 (N.Y.App.Div. 2nd Dept.1992) (modified on other grounds), the court stated that "[i]n the case at bar, however, UCC 3- 405(1)(c) does not come into play at all. Here the checks were not made payable to a payee who was not legitimate and they were not endorsed by anyone other than the named payee, i.e., the defendant." Nevertheless, the court held that plaintiffs had stated a viable cause of action for commercial bad faith against the defendant bank for allegedly participating in the diversion of properly made checks intended for deposit in the plaintiffs' tax depository account to accounts controlled by the plaintiffs' accountant.

Similarly, in the instant case, Renner transferred money to Chase, specifically to be deposited in the Townsend Fund account. The funds were to be invested pursuant to Hampstead's instructions and consistent with the Renner-Hampstead Agreement. However, the funds were diverted. This case does not involve checks being paid over a forged indorsement or checks being issued in the name of fictitious payees. Rather, it involves the misappropriation of funds by Hampstead and the Townsend Defendants after the Plaintiff willingly transferred the funds to them for the promised, albeit nonexistent, investment opportunities.

Many of the cases analyzing whether a cause of action has been stated for commercial bad faith do not even mention § 3-405. Rather, they have adopted the broader language

which has been used to define a commercial bad faith claim. "A cause of action for commercial bad faith against a bank requires allegations of a scheme or acts of wrongdoing, together with allegations of the bank's actual knowledge of the scheme or wrongdoing that amounts to bad faith or allegations of complicity by bank principals in alleged confederation with the wrongdoers." *Peck,* 593 N.Y.S.2d at 510-511; *see also, Nigerian National Petroleum Corp.,* 1999 WL 558141 at 6; *Williams,* 1998 WL 397887 at 9. Under this analysis, Plaintiff's cause of action for commercial bad faith against the Townsend Defendants is stated sufficiently to survive this motion to dismiss. Plaintiff has alleged a scheme or acts of wrongdoing, together with allegations of complicity by the Townsend Defendants in alleged confederation with Hampstead. *See* discussion *supra* Part III.A.3.

**\*24** Accordingly, the Townsend Defendants' motion to dismiss the cause of action for commercial bad faith is denied.

### IV. CONCLUSION

For the reasons stated, the motions to dismiss brought by Defendants Morelli and Chase are granted in full, and the amended complaint is dismissed in its entirety as to those Defendants. The motion to dismiss brought by the Townsend Defendants is granted in part. The third, fourth, fifth and seventh causes of action, asserted against the Townsend Defendants, are dismissed. The Townsend Defendants' motion to dismiss is denied as to the first and eighth causes of action, namely for fraud and commercial bad faith.

Counsel for the remaining parties are directed to attend a status conference in Room 17C, 500 Pearl Street, at 2:00 P.M. on September 8, 2000.

It is SO ORDERED.

Not Reported in F.Supp.2d, 2000 WL 781081 (S.D.N.Y.)

**Motions, Pleadings and Filings (Back to top)**

• 2002 WL 32769152 (Trial Motion, Memorandum and Affidavit) Defendants' Reply to Plaintiff's Memorandum and Factual Showing That Reed Smith Should be

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                          Page 20
Not Reported in F.Supp.2d, 2000 WL 781081 (S.D.N.Y.)
**(Cite as: 2000 WL 781081 (S.D.N.Y.))**

Disqualified from Further Representation of the Defendant Gerald Townsend (Mar. 29, 2002)

• 2002 WL 32769151 (Trial Motion, Memorandum and Affidavit) Plaintiff's Memorandum and Factual Showing That Reed Smith Should be Disqualified from Further Representation of the Defendant Gerald Townsend (Mar. 05, 2002)

• 2002 WL 32769150 (Trial Motion, Memorandum and Affidavit) Defendants' Second Supplemental Memorandum Regarding Palintiff's Motion to Disqualify Defendant Gerald Townsend's Counsel (Feb. 28, 2002)

• 2001 WL 34727855 (Trial Motion, Memorandum and Affidavit) Defendants' Supplemental Memorandum Regarding Plaintiff's Motion to Disqualify Defendant Gerald Townsend's Counsel (Dec. 07, 2001)

