UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x
TZVI WEISS, LEIB WEISS, MALKA WEISS,        :
YITZCHK WEISS, YERUCHAIM WEISS,             :
ESTHER DEUTSCH, MATANYA NATHANSEN, :
CHANA NATHANSEN, MATANYA AND                :
CHANA NATHANSEN FOR THE ESTATE OF           :
TEHILLA NATHANSEN, YEHUDIT                   :
NATHANSEN, SHOSHANA NATHANSEN,              :
HEZEKIEL TOPOROWITCH, PEARL B.              :
TOPOROWITCH, YEHUDA TOPOROWITCH,            :
DAVID TOPOROWITCH, SHAINA CHAVA             :
NADEL, BLUMY ROM, RIVKA                      :
TOPOROWITCH, EUGENE GOLDSTEIN,              :
LORRAINE GOLDSTEIN, BARBARA                  :
GOLDSTEIN INGARDIA, RICHARD                  :
GOLDSTEIN, MICHAEL GOLDSTEIN, CHANA :       **FIRST AMENDED COMPLAINT**
FREEDMAN, HARRY LEONARD BEER AS      :      **JURY  TRIAL DEMANDED**
EXECUTOR OF THE ESTATE OF ALAN BEER, :
HARRY LEONARD BEER, ANNA BEER,              :
PHYLLIS MAISEL, ESTELLE CARROLL,            :      **05-CV-4622 (CPS)(KAM)**
SARRI ANNE SINGER, JUDITH SINGER, ERIC :
M. SINGER , STEVEN AVERBACH, JULIE          :
AVERBACH, TAMIR AVERBACH, DEVIR             :
AVERBACH, SEAN AVERBACH, ADAM               :
AVERBACH, DAVID AVERBACH, MAIDA             :
AVERBACH, MICHAEL AVERBACH, EILEEN :
SAPADIN, DANIEL ROZENSTEIN, JULIA           :
ROZENSTEIN SCHON, JACOB STEINMETZ,          :
DEBORAH  STEINMETZ, AMICHAI                  :
STEINMETZ, NAVA STEINMETZ, ORIT             :
STEINMETZ, NATANEL STEINMETZ,               :
ROBERT L. COULTER, SR. FOR THE ESTATE :
OF JANIS  RUTH COULTER, DIANNE              :
COULTER MILLER, ROBERT L.                    :
COULTER, SR., ROBERT L. COULTER, JR.,       :
LARRY CARTER FOR THE ESTATE OF DIANE :
LESLIE CARTER, LARRY CARTER, SHAUN          :
COFFEL, RICHARD BLUTSTEIN AND               :
KATHERINE BAKER FOR THE ESTATE OF           :
BENJAMIN BLUTSTEIN, RICHARD                  :
BLUTSTEIN, KATHERINE BAKER, REBEKAH :
BLUTSTEIN, NEVENKA GRITZ FOR THE            :
ESTATE OF DAVID GRITZ, NEVENKA GRITZ, :
GLORIA KUSHNER, JACQUELINE                   :

CHAMBERS AS THE ADMINISTRATOR OF      :
THE ESTATE OF ESTHER BABLAR,          :
JACQUELINE CHAMBERS, LEVANA COHEN     :
HAROOCH, AND GRETA GELER AS THE       :
ADMINISTRATOR OF THE ESTATE OF        :
HANNAH ROGEN,                         :
                                      :
               Plaintiffs,      :
                                      :
   -against-                         :
                                      :
                                      :
NATIONAL WESTMINSTER BANK, PLC,       :
                                      :
             Defendant.      :
-------------------------------------------------------------x

Plaintiffs Tzvi Weiss, Leib Weiss, Malka Weiss, Yitzchk Weiss, Yeruchaim Weiss, Esther
Deutsch, Matanya Nathansen, Chana Nathansen, Matanya and Chana Nathansen for the Estate of
Tehilla Nathansen, Yehudit Nathansen, Shoshana Nathansen, Hezekiel Toporowitch, Pearl B.
Toporowitch, Yehuda Toporowitch, David Toporowitch, Shaina Chava Nadel, Blumy Rom,
Rivka Toporowitch, Eugene Goldstein, Lorraine Goldstein, Barbara Goldstein Ingardia, Richard
Goldstein, Michael Goldstein, Chana Freedman, Harry Leonard Beer as Executor of the Estate of
Alan Beer, Harry Leonard Beer, Anna Beer, Phyllis Maisel, Estelle Carroll, Sarri Anne Singer,
Judith Singer, Eric M. Singer, Steven Averbach, Julie Averbach, Tamir Averbach, Devir
Averbach, Sean Averbach, Adam Averbach, David Averbach, Maida Averbach, Michael
Averbach, Eileen Sapadin, Daniel Rozenstein, Julia Rozenstein Schon, Jacob Steinmetz,
Deborah Steinmetz, Amichai Steinmetz, Nava Steinmetz, Orit Steinmetz, Natanel Steinmetz,
Robert L. Coulter, Sr. for the Estate of Janis Ruth Coulter, Dianne Coulter Miller, Robert L.
Coulter, Sr., Robert L. Coulter, Jr., Larry Carter for the Estate of Diane Leslie Carter, Larry
Carter, Shaun Coffel, Richard Blutstein and Katherine Baker for the Estate of Benjamin
Blutstein, Richard Blutstein, Katherine Baker, Rebekah Blutstein, Nevenka Gritz for the Estate
of David Gritz, Nevenka Gritz, Gloria Kushner, Jacqueline Chambers as the Administrator for
the Estate of Esther Bablar, Jacqueline Chambers, Levana Cohen Harooch, and Greta Geler as
the Administrator for the Estate of Hannah Rogen, by their attorneys, allege the following upon
information and belief:

## NATURE OF THE ACTION

     1.     This is a complaint for damages arising out of the conduct of defendant National

Westminster Bank Plc (Hereinafter: "NatWest"). Defendant is a financial institution

headquartered in the United Kingdom that has knowingly collected, provided, and transmitted

money and financial services to HAMAS[1], a Foreign Terrorist Organization (as that term is defined in 8 U.S.C. § 1189 of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA")). NatWest has thereby substantially aided and abetted the commission of acts of international terrorism, as defined by 18 U.S.C. § 2331, including the terrorist attacks that injured the plaintiffs, and has violated the prohibitions on providing material support for acts of international terrorism (18 U.S.C. § 2339B) and on financing acts of international terrorism (18 U.S.C. § 2339C), set forth in the Antiterrorism Act ("ATA") as amended by the AEDPA. Defendant is therefore civilly liable under § 2333(a) of the ATA to the plaintiffs, who have been injured in their person by reason of acts of international terrorism.

## JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction over this action pursuant to 18 U.S.C. §§ 2333 and 2334, as a civil action brought by nationals of the United States, who have been killed or injured by reason of acts of international terrorism, and/or their estates, survivors, and heirs. This Court also has subject matter jurisdiction over this action based on diversity of citizenship pursuant to 28 U.S.C. § 1332(a)(2). The matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

3.      Venue is proper in this district pursuant to 18 U.S.C. § 2334(a) and 28 U.S.C. § 1391(d).

4.      NatWest is subject to personal jurisdiction in the United States pursuant to Fed.R.Civ.P. 4(k) because, among other things, it continuously and systematically does business in the United States. The defendant is also subject to personal jurisdiction in the United States

---

[1] HAMAS is an acronym for "Harakat al-Muqawama al-Islamiyya" also known as the "the Islamic Resistance Movement."

3

pursuant to 18 U.S.C. § 2339B(d)(1)(D) because it has committed tortious acts within the United States by transferring funds through the United States for the benefit of HAMAS, and has purposefully availed itself of United States jurisdiction in the course of committing the wrongful acts alleged herein.

## THE PARTIES

### A.   The Plaintiffs

### JERUSALEM BUS BOMBING – AUGUST 19, 2003

5.     On August 19, 2003, Raed Abdul Hamid Misk, a suicide bomber, detonated explosives on Egged bus No. 2.

6.     The Islamic Resistance Movement (hereinafter known as "HAMAS") claimed responsibility for the attack.

7.     On January 23, 1995, President Clinton issued Executive Order No. 12947 identifying HAMAS as a terrorist organization whose terrorist attacks "constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States."

**The Weiss Family**

8.     Plaintiff Tzvi Weiss, age 20, is a citizen of the United States and a resident of the State of New York.

9.     Tzvi was in Israel studying at a rabbinical college in 2003 and was planning to return to the United States on August 21, 2003.

10.     On the evening of August 19, 2003, he boarded Egged bus No. 2 in Jerusalem after having visited the Kotel (Wailing Wall), Judaism's holiest site, to pray. He was on his way to a friend's wedding.

11.     As the bus arrived at Shmuel Hanavi Street he heard a terrible explosion.

4

Everything went black, and he could not hear anything but a deafening ringing in his ears.

12.     In the panicked aftermath of the explosion, Tzvi jumped out of a window of the bus and began to run, stumbling over dead bodies and body parts as he fled the scene.

13.     Tzvi was covered with blood and his hand had been cut. His body was shaking from the shock of the experience,and he h ad a constant terrible ringing in his ears.[2]

14.     Once he got his bearings, Tzvi telephoned his brother, plaintiff Yitzchk Weiss, and waited for his brother to arrive to accompany him to the hospital.

15.     An ambulance transported Tzvi to Bikur Cholim Hospital where he underwent tests. He later learned that both of his eardrums had been shattered and torn as a result of the explosion.

16.     His left eardrum had been completely torn, and his hearing was severely impaired. He continued to experience severe pain in his hand and was unable to bend his fingers.

17.     Tzvi decided to return home to the United States to be near his family while he began recovering from the injuries and the effects of having been a victim of a terrorist attack. He returned to the United States the following day and visited an ear specialist within hours of his arrival. He underwent tests and was advised to have surgery on his left ear to attempt to regain some of his hearing loss in that ear. Tzvi obtained a second opinion from another doctor who agreed with the diagnosis.

18.     After a number of examinations by the initial physician, and after treatment with antibiotics, Tzvi underwent surgery on his left ear. After the surgery, the incessant ringing in his ears became louder and worse than before.

19.     Tzvi also visited another physician for treatment of the severe pain in his hand.

_____

[2] The medical term for the condition is tinnitus.

5

He was told the injuries might require surgery.

20.    Tzvi continued to visit doctors on numerous occasions to assess his ears, and underwent many tests, but the agonizing ringing continued. Eventually, it was determined that the surgery on Tzvi's left ear had not been successful. Tzvi suffered numerous panic attacks because of his injuries and the symptoms that continued to affect him.

21.    As a result of the injuries that he sustained in the attack, combined with the memories of the attack itself, Tzvi's mental health deteriorated. The suffering that Tzvi has endured as a result of the injuries he sustained in the attack is ongoing and relentless. It has negatively impacted every aspect of his life.

22.    Tzvi enrolled in rabbinical college upon his return to the United States, but the injuries and their symptoms prevented him from concentrating on his schoolwork, and he could no longer achieve the academic success that he had achieved prior to the attack.

23.    As a result of the attack, plaintiff Tzvi Weiss has suffered severe physical and mental anguish and extreme emotional distress.

24.    Plaintiffs Leib and Malka Weiss are citizens of the United States and residents of the State of New York. They are the parents of plaintiff Tzvi Weiss.

25.    Plaintiff Yitzchk Weiss is a citizen of the United States and a resident of the State of Israel. He is a brother of plaintiff Tzvi Weiss.

26.    Plaintiff Yeruchaim Weiss is a citizen of the United States and a resident of the State of Israel. He is a brother of plaintiff Tzvi Weiss.

27.    Plaintiff Esther Deutsch is a citizen of the United States and a resident of the State of New York. She is the sister of plaintiff Tzvi Weiss.

28.    The parents and siblings of Tzvi Weiss experienced great anxiety after learning of

6

the attack that injured Tzvi and observing the suffering that Tzvi has endured as a result of his injuries.

29.     As a result of the attack, plaintiffs Leib Weiss, Malka Weiss, Yitzchk Weiss, Yeruchaim Weiss and Esther Deutsch have suffered severe mental anguish and extreme emotional distress.

**The Nathansen Family**

30.     Tehilla Nathansen was a citizen of the United States and a citizen of the State of Israel.  She was three (3) years old and sitting on her mother's lap when she was murdered in the suicide bomb attack.

31.     The Nathansen family had boarded the bus at the Kotel in Jerusalem, where they had just completed their prayers.

32.     Chana Nathansen, Tehilla's mother, is a citizen of the United States and a citizen and resident of the State of Israel.

33.     Plaintiff Matanya Nathansen, Tehilla's father, is a citizen and resident of the State of Israel.

34.     Plaintiffs Matanya and Chana Nathansen bring this action both individually and on behalf of their three (3) year old daughter's estate.

