UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------- X

TZVI WEISS, *et al.*,

                       Plaintiffs,

               - against -

NATIONAL WESTMINSTER BANK PLC,

                    Defendant.

-------------------------------------------------------- X

                              :
     CV 05-4622 (CPS) (KAM)

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
(212) 225-2000

Attorneys for Defendant
National Westminster Bank Plc

Of Counsel:

Jonathan I. Blackman
Lawrence B. Friedman
Isabelle A. Young

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................... iv

PRELIMINARY STATEMENT ......................................................................... 1

FACTS ALLEGED IN THE AMENDED COMPLAINT .................................... 6

A.    The Plaintiffs ........................................................................................ 6

B.    The Attacks ......................................................................................... 7

C.    HAMAS, The Union Of Good And Interpal ........................................ 9

D.    NatWest ............................................................................................ 14

ARGUMENT ............................................................................................... 17

POINT I

PLAINTIFFS HAVE NOT STATED A CLAIM AGAINST
NATWEST UNDER SECTION 2339B (SECOND CLAIM FOR RELIEF)
OR SECTION 2339C (THIRD CLAIM FOR RELIEF) ................................... 17

A.    The Statutory Framework ................................................................. 20

B.    The Amended Complaint Does Not Plead
    Facts Sufficient To Establish That NatWest
    Knowingly Provided Material Support To A
    Foreign Terrorist Organization Under Section 2339B ......................... 21

    1.    The Amended Complaint Does Not Plead Adequate
        Facts Concerning The Requisite FTO Designation
        Under Section 2339B ................................................................ 21

    2.    The Amended Complaint Does Not Adequately Plead
        That NatWest's Actions Constituted Material Support
        Under Section 2339B ................................................................ 24

    3.    The Amended Complaint Does Not Adequately Plead
        The Requisite Knowledge And Intent Under Section 2339B ......... 25

Page

4.   The Provisions Of Section 2339B Specifically Addressing
Financial Institutions Further Establish That Plaintiffs
Cannot Allege That NatWest Provided Material
Support Under Section 2339B ......................................................   28

C.   The Amended Complaint Does Not Plead Facts
Sufficient To Establish That NatWest Provided
Or Collected Funds In Violation Of Section 2339C ................................   29

1.   The Amended Complaint Does Not Adequately
Plead That NatWest Committed The Requisite
*Actus Reus* Under Section 2339C ................................................   30

2.   The Amended Complaint Does Not Adequately
Allege That NatWest Possessed The Requisite
*Mens Rea* Under Section 2339C ..................................................   33

POINT II

PLAINTIFFS CANNOT IMPOSE GENERAL AIDING
AND ABETTING LIABILITY ON NATWEST ................................................   38

A.   Secondary Liability Should Not Be Implied At All
Under Section 2333(a) ..............................................................   39

B.   When Congress Intended To Create Liability For
Secondary Actors Under Section 2333(a), It Did
So Expressly In Section 2339B And Section 2339C ................................   42

C.   If There Is General Secondary Liability Under Section
2333(a),The Pleaded Facts Must Satisfy Criminal Aiding
And Abetting Standards Under 18 U.S.C. § 2, As They
Indisputably Do Not Here ..........................................................   43

D.   Alternatively, The Pleaded Facts Must Satisfy Aiding
And Abetting Standards Under The Restatement (Second)
Of Torts § 876(b), Which They Also Fail To Do ...................................   44

1.   The Amended Complaint Does Not Allege Facts
Sufficient To Establish That NatWest Had Actual
Knowledge Of The Alleged Terrorist Activities .........................   45

2.   The Amended Complaint Does Not Allege Facts
Sufficient To Establish That NatWest Provided
Substantial Assistance Or Encouragement To The
Alleged Terrorist Activities .........................................   48

Page

POINT III

PLAINTIFFS HAVE NOT PLEADED FACTS SUFFICIENT
TO ESTABLISH THE REQUISITE PROXIMATE CAUSAL
LINK BETWEEN NATWEST'S ALLEGED CONDUCT
AND ANY INJURY PLAINTIFFS SUSTAINED................................................................ 50

POINT IV

PRINCIPLES OF INTERNATIONAL COMITY LEND
FURTHER SUPPORT TO THE DISMISSAL OF PLAINTIFFS'
AMENDED COMPLAINT ............................................................................................... 55

CONCLUSION.................................................................................................................. 58

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

**<u>Statutes</u>**

8 U.S.C. § 1189 ................................................................................................ 21

15 U.S.C. § 15(a) ............................................................................................. 52

18 U.S.C. § 2 .................................................................................................... 43

18 U.S.C. § 1964(c) ......................................................................................... 41

18 U.S.C. § 2331(1) ......................................................................................... 20

18 U.S.C. § 2331(1)(a) .................................................................................... 43

18 U.S.C. § 2333(a) ................................................................................... *passim*

18 U.S.C. § 2339A(b) ...................................................................................... 24

18 U.S.C. § 2339B ...................................................................................... 3, 21

18 U.S.C. § 2339B(a)(1) .................................................................................. 21

18 U.S.C. § 2339B(a)(2) .................................................................................. 28

18 U.S.C. § 2339B(b) ....................................................................................... 28

18 U.S.C. § 2339B(g)(4) .................................................................................. 24

18 U.S.C. § 2339B(g)(6) .................................................................................. 21

18 U.S.C. § 2339C ..................................................................................... 3-4, 32

18 U.S.C. § 2339C(a)(1) ..................................................................... 29, 33, 35

18 U.S.C. § 2339C(e)(4) ............................................................................. 30, 31

18 U.S.C. § 2339C(e)(5) ............................................................................. 30, 32

Page(s)

**Cases**

Armstrong v. McAlpin, 699 F.2d 79 (2d Cir. 1983),
abrogation recognized on other grounds, Rabin v. Fivzar Assocs.,
801 F. Supp. 1045 (S.D.N.Y. 1992)........................................................... 45, 49

Billy Baxter, Inc. v. Coca-Cola Co.,
431 F.2d 183 (2d Cir. 1970), cert. denied, 401 U.S. 923 (1971) ......................................... 52

Bloor v. Carro, Spanbock, Londin, Rodman & Fass,
754 F.2d 57 (2d Cir. 1985)........................................................................ 49

Boim v. Quranic Literacy Inst. & Holy Land Found. for Relief & Dev.,
291 F.3d 1000 (7th Cir. 2002) ..................................................................... passim

Broder v. Cablevision Sys. Corp.,
418 F.3d 187 (2d Cir. 2005)........................................................................ 17

Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,
511 U.S. 164 (1994)..................................................................................... passim

Cohen v. Standard Bank Inv. Corp. (Jersey) Ltd.,
No. 97 Civ. 3802 (SAS), 1998 WL 782024 (S.D.N.Y. Nov. 6, 1998)................................. 47

Cortec Indus., Inc. v. Sum Holding L.P.,
949 F.2d 42 (2d Cir. 1991), cert. denied, 503 U.S. 960 (1992) ............................................ 17

Dep't of Econ. Dev. v. Arthur Anderson & Co.,
924 F. Supp. 449 (S.D.N.Y. 1996)...................................................... 39, 40, 41, 42

Dickens v. Chem. Bank,
573 F. Supp. 1129 (S.D.N.Y. 1983) ...................................................... 45, 47, 48, 49

Dillon v. Militano,
731 F. Supp. 634 (S.D.N.Y. 1990)....................................................... 17, 45, 49

Edwards & Hanly v. Wells Fargo Sec. Clearance Corp.,
602 F.2d 478 (2d Cir. 1979), cert. denied, 444 U.S. 1045 (1980) .............................. 45, 47, 48-49

First Nationwide Bank v. Gelt Funding Corp.,
27 F.3d 763 (2d Cir. 1994), cert. denied, 513 U.S. 1079 (1995) ........................................... passim

Fundacion Museo de Arte Contemporaneo de Caracas – Sofia Imber v.
CBI-TDB Union Bancaire Privee, 996 F. Supp. 277 (S.D.N.Y.),
aff'd, 160 F.3d 146 (2d Cir. 1998) ................................................................. 45-46

Page(s)

Goldfine v. Sichenzia,
118 F. Supp. 2d 392 (S.D.N.Y. 2000) .................................................... 40, 41

Halberstam v. Welch,
705 F.2d 472 (D.C. Cir. 1983)................................................................ 46

Hayden v. Paul, Weiss, Rifkind, Wharton & Garrison,
955 F. Supp. 248 (S.D.N.Y. 1997)......................................................... 41

Hecht v. Commerce Clearing House Inc.,
897 F.2d 21 (2d Cir. 1990)..................................................................... 52

Hilton v. Guyot,
159 U.S. 113 (1895)............................................................................... 55

Holmes v. Sec. Investor Prot.,
503 U.S. 258 (1992).................................................................... 51, 52, 54

Humanitarian Law Project v. Gonzales,
380 F. Supp. 2d 1134 (C.D. Cal. 2005)................................................. 26

In re Gas Reclamation, Inc. Sec. Litig.,
663 F. Supp. 1123 (S.D.N.Y. 1987) ....................................................... 52

In re Terrorist Attacks on Sept. 11, 2001,
349 F. Supp. 2d 765 (S.D.N.Y.), on reconsideration in part,
392 F. Supp. 2d 539 (S.D.N.Y. 2005) ............................................... *passim*

In re Terrorist Attacks on Sept. 11, 2001,
392 F. Supp. 2d 539 (S.D.N.Y. 2005) ................................................... 39

IIT, An Int'l Inv. Trust v. Cornfeld,
619 F.2d 909 (2d Cir. 1980).............................................................. 45, 47

Kidder Peabody & Co. v. Unigestion Int'l, Ltd.,
903 F. Supp. 479 (S.D.N.Y. 1995)........................................................ 40

Kolbeck v. LIT. Am., Inc.,
939 F. Supp. 240 (S.D.N.Y. 1996), aff'd, 152 F.3d 918 (2d Cir. 1998) ............................. 46

Laro, Inc. v. Chase Manhattan Bank (Nat'l Ass'n),
866 F. Supp. 132 (S.D.N.Y. 1994), aff'd, 60 F.3d 810 (2d Cir. 1985) ............................... 47

LaSalle Nat'l Bank v. Duff & Phelps Credit Rating Co.,
951 F. Supp. 1071 (S.D.N.Y. 1996) ...................................................... 41

Page(s)

Lerner v. Fleet Bank, N.A., 318 F.3d 113 (2d Cir.),
cert. denied, 540 U.S. 1012, 123 (2003) .................................................................... 51

Linde v. Arab Bank, PLC,
353 F. Supp. 2d 327 (E.D.N.Y. 2004) ....................................................................... 43

Linde v. Arab Bank, PLC,
384 F. Supp. 2d 571 (E.D.N.Y. 2005) ................................................................... passim

Mackey v. Lanier Collection Agency & Serv., Inc.,
486 U.S. 825 (1988) .................................................................................................. 43

MCI Telecomm. Corp. v. Graphnet, Inc.,
881 F. Supp. 126 (D.N.J. 1995) ............................................................................ 41-42

Nat'l Council of Resistance of Iran v. Dep't of State,
373 F.3d 152 (D.C. Cir. 2004) ............................................................................... 22, 23

Nat'l Labor Relations Bd. v. E.C. Atkins & Co.,
331 U.S. 398 (1947) .................................................................................................. 18

Nigerian Nat'l Petroleum Corp. v. Citibank, N.A.,
No. 98 Civ. 4960 (MBM), 1999 WL 558141 (S.D.N.Y. July 30, 1999) ............................ 48

Nye & Nissen v. United States,
336 U.S. 613 (1949) .................................................................................................. 44

Pennsylvania Ass'n of Edwards Heirs v. Rightenour,
235 F.3d 839 (3d Cir. 2000), cert. denied, 534 U.S. 816 (2001) ........................................ 39, 41

Renner v. Chase Manhattan Bank,
No. 98 Civ. 926 (CSH), 1999 WL 47239 (S.D.N.Y. Feb. 3, 1999) ...................................... 46, 47

Renner v. Chase Manhattan Bank,
No. 98 Civ. 926 (CSH), 2000 WL 781081 (S.D.N.Y. June 16, 2000) ................................. 48

Rolo v. City Investing Co. Liquidating Trust,
155 F.3d 644 (3d Cir. 1998), abrogation on other grounds recognized by
Forbes v. Eagleson, 228 F.3d 471 (3d Cir. 2000) ..................................................... 41

Rosenheck v. Rieber,
932 F. Supp. 626 (S.D.N.Y. 1996) ............................................................................. 41

Ross v. Bolton,
639 F. Supp. 323 (S.D.N.Y. 1986) ......................................................................... 45, 49

Page(s)

Ryan, PRD Corp. v. Hunton & Williams,
No. 99-CV-5938 (JG), 2000 WL 1375265 (E.D.N.Y. Sept. 20, 2000)................................ 46, 48

Tempel v. United States,
248 U.S. 121 (1918)......................................................................................... 18

Tzaras v. Evergreen Int'l Spot Trading, Inc.,
No. 01 Civ. 10726 (LAP), 2003 WL 470611 (S.D.N.Y. Feb. 25, 2003)............................ 47

United States v. Al-Arian,
308 F. Supp. 2d 1322 (M.D. Fla.),
modification denied by, 329 F. Supp. 2d 1294 (M.D. Fla. 2004)......................................... 26

United States v. Dauray,
215 F.3d 257 (2d Cir. 2000)............................................................................. 30, 31

United States v. Friedman,
300 F.3d 111 (2d Cir. 2002), cert. denied, 538 U.S. 981 (2003) ......................................... 44

United States v. Khan,
309 F. Supp. 2d 789 (E.D. Va. 2004) ..................................................................... 22

United States v. Local 560 of the Int'l Bhd. of Teamsters,
Chauffeurs, Warehousemen, & Helpers of Am.,
780 F.2d 267 (3d Cir. 1985), cert. denied, 476 U.S. 1140 (1986) ......................................... 44

United States v. Local 1804-1 Int'l Longshoremen's Ass'n,
812 F. Supp. 1303 (S.D.N.Y. 1993) .................................................................... 43-44

United States v. Medina,
32 F.3d 40 (2d Cir. 1994).................................................................................. 44

United States v. Samaria,
239 F.3d 228 (2d Cir. 2001)................................................................................ 44

United States v. Sattar,
314 F. Supp. 2d 279 (S.D.N.Y. 2004) ..................................................................... 27

Washington State Dep't of Soc. & Health Servs. v. Guardianship Estate of Keffeler,
537 U.S. 371 (2003)......................................................................................... 31

Williams v. Bank Leumi Trust Co. of N.Y.,
No. 96 Civ. 6695 (LMM), 1997 WL 289865 (S.D.N.Y. May 30, 1997)............................ 46, 48

Page(s)

**Other Authorities**

1 Butterworths Money Laundering Law 5 (Daren Allen, ed., 2005) ................................... 27-28

147 Cong. Rec. E2397 (daily ed. Dec. 19, 2001)
(statement of Rep. Sheila Jackson Lee)...................................................................... 32-33

HM Revenue & Customs, http://www.hmrc.gov.uk ................................................. 14

H.R. Rep. No. 107-307 (2001) ..................................................................... 32

Implementation of the International Convention for the Suppression
of Terrorist Bombings and the International Convention for the
Suppression of the Financing of Terrorism: Hearing on H.R. 3275
Before the Subcomm. on Crime of the H. Comm. on the Judiciary,
107th Cong. 10 (2001) (statement of Samuel M. Witten,
Acting Deputy Legal Adviser, Dep't of State)............................................................ 33

Income Tax (Earning and Pensions) Act 2003........................................................... 14

Merriam-Webster OnLine, http://www.m-w.com (last visited Jan. 18, 2006) ................... 31, 32

Mark Pieth and Gemma Aiolfi,
The Private Sector Becomes Active: The Wolfsberg Process,
10 J. Fin. Crime 359 (2003)......................................................................... 28

Restatement (Second) of Torts § 876 (1979)............................................................ 45

Defendant National Westminster Bank Plc ("NatWest") respectfully submits this memorandum of law in support of its motion to dismiss plaintiffs' First Amended Complaint ("amended complaint" or "Am. Compl.") for failure to state a claim upon which relief can be granted, pursuant to Federal Rule of Civil Procedure Rule 12(b)(6).[1]

## PRELIMINARY STATEMENT

Plaintiffs seek treble damages from NatWest, a British bank, under the Antiterrorism Act for injuries they or their relatives suffered in ten terrorist attacks in Israel in 2002 and 2003, eight of which plaintiffs attribute to HAMAS.  They do so simply because NatWest maintained deposit accounts and provided routine banking services in London for a British charitable organization, Interpal, that the U.S. government has accused of supporting HAMAS terrorism, but that the British government has twice cleared of this accusation.  In NatWest's brief in support of its motion to dismiss the initial complaint in this case, NatWest demonstrated that plaintiffs' allegations fell far short of what is required in order to state claims for relief.  Plaintiffs apparently agreed, because they did not oppose NatWest's motion, and instead attempted to cure the fatal defects in their initial pleading by amendment.  Despite this effort, plaintiffs have again failed to state a claim upon which relief can be granted.

