**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

```
-------------------------------------------------- x
TZVI WEISS, et al.,                                :
                                                   :
                         Plaintiffs,               :
                                                   :
        -against-                                  :   CV 05-4622 (CPS) (KAM)
                                                   :
NATIONAL WESTMINSTER, PLC,                          :
                                                   :
                         Defendant.                :
-------------------------------------------------- x
```

## UNREPORTED DECISIONS CITED IN
## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S
## MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

<div style="text-align:center">

CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York-, New York 10006
(212) 225-2000
Attorneys for Defendant
National Westminster Bank Plc

</div>

Of Counsel:

Jonathan I. Blackman
Lawrence B. Friedman
Isabelle A. Young

## INDEX OF UNREPORTED DECISIONS CITED
## IN MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S
## MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

Cohen v. Standard Bank Inv. Corp. (Jersey) Ltd.,
No. 97 Civ. 3802 (SAS), 1998 WL 782024 (S.D.N.Y. Nov. 6, 1998)

Nigerian Nat'l Petroleum Corp. v. Citibank, N.A.,
No. 98 Civ. 4960 (MBM), 1999 WL 558141 (S.D.N.Y. July 30, 1999)

Renner v. Chase Manhattan Bank,
No. 98 Civ. 926 (CSH), 1999 WL 47239 (S.D.N.Y. Feb. 3, 1999)

Renner v. Chase Manhattan Bank,
No. 98 Civ. 926 (CSH), 2000 WL 781081 (S.D.N.Y. June 16, 2000)

Ryan, PRD Corp. v. Hunton & Williams,
No. 99-CV-5938 (JG), 2000 WL 1375265 (E.D.N.Y. Sept. 20, 2000)

Tzaras v. Evergreen Int'l Spot Trading, Inc.,
No. 01 Civ. 10726 (LAP), 2003 WL 470611 (S.D.N.Y. Feb. 25, 2003)

Williams v. Bank Leumi Trust Co. of N.Y.,
No. 96 Civ. 6695 (LMM), 1997 WL 289865 (S.D.N.Y. May 30, 1997)

Westlaw.

Not Reported in F.Supp.2d                                               Page 1
Not Reported in F.Supp.2d, 1998 WL 782024 (S.D.N.Y.)
**(Cite as: 1998 WL 782024 (S.D.N.Y.))**

**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Stanley COHEN Plaintiff,
v.
STANDARD BANK INVESTMENT CORPORATION
(JERSEY) LIMITED, Rosehouse Ltd.,
Tellerstock, Inc., Christopher Carajohn, Richard
Prichard-Jones, Thomas N.
Telegades, Investor Relations, Inc., and Peter C. Tosto
Defendants.
**No. 97 Civ. 3802(SAS).**

Nov. 6, 1998.

Jerome M. Leitner, Leitner & Getz, LLP, New York, New
York, for Plaintiffs.

Lisa Klein Wager, Morgan, Lewis & Bockius LLP, New
York, New York, for Defendant Standard Bank (Jersey)
Limited.

Steven M. Kaplan, Loselle, Greenawalt, Kaplan, Blair &
Adler, New York, New York, for Defendant Tellerstock,
Inc.

Christopher Carajohn, New York, New York, for Defendant
Christopher Carajohn.

Alan S. Sexter, Ed Finkelstein, Sexter & Warmflash, P.C.,
New York, New York, for Defendants American Third
Market Corp. and Israel Englander.

*OPINION AND ORDER*
SCHEINDLIN, J.

**\*1** Plaintiff Stanley Cohen ("Cohen"), brought this action
against all defendants, alleging (1) violations of Section
10(b) of the Securities and Exchange Act of 1934 (the
"Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5
promulgated thereunder, 17 C.F.R. § 240.10b-5; (2)
common law fraud; and (3) negligence and bad faith. By
opinion dated April 27, 1998, the motion of defendant

Standard Bank Investment Corporation (Jersey) Ltd.
("Standard Bank" or the "Bank") to dismiss all claims
pursuant to Fed.R.Civ.P. 9(b) and 12(b)(6) was granted with
leave to amend.

Plaintiff filed an amended complaint on June 1, 1998, in an
attempt to cure the defects in the original complaint. On
August 14, 1998, Standard Bank again moved to dismiss all
claims pursuant to Fed.R.Civ.P. 9(b) and 12(b)(6). At a
pre-motion conference on August 20, 1998, plaintiff
withdrew the federal securities claims against Standard
Bank. On September 18, 1998, Standard Bank filed revised
papers, now moving to dismiss the common law fraud and
the negligence and bad faith claims pursuant to Fed.R.Civ.P.
9(b) and 12(b)(6). For the reasons stated below, Standard
Bank's motion is granted in its entirety.

**I. Jurisdiction**

Despite Cohen's withdrawal of the federal securities claims
against Standard Bank, this Court has supplemental
jurisdiction over the remaining state law claims against
Standard Bank pursuant to 28 U.S.C. § 1367. Section
1367(c)(3) requires that all claims over which the court has
original jurisdiction be dismissed before the state law claims
can be dismissed. If a defendant faces only state claims but
other defendants in the same action continue to face federal
claims, the court must exercise its supplemental jurisdiction
over the remaining state claims. *See* 16 James W. Moore, et
al., Moore's Federal Practice § 106.66[1] (3d ed.1998).
Because federal claims are pending against the other
defendants, the Court must exercise its supplemental
jurisdiction over the claims against Standard Bank.

**II. Factual Background**

Familiarity with the facts of this case as set forth in this
Court's April 27, 1998 opinion is presumed. *See Scone v.
American Third Market Corp., et al,* 97 Civ. 3802, 1998
WL 205338 (S.D.N.Y. April 28, 1998). Only the facts
specifically relevant to Standard Bank's current motion to
dismiss and those pled for the first time in the First
Amended Complaint ("FAC") will be reviewed. For the
purposes of this motion, these facts are assumed to be true.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 2
Not Reported in F.Supp.2d, 1998 WL 782024 (S.D.N.Y.)
**(Cite as: 1998 WL 782024 (S.D.N.Y.))**

A. *The Parties*

Plaintiff Cohen is a resident of the State of New York maintaining an office in Manhattan. *See* FAC at ¶ 1. Defendant Standard Bank is a corporation organized pursuant to the laws of the Island of Jersey, Channel Islands, with an office located in Jersey. *See id.* at ¶ 2. Defendant Christopher Carajohn ("Carajohn") was the principal equity holder of defendant Rosehouse Ltd. ("Rosehouse"), a Bermuda corporation that traded securities of U.S. corporations (collectively, "Rosehouse defendants"). *See id.* at ¶¶ 3-4. Defendant Tellerstock, Inc. is a Delaware corporation engaged in trading securities of U.S. companies ("Tellerstock"). *See id.* at ¶ 6. Defendant Investor Relations, Inc. is a Utah company that traded securities of U.S. companies ("Investor Relations"). *See id.* at ¶ 8.

B. *The Alleged Manipulative Scheme*

**\*2** This action concerns a scheme to manipulate the market prices of certain publicly issued securities and the misrepresentations which allegedly induced plaintiff to purchase large quantities of these securities.

The scheme sought to artificially inflate the price of certain thinly traded "penny stocks" by creating the appearance of demand for those securities. The Rosehouse defendants agreed to purchase these securities from Tellerstock and Investor Relations, to hold the securities for a limited period, and then to resell those securities to Tellerstock and Investor Relations for a minimum guaranteed price or "floor," thereby creating the appearance that the value of the stock had risen. *See id.* at ¶ 23.

As compensation for making these purchases and resales, the Rosehouse defendants were to receive substantial monetary sums from Tellerstock and Investor Relations. *See id.* at ¶ 24. In addition, the Rosehouse defendants agreed to rebate back to Tellerstock and Investor Relations twenty percent of any profits on the resales above the guaranteed price floor. *See id.*

C. *Standard Bank's Alleged Role in the Scheme*

Prior to the transaction at issue, Standard Bank had financed Rosehouse business activities, sustaining a loss of

approximately eight million dollars. *See id.* at ¶ 19. As a consequence, Standard Bank refused to finance further Rosehouse transactions until Standard Bank recouped those losses. *See id.* On August 1, 1995, in furtherance of that effort, Standard Bank extended a two million dollar mortgage to the Rosehouse defendants using Carajohn's home in Bridgehampton, New York as collateral. *See id.* at ¶ 20.

In a further effort to help Standard Bank recoup its losses, sometime in or after January 1996, Rosehouse offered the Bank the opportunity to participate in a transaction involving Market Basket Enterprises, Inc. ("MKTB"), a penny stock, and realize the "guaranteed" profit. *See id.* at ¶ 25. The Bank advanced money to Carajohn to buy 4.8 million shares of MKTB, on its behalf, from Tellerstock and Investor Relations, who agreed to repurchase the shares within three months at a higher price than that paid by the Bank. *See id.* at ¶ 26. The plaintiff claims that the transaction was structured to make Standard Bank appear to be acting solely as lender to Carajohn or Rosehouse, rather than as a principal. *See id.* The plaintiff further alleges that Standard Bank conducted a due diligence investigation into MKTB, from which Standard Bank knew, or should have known, that MKTB originally traded on public markets for much less than the purchase price of the stock. *See id.* at ¶¶ 28-29.

In April and May 1996, Tellerstock and Investor Relations repurchased 850,000 MKTB shares from Standard Bank, but by June 1996, the Bank became worried that Tellerstock and Investor Relations would not be able to repurchase the remaining MKTB shares, and that the Bank would sustain significant losses. *See id.* at ¶¶ 31, 38. On June 18, 1996, two Standard Bank directors met with Rosehouse, Tellerstock, and Investor Relations concerning the liquidation of the MKTB stock. *See id.* at ¶¶ 39-40. Tellerstock and Investor Relations reassured Standard Bank that they would honor their commitment to repurchase the stock.

**\*3** However, Carajohn knew at the time of the meeting that Tellerstock and Investor Relations did not have the funds to repurchase shares, in spite of the representations they made to the Bank. *See id.* at ¶ 40. When Carajohn told Standard

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                    Page 3
Not Reported in F.Supp.2d, 1998 WL 782024 (S.D.N.Y.)
**(Cite as: 1998 WL 782024 (S.D.N.Y.))**

Bank that Tellerstock and Investor Relations could not repurchase the shares, the Bank demanded that Carajohn liquidate the MKTB stock. *See id.*

In February 1996, Cohen authorized Carajohn to execute securities transactions for his account. *See id.* at ¶ 36. On June 21, 1996, Carajohn transferred the remaining 1.5 million MKTB shares to Cohen's account; the proceeds from the sale were immediately credited to Standard Bank. *See id.* at ¶ 41.

When Cohen learned of the transfer, he initially refused to accept the trade. *See id.* at ¶ 45. Carajohn told Cohen that he should accept the trade because Carajohn already had most of the shares sold at a profit, and only needed Cohen to accept the trade before he effected delivery to those purchasers. *See id.* at ¶ 45. In fact, Carajohn had no investors committed to purchasing the MKTB shares. *See id.* at ¶ 47. Relying on Carajohn's misrepresentations, Cohen authorized the transfer of the MKTB securities into his account. *See id.* at ¶ 49. The market price of MKTB stock collapsed and Cohen was unable to sell the shares at anything approaching the purchase price. *See id.* at ¶ 51. Cohen liquidated his MKTB shares in December 1996, accruing a net loss of $1.5 million. *See id.*

Plaintiff now seeks to recover at least $1.645 million which he allegedly lost as a result of the precipitous decline in the price of MKTB securities.

III. Standard of Review Under Rule 12(b)(6)

Dismissal of a complaint pursuant to Rule 12(b)(6) is proper "only where it appears beyond doubt that the plaintiff can prove no set of facts in support of the claim which would entitle him to relief." *Scotto v. Almenas,* 143 F.3d 105, 109-10 (2d Cir.1998) (quoting *Branham v. Meacham,* 77 F.3d 626, 628 (2d Cir.1996)) (internal quotations omitted). "The task of the court in ruling on a Rule 12(b)(6) motion 'is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." ' *Cooper v. Parsky,* 140 F.3d 433, 440 (2d Cir.1998) (quoting *Ryder Energy Distribution Corp. v. Merrill Lynch Commodities, Inc.,* 748 F.2d 774, 779 (2d Cir.1984)). Thus, in deciding such a motion, the court must

accept as true all material facts alleged in the complaint and draw all reasonable inferences in the nonmovant's favor. *See Thomas v. City of New York,* 143 F.3d 31, 36 (2d Cir.1998).

IV. Agency Relationship

Plaintiff seeks to hold Standard Bank vicariously liable for the misrepresentations and fraudulent behavior of Carajohn, who plaintiff claims is Standard Bank's agent. *See* FAC at ¶ 53.

A. *Definition of an Agency Relationship*
**\*4** An agent is a person who consents to a fiduciary relationship resulting from another's consent to allow the person to act on the other's behalf and subject to the other's control. The agent is a person who acts for or in the place of the principal by authority from the principal....

2A N.Y. Jurisprudence 2d, Agency and Independent Contractors § 1 (1998).

B. *Plaintiff's Allegations Regarding Carajohn's Relationship with Standard Bank*

Plaintiff alleges that "[u]pon information and belief, Standard Bank was apprised of the transaction by the Rosehouse Defendants and authorized the 1.5 million MKTB shares to be sold and conveyed to plaintiff's account through its subsidiary, Standard Stockbrokers." FAC at ¶ 41. Standard Bank's knowledge of the transaction, even if true, does not suggest that it had sufficient control over Carajohn to create a fiduciary relationship. Neither does it suggest that Standard Bank knew that Carajohn made misrepresentations to plaintiff to induce that transaction. Further, Cohen's allegation that Carajohn appraised Standard Bank of the transaction was made upon information and belief, with no specific factual allegations, such as when and with whom Carajohn spoke at Standard Bank, or the substance of the conversation.

Plaintiff also alleges that "... Carajohn, at the direction, and with the approval and consent and for the benefit, of Standard Bank ... conveyed 1.5 million of Standard Bank's shares to plaintiff's account...." *Id.* at ¶ 41. This allegation is misleading. It bases the phrase "at the direction, and with

Case 1:05-cv-04622-DLI-RML  Document 40  Filed 01/26/06  Page 6 of 70 PageID #: 839

Westlaw.

Not Reported in F.Supp.2d                                                          Page 4
Not Reported in F.Supp.2d, 1998 WL 782024 (S.D.N.Y.)
(Cite as: 1998 WL 782024 (S.D.N.Y.))

the approval and consent" of Standard Bank on the alleged demands Standard Bank placed upon Carajohn to sell the MKTB stock. However, those allegations were made upon information and belief. Plaintiff pled, in particular, "upon information and belief" that two Standard Bank directors traveled to New York and Bermuda to meet with the Rosehouse defendants to demand that the Bank's MKTB shares be sold. *Id.* at ¶ 39. Plaintiff also pled "upon information and belief" that the Bank instructed the Rosehouse defendants to "undertake all avenues available" to liquidate the stock. *Id.* at ¶ 40.

Two cases are helpful in analyzing whether Cohen has sufficiently pleaded facts from which a reasonable person could conclude that Standard Bank and Carajohn had a principal-agent relationship.

In *Fogel v. Hertz International, Ltd,* 38 A.D.2d 1002, 329 N.Y.S.2d 484 (1st Dep't 1988), several American tourists, encouraged by Hertz advertisements in the United States touting car availability and rental rates in Europe, rented a car in Italy from Hertz. The counter, personnel uniforms, and rental agreement of the Italian agency all bore the Hertz logo. When the car was involved in an accident, Hertz International claimed that Hertz Italiana, not Hertz International, owned the car and therefore Hertz International was not responsible.

Hertz International owned 75 percent of Hertz Italiana stock, shared a common board member with Hertz Italiana, and required that Hertz Italiana name Hertz International as an additional insured. The court denied Hertz International's motion for summary judgment because there were "triable issues" regarding whether the relationship between Hertz International and Hertz Italiana was a principal-agent relationship, and because there were questions regarding Hertz International's degree of control over Hertz Italiana.

*5 In *Heredia v. United States,* 887 F.Supp. 77 (S.D.N.Y.1995), plaintiff sued the United States for severe damages sustained in an automobile accident. Plaintiff alleged that the United States was liable for the negligent acts of its agent, Velasco, a young military recruit acting on the orders of a superior officer. Velasco, a high school student, was enrolled in the Marine Corps' "Delayed Entry

Program," in which a student's application for the Corps was accepted but his recruitment training departure was delayed. During the period of delay the applicant enlisted in the Marine Corps Reserves but performed no official duties and received no pay or benefits. Delayed Entry Program students are called "poolees."

Velasco was assigned to assist a Sergeant Feliz with recruiting activities. Feliz gave Velasco the keys to his personal automobile--in violation of Marine Corps regulations--to run a recruiting errand. With Feliz's knowledge, Velasco was accompanied by Heredia, another poolee. An accident occurred in which Heredia was severely injured. Heredia sued the United States on the grounds that the United States was liable for the poolees and for Sergeant Feliz's supervision of them.

The government argued that both Heredia and Velasco were agents or employees of the federal government, and thus fell under the Federal Tort Claims Act ("FTCA"). [FN1] The court held that although Velasco could not be considered a federal employee, he was nevertheless Feliz's agent because Feliz had instructed him to run the errand. Further, Velasco was acting within the Sergeant's scope of employment, even though Feliz gave his private automobile to Velasco in violation of Marine Corps regulations. Heredia, on the other hand, was not an agent of Sergeant Feliz because Feliz had not asked Heredia to run the errand. Therefore, Heredia could sue the United States, and his claim would not fall under the Federal Employees' Compensation Act ("FECA"). [FN2]

FN1. The FTCA confers exclusive jurisdiction upon the federal courts for civil actions involving personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred. 28 U.S.C. § 1346(b). The FTCA defines "employees" of the United States as "officers or employees of any federal agency, ... and persons acting on behalf of a federal agency in an official

Not Reported in F.Supp.2d                                                                                   Page 5
Not Reported in F.Supp.2d, 1998 WL 782024 (S.D.N.Y.)
**(Cite as: 1998 WL 782024 (S.D.N.Y.))**

capacity, temporarily or permanently in the service of the United States, whether with or without compensation." 28 U.S.C. § 2671.

FN2. The FECA is a federal workers compensation under which federal employees receive immediate, fixed benefits regardless of fault, and without litigation, in exchange for relinquishing the right to sue the Government. *See* 5 U.S.C. § 8101 et seq.

The facts presented here are a far cry from those in *Hertz* or *Heredia,* where courts found agency relationships. Here, Cohen alleges virtually no facts demonstrating an agency relationship. Plaintiff made no allegation that Standard Bank knew that Carajohn told Cohen, let alone that the Bank had control over those misrepresentations. Plaintiff alleged no facts that could demonstrate that Standard Bank and Carajohn had a fiduciary relationship. The few factual allegations Cohen does plead, even if true, cannot establish either a fiduciary or an agency relationship between Carajohn and Standard Bank. [FN3]

FN3. Plaintiff relies on cases discussing the scope of an existing agency relationship, rather than whether such an agency relationship existed in the first place: *O'Boyle v. Avis Rent-A-Car System, Inc. ., 78 A.D.2d 431, 435 N.Y.S.2d 296, 302 (2d Dep't 1981)* ("the focus of our own inquiry must be upon the foreseeability of [plaintiff's] conduct in [committing the tortious act]"); and *First Interregional Equity Corp. v. Haughton, 805 F.Supp. 196 (S.D.N.Y.1992)* (addressing the principal's ability to foresee an agent's damaging conduct).

In contrast to *Heredia*--in which Sergeant Feliz knew before the poolees set out on their errand that Heredia was accompanying Velasco, and violated Marine Corps regulations by giving the poolees his private automobile, thus contributing to the accident--here, Cohen does not allege facts which demonstrate that Standard Bank contributed to (or even subsequently ratified) Carajohn's fraudulent activity. Although Standard Bank may have been "apprised" of Carajohn's transfer of the shares to plaintiff's account, there is no allegation that Standard Bank knew of,

or was under any obligation to know of, Carajohn's misrepresentations.

**C.** *Undisclosed Principal*

**\*6** The liability of an undisclosed principal has been described in the following terms:

Where the principal is not disclosed at the time the agent makes a contract, but it is subsequently ascertained that the agent was acting as agent for another, then the third party may look either to the principal or agent, but in order to hold the principal liable under such circumstances, the third party must show that the agent acted according to his or her authority, or that the agent's acts had been subsequently confirmed and ratified.

2A N.Y. Jurisprudence 2d, Agency and Independent Contractors § 348 (1998). *See also* Antar v. Trans World Airlines, Inc., 66 Misc.2d 93, 320 N.Y.S.2d 355, 357 (1970). An undisclosed principal is one who controls the agent's actions without the third party's knowledge. *See, e.g.,* National Bank of North America v. Newmark, 20 B.R. 842, 857 (E.D.N.Y.1982) (builder's agent sought mortgage without disclosing that the mortgage was sought on behalf of builder's alter ego company).

Standard Bank speculates that plaintiff may be attempting to prove that the Bank should be liable as an undisclosed principal. This theory is just as futile as the agency theory explicitly urged by plaintiff. Plaintiff pleads that "[a]t no time did Carajohn ... ever advise plaintiff Cohen that the[ ] 1.5 million MKTB shares were being conveyed to plaintiff's account from Standard Bank." FAC at ¶ 45. Although Carajohn failed to inform plaintiff that he was transferring MKTB shares owned by Standard Bank, plaintiff has still failed to plead any facts demonstrating that Carajohn was Standard Bank's agent, or that Standard Bank ratified or confirmed Carajohn's fraudulent behavior. Plaintiff has not alleged facts demonstrating that Carajohn acted as the Bank's agent, or that the Bank acted as an undisclosed principal, joining with Carajohn to hide its own involvement.

**D.** *Conclusion*

Based on the facts alleged in the FAC, Carajohn might best

be characterized as an independent contractor of Standard Bank:

> The theory usually adopted to differentiate between an agent and an independent contractor is that a person is regarded as an agent or an independent contractor according to whether the person is subject to, or free from, the control of the employer with respect to the details of the work. Thus, an independent contractor may be distinguished from an agent in that the independent contractor is a person who contracts with another to do something for the employer, but who is not controlled or subject to the control of the employer in the performance of this contract; the employer controls only the result.

2A N.Y. Jurisprudence 2d, Agency and Independent Contractors § 12 (1998). Reading plaintiff's allegations most charitably, Standard Bank exercised no control over Carajohn, but did direct the result--that the stock be sold.

## V. Fraud, Negligence and Bad Faith Claims

### A. *Fraud*

Because plaintiff has failed to plead enough facts to establish an agency relationship between Carajohn and Standard Bank, there is no need to analyze the fraud claim under Rule 9(b). Plaintiff has not pled sufficient facts to hold Standard Bank liable for Carajohn's alleged fraudulent misrepresentations.

### B. *Negligence and Bad Faith*

**\*7** Plaintiff asserts a claim for negligence and bad faith against Standard Bank for failing to ascertain the accuracy of Carajohn's representations concerning the MKTB securities. To state a claim for negligence, a plaintiff must allege that defendant owed her a cognizable duty of care, that the defendant breached that duty, and that the plaintiff was injured as a proximate result of the breach. *See Donohue v. Copiague Union Free School Dist.,* 64 A.D.2d 29, 407 N.Y.S.2d 874, 877 (2d Dep't), *aff'd,* 47 N.Y.2d 440, 418 N.Y.S.2d 375, 391 N.E.2d 1352 (1978). A defendant who owes plaintiff no duty cannot be liable for negligence, even if defendant is negligent. *See Bonnie & Co. Fashions, Inc. v. Bankers Trust Co.,* 945 F.Supp. 693, 713 (S.D.N.Y.1996) (citing *Livingston v. Gribetz,* 549 F.Supp.

238, 242 (S.D.N.Y.1982)). Similarly, a claim for bad faith depends on the existence of a duty owed by defendant to plaintiff. *Cf. Scavo v. Allstate Ins. Co.,* 238 A.D.2d 571, 657 N.Y.S.2d 193, 193 (2d Dep't 1997). Because plaintiff has failed to plead sufficient facts to infer that Standard Bank owed plaintiff any duty of care, the claim for negligence and bad faith against the Bank are dismissed.

## VI. Leave to Amend

Fed.R.Civ.P. 15(a) provides that the court should grant leave to amend "freely ... when justice so requires." The Second Circuit has noted that "[w]hen a motion to dismiss is granted, 'the usual practice is to grant leave to amend the complaint.' ... Although the decision whether to grant leave to amend is within this discretion of the district court, refusal to grant leave must be based on a valid ground." *Oliver Schools, Inc. v. Foley,* 930 F.2d 248, 253 (2d Cir.1991) (quotations omitted) (quoting *Ronzani v. Sanofi S.A.,* 899 F.2d 195, 198 (2d Cir.1990)). Where the possibility exists that the defect can be cured, leave to amend should be granted unless doing so would prejudice the defendant. *See Oliver Schools,* 930 F.2d at 253.

Plaintiff has still failed to plead facts sufficient to defeat defendant's motion to dismiss. This Court has twice considered plaintiff's allegations and twice found them to be insufficient. Defendant has spent considerable resources in attacking two versions of the complaint. It would be patently unfair, both to the defendant and to the court to permit plaintiff to amend the complaint again. Therefore, leave to amend is denied.

## VI. Conclusion

For the foregoing reasons, plaintiff's claims against Standard Bank are dismissed. A conference with all remaining parties will be held on November 25 at 2:30 p.m.

Not Reported in F.Supp.2d, 1998 WL 782024 (S.D.N.Y.)

**Motions, Pleadings and Filings (Back to top)**

• 1:97cv03802 (Docket) (May. 23, 1997)

END OF DOCUMENT

Westlaw.

Not Reported in F.Supp.2d                                                                                          Page 1
Not Reported in F.Supp.2d, 1999 WL 558141 (S.D.N.Y.)
**(Cite as: 1999 WL 558141 (S.D.N.Y.))**

C

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
NIGERIAN NATIONAL PETROLEUM CORPORATION,
Plaintiff,
v.
CITIBANK, N.A., Citibank, Federal Savings Bank; Citicorp
Banking Corporation;
Citicorp; Citibank (New York State); and John Does Inc. 1
to 100, Defendants.
**No. 98 Civ. 4960(MBM).**

July 30, 1999.

Robert D. Owen, Henry G. Burnett, Owen & Davis, New
York, NY, for Plaintiff.

Mark G. Hanchet, Noelle M. Kurtin, Zeichner Ellman &
Krause, New York, NY, for Defendants.

OPINION AND ORDER
MUKASEY, J.

**\*1** Nigerian National Petroleum Corporation ("NNPC"), a
Nigerian corporation that sells crude oil on behalf of the
Nigerian government (Compl.¶ 6), [FN1] sues Citibank,
N.A.; Citibank, Federal Savings Bank; Citicorp Banking
Corp.; Citicorp; Citibank (New York State) (collectively,
"Citibank"); and John Does, 1 to 100, seeking to recover
approximately $15.1 million that it lost as a result of fraud
by a third-party named Alberto Vadra, who used Citibank
accounts. Citibank moves to dismiss plaintiff's amended
complaint pursuant to Fed.R.Civ.P. 12(b)(6) for failure
to state a claim. For the reasons stated below, Citibank's
motion is granted, and the amended complaint is dismissed
with respect to Citibank.

> FN1. "Compl." refers to the amended complaint
> dated September 14, 1998.

I.

The following relevant facts are assumed to be true for the
purposes of this motion. In 1993, Alberto Vadra, a United

States citizen who was born in Argentina, formed two
corporations under the laws of Nevada, one called Ministry
of Petroleum Resources ("MPR"), the other National
Petroleum Resources ("National Petroleum"). (Compl.¶¶ 15,
19) Vadra registered both corporations using his home
address in Las Vegas, Nevada, and, at least as to MPR,
named as directors two persons with addresses in Lagos,
Nigeria. (Id. ¶ ¶ 15, 18-19) In subsequent filings, however,
Vadra replaced these directors with directors from Miami,
Florida, and changed his own address to one in Miami. (Id.
¶¶ 16-18)

In August 1993, Vadra opened three bank accounts at
Citibank: (1) account number 71118209, in the name of
MPR (the "First MPR Account"); (2) account number
71118233, in the name of National Petroleum (the "National
Petroleum Account"); and (3) account number 3200106121,
also in the name of MPR (the "Second MPR Account"). (Id.
¶¶ 21, 23-24) In July 1994, Vadra opened an additional
Citibank account in the name of MPR, numbered 46816814
(the "Third MPR Account"). (Id. ¶ 25) For nine months,
there was minimal activity in the three Citibank accounts
opened in 1993. (Id. ¶ 26) However, in June 1994, Vadra
induced Bank Indosuez, banker for one of NNPC's
customers, to wire transfer $15,144,307.75 intended for
NNPC to the First MPR Account instead (the "First
Fraudulent Transfer"). (Id. ¶¶ 27, 35) [FN2] Although the
documents submitted to Citibank to verify the transfer were
allegedly "riddled with inconsistencies and other badges of
fraud," such as typographical errors and incomplete
addresses (id . ¶¶ 31-34), on June 28, 1994, Citibank
"swiftly processed" the transfer. (Id. ¶ 28)

> FN2. The amended complaint is ambiguous with
> respect to whether the money was diverted from
> NNPC's account at the Central Bank of Nigeria or
> from the Nigerian government's account at the
> Federal Reserve Bank in New York. (Compare id.
> ¶ 27, with id . ¶ 35) This ambiguity is immaterial
> for present purposes.
> The amended complaint is ambiguous also with
> respect to the precise amount that was diverted
> from NNPC. (Compare Compl. ¶ 37
> ($15,144,325.25), with id. ¶ 51 ($15,144,309), and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                 Page 2
Not Reported in F.Supp.2d, 1999 WL 558141 (S.D.N.Y.)
**(Cite as: 1999 WL 558141 (S.D.N.Y.))**

*id.* at p. 24 ($15,144,307.75)) I have accepted the figure in NNPC's prayer for relief, although the precise figure is immaterial for present purposes.

The next day, Vadra faxed a letter, on letterhead from an entity called Transportes Aereos Internacionales S.R.L. ("TAI"), to Donna Harrington, an employee of Citibank in New York City. (*Id.* ¶ 39) The letter, which provided the same address for TAI as Vadra earlier had provided Citibank for MPR, instructed Harrington in typescript to wire transfer the following sums from the First MPR Account: (1) $1 million to Key Biscayne Bank; (2) $3 million to Bank of America; and (3) $11 million to a Citibank account in Vadra's name, numbered 3100170206 ("Vadra's Personal Account"). (*Id.* ¶ 39) In handwriting, the first and third amounts were changed to $2 million and $5 million, respectively. (*Id.*)

**\*2** On the same day, Vadra faxed Harrington another letter--this one on letterhead of an entity called Alneva Enterprises Inc., albeit at the same address as TAI--providing an address for MPR, National Petroleum and an entity called National Maritime Authority ("NMA"). (*Id.* ¶ 40) That address, in Miami, Florida, was Vadra's home address, and above each listing "c/o Alberto Vadra" was written by hand. (*Id.*)

On July 1, 1994, presumably pursuant to Vadra's instructions, Citibank wire transferred the following amounts from the First MPR Account: (1) $2 million to an account at Towerbank in the name of NMA; (2) approximately $3 million to an account at Bank of America in the name of NMA; (3) $5 million to the Third MPR Account; and (4) $5 million to Vadra's Personal Account. (*Id.* ¶ 41) [FN3] In turn, on July 6, 1994, $5 million was wire transferred from Vadra's Personal Account to two banks in Lagos, Nigeria (*id.* ¶ 43); on July 7, 1994, $4 million was wire transferred from the Third MPR Account to the Second MPR Account (*id.* ¶ 48); and between July 11 and 15, 1994, that money was transferred again from the Second MPR Account to four other accounts, including $600,000 to Vadra's Personal Account and $1.9 million to an account in MPR's name at Barnett Bank of South Florida. (*Id.* ¶ 50)

FN3. The discrepancies between Citibank's transfers on July 1, 1994 and Vadra's instructions on June 29, 1994, are unexplained in the amended complaint.

