UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------x

TZVI WEISS, et al.,                          :

                                             :        Case No. CV 05 4622

                      Plaintiffs,            :

                                             :

       -against-                             :        Honorable Charles P. Sifton

                                             :

NATIONAL WESTMINSTER BANK, PLC,              :        Magistrate Judge Kiyo A. Matsumoto

                                             :

                      Defendant.             :

                                             :

------------------------------------------------------------x


**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANT'S MOTION TO DISMISS THE AMENDED COMPLAINT
PURSUANT TO FED. R. CIV. P. 12(b)(6)**


**OSEN & ASSOCIATE, LLC**
700 Kinderkamack Road
Oradell, NJ 07649
(201) 265-6400

Counsel for Plaintiffs

# TABLE OF CONTENTS

INTRODUCTION...................................................................................................1

FACTUAL ALLEGATIONS IN THE COMPLAINT...................................................7

LEGAL ARGUMENT...........................................................................................25

I.    THE COMPLAINT IS NOT SUBJECT TO DISMISSAL UNDER RULE 12(b)(6)......25

   A.    The Applicable Legal Standards On A Rule 12(b)(6) Motion TO Dismiss........25

   B.    Claims Under Section 2333(a) Are Subject To Notice Pleading Only.............26

II.   THE STATUTORY FRAMEWORK OF THE ATA CLEARLY AUTHORIZES CIVIL
     SUITS BASED ON SECONDARY LIABILITY...........................................27

   A.    The § 2333(a) Civil Remedy Was Intended to Strengthen Our Arsenal Against
       Terrorists, Expand the Reach of Tort Law in Favor of U.S. Victims of Terrorism,
       and Imperil the Flow of Money for Terrorism......................................28

   B.    Section 2333(a) Defines the Class of Beneficiaries and Incorporates Federal
       Common Law and Federal Statutory Law............................................29

   C.    Section 2333(a) Liability Extends To Those Who Aided and Abetted Terrorists
       and FTOs...................................................................................32

   D.    Section 2333(a) Liability Extends to Persons Who Substantially Assist Terrorist
       Attacks by Breaching Duties Under § 2339B and § 2339C.........................36

    1.    "Material Support" Under § 2339B Explicitly Includes "Financial
        Services."................................................................................37

    2.    Section 2339C Violations Expressly Include "Transmitting" Funds and
        "Receiving" Funds.....................................................................39

    3.    Section 2339B Is Violated By Providing Material Support to an FTO Through
        Its Agents and Affiliates..............................................................41

III.  PLAINTIFFS HAVE ADEQUATELY ALLEGED THE SCIENTER REQUIRED TO
    STATE THEIR CLAIMS UNDER SECTION 2333......................................42

   A.    Scienter for Civil Aiding and Abetting (First Claim For Relief) Requires Only
       That Defendant be Generally Aware of His Role in the Tortious Activity and
       Knowingly Provide Assistance.......................................................42

B.      Civil Law Scienter As Applied to Section 2333(a) Claims Predicated on Alleged
        Violations of the Criminal "Material Support" Statutes, 18 U.S.C. §§ 2339B-
        2339C..................................................................................................................45

1.      Scienter for Breach of the Duty Imposed By 18 U.S.C. § 2339B(a)(1) (Second
        Claim For Relief) Requires Only Knowledge, Not Intent........................47

2.      Scienter for Breach of the Duty Imposed By 18 U.S.C. § 2339C (Third Claim
        for Relief) Requires Only Unlawful and Willful Conduct With Knowledge of
        the Intended Use of Funds, Not Intent.............................................50

3.      The Allegations of the Complaint Satisfy the Knowledge and Awareness
        Standards.......................................................................................51

   a.          The Clean Bill of Health Argument.............................................52

   b.          The Hindsight Argument.......................................................53

IV.  PLAINTIFFS HAVE ADEQUATELY PLED THE REQUISITE CHAIN OF
CAUSATION REQUIRED BY THE ANTI-TERRORISM ACT AND COMMON LAW
AIDING AND ABETTING.............................................................................56

A.      Proximate Causation for 2339B and 2339C Claims...................................56

B.      Proximate Causation for Common Law Aiding and Abetting Claim...............57

V.  COMITY DOES NOT REQUIRE OR PERMIT DISMISSAL OF THE COMPLAINT..60

CONCLUSION...................................................................................................62

## TABLE OF AUTHORITIES

**Page(s)**

### Cases

Aetna Cas. Sur. v. Leahey Constr. Co., 219 F.3d 519 (6th Cir. 2000) ............... 44

Biton v. Palestinian Interim Self-Government Authority, 310 F. Supp. 2d 172
(D.D.C. 2004) ................................................................................... 1, 27

Boim v. Quranic Literacy Institute and Holy Land Foundation For Relief and
Development, 291 F.3d 1000 (7th Cir. 2002) ........................................... *passim*

Camp v. Dema, 948 F.2d 455 (8th Cir. 1991) ........................................... 44

Carter v. Stanton, 405 U.S. 669 (1972) .................................................. 26

Central Bank of Denver v. First Interstate Bank of Denver, 511 U.S. 164 (1994).. 32, 33, 34

Conley v. Gibson, 355 U.S. 41 (1957) .................................................... 25

Dept. of Econ. Dev. v. Arthur Andersen & Co. (U.S.A.), 924 F. Supp. 449
(S.D.N.Y. 1996) ............................................................................... 34

Estates of Ungar ex rel. Strachman v. Palestinian Authority, 304 F. Supp. 2d 232
(D.RI. 2004) ................................................................................... 1

F. Hoffman-La Roche Ltd. v. Empagran S.A., 542 U.S. 155 (2004) ................. 33, 34

FDIC v. First Interstate Bank of Des Moines, 885 F.2d 423 (8th Cir. 1989) ......... 44

Fireman's Fund Ins. Co. v. Stites, 258 F.3d 1016 (9th Cir. 2001) ...................... 34

Geisler v. Petrocelli, 616 F.2d 636 (2d Cir. 1980) ...................................... 25

Gurary v. Winehouse, 190 F.3d 37 (2d Cir. 1999) ...................................... 26

Halberstam v. Welch, 705 F.2d 472 (D.C. Cir. 1983) ............................... 43, 44, 58, 59, 60

Harris Trust & Sav. Bank v. Salomon Smith Barney, 530 U.S. 238 (2000) ............ 34, 36

Hartford Fire Ins. Co. v. California, 509 U.S. 764 (1993) ................................ 61

Hishon v. King & Spalding, 467 U.S. 69 (1984) ......................................... 25

Holy Land Foundation for Relief and Development v. Ashcroft, 219 F. Supp.
2d 57 (D.D.C. 2002) ……………………………………………………………… 19

Humanitarian Law Project v. Gonzales, 380 F. Supp. 2d 1134 (C.D. Cal. 2005) ….. 7, 50

Humanitarian Law Project v. Reno, 205 F.3d 1130 (9th Cir. 2000) ……………….. 3, 5, 46, 57

Humanitarian Law Project v. Reno, 9 F. Supp. 2d 1205 (C.D. Cal. 1998) …………. 7, 46

Humanitarian Law Project v. U.S. Dep't of Justice, 352 F.3d 382
(9th Cir. 2003), reh'g en banc granted, 382 F.3d 1154 (9th Cir. 2004) …………….. 48

In re CINAR Corp. Securities Litigation, 186 F. Supp. 2d 279 (E.D.N.Y. 2002) …… 61

In re Maxwell Communications Corp., 93 F.3d 1036 (2d. Cir. 1996) ……………….. 61

In re Terrorist Attacks on September 11, 2001, 349 F. Supp. 2d 765
(S.D.N.Y. 2005) ……………………………………………………………… 39, 43

Klinghoffer v. Palestinian Liberation Org., 739 F. Supp. 854 (S.D.N.Y. 1990) …….. 28

Kolbeck v. LIT America, Inc., 939 F. Supp. 240 (S.D.N.Y. 1996) ………………….. 45

Kopec v. Coughlin, 922 F.2d 152 (2d Cir. 1991) ……………………………….…… 26

LaBounty v. Adler, 933 F.2d 121 (2d Cir. 1991) …………………………………….. 26

Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,
507 U.S. 163 (1993) ………………………………………………………….…… 26

Levine v. Diamanthuset Inc., 950 F.2d 1478 (9th Cir. 1991) …………………………. 45

Linde v. Arab Bank, Plc, 384 F. Supp. 2d 571 (E.D.N.Y. 2005) …………………….. passim

Murphy v. U.S., 653 F.2d 637 (D.C. Cir. 1981) ……………………………………… 59

National Council of Resistance of Iran v. Dept. of State, 373 F.3d 152 (D.C. Cir.
2004) ……………………………………………………………………………..... 41

Papasan v. Allain, 478 U.S. 265 (1986) ……………………………………………….. 26

Parklane Hosiery Co. v. Shore, 439 U.S. 322 (1979) ………………………………….. 34

Petro-Tech, Inc. v. W. Co. of N. Am., 824 F.2d 1349 (3d Cir. 1987) …………………. 45

Ricciuti v. N.Y.C. Transit Auth., 941 F.2d 119 (2d Cir. 1991) …………………….... 25

Scheuer v. Rhodes, 416 U.S. 232 (1974) ……………………………………………….. 25

U.S. v. Al-Arian, 308 F. Supp. 2d 1322 (M.D. Fla.), modification denied by, 329 F. Supp.2d 1294 (M.D. Fla. 2004) …………………………………………… 42, 49, 50

U.S. v. Hammoud, 381 F.3d 316 (4th Cir.2004) ……………………………………... 48

U.S. v. Marzook, 383 F. Supp. 2d 1056 (N.D. Ill. 2005) …………………………….. 48, 49

U.S. v. O'Brien, 255 F. Supp. 755 (E.D. Mich 1965) ………………………………… 50

U.S. v. Paracha, 2006 WL 12768 (S.D.N.Y. 2006) …………………………………... 48

U.S. v. Sattar, 314 F. Supp. 2d 279 (S.D.N.Y. 2004) ………………………………… 48

Wiwa v. Royal Dutch Petroleum Co., 2002 WL 319887 (S.D.N.Y. Feb. 28, 2002) …. 33, 45

## Statutes

8 U.S.C. § 1189(a)(1) …………………………………………………………………. 1

18 U.S.C. § 2 …………………………………………………………………………. 32

18 U.S.C. subchapter 113B ………………………………………………………….... 2

18 U.S.C. § 2331 ……………………………………………………………………… 1

18 U.S.C. § 2331(1) …………………………………………………………………… 30, 39

18 U.S.C. § 2331(1)(A) …………………………………………………………….....  30

18 U.S.C. § 2331(1)(B) and (C) ………………………………………………………. 30

18 U.S.C. § 2333 …………………………………………………………………. 3, 26, 35, 61

18 U.S.C. § 2333(a) …………………………………………………………… passim

18 U.S.C. §§ 2334-38 ………………………………………………………………… 27

18 U.S.C. § 2339A …………...………………………………………………… 7, 35, 47, 49

18 U.S.C. § 2339A(b) ………………………………………………………………… 37

18 U.S.C. § 2339B(a)(1) ……………………………………………………………… passim

18 U.S.C. § 2339B(a)(2) ……………………………………………………………….. 37, 38

18 U.S.C. § 2339B(b)   …………………………………………………………….... 37

18 U.S.C. § 2339B(g)(4) …………………………………………………………… 37

18 U.S.C. § 2339C …………………………………………………………………… *passim*

18 U.S.C. § 2339C(a)(1) …………………………………………………………… 39, 47

18 U.S.C. § 2339C(e)(4) …………………………………………………………… 40

18 U.S.C. § 2339C(e)(5) …………………………………………………………… 40

Antiterrorism Act of 1992, Pub. L. No. 102-572, 106 Stat. 4506 (1992) ……………… 28

Antiterrorism Act of 1996, Pub. L. No. 104-132, sec. 301(a)(7), 110 Stat. 1247 …….. *passim*

## Other Authorities

Aiding Terrorists – An Examination of the Material Support Statute: Hearing Before
the Senate Judiciary Comm., 108th Cong.,2nd Sess. May 5, 204 (statement of Asst.
Prof. Robert Chesney) …………………………………………………………… 49

Article 2(b) ……………………………….…………………………………………….. 17

Decision 2005/848/EC …………………………………………………………… 17

Executive Order No. 12947 (60 Fed. Reg. 5079 (Jan. 12, 1995)) ……………………… 11, 17

Executive Order No. 13224 (66 Fed. Reg. 49079 (Sept. 23, 2001)) …………………… 16, 17

Fed. R. Civ. P. 8(a) …………………………………………………………………........... 26

Fed. R. Civ. P. 12(b)(6) …….……………………….……………………………………… *passim*

Fed. R. Civ. P. 56 …………………………………………………………………….…… 26

Fed. R. Evid. 201(b) ……………………………………………………………..….…… 12

Hearing Before the Subcommittee on Courts and Admin. Practice, Senate Committee
on the Judiciary, 101. Cong. 2d Sess. at 136 (1990) …….………………………………… *passim*

H.R. Rep. 107-307, 107th Cong., 1st Sess.12 (2001), 2002 U.S.C.C.A.N. 521, 527,
2001 WL 1518532 ……………………………………………………………………….. 50

Regulation (EC) No. 2580/2001 ………………………………………………………… 17

RESTATEMENT (SECOND) of TORTS § 876 (1979) ………………………………… *passim*

RESTATEMENT (THIRD) FOREIGN RELATIONS LAW § 415, Comment j. ……….. 61

S. Rep. No. 102-342, 102nd Cong., 2d Sess. 22 (1992) ……………………………… 2, 29, 31

137 Cong. Rec. 8143 (1991) …………………………………………………………. 35

141 Cong. Rec. S7661 (daily ed. June 5, 1995) ……………………………………… 46

Plaintiffs respectfully submit this Memorandum of Law in opposition to the Defendant's

Motion to Dismiss the First Amended Complaint ("Complaint") for failure to state a claim under

Fed. R. Civ. P. 12(b)(6).

## INTRODUCTION

This case has been brought by a group of American victims of international terrorism and

their estates, survivors and heirs[1] who have asserted claims arising under the Antiterrorism Act

("ATA"), 18 U.S.C. §§ 2331 et seq., against National Westminster Bank, Plc. ("NatWest" or

"Bank" or "Defendant"), a British financial institution.  Plaintiffs contend that Defendant has

aided and abetted terrorist attacks by knowingly providing material support, including banking

and financial services such as bank accounts, wire transfers and credit card services, to agents of

the Islamic Resistance Movement ("HAMAS"), an entity that has been designated by the United

States as a Foreign Terrorist Organization ("FTO").[2]  Plaintiffs invoke the express civil remedy

under 18 U.S.C. § 2333(a) for precisely the purpose for which it was intended: to enable

American citizens and the estates, heirs and survivors of Americans who are injured or murdered

by acts of international terrorism to use the full range of American tort laws to sue companies

and organizations that have reachable assets and who, by providing aid, assistance and support to

terrorist organizations, have "knowingly or negligently made it possible" for the terrorist

organizations to carry out the attacks that foreseeably resulted in the injuries that these Plaintiffs

---

[1]    Defendant claims that non-U.S. citizens cannot bring suit derived from the injuries or death of family members who are (or were) U.S. citizens.  The statute clearly states otherwise, authorizing suit by the survivors or heirs of any national of the United States. As the court in Estates of Ungar held "[T]his court concludes that the term 'survivors' as used in § 2333(a) includes the parents and siblings of a U.S. national killed by an act of international terrorism." Estates of Ungar ex rel. Strachman v. Palestinian Authority, 304 F. Supp. 2d 232, 264 (D.RI. 2004). See, also, Biton v. Palestinian Interim Self-Governing Authority, 310 F. Supp. 2d 172 (D.D.C. 2004).

[2]    The term Foreign Terrorist Organization, or "FTO," as used herein, is a term of art referring to organizations that have been officially designated as FTOs pursuant to 8 U.S.C. § 1189(a)(1). HAMAS's status as an FTO is set forth in the Complaint at ¶¶ 280-88.

have suffered.[3]

Defendant moves to dismiss the Complaint by making four arguments that share a common fatal flaw: each misreads or simply ignores the express provisions of the deliberate statutory scheme under which Plaintiffs' claims arise and to which their common law civil claim relates: 18 U.S.C. subchapter 113B – "Terrorism."

