UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------x

TZVI WEISS, et al.,                          :
                                             :
                      Plaintiffs,            :
                                             :     05 CV 4622 (CPS) (KAM)
          -against-                          :
                                             :     Honorable Charles P. Sifton
                                             :
NATIONAL WESTMINSTER BANK, PLC,              :     Magistrate Judge Kiyo A. Matsumoto
                                             :
                      Defendant.             :
                                             :
------------------------------------------------------------------x

## DECLARATION OF AARON SCHLANGER

Aaron Schlanger declares as follows:

1.     I am a member of the Bar of this Court and an associate at Osen & Associate,

LLC, counsel for Plaintiff Tzvi Weiss, et al. ("Plaintiffs"). I submit this declaration and exhibits

attached hereto in support of Plaintiffs' Opposition to the Defendant's Motion to Dismiss the

above-captioned action.

2.     Attached hereto as Exhibit A is a true copy of the Declaration of Kenneth R.

McKune, Associate Coordinator for Counterterrorism in the United States Department of State,

filed in connection with Humanitarian Law Project v. Reno, 9 F. Supp. 2d 1205 (C.D. Cal.

1998).

3.     Attached hereto as Exhibit B is the Press Statement issued by the U.K. Charity

Commission on May 30, 1996 – available at http://www.epolitix.com/NR/rdonlyres/49761AE4-

A857-4BAB-ADD1-914D055D1D62/0/CharityCommissionPressRelease1996.doc and

http://www.interpal.org/aboutus/statementcc.html.

4.     Attached hereto as Exhibit C is a true copy from the Israeli Ministry of Foreign

Affairs detailing the murder of Esther Bablar by HAMAS. The page can be found at

http://www.mfa.gov.il/MFA/Terrorism-+Obstacle+to+Peace/Memorial/2002/2/Esther+

Bablar.htm.

5.      Attached hereto as Exhibit D is a true copy of the Government of Israel list of

Unlawful Organizations referenced in the Complaint and available at http://www. justice.gov.il

/NR/rdonlyres/ 57C31612-EFC6-4452-A345-3C082F68D03D/4464/orgillegal.doc.

6.      Attached hereto as Exhibit E is a true copy of the Brief submitted by the United

States as Amicus Curiae in Boim v. Quranic Literacy Institute and Holy Land Foundation for

Relief and Development, 291 F.3d 1000 (7th Cir. 2002), to the Seventh Circuit U.S. Court of

Appeals supporting affirmance of the district court's decision in Boim v. Quranic Literacy

Institute and Holy Land Foundation for Relief and Development, 127 F. Supp. 2d 1002 (N.D. Ill.

2001).

7.      Attached hereto as Exhibit F is a true copy of the Financial Crimes Enforcement

Network Assessment of Civil Money Penalty in In the Matter of the Federal Branch of Arab

Bank, Plc New York, New York.

I declare under the penalty of perjury that the foregoing is true and correct.

Dated: February 9, 2006
       Oradell, New Jersey

Aaron Schlanger, Esq. (AS-9372)
OSEN & ASSOCIATE, LLC
700 Kinderkamack Road
Oradell, New Jersey 07649
Telephone:     201-265-6400
Facsimile:     201-265-0303

# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| Humanitarian Law Project, et al )<br><br>Plaintiffs, )<br><br>vs. )<br><br>Janet Reno, et al, )<br><br>Defendants. ) | No. 98-1971 ABC (BQRx) |

## DECLARATION OF KENNETH R. MCKUNE

.. 1. I, Kenneth R. McKune, am Associate Coordinator for Counterterrorism in the United States Department of State. In this capacity, I am responsible for the formulation, coordination and implementation of United States foreign policy regarding international terrorism. As the Associate Coordinator for Counterterrorism, I serve as a principal advisor to the Secretary of State, and report to her on substantive matters relating to the assessment of foreign terrorist threats and developments worldwide.

2. The Office of the Coordinator for Counterterrorism was established within the Office of the Secretary of State in 1985. In coordinating overseas counterterrorism policy and responding to international terrorist incidents, my office receives reporting and analysis from U.S. intelligence and law enforcement agencies, and from various foreign sources and embassies. The information collected by the Department of State pertains to

1

2

many different foreign terrorist organizations, including the Kurdistan Workers' Party (PKK) and the Liberation Tigers of Tamil Eelam (LTTE). Such data may be classified or unclassified, depending upon the method of collection, source, and content.

3. I make the following statement based upon information made available to me in the performance of my official duties, and upon ongoing consultations within the Department of State and with U.S. intelligence and law enforcement agencies. The following observations and conclusions regarding the PKK and LTTE, and the operation of terrorist groups more generally, have been prepared for use in a public proceeding and are therefore unclassified.

## The PKK

4. Founded in 1974, the PKK is comprised primarily of Turkish Kurds. Its purpose was and is the establishment of an independent Kurdish state in southeastern Turkey.

5. Since its inception, the group has used violent, terrorist means in aid of its goals. The PKK's insurgency has claimed more than 22,000 lives since 1984. The group has attacked Turkish targets in Turkey, and elsewhere in Western Europe. In recent years, the PKK has moved beyond rural-based insurgent activities and embraced urban terrorism. Innocent U.S. civilians have suffered as a direct result of PKK terrorism. The following illustrative incidents are only a portion of the terrorist attacks perpetrated by the PKK.

2

3

a. The PKK claimed responsibility for the bombings of an oil pipeline in southeast Turkey on January 22, 1997 and March 10, 1997.

b. On October 29, 1996, a PKK suicide bomber detonated explosives outside a police station in Sivas, Turkey, killing herself, her accomplice, a bystander, and three policemen. Four other individuals, three of whom were civilians, were also injured. The PKK publicly claimed responsibility for this attack.

c. On October 25, 1996, a PKK suicide bomber detonated a bomb at a Turkish police station in Adana, Turkey, killing herself, three policemen, and a civilian bystander.

d. On September 23, 1996, PKK members hijacked a local bus in Turkey and kidnapped two passengers, one of whom was a U.S. citizen. They were released on September 27, 1996.

e. On June 30, 1996, a PKK suicide bomber detonated a bomb on her person in the middle of a group of soldiers in the town square of Tunceli, Turkey, killing herself and nine others, and wounding 35.

f. In May 1996, PKK leader Abdullah Ocalan publicly announced the PKK's intention to conduct terrorist attacks in areas of Turkey frequented by tourists.

g. On August 28, 1995, Turkish security personnel located and disarmed three PKK bombs at the Galleria Mall in Istanbul.

h. The PKK claimed responsibility for a series of four bombings in downtown Istanbul on August 27, 1995 which killed two people and wounded at least ten others, including a U.S. citizen.

3

i. In June 1994, the PKK claimed responsibility for a bomb attack on a ferry transiting the Bosporus Straits.

j. On November 4, 1993, five widely scattered properties in London, England with links to Turkey were firebombed in near-simultaneous attacks by the PKK.

k. On October 9, 1993, PKK members stopped a local bus in northeastern Turkey and kidnapped a U.S. tourist and a New Zealand tourist, holding them hostage until November 19, 1993.

l. In September 1992, the PKK claimed responsibility for an arson attack on the passenger ferry SARAYBURNU, while it was moored in Istanbul.

## The LTTE

6. The LTTE was founded in 1976 to advocate the establishment of an independent Tamil state in Sri Lanka. As noted below, LTTE has used terrorist tactics, including bombings and political assassinations, to prosecute its campaign for independence. The following illustrative incidents are only a portion of the terrorist attacks perpetrated by the LTTE.

a. On March 5, 1998, an LTTE suicide bomber exploded a car bomb in Maradana, Sri Lanka, killing 37 people, and injuring more than 238 others.

b. On January 25, 1998, the LTTE exploded a truck bomb at the Buddhist Temple of Tooth in Kandy, killing 13 people and injuring 23 others.

5

c. On October 15, 1997, the LTTE detonated a truck bomb near the World Trade Center in central Colombo, injuring more than 100 people including 40 foreigners, among them seven U.S. citizens. Thirteen others were killed in ensuing gunfire between the LTTE terrorists responsible for the attack and security forces.

d. On September 9, 1997, the LTTE attacked a civilian ship north of the port of Trincomalee. Thirty-two people were killed in a subsequent gun battle between LTTE terrorists and security forces.

e. On July 17, 1997, the LTTE seized a cargo ship carrying food, killing one crew member.

f. On July 24, 1996, the LTTE exploded two bombs on a rush-hour commuter train, killing 57 people and injuring more than 250 others.

g. On July 7, 1996, an LTTE suicide bomber killed 21 people and wounded 50 others, including a Sri Lankan cabinet minister.

h. On January 31, 1996, the LTTE exploded a truck bomb filled with an estimated 1,000 pounds of explosives at the Central Bank in Colombo, killing 100 people and injuring more than 1,400. This bombing was the most deadly terrorist incident in the world in 1996.

i. On August 7, 1995, an LTTE suicide bomber exploded a bomb hidden in a coconut cart in Colombo, killing 24 and wounding 40 others.

j. On June 4, 1995, the LTTE exploded a bomb on a ship chartered by the International Committee of the Red Cross in northern Jaffna.

5

6

k. On November 24, 1994, Sri Lankan opposition leader Gamini Dissanayake and 51 others were killed by an LTTE suicide bomber.

l. On April 8, 1994, the LTTE exploded bombs at three Colombo hotels, killing two people.

m. On May 1 1993, an LTTE suicide bomber killed President Ranasinghe Premadasa and 23 others in Colombo.

n. On April 23, 1993, the LTTE assassinated former Sri Lankan Security Minister Lalith Athulathmudali at a rally in Colombo.

o. On September 1, 1992, the LTTE detonated a "bicycle bomb" in eastern Batticaloa, killing 22 civilians.

p. On July 8, 1991, LTTE forces killed 27 civilians in Batticaloa.

q. The LTTE used a car bomb to assassinate Sri Lankan Deputy Defence Minister Ranjan Wijeratne in Colombo on March 2, 1991.

r. On August 12, 1990, LTTE forces killed 120 civilians at Eravur.

s. On August 3, 1990, LTTE personnel used machetes, guns and grenades to kill 140 civilians praying at a mosque in the eastern Sri Lankan village of Kattankudy.

t. On April 13, 1989, an LTTE car bomb exploded in Trincomalee, killing 51 people.

u. On November 14, 1988, LTTE terrorists killed 27 Sinhalese in an attack on a bus in Trincomalee.

v. On June 2, 1987 LTTE terrorists stopped a passenger bus and shot 33 passengers, including 29 Buddhist monks near the eastern town of Arantalawa.

6

7

w. On April 21, 1987, an LTTE car bomb exploded at a Colombo, Sri Lanka bus terminal, killing 113 people.

## Foreign Terrorist Organization Structure and Funding

7. In the interest of law enforcement and national security, and in furtherance of U.S. foreign relations, the Antiterrorism and Effective Death Penalty Act of 1996 prohibits the provision of material support or resources to foreign terrorist groups that have been formally designated, pursuant to statute, as "foreign terrorist organizations" by the Secretary of State. In prohibiting comprehensively the provision of such support and resources, the law does not differentiate between the criminal, terrorist activities of these organizations, and the civil, non-violent activities, if any, in which they might engage. In legislating this particular dimension of the "material support" ban, the Congress found that "foreign organizations that engage in terrorist activity are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct."

8. The experience and analysis of the U.S. government agencies charged with combating terrorism strongly supports this congressional finding. Given the purposes, organizational structure, and clandestine nature of foreign terrorist organizations, it is highly likely that any material support to these organizations will ultimately inure to the benefit of their criminal, terrorist functions -- regardless of whether such support was ostensibly intended to support non-violent, non-terrorist activities.

7

9. This conclusion is based on a number of facts and circumstances. Many of the terrorist organizations designated by the Secretary derive a significant portion of their overall financing from fundraising conducted outside of their area of operations; in the case of the LTTE, for example, the group has historically raised a significant percentage of its funds – millions of dollars annually – in Europe and North America. Organizations such as the PKK and LTTE have established political or humanitarian components in addition to those components that carry out acts of terror. When foreign terrorist organizations that have a dual structure raise funds, they highlight the civilian and humanitarian ends to which such moneys could be put. But at the same time, the funds collected under the guise of political or humanitarian activities ultimately support the terrorist activities of these organizations.

10. This support comes in a variety of forms. Funds raised ostensibly for charitable purposes have in the past been redirected by some terrorist groups to fund the purchase of arms and explosives. For example, Sri Lankan officials have publicly stated that funds raised by the LTTE in London have been used to acquire weapons and explosives. Leaders of LTTE fundraising efforts have publicly admitted that they are not so "naive" as to assume that funds collected by the LTTE will be used only for the "humanitarian" purposes advertised by the LTTE. In the case of other designated terrorist organizations, funds raised for purportedly legitimate purposes are used to support the establishment of logistical infrastructure (communications, housing and the like) and intelligence networks that are shared both by those group members involved in civilian activities and those involved in terrorist activities.

9

11. Terrorist organizations do not maintain *organizational* "firewalls" that would prevent or deter such sharing and commingling of support and benefits. To the contrary, in the case of many terrorist groups, there is contact and in some cases, coordination, between those individuals involved in terrorist activities, and those involved in ostensibly civil, political or humanitarian functions. Indeed, some designated foreign terrorist organizations use social and political components to recruit personnel to carry out terrorist operations, and to provide support to criminal terrorists and their families in aid of such operations.

12. Likewise, there is reason to believe that foreign terrorist organizations do not maintain legitimate *financial* firewalls between those funds raised for civil, non-violent activities, and those ultimately used to support violent, terrorist operations. Terrorist groups operate in clandestine fashion to impede their apprehension by law enforcement authorities. Foreign terrorist organizations can and do take advantage of the fact that money is fungible and that there exist myriad ways to disguise its origin and transfer. It is uniquely in the interests of foreign terrorist organizations *not* to maintain accurate records, *not* to reveal sources of funding for arms, explosives and logistical infrastructure, *not* to admit that they derive criminal, terrorist benefit from ostensibly civilian, humanitarian activities, and indeed, *not* to admit to supporters who believe in the existence of "firewalls" that often these are no more than convenient rationalizations.

13. The PKK has itself not respected the line between humanitarian and violent activities. In January 1997, the United Nations High Commissioner for Refugees was forced to close a Kurdish refugee camp in northern Iraq because the camp had come

9

10

under the control of the PKK, and the PKK had failed to respect its "neutral and humanitarian nature." According to press reports, PKK members "systematically tried to convert [the camp] from a refugee camp into an operational base."

