UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------- X
                                       :

TZVI WEISS, *et al.*,                   :

                           :

                    Plaintiffs,      :

                           :

              - against -         :     CV 05-4622 (CPS) (KAM)

                           :

NATIONAL WESTMINSTER BANK PLC,   :

                           :

                 Defendant.     :

                           :

                           :
-------------------------------------------------------- X

## REPLY MEMORANDUM OF LAW IN SUPPORT OF
## <u>DEFENDANT'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT</u>

CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
(212) 225-2000

Attorneys for Defendant
National Westminster Bank Plc

Of Counsel:

Jonathan I. Blackman
Lawrence B. Friedman
Sanjay S. Mody
Isabelle A. Young

# **TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ................................................................................... iii

PRELIMINARY STATEMENT ............................................................................. 1

ARGUMENT ......................................................................................................... 4

POINT I

PLAINTIFFS ENTIRELY MISCONSTRUE THE PROXIMATE
CAUSE REQUIREMENT FOR CLAIMS ARISING UNDER
SECTION 2333(a), AND FAIL TO PLEAD FACTS SUFFICIENT
TO SATISFY THAT REQUIREMENT............................................................. 4

A.   Plaintiffs' Assertion That Proximate Cause Can Be Presumed
For Section 2333(a) Claims Based On Violations Of Sections
2339B And 2339C Is Meritless ................................................................ 4

B.   Plaintiffs Fail To Apply The Correct Proximate Cause
Standard To Their Aiding And Abetting Claim ........................................ 7

POINT II

PLAINTIFFS FAIL TO ALLEGE THE REQUISITE *MENS REA*
ON THE PART OF NATWEST.......................................................................... 9

A.   Plaintiffs Willfully Distort The U.K. Charity Commission's
1996 Report And Related Documents ........................................................ 10

B.   Plaintiffs Improperly Contend That NatWest Had An Obligation
To Monitor The Israeli Government Designations Of Interpal ................. 11

C.   Plaintiffs Deliberately Ignore The Significance Of The U.K.
Charity Commission's 2003 Findings ........................................................ 13

POINT III

PLAINTIFFS' AIDING AND ABETTING CLAIM IS NOT
AUTHORIZED AS A MATTER OF LAW AND, IN ANY EVENT,
THEIR ALLEGATIONS FAIL TO MEET THE RELEVANT
STANDARDS FOR AIDING AND ABETTING LIABILITY ......................... 15

A.   General Aiding And Abetting Liability Does Not Exist
As A Matter Of Law Under Section 2333(a)............................................. 15

Page

B.    Even Assuming General Secondary Liability Exists
      Under Section 2333(a), Plaintiffs Fail Sufficiently To
      Plead Aiding And Abetting Under 18 U.S.C. § 2 Or
      The Restatement (Second) Of Torts § 876(b)............................................................    21

CONCLUSION........................................................................................................................    24

  
# TABLE OF AUTHORITIES

Page(s)

## Rules and Statutes

18 U.S.C. § 2333(a) .......................................................................................   5

## Cases

Armstrong v. McAlpin,
699 F.2d 79 (2d Cir. 1983),
abrogation recognized on other grounds,
Rabin v. Fivzar Assocs., 801 F. Supp. 1045 (S.D.N.Y. 1992) ...........................................   23

Bloor v. Carro, Spanbock, Londin, Rodman & Fass,
754 F.2d 57 (2d Cir. 1985)...............................................................................................   8

Boim v. Quranic Literacy Inst. & Holy Land Found. for Relief & Dev.,
291 F.3d 1000 (7th Cir. 2002) .......................................................................   6, 9, 15

Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,
511 U.S. 164 (1994)...........................................................................................   15

Dinsmore v. Squadron, Ellenoff, Plesent, Sheinfeld & Sorkin,
135 F.3d 837 (2d Cir. 1998)...........................................................................   17

F. Hoffman-La Roche Ltd. v. Empagran S.A.,
542 U.S. 155 (2004)...........................................................................................   20

Halberstam v. Welch,
705 F.2d 472 (D.C. Cir. 1983) .......................................................................   8, 22

Harris Trust & Sav. Bank v. Salomon Smith Barney Inc.,
530 U.S. 238 (2000)...........................................................................................18-19, 21

Holmes v. Sec. Investor Prot. Corp.,
503 U.S. 258 (1992)...........................................................................................   5

In re Terrorist Attacks on Sept. 11, 2001,
349 F. Supp. 2d 765 (S.D.N.Y.),
on reconsideration in part, 392 F. Supp. 2d 539 (S.D.N.Y. 2005)....................................   4-5, 9

In re South African Apartheid Litig.,
346 F. Supp. 2d 538 (S.D.N.Y. 2004)...............................................................   17

Page(s)

IIT, An Int'l Inv. Trust v. Cornfeld,
619 F.2d 909 (2d Cir. 1980)................................................................................... 23

Kolbeck v. LIT Am., Inc.,
939 F. Supp. 240 (S.D.N.Y. 1996),
aff'd, 152 F.3d 918 (2d Cir. 1998)........................................................................... 23

Leonard F. v. Israel Discount Bank of N.Y.,
199 F.3d 99 (2d Cir. 1999)...................................................................................... 5

Linde v. Arab Bank, PLC,
384 F. Supp. 2d 571 (E.D.N.Y. 2005) ................................................................. 5, 16

Murphy v. United States,
653 F.2d 637 (D.C. Cir. 1981) ................................................................................ 8

United States v. Al-Arian,
308 F. Supp. 2d 1322 (M.D. Fla.),
modification denied by, 329 F. Supp. 2d 1294 (M.D. Fla. 2004)........................................ 9

United States v. Dauray,
215 F.3d 257 (2d Cir. 2000).................................................................................... 19

Wiwa v. Royal Dutch Petroleum Co. & Shell Transport & Trading Co. p.l.c.,
No. 96 Civ. 8386 (KMW), 2002 WL 319887 (S.D.N.Y. Feb. 28, 2002) ...........................16-17, 23

**Other Authorities**

Bank of England, Terrorist Financing: List of Suspects, Sept. 15, 2003,
http://www.bankofengland.co.uk/publications/news/2003/097.htm .................................. 14

Bank of England, Terrorist Financing: List of Suspects & Financial Sanctions:
Afghanistan (Taliban & Usama Bin Laden), Nov. 2, 2001,
http://www.bankofengland.co.uk/publications/news/2001/115.htm .................................. 14

Charity Commission, Operational Guidance: Charities and Terrorism,
http://www.charity-commission.gov.uk/supportingcharities/ogs/g096.asp
(last visited Feb. 16, 2006)...................................................................................... 14

Financial Action Task Force on Money Laundering,
Guidance for Financial Institutions in Detecting Terrorist Financing, Apr. 24, 2002,
Annex 2, http://www.fatf-gafi.org/dataoecd/32/49/34047407.pdf ...................................... 13

Page(s)

