UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

```
-------------------------------------------------- x
TZVI WEISS, et al.,                              :
                                                 :
                    Plaintiffs,                  :
                                                 :
        -against-                                :   CV 05-4622 (CPS) (KAM)
                                                 :
NATIONAL WESTMINSTER BANK PLC,                   :
                                                 :
                    Defendant.                   :
-------------------------------------------------- x
```

## UNREPORTED DECISION CITED IN REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
(212) 225-2000
Attorneys for Defendant
National Westminster Bank Plc

Of Counsel:

Jonathan I. Blackman
Lawrence B. Friedman
Sanjay S. Mody
Isabelle A. Young

Westlaw.

Not Reported in F.Supp.2d                                                                                    Page 1
Not Reported in F.Supp.2d, 2002 WL 319887 (S.D.N.Y.), RICO Bus.Disp.Guide 10,216
(Cite as: 2002 WL 319887 (S.D.N.Y.))

▷

**Motions. Pleadings and Filings**

United States District Court, S.D. New York.
Ken WIWA, individually and as Executor of the
Estate of his deceased father Ken
Saro-Wiwa, and Owens Wiwa, and Blessing
Kpuinen, individually and as
Administratrix of the Estate of her husband, John
Kpuinen, and Jane Doe,
Plaintiffs,
v.
ROYAL DUTCH PETROLEUM COMPANY and
SHELL TRANSPORT AND TRADING
COMPANY p.l.c.,
Defendants.
Ken WIWA, individually and as Executor of the
Estate of his deceased father Ken
Saro-Wiwa, and Owens Wiwa, and Blessing
Kpuinen, individually and as
Administratrix of the Estate of her husband, and John
Kpuinen Plaintiffs,
v.
Brian ANDERSON Defendant.
No. 96 CIV. 8386(KMW).

Feb. 28, 2002.

OPINION & ORDER

WOOD, D.J.

*1 In the two above-captioned actions, plaintiffs allege violations of international, federal, and state law in connection with the Nigerian government's activities in the Ogoni region of Nigeria during the 1990s. Plaintiffs bring suit against two European oil companies [the "corporate defendants"], which plaintiffs allege directed and aided the Nigerian government in violating plaintiffs' rights, and against Brian Anderson, the former managing director of the Nigerian subsidiary of the oil companies.

Plaintiffs filed the first action against the corporate defendants on November 6, 1996, and filed an Amended Complaint on April 29, 1997 By Order dated September 25, 1998 ["1998 Order"], the Court found that the corporate defendants were subject to personal jurisdiction in New York, but dismissed

plaintiffs' amended complaint on *forum non conveniens* grounds. On appeal, the Second Circuit affirmed that the corporate defendants were subject to personal jurisdiction, but reversed the Court's *forum non conveniens* dismissal and remanded the action for further proceedings. *See Wiwa v. Royal Dutch Petroleum Company, et al*, 226 F.3d 88 (2d Cir.2000). Plaintiffs filed a new action against Brian Anderson on March 5, 2001.

Presently before the Court are: (1) defendants' motion to dismiss the actions for lack of subject matter jurisdiction; (2) defendants' motion to dismiss claims for failure to state a claim for which relief may be granted; (3) defendants' motion to abstain on the basis of the act of state doctrine; and (4) defendant Anderson's motion to dismiss on the grounds of *forum non conveniens*. For the reasons stated below, the Court grants defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) with respect to two claims only: Owens Wiwa's Alien Torts Claim Act claims, 18 U.S.C. § 1350 ["ACTA"], founded on an alleged violation of his right to life, liberty and security of person, and his ACTA claim for arbitrary arrest and detention. Plaintiffs are given 30 days from the date of this Order to re-plead those claims. Defendants' motion to dismiss is denied in all other respects.

*BACKGROUND*

*A. The Parties*

Plaintiffs are three former citizens and residents of Nigeria, as well as a Nigerian citizen identified only as Jane Doe. Plaintiff Ken Wiwa, who brings this action individually and as executor of the estate of his father, Ken Saro-Wiwa, is a citizen and resident of Great Britain. (Amended Complaint Against Royal Dutch / Shell, dated April 29, 1997 ["Am. Compl."] ¶ 7). Plaintiff Owens Wiwa, the brother of Ken Saro-Wiwa, remains a Nigerian citizen but resides in Canada. (*Id.* ¶ 8). Plaintiff Blessing Kpuinen, who brings this action individually and as administrator of her husband John Kpuinen's estate, remains a Nigerian citizen but resides in the United States. (*Id.* ¶ 9).

Defendants Royal Dutch Petroleum Company and Shell Transport and Trading Company [collectively, "Royal Dutch / Shell"] are incorporated and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

headquartered in the Netherlands and the United Kingdom respectively. (*Id.* ¶ ¶ 11-12). Royal Dutch / Shell wholly owns The Shell Petroleum Company, Ltd., which in turn wholly owns Shell Petroleum Development Company of Nigeria, Ltd. ["Shell Nigeria"]. (*Id* ¶ 19).

*2 Defendant Brian Anderson was the country chairman of Nigeria for Royal Dutch / Shell and managing Director of Shell Nigeria. (Complaint Against Brian Anderson, dated April 4, 2001 ["Anderson Compl."] ¶ 9). According to plaintiffs, Anderson resides in China. (*Id.*). According to Anderson, however, he is a citizen of the United Kingdom and Northern Ireland who maintains residences in Hong Kong and France. (Declaration of Brian Anderson, dated March 26, 2001 ["Anderson Decl."] ¶ ¶ 2, 4).

### B. Plaintiffs' Factual Allegations

Plaintiff's factual allegations are as follows. [FN1] Ken Saro-Wiwa was the leader of the Movement for the Survival of the Ogoni People ["MOSOP"]; John Kpuinen was the deputy president of MOSOP's youth wing. MOSOP formed in opposition to the coercive appropriation of Ogoni land without adequate compensation, and the severe damage to the local environment and economy, that resulted from Royal Dutch / Shell's operations in the Ogoni region.

> FN1. The facts are drawn from plaintiffs' Amended Royal Dutch / Shell Complaint except where noted. Plaintiffs' complaints against the corporate defendants and Anderson are nearly identical with respect to their factual allegations.

Defendants, operating directly and through Shell Nigeria, recruited the Nigerian police and military to suppress MOSOP and to ensure that defendants' and Shell Nigeria's development activities could proceed "as usual." The corporate defendants, through Anderson, provided logistical support, transportation, and weapons to Nigerian authorities to attack Ogoni villages and stifle opposition to Shell's oil-excavation activities. Ogoni residents, including plaintiffs, were beaten, raped, shot, and/or killed during these raids. Jane Doe was beaten and shot during one raid in 1993, and Owens Wiwa was illegally detained.

In 1995, Ken Saro-Wiwa and John Kpuinen were hanged after being convicted of murder by a special tribunal. Defendants bribed witnesses to testify falsely at the trial, conspired with Nigerian

authorities in meetings in Nigeria and the Netherlands to orchestrate the trial, and offered to free Ken Saro-Wiwa in return for an end to MOSOP's international protests against defendants. During the trial, members of Ken Saro-Wiwa's family, including his elderly mother, were beaten.

### C. Plaintiffs' Claims

### 1. Claims Against Royal Dutch / Shell

Plaintiffs allege that corporate defendants' conduct violated international and common law, and is actionable under the Alien Tort Claims Act ["ACTA"], 28 U.S.C. § 1350 (1993). Specifically, plaintiffs assert claims for the following tortious acts: (1) summary execution with respect to the hangings of Ken Saro-Wiwa and John Kpuinen; (2) crimes against humanity, in that general acts perpetrated against plaintiffs were "inhumane ... [and] of a very serious nature ... committed as part of a ... systematic attack against [a] civilian population or persecutions on political, racial or religious grounds" (Am.Compl.¶ 105); (3) torture with respect to Ken Saro-Wiwa, John Kpuinen, and Jane Doe; (4) cruel, inhuman, or degrading treatment in that the acts allegedly perpetrated against plaintiffs "had the intent and effect grossly humiliating and debasing the plaintiffs, forcing them to act against their will and conscience [*sic* ], inciting fear and anguish, breaking physical or moral resistance, and forcing them to leave their home and country and flee into exile" (Am.Compl.¶ 113); (5) arbitrary arrest and detention with respect to Ken Saro-Wiwa, John Kpuinen, and Owens Wiwa; and (6) violation of the rights to life, liberty and security of person and peaceful assembly and association with respect to Ken-Saro Wiwa, John Kpuinen, Owens Wiwa, and Jane Doe. Plaintiffs also assert the following common law claims under New York, Nigerian, and United States law: (7) wrongful death with respect to Ken Saro-Wiwa and John Kpuinen; (8) assault and battery with respect to all plaintiffs; (9) intentional infliction of emotional distress with respect to all plaintiffs; (10) negligent infliction of emotional distress with respect to all plaintiffs; and (11) negligence with respect to all plaintiffs. Plaintiffs Owens Wiwa and Jane Doe also assert (12) a RICO claim. [FN2]

> FN2. Plaintiffs also maintain that much of defendants' tortious conduct violates several international treaties (Am.Compl.¶ ¶ 98(d), (f), (g), (h), (i)). The Court does not interpret the Amended Complaint to assert claims directly under these treaties.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                     Page 3
Not Reported in F.Supp.2d, 2002 WL 319887 (S.D.N.Y.), RICO Bus.Disp.Guide 10,216
(Cite as: 2002 WL 319887 (S.D.N.Y.))

*2. Claims Against Anderson*

**\*3** Plaintiffs' claims against Anderson differ in three respects from their claims against the corporate defendants. First, plaintiffs allege that some of Anderson's conduct violates, not just the ACTA but also the Torture Victim Protection Act of 1991 ["TVPA"], 28 U.S.C. § 1350, note (1993). Second, Jane Doe is not a plaintiff in the action against Anderson. Third, plaintiffs do not assert a RICO claim against Anderson.

DISCUSSION

*A. ATCA and TVPA*

Plaintiffs premise jurisdiction over their international law claims on the ACTA, 28 U.S.C. § 1350, and general federal question jurisdiction, 28 U.S.C. § 1331 (1993). The ACTA provides that "[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. Section 1350 was enacted in 1789, but was rarely invoked until the Second Circuit's 1980 decision in *Filártiga v. Peña-Irala,* 630 F.2d 876 (2d Cir.1980). In *Filártiga,* the Second Circuit "recognized the important principle" that ATCA "validly creates federal court jurisdiction for suits alleging torts committed anywhere in the world against aliens in violation of the law of nations." *Kadic v. Karadzic,* 70 F.3d 232, 236 (2d Cir.1995) ["*Kadic I* "].

ATCA subject matter jurisdiction is established when three conditions are met: (1) an alien sues (2) for a tort (3) committed in violation of the law of nations (*i.e.,* international law) or a treaty of the United States. *See id.* at 237; *Filártiga,* 630 F.2d at 887. As the Second Circuit explained in *Kadic I,* the third condition is not satisfied "unless the complaint adequately pleads a violation of the law of nations (or a treaty of the United States)." 70 F.3d at 238. Additionally, in order to assert a cause of action under the ACTA, except in a few narrowly defined situations, plaintiffs must allege facts that satisfy the ACTA's state action requirement. Hence, plaintiffs usually must demonstrate that defendant was a government actor or committed the violation while acting "under color of law." *See id* at 239.

Plaintiffs also bring certain claims against Anderson under the TVPA, which provides that "[a]n individual who, under actual or apparent authority, or color of law, of any foreign nation--"

(1) subjects an individual to torture shall, in a civil action, be liable for damages to that individual; or

(2) subjects an individual to extrajudicial killing shall, in a civil action, be liable for damages to the individual's legal representative, or to any person who may be a claimant in an action for wrongful death.

28 U.S.C. § 1350, note, § 2(a). The statute also requires that plaintiffs exhaust "adequate and available" local remedies, *id.* at § 2(b), and provides a ten-year statute of limitations, *id.* at § 2(c). Unlike the ACTA, the TVPA does not in itself supply a jurisdictional basis for plaintiffs' claim. *See Kadic I.* 70 F.3d at 246. Rather, the TVPA works in conjunction with the ACTA, expanding the ACTA's reach to torts committed against United States citizens (not just "aliens") who, while in a foreign country, are victims of torture or "extra judicial killing." [FN3]

> FN3. The TVPA defines "extrajudicial killing" as: "[A] deliberate killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples. Such term, however, does not include any such killing that, under international law, is lawfully carried out under the authority of a foreign nation." 28 U.S.C. § 1350, note, § 3(a).

**\*4** As a preliminary matter, the Court considers defendants' contention that plaintiffs' summary execution and torture claims brought under the ACTA are preempted by the TVPA. Congress enacted the TVPA "to codify the cause of action recognized by this Circuit in *Filártiga,* even as it extend[ed] the cause of action to plaintiffs who are United States citizens." *Kadic v. Karadzic,* 74 F.3d 377, 378 (2d Cir.1996) [*Kadic II* ] (denying rehearing) (citing H.R.Rep. No. 367, 102d Cong., 2d Sess., at 4 (1991), *reprinted in* 1992 U.S.C.C.A.N. 84, 86 ["H.R.Rep. No. 367"] ). Although the *Kadic I* court observed that Congress indicated that the ATCA "should remain intact to permit suits based on ... norms [other than torture and summary execution]," 70 F.3d at 241 (quoting H.R.Rep. No. 367), the court explicitly held that "[t]he scope of [ATCA] remains undiminished by enactment of the [TVPA]," *id,* and affirmed that the *Kadic* plaintiffs had stated claims for torture and summary execution under both ATCA and the TVPA, *see id.* at 244-45. This Court reads *Kadic I* to hold that the TVPA did not preempt torture and summary execution claims

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 4
Not Reported in F.Supp.2d, 2002 WL 319887 (S.D.N.Y.), RICO Bus.Disp.Guide 10,216
**(Cite as: 2002 WL 319887 (S.D.N.Y.))**

under the ATCA.

This Court's interpretation is consonant with interpretations by other courts in other circuits that have considered this question. For example, the district court in *Beanal v. Freeport-McMoran, Inc.*, 969 F.Supp. 362 (E.D.La.1997), held that because "the TVPA 'enhances' rather than shrinks the scope of remedies under [the ACTA], there is no reason to conclude that by enacting the TVPA Congress took away causes of action for torture and extrajudicial killings under § 1350." *Id.* at 380. In fact, no court that has evaluated ACTA claims since the enactment of the TVPA has held that the TVPA in any way preempts ATCA claims for torture and extrajudicial killings. *See, e.g., Abebe-Jira v. Negewo*, 72 F.3d 844, 848 (11th Cir.1996); *Hilao v. Estate of Marcos*, 103 F.3d 767 (9th Cir.1996); *Doe v. Islamic Salvation Front*, 993 F.Supp. 3 (D.D.C.1998) (considering claims brought under both the TVPA and ACTA); *Doe v. Unocal*, 963 F.Supp. 880 (C.D.Cal.1997) ["*Unocal I* "]; *Xuncax v. Gramajo*, 886 F.Supp. 162 (D.Mass.1995). For these reasons, the Court concludes that plaintiffs' claims under ATCA are not preempted by the TVPA. In the instant case, the TVPA simply provides an additional basis for assertion of claims for torture and extrajudicial killing. Plaintiffs have chosen to exercise that option in the action against defendant Anderson.

