UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------------------

x

JAMES STUTTS, et al.,

                    Plaintiffs,

      -against-

THE DE DIETRICH GROUP, et al.,

                   Defendants.

----------------------------------------------------

x

                            <u>MEMORANDUM AND ORDER</u>

                                 03-CV-4058 (ILG)

GLASSER, United States Senior District Judge:

      Plaintiffs are a proposed class of military servicemen or civilian employees of United States Department of Defense contractors who were deployed in the Persian Gulf region during the 1991 Gulf War ("Gulf War").[1]  They seek relief for damages sustained as a result of exposure to toxic agents contained in chemical weapons developed or otherwise obtained by the Iraq government and ultimately detonated by the United States and its allies ("Coalition forces") during the Gulf War conflict.  Plaintiffs assert causes of action against two classes of defendants:  the "Supplier Defendants," foreign corporations that allegedly sold chemical precursors and manufacturing equipment to Iraq that was used to develop the chemical weapons to which plaintiffs were exposed,

---

[1]  The named plaintiffs include James Stutts, Daniel Hammond, Louis William Tabeek, Michael Bogden, Randy Hood, Troy Bilek, Scott Vail (on behalf of himself and his minor child, Nichole Vail), Willie Henry Lee,  Douglas G. Jaime, Luis Latorre-Morales, Donald Frans, Nicholas DeMolfetto, Raymond Bordonaro, Steven McLeod, Karl Bruce Lane and Vincent Conway.

1

and the "Bank Defendants," foreign corporations that acted as correspondent banks under letters of credit issued in favor of the Supplier Defendants to support the sale of goods and services by the Supplier Defendants to Iraq.  The Bank Defendants[2] have moved to dismiss plaintiffs' complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted.  For the reasons that follow, the Court grants the Bank Defendants' motion in its entirety.

## FACTS

This case arises out of the plaintiffs' alleged exposure to sarin nerve gas, mustard gas and other chemical weapons when they were deployed in the Middle East during the Gulf War between January 16, 1991 and April 30, 1991.  Compl. ¶ 2.  Plaintiffs were exposed to those chemical agents when Coalition forces blew up weapons storage facilities in Iraq and chemical weapons were detonated.  Plaintiffs allege that Saddam Hussein used chemical weapons against civilians in Iraq and other neighboring countries and that, despite the widespread knowledge of Hussein's illegal actions, the Supplier Defendants provided him with goods and services that enabled his regime to use chemical weapons.

Plaintiffs' allegations against the Bank Defendants are based on their issuance of letters of credit to the Supplier Defendants in the 1980s.  The complaint alleges that the

---

[2]  The Bank Defendants appearing on this motion are Deutsche Bank AG; ABN Amro Bank NV; Bayerische Landesbank; Gulf International Bank B.S.C.; Mizuho Corporate Bank Ltd., f/k/a Dai-Ichi Kangyo Bank Ltd.; Societe Generale; Credit Lyonnais; BNP Paribas; DZ Bank AG; Bayerische Hypo-und Vereinsbank; Rabobank International; WestLB AG; State Bank of India; Banca Intesa S.p.a., f/k/a Banca Commerciale Italiana; Banca Nazionale del Lavoro; Banca Di Roma; Unicredito Italiano S.p.A.; Banca Popolare Di Milano; Westpac Banking Corporation; DnB Nor Bank ASA, f/k/a Den Norske Bank ASA; National Bank of Pakistan; Habib Bank Ltd.; Banca Comerciale Romana, f/k/a Romanian Bank of Foreign Trade; Arab Bank PLC.; Bank of Tokyo-Mitsubishi Ltd.; Sumitomo Mitsui Banking Corporation; Westpac Banking Corporation; Korea Exchange Bank; National Bank of Kuwait; and Dresdner Bank A.G.

Bank Defendants were aware or reasonably should have been aware of Iraq's use of chemical weapons against Kurdish and other Iraqi citizens prior to the 1991 Gulf War and during Iraq's war with Iran.  Compl. ¶¶ 80, 87.  Notwithstanding this knowledge, the Bank Defendants allegedly issued letters of credit as correspondent banks to the Iraq government "for the benefit of the Supplier Defendants in connection with the sale of goods and services used by Saddam Hussein's regime to produce and/or obtain chemical weapons of mass destruction."  Compl. ¶¶ 40-75, 87.  The complaint describes the process of issuing letters of credit as follows: a "correspondent bank" takes steps to ensure that the sales transaction meets the requirements of the buyer and then pays the seller the amount due under a letter of credit.  Id. ¶ 88.  In the process of acting as correspondent banks, the Bank Defendants would have had to review documents pertinent to the transaction and knew or should have known, therefore, about the parties and goods – namely, manufacturers of chemical agents or production equipment – involved in the transactions.  Id.  Plaintiffs allege that by providing these services, the Bank Defendants themselves violated international laws involving restrictions on chemical weapons and enabled Hussein's regime to carry out extreme acts of violence.

In the complaint, plaintiffs seek compensatory and punitive damages against the Bank Defendants under the Anti-Terrorism Act, 18 U.S.C. § 1331 et seq., the Geneva Convention of 1925, United Nations Security Council Resolutions 582, 588, 596, 612 and 620,[3] customary international law, and the common law torts of aiding and abetting

---

[3]  U.N. Security Council Resolution 582, S.C. Res. 582, U.N. SCOR., 41st  Sess., 2666th mtg., U.N. Doc. S./Res/582 (1986); U.N. Security Council Resolution 588, S.C. Res. 588, U.N. SCOR, 41st  Sess., 2713th mtg., U.N. Doc. S/Res/588 (1986); U.N. Security Council Resolution 596, S.C. Res. 596, U.N. SCOR, 42d  Sess., 2748th mtg., U.N. Doc. S/Res/596 (1987); U.N. Security Council Resolution 612, S.C. Res. 612, U.N. SCOR, 43d  Sess., 2812th mtg., U.N. Doc. S/Res/612 (1988); U.N. Security Council

tortious conduct, civil conspiracy, negligence, and negligence per se.

## DISCUSSION

When deciding a motion to dismiss for failure to state a claim for relief under Fed. R. Civ. P. 12(b)(6), a court takes the facts as alleged in the complaint to be true, and must draw all reasonable inferences from those facts in favor of the plaintiff.  See Ortiz v. Cornetta, 867 F.2d 146, 149 (2d Cir. 1989).  A court must not dismiss a complaint "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [the plaintiff] to relief."  Conley v. Gibson, 355 U.S. 41, 45-46 (1957).

## I.    Violations of the Anti-Terrorism Act

### A.    Primary Violations of § 2333 (Count I)

#### 1.    "International Terrorism"

Plaintiffs assert a cause of action against defendants under 18 U.S.C. § 2331 et seq., the Anti-Terrorism Act (the "ATA").  See Compl. Count I.  The complaint alleges that the Bank Defendants' provision of "financial support used to assist Saddam Hussein's Iraqi regime in the manufacture and stockpiling of chemical weapons constitutes an action of 'international terrorism' as defined in 18 U.S.C. § 2333."  Compl. ¶ 111.

That section of the ATA states in pertinent part:

Any national of the United States injured in his or her person . . . by reason of an act of international terrorism . . . may sue therefor in any appropriate district court of the United States. . . .

Resolution 620, S.C. Res. 620, U.N. SCOR, 43d Sess., 2825th mtg., U.N. Doc. S/Res/620 (1988).

4

The Bank Defendants' primary argument for dismissal of the claim is that plaintiffs fail to sufficiently allege that defendants were involved in "international terrorism" within the meaning of the statute.  Def. Mem. at 7.  The ATA defines "international terrorism" to include activities that "(A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States" and "(B) appear to be intended (I) to intimidate or coerce a civilian population; [or] (ii) to influence the policy of a government by intimidation or coercion . . . and (C) occur primarily outside the territorial jurisdiction of the United States. . . ."[4]  18 U.S.C. § 2331.  Apparently in an effort to sufficiently allege a violation of the criminal laws of the United States as required by § 2331, the complaint states: "Section 18 U.S.C. § 229(a) make [sic] it unlawful for any person to 'assist . . . in any way' in the development or acquisition of chemical weapons."  Compl. ¶ 109.[5]

Plaintiffs' sole allegation of conduct by the Bank Defendants is that they issued letters of credit in favor of the Supplier Defendants.  See Compl. ¶ 111.  The plain language of the ATA compels the conclusion that, by engaging in commercial banking activity, the Bank Defendants were not involved in "violent acts or acts dangerous to human life."  Nor were their actions designed to coerce civilians or government entities as required under § 2331.  Thus, the Bank Defendants' conduct does not constitute

---

[4]  The parties do not dispute that the acts that form the basis of plaintiffs' complaint occurred outside of the United States.

