UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

TZVI WEISS, et al.                                :
                                                  :     Case No. CV 05-4622 (CPS) (KAM)
                        Plaintiffs,               :
                                                  :
        -against-                                 :
                                                  :
NATIONAL WESTMINSTER BANK, PLC :
                                                  :
                        Defendant.                :

**PLAINTIFFS' MEMORANDUM OF LAW
IN SUPPORT OF THEIR MOTION FOR AN ORDER OVERRULING OBJECTIONS
AND COMPELLING FURTHER RESPONSES TO PLAINTIFFS' FIRST SET OF
REQUESTS FOR ADMISSIONS AND RELATED INTERROGATORIES AND
PLAINTIFFS' FIRST REQUEST FOR THE PRODUCTION OF DOCUMENTS**

OSEN & ASSOCIATE, LLC
700 Kinderkamack Road
Oradell, New Jersey 07649
Tel: (201) 265-6400
Fax: (212) 753-3630

KOHN SWIFT & GRAF, P.C.
One South Broad Street
Suite 2100
Philadelphia, PA 19107
Tel: (215) 238-1700
Fax: (215) 238-1968

GLANCY BINKOW & GOLDBERG LLP
430 Park Avenue
New York, New York 10022
Tel: (212) 308-6300
Fax: (212) 308-6570

***Counsel for Plaintiffs***

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................................... 1

PROCEDURAL HISTORY ...................................................................................................... 5

ARGUMENT............................................................................................................................. 8

I.     THE BANK HAS NOT MET ITS BURDEN TO PROVE THE EXISTENCE AND
       APPLICABILITY OF A CONFLICTING FOREIGN LAW............................................. 8

II.    EVEN HAD THE BANK MET ITS BURDEN OF ASSERTING THE APPLICABILITY
       OF FOREIGN SECRECY LAWS, ANY SECRECY OBJECTIONS TO THE
       REQUESTS FOR ADMISSIONS ARE INAPPLICABLE............................................... 10

   A.    Foreign Secrecy Laws Do Not Apply to Requests for Admissions Relating to the
         Authenticity and Admissibility of Documents Plaintiffs Already Possess................... 10

   B.    Foreign Secrecy Laws Do Not Apply to Prevent Discovery of Documents and
         Information Located in the United States. .................................................................... 11

III.   UNDER THE GOVERNING SUPREME COURT ANALYSIS THE BANK IS
       REQUIRED TO PRODUCE THE DISCOVERY SOUGHT HERE................................ 12

   A.    The Comparative State Interests Overwhelmingly Favor Discovery. .......................... 14

       1.    The U.S. Interest ...................................................................................................... 14

       2.    The Foreign State Interests ...................................................................................... 18

   B.    The Discovery Sought is Crucial and Direct Evidence of the Conduct with which the
         Bank is Charged.......................................................................................................... 24

   C.    The Plaintiffs' Requests Are Sufficiently Specific....................................................... 24

   D.    There Are No Substantially Equivalent Alternative Means for Obtaining Transactional
         Evidence, and the Bank Has Suggested None. ............................................................ 25

   E.    The Bank Has Not Shown Undue Hardship in Complying with Plaintiffs' Proper
         Discovery Requests..................................................................................................... 25

IV.    THIS COURT SHOULD ENTER AN ORDER OVERRULING OBJECTIONS,
       COMPELLING DISCOVERY, AND DEEMING THE REQUESTS FOR
       ADMISSIONS ADMITTED. .......................................................................................... 28

A.   The Court Should Enter an Order Deeming Plaintiffs' Requests for Admissions
     Admitted. .................................................................................................................... 28

B.   The Court Should Enter an Order Compelling Production of the Documents Sought by
     Plaintiffs..................................................................................................................... 29

CONCLUSION............................................................................................................................. 30

## TABLE OF AUTHORITIES

### CASES

*Alfadda v. Fenn*,
    149 F.R.D. 28 (S.D.N.Y. 1993)…….…………………………….......…..8, 9, 15, 17, 27

*British Int'l Ins. Co. Ltd. v. Seguros La Republica, S.A.*,
    2000 WL 713057 (S.D.N.Y. June 2, 2000)……………………………..………2, 9, 13, 14

*Clayton Brokerage Co., Inc. of St. Louis v. Clement*,
    87 F.R.D. 569 (D.Md. 1980)…………….………………………………………………….23

*Compagnie Francaise d'Assurance pour le Commerce Exterieur v. Phillips Petroleum Co.*,
    105 F.R.D. 16 (S.D.N.Y. 1984)……………………………………………………………..9

*Dammarell v. Islamic Republic of Iran*,
    2005 WL 756090 (D.D.C. March 29, 2005)……………………………………………..15

*Delozier v. First Nat'l Bank of Gatlinburg*,
    109 F.R.D. 161 (E.D.Tenn. 1986)……..…………………………………………..2, 23

*First Nat'l City Bank of NY v. I.R.S.*,
    271 F.2d 616 (2d Cir. 1959)…………..………..…....………………………………..……..8

*Gen. Atomic Co. v. Exxon Nuclear Co.*,
    90 F.R.D. 290 (S.D. Cal. 1981)………………………………………………….……29

*Graco, Inc. v. Kremlin*,
    101 F.R.D. 503 (N.D.Ill. 1984)………………………….............................................13, 26

*In re Grand Jury Proceedings*,
    873 F.2d 238 (9th Cir. 1989)……………………………………………….…..…...….8

*In re Grand Jury Subpoena dated August 9, 2000*,
    218 F. Supp. 2d 544 (S.D.N.Y. 2002)……………………………..………..3, 26, 28

*In re Lernout & Hausie Sec. Litig.*,
    218 F.R.D. 348 (D. Mass. 2003)……………………………………………9, 10, 11, 26

*In re Uranium Antitrust Litig.*,
    480 F. Supp. 1138 (N.D.Ill. 1979)…………………………………………………16-17

*In re Yassai*,
    225 B.R. 478 (Bankr. C.D. Cal. 1998)…………………………………………………..23

*Linde v. Arab Bank, PLC*,
  384 F. Supp. 2d 571 (E.D.N.Y. 2005)…………………..…………….…..…..……...3, 15, 24

*Madanes v. Madanes*,
  186 F.R.D. 279 (S.D.N.Y. 1999)……………………………………………………….13, 14

*Minpeco, S.A. v. Conticommodity Services, Inc.*,
  116 F.R.D. 517 (S.D.N.Y. 1987)……………………..……9, 12, 17, 18, 20, 24, 26, 27

*Ohio v. Arthur Andersen & Co.*,
  570 F.2d 1370 (10th Cir. 1978)………………………………………………………….…9

*Richmark Corp. v. Timber Falling Consultants*,
  959 F.2d 1468 (9th Cir. 1992)…...............................................................................14, 25

*Roberts v. Heim*,
  130 F.R.D. 430 (N.D. Cal. 1990)…………………………………………………….…..8

*Rosenblatt v. Northwest Airlines, Inc.*,
  54 F.R.D. 21 (S.D.N.Y. 1971)........................................................................................…...23

*S.E.C. v. Banca Della Svizzera Italiana*,
  92 F.R.D. 111 (S.D.N.Y. 1981)……………………………………………………........27

*S.E.C. v. Euro Sec. Fund*,
  1999 WL 182598 (S.D.N.Y. 1999)……………………………………………..……….…..9

*S.E.C. v. Renert*,
  2002 WL 32503671 (D. Conn. June 17, 2002)……………..………………………………...8

*Sneirson v. Chemical Bank*,
  108 F.R.D. 159 (D.Del. 1985)……………………………………………………….….23

*Société Internationale Pour Participations Industrielles et Commerciales, S.A., v. Rogers*,
  357 U.S. 197 (1958)……………...……………………………………………………………….5

*Société Nationale Industrielle Aérospatiale v. U.S. District Court for the Southern District of
  Iowa*, 482 U.S. 522 (1987)…………..…………….……………...……………….2, 11, 13, 18, 24-25

*Ssangyong Corp. v. Vida Shoes Int'l, Inc.*,
  2004 WL 1125659 (S.D.N.Y. May 20, 2004)……………………………..………….27

*Trade Dev. Bank v. Continental Ins. Co.*,
  469 F.2d 35 (2d Cir. 1972)…………………………………………………………........9, 27

*U.S. v. Chase Manhattan Bank, N.A.*,
   584 F. Supp. 1080 (S.D.N.Y. 1984)……………………………………………...……..19, 21

*U.S. v. Davis*,
   767 F.2d 1025 (2d Cir. 1985)………………………...………….………………...………..15, 19, 21

*U.S. v. First Nat'l City Bank*,
   396 F.2d 897 (2d Cir. 1968)………………………………...8, 9, 12, 18, 20, 21, 26, 27, 28

*U.S. v. Hunton & Williams*,
   952 F. Supp. 843 (D.D.C. 1997)……....………………………………………………...…..2

*U.S. v. Miller*,
   425 U.S. 435 (1976)………………………………………………...………………….23

*U.S. v. Prevatt*,
   526 F.2d 400 (5th Cir. 1976)……………….……………….…………………………..2, 23

*U.S. v. Vetco, Inc.*,
   691 F.2d 1281 (9th Cir. 1981)…………………………………………....…….……8, 9

*Weiss v. National Westminster Bank PLC*,
   -- F. Supp. 2d --, 2006 WL 2792770 (E.D.N.Y. Sept. 27, 2006)………...3, 15, 20, 22, 28

