UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------- X

TZVI WEISS, *et al.*,                              :
                                                   :
                        Plaintiffs,                :
                                                   :        CV 05-4622 (CPS) (KAM)
            - against -                            :
                                                   :
NATIONAL WESTMINSTER BANK PLC,                     :
                                                   :
                        Defendant.                 :
                                                   :
---------------------------------------------------------- X

**NATIONAL WESTMINSTER BANK PLC'S MEMORANDUM
OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR AN
ORDER OVERRULING OBJECTIONS TO PLAINTIFFS' FIRST SET
OF REQUESTS FOR ADMISSIONS AND RELATED INTERROGATORIES
AND PLAINTIFFS' FIRST REQUEST FOR THE PRODUCTION OF DOCUMENTS**

CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
(212) 225-2000

Attorneys for Defendant
National Westminster Bank Plc

Of Counsel:

Jonathan I. Blackman
Lawrence B. Friedman
Sanjay S. Mody
Kirsten L. O'Connell

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .............................................................................................. iii

PRELIMINARY STATEMENT ....................................................................................... 1

STATEMENT OF FACTS ............................................................................................... 3

ARGUMENT.................................................................................................................... 5

POINT I

NATWEST HAS EASILY SATISFIED ITS
BURDEN TO GIVE NOTICE OF ITS INTENTION
TO RAISE AN ISSUE OF FOREIGN LAW ....................................................................... 5

POINT II

ENGLISH BANK SECRECY LAW PROHIBITS NATWEST'S
PRODUCTION OF THE DISCOVERY SOUGHT BY PLAINTIFFS ............................... 8

A.     The Documents And Information Sought By Plaintiffs
Fall Squarely Within The Scope Of English Bank
Secrecy Law.......................................................................................................... 8

B.     Plaintiffs' Requests For Admissions Are Not Exempt
From English Bank Secrecy Law ......................................................................... 10

       1.     Plaintiffs' Mere Possession Of The Leaked
Documents Does Not Render English
Bank Secrecy Law Inapplicable................................................................... 11

       2.     The Physical Presence Of The Leaked Documents
In The United States Does Not Render
English Bank Secrecy Law Inapplicable ...................................................... 12

POINT III

THE REQUISITE COMITY ANALYSIS WEIGHS
AGAINST COMPELLING NATWEST'S PRODUCTION
OF THE REQUESTED DISCOVERY ............................................................................. 13

Page

A.    The Governing Comity Analysis Weighs
      Against Compelling NatWest's Violation
      Of English Law ................................................................................................    14

      1.    The United States' Generalized Interest In More
            Complete Discovery Is Outweighed By England's
            Specific Interest In Preserving Bank Customer
            Secrecy ...........................................................................................    15

      2.    NatWest Would Face Substantial Hardship If It
            Complied With Plaintiffs' Discovery Requests ..............................    19

      3.    The Discovery Sought By Plaintiffs, Though
            Potentially Important, Is Available
            Through Alternative Methods ........................................................    21

      4.    NatWest Has Consistently Acted In Good Faith
            In Navigating The Conflict Between Plaintiffs'
            Discovery Requests And English Law .........................................    22

B.    Plaintiffs Can Obtain Their Requested Discovery
      By Employing Letters Of Request ..................................................................    24

POINT IV

PLAINTIFFS' PROPOSED RELIEF IS INAPPROPRIATE
AND OVERBROAD ..............................................................................................    27

CONCLUSION ......................................................................................................    29

# TABLE OF AUTHORITIES

Page(s)

**Rules and Statutes**

Fed. R. Civ. P. 37(b)(2) .......................................................................................... 28

Fed. R. Civ. P. 44.1 ............................................................................................... 6

**Cases**

Alfadda v. Fenn,
149 F.R.D. 28 (S.D.N.Y. 1993) ........................................................................... *passim*

Bodner v. Paribas,
202 F.R.D. 370 (E.D.N.Y. 2000) ......................................................................... 16

British Int'l Ins. Co. v. Seguros La Republica, S.A.,
No. 90 Civ. 2370 (JFK) (FM), 2000 WL 713057 (S.D.N.Y. June 2, 2000) ....................... 7

Buttita v. Asbestos Corp.,
No. A-1610-04T1, 2006 WL 2355200 (N.J. Super. App. Div. Aug. 16, 2006) ................. 26, 27

First Am. Corp. v. Price Waterhouse, L.L.P.,
154 F.3d 16 (2d Cir. 1998)................................................................................... 14

Gen. Atomic Co. v. Exxon Nuclear Co.,
90 F.R.D. 290 (S.D. Cal. 1981) ........................................................................... 22-23

Herrera v. Clipper Group, L.P.,
Nos. 97 Civ. 560 (SAS), 97 Civ. 561 (SAS), 1998 WL 229499
(S.D.N.Y. May 6, 1998)....................................................................................... 12

Hamdi v. Rumsfeld,
542 U.S. 507 (2004)............................................................................................ 15

Hudson v. Hermann Pfauter GmbH & Co.,
117 F.R.D. 33 (N.D.N.Y. 1987)............................................................................ 26

In re Grand Jury Subpoena Dated August 9, 2000,
218 F. Supp. 2d 544 (S.D.N.Y. 2002)................................................................... 14, 19

In re Lernout & Hausie Sec. Litig.,
218 F.R.D. 348 (D. Mass. 2003)........................................................................... 11, 12

iii

|  | Pages(s) |
|---|---|
| In re Magnetic Audiotape Antitrust Litig.,<br>334 F.3d 204 (2d Cir. 2003)............................................................................................... | 8 |
| In re Perrier Bottled Water Litig.,<br>138 F.R.D. 348 (D. Conn. 1991)......................................................................................... | 26, 27 |
| In re Westinghouse Elec. Corp. Uranium Contracts Litig.,<br>563 F.2d 992 (10th Cir. 1977) ........................................................................................... | *passim* |
| Laker Airways Ltd. v. Pan Am. World Airways,<br>607 F. Supp. 324 (S.D.N.Y. 1985) ................................................................................... | 26 |
| Madanes v. Madanes,<br>186 F.R.D. 279 (S.D.N.Y. 1999) ...................................................................................... | 16 |
| Minpeco, S.A. v. Conticommodity Servs., Inc.,<br>116 F.R.D. 517 (S.D.N.Y. 1987) ...................................................................................... | *passim* |
| Peninsula Asset Mgmt. (Cayman) Ltd. v. Hankook Tire Co.,<br>Nos. M8-85 (HB), 5:04-CV-1153, 2005 WL 3046284<br>(S.D.N.Y. Nov. 14, 2005)................................................................................................... | 23-24 |
| Rationis Enters. Inc. of Panama v. Hyundai Mipo Dockyard Co.,<br>426 F.3d 580 (2d Cir. 2005), cert. denied,<br>__U.S.__, 127 S. Ct. 294 (2006)......................................................................................... | 6 |
| Reinsurance Co. of Am. Inc. v. Administratia Asigurarilor de Stat.,<br>902 F.2d 1275 (7th Cir. 1990) .......................................................................................... | 17, 19 |
| Remington Prods., Inc. v. N. Am. Philips Corp.,<br>107 F.R.D. 642 (D. Conn. 1985)........................................................................................ | 23 |
| Richmark Corp. v. Timber Falling Consultants,<br>959 F.2d 1468 (9th Cir. 1992) .......................................................................................... | 16 |
| Safeco of Am. v. Rawstron,<br>181 F.R.D. 441 (C.D. Cal. 1998)....................................................................................... | 11 |
| SEC v. Banca Della Svizzera Italiana,<br>92 F.R.D. 111 (S.D.N.Y. 1981) ........................................................................................ | 16 |
| SEC v. Euro Sec. Fund,<br>No. 98 Civ. 7347 (DLC), 1999 WL 182598 (S.D.N.Y. Apr. 2, 1999) ............................... | 7 |