• 2001 WL 34727854 (Trial Motion, Memorandum and Affidavit) Plaintiff's Summary Memorandum in Support of the Crime-Fraud Exception (Jun. 18, 2001)

• 2001 WL 34727853 (Trial Motion, Memorandum and Affidavit) Defendants' Supplemental Memorandum Regarding Plaintiff's Cross-Motion for a Ruling by the Court Regarding the Applicability of the Crime-Fraud Exception (May. 17, 2001)

• 2001 WL 34727745 (Trial Pleading) Plaintiff's Analysis of Defendant's Submission (May. 02, 2001)

• 2001 WL 34727742 (Trial Pleading) Defendants' Reply to Plaintiff's Submission in Opposition to the Defendants' Claims to Restrict Discovery Based on the Attorney Client Privilege and in Support of the Applicability of the Crime-Fraud Exception (May. 01, 2001)

• 2001 WL 34727743 (Trial Pleading) Plaintiff's Submission in Opposition to the Defendant's Claims to Restrict Discovery Based on the Attorney Client Privilege and in Support of the Applicability of the Crime-Fraud Exception (May. 01, 2001)

• 2001 WL 34727852 (Trial Motion, Memorandum and Affidavit) Defendants' Memorandum of Law in Opposition

to Plaintiff's Cross-Motion for a Ruling by the Court Regarding the Applicability of the Crime-Fraud Exception (Apr. 27, 2001)

• 2001 WL 34727850 (Trial Motion, Memorandum and Affidavit) Plaintiff's Memorandum of Law in Support of Plaintiff's Cross Motion for a Ruling by the Court Regarding the Applicability of the Crime-Fraud Exception (Apr. 19, 2001)

• 2001 WL 34727739 (Trial Pleading) Townsend Financial Services Corp., Townsend Investment Fund, LLC, Townsend Financial Group, Ltd, and Gerald Townsend's Memorandum of Law in Support of Their Motion for Sanctions (Apr. 17, 2001)

• 2001 WL 34727851 (Trial Motion, Memorandum and Affidavit) Memorandum of Law Regarding Advice Provided to Defendants by Donald O. Clark, Esquire (Apr. 2001)

• 2001 WL 34727737 (Trial Pleading) Defendants Townsend Financial Services Corp., Townsend Investment Fund, LLC, Townsend Financial Group, Ltd and Gerald Townsend Answer to Plaintiff's Omnibus Discovery Report (Mar. 13, 2001)

• 2001 WL 34727735 (Trial Pleading) Defendants Townsend Financial Services Corp., Townsend Investment Fund, LLC, Townsend Financial Group, Ltd and Gerald Townsend Answer to Plaintiff's Second Amended Complaint (Feb. 08, 2001)

• 2001 WL 34727733 (Trial Pleading) Second Amended Complaint (Feb. 05, 2001)

• 2001 WL 34727738 (Trial Pleading) Defendants Townsend Financial Services Corp., Townsend Investment Fund, LLC, Townsend Financial Group, Ltd and Gerald Townsend's Response to Plaintiff's Omnibus Discovery Report (2001)

• 2000 WL 34474989 (Trial Pleading) Defendants Townsend Financial Services Corp., Townsend Investment Fund, LLC, and Gerald Townsend Answer to Plaintiff's Amended Complaint (Jul. 05, 2000)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                                          Page 21
Not Reported in F.Supp.2d, 2000 WL 781081 (S.D.N.Y.)
**(Cite as: 2000 WL 781081 (S.D.N.Y.))**

• 1999 WL 33919733 (Trial Pleading) Amended Complaint
(Apr. 16, 1999)

• 1998 WL 34311486 (Trial Pleading) Answer and
Affirmative Defenses of Defendants Townsend Financial
Services Corp., Townsend Investment Fund, LLC, and
Gerald Townsend (Apr. 20, 1998)

• 1998 WL 34311485 (Trial Pleading) Complaint (Feb. 09,
1998)

• 2:98cv00926 (Docket) (Feb. 09, 1998)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.