35.     Chana Nathansen was severely injured in the explosion that killed her daughter and is partially crippled as a result of her injuries. Chana Nathansen had seven (7) ball bearings removed from her body that left bullet holes in her chest, leg and arm. She is also now hearing impaired in one ear.

36.     Plaintiff Chana Nathansen sustained severe physical and mental anguish and extreme emotional distress from witnessing and experiencing first-hand the death of her three

7

year old daughter, and witnessing the severe injuries sustained by her daughters, plaintiff Shoshana Nathansen and plaintiff Yehudit Nathansen, in addition to the injuries she herself sustained.

37.    Matanya Nathansen was injured by the explosion. He suffered fractures in both feet and in his collar bone, and sustained injuries to his lungs, eye and finger. He is now hearing impaired and can no longer walk properly.

38.    In addition to the injuries he sustained as a result of the explosion, plaintiff Matanya Nathansen has sustained severe physical and mental anguish and extreme emotional distress from witnessing and experiencing first-hand the death of his three year old daughter, as well as the severe injuries sustained by his wife and young daughters.

39.    Plaintiff Yehudit Nathansen is a citizen of the United States and a citizen and resident of the State of Israel.  She is the eight (8) year old sister of Tehilla Nathansen and the daughter of Matanya and Chana Nathansen. At the time of the explosion, Yehudit was sitting with her aunt, a few seats away from her parents.

40.    Yehudit sustained physical injuries from the explosion and was treated at Bikur Cholim Hospital in Jerusalem.

41.    Plaintiff Yehudit Nathansen has suffered physical and severe mental anguish and extreme emotional distress from witnessing and experiencing first-hand the death of her three year old sister, as well as the severe injuries sustained by her mother and baby sister, and the injuries to her father.

42.    Plaintiff Shoshana Nathansen is a citizen of the United States and a citizen and resident of the State of Israel.

43.    She is the two (2) year old sister of Tehilla Nathansen.

8

44.     Shoshana Nathansen was sitting on her mother's lap at the time of the explosion. Shoshana was five (5) months old at that time. As a result of the explosion, Shoshana suffered fractures in her leg and hip, deep lacerations in her arm that have left permanent scars, and scars on her face and legs. She also sustained severe physical injuries requiring the removal of numerous ball bearings from her legs. The full effect of her injuries, including her ability to walk, will not be fully known until she is older.

45.     As a result of the terrorist attack, plaintiff Shoshana Nathansen has suffered severe physical and mental anguish and extreme emotional distress.

46.     Plaintiff Hezekial Toporowitch is a citizen of the United States and a citizen and resident of the State of Israel. He is the father of Plaintiff Chana Nathansen and the grandfather of the three Nathansen girls.

47.     Plaintiff Pearl B. Toporowitch is a citizen of the United States and a resident of the State of Israel. She is the mother of plaintiff Chana Nathansen and the grandmother of the three Nathansen girls.

48.     In the middle of the night, Hezekial and Pearl were notified by telephone of the bombing that had killed their granddaughter, Tehilla Nathansen, and crippled their daughter, Chana Nathansen. That night they traveled to Jerusalem. Pearl attempted to obtain further details about the condition of her son-in-law and her granddaughters.

49.     In the aftermath of the bombing, Chana, her husband, and her children were transferred to different hospitals thereby complicating the family's efforts to locate them.

50.     Hezekial was supposed to travel to the central morgue in Holon to attempt to identify his granddaughter's body, but was in too much shock to do so. He was initially told to identify the bodies of two granddaughters since Shoshana had not yet been identified at the

9

hospital and was thought to be deceased.

51.     As a result of the terrorist attack, plaintiff Hezekial Toporowitch has suffered severe mental anguish and extreme emotional distress from experiencing the death of his three year old granddaughter, as well as the severe injuries sustained by his daughter, and injuries sustained by his granddaughters and son-in-law.

52.     As a result of the terrorist attack, plaintiff Pearl B. Toporowitch, has suffered severe mental anguish and extreme emotional distress from experiencing the death of her three year old granddaughter, as well as the severe injuries sustained by her daughter and other granddaughter and injuries to her son-in-law.

53.     Plaintiff Yehuda Toporowitch is a citizen of the United States and a citizen and resident of the State of Israel.

54.     Yehuda Toporowitch is a brother of plaintiff Chana Nathansen and an uncle of the three Nathansen girls.

55.     In the middle of the night he was notified by telephone of the bombing that had killed his niece and crippled his sister.

56.     He had been working at a resort when he received the telephone call, and quickly rushed to a nearby television where graphic images of the bombsite were being broadcast by Israeli television.

57.     Yehuda rushed home and traveled with his parents to the Tel Aviv area and stopped at the home of one of his sisters. He then took a taxicab to the central morgue and attempted to identify his niece's remains, but a positive identification was not possible because of the nature and extent of Tehilla's injuries.

58.     Yehuda then made arrangements for the necessary DNA testing that ultimately

10

confirmed his niece's identity.

59.     As a result of the terrorist attack, plaintiff Yehuda Toporowitch has suffered
severe mental anguish and extreme emotional distress from the death of his three year old niece
and the attempt to identify her remains. He has also suffered severe mental anguish and extreme
emotional distress as a result of the severe injuries sustained by his sister and other niece and
injuries to his brother-in-law.

60.     Plaintiff David Toporowitch is a citizen of the United States and a citizen and
resident of the State of Israel.

61.     He is a brother of plaintiff Chana Nathansen and an uncle of the three Nathansen
girls. He was not present when his parents were notified by telephone of the bombing that killed
his niece and crippled his sister. Instead, he had to piece together the events by himself after his
family had already left for Jerusalem.

62.     Like the rest of his immediate family, David visited his sister and niece in the
hospital and experienced the shock and severe mental anguish and extreme emotional distress
resulting from the emotional trauma of burying his young niece and dealing with the pain and
loss experienced by his sister.

63.     As a result of the terrorist attack, plaintiff David Toporowitch has suffered severe
mental anguish and extreme emotional distress from experiencing the death of his three year old
niece, as well as the severe injuries sustained by his sister and other niece.

64.     Plaintiff Shaina Chava Nadel is a citizen of the United States and a citizen and
resident of the State of Israel.

65.     She is a sister of plaintiff Chana Nathansen and an aunt of the three Nathansen
girls.

11

66. Like the rest of her immediate family, Shaina visited her sister and niece in the hospital and experienced the shock and mental anguish resulting from the emotional trauma of burying her young niece and dealing with the pain and loss experienced by her sister.

67. As a result of the terrorist attack, plaintiff Shaina Chava Nadel has suffered severe mental anguish and extreme emotional distress from experiencing the death of her three year old niece, as well as the severe injuries sustained by her sister and other niece and injuries to her brother-in-law.

68. Plaintiff Blumy Rom is a citizen of the United States and a citizen and resident of the State of Israel.

69. She is a sister of plaintiff Chana Nathansen and an aunt of the three Nathansen girls. Like the rest of her immediate family, Blumy visited her sister and niece in the hospital and experienced the shock and mental distress resulting from the emotional trauma of burying her young niece and dealing with the pain and loss experienced by her younger sister.

70. As a result of the terrorist attack, plaintiff Blumy Rom has suffered severe mental anguish and extreme emotional distress from experiencing the death of her three year old niece, as well as the severe injuries sustained by her sister and other niece and injuries to her brother-in-law.

71. Plaintiff Rivka Toporowitch is a citizen of the United States and a citizen and resident of the State of Israel.

72. She is a sister of plaintiff Chana Nathansen and an aunt of the three Nathansen girls.

73. Like the rest of her immediate family, Rivka visited her sister and niece in the hospital and experienced severe mental anguish and extreme emotional distress from burying her

12

young niece and dealing with the pain and loss experienced by her older sister and injuries to her brother-in-law.

74.     She stayed with her baby niece Shoshana, caring for her during the two weeks that she was hospitalized and for two months after her discharge from the hospital. Having to change the dressings on her niece's wounds, care for her various injuries, and take her to doctors, has deeply emotionally affected her.

75.     As a result of the terrorist attack, plaintiff Rivka Toporowitch has suffered severe mental anguish and extreme emotional distress from experiencing the death of her three year old niece, as well as the severe injuries incurred by her sister, other niece and brother-in-law.

**SHOOTING ATTACK ON ROUTE 60 – JUNE 20, 2003**

**The Goldstein Family**

76.     Howard Goldstein was a citizen of the United States and a citizen of the State of Israel.

77.     He was murdered on June 20, 2003, while driving his car with his parents on Route 60 in Israel.

78.     Howard was in the process of picking up his parents from Jerusalem where they had stayed the previous night following the wedding of Howard's son, David Goldstein.

79.     Howard's father, Eugene Goldstein, was seated in the front passenger seat, and his mother, Lorraine Goldstein, was seated behind her husband.

80.     At some point, as Howard was driving, Eugene noticed two individuals on the side of the road with their backs turned toward the car. As their car approached, the men turned around and began rapidly firing their guns at the Goldsteins' vehicle.

81.     Howard was shot in the chest, left lung, kidney and liver.

13

82. He died almost immediately and his body slumped over the wheel.

83. HAMAS claimed responsibility for the attack.

84. Plaintiffs Eugene and Lorraine Goldstein are citizens of the United States and are residents of the State of New York. They are the parents of Howard Goldstein.

85. Eugene was shot in the back, head and shoulder.

86. The top of the bullet that struck Eugene grazed his head. The remainder exploded in one of his lungs, leaving behind shrapnel in his lung, liver and kidneys. The bullet lodged between his heart and his lungs.

87. Somehow, Eugene managed to steer the car until it ultimately overturned in a ditch.

88. As a result of the terrorist attack, Eugene still has several bullet fragments lodged in his chest. He must undergo an x-ray every three (3) months to monitor the condition of the bullet fragments encapsulated in his chest.

89. He has since returned to his job where he missed three (3) months of work as a result of his injuries.

90. Lorraine was also shot and severely injured.

91. She was struck by a bullet which entered her body through her back, grazed her carotid artery and lodged in her jaw bone. She has three bullet holes in her back.

92. Shrapnel also lodged throughout her body, especially in her back. She also suffered a shattered nose and septum as well as various lacerations resulting from the car crash.

93. Eugene and Lorraine Goldstein remained in Jerusalem at Hadassah Hospital for approximately ten (10) days and were unable to return home when they were discharged from the hospital because the airline did not give Eugene permission to fly due to the poor condition

14

of his lungs.

94.     Lorraine still requires physical therapy because the scar tissue in her jaw prevents her from opening it fully. She still suffers from pain and headaches.

95.     She has had 11 teeth pulled and undergone extensive periodontal and dental work. She must also deal with the harmful effects of shrapnel lodged throughout her body.

96.     As a result of the terrorist attack, plaintiffs Eugene Goldstein and Lorraine Goldstein have suffered severe physical and mental anguish and extreme emotional distress.

97.     The Goldstein family in New York received notice of the attack from two cousins, one of whom saw images of the attack on the internet and sent an instant message to the immediate family.

98.     The Goldstein family sat in horror as they watched images of the attack on the Cable News Network (CNN) shortly after the attack occurred. The video broadcast showed Howard, Eugene and Lorraine Goldstein being pulled from the wreckage of the car Howard Goldstein had been driving.

99.     Lorraine's face and hair were covered with blood.

100.    Plaintiff Richard Goldstein is a citizen of the United States and a resident of the State of New York.  He is a son of plaintiffs Eugene and Lorraine Goldstein and a brother of Howard Goldstein.

101.    After learning of the attack, plaintiff Richard Goldstein telephoned his sister, Barbara Goldstein Ingardia, at work and asked her to return home immediately. When she arrived, her extended family was present. They shared the tragic news that their parents and brother had been attacked. Barbara then made plans to fly to Israel to care for her parents.

102.    As a result of the terrorist attack, plaintiff Richard Goldstein has suffered mental

15

anguish and extreme emotional distress caused by the death of his brother and the life-threatening injuries to both of his parents.

103.    Plaintiff Barbara Goldstein Ingardia is a citizen of the United States and a resident of the State of New York. She is the daughter of plaintiffs Eugene and Lorraine Goldstein and the sister of Howard Goldstein.

104.    Barbara left her job and her immediate family behind and traveled to Israel to care for her parents in Israel during their recovery and to mourn the loss of her brother.

105.    In addition to grappling with the devastating emotional consequences of her brother's death, she was forced to deal with the uncertainty of her mother's recovery due to her severe injuries and age.

106.    At one point during her hospital stay, Lorraine was placed on life support.

107.    Barbara blames herself for encouraging her parents to attend the wedding. As a result of the terrorist attack, plaintiff Barbara Goldstein Ingardia has suffered severe mental anguish and extreme emotional distress.