Plaintiffs' repeated failure to state a claim is unsurprising, because their attempt to foist responsibility for their tragic circumstances onto NatWest is a misguided effort to stretch the Antiterrorism Act ("ATA") far beyond what the statute provides.  Plaintiffs allege that, simply by maintaining deposit accounts at a NatWest branch in London for Interpal, a British-based charity that the U.S. government has designated a supporter of HAMAS – including an

---

[1]    On December 19, 2005, NatWest moved to dismiss the initial complaint, which had been filed by the Weiss plaintiffs alone.  In response, the Weiss plaintiffs announced their intention to amend their complaint, which they did on January 5, 2006, including by adding 62 more plaintiffs to this case.  NatWest now moves to dismiss the amended complaint.

account for the Union of Good, which plaintiffs claim also supports HAMAS, but which the U.S. government has never so designated – NatWest aided and abetted the commission of acts of international terrorism by HAMAS under 18 U.S.C. § 2333(a), and violated the criminal prohibitions against providing material support to a designated foreign terrorist organization ("FTO") under 18 U.S.C. § 2339B and against financing acts of terrorism under 18 U.S.C. § 2339C.  But while plaintiffs' injuries are tragic, and NatWest has deep sympathy for them, plaintiffs have no legal basis, and certainly none under the ATA, to attribute responsibility for these injuries to NatWest.  This is especially true because, as determined in the very decisions the amended complaint selectively cites, Interpal has twice been found by the British government that is NatWest's primary regulator not to be affiliated with HAMAS terrorism, and the Union of Good has never been designated a terrorist organization by either the U.S. or the British governments.

Akin to the initial complaint, the amended complaint deliberately obscures the chronology of relevant events, because that chronology undermines plaintiffs' untenable allegations.  While plaintiffs allege NatWest should have known of Interpal's alleged HAMAS affiliation because the U.S. government named Interpal a Specially Designated Global Terrorist ("SDGT"), the amended complaint obscures the fact that this designation was made only after the last of the ten terrorist attacks that injured plaintiffs.  Plaintiffs also obscure the fact that the handful of Interpal account deposits and withdrawals they identify as transferring funds from and to alleged HAMAS front organizations occurred before any of those transferor or transferee organizations was designated by the U.S. government as a terrorist supporter, to the extent they were ever so designated.

2

Further, while plaintiffs allege that in 1996, years before the attacks they cite, Interpal's accounts at NatWest in London were frozen by the British government and then unfrozen later that year, plaintiffs distort the British government's conclusion that the evidence it had reviewed concerning Interpal did not support a continued freeze. Plaintiffs also completely fail to disclose that, after the last attack they cite, on August 19, 2003, and in response to the U.S. government's SDGT designation, Interpal's accounts were again frozen by the British authorities, but within less than two months, the British government, based upon its review of the evidence concerning Interpal presented to it by the U.S. government, <u>again</u> determined there was no basis for a continued freeze, and therefore unfroze those Interpal accounts.

Apart from these fundamental flaws in plaintiffs' "support of terrorism by hindsight" theory, for the purpose of this dismissal motion, the critical point remains that, even after having had the opportunity to replead their allegations in the face of NatWest's initial dismissal motion, plaintiffs still have not alleged facts sufficient to show actionable misconduct by NatWest under any of the statutory provisions plaintiffs purport to invoke. When Congress enacted 18 U.S.C. § 2333(a), the civil remedy provision of the ATA, it sought to extend civil liability to those who had committed criminal acts of international terrorism under the statute, and did not intend to create a separate cause of action against persons who had not committed a predicate criminal act. Accordingly, plaintiffs must plead facts sufficient to show NatWest's underlying criminal liability as a prerequisite to triggering civil liability under Section 2333(a). They have utterly failed to do so.

<u>First</u>, the amended complaint is devoid of any factual allegations sufficient to establish that the routine banking services NatWest provided to its customer could possibly constitute "providing material support" to HAMAS under 18 U.S.C. § 2339B or "financing"

HAMAS-sponsored terrorism under 18 U.S.C. § 2339C, with the intent or actual knowledge that funds would be used to carry out a terrorist act.  While the amended complaint is replete with allegations concerning HAMAS's terrorist activities and its supposed links to Interpal and the Union of Good, none of these allegations establishes that NatWest's provision of routine banking services to those entities constitutes a criminal violation of either Section 2339B or Section 2339C.

Indeed, in this first fundamental respect – the need to allege acts by NatWest that could possibly constitute "providing material support" to HAMAS or "financing" HAMAS-sponsored terrorism – there is not a single material difference between the initial complaint and the amended complaint.  Both allege only that NatWest provided routine banking services to its customer.

Second, nor can plaintiffs sustain their claim that NatWest is secondarily liable for HAMAS terrorism under an aiding and abetting theory.  As a threshold matter, applying the principles of Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 166 (1994), this Court should not recognize such a claim under 18 U.S.C. § 2333(a). However, assuming that aiding and abetting is actionable under Section 2333(a), plaintiffs have not stated such a claim because they have not pleaded facts sufficient to satisfy the criminal aiding and abetting standards under 18 U.S.C. § 2, which govern here because civil claims under Section 2333(a) must be based on conduct that is a violation of criminal law.  The amended complaint does not allege – because it cannot allege – that NatWest knew of criminal conduct by Interpal or the Union of Good, or that NatWest acted with the specific intent to bring about the underlying crimes by HAMAS.  Plaintiffs fare no better under the civil aiding and abetting standard of Section 876 of the Restatement (Second) of Torts:  there are no allegations sufficient

to show that NatWest knew of any criminal activity by Interpal or the Union of Good, and substantially assisted or encouraged that activity simply by providing them with routine banking services.

In this second fundamental respect as well – the need to allege that NatWest knew of its customer's criminality and specifically intended to further the underlying crimes – there is not a single material difference between the initial complaint and the amended complaint.  In their new pleading, plaintiffs have attempted to embellish their original inadequate pleading by referring to specific deposits into NatWest's customer's accounts and withdrawals from those accounts by other entities, two of which the U.S. government has designated as an SDGT.  But those allegations do plaintiffs no good, even on their baseless theory that a U.S. government SDGT designation automatically places NatWest on notice that the designee is committing a crime, for a very simple reason – in every instance plaintiffs cite, the U.S. government's SDGT designation of the transferor or transferee occurred only <u>after</u> the alleged transfer.

<u>Third</u>, and absolutely fatally to their amended complaint, even if NatWest's alleged conduct could conceivably support a claim that it violated the substantive criminal prohibitions against "act[s] of international terrorism" for purposes of Section 2333(a), plaintiffs have not pleaded <u>any</u> facts sufficient to establish a proximate causal link between NatWest's allegedly actionable conduct and their injury, which is a fundamental prerequisite for establishing civil liability under the statute.  Indeed, under these circumstances, the notion that plaintiffs could ever allege a direct causal link between NatWest's provision of routine banking services associated with maintaining bank accounts in London and plaintiffs' injuries directly caused by ten separate terrorist attacks in Israel, is absurd.

In this third fundamental respect – the need to allege a proximate causal link between what NatWest is accused of having done and plaintiffs' injury – there is no difference whatsoever between the initial complaint and the amended complaint.  Neither addresses this necessary element of plaintiffs' claims at all.

Allowing plaintiffs to prosecute claims against NatWest for liability under the ATA based solely on the allegation that NatWest maintained one or more deposit accounts and provided routine banking services for Interpal, both in Interpal's own name and in the name of the Union of Good, at a NatWest branch in London, would expose nearly all financial institutions to liability for every act of international terrorism by anyone with any claimed connection, however remote, to any deposit account on their books.  This Court, like the Manhattan federal court that last year dismissed similar complaints under Section 2333(a) against several financial institutions in In re Terrorist Attacks on September 11, 2001, 349 F. Supp. 2d 765 (S.D.N.Y.), on reconsideration in part, 392 F. Supp. 2d 539 (S.D.N.Y. 2005), should decline plaintiffs' invitation to permit this result.

## FACTS ALLEGED IN THE AMENDED COMPLAINT[2]

### A.   The Plaintiffs

Twelve plaintiffs are individuals who were directly injured in ten different terrorist attacks that occurred in Israel between March 27, 2002 and August 19, 2003, and who, as a result of the attacks, experienced severe physical and mental anguish and extreme emotional distress.[3]  Eight plaintiffs were killed in those same attacks.[4]

---

[2]   For purposes of the present motion only, plaintiffs' allegations are taken to be true.

[3]   Am. Compl. ¶¶ 13-23 (Tzvi Weiss), 35-36 (Chana Nathansen), 37-38 (Matanya Nathansen), 40-41 (Yehudit Nathansen), 44-45 (Shoshana Nathansen), 85-88, 96 (Eugene Goldstein), 90-96 (Lorraine Goldstein), 136-138 (Sarri Anne Singer), 153-162 (Steven Averbach), 199-202 (Daniel Rozenstein) 211-116 (Jacob Steinmetz), 265, 268-273 (Gloria Kushner).

The overwhelming majority of plaintiffs are not persons who were directly injured in the attacks, but instead are family members who experienced non-physical injuries, as a result of their relatives' injuries or deaths in the attacks, including varying combinations of anxiety, severe mental anguish, extreme emotional distress, and loss of companionship.[5]

While the majority of the plaintiffs are alleged to be U.S. citizens, seven are not. They are therefore barred as a matter of law from bringing any claims under Section 2333(a) of the ATA, and the Court must dismiss their claims on that ground alone.  Am. Compl. ¶¶ 33 (Matanya Nathansen), 163 (Julie Averback), 218 (Amichai Steinmetz, Nava Steinmezt, Orit Steinmetz, and Natanel Seinmezt), 261 (Nevenka Gritz).

**B.    The Attacks**

Plaintiffs generally describe the ten attacks as follows:

---

[4]    Am. Compl. ¶¶ 30 (Tehillan Nathansen), 77, 120 (Alan Beer), 225 (Janis Ruth Coulter), 238 (Diane Carter), 246 (Benjamin Blutstein), 259 (David Gritz), 276 (Ether Bablar), 283 (Hannah Rogen).

[5]    Am. Compl. ¶¶ 28-29 (Leib Weiss, Malka Weiss, Yitzch Weiss, Yeruchaim Weiss and Esther Deutsch), 51 (Hezekial Toporowitch), 52 (Pearl B. Tororowitch), 59 (Yehuda Toropowitch), 62-63 (David Toporowitch), 66-67 (Shaina Chava Nadel), 69-70 (Blumy Rom), 73-75 (Rivka Toporowitch), 102 (Richard Goldstein), 107 (Barbara Goldstein Ingardia), 109 (Michael Goldstein), 116 (Chana Freedman), 125-126 (Harry Leonard Beer), 129-130 (Estelle Carroll and Phyliss Maisel), 132-133 (Anna Beer), 141 (Judith Singer), 144 (Eric Singer), 165 (Julie Averbach), 168 (Tamir Averbach), 171 (Devir Averbach), 173-174 (Sean Averbach), 176-177 (Adam Averbach), 183-184 (David Averbach and Maida Averbach), 186-188 (Michael Averbach), 190-194 (Eileen Sapadin), 207 (Julia Rozenstein Schon), 217 (Deborah Steinmetz), 219 (Amichai Steinmetz, Nava Steinmetz, Orit Steinmetz, and Natanel Steinmetz), 234 (Robert L. Coulter, Sr.), 235 (Dianne Coulter Miller), 236 (Robert L. Coulter, Jr.), 244 (Larry Carter), 245 (Shaun Coffel), 255 (Richard Blutstein), 256 (Katherine Baker), 258 (Rebekah Blutstein), 264 (Nevenka Gritz), 281 (Jacqueline Chambers and Levana Cohen Harroch).  No familial relationship is alleged between Jacob Steinmetz, who was physically injured on January 29, 2003, and Deborah Steinmetz, who allegedly suffered non-physical injuries as a result of the attack on Jacob Steinmetz.  Am. Compl. ¶¶ 208-217.  Several individuals bring claims both individually and as executors or administrators of the estates of family members who were killed in the attacks.  Am. Compl. ¶¶ 34, 124, 231, 240, 249, 262, 278.  Greta Geier however, brings this lawsuit only in her capacity as administrator of Hannah Rogen's estate.

1.   A suicide bomber attack on a bus in Jerusalem on August 19, 2003, for which HAMAS claimed responsibility ("First Attack").  Am. Compl. ¶¶ 5-6.

2.   A shooting attack on a highway in Israel on June 20, 2003, for which HAMAS claimed responsibility ("Second Attack").  Am. Compl. ¶¶ 77, 80, 83.

3.   A suicide bomber attack on a bus in Jerusalem on June 11, 2003, which was carried out by a HAMAS operative ("Third Attack").  Am. Compl. ¶¶ 117-119.

4.   A suicide bomber attack on a bus heading to Jerusalem on May 18, 2003 for which HAMAS claimed responsibility ("Fourth Attack").  Am. Compl. ¶¶ 148-151.

5.   An explosion at a restaurant in Tel Aviv on April 30, 2003, caused by a suicide bomber who "was sent by HAMAS" ("Fifth Attack").  Am. Compl. ¶¶ 195-196.

6.   A shooting attack on a road in Israel on January 29, 2003, for which HAMAS is believed to have been responsible ("Sixth Attack").  Am. Compl. ¶¶ 209-210.

7.   An explosion caused by a bomb in a university cafeteria in Jerusalem on July 31, 2002, for which HAMAS claimed responsibility ("Seventh Attack").  Am. Compl. ¶¶ 220-224.

8.   A suicide bomber attack in an open-air market in Netanya, Israel on May 19, 2002, for which HAMAS and the Popular Front for the Liberation of Palestine claimed responsibility ("Eighth Attack").  Am. Compl. ¶¶ 266-268.

9.   A Palestinian suicide bomber attack at a social club in Isreal on May 7, 2002 ("Ninth Attack").  Am. Compl. ¶ 274.

10.  A HAMAS suicide bomber attack at a hotel in Netanya on March 27, 2002 ("Tenth Attack").  Am. Compl. ¶ 282.

While plaintiffs allege that HAMAS was responsible for the First, Second, Third, Fourth, Fifth, Seventh, Eighth, and Tenth Attacks, they do not allege that the Sixth and Ninth attacks were carried out by HAMAS or any other particular terrorist organization.  Instead, they allege only that HAMAS is "believed" to have been responsible for the Sixth Attack and that a "Palestinian" carried out the Ninth Attack.  Even if the Court were to accept plaintiffs' misguided theory that NatWest's provision of routine banking services to Interpal makes NatWest criminally or civilly responsible for terrorist acts of HAMAS, those plaintiffs injured in

the Sixth Attack (Jacob Steinmetz, Deborah Steinmetz, Amichai Steinmetz, Nava Steinmetz, Orit

Steinmetz and Natanel Steinmetz) and the Ninth Attack (Esther Bablar, Jacqueline Chambers

and Levana Cohen Harooch) would therefore lack any basis for a claim against NatWest.

**C.      HAMAS, The Union Of Good And Interpal**

     **Allegations About HAMAS**.  As might be expected, much of the amended

complaint does not address the activities of NatWest, but instead is devoted to the terrorist

actions of HAMAS.  <u>See</u> Am. Compl. ¶¶ 289-90, 292-295, 298.  The amended complaint notes

that in 1989, Israel declared HAMAS a terrorist organization and an "unlawful organization."

Am. Compl. ¶ 291.  On January 23, 1995, the United States named HAMAS a "Specially

Designated Terrorist" ("SDT") and on October 8, 1997, the United States designated HAMAS an

FTO pursuant to Section 219 of the Immigration and Nationality Act and the Antiterrorism and

Effective Death Penalty Act of 1996.  Am. Compl. ¶¶ 296-297, 299.  This latter designation has

been renewed every two years.  Am. Compl. ¶ 299.  Following the terrorist attacks in the United

States of September 11, 2001, HAMAS was designated by the United States as an SDGT.  Am.