In the meantime, on July 6, 1994 also, Towerbank returned to Citibank the $2 million that had been wire transferred to NMA's account on July 1, 1994, apparently because NMA had not informed Towerbank that it was expecting to receive a large transfer, as required by the bank's rules. (*Id.* ¶ 45) However, Citibank did not redeposit the $2 million into the First MPR Account from which it had been transferred. (*Id.* ¶ 47) Instead, on July 11, 1994, Thomas A. Gallo, Assistant Vice President of Citibank, ordered the money deposited into the National Petroleum Account. (*Id.*) Later the same day, Gallo ordered the money transferred again to Vadra's Personal Account. (*Id.*)

On July 12, 1994, only days after the First Fraudulent Transfer, Vadra effected a second fraudulent transfer at NNPC's expense, diverting $15,543,710 intended for the Nigerian government's account at the Federal Reserve Bank in New York to the First MPR Account (the "Second Fraudulent Transfer"). (*Id.* ¶ 52) However, this time, the fraudulent transfer did not escape NNPC's or the transferring bank's notice. Thus, on July 19 and 20, 1994, respectively, NNPC and the transferring bank notified Gallo, the Assistant Vice President of Citibank, about the fraud. (*Id.* ¶¶ 53-55) On July 27, 1994, having traced some of the Second Fraudulent Transfer to the Third MPR Account, where it had been re-transferred, Citibank remitted $15,543,710 to NNPC's account at the Federal Reserve Bank. (*Id.* ¶ 56)

Notwithstanding discovery of the Second Fraudulent Transfer, however, Citibank did not freeze the First MPR Account. Instead, on July 29, 1994, the bank permitted transfer to the First MPR Account of approximately $1 million from the Third MPR Account. (*Id.* ¶ 60) On the same day, Citibank permitted another $1.1 million to be withdrawn from the Third MPR Account, money which was deposited in an account bearing NMA's name at Bank of America. (*Id.*)

**\*3** Whether, or to what extent, Citibank investigated the

Not Reported in F.Supp.2d                                                                Page 3
Not Reported in F.Supp.2d, 1999 WL 558141 (S.D.N.Y.)
**(Cite as: 1999 WL 558141 (S.D.N.Y.))**

First MPR Account after these events is not apparent. (*Id.* ¶ 58) According to the amended complaint, Citibank "failed to conduct any further inquiry into the [First MPR Account], or if it did conduct an inquiry, recklessly failed to take notice that $15.1 million had been received just two weeks earlier." (*Id.*) Whatever Citibank's knowledge, however, NNPC did not learn of the First Fraudulent Transfer until May 1995, when it finally discovered that the $15,144,307.75 due from Bank Indosuez was never received. (*Id.* ¶ 61-62) NNPC "immediately advised Gallo at Citibank ... by letter dated June 1, 1995 of the newly discovered fraud, and demanded repayment." (*Id.* ¶ 63) Nevertheless, "[n]either Gallo [n]or anyone else at Citibank ... ever replied to NNPC's letter or repaid the $15.1 million in fraudulently transferred funds ." (*Id.* ¶ 64)

Moreover, according to the complaint, Citibank "stonewalled and otherwise impeded subsequent attempts by NNPC to investigate the [First Fraudulent Transfer]." (*Id.; see id.* ¶ 5) Specifically, Citibank refused to release signature cards and photographs of the holders of the First MPR Account, refused to disclose the names or numbers of the accounts to which the First Fraudulent Transfer had been disbursed and refused to disclose the name of the "operator" of the First MPR Account. (*Id.* ¶ 65) After receiving pressure from the U.S. Department of Justice, Citibank did finally release "some relevant documentation." (*Id.* ¶ 66) Allegedly, however, "even this production was plainly inadequate." (*Id.*) According to the complaint, "it was only in May 1998 that NNPC received certain documents revealing Citibank's role in ... permitting Vadra to perpetrate his fraudulent activities." (*Id.*)

On July 10, 1998, NNPC commenced this action. NNPC's amended complaint states five claims: (1) that Citibank was "negligent in permitting and/or failing to prevent the fraud perpetrated by Vadra" (*id.* ¶ 70); (2) that citibank "acted in a commercially unreasonable manner," in violation of the New York Uniform Commercial Code ("NYUCC") (*id.* ¶ 72); (3) that Citibank "negligently and/or recklessly failed to disclose and therefore concealed Vadra's fraudulent and criminal activities" (*id.* ¶ 74); (4) that Citibank "aided and abetted Vadra in the fraud" (*id.* ¶ 76); and (5) that Citibank "acted in commercial bad faith." (*Id.* ¶ 78) NNPC seeks "an

amount not to exceed the sum of $15,144,307.75 plus interest from June 1994, compensatory and punitive damages in an amount to be determined, and such other and further relief as the Court deems proper." (*Id.* at p. 24)

## II.
On a motion to dismiss for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6), the court should dismiss the complaint if it appears " 'beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " *Northrop v. Hoffman of Simsbury, Inc.,* 134 F.3d 41, 44 (2d Cir.1997) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)). It is not the court's function to weigh the evidence that might be presented at trial; instead, the court must merely determine whether the complaint itself is legally sufficient. *See Goldman v. Belden,* 754 F.2d 1059, 1067 (2d Cir.1985). In doing so, the court must accept the material facts alleged in the complaint as true, and draw all reasonable inferences in favor of the plaintiff. *See Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995). The issue before the court on a Rule 12(b)(6) motion "is not whether a plaintiff is likely to prevail ultimately, 'but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleading that a recovery is very remote and unlikely but that is not the test.' " *Id.* (quoting *Weisman v. LeLandais,* 532 F.2d 308, 311 (2d Cir.1976) (per curiam)).

## III.
**\*4** Citibank argues that NNPC's first, second, third and fifth claims are time barred. Because the relevant issues vary to some extent depending on the particular claim, I will consider each claim more or less individually.

Under New York law, which applies in this diversity case, NNPC's first and third claims--for negligence and/or recklessness--are governed by a three-year statute of limitations. *See* N.Y. C.P.L.R. ("CPLR") § 214(4) (McKinney 1990). Because the First Fraudulent Transfer occurred in June 1994, and NNPC did not commence this action until July 10, 1998, it would appear that these claims are barred.

Read liberally, NNPC's memorandum of law makes two

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

arguments to the contrary, neither of which has merit. First, NNPC contends that although the First Fraudulent Transfer occurred in June 1994, its claims against Citibank did not accrue until May 1998, when it finally "received certain documents revealing Citibank's role." (Compl.¶ 67) However, under New York law, the statute of limitations for negligence and/or recklessness "begins to run when the injury first occurs." *Iacobelli Constr., Inc. v. County of Monroe,* 32 F.3d 19, 27 (2d Cir.1994); *see Triangle Underwriters, Inc. v. Honeywell, Inc.,* 604 F.2d 737, 744 (2d Cir.1979) ("A cause of action accrues when acts or omissions constituting negligence produce injury."); *Snyder v. Town Insulation, Inc.,* 81 N.Y.2d 429, 432-33, 599 N.Y.S.2d 515, 516-17 (1993) ("[A]ccrual occurs when the claim becomes enforceable, i.e., when all elements of the tort can be truthfully alleged in a complaint."). Indeed, " 'the statutory period of limitations begins to run from the time when liability for wrong has arisen *even though the injured party may be ignorant of the existence of the wrong or injury.*" ' *Evans v. Visual Tech. Inc.,* 953 F.Supp. 453, 456 (N.D.N.Y.1997) (emphasis added) (quoting *Schmidt v. Merchants Despatch Transp. Co.,* 270 N.Y. 287, 300 (1936)); *see Kronos, Inc. v. AVX Corp.,* 81 N.Y.2d 90, 94, 595 N.Y.S.2d 931, 934 (1993) (stating that the date of injury, "rather than the wrongful act of defendant or discovery of the injury by plaintiff, is the relevant date for marking accrual"). Thus, even accepting as true NNPC's assertion that it remained ignorant of Citibank's alleged complicity until 1998--an assertion that is hard to believe in light of the fact that NNPC wrote to Citibank as early as June 1, 1995 demanding repayment of the money (Compl.¶ 63)--its argument fails.

Second, NNPC contends that the statute of limitations should be equitably tolled because "Citibank itself stymied NNPC's investigation of its role in the fraud for almost four years." (Pl. Mem. in Opp'n at 18) Under New York law, a defendant "may be estopped to plead the Statute of Limitations where [the] plaintiff was induced by fraud, misrepresentations or deception to refrain from filing a timely action." *Simcuski v. Saeli,* 44 N.Y.2d 442, 448-49, 406 N.Y.S.2d 259, 262 (1978); *see also Farkas v. Farkas,* 168 F.3d 638, 642 (2d Cir.1999). [FN4] However, unless the defendant and the plaintiff were in a fiduciary

relationship--which Citibank and NNPC were not--the doctrine of equitable estoppel does not apply without "actual misrepresentation" by the defendant. *Gleason v. Spota,* 194 A.D.2d 764, 765, 599 N.Y.S.2d 297, 299 (2d Dep't 1993) (citing cases); *see General Stencils, Inc. v. Chiappa,* 18 N.Y.2d 125, 128, 272 N.Y.S.2d 337, 340 (1966) (noting that courts may bar assertion of a statute of limitations defense when the defendant's "affirmative wrongdoing" produced the plaintiff's delay). In the present case, NNPC alleges no such misrepresentation.

> FN4. Strictly speaking, NNPC invokes the federal doctrine of equitable tolling. However, equitable tolling applies only to federal claims. *See, e.g., Department of Econ. Dev. v. Arthur Andersen & Co.,* 747 F.Supp. 922, 943 (S.D.N.Y.1990). Equitable estoppel is the comparable doctrine under New York law.

**\*5** Further, equitable estoppel does not apply when a plaintiff "possesse [d] 'timely knowledge' sufficient to place him or her under a duty to make inquiry and ascertain all the relevant facts prior to expiration of the applicable Statute of Limitations." *Gleason,* 194 A.D.2d at 765, 599 N.Y.S.2d at 299 (internal quotation marks and citation omitted). Here, whatever knowledge NNPC had on June 1, 1995--when it wrote to Citibank demanding repayment of the lost money (Compl.¶ 63)--was more than sufficient to place it under such a duty. Accordingly, Citibank is not estopped to raise its statute of limitations defense. NNPC's first and third claims therefore are barred.

IV.

The principal dispute with respect to NNPC's second claim--for violation of the NYUCC--pertains to the relevant limitations period. Article 4A of the NYUCC, which governs wire transfers, *see* NYUCC § 4-A-102, off. cmt. (McKinney 1991), does not provide an express statute of limitations. Citibank argues, therefore, that the claim is governed by CPLR § 214(2), which establishes a three-year limitations period for an action "to recover upon a liability ... created or imposed by statute." NNPC counters that its claim has a common law antecedent and, thus, is not one "created or imposed by statute." *See, e.g., Aetna Life & Cas. Co. v. Nelson,* 67 N.Y.2d 169, 174, 501 N.Y.S.2d 313, 315

Case 1:05-cv-04622-DLI-RML   Document 40   Filed 01/26/06   Page 13 of 70 PageID #: 846

Westlaw.

Not Reported in F.Supp.2d                                                          Page 5
Not Reported in F.Supp.2d, 1999 WL 558141 (S.D.N.Y.)
(Cite as: 1999 WL 558141 (S.D.N.Y.))

(1986) ("[CPLR § 214(2) ] only governs liabilities which would not exist but for a statute. It does not apply to liabilities existing at common law which have been recognized or implemented by statute. Thus, if the [statute imposing liability] merely codifies or implements an existing liability, the three-year statute would be inapplicable." (citations omitted)). Instead, NNPC contends, the claim is governed by CPLR § 213(1), which provides a six-year statute of limitations for any action "for which no limitation is specifically prescribed by law." Following the Second Circuit's recent decision in *Banca Commerciale Italiana v. Northern Trust International Banking Corp.*, 160 F.3d 90 (2d Cir.1998), I agree with Citibank.

In *Banca Commerciale,* the plaintiff sued for return of funds involved in a wire transfer under NYUCC § 4-A-211(6), which provides in relevant part that if a receiving bank, "after accepting a payment order, agrees to cancellation or amendment of the order by the sender ..., the sender ... is liable to the bank for any loss and expenses ... incurred by the bank as a result." *See Banca Commerciale*, 160 F.3d at 93. As here, the defendant argued that the claim was "created or imposed by statute," and therefore governed by the three-year statute of limitations in CPLR § 214(2); the plaintiff contended that its claim had a common law antecedent and, thus, was governed by the six-year limitations period in CPLR § 213(1). *See id.* at 93-94.

The Second Circuit agreed with the defendant, concluding that imposition of liability under § 4-A-211(6) "does not require any showing of the elements required to establish common law fraud or unjust enrichment." *Id.* at 94. More significant for present purposes, the Court stated further:

**\*6** [I]t is widely recognized that Article 4-A was enacted to correct the perceived inadequacy of " 'attempt[ing] to define rights and obligations in funds transfers by general principles [of common law] or by analogy to rights and obligations in negotiable instruments law or the law of check collection." ' *Bangue Worms [v. BankAmerica Int'l,* 77 N.Y.2d 362, 369, 568 N.Y.S.2d 541, 545 (1991) (quoting N.Y.U.C.C. § 4-A-102, cmt.) ].... The Official Comment to Article 4-A states that the drafters made "a deliberate decision ... to write on a clean slate and to treat a funds transfer as a unique method of payment to be

governed by unique rules that address the particular issues raised by this method of payment." N.Y.U.C.C. § 4-A-102, cmt. *This lends powerful support to the application of CPLR § 214(2) to claims brought under Article 4-A.*

Finally, any lingering doubts we might have about imposing a three-year statute of limitations are removed by the New York Court of Appeals' observation in *Bangue Worms* that "[e]stablishing *finality* in electronic fund wire transactions was considered a singularly important policy goal" to be served by Article 4-A. 77 N .Y.2d at 372, 568 N.Y.S.2d [at 547] (emphasis added). This goal is better served by requiring claimants to assert their claims concerning electronic funds transfers within a limitations period of three years rather than six years.

*Id.* at 95 (emphasis added).

Although NNPC fails to identify the NYUCC provision on which its second claim is based, that provision plainly is not § 4-A-211(6). [FN5] Nevertheless, NNPC has not identified any particular common law antecedent to its claim. Further, the Second Circuit's reasoning in *Banca Commerciale* was not limited to § 4-A-211(6). To the contrary, the Court declared broadly that CPLR § 214(2) should be applied to all "claims brought under Article 4A." Accordingly, the three-year statute of limitations from CPLR § 214(2) applies, and NNPC's second claim is barred for the same reasons that its first and third claims were barred.

> FN5. NNPC's second claim states in full: "The defendants acted in a commercially unreasonable manner, in violation of the N.Y.U.C.C. and their duty to provide commercially reasonable security, in permitting and/or failing to prevent the fraud perpetrated by Vadra on NNPC." (Compl.¶ 72) NYUCC § 4-A-202, pertaining to "authorized and verified payment orders," utilizes the phrase "commercially reasonable method of providing security," although it is otherwise not apparent that NNPC's third claim is based on that provision.

### V.

The parties disagree also about the statute of limitations applicable to NNPC's fifth claim, for commercial bad faith. Citibank argues that, in its "essence," the claim is for

negligence, so the three-year limitations period from CPLR § 214 applies. NNPC contends that the claim is "based upon fraud," CPLR § 213(2), which would make the limitations period six years. Although New York courts have not addressed which limitations period applies to claims of commercial bad faith, either way NNPC's claim fails.

Under New York law, a claim for commercial bad faith "requires allegations of a scheme or acts of wrongdoing, together with allegations of the bank's actual knowledge of the scheme or wrongdoing that amounts to bad faith or allegations of complicity by bank principals in alleged confederation with the wrongdoers." Peck v. Chase Manhattan Bank, N.A., 190 A.D.2d 547, 548-49, 593 N.Y.S.2d 509, 510-11 (1st Dep't 1993) (citing Prudential-Bache Sec., Inc. v. Citibank, N.A., 73 N.Y.2d 263, 275-77, 539 N.Y.S .2d 699, 705-07 (1989)); accord Williams v. Bank Leumi Trust Co., No. 96 Civ. 6695(LMM), 1998 WL 397887, at *9 (S.D.N .Y. July 15, 1998). Therefore, a bank is liable for commercial bad faith only where it "acts dishonestly--where it has actual knowledge of facts and circumstances that amount to bad faith, thus itself becoming a participant in a fraudulent scheme." Prudential-Bache, 73 N.Y.2d at 275, 539 N.Y.S.2d at 706. Allegations charging a bank with a "lapse of wary vigilance," with "disregard of suspicious circumstances which might have well induced a prudent banker to investigate," even with "gross negligence," are insufficient to state a claim. Getty Petroleum Corp. v. American Express Travel Related Servs. Co., 90 N.Y.2d 322, 331, 660 N.Y.S.2d 689, 694-95 (1997); accord Prudential-Bache, 73 N.Y.2d at 276, 539 N.Y.S.2d at 706-07; Retail Shoe Health Comm'n v. Manufacturers Hanover Trust Co., 160 A.D.2d 47, 51, 558 N.Y.S.2d 949, 952 (1st Dep't 1990); Calisch Assocs., Inc. v. Manufacturers Hanover Trust Co., 151 A.D.2d 446, 448, 542 N.Y.S.2d 644, 646 (1st Dep't 1989).

*7 A commercial bad faith claim is subject to the requirement of Fed.R.Civ.P. 9(b) that the circumstances of an alleged fraud be alleged with particularity. See Williams, 1998 WL 397887, at *9. However, Rule 9(b) allows knowledge to be averred generally. Nevertheless, the Second Circuit has cautioned that this relaxation of the

rule's specificity requirement "must not be mistaken for license to base claims of fraud on speculation and conclusory allegations." Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir.1994) (internal quotation marks and citations omitted). Thus, a plaintiff is required "to allege facts that give rise to a strong inference of fraudulent intent." Id.; accord Powers v. British Vita, P.L.C., 57 F.3d 176, 184 (2d Cir.1995) (stating that a plaintiff must "provide some minimal factual basis for conclusory allegations of scienter that give rise to a strong inference of fraudulent intent" (internal quotation marks and citation omitted)). This may be accomplished in either of two ways. First, the plaintiff may allege a motive for committing fraud and a clear opportunity for doing so. See Powers, 57 F .3d at 184; Shields, 25 F.3d at 1128. Second, "[w]here motive is not apparent," the plaintiff may "identify[ ] circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater." Powers, 57 F.3d at 184 (quoting Beck v. Manufacturers Hanover Trust Co., 820 F.2d 46, 50 (2d Cir.1987), overruled in part on other grounds, United States v. Indelicato, 865 F.2d 1370, 1383-84 (2d Cir.1989) (en banc) (citations omitted)).

In the present case, NNPC does not allege that Citibank had any motive to assist Vadra in perpetrating fraud. Instead, NNPC argues that the circumstances indicate "conscious behavior" by Citibank. Thus, for example, NNPC alleges that Citibank knowingly or recklessly disregarded several "badges of fraud," including irregularities in the opening of Vadra's accounts and in the documents he submitted to verify the wire transfers; that the assistant bank manager who approved Vadra's application for the First MPR Account in New York had lived on the same street in Miami as one of Vadra's companies, and returned to that address after opening the account; and that the rejection by Towerbank of the $2 million wire transfer "alerted, or ought to have alerted, Citibank to the probability of fraud." (Id. ¶ 46) However, none of these allegations, or any other allegation in NNPC's amended complaint, gives rise to an inference, let alone a "strong inference," that Citibank actually knew of, and participated in, Vadra's fraud. See Retail Shoe Health Comm'n, 160 A.D.2d at 51, 558 N.Y.S.2d at 951 (stating that a claim for commercial bad

Not Reported in F.Supp.2d                                                                                    Page 7
Not Reported in F.Supp.2d, 1999 WL 558141 (S.D.N.Y.)
**(Cite as: 1999 WL 558141 (S.D.N.Y.))**

faith can survive a motion to dismiss "only if the plaintiff has alleged facts inculpating the principals of the bank as *actual participants* in unlawful activity" (emphasis added)). In fact, NNPC's amended complaint leads inexorably to the exact opposite conclusion: that Citibank knew nothing about Vadra's fraud. (*See, e.g.,* Compl. ¶ 58 ("Citibank NA *failed to conduct any further inquiry* into the [First MPR Account], or if it did conduct an inquiry, recklessly *failed to take notice* that $15.1 million had been received just two weeks earlier ...." (emphasis added)).

**\*8** To be sure, NNPC might be correct in contending that there were several red flags that should have alerted Citibank to Vadra's fraud or at least prompted it to investigate, and that Citibank acted negligently in allowing Vadra to make additional wire transfers even after the Second Fraudulent Transfer was uncovered. However, allegations that a bank "disregard[ed] ... suspicious circumstances which might have well induced a prudent banker to investigate" do not suffice to state a claim for commercial bad faith. *Getty Petroleum,* 90 N.Y.2d at 331, 660 N.Y.S.2d at 694-95. Citibank's actions may well have been "lamentable, ... even grossly negligent." *Id.* at 332, 660 N.Y.S.2d at 695. But the amended complaint falls short of alleging that Citibank "had actual knowledge of [the] wrongdoing or was somehow a participant in [the] fraudulent scheme." *Id.* Thus, NNPC's commercial bad faith claim fails.

### VI.

NNPC's final claim--technically, its fourth--is for aiding and abetting Vadra's fraud. To state a claim for aiding and abetting under New York law, a plaintiff must allege: (1) the existence of an underlying fraud; (2) "knowledge" of this fraud on the part of the aider and abettor; and (3) "substantial assistance" by the aider and abettor in achievement of the fraud. *See Oei* v. *Citibank, N.A.,* 957 F.Supp. 492, 520 (S.D.N.Y.1997) (citing *Morin* v. *Trupin,* 711 F.Supp. 97, 112 (S.D.N.Y.1989)); *cf . Kolbeck* v. *Lit America, Inc.,* 939 F.Supp. 240, 245-47 (S .D.N.Y.1996) (discussing the elements, under New York law, of aiding and abetting a breach of fiduciary duty), *aff'd without opinion,* 152 F.3d 918 (2d Cir.1998). Thus, as with a claim for commercial bad faith, liability for aiding and abetting

"require[s] actual knowledge of the primary wrong" by the defendant. *Williams, 1998 WL 397887,* at \*8; *accord Kolbeck,* 939 F.Supp. at 246; *cf. Wight* v. *BankAmerica Corp.,* No. 98 CIV.2010(RPP), 1999 WL 199021, at \*7 (S.D.N.Y. Apr. 8, 1999) (noting that the elements of commercial bad faith and aiding and abetting are "similar"). Accordingly, for the reasons stated in the previous section, NNPC's aiding and abetting claim fails.

Further, even if Citibank had known of Vadra's fraud, NNPC's aiding and abetting claim would still fail because Citibank did not provide "substantial assistance" in the achievement of the fraud, within the meaning of aiding and abetting jurisprudence. A defendant provides substantial assistance only if it "affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables [the fraud] to proceed." *Diduck* v. *Kaszycki & Sons Contractors, Inc.,* 974 F.2d 270, 284 (2d Cir.1992); *see Kolbeck,* 939 F.Supp. at 247. The mere fact that participants in a fraudulent scheme "use accounts at [a bank] to perpetrate it, without more, does not rise to the level of substantial assistance necessary to state a claim for aiding and abetting liability." *Williams* v. *Bank Leumi Trust Co.,* No. 96 CIV. 6695(LMM), 1997 WL 289865, at \*5 (S.D.N.Y. May 30, 1997) (citing *DePinto* v. *Ashley Scott, Inc.,* 222 A.D.2d 288, 290, 635 N.Y.S.2d 215, 217 (1st Dep't 1995)).

\* \* \*

**\*9** For the reasons stated above, Citibank's motion to dismiss is granted, and plaintiff's amended complaint is dismissed with respect to Citibank.

Not Reported in F.Supp.2d, 1999 WL 558141 (S.D.N.Y.)

### **Motions, Pleadings and Filings (Back to top)**

• 1:98cv04960 (Docket) (Jul. 10, 1998)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                    Page 1
Not Reported in F.Supp.2d, 1999 WL 47239 (S.D.N.Y.), Fed. Sec. L. Rep. P 90,438, RICO Bus.Disp.Guide 9679
**(Cite as: 1999 WL 47239 (S.D.N.Y.))**

▷

**Motions, Pleadings and Filings**

United States District Court, S.D. New York.
Klaus RENNER, Plaintiff
v.
CHASE MANHATTAN BANK, Michelino Morelli,
Townsend Financial Services Corp.,
Townsend Investment Fund, LLC, Gerald Townsend, and
Rabon Wolford, Defendants.
**No. 98 Civ. 926(CSH).**

Feb. 3, 1999.

*MEMORANDUM OPINION AND ORDER*
HAIGHT, Senior J.

**\*1** Plaintiff Klaus Renner, according to the allegations of his complaint, is a citizen and resident of Switzerland, an engineer, and the inventor of a snow-removing device. Renner alleges that during the course of his efforts to fund the manufacture and sale of that device, the defendants defrauded him out of $3 million. As against all or certain defendants, his complaint alleges claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq.;* claims under Section 17(a) of the Securities Exchange Act of 1933, 15 U.S.C. § 77q(a), Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b-5, 17 C.F.R. § 240.10b-5 promulgated thereunder; and common law claims for fraud, negligence, breach of contract, breach of fiduciary duty, and breach of the covenant of good faith. Subject matter jurisdiction in this Court does not depend upon the viability of plaintiff's federal claims, since it appears that complete diversity of citizenship exists between the parties.

The first two named defendants are the Chase Manhattan Bank ("Chase") and Michelino Morelli, identified in the complaint at ¶ 8 as at the relevant times "a senior vice-president of Chase and the manager of its Mount Vernon, New York office." [FN1] Chase now moves for an order dismissing the complaint as to it [FN2] pursuant to Rule 12(b)(6), Fed.R.Civ.P., for failure to state a claim upon which relief may be granted; and to dismiss the fraud-based

claims pursuant to Rule 9(b) for failure to plead fraud with the requisite particularity.

> FN1. ¶ 16 of the complaint refers to "Chase's Mount Vernon *branch,"* a word that appears to be the more accurate term in banking parlance.

> FN2. The Chase Legal Department, counsel of record in the case, does not represent Morelli.

I. *Background*

Plaintiff alleges the following facts. [FN3] In or about December 1994, an international confidence man named Dr. Gustav Susse, not a party to this action, opened an account at Chase through Morelli on behalf of Hampstead Trust Ltd., an entity he controlled with defendant Rabon Wolford. Wolford, Morelli, and Susse all were members of a sham New York "Order" of a group called the "Knights of Malta," which purported to enjoy close connections with the Vatican and to perform "good deeds" around the world, but which actually served as a front for complicated fraudulent transactions. As a result of its concern with certain questionable practices, Chase closed Hampstead's account within months after it was opened. Through the assistance of Morelli, Susse then arranged to transact business at Chase through an entity called PTI and through defendant Townsend Financial, which also had set up its accounts at Chase's Mount Vernon branch. [FN4] This arrangement permitted Susse and Hampstead to continue their schemes. In or around November 1995, Hampstead swindled a "Belgian group" out of $5 million, promising to fund a purported $25 million documentary letter of credit through Chase, but instead diverting the funds to Wolford, the Knights of Malta, Susse's brother, and Townsend.

> FN3. For the purposes of Chase's Rule 12(b)(6) motion, I must take "the well-pleaded factual allegations in the complaint as true." *Papasan v. Allain,* 478 U.S. 265, 283 (1986). The requirement does not apply to allegations that are incomprehensibly vague or entirely conclusory. See additional cases cited *infra.*

> FN4. The complaint at times refers to this account

Not Reported in F.Supp.2d                                                                                          Page 2
Not Reported in F.Supp.2d, 1999 WL 47239 (S.D.N.Y.), Fed. Sec. L. Rep. P 90,438, RICO Bus.Disp.Guide 9679
**(Cite as: 1999 WL 47239 (S.D.N.Y.))**

as the "Townsend Financial" account (referring to defendant Townsend Financial Services Corp.) and at other times as the "Townsend Fund" account (referring to defendant Townsend Investment Fund, LLC). Similarly, the complaint also refers at times just to "Townsend," leaving it unclear whether plaintiff means to refer to Townsend Financial, the Townsend Fund, or individual defendant Gerald Townsend. Accordingly, for the purpose of clarity, I will simply use "Townsend" to refer to any and all of the Townsend defendants.

In early February 1996, Renner was introduced to Hampstead as a result of his efforts to raise the necessary funds to manufacture and sell his snow-removing invention. Specifically, Hampstead, through Susse and another non-party director, Alexander Penly, represented to Renner that Hampstead engaged in transactions in "medium term bank debentures" with leading banks. Susse and Penly assured him that Hampstead would invest the money Renner needed to manufacture his invention by using its connections with these major banks to engage in trades of these debentures, guaranteeing an annual return rate of 120%. They advised Renner that Hampstead had purchased Townsend, which they said was its own securities house in the United States. They did not inform him that Townsend only had been established on January 22, 1996, presumably to facilitate the diversion of customer funds.

**\*2** Penly and Susse stressed to Renner that the funds which he invested would be kept in a sub-account at Chase, and that Hampstead had worked with Morelli for several years on transactions with other investors. He was advised that his funds were secure because no money would leave the Chase account unless a bank note or treasury bill of higher value was substituted as collateral. They further emphasized Hampstead's and Morelli's connections with the Knights of Malta and their investment of millions of dollars of Vatican money in humanitarian projects.

On February 8, 1996, Renner signed a contract with Hampstead in which he agreed to invest $3 million with it, which funds were then transferred to Morelli's attention at Chase and specifically designated for the promised Renner sub-account to Townsend's account.

On or about February 12 and 13, 1996, before the Renner money even had arrived at Chase, Morelli and Townsend specifically discussed that Renner was a client of Hampstead; that Hampstead intended to use Renner's money for a purpose not permitted under Renner's agreement with Hampstead; that Renner believed that his money was to be held in a sub-account and that he expected a custody receipt confirmation from Chase; that the defendants wished to deal only with Morelli; that Morelli's personal involvement was important to defendants; and that Chase, Morelli, and Townsend "could be held accountable" in the event of a problem.

On or about February 13, 1996, Chase received Renner's money and issued two Wire Transfer Advances to Townsend, confirming receipt. Morelli confirmed on Chase letterhead that Renner's money had been credited to the Townsend account and that the funds "were received from Swiss Bank Corp., New York via Fed by Order of Klaus Renner." Plaintiff does not state how, where, or to whom Morelli sent this confirmation. On or about February 20, 1996, with Morelli silently on the line, two Chase officers told Townsend by telephone that they were concerned about Townsend's proposed transaction with investor money and asked to see authorization for its use of investor funds. Three days later, Townsend wrote directly to Morelli instructing him to wire almost all of Renner's money to Susse's common-law wife in Monaco, which instruction Chase duly followed. Shortly thereafter, upon Townsend's request, Chase wired the balance of the money to Penly's Geneva bank account. Thus, although questions had been raised at Chase as to the Hampstead and Townsend entities, the funds were transferred and Renner was told neither of the activity in the accounts nor of Chase's concerns.

On or about April 9, 1996, Morelli wrote to Townsend to advise it that Chase would be closing the account as a result of its concerns with Townsend's practices. Susse then informed plaintiff that the Townsend account had been closed; he also falsely told him that the Securities and Exchange Commission had frozen the Townsend funds, but that he intended to continue with the investment program. Having heard nothing further, plaintiff wrote to Susse on June 27, 1996, with a copy to Morelli, confirming Susse's

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                      Page 3
Not Reported in F.Supp.2d, 1999 WL 47239 (S.D.N.Y.), Fed. Sec. L. Rep. P 90,438, RICO Bus.Disp.Guide 9679
**(Cite as: 1999 WL 47239 (S.D.N.Y.))**

repeated promise to return his investment and questioning why it could not be returned immediately. Plaintiff's agents also contacted Morelli by telephone, but he disclaimed any knowledge of Renner's funds.

**\*3** Over a year and a half after plaintiff failed to obtain the return of his money, he brought the present action.

Renner's complaint alleges eleven claims for relief, as follows:

*Claim 1* (against all defendants): Substantive violation of the RICO statute, 18 U.S.C. § 1962(c).

*Claim 2* (against all defendants): RICO conspiracy, in violation of 18 U.S.C. § 1962(d).

*Claim 3* (against all defendants): Securities fraud, in violation of the 1933 and 1934 Acts and accompanying regulations, in connection with the conspirators' promise to trade with Renner's funds in "securities," namely, the "medium term bank debentures."

*Claim 4* (against all defendants): Common law fraud.

*Claim 5* (against Chase only): Negligence, in respect of its failure to "safeguard" Renner's funds on deposit with Chase.

*Claim 6* (against Chase only): Breach of contractual duty to "make sure that Townsend/Hampstead was using the Renner money for authorized purposes."

*Claim 7* (against Chase and Morelli only): Breach of "a covenant of good faith and fair dealing inherent in every contract."

*Claim 8* (against Gerald Townsend and the two Townsend corporate entities only): Breach of contract.

*Claim 9* (against Townsend defendants only): Breach of the covenant of good faith and fair dealing.

*Claim 10* (against Townsend defendants only): Breach of fiduciary duty.

*Claim 11* (against Townsend defendants only): Negligence.

Chase's motion under Rule 12(b)(6) and Rule 9(b) challenges only the claims plaintiff asserts against Chase. No other defendant has made a motion at this time or sought to adopt that of Chase.

II. *Standard of Review*

A. *Rule 12(b)(6)*

On a motion to dismiss under Rule 12(b)(6), the trial court's function "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Geisler v. Petrocelli,* 616 F.2d 636, 639 (2d Cir.1980); *see Ricciuti v. N.Y.C. Transit Authority,* 941 F.2d 119, 124 (2d Cir.1991). "[T]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974). The district court should grant a Rule 12(b)(6) motion "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984) (citing *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)). Except in certain circumstances, consideration of a motion to dismiss the complaint must focus on the allegations contained on the face of the complaint. *See Cortec Industries, Inc. v. Sum Holdings, L.P.,* 949 F.2d 42, 47 (2d Cir.1991); *Kramer v. Time Warner, Inc.,* 937 F.2d 767, 773 (2d Cir.1991). On a motion to dismiss, a district court must accept plaintiff's well-pleaded factual allegations as true, *Papasan v. Allain,* 478 U.S. 265, 283 (1986), and the allegations must be "construed favorably to the plaintiff." *LaBounty v. Adler,* 933 F.2d 121, 123 (2d Cir.1991).

B. *Rule 9(b)*

**\*4** In addition, Rule 9(b) requires that in all allegations of fraud, including actions under § 10(b) and Rule 10b-5, the circumstances constituting the fraud must be stated with particularity. *See Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1127-28 (2d Cir.1994). The pleading must be particular enough to satisfy the three goals of Rule 9(b): (1) to provide a defendant with fair notice of the claims against it; (2) to protect a defendant from harm to its reputation or goodwill by unfounded allegations of fraud; and (3) to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 4

Not Reported in F.Supp.2d, 1999 WL 47239 (S.D.N.Y.), Fed. Sec. L. Rep. P 90,438, RICO Bus.Disp.Guide 9679
**(Cite as: 1999 WL 47239 (S.D.N.Y.))**

reduce the number of strike suits. *See DiVittorio v. Equidyne Extractive Indus., Inc.,* 822 F.2d 1242, 1247 (2d Cir.1987).