First, Defendant repetitively insists that U.S. law creates no liability for "routine banking services." Memorandum of Law in Support of Defendant's Motion to Dismiss the First Amended Complaint ("Def. Mem.") at 1, 3, 4 (twice), 5 (twice), 6, 8, 14 (twice), 15, 18, 19, 25, 26, 27 (twice), 28, 29, 30, 32, 33 (thrice), 38, 48, 49, 49 n.48, 55. According to the Defendant, "It is inconceivable that Congress intended to hold liable for terrorist acts every bank that could be sued in the United States," it protests, "simply because, in the ordinary course of business, funds passed through the customers' accounts and ultimately found their way into the hands of a terrorist organization, especially without any knowledge by the bank that this would occur." Def. Mem. at 30 (emphasis added).

Stated in that way, the Defendant is correct: Congress only extended liability to  banks that "knowingly" (18 U.S.C. § 2339B(a)(1)) provide financial services to a foreign terrorist organization or its agent, or "unlawfully and wilfully, provide[s] or collects funds . . . with the knowledge that such funds are to be used, in full or in part," to carry out terrorist activities.  18 U.S.C. § 2339C (emphasis added).  In so doing, Congress struck at the financial foundation on which international terrorism rests by making even "routine banking services" unlawful when

---

[3]    S. Rep. No. 102-342, 102nd Cong., 2d Sess. at 27; see also Antiterrorism Act of 1990, Hearing Before the Subcommittee on Courts and Admin. Practice, Senate Committee on the Judiciary, 101st Cong. 2d Sess. at 136 (1990) (cited herein as "ATA Hearing") (Congress wished to ensure that torts from terrorist activity would be actionable even if they occurred in a foreign country, and that liability would attach to all persons "who knowingly or negligently make it possible for some actor grievously to injure somebody else [through an act of terrorism]." (testimony of Joseph A. Morris)(emphasis added)).

2

they are provided "knowingly." Defendant's protest that this legislative judgment is unfair or unreasonable is addressed to the wrong branch of government. The Ninth Circuit U.S. Court of Appeals asserted that "[w]e will not indulge in speculation about whether Congress was right to come to the conclusion it did." Humanitarian Law Project v. Reno, 205 F.3d 1130, 1136 (9th Cir. 2000) ("Humanitarian II"). Defendant effectively invites just such speculation by asking for a safe harbor for "routine banking services" supplied with knowledge, and this Court, like the Ninth Circuit U.S. Court of Appeals, should decline the invitation.

Part II of this Memorandum of Law sets forth the statutory scheme enacted by Congress. Plaintiffs show that as an integral part of this nation's counter-terrorism strategy, Congress created an express civil remedy for treble damages for persons injured by reason of acts of international terrorism. The statute was clearly intended to allow claims under Section 2333 to be asserted against all persons along "the chain of causation" by extending the full reach of American tort law, including remedies predicated on secondary liability, in order to attach civil liability to anyone who provides material support for terrorism by knowingly providing financial services of any kind to terrorists, FTOs and/or their agents. In addition, Plaintiffs show that, contrary to Defendant's tortured statutory construction, the relevant statutes mean what their plain words say: that material support includes "financial services," and "providing," "collecting," and "transmitting" funds.

Second (perhaps recognizing that repeating the mantra of "routine banking services" twenty-eight times does not somehow make lawful those services when they are knowingly provided to an FTO or its agent), Defendant also argues that "the Amended Complaint does not adequately plead the requisite knowledge and intent under Section 2339B" Def. Mem. at 25, (emphasis added) or the "requisite bad intent" under Section 2339C. Id. at 35.

In Part III of this Memorandum of Law, Plaintiffs demonstrate that these arguments simply ignore the plain language of the relevant statutory provisions, which expressly require knowledge or intent, in the alternative. Plaintiffs demonstrate that the federal common law of civil aiding and abetting liability also requires no more than Defendant's "general awareness" that those it aids and abets engage in terrorism. The scienter requirements for Plaintiffs' claims are thus set out in the plain language of the relevant statutes and in the common law, and there is no need nor authority for this Court to graft any higher standard from criminal law onto the civil action provided under the ATA.

However, the Defendant adds (repetitively again) that Plaintiffs cannot prove that it knew that its customer, Interpal, was transferring funds to HAMAS and its agents, because the U.K. Charity Commission "twice cleared" Interpal of supporting terrorism or of "any ties" to HAMAS." Def. Mem. at 1, 14 n.11, 12, 16, 18, 19, 23, 33, 35, 56. (emphasis added). Of course, what any foreign government investigation revealed is a question of proof for trial, but even if the excerpt of the Charity Commission report provided by the Defendant or the Commission's press statement could be considered dispositive of a factual issue on a Rule 12(b)(6) motion, the Charity Commission concededly concerned itself only with Interpal's motives and the fact that "funds were not being given solely because of a person's support for Hamas." Friedman Decl. Ex. D, ¶ 128. (emphasis added). Although the Charity Commission confirmed that the Defendant's customer, Interpal, was transferring funds to supporters of Hamas,[4] it concluded that Interpal was "motivated by faith and altruism rather than fanaticsim." Id. As the Seventh Circuit Court of Appeals found in Boim v. Quranic Literacy Inst. and Holy Land Foundation For Relief and Development, however, "[t]errorist organizations use funds for illegal activities regardless of

---

[4] As the Complaint notes, Interpal's spokesman has repeatedly confirmed in published interviews that Interpal may have incidentally donated money to HAMAS-controlled charities. Compl. ¶ 340, n.9.

4

the intent of the donor, and Congress was thus compelled to attach liability to all donations to foreign terrorist organizations." 291 F.3d 1000, 1027 (7th Cir. 2002) (emphasis added). Far from "reasonably conclud[ing] [from the Charity Commission's findings] that funds deposited in and withdrawn from [its customers'] accounts would not be used to carry out terrorist acts," Def. Mem. at 36 (Defendant's emphasis), Defendant was required by Section 2339B to conclude just the opposite: that "all material support given to such an organization aids their unlawful goals." Humanitarian II, 205 F.3d at 1136 (emphasis added). The Charity Commission findings are, therefore, inculpatory, not exculpatory, under U.S. laws. Put another way, even assuming the Charity Commisision was correct and Interpal was only transferring money to HAMAS to help the poor and needy without any specific intent to support HAMAS's terrorist activities, both the donation of the funds and the rendering of financial services to HAMAS unequivocally violate the criminal provision of 18 U.S.C. § 2339B and give rise to civil liability under 18 U.S.C. § 2333(a) regardless of Interpal's motive or NatWest's intent. Violation follows from knowledge alone.

Third, Defendant argues that "the notion that plaintiffs could ever allege a direct causal link between NatWest's provision of routine banking services associated with maintaining bank accounts in London and Planitiffs' injuries directly caused by ten separate terrorist attacks in Israel, is absurd." Def. Mem. at 5 (emphasis added). Plaintiffs respond in Part IV that since it is undisputed that "terrorist organizations do not maintain open books," Humanitarian II, 205 F.3d at 1136 (footnote omitted); "when someone makes a donation to them, there is no way to tell how the donation is used," Id.; and that "[m]ore fundamentally, money is fungible; giving support intended to aid an organization's peaceful activities frees up resources that can be used for terrorist acts," Id. Accordingly, it would be "absurd" for Congress to require a plaintiff to

5

trace a donated dollar directly to the particular terrorist attack that injured him because it would be, in almost all cases, impossible. Such a standard of proof would eviscerate the § 2339B remedy against any defendant who provided fungible financial services to an FTO or its agent.

In fact, Congress expressly found instead that "foreign organizations that engage in terrorist activity are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct." Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. 104-32, §301(a))7), 110 Stat. 1214, 1247 (1996), cited by Linde v. Arab Bank, Plc, 384 F. Supp. 2d 571, 587 (E.D.N.Y. 2005) (emphasis added). The allegations of the Complaint are entirely consistent with this legislative presumption of causation. Moreover, the Complaint also sufficiently alleges that the Defendant's acts foreseeably contributed to the terrorist acts that resulted in Plaintiffs' injuries. The terrorist acts listed in the Complaint are alleged to be the natural and probable consequence of NatWest's knowing and systematic provision of financial services to agents for HAMAS, a terrorist organization with a long, bloody track record of murdering and maiming Israeli civilians and a substantial number of U.S. citizens.

Finally, Defendant makes a half-hearted rhetorical claim that "principles of international comity" require this Court to dismiss an express treble damages remedy for American victims of international terrorism that was intended as an important part of U.S. counter-terrorism strategy. Def. Mem. at 55. As Plaintiffs show in Part V, Defendant cites no cases and identifies no specific foreign law, let alone the interests such theoretical law serves. Defendant provides no explanation why the Plaintiffs or this Court should accept as conclusive the findings of a foreign Charity Commission without citation of its evidence or explanation of its investigatory procedure. Defendant also fails to explain why, if such findings were somehow conclusive, they are not inculpatory rather than exculpatory. It completely ignores the express extraterritorial

6

reach of the statutory scheme under which Plaintiffs sue. Defendant does not even attempt to show that the unidentified foreign interests somehow outweigh the clearly expressed U.S. interest in allowing its own citizens and their estates and heirs to recover for injuries inflicted by acts of international terrorism from those who knowingly provided material support – including financial services.

## FACTUAL ALLEGATIONS IN THE COMPLAINT

Since at least the enactment of the Antiterrorism Act in 1991, U.S. law has focused on disrupting the activities of terrorist organizations by enacting both civil and criminal statutes designed not only to target terrorists themselves but to also reach secondary actors, such as those who provide training or financing to terrorist organizations. With respect to the terrorist organization known as HAMAS, U.S. law and government policy have consistently rejected the claim that HAMAS's terrorist activities can be bifurcated from its charitable or social welfare activities. In fact, as noted elsewhere herein, the enactment of 18 U.S.C. § 2339B in 1996 was explicitly intended to close a perceived ambiguity in the language of § 2339A and to make clear that material support provided to foreign terrorist organizations is unlawful regardless of the donor or facilitator's intent as long as the party providing the material support knows that it is assisting a foreign terrorist organization[5] (or knows that the organization has been designated).

As noted in the Declaration of Kenneth R. McKune, Associate Coordinator for Counterterrorism in the Department of State, filed in <u>Humanitarian Law Project v. Reno</u>, 9 F. Supp. 2d 1205 (C.D. Cal. 1998) ("Humanitarian I"), "In prohibiting comprehensively the

---

[5]     Citing to the House Conference Report on the Comprehensive Antiterrorism Act of 1995 (H.R. Rep. 104-383, at *43 (1995)), the district court in <u>Humanitarian Law Project v. Gonzales</u> explained, "…the legislative history indicates that Congress enacted § 2339B in order to close a loophole left by § 2339A. Congress, concerned that terrorist organizations would raise funds 'under the cloak of a humanitarian or charitable exercise,' sought to pass legislation that would 'severely restrict the ability of terrorist organizations to raise much needed funds for their terrorist acts within the United States.'" 380 F. Supp. 2d 1134, 1146 (C.D. Cal. 2005) ("Humanitarian IV").

provision of such support and resources, the law does not differentiate between the criminal, terrorist activities of these organizations, and the civil, non-violent activities, if any, in which they might engage. In legislating this particular dimension of the 'material support' ban, the Congress found that 'foreign organizations that engage in terrorist activity are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct.'" Schlanger Decl. Ex. A, ¶ 7.

The United Kingdom, unlike the United States, had, until September of 2003, taken a different view. Although the British government regarded HAMAS as a terrorist organization, it distinguished between its terrorist operatives and the social welfare or charitable organizations it controls. Thus, the parties do not fundamentally disagree about many of the facts, but only about their legal significance. It is undisputed that, acting on information from the Israeli and British security services, the Charity Commission froze accounts at NatWest that belonged to NatWest's customer, Interpal, on suspicion that Interpal was channeling large sums of money to HAMAS. Compl. ¶¶ 338, 340; Def. Mem. at 11. It is also undisputed that the Charity Commission unfroze the accounts and made a determination that "funds were not being given solely because of a person's support for HAMAS." Friedman Decl. Ex. D. (emphasis added). The Charity Commission's press statement at the time stated that it "found no evidence in the charity of any pro-terrorist bias..." Schlanger Decl. Ex. B. In short, based on a review of Interpal's records in Britain ("our powers of investigation in the locations where funds are distributed are often limited") the Charity Commission found no specific intent to support HAMAS ("Poverty and need should be the only criteria used when deciding how the charity's funds should be distributed." Friedman Decl. Ex. D.

Thus, the very findings cited ten separate times in Defendant's Memorandum constitute

8

exactly the kind of defense that the 1996 enactment of 18 U.S.C. § 2339B abolished. Plaintiffs allege that the freezing of NatWest's accounts for Interpal and the Charity Commission's subsequent "findings" gave the Defendant actual knowledge of the fact that NatWest was collecting and transmitting funds (i.e. providing financial services) to HAMAS. Put another way, even assuming the Charity Commisision was correct and Interpal was only transferring money to HAMAS to help the poor and needy without any specific intent to support HAMAS's terrorist activities, both the donation of the funds and NatWest's knowledge that it is rendering financial services to HAMAS unequivocally violate the criminal provision of § 2339B and give rise to civil liability under 18 U.S.C. § 2333(a).

Moreover, the Defendant is an international bank that has assumed additional duties to know its customers, investigate suspicious transactions, and engage in ongoing monitoring of individual transactions on customer accounts, in order to prevent money laundering and suppress terror financing. Compl. ¶ 413. The Defendant was (and is) required to conduct its own investigation and continue monitoring Interpal's transactions, including electronic funds transfers to so-called "charitable committees" in the West Bank and the Gaza Strip. Under governing U.S. law, the prohibition against providing material support to HAMAS was not terminated by the Charity Commission's "finding" that Interpal's transfers were motivated by altruism. On the contrary, said "findings" constitute per se violations of U.S. criminal law if the parties rendering the financial services do so knowingly.

Publicly available evidence, including Israel's 1997 designation of Interpal as an "unlawful organization" affiliated with HAMAS, its subsequent designation as a terrorist organization by Israel in 1998, and the further designation of many of the charitable committees to which NatWest provided millions of dollars as "unlawful organizations" affiliated with

9

HAMAS in February 2002, (Compl. ¶¶ 347, 349, 352, 354-5, 357), gave the Defendant additional knowledge and confirmation, prior to any of the attacks that injured the Plaintiffs, that its customer, Interpal, was using NatWest to transfer funds to the agents of HAMAS and HAMAS's charitable fronts. Nevertheless, the Defendant continued to supply financial services to Interpal and make electronic funds transfers on behalf of Interpal to the HAMAS fronts. The Complaint adequately alleges that HAMAS or HAMAS operatives then conducted the attacks that injured the Plaintiffs. Furthermore, even after several of the attacks, and after the United States also designated some of Interpal's donors and "partner" organizations as Specially Designated Global Terrorists, Defendant NatWest continued to conduct electronic transfers from its customer Interpal to HAMAS controlled entities, evidencing its continuing wilful disregard of the applicable criminal laws.

### A. The Founding of The Islamic Resistance Movement ("HAMAS")

In December 1987, Sheik Ahmed Yassin formed the Palestinian Islamic Resistance Movement ("HAMAS") as an offshoot of the Muslim Brotherhood, a radical Islamic group founded in Egypt before World War II. Pursuant to its charter, HAMAS and its operatives plan, assist, and conduct acts of international terrorism in Israel, the West Bank, and the Gaza Strip, including the attacks that injured the Plaintiffs. Compl. ¶¶ 289-90.

### B. Formal Israeli Designations of HAMAS as a Terrorist Organization

In 1989, the Government of Israel declared HAMAS a terrorist organization, and designated it an "unlawful organization" because of its terrorist acts. Notice of the designation was placed in the official Government of Israel publication, the *Announcements and Advertisements Gazette*. Compl. ¶ 291. In the years that followed, HAMAS perpetrated a series of deadly suicide bombings that murdered dozens of people. Compl. ¶¶ 292-5.