14. Even if funds or goods raised for charitable purposes are in fact so used in their entirety, the addition of such funds or goods to the coffers of terrorist groups such as PKK and LTTE unencumbers funds raised from other sources for use in facilitating violent, terrorist activities and gaining political support for these activities. Thus, humanitarian support, however well-intentioned, *increases* the resources that a terrorist organization can dedicate to unlawful, criminal ends. Individuals who wish to assist people in need may provide aid through the many legitimate organizations *not* affiliated with designated terrorist groups that have embraced terror, violence and attacks on innocent civilians.

15. The "cover" of charitable or political non-violent activities located within the organizational structure of a foreign terrorist organization provides effective concealment for the movement and preparations of criminal terrorists, and substantially undermines the investigatory efforts of law enforcement personnel in the United States and abroad, both by the United States and foreign governments. Because money is fungible and difficult to trace, and because terrorist groups do not open their books to the outside world, it is exceedingly difficult for U.S. law enforcement agencies to distinguish between funds used to support exclusively non-violent humanitarian activities, and those used to support criminal, terrorist activities. The means by which terrorist organizations transfer funds abroad are varied and obfuscatory: wire transfers; check cashing services;

11

couriers carrying cash; and complex real estate transactions and bogus commercial transactions. Once funds are transferred to foreign institutions, the ability of the U.S. government to identify the end-recipients and beneficiaries of such funds is dramatically diminished.

16. In addition to national security and law enforcement interests, foreign policy imperatives also strongly support the prohibition on material support to designated terrorist organizations. A number of designated foreign terrorist organizations have attacked moderate governments with which the United States has vigorously endeavored to maintain close and friendly relations. Terrorist attacks on such governments threaten their social, economic and political stability, cause enormous human suffering, and endanger Americans visiting or residing overseas. In some cases, designated terrorist groups also threaten to undermine important foreign policy initiatives undertaken by the United States that have significance for U.S. vital interests beyond our bilateral relations with individual countries. For example, some designated terrorist groups engage in terrorist violence designed to undermine the Middle East peace process, which is of vital interest to the United States; other foreign terrorist organizations attack our NATO allies, thereby implicating important and sensitive multilateral security arrangements. It is a therefore a foreign policy priority of the United States to ensure that terrorist groups do not succeed in undermining such initiatives and arrangements, or in destabilizing foreign governments whose support and cooperation is vital to the United States.

11

12

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 21, 1998.

Kenneth R. McKune

12

# EXHIBIT B

**PRESS RELEASE: THE CHARITY COMMISSION 30 MAY 1996**

**An investigation by the Charity Commission in 1996 into INTERPAL (The Palestinian Relief and Development Fund) concluded that the charity was a well run and committed organisation which carried out important work in a part of the world where there is great hardship and suffering.**

**No evidence was found of any pro-terrorist bias in the charity.**

**The following was the text of a statement issued by the Charity Commission:**

"In early March the Charity Commission opened an investigation into the activities of INTERPAL which with the charities full co-operation, we have now been able to conclude. The Trustees of the charity have strongly refuted allegations made in the press and claim that INTERPAL is independent of any other organisation. Our investigation restricted to the UK would lend support to this statement.

Charity Commission investigators, aided by in-house accountants, have carried out a range of financial checks on the charity's records and controls, backed up by scrutiny of random samples of transactions from information obtained from the charity's bankers. These checks all provided evidence of an appropriate end use of its funds. All the evidence that we were able to uncover, plus our own knowledge of the charity, pointed to a well run and committed organisation which carries out important work in a part of the world where there is great hardship and suffering.

It would be impossible, and inappropriate, for the charity to ensure that its funds only go to supporters of the Israelis in the volatile areas in which it works. They do however need to take every possible step to ensure that their donations only go to charitable purposes, helping the poor and needy. We are satisfied that they do this to the best of their abilities.

It had been alleged that some funds find their way to supporters of terrorism. This is possible in an area of benefit where a significant number of poor and disadvantaged people might support the aims of Hamas. Poverty and need must however be the only criteria when deciding how the charity funds are distributed and aid must not be given because of a person's support for terrorism. We found no evidence in the charity of any pro-terrorist bias or indeed any bias of any kind."

# EXHIBIT C



# ISRAEL MINISTRY OF FOREIGN AFFAIRS

**Esther Bablar**
7 May 2002

## *Esther (Etti) Bablar*



**May 7, 2002 - Esther Bablar, 54, of Bat Yam was one of 15 people killed when a suicide bomber detonated a powerful charge in a game club located on the 3rd floor of a building in Rishon Lezion, causing part of the building to collapse. Hamas claimed responsibility for the attack.**

At about 11:00 PM, the terrorist entered the unlicensed Sheffield Club with a suitcase of explosives, spiked with shrapnels and nails to cause maximum injury. The patrons were trying their luck at slot machines, card games or snooker. 15 were killed, and 55 wounded in the blast.

Esther (Etti) and Yitzhak Bablar were childhood sweethearts. They met in their teens and went out for two years. They parted when Etti moved with her parents to the US. Each married and had children.

Seven years ago, when Etti heard that Yitzhak had divorced his first wife, she came to Israel to see him, went home to divorce her first husband, and came back to marry Yitzhak. Yitzhak's daughter, Tali, said, "They loved each other very much and had loved each all these years." Friends described their love like "Romeo and Juliet".

Etti had just returned from a visit to her children in the US. The couple had gone out to dinner and then stopped at the Sheffield Club. Yitzhak was killed instantly. Etti died the next morning.

Esther Bablar was buried alongside her husband Yitzhak in Holon. She is survived by three children from her former marriage.

# EXHIBIT D

## List of Declarations and Orders

| Date of Declaration/Order | Organization | Significance of Declaration/Order | Party Making Declaration |
|---|---|---|---|
| January 30, 1986 | PLO<br>Palestinian National Liberation Front<br>Palestinian Liberation Army (PLA), Popular Front for the Liberation of Palestine (PFLP) (Habash)<br>Democratic Front for the Liberation of Palestine (DFLP) (Hawatmeh)<br>Popular Liberation War Pioneers<br>Popular Front for the Liberation of Palestine<br>Arab Liberation Front<br>Palestinian Popular Struggle Front<br>Palestinian Liberation Front (PLF)<br>Abu-Nidal Faction<br>Abu-Ibrahim Faction<br>Naji 'Allush Faction<br>Abu-Jabbar Faction<br>Heroes of Return<br>The Popular Front<br>FATAH<br>Palestinian Revolutionary Councils<br>Palestinian National Front<br>Lebanese Armed Revolutionary Faction | Declared a terrorist organization under the Prevention of Terrorism Ordinance | Government decision |
| December 22, 1968 | Tira Culture and Sports Club | Declared an illegal association | Moshe Dayan (Minister of Defense) |
| August 18, 1988 | Popular committees<br>National committees<br>Shock groups<br>Shock forces<br>Popular opposition groups<br>Deterrence groups<br>Deterrence forces | Declared an illegal association | Yitzhak Rabin (Minister of Defense) |
| June 22, 1989 | Hamas<br>Hizballah<br>Islamic Jihad | Declared a terrorist organization under the Prevention of Terrorism Ordinance | Government decision |
| September 15, 1989 | Islamic Resistance Movement<br>Hamas<br>Al-Mujahidin Al-Falastini'in<br>Majd | Declared an illegal association | Yitzhak Rabin (Minister of Defense) |
| October 29, 1990 | Islamic Jihad<br>Palestinian Islamic Jihad | Declared an illegal association | Moshe Arens (Minister of Defense) |
| March 14, 1996 | Holy Land Fund | Seizure order | Shimon Peres (Minister of Defense) |
| March 17, 1996 | Islamic Assistance (Rescue) Committee | Banning order | Shimon Peres (Minister of Defense) |

| | | | |
|---|---|---|---|
| November 28, 1996 | Humanitarian Rescue Committee for Support of Orphans and the Needy | Seizure order | Itzchak Mordechay (Minister of Defense) |
| May 6, 1997 | Falastin Al-Muslima<br>Welfare and Development Fund for Palestine<br>Al-Aksa Fund<br>Holy Land Fund for Relief and Development | Declared an illegal association | Itzchak Mordechay (Minister of Defense) |
| 1998 | Falastin Al-Muslima<br>Welfare and Development Fund for Palestine<br>Al-Aksa Fund<br>Holy Land Fund for Relief and Development | Declared a terrorist organization under the Prevention of Terrorism Ordinance | Government decision |
| May 20, 1998 | Beit El Mal Al-Phalastini Al-Arabi Al-Muslima Al-Aama Al-Mahaduda Ltd. | Amendment to Declaration of Illegal Association | Itzchak Mordechay (Minister of Defense) |
| August 31, 2000 | Al-Kutla Al-Islamia | Amendment to Declaration of Illegal Association | Ehud Barak (Minister of Defense) |
| October 4, 2001 | Al-Qeda, led by Osama Bin-Laden | Declared an illegal association | Binyamin Ben-Eliezer (Minister of Defense) |
| December 6, 2001 | Tanzim - Tanthim<br>Force 17 (Presidential Guard) - al-Amn al-Ri'asah | Declared a terrorist organization under the Prevention of Terrorism Ordinance | Government decision |
| February 25, 2002 | **Charity organizations in Judea, Samaria and the Gaza Strip** affiliated with the Hamas and/or strengthening it or part of the Hamas infrastructure, including<br>**Zakkah and Mercy Society Khan Yunes** (Lajnat Al-Zakkah Al-Rahme Khan Yunes)<br>**Islamic Center (Mujma)** (Al-Mujma Al-Islami), Gaza Strip<br>**Islamic Virtue Society** (Jamaiat Al-Salah Al-Islamaia), Gaza Strip<br>**Islamic Charity Society** (Al-Jamaia Al-Islamia Al-Khiria), Gaza Strip<br>**Loyalty (Wafa) Society to Care for the Aged** (Jamaiat Al-Wafa LiRayat Al-Musenin), Gaza Strip<br>**Society of Charity and Grace for Children** (Jamiat Mubarat Al-Rahme lilAtfal), Gaza Strip<br>**House of Quaran and Sunnah Society** (Jamaiat Dar Al-Quran Wal-Sunnah), Gaza Strip<br>**House of Blessed Quaran and Sunnah** (Jamaiat Dar Al-Quran Al-Karim Wal-Sunnah), Gaza Strip<br>**The Al-Nur Prisoner Society (Jamaiat Al-Nur Al-Khira), Gaza Strip**<br>**Islamic Charity Society Hebron** (Al-Jamaia Al-Islamia Al-Khiria Al-Khalil)<br>**Islah (Reform) Society Jericho** (Jamaiat Al-Islah Al-Khiria Jericho)<br>**Orphan Care Society Bethlehem** (Jamaiat Ra'iat Al-Yatim Bethlehem)<br>**Islah (Reform) Society Al-Bireh** (Jamiat Al-Islah)<br>**Zakkah Committee Ramallah** (Lajnat Zakkah Ramallah) | Declared an illegal association | Binyamin Ben-Eliezer (Minister of Defense) |

| | | | |
|---|---|---|---|
| | **Quran and Sunnah Society Qalqilia** (Jamaiat Al-Quran Wal-Sunnah Qalqilia<br>**Zakkah Committee Yul Karem** (Lajnat Zakkah Tul-Karem)<br>**Islamic Solidarity (Tadamon) Charity Society** (Jamaiat Al-Tadamon), Nablus<br>**Islamic Assistance Society Nablus** (Lajnat Al-Ighatha Al-Islamia Nablus)<br>**Zakkah Funds Committee Jenin** (Lajnat Amwal Al-Zakkah Jenin)<br>**Hebron Young Muslims' Society** (Jamaiat Al-Shuban Al-Muslemin)<br>As well as the following societies based outside of Israel:<br>**World Assembly of Muslim Youth** (Al-Nadwa Al-Alamia LilShabab Al-Islami)<br>**Charity Coalition** (Al-Ta'aluf Al-Khiri)<br>**International Islamic Assistance Organization** (Al-Haya Al-Khairia Al-Islamia Al-Alamia) | | |
| August 11, 2002 | Al-Qa'ida, led by Osama Bin-Laden | Declaration under Prevention of Terrorism Ordinance | Government decision |
| November 28, 2002 | The Tanzim or Al-Aksa Martyrs Brigade | Declared an illegal association | Shaul Mofaz (Minister of Defense |
| December 20, 2002 | Presidential Guard or Force 17 | Declared an illegal association | Shaul Mofaz (Minister of Defense |
| February 7, 2003 | Cultural Committee (Lajnat Al-Tura) also known as:<br>Islamic Awareness Committee (Lajnat Al Tawaia Al Islamia)<br>Movement for Islamic Reform and Justice (Jamaiat Al-Islah Al-Khariya Al-Islamia)<br>Al-Sanabil (NPO) | Declared an illegal association | Shaul Mofaz (Minister of Defense |
| February 9, 2003 | Cultural Committee (Lajnat Al-Tura) also known as:<br>Islamic Awareness Committee (Lajnat Al Tawaia Al Islamia)<br>Movement for Islamic Reform and Justice (Jamaiat Al-Islah Al-Khariya Al-Islamia)<br>Al-Sanabil (NPO) | Declaration under Prevention of Terrorism Ordinance | Government decision |
| March 12, 2003 | Al-Jam'iya Al-Islamiya | Declaration under Prevention of Terrorism Ordinance | Government decision |
| May 30, 2003 | Hizballah | Declaration under Prevention of Terrorism Ordinance | Government decision |
| June 12, 2003 | Hizballah | Declared an illegal association | Government decision |
| October 24, 2003 | Al-Ansar and Al-Quds Force organizations of the Iranian Revolutionary Guard – Lebanon, or any other name used by this organization, including any of its factions and any branch, committee, group or segment of this organization is unlawful organization as defined in the regulations. | Declared an illegal association | Shaul Mofaz (Minister of Defense) |
| June 12, 2003 | Organization for Social Development | Declared an illegal association | Shaul Mofaz (Minister of Defense) |

| March 24, 2004 | The Society for Fostering Arab Women also known as Lajnat Ri'aya Al-Mara Al-Arabia or Jamiat Al-Ri'aya Lilmara Al-Arabiya or any other name used by this organization, including any of its factions and any branch, center, group or segment of this organization is an illegal association as defined in the regulations. | Declared an illegal association and seizure order | Shaul Mofaz (Minister of Defense) |
|---|---|---|---|
| December 9, 2004 | Al-Ekhsan or any other name used by this organization, including all of its factions and any branch, center, committee, group or segment of this organization, is an illegal association as defined in the regulations. | Declared an illegal association | Shaul Mofaz (Minister of Defense) |
| December 30, 2004 | IRFAN (formerly Jerusalem Fund for Human Services) or any other name used by this organization, including all of its factions and any branch, center, committee, group or segment of this organization, is an illegal association as defined in the regulations. | Declared an illegal association | Shaul Mofaz (Minister of Defense) |
| January 10, 2005 | Al-Huda Ramallah led by Kifah Qatash or any other person in its stead, or any other name used by this organization, including all of its factions and any branch, center, committee, group or segment of this organization, is an illegal association as defined in the regulations. | Declared an illegal association | Shaul Mofaz (Minister of Defense) |
| January 30, 2005 | Al-Naka'a in Bethlehem led by Aitaf Alian or any other person in its stead, or any other name used by this organization, including all of its factions and any branch, center, committee, group or segment of this organization, is an illegal association as defined in the regulations. | Declared an illegal association | Shaul Mofaz (Minister of Defense) |
| February 2, 2005 | A group of persons or organization referred to as the Beit Fajar Charitable Society (Lajnat Al-Zakkat Beit Fajar) shall be added to the end of the list of Charity Organizations in Judea, Samaria and the Gaza Strip that are Affiliated with the Hamas and Strengthen the Hamas Infrastructure as well as to the list of Organizations Based Outside of Israel. | Declared an illegal association | Shaul Mofaz (Minister of Defense) |