Home Office, Proscribed Terrorist Groups,
http://www.homeoffice.gov.uk/security/terrorism-and-the-law/
terrorism-act/proscribed-groups (last visited Feb. 16, 2006)................................................ 14

W. Page Keeton, et al., Prosser and Keeton on the Law of Torts § 41 (5th ed. 1984) ...... 5

Suppression of the Financing of Terrorism Convention Implementation
Act of 2002, Pub. L. No. 107-197, § 203, 116 Stat. 724, 727-28 (2002) ........................ 3

U.S. Department of State, Significant Terrorist Incidents, 1961-2003:
A Brief Chronology, http://www.state.gov/r/pa/ho/pubs/fs/5902.htm
(last visited Feb. 16, 2006) ........................................................................................... 18

Wolfsberg Statement on The Suppression of the Financing of Terrorism § 4,
http://www.wolfsberg-principles.com/financing-terrorism.html
(last visited Feb. 16, 2006)........................................................................................... 12-13

National Westminster Bank Plc ("NatWest") respectfully submits this reply memorandum of law in further support of its motion to dismiss plaintiffs' First Amended Complaint (the "amended complaint").[1]

## PRELIMINARY STATEMENT

Plaintiffs vainly seek to rehabilitate their ill-founded claims with a series of erroneous legal contentions, conclusory factual assertions and apparently purposeful manipulations of public documents. While none of plaintiffs' arguments has merit, the Court can largely avoid the thicket of those arguments by starting and ending its analysis with the dispositive defect of plaintiffs' failure to plead the required element of proximate cause under Section 2333(a). Accordingly, NatWest addresses this point first, and then turns to the other fatal flaws in plaintiffs' amended complaint.

Plaintiffs concede that all of their claims seeking civil remedies against NatWest arise under Section 2333(a) and that Section 2333(a) incorporates the basic principles of tort law. However, they try to avoid pleading the fundamental tort law requirement of a proximate causal link between an alleged tortfeasor's misconduct and the complained-of injury by arguing that, when Congress enacted Sections 2339B and 2339C of the Anti-Terrorism Act ("ATA"), it somehow silently deleted the proximate cause requirement that otherwise would apply to personal injury claims resulting from violation of these provisions. Unsurprisingly, plaintiffs cite no statutory language and no well-reasoned case authority for this contention, because none exists. Instead they argue, in effect, that requiring them to prove such a proximate causal link between NatWest's alleged misconduct and their injuries would be too difficult. But the

---

[1]   For the Court's convenience, all terms not defined in this reply brief shall have the same meaning as set forth in NatWest's opening brief dated January 26, 2006 ("Def. Br.").

customary remedy for a plaintiff's inability to satisfy his pleading burdens is not to make those burdens non-compulsory, but instead for the Court to dismiss the claim at issue.  Applying the Second Circuit's standard for pleading proximate cause, the Court should dismiss all of plaintiffs' claims on this ground alone.

Even if the Court were to allow plaintiffs to avoid pleading proximate cause, it should dismiss all of their claims for the independent reason that plaintiffs fail sufficiently to plead NatWest's *mens rea*.  Especially on this issue (but symptomatic of their entire amended complaint and opposition brief), plaintiffs repeatedly resort to the ruse of conflating Interpal with HAMAS in an attempt to sustain their contention that NatWest provided substantial assistance, material support and financing to HAMAS.  But plaintiffs' rhetoric cannot obscure the fact that, at its core, the amended complaint alleges no more than that NatWest held several accounts for Interpal, a charitable organization that was twice investigated by its home government and not once found to have provided funds to HAMAS, and plaintiffs have pleaded no facts to support their conclusory assertion that NatWest knew that Interpal was supporting HAMAS terrorism by any use of Interpal's accounts at NatWest or otherwise.[2]  To the contrary, the fact that the British government twice investigated Interpal and twice found the accusations against it to be unwarranted, and on that basis lifted freezes on Interpal's funds, at NatWest and elsewhere, contradicts any conclusion that NatWest knew Interpal was supporting HAMAS.

Plaintiffs cannot fill this gap by selectively citing, distorting or simply ignoring public documents, including the U.K. Charity Commission's 1996 Report, which showed

---

[2]   Plaintiffs also allege that NatWest maintained an account in the name of the Union of Good, which they do not allege was ever placed on any U.S. or U.K terrorist list.  Am. Compl. ¶ 315.  Plaintiffs now concede that the Union of Good account is not relevant for purposes of their claims.  Plaintiffs' Opposition Brief, dated February 9, 2006 ("Pl. Br.") at 15 n. 8 ("Plaintiffs do not allege that providing financial services to the Union of Good constitutes material support to a designated FTO.").

affirmatively that Interpal did <u>not</u> make financial contributions to HAMAS, and the Charity Commission's 2003 findings that Interpal was <u>not</u> making financial contributions to HAMAS. Nor can they rely on Israeli government designations of Interpal as a terrorist group:  among other things, plaintiffs do not allege that NatWest knew of these Israeli government designations, or had any reason to modify its conduct as a result of them.  To the contrary, the authorities that have jurisdiction over NatWest in the United Kingdom are not alleged to have included the Israeli government designations on their own terrorist watch lists.  Looking past plaintiffs' tortured interpretations and distortions, they fail to allege sufficient facts to plead *mens rea* in the Second Circuit, and all of their claims should be dismissed for this reason too.

Finally, plaintiffs cannot dispute that Section 2333(a) does not authorize their general aiding and abetting claims, and none of their arguments for evading application of the <u>Central Bank</u> rule of statutory construction has merit.  And, even if the Court broadens the scope of liability under Section 2333(a) to reach aiders and abettors, plaintiffs' claim still fails because their allegations fail to satisfy the Second Circuit's well-settled criminal or civil standards for pleading aiding and abetting liability.[3]

---

[3]   While non-U.S. nationals who are the heirs or survivors of U.S. nationals may bring suit under Section 2333(a), Pl. Br. at 1 n.1, 27 n.11, the amended complaint fails to allege that seven of the plaintiffs are U.S. nationals <u>or</u> survivors or heirs of U.S. nationals.  Am. Compl. ¶ 33, 163, 218, 261.  Accordingly, the Court must dismiss the claims of these plaintiffs.

Moreover, because Section 2339C was enacted on June 25, 2002, NatWest's alleged conduct that occurred before that date cannot be actionable and, at a minimum, those plaintiffs injured in attacks occurring before that date, Am. Compl. ¶¶ 265-288, are barred from bringing claims under Section 2339C.  Suppression of the Financing of Terrorism Convention Implementation Act of 2002, Pub. L. No. 107-197, § 203, 116 Stat. 724, 727-28 (2002).

**ARGUMENT**

**POINT I**

**PLAINTIFFS ENTIRELY MISCONSTRUE THE PROXIMATE CAUSE
REQUIREMENT FOR CLAIMS ARISING UNDER SECTION 2333(a), AND
FAIL TO PLEAD FACTS SUFFICIENT TO SATISFY THAT REQUIREMENT**

A.     **Plaintiffs' Assertion That Proximate Cause Can Be Presumed For Section
       2333(a) Claims Based On Violations Of Sections 2339B And 2339C Is Meritless**

Plaintiffs' discussion of their burden of pleading causation is entirely incoherent.