### B. Liability Under the ACTA and TVPA

In their motion to dismiss, defendants argue that plaintiffs' claims under the ACTA and the TVPA are deficient in several respects. First, defendants contend that certain of plaintiffs' claims are inadequate because they are not supported by adequately plead violations of international law, and that plaintiffs have therefore failed to plead the third prong of the ACTA statute (which requires them to plead a violation of "the law of nations"). Second, defendants contend that plaintiffs have not made (and cannot make) a claim under either the TVPA or the ACTA because they have failed to satisfy the state action requirements of these statutes. That is, defendants argue that plaintiffs have failed to plead facts supporting their contention that the corporate defendants or defendant Anderson "acted under color of law."

**\*5** None of these arguments is persuasive, especially when analyzed under the liberal pleading standard applicable to a motion to dismiss. In considering a motion to dismiss for failure to state a claim upon which relief can be granted, the Court merely

"determine[s] whether the complaint itself is legally sufficient," *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir.1985), accepting its factual allegations as true, *see Anatian v. Coutts Bank (Switzerland) Ltd.*, 193 F.3d 85, 88 (2d Cir.1999). All inferences are drawn in favor of the non-moving party. *See Moore v. PaineWebber, Inc.*, 189 F.3d 165, 169 (2d Cir.1999). The complaint should not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Cruz v. Gomez*, 202 F.3d 593, 597 (2d Cir.2000) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)). In making this assessment, the Court "must limit itself to the facts stated in the complaint, documents attached to the complaint as exhibits and documents incorporated by reference in the complaint." *Hayden v. County of Nassau*, 180 F.3d 42, 54 (2d Cir.1999). Using this standard, the Court finds that (1) with the exception of two of Owens Wiwa's claims, plaintiffs have adequately alleged violations of international law, and (2) have satisfied the state action requirements of the ACTA and the TVPA.

### 1. Violations of International Law by Nigerian Authorities and Defendants

In order to give rise to a claim under ACTA, plaintiffs must allege a violation of an international norm that is "specific, universal, and obligatory." [FN4] *Doe v. Unocal*, 110 F.Supp.2d 1294, 1304 (C.D.Cal.2000) ["*Unocal II* "] (citing *In re Estate of Ferdinand Marcos, Human Rights Litigation*, 25 F.3d 1467, 1474-75 (9th Cir.1994) (internal citations omitted)). In other words, actionable violations of international law "are characterized by universal consensus in the international community as to their binding status and their content." *Forti v. Suarez-Mason*, 672 F.Supp. 1531, 1540 (N.D.Cal.1987) ["*Forti I* "]. A norm is "universal, definable and obligatory" if:

> FN4. The *Restatement of Foreign Relations Law* provides a slightly different measure of whether a legal norm is part of "international law": "Customary international law results from a general and consistent practice of states followed by them from a sense of legal obligation." *Rest. (Third) Foreign Relations Law* § 102(2) (1987).

(1) no state condone[s] the act in question and there is a recognizable "universal" consensus of prohibition against it; (2) there are sufficient criteria to determine whether a given action

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                      Page 5
Not Reported in F.Supp.2d, 2002 WL 319887 (S.D.N.Y.), RICO Bus.Disp.Guide 10,216
(Cite as: 2002 WL 319887 (S.D.N.Y.))

amounts to the prohibited act and thus violates the norm; [and] (3) the prohibition against it is non-derogable and therefore binding at all times upon all actors.

*Xuncax*, 886 F.Supp. at 184 (citing generally *Forti I*, 672 F.Supp. at 1540; Affidavit of International Law Scholars ["Law Scholars' Aff."], available at Declaration of David Weissbrodt, dated Mar. 16, 2001 ["Weissbrodt Decl."] at Ex. A; *Restatement (Third) of Foreign Relations Law* § § 701-02. The Court interprets international law as it "has evolved and exists among the nations of the world today," *see Kadic I*, 70 F.3d at 238 (quoting *Filártiga*, 630 F.2d at 881), and as it is set forth in juridical writings on public law, judicial decisions, and the general practice of nations, *see Filártiga*, 630 F.2d at 880-81.

**\*6** As described above, plaintiffs allege violations of seven international norms: (1) summary execution (Saro-Wiwa and John Kpuinen); (2) crimes against humanity (all plaintiffs); (3) torture (Saro-Wiwa, John Kpuinen, and Doe); (4) cruel, inhuman, or degrading treatment (all plaintiffs); (5) arbitrary arrest and detention (Saro-Wiwa, John Kpuinen, and Owens Wiwa); (6) violation of the rights to life, liberty and security of person (Saro-Wiwa, John Kpuinen, Owens Wiwa, and Doe); and (7) violation of the right to peaceful assembly and association (Saro-Wiwa, John Kpuinen, Owens Wiwa, and Doe).

*(a)  Torture, Summary Execution, Arbitrary Detention*

It is well established that torture, summary execution, and arbitrary detention "constitute fully recognized violations of international law," *Xuncax*, 886 F.Supp. at 184, because they are inconsistent with the "inherent dignity and [ ] the equal and inalienable rights of all members of the human family," *Universal Declaration of Human Rights*, preamble & arts. 9-11, G.A. Res. 217A, U.N. Doc. A/811 (1948). As the district court noted in *Xuncax*, each of these practices has been met with "universal condemnation and opprobrium." 886 F.Supp. at 185; *see also Filártiga*, 630 F.2d at 890 ("[T]he torturer has become ... *hostis humani generis*, an enemy of all mankind."); *Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment*, art. 2(2), 39 U.N. GAOR Supp., No. 51, at 197, U.N. Doc. A/39/51 (1984) ["*Convention Against Torture and Degrading Treatment* "] ("No exceptional circumstance whatsoever ... may be invoked as a justification for torture."). Moreover, each of these practices is well defined, *see Xuncax*, 886 F.Supp. at 185; Law Scholars' Aff. at 26, 37, 42.

Thus plaintiffs may allege violations of the international norm against summary execution, torture, and arbitrary arrest under the ACTA.

Defendants do not dispute that plaintiffs have stated claims for summary execution, torture, and arbitrary arrest on behalf of Saro-Wiwa and John Kpuinen. [FN5] Defendants contend, however, that Doe has not alleged facts adequate to support a claim for torture, and that Owens Wiwa has not alleged facts that support a claim for arbitrary arrest. The Court concludes that Doe's allegations with respect to torture are adequate, but that Owens Wiwa has failed to allege facts that support a claim for arbitrary arrest and detention. According to the *Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment*, an act constitutes torture if it (1) inflicts severe pain and suffering (either mental or physical); (2) is inflicted by or at the instigation of a public official; and (3) is inflicted for a purpose such as punishing the victim, or intimidating the victim or a third person. *See Convention Against Torture and Degrading Treatment*, art. 1, 39 U.N. GAOR Supp., No. 51, at 197, U.N. Doc. A/39/51 (1984). Plaintiffs allege that Jane Doe was "beaten and shot by the government troops while protesting the destruction of her property." (Am.Compl.¶ ¶ 43, 109). Although plaintiffs' allegations are less than fulsome, they support the interpretation that Doe was (1) caused extreme pain, (2) by a government official, (3) in order to intimidate or punish her, and thus the allegations are sufficient to withstand defendants' motion to dismiss.

> FN5. Defendants do not challenge the sufficiency of Saro-Wiwa, John Kpuinen, or Blessing Kpuinen's claims, except with respect to the TVPA preemption issue discussed above, and the Court thus does not reach these claims.

**\*7** The Court finds that the facts alleged in plaintiffs' Amended Complaint do not adequately state a claim for the arbitrary arrest or detention of Owens Wiwa, and therefore defendants' motion to dismiss is granted with respect to this claim. Under international law, "arbitrary detention" occurs when a person is detained without warrant or articulable suspicion, is not apprised of charges against him or her, and is not brought to trial. *See, e.g., International Covenant on Civil and Political Rights*, art. 9, 21 U .N. GAOR Supp., No. 16, at 52, U.N. Doc. A/6316 (1966). Plaintiffs provide only a cursory assertion that Owens Wiwa "had previously been arrested and detained without charges" at some undefined time in the past.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(Am.Compl.¶ 84). Accordingly, Owens Wiwa's claim for arbitrary arrest and detention is dismissed with leave to re-plead within 30 days of the filing of this Opinion and Order. [FN6]

> FN6. The Court does not consider whether, as a matter of law, Owens Wiwa must plead "prolonged" detention in order to assert a valid claim under the ACTA.

Plaintiffs' other international law claims present more complex questions, and the Court examines them in turn. [FN7]

> FN7. Neither party provided extensive briefing on the necessary elements of each international law claim. Consequently, the Court set outs its preliminary view of the applicable law, and will reconsider this view either at the summary judgment stage or another pretrial stage of the proceedings.

### (b) Cruel, Inhuman, or Degrading Treatment

Plaintiffs claim that the Nigerian government subjected Saro-Wiwa, John Kpuinen, Owens Wiwa, Blessing Kpuinen, and Jane Doe to "cruel, inhuman, or degrading treatment" by "forcing them to act against their will and conscience [*sic* ], inciting fear and anguish, breaking physical or moral resistance, and forcing them to leave their home and country and flee into exile." (Am.Compl.¶ 113). The international prohibition against "cruel, inhuman, or degrading treatment" is as universal as the proscriptions of torture, summary execution, and arbitrary arrest discussed above. *See Xuncax,* 886 F.Supp. at 186 (noting that "most of the major international human rights instruments conjoin in the same sentence the prohibitions against torture and against cruel, inhuman, or degrading treatment"). International law considers "cruel, inhuman or degrading treatment" as a general category of prohibited conduct of which "torture is at the extreme end." *Convention Against Torture and Other Cruel, Inhuman, Degrading Treatment or Punishment,* S. Exec. Rep. 30, 101st Cong., 2d Sess. 13 (1990); *see also, Convention Against Torture and Degrading Treatment,* art. 16, annex, 39 U.N. GAOR Supp., No. 51, at 197, U.N. Doc. A/39/51 (1984) (defining state obligations with respect to "other acts of cruel, inhuman, or degrading treatment or punishment which do not amount to torture ....").

The difficult issue for the Court, however, is to determine whether "cruel, inhuman, or degrading

treatment" has been defined adequately under customary international law, so that it is actionable under the ACTA. *See Forti v Suarez-Mason,* 694 F.Supp. 702, 712 (C.D.Cal.1988) [*Forti II* ] ("To be actionable under the [ATCA] the proposed tort must be characterized by universal consensus in the international community as to its binding status *and its content* ...."). In sum, the Court must determine (1) whether plaintiffs' alleged mistreatment constitutes "cruel, inhuman, or degrading treatment," and (2) whether such conduct constitutes a violation of international norms cognizable under the ACTA.

\*8 Two other district courts have been confronted with a similar quandary, and their disparate approaches underscore the lack of clarity concerning the status of claims for "cruel, inhuman, or degrading treatment" under the ACTA. In *Forti I,* the court held that plaintiffs' allegations of cruel, inhuman, or degrading treatment "lacks readily ascertainable parameters" and that, therefore, "it is unclear what behavior falls within the proscription." *Forti I, 672* F.Supp. at 1543. The *Forti I* court concluded that, "[l]acking the requisite elements of universality and definability, this proposed tort cannot qualify as a violation of the law of nations." *Id.* at 1543. In *Xuncax,* by contrast, Judge Woodlock considered the definability of this international norm, and maintained that certain "cruel, inhuman, and degrading treatment" was recognized under the ACTA. Judge Woodlock held that if the conduct underlying the allegation of "cruel, inhuman, or degrading treatment" constituted a clear violation of international norms, [FN8] then such claims are cognizable under the ACTA. *See* 886 F.Supp. at 187.

> FN8. Under the facts of *Xuncax,* Judge Woodlock concluded that defendants' alleged conduct---(a) torturing or severely mistreating an immediate relative in plaintiffs' presence, (b) ransacking plaintiffs' homes and threatening their families while plaintiffs looked on, and (c) subjecting plaintiffs to aerial bombings and grenade attacks---constituted "cruel, unusual or degrading treatment" that was cognizable under the ACTA. *See Xuncax, 886 F.Supp. at 187.* To evaluate conduct that was less clearly violative of international law--such as plaintiffs' claims of being put in great fear for their lives and being forced to flee into exile-- Judge Woodlock turned to American constitutional law for guidance. Woodlock concluded that "any act ... which is proscribed by the Constitution of the United

Case 1:05-cv-04622-DLI-RML   Document 49   Filed 02/17/06   Page 8 of 29 PageID #: 1104

Not Reported in F.Supp.2d                                                                Page 7
Not Reported in F.Supp.2d, 2002 WL 319887 (S.D.N.Y.), RICO Bus.Disp.Guide 10,216
(Cite as: 2002 WL 319887 (S.D.N.Y.))

States and by a cognizable principle of international law plainly falls within the rubric of cruel, inhuman, or degrading treatment, and is actionable ... under § 1350." *Id.* Applying this standard, Judge Woodlock maintained that "constructive expulsion"--where "the acts of defendants *on others* had the effect of forcing [plaintiffs] into exile"-- did not violate a defined international norm, nor did it violate any domestic constitutional norm, and hence was not cognizable under ACTA. *Id.* at 189.

The Court is satisfied that Owens Wiwa and Jane Doe have alleged "cruel, inhuman, or degrading" conduct that, while falling short of torture and summary execution, violates international law and is hence cognizable under the ACTA. First, Owens Wiwa alleges that he was forced to flee Nigeria under credible fear of "arbitrary arrest, torture and death," at the hands of the Nigerian military. (Am.Compl.¶ 84). Numerous instruments support the proposition that forced exile violates international law. *See Universal Declaration of Human Rights,* art. 9, U.N. GAOR, 3d Sess., Supp. No. 71, U.N. Doc. A/810 (1948) ( "[n]o one shall be subjected to arbitrary arrest, detention or exile"); *id.* art. 13 ("[e]veryone has the right to ... residence within the borders of each State"); *id.* art. 15 ("[n]o one shall be arbitrarily deprived of his nationality"); *International Covenant on Civil and Political Rights,* art. 12, 21 U.N. GAOR Supp., No. 16, at 52, U.N. Doc. A/6316 (1966) (right to freedom of residence within a country subject only to restrictions provided by law, necessary to protect national security, public order, health, morals or rights and freedoms of others); *American Convention on Human Rights,* 9 I.L.M. 101, art. 20, 22 (1970) (no one to be arbitrarily deprived of nationality; every person has a right to reside within his or her country of citizenship, subject to provisions of law).

Defendants maintain that Owens Wiwa has alleged a claim for "constructive exile," which, according to the *Xuncax* court, is not cognizable under the ACTA. [FN9] Defendants' reliance on *Xuncax* is misplaced. Unlike the plaintiff in *Xuncax,* who argued that threatened injury to *others* forced him into exile, Wiwa argues that credible threats to his *own* life and safety forced him to leave Nigeria. Such conduct, if proved, would clearly violate international norms against forced exile.

FN9. *See supra* note 8.