[5]  Plaintiffs' allegation that the Bank Defendants issued letters of credit does not show that the Bank Defendants assisted in the development or acquisition of chemical weapons by Saddam Hussein.  Moreover, plaintiffs neglect to address the requirement in § 229(a) that a person "knowingly" assist in the production or acquisition of chemical weapons.  As discussed below, plaintiffs fail to sufficiently allege that the Bank Defendants knew about any connection between the letters of credit they issued and Saddam Hussein's stockpiling and use of chemical weapons.

international terrorism.[6]

Case law interpreting § 2333 compels the same result. Both parties cite <u>Boim v. Quranic Literary Institute & Holy Found. for Relief & Dev.</u>, 291 F.3d 1000 (7th Cir. 2002). The Court finds <u>Boim</u> relevant in that it arose in an analogous factual context and adopts its reasoning. In that case, plaintiffs' son was killed in Israel in a drive-by shooting by two Palestinians who were known members of the military faction of Hamas, the extremist Palestinian organization and a recognized terrorist group by the U.S. as of 1995. <u>Id.</u> at 1002. Plaintiffs brought an action under 18 U.S.C. § 2333 against, <u>inter alia</u>, two non-profit organizations that, as the alleged main fronts for Hamas in the United States, raised and funneled money to Hamas overseas. <u>Id.</u> at 1003. In particular, plaintiffs alleged that the funds that defendants provided to Hamas and its members generally paid for weapons, lodging, training, and transportation, among other things, and specifically for the "vehicle, machine guns and ammunition used to kill" their son. <u>Id.</u> at 1004. Based on these allegations, the court considered whether "funding *simpliciter* of a terrorist organization" alone constitutes "international terrorism" under § 2333. First, the court rejected the defendants' argument that the statute only imposes liability on those who have directly committed a violent act within

---

[6] Plaintiffs' complaint and their opposition brief also refer to Iraq's use of chemical weapons against Kurdish and other civilians as terrorist activity. <u>See, e.g.</u>, Compl. ¶ 111; Pl. Opp. at 40 (equating Saddam Hussein's "manufacturing, stockpiling and using chemical weapons" with international terrorism). At the same time, plaintiffs argue that whether Iraq engaged in international terrorism is a factual issue not appropriate for resolution on a motion to dismiss. The Bank Defendants dispute that Iraq's conduct can be considered "international terrorism" as a matter of law under the ATA. <u>See</u> Def. Mem. at 39-41; Def. Reply Mem. at 2. The plaintiffs do not assert a cause of action against Iraq or any Iraqi government actor under the ATA. The Court finds it unnecessary to decide whether Iraq engaged in terrorism because plaintiffs fail to sufficiently allege that the Bank Defendants committed an act of international terrorism to state a claim against them under the ATA. Similarly, the Court need not decide whether Iraq violated the ATA with respect to plaintiffs' aiding and abetting claim under § 2333 because that claim fails for alternate reasons.

the definition of "international terrorism" in § 2331.  It held that the "statute clearly is
meant to reach beyond those persons who themselves commit the violent act that
directly causes the injury."  Id. at 1011.  Relying on principles of tort law to delimit the
reach of § 2333 liability, the court held that a plaintiff must show that a donor of funds
had knowledge and intent to further the donee's use of the funds for violent criminal
acts.  Id.  Thus, funding *simpliciter* does not constitute an act of international terrorism.
Because plaintiffs failed to allege that defendants donated money to Hamas with the
knowledge and intent that such funds would be used to support the murder of plaintiffs'
son, the court found that plaintiffs failed to state a claim under this theory of liability.
Id. at 1012.

   Plaintiffs in this case are correct that the statutory history of § 2331 et seq., see
Boim, 291 F.3d at 1009-11, indicates Congress's intent that liability under the statute is
far-reaching.  See Pl. Opp. at 36-38.  Nevertheless, plaintiffs fail to sufficiently allege
facts showing the Bank Defendants' knowledge and intent.  Given the court's decision in
Boim that direct funding of terrorist activity does not subject a defendant to liability
under § 2333, a fortiori the actions of the Bank Defendants in issuing letters of credit to
manufacturers who allegedly sold chemicals and equipment to Iraq do not constitute
"international terrorism."[7]

---

   [7]  In Boim, the court discussed an alternate theory of civil liability under § 2333 – plaintiffs'
contention that sections 2339A and 2339B imposing criminal liability on those who provide "material
support" to terrorists amplify the definition of "international terrorism" under § 2331.  See 291 F.3d at
1012.  Plaintiffs in this case do not make allegations concerning those sections in their complaint.  In their
opposition brief, however, they briefly discuss those sections as providing for liability against defendants
under § 2333.  Pl. Opp. at 38.  Plaintiffs' argument is unpersuasive because the Boim court imputed a
causation requirement to the term "material," 291 F.3d at 1015, and plaintiffs here fail to sufficiently allege
that the Bank Defendants' actions caused injury to plaintiffs.  Moreover, in their opposition brief, plaintiffs
concede that this case involves a remote causal chain by stating that they were exposed to the chemical
weapons not when they were launched by Saddam Hussein, but when the weapons were detonated by

### 2.   Injury "By Reason Of"

Section 2333 of the ATA permits an action for those injured "by reason of an act of international terrorism."  According to the Boim court, that language implies a proximate cause requirement such that it must be reasonably foreseeable that a defendant's conduct is likely to result in violent criminal acts.  291 F.3d at 1012 (citing Holmes v. Sec. Investor Protection Corp., 503 U.S. 258 (1992) (interpreting "by reason of" language in civil RICO provision to require a showing that the defendant's conduct proximately caused the plaintiff's injury)).  That court found that the murder of plaintiffs' son was not a reasonably foreseeable result of defendants' direct funding of Hamas.  Id.

Plaintiffs' complaint insufficiently alleges that defendants' actions proximately caused their injuries.  Plaintiffs assert that Iraq's use and stockpiling of chemical weapons throughout the 1980s and prior to Gulf War I made it "foreseeable that the chemicals being sold to Iraq during the relevant time period would be used as an instrument of state-sponsored and international terrorism."  Compl. ¶ 111.  Additionally, plaintiffs allege that "the connections and cooperation between agents of the Iraqi regime and known terrorist organizations made it foreseeable that plaintiffs and other U.S. citizens and members of its armed services would be exposed to chemicals and chemical weapons stockpiled in Iraq."  Compl. ¶ 112.  Similarly, they allege that because of the "widespread publicity about Iraq's illegal use of chemical weapons," "Defendants" were on notice that their services "were likely to be used in an unlawful and dangerous manner by Saddam Hussein's regime."  Compl. ¶ 95.  Such general publicity does not

---

Coalition troops.  Pl. Opp. at 39.

8

provide a causal link between the Bank Defendants' conduct and the plaintiffs' injuries. Plaintiffs allege no facts, nor can they, to demonstrate that it was reasonably foreseeable to the Bank Defendants that issuing letters of credit to manufacturers would in any way contribute to Saddam Hussein's use of chemical weapons or <u>a fortiori</u> "the manufacture of chemical weapons <u>in Iraq</u>."  Compl. ¶ 96 (emphasis added).  Plaintiffs fail to sufficiently allege that the Bank Defendants proximately caused plaintiffs' injuries, which they allege directly resulted from exposure to chemical weapons that were detonated by Coalition forces in the Gulf War.[8]

### 3.     Exemption for "Act of War"

As an additional rationale for plaintiffs' failure to state a claim under § 2333, the Bank Defendants contend that plaintiffs' injuries were the result of "acts of war" and therefore fall within an exception to the statute.  Section 2336 states:  "no action shall be maintained under section 2333 of this title for injury or loss by reason of an act of war." The term "act of war" is defined in § 2331 as "any act occurring in the course of (A) declared war; (B) armed conflict, whether or not war has been declared between two or more nations; or (C) armed conflict between military forces of any origin."  Plaintiffs contend that this provision is inapplicable because some of their injuries occurred during March 1991, after the ceasefire in Gulf War I was declared on February 28, 1991. Pl. Opp. at 39.  Additionally, plaintiffs argue that their injuries occurred as a result of

---

[8]  Additionally, plaintiffs allege that the Bank Defendants "were essential to Saddam Hussein's successful development and stockpiling of chemical weapons of mass destruction, and to the placing [of] those weapons in strategic locations where the toxic fallout would permeate the area where Plaintiffs and Coalition troops were located."  Compl. ¶ 96.  This describes "but" causation (<u>i.e.</u>, that but for the Bank Defendants' issuing letters of credits, Hussein would not have developed and stockpiled chemical weapons that later injured plaintiffs) and is insufficient alone to demonstrate that plaintiffs were injured "by reason of" defendants' actions.

"friendly fire" and that § 2336 does not apply to injuries "that just happen to occur during wartime." Id.

The Court is not persuaded by plaintiffs' arguments. Plaintiffs' allegations that the allegedly unlawful acts occurred during the "1991 Persian Gulf War" (Compl. ¶ 1) put this case squarely within the exemption under § 2336 for "acts of war." See Def. Mem. at 7. Moreover, plaintiffs' allegation that their injuries resulted from the detonation of chemical weapons by Coalition forces during the 1991 Persian Gulf War makes clear that plaintiffs have suffered "injury or loss by reason of" declared war or armed conflict. 18 U.S.C. § 2336. The "act of war" exemption under § 2336 thus provides another basis on which to dismiss plaintiffs' claim under the ATA for failure to state a claim for relief. Accordingly, because plaintiffs fail to allege that the Bank Defendants' acts of international terrorism caused the injuries they received during the Persian Gulf War, their claim is dismissed.[9]

## B.  Aiding and Abetting Violations of § 2331 et seq. (Count II)

Plaintiffs assert a cause of action for aiding and abetting violations of the ATA and allege that the Bank Defendants "knowingly and substantially participated in [the international terrorism] of the Iraqi regime of Saddam Hussein in that . . . the Bank Defendants knew or recklessly disregarded acknowledging that the Iraqi government was using goods and services supplied to commit acts of international terrorism."