## STATUTES

18 U.S.C. § 2339A……………………………………….…………………………..……………15

18 U.S.C. § 2339A(b)(1)...…………………………………………………………..…………….15

18 U.S.C. § 2339B…………………………………………………………………………………15

18 U.S.C. § 2339C……………………………………………….………………………………..15, 22

28 U.S.C. § 1783……………………………………………………………………………...12-13

31 C.F.R. § 595.311……………………………………………………………………………….4

31 C.F.R. § 597.309……………………………………………………………………………….4

31 C.F.R. § 594.310……………………………………………………………………………….4

31 C.F.R. Ch. V, App. A………….…………………………………………………………..…...4

Fed. R. Civ. P. 26………………………………………….…………………………………....1

Fed. R. Civ. P. 26(b)(5)……………………………..……………………………………………..2

Fed. R. Civ. P. 36………………………………………………………………….………..2, 29

Fed. R. Civ. P. 37…………………………………………………………………….………..29

Fed. R. Civ. P. 44.1……………………………………………………….……………...2, 9, 18

Fed. R. Evid. 501…………………………………………………………………………….…2

Fed. R. Evid. 803(6)…………………………………………………………...…………………..6

Local Rules of the United States District Courts for the Southern and Eastern Districts of
New York ("Local Rules") 26.2……...………………………...……...…………………………1, 2

## MISCELLANEOUS

69 Fed. Reg. 30361 (May 27, 2004)………………………..……………………………………4, 17

Exec. Or. 13224 (66 Fed. Reg. 490709 (September 23, 2001))……………….....……………4, 18

Exec. Or. 12947 (60 Fed. Reg. 5079) (Jan. 25, 1995)……………….…………………………….4

Antiterrorism and Effective Death Penalty Act ("AEDPA"), Pub. L. 104–132, 110 Stat 1214,
(Apr. 24, 1996)…………………………………………………………………………………….4

Tournier v. National Provincial and Union Bank of England, 1 K.B. 461 (C.A. 1924)....18-19, 21

Financial Action Task Force (FATF) "Forty Recommendations" for Combating Money
Laundering and Terrorist Financing, June 20, 2003, and incorporating the amendments of
October 22, 2004……………………………………………………………………..…………22-23

International Convention for the Suppression of the Financing of Terrorism, G.A. Res. 109,
U.N. GAOR, 54th Sess., Supp. No. 49, at 408, U.N. Doc. A/54/49 (Vol. I) (1999), entered into
force April 10, 2002…………...…………………………………………………….…………...22

Restatement (Second) of Foreign Relations Law of the United States §§ 39-40
(1965)…………………………………………………………………...…………………..…12, 13, 25

Restatement of Foreign Relations Law of the United States (Revised) § 437(1)(c) (Ten.
Draft No. 7, 1986)…………………………………………………………………...………………….2

Restatement (Third) of the Foreign Relations Law of the United States § 442
(1987).......................................................................................................................................passim

U.S. v. Holy Land Foundation for Relief and Development Indictment (superseding indictment filed November 30, 2005; original filed July 24, 2004)………..……………………….…..6

Hearing on The HAMAS Asset Freeze and Other Government Efforts to Stop Terrorist Funding, Before U.S. House of Representatives Subcommittee on Oversight and Investigation, Committee on Financial Services, September 24, 2003………………………15-16

The Role of Charities and NGO's in the Financing of Terrorist Activities, Before the U.S. Senate, Committee on Banking, Housing, and Urban Affairs, Subcommittee on International Trade and Finance, August 1, 2002...………………………………………………...16

## INTRODUCTION

Defendant National Westminster Bank, Plc (the "Bank" or "NatWest") has invoked the United Kingdom's ("UK") bank secrecy laws, together with other British confidentiality laws, to justify its refusal to provide any meaningful discovery to Plaintiffs and prevent them from authenticating the Bank's own transactional documents that are at the heart of this case. Based on its objections to Plaintiffs' First Set of Requests for Admissions and Related Interrogatories ("Requests for Admissions") and First Request for the Production of Documents ("Document Requests"), the Bank has refused to identify the documents it has improperly withheld, nor has it supplied *any* – even redacted – information about them in a privilege log as it is required to do under Rule 26.2 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York ("Local Rules"). Defendant even invoked British secrecy laws as its basis for refusing to respond to Plaintiffs' demand that NatWest admit or deny the authenticity of business records bearing NatWest's logo which Plaintiffs *already produced* to Defendant.[1]

The Bank's position, if accepted, would result in the Court holding that foreign secrecy laws render *any* transactional Bank document – from *any* source and *any* location – automatically undiscoverable and effectively inadmissible in a U.S. court based on the Bank's unilateral and unreviewable determination that customer information may be contained in the document. This Court must reject the Bank's overbroad refusal to comply with Fed. R. Civ. P. 26; indeed no U.S. court has ever recognized such an omnibus and unconditional incantation of foreign secrecy laws. To the contrary, the United States Supreme Court has held that "[i]t is well settled that such [laws] do *not* deprive an American court of the power to order a party subject to its jurisdiction to produce evidence even though the act of production may violate [foreign

---

[1]     *See* Requests for Admissions appended hereto as <u>Exhibit A</u>.

laws]." *Société Nationale Industrielle Aérospatiale v. U.S. District Court for Southern District of Iowa*, 482 U.S. 522, 544 n. 29 (1987) (emphasis added). In fact, Fed. R. Evid. 501 expressly limits the privileges that may be asserted in a U.S. court to privileges traditionally recognized in federal courts.[2]

The Supreme Court has emphasized that the applicability of a foreign secrecy law is part of a comity analysis that a court must conduct in deciding whether to compel discovery and whether sanctions for non-compliance should be imposed. This comity analysis has been codified in the *Restatement (Third) of the Foreign Relations Law of the United States* § 442 (1987). *See Aérospatiale*, 482 U.S. at 544 n. 28 (endorsing the prior draft of the same factors in the *Restatement of Foreign Relations Law of the United States (Revised)* § 437(1)(c) (Ten. Draft No. 7, 1986)); *see also, British Int'l Ins. Co. Ltd. v. Seguros La Republica, S.A.*, 2000 WL 713057, *9 (S.D.N.Y. June 2, 2000) (overruling Defendant's foreign law objection based on § 442 and noting it was previously numbered as § 437).

The party invoking a foreign secrecy restriction has the burden not only of asserting the basis for its objections with particularity under Fed. R. Civ. P. 26(b)(5) and Local Rule 26.2, but must also prove (in accordance with Fed. R. Civ. P. 44.1) that: the foreign law exists; the foreign law applies to the discovery sought; and the foreign law conflicts with U.S. law. The Bank has not met, nor even attempted to meet any of its burden, as Plaintiffs demonstrate in Part I.

Even had the Bank tried to meet its burden, no comity analysis is required for discovery of information to which bank secrecy simply *does not apply*, as Plaintiffs demonstrate in Part II. Plaintiffs are aware of no reported opinions where any American court has ever held that a foreign secrecy law justifies a party's refusal to admit or deny, under Fed. R. Civ. P. 36, the

---

[2]     *See U.S. v. Hunton & Williams*, 952 F. Supp. 843, 856 (D.D.C. 1997); *Delozier v. First Nat'l Bank of Gatlinburg*, 109 F.R.D. 161, 163 (E.D.Tenn. 1986) citing *U.S. v. Prevatt*, 526 F.2d 400, 402 (5th Cir. 1976) ("banker depositor privilege was not recognized at common law" and "does not exist in the Federal Courts.")

2

authenticity and admissibility of identified business records that the opposing party has *already* obtained.   Further, *Restatement (Third)* § 442 applies on its face only to "disclosure of information located *outside* the United States" (emphasis added), not to documents located in New York, whether held by the Bank itself or by Plaintiffs.

Moreover, as discussed in Part III *infra*, regardless of the dictates of foreign secrecy laws, the requisite comity analysis to be applied in this case nevertheless compels the Bank to produce and respond to the Document Requests and Requests for Admissions.  In performing a comity analysis, "[c]ourts consistently hold that the United States interest in law enforcement outweighs the interests of foreign states in bank secrecy and the hardships imposed on the entity subject to compliance." *In re Grand Jury Subpoena dated August 9, 2000*, 218 F. Supp. 2d 544, 554 (S.D.N.Y. 2002).  This holding reflects proper deference not only to the Executive Branch when it enforces domestic laws, but also, and even more importantly, to the substantive congressional interest in the laws enforced.  Here, Judge Sifton has already emphasized that "[i]n enacting the material support statute Congress made an express finding of fact that, 'foreign organizations that engage in terrorist activity are so tainted by their criminal conduct that *any contribution to such an organization facilitates that conduct*.'" *Weiss v. National Westminster Bank PLC*, -- F. Supp. 2d --, 2006 WL 2792770, *18 (E.D.N.Y. Sept. 27, 2006) (emphasis added, citation omitted).  Indeed, in a similar case involving the Anti-Terrorism Act, District Judge Gershon noted in *Linde v. Arab Bank, PLC* that "Congress has expressly made criminal the providing of financial and other services to terrorist organizations and expressly created a civil tort remedy for American victims of international terrorism."  384 F. Supp. 2d 571, 584 (E.D.N.Y. 2005).  The strength of the Congressional interest in private enforcement of these laws overwhelmingly trumps the waivable personal privacy interest in the confidentiality of foreign bank records.