Pages(s)

Societe Internationale Pour Participations Industrielles Et
Commerciales, S.A.v. Rogers, 357 U.S. 197 (1958) .......................................................... 20, 22, 23

Société Nationale Industrielle Aérospatiale v. United States Dist. Ct. for the S.
Dist. Of Iowa, 482 U.S. 522 (1987) ...................................................................................... *passim*

Trade Dev. Bank v. Cont'l Ins. Co.,
469 F.2d 35 (2d Cir. 1972)..................................................................................................... 23

United States v. First Nat'l City Bank,
396 F.2d 897 (2d Cir. 1968)................................................................................................... 7, 20

United States v. Rubin,
836 F.2d 1096 (8th Cir. 1988) ............................................................................................. 14, 16

United States v. Vetco, Inc., 691 F.2d 1281 (9th Cir.),
cert. denied, 454 U.S. 1098 (1981) ...................................................................................... 21

White v. Kenneth Warren & Son, Ltd.,
203 F.R.D. 369 (N.D. Ill. 2001)............................................................................................. 17

**Other Authorities**

Hague Convention on the Taking of Evidence Abroad in Civil or
Commercial Matters, Mar. 18, 1970, 23 U.S.T. 2555, TIAS No. 7444.............................. 2, 24

Restatement (Third) on Foreign Relations Law § 442, Reporter's Note 9 (1987) ............ 15

U.S. Attorney's Manual, Title 9, Criminal Resource Manual § 275 (Oct. 1997)............... 26

9 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 2443
(2d ed. 1994) ......................................................................................................................... 6

Defendant National Westminster Bank Plc ("NatWest") respectfully submits this memorandum of law in opposition to plaintiffs' motion for an order overruling NatWest's objections to plaintiffs' first set of requests for admissions and related interrogatories and plaintiffs' first request for the production of documents.

## PRELIMINARY STATEMENT

Plaintiffs' labored argument for why the Court should compel NatWest's production of documents and information protected by English bank secrecy law relies more on overheated rhetoric than reasoned analysis. Plaintiffs anoint themselves "private attorneys general" charged with combating terrorism, and contend that the U.S. interest in enforcing its anti-terrorism laws trumps the "mere" privacy interests of English bank customers. But of course, plaintiffs are not the U.S. government, and their objective in bringing a civil lawsuit against NatWest is not combating terrorism but seeking money damages from what their lawyers perceive is a deep-pocketed defendant. The national interest in enforcing antiterrorism laws is appropriately entrusted to the U.S. government, which has not charged NatWest with any wrongdoing in connection with plaintiffs' injuries.

Once plaintiffs' rhetoric as self-appointed enforcers of the nation's antiterrorism laws is set aside, the balancing of interests mandated by federal law when a litigant's discovery demands implicate foreign law concerns overwhelmingly favors denying plaintiffs' motion. Under the governing Second Circuit balancing test for such cases, England's significant interest in protecting bank customer secrecy, the risk to NatWest -- an English bank with no branches or offices in the United States that does not conduct business in the United States -- if it were to comply with plaintiffs' discovery requests pertaining to accounts located in England without its

English customer's consent, and NatWest's good-faith efforts in seeking its customer's consent outweigh the generalized U.S. interest in discovery -- especially because plaintiffs' need for discovery can be readily satisfied by alternative means.

Plaintiffs can obtain the requested discovery easily and expeditiously by employing letters of request pursuant to the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, Mar. 18, 1970, 23 U.S.T. 2555, TIAS No. 7444 (the "Hague Convention"). Although resort to Hague Convention procedures is not mandatory under U.S. law, ordering plaintiffs to employ letters of request makes abundant sense here because it would enable them to acquire the discovery they seek and would alleviate any problem with English bank secrecy law. NatWest would thus be able to produce all relevant materials concerning its customer (subject obviously to matters of attorney-client privilege and the like that are not challenged on this motion) without any further delay.[1]

Plaintiffs' refusal even to consider this alternative method of obtaining their requested discovery suggests that they are more interested in using discovery as a one-way street to "beat up" NatWest -- while, as set forth in NatWest's pending motion to compel, refusing to produce any liability-related documents of their own on the purported ground of attorney work product -- than they are in simply obtaining NatWest's customer documents without further litigation. The Court should reject this gamesmanship and require plaintiffs to employ letters of request to obtain this discovery.

---

[1]  As discussed in Point IV below, NatWest has asserted objections other than English bank customer secrecy. Those objections are not the subject of the pending motion practice, which the parties and the Court agreed would be limited to this threshold issue, and will hopefully be resolved in the ordinary course without the need for judicial intervention.

## STATEMENT OF FACTS

Plaintiffs have propounded discovery requests to NatWest seeking, among other things, documents and information concerning NatWest's relationship with its English customer Interpal, which maintains accounts at NatWest in London.  Specifically, in their Document Requests Nos. 1-3, 11, and 12, plaintiffs request production of the following documents:

- "All account records maintained by, or in the custody and control of Defendant that concern INTERPAL, including account opening records, bank statements, wire transactions, deposit slips and all correspondence between Defendant and INTERPAL." (Request No. 1);

- "All documents and communications by or to Defendant concerning INTERPAL, including all internal reports and the contents of any internal investigations undertaken by Defendant that reference INTERPAL." (Request No. 2);

- "All non-privileged documents and communications by or to the Defendant from or to banking regulatory authorities in the United States, United Kingdom, or the European Union . . . concerning INTERPAL and or accounts maintained by the Defendant on INTERPAL's behalf." (Request No. 3);

- "All documents concerning Defendant's freezing of INTERPAL's accounts maintained by NatWest in March of 1996 . . . ." (Request No. 11); and

- "All documents concerning Defendant's freezing of INTERPAL's accounts maintained by NatWest in August and/or September of 2003 . . . ." (Request No. 12).[2]

Separately, in their requests for admission and related interrogatories, plaintiffs request that NatWest admit or deny the authenticity of twenty-five documents purporting to be NatWest documents concerning fund transfers on behalf of Interpal.[3]

---

[2]   Declaration of Jonathan I. Blackman dated November 16, 2006 ("Blackman Decl.") Ex. A, Plaintiffs' First Request For The Production Of Documents dated June 30, 2006 ("Pls.' Document Requests") ¶¶ 1-3, 11, 12.

[3]   See Plaintiffs' Memorandum Of Law In Support Of Their Motion For An Order Overruling Objections And Compelling Further Responses To Plaintiffs' First Set Of Requests For Admissions

Because the above requests directly implicate NatWest's bank-customer relationship with Interpal, the bank objected to each request on the ground, *inter alia,* that its disclosure of the requested documents and information would violate English bank secrecy law:

> NatWest objects to [the discovery request] . . . to the extent [it] seek[s] the disclosure of information subject to applicable English bank customer secrecy laws. Pursuant to Tournier v. National Provincial and Union Bank of England, 1 K.B. 461 (C.A. 1924), and its progeny of English case law, a financial institution, and persons affiliated with and/or employed by a financial institution, are prohibited from disclosing confidential information regarding any existing or former customer, without that customer's prior consent, including but not limited to the customer's name, account information, and transfers into and from the customer's account(s) by and to third parties. Failure to protect such confidential information constitutes a civil offense under English law and could subject NatWest to liability . . .
>
> NatWest has therefore asked Interpal to release NatWest from NatWest's secrecy obligations in order to permit disclosure of information in NatWest's possession relating to Interpal. However, to date, NatWest has not received such a release, and therefore could be exposed to liability under English and U.K. law if it were to disclose such information.[4]

In the three months since plaintiffs served their discovery requests, NatWest has repeatedly sought Interpal's consent to the bank's production of the documents and information sought by plaintiffs. Thus, NatWest and others on its behalf have sent no fewer than four separate letters seeking Interpal's release of the bank's English secrecy law obligations.