108.    Plaintiff Michael Goldstein is a citizen of the United States and a resident of the State of Florida. He is a brother of Howard Goldstein and a son of plaintiffs Eugene and Lorraine Goldstein.

109.    As a result of the terrorist attack, plaintiff Michael Goldstein has suffered severe mental anguish and extreme emotional distress because of the death of his brother and the life-threatening injuries of both of his parents.

110.    Plaintiff Chana Freedman is a citizen of the United States and a citizen and resident of the State of Israel.

111.    She is the daughter of Howard and Michal Goldstein.

112.    Chana and her husband were eating lunch at a mall in Jerusalem when they learned that her father and grandparents had been involved in what they believed to be an automobile accident.

113.    Chana's husband received a telephone call from his father informing the couple to go directly to Hadassah Hospital.

114.    When Chana and her husband arrived at Hadassah Hospital, a social worker informed them that Chana's father had died in the terrorist attack.

115.    Chana informed her brother Daniel and his wife, who had just been married, of the attack when they arrived at the hospital.

116.    As a result of her father's death, plaintiff Chana Freedman has suffered severe mental anguish and extreme emotional distress.

### THE JAFFA ROAD BUS #14A BOMBING: JUNE 11, 2003

117.    At approximately 5:30 p.m. on June 11, 2003, Abdel Madi Shabneh, a HAMAS operative dressed as an ultra-Orthodox Jew, boarded Egged bus #14A at the Mahane Yehuda market.

118.    A short while after Shabneh boarded the bus, as the bus drove down Jaffa Road near the Davidka Square, Shabneh detonated his bomb, wrecking the bus and killing sixteen (16) of its passengers. Over 100 people were wounded, including dozens of bystanders.

119.    Shabneh,an 18 -year old high school student from Hebron, was initially recruited by HAMAS while playing on a local Jihad Mosque soccer team.

**The Beer Family**

120.    Alan Beer, a citizen of the United States, was on the bus returning from a condolence call to his friend's family when the bomber detonated his explosives and killed him.

17

121.    Alan's friend, to whom he had paid the condolence call, learned of the bus bombing and telephoned plaintiff Harry Leonard Beer, Alan's brother, in Cleveland, Ohio. Harry Leonard quickly telephoned his sister, plaintiff Phyllis Maisel, whose son happened to be on the scene of the bombing earlier. Harry Leonard then telephoned his other sister, plaintiff Estelle Carroll and informed her of the terrorist attack.

122.    After speaking with her brother, Phyllis asked her son to return to the crime scene and identify Alan's body.   Thereafter, plaintiffs Anna Beer, Harry Leonard Beer and Estelle Carroll flew to Israel to attend Alan's funeral.

123.    Plaintiff Harry Leonard Beer is a citizen of the United States and a resident of the State of Ohio.

124.    Plaintiff Harry Leonard Beer brings this action both in his individual capacity and as the executor of the Estate of Alan Beer.

125.    Plaintiff Harry Leonard Beer has experienced emotional pain and suffering and the loss of his brother's companionship, advice and counsel.

126.    As a result of the terrorist attack, plaintiff Harry Leonard Beer has suffered severe mental anguish and extreme emotional distress as well as the loss of his brother's companionship, advice and counsel.

127.    Plaintiff Estelle Carroll is a citizen of the United States and a resident of the State of Virginia.

128.    Plaintiff Phyllis Maisel is a citizen of the United States and a resident of the State of Israel.

129.    Plaintiffs Estelle Carroll and Phyllis Maisel have experienced emotional pain and suffering and the loss of their brother's companionship, advice and counsel.

18

130.    As a result of the terrorist attack, plaintiffs Estelle Carroll and Phyllis Maisel have suffered severe mental anguish and extreme emotional distress.

131.    Plaintiff Anna Beer is a citizen of the United States and a resident of the State of Ohio. She is the mother of Alan Beer.

132.    Anna has experienced emotional pain and suffering, the loss of her youngest child's companionship, advice and counsel.

133.    As a result of the terrorist attack, plaintiff Anna Beer has experienced the loss of her youngest son's society, companionship, advice and counsel and has suffered severe mental anguish and extreme emotional distress.

**The Singer Family**

134.    Plaintiff Sarri Anne Singer is a citizen of the United States and a resident of the State of New Jersey.

135.    On June 11, 2003, Sarri Anne Singer boarded bus #14A in Jerusalem to meet a friend for dinner. Soon thereafter, the suicide bomber detonated his bomb only two to three seats away from where Sarri was seated. When the explosives were detonated, Sarri felt a shockwave across her face. The roof of the bus had fallen in and the man in front of her was not moving. Everyone sitting and standing near plaintiff Sarri Singer had been killed.

136.    Sarri was struck with shrapnel from the explosion, which entered her shoulder and broke her clavicle. After the blast she was unable to open her left eye, and her right eye was extremely restricted. She was unable to hear because of a loud ringing in her ears, and her ruptured eardrums. Barely walking, she was taken to an ambulance.

137.    She sustained injuries to her face and legs resulting in scarring. She has undergone physical therapy and will require surgery in the future. Shrapnel had lodged in her

19

gums, moving her teeth. She will need dental work in the future.

138.    As a result of the attack, plaintiff Sarri Anne Singer has suffered severe physical and mental anguish and extreme emotional distress.

139.    Plaintiff Judith Singer is a citizen of the United States and a resident of the State of New Jersey. She is the mother of Sarri Anne Singer.

140.    Judith learned of the attack when her son telephoned her at work.

141.    As a result of the attack plaintiff Judith Singer has suffered severe mental anguish and extreme emotional distress.

142.    Plaintiff Eric M. Singer is a citizen of the United States and a resident of the State of New Jersey. He is the brother of Sarri Anne Singer.

143.    Eric first learned of the attack when he received an emergency phone call from his father while having lunch in a restaurant. After speaking with his mother and notifying his office, Eric and his father flew that night to Israel to be with Sarri.

144.    As a result of the attack, plaintiff Eric Singer has suffered severe mental anguish and extreme emotional distress.

## COMMUTER BUS BOMBING – MAY 18, 2003

### The Averbach Family

145.    Plaintiff Steven Averbach is a citizen of the United States and a citizen and resident of the State of Israel.

146.    He is 39 years old and presently resides near Tel Aviv, Israel, after spending nearly a year in the hospital and a rehabilitation center. He is a married father of four sons ranging in age from three to fourteen. Steve and his wife, Julie, were married in 1994 and have two sons together, Sean (age 10) and Adam (age 5).

147.     Steve's older sons, Tamir (age 15) and Devir (age 12), are from a prior marriage.

148.     On May 18, 2003, Steve was seated on a commuter bus heading for Jerusalem when he noticed an Arab dressed as a religious Jew board the bus. Steve became immediately suspicious.

149.     As Steve approached him, the bomber detonated his explosives.

150.     HAMAS claimed responsibility for the bombing.

151.     The bomber was later identified by his family as Bassem Jamil Tarkrouri.

152.     Seven (7) people were killed by the explosion, ranging in age from 35 to 68. Steve was one of twenty (20) people injured.

153.     Steve absorbed a substantial amount of the impact of the explosion and multiple pieces of shrapnel.

154.     Steve sustained a critical wound when a ball bearing originally packed together with the bomber's explosives penetrated through the skin and muscles of his neck and lodged between his C3 and C4 vertebrae. The ball bearing lodged in his spinal canal causing severe compression damage to his spinal cord. The object was eventually removed during surgery, but not before it had caused severe damage to his spinal cord that rendered him a quadriplegic.

155.     Following surgery, Steve was moved to intensive care where he almost died several times because of an extremely high fever and from the blast injury to his lungs. He has since undergone numerous operations to his back, groin and gastric intestines. He has also undergone a tracheotomy and had a gastric feeding tube inserted as a result of the damage caused by the tracheotomy.

156.     Over the past year Steve returned to the Intensive Care Unit twice with complications.

21

157. Steve is paralyzed from his neck down.

158. On more than one occasion, Steve pleaded with his doctors and family members to take him off of life support.

159. To this day, Steve does not have the use of his arms or legs, and cannot brush his own teeth or scratch his own nose.

160. He is completely dependent on the 24-hour care provided to him and has no foreseeable hope of recovery.

161. He lives in constant pain and battles depression.

162. Plaintiff Steve Averbach has suffered severe physical and mental anguish and extreme emotional distress as a result of the attack.

163. Plaintiff Julie Averbach is a citizen and resident of the State of Israel. She is the wife of Steve Averbach and the mother of Sean and Adam Averbach.

164. As the result of the injuries sustained by Steve, Julie has had to relocate her family to be closer to the rehabilitation center where Steve resided for nearly a year. Steve moved home from the rehabilitation center in July 2004, but requires continuous 24-hour care. Julie is now, in most respects, a single parent and cannot enjoy the normal companionship, day-to-day assistance and mutual support that she previously received from her husband.

165. As a result of the attack, plaintiff Julie Averbach has suffered severe mental anguish and extreme emotional distress.

166. Plaintiff Tamir Averbach is a citizen of the United States and a citizen and resident of the State of Israel.

167. He is the fifteen (15) year old son of Steve Averbach and Steve's first wife.

168. Plaintiff Tamir Averbach has experienced severe mental anguish and extreme

22

emotional distress from witnessing his father's relentless and painful suffering, his repeated surgeries and brushes with death, his negative prognosis and his permanent physical condition.

169.    Plaintiff Devir Averbach is a citizen of the United States and a citizen and resident of the State of Israel. He is the twelve (12) year old son of Steve Averbach and Steve's first wife.

170.    Devir and his elder brother, Tamir, remember what it was like when their father was an able-bodied man.

171.    As a result of the attack, plaintiff Devir Averbach has suffered severe mental anguish and extreme emotional distress as a result of his father's relentless and painful suffering, repeated surgeries and brushes with death, his negative prognosis and his permanent physical condition.

172.    Plaintiff Sean Averbach is a citizen of the United States and a citizen and resident of the State of Israel. He is the ten (10) year old son of plaintiffs Steve and Julie Averbach.

173.    As a result of the brutal attack on his father, he has been emotionally traumatized and has lost the sense of protection and safety he once enjoyed from his father. Due to the severity of his father's injuries, ordinary companionship and simple pleasures of traveling with or playing sports with his father have been denied to him, and will in all likelihood be denied to him for the remainder of his father's life.

174.    As a result of the attack, plaintiff Sean Averbach has suffered severe mental anguish and extreme emotional distress.

175.    Plaintiff Adam Averbach is a citizen of the United States and a citizen and resident of the State of Israel. He is the five (5) year old son of Steve and Julie Averbach.

176.    As a result of the brutal attack on his father he has been emotionally traumatized

23

and will in all likelihood never possess memory of a time when his father was capable of using his arms and legs. Due to the severity of his father's injuries, ordinary companionship and simple pleasures of walking together, driving in a car with, or playing sports with his father have been denied to him and will in all likelihood be denied to him for the remainder of his father's life.

177.    As a result of the attack, plaintiff Adam Averbach has suffered severe mental anguish and extreme emotional distress.

178.    Plaintiffs Dr. David Averbach and his wife, Maida Averbach, are United States citizens and residents of the State of New Jersey. They are the parents of plaintiff Steve Averbach.

179.    They returned home late on May 17, 2003, from a dinner honoring David. Soon thereafter, Maida switched on Fox News and learned that a bus had been bombed in Jerusalem on Sunday morning in Israel. Maida recognized her son's hand leaning out of a stretcher on the news footage but decided not to inform her husband until the next morning.

180.    After a sleepless night, Maida received a telephone call on Sunday morning at 5:50 a.m. from her daughter-in-law and a social worker from Hadassah Hospital. They explained that Steve had been grievously wounded by the explosion and had a ball bearing lodged between his C3 and C4 vertebrae.

181.    As a respected surgeon with many years of experience, David immediately understood the severity of his son's injuries.

182.    Dr. and Mrs. Averbach have partially retired from their jobs so that they may spend more time with Steve and his children.

183.    Plaintiffs David Averbach and Maida Averbach have experienced severe mental anguish and extreme emotional distress as a result of the terrorist attack, and in the case of Maida

Averbach, from the moment she saw her son's hand on television in the early morning hours of
May 18, 2003.

184.    Steve's continued inability to use his hands and legs, his inevitable battle with
depression and the emotional effect it has had on Steve's four young children are a constant
source of continued anguish to both of his parents.

185.    Plaintiff Michael Averbach is a citizen of the United States and a resident of the
State of New Jersey. He is the brother of Steve Averbach.

186.    Michael Averbach has always looked up to his brother and admired him. The
injuries that his brother has sustained have been a severe emotional blow to Michael.