Compl. ¶ 300-301.  On September 12, 2003, the European Union designated HAMAS a terrorist

organization.  Am. Compl. ¶ 382.

     **Allegations About The Union Of Good And Interpal**.  The amended complaint

asserts a connection between the terrorist activities of HAMAS and Interpal, alleging that:  (i)

HAMAS receives most of its money through donations coordinated by Saudi and Gulf State

charities and the Union of Good, which is alleged to be not an entity itself, but instead a global

network of charities operated by the Muslim Brotherhood; and (ii) the Union of Good raises

funds which are channeled through Interpal, which maintains several accounts at NatWest.  Am. Compl. ¶ 309; see also Am. Compl. ¶¶ 310-312, 335, 384.[6]

Critically, while plaintiffs allege that the Union of Good is connected with HAMAS's terrorist activities, they do not allege, and cannot allege, that the Union of Good itself ever was placed on any U.S. or U.K terrorist list prior to or even after the attacks that injured plaintiffs.  Moreover, while plaintiffs allege that the Al-Aqsa Foundation is "under the umbrella of the Union of Good, and was designated by the U.S. government as an SDGT on May 29, 2003, Am. Compl. ¶¶ 313-314, 371, this designation occurred only after what the amended complaint alleges were Interpal's transfers of funds from that organization.

Plaintiffs also allege in entirely conclusory terms that "NatWest, at all relevant times has had direct, first-hand knowledge of the organizations to which [the Union of Good] 'support' has been transmitted, i.e. dozens of notorious HAMAS front organizations," Am. Compl. ¶ 325, but they fail to allege a single fact as to by whom, how or when NatWest

---

[6]   While plaintiffs allege that Interpal provides funds for a number of charitable organizations that belong to HAMAS's financial infrastructure, Am. Compl. ¶¶ 351-358, there is no allegation that any of these entities was designated a terrorist organization by any government other than the Israeli government, Am. Compl. ¶ 358, and there is no allegation that NatWest ever knew of any such Israeli designation, even if such knowledge were sufficient to trigger NatWest's liability, which it is not.  Thus, plaintiffs do not allege – nor can they allege – that any of these organizations had been placed on any official U.S. or U.K terrorist lists prior to any of the attacks that injured plaintiffs.  If even the U.S. and U.K. governments had not determined that these charities were controlled by HAMAS, plaintiffs' allegations about press and other hearsay charges concerning those organizations' purported ties to HAMAS cannot possibly establish that NatWest knew these organizations were HAMAS agents or HAMAS-controlled entities.

The amended complaint alleges that the Jenin Charity Committee and Tulkarem Charity Committee "are specifically identified as HAMAS-controlled organizations by the United States [g]overnment in the July 2004 criminal indictment of Holy Land Foundation for Relief and [D]evelopment in the Northern District of Texas."  Am. Compl. ¶ 351 n.10.  But this indictment was filed many months after the ten attacks that injured plaintiffs, and it mentions neither NatWest nor Interpal.  Declaration of Lawrence B. Friedman, dated January 26, 2006, ("Friedman Decl.") Ex. A, Holy Land Foundation for Relief and Development Fund Indictment, filed July 26, 2004.

purportedly gained this "knowledge."  Plaintiffs also allege that NatWest knew of the pro-

HAMAS views of Dr. Yussef al-Qaradawi, the head of the Union of Good, and how "his myriad

of charitable front organizations channel funds to HAMAS," but in a complete <u>non</u> <u>sequitur</u>

plaintiffs attribute this purported knowledge by NatWest solely to the fact that "millions of

dollars flow through accounts held at NatWest."  Am. Compl. ¶ 330.  Moreover, while plaintiffs

seek to link Interpal and the Union of Good with HAMAS through citations to various news

articles,[7] the amended complaint fails to allege any facts sufficient to establish that NatWest

<u>knew</u> of these alleged connections.

      In addition, the amended complaint either misconstrues or ignores the undisputed

findings by the U.K. government regarding Interpal, which diverged sharply from those of the

U.S. government, and which the Court may properly consider on this motion because they are

partly alleged in the amended complaint and relied upon by plaintiffs.  <u>See</u> pp. 17, 18 n.16, <u>infra</u>.

Thus, the amended complaint alleges that in March 1996, the U.K. Charity Commission,

established under U.K. law as regulator and registrar for charities in England and Wales, froze

Interpal's assets as a precautionary measure based on allegations Interpal had channeled money

---

[7]    While not germane to the instant motion, it is noteworthy that many of these citations are taken dramatically out of context, if not presented in outright misleading terms.  For example, the amended complaint purports to quote the Chairman of Interpal, Ibrahim Hewitt, as stating it was "possible that some of Interpal's beneficiaries in the Palestinian territories had been established by HAMAS" and that Interpal "deal[s] with people whether they are HAMAS or whether they are Fatah," Am. Compl. ¶¶ 340 n.9, 380, when in fact Mr. Hewitt also said "that Hamas runs a large social welfare and religious network separate from its military wing, Izz el-Deen al-Qassam," explaining "[i]t's like the difference between Sinn Fein and the IRA," and also stated that "[Interpal's] money goes to the poor and needy in the occupied territories.  We don't want to get sucked into politics."  <u>See</u> Friedman Decl. Ex. B, Julian Borger, <u>Close Trust, Israel Pleads; Britain is being asked to clamp down on Palestinian fundraisers</u> ("<u>Close Trust</u>"), The Guardian, Aug. 7, 1997.

to HAMAS.[8]  Am. Compl. ¶¶ 338-340.  Plaintiffs now concede in their amended complaint that

the Charity Commission soon unfroze Interpal's accounts, a fact plaintiffs misleadingly omitted

from their initial complaint, as was exposed in NatWest's initial dismissal brief.  Am. Compl.

¶ 341.  Although plaintiffs attempt to minimize the Charity Commission's findings by

mischaracterizing them, these findings speak for themselves, and it is indisputable that the

Charity Commission ultimately found no evidence of any inappropriate activity by Interpal, and

therefore lifted the freeze on Interpal's assets.  Am Compl. ¶ 342.  See Friedman Decl. Ex. C,

U.K. Charity Commission Report, dated Sept. 24, 2003 ("2003 Charity Commission Report"),

Ex. D, Extract from U.K. Charity Commission Annual Report of 1996 ("1996 Charity

Commission Extract").[9]

       The amended complaint further alleges that on August 22, 2003, after the various

attacks that injured plaintiffs, Interpal was designated an SDGT by the U.S. government.  Am.

Compl. ¶ 379.  Plaintiffs also allege that the U.K. Charity Commission subsequently launched a

second investigation and froze Interpal's assets on August 26, 2003.  Am. Compl. ¶ 380.[10]

---

[8]   The Charity Commissioners are appointed by the Home Secretary, and their powers and functions, including their power to institute inquiries, are laid out in the Charities Act 1993.

[9]   See also Am. Compl. ¶ 339 n.8; Friedman Decl. Ex. B, Close Trust (Interpal's "British accounts were temporarily frozen, but after a two-month investigation, the Charity Commission gave Interpal a clean bill of health in May 1996.  'They were well organised and we found no evidence of any donation that could not be accounted for, or that had been given for political reasons,' the commission's 1996 annual report said, adding that Interpal's trustees and staff appeared to be 'motivated by faith and altruism rather than fanaticism.'"); see also Am. Compl. ¶ 380; Friedman Decl. Ex. E, 'Hamas-linked' relief funds frozen – British Muslims furious over charity commission's decision to follow US in closing accounts of the UK-based Interpal ("'Hamas-linked' relief funds frozen"), The Guardian, Aug. 28, 2003 (same).

[10]   Friedman Decl. Ex. E, 'Hamas-linked' relief funds frozen, (also noting that while the Charity Commission opened a formal investigation in 2003, "[t]he charity can still transfer funds to Palestine, where money is channeled to schools, hospitals and bereaved families, but must ask permission from the charity commission").  See also Friedman Decl. Ex. C, 2003 Charity

Nonetheless, plaintiffs deceptively omit the indisputable fact that, after an extensive renewed investigation, the U.K. Charity Commission closed its inquiry, found no wrongdoing by Interpal, unfroze Interpal's accounts and noted that the U.S. authorities had been unable to provide evidence to support its allegations against Interpal.  Friedman Decl. Ex. C, 2003 Charity Commission Report, Ex. G, U.K. Charity Commission Order unfreezing Interpal's accounts held at NatWest, dated Sept. 24, 2003 ("2003 Charity Commission Unfreezing Order").  Tellingly, plaintiffs do not allege – because they cannot allege – that the British government ever placed Interpal on a terrorist watch list.

Plaintiffs' allegation that the 1996 Charity Commission investigation that ultimately cleared Interpal of any wrongdoing somehow "placed NatWest on notice that it was transferring funds to HAMAS," Am. Compl. ¶ 347, therefore turns reality precisely on its head. The Charity Commission's indisputable findings in 1996 and 2003 that there was <u>no</u> demonstrated connection between Interpal and HAMAS's terrorist acts establishes that, in providing routine banking services to Interpal, NatWest did <u>not</u> act with knowledge that it was supporting HAMAS-sponsored terrorism.

Finally, the amended complaint alleges that Interpal was declared an "unlawful organization" by the government of Israel in May 1997 and a "terrorist organization" by the government of Israel in January 1998.  Am. Compl. ¶¶ 347, 349.  However, the amended complaint does not allege that NatWest was aware of these declarations, nor does it allege any reason why NatWest must abide by the government of Israel's views rather than those of NatWest's own government in the United Kingdom, which twice found Interpal does not have terrorist connections, and which has never included Interpal on any terrorist watch list.

---

Commission Report; Ex. F, U.K. Charity Commission Order freezing Interpal's accounts held at NatWest, dated Aug. 26, 2003.

D.     **NatWest**

Plaintiffs do <u>not</u> seek damages from (i) the perpetrators of any of the ten attacks or their estates, (ii) HAMAS, which they claim is responsible for the First through Fifth, Seventh, Eighth and Tenth Attacks, or (iii) Interpal or the Union of Good.  In striking contrast to its multitude of allegations about HAMAS, other organizations and the purported activities of Interpal and the Union of Good, the amended complaint alleges only a handful of facts about NatWest.  Plaintiffs' essential allegation pertaining to NatWest's conduct remains the same: NatWest simply performed routine banking services for its customer Interpal, which in turn amounts to nothing more than the maintenance of deposit accounts and the acceptance of deposits into and withdrawals from those accounts.  Thus, plaintiffs allege:

1.     "NatWest maintains a U.S. Dollar account for the Union of Good . . . ."  Am. Compl. ¶ 315.[11]

2.     "On or before January 1, 1996, Interpal opened one or more accounts with defendant NatWest."  Am. Compl. ¶ 337.

3.     "NatWest also provides Interpal with merchant banking services . . ., thereby making it possible for Interpal to maintain merchant accounts with MasterCard, VISA and other credit card companies."[12]  Am. Compl. ¶ 388.

4.     NatWest "mak[es] it possible for British nationals to make direct contributions to Interpal by way of their employer's payroll department through a program called 'Give As You Earn.'"[13]  Am. Compl. ¶ 390.

---

[11]   The account plaintiffs attribute to the Union of Good was in fact also opened and owned by Interpal under the name of the Union of Good.  Accordingly, plaintiffs' allegations all therefore depend upon sanctioning NatWest for its provision of routine banking services to one customer, Interpal, that has twice been cleared by the British government.

[12]   Although the amended complaint does not specify what these merchant banking services entail, presumably they enabled NatWest to accept deposits on behalf of Interpal from individuals and entities that wished to deposit funds into Interpal's accounts using credit cards.

[13]   This program was established by the U.K. government itself, and is not run by NatWest.  <u>See</u> Income Tax (Earnings and Pensions) Act 2003.  The relevant U.K government website (<u>available at</u> http://www.hmrc.gov.uk) indicates to which eligible charities individual contributors can contribute their pre-tax earnings.  <u>As of the date of the filing of this motion,</u>

To these general allegations of routine banking services, plaintiffs have added a few specific deposits to and withdrawals from Interpal accounts. They include: (i) a deposit of $66,000 to an Interpal account from the Holy Land Foundation for Relief and Development ("HLF") in April 2000, Am. Compl. ¶ 360; (ii) deposits totaling $70,000 for Interpal from the Al-Aqsa organization in Yemen in or about January 2001, Am. Compl. ¶ 373; (iii) at least two payments to an Interpal account totaling €295,000 to the Dutch branch of the Al-Aqsa Foundation on March 27, 2003, Am. Compl. ¶ 370; (iv) a £21,404 transfer from an Interpal account to the Tulkarem Zakat Committee Society on February 19, 2003, Am. Compl. ¶ 393; (v) a £73,757 transfer from an Interpal account to the Jenin Charitable Society on July 30, 2003, Am. Compl. ¶ 395; and (vi) a £32,329 transfer to the same organization on November 5, 2003. Am. Compl. ¶ 400. Critically, however, as <u>of the dates of each of these deposits and withdrawals, none of these depositors and none of the transferees is alleged to have been designated as a terrorist organization by any government other than the Israeli government.</u>[14]

---

<u>Interpal (<i>a.k.a.</i> Palestinians Relief and Development Fund) continues to be listed as a lawful charitable recipient.</u> NatWest's role is limited to acting as a depository for funds that are deducted from individual contributors' payrolls and transferred to U.K government approved charities, including Interpal.

[14]    While the amended complaint alleges that in December 2001 (i) HLF was designated an SDT and SDGT by the U.S. government, (ii) the Counsel for the European Union designated HLF as a terrorist entity, and (iii) HLF was listed on the EU Credit Sector Federations list, these designations occurred <u>after</u> the alleged deposit to an Interpal account by HLF. Am. Compl. ¶¶ 362-365.

The August 8, 2002 court finding that plaintiffs reference concerning HLF also was published after the alleged deposit, and plaintiffs again fail to allege that NatWest knew of this decision. Am. Compl. ¶¶ 366-368.

The amended complaint alleges that in January 2003, German authorities arrested the head of the Al-Aqsa Foundation, and he was later convicted of providing material support to HAMAS in violation of 18 U.S.C. § 2339B. Am. Compl. ¶¶ 374-376. However, plaintiffs do not allege that NatWest was aware of this conviction, and again, this occurred approximately two years <u>after</u> NatWest accepted deposits totaling $70,000 on behalf of

Moreover, the amended complaint does not allege that NatWest was aware of the Israeli government designations, and provides no reason in fact or in law as to why those designations should be binding upon NatWest, especially when its own home government twice concluded there were no demonstrated ties between Interpal and HAMAS's terrorist acts.

Based on these minimal allegations, selectively quoted British press reports about Interpal's ties to HAMAS that are belied by the U.K. Charity Commission's two investigations, Interpal's after-the-fact designation as an SDGT by the U.S. government and the Israeli government's designation of Interpal as an "unlawful" or "terrorist" organization, plaintiffs seek to hold NatWest civilly liable under the ATA for their injuries stemming from ten different attacks, asserting that NatWest (i) has substantially aided and abetted the commission of acts of

---

Interpal from the Al-Aqsa organization in Yemen.  The Al-Aqsa Charitable Foundation was not designated an SDGT until May 29, 2003, <u>after</u> the alleged transactions with Interpal accounts, <u>see</u> Am. Compl. ¶¶ 314, 371, and plaintiffs do not allege that NatWest ever knew of this designation.

Moreover, the U.K. Charity Commission had specifically investigated funds Interpal allegedly received from the Al-Aqsa Foundation in the Netherlands and concluded "the funds received were in respect of humanitarian work already carried out by Interpal" and which were "then invoiced to [t]he Al-Aqsa Foundation."  Friedman Decl. Ex. C, 2003 Charity Commission Report.

While plaintiffs allege that the Tulkarem Zakat Committee Society, the Jenin Charitable Society and the World Assembly of Muslim Youth had been designated unlawful organizations by the government of Israel, Am. Compl. ¶ 393, they do not allege – nor can they allege – that these organizations had been placed on any official U.S. or U.K. terrorist list prior to <u>any</u> of the attacks that injured plaintiffs, nor do they allege that NatWest knew of the Israeli designations.  The U.S. Department of Justice's allegation that the Tulkarem Zakat Committee Society and the Jenin Charitable Society were "organization[s], which operated on behalf of, or under the control of, HAMAS," Am. Compl. ¶¶ 394, 398, was made in the November 30, 2005 indictment of the HLF, <u>years</u> after the various attacks that injured plaintiffs and mentions neither NatWest nor Interpal.  Friedman Decl. Ex. H, Holy Land Foundation Indictment, filed November 30, 2005.  See also p.10 n.6, <u>supra</u>.