"[C]onclusory allegations that defendant's conduct was fraudulent or deceptive are not enough." *Decker v. Massey-Ferguson, Ltd.,* 681 F.2d 111, 114 (2d Cir.1982). A complaint alleging fraud must (1) specify the statements, oral or written, that the plaintiff contends were fraudulent, either as misrepresentations or containing fraudulent omissions; (2) identify the speaker or the writer; state where, when, and to whom the statements were made; and (3) explain why the statements were fraudulent. *Acito v. Imcera Group, Inc.,* 47 F.3d 47, 51 (2d Cir.1995). Thus Rule 9(b) requires a plaintiff to identify which defendant caused each allegedly fraudulent communication to be spoken, written, wired or mailed, and to whom; when the communication was made; and how it furthered the fraudulent scheme. *McLaughlin v. Anderson,* 962 F.2d 187, 191 (2d Cir.1992). In cases with multiple defendants, Rule (9b) requires that the complaint allege facts specifying each defendant's contribution to the fraud. Although the rule does not require a plaintiff to allege scienter with great specificity, it does require plaintiff to plead a factual basis which gives rise to a strong inference of fraudulent intent. *Wexner v. First Manhattan Co.,* 902 F.2d 169, 172 (2d Cir.1990). "Where pleading is permitted on information and belief, a complaint must adduce specific facts supporting a strong inference of fraud or it will not satisfy even a relaxed pleading standard." *Id.* Rule 9(b)'s particularity requirements have "even greater urgency" in civil RICO actions. *Morin v. Trupin,* 778 F.Supp. 711, 716 (S.D.N.Y.1991).

III. *Discussion*

A. *The RICO Claim*

*The Private Securities Litigation Reform Act*

In his complaint, plaintiff alleged violations both of RICO and of the securities laws. Chase, moving to dismiss the RICO claim against it, argues that plaintiff's RICO claim is barred under the recently enacted Private Securities Litigation Reform Act ("Reform Act"), Pub.L. No. 104-67,

109 Stat. 737 (1995).

The Reform Act amends the RICO statute, 18 U.S.C. § 1964(c), to provide that "no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962." The Reform Act's legislative history shows that Congress intended to eliminate securities fraud as a RICO predicate offense, along with other offenses, such as mail or wire fraud, "if such offenses are based on conduct that would have been actionable as securities fraud." Senate Report No. 104-98, 2 U.S.C.C.A.N. 679, 698 (1995). Case law interpreting the statute has established that "where allegations of mail and wire fraud derive from conduct otherwise actionable as securities fraud, no RICO claim will lie." *ABF Capital Management v. Askin Capital Management, L.P.,* 957 F.Supp. 1308, 1319 (S.D.N.Y.1997).

**\*5** Thus the preclusive effect of the Reform Act does not depend upon whether a plaintiff has specifically alleged securities fraud as a predicate act for his RICO claims. The question turns upon the defendant's conduct, as alleged in the complaint. If that conduct "would have been actionable as securities fraud," the Reform Act bars a RICO claim, even if the pleader eschews reference to the securities laws in describing the predicate acts and dresses his claim in other clothing (as the Reform Act undoubtedly will inspire RICO-minded pleaders to do). The Senate Report, cited *supra,* makes Congress's purpose plain enough:

The Committee intends this amendment to eliminate securities fraud as a predicate act of racketeering in a civil RICO action. In addition, a plaintiff may not plead other specified offenses, such as mail or wire fraud, as predicate acts of racketeering under civil RICO if such offenses are based on conduct that would have been actionable as securities fraud.

In the case at bar, plaintiff alleges as predicate acts mail fraud, wire fraud, money laundering, and Travel Act violations, Complaint at ¶ 56, a list he repeats in his RICO Statement at ¶ 5a. There is no reference to securities fraud as a predicate act. Nonetheless, the pleading implicates the Reform Act, because the Third Claim for Relief, captioned "Securities Fraud," alleges that the "medium term bank

Not Reported in F.Supp.2d                                                                                       Page 5
Not Reported in F.Supp.2d, 1999 WL 47239 (S.D.N.Y.), Fed. Sec. L. Rep. P 90,438, RICO Bus.Disp.Guide 9679
**(Cite as: 1999 WL 47239 (S.D.N.Y.))**

debentures" the conspirators promised to trade with Renner's funds are "securities" within the 1933 and 1934 Acts. Complaint, ¶ 66. The Townsend defendants are identified as the architects and principal actors in the fraudulent scheme, *id.,* ¶¶ 68, 69. Paragraph 70 alleges: "Chase, Morelli and Wolford, knowing that such representations were false, *aided and abetted the securities fraud* by participating in inducing Renner to enter the transaction and then diverting the money to the conspirators." (emphasis added).

Implicitly acknowledging the preclusive effect of the Reform Act, and seeking to preserve his RICO claim, plaintiff argues in his opposing papers that the scheme he alleges "is not 'core' securities fraud that Congress aimed to prohibit from RICO," brief at 29, and then goes so far as to purport to "withdraw[ ] the securities claim in order to avoid unnecessary litigation on collateral issues," *id.* at 48 n. 11.

Those defensive maneuvers will not suffice to salvage a RICO claim if Chase's alleged conduct, whatever the label affixed to it, is "actionable as securities fraud," a question whose answer depends upon the substantive law of securities fraud.

A threshold question arises as to whether "securities" are involved at all. The complaint alleges fraudulent promises to trade in "medium term bank debentures." Such instruments certainly sound like "securities," particularly given the broad definitions of that word in the 1933 Act, 15 U.S.C. § 77b(a)(1) ("The term 'security' means any ... debenture, ... or, in general, any interest or instrument commonly known as a 'security' "); and the 1934 Act, 15 U.S.C. § 78c(a)(10) (same).

**\*6** However, the case is complicated by the fact that, on plaintiff's theory, the bank debentures did not exist and never had. In a criminal case, *United States v. Jones,* 648 F.Supp. 225, 231-32 (S.D.N.Y.1986), this Court dismissed securities fraud charges from an indictment involving a hoary "pigeon drop" scam because "[n]o actual securities existed in this case. No genuine transactions in securities occurred or were contemplated. References to securities simply formed a part of the talker's patter," *aff'd in part, rev'd in part on other grounds,* 839 F.2d 900 (2d Cir.1988).

[FN5] *Cf. United States v. Schlei,* 122 F.3d 944, 972-73 (11th Cir.1997) ("The fraud provisions are not defeated by the fact that a security purportedly traded is nonexistent or fictitious ... A contrary result would encourage rather than curb fraud."), *cert. denied,* 118 S.Ct. 1523 (1998).

> FN5. The government did not cross-appeal from the trial court's dismissal of the securities charges in *Jones,* and so the Second Circuit had no occasion to consider the question.

But I need not pursue this question further because the application of the Reform Act turns upon whether Chase's alleged conduct is "actionable" under the securities laws; and, assuming without deciding that the case falls within those laws, Chase's conduct is not actionable under them.

As noted, the complaint asserts that Chase, Morelli, and Wolford "aided and abetted" the fraudulent acts of others. [FN6] That allegation is legally insufficient because secondary liability for aiding and abetting is not a valid basis for a securities fraud claim.

> FN6. Morelli is the only Chase employee named in the complaint. Chase's vicarious liability for Morelli's acts is considered *infra* .

The Supreme Court's decision in *Central Bank v. First Interstate Bank,* 511 U.S. 164 (1994) holds that a claim under § 10(b) must allege that a defendant has personally and directly committed fraud. "[T]he statute prohibits only the making of a material misstatement (or omission) or the commission of a manipulative act ... The proscription does not include giving aid to a person who commits a manipulative or deceptive act. We cannot amend the statute to create liability for acts that are not themselves manipulative or deceptive within the meaning of the statute." 511 U.S. at 177-78. Under *Central Bank,* secondary liability for "aiding and abetting" no longer is a basis for a § 10(b) claim. *Id.* at 191 ("Because the text of § 10(b) does not prohibit aiding and abetting, we hold that a private plaintiff may not maintain an aiding and abetting suit under § 10(b)."). *See also Shapiro v. Cantor,* 123 F.3d 717, 721 (2d Cir.1997) (affirming dismissal and holding that an "assertion of aiding and abetting does not support a claim

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 6
Not Reported in F.Supp.2d, 1999 WL 47239 (S.D.N.Y.), Fed. Sec. L. Rep. P 90,438, RICO Bus.Disp.Guide 9679
**(Cite as: 1999 WL 47239 (S.D.N.Y.))**

under § 10(b) as interpreted by the *Central Bank* Court"); *In re JWP Inc. Sec. Litigation,* 928 F.Supp. 1239, 1255-56 (S.D.N.Y.1996) (dismissing misrepresentation claim against audit committee defendants where those defendants did not actually make the alleged misrepresentations).

Here, plaintiff does not allege that defendants Chase, Morelli, or Wolford made any material misstatements or omissions in connection with the purchase or sale of any securities; rather, plaintiff alleges that they merely "aided or abetted" the Townsend defendants and Susse in carrying out the securities fraud. *Central Bank* instructs us that Chase, Morelli, and Wolford may not be held liable for such secondary actions. Accordingly, plaintiff's claim under the securities laws would fail in any event as against these defendants.

**\*7** Because plaintiff's claim would not have been "actionable" against Chase under the securities law, the mere fact that plaintiff baselessly asserted it in his complaint would not bar a RICO claim against under the Reform Act. However, plaintiff's RICO claim fails on other grounds.

*Pattern of Continuous Activity*

To state a claim under RICO, a plaintiff must allege (1) a violation of the RICO statute, 18 U.S.C. § 1962; (2) an injury to business or property; and (3) that the injury was caused by the violation of § 1962. *Pinnacle Consultants, Ltd. v. Leucadia Nat'l Corp.,* 101 F.3d 900, 903-04 (2d Cir.1996). Section 1962 prohibits: a) the use of income "derived ... from a pattern of racketeering activity" to acquire an interest in, establish, or operate an enterprise engaged in or whose activities affect interstate commerce; b) the acquisition of any interest in or control of such an enterprise "through a pattern of racketeering activity"; c) the conduct or participation in the conduct of such an enterprise's affairs "through a pattern of racketeering activity"; and (d) conspiring to do any of the above. 18 U.S.C. § 1962; *see also GICC Capital Corp. v. Technology Finance Group, Inc.,* 67 F.3d 463, 465 (2d Cir.1995), *cert. denied,* 518 U.S. 1017 (1996). The existence of a "pattern of racketeering activity" is therefore a requirement under any prong of § 1962. *See GICC Capital Corp.,* 67 F.3d at 465. [FN7] To establish such a pattern, "a plaintiff must plead at

least two predicate acts, show that the acts are related and that they amount to, or pose a threat of, continuing criminal activity." *Id.; see also H.J. Inc. v. Northwestern Bell Telephone Co.,* 492 U.S. 229, 240 (1989) ("To establish a RICO pattern it must also be shown that the predicates themselves amount to, or that they otherwise constitute a threat of, continuing racketeering activity.").

> FN7. Plaintiff at bar alleges violations of §§ 1962(c) and 1962(d).

In *H.J. Inc.,* the Supreme Court parsed out the two components of the continuity requirement: " 'Continuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." 492 U.S. at 241-42. *See also GICC Capital Corp.,* 67 F.3d at 466 ("a plaintiff in a RICO action must allege either an 'open-ended' pattern of racketeering activity (i.e., past criminal conduct coupled with a threat of future criminal conduct) or a 'closed-ended' pattern of racketeering activity (i.e., past criminal conduct 'extending over a substantial period of time')"); *Batra v. Pace University,* 1998 WL 684621, at \*5 (S.D.N.Y.1998). Plaintiff asserts that he has pleaded both an open-ended and a close-ended pattern of criminal activity. "Racketeering activity includes the commission of specified state-law crimes, conduct indictable under various provisions within Title 18 of the United States Code, and certain other federal offenses." *Pinnacle Consultants,* 101 F.3d at 904 (citing 18 U.S.C. § 1961(1)).

**\*8** To determine whether a threat of "open-ended" continuity exists, a court must examine the nature of either: (1) the predicate acts alleged; or (2) the enterprise at whose behest the predicate acts were performed. *Schlaifer Nance & Co. v. Estate of Warhol,* 119 F.3d 91, 97 (2d Cir.1997). In this case, the moving defendants are not engaged in inherently illegal enterprises. *See Giannacopolous v. Credit Suisse,* 965 F.Supp. 549, 552 (S.D.N.Y.1997); *Shamis v. Ambassadors Factors Corp.,* 1997 WL 473577, at \*13-14 (S.D.N.Y.1997). Here, as in *Shamis,* where "all the specific acts of racketeering ... arose out of the master agreement" between the parties, "the nature of the predicate acts and the enterprise alone do not support a finding of an 'open-ended'

Case 1:05-cv-04622-DLI-RML   Document 40   Filed 01/26/06   Page 22 of 70 PageID #: 855

Westlaw.

Not Reported in F.Supp.2d                                                    Page 7
Not Reported in F.Supp.2d, 1999 WL 47239 (S.D.N.Y.), Fed. Sec. L. Rep. P 90,438, RICO Bus.Disp.Guide 9679
**(Cite as: 1999 WL 47239 (S.D.N.Y.))**

pattern of racketeering activity," and the Court must then "look to more general factors to determine whether the threat of continuing activity exists." *Id.* at *14 (citations omitted). However, where, as here, the alleged scheme had as its goal the fraudulent one-time inducement of one victim to part with his money, the allegations are insufficient to state a claim of open-ended continuity. *See Schlaifer Nance, 119 F.3d at 97-98* ("the allegedly fraudulent acts, although they spanned over three years, were not continuous for RICO purposes because they were acts related to a single contract and single scheme to defraud"); *China Trust Bank of New York v. Standard Chartered Bank, PLC, 981 F.Supp. 282, 287 (S.D.N.Y.1997)* ("The Court cannot infer a threat of repeated fraud from the alleged single scheme"). There is no threat that the fraud alleged in the complaint will continue. Renner, understandably enough, is having nothing further to do with Susse and his confederates, Chase has closed the Townsend account, and Morelli and Wolford seem to have disappeared; they have not been served with process, and plaintiff's counsel noted in the Clerk's Cover Sheet that he has not been able to locate those defendants by the exercise of diligence.

In these circumstances, plaintiff cannot demonstrate RICO "open-ended" continuity.

A party demonstrates "close-ended" continuity by proving a series of related predicate acts extending over a substantial period of time. *H.J. Inc., 492 U.S. at 242,* "Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct." *Id.*

To determine whether closed-ended continuity exists, courts consider a number of factors, including: "the length of time over which the alleged predicate acts took place, the number and variety of acts, the number of participants, the number of victims, and the presence of separate schemes." *GICC, 67 F.3d at 467* (citations omitted); *see also Skylon Corp. v. Guilford Mills, Inc., 1997 WL 88894,* at *5 (S.D.N.Y.1997). Plaintiff has failed to allege a close-ended pattern of RICO activity under the foregoing factors.

*Length of Time:*

**\*9** All of the racketeering acts that victimized plaintiff, as alleged in the complaint, occurred in February and March of 1996. A two-month period of time is insufficient for the purposes of the RICO statute. *See H.J., Inc., 492 U.S. at 242* ("predicate acts extending over a few weeks or months ... do not satisfy [the continuity] requirement"). In *GICC,* the Second Circuit concluded that closed-ended continuity is not satisfied where the RICO pattern alleges a one-victim scheme to defraud over a period of less than two years. 67 F.3d at 463, 467; *see also North American Development, Inc, v. Shahbazi, 1996 WL 306538,* at *6 (S.D.N.Y.1996) (collecting cases).

*Number, Nature, and Variety of Predicate Acts:*

Where the predicate acts alleged are not inherently unlawful acts, such as murder or obstruction of justice, courts normally require a longer span of time to satisfy the continuity requirement. *See, e.g., Skylon Corp., 1997 WL 88894,* at *6. Accordingly, none of these factors are of any assistance to plaintiff, who alleges several predicate acts (none of them inherently unlawful) typical of a garden-variety fraud.

*Number of Participants:*

This factor similarly is unhelpful to plaintiff, as he does not allege a far-reaching scheme perpetrated by a host of conspirators. Instead, he implicates Chase, an officer of Chase, an officer of Hampstead, and the various Townsend defendants, who may be considered as one entity. *See R.C.M. Exec. Gallery Corp. v. Rols Capital Co., 901 F.Supp. 630, 640-41 (S.D.N.Y.1995).*

*Presence of Separate Schemes:*

Courts typically dismiss RICO claims, such as the one at bar, based upon the limited nature of the scheme alleged. *See Skylon Corp., 1997 WL 88894,* at * 7 (collecting cases). A court may consider allegations of a "complex, multi-faceted conspiracy," in determining whether the complaint satisfies the continuity requirement, *GICC, 67 F.3d at 468-69;* however, where, as here, the allegedly criminal acts were "narrowly directed toward a single fraudulent end with a limited goal," the claim typically will

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

fail. *Skylon Corp.,* 1997 WL 88894, at *7 (internal citation omitted). The simple fraud alleged here, fraudulently bilking plaintiff and diverting his money, simply does not constitute the long-term criminal conduct prohibited under RICO.

Plaintiff attempts to demonstrate that the scheme to defraud him was part of a larger venture that stretched from late 1994 until August 1996. In support of that effort, plaintiff alleges that Hampstead opened a Chase account in December 1994, which Chase closed several months later when Hampstead "presented documentary letters of credit that were fraudulent," Complaint, ¶¶ 13-15; and that, in or around November 1995, Hampstead "induced a Belgian group to provide it with $5 million so that Hampstead would fund a purported $25 million documentary letter of credit through Chase," which Hampstead then diverted to various co-conspirators, *id.,* ¶ 17.

***10** Plaintiff may intend by these allegations of other fraudulent acts to demonstrate either open-ended continuity (by showing the threat of ongoing fraud by the enterprise) or closed-end continuity (by enlarging the relevant period of time). But these allegations are insufficient to make either showing.

First, these other acts, to the extent that they can be understood on the basis of plaintiff's barebones allegations, are unrelated in purpose or methodology to the conduct that injured plaintiff. That is significant because "acts ... [that] are unrelated to the predicate acts which allegedly injured plaintiff ... cannot be considered as part of the activity to extend the scope of the pattern." *Shamis,* 1997 WL 473577 at *15 (citation and internal quotations omitted) *See Burdick v. American Express Co.,* 865 F.2d 527, 529 (2d Cir.1989) (where plaintiff employee sued defendant bank employer for termination as a result of his complaints about fraud on customers, plaintiff could not assert RICO violation because harm to defendant's customers resulting from defendant's fraudulent practices was "too remotely related" to predicate acts alleged); *Vild v. Visconsi,* 956 F.2d 560, 566 (6th Cir.1992) (finding different types of conduct alleged to be unrelated); *Committee to Defend the United States Constitution v. Moon,* 776 F.Supp. 568, 572 (D.D.C.1991); *Shamis,* 1997 WL 473577 at *15.

Second, these allegations of other fraudulent acts fail entirely to comply with the pleading requirements of Rule 9(b), discussed *supra.* As there noted, the law of this circuit requires that allegations of fraud specify the statements made that were false or misleading, give particulars as to the respect in which it is contended that the statements were fraudulent, and state the time and place the statements were made and the identity of the persons who made them. These pleading requirements apply with full force to the allegations in a RICO complaint intended to demonstrate continuity, *Shamis,* 1997 WL 88894, at *15; and the allegations in the case at bar are wholly insufficient to support an inference that the defendants engaged in ongoing and repeated racketeering activity over a term of years, or that they are likely to do so in the future.

For the foregoing reasons, plaintiff has failed to allege a viable RICO claim against any defendant. But there is an additional reason why the RICO claim fails as against Chase.

The only Chase employee named in the complaint is Morelli, the seemingly faithless manager of Chase's Mount Vernon branch (if plaintiff's descriptions of his conduct are accurate). This Court and other district courts in the circuit have held that "corporations may not be held vicariously liable for the actions of their employees in violation of the RICO statute where the plaintiff has not alleged any facts which portray the company as an active perpetrator of the fraud or a central figure in the criminal scheme." *Oatar National Navigation & Transportation Co., Ltd. v. Citibank, N.A.,* 1992 WL 276565, at *7 (S.D.N.Y.1992) (citations and internal quotation marks omitted); *see also Schmidt v. Fleet Bank,* 1998 WL 47827, at *12 (S.D.N.Y.1998) ("Although the Second Circuit has not addressed the issue, district courts within this circuit have been reluctant to impose vicarious liability under RICO"; *held,* defendant Fleet Bank not liable under RICO for acts of its vice-president and branch manager, one Patnoi, where "the complaints do not sufficiently allege that Fleet was a central figure in the criminal scheme or that it benefitted from Patnoi's alleged participation in the scheme.").

***11** In the case at bar, plaintiff's complaint is entirely lacking in well-pleaded factual allegations that Chase (as

opposed to its branch manager Morelli) was a central figure in the scheme or stood to benefit from it. On the contrary: plaintiff's allegations in ¶ 31 of the Complaint that two unidentified Chase officers "told Townsend by phone on February 20, 1996 that they were concerned about the Townsend Fund's proposed transactions with investor money" and demanded to see an authorization "that the money in the Townsend account could be used in that way" convincingly depict Chase as an honest bank, trying to prevent, not promote, a possibly fraudulent transfer of funds by Townsend--an effort that Morelli (silently listening to the conversation) was able to circumvent three days later. Nor is there, or could there logically be, any allegation in the complaint that Chase as an institution stood to benefit from the scheme. [FN8]

> FN8. Notwithstanding the failure of the complaint to allege any benefit to Chase, plaintiff's brief asks the reader to infer it, apparently on the theory that Chase would receive "commissions and fees" from the fraudulent transaction. Brief at 40. Quite apart from the requirement that allegations of fact should appear in the pleadings, not briefs of counsel, this requested inference makes no sense, since the Renner funds, after a brief pause in the Townsend account at Chase, were dispatched to the fraudsmen in Monaco. It is fanciful to infer that Chase profited so much from this particular transaction that it was willing to become a partner in fraud to effect it.

For the foregoing reasons, the RICO claims against Chase will be dismissed. [FN9]

> FN9. I have not found it necessary to discuss all of the grounds which Chase argues for dismissing the RICO claims against it.

B. *Securities Fraud:*

Plaintiff's claim for securities fraud is not viable, for the reasons previously stated, *supra.*

* * *

Plaintiff also alleges several common law claims. Because

one of the bases for this Court's jurisdiction is diversity of citizenship under 28 U.S.C. § 1332, I must address each in turn.

C. *Common Law Fraud*

The complaint alleges at ¶ 72 that "Susse and Penly, aided and abetted by Chase, Morelli, Townsend, Townsend Financial and Townsend Fund, made knowing and intentional misrepresentations to Renner ... ".

Thus plaintiff's claim against Chase is limited to one of aiding and abetting the fraud of others. That is understandable, since the first of four elements that a plaintiff must prove by clear and convincing evidence to sustain a claim of fraud is that the defendant in question made a material false representation to the plaintiff. [FN10] *See Banque Arabe v. Maryland National Bank,* 57 F.3d 146, 153 (2d Cir.1995). The complaint contains no allegation that Morelli or anyone else at Chase made any representation to Renner which induced Renner to hand over his money to others. The only communication from anyone at Chase to plaintiff referred to in the complaint appears at ¶ 50, where it is alleged that in a telephone conversation on June 27, 1996, between Felix Renner, plaintiff's brother, and Morelli, "Morelli disclaimed knowledge about the Renner transaction and claimed to know nothing about Townsend, Hampstead or Susse." Even if that disclaimer was false, it did not induce any action on the part of plaintiff, nor did it cause him to suffer damage; according to the complaint, his money was by that time long gone. [FN11]

> FN10. The other three elements are that the defendant intended to defraud the plaintiff thereby; that the plaintiff reasonably relied upon the representation; and that the plaintiff suffered damage as the result of such reliance. *Banque Arabe,* 57 F.3d at 153.1995).

> FN11. In dealing with communications between Morelli and plaintiff, I do not lose sight of the allegation in ¶ 29 of the complaint that on or about February 15, 1996, "Morelli confirmed on Chase Mount Vernon branch letterhead that the Renner money had been credited to the Townsend Fund

Case 1:05-cv-04622-DLI-RML   Document 40   Filed 01/26/06   Page 25 of 70 PageID #: 858

Westlaw.

Not Reported in F.Supp.2d                                                                                          Page 10
Not Reported in F.Supp.2d, 1999 WL 47239 (S.D.N.Y.), Fed. Sec. L. Rep. P 90,438, RICO Bus.Disp.Guide 9679
**(Cite as: 1999 WL 47239 (S.D.N.Y.))**

account and that the funds 'were received from Swiss Bank Corp., New York via Fed by Order of Klaus Renner." ' Plaintiff does not allege that this letter was sent to him; and a careful reading of the complaint suggests that Morelli sent it to Chase's customer, Townsend, which on the same day sent a "Custody Receipt Confirmation" in quite different terms to Renner. Complaint, ¶ 27.

I turn, then, to whether the complaint adequately alleges a claim against Chase for aiding and abetting the fraud of Susse and Penly.

To establish aiding and abetting under New York law, plaintiff must show (1) the existence of a violation by the primary wrongdoer; (2) knowledge of this violation on the part of the aider and abettor; an (3) substantial assistance by the aider and abettor in the achievement of the primary violation. *See* *Williams v. Bank Leumi Trust Co., 1997 WL 289865,* at *4 (S.D.N.Y.1997) (collecting cases); *Moll v. U.S. Life Title Insurance Co. of New York, 710 F.Supp. 476, 479 (S.D.N.Y.1989)* (citing elements in context of aiding and abetting fraud).

**\*12** The pleading requirements of Rule 9(b), previously discussed, apply to a claim for aiding and abetting fraud. *See,* *Williams, 1997 WL 289865,* at *5; *ABF Capital Management v. Askin Capital Management, L.P., 957 F.Supp. at 1328* ("claim of aiding and abetting fraud must meet the pleading requirements of Rule 9(b)"); *Frota v. Prudential Bache Securities, Inc., 639 F.Supp. 1186, 1193 (S.D.N.Y.1986)* (applying Rule 9(b) to breach of fiduciary duty claims based on allegations of fraudulent conduct).

The complaint at bar fails to conform to the relevant pleading requirements in several respects.

First, the complaint fails adequately to allege knowledge on the part of Chase of the fraudulent scheme that Susse and others intended to perpetrate, and did perpetrate, upon Renner. That is so even if, assuming without deciding, the knowledge of Morelli should be imputed in law to his employer, Chase.

New York law requires that an aider and abettor have actual knowledge of the primary wrong; constructive knowledge is not sufficient. *See* *Kolbeck v. LIT America, Inc., 939 F.Supp. 240, 246 (S.D.N.Y.1996)* (collecting cases); *Williams, 1997 WL 289865,* at *5 ("The only apparent basis for Bank Leumi's alleged knowledge of the check-kiting scheme was the sequence of the account transfers, and the contention that Bank Leumi was informed that the purpose of the $4 million check was for the purchase of LifeCo stock. At most, these facts raise the issue of constructive knowledge which is insufficient to state a claim for aiding and abetting").

Morelli, the Mt. Vernon branch manager, is the only Chase employee identified in the complaint. If there were other Chase officers or employees involved in this transaction, the complaint fails to identify or describe them, in violation of Rule 9(b).

As for Morelli, only two paragraphs of the complaint contain allegations which could be read as evidencing some degree of troublesome knowledge on Morelli's part. The first of these is ¶ 25. That paragraph alleges that on or about February 12 and 13 1996, before the Renner money had been transferred to Chase, Morelli and Townsend had a discussion about how Hampstead would use Renner's money, and how the account to which the Renner money would be paid could be structured. At the very most, these allegations raise the possibility of constructive knowledge on Morelli's part, namely, that Townsend might not be dealing with Renner in a wholly forthright manner, consistent with Renner's instructions and expectations. But the allegations fall well short of imparting to Morelli actual knowledge that, as soon as the Renner funds were received, they would be diverted to conspirators in Monaco, as the complaint alleges did occur.

Furthermore, although plaintiff does not characterize the allegations of ¶ 25 as having been made "upon information and belief," it is difficult to see how it could be otherwise; the paragraph purports to summarize the contents of a conversation between Morelli and Townsend. This is significant, since it is well settled that "allegations made on information and belief are insufficient unless the facts are peculiarly within the knowledge of the defendants, in which case the complaint must alleges facts demonstrating the

basis for the information and belief." *National Council of Young Israel v. Wolf,* 963 F.Supp. 276, 281 (S.D.N.Y.1997) (citations and internal quotation marks omitted). The complaint nowhere alleges the basis for plaintiff's information and belief.

**\*13** The same considerations apply to ¶ 31 of the complaint, which alleges that on or about February 20, 1996, Morelli "listened silently on the line" to a telephone conversation between two unidentified Chase officers and Townsend. The officers told Townsend, according to these allegations, that they were concerned "about the Townsend fund's proposed transactions [unspecified] with investor money [also unspecified]" and asked to see an authorization "that the money in the Townsend account could be used in that way" (there being no further description of what "that way" referred to). Again, these allegations establish nothing more than constructive knowledge of possible concerns, rather than actual knowledge of the fraud eventually perpetrated. And, since it is equally clear that plaintiff bases this allegation "upon information and belief," it is deficient in its failure to allege facts demonstrating the basis for that information and belief.

Thus it is apparent that the complaint does not sufficiently allege the second element of the claim for aiding and abetting fraud, that of actual knowledge on the part of the alleged aider and abettor.

D. *Negligence*

Plaintiff's fifth claim alleges negligence against Chase. Plaintiff alleges that by accepting Renner's funds, Chase owed a duty to Renner in connection with the funds, which Chase negligently breached by failing to protect the funds from fraudulent diversion. Complaint, ¶ 76-78.

To establish a claim for negligence under New York Law, "a plaintiff must show that the defendant owed the plaintiff a cognizable duty of care, that the defendant breached that duty, and that the plaintiff suffered damages as a proximate result of that breach." *King v. Crossland Savings Bank,* 111 F.3d 251, 259 (2d Cir.1997); *see also Stagl v. Delta Airlines, Inc.,* 52 F .3d 463, 467 (2d Cir.1995); *Solomon v. City of New York,* 66 N.Y.2d 1026, 1027 (N.Y.1985).

Plaintiff's negligence claim against Chase fails because Chase did not owe plaintiff a cognizable duty of care. Whatever duty of care banks owe to their customers, *see King,* 111 F.3d at 259, Renner was not a customer of Chase. The Chase customer involved in this case was the Townsend fund, into which Chase (acting through Morelli) paid Renner's funds when they were received through Renner's Swiss Bank.

These circumstances reduce Renner to the necessity of arguing that Chase owed him a duty to prevent Chase's customer, Townsend, from defrauding Renner. But it is well settled that a bank owes no such duty to a non-customer third-party. *See Guidry v. Bank of LaPlace,* 740 F.Supp. 1208 (E.D.La.1990) (as a matter of law, bank does not owe duty of care to non-customer defrauded by bank customer), *aff'd as modified,* 954 F.2d 278 (5 th Cir.1992); *E.F. Hutton Mortgage Corp. v. Equitable Bank, N.A.,* 678 F.Supp. 567 (D.Md.1988) (even if bank knew of or suspected customer's fraudulent scheme, it owed no duty to third-party, non-customer plaintiff and thus was not liable for negligence); *see also Century Business Credit Corp. v. North Fork Bank,* 246 A.D.2d 395, 396, 668 N.Y.S.2d 18, 19 (N.Y.App. Div. 1 st Dep't 1998) (holding that bank is not liable for negligence to customer's creditors, and stating that requiring a bank to monitor its customer's account would "unreasonably expand banks' orbit of duty."); *Stuart v. Tomasino,* 148 A.D.2d 370, 539 N.Y.S.2d 327 (N.Y.App. Div. 1 st Dep't 1989) (no duty of care owed by mortgagee bank to mortgagors in action by mortgagors against individuals who had defrauded them, resulting in default on mortgage); *Regency House, Inc. v. Citibank, N.A.,* 202 A.D.2d 655, 657, 610 N.Y.S.2d 535, 536 (N.Y.App. Div.2d Dep't 1994) (shareholders of foreclosed property failed to establish any duty owed to them by bank for negligence arising from foreclosure); *Cohen v. Standard Bank Investment Corp., Ltd.,* 1998 WL 782024, at \*7 (S.D.N.Y.1998) (no duty of care owed by bank to investor in allegedly fraudulent scheme perpetrated by bank borrower).

**\*14** The cases cited by plaintiff relate only to instances in which the bank has a fiduciary duty to the plaintiff. As a general rule, a bank has no duty to monitor even a fiduciary

Not Reported in F.Supp.2d                                                                                          Page 12
Not Reported in F.Supp.2d, 1999 WL 47239 (S.D.N.Y.), Fed. Sec. L. Rep. P 90,438, RICO Bus.Disp.Guide 9679
**(Cite as: 1999 WL 47239 (S.D.N.Y.))**

account under New York law. *See, e.g., Home Savings of America, FSB v. Amoros,* 233 A.D.2d 35, 38, 661 N.Y.S.2d 635, 637 (N.Y.App. Div. 1 st Dep't.1997) ("Ordinarily, of course, a depositary bank has no duty to monitor fiduciary accounts maintained at its branches to safeguard the funds in those accounts from fiduciary misappropriation."). However, plaintiff notes that this rule is altered where "there are facts ... indicating misappropriation." *In re Knox,* 64 N.Y.2d 434, 438 (N.Y.1985). Plaintiff asserts that because Chase had knowledge of Hampstead and Townsend before the Renner funds were deposited, it was negligent in its failure to question their motives and practices in connection with the Renner deposit.

In order for a bank to be liable for the diversion of fiduciary funds, plaintiff must show that the bank either itself benefitted from the transaction or that it had notice or knowledge that a diversion was intended or was in progress. *Knox,* 64 N.Y.2d 438; *see also Diller v. Schick,* 1998 WL 635539, at *2 (S.D.N.Y.1998) (citing *Home Savings of America,* 661 N.Y.S.2d at 637). The test is that "[f]acts sufficient to cause a reasonably prudent person to suspect that trust funds are being misappropriated will trigger a duty of inquiry on the part of a depositary bank, and a bank's failure to conduct a reasonable inquiry when the obligation to do so arises will result in the bank being charged with such knowledge as inquiry would have disclosed." *Home Savings of America,* N.Y.S.2d at 637 (internal citations omitted).