10

In November 1994, the Palestine and Lebanon Relief Fund, a British charity, was reincorporated as Interpal. Compl. ¶ 336.

HAMAS receives a majority of its financing through donations coordinated by prominent Saudi and Gulf State charities and the global network of charities known as the Union of Good, which is operated by the Muslim Brotherhood. The Union of Good, in turn, raises funds that are, in part, channeled through Interpal. Compl. ¶ 309.

## C.    Formal U.S. Designation of HAMAS as a Terrorist Organization

Pursuant to Executive Order No. 12947,[6] President Clinton designated HAMAS a "Specially Designated Terrorist" ("SDT") in 1995. Compl. ¶¶ 296-7.

## D.    The Charity Commission Investigation of Interpal in 1996

On or before January 1, 1996, Interpal opened one or more accounts with Defendant NatWest. Compl. ¶ 337.

For more than nine (9) years, Defendant NatWest has knowingly maintained numerous accounts for Interpal and has collected, received, transmitted, and provided <u>millions of dollars</u> on behalf of Interpal directly to agents of HAMAS through the following accounts:

U.S. Dollar Account Number – 140-00-04156838

Euro Account Number – 60720508524882

Sterling Account Number – 60082295142940

Compl. ¶¶ 385-86.

The allegations of links between Interpal and HAMAS were published in numerous British newspapers at the time, including *The Guardian* and *The Times of London*. Compl. ¶ 339.

The Charitiy Commission was established by law as a regulator and registrar for charities in England and Wales (Compl. ¶ 338) and investigated Interpal in 1996:

---

[6]    60 Fed. Reg. 5079 (Jan. 12, 1995)

11

- In March 1996, the Charity Commission froze Interpal's accounts at NatWest based on evidence that it had channelled money to HAMAS. Compl. ¶ 338.

- A spokesman for the Charity Commission told *The Guardian* that Interpal's bank accounts had been frozen "as a precautionary measure." Even after the widely published reports of Interpal's links to HAMAS, NatWest did not terminate its relationship with Interpal. Compl. ¶ 340.

- The Charity Commission ultimately unfroze the accounts ostensibly because the British government distinguished (at the time) between the military and social or charitable wings of HAMAS. There was no finding by the Charity Commission that Interpal had not transferred funds to HAMAS per se, nor did Interpal attempt to deny that it was transferring millions of dollars to HAMAS. Compl. ¶ 341.

- A month later, on May 30, 1996, the Charity Commission issued a report concerning Interpal finding that: "Poverty and need must however be the only criteria when deciding how the charity's funds are distributed and aid must not be given because of a person's support for terrorism. We found no evidence in the charity (Interpal) of any pro-terrorist bias, or indeed bias of any kind." Compl. ¶ 342.

Defendant has asked the Court to take "judicial notice" of the Charity Commission report. Def. Mem. at 18 n.6. Without agreeing that its alleged findings are not "subject to reasonable dispute" in this jurisdiction, see Fed. R. Evid. 201(b), Plaintiffs note that the Charity Commission found that it was possible some of Interpal's funds were going to "supporters of terrorism," Schlanger Decl. Ex. B, but that such transfers were without "any pro-terrorist bias." Compl. ¶ 343. The Commission also explained that "[r]elief cannot be denied to . . . [supporters of HAMAS] because of that support but at the same time we needed to ensure, to the best of our abilities, that funds were not being given solely because of a person's support for Hamas." Friedman Decl. Ex. D, ¶ 128 (emphasis added). The Charity Commission concluded that Interpal's funds transfers to supporters of Hamas were "motivated by faith and altruism rather than fanaticism." Id. at ¶ 129.

As noted in the Complaint, however, HAMAS's terrorist operations depend upon its religious and social activities to recruit, educate and train terrorists and to collect material and

aid. Its terrorist operations and social activities operate side-by-side and support each other. Compl. ¶ 302.

For the purpose of raising funds for its operations, HAMAS has established or taken control of "charity" committees across the Palestinian Authority-controlled territory ("PACT") and abroad, including committees in Ramallah, Jenin, and Tulkarem. Each of these committees is controlled by HAMAS agents and collects and distributes its funds on behalf of HAMAS. Compl. ¶ 304.

As the Complaint notes, one of the important roles of these "charities" is their involvement in the channeling of funds to identify and recruit potential terrorists and to pay expenses for and assist the families of terrorist operatives who are arrested, injured or killed. These entities also assist with the provision of housing subsidies to the families of suicide bombers whose homes are often demolished by the Israeli army after the bomber's identity has been confirmed. Compl. ¶¶ 305-06.

On February 25, 1996, a HAMAS suicide bomber blew up a bus in Jerusalem killing twenty-six (26) people, three (3) of whom were U.S. citizens, and injuring eighty (80) people, three (3) of whom were U.S. citizens. Compl. ¶ 298.

On April 24, 1996, Congress amended the Antiterrorism Act by enacting the AEDPA, including 18 U.S.C. § 2339B, and found that "Foreign organizations that engage in terrorist activity are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct." Antiterrorism Act of 1996, Pub. L. No. 104-132, sec. 301(a)(7), 110 Stat. 1247. Compl. ¶ 308.

## E.    Israeli Designations of Interpal and Holy Land Foundation in 1997

In May 1997, the Government of Israel declared Interpal an "unlawful organization"

because of its fundraising activities on behalf of HAMAS. Notice of the designation was placed in the official publication, the *Announcements and Advertisements Gazette*. Compl. ¶ 347.

On May 6, 1997, the Government of Israel designated the Holy Land Foundation for Relief and Development ("HLF") a HAMAS front organization, and declared that HLF "deals in the practice of transferring monies to families of HAMAS activists, who carried out deadly attacks ..." Compl. ¶ 360, n.12.

### F.    U.S. Designation of HAMAS, October 8, 1997

On October 8, 1997, by publication in the <u>Federal Register</u>, the United States Secretary of State designated HAMAS a Foreign Terrorist Organization pursuant to Section 219 of the Immigration and Nationality Act[7] and the Antiterrorism and Effective Death Penalty Act of 1996. The designation of HAMAS as a Foreign Terrorist Organization has been renewed every two years since 1997. Compl. ¶ 299.

Interpal was further designated a terrorist organization in January 1998 by the Government of Israel. Notice of the designation was placed in the *Announcements and Advertisements Gazette*. Compl. ¶ 349.

### G.    The Second Intifada and the Formation of the Union of Good in 2000

In late September 2000, a violent conflict commonly known as the "Second Intifada" erupted between the Palestinians and Israel. Compl. ¶ 310. A few weeks later, in October 2000, I'Tilafu Al-Khayr a/k/a the Union of Good was established by the Muslim Brotherhood. Compl. ¶ 310.

The Union of Good, comprised of more than fifty (50) Islamic charitable foundations worldwide, is a principal fundraising mechanism for HAMAS. Its primary "charitable" purpose is to provide financial support for HAMAS and its agents in the PACT. Compl. ¶¶ 312-13. The

---

[7]    8 U.S.C. § 1189.

14

Union of Good uses Interpal as its principal clearing house for funds raised throughout Europe and the Middle East. Compl. ¶ 316.

The Union of Good is headed by Dr. Yussuf al-Qaradawi, an extremist Sunni Muslim scholar based in Qatar. He has been on the U.S. Government watch list since 1999, has his own weekly television program on *Al Jazeera* and has publicly issued an Islamic religious edict (*fatwa*) authorizing suicide bombing attacks against Israel. Compl. ¶¶ 319-322.

## H.    NatWest's Union of Good Account and Website

NatWest maintains a U.S. Dollar account for the Union of Good with the account number 140-00-08537933. Compl. ¶ 315.   Moreover, the Union of Good's "101 Days Campaign" maintains its own website at www.101days.org.  The campaign solicits funds for HAMAS and directs prospective donors to donate via Interpal's NatWest account numbers 60082295142940 (Sterling) and 60720508524882 (Euros). Compl. ¶ 317.[8]

## I.    Interpal's Website and its Link with the Union of Good

Interpal's own website directly manifests the symbiotic link between the Union of Good and Interpal, soliciting donations for the former and explicitly stating that:

> Any donation that is made to INTERPAL through this web page is distributed with the knowledge and approval of the other members of the Union for Good directly to the charities in Palestine that are implementing the work creation programs [sic]. Compl. ¶ 318.

## J.    NatWest's Provision of Financial Services to HAMAS and HAMAS Fronts

During this time period NatWest provided (and continues to this day to provide) financial services to HAMAS via various HAMAS-controlled institutions including, but not limited to: the

---

[8]     Contrary to Defendant's assertion, Plaintiffs do not allege that providing financial services to the Union of Good constitutes material support to a designated FTO.  The legally significant point is that the Union of Good uses NatWest to transmit funds to HAMAS and the Union of Good.  Moreover, its spiritual leader, Sheik al-Qaradawi, is an outspoken advocate of HAMAS and a public supporter of terrorist attacks directed against Israel, and the Defendant is alleged to know this. Compl. ¶ 330.

Orphan Care Society of Bethlehem, Al-Islah Charitable Society in Ramallah-Al-Bireh, the Ramallah-Al Bireh Charitable Society, the Jenin Charity Committee, the Hebron Islamic Association, Tulkarem Charity Committee, Al-Mujama al-Islami, the Islamic Charitable Society in the Gaza Strip, and the Muslim Youth Association of Hebron.  Compl. ¶ 351.

### K.   Payment Deposited By NatWest for Holy Land Foundation, April 2000

In April 2000, NatWest accepted a deposit of $66,000.00 for Interpal from the Holy Land Foundation for Relief and Development ("HLF"), Compl. ¶ 360, which had previously been designated an unlawful organization by Israel in 1997. Compl. ¶ 347.

### L.   Payment Deposited By NatWest for Al-Aqsa Organization in Yemen 2001

In or about January 2001, NatWest accepted deposits totalling $70,000.00 on behalf of Interpal from the Al-Aqsa organization in Yemen. Compl. ¶ 373.

### M.   U.S. Designation of HAMAS and U.S. and European Designations of Holy Land Foundation 2001

After the September 11, 2001 terrorist attacks on the United States, President Bush issued Executive Order No. 13224[9] on September 23, 2001, declaring a national emergency with respect to the "grave acts of terrorism ... and the continuing and immediate threat of further attacks on United States nationals or the United States." Compl. ¶ 300.

Executive Order No. 13224 designated HAMAS as a Specially Designated Global Terrorist ("SDGT").  The Order blocked all property and interests in property of  SDGTs, including HAMAS. Compl. ¶ 301.

According to a prior version of Interpal's website (dating back to August 2001), Interpal directed persons wishing to make "international donations" to donate to HLF. Compl. ¶ 361.

On December 4, 2001, the U.S. Secretary of Treasury determined that the Holy Land

---

[9]      66 Fed. Reg. 49079 (Sept. 23, 2001)

Foundation was subject to Executive Order Nos. 12947 and 13224 because HLF "acts for or on behalf of" HAMAS. Compl. ¶ 362. Accordingly, HLF was designated a Specially Designated Terrorist under Executive Order No. 12947, and an SDGT under Executive Order No. 13224. Compl. ¶ 363.

Also in December 2001, the Counsel of the European Union designated Holy Land Foundation a terrorist entity under Article 2(b) and Regulation (EC) No. 2580/2001 on specific restrictive measures directed against certain persons and entities with a view to combating terrorism and repealing Decision 2005/848/EC. Compl. ¶ 364.

Despite the designation of HLF by the Government of Israel, the U.S. and the European Union, NatWest ignored the obvious warning signs and took no action to close Interpal's accounts and continued to transfer funds on behalf of Interpal even after the United States designated it a Global Terrorist.

**N.     Israeli Designation of Orphan Care Society of Bethlehem, Al-Islah Charitable Society in Ramallah-Al-Bireh, Jenin Zakat Committee and Tulkarem Charity Committee as HAMAS Fronts in February 2002**

On February 25, 2002, the Orphan Care Society of Bethlehem was outlawed by the Government of Israel based on its being affiliated with HAMAS. Most of its chief functionaries, including its director, Dr. Ghassan Harmass, are HAMAS terrorists. The Orphan Care Society pays subsidies to the children of HAMAS "martyrs" and imprisoned HAMAS members. Compl. ¶ 352.

In February 2002, the Al-Islah Charitable Society in Ramallah-Al-Bireh, the Jenin Zakat Committee and the Tulkarem Charity Committee were declared "unlawful organization[s]" by the Government of Israel based on their being affiliated with HAMAS. Compl. ¶¶ 354-5, 357.

On March 11, 2002, HLF filed suit seeking to enjoin the U.S. Government from

17

continuing to block or freeze its assets. Compl. ¶ 366.

### O.    Passover Massacre in Netanya, March 27, 2002

On March 27, 2002, a HAMAS suicide bomber detonated explosives in the Park Hotel in Netanya, killing thirty (30) people, including Hannah Rogen, who was severely wounded in the attack and died from her wounds six days later, on April 2, 2002. Compl. ¶ 282.

### P.    Sheffield Club Bombing, May 7, 2002

On May 7, 2002, a Palestinian suicide bomber detonated a bomb in the Sheffield Club, an unlicensed social club and gambling parlor. Fifteen (15) people were killed, including Esther Bablar. Compl. ¶¶ 274-6.[10]

### Q.    Netanya Suicide Bombing, May 19, 2002

On May 19, 2002, a suicide bomber detonated a bomb, killing three (3) people, and wounding more than fifty (50) others, including Plaintiff Gloria Kushner. Gloria's spine was injured, the permanent bridge in her mouth was cracked, and she had to undergo surgery. Both HAMAS and the Popular Front for the Liberation of Palestine claimed responsibility for the attack. Compl. ¶¶ 266-71.

### R.    Royal Bank of Scotland Group Adopts New "Know Your Customer" Guidelines, July 16, 2002

On July 16, 2002, the Royal Bank of Scotland Group (NatWest's parent company) adopted new "Know Your Customer" guidelines and adopted the so-called Wolfsberg Principles for the Suppression of Terror Financing. NatWest committed to implement "procedures for consulting applicable lists and taking reasonable and practicable steps to determine whether a person involved in a prospective or existing business relationship appears on such a list." Compl.

---

[10]    HAMAS was responsible for the attack, but due to typographical error, the Complaint omitted this allegation. See Schlanger Decl. Ex. C.

¶ 411.  At the same time, the Royal Bank of Scotland acknowledged that: "Funds used to support terrorism do not derive exclusively from criminal activities and differ from those associated with most existing money laundering offences," and committed itself to "the ongoing monitoring of individual transactions on customer accounts… ." Compl. ¶ 412.

## S.  Al-Aqsa Foundation in Germany Closed

On July 31, 2002, German authorities closed the Al-Aqsa Foundation in Germany because of its support of HAMAS. Compl. ¶ 370 n.14.

## T.  HAMAS Bombing of Hebrew University Cafeteria

On July 31, 2002, Mohammed Odeh detonated explosives in the Hebrew University Cafeteria, killing nine (9) people, including Janis Ruth Coulter, Diane Leslie Carter, Benjamin Blutstein, and David Gritz, and injuring as many as eighty-five (85) others. HAMAS claimed responsibility for the attack. Compl. ¶¶ 220-2, 225, 238, 246, 259.

## U.  August 8, 2002 Holy Land Foundation Decision

On August 8, 2002, three weeks after the Royal Bank of Scotland announced its new "Know Your Customer" guidelines, the United States District Court for the District of Columbia issued a written opinion in Holy Land Foundation for Relief and Development v. Ashcroft, 219 F. Supp. 2d 57, 70 (D.D.C. 2002), determining that "between 1992 and 1999, HLF contributed approximately 1.4 million dollars to eight Hamas-controlled "zakat" (or charity) committees…. HLF grant lists also establish that, between 1992 and 2001, HLF gave approximately five million dollars to seven other Hamas-controlled charitable organizations, including a hospital in Gaza." Compl. ¶¶ 366-7.