List of groups declared "Unlawful Organizations" in Israel by order of the Minister of Defense according to Emergency Defense Regulations (Article 84 2 A) 1945

| No. | Hebrew Name | Arabic Name | English Name | Location |
|---|---|---|---|---|
| 1 | Va'adat Kaspei Hatzedaka Jenin | Lajnat Amwal Al-Zakkah Jenin | ZAKKAH FUNDS COMMITTEE JENIN | Jenin |
| 2 | Va'adat Hasiyua Ha'islamit Shechem | Lajnat Al-Ighatha Al-Islamia Nablus | ISLAMIC ASSISTANCE SOCIETY NABLUS | Nablus |
| 3 | Agudat Hasolidariut Letzedaka Islamit Beshechem | Jamaiat Al-Tadamon | ISLAMIC SOLIDARITY (TADAMON) CHARITY SOCIETY | |
| 4 | Va'adat Hatzedaka Tul Karem | Lajnat Zakkah Tul-Karem | ZAKKAH COMMITTEE TUL KAREM | Tul-Karem |
| 5 | Agudat Al-Quran ve'Alsunnah Kalkilia | Jamaiat Al-Quran Wal-Sunnah Qalqilia | QURAN AND SUNNAH SOCIETY QALQILIA | Qalqilia |
| 6 | Agudat Hatzedaka (Hereforma) Hislamit El Bireh | Jamaiat Al-Islah Al-Islamia Al-Bireh | ISLAH (REFORM) SOCIETY EL BIREH | Ramallah |
| 7 | Va'adat Hatzedaka Be'ramallah | Lajnat Zakkah Ramallah | ZAKKAH COMMITTEE RAMALLAH | Ramallah |
| 8 | Ha'aguda Letipul beyitumim Bebeit Lechem | Jamaiat Ra'iat Al-Yatim Bethlehem | ORPHAN CARE SOCIETY BETHLEHEM | Bethlehem |
| 9 | Agudat Hareforma Beyericho | Jamaiat Al-Islah Al-Khiria Jerricho | ISLAH (REFORM) SOCIETY JERICHO | Jericho |
| 10 | Agudat Hatzedaka Ha'islamit Hevron | Al-Jamaia Al-Islamia Al-Khiria Al-Khalil | ISLAMIC CHARITY SOCIETY HEBRON | Hebron |
| 11 | Agudat Hatze'irim Hamuslemim | Jamaiat Al-Shuban Al-Muslemin | SOCIETY OF MUSLIM YOUTH | Hebron |
| 12 | Agudat Hamerkaz Ha'islami | Al-Mujma Al-Islami | ISLAMIC CENTER (MUJMA) | Gaza Strip |
| 13 | Agudat Tohar Hamidot Ha'islamit | Jamaiat Al-Salah Al-Islamaia | ISLAMIC VIRTUE SOCIETY | Gaza Strip |
| 14 | Ha'aguda Ha'islamit | Al-Jamaia Al-Islamia Al-Khiria | ISLAMIC CHARITY SOCIETY | Gaza Strip |
| 15 | Agudat Hane'emanut Letipul Bekshishim | Jamaiat Al-Wafa LiRayat Al-Musenin | LOYALTY (WAFA) SOCIETY TO CARE FOR THE AGED | Gaza Strip |
| 16 | Agudat Mosad Hatzedaka Ve'hahesed Leyeladim | Jamalat Mubarat Al-Rahme LilAtfal | SOCIETY OF CHARITY AND GRACE FOR CHILDREN | Gaza Strip |
| 17 | Agudat Beit Hakaran Vehasunna | Jamaiat Dar Al-Quran Wal-Sunnah | HOUSE OF QURAN AND SUNNAH SOCIETY | Gaza Strip |
| 18 | Agudat Beit Hakaran Hamevorach Vehasunna | Jamaiat Dar Al-Quran Al-Karim Wal-Sunnah | HOUSE OF BLESSED QURAN AND SUNNAH | Gaza Strip |
| 19 | Va'adat Hatzedakah Vehahesed Han Yunes | Lajnat Al-Zakkah Al-Rahme Khan Yunes | ZAKKAH AND MERCY SOCIETY KHAN YUNES | Gaza Strip |
| 20 | Agudat Alnur | Jamaiat Al-Nur | EL-NUR SOCIETY | Gaza Strip |
| 21 | Beit Almal Hafalestini Ha'aravi Ba'am | Bait Al - Mal Al-Falastini Al-Arabi Al-Musahema Al-'Ama Al-Mahdooda | BEIT ELMAL ALFALASTINI ELARABI LTD. | Ramallah, Nablus |
| 22 | Irgun Hahesed Ha'islami Ha'olami | Hai'at Al-Ighatha Al-Islamia Al-'Alamia | ISLAMIC INTERNATIONAL RELIEF ORGANIZATION (IIRO)/ISLAMIC INTERNATIONAL CHARITABLE FOUNDATION (IICF) | Saudia Arabia |
| 23 | Hakenes Ha'olami Lenoar Islami | Al-Nadwa Al-Islamia LilShabab Al-Islami | WORLD ASSEMBLY OF MUSLIM YOUTH | Saudia Arabia |
| 24 | Ko'alitzyat Hatzedaka | 'Itilaf Al-Khair | UNION OF GOOD | Worldwide |
| 25 | Falastin Almaslama | Falastin Al-Muslima | PALESTINE EL-MULIMAH | UK |

| | | | |
|---|---|---|---|
| 26 | Keren Ha'adama Hakedosha Lerevacha u'fituach | Muassasat Al-Ard Al-Mukadasah Lilighatha WalTanamia | HOLY LAND FUND FOR RELIEF AND DEVELOPMENT | USA |
| 27 | Keren Alaksa | Muassasat Al-Aqsa Al-Khiria | AL-AQSA FUND | Germany, UK, Holland, Denmark |
| 28 | Keren Harevacha Vehafituach Lefalestin – Interpal | Al-Sunduq Al-Falastini Lil-Ighatha Wal-Tanamia-INTERPAL | PALESTINE RELIEF AND DEVELOPMENT FUND-INTERPAL | UK |
| 29 | Hava'ad Le'ezra Ve'lesolidariut im Falestin | Al-Lajna Al-Khiria LiMunasarat Falastin | LE COMMITE DE BIENFAISANE ET DE SOLIDARITE AVEC PALESTINE | France |
| 30 | Hakutla Ha'islamit | Al-Kutla Al-Islamia | ELKUTLA ELISLAMIA | Universities in the Territories |

# רשימת הכרזות וצווים

| תאריך ההכרזה/צו | שם הארגון | מהות ההכרזה/צו | הגורם המכריז |
|---|---|---|---|
| 30/01/86 | אש"פ<br>חזית ההצלה הלאומית הפלסטינית<br>צבא השחרור הפלסטיני, חזית העממית לשחרור פלסטין (חבש)<br>החזית העממית הדמוקרטית לשחרור פלסטין (חואתמה)<br>חלוצי מלחמת השחרור העממית<br>החזית העממית לשחרור פלסטין<br>חזית השחרור הערבית<br>חזית המאבק העממי הפלסטיני<br>חזית השחרור הפלסטינית<br>פלג אבו-נידאל<br>פלג אבו-אבראהים<br>פלג נאג'י עלוש<br>פלג אבו ג'אבר<br>ארגון "גבורי השיבה"<br>החזית העממית<br>פת"ח<br>הועדות המהפכניות הפלסטיניות<br>החזית הלאומית הפלסטינית<br>סיעת המזוינות המהפכניות הלבנוניות | הכרזה כארגון טרור לפי פקודת מניעת טרור | החלטת ממשלה |
| 22/12/68 | המועדון לתרבות ולספורט טירה | הכרזה על התאחדות בלתי מותרת | משה דיין (שר הבטחון) |
| 18/08/88 | ועדות עממיות<br>ועדות לאומיות<br>קבוצות הלם<br>כוחות הלם<br>קבוצות התנגדות עממית<br>קבוצות הרתעה<br>כוחות הרתעה | הכרזה על התאחדות בלתי מותרת | יצחק רבין (שר בטחון) |
| 22/06/89 | חמא"ס<br>חיזבאללה<br>הג'יהאד האיסלמי | הכרזה כארגון טרור לפי פקודת מניעת טרור | החלטת ממשלה |
| 15/09/89 | תנועת ההתנגדות האיסלמית<br>חמא"ס<br>אלמג'אהידון אלפלסטיניון<br>מג'ד | הכרזה על התאחדות בלתי מותרת | יצחק רבין (שר בטחון) |
| 29/10/90 | הג'יהאד האיסלמי<br>הג'יהאד האיסלמי הפלשתיני | הכרזה על התאחדות בלתי מותרת | משה ארנס (שר הבטחון) |
| 14/03/96 | קרן האדמה הקדושה | צו החרמה | שמעון פרס (שר הבטחון) |
| 17/03/96 | ועדת הסיוע (ההצלה) האיסלמית | צו החרמה | שמעון פרס (שר הבטחון) |
| 28/11/96 | ועדת ההצלה ההומניטרית לתמיכה ביתומים ובמזקקים | צו החרמה | יצחק מרדכי (שר הבטחון) |

| תאריך | תיאור | סוג ההכרזה | שר |
|---|---|---|---|
| 06/05/97 | פלסטין אלמסלמה<br>קרן הרווחה והפיתוח לפלסטין<br>קרן אלאקצא<br>קרן האדמה הקדושה לרווחה ולפיתוח | הכרזה על התאחדות<br>בלתי מותרת | יצחק מרדכי (שר הבטחון) |
| 1998 | פלסטין אלמסלמה<br>קרן הרווחה והפיתוח לפלסטין<br>קרן אלאקצא<br>קרן האדמה הקדושה לרווחה ולפיתוח | הכרזה כארגון טרור<br>לפי פקודת מניעת<br>טרור | החלטת ממשלה |
| 20/05/98 | חברות בית אל-מאל אלפלסטיני אלערבי אלמוסהימה אלעאמה אלמחדודה בע"מ | תיקון להכרזה על<br>התאחדות בלתי<br>מותרת | יצחק מרדכי (שר הבטחון) |
| 31/08/00 | אלכותלה אלאיסלאמיה | תיקון להכרזה על<br>התאחדות בלתי<br>מותרת | אהוד ברק (שר הבטחון) |
| 04/10/01 | אל קאעדה, בראשותו של אוסמה בן-לאדן | הכרזה על התאחדות<br>בלתי מותרת | בנימין בן-אליעזר (שר הבטחון) |
| 06/12/01 | התנט'ים - תנט'ים<br>כוח 17 (המשמר הנשיאותי) - קואת 17 אמן אלראסה | הכרזה כארגון טרור<br>לפי פקודת מניעת<br>טרור | החלטת ממשלה |
| 25/02/02 | "אגודות **הצדקה באיו"ש ואזח"ע"** השייכות לארגון החמאס, ו/או תומכות בו ומחזקות את התשתית של החמאס, לרבות:<br>**"ועדת הצדקה והחסד חאן יונס"** ("לג'נת זכאת אלרחמה חאן יונס"<br>**"אגודת המרכז האיסלאמי"** ("אלמג'מע אלאסלאמי") רצועת עזה<br>**"אגודת טוהר המידות האסלאמית"** (ג'מעית אלצלאח אלאסלאמיה") רצועת עזה<br>**"האגודה האסלאמית"** (אלג'מעיה אלאסלאמיה") רצועת עזה<br>**"אגודת הנאמנות לטיפול בקשישים"** ("ג'מעית אלופאא לרעאית אל מסנין") רצועת עזה<br>**"אגודת מוסד הצדקה והחסד לילדים"** ("ג'מעית מברת אלרחמה ללאטפאל") רצועת עזה<br>**"אגודת בית הקוראן והסונה"** ("ג'מעית דאר אלכתאב ואלסנה") רצועת עזה<br>**"אגודת בית הקוראן המבורך והסונה"** ("ג'מעית דאר אלקראן אלכרים ואלסנה") רצועת עזה<br>**"אגודת "האסיר אלמר"** ("ג'מעית אלמר אלח'ירה) רצועת עזה<br>**"אגודת הצדקה האסלאמית חברון"** ("אלג'מעיה אלח'ירה אלאסלאמיה אלח'ליל")<br>**"אגודת הרפורמה בריחו"** ("ג'מעית אלאצלאח אלח'יריה")<br>**"האגודה לטיפול ביתומים בבית לחם"** ("ג'מעית רעאית אליתים בית לחם")<br>**"אגודת הצדקה (הרפורמה) האסלאמית באלבירה"** ("ג'מעית אלאצלאח")<br>**"ועדת הצדקה ברמאללה"** ("לג'נת אלזכאת רמאללה")<br>**"אגודת אלקראן ואלסונה קלקליה"** ("ג'מעית אלקראן ואלסנה קלקליה")<br>**"ועדת הצדקה טול כרם"** ("לג'נת אלזכאת טול כרם")<br>**"אגודת הסולידריות לצדקה האסלאמית"** ("ג'מעית אלתדאמן אלח'יריה אלאסלאמיה") שכם<br>**"ועדת הסיוע האסלאמית שכם"** ("לג'נת אלאע'אתיה אלאסלאמיה נאבלס")<br>**"ועדת כסף הצדקה ג'נין")** ("לג'נת אמואל אלזכאה ג'נין")<br>**"אגודת הצעירים המוסלמים"** ("ג'מעית אלשיבען אלמסלמין") חברון<br>וכן האגודות האלה שמרכזן בחו"ל:<br>**"הכנף העולמי לנוער אסלאמי"** ("אלנדוה אלעאמלמיה לשבאב אסלאמי")<br>**"קואליצית הצדקה"** ("אאתלאף אלח'יר")<br>**"אגודת הסיוע האסלאמית העולמית"** ("אלהיאה אלח'יריה אלאסלאמיה אלעאלמיה") | הכרזה על התאחדות<br>בלתי מותרת | בנימין בן-אליעזר (שר הבטחון) |
| 11/08/02 | אל קעידה, בראשותו של אוסמה בן לאדן | הכרזה לפי הפקודה<br>למניעת טרור | החלטת ממשלה |