Recognizing their inability to plead sufficiently that NatWest's alleged misconduct proximately

caused their injuries, plaintiffs suggest that there are different causation requirements for claims

based on (i) general aiding and abetting liability, which they erroneously contend to exist under

Section 2333(a), and (ii) violations of Sections 2339B and 2339C.[4]  See Pl. Br. at 56-60.  No

such distinction exists.  As plaintiffs admit, all of their claims arise under Section 2333(a), see id.

at 27 ("Plaintiffs predicate all of their claims on 18 U.S.C. § 2333(a) . . . ."), and 36 ("Section

2333(a)'s civil remedy must be construed to reach entities that violate the duties set out in the

correlative criminal provisions of Chapter 113B . . . ."), and therefore all of their claims must

satisfy that section's express requirement – affording relief only to certain persons injured "by

reason of an act of international terrorism" – of pleading and proof of a proximate causal link

between the misconduct by NatWest that plaintiffs allege and plaintiffs' injuries.  See In re

Terrorist Attacks on Sept. 11, 2001, 349 F. Supp. 2d 765, 825-26 (S.D.N.Y.) ("Plaintiffs

[asserting claims based on ATA's material support provisions] will have to present a sufficient

causal connection between that support and the injuries suffered by [p]laintiffs. . . .  Proximate

---

[4]     As is discussed in NatWest's opening brief, see Def. Br. at 39-42, and in Part III infra,
        Section 2333(a) does not permit plaintiffs' general aiding and abetting claims at all.

4

cause will support this connection."), on reconsideration in part, 392 F. Supp. 2d 539 (S.D.N.Y. 2005) (internal citations omitted).

Indeed, a close reading of plaintiffs' brief demonstrates that they in fact concede that proximate cause is a required element of their claims.  Not only do they refer to proximate cause, Pl. Br. at 59, but they also repeatedly acknowledge that Section 2333(a) "must be construed[] using well-developed American tort law" and "read broadly to impose 'liability at any point along the casual chain of terrorism.'"  See e.g., Pl. Br. at 31, 59 (citation omitted). "Well-developed American tort law" of course includes principles of proximate causation.  See W. Page Keeton, et al., Prosser and Keeton on the Law of Torts § 41 (5th ed. 1984).  And if there could be any question about this, the text of Section 2333(a) would dispel it, by providing that only a U.S. national injured "by reason of an act of international terrorism" has standing to sue (emphasis supplied), employing a time-honored statutory causal link requirement – "by reason of" – which the Supreme Court has definitively construed in the context of this phrase's use in the RICO statute to mean that the defendant's tortious conduct must be both the "but for" and the proximate cause of the alleged injury.  See Holmes v. Sec. Investor Prot. Corp., 503 U.S. 258 (1992); see also Leonard F. v. Israel Discount Bank of N.Y., 199 F.3d 99, 104 (2d Cir. 1999) ("When judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its . . . judicial interpretations as well.") (citations and internal quotation marks omitted).[5]  Stunningly, despite NatWest's lengthy discussion of Holmes in its opening brief, Def.

---

[5]   Judge Gershon's conclusion in Linde v. Arab Bank, PLC, 384 F. Supp. 2d 571 (E.D.N.Y. 2005) that plaintiffs need only plead that their injuries were caused by an act of international terrorism, and not that their injuries were proximately caused by the defendant's conduct, by contrast, ignores the plain meaning ascribed by Congress, the Supreme Court and the Second

Br. at 51-54, and what <u>Holmes</u> teaches is plaintiffs' pleading burden under the "by reason of" requirement of Section 2333(a), <u>plaintiffs' brief does not address Holmes at all</u>.

   In an effort to escape the conclusion that plaintiffs must plead proximate cause and have failed to do so, they seek to rely on a Congressional finding that they claim creates a legislative presumption of causation under Sections 2339B and 2339C.  Pl. Br. at 56-57.[6]  But this statement – that "foreign organizations that engage in terrorist activity are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct" – was simply Congress's stated justification for criminalizing the conduct addressed in Section 2339B.  This finding says nothing about the elements of civil liability under Section 2333(a), and certainly cannot plausibly be read to trump the "by reason of" language in that section, or remove proximate causation as an element of civil liability.

   Plaintiffs complain that "[a]bsent this legislative presumption of causation," the pleading burden for a Section 2333(a) claim would be exceedingly difficult, and that no plaintiff would be able to prove the requisite causal connection between NatWest's alleged misconduct and their injuries.  Pl. Br. at 56.  This is demonstrably incorrect, because plaintiffs in other ATA cases <u>have</u> pleaded facts that satisfy the causal link required under Section 2333(a).  In <u>Boim v. Quranic Literacy Institute & Holy Land Foundation for Relief & Development</u>, for instance, the plaintiffs pleaded proximate cause by alleging specifically that funds provided by the defendant terrorist front organizations were actually used to buy weapons and train the perpetrators of the subject terrorist acts.  291 F.3d 1000, 1023-24 (7th Cir. 2002).  The fact that plaintiffs here

_____

Circuit to the words "by reason of" that are specifically used in Section 2333(a), and is therefore wrong as a matter of law.  <u>See</u> Def. Br. at 51-52.

[6] Even the isolated statement they cite was made at the time Section 2339B was enacted, and not Section 2339C, which was enacted years later.

virtually concede that they cannot plead proximate cause is a reason to dismiss the amended complaint; it is not a reason for misinterpreting Section 2333(a) to remove its proximate causation requirement.

While the statutory "by reason of" language forecloses plaintiffs' argument, their theory that claims under Section 2333(a) that are predicated on violations of Sections 2339B and 2339C do not require proximate cause is also belied by the consequences that would flow from adopting that theory.  Absent a proximate cause requirement, the range of potential defendants in cases predicated on violations of Sections 2339B and 2339C would be practically infinite, and could here include, for instance, the British government for adopting the "Give as You Earn" program through which the British government has made Interpal an available recipient for employee charitable contributions, Am. Compl. ¶ 390; every employer and employee in the U.K. who has knowingly contributed to Interpal through that program; and the U.K. Charity Commission, for unfreezing Interpal's assets and thereby giving its imprimatur to NatWest's service of Interpal's accounts.  There is nothing in the language of the statute to suggest that Congress intended to authorize limitless suits against actors so tangentially "involved" in the commission of terrorist acts.  The statute's "by reason of" requirement points towards precisely the opposite conclusion – plaintiffs must plead proximate cause, as they concede they have failed to do.