**\*9** Second, Owens Wiwa states a claim under

international law with respect to his allegation concerning defendants' attempt to bribe him to gain his brother's freedom (Am.Compl.¶ ¶ 8, 67, 69, 72, 73). Such conduct constitutes "cruel, inhuman or degrading treatment." *See* Law Scholars' Aff. At 33 (defining degrading treatment as "that which grossly humiliates a person before other or forces the person to act against his/her will or conscience, or incites fear, anguish, or inferiority ...") (citing *Ireland v.. United Kingdom,* 25 Eur. Ct. H.R. (ser.A) 65-67 (1978). Finally, Doe's allegations that defendants entered her village, beat her, and destroyed her property, also, if true, demonstrate "cruel, inhuman or degrading treatment" in violation of international law. (Am.Compl.¶ 43).

For these reasons, the Court finds that Owens Wiwa and Jane Doe have pled facts that support a claim for "cruel, inhuman or degrading treatment." Defendants do not contest, and the Court does not evaluate, whether plaintiffs plead facts that demonstrate a violation of this norm with respect to Ken Saro-Wiwa, John Kpuinen, Ken Wiwa, or Blessing Kpuinen.

*(c) Crimes Against Humanity*

Plaintiffs also allege violations of the international norm prohibiting crimes against humanity--a norm that is customary, obligatory, and well--defined in international jurisprudence. As stated by the Hague tribunal in *Prosecutor v. Tadic,* 36 I.L.M. 908 (Case No. IT-94-1-T, May 7, 1997) "the commission of crimes against humanity violate[s] customary international law." *Id.* at 937. Article 7 of the Statute of the International Criminal Court defines a crime against humanity as "any of the enumerated acts [listed below] committed as part of a widespread or systematic attack directed against any civilian population, with knowledge of the attack." *Rome Statute of the International Criminal Court,* adopted by the United Nations Diplomatic Conference of Plenipotentiaries on the Establishment of an International Court on 17 July 1998 (*cited in Prosecutor v. Rutaganda,* 39 I.L.M. 557, 570 (Case No. ICTR-96-3-T, May 2000)) ["I.C.C. Statute"]. Article 7 lists the "enumerated acts" as:

  murder; extermination; enslavement; deportation or forcible transfer of population; imprisonment or other severe deprivation of physical liberty in violation of fundamental rules of international law; torture; rape, sexual slavery, enforced prostitution, forced pregnancy, enforced sterilization, or any other form of sexual violence of comparable gravity; persecution against any identifiable group

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                         Page 8
Not Reported in F.Supp.2d, 2002 WL 319887 (S.D.N.Y.), RICO Bus.Disp.Guide 10,216
(Cite as: 2002 WL 319887 (S.D.N.Y.))

or collectivity on political, racial, national, ethnic, cultural, religious, gender ... or other grounds that are universally recognised as impermissible under international law, in connection with any act referred to in this paragraph or any other crime within the jurisdiction of the court; enforced disappearance of persons; the crime of apartheid; other inhumane acts of a similar character intentionally causing great suffering or serious injury to body or mental or physical health.

*10 I.C.C. Statute, art. 7 (cited in *Rutaganda, 39 I.L.M. at 570).*

Customary international law defines "widespread" as "massive, frequent, large scale action, carried out collectively with considerable seriousness and directed against a multiplicity of victims," and "systematic" as "thoroughly organised action, following a regular pattern on the basis of a common policy and involving substantial public or private resources." *Rutaganda, 39 I.L.M. at 571.* As the *Rutaganda* tribunal noted, "it is not essential for th[e violating] policy to be adopted formally as a policy of a State. There must, however, be some kind of preconceived plan or policy." *Id.* at 571 (citing *Report on the International Law Commission to the General Assembly,* 51 U.N. GAOR Supp., No 10, at 94, U.N.Doc. A/51/10 (1996).

The further requirement that a crime against humanity be committed against a "population" distinguishes these crimes from a "single or isolated act which, although possibly constituting war crimes or crimes against national penal legislation, do[es] not rise to the level of crimes against humanity." *Id.* at 941. As the *Tadic* tribunal noted: "[T]he emphasis is not on the individual victim but rather on the collective, the individual being victimised not because of his individual attributes but rather because of his membership of a targeted civilian population." [FN10] *Tadic, 36 I.L.M. at 941.* [FN11] Although this requirement "ensures that what is to be alleged will not be one particular act but, instead, a course of conduct," nevertheless "a single act by a perpetrator, taken within the context of a widespread or systematic attack against a civilian population entails individual criminal responsibility and an individual perpetrator need not commit numerous offences to be held liable." *Id* at 942-43. Moreover, it is also well established that crimes against humanity "do not require a connection to international armed conflict." *Id.* at 937 (citations omitted). In sum, under the definition of "crimes against humanity" provided in Article 7 of the I.C.C., plaintiffs must demonstrate (1) violation of one of the enumerated acts, (2)

committed as part of a widespread attack against a civilian population, (3) with knowledge of the attack.

> FN10. It is unclear whether discriminatory treatment is a necessary element of an allegation of a crime against humanity. *See Prosecutor v. Ruggiu,* 39 I.L.M. 1338, 1341 (Case No. ICTR-97-32-I, June 2000). In any event, one of the established forms of discrimination is political persecution, *see Tadic, 36 I.L.M. at 960,* which plaintiffs in this case certainly plead.

> FN11. One commentary describes the rationale behind the norm as follows:
> Only crimes which either by their magnitude and savagery or by their large number or by the fact that a similar pattern was applied at different times and places, endangered the international community or shocked the conscience of mankind, warranted intervention by States other than that on whose territory the crimes had been committed, or whose subjects had become their victims.
> *History of the United Nations War Crimes Commission and the Development of Laws of War* 179 (The United Nations War Crimes Commission: London, 1948) (*cited in Tadic,* 36 I.L.M. at 941).

Applying these standards to the facts alleged in the instant case, the Court finds that plaintiffs have stated various facts that satisfy the I.C.C.'s definition of crimes against humanity. First, the alleged forced exile of Owens Wiwa and the beating of Jane Doe as she was protesting the destruction of her property, both involve acts specified in Article 7 of the I.C.C. as crimes against humanity (*i e.,* deportation or forced exile; torture). [FN12] Second, these acts were allegedly perpetrated against members of a specific civilian population--the Ogoni people--as part of a widespread attack, and arguably involved "persecution against [an] identifiable group or collectivity on political, ... ethnic, cultural ... or other grounds that are universally recognized as impermissible under international law." *Rutaganda, 39 I.L.M. at 570.* Third, the mistreatment of Owens Wiwa and Doe are alleged to have been intentional, and hence "knowing." Such conduct, if proven, satisfies the definition of "crimes against humanity" provided in Article 7 of the I.C.C., violates international law, and therefore is actionable under the ACTA.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-04622-DLI-RML   Document 49   Filed 02/17/06   Page 10 of 29 PageID #: 1106

Not Reported in F.Supp.2d                                                                              Page 9
Not Reported in F.Supp.2d, 2002 WL 319887 (S.D.N.Y.), RICO Bus Disp.Guide 10,216
(Cite as: 2002 WL 319887 (S.D.N.Y.))

FN12. The Court notes that if plaintiffs successfully re-plead Owens Wiwa's claims for arbitrary arrest and detention, those claims would also state a "crime against humanity," as defined in Article 7 of the I.C.C.

### (d) Right to Life, Liberty, and Personal Security, and the Right to Peaceful Assembly and Expression

*11 Finally, defendants do not dispute that customary international law prohibits violations of the right to life, liberty, and personal security, and of the right to peaceful assembly and expression. In its general terms, the right to life, liberty, and personal security encompasses the right not to be subjected to arbitrary detention, summary execution, and other abusive treatment by governments. *See* Weissbrodt Decl. at ¶ ¶ 8-26 (citing, *inter alia, Universal Declaration on Human Rights,* art. 3, U.N. Doc. A/810 at 71 (1948); *International Covenant on Civil and Political Rights,* art. 6(1), 21 U.N. GAOR Supp., No. 16, at 52, U.N. Doc. A/6316 (1966)). The right to peaceful assembly and expression include the right not to be subjected to the use of force or violence by police or military while engaged in peaceful protest. *See Code of Conduct for Law Enforcement Officials,* annex, 34 U.N. GAOR Supp., No. 46, at 186, U.N. Doc. A/34/46 (1979) ("[F]irearms should not be used except when a suspected offender offers armed resistance or otherwise jeopardizes the lives of the others and less extreme measures are not sufficient ..."); *Basic Principles on the Use of Force and Firearms by Law Enforcement Officials, Eighth United Nations Congress on the Prevention of Crime and the Treatment of Offenders,* principle 9, U.N. Doc. A/CONF. 144/28/Rev.1, at 112, (1990) ["*Basic Principles* "] (law enforcement officials shall not use firearms except in self-defense or defense of others against imminent threat of death or to prevent other grave threats to life, and only when less extreme measures are unavailable); *id.* principle 13 (when dispersing assemblies, force must be avoided or, if that is not possible, minimally used); *id.* principle 12 (recognizing that governments may use force against peaceful demonstrators only within limits defined in the document). In short, the use of arbitrary force against individuals, or violently dispersing peaceful protestors (even when such protest violates local law) violates these well-articulated international norms.

Under these standards, Doe's allegations that she was shot and beaten while peacefully protesting are sufficient to state a claim for relief pursuant to both of these international norms: the right to personal security and the right to peaceable assembly. (Am.Compl.¶  ¶    43, 109). Notwithstanding defendants' contentions to the contrary, there is no requirement that Doe demonstrate that the force used against her was excessive or unreasonable. Under the international law instruments cited supra, beating and shooting a civilian engaged in peaceful protest is excessive and unreasonable.

The Court finds that Owens Wiwa has pled facts sufficient to support the claim that his right to peaceful assembly and expression was violated, but that he has failed to plead facts that support his contention that defendants violated his right to life, liberty, and personal security. Plaintiffs contend that defendants violated Owens Wiwa's right to assembly and expression by presenting Owens Wiwa with an untenable (and inhumane) "trade": his brothers' release from prison in exchange for an end to MOSOP's protests against Shell Nigeria's activities. Given that Owens Wiwa was, like his brother, an active member of MOSOP, such conduct was clearly intended to curtail Wiwa's political activities. The Court cannot find, however, that Owens Wiwa states a claim for violation of his right to life, liberty, and personal security. Although Owens Wiwa complains of past arbitrary arrest (which would violate his right to liberty), as discussed *supra,* those allegations are too cursory to withstand even the generous standard required under Rule 12. As a consequence, plaintiffs' claim for a violation of Owens Wiwa's right to life, liberty, personal security is dismissed with leave to re-plead this claim.

*12 To summarize, the Court finds that plaintiffs have alleged conduct that violates the rights of Jane Doe and Owens Wiwa as secured under international law, and which therefore constitutes actionable conduct under the ACTA, with respect to the following claims: (1) crimes against humanity with respect to Doe and Owens Wiwa; (2) torture with respect to Doe; (3) cruel, inhuman, or degrading treatment with respect to Doe and Owens Wiwa; (4) violation of the right to life, liberty and security of person with respect to Doe; (5) violation of the right to peaceful assembly and association with respect to Doe and Wiwa. Plaintiffs' allegations of arbitrary arrest and detention, and violation of the right to life, liberty and security of the person with respect to Owens Wiwa do not adequately demonstrate violations of international law, and therefore are not actionable under the ACTA. Plaintiffs are given 30 days from the date of this Order and Opinion to re-plead these two claims.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*A. Liability of Private Actors Under ATCA and TVPA*

Having determined that plaintiffs have alleged violations of international human rights law, the Court must next consider whether plaintiffs are required to demonstrate state action in order to support their claims and, if so, whether they have met that burden.

*(1) Does the State Action Requirement Apply?*

The ACTA and TVPA have similar, albeit not identical, state action requirements. Statutory language makes clear that *all* claims brought under the TVPA must demonstrate that the alleged violations were perpetrated "under actual or apparent authority, or color of law, of any foreign nation." 28 U.S.C. § 1350, note, § 2(a). Thus, in order for plaintiffs to sustain their claims against Brian Anderson brought pursuant to the TVPA, they must satisfy the state action requirement.

The ACTA's state action requirement is defined by precedent and is more complex. In *Kadic I*, the Second Circuit described three categories of international law violations: "(a) genocide, (b) war crimes, and (c) other instances of inflicting death, torture, and degrading treatment." *Kadic I*, 70 F.3d at 241. With respect to the first two categories, the *Kadic I* court held that individuals could be held liable for these torts without any showing of state action. *Id.* at 241-42, 244. With respect to the third category, the appeals court held that "torture and summary execution--when not perpetrated in the course of genocide or war crimes--are proscribed by international law only when committed by the state officials or under color of law." *Id.* at 243. This limitation is not absolute. Language used by the *Kadic I* Court did not entirely foreclose the possibility that individuals could be held liable for "other instances of inflicting death, torture, and degrading treatment" without a showing of state action.

Plaintiffs argue that the alleged "crimes against humanity" committed by defendants do not require a showing of state action because the alleged crimes fit into the narrow category of "death, torture, and degrading treatment" that, under *Kadic I*, does not require a showing of state action. The *Kadic I* court did not, however, give any examples of "crimes against humanity" that would fall into the third category but not require a showing of state action. I conclude that none of the crimes plaintiffs allege in

the instant case plausibly fit into that category. Indeed, the crimes against humanity plaintiffs allege--summary execution, arbitrary imprisonment, and persecution of a group based on political grounds--all fall squarely within the category of international law violations that require a showing of state action, pursuant to *Kadic I*. *Id* at 243 ("[T]orture and summary execution--when not perpetrated in the course of genocide or war crimes--are proscribed by international law only when committed by state officials or under color of law.") It would not be reasonable for a claimant to be required to plead state action to assert a claim for summary execution or torture, but not to be required to plead state action to assert a lesser crime such as assault, arbitrary detention, or political persecution.

**\*13** For these reasons, the Court concludes that plaintiffs must demonstrate state action in order to proceed with their ACTA and TVPA claims.

*(2) Corporate Defendants' Liability for the Acts of the Nigerian Authorities*

To determine whether a private actor acts under color of law in the context of a claim under ATCA and the TVPA, the Court must look to the standards developed under 42 U.S.C. § 1983. *See Kadic I*, 70 F.3d at 242. [FN13] "A private individual acts under color of law within the meaning of section 1983 when he acts together with state officials or with significant state aid." *Id.* The relevant test in this case is the "joint action" test, under which private actors are considered state actors if they are "willful participant[s] in joint action with the State or its agents." *See Dennis v. Sparks*, 449 U.S. 24, 27 (1980); *see also Unocal I*, 963 F.Supp. at 891 ("[W]here there is a substantial degree of cooperative action between the state and private actors in effecting the deprivation of rights, state action is present.").

> FN13. The TVPA's state action requirement can also be satisfied with reference to agency principles. *See* 28 U.S.C. § 1350, note, § 2(a). However, because the Court finds that plaintiffs have satisfied the state action requirement of the TVPA and ACTA by standards provided by section 1983 jurisprudence, it need not also consider whether they have satisfied the alternative agency principles.