---

[9] Defendants also argue that plaintiffs' "conclusory allegation" that their injuries stem from "conduct of defendants that occurred on or after October 29, 1988" (Compl. ¶ 113) is insufficient in that it does not identify specific activities of the Bank Defendants within the four-year statutory period of § 2331 (see History; Effective and Applicability Provisions). Def. Mem. at 10. Plaintiffs' allegation regarding the statutory time period in the complaint is sufficient for purposes of this motion. Nevertheless, plaintiffs' allegations fail to state a claim for the reasons above.

Compl. ¶ 118.

The Bank Defendants argue that they are entitled to dismissal of plaintiffs' aiding and abetting claim under the ATA because no such cause of action exists.  Although in Boim, the Seventh Circuit recognized such a cause of action, the Bank Defendants argue that the Boim court misinterpreted the Supreme Court's holding in Central Bank of Denver v. First Interstate Bank of Denver, 511 U.S. 164 (1994), in reaching its conclusion.  They argue that Central Bank stands for the proposition that "a federal civil remedy for aiding and abetting is available only where it is expressly provided for by statute."  Def. Mem. at 39.[10]  In opposition, plaintiffs rely on the Boim court's holding that there is a civil cause of action for aiding and abetting a violation of § 2333.

Plaintiffs in Boim asserted an aiding and abetting theory of liability against defendants for supplying money for weapons to the terrorists who allegedly murdered their son, funding the training of those terrorists and providing financial support to the terrorists' families.  As an initial matter, the Boim court addressed whether § 2333 imposes liability for aiding and abetting acts of international terrorism in the context of providing funds to terrorists.  The defendants in that case argued that the Supreme Court's ruling in Central Bank, 511 U.S. 164, prohibited a finding that § 2333 imposes civil liability for aiding and abetting acts of international terrorism where the statute does not expressly impose such liability.  291 F.3d at 1016.  The Seventh Circuit rejected that argument, finding that § 2333 was distinguishable from § 10(b) of the Securities Act of 1934, the statute at issue in Central Bank, because § 2333 expressly provides for a

_____

[10]  Central Bank held that a private plaintiff could not maintain an action for aiding and abetting under § 10(b) of the Securities and Exchange Act.  511 U.S. at 191.

private right of action, and thus the court need not "stack inferences" to find that Congress intended to extend civil liability to aiding and abetting.  <u>Id.</u> at 1019.  Moreover, the definition of "international terrorism" under § 2331 – embracing activities that "involve" violent acts – is broad and suggests that § 2333 encompasses principles of tort law, including liability for aiding and abetting.  <u>Id.</u> at 1020.  Finally, the court found that extending liability to aiding and abetting acts of international terrorism would be consistent with Congress' intent to impose liability beyond persons acting directly under § 2333.  <u>Id.</u> at 1021.

In order to state a claim for aiding and abetting under § 2333, the <u>Boim</u> court required plaintiffs to allege that defendants knew about the terrorists' illegal operations and provided funds with the intent to further those activities.  <u>Id.</u> at 1024.  <u>See also</u> <u>Burnett v. Al Baraka Inv. & Dev. Corp.</u>, 274 F. Supp. 2d 86, 105 (D. D.C. 2003) (finding plaintiffs sufficiently alleged aiding and abetting under ATA where complaint stated that defendant knowingly provided funds directly to terrorist organization in furtherance of terrorist activities).  <u>Cf.</u> <u>Ungar v. Islamic Republic of Iran</u>, 211 F. Supp. 2d 91, 99-100 (D. D.C. 2002) (allegations that Iran and government officials aided and abetted murder of plaintiffs' children by providing funds to terrorists failed to show that defendants knowingly and substantially assisted in the murders).  The court found that plaintiffs' allegations were sufficient to show knowledge and intent.

In contrast, plaintiffs in this case have failed to sufficiently allege that the Bank Defendants knew about Iraq's illegal use of chemical weapons or intended to facilitate that activity.  The complaint makes the wide-sweeping allegation that defendants "knew, or reasonably should have known" that, as a result of services they provided, Hussein's

regime and its use of chemical weapons endangered "all who opposed Saddam Hussein."
Compl. ¶ 95. They allege no facts to suggest that the Bank Defendants intended to
further Saddam Hussein's activities. Moreover, courts hold that where a plaintiff fails to
show a causal link between the alleged unlawful act and defendants' participation in the
commission of that act, it is more difficult to demonstrate that the defendants knowingly
and substantially assisted in the unlawful activity. See Ungar, 211 F. Supp. 2d at 99-100.
As discussed above, plaintiffs fail to sufficiently allege that the Bank Defendants caused
their injuries. Accordingly, Count II is dismissed.

## II.    Violations of International Law (Count III)

Plaintiffs assert claims in the complaint under the Geneva Convention of 1925
(the "Convention"), United Nations Security Council Resolutions ("U.N. Resolutions")
582, 588, 596, 612 and 620, and customary international law. See Compl. Count III.
They allege that the prohibition on the use of chemical weapons in warfare since the
Convention in 1925 constitutes a peremptory or jus cogens norm of international law.
Compl. ¶ 122. Moreover, they allege that the "development, manufacture and
stockpiling of chemical weapons" is prohibited by customary international law. Id. ¶
123.

The plaintiffs allege that Saddam Hussein violated the Convention, U.N.
Resolutions and customary international law by wielding chemical weapons against
Iraqi citizens "during peacetime and against combatants during armed conflicts" and
that the Bank Defendants knew or should have known about these acts. Compl. ¶ 124.
Plaintiffs allege that the Bank Defendants violated international laws "and/or aided and
abetted violations" of those laws by "assisting, facilitating and cooperating with the Iraqi

13

regime of Saddam Hussein in efforts to develop chemical weapons of mass destruction by providing bank services under letters of credit related to the sale of goods and services that were necessary to produce, obtain and stockpile chemical weapons of mass destruction." Id. ¶ 126. Plaintiffs further allege that the Bank Defendants' violation of the international laws "was the producing and proximate cause" of plaintiffs' injuries. Id. ¶ 127.

### A. No Private Right of Action

As an initial matter, the Court must determine whether the sources of international law cited in the complaint provide private rights of action. In order for an international treaty such as the Geneva Convention of 1925[11] to provide for a private right of action it must be "self-executing," meaning that a private right of action is explicitly provided for in the treaty or the treaty has been implemented by a U.S. federal statute. In Flores v. Southern Peru Copper Corp., the Second Circuit discussed the distinction between self-executing and non-self-executing treaties:

> Self-executing treaties are those that immediate[ly] creat[e] rights and duties of private individuals which are enforceable and [are] to be enforced by domestic tribunals. Non-self-executing treaties require implementing action by the political branches of government or . . . are otherwise unsuitable for judicial application.

414 F.3d 233, 257 N.34 (2d Cir.2003) (internal citations and quotation marks omitted); see also Wang v. Ashcroft, 320 F.3d 130, 140 (2d Cir. 2003) ("Unless a treaty is self-executing ... it does not, in and of itself, create individual rights"); Columbia Marine

---

[11] The Geneva Convention of 1925 prohibits "the use in war of asphyxiating, poisonous or other gases, and of analogous liquids, materials or devices." See Joint Appendix ("J.A.") at 1. The United States Senate gave its advice and consent to ratification of that treaty on December 16, 1974.

Servs., Inc. v. Reffet Ltd., 861 F.2d 18, 21 (2d Cir. 1988) (same); Hanoch Tel-Oren v.

Libyan Arab Republic, 517 F. Supp. 542, 546 (D. D.C. 1981) ("only treaties with a specific

provision permitting a private action, or one to be clearly inferred, may suffice as the

basis for federal jurisdiction").

    The Bank Defendants argue that the Geneva Convention is not self-executing and

therefore does not provide plaintiffs with a private right of action.  Def. Mem. at 11.

Plaintiffs concede that the Convention is non-self-executing, but argue that export

prohibitions on chemical weapons enacted by the members of the Australia Group[12] and

some governments' efforts to enforce laws against supplying countries such as Iraq with

materials to manufacture chemical weapons constitute "implementing action by the

political branches of government."  Pl. Opp. at 10; see Plaintiffs' Appendix ("PA")-156

(news article discussing arrests of persons by German officials for supplying Iraq with

equipment for chemical weapons); PA 157-60 (news article discussing U.S. concern

about supply of chemical weapons equipment to Middle East countries).  Plaintiffs cite

no authority supporting their position that these are actions taken by the political

branches of government to implement the Geneva Convention.

    Moreover, courts hold that the Geneva Conventions are not self-executing

treaties and routinely reject private claims brought under them.  See, e.g., Argentine

Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 442 (1989) (Geneva

Convention on the High Seas, 13 U.S.T. 2312, does not create a private right of action,

---

    [12]  Formed in 1984, the Australia Group is an organization of nations (including Australia, France,
Germany, Italy, Japan, Korea, Netherlands, New Zealand, Norway, Romania, the United Kingdom and
Switzerland) that "placed licensing restrictions on the export of chemicals used in the manufacture of
chemical weapons" in response to findings by a U.N. Secretary General mission that chemical weapons
were used in the Iran-Iraq war.  See Compl. ¶ 83.

but sets forth substantive rules of conduct and states that compensation shall be paid for certain wrongs); <u>United States v. Fort</u>, 921 F. Supp. 523, 526 (N.D. Ill. 1996) ("The courts have consistently held that the Geneva Conventions . . . are not self-executing and, thus, provide no basis for the enforcement of private rights in domestic courts."). Accordingly, since the Geneva Convention is not self-executing and Congress has not passed implementing legislation, plaintiffs have no private right of action under the Convention.