This conclusion applies with special force to bank customers that the United States government designates as Specially Designated Global Terrorists (SDGTs).[3] Pursuant to Executive Order No. 13224, 66 Fed. Reg. 49079 (Sept. 23, 2001), which established the "SDGT" designation, the President found that "because of the pervasiveness and expansiveness of the financial foundation of foreign terrorists," it is necessary to identify by designation persons and entities "that support or otherwise associate with these foreign terrorists." The President also deemed it critical to subject the identified individuals and entities to sanctions, including blocking their assets and prohibiting them from transacting business in the United States. Further, the President concluded it was necessary to "share information by [the] United States and foreign financial institutions as an additional tool to enable the United States to combat the financing of terrorism." *Id.* The Bank's customer, Interpal,[4] was named an SDGT on August 22, 2003, but the activities that prompted its designation obviously did not commence on that date. Plaintiffs respectfully suggest that the Bank's position concerning bank secrecy can be summarized as follows:

> *The President of the United States found that, our customer Interpal's activities prior to August 2003 made it a global terrorist, and he therefore blocked Interpal's assets and prohibited its transactions in the United States. Nevertheless, a Federal District Court should keep secret the records of those assets and transactions to protect the commercial privacy of Interpal – a Specially Designated Global Terrorist.*

Stating such a proposition is to axiomatically refute it. The United States' interest in

---

[3]    See 31 C.F.R. § 594.310; those individuals and entities classified as SDGTs are included in a comprehensive U.S. Government terrorism watch list known as the "OFAC list"; it is published and updated as 31 C.F.R. Ch. V, App. A, and is also available at http://www.ustreas.gov/offices/enforcement/ofac/sdn/t11sdn.pdf. The list also includes those labeled as Specially Designated Terrorists (SDTs) (*see* 31 C.F.R. § 595.311) pursuant to Exec. Or. 12947 (60 Fed. Reg. 5079) (Jan. 25, 1995), and Foreign Terrorist Organizations (FTOs) (*see* 31 C.F.R. § 597.309) pursuant to the Antiterrorism and Effective Death Penalty Act ("AEDPA"), Pub. L. 104–132, 110 Stat 1214, (Apr. 24, 1996).

[4]    Interpal, a/k/a Palestinian Relief and Development Fund, is an alleged HAMAS charitable front organization designated by the U.S. Government as an SDGT to whom the Defendant provides material support as alleged in this lawsuit. *See* 69 Fed. Reg. 30361 (May 27, 2004); U.S. Treasury Press Release of August 22, 2003 (available at http://www.treas.gov/press/releases/js672.htm).

4

combating the financial support that the Bank provided to HAMAS through Interpal utterly outweighs Interpal's alleged commercial privacy interests and requires enforcement of the Plaintiffs' discovery requests.

The Supreme Court has held that the "willfulness or good faith of [the party invoking foreign secrecy laws to resist discovery] can hardly effect the fact of noncompliance and are relevant only to the path which the District Court might follow in dealing with petitioner's failure to comply." *Société Internationale Pour Participations Industrielles et Commerciales, S.A., v. Rogers*, 357 U.S. 197, 208 (1958). *Accord Restatement (Third)* § 442(2)(c). As a result, and as shown in Part IV, the real issue addressed by the instant motion is not *whether* the Bank must comply with proper discovery requests going to the evidentiary heart of this action, but rather what sanctions this Court should enter for the Bank's non-compliance. The most appropriate sanction at this stage of the litigation should include an order "mak[ing] findings of fact adverse to" the Bank, *Restatement (Third)* § 442(2)(c) with respect to the Requests for Admissions and an order compelling production of the documents sought by the Plaintiffs, without foreclosing the possibility of more severe sanctions should further evidence of the Bank's refusal to comply with legitimate discovery continue even after the initial Rule 37 sanctions have been imposed.

## **PROCEDURAL HISTORY**

On February 14, 2006, this Court entered a Protective Order to maintain the confidentiality of banking information disclosed by the Defendant. Nevertheless, the Bank now asserts that foreign secrecy restrictions prevent it from revealing the banking information that Plaintiffs have requested.

On June 30, 2006, Plaintiffs served their Document Requests on the Defendant.[5] Five days later on July 5, 2006, Plaintiffs served the Requests for Admissions seeking admissions regarding the authenticity of twenty-five (25)[6] documents that Plaintiffs had produced to the Bank and identified by their production numbers. Specifically, the Bank is requested (and required) to either admit, deny, or set forth in detail the reasons why it is unable to either admit or deny, the truth of the following facts, that:

(1) each document is a record of regularly conducted business activity of the Bank within the meaning of Rule 803(6) of the Federal Rules of Evidence (Request 1);

(2) each document is an accurate reproduction of an original document maintained in the Bank's files (Request 2);

(3) the document accurately identifies an account or accounts of a customer or customers of defendant (Request 3); and

(4) the document accurately sets forth the details of a transaction processed by defendant (Request 4).[7]

The nature of the identified 25 documents is critical. All are documents which, on their face, indicate that they are NatWest business records. All of the documents reflect transactions initiated by Defendant's customer, Interpal, a designated SDGT.[8] Additionally, at least eight (8) of these documents involve wire transfers to organizations identified by the United States Department of Justice as controlled by HAMAS, an FTO.[9]

---

[5]    *See* Discovery Requests appended hereto as Exhibit B.

[6]    Copies of the 25 documents described in the Requests—which all contain information clearly linking them to National Westminster Bank—are submitted as Exhibit C(1) – C(25).

[7]    The related interrogatories request additional information regarding the identified documents that are contingent upon the particular response provided by the Bank concerning the matters as to which admissions were requested.

[8]    *See* http://www.ustreas.gov/offices/enforcement/ofac/sdn/t11sdn.pdf.

[9]    *See U.S. v. Holy Land Foundation for Relief and Development* Indictment at p. 18 (superseding indictment filed November 30, 2005 and original filed July 24, 2004) available at http://www.usdoj.gov/usao/txn/PressRel05/HLFSupers.Indictment.pdf. The original indictment is available at http://www.usdoj.gov/usao/txn/PressRel04/HLF%20Indictment.pdf.

6

On August 14, 2006, Defendant served its responses and objections to the Document
Requests and Requests for Admissions. In both of its responses, Defendant objected on the
ground that British secrecy laws prevented a substantive response. Defendant further stated that:

NatWest has therefore asked Interpal to release NatWest from NatWest's secrecy
obligations in order to permit disclosure of information in NatWest's possession
relating to Interpal. However, to date, NatWest has not received such a release,
and therefore could be exposed to liability under English and U.K. law if it were
to disclose such information.[10]

At the status conference held before Your Honor on September 11, 2006, Defendant was
instructed to "report to the Court by 9/20/06 regarding the date by which their clients' customers
will advise whether they will agree to waive the confidentiality of their records." In addition, at
this conference, Defendant stated that the British government had no objections to Plaintiffs'
discovery requests.[11] Defendant's counsel wrote to the Court on September 20, 2006 regarding
Defendant's efforts to secure a waiver of the bank secrecy laws, and stated "[t]o date, neither
NatWest nor I has received any response to our prior letters to Interpal and its counsel, including
my letter to counsel of last week. I will promptly inform the Court as soon as we receive any
such response."

On September 20, 2006, the Court again instructed the Defendant to provide a "report to
the Court regarding the date by which its customers will advise whether they will agree to waive
the confidentiality of their records."

On October 2, 2006, Defendant's counsel reported that:

Last week, counsel for Interpal confirmed that he had received the letter I had sent
to him on September 22, notifying him of Your Honor's request for a status report
by today. He informed me that he reported to his client the contents of my prior

---

[10]     *See* Defendant's Responses and Objections to the Document Requests (copy attached as <u>Exhibit D</u>),
General Objection 9; Defendant's Responses and Objections to the Requests for Admissions (copy attached as
<u>Exhibit E</u>), General Objection Number 7.

[11]     As characterized by defense counsel, the British government has essentially waived any assertion of
secrecy objections it might have, but did not waive any independent privacy assertions Interpal might interpose.

7

letter to him – which I described in my September 20 letter to Your Honor – and that he is awaiting his clients' response. I will promptly inform the Court as soon as we receive any further information on this subject.

Based on Defendant's response to the Document Requests and Requests for Admissions, it is plain that the Bank refuses to comply with its discovery obligations based on the alleged restrictions imposed by foreign secrecy laws. The Bank has also advised the Court on two separate occasions, to date, of its inability to obtain Interpal's consent to disclose the records.

## ARGUMENT

## I.   THE BANK HAS NOT MET ITS BURDEN TO PROVE THE EXISTENCE AND APPLICABILITY OF A CONFLICTING FOREIGN LAW.

The Bank objected to Plaintiffs' Document Requests and Requests for Admissions on the grounds that they require it to reveal information that may be protected from disclosure by UK law including "applicable English bank customer secrecy laws."[12]   However, "it is worth remembering that *the party relying on the foreign law* as an excuse bears the burden of demonstrating that such law *actually* bars the production or testimony at issue." *Alfadda v. Fenn*, 149 F.R.D. 28, 34 (S.D.N.Y. 1993) (emphasis added).[13]   The Second Circuit has noted "[t]here is little merit . . . in [the Bank's] suggestion that the mere existence of a bank secrecy doctrine *requires us to accept on its face the bank's assertion that compliance with [the discovery demand] would violate an important public policy of [the foreign state]*." *U.S. v. First Nat'l City Bank*, 396 F.2d 897, 904 (2d Cir. 1968) (emphasis added). Thus, NatWest's reliance on the mere existence of foreign secrecy laws fails to demonstrate their actual application to the

---

[12]     *See* Exhibits D & E, *supra*.