- On July 3, Jackie Sheftali, internal counsel for the Royal Bank of Scotland Group Plc ("RBS"), the corporate parent of NatWest, sent the first letter to Interpal "request[ing] [its] written consent for [NatWest] to disclose documents held in its possession, custody and/or control pertaining to [Interpal's]

---

And Related Interrogatories And Plaintiffs' First Request For The Production Of Documents ("Pls.' Br.") at 6, Exs. C1-C25.

[4]  Blackman Decl. Ex. B, NatWest's Responses And Objections To Plaintiffs' First Request For The Production Of Documents dated August 14, 2006 ("NatWest's Document Request Responses"), at 4-5; Blackman Decl. Ex. C, NatWest's Responses And Objections To Plaintiffs' First Set Of Requests For Admissions And Related Interrogatories dated August 14, 2006 ("NatWest's Requests for Admissions Responses"), at 3-4.

relationship with the Bank" and asked Interpal to "reply to this letter as a matter of urgency and in any event no later than . . . 14 July 2006." Blackman Decl. Ex. D.

- On July 27, Ms. Sheftali sent a <u>second</u> letter to Interpal "renew[ing] the request for consent contained in our letter dated July 3, 2006." Id. Ex. E.[5]

- On September 14, counsel for NatWest in this action sent on the bank's behalf a <u>third</u> letter to Interpal's counsel "reiterat [ing] the bank's desire for a prompt response to its request" set forth in Ms. Sheftali's July 3 and July 27 letters, and asking for a "respon[se] to this letter" before September 20. Id. Ex. F.

- On September 22, counsel sent on the bank's behalf a <u>fourth</u> letter "again reiterat[ing] the bank's desire for a prompt response to its prior requests" and asking Interpal's counsel to "respond to this letter before" October 2. Id. Ex. G.[6]

Despite its assiduous efforts, NatWest has been unsuccessful thus far in obtaining Interpal's consent to the bank's production of the requested documents and information. On September 26, we received a response from Interpal's counsel stating that he had received our September 22 letter and had "reported the contents of your letter of 14 September 2006 to [Interpal]" but "[a]s yet . . . I have not received [Interpal's] instructions further to the same." Blackman Decl. Ex. H.

## ARGUMENT

### POINT I

### NATWEST HAS EASILY SATISFIED ITS BURDEN TO GIVE NOTICE OF ITS INTENTION TO RAISE AN ISSUE OF FOREIGN LAW

Plaintiffs initially contend that NatWest should be precluded from asserting its English bank secrecy law objection because it has supposedly failed to describe with particularity the content of the relevant law and the law's applicability to plaintiffs' discovery

---

[5]    This letter was inadvertently misdated July 3, 2006.

[6]    We sent the September 14 and 22 letters to Interpal's counsel pursuant to the Court's instructions that NatWest make additional efforts to obtain Interpal's consent to the requested discovery.

requests. See Pls.' Br. at 8-9; id. at 18 (complaining that NatWest "has merely cited various foreign laws, absent any expert analysis pursuant to Fed. R. Civ. P. 44.1"). This argument is baseless.

Under Federal Rule of Civil Procedure 44.1, "[a] party who intends to raise an issue concerning the law of a foreign country" is required simply to "give notice by pleadings or other reasonable written notice." The Second Circuit has explained that "notice under Rule 44.1 differs from argument -- notice merely call[s] attention to the fact that the issue will be raised, whereas argument lays out, *inter alia*, the provisions of foreign law, the basis for its relevance, and the application of the foreign law to the facts of the case." Rationis Enters. Inc. of Panama v. Hyundai Mipo Dockyard Co., 426 F.3d 580, 585-86 (2d Cir. 2005), cert. denied, __U.S.__, 127 S. Ct. 294 (2006). Therefore, at the Rule 44.1 stage in the proceedings, "a litigant must provide the opposing party with reasonable notice that an argument will be raised, but the litigant need not flesh out its full argument . . . ." Id. at 586; see also 9 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 2443 (2d ed. 1994) ("The function of the notice is not to spell out the precise contents of foreign law but rather to inform the court and the litigants that it is relevant to the lawsuit. Thus, a high degree of specificity is not required.").

The decisions plaintiffs cite for their argument that NatWest was supposedly required, before the instant motion was even made, to provide "information of sufficient particularity and specificity to allow the Court to determine whether the discovery sought is indeed prohibited by foreign law," Pls.' Br. at 9 (quotation marks and citations omitted), are

completely inapposite.[7] In all of these cases the court was addressing the burden of proof applicable at a later stage in the proceedings when the court was actually ruling on the preclusive effect of the foreign law at issue. See, e.g., Alfadda v. Fenn, 149 F.R.D. 28, 34 (S.D.N.Y. 1993) (whether Swiss secrecy laws preclude defendant from answering deposition questions); United States v. First Nat'l City Bank, 396 F.2d 897, 904 (2d Cir. 1968) (whether German law precludes defendant's compliance with grand jury subpoena duces tecum); SEC v. Euro Sec. Fund, No. 98 Civ. 7347 (DLC), 1999 WL 182598 (S.D.N.Y. Apr. 2, 1999) (whether Swiss law precludes defendant's appearance for depositions and production of documents); British Int'l Ins. Co. v. Seguros La Republica, S.A., No. 90 Civ. 2370 (JFK) (FM), 2000 WL 713057, at *8 (S.D.N.Y. June 2, 2000) (whether Mexican law precludes defendant's compliance with requests for post-judgment asset discovery). None of these cases bears on NatWest's threshold notice requirement under Rule 44.1, or even remotely suggests that a party invoking foreign bank secrecy law is, in effect, required to submit a full brief in support of its objections along with its initial discovery response. Indeed, any such requirement would create unnecessary work for everyone, and would defeat the policy of trying to resolve discovery issues informally among counsel before briefing and motion practice, as reflected not only in the Federal Rules discovery provisions, but also in Local Rule 37.3.

---

[7] Plaintiffs also argue that NatWest "has the burden . . . of asserting the basis for its objections with particularity under Fed. R. Civ. P. 26(b)(5) and Local Rule 26.2" and note that Federal Rule of Evidence 501 "expressly limits the privileges that may be asserted in a U.S. court to privileges recognized in federal rules." Pls.' Br. at 2. Those rules, which apply when a party asserts a privilege as a basis for withholding otherwise discoverable or admissible information, are irrelevant to the instant dispute because NatWest has objected to plaintiffs' requested discovery not on the basis of any privilege belonging to it, but on grounds of a foreign law to which it is subject.

NatWest clearly satisfied its minimal burden under Rule 44.1 to give notice of its intention to raise an issue of foreign law in its initial discovery responses. The bank not only identified the foreign law prohibiting it from voluntarily disclosing customer information without customer consent (English bank secrecy law), but also explained the consequences if it were it to disclose such information (civil offense of English law), and described its proposal for securing lawful disclosure of the information (obtaining its customer's consent). See NatWest's Document Request Responses at 4-5; NatWest's Requests For Admissions Responses at 3-4.[8] Nothing more is required.