187.    Since the date of the attack Michael has flown to Israel repeatedly, often at his
brother's request, simply to sit by Steve's bedside and talk.

188.    As a result of the terrorist attack, plaintiff Michael Averbach has suffered severe
mental anguish and extreme emotional distress.

189.    Plaintiff Eileen Sapadin is a citizen of the United States and a resident of the State
of New Jersey. She is the sister of Steve Averbach.

190.    Eileen was staying at her parents' home with her husband and three of her four
children on the morning her mother received notification of the attack.

191.    Eileen has experienced tremendous emotional pain and sadness as a result of the
severity of the injuries that Steve sustained as a result of the attack.

192.    She suffers from anxiety and depression, has trouble sleeping and cries every day.

193.    In the past year, she has lost more than thirty pounds and has suffered physical
exacerbations of a colitis condition that was in remission prior to the attack that severely injured
her brother.

194.    As a result of the terrorist attack, plaintiff Eileen Sapadin has suffered severe physical and mental anguish and extreme emotional distress.

## THE MIKE'S PLACE BOMBING - TEL AVIV, APRIL 30, 2003

### The Rozenstein Family

195.    On April 30, 2003, a suicide bomber, Asif Muhammad Hanif, entered Mike's Place, a popular bar situated on the seashore a few hundred meters from the American Embassy in Tel Aviv, and detonated his explosives.[3]

196.    The attack was perpetrated by Asif Muhammad Hanif, 22, a British citizen who entered Israel through Jordan. He was sent by HAMAS.

197.    Plaintiff Daniel Rozenstein is a citizen of the United States and a citizen and resident of the State of Israel.

198.    Daniel was seated inside the bar and decided to step outside when he crossed paths with the suicide bomber in the entry way just as he detonated his explosives.

199.    As a result of the attack, Daniel suffered third degree burns over his entire body. Since his back was to the bomber, Daniel's back bore the brunt of the explosion.

200.    After three days in the hospital, Daniel slipped into a coma that lasted eight days. He was placed on a respirator and other life supports for over a week. He remained in the hospital for one and a half months, followed by eight months of treatment as an outpatient.

201.    Since the bombing he has sustained severe hearing loss. He cannot maintain his balance, is often dizzy, and frequently experiences black outs. Much of his body is covered by scar tissue, including his back and hands. His right hand no longer functions properly because it

---

[3] There were actually two (2) bombers, both British nationals sent by HAMAS, but the explosive belt on one of them failed to detonate.

is covered in scar tissue.

202.    As a result of the attack, plaintiff Daniel Rozenstein has suffered severe physical and mental anguish and extreme emotional distress.

203.    Plaintiff Julia Rozenstein Schon is a citizen of the United States and a citizen and resident of the State of Israel. She is the sister of plaintiff Daniel Rozenstein.

204.    On the night of the bombing, Julia received a telephone call from the father of Daniel's girlfriend. She was told there had been an attack and that no one was certain of Daniel's condition.

205.    When Julia first saw Daniel she did not recognize him because his body was horribly burned and his face and ears were swollen beyond recognition. She spent many days in the hospital, and was there when her brother slipped into a coma.

206.    Julia still suffers nightmares and is traumatized by the attack. Even now, she calls her brother compulsively to be certain that he is not in danger.

207.    As a result of the attack, plaintiff Julia Rozenstein Schon has suffered severe mental anguish and extreme emotional distress.

## SHOOTING ATTACK ON ROAD #60 - JANUARY 29, 2003

### The Steinmetz Family

208.    Plaintiffs Jacob Steinmetz and Deborah Steinmetz are citizens of the United States and citizens and residents of the State of Israel.

209.    On January 29, 2003, Jacob was driving their car on Road #60. Deborah sat in the front passenger seat of the car. As their car made a turn, two masked men began shooting at the car. The entire driver's side of the car was riddled with bullets.

210.    It is believed that HAMAS was responsible for the attack.

211.    Two bullets hit Jacob. One shot passed through the car seat and lodged in his leg. The other shot entered his arm and passed through his elbow.

212.    After arriving at the hospital and over the next few days, Jacob underwent a number of operations.

213.    Four metal spikes were surgically inserted into his bone in order to restrain his arm. The spikes remained there for three months and severely restricted his arm's mobility. Additional plastic surgeries were performed. Jacob received a skin graft from his leg to cover the opening in his elbow.

214.    In 2003, Jacob underwent a complete elbow replacement that included the placement of a large metal hinge.

215.    Presently, the use of Jacob's arm is greatly limited.

216.    As a result of the attack, plaintiff Jacob Steinmetz has suffered severe physical and mental anguish and extreme emotional distress.

217.    As a result of being in the car that terrorists targeted, plaintiff Deborah experiences great anxiety and has suffered severe mental anguish and extreme emotional distress.

218.    Plaintiffs Amichai Steinmetz, Nava Steinmetz, Orit Steinmetz and Natanel Steinmetz are the children of Jacob and Deborah Steinmetz.

219.    As a result of the attack, plaintiffs Amichai Steinmetz, Nava Steinmetz, Orit Steinmetz and Natanel Steinmetz have suffered severe mental anguish and extreme emotional distress.

## THE HEBREW UNIVERSITY CAFETERIA BOMBING - JULY 31, 2002

220.    On the afternoon of July 31, 2002, approximately 100 people were eating lunch in

28

the Frank Sinatra cafeteria on the Hebrew University Mount Scopus campus in Jerusalem. A

bomb planted inside the cafeteria exploded, killing nine (9) people and injuring as many as

eighty-five (85) others. Five Americans were killed in the attack, including Janis Ruth Coulter,

Benjamin Blutstein, Diane Carter and David Gritz.

221.   HAMAS claimed responsibility for the attack.

222.   According to published reports, Mohammed Odeh, who worked at Hebrew

University as a painter for an Israeli contractor, carried out the attack.

223.   Odeh received the explosives from accomplices in the West Bank town of

Ramallah, where the HAMAS cell command was located. On the night before the attack, Odeh

had jumped over a fence on the campus and hid the explosives under a bush. The next morning,

he walked through the main gate using his employee permit, picked up the bomb and planted it

in the cafeteria. He then remote detonated the explosives with a cell phone.

224.   Familiar with the university, Odeh had chosen the Frank Sinatra Cafeteria as the

site for the bombing, knowing that few Arabs frequented the cafeteria and that foreign students

frequently dined there.

## The Coulter Family

225.   Janis Ruth Coulter, a 36 year old citizen of the United States, was in the cafeteria

when the bomb exploded killing her and injuring her friend who she was eating lunch with.

226.   She was the assistant director of the Hebrew University's Rothenberg

International School's Office of Academic Affairs in New York.

227.   Janis had arrived in Israel just one day before the bombing to accompany a group

of nineteen (19) American students who were scheduled to attend classes at the university.

228.   Plaintiff Robert L. Coulter, Sr. was watching television news that morning in the

United States when he saw a "news flash" about a bombing at Hebrew University. Thinking he saw his daughter's head lying in an unsealed body bag, he called his other daughter, plaintiff Dianne Coulter Miller. Dianne called Janis's boss in New York and both Mr. Coulter and his daughter desperately tried to reach Janis on her cell phone without success.

229.    Plaintiff Robert Coulter, Jr. had heard about the bombing on the radio on the way to work, but didn't make the connection with Janis's visit to Israel. His father called him at work about the possibility that Janis was at the cafeteria and he then drove immediately to his father's house.

230.    Initially, Janis was identified only through the numbers on her medical alert bracelet. Eventually, the family retrieved Janis's dental records and faxed them to Israel where, later that evening, her death was confirmed.

231.    Plaintiff Robert L. Coulter, Sr. is a citizen of the United States and a resident of the State of Massachusetts. He brings this action both individually and on behalf of the Estate of Janis Ruth Coulter.

232.    Plaintiff Dianne Coulter Miller is a citizen of the United States and a resident of the State of Massachusetts.

233.    Plaintiff Robert L. Coulter, Jr. is a citizen of the United States and a resident of the State of Massachusetts.

234.    As a result of Janis's death, plaintiff Robert L. Coulter, Sr. has experienced emotional pain and suffering, loss of his daughter's society, companionship, comfort, advice and counsel and has suffered severe mental anguish and extreme emotional distress.

235.    As a result of Janis's death, plaintiff Dianne Coulter Miller has experienced emotional pain and suffering, loss of his sister's society, companionship, comfort, advice and

counsel and has suffered severe mental anguish and extreme emotional distress.

236.    As a result of Janis's death, plaintiff Robert L. Coulter, Jr. has experienced

emotional pain and suffering, loss of his sister's society, companionship, comfort, advice and

counsel and has suffered severe mental anguish and extreme emotional distress.

## The Carter Family

237.    Diane Leslie Carter, a 38 year old citizen of the United States and resident of the

State of North Carolina, was eating lunch in the cafeteria when the bomb exploded.

238.    Diane Carter was killed by the bomb blast.

239.    In 1990, Diane had moved to Israel, where she worked as a librarian and archivist

in the National Library on the Givat Ram campus of Hebrew University in Jerusalem.

240.    Plaintiff Larry Carter is a citizen of the United States and a resident of the State of

North Carolina. He is the father of Diane Carter. He brings this action both individually and on

behalf of the Estate of Diane Leslie Carter.

241.    Larry learned of his daughter's death from a journalist who called his home. After

conferring with his ex-wife, Diane's mother, Larry was able to confirm that his daughter was, in

fact, killed in the bombing.

242.    Diane's sister, plaintiff Shaun Coffel, is a citizen of the United States and a

resident of the State of Virginia.

243.    Both Larry and Shaun learned that Diane had been buried in Israel only moments

before the funeral was scheduled to begin. Neither of them had the opportunity to say goodbye to

Diane.

244.    As a result of Diane Carter's death, plaintiff Larry Carter has suffered severe

mental anguish and extreme emotional distress.

245. As a result of Diane Carter's death, plaintiff Shaun Coffel has suffered severe mental anguish and extreme emotional distress.

**The Blutstein Family**

246. Benjamin Blutstein, a 25 year old citizen of the United States and resident of the State of Pennsylvania, was killed in the blast.

247. Benjamin had come to Israel for a two-year study program at the Pardes Institute in Jerusalem to become a teacher.

248. Benjamin was scheduled to fly home to visit his family in Pennsylvania the day after he was murdered by HAMAS terrorists. Instead, two days after the attack, Benjamin's body was flown home and buried in his parents' home town of Harrisburg, Pennsylvania.

249. Plaintiffs, Dr. Richard Blutstein and Dr. Katherine Baker, bring this action both individually and on behalf of the Estate of Benjamin Blutstein.

250. Plaintiff Dr. Richard Blutstein is a citizen of the United States and a resident of the State of Pennsylvania.

251. Plaintiff Dr. Katherine Baker is a citizen of the United States and a resident of the State of Pennsylvania.

252. Plaintiff Rebekah Blutstein is a citizen of the United States and a resident of the State of Pennsylvania. She is the sister of Benjamin Blutstein.

253. Richard first heard about the attack while watching Fox News early in the morning. He then called Benjamin's cell phone and got a recording. Shortly thereafter he contacted friends in Israel to ascertain if Benjamin had been injured in the attack. After a friend made a positive identification, Richard received a call confirming Benjamin's death.

254. Katherine learned that her son had been killed in the attack when she received a

call from a representative of the American Embassy. She was too overwhelmed with emotion to call her husband. Richard received the call from a neighbor, who was with Katherine. Katherine then composed herself enough to inform her daughter, Rebekah.

255.    As a result of Benjamin's death, plaintiff Richard Blutstein has experienced emotional pain and suffering, loss of his son's society, companionship, comfort, advice and counsel and has suffered severe mental anguish and extreme emotional distress.

256.    As a result of Benjamin's death, plaintiff Katherine Baker has experienced emotional pain and suffering, loss of Benjamin's society, companionship, comfort, advice and counsel and has suffered severe mental anguish and extreme emotional distress.

257.    Although Rebekah's father had informed her about the attack, Rebekah's mother was the one who told her that her brother had died.

258.    As a result of Benjamin's death, plaintiff Rebekah Blutstein, has experienced emotional pain and suffering, loss of her brother's society, companionship, comfort, protection, advice and counsel and has suffered severe mental anguish and extreme emotional distress.

**The Gritz Family**

259.    David Gritz, a 24 year old dual citizen of the United States and France was killed in the explosion. He had come to Israel for the first time with the help of a scholarship from the Hartman Institute to study philosophy and write his doctorate.

260.    He died after being in Israel for only two weeks.

261.    Plaintiff Nevenka Gritz is a citizen and resident of France. She is the mother of David Gritz, who was an only child.