Also, while plaintiffs have failed to allege how <u>any</u> of the alleged transfers proximately caused the attacks that injured plaintiffs, the November 5, 2003 transfer to the Jenin Charitable Society occurred <u>after</u> all these attacks and, as a matter of law and common sense, cannot be said to have proximately caused them.  <u>See</u> p. 53-54, <u>infra</u>.

international terrorism, including the terrorist attacks that injured plaintiffs, (ii) has provided material support for acts of international terrorism, and (iii) has financed acts of international terrorism.  Am. Compl. ¶ 1.  This legal conclusion is meritless:  NatWest is not a terrorist or a supporter of the terrorists who injured plaintiffs.  Despite being afforded the opportunity to replead their allegations after NatWest identified the fatal defects in plaintiffs' initial pleading, plaintiffs still fall markedly short of alleging facts supporting findings of criminal liability, or consequent civil liability, under the ATA.

## ARGUMENT

### POINT I

### PLAINTIFFS HAVE NOT STATED A CLAIM AGAINST NATWEST UNDER SECTION 2339B (SECOND CLAIM FOR RELIEF) OR SECTION 2339C (THIRD CLAIM FOR RELIEF)

Although the well-pleaded facts of the complaint must be taken as true on a motion to dismiss, a plaintiff cannot simply plead legal conclusions.  First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 771 (2d Cir. 1994) ("conclusions of law or unwarranted deductions of facts are not admitted"), cert. denied, 513 U.S. 1079 (1995) (citations omitted); Dillon v. Militano, 731 F. Supp. 634, 639 (S.D.N.Y. 1990) (mere conclusions do not suffice).  Moreover, where, as here, a plaintiff makes allegations based upon portions of published documents, he cannot allege facts inconsistent with the totality and context of these documents, or prevent the Court from reviewing these documents in their entirety in connection with a motion to dismiss.  Broder v. Cablevision Sys. Corp., 418 F.3d 187, 196 (2d Cir. 2005); Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 46-48 (2d Cir. 1991), cert. denied, 503 U.S. 960 (1992).

When stripped of its rhetoric, conclusory statements and unwarranted deductions, the amended complaint simply alleges that at least some of plaintiffs were injured by HAMAS

17

terrorist acts,[15] and that NatWest in London: (i) maintains a bank account for Interpal, Am

Compl. ¶¶ 337, 385-386, an organization that was never designated as an FTO, was designated

by the U.S. government as an SDGT only <u>after</u> the attacks on plaintiffs, and was twice found by

NatWest's own government to have no ties to HAMAS terrorism;[16] (ii) maintains a bank account

in the name of the Union of Good, Am. Compl. ¶ 315, which plaintiffs do not allege was ever

designated a terrorist organization; (iii) provides Interpal with services that make it possible for

Interpal to maintain merchant accounts with certain credit card companies, Am. Compl. ¶ 388;

(iv) provides banking services for employees of British businesses who make charitable

contributions to Interpal through the British "Give As You Earn" program, Am. Compl. ¶ 390;

and (v) on a handful of occasions processed specific transactions on behalf of Interpal with four

organizations, none of which was designated a terrorist organization even by the U.S.

government at the time of those transactions.  Am. Compl. ¶¶ 360, 370, 373, 393, 395, 400.

Thus, plaintiffs have added no new material allegations to their initial complaint.  As in their

initial complaint, plaintiffs' allegations amount to nothing more than NatWest's provision of

routine banking services to its British customer in London in a manner that does not violate any

British law.

        These facts therefore closely resemble those alleged in <u>Terrorist Attacks</u>, 349 F.

Supp. 2d at 833-35, where the court dismissed various complaints under Section 2333(a) against

---

[15]   As noted above, plaintiffs do not allege that HAMAS was responsible for the Sixth and Ninth
Attacks.  <u>See</u> pp. 8-9, <u>supra</u>.

[16]   Besides being reflected in documents referred to in the amended complaint, the U.K. Charity
Commission's official investigations of Interpal and its orders to unfreeze Interpal's accounts
are properly the subject of judicial notice.  <u>See Tempel v. United States</u>, 248 U.S. 121, 130
(1918) (taking judicial notice of reports of the Secretary of War); <u>Nat'l Labor Relations Bd.
v. E.C. Atkins & Co.</u>, 331 U.S. 398, 406 n.2 (1947) (taking judicial notice of circular issued
by military authorities).

several financial institutions, holding that the provision of routine banking services could not subject the banks to ATA liability.  The same ruling should follow here.

Conversely, these facts are dramatically different from those found sufficient to withstand dismissal motions in prior Section 2333(a) cases.  In Boim v. Quranic Literacy Institute & Holy Land Foundation for Relief & Development, 291 F.3d 1000 (7th Cir. 2002), the first appellate Section 2333(a) decision, the defendants were themselves alleged HAMAS front organizations which provided funds to "pa[y] for the vehicle, machine guns and ammunition used to kill [Plaintiff] David Boim, . . . [and] the training of . . . Hamas operatives involved in the attack on David Boim," and those funds "were also used to provide a stipend for [the] family" of one of the alleged perpetrators, who was subsequently killed when he later staged a suicide bomber attack.  Id. at 1004.  In Linde v. Arab Bank, PLC, 384 F. Supp. 2d 571 (E.D.N.Y. 2005), the defendant Jordanian bank, in addition to providing financial services to charitable organizations with alleged ties to terrorist organizations, held an account for HAMAS itself, and also was the exclusive administrator of the "death and dismemberment benefit plan" that provides money to families of Palestinian terrorists killed in perpetrating acts of terrorism, and as such, "create[s] an incentive to engage in terrorist acts . . . ."  Id. at 576-77.

These facts are sharply distinguishable from what is pleaded here, which is a British bank's provision of routine banking services for a British customer which was not identified as an SDGT by the U.S. government until after the attacks alleged, and received a clean bill from the British government authorities both before and after those events, and in the name of another customer which has not been designated a terrorist organization by either the United States or the United Kingdom.

19

A.  **The Statutory Framework**

       In their amended complaint, plaintiffs bring suit against NatWest on the basis of

Section 2333(a) of the ATA.  It provides as follows:

> (a)  Action and jurisdiction. -- Any national of the United States injured in
> his or her person, property, or business by reason of an act of international
> terrorism, or his or her estate, survivors, or heirs, may sue therefore in any
> appropriate district court of the United States and shall recover threefold
> the damages he or she sustains and the cost of the suit, including
> attorney's fees.

18 U.S.C. § 2333(a).  "[I]nternational terrorism" in turn "means activities that . . . involve violent

acts or acts dangerous to human life that are a violation of the criminal laws of the United States

or of any State, or that would be a criminal violation if committed within the jurisdiction of the

United States or of any State," and appear intended to coerce civilian populations or affect

government actions, and are transnational in scope.  18 U.S.C. § 2331(1).  <u>As these provisions</u>

<u>make clear, civil liability under Section 2333(a) is premised on the commission of predicate</u>

<u>criminal acts involving violent terrorism.</u>

       Plaintiffs base their Section 2333(a) claim, in turn, on violations of two specific

criminal provisions of the ATA, Section 2339B(a)(1) (Second Claim for Relief), which prohibits

the provision of material support to terrorists, and Section 2339C (Third Claim for Relief), which

prohibits the financing of terrorist activities, and on general aiding and abetting liability (First

Claim for Relief).  For the reasons stated below, the facts plaintiffs have alleged cannot support a

claim for criminal liability under either of these specific criminal ATA provisions, and the

Second and Third Claims for Relief must be dismissed.  Plaintiffs also fail to state a claim for

general "aiding and abetting" liability under Section 2333(a) (First Claim for Relief), which for the reasons discussed in Point II below should be dismissed as well.[17]

**B.      The Amended Complaint Does Not Plead Facts Sufficient To Establish That NatWest Knowingly Provided Material Support To A Foreign Terrorist Organization Under Section 2339B**

Plaintiffs' second claim for relief must be dismissed because they have failed to plead facts sufficient to establish under Section 2339B that NatWest "knowingly provide[d] material support or resources to a foreign terrorist organization."  18 U.S.C. § 2339B(a)(1). While the amended complaint alleges in conclusory terms that "[b]y knowingly collecting and transferring funds for the benefit of HAMAS, the defendant has provided material support to a designated Foreign Terrorist Organization," Am. Compl. ¶ 428, it does not adequately plead any of the requirements of Section 2339B(a)(1).

**1.      The Amended Complaint Does Not Plead Adequate Facts Concerning The Requisite FTO Designation Under Section 2339B**

As a threshold matter, the amended complaint should be dismissed because it fails to allege, and cannot allege, that Interpal or the Union of Good is an FTO.  The statute defines "terrorist organization" as "an organization designated as a terrorist organization under section 219 of the Immigration and Nationality Act," 8 U.S.C. § 1189.  18 U.S.C. § 2339B(g)(6).[18]

---

[17]   Because the Second and Third Claims attempt, albeit inadequately, to allege specific predicate violations by NatWest, we address them first in this Point I, and then turn to the vaguer "aiding and abetting" allegations of the First Claim in Point II.

[18]   In December 2004, Congress amended Section 2339B to include the following language: "To violate this paragraph, a person must have knowledge that the organization is a designated terrorist organization (as defined in subsection (g)(6)), that the organization has engaged or engages in terrorist activity (as defined in section 212(a)(3)(B) of the Immigration and Nationality Act), or that the organization has engaged or engages in terrorism (as defined in section 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989)." 18 U.S.C. § 2339B.  Notwithstanding the fact that this language was enacted after the various attacks on plaintiffs, and therefore is not determinative, the only prong under which plaintiffs

While plaintiffs allege that HAMAS was designated a "Foreign Terrorist Organization pursuant to Section 219 of the Immigration and Nationality Act and the Antiterrorism and Effective Death Penalty Act of 1996" in 1997, Am. Compl. ¶ 299, they have not alleged – nor can they allege – that NatWest's customer was ever designated an FTO.  Plaintiffs merely allege that Interpal was designated an SDGT, Am. Compl. ¶ 379, a designation distinct from an FTO designation, and one that occurred after the various attacks on plaintiffs, and they do not allege that the Union of Good has ever been designated a terrorist organization by any government, let alone the U.S. government.

It is not sufficient for plaintiffs to allege under Section 2339B that NatWest indirectly provided material support to an FTO (i.e., HAMAS) by providing routine banking services to Interpal or the Union of Good.  United States v. Khan, 309 F. Supp. 2d 789, 821 (E.D. Va. 2004) (noting that Section 2339B only prohibits "material support or resources directly to" the FTO) (emphasis added) (citations and internal quotation marks omitted).  Nor is it sufficient for plaintiffs to conclude that, because NatWest processed deposits or withdrawals involving depositors or transferees with alleged ties to terrorist organizations, Am. Compl. ¶¶ 360, 370, 373, 385, 392-393, 395, 400, NatWest has therefore provided financial services to an FTO.  Am. Compl. ¶¶ 391, 423, 425, 428-430.  NatWest's customer was Interpal, and no one else.

Plaintiffs also have not alleged that Interpal or the Union of Good is an alias of HAMAS or that HAMAS "so dominates and controls [Interpal or the Union of Good] that they must be considered principal and agent."  Nat'l Council of Resistance of Iran v. Dep't of State, 373 F.3d 152, 157 (D.C. Cir. 2004).  Interpal's and the Union of Good's alleged indirect ties to

---

purport to plead a claim is alleged support to an FTO under subsection (g)(6).  Am. Compl. ¶¶ 299, 428, 432.

HAMAS, Am. Compl. ¶¶ 309, 311-312, 324, 339, 351, 384, 391, 418, 425, 429-430, do not

suffice to establish that Interpal or the Union of Good was or is acting as an agent of HAMAS.

Cf. Nat'l Council of Resistance of Iran, 373 F.3d at 159 (The two organizations commingled

"bank records, signed black checks, . . . propaganda, . . . publications, travel documents, and

letterhead" and "the two organizations shared an essentially unitary leadership structure.").  This

is especially true because U.K. regulators have twice concluded that Interpal has <u>no</u>

demonstrated ties to HAMAS terrorism, and because plaintiffs have not alleged that the Union of

Good has ever been designated a terrorist organization.  Friedman Decl. Ex. D, 1996 Charity

Commission Extract, Ex. C, 2003 Charity Commission Report, Ex. G, 2003 Charity Commission

Unfreezing Order.  "Given the stringent requirements that must be met before a group is

designated a foreign terrorist organization," <u>Boim</u>, 291 F.3d at 1027, plaintiffs cannot bring a

Section 2339B claim based on alleged support to any entity that does not meet those

requirements.[19]

---

[19]   In addition, the plaintiffs seeking relief on account of the Sixth and Ninth Attacks have not
properly pleaded claims under Section 2339B because they have not alleged that the attacks
were carried out by any FTO.  Am. Compl. ¶¶ 208-219 (the allegations regarding the Sixth
Attack state "[i]t is believed that HAMAS was responsible for the attack"), 274-281 (the
allegations regarding the Ninth Attack state only the attack was carried out by "a Palestinian
suicide bomber").  It is not sufficient to allege generally that plaintiffs were injured in an
attack; the attack must have been perpetrated by an FTO to create the possibility of liability
under Section 2339B.  Accordingly, the Section 2339B claim of plaintiffs Jacob Steinmetz,
Deborah Steinmetz, Amichai Steinmetz, Nava Steinmetz, Orit Steinmetz and Natanel
Steinmetz, who were injured in the Sixth Attack, and of plaintiffs Esther Bablar, Jacqueline
Chambers and Levana Cohen Harooch, who were injured in the Ninth Attack, must be
dismissed.  Similarly, the claims under Section 2339C that NatWest is liable because it has
provided financial services to HAMAS, Am. Compl. ¶ 435, cannot relate to those plaintiffs,
because they have not alleged that HAMAS was responsible for the attacks on them.

### 2. The Amended Complaint Does Not Adequately Plead That NatWest's Actions Constituted Material Support Under Section 2339B

The amended complaint fails to allege facts showing that NatWest provided material support or resources to an FTO.[20]  Plaintiffs' allegations in their amended complaint confirm that they accuse NatWest only of providing routine banking services that are insufficient as a matter of law to trigger liability.

In this respect, as well as others, Plaintiffs' amended complaint resembles the dismissed allegations in In re Terrorist Attacks on September 11, 2001, 349 F. Supp. 2d 765 (S.D.N.Y.), on reconsideration in part, 392 F. Supp. 2d 539 (S.D.N.Y. 2005), where the plaintiffs claimed that the defendants "provided material support to the al Qaeda terrorists who perpetrated the attack on September 11, 2001," by alleging, among other things, that:

> (1) the banking defendants "provided essential support to the al Qaeda organization and operations" and "acted as instruments of terror, in raising, facilitating and transferring money to terrorist organizations;"

> (2) Al Rajhi Bank is "the primary bank for a number of charities that serve as al Qaeda front groups, including Al Haramain, MWL, WAMY, SJRC, and IIRO;"

> (3) "Al Rajhi continues to maintain Al Haramain's accounts despite Al Haramain's designation on March 11, 2002 as terrorist organizations by both the United States and Saudi Arabian Authorities;"

> (4) "Al Rajhi Bank knew or had to know that its depositors, Defendant charities WAMY, MWL, IIRC, and SJRC were material supporters of terrorism;"

---

[20]  As amended in December 2004, material support or resources are defined under the statute as "any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel . . ., and transportation, except medicine or religious materials."  18 U.S.C. § 2339A(b); see 18 U.S.C. § 2339B(g)(4) (incorporating the definition of "material support or resources" used in Section 2339A).  The prior versions of the statute also included the term "financial services," which is the form of material support purportedly invoked by plaintiffs here.

     (5)   one of the hijackers held an account at Al Rajhi Bank and another hijacker made a transfer to this account;

     (6)   "[m]embers of the Al Rajhi family, which owns and controls Al Rajhi Bank, are alleged to have ties to Osama bin Laden's personal secretary;" and

     (7)   Al Rajhi family members are "closely associated with wealthy donors to Osama bin Laden."

Id. at 825, 831-32 (citations and internal quotation marks omitted) (emphasis added).[21]

Notwithstanding these allegations, Judge Casey dismissed the complaint as against Al Rajhi Bank and held that there exists "no basis for a bank's liability for injuries funded by money passing through it on routine banking business."[22] Id. at 833.