In the case at bar, these principles avail plaintiff nothing. First, the Townsend Fund account with Chase was not a *fiduciary* account; accordingly, there is no reason to depart from the general rule that a bank cannot be held accountable for the ways in which its customers manage their accounts. Further, even if one assumes a fiduciary relationship, plaintiff has not pleaded facts sufficient to establish negligence. In those instances in which the New York courts have found that a bank has received adequate notice of a fraud, either the bank has accepted money from a fiduciary account in order to satisfy the fiduciary's personal debt to the bank, *see Bischoff v. Yorkville Bank,* 218 N.Y. 106, 112 N.E. 759 (N.Y.1916); *In re Knox,* 64 N.Y.2d 434, or there is a history of overdrafts in the fiduciary account. *Home*

*Savings of America,* N.Y.S.2d at 637. Here, there is no allegation that any payment was made to Chase; nor is there any allegation that the Townsend account ever was overdrawn. Accordingly, plaintiff has not shown that Chase had notice of an impending or ongoing misappropriation.

E. *Breach of Contract and Breach of Covenant*

I will discuss plaintiff's last two claims against Chase together.

***15** Plaintiff's sixth claim alleges that in the circumstances alleged, "Chase assumed a contractual duty to make sure that Townsend/Hampstead was using the Renner money for authorized purposes." Complaint, ¶ 82.

The seventh claim alleges that plaintiff was "relying on Chase's integrity in making the investment with the belief that the funds would be safeguarded," and that by receiving Renner's funds and depositing them in the Townsend Fund account, Chase (acting through Morelli) "undertook a covenant of good faith and fair dealing inherent in every contract," which Chase broke by issuing a misleading "custody receipt confirmation" and "failing to advise Renner that the funds entrusted to Chase were being looted, or even to inquire whether Renner was aware of, and had authorized, the questionable transactions Chase detected." *Id.,* ¶¶ 86-89.

The sixth claim need not detain us. In order to form a contract under New York law, there must be an offer, acceptance, and consideration, and a showing of "a meeting of the minds, demonstrating the parties' mutual assent and mutual intent to be bound." *Oscar Productions, Inc. v. Zacharius,* 893 F.Supp. 250, 255 (S.D.N.Y.1995). The complaint at bar contains no allegation that plaintiff and Chase entered into an express contract, either written or oral; in the latter instance, the burden on a plaintiff is heavier because "a primary concern for courts in such disputes is to avoid trapping parties in surprise contractual obligations that they never intended." *Arcadian Phosphates, Inc. v. Arcadian Corp.,* 884 F.2d 69, 72 (2d Cir.1989) (citation and internal quotation marks omitted). Nor, given the principles of banking law discussed *supra,* may a contract binding Chase to plaintiff be implied.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-04622-DLI-RML   Document 40   Filed 01/26/06   Page 28 of 70 PageID #: 861

Westlaw.

Not Reported in F.Supp.2d                                                                                 Page 13
Not Reported in F.Supp.2d, 1999 WL 47239 (S.D.N.Y.), Fed. Sec. L. Rep. P 90,438, RICO Bus.Disp.Guide 9679
(Cite as: 1999 WL 47239 (S.D.N.Y.))

The most that can be said for plaintiff's seventh claim against Chase is that it is an inartful effort to plead a claim for "commercial bad faith." This is a cause of action against banks, sounding more in tort than in contract, that New York law recognizes in certain special circumstances. *See Prudential-Bache Securities, Inc. v. Citibank, N.A., 73 N.Y.2d 263, 275-77, 536 N.E .2d 1118 (N.Y.1989); Peck v. Chase Manhattan Bank, N.A., 190 A.D .2d 547, 593 N.Y.S.2d 509 (N.Y.App.Div. 1st Dept.1993).* The plaintiff need not be a customer of the defendant bank, nor related to the bank by contract. Plaintiff need only be a foreseeable victim of a fraudulent scheme executed by lower echelon bank employees; bank liability attaches if "managerial employees of the bank knew of and thus participated in the scheme." *Prudential-Bache, 73 N .Y.2d at 277.* In that regard, allegations charging managerial employees with "merely a lapse of wary vigilance" or "even suspicious circumstances which might well have induced a prudent banker to investigate" are insufficient, *id. at 276.* Individuals more exalted in the bank hierarchy than a branch assistant manager (the fraudsman in *Prudential-Bache, see 73 N.Y.2d at 267,* and the analogue to Morelli in the case at bar) [FN12] must have had actual knowledge of the particular scheme and, by their silence and inaction, participated in it.

> FN12. This parenthetical observation assumes without deciding that Morelli was a knowing participant in the fraud plaintiff charges, a circumstance which, as discussed *supra,* plaintiff has not adequately alleged.

*16 There are no allegations sufficient to make that showing in the complaint at bar; it may be contrasted in that regard with the allegations in *Prudential-Bache,* summarized at 73 N.Y.2d 276-77.

It follows that plaintiff's sixth and seventh claims against Chase must also be dismissed.

All the claims against Chase being deficient for the reasons stated, the Clerk of the Court is directed to dismiss the complaint as against defendant Chase Manhattan Bank in its entirety.

Since the Court's decision as to certain claims depends in part upon the inadequacies of the pleading, plaintiff is given leave, if he is so advised and in a position to do so consistent with Rule 11, Fed.R.Civ.P., to file and serve an amended complaint as to the first, second, and fourth claims against Chase, within forty-five (45) days of the date of this Opinion and Order. Leave to amend is denied as to plaintiff's other claims against Chase.

Counsel for all parties are directed to attend a status conference in Room 17C, 500 Pearl Street, at 2:00 p.m. on April 9, 1999.

It is SO ORDERED.

Not Reported in F.Supp.2d, 1999 WL 47239 (S.D.N.Y.), Fed. Sec. L. Rep. P 90,438, RICO Bus.Disp.Guide 9679

**Motions, Pleadings and Filings (Back to top)**

• 2001 WL 34727738 (Trial Pleading) Defendants Townsend Financial Services Corp., Townsend Investment Fund, LLC, Townsend Financial Group, Ltd and Gerald Townsend's Response to Plaintiff's Omnibus Discovery Report (2001)

• 2000 WL 34474989 (Trial Pleading) Defendants Townsend Financial Services Corp., Townsend Investment Fund, LLC, and Gerald Townsend Answer to Plaintiff's Amended Complaint (Jul. 05, 2000)

• 1999 WL 33919733 (Trial Pleading) Amended Complaint (Apr. 16, 1999)

• 1998 WL 34311486 (Trial Pleading) Answer and Affirmative Defenses of Defendants Townsend Financial Services Corp., Townsend Investment Fund, LLC, and Gerald Townsend (Apr. 20, 1998)

• 1998 WL 34311485 (Trial Pleading) Complaint (Feb. 09, 1998)

• 2:98cv00926 (Docket) (Feb. 09, 1998)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 1
Not Reported in F.Supp.2d, 2000 WL 781081 (S.D.N.Y.)
**(Cite as: 2000 WL 781081 (S.D.N.Y.))**

▷

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Klaus RENNER, Plaintiff
v.
CHASE MANHATTAN BANK, Michelino Morelli,
Townsend Financial Services Corp.,
Townsend Investment Fund, LLC, Gerald Townsend, and
Rabon Wolford, Defendants.
**No. 98 CIV. 926(CSH).**

June 16, 2000.

MEMORANDUM OPINION AND ORDER
HAIGHT, Senior District J.

**\*1** Plaintiff brought this diversity action after allegedly being defrauded out of $3 million, a "prime bank guarantee scam" engineered by Defendants. After the original complaint was dismissed in its entirety against Defendant Chase Manhattan Bank ("Chase"), Plaintiff filed an amended complaint, in which he asserted common law claims for fraud, commercial bad faith, breach of contract, breach of the covenant of good faith, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and negligence. Defendants Chase and Michelino Morelli, and Defendants Townsend Financial Services Corp., Townsend Investment Fund, LLC, and Gerald Townsend (collectively "Townsend") now move to dismiss the amended complaint pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a cause of action upon which relief can be granted, and pursuant to Fed.R.Civ.P. 9(b) for failure to plead fraud with particularity.

I. BACKGROUND
The facts of this case are set out at length in my prior opinion. *See Renner v. Chase Manhattan Bank,* 1999 WL 47239 (S.D.N.Y.1999) ("*Renner I* "). However, as resolution of the present motions are dependent largely on the pleadings, and since those pleadings have been amended, I revisit the facts of the case and summarize them below.

Plaintiff alleges the following facts in his amended complaint:

"Renner was swindled out of $3 million by an organized band of international confidence men affiliated with a claimed charitable organization known as the 'Knights of Malta OSJ'....The scheme that defrauded Renner was a variation on a 'prime bank guarantee' scam, under which victims are promised enormous returns based upon low-risk 'trading' of non-existent financial instruments, such as bank debentures, letters of credit or other 'instruments' supposedly issued by leading world banks on a highly secretive basis." (Amended Complaint, ¶¶ 1, 2).

In or about December 1994, Dr. Gustav Susse, not a party to this action, opened an account at Chase through Morelli, manager of Chase's Mount Vernon branch, on behalf of Hampstead Trust Ltd. ("Hampstead"), an entity he controlled with Defendant Rabon Wolford. Morelli, Susse and Wolford were all members of the Knights of Malta, a sham charitable organization, which they used as a vehicle for fraudulent transactions. The Hampstead account was closed in early 1995 because of irregularities, specifically related to fraudulent Taiwanese letters of credit against which Hampstead sought to establish a line of credit. Nevertheless, Susse continued to transact business at Chase through other entities, including the Knights of Malta, Prime Trade Investment Ltd. ("PTI"), and Defendant Townsend Financial Services Corp. ("Townsend Financial"), all of which opened Chase accounts through Morelli.

In or about August 1995, Townsend entered into an "Asset Management Contract" with Hampstead pursuant to which Townsend would handle Hampstead's financial transactions in exchange for a 0.5% commission per transaction, a $50,000 annual retainer and a loan of capital. Although Townsend questioned Hampstead's "trading mechanism," and suspected possible fraud, he disregarded those suspicions and went forward with the agreement.

**\*2** In or about November 1995, Hampstead obtained $5 million from Gulf Capital Resources to fund a nonexistent letter of credit. Approximately half of the money was moved through Townsend's Chase account and diverted to Townsend, Hampstead, the Knights of Malta and Susse's

Westlaw.

Not Reported in F.Supp.2d                                                                          Page 2
Not Reported in F.Supp.2d, 2000 WL 781081 (S.D.N.Y.)
**(Cite as: 2000 WL 781081 (S.D.N.Y.))**

brother. The money diverted to the Knights of Malta was subsequently withdrawn at casino ATMs and by checks made out to "cash." During the same time period, Chase could not verify and, thus, refused to hold on behalf of Hampstead treasury bonds supposedly issued by the Republic of Central Africa.

In February 1996, Plaintiff, who had invented a snow-removing machine, was seeking capital to manufacture and sell the invention. After Plaintiff was introduced to Hampstead, Susse explained to Plaintiff that Hampstead engaged in "transactions in 'medium term bank debentures' from the 'top 25 West-European issuing banks," ' (Amended Complaint, ¶ 30), and promised a 120% annual return on Renner's investments. In order to legitimate the scheme, Susse further explained that the transactions were completed through Townsend, Hampstead's U.S. securities house; that the funds invested would be placed in a sub-account at Chase; and when withdrawn, the funds would be secured by a bank note or treasury bill of higher value. Susse told Renner that Morelli and Hampstead had a history of working together on such transactions, and that Hampstead invested money in a similar fashion for the Knights of Malta, which was involved in humanitarian projects funded by the Vatican.

Induced by Susse's blandishments, Renner signed a "Management Agreement" (hereinafter the "Renner-Hampstead Agreement") pursuant to which he agreed to invest $3 million with Hampstead. The funds were to be transferred to the Townsend Investment Funds, LLC ("Townsend Fund") account at Chase, which would issue a custody receipt confirmation. Before the funds were transferred, Gerald Townsend and Morelli allegedly discussed the fact that Renner was a client of Hampstead, that Hampstead intended to use Renner's money to purchase bonds for other clients in violation of the Renner-Hampstead Agreement, and that Townsend wanted to deal directly with Morelli. In addition, they also mentioned that "Chase, Morelli and Townsend could be 'held accountable' if problems developed." (Amended Complaint, ¶ 35). Morelli was apparently uneasy about the proposed transactions. Upon Townsend's urging, a series of phone calls between Wolford, Townsend and Morelli

followed.

On or about February 13, 1996, Chase received Plaintiff's funds and issued two Wire Transfer Advices to Townsend, confirming receipt of the $3 million, that the funds were received for Renner's "benefit" and in his "favour," and that Renner was a client of Hampstead. On February 15, 1996, Morelli faxed a letter to Townsend on Chase letterhead confirming that Renner's money had been deposited in the Townsend Fund account. Townsend then faxed the Morelli confirmation to Renner with a letter entitled Custody Receipt Confirmation "which deceptively stated that the $3 million had been received in accounts designated as 'Chase 404-1-1-129638, Hampstead 240-280, and sub-account 240-280-Renner." ' (Amended Complaint, ¶ 40).

**\*3** On or about February 15, 1996 Townsend sent a letter to Chase outlining the proposed use of Plaintiff's investment to fund a letter of credit supporting a $181.5 million "performance bond" for the benefit of Apex Air/Senkale along with instructions on how to carry out the transaction. Morelli, in turn, showed the proposal to several other Chase employees. Due to questions regarding the transaction, including the possibility that it was fraudulent, Chase refused to approve the transaction. Chase also questioned Townsend's proposal to use Renner's funds to establish a letter of credit as part of a real estate transaction in Italy.

Nevertheless, when Townsend, on Susse's instruction, directed Chase to wire $718,000 from the Townsend Fund account to an account in an Italian bank, Chase complied. On February 23, 1996, Townsend instructed Morelli to wire an additional $2.7 million of Renner's funds to a Monaco bank account belonging to Gloria Russo, Susse's common law wife. The money was then used by Susse and Russo to purchase a mansion in France. On or about February 27, 1996, Townsend arranged for Morelli to wire yet another $100,000 out of the Townsend Fund account to an Arab bank account in Geneva belonging to Alexander Penly, a director of Hampstead.

On or about March 4, 1996, in response to inquiries from Renner's bank in Switzerland, Townsend confirmed that Plaintiff's money was safe and continued to be held in a sub-account at Chase. Townsend did not disclose that, in

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 3
Not Reported in F.Supp.2d, 2000 WL 781081 (S.D.N.Y.)
**(Cite as: 2000 WL 781081 (S.D.N.Y.))**

fact, most of the money had been withdrawn and diverted for purposes other than those stated in the Renner-Hampstead Agreement. On or about April 3, 1996, Townsend wired $80,000 to Renner in response to Plaintiff's queries regarding the failure of Hampstead and Townsend to meet the schedule of profit payments set out in the Renner-Hampstead Agreement.

Supposedly after a Swiss customer registered a complaint with Chase against Townsend and Hampstead, on or about April 9, 1996, Morelli informed Townsend by letter that after having " 'carefully reviewed your banking transactions' and concluding that 'the pattern of your account activity is not consistent with our knowledge of your business or personal affairs as noted on your account documentation," ' Chase was closing the Townsend Financial and Townsend Fund accounts. (Amended Complaint, ¶ 63). The remaining balance was to be delivered to Townsend by official check, and no further wire transfers, in or out of the account, would be accepted. Chase also closed the accounts of PTI, the attorney for Hampstead and PTI, and the Knights of Malta.

Unaware that his funds had been diverted, and upon Susse's request, Renner wrote to Morelli assuring him that he had not complained and that he expected that Hampstead would honor their agreement. He also invited Chase to contact him with any questions. Susse led Plaintiff to believe that such a letter would help resolve any legal problems.

On April 16, 1996, Susse told Renner that Chase had closed the Townsend Fund account, but that the money would be relocated to Banker's Trust. Soon thereafter, Susse advised Renner that the SEC had frozen Townsend's funds, but that this would not affect Plaintiff's investment program.

**\*4** On or about April 24, 1996, Townsend was informed that the SEC was investigating Hampstead and Townsend for prime bank fraud. Although Townsend was concerned by the investigation and seriously questioned the Hampstead-related transactions, Susse convinced Townsend to continue to work for Hampstead.

On or about May 21, 1996, in response to continued inquiries by Renner's representative, Townsend stated that the funds were being used for a performance bond relating

to a letter of credit from Dubai Bank, and had been wired to Monaco per Susse's direction. On June 27, 1996, Renner wrote to Susse and copied Morelli, demanding the return of his money. A representative of Renner also contacted Morelli directly, but Morelli disavowed all knowledge about Townsend, Hampstead, Susse and the Renner investment. Morelli again refused to provide information upon further inquiry in August 1996.

On February 9, 1998, Renner commenced the instant action. In *Renner I,* I granted Defendant Chase's motion to dismiss the complaint with leave to amend. Thereafter Plaintiff filed the present amended complaint. Plaintiff asserts eight claims for relief:

Claim 1 (against all defendants): common law fraud.

Claim 2 (against Chase only): commercial bad faith.

Claim 3 (against the Townsend Defendants): breach of contract.

Claim 4 (against the Townsend Defendants): breach of the covenant of good faith.

Claim 5 (against the Townsend Defendants): breach of fiduciary duty.

Claim 6 (against Chase only): aiding and abetting breach of fiduciary duty.

Claim 7 (against the Townsend Defendants): negligence.

Claim 8 (against the Townsend Defendants): commercial bad faith.

The various Defendants, with the exception of Wolford, who has not appeared in the action, now move to dismiss the amended complaint in its entirety. I will examine each claim in turn.

## II. STANDARD OF REVIEW

On a motion to dismiss under Rule 12(b)(6), the trial court's function "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Geisler v. Petrocelli, 616 F.2d 636, 639 (2nd Cir.1980); see Ricciuti v. N.Y.C. Transit Authority,* 941 F.2d 119, 124 (2nd Cir.1991). "[T]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974). The district court should grant a Rule 12(b)(6) motion "only if it is clear that no relief could be granted under any set of

Not Reported in F.Supp.2d                                                                    Page 4
Not Reported in F.Supp.2d, 2000 WL 781081 (S.D.N.Y.)
**(Cite as: 2000 WL 781081 (S.D.N.Y.))**

facts that could be proved consistent with the allegations." *Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984) (*citing Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)).

Consideration of a motion to dismiss a complaint ordinarily focuses on the allegations contained on the face of the complaint. *See Cortec Industries, Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2nd Cir.1991), *cert. denied,* 112 S.Ct. 1561 (1992); *Kramer v.. Time Warner Inc.,* 937 F.2d 767, 773 (2nd Cir.1991). On a motion to dismiss, a district court must accept plaintiff's well-pleaded factual allegations as true, *Papasan v. Allain,* 478 U.S. 265, 283 (1986), and the allegations must be "construed favorably to the plaintiff." *LaBounty v. Adler,* 933 F.2d 121, 123 (2nd Cir.1991). "[A] Rule 12(b)(6) motion to dismiss need not be granted nor denied in toto but may be granted as to part of a complaint and denied as to the remainder." *Decker v. Massey-Ferguson, Ltd.,* 681 F.2d 111, 115 (2nd Cir.1982).

### III. DISCUSSION
#### A. *Claim One--Common Law Fraud*

**\*5** Fed.R.Civ.P. 9(b) provides "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." Accordingly, a complaint alleging fraud must (1) specify the statements, oral, or written, that the plaintiff contends were fraudulent, either as misrepresentations or containing fraudulent omissions; (2) identify the speaker or the writer; (3) state where, when and to whom the statements were made; and (4) explain why the statements were fraudulent. *Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 51 (2nd Cir.1995). In cases with multiple defendants, Rule 9(b) requires that the complaint allege facts specifying each defendant's contribution to the fraud. Although the rule does not require a plaintiff to allege scienter with great specificity, it does require the plaintiff to plead a factual basis which gives rise to a strong inference of fraudulent intent. *Wexner v. First Manhattan Co.,* 902 F.2d 169, 172 (2nd Cir.1990). "The requisite 'strong inference' of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or

recklessness." *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2nd Cir.1994).

"Under New York law, the elements of common law fraud are "a material, false representation, an intent to defraud thereby, and reasonable reliance on the representation, causing damage to the plaintiff." *Chanayil v. Gulati,* 169 F.3d 168, 171 (2nd Cir.1999) (quoting *Katara v. D.E. Jones Commodities, Inc.,* 835 F.2d 966, 970-71 (2nd Cir.1987)). As to Defendants Chase, Morelli and Wolford, Plaintiff alleges only that they aided and abetted the perpetrators of the fraud, namely the Townsend defendants, and Susse and Penly (neither of whom are parties to this action). "The general requirements for establishing aiding and abetting liability are well settled in this Circuit. Plaintiffs must prove (1) a...violation by a primary wrongdoer, (2) knowledge of the violation by the person sought to be charged, and (3) proof that the person sought to be charged substantially assisted in the primary wrongdoing." *Armstrong v. McAlpin,* 699 F.2d 79, 91 (2nd Cir.1983). Rule 9(b)'s requisite pleading with particularity applies equally to claims for fraud and aiding and abetting fraud. *See Williams v. Bank Leumi Trust Company,* 1997 WL 289865 at 5 (S.D.N.Y.1997); *ABF Capital Management v. Askin Capital Management, L.P.,* 957 F.Supp. 1308, 1328 (S.D.N.Y.1997).

#### 1. *Defendant Michael Morelli*

Plaintiff claims that Morelli aided and abetted Susse, Penly and Townsend in their scheme to defraud Renner out of $3 million.

Before assessing the sufficiency of the pleadings with respect to the requisite elements of an aiding and abetting claim, I must first address Morelli's argument that most of the allegations against him are made upon information and belief. Morelli correctly points out that "[a]llegations of fraud cannot ordinarily be based upon information and belief, except as to matters peculiarly within the opposing party's knowledge." *Campaniello Imports, Ltd. v. Saporiti Italia S.p.A.,* 117 F.3d 655, 664 (2nd Cir.1997) (internal quotations and citations omitted). However, Morelli suggests that numerous allegations, although not explicitly labeled as having been made on information and belief, are, in fact, pleaded in just such a manner. Morelli fastens upon

Not Reported in F.Supp.2d                                                                                     Page 5
Not Reported in F.Supp.2d, 2000 WL 781081 (S.D.N.Y.)
(Cite as: 2000 WL 781081 (S.D.N.Y.))

a statement in *Renner I* that "although plaintiff does not characterize the allegations of ¶ 25 as having been made 'upon information and belief,' it is difficult to see how it could be otherwise." 1999 WL 47239 at 12. This statement was made in reference to an alleged conversation between Morelli and Townsend. Plaintiff was not present, nor did he allege any basis for the information. In the amended complaint, Renner reiterates that allegation, but asserts that the conversation is documented by a contemporaneous memorandum. (Amended Complaint, ¶ 35). Morelli similarly refers to other allegations that are now made on the basis of telephone records and contemporaneous documents.

*6 Morelli calls the Plaintiff to task for not attaching to the complaint the underlying documents that support his allegations and even questions whether the documents exist. However, as Plaintiff notes, this is a motion to dismiss and not a motion for summary judgment, and, therefore, decision is based on the pleadings and not additional affidavits, depositions and other evidence. Plaintiff need not prove his claim, but rather only show that he is entitled to present it. Morelli is correct that a court may consider documents integral to plaintiff's allegations, even if they are not attached to the pleading or incorporated by reference therein, without converting the motion into one for summary judgment. *See Cortec Industries, Inc., 949 F.2d at 47; see also, I. Meyer Pincus & Associates, P.C. v. Oppenheimer & Co., Inc.,* 936 F.2d 759, 762 (2nd Cir.1991) (quoting 5 C. Wright & A. Miller, Federal Practice & Procedure § 1327, at 762-763 and n. 6 (1990)) ("when 'plaintiff fails to introduce a pertinent document as part of his pleading, defendant may introduce the exhibit as part of his motion attacking the pleading.' "). However, the pleading is not deficient merely because the plaintiff did not include the supporting evidence for the allegations with the complaint. *See Artco, Inc. v. Kidde, Inc.,* 1989 WL 140284 at 5 (S.D.N.Y.1989) (quoting 5 C. Wright & A. Miller, Federal Practice and Procedure § 1327, at 762 and n. 5 (1990)) ("The provision for incorporation of exhibits is permissive only, and there is no requirement that the pleader attach a copy of the writing on which his action ... is based.").

Nevertheless, this does not mean that Renner's complaint as to Morelli can withstand further scrutiny. As noted, a viable claim for aiding and abetting includes three elements. Assuming for the purposes of this motion that Renner was the victim of a fraudulent scheme hatched by Susse, the amended complaint must sufficiently allege that Morelli, as aider and abettor, knew about the primary wrongdoer's fraud and substantially assisted in the primary wrongdoing. Plaintiff's pleadings are deficient on both counts. Failure to sufficiently plead either element is fatal to Renner's claim.

With respect to the knowledge element for aiding and abetting liability, "New York courts and federal courts in this district have required actual knowledge." *Kolbeck v. LIT America,* Inc., 939 F.Supp. 240, 246 (S.D.N.Y.1996); *see also, Wight v. Bankamerica Corp.,* 219F.3d79, 2000 WL 728964 at 13 (2nd Cir.2000) ("a claim for aiding and abetting fraud requires plaintiff to plead facts showing the existence of a fraud, defendant's knowledge of the fraud, and that the defendant provided substantial assistance to advance the fraud's commission.") (citations and internal quotation marks omitted); *Williams,* 1997 WL 289865 at 5. Although Renner argues that Morelli knew that Renner had wired money to the Townsend Fund account pursuant to the Renner-Hampstead Agreement, Plaintiff does not allege that Morelli had actual knowledge of the fraud. In *Renner I,* I discussed the allegations concerning Morelli's knowledge, or, more precisely, the lack thereof. 1999 WL 47239 at 12-13. Although the complaint has been amended, the allegations relevant to establishing Morelli's actual knowledge are virtually the same, and so is my conclusion. [FN1]

> FN1. The Second Circuit has very recently stated that "knowledge of the underlying wrong" is a "required element" under New York law on claims of aiding and abetting fraud, aiding and abetting breach of fiduciary duty, and commercial bad faith. *Wight,* 2000 WL 728964 at 13, a decision handed down on May 25, 2000. This holding is applicable to a number of the Plaintiff's claims discussed in text.

*7 In ¶ 35 of the amended complaint, Renner alleges that Morelli had a conversation with Townsend during which

Not Reported in F.Supp.2d                                                    Page 6
Not Reported in F.Supp.2d, 2000 WL 781081 (S.D.N.Y.)
**(Cite as: 2000 WL 781081 (S.D.N.Y.))**

they discussed that Renner was a client of Hampstead, that Hampstead intended to use the Plaintiff's funds to purchase a performance bond for another Hampstead customer, that Renner wanted confirmation by Chase of the receipt of his money in the Townsend Fund account, and the merits of using a custodial versus a commercial account. With respect to these allegations, I previously held that, "[a]t the very most, these allegations raise the possibility of constructive knowledge on Morelli's part, namely, that Townsend might not be dealing with Renner in a wholly forthright manner, consistent with Renner's instructions and expectations. But the allegations fall well short of imparting to Morelli actual knowledge that, as soon as the Renner funds were received, they would be diverted to conspirators in Monaco, as the complaint alleges did occur." *Renner I*, 1999 WL 47239 at 12. Whereas no factual basis for these allegations was asserted in the initial complaint, Plaintiff now makes these allegations on the basis of a contemporaneous memorandum prepared by Townsend. While this may cure the concern I previously expressed, namely, that if the allegations were made on information and belief they would be insufficient under the heightened pleading requirements for fraud, Plaintiff has not alleged any additional facts that suggest that Morelli had actual knowledge of the scheme to divert Renner's money.

Morelli was allegedly " 'uneasy' about the proposed use of the Renner's (sic) funds" after the discussion with Townsend. As a result, Townsend urged Susse and/or Wolford to speak with him, which Wolford apparently did. (Amended Complaint, ¶ 36). But without more, this only shows that Morelli was suspicious or had questions regarding the account. The phone calls that followed may have resolved any lingering doubts held by Morelli [FN2] or they may have substantiated Plaintiff's allegation that Morelli was party to the fraud. However, Plaintiff only speculates about the topic of the telephone discussions. I cannot assume that simply because Morelli questioned the way in which the money would be used means that he actually knew that a fraudulent scheme was in place.

> FN2. *See* Amended Complaint, ¶ 45, referring to a subsequent letter from Townsend to Chase in which he stated, among other things, that it was

> "Townsend's understanding that Wolford and Morelli had spoken since February 12 and that Wolford had 'clarified' some of Morelli's questions about the letter of credit and the use of the Renner funds."

Renner also alleges that Morelli was on the line during a conversation between Townsend and other Chase employees, who refused to approve certain questionable transactions relating to the proposed purchase of a performance bond and the establishment of documentary letters of credit for a real estate transaction. (Amended Complaint, ¶ 49). Although Renner now makes these allegations on the basis of contemporaneous documents and has provided more detail, as compared with the initial complaint, he still fails to explain how Morelli's knowledge of this conversation amounts to any more than knowledge that these particular transactions were rejected. Similarly, Morelli's knowledge that a portion of the funds transferred were wired to the account of Susse's common law wife, (Amended Complaint, ¶¶ 52, 55), is not equivalent to actual knowledge of fraud.

**\*8** The amended complaint also includes allegations regarding Morelli's handling of Hampstead accounts that were closed due to irregularities. (Amended Complaint, ¶¶ 16-18). However, the allegations concerning the nature of the "irregularities" and Morelli's involvement are made on information and belief. Moreover, these older accounts and transactions did not involve Plaintiff or the Townsend Defendants; they do not constitute actual knowledge of a fraud perpetrated years later merely because Hampstead was involved. At most, Renner is entitled to the inference that Morelli should have known that there was the possibility of fraud. But what Morelli should have known is irrelevant. The law is only interested in what he actually knew, and Plaintiff has failed to demonstrate that the amended complaint adequately alleges that Morelli knew about the fraudulent scheme.

Plaintiff's amended complaint is deficient as to allegations of substantial assistance as well. Morelli played no part in inducing Renner to invest his money with Hampstead. [FN3] However, Plaintiff argues that Morelli facilitated the fraud once the money was wired to the Townsend Fund

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                                    Page 7
Not Reported in F.Supp.2d, 2000 WL 781081 (S.D.N.Y.)
**(Cite as: 2000 WL 781081 (S.D.N.Y.))**

account at Chase. Specifically, Renner alleges that Morelli sent a letter to Townsend on February 15, 1996 confirming receipt of Plaintiff's funds. (Morelli Notice of Motion, Exh. D.). Apparently, Townsend then forwarded this letter, along with a "Certificate of Custody & Receipt of Funds," prepared by Townsend, to Renner. (Morelli Notice of Motion, Exh. I.). Even according to the facts alleged in the amended complaint, the information recited in the Morelli letter regarding the funds was accurate at that time. Nevertheless, Renner concludes that "[u]pon information and belief, the sole purpose of the Morelli letter reciting the source of the funds was so that it could be provided to Renner, together with the Townsend 'Custody Receipt Confirmation', to convey the false impression that the representations made to Renner by Hampstead regarding the custody of funds at Chase were accurate. At the same time as Morelli was assisting Hampstead's fraud, he hoped to avoid personal liability by issuing a substitute for the 'Custody Receipt Confirmation' he knew was set forth in the Hampstead-Renner Management Agreement." (Amended Complaint, ¶ 41).

> FN3. Plaintiff does allege that Susse and Penly emphasized their ongoing working relationship with Morelli as part of their pitch to convince Renner to invest. (Amended Complaint, ¶¶ 31-32). However, there are no allegations that Morelli approved, let alone was aware of, the making of such representations.

Not only is this allegation made solely on information and belief, but it is entirely conclusory. Following factual statements, such as the fact that Morelli sent the letter to Townsend, by an unsupported conclusion, such as Plaintiff's speculation that "the sole purpose of the Morelli letter" was to assist in the fraud, is not the proper method of pleading under Rule 9(b). *See* Shields, 25 F.3d at 1129. Furthermore, it was Townsend who forwarded the letter to Renner. Plaintiff does not allege that Morelli knew or approved of Townsend's decision to do so. Lastly the letter does not promise, guarantee, or otherwise imply that the money would remain in the Townsend Fund account, but rather only that the initial investment had been received.

**\*9** The next step Morelli took with respect to the Townsend

Fund account was to pass on Townsend's proposal to fund a letter of credit supporting a performance bond for the benefit of Apex Air/Senkale to Charles Jagielski, another Chase employee. Jagielski then showed it to Jo Morrision, who specialized in letters of credit, who, in turn, discussed it with Jim Cahill. Confused by the proposal, Chase sought clarification from Townsend. However, unsatisfied with his response, Chase rejected the proposal. "One provides substantial assistance if he affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enable it [the fraud] to proceed." Kolbeck, 939 F.Supp. at 247 (internal quotations and citation omitted). Far from concealing or assisting in the fraud, in this instance, Morelli sought approval of Townsend's proposal from other Chase employees more familiar with letter of credit transactions. There are no allegations in the amended complaint that Morelli even advocated the proposal or that he attempted to persuade Chase to reconsider its decision to reject the transaction. The same can be said with respect to the proposed real estate transaction which also would have involved a letter of credit.

Although Morelli did follow Townsend's instructions with respect to the subsequent transfers of money out of the Townsend Fund account, there is no allegation that Morelli intended to divert Renner's funds for unauthorized purposes. Perhaps Morelli should have investigated the purpose of the transfers, especially in light of Townsend's rejected proposals for the use of the funds which immediately preceded the transfers. However, "inaction, or a failure to investigate, constitutes actionable participation only when a defendant owes a fiduciary duty directly to the plaintiff; that the primary violator owes a fiduciary duty to the plaintiff is not enough." *Id.* The amended complaint does not include any allegation that Morelli had a duty to Plaintiff.