In 2002 alone, NatWest transferred over $1,500,000.00 to the following HAMAS front organizations: the Orphan Care Society of Bethlehem, Al-Islah Charitable Society in Ramallah-

Al-Bireh, the Ramallah-Al-Bireh Charitable Society, the Jenin Charity Committee, the Hebron Islamic Association, Tulkarem Charity Committee, Al-Mujama al-Islami, the Islamic Charitable Society in the Gaza Strip, and the Muslim Youth Association of Hebron. All of these organizations had been previously designated as unlawful by the Government of Israel on February 25, 2002 because of their affiliation with HAMAS. Compl. ¶ 358; See also Government of Israel list of unlawful organizations attached to Schlanger Declaration as Exhibit D.

## V. Head of the Al-Aqsa Organization in Yemen Arrested by FBI, January 2003

On January 1, 2003, the Danish Government charged three Al-Aqsa Foundation officials in Denmark with supporting terrorism. Compl. ¶ 370 n.14. On January 10, 2003, German authorities arrested Sheik Mohammed Ali Hasan al-Moayad, the head of the Al-Aqsa organization in Yemen, at the request of the U.S. Department of Justice and the Federal Bureau of Investigation. The arrest, for knowingly and intentionally conspiring to provide material support and resources to Al-Qaeda and HAMAS, took place after a year-long investigation and undercover operations by the FBI's Joint Terrorism Task Force. Compl. ¶ 374.

Prior to his arrest in Germany, Sheik al-Moayad had met with an undercover government informant and proffered proof of his prior fundraising on behalf of HAMAS by tendering to the undercover government informant a receipt from Interpal confirming a $70,000.00 donation from the Sheik's Al-Aqsa organization in Yemen. Compl. ¶ 375.

## W. Shooting Attack on Road #60, January 29, 2003

On January 29, 2003, Plaintiff Jacob Steinmetz was driving on Road #60, when two masked men, acting on behalf of HAMAS, shot at his car, striking him in his leg and arm. Compl. ¶¶ 209-11. Jacob underwent several surgeries, and a complete elbow replacement.

20

Compl. ¶¶ 212-4.

### X.    NatWest Transfers £21,404 ($34,051.60 U.S.) to the Tulkarem Charity Committee, February 19, 2003

On February 19, 2003, NatWest transferred £21,404 ($34,051.60 U.S.) to the HAMAS front organization, the Tulkarem Charity Committee, and charged a commission of £10. See Exhibit A attached to the Complaint. As noted in Parts II-N and U above, the Government of Israel had designated the Tulkarem Charity Committee (the HAMAS front that received the funds) as an unlawful organization one year before the transfer, and Interpal, NatWest's customer, as an unlawful organization six years before the transfer, due to their support for, or control by, HAMAS. Compl. ¶ 393.

### Y.    NatWest Deposits 295,000 Euros from the Dutch Branch of the Al-Aqsa Foundation, March 2003

On March 27, 2003, NatWest deposited at least two payments to Interpal totalling 295,000 Euros from the Dutch branch of the Al-Aqsa Foundation, Compl. ¶ 370, notwithstanding the prior Danish and German arrest of Al-Aqsa officials for supporting terrorism. Compl. ¶¶ 370 n.14, 374.    In April 2003, Dutch authorities blocked Al-Aqsa Foundation assets in The Netherlands based on information that funds were provided to organizations supporting terrorism in the Middle East. Compl. ¶ 370 n.14.

### Z.    HAMAS Suicide Bombing at Mike's Place, April 30, 2003

On April 30, 2003, Asif Muhammad Hanif, a suicide bomber sent by HAMAS, entered Mike's Place, a popular bar situated on the seashore a few hundred meters from the American Embassy in Tel Aviv, and detonated his explosives. Compl. ¶¶ 195-6.    Plaintiff Daniel Rozenstein was seated inside the bar and decided to step outside when he crossed paths with the suicide bomber in the entry way just as he detonated his explosives. Compl. ¶ 198. As a result of

21

the attack, Daniel suffered third degree burns over his entire body. Compl. ¶ 199. After three days in the hospital, Daniel slipped into a coma that lasted eight days. He was placed on a respirator and other life support for over a week and remained in the hospital for one and a half months, followed by eight months of treatment as an outpatient. Compl. ¶ 200.

### AA.    HAMAS Suicide Bus Bombing, May 18, 2003

On May 18, 2003, Plaintiff Steven Averbach was seated on a commuter bus heading for Jerusalem when a HAMAS suicide bomber detonated his explosives. Compl. ¶¶ 148-51. Seven (7) people ranging in age from 35 to 68 were killed by the explosion. Compl. ¶ 152. Steven sustained a critical wound when a ball bearing originally packed together with the bomber's explosives penetrated through the skin and muscles of his neck and lodged between his C3 and C4 vertebrae. The ball bearing lodged in his spinal canal causing severe compression damage to his spinal cord. The object was eventually removed during surgery, but not before it had caused severe damage to his spinal cord that rendered him a quadriplegic. Compl. ¶ 154.

### BB.    U.S. Designation of Al-Aqsa Foundation, May 29, 2003

On May 29, 2003, the U.S. Treasury Department added the Al-Aqsa Foundation to its list of Specially Designated Global Terrorist entities, accusing the organization of funneling funds, including money donated for charitable purposes, to HAMAS. Compl. ¶ 371.

### CC.    HAMAS Suicide Bombing on Jaffa Road Bus #14, June 11, 2003

On June 11, 2003, Abdel Madi Shabneh, a HAMAS operative dressed as an ultra-Orthodox Jew, boarded Egged bus #14A and detonated a bomb, wrecking the bus and killing sixteen (16) of its passengers. The bomber killed Alan Beer, whose family members are Plaintiffs in this action, and wounded more than one hundred (100) people, including Plaintiff Sarri Singer. ¶¶ 117-8.

## DD. Howard Goldstein is Murdered by HAMAS and his Parents are Shot, June 20, 2003

Plaintiffs Eugene Goldstein and Lorraine Goldstein were shot, and their son Howard was murdered, during a roadside ambush perpetrated by HAMAS on Route #60, on June 10, 2003. Compl. ¶¶ 77-8, 81-3, 85, 90.

## EE. NatWest Transfers £73,757 ($119,809.00 U.S.) to the Jenin Charitable Society, July 30, 2003

On July 30, 2003, NatWest transferred £73,757 ($119,809.00 U.S.) to the Jenin Charitable Society, debiting Interpal's Account Number 600822-95142940. See Exhibit B attached to the Complaint. This transaction was financed by the World Assembly of Muslim Youth ("WAMY"), the Saudi "charity" linked to both HAMAS and Al Qaeda financing. At the time NatWest transferred this amount to HAMAS, WAMY (the source of the funds), Interpal (the repository of the funds) and the Jenin Charitable Society (the HAMAS front that received the funds) had all been previously designated as unlawful organizations by the Government of Israel due to their support for, or control by, HAMAS. Compl. ¶ 395.

## FF. HAMAS Suicide Bomber Blows Up Jerusalem Bus, August 19, 2003

On August 19, 2003, Raed Abdul Hamid Misk, a suicide bomber, detonated explosives on Egged bus # 2, killing Tehilla Nathansen, and injuring members of the Nathansen family and Plaintiff Tzvi Weiss. HAMAS claimed responsibility for the attack. Compl. ¶¶ 5-6, 13, 15-6, 18, 20-3, 30, 35, 37, 39-40, 42-44.

## GG. U.S. Government Designation of Interpal as Specially Designated Global Terrorist

Following this atrocity, on August 22, 2003, President George W. Bush stated:

At my direction, the Treasury Department has moved today to block and freeze the assets of six top HAMAS leaders and five non-governmental organizations that I am advised provide financial support to HAMAS. By claiming

23

responsibility for the despicable act of terror on August 19, HAMAS has reaffirmed that it is a terrorist organization committed to violence against Israelis and to undermining progress toward peace between Israel and the Palestinian people. Compl. ¶ 378.

In an interview reported in *The Guardian* on August 28, 2003, after the U.S. Government designation, Mr. Hewitt, Chairman of Interpal, NatWest's customer, was publicly quoted as saying: "We deal with people whether they are HAMAS or whether they are Fatah." Compl. ¶ 380.

On September 12, 2003, the European Union designated all of HAMAS (including its social "wing") a terrorist organization, but even then, NatWest took no action to close Interpal's accounts. Compl. ¶ 381.

## HH. NatWest Transfers £32,329 ($54,322.40 U.S.) to the Jenin Charitable Society

On November 5, 2003, two months AFTER the official U.S. designation of Interpal as a global terrorist, NatWest transferred £32,329 ($54,322.40 U.S.) to the Jenin Charitable Society, debiting Interpal's Account Number 600822-95142940. See Exhibit C attached to the Complaint. Compl. ¶ 400.

## II. NatWest Financial Services for HAMAS

By maintaining accounts for HAMAS's agent, Interpal, and affecting electronic transfers from those accounts to accounts of "charitable" fronts and agents for HAMAS in the West Bank and Gaza Strip, NatWest provides HAMAS with a highly convenient method to collect and transfer funds in U.S. Dollars as well as Sterling and Euros. Compl. ¶ 387.

NatWest also provides Interpal with merchant banking services, directly and through another Royal Bank of Scotland subsidiary, thereby making it possible for Interpal to maintain merchant accounts with MasterCard, VISA and other credit card companies. This allows HAMAS to solicit contributions in dozens of currencies from around the world and allows

24

Interpal to solicit funds for HAMAS via its website at www.interpal.org. Compl. ¶¶ 388-9.

In addition, NatWest, with the help of financial products provided by its sister company, provides further substantial assistance to HAMAS by making it possible for British nationals to make direct contributions to Interpal by way of their employer's payroll department through a program called "Give As You Earn." Compl. ¶ 390.

By knowingly providing accounts in multiple currencies, and providing credit card services and other financial services, NatWest clearly provides substantial assistance to HAMAS, and it is reasonably foreseeable that the millions of dollars transmitted by NatWest to HAMAS would further HAMAS's unlawful goals, including terrorism.

## LEGAL ARGUMENT

## I.   THE COMPLAINT IS NOT SUBJECT TO DISMISSAL UNDER RULE 12(b)(6)

### A.   The Applicable Legal Standards On A Rule 12(b)(6) Motion to Dismiss.

A complaint must not be dismissed with prejudice prior to discovery unless "it appears beyond doubt that plaintiffs can prove no set of facts to support their claim that would entitle them to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957); Hishon v. King & Spalding, 467 U.S. 69, 73 (1984). The trial court's function "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." Geisler v. Petrocelli, 616 F.2d 636, 639 (2d Cir. 1980). See, Ricciuti v. N.Y.C. Transit Auth., 941 F.2d 119, 124 (2d Cir. 1991). The Court should seek only to determine whether the claimants are entitled to offer evidence to support their claims. Scheuer v. Rhodes, 416 U.S. 232, 236 (1974) ("Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test.")

On a motion addressed to the pleadings, the district court must accept all of the Plaintiffs' allegations as true, Papasan v. Allain, 478 U.S. 265, 283 (1986), and all inferences should be "construed favorably to plaintiff." LaBounty v. Adler, 933 F.2d 121, 123 (2d Cir. 1991).

## B. Claims Under Section 2333(a) Are Subject To Notice Pleading Only.

In Boim, 291 F.3d at 1008, the Seventh Circuit affirmed the denial of a Rule 12(b)(6) motion based on its conclusion that the liberal notice pleading standards must be applied to claims under Section 2333, ruling that:

> The Boims thus need not set out in detail all of the facts upon which they base their claim. Rule 8(a) requires only that the complaint give the defendants fair notice of what their claim is and the grounds upon which it rests. Leatherman, 507 U.S. at 168.

The Complaint here clearly provides Defendant with sufficient notice of Plaintiffs' claims. Nothing more is required at this stage.

When a defendant brings a motion to dismiss and proffers materials outside the pleadings, the language of Rule 12(b) suggests that the court may exclude the additional material and decide the motion on the complaint alone or it may convert the motion to one for summary judgment under Fed. R. Civ. P. 56 and afford all parties the opportunity to present supporting material. See, e.g., Kopec v. Coughlin, 922 F.2d 152, 154-55 (2d Cir. 1991), citing, Carter v. Stanton, 405 U.S. 669, 671 (1972) (per curiam) (where "matters outside the pleadings were presented and not excluded by the court[, t]he court was … required by Rule 12(b) of the Federal Rules of Civil Procedure to treat the motion to dismiss as one for summary judgment and to dispose of it as provided in Rule 56."). A district court ordinarily must give notice to the parties before converting a motion to dismiss pursuant to Rule 12(b)(6) into one for summary judgment and considering matters outside the pleading. Gurary v. Winehouse, 190 F.3d 37, 43 (2d Cir. 1999). Since Defendant has nowhere called its motion a motion for summary judgment,

Plaintiffs assume that the motion is still governed by Fed. R. Civ. P. 12(b) and the facts in the

Complaint must be deemed true for purposes of the motion.

## II.    THE STATUTORY FRAMEWORK OF THE ATA CLEARLY AUTHORIZES CIVIL SUITS BASED ON SECONDARY LIABILITY

Plaintiffs predicate all of their claims on 18 U.S.C. § 2333(a), which provides:

Any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees.[11]

Substantively, the Section 2333(a) remedy was intended to strengthen this country's

arsenal against terrorists, expand the reach of tort law for the benefit of U.S. victims of terrorism

abroad, and imperil the flow of money for terrorism by exposing anyone in the causal chain of

terrorism to civil liability.    Procedurally, the § 2333(a) remedy, in conjunction with its

procedural incidents in 18 U.S.C. §§ 2334-38, was intended to lower jurisdictional and

procedural barriers to suits by U.S. victims of terrorism.    Congress clearly wished to ensure that

torts related to terrorist activity would be actionable even if they occurred in a foreign country

and that liability would attach to all persons "who knowingly or negligently make it possible for

some actor grievously to injure somebody else [through an act of terrorism]." See, ATA Hearing

at 136 (Statement of Joseph A. Morris)(emphasis added).

---

[11]    Contrary to Defendant's unsupported passing assertion that claims under 18 U.S.C. § 2333(a) brought by non-U.S. citizens must be dismissed as a matter of law (Def. Mem. at 7), even a cursory reading of 2333(a) reveals that Defendant's assertion not only lacks merit but is plainly wrong. See, e.g. Biton v. Palestinian Interim Self-Gov't Auth., 310 F. Supp. 2d 172 (D.D.C. 2004).

27

**A.    The § 2333(a) Civil Remedy Was Intended to Strengthen Our Arsenal
Against Terrorists, Expand the Reach of Tort Law in Favor of U.S. Victims
of Terrorism, and Imperil the Flow of Money for Terrorism.**

Section 2333(a) was originally enacted in 1990, repealed for technical reasons, and then
re-enacted in 1991 as part of the Antiterrorism Act of 1992. Pub. L. No. 102-572, 106 Stat. 4506
(1992).[12]   The legislation was prompted by a civil suit against the Palestinian Liberation
Organization in federal court for the murder of Leon Klinghoffer, a U.S. citizen killed by
Palestinian terrorists during a highjacking of the *Achille Lauro* cruise ship. The sponsors of the
legislation wanted to build on Klinghoffer v. Palestinian Liberation Org., 739 F. Supp. 854
(S.D.N.Y. 1990), to expand federal jurisdiction to hear terror victims tort suits for attacks
perpetrated abroad.   The government supported this effort. The Deputy Legal Adviser for the
Department of State, Alan Kreczko, testified before the Senate that: "This bill ... expands the
Klinghoffer opinion.  Whereas that opinion rested on the special nature of our admiralty laws,
this bill will provide general jurisdiction to our Federal courts and a cause of action for cases in
which an American has been injured by an act of terrorism overseas.  This bill is a welcome
addition to our arsenal against terrorists." See, ATA Hearing at 12 (emphasis added).  He also
added that it would "pave the way for ... victims of terrorism to seek justice via the federal
courts and [that] the possibility of civil damages may well serve as an economic disincentive to
terrorism." Id. at 17.  The § 2333(a) civil remedy is therefore not simply another private tort, but
is embued with the public interest.  It was intended to strengthen this country's arsenal against
terrorism, expand the reach of tort law for the benefit of U.S. victims of terrorist attacks abroad,
and create an economic disincentive to terrorism.  The statute must be construed to further these

---

[12]    The legislative history is described more fully in the Brief for the United States as Amicus Curiae
Supporting Affirmance, filed in Boim, ("U.S. Amicus Brief") at 11-18, a copy of which is attached to the Schlanger
Declaration as Exhibit E. The Seventh Circuit substantially adopted the Government's account of this legislative
history in its opinion. See Boim, 291 F.3d at 1010-1012.

ends.