| | | | |
|---|---|---|---|
| 28/11/02 | התבזים או גדודי חללי אל אקצא | הכרה על התאחדות בלתי מותרת | שאול מופז (שר הבטחון) |
| 20/12/02 | בטחון הנשיאות או כח 17 | הכרה על התאחדות בלתי מותרת | שאול מופז (שר הבטחון) |
| 07/02/03 | ועדת המורשת ("לג'נת אלתראת") והמוכרת גם בשמות: ועדת התודעה האיסלמית ("לג'נת אל תוועיה אל אסלאמיה") תנועת התיקון והצדק האסלאמית ("ג'מעיית אל אצלאח אלח'יריה אל אסלאמיה") עמותת "אלסנאבל" | הכרה על התאחדות בלתי מותרת | שאול מופז (שר הבטחון) |
| 09/02/03 | ועדת המורשת ("לג'נת אלתראת") והמוכרת גם בשמות: ועדת התודעה האיסלמית ("לג'נת אל תוועיה אל אסלאמיה") תנועת התיקון והצדק האסלאמית ("ג'מעיית אל אצלאח אלח'יריה אל אסלאמיה") עמותת "אלסנאבל" | הכרה לפי הפקודה למניעת טרור | החלטת ממשלה |
| 12/03/03 | "ג'אמעה איסלמיה" | הכרה לפי הפקודה למניעת טרור | החלטת ממשלה |
| 30/05/03 | חיזבאללה | הכרה לפי הפקודה למניעת טרור | החלטת ממשלה |
| 12/06/03 | חיזבאללה | הכרה על התאחדות בלתי מותרת | החלטת ממשלה |
| 24/10/03 | אגודת אלאבצאר וכח קודס של משמרות המהפכה האיראניים – לבנון, או כל שם אחר שיכונה ארגון זה, לרבות כל פלגיו וכל סניף, ועד, קבוצה או סיעה של ארגון זה, הוא התאחדות בלתי מותרת כמשמעותה בתקנות. | הכרה על התאחדות בלתי מותרת | שאול מופז (שר הבטחון) |
| 12/06/03 | "המוסד לפיתוח החברה" | הכרה על התאחדות בלתי מותרת | שאול מופז (שר הבטחון) |
| 24/3/04 | "האגודה לטיפוח האשה הערבה" והידועה גם בשם "לג'נת רעאית ללמראה אלערביה" או "ג'מעית אלרעאחה ללמראה אלערביה", או בכל שם אחר שיכונה בו ארגון זה, לרבות כל פלגיו ועל סניף, מרכז, ועד, קבוצה או סיעה של ארגון זה, הוא התאגדות בלתי מותרת כמשמעותה בתקנות. | הכרה על התאחדות בלתי מותרת וצו החרמה | שאול מופז (שר הבטחון) |
| 9/12/04 | אגודת אלאחסאן או בכל שם אחר שיכונה בו ארגון זה, לרבות כל פלגיו וכל סניף, מרכז, ועד, קבוצה או סיעה של ארגון זה, הוא התאחדות בלתי מותרת כמשמעותה בתקנות | הכרה על התאחדות בלתי מותרת | שאול מופז (שר הבטחון) |
| 30/12/04 | מוסד אירפאן (בשמו הקודם "קרן ירושלים לשירותים הומניים) או בכל שם אחר שיכונה בו ארגון זה, לרבות כל פלגיו וכל סניף, מרכז, ועד, קבוצה או סיעה של ארגון זה הוא התאחדות בלתי מותרת כמשמעותה בתקנות | הכרה על התאחדות בלתי מותרת | שאול מופז (שר הבטחון) |
| 10/1/05 | "אגודת אלהודא-רמאללה" בראשותה של כפאת קטש או כל אדם אשר יבוא במקומה, או בכל שם אחר שיכונה בו ארגון זה, לרבות כל פלגיו וכל סניף, מרכז, ועד, קבוצה או סיעה של ארגון זה, הוא התאחדות בלתי מותרת כמשמעותה בתקנות | הכרה על התאחדות בלתי מותרת | שאול מופז (שר הבטחון) |
| 30/1/05 | "אגודת אלנקּאא בבית לחם" בראשותו של עטאף עליאן או כל אדם אשר יבוא במקומה, או בכל שם אחר שיכונה בו ארגון זה, לרבות כל פלגיו וכל סניף, מרכז, ועד, קבוצה או סיעה של ארגון זה, הוא התאחדות בלתי מותרת כמשמעותה בתקנות | הכרה על התאחדות בלתי מותרת | שאול מופז (שר הבטחון) |
| 2/2/05 | אחרי רשימת "אגודות הצדקה באיו"ש ואזה"ע השייכות לארגון החמאס או תוסמכת בו ונחזקות את התשתית של החמאס" וכן רשימת "האגודות האלה שמרכזן בחו"ל יבוא חבר בני אדם או הארגון הממונה ועדת הצדקה בית פג'אר (לג'נת אלזכאת בית פג'אר) | הכרה על התאחדות בלתי מותרת | שאול מופז (שר הבטחון) |

רשימת הגופים המוכרזים כ "התאחדויות בלתי מותרות" בישראל בצו שהב"ט עפ"י תקנות ההגנה לשעת חירום (סעיף 84  2 א') 1945

| מס"ד | שם הגוף בעברית | שם הגוף בערבית | שם הגוף באנגלית | מיקום |
|---|---|---|---|---|
| 1 | ועדת כספי הצדקה ג'נין | לג'נת אמואל אלזכאה ג'נין | ZAKKAH FUNDS COMMITTEE JENIN | ג'נין |
| 2 | ועדת הסיוע האסלאמית שכם | לג'נת אלאע'אע'ת'ה אלאסלאמיה נאבלס' | ISLAMIC ASSISTANCE SOCIETY NABLUS | שכם |

| מיקום | שם באנגלית | שם בערבית | שם בעברית | # |
|---|---|---|---|---|
|  | ISLAMIC SOLIDARITY (TADAMON) CHARITY SOCIETY | גמעית אלתצ'אמן אלח'ירה אלאסלאמיה' | אגודת הסולידריות לצדקה אסלאמית בשכם | 3 |
| טול כרם | ZAKKAH COMMITTEE TUL KAREM | לג'נת אלזכאת טול כרם' | ועדת הצדקה טול כרם | 4 |
| קלקיליה | QURAN AND SUNNAH SOCIETY QALQILIA | ג'מעית אלקראן ואלסנה קלקיליה' | אגודת אלקראן ואלסונה קלקיליה | 5 |
| רמאללה | ISLAH (REFORM) SOCIETY EL BIREH | ג'מעית אלאצלאח' אלאסלאמיה אל בירה' | אגודת הצדקה (הרפורמה) האסלאמית אל בירה | 6 |
| רמאללה | ZAKKAH COMMITTEE RAMALLAH | לג'נת אלזכאת רמאללה' | ועדת הצדקה ברמאללה | 7 |
| בית לחם | ORPHAN CARE SOCIETY BETHLEHEM | ג'מעית רעאית אליתים בית לחם' | האגודה לטיפול ביתומים בבית לחם | 8 |
| יריחו | ISLAH (REFORM) SOCIETY JERICHO | ג'מעית אלאצלאח אלח'ירה יריחו' | אגודת הרפורמה ביריחו | 9 |
| חברון | ISLAMIC CHARITY SOCIETY HEBRON | אלג'מעיה אלח'ירה אלאסלאמיה אלחלילי' | אגודת הצדקה האסלאמית חברון | 10 |
| חברון | SOCIETY OF MUSLIM YOUTH | ג'מעית אלשבאן אלמסלמין' | אגודת הצעירים המוסלמים | 11 |
| אזה"ע | ISLAMIC CENTER (MUJMA) | אלמג'מע אלאסלאמי' | אגודת המרכז האסלאמי | 12 |
| אזה"ע | ISLAMIC VIRTUE SOCIETY | ג'מעית  אלצלאח אלאסלאמיה' | אגודת טוהר המידות האסלאמית | 13 |
| אזה"ע | ISLAMIC CHARITY SOCIETY | אלג'מעיה אלאסלאמיה אלח'ירה' | האגודה האסלאמית | 14 |
| אזה"ע | LOYALTY (WAFA) SOCIETY TO CARE FOR THE AGED | ג'מעית אלופאא לרעאית אלמסנין' | אגודת הנאמנות לטיפול בקשישים | 15 |
| אזה"ע | SOCIETY OF CHARITY AND GRACE FOR CHILDREN | ג'מעית מברת אלרחמה ללאטפאל' | אגודת מוסד הצדקה והחסד לילדים | 16 |
| אזה"ע | HOUSE OF QURAN AND SUNNAH SOCIETY | ג'מעית דאר אלקראן אלכרים ואלסנה' | אגודת בית הקראן והסונה | 17 |
| אזה"ע | HOUSE OF BLESSED QURAN AND SUNNAH | ג'מעית דאר אלקראן אלכרים ואלסנה' | אגודת בית הקראן  המבורך והסונה | 18 |
| אזה"ע | ZAKKAH AND MERCY SOCIETY KHAN YUNES | לג'נת אלזכאת אלרחמה חאן יונס' | ועדת הצדקה והחסד חאן יונס | 19 |
| אזה"ע | EL-NUR SOCIETY | ג'מעית אלנור' | אגודת "אלנור" | 20 |
| רמאללה, שכם | BEIT ELMAL ALFALASTINI ELARABI LTD. | בית אלמאל אלפלסטיני אלערבי – אלמסאהמה אלעאמה אלמחדודה' | בית אלמאל הפלסטיני הערבי בע"מ | 21 |
| סעודיה | ISLAMIC INTERNATIONAL RELIEF ORGANIZATION (IIRO)/ISLAMIC INTERNATIONAL CHARITABLE FOUNDATION (IICF) | היא'ה אלאע'את'ה אלאסלאמיה אלעאלמיה' | ארגון החסד האסלאמי העולמי | 22 |
| סעודיה | WORLD ASSEMBLY OF MUSLIM YOUTH | אלנדוה אלעאלמיה ללשבאב אלאסלאמי' | הכנס העולמי לנוער אסלאמי | 23 |
| כלל עולמי | UNION OF GOOD | אאתלאף אלח'יר' | קואליציית הצדקה | 24 |
| בריטניה | PALESTINE EL-MULIMAH | פלסטין אלמסלמה' | פלסטין אלמסלמה | 25 |
| ארה"ב | HOLY LAND FUND FOR RELIEF AND DEVELOPMENT | מא'ססה אלארצ' אלמקדסה ללאע'את'ה ואלתנמיה' | קרן האדמה הקדושה לרווחה ופיתוח | 26 |
| גרמניה, בריטניה, הולנד, דנמרק | AL-AQSA FUND | מא'ססה אלאקצא אלח'ירה' | קרן אלאקצא | 27 |
| בריטניה | PALESTINE RELIEF AND DEVELOPMENT FUND-INTERPAL | אלצנדוק אלפלסטיני ללאע'את'ה ואלתנמיה – אינטרפל" | קרן הרווחה והפיתוח לפלסטין – אינטרפל | 28 |

| 29 | הועד לעזרה ולסולידריות עם פלסטין | אללג'נה אלח'יריה למנאצרה פלסטין | LE COMMITE DE BIENFAISANE ET DE SOLIDARITE AVEC PALESTINE | צרפת |
| 30 | הכתלה האסלאמית | אלכתלה אלאסלאמיה' | ELKUTLA ELISLAMIA | אוניברסיטאות בשטחים |

# EXHIBIT E

United States Court of Appeals,

Seventh Circuit.

Joyce BOIM and Stanley Boim, individually and as Administrator of the Estate of

David Boim, Plaintiffs/Appellees,

v.

QURANIC LITERACY INSTITUTE, and Holy Land Foundation for Relief and

Development, Defendants/Appellants.

Nos. 01-1969, 01-1970.

November 14, 2001.

On Appeal from the United States District Court for the Northern District of Illinois

Brief for the United States as Amicus Curiae Supporting Affirmance

Robert D. McCallum, Jr., Assistant Attorney General, Patrick J. Fitzgerald, United States Attorney, Gregory G. Katsas, Deputy Assistant Attorney General, Douglas Letter (202) 514-3602, Appellate Litigation Counsel, Civil Division, Room 9106, U.S. Department of Justice, 601 D St., N.W., Washington, D.C. 20530-0001.

**\*i TABLE OF CONTENTS**

INTERESTS OF THE UNITED STATES ... 2

STATEMENT ... 3

ARGUMENT ... 9

CONCLUSION ... 31

CERTIFICATE OF COMPLIANCE ... 32

CERTIFICATE OF SERVICE

Note: Table of Contents page numbers missing in original document

TABLE OF AUTHORITIES

Cases:

Alexander v. Sandoval, 121 S. Ct. 1511 (2001) ... 21

Central Bank of Denver v. First Interstate Bank of Denver, 511 U.S. 164 (1994) ... 18, 20

Damato v. Hermanson, 153 F.3d 464 (7th Cir. 1988) ... 10, 17

Dames & Moore v. Regan, 453 U.S. 654 (1981) ... 30

Eastern Trading Co. v. Refco, Inc., 229 F.3d 617 (7th Cir. 2000) ... 17

Equal Employment Opportunity Commission v. Illinois, 69 F.3d 167 (7th Cir. 1995) ...