**B.    Plaintiffs Fail To Apply The Correct Proximate
Cause Standard To Their Aiding And Abetting Claim**

Even where plaintiffs concede the necessity of pleading proximate causation – in connection with their otherwise flawed general aiding and abetting claim – they cite the wrong standard.  Eschewing (because it is fatal to their case) controlling Second Circuit authority that proximate cause requires a <u>direct relationship</u> between the plaintiff's injury and the defendant's

tortious conduct, and is intended to limit a defendant's liability to those acts of the defendant that are a substantial factor in the chain of causation and are reasonably foreseeable, see Def. Br. at 51-52, plaintiffs invite the Court to apply a "substantial assistance" standard derived from the Restatement (Second) of Torts § 876(b), which addresses secondary tort liability. However, even if the Court were to apply the "substantial assistance" standard, the Second Circuit has repeatedly held that the "substantial assistance" standard necessarily incorporates the requirement of pleading proximate cause. See Bloor v. Carro, Spanbock, Londin, Rodman & Fass, 754 F.2d 57, 62 (2d Cir. 1985) ("In alleging the requisite 'substantial assistance' by the aider and abettor, the complaint must allege that the acts of the aider and abettor proximately caused the harm to the corporation on which the primary liability is predicated.") (citing Armstrong v. McAlpin, 699 F.2d 79, 92 (2d Cir. 1983) and Edwards & Hanly v. Wells Fargo Sec. Clearance Corp., 602 F.2d 478, 484 (2d Cir. 1979), cert denied, 444 U.S. 1045 (1980)); see also Def. Br. at 49 n.48.[7]

\* \* \*

Having brought a civil proceeding against NatWest under Section 2333(a), plaintiffs must sufficiently plead all of the elements, including proximate cause, that this statute requires. They have failed to do so, and for this reason the Court should dismiss the amended complaint without any need to address plaintiffs' other meritless contentions.

---

[7]  Once again electing to disregard Second Circuit authority that is unhelpful to their cause, plaintiffs urge the Court to define "substantial assistance" on the basis of two D.C. Circuit Court decisions, Halberstam v. Welch, 705 F.2d 472 (D.C. Cir. 1983), and Murphy v. United States, 653 F.2d 637 (D.C. Cir. 1981). But even if this Court were to reject Second Circuit law in favor of this non-controlling authority, plaintiffs' conclusory (and inflammatory) allegations that NatWest "provided substantial assistance to HAMAS," "help[ed] to legitimate an FTO," and "serve[d]as one of HAMAS's bankers," Pl. Br. at 57, 59, simply conflate Interpal with HAMAS and fall markedly short of pleading that NatWest's conduct substantially assisted the terrorist attacks that caused plaintiffs' injuries.

# POINT II

## PLAINTIFFS FAIL TO ALLEGE THE REQUISITE
## _MENS REA_ ON THE PART OF NATWEST

Lacking sufficient facts to plead the _mens rea_ requirements under Sections 2333(a), 2339B and 2339C, plaintiffs rely on an assortment of conclusory assertions, irrelevant facts and repeated distortions of the public record. For example, they cite allegations in the amended complaint that NatWest "knows that it provides material support to HAMAS, a Foreign Terrorist Organization, and it knows that HAMAS commits horrific terrorist attacks of the kind that have maimed and murdered American citizens such as plaintiffs;" that "Defendant knows of HAMAS's terrorist activities;" and that "HAMAS had been designated a Foreign Terrorist Organization by the United States Government." Pl. Br. at 51 (citing various paragraphs of the amended complaint). But there is no claim by plaintiffs, nor could there be, that NatWest maintained a bank account for HAMAS, or sent money to HAMAS. The claims in this case involve one thing and one thing only: NatWest's provision of banking services to Interpal. Thus, what plaintiffs must properly plead is not that NatWest knew of HAMAS's terrorist activities, but that NatWest knew that its banking services to Interpal constituted substantial assistance, material support or financing to HAMAS. This they simply have not done. [8]

---

[8]  Plaintiffs argue that the Court should reject the specific intent requirement under Section 2339B as construed in United States v. Al-Arian, 308 F. Supp. 2d 1322, 1338-39 (M.D. Fla.), modification denied by, 329 F. Supp. 2d 1294 (M.D. Fla. 2004). Pl. Br. at 47-50. However, the specific intent requirement is also consistent with the Seventh Circuit's decision in Boim, where the court determined that plaintiffs must show the defendant knew about the unlawful activities and intended to bring about those unlawful activities. Boim, 291 F.3d at 1023-24; see also Terrorist Attacks, 349 F. Supp. 2d at 828; Def. Br. at 27. For the reasons set forth in NatWest's opening brief, see Def. Br. at 26-27, plaintiffs fail to meet the specific intent requirement under Section 2339B.

Moreover, to the extent plaintiffs are contending that the relevant _mens rea_ under Sections 2333(a), 2339B or 2339C can be satisfied by alleging mere negligence, see Pl. Br. at 27

A.    **Plaintiffs Willfully Distort The U.K. Charity
       <u>Commission's 1996 Report And Related Documents</u>**

Plaintiffs rely heavily upon the Charity Commission's 1996 Report to impute to

NatWest knowledge of Interpal's alleged ties to HAMAS.  They argue, for instance, that

NatWest "clearly knew that it was transferring funds to a Foreign Terrorist Organization as early

as 1996 when the U.K. Charity Commission refused to close Interpal for sending money to

supporters of HAMAS as long as 'funds were not being given <u>solely</u> because of a person's

support for HAMAS," and that the "Charity Commission effectively found that [NatWest's]

customer, Interpal, made donations to HAMAS supporters."  Pl. Br. at 38, 53 (emphasis in

original).  This argument turns the language of the Report on its head in a manner that verges on

the Orwellian.  What the plain language of the Commission's findings actually recites is as

follows:

> We anticipated that Hamas will have supporters in the areas where INTERPAL
> distributes aid.  Relief cannot be denied to them because of that support but at the
> same time we needed to ensure, to the best of our abilities, that funds were not
> being given solely because of a person's support for Hamas.  Poverty and need
> should be the only criteria used when deciding how the charity's funds should be
> distributed.
> . . .
>
> We scrutinized in detail the charity's controls and records.  They were well
> organised and we found no evidence of any donations that could not be accounted
> for or that had been given for political reasons.  All of the evidence that we
> obtained suggests that INTERPAL is independent and non-profit making.
> Scrutiny of the charity's publicity and documentation provided no evidence of
> any pro-terrorist or anti-Israeli propaganda and interviews with the trustees and
> staff suggested that they [w]ere motivated by faith and altruism rather than
> fanaticism.

---

(citing congressional testimony of Joseph Morris), a negligence standard simply cannot be
inferred from the statutory text and is inconsistent with the relevant caselaw.  <u>See</u> Def. Br. at
25-26, 33-34, 45-48, <u>see also</u> p. 19 n.13, <u>infra</u>.