In order to meet this burden in the instant case, plaintiffs have presented two theories of "joint

action" that would satisfy the state action requirement. First, they contend that the facts alleged demonstrate a substantial degree of cooperative action between corporate defendants and the Nigerian government in the alleged violations of international law. Second, they argue that the facts demonstrate that Shell Nigeria and the Nigerian government engaged in significant cooperative action that violated plaintiffs' rights, and that corporate defendants had sufficient knowledge of this conduct that they may be held liable for Shell Nigeria's conduct. [FN14] The Court finds that plaintiffs have pled facts that support their first theory of "joint action" and have therefore demonstrated that corporate defendants acted under color of law in the commission of acts alleged by plaintiffs to have violated international law. The Court need not consider plaintiffs' second theory of state action.

> FN14. To support this theory, plaintiffs maintain that Royal Dutch / Shell "dominated and controlled" Shell Nigeria and "each was the alter ego of the other" (Am.Compl.¶ 21). Defendants disagree with plaintiffs' characterization of the relationship between defendants and Shell Nigeria, and contend that applicable agency law does not allow corporate defendants to be held liable for torts committed by Shell Nigeria. The Court agrees with plaintiffs. Plaintiffs have adequately pled that that Royal Dutch / Shell controlled Shell Nigeria, and that the activities of Shell Nigeria can thus be imputed to the parent company. Plaintiffs have alleged meetings in London and the Netherlands concerning MOSOP, and coordination of the anti-MOSOP campaign between corporate defendants and Shell Nigeria, in part through Brian Anderson. Such factual allegations, although limited, are sufficient to give rise to an inference that defendants did more than merely "hold stock" in Shell Nigeria. By involving themselves directly in Shell Nigeria's anti-MOSOP activities, and by directing these activities, defendants made Shell Nigeria their agent with respect to the torts alleged in the complaint. Defendants also contend that plaintiffs' allegations regarding the relationship between Royal Dutch / Shell and Shell Nigeria are conclusory and unfounded, and are therefore inadequate to satisfy even Rule 12's liberal pleading standard. To support this argument, defendants rely on *De Jesus*

*v. Sears, Roebuck & Co., Inc.,* 87 F.3d 65 (2d Cir.1996), in which the Second Circuit held that "[a] complaint which consists of conclusory allegations unsupported by factual assertions fails even the liberal standard of Rule 12(b)(6)." *Id.* at 70. Defendants' reliance on *De Jesus* is misplaced. In that case, the court held that an allegation that fraudulent acts of the subsidiary "were caused by, known to and ratified by [the parent corporation]" was insufficient to demonstrate corporate domination and, hence, to withstand a motion to dismiss. *See id.* The allegations contained in the *De Jesus* complaint were, unlike those contained in plaintiffs' Amended Complaint, conclusory and unsupported by factual assertions.

In their Amended Complaint, plaintiffs allege various acts that, if proven, would demonstrate "a substantial degree of cooperative action between" corporate defendants and Nigerian officials in conduct that violated plaintiffs' rights. In February 1993, Royal Dutch / Shell met with Nigerian officials in England and the Netherlands to formulate an anti-MOSOP campaign (Am.Compl.¶ 40). Plaintiffs further allege that Royal Dutch / Shell made payments to the Nigerian military and police (*Id.* ¶ 33(a)), contracted for the purchase of weapons for the Nigerian police (*Id.* ¶ 33(b)), coordinated with the Nigerian military and police on intelligence matters related to the anti-MOSOP campaign (*Id.* ¶ 33(c)), helped plan "raids and terror campaigns conducted in Ogoni" (*Id.* ¶ 33(g)), bribed (or attempted to bribe) witnesses to give false testimony against Saro-Wiwa (*Id.* ¶ 33(e)), provided the Nigerian military with boats and helicopters to facilitate attacks on Ogoni villages (*Id.* ¶ ¶ 53-54), and paid the Nigerian military to respond violently to complaints regarding oil spills and to generally monitor and "contain" protests against Royal Dutch / Shell activities (*Id.* ¶ ¶ 56-58, 64, 65). Plaintiffs' allegations suffice to support a claim that defendants were "willful participant[s] in joint action with the state or its agents," and can hence be treated as state actors for the purpose of the ACTA.

*14 Defendants argue that plaintiffs must demonstrate that Royal / Dutch Shell acted in concert with the Nigerian government with respect to each human rights violations allegedly committed against each plaintiff, and have failed to do so in their Amended Complaint. The Court disagrees for three reasons. First, plaintiffs have alleged that defendants

jointly collaborated with the Nigerian government in committing several of the claimed violations of international law, such as planning the arbitrary arrest and killing of Ken Saro-Wiwa and John Kpuinen, the attempted bribery of Owens Wiwa, and bribery (or attempted bribery) of witnesses to give false testimony against Saro-Wiwa. Second, under section 1983 jurisprudence, individuals engaged in a conspiracy with government actors to deprive others of their constitutional rights act "under color of law" to commit those violations. *See Dennis*, 449 U.S. at 27-28 (dismissal of section 1983 suit is inappropriate where plaintiff alleges that a private individual engaged in a conspiracy with state officials to deprive another of constitutional rights). Section 1983 case law does not require plaintiffs' complaint to allege that private actors and state actors acted in concert to commit each specific act that violates plaintiffs' rights. *See, e.g., Burton v. Wilmington Parking Authority*, 365 U.S. 715, 724-725 (1961) (finding joint conduct between a government agency and private restaurant based on public ownership and maintenance of the restaurant's leased space, and financial benefits derived by the government from the lease arrangement). [FN15] Rule 8(a)(2) of the Federal Rules of Civil Procedure requires a complaint to include only "a short and plain statement of the claim showing that the pleader is entitled to relief." In *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163 (1993), the Supreme Court observed that "the Federal Rules of Civil Procedure do not require a claimant to set out in detail the facts upon which he bases his [section 1983] claim." *Id* at 168. (quoting *Conley v. Gibson*, 355 U.S. 41 (1957)). Rather, plaintiffs are required to provide "a short and plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Id.* The allegations in the Amended Complaint concerning the joint conduct of defendants and the Nigerian government are sufficient to satisfy Rule 8(a)(2), [FN16] and therefore to survive a challenge pursuant to Rule 12. [FN17]

> FN15. The cases defendants cite do not require the Court to hold otherwise. Both *American Mfrs Mut. Ins. Co v. Sullivan*, 526 U.S. 40 (1999) and *Blum v. Yaretsky*, 457 U.S. 991 (1982) involved the specific issue of whether the state could be held responsible for the conduct of a private entity engaged in a heavily regulated industry, such as workers' compensation insurance. In those cases, the Supreme Court used language requiring that plaintiffs

demonstrate defendants' involvement in the "specific conduct" alleged to have violated plaintiffs' rights in order to satisfy the state action requirement, to ensure that the government is not automatically held liable for the conduct of heavily regulated businesses. *See American Mfrs Mut Ins. Co.*, 526 U.S. at 52 ("In cases involving extensive state regulation of private activity, we have consistently held that '[t]he mere fact that a business is subject to state regulation does not by itself convert its action into that of the State for purposes of the Fourteenth Amendment.') (citations omitted); *Blum*, 457 U.S. at 1004 ("[A]lthough it is apparent that nursing homes in New York are extensively regulated, '[t]he mere fact that a business is subject to state regulation does not by itself convert its action into that of the State for purposes of the Fourteenth Amendment." ') (citations omitted).

> FN16. Defendants' reliance on *Unocal II*, in which a district Court refused to hold corporate defendants liable for human rights abuses allegedly perpetrated by the Burmese military, is misplaced for two reasons. First, the *Unocal II* court was considering a motion for summary judgment, and hence analyzed plaintiffs' evidence with more rigor than is used in considering a motion to dismiss. Second, unlike plaintiffs in the instant case, the *Unocal II* plaintiffs presented no evidence that corporate defendants in that case "participated in or influenced the military's unlawful conduct ." *Unocal II*, 110 F.Supp. at 1306.

> FN17. Defendants' arguments concerning whether the ACTA and TVPA provide a cause of action for aider and abettor liability, or for conspiracy, are off-point. Plaintiffs raised the possibility that defendants could be held liable under a theory of secondary liability for violations of international law in the section of their memorandum of law in which they maintain that the state action requirement of the ACTA does not apply in the instant actions. Because the Court finds that (1) the state action requirement *does* apply to plaintiffs' claims, and (2) that plaintiffs have satisfied the "joint action test," the Court does not address the merits of defendants' arguments concerning

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-04622-DLI-RML    Document 49    Filed 02/17/06    Page 14 of 29 PageID #: 1110

Not Reported in F.Supp.2d                                                                Page 13
Not Reported in F.Supp.2d, 2002 WL 319887 (S.D.N.Y.), RICO Bus.Disp.Guide 10,216
(Cite as: 2002 WL 319887 (S.D.N.Y.))

secondary liability under the ACTA or the TVPA.

### 3. Liability of Anderson under the ACTA and TVPA

Defendant Anderson maintains that plaintiffs have failed to plead facts that demonstrate that he acted under color of law to violate plaintiffs' rights, and thus have failed to state a claim under either the ACTA or TVPA. Plaintiffs maintain, and defendant Anderson does not contest, that private individuals can be held liable pursuant to the ACTA and the TVPA, as long as plaintiffs adequately demonstrate that the individual acted "under color of law." *See Kadic I,* 70 F.3d at 245-46. Plaintiffs have met this burden.

**\*15** As discussed above in the analysis of Royal Dutch / Shell's liability, in order to hold that defendant Anderson acted "under color of law" the Court must find that he was a "willful participant" in joint action with the state or its agents in the deprivation of plaintiffs' rights. According to plaintiffs' complaint, defendant Anderson provided financial assistance to the military police who were involved in various human rights abuses against the Ogoni (Anderson Compl. ¶ ¶ 20(a)-(c)), offered bribes for false testimony against Saro-Wiwa and others (*Id.* ¶ ¶ 20(g), 38), participated in the campaign to arrest Saro-Wiwa (*Id.* ¶ 20(g)), and offered to trade Saro-Wiwa's life for an end to MSOPO's anti-Shell activities (*Id.* ¶ 43). [FN18] Such allegations, if proven, will support plaintiffs' contention that defendant Anderson was a "willful participant" in the Nigerian government's alleged deprivation of plaintiffs' rights as secured under international law. Consequently, for purposes of surviving a motion to dismiss, plaintiffs have adequately demonstrated that defendant Anderson acted "under color of law" to deprive plaintiffs of their rights.

> FN18. Defendant Anderson contends that he can not be held liable for his alleged offer to trade Saro-Wiwa's life for an end to MOSOP's anti-Shell activities because such conduct does not involve "concerted action between Mr. Anderson and the Nigerian government to commit any human rights violation," and because "a private party's receipt of indirect benefits ... from unlawful state conduct" does not create liability against that private party. (Def. Anderson's Mem. of Law, dated March 27, 2001 at 9 n.13). Defendant Anderson relies on

*Carmichael v. United Tech. Corp.,* 835 F.2d 109, 114-15 (5th Cir 1988), in which the Fifth Circuit dismissed an ATCA action in which plaintiff attempted to hold a corporation liable for torture committed by the Saudi Arabian government. The corporation in question allegedly could have secured plaintiffs' release from a Saudi prison by releasing him from his lawful debts to the corporation, but the corporation refused to do so. *Carmichael* is not instructive in the instant case. Failure to release a debtor from lawful debts is a very different than actively and illegally attempting to bribe the family members of an illegally detained individual. If proven, the latter conduct could open defendant Anderson to liability for "cruel, inhuman, or degrading treatment" for exposing Saro-Wiwa's family to the mental anguish created, if plaintiffs demonstrate that Anderson's conduct involved significant cooperation with the government. Defendant Anderson's reliance on *Bigio v. Coca-Cola Co.,* 239 F.3d 440 (2d Cir.2000) is equally unconvincing. In that case, the defendant corporation did not actively participate in or encourage the alleged unlawful state conduct, but rather entered into a lease for property that was purportedly expropriated from plaintiffs because of their religion. *See Bigio,* 239 F.3d at 448. Unlike the case at bar, in *Bigio,* defendant was not a "willful participant" in unlawful conduct, but an inadvertent beneficiary.

### B. Additional Defenses Raised by Anderson

In addition to asserting several of the defenses averred by Royal Dutch / Shell, defendant Anderson asserts three others: (1) the TVPA provides a cause of action against only those directly responsible for torture or extrajudicial killing, and not those who allegedly "aid and abet" such action; (2) plaintiffs have failed to satisfy the TVPA's exhaustion requirement; (3) most of plaintiffs' ACTA claims against Anderson are time-barred. For the reasons explained below, the Court finds these arguments unpersuasive.

### (1) Scope of Liability Under the TVPA

Defendant Anderson maintains that the TVPA provides a cause of action against only those who "subject[ed]" the alleged victim to acts of torture or

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 319887 (S.D.N.Y.), RICO Bus.Disp.Guide 10,216
(Cite as: 2002 WL 319887 (S.D.N.Y.))

Page 14

extrajudicial killing. Hence, he interprets the TVPA to provide a cause of action against individuals who are "primary violators," and not those who "aid and abet" or conspire to commit acts of torture or extrajudicial killing. Plaintiffs contend that the text and legislative history of the TVPA counsels a contrary reading of the statute, and that defendant Anderson misconstrues the precedent he cites for support. The Court agrees with plaintiffs.

The TVPA provides for liability for an individual who "subjects" another to torture or extrajudicial killing. See 28 U.S.C. § 1350, note, § § 2(a) & (b). While the language of the TVPA could be more precise, the definition of the verb "subject" suggests, as plaintiffs argue, that the use of that word expands rather than narrows the reach of the statute. "Subject" means to cause someone "to undergo the action of something specified; to expose ... to make liable or vulnerable." Random House Webster's College Dictionary (1999). Using this definition, individuals who "cause someone to undergo" torture or extrajudicial killing, as well as those who actually carry out the deed, could be held liable under the TVPA. The legislative history of the TVPA supports this reading. In the Committee Report, the Senate Judiciary Committee explained that the Act would permit suits "against persons who ordered, abetted, or assisted in torture." S.Rep. No. 249, 102nd Cong., 1st Sess. (1991) (1991 WL 258662, *9-10). [FN19]

> FN19. Even if the language and legislative history of the TVPA did not warrant the conclusion that the Act allows for aider and abettor liability, the Restatement of Torts (Second) counsels such an interpretation. Section 876 of the Restatement provides for aider and abettor liability for tortious conduct where the defendant (a) "does a tortious act in concert with another ...", or (b) "knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement ...", or (c) "gives substantial assistance to the other in accomplishing the tortious result and his own conduct ... constitutes a breach of duty" to the victim. Restatement of Torts (Second). § 876 (2000). In the instant case, plaintiffs have alleged that Anderson engaged in conduct that, if proven, satisfies all three of these tests for aider and abettor liability.