Plaintiffs also assert a cause of action under U.N. Security Council Resolutions 582, 588, 596, 612 and 620. <u>See</u> Compl. Count III. The Bank Defendants argue that those Resolutions do not provide a private cause of action. <u>See</u> Def. Mem. at 12. Plaintiffs do not refer to, and the Court has not found, any case law regarding whether the particular Resolutions which plaintiffs cite are self-executing or provide a private right of action. While it does not address the particular Resolutions at issue in this case, <u>Diggs v. Richardson</u>, 555 F.2d 848 (D.C. Cir. 1976), provides guidance for determining whether a Resolution is self-executing. In that case, individuals sued for a declaratory judgment under Resolution 301, which prohibited U.N. member states from dealing with South Africa to the extent that such activity would impliedly endorse the legality of South Africa's occupation of Namibia. <u>Id.</u> at 849. The court looked to the "intent of the signatory parties as manifested by the language of the instrument" and determined that "the provisions here in issue were not addressed to the judicial branch of our government" for enforcement. <u>Id.</u> at 851. The <u>Diggs</u> court held that because the provisions of Resolution 301 do "not confer rights upon individual citizens; they call upon governments to take certain action," there was no private right of action enabling

16

Resolution 301 to be judicially enforced.  Id.

Similarly, Smith v. Socialist People's Libyan Arab Jamahiriya, 886 F. Supp. 306 (E.D.N.Y. 1995), involved two Resolutions that called for Libya to accept responsibility for the bombing of Pan Am flight 103 which killed plaintiffs' decedents.  With respect to whether those Resolutions created a private right of action, the court found that the purpose of the Resolutions, to condemn terrorism and impose economic and diplomatic sanctions against Libya, encouraged government action.  Id. at 311.  Because Resolutions 731 and 748 were directed at governments to take action and were not addressed to the judiciary for enforcement, they were not self-executing and did not provide a private right of action.  Id. at 312.  Moreover, the court rejected plaintiffs' argument that the mere incorporation of a declaration by the United States and the United Kingdom, directing Libya to pay compensation for the attack, created a private right of action.  Id.

The Resolutions plaintiffs invoke here involve the Security Council's concerns about the conflict between Iraq and Iran and, in particular, the use of chemical weapons in contravention of the Geneva Convention of 1925.  See, e.g., Resolution 582 ("calls upon both parties to submit immediately all aspects of the conflict to . . . peaceful settlement of disputes"); Resolution 620 ("Deeply dismayed by the . . . continued use of chemical weapons in the conflict between the Islamic Republic of Iran and Iraq").  Nothing in the text of these Resolutions suggests that they are self-executing or create a private right of action.  As in Smith and Diggs, the Resolutions which plaintiffs invoke call upon the governments of Iraq and Iran to end their conflict and do not create a judicially enforceable individual right of action.

Accordingly, since the Geneva Convention and the U.N. Security Council

Resolutions provide no private right of action for plaintiffs, Count III is dismissed.

**B.    Customary International Law**

Plaintiffs assert a cause of action under customary international law in Count III of the complaint.  As an initial matter, defendants contend that customary international law does not provide plaintiffs with a private right of action.  See Def. Mem. at 13-15. Plaintiffs do not dispute this point in their memorandum of law.  Courts hold that "like international treaty law, customary international law prescribes norms of conduct among nations, but does not create private rights of action for individuals." Friedman v. The Bayer Corp., 1999 WL 33457825, at *3 (E.D.N.Y. Dec. 15, 1999) (dismissing plaintiffs' claims based on customary international law for alleged misconduct by defendants' parent corporations during World War II in cooperation with Nazi Germany).  See also Kadic v. Karadzic, 70 F.3d 232, 246 (2d Cir. 1995) ("The law of nations generally does not create private causes of action to remedy its violations, but leaves to each nation the task of defining the remedies that are available for international law violations"); Tel-Oren v. Libyan Arab Republic, 726 F.2d 774, 778 (D.C. Cir. 1984) ("the law of nations never has been perceived to create or define the civil actions to be made available by each member of the community of nations; by consensus, the states leave that determination to their respective municipal laws"). Thus, in the absence of a private right of action, plaintiffs' claims under customary international law fail.

Even if customary international law did provide a private right of action against defendants, plaintiffs' allegations would be inadequate to state a claim against the Bank Defendants.  The Second Circuit's decision in Flores, 414 F.3d 233, guides the Court in

analyzing plaintiffs' claim under customary international law.  The issue in that case was whether plaintiffs, who were residents of Ilo, Peru and relatives of deceased Ilo residents, stated a claim under the Alien Tort Claims Act[13] for violations of the rights to health and life found in customary international law.  Defendants was a United States company that engaged in mining, refining and smelting in Ilo and allegedly caused plaintiffs and their decedents to suffer lung disease.  Id. at 236-37.  The Second Circuit defined "customary international law" as non-treaty based international law.  Id. at 237.  Critical to asserting a claim under customary international law is that the plaintiff demonstrates a violation of "well-established universally recognized norms of international law."  Id. at 240 (quoting Filartiga v. Pena-Irala, 630 F.2d 876, 888 (2d Cir. 1980)).  Customary international law is comprised of "those rules that States universally abide by, or accede to, out of a sense of legal obligation and mutual concern."  Flores, at 257.  In other words, "for a principle to have ripened . . . into a settled rule of international law, it must command the general assent of civilized nations."  Filartiga, 630 F.2d at 881.  Thus, what defines a rule of international law is its universality.[14]

The "formal lawmaking and official actions" of states is the primary source for determining rules of customary international law.  Flores, 414 F.3d at 247 ; see also United States v. Yousef, 327 F.3d 56, 101 (2d Cir. 2003).  Additionally, a court may

---

[13]  The Alien Tort Claims Act, 28 U.S.C. § 1350, provides for federal jurisdiction over a claim by a United States national involving a violation of a treaty of the United States or international law (referred to as the "law of nations").  See Flores, 414 F.3d at 247.

[14]  An example of a universally accepted norm that is considered a rule of customary international law is the prohibition on torture.  See Filartiga, 630 F.2d at 890 ("Among the rights universally proclaimed by all nations . . . is the right to be free of physical torture.");  see also Presbyterian Church of Sudan v. Talisman Energy, Inc., 244 F. Supp. 2d 289, 305 (S.D.N.Y. 2003) (genocide, war crimes, torture and enslavement are universally-recognized norms of international law).

consider and a plaintiff may "consult[] the works of jurists, writing professedly on public law; or [] the general usage and practice of nations; or [] judicial decisions recognising and enforcing that law."  Filartiga, 630 F.2d at 880.

Although plaintiffs allege that the prohibition against "the development, manufacture and stockpiling of chemical weapons" is a rule of customary international law (Compl. ¶ 123), the focus of their arguments and the evidence they rely upon is instead that customary international law restrains the use of chemical weapons.  In their opposition brief, they argue that the Geneva Convention and U.N. Security Council Resolutions "were intended to stop Iraq's use of chemical weapons, to stop further production to prevent future use, and that this is part of customary international law." See Pl. Opp. at 7.  They also contend that the U.N. Resolutions under which they assert a cause of action "all . . . condemned Iraq's use of chemical weapons."  Id. at 6.  The text of these international law documents makes clear the uniform prohibition on the use of chemical weapons in war.  See Flores, 414 F.3d at 250 (treaties suffice as evidence of universality where "an overwhelming majority of States have ratified the treaty").[15]

Plaintiffs' arguments do not support liability against the Bank Defendants because they do not allege that the Bank Defendants used chemical weapons.  Indeed, in their opposition brief, plaintiffs assert that "Other than Saddam Hussein, there have been no significant violations of the Geneva Protocol of 1925."  Pl. Opp. at 9.  This contention that Saddam Hussein violated the Geneva Convention does not suffice to state a claim against the Bank Defendants.  The only allegations plaintiffs make

---

[15]  At least 133 states have ratified the Geneva Convention of 1925.  See Pl. Opp. at 6 (citing Geneva Convention, J.A. at 1).  Four of the U.N. Security Council Resolutions at issue here were passed unanimously and the fifth passed by a vote of ten to one.  Id.

regarding the Bank Defendants' conduct is that they provided letters of credit in favor of the Supplier Defendants.  Despite their attempt to cast the Bank Defendants as having played "a necessary role in assisting Iraq to develop the chemical weapons that caused the injuries of plaintiffs" (Pl. Opp. at 8), plaintiffs insufficiently allege that providing letters of credit violates the rule of international law – use of chemical weapons – which their evidence supports.

Plaintiffs propose an alternative rule of customary international law – prohibition on the development, manufacture and stockpiling of chemical weapons – that is not supported by the Geneva Convention or the U.N. Security Resolutions. Plaintiffs have not established that the prohibition for which they advocate is a "sufficiently definite" norm of international law.[16]  Flores, 343 F.3d at 160.  This inadequacy in plaintiffs' pleading is made more conspicuous by defendants' argument against uniform prohibition on chemical weapons as a rule of international law.  They discuss at length the ways in which the United States continued to engage in export trade with Iraq during the 1980s and that the U.N. Security Council did not pass any Resolutions prohibiting the manufacture and development of chemical weapons or provision of letters of credit for transactions involving Iraq.[17]  See Def. Mem. at 19-24.