[13]     *See also SEC v. Renert*, 2002 WL 32503671, *2 (D. Conn. Jun. 17, 2002) (citing *First Nat'l City Bank of N.Y. v. IRS*, 271 F.2d 616, 620 (2d Cir. 1959) ("The burden is on the party opposing discovery to establish that compliance with the request would violate the laws of a foreign sovereign"); *Roberts v. Heim*, 130 F.R.D. 430, 436 (N.D. Cal. 1990) ("The party relying on foreign law has the burden of showing that such law bars production."), quoting *U.S. v. Vetco, Inc.*, 691 F.2d 1281, 1289 (9th Cir. 1981); *In re Grand Jury Proceedings*, 873 F.2d 238, 239 (9th Cir. 1989).

discovery requests at hand. *Alfadda*, 149 F.R.D. at 34. *See also S.E.C. v. Euro Sec. Fund*, 1999 WL 182598, *3 (S.D.N.Y. Apr. 2, 1999) (quoting *Alfadda*, 149 F.R.D. at 34).[14] NatWest simply has not demonstrated that responding to discovery demands actually violates the vague, exception-riddled laws it cites.

The party resisting discovery meets its threshold burden only when it has "provide[d] the Court with information of sufficient particularity and specificity to allow the Court to determine whether the discovery sought is indeed prohibited by foreign law." *Alfadda*, 149 F.R.D. at 34 (citing *Ohio v. Arthur Andersen & Co.*, 570 F.2d 1370, 1374 (10th Cir. 1978), *cert. denied*, 439 U.S. 833 (1978); *Compagnie Francaise d' Assurance pour le Commerce Exterieur v. Phillips Petroleum Co.*, 105 F.R.D. 16, 24-25 (S.D.N.Y. 1984)). Although Fed. R. Civ. P. 44.1 contemplates alternative methods of proving foreign law, courts uniformly require the party invoking that rule to make particularized proof of the law's purpose and actual application, usually through expert testimony.[15]

The Bank bears the initial burden, therefore, of proving the precise national interest the identified foreign law serves, the scope of its exceptions, how it is applied to documents held abroad or admissions made abroad, how it is enforced, and the prospects of liability to the Bank from complying with a U.S. discovery obligation or court order; it has failed to meet this burden.

---

[14]     *See also British Int'l. Ins. Co. Ltd. v. Seguros La Republica, S.A.*, 2000 WL 713057, *8 (S.D.N.Y. Jun. 2, 2000) (quoting *Vetco*, 691 F.2d at 1289).

[15]     *See Alfadda*, 149 F.R.D. at 31-33 (relying on submitted expert opinions regarding the scope and application of Swiss bank secrecy law, as well as case law and law review articles discussing the law); *British Int'l Ins. Co.*, 2000 WL 713057, *10 (relying on written certifications by Mexican law experts and criticizing party invoking bank secrecy for failure to adduce evidence suggesting why the law was promulgated "or the precise national interest it is intended to serve"); *First Nat'l City Bank*, 396 F.2d at 899 (relying on expert witnesses who "discussed with great particularity the precise nature of German bank secrecy and Citibank's prospective liability under German law" for disclosure); *In re Lernout & Hauspie Sec. Litig.*, 218 F.R.D. 348, 349 (D. Mass. 2003); *Minpeco v. Conticommodity Services, Inc.*, 116 F.R.D. 517, 524 (S.D.N.Y. 1987) (relying on expert affidavits about law and how it would be applied); *Trade Dev. v. Continental Ins. Co.*, 469 F.2d 35, 40 (2d Cir. 1972).

9

## II.     EVEN HAD THE BANK MET ITS BURDEN OF ASSERTING THE APPLICABILITY OF FOREIGN SECRECY LAWS, ANY SECRECY OBJECTIONS TO THE REQUESTS FOR ADMISSIONS ARE INAPPLICABLE.

No comity analysis is required for the Requests for Admissions because no foreign secrecy law is applicable to them.

### A.     Foreign Secrecy Laws Do Not Apply to Requests for Admissions Relating to the Authenticity and Admissibility of Documents Plaintiffs Already Possess.

As noted above, Plaintiffs served the Requests for Admissions concerning the authenticity and admissibility of documents that Plaintiffs already possess. The Bank claims that foreign secrecy law is a *shield* against the production of documents or disclosure of interrogatory answers that might reveal confidential commercial information. Plaintiffs are aware of no case where an American court held that a bank can apply foreign secrecy law as a *sword* – to prevent the requesting party from obtaining admissions concerning the authenticity and admissibility of documents that the requesting party *already* possesses in the United States. To hold otherwise would extend unjustifiably a problematical foreign limitation on full merits discovery to block a party from using documents already available – the only effective alternative means of obtaining transactional documents that the Bank itself refuses to produce on bank secrecy grounds. *See* Part III, E *infra* (discussing the availability of alternative means of securing information as part of the comity analysis).

Furthermore, the foreign secrecy laws invoked by the Bank turn on the secrecy of certain commercial information. In *In re Lernout & Hausie Sec. Litig.*, 218 F.R.D. 348 (D. Mass. 2003) the plaintiffs had already been shown the documents that the defendant asserted were subject to a foreign secrecy law. Unsurprisingly, the court observed that "[t]he plaintiffs' most compelling argument … is that … *such documents have already been disclosed, are therefore no longer confidential and thus there is no reason that [the defendant] cannot simply turn over copies of*

10

*documents that the plaintiffs have already seen*." *Id.* at 350-51. (emphasis added). While exceptions in the applicable foreign law supported this conclusion, *Lernout* also rested substantially on plain common sense: "Both common sense and the law dictate that [the defendant] should be required to produce copies of its audit work papers ... *since the plaintiffs have already been made privy to the information contained within such papers*." *Id.* at 351. (emphasis added). The same common sense applies here, where the Bank is only required to admit the authenticity and admissibility as business records of documents to which Plaintiffs "have already been made privy." As the *Lernout* court concluded, "by virtue of the plaintiffs having had access to the information ..., it is no longer secret ..." *Id.* at 353 n. 10.

## B. Foreign Secrecy Laws Do Not Apply to Prevent Discovery of Documents and Information Located in the United States.

*Restatement (Third)* § 442: (1) affirms the authority of this Court to order production of information "*outside the United States*" (*id.* § 442(1)(a)); (2) identifies the factors this Court should consider in issuing an "order directing production of information *located abroad*" (*id.* § 442(1)(c)); and (3) describes the court's discretion to impose sanctions when "disclosure of information *located outside the United States* is prohibited by" foreign law. *Id.* § 442(2) (emphasis added). Indeed, in the seminal Supreme Court decision on the effect of foreign blocking statutes, which endorsed the comity analysis eventually codified in *Restatement (Third)* § 442, the foreign parties responded to requests for production of documents and for admissions "without objection, *at least insofar as they called for material or information that was located in the United States*." *Aérospatiale*, 482 U.S. at 525 n. 4. (emphasis added). The Court's opinion addressed only "the scope of the district court's power to order *foreign discovery* in the face of objections by foreign states ..." *Id.* at 544 n. 28 (emphasis added).

11

Thus, to the extent that Plaintiffs' discovery requests target documents or information located in the United States, this Court need not undertake any comity analysis for such documents or information. Here, all the documents that are the subject of Plaintiffs' Requests for Admissions are physically present in the United States. Therefore, the Bank's foreign secrecy law objections to material or information located in the United States should be rejected.

## III.   UNDER THE GOVERNING SUPREME COURT ANALYSIS THE BANK IS REQUIRED TO PRODUCE THE DISCOVERY SOUGHT HERE.

When discovery requests in U.S. courts conflict with foreign blocking statutes, such as foreign bank secrecy laws, a federal court should take comity into account by comparing the competing U.S. and foreign interests. Here, the interests of the United States in having "private attorney generals" enforce the antiterrorism laws and in having this adjudication be based on the best evidence available, overwhelm any conflicting interests of the United Kingdom in prohibiting disclosure of private commercial records, both under the modern *Restatement (Third)* comity analysis endorsed in 1987 by the Supreme Court, and the predecessor *Restatement (Second)*[16] §§ 39-40 test that in the past has been applied in various forms by some courts in this Circuit. *See, e.g. Minpeco,* 116 F.R.D. at 522-23; *see also First Nat'l City Bank,* 396 F.2d at 901 (quoting *Restatement (Second)* § 39 ("under the principles of international law, '[a] state having jurisdiction to prescribe or enforce a rule of law is not precluded from exercising its jurisdiction solely because such exercise requires a person to engage in conduct subjecting him to liability under the law of another state having jurisdiction with respect to that conduct'")).

In drafting the *Restatement (Third)*, the American Law Institute proposed an analysis that it tailored precisely to conflicts between foreign blocking statutes and U.S. discovery procedures, which clearly authorize the disclosure of foreign information. *See* 28 U.S.C. § 1783 (authorizing

---

[16]     *Restatement (Second) of Foreign Relations Law of the United States* (1965).