## POINT II

### ENGLISH BANK SECRECY LAW PROHIBITS NATWEST'S PRODUCTION OF THE DISCOVERY SOUGHT BY PLAINTIFFS

Now that plaintiffs have filed the instant motion to compel, NatWest, as the party asserting a foreign law objection, must "provide the Court with information of sufficient particularity and specificity to allow [it] to determine whether the discovery sought is indeed prohibited by foreign law." Alfadda, 149 F.R.D. at 34. NatWest has done so.

A.    **The Documents And Information Sought By Plaintiffs Fall Squarely Within The Scope Of English Bank Secrecy Law**

English secrecy law indisputably forbids NatWest's voluntary production of the documents and information sought by plaintiffs. Charles Hollander, a leading English barrister specializing in disclosure and confidentiality obligations under English law and the author of an

---

[8]    NatWest's responses and objections to plaintiffs' discovery requests were its first opportunity to give written notice of its intention to rely on English bank customer secrecy laws. Compare In re Magnetic Audiotape Antitrust Litig., 334 F.3d 204, 209 (2d Cir. 2003) (barring appellant from raising defense under Korean law because of its failure to comply with Rule 44.1, where appellant failed to raise Korean law issue in district court and waited almost an entire month before raising issue in appellate proceedings).

English book on the law of documents, explains that in "the well-known case of" Tournier v. National Provincial and Union Bank of England, [1924] 1 KB 461, 485 (C.A.), the English Court of Appeal held that "a banker had a duty to keep the customer's affairs confidential, and that confidentiality included an obligation not to reveal details as to the state of the customer's account." Declaration of Charles Simon Hollander dated November 10, 2006 ("Hollander Decl.") ¶¶ 2, 6. The right of confidentiality recognized in Tournier belongs to the customer "and thus cannot be waived by the bank." Id. ¶ 6. Accordingly, "a bank customer who believes that a bank intends to breach that duty [of confidentiality] would be entitled to protect his rights by obtaining an injunction from the English courts." Id. ¶ 7.

Hollander observes that "[t]he principles set out in Tournier are as relevant today as they were when the case was decided in 1924." Id. ¶ 7. Indeed, since the Tournier ruling, a number of cases have "demonstrate[d] the importance given by the English courts to the banker-customer confidentiality under the principles set out in the Tournier case." Id. ¶¶ 12-14. The principle of banker-customer confidentiality "is regarded as of sufficient importance that, in an appropriate case, the English court will [enjoin] a bank from complying with the order of a foreign court [compelling discovery of customer information] rather than permit the confidentiality to be breached." Id. ¶ 14.

NatWest's production of the discovery sought by plaintiffs would plainly require it to reveal confidential information concerning its customer's affairs and would thus violate the Tournier secrecy rule, unless such production were made pursuant to one of its recognized exceptions. As Hollander describes, the four exceptions to the rule are "(a) [w]here disclosure is under compulsion by law (b) where there is a duty to the public to disclose (c) where the interests

9

of the bank require disclosure (d) where the disclosure is made by the express or implied consent of the customer." Id. ¶ 8. Here, NatWest has sought to invoke the fourth exception -- consent of its customer Interpal -- but has not received it. Hollander concludes that neither this nor the second or third exceptions would apply here. Id. ¶ 9. NatWest thus asks this Court to issue a letter of request asking an English court to order production of the requested documents, so that NatWest may produce them under compulsion of law.

## B.     Plaintiffs' Requests For Admissions Are Not Exempt From English Bank Secrecy Law

Plaintiffs argue that English bank secrecy law is inapplicable to their requests for admissions because the documents that are the subject of the requests are (1) already in plaintiffs' possession, and (2) located in the United States. See Pls.' Br. at 10-12.[9] The documents in question, whose authenticity as records of transactions of NatWest's customer Interpal plaintiffs seek to have NatWest admit, appear to have been obtained by plaintiffs from Israeli government sources, which in turn apparently seized them from Palestinian entities in the occupied territories, although we cannot know this for certain since plaintiffs refuse on purported grounds of work product to provide any information about the bases of their liability case against NatWest. Setting aside the propriety of foreign government intelligence sources in effect leaking documents to private parties on a selective basis, plaintiffs' argument that the dubious manner in

---

[9]     Plaintiffs complain that NatWest is impermissibly using bank secrecy as a "sword" instead of a "shield" to avoid answering plaintiffs' requests for admissions. In fact, NatWest is doing neither. As discussed in note 7, NatWest is not *seeking* to avoid disclosure of its customer's information on the grounds of any privilege belonging to NatWest, but that it is *prohibited from* making such disclosure voluntarily under the governing foreign law.

10

which those documents came into their possession somehow solves NatWest's bank secrecy concerns is meritless.[10]

 1. Plaintiffs' Mere Possession Of The Leaked Documents
    Does Not Render English Bank Secrecy Law Inapplicable

Plaintiffs rely on In re Lernout & Hausie Securities Litigation, 218 F.R.D. 348 (D. Mass. 2003) ("Lernout") in support of their claim that their possession of the leaked documents renders English bank secrecy law inapplicable to their requests for admissions. See Pls.' Br. at 10-11. In Lernout, the defendant auditor objected to production of certain requested documents on the ground that Belgian secrecy law prohibited disclosure of client information contained in the documents. The court ordered the defendant to produce the requested documents for the principal reason that the plaintiffs had "already been made privy to the [client] information" inasmuch as plaintiffs' counsel had reviewed the documents in parallel criminal proceedings against the auditor, and thus "from a common sense perspective, the most logical result is for [the defendant] to turn over the [requested documents]." Lernout, 218 F.R.D. at 351.

The instant case is plainly distinguishable from Lernout for at least two reasons. First, in Lernout, the central question was whether the lapsed confidentiality of the documents at issue rendered inapplicable Belgian secrecy law preventing disclosure of confidential information; the authenticity of the documents was not disputed in that case. Here, by contrast, what the leaked documents "are" is precisely what plaintiffs seek to uncover through their

---

[10] Plaintiffs also contend that their requests for admission are "the only effective alternative means of obtaining transactional documents that [NatWest] itself refuses to produce on bank secrecy grounds." Pls. Br. at 10. However, requests for admissions are not discovery devices and "'are not to be treated as substitutes for discovery processes to uncover evidence . . . .'" Safeco of Am. v. Rawstron, 181 F.R.D. 441, 445 (C.D. Cal. 1998) (citation omitted). Moreover, as discussed in Point III.B below, plaintiffs may seek their requested discovery through letters of request pursuant to the Hague Convention.

11

requests for admission. Although plaintiffs have become "privy to" the information contained in

the leaked documents, their possession of the documents by itself has no bearing on the

documents' authenticity. Second, in contrast to the Lernout plaintiffs who reviewed the

documents at issue with the defendant's effective consent,[11] plaintiffs here have not received

NatWest's consent to obtain the leaked documents, and in fact refuse to explain how they came

into possession of the documents. Under these circumstances, plaintiffs cannot use their

appropriation of confidential information as a ground for requiring NatWest to breach its own

confidentiality obligations. Cf. Herrera v. Clipper Group, L.P., Nos. 97 Civ. 560 (SAS), 97 Civ.

561 (SAS), 1998 WL 229499, at *2 (S.D.N.Y. May 6, 1998) (admonishing plaintiff who

appropriated employer's confidential documents for use in discrimination suit that "[t]he

discovery process is not meant to be supplemented by the unlawful conversion of an adversary's

proprietary information").