262.    Plaintiff Nevenka Gritz brings this action both individually and on behalf of the Estate of David Gritz.

33

263.    Nevenka and her husband, Norman Gritz, were in New York on the day their son
was murdered. Friends of theirs informed them that television reports had indicated that a
bombing had taken place at Hebrew University. Nevenka and her husband attempted to reach
their son by phone, and then called the Israeli consulate in the hopes of getting more information.
Eventually, confirmation came from the Israeli consulate that David's body had been identified.

264.    As a result of David's death, plaintiff Nevenka Gritz has experienced emotional
pain and suffering, loss of their only child's society, companionship, comfort, advice and counsel
and suffered severe mental anguish and extreme emotional distress.

## NETANYA SUICIDE BOMBING – MAY 19, 2002

### Gloria Kushner

265.    Plaintiff Gloria Kushner is a citizen of the United States and a citizen of the State
of Florida.

266.    She was injured by a suicide bomber in Netanya, Israel, on May 19, 2002.

267.    Both HAMAS and the Popular Front for the Liberation of Palestine claimed
responsibility for the attack.

268.    Gloria was walking in an open air market when a suicide bomber blew himself up
between the stalls, killing three (3) individuals and wounding more than fifty (50) people.

269.    Gloria was approximately one hundred and fifty feet away from the suicide
bomber when he detonated the bomb. As the bomb exploded, nails, screws and bolts flew in
every direction and glass shattered on the main street from the buildings surrounding the market.

270.    Gloria was thrown against a vegetable stand, injuring her spine, right knee and
right ear.  The permanent bridge in her mouth cracked and a shard of glass imbedded itself in her
chin.

34

271. She had to undergo surgery to remove the resulting lump and she continues to suffer from headaches and numbness in her fingers due to the injury to her neck.

272. She suffers from post traumatic stress disorder and still has flashbacks and nightmares whenever she hears an ambulance or fire truck.

273. As a result of the terrorist attack, plaintiff Gloria Kushner has experienced severe physical and mental anguish and extreme emotional distress.

## THE SHEFFIELD CLUB BOMBING OF MAY 7, 2002

274. On the night of May 7, 2002, a Palestinian suicide bomber entered the third floor of a building in Rishon Letzion's new industrial area that housed the Sheffield Club, an unlicensed social club and gambling parlor, and detonated a bomb.

275. Eyewitnesses reported that the bomb blast propelled many of the victims through the club's windows and on to parked cars in the parking lot three floors below.

276. Fifteen (15) people were killed by the attack including Esther Bablar, an American citizen who had returned to Israel after thirty (30) years to marry her childhood sweetheart, Yitzhak, who was also killed in the attack. Esther died of her injuries the following morning. Esther is survived by three children.

### The Bablar Family

277. Plaintiffs Jacqueline Chambers and Levana Cohen Harooch are citizens of the United States and residents of the State of Florida. They are the daughters of Esther Bablar.

278. Plaintiff Jacqueline Chambers brings this action both individually and on behalf of the Estate of Esther Bablar.

279. Esther had spent the month before the bombing in Florida with her youngest daughter, plaintiff Levana Cohen Harooch who had just given birth to Esther's grandchild and

had been in New York visiting Jacqueline the day before the attack.

280.    On the day of the attack, a member of the Bablar family in Israel contacted Esther's sister in New York and told her the bad news. Eventually both of Esther's daughters were notified and they quickly made arrangements to board a flight to Israel with their aunt and uncle.

281.    As a result of the terrorist attack, plaintiffs Jacqueline Chambers and Levana Cohen Harooch have experienced emotional pain and suffering, and the loss of their mother's society, companionship, comfort, protection, attention, advice and counsel.

## PASSOVER MASSACRE AT THE PARK HOTEL IN NETENAYA: MARCH 27, 2002
### The Rogen Family

282.    On March 27, 2002, a HAMAS suicide bomber blew himself up near the dining area within the Park Hotel in Netanya. It was the night of the Jewish holiday of Passover and the hotel dining room was filled with hundreds of people celebrating the Passover Seder with their families and friends. Thirty (30) people were murdered in the bombing, including Hannah Rogen, who was severely wounded in the attack and died of the wounds six days later on April 2, 2002.

283.    Hannah was a Holocaust survivor who immigrated to the United States after World War II. She was attending the Passover Seder at the invitation of a childhood friend, Yulia Talmi, who was also killed in the attack.

284.    Hannah was a citizen of the United States at the time of her death.

285.    Plaintiff Greta Geler is the great niece of Hannah Rogen and the Administrator of the Estate of Hannah Rogen.  She brings this action as Administrator of the Estate of Hannah Rogen.

## B.     The Defendant

286.     National Westminster Bank, Plc ("NatWest") is a British financial institution with

its principal place of business in London, United Kingdom. It is part of the Royal Bank of

Scotland Group.

287.     NatWest conducts business in the United States and in New York, both directly

and through its agents, at a number of locations including 101 Park Avenue, New York, New

York 10178, and 600 Steamboat Road, Greenwich, Connecticut 06830, which it also lists in its

annual report as one of its "principal offices."

288.     NatWest has also been registered to conduct business within the State of Texas

since 1999, and state records list its address as 600 Travis Street in Houston, Texas.


## FACTUAL ALLEGATIONS

## I.     THE ISLAMIC RESISTANCE MOVEMENT ("HAMAS")

### A.     The Founding of HAMAS

289.     In December 1987, Sheik Ahmed Yassin formed the Palestinian Islamic

Resistance Movement ("HAMAS") as an offshoot of the Muslim Brotherhood, a radical Islamic

group founded in Egypt before World War II.

290.     Pursuant to its charter, HAMAS and its operatives plan, assist, and conduct acts of

international terrorism in Israel, the West Bank, and the Gaza Strip, including the attacks that

injured the plaintiffs.

### B.     Formal Designations of HAMAS as a Terrorist Organization

291.     In 1989, the Government of Israel declared HAMAS a terrorist organization and

designated it an "unlawful organization" because of its terrorist acts. Notice of the designation

37

was placed in the official Government of Israel publication, the *Announcements and Advertisements Gazette*.

292. Initially, HAMAS specialized in kidnapping and executing people suspected of cooperating with Israel. It quickly evolved and broadened its operations so that by the early 1990s it specialized primarily in murdering civilians in Israel.

293. For example, on April 6, 1994, a HAMAS suicide bomber blew up a bus in Afula, killing eight (8) people.

294. On April 13, 1994, a HAMAS suicide bomber blew up a bus in Hadera, killing five (5) people.

295. On October 19, 1994, a HAMAS suicide bomber blew up a bus in Tel Aviv, killing twenty-two (22) people.

296. On January 23, 1995, President Clinton issued Executive Order No. 12947. President Clinton found that "grave acts of violence committed by foreign terrorists that threaten to disrupt the Middle East peace process constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States."

297. Executive Order No. 12947 designated HAMAS as a "Specially Designated Terrorist" (SDT). Executive Order No. 12947 blocked all property and interests in property of the terrorist organizations and persons designated in the Order, including HAMAS.

298. On February 25, 1996, a HAMAS suicide bomber blew up a bus in Jerusalem killing twenty-six (26) people, three (3) of whom were U.S. citizens, and injuring eighty (80), three (3) of whom were U.S. citizens. HAMAS claimed responsibility for the bombing.

299. On October 8, 1997, by publication in the Federal Register, the United States Secretary of State designated HAMAS a Foreign Terrorist Organization pursuant to Section 219

38

of the Immigration and Nationality Act and the Antiterrorism and Effective Death Penalty Act of
1996. The designation of HAMAS as a Foreign Terrorist Organization has been renewed every
two years since 1997.

300.     After the September 11, 2001 terrorist attacks on the United States, President
Bush issued Executive Order No. 13224, declaring a national emergency with respect to the
"grave acts of terrorism ... and the continuing and immediate threat of further attacks on United
States nationals or the United States."

301.     Executive Order No. 13224 designated HAMAS as a Specially Designated Global
Terrorist ("SDGT"). Executive Order No. 13224 blocked all property and interests in property
of the SDGTs, including HAMAS.

### C.     HAMAS's Organizational Structure

302.     HAMAS's terrorist operations depend upon its religious and social activities to
recruit, educate and train terrorists and to collect material and aid. Its terrorist operations and
social activities operate side-by-side and support each other.

#### 1.     The "Dawa"

303.     HAMAS's infrastructure in Palestinian Authority-controlled territory ("the
PACT") is comprised of two interwoven components: its terrorist apparatus, and its religious and
social infrastructure, which is responsible for recruiting and training terrorists. This patchwork
of charitable and social institutions is commonly referred to by HAMAS as the "Dawa."

304.     For the purpose of raising funds for its operations, HAMAS has established or
taken control of "charity" committees across the PACT and abroad, including committees in
Ramallah, Jenin, and Tulkarem. Each of these committees is controlled by HAMAS agents and

collects and distributes its funds on behalf of HAMAS.[4]

305.     One of the important roles of these "charities" is their involvement in the channeling of funds to pay expenses for and assist the families of terrorist operatives who are arrested, injured or killed. These entities also assist with the provision of housing subsidies to the families of suicide bombers whose homes are often demolished by the Israeli army after the bomber's identity has been confirmed.

306.     The network of these "charities" and other "charitable" associations not only helps raise funds for HAMAS's terrorist operations, but also helps it to identify and recruit potential terrorists.  The network also assists recruitment, in part, by funneling money to pay benefits to the families of terrorist operatives who are arrested, injured, or killed.

307.     Nonetheless, HAMAS, like other foreign terrorist organizations, collects funds under the guise of political or humanitarian activities, thus ultimately supporting the kind of terrorist activities that injured the plaintiffs herein.

## 2.     Terrorism Financing

308.     Funds raised by or on behalf of HAMAS for "charitable purposes" are used to finance its terrorist activities. As Congress found when passing the AEDPA: "Foreign organizations that engage in terrorist activity are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct." Antiterrorism Act of 1996, Pub. L. No. 104-132, sec. 301(a)(7), 110 Stat. 1247.

309.     HAMAS receives a majority of its financing through donations coordinated by prominent Saudi and Gulf State charities and the global network of charities known as the Union of Good, operated by the Muslim Brotherhood. The Union of Good, in turn, raises funds that are,

---

[4] There are approximately 80 such "charitable" committees in the West Bank and Gaza Strip nominally supervised by the Palestinian Authority's Ministry of Waqf and Religious Affairs.

in part, channeled through an entity known as the Palestine Relief and Development Fund and/or Interpal (Hereinafter: "Interpal"), which maintains several accounts with defendant NatWest.

### a.   The Union of Good

310.   I'Tilafu Al-Khayr a/k/a the Union of Good is an umbrella organization established by the Muslim Brotherhood in October 2000, immediately following the outbreak of the ongoing violent Palestinian-Israeli confrontation commonly termed the "Second Intifada."

311.   The Union of Good is thus a principal fundraising mechanism for HAMAS.

312.   The Union of Good's primary "charitable" purpose is to provide financial support for HAMAS and its agents in the PACT.

313.   The Union of Good is comprised of more than fifty (50) Islamic charitable foundations worldwide.  The U.S. Government has designated several of these foundations, including Interpal and the Al-Aqsa Charitable Foundation, as Specially Designated Global Terrorists ("SDGT").

314.   The U.S. Government designated Interpal an SDGT on August 22, 2003, and designated the Al-Aqsa Charitable Foundation an SDGT on May 29, 2003.

315.   NatWest maintains a U.S. Dollar account for the Union of Good with the account number 140-00-08537933.

316.   The Union of Good uses Interpal as its principal clearing house for funds raised throughout Europe and the Middle East.

317.   For example, in recent months, plaintiffs discovered that the Union of Good's "101 Days Campaign" maintains its own website at www.101days.org. The campaign solicits funds for HAMAS and directs prospective donors to donate via Interpal's NatWest account numbers 60082295142940 (Sterling) and 60720508524882 (Euros).

318.    **Interpal's own website directly manifests the symbiotic link between the**

**Union of Good and Interpal, soliciting donations for the former and explicitly stating that:**

> Any donation that is made to INTERPAL through this web page is distributed
> with the knowledge and approval of the other members of the Union for Good
> directly to the charities in Palestine that are implementing the work creation
> programs [sic].[5]

319.    The Union of Good is headed by Dr. Yussuf al-Qaradawi, an extremist Sunni

Muslim scholar based in Qatar. NatWest is will aware of al-Qaradawi's connections to terrorism

and his connection to Interpal.

320.    To begin with, al-Qaradawi has been on the U.S. Watch List since November

1999 and cannot travel to the United States.

321.    Al-Qaradawi was also a leading shareholder and principal in the Al Taqwa Bank,

which was officially designated as a Specially Designated Global Terrorist on November 7,

2001, because of its ties to fundraising and money laundering for al Qaeda and HAMAS.