       The same result obtains here, where plaintiffs' claims are based on allegations that are even more insubstantial than those dismissed in the Terrorist Attacks case. At best, the amended complaint here alleges that NatWest provided Interpal with routine banking services in Britain, both in Interpal's own name and in the name of the Union of Good. But NatWest's mere maintenance of deposit accounts for Interpal and in the name of the Union of Good, and its processing of transactions in those accounts, do not constitute "material support" within the meaning of the statute. Terrorist Attacks, 349 F. Supp. 2d at 833-36.

     **3.**     **The Amended Complaint Does Not Adequately Plead The Requisite Knowledge And Intent Under Section 2339B**

       Finally, plaintiffs never plead that NatWest knowingly provided material support to an FTO, and plaintiffs cannot plead facts sufficient to support such an allegation. Plaintiffs summarize the gist of their allegations as follows: "By knowingly collecting and transferring

---

[21]   While the claims in Terrorist Attacks appear to have been brought under Section 2339A, Section 2339A and Section 2339B include the identical definition of "material support."

[22]   The court also granted motions to dismiss by the Saudi American Bank, the Arab Bank and Al Baraka Investment & Development Corporation for similar reasons. Id. at 834-36.

funds for the benefit of HAMAS, the defendant has provided material support to a designated

Foreign Terrorist Organization . . . ."  Am. Compl. ¶ 428.  But that NatWest knowingly provided

routine banking services to Interpal or even to the Union of Good, which plaintiffs do not allege

have been designated FTOs, and transferred funds to other charitable organizations, which

plaintiffs also do not allege have been designated FTOs, is simply not an allegation that NatWest

<u>knowingly</u> provided material support to <u>HAMAS</u>.[23]

       Section 2339B must be read to require plaintiffs to allege that NatWest

specifically intended to further the terrorist activities of the foreign terrorist organization.  <u>United

States v. Al-Arian</u>, 308 F. Supp. 2d 1322, 1338-39 (M.D. Fla.), <u>modification denied by</u>, 329 F.

Supp. 2d 1294 (M.D. Fla. 2004).  This requirement of a showing of intent to further terrorist

activities is essential to avoid criminalizing the provision of routine, innocent services and

permitting allegations of guilt by association.  As the <u>Al-Arian</u> court put it, without this

requirement "a cab driver could be guilty for giving a ride to a FTO member to the UN, if he

knows that the person is a member of the FTO" and "a hotel clerk in New York could be

committing a crime by providing lodging to that same FTO member under similar circumstances

as the cab driver."[24]  <u>Al-Arian</u>, 308 F. Supp. 2d at 1337-38. [25]

---

[23]   Moreover, none of plaintiffs' allegations concerning NatWest's alleged knowledge of
unsubstantiated reports of connections between Interpal, the Union of Good and HAMAS
establishes the requisite knowledge on the part of NatWest.  <u>See</u> pp. 33-38, <u>infra</u> (discussing
plaintiffs' *mens rea* allegations in detail).

[24]   "Other examples of innocent conduct that could be prohibited include the same person
allowing the FTO member to spend the night at his house, cashing a check, loaning the
member a cell phone for use during the stay, or allowing the member to use the fax machine
or laptop computer in preparing the petition."  <u>Al-Arian</u>, 308 F. Supp. 2d at 1338 n.31.

[25]   While a court in the Ninth Circuit declined to apply this *mens rea* requirement, it noted that
"the circumstances of the hotel clerk and cab driver" in <u>Al-Arian</u> "[were] not before this
Court."  <u>Humanitarian Law Project v. Gonzales</u>, 380 F. Supp. 2d 1134, 1147 n.15 (C.D. Cal.
2005).  Although at least one court in the Second Circuit has held that Section 2339B
requires plaintiffs to plead knowledge and not intent, here plaintiffs have failed to plead facts

The same concerns are equally implicated by plaintiffs' attempt to hold a bank liable for providing routine banking services to a charitable organization that allegedly provides funds to "front" organizations that in turn fund HAMAS, without an allegation that the bank specifically intended to further HAMAS's terrorist activities, or that the bank even knew that its customer funded HAMAS.  This specific intent requirement is consistent with the Seventh Circuit's decision in Boim, where the court held that to succeed under Section 2333(a), the plaintiff must show the defendant knew about the unlawful activities and intended to bring about those unlawful activities.  Boim, 291 F.3d at 1023-24; see also Terrorist Attacks, 349 F. Supp. 2d at 828.  Here, plaintiffs have failed to plead any facts supporting even an inference that NatWest intended to support the activities of an FTO, let alone to bring about the ten attacks that injured plaintiffs.  Accordingly, plaintiffs' attempt to hold NatWest liable for those attacks under Section 2339B simply because it provided routine banking services to Interpal, or in the name of the Union of Good, must fail.

Finally, the Court should reject plaintiffs' attempt to cure their failure to allege that NatWest acted with the requisite criminal intent by citing various "know your customer" and anti-terrorist financing standards promulgated by the Financial Action Task Force (FATF), the Basel Group of Bank Supervisors (more commonly referred to as the Basel Committee On Banking Supervision), and the Wolfsberg Group that are supposedly "binding on banks and bankers doing business internationally."  See Am. Compl. ¶¶ 402-418.  It is indisputable that the banking practice standards published by each of these financial groups do not have the force of law, and that NatWest's compliance with them is not compulsory.  1 Butterworths Money Laundering Law 5, ¶¶ 329, 330-40 (Daren Allen, ed., 2005) (noting that the FATF's Forty

_____

sufficient even to establish that NatWest knowingly provided material support to HAMAS. See United States v. Sattar, 314 F. Supp. 2d 279, 301 (S.D.N.Y. 2004).

Recommendations, promulgated to provide standards in the fight against money laundering,

"under international law . . . do not have a binding effect, as a matter of either custom or

convention" and that the Special Recommendations on Terrorist Financing  "are complementary

to the Forty Recommendations"); Butterworths, supra, at ¶ 547 (the Basel Committee Statement

on the Prevention of Criminal Use of the Banking System for the Purpose of Money Laundering

"does not have binding legal status and its implementation is dependent on national law and

practice."); Mark Pieth & Gemma Aiolfi, The Private Sector Becomes Active: The Wolfsberg

Process, 10 J. Fin. Crime 359, 361 (2003) (describing the Wolfsberg Principles as a "voluntary

code of conduct").  Therefore, plaintiffs cannot rely upon alleged violations of these standards to

demonstrate the criminal intent necessary to establish a violation of the ATA.

> **4.      The Provisions Of Section 2339B Specifically Addressing
> Financial Institutions Further Establish That Plaintiffs
> Cannot Allege That NatWest Provided Material Support
> Under Section 2339B**

The reporting provisions in Section 2339B(a)(2)[26] and the civil penalty provisions

in Section 2339B(b),[27] specifically relating to financial institutions that learn they are in

possession of funds in which a foreign terrorist organization has an interest, also indicate that

Congress did not intend to make a bank's mere maintenance of an account for a customer, or

other related routine banking services, grounds for criminal prosecution of the bank (and hence

civil liability under Section 2333(a)) for providing "material support" to terrorist organizations

---

[26]   "Except as authorized by the Secretary, any financial institution that becomes aware that it
has possession of, or control over, any funds in which a foreign terrorist organization, or its
agent, has an interest, shall -- (A) retain possession of, or maintain control over, such funds;
and (B) report to the Secretary the existence of such funds in accordance with regulations
issued by the Secretary."  18 U.S.C. § 2339B(a)(2).

[27]   "Any financial institution that knowingly fails to comply with subsection (a)(2) shall be
subject to a civil penalty in an amount that is the greater of -- (A) $50,000 per violation; or
(B) twice the amount of which the financial institution was required under subsection (a)(2)
to retain possession or control."  18 U.S.C. § 2339B(b).

that may have received payments from that account.  Congress would hardly have enacted these civil reporting provisions in Sections 2339B(a)(2) and 2339B(b), and certainly would not have imposed civil penalties for a violation of these provisions, if the mere maintenance of such accounts and provision of such services was a criminal violation under Section 2339B(a)(1). This provides a further reason why the language of the statutory provisions upon which plaintiffs rely cannot be construed to make actionable what plaintiffs accuse NatWest of doing here.

**C.     The Amended Complaint Does Not Plead Facts Sufficient To Establish That NatWest Provided Or Collected Funds In Violation Of Section 2339C**

Plaintiffs' third claim for relief must be dismissed because plaintiffs have failed to plead facts sufficient to establish under Section 2339C that NatWest "unlawfully and willfully provide[d] or collect[ed] funds with the intention that such funds be used, or with the knowledge that such funds are to be used, in full or in part, in order to carry out" a proscribed act.  18 U.S.C. § 2339C(a)(1).

The amended complaint alleges in the most conclusory terms that "[NatWest] willfully and unlawfully provides financial services to HAMAS by collecting, receiving, transmitting, and providing funds, through accounts it maintains for Interpal and the Union of Good and through credit card payments it receives on behalf of Interpal with the knowledge that such funds have been and will be used, in part, to facilitate acts intended to cause death or serious bodily injury to civilians such as the victims of the terrorist acts described in this complaint."  Am. Compl. ¶ 435.  However, the only specific facts plaintiffs allege for this legal conclusion, see Am. Compl. ¶¶ 315, 337, 360, 370, 373, 385-386, 388, 390, 393, 395, 400, amount to nothing more than the provision of routine banking services, see p. 18, supra, and as such they manifestly fail to allege that NatWest committed the crime of intentionally or

knowingly providing financing for terrorism, as required for criminal liability under Section 2339C, and consequent civil liability under Section 2333(a).[28]

1.     **The Amended Complaint Does Not Adequately Plead That NatWest Committed The Requisite *Actus Reus* Under Section 2339C**

As defined in Section 2339C(e)(4), the term "'provides' includes giving, donating, and transmitting," and under Section 2339C(e)(5) the term "'collects' includes raising and receiving."  The plain meaning of the statute makes clear that the words "collects" and "provides" cannot encompass the routine processing by a bank of deposits to and withdrawals from deposit accounts, funds deposited through a government devised program for charitable contributions to be made by wage earners, or deposits generated by payments to credit card companies.  This is especially true in light of the fundamental rule of statutory construction that "[a] statute should be interpreted in a way that avoids absurd results."  United States v. Dauray, 215 F.3d 257, 264 (2d Cir. 2000).

This statute is plainly directed toward capturing the providing of funds for criminal conduct, or raising funds for such conduct.  It is inconceivable that Congress intended to hold liable for terrorist acts every bank that could be sued in the United States, simply because, in the ordinary course of business, funds passed through the banks' customers' accounts and ultimately found their way into the hands of a terrorist organization, especially without any knowledge by the bank that this would occur.  To ascribe such an intent to Congress would be as untenable as claiming that the United States Postal Service should be liable under Section 2339C

---

[28]   As discussed above, p. 23 n.19, supra, plaintiffs injured in the Sixth and Ninth Attacks have not alleged that HAMAS was responsible for the attacks in which they were injured, and therefore their claims for relief under Section 23339C must be dismissed.

every time someone sends a check through the U.S. mail system, because the funds are alleged to have been used to carry out an act of terrorism.

That the statutory terms "provides" and "collects" cannot encompass the actions alleged by Plaintiffs is also consistent with the heading of Section 2339C, entitled "[p]rohibitions against the <u>financing</u> of terrorism" (emphasis added).  The most appropriate dictionary definition of "finance" is "to raise or provide funds or capital for."  Merriam-Webster OnLine, http://www.m-w.com (last visited Jan. 18, 2006).  The purpose of the statute plainly is to prohibit financing of terrorism, and not to prohibit a bank from maintaining deposit accounts for customers or accepting deposits under a government sponsored charitable giving system or generated through credit card payments.

It is also a well-established principle of statutory construction that a grouping of words marks an intention that they be understood in the same general sense, that the meaning of a word can be gathered from the context or by reference to the meaning of words associated with it, and that where specific words follow a general term or where general terms follow a specific word, the more general terms are to be construed to cover objects similar in nature to those covered by the more specific terms.[29]  Based on these principles, the term "transmit" in Section 2339C(e)(4) must be understood to have a similar meaning as "give"[30] and

---

[29]  These principles are so old and well established as to have Latin names attached to them: *noscitur a sociis* ("it is known from its associates") and *ejusdem generis* ("of the same kind").  <u>See</u> <u>Washington State Dep't of Soc. & Health Servs. v. Guardianship Estate of Keffeler</u>, 537 U.S. 371, 384-85 (2003) ("The maxim *noscitur a sociis* . . . is often wisely applied where a word is capable of many meanings in order to avoid the giving of unintended breadth to the Acts of Congress.") (citation and internal quotation marks omitted); <u>Dauray</u>, 215 F.3d at 262.

[30]  The word "give," while subject to various meanings, is best understood in this context as "to make a present of."  Merriam-Webster OnLine, http://www.m-w.com (last visited Jan. 18, 2006).

"donate,"[31] and those words should guide the meaning of the term "provide" in that section.  The obvious intent is to penalize persons who donate funds to pay for terrorist activities, not to prosecute banks that merely permit withdrawals from a deposit account at the behest of a customer.

For similar reasons, the statutory term "collecting" in Section 2339C(e)(5) cannot be interpreted to include the transactions described by Plaintiffs.  The term "receiving" should be construed with its companion term "raising,"[32] and the meaning of the word "collects" should be construed to reflect this meaning.  These terms imply that the person or entity must <u>actively raise</u> funds, and must do something more than <u>passively receive</u> funds.  This is again consistent with the title of this provision, which proscribes "financing."  <u>See</u> 18 U.S.C. § 2339C.  Again, the intent of the statute is to criminalize fund-raising for terrorist organizations, not the provision of routine banking services by a depository institution.

The legislative history of Section 2339C substantiates the conclusion that it is not directed at the maintenance of bank deposit accounts or the other routine banking services plaintiffs describe.  The purpose of Section 2339C was to implement the International Convention for the Suppression of the Financing of Terrorism (the "Convention") and to criminalize fund raising for terrorism.  H.R. Rep. No. 107-307, at 6-7 (2001); <u>see also</u> 147 Cong. Rec. E2397 (daily ed. Dec. 19, 2001) (statement of Rep. Sheila Jackson Lee ("H.R. 3275 implements the International Convention for the Suppression of the Financing of Terrorism, which requires signatories to prosecute or extradite <u>people who contribute to, or collect money</u>

---

[31]  The word "donate" is defined as "to make a gift of."  Merriam-Webster OnLine, http://www.m-w.com (last visited Jan. 18, 2006).

[32]  The word "raise," while subject to various meanings, is best defined as in this context as "to get together for a purpose."  Merriam-Webster OnLine, http://www.m-w.com (last visited Jan. 18, 2006).

for, terrorist groups.") (emphasis added); <u>Implementation of the International Convention for the Suppression of Terrorist Bombings and the International Convention for the Suppression of the Financing of Terrorism: Hearing on H.R. 3275 Before the Subcomm. on Crime of the H. Comm. on the Judiciary</u>, 107th Cong. 10 (2001), (statement of Samuel M. Witten, Acting Deputy Legal Adviser, Dep't of State) ("[T]he Convention will obligate States to criminalize conduct related to the <u>raising of money</u> and other assets to support terrorist activities.") (emphasis added).  The focus of the Convention, and consequently of Section 2339C that implements the Convention, is on "front" organizations or other groups that allegedly fund terrorist activities, not on financial institutions that provide routine banking services.

If Interpal and the Union of Good are, as plaintiffs believe, fundraisers for terrorists in HAMAS, plaintiffs could properly sue them under Section 2339C, although plaintiffs have not done this.  But NatWest is not liable under Section 2339C simply for providing routine banking services to its customer, especially one which has been twice investigated by the authorities where NatWest principally does business, and where its accounts are held, and twice found <u>not</u> to be involved in terrorism.

2.    **The Amended Complaint Does Not Adequately Allege That NatWest Possessed The Requisite *Mens Rea* Under Section 2339C**

Even if these routine banking services constituted "providing" or "collecting" funds by NatWest within the meaning of Section 2339C, plaintiffs have fallen far short of alleging facts establishing that NatWest had the required mental state for liability under that statute.  Under Section 2339C, plaintiffs must allege facts showing that NatWest "unlawfully and willfully provides or collects funds with the <u>intention that such funds are to be used</u>, or with the <u>knowledge that such funds are to be used</u>" for a terrorist act.  18 U.S.C. § 2339C(a)(1) (emphasis added).  They have failed to do so.