For this same reason, Morelli cannot be held accountable for his failure to respond to Renner's letters and inquiries regarding Hampstead, Townsend and Susse. In addition, "a bank should keep its own customers' affairs confidential." Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, Nat. Ass'n, 731 F.2d 112, 123 (2nd Cir.1984); *see also* Graney Development Corp. v. Taksen, 400 N.Y.S.2d 717, 719 (N.Y.Sup.Ct.1978), *aff'd,* 411 N.Y.S.2d 756

Not Reported in F.Supp.2d                                                                                           Page 8
Not Reported in F.Supp.2d, 2000 WL 781081 (S.D.N.Y.)
**(Cite as: 2000 WL 781081 (S.D.N.Y.))**

(N.Y.App.Div.1978) ("It is implicit in the contract of the bank with its customer or depositor that no information may be disclosed by the bank or its employees concerning the customer's or depositor's account.") (internal quotations and citations omitted); 9 N.Y. Jur.2d Banks and Financial Institutions § 195 (1999). [FN4] To state a claim for fraud based on non-disclosure, "there must be a showing that a duty of disclosure existed." *Aaron Ferer, 731 F.2d at 123.* Renner has not made the requisite showing. [FN5]

> FN4. Renner points out that Morelli spoke with Wolford about the account in breach of the confidentiality it now uses as a defense. However, Morelli spoke to Wolford only upon Townsend's, the customer's, request. Thus the communication was sanctioned by the customer. Moreover, even had Chase breached its duty not to disclose information without the consent of the customer to someone other than Renner, it would hardly entitle Renner to such information or authorize Chase to commit the breach again.

> FN5. Plaintiff argues that a duty of disclosure may arise "where: (1) one party has superior knowledge of certain information; (2) that information is not readily available to the other party; and (3) the first party knows that the second party is acting on the basis of mistaken knowledge." *Banque Arabe et Internationale D'Investissement v. Maryland National Bank, 57 F.3d 146, 155 (2nd Cir.1995).* This duty has been found only in the context of negotiations between parties to a business transaction. *See id.; see also, Aaron Ferer, 731 F.2d at 123; Ray Larsen Associates, Inc. v. Nikko America, Inc., 1996 WL 442799 at 5 (S.D.N.Y.1996).* Renner was not conducting business or negotiating a contract with Morelli or Chase, and, therefore, I question whether this basis for a duty of disclosure would even apply in this case. *See Williams v. Bank Leumi Trust Company of New York, 1998 WL 397887 at 8 (S.D.N.Y.1998)* However, even if it did, Plaintiff has not adequately alleged facts demonstrating that Morelli or other Chase employees knew that

Renner was acting or relying on erroneous information.

**\*10** Rule 9(b) also requires that the pleadings give rise to a strong inference of fraudulent intent. With respect to Morelli, this element is completely lacking. As noted, scienter may be inferred from motive or recklessness on the part of the defendant. "Motive would entail concrete benefits that could be realized" as a result of the fraud. *Shields, 25 F.3d at 1130.* However, "Plaintiff acknowledges "that he cannot now prove that Morelli received money or other benefits from his participation." (Plaintiff's Memorandum in Opposition, p. 43, n. 11). This concession explains the absence from the amended complaint of allegations of motive. In his brief, Renner speculates that "[p]lausible motives would include his [Morelli's] interest in helping the Knights of Malta or his long-time friend, Wolford, or his desire to induce the huge transactions Hampstead had always promised to deliver to the Mount Vernon Branch." *Id.* These suggested motives for participation in the fraud are mere conjectures and do not appear in the complaint, but rather only in Plaintiff's brief. That aside, such allegations do not give rise to the requisite inference of fraud.

The mere fact that Morelli was manager of the Mount Vernon Branch, and would likely seek to attract business is not enough. A "plaintiff must do more than merely charge that executives aim to prolong the benefits of the positions they hold," whether it be compensation or prestige. *Shields, 25 F.3d at 1130- 1131; see also, Laro, Inc. v. Chase Manhattan Bank, 866 F.Supp. 132 (S.D.N.Y.1994)* (refusing to draw inference of fraud based on bank's alleged attempt "to cultivate favorable banking relationship" with customer). In addition, the fact alone that Morelli allegedly had an ongoing relationship with the perpetrators of the fraud does not translate into motive. Plaintiff must, but has not, allege that Morelli stood to gain something from his participation in the fraud.

Renner also claims that Morelli was reckless in the manner in which he handled the Townsend Fund account. The Second Circuit has held that a plaintiff faces a "significant burden...in stating a fraud claim based on recklessness." *Chill v. General Electric Company, 101 F.3d 263, 270 (2nd*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-04622-DLI-RML   Document 40   Filed 01/26/06   Page 37 of 70 PageID #: 870

Westlaw.

Not Reported in F.Supp.2d                                                     Page 9
Not Reported in F.Supp.2d, 2000 WL 781081 (S.D.N.Y.)
(Cite as: 2000 WL 781081 (S.D.N.Y.))

Cir.1996). "[R]eckless conduct is, at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care." *Id.* at 269 (internal quotations and citations omitted). The facts alleged in the amended complaint fall short of this demanding standard.

When Townsend proposed the letter of credit transactions, Morelli passed the information onto other Chase employees for further review. As a result, those transactions were rejected.

In April 1996, Plaintiff sent a letter to Morelli stating that Renner had not complained to Chase regarding Hampstead, and that he was "happy with Hampstead Trusts and with Dr. Susse's help." (Morelli Notice of Motion, Exh. G). The letter from Renner followed immediately after the Townsend Fund account was closed. Renner alleges that he was unaware of the closing of the account at that time, or the fact that his funds had been transferred. Consequently, he reasons, Morelli participated in a coverup by not responding to Renner's letter.

*11 However, there is nothing in Plaintiff's letter that would alert Morelli to the fact that Renner had been misled. On the contrary, the fact that Renner wrote such a letter indicates that he knew there had been complaints about Hampstead. Nevertheless, in light of that knowledge, he assured Morelli that he was satisfied with Hampstead and Susse. Although Renner was informed that the accounts were closed shortly thereafter, he did not contact Morelli or Chase, until late June 1996, indicating any change in position or dissatisfaction with Hampstead and Townsend. Even when drawing all inferences in Renner's favor, under such circumstances, Morelli's failure to respond to Plaintiff's letter does not constitute conscious misbehavior suggesting participation in the fraud.

Morelli did allow the transfers of the funds to be processed. Perhaps his failure to investigate the purpose of the transfers in light of the recently rejected transactions constituted poor judgment. However, it was not until approximately a month after the transfers were made that alleged improprieties on the part of Hampstead and Townsend were reported to Chase. Moreover, Renner unfairly equates the rejected

transactions, which involved establishing letters of credit in the amounts of $181.5 million and $10 million, with direct transfers of funds totaling some $3.5 million. Even if Morelli should have been more curious, alert, skeptical or concerned, his conduct in honoring a transfer request on the part of Townsend, who was responsible for facilitating transactions for Hampstead customers, does not rise to a level of recklessness that would support an inference of fraudulent intent. *See Chill,* 101 F.3d at 270; *see also Shields,* 25 F.3d at 1129.

For the reasons stated above, Plaintiff has failed to adequately plead fraud with respect to Defendant Morelli. As that is the only claim asserted against Morelli, the amended complaint is dismissed as to him. I will not grant Plaintiff leave to file a further amended pleading.

### 2. *Defendant Chase Manhattan Bank*

As with Morelli, Plaintiff alleges that Chase aided and abetted in the fraud. Since, according to the amended complaint, Chase acted primarily through Morelli, the aiding and abetting claim against Chase stands or falls, in large part, with the claim against Morelli. Having dismissed the aiding and abetting claim against Morelli, I must also dismiss a derivative claim against Chase. However, some comment is required.

Renner and Chase dispute whether Chase can be held vicariously liable for any wrongdoing on the part of its employee, Morelli. Chase cites several cases for the proposition that an employer will not be held vicariously liable for the fraudulent acts of its employee in circumstances analogous to the case at bar. *See, e.g. Schmidt v. Fleet Bank,* 1998 WL 47827 (S.D.N.Y.1998); *Qatar National Navigation & Transportation Co., Ltd. v. Citibank, N.A.,* 1992 WL 276565 (S.D.N.Y.1992). However, Plaintiff correctly points out that although the cases cited by Chase revolve around fraud claims, they all arise specifically in the context of RICO actions. In *Qatar* this Court explained that "[d]ecisions in this district generally hold that corporations may not be held vicariously liable for the actions of their employees in violation of the RICO statute....Essentially, vicarious liability has been held to be at odds with Congressional intent in enacting RICO since the statute was designed to protect corporations from criminal infiltration

Not Reported in F.Supp.2d                                                                  Page 10
Not Reported in F.Supp.2d, 2000 WL 781081 (S.D.N.Y.)
**(Cite as: 2000 WL 781081 (S.D.N.Y.))**

rather than hold them liable." *Qatar, 1992 WL 276565 at 7* (citations omitted). There is nothing in the Court's reasoning in *Qatar* to suggest that its holding extends beyond RICO actions or that it should be treated as anything but a narrow exception to the general principle of respondeat superior.

**\*12** This Court has stated in the context of a common law fraud claim that "[u]nder the law of agency, a principal is liable to third parties for the acts of an agent operating within the scope of his real or apparent authority." *Cosmos Import & Export Ltd. v. Merrill Lynch,* 1997 328068 (S.D.N.Y.1997) (collecting cases); *see also, Prudential-Bache Securities, Inc. v. Citibank, N.A., 73 N.Y.2d 263 (N.Y.1989);* 9 N.Y. Jur.2d Banks and Financial Institutions § 165 (1999) ("the general rule is that a bank is liable for the fraudulent acts or representations of an officer or employee acting within the course and apparent scope of his employment or authority"). Although the initial complaint contained claims brought under RICO, those causes of action have been dismissed. *See Renner, 1999 WL 47239.* Accordingly, the cases cited by Chase are inapplicable. Nonetheless, although vicarious liability is not precluded, given Plaintiff's repeated failure to plead fraud on the part of Morelli with particularity, there is no basis to impose vicarious liability upon Chase.

However, this does not completely dispose of the fraud claim against Chase. Plaintiff makes several allegations against Chase that extend beyond Morelli's role. But as with Morelli, Chase had at most a constructive knowledge of the fraud, and no more. Renner makes much of the fact that there had been alerts issued by regulatory officials, including the Securities and Exchange Commission and the Federal Reserve, warning banks about schemes like the one which defrauded Plaintiff. On the basis of such warnings, Plaintiff assumes that Chase "knew that the scheme was afoot when it received...a copy of" the Renner-Hampstead Agreement. (Amended Complaint, ¶ 3, 38). However, Renner provides no factual basis for his conclusion. Perhaps Chase should have been on notice, but constructive knowledge will not satisfy the demanding pleading requirement of Rule 9(b).

Plaintiff also argues that other Chase officials, including Charles Jagielski and Jo Morrison, knew about the fraud

when they rejected Townsend's proposals involving letters of credit. Although they rejected the transactions on the basis that they were potential vehicles for fraud, there is no factual basis for the assertion that Chase officials actually knew that the fraud was, in fact, occurring.

Even if actual knowledge could be attributed to Chase, it did not substantially assist in the fraud. "The mere fact that all the participants in the alleged scheme used accounts at [Chase] to perpetrate it, without more, does not rise to the level of substantial assistance necessary to state a claim for aiding and abetting liability." *Williams, 1997 WL 289865 at 5.* Plaintiff claims that Chase "did not take any of the steps a prudent banker would take when confronted with questionable activity, e.g., freezing the Renner funds, reporting this suspicious activity to law enforcement authorities, obtaining authorization from Renner or relieving Morelli of responsibility." (Plaintiff Memorandum of Law, p. 18). This conclusory allegation is not supported by any allegation that other Chase officials had any reason to believe Morelli was engaged in questionable conduct. Nor was there a duty on the part of Chase to obtain authorization from Renner, a non-customer, before approving transactions for the Townsend Fund account. Moreover, as stated previously, absent a fiduciary duty, inaction does not constitute substantial assistance. *See Kolbeck, 939 F.Supp. at 247.* Further investigation was prompted once Chase received a complaint against Townsend and Hampstead alleging numerous improprieties. Promptly thereafter Chase closed the Townsend Fund account. Although Chase might be faulted for not acting more quickly, its actions do not amount in law to active participation or assistance in perpetrating the fraud.

**\*13** Plaintiff purports to find a duty on the part of Chase to Renner by characterizing the deposit on his behalf as a "special deposit." As explained by the Court of Appeals in *Peoples Westchester Savings Bank v. F.D.I.C., 961 F.2d 327, 330 (2nd Cir.1992),* "[a]ll deposits made with bankers may be divided into two classes, namely those in which the bank becomes a bailee of the depositor, the title of the thing deposited remaining with the latter; and that other kind of deposit of money peculiar to the banking business, in which the depositor, for his own convenience, parts with the title to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 11
Not Reported in F.Supp.2d, 2000 WL 781081 (S.D.N.Y.)
**(Cite as: 2000 WL 781081 (S.D.N.Y.))**

his money, and loans it to the banker." (internal quotations and citations omitted). In the parlance of banking, deposits in the former class are characterized as "special," and those in the latter class as "general." Plaintiff claims Chase knew the funds deposited by Townsend belonged to Renner and were intended to be used for his benefit. However, "a deposit made in the ordinary course of business is presumed to be general, and the burden of proof is on the depositor to overcome such presumption." *Id.* (internal quotations and citations omitted).

In *Peoples,* a lawyer deposited funds on behalf of a client. Although the bank was aware that the funds belonged to a third party, this knowledge alone was not sufficient to create a special deposit. The Court of Appeals stated, "absent clear evidence of intent to create a special deposit, or an explicit agreement between an attorney and a bank to segregate funds, the same relation of trust exists between the attorney and the bank as between the bank and any other general depositor; the relation of trust between the attorney and his client does not pass to or charge the bank as trustee of the client in respect to the money deposited." Id. at 331 (internal citations and quotations omitted). "[T]he lawyer, not the bank, is charged with a fiduciary duty to the client. Indeed, the bank has no greater obligation under the statute than to follow the instructions of the legal signatory--the lawyer." *Id.* at 332. In the case at bar, Townsend is the analogue of the lawyer and Renner that of the client. Although Townsend may have had a special duty with respect to Renner's funds, *see* discussion *infra* Part III.E., that duty did not pass to Chase. Plaintiff has failed to allege any facts that would support an intention on Chase's behalf to create a special deposit or to assume some duty to monitor the funds on behalf of Renner.

As with Morelli, Plaintiff has failed to allege any facts that would give rise to a strong inference of fraudulent intent on the part of Chase. Renner is unable and has not alleged any motive or identified any benefit that would accrue to Chase for participating in the fraud. Recognizing this missing element, Plaintiff argues that "proof of motive is not required where (as here) a strong inference of conscious wrongdoing exists." (Plaintiff Memorandum of Law, p. 24). In support of this statement, Renner cites *Local 875 I.B.T.*

*Pension Fund v. Pollack,* 992 F.Supp. 545, 562 (E.D.N.Y.1998): "That...the evidence of motive is limited to commissions is not a reason to dismiss the Amended Complaint where conscious fraudulent behavior is so clearly alleged." However, in that case, a defendant employee of the defendant investment firm was an active participant in the fraud and had made at least four misrepresentations. No such involvement on the part of Morelli or Chase is alleged here. "[A] plaintiff need not allege facts which show a defendant had a motive for committing fraud, so long as plaintiff adequately identifies circumstances indicating conscious behavior by the defendant from which an intent to defraud may fairly be inferred. However, where a particular defendant's nature to defraud is not apparent, the strength of the circumstantial allegations must be correspondingly greater." *Qatar,* 1992 WL 276565 at 6 (internal quotations and citations omitted). As a result, Plaintiff must allege more than Chase's interest in bank fees and deposits in order to create a reasonable inference of fraudulent intent. *See Chill,* 101 F.2d at 268 ("such a generalized motive, one which could be imputed to any publicly-owned, for-profit endeavor, is not sufficiently concrete for purposes of inferring scienter."); *see also,* Schmidt, 1998 WL 47827 at 10 ("logic defeats the inference that Fleet would expose itself to substantial financial liability and reputational harm by participating in Schick's scheme simply for the short-term benefit of having access to additional deposits.").

**\*14** Nor can Renner satisfy the requisite element of scienter by claiming that Chase was reckless or willfully blind to the fraudulent scheme. When Townsend proposed questionable transactions, several different levels of Chase officials reviewed the proposals, sought clarification from Townsend, and when still unsatisfied, refused to approve the transactions. When Chase was notified that complaints regarding Townsend and Hampstead had been received, it immediately investigated and chose to close the Townsend Fund account. Once made aware of alleged improprieties, Chase refused to authorize any further wire transfers in or out of this account. Such actions do not bespeak recklessness.

With respect to the transfers that Chase did allow, "a depository bank is mandated to obey the commands of an

Not Reported in F.Supp.2d                                                                 Page 12
Not Reported in F.Supp.2d, 2000 WL 781081 (S.D.N.Y.)
**(Cite as: 2000 WL 781081 (S.D.N.Y.))**

authorized depositor." *Latallo Establissement v. Morgan Guaranty Trust Company of New York,* 553 N.Y.S.2d 686, 689 (N.Y.App.Div. 1st Dept.1990) In *Latallo,* the Court held that the bank was not liable for the transfer of funds to personal accounts by an authorized signatory, stating that "[t]he fact that he may not have exercised his authority in the manner in which his parents [who made him an authorized signatory] would have preferred is hardly the concern of Morgan Guaranty." *Id.* at 688. Townsend was authorized by Renner to deposit his funds in the Townsend Fund account and to direct the investment of those funds. Townsend was Chase's customer, not Plaintiff.

Furthermore, when Chase honored the wire transfers in the instant case, the Renner funds had only been on deposit for a short time. This is not a case where an ongoing fraud is alleged of which the bank could not help but be aware. Rather, the scheme alleged involved Townsend making deposits on behalf of Hampstead clients, and then almost immediately wiring that money out of the Chase accounts. Although Renner alleges that the same fraud was perpetrated on Gulf Capital Resources three months earlier, there is no allegation suggesting that Chase had been alerted to the fraud. Once complaints were registered, Chase acted immediately to close the accounts. Renner's claims that Chase should have detected the fraud sooner and acted more quickly may suggest a short term lack of vigilance, but that is insufficient to demonstrate an intent to assist in fraud. *See Chill,* 101 F.3d at 270; *see also Shields,* 25 F.3d at 1129.

For the reasons stated above, Plaintiff's cause of action for aiding and abetting fraud against Defendant Chase is dismissed.

### 3. *Townsend Defendants*

Unlike Morelli and Chase, Renner claims that Townsend participated directly in the fraud.

Townsend argues that the fraud claim against it is based on two alleged misrepresentations. The first communication occurred on February 15, 1996. Townsend sent to Renner Morelli's letter confirming receipt of Plaintiff's funds and a Certificate of Custody & Receipt of Funds issued by Townsend. The Certificate stated that the funds were placed in Chase Account # 404-1- 129638, and credited within the

Fund to the Hampstead Account # 240-280, sub-account # 240-280-Renner. (Townsend Notice of Motion, Exh. B.). Although Renner claims that the designation that his funds were placed in a sub-account was misleading, Townsend maintains that this was not a false representation. The funds were received and placed in the named accounts. This is confirmed by the Wire Transfer Advices issued by Chase. (*Id.*). A false representation is essential to a viable fraud claim. As a result, Plaintiff's allegations are deficient with respect to this communication.

**\*15** The second communication addressed by Townsend occurred on May 21, 1996. On that day, a Renner representative called Townsend to inquire as to the status of Plaintiff's funds. "Townsend falsely replied that the funds had been used for a performance bond relating to a letter of credit from Dubai Bank." (Amended Complaint, ¶ 74). In fact, the funds had been wired to an Italian bank account belonging to a company called Verbena S.R.L., which was involved in the proposed real estate transaction, to a Monaco bank account belonging to Gloria Russo, Susse's common-law wife, and to an account at Arab Bank in Switzerland belonging to Alexander Penly, Susse's partner in Hampstead.

Townsend focuses on a letter he sent to Renner memorializing the May 21, 1996 conversation. In it he stated that "[t]he Fund transferred $2.7 million on February 23, 1996 to the following coordinates: Credit Foncier de Monaco, banker-Tedesco, account 97020. The transfer was per the specific written instruction of [Susse], who informed us that the purpose of the transfer was for Hampstead to utilize the funds in the acquisition of a performance bond relating to a letter of credit from Dubai Bank. We do not know the present status of this transaction." (Amended Complaint, ¶ 75). Townsend argues that he only communicated what Susse told him, implying that Townsend, like Renner, was mislead.

But Townsend's letter reflects a careful choice of words. Townsend does not explicitly argue that he believed the funds were actually being used to fund the performance bond, nor could he. Having directed the transfers, Townsend knew the money in the Townsend Fund account had been wired to three separate accounts, two of which were

Case 1:05-cv-04622-DLI-RML   Document 40   Filed 01/26/06   Page 41 of 70 PageID #: 874

personal accounts, in three different countries. He knew Penly was a director of Hampstead and that Gloria Russo was Susse's common-law wife. He also knew that Chase had closed the Townsend Fund account and that Hampstead, Townsend Financial and the Townsend Fund were under investigation by the SEC for the manner in which they handled customer accounts. Given that Renner had inquired about the location of his funds and expressed concern about their safety, Townsend's response was completely inadequate. Townsend gave Renner the erroneous impression that his funds were being invested according to Plaintiff's agreement with Hampstead. Therefore, even if the affirmative statement by Townsend was not a falsehood, Townsend omitted material information that qualified that statement. This is especially true in light of the fact that Townsend "professed to know nothing more," (Amended Complaint, ¶ 75), when a Renner representative called back for more information after receiving Townsend's letter. *See* 60 N.Y. Jur. Fraud and Deceit § 92 ("Telling half a truth has been declared to be equivalent to concealing the other half. Even though one is under no obligation to speak as to a matter, if he undertakes to do so, either voluntarily or in response to inquiries, he is bound not only to state truly what he tells, but also not to suppress or conceal any facts within his knowledge which will materially qualify those stated....Although every word one says may be true, if something is left out which absolutely qualifies the words they may amount to a false statement.").

**\*16** In *Local 875 I.B.T. Pension Fund v. Pollack,* the defendant made a similar argument, claiming that he too was a victim. He claimed he had no intent to spread false information, and was tricked into making the misleading statements answering plaintiffs' concerns after plaintiffs' funds had already been misappropriated. The Court rejected a motion to dismiss, reasoning that "[w]here, as here, it is at least equally plausible to view Gevers' statements as being motivated by perfidy or shame, the court must, on this motion, opt for perfidy." *Pollack,* 992 F.Supp. at 558. In the case at bar, given Townsend's alleged knowledge regarding the transfers of Renner's funds at the time of the May 21, 1996 statement, Plaintiff is also entitled to such an inference.

Nonetheless, Townsend argues that Plaintiff could not have relied on his statement. Although the statement did not induce Renner to invest the fundshe had done so months earlierTownsend's statement gave Renner the false impression that his money was being invested, and, therefore, there was no cause for concern or to demand an immediate return of the funds. As such, the statement perpetuated the fraud. According to the amended complaint, Plaintiff did not take further action to recover his money until over a month later, which would suggest that Townsend had temporarily put Renner's fears to rest. Accordingly, on a motion to dismiss, Renner is entitled to the reasonable inference that he did rely on Townsend's information and that had Townsend provided full disclosure, Renner would have taken more immediate and effective action to recover his funds.

Townsend ignores a third communication which provides a basis for Plaintiff's fraud claim. On or about March 4, 1996, Renner's bank in Switzerland contacted Townsend on behalf of Renner "seeking assurances that the money invested was safe." (Amended Complaint, ¶ 58). Although virtually all of the money had been wired out of the Chase account by Townsend, he "reiterated his certification that the funds had been received by Chase and were held in a subaccount for Renner." (*Id.*). According to the facts alleged, this was a blatant fabrication.

This misrepresentation was compounded shortly thereafter. On or about April 3, 1996, Townsend wired $80,000 to Renner in response to Plaintiff's questions concerning the failure to pay scheduled profits on his investment. The money actually represented the little that was left in the Chase account after the misappropriations. Knowing that Plaintiff would perceive the payment as a return on his investment, Townsend did not inform Renner that the payment was drawn from the principal, thus obviating the need to explain why Renner's money had not been invested as agreed and that it was no longer safe in the Chase account.

Plaintiff does not allege a false statement in this instance. Nevertheless, although mere silence is not actionable as fraud, silence can be distinguished from concealment. "Concealment becomes a fraud where there is any act which

Not Reported in F.Supp.2d                                                                          Page 14
Not Reported in F.Supp.2d, 2000 WL 781081 (S.D.N.Y.)
**(Cite as: 2000 WL 781081 (S.D.N.Y.))**

affirmatively tends to a suppression or disguise of the truth or to a withdrawal or distraction from the real facts. Under such circumstances, fraud springs from the overt act of misconduct relied upon with the same force and effect as an actual verbal misrepresentation." 60 N.Y. Jur. Fraud and Deceit § 89. By wiring the money in direct response to Plaintiff's inquiry about profits, Townsend concealed the fact that there were no profits and that almost all of the principal had been misappropriated. Townsend does not address this allegation.

**\*17** The allegations in the amended complaint are also sufficient to give rise to a strong inference of fraudulent intent on the part of Townsend. Townsend had both motive and opportunity to commit the fraud against Renner. Pursuant to the Renner-Hampstead Agreement, Renner deposited $3 million in the Townsend Fund account. As such, Townsend had control over Plaintiff's funds and, as is clear from the amended complaint, exercised that control to wire transfer nearly all of Renner's money to his alleged coconspirators. With respect to motive, Townsend received a $50,000 annual retainer from Hampstead, as well as a 0.5 percent commission on each Hampstead transaction. In addition, Hampstead loaned Townsend, in return for his participation in the fraud, $500,000 to supplement Townsend's lack of capital. Although, as stated, regular profits and commissions do not constitute motive, the amended complaint contains allegations that Townsend knew the transactions contemplated by Hampstead were a fraud from the start; and, in contrast to Morelli and Chase, sufficient specific facts are alleged as to Townsend to support that conclusion. On Plaintiff's theory of the case, these funds were not earnings from the ordinary course of business but payments for Townsend's participation in the fraud. Part of the payments or an additional payment was appropriated from funds provided by another Hampstead client, Gulf Capital Resources.

Townsend was responsible for the many wire transfers which diverted funds from the accounts of Hampstead clients, including Plaintiff, placing him in the center of the scheme to defraud. In light of the analysis above, Renner has met the pleading requirement with respect to Townsend. Accordingly, the motion to dismiss the fraud claim against

the Townsend Defendants is denied.

### B. *Claim Two--Commercial Bad Faith (Against Defendant Chase)*

As defined by the New York Court of Appeals, a claim for commercial bad faith lies "[w]here a depositary bank acts dishonestly--where it has actual knowledge of facts and circumstances that amount to bad faith, thus itself becoming a participant in a fraudulent scheme." *Prudential-Bache Securities, Inc. v. Citibank, N.A., 73 N.Y.2d 263, 275 (N.Y.1989)*. Since I have already held that Chase did not have actual knowledge of the fraudulent scheme, this claim must fail. Although Chase may have had suspicions and may have been negligent in its response, such allegations are not sufficient to state a claim for commercial bad faith. Plaintiff must plead more than "merely a lapse of wary vigilance or even suspicious circumstances which might well have induced a prudent banker to investigate. Such assertions of bank negligence by a drawer would be insufficient to state a cause of action against a depositary bank." Id. at 276 (internal quotations and citations omitted); *see also, Nigerian National Petroleum Corp. v. Citibank, N.A., 1999 WL 558141 at 8 (S.D.N.Y.1999)* ("NNPC might be correct in contending that there were several red flags that should have alerted Citibank to Vadra's fraud or at least prompted it to investigate, and that Citibank acted negligently in allowing Vadra to make additional wire transfers even after the Second Fraudulent Transfer was uncovered. However allegations that a bank disregard[ed]... suspicious circumstances which might have well induced a prudent banker to investigate do not suffice to state a claim for commercial bad faith.") (internal quotations and citations omitted); *Calisch Associates, Inc. v. Manufacturers Hanover Trust Company, 542 N.Y.S.2d 644, 646 (N.Y.App.Div. 1st Dept.1989)* ("At most, these allegations amount to a claim that defendant bank was negligent in not being sufficiently vigilant and/or not providing satisfactory instruction to its staff. The third cause of action should, consequently have been dismissed.").

**\*18** As Chase correctly points out, courts have generally required that a member of the bank be an active participant in the fraud. *See, e.g, Prudential-Bache Securities, 73 N.Y.2d 263* (two bank employees accepted bribes in return

Case 1:05-cv-04622-DLI-RML   Document 40   Filed 01/26/06   Page 43 of 70 PageID #: 876

Westlaw.

Not Reported in F.Supp.2d                                                                Page 15
Not Reported in F.Supp.2d, 2000 WL 781081 (S.D.N.Y.)
**(Cite as: 2000 WL 781081 (S.D.N.Y.))**

for setting up accounts to facilitate fraud); *Peck v. Chase Manhattan Bank, N.A., 593 N.Y.S .2d 509 (N.Y.App.Div. 1st Dept.1993)* (bank alleged to have knowingly permitted forgeries and established accounts to facilitate fraud); *Retail Shoe Health Com'n v. Manufacturers Hanover Trust Company, 558 N.Y.S.2d 949, 951 (N.Y.App.Div.1990)* (plaintiff must plead "facts inculpating the principals of the bank as actual participants in unlawful activity."). In the case at bar, Morelli is the only branch employee Plaintiff seeks to cast in the role of fraudsman. However, given my findings regarding Morelli's knowledge and participation, and in the absence of allegations that other Chase employees actively promoted the fraud, the cause of action for commercial bad faith against Defendant Chase is dismissed.

### C. Claim Three--Breach of Contract

Plaintiff also claims that the Townsend Defendants breached their alleged contract with Renner. "The elements required to state a valid claim for breach of contract are: (1) the existence of a contract; (2) due performance of the contract by the plaintiff; (3) breach of contract by the defendant; and, (4) damages resulting from the breach." *K. Bell & Associates, Inc. v. Lloyd's Underwriters, 827 F.Supp. 985, 988 (S.D.N.Y.1993); see also, Pits, Ltd. v. American Express Bank International, 911 F.Supp. 710, 719 (S.D.N.Y.1996)*. Although a cause of action for breach of contract need not be pleaded with particularity, Renner's allegations are legally insufficient.

Townsend managed Plaintiff's money as a client of Hampstead and pursuant to Townsend's agreement with Hampstead. Plaintiff does not allege that he was a third-party beneficiary of that contract. Nor was Townsend a party to the Plaintiff's agreement with Hampstead. As such, Plaintiff alleges neither a written nor an oral contract between Renner and Townsend.

However, this is not necessarily fatal to his claim. In the absence of an express agreement, "[a] contract implied in fact [may be] inferred from the facts and circumstances of the case and from the conduct of the parties." *Portugal Trade Corp. v. Spirit Transport, Inc., 1987 WL 6436 at 7 (S.D.N.Y.1987)*. Plaintiff argues that "[b]y accepting the Renner money as the designated 'security house' for

Hampstead, purportedly creating a sub-account, and communicating with Renner with respect to the custody of his funds, Townsend, Townsend Financial and Townsend Fund agreed to keep the Renner money safe and secure, to communicate fully and promptly with Renner in accordance with the account instructions between Hampstead and Renner and regularly to remit trading proceeds." (Amended Complaint, ¶ 94).

"As with an express contract, a key element of a contract implied in fact is that there be mutual agreement between the parties." *Portugal Trade Corp., 1987 WL 6436 at 7*. Plaintiff alleges no facts supporting Townsend's intention to be bound to Plaintiff. Renner agreed with Hampstead that Hampstead would invest Plaintiff's money and be responsible for remitting the promised returns, as well as the principal after one year. The fact that Hampstead conducted transactions through Townsend does not create a contract between Townsend and Renner. Although Townsend confirmed receipt of the Renner funds and responded to Plaintiff's inquiries on other occasions, Townsend made no promises to Plaintiff regarding how the money would be handled. In fact, Townsend indicated that he transferred the money pursuant to Susse's instructions, indicating that Townsend was not making investment decisions on behalf of Plaintiff. Renner does not adequately allege a mutual understanding of contractual obligations between Plaintiff and Townsend such that a contract can be inferred from their conduct. Furthermore, Plaintiff does not allege any consideration for the supposed contract. Renner concedes that Townsend was compensated for his services by Hampstead.

**\*19** "Without agreement there can be no contract, and, of course, without a contract there can be no breach." *Kleinschmidt Division of SCM Corp., v. Futuronics Corp., 395 N.Y.S.2d 151, 152 (N.Y.1977)*. Accordingly, Plaintiff's claim for breach of contract is dismissed.

### D. Claim Four--Breach of Covenant of Good Faith

Plaintiff brings this cause of action against the Townsend Defendants. Plaintiff concedes that the covenant of good faith arises out of and is inherent in a contract. "[A]bsent a contract there is no covenant of good faith and fair dealing." *Industrial Acoustics Company, Inc. v. Energy Services, Inc.,*

Not Reported in F.Supp.2d                                                      Page 16
Not Reported in F.Supp.2d, 2000 WL 781081 (S.D.N.Y.)
**(Cite as: 2000 WL 781081 (S.D.N.Y.))**

1995 WL 274432 at 8 (S.D.N.Y.1995); *see also, Geler v. National Westminster Bank USA,* 770 F.Supp. 210, 215 (S.D.N.Y.1991). Having found that Plaintiff has failed to adequately plead that there was a contract between Renner and Townsend, there is no basis for a covenant of good faith, and, thus, no cognizable claim for the breach of that covenant. Therefore, claim four is dismissed.

E. *Claim Five--Breach of Fiduciary Duty*

As his fifth cause of action, Plaintiff asserts a claim of breach of fiduciary duty against the Townsend Defendants. "A fiduciary relationship exists under New York law when one person is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." *Flickinger v. Harold C. Brown & Co., Inc.,* 947 F.2d 595, 599 (2nd Cir.1991) (internal quotations and citations omitted); *see also, Press v. Chemical Investment Services Corp.,* 988 F.Supp. 375, 386 (S.D.N.Y.1997) ("The crucial factor in determining whether a broker has been 'entrusted' with particular matters such that a fiduciary obligation attaches, appears to be whether the broker exercises discretion over those matters. In other words, '[i]n the absence of discretionary trading authority delegated by the customer to the broker...a broker does not owe a general fiduciary duty to his client." ') (quoting *Bissell v. Merrill Lynch & Co., Inc.,* 937 F.Supp. 237, 246 (S.D.N.Y.1988).