Testimony by a former Department of Justice attorney and former General Counsel of the United States Information Agency, Joseph A. Morris, was particularly influential in the hearings on the original legislation. He testified:

> International terrorism has become, in many respects, an industry. It rests on a foundation of money. Money is often more important to the masters of terrorism than are people. That they care little for their victims goes without saying; but it is instructive that many terrorist organizations appear to care little for their own operatives, treating them as fungible and expendable. [Id. at 84-85.]

Although Mr. Morris was testifying in 1990, a decade before the Second Intifada, his testimony was prescient. The suicide bombers of the Second Intifada are obviously "fungible and expendable," and the "industry" that sets them to murder has its own interlocking corporate structure of terrorist organizations, "charitable fronts," and "fundraising organizations," its own bank accounts and, thanks to the Defendant, access to merchant banking services and credit cards.

The § 2333(a) remedy provides one legislative response to this growth industry. "[B]y its provisions for compensatory damages, treble damages, and <u>the imposition of liability at any point along the causal chain of terrorism, it would interrupt, or at least imperil, the flow of terrorism's lifeblood: money</u>." Id. at 85 (emphasis added). Subsequently, the Senate Report explaining the § 2333(a) remedy quoted and adopted Mr. Morris's underlined testimony verbatim. S. Rep. No. 102-342, 102nd Cong., 2d Sess. at 22 (1992).

## B.    Section 2333(a) Defines the Class of Beneficiaries and Incorporates Federal Common Law and Federal Statutory Law.

Section 2333(a) provides that any U.S. national "injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs,

may sue therefor ..." Section 2331, in relevant part, defines "international terrorism" as

> activities that involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State; [and] appear to be intended to intimidate or coerce a civilian population; to influence the policy of a government by intimidation or coercion; or to affect the conduct of a government by mass destruction, assassination, or kidnapping; and occur primarily outside the territorial jurisdiction of the United States ... [18 U.S.C. § 2331(1).]

Plainly, the Plaintiffs have been injured by "violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any state," or would be if committed here. See, e.g., Compl. ¶¶ 5, 6, 80, 83, 117, 118, 148, 149, 150, 195, 196, 209, 210, 220, 221, 266, 267, 268, 274, 282. Defendant does not dispute this fact. The violent acts that give rise to Plaintiffs' injuries, i.e., murder, attempt to commit murder, and physical violence that results in serious bodily injury, clearly qualify as "violent acts or acts dangerous to human life," and thus fall within Section 2331(1)(A). Defendant does not challenge the sufficiency of Plaintiffs' allegations with respect to the apparent purpose and location of these acts, as required by Section 2331(1)(B) and (C). Thus, Plaintiffs have alleged that they were injured "by reason of an act of international terrorism," as required by § 2333(a).

Although Section 2333(a) identifies who may sue, it is silent about who may be sued in the civil action that it creates. This was not an oversight. As Mr. Morris testified,

> [t]he substance of such an action is not, and need not be, by the statute, for the fact-patterns that may give rise to such suits may be as varied and numerous as those found in the law of torts, and it is essentially to the existing, well-developed American State and Federal body of common and statutory tort law that this bill opens the door. [ATA Hearing, at 86 (emphasis added).]

"American tort law in general," Morris explained, "would speak quite effectively to the facts and circumstances of most terrorist actions not involving acts of state by foreign governments." ATA Hearing, at 83. The Senate Committee on the Judiciary agreed; its report accompanying the final

bill quoted and adopted the foregoing underlined parts of Mr. Morris's testimony substantially verbatim. See S. Rep. No. 102-342, 102d Cong., 2d Sess. at 22 (1992).

Accordingly, potential defendants to a § 2333(a) claim certainly include the terrorists themselves who directly commit violent criminal acts. Defendant, however, contends that § 2333(a) liability cannot reach any persons "who had not committed a predicate criminal act" of international terrorism. Def. Mem. at 3. As the United States pointed out in its amicus curiae brief in Boim, Section 2333(a) is "a largely hollow remedy if it merely allows suits against terrorists who pull the trigger or plant the bomb," because such defendants rarely have more than minimal assets and are often impossible to find. U.S. Amicus Brief, at 18. The Seventh Circuit Court of Appeals agreed, holding that such a restrictive reading would give the civil remedy "little effect." Boim, 291 F.3d at 1021. These conclusions apply with even greater force to suicide bombers, such as those who injured many of the Plaintiffs in this case. Section 2333(a) would not be just a "hollow remedy" with "little effect" against terrorists who are not just gone but dead. It would be a cruel hoax.

As noted by the Court in Linde, therefore, "Section 2333 does not limit the imposition of civil liability only to those who directly engage in terrorist acts," 384 F. Supp. 2d at 582, or who themselves "committed the predicate acts," as Defendant would have it. Contrary to Defendant's contorted reading, Section 2333(a) must be construed, using well-developed American tort law, to cast its net beyond the terrorists themselves.

The RESTATEMENT (SECOND) of TORTS § 876 (1979) provides that for "harm resulting to a third person from the tortious conduct of another, one is subject to liability if he

> (a)     does a tortious act in concert with the other or pursuant to a common design with him, or

> (b)     knows that the other's conduct constitutes a breach of duty and gives

31

substantial assistance or encouragement to the other so to conduct himself, or

(c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person. Id.

Plaintiffs' First Claim for Relief, alleging that Defendant aided and abetted terrorists, falls squarely within RESTATEMENT (SECOND) TORTS § 876(b) (1979). Plaintiffs' Second and Third Claims, alleging that the Bank violated its independent duties established under Section 2333(a)'s corresponding criminal anti-terrorist provisions – Sections 2339B, and 2339C – fall squarely within RESTATEMENT (SECOND) TORTS § 876(c) (1979).

## C. Section 2333(a) Liability Extends To Those Who Aided and Abetted Terrorists and FTOs.

Under common law civil theories of aiding and abetting and conspiracy tort liability, the universe of potential Defendants under Section 2333(a) includes those who aid and abet or conspire with the terrorists who committed the violent criminal acts by reason of which the Plaintiffs were injured. Boim, 291 F.3d at 1021. Contrary to Defendant's assumption ("there is no implied claim for aiding and abetting" (Def. Mem. at 38)), aiding and abetting liability in this case is not inferred from the criminal aiding and abetting statute, 18 U.S.C. § 2. As the Seventh Circuit found in Boim, "aiding and abetting liability is both appropriate and called for by the language, structure and legislative history of section 2333." Id. (emphasis added). By incorporating American tort law, the civil remedy of Section 2333(a) includes civil aiding and abetting liability. As noted above, the relevant standard is set forth in the RESTATEMENT (SECOND) of TORTS §876(b) and §876(c) (1979), not 18 U.S.C. § 2.

Nor is this conclusion "foreclosed by [the] Supreme Court precedent" of Central Bank of Denver v. First Interstate Bank of Denver, 511 U.S. 164 (1994), as Defendant argues. Def. Mem.

32

at 38. The <u>Boim</u> court considered and squarely rejected the same argument.

> The <u>Central Bank</u> analysis provides guidance but is not determinative here for a number of reasons. First, <u>Central Bank</u> addressed extending aiding and abetting liability to an implied right of action, not an express right of action as we have here in section 2333. Second, Congress expressed an intent in the terms and history of section 2333 to import general tort law principles, and those principles include aiding and abetting liability. Third, Congress expressed an intent in section 2333 to render civil liability at least as extensive as criminal liability in the context of the terrorism cases, and criminal liability attaches to aiders and abettors of terrorism. <u>See</u> 18 U.S.C. § 2. Fourth, failing to extend section 2333 liability to aiders and abettors is contrary to Congress' stated purpose of cutting off the flow of money to terrorists at every point along the chain of causation. [<u>Boim,</u> 291 F.3d at 1019.]

The reasoning behind the <u>Boim</u> decision was adopted by Judge Gershon in <u>Linde</u>, 384 F. Supp. 2d at 583, and by Judge Wood in <u>Wiwa v. Royal Dutch Petroleum Co.</u>, 2002 WL 319887, *16 (S.D.N.Y. Feb. 28, 2002). The <u>Wiwa</u> court, following the lower court's decision in <u>Boim,</u> rejected the analogy to <u>Central Bank</u> and applied principles of aiding and abetting liability to the Torture Victims Protection Act.

The Defendant's attempts to counter the obvious intent of the statutory scheme by comparing Section 2333(a) to the provisions of civil RICO are untenable. The Defendant relies upon numerous civil RICO cases decided <u>after</u> the Supreme Court's 1994 decision in <u>Central Bank</u>, in which it held that the statute does not extend to aiding and abetting liability. When interpreting statutes however, federal courts are required to consider the case law existing <u>at the time the statute was enacted.</u> In analogizing Section 2333(a) to civil RICO, this Court must focus on case law that prevailed at the time when Congress wrote the statute in question (1990-91). For example, in <u>F. Hoffman-La Roche Ltd. v. Empagran S.A.</u>, the Supreme Court construed an antitrust civil damages provision, finding "no significant indication that <u>at the time Congress wrote this statute</u> courts would have thought the Sherman Act applicable in these circumstances" 542 U.S. 155, 169 (2004) (emphasis added). The Supreme Court conducted an extensive

33

analysis of six court cases, all decided <u>before the enactment of the statute in question,</u> and concluded "[t]he upshot is that no pre-1982 case provides significant authority for application of the Sherman Act in the circumstances we here assume."[13] <u>Id.</u> at 173.

Based on the state of the law in 1990-1991, it is clear that Congress would have assumed that it was enacting a statute that would be construed to provide for aiding and abetting liability. A Southern District of New York court accurately summarized pre-<u>Central Bank</u> case law as follows:

> Several courts have expressly or implicitly recognized civil liability for aiding and abetting a RICO violation, but usually without much discussion of whether RICO imposes such liability. However, all of the above-cited cases were decided before <u>Central Bank</u> was decided in April 1994. In fact, before Central Bank was handed down, 11 different Circuits had recognized a private right of action for aiding and abetting securities fraud under Rule 10b-5. See <u>Central Bank</u>, 511 U.S. at 192, 114 S. Ct. at 1456 (Stevens, J., dissenting). [<u>Dept. of Econ. Dev. v. Arthur Andersen & Co. (U.S.A.)</u>, 924 F. Supp. 449, 477 (S.D.N.Y. 1996) (citations omitted).]

In any case, the more relevant Supreme Court precedent is not <u>Central Bank</u>, but <u>Harris Trust & Sav. Bank v. Salomon Smith Barney</u>, 530 U.S. 238 (2000), decided after <u>Central Bank.</u> There the Court decided that a civil action under ERISA reached beyond identified immediate wrongdoers to third parties. Emphasizing that the statute, like Section 2333(a) in this case, "admits of no limit ... on the universe of possible defendants" (<u>Id.</u> at 246), the Court stated that it would "ordinarily assume that Congress's failure to specify proper defendants [in the statute] was intentional." <u>Id.</u> at 247. While legislative history could rebut that assumption, <u>See, e.g.,</u> <u>Central Bank</u>, 511 U.S. at 183-84 (declining to find aiding and abetting liability in part because statute already expressly provides for "controlling person" liability), the legislative history of

---

[13]    <u>Accord</u> <u>Fireman's Fund Ins. Co. v. Stites</u>, 258 F.3d 1016, 1020 (9th Cir. 2001) (refusing to apply Supreme Court's decision in <u>Parklane Hosiery Co. v. Shore</u>, 439 U.S. 322 (1979) to analyses of offensive collateral estoppel because "when RICO was enacted in 1970, federal common law did not allow for offensive non-mutual collateral estoppel ... Such estoppel was only authorized in 1979, when the Supreme Court decided <u>Parklane</u>.").

Section 2333(a) points in precisely the opposite direction. "Failing to extend Section 2333(a) liability to aiders and abettors is contrary to Congress' stated purpose of cutting off the flow of money to terrorists at every point along the chain of causation." Boim, 291 F.3d at 1019.

Again, Mr. Morris's testimony in the hearings on the Section 2333 remedy is instructive. Rebutting a suggestion that the bill should be made more specific, Mr. Morris reminded the Senate Subcommittee that:

> the bill as drafted is powerfully broad, and its intention, as I read it, is to bring focus on the problem of terrorism, and reaching behind the terrorist actors to those who fund and guide and harbor them, bring all of the substantive law of the American tort law system .... Let us make all the tort law in the country available to see what we can do to sort out these suits, all the doctrines of vicarious and shared liability, joint and several liability, and so forth, and let us see if we can't nail all the tort-feasors down the chain, from the person who starts spending the money to the person [who] actually pulls the trigger. [ATA Hearing, at 136-7.]

The sponsor of Section 2333, Senator Grassley, concurred, and explained to the Senate that the Antiterrorism Act "accord[s] victims of terrorism the remedies of American tort law." 137 Cong. Rec. 8143 (1991). The Government surely was correct in urging in Boim, that "under Section 2333(a), victims of 'international terrorism' ... can sue not only those who actually commit the acts of terrorism, but also persons or entities who would be liable for those acts under civil tort principles of aiding/abetting." Boim, U.S. Amicus Brief at 17-18 (emphasis added). Defendant's contrary arguments would eviscerate the Section 2333(a) civil remedy by relegating the universe of potential defendants to the graveyard of suicide bombers.

Finally, Congress gave no indication whatsoever that by criminalizing material support in enacting Sections 2339B and 2339C several years after creating the § 2333(a) civil remedy, it somehow meant to curtail that remedy, as Defendant half-heartedly alleges without citation to any legislative history. Def. Mem. at 42-3. Congress simply added to the government's criminal arsenal, recognizing belatedly that terrorists could bypass Section 2339A by using foreign

terrorist organizations and their agents as conduits for support, as they did here with the Defendant's knowing assistance.  Far from silently rescinding the common law aiding and abetting remedy it created in the ATA, Congress, by later enacting Sections 2339B and 2339C added duties whose violation also gives rise to liability under RESTATEMENT (SECOND) OF TORTS § 876(c), as discussed below.

**D.      Section 2333(a) Liability Extends to Persons Who Substantially Assist Terrorist Attacks by Breaching Duties Under § 2339B and § 2339C.**

As the RESTATEMENT (SECOND) TORTS § 876(c) sets forth, a defendant incurs civil liability if he (or it) "gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person." (emphasis added).  While Sections 2339B and 2339C define crimes, they correlatively define duties.  As the Supreme Court found in Harris Trust, when a statute "makes no mention at all of which parties may be proper defendants," the courts may appropriately look to provisions which create duties to identify possible defendants. 530 U.S. at 246-7.  At the very least, Section 2333(a)'s civil remedy must be construed to reach entities that violate the duties set out in the correlative criminal provisions of Chapter 113B, where the civil remedy and criminal provisions appear alongside each other.  The Seventh Circuit correctly concluded in Boim that "[t]here is no textual, structural or logical justification for construing the civil liability imposed by Section 2333(a) more narrowly than the corresponding criminal provisions." Boim, 291 F.3d at 1015. When Congress imposed criminal liability for providing financial services to Terrorist Organizations, it intended to impose civil liability at least as broad for providing the same services.

And so Defendant concedes: "…violation of [Sections 2339B or 2339C] … gives rise to

36

civil liability under the ATA." Def. Mem. at 42.  It therefore has only the arguments that neither

section – despite its plain language – reaches the banking services the Defendant supplies.

### 1.    "Material Support" Under § 2339B Explicitly Includes "Financial Services."

Section 2339B makes it a crime to "knowingly provide[] material support or resources to

a foreign terrorist organization, or [to] attempt[] or conspire[] to do so." 18 U.S.C.§ 2339B(a)(1).