17

Estates of Ungar v. The Palestinian Authority, 153 F. Supp. 2d 76 (D.R.I. 2001) ... 23

*iii Fassett v. Delta Kappa Epsilon (New York), 807 F.2d 1150 (3d Cir. 1986), cert. denied, 481 U.S. 1070 (1987) ... 18

Harris Trust and Savings Bank v. Salomon Smith Barney Inc., 530 U.S. 238 (2000) ... 22

Halberstam v. Welch, 705 F.2d 472 (D.C. Cir. 1983) ... 10, 18, 23, 24, 25

Humanitarian Law Project v. Reno, 205 F.3d 1130 (9th Cir. 2000), cert. denied, 121 S. Ct. 1226 (2001) ... 8, 27, 28

Itek Corp. v. First National Bank of Boston, 704 F.2d 1 (1st Cir. 1983) ... 30

Klinghoffer v. Palestine Liberation Organization, 739 F. Supp. 854 (S.D.N.Y. 1990) ... 12

Molzof v. United States, 502 U.S. 301 (1992) ... 10

Offshore Logistics, Inc. v. Tallentire, 477 U.S. 207 (1986) ... 12

Rice v. Paladin Enterprises, Inc., 128 F.3d 233 (4th Cir. 1997), cert. denied, 523 U.S. 1074 (1998) ... 17

In re Temporomandibular Joint (TMJ) Implants Products Liability Litigation, 113 F.3d 1484 (8th Cir. 1997) ... 18

United States v. One 1997 E35 Ford Van, 50 F. Supp. 2d 789 (N.D. Ill. 1999) ... 5

United States v. Peoni, 100 F.2d 401 (2d Cir. 1938) ... 17

United States v. Zafiro, 945 F.2d 881 (7th Cir. 1991), affirmed, 506 U.S. 534 (1993) ... 7

Constitution:

United States Constitution, First Amendment ... 6, 8, 9, 27, 28

*iv Statutes:

18 U.S.C. § 2 ... 7

18 U.S.C. (1988 ed.) § 2331 ... 15

18 U.S.C. § 2331(1) ... 4

18 U.S.C. § 2333(a) ... passim

18 U.S.C. § 2336 ... 12, 30

18 U.S.C. § 2337 ... 12, 30

18 U.S.C. § 2339A ... 6, 7, 8, 16

18 U.S.C. § 2339B ... 6, 7, 8, 16, 27, 29

28 U.S.C. § 517 ... 1

Death on the High Seas Act, 46 U.S.C. § 761 ... 12

Securities Act of 1934, Section 10(b) ... 20

Pub. Law No. 101-519, 104 Stat. 2250 (1990) ... 11

Pub. Law No. 102-572, 106 Stat. 4506 (1992) ... 11

Regulations:

60 Fed. Reg. 5081 (1995) ... 27

62 Fed. Reg. 52649 (1997) ... 27

*v 66 Fed. Reg. 49079 (2001) ... 28

66 Fed. Reg. 51088 (2001) ... 27

Order:

Executive Order 12947 ... 27

Executive Order 13224 ... 28

Rules:

Fed. R. App. P. 29(a) ... 1

Legislative Materials:

136 Cong. Rec. 7592 (1990) ... 14

137 Cong. Rec. 8143 (1991) ... 11, 15

Antiterrorism Act of 1990, Hearing before the Subcommittee on Courts and
Administrative Practice, Senate Committee on the Judiciary 101st Cong. 2d Sess.
(1990) ... 11-12

S. Rep. No. 102-342 (1992) ... 11, 15, 19

Miscellaneous:

Restatement (Second) of Torts, §876(b) (1979) ... 10, 20, 22
**\*1** Pursuant to this Court's order of September 24, 2001, as well as 28 U.S.C. § 517
and Federal Rule of Appellate Procedure 29(a), the United States files this brief as
amicus curiae, supporting affirmance of the district court's order denying the motion to
dismiss by defendants/appellants. In our view, the district court properly denied the
motion to dismiss, but we do not fully support the reasoning of the district court.
**\*2** As explained below, the United States believes that in the statutory provision at
issue (18 U.S.C. § 2333(a)), Congress established a cause of action in federal court to
be defined by common law tort principles, under which United States nationals can sue

those who injure them through acts of international terrorism. In light of Congress' intent, the district court here properly denied the motion to dismiss at this early stage of the litigation because the allegations of the complaint, when fairly read, could state a cause of action against the defendants/appellants under the recognized civil tort doctrine of aiding/abetting liability. In addition, the district court correctly rejected the argument that Section 2333(a) is unconstitutional if it provides liability under the allegations in the complaint.

The Government takes no position here on whether plaintiffs ultimately should prevail on their claims in this litigation; that question can be answered only after further appropriate proceedings in the district court.

## INTERESTS OF THE UNITED STATES

The United States greatly appreciates the Court's invitation to file an amicus brief here. As the legislative history of Section 2333(a) shows, the Government believes that this provision can be an effective weapon in the battle against international terrorism; it fights terrorism by discouraging those who would provide financing for this activity. Thus, the United States has an obvious interest in the proper application *3 of this statute. Furthermore, we support the district court's conclusion that defendants' constitutional attack against Section 2333(a) is wrong.

## STATEMENT

1. This interlocutory appeal arises from a civil suit brought by the plaintiffs/appellees Joyce and Stanley Boim stemming from their allegation that their son David was murdered by Hamas terrorists in the Middle East in 1996. The Boims filed this action under 18 U.S.C. § 2333(a), which provides:

Any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefore in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees.

Several of the defendants named by the Boims moved to dismiss the complaint, arguing that Section 2333(a) does not provide a cause of action against them because they were not directly involved in David Boim's murder.

The Boims' complaint pursues defendants/appellants Quranic Literacy Institute ("Quranic Institute") and the Holy Land Foundation for Relief and Development ("Holy Land Foundation") - two non-profit entities organized and operating in the United States - under two theories. First, the Boims contend that two Hamas operatives committed an act of international terrorism by murdering their son, and that Quranic Institute and Holy Land Foundation are liable for aiding and abetting that tort *4 by giving funds to Hamas. Second, the Boims assert that, by providing material support to Hamas, these defendants have themselves committed acts of "international terrorism," which is statutorily defined (18 U.S.C. 2331(1)) as

activities that - (A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State;

(B) appear to be intended -

(i) to intimidate or coerce a civilian population;

(ii) to influence the policy of a government by intimidation or coercion; or

(iii) to affect the conduct of a government by assassination or kidnapping; and

(C) occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished * * *.

[FN1]

> FN1. This provision was slightly amended by Section 802 of the USA
> Patriot Act of 2001 (Pub. Law No. 107-56; 115 Stat. 272, 376 (2001)).
> Subsection (1)(B)(iii) has been amended to read: "by mass destruction,
> assassination, or kidnapping."

The Boims allege that Hamas is a Palestinian terrorist organization depending heavily
on contributions from the United States and Europe, with "command and control
centers" in the United States coordinating fundraising and money laundering, and
channeling funds to Hamas operatives in the West Bank and Gaza. The complaint *5
asserts "on information and belief" that the Quranic Institute and the Holy Land
Foundation are among "Hamas' main fronts in the United States. These organizations'
purportedly humanitarian functions mask their core mission of raising and funneling
money and other resources to Hamas operatives in support of their terrorist
campaigns." Supp. App. 15. [FN2]

> FN2. The United States has asserted in other proceedings that the
> Quranic Institute was involved in the early 1990s in laundering money
> to provide support for Hamas terrorist activities. See United States v.
> One 1997 E35 Ford Van, 50 F. Supp.2d 789, 795 (N.D. Ill. 1999) (civil
> forfeiture action against Quranic Institute and others).

For this Court's current purposes, the central part of the Boims' allegations are that:
funds collected in the United States were sent to Hamas operatives for the purpose of
financing terrorist activities. * * * Hamas operatives in the West Bank and Gaza used
the money wired from the United States to buy weapons and carry out terrorist
attacks, including the attack on David Boim. Funds were drawn from a pool of such
funds by Hamas military organizers to finance training, weaponry, lodging, false
documentation/identification, communications equipment, facilities, lethal substances,
explosives, personnel, transportation, and other material support. * * * Upon
information and belief among the expenditures paid for by this pool of money were the
vehicle, machine guns, and ammunition used to kill David Boim, and the training of
Hinawi, Al- Sharif, and other Hamas operatives involved in this attack. (Supp. App. 22)
[emphasis added]

*6 In the face of these allegations, defendants Quranic Institute and Holy Land
Foundation urged a narrow interpretation of Section 2333(a), which would deny
liability against entities that provided funds to Hamas, but did not otherwise participate
in David Boim's murder. Defendants also argued that Section 2333(a) is
unconstitutional insofar as it imposes liability on them, since they claim a First
Amendment right to associate with Hamas.

2. The district court denied defendants' motion to dismiss, in an opinion published at
127 F. Supp.2d 1002.

The district court first rejected defendants' narrow view of the statute. The court found
that the statutory scheme "reaches beyond the violent act itself to the individuals who
knew about the violent act and participated in the preparation of the plan to commit
the violent act." Id. at 1014-15. The court also concluded, however, that merely
contributing money to Hamas does not fit within the statutory language defining
"international terrorism." Ibid.

The district court then looked to two later-enacted criminal provisions, 18 U.S.C. §
2339A (passed in 1994), and 18 U.S.C. § 2339B (passed in 1996) to determine the
reach of Section 2333(a). Those provisions respectively criminalize the provision of
material support for specified criminal offenses likely to be committed by terrorists,

and the provision of material support to designated Foreign Terrorist **\*7** Organizations for any purposes. [FN3] The district court seemed to conclude that conduct covered by Sections 2339A and 2339B falls within the definition of acts of "international terrorism," and is therefore civilly actionable under Section 2333(a). 127 F. Supp.2d at 1015-16.

> FN3. Both of these provisions were amended by the USA Patriot Act of
> 2001, although not in ways that should affect this case. See Sections
> 805, 810(c) and (d), and 811(f) (Pub. Law No. 107-56; 115 Stat. 272,
> 377, 380, 381 (2001)).

Nevertheless, the district court stated that, to reach the organizational defendants' actions that occurred before Sections 2339A and 2339B were enacted, plaintiffs must succeed on their theory of aiding and abetting liability. The court ruled that the scopes of Sections 2331(1) and 2333(a) are co-extensive, both covering "international terrorism," and that aiding and abetting international terrorism "is itself a criminal violation." 127 F. Supp.2d at 1018. The court therefore determined that the Boims will have to prove the elements of aiding and abetting liability "including knowledge and intent \* \* \*." Ibid. In so ruling, the court cited a criminal aiding/abetting liability case, United States v. Zafiro, 945 F.2d 881, 887 (7th Cir. 1991), affirmed, 506 U.S. 534 (1993). [FN4]

> FN4. Criminal aiding/abetting liability is provided for by statute in 18
> U.S.C. § 2: "Whoever commits an offense against the United States or
> aids, abets, counsels, commands, induces or procures its commission, is
> punishable as a principal."

**\*8** The district court also held that plaintiffs had pled sufficient facts to meet civil pleading requirements. 127 F. Supp.2d at 1018-19. And, in response to defendants' argument that plaintiffs were attempting to avoid causation requirements, the court ruled that plaintiffs "will have to prove that the funding at issue in the instant case was 'material.'" Id. at 1020.

Finally, the district court rejected the argument that imposing liability on the defendants here would violate asserted First Amendment rights. "The court has already found that the complaint contains extensive allegations concerning the alleged funding to Hamas and does not seek to impose liability for mere political association or belief." Id. at 1020. The court so found because it concluded that plaintiffs will have to establish either violations of 18 U.S.C. §§ 2339A or 2339B, or prove that defendants aided and abetted terrorist acts, including a specific intent to fund Hamas' military wing. On this point, the court relied on the Ninth Circuit's decision in the Government's favor in Humanitarian Law Project v. Reno, 205 F.3d 1130, 11133 (9th Cir. 2000), cert. denied, 121 S. Ct. 1226 (2001), holding that there is no constitutional right to provide funds to designated foreign terrorist organizations.

Defendants Quranic Institute and Holy Land Foundation appeal from the district court's denial of the motion to dismiss.

## ARGUMENT

**\*9** The district court properly denied the motion to dismiss here, and correctly rejected defendants' argument that they could not be held liable unless they directly participated in David Boim's murder. As validly construed, Section 2333(a) provides liability under standard, common law tort principles, and those principles include aiding/abetting liability in appropriate circumstances; i.e., when the defendant

knowingly and substantially assisted tortious conduct by the principal.

These conclusions are demonstrated by the text of Section 2333(a) and its history. Thus, close attention to the language and legislative development of Section 2333(a) provides the answer to the statutory issues raised in this appeal.

In addition, when the conditions for standard civil aiding and abetting are met, there can be no serious constitutional question about imposing liability; neither the First Amendment nor any other part of the Constitution guarantees a right to fund a foreign terrorist organization, especially when it is a natural consequence that the money donated will be used to commit terrorist acts such as murder.

1. The text of Section 2333(a) supports the view that, at bottom, the Boims' suit should be analyzed primarily as a standard tort case. The statutory language provides that "[a]ny national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefore" 18 U.S.C. § 2333(a). This text contains all of *10 the elements of a traditional tort: breach of a legal duty (i.e., commission of an act of "international terrorism"); personal or economic injury; and an appropriate causal connection between the breach and the injury.

Section 2333(a) precisely specifies the range of possible plaintiffs, but simply does not address - and thus in no way restricts - the range of possible defendants. Any such restrictions therefore must arise, if at all, from background tort principles that Congress presumably intended to incorporate. See, Molzof v. United States, 502 U.S. 301, 305-07 (1992) (meaning of statutory language determined by background common law principles against which Congress legislates).

As explained below, far from limiting the range of defendants who may be sued, the relevant background principles here plainly extend tort liability not only to defendants who actually commit a tort, but also those who aid and abet in its commission. See, e.g., Restatement (Second) of Torts, §876(b)(1979)(describing tort liability for concerted action); Damato v. Hermanson, 153 F.3d 464,472 n.10(7th Cir. 1988)(applying civil tort aiding/abetting liability); Halberstam v. Welch, 705 F.2d 472, 477-88 (D.C. Cir. 1983) (same).

Construed against the relevant tort-law backdrop, the text of Section 2333(a) thus strongly suggests that Congress intended to preserve - not abrogate - settled *11 principles of civil liability for aiding and abetting. This conclusion is confirmed by the development of Section 2333(a), to which we now direct the Court's attention.

2. The history of Section 2333(a) is unusual. This provision was originally enacted by Congress in 1990, as the Antiterrorism Act of 1990, which was appended to a bill dealing with military spending and construction. See Pub. Law No. 101-519; 104 Stat. 2250 (1990). It was repealed in 1991, after this statute had been in existence for about five months, because the Conference Committee on the 1990 legislation had intended to delete the provision before passage, but had not done so because of a clerical error; Congress had therefore passed Section 2333(a) in 1990, by apparent mistake. See S. Rep. No. 102-342, at 22(1992); 137 Cong. Rec. 8143(1991)(Sen. Grassley).

Section 2333(a) was shortly thereafter reintroduced as part of the Antiterrorism Act of 1992, which was part of larger legislation reforming the federal courts. It was enacted then in identical form to its prior version. See Pub. Law No. 102-572, 106 Stat. 4506(1992). At both times, Senator Grassley was a principal sponsor of Section 2333(a). Given this process, the history of both the 1990 and 1992 legislation is relevant here.

Representatives of the Departments of State and Justice testified in favor of Section 2333(a) in 1990. (Both agencies sought changes to the original bill, in order *12 to protect ongoing criminal cases and investigations from interference by civil litigation, and to make clear that foreign states could not be sued under this provision; each of these safeguards was accomplished. See 18 U.S.C. §§ 2336 and 2337.)