Friedman Decl. Ex. D ¶¶ 128-29.  Thus, contrary to plaintiffs' selective quotations and deliberate

misrepresentation of the Report, the relevant passage, read in full, shows that the Commission

affirmatively found that Interpal did <u>not</u> donate to HAMAS; rather, the Commission merely

noted the presence of HAMAS "supporters in the areas" to which Interpal sends aid.  If the fact

that terrorist sympathizers merely live in a geographic area to which a charity contributes is

enough to render the charity a "knowing" supporter of terrorist activity, then all forms of

charities and sovereigns that historically have given aid to Palestinian areas – including the

United States and Israeli governments, which furnish a significant part of the Palestinian

Authority's budget – would fall within the scope of the ATA provisions.

   Nor is plaintiffs' characterization of the Commission's 1996 Report an isolated

instance of their willingness to manipulate facts in the public record.  For example, contrary to

plaintiffs' assertions, the Commission's May 1996 press release cannot plausibly be read to

support their conclusion that Interpal was transmitting money to HAMAS.  Pl. Br. at 9.  It simply

states that Interpal's funds are directed to areas "where a significant number of poor and

disadvantaged people <u>might</u> support the <u>aims</u> of Hamas."  Schlanger Decl. Ex. B (emphasis

added).  The press release further states that the Commission was "satisfied" that Interpal

"take[s] every possible step to ensure that [its] donations only go to charitable purposes, helping

the poor and the needy."  <u>Id.</u>

**B.** **Plaintiffs Improperly Contend That NatWest Had An Obligation**
  **<u>To Monitor The Israeli Government Designations Of Interpal</u>**

   Plaintiffs further argue that the Charity Commission's 1996 investigation and

Report should have prompted NatWest to consult the Israeli government's watch list, on which

Interpal and groups to which Interpal made contributions were designated as terrorist

organizations.  According to plaintiffs, the Israeli government designations "gave [NatWest]

11

additional knowledge and confirmation . . . that its customer, Interpal, was using NatWest to transfer funds to the agents of HAMAS and HAMAS's charitable fronts."  Pl. Br. at 10.  But the criminal violations of the ATA that plaintiffs claim as the predicates for civil liability require intentional wrongdoing, not negligence.  That NatWest allegedly could or should have known about Interpal's alleged ties to HAMAS is not an allegation that NatWest in fact had knowledge of Interpal's alleged financing or support of terrorist acts, as Sections 2333(a), 2339B and 2339C plainly require.  As discussed in NatWest's opening brief, see Def. Br. at 16, the Israeli government designations provide an insufficient basis for pleading NatWest's *mens rea* because plaintiffs do not allege – and cannot allege – NatWest's knowledge of these designations.  Equally important, plaintiffs nowhere explain – even if a negligence standard were relevant – why NatWest, as a British bank, should have abided by the Israeli government's conclusion in a matter involving NatWest's services to a British client, where the European Union and the United Kingdom have declined to adopt the findings of the Israeli government.

In a related vein, plaintiffs argue that NatWest should have been monitoring Israeli government designation lists on the basis of the "Know Your Customer" guidelines provided in the Wolfsberg Statement on the Suppression of the Financing of Terrorism.  They assert that, under the guidelines of the Wolfsberg Statement, "NatWest committed itself to implement: 'procedures for consulting applicable lists and taking reasonable and practicable steps to determine whether a person involved in a prospective or existing business relationship appears on such a list.'"  Pl. Br. at 54 (quoting Am. Compl. ¶ 411) (emphasis added).  A closer reading of the Wolfsberg Statement, however, reveals that plaintiffs' reliance upon this short excerpt is misplaced and misleading.  Just two paragraphs earlier, the Wolfsberg Statement provides that "the proper identification of customers by financial institutions can improve the

efficacy of searches <u>against lists of known or suspected terrorists issued by competent authorities</u> <u>having jurisdiction over the relevant financial institution (applicable lists)</u>."  <u>Wolfsberg</u> <u>Statement on the Suppression of the Financing of Terrorism</u> § 4, http://www.wolfsberg-principles.com/financing-terrorism.html (last visited Feb. 16, 2006) (emphasis added).  Plaintiffs have not alleged that the Israeli government has or had any jurisdiction over NatWest, nor can they so allege, as NatWest conducts no business there.  Def. Br. at 36.  By the very terms of the statement on which plaintiffs rely, therefore, the Israeli government designations did not and do not constitute "applicable lists" for NatWest's "Know Your Customer" investigations.[9]

**C.      Plaintiffs Deliberately Ignore The Significance Of The U.K. Charity Commission's 2003 Findings**

Finally, plaintiffs fail to address the Charity Commission's 2003 findings regarding Interpal, and make only passing reference to the Commission's investigation.  Pl. Br. at 52.  The Charity Commission initiated its 2003 investigation of Interpal following President Bush's designation of Interpal as an SDGT on August 21, 2003, requested evidence from U.S. authorities to support this designation, and ordered Interpal's funds frozen on August, 26, 2003. Def. Br. at 12; Friedman Decl. Ex. C ¶¶ 5-7.  The E.U. and U.K. listings of HAMAS as a terrorist group occurred less than a month later, <u>while the Charity Commission was conducting</u>

---

[9]   The position of the Wolfsberg Statement is consistent with the other standards cited by plaintiffs in their amended complaint.  The FATF "Guidance for Financial Institutions in Detecting Terrorist Financing," Am. Compl. ¶¶ 408-09, provides that there are "[s]everal sources of information exist that may help financial institutions in determining whether a potentially suspicious or unusual transaction could indicate funds involved in the financing of terrorism and thus be subject to reporting obligations under national anti-money laundering or anti-terrorism laws and regulations."  Financial Action Task Force on Money Laundering, <u>Guidance for Financial Institutions in Detecting Terrorist Financing</u>, Apr. 24, 2002, Annex 2, http://www.fatf-gafi.org/dataoecd/32/49/34047407.pdf.  However, while the FATF Guidance report mentions lists maintained by the United Nations, the FATF, the United States, and the European Union, it does not refer to Israeli government designations or the Israeli "Announcements and Advertisements Gazette."

its investigation.[10]  Nine days after the U.K. listing of HAMAS, the Charity Commission ordered

Interpal's funds unfrozen.  Def. Br. at 13; Friedman Decl. Ex. G.  In its 2003 report, the Charity

Commission stated as follows:

> The Commission concluded that in the absence of any clear evidence showing
> INTERPAL had links to Hamas' political or violent militant activities,
> INTERPAL's bank accounts should be unfrozen and the Inquiry closed.  The
> bank accounts were 'unfrozen' and the Inquiry was closed on 24 September 2003.
>
> The Commission's own work reveals that connections or links between registered
> charities in England and Wales and terrorist organizations are very rare.
> However, any links between charities and terrorist activity are totally
> unacceptable and corrosive of public confidence in charities.  'Links' in this case
> might include fundraising or provision of facilities, but also include formal or
> informal links to organizations 'proscribed' under the Terrorism Act 2000, and
> any subsequent secondary legislation.

Friedman Decl. Ex. C. ¶¶ 9, 11 (emphasis added).