*16 Defendants argue that Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164 (1994), in which the Supreme Court held there is no aiding and abetting cause of action in private civil suits brought under federal securities law, requires the Court to reject plaintiffs' assertion of secondary liability under the TVPA. See also Dinsmore v. Squandron, Ellenoff, Plesent, Sheinfeld & Sorkin, 135 F.3d 837 (2d Cir.1998) (applying the reasoning of Central Bank to preclude conspiracy liability under federal securities law). Neither Central Bank nor Dinsmore holds that a statute must explicitly allow for secondary liability in order for a court to hold aiders and abetters or co-conspirators liable. Rather, Central Bank and Dinsmore support the proposition that the scope of liability under a statute should be determined based on a reading of the text of the specific statute. See Central Bank, 511 U.S. at 175 ("Our consideration of statutory duties, especially in cases interpreting 10(b)(5), establishes that the statutory text controls the definition of conduct covered by § 10(b)."); Dinsmore, 135 F.3d at 844 ("The statutory text ... was the determinative issue in Central Bank, and it controls here as well."); Boim v. Quranic Literacy Institute, 127 F.Supp.2d 1002, 1017 (N.D.Ill.2001) ("Central Bank [does not] hold that aiding and abetting is generally precluded from federal civil causes of action," but requires that courts examine the language of the individual statute). As explained above, the Court finds that the language and legislative history of the TVPA supports liability for aiders and abettors of torture and extrajudicial killings.

### (2) Limitation of Claimants under TVPA

Defendant Anderson further argues that the TVPA contains an "express limitation on the class of plaintiffs who can bring claims under the statute," thus barring plaintiffs' claim for torture on behalf of Saro-Wiwa and John Kpuninen, brought by their legal representatives, Ken Wiwa and Blessing Kpuinen. To support this argument, Anderson provides a comparative reading of two sections of the TVPA: that which provides a cause of action for torture, section 2(a)(1), and that which describes the cause of action for extrajudicial killing, section 2(a)(2). Anderson reasons that because section 2(a)(2) explicitly provides that a claim for "extrajudicial killing" may be brought by the "individual's legal representative," and section 2(a)(1) provides that a defendant may be liable for a claim of torture "to that individual," it follows that section 2(a)(1) allows victims of torture victims only--and not their representatives--to sue under the TVPA. Anderson's interpretation of the TVPA, while not entirely implausible, is overly restrictive. Under such

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-04622-DLI-RML   Document 49   Filed 02/17/06   Page 16 of 29 PageID #: 1112

Not Reported in F.Supp.2d                                                                Page 15
Not Reported in F.Supp.2d, 2002 WL 319887 (S.D.N.Y.), RICO Bus.Disp.Guide 10,216
(Cite as: 2002 WL 319887 (S.D.N.Y.))

a reading of the statute, the most egregious violations of section 2(a)(1)--torture resulting in death or rendering the victim incompetent--would go unaddressed by the TVPA. Because defendant Anderson's interpretation thwarts the purpose of the TVPA to redress and, hence, deter torture, the Court declines to adopt it. [FN20]

> FN20. The result would be the same if the Court were to apply New York state law to determine whether Ken Wiwa and Blessing Kpuinen can bring a claim for torture behalf of Ken-Saro Wiwa and John Kpuinen. Under New York law, "[n]o cause of action for injury to [a] person ... is lost because of the death of the person in whose favor the cause of action existed." N.Y.E.P.T.L. § 11-3.2(b). Cf. *Xuncax*, 886 F.Supp. at 192 (applying Massachusetts state law to determine whether a spouse or father can recover for claims of arbitrary detention or torture brought under the ACTA). In dicta, the *Xuncax* court rejected the argument that, by its own terms, the TVPA allows a "third party" relative (*i e.,* one not appointed as a legal representative) to bring a claim for torture. In so far as the Court's holding in the instant case is inconsistent with the *Xuncax* court's analysis, the Court respectfully disagrees.

### (3) Exhaustion under TVPA

**\*17** Defendant Anderson argues that plaintiffs' TVPA claims should be dismissed because plaintiffs have failed to demonstrate that they have exhausted all "available and adequate remedies" in Nigeria, as required by the TVPA. *See* 18 U.S.C. § 1350, note, § 2(b). Specifically, Anderson maintains that Nigerian Courts or the Nigerian Human Rights Violation Investigation Commission, led by Justice Oputa ("the Oputa Commission"), provide an available and adequate remedies in Nigeria that plaintiffs have not exhausted. [FN21] In addition, Anderson maintains that, because "[p]laintiffs have not alleged that these--or other--Nigerian proceedings will not provide adequate remedies," this Court need not "perform the sensitive and difficult task of passing judgment on the judicial proceedings of a foreign sovereign." (Deft. Anderson's Mem. of Law at 16-17). The Court disagrees.

> FN21. Anderson points to plaintiff Ken Wiwa's alleged petition to the Oputa Commission relating to the execution of his

father, Saro-Wiwa, and others as evidence that plaintiffs have not exhausted their Nigerian remedies. The Court observes that it may not take judicial notice of this document without converting Anderson's motion to dismiss into a motion for summary judgment. *See Tarshis v Riese Organization,* 211 F.3d 30, 39 (2d Cir 2000) ("Ordinarily, in deciding a motion to dismiss for failure to state a claim, the district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken"). A list of petitions submitted in a foreign proceeding are not matters of public record that are "capable of accurate and ready determination ." *See* Fed.R.Evid. 201(b) ("A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."). Under this standard, the Court may, however, take judicial notice of *The Tribunals Inquiry Act* (the Nigerian statute that created the Oputa Commission) without converting defendants' motion to dismiss into a motion for summary judgment.

As an initial matter, defendants, not plaintiffs, bear the burden of demonstrating that plaintiffs have not exhausted "alternative and adequate" remedies in Nigeria. The Senate Committee Report specifies in unusual detail the procedure that courts should use to assess the exhaustion requirement of TVPA:

[A]s a general matter, the committee recognizes that in most instances the initiation of litigation under this legislation will be virtually prima facie evidence that the claimant has exhausted his or her remedies in the jurisdiction in which the torture occurred. The committee believes that courts should approach cases brought under the proposed legislation with this assumption.

.... Once the defendant makes a showing of remedies abroad which have not been exhausted, the burden shifts to the plaintiff to rebut by showing that the local remedies were ineffective, unobtainable, unduly prolonged, inadequate, or obviously futile. The ultimate burden of proof and persuasion on the issue of exhaustion of remedies, however, lies with the defendant.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-04622-DLI-RML Document 49 Filed 02/17/06 Page 17 of 29 PageID #: 1113

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 319887 (S.D.N.Y.), RICO Bus.Disp.Guide 10,216
(Cite as: 2002 WL 319887 (S.D.N.Y.))

Page 16

S.Rep. No. 249 (1991 WL 258662, *9-10) Other courts that have considered the exhaustion defense have recognized that the legislative history of the TVPA "indicates that the exhaustion requirement ... was not intended to create a prohibitively stringent condition precedent to recovery under the statute." *Xuncax*, 886 F.Supp. at 178; *see also, Hilao*, 103 F.3d at n.778 (applying the burden shifting procedure suggested in the Senate Committee Report). Thus, Anderson bears the burden of demonstrating that plaintiffs have failed to exhaust "available and adequate remedies" in Nigeria. Only after Anderson has made this showing are plaintiffs required to demonstrate that such remedies are not, in fact, "adequate" or are "obviously futile."

Anderson has not met this initial burden. As plaintiffs observe, Anderson does not demonstrate that a Nigerian court would be amenable to a suit for violations of international law, brought against a non-citizen, non-resident of Nigeria, such as Anderson (who claims to be a citizen of Britain and Northern Ireland, and a resident of France and Hong Kong (Anderson Decl. ¶ 4)). Even if Anderson had demonstrated that a Nigerian court *could* exercise jurisdiction over such a suit, plaintiffs have provided sufficient evidence of the inadequacy of that forum. Although political conditions in Nigeria have improved since 1995, Nigerian courts remain an uncertain forum for justice. *See* U.S. Dept. of State, *2000 Country Reports on Human Rights Practices, Nigeria* (Feb.2001), *available at http://www.state.gov /g/drl/rls/hrrpt/2000/af/700.htm* ("The judiciary is subject to political influence, and is hampered by corruption and inefficiency. The judicial system was incapable of providing citizens with the right to a speedy, fair trial.").

*18 Anderson also suggests that the Oputa Commission provides an alternative remedy for plaintiffs. Once again, however, plaintiffs have demonstrated that the Commission does not provide an adequate alternative forum for their claims. It is true that the Oputa Commission was established by Nigeria's new civilian leadership to investigate "gross violations of human rights committed in Nigeria" between 1966 and 1999. *Tribunals of Inquiry Act (Amend.),* ch. 447(a) (Oct. 4, 1999) (Nigeria). However, the Commission's chief purpose is not to "remedy" such violations, but to promote reconciliation. *Id.* Indeed, the Oputa Commission lacks the power to remedy violations of human rights; it may only "[r]ecommend measures which may be taken whether judicial, administrative, legislative or institutional ..." *Tribunals of Inquiry Act*

*(Amend.),* ch. 447(d) (Oct. 4, 1999) (Nigeria). [FN22] Anderson has failed to demonstrate that plaintiffs have adequate, alternative remedies available in Nigeria. Hence, the Court should not, and does not, dismiss plaintiffs' TVPA claims against defendant Anderson due to failure to exhaust alternative remedies.

> FN22. Moreover, evidence collected by the Commission is not admissible in any civil or criminal proceeding. *See Tribunals of Inquiry Act,* ch. 447, § 8 (June 2, 1966) (Nigeria)

*(3) Statute of Limitations under ACTA*

Defendant Anderson asserts that plaintiffs' ACTA claims and supplemental state law tort claims are barred by the statute of limitations. For the reasons set forth below, Anderson's statute of limitations defense fails.

*(a) Statute of Limitations for the ACTA*

The ACTA does not contain a statute of limitations. When a federal cause of action lacks a specific period of limitations, federal law usually "borrows" the limitations period of the closest analogous cause of action under the law of the forum state. *See North Star Steel Co. v. Thomas,* 515 U.S. 29, 33-34 (1995). However, there is an important, if narrow, exception to this general rule: if application of the state limitations period will "frustrate or interfere with the implementation of national policies," *id.* at 34 (internal quotations omitted), or when a federal law "clearly provides a closer analogy than available state statutes, and when the federal policies at stake ... make the [federal statute] a significantly more appropriate vehicle for interstitial lawmaking," *Reed v. United Transp. Union,* 488 U.S. 319, 324 (1989) (internal quotations omitted), courts are to apply the limitations period of the closest analogous federal statute.

Anderson maintains that the applicable limitations period for plaintiffs' ACTA claims is that which is applicable to analogous causes of action in the forum state, New York. Anderson thus argues that New York's one-year limitations period for actions for assault, battery and false imprisonment, *see* N.Y.C.P.L.R. § 215, or the three-year limitations period for other personal injuries, *see* N.Y.C.P.L.R. § 214(5), applies to plaintiffs' ACTA claims. Following the same principle, Anderson argues that New York's rule requiring that all causes of action

Not Reported in F.Supp.2d                                                                    Page 17
Not Reported in F.Supp.2d, 2002 WL 319887 (S.D.N.Y.), RICO Bus.Disp.Guide 10,216
(Cite as: 2002 WL 319887 (S.D.N.Y.))

brought on behalf of a deceased claimant must be commenced within one year after the claimant's death, *see* N.Y.C.P.L.R. § 210, applies to claims brought by Ken Wiwa and Blessing Kpuinen on behalf of Saro-Wiwa and John Kpuinen. Because plaintiffs' causes of action accrued no later than November 1995 (Am.Compl.¶ ¶ 46-47), and plaintiffs did not file their complaint against Anderson until April 4, 2001, Anderson concludes that both the three-year and one-year limitations periods have run and that, therefore, the ACTA claims filed against him are time barred.

*19 The court need not and does not decide whether defendant Anderson's analysis of the state law statutes of limitations is correct because the statutes are inapplicable to plaintiffs' ACTA claims. [FN23] First, it is evident that the TVPA, which was enacted as a statutory note to the TVPA, is the closest analogous statute to the ACTA, and "clearly provides a closer analogy than available state statutes." *United Steelworkers of Am., AFL-CIO-CLC v. Crown Cork & Seal Co., Inc.,* 32 F.3d 53, 57 (3d Cir.1994), *aff'd North Star Steel,* 515 U.S. 29 (1995). Second, application of the state law periods of limitations would frustrate the "federal policies" at stake in the ACTA: to allow victims of international law violations committed in a foreign country to redress those violations in United States courts. ACTA plaintiffs confront obstacles not generally present in state tort and wrongful death suits: difficulties of gathering evidence sufficient to support a complaint; unavailability or hesitation of witnesses who may fear reprisal by a corrupt regime; other delays caused by ongoing human rights violations. Application of the shorter statutes of limitations available under New York law would be especially burdensome for plaintiffs filing (or planing to file) ACTA claims.

> FN23. The Court notes, however, that Anderson did not take into consideration the New York state tolling provision, N.Y.C.P.L.R. § 207, that allows tolling "[i]f, when a cause of action accrues against a person, he is without the state, the time within which the action must be commenced shall be computed from the time he comes into or returns to the state."

Finally, in borrowing the ten-year period of limitations from the TVPA the Court follows other courts that have considered the limitations period applicable to ACTA claims since the passage of the TVPA in 1991. *See In re World War II Era Japanese Forced Labor Litigation,* 164 F.Supp.2d 1160, 1180

(N.D.Cal.2001); *Iwanowa v. Ford Motor Co.,* 67 F.Supp.2d 424, 462 (D.N.J.1999); *Cabiri v. Assasie-Gyimah,* 921 F.Supp. 1189, 1195-96 (S.D.N.Y 1996); *but see Xuncax,* 886 F.Supp. at 191-193 (applying Massachusetts' statute of limitations to ACTA claims without considering applicability of the TVPA ten-year statute of limitations). [FN24] For these reasons, the Court finds that the TVPA's ten-year statute of limitations is the appropriate period of limitations for plaintiffs' ACTA claims and, hence, that defendant Anderson's statute of limitations defense fails.

> FN24. Defendant Anderson's reference to *Forti I,* in which the court applied an analogous state-law statute of limitations, is inapposite because *Forti I* was decided prior to the enactment of the TVPA in 1991, and hence the TVPA was not available as a closer analogous federal statute. *See* 672 F.Supp. at 1548-51.

### (b) Statute of Limitations for State Law Claims

Defendant Anderson maintains that plaintiffs' supplemental tort claims are subject to the same limitations period that is applied by the courts of the forum state. *See Guaranty Trust Co. of New York v. York,* 326 U.S. 99, 110 (1945) (state statutes of limitations apply to state law claims brought in federal court pursuant to diversity jurisdiction). Under this rule, Anderson argues, plaintiffs' intentional tort claims are governed by the one-year period of limitations of N.Y.C.P.L.R. § 215, and their negligence claims are governed by the three-year limitations period of N.Y.C.P.L.R. § 214(5). Thus, Anderson reasons, because six years lapsed between the alleged violations and the filing of the complaint, all of plaintiffs' supplemental claims are time barred.

*20 The Court agrees with defendant Anderson that New York statutes of limitations apply to plaintiffs' supplemental state law tort claims. *See Bouton v. BMW of North America,* 29 F.3d 103, 110 (3d Cir.1994)(recognizing that the rule requiring application of state law limitations periods to state claims brought pursuant to diversity jurisdiction also applies to supplemental state law claims). This rule of decision, however, also requires federal courts to apply state rules that are an "integral part of the statute of limitations," including tolling rules. *Walker v. Armco Steel Corp.,* 446 U.S. 740, 751 & n.12 (1980) (internal quotations omitted). New York law allows tolling "[i]f, when a cause of action accrues against a person, he is without the state, the time

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 319887 (S.D.N.Y.), RICO Bus.Disp.Guide 10,216
(Cite as: 2002 WL 319887 (S.D.N.Y.))

within which the action must be commenced shall be computed from the time he comes into or returns to the state." N.Y.C.P.L.R. § 207. [FN25]

> FN25. The exception to the tolling provision, N.Y.C.P.L.R. § 207(3) ("while jurisdiction over the person of the defendant can be obtained without personal delivery of the summons to the defendant within the state" the limitations period does not toll), does not apply because plaintiffs did not have personal jurisdiction over defendant Anderson until his March 2001 visit to New York, at which time plaintiffs served him with a summons.