---

[16]  Even if the Court were to find plaintiffs' evidence of customary international law sufficient to show a universal prohibition on the development, manufacture and stockpiling of chemical weapons, plaintiffs' claims under international law would fail because they do not sufficiently allege how issuing letters of credit is encompassed by that restriction.

[17]  Defendants acknowledge the "Convention on the Prohibition of the Development, Production, Stockpiling and Use of Chemical Weapons and on their Destruction," which was opened for ratification in 1993 and went into effect April 29, 1997.  Def. Mem. at 18.  That treaty was signed (but not ratified) by 144 states as of May 13, 1993.  See J.A. at 3, 27-32.  The Bank Defendants argue that the date on which this convention was created supports their argument that in the 1980s there was no prohibition on the development and stockpiling of chemical weapons.  See Def. Mem. at 18.

Moreover, this case is distinguishable from <u>Filartiga</u> where, based on several international human rights documents, the court found evidence of a universal prohibition on torture between and among states which constituted a "clear and unambiguous" rule of customary international law. 630 F.2d at 880-84. By contrast, in <u>Flores</u>, after reviewing numerous treaties, U.N. declarations, decisions of multinational tribunals, and expert affidavits submitted by plaintiffs, the Second Circuit held that plaintiffs provided insufficient evidence to establish that intranational pollution violates a rule of customary international law. 343 F.3d at 172. The material provided to the Court in this case falls far short of the evidence in <u>Flores</u> which was insufficient to establish a violation of customary international law. Plaintiffs' failure to sufficiently allege that the Bank Defendants violated a rule of customary international law compels the Court to dismiss their cause of action.[18]

## III.   <u>Aiding and Abetting Liability (Count X)</u>

Plaintiffs allege that the Bank Defendants aided and abetted violations of international law in Count III and also assert a cause of action in Count X for Aiding and Abetting Tortious Conduct. The Court discusses those theories of aiding and abetting

---

[18]   Plaintiffs invoke the principle of <u>jus cogens</u> in their complaint, alleging that the prohibition on development and manufacture of chemical weapons is a <u>jus cogens</u> norm of international law. Compl. ¶ 122. In their opposition brief, plaintiffs define <u>jus cogens</u> as a "norm accepted and recognized by the international community of states as a whole as a norm from which no derogation is permitted and which can be modified only by a subsequent norm of general international law having the same character." Pl. Opp. at 5 (citing <u>Siderman de Blake v. Argentina</u>, 965 F.2d 699, 714 (9th Cir. 1992)). <u>Siderman</u> explains that the body of <u>jus cogens</u> norms depends not on the consent of nations, as does customary international law, but "is derived from values taken to be fundamental by the international community"; <u>jus cogens</u> norms "enjoy the highest status within international law." 965 F.2d at 714-16. <u>See also</u> <u>Talisman Energy</u>, 244 F. Supp. 2d at 306. This Court has ruled that plaintiffs fail to establish that prohibition on the development, manufacture and stockpiling of chemical weapons is a rule of customary international law. <u>A fortiori</u>, plaintiffs are unable to establish that the prohibition they advance rises to the level of a <u>jus cogens</u> norm of international law.

liability in this section.

### A.    Aiding and Abetting Violations of International Law

As an initial matter, courts applying U.S. tort law hold that where a plaintiff has failed to establish a primary violation, a cause of action for aiding and abetting will not lie. See, e.g., Geren v. Quantum Chem. Corp., 832 F. Supp. 728, 737-38 (S.D.N.Y. 1993) (rejecting claim for aiding and abetting breach of fiduciary duty because plaintiff's primary violation claim was time-barred).  As discussed above, the sources of international law on which plaintiffs premise their claims do not provide private rights of action, and thus, plaintiffs fail to establish primary violations of international law.  It follows that plaintiffs' claim for aiding and abetting violations of international law fails.

The Court will nevertheless briefly discuss the parties' argument regarding whether international law recognizes a cause of action for civil aiding and abetting.  The Bank Defendants argue that no such cause of action exists.  See Def. Mem. at 42.  Instead, they argue, international tribunals considering the issue have recognized a cause of action for criminal aiding and abetting under international law, which imposes liability on individuals (as opposed to corporations) who were personally present for the alleged unlawful acts.  Id. (citing decisions of international tribunals recognizing claims for aiding and abetting criminal violations of international law).  In opposition, plaintiffs contend that a cause of action for aiding and abetting violations of international law exists, but do not cite any authority for that proposition.  See Pl. Opp. at 34 (merely describing the Bank Defendants' contention that there is no such cause of action as "dubious" and citing Boim, which involved the ATA, 18 U.S.C. § 2333, and not international law).  An instructive case is Talisman Energy, supra n.14, 244 F. Supp. 2d

289, which concerned an action against a Canadian corporation that was granted an oil concession by the government of Sudan. The complaint set forth the facts as follows: under the agreement, defendant engaged in oil exploration and invested in development of roadways around, and security for, oil fields, and the Sudan government allegedly used that infrastructure and capital generated to support its Islamic ethnic cleansing campaign. Id. at 299. The court refused to dismiss plaintiffs' claims for conspiracy and aiding and abetting violations of international law (namely, human rights prohibitions against ethnic cleansing) by the government of Sudan. The court framed the issue as whether plaintiffs' claims are "actionable theories of civil liability under the ATCA," and considered human rights instruments recognizing complicity in addition to decisions of international tribunals concerning criminal complicity. Id. at 320-24. The court found that plaintiffs stated a claim for aiding and abetting where defendant provided "direct and substantial assistance" to Sudan (in securing the oil fields, hiring military advisors to coordinate with Sudan, meeting with Sudan to discuss disposing of civilians in areas around the oil fields, building roads and providing vehicles for use in Sudan's ethnic cleansing campaign) with the knowledge that Sudan was engaged in ethnic cleansing. Id. at 300, 323. Talisman Energy suggests that theories of complicity are available under international law against corporations for civil law violations. See also Burnett, supra, 274 F. Supp. 2d at 100 (liability may be imposed under the Alien Tort Claim Act for aiding and abetting or participating in conspiracy).

Nevertheless, plaintiffs' allegations – that the Bank Defendants acted as correspondent banks for the Supplier Defendants – are of a decidedly different dimension and distinguishable from the allegations of defendants' knowing and direct

funding of the Sudan government in <u>Talisman Energy</u>.  Moreover, courts have declined

to impose liability on defendants for participation in a commercial enterprise that

allegedly assists in another's violations of international law.  For example, in <u>Bigio v.</u>

<u>Coco-Cola Co.</u>, 239 F.3d 440, 444 (2d Cir. 2001), the plaintiffs alleged that the Egyptian

government confiscated their property in Egypt because of their Jewish heritage in

violation of international human rights laws and that defendant Coca-Cola Company,

with knowledge of the unlawful seizure of plaintiffs' property, later purchased or leased

the property.  With respect to plaintiffs' claims that defendant assisted the Egyptian

government in violating international human rights laws, the court held that defendant

Coca-Cola's receipt of an "indirect economic benefit" from the Egyptian government's

sale was insufficient to support a claim over a private company under the Alien Tort

Claims Act.  <u>Id.</u> at 449.  <u>See also</u> <u>Carmichael v. United Tech. Corp.</u>, 835 F.2d 109, 113-14

(5th Cir. 1988) (dismissing claim against accounting company that was creditor of

plaintiff's company where no evidence existed in record that defendant aided or abetted

Saudi government in torturing plaintiff in prison).  Thus, plaintiffs' claim for aiding and

abetting violations of international law fails.

### B.  Aiding and Abetting Tortious Conduct

Plaintiffs assert a cause of action for "Aiding and Abetting Tortious Conduct" in

Count X of the complaint.  They allege that the Bank Defendants, "by acting as

correspondent banks on letters of credit necessary to the completion of transactions

between the Supplier Defendants and the Iraqi regime of Saddam Hussein, were aware

of their role as part of the unlawful and/or tortious activity that gave rise to the injuries

of Plaintiffs and other members of the Class at the time the Bank Defendant [sic]

performed their services as correspondent banks." Compl. ¶ 160. Plaintiffs further allege

that the Bank Defendants "knowingly and substantially participated in the unlawful

and/or tortious conduct of the Supplier Defendants in that the Bank Defendants knew of

the nature of the goods and services sold and to whom the goods and services were

being provided." Id. ¶ 161.

The required elements of a cause of action for aiding and abetting a tortfeasor

under New York or federal common law are: "(1) the existence of a violation by the

primary wrongdoer; (2) knowledge of this violation on the part of the aider and abettor;

(3) substantial assistance by the aider and abettor in the achievement of the primary

violation." Williams v. Bank Leumi Trust Co. of N.Y., 1997 WL 289865, at *4 (S.D.N.Y.

May 30, 1997). See also Pittman v. Grayson, 149 F.3d 111, 123 (2d Cir. 1998) (describing

aiding and abetting elements under New York law); Lindsay v. Lockwood, 163 Misc. 2d

228, 233 (N.Y. Sup. Ct. 1994) (same).[19]

The Bank Defendants move to dismiss plaintiffs' claim for aiding and abetting

because plaintiffs have failed to sufficiently allege the requisite element of knowledge.