12

subpoenas of witnesses and documents abroad). The new *Restatement* test addressed the concerns expressed by courts that the 1965 *Restatement (Second)* only "address[ed] international conflicts in general, and [was] not tailored precisely to conflicts between discovery procedures and blocking statutes." *Graco, Inc. v. Kremlin*, 101 F.R.D. 503, 512 (N.D.Ill. 1984).

In *Aérospatiale*, the Supreme Court unanimously endorsed the proposed *Restatement* analysis, the majority asserting that the new *Restatement* analysis suggested "the nature of the concerns that guide a comity analysis," 482 U.S. at 544 n. 28, and the dissenters finding that the new analysis "is perfectly appropriate for courts to use when no treaty has been negotiated to accommodate the different legal systems." *Id.* at 556. That analysis was published in *Restatement (Third)* § 442 (1987), and Second Circuit courts have subsequently applied this test to foreign discovery disputes. *See, e.g. British Int'l Ins. Co. Ltd.*, 2000 WL 713057, \*9 (applying § 442 and noting it was previously numbered as § 437 in the tentative draft); *Madanes v. Madanes*, 186 F.R.D. 279, 285-86 (S.D.N.Y. 1999). The *Restatement (Third)* analysis provides:

§ 442. Requests For Disclosure: Law Of The United States

(1) (a) A court or agency in the United States, when authorized by statute or rule of court, may order a person subject to its jurisdiction to produce documents, objects, or other information relevant to an action or investigation, even if the information or the person in possession of the information is outside the United States.

(b) Failure to comply with an order to produce information may subject the person to whom the order is directed to sanctions, including finding of contempt, dismissal of a claim or defense, or default judgment, or may lead to a determination that the facts to which the order was addressed are as asserted by the opposing party.

(c) In deciding whether to issue an order directing production of information located abroad, and in framing such an order, a court or agency in the United States should take into account the importance to the investigation or litigation of the documents or other information requested; the degree of specificity of the request; whether the information originated in the United States; the availability of alternative means of securing the information; and the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine important interests of the state where the information is located.

(2) If disclosure of information located outside the United States is prohibited by a law, regulation, or order of a court or other authority of the state in which the information or prospective witness is located, or of the state of which a prospective witness is a national,

(a) a court or agency in the United States may require the person to whom the order is directed to make a good faith effort to secure permission from the foreign authorities to make the information available;

(b) a court or agency should not ordinarily impose sanctions of contempt, dismissal, or default on a party that has failed to comply with the order for production, except in cases of deliberate concealment or removal of information or of failure to make a good faith effort in accordance with paragraph (a);

(c) a court or agency may, in appropriate cases, make findings of fact adverse to a party that has failed to comply with the order for production, even if that party has made a good faith effort to secure permission from the foreign authorities to make the information available and that effort has been unsuccessful.

Given the Supreme Court's endorsement of the *Restatement (Third)* analysis, and that analysis's precise application to discovery conflicts, Plaintiffs submit that this analysis applies to the instant conflict.

## A.    The Comparative State Interests Overwhelmingly Favor Discovery.

A comparison of "the extent to which noncompliance would undermine important interests of the United States, or compliance with the request would undermine important interests of the state where the information is located" is at the heart of the § 442(1)(c) *Restatement (Third)* test. Indeed, courts have routinely characterized this as the most important factor in the comity analysis. *See, e.g. Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468, 1476 (9th Cir. 1992) (applying § 442 and noting "[t]his is the most important factor"); *Madanes*, 186 F.R.D. at 286; *British Int'l Ins. Co. Ltd.*, 2000 WL 713057 at *9 (S.D.N.Y. 2000) ("this is obviously the most important consideration").

### 1.    The U.S. Interest

Axiomatically, the United States always "has an interest in the full and fair adjudication

14

of matters before its courts, which is only possible through complete discovery." *Alfadda*, 149 F.R.D. at 34. Here that interest is strongly reinforced by the U.S. interest in the enforcement of its antiterrorism laws. *See, e.g. Dammarell v. Islamic Republic of Iran*, 2005 WL 756090, \*20 (D.D.C. March 29, 2005) (a terrorist attack on U.S. nationals "elevate[s] the interests of the United States to nearly it[s] highest point"); *cf. U.S. v. Davis*, 767 F.2d 1025, 1035 (2d Cir. 1985).

In denying the Bank's motion to dismiss this action, Judge Sifton articulated that exact interest, observing: "[i]n enacting the material support statute Congress made an express finding of fact that, 'foreign organizations that engage in terrorist activity are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct.'" *Weiss*, 2006 WL 2792770, \*18 (citation omitted). Congress not only criminalized providing "material support" to terrorists or foreign terrorist organizations, *see* 18 U.S.C. §§ 2339A, 2339B, & 2339C, but expressly targeted banks by defining material support to include "financial services." 18 U.S.C. § 2339A(b)(1). Judge Sifton therefore rejected the Bank's challenge to Plaintiffs' claims based on the Bank's violation of these statutes. Moreover, Judge Sifton found that in 18 U.S.C. § 2339C Congress also expressly targeted "transmitting" and "receiving" funds in support of terrorist activities. He further noted that in *Linde*, allegations "that a bank received funds as deposits and transmitted funds to terrorist organizations were sufficient to create liability under 2339C." *Weiss*, 2006 WL 2792770, \*16 (citing *Linde*, 384 F. Supp. 2d at 588).

The Congressional interest Judge Sifton recognized is further evidenced by specific Congressional hearings on the issue of HAMAS and its terror financing where, for example, Representative Sue W. Kelly stated that HAMAS is:

> the Palestinian organization responsible for many heinous acts of terror. HAMAS has threatened the State of Israel and taken credit for atrocious attacks that have

killed hundreds of innocent civilians, including Americans and other individuals from countries around the world. Equally disturbing, *the group has been able to finance this terror through complex and sophisticated schemes that include significant assistance from international charities* ... The United States Government has set an example for the world by clamping down on these groups and seizing their financial life blood through the help of new tough federal laws ... We have to be resilient in our quest to protect the American people by tracking down and draining terrorist funding, and in particular the HAMAS funding. On August 22, [2003], *the President displayed steadfast leadership with an announcement to freeze the assets of key HAMAS leaders and specific international charities supporting the group. This decision demonstrates the Administration's commitment to the war against terror, and it sends a clear message to the world that organizations linked to this heinous group will not be tolerated.* [emphasis added.]

Statement of Chairwoman Sue W. Kelly, *Hearing on The HAMAS Asset Freeze and Other Government Efforts to Stop Terrorist Funding, Before U.S. House of Representatives Subcommittee on Oversight and Investigation, Committee on Financial Services*, September 24, 2003, at pp. 1-2.[17] In a similar hearing, Senator Evan Bayh stated:

*Cutting off the financing of terrorist organizations is a critically important component of the war against terror and to protect America.* But it is often an invisible part of that war. When we cut off the finances of these organizations, we in many cases are literally taking weapons out of their hands ... *This hearing has been called to send a very clear signal that those who use the cover of humanitarian and charitable efforts to hide their support for the murderous acts of terrorism should have no safe harbor in our country or anywhere else on the globe*, and that we will do everything humanly possible to stop this illicit financial activity, and that *we will expect our allies to do the same*. [emphasis added.]

Statement of Chairman Evan Bayh, *The Role of Charities and NGO's in the Financing of Terrorist Activities, Before the U.S. Senate, Committee on Banking, Housing, and Urban Affairs, Subcommittee on International Trade and Finance*, August 1, 2002, at pp. 1-2.[18]   *See In re Uranium Antitrust Litig.*, 480 F. Supp. 1138, 1154 (N.D.Ill. 1979) (finding, for purposes of comity analysis, that the "strength of congressional policies underlying the statute which forms

---

[17]   Available at http://financialservices.house.gov/media/pdf/092403ke.pdf.

[18]   Available at http://banking.senate.gov/_files/107988.pdf.

16

the basis for plaintiffs' action ... is evidenced by extensive subcommittee investigations" into the alleged practices).

**In other words, Congress was concerned with precisely the financial services that Plaintiffs have alleged that the Bank provides for terrorist groups and their charitable front organizations, which are evidenced by the information the Bank is shielding behind claims of foreign secrecy laws.**

In fact, the transactional documents the Bank now refuses to disclose, or even admit, are not just evidence; the documents are *themselves* the criminal transactions that Congress tried to interdict in enacting the material support laws. Put simply, the documents in question *are* the chief physical manifestation of the unlawful acts that Congress sought to deter.

Of course, the Government has not (yet) indicted the Bank, and these are private civil lawsuits. But the U.S. interest in the enforcement of its antiterrorism laws rests chiefly on deference to Congressional policies embodied in those laws, not simply on deference to the Executive as prosecutor. Here, as in *Minpeco*, "the formal posture of [the case] is less significant in that the plaintiffs here are asserting private rights of action under [federal law] that have the effect – intended by Congress – of enforcing the law by means of 'private attorney generals.'" *Minpeco*, 116 F.R.D. at 523-24. *Accord Alfadda*, 149 F.R.D. at 35.