     2.      The Physical Presence Of The Leaked Documents In The United
            States Does Not Render English Bank Secrecy Law Inapplicable

        Plaintiffs' argument that the physical presence of the leaked documents in the

United States precludes application of English bank secrecy law to the information contained in

those documents is equally infirm. Their reliance on the Restatement (Third) § 442 and the

Aérospatiale ruling is a *non-sequitur*. The fact that those authorities address the foreign secrecy

obligations applicable to documents located abroad does not mean that the same secrecy

obligations do not also apply to documents that were maintained abroad, but brought to the

---

[11]    Indeed, the Lernout court noted that the defendant auditor had "itself recommended that the plaintiffs become civil litigants in the criminal action in Belgium as a way of obtaining the documents they sought." 218 F.R.D. at 350 n.2.

United States under unknown circumstances by persons other than either their lawful custodian or the person subject to the secrecy obligation. Surely plaintiffs would not suggest that if someone had stolen these documents from NatWest in London and brought them to the United States, that would somehow eliminate NatWest's bank secrecy concerns under English law, and on the present record, we know no more than that the documents came here without the knowledge or consent of either NatWest or its customer. Bank secrecy depends on the law governing the bank-customer account relationship, which in this case is English law, see Hollander Decl. ¶ 5, not on whether documents containing protected information were physically moved to the United States by persons unknown.

**POINT III**

**THE REQUISITE COMITY ANALYSIS WEIGHS AGAINST
COMPELLING NATWEST'S PRODUCTION OF THE REQUESTED DISCOVERY**

In deciding whether to compel the production of discovery in violation of applicable foreign law, courts must determine whether comity requires deference to the foreign law. See Société Nationale Industrielle Aérospatiale v. United States Dist. Ct. for the S. Dist. of Dist. Iowa, 482 U.S. 522 (1987) ("Aérospatiale"). In this case, the governing Second Circuit comity analysis weighs in favor of deference to English secrecy law and against NatWest's production of the requested discovery. More fundamentally, this discovery dispute is entirely avoidable and unnecessary because plaintiffs can obtain their requested discovery by employing letters of request pursuant to the Hague Convention, which would avoid any issue under English bank secrecy law.

13

A.    **The Governing Comity Analysis Weighs Against**
      **Compelling NatWest's Violation Of English Law**

As a threshold issue, plaintiffs cite the wrong standard for resolving foreign

discovery disputes in this Circuit. Courts in the Second Circuit apply a four-factor balancing

test, derived from the Restatement (Second) of the Foreign Relations Law of the United States,

for determining whether a U.S. court should force a party to provide discovery in violation of

foreign law. The factors in this balancing test (the "Minpeco factors") are: (1) "the competing

interests of the nations whose laws are in conflict;" (2) "the hardship that compliance would

impose on the party or witness from whom discovery is sought;" (3) "the importance to the

litigation of the information and documents requested;" and (4) "the good faith of the party

resisting discovery." First Am. Corp. v. Price Waterhouse, LLP, 154 F.3d 16, 22 (2d Cir. 1998)

(citing Minpeco, S.A. v. Conticommodity Servs., Inc., 116 F.R.D. 517, 523 (S.D.N.Y. 1987));

see also In re Grand Jury Subpoena Dated August 9, 2000, 218 F. Supp. 2d 544, 554 (S.D.N.Y.

2002) (reciting Minpeco factors); Alfadda, 149 F.R.D. at 34 (reciting Minpeco factors and citing

Second Circuit decisions); United States v. Rubin, 836 F.2d 1096, 1101 (8th Cir. 1988) (listing

Second Circuit among circuits that apply balancing test derived from Restatement (Second)).[12]

The first two factors -- the balance of sovereign interests and hardship of compliance -- are of

paramount importance. Minpeco, 116 F.R.D. at 522. Here, a balancing of the Minpeco factors

---

[12]   In proposing a balancing test derived from the Restatement (Third) of the Foreign Relations Law of
the United States, see Pls.' Br. at 12-14, plaintiffs clearly are seeking to deter this Court's
consideration of the hardship imposed on NatWest if it were to comply with their discovery demands
in violation of English law. However, plaintiffs implicitly acknowledge the applicability of the
Minpeco factors in this case by nevertheless deeming it necessary to address the hardship-of-
compliance factor in their argument. See Pls. Br. at 25.

14

strongly weighs in favor of excusing NatWest's voluntary compliance with plaintiffs' discovery requests.

     1.      The United States' Generalized Interest In More
                Complete Discovery Is Outweighed By England's
                <u>Specific Interest In Preserving Bank Customer Secrecy</u>

           Plaintiffs vastly overstate the United States' interest in their discovery requests. Contrary to plaintiffs' hyperbolic claim (emblematic of their rhetorical bootstrapping in this lawsuit more generally), they are not "private attorneys general" responsible for enforcing the nation's antiterrorism laws. That sovereign function is entrusted to the U.S. government. <u>See</u> <u>Hamdi v. Rumsfeld</u>, 542 U.S. 507, 531 (2004) ("Without doubt, our Constitution recognizes that core strategic matters of warmaking belong in the hands of those who are best positioned and most politically accountable for making them."). Rather, plaintiffs are private citizens who have filed a civil lawsuit seeking money damages from a perceived deep-pocketed defendant. And "[p]rivate litigants" in plaintiffs' position "cannot be expected to have comparable concern for the national interest or for abiding by international undertakings." Restatement (Third) on Foreign Relations Law § 442, Reporter's Note 9 (1987); <u>cf. In re Westinghouse Elec. Corp.</u> <u>Uranium Contracts Litig.</u>, 563 F.2d 992, 999 (10th Cir. 1977) (in civil action for breach of contract, noting that "[w]e are not here concerned with any grand jury investigation, or the enforcement, as such, of antitrust laws"). Plaintiffs' attempt to wrap themselves in the flag and advance their civil claims by invoking the U.S. interest in combating terrorism should be summarily rejected.

           In this case involving the tort claims of private litigants against an English bank for alleged misconduct that occurred abroad, the U.S. interest is no more than what it is in any

15

civil action: to provide litigants in its courts with access to the discovery needed to fairly and fully present their case. See In re Westinghouse, 563 F.2d at 999 (noting the U.S. interest in "making certain that any litigant in its courts is afforded adequate discovery to the end that he may fully present his claim"); Alfadda, 149 F.R.D. at 34 (observing that United States "has an interest in the full and fair adjudication of matters before its courts, which is only possible through complete discovery").[13]  Here, that generalized U.S. interest is outweighed by England's specific interest in preserving bank customer secrecy.

As embodied in Tournier and the cases since that ruling, England has an obvious and undeniable national interest in protecting customer privacy and enforcing its internal banking laws with respect to English banks in NatWest's position. See Bodner v. Paribas, 202 F.R.D. 370, 376 n.6 (E.D.N.Y. 2000) (recognizing that "the principal purpose of the [French bank secrecy] law appears to be to protect client confidences"); Rubin, 836 F.2d at 1102 (finding that "the Cayman Islands seeks to protect the right of privacy that is incorporated into its bank secrecy laws"). English bank secrecy law is thus to be distinguished from so-called "blocking statutes" designed solely to protect domestic parties from foreign discovery -- contrary to plaintiffs' unsupported assertion, see Pls.' Br. at 12 -- and England's interest in its law should be

---

[13]    In evaluating the U.S. interest implicated in plaintiffs' discovery requests, it is worth noting that neither the acts that caused plaintiffs' injuries, nor the conduct of NatWest alleged to have contributed to those injuries, occurred in the United States. As one court has observed, U.S. interests in litigants' claims "diminish the less closely a case is related to the United States." Madanes v. Madanes, 186 F.R.D. 279, 286 (S.D.N.Y. 1999).  It makes sense, then, that in cases in which courts compel discovery that otherwise would violate foreign secrecy law, the party ordered to comply with discovery requests is typically accused of misconduct in the United States. See, e.g., Alfadda, 149 F.R.D. 28 (stock offering in the United States); SEC v. Banco Della Svizzera Italiana, 92 F.R.D. 111 (S.D.N.Y. 1981) (transactions on U.S. securities exchanges); Richmark Corp. v. Timber Falling Consultants, 959 F.2d 1468 (9th Cir. 1992) (purchase of timber in the United States).  Although plaintiffs are asserting claims under the Anti-Terrorism Act (the "Act") -- a statute which indisputably has extraterritorial application -- nothing in the Act precludes NatWest's ability (and, indeed, duty) to assert foreign law objections to plaintiffs' discovery demands.