322.    Nor is al-Qaradawi an obscure or shadowy figure. On the contrary, he has his own

weekly television program on *Al Jazeera* and has very publicly issued an Islamic religious edict

(*fatwa*) authorizing suicide bombing attacks against Israel.[6]

323.    In fact, on April 14, 2002, al-Qaradawi appeared on *Al Jazeera* extolling "jihad

and martyrdom" against Israelis and denouncing the U.S. designation of HAMAS and other

terrorist organizations.

324.    Although the Union of Good and other fundraising organizations for HAMAS

speak only generally about the Intifada and the families of the 'martyrs,' NatWest has been, and

---

[5] http://www.interpal.org/web/101.htm

[6] Al-Qaradawi was also the first scholar who authorized women to commit suicide attacks (March 2002) in the
context of the second Intifada, as cited in HAMAS's official website: http://www.palestine-
info.info/arabic/fatawa/alamaliyat/qaradawi.htm.

remains, in a unique position to monitor and quantify most of the transactions flowing into the

Union of Good and Interpal accounts. NatWest is also in a position to monitor and determine the

identities of the entities to which the Union of Good and Interpal transmit the funds they collect

via NatWest accounts.

325.    Thus, while the 101 days website speaks obliquely of supporting "**the families of**

**the injured and the martyred in particular,**" NatWest, at all relevant times has had direct,

first-hand knowledge of the organizations to which this 'support' has been transmitted, i.e.

dozens of notorious HAMAS front organizations.

326.    As recently as October 29, 2005, in an interview with *The Guardian* newspaper,

al-Qaradawi discussed suicide bombing in Israel and is quoted as saying:

> The actor who commits this is a martyr because he gave his life for the noble
> cause of fighting oppression and defending his community. These operations are
> best seen as the weapon of the weak against the powerful. It is a kind of divine
> justice when the poor, who don't have weapons, are given a weapon which the
> fully equipped and armed-to-the-teeth powerful don't have - the powerful are not
> willing to give their lives for any cause.

327.    More importantly, al-Qaradawi's views and activities have been a matter of public

record for many years.[7]

328.    Through his many public appearances and popular television program, al-

Qaradawi has never concealed his views about the moral rectitude of murdering Jews and

Israelis.

329.    To take just one example, in the September 1999 edition of the *Palestine Times*,

in an article entitled "Sheikh Yousuf al-Qaradawi: Hamas and the Islamic Jihad represent the

glorious face of the Islamic Umma- Interview" al-Qaradawi blessed "the martyrdom operations

---

[7] Al-Qaradawi was the subject of massive publicity in Great Britain when he was invited to London by its mayor in
July 2004, but his prominence long predates that event.

in which a given Moslem fighter turns himself or herself into a human bomb that casts terror in the hearts of the enemy. . . . If we can't carry out acts of Jihad ourselves, we at least should support and prop up the Mujahideen financially and morally so that they will be steadfast until God's victory."

330. NatWest is, and at all relevant times was, aware of al-Qaradawi's views. More importantly, NatWest has specific and detailed knowledge of how al-Qaradawi and his myriad of charitable front organizations channel funds to HAMAS because millions of dollars flow through accounts held at NatWest.

331. Al-Qaradawi might be considered the "chairman of the board" of HAMAS's global fundraising efforts, but Issam Yusuf a/k/a Essam Yussef a/k/a Issam Yusuf Mustafa is the operational head (Vice Chairman and Managing Trustee) of the Union of Good. He is a HAMAS agent and former vice chairman of Interpal, and he manages HAMAS's day-to-day fundraising efforts.

332. The board of directors of the Union of Good includes three senior HAMAS figures: Sheikh Hamid al-Bitawi, Dr. Essam Salhoub, and Bassam Jarrar.

333. In 2001, al-Qaradawi publicly described the activities of the Islamic charitable societies sustaining the Intifada against Israel as a "new type of *jihad*, financial *jihad*, through which financial support is guaranteed to the martyrs' families, Palestinian prisoners and detainees, and every Palestinian whose property is damaged during the conflict."

334 As of the filing of this Amended Complaint, NatWest collects and transmits funds on behalf of the Union of Good and its largest fundraising arm, Interpal.

### b. Interpal

335. Charitable donations to the Union of Good are partially collected and distributed

through Interpal.

336.    Interpal was founded in 1981 as the Palestine and Lebanon Relief Fund and was
reincorporated as Interpal in November 1994.

337.    On or before January 1, 1996, Interpal opened one or more accounts with
defendant NatWest.

338.    The Charity Commission, established by law as a regulator and registrar for
charities in England and Wales, froze Interpal's accounts at NatWest in March 1996 based
on evidence that it channelled money to HAMAS.

339.    The allegations of links between Interpal and HAMAS were published in
numerous British newspapers at the time, including *The Guardian* and *The Times of London.*[8]

340.    A spokesman for the Charity Commission told *The Guardian* that Interpal's bank
accounts had been frozen "as a precautionary measure." Following the widely published reports
of Interpal's links to HAMAS, NatWest took no action to terminate its relationship with
Interpal.[9]

341.    The Charity Commission ultimately unfroze the accounts ostensibly because the
British government distinguished (at the time) between the military and social or charitable
wings of HAMAS.  There was no finding by the Charity Commission concerning Interpal's
relationship with HAMAS per se, nor did Interpal attempt to deny that it was transferring

---

[8] Richard Norton-Taylor and Ian Black, *Palestinian Charity Funds Frozen Over 'Hamas Link,'* THE GUARDIAN,
Mar. 9, 1996; Richard Norton-Taylor, *News in Brief: Palestinian Group Cleared*, THE GUARDIAN,  Mar. 13, 1996;
Julian Borger, *Close Trust, Israel Pleads; Britain is being asked to clamp down on Palestinian fundraisers,* Sept. 7,
1997; Stewart Tendler and Christopher Walker, *MI5 study 'charity cash linked to Hamas,'* THE TIMES, Mar. 6,
1996; Stewart Tendler, *Charity's funds are frozen over alleged Hamas link,* THE TIMES, Mar. 9, 1996; Adrian Lee
and Michael Evans, *MI5 traces network of Hamas funding,* THE TIMES, Mar. 11, 1996.

[9] In an interview reported in THE GUARDIAN on August 7, 1997, Mr. Ibrahim Hewitt, Chairman of Interpal, publicly
acknowledged that it was possible that some of Interpal's beneficiaries in the Palestinian territories had been
established by HAMAS.

millions of dollars to HAMAS.

342.    The Charity Commission's May 30, 1996 report concerning Interpal stated its

findings as follows:

> Poverty and need must however be the only criteria when deciding how the
> charity's funds are distributed and aid must not be given because of a person's
> support for terrorism. We found no evidence in the charity (Interpal) of any pro-
> terrorist bias, or indeed bias of any kind.

343.    Thus, the Charity Commission finding was that Interpal donated funds [to

HAMAS] without any evident intent to support terrorism per se, or as the Commission put it,

without "any pro-terrorist bias."

344.    U.S. anti-terrorism laws, however, do not distinguish between "biased" and

"unbiased" support provided to designated Foreign Terrorist Organizations.

345.    As Kenneth R. McKune, Associate Coordinator for Counterterrorism at the U.S.

Department of State noted in a sworn declaration on April 21, 1998:

> [T]he Antiterrorism and Effective Death Penalty Act of 1996 prohibits the
> provision of material support or resources to foreign terrorist groups that have
> been formally designated, pursuant to statute, as "foreign terrorist organizations"
> by the Secretary of State.  In prohibiting comprehensively the provision of such
> support and resources, the law does not differentiate between the criminal,
> terrorist activities of these organizations, and the civil, non-violent activities, if
> any, in which they might engage.  In legislating this particular dimension of the
> "material support" ban, the Congress found that "foreign organizations that
> engage in terrorist activity are so tainted by their criminal conduct that any
> contribution to such an organization facilitates that conduct."

346.    NatWest nonetheless provided (and continues to provide) funds for

institutions that belong to HAMAS's financial infrastructure in the PACT, including many

entities the Government of Israel has declared unlawful and the U.S. Department of Justice has

identified as agents of HAMAS.

347.    Following the March 1996 British investigation which first placed NatWest on

notice that it was transferring funds to HAMAS, Interpal was declared an "unlawful organization" by the Government of Israel in May 1997 because of its fundraising activities on behalf of HAMAS. Notice of the designation was placed in the official publication, the *Announcements and Advertisements Gazette.*

348. Despite this designation, NatWest did not cease providing financial services to Interpal.

349. Interpal was further designated a terrorist organization in January 1998 by the Government of Israel. Notice of the designation was also placed in the *Announcements and Advertisements Gazette.*

## II.   DEFENDANT'S CONDUCT

### A.   NatWest Transfers to HAMAS Entities

350. Despite this designation and the knowledge that it was providing financial services to a Foreign Terrorist Organization, NatWest did not cease providing financial services to Interpal.

351. NatWest provided **and continues to provide** financial services to HAMAS via various HAMAS-controlled institutions including, but not limited to: the Orphan Care Society of Bethlehem, Al-Islah Charitable Society in Ramallah-Al-Bireh, the Ramallah-Al-Bireh Charitable Society, the Jenin Charity Committee, the Hebron Islamic Association, Tulkarem Charity Committee, Al-Mujama al-Islami, the Islamic Charitable Society in the Gaza Strip, and the Muslim Youth Association of Hebron.[10]

352. The Orphan Care Society of Bethlehem was outlawed by the Government of

---

[10] The Jenin Charity Committee and Tulkarem Charity Committee (among others) are specifically identified as HAMAS-controlled organizations by the United States Government in the July 2004 criminal indictment of Holy Land Foundation for Relief and Development in the Northern District of Texas.

47

Israel in February 2002. Most of its chief functionaries, including its director, Dr. Ghassan
Harmass, are HAMAS terrorists. The Orphan Care Society pays subsidies to the children of
HAMAS "martyrs" and imprisoned HAMAS members.[11]

353.    The 2001 version of Interpal's website stated that Interpal "works closely with"
the Orphan Care Society.

354.    The Al-Islah Charitable Society in Ramallah-Al-Bireh was founded in 1997. The
Government of Israel declared the Al-Islah Charitable Society an "unlawful organization" in
February 2002. The Al-Islah Charitable Society regularly transfers money for the benefit of the
families of HAMAS "martyrs," and subsidizes the renovation of homes that belong to the
families of suicide bombers and were destroyed by Israel. The Al-Islah Charitable Society
supports the families of "martyrs," HAMAS prisoners in Israeli jails, and deported HAMAS
members.

355.    The Jenin Zakat Committee was declared an "unlawful organization" in February,
2002. This "charity" is run by HAMAS terrorists, and it provides aid to HAMAS terrorists, to
the families of "martyrs," and Palestinians wounded or imprisoned as a result of violent
confrontations with Israel.

356.    The 2001 version of Interpal's website states that Interpal "works closely with"
the Jenin Zakat Committee.

357.    The Tulkarem Charity Committee was founded in 1981. The Government of
Israel declared the Tulkarem Charity Committee an "unlawful organization" in February, 2002.
The Committee is headed by a HAMAS terrorist.

358.    In 2002 alone, NatWest transferred over $1,500,000.00 to the HAMAS front

---

[11] In an interview published on the 101 days website, Dr. Harmass states that Interpal is one of the Orphan Care Society's largest sources of donations. : http://www.101days.org/arabic/taqareer/yateem.htm

organizations listed in paragraph 351, which had been previously designated as unlawful organizations by the Government of Israel because of their affiliation with HAMAS.

**B.    Funds Collected by NatWest from Specially Designated Global Terrorists and Convicted Fundraisers for HAMAS**

359.    On at least three separate occasions NatWest accepted deposits on behalf of Interpal from organizations and entities whose terrorist connections are a matter of public record.

360.    In April 2000, NatWest accepted a deposit of $66,000.00 for Interpal from the Holy Land Foundation for Relief and Development ("HLF").[12]

361.    According to a prior version of Interpal's website (dating back to August 2001), Interpal directs persons wishing to make "international donations" to donate to HLF.

362.    On December 4, 2001, the U.S. Secretary of Treasury determined that HLF was subject to Executive Order Nos. 12947 and 13224 because HLF "acts for or on behalf of" HAMAS.

363.    Accordingly, HLF was designated an SDT under Executive Order No. 12947 and an SDGT under Executive Order No. 13224.

364.    In December 2001, the Counsel of the European Union designated Holy Land Foundation as a terrorist entity under Article 2(b) and Regulation (EC) No. 2580/2001 on specific restrictive measures directed against certain persons and entities with a view to combating terrorism and repealing Decision 2005/848/EC.