33

The *mens rea* requirement of Section 2339C dictates that plaintiffs allege facts sufficient to establish that NatWest <u>specifically intended</u> or <u>actually knew</u> the funds would be used in a terrorist act.  This specific intent or actual knowledge requirement is consistent with the Seventh Circuit's decision in <u>Boim</u>, where the court held that to succeed under Section 2333(a), the plaintiff must show the defendant knew about the unlawful activities and <u>intended</u> to bring about those unlawful activities; otherwise the court would be imposing strict liability.  <u>Boim v. Quranic Literacy Inst. & Holy Land Found. For Relief & Dev.</u>, 291 F.3d 1000, 1023-24 (7th Cir. 2002); <u>see also</u> <u>In re Terrorist Attacks on Sept. 11, 2001</u>, 349 F. Supp. 2d 765, 828 (S.D.N.Y.), <u>on reconsideration in part</u>, 392 F. Supp. 2d 539 (S.D.N.Y. 2005).  Here, the factual allegations of the amended complaint establish, at most, nothing more than the existence of unsubstantiated reports of connections between Interpal, the Union of Good, and HAMAS that fall woefully short of establishing specific intent or actual knowledge on the part of NatWest that any funds in any NatWest account would be used for terrorist acts.

Indeed, the undisputed facts in the documents that the Court may consider on this motion refute the existence of any such intent or knowledge.  While the amended complaint alleges that NatWest continued to maintain the Interpal accounts after they were frozen by the U.K. Charity Commission in 1996 despite reports of links between Interpal and HAMAS in British newspapers, Am. Compl. ¶¶ 338-340, it is indisputable that the U.K. Charity Commission ultimately found <u>no</u> evidence of inappropriate activity, and thus lifted the freeze on Interpal's assets.[33]  Friedman Decl. Ex. D, 1996 Charity Commission Extract, Ex. C, 2003 Charity Commission Report.

---

[33]  Plaintiffs concede "the Charity Commission finding was that Interpal donated funds [to HAMAS] <u>without any evident intent to support terrorism</u> per se, or as the Commission put it, without "any pro-terrorist bias."  Am. Compl. ¶ 343.  Plaintiffs attempt to spin this finding by

The amended complaint also shamelessly omits that the U.K. Charity Commission again determined in 2003, after the U.S. government SDGT designation of Interpal, that Interpal has no illicit ties to HAMAS.  Friedman Decl. Ex. C, 2003 Charity Commission Report, Ex. G, 2003 Charity Commission Unfreezing Order.  Following the U.K. Charity Commission's findings, NatWest could reasonably conclude that funds deposited in and withdrawn from Interpal's accounts would not be used to carry out terrorist acts.  Notably, the amended complaint does not allege that any U.K. regulatory or governmental authority ever placed Interpal on a terrorist watch list, even after the U.S. designation in August 2003, or that NatWest was ever aware of the U.S. designation.

It bears emphasis that plaintiffs allege that it was the British government's temporary freeze of Interpal's accounts in 1996 that "first placed NatWest on notice that it was transferring funds to HAMAS," Am. Compl. ¶ 347.  Nonetheless, plaintiffs baselessly treat this purported "notice" as if it were a one-way ratchet.  They conspicuously ignore the necessary conclusion from their premise, which is that after the British government subsequently twice cleared Interpal of any wrongdoing, NatWest could not have acted with the requisite bad intent when it continued to provide routine banking services to Interpal.

Nor does Interpal's designation by Israel as an unlawful organization in May 1997 and a terrorist organization in January 1998, and the publication of these designations in the Israeli Announcements and Advertisements Gazette, Am. Compl. ¶¶ 347, 349, evidence the

---

asserting "U.S. anti-terrorism laws, however, do not distinguish between 'biased' and 'unbiased' support provided to Foreign Terrorist Organizations," Am. Compl. ¶ 344, in essence arguing that support for terrorist organizations is a strict liability crime under the ATA.  This is contradicted by Section 2339C, which requires a finding – and therefore factual allegations in the amended complaint – that funds are provided or collected "with the intention that such funds be used, or with the knowledge that such funds are to be used . . . ." 18 U.S.C. § 2339C(a)(1) (emphasis added).

requisite levels of specific intent or actual knowledge on the part of NatWest.  There is no allegation that NatWest was even aware of the Israeli designations, nor any reason why it would have been, since it does not do business in Israel.  Nor is there any allegation that NatWest, a British bank, would or should have accepted Israel's views on the status of a British-based depositor that was investigated and cleared of any ties to HAMAS by the British government.

For the same reasons, Israel's designation of HLF, an alleged source of a deposit into an Interpal account, as a "HAMAS front organization" in 1997, Am. Compl. ¶ 360, n.12, and its designation of the Jenin Zakat Committee Society and Tulkarem Charity Committee, alleged recipients of transfers from an Interpal account, as "unlawful organization[s]" in February 2002, Am. Compl. ¶¶ 355, 357, 393, 395, 400, which designations plaintiffs do not even allege were published by the Israeli government, cannot evidence the requisite levels of specific intent or actual knowledge on the part of NatWest.

The same is true with respect to the amended complaint's allegations about U.S. and E.U. designations of the HLF, which is said to have made a deposit to an Interpal account in April 2000, and the Al-Aqsa Charitable Foundation, which is said to have made deposits to an Interpal account in January 2001 and March 2003.  Am. Compl. ¶¶ 360, 370, 373.  The U.S. government designated the Al-Aqsa Charitable Foundation as an SDGT in May 2003, Am. Compl. ¶ 314, <u>after</u> both of the alleged transactions with that entity had occurred.  Likewise, HLF was designated a terrorist organization by the United States, the Counsel for the European Union and the E.U. Credit Sector Federations list in December 2001, again only <u>after</u> the transactions plaintiffs allege.[34]  Am. Compl. ¶¶ 362-365.

---

[34]   Plaintiffs also fail to allege that NatWest was aware of, or had reason to be aware of, the August 8, 2002 U.S. court opinion describing HLF's ties to HAMAS, Am. Compl. ¶¶ 366-368, which in any event was published <u>after</u> the alleged transfer.

Finally, Interpal's designation as an SDGT by the U.S. government on August 22, 2003, Am. Compl. ¶ 379, occurred <u>after</u> all of the attacks on which plaintiffs base their claims. This designation, therefore, cannot – as a matter of law and common sense – establish that, at or before the time of plaintiffs' injuries, NatWest provided funds to Interpal with the intention or knowledge that they would be used in a terrorist attack that injured plaintiffs.

Plaintiffs' various allegations regarding the Union of Good are similarly unavailing.  Plaintiffs allege in the most conclusory terms that: (i) the Union of Good uses Interpal as a clearing house for funds raised for HAMAS in Europe and the Middle East and NatWest has "first-hand knowledge" of the HAMAS front organizations to which such funds have been transmitted due to its "unique position to monitor and quantify most of the transactions" and "identities" to which the Union of Good and Interpal transmitted funds, Am. Compl. ¶¶ 311-313, 316-318, 324-325; and (ii) NatWest is purportedly aware of the inflammatory pro-HAMAS views of the head of the Union of Good, Dr. Yussuf al-Qaradwi. Am. Compl. ¶ 330.

Significantly, however, <u>neither the United States nor the United Kingdom has ever classified the Union of Good as a terrorist organization</u>.  Furthermore, as discussed above, plaintiffs plead no facts that would support the conclusion that NatWest had knowledge that organizations such as Jenin Zakat Committee or Tulkarem Charitable Committee were "HAMAS front organizations."  Am. Compl. ¶¶ 351, 358.  Plaintiffs' allegation that NatWest purportedly knew of the pro-HAMAS views of al-Qardawi because "millions of dollars flow through accounts held at NatWest," Am. Compl. ¶ 330, is a pure <u>non</u> <u>sequitur</u>.  <u>See</u> p. 11, <u>supra</u>.

In sum, none of the facts alleged in the amended complaint show that NatWest <u>specifically intended</u> or <u>actually knew</u> the funds held in the accounts of Interpal or in the name of

the Union of Good, or the funds deposited into or withdrawn from the accounts, would be used

for an act of HAMAS terrorism.  Essentially, all plaintiffs have alleged is that Interpal

maintained bank accounts at NatWest into which and from which certain deposits and

withdrawals were made that allegedly resulted in transfers to or from organizations connected

with HAMAS.  This is manifestly inadequate to show that the routine banking services provided

by NatWest fell within the criminal provisions of Section 2339C, much less that NatWest acted

with the specific intent or actual knowledge to further terrorist acts necessary for liability under

that section.  Thus, plaintiffs' claim for relief under Section 2339C must be dismissed.

**POINT II**

**PLAINTIFFS CANNOT IMPOSE GENERAL
AIDING AND ABETTING LIABILITY ON NATWEST**

Unable to plead facts satisfying the requirements for liability under Section

2339B and Section 2339C, plaintiffs apparently seek to allege general secondary liability under

Section 2333(a) by relying on the inherently questionable assumption that general aiding and

abetting liability exists under Section 2333(a).  Their theory for this claim appears to be that the

ten attacks were attempts to murder or cause serious bodily injury to a national of the United

States outside the United States in violation of 18 U.S.C. § 2332, and that even though plaintiffs

know that a responsible prosecutor would never bring such a charge, NatWest somehow is

criminally responsible (and therefore civilly liable under Section 2332(a)) for aiding and abetting

this act of attempted murder.

However, Section 2333(a) contains no reference to secondary liability for aiding

and abetting, and the structure of the ATA, read in light of the Supreme Court's decision in

Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 166

(1994), indicates there is no implied claim for aiding and abetting.  This is especially true

38

because Congress specifically provided a basis for addressing the conduct of secondary actors under Section 2339B and Section 2339C, violations of which trigger civil liability under Section 2333(a), without providing any language in Section 2333(a) about more general secondary liability.  While the Seventh Circuit in <u>Boim</u> and Judge Gershon in <u>Linde</u> (who relied on the Seventh Circuit's decision without engaging in independent analysis), have previously allowed certain aiding and abetting claims to survive a dismissal motion under Section 2333(a), this Court is not bound by those decisions, and should hold instead that Section 2333(a) does not provide for general aiding and abetting claims.[35]

A.     **Secondary Liability Should Not Be
       Implied At All Under Section 2333(a)**

While <u>Central Bank</u> addressed the existence of civil aiding and abetting liability under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder, its rationale is clearly not so limited.  <u>Pennsylvania Ass'n of Edwards Heirs v. Rightenour</u>, 235 F.3d 839, 843 (3d Cir. 2000), <u>cert. denied</u>, 534 U.S. 816 (2001) ("nothing in <u>Central Bank</u> indicates that its reasoning is specific to the particular statute presented in that case").  Under the teaching of <u>Central Bank</u>, there is no general presumption of aiding and abetting in a civil private action under Section 2333(a).  <u>Central Bank</u>, 511 U.S. at 182; <u>see also</u> <u>Dep't of Econ. Dev. v. Arthur Anderson & Co.</u>, 924 F. Supp. 449, 476 (S.D.N.Y. 1996).  Rather, in order to determine whether Section 2333(a) specifically incorporates aiding and abetting liability, the Court must look to the

---

[35]   As discussed above, in <u>In re Terrorist Attacks on September 11, 2001</u>, 349 F. Supp. 2d 765 (S.D.N.Y. 2005), the court dismissed complaints and claims against various defendants, including banks similarly situated to NatWest, but did not independently analyze implied aiding and abetting liability under Section 2333(a).  <u>See also</u> <u>In re Terrorist Attacks on Sept. 11, 2001</u>, 392 F. Supp. 2d 539 (S.D.N.Y. 2005) (dismissing additional claims and complaints).

explicit statutory language.  Central Bank, 511 U.S. at 173, 175, 182; Dep't of Econ. Dev., 924 F. Supp. at 475; see also Goldfine v. Sichenzia, 118 F. Supp. 2d 392, 399 (S.D.N.Y. 2000).

The language of Section 2333(a) is unambiguous, and does not mention general secondary liability at all.[36]  Because "Congress knew how to impose aiding and abetting liability when it chose to do so," Central Bank, 511 U.S. at 176 (citations omitted), and because Congress did not explicitly provide for aiding and abetting liability under Section 2333(a), this Court should not read such a claim into that statute.  See also Kidder Peabody & Co. v. Unigestion Int'l, Ltd., 903 F. Supp. 479, 496 (S.D.N.Y. 1995).  Nor can it be said that in enacting Section 2333(a), Congress "legislated with an understanding . . . that aiding and abetting liability was well established in both civil and criminal actions" because, as the Supreme Court explained in Central Bank, while aiding and abetting "is an ancient criminal law doctrine" its civil application under the Restatement of Torts "has been at best uncertain."  Central Bank, 511 U.S. at 181-82 (citation and internal quotation marks omitted).

In Boim, where the Seventh Circuit permitted an aiding and abetting claim under Section 2333(a) in a case in which two charitable front organizations were alleged to have directly supplied money to buy the weapons used to injure the plaintiffs, train the shooters, and compensate the families of the attackers, the court sought to distinguish Central Bank by stating that "Central Bank addressed extending aiding and abetting liability to an implied right of action, not an express right of action as we have here in section 2333."  Boim, 291 F.3d at 1019.  However, courts in the Second Circuit have reached precisely the opposite conclusion, holding that arguments against inferring secondary liability with respect to a civil action that is expressly

---

[36]   While the Supreme Court acknowledged that "aiding and abetting a wrongdoer ought to be actionable in certain instances," such liability is limited to those situations where "aiding and abetting is covered by the statute."  Central Bank, 511 U.S. at 177.  Here, the ATA is silent on aiding and abetting liability.

created by a statute are <u>stronger</u> than where the cause of action is only implied.  <u>See Hayden v.</u>

<u>Paul, Weiss, Rifkind, Wharton & Garrison</u>, 955 F. Supp. 248, 256-57 (S.D.N.Y. 1997); <u>see also</u>

<u>Dep't of Econ. Dev.</u>, 924 F. Supp. at 476.  This approach, which undercuts one of the principal

rationales of <u>Boim</u>, makes eminent sense:  unlike implied causes of action, where courts must

speculate about congressional intent, here Congress clearly and explicitly provided for a private

civil right of action under Section 2333(a), but just as clearly did not make explicit provision for

secondary liability.

        In addition, in the wake of the seminal <u>Central Bank</u> decision, courts have

expressly refused to infer aiding and abetting liability in statutes with statutory language

analogous to the ATA.  Thus, the Third Circuit has held there is no civil aiding and abetting

liability under the civil RICO provision, which contains nearly identical language to the civil

remedy provision of Section 2333(a).[37]  <u>See Pennsylvania Ass'n of Edwards Heirs</u>, 235 F.3d at

840; <u>Rolo v. City Investing Co. Liquidating Trust</u>, 155 F.3d 644, 657 (3d Cir. 1998), <u>abrogation</u>

<u>on other grounds recognized by</u> <u>Forbes v. Eagleson</u>, 228 F.3d 471 (3d Cir. 2000).  Similarly,

district courts in the Second Circuit have held there exists no civil private right of action for

aiding and abetting a RICO violation.  <u>See Hayden</u>, 955 F. Supp. at 253, 256; <u>Dep't of Econ.</u>

<u>Dev.</u>, 924 F. Supp. at 477.[38]  Likewise, there exists no secondary liability for aiding and abetting

---

[37]   The RICO civil remedies provision states that "[a]ny person injured in his business or
property by reason of a violation of section 1962 of this chapter may sue therefore in any
appropriate United States district court and shall recover threefold the damages he sustains
and the cost of the suit, including a reasonable attorney's fee . . . ."  18 U.S.C. § 1964(c).

[38]   <u>See also</u> <u>Goldfine</u>, 118 F. Supp. 2d at 406; <u>LaSalle Nat'l Bank v. Duff & Phelps Credit</u>
<u>Rating Co.</u>, 951 F. Supp. 1071, 1089 (S.D.N.Y. 1996); <u>Rosenheck v. Rieber</u>, 932 F. Supp.
626, 628 n.1 (S.D.N.Y. 1996).

under the Sherman Act.  MCI Telecomm. Corp. v. Graphnet, Inc., 881 F. Supp. 126, 129 (D.N.J. 1995).[39]

      The Court should follow this precedent, and should decline to infer a claim for aiding and abetting liability under Section 2333(a).