Plaintiff contends that "[b]y inducing Renner to part with money by claiming that they were engaged in customer transaction (sic) and that Renner's funds would be kept safe and secure and in 'custody,' Townsend, Townsend Financial and Townsend Fund stood in a fiduciary relationship toward Renner and owed him a higher duty of honor and care." (Amended Complaint, ¶ 103). However, these allegations support a fiduciary relationship no more than they supported a contractual relationship between Renner and Townsend.

The facts in *Flickinger v. Harold C. Brown & Co., Inc.,* 947 F .2d 595, are similar to those in the case at bar. Flickinger was a long time client of defendant Brown, a securities broker. Brown, in turn, had an agreement with defendant Bradford Broker Settlement, Inc. ("BBSI"), who served as a clearing agent for Brown. Pursuant to the agreement between Brown and BBSI, BBSI would execute and clear transactions for Brown's clients. Flickinger brought an action against both Brown and BBSI after BBSI failed to deliver certain shares of stock purchased by Flickinger through Brown. Although the Court of Appeals held a fiduciary relationship existed between Flickinger and Brown, the Court found that no such relationship existed between the investor and the clearing agent.

**\*20** In the instant case, Renner, like Flickinger, invested money with one party, Hampstead, who, in turn, contracted with another party, Townsend, to facilitate transactions on Hampstead's clients' behalf. As with Flickinger and BBSI, there was no agreement between Renner and Townsend. Townsend, like BBSI, merely followed Hampstead's instructions regarding Hampstead's client's funds. Plaintiff attempts to distinguish *Flickinger* by noting that Flickinger and BBSI never had any direct contact. Although there were some communications between Renner and Townsend, mere contact, standing alone, does not create a fiduciary duty. In *Flickinger,* the reason the Court of Appeals held that there was a fiduciary duty between Flickinger and Brown was the longstanding arrangement under which Brown provided investment advice. *Id.* In the case at bar, Townsend and Renner knew one another for only a short time. Moreover, Townsend did not provide or offer investment advice; nor did he have any discretion over how Renner's funds were to be invested. (See Townsend Notice of Motion, Exh. C., Asset Management Contract between Hampstead and Townsend, p. 2, stating that "[Townsend] shall only act for and on behalf of [Hampstead] and can not be made responsible and/or liable for any losses or damages caused by [Hampstead's] instructions. [Townsend] shall not cause any transactions without the written approval or/and instructions given by [Hampstead]."). The fact that Townsend confirmed receipt of the Renner funds also does not give rise to a fiduciary duty. BBSI sent periodic activity statements to Flickinger, but did not incur a duty thereby. *Flickinger,* 947 F.2d at 597. "That plaintiffs may have regarded defendants as their fiduciaries is not enough to establish a fiduciary duty when that duty otherwise would not exist. *Kolbeck v. LIT America, Inc.,* 923 F.Supp. 557, 572 (S.D.N.Y.1996). Consequently, Townsend did not owe a fiduciary duty to Renner.

Plaintiff argues, in the alternative, that "Townsend is liable

Not Reported in F.Supp.2d                                                                                          Page 17
Not Reported in F.Supp.2d, 2000 WL 781081 (S.D.N.Y.)
(Cite as: 2000 WL 781081 (S.D.N.Y.))

for aiding and abetting Hampstead's breach of fiduciary duty." (Plaintiff Memorandum of Law, p. 39). However, Plaintiff did not state a cause of action against Townsend for aiding and abetting breach of fiduciary duty in the amended complaint, *see* Kolbeck, 923 F.Supp. at 573 ("In their brief, plaintiffs' claim for breach of fiduciary duty has been transformed into a claim for participating in another's breach of fiduciary duty....Because plaintiffs' belated claim does not appear anywhere in the complaint, even under the most generous reading, it is inappropriate to address that claim."); nor is there reason to believe that what Plaintiff really intended was an aiding and abetting claim, since Plaintiff separately stated such a cause of action against Defendant Chase.

For these reasons, the cause of action for breach of fiduciary duty against the Townsend Defendants is dismissed.

F. *Claim Six--Aiding and Abetting Breach of Fiduciary Duty*
**\*21** Plaintiff has stated a cause of action against Defendant Chase for aiding and abetting a breach of fiduciary duty. The elements of such a claim are similar to those for aiding and abetting fraud. "The claimant must prove (1) a breach by a fiduciary of obligations to another, (2) that the defendant knowingly induced or participated in the breach, and (3) that the plaintiff suffered damages as a result of the breach." S & K Sales Co. v. Nike, Inc., 816 F.2d 843, 847-848 (2nd Cir.1987).

With respect to the first element, Plaintiff claims that Townsend breached its fiduciary duty to Renner. Having found that the Townsend Defendants did not owe a fiduciary duty to Renner, the cause of action against Chase for aiding and abetting that breach necessarily fails.

In addition, even assuming arguendo that Townsend did have a fiduciary duty to Renner, and that it breached that duty, Plaintiff must still plead actual knowledge of the breach on the part of the aider and abettor. *See* Kolbeck, 939 F.Supp. at 246-247 (collecting cases). However, Plaintiff does not allege that Chase had actual knowledge of Townsend's alleged wrongdoing, or that Chase provided that substantial assistance necessary to establish aiding and abetting liability. *See* discussion *supra* Part III.A.2.

Accordingly, Plaintiff's cause of action against Chase for aiding and abetting Townsend's breach of its fiduciary duty is dismissed.

## G. *Negligence*

Plaintiff's seventh claim alleges negligence against the Townsend Defendants. "In order to establish a prima facie case of negligence under New York law, a claimant must show: 1) the existence of a duty flowing from defendant to plaintiff; 2) a breach of this duty; 3) a reasonably close causal connection between the contact and the resulting injury; and 4) actual loss, harm or damage." *Integrated Waste Services, Inc. v. Akzo Nobel Salt, Inc.,* 113 F.3d 296, 299 (2nd Cir.1997) (internal quotations and citations omitted). Plaintiff alleges that "by accepting the Renner money, issuing a notification and confirmation of sub-account, issuing a 'Certificate of Custody & Receipt of Funds,' leading Renner to believe that his funds were being kept in a Chase sub-account, promising to invest the Renner funds in accordance with the account instructions so that Hampstead could engage in trading transactions and promising to remit trading proceeds, Townsend, Townsend Financial and Townsend Fund assumed a duty to Renner." (Amended Complaint, ¶ 113). However, Plaintiff has failed to direct this Court to any case or law supporting his conclusion that these facts give rise to a duty of care.

In *Kolbeck v. LIT America, Inc.,* 113 F.3d 296, on facts similar to the case at bar, the negligence claim was dismissed. In *Kolbeck,* Christian Schindler perpetrated a scheme in which he solicited millions of dollars from international investors to invest in American commodities markets by promising large returns with little to no risk. In order to lend credibility to the scheme, Schindler engaged several brokerage firms who cleared the commodity futures trades for Schindler. Schindler ultimately diverted the funds received from his customers for his own use. Although plaintiffs alleged that members of the brokerage firms participated in soliciting their money by leading tours of the New York Futures Exchange and of their offices, and that they did not correct Schindler when he told prospective investors that Schindler and the brokerage firms were trading partners, the investors would have individual accounts with the brokerage firm, and that the brokerage

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

firm "would be looking out for the best interests of the clients," *id.* at 561-562, the Court held that the defendant brokerage firms had not assumed a duty of care. *Id.* at 572.

**\*22** In the case at bar, Townsend played no role in soliciting Renner's funds. Townsend merely confirmed receipt of the funds pursuant to its agreement with Hampstead. Renner was not a client of Townsend's, but rather of Hampstead. Townsend had no discretion over how Renner's funds were to be invested, and it was with Hampstead, not Townsend, that Renner had entered a profit sharing agreement. It is completely unclear how Plaintiff derives a duty on the part of Townsend to ensure Plaintiff's funds were used in a manner consistent with the Renner-Hampstead Agreement. In his brief, Plaintiff does not put forth any theory upon which this Court might find a duty of care. Instead, Renner recites the allegations in the amended complaint and baldly asserts that such facts create a duty of care without explaining why.

These facts fell short of establishing a contractual relationship and a fiduciary relationship between Townsend and Renner. *See* discussion *supra* Parts III.C. and E. Similarly, they do not give rise to a duty of care. Therefore, Plaintiff's negligence claim against the Townsend Defendants is dismissed.

### H. *Commercial Bad Faith (Against the Townsend Defendants)*

As its final claim, Plaintiff alleges commercial bad faith against the Townsend Defendants. Plaintiff asserted the same cause of action against Defendant Chase. *See* discussion *supra* Part III.B.

Townsend argues that a claim of commercial bad faith must be brought against a bank. Since none of the Townsend Defendants are banks, Townsend concludes that this claim cannot lie. However, case law makes it clear that a defendant need not be a bank in order for a plaintiff to assert a claim of commercial bad faith. *See, e.g., Federal Insurance Company v. Charles Schwab & Co., Inc., 986 F.Supp. 837 (S.D.N.Y.1997)* (considering commercial bad faith claim brought against brokerage firm, but dismissing claim for failure to plead actual knowledge on part of the defendant of fraudulent scheme); *Getty Petroleum Corp. v.*

*American Express Travel Related Services Co., Inc., 660 N.Y.S.2d 689 (N.Y.1997)* (commercial bad faith claim brought against credit card company viable, but dismissed for lack of evidence of actual knowledge of fraud); *Stockton v. Gristedes Supermarkets, Inc., 576 N.Y.S.2d 267 (N.Y.App.Div. 1st Dept.1991)* ("court properly sustained the cause of action for commercial bad faith" against defendant supermarket); *National Union Fire Insurance Co. of Pittsburgh, Pa. v. Glass Check Cashing Corp., 576 N.Y.S.2d 260 (N.Y.App.Div.1991)* (cause of action for commercial bad faith against non-bank defendant sufficiently stated, but summary judgment in favor of defendant appropriately granted where plaintiff failed to show defendant's "out-and-out dishonesty").

But Townsend argues that such cases are distinguishable. In the cases in which a viable commercial bad faith claim was asserted against non-bank entities, Townsend contends that, unlike the case at bar, the defendants had, in effect, assumed the role of a bank and were involved in a fraudulent check-cashing scheme. Townsend is correct that in each commercial bad faith case involving a non-bank defendant, the defendant acted as a depositary. *See Federal Insurance Company, 986 F.Supp. 837* (brokerage firm, which accepted fraudulently signed stolen checks to open up brokerage accounts, treated as non-bank depositary); *Getty Petroleum Corp., 660 N.Y.S.2d 689* (credit card company, which accepted stolen checks with forged indorsements to pay off wrongdoer's credit card debt, treated as non-bank depositary); *Stockton, 576 N.Y.S.2d 267* (store, which cashed checks for customers, treated as non-bank depositary); *National Union Fire Insurance Company of Pittsburgh, Pa.., 576 N.Y.S.2d 260* (same). However, I do not agree that Townsend cannot be characterized in the same manner, that is as a non-bank transferee or depositary. Townsend, like Charles Schwab in *Federal Insurance Company,* opened an investment account with Renner's money, allegedly knowing that Hampstead intended to misappropriate the funds.

**\*23** However, unlike in these other cases, the case at bar does not involve either stolen checks or forged indorsements. Commercial bad faith was recognized as a cause of action by New York courts as an "exception to the

Not Reported in F.Supp.2d                                                                                    Page 19
Not Reported in F.Supp.2d, 2000 WL 781081 (S.D.N.Y.)
**(Cite as: 2000 WL 781081 (S.D.N.Y.))**

general principle that a drawer does not have a cause of action against a depository, but must instead look to the drawee bank for recovery when a fraudulently signed check has been paid. *Federal Insurance Company,* 986 F.Supp. at 840; *see also, Getty Petroleum,* 660 N.Y.S.2d at 695 ("there is a 'commercial bad faith' exception to UCC 3-405"). The rule that gives rise to the exception is N.Y. U.C.C. § 3-405 (McKinney 1999), also known as the "fictitious payee" or "padded payroll" provision. Although, Townsend does not explicitly argue as much, it seems logical that if § 3-405 does not apply to the case at bar, neither can the exception to that section, namely a cause of action for commercial bad faith.

The logical appeal of such an argument notwithstanding, the applicability of § 3-405 is not a prerequisite to a commercial bad faith claim. In *Rose Lee Mfg. Inc. v. Chemical Bank,* 563 N.Y.S.2d 965, 967 (N.Y.Sup.Ct.1990), *aff'd,* 588 N.Y.S.2d 408 (N.Y.App.Div. 2nd Dept.1992) (modified on other grounds), the court stated that "[i]n the case at bar, however, UCC 3- 405(1)(c) does not come into play at all. Here the checks were not made payable to a payee who was not legitimate and they were not endorsed by anyone other than the named payee, i.e., the defendant." Nevertheless, the court held that plaintiffs had stated a viable cause of action for commercial bad faith against the defendant bank for allegedly participating in the diversion of properly made checks intended for deposit in the plaintiffs' tax depository account to accounts controlled by the plaintiffs' accountant.

Similarly, in the instant case, Renner transferred money to Chase, specifically to be deposited in the Townsend Fund account. The funds were to be invested pursuant to Hampstead's instructions and consistent with the Renner-Hampstead Agreement. However, the funds were diverted. This case does not involve checks being paid over a forged indorsement or checks being issued in the name of fictitious payees. Rather, it involves the misappropriation of funds by Hampstead and the Townsend Defendants after the Plaintiff willingly transferred the funds to them for the promised, albeit nonexistent, investment opportunities.

Many of the cases analyzing whether a cause of action has been stated for commercial bad faith do not even mention § 3-405. Rather, they have adopted the broader language

which has been used to define a commercial bad faith claim. "A cause of action for commercial bad faith against a bank requires allegations of a scheme or acts of wrongdoing, together with allegations of the bank's actual knowledge of the scheme or wrongdoing that amounts to bad faith or allegations of complicity by bank principals in alleged confederation with the wrongdoers." *Peck,* 593 N.Y.S.2d at 510-511; *see also, Nigerian National Petroleum Corp.,* 1999 WL 558141 at 6; *Williams,* 1998 WL 397887 at 9. Under this analysis, Plaintiff's cause of action for commercial bad faith against the Townsend Defendants is stated sufficiently to survive this motion to dismiss. Plaintiff has alleged a scheme or acts of wrongdoing, together with allegations of complicity by the Townsend Defendants in alleged confederation with Hampstead. *See* discussion *supra* Part III.A.3.

**\*24** Accordingly, the Townsend Defendants' motion to dismiss the cause of action for commercial bad faith is denied.

IV. CONCLUSION
For the reasons stated, the motions to dismiss brought by Defendants Morelli and Chase are granted in full, and the amended complaint is dismissed in its entirety as to those Defendants. The motion to dismiss brought by the Townsend Defendants is granted in part. The third, fourth, fifth and seventh causes of action, asserted against the Townsend Defendants, are dismissed. The Townsend Defendants' motion to dismiss is denied as to the first and eighth causes of action, namely for fraud and commercial bad faith.

Counsel for the remaining parties are directed to attend a status conference in Room 17C, 500 Pearl Street, at 2:00 P.M. on September 8, 2000.

It is SO ORDERED.

Not Reported in F.Supp.2d, 2000 WL 781081 (S.D.N.Y.)

**Motions, Pleadings and Filings (Back to top)**

• 2002 WL 32769152 (Trial Motion, Memorandum and Affidavit) Defendants' Reply to Plaintiff's Memorandum and Factual Showing That Reed Smith Should be

Not Reported in F.Supp.2d                                                                 Page 20
Not Reported in F.Supp.2d, 2000 WL 781081 (S.D.N.Y.)
**(Cite as: 2000 WL 781081 (S.D.N.Y.))**

Disqualified from Further Representation of the Defendant Gerald Townsend (Mar. 29, 2002)

• 2002 WL 32769151 (Trial Motion, Memorandum and Affidavit) Plaintiff's Memorandum and Factual Showing That Reed Smith Should be Disqualified from Further Representation of the Defendant Gerald Townsend (Mar. 05, 2002)

• 2002 WL 32769150 (Trial Motion, Memorandum and Affidavit) Defendants' Second Supplemental Memorandum Regarding Palintiff's Motion to Disqualify Defendant Gerald Townsend's Counsel (Feb. 28, 2002)

• 2001 WL 34727855 (Trial Motion, Memorandum and Affidavit) Defendants' Supplemental Memorandum Regarding Plaintiff's Motion to Disqualify Defendant Gerald Townsend's Counsel (Dec. 07, 2001)

• 2001 WL 34727854 (Trial Motion, Memorandum and Affidavit) Plaintiff's Summary Memorandum in Support of the Crime-Fraud Exception (Jun. 18, 2001)

• 2001 WL 34727853 (Trial Motion, Memorandum and Affidavit) Defendants' Supplemental Memorandum Regarding Plaintiff's Cross-Motion for a Ruling by the Court Regarding the Applicability of the Crime-Fraud Exception (May. 17, 2001)

• 2001 WL 34727745 (Trial Pleading) Plaintiff's Analysis of Defendant's Submission (May. 02, 2001)

• 2001 WL 34727742 (Trial Pleading) Defendants' Reply to Plaintiff's Submission in Opposition to the Defendants' Claims to Restrict Discovery Based on the Attorney Client Privilege and in Support of the Applicability of the Crime-Fraud Exception (May. 01, 2001)

• 2001 WL 34727743 (Trial Pleading) Plaintiff's Submission in Opposition to the Defendant's Claims to Restrict Discovery Based on the Attorney Client Privilege and in Support of the Applicability of the Crime-Fraud Exception (May. 01, 2001)

• 2001 WL 34727852 (Trial Motion, Memorandum and Affidavit) Defendants' Memorandum of Law in Opposition

to Plaintiff's Cross-Motion for a Ruling by the Court Regarding the Applicability of the Crime-Fraud Exception (Apr. 27, 2001)

• 2001 WL 34727850 (Trial Motion, Memorandum and Affidavit) Plaintiff's Memorandum of Law in Support of Plaintiff's Cross Motion for a Ruling by the Court Regarding the Applicability of the Crime-Fraud Exception (Apr. 19, 2001)

• 2001 WL 34727739 (Trial Pleading) Townsend Financial Services Corp., Townsend Investment Fund, LLC, Townsend Financial Group, Ltd, and Gerald Townsend's Memorandum of Law in Support of Their Motion for Sanctions (Apr. 17, 2001)

• 2001 WL 34727851 (Trial Motion, Memorandum and Affidavit) Memorandum of Law Regarding Advice Provided to Defendants by Donald O. Clark, Esquire (Apr. 2001)

• 2001 WL 34727737 (Trial Pleading) Defendants Townsend Financial Services Corp., Townsend Investment Fund, LLC, Townsend Financial Group, Ltd and Gerald Townsend Answer to Plaintiff's Omnibus Discovery Report (Mar. 13, 2001)

• 2001 WL 34727735 (Trial Pleading) Defendants Townsend Financial Services Corp., Townsend Investment Fund, LLC, Townsend Financial Group, Ltd and Gerald Townsend Answer to Plaintiff's Second Amended Complaint (Feb. 08, 2001)

• 2001 WL 34727733 (Trial Pleading) Second Amended Complaint (Feb. 05, 2001)

• 2001 WL 34727738 (Trial Pleading) Defendants Townsend Financial Services Corp., Townsend Investment Fund, LLC, Townsend Financial Group, Ltd and Gerald Townsend's Response to Plaintiff's Omnibus Discovery Report (2001)

• 2000 WL 34474989 (Trial Pleading) Defendants Townsend Financial Services Corp., Townsend Investment Fund, LLC, and Gerald Townsend Answer to Plaintiff's Amended Complaint (Jul. 05, 2000)

Not Reported in F.Supp.2d                                                                      Page 21
Not Reported in F.Supp.2d, 2000 WL 781081 (S.D.N.Y.)
**(Cite as: 2000 WL 781081 (S.D.N.Y.))**


• 1999 WL 33919733 (Trial Pleading) Amended Complaint
(Apr. 16, 1999)

• 1998 WL 34311486 (Trial Pleading) Answer and
Affirmative Defenses of Defendants Townsend Financial
Services Corp., Townsend Investment Fund, LLC, and
Gerald Townsend (Apr. 20, 1998)

• 1998 WL 34311485 (Trial Pleading) Complaint (Feb. 09,
1998)

• 2:98cv00926 (Docket) (Feb. 09, 1998)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                  Page 1
Not Reported in F.Supp.2d, 2000 WL 1375265 (E.D.N.Y.)
**(Cite as: 2000 WL 1375265 (E.D.N.Y.))**

⚑

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, E.D. New York.
Peter F. RYAN, PRD Corp., Dale W. Ryan, PDR Holdings,
Inc., PDR Corp. Defined
Benefit Plan & Trust, Ryan Realty Trust, Loperena Trust,
Jaquith Holdings,
Inc., Peter F. Ryan Irrevocable Trust, Research & Finance
Corp., Glen Guillet,
DOIT Corp., Zayin Investments, Ltd., Beny Primm, RPE
Management, Inc., Daniel
Langer, Jay Sicklen, Mykerinus Holdings, Inc., and Charles
Schmidt, Plaintiffs,
v.
HUNTON & WILLIAMS, Scott J. McKay Wolas, Franklin
H. Stone, Christopher M.
Mason, Kathy McClesky Robb, Jerry E. Whitson, Tardino
& Tardino, Victor J.
Tardino, Jr., Victor J. Tardino, Sr., Crystal Waters, N.V.,
Crystal
Distributors, L.P., Crystal Distributors, L.P. II, Chase
Manhattan Bank f/k/a
Chemical Bank, Fleet Bank f/k/a National Westminster
Bank, and Gregory Wolas,
Defendants.
**No. 99-CV-5938 (JG).**

Sept. 20, 2000.

Sigmund S. Wissner-Gross, Esq., Heller, Horowitz & Feit,
P.C., New York, for Plaintiffs.

Andrew R. Kosloff, Esq., The Chase Manhattan Bank Legal
Department, New York, for Defendant Chase Manhattan
Bank.

MEMORANDUM AND ORDER
GLEESON, District J.

**\*1** The plaintiffs initiated this action to recover for injuries
they sustained as a result of their investment in a "Ponzi"
scheme operated by Scott J. McCay Wolas ("Wolas"), a
partner at the New York office of Hunton & Williams ("H

& W"). Defendant Chase Manhattan Bank ("Chase") has
moved to dismiss the claims against it for failure to state a
claim upon which relief can be granted and for failure to
plead fraud with particularity pursuant to Rules 12(b)(6) and
Rule 9(b) of the Federal Rules of Civil Procedure. For the
following reasons, the motion is granted.

BACKGROUND
The following factual background is based on the
allegations contained in the plaintiffs' complaint, which are
assumed to be true for the purposes of this motion.

From 1989 to 1995, Wolas ran a "Ponzi" scheme. He
induced the plaintiffs and others to invest with him by
misrepresenting that their investments would be used to
purchase large shipments of Scotch whiskey in Scotland for
resale in the Orient. In fact, there were no such purchases;
instead, Wolas used the funds to pay prior "investors" and
for other unknown purposes. In 1995, Wolas absconded,
and his whereabouts are still unknown. (*See* Compl. ¶ 1.)

In 1994 Chemical Bank [FN1] ("Chemical") was on notice
of various of "red flags" that indicated fraudulent conduct
by Wolas and/or those with whom he was associated. For
example, in May 1994, John Dolan, a cohort of Wolas, tried
to open an account at Chemical in the name of SEV
Enterprises, Inc. ("SEV"). Chemical, however, declined to
open the account because Patrick J. Connor, of Chemical's
in-house fraud investigative unit, suspected that SEV was
probably running an "advance fee scam." (*Id.* ¶¶ 111-12.)
Then, on June 29, 1994, a lawyer representing an former
associate at H & W contacted Mark E. Segal, Assistant
General Counsel of Chemical, and informed him that Wolas
fraudulently overbilled Manufacturers Hanover Trust,
Chemical's predecessor, for work done on a litigation
matter. Later that year, Chemical shut down accounts
maintained by Wolas and Albert H. Wolas, Inc., a family
business owned by Wolas's father and brother, after a
$950,000 check to Wolas, drawn on one of the business
accounts, bounced. (*See id.* ¶¶ 113-14.)

> FN1. Chemical Bank has since merged with
> Defendant Chase Manhattan Bank.

On March 16, 1995, just three months before the "Ponzi"

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 2
Not Reported in F.Supp.2d, 2000 WL 1375265 (E.D.N.Y.)
**(Cite as: 2000 WL 1375265 (E.D.N.Y.))**

scheme collapsed, Dolan opened a primary account in the name of SEV and Wolas opened a sub-account (to the SEV account) at a Chemical branch on Third Avenue in Manhattan. Although the sub-account was an attorney escrow account, Wolas authorized Dolan, a non-lawyer, to have signing authority over the sub-account. Wolas and/or Dolan further informed Chemical in-house counsel Manuel Gottlieb that the sub-account was an attorney escrow account and that all of the money passing through the sub-account was escrow money. (*See id.* ¶¶ 110, 115-16.)

From the accounts' inception, branch officer Kevin O'Dea suspected that they were a vehicle for fraudulent activity and immediately referred them to Chemical's in-house fraud investigative unit. On May 2, 1995, an employee of the fraud unit notified O'Dea and Gottlieb of the unit's concerns one year earlier when Dolan tried to open an account in the name of SEV, and urged that Chemical immediately shut down the primary and subaccounts. Then, on May 5, 1995, O'Dea notified Dolan and SEV that the accounts had to be closed by June 5, 1995, one month later. [FN2] (*See id.* ¶¶ 115, 117-18.)

> FN2. On May 30, 1995, a grand jury in the Southern District of Texas issued a subpoena, in part, to one of the two SEV sub-accounts. This subpoena was faxed to in-house counsel Gottlieb on June 1, 1995. (*See* Compl. ¶ 124.)

A. *The Account Activity*

*2 In April and May of 1995, O'Dea and his assistant signed or approved bank checks and transfers out of Wolas's sub-account and into the SEV primary account. Specifically, O'Dea effected the following transactions:
  (i) Beginning on April 27, 1995, O'Dea personally signed bank checks drawn on the Wolas sub-account;
  (ii) On April 25, 1995, O'Dea personally approved the internal transfer of $1 million of investor funds from the sub-account to the SEV primary account, and such transfer occurred on April 27, 1995; and
  (iii) On May 2, 1995, O'Dea's assistant approved the transfer of $1.6 million from the sub-account to the SEV primary account.
(*See* Compl. ¶ 119.)

Then, on April 27, 1995, O'Dea personally approved the issuance of two Chemical checks drawn on the SEV primary account, each in the amount of $100,000, and certified another SEV primary account check, in the amount of $28,459. Several days later, O'Dea approved a May 2, 1995, certified check for $200,000 drawn on the SEV primary account. This check was immediately altered to indicate that it was drawn on the sub-account. By no later than May 10, 1995, O'Dea knew that this certified check had been altered, and relied on this information in insisting that the accounts be closed. (*See id.* ¶ 120.)

By May 2, 1995, O'Dea was also aware that $10 million was to be wired into another SEV sub-account at Chemical. (*See id.* ¶ 121 .) O'Dea (and/or another Chemical employee or officer) specifically approved multiple wire transfers that resulted in the theft of investor funds. For example, O'Dea approved the following transactions:
  (i) the May 2, 1995, wire transfer of $50,000 from the SEV primary account to Kehle & Co., Inc. in Florida;
  (ii) the May 4, 1995, wire transfer of $40,000 to a "Keeco" entity in Washington;
  (iii) the May 4, 1995, wire transfer of $50,000 for credit to Warley, Inc.;
  (iv) the May 4, 1995, wire transfer of $7,500 to Jim Roma in Washington, with "special instructions" from "F. Kelly," which O'Dea knew was false and fraudulent since the funds did not come from F. Kelly;
  (v) the May 12, 1995, wire transfer of $10,000 to "David J. Friednbach" in Oregon; and
  (vi) the May 12, 1995, wire transfer of $500,000 to "Jack Vita, Esq. Client Trust Account," with "special instructions" from "Warley, Inc.," which O'Dea knew was false and fraudulent since the funds did not come from Warley, Inc.
(*See id.* ¶ 122.)

B. *The Relevant Plaintiffs*

1. *DOIT Corp.*

O'Dea was aware that several million dollars had been wired from the Florida Cordova Law Center ("Cordova"), in April and May 1995, to the Wolas sub-account at Chemical. However, neither O'Dea nor anyone else at Chemical

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

contacted Cordova regarding the purpose of those transfers or alerted it of Chemical's concerns. On May 16, 1995, Plaintiff DOIT Corp. ("DOIT") deposited $500,000 in escrow with the Cordova, with the expectation that the funds would then be transferred to the Wolas sub-account at Chemical. DOIT was never advised that Chemical had already taken steps to shut down the sub-account. (*See id.* ¶ 125.)

2. *Research & Finance Corp.*

**\*3** In late May 1995, the Chairman of the Research & Finance Corp. ("RFIN"), who maintained personal accounts at Chemical, contacted Chemical's Private Banking Group to confirm the status of what he believed was an H & W Client Funds account before he transferred $500,000 out of his personal account on behalf of RFIN to that account. The Chairman was advised that the H & W Client Funds account was in good standing, but was not told, among other things, (i) that the escrow account was a sub-account of SEV; (ii) that the sub-account was Wolas's and that H & W did not maintain the firm's principal attorney escrow account at Chemical; (iii) that Chemical had notified Wolas and SEV in early May 1995 to close the primary and subaccounts; and (iv) that Chemical believed that primary and subaccounts were being used for fraudulent purposes. (*See id.* ¶ 126.)

On June 29, 1995, pursuant to H & W's instructions, RFIN's accountant attempted to transfer $500,000 on RFIN's behalf to the Wolas sub-account at Chemical, believing it to be an escrow account maintained by H & W. As the SEV account and Wolas sub-account had already been closed at that point, the transfer did not go through. Chemical did not disclose to RFIN, however, why the Wolas sub-account had been closed. Believing it to be an administrative matter and that H & W had moved its escrow account to another bank, RFIN transferred the funds on July 13, 1995, to an account at National Westminster Bank ("Nat West"), now known as Fleet Bank, maintained by Wolas. (*See id.* ¶ 127.)

C. *This Action*

On September 24, 1999, various investors in Wolas's "Ponzi" scheme commenced this action for damages against

H & W, Wolas, and other defendants for violations of the Securities Exchange Act of 1934, the Racketeering Influenced and Corrupt Organization Act, and New York common law. Relevant to the motion before me now are the claims by DOIT and RFIC against Chase (formerly Chemical) for fraud, aiding and abetting fraud, and commercial bad faith. [FN3] Chase has moved to dismiss these claims for failure to state a claim upon which relief can be granted and for failure to plead fraud with particularity, pursuant to Rules 12(b)(6) and Rule 9(b) of the Federal Rules of Civil Procedure.

> FN3. Although Plaintiff Glen Guillet originally asserted these claims against Chase as well, I was informed at oral argument on May 26, 2000, that Guillet's claims had been settled.

DISCUSSION

A. The Rule 12(b)(6) Standard

In a 12(b)(6) motion, a federal court's task in determining the sufficiency of a complaint is "necessarily a limited one." *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974). The inquiry focuses not on whether a claim might ultimately prevail on her claim, but on whether she is entitled to offer evidence in support of the allegations in the complaint. *See id.* "Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test." *Id.* Rule 12(b)(6) warrants a dismissal only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957); *see also Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton College,* 128 F.3d 59 (2d Cir.1997). In considering a defendant's motion, the Court must accept as true all the factual allegations in the complaint and must draw all reasonable inferences in favor of the plaintiff. *See Hamilton,* 128 F.3d at 59 (citing *Hospital Bldg. Co. v. Trustees of Rex Hosp.,* 425 U.S. 738, 740 (1976)).

B. *Common Law Fraud*

**\*4** Chase contends that RFIN's fraud or fraudulent concealment claims must be dismissed because it has failed to allege the elements of the claims and sufficient facts to

Not Reported in F.Supp.2d                                                                    Page 4
Not Reported in F.Supp.2d, 2000 WL 1375265 (E.D.N.Y.)
**(Cite as: 2000 WL 1375265 (E.D.N.Y.))**

give rise to a strong inference of fraudulent intent under Rule 9(b). [FN4]

> FN4. DOIT has abandoned its fraud claim against Chase. (See Pls.' Mem. of Law in Opp'n at 3 n. 2.)

To state a claim of common law fraud under New York law, plaintiff must establish, by clear and convincing evidence, that (i) the defendant made a material misrepresentation; (ii) with knowledge of its falsity; (iii) with the intent to defraud the plaintiff; (iv) on which the plaintiff reasonably relied; and (v) that caused damage to the plaintiff as a result. See Schlaifer Nance & Co. v. Estate of Andy Warhol, 119 F.3d 91, 98 (2d Cir.1997); Banque Arabe et Internationale D'Investissement v. Maryland National Bank, 57 F.3d 146, 153 (2d Cir.1995).

1. Proximate Cause

RFIN alleges that Chemical made a material false misrepresentation when it represented to RFIN's Chairman that the Wolas sub-account was in good standing. It further alleges that it reasonably relied on this representation and suffered at least $500,000 in damages when its investment was later misappropriated by Wolas from his account at NatWest. In response, Chase contends that RFIN has failed to establish that Chemical's statement was the proximate cause of RFIN's injury. I agree.