Section 2339B broadly defines "material support or resources" as:

> any property, tangible or intangible, or service, including currency or monetary
> instruments or financial securities, <u>financial services</u>, lodging, training, expert
> advice or assistance, safehouses, false documentation or identification,
> communications equipment, facilities, weapons, lethal substances, explosives,
> personnel…, and transportation, except medicine or religious materials. [18
> U.S.C. § 2339B(g)(4) (incorporating the definition of "material support or
> resources" used in Section 2339A(b) (emphasis added).]

Plaintiffs respectfully submit that if the term "financial services" is to have any meaning

within the statute it must surely encompass opening bank accounts, collecting funds, transmitting

funds and providing merchant account credit card services.  In fact, the statute differentiates

"currency or monetary instruments" – the funds themselves – from "financial services," making

it even plainer that such services include what the Defendant ad nauseum attempts to trivialize as

"routine banking services."

Defendant, however, also argues that the reporting provisions in Section 2339B(a)(2)[14]

and the civil penalty provisions in Section 2339B(b),[15] specifically relating to financial

---

[14]    "Except as authorized by the Secretary, any financial institution that becomes aware that it has possession
of, or control over, any funds in which a foreign terrorist organization, or its agent, has an interest, shall -- (A) retain
possession of, or maintain control over, such funds; and (B) report to the Secretary the existence of such funds in
accordance with regulations issued by the Secretary." 18 U.S.C. § 2339B(a)(2).

[15]    "Any financial institution that knowingly fails to comply with subsection (a)(2) shall be subject to a civil
penalty in an amount that is the greater of -- (A) $50,000 per violation; or (B) twice the amount of which the
financial institution was required under subsection (a)(2) to retain possession or control." 18 U.S.C. § 2339B(b).

institutions that "become aware" they are in possession of funds in which a foreign terrorist organization or its agent has an interest, are a safe harbor insulating banks from criminal prosecution, and derivatively, civil liability, under the material support statute. Def. Mem. at 28-9. This turns the statute on its head. Congress recognized that banks such as Defendant are uniquely positioned to disrupt the financial lifeblood of FTOs. For that reason, Section 2339B(a)(2) plainly imposes additional, not fewer, duties on banks to report and to freeze accounts. They require a bank, as soon as it becomes aware that it has control over funds of an FTO or its agent, to freeze them and report them to the Department of Justice – as opposed to merely refunding money in its possession or refusing to execute a particular transaction.

Continuing to process transactions after such awareness violates the baseline criminal provision of Section 2339B(a)(1), which applies to "whoever" knowingly provides financial services to an FTO, sensibly not exempting banks that are the most likely conduits for such support. Section 2339B(a)(2) simply gives the Department of Justice the option of imposing a civil penalty for failure to freeze funds or failure to promptly notify the Attorney General of the existence of the funds. It does not sub silentio remove the prosecution option.

Of course, Defendant's formulation that "mere maintenance of an account for a customer, or other related routine banking services" standing alone would not give rise to criminal liability under Section 2339B, is still correct. The touchstone of the statute is knowledge and without some form of knowledge, the mere maintenance of a customer account would not give rise to liability. See infra Part III. In the present case, however, the Defendant clearly knew that it was transferring funds to a Foreign Terrorist Organization as early as 1996 when the U.K. Charity Commission refused to close Interpal for sending money to supporters of HAMAS as long as "funds were not being given solely because of a person's support for Hamas."

As noted above, the Defendant continuously characterizes its conduct as "providing routine banking services" and cites In re Terrorist Attacks on September 11, 2001 to support its position. But In re Terrorist Attacks carefully makes the distinction that Defendant omits:

> Providing routine banking services, without having knowledge of the terrorist activities, cannot subject Arab Bank to liability. While claiming Arab Bank has ties with known Hamas fronts, the Federal complaint does not contain any allegation of a connection between Hamas and Osama bin Laden, al Qaeda, or the September 11 attacks. [In re Terrorist Attacks on September 11, 2001, 349 F. Supp. 2d 765, 835 (S.D.N.Y. 2005) (emphasis added).]

As the court in Linde noted, commenting on the same case:

> The Court [in In re Terrorist Attacks] held that, absent knowledge of the terrorist activities, the banks could not be liable for injuries caused by money routinely passing through them. Although plaintiffs in those cases did allege that some of the banks had ties to HAMAS, there was no allegation of any connection between HAMAS and Osama Bin Laden, Al Qaeda, or the September 11th attacks, so those allegations were insufficient to state a claim against the banks for injuries arising from the September 11th attacks. By contrast, here, plaintiffs allege ... that the Bank knows that the groups to which it provides services are engaged in terrorist activities." [Linde, 384 F. Supp. 2d at 587-588 (citations omitted) (emphasis added).]

## 2. Section 2339C Violations Expressly Include "Transmitting" Funds and "Receiving" Funds.

Similarly, Section 2339C makes it a crime to:

> by any means, directly or indirectly, unlawfully and willfully provide[] or collect[] funds with the intention that such funds be used, or with the knowledge that such funds are to be used, in full or in part, to carry out . . . any . . . act intended to cause death or serious bodily harm to a civilian .... [18 U.S.C. § 2339C(a)(1)].

This provision unsurprisingly echoes the statutory definition of international terrorism in Section 2331(1), which also informs Section 2333(a). According to the Defendant however, the statutory terms 'provides' and 'collects' cannot encompass the actions alleged by Plaintiffs because the statute was intended to "prohibit financing of terrorism" and "terror financing" does not encompass collecting and transmitting millions of dollars on behalf of a Specially Designated

Global Terrorist for the benefit of one of the world's largest and most lethal terrorist organizations.

Section 2339C(e)(4) defines the word "provides" to include "giving, donating and transmitting." Defendant, however, argues that the term "transmitting" in Section 2339C(e)(4) does not mean what it actually says but "must be understood to have a similar meaning as 'give' and 'donate'." Def. Mem. at 31-2. The absurdity of this argument is underscored by its tortured reading of the term "receiving" in Section 2339C(e)(5) which Defendant argues is limited to "actively raising funds" but does not include passively receiving funds. Def. Mem. at 32. Unfortunately for the Defendant, Congress explicitly defined the term "collects" to include both "raising and receiving" which encompasses both the active fundraising which Defendant concedes to be contemplated by the statute and the separate act of receiving funds. Defendant would have this court instead believe that despite the express language of the statute, Congress intended to deter terrorists from "actively raising funds" but was indifferent to the use of the international banking system as the primary means of terrorism financing. That conclusion is simply untenable.

The Complaint alleges in detail that NatWest transmits funds to HAMAS (Comp. ¶¶ 310-15, 328, 339, 341, 344, 345) and collects funds for HAMAS (Compl. ¶¶ 313, 330). This issue was squarely addressed by this district court in Linde which held:

the term "provides" includes "transmitting" funds, and the term "collects" includes "receiving" funds. It is these terms upon which plaintiffs rely in pleading a violation of Section 2339C. Plaintiffs seek to reach the banking activities of receiving deposits and transmitting funds between accounts on the basis that the accounts (and funds) belong to groups engaged in terrorist activity, *i.e.,* the charity fronts that operate as agents of HAMAS. Plaintiffs acknowledge that, under this claim, they will have to prove that [the bank] knew that the funds it received as deposits and transmitted to various organizations were to be used for conducting acts of international terrorism. Because the complaints allege such knowledge on the part of the Bank, this claim will not be dismissed. [Linde 384 F.

40

Supp. 2d at 588.]

The plain language of 2339C compels the same result here.

### 3.   Section 2339B Is Violated By Providing Material Support to an FTO Through Its Agents and Affiliates.

Defendant, however, argues that Section 2339B only prohibits providing material support <u>directly</u> to an FTO, and therefore "the amended complaint should be dismissed because it fails to allege, and cannot allege, that Interpal or the Union of Good is an FTO." Def. Mem. at 21. Plaintiffs' claims however, are premised on Defendant's having provided material support to HAMAS, a designated FTO, through charitable fronts which act for it or are under its control. See, e.g., Compl. ¶¶ 352, 354-5, 357. Were Defendant correct, every supporter of an FTO could escape § 2339B liability by the simple precaution of sending it money through an intermediary. Congress did not enact such a paper tiger.

The very case cited by Defendant, National Council of Resistance of Iran v. Department of State, 373 F.3d 152 (D.C. Cir. 2004), expressly refutes Defendant's nonsensical claim:

> [I]t is implausible to think that Congress permitted the Secretary to designate an FTO to cut off its support in and from the United States, but did not authorize the Secretary to prevent that FTO from marshaling all the same support via juridically separate agents subject to its control. For instance, under NCRI's conception, the Government could designate XYZ organization as an FTO in an effort to block United States support to that organization, but could not, without a separate FTO designation, ban the transfer of material support to XYZ's fundraising affiliate, FTO Fundraiser, Inc. The crabbed view of alias status advanced by NCRI is at war not only with the antiterrorism objective of AEDPA, but common sense as well. [Id. at 158.]

Nor did National Council of Resistance require strict application of the rules of agency to establish the necessary relationship between an FTO and its "fundraising afilliate." It simply found the relationship is "established at least" by the FTO's control of the latter. Id. (emphasis added).

41

Here the Amended Complaint expressly alleges – and the exhibits attached to the Amended Complaint confirm – that NatWest has transferred large sums of money to HAMAS charitable fronts that the U.S. Government or Israeli Government, or both, has charged are "operated on behalf of, or under the control of, HAMAS." Compl. ¶¶ 351-2, 354-5, 357. This is more than sufficient at the pleadings stage to establish the relationship between HAMAS and its fronts. Defendant's real objection is to the proof of relationship, not the pleading. At trial, Plaintiffs will bear the burden of establishing that the organizations in question are in fact "operated on behalf of, or under the control of, HAMAS."

## III.   PLAINTIFFS HAVE ADEQUATELY ALLEGED THE SCIENTER REQUIRED TO STATE THEIR CLAIMS UNDER SECTION 2333.

A portion of Defendant's Memorandum is devoted to a muddled attack on the scienter Plaintiffs must plead. Defendant alleges that "Section 2339B must be read to require Plaintiffs to allege that NatWest specifically intended to further the terrorist activities of the foreign terrorist organization," citing U.S. v. Al-Arian, 308 F. Supp. 2d 1322, 1338-39 (M.D. Fla.), modification denied by 329 F. Supp. 2d 1294 (M.D. Fla. 2004). Def. Mem. at 26. Elsewhere, Defendant claims that Plaintiffs must allege "that the bank specifically intended to further HAMAS's terrorist activities," Def. Mem. at 27, or to demonstrate the "requisite bad intent when it continued to provide routine banking services to Interpal." Def. Mem. at 35. These scienter requirements are, however, contrary to the plain language and legislative history of the applicable statutes, as well as the applicable federal common law.

### A.   Scienter for Civil Aiding and Abetting (First Claim For Relief) Requires Only That Defendant be Generally Aware of His Role in the Tortious Activity and Knowingly Provide Assistance.

As noted above, the Senate Report on Section 2333(a) explicitly stated that the precise substance of actions under Section 2333(a) "is not defined by the statute, because the fact

patterns giving rise to such suits will be as varied and numerous as those found in the law of torts." The legislative history of Section 2333(a) makes it clear that Congress intended to give terrorism victims an express civil cause of action that would incorporate the full reach of tort law in general, and the tort principles of aiding and abetting liability in particular.

The federal common law approach to civil aiding and abetting liability was set forth in the leading case of Halberstam v. Welch, 705 F.2d 472 (D.C. Cir. 1983).[16] The analysis set forth in Halberstam has been adopted by courts in the Second Circuit, including two courts applying Plaintiffs' analysis to aiding and abetting terrorism. See Linde v. Arab Bank, 384 F. Supp. 2d 571 (E.D.N.Y. 2005); In re Terrorist Attacks on September 11, 2001, 349 F. Supp. 2d 765 (S.D.N.Y. 2005). In Halberstam, the defendant (Hamilton) was held civilly liable under an aiding/abetting theory for the death of Halberstam after he was killed by a burglar (Welch), who lived with Hamilton. Hamilton had not participated in Halberstam's murder or indeed even in Welch's many burglaries. The D.C. Circuit nonetheless found that although "Hamilton and Welch did not commit burglaries together," their activities were "symbiotic" because Hamilton knew about Welch's illegal activities and assisted him in various ways (e.g., filing a tax return that hid burglary profits). Id. at 486-7. Consistent with other federal circuits, the court in Halbertam cited to general civil aiding and abetting law, including Section 876 of the RESTATEMENT (SECOND) TORTS, to find that civil aiding/abetting liability depends upon:

> (1)  a showing that the party whom the defendant aids must perform a wrongful act that causes an injury;

---

[16]  Halberstam is widely regarded as the seminal case for civil aiding and abetting law because, although based on diversity jurisdiction, there was no existing state law to apply, and the Court of Appeals therefore synthesized the general American tort law on civil aiding and abetting including the standards set out by the RESTATEMENT (SECOND) TORTS § 876 (1979). Halberstam, 705 F.2d at 477 (analyzing and adopting these standards). The incorporation of the general American tort law to fill in the interstices of the Section 2333(a) was what Congress expressly intended. Both the United States in its Amicus Brief, and the Seventh Circuit Opinion in Boim substantially adopted the Halberstam court's analysis. Boim, 291 F.3d at 1012; U.S. Amicus Brief at 22-25.

(2)     the defendant must be <u>generally aware</u> of his role as part of an overall illegal or tortious activity at the time that he provides assistance; and

(3)     the defendant must <u>knowingly</u> and substantially assist the principal violation but need not actually agree to join the wrongful conduct. [<u>Id</u>. at 477-478 (emphasis added).]

The D.C. Circuit additionally made clear in <u>Halberstam</u> that a defendant does not have to

participate in, or even know about, the specific bad act carried out that harms the victim. As the

Court concluded:

> it was a natural and foreseeable consequence of the activity Hamilton helped Welch to undertake. It was not necessary that Hamilton knew specifically that Welch was committing burglaries. Rather, when she assisted him, it was enough that she knew he was involved in some type of personal property crime at night - whether as a fence, burglar, or armed robber made no difference - because violence and killing is a foreseeable risk in any of these enterprises.

<u>Id</u>. at 488. In the present case, NatWest didn't merely file a tax return for HAMAS. The Bank

actively distributed millions of dollars to an organization dedicated to committing murder and

mayhem on an astonishing scale.

The federal circuits characterizing the scienter requirement for civil aiding and abetting

have generally adopted the RESTATEMENT's approach, with slight variations. The Eighth

Circuit has, for example, suggested that "the exact level [of knowledge] necessary for liability

remains flexible and must be decided on a case-by-case basis." <u>Camp v. Dema</u>, 948 F.2d 455,

459 (8th Cir. 1991) ("A party who engages in atypical business transactions ... may be found

liable as an aider and abettor with a minimal showing of knowledge"). Here, the Bank's role in

knowingly providing millions of dollars to HAMAS can hardly be described as "typical business

transactions" precisely because the bank knew its own customer and knew the destination of the

money it was providing. In <u>Aetna Cas. Sur. v. Leahey Constr. Co.</u>, 219 F.3d 519, 536 (6th Cir.

2000), the Sixth Circuit held that the knowledge of the primary tort required to impose civil

aiding and abetting liability on a bank can be proven either by direct or circumstantial evidence).

In <u>FDIC v. First Interstate Bank of Des Moines,</u> the Eighth Circuit held that under the common

law, "liability is sufficiently established by an aider-abettor's knowledge of the wrong and its

awareness of its assistance in furthering the scheme." 885 F.2d 423, 431 (8th Cir. 1989) (citing

the RESTATEMENT (SECOND) TORTS § 876 (1979) comment d). <u>See also</u> <u>Petro-Tech, Inc.</u>

<u>v. W. Co. of N. Am.,</u> 824 F.2d 1349, 1357 (3d Cir. 1987); <u>Levine v. Diamanthuset Inc.,</u> 950 F.2d

1478, 1483 (9th Cir. 1991) (applying a "reckless disregard" standard to claims of aiding and

abetting a securities law violation).  Some courts in the Second Circuit have also used an "actual

knowledge" standard in aiding and abetting cases. <u>See, e.g., Kolbeck v. LIT America, Inc.,</u> 939

F. Supp. 240 (S.D.N.Y. 1996). <u>See also</u> <u>Wiwa,</u> 2002 WL 319887 at *15-16 (adopting Section

876 of the RESTATEMENT (SECOND) TORTS and recognizing secondary liability).   The

court in <u>Linde</u> thus correctly construed the civil aiding and abetting standard for Section 2333(a)

liability to be "general awareness" and "knowing assistance," following the RESTATEMENT.