The testimony of then-Deputy Legal Adviser Alan Kreczko reveals that the State Department agreed with Senator Grassley's goal of expanding the then-recent decision

in Klinghoffer v. Palestine Liberation Organization, 739 F. Supp. 854 (S.D.N.Y. 1990).
See Antiterrorism Act of 1990, Hearing before the Subcommittee on Courts and
Administrative Practice, Senate Committee on the Judiciary, 101 st Cong. 2d Sess., at
1, 12, 17(1990).
In Klinghoffer, the family of a U.S. citizen murdered during a terrorist attack on a
cruise ship in the Mediterranean Sea sued various entities in tort under state law,
general maritime law, and the Death on the High Seas Act, and the defendants filed
third party complaints to bring the PLO into the case. The district court found that the
Klinghoffer family claims against the PLO were cognizable in federal court under federal
admiralty jurisdiction and the Death on the High Seas Act (46 U.S.C. § 761) because
the tort there - the murder of Klinghoffer - occurred in navigable waters. See 739 F.
Supp. at 858-59. [FN5]

> FN5. Liability under the Death on the High Seas Act is defined by federal
> case law developed under the statute. See Offshore Logistics, Inc. v.
> Tallentire, 477 U.S. 207 (1986).


**\*13** Building on the Klinghoffer litigation, Congress and the State Department wanted
through Section 2333(a) to ensure that torts from terrorist activity would be actionable
even if they occurred on land in a foreign country: "This bill \* \* \* expands the
Klinghoffer opinion. Whereas that opinion rested on the special nature of our admiralty
laws, this bill will provide general jurisdiction to our Federal courts and a cause of
action for cases in which an American has been injured by an act of terrorism
overseas. The bill is a welcome addition to our arsenal against terrorists." Hearing, at
12 (Kreczko testimony).
A former high-level Department of Justice attorney and General Counsel of the United
States Information Agency, Joseph A. Morris, also testified at the 1990 hearings in
favor of Section 2333(a). Morris too favored ensuring that Klinghoffer would apply to
land-based terrorism. Most importantly for the Court's purposes today, Morris
explained that "American victims seeking compensation for physical, psychological, and
economic injuries naturally turn to the common law of tort. American tort law in
general would speak quite effectively to the facts and circumstances of most terrorist
actions not involving acts of state by foreign governments." Hearing, at 83.
**\*14** Professor Wendy Perdue also testified at the hearings and noted that a meaningful
remedy for victims must include authorizing suits not just against those committing
terrorist acts, who are unlikely to have assets in the United States, but also against
"the organizations, businesses and nations who support, encourage and supply
terrorists who are likely to have reachable assets." Hearing, at 126. Professor Perdue
cautioned that the language of Section 233 3(a) was not clear as to whether it allowed
recovery against such groups. Ibid.
Senator Grassley raised this point with Morris, who responded that the bill as drafted
will indeed "bring all of the substantive law of the American tort law system" into play.
Id. at 136. Morris went on to note that in criminal law there is a doctrine of vicarious
liability, and "[t]he tort law system has similar rules where liability attaches to those
who knowingly or negligently make it possible for some actor grievously to injure
somebody else. As Section 2333(a) of this bill is drafted, it brings all of that tort law
potential into any of these civil suits." Ibid.
When Senator Grassley introduced the Antiterrorism Act of 1990 on the Senate floor,
he emphasized that the bill was warranted because "[u]nfortunately, victims who turn
to the common law of tort or Federal statutes, find it virtually impossible to pursue
their claims because of reluctant courts and numerous jurisdictional hurdles." 136
Cong. Rec. 7592 (1990). He also noted that "[t]his legislation will serve as an **\*15**
appropriate civil counterpart to the criminal statute." Ibid. Accord id. at 7594 (Sen.

Heflin).

Senator Grassley was referring to the existence of then-Section 2331 of Title 18, which at that time provided criminal liability for terrorist acts against a U.S. national while outside the United States. See 18 U.S.C. (1988 ed.) § 2331 (now codified at 18 U.S.C. § 2332). That criminal statute specifically provided for punishment for those who were part of a terrorist conspiracy; i.e., concerted activity.

After the repeal of Section 2333(a) mentioned above, Senator Grassley reintroduced the provision in 1991, and explained that his bill "removes the jurisdictional hurdles in the courts confronting victims and it empowers victims with all the weapons available in civil litigation * * *. The [Antiterrorism Act] accords victims of terrorism the remedies of American tort law * * *" 137 Cong. Rec. 8143 (1991).

The Senate report on Section 2333(a) explained the events surrounding the provision's earlier passage and repeal. Significantly, the report emphasized that, by imposing "liability at any point along the causal chain of terrorism, it would interrupt, or at least imperil, the flow of money." S. Rep. 102- 342, at 22. The Senate report also explained that the substance of actions under Section 2333 (a) "is not defined by the statute, because the fact patterns giving rise to such suits will be as varied and *16 numerous as those found in the law of torts. * * * This section extends the same jurisdictional structure that undergirds the reach of American criminal law to the civil remedies that it defines." Id. at 45.

In sum, the development of Section 2333(a) makes it clear that Congress acted to give terrorism victims a sure civil cause of action that would incorporate the law of torts in general, and the tort principles of aiding/abetting liability in particular. Accordingly, Section 2333(a) must be construed by reference to those principles.

3. Given Congress' goal, the district court here erred to the extent it looked to 18 U.S.C. §§ 2339A and 2339B - criminal provisions passed several years after Section 2333(a) - in determining the scope of Section 2333(a), and in apparently restricting aiding/abetting liability to the criminal version of that doctrine. [FN6] Instead, under Section 2333(a), U.S. victims of "international terrorism" (as defined in Section 2331(1)) can sue not only those who actually commit the acts of terrorism, but also *17 persons or entities who would be liable for those acts under civil tort principles of aiding/abetting.

> FN6. We note that the district court seems to have inadvertently
> misconstrued both of these criminal provisions as covering only support
> that is "material," in the sense of substantial or considerable. See 127
> F. Supp.2d at 1016, 1019-20. This is a misunderstanding of those
> provisions. The term "material support or resources" is a term of art
> defined in Section 2339A(b), and relates to the type of assistance
> provided (i.e., funds, virtually all goods, and some services), rather
> than whether it is substantial or considerable. Indeed, the goal of
> Section 2339B would be severely undermined if Foreign Terrorist
> Organizations designated by the Secretary of State were allowed to
> raise money in the United States through small amounts from each
> donor.

This Court and its sister Circuits have recognized the important distinction between criminal and civil aiding/abetting liability. As Judge Learned Hand explained, the intent standard in the civil tort aiding/abetting context is that the wrongful conduct be the natural consequence of the defendant's original act, while criminal intent to aid and abet requires that the defendant have a "purposive attitude" toward the commission of the offense. See Damato, 153 F.3d at 472 n. 10 (endorsing definition of aiding/abetting liability set out by Judge Hand in United States v. Peoni, 100 F.2d 401,

402 (2d Cir. 1938)); Rice v. Paladin Enterprises, Inc., 128 F.3d 233, 251 (4th Cir. 1997)(same), cert. denied, 523 U.S. 1074(1998). Accordingly, the civil doctrine of aiding and abetting is significantly broader than its criminal counterpart. See Equal Employment Opportunity Commission v. Illinois, 69 F.3d 167, 170 (7th Cir. 1995) (noting that criminal aiding and abetting "requires even more" than the "substantial and knowing assistance" necessary for civil aiding/abetting liability). See also Eastern Trading Co. v. Refco, Inc., 229 F.3d 617, 622-24 (7th Cir. 2000).

Because Section 2333(a) imposes civil liability and because Congress plainly intended to incorporate civil tort law principles, that is what Section 2333(a) embodies. Thus, to determine liability under this section, a court must look to civil aiding/abetting **\*18** jurisprudence, which is summarized in the seminal D.C. Circuit opinion in Halberstam v. Welch, 705 F.2d 472 (D.C. Cir. 1983). See Central Bank of Denver v. First Interstate Bank of Denver, 511 U.S. 164, 181 (1994)(describing Halberstam as "a comprehensive opinion on the subject"). Accord In re Temporomandibular Joint (TMJ) Implants Products Liability Litigation, 113 F.3d 1484,1495-96(8th Cir. 1997) (relying on Halberstam discussion of civil aiding/abetting liability); Fassett v. Delta Kappa Epsilon (New York), 807 F.2d 1150, 1162- 64 (3d Cir. 1986) (same), cert. denied, 481 U.S. 1070 (1987).

This application of Section 2333(a) accomplishes Congress' purpose. As the plaintiffs/appellees have pointed out, defendants' contrary restrictive reading of the statute would mean that Congress created a largely hollow remedy if it merely allows suits against terrorists who pull the trigger or plant the bomb. Obviously, such persons will rarely have more than minimal assets to attach, and will likely not be dissuaded in advance by the threat of a later civil suit. By contrast, organizations that fund terrorist entities are much more likely to have assets they wish to protect, and will thus be far more concerned about later legal actions holding them liable for terrorist acts. Liability under Section 2333(a) should be imposed "at any point along the causal chain of terrorism, [because] it would interrupt, or at least imperil, the flow of money." S. Rep. 102-342, at 22. Consequently, the statutory reading we urge better **\*19** advances Congress' goal of providing compensation for, and deterrence against, acts of international terrorism.

While Section 2333(a) is defined by civil tort principles, the subsequent enactments of Sections 2339A and 2339B reinforce the conclusion that Section 2333(a) cannot plausibly be limited to those who personally commit acts of "international terrorism." Section 2339A makes it unlawful to provide "material support or resources" to any person "knowing or intending that they are to be used" in preparing or carrying out certain specified terrorism-related crimes. Section 2339B makes it unlawful to "knowingly provide] material support or resources," for any reason, to an entity designated as a "foreign terrorist organization."

These provisions demonstrate that Congress intended to impose even criminal liability not only on those who personally commit acts of terrorism, but also on those who significantly assist such acts. There is no textual or structural justification for construing the civil-liability provision in Section 2333 (a) to sweep far more narrowly in this regard than its criminal counterparts, and it would be strange to impute such an unusual intent to Congress.

4. In their appellate briefs, the defendants/appellants have fought the possible imposition of aiding/abetting liability under Section 2333(a), arguing that, in light of the Supreme Court's decision in Central Bank of Denver v. First Interstate Bank, 511 **\*20** U.S. 164,175-191(1994), they cannot be held liable for aiding and abetting under this section without an express statement from Congress on this point. In Central Bank of Denver, the Supreme Court refused to imply a private right of action for aiding/abetting liability for violations of Section 10(b) of the Securities Act of 1934. That decision is inapposite here.

In Central Bank of Denver, the Supreme Court focused on the lack of a statutory private right of action under Section 10(b), and the fact that the Court has nevertheless implied such causes of action. Under such circumstances, the Court held

that liability must be limited to instances in which the statutory text of Section 10(b) proscribes private conduct. See 511 U.S. at 175-78. The Court also looked to surrounding provisions in the securities laws, noting that their express rights of action specify a range of liable defendants not including aiders and abettors (see id. at 178-81), and that, in other securities provisions, Congress "chose to impose some forms of secondary liability, but not others." See id. at 184.

Nevertheless, citing the Restatement (Second) of Torts, § 876(b)(1979), the Central Bank of Denver Court recognized that "[t]o be sure, aiding and abetting a wrongdoer ought to be actionable in certain instances." 511 U.S. at 177. Moreover, the Court ultimately concluded that the existence of a private right of action for aiding and abetting is a question of statutory intent. See id. at 182.

**\*21** None of the interpretive considerations addressed in Central Bank of Denver is relevant here. Section 2333(a) provides an express, not implied, right of action for U. S. victims of international terrorism. And, Section 2333(a) is not a statute regulating commercial transactions or imposing liability for violations of such a statute; it instead imposes liability for violent criminal acts that are malum in se.

Further, in contrast to the express rights of action under the securities laws, Section 2333(a) nowhere restricts the class of potentially liable defendants to those who actually commit the prohibited acts. In addition, Congress did not selectively choose to impose only some forms of secondary liability in related statutory provisions. Finally, the legislative history of Section 2333(a), detailed above, confirms that the cause of action under this provision is to be governed by standard tort principles, including specifically those of concerted action liability.

For all of these reasons, giving Section 2333(a) its intended breadth is in no way inconsistent with Central Bank of Denver, or with other Supreme Court cases dealing with the scope of private rights of action. See Alexander v. Sandoval, 121 S. Ct. 1511, 1519-21 (2001) (finding that provision allowing private enforcement of Title VI of the Civil Rights Act of 1964 does not provide a cause of action for private enforcement of agency regulations implementing that statute).

**\*22** Indeed, this case is considerably closer to the Supreme Court's decision in Harris Trust and Savings Bank v. Salomon Smith Barney Inc., 530 U.S. 238 (2000). There, the Court interpreted ERISA to reach more than the immediate wrongdoer, and allowed an action for restitution against a third party who would have been liable under the common law of trusts. Id. at 245-53. The Court found it significant that ERISA Section 502(a)(3) does not limit, or even mention, the class of potential defendants; the section instead focuses on redressing an act or practice that violates ERISA. 530 U.S. at 246. Similarly, here, the focus of Section 2333(a) is on the conduct that violates federal law (an act of international terrorism) and on providing appropriate redress.

Moreover, in Harris Trust, the Court found (530 U.S. at 247-49) its interpretation reinforced by ERISA Section 502(l), concerning imposition of civil penalties. Yet, Section 502(l) was enacted 15 years after Section 502(a)(3). In the case at bar, as noted above, even though later enacted, the terms of criminal liability in Sections 2339A and 2339B, can in the same way help give meaning to Section 2333(a) because these provisions make it unlawful to lend material assistance to terrorist organizations in certain circumstances.

5. Under the civil aiding/abetting principles described in Halberstam, the district court here correctly denied the motion to dismiss. Accord **\*23**Estates of Ungar v. The Palestinian Authority, 153 F. Supp.2d 76, 94, 97-98 (D.R.I. 2001)(rejecting motion to dismiss allegations that Palestinian Authority is liable under Section 2333(a) for providing various forms of support to Hamas).

In Halberstam, the D.C. Circuit canvassed general aiding and abetting law, including Section 876 of the Restatement (Second) of Torts, dealing with liability for persons acting in concert. That court noted that civil aiding/abetting liability depends upon: (1) a showing that the party whom the defendant aids must perform a wrongful act that causes an injury; (2) "the defendant must be generally aware of his role as part of an

overall illegal or tortious activity at the time that he provides assistance; and (3) the defendant must knowingly and substantially assist the principal violation." 705 F.2d at 477. Further, aiding/abetting "focuses on whether a defendant knowingly gave 'substantial assistance' to someone who performed wrongful conduct, not on whether the defendant agreed to join the wrongful conduct." Id. at 478.