Thus, during the 2003 investigation, the Charity Commission (i) investigated

Interpal's alleged ties to HAMAS at a time when HAMAS as a whole, and not just its terrorist

wing, was on both U.K. and E.U. terrorist financing lists; and (ii) investigated both formal and

informal links to organizations proscribed under the Terrorism Act 2000, which included

HAMAS.  Yet the Charity Commission still concluded there was no "clear evidence showing

---

[10]   HAMAS's terrorist wing, the Hamas Izz al-Din al-Qassem Brigades, had been listed as a
proscribed group under the U.K. Terrorism Act 2000 since March 2001, and had been listed
under the U.K. Terrorist Financing regime list since November 2001.  See Home Office,
Proscribed Terrorist Groups, http://www.homeoffice.gov.uk/security/terrorism-and-the-law/
terrorism-act/proscribed-groups (last visited Feb. 16, 2006); Charity Commission,
Operational Guidance: Charities and Terrorism, http://www.charity-
commission.gov.uk/supportingcharities/ogs/g096.asp (last visited Feb. 16, 2006); Bank of
England, Terrorist Financing: List of Suspects & Financial Sanctions: Afghanistan (Taliban
& Usama Bin Laden), Nov. 2, 2001,
http://www.bankofengland.co.uk/publications/news/2001/115.htm.  As plaintiffs note,
HAMAS as a whole was added to the U.K. terrorist financing list on September 15, 2003,
pursuant to the European Council Decision 2003/646/EC of September 13, 2003.  See Bank
of England, Terrorist Financing: List of Suspects, Sept. 15, 2003,
http://www.bankofengland.co.uk/publications/news/2003/097.htm.

INTERPAL had links to Hamas' political or violent militant activities."  Friedman Decl. Ex. C. ¶ 9.

*   *   *

Accordingly, plaintiffs have failed to allege any facts to support their conclusion that NatWest intentionally furnished material support or provided financing services to HAMAS. Their potpourri of allegations about newspaper reports and Israeli government designations of Interpal that NatWest is not even alleged to have known about fail to satisfy the *mens rea* requirement for pleading violations of the ATA.

**POINT III**

**PLAINTIFFS' AIDING AND ABETTING CLAIM IS NOT AUTHORIZED AS A MATTER OF LAW AND, IN ANY EVENT, THEIR ALLEGATIONS FAIL TO MEET THE RELEVANT STANDARDS FOR AIDING AND ABETTING LIABILITY**

**A.    General Aiding And Abetting Liability Does Not Exist As A Matter Of Law Under Section 2333(a)**

Plaintiffs advance four different arguments as to why this Court should ignore the rule of statutory construction set forth by the Supreme Court in Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164 (1994), and expand the scope of liability under Section 2333(a) beyond what the statutory text allows.  See Pl. Br. at 32-36.  None of their arguments has merit.

First, plaintiffs refer to three decisions – none of which is binding on this Court – to suggest erroneously that Central Bank has no application to this case.  They rely principally on the Seventh Circuit's decision in Boim, 291 F. 3d 1000.  See Pl. Br. at 33.  As NatWest explained in its opening brief, Boim adopts a more relaxed standard than courts in the Second Circuit follow for inferring a cause of action for secondary liability where, as here, the statutory

15

text does not explicitly provide for it.  Thus, Boim is not a basis on which this Court should

ascertain the existence or scope of such liability under Section 2333(a).  See Def. Br. at 40-41.

Plaintiffs' reliance on Linde v. Arab Bank, PLC, 384 F. Supp. 2d 571 (E.D.N.Y.

2005), is similarly unavailing.  Judge Gershon's ruling permitting certain aiding and abetting

claims under Section 2333(a) is entirely dependent upon the Seventh Circuit's ruling in Boim.

Judge Gershon did not independently analyze the scope of civil liability under Section 2333(a) or

follow the prevailing rule of statutory construction in the Second Circuit – i.e., a cause of action

for secondary liability should not be inferred when a statute creating a private right of action

makes no reference to it.  See Def. Br. at 39-42.  This Court should follow that rule, and decline

to read aiding and abetting liability into the statutory text.

Plaintiffs entirely misconstrue the third decision on which they rely, Wiwa v.

Royal Dutch Petroleum Co. & Shell Transport & Trading Co. p.l.c., No. 96 Civ. 8386 (KMW),

2002 WL 319887 (S.D.N.Y. Feb. 28, 2002).  Plaintiffs there brought an aiding and abetting

claim under the Torture Victims Protection Act ("TVPA") against an individual defendant in

connection with torture and killings in Nigeria.  The individual defendant moved to dismiss the

claim on the ground that the TVPA did not expressly provide for aiding and abetting liability, but

the court denied the motion.  Plaintiffs here mistakenly argue that the Wiwa court "rejected the

analogy to Central Bank and applied principles of aiding and abetting liability to the ['TVPA']."

Pl. Br. at 33.  To the contrary, Judge Wood in Wiwa did precisely what Central Bank requires

and what this Court should do here – consult, in the first instance, the statutory text to determine

the extent of private liability arising under a statute:

> The TVPA provides for liability for an individual who "subjects" another to
> torture or extrajudicial killing.  See 28 U.S.C. § 1350, note, §§ 2(a) & (b).  While
> the language of the TVPA could be more precise, the definition of the verb
> "subject" suggests, as plaintiffs argue, that the use of that word expands rather

16

> than narrows the reach of the statute.  "Subject" means to cause someone "to
> undergo the action of something specified; to expose . . . to make liable or
> vulnerable."  Random House Webster's College Dictionary (1999).  Using this
> definition, individuals who "cause someone to undergo" torture or extrajudicial
> killing, as well as those who actually carry out the deed, could be held liable
> under the TVPA.

Wiwa, 2002 WL 319887, at *15.  Notably, Judge Wood observed that her ruling was wholly

consistent with the Central Bank rule that "the scope of liability under a statute should be

determined based on a reading of the text of the specific statute."  Id. at *16 (citations omitted).[11]

In the instant case, not only did Congress decline to provide an explicit cause of action for aiding

and abetting in Section 2333(a) but, in contrast to the TVPA, there is simply no analogous

language in Section 2333(a) that could be read to provide for general aiding and abetting claims.

The refusal to read aiding and abetting liability into Section 2333(a) in the

absence of any textual mandate reflects appropriate judicial deference to Congressional

authority.  In In re South African Apartheid Litigation, 346 F. Supp. 2d 538 (S.D.N.Y. 2004),

apartheid victims asserted an aiding and abetting claim against an individual defendant under the

Alien Tort Claims Act ("ATCA"), a statute that, like Section 2333(a), does not expressly provide

for aider and abettor liability.  Judge Sprizzo dismissed the claim, observing that "the

applicability of that concept [of general aiding and abetting liability] in a civil context is dubious

---

[11]  See also Dinsmore v. Squadron, Ellenoff, Plesent, Sheinfeld & Sorkin, 135 F.3d 837, 844 (2d
Cir. 1998) (In decision applying reasoning of Central Bank to preclude conspiracy liability
under federal securities laws, noting that "[t]he statutory text . . . was the determinative issue
in Central Bank, and it controls here as well.").  In this connection, it is worth noting
plaintiffs' inconsistent arguments about the importance of statutory text.  In furtherance of
their aiding and abetting claim, they are seeking to have this Court move beyond the
unambiguous statutory text and enlarge the scope of liability to include secondary actors.  In
furtherance of their knowledge argument, they argue that the Court should hew closely to the
statutory text and not enforce a specific intent requirement, which they erroneously claim the
predicate criminal provisions of the ATA do not contain.  Compare Pl. Br. at 32-37 with Pl.
Br. at 56-57.

at best," citing <u>Central Bank</u>, and that "Congress should be deferred to with respect to innovative interpretations of that statute." <u>Id.</u> at 550. So too here. The Court should resist plaintiffs' invitation to assume the legislative function and amend the statutory text.