Applying this rule to the instant case, the Court finds that plaintiffs' supplemental tort claims are not barred under New York law. According to Anderson's Declaration, he conceded that his March 2001 trip to New York, during which he was served, "was the first time [he] had visited that state (other than in transit) since the 1960's." (Anderson Decl. ¶ 6). Thus, even if Anderson's assessment of the applicable state law limitations period is correct--which the Court does not accept or reject--those limitations periods would have tolled from 1995 to 2001, pursuant to N.Y.C.P.L.R. § 207. Consequently, plaintiffs' supplemental state law claims are not time-barred.

### C. RICO Claims

Plaintiffs contend that Royal Dutch / Shell's actions violated the civil RICO statute, Title 18 U.S.C. § 1962. Specifically, plaintiffs claim that corporate defendants are liable for Jane Doe's loss of property and Owens Wiwa's loss of business. Defendants contend that RICO does not apply to this extraterritorial action, that plaintiffs fail to state a claim under either section 1962(c) or section 1962(d), [FN26] and that plaintiffs lack standing to bring a RICO claim. The Court concludes below these contentions are without merit.

> FN26. Plaintiffs withdrew their claim for a violation of section 1962(b). (RICO Stmt. at 23).

### 1. RICO Extraterritorial Jurisdiction

The RICO statute is silent as to its extraterritorial application. See North South Finance Corp. v. Al-Turki, 100 F.3d 1046, 1051 (2d Cir.1996). Although it is clear that a foreign corporation is not shielded from RICO liability merely because of its location, see id.; Alfadda v. Fenn, 935 F.2d 475, 479 (2d Cir.1991), the degree of domestic activity required to justify RICO jurisdiction over the foreign corporation is not obvious, see North South Finance, 100 F.3d at 1051. Courts are guided in this determination by "precedents concerning subject matter jurisdiction for international securities transactions and antitrust matters." Id.; see also Unocal II, 110 F.Supp.2d at 1311. The Second Circuit has cautioned, however, that the appropriate test varies "depend[ing] on the substantive law to be applied," and that the tests developed in securities and antitrust cases may not provide perfect models because they are "premised upon congressional intent in enacting the Securities Exchange Act and the antitrust statutes, not the intention of Congress concerning RICO." North South Finance, 110 F.3d at 1052. The ultimate inquiry is whether "Congress would have wished the precious resources of United States courts" to be concerned with the transactions at hand. See id. (quoting Bersch v. Drexel Firestone, Inc., 519 F.2d 974, 985 (2d Cir.1975)).

*21 In North South Finance, the Second Circuit outlined two tests for determining whether sufficient domestic activity exists to justify subject matter jurisdiction: the "conduct test" and the "effects test." See 100 F.3d at 1051; Unocal II, 110 F.Supp.2d at 1311. Plaintiffs in this case rely exclusively on the "effects test" to justify subject matter jurisdiction, and the Court considers this test only.

As the Second Circuit observed in North South Finance, there are differences between the effects test as it applies in securities fraud cases and as it applies in antitrust cases. Statutes prohibiting securities fraud "may be given extraterritorial reach whenever a predominantly foreign transaction has substantial effects within the United States." 100 F.3d at 151 (quoting Consolidated Gold Fields PLC v. Minorco, S.A., 871 F.2d 252, 261-62 (2d Cir.1989)). In this context, transactions "with only remote and indirect effects in the United States do not qualify as substantial." North South Finance, 100 F.3d at 1051 (citing Consolidated Gold Fields, 871 F.2d at 261-62). With respect to anticompetitive behavior occurring outside the United States, antitrust liability may attach "if the conduct is intended to and actually does have an effect on United States imports or exports which the state reprehends." Id. (citing United States v. Aluminum Co. of America, 148 F.2d 416, 443-44 (2d Cir.1945); see also National Bank of Canada v. Interbank Card Ass'n, 666 F.2d 6, 8 (2d Cir.1981) (noting that inquiry is whether alleged

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-04622-DLI-RML   Document 49   Filed 02/17/06   Page 20 of 29 PageID #: 1116

Not Reported in F.Supp.2d                                                              Page 19
Not Reported in F.Supp.2d, 2002 WL 319887 (S.D.N.Y.), RICO Bus.Disp.Guide 10,216
(Cite as: 2002 WL 319887 (S.D.N.Y.))

antitrust violation "has, or is intended to have, any anticompetitive effect upon United States commerce, either commerce within the United States or export commerce from the United States"). The *North South Finance* panel suggested that the antitrust-based effects test may be "more appropriate" for RICO claims because "the civil action provision of RICO was patterned after the Clayton Act." *North South Finance*, 100 F.3d at 1052 (quoting *Agency Holding Corp. v. Malley-Duff & Assoc. Inc.*, 483 U.S. 143, 150 (1987). However, the panel also noted that "RICO (like the antitrust laws) provides for treble damages, which heightens concerns about international comity and foreign enforcement," *id.* (comparing 18 U.S.C. § 1964(c) with 15 U.S.C. § 15(a)); *see also Unocal II*, 110 F.Supp.2d at 1311 (applying securities-based effects test), leaving this Court, like the panel, uncertain as to which "effects test" should be used to evaluate the extraterritorial application of RICO. In either case, however, the reasoning behind the test is "to protect ... domestic markets from corrupt foreign influences." *Madenes v. Madenes*, 981 F.Supp. 241, 250 (S.D.N.Y.1997). The Court need not decide which variant of the "effects test" applies to determinations of the applicability of RICO to extraterritorial racketeering. Under either test, the Court finds that plaintiffs have adequately pled facts that support subject matter jurisdiction over plaintiffs' RICO claims.

**\*22** Plaintiffs assert that subject matter jurisdiction is appropriate because "[m]uch of defendants' oil is shipped to the United States" and defendants had the "intention to gain significant competitive advantage" in the United States through their racketeering activities (Pls.' Mem. at 21). Plaintiffs allege that 90 percent of Nigeria's crude oil yield comes from the Niger Delta (the region in which Ogoni is located) and that defendants' commission of predicate acts was designed to facilitate the exploitation of the Ogoni oil fields (Am. Compl. ¶ 30; RICO Stmt. at 23). Plaintiffs further allege that 40 percent of Nigeria's oil production is exported to the United States (Am.Compl.¶ 31). More specifically, plaintiffs claim that defendants' unlawful exploitation of the Ogoni oil fields resulted in lower production costs and thus an unfair advantage in the United States oil market. [FN27] Although the Court recognizes that plaintiffs' allegations are perhaps less explicit than they could be, the Court finds that the allegations, read favorably to plaintiffs, demonstrate that corporate defendants' racketeering activities, if proven, have effects on the United States economy that plainly support subject matter jurisdiction under the civil RICO statute for purposes of a Rule 12 motion

> FN27. Although the Amended Complaint, even read liberally, does not contain these all of these allegations, plaintiffs' RICO statement sufficiently supports jurisdiction on these grounds. (RICO Stmt. at 22-23). It is well established that the Court, in deciding a motion to dismiss a RICO claim, may consider facts alleged in a RICO statement without converting the motion into one for summary judgment. *See McLaughlin v. Anderson*, 962 F.2d 187, 189 (2d Cir.1992) ("In analyzing the issues on this motion to dismiss, we must take as true the facts as alleged in the complaint and as supplemented by the RICO case statement ordered by the district court.").

### 2. Plaintiffs' RICO Claims

RICO provides a civil cause of action for "[a]ny person injured in his business or property by reason of a violation of section 1962 ." 18 U.S.C. § 1964(c). Plaintiffs allege violations of two subsections found in section 1962: section 1962(c) and section 1962(d). Title 18 U.S.C. § 1962(c) provides that:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.

Section 1962(d) makes it "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c)" of Section 1962.

### (a) Plaintiffs' 1962(c) Claim

To state a claim under § 1962(c), a plaintiff must demonstrate: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985). RICO defines "racketeering activity" to mean the commission of any one of the many enumerated "predicate acts" listed in section 1961(1). In addition, by its own terms, section 1962(c) requires that, to be actionable under RICO, the enterprise must be "engaged in, or the racketeering activities affect, interstate or foreign commerce." 18 U.S.C. § 1962(c). The Court examines these elements in turn.

### (i) Enterprise

In order to plead a civil RICO violation, plaintiffs

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 319887 (S.D.N.Y.), RICO Bus.Disp.Guide 10,216
(Cite as: 2002 WL 319887 (S.D.N.Y.))

must allege the existence of an enterprise, "a group of persons associated together for a common purpose of engaging in a course of conduct." *Procter & Gamble Co. v. Big Apple Indus. Bldgs., Inc.*, 879 F.2d 10, 15 (2d Cir.1989). Under RICO, an enterprise "includes any individual, partnership, corporation, association or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

**\*23** Plaintiffs allege a RICO enterprise between the two corporate defendants (each of which is separately incorporated), Shell Nigeria, the Nigerian authorities, and Willbros West Africa, Inc. (Am.Compl.¶ ¶ 11, 12, 155- 58). Each of these named participants is an "individual or entity capable of holding a legal or beneficial interest in property," thus satisfying 18 U.S.C. § 1961(3). *Cf. See United States v. Angelilli*, 660 F.2d 23, 30-33 (2d Cir.1981) (section 1961(4) definition of "enterprise" encompasses governmental entity). Plaintiffs further allege that the various defendants attended meetings and coordinated activities in an effort to facilitate oil extraction through the subjugation of the local populace. (Am.Compl.¶ ¶ 33, 40, 79, 165). These allegations satisfy plaintiffs' pleading burden on a motion to dismiss.

Defendants argue that the enterprise plaintiffs describe in their pleadings fails to conform to RICO's definition of an "enterprise." Specifically, defendants argue that plaintiffs have alleged an enterprise that consists of defendants and their agents only, and that such an association fails to satisfy section 1962(c)'s definition of "enterprise," which requires that the enterprise be distinct from the "person" conducting the racketeering activities. In support of this argument, defendants cite *Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*, 30 F.3d 339, 344 (2d Cir.1994), in which the Second Circuit held that "alleging a RICO enterprise that consists merely of a corporate defendant associated with its own employees or agents carrying on regular affairs of the defendant" will not satisfy RICO's definition of "enterprise." *See also, Discon. Inc v. NYNEX Corp.*, 93 F.3d 1055, 1064 (2d Cir.1996), *rev'd on other grounds*, 525 U.S. 128 (1998) (holding that a parent corporation and two subsidiary corporations may not constitute a RICO "enterprise" when alleged predicate acts were committed within the scope of the agency relationship).

Defendants' argument fails because assuming, *arguendo*, that the three corporate entities are incapable of forming a RICO enterprise--a

conclusion the Court need not reach at present [FN28]--the alleged "enterprise" still includes at least three separate entities: the corporate defendants (with Shell Nigeria), the Nigerian military, and Willbros. [FN29] Defendants further argue that the Nigerian military cannot be part of an enterprise with corporate defendants because plaintiffs have alleged elsewhere in their Amended Complaint that the military functioned as the agents of the corporate defendants and Shell Nigeria.

> FN28. The Second Circuit has left open the possibility that corporations and their agents or subsidiaries could be considered an "enterprise" if the alleged predicate acts were *not* committed within the scope of the agency relationship. *See Riverwoods*, 30 F.3d at 344; *Discon*, 93 F.3d at 1064. Moreover, the Supreme Court has recently suggested that a corporation and its president can be considered an "enterprise" for RICO purposes, even when the alleged predicate acts were committed by the president "acting in the scope of his employment." *Cedric Kushner Promotions Ltd. v. King*, 533 U.S. 158, ___, 121 S.Ct 2087, 2092 (2001) ("[The Second Circuit's] critical legal distinction-between employees acting within the scope of corporate authority and those acting outside that authority-is inconsistent with [RICO's] basic statutory purpose.").

> FN29. The Court disagrees with defendants' contention that plaintiffs have not alleged facts that support a finding that Willbros was part of the alleged RICO enterprise. Plaintiffs' RICO statement alleges involvement by Willbros that is sufficient to support plaintiffs' contention that Willbros formed part of the enterprise, at least through part of 1993. (RICO Stmt. at 21) In addition, even if Willbros was not a participant in the alleged "enterprise," the Court knows of no requirement that an enterprise must involve more than two "persons." *See Cedric Kushner Promotions*, 121 S.Ct at 2092 (recognizing a RICO enterprise constituting the president and sole shareholder).

Defendants again rely on *Riverwoods* and *Discon* to support the proposition that the corporate defendants could not be part of an "association-in-fact" with their alleged agent, the Nigerian military. [FN30]

Although *Riverwoods* and *Discon* foreclose the possibility that an RICO "enterprise" can be comprised of a corporation and its employees or subsidiaries in most situations, they do not preclude the possibility that two entities in a principal-agent relationship might also function as separate "persons" in a RICO "enterprise" when the agent-subsidiary is not acting in the scope of the agency relationship. Moreover, the Supreme Court has recently suggested that, in certain circumstances, a corporation and its president can be considered an "enterprise" for RICO purposes, even when the alleged predicate acts were committed by the president "acting in the scope of his employment." *Cedric Kushner Promotions,* 121 S.Ct at 2092 ("[The Second Circuit's] critical legal distinction--between employees acting within the scope of corporate authority and those acting outside that authority--is inconsistent with [RICO's] basic statutory purpose."). Thus, although some authority weighs against recognizing an "enterprise" that is comprised of a corporation and its agents or subsidiaries, recent Supreme Court case law suggests that the "distinctiveness" requirement imposed by section 1962(c) is not as rigid as prior circuit precedent suggests. Given the facts of the instant case, the Court finds that plaintiffs have alleged facts sufficient to plead the existence of a RICO enterprise involving corporate defendants, Shell Nigeria, the Nigerian military, and perhaps Willbros.

> FN30. Defendants repeatedly state that plaintiffs have alleged that the Nigerian military functioned as corporate defendants' "agent." The Court finds, however, that plaintiffs have not relied on that characterization to support their ACTA claims, or their RICO claims. Nevertheless, insofar as plaintiffs' other legal claims rely on such a relationship--an issue which the Court does not decide at this time--the Court finds that Second Circuit case law cited by defendants is not dispositive of whether corporate defendants' relationship with the Nigerian military could constitute an "enterprise" under RICO.