They argue that New York and federal law[20] require actual knowledge and therefore

plaintiffs' allegations that the Bank Defendants "knew or should have known" are

insufficient as a matter of law. Def. Mem. at 47. Moreover, defendants contend that

---

[19] The elements of aiding and abetting (a type of concerted action liability) as set forth in the Restatement of Torts also include knowledge and substantial assistance: "(b) knowledge that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself." Restatement (Second) of Torts § 876(b).

[20] In their memorandum of law, the Bank Defendants argue that plaintiffs neglect to specify the jurisdiction under whose laws their claims arise. Def. Mem. at 47. In any event, as defendants contend, and as will be made clear by the following discussion, plaintiffs' cause of action for aiding and abetting tortious conduct fails irrespective of whether New York or federal law is applied.

given the nature of transactions involving letters of credit, banks such as defendants are independent from and cannot be deemed to have knowledge about the underlying sale. Id. at 47-49. Finally, the Bank Defendants argue that plaintiffs fail to allege that the defendants knew that chemical weapons were being sold. Id. at 49.

New York law requires a plaintiff asserting an aiding and abetting cause of action to allege actual knowledge; constructive knowledge is insufficient.[21] In Williams, supra, 1997 WL 289865, at *5, the court dismissed an aiding and abetting claim against a bank for its alleged participation in a check-kiting scheme. The court found that plaintiff's allegations that the bank "knew, or recklessly disregarded" or "knew or should have known of the primary wrongdoing" were insufficient to establish actual knowledge as required by New York law. Id. at *5. Moreover, plaintiff's "conclusory allegations that [defendant bank] was aware of the scheme" were inadequate to satisfy plaintiff's pleading burden. Id. See also Kolbeck, 939 F. Supp. at 246 (describing New York common law requirement of actual knowledge); Kaufman v. Cohen, 307 A.D.2d 113, 125 (N.Y. App. Div. 2003) (same).[22]

Similarly, plaintiffs in this case fail to adequately allege that the Bank Defendants

---

[21] Plaintiffs contend that the disagreement among courts as to whether aiding and abetting liability requires actual or constructive knowledge is "academic" since plaintiffs have alleged both in their complaint. Pl. Opp. at 30. To that end, they cite Diduck v. Kaszycki & Sons Contr., 974 F.2d 270, 283 (2d Cir. 1992), in which the court held that constructive knowledge was sufficient for a claim of aiding and abetting breach of fiduciary duty in the ERISA context. The Court adopts the reasoning of other district courts in this circuit limiting Diduck to the context in which it arose. See, e.g., Kolbeck v. LIT Am., Inc., 939 F. Supp. 240, 246 (S.D.N.Y. 1996). The Second Circuit has since required actual knowledge to state a claim for participation in breach of fiduciary duty. See SCS Communication v. Herrick Co., Inc., 360 F.3d 329, 342-43 (2d Cir. 2004) (requiring evidence that defendant "knowingly participated" or "knew" about the breach of duty).

[22] Plaintiffs' discussion of cases outside of this circuit (which, as plaintiffs acknowledge, applied the actual knowledge standard to claims for aiding and abetting liability) do not rehabilitate the deficiencies in plaintiffs' pleading. See Pl. Opp. at 31-32.

had actual knowledge of the sales for which they issued letters of credit, or for that matter, any tortious conduct that allegedly caused plaintiffs' injuries. Their allegations that "The Bank Defendants [] knew or reasonably should have known about the" use of chemical weapons by Iraq (Compl. ¶ 87), and that "the Bank Defendants knew or should have known that [their] conduct was unlawful" (Compl. ¶ 89), at best establish constructive knowledge, which fails under New York law as set forth in <u>Williams</u>. Moreover, as in <u>Williams</u>, plaintiffs' allegation that the Bank Defendants "were aware of their role as part of the unlawful and/or tortious activity that gave rise to the injuries of the Plaintiffs" is conclusory and insufficient to establish actual knowledge on the part of the defendants. <u>See also</u> <u>Renner v. Chase Manhattan Bank</u>, 1999 WL 47239, at *12-13 (S.D.N.Y. Feb. 3, 1999) (dismissing aiding and abetting claim against bank defendant where plaintiff's allegations that defendant had conversations with tortfeasor about how plaintiff's account would be managed and structured failed to show bank had actual knowledge of fraud perpetrated).

To refute plaintiffs' argument that they must have had knowledge of the underlying sales transaction, the Bank Defendants underscore the independence of banks in letter of credit transactions.[23] Def. Mem. at 48 (citing <u>KMW Int'l v. Chase Manhattan Bank</u>, 606 F.2d 10, 15 (2d Cir. 1979) ("As a matter of law, a bank's obligation

---

[23] <u>Alaska Textile Co. v. Chase Manhattan Bank</u>, 982 F.2d 813, 815 (2d Cir. 1992), provides the following explanation of a letter of credit transaction: A foreign buyer is interested in a seller's products. Where the seller is not familiar with the buyer and has no guarantee that the buyer is worthy of payment if the seller ships its goods to the buyer, the seller can arrange to have a bank issue a letter of credit in favor of the seller. The bank will then pay the seller once it ships its goods to the buyer. Thus, the letter of credit functions as an assurance of the buyer's integrity for the amount owed to the seller. The letter of credit is based on documents shared by the seller with the bank and arranges for reimbursement of the bank by the seller once the bank makes payment under the letter of credit. The letter of credit is completely independent of the underlying sales transaction. <u>See also</u> <u>Oie v. Citibank</u>, 957 F. Supp. 492, 502-03 (S.D.N.Y. 1997).

28

under a letter of credit is totally independent of the underlying transaction.")).  Because of this obligation of independence, the Bank Defendants argue, they may not be presumed to have known that the goods sold were to be used in making chemical weapons.  Def. Mem. at 49.  Plaintiffs rely on Oie v. Citibank, 957 F. Supp. 492 (S.D.N.Y. 1997), to show that based on their role as issuers of letters of credit, the Bank Defendants had actual knowledge of Saddam Hussein's unlawful use of the goods provided by the Supplier Defendants.  However, that case makes clear that issuers of letters of credit are "third parties ignorant of the specifics of the transactions" who merely deal in documents describing the terms of the credit extended.  Oie, 957 F. Supp. at 503.  The Court is not called upon to rule on the extent of knowledge possessed by banks issuing letters of credit.  Defendants' argument in this regard merely provides additional evidence of the flaw in plaintiffs' complaint – that it fails to allege that the Bank Defendants actually knew that the materials being sold by the Supplier Defendants to Hussein would be used in making chemical weapons.

Because plaintiffs fail to sufficiently allege that the Bank Defendants knew about any alleged tortious conduct, they fail to state a claim for aiding and abetting against defendants.[24]

---

[24]  The Court does not discuss the other elements of the tort – primary violation and substantial assistance –  given that plaintiffs' claim is dismissed for failure to adequately plead knowledge.  Plaintiffs' complaint does not make clear what primary violation the Bank Defendants are alleged to have aided and abetted.  Indeed, on one hand they allege that the Bank Defendants knew or should have known about Hussein's alleged misconduct (Compl. ¶ 87) and, on the other, they allege that the Bank Defendants participated in the Supplier Defendants' tortious conduct.  Compl. ¶ 161.  Even assuming that the complaint asserts a primary violation by the Supplier Defendants, plaintiffs fail to allege facts suggesting that the Bank Defendants affirmatively assisted in that conduct with the intent that Hussein use chemical weapons.  See Kaufman, 307 A.D.2d at 126.  Their only allegation of conduct by the Bank Defendants – that the Bank Defendants acted as correspondent banks in issuing letters of credits – does not indicate that the Bank Defendants in any way substantially assisted the production of chemical weapons.  Moreover, plaintiffs' assertion that the Bank Defendants are liable based on their "silence" to Coalition forces about providing banking services is wholly unsupported.  Compl. ¶ 90.  Inaction can only constitute

## IV.    Civil Conspiracy/Concerted Action (Count XI)

In Count XI of the complaint, plaintiffs assert a "Civil Conspiracy/Concerted Action" cause of action against the Bank Defendants. They allege that the Bank and Supplier Defendants agreed to participate "in an unlawful act or a lawful act in an unlawful means." Compl. ¶ 165. Additionally, they allege that the Bank Defendants performed an overt act in furtherance of the conspiracy by "providing necessary banking services." Id. ¶ 166. Finally, plaintiffs allege that they were injured as a result of the alleged conspiracy. Id. ¶ 167.

"To plead a valid cause of action for conspiracy, a plaintiff in New York must allege the primary tort and four elements: (a) a corrupt agreement between two or more persons; (b) an overt act in furtherance of the agreement; (c) the parties' intentional participation in the furtherance of a plan or purpose; and (d) the resulting damage or injury." 777388 Ontario Ltd. v. Lencore Acoustics Corp., 142 F. Supp. 2d 309, 319 (E.D.N.Y. 2001) (Glasser, J.) (citations and footnote omitted). See also Lindsay, 163 Misc. 2d at 234. Conspiracy claims premised upon "conclusory, vague or general" allegations will not withstand a motion to dismiss. Boddie v. Schneider, 105 F.3d 857, 862 (2d Cir. 1997). See also Goldstein v. Siegel, 19 A.D.2d 489, 493 (N.Y. App. Div. 1963) (a plaintiff must "allege at least some of the facts of agreement or separable acts, if any, of the alleged co-conspirators in order to support the responsibility of each for the acts of all the others. Otherwise, the allegation remains the barest of legal conclusions.").