Furthermore, the Executive Branch of the United States has also asserted the Congressional interests that Plaintiffs seek to enforce. The United States Treasury Department has, for example, explicitly prohibited financial transactions with Defendant's customer, which is designated as an SDGT.[19] Moreover, after a HAMAS suicide bomber blew up a Jerusalem bus on August 19, 2003, killing twenty-three people and injuring more than one hundred thirty,

---

[19]    *See* 69 Fed. Reg. 30361 (May 27, 2004); *see also* U.S. Treasury Press Release of August 22, 2003 (available at http://www.treas.gov/press/releases/js672.htm).

*including some of the plaintiffs in this case*, President George W. Bush explicitly stated on

August 22, 2003:

> At my direction, the Treasury Department has moved today to block and freeze the assets of six top HAMAS leaders and five non-governmental organizations that I am advised provide financial support to HAMAS. By claiming responsibility for the despicable act of terror on August 19, HAMAS has reaffirmed that it is a terrorist organization committed to violence against Israelis and to undermining progress toward peace between Israel and the Palestinian people.[20]

The Bank's customer, Interpal, was one of these five non-governmental organizations.[21] These

actions reflect the profound interest of the United States in blocking and prohibiting the

provision of financial services to designated terrorist organizations. In sum, as in *Minpeco*, "it is

difficult to imagine a private commercial lawsuit which could be more infused with the public

interest." *Minpeco*, 116 F.R.D. at 523-24.

### 2.    The Foreign State Interests

Because the Bank has merely cited various foreign laws, absent any expert analysis

pursuant to Fed. R. Civ. P. 44.1, Plaintiffs can only speculate as to the foreign state interests such

laws advance. As noted above, the mere existence of such laws does not automatically suggest

that compliance with U.S. discovery demands violates important foreign state interests. *First

Nat'l City Bank*, 396 F.2d at 904. "The blocking statute ... is relevant to the court's

particularized comity analysis only to identify the nature of sovereign interests in nondisclosure

of specific kinds of material." *Aérospatiale*, 482 U.S. at 544 n. 29.

Defendant cites *Tournier v. National Provincial and Union Bank of England*, 1 K.B. 461

(C.A. 1924) and its progeny of English case law to support its claim that it is "prohibited from

---

[20]    Statement on Executive Order 13224 (available at
http://www.whitehouse.gov/news/releases/2003/08/20030822-2.html).

[21]    *See* U.S. Treasury Press Release of August 22, 2003 available at
http://www.treas.gov/press/releases/js672.htm.

18

disclosing confidential information regarding any existing or former customer, without that customer's prior consent" and that "[f]ailure to protect such confidential information constitutes a civil offense under English law and could subject NatWest to liability."[22] However, this hardly conveys the foreign interests at stake, nor does it adequately justify Defendant's failure to comply with discovery. In fact, the English law Defendant relies on has been previously analyzed and rejected in this Circuit.

In *U.S. v. Chase Manhattan Bank, N.A.*, 584 F. Supp. 1080, 1084 (S.D.N.Y. 1984) the defendant cited the *Tournier* case now relied upon by NatWest when it objected to producing information from its bank branch in British-governed Hong Kong. The court identified no fewer than four exceptions to English bank secrecy including: "(1) where there is an independent duty to the public to disclose; (2) where the customer expressly or impliedly consents to disclosure; (3) where the interests of the bank require disclosure; and (4) where disclosure is under compulsion of the law." *Id.* (citing *Tournier*, 1 K.B. at 473). The *Chase Manhattan* court held these exceptions applied and, accordingly, compelled discovery. These factors are equally applicable in the instant case where the Bank is accused of criminally violating the U.S. antiterrorism material support statutes.

In fact, the numerous exceptions in the identified foreign secrecy law undercut any legitimate foreign interest in maintaining confidentiality. *See Davis*, 767 F.2d at 1035 (emphasizing the law's many exceptions as detracting from the state interest in customer privacy). The relevant secrecy case law cited by Defendant authorizes customers to waive secrecy. In this Circuit, this is a crucial diminution of the foreign state interest advanced by the foreign law:

---

[22]      *See* Exhibit D at p. 4; Exhibit E at pp. 3-4.

> [A]lthough the bank secrecy privilege is codified in the Swiss criminal code, it differs from the traditional criminal proscription *in that it remains a personal privilege that can be waived by the bank customer. In this sense, then, the Swiss bank secrecy law primarily protects the right of commercial privacy of bank clients*, not the Swiss government itself or some other public institution or interest. [*Minpeco*, 116 F.R.D. at 525. (emphasis added).]

The law the Bank relies upon is not therefore an expression of pure sovereignty but is, instead, a mere personal privacy interest routinely waivable by customers and enforced, not through criminal sanction, but by *civil* litigation. In a similar situation, the Second Circuit discounted a German bank secrecy law by noting that "it is surely of considerable significance that Germany considers bank secrecy simply a privilege that can be waived by the customer and is content to leave the matter of enforcement to the vagaries of private litigation. Indeed, bank secrecy is not even required by statute." *First Nat'l City Bank*, 396 F. 2d at 903.

Moreover, while the Bank's customer, Interpal, refuses to permit the Defendant to disclose its bank records, it is hard to credit Interpal's privacy interest in this instance. As Judge Sifton noted, "[i]n 2001 Interpal's website reflected that it worked with the known terrorist organizations the Orphan Care Society, the Jenin Committee and directed persons wishing to make donations to donate to HLF." *Weiss*, 2006 WL 2792770, *17. In fact, Interpal – NatWest's customer – has for many years posted on the internet the names of various organizations to whom it has donated funds. Moreover, as of the filing of this Memorandum of Law, Interpal continues – astonishingly – to post its account information at NatWest on its website and specifically encourages donations to account numbers at NatWest *after* the President blocked its assets in the U.S. because of its financial support for HAMAS and its "despicable act of terror." Lastly, as noted in Plaintiffs' Amended Complaint ¶ 517, Interpal has for many years been an integral part of the so-called "101 Days Campaign" which raises money for the Palestinian Intifada. That "campaign" has its own website at www.101days.org which also provides

Interpal's account information at NatWest to help facilitate donations to the cause. Interpal has, therefore, by virtue of its various disclosures and continued publication of its account information, consented implicitly to the disclosure of the information sought by the Plaintiffs. At the very least, these voluntary public disclosures demonstrate the minimal privacy interest that the Bank's customer can credibly assert.

Furthermore, English law provides an exception to bank secrecy where there has been a judicial order. *Chase Manhattan Ban*, 584 F. Supp. at 1084. In *First Nat'l City Bank* the Second Circuit noted the German bank secrecy law was no bar to disclosure in a German criminal proceeding, and it concluded therefore that "it should have no greater impact in a criminal proceeding in this country." 396 F. 2d at 904 n. 11. If bank secrecy may be set aside by court orders of British courts, it should also be overridden by appropriate court orders of U.S. courts.

Finally, the UK's interest in bank secrecy here is trumped by other important interests of the United Kingdom. In *Chase Manhattan Bank*, 584 F. Supp. at 1085 the court noted that according to L.J. Atkin's decision in *Tournier*, 1 K.B. at 486 "a bank may have to disclose records if such disclosure is necessary to protect 'the public against fraud or crime.'" Such a "crime or fraud" exception, which the United States has even for the otherwise inviolate attorney-client privilege, is controlling here in a civil action premised upon violation of U.S. criminal laws pertaining to terrorism. *Compare Davis*, 767 F.2d at 1035 (2d Cir. 1985) (noting that Cayman Islands have a policy against such use of bank secrecy laws and therefore finding that disclosure of bank records in a criminal case would not affect any strong national policy interest of the Islands). In fact, both the United Kingdom[23] and the United States[24] are parties to

---

[23]     The United Kingdom signed on January 10, 2000 and ratified on March 7, 2001; *see http://untreaty.un.org/ENGLISH/bible/englishinternetbible/partI/chapterXVIII/treaty12.asp.*

[24]     *Id.* The U.S. signed on January 10, 2000 and ratified on June 26, 2002.

21

the U.N.'s *International Convention for the Suppression of the Financing of Terrorism.*[25] This Convention actually forms the underlying legal authority for 18 U.S.C. § 2339C, upon which one of Plaintiffs' claims is based.[26]  *See Weiss*, 2006 WL 2792770, *16.  Article 12(2) of this convention specifically requires that "*States Parties may not refuse a request for mutual legal assistance on the ground of bank secrecy.*" (emphasis added).  Thus, even United Kingdom law requires NatWest to comply with discovery in cases involving allegations of terrorism financing.

The United Kingdom and the United States are also members of the Financial Action Task Force (FATF)[27] and have expressly accepted the FATF's Forty Recommendations on Money Laundering and the Special Recommendations on Terrorist Financing (the "Forty Recommendations").[28]  As Judge Sifton noted, because "[t]he United Kingdom is a participant in the FATF...NatWest is bound by these standards." *Weiss*, 2006 WL 2792770, *7. Recommendation 4 states "[c]ountries should ensure that financial institution secrecy laws do not inhibit implementation of the FATF Recommendations."   Recommendation 36 states "[c]ountries should rapidly, constructively and effectively provide the widest possible range of mutual legal assistance in relation to money laundering and terrorist financing investigations, prosecutions, and related proceedings.  In particular, *countries should ... [n]ot refuse to execute a request for mutual legal assistance on the grounds that laws require financial institutions to maintain secrecy or confidentiality.*" (emphasis added).  Finally, Recommendation 40 states "[c]ountries should ensure that their competent authorities provide the widest possible range of

---

[25]     International Convention for the Suppression of the Financing of Terrorism, G.A. Res. 109, U.N. GAOR, 54th Sess., Supp. No. 49, at 408, U.N. Doc. A/54/49 (Vol. I) (1999), *entered into force* April 10, 2002; available at *http://www.un.org/law/cod/finterr.htm*.