16

accorded correspondingly more weight. See Minpeco, 116 F.R.D. at 528 (contrasting party's

reliance on Swiss bank secrecy law favorably with the "situation in which the party resisting

discovery has relied on a sham law such as the blocking statute to refuse disclosure");

Reinsurance Co. of Am., Inc. v. Administratia Asigurarilor de Stat, 902 F.2d 1275, 1280 (7th

Cir. 1990) ("Unlike a blocking statute, Romania's law appears to be directed at domestic affairs

rather than merely protecting Romanian corporations from foreign discovery requests."); cf.

White v. Kenneth Warren & Son, Ltd., 203 F.R.D. 369, 375 (N.D. Ill. 2001) (in evaluating

English interest in law prohibiting production of witness statements, finding that "the English

interest in confidentiality seem [sic] quite compelling considering the penalties involved and to

the extent their law appears aimed toward domestic affairs").[14]

      Plaintiffs argue that England's interest in preserving confidentiality should not be

accorded much weight because bank customer secrecy is a "mere personal privacy interest [that

is] routinely waivable by customers and enforced . . . by *civil* litigation." Pls.' Br. at 19-20

(emphasis in original).  This argument is unavailing for at least two reasons.  First, plaintiffs fail

to articulate why the prospect of civil liability in England should be accorded de minimis respect,

while simultaneously (and incorrectly) asserting that their own civil claims against NatWest

should be accorded a weight equivalent with criminal proceedings brought by the U.S.

government.  Second, although bank customer confidentiality is waivable by the customer, that

fact alone does not preclude a finding of compelling sovereign interest as a matter of law.  See

---

[14]    Plaintiffs cite to several U.S. cases in arguing that England's privacy interest should not be accorded
much weight.  See Pls.' Br. at 23 n.30.  However, the relevant interest for purposes of the foreign side
of the balancing test is the significance accorded to its law by the foreign sovereign -- here, England.

17

Minpeco, 116 F.R.D. at 525 (Swiss bank secrecy exceptions, including customer consent, ultimately not dispositive).

Plaintiffs also argue that "it is hard to credit Interpal's privacy interest in this instance" because Interpal has publicized information about its NatWest account on the internet, and such publication should be deemed implied consent to the bank's disclosure of Interpal's confidential information. See Pls.' Br. at 20-21. This argument is baseless. Plaintiffs fail to cite a single authority in support of their implied consent theory, which, even if it existed, would be inapplicable to a party like Interpal that is not before the Court. Moreover, Interpal's mere publication of its account number and the names of certain parties to which it sent funds cannot reasonably be construed as implicit consent to NatWest's extensive disclosure of all of its confidential account information. Indeed, if such limited disclosure were sufficient to constitute waiver, that would completely eviscerate the English law protection of bank customer information: every business or non-profit entity obviously provides information about how to send money to its bank account to persons with whom it deals, without waiving the protection of bank secrecy for the transactions in its account. Moreover, the relevant interest for present purposes is not Interpal's privacy interest but rather England's interest as embodied in the Tournier principle of bank customer confidentiality. NatWest is not arguing that the Court should defer to the privacy interest of Interpal, but rather that it should accord "due respect" to the English interest in customer secrecy as recognized by English courts for more than 80 years.

Finally, plaintiffs argue that the English interest in bank secrecy "is trumped by other important interests of the United Kingdom," as reflected in its participation, along with the United States, in the United Nations International Convention for the Suppression of the

18

Financing of Terrorism (the "Terrorism Convention") and the Financial Action Task Force ("FATF"). See Pls.' Br. at 21-22. This is also specious: plaintiffs have no plausible ground to claim to represent the interests of a foreign sovereign. Furthermore, to the extent the Terrorism Convention and the FATF are at all applicable to the Court's determination of England's sovereign interest, it is notable that both contemplate and are premised on cooperation between nation-states. England's sovereign interest in mutual cooperation with the United States on discovery matters is precisely why the Court should use the machinery expressly adopted by international treaty for such cooperation, namely, the Hague Convention, as discussed below.[15]

2.    NatWest Would Face Substantial Hardship If It
      Complied With Plaintiffs' Discovery Requests

The second Minpeco factor, which considers the hardship of compliance on the party from whom U.S. discovery is sought, also weighs in favor of NatWest, when the alternative method of Hague Convention discovery is readily available. As discussed above, the English law prohibition on disclosure of bank customer information is valid and enforceable -- it is not merely a "law on the books" that plaintiffs can easily dismiss. See Reinsurance Co. of Am. Inc., 902 F.2d at 1281 (in evaluating hardship, noting evidence that Romanian secrecy law is vigorously enforced); cf. In re Grand Jury Subpoena, 218 F. Supp. 2d at 563 (in evaluating hardship, finding no evidence that asserted foreign confidentiality rule "is enforced by any active prosecution"). Perhaps equally severe are the professional and reputational consequences if

---

[15]   Plaintiffs, having invoked "other important interests of the United Kingdom" as a basis for trumping English bank secrecy law, surely must recognize that the United Kingdom would have an interest in an English court issuing a production order relating to bank accounts located at an English bank.

19

NatWest were to betray its customer's confidence by producing the requested documents and information in violation of English secrecy law.[16]

Plaintiffs argue, in effect, that NatWest should not be heard to complain about any hardship it suffers as a result of its compliance with their discovery requests because the bank chose to conduct business in the United States and therefore must bear the consequences. See Pls.' Br. at 28. In fact, NatWest does not conduct business in the United States, its customer's accounts are located in England, and plaintiffs do not allege that the bank committed any misconduct here. In any event, plaintiffs' argument runs directly contrary to the Supreme Court's ruling in Aérospatiale, which requires that courts resolving foreign discovery disputes take comity concerns into account, and ignores England's legitimate interest in preserving bank customer confidentiality. Accordingly, this argument should be summarily rejected. See In re Westinghouse, 563 F.2d at 999 (rejecting argument that corporation doing business in Utah but resisting production of documents on Canadian law grounds "is somehow ungrateful when it fails to obey the discovery orders of the local courts," and reversing trial court's ruling compelling discovery because it failed to apply requisite comity analysis); see also Société Internationale Pour Participations Industrielles Et Commerciales S.A. v. Rogers, 357 U.S. 197, 211-12 (1958) (noting that party resisting discovery "explicitly recognizes that it is subject to procedural rules of United States courts in this litigation and has made full efforts to follow these

---

[16] The fact that NatWest's voluntary production of the requested discovery would constitute a civil rather than criminal offense under English secrecy law does not render its hardship insubstantial. See United States v. First Nat'l City Bank, 396 F.2d 897, 901-02 (2d Cir. 1968) (rejecting government's argument that party's non-compliance with court production order should be excused only if it will suffer criminal liability in foreign country).

rules[,] . . . asserts no immunity from them [but] asserts only its inability to comply because of foreign law").[17]

    3.    The Discovery Sought By Plaintiffs, Though Potentially
            Important, Is Available Through Alternative Methods