365.    In order to facilitate the application of financial sanctions, the European Banking Federation, the European Savings Banks Group, the European Association of Co-operative Banks and the European Association of Public Banks (the "EU Credit Sector Federations") and

---

[12] On May 6, 1997, the Government of Israel designated the Holy Land Foundation for Relief and Development ("HLF") as a HAMAS front organization and declared that HLF "deals in the practice of transferring monies to families of HAMAS activists, who carried out deadly attacks ...."

the Commission recognized the need for an EU consolidated list of persons, groups and entities subject to CFSP related financial sanctions. It was therefore agreed that the Credit Sector Federations would set up a database containing the consolidated list for the Commission, which would host and maintain the database and keep it up-to-date. This database was developed first and foremost to assist the members of the EU Credit Sector Federations in their compliance with financial sanctions. HAMAS and HLF were so listed in December 2001.

366.    On March 11, 2002, HLF filed suit seeking to enjoin the U.S. Government from continuing to block or freeze its assets.

367.    On August 8, 2002, the United States District Court for the District of Columbia issued a written opinion in *Holy Land Foundation for Relief and Development v. Ashcroft*, 219 F. Supp. 2d 57, 70 (D.D.C. 2002) finding that "between 1992 and 1999, HLF contributed approximately 1.4 million dollars to eight Hamas-controlled "zakat" (or charity) committees.... HLF grant lists also establish that, between 1992 and 2001, HLF gave approximately five million dollars to seven other Hamas-controlled charitable organizations, including a hospital in Gaza."[13]

368.    The publicly available 2002 court decision sets forth with specificity the legal basis for concluding that HLF's conduct – which is nearly identical to that of Interpal – constituted support for terrorism.

369.    Like HLF, the Al-Aqsa Charitable Foundation is a critical part of HAMAS's transnational terrorist support infrastructure. The Al-Aqsa Foundation also maintained branch offices in The Netherlands, Denmark, Belgium, Sweden, Pakistan, South Africa, Yemen and elsewhere.

---

[13] In fact, in November 2001, the FBI identified eight (8) charitable fronts as agents of HAMAS, at least 6 of whom have been NatWest wire transfer recipients. See, Memorandum of Dale L. Watson, the Assistant Director of the FBI's Counterterrorism Division, written to R. Richard Newcomb, Director of the United States Treasury Department's Office of Foreign Assets Control ("OFAC") and dated November 5, 2001.

370. On March 27, 2003, NatWest deposited at least two payments to Interpal totalling 295,000 Euros from the Dutch branch of the Al-Aqsa Foundation.[14]

371. Two months later, on May 29, 2003, the U.S. Treasury Department added the Al-Aqsa Foundation to its list of Specially Designated Global Terrorist entities, accusing the organization of funneling funds -- including money donated for charitable purposes -- to the militant terrorist group HAMAS.

372. Nonetheless, NatWest took no steps to close its Interpal accounts.

373. Years earlier, in or about January 2001, NatWest accepted deposits totaling $70,000.00 on behalf of Interpal from the Al-Aqsa organization in Yemen.

374. On January 10, 2003, German authorities arrested Sheik Mohammed Ali Hasan al-Moayad, the head of the Al-Aqsa organization in Yemen, at the request of the U.S. Department of Justice and the Federal Bureau of Investigation. The arrest took place after a year-long investigations of al-Moayad and undercover operations by the FBI's Joint Terrorism Task Force for his knowingly and intentionally conspiring to provide material support and resources for Al-Qaeda and HAMAS.

375. Prior to his arrest in Germany, Sheik al-Moayad had met with an undercover government informant and proffered proof of his prior fundraising on behalf of HAMAS by tendering to the undercover government informant a receipt from Interpal confirming a $70,000.00 donation from the Sheik's Al-Aqsa organization in Yemen.

376. Sheik al-Moayad was subsequently convicted of providing material support to HAMAS in violation of 18 U.S.C. § 2339B and in 2005 was sentenced to 75 years in prison.

---

[14] On July 31, 2002, German authorities closed the Al-Aqsa Foundation in Germany because of its support for HAMAS. On January 1, 2003, the Danish government charged three Al-Aqsa Foundation officials in Denmark with supporting terrorism. In April 2003, Dutch authorities blocked Al-Aqsa Foundation assets in The Netherlands based on information that funds were provided to organizations supporting terrorism in the Middle East.

**C.** **Interpal's Designation by the U.S. Government in 2003 and Defendant's Continuing Conduct**

377. The August 19, 2003 HAMAS suicide bombing of a bus resulted in the death of

Tehilla Nathansen, and injuries to members of the Nathansen family and plaintiff Tzvi Weiss.

378. Following this atrocity, President George W. Bush stated:

At my direction, the Treasury Department has moved today to block and freeze the assets of six top HAMAS leaders and five non-governmental organizations that I am advised provide financial support to HAMAS. By claiming responsibility for the despicable act of terror on August 19, HAMAS has reaffirmed that it is a terrorist organization committed to violence against Israelis and to undermining progress toward peace between Israel and the Palestinian people.

379. Thereafter, Interpal, as one of the five non-governmental organizations, was

designated as an SDGT on August 22, 2003.

380. In an interview reported in *The Guardian* on August 28, 2003, after the U.S.

Government designation, Mr. Hewitt, Chairman of Interpal, was publicly quoted as saying:

"We deal with people whether they are HAMAS or whether they are Fatah."

381. Even after Interpal's designation as a Specially Designated Global Terrorist

organization and its Chairman's public admission of its relationship to HAMAS, already

designated a Foreign Terrorist Organization, NatWest again took no action to cease its

relationships with Interpal.

382. On September 12, 2003, the European Union designated all of HAMAS

(including its social "wing") a terrorist organization, but even then, NatWest took no action to

close Interpal's accounts.

383. To this day, notwithstanding all of this publicly available information, NatWest

continues to collect and transmit funds for HAMAS.

**D.     Specific Accounts and Transactions**

384.    Interpal is a pivotal part of HAMAS's fundraising infrastructure and a significant source of HAMAS's financing.

385.    For more than nine (9) years, defendant NatWest has knowingly maintained numerous accounts for Interpal and has collected, received, transmitted, and provided **millions of dollars** on behalf of Interpal directly to agents of HAMAS in the PACT.

386.    These accounts include:

U.S. Dollar Account Number – 140-00-04156838

Euro Account Number – 60720508524882

Sterling Account Number – 60082295142940

387.    NatWest thereby provides HAMAS with a highly convenient method to collect and transfer funds in U.S. Dollars as well as Sterling and Euros.

388.    NatWest also provides Interpal with merchant banking services, directly and through another Royal Bank of Scotland subsidiary, thereby making it possible for Interpal to maintain merchant accounts with MasterCard, VISA and other credit card companies.

389.    This allows HAMAS to solicit contributions in dozens of currencies from around the world and allows Interpal to solicit funds for HAMAS via its website at www.interpal.org.

390.    In addition, NatWest, with the help of financial products provided by its sister company, provides further substantial assistance to HAMAS by making it possible for British nationals to make direct contributions to Interpal by way of their employer's payroll department through a program called "Give As You Earn."

391.    Since March 1996, defendant NatWest has known that it has been providing financial services to HAMAS and that Interpal collects money for, and transmits money to,

HAMAS, a Foreign Terrorist Organization.

392. NatWest has transferred funds directly to HAMAS-controlled entities on hundreds (if not thousands) of occasions.

393. For example, on February 19, 2003, NatWest transferred £21,404 ($34,051.60 U.S.) to the HAMAS front organization, the Tulkarem Zakat (Charity) Committee Society and charged a commission of £10. See Exhibit A attached. At the time NatWest transferred this amount to HAMAS, both Interpal (the repository of the funds) and the Tulkarem Charitable Society (the HAMAS front that received the funds) had been designated as unlawful organizations by the Government of Israel due to their support for or control by HAMAS.

394. The U.S. Department of Justice has identified the Tulkarem Charitable Society as an "organization, which operated on behalf of, or under the control of, HAMAS."

395. Likewise, on July 30, 2003, NatWest transferred £73,757 ($119,809.00 U.S.) to the Jenin Charitable Society, debiting Interpal's Account Number 600822-95142940. See Exhibit B attached. This transaction was apparently financed by the World Assembly of Muslim Youth ("WAMY"), the well known Saudi "charity" linked to both HAMAS and Al Qaeda financing.[15] At the time NatWest transferred this amount to HAMAS, WAMY (the source of the funds), Interpal (the repository of the funds) and the Jenin Charitable Society (the HAMAS front that received the funds) had all been designated as unlawful organizations by the Government of Israel due to their support for or control by HAMAS.

397. One of Interpal's officers/directors, Mahfuzh Safiee is an officer of WAMY, Ltd. (a European branch of WAMY).

---

[15] The WAMY Conference in Riyadh in October 2002 was attended by the head of the HAMAS Political Bureau, Khalid Mishal, who was also designated a Specially Designated Global Terrorist on August 22, 2003, pursuant to Executive Order No. 13224.

398.     The U.S. Department of Justice has identified the Jenin Charitable Society as an "organization, which operated on behalf of, or under the control of, HAMAS."

399.     Nor did NatWest cease providing enormous sums of money to HAMAS even after Interpal was formally designated a Specially Designated Global Terrorist by President Bush on August 22, 2003. On the contrary, the same millions of dollars that NatWest transferred to HAMAS since 1996 and that helped maim and murder U.S. citizens such as the plaintiffs and bankroll the families of terrorists, including suicide bombers, continued to flow unabated even after the U.S. Government designation of Interpal.

400.     For example, on November 5, 2003 (two months **AFTER** the official U.S. designation), NatWest transferred £32,329 ($54,322.40 U.S.) to the same well-known HAMAS front organization, the Jenin Charitable Society, debiting Interpal's Account Number 600822-95142940. See Exhibit C attached.

401.     Transactional documents of the kind attached to this complaint are *themselves* the criminal transactions that Congress tried to interdict by enacting both the criminal provisions of 18 U.S.C. §§ 2339B and 2339C and the civil provision of 18 U.S.C. § 2333(a) as set forth below.

        **E.     NatWest's Regulatory Obligations and Duty of Care**

402.     All banks which have international operations or relationships with correspondent banks have a duty, based on international banking norms, to adopt know your customer ("KYC"), anti-money laundering ("ATL"), and anti-terrorist financing ("ATF") standards which are defined and enforced by the Financial Action Task Force ("FATF") and its supportive governments.

403.     The United Kingdom is a participant in the FATF.

404.     This duty devolves upon officials and directors of all such banks and includes a

due diligence obligation to monitor publicly accessible information and allegations in relation to "high risk" customers, which would include charities collecting funds from the public.

405.    This duty to monitor and profile charity customers arises independently of any particular transaction.

406.    Beginning with the creation of FATF in 1989 and especially since the collapse of the Bank of Credit and Commerce International and the enactment of the first European Union directive on the subject in 1991, a consensus has evolved in the banking community concerning know your customer and anti-terrorist financing standards required by international banking institutions.

407.    These standards are encapsulated in written principles issued by FATF and the Basel Group of Bank Supervisors.

408.    In April 2002, the FATF issued a report entitled "Guidance For Financial Institutions in Detecting Terrorist Financing." The report was issued to all major international financial institutions to provide guidance to "ensure that financial institutions do not unwittingly hide or move terrorist funds. Financial institutions will thus be better able to protect themselves from being used as a conduit for such activity …"

409.    In addition to its inherent obligation not to violate the criminal statutes of the United States, the FATF report very clearly put NatWest on notice that:

> Regardless of whether the funds in a transaction are related to terrorists for the purposes of national criminal legislation, business relationships with such individuals or other closely associated persons or entities could, under certain circumstances, expose a financial institution to significant reputational, operational, and legal risk. This risk is even more serious if the person or entity involved is later shown to have benefited from the lack of effective monitoring or willful blindness of a particular institution and thus was to carry out terrorist acts.

410.    There are also standards developed by the Wolfsberg Group of banks that affect

the correspondent banks of Wolfsberg Group member financial institutions.

411.    On July 16, 2002, the Royal Bank of Scotland Group (NatWest's parent
company) adopted new "Know Your Customer" guidelines and adopted the so-called Wolfsberg
Principles for the Suppression of Terror Financing thereby committing NatWest to implement:
"procedures for consulting applicable lists and taking reasonable and practicable steps to
determine whether a person involved in a prospective or existing business relationship appears
on such a list."

412.    At the same time, NatWest's parent company publicly acknowledged that: "Funds
used to support terrorism do not derive exclusively from criminal activities and differ from those
associated with most existing money laundering offences" and committed itself to "the ongoing
monitoring of individual transactions on customer accounts…."