**B.    When Congress Intended To Create Liability For Secondary Actors Under Section 2333(a), It Did So Expressly In Section 2339B And Section 2339C**

      The absence of general secondary liability under Section 2333(a) does not excuse secondary actors of all civil liability under the ATA.  On the contrary, by enacting Sections 2339B and 2339C, the violation of which gives rise to civil liability under Section 2333(a), Congress expressly established the circumstances under which secondary civil liability is warranted for persons who do not themselves commit terrorist acts.  In doing so, it also demonstrated that generalized civil aiding and abetting liability is not within the ambit of Section 2333(a).  See Central Bank, 511 U.S. at 184 ("The fact that Congress chose to impose some forms of secondary liability, but not others, indicates a deliberate congressional choice with which the courts should not interfere."); see also Dep't of Econ. Dev., 924 F. Supp. at 476.

      Indeed, if Congress believed there was general civil aiding and abetting liability under Section 2333(a), there would have been no reason for it to enact Section 2339B and Section 2339C.  The specific liability for providing material support to a designated foreign terrorist organization under Section 2339B, and for financing terrorism under Section 2339C,

---

[39]   In addition, simply because criminal aiding and abetting liability exists under 18 U.S.C. § 2 does not mean that civil aiding and abetting liability exists as a matter of law.  Dep't of Econ. Dev., 924 F. Supp. at 476 (quoting Jed S. Rakoff, Aiding and Abetting Under Civil RICO, N.Y.L.J., May 12, 1994, at 3) ("[T]here is no suggestion that [18 U.S.C. § 2], enacted in 1909, was intended to authorize civil liability for aiding and abetting in any situation in which Congress thereafter combined civil and criminal penalties in one statute, whether in RICO (enacted in 1970), the Securities Exchange Act (enacted in 1934), or elsewhere.").

would be superfluous if the same conduct could also be actionable under a general aiding and abetting theory.  <u>Mackey v. Lanier Collection Agency & Serv., Inc.</u>, 486 U.S. 825, 837 (1988) ("[W]e are hesitant to adopt an interpretation of a congressional enactment which renders superfluous another portion of that same law.").

      Accordingly, the fact that Congress expressly provided for secondary liability in Sections 2339B and 2339C when it wished to do so provides yet another reason why the Court should not find a basis for alleging secondary liability in Section 2333(a).

**C.**    **If There Is General Secondary Liability Under Section 2333(a), The Pleaded Facts Must Satisfy Criminal Aiding And Abetting Standards Under 18 U.S.C. § 2, As They Indisputably Do Not Here**

      If the Court nonetheless concludes that a civil recovery for aiding and abetting liability can be had under Section 2333(a), independent of legally sufficient allegations of violations of Section 2339B and Section 2339C, plaintiffs would need to satisfy the criminal standards of aiding and abetting liability under 18 U.S.C. § 2,[40] because all civil liability under Section 2333(a) requires a predicate criminal violation.[41]  <u>Boim</u> itself inferred aiding and abetting liability under Section 2333(a) based, in part, on the applicable criminal standards. <u>Boim</u>, 291 F.3d at 1020-21.  To the extent courts have allowed aiding and abetting claims under the civil RICO provisions prior to <u>Central Bank</u>, they also have applied the criminal aiding and abetting standard.  <u>United States v. Local 1804-1 Int'l Longshoremen's Ass'n</u>, 812 F. Supp. 1303, 1327, 1346-47 (S.D.N.Y. 1993) ("In a civil RICO suit, the Court applies the criminal

---

[40]   "Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."  18 U.S.C. § 2.

[41]   Under Section 2333(a), civil liability arises where injury is caused "by reason of an act of international terrorism," 18 U.S.C. § 2333(a), which is defined, under Section 2331, as activities that "involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State."  18 U.S.C. § 2331(1)(a).  <u>See also</u> <u>Linde v. Arab Bank, PLC</u>, 353 F. Supp. 2d 327, 331 (E.D.N.Y. 2004).

standard in determining aiding and abetting liability."); see also United States v. Local 560 of the Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen, & Helpers of Am., 780 F.2d 267, 284 (3d Cir. 1985) ("although the present case is civil in character, the criminal standard for aiding and abetting applies"), cert. denied, 476 U.S. 1140 (1986).

Plaintiffs' amended complaint fails to satisfy the standard for criminal aiding and abetting liability, which requires plaintiffs to plead facts establishing that NatWest associated itself with the ten attacks perpetrated against plaintiffs, thereby knowing about those crimes, and specifically sought to bring them about and make them succeed. Nye & Nissen v. United States, 336 U.S. 613, 619 (1949); United States v. Medina, 32 F.3d 40, 45 (2d Cir. 1994). To the contrary, the amended complaint makes no reference at all to (i) NatWest's knowledge of the various attacks, (ii) NatWest's specific intent to further any of those attacks, or even (iii) NatWest's specific intent to further HAMAS's terrorist acts more generally. See United States v. Samaria, 239 F.3d 228, 234-35 (2d Cir. 2001).[42]

Accordingly, even if the Court concludes that plaintiffs could theoretically allege general aiding and abetting liability under Section 2333(a), they have failed to adequately allege any such liability here. Plaintiffs' attempt to assert an aiding and abetting claim therefore fails as a matter of law.

**D. Alternatively, The Pleaded Facts Must Satisfy Aiding And Abetting Standards Under The Restatement (Second) Of Torts § 876(b), Which They Also Fail To Do**

Finally, even if the Court determines that plaintiffs' pleadings need not satisfy the criminal aiding and abetting standards, at a minimum, plaintiffs must plead facts sufficient to

---

[42]  Even if plaintiffs had alleged that NatWest knew that "some crime would be committed," which they have not and cannot, that is insufficient to establish criminal liability for aiding and abetting. United States v. Friedman, 300 F.3d 111, 124 (2d Cir. 2002), cert. denied, 538 U.S. 981 (2003).

satisfy the Restatement (Second) of Torts § 876(b).  This section provides that "[f]or harm resulting to a third person from the tortious conduct of another, one is subject to liability if he . . . knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself."  Restatement (Second) of Torts § 876 (1979) (emphasis added).  Plaintiffs have failed to do this, even under the most liberal pleading standards.[43]

1.     **The Amended Complaint Does Not Allege Facts Sufficient To Establish That NatWest Had Actual Knowledge Of The Alleged Terrorist Activities**

First, plaintiffs have not alleged facts sufficient to establish that NatWest knew Interpal or the Union of Good were directly connected to the alleged terrorist activities of HAMAS[44] or that NatWest knew of the alleged terrorist activity that Interpal and the Union of Good were supposedly supporting, much less the specific attacks which injured plaintiffs.  Cf. Boim, 291 F.3d at 1023.  Courts within the Second Circuit have adopted precisely such an actual knowledge standard for aiding and abetting liability.  Fundacion Museo de Arte Contemporaneo de Caracas – Sofia Imber v. CBI-TDB Union Bancaire Privee, 996 F. Supp. 277, 293 (S.D.N.Y.),

---

[43]   The Second Circuit has held that the three prerequisites to civil aiding and abetting liability, outside the context of a statute such as the ATA that requires predicate criminal acts, are: (1) a primary violation by someone other than the aider and abettor; (2) knowledge of the primary violation; and (3) substantial assistance of the violation.  Armstrong v. McAlpin, 699 F.2d 79, 91 (2d Cir. 1983), abrogation recognized on other grounds, Rabin v. Fivzar Assocs., 801 F. Supp. 1045 (S.D.N.Y. 1992); IIT, An Int'l Inv. Trust v. Cornfeld, 619 F.2d 909, 922 (2d Cir. 1980).  See also Dillon v. Militano, 731 F. Supp. 634, 638 (S.D.N.Y. 1990); Ross v. Bolton, 639 F. Supp. 323, 326 (S.D.N.Y. 1986); Dickens v. Chem. Bank, 573 F. Supp. 1129, 1131 (S.D.N.Y. 1983); Edwards & Hanly v. Wells Fargo Sec. Clearance Corp., 602 F.2d 478, 483 n.5 (2d Cir. 1979) (referencing Restatement (Second) of Torts § 876), cert. denied, 444 U.S. 1045 (1980).

[44]   Given that NatWest is not alleged to have directly provided substantial assistance to HAMAS, it is not enough for plaintiffs to establish that NatWest knew about HAMAS's terrorist activities generally; rather plaintiffs must plead facts sufficient to establish that NatWest knew of Interpal's and the Union of Good's alleged ties to HAMAS's terrorist activities.

aff'd, 160 F.3d 146 (2d Cir. 1998); Kolbeck v. LIT. Am., Inc., 939 F. Supp. 240, 246-47

(S.D.N.Y. 1996), aff'd, 152 F.3d 918 (2d Cir. 1998); Renner v. Chase Manhattan Bank, No. 98

Civ. 926 (CSH), 1999 WL 47239, at *12 (S.D.N.Y. Feb. 3, 1999);[45] Williams v. Bank Leumi

Trust Co. of N.Y., No. 96 Civ. 6695 (LMM), 1997 WL 289865, at *5 (S.D.N.Y. May 30,

1997).[46]  None of plaintiffs' allegations rises to the level of actual knowledge.

Plaintiffs' conclusory allegation that NatWest was and is "aware that HAMAS

collects and receives funds transmitted by [NatWest] at the request of Interpal and the Union of

Good and that HAMAS has committed numerous criminal acts, including the suicide bombings

and other acts of international terrorism that have injured American citizens, including

plaintiffs," Am. Compl. ¶ 425, does not suffice to establish that NatWest had actual knowledge

that funds withdrawn from Interpal accounts were being used for terrorist acts.  See also Ryan,

PRD Corp. v. Hunton & Williams, No. 99-CV-5938 (JG), 2000 WL 1375265, at *9 (E.D.N.Y.

Sept. 20, 2000) (authorizing the transfers between one account and another and approving wire

transfers "do not create an inference of knowledge of the scheme").

Likewise, plaintiffs' allegations of Interpal's and the Union of Good's indirect ties

to HAMAS do not establish that NatWest actually knew that either Interpal or the Union of Good

was an agent of HAMAS or acting on behalf of HAMAS, see p. 22-23, supra, and therefore

cannot establish the requisite level of knowledge on the part of NatWest.  What NatWest

---

[45]  For the Court's convenience, copies of unreported decisions cited in the brief are attached
hereto in alphabetical order.

[46]  While the D.C. Circuit has stated that general awareness of the defendant's role in the illegal
activities suffices, the court also noted that this element can be articulated differently.
Halberstam v. Welch, 705 F.2d 472, 477, 478 n.8 (D.C. Cir. 1983).  To the extent Judge
Gershon in Linde v. Arab Bank, PLC, 384 F. Supp. 2d 571, 583-84 (E.D.N.Y. 2005),
accepted the general awareness standard laid out in Halberstam, that decision is inconsistent
with the actual knowledge requirement in the Second Circuit.

specifically knew about Interpal was it had twice been investigated by British regulators, and was twice cleared of any alleged ties to HAMAS terrorism.  See pp. 11-13, supra.

Moreover, in order to impose liability on NatWest for allegedly aiding and abetting acts of international terrorism, plaintiffs must also allege facts establishing that NatWest specifically intended to further HAMAS's terrorist activities.  Boim v. Quranic Literacy Inst. & Holy Land Found. For Relief & Dev., 291 F.3d 1000, 1015, 1021-25 (7th Cir. 2002) (defendant must know about the terrorist activity and provide aid with the specific intent to further that illegal activity); Laro, Inc. v. Chase Manhattan Bank (Nat'l Ass'n), 866 F. Supp. 132, 139 n.3 (S.D.N.Y. 1994) (noting that the aiding and abetting standard in the Restatement (Second) of Torts § 876(b), like the criminal standard articulated in 18 U.S.C. § 2, requires conscious assistance), aff'd, 60 F.3d 810 (2d Cir. 1995).  See also Edwards & Hanly v. Wells Fargo Sec. Clearance Corp., 602 F.2d 478, 485 (2d Cir. 1979) ("Finding a person liable for aiding and abetting . . . requires something closer to an actual intent to aid in a fraud."), cert. denied, 444 U.S. 1045 (1980); IIT, An Int'l Inv. Trust, 619 F.2d at 925 (When no duty is owed, "an alleged aider-abettor should be found liable only if scienter of the high 'conscious intent' variety can be proved."); Dickens, 573 F. Supp. at 1132 (heightened scienter requirement of aider and abettor where defendant does not owe a fiduciary duty to plaintiff).  Here, plaintiffs have not alleged – nor can they allege – that NatWest owed them any special duty,[47] and they have not pleaded a

---

[47]   See Tzaras v. Evergreen Int'l Spot Trading, Inc., No. 01 Civ. 10726 (LAP), 2003 WL 470611, at **5-6 (S.D.N.Y. Feb. 25, 2003) (bank owed no duty of care to non-customer and no duty to prevent its customer from defrauding non-customer); Renner, 1999 WL 47239, at *13 ("[Plaintiff argues] that [bank] owed him a duty to prevent [bank's] customer . . . from defrauding [Plaintiff].  But it is well settled that a bank owes no such duty to a non-customer third-party."); Cohen v. Standard Bank Inv. Corp. (Jersey) Ltd., No. 97 Civ. 3802 (SAS), 1998 WL 782024, at *7 (S.D.N.Y. Nov. 6, 1998) (no duty of care owed by bank to investor in allegedly fraudulent scheme perpetrated by bank's borrower); see also Linde, 384 F. Supp.

single fact to establish that NatWest <u>specifically intended</u> to facilitate HAMAS's terrorist

activities, much less the ten attacks that injured plaintiffs.

> **2.      The Amended Complaint Does Not Allege Facts Sufficient To Establish That NatWest Provided Substantial Assistance Or Encouragement To The Alleged Terrorist Activities**

Finally, the amended complaint does not plead facts sufficient to establish that

NatWest's conduct constituted <u>substantial assistance or encouragement</u> of the alleged terrorist

activities.  It is well-established that a bank's maintenance of a routine deposit account for a

customer – which is all plaintiffs have pleaded – does not constitute substantial assistance to

allegedly illegal activity relating to the passage of funds in and out of the account.  <u>Williams</u>,

1997 WL 289865, at *5 ("[T]he mere fact that all the participants in the alleged scheme used

accounts at [a bank] to perpetrate it, without more, does not rise to the level of substantial

assistance necessary to state a claim for aiding and abetting liability."); <u>Nigerian Nat'l Petroleum</u>

<u>Corp. v. Citibank, N.A.</u>, No. 98 Civ. 4960 (MBM), 1999 WL 558141, at *8 (S.D.N.Y. July 30,

1999) (bank did not give substantial assistance by repeatedly executing wire transfers for

millions of dollars); <u>Renner v. Chase Manhattan Bank</u>, No. 98 Civ. 926 (CSH), 2000 WL

781081, at *12 (S.D.N.Y. June 16, 2000) (simply because participants used accounts held at

bank did not establish substantial assistance of the participants of a prime bank guarantee scam);

<u>Ryan</u>, 2000 WL 1375265, at *9 ("The affirmative acts of opening accounts, approving various

transfers, and then closing the accounts on the basis of suspected fraud, without more, do not

constitute substantial assistance," notwithstanding allegation that bank was on notice of various

red flags.); <u>Dickens</u>, 573 F. Supp. at 1132 ("the simple act of maintaining a checking account"

cannot subject "bank to aider and abettor liability"); <u>see also</u> <u>Edwards</u>, 602 F.2d at 485 (A bank

---

2d at 582 n.8 (Finding "no statutory basis for plaintiffs' argument that recklessness would be sufficient to meet the statutory requirements.").

is not an aider and abettor where it "lends money to a customer who then uses it to perpetrate a fraudulent scheme."); Armstrong, 699 F.2d at 91 ("[W]e are not prepared to hold that a broker who merely executes an investment manager's orders for improper purchases or sales can be held liable as an aider and abettor of the investment manager.").  Similarly, simply acting as a depository for funds, cannot constitute providing substantial assistance to an underlying criminal act.  Ross, 639 F. Supp. at 327 (dismissing complaint against clearing agent).