"The absence of adequate causation is ... fatal to a common law fraud claim under New York law." Bennett v. United States Trust Co., 770 F.2d 308, 316 (2d Cir.1985). A plaintiff may establish proximate cause if an injury "is the natural and probable consequence of the defrauder's misrepresentation or if the defrauder ought reasonably to have foreseen that the injury was a probable consequence of his fraud." ' Citibank, N.A. v. K-H Corp., 968 F.2d 1489, 1496 (2d Cir.1992) (quoting Cumberland Oil Corp. v. Thropp, 791 F.2d 1037, 1044 (2d Cir.1986)). "The requisite causation is established only where the loss complained of is a direct result of the defendant's wrongful actions and independent of other causes." Revak v. SEC Realty Corp., 18 F.3d 81, 89-90 (2d Cir.1994) (citing Bennett, 770 F.2d at 316).

In Bennett, the plaintiffs used the proceeds of a series of loans from the defendant bank to purchase public utility stock and then deposited the stock with the bank as collateral for the loans. See 770 F.2d at 310. In negotiating the loans, the bank misrepresented to the plaintiffs that the Federal Reserve's margin rules do not apply when public utility stock is deposited as collateral. The stock subsequently generated insufficient dividends to cover the interest, and its market value decreased. Thus, in addition to the plaintiffs' loss of the equity itself, they owed the bank the outstanding interest and principal in excess of the stock's depreciated value. See id. The district court dismissed the plaintiffs' common law fraud claim for lack of causation and the Second Circuit affirmed, concluding that the plaintiffs had only alleged "but for" causation, i.e., that they would not have purchased the stock if the bank had denied the loans. See id. at 314-16. Noting that the plaintiffs' common law fraud and securities fraud claims were equally flawed, the court stated that there was "simply no direct or proximate relationship between the loss and the misrepresentation." Id. at 314, 316. The court emphasized that the plaintiffs approached the bank for a loan with the plan to purchase the public utility stock; the bank recommended neither public utility stock in general, that stock in particular, nor the investment value of any such stock. See id. at 313-14. Accordingly, the court concluded that the "loss at issue was caused by the [plaintiffs'] own unwise investment decisions, not by [the bank's] misrepresentation." Id. at 314.

*5 RFIN's fraud claim fails for precisely the same reasons. RFIN approached Chemical with the intention of investing in Wolas's whiskey scheme. Indeed, RFIN's Chairman contacted Chemical's Private Banking Group only to confirm the status of Wolas's account at Chemical prior to directing the transfer of $500,000 into the account. (See Compl. ¶ 126.) At that time, the Chairman was told that Wolas's account was in good standing. (See id.) Although RFIN insists that it would not have invested with Wolas (by depositing $500,000 in his account at Nat West after learning that the Chemical account was closed) if the Chemical officer had not made that representation or had told RFIN's Chairman of Chemical's concerns about the Wolas sub-account, these allegations at most establish "but

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                        Page 5
Not Reported in F.Supp.2d, 2000 WL 1375265 (E.D.N.Y.)
(Cite as: 2000 WL 1375265 (E.D.N.Y.))

for" causation. Simply put, the direct and proximate cause of RFIN's loss was Wolas's fraud, not Chemical's representation about the status of the Wolas sub-account.

### 2. *Duty to Disclose*

In addition, RFIN asserts that it has a claim of fraudulent concealment based on Chemical's failure to disclose to RFIN's Chairman that (i) Chemical had notified Wolas and SEV that it would close the accounts as of June 5, 1995; (ii) Chemical suspected fraudulent activity in the accounts; (iii) H & W did not maintain an escrow account at Chemical; and (iv) Wolas's escrow account was a sub-account of the SEV account.

To establish a claim of fraudulent concealment under New York law, the plaintiff must prove the aforementioned elements of common law fraud *and* that "the defendant had a duty to disclose the material information." *Banque Arabe, 57 F.3d at 153*. A duty to disclose may arise in two circumstances: (i) "where the parties enjoy a fiduciary relationship" and (ii) "where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge." *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, N.A., 731 F.2d 112, 123 (2d Cir.1984)*.

RFIN claims that Chemical's duty to disclose arose from its superior information about the status of the Wolas sub-account. It argues that such information was not readily available to RFIN, and that Chemical knew that RFIN was acting, or attempting to act, on the basis of mistaken knowledge when RFIN attempted to transfer $500,000 to the account after it was closed.

As an initial matter, I question whether RFIN may bring a fraudulent concealment claim against Chase since such a claim "ordinarily arises only in the context of business negotiations where parties are entering a contract." *Ray Larsen Assocs., Inc. v. Nikko Am., Inc.,* No. 89 Civ. 2809(BSJ), *1996 WL 442799, at *5 (S.D.N.Y. Aug. 6, 1996); see also Renner v. Chase Manhattan Bank,* No. 98 Civ. 926(CSH), *2000 WL 781081, at *9 n. 5 (S.D.N.Y. June 14, 2000)* (questioning in *dicta* whether defendant bank had duty to disclose where plaintiff neither conducted business

nor negotiated contracts with bank or bank employee); *Williams v. Bank Leumi Trust Co., No. 96 Civ. 6695(LMM), 1998 WL 397887,* at *8 (S.D .N.Y. July 15, 1998) (questioning in *dicta* whether insurance company receiver had standing to bring fraudulent concealment claim where defendant bank and insurance company "never stood on opposite sides of the same transaction").

***6** However, even if RFIN can state a fraudulent concealment claim in these circumstances, it has not done so. Chase cannot properly be held accountable for failing to disclose information about the Wolas's sub-account to RFIN. "[A] bank should keep its own customers' affairs confidential." *Aaron Ferer, 731 F.2d at 123* (citing *Graney Dev. Corp. v. Taksen, 400 N.Y.S.2d 717, 719 (Sup.Ct.), aff'd, 411 N.Y.S.2d 756 (4th Dep't 1978)*); *see also Graney, 400 N.Y.S.2d at 719* ("It is implicit in the contract of the bank with its customer or depositor that no information may be disclosed by the bank or its employees concerning the customer's or depositor's account.") (internal quotation marks and citations omitted); *Renner, 2000 WL 781081, at *9* (citing *Aaron Ferer* and *Graney* and noting that bank officer had no duty to respond to plaintiff's letters inquiring about bank customers); *cf. Young v. United States Dep't of Justice, 882 F.2d 633, 640-43 (2d Cir.1989)* (encouraging New York courts to recognize duty of confidentiality between bank and customer). Thus, Chemical had no duty to volunteer to RFIN additional information about the alleged suspicious activity in the Wolas sub-account.

Finally, even if Chemical was obligated to disclose this additional information, there is no indication that Chemical knew that RFIN was acting on the basis of mistaken knowledge concerning the financial transaction between Wolas and RFIN. According to the plaintiff's allegations, Chemical knew only that RFIN inquired about the sub-account and attempted to transfer funds to the account after it had been closed. This attempted transfer does not support an inference that RFIN was acting on its mistaken information that Wolas was not engaging in fraud. For all Chemical knew, assuming Chemical knew of the scheme at all, RFIN was a cohort of Wolas, not a potential defrauded investor. Accordingly, RFIN has not stated claim for fraudulent concealment. [FN5]

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 6
Not Reported in F.Supp.2d, 2000 WL 1375265 (E.D.N.Y.)
**(Cite as: 2000 WL 1375265 (E.D.N.Y.))**

FN5. RFIN's fraudulent concealment claim also fails due to the absence of proximate cause. *See supra.*

3. *Intent to Defraud Under* Rule 9(b)

Lastly, RFIN's fraud claim must also be dismissed for the failure to plead Chemical's intent to defraud with the requisite particularity to satisfy Rule 9(b) of the Federal Rules of Civil Procedure. Rule 9(b) provides, in pertinent part, that "[i]n all averments of fraud ..., the circumstances constituting fraud ... shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." Fed.R.Civ.P. 9(b). The rule is designed to "provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from improvident charges of wrongdoing, and to protect a defendant against the institution of a strike suit." *Acito v. Imcera Group, Inc.,* 47 F.3d 47, 52 (2d Cir.1995) (quoting *O'Brien v. National Property Analysts Partners,* 936 F.2d 674, 676 (2d Cir.1991)) (internal quotation marks omitted). Allegations of fraud, therefore, must be specific enough to provide a defendant with "a reasonable opportunity to answer the complaint and ... adequate information to frame a response." *Ross v. A.H. Robins Co.,* 607 F.2d 545, 557-58 (2d Cir.1979).

**\*7** Four essential requirements comprise Rule 9(b). A plaintiff must (i) " 'specify the statements that the plaintiff contends were fraudulent" '; (ii) " 'identify the speaker" '; (iii) " 'state where and when the statements were made" '; and (iv) " 'explain why the statements were fraudulent." ' *Acito,* 47 F.3d at 51 (quoting *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1175 (2d Cir.1993)). Although a plaintiff need not plead detailed evidentiary matters, *see Credit & Fin. Corp. v. Warner & Swasey Co.,* 638 F.2d 563, 566 (2d Cir.1981), it must plead "facts that give rise to a strong inference of fraudulent intent," *see Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir.1994). This inference may be established either (i) "by alleging facts to show that defendants had both motive and opportunity to commit fraud," or (ii) "by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Id.*

RFIN concedes that it does not rely on evidence of motive and opportunity to commit fraud to satisfy its burden under Rule 9(b). Accordingly, I will restrict my analysis to whether RFIN's allegations establish circumstantial evidence of recklessness to give rise to the requisite inference of fraudulent intent.

Recklessness is established by conduct which is " 'highly unreasonable and which represents an extreme departure from the standard of ordinary care ... to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." ' *Chill v. General Elec. Co.,* 101 F.3d 263, 269 (2d Cir.1996) (quoting *Rolf v. Blyth, Eastman Dillon & Co.,* 570 F.2d 38, 47 (2d Cir.1978)) (alteration in *Rolf* ). In some instances, an inference of recklessness may be raised by " '[a]n egregious refusal to see the obvious, or to investigate the doubtful." ' *Id.* (quoting *Goldman v. McMahan, Brafman, Morgan & Co.,* 706 F.Supp. 256, 259 (S.D.N.Y.1989)). Nonetheless, the plaintiff bears a "significant burden ... in stating a fraud claim based on recklessness." *Id.* at 270.

Here, RFIN has failed to allege facts that constitute strong circumstantial evidence of recklessness. First, in March 1995, when the accounts were opened, Chemical had no actual knowledge that Dolan and Wolas had previously engaged in fraudulent activity. Rather, Chemical's officer, Bruce Whitcomb, had been "suspicious" of fraud in 1994, and had referred the matter to the fraud unit, which had concluded that it was "probably an advance fee scam." (Compl.¶ 112.) Likewise, neither the anonymous report to Chemical's Assistant General Counsel, Mark Segall, that Wolas had fraudulently overbilled Chemical's predecessor on a litigation matter nor the allegation that Chemical closed down a Wolas family business account due to a bounced check (both of which occurred in 1994) establishes that Chemical knew Wolas was engaged in fraud in 1995. (*See* Com pl. ¶¶ 113-14.) Thus, these allegations do not give rise to any inference of Chemical's fraudulent intent.

**\*8** Second, the allegations that Chemical's branch officer, Kevin O'Dea, approved various internal transfers between the SEV account and the sub-account, (*see* Compl. ¶¶ 119-20), similarly do not satisfy Rule 9(b)'s requirement. *See Williams v. Bank Leumi Trust Co.,* No. 96 Civ.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 7
Not Reported in F.Supp.2d, 2000 WL 1375265 (E.D.N.Y.)
**(Cite as: 2000 WL 1375265 (E.D.N.Y.))**

6695(LMM), 1997 WL 289865, at *3 (S.D.N.Y. May 30, 1997) (mere transfer of funds between accounts was insufficient to raise inference of knowledge of check-kiting scheme to satisfy Rule 9(b) or Rule 12(b)(6) for claim of fraudulent concealment).

Third, as soon as Chemical's fraud investigative unit alerted O'Dea of the prior suspected advance fee scam and urged that Chemical shut down the accounts, O'Dea notified Dolan that the SEV account and the Wolas sub-account would be closed in one month. (*See* Compl. ¶¶ 117-18.) Although Chemical may have shown greater vigilance by closing the accounts immediately, rather than continuing to approve transfers and bank checks until the accounts were closed one month later, this failing does not establish recklessness sufficient to raise a strong inference of Chemical's intent to defraud RFIN. *See Chill*, 101 F.3d at 269; *see also Renner*, 2000 WL 781081, at *14 (bank's failure to detect fraud sooner insufficient to satisfy Rule 9(b) burden of pleading fraudulent intent for aiding and abetting fraud claim); *Nigerian Nat'l Petroleum Corp. v. Citibank, N.A., No. 98 Civ. 4960(MBM), 1999 WL 558141*, at * 7-*8 (S.D.N.Y. July 30, 1999) (bank's negligent failure to investigate several red flags and to prevent additional wire transfers after second fraudulent transfer uncovered by transferring bank did not give rise to strong inference of fraudulent intent to satisfy Rule 9(b) for claims of commercial bad faith and aiding and abetting fraud).

Finally, in light of the aforementioned case law concerning the confidential nature of bank customer information, Chemical's failure to provide information to RFIN about Wolas's sub-account beyond the representation that it was in good standing cannot give rise to an inference of an intent to defraud.

In sum, RFIN has failed its significant pleading burden. Its allegations do not raise any inference, let alone a strong inference, of an intent to defraud. Accordingly, RFIN's fraud and fraudulent concealment claims must be dismissed.

C. *Aiding and Abetting Fraud*

To establish a claim of aiding and abetting fraud under New York law, a plaintiff must establish (i) the existence of a violation by the primary wrongdoer; (ii) knowledge of this violation by the aider and abettor; and (iii) proof that the aider and abettor substantially assisted in the primary wrong. *See Armstrong v. McAlpin*, 699 F.2d 79, 91 (2d Cir.1983). Chase contends, and I agree, that RFIN and DOIT have failed to allege either Chemical's knowledge of Wolas's fraud or that Chemical substantially assisted in the commission of the fraud.

1. *Actual Knowledge*

New York law requires a plaintiff to establish that the alleged aider and abettor had " 'actual knowledge' " of the primary wrong. *Renner*, 2000 WL 781081, at *6 (quoting *Kolbeck v. LIT Am., Inc ., 939 F.Supp. 240, 246 (S.D.N.Y.1996)*); *see also Wight v. Bankamerica Corp., 219 F.3d 79, 91 (2d Cir.2000)* (stating that "knowledge of the underlying wrong" is "required element" under New York law).

**\*9** Here, the plaintiffs have failed to allege that Chemical had actual knowledge of Wolas's fraud. As explained *supra*, the allegations that Chemical suspected that Dolan and SEV were running an advance fee scam in 1994, (*see* Compl. ¶ 112), that Wolas allegedly overbilled Chemical's predecessor in connection with litigation, (*see id.* ¶ 113), and that Chemical shut down a Wolas family account in 1994 due to a bounced check, (*see id.* ¶ 114), do not establish that Chemical had actual knowledge of Wolas's fraudulent scheme in 1995.

Turning to the allegations in 1995, O'Dea requested Chemical's fraud investigation unit to review the SEV account and the Wolas sub-account based on suspicions--not actual knowledge--of fraudulent activity. (*See id.* ¶ 115, 117.) Subsequently, upon receiving the recommendation of the fraud unit that the accounts be closed, O'Dea informed Dolan that Chemical would close the accounts in one month. (*See id.* ¶ 117-18.) Allegations that Chemical suspected fraudulent activity, however, do not raise an inference of actual knowledge of Wolas's fraud. [FN6]

 FN6. This case is closely analogous to Judge Haight's opinion in *Renner*, 2000 WL 781081. In

Not Reported in F.Supp.2d                                                         Page 8
Not Reported in F.Supp.2d, 2000 WL 1375265 (E.D.N.Y.)
**(Cite as: 2000 WL 1375265 (E.D.N.Y.))**

that case, the plaintiff alleged that Chase aided and abetted a prime bank guarantee scam. The allegation of actual knowledge on the part of Chase was based on, *inter alia,* its officials' rejection of a letter of credit proposal based on their suspicion that the letters were potential vehicles for fraud. *See id.* at *12. The court rejected this argument, however, and concluded that there was "no factual basis for the assertion that Chase officials actually knew the fraud [they suspected] was, in fact, occurring." *Id.*

Finally, O'Dea's authorization of transfers between the SEV account and the sub-account, (*see id.* ¶ 119), and his approval of multiple wire transfers, (*see id.* ¶ 122), do not create an inference of knowledge of the scheme. In *Williams,* 1997 WL 289865, a statutory receiver for an insurance company brought an action for, *inter alia,* aiding and abetting fraud, and alleged that the defendant bank had actual knowledge of a check-kiting scheme where the bank had approved various bank transfers. *See id.* at *4. The court rejected this argument, concluding that the account transfers and other allegations established only constructive knowledge on the part of the bank, which is insufficient to state a claim for aiding and abetting fraud. *See id.* Similarly, in this case, the plaintiffs have failed to establish that Chemical had any actual knowledge of Wolas's fraud, and thus, their aiding and abetting fraud claim must be dismissed. [FN7]

> FN7. The plaintiffs' remaining allegations, that Chemical improperly permitted Dolan, a non-lawyer, to be a signatory on the Wolas's attorney escrow account, (*see* Compl. ¶ 116), that Chemical knew that a check drawn on the SEV account had been altered to reflect that it was issued from the Wolas sub-account, (*see id.* ¶ 120), and that Chemical knew that H & W did not maintain a firm escrow account at Chemical, (*see id.* ¶ 123), do not establish that Chemical knew of Wolas's fraud. These allegations only support a finding that Chemical had constructive notice of the fraud.

2. *Substantial Assistance*

The second element of an aiding and abetting fraud claim is substantial assistance. "A defendant provides substantial assistance only if it 'affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables [the fraud] to proceed." ' *Nigerian Nat'l,* 1999 WL 558141, at *8 (quoting *Diduck v. Kaszycki & Sons Contractors, Inc.,* 974 F.2d 270, 284 (2d Cir.1992)) (alteration in *Nigerian Nat'l* ).

Again, the plaintiffs have failed to allege that Chemical substantially assisted Wolas's fraud. The affirmative acts of opening the accounts, approving various transfers, and then closing the accounts on the basis of suspected fraud, without more, do not constitute substantial assistance. In *Williams,* the court considered whether the use of bank accounts by the participants in the fraudulent scheme constituted substantial assistance by the bank in the participants' fraud. *See* 1997 WL 289865, at *4. Rejecting the claim, the court held that "the mere fact that all the participants in the alleged scheme used accounts at [the bank] to perpetrate it, without more, does not rise to the level of substantial assistance necessary to state a claim for aiding and abetting liability." *Id.; see also Nigerian Nat'l,* 1999 WL 558141, at *8 (bank's execution of repeated wire transfers for millions of dollars did not constitute substantial assistance for an aiding and abetting fraud claim); *Renner,* 2000 WL 781081, at *12 (Chase did not give substantial assistance to participants of prime bank guarantee scam simply because participants used accounts at Chase).

**\*10** Turning to the plaintiffs' allegations of Chemical's inaction, *e.g.,* failing to shut down the accounts sooner or to inform the plaintiffs about the suspected fraud, these omissions likewise do not rise to the level of substantial assistance. As previously stated, a defendant may provide substantial assistance by failing to act only when it was required to act. *See Nigerian Nat'l,* 1999 WL 558141, at *8. Absent a confidential or fiduciary relationship between the plaintiff and the aider and abettor, the inaction of the latter does not constitute substantial assistance warranting aider and abettor liability. *See King v. George Schonberg & Co.,* 650 N .Y.S.2d 107, 108 (1st Dep't 1996); *see also Renner,* 2000 WL 781081, at *12 ("[A]bsent a fiduciary duty, inaction does not constitute substantial assistance."). Here,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                  Page 9
Not Reported in F.Supp.2d, 2000 WL 1375265 (E.D.N.Y.)
**(Cite as: 2000 WL 1375265 (E.D.N.Y.))**

the plaintiffs and Chemical do not have a fiduciary relationship. The relationship between a bank and its depositor is not a fiduciary one, but only that of a debtor and creditor. *See Aaron Ferer & Sons, Ltd. v. Chase Manhattan Bank, N.A.,* 731 F.2d 112, 122 (2d Cir.1984). Thus, RFIN or RFIN's Chairman, who had an account at Chemical's Private Banking Group, did not have a fiduciary relationship with Chemical. DOIT is not even a client of Chemical. Moreover, even assuming that RFIN had a confidential relationship with Chemical by virtue of its status as a customer, *see id.* at 123 ("[A] bank should keep its own customers' affairs confidential." (citing *Graney Dev. Corp. v. Taksen,* 400 N.Y.S.2d 717, 719 (Sup.Ct.), *aff'd,* 411 N.Y.S.2d 756 (4th Dep't 1978))), Chemical was under no obligation to disclose confidential information about Wolas, another customer. The plaintiffs, therefore, have failed to establish that Chemical substantially assisted in Wolas's fraud. Accordingly, their aiding and abetting fraud claim must be dismissed.

D. *Commercial Bad Faith*

A claim for commercial bad faith against a depository bank will lie if the "bank acts dishonestly--where it has actual knowledge of facts and circumstances that amount to bad faith, thus itself becoming a participant in the fraudulent scheme." *Prudential-Bache Sec., Inc. v. Citibank, N.A.,* 73 N.Y.2d 263, 275 (1989). Thus, "knowledge of the underlying wrong" is a "required element" of commercial bad faith under New York law. *Wight v. Bankamerica Corp.,* 219 F.3d 79, 91 (2d Cir.2000).

As I have already concluded that the complaint fails adequately to allege that Chemical had actual knowledge of Wolas's fraud, the plaintiffs' claim for commercial bad faith must also be dismissed. At most, the plaintiffs have alleged that Chemical negligently failed to monitor the accounts adequately and close them promptly. However, pleading " 'merely a lapse of wary vigilance or even suspicious circumstances which might well have induced a prudent banker to investigate" ' is insufficient to state a claim of commercial bad faith. *Renner,* 2000 WL 781081, at *17 (quoting *Prudential-Bache,* 73 N.Y.2d at 275); *see also Nigerian Nat'l,* 1999 WL 558141, at *8 (bank's alleged failure to investigate "red flags" and negligent approval of

additional wire transfers, even after bank was alerted to fraudulent transfer, insufficient to state commercial bad faith claim).

**\*11** The plaintiffs' reliance on *Prudential-Bache,* 73 N.Y. 263, and *Peck v. Chase Manhattan Bank, N.A.,* 593 N.Y.S. 509 (1st Dep't 1993), to support their contention that Chemical had actual knowledge of Wolas's fraud is unpersuasive. Indeed, these cases support Chase's position. In *Prudential-Bache,* two bank officers were convicted of accepting bribes in connection with participation in a fraudulent scheme. The bank officers set up accounts without proper opening records and corporate resolutions, and with fictitious corporate officers, and also agreed not to prepare certain records required to be filed with the Internal Revenue Service. *See* 73 N.Y.2d at 267. To implement the embezzlement scheme, one of the co-conspirators cashed several checks on a single day and often left the branch with large quantities of cash or cashiers' checks. Furthermore, other bank employees, including managers, were also allegedly aware of the fraud due to a co-conspirator's frequent visits to the bank, his repeated large cash withdrawals at teller windows, and his conversations with other bank employees. *See id.* at 268. Although the bank argued that the conduct of its agents, the convicted officers, could not be imputed to it under the adverse agent doctrine, the New York Court of Appeals declined to decide that issue and held that the plaintiff had stated a commercial bad faith claim against the bank. *See id.* at 276-77. In *Peck,* the plaintiff alleged that an internal bank memorandum reflected that bank employees actually knew that checks payable to third parties were being deposited into the thief's account, but no action was taken. 593 N.Y.S.2d at 511. The trial court granted the bank's motion to dismiss, but the Appellate Division reversed, holding that the allegations of actual knowledge adequately stated a claim for commercial bad faith. *See id.*

Here, the plaintiffs' allegations fall short of these cases, which involved either active participation in the fraud by bank officials or actual knowledge on their part of the ongoing fraud, as they have failed to allege either on the part of Chemical. Accordingly, their commercial bad faith claim must be dismissed.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                           Page 10
Not Reported in F.Supp.2d, 2000 WL 1375265 (E.D.N.Y.)
**(Cite as: 2000 WL 1375265 (E.D.N.Y.))**


E. *Leave to Amend*

The plaintiffs argue, in the alternative, that if I grant Chase's motion I should give them leave to replead. I decline to do so.

A district court may deny leave to amend a complaint if the amendment would be futile. *See Foman v. Davis,* 371 U.S. 178, 182 (1962). As the plaintiffs drafted their complaint well after discovery had been taken in a related case, *see Accousti v. Wolas,* 95-CV-5267 (JG) (E.D.N.Y. filed Dec. 20, 1995), an opportunity to amend would be futile. *See Billard v. Rockwell Int'l Corp.,* 683 F.2d 51, 57 (2d Cir.1982) (denial of leave to amend not abuse of discretion where plaintiff had "access to full discovery" in a related case).

CONCLUSION

For the aforementioned reasons, Chase's motion to dismiss is granted.

**\*12** So Ordered.

Not Reported in F.Supp.2d, 2000 WL 1375265 (E.D.N.Y.)

**Motions, Pleadings and Filings (Back to top)**

• 1:99cv05938 (Docket) (Sep. 24, 1999)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                      Page 1
Not Reported in F.Supp.2d, 2003 WL 470611 (S.D.N.Y.), Comm. Fut. L. Rep. P 29,406
**(Cite as: 2003 WL 470611 (S.D.N.Y.))**

c

**Motions, Pleadings and Filings**

United States District Court,
S.D. New York.
Christos TZARAS, Plaintiff,
v.
EVERGREEN INTERNATIONAL SPOT TRADING,
INC., a/k/a Evergreen International
Trading, Inc., First Equity Enterprises, Inc., Andrei
Koudachev, Gary Farberov,
Polina Sirotina, Justin C. Fauci, Ryan Swanson, Peter J.
Papaemanuel, Gary
Gelman, Forex Intrnational, Ltd., Chase Manhattan Bank,
N.A., and John Does
Nos. 1-100, Defendants.
**No. 01 Civ. 10726(LAP).**

Feb. 25, 2003.

Investor who had invested $1.7 million in a spot trading company filed amended complaint against the company and others, including the bank in which the trading company pooled the investor's money, and alleged that the bank violated provisions of the New York Uniform Commercial Code (UCC) relating to misdescription of beneficiary and was negligent under New York Law. On bank's motion to dismiss the amended complaint, the District Court, Preska, J., held that: (1) bank had properly credited money to beneficiary's account as mentioned in the wire transfer and there was no "misdescription of beneficiary," and (2) bank owed no duty of care to investor who was not customer of bank.

Motion to dismiss granted.

West Headnotes

**[1] Banks and Banking** ⚖188.5
52k188.5 Most Cited Cases
Payment orders did not contain misdescription of beneficiary so as to trigger provision of New York Uniform Commercial Code (UCC) requiring bank to refuse acceptance of payment order, despite wire transfer instructions for further credit to bogus sub-accounts, where

payment orders also identified one proper account name and number at bank, thus indicating identifiable beneficiary. McKinney's Uniform Commercial Code § 4-A-207.

**[2] Banks and Banking** ⚖100
52k100 Most Cited Cases

**[2] Banks and Banking** ⚖188.5
52k188.5 Most Cited Cases
Bank that accepted wire transfers from non-customer for deposit into customer's account and that ignored non-customer's additional wire transfer instructions to credit funds to sub-accounts with the words "for further credit," owed no duty of care to non-customer and no duty to prevent its customer from defrauding non-customer, which thus precluded non-customer's negligence claim under New York law.

*MEMORANDUM AND ORDER*

PRESKA, J.

**\*1** Plaintiff Christos Tzaras ("Tzaras") brings this amended complaint ("Complaint" or "Compl.") as against defendants Evergreen International Spot Trading, Inc., a/k/a Evergreen International Trading, Inc., First Equity Enterprises, Inc., Andrei Koudachev, Gary Farberov, Polina Sirotina, Justin C. Fauci, Ryan Swanson, Peter J. Papaemanuel, Gary Gelman, Forex International, Ltd., Chase Manhattan Bank, N.A., and John Does Nos. 1-100 for damages arising out of Tzaras' investment of over $1.7 million in foreign currency exchange transactions on the "spot market." (Compl.¶ 1). Counts Seven and Nine of the Complaint charge Chase Manhattan Bank, N.A. (now known as JP Morgan Chase Bank, hereafter referred to as "Chase") with violations of N.Y.U.C.C. § 4-A-207 and with common law negligence, respectively. [FN1] (Compl.¶¶ 100-106, 112-118). Chase now moves, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss Counts Seven and Nine, the only counts in which it is named as a defendant, for failure to state a claim upon which relief can be granted. For the reasons stated herein, Chase's motion is granted, and the claim is dismissed.

FN1. Count Eight of plaintiff's Complaint also charged Chase with violation of N.Y.U.C.C. §

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 2
Not Reported in F.Supp.2d, 2003 WL 470611 (S.D.N.Y.), Comm. Fut. L. Rep. P 29,406
**(Cite as: 2003 WL 470611 (S.D.N.Y.))**

4-A-303. (Compl.¶¶ 107-111). However, plaintiff withdrew this charge in his May 22, 2002 Memorandum of Law in Opposition to Defendant JP Morgan Chase Bank's Motion to Dismiss ("Pl's Opp. Br."). (Pl's Opp. Br. at 2, fn. 1).

BACKGROUND

The pertinent facts with regard to this motion, as alleged by plaintiff, are as follows. From June 1999 through and including September 2001, plaintiff Christos Tzaras, a Greek shipping executive, invested more than $1.7 million with defendant Evergreen International Spot Trading, Inc. ("Evergreen"), a company that claimed to be engaged in foreign currency exchange transactions on the "spot market," a forum for currency trading in which foreign currency is purchased for immediate (as compared to future) delivery. (Compl.¶¶ 1, 18).

Tzaras first learned of Evergreen in or about May 1999, when he began receiving unsolicited telephone calls from Justin C. Fauci and Ryan Swanson, two employees of Evergreen, at his home in Monaco. (Compl.¶ 27). During the course of these conversations, which continued through June 1999, Fauci and Swanson represented to Tzaras that Evergreen was a large, well-established company with a highly successful track record of currency trading on the spot market; that Evergreen was, at the time of those conversations, actively managing over $200 million in investor assets; that Evergreen "guaranteed" a return on investment of between 20-30% per year; that none of the monies invested with Evergreen would be used for currency trading but rather would be used solely as collateral for certain loans that Evergreen would later secure; that the monies sent to Evergreen would be pooled with other monies and that the gains, commissions and clearing expenses associated with Evergreen's trades would be apportioned pro rata to each investor's account; and that although Tzaras' investment would be placed in a bank account maintained by First Equity at Chase, these monies would be immediately segregated into separate sub-accounts that bore his name. (Compl.¶ 27). These representations were later confirmed in correspondence sent by Evergreen, including letters to Tzaras dated June 2, 1999, May 19, 2000, and July 25, 2000.(Id.). As the complaint alleges,

such representations were particularly important to Tzaras since, as Fauci and Swanson explained, Chase's role as a depository bank was intended to provide potential investors with "peace of mind." (Id.).

**\*2** Based upon and in reliance on the above-mentioned representations, Tzaras agreed to allow Evergreen to act as his currency trader and fiduciary. (Compl.¶ 28). Thereafter, Evergreen purported to create two sub-accounts for Tzaras at Chase: the first, which bore Account No. 62643, was to hold Tzaras' investments in United States dollars; the second, which bore Account No. 64128, was to hold Tzaras' investments in Euros. (Id.).

From June 1999 through May 2001, Tzaras caused approximately $1.7 million of his monies to be wired to the two above-referenced accounts at Chase. (Compl.¶ 29). Tzaras transferred these monies using funds from one of three sources: from an account with Compagnie Monegasque de Banque, a Monaco-based bank; from an account with Credit Agricole, a Nice-based bank; or from a securities account maintained with Prudential Securities. (Compl.¶ 30). Following Evergreen's instructions, Tzaras made each transfer with the express direction that these monies were to be deposited in First Equity's account with Chase "for further credit to" Tzaras. (Id.). In many cases, these directions specifically identified Tzaras as having "Account No. 62643" or "Account No. 64128." (Id .). From June 1999 through September 2001, Tzaras made repeated inquiries of Evergreen employees into the status of his accounts, who assured him that his funds were securely held in his Chase sub-accounts and that his investments were performing well above expectations. (Compl.¶ 36, 37).

Following the events of September 11, 2001, Tzaras learned, through a series of press accounts and disclosures, that Evergreen was merely a sham entity created in order to facilitate the theft of investor assets. (Compl.¶ 38). As set forth in plaintiff's complaint, many of the monies stolen as part of the Evergreen scheme have been transferred to secret bank accounts in Switzerland and elsewhere. (Compl.¶ 39).

According to plaintiff's complaint, upon information and belief, in September 2000, Chase directed the closure of two bank accounts maintained in the name of Evergreen.

Not Reported in F.Supp.2d                                                                Page 3
Not Reported in F.Supp.2d, 2003 WL 470611 (S.D.N.Y.), Comm. Fut. L. Rep. P 29,406
**(Cite as: 2003 WL 470611 (S.D.N.Y.))**

(Compl.¶ 48). Again upon information and belief, plaintiff alleges that Chase took this action because, among other things, it was concerned about certain suspicious transactions in these accounts, the same kind of transactions that were also taking place in First Equity's account. (Id.). As plaintiff alleges, "Notwithstanding its knowledge of the activities in the Evergreen accounts, Chase took no such similar action with respect to First Equity's account. Under the 'Know Your Customer' procedures and suspicious activity reporting requirements implemented in the Bank Secrecy Act ... Chase was required to monitor and report such suspicious activities." (Compl.¶ 49).

On November 28, 2001, plaintiff filed an original complaint. On December 20, 2001, plaintiff filed an amended complaint, which is the subject of the instant motion. In Count Seven of that Complaint, plaintiff alleges that Chase knew that the sub-accounts in Tzaras' name never existed. (Compl.¶ 103). According to plaintiff, Chase also knew that a conflict existed between Tzaras' wire transfer instructions, which made specific reference to such sub-accounts, and the actual accounts in existence at Chase during this period. (Id.). Therefore, plaintiff asserts in Count Seven, Chase violated N .Y.U.C.C. § 4- A-207, which requires a banking institution to refuse acceptance of payment orders where the person or account to whom a payment is to be credited is either nonexistent or unidentifiable, by accepting the payments that Tzaras made to First Equity's accounts at Chase. (Compl.¶¶ 104, 105).