<u>Linde,</u> 384 F. Supp. 2d at 584.  The same standard applies to Plaintiffs' First Claim in this case.

**B.     Civil Law Scienter As Applied to Section 2333(a) Claims Predicated on Alleged Violations of the Criminal "Material Support" Statutes, 18 U.S.C. §§ 2339B-2339C.**

Although Defendant lumps sections 2339B and 2339C together to urge a "knowing and

intentional" scienter standard, neither section requires specific intent.  To understand why these

statutes focus on knowledge rather than specific intent, however, it is essential to focus on the

two characteristics of material support to which Congress responded: the fungibility of funds,

and the legitimizing nature of so-called humanitarian support for terrorists, their families and

foreign terrorist organizations.

45

Because money is fungible, every dollar provided or transmitted for any purpose to a terrorist or a foreign terrorist organization with finite resources is a dollar available for terrorism. This is a truism even for terrorists or foreign terrorist organizations that also engage in non-terrorist activities, as explained by the Associate Coordinator for Counterterrorism in the Department of State. Declaration of Kenneth R. McKune, Humanitarian I, 9 F. Supp. 2d 1205 (C.D. Cal. 1998), attached to the Schlanger Declaration as Exhibit A.

> Many of the terrorist organizations designated by the Secretary derive a significant portion of their overall financing from fundraising conducted outside of their area of operations. ... When foreign terrorist organizations that have a dual structure raise funds, they highlight the civilian and humanitarian ends to which such moneys could be put. But at the same time, the funds collected under the guise of political or humanitarian activities ultimately support the terrorist activities of these organizations ... Even if funds or goods raised for charitable purposes are in fact so used in their entirety, the addition of such funds or goods to the coffers of terrorist groups ... unencumbers funds raised from other sources for use in facilitating violent, terrorist activities and gaining political support for these activities. Thus, humanitarian support, however well-intentioned, increases the resources terrorist organization can dedicate to unlawful, criminal ends. Individuals who wish to assist people in need may provide aid through the many legitimate organizations not affiliated with designated terrorist groups that have embraced terror, violence and attacks on innocent civilians. [Id. at 8-10 (emphasis in original)]

During consideration of material support legislation, Senator Feinstein agreed with this view, noting that so-called humanitarian contributions "will ultimately go to bombs and bullets, rather than babies or, because money is fungible, free up other funds to be used on terrorist activities." 141 Cong. Rec. S7661 (daily ed. June 5, 1995). As the Ninth Circuit explained, "[E]ven contributions earmarked for peaceful purposes can be used to give aid to the families of those killed while carrying out terrorist acts, thus making the decision to engage in terrorism more attractive." Humanitarian II, 205 F.3d at 1136 (footnote omitted; emphasis added).

Moreover, such contributions also legitimate terrorist acts. When otherwise reputable international financial institutions make it their "routine banking business" to transfer

"charitable" contributions to FTOs or their agents who commit murder, they become part of the "industry" of international terrorism and lend it legitimacy. ATA Hearing at 84 (testimony of Joseph A. Morris).

Reflecting these facts of terrorist financing, Congress expressly found in the ATA that "foreign organizations that engage in terrorist activity are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct." Antiterrorism Act of 1996, Pub. L. No. 104-132, sec. 301(a)(7), 110 Stat. 1247. Congress reasoned that it could only deny such support for the terrorist acts of the FTOs by denying them all support. As the Seventh Circuit U.S. Court of Appeals summarized this reasoning in Boim, "[T]errorist organizations use funds for illegal activities regardless of the intent of the donor, and Congress was thus compelled to attach liability to all donations to foreign terrorist organizations." Boim, 291 F.3d at 1027. Congress therefore criminalized all material support – including financial services – to an FTO or its agent regardless of the intent of the supporter, provider, or transmitter, under 2339B(a)(1) as long as such a person or entity had knowledge that the FTO engages in terrorism activities, or of the designation, or under 2339C(a)(1) knowledge that the funds were to were to be used, in whole or in part, to carry out such activities. Id. The scienter language of sections 2339B and 2339C must be viewed through the prism of this legislative reasoning.

### 1.   Scienter for Breach of the Duty Imposed By 18 U.S.C. § 2339B(a)(1) (Second Claim For Relief) Requires Only Knowledge, Not Intent.

Defendant faults the complaint for failing to plead "specific intent" under section 2339B, without anywhere quoting the plain words of the statute and relying instead on a single criminal case from the Middle District of Florida. Def. Mem. at 25-9. The plain language of Section 2339B, however, requires only that a person "knowingly" provide material support or resources to a FTO as defined by the statute. As sections 2339A and 2339C show, when Congress meant

"specific intent," it said so (though in both provisions it is an <u>alternative</u> to knowledge). Defendant conspicuously fails to acknowledge appellate authority in the Ninth and Fourth Circuits that reads the statute as written, to require mere knowledge rather than specific intent; relegates authority to the same effect in this Circuit to a footnote without distinguishing it, Def. Mem. at 26 n.25; and fails to acknowledge that multiple courts in this Circuit have squarely rejected its specific intent claims.

In <u>Humanitarian Law Project v. U.S. Dep't of Justice</u>, 352 F.3d 382, 404-05 (9th Cir. 2003), <u>reh'g en banc granted</u>, 382 F.3d 1154 (9th Cir. 2004) ("Humanitarian III"), the Ninth Circuit rejected the argument that "knowingly" in section 2339B means "specifically intended." Reasoning from the fungibility of funds and the corresponding legislative determination to criminalize all material support to FTOs and their agents, regardless of intent, the Ninth Circuit expressly found that it was sufficient to show either that the supporter knew of the designation of the FTO, or that, even if it was unaware of the designation, it knew of the terrorist activities conducted by the FTO.  The Fourth Circuit Court of Appeals followed suit in a criminal case, <u>U.S. v. Hammoud</u>, 381 F.3d 316, 328 (4th Cir. 2004).  Defendant acknowledges grudgingly ("<u>at least one</u> court in the Second Circuit has held that Section 2339B requires plaintiffs to plead knowledge and not intent"; Def. Mem. at 26-7 n.25 (emphasis added)) that Judge Koetl reached the same conclusion in <u>U.S. v. Sattar</u>, 314 F. Supp. 2d 279 (S.D.N.Y. 2004), but makes no effort to explain why Defendant thinks he was wrong, or even to acknowledge, let alone distinguish, the growing number of other decisions in this Circuit that reach the same conclusion. See <u>Linde</u>, 384 F. Supp. 2d at 586 (which the Defendant cites elsewhere in its Memorandum); <u>U.S. v. Paracha</u>, 2006 WL 12768 (S.D.N.Y. 2006). See also <u>U.S. v. Marzook</u>, 383 F. Supp. 2d 1056 (N.D. Ill. 2005) (rejecting specific intent argument).

Defendant's reliance on the single errant case rejecting section 2339B's plain language and challenging this line of authority is misplaced for several reasons. First, in <u>Al-Arian</u>, 308 F. Supp. 2d at 1339 (M.D. Fla. 2004), the court grafted a specific intent requirement on to the statute to meet constitutional due process concerns about imposing <u>criminal</u> liability for knowing conduct. In this case, defendant faces only civil liability.[17]

Second, <u>Al-Arian</u> was not only at odds with the weight of the case law, but also with the legislative history explained above. <u>See</u> <u>Marzook</u>, 383 F. Supp. 2d at 1070 ("such a reading [that section 2339B requires specific intent] clashes with Congress's intent"). See <u>Terrorists – An Examination of the Material Support Statute: Hearing Before the Senate Judiciary Comm.</u>, 108th Cong., 2nd Sess. May 5, 2004 (statement of Asst. Prof. Robert Chesney) ("By interpreting the statute to require proof of specific intent to further the illegal ends of the recipient organization in all its applications, the [<u>Al-Arian</u>] district court in effect rejected the Congressional determination that all forms of support for a foreign terrorist organization, however well-intentioned, enhance the overall capacity of the organization to engage in activities harmful to the U.S. national security and foreign policy").

Finally, Congress has rejected the standard adopted by <u>Al-Arian</u> by adding the clarifying language to section 2339B(a)(1) that now appears as the second sentence of that sub-provision, explicitly endorsing the Ninth Circuit construction of the statute's knowledge requirement. As Judge Gershon found in <u>Linde</u>, "Congress appears to have expressed its disagreement with decisions . . . imputing an intent requirement into Section 2339B equivalent to the intent requirement of section 2339A, <u>e.g.</u>, <u>U.S. v. Al-Arian</u>, 308 F. Supp. 2d 1322, 1337-39 (M.D. Fla.

---

[17]    The Complaint herein also does not charge the Defendant with making any donations to FTOs and therefore does not implicate any associational rights that might otherwise bear on the construction of the statutory knowledge requirement. Properly read, <u>Boim</u>'s references to intent were in response to First Amendment freedom of association challenges, not available to or made by the Defendant in this case. <u>See Boim</u>, 291 F.3d at 1021-1027.

2004)." 384 F. Supp. 2d at 587. Accord Humanitarian IV, 380 F. Supp. 2d at 1147. Notwithstanding the Defendant's effort to suggest that the amendment changed the standard after the attacks on Plaintiffs, Def. Mem. 21 n.18, the "knowingly" standard of section 2339B(a)(1) has remained the same before and after. The amendment, prompted by the erroneous decision in Al-Arian, simply clarified, but did not change the statute. See Humanitarian IV, 380 F. Supp. 2d at 1147 (noting that 2004 amendment "clarified" the mens rea requirement). See also Linde, 384 F. Supp. 2d at 587 n.10.

### 2. Scienter for Breach of the Duty Imposed By 18 U.S.C. § 2339C (Third Claim for Relief) Requires Only Unlawful and Willful Conduct With Knowledge of the Intended Use of Funds, Not Intent.

Section 2339C criminalizes "unlawfully and willfully" providing or collecting funds "with the intention that such funds be used, or with the knowledge that such funds are to be used, in full or in part, in order to carry out "acts intended to kill or injure civilians." 18 U.S.C. § 2339C. Since this section expressly differentiates "intention" from "knowledge," any argument by Defendant that Plaintiffs must plead specific intent (Def. Mem. at 34) is plainly contrary to the statute.

The legislative history of this provision states that "[t]he term 'unlawfully' is intended to embody common law defenses. The term 'willfully' means voluntary or intentional." H.R. Rep. 107-307, 107th Cong., 1st Sess. 12 (2001), 2002 U.S.C.C.A.N. 521, 527, 2001 WL 1518532 (emphasis added). Courts have rarely construed the term "unlawfully" to mean anything beyond its obvious connotation as "contrary to law."[18]  Accordingly, Section 2339C requires some form of voluntary or intentional conduct with either the intent to provide funds used to kill or injure

---

[18]      One court that did interpret the term in the context of a federal statute stated: "It would seem to us that 'unlawfully' is a conclusion of law meaning 'contrary to law' and no more. We do not interpret it as meaning 'knowingly'" U.S. v. O'Brien, 255 F. Supp. 755, 758 (E.D. Mich 1965).

civilians or the knowledge that the funds will be used, at least in part, to help kill or injure civilians.

Since the Complaint clearly alleges that "[t]he network of these "charities" and other "charitable" associations not only help[] raise funds for HAMAS's terrorist operations, but also help[] it to identify and recruit potential terrorists," Plaintiffs have sufficiently pled a claim pursuant to Section 2339C. See Compl. ¶ 306. Furthermore, inasmuch as the Defendant continues to provide financial services and to collect and transmit large sums of money even after the United States has designated its customer Interpal a Specially Designated Global Terrorist explicitly linked to HAMAS, a designated FTO, its conduct is self-evidently both willful and unlawful.

### 3.      The Allegations of the Complaint Satisfy the Knowledge and Awareness Standards.

The Complaint expressly alleges that NatWest "knows that it provides material support to HAMAS, a Foreign Terrorist Organization, and it knows that HAMAS commits horrific terrorist attacks of the kind that have maimed and murdered American citizens such as plaintiffs." Compl. ¶ 424. It also alleges that "Defendant knows of HAMAS's terrorist activities" and that "HAMAS had been designated a Foreign Terrorist Organization by the United States Government." Compl. ¶¶ 325, 330, 350, 385, 391, 423-4, 428, 431-3. Defendant therefore relies on two arguments to dismiss these allegations. The first is that the U.K. Charity Commission's findings conclusively establish that they had no knowledge ("the Clean Bill of Health Argument"), and the second is that all of the terrorist attacks that injured Plaintiffs took place before any U.S. designations of Interpal or its fund transferees as HAMAS agents or affiliates ("the Hindsight Argument").

### a.    The Clean Bill of Health Argument

The Bank argues repetitively that its customer, Interpal, received a "clean bill of health" from the U.K. Charity Commission in 1996 and 2003, conclusively establishing that the Defendant had no knowledge that the financial services the Bank was furnishing were supporting HAMAS or its agents. Def. Mem at 1, 14 n.11, 12, 16, 18, 19, 23, 33, 35, 56. This argument misses the significance of the Charity Commission's investigations, erroneously uses it as evidence to dispute a well-pleaded allegation of the Complaint, and, most importantly, misstates what the Commission actually found.

The Commission stated in May 1996 that it had opened an investigation of Interpal, the Defendant's customer, in part in response to "allegations that some of [Interpal's] funds had been misappropriated for the political or violent militant activities of Hamas in Palestine," Friedman Decl. Ex. C, ¶ 3, including "allegations made in the press." Schlanger Decl. Ex. B (1996 Press Release); See also Compl. ¶ 339, n.8. The same allegations and public information that prompted the Charity Commission to launch its investigation put the Defendant on notice that Interpal was linked to HAMAS. In fact, as an international bank, the Defendant had special duties (both imposed by law and self-imposed) to investigate its customer and its suspicious fund transfers. It could not rely on the Charity Commission investigation, and, indeed, had more transactional information available to it to explore such allegations than were likely available to the Charity Commission. The Defendant has therefore been on notice of Interpal's links to Hamas since at least 1996 and in possession of the best evidence available to probe those links.

Had the Charity Commission given Interpal a clean bill of health from an American legal standpoint in 1996 (or in 2003, when it followed up similar allegations about Interpal), it would at best raise a dispute about whether such factual conclusions were correct and whether the

Defendant relied upon them in fact or knew otherwise – issues inappropriate for resolution on a Rule 12(b)(6) motion. But the Charity Commission did no such thing. Employing the criterion that "funds were not being given solely because of a person's support for Hamas," and assuming that "[r]elief cannot be denied to them because [HAMAS supporters] because of that support," it found no evidence that the donations "had been given for political reasons," or that Interpal staff were motivated by "fanaticism" rather than "faith and altruism." Friedman Decl., Ex. D ¶¶ 128-129. Even assuming that the Charity Commission "finding" could theoretically refute an allegation of the complaint at the pleading stage, the Charity Commission effectively found that the Defendant's customer, Interpal, made donations to HAMAS supporters. Since it is undisputed that HAMAS was and is a Designated Foreign Terrorist Organization, the Charity Commission report gave the Defendant knowledge that its customer was supporting a terrorist organization or its agents, regardless of its motive.

### b.     The Hindsight Argument

Defendant's second line of attack on the knowledge allegations in the Complaint is that the relevant U.S. designations of HAMAS agents occurred after the attacks on Plaintiffs, too late for Defendant to have known it was supporting HAMAS. This "hindsight argument" (Def. Mem. at 3), however, assumes that prior designations of the agents to which NatWest transferred funds are either irrelevant or utterly escaped its compliance officers as a factual matter. It contends that "there is no allegation that NatWest was even aware of the Israeli designations, nor any reason why it would have been, since it does not do business in Israel." Def. Mem. at 36.