The D.C. Circuit additionally made clear in Halberstam that the defendant does not have to participate in, or even know about, the specific bad act carried out that harms the victim. Rather, as Judge Hand had earlier noted, the central question turns on foreseeability and natural consequences. Id. at 483- 85. Thus, in Halberstam, the defendant(Hamilton) was civilly liable under an aiding/abetting theory for the death of Halberstam after he was killed by a burglar (Welch), who lived with Hamilton. **\*24** Hamilton had not participated in Halberstam's murder or indeed even in Welch's many burglaries; "Hamilton and Welch did not commit burglaries together but their activities were symbiotic," because Hamilton knew about Welch's illegal activities and assisted him in various ways (e.g., filing a tax return that hid burglary profits). Id. at 486- 87. As the D.C. Circuit concluded, "it was a natural and foreseeable consequence of the activity Hamilton helped Welch to undertake. It was not necessary that Hamilton knew specifically that Welch was committing burglaries. Rather, when she assisted him, it was enough that she knew he was involved in some type of personal property crime at night - whether as a fence, burglar, or armed robber made no difference - because violence and killing is a foreseeable risk in any of these enterprises." Id. at 488. Given these principles, which describe federal common law, denial of the motion to dismiss here was appropriate. Plaintiffs have alleged that the Quranic Institute and Holy Land Foundation knowingly provided funds to Hamas, which were used for terrorist purposes. The requirements for aiding/abetting liability appear to be met because we understand the complaint to say that the defendants/appellants were aware of the terrorist actions of Hamas, and had a "core mission of raising and funneling money and other resources to Hamas operatives in support of their terrorist **\*25** campaigns." Supp. App. 15. Moreover, they allegedly provided money to a pool used by Hamas to purchase the vehicle, machine gun, and ammunition used to kill David Boim. Supp. App. 22.

As Halberstam makes clear, there is no requirement that the Boims demonstrate that the Quranic Institute and Holy Land Foundation participated in David Boim's shooting, or even knew about it. Rather, plaintiffs must prove that these defendants helped Hamas (and, through it, Hinawi and Al-Sharif) in some knowing and substantial way, and that it was a natural consequence that the funds these entities were providing would lead to terrorist acts, such as David Boim's murder.

In sum, we do not believe it sufficient for liability under Section 2333(a) to show simply that defendants provided funds to a terrorist group, and that group later committed an act of international terrorism injuring a U.S. national. However, the provision of funds could be enough if the provider was "generally aware" of the principal's terrorist activity, and if the provision of funds "substantially assist[ed]" the terrorist act in question. See Halberstam, 705 F.2d at 477.

As in tort law in general, the results under Section 2333(a) will vary depending upon the specific facts in any individual case. Nevertheless, we agree with the district court here that adequate allegations have been raised in plaintiffs' complaint to defeat a motion to dismiss at this stage.

**\*26** 6. To the extent plaintiffs contend alternatively that, merely by giving money to Hamas, defendants/appellants themselves committed an act of "international terrorism" covered by Section 2331(1) and are therefore liable under Section 2333(a), we do not agree in the circumstances of this case.

Section 2331(1) may have a broad reach and cover instances in which an individual provides funds to a terrorist, such as when those funds, even if small, are a key part of a terrorist enterprise. But this Court need not decide today the precise boundaries of Section 2331(1) because, even if the contribution of funds to Hamas by the Quranic Institute and the Holy Land Foundation constituted an "act of international terrorism,"

and even if plaintiffs prove that Hamas orchestrated the murder of David Boim, it would not necessarily follow that plaintiffs could recover damages from them. A plaintiff in a Section 2333(a) suit must prove that he has been injured "by reason of an act of international terrorism." 18 U.S.C. § 2333(a).

Therefore, under the Boims' alternative theory of liability against defendants/appellants directly under Sections 2331(1) and 2333(a), they would have to prove that their son's murder occurred "by reason of" the defendants' contributions to Hamas. Hence, treating the provision of funds to Hamas by the defendants as an act of international terrorism in and of itself would not relieve the **\*27** plaintiffs of the necessity under Section 2333(a) to establish a causal link between the donations and David Boim's murder.

7. We also believe that the district court was clearly correct in holding that Section 2333(a), as construed in the way described in this brief, would in no way violate First Amendment rights. As the Ninth Circuit held in Humanitarian Law Project, there is no First Amendment right of association to provide material support to foreign terrorist organizations. 205 F.3d at 1133. Accordingly, the Quranic Institute and Holy Land Foundation have no valid claim that their rights would be harmed by the Boims' suit, since they have no constitutional right to provide money to Hamas in the first place. This point is no less correct even though the defendants/appellants provided funds to Hamas before it first became illegal to do so in 1995. [FN7] The fact remains that **\*28** there was plentiful information at that time that Hamas was engaging in terrorist activities, and the First Amendment does not protect the rights of U.S. persons or entities to send money overseas to groups carrying out terrorism. Moreover, it is difficult to see how a serious argument can be made that the Constitution is violated by a statute providing that, under standard tort principles, an individual or entity is civilly liable for aiding and abetting the commission of murder against a U.S. citizen.

> FN7. The tape of the oral argument in this case reveals that there was possibly some confusion about the different provisions prohibiting donation
>
> of funds to Hamas. The President first in Executive Order 12947 in 1995, made it illegal for U.S. persons to provide financial assistance to Hamas. 60 Fed. Reg. 5081 (1995). That Executive Order has been renewed several times. Separately, in 1997, under the Antiterrorism and Effective Death Penalty Act of 1996, the Secretary of State designated Hamas as a Foreign Terrorist Organization. See 62 Fed. Reg. 52649 (1997). It is thus illegal to provide any material support to Hamas under this statute also. See 18 U.S.C. § 2339B. That designation has been renewed periodically. See 66 Fed. Reg. 51088 (2001). In addition, pursuant to Executive Order 13224, in a further effort to combat terrorist financing after the events of September 11,2001, Hamas has been designated once again, and financial dealings with it by U.S. persons have been forbidden under that order as well. See 66 Fed. Reg. 49079 (2001).

The "specific intent to further illegal aims" standard advocated by the defendants/appellants and their amici would allow civil liability under Section 2333(a), or the related criminal provisions, only if the defendants specifically intended actual terrorist acts. If this theory were correct, defendants would have a constitutional right to donate funds to Usama bin Laden's al-Qaida group, so long as the funds were meant by the donor for "political" or "humanitarian" activities.

This reading of the First Amendment right of association is obviously wrong. As the

Ninth Circuit explained in Humanitarian Law Project in rejecting just such a claim there, "[m]aterial support given to a terrorist organization can be used to promote the organization's unlawful activities, regardless of donor intent." 205 F.3d at 1134. In so ruling, that court recognized: an express finding by Congress that any **\*29** contribution to a foreign terrorist organization facilitates its terrorist conduct; that terrorist organizations do not maintain open books; that even contributions earmarked for peaceful purposes can be used to make the decision to engage in terrorism more attractive; and that, "[m]ore fundamentally, money is fungible; giving support intended to aid an organization's peaceful activities frees up resources that can be used for terrorist acts." 205 F.3d at 1136.

Upholding the constitutionality of 18 U. S.C. § 233 9B, the Ninth Circuit ruled that "the federal government clearly has the power to enact laws restricting the dealings of United States citizens with foreign entities"; that the Government has a substantial and legitimate interest in preventing the spread of international terrorism; and that the Government's interest in preventing such terrorism is unrelated to suppressing freedom of expression. 205 F.3d at 1135. The Ninth Circuit's decision is clearly correct, and this Court should also deny defendants/appellants' rather startling claim of a supposed constitutional right to provide substantial and knowing assistance to Hamas as it carries out terrorist acts.

8. We finally wish to allay any overarching concerns the Court might have that allowing suits such as this one to proceed will interfere with federal law enforcement efforts against terrorists or entities that support them. As noted earlier, Congress reacted to the possible problems identified by the State and Justice Departments in **\*30** 1990, and enacted protections for the Executive Branch. See 18 U.S.C. §§ 2336 and 2337. Finally, this Court inquired at oral argument what would happen if the Government had taken steps to freeze defendants' assets that plaintiffs seek. As the federal courts have recognized, the courts lack power to enforce judgments against assets frozen by the President. See, e.g., Dames & Moore v. Regan, 453 U.S. 654 (1981); Itek Corp. v. First National Bank of Boston, 704 F2d 1,9-10 (1st Cir. 1983).

Thus, there is no conflict between the current suit and overarching Executive Branch concerns.

**\*31** CONCLUSION

For the foregoing reasons, the order by the district court denying defendants' motion to dismiss should be affirmed.
Boim v. Quranic Literacy Institute
2001 WL 34108081

# EXHBIT F

**UNITED STATES OF AMERICA**
**DEPARTMENT OF THE TREASURY**
**FINANCIAL CRIMES ENFORCEMENT NETWORK**

| | |
|---|---|
| IN THE MATTER OF: | ) |
| | ) |
| | ) |
| | ) Number 2005-2 |
| THE FEDERAL BRANCH OF | ) |
| ARAB BANK PLC | ) |
| NEW YORK, NEW YORK | ) |

## ASSESSMENT OF CIVIL MONEY PENALTY

### I. INTRODUCTION

The Secretary of the United States Department of the Treasury has delegated to the Director of the Financial Crimes Enforcement Network the authority to determine whether a financial institution has violated the Bank Secrecy Act and the regulations issued pursuant to that Act,[1] and what, if any, sanction is appropriate.

In order to resolve this matter, and only for that purpose, the Federal Branch of Arab Bank plc, New York, New York ("Arab Bank – New York") has entered into a CONSENT TO THE ASSESSMENT OF CIVIL MONEY PENALTY ("CONSENT") dated August 17, 2005, without admitting or denying the determinations by the Financial Crimes Enforcement Network, as described in Sections III and IV below, except as to jurisdiction in Section II below, which is admitted.

The CONSENT is incorporated into this ASSESSMENT OF CIVIL MONEY PENALTY ("ASSESSMENT") by this reference.

### II. JURISDICTION

Arab Bank is a public shareholding company and banking institution, with headquarters in Amman, the capital city of the Hashemite Kingdom of Jordan. Arab Bank has approximately 400 branches, offices, and subsidiaries – members of the Arab Bank Group – in thirty countries. The Arab Bank Group employs approximately 7,500 people and provides retail, private, corporate, correspondent, and other banking services to numerous businesses, organizations, institutions, and individuals in the Middle East and throughout the world. As of December 31, 2004, the Arab Bank Group had consolidated total assets of $27 billion. For the year ending December 31, 2004, the Arab Bank Group had consolidated net income of $319 million. The Arab Bank Group is a leading provider of financial services in the Middle East and North Africa.

---

[1] 31 U.S.C. §§ 5311 et seq. and 31 C.F.R. Part 103.

Arab Bank – New York is a branch of Arab Bank in the United States, and a member of the Arab Bank Group. Arab Bank – New York received a license from the Office of the Comptroller of the Currency in 1983. The Office of the Comptroller of the Currency examines Arab Bank – New York for compliance with the Bank Secrecy Act and its implementing regulations, and for compliance with similar rules under Title 12 of the United States Code.

At all relevant times, Arab Bank – New York was a "financial institution" and a "bank" within the meaning of the Bank Secrecy Act and the regulations issued pursuant to that Act.[2]

## III.   DETERMINATIONS

### A.   Summary

Arab Bank – New York is a member of the Arab Bank Group located in the United States.[3] Arab Bank – New York served as a clearing institution for funds transfers in United States dollars. The funds transfers occurred on a global basis.

Arab Bank – New York served as an intermediary institution. Arab Bank – New York performed the clearing function for members of the Arab Bank Group in foreign jurisdictions and domestic and foreign correspondent institutions independent of the Arab Bank Group. In addition, as a member of the Clearing House Interbank Payments System (CHIPS) and other settlement systems in the United States, Arab Bank – New York cleared funds transfers involving major commercial banks in the United States. None of the originators and beneficiaries in funds transfers that Arab Bank – New York cleared as an intermediary institution held accounts at Arab Bank – New York.

Arab Bank – New York cleared funds transfers from originators with accounts at members of the Arab Bank Group in foreign jurisdictions, to beneficiaries with accounts at the same or other members of the Arab Bank Group in foreign jurisdictions. Similarly, Arab Bank – New York cleared funds transfers for originators and beneficiaries with accounts at correspondent institutions.

Arab Bank – New York cleared funds transfers from originators with accounts at members of settlement systems in the United States, to beneficiaries with accounts at correspondent institutions or members of the Arab Bank Group in foreign jurisdictions. Arab Bank – New York also cleared funds transfers that flowed in the opposite direction – from originators with accounts at correspondent institutions or members of the Arab Bank Group in

---

[2]31 U.S.C. § 5312(a)(2) and 31 C.F.R. § 103.11.

[3]Branches and subsidiaries of Arab Bank in foreign jurisdictions held correspondent accounts at Arab Bank – New York. For purposes of the Bank Secrecy Act, a "correspondent account" includes "a formal banking or business relationship ... established to make payments or other disbursements on behalf of a foreign bank, or to handle other financial transactions related to the foreign bank." 31 C.F.R. § 103.175(d). Branches and subsidiaries of Arab Bank in foreign jurisdictions are "foreign banks" for purposes of the Bank Secrecy Act. *See* 31 C.F.R. § 103.11(o).

foreign jurisdictions, to beneficiaries with accounts at members of settlement systems in the United States.

On average, Arab Bank – New York processed 500,000 funds transfers per year. [4] The customer base and geographic locations of the Arab Bank Group and correspondent institutions, and the volume of funds transfers that Arab Bank – New York cleared, posed heightened risks of money laundering and terrorist financing. An investigation by the Financial Crimes Enforcement Network revealed that Arab Bank – New York failed to apply an adequate system of internal controls to the clearing of funds transfers.[5] The investigation also revealed that Arab Bank – New York failed to conduct adequate independent testing to allow for the timely identification and correction of Bank Secrecy Act compliance failures. These failures in internal controls and independent testing led, in turn, to a failure on the part of Arab Bank – New York to identify and report suspicious transactions in a timely manner. The failures of Arab Bank – New York to comply with the Bank Secrecy Act and the regulations issued pursuant to that Act were significant.