<u>Second</u>, plaintiffs advance the fallacy that this Court's refusal to read aiding and aiding liability into Section 2333(a) "would eviscerate the Section 2333(a) civil remedy by relegating the universe of potential defendants to the graveyard of suicide bombers." Pl. Br. at 35. This inflammatory assertion elides the fact that not all terrorist attacks are perpetrated by suicide bombers, and that there are primary actors – those who plan or organize the attacks – who fall squarely within the scope of liability of Section 2333(a).[12]

More important for plaintiffs' "deep pocket" argument (for that is really what it is), the lack of general secondary liability under Section 2333(a) does not relieve secondary actors who participate in terrorist acts of civil liability. On the contrary, Sections 2339B and 2339C clearly set forth the circumstances under which persons who do not themselves pull the metaphorical trigger – including persons who knowingly lend material support to terrorist acts and who knowingly finance them – may nevertheless be held civilly liable under the ATA. Read alongside these other ATA provisions (which would be made entirely redundant under plaintiffs' theory), the limitation of liability under Section 2333(a) to persons who violate the substantive prohibitions of the ATA, including those penalizing secondary actors, without also providing for general aiding and abetting liability, is entirely appropriate. <u>See</u> <u>Harris Trust & Sav. Bank v. Salomon Smith Barney Inc.</u>, 530 U.S. 238, 247 (2000) ("ERISA's 'comprehensive and

---

[12]    Further, the tragic historical reality that plaintiffs ignore in their brief is that suicide bombings did not become the predominant form of terrorist activity until well after Congress enacted Section 2333(a). <u>See</u> U.S. Department of State, <u>Significant Terrorist Incidents, 1961-2003: A Brief Chronology</u>, http://www.state.gov/r/pa/ho/pubs/fs/5902.htm (last visited Feb. 16, 2006).

reticulated' scheme warrants a cautious approach to inferring remedies not expressly authorized by the text."). In short, no statutory text authorizes plaintiffs' general aiding and abetting claim under Section 2333(a), and plaintiffs fail to make any compelling arguments for why Congress would have chosen to authorize such claims under Section 2333(a) <u>sub silentio</u>.[13]

Third, plaintiffs make the astounding claim that, in interpreting the scope of Section 2333(a), "federal courts are required to consider the case law existing at the time the statute was enacted" and that this Court must therefore reject NatWest's reference to post-<u>Central Bank</u> decisions in which courts declined to allow general aiding and abetting liability claims under civil RICO. Pl. Br. at 33. Put differently, plaintiffs are contending that the teaching of <u>Central Bank</u> cannot be applied to statutes enacted before the Supreme Court's 1994 ruling. But plaintiffs do not – because they cannot – point to any language in <u>Central Bank</u> giving the ruling only prospective effect. Moreover, their argument is implausible on its face: applying plaintiffs' theory of statutory construction, <u>Central Bank</u> itself would have been resolved differently. After all, <u>Central Bank</u> addressed whether plaintiffs were allowed to bring aiding and abetting claims under Section 10b and Rule 10b-5 of the Securities Exchange Act <u>of 1934</u>. Unsurprisingly, the Supreme Court did not consider caselaw in existence at the time the

---

[13]   Throughout their brief, plaintiffs repeatedly rely on the congressional testimony of Joseph Morris, whom plaintiffs describe as "a former Department of Justice attorney and former General Counsel of the United States Information Agency," Pl. Br. at 29, to buttress their more expansive reading of the scope of liability under Section 2333(a). <u>Id.</u> at 35 ("[T]he bill as drafted is powerfully broad, and its intention, as I read it, is to bring focus on the problem of terrorism, and reaching behind the terrorist actors to those who fund and guide and harbor them . . . ."). Plaintiffs fail to explain why the Court should favor the testimony of a non-Member of Congress over the unambiguous text of Section 2333(a), which on its face does not incorporate the broader liability under Section 2333(a) that Morris favored. <u>See</u> <u>United States v. Dauray</u>, 215 F.3d 257, 260, 264 (2d Cir. 2000) (explaining that the "starting point in statutory interpretation is the statute's plain meaning" and that the Court will "resort to legislative history" only "[w]hen the plain language and canons of statutory interpretation fail to resolve statutory ambiguity.").

Securities Exchange Act was enacted in 1934, or when the Securities and Exchange Commission adopted Rule 10b-5 in 1942, but rather applied its rule of statutory construction retroactively in finding there is no aiding and abetting liability under Rule 10b-5.  Similarly, the courts applying Central Bank's 1994 ruling on the non-existence of aiding and abetting liability to the civil provisions of the RICO statute have done so notwithstanding the fact that civil RICO was enacted almost 25 years earlier, in 1970.

Plaintiffs' single citation in support of their radical theory of statutory construction, F. Hoffman-La Roche Ltd. v. Empagran S.A., 542 U.S. 155 (2004), does nothing to advance their argument.  In that case, the Supreme Court had to construe whether a statute, the Foreign Trade Antitrust Improvements Act of 1982 ("FTAIA"), extended the reach of Sherman Act antitrust regulations to conduct having independent foreign effects.  As a first step, the Court noted that "Congress designed the FTAIA to clarify, perhaps to limit, but not to expand in any significant way, the Sherman Act's scope as applied to foreign commerce.  See House Report 2-3."  F. Hoffman-La Roche, 542 U.S. at 169 (emphasis in original).  As the Court's ruling clearly indicates, it was interested in caselaw interpreting the Sherman Act as of 1982 not because it was advocating the radical theory of statutory construction that plaintiffs advance, but instead, given its premise, because contemporaneous caselaw was helpful in ascertaining the existing reach of the Sherman Act.  See id. ("And we have found no significant indication that at the time Congress wrote this statute courts would have thought the Sherman Act applicable in these circumstances.").  In short, nothing in F. Hoffman-La Roche, or any other decision of which NatWest is aware, requires the Court to consider prevailing rules of statutory construction at the time of a statute's enactment and to disregard the Supreme Court's subsequent decisions.