*(ii) Commission of Predicate Acts*

**\*24** It is well established that "Congress did not deploy RICO as an instrument against all unlawful acts ... [but] targeted only predicate acts catalogued under section 1961(1)." *Hecht v. Commerce Clearing House, Inc.,* 897 F.2d 21, 25 (2d Cir.1990). Section 1961(1) defines racketeering activity, in relevant parts, as (a) "any act or threat involving murder,

kidnapping, gambling, arson, robbery, bribery, extortion, ... which is chargeable under State law and punishable by imprisonment for more than one year" and (b) "any act which is indictable under" the Hobbs Act, Title 18 U.S.C. § 1951 (relating to interference with commerce, robbery, or extortion). 28 U.S.C § 1961(1). Plaintiffs have alleged numerous predicate acts, including bribery (Am.Compl.¶ ¶  33(g), 75, 165(c)); murder (*Id* ¶ ¶ 37, 56, 64, 165(b)); arson (*Id* . ¶ ¶ 60, 64, 165(a)); and extortion in violation of the Hobbs Act, 18 U.S.C. § 1951 (*Id.* ¶ ¶ 43, 76, 84, 85, 165(e), 166). These acts constitute "racketeering activity" as defined in section 1961.

Defendants contend that plaintiffs' alleged predicate acts are invalid because they occurred in Nigeria and thus do not plead violations of the laws of a state or of the United States. The Court disagrees.

The Second Circuit, in a series of opinions, has clarified the extent to which a RICO plaintiff must allege a predicate offense actually chargeable under the laws of a particular state. In *United States v. Bagaric,* the court held that "[u]nder RICO ... state offenses are included by generic designation," and that "[r]eferences to state law serve [merely] a definitional purpose, to identify *generally* the kind of activity made illegal by the federal statute." 706 F.2d 42, 62 (2d Cir.1983), *abrogated on other grounds by National Org. for Women, Inc. v Scheidler,* 510 U.S. 249 (1994) (cited in *United States v Carrillo,* 229 F.3d 177, 182 (2d Cir.2000) (emphasis in citing case)). In *United States v. Coonan,* the appeals court held that a state law crime could constitute a predicate offense even though the defendant had been acquitted of the crime in state court, because "chargeable under state law" does not require that the particular underlying conduct at issue could have been charged under state law, only that such conduct be "chargeable" as a general matter. *See* 938 F.2d 1553, 1564-65 (2d Cir.1991). However, in a later opinion, the Second Circuit clarified that that a predicate act based on state law must "include the essential elements of the state crime." *Carillo,* 229 F.3d at 186.

The issue for this Court to determine is whether location of the crime is an "essential" element under *Carillo,* and therefore whether a predicate violation of state law must occur within the jurisdictional boundaries of a state in order to be chargeable under the laws of the state. The Court finds that location is not an essential element. First, the *Carillo* Court was concerned with a failure to allege substantive elements, such as intent to harm. *See* 229 F.3d at 184

Not Reported in F.Supp.2d                                                                                    Page 22
Not Reported in F.Supp.2d, 2002 WL 319887 (S.D.N.Y.), RICO Bus.Disp.Guide 10,216
(Cite as: 2002 WL 319887 (S.D.N.Y.))

(using hypotheticals to illustrate need to demonstrate substantive elements of underlying crimes). Notwithstanding defendants' argument to the contrary, the Court finds that location is best categorized as a procedural obstacle to conviction of the sort that plaintiffs are not required to satisfy in order to allege a predicate act under RICO. *See Coonan,* 938 F .3d at 1564 ("We are satisfied that Congress did not intend to incorporate the various states' procedural and evidentiary rules into the RICO statute.") (citations omitted). *But see Peters v. Welsh Development Agency,* 1991 WL 172950, at * 7 (N.D.Ill. Aug. 29, 1991). [FN31] Second, the Court notes that it would make little sense for the Second Circuit to endorse a subject matter jurisdiction test for RICO that contemplates "conduct occurring outside the United States" if such conduct could not form the predicate acts necessary to plead a RICO claim *See North South Finance,* 100 F.3d at 1052. For these reasons, the Court concludes that plaintiffs' allegations of predicate acts outside of the United States are sufficient to meet the requirements of § 1962(c). [FN32]

> FN31. To the extent that this conclusion is inconsistent with *Peters,* the Court respectfully disagrees with the *Peters* decision.

> FN32. Defendants argue that plaintiffs have failed to plead a Hobbs Act violation because extortion is actionable under that statute only if it "obstructs, delays, or affects commerce" within the United States. 18 U.S.C. § 1951(b)(3). Although it is arguable that an "essential element" of a Hobbs Act violation is the requirement that the robbery or extortion "affects commerce," *see* 18 U.S.C. § 1951(a), the behavior plaintiffs allege is sufficient to satisfy section 1951's liberal commercial nexus requirement. The Second Circuit has held that virtually *any* effect on interstate commerce, "whether slight, subtle or even potential, is sufficient to uphold a prosecution under the Hobbs Act." *United States v Shareef,* 190 F 3d 71, 75 (2d Cir.1999). Thus, even if none of the extortionate acts occurred in the United States, any such extortionate act is actionable under the Hobbs Act if it has the requisite effect on interstate commerce or commerce between the United States a foreign country. *See United States v. Inigo,* 925 F.2d 641, 648 (3d Cir.1991). In the instant case, plaintiffs have alleged that

corporate defendants' Hobbs Act violations-- extortion of property from plaintiff Owens Wiwa and Jane Doe--was part of a scheme to obtain oil at reduced cost. Much of that oil, in turn, was exported to the United States where it was sold at a reduced price. (Am. Compl. ¶ ¶ 30, 31; RICO Stmt. at 22- 23). The Court finds that, examined under the liberal pleading requirements of Rule 8, these allegations are adequate to satisfy the Hobbs Act requirement that the alleged extortion affect interstate or foreign commerce.

Additionally, even if the facts plaintiffs allege in support of the Hobbs Act violation fail to satisfy the commercial nexus requirements of that statute, commission of extortion as defined by state law is also a predicate act under section 1961(1)(A). Thus, plaintiffs might well be able to rely on New York state extortion law to support their contention that the extortionate acts they describe constitute a predicate act under RICO.

*(iii) Pattern of Racketeering Activity*

**\*25** Plaintiffs must allege a pattern of racketeering activity, which is defined as "a series of allegedly criminal acts" that is independent of the enterprise itself. *See Procter & Gamble,* 879 F.2d at 15. In order to properly plead a pattern of racketeering activity, plaintiffs must demonstrate:

> that each defendant ... committed ... at least two RICO predicate acts, and that the alleged predicate acts related to each other and 'amount to, or ... otherwise constitute a threat of, continuing racketeering activity.'

*De Falco,* 923 F.Supp. at 477 (emphasis added) (citing *H J Inc v. Northwestern Bell Tel Co.,* 492 U.S 229, 240 (1989). [FN33]

> FN33. To the extent that *De Falco* endorsed the view that an individual who aided or abetted the commission of a predicate act could be held liable under RICO, that portion of the case was overruled by the Second Circuit in *De Falco v Bernas,* 244 F.3d 286, 330 (2d Cir 2001) (adopting, without discussion, the lower court's holding that, following the Supreme Court's decision in *Central Bank,* 511 U.S. 164, RICO can no longer be interpreted to provide for aider- and-abettor liability).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

It is evident that plaintiffs sufficiently plead that defendants committed at least two predicate acts, that those predicate acts were related, and that there remains a continued threat of racketeering activity. Specifically, plaintiffs contend that corporate defendants bribed two individuals (Naayone Nkpah and Charles Danwi) in return for false testimony against Ken Saro-Wiwa and others (Am.Compl.¶ 75). Plaintiffs also allege that corporate defendants, through Brian Anderson, committed extortion by threatening Owens Wiwa and forcing him to abandon his medical practice (RICO Stmt. at 20). They further contend that the Nigerian military murdered numerous people (including Ken-Saro Wiwa and John Kpuinen) (RICO Stmt. at 18-19; Am. Compl. ¶ ¶ 56, 64, 165(b)), committed arson (Am.Compl.¶ ¶ 60, 64, 165(a)), and violated the Hobbs Act (Am.Compl.¶ 43). Thus, plaintiffs have pled facts to support a finding "that each defendant ... committed ... at least two RICO predicate acts." *De Falco*, 923 F.Supp. at 477. In addition, it cannot be contested that the "alleged predicate acts are related to each other and 'amount to, or ... otherwise constitute a threat of, continuing racketeering activity.' " *Id.* As plaintiffs explain in their RICO statement, "the alleged predicate acts of murder, arson, bribery and extortion relate to each other as part of a common plan by defendants to suppress any opposition to their exploitation of the petroleum resources of the Ogoni region of Nigeria ..." (RICO Stmt. at 20). This pattern, plaintiffs contend, has continued from at least 1990 to the present time. (*Id.*). Plaintiffs have demonstrated defendants' direct involvement in a "pattern" of racketeering activities.

*(iv) Commercial Nexus*

To be actionable under RICO, section 1962(c) requires that plaintiffs show that the alleged racketeering activities "affect interstate or foreign commerce". 18 U.S.C. § 1962(c). For the same reasons that plaintiffs have adequately demonstrated that defendants' racketeering activities justify extraterritorial jurisdiction, the Court finds that plaintiffs have demonstrated that defendants' acts "affect interstate or foreign commerce."

The Court concludes that plaintiffs have pled facts that support a claim for a violation of 18 U.S.C. § 1962(c).

*(b) Plaintiffs' Claim under § 1962(d)*

*26 Section 1962(d) provides civil liability for conspiring to engage in conduct described in sections 1962(a), 1962(b), or 1962(c). In order to state a claim under this section, plaintiffs must allege an agreement between defendants and others to facilitate the commission of a violation of section 1962(c). *See Salinas v. United States,* 522 U.S. 52, 65 (1997) (holding that there is no "overt act" requirement for a RICO conspiracy). Defendants argue that plaintiffs have failed to allege that defendants agreed that they or anyone else would use a RICO enterprise to extort property from Owens Wiwa or Doe. However, as plaintiffs contend, both the Amended Complaint and the RICO Statement are replete with facts alleging or implying an agreement involving defendants to commit the predicate acts of murder, arson, bribery, and extortion. (RICO Stmt. at 3-6). Moreover, RICO does not require that co-conspirators in a § 1962(d) conspiracy know of all violations by other conspirators in furtherance of the conspiracy. *See United States v. Zichettello,* 208 F.3d 72, 100 (2d Cir.2000) ("[T]here is no rule requiring the government to prove that a [RICO] conspirator knew of all criminal acts by insiders in furtherance of the conspiracy."). The Court finds that facts alleged by plaintiffs provide sufficient evidence of an agreement by corporate defendants and other members of the enterprise to commit the predicate acts.

*(c) RICO Standing*

With respect to standing, "[t]he RICO civil liability provision confers standing on 'any person injured in his business or property by reason of a violation of section 1962.' " *See Hecht,* 897 F.2d at 23 (quoting 18 U.S.C. § 1964(c)). Thus, in order to have standing to assert a civil RICO claim, a plaintiff must allege the following:

(1) a violation of section 1962; (2) injury to business or property; and (3) causation of the injury by the violation.

*Id., see also De Falco v. Dirie,* 923 F.Supp. 473, 476 (S.D.N.Y.1996).

*(i) Violations of § 1962(c) and (d)*

For the reasons stated above, *supra* sections C(2)(a) and C (2)(b), the Court finds that plaintiffs have properly pled violations of sections 1962(c) and 1962(d).

*(ii) Injury to Property or Business*

Plaintiffs Owens Wiwa and Jane Doe allege that defendants' racketeering activities--specifically extortion and murder--caused injury to their businesses and property. Plaintiffs allege that Owens

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 319887 (S.D.N.Y.), RICO Bus.Disp.Guide 10,216
(Cite as: 2002 WL 319887 (S.D.N.Y.))

Wiwa was forced to flee Nigeria and leave his medical practice because he feared arbitrary arrest, torture and death as a consequence of defendants' racketeering activities. Plaintiff Jane Doe alleges that she was physically injured and lost her crops when the Nigerian military, acting with Shell Nigeria, beat and shot her. (Am.Compl.¶ 42-43). Due to this conduct, Doe maintains that she suffered an injury to her business because she can no longer operate her farm (*Id.*). The Court concludes that plaintiffs have adequately pled injury due to defendants' racketeering activities.

*(iii) Proximate Cause*

**\*27** Finally, to satisfy RICO's standing criteria, a plaintiff must show that his or her injury was caused by "by the conduct constituting the violation" of RICO. *Sedima,* 473 U.S. at 496. In other words, plaintiffs must show that the injury was caused by one or more RICO predicate acts. *See Beck v. Prupis.* 529 U.S. 494, 505 (2000). Moreover, the predicate act must be "the legal or proximate cause" of the injury. *First Nationwide Bank,* 27 F.3d at 769. A predicate act "proximately causes a plaintiff's injury if [it is a] substantial factor[ ] in the sequence of responsible causation, and if the injury is reasonably foreseeable or anticipated as a natural consequence." *Hecht,* 897 F.2d at 23-24 (citations omitted).

Plaintiffs allege that "[i]t was the object of the extortion to force plaintiffs Owens Wiwa and Jane Doe to surrender their property ." (Am.Compl.¶ 166). Specifically, plaintiffs claim that Owens Wiwa was forced to give up his medical practice and flee Nigeria because he feared torture and death due to his opposition to defendants' activities in Nigeria. Plaintiffs further contend that his departure from Nigeria was an intended and foreseeable result of defendants' offer to trade Ken Saro-Wiwa's freedom for an agreement by Owens Wiwa to end MOSOP's protest activities, and the subsequent killing of Saro-Wiwa. Thus, plaintiffs argue that the murder and extortion proximately caused injury to Owens Wiwa's business (*i.e.,* his medical practice), satisfying the causation element of the RICO standing requirements of section 1962(c). (RICO Stmt. at 10, 25). They further maintain that, because these overt acts were committed in furtherance of a RICO conspiracy (and are themselves predicate acts), Owens Wiwa has alleged facts sufficient to satisfy the standing requirement of section 1962(d). The Court finds that plaintiffs' allegations of causation with regard to Owens Wiwa's injuries are sufficient to satisfy the "proximate cause" criterion of RICO's standing

requirements.

Plaintiffs allege a slightly more straightforward relationship between injury to Jane Doe's business and defendants' commission of a racketeering activity. She contends that defendants' Hobbs Act violations prevented her from harvesting her crops and from continuing her farming business. The Court finds that the alleged Hobbs Act violation was a "substantial factor" in the injury to Doe's business, and that the injury was a "reasonably foreseeable" consequence of their conduct.

Because plaintiffs meet the *Hecht* requirements for standing, the Court denies defendants' motion to dismiss the RICO claims based on a failure to satisfy the elements of RICO's standing requirements.

*D. Act of State Doctrine*

Corporate defendants and defendant Anderson urge the Court to abstain from exercising jurisdiction over this case under the act of state doctrine. The Supreme Court articulated this doctrine as follows:

> Every sovereign State is bound to respect the independence of every other sovereign State, and the courts of one country will not sit in judgment on the acts of the government of another, done within its own territory. Redress of grievances by reason of such acts must be obtained through the means open to be availed of by sovereign powers as between themselves.

**\*28** *Underhill v. Hernandez,* 168 U.S. 250, 252 (1897). More recently, the Supreme Court explained that "[t]he act of state doctrine in its traditional formulation precludes the courts of this country from inquiring into the validity of the public acts of a recognized foreign sovereign power committed within its own territory." *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398,401 (1964); *see also Bigio v. Coca-Cola Co.,* 239 F.3d 440, 451 (2d Cir.2000). The burden of proof lies with defendants to justify application of the doctrine, *see Alfred Dunhill of London, Inc. v. Republic of Cuba,* 425 U.S. 682, 694 (1976); *Bigio,* 239 F.3d at 453, and "it would be a rare case in which the act of state doctrine precluded suit under section 1350," *Kadic,* 70 F.3d at 250.