---

substantial assistance for purposes of aiding and abetting liability where the defendant owes the plaintiff a fiduciary duty. See Kolbeck, 939 F. Supp. at 247. Plaintiffs do not allege any facts to show that the Bank Defendants owed plaintiffs a duty.

Plaintiffs' conspiracy allegations are insufficient in all respects. First, plaintiffs
do not make any factual allegations that the Bank Defendants and the Supplier
Defendants agreed to participate in an unlawful act. Their conclusory assertion that the
defendants had an agreement fails to meet their pleading burden. Compl. ¶ 165. The
complaint provides no basis on which to conclude that the Bank Defendants, the
Supplier Defendants and Saddam Hussein shared a common goal relating to the
proliferation and use of chemical weapons. See Ungar, supra, 211 F. Supp. 2d at 100 (in
the absence of allegations that Hamas members who murdered plaintiffs' children and
Iranian government agencies and officials reached an agreement to commit the murders
or, at a minimum, shared common goals, the plaintiffs failed to establish liability for
conspiracy). Plaintiffs' citation to Bodner v. Banque Paribas, 114 F. Supp. 2d 117
(E.D.N.Y. 2000), only highlights the inadequacy of their allegations. Pl. Opp. at 27. In
that case, there were numerous allegations from which the court inferred that the
French bank defendants conspired with the Nazi and Vichy regimes to deprive plaintiffs'
Jewish ancestors of their property during the Holocaust, including a French Banking
Association Circular that detailed a plan to take plaintiffs' property; that the banks
blocked and confiscated plaintiffs' accounts; and asked genealogical questions of
plaintiffs designed to prohibit non-Jewish customers from withdrawing or transferring
funds.[25] 114 F. Supp. 2d at 122. It is unquestionable that plaintiffs' allegations fall far

---

[25] The inadequacy of plaintiffs' complaint is underscored by their failure to make sufficient
allegations concerning an unlawful act which the Bank Defendants allegedly agreed to further in
cooperation with the Supplier Defendants. In their opposition brief, they assert that an "unlawful act or a
lawful act in an unlawful means" involved providing Saddam Hussein with the opportunity to violate
international law by obtaining and using chemical weapons of mass destruction. Pl. Opp. at 28. This
belated attempt will not cure the deficiency in plaintiffs' complaint.

short of those in <u>Bodner</u>.

Moreover, plaintiffs allege that the Bank Defendants performed an "overt act" by providing letters of credit in favor of the Supplier Defendants, but utterly fail to allege facts suggesting that this act was done in furtherance of an agreement to commit unlawful acts with the Supplier Defendants. Plaintiffs' only factual allegation regarding the Bank Defendants' conduct – that they issued letters of credit in favor of the Supplier Defendants – in no way suggests that the banks intended to further Hussein's use of chemical weapons by engaging in commercial banking transactions with manufacturers and suppliers of chemicals. Accordingly, plaintiffs fail to state a claim for conspiracy against the Bank Defendants.

## V.    <u>Negligence and Gross Negligence (Count VII)</u>

Plaintiffs assert a cause of action against the Bank Defendants for negligence and/or gross negligence. Specifically, they allege that the Bank Defendants, "by acting as correspondent banks on letters of credit necessary to the completion of transactions between the Supplier Defendants and the Iraqi regime of Saddam Hussein, knew or reasonably should have known of their role in providing, selling and/or entrusting to the Iraqi Regime of Saddam Hussein chemicals and equipment that could be used for making chemical weapons and knew or should have known that such actions would cause persons, including plaintiffs, to be injured or killed." Compl. ¶ 146.

In order to survive a motion to dismiss, a plaintiff must demonstrate the "existence of a duty, the breach of which may be considered the proximate cause of the damages suffered by the injured party." <u>Becker v. Schwartz</u>, 46 N.Y.2d 401, 410 (N.Y. 1978). "The threshold question in any negligence action is: does defendant owe a legally

recognized duty of care to plaintiff?"  <u>Hamilton v. Beretta U.S.A. Corp.</u>, 96 N.Y.2d 222, 232 (N.Y. 2001).  Whether a duty exists is a question of law that is appropriately decided on a motion to dismiss because duty "has meaning only when it is considered in relation to both the harm that the duty exists to prevent and the class of individuals to whom it is owed."  <u>Waters v. New York City Hous. Auth.</u>, 69 N.Y.2d 225, 228-29 (1987 N.Y.).  An injured plaintiff "must show that the defendant owed not merely a general duty of care to society, but a specific duty that was owed to him or her, for '[w]ithout duty running directly to the injured person, there can be no liability in damages, however careless the conduct or foreseeable the harm."  <u>Hamilton</u>, 96 N.Y.2d at 232.  The only relationship alleged is that between the Bank Defendants and the Supplier Defendants and this does not suffice to find a specific duty owed to plaintiffs by the Bank Defendants.  <u>See</u> Compl. ¶ 146.  Moreover, courts do not hold that banks owe a limitless duty of care to others.  <u>See</u> <u>Tazaras v. Evergreen Int'l Spot Trading, Inc.</u>, 2003 WL 470611, at *6 (S.D.N.Y. Feb. 25, 2003) (holding bank owed no duty in negligence action to non-customer).

A duty may also be imposed based on the defendant's relationship to a third-person tortfeasor.  A defendant generally "has no duty to control the conduct of third persons so as to prevent them from harming others, even where as a practical matter defendant can exercise such control."  <u>D'Amico v. Christie</u>, 71 N.Y.2d 76, 88 (N.Y. 1987) (citing <u>Pulka v. Edelman</u>, 40 N.Y.2d 781, 783 (N.Y. 1976)).  However, "a duty may arise . . . where there is a relationship [] between defendant and a third-person tortfeasor that encompasses defendant's actual control of the third person's actions. . . ."  <u>Hamilton</u>, 96 N.Y.2d at 233.  In finding such a duty, it is crucial "that the defendant's relationship with [the tortfeasor] places defendant in the best position to protect against the risk of harm."

33

Id.  Plaintiffs in this case do not sufficiently allege that the Bank Defendants controlled any third parties – either the Supplier Defendants, the U.S. Military or Coalition forces, the Iraqi regime or Saddam Hussein – whose actions form the basis for plaintiffs' complaint.  The independence of the Bank Defendants as issuers of letters of credit makes clear that they did not control the Supplier Defendants' actions with respect to the chemicals or equipment sold to Iraq.  It follows that the Bank Defendants would not have been in the best position to protect plaintiffs from the harm caused by Coalition forces' detonation of chemical weapons in storage facilities and ammunition dumps in Iraq.  See Hamilton, 96 N.Y.2d at 234 (refusing to expand the scope of duty to impose liability on manufacturers of handguns where the connection between defendants, plaintiffs and the tortfeasors was sufficiently remote that it was clear defendants were not in a position to prevent the harm to plaintiffs).

Furthermore, plaintiffs' suggestion that it was foreseeable that the Bank Defendants' provision of letters of credit would result in harm to plaintiffs and thus defendants owed plaintiffs a duty is meritless, if not specious.  "Foreseeability alone, does not define duty – it merely determines the scope of the duty once it is determined to exist."  Hamilton, 96 N.Y.2d at 232.  See also McCarthy v. Olin Corp., 119 F.3d 148, 156 (2d Cir. 1997) (no duty imposed on gun manufacturer for plaintiffs' injuries even though it may have been foreseeable that gun would be misused criminally).  Even if plaintiffs had established that defendants owed them a duty, the argument that their injuries were foreseeable is unpersuasive.  Plaintiffs cite In re September 11 Litigation, 280 F. Supp. 2d 279 (S.D.N.Y. 2003), in which the court held that airline defendants owed a duty to plaintiffs who were injured "on the ground" on September 11, 2001 to

34

properly screen passengers boarding their flights.  <u>See</u> Pl. Opp. at 16.  That case is distinguishable because the court relied on precedent finding a duty owed by the airlines to persons on the ground.  280 F. Supp. 2d at 294-95.  Moreover, the court held that the connection between the airline defendants and the "ground victims" was less remote and therefore it was foreseeable that the airline screening procedures benefitted persons on the ground.  <u>Id.</u> at 292-93.  By contrast, in this case, it was not foreseeable that providing letters of credit for the sale of chemicals and manufacturing equipment between independent third parties was likely to result in plaintiffs' injuries.  <u>See</u> <u>Burnett</u>, 274 F. Supp. 2d at 108 (dismissing negligence claim against entity that allegedly funded al Qaeda and facilitated September 11, 2001 terrorist attack where defendant owed no duty to victims).