[26]     *See* 18 U.S.C. § 2339C, notes.

[27]     FATF was established by the G-7 Summit that was held in Paris in 1989; it is an inter-governmental body that sets standards and develops and promotes policies to combat money laundering and terrorist financing.

[28]     *Available at* http://www.fatf-gafi.org/dataoecd/7/40/34849567.PDF.

22

international co-operation to their foreign counterparts ... Exchanges should be permitted without unduly restrictive conditions.  In particular ... *[c]ountries should not invoke laws that require financial institutions to maintain secrecy or confidentiality as a ground for refusing to provide co-operation*." (emphasis added).  This convergence between U.S. and UK interests plainly tips the balance in favor of disclosure in terrorism cases.[29]

But the balancing analysis hardly needs this help.  The purely personal privacy interest advanced by the waivable foreign bank secrecy laws on which the Bank relies cannot possibly tip the scales against the clearly-expressed U.S. interest in preventing the provision of financial services for terrorists to kill and maim American nationals like the Plaintiffs.  Such a personal privacy interest has not even been recognized by American courts in more mundane legal proceedings, yet alone in cases involving international terrorism. [30]

Defendant cannot credibly argue that the bank privacy interest of Interpal, a designated SDGT (the same designation applied to *Al-Qaeda*),[31] trumps American terror victims' interest in exercising discovery rights.  The comity analysis overwhelmingly requires the Bank to comply with Plaintiffs' discovery demands.

---

[29]     It should be noted that HAMAS is also designated on the Bank of England's Consolidated List of Financial Sanctions as a terrorist organization.  The list is available at:
http://www.bankofengland.co.uk/publications/financialsanctions/sanctionsconlist.htm

[30]     *See  U.S. v. Miller*, 425 U.S. 435, 442-43 (1976), holding there is "no legitimate 'expectation of privacy'" in banking records and "[t]he depositor takes the risk, in revealing his affairs to another, that the information will be conveyed by that person to the Government"; *Clayton Brokerage Co., Inc. of St. Louis v. Clement*, 87 F.R.D. 569, 571 (D.Md. 1980) (bank must comply with civil discovery request because "the issuance of a subpoena requiring the bank to produce its records is not violative of any cognizable privacy right of the [account holder]"); *accord In re Yassai*, 225 B.R. 478, 483 (Bankr. C.D. Cal. 1998); *Sneirson v. Chemical Bank*, 108 F.R.D. 159, 160-61 (D.Del. 1985); *see also Rosenblatt v. Northwest Airlines*, Inc., 54 F.R.D. 21, 22 (S.D.N.Y. 1971) ("There is no banker-client privilege"); *Delozier v. First Nat'l Bank of Gatlinburg*, 109 F.R.D. 161, 163 (E.D.Tenn. 1986) citing *U.S. v. Prevatt*, 526 F.2d 400, 402 (5th Cir. 1976) ("banker-depositor privilege does not exist in the Federal courts.")

[31]     http://www.ustreas.gov/offices/enforcement/ofac/sdn/t11sdn.pdf.

**B.    The Discovery Sought is Crucial and Direct Evidence of the Conduct with which the Bank is Charged.**

The significance of this factor is suggested by the prominent place it occupies in the *Restatement (Third)* analysis.    Here, the transactional documents that Plaintiffs seek to authenticate are direct evidence of the financial services that the Bank provided to a Foreign Terrorist Organization.  Moreover, as the court in *Linde* noted, plaintiffs in an antiterrorism act case have the burden at trial both of establishing the financial services and fund transfers, and of showing that the bank acted with the requisite knowledge. *Linde*, 384 F. Supp. 2d at 588.  The documents Plaintiffs seek to obtain or to authenticate by interrogatories and admissions – which almost certainly are the Bank's own – are certainly "the kind of business documents … crucial to the litigation." *Minpeco*, 116 F.R.D. at 517.

**C.    The Plaintiffs' Requests Are Sufficiently Specific.**

There is also no serious controversy about the specificity of the requests at issue. Plaintiffs' discovery requests are specific and limited in scope.  In any case, the specificity of the request is tied to the well-pleaded claims in the Amended Complaint, which Judge Sifton upheld squarely in denying the Bank's motion to dismiss.  No more is required for a discovery request under the comity analysis.

Plaintiffs have argued that foreign secrecy does not apply, and therefore that *no* comity analysis is appropriate to the Requests for Admissions.  But even if comity analysis is relevant, the Supreme Court has emphasized that requests for admissions and the accompanying interrogatories are "simpler" and "certainly less intrusive" than broad-gauge production requests. *Aérospatiale*, 482 U.S. at 545.  The Court stressed that:

> American courts are not required to adhere blindly to the directives of [a foreign blocking statute that] … if taken, literally, would appear to represent an extraordinary exercise of legislative jurisdiction by [the foreign state] over a

> United States district judge, forbidding him or her to order ... *even simple requests for admissions or interrogatories that the party could respond to on the basis of personal knowledge.*

*Id.* at 544 n. 29 (emphasis added).  Here, Plaintiffs' Requests for Admissions target twenty-five specific documents and seeks a precise set of evidentiary admissions about them.  The interrogatories are tied to the documents.  Thus, the specificity of Plaintiffs' requests clearly favors discovery.

**D.    There Are No Substantially Equivalent Alternative Means for Obtaining Transactional Evidence, and the Bank Has Suggested None.**

If the Bank succeeds in withholding documents on foreign secrecy grounds, and is not compelled to admit or authenticate its own business records, Plaintiffs have no alternative means of obtaining transactional evidence of the Bank's actionable conduct.  Because the Bank is seeking to shield these critical records on foreign secrecy grounds, it is the Bank's burden to suggest plausible alternatives.  *Richmark*, 959 F.3d at 1475.  The only logical alternative would be to serve letters of request on Interpal, a SDGT, that has refused to even consent to Defendant's waiver request.  Nothing could be more futile.

**E.    The Bank Has Not Shown Undue Hardship in Complying with Plaintiffs' Proper Discovery Requests.**

The *Restatement (Third)* comity analysis endorsed by the Supreme Court in *Aérospatiale* focuses on the nature and importance of the discovery sought and the conflicting interests of the United States and the foreign state where the information is located.  It does *not* carry forward the *Restatement (Second)* factor of hardship to the party targeted with a discovery request.  Yet, even if "hardship" was still a valid factor in the analysis, the Bank fails to demonstrate hardship outbalancing the strong United States interest in discovery required for enforcement of the antiterrorism laws.

*First*, the Bank wholly fails to demonstrate that the foreign secrecy laws it invokes are

actually enforced against banks who operate in the United States who disclose under compulsion of U.S. discovery orders and rules. *See Graco, Inc.*, 101 F.R.D. at 513-514 (considering under prior *Restatement (Second)* analysis "whether a competing regulatory scheme actually regulates the conduct in question, or whether it merely is on the books or otherwise is ineffective"). Unlike the present case, in *In re Grand Jury Subpoena Dated August 9, 2000*, 218 F. Supp. 2d 544 (S.D.N.Y. 2002), the corporation resisting discovery offered an opinion by the foreign state's Ministry of Justice. Nevertheless, the *Grand Jury Subpoena* court noted that neither the corporation nor the ministry "presented any evidence that the confidentiality asserted by the Republic is enforced by any active prosecution." *Id.* at 563. Similarly, in *First Nat'l City Bank* the bank presented expert testimony discussing "with great particularity the precise nature ... of [the Bank's] prospective liability," *First Nat'l City Bank*, 396 F. 2d at 899 (upholding a contempt order against the bank), and in *Lernout*, the court emphasized that the expert for the auditor resisting discovery could not find any reported decision actually disciplining an auditor who was a defendant in a legal proceeding for violating the duty of secrecy. *Lernout*, 218 F.R.D. at 352.

So too here, the *least* the Bank must present is evidence that banks have been previously prosecuted by UK authorities for complying with U.S. discovery orders targeting protected information in cases in which they are primary defendants. It has not done so.

*Second*, the issue is not just whether the bank secrecy laws are *ever* enforced, but "the likelihood that enforcement of foreign law will be successful." *Minpeco*, 116 F.R.D. at 527. The Bank's barebones proffer of citations to UK laws sheds no light on the possible availability of "necessity" or "impossibility" defenses to a criminal prosecution or civil case for complying with this Court's orders. *See, e.g. First Nat'l City Bank*, 396 F. 2d at 900 (adverting to such defenses under foreign law in assessing hardship).

*Third*, the significance of the hardship factor depends "on the status in the litigation of the

party resisting discovery." *Minpeco*, 116 F.R.D. at 526. As the court explained in *Alfadda*:

> While some courts have been hesitant to require a non-party witness, who is an
> innocent source of information and a stranger to the litigation, to be forced to
> undergo hardship for the sake of discovery, *any potential hardship faced by a
> primary defendant in litigation may be weighed less heavily by the court*.
> [*Alfadda*, 149 F.R.D. at 38-39. (emphasis added)]

Here the Bank *is* the "primary defendant" and any hardship it asserts must therefore be weighted

less heavily in the analysis. Indeed, though the entity resisting discovery in *Minpeco* was no

longer a primary defendant, the court observed that "it might be argued with some force that … a

primary defendant should be required to produce information plaintiffs need to make a case

against [such a defendant] itself." *Minpeco*, 116 F.R.D. at 530.