Although the documents and information sought by plaintiffs are undeniably of potential importance to the outcome of this litigation, the ability to obtain the discovery through alternative means substantially diminishes the importance of this factor. As discussed in Point III.B below, plaintiffs may use the Hague Convention as a method to request the discovery they are seeking. Where a party seeks documents and information that are cumulative of discovery they can obtain through other methods, this factor is accorded less significance in the comity analysis. See United States v. Vetco, Inc., 691 F.2d 1281, 1290 (9th Cir.) (in evaluating importance of discovery sought to conduct of litigation, noting that "[c]ourts have refused to require production where the documents sought are largely cumulative of records already produced"), cert. denied, 454 U.S. 1098 (1981); In re Westinghouse, 563 F.2d at 999 ("present discovery, though admittedly of potential significance, is still in a sense cumulative" where party seeking discovery had conducted depositions); cf. Aérospatiale, 482 U.S. at 546 ("American courts, in supervising pretrial proceedings, should exercise special vigilance to protect foreign litigants from the danger that unnecessary, or unduly burdensome, discovery may place them in a

---

[17]   Plaintiffs perfunctorily argue that NatWest would suffer no hardship in answering their requests for admissions because the bank would be required to do so in New York, where the asserted secrecy objections do not apply. However, the relevant bank accounts are held in England and it is therefore English law that governs the contractual relationship between NatWest and its customer. Accordingly, English law underpins NatWest's obligations with respect to disclosure of its customer's information. See Hollander Decl. ¶ 5.

disadvantageous position."). Here, the Hague Convention will give plaintiffs what they are

seeking, and should be the method that they follow.

> 4. NatWest Has Consistently Acted In Good
> Faith In Navigating The Conflict Between
> Plaintiffs' Discovery Requests And English Law

The final Minpeco factor is satisfied here because NatWest has at all times acted

in good faith to provide the discovery sought by plaintiffs. As described above, NatWest has

diligently sought Interpal's waiver of its bank secrecy rights (four separate letters requesting a

waiver over a two-month period), albeit without success. See Société Internationale, 357 U.S. at

208 (defendant "in good faith made diligent efforts" to provide requested discovery by seeking

bank secrecy waivers from trading customers); Minpeco, 116 F.R.D. at 528 (same); Alfadda, 149

F.R.D. at 40 (where defendant raised Swiss secrecy objection to production of discovery, its

"attempt to secure secrecy waivers . . . is indeed evidence of good faith").

Nor is this a case in which NatWest's inability to produce the requested discovery

has in any way been fostered by its own conduct. Cf. Société Internationale, 357 U.S. at 208-09

(rejecting argument that ownership of property was transferred to take advantage of Swiss

secrecy laws but noting that the petitioner's having "deliberately courted legal impediments to

production . . . , if supported by the facts, would have a vital bearing" on the court's ruling);

Minpeco, 116 F.R.D. at 529 (finding that defendant bank resisting discovery under Swiss secrecy

law evinced bad faith in making use of U.S. commodities markets knowing it was subject to

reporting requirements under U.S. law but without securing consent to disclosure from its

customers); Gen. Atomic Co. v. Exxon Nuclear Co., 90 F.R.D. 290, 296-99 (S.D. Cal. 1981)

(finding that defendant stored documents in Canada with expectation that Canadian law would

prohibit their disclosure in anticipated litigation in United States). Nor has NatWest "relied on a

sham law such as a blocking statute to refuse disclosure" or failed to make "reasonable efforts to

apply to the appropriate governmental authority for an exemption to such a statute." Minpeco,

116 F.R.D. at 528 (citing cases).[18] To the contrary, NatWest has made every effort to provide

the discovery sought by plaintiffs without violating its own secrecy obligations under English

law.

\*       \*       \*

A balancing of the Minpeco factors leads to the conclusion that the Court should

decline to order NatWest to produce documents protected by English bank secrecy law. See

Société Internationale, 357 U.S. at 213 (excusing party's inability to comply with pretrial

production order because production of documents would violate Swiss secrecy laws); Trade

Dev. Bank v. Cont'l Ins. Co., 469 F.2d 35 (2d Cir. 1972) (upholding trial court's ruling that as

matter of comity it would not order disclosure of customer identities prohibited under Swiss

law); Minpeco, 116 F.R.D. 517 (undertaking balancing analysis and denying motion to compel

discovery prohibited under Swiss bank secrecy law); Peninsula Asset Mgmt. (Cayman) Ltd. v.

Hankook Tire Co., Nos. M8-85 (HB), 5:04-CV-1153, 2005 WL 3046284 (S.D.N.Y. Nov. 14,

2005) (undertaking balancing analysis and denying motion to compel discovery prohibited under

---

[18]   As further evidence of NatWest's good faith, the bank initially raised an objection to producing
certain discovery sought by plaintiffs on the ground that doing so might constitute a criminal offense
under U.K. anti-money laundering laws, see NatWest's Document Request Responses at 5,
NatWest's Requests For Admissions Responses at 4, but then subsequently obtained the required
consent to production of the requested discovery and withdrew this objection. Cf. Remington Prods.,
Inc. v. N. Am. Philips Corp., 107 F.R.D. 642, 653 (D. Conn. 1985) (finding lack of good faith where
party resisting disclosure failed to make reasonable efforts to apply to appropriate governmental
authority for exemption to statute).

23

Korean law). Instead, the Court should issue letters of request for discovery of these documents

in England, which would obviate any issue of bank secrecy under English law.

**B.     Plaintiffs Can Obtain Their Requested**
**Discovery By Employing Letters Of Request**

It cannot be seriously disputed that plaintiffs can obtain their requested discovery

easily and expeditiously by utilizing letters of request, directed at NatWest and/or Interpal, under

the Hague Convention.[19]

The Hague Convention was adopted by its contracting states -- including the

United States and England -- in an attempt to establish procedures for obtaining evidence located

abroad that a state executing a request would find "tolerable," and which the state from which a

request came would find "utilizable." Aérospatiale, 482 U.S. at 530. Among the procedures

established under the Hague Convention for obtaining evidence located abroad are "letters of

request" from the trial court to the appropriate authority in the foreign country, requesting a

foreign court "to obtain evidence, or to perform some other judicial act." Hague Convention, art.

1, 23 U.S.T. 2555.

In Aérospatiale, the Supreme Court observed that "the degree of friction created

by discovery requests . . . and the differing perceptions of the acceptability of American-style

discovery under national and international law, suggest some efforts to moderate the application

abroad of U.S. procedural techniques, consistent with the overall principle of reasonableness in

the exercise of jurisdiction." Aérospatiale, 482 U.S. at 544 n.29 (quoting Restatement § 437,

---

[19]     Notably, among the comity factors proposed by plaintiffs themselves is "the availability of alternative
means of securing the information" located abroad. See Pls.' Br. at 13 (quoting Restatement (Third)
§ 442(1)(c)). The employment of Hague Convention discovery procedures of course constitutes an
alternative means for plaintiffs to obtain their requested discovery.

Reporter's Note 5 at 42).  Accordingly, the Court ruled that American courts addressing foreign

discovery disputes should "take care to demonstrate due respect for any special problem

confronted by the foreign litigant on account of its nationality or the location of its operations,

and for any sovereign interest expressed by a foreign state." Aérospatiale, 482 U.S. at 546.