413.    In September 2002, the RBS Group of which NatWest issued a "Statement of
Principles for Fighting Crime and the Financing of Terrorism." The document describes their
plan to institute AML controls, particularly on terrorist financing, and to cooperate with U.K.
authorities in criminal investigations.

414.    These standards are binding on banks and bankers doing business internationally,
due to their commercial relationships with the banks of other countries that are legally obligated
to apply these norms.

415.    Accordingly, NatWest had (and has) and affirmative duty to monitor publicly
available information and allegations about its customer, Interpal.

416.    NatWest also had (and has) an affirmative duty to monitor publicly available
information and allegations about its customer's parent organization – the Union of Good – as
well as publicly available information concerning HAMAS controlled entities to which its

57

customer transferred millions of dollars.

417.    It was and remains the standard in the international banking industry for

compliance departments at banks like NatWest to access, in detail, public allegations of

misconduct by such "charities" or diversions of their funds to terrorist activities.

418.    In many cases, information linking payees of NatWest transactions and HAMAS

could readily be obtained by simple Internet searches or by subscribing to a database or press

clippings service.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

## AIDING AND ABETTING THE MURDER, ATTEMPTED MURDER OR PHYSICAL VIOLENCE TO UNITED STATES CITIZENS IN VIOLATION OF 18 U.S.C. § 2332(a); 18 U.S.C. § 2332(b); 18 U.S.C. § 2332(c) AND 18 U.S.C. § 2333(a)

419.    Plaintiffs repeat and re-allege each and every allegation of the foregoing

paragraphs as if fully set forth herein.

420.    Plaintiffs have been injured in their person by reason of acts committed by

HAMAS that involved violence and were dangerous to human life and that violated the criminal

laws of the United States, including the prohibition on killing, attempting to kill, causing serious

bodily injury, or attempting to cause serious bodily injury to U.S. citizens as set forth in 18

U.S.C. § 2332.

421.    The acts of HAMAS in killing and attempting to kill U.S. nationals and other

persons were and are intended to: (a) intimidate or coerce the civilian population of Israel; (b)

influence the policy of the Government of Israel by intimidation or coercion; and (c) affect the

conduct of the Government of Israel by mass destruction and murder.

422.    The acts of terrorism set forth herein were extreme and outrageous and were

committed with the knowledge of, and intention to, cause extreme physical pain and suffering to any and all persons within close proximity of the attack, and extreme emotional distress to the family members of those who were killed or injured by reason of the act.

423.    The financial services which defendant knowingly provides to HAMAS by collecting and transmitting funds on behalf of HAMAS, and making it possible for HAMAS to obtain donations through credit cards like VISA and MasterCard, which are available throughout much of the world, substantially assist HAMAS in its recruiting, rewarding, and providing incentives to suicide bombers and other terrorists.  These financial services facilitate acts of terrorism in violation of 18 U.S.C. § 2332 that have caused injuries to plaintiffs.

424.    Defendant knows that it provides material support to HAMAS, a Foreign Terrorist Organization, and it knows that HAMAS commits horrific terrorist attacks of the kind that have maimed and murdered American citizens such as plaintiffs.

425.    Throughout the period in which it has provided financial services for the benefit of HAMAS, defendant was, and to this date remains, aware that HAMAS collects and receives funds transmitted by defendant NatWest at the request of Interpal and the Union of Good and that HAMAS has committed numerous criminal acts, including the suicide bombings and other acts of international terrorism that have injured American citizens, including plaintiffs.

426.    By aiding and abetting violations of 18 U.S.C. § 2332 that have caused each of the plaintiffs to be injured in his or her person and property, defendant is liable pursuant to 18 U.S.C. § 2333(a) for any and all damages that plaintiffs have sustained as a result of such injuries.

## SECOND CLAIM FOR RELIEF

### COMMITTING ACTS OF INTERNATIONAL TERRORISM
### IN VIOLATION OF 18 U.S.C. § 2339B(a)(1) AND 18 U.S.C. § 2333(a)

427.   Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

428.   By knowingly collecting and transferring funds for the benefit of HAMAS, the defendant has provided material support to a designated Foreign Terrorist Organization under the Antiterrorism and Effective Death Penalty Act of 1996 in violation of 18 U.S.C. § 2339B(a)(1).

429.   As stated above, the Union of Good and Interpal are major funding sources for HAMAS.

430.   By providing a wide range of vital financial services to these entities, defendant NatWest substantially assists HAMAS in its recruiting, rewarding, and providing incentives to suicide bombers and other terrorists.

431.   Defendant knows of HAMAS's terrorist activities.

432.   Defendant knows that HAMAS had been designated a Foreign Terrorist Organization by the United States Government.

433.   By knowingly providing material support to a designated Foreign Terrorist Organization, defendant is therefore civilly liable for damages to plaintiffs for their injuries pursuant to 18 U.S.C. § 2333(a).

## THIRD CLAIM FOR RELIEF

### COLLECTING AND PROVIDING FUNDS FOR THE FINANCING OF TERRORISM
### IN VIOLATION OF 18 U.S.C. § 2339C and 18 U.S.C. § 2333(a)

434.   Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

435.    Defendant wilfully and unlawfully provides financial services to HAMAS by collecting, receiving, transmitting, and providing funds, through accounts it maintains for Interpal and the Union of Good and through credit card payments it receives on behalf of Interpal with the knowledge that such funds have been and will be used, in part, to facilitate acts intended to cause death or serious bodily injury to civilians such as the victims of the terrorist acts described in this complaint.

436.    The acts committed against the plaintiffs were intended to: (a) intimidate or coerce the civilian population of Israel; (b) influence the policy of the Government of Israel by intimidation or coercion; and (c) affect the conduct of the Government of Israel by mass destruction and murder.

437.    Defendant is therefore liable to the plaintiffs who have suffered injuries to their person and property by reason of such acts under 18 U.S.C. § 2333(a).

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray that this Court:

(a)     Enter judgment against the defendant and in favor of each plaintiff for

compensatory damages in amounts to be determined at trial;

(b)     Enter judgment against the defendant and in favor of each plaintiff for

treble damages pursuant to 18 U.S.C. § 2333(a);

(c)     Enter judgment against the defendant and in favor of each plaintiff for any

and all costs sustained in connection with the prosecution of this action, including attorneys'

fees, pursuant to 18 U.S.C. § 2333(a);

(d)     Enter an Order declaring that the defendant has violated, and is continuing

to violate, the Antiterrorism Act, 18 U.S.C. § 2331 *et seq.*; and

(e)     Grant such other and further relief as justice requires.

## JURY DEMAND

PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

Dated: January 5, 2006
       Oradell, New Jersey

OSEN & ASSOCIATE, LLC

By _____
       Gary M. Osen, Esq. (GO-5790)
       Peter Raven-Hansen, Esq., Of Counsel
       *(pro hac vice motion to be filed)*
       700 Kinderkamack Road
       Oradell, New Jersey 07649
       Telephone: (201) 265-6400
       Facsimile:  (201) 265-0303

       Attorneys for Plaintiffs

WECHSLER HARWOOD LLP
Andrew D. Friedman, Esq. (AF-6222)
488 Madison Avenue
New York, New York 10022
(212) 935-7400

KOHN, SWIFT & GRAF, P.C.
Robert A. Swift, Esq.
Steven M. Steingard, Esq.
One South Broad Street
Philadelphia, PA 19107
(215) 238-1700

McINTYRE, TATE, LYNCH & HOLT, LLC
David J. Strachman, Esq.
321 South Main Street, Suite 400
Providence, Rhode Island 02903
(401) 351-7700

NITSANA DARSHAN-LEITNER & ASSOCIATES
Nitsana Darshan-Leitner, Esq.
11 Havatikim Street
Petah Tikva, 49389 Israel
(Israel Tel. (972) 3-933-4472)

# EXHIBIT A

# ⍣ NatWest

## PAYMENT DEBIT ADVICE

THE SECRETARY
PALESTINIANS RELIEF & DEV FUND
PO BOX NO 3333
LONDON
NW5 1RW

Our ref: IUCCTY000410265
Your ref ETR 2003 81
Date    19th February 2003

We confirm having remitted the following Standard transfer.

Amount debited·  GBP 21,450.00
From account:    600022-95142940
Amount sent:     GBP 21,424.00

Debit date: 19th February 2003

In favour of:
TULKAREM ZAKAT COMMITTEE

Beneficiary bank:
ARAB BANK PLC
(TULKARM BRANCH)
TULKARM
PALESTINIAN TERRITORY (OCCUPIED)

Beneficiary account number.
90705000100500

Payee bank:
ARABGE2LXXX

Payment details:
SPONSORS AN ORPHAN/NEEDY CHILDPROG
RAMADAN PROJECTS QURBANI MEA

Ordered by:
PALESTINIANS DEV FUND INTERPAL

Transactional Information:

Requested amount.          GBP 21,450.00

Rate:
Currency exchange contract:

NWB commission charges:      0.00

Agent banks charges:         0.00

This notification is not confirmation of receipt of the funds by the beneficiary - the Bank does not accept any liability whatsoever for any loss or damage arising in any way from any use of or reliance placed on the information.

National Westminster Bank plc Registered in England No 929027 Registered Office: 135 Bishopsgate, London EC2M 3UR

Regulated by the Financial Services Authority

NatWest Bank PLC

Agency agreements valid between members of The Royal Bank of Scotland Group.

# EXHIBIT B

 **NatWest**

# PAYMENT DEBIT CONFIRMATION

000185/002432

THE SECRETARY
PALESTINIANS RELIEF & DEV FUND
PO BOX NO 3333
LONDON
NW6 1RW

Our ref:  EBANKGO02676119
Your ref: +BTR/03/267-097
Date:     30th July 2003
Delivery ref:  0020030730023602

## We confirm having remitted the following Standard transfer.

Amount debited:   GBP  73,757.00
From account      600822-95142940
Amount sent:      GBP  73,757.00

Debit date: 30th July 2003

In favour of:
JENIN ZAKAT COMMITTEE
ALAWQAF BUILDING
ALHASBA STREET, JENIN
PALESTINE

Beneficiary bank:
CAIRO-AMMAN BANK
JENIN BRANCH
PALESTINE

Beneficiary account number:
015002364000

Payee bank:
CAIRO AMMAN

Payment details:
WAIS' RIYADH/SHARQIAH ORPHANS,
SCHOOL KIT AND NEEDY STUDENTS,
AND TWO FREEZER UNITS

Ordered by:
INTERPAL

**Transactional information:**

Requested amount:        GBP  73,757.00

Rate:
Currency exchange contract:

NWB commission charges:   GBP  11.00

Agent banks charges:      0.00

Charges debited to account: 600822-95142983

This notification is not confirmation of receipt of the funds by the beneficiary - the Bank does not accept
any liability whatsoever for any loss or damage arising in any way from any use of or reliance placed on the
information.

National Westminster Bank plc. Registered in England No 929027. Registered Office; 135 Bishopsgate, London EC2M 3UR

Regulated by the Financial Services Authority.

Agency agreements exist between members of The Royal Bank of Scotland Group.

**NatWest Bank PLC**

# EXHIBIT C

## ⟳ NatWest

## PAYMENT DEBIT CONFIRMATION

{000092.001472}

THE SECRETARY
PALESTINIANS RELIEF & DEV FUND
PO BOX NO 3333
LONDON
NW6 1RW

Our ref: EBANKGO03684066
Your ref: +BTR/03/369-178
Date: 5th November 2003
Delivery ref: 0020031105024512

### We confirm having remitted the following Standard transfer.

Amount debited: GBP 32,329.00
From account: 600822-95142940
Amount sent: GBP 32,329.00

Debit date: 5th November 2003

In favour of:
JENIN ZAKAT COMMITTEE
ALAWQAF BUILDING
· ALHASBA STREET, JENIN
PALESTINE

Beneficiary bank:
CAIRO-AMMAN BANK
JENIN BRANCH
PALESTINE

Beneficiary account number:
015002364000

Payee bank:
CAIRO AMMAN

Payment details:
REBUILDING OF VILLAGE MOSQUE,
RAMADAN AND SPONSORSHIP PROJECTS

Ordered by:
INTERPAL

### Transactional information:

Requested amount: GBP 32,329.00

Rate:
Currency exchange contract:

NWB commission charges: GBP 11.00

Agent banks charges: 0.00

Charges debited to account: 600822-95142983

This notification is not confirmation of receipt of the funds by the beneficiary - the Bank does not accept
any liability whatsoever for any loss or damage arising in any way from any use of or reliance placed on the
information.

Sheet 18 of 59

National Westminster Bank plc. Registered in England No 929027 Registered Office: 135 Bishopsgate, London EC2M 3UR

Regulated by the Financial Services Authority.

NatWest Bank PLC

Agency agreements exist between members of The Royal Bank of Scotland Group.