Judge Casey applied these principles in the Terrorist Attacks case, when he dismissed Section 2333(a) claims against a Saudi bank for making funds transfers and engaging in other routine banking transactions for various charities that allegedly supported terrorism.  In re Terrorist Attacks on Sept. 11, 2001, 349 F. Supp. 2d 765, 833 (S.D.N.Y.), on reconsideration in part, 392 F. Supp. 2d 539 (S.D.N.Y. 2005).  This Court should do likewise.  Plaintiffs' conclusory statement that NatWest has "substantially aided and abetted the commission of acts of international terrorism," Am. Compl. ¶ 1, without any supporting factual allegations, cannot suffice to state a claim under Section 2333(a), and should be dismissed.  Armstrong, 699 F.2d at 93 ("Conclusory allegations that the bank aided and abetted are not enough.") (citation omitted); Dillon, 731 F. Supp. at 639 ("mere conclusions of the pleader of substantial assistance do not suffice."); Dickens, 573 F. Supp. at 1134 (same) (citation omitted).[48]

---

[48]  "Substantial assistance" overlaps to a degree with the requirement of pleading proximate cause.  See Bloor v. Carro, Spanbock, Londin, Rodman & Fass, 754 F.2d 57, 62 (2d Cir. 1985) ("In alleging the requisite 'substantial assistance' by the aider and abettor, the complaint must allege that the acts of the aider and abettor proximately caused the harm to the corporation on which the primary liability is predicated.") (citations omitted); Edwards, 602 F.2d at 484 (the alleged conduct of the aider and abettor must be the proximate cause of the injury); Armstrong, 699 F.2d at 92.  As set forth in Point III of this brief, plaintiffs have also pleaded no facts to support the existence of a proximate causal link between (i) NatWest's routine banking services for Interpal or NatWest's alleged maintenance of a bank account in the name of the Union of Good and (ii) the ten attacks that injured plaintiffs in Israel.

**POINT III**

**PLAINTIFFS HAVE NOT PLEADED FACTS SUFFICIENT TO
ESTABLISH THE REQUISITE PROXIMATE CAUSAL LINK BETWEEN
NATWEST'S ALLEGED CONDUCT AND ANY INJURY PLAINTIFFS SUSTAINED**

Wholly apart from their failure to allege facts sufficient to support any claim for predicate violations of either Section 2339B(a)(1) or Section 2339C, or aiding and abetting liability under Section 2333(a), plaintiffs have entirely failed to plead facts sufficient to allege the requisite proximate causal link between NatWest's provision of routine banking services to its customers and the injuries plaintiffs sustained as a result of the ten separate attacks.  This case therefore stands in stark contrast to <u>Boim</u>, where the plaintiffs alleged that the funds supplied by the defendant terrorist front organizations were used to buy the weapons and train the men who killed Mr. Boim, as well as to compensate the families of the murderers.  <u>Boim</u>, 291 F.3d at 1023-24.  It also stands in stark contrast to <u>Linde</u>, where the plaintiffs alleged that the defendant bank actually held an account for HAMAS which was used to fund terrorist activities and administered a "death and dismemberment benefit plan" that created an incentive and reward for suicide attacks.  <u>Linde</u>, 384 F. Supp. 2d 576-77.

Here, plaintiffs have alleged no proximate causal connection between NatWest's alleged conduct (<i>i.e.</i>, the routine maintenance of bank accounts in London) and the injuries caused by the ten separate attacks in Israel from March 27, 2002 to August 19, 2003.  This alone is fatal to their claims.

---

Again, Judge Gershon in <u>Linde</u> misconstrued the applicable standards under the Restatement (Second) Torts § 876(b) in the Second Circuit by adopting a general awareness standard, rather than an actual knowledge standard, by disregarding the specific intent requirement which courts in this Circuit have adopted, by stripping the substantial assistance requirement of the requisite proximate causal link, and by deeming the provision of routine banking services alone sufficient to constitute substantial assistance.  <u>Linde</u>, 384 F. Supp. 2d at 583-85.

Section 2333(a) provides that "[a]ny national of the United States injured in his or her person, property, or business by reason of an act of international terrorism" may bring a civil suit.  18 U.S.C. § 2333(a) (emphasis added).  As the court in Boim noted, the "Supreme Court has interpreted identical ["by reason of"] language to require a showing of proximate cause." Boim, 291 F.3d at 1011.  See also Terrorist Attacks, 349 F. Supp. 2d at 825-26 ("Plaintiffs will have to present a sufficient causal connection between the support and injuries suffered by Plaintiffs . . . .  Proximate cause will support this connection.") (citations omitted).  The Supreme Court decision referenced in Boim is Holmes v. Securities Investor Protection, 503 U.S. 258 (1992), the landmark ruling in which the Supreme Court held that under the RICO civil remedy provision, 18 U.S.C. § 1964(c), which applies to persons injured "by reason of" the defendant's predicate acts, the defendant's tortious conduct must be both the factual and proximate cause of the alleged injury.  Holmes, 503 U.S. at 268.

The Second Circuit has explained that proximate cause requires a direct relationship between the plaintiff's injury and the defendant's tortious conduct, and is intended to limit a defendant's liability to those acts of the defendant that are a substantial factor in the chain of causation and are reasonably foreseeable.  Lerner v. Fleet Bank, N.A., 318 F.3d 113, 122-24 (2d Cir.) (finding investors failed to show that banks' violations of state escrow fund reporting requirements proximately caused investors' loss of money through lawyer's Ponzi scheme because "[t]he racketeering activities alleged [were] not a substantial factor in the chain of causation that led to plaintiffs' losses," "[n]or were those losses a reasonably foreseeable consequence of that conduct."), cert. denied, 540 U.S. 1012 (2003); First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 769-70, 772 (2d Cir. 1994) (Finding that alleged misrepresentations concerning value of secured property were not proximate cause of injuries

51

because the "alleged injury was insufficiently close in time to the alleged misrepresentations to warrant the inference of a nexus between the two."), cert. denied, 513 U.S. 1079 (1995); Hecht v. Commerce Clearing House Inc., 897 F.2d 21, 23-25 (2d Cir. 1990) (finding former employee's injury was not proximately caused by alleged RICO violation); see also In re Gas Reclamation, Inc. Sec. Litig., 663 F. Supp. 1123, 1124-26 (S.D.N.Y. 1987) (finding investment group did not plead proximate causal link between alleged injury and alleged predicate acts).  The same direct causal link is also required under Section 4 of the Clayton Act, which also uses – and is the original source for – the "by reason of" language.  15 U.S.C. § 15(a).  See Billy Baxter, Inc. v. Coca-Cola Co., 431 F.2d 183, 187 (2d Cir. 1970), cert. denied, 401 U.S. 923 (1971).

Because Congress used the same words, "by reason of," in Section 2333(a), the Court "can only assume it intended them to have the same meaning that courts had already given them."  Holmes, 503 U.S. at 268.  Accordingly, plaintiffs must allege that NatWest's maintenance of deposit accounts for Interpal and in the name of the Union of Good in London, and the alleged deposits to and withdrawals from these accounts, proximately caused the injuries to plaintiffs.  Plaintiffs have failed to do so.  Simply stated, the amended complaint does not even purport to make a single allegation that NatWest's actions proximately caused plaintiffs' injuries.

Even giving the amended complaint the most generous possible reading, it does nothing to remedy plaintiffs' prior failure to allege that anything NatWest did or omitted to do proximately caused plaintiffs' injuries.  Rather, it only suggests a remote, indirect and unforeseeable connection (if any connection at all) between NatWest's alleged conduct and plaintiffs' alleged injuries, which were directly caused by HAMAS-affiliated attacks[49] over an 18

---

[49]   The only exceptions are the Sixth and Ninth Attacks, which have an even more tenuous causal link to NatWest's actions, because plaintiffs do not allege these attacks were committed by HAMAS.  As discussed above, see pp. 8-9, 23 n.19, 30 n.28, supra, the claims

month period from March 27, 2002 to August 19, 2003 in Israel.  See First Nationwide Bank, 27 F.3d at 769 ("[W]hen factors other than the defendant's [conduct] are an intervening direct cause of a plaintiff's injury, that same injury cannot be said to have occurred by reason of the defendant's actions.").

Indeed, plaintiffs' dramatic expansion of the number of alleged attacks from their initial complaint, and the time period during which those attacks occurred – from the one August 19, 2003 attack alleged in the initial complaint to ten attacks over than 18 month period in the amended complaint – renders it even more implausible that plaintiffs could ever adequately allege, let alone prove, that NatWest's provision of routine banking services to its customers proximately caused plaintiffs' injuries.  Plaintiffs essentially suggest no limits on NatWest's liability, implying NatWest should be held liable for any terrorist attack in Israel for as long as NatWest maintained deposit accounts for Interpal and in the name of the Union of Good.  This is plainly contrary to the requirement that plaintiffs establish the necessary proximate causal connection between NatWest's actions and plaintiffs' injuries.

Plaintiffs' allegations about specific transactions involving Interpal's accounts, Am. Compl. ¶¶ 358, 360, 370, 373, 393, 395, 400, do nothing to address the proximate cause element of their claims, because plaintiffs make no allegations as to the disposition of any of the funds at issue or that any were ever transferred to HAMAS, or were used to finance the perpetrators of the ten attacks.

Furthermore, no transaction that occurred well before one of the alleged attacks can establish the necessary proximate causal link between NatWest's actions and plaintiffs' injuries.  See First Nationwide Bank, 27 F.3d at 772 ("When a significant period of time has

---

by plaintiffs seeking relief under Section 2339B and Section 2339C for the Sixth and Ninth Attacks must be dismissed.

elapsed between the defendant's actions and the plaintiff's injury, there is a greater likelihood that the loss is attributable to events occurring in the interim.").  For example, the April 2000 HLF deposit, Am. Compl. ¶ 360, and the January 2001 Al-Aqsa Foundation in Yemen deposit, Am. Compl. ¶ 373, both occurred years before <u>all</u> of the alleged attacks (the earliest of which occurred on March 27, 2002).

Additionally, it is incontrovertible that no transaction that occurred <u>after</u> an alleged attack could possibly be construed as establishing the necessary proximate causal link between NatWest's actions and plaintiffs' injuries.  For example, the November 5, 2003 transfer to the Jenin Charitable Society, Am. Compl. ¶ 400, took place after <u>every</u> attack alleged. Similarly, the alleged transfers involving the Tulkarem Zakat Committee Society on February 19, 2003, Am. Compl. ¶ 393, the Jenin Charitable Society on July 30, 2003, Am. Compl. ¶ 395, and the Dutch branch of the Al-Aqsa Foundation on March 27, 2003, Am. Compl. ¶ 370, cannot be proximately linked to the Sixth, Seventh, Eighth, Ninth and Tenth Attacks, the most recent of which occurred on January 29, 2003.

For this same reason, plaintiffs cannot benefit from their desperate condemnation of NatWest for failing to close the Interpal accounts after the U.S. government designated Interpal as an SDGT on August 22, 2003.  Am. Compl. ¶ 379.  Because no plaintiff was injured after that date, none can claim that any transaction in those accounts after that date can be causally linked to any injury any plaintiff may have suffered on a prior date.

Congress's desire that the ATA and the civil remedy provision of Section 2333(a) should be construed liberally does not relieve plaintiffs of their obligation to plead facts sufficient to show the requisite proximate causal link any more than the liberal construction afforded the RICO statute.  <u>Holmes</u>, 503 U.S. at 274; <u>First Nationwide Bank</u>, 27 F.3d at 769

("Although we are mindful of the admonition that RICO is to be liberally construed, the foregoing holds true in a RICO setting because proximate cause, a common law concept, exists independently of the statute."). <u>Holmes's</u> teachings apply here with equal force; absent some indication from Congress that it intended to dispense with standard principles of proximate causation in providing a civil remedy for victims of terrorism – which is virtually impossible in light of Congress's use of the time-honored "by reason of" language in Section 2333(a) – civil recovery under the ATA requires pleading and proof of proximate cause.  Here, there is no such pleading with respect to any of the claims in the amended complaint.  Because of this failure, the amended complaint must be dismissed:  the mere provision of routine banking services is no basis for subjecting NatWest to treble damages for the terrorist acts of HAMAS in Israel.[50]

**POINT IV**

**PRINCIPLES OF INTERNATIONAL COMITY LEND FURTHER<br>SUPPORT TO THE DISMISSAL OF PLAINTIFFS' AMENDED COMPLAINT**

International comity is the "recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation."  <u>Hilton v. Guyot</u>, 159 U.S. 113, 163 (1895).  Such recognition "is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other."  <u>Id.</u> at 163-64.  Here, considerations of international comity militate strongly against the Court stretching the statutory provisions plaintiffs purport to invoke beyond any reasonable construction, to find that plaintiffs' conclusory allegations state actionable claims under Section 2333(a).

---

[50]   The court in <u>Linde</u> entirely misconstrued the proximate cause requirement.  <u>Linde</u>, 384 F. Supp. 2d at 581-82.  Judge Gershon concluded that the plaintiffs need only plead that their injuries were caused by an act of international terrorism, and not that their injuries were proximately caused by a defendant's conduct.  Judge Gershon's interpretation ignores the plain meaning ascribed by Congress, the U.S. Supreme Court and the Second Circuit to the words "by reason of," which are specifically used in Section 2333(a), and is therefore wrong as a matter of law.

55

As the allegations of the amended complaint make clear, this lawsuit involves an effort to impose liability on a British bank that is regulated by British banking authorities, and based on allegations surrounding that bank's British customer and its British accounts. Plaintiffs' claims are that NatWest engaged in criminal support of terrorists by providing routine banking services to Interpal, an organization that has <u>twice</u> been investigated and found not to be affiliated with terrorists by the U.K. Charity Commission, the British government agency responsible under British law for such investigations, and by allegedly maintaining an account in the name of the Union of Good, which plaintiffs claim supports HAMAS's terrorist activities, but which has never been placed on any U.S. or U.K terrorist list.  <u>See</u> Friedman Decl. Ex. D, 1996 Charity Commission Extract, Ex. C, 2003 Charity Commission Report.

Essentially, plaintiffs assert NatWest should pay them treble damages (and attorneys' fees) for complying with the findings of its own governmental authorities in the United Kingdom regarding Interpal, and that instead it should have relied on newspaper articles and Israeli government publications, and should have somehow foreseen, after all the relevant events had occurred, that the U.S. government would designate Interpal an SDGT.  To state this position is to demonstrate its infirmity.

It is noteworthy on this issue that even the U.S. government's designation of Interpal as an SDGT does not purport to freeze any Interpal accounts outside the United States, such as the accounts at issue here.  Friedman Decl. Ex. I, Exec. Order No. 13224, 66 Fed. Reg. 49,079 (Sept. 25, 2001).  Executive Order 13224 provides that "all property and interests in property of the following persons that are <u>in the United States</u> or that hereafter come <u>within the United States</u>, or that hereafter come <u>within the possession or control of United States persons</u> are blocked." <u>Id.</u> at § 1 (emphasis added).  In addition, "any transaction or dealing <u>by United</u>

States persons or within the United States in property blocked pursuant to this order is prohibited" and "any transaction by any United States person or within the United States that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in this order is prohibited."  Id. §§ 2(a), (b) (emphasis added).[51]

And, of course, in its 2003 investigation, the U.K. Charity Commission specifically rejected evidence presented by U.S. authorities in support of Interpal's designation as an SDGT.  See Friedman Decl. Ex. C, 2003 Charity Commission Report, Ex. G, 2003 Charity Commission Unfreezing Order.  Plaintiffs thus seek to penalize NatWest civilly for (i) not closing an account in the name of the Union of Good which has never been designated as a terrorist organization by either the United States or the United Kingdom, and (ii) not closing accounts held for Interpal that even the U.S. government did not order frozen, that the U.K. authorities specifically found should not be frozen, and that belong to a customer that has never been placed on a terrorist list by the U.K. government.

At bottom, it would offend principles of international comity to hold NatWest liable for following the regulatory and anti-terror enforcement policies of its own government in the United Kingdom.

---

[51]   The only provision of the ATA that specifically regulates financial institutions, Section 2339B(a)(2) (requiring financial institutions to report the existence of any funds of a foreign terrorist organization to the Secretary of the Treasury), does not apply to NatWest, a foreign bank that has no active presence in the United States.  See Friedman Decl. Ex. J, The Federal Reserve Board Structure Data Report For U.S. Offices Of Foreign Banks, as of September 30, 2005 (indicating NatWest has no agency or branch in the United States).

## **CONCLUSION**

For the foregoing reasons, the Court should grant NatWest's motion to dismiss

the amended complaint.

Dated:  New York, New York
       January 26, 2006

                          Respectfully submitted,

                          CLEARY GOTTLIEB STEEN & HAMILTON LLP

                          By:___/s/ Lawrence B. Friedman_____
                                Jonathan I. Blackman (JB 3846)
                                Lawrence B. Friedman (LF 9978)
                                Members of the Firm

                                One Liberty Plaza
                                New York, New York 10006
                                (212) 225-2000

                                Attorneys for Defendant
                                National Westminster Bank Plc

Of Counsel:
    Isabelle A. Young