**\*3** In Count Nine of the Complaint, plaintiff alleges a claim for common law negligence against Chase for breaching its duty to exercise ordinary and reasonable care. (Compl.¶¶ 113, 115). According to plaintiff, Chase was negligent in accepting wire transfers when precluded from doing so under § 4-A-207 and in ignoring suspicious activities taking place in First Equity's account. (Id.). Chase's failure to detect these activities, plaintiff contends, enabled other of the named defendants in this case to undertake their acts of conversion and theft. (Compl.¶ 116).

On March 8, 2002, Chase moved to dismiss Counts Seven, Eight and Nine of the Complaint pursuant to Rule 12(b)(6). [FN2] Chase asserts that Count Seven should be dismissed because Chase properly credited the bank account of First

Equity, whose account number appeared on the wire instructions as the beneficiary, and that any additional notation information that plaintiff included is simply extraneous as to Chase's legal obligations. (Memorandum of Law in Support of JPMorgan Chase Bank's Motion to Dismiss Plaintiff's Amended Complaint, cited herein as "Def's Br.," at 2). Furthermore, Chase moves to dismiss Count Nine because: (a) the bank does not owe a duty of care to non-customers; (b) N.Y.U.C.C. Article 4A cannot be circumvented by alleging negligence claims; and (c) any obligation which Chase may have had relative to First Equity's account under applicable banking law governing a bank's duty to report "suspicious transactions" is not actionable by private parties. (Def's Br. at 3).

> FN2. As noted above, the motion to dismiss Count Eight is now moot in light of plaintiff's withdrawal of that claim in plaintiff's Opposition Brief. See n. 1, supra.

## DISCUSSION

### I. Standard for Rule 12(b)(6)

When deciding a motion to dismiss under Rule 12(b)(6), I must accept as true all well-pleaded factual allegations of the complaint and draw all inferences in favor of the pleader. *See* *City of Los Angeles v. Preferred Communications, Inc.,* 476 U.S. 488, 493, 106 S.Ct. 2034, 90 L.Ed.2d 480 (1986); *Miree v. DeKalb County,* 433 U.S. 25, 27 n. 2, 97 S.Ct. 2490, 53 L.Ed.2d 557 (1977) (referring to "well-pleaded allegations"); *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1174 (2d Cir.1993). In order to avoid dismissal, plaintiff must do more than plead mere "[c]onclusory allegations or legal conclusions masquerading as factual conclusions." *Gebhardt v. Allspect, Inc.,* 96 F.Supp.2d 331, 333 (S.D.N.Y.2000) (quoting 2 James Wm. Moore, Moore's Federal Practice ¶ 12.34[a][b] (3d ed.1997)). Dismissal is proper only when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); accord *Cohen v. Koenig,* 25 F.3d 1168, 1172 (2d Cir.1994).

### II. Motion to Dismiss the N.Y.U.C.C. § 4-A-207 Claim

Not Reported in F.Supp.2d                                                                       Page 4
Not Reported in F.Supp.2d, 2003 WL 470611 (S.D.N.Y.), Comm. Fut. L. Rep. P 29,406
**(Cite as: 2003 WL 470611 (S.D.N.Y.))**

[1] In its motion to dismiss, Chase asserts that the Complaint fails to state a claim under N.Y.U.C.C. § 4-A-207 because, among other reasons, there was no "Misdescription of Beneficiary" to trigger the provisions of Article 4A. Whereas plaintiff claims that the wire transfer instructions of "for further credit" to his "sub-accounts" at Chase rendered the beneficiary unidentifiable or non-existent under § 4-A-207, Chase contends that because plaintiff's wire instructions clearly identified an account number at Chase and properly named First Equity as the beneficiary, the provisions of § 4-A-207 do not apply. (Def's Br. at 12; Pl's Opp. Br. at 6). According to Chase, since Tzaras' payment orders set forth First Equity's account number as well as the correct title associated with that account number, any other information provided by Tzaras was mere surplusage and is irrelevant to the issue of Chase's liability.

*4 N.Y.U.C.C. § 4-A-207(1) (entitled "Misdescription of Beneficiary") provides:

   Subject to subsection (2), if, in a payment order received by the beneficiary's bank, the name, bank account number, or other identification of the beneficiary refers to a nonexistent or unidentifiable person or account, no person has rights as a beneficiary of the order and acceptance of the order cannot occur.

Subsection (2) then addresses instances where the beneficiary's name and account number do not match but, under certain conditions, the funds transfer can still go forward based on the beneficiary's account number alone. [FN3]

      FN3. N.Y.U.C.C. § 4-A-207(2)(a) provides, in pertinent part:
      "... [I]f the beneficiary's bank does not know that the name and number refer to different persons, it may rely on the number as the proper identification of the beneficiary of the order. The beneficiary's bank need not determine whether the name and number refer to the same person."
      Subsection (2) does not, however, apply in the instant case, because that subsection applies only when a beneficiary's bank identifies the beneficiary both by name and account number but the name

and number refer to *different* persons. Here, the name and account number refer to the same entity--First Equity. Moreover, subsection (2) modifies situations where subsection (1) applies. As this Court now holds, the provisions of subsection (1) are inapplicable to the instant case.

Chase asserts that because Tzaras' payment orders provided First Equity's account number and title of the account, the electronic processing system that Chase uses to process funds transfers properly credited First Equity's accounts as a matter of law, regardless of the further information that Tzaras provided in his orders. Plaintiff, quite obviously, disagrees, insisting that the "for further credit" instructions bring the instant case under the "or other identification" clause of § 4-A-207(1), thereby rendering the beneficiary misdescribed as defined under § 4-A-207(1).

In *Donmar Enters., Inc. v. Southern Nat'l Bank of North Carolina*, 828 F.Supp. 1230, 1239-40 (W.D.N.C.1993), the court found that § 4-A-207 "straightforwardly requires banks to reject funds transfers received through the FedWire system which do not come to them bearing at least one identifiable beneficiary." The *Donmar* court, in finding that the beneficiary in question was clearly identified, declared:

   The Court finds that § 4A-207 only requires a bank to refuse a payment order when the beneficiary is unidentifiable. A beneficiary can be identified in any number of ways including the plain wording of the transfer order or the circumstances of the transfer.... There was admittedly at least one identifiable beneficiary, and since § 4A-207 requires no more, the Defendant was not required to refuse the transfer under § 4A-207.

*Id.* at 1240.

Here, plaintiff does not dispute that each of his nine wire transfer payment orders set forth the account number and name of First Equity. Instead, plaintiff maintains that the language of "for further credit to" Tzaras constitutes "other identification of the beneficiary" that refers to a non-existent or unidentifiable person or account. (Pl's Opp. Br. at 6). Plaintiff focuses on the disjunctive "or" in the language of § 4-A-207(1), arguing that if even one of the methods of identification (account number, account name, or "other identification of the beneficiary") refers to a non-existent

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 5
Not Reported in F.Supp.2d, 2003 WL 470611 (S.D.N.Y.), Comm. Fut. L. Rep. P 29,406
**(Cite as: 2003 WL 470611 (S.D.N.Y.))**

account, § 4-A-207(1) applies. (Pl's Opp. Br. at 8-10). Plaintiff cites to the Hawkland treatise, in which the author warns that despite the likely intention of the drafters to the contrary, § 4-A-207(1) might apply even where a beneficiary's name and account number are the same but "other identification" is different. 6A Hawkland UCC Series § 4A-207:1 (2001).

**\*5** In *New South Fed. Sav. Bank v. Flatbush Fed. Savs. & Loan Ass'n,* 01 Civ. 9024, 2002 U.S. Dist. LEXIS 20512, at \*6 (S.D.N.Y. Oct. 25, 2002), Magistrate Judge Eaton, addressing § 4-A-207(1), noted that the main purpose of the Hawkland treatise is to caution senders of payment orders to avoid including two names in order to avoid the possibility of confusion under Article 4A. Judge Eaton then proceeded to adopt instead the reasoning of Judge Potter in *Donmar,* finding that because there was admittedly one identifiable beneficiary, the requirements of § 4-A-207(1) are met, and there is no "misdescription of beneficiary." *New South,* 2002 U.S. Dist. LEXIS 20512, at \*5- 6.

Like Judge Eaton, I adopt the analysis of Judge Potter in *Donmar.* [FN4] Section 4-A-207(1) requires that there be at least one identifiable beneficiary. *See also* N.Y.U.C.C. § 4-A-207 Official Comment 1. Here, the name and the account number referred to First Equity. Therefore, I find that there was an identifiable beneficiary, that § 4-A-207(1) requires no more, that there was no "misdescription of beneficiary," and that Chase was not required to refuse plaintiff's transfer under § 4-A-207(1). Accordingly, Chase's motion to dismiss Count Seven of the Complaint is hereby GRANTED.

> FN4. Even were I not persuaded by Judge Potter's analysis, I would find that the "for further credit" language included in plaintiff's wire transfers was legally insufficient to constitute "other identification of the beneficiary" under § 4-A-207(1). Construing the pleadings in the light most favorable to plaintiff, which I am required to do on a motion to dismiss, the language of "for further credit" to Tzaras' bogus account number does not serve to identify the beneficiary. Rather, it serves to instruct the beneficiary--First Equity--how to allocate the funds among its

various "subaccounts." Section 4-A-103(b) defines the beneficiary as "the person to be paid by the beneficiary's bank [here, Chase]." The "beneficiary" here, as defined by § 4-A-103(b), was First Equity, because First Equity's account would, at the very least, initially receive the funds from plaintiff's wire transfer. If plaintiff's analysis were accepted, a beneficiary would never be able to include any internal information, i.e., information recognizable to the beneficiary's internal systems but not to the receiving bank, without risking non-completion of the transfer.

III. Motion to Dismiss the Negligence Claim

[2] In its motion to dismiss, Chase also asserts that Tzaras has failed to state a claim under New York common law for negligence because Chase owed Tzaras, a non-customer, no duty of care, because Article 4A preempts the field of misdirected wire transfers and because Chase's duty to report suspicious activities does not give rise to a private cause of action. (Def's Br. at 18; Pl's Opp. Br. at 17).

To establish a prima facie case of negligence under New York law, plaintiff here must establish "(1) the defendant owed the plaintiff a cognizable duty of care as a matter of law; (2) the defendant breached that duty; and (3) plaintiff suffered damage as a proximate result of that breach." *Curley v. AMR Corp.,* 153 F.3d 5, 13 (2d Cir.1998).

As an initial matter, the issue of whether, under New York common law, a duty of care is owed to plaintiff is a question of law that is properly before this Court on a motion to dismiss. *See Purdy v. Public Adm'r of Westchester,* 72 N.Y.2d 1, 8, 530 N.Y.S.2d 513, 526 N.E.2d 4 (1988) ("whether a member or group owes a duty of care to reasonably avoid injury to another is of course a question of law for the courts"). In the instant case, Tzaras maintains that by accepting the wire transfers to First Equity's account, Chase breached its duty to Tzaras to exercise ordinary and reasonable care. (Compl.¶ 113). Chase, in turn, counters by arguing that a bank does not owe a duty of care to a non-customer. (Def's Br. at 17).

On the issue of a bank's duty of care to non-customers, I

find the opinion in *Renner v. Chase Manhattan Bank,* 98 Civ. 926(CSH), 1999 U.S. Dist. LEXIS 978 (S.D.N.Y. Feb. 3, 1999), instructive. In *Renner,* the plaintiff sued Chase for, among other claims, negligence under New York common law arising out of Chase's failure to prevent Chase's customer, Townsend, from defrauding the plaintiff. *Id.* at *40. In dismissing the negligence claim against Chase, Judge Haight declared:

**\*6** Plaintiff's negligence claim against Chase fails because Chase did not owe plaintiff a cognizable duty of care. Whatever duty of care banks owe to their customers, Renner was not a customer of Chase. The Chase customer involved in this case was the Townsend fund, into which Chase ... paid Renner's funds when they were received through Renner's Swiss Bank.

These circumstances reduce Renner to the necessity of arguing that Chase owed him a duty to prevent Chase's customer, Townsend, from defrauding Renner. But it is well settled that a bank owes no such duty to a non-customer third-party.

*Id.* at *39-40 (internal citations omitted).

The facts in the instant case are similar to those in *Renner.* Here, Tzaras contends that Chase owed him a duty to prevent First Equity from defrauding him. However, like in *Renner,* and as Tzaras concedes, Tzaras was not a customer of Chase. Chase's involvement extended only insofar as it allowed the wire transfer from Tzaras to First Equity, Chase's customer, to be completed. Therefore, I reach the same conclusion here that Judge Haight did in *Renner* that, under New York common law, Chase owed no duty of care to Tzaras. *Id.* at *39-40; *see also Guidry v. Bank of LaPlace,* 740 F.Supp. 1208, 1218-19 (E.D.La.1990) (as a matter of law, bank owes no duty of care to non-customer defrauded by bank customer); *Century Bus. Credit Corp. v. North Fork Bank,* 246 A.D.2d 395, 396, 668 N.Y.S.2d 18, 19 (1st Dept.1998) ("to hold that banks owe a duty to their depositors' creditors to monitor the depositors' financial activities ... would be to unreasonably expand banks' orbit of duty"); *Johnson v. Chase Manhattan Bank,* 98 Civ. 8173(RMB)(RLE), 2000 U.S. Dist. LEXIS 5587, at *15 (S.D.N.Y. April 27, 2000) ("The general rule is that a bank does not owe a duty to a non-customer third-party.").

Plaintiff, in his opposition papers, attempts to manufacture a fiduciary duty arising out of Chase's alleged knowledge that the funds were to be deposited in the sub-account referenced in the "for further credit" language. However, there is no authority to support the assertion that "for further credit" language suffices to create a fiduciary duty, and I decline to adopt such a broad reading of fiduciary duty as would encompass the activities alleged by Tzaras here. Moreover, even were I to find that a fiduciary account existed, "[a]s a general rule, a bank has no duty to monitor even a fiduciary account under New York law." *Renner,* 1999 U.S. Dist. LEXIS 978, at *41.

Because Chase owed no duty of care to plaintiff, plaintiff cannot, as a matter of New York common law, make out a cognizable claim for negligence. Even if all of the facts that plaintiff alleges were proved at trial, plaintiff would still fail to make out an essential element of negligence required under New York law. Accordingly, Chase's motion to dismiss Count Nine of the Complaint is also GRANTED. [FN5]

> FN5. Because Chase has prevailed on its motion to dismiss Count Nine on the duty of care issue, I do not address the alternative grounds argued by Chase on Count Nine, *viz.,* field preemption under Article 4A and the unavailability of a private cause of action under "suspicious activity" reporting requirements.

CONCLUSION

**\*7** Chase's motion to dismiss Counts Seven and Nine of the Amended Complaint without leave to amend (Docket no. 12) is GRANTED.

SO ORDERED:

Not Reported in F.Supp.2d, 2003 WL 470611 (S.D.N.Y.), Comm. Fut. L. Rep. P 29,406

**Motions, Pleadings and Filings (Back to top)**

• 1:01cv10726 (Docket) (Nov. 28, 2001)

END OF DOCUMENT

**Westlaw.**

Not Reported in F.Supp.                                                                          Page 1
Not Reported in F.Supp., 1997 WL 289865 (S.D.N.Y.)
**(Cite as: 1997 WL 289865 (S.D.N.Y.))**

**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Donna Lee H. WILLIAMS, Insurance Commissioner for the
State of Delaware as
Receiver for National Heritage Life Insurance Company, a
company in
Liquidation, Plaintiff,
v.
BANK LEUMI TRUST COMPANY of NEW YORK, a
New York Commercial Bank and Trust
Company; and Mark Yackow, Individually, Defendants.
**No. 96 CIV. 6695(LMM).**

May 30, 1997.

*MEMORANDUM AND ORDER*

McKENNA, District Judge.

**\*1** Defendant Bank Leumi Trust Company of New York
("Bank Leumi") moves, pursuant to Rules 12(b)(6) and 9(b)
of the Federal Rules of Civil Procedure, to dismiss plaintiff's
complaint, which chronicles an alleged "check-kiting"
scheme by third parties who utilized accounts at Bank
Leumi to implement the scheme.

For the reasons set forth below, Bank Leumi's motion to
dismiss as to Bank Leumi is granted. [FN1]

> FN1. Bank Leumi also moves for sanctions against
> plaintiff on the ground that she lacks evidentiary
> support for her allegations. Although the Court
> finds plaintiff's complaint inadequate, Bank
> Leumi's motion for sanctions is denied.

I. Factual Background

Plaintiff is the statutory receiver for National Heritage Life
Insurance Co. ("NHL"). Due to NHL's insolvency, on May
25, 1994, the Delaware Chancery Court, on plaintiff's
application, entered a Rehabilitation and Injunction Order,
which directed plaintiff to take possession and control of

NHL's property, assets, business and affairs. On November
21, 1995, a Liquidation and Injunction Order was entered
replacing the Rehabilitation Order, which directed plaintiff
to maintain possession and control of the property, assets,
business and affairs of NHL. Plaintiff commenced this
action on behalf of NHL and all of its creditors, including
all of its policyholders.

According to the complaint, in May 1990, the Delaware
Insurance Department expressed serious concern regarding
the sufficiency of the statutory surplus of NHL, and advised
it to raise additional capital. In response to these regulatory
concerns, NHL and its parent company, LifeCo Investment
Group Inc. ("LifeCo"), intensified efforts to obtain
additional capital for NHL. Apparently as a result of these
intensified efforts, on or about June 29, 1990, a company
named Tri-Atlantic Holdings, Ltd. ("Tri-Atlantic") entered
into a Stock Purchase Agreement, which would provide
Tri-Atlantic with control of both LifeCo and NHL.

Tri-Atlantic and its unnamed principals engaged an
attorney, Michael Blutrich, to assist it in obtaining a loan
from Bank Leumi through co-defendant Mark Yackow for
the purpose of fulfilling its $4 million obligation under the
Stock Purchase Agreement. Shortly before the scheduled
closing of the Stock Purchase Agreement, Bank Leumi
refused to provide the loan.

On or about August 9, 1990, a bank account was opened in
NHL's name by an unnamed individual at Bank Leumi's
Centre Street Branch (the "Centre Street Branch"). The
NHL account was to serve as the depository of the $4
million to be paid by Tri-Atlantic for the purchase of LifeCo
stock pursuant to the Stock Purchase Agreement. On or
about September 5, 1990, Tri-Atlantic and Blutrich caused a
bank account in the name of Capital Comparisons, Inc.
("CCI") to be opened at the Centre Street Branch. On that
date Tri-Atlantic and/or Blutrich caused $1 million to be
deposited into the CCI account. On or about September 7,
1990, Blutrich caused a bank account in his name to be
opened at the Centre Street Branch with a one hundred
dollar deposit. Also on September 7, 1990, Tri-Atlantic
and/or Blutrich caused $1 million to be transferred from the
CCI account to the Blutrich account. Plaintiff alleges, upon
information and belief, that Yackow assisted in the opening

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                                    Page 2
Not Reported in F.Supp., 1997 WL 289865 (S.D.N.Y.)
**(Cite as: 1997 WL 289865 (S.D.N.Y.))**

of the NHL, the CCI, and the Blutrich accounts. (Compl.¶¶ 37, 41, 43.)

**\*2** On or about Friday, September 7, 1990, at approximately 5:30 p.m., Tri-Atlantic and Blutrich commenced the closing of the Stock Purchase Agreement. The complaint does not specify the other participants, if any, at the closing. At the closing, Blutrich and Tri-Atlantic tendered to LifeCo and NHL a check for $4 million drawn against the Blutrich account. At the time the check was presented, the Blutrich account had a balance of only $1,000,100.00. The check was tendered after business hours on Friday so that NHL could not deposit the check immediately because Blutrich and Tri-Atlantic knew the Blutrich account had insufficient funds to cover the check. Moreover, Blutrich and Tri-Atlantic did not want NHL to deposit the check before Tri-Atlantic assumed control of NHL. On September 7, 1990, immediately following the closing, Tri-Atlantic assumed control of LifeCo and NHL.

On or about September 10, 1990, as part of Tri-Atlantic and Blutrich's alleged scheme to embezzle money from NHL, Tri-Atlantic caused NHL to enter into an agreement with CCI which obligated NHL to pay CCI $3 million as a fiduciary deposit. On September 10, 1990, Tri-Atlantic and/or Blutrich, through the assistance and involvement of defendants, caused $2.5 million to be transferred from the NHL account to the CCI account, and then from the CCI account to the Blutrich account.

On September 11, 1990, Tri-Atlantic and/or Blutrich, through the assistance and involvement of defendants, caused $500,000 to be transferred from the NHL account to the CCI account, and then from the CCI account to the Blutrich account. On that same day, Bank Leumi, through Yackow, received from NHL the $4 million check given to NHL by Blutrich. Bank Leumi, through Yackow, was informed by NHL that the $4 million check was for Tri-Atlantic's purchase of LifeCo stock.

The result of the alleged scheme is clear. Tri-Atlantic allegedly purchased the LifeCo stock with $3 million of NHL's money.

Plaintiff alleges that at the time Bank Leumi, through

Yackow, received the $4 million check, "they knew the transfers in the total amount of three million dollars ($3,000,000.00) had been made from the NHL Account ultimately to the Blutrich Account to cover the four million dollar ($4,000,000.00) check that Blutrich had tendered to NHL on September 7, 1990, against the Blutrich Account." (Compl.¶ 67.) Upon information and belief, plaintiff alleges that Bank Leumi, through Yackow, was instructed by Blutrich or Tri-Atlantic "to delay deposit of the four million dollar ($4,000,000.00) check into the NHL Account until the transfers required to accomplish the check-kite were complete." (Compl.¶ 68.) Also upon information and belief, plaintiff alleges that Bank Leumi and Yackow assisted Tri-Atlantic and Blutrich in order to generate substantial fees and commissions for Bank Leumi. (Compl.¶ 71.)

Plaintiff further alleges that defendants acted "intentionally, recklessly or carelessly in perpetrating or aiding and abetting Tri-Atlantic's scheme to defraud NHL out of three million dollars ($3,000,000.00) in order to wrongfully gain control over the affairs of NHL." (Compl.¶ 72.) Moreover, "absent Defendants' intentional, reckless or careless handling and monitoring of the CCI Account, Blutrich Account and NHL Account, Tri-Atlantic and Blutrich would have been unable to perpetrate their fraud and/or the Delaware Insurance Department and/or NHL would have been able to detect Tri-Atlantic's fraudulent scheme." (Compl.¶ 73.) As a direct and proximate result of defendants' allegedly wrongful conduct, NHL and its policyholders and other creditors have suffered millions of dollars in damages. (Compl.¶ 76.)

**\*3** Plaintiff asserts five causes of action against both defendants: (1) aiding and abetting fraud; (2) aiding and abetting breach of fiduciary duty; (3) commercial bad faith; (4) breach of fiduciary duty; and (5) common law fraud.

II. Discussion
A. Standard of Review

In deciding a motion to dismiss a complaint for failure to state a claim upon which relief can be granted, the Court views the complaint in the light most favorable to the plaintiff. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). The Court must accept the factual allegations contained in the complaint as true.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                 Page 3
Not Reported in F.Supp., 1997 WL 289865 (S.D.N.Y.)
**(Cite as: 1997 WL 289865 (S.D.N.Y.))**

*Cooper v. Pate,* 378 U.S. 546, 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964). The motion will be granted only if it appears beyond doubt that the plaintiff can prove no set of facts in support of her claim that entitle her to relief. *Scheuer,* 416 U.S. at 236 (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

Under Rule 9(b) of the Federal Rules of Civil Procedure:
    In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.
Fed.R.Civ.Proc. 9. Rule 9(b) furthers three goals. It provides defendants with fair notice of plaintiff's claim to enable the preparation of a defense; it protects defendants from harm to their reputation and goodwill; and it reduces the number of strike suits. *DiVittorio v. Equidyne Extractive Industries, Inc.,* 822 F.2d 1242, 1247 (2d Cir.1987).

B. Common Law Fraud
To establish a claim for common law fraud under New York law, a plaintiff must show:
    (1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance.
*Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank,* 57 F.3d 146, 153 (2d Cir.1995). Plaintiff does not allege any affirmative misrepresentation by Bank Leumi, but contends that Bank Leumi "fraudulently concealed the activity in the CCI, Blutrich and NHL Accounts which resulted in NHL losing three million dollars." (Compl.¶ 121.) Plaintiff claims that Bank Leumi had a duty to disclose based upon its superior knowledge relating to the account transfers. (P1.Mem.24.) A duty to disclose may arise where: "(1) one party has superior knowledge of certain information; (2) that information is not readily available to the other party; and (3) the first party knows that the second party is acting on the basis of mistaken knowledge." *Banque Arabe,* 57 F.3d at 155.

The allegations in the complaint fail to satisfy Rules 9(b) and 12(b)(6) for a number of reasons. First, the complaint fails to allege that Bank Leumi had knowledge of the

check-kiting scheme with sufficient detail. The mere transfer of money between the NHL, CCI, and Blutrich accounts is insufficient to raise an inference of knowledge of the scheme. The fact that Yackow allegedly participated in all the money transfers adds a little weight to the allegation of knowledge, but these allegations are apparently made on information and belief only. "[A]llegations made on information and belief are insufficient unless the facts are peculiarly within the knowledge of the defendants, in which case the complaint must allege facts demonstrating the basis for the information and belief.' " *National Council of Young Israel v. Wolf,*--F.Supp.--, 1997 WL 227603, at *4 (S.D.N.Y.1997) (quoting *Spira v. Nick,* 876 F.Supp. 553, 557 (S.D.N.Y.1995)).

**\*4** The complaint does not clarify on what basis Bank Leumi or Yackow would have facts "peculiarly" within their knowledge, nor does the complaint state the factual basis for its allegations on information and belief. Also, even if Yackow participated in all the money transfers, this fact, without more, does not raise an inference that Bank Leumi had knowledge of Tri-Atlantic's alleged scheme.

Second, the complaint fails to allege that the information allegedly possessed by Bank Leumi was not readily available to NHL. Noticeably absent from the complaint are the names, with the exception of Blutrich, of any of the principle actors on behalf of NHL or Tri-Atlantic. Significantly, the allegations in the complaint do not preclude the conclusion that the unnamed principles of NHL were complicitous in the alleged scheme. Of course, this is not necessarily the case, but the complaint does not clarify who at NHL was allegedly defrauded.

Third, the complaint fails to allege who relied on Bank Leumi's alleged silence. The specific facts relating to the money transfers are vague. For example, the complaint alleges that Tri-Atlantic and/or Blutrich caused the transfers to occur. How did they cause it? Who provided Bank Leumi with the instructions to transfer money? How were those instructions conveyed and when? Did the individual providing the instructions have authority to provide them? These are facts that, at least on their face, would not seem to be peculiarly within Bank Leumi's knowledge and thus could not be alleged on information and belief.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 4
Not Reported in F.Supp., 1997 WL 289865 (S.D.N.Y.)
**(Cite as: 1997 WL 289865 (S.D.N.Y.))**

Additional questions raised by the vagueness of the complaint include, to whom at bank Leumi were the instructions to transfer money given? At what point in time was Bank Leumi aware of the scheme? How, other than the sequence of the money transfers, was Bank Leumi aware of the scheme? At the time Bank Leumi learned of the scheme or became, as plaintiff apparently claims, a participant in it, who should Bank Leumi have contacted? How would Bank Leumi have known to contact that person? [FN2] To the extent the answers to these questions can be and are based upon information and belief, what is the factual basis for plaintiff's belief?

> FN2. The Court notes that as the complaint now reads, the earliest Bank Leumi would have been aware of the scheme was on September 11, 1990, when it was presented with the $4 million check. At that time, however, Tri-Atlantic apparently already had control over NHL. Thus, it is unclear who was defrauded and who plaintiff claims Bank Leumi should have contacted.

In sum, the conclusory allegations of the complaint wholly fail to satisfy plaintiff's burden to allege the circumstances of the alleged fraud with particularity or to state a claim for fraud upon which relief can be granted.

C. Aiding and Abetting Claims
To establish aiding and abetting under New York law, plaintiff must show: (1) the existence of a violation by the primary wrongdoer; (2) knowledge of this violation on the part of the aider and abettor; and (3) substantial assistance by the aider and abettor in the achievement of the primary violation. _Morin v. Trupin,_ 711 F.Supp. 97, 112 (S.D.N.Y.1989) (citing elements in context of aiding and abetting breach of fiduciary duty) (quoting _Samuel M. Feinberg Testamentary Trust v. Carter,_ 652 F.Supp. 1066, 1082 (S.D.N.Y.1987)); _Moll v. U.S. Life Title Insurance Company of New York,_ 710 F.Supp. 476, 479 (S.D.N.Y.1989) (citing elements in context of aiding and abetting fraud). Assuming a primary violation on the part of the wrongdoer (either fraud or breach of fiduciary duty), plaintiff has failed to set forth facts sufficient to establish the second and third prongs of aider-and-abettor liability.

**\*5** New York courts require actual knowledge of the primary wrong by the alleged aider and abettor. _Kolbeck v. LIT America, Inc.,_ 939 F.Supp. 240, 246 (S.D.N.Y.1996). In some paragraphs of the complaint, plaintiff alleges that Bank Leumi "knew, or recklessly disregarded," or "knew or should have known" of the primary wrongdoing. (See, e.g., Compl. ¶¶ 83, 95.) These disjunctive phrases are insufficient under the actual knowledge standard. Moreover, plaintiff's conclusory allegations that Bank Leumi was aware of the scheme, _see, e.g.,_ Compl. ¶ 67, also fail to satisfy plaintiff's burden to plead actual knowledge. The only apparent basis for Bank Leumi's alleged knowledge of the check-kiting scheme was the sequence of the account transfers, and the contention that Bank Leumi was informed that the purpose of the $4 million check was for the purchase of LifeCo stock. At most, these facts raise the issue of constructive knowledge which is insufficient to state a claim for aiding and abetting. _Kolbeck, 939 F.Supp. at 246._

As to the third prong, the mere fact that all the participants in the alleged scheme used accounts at Bank Leumi to perpetrate it, without more, does not rise to the level of substantial assistance necessary to state a claim for aiding and abetting liability. See _DePinto v. Ashley Scott, Inc.,_ 222 A.D.2d 288, 635 N.Y.S.2d 215, 217 (1st Dep't 1995).

Thus, plaintiff has failed to satisfy her pleading burden to establish aiding and abetting liability under Rule 12(b)(6). To the extent that plaintiff's aiding and abetting claims are premised on her allegations of fraudulent conduct--which appears to be the substance of all of plaintiff's claims-- plaintiff has also failed to satisfy her pleading burden under Rule 9(b). [FN3] See _ABF Capital Mgt. v. Askin Capital Mgt., L.P.,_ 957 F.Supp. 1308, 1328 (S.D.N.Y.1997) ("claim of aiding and abetting fraud must meet the pleading requirements of Rule 9(b)"); _Frota v. Prudential-Bache Securities, Inc.,_ 639 F.Supp. 1186, 1193 (S.D.N.Y.1986) (applying Rule 9(b) to breach of fiduciary duty claims based on allegations of fraudulent conduct).

> FN3. Plaintiff has also failed to allege a primary breach of fiduciary duty. The relationship between a bank and its depositor is usually not a fiduciary relationship, but that of debtor and creditor. _Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, N.A.,_

Not Reported in F.Supp.                                                                                          Page 5
Not Reported in F.Supp., 1997 WL 289865 (S.D.N.Y.)
**(Cite as: 1997 WL 289865 (S.D.N.Y.))**

731 F.2d 112, 122 (2d Cir.1984). Plaintiff has not supplied any facts indicating that the relationship between Bank Leumi and NHL was anything but the usual debtor-creditor relationship. *See Scott v. Dime Savings Bank of New York, FSB,* 886 F.Supp. 1073, 1078 (S.D.N.Y.1995) (finding fiduciary relationship between bank and unsophisticated depositors where bank (1) encouraged depositors to borrow $100,000 when they only wanted to borrow $5000, which provided bank with fees, interest, and a mortgage on one depositor's house; (2) induced depositors to invest substantial part of borrowed sums through its affiliate; and (3) participated with depositors in stock purchases and sales that generated commissions for bank), *aff'd,* 101 F.3d 107 (2d Cir.1996), *cert. denied,* 520 U.S. 1122, 117 S.Ct. 1260, 137 L.Ed.2d 339 (1997).

### D. Commercial Bad Faith

"A cause of action for commercial bad faith against a bank requires allegations of a scheme or acts of wrongdoing, together with allegations of the bank's actual knowledge of the scheme or wrongdoing that amounts to bad faith or allegations of complicity by bank principals in alleged confederation with the wrongdoers." *Peck v. Chase Manhattan Bank, N.A.,* 190 A.D.2d 547, 593 N.Y.S.2d 509, 510-11 (1st Dep't 1993) (citing *Prudential-Bach Securities. Inc. v. Citibank, N.A.,* 73 N.Y.2d 263, 539 N.Y.S.2d 699, 536 N.E.2d 1118 (Ct.App.1989)).

As explained above, plaintiff has not set forth facts sufficient to raise an inference of actual knowledge of the alleged scheme. Moreover, the vague allegations in the complaint are insufficient to raise an inference of bad faith or complicity on the part of Bank Leumi. Thus, the complaint fails to allege a cause of action for commercial bad faith.

### III. Conclusion

**\*6** For the reasons set forth above, Bank Leumi's motion to dismiss as to Bank Leumi is granted. The Court grants plaintiff leave to amend her complaint within thirty days of this Memorandum and Order. Bank Leumi's motion for sanctions is denied.

SO ORDERED.

Not Reported in F.Supp., 1997 WL 289865 (S.D.N.Y.)

### Motions, Pleadings and Filings (Back to top)

• 1:96cv06695 (Docket) (Sep. 04, 1996)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.