Paragraph 350 of the Complaint however, specifically alleges that "Despite [the Israeli] designation [of Interpal as a terrorist organization] and the knowledge that it was providing financial services to a Foreign Terrorist Organization, NatWest did not cease providing financial

services to Interpal." As shown above, the Defendant was on notice in March of 1996, of
Interpal's transfers of funds to HAMAS supporters and obliged as an international bank to
conduct its own investigation of its customer's transactions. The Defendant makes much of the
fact that the Holy Land Foundation was not indicted in the United States until 2004, but the
Complaint explicitly notes that Holy Land Foundation was designated as a HAMAS front
organization by the Government of Israel on May 6, 1997 – more than six years earlier and three
years before NatWest accepted a deposit from HLF. Compl. ¶ 360 n.12. Likewise, the
Complaint clearly alleges that the Jenin and Tulkarem Charity Committees were designated as
"Unlawful Organizations" by the Government of Israel in February 2002 because of their
connection to HAMAS. Compl. ¶¶ 354, 355, 357. In view of the fact that NatWest was put on
notice of Interpal's connections to HAMAS, and the Royal Bank of Scotland Group's (NatWest's
parent company) adopted new "Know Your Customer" guidelines at least as early as 2002 (and,
as an international bank, almost certainly had comparable compliance rules before that date), as
well as the so-called Wolfsberg Principles for the Suppression of Terror Financing, NatWest
committed itself to implement: "procedures for consulting applicable lists and taking reasonable
and practicable steps to determine whether a person involved in a prospective or existing
business relationship appears on such a list." Compl. ¶ 411. The Israeli lists were not just a
matter of formal public record, but published by the Israeli Government. Compl. ¶¶ 347, 349.

Of course, Plaintiffs have not contended that Israel's designations are binding on the
Defendant under U.S. law in the same way as an FTO designation by the U.S. Government is, but
they are evidence from which NatWest should have inferred that Interpal's "partners" and
beneficiaries were HAMAS agents. Moreover, that evidence did not stand alone. The very
media reports that prompted the Charity Commission investigation – British media – were further

circumstantial evidence supporting this inference, as, indeed, was Interpal's own website, listing some of its "partners." See, e.g., Compl. ¶¶ 353, 356, 361.

Obviously, definitive proof of NatWest's knowledge is a matter for discovery, but at the pleading stage the fact that NatWest's customer had its accounts frozen based on allegations that it was fundraising for a Palestinian terrorist organization well known for targeting and murdering Israelis is more than sufficient to demonstrate that NatWest would have been on notice to check the Israeli terror watch list for any further mention or designation of its own customer or its transferees.

The Complaint alleges the Orphan Care Society, the Jenin Zakat Committee and HLF were all featured on Interpal's website in 2001. HLF was designated by Israel four (4) years earlier and by the U.S. in December of that year. The other two were designated in February of 2002. All of the Plaintiffs were killed or injured after those designations.

Making the hindsight argument, Defendant makes much of the fact that NatWest collected large sums of money from the Holy Land Foundation and the Al Aqsa Foundation before they were designated as terrorists – as if this fact is exculpatory. On the contrary, Plaintiffs respectfully submit that once the Defendant knew that Interpal was sending funds to a designated entity, it should have known (and almost certainly did know) that many of its other transferees were agents of HAMAS. As FinCEN has elsewhere noted, "[D]esignations of individuals and entities as terrorists by the United States Government provide critical information for financial institutions to use in assessing terrorist financing risk. " See Schlanger Decl. Ex. F at 7. For example, once an Interpal "donor" like HLF was designated by the United States, in December 2001 (before any attacks alleged in the Complaint), the Defendant was on further notice to conduct its own investigation of Interpal's other donors and transferees, especially because it had

already been alerted to Interpal transfers to HAMAS supporters in 1996 by the Charity Commission "findings."  Common sense suggests that at some point the accumulation of designations of Interpal donors and transferees gives knowledge to even the most blissfully blind bank that its customer is supporting HAMAS, a notorious and long-designated FTO.  In any case, Plaintiffs argue that point occurred at the outset in 1996 but the ultimate determination is a question for the trier of fact, and not a question this Court can decide as a matter of law on the pleadings, before any discovery has begun.

The Defendant's attack on the designations is tantamount to a denial of knowledge.  But denial creates a dispute, not a basis for dismissal on a Rule 12(b)(6) motion where in all facts alleged must be deemed true.  The Complaint sets forth more than ample allegations to conclude that NatWest possessed the requisite knowledge.

## IV.    PLAINTIFFS HAVE ADEQUATELY PLED THE REQUISITE CHAIN OF CAUSATION REQUIRED BY THE ANTITERRORISM ACT AND COMMON LAW AIDING AND ABETTING.

### A.    Proximate Causation for 2339B and 2339C Claims

In enacting the material support statutes, Congress made an express finding of fact that "foreign organizations that engage in terrorist activity are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct." Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. 104-32, §301(a))7), 110 Stat. 1214, 1247 (1996) (emphasis added).  Absent this legislative presumption of causation, no Section 2333(a) plaintiff could ever prove that particular funds electronically transferred or otherwise donated to an FTO or its agent were used to fund a particular attack because, as the Ninth Circuit correctly observed:

> terrorist organizations do not maintain open books. Therefore, when someone makes a donation to them, there is no way to tell how the donation is used.

> Further, as amicus Anti-Defamation League notes, <u>even contributions earmarked</u>
> <u>for peaceful purposes can be used to give aid to the families of those killed while</u>
> <u>carrying out terrorist acts, thus making the decision to engage in terrorism more</u>
> <u>attractive.</u> More fundamentally, money is fungible; giving support intended to aid
> an organization's peaceful activities frees up resources that can be used for
> terrorist acts. [<u>Humanitarian ll</u>, 205 F.3d at 1136 (footnote omitted; emphasis
> added).]

Consequently, Defendant's insistence that Plaintiffs must "allege a <u>direct</u> causal link

between NatWest's provision of routine banking services associated with maintaining bank

accounts in London and plaintiffs' injuries <u>directly</u> caused by" particular terrorist attacks would

plainly eviscerate the section 2333(a) remedy and overturn Congress's finding. Def. Mem. at 5.

Whether or not Congress was right is not a question for the parties or the Court (though the Ninth

Circuit observed that "Congress has the fact-finding resources to properly come to such a

conclusion.") <u>Humanitarian II</u>, 205 F.3d at 1136.

The <u>Linde</u> court therefore was correct in finding that to establish causation, plaintiffs

there, suing under sections 2333(a) and 2339B for material support by a bank "will have to prove

that the Bank provided these services to the particular group responsible for the attacks giving

rise to their injuries," and <u>not</u> some impossible "direct" or "but for" causation. 384 F. Supp. 2d at

585.

## B.      Proximate Causation for Common Law Aiding and Abetting Claim.

Plaintiffs have clearly alleged in detail that NatWest is subject to liability for the terrorist

attacks set forth in the Complaint that were perpetrated by HAMAS because (a) NatWest was

generally aware of HAMAS's tortious conduct; (b) NatWest provided substantial assistance to

HAMAS by transmitting millions of dollars to the organization and making it possible for

HAMAS to raise funds through a variety of financial products including credit card donations,

thereby constituting a substantial factor in causing the terrorist acts which HAMAS committed;

and (c) terrorist attacks were (and remain) a foreseeable consequence of the millions of dollars

provided to HAMAS by NatWest.  Compl. ¶¶ 423, 424, 430.

These factual allegations fall squarely within the elements set forth in § 876 of the

RESTATEMENT (SECOND) OF TORTS and in the leading case of Halberstam v. Welch, for

general aiding and abetting liability. Plaintiffs must allege that:

> (1)    the party whom the defendant aids [in this case HAMAS] must perform a
>        wrongful act that causes an injury [a terrorist attack that injured the
>        plaintiffs];
>
> (2)    the defendant must be generally aware of his role as part of an overall
>        illegal or tortious activity at the time that he provides assistance; [knowing
>        that its customer raises millions of dollars for a terrorist organization and
>        transferring funds to that organization] and
>
> (3)    the defendant must knowingly and substantially assist the principal
>        violation but need not actually agree to join the wrongful conduct. [Id. at
>        477- 78]

The Comment Section of the Restatement is particularly relevant to the factual

allegations pled in the Complaint:

> If the encouragement or assistance is a substantial factor in causing the resulting
> tort, the one giving it is himself a tortfeasor and is responsible for the
> consequences of the other's act. ... The rule applies whether or not the other
> knows his act is tortious. ... It likewise applies to a person who knowingly gives
> substantial aid to another who, as he knows, intends to do a tortious act.
> RESTATEMENT (SECOND) OF TORTS §876, comment on Clause (b) at 317
> (1979) (emphasis added).

NatWest is alleged to have provided millions of dollars to HAMAS. Compl. ¶ 385. The

payments provided served as a vital source of funding for a designated FTO.  Likewise, the sheer

quantity of the funds is a substantial factor in helping HAMAS "to identify and recruit potential

terrorists.  The network also assists recruitment, in part, by funneling money to pay benefits to

the families of terrorist operatives who are arrested, injured, or killed." Compl. ¶ 306.

There is also a more subtle normative component that makes the Defendant's conduct even more chilling. It is one thing for the terrorist organizations and their charitable fronts to clandestinely support the families of their comrades who have been killed, injured or captured. It is quite another for a well known and generally respected international financial institution to help legitimate an FTO or its agent, or a Specially Designated Global Terrorist by knowingly providing "routine banking services" as if the customer and its transferees were an ordinary business. Thus, the inescapable fact is that NatWest's willingness to serve as one of HAMAS's bankers is a substantial factor in causing terrorism by legitimating it in a way that would not otherwise have been possible. Proximate cause is defined as "a test of whether the injury is the natural and probable consequence of the negligent or wrongful act and ought to be foreseen in light of the circumstances." Murphy v. U.S., 653 F.2d 637, 648 n.48 (D.C. Cir. 1981). In the context of global terrorism, the Antiterrorism and Effective Death Penalty Act of 1996 and its predecessor provisions, including Section 2333(a), were intended to be read broadly to impose "liability at any point along the causal chain of terrorism ..." S. Rep. No. 102-342 at 22. (emphasis added).

The Defendant effectively asks this court to find, as a matter of law, that the large sums of money provided to HAMAS by NatWest were not a substantial factor in causing the acts or the natural and probable consequence of knowingly and systematically providing financial support to HAMAS. As previously noted, Halberstam is widely regarded as the seminal case for civil aiding and abetting law. Therein, Judge Wald comprehensively compiled the general law on civil aiding and abetting, which has been widely adopted as the federal common law.

In accordance with Halberstam, Plaintiffs need not show that NatWest transferred funds to each terrorist who actually attacked the Plaintiffs. It is legally sufficient that, as Plaintiffs

59

clearly and repeatedly allege in the Complaint, NatWest substantially encouraged the terrorist attacks by providing millions of dollars in funding to the terrorist organization that perpetrated the attacks. Thus, the Plaintiffs' burden at trial is to prove that: (1) each of the victims was in fact killed or injured by reason of an act of international terrorism (as opposed to apolitical criminal violence); (2) that each of the victims was in fact injured or killed by HAMAS; and (3) that NatWest provided financial services, including "collecting" and "transmitting" funds for the benefit of HAMAS. These elements have all been properly alleged in the Complaint.

## V.   COMITY DOES NOT REQUIRE OR PERMIT DISMISSAL OF THE COMPLAINT.

Finally, Defendant invokes "considerations of international comity" to urge dismissal of the complaint. The precise basis for such drastic action is unclear. The only case cited by Defendant is one in which the Supreme Court declined to enforce a foreign judgment. Plaintiffs are therefore left to guess at some legal framework or theory for the drastic remedy of dismissal for reasons of "comity" that appears to have eluded the Defendant.

If the Defendant's theory is that some conflicting law of the United Kingdom is entitled to precedence over the U.S. antiterrorism laws, as a matter of comity, it has utterly failed to identify the conflicting law, articulate the U.K. interests, or show the conflict. Even if it had, Defendant would still have to overcome the insuperable burden of showing that the U.K. interests outweigh the interest Congress expressed by affording Plaintiffs a treble damages civil remedy against those who aid and abet terrorism or give material support to terrorist organizations. The Second Circuit has stated that a "true conflict" is a threshold requirement before a court should even begin such a balancing analysis, and that such a conflict exists between two countries only if the laws of one "require conduct that violates [the laws of the

60

other]." In re Maxwell Communications Corp., 93 F.3d 1036, 1049-50 (2d. Cir. 1996).  In adopting this requirement, the Maxwell court relied on the Supreme Court's decision in Hartford Fire Ins. Co. v. California, 509 U.S. 764, 798-99 (1993).  In Hartford Fire, the Supreme Court declined to dismiss the suit on grounds of comity, because it was possible "[to] comply with the laws of both [the United States and Britain]." Id. at 799.  Since Maxwell, courts in the Second Circuit have been consistent in affirming a "true conflict" threshold.  See, In re CINAR Corp. Securities Litigation, 186 F. Supp. 2d 279 (E.D.N.Y. 2002).

Defendant has not shown, or even attempted to show that it would be impossible for it to comply with both American antiterrorism laws and British laws or that under British law it is legally obligated to maintain accounts for Interpal or transmits funds to HAMAS.  Indeed, the Supreme Court, in Hartford Fire, rejected the comity argument "even where the foreign state has a strong policy to permit or encourage such conduct."    509 U.S. at 798-99, citing RESTATEMENT (THIRD) FOREIGN RELATIONS LAW § 415, Comment j.

Defendant thinks it is "noteworthy" that Executive Order No. 13224 provides for blocking SDGT assets only in the United States.  It is unclear why.  Defendant has not challenged the self-evident and express extraterrorial application of Sections 2333, 2339B or 2339C.  Congress can criminalize conduct abroad that supports the murder of Americans, without attempting to block a foreign asset held abroad.

In short, as articulated by the Defendant, comity is less a "doctrine" than a fond hope.

61

## CONCLUSION

For the reasons set forth above, Defendant's motion should be denied in its entirety.


Dated: February 9, 2006

OSEN & ASSOCIATE, LLC
Gary M. Osen (GO-5790)
Peter Raven-Hansen, Of Counsel
(*pro hac vice motion pending*)
700 Kinderkamack Road
Oradell, New Jersey 07649
(201) 265-6400

Counsel for Plaintiffs


KOHN SWIFT & GRAF, P.C.
Robert A. Swift
Steven M. Steingard
One South Broad Street
Suite 2100
Philadelphia, PA 19107
(215) 238-1700

WECHSLER HARWOOD, LLP
Andrew D. Friedman (AF-6222)
488 Madison Avenue
New York, NY 10022
(212) 935-7400

McINTYRE, TATE, LYNCH & HOLT, LLC
David J. Strachman, Esq.
321 South Main Street, Suite 400
Providence, Rhode Island 02903
(401) 351-7700

NITSANA DARSHAN-LEITNER & ASSOCIATES
Nitsana Darshan-Leitner, Esq.
11 Havatikim Street
Petah Tikva, 49389 Israel
(Israel Tel. (972) 3-933-4472)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

TZVI WEISS, et al.,                           :
                                              :        Case No. CV 05 4622
                         Plaintiffs,          :
                                              :
     -against-                                :        Honorable Charles P. Sifton
                                              :
NATIONAL WESTMINSTER BANK, PLC,               :        Magistrate Judge Kiyo A.
Matsumoto
                                              :
                         Defendant.           :
                                              :

---------------------------------------------------------------x

## CERTIFICATE OF SERVICE

        I, Aaron Schlanger, an attorney admitted to practice before the courts of the State
of New York and an Associate of the firm of Osen & Associate, LLC, hereby certify that
on the 9th day of February 2006, the Plaintiffs' Memorandum of Law in Opposition to
Defendant's Motion to Dismiss the First Amended Complaint and including the
Declaration of Aaron Schlanger and Exhibits A through F, were served electronically
upon Lawrence B. Friedman and Jonathan I. Blackman of Cleary Gottlieb Steen &
Hamilton LLP, One Liberty Plaza, New York, New Yok 10006.


Dated: Oradell, New Jersey
       February 9, 2006

                                                       Aaron Schlanger