On February 8, 2005, the Office of the Comptroller of the Currency and Arab Bank – New York entered into a Consent Order. On February 24, 2005, the Office of the Comptroller of the Currency and Arab Bank – New York amended the Consent Order. The Office of the Comptroller of the Currency determined that Arab Bank - New York violated 12 C.F.R. §§ 21.11 and 21.21. Arab Bank – New York entered into the original and amended Consent Order without admitting or denying the determinations by the Office of the Comptroller of the Currency. The original and amended Consent Order imposed restrictions on the processing of funds transfers, and the amended Consent Order required the development and implementation of a plan for conversion from a federal branch to a federal agency.[6]

### B. Violations of the Requirement to Implement an Anti-Money Laundering Program

The Financial Crimes Enforcement Network has determined that Arab Bank – New York violated the anti-money laundering program requirements of the Bank Secrecy Act and the regulations issued pursuant to that Act.[7] A federal branch of a foreign bank must implement an anti-money laundering program that conforms with rules of the Office of the Comptroller of the Currency. Since 1987, the Office of the Comptroller of the Currency has required a program "reasonably designed to assure and monitor compliance" with reporting and record keeping requirements under the Bank Secrecy Act.[8] Reporting requirements under the Bank Secrecy Act

---

[4]Arab Bank – New York did process funds transfers for originators or beneficiaries with accounts at Arab Bank – New York. Arab Bank – New York served as the originating or beneficiary institution – and not the clearing institution and an intermediary institution – in these funds transfers.

[5]The Financial Crimes Enforcement Network based the investigation, in part, on a separate investigation by the Office of the Comptroller of the Currency.

[6]The Consent and this Assessment remain binding on Arab Bank – New York upon its conversion to a federal agency, and all references to Arab Bank – New York encompass that entity in its subsequent capacity as a federal agency.

[7]31 U.S.C. § 5318(h)(1) and 31 C.F.R. § 103.120. These requirements became effective on April 24, 2002.

-4-

include the requirement to report suspicious transactions. An anti-money laundering program must contain the following elements: (1) a system of internal controls; (2) independent testing for compliance; (3) the designation of an individual, or individuals, to coordinate and monitor day-to-day compliance; and (4) training of appropriate personnel. [9]

        1. Internal Controls

Arab Bank – New York failed to implement an adequate system of internal controls to comply with the Bank Secrecy Act and manage the risks of money laundering and terrorist financing involving funds transfers for originators and beneficiaries without accounts at Arab Bank – New York. Arab Bank – New York served as a clearing institution for a substantial volume of funds transfers in United States dollars. The Arab Bank Group and a number of correspondent institutions operated in jurisdictions that posed heightened risks of money laundering and terrorist financing.

Nevertheless, Arab Bank – New York established inappropriate limitations on the scope of systems and controls to comply with the Bank Secrecy Act and manage the risks of money laundering and terrorist financing. Arab Bank – New York focused on direct customers of Arab Bank – New York, as opposed to originators and beneficiaries without accounts at Arab Bank – New York. Arab Bank – New York extended transaction monitoring and review to only those individuals and entities that Arab Bank – New York viewed as direct customers of Arab Bank – New York. The Bank Secrecy Act requires a program reasonably designed to ensure compliance with, among other things, the requirement to report suspicious transactions. The requirement to report suspicious transactions applies to transactions "conducted or attempted by, at, or through" Arab Bank – New York, regardless of whether the transactions involve direct customers of Arab Bank – New York.

These limitations resulted in certain failures of internal controls at Arab Bank – New York. First, Arab Bank – New York failed to monitor, for potentially suspicious activity by originators and beneficiaries without accounts at Arab Bank – New York, funds transfers that Arab Bank – New York cleared as an intermediary institution. In fact, records of Arab Bank – New York indicate that no monitoring of these funds transfers occurred before June 2002. Afterwards, Arab Bank – New York conducted manual reviews of spreadsheets containing information on these funds transfers. However, given the volume of activity, manual review did not – and could not – adequately detect suspicious transactions.

Effective monitoring of these funds transfers required automation. In 2000, Arab Bank – New York decided to develop an automated monitoring system. To use the system effectively, Arab Bank – New York needed to implement procedures enabling the system to capture funds transfers that displayed indicia of suspicious activity by originators and beneficiaries in funds transfers Arab Bank – New York cleared, including procedures for incorporating – to the extent appropriate and practical – existing identifying and other information on the originators and beneficiaries. Arab Bank – New York failed to implement these procedures. The automated

---

[8]12 C.F.R. § 21.21(b).

[9] 12 C.F.R. § 21.21(c).

monitoring system proved inadequate, in light of the heightened risks associated with funds transfers flowing through Arab Bank – New York.

In addition, Arab Bank – New York failed to implement procedures for obtaining relevant information, from fellow members of the Arab Bank Group or correspondent institutions, on the potentially suspicious nature of funds transfers cleared by Arab Bank – New York. Law enforcement or regulatory authorities had frozen or monitored accounts at members of the Arab Bank Group. An adequate system of internal controls should have included procedures for obtaining this information on a regular and timely basis, to the extent Arab Bank-New York cleared funds transfers involving these accounts, and to the extent obtaining the information proved appropriate and practical.

For example, during the period from 2000 through 2004, management of an Arab Bank affiliate in the Palestinian Territories received, from regulatory authorities in the Palestinian Territories, orders that focused explicitly on funds transfers to a number of beneficiaries with accounts at members of the Arab Bank Group in the Palestinian Territories. In addition, regulatory authorities in the Palestinian Territories issued circulars containing the names of suspected criminals and ordered institutions holding accounts of the suspected criminals to either freeze the accounts or place the accounts on a watch list. Despite the heightened risk of illicit activity, Arab Bank – New York failed to implement procedures for obtaining this type of information from other members of the Arab Bank Group, to mitigate the risk and ensure compliance with the Bank Secrecy Act.

Moreover, Arab Bank – New York failed to implement procedures, commensurate with the risks posed by its U.S. dollar clearing activities, for obtaining and utilizing publicly available information, to monitor and identify funds transfers that warranted further investigation, or to conduct follow-up investigations if Arab Bank – New York had identified anomalies or potentially suspicious funds transfers. Names similar to those of originators and beneficiaries in funds transfers cleared by Arab Bank – New York appeared in credible sources of publicly available information. The sources included Congressional testimony, indictments in the United States, and well-publicized research and media reports. Due to the heightened risks of money laundering and terrorist financing, Arab Bank – New York should have developed procedures for utilizing – to the extent appropriate and practical – publicly available information concerning beneficiaries and originators, on a risk-assessed basis.

Finally, in a few instances, manual review of records did lead to the detection of anomalies. On those occasions where Arab Bank – New York requested information from other members of the Arab Bank Group, Arab Bank – New York often accepted generic replies, indicating merely that the members knew their customers – replies that did not provide an adequate basis for determining whether the funds transfers had a business or lawful purpose.[10]

___

[10]*See* 31 U.S.C. §5318(g) and 31 C.F.R. §103.18(a)(2)(iii). Under these sections of law and regulation, once Arab Bank – New York determines that a funds transfer "has no business or apparent lawful purpose or is not the sort in which the particular customer would normally be expected to engage," the funds transfer would qualify as "suspicious" if Arab Bank – New York knows of no reasonable explanation for the funds transfer after examining the available facts, including background and possible purpose of the funds transfer.

## 2. Independent Testing

Arab Bank – New York failed to implement adequate procedures for independent testing. The internal audit function at Arab Bank – New York failed to conduct testing sufficient to assess the adequacy of the anti-money laundering program at Arab Bank – New York. Internal audit failed to follow-up on, or convey in a timely manner, conclusions concerning the adequacy of Bank Secrecy Act compliance at Arab Bank – New York. In fact, audit reports contained inaccurate assessments of the extent to which Arab Bank – New York was implementing an automated monitoring system for funds transfers that Arab Bank – New York cleared as an intermediary institution.

## C. Violations of the Requirement to Report Suspicious Transactions

The Financial Crimes Enforcement Network has determined that Arab Bank – New York violated the suspicious transaction reporting requirements of the Bank Secrecy Act and regulations issued pursuant to that Act.[11] These reporting requirements impose an obligation on financial institutions to report transactions that the institution "knows, suspects, or has reason to suspect" are suspicious. The financial institution must report the transactions if the transactions involve or aggregate to at least \$5,000, and the transactions are "conducted or attempted by, at, or through" the financial institution. A transaction is "suspicious" if the transaction: (1) involves funds derived from illegal activities, or is conducted to disguise funds derived from illegal activities; (2) is designed to evade the reporting or record keeping requirements of the Bank Secrecy Act or regulations under the Bank Secrecy Act; or (3) has no business or apparent lawful purpose or is not the sort in which the customer would normally be expected to engage, and the financial institution knows of no reasonable explanation for the transaction after examining the available facts, including background and possible purpose of the transaction.[12]

Financial institutions must report suspicious transactions by filing suspicious activity reports.[13] In general, financial institutions must file a suspicious activity report no later than thirty (30) calendar days after detecting facts that may constitute a basis for filing a suspicious activity report. If no suspect was identified on the date of detection, a financial institution may delay the filing for an additional thirty (30) calendar days, to identify a suspect. However, in no event may the financial institution file a suspicious activity report more than sixty (60) calendar days after the date of detection.[14]

Arab Bank – New York failed to file a number of suspicious activity reports in a timely manner. As stated, Arab Bank – New York served as a clearing institution for a substantial volume of funds transfers in United States dollars. Arab Bank – New York cleared funds transfers for originators or beneficiaries with accounts in jurisdictions that posed heightened risks

---

[11]31 U.S.C. § 5318(g) and 31 C.F.R. § 103.18.

[12]31 C.F.R. § 103.18(a)(2)(i) through (iii).

[13]31 C.F.R. § 103.18(b)(2).

[14]31 C.F.R. § 103.18(b)(3).

of money laundering and terrorist financing. All of these funds transfers represented transactions "conducted or attempted by, at, or through" Arab Bank – New York.

Arab Bank – New York failed to identify a number of potentially suspicious funds transfers. Had Arab Bank – New York implemented an adequate, risk-commensurate anti-money laundering program, identified certain funds transfers for further investigation, and performed an appropriate investigation, Arab Bank – New York would have found that names similar to those of originators and beneficiaries in funds transfers cleared by Arab Bank – New York appeared in credible and publicly available sources of information, including Congressional testimony, indictments in the United States, and well-publicized research and media reports, linking the originators and beneficiaries to illicit activity. Some originators or beneficiaries appeared in subpoenas or other legal process that Arab Bank – New York received from law enforcement in the United States.[15] Systems and controls for ensuring compliance with the requirement to report suspicious transactions should have included procedures for obtaining this information, to the extent appropriate and practical.

For example, during the period from 2001 through 2004, Arab Bank – New York cleared funds transfers for originators or beneficiaries that the Office of Foreign Assets Control or the Department of State later designated as "specially designated terrorists," "specially designated global terrorists," or "foreign terrorist organizations." At the time of the funds transfers, neither the Office of Foreign Assets Control nor the Department of State had designated the originators or beneficiaries. Arab Bank – New York largely complied with the requirement to cease clearing funds transfers once the Office of Foreign Assets Control designated an entity as a "specially designated terrorist," "specially designated global terrorist," or "foreign terrorist organization."

However, designations of individuals and entities as terrorists by the United States Government provide critical information for financial institutions to use in assessing terrorist financing risk. Once a designation occurred, Arab Bank – New York failed to review recent activity, occurring prior to the designation and associated with the designated entities, to identify potentially suspicious activity. Had such a review been conducted, it would have uncovered originators and beneficiaries – with possible ties to the designated entities – that had recently engaged in potentially suspicious activity. Arab Bank – New York failed to review information in its possession that would have shown it was clearing funds transfers for individuals and entities dealing with subsequently designated terrorists and terrorist organizations, failed to analyze this information, and failed to file suspicious activity reports.

Arab Bank – New York did not file the majority of its suspicious activity reports referencing terrorist financing until after the Office of Comptroller of the Currency commenced a review of its funds transfer activity in July 2004. An adequate anti-money laundering program would have allowed Arab Bank – New York to file suspicious activity reports in a timely manner.

___

[15]While a subpoena from law enforcement does not represent, in and of itself, cause for filing a suspicious activity report, the subpoena is an important piece of information that places a financial institution on notice of the need to conduct a further review of accounts or activity involving the subject of the subpoena to identify potentially suspicious activity. Arab Bank – New York failed to conduct such reviews.

## IV.   CIVIL MONEY PENALTY

Under the authority of the Bank Secrecy Act and the regulations issued pursuant to that Act,[16] the Financial Crimes Enforcement Network has determined that a civil money penalty is due for the violations of the Bank Secrecy Act and the regulations issued pursuant to that Act described in this Assessment.

Based on the seriousness of the violations at issue in this matter, and the financial resources available to Arab Bank – New York, the Financial Crimes Enforcement Network has determined that the appropriate penalty in this matter is $24,000,000.00.

## V.   CONSENT TO ASSESSMENT

To resolve this matter, and only for that purpose, Arab Bank – New York, without admitting or denying either the facts or determinations described in Sections III and IV above, except as to jurisdiction in Section II, which is admitted, consents to the assessment of a civil money penalty against it in the sum of $24,000,000.00.  The assessment shall be concurrent with the assessment of a civil money penalty, in the amount of $24,000,000.00, by the Office of the Comptroller of the Currency, and shall be satisfied by one payment of $24,000,000.00 to the Department of the Treasury.

Arab Bank – New York agrees to pay the amount of $24,000,000.00 within five (5) business days of this ASSESSMENT.  Such payment shall be:

a.    Made by certified check, bank cashier's check, bank money order, or wire;

b.    Made payable to the United States Department of the Treasury;

c.    Hand-delivered or sent by overnight mail to the Financial Crimes Enforcement Network, Attention: Associate Director, Administration & Communications Division, 2070 Chain Bridge Road, Suite 200, Vienna, Virginia 22182; and

d.    Submitted under a cover letter, which references the caption and file number in this matter.

Arab Bank – New York recognizes and states that it enters into the CONSENT freely and voluntarily and that no offers, promises, or inducements of any nature whatsoever have been made by the Financial Crimes Enforcement Network or any employee, agent, or representative of the Financial Crimes Enforcement Network to induce Arab Bank – New York to enter into the CONSENT, except for those specified in the CONSENT.

Arab Bank – New York understands and agrees that the CONSENT embodies the entire agreement between Arab Bank – New York and the Financial Crimes Enforcement Network relating to this enforcement matter only, as described in Section III above. Arab Bank – New York further understands and agrees that there are no express or implied promises,

---

[16]31 U.S.C. § 5321 and 31 C.F.R. § 103.57.

-9-

representations, or agreements between Arab Bank – New York and the Financial Crimes
Enforcement Network other than those expressly set forth or referred to in the CONSENT and
that nothing in the CONSENT or in this ASSESSMENT is binding on any other agency of
government, whether federal, state, or local.

VI.   RELEASE

    Arab Bank – New York understands that execution of the CONSENT, and compliance
with the terms of this ASSESSMENT and the CONSENT, constitute a complete settlement of
civil liability for the violations of the Bank Secrecy Act and regulations issued pursuant to that
Act described in the CONSENT and this ASSESSMENT.

By:   _____

      William J. Fox, Director
      Financial Crimes Enforcement Network
      United States Department of the Treasury

Date:   **19 - AUG - 2005**