20

Fourth, in a last gasp, plaintiffs argue that the Court's interpretation of Section 2333(a) should be guided not by Central Bank but Harris Trust, decided after Central Bank. Pl. Br. at 34-35. This argument can be dispatched easily for several reasons. First, in Harris Trust, the plaintiffs were seeking to sue the counterparty to a "party in interest" transaction prohibited under the ERISA statute, even though the provision under which the plaintiffs brought their claim did not specifically identify the counterparty as a prospective defendant. Thus, the prospective defendant in Harris Trust – a party more akin to a primary than a secondary wrongdoer – is conceptually different from NatWest, the alleged aider and abettor that plaintiffs in this case seek to bring within the scope of Section 2333(a). Second, the Harris Trust Court, in line with its earlier Central Bank ruling, concluded that an indefinite statutory text did not, in and of itself, license claims against any named defendant. While the Court noted that the statutory text "admits of no limit . . . on the universe of possible defendants," it further observed that "ERISA's 'comprehensive and reticulated' scheme warrants a cautious approach to inferring remedies not expressly authorized by the text," and, ultimately, based its ruling on another similarly worded provision of ERISA allowing suits against an "other person" (and thus including counterparties to the prohibited transaction).[14] Harris Trust, 530 U.S. at 239, 247-48. Third, and fatally to plaintiffs' argument, the Supreme Court in Harris Trust made no reference to its Central Bank decision or to the fundamental rule of statutory construction announced in the earlier decision. It is implausible that the Court would adopt, as plaintiffs suggest, a new rule of statutory construction without referencing the Central Bank rule, let alone announcing that the Central Bank rule was no longer in force.

---

[14]   In the instant case, of course, there is no such similarly worded provision in the ATA from which the Court could glean that Congress intended 2333(a) to incorporate aiding and abetting liability.

**B.     Even Assuming General Secondary Liability Exists Under Section
2333(a), Plaintiffs Fail Sufficiently To Plead Aiding And Abetting
Under 18 U.S.C. § 2 Or The Restatement (Second) Of Torts § 876(b)**

Plaintiffs fail even to address in their brief the point that, if the Court chooses to

expand the scope of liability under Section 2333(a) to allow aiding and abetting claims, they

would need to satisfy the criminal standards of aiding and abetting under 18 U.S.C. § 2.  As

discussed supra, p. 4, and in NatWest's opening brief, Def. Br. at 3 and 43, civil liability under

Section 2333(a) requires a predicate criminal violation – a point that plaintiffs expressly concede

in their brief.  See Pl. Br. at 36 ("At the very least, Section 2333(a)'s civil remedy must be

construed to reach entities that violate the duties set out in the correlative criminal provisions of

Chapter 113B . . . .").  For the reasons set forth in NatWest's opening brief, plaintiffs' amended

complaint fails as a matter of law to satisfy the demanding standard for criminal aiding and

abetting liability.  See Def. Br. at 43-44.

If the Court nonetheless determines that plaintiffs need only plead facts sufficient

to satisfy the civil aiding and abetting standard under the Restatement (Second) of Torts §

876(b), they still must plead that NatWest (i) had actual knowledge that Interpal was supporting

terrorist activities, and (ii) gave substantial assistance or encouragement to those terrorist

activities.  Id. at 45-49.  For the reasons discussed in NatWest's opening brief, they have not

done so.  Id.

Realizing that their allegations fall woefully short of the actual knowledge

standard, plaintiffs contend that NatWest need only have been "generally aware" that Interpal

was supporting terrorist activities, relying primarily on the D.C. Circuit standard for civil aiding

and abetting liability set forth in Halberstam v. Welch, 705 F.2d 472 (D.C. Cir. 1983), and

secondarily on decisions from other federal circuits.  See Pl. Br. at 44-45.  However, courts

within the Second Circuit have ruled that civil aiding and abetting liability requires actual

22

knowledge of the primary violation.  See Kolbeck v. LIT Am., Inc., 939 F. Supp. 240, 247

(S.D.N.Y. 1996) ("The Restatement Second of Torts also has been interpreted to include a

requirement of actual knowledge."), aff'd, 152 F.3d 918 (2d Cir. 1998); Wiwa, 2002 WL

319887, at **15-16; see also Armstrong v. McAlpin, 699 F.2d 79, 91 (2d Cir. 1983), abrogation

recognized on other grounds, Rabin v. Fivzar Assocs., 801 F. Supp. 1045 (S.D.N.Y. 1992); IIT,

an Int'l Inv. Trust v. Cornfeld, 619 F.2d 909, 922 (2d Cir. 1980); see also citations set forth in

Def. Br. at 45-46 & 45 n.43.[15]  For the reasons discussed above in Point II, the amended

complaint fails to satisfy the actual knowledge standard (although the allegations in the amended

complaint also fail to satisfy even the less demanding "general awareness" standard).[16]  See also

Def. Br. at 45-49.

Accordingly, plaintiffs have failed to state a claim for aiding and abetting liability

under Section 2333(a), and their first claim for relief must be dismissed.

---

[15]  Plaintiffs themselves appear to recognize the inapplicability of their "general awareness" standard when the prevailing standard within the Second Circuit is actual knowledge.  After citing caselaw from other circuits in support of their less exacting standard, plaintiffs sheepishly confess that "[s]ome courts in the Second Circuit have also used an 'actual knowledge' standard in aiding and abetting cases," citing decisions from the Eastern and Southern Districts of New York.  Pl. Br. at 45.  But to the extent Judge Gershon in Linde and Judge Casey in Terrorist Attacks adopted the Halberstam "general awareness" standard, they misconstrued the applicable Second Circuit test.

[16]  Moreover, as discussed in NatWest's opening brief, in order to impose liability on NatWest for allegedly aiding and abetting acts of international terrorism, plaintiffs must also allege facts establishing that NatWest specifically intended to further HAMAS's terrorist activities.  See Def. Br. at 47-48.  The amended complaint is devoid of any allegations of specific intent, and plaintiffs have all but conceded that they have not alleged specific intent on the part of NatWest.

Plaintiffs' general aiding and abetting claim fails for the additional reason that they do not allege facts sufficient to establish that NatWest provided substantial assistance to the alleged terrorist activities.  See Def. Br. at 48-49.  Plaintiffs do not challenge that the "substantial assistance" element is as NatWest describes it in its opening brief other than in the most conclusory terms, see Pl. Br. at 36-37, and NatWest therefore will not repeat its prior presentation here.

## **CONCLUSION**

For the foregoing reasons and those expressed previously, the Court should grant

NatWest's motion to dismiss the amended complaint.

Dated: New York, New York
        February 17, 2006

Respectfully submitted,

CLEARY GOTTLIEB STEEN & HAMILTON LLP

By:   /s/ Lawrence B. Friedman
        Jonathan I. Blackman (JB 3846)
        Lawrence B. Friedman (LF 9978)
        Members of the Firm

        One Liberty Plaza
        New York, New York 10006
        (212) 225-2000

        Attorneys for Defendant
        National Westminster Bank Plc

Of Counsel:

        Sanjay S. Mody
        Isabelle A. Young

24