To determine whether to apply the act of state doctrine, the Court should "weigh in balance the foreign policy interests that favor or disfavor [its] application." *Republic of Philippines v. Marcos,* 806 F.2d 344, 359 (2d Cir.1986). Because "the policy concerns underlying the doctrine require that the political branches be preeminent in the realm of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-04622-DLI-RML   Document 49   Filed 02/17/06   Page 26 of 29 PageID #: 1122

Not Reported in F.Supp.2d                                                                    Page 25
Not Reported in F.Supp.2d, 2002 WL 319887 (S.D.N.Y.), RICO Bus.Disp.Guide 10,216
**(Cite as: 2002 WL 319887 (S.D.N.Y.))**

foreign relations ... [,] 'the less important the implications of an issue are for our foreign relations, the weaker the justification for exclusivity in the political branches." ' *Braka v. Bancomer, S.N.C.,* 762 F.2d 222, 224 (2d Cir.1985) (citing *Sabbatino,* 376 U.S. at 428). Under Second Circuit precedent, the Court should consider whether resolution of the case will "likely impact on international relations" or "embarrass or hinder the executive in the realm of foreign relations." *Allied Bank Int'l v. Banco Credito Agricola de Cartago,* 757 F.2d 516, 520-21 (2d Cir.1985). If the government "which perpetrated the challenged act of state is no longer in existence," *Sabbatino,* 376 U.S. at 428, "the danger of interference with the Executive's conduct of foreign policy is surely much less than the typical case where the act of state is that of the current foreign government," *Marcos,* 806 F.2d at 359. In this case, the military regime responsible for the alleged torts has been replaced by a democracy, and the new government has set up a commission to investigate the alleged abuses. Consequently, any finding of improprieties on the part of the previous regime "would more likely be consonant, than at odds, with the present position of the [Nigerian] government" and thus the danger of hindrance or embarrassment is "dim indeed." *Bigio,* 239 F.3d at 453. Much like the situation in *Bigio,* the current Nigerian regime is "far removed" in circumstance and seems likely to "repudiate [ ] the acts in question." *Id.* Thus, the Court finds no basis to conclude that adjudicating plaintiffs' claims would interfere with Nigerian-American relations, and the Court declines to invoke the act of state doctrine.

### E. Forum Non Conveniens

Defendant Anderson claims that the action against him should be dismissed on the grounds of *forum non conveniens.* In deciding this portion of Anderson's motion, the Court relies on the Second Circuit's holding that a dismissal on *forum non conveniens* grounds was not proper on behalf of the corporate defendants in this case, *see Wiwa,* 226 F.3d at 108, as well as long-standing tenets of *forum non conveniens* jurisprudence. Although Anderson points out important distinctions between himself and the corporate defendants, the Court concludes that these distinctions do not warrant a different result.

**\*29** The doctrine of *forum non conveniens* permits a federal court to decline to entertain a case over which it has jurisdiction if dismissing the action would serve the ends of justice or the convenience of the parties. *See DiRienzo v. Philip Servs. Corp.,* 232 F.3d

49, 56 (2d Cir 2000). A *forum non conveniens* motion is decided in two parts. First, the court considers whether an alternative forum exists. *See Peregrine Myanmar Ltd v. Segal,* 89 F.3d 41, 46 (2d Cir.1996). If an adequate alternative forum is available, the court then considers the private and public convenience factors set forth in *Gulf Oil Corp v. Gilbert,* 330 U.S. 501, 506-507 (1947) and more recent *forum non conveniens* precedent to determine whether a trial in plaintiffs' chosen forum would either (1) create "oppressiveness and vexation" for the defendant out of proportion to plaintiffs' convenience, or (2) be inappropriate because of " 'considerations affecting the court's own administrative and legal problems." ' *Piper Aircraft v. Reyno,* 454 U.S. 235, 241 (1981)(citing *Koster v. (American) Lumbermens Mut Casualty Co.,* 330 U.S. 518, 524 (1947)).

### (1) Adequate Alternative Forum

The Court has already found that England is an adequate forum for adjudication of plaintiffs' claims. *See* 1998 Order at 12-13. The addition of TVPA claims in the complaint against Anderson does not affect this analysis, because the "subject matter" of plaintiffs' claims is unchanged. *See Piper Aircraft,* 454 U.S. at 255 n.21 (an alternative forum is adequate if it permits "litigation of the subject matter of the dispute"); *PT United Can Co. v. Crown Cork & Seal Co.,* 138 F.3d 65, 74 (2d Cir.1998). Consequently, the Court finds that England is an adequate forum to adjudicate plaintiffs' claims against Anderson.

### (2) Analysis of the Gilbert Factors

After finding that the alternative forum is appropriate, the Court must determine if the balance of the public and private factors identified in *Gilbert* favors litigation in the alternative forum. *See Dorfman v. Marriott International Hotels, Inc.,* No. 99 Civ. 10496, 2001 WL 69423, \*7 (S.D.N.Y. Jan 29, 2001). Defendant has the burden of showing that the factors "tilt[ ] strongly" in favor of dismissal, *see R. Maganlal & Co v. M.G. Chem. Co.,* 942 F.2d 164, 167 (2d Cir.1991), and "the plaintiff's choice of forum should rarely be disturbed." *Gilbert,* 330 U.S. at 508. In *Wiwa,* the Second Circuit reaffirmed that a plaintiff's status as a United States resident was "a consideration favoring plaintiff's choice of a U.S. forum," and held that the TVPA "expresses a policy favoring our courts' exercise of the jurisdiction conferred by the ATCA in cases of torture unless the defendant has fully met the burden" imposed by

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 319887 (S.D.N.Y.), RICO Bus.Disp.Guide 10,216
(Cite as: 2002 WL 319887 (S.D.N.Y.))

Page 26

*Gilbert* and *R. Maganlal. Wiwa,* 226 F.3d at 103 & 106. The Court considers Anderson's motion in light of these teachings.

### (a) Public Interest Factors

**\*30** The first two public interest factors consider the local interest in the dispute and the burden on a local jury. The Second Circuit has already ruled that England's interest in adjudicating this dispute because it involves a British citizen is matched by the United States' interest in adjudicating a matter involving two of its residents. *See Wiwa,* 226 F.3d at 107. The fact that one of the plaintiffs has moved from the United States and that Anderson is a citizen of the United Kingdom (although not a resident) does not mandate a different result. Because the United States has an interest in this dispute, it will not be a burden on a local jury. *See Peregrine Myanmar,* 89 F.3d at 47. Accordingly, these factors favor retaining jurisdiction.

The next public interest factor that the Court must consider is whether retaining the case will require the Court to "untangle problems in conflicts of law, and in law foreign to itself." *Gilbert,* 330 U.S. at 509. While the resolution of this case will most likely involve the resolution of conflicts-of-law issues and the application of foreign law, this factor is unchanged from the previous analysis, and was given little weight by the *Wiwa* appellate panel. *See Wiwa,* 226 F.3d at 107-108. Moreover, "it is well-established that the need to apply foreign law is not alone sufficient to dismiss under the doctrine of forum non conveniens." *R. Maganlal,* 942 F.2d at 169. In the instant case, the strong policy "favoring receptivity by our courts" to ACTA and TVPA suits mitigates against the importance of this factor. *See Wiwa,* 226 F.3d at 105. Accordingly, the Court finds that the application of foreign law, considered independently and in conjunction with other factors, is insufficient to overcome the strong presumption in favoring plaintiffs' choice of forum.

Finally, there are no "administrative difficulties stemming from court congestion" in this case, *see Scottish Air International, Inc. v. British Caledonian Group, PLC,* 81 F.3d 1224, 1232 (2d Cir.1996), because the Court is already handling plaintiffs' almost identical claims against the corporate defendants. Indeed, it would be far more efficient to handle the two actions together, and accordingly the Court finds that this factor strongly weighs in favor of retaining jurisdiction.

### (b) Private Interest Factors

The Second Circuit found that the corporate defendants had made only a "minimal" showing in support of an English forum. *See Wiwa,* 226 F.3d at 107. In the view of the appellate panel, defendants did not demonstrate that the costs of transporting evidence and witnesses would be overly burdensome. *See Id.* Moreover, the panel found any additional costs and inconvenience imposed on the corporate defendants by retaining jurisdiction would be "fully counterbalanced by the cost and inconvenience to the plaintiffs of requiring them to reinstitute the litigation in England--especially given the plaintiffs' minimal resources in comparison to the vast resources of the defendants." *Id.*

**\*31** The Court finds that Anderson has not identified any factor that would compel a different result in the Anderson action. The actions against Anderson and the corporate defendants will involve much of the same evidence and many of the same witnesses. (Anderson Decl. ¶ ¶ 9, 10). [FN34] Consequently, the burden on Anderson to defend this action in New York will be significantly diminished by discovery and motion practice in this Court; in fact, defending the Anderson action in England could, in many respects, be more burdensome, given the duplication of effort that would necessarily result. In contrast, the burden on plaintiffs to litigate in two fora would be enormous, and would easily outweigh the comparatively minimal burden on Anderson to coordinate discovery with the corporate defendants, especially given that counsel for the corporate defense is also handling Anderson's defense.

> FN34. Anderson's identification of two additional witnesses does not tilt the balance of the factors strongly in favor of dismissal, even assuming that these witnesses do in fact live in Great Britain.

### (c) Balancing the Factors

It is evident from the discussion above that Anderson has not met his burden of demonstrating that the *Gilbert* factors tilt strongly in favor of litigation in an English court. For this reason, the Court denies Anderson's motion to dismiss the action against him on *forum non conveniens* grounds.

### F  State Law Claims

Because plaintiffs bring valid federal claims, the Court will exercise supplemental jurisdiction over

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-04622-DLI-RML   Document 49   Filed 02/17/06   Page 28 of 29 PageID #: 1124

Not Reported in F.Supp.2d                                                    Page 27
Not Reported in F.Supp.2d, 2002 WL 319887 (S.D.N.Y.), RICO Bus.Disp.Guide 10,216
(Cite as: 2002 WL 319887 (S.D.N.Y.))

plaintiffs' state law claims, which arise out of the same common nucleus of operative facts as the federal claims under consideration. *See* 28 U.S.C § 1367(a).

## CONCLUSION

For the reasons set forth above, the Court grants defendants' motion to dismiss the actions pursuant to Fed.R.Civ.P. 12(b)(6) with respect to two claims: plaintiff Owens Wiwa's ACTA claim founded on an alleged violation of his right to life, liberty and security of person, and his ACTA claim for arbitrary arrest and detention. Plaintiffs are given 30 days from the date of this Order to re-plead these claims. Defendants' motion to dismiss is denied in all other respects.

The Court hereby consolidates the two actions for all pretrial purposes.

The reference to a Magistrate Judge is withdrawn.

Counsel are directed to meet within 14 days of this Order for a conference pursuant to Fed.R.Civ.P. 26, and to submit a proposed scheduling order and discovery plan to Chambers within 21 days of this Order. Counsel should contact the Court's Deputy, Paul Robilotti, within 10 days of this Order to schedule a conference with the Court.

SO ORDERED.

Not Reported in F.Supp.2d, 2002 WL 319887 (S.D.N.Y.), RICO Bus.Disp.Guide 10,216

**Motions, Pleadings and Filings (Back to top)**

• 2003 WL 23474982 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Defendants' Motion to Dismiss (Dec. 02, 2003)

• 2003 WL 23671687 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Defendants' Motion to Dismiss (Dec. 02, 2003)

• 2003 WL 23671686 (Trial Motion, Memorandum and Affidavit) Wiwa Plaintiffs' Corrected Opposition to Defendants' Motions to Dismiss Complaints (Nov. 26, 2003)

• 2002 WL 32495910 (Trial Pleading) Answer (Apr. 18, 2002)

• 2002 WL 32595715 (Trial Pleading) Answer (Apr. 18, 2002)

• 2002 WL 32495911 (Trial Pleading) Second Amended Complaint for Summary Execution; Crimes Against Humanity; Torture; Cruel, Inhuman or Degrading Treatment; Arbitrary Arrest and Detention; Violation of the Rights to Life, Liberty and Security of Person and Peaceful Assembly and Associa tion; Wrongful Death; Assault and Battery; Intentional Infliction of Emotional Distress; Negligent Infliction of Emotional Distress; Negligence; and Violations of the Racketeer Influenced and Corrupt Organizations Act (Mar. 27, 2002)

• 2002 WL 32595712 (Trial Pleading) Second Amended Complaint for Summary Execution; Crimes Against Humanity; Torture; Cruel, Inhuman or Degrading Treatment; Arbitrary Arrest and Detention; Violation of the Rights to Life, Liberty and Security of Person and Peaceful Assembly and Associa tion; Wrongful Death; Assault and Battery; Intentional Infliction of Emotional Distress; Negligent Infliction of Emotional Distress; Negligence; and Violations of the Racketeer Influenced and Corrupt Organizations Act (Mar. 27, 2002)

• 2001 WL 34545566 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Plaintiffs' Motion to Strike, or, in the Alternative, for Leave to File a Sur-Reply Brief to Defendants' Motion to Dismiss (Dec. 23, 2001)

• 2001 WL 34611643 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Plaintiffs' Motion to Strike, or, in the Alternative, for Leave to File a Sur-Reply Brief to Defendants' Motion to Dismiss (Dec. 23, 2001)

• 2001 WL 34727847 (Trial Motion, Memorandum and Affidavit) Defendants' Memorandum of Law in Response to Plaintiffs' Surreply (May. 07, 2001)

• 2001 WL 34545560 (Trial Motion, Memorandum and Affidavit) Defendants' Opposition to Plaintiffs' Motion for Leave to File A Surreply (Apr. 24, 2001)

• 2001 WL 34611633 (Trial Motion, Memorandum and Affidavit) Defendants' Opposition to Plaintiffs' Motion for Leave to File A Surreply (Apr. 24, 2001)

• 2001 WL 34545645 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Opposition to Defendants' Motion to Dismiss (Mar. 16, 2001)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                              Page 28
Not Reported in F.Supp.2d, 2002 WL 319887 (S.D.N.Y.), RICO Bus Disp Guide 10,216
**(Cite as: 2002 WL 319887 (S.D.N.Y.))**

• 2001 WL 34611630 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Opposition to Defendants' Motion to Dismiss (Mar. 16, 2001)

• 2001 WL 34545556 (Trial Motion, Memorandum and Affidavit) Defendants' Memorandum of Law in Support of Their Motion to Dismiss the Amended Complaint (Feb. 23, 2001)

• 2001 WL 34611627 (Trial Motion, Memorandum and Affidavit) Defendants' Memorandum of Law in Support of Their Motion to Dismiss the Amended Complaint (Feb. 23, 2001)

• 1998 WL 34311479 (Trial Pleading) Memorandum of Law in Support of Plaintiffs' Motion for Reconsideration of Order of September 25, 1998 (Oct. 13, 1998)

•          1:96cv08386_____(Docket) (Nov. 08, 1996)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.