In <u>Palsgraf v. Long Island R.R.</u>, 248 N.Y. 339, 344 (1928), Judge Cardozo, although in a decidedly different context and yet with peculiar relevance to what we decide here, penned the following familiar phrase: "The risk reasonably to be perceived defines the duty to be obeyed."  What the plaintiffs essentially ask the Court to accept is that by providing letters of credit to the manufacturers of chemicals, the Bank Defendants should have perceived the risk that those chemicals would be sold to Iraq; that Saddam Hussein would use those chemicals to manufacture lethal weapons; that those weapons would be stockpiled in a location that would one day be bombed by coalition forces; that the bombs would hit and detonate those weapons; that the detonation would cause the toxic emissions to be released; that those emissions would permeate the atmosphere; that the plaintiffs would be present in that atmosphere, inhale those emissions and sustain the injuries alleged.  Given that procession of events,

this Court is driven to conclude that there was nothing to suggest to the most cautious mind that a letter of credit would cause the harm the plaintiffs allege. To attribute such foresight to the Banks is to attribute a prescience that is beyond human ken.

In an apparent effort to rehabilitate their insufficient pleadings, plaintiffs assert in their memorandum of law that the Bank Defendants owe them a duty as illustrated by the doctrine of negligent entrustment. Pl. Opp. at 12-15. That doctrine is described as follows: "One who supplies directly or through a third person a <u>chattel</u> for the use of another whom the supplier knows or from facts known to him should know to be likely because of his youth, inexperience or otherwise, to use it in a manner involving unreasonable risk of bodily harm to himself and others whom the supplier should expect to share in, or be in the vicinity of its use, is subject to liability for bodily harm caused thereby to them." Restatement (Second) of Torts § 390 (emphasis added). The doctrine of negligent entrustment has no application for the obvious reason that a letter of credit is not a chattel; and to restate the doctrine substituting "letter of credit" for "chattel" makes even the suggestion that the doctrine applies here senseless. the most causal examination of the illustrations to the Restatement § 390 would make the inapplicability of that doctrine to a letter of credit immediately apparent. In analogous cases, courts have rejected the application of the negligent entrustment doctrine to hold lenders or co-signors of loans responsible to an injured plaintiff for a third-party's negligence. <u>See</u> <u>Zedella v. Gibson</u>, 650 N.E.2d 1000, 1003-4 (Ill. Sup. Ct. 1995) (refusing to apply negligent entrustment doctrine to father who had co-signed his son's car loan three years before his son was involved in an accident causing injury to the plaintiff); <u>Altman v. Morris Plan Co.</u>, 58 Cal. App. 3d 951, 961 (Cal. Ct. App. 1976)

(dismissing negligent entrustment claim against company that financed automobile knowing of driver's poor record and concluding that "[i]f the duty of evaluating a driver's competence is to be borne by lending institutions in connection with the financing of automobile purchases, it is the job of the Legislature and not the courts to so provide.").

In any event, they otherwise fail to satisfy the requirements for negligent entrustment, which are that defendants supplied a dangerous instrument and controlled the actions of the person or entity to whom it supplied the instrument. Plaintiffs in this case do not allege either that the Bank Defendants supplied a dangerous instrument to anyone or that defendants controlled a person to whom such an instrument was entrusted. Moreover, plaintiffs do not sufficiently allege that the Bank Defendants knew about the Iraq government's use of chemicals and equipment provided to it by the Supplier Defendants. The court in <u>Hamilton</u> rejected plaintiffs' assertion of negligent entrustment as an alternative basis for imposing a duty of care on defendant gun manufacturers because plaintiffs failed to sufficiently adduce evidence that defendants knew the entrustees (gun distributors) were illegally selling the guns. 96 N.Y.2d at 237. The same result is warranted here.

Finally, defendants persuasively assert strong policy reasons against imposing a duty of reasonable care. Extending the scope of duty to persons injured by a thing, the sale of which a bank facilitated by issuing a letter of credit to its manufacturer, would require banks to investigate the manufacturer of that thing; inquire as to the person or entities to whom that manufacturer then intends to sell that thing; investigate the uses to which that buyer intends to put the thing; and weigh the potential risks that the

reasonable end user could or should foresee. To impose such a duty upon banks would impose an intolerable burden on the financial community in general and upon banks in particular, and wreak incalculable harm upon commerce. Cf. Confeccoes Texteis de Vouzela, LDA v. Riggs Nat'l Bank, 994 F.2d 851, 854 (D.C. Cir. 1993). Since plaintiffs fail to sufficiently allege that the Bank Defendants owed them a duty, their negligence claim fails as a matter of law.[26] See Tzaras, 2003 WL 470611, at *6.

## VI.  Negligence Per Se (Count VIII)

Plaintiffs assert a cause of action for negligence per se based on the Bank Defendants' alleged violation of the Geneva Convention of 1925, the Biological Weapons Convention of 1972, U.N. Security Council Resolutions 582, 588, 596, 612 and 620, and the export laws of the nations from which the Supplier Defendants exported goods and services to Iraq. Compl. ¶ 150.

The Bank Defendants contend that plaintiffs' claim fails as a matter of law because they have no private right of action under the cited international treaties and laws and because there is no precedent for pursuing a negligence per se claim based on a treaty or international law. Def. Mem. at 36-37. Plaintiffs respond that these agreements contain a codified standard of reasonable care which the Bank Defendants allegedly breached. They are wrong.

A plaintiff asserting negligence per se satisfies two elements of negligence, duty and breach, by showing that defendant violated a statute intended to protect plaintiff:

---

[26] Plaintiffs assert a claim for gross negligence in Count VII, which, in addition to the elements of ordinary negligence, requires that the plaintiff show "conduct that evinces a reckless disregard for the rights of others or smacks of intentional wrongdoing." AT&T v. New York, 83 F.3d 549, 556 (2d Cir. 1996). Since plaintiffs fail to sufficiently allege that the Bank Defendants owe them a duty, they fail to state a claim for gross negligence.

38

> Under the rule of negligence per se, if a statute is designed to protect a class of persons, in which the plaintiff is included, from the type of harm which in fact occurred as a result of its violation, the issues of the defendant's duty of care to the plaintiff and the defendant's breach of that duty are conclusively established upon proof that the statute was violated.

Dubai Islamic Bank v. Citibank, N.A., 126 F. Supp. 2d 659, 668 (S.D.N.Y. 2000) (citation omitted).  See also German v. Fed. Home Loan Mortgage Corp., 896 F. Supp. 1385, 1397 (S.D.N.Y. 1995) ("Under a negligence per se regime, the statute creates the duty and the violation establishes the breach.").

As discussed above, plaintiffs' claims that the Bank Defendants violated the Geneva Convention and the U.N. Security Council Resolutions fail because those enactments provide no private right of action, see discussion supra, and thus, plaintiffs are not members of a class the enactments were designed to protect.   Put differently, the banks owed the plaintiffs no duty.  See Dubai Islamic Bank, 126 F. Supp. 2d at 668 (dismissing negligence per se claim based on criminal money laundering statute because statute did not create a private right of action).  Moreover, plaintiffs do not cite any authority (and the Court has found none) for a finding of negligence per se predicated upon a violation of international law.  In the absence of any such authority, plaintiffs' ipse dixit that it is "illogical" that international law documents would not be regarded under the law of negligence per se as codifications of the common law (negligence) standard of care is not persuasive.   Accordingly, plaintiffs' claim for negligence per se is dismissed.

Because the Court dismisses plaintiffs' claims for the reasons stated above, it is not necessary to reach defendants' other arguments for dismissal, namely that this action involves a non-justiciable political question or that plaintiffs lack standing to

assert their claims.  <u>See</u> Def. Mem. 57-65.[27]

<u>**CONCLUSION**</u>

For the foregoing reasons, defendants' motion to dismiss the complaint is granted in its entirety and plaintiffs' complaint is dismissed as against the Bank Defendants identified in footnote 2, <u>supra</u>.

SO ORDERED.

Dated: June 30, 2006
        Brooklyn, New York

_____
I. Leo Glasser
United States District Judge

Copies of the foregoing were electronically sent on this day to:

<u>Attorney for Plaintiffs:</u>
Kenneth F. McCallion
McCallion & Associates LLP

<u>Attorneys for Defendants:</u>

Jamison A. Diehl
Lance T. Lackey

---

[27]  Plaintiffs' Medical Monitoring "claim for relief," Compl. Count XII, "does not seek damages," but asks the Court to establish a "program . . . in order to provide for early treatment of diseases and conditions caused by the exposure to the Supplier Defendants' products."  Compl. ¶ 175.  Because plaintiffs have failed to establish liability against the Bank Defendants, the Court rejects their claim for medical monitoring.  <u>See</u> <u>Doyle v. Coombe</u>, 976 F. Supp. 183, 185 n.1 (W.D.N.Y. 1997) (rejecting request for court-supervised medical monitoring fund as "nothing more than a request for money damages").  Moreover, plaintiffs fail to sufficiently allege that the Bank Defendants exposed them to toxic substances, thus causing their injuries.  <u>See</u> <u>Gibbs v. DuPont De Nemours & Co., Inc.</u>, 876 F. Supp. 475, 478-79 (W.D.N.Y. 1995) (in order to establish a cause of action for medical monitoring, plaintiff must show exposure to a hazardous substance by defendant's negligence); <u>Askey v. Occidental Chemical Corp.</u>, 102 A.D.2d 130, 137 (N.Y. App. Div. 1984) (recognizing a claim for medical monitoring as an element of consequential damage and requiring proof that there was a reasonable probability that harm would flow from defendant's exposure of plaintiff to harmful substances).

40

Steven M. Zager
Akin Gump Strauss Hauer & Feld LLP
Houston, TX 77002