*Fourth*, courts consistently hold that any hardship suffered by the party resisting

disclosure can be "greatly lessened" by an appropriate protective order. *See, e.g. Ssangyong

Corp. v. Vida Shoes Int'l, Inc.*, 2004 WL 1125659, *13 (S.D.N.Y. May 20, 2004). For example,

in *Trade Dev. Bank*, 469 F. 2d at 41 n. 3, for example, the Court of Appeals emphasized that

"apprehension on the part of the Bank's clients that the information as to their identities would

be misused could have been minimized by a protective order prohibiting the parties from

disclosing the information to third persons or using it for any purpose other than the pending

suit." Here, this Court already entered such an order, lessening any theoretical hardship.

*Fifth*, answering the Requests for Admissions will presumably take place in New York,

where U.S. law predominately governs. *See S.E.C. v. Banca Della Svizzera Italiana*, 92 F.R.D.

111, 119 (S.D.N.Y. 1981) (noting, in ordering discovery, that "[p]erformance may be said to

occur here as well as in Switzerland since the actual answering of the interrogatories will

presumably take place in the United States, where [the foreign company's] lawyers are").

27

Moreover, here, as in *In re Grand Jury Subpoena Dated August 9, 2000*, even for documents located abroad, "production of the documents is relatively straightforward, as the documents can be copied and shipped to the [Bank's] New York offices ..." *In re Grand Jury Subpoena Dated August 9, 2000*, 218 F. Supp. 2d at 563.

*Finally*, when a bank chooses to conduct business and opens branches both at home *and* abroad in the United States, the Second Circuit has held that "*it must confront ... the need to 'surrender to one sovereign or the other the privileges received therefrom' or, alternatively, a willingness to accept the consequences.*" *First Nat'l City Bank*, 396 F.2d at 905. (emphasis added). Here, it is clear that NatWest "assume[d] the risk of conflicting legal imperatives," *In re Grand Jury Subpoena Dated August 9, 2000*, 218 F. Supp. at 563, and cannot complain of its resulting, self-inflicted hardships. Thus, as Judge Sifton wrote, "NatWest is ... obligated, to follow the more stringent American law." *Weiss*, 2006 WL 2792770, *19.

## IV.   THIS COURT SHOULD ENTER AN ORDER OVERRULING OBJECTIONS, COMPELLING DISCOVERY, AND DEEMING THE REQUESTS FOR ADMISSIONS ADMITTED.

The Bank's incantation of foreign secrecy laws to Plaintiffs' Request for Admissions and Request for Documents requires several different forms of relief appropriate to the discovery setting, as set out below and in the attached proposed production order.

### A.   The Court Should Enter an Order Deeming Plaintiffs' Requests for Admissions Admitted.

*Restatement (Third)* § 442(1)(b) provides that the "failure to comply with an order to produce information may subject the person to whom the order is directed to sanctions, *including finding of contempt, dismissal of a claim or defense, or default judgment, or may lead to a determination that the facts to which the order was addressed are as asserted by the opposing party*." (emphasis added).

Such relief is not punitive, but instead attempts to place the parties in the position that they would have occupied but for the non-compliance with the discovery process. By tailoring the remedy to findings reasonably possible had the information been disclosed properly, such relief serves the important purpose of allowing the litigation to go forward on at least the "second best" available information. *See*, *e.g. Gen. Atomic Co. v. Exxon Nuclear Co.*, 90 F.R.D. 290, 307-09 (S.D. Cal. 1981) (holding that party's own unauthenticated documents in the possession of the other party would be deemed admissible into evidence as a partial remedy to overcome the prejudice caused by the assertion of foreign secrecy laws).

Plaintiffs have demonstrated herein that foreign secrecy laws are inapplicable to their Requests for Admissions of the authenticity and admissibility of the Bank's own business records already in Plaintiffs' possession. The Bank cannot, in good faith, refuse to admit or deny the admissions with respect to its own documents. In accordance with Fed. R. Civ. P. 36(a) and *Restatement (Third)* § 442(2)(c), the Court should therefore order the documents that are the subjects of the request to be authenticated and admitted.[32]

### B. The Court Should Enter an Order Compelling Production of the Documents Sought by Plaintiffs

For the reasons set forth above, Defendant's Objections to Plaintiffs' discovery demands based on assertions of English bank secrecy laws should be overruled. Plaintiffs respectfully request that the Court issue an order in the form attached compelling the Defendant to produce all records which it currently withholds on foreign bank secrecy grounds. Should Defendant fail to comply with such Court order, Plaintiffs reserve their rights to seek additional sanctions under Fed. R. Civ. P. 37 together with such other and further relief as may be just and proper under the circumstances.

---

[32]    Fed. R. Civ. P. 36(a) permits this Court to enter a "deeming sanction" or, alternatively, to issue an order requiring the Defendant to answer the discovery requests.

## CONCLUSION

Because the comity analysis set forth above applies equally to every other assertion of foreign secrecy law, and for each of them, the U.S. interest in discovery outweighs any foreign interest, this Court should: (1) comprehensively overrule Defendant's objections and order documents that the documents that are the subject of the requests be authenticated and admitted; (2) issue a document production order; and (3) reserve the issue of further sanctions should Defendant refuse commencing document production or responding to interrogatories within thirty (30) days of the issuance of the Order.

Dated: October 18, 2006
        Oradell, New Jersey

Respectfully submitted,

OSEN & ASSOCIATE, LLC
Gary M. Osen (GO-5790)
Joshua D. Glatter (JG-0184)
Peter Raven-Hansen, Of Counsel
700 Kinderkamack Road
Oradell, New Jersey 07649
Tel: (201) 265-6400
Fax: (201) 265-0303

KOHN SWIFT & GRAF, P.C.
Robert A. Swift
Steven M. Steingard
One South Broad Street
Suite 2100
Philadelphia, PA 19107
Tel: (215) 238-1700
Fax: (215) 238-1968

GLANCY BINKOW & GOLDBERG LLP
Andrew D. Friedman
Of Counsel
430 Park Avenue
New York, New York 10022
Tel: (212) 308-6300
Fax: (212) 308-6570

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

———————————————————————

TZVI WEISS, et al.                          :

                     Plaintiffs,        :

       -against-                             :

NATIONAL WESTMINSTER BANK, PLC :

                  Defendant.          :

———————————————————————

Case No. CV 05-4622 (CPS) (KAM)

## [PROPOSED] PRODUCTION ORDER

The Court has under consideration Plaintiffs' Motion for an Order Overruling Objections and Compelling Further Responses to Plaintiffs' First Set of Requests for Admissions and Related Interrogatories and Plaintiffs' First Request for the Production of Documents. The above action is currently pending in the United States District Court for the Eastern District of New York and alleges violations by the Defendant of, among other laws, 18 U.S.C. §§ 2333(a), 2339B, and 2339C. The Court has considered the memoranda of all parties and held oral argument on _____ __, 2006. The Court grants the Plaintiffs' Motion:

IT IS HEREBY ORDERED THAT:

1.     The laws of the United Kingdom do not excuse the Defendant from complying with its discovery obligations pursuant to the Federal Rules of Civil Procedure.

2.     Defendant's foreign law objections are hereby overruled in each and every discovery response, and Defendant may no longer assert this objection to future discovery requests.

3.     All documents that were attached to Plaintiffs' July 5, 2006 First Set of Requests for Admissions and Related Interrogatories and which the Defendant refused to admit or deny

because of foreign law are hereby deemed records of regularly conducted activity under Federal Rule of Evidence 803(6) and shall be admitted into evidence at trial without the need for further authentication.

4.      The Defendant shall answer Plaintiffs' pending discovery requests that it has refused to answer based on assertions of British secrecy laws.

5.      Additional sanctions including, but not limited to, making findings of fact adverse to the Defendant shall be imposed if the Defendant fails to comply with its obligations under the Federal Rules of Civil Procedure.

6.      Defendant is further ordered to produce all documents sought by Plaintiffs in their First Request for the Production of Documents.

7.      Should Defendant fail to commence document production within thirty (30) days of this Order, Plaintiffs are directed to move for further relief pursuant to Fed. R. Civ. P. 37.

SO ORDERED:

_____

HON. KIYO A. MATSUMOTO
United States Magistrate Judge

Dated:

## CERTIFICATE OF SERVICE

I, Aaron Schlanger, hereby certify that I am over the age of 18 years, am employed by the law firm of OSEN & ASSOCIATE, LLC and that on October 18, 2006, I caused the attached Plaintiffs' Motion for an Order Overruling and Compelling Further Responses to Plaintiffs' First Set of Requests for Admissions and Related Interrogatories and Plaintiffs' First Request for the Production of Documents to be served in accordance with the Federal Rules of Civil Procedure, and/or the Court's Local Rules, and/or the Rules on Electronic Service, upon the following counsel by indicated means:

## Counsel for Defendant National Westminster Bank By Electronic Mail

Lawrence B. Friedman, Esq.
(lfriedman@cgsh.com)
Jonathan I. Blackman, Esq.
(jblackman@cgsh.com)
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006

Aaron Schlanger