Although the Court believed it was imprudent to announce a "general rule" of "first resort" to

Hague Convention procedures "in all cases" involving foreign discovery disputes, it noted that in

some cases "a litigant's first use of [such] procedures can be expected to yield more evidence

abroad more promptly than use of the normal procedures governing pre-trial civil discovery." Id.

at 543 n.26.[20]

   This is precisely such a case.  Requiring plaintiffs here to employ letters of

request would demonstrate "due respect" for English law without impairing their ability to obtain

the requested discovery.[21]  NatWest would not raise any objection on secrecy grounds if an

English court directed it to produce the documents and information sought by plaintiffs -- nor

could it because an English court order executing a letter of request would constitute

---

[20] See also Aérospatiale, 482 U.S. at 541 (ruling that Hague Convention "procedures are available
whenever they will facilitate the gathering of evidence by the means authorized in the Convention . . .
[and] Convention does 'apply' to the production of evidence in a litigant's possession in the sense
that it is one method of seeking evidence that a court may elect to employ").

[21] Nor could plaintiffs credibly argue that reliance upon letters of request would unduly prolong
discovery in this case.  Justice Blackmun responded to precisely this apprehension in his Aérospatiale
concurrence, explaining that, "[e]xperience with the Convention suggests [that] contracting parties [to
the Convention] have honored their obligation to execute letters of request expeditiously and to use
compulsion if necessary." Aérospatiale, 482 U.S. at 562 (Blackmun, J., concurring in part).  Indeed,
had plaintiffs applied to this Court for letters of request when NatWest first raised its secrecy law
objections more than three months ago as of the date of this brief, it is reasonable to expect that by
now the Court would have granted plaintiffs' application and issued the letters of request, and that the
English courts would have directed NatWest and/or Interpal to produce the requested discovery.  This
fact alone belies any assertion by plaintiffs that they urgently require the documents and information
that are the subject of their discovery requests.

"compulsion of law" that would moot any issue of bank-client secrecy under the Tournier

principle. See Hollander Decl. ¶ 16 (noting that "it would be open to the New York court to

make a request to the English court to deal with disclosure under the letters rogatory principle").

In short, this is a case where first use of Hague Convention procedures can be

expected to yield the same evidence, and more promptly, than resort to federal discovery rules.

See Hudson v. Hermann Pfauter GmbH & Co., 117 F.R.D. 33, 40 (N.D.N.Y. 1987) (concluding

that "use of [Hague] Convention procedures in the first instance is preferred"); Laker Airways

Ltd. v. Pan Am. World Airways, 607 F. Supp. 324, 326 (S.D.N.Y. 1985) (vacating subpoenas

served upon New York branch offices of English corporate defendants because service in New

York was "a transparent attempt to circumvent the Hague Convention"); In re Perrier Bottled

Water Litig., 138 F.R.D. 348, 356 (D. Conn. 1991) (granting motion for protective order and

ordering plaintiff to employ Hague Convention procedures to pursue discovery of materials in

France); cf. Buttita v. Asbestos Corp., No. A-6101-04T1, 2006 WL 2355200, at *14, 21 (N.J.

Super. App. Div. Aug. 16, 2006) (remanding issue of whether to uphold defendant's discovery

objections under Quebec law and instructing trial court that "[e]ven if a consideration and

weighing of [comity] factors results in a conclusion that [the defendant] must comply with the

discovery demand, on remand the trial court must also consider whether less severe methods of

compliance are available").[22]

---

[22] As discussed above, the Court should reject plaintiffs' depiction of this civil lawsuit as part and parcel of the nation's antiterrorism efforts. However, if the Court accepts plaintiffs' claim to be acting as enforcers of U.S. antiterrorism laws, it is notable that the Criminal Resource Manual provided to U.S. Attorneys provides that "[l]etters rogatory are the customary method of obtaining assistance from abroad in the absence of a treaty or executive agreement." U.S. Attorney's Manual, Title 9, Criminal Resource Manual § 275 (Oct. 1997). Plaintiffs, as self-anointed "private attorneys general," should at the very least be expected to employ a procedural process that is the "customary method" used by attorneys for the U.S. government.

Reliance on letters of request is particularly appropriate in this case because the parties are still in the earliest stage of discovery[23] and plaintiffs have made <u>no effort whatsoever</u> to employ alternative means to obtain their requested documents and information.  The Court should not allow plaintiffs to obtain an advantage in this lawsuit because of NatWest's reluctance to violate governing English law.  For this additional reason, the Court should order plaintiffs to obtain their requested discovery by employing letters of request under the Hague Convention.

Finally, in the unlikely event that letters of request prove unsuccessful in producing the discovery sought by plaintiffs, the Court would retain the authority to order production of the requested material under federal discovery rules.  <u>See</u> <u>In re Perrier</u>, 138 F.R.D. at 356 (ordering use of Hague Convention procedures in first instance and noting that "[s]hould these procedures prove unavailing," court would consider ordering production pursuant to federal discovery rules) (citing <u>Aérospatiale</u>, 482 U.S. at 539-40).

### POINT IV

### PLAINTIFFS' PROPOSED RELIEF IS INAPPROPRIATE AND OVERBROAD

Even if the Court declines to excuse NatWest's compliance with plaintiffs' discovery requests, it should not grant the inappropriate and overbroad relief that plaintiffs seek.

Plaintiffs request that the Court enter an order deeming the leaked documents authenticated and admitted.  <u>See</u> Pls.' Br. at 28-29 & Pls.' Proposed Production Order.  In support of this request, they cite to the Restatement (Third) on Foreign Relations Law § 442(1)(b), which provides that the "failure to comply with an order to produce information may subject the person to whom the order is directed to sanctions . . . ." and <u>General Atomic</u>, 90

---

[23] Thus far, the parties have served only one set of discovery requests on each other, and only one deposition, of a plaintiff in precarious health as a result of his injuries, has occurred.

F.R.D. at 307-09, where the court sanctioned a party that failed to comply with discovery orders and that was found to have engaged in a deliberate strategy of concealing documents. These authorities are, of course, entirely consistent with Fed. R. Civ. P. 37(b)(2), which authorizes a court's imposition of sanctions against a party who "fails to obey an order to provide or permit discovery." But in this case the Court has not entered any order directing NatWest to answer the requests for admissions and NatWest has raised its secrecy objections in good faith. Accordingly, there is no basis for the Court to impose sanctions, including "deemed" admissions, on NatWest, at this stage in the proceedings.

Plaintiffs also request that the Court direct NatWest to "answer Plaintiffs' pending discovery requests that it has refused to answer based on assertions of British secrecy laws" and "to produce all documents sought by Plaintiffs in their First Request for the Production of Documents." Pls.' Proposed Production Order. However, NatWest has asserted objections other than English bank customer secrecy (including that plaintiffs' requests are overly broad and unduly burdensome) as well as the normal privileges (including attorney-client and attorney work product privileges) that serve as additional bases for withholding certain of the materials that plaintiffs seek. See NatWest's Document Responses; NatWest's Requests For Admissions Responses. These objections are not the subject of the pending motion practice, and will be dealt with in the normal course among counsel, hopefully without the need for any motion practice, after the threshold issues of bank secrecy have been resolved by the Court. It is therefore utterly improper, and a further example of gross over-reaching, for plaintiffs to try to "sneak in" an order that would in effect overrule all of these other objections as part of the present motion.

28

## CONCLUSION

For the reasons discussed above, the Court should deny plaintiffs' motion.

Dated: New York, New York
      November 16, 2006

Respectfully submitted,

CLEARY GOTTLIEB STEEN & HAMILTON LLP

By:_____
    Jonathan I. Blackman (JB 3846)
    Lawrence B. Friedman (LF 9978)
    Members of the Firm

    One Liberty Plaza
    New York, New York 10006
    (212) 225-2000

    Attorneys for Defendant
    National Westminster Bank Plc

Of Counsel:

    Sanjay S. Mody
    Kirsten O'Connell