**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

```
------------------------------------------------------ x
```
TZVI WEISS, *et al.*,                    :
                                         :
                        Plaintiffs,      :
                                         :
            -against-                    :    CV 05-4622 (CPS) (KAM)
                                         :
NATIONAL WESTMINSTER, PLC,               :
                                         :
                        Defendant.       :
```
------------------------------------------------------ x
```

## ENGLISH LAW DECISIONS CITED IN EXPERT
## DECLARATION OF CHARLES SIMON HOLLANDER

CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
(212) 225-2000
Attorneys for Defendant
National Westminster Bank Plc

Of Counsel:

Jonathan I. Blackman
Lawrence B. Friedman
Sanjay S. Mody
Kirsten L. O'Connell

## INDEX OF ENGLISH LAW DECISIONS CITED IN
## EXPERT DECLARATION OF CHARLES SIMON HOLLANDER

1.   FDC Co. Ltd. v. Chase Manhattan Bank NA,
     1984 unreported Hong Kong CA

2.   Lipkin Gorman v. Karpnale Ltd.,
     1989 1 WLR 1340

3.   MacKinnon v. Donaldson Lufkin & Jenrette Securities,
     1986 Ch 482

4.   R. v. Grossman,
     1981 73 Cr App R 302

5.   Science Research Council v. Nasse,
     1980 AC 1028

6.   Tournier v. National Provinical and Union Bank of England,
     1924 1 KB 461

7.   Wallace Smith Trust v. Deloitte Haskins & Sells,
     1997 1 WLR 257

8.   X AG v. A Bank,
     1983 2 All ER 464

1



# Court of Appeal of Hong Kong

[Index] [Search] [MS-Word format] [Corrigendum] [Context] [Help]

CACV000131/1984

IN THE COURT OF APPEAL

1984, Nos. 65 and 131

(Civil)

1984, No. 65

BETWEEN

**F.D C. CO. LTD.**      Plaintiffs (Respondents)

VANGUARD INPERNATIONAL MANUFACTURING LTD. INC.

GARPEG LTD.

and

THE **CHASE MANHATTAN** BANK, N. A.      Defendant (Appellant)

-----------------

1984, No. 131

BETWEEN

**F.D C.CO. LTD.**      Plaintiffs (Respondents)

and

## THE ✦CHASE ✦ ✦ MANHATTAN✦ BANK, N.A.

Defendant
(Appellant)

------------------

Coram: Sir Alan Huggins, V.-P., Yang & Silke, JJ.A.

Date of hearing: 24th-27th September, 1984.

Date of hearing: 17th October 1984.

---

## JUDGMENT

---

Sir Alan Huggins, V.-P.:

The plaintiff Companies brought actions in which the principal relief sought was an injunction to restrain the defendant Bank from disclosing details of their accounts with the Bank. They then applied for, and obtained from the judge in chambers, interim injunctions to restrain disclosure pending trial. It was against those interim injunctions that the Bank appealed. By consent of the parties this court has agreed that

"1. The hearings of the motions for an interlocutory injunction and for an order discharging that injunction before Clough J. be treated as having been the trial of the action.

2. The affidavits sworn on the motions be treated as evidence given at the trial and the interlocutory injunction granted by the judge be treated as a final injunction made at trial. "

Two of the Plaintiffs are companies incorporated in Hong Kong and the third is a company registered in Panama.

The Bank has its head office in the United States of America and maintains local branches in Hong Kong.

Case 1:05-cv-04622-DLI-RML    Document 83-4    Filed 12/18/06    Page 6 of 140    PageID #: 1622

Each of the Plaintiffs opened one or more accounts with the bank in Hong Kong. The particulars of those accounts are not material. It is alleged by the Plaintiffs that, by virtue of the relationships of customer and banker which exist between them and the Bank, the Bank

> " owes the Plaintiff/s/ duty of secrecy and confidence in respect of /the accounts/, or transactions thereto, or securities in respect thereof and all documents and information arising therefrom or relating thereto".

The proceedings arose in this way. The Internal Revenue Service of the United States Government is investigating the tax liability of a Mr. Aldo Gucci and of Gucci Shops Incorporated. The investigators suspect that those persons are in some way unlawfully evading the payment of tax and that inspection of the accounts of the Plaintiffs would assist the investigation. Proceedings under the relevant United States legislation were therefore taken against the Bank, those proceedings being served upon the head office. As a result the Bank was ordered to disclose the Plaintiffs' accounts and, upon its declining to do so, has in respect of two of the Plaintiffs been ordered to pay daily fines until compliance. When the Plaintiffs first heard of the proceedings in the United States, they wrote to the Bank and sought an undertaking that there would be no disclosure. The Bank replied that it was defending the proceedings in the United States and that for the present it did not intend to produce the records demanded. However, the Bank was not prepared to give an undertaking the observance of which might constitute a breach of the United States' law. It was upon receipt of this refusal that the actions were commenced in Hong Kong.

It is not in dispute that the first and fundamental issue to be decided is as to the terms of the several agreements between the Plaintiffs and the Bank. As is usual when a company opens a bank account, the Plaintiffs passed in respect of each account a resolution in a form prescribed by the Bank. This form was designed merely to set out the authority of the Bank to act upon instructions purporting to emanate from the customer: the parties did not otherwise expressly agree any of the terms upon which they were contracting. For such terms one has to inquire what terms are implied by the domestic law of Hong Kong, it being an agreed fact that the contracts are governed by Hong Kong law. It is common ground that the terms include one imposing an obligation of secrecy upon the Bank, but it is the extent of that obligation which is in issue.

On behalf of the Plaintiffs Mr. Hoffman has placed great emphasis on the distinction which was drawn in two cases in the House of Lords between terms which are implied in all contracts between persons entering into a special relationship such as that of banker and customer and those which are implied in a particular contract in order to give it business efficacy. The first of these cases was <u>Lister</u> v <u>Romford Ice & Cold Storage Co. Ltd.</u> 1957 A.C. 555, where one of the issues was whether in a contract of employment between a lorry driver and his master there was an implied term that the driver would be entitled to be indemnified by his master in respect of damages payable by the driver as a result of his negligence where his master was in fact insured or was required by law to be issued or where, as a reasonable and prudent person, his master ought to have been insured. It was held that no such term should be implied. In the course of his speech Lord Simonds said at P. 576:

> "
> ... the real question becomes, not what terms can be implied in a contract between two individuals who are assumed to be making a bargain in regard to a particular transaction or course of business; we have to take a wide view, for we are concerned with a general question, which, if not correctly described as a question of status, yet can only be answered by considering the relation in which the

drivers of motor-vehicles and their employers generally stand to each other. Just as the duty of care, rightly regarded as a contractual obligation, is imposed on the servant, or the duty not to disclose confidential information (see Robb v Green 1895 2 Q.B. 315; 11 T.L.R.), or the duty not to betray secret processes (see Amber Size and Chemical Co. Ltd. v Menzel 1913 2 Ch.239; 29 T.L.R. 590), just as the duty is imposed on the master not to require his servant to do any illegal act, just so the question must be asked and answered whether in the world in which we live today it is a necessary condition of the relation of master and man that the master should, to use a broad colloquialism, look after the whole matter of insurance. If I were to try to apply the familiar tests where the question is whether a term should be implied in a particular contract in order to give it what is called business efficacy, I should lose myself in the attempt to formulate it with the necessary precision. The necessarily vague evidence given by the parties and the fact that the action is brought without the assent of the employers shows at least ex post facto how they regarded the position. But this is not conclusive; for, as I have said, the solution of the problem does not rest on the implication of a term in a particular contract of service but upon more general considerations. "

.

Lord Tucker expressed the same view in these words at p. 594:

"Some contractual terms may be implied by general rules of law. These general rules, some of which are now statutory, for example, Sale of Goods Act, Bills of Exchange Act, etc., derive in the main from the common law by which they have become attached in the course of time to certain classes of contractual relationships, for example, landlord and tenant, innkeeper and guest, contracts of guarantee and contracts of personal service. Contrasted with such cases as these there are those in which from their particular circumstances it is necessary to imply a term to give efficacy to the contract and make it a workable agreement in such manner as the parties would clearly have done if they had applied their minds to the contingency which has arisen. These are the 'officious bystander' type of case, to use Mackinnon L.J.'s well-known words. I do not think the present case really comes in that category, it seems to me to fall rather within the first class referred to above."

In Liverpool City Council v Irwin 1977 A C. 239 it was decided that in contracts of tenancy relating to flats there was, in the absence of express provision, an implied term that the landlord would take reasonable care to keep essential means of access in reasonable repair and usability and that this applied to local authority lettings.

Mr. Saville argues that this is a very different approach from that adopted in the leading case on the obligation of secrecy imposed on a banker, Tournier v National provincial and Union Bank of England 1924 1 K.B. 461. The plaintiff, a customer of the defendant bank, received a cheque drawn in his favour by another customer of the same bank. Instead of having it credited to his own account the plaintiff endorsed it to a third person, who paid it into his account with another bank. The plaintiff's account was overdrawn and, when the cheque was returned to the defendant bank, the manager inquired of the third person's bank who the third person was. He was told that the cheque had been paid to a book-maker, and this information was disclosed to the plaintiff's employers. The question was whether the defendant bank was in breach of its implied obligation of secrecy. All the Lords Justices were of opinion that it was an implied term of a contract between a banker and his customer that the bank would not divulge to third persons either the state of the customer's account or any of his transactions with the bank or any information relating to the customer acquired through the keeping of his account unless (1) the disclosure was under compulsion of law, (2) there was a public duty to disclose, (3) the interests of the bank required disclosure or (4) disclosure was

made by the express or implied consent of the customer. The majority held that there had been a breach of the defendant's obligation vis-à-vis the plaintiff, whilst Lord Justice Scrutton thought the only breach was vis-à-vis the drawer of the cheque. However it should be noted that Lord Justice Bankes at p. 473 said that it was not possible to frame any exhaustive definition of the duty and warned of the necessity for caution in speaking on a question upon which there had previously been no authority. Therefore' he confined his observations to the facts of the particular case. Lord Justice Atkin at p. 486 also spoke of the difficulty of hitting upon a formula which would define the maximum of the obligation which had necessarily to be implied. He expressed the obligation not to disclose without the customer's consent as being

> " subject to the qualification that the bank have the right to disclose such information when, and to the extent to which it is reasonably necessary for the protection of the bank's interests, either as against their customer or as against third parties in respect of transactions of the bank for or with their customer, or for protecting the bank, or persons interested, or the public, against fraud or crime."

He expressly refrained from giving any final opinion on the practice of bankers to give one another information as to the affairs of their respective customers, "except to say ... that if it is justified it must be upon the basis of an implied consent of the customer". Nevertheless his reference to the practice of bankers seems to me a clear indication that the Lord Justice thought such practice was a material consideration and that could only be on the basis that the parties to a banking contract were assumed to know the practice of bankers and would be assumed to have agreed to be contracting subject to that practice in the absence of express provision to the contrary. As it seems to me there is no material distinction between Tournier v National Provincial and Union Bank of England and the later cases, and where one is considering the implication of a term into a contract the basic element is always that the parties must necessarily be presumed to have intended to contract on the basis of the suggested term. That element will be present both where the term is necessary in order to give the contract business efficacy and also where there is some established practice which a person entering into that type of contract is presumed to accept.

In Tournier's Case the English Court of Appeal indicated four qualifications to an otherwise absolute obligation of secrecy. Although Mr. Saville contends that the Plaintiffs are seeking to widen the ambit of the resulting obligation, as it seems to me his argument seeks to narrow it. It does so by construing the first qualification (disclosure under compulsion of law) as including an order of a foreign court to produce documents which are in Hong Kong. Such a construction was never within the contemplation of the judges in Tournier's Case and in my view a term so construed would not be reasonable. The Plaintiffs contracted with the Bank in Hong Kong and it was intended by both sides that the accounts would be kept in Hong Kong. I adopt the view of the English Court of Appeal in Reg. v Grossman (1981) 73 Cr. App. R. 302 and conclude that the Hong Kong Branch of the Bank should for present purposes be considered as a different entity separate from the head office in New York. Anyone opening an account in Hong Kong would anticipate that in the ordinary course of business the records containing the details of that account would be kept entirely within the office or branch at which the account was opened. Nevertheless, he would recognize that there might be circumstances (for example a special investigation into a suspected fraud) in which the ordinary course of business would be extended and require that such details be sent to another office of the same bank. If the bank were a foreign bank, that might even involve sending the details out of the Colony, but, as it seems to me, that is the only relevance of the fact that the defendant Bank here has its head office in the United States of America. Clearly the obligation of secrecy is not subject to territorial limits, thus permitting the Bank to publish the Plaintiffs' accounts anywhere but in Hong Kong. Had the Bank in the ordinary course of business sent details of the Plaintiffs' accounts to its head office in the United States of America the Bank could not properly have volunteered information about the accounts to the United States Government, but Mr. Hoffman concedes that he would then not have been able properly to ask the courts of Hong Kong to restrain production in New York in the face of the orders for production made by the United States' courts. As things are, the information is not in the

United States of America and it is not suggested that the information is needed in the United States of America in the ordinary course of banking business: it is required by the head office solely for the purpose of its being disclosed to the United States' Government.


Mr. Saville's argument involves the contention that, by sending details of the Plaintiffs' accounts to the head office, the Hong Kong Branch would not be disclosing the information to a third person and that there would therefore be no breach in Hong Kong of the duty of secrecy which could properly be restrained by an injunction of the Hong Kong courts. Although that argument has a superficial attraction, I do not think it can be right. I think it would be closing our eyes to the reality of the situation to allow the Bank to make an internal transfer of information which it would not make in the ordinary course of banking business when that transfer is designed for no other purpose than to bring the information within the jurisdiction of the foreign court. Although the orders of the United States' courts are in fact addressed to the Bank in New York, they are aimed unashamedly at information which is within the jurisdiction of the Hong Kong courts and they are therefore intended to have extra-territorial effect. That is the basis of the Attorney General's intervention in the proceedings in the United states' of America, where he has indicated that there are alternative procedures which would be open to the United States' Government and which would not infringe the sovereignty of the Crown in right of Hong Kong. Mr. Saville argues that orders are commonly made for discovery of documents lying within other jurisdictions, but that is a very different thing from ordering production. The Hong Kong courts could enjoin the Bank against disclosing the information to the United States' Government in Hong Kong and I am satisfied that they can restrain a transfer which is nothing more nor less than a device to avoid the enforcement in Hong Kong of the orders of a foreign court.


It is then argued that in the exercise of our discretion we ought not to issue an injunction which would place the Bank in the appalling situation that, if it obeyed the injunction, it would be in breach of orders of the courts of its own country. I am not unsympathetic to the difficulty in which the Bank finds itself, but the question is whether we are to treat that difficulty as an overriding factor. In so saying I do not overlook the contention of Mr. Hoffman that in the end the difficulty will be found to be more apparent than real because the existing orders of the United States' courts (which are under appeal) will be held to have been wrongly made. For my part I am not willing to embark upon a review of the judgments upon which those orders are founded: there is before us evidence of the United States' law which is inconsistent with those judgments, but arguments which might carry weight with me might be viewed differently by the United States' appellate courts. I am content to proceed on the assumption that the judgments are as correct as they are presently binding. At the same time we are not bound to hold back from enforcing the law of Hong Kong at the dictate of a foreign power: see British Mylon Spinners Ltd. v Imperial Chemical Industries Ltd. 1953 Ch. 19, 27. Like Lord Evershed, M.R. I do not conceive that I am offending in any way the principles of comity which apply between the two countries. All persons opening accounts with banks in Hong Kong, whether local or foreign banks, are entitled to look to the Hong Kong courts to enforce any obligation of secrecy which, by the law of Hong Kong, is implied by virtue of the relationship of customer and banker. The obligation is implied for the very reason that it is fundamental to that relationship. Mr. Hoffman submits that on the principles stated in Doherty v Allman (1878) 3 A.C. 709 by lord Cairns, L.C. the plaintiffs are entitled as of right to an injunction. He said at p.720:


" If parties, for valuable consideration, with their eyes open, contract that a particular thing shall not be done, all that a Court of Equity has to do is to say, by way of injunction, that which the parties have already said by way of covenant, that the thing shall not be done; and in such case the injunction does nothing more than give the sanction of the process of the Court to that which already is the contract between the parties. It is not then a question of the balance of convenience or inconvenience, or of the amount of damage or of injury - it is the specific performance, by the Court, of that negative bargain which the parties have made, with their eyes open, between themselves. "

Mr. Saville replies that the undertaking to maintain secrecy is a positive covenant and not a negative covenant. The relevant term implied in a contract between banker and customer can be stated either as a positive covenant to maintain secrecy or as a negative covenant against disclosure. The effect is the same and the customer is entitled to the appropriate remedy, whether that be expressed as a mandatory injunction or as a restrictive injunction. In either case the injunction will usually be granted, even though no damage is shown, although in special circumstances the court may refuse an injunction and award damages in lieu under the power now granted to it by statute. That is in accordance with the previous Chancery practice stated by Lord Cairns, L.C. in Attorney General v. Mid-Kent Railway Co. & South Eastern Railway Co. (1867) L.R. 3 Ch. App. 100, 103:

> " It is true that in many cases where the injury has been trifling, where there has been improper delay, or where the injury is transitory, this Court has left the complainant to his remedy at law".

I accept that the court has to decide in the particular circumstances of this case whether the interest in preserving the confidence between the Bank and its customers "is outweighed by other interests to which the law attaches importance" : British Steel Corporation v Granada Television Ltd. 1981 A.C. 1096, 1169A. I am not persuaded that it is.

I would dismiss the appeal.

Yang, J.A.:

I too would dismiss the appeal for the reasons stated in the learned Vice President's judgment.

There are just three points I would like to add.

Firstly, I have no doubt that under the laws of Hong Kong all the banks carrying on their banking business in Hong Kong owe the same obligations to their customers irrespective of where their head offices happen to be. It cannot be the law that a bank with its head office in New York has a somewhat different relationship with its customers to that of a bank with its head office in say Paris or Tokyo, unless some specific agreement is otherwise reached between the two parties to govern their respective rights and obligations. A customer opening an account with any bank in Hong Kong is entitled to assume that the usual rules about confidentiality as stated in Tournier's Case apply. He might well have chosen to bank in Hong Kong rather than somewhere else because of the protection our banking law offers him by insisting that the bank should keep any information about him confidential. There is no reason for him to suspect that the extent of such confidentiality might vary from bank to bank depending on where its head office is located. What we are concerned with here is not, as Mr. Saville put it, the relationship between a foreign bank operating in Hong Kong and its customer. The relationship under consideration is between a bank registered in Hong Kong and a customer in Hong Kong, their relationship being governed by Hong Kong law.

Secondly, it is worth citing <u>Kleinwort, Sons & Co.</u> v. <u>Ungarische Baumwolle Industrie Aktiengesellschaft</u> (1939) 2 K.B. 678 where du Parcq L.J. said (at p. 699):

" I do not say for a moment that a sovereign State may not legislate to control the acts of its subjects beyond its borders. Of course it may. Nothing can prevent a sovereign State from so legislating, and it is a matter with which these Courts have no concern. But it is right that it should be understood that, if a sovereign State legislates so as to interfere with the acts of its subjects outside its own territory and, in a sense, its own jurisdiction, then it cannot expect - and I suppose that no State would expect - that the Courts of another country will enforce that legislation at the expense of their own laws. Primarily it is our business to see that English contracts are observed and carried out according to English law. "

Mr. Hoffman argues that our case is a dispute between Hong Kong courts and United States courts. With respect to him, I do not see the problem quite in that light. The question is simply one of applying our own law in our own courts.

Thirdly, the facts of R. v. Grossman (supra) are so apposite that it might be useful to refer to them at some length, though for the purpose of the, present case I need not go further than repeating the headnote of the report:

"

By section 7 of the Bankers' Books Evidence Act 1879: 'On an application of any party to legal proceedings a court or judge may order that such party be at liberty to inspect and take copies of any entries in a banker's book for any of the purposes of such proceedings. An order under this section may be made either with or without summoning the bank or any other party and shall be served on the bank three clear days before the same is to be obeyed, unless the court or judge otherwise directs. "

G was charged before a Welsh magistrates' court with offences involving tax evasion. The Revenue required evidence that G had deposited money with a company, J.B.K., with whom he had connections, in a Manx bank; S.I.B., which held a numbered account at a branch of an English bank in the Isle of Man. Accordingly, the Revenue applied for an order to inspect the relevant entries in the numbered account under section 7 of the Bankers' Books Evidence Act 1879. It was addressed to the London headquarters of the English bank and S.I.B. were informed of that fact. S.I.B. obtained an injunction in the Isle of Man restraining the English bank from disclosing or permitting inspection of the numbered account aforesaid. The Revenue then decided to apply to the English courts under the Act of 1879 to facilitate the proceedings in Wales and sought an order from an English High Court judge addressed to the English bank's London address. The application was made ex parte and the judge granted it, permitting thereby the inspection by the Revenue of the S.I.B. account relating to J.B.K.S.I.B. sought to set aside that order by applying for leave to be joined as a party to the proceedings and then appealed to the Court of Appeal to have the judge's order set aside.

F.D.C. CO. LTD. AND ANOTHER v THE CHASE MANHATTAN BANK, N.A. - [1984] HKCA 2 Page 9 of 16
Case 1:05-cv-04622-DLI-RML Document 85-4 Filed 12/18/06 Page 12 of 140 PageID #:
1628

Held, that in criminal matters an order can be made under section 7 of the Bankers' Books Evidence Act 1879 for inspection of the account of a bank's customer even though he is not a party to the proceedings; but only in exceptional circumstances. It was important that the Court should respect the confidence of a bank account and only if the public interest in helping the prosecution outweighed the private interest of confidentiality should inspection be ordered. In the instant case as the English bank's branch in the Isle of Man was subject to Manx law and regulations it was to be considered as a different entity from its headquarters branch in London; thus it should be considered as a foreign bank and, therefore, not subject to the Court's jurisdiction. Accordingly, the Court in its discretion, should not order the English bank's head office to produce the documents in question, although it could be done. The judge's order should be discharged. "

It is interesting to note how the English court viewed the English bank in the Isle of Man with its head office in London: a situation which might be compared with the position of Chase in Hong Kong with its head office in New York.

Silke, J.A.:

On the 28th January 1984 there were issued three writs with Statement of Claim endorsed. The first by **F.D.C.** Co. Ltd. - "**F.D.C.**" - the second by Garpeg Ltd. - "Garpeg" - and the third by Vanguard International Manufacturing Inc. - "Vanguard". I shall refer to these entities generally as "the companies". The defendant in each case was **Chase Manhattan** Bank N.A. - "Chase". Each sought, inter alia, injunctive relief.

The injunction sought was in these terms:

" An injunction to restrain the Defendant whether by itself, its servants or agents or otherwise howsoever from producing, passing or divulging or causing to produce, pass or divulge to the Head Office of or to any other office or branch of the Defendant out of the jurisdiction or to any person including but not limited to the CIR or the IRS of the United States Government or otherwise to remove or cause to be removed from the jurisdiction any document, record or information arising from or relating in any way whatsoever to the 1st and 2nd accounts or any of them maintained by the Defendant in the name the Plaintiff within the jurisdiction, any transactions thereon or connected therewith or any securities in respect thereof. "

On the 30th January 1984 **F.D.C.** and Garpeg filed summons seeking an interim injunction. On the 22nd February 1984 Vanguard filed a similar summons. Mayo, J. granted ex parte injunctions in favour of Garpeg and **F.D.C.** on the 30th January, and a further ex parte injunction in similar terms was obtained from Mayo, J. by Vanguard on the 14th February.

Garpeg and **F.D.C.** are both companies incorporated and having their registered office and place of business in Hong Kong. Vanguard is a company incorporated in Panama and having a registered office and its place of business in Hong Kong. All three are customers of Chase maintaining various accounts at a Hong Kong branch of that Bank. It is agreed that the banker customer contracts are governed by Hong Kong law.

The inter partes hearing took place before Clough, J., who made an order continuing the injunctions until the trial or further order on the 3rd April 1984. He gave his reserved reasons on the 24th April. Notice of Appeal against his orders was filed by Chase on the 17th April.

On the 30th July Chase, as the result of matters which had taken place in the United States and to which I shall refer in a moment, applied to Clough, J. for an order discharging the injunctions on the ground of change of circumstance. On the 7th August Clough, J. refused the application. A Notice of Appeal was filed on the same day against that refusal.

By consent before us, it was agreed:

(1) that the hearings of the motions for interlocutory 'injunction and for an order discharging that injunction before Clough, J. be treated as having been the trial of the action.

(2) The affidavits sworn on the motions be treated as evidence given at the trial and the interlocutory injunction granted by the Judge be treated as a final injunction made at trial.

This was an eminently sensible course in that there was no further evidence to be adduced and all relevant matters were before Clough, J. If we were to accede to the course agreed by Counsel, the delay which would be necessitated by a trial and possible subsequent appeal would be obviated. We agreed that we should take this course and that we should treat this Appeal as an appeal from a final order.

These proceedings stem from the investigations of the Internal Revenue Service of the United States - "I.R.S." - into the affairs of Gucci Shons Inc. and of Mr. Aldo Gucci. The I.R.S. claim that the three companies in Hong Kong are really the creature of Aldo Gucci and Gucci shops and that they have been used as conduits for income of the Gucci interests in order to evade United States tax liability. I do not think it necessary to go into the background of that belief in any detail.

Following on that belief and in order to further its investigations, the I.R.S. issued summons under the relevant United States legislation to Chase requiring it to produce bank records, documents and information relating to dealings with Gucci and Aldo Gucci. The summons covers such matters both in the possession of Chase in the United States and in Chase's possession in its Branches or Head Office in Hong Kong and relates directly to accounts maintained by the companies with Chase. The dates of those summonses were, in respect of Garpeg and

**F.D.C**., the 19th December 1983 and, of Vanguard, the 22nd August 1983.

The companies, becoming aware of the possibility of the issue of such summonses, wrote to Chase seeking an undertaking that Chase would not disclose any information to any agency or department of the United States Government relating to themselves or their accounts. In reply, Chase informed the companies that they had no present intention of producing any such records from Hong Kong but could not give an assurance that such records would not be produced in the future.

Proceedings for enforcement and matters ancillary thereto took a somewhat convoluted path before the United States Courts. It is normal procedure, when persons fail to comply with an I.R.S. summons of this nature, that the Attorney General of the United States makes application to a District Court, a Superior Court in the Federal System, for an order enforcing the summonses. Such proceedings were begun in the Second Circuit in the New York District Court. Both Chase and the companies intervened in those proceedings as they were entitled to do.

On the 27th March 1984 Goettel D.J. made an enforcement order in respect of the **F.D.C**. account. Chase has appealed this enforcement order.

On the 23rd March 1984 Sweet D.J. made a similar enforcement order in respect of the Garpeg account, cutting down to some extent the width of the I.R.S. summons. Both Garpeg and Chase have appealed against this order.

On the 6th July 1984 Sweet D.J. made an enforcement order in respect of the Vanguard accounts. That order has also been appealed by both Chase and Vanguard.

On the 7th June 1984, subsequent to the inter partes hearing on the interlocutory injunctions in Hong Kong, the Attorney General of the United States filed motions for contempt orders against Chase for its failure to comply with the enforcement orders as to the Garpeg and **F.D.C**. accounts.

On the 10th July 1984, after a contested inter partes hearing, Sweet D.J. adjudged Chase to be in contempt on the Garpeg account summons and fined Chase the sum of US$10,000 per day. The order as to the fine has been stayed. It was this contempt order which led to the application by Chase before Clough, J. to discharge the injunctions.

On the 16th August 1984, again after a contested inter partes hearing, Goettel D.J. adjudged Chase in contempt for non-compliance with the **F.D.C**. summons and imposed upon Chase a fine of US$5,000 per day. Again, the order has been stayed.

Case 1:05-cv-04622-DLI-RML Document 83-4 Filed 12/18/06 Page 15 of 140 PageID #: 1631

All the several appeals in the United States are pending and it is worthy of comment that the Crown, with the consent of all parties, has submitted an amicus curiae brief and it will seek to be represnted before the United States Courts at the hearing of the consolidated appeals that is the consolidated appeal against the Garpeg and **F.D.C**. enforcement orders.

The enforcement orders made by the United States District Court are final and conclusive orders. They can only be altered by an Appellate Court. The contempt orders are also final and conclusive though they also may be altered upon appeal.

It will be seen from this brief resume of matters which occurred prior to the hearing of this Appeal that Chase are in a very difficult position. They are caught between the upper millstone of the injunctive orders made in Hong Kong and the nether one of the orders made in their jurisdiction of domicile. They have involved themselves, and very properly so, in the proceedings both in these Courts and in the foreign Court. They have undoubtedly incurred considerable expenses in so doing.

The issue here is the scope of the implied contract of confidentiality existing as between a banker and a customer. It is not contested that such a term is implicit in the relationship of banker and customer and that must be so.

Chase, represented by Mr. Saville, Q.C. with him Mr. Ribeiro, contends that there could never have been in the contemplation of the parties at the time when they entered into the relationship which exists between them a term so wide so that it would extend confidentiality to documents in the possession of a United States bank in defiance of an order of a United. States Court.

Mr. Saville has, in a very interesting argument, submitted that the test to be applied as to the existence and scope of such an implied term is the specific one - necessity. He further submits that even if the term is as wide as that sought by the companies, then the performance by Chase of its obligation has in the United States become unlawful and the Bank is thus excused. If we are against him on his general propositions he advances the further argument that the scope of the injunction sought should be narrowed and, further, that in any event this is not a suitable case for the Court to give injunctive relief to the companies.

Mr. Hoffman, Q.C., with him Mr. Tong, who represents the companies, argues for a general, not a specific, test of that which is the scope of the implied term - the distinction being between a specific term which the Court must be satisfied was necessarily within the contemplation and intention of the parties at the time of their entry into the contract as contrasted with a general implied term which is a part of the general law and may or may not be necessarily have been in contemplation. I accept that where such distinction is made different principles apply as to the test of the existence of such a term.

Generally, on an implied term, we have been referred by Counsel to Tournier v. National Provincial and Union Bank of England[1] which is the locus classicus on the matter. It is only necessary for me to refer to that portion of the headnote at page 461 which says:

" It is an implied term of the contract between a banker and his customer that the banker will not divulge to third persons without the consent of the customer express or implied, either the state of the customer's account, or any of his transactions with the bank, or any information relating to the customer acquired through the keeping of his account, unless the banker is compelled to do so by order of a Court, or the circumstances give rise to a public duty of disclosure, or the protection of the banker's own interests requires it. "

And, further, to that which Bankes, L.J. said at page 471:

" At the present day I think it may be asserted with confidence that the duty is a legal one arising out of contract, and that the duty is not absolute but qualified. It is not possible to frame any exhaustive definition of the duty. The most that can be done is to classify the qualification, and to indicate its limits. "

That succinctly expresses the position.

Mr. Saville has laid great stress upon the actions of the United States Courts and the effect of those actions upon the United States national - Chase being an American bank and domiciled in that country.

The Second Circuit District Court in New York saw fit to make the orders they did in full knowledge of the Hong Kong proceedings and certainly, in the contempt hearings, with knowledge of the judgment of Clough, J. I would expressly refrain from entering into that which was graphically described by Mr. Hoffman as "a game of judicial chicken" as between these Courts and the Courts of a foreign jurisdiction. It would be for the United States Courts to take whatever measures they think fit to grant relief to their own national in their own courts. I think it would be quite wrong for us to seek to in any way interfere with their jurisdiction.

I would make but this one comment. It seems a little strange (a)  in the light of the evidence as to foreign law before us and of the law to which Leggatt, J. made reference in X AG v. A Bank[2]; (b)  in the light of the Restatement cited by Sweet D.J. in his Opinion in the contempt proceedings which reads:

"Section 420(2)-

If disclosure of information located outside the United States it is prohibited by a law or regulation of the State in which the information or prospective witness is located

(a)  the person to whom the order is directed may be required by the court to make a good faith effort to secure permission from the foreign authorities to make this information available;

(b)  the court may not ordinarily impose the sanction of contempt, dismissal or default on the party that has failed to comply with the order for production, except in cases of deliberate concealment or removal of information or of failure to make a good faith effort in accordance with paragraph

(a) ......... "

(Restatement (proposed) of Foreign Relations Law of the United States (Revised)(Tent. Draft No. 3, March 15, 1982))

adopted or not by the Second Circuit; (c) in the light of the decision of the United States Supreme Court in Society Internationale Pour Participations Industrielles et Commerciales, S.A. v. Rogers[3], that Sweet D.J. should, in the contempt proceedings, have held that because "foreign compulsion" and "good faith" had been raised in the. course of the enforcement proceedings, they were not therefore available to chase as a defence in the contempt proceedings.

Whether the United States Courts do or do not wish to place that which appears to be an intolerable burden on an American bank operating outside the confines of the United States is of course entirely a matter for those Courts.

It seems to me that our considerations here are in the context of a banker customer relationship existing in Hong Kong between customers in Hong Kong and a bank in Hong Kong. This is the relevant matter for the purposes of the Laws of Hong Kong and that compendious description I include that which is the basis of all law, the Common Law, and such statutes as may exist. Chase is, in this context, a Hong Kong bank.

If the documents, the production of which is now sought by the I.R.S., not from the taxpayer being investigated but from third parties, had already been within the jurisdiction of the American courts then the position might very well be different. But we are called upon to make a decision in the context of the facts as they now exist. The documents are in Hong Kong and have been here prior to the institution of these proceedings. Whether one tests the implied term by the specific test of Mr. Saville or the general test of Mr. Hoffman, in my judgment that confidentiality which would have been, and indeed must have been, in the contemplation of the parties at the time when they entered into this contract would have been a non-disclosure to third parties in and out of Hong Kong unless one of the exceptions in Tournier[1] applied.

F.D.C. CO. LTD AND ANOTHER v. THE CHASE MANHATTAN BANK, N.A. [1984] HKC · Page 15 of 16
Case 2:05-cv-04622-DLR-RME Document 69-4 Filed 12/18/06 Page 18 of 140 PageID #:
1634

Mr. Saville has said that the "legal compulsion" exception is the compulsion of American law - the domiciliary law - which would excuse chase's compliance with its implied contractual obligations. It is also his contention, though not made with the same strength, that the interests of the Bank necessitate disclosure.

On the first point, it is implicit in the judgment of my Lord Vice-President that compulsion of law does, and in particular in the circumstances here must, relate to the compulsion of Hong Kong law and I agree. While I fully accept that the financial implication of this and of the foreign proceedings, on the face of it, would suggest that it would be in the interests of the Bank to disclose and therefore to excuse them under a <u>Tournier</u>[1] exception from the performance of their obligation, I do not read that exception to be in reality such cover. It must mean in the interests of ordinary banking practice, such as when they find it necessary to sue upon an overdraft or matters of that kind. The issues here are very much wider than those narrow interests of the Bank as I see them to be.

We are not directly concerned and I do not intend to deal with the issue of the enforcement of foreign revenue proceedings in this jurisdiction. There might well be further argument on this aspect in other applications and it might well be that such enforcement could be a complete bar. But that is by the way.

In <u>Tournier</u>[1], Scrutton, L.J. at page 480 referred to <u>In re Comptoir Commercial Anversois and Power</u>[4], a decision upon which Mr. Saville relies, and said of it:

" The contract is alleged in the claim as 'implied', and according to the decision of this court in <u>In Re re Comptoir Commercial Anversois and Power</u>, implied terms are a question of law for the court, the jury finding such facts as are necessary or material to enable the Court to judge of the implication. The Court will only imply terms which must necessarily have been in the contemplation of the parties in making the contract. Applying this principle to such knowledge of life as a judge is allowed to have, I have no doubt that it is an implied term of a banker's contract with his customer that the banker shall not disclose the account, or transactions relating thereto, of his customer except in certain circumstances. "

I have no doubt at all that in the circumstances of this case such an implied term as I have indicated necessarily exists and I do not think there are any circumstances on the evidence before us which would dilute it. I equally have no doubt that the terms of the injunction sought are not too wide. For to allow chase now to transfer any of the records or documents sought by the Internal Revenue Service to their Headquarters in the United States whether in the course of normal banking practice or not, would be to violate the confidentiality which exists as between Chase in Hong Kong and its customers in Hong Kong.

Hong Kong law is the lex loci solutionis. The performance of its contract by chase is in Hong Kong. There is no order in Hong Kong compelling disclosure, indeed quite to the contrary.

Case 1:05-cv-04022-DLI-RML    Document 85-4    Filed 12/18/06    Page 19 of 140 PageID #:
1635

I am in respectful agreement with the order proposed by my Lord Vice President. I too would dismiss the appeals.

17th October 1984

1)    [1924] 1 K. B. 461

(2)    [1983] 2 All E.R. 464

(3)    357 U.S. 197, 212 (1958)

(4)    [1920] 1 K.B. 868

Representation:

2

25 of 25 DOCUMENTS

Lipkin Gorman (a firm) v Karpnale Ltd and another

COURT OF APPEAL, CIVIL DIVISION

*[1992] 4 All ER 409, [1989] 1 WLR 1340*

**HEARING-DATES: 21, 22, 23, 24, 27, 28, 29, 30 JUNE, 1, 4, 5, 6, 7 JULY, 13 OCTOBER 1988**

13 OCTOBER 1988

## CATCHWORDS:

Gaming - Club - Stolen money - Purchase of gaming chips with stolen money - Whether exchange of cash for gaming chips valuable consideration - Whether owner of stolen money lost by thief in gambling having right to recover from gaming club where money lost by thief - Whether money had and received by gaming club under a void contract Gaming Act - 1845, s 18.

Bank - Banker/client relationship - Duty of bank - Execution of customer's orders - Drawing and payment of customer's cheques - Bank's duty to exercise reasonable skill and care - Duty of paying banker to honour customer's cheques in accordance with customer's mandate - Partner in solicitors' firm dishonestly obtaining money from firm's clients' account to finance gambling - Account operated dishonestly - Bank aware that partner gambling heavily but not that he was dishonestly obtaining money from firm's clients' account - Whether bank negligent and liable for breach of contract in continuing to pay cheques without inquiry - Whether reasonable banker would have had reasonable grounds for believing account being operated dishonestly.

Bill of exchange - Holder in due course - Holder taking in good faith with no notice of defect in title - Gaming club - Club accepting banker's draft drawn in favour of firm of solicitors - Whether club ought to have been put on notice of possible defect in title - Whether club liable for conversion of draft - Bills of Exchange Act 1882, s 29(1)(b).

## HEADNOTE:

C, a partner in the plaintiff firm of solicitors, was a compulsive gambler who regularly and frequently gambled at a casino run by the first defendants (the club). Gaming at the club was conducted by way of chips of various marked denominations which could be obtained in exchange for cash and then used at the gaming table. The chips could also be used at the club to buy refreshments and were redeemed by the club at their face value when presented. In order to finance his gambling C resorted to drawing cheques on the firm's clients' account, which was held at the same branch of the second defendants (the bank) as his personal account. As a partner C had authority to draw cheques on the clients' account on his signature alone. By the time C's theft from the clients' account was discovered almost £ 223,000 was missing, most of it having been lost by C at the club. C's principal method of obtaining money from the firm's clients' account was to persuade the firm's cashier, whom he had suborned, to make out a cheque payable to cash drawn on the clients' account, which C then signed. The cashier would then cash the cheque and hand the money to C, who then changed the money for gaming chips at the club. C also drew cheques on the clients' account in favour of a building society account operated by him and in one instance procured the issue of a banker's draft for £ 3,735 in favour of the firm by issuing a cheque in favour of the bank drawn on the clients' account. He then presented the draft to the club, which accepted it. The bank's branch manager was aware that C was cashing cheques at a casino and although he discussed with C the bank's concern about C's gambling he did not pass on his knowledge of C's gambling to the firm's partners. On discovering C's fraud the plaintiff firm brought an action against the club and the bank to recover the loss incurred by them, claiming against the club, inter alia, for money had and received under a contract which was void under s 18 [a] of the Gaming Act 1845, and against both the club and the bank for conversion of the banker's draft for £ 3,735 and as constructive trustees by being the knowing recipient of trust property in the case of the club and by rendering knowing assistance to a breach of trust in the case of the bank. The club contended that a contract for the sale of gaming chips was not caught by s 18 of the 1845 Act because it was a contract preparatory to gaming and not by way of

[1992] 4 All ER 409, [1989] 1 WLR 1340

gaming, that it was a holder in due course of the banker's draft for £ 3,735 under s 29(1)(b) [b] of the Bills of Exchange Act 1882 and was protected from liability in respect of the claim for conversion because it had taken the draft 'in good faith and for value, and ... at the time the bill was negotiated to [the club it] had no notice of any defect in the title of [C]', and that it was not liable as a constructive trustee because it had no knowledge that C was using funds misappropriated from the firm's clients' account to finance his gambling. The bank similarly contended that it had no knowledge that C was misappropriating funds from the firm's clients' account held by it to finance his gambling. The judge held (i) that the plaintiffs' claim against the club for money had and received under a void contract failed because, although a contract for the sale of gaming chips was rendered void by s 18 of the 1845 Act, the owner of money which had been stolen and then lost by the thief in gambling had no right to recover from the person to whom the thief had lost it, (ii) that the club could not claim to have become a holder of the draft in due course under s 29(1)(b) of the 1882 Act and was therefore liable for the value of the draft, (iii) that the club did not have constructive knowledge of C's misuse of trust funds, (iv) that the bank through their branch manager had constructive knowledge of C's misuse of trust funds, but (v) when the partners in the firm discovered that C was dishonestly operating the office account, that should have put them on notice of the possibility that C was also defrauding the clients' account and the bank was not liable for the trust funds gambled away by C after time. The solicitors appealed and the bank and the club cross-appealed.

  a  Section 18, so far as material. is set out at p 427 j to p 428 a, post

  b  Section 29(1), so far as material, provides: 'A holder in due course is a holder who has taken a bill, complete and regular on the face of it, under the following conditions; namely ... (b) That he took the bill in good faith and for value, and that at the time the bill was negotiated to him he had no notice of any defect in the title of the person who negotiated it.'

  Held - (1) (Nicholls LJ dissenting) Although the transaction by which the club exchanged a gambler's money for chips was a contract since (per May LJ) the club gave valuable consideration for the gambler's money when it issued him with chips to enable him to gamble and undertook to cash the chips and (per Parker LJ) the contract by the club to pay cash for gaming chips was consideration for the payment of cash by the gambler for the use of the chips, the transaction encompassing the exchange of money for chips was separate and distinct from the subsequent gaming which was enabled to take place by the transaction and was therefore not a contract by way of gaming or wagering which was void under s 18 of the 1845 Act. However, since the club had taken the cash in good faith, for valuable consideration and without notice that it had been stolen, the solicitors' claim against the club for money had and received failed and the solicitors' appeal against the dismissal of that claim would be dismissed (see p 415 d h j, p 428 h j, p 429 g, p 430 b c and p 433 d, post); Earl of Ellesmere v Wallace [1929] 2 Ch 1 applied; Clarke v Shee and Johnson (1774) 1 Cowp 197, Morgan v Ashcroft [1937] 3 All ER 92, Transvaal and Delagoa Bay Investment Co Ltd v Atkinson [1944] 1 All ER 579 and Hill v William Hill (Park Lane) Ltd [1949] 2 All ER 452 distinguished.

  (2) The bank could not be liable as a constructive trustee unless it was also liable for breach of contract since the bank's contractual duty to pay cheques signed in accordance with its mandate required the bank to perform that duty without negligence and if there was no negligence on the part of the bank it could not be liable as a constructive trustee. In so far as the solicitors had alleged and the judge had held that the branch manager and therefore the bank had constructive knowledge of C's misuse of trust funds because the manager had acted with want of probity either in ignoring the obvious source of C's funds for gambling or in wilfully and recklessly failing to make such inquiries as an honest and reasonable man would have made, that allegation had not been open to the solicitors on the pleadings and (Nicholls LJ dubitante) the judge's finding could not be upheld. Accordingly, the solicitors' claim against the bank for breach of contract or as a constructive trustee based on the manager's constructive knowledge failed. As regards the claim against the bank of breach of contract generally (Nicholls LJ concurring), the primary duty of a paying banker of a current account in credit was to honour its customer's instructions for payment of cheques in accordance with the customer's mandate but if a reasonable banker would have had reasonable grounds for believing that the account was being operated dishonestly a bank which continued to pay cheques without inquiry would be negligent and liable for breach of contract. On the facts, there was nothing in the way that C and and the firm's cashier had operated the clients' account which would have caused a reasonable banker to believe that there was possibly something wrong in the way the account was being operated. Furthermore, the branch manager would have been in breach of the bank's duty of confidentiality to C as a personal customer if he had informed the firm of his knowledge of C's gambling. Accordingly, the solicitors' claim against the bank for breach of contract generally failed and therefore the bank's appeal would be allowed (see p 418 b to d, p 421 d e h j, p 422 j to p 423 a e g h, p 424 b, p 425 d g, p 437 d e, p 439 b c, p 441 f g, p 443 c g h, p 444 d to f h, p 449 j and p 450 b g h, post); Tournier v National Provincial and Union Bank of England [1923] All ER Rep 550 and Barclays Bank plc v Quincecare Ltd (1988) [1992] 4 All ER 363 applied; dicta of Ungoed-Thomas J in Selangor United

[1992] 4 All ER 409, [1989] 1 WLR 1340

Rubber Estates Ltd v Cradock (a bankrupt) (No 3) [1968] 2 All ER 1073 at 1118 and of Brightman J in Karak Rubber Co Ltd v Burden (No 2) [1972] 1 All ER 1210 at 1231 doubted.

(3) The solicitors were entitled to succeed in their claim for conversion of the bank draft for £ 3,735 because they had had an immediate right to possession of the draft as soon as it was drawn and there was ample evidence that the claim did not come within s 29(1)(b) of the 1882 Act (see p 425 e to g, p 435 h to p 436 a and p 449 h j, post).

Decision of Alliott J [1992] 4 All ER 331 reversed in part.

## NOTES:

Notes

For gaming and wagering contracts, see 4 Halsbury's Laws (4th edn) paras 9, 17, and for cases on the subject, see 25 Digest (Reissue) 464-467, 4114-4131.

For void and illegal contracts, see 9 Halsbury's Laws (4th edn) para 420, and for cases on the subject, see 12(1) Digest (2nd reissue) 466, 3592-3593.

For a banker's duty when paying cheques, see 3(1) Halsbury's Laws (4th edn reissue) para 163, and for cases on the subject, see 3 Digest (Reissue) 614-631, 3885-3957.

For banker's drafts, see 3(1) Halsbury's Laws (4th edn reissue) para 227, and for cases on the subject, see 3 Digest (Reissue) 600, 3808-3809.

For the Gaming Act 1845, s 18, see 5 Halsbury's Statutes (4th edn) (1989 reissue) 13.

For the Bills of Exchange Act 1882, s 29, see ibid 351.

## CASES-REF-TO:

Cases referred to in judgments

Baden v Société Générale pour Favoriser le Développement du Commerce et de l'Industrie en France SA (1982) [1992] 4 All ER 161; on appeal (1985) [1992] 4 All ER 279n, [1985] CA Transcript 65.

Bank of New South Wales v Goulburn Valley Butter Co Pty Ltd [1902] AC 543, [1900-3] All ER Rep 935, PC.

Banque Belge pour l'Etranger v Hambrouck [1921] 1 KB 321, CA.

Barclays Bank plc v Quincecare Ltd (1988) [1992] 4 All ER 363.

Barnes v Addy (1874) LR 9 Ch App 244, LC and LJJ.

Belmont Finance Corp Ltd v Williams Furniture Ltd [1979] 1 All ER 118, [1979] Ch 250, [1978] 3 WLR 712, CA.

Bodenham v Hoskins (1852) 21 LJ Ch 864, [1843-60] All ER Rep 692; affd 2 De GM & G 903, 42 ER 1125, LJJ.

Bridger v Savage (1885) 15 QBD 363, [1881-5] All ER Rep 1065, CA.

Brownlow v Davis (1943) 69 Ga App 111, Ga Ct of Apps.

Carl-Zeiss-Stiftung v Herbert Smith & Co (a firm) (No 2) [1969] 2 All ER 367, [1969] 2 Ch 276, [1969] 2 WLR 427, CA.

Carpenters' Co v British Mutual Banking Co Ltd [1937] 3 All ER 811, [1938] 1 KB 511, CA.

CHT Ltd v Ward [1963] 3 All ER 835, [1965] 2 QB 63, [1963] 3 WLR 1071, CA.

Clarke v Shee and Johnson (1774) 1 Cowp 197, 98 ER 1041.

Commercial Banking Co of Sydney Ltd v Mann [1960] 3 All ER 482, [1961] AC 1, [1960] 3 WLR 726, PC.

Conway v Conway (1893) 4 Misc 312, NY Sup Ct.

Cundy v Lindsay (1878) 3 App Cas 459, [1874-80] All ER Rep 1149, HL.

Ellesmere (Earl) v Wallace [1929] 2 Ch 1, CA.

[1992] 4 All ER 409, [1989] 1 WLR 1340

Forsikringsaktieselskapet Vesta v Butcher [1988] 2 All ER 43, [1989] AC 852, [1988] 3 WLR 565, CA.

Golightly v Reynolds (1772) Lofft 88, 98 ER 547.

Gray v Johnston (1868) LR 3 HL 1.

Greenwood v Martins Bank Ltd [1933] AC 51, [1932] All ER Rep 318, HL.

Hill v William Hill (Park Lane) Ltd [1949] 2 All ER 452, [1949] AC 530, HL.

Karak Rubber Co Ltd v Burden (No 2) [1972] 1 All ER 1210, [1972] 1 WLR 602.

Keane v Robarts (1819) 4 Madd 332, 56 ER 728.

MacDonald v Green [1950] 2 All ER 1240, [1951] 1 KB 594, CA.

M'Queen v Great Western Rly Co (1875) LR 10 QB 569.

Marfani & Co Ltd v Midland Bank Ltd [1968] 2 All ER 573, [1968] 1 WLR 956, CA.

Miller v Race (1758) 1 Burr 452, 97 ER 398.

Morgan v Ashcroft [1937] 3 All ER 92, [1938] 1 KB 49, CA.

Nihill (a minor) v Nihill (1983) 134 NLJ 633, CA.

R v Crown Court at Knightsbridge, ex p Marcrest Properties Ltd [1983] 1 All ER 1148, [1983] 1 WLR 300, CA.

Selangor United Rubber Estates Ltd v Cradock (a bankrupt) (No 3) [1968] 2 All ER 1073, [1968] 1 WLR 1555.

Simpson v Brooks (1945) 208 Ark 1093, Ark SC.

Sinclair Houston Federal Credit Union v Hendricks (1954) 268 SW 2d 290, Tex Ct of Civil Apps.

Tai Hing Cotton Mill Ltd v Liu Chong Hing Bank Ltd [1985] 2 All ER 947, [1986] AC 80, [1985] 3 WLR 317, PC.

Tournier v National Provincial and Union Bank of England [1924] 1 KB 461, [1923] All ER Rep 550, CA.

Transvaal and Delagoa Bay Investment Co Ltd v Atkinson [1944] 1 All ER 579.

Union Bank of Australia Ltd v McClintock [1922] 1 AC 240, PC; rvsg (1920) 20 SR (NSW) 494, NSW SC.

Westminster Bank Ltd v Hilton (1926) 43 TLR 124, HL.

Cases also cited

Bluck v Siddaway (1846) 15 LJQB 359.

Carlton Hall Club Ltd v Laurence [1929] 2 KB 153, [1929] All ER Rep 605, DC.

Diggle v Higgs (1877) 2 Ex D 422, 46 LJQB 721, CA.

Diplock's Estate, Re, Diplock v Wintle [1948] 2 All ER 318, [1948] Ch 465, CA; affd sub nom Ministry of Health v Simpson [1950] 2 All ER 1137, [1951] AC 251, HL.

Fibrosa Spolka Akcyjna v Fairbairn Lawson Combe Barbour Ltd [1942] 2 All ER 122, [1943] AC 32, HL.

Jacques v Golightly (1776) 2 Wm Bl 1073, 96 ER 632.

Nelson v Larholt [1947] 2 All ER 751, [1948] 1 KB 339.

Sinclair v Brougham [1914] AC 398, [1914-15] All ER Rep 622, HL.

Stuart v Stephen (1940) 56 TLR 571.

Taylor v Plumer (1815) 3 M & S 562, [1814-23] All ER Rep 167, 105 ER 721.

Varney v Hickman (1847) 5 CB 271, 136 ER 881.

Woolf v Freeman [1937] 1 All ER 178.

[1992] 4 All ER 409, [1989] 1 WLR 1340

## INTRODUCTION:

Appeal and cross-appeals

The plaintiffs, Lipkin Gorman (a firm) (the solicitors), appealed from so much of the order of Alliott J ([1992] 4 All ER 331, [1987] 1 WLR 987) made on 31 July 1986 pursuant to his judgment given on 8 April 1986 whereby he ordered, inter alia, that (i) the first defendants, Karpnale Ltd, the owners of the Playboy Club (the club), pay the solicitors the sum of £ 3,735 and £ 2,665 interest being the amount of a bank draft made in favour of the solicitors who claimed it was money had and received by the club for which the club was liable in conversion, (ii) the second defendants, Lloyds Bank plc (the bank), pay the solicitors the sum of £ 151,705.97 being the amount lost, £ 87,187.34 in the period from 3 July to 30 September 1980 by the solicitors from their client's account held by the bank due the fraud of Norman Barry Cass, a former partner in the solicitors' firm and interest and (iii) that the solicitors pay the bank the sum of £ 8,700 being the sum claimed by the bank on its counterclaim. The solicitors by their notice of appeal dated 16 October 1986 appealed from the judge's dismissal of their claim (a) against the club for £ 222,903.98 being the full amount taken from the solicitors' client's account by Cass and lost by him at the club in the course of gambling and (b) against the bank for the full amount taken from the client's account by Cass until his fraud was discovered following the termination of his partnership as from 31 December 1980. The club cross-appealed against the judgment against it for £ 6,400 and the bank cross-appealed from the judgment against it for £ 151,705.97. The facts are set out in the judgment of May LJ.

## COUNSEL:

Dermod O'Briell QC, Thomas Putnam and Simon Gaunt (instructed by Reynolds Porter Chamberlain) for the solicitors.; Jonathan Sumption QC and Richard Slade (instructed by Linklaters & Paines) for the bank.; Gavin Lightman QC and Alan Boyle (instructed by Clifford Chance) for the club.

## JUDGMENT-READ:

Cur adv vult

13 October 1988. The following judgments were delivered.

13 October 1988

## PANEL: MAY, PARKER AND NICHOLLS LJJ

## JUDGMENTBY-1: MAY LJ.

## JUDGMENT-1:

MAY LJ.

We have before us an appeal and cross-appeals from a judgment of Alliott J given on 8 April 1986 ([1992] 4 All ER 331, [1987] 1 WLR 987). For the sake of clarity I shall refer to the plaintiffs in the action as 'the solicitors'. The first defendants were previously known as the Playboy Club of London Ltd; as such they operated the Playboy Club in Park Lane and in this judgment I shall refer to them as 'the club' or 'the casino'. Finally, I shall refer to the second defendants in the litigation as 'the bank'. The basic facts of this case are simple. One Norman Barry Cass was a compulsive gambler. He was also from 1978 to 1980 a partner in the solicitors' firm and able to draw upon their clients' account on his signature alone. This account was maintained and operated at the bank's branch in Brook Street, London W1. Cass's personal resources were insufficient to fund his addiction and consequently, from some time probably in July 1979, he began to use, and thus steal, moneys from the solicitors' clients' account. As the learned judge said, precise quantification of the sums which Cass took was difficult but the net loss to the clients' account, taking account of substantial recredits, cannot have been less than £ 222,908.98.

The causes of action relied on by the solicitors in the court below were numerous. They succeeded, first, against the club in conversion of a draft for £ 3,735, originally obtained by Cass for a proper purpose, but improperly accepted for the purposes of gaming by a servant of the club. Secondly, they succeeded against the bank as a constructive trustee of the moneys in the solicitors' clients' account on the ground of the want of probity of the bank's manager of the Brook Street branch at least since 3 July 1980. However the learned judge held that they discovered Cass's dishonesty and had only themselves to blame for any loss sustained by them after 1 October 1980. He computed the loss of the solicitors

[1992] 4 All ER 409, [1989] 1 WLR 1340

over the short period from 3 July to 30 September 1980 as £ 87,187.34. In the result, after a three week trial and by a reserved judgment, the learned judge gave judgment for the solicitors against the club for £ 6,400, comprising the value of the draft of £ 3,735 with interest of £ 2,665 and half the solicitors' costs of the action against the club from 14 May 1985. He further gave judgment for the solicitors against the bank for £ 151,706.17, comprising the loss of £ 87,187.34 together with £ 64,518.83 interest and their costs of the action. On the bank's counterclaim on an undertaking given in the relevant period by Cass, he gave judgment for them against the solicitors for the sum of £ 5,000 plus interest of £ 3,700, a total of £ 8,700 and their costs of the counterclaim. The learned judge also gave leave to both the club and the bank to appeal on the question of costs.

Before this court the solicitors contended that the club were liable to them for the full amount of £ 222,908.98 as money had and received and that they were entitled to maintain their judgment for the conversion of the draft for £ 3,735. Against the bank they claimed the full amount lost on the basis that the bank had at all material times, not just for the limited period of six months, been a constructive trustee rendering knowing assistance to Cass in his dishonesty or in the alternative as damages for breach of contract. Early in the argument however counsel for the solicitors accepted that if he could not succeed in breach of contract he could not do so on any basis that the bank had constituted itself a constructive trustee. In the result the principal contest before us between the solicitors and the club has been on the claim based on money had and received, and between the solicitors and the bank on the allegation of breach of contract. Both the club and the bank have cross-appealed asking that each should have judgment against the solicitors with costs. In the alternative, if they fail on the substantive points, they seek substantial variations in the orders for costs made at trial.

Although we heard the appeals between the solicitors and the bank first, in this judgment I deal at the outset with the solicitors' claim against the club. I do so because in my opinion there is a simple answer to it, namely that the latter took Cass's money bona fide, without notice of the defect in his title and for value. Save that is in respect of the claim on the draft for £ 3,375.

Counsel for the solicitors sought to argue that the club had not taken Cass's money for value because it had done so under a contract made void by the first limb of s 18 of the Gaming Act 1845. He submitted that Cass had exchanged his cash for the usual chips under a contract by way of gaming or wagering, that this was void under the statute and that consequently the club had given no consideration for the exchange. However, in Earl of Ellesmere v Wallace [1929] 2 Ch 1 at 33, 48 the court clearly held that the phrase a 'contract by way of gaming or wagering' meant a contract for or of gaming or wagering (per Lawrence and Russell LJJ). Thus if on the exchange of money and chips there came into being a contract between Cass and the club it was not one avoided by s 128 of the 1845 Act.

Faced with this authority, counsel alternatively submitted that on a realistic analysis (cf Hill v William Hill (Park Lane) Ltd [1949] 2 All ER 452, [1949] AC 530) no contract between the two parties was made. All that happened, he contended, was that the parties treated cash on the one hand and chips on the other as interchangeable; there was no element of purchase for value. Thus he could trace the solicitors' cash even into the club's bank account: see Banque Belge pour l'Etranger v Hambrouck [1921] 1 KB 321 and the discussion in Goff and Jones Law of Restitution (3rd edn, 1986) pp 65-69. For my part, however, this is not a realistic analysis in this case: for his money, at the least, Cass obtained chips which enabled him to game; he could use them for cash when purchasing refreshment in the club; it was implicit that the latter undertook to cash all his chips in when he wished it to do so and to give him the appropriate sum of money. Such an arrangement was clearly an agreement supported by valuable consideration moving from the club and in my opinion must in law have been a contract-though not one by way of gaming or wagering.

In my opinion, therefore, the solicitors' claim against the club on the basis of 'money had and received' had to fail, as the learned judge held, though on different grounds from those on which I would dismiss the claim.

In passing, I comment that one must not let one's mind be prejudiced by the gambling context that there is behind the solicitors' claim against the club. The latter was licensed under the relevant statutes and its gambling activities were entirely lawful. In such circumstances there was in my opinion no, or no sufficient, element of 'unfair enrichment' on the part of the club to entitle the solicitors to succeed against them.

As I have indicated, I think that this point is a short one and I know that I shall not be considered discourteous if I do not refer to the number of authorities and other arguments put before us on the issue.

Next, but subject to the preliminary point with which I now deal, the extent of the bank's knowledge of Cass's conduct, principally by Mr Fox, their manager, actual or inferential which was material to the three allegations of want of probity, constructive trusteeship and negligence respectively, was argued both before us and the learned judge below

with reference to the categorisation of the types of knowledge referred to in the judgment of Peter Gibson J in Baden v Société Générale pour Favoriser le Développement du Commerce et de l'Industrie en France SA (1982) [1992] 4 All ER 161 at 235, namely: (i) actual knowledge; (ii) wilfully shutting one's eye to the obvious; (iii) wilfully and recklessly failing to make such inquiries as an honest and reasonable man would make: (iv) knowledge of circumstances which would indicate the facts to an honest and reasonable man; (v) knowledge of circumstances which would put an honest and reasonable man on inquiry.

However, when counsel for the solicitors began to open the appeal against the bank, on the basis that its manager, Mr Fox, was aware of Cass's fraudulent designs in one or other of the first three of the five senses listed by Peter Gibson J and thus must have been a party to them, counsel for the bank objected, as he had below, that such a contention was not open to the solicitors on their pleadings. However, we allowed counsel for the solicitors to argue his contention that the bank knew of Cass's dishonesty de bene esse, saying that we would deal with the objection taken on the pleadings in our judgment.

The principal authority to which we were referred on this aspect of the case was Belmont Finance Corp Ltd v Williams Furniture Ltd [1979] 1 All ER 118 [1979] Ch 250. In that case the allegation was that a limited company had itself given two of its three directors financial aid to buy its own shares, contrary to s 54 of the Companies Act 1948. The statement of claim alleged that the defendants 'were at all material times aware or ought to have been aware' of the relevant facts and alleged conspiracy. It further alleged that the defendant directors were guilty of misfeasance and breach of trust. At first instance and at the close of the case for the plaintiff company's case, Foster J held, inter alia, that since the pleadings did not allege fraud or dishonesty they did not disclose a claim against the defendants of a breach of constructive trust. Both the learned judge and thereafter this court on appeal adopted and applied the principle stated by Lord Selborne LC in Barnes v Addy (1874) LR 9 Ch App 244 at 251-252, to the effect that anyone who assists with knowledge a dishonest or fraudulent design on the part of trustees is liable to be treated as a constructive trustee.

In these circumstances, when the Belmont Finance case reached this court, the question of the adequacy of the pleadings in that case was clearly a relevant and important issue. After discussing but expressing only a preliminary view whether, subject to other points, constructive knowledge of the alleged dishonesty was sufficient or whether actual knowledge had to be proved, Buckley LJ turned to the nature and extent of the plea of knowledge, whether actual or constructive, in the statement of claim. He said ([1979] 1 All ER 118 at 131, [1979] Ch 250 at 268):

'Paragraph 18 [of the pleading] does not allege exclusively actual knowledge; it says that the defendants were aware, or ought-to have been aware. It seems to me therefore that the plaintiff does not unequivocally assert that the fact that the price was an inflated one was known to the defendants or any of them, although it is open to him on the pleadings to prove that this was so. The pleading does not demonstrate that the plaintiff relies on dishonesty as an essential element of his cause of action. So in my opinion this statement of claim does not unequivocally and clearly indicate that the plaintiff is proposing to assert that the transaction was a dishonest one.'

Orr LJ agreed with the judgment of Buckley LJ and quoted the passage from the notes in the then current Supreme Court Practice 1976 vol 1, para 18/12/11, which remain in the latest edition:

'Fraudulent conduct must be distinctly alleged and as distinctly proved and it is not allowable to leave fraud to be inferred from the facts.'

(See [1979] 1 All ER 118 at 132, [1979] Ch 250 at 270.)

In his turn Goff LJ began his judgment by stressing that on the issue relevant to the instant appeal the court was there dealing with a pleading point and said ([1979] 1 All ER 118 at 135, [1979] Ch 250 at 274):

'However, in my judgment this pleading is defective so far as fraud is concerned, because it does not make it clear that the pleader means to charge fraud, because he says in para 18 that the defendants and each of them were at all material times aware, or ought to have been aware and the latter part is, as counsel for the plaintiff was constrained to admit, consistent with innocence.'

Thus, first, where fraud or dishonesty is material this must be clearly pleaded-if not explicitly, then in such terms that the reader of the pleading can be left in no reasonable doubt that this is being alleged.

Secondly, where an element in the alleged fraud or dishonesty relied on is the other party's knowledge of a given fact or state of affairs, this must be explicitly pleaded. It is ambiguous and thus demurrable, if fraud is relied on, to use the common 'rolled up plea' that a defendant knew or ought to have known a given fact. If it is desired to allege and

plead fraud and, in the alternative, negligence based upon similar contentions, then the former must be pleaded first and clearly and the relevant part of the plea confined to the fraud. The allegation in negligence can then be pleaded separately and as a true alternative contention.

In the instant case I think that para 18(2) of the rereamended statement of claim together with para (2)(C) of the prayer for relief against the bank, read as they stood, comprised a sufficient allegation of dishonesty and fraud against the bank, their servants or agents, upon which the learned judge, if the evidence accepted by him had been sufficient to justify such a finding, could have founded the want of probity with knowledge on the part of the bank manager, Fox, and thus held the bank to have been a constructive trustee for the solicitors of the moneys stolen by Cass.

However, when the solicitors were asked for further and better particulars of the allegations in para 18(2) of the statement of claim, in their answer, in so far as various cashiers, clerks and junior staff other than Mr Fox were concerned, they reverted to and pleaded what I have described as the 'rolled up plea' in this context, namely not merely that such staff knew, but alternatively ought to have known, the facts alleged.

In so far as Fox personally is concerned, the position is not as simple. In sub-para (b)(i) of the relevant particulars the pleader alleged against him that he (Fox) knew the facts and matters set out in sub-sub-paras (1) to (7) on p 7 of the further and better particulars. However, overleaf the pleader alleged in addition that Fox 'knew or ought to have known' of a substantial number of the facts and matters previously referred to in the particulars of the plea relating to the bank's subordinate employees.

In these circumstances and in the light of the principles of pleading which in my opinion must be strictly observed, the solicitors were only entitled to contend for and, given the evidence and sufficient findings of fact, the learned judge was only entitled to find dishonesty, fraud, lack of probity, call it what one will, on the basis of the allegations in sub-sub-paras (1) to (7) to which I have referred.

It is sufficient if I say at this stage that such allegations, even if fully made out, were wholly inadequate material upon which to base a finding, or an inference of fraud or dishonesty on Fox's part.

The principal passage in the learned judge's judgment on which he based his finding that the bank were at least in part liable to the solicitors is at [1992] 4 All ER 331 at 355, [1987] 1 WLR 987 at 1012-1013. I shall deal further later in this judgment with the two findings of fact contained in the first two sentences of this paragraph of the judgment at first instance. However, for the reasons I have given I think that the bank's challenge to the judge's finding of knowledge on the part of Fox of Cass's fraud is made out and that the finding against the bank on this score cannot be upheld. See also the decision of this court in Nihill (a minor) v Nihill (1983) 134 NLJ 633.

I turn to the solicitors' claim against the bank based on contract or negligence. We are here concerned with the general relationship between a banker and his customer in the common case where the latter has a current account with the former which is in credit. The underlying basis of this relationship is that it is one of debtor and creditor. The money deposited with a bank becomes its own. It is prima facie bound to meet its debt when called upon to do so. As Lord Atkinson said in Westminster Bank Ltd v Hilton (1926) 43 TLR 124 at 126:

'It is well established that the normal relation between a banker and his customer is that of debtor and creditor, but it is equally well established that quoad the drawing and payment of the customer's cheques as against money of the customer's in the banker's hands the relation is that of principal and agent. The cheque is an order of the principal's addressed to the agent to pay out of the principal's money in the agent's hands the amount of the cheque to the payee thereof.'

Indeed any failure by a bank to honour its customer's instructions may well redound to the serious discredit of the customer himself.

On the authorities it is clear that at least in the last century the terms of a customer's mandate to his banker in respect of his current account were sacrosanct. In Bodenham v Hoskins (1852) 21 LJ Ch 864 at 869, [1843-60] All ER Rep 692 at 694 Kindersley V-C said:

'Let us see, therefore, what was the position of the bankers in the matter. I entirely agree with many of the observations that have been made by the counsel for the defendants, that, as between banker and customer, in a naked case of banker and customer, the banker looks only to the customer, in respect of the account opened in that customer's name, and whatever cheques that customer chooses to draw, the banker is to honour. He is not to inquire for what purpose the customer opened the account; he is not to inquire what the monies are that are paid in to that account, and he is not to

[1992] 4 All ER 409, [1989] 1 WLR 1340

inquire for what purpose monies are drawn out of that account: that is the plain general rule, as between banker and cus-
tomer.'

In the similar case of Gray v Johnston (1868) LR 3 HL 1 at 11 Lord Cairns LC said:

'I think, fortunately, your Lordships will find that the law on that point is clearly laid down, and may be derived
without any hesitation from the authorities which have been cited in the argument at your Lordships' bar, and I appre-
hend that you will agree with me when I say that the result of those authorities is clearly this: in order to hold a banker
justified in refusing to pay a demand of his customer, the customer being an executor, and drawing a cheque as an ex-
ecutor, there must, in the first place, be some misapplication, some breach of trust, intended by the executor, and there
must in the second place, as was said by Sir John Leach, in the well known case of Keane v. Robarts ((1819) 4 Madd
332 at 357 56 ER 728 at 737), be proof that the bankers are privy to the intent to make this misapplication of the trust
funds ...'

In similar vein Lord Westbury said (at 14):

'The relation between banker and customer is somewhat peculiar, and it is most important that the rules which regu-
late it should be well known and carefully observed. A banker is bound to honour an order of his customer with respect
to the money belonging to that customer which is in the hands of the banker; and it is impossible for the banker to set up
a jus tertii against the order of the customer, or to refuse to honour his draft, on any other ground than some sufficient
one resulting from an act of the customer himself. Supposing, therefore, that the banker becomes incidentally aware that
the customer, being in a fiduciary or a representative capacity, meditates a breach of trust, and draws a cheque for that
purpose, the banker, not being interested in the transaction, has no right to refuse the payment of the cheque, for if he
did so he would be making himself a party to an inquiry as between his customer and third persons. He would be setting
up a supposed jus tertii as a reason why he should not perform his own distinct obligation to his customer.'

Finally in Bank of New South Wales v Goulburn Valley Butter Co Pty Ltd [1902] AC 543 at 550, [1900-3] All ER
Rep 935 at 938 Lord Davey, in giving the opinion of the Privy Council, said:

'The law is well settled that in the absence of notice of fraud or irregularity a banker is bound to honour his custom-
ers cheque ...'

However, in two relatively recent decisions, strongly relied on by counsel for the solicitors, it seems to me that at
first instance two learned judges went appreciably further. These two decisions were Selangor United Rubber Estates
Ltd v Cradock (a bankrupt) (No 3) [1968] 2 All ER 1073, [1968] 1 WLR 1555 and Karak Rubber Co Ltd v Burden (No
2) [1972] 1 All ER 1210, [1972] 1 WLR 602. The facts of each case were complicated and it is unnecessary to set them
out in detail. The disputes were concerned with the use of a limited company's moneys to finance the purchase of its
own shares. In addition to claims against personal defendants the several banks involved in the relevant transaction were
also sued, first, as constructive trustees with the directors of the company's funds in respect of breach of trust and, sec-
ondly, in negligence in relation to the way the banks paid cheques drawn on them.

In the circumstances of the instant case it may strictly be unnecessary to consider the views expressed in both the
Selangor and Karak decisions about how far a claimant against a bank has to go to demonstrate that the latter acted as a
constructive trustee of its customer's funds. However, it seems to me that in each case the court considered whether a
constructive trust had come into existence on the one hand, and whether the bank had been negligent on the other, from
very much the same viewpoint. In the Selangor case Ungoed-Thomas J first considered the potential liability of the
relevant bank as a constructive trustee. In doing so he quoted the well-known dictum of Lord Selborne LC in Barnes v
Addy (1874) LR 9 Ch App 244 at 252 to the effect that persons are not to be held to be trustees 'unless they assist with
knowledge in a dishonest and fraudulent design on the part of the [other] trustees'-in Selangor the directors were so in-
volved. Ungoed-Thomas J said ([1968] 2 All ER 1073 at 1096, [1968] 1 WLR 1555 at 1580): 'There are thus three ele-
ments: (1) assistance by the stranger, (2) with knowledge, (3) in a dishonest and fraudulent design on the part of the
trustees.' He then held ([1968] 2 All ER 1073 at 1104, [1968] 1 WLR 1555 at 1590):

'The knowledge required to hold a stranger liable as constructive trustee in a dishonest and fraudulent design, is
knowledge of circumstances which would indicate to an honest, reasonable man that such a design was being commit-
ted or would put him on enquiry, which the stranger failed to make, whether it was being committed.'

However, both Sachs LJ in Carl-Zeiss-Stifting v Herbert Smith & Co (a firm) (No 2) [1969] 2 All ER 367 at 379,
[1969] 2 Ch 276 at 298 and Goff LJ in Belmont Finance Corp Ltd v Williams Furniture Ltd [1979] 1 All ER 118 at 136,
[1979] Ch 250 at 275 said that this was too wide. What has to be shown is an 'element ... of dishonesty or of consciously

acting improperly, as opposed to an innocent failure to make what a court may later decide to have been proper enquiry' per Sachs LJ. Also in the Carl-Zeiss-Stiftung case [1969] 2 All ER 367 at 381-382, [1969] 2 Ch 276 at 301 Edmund Davies LJ said that the concept of 'want of probity' appeared to provide a useful touchstone in considering circumstances alleged to give rise to constructive trusts. He continued:

'It is because of such a concept, that evidence as to "good faith", "knowledge" and "notice" plays so important a part in the reported decisions. It is true that not every situation where probity is lacking gives rise to a constructive trust. Nevertheless, the authorities appear to show that nothing short of it will do. Not even gross negligence will suffice.'

In my opinion, therefore, there is at least strong persuasive authority for the proposition that nothing less than knowledge, as defined in one of the first three categories stated by Peter Gibson J in Baden's case, of an underlying dishonest design is sufficient to make a stranger a constructive trustee of the consequences of that design.

When Ungoed-Thomas J turned to consider the claim against the banks in Selangor based on negligence, he said ([1968] 2 All ER 1073 at 1105, [1968] 1 WLR 1555 at 1591):

'A further and alternative claim is made against the defendant banks for negligence. This is a claim for damages at common law, as contrasted with a claim for equitable relief against the banks, as well as against other defendants, to replace moneys misapplied as trustees or constructive trustees. Both these equitable and common law claims, as against both defendant banks, involve the allegations that they ought to have made enquiry. Such allegations, though differing in the case of each bank, are identical under both the equitable and the common law claim, and it is common ground that any standard of care which puts on enquiry or notice is the same under both claims.'

In my opinion, whether it was by concession or not, it was wrong to equate the duty to inquire where there has been fraud and the bank is proved to have known of it with that where all that is being alleged is that the bank has been negligent. Nor was it necessary to rely upon any such equivalence in order to decide the issues in the Selangor case. It was because of this error I think that both Ungoed-Thomas J in Selangor [1968] 2 All ER 1073 at 1118, [1968] 1 WLR 1555 at 1608 and Brightman J in Karak [1972] 1 All ER 1210 at 1231, [1972] 1 WLR 602 at 629 stated the common law of duty of care on a paying banker in the normal case of a current account in credit too highly. The relationship between the parties is contractual. The principal obligation is upon the bank to honour its customers' cheques in accordance with its mandate on instructions. There is nothing in such a contract, express or implied, which could require a banker to consider the commercial wisdom or otherwise of the particular transaction. Nor is there normally any express term in the contract requiring the banker to exercise any degree of care in deciding whether to honour a customer's cheque which his instructions require him to pay. In my opinion any implied term requiring the banker to exercise care must be limited. To a substantial extent the banker's obligation under such a contract is largely automatic or mechanical. Presented with a cheque drawn in accordance with the terms of that contract, the banker must honour it save in what I would expect to be exceptional circumstances.

Mr Sumption QC on behalf of the bank accepted that an objective test had to be applied and that accordingly there had to be some limits of the bank's entitlement to treat its mandate as absolute. However, he contended that the circumstances in which this was so would be very limited indeed. He accepted that there would be implied into the mandate a term that it should not be given effect to if the relevant transaction was patently dishonest. In so far as any duty to inquire before paying a cheque drawn in accordance with the mandate was concerned, he submitted that this duty could only arise when the transaction on its face was dishonest, but could have an honest explanation if appropriate inquiry was made. Counsel accepted that if a bank knows of facts which a reasonable bank manager would think were probably dishonest then inquiry would be appropriate.

For my part I would hesitate to try to lay down any detailed rules in this context. In the simple case of a current account in credit the basic obligation on the banker is to pay his customer's cheques in accordance with his mandate. Having in mind the vast numbers of cheques which are presented for payment every day in this country, whether over a bank counter or through the clearing bank, it is in my opinion only when the circumstances are such that any reasonable cashier would hesitate to pay a cheque at once and refer it to his or her superior, and when any reasonable superior would hesitate to authorise payment without inquiry, that a cheque should not be paid immediately upon presentation and such inquiry made. Further, it would I think be only in rare circumstances, and only when any reasonable bank manager would do the same, that a manager should instruct his staff to refer all or some of his customers' cheques to him before they are paid.

In this analysis I have respectfully derived substantial assistance from the material parts of the judgment of Steyn J in Barclays Bank plc v Quincecare Ltd (1988) [1992] 4 All ER 363 esp at 375-377.

[1992] 4 All ER 409, [1989] 1 WLR 1340

I next consider whether it was shown that the bank were in breach of their contract with the solicitors, that is to say whether it was shown they failed to exercise that degree of care towards their customer which the law required, as I have just discussed. The judge below did not consider this aspect of the case in any detail as he held the bank liable, at least in part, on the ground that they had been constructive trustees. However, I have no doubt that he would have found the bank and its servants negligent had it been necessary to do so and thus the bank contend by their cross-notice that they were not in breach of any contract between them and the solicitors.

I think that it is helpful to sketch in at least part of the further factual background at this stage. First, Cass had been introduced to the bank by the solicitors as a relatively junior employee in order to help him with his then financial diffi- culties. Secondly, however, Cass did not use the account or the loan facilities that he was allowed upon it properly or truthfully. He was in truth a thoroughly unsatisfactory customer, exceeding the limits on the overdraft which the bank allowed him and telling the bank untruths about the purposes for which his advances were sought. In so far as Cass's general operation of his account was concerned, he not infrequently drew cheques, no doubt against a cheque card, for the round sum of £ 50, and bank officials recognised that a substantial number of these were to enable him to continue to gamble.

As we indeed know, he was continuing to gamble not merely in units of £ 50 but in very substantial sums indeed, the greater part drawn in cash from the solicitors' clients' account. A single telephone call to Mr Gorman, one of the partners in the plaintiff firm, would have brought the whole enterprise to a close. Was there any duty on the bank to make such a call? Rather more searching inquiry by the bank of Cass about where he was obtaining his funds with which to gamble, even to the extent of which they were aware, might well also have had the same effect. Was there any duty on the bank to make that inquiry until the truth was out?

In this general context we were referred to Tournier v National Provincial and Union Bank of England [1924] 1 KB 461, [1923] 3 All ER Rep 550. The facts of that case had some points of similarity with those of the instant one. The plaintiff was a customer of the defendant bank. Another customer of the bank drew a cheque in favour of the plaintiff. He indorsed it to a third person who had an account with another bank. When the cheque came back to the defendant bank in the normal way, their manager asked the intermediate bank to whom the cheque had been paid. He was told it was to a bookmaker. That information the defendants disclosed to third persons. The issue in the case was the correct- ness or otherwise of the trial judge's direction to the jury about the nature and extent of the obligation of secrecy owed by a bank to its customers. In his judgment, with which Atkin LJ agreed, Bankes LJ held that there was an obligation on a bank to keep secret any information about its customers which may have come to it as the result of the banker/customer relationship, save in four cases which are irrelevant for present purposes. Scrutton LJ dissented, but not in terms which alter the situation in the instant case.

The correctness of the principles of law stated by the majority in Tournier's case has not been doubted since the case was decided and in these circumstances the bank in the instant case were under a clear obligation to Cass not to make known to anyone, including the solicitors, information which had come to them as a result of him having his per- sonal account with them. Had the bank's manager, Mr Fox, telephoned Mr Gorman to tell him that it was clear to them from the way in which Cass had been operating his account that he was gambling and gambling compulsively, this would have been a breach of their obligation to Cass. Thus they can be under no liability to the solicitors for having failed to do so.

An argument based on the Tournier principles could be raised against any suggestion that even if he had had the relevant knowledge Mr Fox would have been in breach of his duty to Cass had he (Fox) got in touch with Mr Gorman and told him how Cass was operating the solicitors' clients' account. However, this was not raised in the submissions to us and in my opinion could not succeed. After all Mr Gorman himself was one of the account-holders of the clients' account.

I think that if Fox had or ought to have learnt of the frequent and substantial withdrawals by Cass in cash from the clients' account even the limited duty of care to which he was subject would have required him to tell Mr Gorman. In his judgment the judge below found ([1992] 4 All ER 331 at 355, [1987] 1 WLR 987 at 1012-1013)-

'that Mr Fox, and therefore the bank, did have reasonable grounds for believing that the probability was that Cass was operating the clients' account in fraud. The conduct of, I assume, an otherwise honourable man is only explicable on the ground that he knew full well what he would find and dare not look. I have reached this conclusion upon the ba- sis of the inferences to be drawn from the facts established relating to Mr Fox's own conduct.'

[1992] 4 All ER 409, [1989] 1 WLR 1340

But this finding of the learned judge was clearly based upon a case of dishonesty advanced against Mr Fox which, as I have already said, the plaintiffs were not entitled on the pleadings to raise.

In the course of his submissions to us Mr Sumption listed the four principal grounds, or 'pillars' as he described them, upon which the judge reached his conclusion about Mr Fox's guilty knowledge. I have considerable sympathy with the learned judge because the trial of this action occupied 21 sitting days and many arguments were and indeed had to be deployed before him as it was not known what findings of fact there were going to be. A substantial number of those arguments were not addressed to us. Further, I have no doubt that a large part of the trial below was taken up by a consideration of Fox's alleged dishonesty, or lack of probity, which I have already said was in my opinion a case not open to the plaintiffs on the pleadings. Bearing all this in mind, and having been taken through the relevant evidence on the four 'pillars' by Mr Sumption and counsel for the solicitors, I am respectfully forced to the conclusion that there was no sufficient evidence to justify the judge's basic findings. It is unnecessary for me to repeat Mr Sumption's analysis of the evidence, particularly that of the experienced banker called on behalf of the solicitors, in detail in this judgment. I merely say that I do not think that it was demonstrated that Mr Fox was being secretive either with his superiors or with Mr Gorman. I remind myself of the realities of how cashiers have to do their jobs and do in fact transact business in a busy, albeit not large, West End branch of a bank, and I quote three (not consecutive) answers which the experienced banker witness gave in cross-examination:

'Q. You could have had no knowledge that they were thefts [from the clients' account distinguished from knowledge of Cass's gambling] at the time? A. No, correct.

Q. So you would not characterise it as unreasonable a manager who felt that weighing up all the circumstances it was not an appropriate matter to discuss with the partners? A. It depends how managers weigh up matters. One manager makes a very different approach from another.

Q. If a number of cashiers at different times, as a result of the operation of pure chance, are handling a particular account, I suggest that it would be quite impossible for any one cashier to build up a reliable indication of what the ordinary pattern of transactions on that account was? A. Yes.'

For all these reasons I think that the learned judge was wrong to conclude that the bank acted in such a way as to render themselves constructive trustees for the solicitors, or that, by Mr Fox, they committed any breach of the limited duty of care which they owed to the solicitors, their current account customers.

On the question whether the solicitors had made out a case in negligence against the bank, counsel for the solicitors sought to rely on the fact that the bank had called no evidence and invited the judge below and this court to draw an inference, that is to say a positive inference, against the bank on this ground. In my opinion this submission is wholly destroyed by a short dictum from the judgment of Cockburn CJ in M'Queen v Great Western Rly Co (1875) LR 10 QB 569 at 574:

'If a prima facie case is made out, capable of being displaced, and if the party against whom it is established might by calling witnesses and producing particular evidence displace that prima facie case, and he omits to adduce that evidence, then the inference fairly arises, as a matter of inference for the jury and not a matter of legal presumption, that the absence of that evidence is to be accounted for by the fact that even if it were adduced it would not displace the prima facie case. But that always presupposes that a prima facie case has been established; and unless we can see our way clearly to the conclusion that a prima facie case has been established, the omission to call witnesses who might have been called on the part of the defendants amounts to nothing.'

The conclusions which I have expressed on the issue of liability on the part of the bank in truth render it unnecessary for me to deal with the subsidiary defences raised by it to any claim that the solicitors might have had, namely those of contributory negligence, absence of causation and discretion. However, as the learned judge's finding against the solicitors on these heads was appealed by them before us, I refer to this briefly. The essential facts are that at the end of September 1980 Mr Gorman discovered that Cass had been dishonest in relation to some of his claims in respect of travel expenses on the solicitors' office account with the bank as distinct from their clients' account. The solicitors said nothing about this to the bank and in consequence Cass was able to continue his depredations on the latter account until he fled towards the end of November 1980. Alliott J in his judgment said ([1992] 4 All ER 331 at 362, [1987] 1 WLR 987 at 1019):

'I hold that the solicitors reaction in the first week of October was totally inadequate to the circumstances they had stumbled on. From then on they have no one to blame but themselves for their loss, and it would be inequitable to grant them any relief (save in respect of the conversion already dealt with) for any loss sustained after 1 October 1980.'

[1992] 4 All ER 409, [1989] 1 WLR 1340

By this finding I understand the judge to have held that from 1 October 1980 the solicitors' contributory negligence had been total, that in consequence any negligence or breach of trust on the part of the bank had had no causative potency in so far as any loss by the solicitors thereafter was concerned, and that in any event, in so far as the claim laid in breach of constructive trust was concerned, the solicitors did not come with clean hands and that in the exercise of his discretion he would therefore grant them no relief.

As we are no longer concerned with the claim for breach of trust I need not deal in detail with the last of the three points to which I have just referred.

The solicitors' appeal against the finding of contributory negligence was based on the argument that contributory negligence was not an available defence in cases of breach of contract. In my opinion, at least where a defendant's liability in contract is the same as his liability in the tort of negligence independently of the existence of any contract, the recent decision of this court in Forsikringsaktieselskapet Vesta v Butcher [1988] All ER 43, [1989] AC 852 makes it clear that the court does have power to apportion blame under the Law Reform (Contributory Negligence) Act 1945 [c].

c  Subsequent to the decision reported herein Forsikringsaktieselskapet Vesta v Butcher was affirmed by the House of Lords: see [1989] 1 All ER 402, [1989] AC 852.

Further, authorities such as Greenwood v Martins Bank [1933] AC 51 [1932] All ER Rep 318 and Tai Hing Cotton Mill Ltd v Liu Chong Hing Bank Ltd [1985] 2 All ER 947 [1986] AC 80 made it clear that it is an implied term of the relationship between a banker and his customer at least in relation to the operation of a current account that the latter will notify the former as soon as he learns that the account is being operated by a dishonest person. This the solicitors did not do.

In those circumstances, on the findings of fact by the learned judge, for which there was ample evidence to support, I do not think that any valid challenge can be mounted by the solicitors against the judge's decision on these points.

I turn finally to the respective cross-appeal by the club against the judge's judgment against them for the conversion of the draft for £ 3,735, and by the solicitors against the judge's judgment on the bank's counterclaim for £ 5,000 in respect of the undertaking given by Cass to the bank in the formal course of his professional business as a solicitor. I hope I shall not be thought discourteous if I deal with these matters very briefly. As to the former, there was ample evidence before the judge to entitle him to conclude that the club did not come within s 29(1)(b) of the Bills of Exchange Act 1882. Consequently no valid challenge against his decision in relation to the draft can be mounted. As to the latter, the judge said ([1992] 4 All ER 331 at 362, [1987] 1 WLR 987 at 1019): 'Only in the context of the wider litigation is it conceivable that this issue would have remained alive.' I wholeheartedly agree.

In my opinion, therefore, the bank's appeal against the judgment against it as an alleged constructive trustee and in negligence succeeds and the solicitors' appeal in respect of it fails. The respective contentions by the club and the solicitors and the bank in respect of the draft and undertaking also fail.

**JUDGMENTBY-2:** PARKER LJ.

**JUDGMENT-2:**

PARKER LJ.

In 1976 one Norman Cass became a salaried partner in the plaintiff firm (the solicitors). His partners regarded him highly and were anxious to assist him in his, then, comparatively minor financial difficulties. They introduced him to the manager of the Brook Street branch of the second defendants (the bank) and he thereafter maintained and operated at the branch a current account. He also maintained a loan account but we are not concerned with that. The solicitors were also customers of the branch, maintaining there their client account, the mandate in respect of which provided for its operation on the single signature of any one of the partners.

Between April and November 1980 Cass fraudulently abstracted from the client account large sums of money which he used for his own purposes. Such purposes consisted in gambling at the casino operated by the first defendants at the Playboy Club (the club) in Park Lane. His gambling over the period resulted in net losses of some £ 180,000.

By writ dated 4 December 1981 the solicitors commenced proceedings against the club seeking to recover from them the moneys abstracted by Cass from the client account and passed to them. On 22 May 1985, pursuant to leave granted on 14 May 1985, the writ was amended so as to join the bank as defendants and to claim such moneys addition-

[1992] 4 All ER 409, [1989] 1 WLR 1340

ally or alternatively from them. There were voluminous pleadings, which included a counterclaim by the bank for £ 5,000 on an undertaking given by Cass in the name of the firm.

The trial before Alliott J commenced on 20 February 1986 and lasted for 21 days. The bank submitted that there was no case to answer and called no evidence. Judgment was given on 8 April 1986 (see [1992] 4 All ER 331 [1987] 1 WLR 987). The claim against the club succeeded to the extent only of £ 6,400 being as to £ 3,735, the amount of a draft drawn by the bank on itself and payable to the solicitors, which Cass had indorsed and delivered to the club in ex-change for gambling chips, and as to £ 2,665, interest thereon. The solicitors were also granted against the club half of their costs of the action from 14 May 1985. The claim against the bank was more successful, the solicitors obtaining judgment for £ 151,705 and costs, this sum being in respect of abstractions by Cass during the period from 3 July 1980 to 1 October 1980. The basis of this judgment was that as from 3 July 1980 the bank had rendered themselves liable as constructive trustees but that from 1 October the solicitors had no one to blame but themselves.

The counterclaim of the bank succeeded and judgment was given on the counterclaim for £ 8,700 (£ 5,000 and £ 3,700 interest) and costs. Both defendants were given leave to appeal on costs.

In view of the arguments presented before us I feel it necessary to mention at this stage that the foregoing is only a simplified summary and that, in referring to moneys having been abstracted from the client account, I should not be taken as accepting an argument advanced by Mr Lightman QC for the club that Cass did not steal from the solicitors at all.

From the judgment of Alliott J the solicitors appeal, seeking (1) to recover all the moneys abstracted and passed to the club, (2) to increase the amount of the judgment against the bank by extending the period of their liability so as to run from 1 May 1980 to the end of November 1980 and (3) to set aside the judgment on the counterclaim.

The club and the bank both cross-appeal, contending that the claims against them should be dismissed.

Although the claims against the bank and against the club are differently based both as to fact and law and must be separately considered, the facts relating to Cass's abstractions from the client account form the essential background to both claims and I deal with them first.

The abstractions-facts

Essentially there were three methods used. That most frequently used took the following form. Cass would draw a cheque on the client account to cash, signed by himself, or cause one Chapman, a clerk employed by the solicitors, who had sole charge of all accounting matters, to prepare such a cheque which he would then sign. The cheque was then taken to the branch and delivered to one of the cashiers by Chapman who received cash in exchange. Chapman thereaf-ter handed the cash to Cass, who took it to the club and there delivered it in exchange for gambling chips. The cheque stubs did not, however, show that the cheque was drawn to cash. Instead, the name of a client was inserted.

The second method was for Cass to draw a cheque on the client account in favour of a building society for crediting to an account operated solely by Cass. The cheque was then collected and placed to the building society account from which Cass would then draw cash and use it in the same way.

The final method was for Cass to draw a cheque on the client account in favour of the bank. This would be taken to the bank by Chapman, who would receive in exchange a draft drawn by the bank on itself in favour of the solicitors. Such draft was then indorsed to the club by Cass and delivered to them in exchange for chips.

The claim against the club

At the trial the solicitors advanced claims against the club under eight heads. They succeeded in respect of one only, namely the claim in respect of conversion of the draft for £ 3,735. All the remainder were rejected. From such rejection the solicitors do not appeal, save as to one head, namely that they are entitled to recover the moneys from the client account which Cass passed to the club on the ground that they were moneys had and received for the solicitors' use.

There thus falls for determination the validity of the claim for moneys had and received and, under the cross-appeal, the validity of the claim for conversion of the draft.

The claim for moneys had and received

[1992] 4 All ER 409, [1989] 1 WLR 1340

It is accepted by the solicitors that, even if their claim is otherwise valid, it will fail if the club received the moneys in good faith, for value, and without notice of any defect in or want of title on the part of Cass. The club contends and the solicitors deny that the moneys were so received.

I shall consider this issue before all others. It is an issue which is a narrow one because, in the light of the judge's unchallenged findings, it must be accepted that the club received the moneys in good faith and without notice. The question, therefore, is whether the club received the moneys for value.

The answer to this question depends partly on the facts and partly on the effect of certain provisions of the Gaming Acts, in particular s 18 of the Gaming Act 1845. The relevant facts are simple. The procedures at the club were that gambling was conducted by way of chips of various marked denominations. Chips were acquired in one of the following ways. They could be obtained at the gaming tables in exchange for cash. This method was used when a customer wished to acquire a comparatively small amount of chips. If the customer required comparatively large amounts he would exchange his cash at the cash desk for a cheque credit slip or slips. These slips would then be exchanged at the tables for chips. Alternatively, if the customer wished to pay by cheque he would exchange his cheque at the cash desk either for cash or a cheque credit slip or slips and use the cash or cheque credit slips to obtain chips at the tables. Cash so obtained could also of course be used to buy meals at the restaurant or drinks at the bars. So also could chips, which were valid throughout the building and which could be exchanged back for cash at any time. We are not, on this appeal, concerned with winnings, but for completeness I add that a winning customer at completion of play could exchange chips won for what is called a cheque credit equivalent which he could then exchange for cash or a cheque in his favour.

Mr Cass obtained chips by the cash method and by the cheque methods. He was from time to time also a winner and received winnings cheques.

I turn now to the Gaming Acts. Section 18 of the 1845 Act, so far as material, provides:

'... all Contracts or Agreements, whether by Parole or in Writing, by way of gaming or wagering, shall be null and void; and ... no Suit shall be brought or maintained in any Court of Law or Equity for recovering any Sum of Money or valuable Thing alleged to be won upon any Wager, or which shall have been deposited in the Hands of any Person to abide the Event on which any Wager shall have been made ...'

It will be seen that there are three limbs to the section. Under the first limb all contracts or agreements by way of gaming or wagering are made null and void. By the second limb suits to recover any sum of money or valuable thing alleged to be won on any wagers are prohibited. By the third limb there are also prohibited actions to recover any sum of money or valuable thing deposited in the hands of any person to abide the event on which any wager has been made.

The only other immediately relevant provision of the Gaming Acts is s 16 of the 1968 Act. It appears in Pt II of the Act, which part applies to gaming on premises licenced or registered under the Act. Subsection (1) prohibits, subject to sub-s (2), the holder of the licence or any person on his behalf or acting under any arrangements with him from, inter alia, making a loan or granting any credit to any person for enabling any person to take part in the gaming on the licensed premises. Subsection (2) prohibits the licence holder etc from accepting a cheque and giving in exchange cash or tokens for enabling any person to take part in the gaming on the premises unless certain conditions are fulfilled, but provides that, if they are, the giving of cash or tokens in exchange for a cheque shall not be taken to contravene sub-s (1). Subsection (3) does not call for mention, but sub-s (4) I must set out. It provides:

'Nothing in the Gaming Act 1710, the Gaming Act 1835, the Gaming Act 1845 or the Gaming Act 1892 shall affect the validity of, or any remedy in respect of, any cheque which is accepted in exchange for cash or tokens to be used by a player in gaming to which this Part of this Act applies.'

The club was at all material times licensed under the Act.

It will thus be seen that if Cass had first paid the cash withdrawn from the solicitors' client account into an account of his own on which he had then drawn a cheque for a like amount on that account in favour of the club and delivered it to the club in exchange for cash or tokens, the club would not have been prevented by s 18 of the 1845 Act or any of the other Acts from recovering on the cheque if it was dishonoured.

It will also be seen that the exchange of a cheque for cash or tokens is regarded as a transaction for the purpose of enabling gambling to take place, not as a gambling transaction.

So much for the statutory provisions which are immediately material. The club contends that when Cass exchanged cash (or cheques) for chips, they took for valuable consideration. A contract was then made, which contract was not by

[1992] 4 All ER 409, [1989] 1 WLR 1340

way of gaming or wagering and was thus unaffected by s 18 of the 1845 Act. It was at most a contract for the purpose of enabling gaming to take place, which is recognised by the 1968 Act to be a different contract.

I accept that, if there was a contract when Cass exchanged cash for chips, it was not a contract by way of gaming or wagering within the meaning of s 18 of the 1845 Act. No bet was then made and no bet might ever be made for Cass, having observed the run of play at a table or tables, might have decided not to play at all. Alternatively, he might have used some of the chips with which to play, some to pay for a meal or drinks and cashed in the remainder. It appears to me to follow from the decision of this court in Earl of Ellesmere v Wallace [1929] 2 Ch 1 that in such circumstances any contract made at the time of exchange was not caught by s 18.

Was there then a contract? Mr O'Brien QC for the solicitors appeared to me to proceed initially on the basis that there was, but that it was one within the section. In reply, however, he contended squarely that there was not. He accepted that if a customer, having obtained chips, later sought to return all or some of them in exchange for cash and the club refused to pay, the customer could recover the appropriate amount by action, but this he contended would not be by reason of any promise to pay but because the club had given no consideration. All it had given was a valueless piece of plastic which remained its own property and which it could refuse to accept as a bet or as payment for a meal or drinks if it wished to do so. In the light of the evidence I confess that I find this contention quite unreal. The whole basis of the transaction was that the club would redeem chips at their face value when presented, would accept them as bets and would accept them as payment for meals or drinks. It promised to do so and such a promise is, it appears to me, good and valuable consideration for the payment of the cash.

Both parties sought assistance from the provisions of the 1968 Act. For the club it was contended that it demonstrated that the acquisition of tokens was merely an agreement preparatory to or for enabling subsequent contracts by way of gaming or wagering to be made and that it would be absurd that, if the tokens were given in exchange for a cheque, the transaction would be valid but that if given in exchange for cash it would be invalid. For the solicitors it was submitted that, as the Act expressly validated cheque transactions, it was clear that transactions for cash were intended to remain invalid. The judge accepted the solicitors' contention. I am, with respect, unable to do so. The fact that cheque transactions alone were covered was, in my view, because the section was aimed at the prevention or restriction of gambling on credit and it is only where a cheque is given that credit is provided. There was thus no need to deal with cash transactions at all. For my part such significance as there may be in the provisions of the 1968 Act lies in the fact that a transaction under which tokens (or cash) are (is) given in exchange for a cheque is for the purpose of enabling gambling to take place. The cheque is consideration for the cash or tokens and the cash or tokens consideration for the cheque. Gaming or wagering contracts may or may not follow. If this is right it must surely follow that if cash is given for tokens each is valuable consideration for the other. The tokens or chips may be no more than pieces of plastic but that does not prevent them from being so.

On the simple ground that the club took the cash in good faith, for valuable consideration and without notice, the solicitors' claim against the club, in my view, fails. I should, however, make reference to some of the many authorities which were drawn to our attention. I deal first with those mentioned by Alliott J in his judgment on this point.

In Hill v William Hill (Park Lane) Ltd [1949] 2 All ER 452 at 478, [1949] AC 530 at 574 Lord MacDermott, in dealing with a question arising under the second limb of s 18 of the 1845 Act, said:

'... when default is made in payment of a debt of honour the defaulter may well find himself willing to confer, it may be by gift or contract, some advantage on the winner which he would not otherwise have thought of conferring. In contracts made in such circumstances it does not, in my opinion, necessarily follow that the consideration moving from the loser will always be a "sum of money or valuable thing alleged to be won upon any wager" within the meaning of s. 18. In cases of doubt I think the court must look to the reality of the transaction and come to a finding as to what the true intention was. Where the promise is to pay money it will generally, I think, be relevant to enquire whether the debt of honour is to be regarded as discharged by the payment, but the circumstances to be considered must, of course, depend on the facts of each instance.'

Alliott J relied on this passage in concluding that the chips transactions were in reality by way of gaming or wagering, but Lord MacDermott was doing no more than stating that the task of the court is to ascertain the true intention of the parties and what had to be considered in that case was simply whether the sum sought to be recovered was a sum of money or valuable thing alleged to be won upon any wager. Here the questions were different, namely whether the chips transactions were, apart from s 18, contracts at all and whether, if so, they were contracts by way of gaming or wagering. I accept that the reality must be looked at in both cases, but the reality in my view requires the first question to be answered in the affirmative and the second in the negative.

[1992] 4 All ER 409, [1989] 1 WLR 1340

Two further cases were relied upon by the judge. The first is Morgan v Ashcroft [1937] 3 All ER 92, [1938] 1 KB 49 in which a bookmaker claimed to recover against a client a sum of money alleged to have been overpaid to the client in respect of betting transactions due to a mistake of fact. The counterclaimed for a sum allegedly due to him. In this court it was held that the bookmaker's claim failed on two grounds. The first was that, in order to ascertain whether an overpayment had been made, an account would have to be taken and that since this would have involved recognising the betting contracts as producing legal obligations, notwithstanding the fact that they were null and void under s 18, the court could not do so and the claim must fail. The second ground was that the alleged mistake was simply that the bookmaker believed that a wagering debt was due from him to the client when it was not. If however it had been true, there would have been no liability to make the payment which would have been in law a voluntary payment. It could not therefore be recovered. The first ground would be an obstacle to the solicitors if the upholding of their claim would involve recognition that Cass's betting contracts had legal force, but it would do no such thing. The validity or otherwise of the solicitors' claim is not in any way dependent on recognising the validity of Cass's operations. It proceeds wholly on the basis that they were invalid. The only possible relevance of the first ground is that it demonstrates that a claim, not itself being a claim on a void betting contract, may fail because it is so dependent.

The second ground of the decision is not in my view of any relevance to the circumstances of the present case. No question of mistake arises.

The second case is Transvaal and Delagoa Bay Investment Co Ltd v Atkinson [1944] 1 All ER 579. In that case the first defendant had fraudulently obtained cheques intended for distribution to the plaintiff company's shareholders but had instead paid them into banking accounts of his wife, the second defendant, who had no knowledge that the money was that of the plaintiffs. She was no more than an innocent volunteer. The plaintiff's claim to recover from her failed. The judge observed that the club too were in the context of this claim innocent volunteers. If I am right in my view that they received the cash for valuable consideration, they were of course not volunteers, but have a good defence. If, on the other hand, they had no contract at all, or had only contracts rendered null and void by s 18 of the 1845 Act, it may be true that they were merely innocent volunteers. The circumstances of the two cases are however so wholly different that I could not regard the Delagoa case as being an answer to the solicitors' claim.

Finally, so far as the judgment is concerned, there is a group of American cases in which the owner of stolen money which the thief had lost in gambling were held entitled to recover from the bookmaker to whom it had been lost. Those cases are Conway v Conway (1893) 4 Misc 312, Brownlow v Davis (1943) 69 Ga App 111, Simpson v Brooks (1945) 208 Ark 1093 and Sinclair Houston Federal Credit Union v Hendricks (1954) 268 SW 2d 290. These cases would afford support to the solicitors' claim if the club was unable, contrary to my view, to establish that it took in good faith, for valuable consideration and without notice. They do not however impinge upon the defence so based. The judge found them, even on that basis, insufficiently persuasive for him to follow them. He also observed that those from New York and Arkansas were of little assistance, for they were based on local statutes conferring on losers the right to recover their losses. In so doing he was partially in error, but it is of little moment. What principally influenced him is, plainly, that it was conceded that there was no reported case in this jurisdiction in which the owner of stolen money had recovered it in a quasi-contractual claim from the person to whom the thief had lost it gambling and he was not prepared to extend the law.

I move from the cases referred to in the judgment to others that require mention. In MacDonald v Green [1950] 2 All ER 1240, [1951] 1 KB 594 this court had to consider the validity of a claim to recover money lent, the defence being that the money was irrecoverable by reason of the provisions of s 1 of the Gaming Act 1892, which provided that a promise to pay any person a sum of money paid by him under or in respect of any contract rendered null and void under the Gaming Act 1845 should itself be null and void and that no action should be brought to recover any such sum. The defendant at the request of a gambling loser advanced him money with an express stipulation that it should be used to pay off gambling debts. It was held that by reason of the express stipulation the promise to repay could not be enforced but that it would have been otherwise if there had been no such stipulation even if it had been contemplated by both parties that the borrower would probably use it for paying debts or even intended that it should be so used. An argument might, I think, have been founded indirectly on this case if there had been a stipulation that the chips obtained by Cass must be used for gaming or wagering, but there was no such stipulation.

In CHT Ltd v Ward [1963] 3 All ER 835, [1965] 2 QB 63 the plaintiffs were proprietors of a gaming club. Poker was played at the club and was lawful gaming under the Betting and Gaming Act 1960. Chips were used for the purpose of betting and as in the present case they could be used as the equivalent of cash for the purchase of food, drinks etc. When the chips were issued the member's account was debited with the face value and weekly statements were sent out for settlement. At the end of play players would normally exchange their chips for cash with the result that the plaintiffs

[1992] 4 All ER 409, [1989] 1 WLR 1340

paid the losers' losses to the winners. At the end of June 1961 the defendant's account was in debit in the amount of some £ 196 and the plaintiffs sought to recover the amount as money lent for the purpose of enabling him to engage in gaming at the club. It was held by this court that the reality of the transaction was that the plaintiffs had agreed to pay the defendants' losses up to the amount of chips handed over on a promise by her to reimburse them weekly and they had in fact paid such losses. Accordingly, the claim to recover was defeated by s 1 of the 1892 Act. In giving the judgment of the court Davies LJ said ([1963] 3 All ER 835 at 838, [1965] 2 QB 63 at 79-80):

'The main contention for the plaintiffs, put in various ways, was that the issue of the chips to the defendant was equivalent to a loan of money. The chips, it was said, were private currency. Any losses were paid at the table in such currency, and the defendant's promise to pay the plaintiffs was not a promise to repay any payment made by the plaintiffs to winners but was a promise to return the chips to the plaintiffs and to settle in account for cash any shortfall. And this promise, it is said, arose at the time when each batch of chips was taken by the defendant. It is impossible to accept this analysis of the situation. People do not game in order to win chips. They game in order to win money. The chips are not money or money's worth. They are mere counters or symbols used for the convenience of all concerned in the gaming. If actual money were lent to the defendant in order to game and the game were played for cash, the defendant would pay her own losses in cash and the plaintiffs would be under no obligation to pay anything to the winners. Conversely, it is to be observed that if the defendant paid actual cash to the plaintiffs on taking delivery of chips, the defendant would be under no obligation thereafter to pay anything to the plaintiffs, though, of course, the plaintiffs would be bound to pay cash to the winners to redeem the chips.'

Later he said ([1963] 3 All ER 835 at 842-843, [1965] 2 QB 63 at 86):

'... as the law ... stands, it would seem that if the true nature of the transaction in the present case were that the plaintiffs had advanced money to the defendant for the purpose of lawful gaming, the plaintiffs would have been entitled to succeed.'

That case was a case where the chips were supplied on credit, whereas here they were not.

The solicitors seek comfort from the observation that chips were not money or moneys worth of the defendants from (a) the statement that if the defendant had paid cash on delivery of the chips she would be under no obligation to pay anything thereafter to the club, although of course the club would be bound to pay cash to the winners to redeem the chips, and (b) the recognition that a genuine loan for the purpose of lawful gaming would be recoverable.

The observation that the chips were not money or moneys worth is in my view of little avail, when at the same time the court was saying both that if cash had been paid the club would have been bound to pay cash to winners and that a loan for the purpose of gambling would be recoverable.

In R v Crown Court at Knightsbridge, ex p Marcrest Properties Ltd [1983] 1 All ER 1148, [1983] 1 WLR 300 this court was concerned not with s 18 of the 1845 Act but with s 16 of the 1968 Act. The facts, so far as immediately relevant, were that a gaming club provided customers with chips in exchange for cheques. It was expected that the cheques would be dishonoured on first presentation and when this happened the club accepted further cheques for lesser sums.

Two questions arose; the first whether the acceptance of the original cheques, knowing that they would be dishonoured was a breach of s 16(1) by the granting of credit notwithstanding the provisions of sub-s (2); the second whether in accepting a lesser sum than the amount of the original cheque there was a contravention of the prohibition also in s 16(1) against 'the release of the whole or part of any debt ... in respect of any losses incurred by any person in the gaming'. Ackner LJ said ([1983] 1 All ER 1148 at 1154-1155, [1983] 1 WLR 300 at 309-310):

'This raises the question: how can a debt in respect of losses incurred in the gaming arise? If a customer loses either cash at the tables or tokens that he has bought with cash, then he owes no debt to the casino. He has gambled with cash or the equivalent and he has lost cash or the equivalent. We agree with the Divisional Court that a debt to the casino can only arise where credit has been given by the casino to the customer. However, as previously stated, the only lawful credit that the casino can give is to accept a cheque to enable the customer to take part in the gaming. Again, as previously stated, such a cheque must comply with s 16(2) and (3). Thus the only way in which a debt in respect of any loss incurred in gaming can lawfully arise is if that cheque is dishonoured ... In our judgment, when the cheque is given by the customer to enable him to take part in the gaming, and is subsequently dishonoured, then prima facie a debt has been incurred in respect of losses incurred in the gaming. Of course, if the customer can establish that he never used the cash or tokens purchased by means of his cheque, or that he in fact made no loss as a result of being enabled through the acceptance by the casino of his cheque to take part in gambling on their premises, then he will have destroyed the prima facie case that the cheque which was dishonoured had created a debt in respect of a loss incurred by him on the occasion of their cash-

ing his cheque ... The chips are purchased only for the purpose of enabling the purchaser to take part in the gaming. If they are used and a loss is incurred, that loss will arise before the cheque is in fact dishonoured.'

It is to be noted that the chips transaction was throughout treated as a quite separate transaction from the subsequent gaming.

The foregoing three cases all support the view that where cash is given for chips the transaction is separate and distinct from the subsequent gaming which it enables to take place.

I should however be reluctant to hold that the money was irrecoverable from the club merely because the chips transactions were interposed and that it would have been recoverable if, instead of obtaining chips for cash, Cass had actually gambled with the cash under what would clearly have been a gaming or wagering contract made null and void by s 18. The learned judge held, in effect, that even in those circumstances it would not be recoverable. If he was right no difficulty arises.

Was he right? Mr O'Brien contends that he was not. Mr Lightman contends that he was for a variety of reasons. Before the judge it was believed that there was no British case in which the owner of money which had been gambled away by a thief had been held entitled to recover it from the winning gambler. Since then Mr O'Brien or his learned junior has discovered a decision of Lord Mansfield CJ in which the owner was held to be so entitled. That case is Clarke v Shee and Johnson (1774) 1 Cowp 197, 98 ER 1041. The wager upon which the stolen moneys had been lost was upon the chances of tickets coming up in the state lottery of 1772. Section 19 of the Act 12 Geo 3 c 63 (national debt and lottery) of that year expressly prohibited such a wager, provided that any such wager and agreement relating thereto should be null and void and provided also that any person who offended against the prohibition should be subject to penalties. The thief was a clerk named Wood employed by the plaintiff. He had received moneys from the plaintiffs' customers in the ordinary course of business and used it for the wager. The plaintiff claimed to recover the moneys as moneys had and received to his use. In giving judgment Lord Mansfield CJ said (1 Cowp 197 at 200-201, 98 ER 1041 at 1043):

'The next sort of prohibition is founded upon general reasons of policy and public expedience. There both parties offending are equally guilty; par est delictum, et potior est conditio defendentis. The prohibition in the Lottery Act, stat. 12 Geo. 3, c. 63, is of this sort; and in this case no doubt but the defendants and the witness Wood were equally guilty. Therefore at Guildhall upon the first impression, I was of opinion against the plaintiff; because I thought that the master could not stand in a better situation than the servant, and the servant was clearly particeps criminis. But I changed my opinion; I thought, and now think, the plaintiff does not sue as standing in the place of Wood his clerk: for the money and notes which Wood paid to the defendants, are the identical notes and money of the plaintiff. Where money or notes are paid bonâ fide, and upon a valuable consideration, they never shall be brought back by the true owner; but where they come malâ fide into a person's hands, they are in the nature of specific property; and if their identity can be traced and ascertained, the party has a right to recover. It is of public benefit and example that he should: but otherwise, if they cannot be followed and indentified, because there it might be inconvenient and open a door to fraud. Miller versus Race ((1758) 1 Burr 452, 97 ER 398): and in Golightly versus Reynolds ((1772) Lofft 88, 98 ER 547), the identity was traced through different hands and shops. Here the plaintiff sues for his identified property, which has come to the hands of the defendants iniquitously and illegally, in breach of the Act of Parliament. Therefore they have no right to retain it; and consequently the plaintiff is well entitled to recover.'

This 200-year-old authority, so far as can be ascertained, has not been the subject of subsequent comment. It does not in my view avail the solicitors here. The defendants had won on a wager expressly prohibited by Act of Parliament; under the Act the winnings were subject to forfeiture and he was liable to a penalty of three times that amount. In such circumstances it is hardly surprising that it should have been held that he was not entitled to retain the money against the victim of the theft.

By contrast the club, on the hypothesis that they received the money under contracts rendered void by s 18 of the 1845 Act, received it under contracts which were not prohibited and which, although void and thus incapable of creating legal rights, created debts of honour and were lawful.

In Bridger v Savage (1885) 15 QBD 363, [1881-5] All ER Rep 1065 the plaintiff sought to recover from an agent, whom he had engaged to place bets for him, the amount which the agent had been paid on successful bets. The agent resisted the claim on the ground that the moneys had been paid under contracts which were rendered null and void by s 28 of the 1845 Act. The defence failed. Bowen LJ said (15 QBD 363 at 367-368, [1881-5] All ER Rep 1065 at 1067):

'As regards the law it appears to me to be clear, both on principle and according to the authorities, that there is no ground for the defence which has been set up in this action. Now with respect to the principle involved in this case, it is

to be observed that the original contract of betting is not an illegal one, but only one which is void. If the person who has betted pays his bet, he does nothing wrong; he only waives a benefit which the statute has given to him, and confers a good title to the money on the person to whom he pays it. Therefore when the bet is paid the transaction is completed, and when it is paid to an agent it cannot be contended that it is not a good payment for his principal. If not, how monstrous it would be that the agent who has received money which belongs to his principal, and which he received for his principal, and only on that account, should be allowed to say that the payment was bad and void.'

In the present case Cass's position was, it appears to me, very similar. If he had used cash instead of tokens to place his bet he would have done nothing wrong. When he paid on the bet, having lost, or received payment having won, neither he nor the club would have done anything wrong. They would each have conferred a good title on the other to the money. The transactions would have been completed.

Prior to completion Cass could of course have refused to pay, but once he had paid that would have been an end of the matter. He could not recover money paid on a consideration which had wholly failed because the contract was no longer executory. What is void is the promise to pay not the payment. When payment is made the loser gives consideration and he does not in my view give it for a consideration which has failed. When he places his bet, eg on a roulette game, and the casino accept it, he obtains in exchange the chance of winning and thus being paid, and confers on the casino the like chance of winning and being paid. The respective promises to pay are void but in my view when the bet is paid, whichever way the payment goes, the payee takes the money for valuable consideration.

Conversion of the draft

The circumstances here were that the draft together with another draft for £ 23,000 was obtained from the bank in exchange for a single cheque drawn in favour of the bank. It is common ground that the draft for £ 23,000 was obtained and used for a lawful purpose. The judge concluded that the particular draft for £ 3,735 was also so obtained. It is contended that he should not have done so, because it was not pleaded and because there was in any event no evidence to support such a finding. I am unable to accept either contention, but I do not consider that either of them makes any relevant difference. That Chapman had authority to present cheques in favour of the bank and receive in exchange drafts in favour of the solicitors is beyond doubt. It may well be that Cass intended throughout that when the draft for £ 3,735 was brought to him he would use it for his own purposes, but when the bank handed the draft in favour of the solicitors to Chapman, the solicitors' own agent, it was, as it seems to me, plain that they intended it to become and it did become the solicitors' property. Mr Lightman contended on the basis of two cases in the Privy Council, Union Bank of Australia Ltd v McClintock [1922] 1 AC 240 and Commercial Banking Co of Sydney Ltd v Mann [1960] 3 All ER 482, [1961] AC 1, that this was not so, that the solicitors did not get title when the draft was handed to Chapman, that they could not get title without ratifying Chapman's (or Cass's) authority to obtain the drafts and that they could not do this without also ratifying Cass's subsequent dealing with it, which ratification would defeat this claim. Mr Lightman even went so far as to contend that had Cass's partners met Chapman on his way back from the bank and demanded the draft Chapman could properly have refused to hand it over unless and until they had first ratified the transaction. The authority of the two cases relied on is not binding upon us but must be regarded as particularly persuasive in view of the individual authority of those concerned. Nevertheless, I find great difficulty in following the reasoning. I am also quite unable to accept that the decisions establish that in cases such as the present, either in relation to the drafts or the cash, that the solicitors had no property in either unless and until they ratified. It does not however in my view matter. To maintain an action in conversion it is sufficient for the solicitors to show an immediate right to possession and this in my view they had. If at the very moment that Cass was about to hand over the draft to the club Mr Gorman (one of the partners) had stepped in and demanded it be delivered to him on behalf of the firm I cannot see that Cass would have had any answer. What could he say? 'No, you cannot have it because I have stolen or am about to steal it?' Any such suggestion appears to me absurd. I add however that the suggestion that the property in it never passed to the solicitors appears to me wholly unsustainable. The draft was made out to the solicitors and handed to their agent. Cass cannot have stolen it before it was handed over, albeit he may have intended to do so the moment he got his hands on it, but that is a different matter. It is not suggested that Chapman stole it. When he received it, it was plainly his duty to hand it to the solicitors and, having so received it, the property in my view then passed to them. There was intention to pass property and a delivery. The learned judge's conclusion in respect of the draft was in my view correct.

So far as concerns the club's appeal and cross-appeal I would therefore dismiss both.

The solicitors' claim against the bank

All the cheques were within the bank's mandate and, there being funds to meet them, the bank's primary obligation was to honour them. Such obligation is however not absolute. It is common ground that in some circumstances a bank

[1992] 4 All ER 409, [1989] 1 WLR 1340

would, notwithstanding that it honoured a cheque duly signed by a person whose signature it was authorised and required to honour, nevertheless be acting in breach of contract. An extreme example would be where the bank in fact knows a cheque is being drawn in fraud of the customer or, what amounts to the same, they turn a blind eye to the obvious.

The solicitors' claim against the bank in the present case is based on the alternative grounds that in honouring the cheques the bank acted in breach of contract or rendered themselves liable as constructive trustees.

The judge did not separately deal with the contractual claim, but held the bank liable as constructive trustees. His basis for doing so depended on findings in relation to Mr Fox who had taken over as manager of the branch in July 1979 and remained as manager throughout the period of Cass's fraudulent operations. The judge said ([1992] 4 All ER 331 at 355, 357, [1987] 1 WLR 987 at 1012-1013, 1014):

'I find as a fact that Mr Fox deliberately and systematically suppressed his knowledge of Cass's gambling from coming to his superior's notice. I find as a fact that Mr Fox deliberately lied to Mr Gorman in the terms of his own note, denying that the bank were in any way on notice of Cass's gambling. Why should he do that? He was certainly acting with want of probity. I have been driven to the conclusion-reluctantly, since it impugns the honour of a man who has not had the opportunity to give evidence because of a tactical decision on the part of his employers-that his conduct is only explicable upon the basis that he was shutting his eyes to the obvious source of Cass's money to gamble with, or was wilfully and recklessly failing to make such inquiries as a reasonable and honest man would make. I find that Mr Fox and therefore the bank, did have reasonable grounds for believing that the probability was that Cass was operating the clients' account in fraud. The conduct of, I assume, an otherwise honourable man is only explicable on the ground that he knew full well what he would find and dare not look. I have reached this conclusion upon the basis of the inferences to be drawn from the facts established relating to Mr Fox's own conduct ... In their submissions, the solicitors contend that Mr Fox should have briefed himself for the interview of 15 May 1980 by looking at, inter alia, the clients' account and could only fail to appreciate what Cass was doing if he wilfully closed his eyes. I am not prepared to fix Mr Fox with knowledge before 3 July 1980, when, in the memorandum card, he records his refusal to accept that Cass's gambling is a controlled outlay. From that date I hold the bank are liable (subject to my findings hereafter) as constructive trustees for rendering knowing assistance.'

If these findings are sustainable there can be no doubt that the bank were liable both as constructive trustees and for breach of contract. For the bank, however, Mr Sumption QC submits, first, that it was not pleaded that Mr Fox had reasonable grounds for believing that the probability was Cass was operating the client account in fraud and had wilfully closed his eyes to what he knew full well he would find there and that it was accordingly not open to the judge so to find, secondly, that even if it was open on the pleadings there was no evidence on which the judge could so find, thirdly, that there was no sufficient evidence to render the bank liable either as constructive trustees or for breach of contract on any other basis and, fourthly, that the only real question was whether the bank were liable for breach of contract, because if they were, the question whether they were liable as constructive trustees was irrelevant and, if they were not liable for breach of contract, they could not be liable as constructive trustees.

In essence the solicitors' case was simply that the judge was correct so far as he went, but that (a) he ought to have fixed the bank with knowledge from May rather than July 1980 and (b) he ought not to have found that as from 29 September the solicitors were entirely the authors of their own wrong.

I have no hesitation in accepting the fourth of Mr Sumption's submissions. The contrary was indeed not seriously argued. It is in my view clear that the bank could not have rendered itself liable as constructive trustee unless it was also liable for breach of contract and that if it was not liable for breach of contract it could not be liable as constructive trustee. This is because, stated in broad terms, the bank's duty to pay cheques signed in accordance with its mandate is subject to the qualification that it must be performed without negligence and that (i) negligence may exist where there is no question of the circumstances giving rise to a finding of constructive trusteeship, (ii) if there is no negligence I cannot envisage, at least in this case, any facts which would found liability on the ground of constructive trusteeship. I find it therefore unnecessary to say anything further with regard to Mr Sumption's fourth submission.

I shall consider next the first submission and thereafter the second and third submissions taken together.

First submission-the pleading point

The rereamended statement of claim contained, so far as material, the following allegations with regard to the bank:

[1992] 4 All ER 409, [1989] 1 WLR 1340

'5. There were implied terms of the agreement referred to in paragraph 4 hereinabove for the operation and maintenance of the Client Account as follows namely: (1) that the Second Defendant [the bank] would exercise reasonable care and skill in the maintenance and operation of the Client Account and in particular in making payments out of or debits from the said account to ensure that the such payments and debits were proper debits and payments and not part of a fraud; and (2) that the Second Defendant would make such inquiries and give such warnings to the Plaintiff firm's partners other than Mr. Cass as might in the circumstances be appropriate and practical if the Second Defendant had or an honest and reasonable banker in the position of the Second Defendant would have had grounds for believing that a person such as Mr. Cass purporting to operate the Client Account was operating or otherwise acting in relation thereto for the purpose of or with the intention of looting the Client Account ...

18. (1) At all material times the Second Defendant knew or ought to have known, or alternatively knew or ought to have known of circumstances which would have indicated or was put on enquiry that such payments and debits and issue of drafts as are referred to in paragraph 7 hereinabove were made or procured to be made as part of the said dishonest and fraudulent design by Mr. Cass. An honest and reasonable banker in the position of the Second Defendant would or should have known thereof alternatively would have been put on such enquiry. (2) In making such payments, debits and issuing such drafts as are referred to in paragraph 7 hereinabove the Second Defendant (a) assisted with knowledge, being the knowledge referred to in subparagraph (1) hereof in the dishonest and fraudulent design perpetrated by Mr. Cass in relation to the Client (b) in breach of the implied terms referred to in paragraph 5 hereinabove failed to exercise reasonable care and skill in operating the Client Account and failed to make such inquiries as were in the circumstances appropriate and practical ...'

Paragraph 18 continued with particulars which need not be set out, for they were, in effect, superseded by later particulars.

There were two sets of such particulars, the first of which was provided pursuant to request and the second of which was headed 'Voluntary Further and Better Particulars of the Amended Statement of Claim'. I refer only to the second set.

Under para 18 the plaintiffs set out what they alleged Mr Fox (a) knew, and (b) ought to have known. Under (a) the immediately material averments were that Mr Fox knew 'that Mr. Cass was accustomed to indulge in gambling on a scale which he could not afford' and 'that Mr. Cass's said gambling was at least in part financed from a source of funds of which Mr. Fox had no actual knowledge' (my emphasis).

Under (b) such averments were that Mr Fox ought to have known 'that a source of funds with which it was possible that the credits to Mr. Cass's account (other than credits arising from his drawings or income from the Plaintiffs) was the client account' and 'that a source of funds with which it was possible that Mr. Cass could finance his gambling activities was the client account' (my emphasis).

It was thus specifically alleged that Mr Fox did not know whence came the funds with which Cass was in part financing his gambling activities and that what he ought to have known was only that it was possible that Mr Cass could be financing his gambling from the client account.

There is no allegation that Mr Fox deliberately and systematically suppressed his knowledge of Cass's gambling from coming to his superiors' notice, or that long after the event he had lied to Mr Gorman when he said that the bank were on notice of Cass's gambling, or that from these or other facts it was to be inferred that Mr Fox was shutting his eyes to the obvious source of Cass's money with which to gamble or was wilfully and recklessly failing to make such inquiries as a reasonable and honest man would make, or that Mr Fox had reasonable grounds for believing that the probability was that Cass was operating the client account in fraud, or that Mr Fox knew full well what he would find if he looked at the client account and dare not look.

It was in the absence of these allegations and on the basis of the evidence as it stood at the close of the solicitors' case that Mr Sumption made his submission that there was no case and as a consequence called no evidence. His submission that it was not open to the judge to make such findings is supported by two decisions of this court, Belmont Finance Corp Ltd v Williams Furniture Ltd [1979] 1 All ER 118, [1979] Ch 250 and Nihill (a minor) v Nihill (1983) 134 NLJ 633. Neither of those two cases in my view establish that a pleading that a defendant knew or ought to have known that transactions were part of a fraudulent or dishonest design is a bad pleading if followed by proper and sufficient particulars. Paragraph 18 of the solicitors' pleading in the present case stands, in my view, thus: (1) if not followed by particulars, it would be manifestly defective quite generally on the ground of want of particularity; (2) it would allow of particulars being given under it to support the plea of actual knowledge or of a wilful shutting of ones eyes to the

[1992] 4 All ER 409, [1989] 1 WLR 1340

obvious or of wilfully or of recklessly failing to make inquiries or of having reasonable grounds for believing that Cass was probably operating the client account in fraud; (3) its actual ambit is, like any other paragraph which requires to be particularised, defined, restricted or limited by the particulars in fact given.

In the instant case the findings of Alliott J, as he expressly recognised, impugn the honour of a man who, owing to a perfectly proper tactical decision by Mr Sumption, had no opportunity to give evidence. They, in effect, uphold a charge of serious dishonesty which was not within the particulars pleaded and, with respect to the learned judge, such findings should not in my view have been made and cannot be relied on on this appeal.

The pleading point was fully argued during the course of Mr O'Brien's opening of his case against the bank and we then decided to allow the substance of the case to be fully argued and to reserve our judgment on the pleading point until the judgment on the appeal. I have given above my views thereon. I should add that during the argument on the pleading point both sides canvassed subsidiary arguments based on the manner in which the trial had proceeded and the extent to which adverse inferences could be drawn from the fact that Mr Fox had not been called. I do not myself consider that they affect the matter: as to the first because such indications as there were, prior to or after Mr Sumption's election to make a submission and call no evidence, that the solicitors intended to set up a positive case of dishonesty were and are not sufficient in my view to overcome his objection either at the trial or in this court: as to the second, because whatever inferences it might have been legitimate to draw from failure to call Mr Fox cannot include inferences that Mr Fox was guilty of unpleaded dishonest conduct.

The second and third submissions

Mr Sumption submitted that there was no evidence to support the judge's findings, or any other findings, to warrant a conclusion of breach of contract or of liability as a constructive trustee.

The law

That a bank has a duty of care to its customers when carrying out its mandate is beyond doubt, but so to state advances matters but little, for in each case the question for decision is whether a bank has failed in that duty and there are very many cases on the subject, a considerable number of which were cited in argument. In my view such cases must be approached with caution, for essentially they are no more than decisions of fact, ie of the application of the law to an endless variety of circumstances. Expressions in them, such as that a paying bank must pay under its mandate save in extreme cases, or that a bank is not obliged to act as an amateur detective, or that suspicion is not enough to justify failing to pay according to the mandate, or other like observations which are to be found in the cases, are no more than comments on particular facts or situations and embody in my view no principles of law. Furthermore, what would or might have been held to be a breach of duty at one time may not be a breach of duty at another. As Diplock LJ said in Marfani & Co Ltd v Midland Bank Ltd [1968] 2 All ER 573 at 579, [1968] 1 WLR 956 at 972:

'What facts ought to be known to the banker, i.e., what inquiries he should make, and what facts are sufficient to cause him reasonably to suspect that the customer is not the true owner, must depend upon current banking practice and change as that practice changes. Cases decided thirty years ago when the use by the general public of banking facilities was much less widespread, may not be a reliable guide to what the duty of a careful banker, in relation to inquiries and as to facts which should give rise to suspicion, is today.'

In addition, cases relating to a collecting banker being sued in conversion and those relating to a paying banker sued for breach of contract raise different considerations. In the former class of case it is for the banker to establish that he collected without negligence, in the latter the burden is on the customer to prove negligence. The statutory protection is also different in the two types of case, as can be seen from the observation of Greer LJ in Carpenters' Co v British Mutual Banking Co Ltd [1937] 3 All ER 811 at 816, [1938] 1 KB 511 at 529:

'In my judgment, the Bills of Exchange Act, 1882 s. 60, protects a bank only when that bank is merely a paying bank, and is not a bank which receives the cheque for collection.'

Finally, it is to be noted that the distinction between liability as a constructive trustee and liability for breach of contract is frequently blurred or unconsidered.

For the above reasons it would not in my judgment serve any useful purpose to embark on an analysis of the many authorities cited.

In the course of his judgment Alliott J said ([1992]4 All ER 331 at 349, [1987] 1 WLR 987 at 1006):

[1992] 4 All ER 409, [1989] 1 WLR 1340

'When (as in this case) the alleged constructive trustee is a bank, the court's approach must reflect the established contractual duties of a bank. In this context counsel for the bank made five propositions to me, as follows. (1) The bank is entitled to treat the customer's mandate at its face value save in extreme cases. (2) The bank is not obliged to question any transaction which is in accordance with the mandate, unless a reasonable banker would have grounds for believing that the authorised signatories are misusing their authority for the purpose of defrauding their principal or otherwise defeating his true intention. (3) It follows that if a bank does not have reasonable grounds for believing that there is fraud it must pay. (4) Mere suspicion or unease do not constitute reasonable grounds and are not enough to justify a bank in failing to act in accordance with a mandate. (5) A bank is not required to act as an amateur detective. Those propositions were well supported by authority which it is unnecessary for me to cite, and I accept them. Counsel for the bank also conceded that if the bank had reasonable grounds for believing that Cass was operating the clients' account in fraud of the solicitors, then it is accepted that it is the duty of the bank not to honour cheques drawn by Cass even when drawn within the mandate. Again I approach that concession on the basis that reasonable grounds must be construed in the light of the three types of knowledge I have restricted myself to considering.'

So far as breach of contract is concerned the judge's approach was in my judgment more favourable to the bank than was justified if, as appears to be the case, he considered that some want of probity was required even to establish breach of contract. Mr Sumption had not so submitted nor did he so submit before us. If a reasonable banker would have had reasonable grounds for believing that Cass was operating the client account in fraud, then, in continuing to pay the cash cheques without inquiry, the bank would, in my view, be negligent and thus liable for breach of contract, albeit neither Mr Fox nor anyone else appreciated that the facts did afford reasonable grounds and was thus innocent of any sort of dishonesty.

In Nihill (a minor) v Nihill (1983) 134 NLJ 633, [1983] CA Transcript 276 Slade LJ said:

'There is thus a strong expression of opinion of a majority of this court in the Belmont case, though without finally deciding the point, that constructive notice will not suffice to render a person liable as constructive trustee under this head, unless he has wilfully shut his eyes to dishonesty, or has wilfully or recklessly failed to make such inquiries as an honest and reasonable man would make. Nevertheless, for present purposes, I for my part would be prepared to assume in favour of the plaintiff, though without deciding the point, that the onus of proof which she would have to satisfy in regard to knowledge on the part of the bank would be less onerous than that. I would be prepared to assume, without so deciding, that if there were facts known to the bank which ought to have alerted it to the probability that the first and second defendants were committing fraudulent breaches of trust, this would render the bank liable as constructive trustee, if it had assisted in such breaches by allowing the relevant moneys to be drawn out of the relevant account. I deliberately refer to probability rather than to possibility, because in my opinion on no footing could the bank have become liable as constructive trustee in allowing these moneys to be drawn out of the trust account merely because it knew of the possibility that breaches of trust were being committed. If mere possibility sufficed to fix a bank with liability as constructive trustee in such circumstances, potential liability would arise in almost any instance where a bank allowed trustees to draw on a trust account.' (Slade LJ's emphasis.)

Slade LJ was there considering a case based on constructive trusteeship, not breach of contract, but to a great extent his observations are in my judgment equally applicable to a claim based on breach of contract. I would not, however, accept that a bank could always properly pay if it had reasonable grounds for a belief falling short of probability. The question must be whether, if a reasonable and honest banker knew of the relevant facts, he would have considered that there was a serious or real possibility albeit not amounting to a probability that its customer might be being defrauded, or, in this case, that there was a serious or real possibility that Cass was drawing on the client account and using the funds so obtained for his own and not the solicitors or beneficiaries' purposes. That, at least, the customer must establish. If it is established, then in my view a reasonable banker would be in breach of duty if he continued to pay cheques without inquiry. He could not simply sit back and ignore the situation. In order so to establish the customer cannot, of course, rely on matters which a meticulous ex post facto examination would have brought to light. Such an examination may well show that it was indeed obvious what Cass was doing, but in the present case the inquiry is simply whether Mr Fox, and therefore the bank, had, on the basis of the facts and banking practices established at the time, reason to believe that there was a serious possibility that Cass was misusing his authority to sign under the mandate in order to obtain and misapply the cash handed to Chapman in fraud of the solicitors.

The solicitors' case has three elements, which can be conveniently summarised as follows. (a) Fox knew that Cass was an uncontrolled gambler, that the turnover on his account was such that he must be obtaining moneys from some source other than his salary and that Cass had in the past lied to the bank and/or failed to honour promises made to the bank. A reasonable banker would therefore have reason to conclude that there was at least a serious possibility that the

[1992] 4 All ER 409, [1989] 1 WLR 1340

client account was the source of the funds. (b) The cash drawings on the client account would have revealed that the vast majority were on Cass's signature and that the amounts and frequency of the drawings would quite apart from (a) above have given a reasonable banker reason to conclude that there was at least a serious possibility that Cass was misapplying the moneys drawn. (c) If either (a) or (b) alone would not have led a reasonable banker so to conclude, the two taken together would have done so.

The facts

These are very fully recited in the judgment. I do not propose therefore to do more than set out those of them which appear to me of the most importance and to add certain matters which were not referred to in the judgment. I begin with facts relating to the branch itself. Although it was not a particularly large branch, its statistical records show, amongst other things, that in the period with which we are directly concerned, that is to say the first and second six months of 1980 the total staff numbered 25; there were between 2,800 and 2,900 current accounts in operation; a little over 1,600 current account items per day were dealt with; cash transactions averaged about 440 per day; there were five cashiers.

The bank's internal instructions, so far as the encashment of cheques are concerned, provided that up to a floor limit, fixed by the manager, they might be encashed at the discretion of the cashier, provided that the name of the drawer was not on the cashier's warning list. Above the floor limit cashiers were required to check 'for signature and availability of balance before encashment unless the identity and credit standing of the drawer are known to the cashier'. As to crossed cheques the instructions were that they should only be cashed for the drawer or a person known to the bank as his agent and that an encashment supported by a letter apparently signed by the drawer must be referred to the manager.

None of the cheques here in question would, as it seems to us, have called for reference to Mr Fox, nor is it suggested that they should.

As to the manager it was provided that 'the manager or his deputy should examine periodically the whole of the day's current account vouchers, noting particularly any failure to carry out the rules and any possible irregularities in customers' accounts.

Such periodic checking would clearly not have revealed the pattern of cash withdrawals, but the system could not in my view be regarded as inadequate.

I now turn to the facts relating to Cass and his current account and the solicitors' current account. I take the latter first. We have been helpfully provided with a schedule of all cheques drawn for cash on the account from 1 January 1979 to the end of November 1980. The first of such cheques alleged in the statement of claim to have been drawn fraudulently is dated 15 April 1980, this despite the exhaustive inquiries which had been made before that pleading was delivered. It is however suggested that some of the cheques so drawn in the previous year may have been fraudulent. In the previous year there were some 43 of such cheques varying in amount from £ 10 to £ 4,630.76. All save 15 of these were signed by Cass. Of the remainder, eight were signed by Mr Lipkin and seven by Mr Klinger. In the subsequent period of eight months 86 such cheques were drawn, of which some 63 totalling £ 227,474 were drawn fraudulently. The pattern of such drawings, so far as the 63 cheques are concerned, calls for mention. It was as follows: April 4, May 6, June 4, July 7, August 13, September 2, October 16 and November 11. There were 24 in what may be called round numbers. The remainder were for specific amounts, sometimes to the extent of including pence.

The cash transactions amounted to about one in seven of the debit entries on the account. This would not, however, have been apparent from a check on the account sheets, only by an examination of the cheques themselves.

The overall situation which has therefore to be considered is one in which there were a maximum of 63 fraudulent cash cheques drawn by an authorised signatory on one of some 2,800 current accounts over a period during which there were many thousands of cash transactions and during which the total debit entries on the fraudulently operated account were about seven times the number of fraudulent entries.

In order for Mr Fox to have had any reason to believe that there even might be something wrong with the operation of the client account, he would have had to examine the paid cheques and conclude that on the basis of their signatures, amounts and frequency, this was a serious possibility.

On the evidence I can see no basis upon which it could be said that a reasonable banker would either have done so or, had he done so, would have had reason to believe any such thing. The solicitors' evidence, given by an admittedly exceptionally zealous retired banking witness, was only that he would have conducted irregular checks, that this would

have included only flicking through the cheques, that he would not have paid particular attention to them, that the size of the withdrawals would not have raised suspicion and that the frequency of withdrawals would not have done so until October. Furthermore, having expressed the view that Mr Fox connived in Cass's activities there followed this question and answer:

'Q. Mr Marks please listen most carefully to my question and answer that question only. Is it the gambling that you say he connived in or is it the theft? A. I must say the gambling because I have no knowledge of the actual thefts. I could have had no knowledge that there were thefts at the time.'

In my view it could only have been if Cass's operations on his private account, together with Mr Fox's knowledge of his personal behaviour, would have caused a reasonable bank manager to consider that there was a serious possibility that Cass might be operating the client account fraudulently that any such investigation of that account should have taken place as would have confirmed such possibility.

I turn therefore to Cass himself. Mr Fox certainly knew that he was an uncontrolled gambler. Equally certainly his dealings with the bank were such that Mr Fox would not have tolerated his retention as a customer, but for his introduction by and continued association with the bank's valued clients. I can however find nothing in the evidence which suggests that a reasonable bank manager, knowing what Mr Fox knew, would have had reason to believe that there was a serious, or any possibility, that he might be 'looting' the client account. Despite his shortcomings in his dealings with the bank, he had come recommended by a highly respectable firm of solicitors, and any bank manager would, as it seems to be, have regarded any such fraudulent conduct on his part as virtually unthinkable. The evidence of the plaintiffs' banking witness was very clear on the point. I quote:

'Q. You had 45 years' experience of retail banking? A. To be perfectly correct, 40 years; I was away in the forces for five years.

Q. Would you agree that the fraudulent operation of business accounts by authorised signatories is fortunately relatively rare? A. Fortunately, yes.

Q. Have you ever in your experience as a banker experienced a case of a partner of a firm of solicitors stealing large amounts of clients' money by the fraudulent use of his power to sign the cheques? A. Fortunately, never.

Q. In 40 years? A. No.

Q. And the average bank manager would regard a practising solicitor, I take it, as about the most respectable client that he could have? A. Yes, I would think so.

Q. And the least likely to be committing a fraud? A. I would be most loathe to accuse a solicitor of fraud, yes.

Q. And that would apply with particular force if he was also a partner of a highly respectable firm which had been banking with the branch for a number of years? A. Certainly.'

Why, then, should Mr Fox ever have suspected that Cass might be looting the client account? Much reliance was placed on the increased turnover on his current account, but on examination of the figures in the light of the solicitors' banking evidence I consider there is no significance in the point.

The point most urged by the solicitors was that Mr Fox knew that Cass was a gambler, did not inform his superior of the fact and afterwards lied to Mr Gorman about the matter. It was upon this that the learned judge principally relied in reaching his conclusions. In so doing he, in my judgment, erred. True it is that Mr Fox did not inform his superior. It may be that in duty to his employers he should have done so, although I regard this as by no means certain. He was not seeking authority for any overdraft that was not within his discretion or which, if granted, might have exposed the bank to risk and he was effectively ensuring that Cass's operations on his personal account were contained. Even, however, if he was negligent vis-à-vis his employers, this does not show that he was negligent vis-à-vis his customers, the solicitors. Far less does it justify any inference that he deliberately suppressed the knowledge of gambling and deliberately refrained from investigating the client account because he knew what he would find there.

It would serve no useful purpose in what has, I fear, already been an over-long judgment, to examine each of the straws relied upon by the solicitors to make the bricks necessary to constitute proof of negligence. I can only say that in my view they do not do so.

Mr Fox was dealing with an extremely cunning man, whom he had no reason to believe might be a thief, let alone a thief from his employers' client account, any fraudulent operation of which would be inviting discovery by his employ-

ers before very long. If the solicitors' submissions were to be accepted, it would in my view place on banks a wholly unrealistic burden, for it would involve the manager of a bank which held a solicitors' client account and also the personal accounts of one or more of the partners, with power of signature on the client account, continually monitoring the personal and client accounts for signs that one of the partners might be abusing his signing powers.

I do not consider that a case of negligence has been made out, still less a case that the bank were liable as constructive trustees. I would therefore allow the appeal of the bank and dismiss the cross-appeal of the solicitors under this head.

The claim on the undertaking

I need say no more about this than that I can see no ground for interfering with the judge's conclusion and I would dismiss the solicitors' appeal against such conclusion.

The foregoing conclusions make it unnecessary to deal also with questions of causation or contributory negligence.

**JUDGMENTBY-3:** NICHOLLS LJ.

**JUDGMENT-3:**

NICHOLLS LJ.

The main claim against the club: (1) valuable consideration

The plaintiff solicitors' appeal against the Playboy Club (the club) in Park Lane is in respect of money drawn from the firm's client account with Lloyds Bank plc (the bank) on cheques signed on behalf of the firm by Mr Cass. All the cheques with which this appeal is concerned were cheques requiring payment in cash. The cash so drawn was taken by Mr Cass to the club. There it was spent by him on gaming. Ultimately it was all lost, almost entirely at American roulette. The gaming procedure at the club was this. Gaming took place with chips. Normally cash would be exchanged for chips at the gaming table. Large amounts of cash, however, were exchanged at the cash desk on any floor for a slip, confusingly known as a cheque credit slip, which would then be exchanged for chips at any gaming table. At the end of his play a punter obtained at the table a cheque credit slip of appropriate amount for any chips, including winnings, he then had. He could then exchange that slip for cash or a club cheque at the cash desk. In the present case Mr Cass did win from time to time, but all his winnings were subsequently lost in further gaming at the club's casino. Altogether he, a solicitor and partner of the plaintiff firm, gambled away in this fashion over £ 200,000, extracted from his firm's client account.

On the assumption, to which I shall return, that the money drawn from the solicitors' firm's account and used by Mr Cass in this way was the firm's money, the question which arises is whether the money was received by the club in good faith and for valuable consideration. If it was, then it is not recoverable by the solicitors even though it was stolen money. Lord Mansfield CJ set out the principle in Miller v Race (1758) 1 Burr 452 at 457-458, 97 ER 398 at 401:

'It has been quaintly said, "that the reason why money can not be followed is, because it has no earmark:" but this is not true. The true reason is, upon account of the currency of it: it can not be recovered after it has passed in currency. So, in case of money stolen, the true owner can not recover it, after it has been paid away fairly and honestly upon a valuable and bonâ fide consideration: but before money has passed in currency, an action may be brought for the money itself.'

The club's good faith is not in doubt. What is in issue is whether the club gave valuable consideration. If the money itself had been used in play at the gaming table it is clear that the club would not have furnished valuable consideration. Under s 18 of the Gaming Act 1845 all contracts or agreements by way of gaming or wagering are made null and void. So that if the money had been staked by Mr Cass on the table, and had been received by the club at the table when Mr Cass's play was unsuccessful, the club would not have given valuable consideration. The money would have been paid to the club under a void contract. Under that contract the club assumed an obligation to pay Mr Cass if he won, but in law that obligation was void.

No doubt Mr Cass himself could not have recovered money he had staked at the table and lost. He would have paid the money to the club in satisfaction of a gaming 'debt'. Although that debt was void in law, and hence would not constitute valuable consideration for the payment, Mr Cass could no more have recovered from the club the money paid over by him with the intention of satisfying a gaming 'obligation' than can a donor recover from his donee money paid to the

donee by way of gift. As Bowen LJ observed in Bridger v Savage (1885) 15 QBD 363 at 367, [1881–5] All ER Rep 1065 at 1067:

'If the person who has betted pays his bet, he does nothing wrong; he only waives a benefit which the statute has given to him, and confers a good title to the money on the person to whom he pays it.'

He confers a good title, in the same way as a donor confers a good title on his donee. In each case the money would be irrecoverable by the payer. But in neither case would the payee have furnished valuable consideration for the money received by him. So if the payer's title to the money were defective, the true owner of the money could, in each case, assert his title against the recipient of his money. The recipient, whether payee or donee, would be a mere volunteer.

The club's case is that the gaming took place, not with cash but with chips. The club contends that the exchange of the firm's money for chips preparatory for play and immediately prior to play, either at the table itself or at one of the cash desks in the way I have described, makes all the difference. I am unable to accept this. The cheque credit slips were no more than receipts for the cash handed in at the cash desk. Likewise the chips. They were no more than tokens which it was convenient to use in play in preference to cash. As Davies LJ observed in CHT Ltd v Ward [1963] 3 All ER 835 at 838, [1965] 2 QB 63 at 79, the chips were not money or money's worth; they were mere counters or symbols used for the convenience of all concerned in the gaming. As tokens, the chips indicated that the holder had lodged cash with the club or, when a cheque had been used, had been given credit by the club, to the extent indicated by the tokens. It is as though the customer had been given a series of receipts in respect of the money handed over by him prior to beginning to play. The money was to go to the winners, or be returned to the customer if not spent on gaming. When the customer played at the table he was playing with the money he had brought with him to the casino, just as much as if he had used the banknotes themselves rather than the chips for which he had exchanged the banknotes preparatory to the start of play.

I do not believe that this internal, preliminary, preparatory step, of issuing chips for cash, adopted for considerations of practical convenience, can have the effect in law that the club gave valuable consideration for the money it received, when the position in law under the statute is that if money rather than tokens had been used at the table the club would not have given valuable consideration. I find such a conclusion repugnant to common sense. I have the utmost difficulty in accepting that the handing over of cash for tokens to be used in gaming can be a transaction for valuable consideration when use of the cash itself for the same gaming would not be a transaction for valuable consideration. In my view receipt of money 'up front' by the croupier or cashier in the casino from a would-be gambler before he can play, on terms that any money not lost on gaming will be refunded, does not constitute the giving of valuable consideration by the club for the purpose of the club acquiring a good title to stolen money.

I turn to consider more closely the legal effect of the contract relied on by the club. In my view this contract gives rise to considerable difficulties. It is said that the club bound itself to redeem any unused tokens and that this obligation was valuable consideration. No doubt the club, and those who used the club's facilities, proceeded on the common understanding that on request the club would pay cash (or issue a club cheque) in exchange for chips handed in by the customers. But there could not have been a legally enforceable contract in those terms. I am not persuaded that a customer who presented chips, or a cheque credit slip, representing his winnings to the cashier could have sued the club for payment in the very unlikely event of payment being refused. Such a claim would seem to fall squarely within the second limb of s 18 of the Gaming Act 1845, which prohibits the bringing of any suit for recovering any sum of money or valuable thing alleged to be won upon any wager. I express this view with diffidence in the light of the dictum to the contrary effect in CHT Ltd v Ward [1963] 3 All ER 835 at 839, [1965] 2 QB 63 at 80. But there the court was focusing attention on s 1 of the Gaming Act 1892, and it is not clear that the members of the court had the Gaming Act 1845 in mind on this point.

Although no action would have been maintainable in respect of winnings, would the customer have had an enforceable claim for repayment in respect of unused chips that is chips given to him by the club in exchange for cash and not used by him in gaming? Here also there are difficulties. I suspect that in practice, after playing for some time, it would usually be impossible to separate the chips held by the player into two piles, one being the chips acquired by him from winnings, and the other being the unused chips. Further, a dispute over which chips were winnings and which were not would be in substance a dispute as to the state of account between a player and a casino, and that is not a dispute which the court will investigate: see Morgan v Ashcroft [1937] 3 All ER 92 at 95, 100, [1938] 1 KB 49 at 61, 69 per Greene MR and Scott LJ. Having regard to these legal obstacles I am not persuaded that when cash was exchanged for chips the parties did enter into a legally enforceable contract.

I am fortified in my approach to this question by the decision in CHT Ltd v Ward. There Crockford's operated a procedure of issuing and playing with chips similar to that used by the club in the present case. The question there was different, because the chips had been supplied to the player on credit. But the court was faced with an argument by Crockford's that when each batch of chips was taken by Mrs Ward she became obliged to pay for them. Her obligation arose at that stage. At that stage, of course, the chips had not been lost in play by Mrs Ward, and Crockford's had not paid cash to the winners in exchange for the chips won by them from Mrs Ward. Hence, it was argued, Mrs Ward's promise to pay for the chips, upon which Crockford's were suing her, was not caught by s 1 of the Gaming Act 1892 as a promise to pay Crockford's a sum of money paid by them under or in respect of a contract rendered null and void by the Gaming Act 1845. The Court of Appeal refused to adopt such a rigid, step-by-step analysis of the position. The issue of the chips to Mrs Ward was part of a whole system whereunder after play was over the winners were to look to the club for their cash winnings and, when the chips had been delivered on credit, the losers were to reimburse the club for their losses. Likewise here, adopting the same broad approach in this case where the chips were handed over for cash: the system was that when the player paid cash to the club on taking delivery of chips for use in gaming the player would be under no obligation to pay anything to the club in respect of his losses from gaming. He had already paid cash to the club, for that very purpose. That purpose being discharge of a gaming contract, the club did not give valuable consideration in exchange for the money handed over by Mr Cass.

Of course, if a player bought refreshments within the casino, in practice the club accepted payment in chips. But I am not persuaded that the club was under an enforceable legal obligation to do so. Moreover, I would treat this other possible use of chips as de minimis. I am not aware that it has been suggested in this case that any material part of the money paid by Mr Cass to the club was spent in this way. The substance of the matter is that, as all parties knew and intended, the chips handed over were to be used and could be used for one purpose only, namely gaming at the club.

Nor am I greatly impressed by the argument that the conclusion I have stated above regarding value puts the club in a worse position than if it had accepted a cheque from Mr Cass. The same complaint would be true if Mr Cass had used money at the gaming tables rather than chips. By s 16 of the Gaming Act 1968 Parliament amended the Gaming Act 1845 and other statutes in respect of certain cheques accepted in exchange for cash or tokens enabling a person to take part in gaming on licensed premises. Parliament has chosen otherwise to leave the Gaming Act 1845, with all the consequences flowing from it, in force.

It may seem hard that the club, carrying on a lawful business, should not have the same protection in respect of money received by it in good faith in the course of that business as do others carrying on other types of business. But I do not think this is a good reason for drawing a distinction between the consequences in law of (i) gaming with stolen money and (ii) gaming with chips issued at the gaming table in exchange for stolen money.

(2) The firm's money

The club's next line of defence was that the solicitors did not acquire title to the money withdrawn by Mr Cass from the firm's client account with the bank because he acted without authority when he withdrew the money for an improper purpose. It was submitted that to acquire title to the money the solicitors needed to ratify Mr Cass's action in withdrawing the money. Ratification was never pleaded or proved.

In my view this submission is misconceived. Prior to being handed across the counter to Mr Chapman the banknotes, of course, belonged to the bank. But the solicitors had the right to be paid a sum equal to the amount standing to the credit of their account. On behalf of the firm, albeit improperly, Mr Cass exercised that right, by signing a cheque and thereby calling for payment of part of that sum in cash. Mr Chapman then took the cheque, on behalf of the firm, to the bank, where he received the banknotes in exchange for the cheque. I am unable to see why the title to the money paid out in this way by the bank did not pass automatically to the plaintiff solicitors. The money was handed by the bank to Mr Chapman as the solicitors' agent in discharge of the bank's contractual obligation to the solicitors as the holders of the relevant account.

Mr Lightman QC relied strongly on the two Privy Council decisions of Union Bank of Australia Ltd v McClintock [1922] 1 AC 240 and Commercial Banking Co of Sydney Ltd v Mann [1960] 3 All ER 482, [1961] AC 1. I do not think that those cases assist the club. They are both distinguishable. Shortly stated, they concerned claims against collecting banks for conversion of bank drafts, payable to third parties or to fictitious persons, which a manager or partner of the respective plaintiffs had procured by the misuse of moneys in the plaintiffs' bank accounts. To succeed in conversion the plaintiffs had to show that they had title to the bank drafts. In each case they failed to do so. It was held that the drafts did not automatically become the property of the respective plaintiffs. To acquire title to the drafts the plaintiffs had to ratify the manager's or partner's wrongful use of the plaintiffs' money in obtaining the bank drafts. If they had so

ratified, the claims against the banks would still have failed because they could not ratify the rogues' acts in obtaining the bank drafts in favour of third parties without also ratifying the third parties' collection of the bank drafts through the defendant banks. In Mann's case [1960] 3 All ER 482 at 486, [1961] AC 1 at 11 Viscount Simonds said this on the title point:

'In effect, Richardson, by means of unauthorised cheques, misappropriated moneys in the trust account and used them to acquire bank cheques from the A.N.Z. bank which bound that bank to pay Ward or bearer out of its own money the amounts specified in the cheques. Their Lordships were not referred to any case in which in such circumstances property so acquired has been held to belong automatically to the party defrauded. In the present case, as in McClintock's case ([1922] 1 AC 240), counsel sought to rely on such cases as Cundy v. Lindsay ((1878) 3 App Cas 459, [1874-80] All ER Rep 1149), but it appears to their Lordships, as it must have done to the Board in McClintock's case, that the principle that the purchaser of a chattel takes it, as a general rule, subject to what may turn out to be informalities of title has no application to a case of misappropriation of funds by an agent and their subsequent application for his own purposes. That there is a remedy, perhaps more than one, available to the person defrauded is obvious, but that is not to say that the property so acquired at once belongs to him so that he can sue in conversion a third party into whose hands it has come.'

The present case is quite different. Here there is no question of the solicitors' claim depending on their having title to some property acquired by Mr Cass with misappropriated money. The solicitors' claim is to the money itself, withdrawn from their bank account. That was the money taken by Mr Cass to the club, who in all innocence, converted it to the club's own use.

In my view the solicitors' appeal in respect of their main claim against the club succeeds. It is not necessary to consider whether the solicitors would succeed with their claim expressed as a claim for money had and received because the facts pleaded and proved establish a simple cause of action in conversion. For this cause of action to lie the banknotes handed by Mr Cass to the club must be the same as those handed by the bank to Mr Chapman, and then by Mr Chapman to Mr Cass in the solicitors' office. But the sums withdrawn from the bank and spent in gambling are such that the overwhelming likelihood is that, with trifling exceptions at most, the banknotes were the same ones.

(3) Contributory negligence

Some arguments were advanced concerning contributory negligence as a defence. But contributory negligence is no defence in proceedings founded on conversion: see s 11 of the Torts (Interference with Goods) Act 1977. The reference to conversion in s 11 is quite general, and I do not think that it is to be read as applying only to conversion of 'goods' which are restrictively defined in s 14(1) as excluding money.

I would allow the solicitors' appeal against the club.

The claim against the club in respect of the draft for £ 3,735

On 4 November 1980 a bankers' draft was issued by the bank in favour of the solicitors, at the request of Mr Cass. Mr Cass indorsed the draft in favour of the club. On 9 November the club accepted the indorsed draft from Mr Cass, who proceeded to play at the casino with chips representing the sum of £ 3,735. I agree that, for the reasons given by Parker LJ, the solicitors had title to this bankers' draft made out in their favour, whether or not it was initially obtained by Mr Cass for a proper purpose. Furthermore, as with the cash exchanged for chips, so with this bankers' draft: the club did not, in the eye of the law, give value in exchange for the draft, for the same reasons as those discussed above concerning the cash handed by Mr Cass to the club. Thus the club was not a holder in due course within s 29 of the Bills of Exchange Act 1882. I would dismiss the club's appeal regarding conversion of this draft.

The claim against the bank

For the reasons given by Parker LJ I would allow the bank's appeal, and dismiss the solicitors' cross-appeal and also their appeal concerning the undertaking.

The pleadings point

I add some observations on only one point. In the course of the appeal Mr Sumption QC raised a pleadings objection to a case being made against the bank on the ground upheld by the judge: that Mr Fox, the branch manager, shut his eyes to the obvious source of the money used by Mr Cass for gambling, and that he wilfully and recklessly failed to make such inquiries as a reasonable and honest man would have made. I agree with Parker LJ's observations on the proper interpretation of the pleadings in this case. I also agree with him that a plea that a defendant knew or ought to

[1992] 4 All ER 409, [1989] 1 WLR 1340

have known that transactions were part of a fraudulent and dishonest design can be an adequate plea of knowledge if, but only if, the plea is girded with appropriate particulars of the allegation that the defendant 'knew' of the matters in question.

Where I feel unable, with respect, to agree with Parker and May LJJ is in the conclusion which follows from that in this case. What has made me anxious is the course which the trial took. At the trial Mr O'Brien QC opened, and he thereafter presented against the bank, a case to the effect that Mr Fox wilfully shut his eyes to the obvious. Mr O'Brien did so without objection from Mr Sumption. Objection was first taken by Mr Sumption after the close of the solicitors' case and after he had elected to call no evidence, and the objection then taken was to any case that the bank actually knew. The judge upheld that objection, but he also said that the solicitors could pursue their 'dared not look' claim (that is that Mr Fox deliberately did not make further investigations because he feared what he might find). Had the bank's advisers been under any misapprehension thus far during the trial about the nature of the case which was being and had been presented against the bank, experienced counsel would surely have said so at this point. The matter would then have come out into the open, leave to amend the pleadings could have been sought by the solicitors and the bank could, if it wished, have sought an opportunity even at that stage to call evidence from Mr Fox or others.

Had a decision on this pleadings point become necessary on this appeal I would have been troubled that, despite the state of the pleadings, it would be unjust to the plaintiff solicitors, having regard to the unusual course which this point took at the trial, to refuse to permit them to pursue the 'dared not look' case. Conversely, although the claim is a very serious one, to permit the solicitors to present such a case would not be unjust to the bank so long as the solicitors were confined, in presentation of that case, to the substance of the facts and matters particularised in the pleadings and established by evidence.

However, it is not necessary for me to elaborate further on this, or to express any final views about it, because on the facts even the claim in negligence against the bank fails. A fortiori so does the claim that Mr Fox acted with a lack of probity, and deliberately failed to make such inquiries as a reasonable and honest man would have made.

**DISPOSITION:**

Solicitors' appeals dismissed. Bank's appeals allowed. Leave to appeal to the House of Lords refused.

27 February 1989. The Appeal Committee of the House of Lords gave the solicitors and the club leave to appeal and to cross-appeal respectively.

Carolyn Toulmin Barrister.

3

55 of 59 DOCUMENTS

## MACKINNON v DONALDSON, LUFKIN AND JENRETTE SECURITIES CORPORATION AND OTHERS

[CHANCERY DIVISION]

*[1986] Ch 482*

**HEARING-DATES:** 31, October 1, 5 November 1985

5 November 1985

## CATCHWORDS:

Evidence - Documentary - Bankers' books - Right to inspect and take copies as evidence - Books relating to account with American bank in New York - Ex parte order and subpoena requiring bank to produce books - Whether infringements of sovereignty of United States - Whether justified - Whether ex parte order appropriate - Bankers' Books Evidence Act 1879 (42 & 43 Vict. c. 11), s. 7

## HEADNOTE:

In an action brought by the plaintiff against certain company and individual defendants alleging fraud, the plaintiff obtained an order ex parte under section 7 of the Bankers' Books Evidence Act 1879 n1 against an American bank which was not a party to the action. The order required the bank to produce books and other papers, held at its head office in New York, which related to an account of one of the defendants, a Bahamian company, which, having been struck off the Bahamian register of companies since the issue of the writ, had ceased to exist. The plaintiff then issued a subpoena duces tecum against an officer of the bank at its London office.

On a motion by the bank to discharge the order and the subpoena on the grounds that they exceeded the jurisdiction of the court and infringed the sovereignty of the United States: -

Held, discharging the order and the subpoena, that, save in exceptional circumstances, the court should not require a foreigner who was not a party to an action, and in particular a foreign bank which would owe a duty of confidence to its customers regulated by the law of the country where the customer's account was kept, to produce documents outside the jurisdiction concerning business transacted outside the jurisdiction; that the order and the subpoena, taking effect in New York, were infringements of the sovereignty of the United States; and that, in all the circumstances and particularly as legitimate alternative procedures were available to the plaintiff, such infringements were not justified (post, pp. 493F-G,G - 494A, C-G, 500A-C).

Reg. v. Grossman (1981) 73 Cr.App.R. 302, C.A. applied.

British South Africa Co. v. De Beers Consolidated Mines Ltd. [1910] 2 Ch. 502, C.A. and Acrow (Automation) Ltd. v. Rex Chainbelt Inc. [1971] 1 W.L.R. 1676, C.A. distinguished.

Bankers Trust Co. v. Shapira [1980] 1 W.L.R. 1274, C.A. and X A.G. v. A Bank [1983] 2 All E.R. 464 considered.

Per curiam. Orders under the Bankers' Books Evidence Act 1879 concerned with documents outside the jurisdiction are so unusual that they should ordinarily be made on notice to the bank (post, p. 497D-E).

n1 Bankers' Books Evidence Act 1879, s. 7: "On the application of any party to a legal proceeding a court or judge may order that such party be at liberty to inspect and take copies of any entries in a banker's book for any of the purposes of such proceedings. An order under this section may be made either with or without summoning the bank or any other party..."

## INTRODUCTION:

## MOTION

By a writ dated 22 December 1983, the plaintiff, Kenneth Thomas Mackinnon, sought against the defendants, Donaldson, Lufkin and Jenrette Securities Corporation, Donaldson, Lufkin and Jenrette (Asia)

Ltd., Investment Advisory Services (1979) Ltd., Alan David Shepherd, G. Raymond Lanciault and the Martini Foundation inter alia, (1) damages for breach of an agreement made in October 1980 between the plaintiff and the fourth defendant as managing director of the second defendant whereby it was agreed that the first and/or second defendants would provide or procure finance for plaintiff; (2) damages for deceit in respect of false representations deliberately made by the fourth defendant to the plaintiff on behalf of the first and/or second defendants; (3) damages for breach of an agreement made in October 1980 between the plaintiff and the fifth defendant whereby it was agreed that the sixth defendant would provide finance for the plaintiff; (4) damages for deceit in respect of false representation deliberately made by the fifth defendant to the plaintiff on behalf of the sixth defendant; (5) damages for conspiracy to defraud the plaintiff; and (6) the return of U.S. $250,000 paid by the plaintiff to the third defendant for a consideration which had wholly failed as money had and received by the defendant to the use of the plaintiff. The plaintiff obtained an order ex parte from Master Gowers on 2 October 1985 under the Bankers' Books Evidence Act 1879 allowing the plaintiff to inspect and take copies of entries in the books of Bank of America, Chase Manhattan Bank and Citibank N.A.

By a notice of motion dated 25 October 1985, Citibank N.A. and Barry Robinson applied to the court for orders that (1) Citibank N.A. be joined as seventh defendant to the action, pursuant to R.S.C., Ord. 15, r. 2(6); (2) the order of 2 October 1985 be set aside or varied so as to exclude all books outside the jurisdiction of the court, or alternatively, Citibank N.A. be given leave to appeal to the Court of Appeal against that order; and (3) a subpoena dated 4 October 1985 addressed to Barry Robinson of Citibank N.A. be set aside on the grounds that it was procured for the purpose of securing the production of documents in the possession of Citibank N.A.'s head office in New York, United States of America, and was thus an abuse of the powers of the court, and/or ought not to have been issued, in that the proper means of securing production of such documents was by the procedure contained in R.S.C., Ord. 39, or, alternatively, the subpoena be varied so as to exclude from production all documents out of the court's jurisdiction.

The facts are stated in the judgment.

## COUNSEL:

Jonathan Hirst for the bank. There are grave objections of principle to the master's order. Its purpose is clearly to procure production of the bank's documents in New York. The plaintiff is seeking to obtain discovery from a non-party of bank documents outside the jurisdiction. The order short-circuits the internationally agreed procedure under the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters in a way which our courts have deprecated when United States Courts have tried it in the past. The bank is unlikely to be unco-operative or difficult if the plaintiff applies to the court in New York; but the bank objects in principle to an application here. It further objects to the fact that the master's order was made ex parte.

It is clear from Reg. v. Grossman (1981) 73 Cr.App.R. 302 that a bank should never (or only in the most exceptional circumstances) be

ordered to produce a document which it holds abroad. Although it has been held in Bonalumi v. Secretary of State for the Home Department[1985] Q.B. 675 that the Grossman case was decided per curiam, the judgments are correct insofar as they suggest that the bank cannot apply to set aside an order made ex parte without being joined as a defendant before doing so: see Boyle v. Sacker (1888) 39 Ch.D. 249; H.M.S. Archer [1919] P. 1; WEA Records Ltd v. Visions Channel 4 Ltd. [1983] 1 W.L.R. 721 and Becker v. Noel (Practice Note) [1971] 1 W.L.R. 803. There was a stronger case for making an exception in Reg. v. Grossman,73 Cr.App.R. 302 than in the present case because (a) in that case the bank had its head office within the jurisdiction and (b) the revenue had already tried unsuccessfully to obtain the documents in the Isle of Man. The "fortuitous" aspect is even more striking here where the plaintiff has taken advantage of the presence of a branch within the jurisdiction; also no attempt has been made to obtain the documents in New York.

The court should not undermine the system which preserves United Kingdom sovereignty when parties to foreign proceedings seek to obtain evidence in this jurisdiction; compare the Evidence (Proceedings in Other Jurisdictions) Act 1975, section 3. The converse procedure when parties to English proceedings wish to obtain evidence abroad is provided by R.S.C., Ord. 39 which is a complete code. The system combines court procedures and diplomacy in a way which preserves the interests of both jurisdictions concerned. Alternatively the plaintiff could apply to the court for

[1986] Ch 482

leave to make a direct application to the New York court for discovery: South Carolina Insurance Co. v. Assurantie Maatschappij "De Zeven Provincien" N.V. [1986] Q.B. 348. The English courts have objected to the assertion by New York courts of the "long arm of jurisdiction"; compare In re Westinghouse Electric Corporation Uranium Contract Litigation M.D.L. Docket No. 235 (Nos. 1 and 2) [1978] A.C. 547, 608D et seq. per Lord Wilberforce and per Lord Diplock at pp. 639F et seq. So has Parliament: see the Protection of Trading Institute Act 1980. This order and subpoena are invasions of the jurisdiction and sovereignty of the U.S.A., and they also deny the bank the opportunity of seeking any protection to which it may be entitled in New York.

X A.G. v. A Bank [1983] 2 All E.R. 464 was this case in reverse except that there the bank had its head office in New York. Leggatt J. clearly disapproved of the powers exercised by the United States court which he described as "excessive"; see at p. 480B, and as placing the bank in a "dilemma"; see at p. 480F. The English court should not grant the order and subpoena and wait to see if they result in an injunction in New York.

As to the dissolution of the bank's customer, (a) that does not destroy the right of confidentiality and the court cannot be sure that the bank will not be in breach if it complies and (b) the fact that the plaintiff would have a strong case if he used the right procedure is no excuse for trying to short-circuit it.

The New York court's recent decision in Laker Airways Ltd. v. Pan American World Airways (1985) 607 F.Supp. 324 indicates a welcome

change of attitude on the part of some United States judges which we should encourage by maintaining the same attitude ourselves.

John McDonnell Q.C. for the plaintiff. The English court asserts jurisdiction over foreign corporations who carry on business here because they are regarded as "English residents," even though they may also be resident in other jurisdictions: see Newby v. Colt's Patent Firearms Manufacturing Co. (1872) L.R. 7 Q.B. 293 and Compagnie G n rale Transatlantique v. Thomas Law & Co. [1899] A.C. 431. For the application of this principle to banks see Lhoneux, Limon & Co. v. Hong Kong and Shanghai Banking Corporation (1886) 33 Ch.D. 446 and Haggin v. Comptoir D'Escompte de Paris (1889) 23 Q.B.D. 519. The bank has submitted to the jurisdiction of the English court by (a) taking up residence here, (b) by registering under Part X of the Companies Act 1948 which enables it to be served with process and (c) by securing recognition under the Banking Act 1979, which makes it a "bank" within the meaning of the Bankers' Books Evidence Act 1879, section 9, as amended: see Employers' Liability Assurance Corporation Ltd. v. Sedgwick, Collins & Co. Ltd. [1927] A.C. 95. The bank is thus liable to be sued or compelled to give discovery as a defendant or to give evidence or produce documents under subpoena which may assist to do justice between other litigants just like any other resident subject to the jurisdiction.

If, as is plainly the case, an English resident with no second residence can be compelled to produce on discovery, as a defendant, or under subpoena, as a witness, documents which are in his possession or overseas - subject to any excuses justified by applicable foreign law (see Farquharson v. Balfour (1823) T. & R. 184), why should a resident who has a second residence be in a different position? The real underlying problems where banks are concerned is that the production of documents by way of discovery or under subpoena may affect the rights of third party customers. Even without a foreign element, a subpoena against a bank to produce documents relating to a third party's account without reference to the third party may well not be enforced; and in that situation the court is always very cautious about orders made under the Bankers' Books Evidence Act 1879. It is a fortiori if the customer is outside the jurisdiction, even if the documents are here and no foreign branch is involved, though in such a case it can be argued that the customer has submitted the documents to the jurisdiction by keeping his accounts here.

The case for non-intervention is even stronger where a customer who is not subject to the English jurisdiction has his account with an overseas branch of a bank which is subject to the jurisdiction; it is accepted that in such a case the court should not use its power in personam over the bank save in exceptional circumstances. But where, as here, both the bank and its customer are, in one way or another, subject to the jurisdiction, the fact that the account is kept at a foreign branch should be irrelevant, unless some actual conflict of law arises.

There is nothing "fortuitous" about the bank having a branch here; that is a choice which the bank has made in its own commercial

interests. What is "fortuitous" is that the customer who is the real target of the subpoena has chosen to keep its overseas account with a bank which has chosen to submit itself to the English jurisdiction. It would certainly be objectionable to take advantage of the bank's presence here in order to compel it to produce overseas documents where the real target was a customer against whom the court's process would not lie; but it is not objectionable to compel the bank

to produce overseas documents if (a) the bank is itself the real target, or defendant, or (b) the real target is a customer who is amenable to the court's process, but from whom for some reason the document cannot be obtained. A parallel distinction might be drawn if the bank were subpoenaed to produce documents within the jurisdiction relating to a third party customer. That is what Leggatt J. meant by "excessive" in the X A.G.case [1983] 2 All E.R. 464, 480B. This is also the true explanation of the Grossman case, 73 Cr.App.R. 302, where the documents related to the account of a customer who was not amenable to the jurisdiction. When the Court of Appeal referred to the Isle of Man branch as a separate entity, they merely had in mind that the customer had not submitted to the jurisdiction in the sense in which it would have done by keeping its account with the bank's head office in London.

In the present case, the customer, International Advisory Services (1979) Ltd. (I.A.S.) had submitted to the jurisdiction by having its place of business in London, or at all events the court was prepared to assert it, having given leave to effect service in the Bahamas under R.S.C., Ord. 11. Thus if it had not been dissolved before service it would have had to give discovery.

The exercise of jurisdiction in personam over a foreigner resident here or over any defendant in respect of property outside the jurisdiction does not usually infringe foreign sovereignty or jurisdiction. It cannot do so where the personal remedy granted does not affect the rights of third parties who are not subject to the jurisdiction. What would be objectionable would be for the court to make an order in personam against a person subject to the jurisdiction which affected the rights of another person who was not subject to the jurisdiction; but that is not the present case.

No objection to the order or subpoena can be founded on any rights of I.A.S. because (1) it is not only dissolved but has no assets or liabilities and, even if the right to confidentiality could vest in the Treasurer of the Bahamas as adjunct to some credit balance or other asset, it cannot be "property" in vacuo where there are no assets for the confidentiality to protect. (2) I.A.S. would have to disclose the information sought and counterpart documents as a defendant if it had not brought about its own dissolution so any vestigial duty of confidence cannot relieve the bank from producing the documents. (3) The bank has not suggested that it is in fact under any conflicting legal obligation in New York.

The Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters as cutting down the remedies open to litigants: all it sets out to do is to provide an orderly and mutual system for obtaining documents from persons not subject to the jurisdiction of the

applicant state but subject to the jurisdiction of the respondent state. It would be highly inconvenient to treat it as substituting its own procedure for existing powers to obtain documents from persons subject to the jurisdiction of both the states in question.

The bank's reasoning has in fact been adopted in the United States of America and taken to extreme lengths. Discovery against foreign parties to litigation is now apparently limited to documents within the jurisdiction and documents abroad can only be obtained under the Convention. This development may explain the difference between the attitudes of the New York courts in United States v. First National City Bank (1968) 396 F. 2d 897 and the Laker case, 607 F.Supp. 324. That reasoning has not yet been adopted here. Foreign defendants are regularly compelled to give discovery of their overseas documents, for example, orders have been made against the first two defendants in the present case, and according to the relevant department of the court no letters of request for documents only have yet been issued.

The court should regard the Hague Convention as providing a procedure for cases where discovery and subpoena are not available and should not refrain from granting those forms of relief against persons who are subject to the jurisdiction unless (a) there is a real risk of a clash with foreign sovereignty or jurisdiction or (b) third parties outside the jurisdiction may be materially affected. That would be consistent with South Carolina Insurance Co. v. Assurantie Maatschappij "De Zeven Provincien" N.V. [1986] Q.B. 348 which is relied on for (a) the explanation of the rule that procedure is governed by the lex fori (see at pp. 355H, and 358B), (b) the indication that the court should use its control of proceedings to assist in keeping down costs and in particular minimising the need for recourse to other tribunals (see at pp. 358B-D) and (c) the assumption that production of the documents in question would have been compellable by subpoena if the possessors - not the documents - had been within the jurisdiction (see at pp. 354H-355A).

Lord Wilberforce's comment in the Westinghouse case [1978] A.C. 547 about the Act of 1975 being more restrictive than the previous law was only referring to the procedure for obtaining evidence from persons not subject to the jurisdiction. He was not referring to the remedies available against persons subject to the jurisdiction.

Our "mere witness" rule makes American subpoenas for pre-trial discovery against non-parties objectionable not because they purport to operate extra-territorially but because they represent relief not available in English proceedings.

[1986] Ch 482

That was a major factor in the Westinghouse case: see the comments of Lord Diplock in British Airways Board v. Laker Airways Ltd. [1985] A.C. 58, 78D. Hostility of the English courts to that procedure has no bearing on the present problem, for here Citibank is trying to resist a subpoena which would clearly lie against an English bank for the production of English documents. In effect they say that the duty of persons subject to the jurisdiction to assist the court as witnesses does not apply to corporations with a domicile or second residence outside the jurisdiction, or at any rate the duty does not extend to information or documents of such a corporation outside the

jurisdiction. But the plaintiff has a positive right to extract the information and documents in question from anyone subject to the court's jurisdiction under the principle of Bankers Trust Co. v. Shapira [1980] 1 W.L.R., 1274 which is an exception to the "mere witness" rule. In these circumstances there is a cause of action for discovery: see Norwich Pharmacal Co. v. Customs and Excise Commissioners [1974] A.C. 133; Bankers Trust Co. v Shapira [1980] 1 W.L.R. 1274 and London & Counties Securities Ltd. (In Liquidation) v. Caplan (unreported), 26 May 1978, Templeman J. Compare Cook Industries Inc. v. Galliher [1979] Ch. 439 where the court made an order under this jurisdiction for the inspection of property in France. In these circumstances it goes without saying that the customer cannot object; the right to discovery is founded on the prima facie case of fraud against the customer.

There is no objection on grounds of comity in the present case. Compare In re Consolidated Rendering Co. (1907) 66 Atl. 790; United States v. First National City Bank, 396 F. 2d 897 and the expert evidence as to New York law summarised in X A.G. v. A Bank [1983] 2 All E.R. 464, 472D-474F. Contrast Reg. v. Grossman, 73 Cr.App.R. 302 where the order was as objectionable as it could possibly be because it was obtained after the Manx court had refused relief and it had been followed by a Manx injunction.

In fact the plaintiff is not seeking to obtain discovery from a non-party; the subpoena is part of the court's normal procedure and the order merely relieves the bank from bringing its original books to court. It is normal for the order to be obtained ex parte so far as the bank is concerned; the remarks in the Grossman case were directed at the failure to notify the customer which does not arise in the present case since the customer has been dissolved. The procedure adopted does not deny Citibank the opportunity of claiming any protection which would be available to it in New York; it could have raised any such point on this application but has not done so.

There is no great constitutional issue raised of the kind suggested by the bank. When the remedy sought is in personam the English court's writ does run abroad: compare Acrow (Automation) Ltd. v. Rex Chainbelt Inc. [1971] 1 W.L.R. 1676. The true principle at stake is the plaintiff's right to require any person subject to the jurisdiction to produce at the trial of his action any evidence which may assist the court to do justice between the parties. That principle should only be cut down by a conflicting right and there is no such right asserted here but merely a nebulous and unfounded point of diplomatic principle or alleged conflict between the English and New York courts.

Hirst, in reply. The bank does not dispute that the court has jurisdiction over it as a result of its presence within the jurisdiction. The issue is whether the court should exercise the jurisdiction. In international law the United Kingdom has no jurisdiction over the bank in respect of what it has or does outside the United Kingdom. This principle would be modified if the bank had duly been made a party to the litigation; but that is not the case, The English courts have been increasingly cautious about exercising jurisdiction of this kind. The Norwich Pharmacal case

[1974] A.C. 133 involving documents within the jurisdiction was an exceptional case. The Bankers Trust case [1980] 1 W.L.R. 1274 and the London & Counties Securities case (unreported), 26 May 1978, Templeman J. involved hot pursuit of missing funds. That did not arise in this case where the trail was cold.

Cur. adv. vult.

5 November.

PANEL: Hoffmann J

JUDGMENTBY-1: HOFFMANN J

JUDGMENT-1:

HOFFMANN J: read the following judgment. This motion raises a point of some importance to banks, especially foreign banks with branches in London. A plaintiff in an action before this court has served a subpoena and an order obtained ex parte under the Bankers' Books Evidence Act 1879 upon Citibank at its branch office in London. Citibank is a New York bank with its head office in Manhattan and with branches all over the world. It is not a party to the proceed-

ings. The subpoena and the order require Citibank to produce books and other papers held at its head office in New York, relating to transactions which took place in New York on an account maintained there by a Bahamian company. Citibank has moved to set aside the subpoena and to discharge the ex parte order on the grounds that in principle it exceeds the international jurisdiction of this court and infringes the sovereignty of the United States.

The background to the motion is international fraud. Mr. Mackinnon, the plaintiff in the action, alleges that he has been swindled out of U.S. $250,000 by the two personal defendants, Mr. Alan Shepherd and Mr. Raymond Lanciault. He says that they pretended that through certain American and Hong Kong companies and a Liechtenstein foundation, they would procure for him a loan of U.S. $360 million to enable him to buy a property in Hong Kong. At their request he paid an advance fee of U.S. $250,000 into an account of International Advisory Services (1979) Ltd. ("I.A.S."), a Bahamian company represented by Mr. Lanciault, at Citibank, New York. In truth, says the plaintiff, there was never any intention or ability to procure a loan. The transaction was simply a scheme to defraud. His action is to recover the U.S. $250,000 and for damages. The trial is due to begin on the 25th of this month.

I.A.S. is named as a defendant in the writ and ordinarily would have had to disclose on discovery the documents or copy documents concerning the operation of its account with Citibank. This would have shown, for example, on whose authority the account was operated and what happened to the U.S. $250,000. Unfortunately, however, I.A.S. has ceased to exist. When an attempt was made in March 1985 to serve it with notice of the writ pursuant to leave granted under R.S.C., Ord. 11, it was found that on 26 January 1985 it had been struck off the Bahamian companies register under the Removal of Defunct Companies Act [c. 185 of the 1965 consolidation] and the Removal of Defunct Companies (Amendment) Act 1975. The file disclosed that this had been done at the request of the company's Bahamian directors on the ground that it had no assets or liabilities and was no longer operating.

The plaintiff therefore wishes to obtain the books and documents from Citibank itself. If Citibank did not have a branch in England, there

would be only two ways in which this could be done. The first and more orthodox route would be to apply to a master under R.S.C., Ord. 39 for the issue of letters of request to the courts of New York specifying the documents required to be produced. The United States and the United Kingdom are both parties to the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters and, subject to any questions of privilege or public policy under New York law (compare section 3 of the Evidence (Proceedings in Other Jurisdictions) Act 1975) this court is entitled under the Convention to the assistance of the New York courts in obtaining evidence for the purposes of the pending action.

The second route is for the plaintiff to apply directly to a court in New York under provisions of United States or New York legislation. To adopt this course, the plaintiff would first have to obtain the leave of this court: see South Carolina Insurance Co. v. Assurantie Maatschappij "De Zeven Provincien" N.V. [1986] Q.B. 348 and the defendants, who are not party to this motion, would be entitled to be heard on an application for leave. At the moment, however, I cannot see why, subject to any question of costs, the plaintiff should not obtain such leave if a direct application is likely to be more expeditious than letters of request. Citibank concede that the plaintiff has made out a strong case for the relevance of the documents and would be happy to produce them under the protection of an order of the New York court, whatever method may be used to obtain such an order.

It appears that in September 1985 the plaintiff's legal advisers surveyed the fruits of discovery from the various defendants and decided that they needed to obtain the documents in question from Citibank and also other American and Hong Kong documents relevant to the alleged fraud in the possession of the Chase Manhattan Bank and the Bank of America. With the trial two months away, an application for letters of request was thought to be too dilatory. Application was therefore made ex parte to the master for orders upon all three banks under section 7 of the Bankers' Books Evidence Act 1879 requiring, in the case of Citibank, that the plaintiff and his solicitors

"be at liberty to inspect and take copies of any entries in the books ... relating to the sum of U.S. $250,000 paid on 24 October 1980 ... to Citibank's [New York] office for the account of International Advisory Services (1979) Ltd. number 10776363 including any entries showing what has become of the said sum of $250,000."

The master made an order in those terms on 2 October 1985. Two days later, the plaintiff caused subpoenas ad testificandum and duces tecum to be issued to the three banks. In the case of Citibank the subpoena, as now amended, requires it to attend by its proper officer to give evidence on the part of the plaintiff and to produce by its proper officer

"all correspondence, drafts, cheques, vouchers, internal memoranda and any other documents or records or copies thereof relating to account number 10776363 with your head office in New York..."

Both the order and subpoena were directed to Citibank at its office at 336, The Strand, London, and served upon it there.

I conclude this recital of the facts by mentioning two matters. First, so far as the subpoena ad testificandum is concerned, I was told that there is an officer of Citibank now resident in England who may have some knowledge of transactions on the account in question, though probably not those in issue. There is no objection to his attendance pursuant to the subpoena. The only objection is to production of the documents in New York. Secondly, I was told that Chase Manhattan Bank and Bank of America have complied with the orders and do not object to compliance with the subpoenas.

Before turning to the matters in controversy, I should note two points on which counsel were agreed. The first is that Citibank has locus standi to bring this motion without being joined as a party to the action. In the case of a subpoena there is no doubt that the person served may apply to have it set aside, in this division by summons to the master or motion to the judge. The Bankers' Books Evidence Act 1879 was, as Bankes L.J. said in Waterhouse v. Barker [1924] 2 K.B.759, 763:

"passed in the interest of bankers in order to prevent interference with their business, and needless expense and trouble, and to facilitate the giving in evidence of relevant material contained in their books."

An order under section 7 of the Act therefore has strong analogies with a subpoena, tailored to meet the convenience of banks. It would be illogical if the bank had no locus standi to apply to discharge it. In Reg. v. Grossman (1981) 73 Cr.App.R. 302 a customer who wished to discharge an ex parte order made upon its bank went to the lengths of applying to be joined as a party and then appealing to the Court of Appeal (Civil Division). Quite apart from the fact that the proceedings in that case were criminal and that the Court of Appeal, therefore, had no jurisdiction (see Bonalumi v. Secretary of State for the Home Department [1985] Q.B. 675), the procedure there adopted seems to offend against the rule that no appeal may be brought against an order made ex parte until an application to discharge it has been made under R.S.C., Ord. 32, r. 6 to the judge who granted the order: see WEA Records Ltd. v. Visions Channel 4 Ltd. [1983] 1 W.L.R. 721. It is true that the applicant in Grossman's case, 73 Cr.App.R. 302 was the customer rather than the bank itself. Nevertheless, if any person affected may apply to discharge an injunction (see Halsbury's Laws of England, 4th ed., vol. 24 (1979), para. 1111), I do not see why the same should not be true of an order under the Bankers' Books Evidence Act 1879.

The analogy between an order under the Act and a subpoena leads to the other point on which counsel were agreed, namely, that for the purposes of the jurisdictional point I have to consider no distinction can be drawn between the order and the subpoena. If it would be improper to require production of the New York documents by subpoena, it could not be proper to require their inspection and copying by order under the Act.

The argument in support of the subpoena and order by Mr. McDonnell, for the plaintiff, is simple. Citibank carries on business in London. It has complied with the provisions of section 691 of the Companies Act 1985 by registering, inter alia, the names and addresses of persons resident within the jurisdiction authorised to accept service of process on the bank's behalf. It has applied for and obtained the privileges of recognition as a bank by the Bank of England under the Banking Act 1979. Citibank has therefore submitted itself to the jurisdiction of the English court. It follows that it can be required to comply with a subpoena in the same way as an English company. Unless there is some good reason for non-production, for example, that production would be unlawful by the law of the place where the documents are kept, the fact that the documents in question happen to be out of the jurisdiction is no reason for discharging the subpoena.

I think that this argument confuses personal jurisdiction, i.e., who can be brought before the court, with subject matter jurisdiction, i.e., to what extent the court can claim to regulate the conduct of those persons. It does not follow from the fact that a person is within the jurisdiction and liable to be served with process that there is no territorial limit to the matters upon which the court may properly apply its own rules or the things which it can order such a person to do. As Dr. Mann observed in a leading article, "The Doctrine of Jurisdiction in International Law," (1964) 111 Recueil des cours 146:

"The mere fact that a state's judicial or administrative agencies are internationally entitled to subject a person to their personal or 'curial' jurisdiction does not by any means permit them to regulate by their orders such person's conduct abroad. This they may do only if the state of the forum also has substantive jurisdiction to regulate conduct in the manner defined in the order. In other words, for the purpose of justifying, even in the territory of the forum, the interna-

tional validity of an order, not only its making, but also its content must be authorised by substantive rules of legislative jurisdiction."

See also by the same author "The Doctrine of International Jurisdiction Revisited after Twenty Years," (1984) 196 Recueil des cours 9, 19.

The content of the subpoena and order is to require the production by a non-party of documents outside the jurisdiction concerning business which it has transacted outside the jurisdiction. In principle and on authority it seems to me that the court should not, save in exceptional circumstances, impose such a requirement upon a foreigner, and, in particular, upon a foreign bank. The principle is that a state should refrain from demanding obedience to its sovereign authority by foreigners in respect of their conduct outside the jurisdiction. It is perhaps ironic that the most frequent insistence upon this principle by Her Majesty's Government has been as a result of its violation by the courts and government agencies of the United States. In particular, Her Majesty's Government has on several occasions objected to the application by United States courts and agencies of the United States antitrust laws to British companies in respect of their conduct outside the United States.

It has also objected to demands made upon such companies for the production of documents situated outside the United States and concerned with transactions taking place abroad: see the submissions for the Crown in In re Westinghouse Electric Corporation Uranium Contract Litigation M.D.L. Docket No. 235 (No. 1 and No. 2) [1978] A.C. 547, 589.

Similarly in X A.G. v. A Bank [1983] 2 All E.R. 464, the United States department of justice issued a subpoena to a New York bank requiring it to produce to a New York grand jury the documents relating to the accounts maintained at its London branch by two Swiss companies, one having a major branch in New York, and a Panamanian corporation resident in Switzerland. An order for the enforcement of this subpoena was made by a New York court. Leggatt J. described the order, at p. 480, as "the exercise by the United States court in London of powers which, by English standards, would be regarded as excessive..." Conversely, it seems to me that the subpoena and order in this case, taking effect in New York, are an infringement of the sovereignty of the United States. The need to exercise the court's jurisdiction with due regard to the sovereignty of others is particularly important in the case of banks. Banks are in a special position because their documents are concerned not only with their own business but with that of their customers. They will owe their customers a duty of confidence regulated by the law of the country where the account is kept. That duty is in some countries reinforced by criminal sanctions and sometimes by "blocking statutes" which specifically forbid the bank to provide information for the purpose of foreign legal proceedings: compare section 2 of our Protection of Trading Interests Act 1980. If every country where a bank happened to carry on business asserted a right to require that bank to produce documents relating to accounts kept in any other such country, banks would be in the unhappy position of being forced to submit to whichever sovereign was able to apply the greatest pressure.

I have stated the principle as being a self-imposed limitation upon a state's sovereign authority and I must clarify this concept by distinguishing certain other cases relied on by Mr. McDonnell. First, I am not concerned with the enforcement of private rights arising out of matters properly subject to the jurisdiction of the court. For example, a foreigner may have agreed by a contract over which the court has jurisdiction to perform various acts abroad. There can be no objection in principle to the enforcement of those rights by injunction or specific performance, even though this requires the performance of acts abroad: see British South Africa Co. v. De Beers Consolidated Mines Ltd. [1910] 2 Ch. 502; Acrow (Automation) Ltd. v. Rex Chainbelt Inc. [1971] 1 W.L.R. 1676. But a subpoena does not involve the enforcement of a private right. It is an exercise of sovereign authority to require citizens and foreigners within the jurisdiction to assist in the administration of justice.

Secondly, I am not concerned with the discovery required by R.S.C., Ord. 24 from ordinary parties to English litigation who happen to be foreigners. If you join the game you must play according to the local rules. This applies not only to plaintiffs but also to defendants who give

notice of intention to defend. The recent decision of the Court of Appeal in the South Carolina Insurance Co. case [1986] Q.B. 348 shows that adherence to local rules requires also forbearance from taking advantage of more advantageous rules available elsewhere. Of course, a party may be excused from having to produce a document on the grounds that this would violate the law of the place where the document is kept: compare Soci t Internationale pour Participations Industrielles et Commerciales S.A. v. Rogers (1958) 357 U.S. 197. But, in principle, there is no reason why he should not have to produce all discoverable documents wherever they are.

The authority most in point and upon which Mr. Hirst for the bank mainly relied is the decision of the Court of Appeal (Civil Division) in Reg. v. Grossman, 73 Cr.App.R. 302. The fact that this decision was given per incuriam without jurisdiction does not detract from its authority on the matters now in issue. It concerned the propriety of an order made ex parte under section 7 of the Bankers' Books Evidence Act 1879 on Barclays Bank Ltd. at its head office in London requiring it to allow the Inland Revenue to inspect and take copies of an account maintained by Savings and Investment Bank Ltd., an Isle of Man company, with Barclays Bank's branch in the Isle of Man. The evidence was required for the purpose of a prosecution for tax evasion pending against Mr. Grossman before a criminal court in Wales. It appears that an application for a similar order had previously been made to the court in the Isle of Man and had been refused. Lord Denning M.R. held that the order should not have been made. He said, at pp. 307-308:

"I think that the branch of Barclays Bank in Douglas, Isle of Man, should be considered in the same way as a branch of the Bank of Ireland or an American bank, or any other bank in the Isle of Man which is not subject to our jurisdiction. The branch of Barclays Bank in Douglas, Isle of Man, should be considered as a different entity separate from the head office in London. It is subject to the laws and regulations of the Isle of Man. It is licensed by the Isle of Man government. It has its customers there who are subject to the Manx laws. It seems to me that the court here ought not in its discretion to make an order against the head office here in respect of the books of the branch in the Isle of Man in regard to the customers of that branch. It would not be right to compel the branch - or its customers - to open their books or to reveal their confidences in support of legal proceedings in Wales. Any order in respect of the production of the books ought to be made by the courts of the Isle of Man - if they will make such an order. It ought not to be made by these courts. Otherwise there would be danger of a conflict of jurisdictions between the High Court here and the courts of the Isle of Man. That is a conflict which we must always avoid. ... It seems to me that, although this court has jurisdiction to order the head office here to produce the books, in our discretion it should not be done."

Shaw L.J. agreed with Lord Denning M.R. and mentioned, as Lord Denning M.R. had done before the passage I have cited, that since the ex

parte order the court in the Isle of Man had actually granted an injunction restraining Barclays Bank from disclosing the books. Oliver L.J. said that an order to inspect the account of a foreign customer maintained with a foreign branch of an English bank was "a very strong thing to seek." He went on, at p. 309:

"The English court is asked to order, because of the fortuitous fact that the head office of Barclays Bank is situated in this country, the disclosure of a foreign banker's account maintained at a foreign branch of Barclays Bank. That is sought in the face of a subsisting injunction of a court of competent jurisdiction in the Isle of Man ... I do not say that an order in such unusual circumstances can never be made, but it would I think be one which ought to be made only on a case very much stronger than that which the Inland Revenue have been able to deploy..."

Mr. Hirst rightly points out that in two respects this is an a fortiori case. Barclays was at least an English bank whereas Citibank is foreign. International law generally recognises the right of a state to regulate the conduct of its own nationals even outside its jurisdiction, provided that this does not involve disobedience to the local law. So banks, as I have already said, are in a special position. The nature of banking business is such that if an English court invokes its jurisdiction even over an English bank in respect of an account at a branch abroad, there is a strong likelihood of conflict with the bank's duties to its customer under the local law. It is therefore not surprising that any bank, whether English or foreign, should as a general rule be entitled to the protection of an order of the foreign court before it is required to disclose documents kept at a branch or head office abroad.

Secondly, Mr. Hirst says that in Reg. v. Grossman, 73 Cr.App.R. 302 there was no other way to obtain the documents. The court of the Isle of Man had refused to order production. In this case there are, as I have mentioned, two methods by which the documents could be obtained without infringing United States sovereignty and without depriving Citibank of the protection of a New York order. Mr. Hirst submits that as between states which are party to the Hague Convention or similar bilateral treaties, evidence should ordinarily be obtained only by the methods prescribed or permitted in the convention. He referred me to a recent decision of the New York Federal District Court in Laker Airways Ltd. v. Pan American World Airways (1985) 607 F.Supp. 324 in which Brieant J. quashed a subpoena served on two English banks at their New York offices requiring them to produce documents held in England relating to transactions which took place in England. Brieant J., held that this was in principle "inappropriate" and also constituted "an end run ... around the Hague Convention." This decision shows a welcome revival in a United States court of sensitivity to foreign sovereign interests and I accept Mr. Hirst's submission that its reasoning applies equally to this case.

Mr. McDonnell argued that Reg. v. Grossman, 73 Cr.App.R. 302 was distinguishable on two grounds. First, compliance with the order would have been unlawful by the law of the Isle of Man whereas in this

case there is no suggestion that disclosure would violate any law of New York. Likewise, in Laker Airways Ltd. v. Pan American World Airways,607 F.Supp. 324 Brieant J. said that failure to use the Hague Convention was "more than a mere technicality" because production of the documents had been made unlawful in English law by orders made under the Protection of Trading Interests Act 1980. Secondly, the customer in Grossman's case, 73 Cr.App.R. 302 was a foreign company not party to the proceedings whereas in this case the customer, though Bahamian by incorporation, appears at some stage to have carried on business in London and would, if it had not ceased to exist, be a party to the action.

It seems to me that Grossman's case decides that an order in respect of documents held at a bank's foreign branch or head office should not be made save in very exceptional circumstances. Matters of the kind mentioned by Mr. McDonnell may be relevant in deciding whether or not to make an order in exceptional circumstances but do not affect the general principle. In Grossman's case Shaw and Oliver L.JJ. also said that although the Bankers' Books Evidence Act 1879 allowed an application to be made ex parte, where the accounts of third parties were affected the application should ordinarily be made upon notice to the customer. In this case, notice could not be given to the customer and application was therefore made ex parte. Mr. McDonnell said that there could be no prejudice to the bank if it was served with the order and left to apply to discharge it if it objected to compliance. But I think that orders concerned with documents outside the jurisdiction are so unusual that they should ordinarily be made on notice to the bank so as to give the bank full opportunity to investigate the position in the foreign jurisdiction.

Before turning to the question of whether such exceptional circumstances exist in this case, I must address another argument advanced by Mr. McDonnell. On the particular facts of this case, he says, the order and subpoena seeking information about the I.A.S. account should be equated to ordinary discovery against a defendant. It follows that in accordance with the general rules of discovery, production should be ordered unless there are grounds on which it should be excused. The basis of this submission is that under the rule in Norwich Pharmacal Co. v. Customs and Excise Commissioners [1974] A.C. 133, as extended by the Court of Appeal in Bankers Trust Co. v. Shapira[1980] 1 W.L.R. 1274, the plaintiff would be entitled to join Citibank as a defendant and demand discovery of the documents in question in order to be able to trace the proceeds of his U.S. \$250,000. Mr. Hirst agreed that for the purpose of deciding this point I should deal with the matter as if there was a motion before me to join Citibank as a defendant and require production of the documents by way of Bankers Trust Co. discovery. The Bankers Trust Co. case establishes the jurisdiction of the court to order a bank to give discovery of documents relating to a customer's account when there is, in the words of Lord Denning M.R., at p. 1282:

"a good ground for thinking the money in the bank is the plaintiff's money - as, for instance, when the customer has got the money by

fraud - or other wrongdoing - and paid it into his account at the bank."

The purpose of the discovery is to trace the money and find out what has happened to it. This jurisdiction is in turn founded on the principle disinterred by the House of Lords in the Norwich Pharmacal case [1974] A.C. 133 and formulated as follows by Lord Reid, at p. 175:

"if through no fault of his own a person gets mixed up in the tortious acts of others so as to facilitate their wrongdoing he may incur no personal liability but he comes under a duty to assist the person who has been wronged by giving him full information and disclosing the identity of wrongdoers."

The Norwich Pharmacal case is therefore an exceptional case in which a bank can be named as a defendant solely for the purpose of obtaining discovery and without there being any cause of action against it.

It seems to me that for the purposes of the jurisdictional rules now under consideration, the Norwich Pharmacal case is much more akin to the subpoena directed to a witness than the discovery required of an ordinary defendant. It is a general duty imposed upon persons who become "mixed up" in tortious acts to produce evidence and documents before trial comparable with the general duty upon all persons who have relevant knowledge or documents to give evidence at the trial. It is, therefore, also an exercise of sovereign authority and not merely a condition of being allowed to take part as plaintiff or defendant in an English trial. In the United States there is a general right to discovery from third parties but the fact that this process is characterised as discovery does not alter its nature for the purposes of international jurisdiction. In addition, the policy grounds for the restraint enjoined in Reg. v. Grossman, 73 Cr.App.R. 302 apply with equal force to discovery under Bankers Trust Co. v. Shapira [1980] 1 W.L.R. 1274.

In Bankers Trust Co. v. Shapira the order was made against an English bank in respect of an account maintained in London. The question of international jurisdiction was not considered. However, in one of the cases cited by the Court

[1986] Ch 482

of Appeal, London and County Securities Ltd. (In Liquidation) v. Caplan (unreported), 26 May 1978, Templeman J. had ordered an English bank to procure from its foreign banking subsidiaries documents relating to accounts connected with the defendant in order to trace assets which he was said to have embezzled. Templeman J. described the relief which he was granting as "onerous and ... to be granted only in the most exceptional circumstances." The exceptional circumstances were that the case was one of crime and fraud where "unless effective relief is granted, justice may well become impossible because the evidence and the fruits of crime and fraud may disappear." The foreign subsidiary banks were indemnified against liability in damages under the local law by the cross-undertaking in damages and the infringement of sovereignty was excused by a commercial equivalent of hot pursuit.

In my judgment, the authorities on Bankers Trust Co. v. Shapira[1980] 1 W.L.R. 1274 discovery against a bank are consistent with what seems to me to be correct in principle, namely, that its international

jurisdictional limits are the same as those of a subpoena duces tecum or an order under the Bankers' Books Evidence Act 1879.

I therefore come finally to the question of whether this can be regarded as an exceptional case justifying the making of an exorbitant order. It does have at least one very unusual feature, namely, that the customer to whom any duty of confidence is likely to be owed under New York law has ceased to exist. It is true that under the Bahamian Removal of Defunct Companies Act the assets of a dissolved company vest in the treasurer of the Bahamas. But the company had no other assets or liabilities and the possibility that the treasurer may assert a right of confidence in gross in the courts of New York is somewhat improbable. Compliance with the order is therefore highly unlikely to involve Citibank in any civil liability in New York and the plaintiff through Mr. McDonnell has offered to indemnify Citibank by way of undertaking in damages against any which may arise. There is no suggestion that compliance would in any other respect be unlawful by New York law and, as I have noted, Chase Manhattan and Bank of America have felt able to comply with similar orders. It is accepted that documents are needed for the purposes of the trial which will shortly take place.

On the other hand, I think that it would be wrong to undertake a process of weighing the interests of this country in the administration of justice and the interests of litigants before its courts against those of the United States. As appears from the judgment before Leggatt J. in X A.G. v. A Bank [1983] 2 All E.R. 464 this is an exercise which has frequently been undertaken by the courts of the United States. It is extremely difficult to perform in a way which carries conviction outside the forum. Distinguished American commentators as well as foreign observers have not failed to notice that the balance invariably comes down in favour of the interests of the United States. It is equally hard for a court in this country, with a duty to administer justice here, to put objectively into the scales the interests of a foreign country in the integrity of its sovereignty over persons or transactions within its jurisdiction. It is likewise inappropriate to decide the matter on a balance of convenience between the plaintiff and the bank. It seems to me that in a case like this, where alternative legitimate procedures are available, an infringement of sovereignty can seldom be justified except perhaps on the grounds of urgent necessity relied upon by Templeman J. in the London and County Securities Ltd. v. Caplan (unreported).

If this matter had come before me in September 1985, I would have had no hesitation in saying that the subpoena and order should be discharged and that the plaintiff should make application, directly or indirectly, to the courts of New York. There is no question here of hot pursuit. The money has almost certainly been long ago spirited away. But I have anxiously considered whether to make an exceptional order on the grounds that there is now little time before trial. The difficulty is that the plaintiff has no satisfactory explanation for why he has left it so late. The relevance and importance of the documents concerning the Citibank account must have been known from the commencement of the proceedings. The plaintiff has known since March 1985 that I.A.S. has

been struck off. I am told that the file relating to the striking off was mislaid by the Bahamian authorities and was not recovered until recently, but the affidavit of the plaintiff's solicitor in support of his ex parte application says unequivocally that he learned in March that I.A.S. had been struck off. It must have been obvious that the prospects of getting these documents by ordinary discovery were not high.

Equally, I am not satisfied that even now it will not be possible to obtain the documents before trial from the New York court. A motion for leave to apply directly under United States or New York legislation can be brought on two clear days' notice. I would be willing, if asked, to abridge even this period. Citibank have said that they are willing to cooperate in obtaining an appropriate New York order as quickly as possible. In those circumstances, I think that I should exercise my discretion by following the principle stated in Reg. v. Grossman, 73 Cr.App.R. 302 and discharge the order and subpoena.

[1986] Ch 482

**DISPOSITION:**

Order accordingly.

**SOLICITORS:**

Solicitors: Coward Chance; Compton Carr.

T. C. C. B.

(c)2001 The Incorporated Council of Law Reporting for England & Wales

4

19 of 19 DOCUMENTS

R v GROSSMAN

COURT OF APPEAL, CIVIL DIVISION

*73 Cr App Rep 302, 10 Legal Decisions Affecting Bankers 282*

**HEARING-DATES:** 2, 3, 4 March 1981

4 March 1981

## CATCHWORDS:

Evidence -- Bankers' Books -- Right to Inspect and Take Copies as Evidence -- Bank Customer's Account in Isle of Man -- Application to Banks Outside Jurisdiction -- Whether Order of Inspection Should be Made -- Bankers' Books Evidence Act 1879 (42 & 43 Vict. c. 11), s. 7.

## HEADNOTE:

By section 7 of the Bankers' Books Evidence Act 1879: "On an application of any party to legal proceedings a court or judge may order that such party be at liberty to inspect and take copies of any entries in a banker's book for any of the purposes of such proceedings. An order under this section may be made either with or without summoning the bank or any other party and shall be served on the bank three clear days before the same is to be obeyed, unless the court or judge otherwise directs."

G was charged before a Welsh magistrates' court with offences involving tax evasion. The Revenue required evidence that G had deposited money with a company, J.B.K., with whom he had connections, in a Manx bank, S.I.B., which held a numbered account at a branch of an English bank in the Isle of Man. Accordingly, the Revenue applied for an order to inspect the relevant entries in the numbered account under section 7 of the Bankers' Books Evidence Act 1879. It was addressed to the London headquarters of the English bank and S.I.B. were informed of that fact. S.I.B. obtained an injunction in the Isle of Man restraining the English bank from disclosing or {303} permitting inspection of the numbered account aforesaid. The Revenue then decided to apply to the English courts under the Act of 1879 to facilitate the proceedings in Wales and sought an order from an English High Court judge addressed to the English bank's London address. The application was made ex parte and the judge granted it, permitting thereby the inspection by the Revenue of the S.I.B. account relating to J.B.K. S.I.B. sought to set aside that order by applying for leave to be joined as a party to the proceedings and then appealed to the Court of Appeal to have the judge's order set aside.

Held, that in criminal matters an order can be made under section 7 of the Bankers' Books Evidence Act 1879 for inspection of the account of a bank's customer even though he is not a party to the proceedings; but only in exceptional circumstances. It was important that the Court should respect the confidence of a bank account and only if the public interest in helping the prosecution outweighed the private interest of confidentiality should inspection be ordered. In the instant case as the English bank's branch in the Isle of Man was subject to Manx law and regulations it was to be considered as a different entity from its headquarters branch in London; thus it should be considered as a foreign bank and, therefore, not subject to the Court's jurisdiction. Accordingly, the Court in its discretion, should not order the English bank's head office to produce the documents in question, although it could be done. The judge's order should be discharged.

MARLBOROUGH STREET MAGISTRATES' COURT METROPOLITAN STIPENDIARY MAGISTRATE, ex p. SIMPSON (1980) 70 Cr.App.R. 291 applied.

[For Bankers' Books Evidence Act 1879, s. 7, see Archbold (40th ed.), para. 1267.]

## INTRODUCTION:

73 Cr App Rep 302, 10 Legal Decisions Affecting Bankers 282

Appeal.

This was an appeal by the Savings and Investment Bank Ltd., against an order made by Skinner J., on February 12, 1981, and directed to Barclays Bank Ltd., 50 Lombard Street, London E.C.3, that the Commissioners of Inland Revenue or their servants be at liberty to inspect and take copies of all entries in the books of Barclays Bank Ltd., Victoria Street, Douglas, Isle of Man, relating to the account No. 50783064 of the Savings and Investments Bank Ltd. in so far as it related to J.B.K. Constructions Ltd. and of Barclays Bank Ltd., of 60 Union Street, Broadmeads, Bristol, relating to the account of J.B.K. Constructions Ltd. between May 15 and October 4, 1979. The facts relating to the application are set out in the judgment of Lord Denning M.R. The appeal was argued on March 2, 3 and 4, 1981.

## COUNSEL:

Anthony Scrivener, Q.C. and Michael Jump, for the appellants, the Savings and Investment Bank, Ltd. William Denny, Q.C. and Robert Rhodes, for the respondents, the Inland Revenue.

## PANEL:

LORD DENNING MR, LORD JUSTICE SHAW AND LORD JUSTICE OLIVER

## JUDGMENTBY-1:

LORD DENNING MR

## JUDGMENT-1:

LORD DENNING MR: A man called Joseph Henry David Grossman was arrested on September 19, 1979. On his arrest there was found on him two bank paying-in books. They showed that he had been paying in money to an account of Barclays Bank at Douglas in the Isle of Man. It was a numbered account No. 50783064.

Joseph Grossman was taken before the magistrates sitting at Llantrisand in {304} the county of Mid-Glamorgan in Wales. He was charged with fraud on the Revenue. He was granted bail but absconded. On January 14, 1981, on arrival at London Airport he was re-arrested. He is now in custody awaiting trial. The Revenue authorities are preparing the case against him. In support of it they wish to inspect and take copies of some of the numbered accounts which are kept at Barclays Bank in the Isle of Man. The Isle of Man is still outside the jurisdiction of these courts.

The question is whether the courts of England and Wales can make an order (under s. 7 of the Bankers' Books Evidence Act 1879) so as to require the disclosure of the accounts in the books of Barclays Bank in the Isle of Man.

Before I go into detail, I must describe the nature of the case against Joseph Grossman. It goes back to the days of the "lump." When contractors were engaged on building or other work, they used to engage the workmen as "labouronly subcontractors." In point of law the workmen were not servants but principals. They were paid full earnings without deduction of PAYE. They did not pay insurance stamps. They were not insured against accidents at work. Theoretically they were liable to pay tax on their earnings. In practice they never paid any tax. They were never on the site long enough for the Revenue to catch up with them.

In order to overcome this subterfuge, Parliament passed sections 68 to 71 of the Finance (No. 2) Act 1975. Under it the contractors were bound to deduct 35 per cent. of the men's earnings and pay it over to the Revenue -- so as to make up for the tax lost by the subterfuge.

But some contractors were allowed to avoid this 35 per cent. If they satisfied the Revenue authorities of various matters, they were granted examption. One of those who was granted exemption was an English company called J.B.K. Construction Ltd. (J.B.K.). On November 17, 1977, it was granted an exemption certificate. But J.B.K. proved to be unworthy of it. It never made any tax returns or paid any tax. So in January 1979 the exemption certificate was cancelled. The Revenue asked for it back. But it was never returned.

The case against Joseph Grossman appears to be this: He is said to have got hold of some of the documents of J.B.K. He got hold of their invoice forms and their exemption certificate. He then fiddled the documents so as to interpose the name of J.B.K. between the contractors and their workmen. Instead of the contractors paying the men their earnings less the 35 per cent. for the Revenue, the contractors paid the full amount of the men's earnings by cheques made out in favour of J.B.K. (without deducting the 35 per cent.). That money was paid into the numbered account in

73 Cr App Rep 302, 10 Legal Decisions Affecting Bankers 282

the Isle of Man. It was drawn out afterwards and used so as to pay the men their earnings: but less only 6 per cent. Joseph Grossman seems to have taken the 6 per cent. for himself. Seeing that the men's average weekly earnings came to as much as £ 40,000, this meant that Joseph Grossman took about £ 2,400 for himself.The Revenue took nothing.

Those charges are before the court in Wales. I do not say that the charges will be maintained. I have just shown the nature of them so as to show how the point arises. The charges against Joseph Grossman are put on three grounds. The first count is a charge concerning payment made on an invoice by J.B.K., nominally for labour supplied by J.B.K. That payment was put into the numbered account, and the money was collected there. The second count related to his use of the exemption certificate. The third count deals with J.B.K.'s payment to the workmen without making due deductions. {305}

Although the Revenue have a good deal of evidence in support of those charges against Grossman, they desire to obtain what they describe as "confirmatory evidence" by getting the bank accounts into which these moneys were collected, and out of which they were paid.

I will describe the account at Barclays Bank in the Isle of Man. It is headed "Account Number 50783064, Barclays Bank Ltd., Victoria Street, Douglas, Isle of Man.  Account Savings and Investment Bank Limited" -- (S.I.B.).

At once the question arises: What is Savings and Investment Bank Limited? It is a company registered under Manx law. It has no place of business in England and Wales. It is licensed to operate as a bank under the Manx banking laws. It collects cheques and pays them. It collects them through the medium of the branch of Burclays Bank in the Isle of Man using it as a clearing house. For instance, when a cheque was paid in favour of J.B.K. for collection, the amount was passed by S.I.B. into Barclays Bank. Barclays collected the money, and it was credited to the account which the Savings and Investment Bank had with Barclays Bank. Then when J.B.K. wanted to pay out money, they did it by giving a direction to S.I.B.: and the amount would be paid out of this account. Virtually S.I.B. ran the numbered account as though they were themselves a bank with their own customers. Barclays had no knowledge of the names of their customers.

The position now is that the Revenue authorities want disclosure of the Savings and Investment Bank's account with Barclays Bank at the Douglas, Isle of Man, Branch. They want the books relating to it. They feel that if they can get the books of account it will help them in their case in Wales against Joseph Grossman. They think that, by tracing the figures, they can marry the items up which were paid in for collection by J.B.K. and those which were paid out. That is the purpose of the inspection and discovery which is sought under the Bankers' Books Evidence Act 1879.

In 1979 officers of the Revenue went to the Isle of Man. They sought an order under the Manx Bankers' Books Evidence Act 1935. They applied for an order to inspect and take copies of the books of the Isle of Man Branch of Barclays Bank. When that application came before the Deemster in the Isle of Man, he would have nothing of it. He refused to allow proceedings to be brought in the Isle of Man to facilitate court proceedings in Wales. The application did not come within the Isle of Man Bankers' Book Evidence Act at all, because that only applies to legal proceedings in the Isle of Man. To use this Act for proceedings to be held in Wales was quite out of the question. According to the newspapers, the Deemster gave a stern warning to the United Kingdom tax authorities. He said that no such application could be made in the Isle of Man.

There the matter rested. Nothing was done for a while because Joseph Grossman jumped his bail. He was re-arrested in January, 1981, and was placed in custody. The Revenue authorities then decided that the best way of dealing with the matter was to apply to the English courts under the English Bankers' Books Evidence Act 1879 -- so as to facilitate the proceedings in Wales. Accordingly, they sought an order from the High Court of Justice in England addressed -- not to Barclays Bank in the Isle of Man -- but to Barclays Bank Ltd. at 54 Lombard Street, London. They went before Skinner J. on February 12, 1981. They put an affidavit before him. It did not have to be served on anyone. According to section 7 of the Bankers' Books Evidence Act it can be done "with or without summoning the bank or any other party." After reading the affidavit, Skinner J. {306} made this order: "Upon hearing counsel for Her Majesty's Commissioners of Inland Revenue and upon reading the affidavit of John Robert Dodsworth filed February 12, 1981 IT IS ORDERED THAT Her Majesty's Commissioners of Inland Revenue or their servants be at liberty to inspect and take copies of all entries in the books of Barclays Bank Limited, Victoria Street, Douglas, Isle of Man relating to the account number 50783064 of the Savings and Investment Bank Limited so far as it relates to J.B.K.  Constructions Limited, and of Barclays Bank Limited, 60 Union Street, Broadmeads, Bristol, relating to the account of J.B.K. Constructions Limited, between May 15, 1979, and October 4, 1979" -- directed as I have said, to Barclays Bank Ltd., 54 Lombard Street, London, E.C.3.

That application was made ex parte. It was served on Barclays Bank in London. They notified S.I.B. Then Barclays Bank in London considered what to do. They wrote a letter saying that they were taking a neutral stance: they would await the decision of the court. But S.I.B. -- quite independently of Barclays Bank -- sought to set the order aside. They said, "We are a customer of Barclays Bank in the Isle of Man. The Revenue are asking Barclays Bank to produce our account with them. It is only a customer's account. We object to the bank showing our account. Furthermore, the English court has no jurisdiction as it relates to the Isle of Man."

At any rate, Skinner J. made the order ex parte. There is no machinery for appeal in the statute. S.I.B. had to go through an elaborate machinery. They had to apply for leave to be joined as a party to the proceedings: and, after being joined, to apply for leave to appeal to this Court. So they have. They have appealed to this Court. We have heard the matter for two and a half days. If has to be decided at once because of the pending proceedings in Wales.

The question is as to whether the case comes within section 7 of the Bankers' Books Evidence Act 1879. The section provides: "On the application of any party to a legal proceeding a court or judge may order that such party be at liberty to inspect and take copies of any entries in a banker's book for any of the purposes of such proceedings. An order under this section may be made either with or without summoning the bank or any other party, and shall be served on the bank three clear days before the same is to be obeyed, unless the court or judge otherwise directs."

"Legal proceedings" is defined as meaning any criminal or civil proceedings. So it clearly covers these criminal proceedings of Wales. "A court or judge may order" is clearly the High Court judge here. If I may say so, the wording of the statute is wide enough to cover the account not only of a party to the proceedings -- not only an account of Joseph Grossman -- but also an account of other persons with the bank. How far should the statute be used for this purpose? That is the question.

Mr. Scrivener submitted that the power to order inspection and discovery like this -- before a trial -- ought to be watched carefully. Especially when it asks for a sight of a customer's account -- a customer who is in no way whatever involved in the legal proceedings -- a customer to whom the bank owe a duty of confidence under which it ought not to disclose his account to anyone except under an order of the court or in very special circumstances. See the principles stated in TOURNIER v. NATIONAL PROVINCIAL AND UNION BANK OF ENGLAND [1924] 1 K.B. 461.

I need not go into all the cases. Mr. Scrivener and Mr. Denny very helpfully {307} took us through them. It is quite plain that, in the ordinary way, in civil litigation, an order of this kind is only made against the account of the party who is involved in the litigation: or, if it is in the name of some other person. the account which is really the account of the party. In exceptional circumstances such an order can be made against another person altogether -- who is not a party -- but caution must be used before so doing. Such appears from SOUTH STAFFORDSHIRE TRAMWAYS COMPANY v. EBBSMITH [1895] 2 Q.B. 669, 675, per Lord Esher; from POLLOCK v. GARLE [1898] 1 Ch. 1, 5; and from WATERHOUSE v. BARKER [1924] 2 K.B. 749, 772, per Atkin L.J.

In criminal cases the cases are fewer in number. It is clear that an order under section 7 can be made for the inspection of the account of the accused person. There are also cases in which the account of a near relative -- such as a wife's account -- has been the subject of an order. See WILLIAMS v. SUMMERFIELD (1972) 56 Cr.App.R. 597; [1972] 2 Q.B. 512; and ANDOVER JUSTICES, ex parte RHODES [1980] Crim.L.R. 644. In MARLBOROUGH STREET MAGISTRATES' COURT METROPOLITAN STIPENDIARY MAGISTRATE, ex p. SIMPSON (1980) 70 Cr.App.R. 291, Lord Widgery C.J. stressed the care which should be exercised in making an order under section 7. He said that it should be framed in clear words so that the bank can know exactly what should be done. It should also specify the period of time to be covered by the disclosure.

In exceptional circumstances, in criminal cases, the Court can order the inspection of the account of a bank's customer even though he is not a party. But I would only say this: It is important that the Court should respect the confidence of a bank account. Before the confidence is impugned, the judge ought to see how the balance comes down. He should consider whether the public interest in helping the prosecution outweighs the private interest in keeping a customer's bank account confidential. It is only when the public interest prevails that he should order inspection. In our present case the order includes the account of J.K.B. at the branch in Bristol of Barclays Bank. That is quite justifiable. The public interest demands it.

But it is very different when the account is in the Isle of Man. Here the Revenue authorities seek to inspect the books of Barclays Bank in the Isle of Man so as to get discovery of the entries for use in the prosecution in Wales. How far should this be done?

73 Cr App Rep 302, 10 Legal Decisions Affecting Bankers 282

We now know that the courts in the Isle of Man take a strong view against their process being used to compel bankers' books there being inspected so as to help legal proceedings in England. In this very case, after the order was made by Skinner J. on February 12, 1981, the Deemster in Douglas, Isle of Man, made an order granting an injunction against Barclays Bank there, restraining them from disclosing or permitting inspection of their books relating to that very account number 50783064.

The Revenue authorities seek to overcome the difficulty by asking for an order -- not against the branch of Barclays Bank in the Isle of Man -- but against Barclays Bank at 54 Lombard Street here in London. They say the case comes under the Bankers' Books Evidence Act 1879. It is a personal order just like the old subpoena duces tecum. It is a personal order against the head office: and so it is no answer for the head office to say that they would have difficulty in getting the books from the Isle of Man.

I was impressed at first by Mr. Denny's argument for the Revenue authorities. But on reflection I think that the branch of Barclays Bank in Douglas, Isle of {308} Man, should be considered in the same way as a branch of the Bank of Ireland or an American bank, or any other bank in the Isle of Man which is not subject to our jurisdiction. The branch of Barclays Bank in Douglas, Isle of Man, should be considered as a different entity separate from the head office in London. It is subject to the laws and regulations of the Isle of Man. It is licensed by the Isle of Man government. It has its customers there who are subject to the Manx laws. It seems to me that the court here ought not in its discretion to make an order against the head office here in respect of the books of the branch in the Isle of Man in regard to the customers of that branch. It would not be right to compel the branch -- or its customers -- to open their books or to reveal their confidences in support of legal proceedings in Wales.

Any order in respect of the production of the books ought to be made by the courts of the Isle of Man -- if they will make such an order. It ought not to be made by these courts. Otherwise there would be danger of a conflict of jurisdictions betwen the High Court here and the courts of the Isle of Man. That is a conflict which we must always avoid. From a practical point of view, it seems to me that, in order to have inspection of the books of a bank in England or Wales, an application should be made under the 1879 Act here: and that for inspection of the books and entries in the Isle of Man the application should be made under the Isle of Man statutes. This case does not come under the Isle of Man statutes. It is no good going there. It seems to me that, although this court has jurisdiction to order the head office here to produce the books, in our discretion it should not be done.

Skinner J. did not have the benefit of hearing the arguments and considerations as we did. The matter has been argued de novo before us. The appeal should be allowed and the order set aside. This means that the Revenue will not have available all the material which they would like in order to prosecute Mr. Grossman in Wales. They must do the best they can without it. i may add that I am not at all sure how useful these entries would have been even if they had been made available. But in the circumstances that does not arise.

I think the appeal should be allowed and the order set aside so far as it relates to the entries in the books of the branch in the Isle of Man: but it should stand so far as it relates to the branch at Bristol.

**JUDGMENTBY-2:** SHAM L.J.

**JUDGMENT-2:**

SHAW L.J.: I agree. Like Lord Denning M.R., I arrive at the conclusion that the order made by Skinner J. should be set aside upon a consideration of the practicalities rather than the bare legalities of the position disclosed by the history of this matter -- a history beset by very many unusual features to which the Master of the Rolls has adverted. Skinner J. was not put into possession of all the material facts. Since his order there has been an injunction granted to the appellants in the Manx courts. In addition, the information which is likely to be derived from an inspection of the books of Barclays Bank is at best speculative; it may prove of very scanty scanty assistance to the Revenue.

Section 7 does indeed provide that an order under it may be made either with or without notice to the bank or any other party affected. I would for myself suggest that where the interests of other persons are involved (such as their right to privacy), it is desirable that notice should be given to those persons unless considerations of urgency or secrecy make it imperative that the application should be dealt with ex parte. I would allow the appeal. {309}

**JUDGMENTBY-3:** OLIVER L.J.

**JUDGMENT-3:**

73 Cr App Rep 302, 10 Legal Decisions Affecting Bankers 282

OLIVER L.J.: I also agree. So far as the question of jurisdiction is concerned, although it was not treated at first as entirely clear that section 7 of the Bankers' Books Evidence Act enabled an order to be made in relation to an account of a person not a party to any proceedings (I refer particularly to the judgment of Chitty L.J. in POLLOCK v. GARLE [1898] 1 Ch. 1, 5-6), it has now been clearly established for many years that the section does enable such orders to be made and it is now, in my judgment, far too late to depart from a practice which has been established for well over half a century even were there material in the terms of the section itself to justify a more restricted interpretation -- a matter on which I for my part am far from persuaded. There is, therefore, in my judgment, no doubt that the order made by the learned judge in this case was one which he had jurisdiction to make.

The real question in the appeal is whether in the very unusual circumstances of this case an order should have been made in the exercise of the court's discretion. I should say that this Court has had the benefit of a great deal more material and argument than was available to the learned judge. Had the learned judge had the benefit of this material and argument, it must be doubtful whether he himself would have made the order. The material now available indicates, in my judgment, that this is a case in which an order should not be made.

The power to order inspection under the Act in the case of accounts of persons not party to the proceedings is one which, as has been emphasised in a number of cases, should be exercised only with the greatest caution because it is a clear infringement of an individual's right to privacy; and the considerations which should move the court have been set out in the judgment of Lord Widgery, C.J. in WILLIAMS v. SUMMERFIELD (1972) 56 Cr.App.R. 597, 602; [1972] 2 Q.B. 512, 518.

I am bound to say that I think the practice of making orders ex parte in respect of the accounts of persons who are genuinely third parties unconnected with the proceedings (save that they may perhaps be in possession of some evidence) is a most undesirable one. The Act provides no machinery for going back to the judge once the order has been made; so that the party affected, if he wishes to object, must apply (as in this case) to be joined and then appeal to this Court. That strikes me as a profoundly unsatisfactory situation; and, speaking for myself, i would like to see it become a regular practice that in cases where third parties are involved the order should either not be made until the account owner has been informed and given an opportunity to be heard or should be made in the form of an order nisi, allowing a period for the person affected to come before the court and show cause why the order should not be effective.

In the case of SOUTH STAFFORDSHIRE TRAMWAYS CO. v. EBBSMITH [1895] 2 Q.B. 669 Kay L.J. expressed the view at p. 677 that no court would dream of making such an order without having the person affected before it.

Now in the instant case what is sought is a very unusual order. It is an order seeking inspection of the account of a foreign bank not resident within the jurisdiction of this court, that account being maintained with a foreign branch of an English bank as its clearing bank. It so happens that the foreign bank with which the account is maintained is a branch only of a banking company incorporated in England and is not a separate local company incorporated as a subsidiary in the foreign jurisdiction. Now that is a very strong thing to seek. The English Court is asked to order, because of the fortuitous fact that the head {310} office of Barclays Bank is situated in this country, the disclosure of a foreign banker's account maintained at a foreign branch of Barclays Bank. That is sought in the face of a subsisting injunction of a court of competent jurisdiction in the Isle of Man -- true only an interim injunction -- which specifically forbids the Isle of Man branch from disclosing the foreign bank's customer's account to the English Inland Revenue.

I do not say that an order in such unusual circumstances can never be made, but it would I think be one which ought to be made only on a case very much stronger than that which the Inland Revenue have been able to deploy in the instant case.

For those reasons I too would allow the appeal.

**DISPOSITION:**

Appeal allowed.

**SOLICITORS:**

Olivestone, Hanson and Peltz, for the appellant. Solicitor, Inland Revenue, for the respondents.

5

Science Research Council v Nasse, BL Cars Ltd (formerly Leyland Cars) v Vyas

HOUSE OF LORDS

*[1980] AC 1028, [1979] 3 All ER 673, [1979] 3 WLR 762, [1979] ICR 921*

**HEARING-DATES:** 5, 6, 7, 11, 12, 13, 14, 18 June, 1 November 1979

1 November 1979

**CATCHWORDS:**

Industrial tribunal -- Procedure -- Discovery - Confidential documents - Complaint of discrimination in employment - Discovery of confidential reports and references on employees and applicants for employment - Principles applicable in ordering discovery - Whether discovery at tribunal's discretion - Whether tribunal's discretion to order discovery same as discretion to order discovery in county court - Whether general order for discovery of all reports or references on employees should be made - Whether tribunal under a duty to inspect documents before ordering discovery - Industrial Tribunals (Labour Relations) Regulations 1974 (SI 1974 No 1386), Sch, r 4(1)(b) - CCR Ord 14, r 2(2).

**HEADNOTE:**

In the first case the complainant, a clerical officer employed by the Science Research Council, made a complaint to an industrial tribunal that the council had discriminated against her in selecting two other clerical officers, but not her, to be interviewed for promotion. The complaint alleged that she had been discriminated against on the ground of her trade union activities, contrary to s 53(1) of the Employment Protection Act 1975, and because she was a married woman, contrary to s 6 of the Sex Discrimination Act 1975. Each year a confidential report was made on every employee by his or her immediate superior giving a detailed assessment of the employee's performance during the yar and his or her suitability for promotion. The reports were studied by a local review board which analysed and commented on them and then made recommendations for promotion. Before the industrial tribunal hearing took place the complainant applied, under r 4(1) a of the rules of procedure b for industrial tribunals, for discovery of the annual confidential reports on the two officers who were selected for interview and herself and the relevant extracts from the minutes of the local review board. The council were willing to disclose the reports on the complainant herself but declined to disclose the reports on the other two officers or the extracts from the minutes dealing with them. The industrial tribunal made an order, under r 4(1)(b), for discovery of the documents sought without having inspected them. The council appealed to the Employment Appeal Tribunal which affirmed the industrial tribunal's decision. The council appealed to the Court of Appeal c which held that in exceptional cases an industrial tribunal could order the disclosure of confidential documents which had been sought to be withheld on the ground of public interest immunity, if the chairman after inspecting the documents he decided that it was essential in the interests of justice that the confidence should be overridden. The court allowed the council's appeal and set aside the order for discovery on the ground that disclosure of the documents was not necessary for fairly disposing of the appeal. The complainant appealed to the House of Lords.

a Rule 4(1), so far as material, is set out at p 693 g, post

b Industrial Tribunal (Labour Relations) Regulations 1974, Sch

nc [1978] 3 All ER 1196, [1979] QB 144

In the second case the complainant, who was of Asian origin and was employed by Leyland Cars at one of their works, made a complaint to an industrial tribunal that Leyland had discriminated against him by refusing his application to transfer to another department of the works where posts had been advertised. The complainant alleged that he had been discriminated against because of his colour, contrary to s 4(2)(b) of the Race Relations Act 1974, and that after an

[1980] AC 1028, [1979] 3 All ER 673, [1979] 3 WLR 762, [1979] ICR 921

interview by a panel two white employees whose qualifications were inferior to his own had been selected for the advertised posts. The complainant was dissatisfied with the answers given by Leyland to interrogatories put to them under the Race Relations Act 1976 and applied for further particulars of documents relating to the employees who had applied for transfer to the advertised posts. Leyland were willing to disclose certain information but not the service records, personal history forms or personal assessment records of the other employees, or the reports of the members of the interviewing panel. The complainant's application to an industrial tribunal, under r 4(1) of the rules of procedure, for discovery of that information was refused. The complainant appealed to the Employment Appeal Tribunal which, following its decision in the first case, allowed the appeal and ordered discovery of the information without the chairman having seen the documents. Leyland appealed to the Court of Appeal d. On the hearing of the appeal they gave evidence that disclosure of confidential information about employees would constitute a gross breach of faith and would be likely to damage industrial relations and impair the efficiency of their promotion procedures, which were similar to those of many industrial concerns. They contended that the withholding of such confidential information was protected by public interest immunity and disclosure should never be made unless the person supplying the information was willing to allow disclosure. The Court of Appeal allowed Leyland's appeal and set aside the order for discovery on the ground that discovery of the confidential information relating to the successful employees was not necessary. The complaint appealed to the House of Lords.

d [1978] 3 All ER 1196

Held - (i) Whether discovery of confidential assessments, references, reports or other documents relating to an employee or applicant for employment should be ordered in proceedings before an industrial tribunal arising out of discrimination in employment was always a question of discretion for the court under r 4(1)(b) of the rules of procedure because such confidential documents were not protected from disclosure on the ground of public interest immunity. In exercising that discretion, which was the same as the county court's discretion under CCR Ord 14, r 2(2), an industrial tribunal should not order discovery unless it was necessary either for disposing fairly of the proceedings or for saving costs, and when exercising that discretion, in relation to confidential documents, it should in the interests of justice have regard to (a) the fact that the documents were confidential and that to order disclosure would involve a breach of confidence and (b) the extent to which the interest of third parties would be affected by disclosure. Furthermore, although relevance was a necessary ingredient, the tribunal was not bound to order discovery of all documents which were relevant if, for example, the information could be obtained from other sources. If however discovery was necessary for fairly disposing of the proceedings discovery must be ordered notwithstanding the documents' confidentiality. In deciding whether discovery was necessary for that reason the tribunal should first inspect the documents and consider whether justice could be done by special measures, such as covering up confidential but irrelevant parts of the documents, substituting anonymous references for specific names, or, in rare cases, a hearing in camera (see p 679 g to p 680 d, p 684 b c and e to p 685 a and f to h, p 686 a b h, p 687 b to d, p 689 b to f, p 690 a b, p 693 b, p 695 f to j, p 696 g h, p 697 c d and p 698 b d to f and j to p 699 d, post), dictum of Arnold J in British Railways Board v Natarajan [1979] 2 All ER at 799 approved.

(ii) The Court of Appeal had rightly held that discovery should not have been ordered in either of the two cases without the respective tribunals first inspecting the documents. Accordingly the appeals would be dismissed and the cases remitted to the tribunals so that the chairmen could examine those documents claimed to be confidential before deciding whic, if any, should be disclosed and inspected and whether any irrelevant parts of the disclosed documents should be covered up (see p 682 e to h, p 685 h to p 686 b, p 689 h, p 690 b c, p 697 a to d, and p 699 d e, post). approved.

Decision of the Court of Appeal [1978] 3 All ER 1196 affirmed.

**NOTES:**

For discovery of documents in proceedings before industrial tribunals, see 16 Halsbury's Laws (4th Edn) para 1018, and for the rules of procedure which apply to the proceedings, see ibid paras 1014-1028.

For discovery of documents in the country court, see 10 ibid paras 287, 288.

For withholding documents on the ground that disclosure would be injurious to the public interest, see 13 ibid paras 86-91, and for cases on the subject, see 18 Digest (Reissue) 154-160, 1265-1301.

[1980] AC 1028, [1979] 3 All ER 673, [1979] 3 WLR 762, [1979] ICR 921

## CASES-REF-TO:

Argyll (Duke of) v Duchess of Argyll 1962 SC (HL) 88, 27(1) Digest (Reissue) 418, * 1647.

Attorney-General v Clough [1963] 1 All ER 420, [1963] 1 QB 773, [1963] 2 WLR 343, 22 Digest (Reissue) 459, 4587.

Attorney-General v Mulholland, Attorney-General v Foster [1963] 1 All ER 767, [1963] 2 QB 477, [1963] 2 WLR 658, CA, 22 Digest (Reissue) 459, 4588.

Attorney-General v North Metropolitan Tramways Co [1892] 3 Ch 70, 61 LJ Ch 693, 67 LT 283; affd (1895) 72 LT 340, CA, 18 Digest (Reissue) 12, 51.

British Railways Board v Natarajan, Natarajan v British Railways Board [1979] 2 All ER 794, [1979] ICR 326, EAT.

Conway v Rimmer [1968] 1 All ER 874, [1968] AC 910, [1968] 2 WLR 998, HL, rvsg [1967] 2 All ER 1260, [1967] 1 WLR 1031, CA, 18 Digest (Reissue) 155, 1273

Crompton (Alfred) Amusement Machines Ltd v Customs and Excise Comrs (No 2) [1973] 2 All ER 1169, [1974] AC 405, [1973] 3 WLR 268, HL, 18 Digest (Reissue) 102, 756.

D v National Society for the Prevention of Cruelty to Children [1977] 1 All ER 589, [1978] AC 171, [1977] 2 WLR 201, HL.

Duncan v Cammell Laird & Co Ltd [1942] 1 All ER 587, [1942] AC 624, 111 LJKB 406, 166 LT 366, HL, 18 Digest (Reissue) 155, 1272.

Grosvenor Hotel, London, Re, (No 2), [1964] 3 All ER 354, [1965] Ch 1210, [1964] 3 WLR 992, CA, 18 Digest (Reissue) 157, 1279.

Hopkinson v Lord Burghley (1867) LR 2 Ch App 447, 36 LJ Ch 504, LJJ, 18 Digest (Reissue) 148, 1193.

McIvor v Southern Heath and Social Services Board [1978] 2 All ER 625, [1978] 1 WLR 757, HL.

North British Railway Co v Garroway (1893) 20 R (Ct of Sess) 397.

Oxford v Department of Health and Social Security [1977] ICR 884, EAT.

Rogers v Secretary of State for the Home Department, Gaming Board for Great Britain v Rogers [1972] 2 All ER 1057, [1973] AC 388, [1972] 3 WLR 279, 136 JP 574, HL, 22 Digest (Reissue) 461, 4600.

Stone v Charrington & Co Ltd (15th February 1977) unreported, EAT.

## INTRODUCTION:

Interlocutory appeals.  Science Research Council v Nasse

The employee, Joan Marguerite Nasse, a clerical officer employed by the Science Research Council ('the SRC') at their Appelton laboratory, complained to an industrial tribunal that the SRC, in not selecting her an interview with a view to promotion to executive officer, had discriminated against her because of her trade union activities and because she was a married woman, contrary to s 53(1) of the Employment Protection Act 1975 and s 6 of the Sex Discrimination Act 1975, respectively.  The SRC filed an answer denying discrimintion.  Mrs Nasse applied by letter dated 8th May 1977, pursuant to r 4(1)(b) of the rules of procedure contained in the schedule to the Industrial (Labour Relations) Regulations 1974 for an order requiring the SRC to disclose the annual confidential reports for the years 1975 and 1976 relating to herself and the two clerical officers who were selected for interview for promotion (later extended in the case of one of the officers to 1974) and the minutes of the local review board.  The SRC opposed the application so far as disclosure of the confidential reports relating to the two clerical officers and the extracts from the minutes dealing with those officers was concerned.  On 23rd November 1977 an industrial tribunal sitting in London (chairman Mr Oliver Lodge) ordered inspection of all documents in respect of which the application was made.  The SRC appealed to the Employment Appeal Tribunal (Bristow J, Mrs A L T Taylor and Mr R Thomas) which, on 20th March 1978, dismissed the appeal and ordered the SRC to disclose the confidential reports for 1975 and 1976 on the two clerical officers who were selected for interview and the minutes of the local review board relating to the decision to select those officers for interview and not to select Mrs. Nasse.  On 26th July 1978 the Court of Appeal n1 (Lord Denning MR, Lawton and Browne LJJ) allowed an appeal by the SRC and refused Mrs Nasse's application for discovery.  Mrs Nasse appealed to the House of Lords pursuant to leave of the House granted on 19th October 1978.  The facts are set out in the opinion of Lord Wilberforce.

n1 [1978] 3 All ER 1196, [1979] QB 144

BL Cars Ltd (formerly Leyland Cars) v Vyas

[1980] AC 1028, [1979] 3 All ER 673, [1979] 3 WLR 762, [1979] ICR 921

The employee, Nat Vinu Vyas, who was employed by Leyland Cars (now BL Cars Ltd) at their Cowley works, complained to an industrial tribunal that Leyland Cars had discriminated against him on the grounds of race, colour, ethnic or national origin, contrary to s 4(2)(b) of the Race Relations Act 1976, in refusing his application for transfer to another department at the Cowley works and in accepting the applications for transfer of two other employees. The Commission for Racial Equality supported his complaint. Leyland Cars denied discrimination. By letter dated 15th February 1978, the commission applied to the secretary of the industrial tribunals, under r 4(1) of the rules of procedure contained in the schedule to the Industrial Tribunals (Labour Relations) Regulations 1974, for disclosure by Leyland Cars of specified information. Leyland Cars disclosed some of that information but refused to disclose details of the employment and service records of the persons apart from Mr Vyas who were interviewed for transfer to the other department, and the completed interview report forms returned by each member of the interview panel in relation to those persons and Mr Vyas. By letter dated 14th March the chairman of the tribunals refused to make an order for further and better particulars of the withheld documents. The commission on behalf of Mr Vyas appealed to the Employment Appeal Tribunal (Phillips J, Mr A J Nicol and Mr J M Wood) which, on 28th April, allowed the appeal, following their decision in Science Research Council v Nasse n2, and ordered discovery of the withheld documents. On 26th July 1978 the Court of Appeal n1 (Lord Denning MR, Lawton and Browne LJJ) allowed an appeal by Leyland Cars. Mr Vyas appealed to the House of Lords with leave of the House granted on 19th October 1978. The facts are set out in the opinion of Lord Wilberforce.

n1 [1978] 3 All ER 1196, [1979] QB 144

n2 [1978] ICR 777

**COUNSEL:**

Raymond Kidwell QC and Frederic Reynold for Mrs Nasse. T H Bingham QC, Peter Gibson and David Blunt for the SRC. Anthony Lester QC n1 and Frederic Reynold for Mr Vyas. Robert Alexander QC and Michael Howard for BL Cars Ltd.

n1 Lester QC, as a special concession from the House and with the consent of opposing counsel, was granted permission, after he had presented his arguments on behalf of Mr Vyas, to present arguments on behalf of the Equal Opportunities Commisson and the Commisson for Racial Equality

**JUDGMENT-READ:**

Their Lordships took time for consideration. 1st November. The following opinions were delivered.

**PANEL:** LORD WILBERFORCE, LORD SALMON, LORD EDMUND-DAVIES, LORD FRASER OF TULLYBELTON AND LORD SCARMAN

**JUDGMENTBY-1:** LORD WILBERFORCE.

**JUDGMENT-1:**

LORD WILBERFORCE. My Lords, Mrs Nasse and Mr Vyas, who are the two appellants in these conjoined appeals, have complained to industrial tribunals of discrimination against them by their employers.

Mrs Nasse was employed as a clerical officer by the Science Research Council ('SRC') a body incorporated by Royal Charter. She sought, unsuccessfully, promotion to the grade of executive officer and complained, originally, that she had been discriminated against on the ground of her activities in her trade union. Later she added a complaint of discrimination under the Sex Discrimination Act 1975.

Mr Vyas was employed as a methods analyst by Leyland Cars (now BL Cars Ltd) ('Leyland'). He sought, unsuccessfully, a level transfer to another division in the company, and complained of discrimination on racial grounds: he is of Asian origin.

[1980] AC 1028, [1979] 3 All ER 673, [1979] 3 WLR 762, [1979] ICR 921

Each appeal raises the question whether and to what extent a complaint under the Employment Protection Act 1975, or the Sex Discrimination Act 1975&or the Race Relations Act 1976, may obtain discovery and inspection of documents, and, in particular, whether she or he is entitled to see confidential assessments, references, reports or other documents relating to the complainant and to other persons, particularly those persons who have been preferred to the complainant. In each case the employer has been willing to produce for inspection a certain amount of material. But in each case it objects to the disclosure of matters revealed in confidence on the ground, broadly, that this would involve a breach of the confidence under which the material came into existence, and would undermine the whole system and structure of promotion and employer management.

The appeals call for a decision on principles applicable generally to complaints of discrimination, but in the end these particular cases have to be decided, so I think it advisable to say something more about them before attempting generalisations. Mrs Nasse, as had other employees of the SRC, had made on her an annual confidential report. This form of report, commonly used in the public service, is made by the employee's immediate superior, by an officer senior to the reporting officer, and by the next senior officer to the latter. These reports to some extent involve an assessment of personal qualities and are confidential in the sense that those signing them know that they will not be shown to the person reported on. They are also confidential in the sense that the person reported on knows that the contents of the report will only be used or disclosed for the purpose of monitoring his performance. However, the person reported on may ask to be told of some of the information given in the report.

The reports on Mrs Nasse, in accordance with the usual procedure, were considered by a local review board together with reports on other employees. The local review board made notes from the reports and then made recommendations to the director of the laboratory where she was employed as to clerical officers to be put forward for promotion. After endorsement by the director, the recommendations were forwarded to a central review board. Mrs. Nasse was not recommended for promotion: the only officer who was recommended in 1976 was a Mr Roberts. The central review board decided to call for interview Mr Roberts and a Miss Richardson, but not Mrs Nasse. Ultimately Mr Roberts and Miss Richardson were promoted.

The documents which Mrs Nasse, by letter to the industrial tribunal, requested should be supplied to her were (a) the annual confidential reports on Mr Roberts, Miss Richardson and herself for 1975 and 1976 (later extended in the case of Mr Roberts to 1974) and (b) the minutes of the local reivew board. The SRC furnished her with copies of the report on herself but refused her other requests. After a hearing on 23rd November 1977 the industrial tribunal granted Mrs Nasse's application and this decision (with a small variation) was upheld by the Employment Appeal Tribunal on 20th March 1978. On appeal by the SRC to the Court of Appeal, that court allowed the appeal and refused Mrs Nasse's application.

Mr Vyas applied in October 1977 for a level transfer to a position in respect of which his employer had advertised two vacancies. Three other persons applied for the vacancies and they, together with Mr Vyas, were interviewed. Mr Vyas was unsuccessful. After he had made his complaint to an industrial tribunal an application was made (inter alia) for an order requiring the employer to disclose details of the employment record of the other persons interviewed, their service records, personal history forms, personal assessment records and details of commendations, if any, together with their application forms for the post advertised. He also asked for disclosure of the completed interview report forms returned by each member of the interview panel in relation to each person interview. Certain other information requested was supplied to the complaint, but the employer objected to disclosing the matters referred to. As to the latter, the chairman of the industrial tribunal refused the application, but it was allowed on appeal by the Employment Appeal Tribunal, with an indication that in doing so the tribunal felt constrained to follow its decision in Mrs Nasse's case. On appeal to the Court of Appeal, an affidavit was admitted at a late stage from the employer's staf director stating that disclosure of such documents would lead to an inhibition of freedom and candour in reporting and an inhibition on the part of employees when applying for jobs or promotion. It was further stated that such disclosure would constitute a breach of faith which would be likely to lead to industrial unrest and diminution of the effectiveness of selection procedures. The Court of Appeal allowed the employer's appeal.

On the appeals coming before your Lordships very extensive arguments were heard ranging widely over many areas of substantive and procedural law, with references to American cases under the Civil Rights Act 1964 and to the European Convention of Human Rights n1, art 6. Since I regard our task in this House to be at most to establish rules which can be applied by industrial tribunals (and analogously by county courts in discrimination cases), I shall summarise the statutory background and then state the conclusions to which I have come before developing certain supporting arguments.

[1980] AC 1028, [1979] 3 All ER 673, [1979] 3 WLR 762, [1979] ICR 921

n1 Rome, 4th November 1950; TS 71 (1953); Cmd 8969

There are three statutes dealing with discrimination: in these appeals we are concerned with all of them. I shall refer only to such provisions as are essentially relevant. The Employment Protection Act 1975, ss 53 to 56, deals with action taken against an employee for the purpose of penalising him for being a member of an independent trade union, or of preventing or deterring him from taking part in the activities of an independent trade union. Complaints go to an industrial tribunal where the employer has the burden of showing that the purpose for which the action was taken was not such as has been mentioned (see s 55(1)(b)). Complaints of discrimination in employment under the Sex Discrimination Act 1975 or the Race Relations Act 1976 also go to an industrial tribunal, but in these cases the burden of proof is on the employee. Discrimination in other matters (eg as to education or housing) go to a county court and are to be dealt with 'as any other claim in tort' (see ss 6l(1) and 57(1) of these Acts respectively).

In cases under the Sex Discrimination Act 1975 and the Race Relations Act 1976 the necessary information and material to support or refute a claim will rarely be in the possession of the employee, but, on the contrary, is likely to be in the possession of the employer. Discrimination, at least in promotion cases, involves an allegation that, although the unselected complainant is as well qualified as the person selected, or indeed better qualified, he was not chosen, an allegation which almost necessarily involves a careful comparison of qualifications and an enquiry into the selection process. The employer is likely to have information on these matters. So, in order to ensure its production, each of the Acts contains a powerful inquisitorial procedure enabling the statutory commissions set up under each Act to obtain information. They may conduct a 'formal investigation' and in the course of it require any person to give oral information and produce documents; there is however the limitation that a person cannot be required to give information, or produce documents, which he could not be compelled to give in evidence or produce in civil proceedings before the High Court. If an individual considers that he may have been discriminated against, the relevant commission may assist him (by advice or 'legal aid') and may help him to question the employer by means of a questionnaire. If the employer refuses to answer, or if his answer appears evasive or equivocal, inferences adverse to him may be drawn. Furthermore, industrial tribunals have powers, of their own motion, to ask for particulars of the grounds on which a person relies and of any facts or contentions relevant thereto. These provisons may appear Draconian (they did so to some extent to Lord Denning MR) but for my part I do not find it necessary to characterise them. The powers have been conferred by Parliament on statutory bodies as part of the machinery for eliminating discrimination in situations where the parties are of unequal strength: no instance was given to us of an oppressive use of them and we should presume that they will be reasonably used for the purpose for which they were given. The relevant point to be made is that, by reason of these powers, employees and the tribunals have the means, before any question of discovery arises, to obtain a great deal of information which may assist the employees' case, and indeed by conferring them Parliament has shown that its policy is that they should have every chance to lay before the tribunal or the court all material that may be relevant to a discrimination claim.

That brings me to the question of discovery (in which I include inspection) as to which the situation, as I see it, is formally simple. By a number of cross-references between regulations n1, the County Court Rules and the Rules of the Supreme Court the position is reached that the tribunal, or the county court, has a general discretion to order discovery, coupled with the qualification that 'discovery shall not be ordered if and so far as the court is of opinion that it is not necessary either for disposing fairly of the proceedings or for saving costs' (CCR Ord 14, r 2(2); emphasis mine). These provisions, applied as they have been since their introduction, are sufficient to provide a solution for the issues in these appeals. These are, broadly, two. First, is there in relation to confidential documents, or any relevant class of confidential documents, any immunity from disclosure? Second, if not, how should the tribunal exercise its discretion as to discovery in relation to confidential documents in this field? (Here and elsewhere I use the word 'tribunal' so as to include, where appropriate, a county court.)

n1 Ie the Industrial Tribunals (Labour Relations) Regulations 1974 (SI 1974 No 1386), as amended by the Industrial Tribunals (Labour Relations) (Amendment) Regulations 1978 (SI 1978 No 991)

On these points my conclusions are as follows:

(1) There is no principle of public interest immunity, as that expression was developed from Conway v Rimmer n2, protecting such confidential documents as these with which these appeals are concerned. That such an immunity exists,

Case 1:05-cv-04622-DLI-RML   Document 83-4   Filed 12/18/06   Page 79 of 140 PageID #: 1695

[1980] AC 1028, [1979] 3 All ER 673, [1979] 3 WLR 762, [1979] ICR 921

or ought to be declared by this House to exist, was the main contention of Leyland.  It was not argued for by the SRC; indeed that body argued against it.

n2 [1968] 1 All ER 874, [1968] AC 910

(2) There is no principle in English law by which documents are protected from discovery by reason of confidentiality alone.  But there is no reason why, in the exercise of its discretion to order discovery, the tribunal should not have regard to the fact that documents are confidential, and that to order disclosure would involve a breach of confidence.  In the employment field, the tribunal may have regard to the sensitivity of particular types of confidential information, to the extent to which the interests of third parties (including other employees on which confidential reports have been made, as well as persons reportinge may be afected by disclosure, to the interest which both employees and employers may have in reserving the confidentiality of personal reports, and to any wider interest which may be seen to exist in preserving the confidentiality of systems of personal assessments.

(3) As a corollary to the above, it should be added that relevance alone, though a necessary ingredient, does not provide an automatically sufficient test for ordering discovery.  The tribunal always has a discretion.  That relevance alone is enough was, in my belief, the position ultimately taken by counsel for Mrs Nasse thus entitling the complainant to discovery subject only to protective measures (sealing up etc).  This I am unable to accept.

(4) The ultimate test in discrimination (as in other) proceedings is whether discovery is necessary for disposing fairly of the proceedings.  If it is, then discovery must be ordered notwithstanding confidentiality.  But where the court is impressed with the need to preserve confidentiality in a particular case, it will consider carefully whether the necessary information has been or can be obtained by other means, not involving a breach of confidence.

(5) In order to reach a conclusion whether discovery is necessary notwithstanding confidentiality the tribunal should inspect the documents.  It will naturally consider whether justice can be done by special measures such as 'covering up', substituting anonymous references for specific names, or, in rare cases, hearing in camera.

(6) The procedure by which this process is to be carried out is one for tribunals to work out in a manner which will avoid delay and unnecessary applications.  I shall not say more on this aspect of the matter than that the decisions of the Employment Appeal Tribunal in Stone v Charrington & Co Ltd n1 per Phillips J, Oxford v Department of Health and Social Security n2 per Phillips J and British Railways Board v Natarajan n3 per Arnold J, well indicate the lines of a satisfactory procedure, which must of course be flexible.

n1 (15th February 1977) unreported

n2 [1977] ICR 884 at 887

n3 [1979] 2 All ER 794

(7) The above conclusions are essentially in agreement with those of the Court of Appeal n4.  I venture to think however that the formula suggested, namely:

n4 See [1978] 3 All ER 1196 at 1208, [1979] QB 144 at 173 per Lord Denning MR

'The industrial tribunals should not order or permit the disclosure of reports or references that have been given and received in confidence except in the very rare cases where, after inspection of a particular document, the chairman decides that it is essential in the interests of justice that the confidence should be overridden: and then only subject to such conditions as to the divulging of its as he shall think fit to impose, both for the protection of the maker of the document and the subject of it.'
may be rather too rigid.  For myself I prefer to rest such rule as can be stated on the discretion of the court.

To these conclusions I will now add some supporting arguments.  I make these briefly since a large part of the ground is familiar, and to deal fully with all the contentions we have heard would require treatment disproportionate to the case.  In the end the issue between the parties, apart from the claim to public interest immunity, is a narrow one.

[1980] AC 1028, [1979] 3 All ER 673, [1979] 3 WLR 762, [1979] ICR 921

1. I reject the contention of public interest immunity basically on three grounds.  First there is no acceptable analogy, still less any precedent, on which such a claim could be admitted.  The area in which the immunity is claimed is essentially one of private right even though interest beyond those of the particular employer concerned may be involved.  Secondly, to admit such a claim in this field would conflict with the clear public interest accepted and emphasised by Parliament in the Sex Discrimination Act 1975 and the Race Relations Act 1976 that the fullest information should be before the tribunals.  Thirdly, to admit such a claim would produce most undesirable results in excluding classes of documents altogether from use in the proceedings, since documents covered by immunity on grounds of public interest not only may but must be withheld.

2. No authority is needed for the negative proposition that confidentiality alone is no ground for protection; see, however, Alfred Crompton Amusement Machines Ltd v Customs and Excise Comrs (No 2). n1

n1 [1973] 2 All ER 1169, [1974] AC 405

English law as to discovery is extremely far reaching; parties can be compelled to produce their private diaries; confidences, except between lawyer and client, may have to be broken however intimate they may be.  But there are many examples of cases where the courts have recognised that confidences, particularly those of third persons, ought, if possible, in the interests of justice, to be respected.  See, for recent examples, Attorney-General v Mulholland n2 and Attorney-General v Clough n3 and compare Attorney-General v North Metropolitan Tramways Co n4.  This principle was accepted by this House in D v National Society for Prevention of Cruelty to Children n5.  Employment cases, and indeed all cases involving selection, involve a wide dimension of confidentiality, affecting other candidates or applicants, who may be numerous, and a number of reporting officers and selection bodies.  No court attempting to administer these Acts can fail to give weight to this, though it is not, as above stated, the only element.  It is sometimes said that in taking this element into account, the court has to perform a balancing process.  The metaphor is one well worn in the law, but I doubt if it is more than a rough metaphor.  Balancing can only take place between commensurables.  But here the process is to consider fairly the strength and value of the interest in preserving confidentiality and the damage which may be caused by breaking it; then to consider whether the objective, to dispose fairly of the case, can be achieved without doing so, and only in a last resort to order discovery, subject if need be to protective measures.  This is a more complex process than merely using the scales: it is an exercise in judicial judgment.

n2 [1963] 1 All ER 767, [1963] 2 QB 477

n3 [1963] 1 All ER 420, [1963] 1 QB 773

n4 [1892] 3 Ch 70

n5 [1977] 1 All ER 589, [1978] AC 171

3. It was justly pointed out by counsel for Mr Vyas, also representing the commissions, that Parliament in enacting the two discrimination Acts, and also in the field of employment protection, undoubtedly had in mind that considerations of confidentiality might arise, and indeed legislated as to this matter.  Thus, in the Industrial Relations Act 1971, while employers were obliged to disclose certain information to employees, or to trade union representatives (ss 56, 57), there was a specific provision relieving employers of their obligation as regards 'information which has been communicated to the employer in confidence, or which the employer has otherwise obtained in consequence of the confidence reposed in him by another person' (s 158(1)).  That same Act contained provision regarding discovery in industrial tribunals similar to those which apply in the present cases (Sch 6, para 2(d)) without any reference to confidential matters.  On the repeal of the Industrial Relations Act 1971 these provisions were carried forward into the Trade Union and Labour Relations Act 1974 which extended the powers of industrial tribunals (Sch 1, Part III, para 16) with a similar reference to confidential matters as had been made in s 158 above (Sch 1, Part III, para 21(5)), power being given to sit in private to protect confidentiality.  So the policy of this Act was to allow discovery and inspection in industrial tribunals on the same basis as would be allowed in county courts with specified safeguards for confidentiality.  The Employment Protection Act 1975 contained similar provisions regarding disclosure and confidential information to those contained in the (repealed) Industrial Relations Act 1971, ss 56 and 158, but gave no immunity as regards such information in proceedings in industrial tribunals under Part II of that Act.  These repeated enactments show, it was said, a deliberate abstention by Parliament from introducing any immunity for confidential informaion into proceedings before industrial tribunals, although Parliament had to hand the necessary language for so doing.

[1980] AC 1028, [1979] 3 All ER 673, [1979] 3 WLR 762, [1979] ICR 921

My Lords, I recognise the force of all this but I do not think that it leads to the conclusion which is sought to be drawn from it. The fact that Parliament has conferred a specific degree of immunity on confidential information required to be disclosed in particular circumstances is not inconsistent with a legislative intention that industrial tribunals should have the same power, in their discretion, to refuse or limit discovery where confidential information is concerned. This power is not one to confer immunity: it is simply the ordinary discretionary power which is enjoyed by the High Court and by county courts. By equating the powers of the tribunals to those of the courts, Parliament has, in my opinion, indicated in a clear enough way that those limitations on the granting of discovery which the courts have long accepted should apply to tribunals, and the granting of the much wider immunity in other cases does not, in my understanding, negate this.

4. The European Convention on Human Rights n1. The point here is a very short one. Article 6 (1) of the Convention guarantees the right to a fair hearing: Mr Vyas relies on this as requiring total disclosure of all information relevant to the case, confidential or not. But this is a fallacy, because the whole aim and object to those carefully worked out provisions of English law which regulate the right to discovery and inspection of documents is precisely to achieve a fair hearing. That is the standard of our law and it is unnecessary to have resort to the Convention to establish it.

n1 Rome, 4th November 1950; TS 71 (1953); Cmd 8969

It remains to dispose of the actual appeals. In Mrs Nasse's case, discovery was sought of a whole range of documents as specified above, claimed by the employer to be confidential. The chairman of the industrial tribunal ordered accordingly without inspecting the documents. The Court of Appeal held that this was wrong and that discovery should only be ordered if, after inspection, the tribunal considered discovery to be necessary in order to dispose fairly of the proceedings. In my opinion, the Court of Appeal was right, and the appeal must be dismissed. This does not prevent Mrs Nasse, if she goes on with her case, from requesting the tribunal to look at the requested documents and ordering, subject if necessary to safeguards, discovery and inspection of such of them as are necessary for fair disposal of the case. In Mr Vyas's case the situation is similar. The Employment Appeal Tribunal ordered that he should be allowed to inspect all the documents to which I have referred (as listed in a letter dated 15th February 1978) regardless of confidentiality. The Court of Appeal held that this was wrong and I agree with them. The order of the Employment Appeal Tribunal was correctly set aside, and the appeal must be dismissed. However some of the documents may well be necessary for disposing fairly of the case. If it goes on, the industrial tribunal should consider, at the time and in the manner which it considers most suitable, which, if any, of the requested documents should be disclosed and produced in order to enable the proceedings to be fairly disposed of.

I would dismiss the appeals and order each appellant to pay the respective respondents' costs in this House.

JUDGMENTBY-2: LORD SALMON.

JUDGMENT-2:

LORD SALMON. My Lords, my noble and learned friend, Lord Wilberforce, has lucidly stated all the material facts, the relevant provisions of the three statutes and the rules and orders with which these two appeals are concerned. I will not repeat but gratefully adopt them.

The question which these appeals raises is of great importance: what rights has an employee, complaining of unlawful discrimination, to obtain an order against his employer for the production of documents which contain confidential information? 'Complaintsh include all who complain of and seek redress for unlawful discrimination on account of their sex, race or trade union activities. Such discrimination is treated as a tort in England and as a breach of statutory duty in Scotland.

It is plain from the Industrial Tribunals (Labour Relations) Regulations 1974 that Parliament did not intend to deprive the person against whom such discrimination is alleged to have been committed, of any of the facilities enjoyed by the ordinary plaintiff suing for damages for tort. One of the most useful of these facilities is the right in certain circumstances to obtain an order for discovery and inspection of documents. This right is of particular importance in cases of alleged discrimination such as the present for it is the employer alone who will ordinarily be in possession of the documents likely to throw light on the question as to whether or not the employer has unlawfully discriminated against the complainant. I do not think that the importance to the complainant of his right to claim an order for inspection of the relevant documents is diminished by the statutory machinery which exists to allow the complainant and indeed the in-

Case 1:05-cv-04622-DLI-RML   Document 83-4   Filed 12/18/06   Page 82 of 140 PageID #: 1698

[1980] AC 1028, [1979] 3 All ER 673, [1979] 3 WLR 762, [1979] ICR 921

dustrial tribunal to question the employer and at an early stage to obtain answers relating to whether the employer has unlawfully discriminated against his employee. It is, no doubt, possible that the answers, if reliable, might establish or negative the alleged unlawful discrimination and therefore make inspection of any documents unnecessary. On the other hand, there is the danger that the answers may be exiguous or unreliable and misleading. The only way of testing the accuracy of the employer's answers may often be by comparing them with the reports and records in their possession. The statutory machinery for obtaining early information from the employers was not, in my view, intended to be a substitute for, but an addition to the complainant's rights to discovery and inspection of documents.

It is plain from the facts of the present case that there is, particularly in large enterprises, an elaborate system for making and filing written reports and records in relation to each employee, and that these reports are of special importance when it comes to decide which of the employees applying for promotion or transfer shall be interviewed by the panel which selects the applicants for promotion or transfer. Suppose that one of the candidates who happened to be black had excellent written records and reports but failed to obtain the promotion or transfer for which he had applied, whilst two other candidates who happened to be white did obtain promotion or transfer although their records and reports were far below those of the black man; this could well be regarded as establishing, at any rate, a strong prima facie case of race discrimination. But without discovery and inspection of the relevant documents, the truth could not have been found nor justice done.

The argument advanced with great skill and relied on almost exclusively by counsel for British Leyland was that the following documents which Mr Vyas required to be produced enjoyed public interest immunity:

'3. Details of the employment record of the persons mentioned in (1) and (2) above; their service records whilst in the employment of the respondents, ie length of service, positions held, promotions, job classification according to grades, personal history forms, personal assessment records and details of commendations (if any) etc. together with their application forms for the post advertised, and applied for by the applicant...

'6. The completed interview report forms returned by each and every member of the interview panel in relation to every person, including the applicant, interviewed for the afore-mentioned post in the services division of the respondents.'

I cannot agree that the production of such documents could have the dire effect which has been suggested, and of which there is certainly no real evidence. I cannot accept the proposition that those whose duty it was to write reports about a candidate and his record, suitability for promotion etc would lack in candour because the reports, or some of them, might possibly sometimes see the light of day. This proposition bears a striking resemblance to that which was accepted as sound for upwards of 20 years after the obiter dicta pronounced by Viscount Simon LC in Duncan v Cammell Laird & Co Ltd n1. This proposition was however held to be unsound in Re Grosvenor Hotel, London (No 2) n1, and generally accepted as unsound during the three years following that decision. The obiter dicta in Duncan v Cammell Laird & Co Ltd n2 was then temporarily revivified by a majority decision of the Court of Appeal in Conway v Rimmer n3, but was finally put to rest when that majority decision was reversed in your Lordships' House n4. No more than I accept the proposition relating to candour, do I accept the proposition that employees anxious for promotion or transfer would be inhibited from making the necessary applications if they knew that their application forms and the written decisions relating to them might also sometimes be allowed to see the light of day.

n1 [1942] 1 All ER 587, [1942] AC 624

n1 [1964] 3 All ER 354, [1965] Ch 1210 at 1233

n2 [1942] 1 All ER 587, [1942] AC 624

n3 [1967] 2 All ER 1260, [1967] 1 WLR 1031, CA

n4 [1968] 1 All ER 874, [1968] AC 910

I do not consider that an order to produce for the employees' inspection such documents as those to which I have referred could be contrary to public interest; nor do any such documents bear any resemblance to the kind of documents which are normally accepted as immune from production in the public interest. I therefore consider that the main argument relied on by British Leyland (but rejected by the Science Research Council in the second appeal) must fail.

[1980] AC 1028, [1979] 3 All ER 673, [1979] 3 WLR 762, [1979] ICR 921

The next question that arises is whether and to what extent the fact that the documents concerned are considered to be confidential affects the complainant's right to discovery and inspection. In most cases, whether before the High Court, the county court or an industrial tribunal, there has been discovery of documents with no claim to privilege or immunity from production; and the documents are normally produced for inspection as a matter of course. This however does not always apply to cases in which the documents which one of the parties wishes to inspect have come into the hands of the other party in confidence. It has long been established, however, that no documents which have been acquired in confidence can for that reason be privileged from production or inspection. This point was not challenged by counsel for the Science Research Council or British Leyland; and no doubt this also explains why counsel for British Leyland relied almost entirely on public interest immunity.

Since confidential documents are not privileged from inspection and public interest immunity fails, the tribunal, which for this purpose is in the same position as the High Court and the county court, may order discovery (which includes inspection) of any such documents as it thinks fit, with this proviso: discovery shall not be ordered if and so far as the court [or tribunal] is of opinion that it is not necessary either for disposing fairly of the proceedings or for saving costs.

If the tribunal satisfied that it is necessary to order certain documents to be disclosed and inspected in order fairly to dispose of the proceedings, then, in my opinion, the law requires that such an order should be made; and the fact that the documents are confidential is irrelevant.

The law has always recognised that it is of the greatest importance from the point of view of public policy that proceedings in the courts or before tribunals shall be fairly disposed of. This, no doubt, is why the law has never accorded privilege against discovery and inspection to confidential documents which are necessary for fairly disposing of the proceedings. What does 'necessary' in this context mean? If, of course, includes the case where the party applying for an order for discovery and inspection of certain documents could not possibly succeed in the proceedings unless he obtained the order; but it is not confined to such cases. Suppose, for example, a man had a slim chance of success without inspection of documents but a very strong chance of success with inspection, surely the proceedings could not be regarded as being fairly disposed of, were he to be denied inspection.

I, of course, recognise that the tribunal, like the courts, has a discretion in the exercise of its power to order discovery. It would, however, in my view, be a wholly wrongful exercise of discretion, were an order for discovery and inspection to be refused because of the court's or the tribunal's natural aversion to the disclosure of confidential documents notwithstanding that the proceedings might not be fairly disposed of without them.

I cannot accept the view that the courts have recognised that there are circumstances in which the confidentiality of documents should be so respected that their production should be refused even if by doing so the proceedings might not be fairly disposed of. Rogers v Secretary of State for the Home Department n1 and D v National Society for the Prevention of Cruelty to Children n2 have been relied on for support of this view but they do not appear to me to have anything to do with it. In the first case, an application had been made to the Gaming Board to issue a certificate consenting to an applicant applying to the licensing authority for a licence to carry on a gaming club. An anonymous letter had been received by the Gaming Board strongly suggesting that the applicant was not fit to have such a licence issued to him. The applicant applied to be shown this letter. The Gaming Board refused to disclose it. Your Lordships decided that it would have been contrary to the public interest for such a letter (the contents of which could have revealed the identity of its writer) to be disclosed. To disclose it might have discouraged others from communicating to the Board what they knew about applicants for fear of libel actions, their safety and maybe their lives. It was of the greatest public importance for the Board to obtain every scrap of information it could in respect of anyone proposing to apply for a licence to carry on a gaming club. The basis of your Lordships' decision had little to do with respect for confidentiality, but a great deal to do with the danger of eliminating the Board's sources of information.

n1 [1972] 2 All ER 1057, [1973] AC 388

n2 [1977] 1 All ER 589, [1978] AC 171

D v National Society for the Prevention of Cruelty to Children n2 had equally little to do with respect for confidentiality. Cruelty to children is a most serious and fairly common social evil. The society for its prevention has done much successful work, a large proportion of which was made possible by the information received by the society. Your Lordships held that it was in the public interest that the identity of the society's informers should not be revealed for much the same reason as the identity of police informers is not revealed. If it were, informers would cease to inform.

[1980] AC 1028, [1979] 3 All ER 673, [1979] 3 WLR 762, [1979] ICR 921

The result would be strongly against public interest for in the one case little children would suffer and in the other case crime would increase.

n2 [1977] 1 All ER 589, [1978] AC 171

My Lords, I cannot agree that industrial tribunals should approach cases such as these relating to confidential documents with any preconceived notion that discovery should not be ordered 'except in very rare cases' and only in the last resort. I think that these cases should be approached with a completely open mind. The question being 'is discovery necessary for fairly disposing of these proceedings?', if the answer to that question is in the affirmative, as I venture to think it often maybe, then discovery should be ordered notwithstanding the documents' confidentiality. The irrelevant parts of the documents should, of course, be effectively covered up.

In my view, it would be impossible for a tribunal to decide whether the disclosure of confidential documents was necessary for fairly disposing of the proceedings, without examining the documents. I think that in Science Research Council v Nasse n3 the appeal tribunal did not examine the documents and said 'disclosure of the documents... is... necessary in order that the industrial tribunal may be in a position to do justice not only to [Mrs Nasse] but to [the Council]...' because it overlooked the fact that the council might not wish to make use of the documents even if they were in its favour.

n3 [1978] ICR 777 at 780

My Lords, I would dismiss both appeals and remit the two cases to the tribunal so that the chairman may now examine the documents which are claimed to be confidential and decide which (if any) of them should be disclosed and inspected, and order any irrelevant parts of the disclosed documents to be covered up. I consider that especially as there has already been such a long delay, it may well be desirable that the question of discovery should be resolved as soon as possible, so that if it resolved in favour of the complainants, inspection may take place well in advance of the hearing.

**JUDGMENTBY-3:** LORD EDMUND-DAVIES.

**JUDGMENT-3:**

LORD EDMUND-DAVIES. My Lords, I respectfully agree with the reasons for dismissing these consolidated appeals advanced in the speech of my noble and learned friend, Lord Wilberforce, which I have had the advantage of reading in draft, and also with the order which he proposes. What follows should therefore be regarded as simply enlarging on some of the topics involved which are of particular interest and importance.

The principal issue raised is as to the manner in which the discretionary powers conferred on industrial tribunals to order discovery and inspection of documents should be exercised in cases of alleged discriminaton in the employment field, where the complainant seeks access to confidential assessments and other documents relating to his fellow-employees. The appeals also indirectly concern the powers conferred on county courts in cases of alleged sex or racial discrimination outside the employment field, under Part III of both the Sex Discrimination Act 1975 and the Race Relations Act 1976. The relevant facts are related in the speeches of others of your Lordships and I shall not repeat them.
1. Public interest immunity

I deal first with the plea (advanced only on behalf of the employers of Mr Vyas, but disclaimed and indeed criticised by the Science Research Council) that such confidential documents are protected by public interest immunity. It was rightly rejected by a majority of the Court of Appeal Browne LJ saying n1:

n1 [1978] 3 All ER 1196 at 1213, [1979] QB 144 at 180

'I am most impressed by the disadvantages of the disclosure of such [confidential] information... But I have come to the conclusion that I cannot hold that the disclosure of this information is prohibited by "public interest privilege". It is now established that this "privilege" is not confined to government departments or other organs of the central government, but it has so far been confined to bodies cexercising statutory duties or functions. Further, it has so far been confined to cases analogous to the "police informer" immunity (Rogers v Secretary of State for the Home Department

[1980] AC 1028, [1979] 3 All ER 673, [1979] 3 WLR 762, [1979] ICR 921

n2 and the NSPCC case n3. If it extends to the present cases, it would mean that an employer who wished to rely on some such confidential report (presumably with the consent of the author) would not be able to do so: counsel for Leyland Cars said that Leyland Cars would accept this, and would rather lose a case than disclose confidential information, but other employers... might take a different view. Further, if such a "public interest privilege" applies, the commission [for Racial Equality] would not be entitled to require such information in their inquisitorial role (see the Sex Discrimination Act 1975, s 59(3), and the Race Relations Act 1976, s 50(3)). And if there was a duty not to disclose such documents in discrimination proceedings it would also apply in ordinary litigation.'

    n2 [1972] 2 All ER 1057, [1973] AC 388

    n3 [1977] 1 All ER 589, [1978] AC 171 at 203.

To hold that public interest immunity applied here would mean that, whatever the attitude of the parties concerned, it could never be waived and would indeed have to be raised by the chairman or judge himself if not taken by the parties or by the Crown (see Rogers v Secretary of State for the Home Department n2). The manifest intention of Parliament could thereby become substantially frustrated. I therefore concur in holding that this plea of immunity should be rejected.

    n2 [1972] 2 All ER 1057, [1973] AC 388

## 2. Protection of confidentiality

Counsel for the appellants went so far as to submit that the confidential nature of the documents here in question is totally irrelevant to the matter of discovery, and that the tribunal or court should therefore wholly ignore the protests of third parties against the disclosure of information furnished by them in the belief that neither it nor its sources would ever be revealed. Reliance for that submission was placed on cases ranging from Hopkinson v Lord Burghley n1 in 1867 to McIvor v Southern Health and Social Services Board n2 in 1978; and the Industrial Relations Act 1971, s 158(1), and the Employment Protection Act 1975, s 18, were adverted to as illustrating Parliament's ability to provide express safeguards for the preservation of confidences when it thinks this is desirable. But for myself I am wholly unable to spell out from the absence of corresponding statutory provisions applicable to the present cases the conclusion that confidentiality is an irrelevance. It is true that it cannot of itself ensure protection from disclosure (see Alfred Crompton Amusement Machines Ltd v Customs and Excise Comrs (No 2) n3; D v National Society for Prevention of Cruelty to Children n4), but confidentiality may nevertheless properly play a potent part in the way in which a tribunal or court exercises its discretion in the matter of discovery.

    n1 (1867) LR 2 Ch App 447

    n2 [1978] 2 All ER 625, [1978] 1 WLR 757

    n3 [1973] 2 All ER 1169, [1974] AC 405

    n4 [1977] 1 All ER 589, [1978] AC 171

There was ample evidence supporting the view expressed by the Court of Appeal that the disclosure to inspection of confidential reports could well create upsets and unrest which would have a general deleterious effect. And a court, mindful of that risk, may understandably, and properly, think it right to scrutinise with particular care a request for their inspection. That is not to say, however, that the fear of possible unrest should deter the court from ordering discovery where the demands of justice clearly require it, but it serves to counsel caution in such cases.

## 3. Rules governing discovery

As the heading to Mrs Nasse's first letter showed, her original complaint related solely to 'Discrimination for Trade Union Activities', and this was adhered to throughout until, in her originating application three months, later, she added for the first time, 'Discrimination against me because I am a married person'. I mention this because there is an important difference between the Employment Protection Act 1975 and the Sex Discrimination Act 1975 in that if an employee complains to an industrial tribunal of penalisation because of participation in trade union activities, s 55(1) of the former Act (now s 25 of the Employment Protection (Consolidation) Act 1978) imposes on the employer the burden of

[1980] AC 1028, [1979] 3 All ER 673, [1979] 3 WLR 762, [1979] ICR 921

establishing the contrary. But no corresponding provision is contained in the latter Act, or in the Race Relations Act 1976 on which Mr Vyas relies.

Mrs Nasse's employers expressly conceded the relevance to her complaint of the withheld documents. That concession, in combination with the aforementioned statutory provision in her favour, formed the basis of her counsel's submission that she was entitled as of right to the interlocutory relief sought. For, so he submitted, as no one suggested that her case was frivolous or vexatious, the interest of others (not being parties to the litigation) in having their confidences preserved had to be ignored. And, he added, the single fact that she had never even been interviewed for the appointment she sought showed that she had been eliminated solely on the basis of her documents and those of the other aspirants, and this established the great importance to her of obtaining discovery. Indeed she had testified to the industrial tribunal that they were 'all the evidence I can produce' and had added that she had 'no case without them'.

My Lords, I have referred to the facts of Mrs Nasse's case in a little detail because they are, as I think, helpful in considering the proper approach in this matter of discovery. Counsel for both appellants stoutly submitted that in such circumstances a general order for production and inspection of all relevant documents should forthwith be made. As to that, it has to be said in the first place that acceptance of the submission would involve departure from the settled practice of industrial tribunals, regarding which Phillips J in Stone v Charrington & Co Ltd n1 made the following wise observations, based on his great experience of the practical operation of the relevant legislation:

n1 (15th February 1977) unreported

'Industrial tribunals were set up with the purpose of operating cheaply, quickly and informally, and as far as possible therefore it is desirable that the formalities of the regular courts should be avoided. To introduce a formal system of discovery and inspection, interlocutories, and so on, might in the abstract produce more perfect justice, but it would be at such great cost in time, money and manpower that the whole machine would grind to a halt... Occasionally it becomes necessary for adjournments to be granted so that unforeseen problems can be considered in the light of additional documents and enquiries, or further particulars. No doubt that is sometimes inconvenient and is not an ideal solution, but it is the only alternative to an elaborate structure of interlocutory proceedings... We should certainly not discourage... making orders for particular discovery, and so on, in cases where to do so is really necessary to ensure the fair trial of the application. But it would be absurd to do so as a matter of routine in every case.'

The second thing to be said about the appellants' submission that they are entitled as of right to general discovery is that it is unacceptable whenever (as here) disclosure is resisted; and this even though a party is in the ordinary way permitted to inspect relevant documents listed by his opponent as being in his possession, custody or power. Indeed, the rules governing discovery in cases arising under these three statutes are no different in nature from those governing discovery in the general run of cases: see, for example, Attorney-General v North Metropolitan Tramways Co n2. Industrial tribunals are regulated by r 4(1)(b) of the schedule to the Industrial Tribunal Rules 1974, entitling them to 'grant... such discovery or inspection of documents as might be granted by a county court', while the latter court, whether dealing with Sex Discrimination Act or Race Relations Act cases or indeed any other kind of litigation shall not make an order for inspection of documents 'if and so far as the court is of opinion that it is not necessary either for disposing fairly of the proceedings or for saving costs' (CCR Ord 14, r 2(2)). In a similar manner, complaints of discrimination outside the employment field are required to be dealt with in England 'in like manner as any other claim in tort', and in Scotland as in 'any other claim... in reparation for breach of statutory duty' (see the Sex Discriminaton Act 1975, s 66(1), and the Race Relations Act 1976, s. 57(1)).

n2 [1892] 3 Ch 70; affd (1895) 72 LT 340

So an industrial tribunal or county court needs to be satisfied not only of the relevance of documents, but also that inspection of them, and each of them, is 'necessary' for achieving one or both of the purposes indicated. Admissions already made by the party against whom inspection is sought may have rendered discovery unnecessary, or (as counsel for Mr Vyas conceded) the probative value of documents may clearly be so slight as to render unjustifiable an order for their inspection. Or the very nature of the documents, their dates, or other features may indicate that they are unlikely to prove 'necessary'. Again, a request for inspection of a great mass of documents, without any attempt at selection, could well be regarded as oppressive. Or resort to the various procedures under the statutes (described as 'inquisitorial' and 'litigious' by Lord Denning MR n3) may have yielded as much information as any documents would be likely to do; and, although counsel for Mr Vyas disputed the relevance of such procedures to the matter in hand, I see no reason why

[1980] AC 1028, [1979] 3 All ER 673, [1979] 3 WLR 762, [1979] ICR 921

a tribunal, being naturally reluctant to order discovery of confidential documents if this could properly be avoided, should not first resort to the implementation of such procedures.  But, on the other hand, the aforementioned statutory provision in favour of employees created by the Employment Protection Act 1975, s 55(1) seems irrelevant; for, although it would operate to preclude a successful submission by the employer of 'no case to answer', inspection of his documents might nevertheless be essential for the effective cross-examination of his witnesses and to counter submissions presented on his behalf.

n3 [1978] 3 All ER 1196 at 1205 and 1207, [1979] QB 144 at 170, 171 and 172

But what if, having heeded all proper considerations, the tribunal or county court judge remains in doubt about the necessity, and therefore the propriety, of ordering discovery?  Resort may then be had to their statutory power to inspect the withheld documents for themselves, Lord Denning MR n1 putting the matter in this way:

n1 [1978] 3 All ER 1196 at 1208, [1979] QB 144 at 173

'The industrial tribunals should not order or permit the disclosure of reports or references that have been given and received in confidence except in the very rare cases where, after inspection of a particular document, the chairman decides that it is essential in the interests of justice that the confidence should be overridden; and then only subject to such conditions as to the divulging of it as he shall think fit to impose, both for the protection of the maker of the document and the subject of it.  He might, for instance, limit the sight of it to counsel and solicitors on their undertaking that it should go no further.' (Emphasis mine).

With respect, however, I would omit the reference to 'very rare cases', for this could convey to some the mistaken notion that a tribunal or judge should approach the problem from the viewpoint that he is being asked to sanction something which, on the face of it is unwarrantable and that he should seek all means of avoiding it.  But, as Lawton LJ n2 said, the matter is largely one of emphasis, and I am with him when he added:

n2 [1978] 3 All ER 1196 at 1211, [1979] QB 144 at 177

'In my judgment, when balancing the interest of the applicant against the desirability of preserving confidentiality, the judge or chairman must remember that Parliament has created new causes of action which it has enacted are to be tried like actions in tort.  If amongst the defendant's documents there are some (albeit confidential ones) which will help the application to prove his case, he is entitled to see them: the statutory Rules of Procedure and County Court Rules say so.'

4. Conclusion

I studiously refrain from further comment on the facts of these two cases lest I appear to advert, however unintentionally, to their prospects of success, a consideration which has no relevance where no one suggests the claims are frivolous or vexatious.  But what is directly in point is that in the case of Mrs Nasse the industrial tribunal (upheld on appeal) granted her originating application on her ipse dixit that the withheld documents were necessary for the establishment of her claim, while in the later case of Mr Vyas the Employment Appeal Tribunal (presided over by Phillips J) with manifest reluctance reversed the industrial tribunal's refusal of discovery, on the ground that to depart from the recent decision in Science Research Council v Nasse n3 'would only cause confusion were we at this stage to take a different line from that which has been taken previously'.

n6 [1978] ICR 777

While the reluctance of Phillips J is understandble, the outcome in both cases was, in my judgment, unacceptable.  For neither the tribunals nor the Employment Appeal Tribunals were possessed of sufficient knowledge to entitle them to decide as they did, and whether any of the documents sought were 'necessary for disposing fairly of the proceedings or for savings costs' must for them have been still a matter of mere guesswork.  That being the position, the proper course was thatdescribed by Arnold J in British Railways Board v Natarajan n4:

n4 [1979] 2 All ER 794 at 799

[1980] AC 1028, [1979] 3 All ER 673, [1979] 3 WLR 762, [1979] ICR 921

'We think that before deciding whether an examination is necessary, the judge or chairman of the tribunal... or the appellate court... must decide whether there is a prima facie prospect of relevance of the confidential material to an issue which arises in the litigation; put another way, whether it is reasonable to expect that there is any real likelihood of such relevance emerging from the examination. If there is not, we do not think that the exercise of examination is necessary or should take place.'

Whether a tribunal or court should decide that they themselves should inspect must always depend on the particular facts and issues, thought it is difficult to see how they can ever properly conclude that discovery is 'necessary' without such inspection. But where a court inspection is decided on, there can be no hard-and-fast rule as to when it should take place. As Arnold J said further in Natarajan's case n1:

n1 [1979] 2 All ER 794 at 799

'... it is, we think, a matter of convenience in each case whether the examination should take place at the interlocutory stage of discovery or immediately the matter arises at the trial. We can conceive that there would be many cases in which, having regard to the probable way in which the material, if found relevant, would have to be treated, that it would be essential for the decision to be made at the interlocutory stage of discovery. But there are also cases where, having regard to the way in which the material would have to be dealt with, such an early examination would not be necessary. That is a matter which we think must be decided in relation to each case in which the point is relevant.'

The Court of Appeal rightly held that discovery should not have been ordered in either of these two cases without the respective industrial tribunals or the apellate courts first inspecting the withheld documents. That unfortunately not having been done, it follows that both ppeals should be dismissed. The cases should be remitted to the respective industrial tribunals, so that they may consider afresh the matter of discovery in the light of the observations of your Lordship's House.

**JUDGMENTBY-4:** LORD FRASER OF TULLYBELTON.

**JUDGMENT-4:**

LORD FRASER OF TULLYBELTON. My Lords, these appeals raise questions of much practical importance about the powers of industrial tribunals and county courts to order discovery and inspection of confidential documents in proceedings by persons complaining of discrimination on the ground of sex, race, or trade union activities, contrary to the recent Acts making such discrimination unlawful. The first question is whether confidential documents relating to persons other than the complainers are covered by public interest immunity, with the result that tribunals and courts cannot order them to be disclosed. If the answer to that question is that the documents are not immune from disclosure in such proceedings, a second question arises as to the circumstances in which tribunals (or county courts) should order them to be disclosed.

In one appeal the appellant and claimant is a married woman, Mrs Nasse, who was employed by the Science Research Council ('SRC') as a clerical officer at their Appleton laboratory. In 1977 two other clerical officers, one a man and the other a woman, who was then single but has since married, were interviewed for promotion, although they were both junior to Mrs Nasse in terms of service and in her view their claims to promotion were no better than hers. Mrs Nasse was not called for interview at that time. The appellant complainer in the other appeal is Mr Vyas who was employed by BL Cars Ltd ('BL') as a senior supplies analyst. Mr Vyas is ofAsian origin. He applied for transfer to one of the vacancies in the same grade as the job that he held at the time. He was not selected for transfer but two other men, one of whom was of a lower grade than he was, were transferred to the job for which he had applied.

In both appeals the complainers allege, and invite an industrial tribunal to infer, that the reason why they were not selected for interview (in Mrs Nasse's case) or for transfer (in Mr Vyas's, case) must have been unlawful discrimination by the employers. Mrs Nasse complained that the SRC had penalised her for her militant behaviour as chairman of the local sub-branch of a trade union, and had also discriminated against her because she was a married woman, and that they had thereby acted contrary to s 53 of the Employment Protection Act 1975, and s 6 of the Sex Discrimination Act 1975. Mr. Vyas's complaint was that BL had discriminated against him because of his racial origin, contrary to s 4(2)(b) of the Race Relations Act 1976. The common feature of both cases which is relevant for present purposes is that the allegations involve comparison between the complainers' qualifications and those of other employees with whom they were in competition for promotion or transfer. The argument for both complainers, in its simplest form, is that all records and reports bearing on the qualifications of the appellants themselves and of their fellow employees who

[1980] AC 1028, [1979] 3 All ER 673, [1979] 3 WLR 762, [1979] ICR 921

were preferred to them must be relevant for the purpose of such comparison and therefore that production and inspection of all these records and reports should be ordered as of course and in advance of the hearing by the industrial tribunal. The arguments for the two apellants on the principles which should be applied did not, in the end, raise substantially different issues, and they can I think be considered together.

The employers (respondents in the appeals) presented quite separate arguments. BL contended that the documents which are the subject of dispute fall within a class of documents which is protected from disclosure by what was known formerly as Crown privilege, now as public interest immunity. The SRC did not rely on public interest immunity, and indeed they supported the complainers in arguing against it, but they argued that the documents should not be ordered to be produced unless they were not only relevant, but necessary for the fair disposal of the case. The point at issue between the SRC and the complainers came down eventually to this: there being no immunity for the documents, is the discretionary power of a tribunal to refuse to order their production excluded if they are relevant (as the appellants contended) or only if they are not merely relevant but necessary for fairly disposing of the proceedings (as the DRC contended)? To put it the other way round, is the tribunal bound to order discovery and inspection of all documents that are relevant, or only of those that are necessary for fairly disposing of the proceedings?

The first question is whether the documents in question are protected by public interest immunity. The disputed documents in Mr Vyas's appeal are the following. (1) The employment records of all the employees who were interviewed for the position for which Mr Vyas unsuccessfully applied. These records would include records of the employee's service, positions occupied, promotions, personal history forms, personal assessment records, details of commendations and other such matters. (2) The completed interview report forms returned by each and every member of the interview panel who interviewed Mr Vyas and the other applicants for transfer. In Mrs Nasse's appeal the disputed documents are the annual confidential reports for the years 1975 and 1976 of the two clerical officers who were selected to appear before the interview panel when she was not, and the minutes of the local review board of meetings at which it considered the annual confidential reports for 1976 of the clerical officers employed at the Appleton laboratory. In both cases the confidential reports relating to the complainers themselves have been disclosed to them, along with certain other information for which they asked. The appeals are concerned entirely with confidential reports on fellow employees. It is appearent that the fellow employees who were the subject of the reports might well object to their being disclosed, and in Mrs Nasse's case one of them has done so.

Both employers rightly accepted that the reports were not entitled to immunity from disclosure merely because they were confidential. The law on this matter was stated in Alfred Crompton Amusement Machines v Customs and Excise Comrs (No 2) n1 by Lord Cross of Chelsea who said:

n1 [1973] 2 All ER 1169 at 1184, [1974] AC 405 at 433

'"Confidentiality" is not a separate head of privilege, but it may be a very material consideration to bear in mind when privilege is claimed on the ground of public interest. What the court has to do is to weigh on the one hand the considerations which suggest that it is in the public interest that the documents in question should be disclosed and on the other hand those which suggest that is in the public interest that they should not be disclosed and to balance one against the other.'

The considerations that were urged on behalf of BL as showing that it would not be in the public interest for the documents concerned in MR Vyas's case to be disclosed may be summarised, not I hope unfairly, as follows. (They would apply equally to Mrs Nasse's case). First, it was said that disclosure of confidential reports such as are in question here would inhibit candour by senior employees in reporting on the suitability of subordinate employees for promotion and would also inhibit employees from applying for promotion. Secondly it was said that disclosure would be a breach of faith with the authors of the reports and with the subjects of the reports, that it would be likely to have an adverse effect on industrial relations, and might well lead to industrial unrest. These arguments were supported by an affidavit from BL's staff director. In Mrs Nasse's case, although the SRC were not claiming immunity from disclosure, there were affidavits from one of the employees who was interviewed in preference to Mrs Nasse objecting strongly to disclosure of his own confidential reports and there was a more general objection from the staff side of the SRC Whitley Council to disclosure of all such reports. The public interest was said to be involved because of the importance of having a proper system for making decisions to employ and promote persons in industry in order to secure efficiency, and because of the risk that such a system could not be maintained unless complete candour could be ensured for those responsible for operating it.

[1980] AC 1028, [1979] 3 All ER 673, [1979] 3 WLR 762, [1979] ICR 921

The argument based on the need for candour in reporting echoes the argument which was presented in Conway v Rimmer n1 and I do not think that it has any greater weight now than it had then. The objections by and on behalf of employees other than the complainers to having their confidential reports disclosed, readily understandable as they are, do not create a public interest against disclosure. They are based on a private interest which must yield, in accordance with well-established principles, to the greater public interest that is deemed to exist in ascertaining the truth in order to do justice between the parties to litigation. I am not satisfied that disclosure of the contents of confidential reports of the kind in question here would have serious consequences on the efficiency of British industry. In any event, the possibility of industrial unrest is not a sufficient reason for the courts to fail to give full effect to the intentions of Parliament; the courts cannot refuse to apply the law between litigants because of threats by third parties. Much reliance was placed in argument on a passage in the speech of Lord Hailsham of St Marylebone in D v National Society for the Prevention of Cruelty to Children n2 as follows:

n1 [1968] 1 All ER 874, [1968] AC 910

n2 [1977] 1 All ER 589 at 605, [1978] AC 171 at 230

'The categories of public interest are not closed, and must alter from time to time whether by restriction or extension as social conditions and social legislation develop.'

Speaking for myself I fully accept that proposition, but any extension can only be made by adding new categories analogous to those already existing, just as in that case immunity was extended to a new category of informers to the NSPCC by analogy with informers to the public who were already entitled to immunity. There is no analogy between the suggested public interest in the present cases and the kinds of public interest that have so far been held to justify immunity from disclosure. Such public interest as there is in withholding the documents from disclosure is not enough to justify the creation of a new head of immunity for a whole class of documents.

Two other considerations point against immunity. One is that in some cases immunity would make it impossible for an employee to enforce his rights under the Acts. The confidential information is almost always in the possession of the employer, and, in cases where discrimination cannot be inferred from the bare fact that someone other than the complainer has been selected for preferment, it may be of vital importance to the complainer to have access to the reports on the preferred individual. This is particularly true where the complaint is based on discrimination on grounds of race or sex, because in those cases the onus of proof is on the complainer. But even where the complaint is of discrimination for trade union activities, and the onus is one the employer, disclosure may be essential in order to do justice between the parties.

The second consideration is that, if public interest immunity applied, it could not be waived either by the employer alone, or by the employer with the consents of the individual who is the subject of a report and of the person who made it. That would be inconvenient, and, in my opinion, quite unnecessarily restrictive.

For these reasons I think that the confidential reports in question here are not protected by public interest immunity.

I pass now to consider the circumstances in which production ought to be ordered by a tribunal. For this purpose it is necessary to look first at the three statutes under which the appeals arise: the Sax Discrimination Act 1975, the Race Relations Act 1976, and the Employment Protection Act 1975 (the relevant part of which is now superseded by the Employment Protection (Consolidation) Act 1978). The effect of these Acts, so far as material for present purposes, was to create new statutory duties including duties imposed on employers to refrain from discriminating against employees (in which term I include applicants for employment) on the grounds of their sex, race, or trade union activities. It conferred corresponding statutory rights of their sex, race, or trade union that their rights have infringed in fields other than the employment filed 'may be made the subject of civil proceedings in like manner as any other claim in tort or (in Scotland) in reparation for breach of statutory duty' (see the Sex Discrimination Act 1975, § 66(1) and Race Relations Act 1976, s 57(1); emphasis mine), the proceedings being brought in the county court or the sheriff court. Where the complaint arises in the employment field it may be presented to an industrial tribunal (see the Sex Discrimination Act 1975, s 63, and the Race Relations Act 1976, s 54) but the subsequent proceedings are essentially of the same nature as proceedings for discrimination in other fields. So are proceedings under s 54 of the Employment Protection Act 1975 following on a complaint of discrimination for trade union activity. Accordingly we are concerned with proceedings for tort, or breach of statutory duty, and the ordinary rules with regard to discovery and inspection of documents in such proceedings should apply unless there are express provisions in the statutes, or other special reasons, to the contrary.

[1980] AC 1028, [1979] 3 All ER 673, [1979] 3 WLR 762, [1979] ICR 921

As regards express provisions, those applicable to the present appeals are found mainly in the Industrial Tribunals (Labour Relations) Regulations 1974 n1 amended in minor respects in 1978. By r 4 in the schedule to the 1974 regulations it is provided as follows:

n1 SI 1974 No 1386 as amended by SI 1978 No 991

'(1)... a tribunal may on the application of a party to the proceedings... made either by notice to the Secretary of the Tribunals or at the hearing of the originating application... (b) grant to the person... making the application such discovery or inspection of documents as might be granted by a county court... and may appoint the time at or within which or the place at which any act required in pursuance of this Rule is to be done.'
The discovery and inspection that might be granted by a county court is regulated by rules of court, including CCR Ord 14, r 2 which provides that the court may order discovery to be made of such documents as it thinks fit and adds:

'... but discovery shall not be ordered if and so far as the court is opinion that it is not necessary either for disposing fairly of the proceedings or for saving costs.'
So far, therefore, from there being express provision that the ordinary rules for discovery are not to apply, the ordinary rules are in effect incorporated into the rules for industrial tribunals.

Are there then special reasons why the ordinary rules should be applied in a way different from that in which they are applied by the county court? Some reasons were suggested. Counsel for the appellants, who argued that all relevant information should be disclosed, relied on provisions in the statutes restricting the obligations of respondents to disclose information for certain purposes, not including proceedings in respect of the tort of discrimination. Thus in the Employment Protection Act 1975, s 17 imposes on an employer an obligation, for the purposes of collective bargaining with a trade union, to make very extensive disclosure of information to the trade union representatives. But s 18, which limits the obligation, provides that no employer shall 'by virtue of section 17 above' be required to disclose, inter alia, '© Any information which has been communicated to the employer in confidence...' The provisions of ss 17 and 18 are derived from the Industrial Relations Act 1971 (repealed and partly re-enacted by the Trade Union and Labour Relations Act 1974). Section 17 corresponds to s 56 of the 1971 Act. Section 22 of the 1971 Act created a civil right in employees not to be unfairly dismissed. Section 158 of the 1971 Act is in terms almost identical with those of s 18 of the 1975 Act, and it gave employers immunity only against the obligations of disclosure arising 'by virtue of section 56' (or s 57 which required large employers to disclose information to their employees). The argument, as I understood it, was that Parliament had had in mind the need to protect employers from an obligation to disclose confidential information where the obligation arose 'by virtue of' s 17 of the 1975 Act or ss 56 and 57 of the 1971 Act, but had not thought it appropriate to give protection from such obligation arising from other sources such as s 22 of the 1971 Act or the general law applicable to proceedings for tort under the 1975 Act. The only protection that Parliament considered appropriate for confidential information in proceedings before an industrial tribunal was the power given to tribunals to sit in private: see para 3 of Sch 6 to the 1971 Act (repeated in para 21 of Sch 1 to the 1974 Act) and r 6(1)(b) of the 1974 rules for industrial tribunals, to which I have already referred. A similar point arises under the Sex Discrimination Act 1975 where s 61(1) provides that information given to the Equal Opportunities Commission in connection with a formal investigation shall not be disclosed by the commission except in certain events which include on the orders of a court (para (a)) and for the purpose of civil proceedings to which the commission is a party (para (f)). Section 61(3) of the Act directs the commission in preparing its report to exclude so far as consistent with their duty, any matter which relates to the private affairs of any individual or business interests of any person 'where the publication of that matter might, in the opinion of the commission, prejudicially affect that individual or person'. These provisions also show that Parliament did not think it necessary to give any special immunity against disclosure of confidential information except in the case of a formal investigation. There are exactly similar provisions in the Race Relations Act 1976. The argument seems to me quite correct so far as it goes, but the conclusion to which it leads is that Parliament, having made no special provisions for discovery in proceedings before an industrial tribunal, must be presumed to have intended that (as the 1974 rules say) discovery should be 'such as might be granted by a county court', neither more nor less.

Several arguments were adduced on behalf of the respondents with a view to showing that discovery in proceedings under these statutes should be more restricted than in civil proceedings. One was that adequate other means have been specially provided by the statutes for enabling complainers to obtain information, and that there is therefore no need for the ordinary rules of discovery to be applied in their full rigour. A statutory power of interrogation ('the questionnaire procedure') is provided by s 74 of the Sex Discrimination Act 1975 with a view to helping an aggrieved person to decide whether to institute proceedings. The respondent is bound to answer the questionnaire and the court may draw an

[1980] AC 1028, [1979] 3 All ER 673, [1979] 3 WLR 762, [1979] ICR 921

adverse inference if it considers his replies to be evasive or equivocal. A further provision is that by s 75 of the Act the Equal Opportunities Commission may give assistance to a complainer both in the form of advice and of financial aid. Moreover the Equal Opportunities Commission has power under s 57 to conduct a formal investigation for any purpose connected with carrying out its statutory duties, and to require any person to furnish under s 59 written and oral information and to produce documents. No doubt that use of these procedures, especially the questionnaire procedure, will often make extensive discovery of documents unnecessary, but I do not think it will do so in all cases. Some respondents may be less responsible than the respondents in the present appeals and it would not be right that there should be no means of verifying their replies to the questionnaire by reference to their own records. Even where frank replies to the questionnaires are made, they may be of less use in revealing the respondent's reasons than his actual records and reports. It is not so much that the reports are likely to contain positive statements of discrimination on grounds of sex or race or trade union activity, as that they may, by their silence as to any particular merits of an employee who has been promoted, lead to an inference that the only reason for his being promoted in preference to the complainer must have been that the employer had discriminated against the complainer. As regards the formal investigations, these will be directed to the 'strategic' object of ascertaining the practice in a firm or a whole industry, and the commission is directed not to disclose information received in connection with a formal investigation except under certain conditions, one of which is that publication must be in the form of a summary or other general statement which does not identify any person to whom the information relates: Sax Discrimination Act 1975, s 61(1)© . Such a summary would be of little use to complainers such as the present apellants who rely on comparisons with particular persons in order to prove their complaint.

Another suggested reason why discovery in proceedings under the statutes should be more restricted than in ordinary civil proceedings was that disclosure of personal particulars about an employee (such as the successful candidate for promotion) would be more objectionable when made to a colleague beside whom he would have to continue working than it would be when made by a party to an ordinary litigation who would not usually have a continuing relationship with the opposing party. A hearing in private (which may be ordered by a tribunal for the purpose of hearing evidence of information communicated to the witness in confidence: see r 6(1)(b) in the schedule to the 1974 rules) provides no solution of this difficulty, because it does not avoid disclosure to the complainer, who is a fellow employee. There is force in this argument, but it should be possible, by the use of the ordinary rules of discovery, to protect an employee from any embarrassing disclosure which is not absolutely necessary for disposal of the case. Discovery of confidential reports sought by one party and objected to by the other should not be ordered when the same information can be obtained from other sources which are not confidential or which do not contain sensitive material. The court or tribunal always has a discretion to refuse to order discovery which it would operate oppressively: oppression could occur if the quantity of documents involved is large or if the information is private and could be otained in another way without infringing privacy: see Attorney-General v North Metropolitan Tramways Co n1. Where discovery of confidential reports has to be ordered in spite of objections, every effort should be made to avoid disclosing sensitive information by covering up any parts of the documents disclosure of which is not essential. But where disclosure is necessary then in my opinion it must be made and personal privacy must be sacrificed in the interest of justice.

n1 [1892] 3 Ch 70

Where the holder of reports or other documents objects to producing them on the ground that they have been written on the basis that they will be confidential or when they contain sensitive private particulars about third partis, it will be the duty of the judge or of an appropriate officer of the court to read them and decide whether disclosure of the contents is necessary for the fair disposal of the case, or for saving expense. On a procedural level, we heard some argument about the stage at which discovery ought to be ordered in proceedings before an industrial tribunal. The respondents contended that discovery and inspection should not normally be made until the hearing. The appellants contended that it should normally be made at the interlocutory stage. Rule 4(1) quoted above) certainly contemplates disclosure at the interlocutory stage as a possibility; but it does not seem to indicate that it is to be the normal practice. I can see arguments tending in both directions. In favour of early disclosure, there is the fact that there will be cases where discovery should satisfy a complainer that his complaint is unfounded and that proceedings ought to be dropped at once without further expenditure of time and money. Moreover if the number of documents to be discovered is large, then discovery at the hearing will amost certainly cause delay. On the other hand the procedure before an industrial tribunal is less formal than in court, the pleadings are exiguous; and hearings often take place very shortly after proceedings have been instituted. These are all factors tending to suggest that interlocutory procedure relating to discovery should be avoided if possible: see Stone v Charrington & Co Ltd n1 in the Employment Appeal Tribunal per Phillips J. Th solu-

[1980] AC 1028, [1979] 3 All ER 673, [1979] 3 WLR 762, [1979] ICR 921

tion seems to me very much a matter for the industrial tribunals and the Employment Appeal Tribunal to work out in the light of experience; the practice probably ought to be flexible and to have regard to such matters as the nature of the case and the volume of documents involved. I agree entirely with the observations on this matter of Arnold J in British Railways Board v Natarajan n2.

n1 (15th February 1977) unreported

n2 [1979] 2 All ER 794 at 799

We were reminded during the argument that the statutes under which these appeals arise apply not only to England but also to Scotland (though not to Northern Ireland) and our attention was called to The Industrial Tribunals (Labour Relations) (Scotland) Regulations 1974 n3 which regulates the procedure of tribunals in Scotland by rules which are almost exactly the same mutatis mutandis as the rules for tribunals in England. The effect is to apply to sheriff court rules as to granting commission and diligence for recovery of documents. If there had been anything in Scots law or practice on this matter which seemed to make the kind of approach that I have suggested unsuitable for application in Scotland, I would have reconsidered my view. But I do not think there is. It seems that confidentiality (in the sense of immunity) is rather more extensive in Scotland where it applies to a private diary (see Duke of Argyll v Duchess of Argyll n4) than in England, but I do not think there is any difference in the extent of immunity relevant to the question raised here. The court in Scotland will exercise its discretion to refuse to order a third party to produce private documents containing relevant information if the information has been (or, I think, can be) obtained from other sources which do not involve disclosing private information (see North British Railway Co v Garroway n5). The Scottish system of having excerpts taken from books and records by a commissioner, appointed as an officer of the court, would make it easy in a case where disclosure is to be dealt with at the interlocutory stage, to avoid disclosing personal particulars about third parties, unless their disclosure is essential. Accordingly I do not see any reason why the views I have expressed in these appeals should not be conveniently applicable by a tribunal sitting in Scotland.

n3 SI 1974 No 1387

n4 1962 SC (HL) 88

n5 (1893) 20 R (Ct of Sess) 397

The result is that I agree substantially with the principle stated in the Court of Appeal by Lord Denning MR n6 and approved by Browne LJ (which has been quoted by my noble and learned friend, Lord Wilberforce) except that I would omit from it the words 'in the very rare cases'. I doubt whether the cases in which the chairman of an industrial tribunal will decide that disclosure of confidential reports is necessary will be very rare, and I do not think it would be right to suggest that the chairman should approach consideration of any particular case with a presumption against disclosure.

n6 [1978] 3 All ER 1196 at 1208, [1979] QB 144 at 173

I come back at last to the instant appeals. In Mrs Nasse's case the chairman of the industrial tribunal ordered discovery of the documents in question without having seen them, and his decision was upheld by the Employment Appeal Tribunal. In Mr Vyas's case the chairman of the industrial tribunal refused to order discovery and his decision was reversed by the Employment Appeal Tribunal. In my opinion the latter tribunal erred in both cases in ordering discovery, in spite of objections by the respondents without the chairman of the respective industrial tribunals having seen the documents. I agree with the Court of Appeal that both cases should go back to an industrial tribunal so that the chairman can look at the documents now. He may be able to decide, immediately after reading them, whether it is essential that they should be produced in whole or in part, or he may think it better to defer a decision in one or other case, or in both cases, until the hearing. The reason why I think the chairman should look at the documents now is that the long delay, which has already occurred by reason of the appeals, has prevented the complaints from being disposed of rapidly and informally, and has therefore removed one of the main objections to dealing with the discovery at the interlocutory stage.

I would dismiss both appeals and make an order in the terms proposed by my noble and learned friend, Lord Wilberforce.

[1980] AC 1028, [1979] 3 All ER 673, [1979] 3 WLR 762, [1979] ICR 921

**JUDGMENTBY-5:** LORD SCARMAN.

**JUDGMENT-5:**

LORD SCARMAN. My Lords, I also would dismiss both appeals. I would respectfully adopt the reasoning and the conclusion of my noble and learned friend, Lord Fraser of Tullybelton, subject only to the observations which I now make, on these appeals.

The confidential nature of a document does not, by itself, confer 'public interest immunity' from disclosure. The confidential nature of a document or of evidence is no ground for a refusal to disclose the document or to give the evidence, if the court requires it: see Alfred Crompton Amusement Machines Ltd v. Customs and Excise Comrs (No 2) n1 and Attorney-General v Clough. n2

n1 [1973] 2 All ER 1169, [1974] AC 405

n2 [1963] 1 All ER 420, [1963] 1 QB 773

For myself, I regret the passing of the currently rejected term 'Crown privilege'. It at least emphasised the very restricted area of public interest immunity. As was pointed out by counsel who presented most helpful submissions on behalf of the two statutory bodies as well as specifically for the appellant, Mr Vyas, the immunity exists to protect from disclosure only information the secrecy of which is essential to the proper working of the government of the state. Defence, foreign relations, the inner workings of government at the highest levels where ministers and their advisers are formulating national policy, and the prosecution process in its pre-trial stage are the sensitive areas where the Crown must have the immunity if the government of the nation is to be effectually carried on. We are in the realm of public law, not private right. The very special case of D v National Society for the Prevention of Cruelty to Children n3 is not to be seen as a departure from this well established principle. Immunity from disclosure existed in that case because the House recognised the special position of the NSPCC in the enforcement process of the provisions of the Children Act 1969, a position which the House saw as comparable with that of a prosecuting authority in criminal proceedings. But I would not, with respect, go as far as my noble and learned friend, Lord Hailsham n4, when he said in that case 'The categories of public interest are not closed'; not can I agree with the dictum of my noble and learned friend, Lord Edmund-Davies n5, that, where a confidential relationship exists and disclosure would be in breach of some ethical or social value involving the public interest, the court may uphold a refusa to disclose relevant evidence, If, on balance, the public interest would be better served by excluding it.

n3 [1977] 1 All ER 589, [1978] AC 171

n4 [1977] 1 All ER 589 at 605, [1978] AC 171 at 230

n5 [1977] 1 All ER 589 at 618, [1978] AC 171 at 245

I do not find anything in Conway v Rimmer n6 or the cases therein cited which would extend public interest immunity in this way. On the contrary, the theme of Lord Reid's speech n7 is that the immunity arises only if 'disclosure would involve a danger of real prejudice to the national interest'. The public interest protected by the immunity is that 'harm shall not be done to the nation or the public service by disclosure' (see per Lord Reid n1). Whatever may be true generally of the categories of public interest, the 'public interest immunity', which prevents documents from being produced or evidence from being given, is restricted, and is not, in my judgment, to be extended either by damanding ministers or by the courts. And, though I agree with my noble and learned friend, Lord Edmund-Davies, in believing that a court may refuse to order production of a confidental document if it takes the view that justice does not require its production, I do not see the process of decision as a balancing act. If the document is necessary for fairly disposing of the case, it must be produced, notwithstanding its confidentiality. Only if the document should be protected by public interest immunity, will there be a balancing act. And then the balance will be not between 'ethical or social'' values of a confidential relationship involving the public interest and the document's relevance in the litigation, but between the public interest represented by the state and its public service, ie the executive government, and the public interest in the administration of justice: see per Lord Reid n1. Thus my emphasis would be different from that of my noble and learned

friends. 'Public interest immunity' is, in my judgment, restricted to what must be kept secret for the protection of government at the highest levels and in the truly sensitive areas of executive responsibility.

n6 [1968] 1 All ER 874, [1968] AC 910

n7 [1968] 1 All ER 874 at 879, [1968] AC 910 at 939

The submission, therefore, of the respondents in the Vyas case that confidential reports on other employees, and particularly on those who succeeded where the applicant failed, are immune from disclosure must be rejected. The question, then, becomes one of the exercise of the court's discretion.

It does not follow that, because we are outside the field of public interest immunity, the confidential nature of documents is to be disregarded by the court in the exercise of its discretionary power to order discovery of documents.

Under the modern practice, discovery is to be ordered in the High Court, the county court, and in an industrial tribunal whenever necessary for fairly disposing of the case or saving costs: see RSC Ord 24, rr 3, 5 and 8; CCR, Ord 14, r 2(2); the Industrial Tribunals (Labour Relations) Regulations 1974, r 4 of the schedule, as amended.

In most, but not all, High Court litigation discovery is 'automatic': see RSC Ord 24, r 2. But the right to object to production of documents as unnecessary remains available to the party who has to make the discovery. In an industrial tribunal (as also in a county court) discovery is not automatic. An order has to be made by the tribunal in the proceedings. An industrial tribunal (but not, I think, a county court) may make an order not only on party's application, but by its own motion. And the tribunal (or court) may make either a general order or one limited to specific documents or classes of documents.

How should the discretion of an industrial tribunal (or a county court) be exercised in a discrimination case? Counsel for the appellant Mrs Nasse submitted that in all such cases all relevant documents should be disclosed: in other words, that a general order should be made. And counsel for the appellant Mr Vyas supported this submission. Counsel for Mrs Nasse further submitted that the confidential nature of a document, if relevant, was no ground for refusing to order its disclosure. Counsel for Mr Vyas, while stoutly rejecting any suggestion of public interest immunity, did not go so far. He accepted that the court has a discretion but argued for general orders in discrimination cases on the reasonable ground that the very nature of such cases requires a comparison of the qualifications and circumstances of the disappointed applicant with those who were successful where he failed or who were in competition with him. In my judgment, however, both submissions are too wide. The criterion is not relevance alone, nor are general orders for discovery appropriate in this class of litigation. The true test, as formulated by the rules of court, is whether discovery is necessary either to save costs or for the fair disposal of the case. Where speed and cheapness of legal process are essential, as they are in county courts and industrial tribunals, general orders should ordinarily be avoided. And where, as will be frequent in this class of litigation, confidential records about other people are relevant, the court must honour the confidence to this extent: that it will not order production unless the interest of justice requires that they be disclosed. No hard and fast rules can be laid down: but I agree with others of your Lordships in thinking that the Employment Appeal Tribunal gave bery useful guidance on the appropriate practice in British Rail ways Board v Natar ajan n1: see judgment delivered by Arnold J.

n1 [1979] 2 All ER 794 at 799

To conclude, I recognise the importance of discovery in discrimination cases. There is no special law protecting confidential documents in such cases. It is for that reason that I have avoided discussing the new 'statutory torts' or the investigating powers of the statutory bodies. We are concerned with the litigation of private citizens seeking redress for private wrongs. The only complicating factor is the confidential nature of relevant documents in the possession of the party from whom redress is sought. The production of some of these may be necessary for doing justice to the applicant's case. If production is necessary, they must be produced. The factor of confidence however militates against general orders for discovery and does impose on the tribunal the duty of satisfying itself, by inspection if need be, that justice requires disclosure. Ordinarily, therefore, a tribunal will itself examine documents which are confidential before it orders their disclosure.

I agree therefore that the two appeals should be dismissed. It will be for the industrial tribunal in each case to decide whether, and to what extent, discovery should be ordered. I would expect that the tribunal would decide to inspect

[1980] AC 1028, [1979] 3 All ER 673, [1979] 3 WLR 762, [1979] ICR 921

the documents for which confidence is claimed and determine whether any, and if so, which, should be produced.  The inspection should be before the hearing takes place, so that the applicant may consider any that are produced.  But the tribunal retains the power to order the production of further documents at a later state (including at the hearing itself) if in its judgment it becomes necessary to do so in the interests of justice.

## DISPOSITION:

Appeals dismissed.

## SOLICITORS:

Lawford & Co (for Mrs Nasse); Treasury Solicitor (for the SRC); Bindman & Partners (for Mr Vyas); R P A Coles (for BL Cars Ltd).

6

39 of 42 DOCUMENTS

TOURNIER v NATIONAL PROVINCIAL AND UNION BANK OF ENGLAND

[IN THE COURT OF APPEAL.]

*[1924] 1 KB 461*

**HEARING-DATES:** 9, 12, November 17 December 1923

17 December 1923

**CATCHWORDS:**

Banking - Banker and Customer - Implied Contract between - Obligation of Secrecy - Limitations of.

**HEADNOTE:**

It is an implied term of the contract between a banker and his customer that the banker will not divulge to third persons, without the consent of the customer express or implied, either the state of the customer's account, or any of his transactions with the bank, or any information relating to the customer acquired through the keeping of his account, unless the banker is compelled to do so by order of a Court, or the circumstances give rise to a public duty of disclosure, or the protection of the banker's own interests requires it.

The plaintiff was a customer of the defendant bank. A cheque was drawn by another customer of the defendants in favour of the plaintiff, who instead of paying it in to his own account indorsed it to a third person who had an account at another bank. On the return of the cheque to the defendants their manager inquired of the last named bank who the person was to whom it had been paid, and was told it was a bookmaker. That information the defendants disclosed to third persons:-

Held (by Bankes and Atkin L.JJ.), that that disclosure constituted a breach of the defendants' duty to the plaintiff, for though the information was acquired not through the plaintiff's account but through that of the drawer of the cheque, it was acquired by the defendants during the currency of the plaintiff's account and in their character as bankers.

By Scrutton L.J., contra, that although the disclosure was a breach of the defendants' duty to the drawer, it was not a breach of their duty to the plaintiff.

**INTRODUCTION:**

APPEAL of the plaintiff from a verdict and judgment in favour of the defendants at the trial before Avory J. and a jury.

The plaintiff was a customer of the Moorgate Street branch of the defendants' bank, and in March, 1922, his account was overdrawn to the amount of 9l. 8s. 6d. The defendants pressed him to pay off the overdraft, and in April, 1922, he entered into an arrangement with them to pay off 1l. a week commencing on April 17. He paid three instalments, and then ceased to make any further payments. On June 8, 1922, he entered the service of a company called Kenyon & Co. under an agreement for a three months' employment as traveller and

salesman. Shortly afterwards a cheque for 45l. was drawn in his favour by a company called Woldingham Traders, Ld., who were also customers of the same branch of the defendants' bank, but the plaintiff did not pay that cheque into his account. The cheque was eventually returned to the defendants for payment by the London City and Midland Bank. The manager of the defendants' Moorgate Street branch, a Mr. Fennell, then inquired of the London City and Midland Bank who their customer was for whom payment of the cheque had been collected, and was told he was a bookmaker of the name of Lloyd. Mr. Fennell then rang up Kenyon & Co. on the telephone and had a conversation with two directors of that company, a Mr. Wells and a Mr. Kenyon. He asked for the plaintiff's private address, and told them that the plaintiff was indebted to the bank, and that though several letters had been written to him he had not replied. Mr. Fennell, according to his own evidence, added: "Tournier must be getting money from somewhere or other; I have seen

a cheque coming through the bank payable to Tournier and have been informed that one cheque has gone to the credit of a bookmaker's account, and if that is the case he ought to pay the bank off some of his debt." In consequence of that communication Kenyon & Co. refused to renew the plaintiff's employment when the three months' agreement expired.

The plaintiff brought this action (1.) for slander, and (2.) for breach of an implied contract that the defendants would not disclose to third persons the state of the plaintiff's account or any transactions relating thereto. The slander alleged was twofold: it was alleged in para. 2 that Mr. Fennell said over the telephone to Mr. Wells, "I am afraid that Mr. Tournier is engaged with bookmakers, as we have been able to trace a cheque or cheques passing from Mr. Tournier's account to bookmakers"; and in para. 3 that he said to the other director, Mr. Kenyon, "Tournier's account is overdrawn, and various promises made by him to give the matter his attention have not been fulfilled, cheques passed through Tournier's account were for betting men, and we think that

Tournier is betting heavily"; the innuendo being that the plaintiff was an undesirable person to be employed by Kenyon & Co. and a person not fit to conduct their business or to be entrusted with money. At the trial the actual words proved in evidence were slightly different from those above set out in the statement of claim, and also from the evidence of Mr. Fennell. According to Mr. Wells' evidence the words spoken to him were, "As we have been able to trace a cheque or cheques to a bookmaker we are afraid he is mixed up with bookmakers." Mr. Kenyon said that the words spoken to him were, "He has made various promises to look into the matter and has not done so, and various cheques going through Tournier's account were going to betting men." On the second head of claim, that for breach of an implied contract of secrecy, the obligation claimed was alleged to be an absolute obligation unqualified by any exceptions. It appeared that in the pass books issued by the defendants to their customers, including the pass book of the plaintiff, there was on the first page a statement that "The officers of the Bank are bound to secrecy as regards the transactions of its customers."

Avory J. left the following questions to the jury:-

1. Were the words complained of in para. 2 or para 3 of the statement of claim spoken by Mr. Fennell? Answer No. The plaintiff's counsel had asked the judge to add to the question the words, "or words to the like effect," but the judge had refused.

2. If so, were such words defamatory of the plaintiff, that is, were they calculated to expose him to hatred, ridicule, or contempt in the mind of a reasonable man? Answer No.

3. Has the plaintiff suffered actual damage by the speaking of such words? Answer No. On this head the evidence was that business was not brisk and that Kenyon & Co. would probably have declined to renew the plaintiff's employment in any case.

4. Was Mr. Fennell actuated by malice in speaking the words, that is, was he acting from any indirect motive other than a desire to do his duty? Answer No.

5. Was the communication with regard to the plaintiff's account at the bank made on a reasonable and proper occasion? Answer Yes.

6. What damages? None.

Judgment was thereupon entered for the defendants.

The plaintiffs appealed.

## COUNSEL:

Sir H. Smith K.C. and Pitt for the appellant. The summing up of the learned judge was defective on both heads of the claim. On the claim for slander he omitted to ask the jury whether the words proved to have been spoken by Fennell were the same in substance as those pleaded in paras. 2 and 3 of the statement of claim, and though in actions for slander it was formerly essential to prove the actual words pleaded, that strict rule has been relaxed, and "for a long time it has been held to be enough to prove the substance of the words alleged in the declaration": per Lord Coleridge C.J. in Harris v. Warre. n(1) He refused to ask the jury whether "words to the like effect" had been spoken by Fennell, although in Dalgleish v. Lowther n(2) an interrogatory administered to the defendant in an action of slander asking whether he had spoken the words set out in the statement of claim "or words to that effect" was held by the Court of Appeal to be a proper interrogatory. On the claim for breach of the implied contract of secrecy also the summing up was defective, as the learned judge asked the jury the question whether the communication with regard to the plaintiff's ac-

count was made "on a reasonable and proper occasion," without giving them any direction as to the circumstances in which the occasion would be reasonable or proper. In Hardy v. Veasey n(3) where the plaintiff, a customer of the defendants' bank, alleged in his amended declaration that the defendants had communicated the state of his account to a third person in breach of their implied promise not to disclose it "except on a reasonable and proper occasion," it is true that no direction was given by the trial judge as to

> n(1) (1879) 4 C. P. D. 125, 128.
>
> n(2) [1899] 2 Q. B. 590.
>
> n(3) (1868) L. R. 3 Ex. 107.

what constituted a reasonable and proper occasion, and no objection was taken by the Court to that omission. But it was not necessary to do so. The plaintiff had overdrawn his account, and the third person to whom the defendants mentioned the fact was a moneylender from whom they tried to obtain assistance for the plaintiff, and the only question left to the jury was whether the communication to the moneylender was officious and unjustifiable, the judge telling them that if it was made with an honest intention of getting such assistance he doubted whether the action was maintainable. The jury having found for the defendants, the only objection taken to the summing up was that the latter statement was a misdirection. The Court held that it was not.

J. G. Hurst K.C. and Morle for the respondents. On the claim for slander the judge was right in refusing to add to the question left to the jury the words "or words to the like effect." "In libel and slander the very words complained of are the facts on which the action is grounded. It is not the fact of the defendant having used defamatory expressions, but the fact of his having used those defamatory expressions alleged, which is the fact on which the case depends": per Lord Coleridge C.J. in Harris v. Warre. n(1) In that case a statement of claim, which alleged that the defendant had written letters to the chief constable charging the plaintiff with having been concerned in a murder, without setting out the actual contents of the letters, was held bad on demurrer. That case is quite consistent with Dalgleish v. Lowther. n(2) In exhibiting interrogatories a plaintiff may ask: "Did you use [specific words] or words to that effect?" But a very different and much more strict standard is to be applied when it is a matter of correspondence between pleadings and proof. If the plaintiff's counsel intended to treat the words proved to have been spoken by Fennell as material he ought to have asked for an amendment of the claim, but he did not. In Ecklin v. Little n(3) the words alleged in the statement of claim were: "I hear the plaintiff is a divorced man; you

> n(1) 4 C. P. D. 125, 128.
>
> n(2) [1899] 2 Q. B. 590.
>
> n(3) (1890) 6 Times L. R. 366.

had better inquire." The words proved in evidence were such that the jury might infer that the defendant was asserting as a fact that the plaintiff had divorced, and not merely that she had heard a rumour to that effect from third persons. Under those circumstances the Court held that the plaintiff could not rely on the words proved without an amendment.

With regard to the second head of the plaintiff's claim that there was a breach of the implied contract of secrecy it is to be observed that it has never yet been decided that the duty not to disclose the state of the customer's account is anything more than a moral one. In Hardy v. Veasey n(1) the Court expressly said that it was not necessary for them to decide whether there was a contract or legal duty not to disclose; their decision was nothing more than that, if there was such a duty except on a reasonable and proper occasion, the circumstances of the case brought it within the exception. It is clear that a banker is compellable to disclose the state of the customer's account if ordered to do so by a judge: Loyd v. Freshfield. n(2) It also seems clear that there are other exceptions than compulsion of law. In Tassell v. Cooper n(3), a count which alleged that the plaintiff was a customer of the defendant bank and that it became the duty of the defendants not to disclose the particulars of the plaintiff's account without his authority except to persons presenting for payment cheques or bills drawn or accepted by the plaintiff, "unless compellable by due course of law so to do," was held bad. In Foster v. Bank of London n(4) the holder of a bill of exchange for 532l. accepted by the plaintiff payable at the defendants' bank on presenting it for payment was told that the plaintiff's balance was not sufficient to meet it by 104l., whereupon the holder paid in 104l. to the plaintiff's account and obtained payment of the bill. In an action against the

bank for disclosing the state of the plaintiff's account Erle C.J. left it as a question of fact to the jury whether there was such a duty, and the

> n(1) L. R. 3 Ex. 107.
>
> n(2) (1826) 2 C. & P. 325.
>
> n(3) (1850) 9 C. B. 509.
>
> n(4) (1862) 3 F. & F. 214.

jury, having found that there was, gave the plaintiff a verdict for the amount at which his balance stood before the 104l. was paid in, apparently upon the ground that the act of the banker was in fraud of the plaintiff's other creditors: see per Martin B. in Hardy v. Veasey.  n(1) In the present case the plaintiff alleged the banker's duty of non-disclosure to be not merely a legal duty, but an absolute one without exceptions. All that Avory J. was called upon to do was to rule whether the duty as pleaded existed, and he was right in ruling that it did not. But even if the duty of non-disclosure is a legal duty, it is subject to the exception that the banker may do what is necessary for the protection of his own interests. Here the defendants were in the position of creditors trying to recover the balance of an overdraft. The state of the plaintiff's account was a matter in which they were interested. Their communication of it was on a privileged occasion, and there was no evidence of malice. The intimation that the plaintiff had been dealing with bookmakers was not a breach of the duty of non-disclosure at all, for it was based on facts which had no connection with his account, but which they had learnt from another source.

Cur. adv. vult.

Dec. 17. The following written judgments were delivered:-

**PANEL:** BANKES, SCRUTTON, and ATKIN L.JJ

**JUDGMENTBY-1:** BANKES L.J

**JUDGMENT-1:**

BANKES L.J: In this appeal the plaintiff asks for a new trial on the ground of misdirection by the learned judge. The action was founded on statements alleged to have been made by an acting manager of a branch of the defendant bank. The plaintiff complained that the statements were slanderous, and further that they constituted a breach of the duty owed by the bank to him. The short facts leading up to the action were as follows: The plaintiff was a customer of the Finsbury Pavement branch of the defendant bank. In April, 1922, his account was overdrawn to a small amount, and on April 8 the plaintiff signed a document agreeing to pay off the debt by weekly instalments of 1l.

> n(1) L. R. 3 Ex. 107.

At the time this document was signed the plaintiff was about to enter the employ of a firm of Kenyon & Co., and on the document containing the agreement the plaintiff wrote their name and address. The plaintiff did not pay the weekly instalments as agreed. In July the acting manager of the branch, by name Fennell, got into telephonic communication with Kenyon & Co. for the purpose of ascertaining the plaintiff's private address. The inquiry led to further conversation with two directors of the company, one of the name of Wells, and the other of the name of Kenyon. The plaintiff's complaint in the action was that in the course of that conversation on the telephone Fennell had told Kenyon that the plaintiff's account was overdrawn, that various promises made by him to give the matter his attention had not been fulfilled, that cheques which passed through his account were for betting men, and that the bank thought that he was betting heavily. To Wells Fennell was alleged to have said that he was afraid that the plaintiff was engaged with bookmakers, as the bank had been able to trace a cheque or cheques passing from the plaintiff's account to bookmakers. The innuendo pleaded was that the words complained of meant and were understood to mean that the plaintiff was an undesirable person to be employed by Messrs. Kenyon & Co., and a person not fit to conduct their business or to be entrusted with money. Wells and Kenyon were called as witnesses for the plaintiff, and they deposed to a conversation with Fennell in the terms alleged in the statement of claim. So far therefore as the plaintiff's evidence was concerned there was no necessity for the judge to ask the jury any question other than the one which he did ask them, namely - whether the words

complained of were spoken by Fennell. In order to contradict the plaintiff's version of the conversation Fennell was called for the defendants. His account of the conversation was that he rang up Messrs. Kenyon in order to ascertain what the plaintiff's private address was, and whether he was working on salary or commission. He was asked why he made the inquiry, and he then explained that the

plaintiff was indebted to the bank in a small amount, and that he had not replied to letters. He then went on to say that the plaintiff must be getting money from some source or other, that he had seen cheques coming through the bank payable to the plaintiff, and that he had made it his business to find out where one cheque had gone to, and that he had been informed that it had gone to the credit of a bookmaker's account, and that if that was the case he thought that the plaintiff ought to have paid off some of his debt to the bank. It was after and in consequence of this evidence by Fennell that the plaintiff's counsel pressed the learned judge to ask the jury whether the words complained of or words to a like effect had been proved, his object being obviously to obtain a verdict on Fennell's evidence if the jury accepted his version of the conversation in preference to that of Wells and Kenyon. The learned judge refused to adopt this course. The question on this part of the case is whether he was right in so deciding. The strictness of the old rule in reference to variance between proof and pleading in actions of libel and slander has long ago disappeared. It is still necessary to plead the exact language complained of, but proof of language substantially the same as that pleaded is admissible and should be submitted to the jury. Lord Coleridge C.J. states the present rule in Harris v. Warre n(1) as follows: "In libel and slander everything may turn on the form of words, and in olden days plaintiffs constantly failed from small and even unimportant variance between the words of the libel or slander set out in the declaration and the proof of them. For a long time it has been held to be enough to prove the substance of the words alleged in the declaration, but if there was difference between both the form and substance of the words alleged, and of the words proved, the defendant was entitled to succeed. In libel and slander the very words complained of are the facts on which the action is grounded. It is not the fact of the defendant having used defamatory expressions, but the fact of his having used those defamatory

n(1) 4 C. P. D. 125, 128.

expressions alleged, which is the fact on which the case depends." There can be no question as to the difference in form between the rival accounts of the conversation. Do they differ in substance? Every case must depend upon its own circumstances, and no rule can be laid down as to what constitutes a substantial difference. In my opinion there was such a substantial difference between the rival accounts of the conversation that Fennell's version ought not to have been submitted to the jury as proof of the plaintiff's pleaded case without an amendment. Even if that view is not correct I do not think that the learned judge was wrong in refusing to add to his question "or words to the like effect." If Fennell's evidence was to be submitted to the jury at all in proof of the plaintiff's case it should have been done by a series of questions which would have made it quite clear to the jury that when they had to consider whether the words were defamatory they must consider that question in reference only to the version of the conversation which they accepted. I do not take the view that there was any material misdirection by the learned judge on this part of the case; though had the question depended upon whether the ancient definition of what constitutes a slander is sufficiently wide for a case like the present I should have hesitated before saying that it is. As the other members of the Court think that the order for a new trial should include both branches of the claim I do not differ from them, though I do adhere to my view that an amendment is necessary to enable the plaintiff to do what he attempted unsuccessfully to do at the trial.

The case with regard to the claim for damages for breach of duty raises a very important question, and one on which the learned judge did not, in my opinion, sufficiently direct the jury. The case for the plaintiff as alleged in the statement of claim was that the bank were absolutely pledged to secrecy in regard to the plaintiff's account and business, and all matters incidental thereto, and that it was an implied term of the contract between the plaintiff and the bank that they would not disclose to any one any of the plaintiff's business with the bank or matters arising therefrom, or the nature

or state of his account, or any transactions relating thereto. The learned judge very properly, in my opinion, ruled against the existence of any such absolute contract. The matter might have rested there. It did not do so, however, because in his summing up the learned judge did give a direction to the jury on the law on the point, and asked them a question with regard to it. The question was this: "Was the communication with regard to the plaintiff's account at the bank made on a reasonable and proper occasion?" and his direction on this point was as follows: "Fifthly, I shall have to ask, in view of the other claim for breach of contract, whether the communication of the state of the plaintiff's account at the bank, which was made to his employers, was, under the circumstances, made on a reasonable and proper occasion; that is to say, whether there was a reasonable justification for his making that communication? I shall hold, as a

matter of law, that there is no such absolute contract as Sir Harold Smith has contended for between a banker and his customer. He has contended that there is an absolute contract that the banker shall not under any circumstances disclose the state of a customer's account to another person. I hold, as a matter of law, that there is no such absolute contract. But, if the banker has made that disclosure justifiably, that is to say, if, under the circumstances of the particular case, it was reasonable and proper that he should make the communication, then there is no breach of contract on his part." With all respect to the learned judge this is not a sufficient explanation of what is a difficult and hitherto only very partially investigated branch of the law. The judge no doubt took the form of the question from the case of Hardy v. Veasey n(1) , in which the judges raised, without deciding them, a number of questions in relation to the duty of banker towards customer not to disclose his affairs, and amongst others the question whether the duty was a legal or only a moral one, and if legal whether it arose out of contract or out of tort. At the present day I think it may be asserted with confidence that the duty is a

n(1) L. R. 3 Ex. 107.

legal one arising out of contract, and that the duty is not absolute but qualified. It is not possible to frame any exhaustive definition of the duty. The most that can be done is to classify the qualification, and to indicate its limits. For this purpose the case of Hardy v. Veasey n(1) is of no assistance. The plaintiff in his amended declaration in that case set out a promise on the part of the bank not to disclose the state of his banking account except "on a reasonable and proper occasion." To this the defendants pleaded a denial, and leave and licence. The disclosure complained of was made to a moneylender, to whom the defendant's manager applied with a view of obtaining assistance for the plaintiff. The learned judge who tried the action stated that the question for the jury would be "Whether the communication to the moneylender of the state of the plaintiff's account was an officious and unjustifiable one?" and he added: "If it was made with reasonable hope and an honest intention of getting assistance for the plaintiff I should doubt whether the action is maintainable." The jury found for the defendants. The discussion in the Court of Exchequer took place upon an application for a new trial, and no decision was given except that there had been no misdirection and no wrong verdict. The plaintiff by his pleading had confined his complaint to a disclosure on some occasion other than a reasonable and proper occasion, and the Chief Baron in his judgment is only referring to the plaintiff's complaint when he uses those words. The question was never raised, whether it was a proper way of ascertaining what the defendants' duty was to ask a question of the jury in that form. Had that question been discussed, I cannot think that the Court would have approved of such a question, partly because it is leaving to the jury a question which is primarily a question for the judge, and partly because it leaves the jury entirely without instruction as to what the circumstances are which they are entitled to take into consideration in arriving at a conclusion as to what is reasonable and what is propel. In my opinion it is necessary in a case like the present to direct the jury what

n(1) L. R. 3 Ex. 107.

are the limits, and what are the qualifications of the contractual duty of secrecy implied in the relation of banker and customer. There appears to be no authority on the point. On principle I think that the qualifications can be classified under four heads: (a) Where disclosure is under compulsion by law; (b) where there is a duty to the public to disclose; (c) where the interests of the bank require disclosure; (d) where the disclosure is made by the express or implied consent of the customer. An instance of the first class is the duty to obey an order under the Bankers' Books Evidence Act. Many instances of the second class might be given. They may be summed up in the language of Lord Finlay in Weld-Blundell v. Stephens n(1) , where he speaks of cases where a higher duty than the private duty is involved, as where "danger to the State or public duty may supersede the duty of the agent to his principal." A simple instance of the third class is where a bank issues a writ claiming payment of an overdraft stating on the face of the writ the amount of the overdraft. The familiar instance of the last class is where the customer authorizes a reference to his banker. It is more difficult to state what the limits of the duty are, either as to time or as to the nature of the disclosure. I certainly think that the duty does not cease the moment a customer closes his account. Information gained during the currency of the account remains confidential unless released under circumstances bringing the case within one of the classes of qualification I have already referred to. Again the confidence is not confined to the actual state of the customer's account. It extends to information derived from the account itself. A more doubtful question, but one vital to this case, is whether the confidence extends to information in reference to the customer and his affairs derived not from the customer's account but from other sources, as, for instance, from the account of another customer of the customer's bank.

It is very necessary to speak with caution on this question upon which there is no authority. I desire therefore to confine my observations to the facts of this particular case.

n(1) [1920] A. C. 956, 965.

The information which the branch manager is said to have disclosed, and which disclosure is said to have constituted a breach of duty, came to the bank in the following manner. A cheque was drawn by a customer of the bank on their Moorgate Street branch in favour of the plaintiff. The cheque was paid in to the account of a customer at the London City and Midland Bank. When the cheque came back to the Moorgate Street branch Mr. Fennell's attention was called to the fact that the plaintiff had not paid the cheque in to his account, and Mr. Fennell then made inquiries of the London City and Midland Bank, the reply to which he is said to have committed a breach of his duty in disclosing. The privilege of non-disclosure to which a client or a customer is entitled may vary according to the exact nature of the relationship between the client or the customer and the person on whom the duty rests. It need not be the same in the case of the counsel, the solicitor, the doctor, and the banker, though the underlying principle may be the same. The case of the banker and his customer appears to me to be one in which the confidential relationship between the parties is very marked. The credit of the customer depends very largely upon the strict observance of that confidence. I cannot think that the duty of non-disclosure is confined to information derived from the customer himself or from his account. To take a simple illustration. A police officer goes to a banker to make an inquiry about a customer of the bank. He goes to the bank, because he knows that the person about whom he wants information is a customer of the bank. The police officer is asked why he wants the information. He replies, because the customer is charged with a series of frauds. Is the banker entitled to publish that information? Surely not. He acquired the information in his character of banker. So in the present case Mr. Fennell was put upon inquiry by a cheque drawn in the plaintiff's favour upon a customer's account. He acquired the information which he is said to have divulged in his character as the plaintiff's banker. I use the expression "in the character of banker," because I find that expression

used by Gurney B. in the case of Davies v. Waters n(1) , in which the question was raised whether a solicitor had acquired certain information as attorney for a client or as his trustee. In his judgment Gurney B. says this: "But the objection here goes further; for just an hour before the trial, being possessed of the deed, and possessed of it in the character of trustee, he takes it to the consultation, and there, in the character of attorney for the defendant, and for the express purpose of informing the minds of the counsel for the defendants, he reads the deed, and by that means acquires his knowledge of its contents. Can it be doubted that this is a knowledge acquired in the character of professional adviser of the party? If so, it is fit and proper that knowledge so acquired should be held sacred." Rolfe B. did not agree with this view of the facts, but I cite the passage because it introduces what is, I think, a convenient indication of the limits of professional or commercial privilege in relation to non-disclosure. In Taylor v. Blacklow n(2) Vaughan J., in speaking of a violation by a solicitor of the professional privilege, speaks of it as a breach of a great moral duty, and he adds that "the law is never better employed than in enforcing the observance of moral duties." In the present case I think that the information obtained by Mr. Fennell as the result of his inquiry of the London City and Midland Bank was covered by the privilege of the customer, and that the bank are liable for any disclosure of that information which may have caused damage to the plaintiff unless the bank can bring the disclosure of the information so derived under one of the classified qualifications I have already referred to.

It follows from what I have said that in my opinion a direction to the jury in a case such as the present must inform the jury of the nature and limits and qualifications of the duty of the bank as a matter of law, leaving to them only questions for the purpose of ascertaining their view whether the communication complained of was or was not made, and whether it did or did not come within any of the protected occasions to which I have called attention. For these reasons

n(1) (1842) 9 M. & W. 608, 613.

n(2) (1836) 3 Bing. N. C. 235, 249.

I consider that the appeal must be allowed with costs, the judgment entered for the defendants set aside, and a new trial ordered. The costs of the first trial to abide the event of the new trial.

**JUDGMENTBY-2:** SCRUTTON L.J

**JUDGMENT-2:**

SCRUTTON L.J: This application for a new trial raises questions of some general importance, though I can understand the jury who answered all questions against the plaintiff not taking a favourable view of his case. He had an account with the defendant bank which, in October, 1921, was overdrawn about 8l. He paid nothing in to this account until April, 1922, when, being pressed to pay his debt, he agreed to do so by weekly instalments of a pound. He paid three of these, but not punctually, and in July, 1922, had not paid for some time, his overdraft then being 6l. or so. Under these circumstances the bank manager found that cheques made payable to him were being paid to strangers at another bank, instead of being used to discharge his overdraft. He also found that one of these cheques came to the bank from the account of a betting man. He was naturally annoyed, and in endeavouring to obtain the private address of the plaintiff from his employers, he made statements, the exact terms of which were in dispute, about the state of the plaintiff's account, and the cheque coming from a bookmaker's account. On hearing of this the plaintiff brought an action against the bank (1.) for slander, alleging as special damage the loss of his situation, (2.) for breach of contract to keep his account secret. The two causes of action have different histories and arguments relating to them, and I deal with them separately.

As to slander, the plaintiff alleged two conversations, one with Wells, to whom Fennell is alleged to have said: "I am afraid that Mr. Tournier is engaged with bookmakers, as we have been able to trace a cheque or cheques passing from Mr. Tournier's account to bookmakers"; the other with Mr. Kenyon, to whom he is alleged to have said: "Tournier's account is overdrawn, and various promises made by him to give the matter his attention have not been fulfilled, cheques

passed through Tournier's account were for betting men, and we think that Tournier is betting heavily." The witnesses gave evidence substantially as pleaded. The bank manager said he asked the plaintiff's employers for his private address, and whether he was paid by salary or commission, and on being asked why he wanted to know said that the plaintiff was slightly overdrawn, and had not answered the bank's letters, and as the manager had seen cheques payable to the plaintiff coming through another bank account, and found they came from a bookmaker's account, he thought the plaintiff ought to pay up. It will be seen he alleges that he said nothing about cheques passing from Tournier's account to bookmakers, or that Tournier was betting heavily; he did mention the overdraft, and that one cheque payable to Tournier had passed through a bookmaker's account. No application was made by the plaintiff to amend by relying on the words proved by the defendants, but when the judge proposed to ask the jury the question: "Were the words complained of in paragraph 2, or paragraph 3 of the claim, spoken by Mr. Fennell?" counsel asked him to add "or words to the like effect," which the judge refused. The jury found that the words alleged in the claim were not spoken. They went on to find that they, presumably the words alleged, were not defamatory. On this the judge had directed them that defamatory words were words tending to expose the plaintiff to "hatred, ridicule, and contempt" in the mind of a reasonable man. I do not myself think this ancient formula is sufficient in all cases, for words may damage the reputation of a man as a business man, which no one would connect with hatred, ridicule, or contempt. This misdirection is, however, not raised by the notice of appeal. The jury appear to have thought that to say that a man's account was overdrawn, and that he betted, was no reasonable cause for "hatred, ridicule, and contempt"; whether they would have thought such words damaging to the reputation of a business man I do not know. The more substantial matter is the refusal of the judge to add the words "to the like effect," and his failure to direct the jury that they should

consider whether the words alleged, or a material and defamatory part of them, were in substance uttered. There is no doubt that precise words must be alleged in the statement of claim, and only a century ago the most minute variation in proof was ground for non-suiting the plaintiff. One who complained of the words: "This is my umbrella, and he stole it from my back door," and proved: "It is my umbrella, and he stole it from my back door" was nonsuited in 1819 by the full Court: Walters v. Mace n(1) , it being proved that the umbrella was not in the presence of the speaker, so that "This" referred to a present umbrella, and "It" to an absent one, a different thing. But I think modern practice is, as stated by Lord Coleridge in Harris v. Warre n(2) , that it is enough to prove the substance of the words alleged, or I would add, of a material and defamatory part of them. In the case of interrogatories the Court has decided that the defendant may be asked whether he spoke the words "or words to that effect," meaning, according to Sir Francis Jeune, "anything in substance like them," "words which, though not exactly the same, are to that effect." n(3) So far as the words proved make a materially different allegation, amendment is necessary if that allegation is to be relied on; but in my view the jury should be directed that if they think the defendant used, in substance, the words, or a material and defamatory part of the words complained of, they should say so, and he is liable. I have no doubt that in this case part of the words alleged are materially different from the defendant's admission, but I think the jury should have been directed to consider whether or not part of the defendant's admission was a material and defamatory part of the words complained of. It is obvious, however, that if the claim for slander stood alone the statement about overdraft was justified, and the jury obviously did

not think, and might reasonably not think, the statement about one cheque from a bookmaker's account defamatory. On this part of the case, if it stood alone, I should not be disposed

     n(1) (1819) 2 B. & Al. 756.

     n(2) 4 C. P. D. 125.

     n(3) Dalgleish v. Lowther [1899] 2 Q. B. 590.

to order a new trial, though I think the summing up was defective.

The other cause of action is of far more public interest. The plaintiff alleged an absolute contract to be implied that the bank should not disclose the plaintiff's account or matters arising therefrom, or any transactions relating thereto, to anybody. The judge directed the jury there was no such absolute contract, and I think he was right. There is clearly no privilege to abstain from answering in a Court of justice questions as to a customer's account: Loyd v. Freshfield n(1) , per Abbott C.J.; and the bank can disclose the state of the account by bringing an action to recover overdraft.

The learned judge left to the jury the question: "Was the communication with regard to the plaintiff's account at the bank made on a reasonable and proper occasion?" I think he took these words from the judgments of Kelly C.B. and Martin B. in Hardy v. Veasey n(2) , though in that case the actual question left to the jury was: Was the communication "an officious and unjustifiable one?" But having read them the questions, the learned judge, by some unfortunate oversight, omitted to give the jury any direction as to the standard by which reasonableness and propriety were to be considered; indeed, as the jury had found that the words alleged by the plaintiff were not uttered, it is not clear to what communication the question and answer related.

It is curious that there is so little authority as to the duty to keep customers' or clients' affairs secret, either by banks, counsel, solicitors or doctors. The absence of authority appears to be greatly to the credit of English professional men, who have given so little excuse for its discussion. As to bankers, there is the ruling of Abbott C.J., already referred to, as to the duty to disclose in the law Courts; there is the opinion of two judges on demurrer in Tassell v. Cooper n(3) in 1850, that a count that a bank had a duty not to disclose the state of a customer's account showed no cause of action; but here counsel, who was winning on another count,

     n(1) 2 C. & P. 325, 329.

     n(2) L. R. 3 Ex. 107.

     n(3) 9 C. B. 509.

abandoned the count attacked n(1) ; there is the fact that in 1862, in Foster v. Bank of London n(2) , Erle C.J. asked the jury whether it was the duty of the bank not to disclose to a person presenting a bill or cheque the exact state of a customer's account as contrasted with a statement of "not sufficient assets," and on their replying that the duty was as stated said "he knew of no law against that"; and lastly, the judgment in 1868 in Hardy v. Veasey n(3) of the Court of Exchequer, that if there was a duty not to disclose the state of a customer's account it was subject to an exception in favour of disclosure reasonable and proper in the interests of the customer himself. It is to be noticed that in the last case the Court were under the impression that there was no reported case in which an action had been brought against a solicitor for disclosure of his client's affairs; they had not been referred to Taylor v. Blacklow n(4) , an action for such disclosure, where all the judges recognized such a duty, tracing it back to a passage in Comyn's Digest, tit. "Action on the Case for Deceit," A.5. n(5) It might be possible to rest the duty on the express words in the bank's pass book: "The officers of the bank are bound to secrecy as regards the affairs of its customers," though even then exceptions must be introduced by implication. The contract is alleged in the claim as "implied," and according to the decision of this Court in In re Comptoir Commercial Anversois and Power n(6) , implied terms are a question of law for the Court, the jury finding such facts as are necessary or material to enable the Court to judge of the implication. The Court will only imply terms which must necessarily have been in the contemplation of the parties in making the contract. Applying this principle to such knowledge of life as a judge is allowed to have, I have no doubt that it is an implied term of a banker's contract with his customer that the banker shall not disclose the account, or transactions relating thereto, of his customer except in certain circumstances. This duty

[1924] 1 KB 461

n(1) 9 C. B. 532.

n(2) 3 F. & F. 214.

n(3) L. R. 3 Ex. 107.

n(4) 3 Bing. N. C. 235.

n(5) 3 Bing. N. C. 248, 249.

n(6) [1920] 1 K. B. 868.

equally applies in certain other confidential relations, such as counsel or solicitor and client, or doctor and patient. The circumstances in which disclosure is allowed are sometimes difficult to state, especially in the case of a medical man; and I do not propose to do more than indicate the exceptions material to the present case. I think it is clear that the bank may disclose the customer's account and affairs to an extent reasonable and proper for its own protection, as in collecting or suing for an overdraft; or to an extent reasonable and proper for carrying on the business of the account, as in giving a reason for declining to honour cheques drawn or bills accepted by the customer, when there are insufficient assets; or when ordered to answer questions in the law Courts; or to prevent frauds or crimes. I doubt whether it is sufficient excuse for disclosure, in the absence of the customer's consent, that it was in the interests of the customer, where the customer can be consulted in reasonable time and his consent or dissent obtained. I think also, in accordance with well-known authorities on the duties and privileges of legal advisers, that the implied legal duty towards the customer to keep secret his affairs does not apply to knowledge which the bank acquires before the relation of banker and customer was in contemplation, or after it ceased; or to knowledge derived from other sources during the continuance of the relation. For instance, the banker hears from an entirely independent source that one of its customers has speculative dealings in oil, may it disclose that fact to another of its customers also interested in oil? As we have only to imply terms which the parties must necessarily have contemplated, how can it be said that it is a necessary term that the bank shall not talk about the customer at all, though the subject matter of its conversation is not derived from its dealings with the customer? This position would be the same as prevails in the case of legal advisers, as stated in Taylor on Evidence n(1) , and supported by the cases of Brown v. Foster n(2) ; Griffith v. Davies n(3) , as to which see per Alderson B.

n(1) 11th ed., ss 930, heads 2 to 5.

n(2) (1857) 26 L. J. (Ex.) 249.

n(3) (1833) 5 B. & Ad. 502.

in Davies v. Waters n(1) ; Lewis v. Pennington. n(2) It appears to me, therefore, that we cannot imply an obligation to keep secret information about a customer derived not from that customer or his account, but from the account of another customer. The second customer may complain, but not the first. It is not possible to apply this rule to the facts of the present case so as to avoid a new trial, for we do not know what words were spoken, or how any statement about cheques for betting was mixed up with statements about overdraft. I hold therefore that if the bank knows something about customer A., through customer B.'s account, his duty not to disclose is one owing to customer B. and not to customer A.

None of these matters, or standards by which the propriety of disclosure should be judged, were explained to the jury, and it is obvious that some of them were very material to the facts of this case. What, if anything, was known or suspected about betting was known through the account of another customer, but the suggestion, if made, that the overdraft was due to betting, might be considered by the jury as the disclosure of the plaintiff's account, or might not. I think a new trial should be ordered of this issue, which is an important one; and as the treatment of the issue as to slander was not very satisfactory, I think the new trial should extend to the whole action, and I therefore do not comment further on the facts of the case. The plaintiff must have the costs of the appeal, and those of the first hearing should abide the event of the second hearing. The plaintiff must consider whether he should apply to amend.

**JUDGMENTBY-3:** ATKIN L.J

**JUDGMENT-3:**

[1924] 1 KB 461

ATKIN L.J: This is an action brought by the plaintiff against the defendant bank in respect of words spoken by the manager of a branch of the bank. The plaintiff alleges as causes of action: (A) slander; (B) breach of an implied contract not to divulge information concerning the plaintiff's transactions with the bank. The second point involves a question of considerable public importance, and I propose to consider it first.

n(1) 9 M. & W. 608, 611.

n(2) (1860) 29 L. J. (Ch.) 670.

In Joachimson v. Swiss Bank Corporation n(1) this Court had to consider what were the terms of the contract made between banker and customer in the ordinary course of business when a current account is opened by the bank. All the members of the Court were of opinion that the contract included several implied terms, some of which were then stated, so far as was necessary for the determination of that case, which turned upon the necessity of a demand before the customer could sue the bank for the amount of his credit balance. It is now necessary to consider whether there is any, and if so what, implied term as to an obligation of secrecy on the part of the bank. The question of what terms are to be implied in a contract is a question of law: In re Comptoir Commercial Anversois and Power n(2) ; and the rules by which the Court should be guided are contained in passages from the judgments of Lord Esher in Hamlyn v. Wood n(3) , and of Lord Watson in Dahl v. Nelson, Donkin & Co. n(4) , cited by Bankes L.J. n(5) The principle is stated by Scrutton L.J. in words substantially to the same effect n(6) : "The Court," he says, "and not the jury, are the tribunal to find such a term; they ought not to imply a term merely because it would be a reasonable term to include if the parties had thought about the matter, or because one party, if he had thought about the matter, would not have made the contract unless the term was included; it must be such a necessary term that both parties must have intended that it should be a term of the contract, and have only not expressed it because its necessity was so obvious that it was taken for granted." Is there any term as to secrecy to be implied from the relation of banker and customer? I have myself no doubt that there is. Assuming that the test is rather stricter than Lord Watson would require, and is not merely what the parties, as fair and reasonable men, would presumably have agreed upon, but what the Court considers they must necessarily

n(1) [1921] 3 K. B. 110.

n(2) [1920] 1 K. B. 868.

n(3) [1891] 2 Q. B. 488.

n(4) (1881) 6 App. Cas. 38.

n(5) [1920] 1 K. B. at pp. 886-7.

n(6) Ibid. at pp. 899-900.

have agreed upon, it appears to me that some term as to secrecy must be implied. The bank find it necessary to bind their servants to secrecy; they communicate this fact to all their customers in their pass-book, and I am satisfied that if they had been asked whether they were under an obligation as to secrecy by a prospective customer, without hesitation they would say yes. The facts in this case as to the course of business of this bank do not appear to be in any degree unusual in general banking business. I come to the conclusion that one of the implied terms of the contract is that the bank enter into a qualified obligation with their customer to abstain from disclosing information as to his affairs without his consent. I am confirmed in this conclusion by the admission of counsel for the bank that they do, in fact, consider themselves under a legal obligation to maintain secrecy. Such an obligation could only arise under a contractual term.

The important point, and one which presents difficulties, is as to the extent of the obligation. The plaintiff's pleading alleged the obligation in wide terms as absolute and unconditional. The learned judge, as I think quite rightly, ruled that there was no such absolute duty, and the trial then proceeded without further amendment of the pleadings on the footing that the plaintiff relied on a breach of the true contract, whatever it was. The learned judge directed the jury: "If the banker has made the disclosure justifiably, that is to say, if, under the circumstances of the particular case, it was reasonable and proper that he should make the communication, then there is no breach of contract on his part." Without any further direction he left to the jury the question: "Was the communication with regard to the plaintiff's account at the bank made on a reasonable and proper occasion?" The direction and question appear to follow the direction to the

jury given by Byles J. in Hardy v. Veasey n(1) , affirmed by the Court of Exchequer. I think that the decision in that case was based on the fact that the formula approved was that adopted by the plaintiff's counsel

n(1) L. R. 3 Ex. 107.

in his pleading, and accepted by him as representing the true issue to be left to the jury. In fact, however, to leave to the jury what is "justifiable" or "proper" is merely to tell them that the bank may not divulge information except on occasions when they may divulge it, and that of what those occasions are the jury are the judges. This appears to me to treat as fact what is matter of law, and to afford no guidance to the jury, leaving the rights and duties as between customer and banker to vary with the individual views of juries in each case.

The first question is: To what information does the obligation of secrecy extend? It clearly goes beyond the state of the account, that is, whether there is a debit or a credit balance, and the amount of the balance. It must extend at least to all the transactions that go through the account, and to the securities, if any, given in respect of the account; and in respect of such matters it must, I think, extend beyond the period when the account is closed, or ceases to be an active account. It seems to me inconceivable that either party would contemplate that once the customer had closed his account the bank was to be at liberty to divulge as it pleased the particular transactions which it had conducted for the customer while he was such. I further think that the obligation extends to information obtained from other sources than the customer's actual account, if the occasion upon which the information was obtained arose out of the banking relations of the bank and its customers - for example, with a view to assisting the bank in conducting the customer's business, or in coming to decisions as to its treatment of its customers. Here, again, counsel for the bank admitted that the bank treated themselves as under such an obligation, and this, I think, would be in accordance with ordinary banking practice. In this case, however, I should not extend the obligation to information as to the customer obtained after he had ceased to be customer. Speaking for myself, I find little assistance from considering the implications that have been found by the Courts to arise from contracts in other occupations and

professions, such as those of solicitors or doctors. The limitation of the implied term must vary with the special circumstances peculiar to each class of occupation. On the other hand, it seems to me clear that there must be important limitations upon the obligation of the bank not to divulge such information as I have mentioned. It is plain that there is no privilege from disclosure enforced in the course of legal proceedings. But the bank is entitled to secure itself in respect of liabilities it incurs to the customer, or the customer to it, and in respect of liabilities to third parties in respect of the transactions it conducts for or with the customer. It is difficult to hit upon a formula which will define the maximum of the obligation which must necessarily be implied. But I think it safe to say that the obligation not to disclose information such as I have mentioned is subject to the qualification that the bank have the right to disclose such information when, and to the extent to which it is reasonably necessary for the protection of the bank's interests, either as against their customer or as against third parties in respect of transactions of the bank for or with their customer, or for protecting the bank, or persons interested, or the public, against fraud or crime. I have already stated the obligation as an obligation not to disclose without the customer's consent. It is an implied term, and may, therefore, be varied by express agreement. In any case the consent may be express or implied, and to the extent to which it is given the bank will be justified in acting. A common example of such consent would be where a customer gives a banker's reference. The extent to which he authorizes information to be given on such a reference must be a question to be determined on the facts of each case. I do not desire to express any final opinion on the practice of bankers to give one another information as to the affairs of their respective customers, except to say it appears to me that if it is justified it must be upon the basis of an implied consent of the customer.

As to the rest of the case based on slander, I think that this issue must also be submitted for a new trial. I do not

think that it is a sufficient direction to a jury on what is meant by "defamatory" to say, without more, that it means: Were the words calculated to expose the plaintiff to hatred, ridicule, or contempt, in the mind of a reasonable man? The formula is well known to lawyers, but it is obvious that suggestions might be made very injurious to a man's character in business which would not, in the ordinary sense, excite either hate, ridicule, or contempt - for example, an imputation of a clever fraud which, however much to be condemned morally and legally, might yet not excite what a member of a jury might understand as hatred, or contempt. Speaking for myself, I also think that it is undesirable where an issue of privilege is raised to leave a question of express malice to be decided by the jury before the judge has ruled whether the occasion is privileged. The judge has to determine, not only whether the occasion is privileged, but whether the defendant has gone beyond the privilege which the occasion creates: Adam v. Ward. n(1) In the words of Lord Loreburn: "All this is for the judge alone, and the question of malice, which is for the jury, cannot arise till the judge has ruled on the whole

[1924] 1 KB 461

question of privilege." In many cases, and I think this is one, the jury cannot form a correct opinion as to what is express malice until the judge has ruled whether the circumstances exist, as to legal or social duty and so forth, on which the legal privilege depends; and if the occasion is not privileged, or has been, in fact, exceeded, the question of express malice is irrelevant; and I think it is a disadvantage to the administration of justice that questions should be asked of the jury unnecessarily when the final decision may appear to conflict with their answers. It is also, I think, clear that the plaintiff was entitled to put before the jury his case that the words proved, though not the very words pleaded, were words substantially to the same effect. Whether this be done by amending the pleading, by framing the question to the jury so as to raise the point, or by directing the jury that the words pleaded would be proved by proof of words substantially to the same

n(1) [1917] A. C. 309, 321.

effect, seems to me immaterial. No slander of any complexity could ever be proved if the ipsissima verba of the pleading had to be established. There appears to me to be ample authority in well established every day practice, and in the decisions upon the form of interrogatories in such cases, to support the view that I am expressing.

For the above reasons, without expressing an opinion upon the points raised between the parties at the trial, I come to the opinion that this appeal must be allowed, and a new trial ordered.

**DISPOSITION:**

Appeal allowed.

**SOLICITORS:**

Solicitor for the appellant: J. R. Cort Bathurst.

Solicitors for the respondents: Wilde, Wigston & Sapte.

J. F. C.

(c)2001 The Incorporated Council of Law Reporting for England & Wales

7

20 of 20 DOCUMENTS

Wallace Smith Trust Co Ltd (in liq) v Deloitte Haskins & Sells (a firm) and another

COURT OF APPEAL, (CIVIL DIVISION)

*[1996] 4 All ER 403, [1997] 1 WLR 257*

**HEARING-DATES: 15, 16 MAY, 10 JULY 1996**

10 JULY 1996

## CATCHWORDS:

Discovery -- Production of documents -- Order for production for inspection -- Transcripts and tapes of interviews -- Interviews of partner and employee of defendants conducted by Serious Fraud Office under statutory powers -- Plaintiff seeking production of transcripts and tapes -- Whether production necessary for fair disposal of action -- Whether court should inspect documents when considering application for order for production -- RSC Ord 24, r 13.

Discovery -- Production contrary to public interest -- Documents containing information obtained under statutory powers -- Transcripts and tapes of interviews of partner and employee of defendants conducted by Serious Fraud Office -- Whether public interest immunity attaching to transcripts and tapes -- Whether defendants entitled to withhold production of transcripts and tapes -- Criminal Justice Act 1987, s 2.

## HEADNOTE:

The plaintiff company carried on business as a bank authorised and regulated by the Bank of England and its auditors were the first defendant, which subsequently merged with the second defendant. In April 1991 joint liquidators were appointed in respect of the company, which shortly afterwards ceased business. The Serious Fraud Office thereupon investigated the affairs of the company and served notices pursuant to s 2 of the Criminal Justice Act 1987 on D and G, a partner and employee respectively of the defendants. D and G were interviewed by the Serious Fraud Office in February 1992 and the interviews were recorded on tape and transcripts were produced. In July the liquidators commenced proceedings against the defendants, alleging that they were in breach of their duties both in contract and in tort in failing to detect that the company's business was being fraudulently conducted. The liquidators sought discovery of the tapes and transcripts of interviews with D and G and applied for an order for their production for inspection pursuant to RSC Ord 24, r 13. The defendants claimed that those documents were privileged from production as being subject to public interest immunity on the grounds that they contained information disclosed to a public body under compulsion of law and that it had not been shown that their production was necessary for fairly disposing of the action, as required by Ord 24, r 13. The judge, who did not inspect the documents, held that the documents did not attract public interest immunity, but he dismissed the liquidators' application on the ground that he was not satisfied that production of the tapes and transcripts was necessary for the fair disposal of the action. The liquidators appealed.

Held -- (1) Where an application was made to the court for an order for the production of documents pursuant to RSC Ord 24, r 13 and the applicant showed that such production might be necessary for the fair disposal of the action, the court should inspect the documents and should only refuse an order if, after considering them in the light of the material already in the applicant's possession, it concluded that they were not in fact necessary for such disposal. In considering the application, the court should examine the facts of the case and in particular should consider the central issues of the action, the nature of the documents and the information they were likely to contain; it could also take into account whether the documents were confidential and, if so, whether the information sought could be obtained by some other means. Since the tapes and transcripts were undoubtedly likely to contain material necessary for the fair disposal of the action as the witnesses would have been well informed at the time of their interviews owing to an internal inquiry by the defendants, and the tapes were likely to provide an insight into the state of knowledge of the defendants in the period leading up to the collapse of the company, it followed that the judge had misdirected himself in failing to inspect the documents. The appeal would therefore be allowed and the matter referred back to the judge so that he could do so (see p 412 e to j, p 413 e to g j to p 414 b, p 416 g, p 417 a, p 418 c, p 419 d and p 420 c j, post); Science Research Council v

Nassi, BL Cars Ltd (formerly Leyland Cars) v Vyas [1979] 3 All ER 673 and Kaufmann v Credit Lyonnais Bank (1995) Times, 1 February applied.

(2) Although the tapes and transcripts came into existence by reason of the special powers conferred on the Serious Fraud Office by the 1987 Act, which contained detailed provisions setting out the use which the Serious Fraud Office might make of the information which was provided to it and the persons to whom that information might be disclosed, there was no basis on which the defendants could claim public interest immunity for the copies of those documents in their hands. It followed that that claim was without foundation (see p 416 c f, p 417 a and p 420 d e j, post).

## NOTES:

For production of documents by order of the court, see 13 Halsbury's Laws (4th edn) para 64, and for withholding documents on the ground of public interest immunity, see ibid paras 86-91, and for cases on those subjects, see 18 Digest (2nd reissue) 203-219, 1822-1879.

For the Criminal Justice Act 1987, s 2, see 12 Halsbury's Statutes (4th edn) (1994 reissue) 1103.

## CASES-REF-TO:

Air Canada v Secretary of State for Trade (No 2) [1983] 1 All ER 910, [1983] 2 AC 394, [1983] 2 WLR 494, HL.
Arbuthnott v Fagan (1994) Independent, 11 July, [1994] CA Transcript 841.
Arrows Ltd, Re (No 4), Hamilton v Naviede [1994] 3 All ER 814, [1995] 2 AC 75, [1994] 3 WLR 656, HL.
Bellenden (formerly Satterthwaite) v Satterthwaite [1948] 1 All ER 343, CA.
Cie Financihre et Commerciale du Pacifique v Peruvian Guano Co (1882) 11 QBD 55, CA.
Dolling-Baker v Merrett [1991] 2 All ER 890, [1990] 1 WLR 1205, CA.
Kaufmann v Credit Lyonnais Bank (1995) Times, 1 February.
Lonrho plc v Fayed (No 4) [1994] 1 All ER 870, [1994] QB 775, [1994] 2 WLR 209, QBD and CA.
Macmillan Inc v Bishopsgate Investment Trust Ltd [1993] 4 All ER 998, [1993] 1 WLR 1372, Ch D and CA.
R v Chief Constable of the West Midlands Police, ex p Wiley, R v Chief Constable of the Nottinghamshire Constabulary, ex p Sunderland [1994] 3 All ER 420, [1995] 1 AC 274, [1994] 3 WLR 433, HL.
R v Reading Justices, ex p Berkshire CC [1996] 1 Cr App R 239, DC.
Science Research Council v Nassi, BL Cars Ltd (formerly Leyland Cars) v Vyas [1979] 3 All ER 673, [1980] AC 1028, [1979] 3 WLR 762, HL.
Smith v Director of Serious Fraud Office [1992] 3 All ER 456, [1993] AC 1, [1992] 3 WLR 66, HL.
Taylor v Anderton (Police Complaints Authority intervening) [1995] 2 All ER 420, [1995] 1 WLR 447, CA.
Ventouris v Mountain [1991] 3 All ER 472, [1991] 1 WLR 607, CA.

## CASES-CITED:

Barlow Clowes Gilt Managers Ltd, Re [1991] 4 All ER 385, [1992] Ch 208.
Burmah Oil Co Ltd v Bank of England [1979] 2 All ER 461, [1979] 1 WLR 473, CA; affd on other grounds [1979] 3 All ER 700, [1980] AC 1090, HL.
Conway v Rimmer [1968] 1 All ER 874, [1968] AC 910, HL.
Crompton (Alfred) Amusement Machines Ltd v Customs and Excise Comrs [1973] 2 All ER 1169, [1974] AC 405, HL.
G v G [1985] 2 All ER 225, [1985] 1 WLR 647, HL.
Hargreaves (Joseph) Ltd, Re [1900] 1 Ch 347, CA.
McDonald v Horn (20 February 1995, unreported), Ch D.
Makanjuola v Comr of Police of the Metropolis [1992] 3 All ER 617, CA.
Marcel v Comr of Police of the Metropolis [1992] 1 All ER 72, [1992] Ch 225, CA.
Morris v Director of the Serious Fraud Office [1993] 1 All ER 788, [1993] Ch 372.
Palermo, The (1883) 9 PD 6, CA.
Svenska Handelsbanken v Sun Alliance and London Insurance plc [1995] 2 Lloyd's Rep 84.
Westminster Airways Ltd v Kuwait Oil Co Ltd [1950] 2 All ER 596, [1951] 1 KB 134, CA.

## INTRODUCTION:

Interlocutory appeal

[1996] 4 All ER 403, [1997] 1 WLR 257

By notice dated 10 April 1995 Christopher Hayward and Philip Wallace, the liquidators of Wallace Smith Trust Co Ltd, appealed from the decision of Carnwath J on 21 December 1994 refusing their application for an order for the production of tapes and transcripts of the interviews of Gareth Davies and Wolfie Ginsberg, a former partner and manager respectively of the defendants, Deloitte Haskins & Sells and Coopers & Lybrand Deloitte, conducted by the Serious Fraud Office in February 1992 pursuant to notices served under s 2 of the Criminal Justice Act 1987. By a respondent's notice dated 26 April 1995 the defendants challenged Carnwath J's rejection of their alternative objection to production of the tapes and transcripts on public interest immunity grounds. The facts are set out in the judgment of Neill LJ.

## COUNSEL:

Mark Hapgood QC and Philip Sales for the plaintiffs; Ian Croxford QC and Andrew Onslow for the defendants.

## JUDGMENT-READ:

Cur adv vult 10 July 1996. The following judgments were delivered.

## PANEL: NEILL, SIMON BROWN, WAITE LJJ

## JUDGMENTBY-1: NEILL LJ

## JUDGMENT-1:

NEILL LJ:

Introduction

This appeal relates to an application by the liquidators of a company in liquidation for the production for inspection of certain tapes and transcripts of interviews which took place in February 1992 when the affairs of the company were being investigated by the Serious Fraud Office (the SFO).

The application, which was brought pursuant to RSC Ord 24, r 13, was dismissed by Carnwath J on 21 December 1994 on the ground that he was not satisfied that the production of the documents was necessary for the 'fair disposal of the cause'. In the course of his judgment, however, he rejected an alternative argument advanced on behalf of the defendants to the effect that the documents were protected from production by the rules of public interest immunity. The respondents to the appeal seek, if necessary, to challenge the judge's ruling on public interest immunity.

I propose to deal first with the issue arising under RSC Ord 24, r 13, as I am satisfied that it is right to consider this issue before the issue relating to public interest immunity: see R v Chief Constable of the West Midlands Police, ex p Wiley, R v Chief Constable of the Nottinghamshire Constabulary, ex p Sunderland [1994] 3 All ER 420 at 423, [1995] 1 AC 274 at 280 per Lord Templeman. I must start, however, by giving some account of the facts.

The facts

Until about 30 April 1991 Wallace Smith Trust Co Ltd (WSTC) carried on business as a bank authorised and regulated by the Bank of England under the Banking Acts 1979 and 1987. WSTC's banking business consisted of, inter alia, the taking of and making of deposits from and to other banks and trading in financial instruments, namely certificates of deposit, bills of exchange and bankers' acceptances.

At all material times the chairman and managing director of WSTC was Mr Wallace Duncan Smith (Mr Smith).

From about 1976 until about April 1990 Deloitte Haskins & Sells (Deloitte), a firm of chartered accountants, acted as auditors of the accounts produced each year by WSTC. In particular they acted as auditors of the accounts for the financial years 1984-85 to 1988-89. In about April 1990 Deloitte merged with another firm of chartered accountants. The merged firm subsequently in 1992 changed its name to Coopers & Lybrand (Coopers). After the merger, Coopers acted as auditors of the accounts produced by WSTC for the financial year 1989-90. In each of the financial years between 1984-85 and 1989-90, the end of WSTC's financial year was 30 April.

On 28 April 1991 Mr Smith informed the Bank of England that WSTC had a deficiency of about £ 70m. On 30 April 1991 Mr Christopher Hayward and Mr William Radford were appointed by the Companies Court as joint provisional liquidators of WSTC. On 12 June 1991 it was ordered by the court that WSTC should be wound up and Mr Hay-

[1996] 4 All ER 403, [1997] 1 WLR 257

ward and Mr Radford were appointed as joint liquidators. On 23 February 1993 Mr Radford retired and was replaced as a joint liquidator by Mr Philip Wallace.

After WSTC ceased business on 30 April 1991 its affairs were investigated by the SFO. At about the end of April 1991 Mr Smith was arrested.

On 14 May 1991 a notice was served on Mr Gareth Davies pursuant to s 2 of the Criminal Justice Act 1987. Mr Davies was a former partner in Deloitte and also a partner in the merged firm. He had been engaged in the audit of the accounts of WSTC in the relevant financial years.

The notice, which was from the SFO, was, as far as is material, in the following terms:

'NOTICE REQUIRING ATTENDANCE TO ANSWER QUESTIONS FURNISH INFORMATION AND PRODUCE DOCUMENTS

PERSONS UNDER INVESTIGATION: Wallace Duncan Smith and Wallace Smith Trust Co Limited

1. The Director of the Serious Fraud Office has decided to investigate suspected offences which appear to her to involve serious or complex fraud. 2. Pursuant to s 2(11) of the Criminal Justice Act 1987 (the Act) I have been authorised by the director of the Serious Fraud Office to exercise on her behalf all the powers conferred by s 2 of the Act for the purpose of investigating the affairs of the persons under investigation. 3. There appears to me, for the purposes of the investigation referred to at 1 above, to be good reason to exercise the powers conferred by s 2(2) and (3) of the Act for the purpose of investigating the affairs of the persons under investigation. I have reason to believe that you have relevant information about the affairs of the persons under investigation, and I therefore require you to answer questions or otherwise furnish information to me with respect to matters relevant to the investigation forthwith. I also require you to produce to me forthwith the following documents which appear to me to relate to the matters relevant to the investigation: All files, documents and papers relating to the persons under investigation and connected companies as per the attached list.'

Enclosed with the notice was a list of 17 identified documents and also a list of ten companies connected with WSTC.

On 20 June 1991 a further notice under s 2 of the 1987 Act was sent to Mr Davies. The notice was in substantially the same terms as the notice dated 14 May 1991 but in the June notice the persons under investigation were identified as being Mr Smith and WSTC and also a number of other companies additional to those set out in the list enclosed with the earlier notice. The names of the persons under investigation concluded with the words '. . . and related companies and persons'.

The final paragraph of the notice dated 20 June was in these terms: 'All files, documents and papers relating to the persons under investigation.' On 5 February 1992 a third notice under s 2 of the 1987 Act was sent to Mr Davies. This notice was in similar terms to the earlier notice save that (a) the persons under investigation were stated to be 'Wallace Duncan Smith, Wallace Smith Trust Company Limited and related companies and persons'; and (b) the last paragraph of the letter was in these terms --

'I have reason to believe that you have relevant information about the affairs of the persons under investigation, and I therefore require you to answer questions or otherwise furnish information to me with respect to matters relevant to the investigation at Elm House . . . on Thursday 13 February 1992 at [as amended on 13 February] 2.30 p.m. I also require you to produce to me at the same place on the same date at the same time the following documents which appear to me to relate to matters relevant to the investigation: All audit working papers and any additional documents and records in the possession of Coopers Lybrand Deloitte which support the audit opinions on the financial statements of Wallace Smith Trust Company Limited for the year ended 30 April 1987 and for the year ended 30 April 1990.'

In addition, on 5 February 1992 a notice under s 2 of the 1987 Act was served on Mr W Ginsberg, who had been a manager employed by Deloitte and who subsequently became a manager in the audit department of Coopers. The notice served on Mr Ginsberg was in the same terms as the notice served on Mr Davies on 5 February 1992 save that he was asked to attend at Elm House at 10.30 am on 13 February.

On 13 February 1992 Mr Davies and Mr Ginsberg duly attended for interviews at Elm House, the offices of the SFO. The interviews were recorded and tapes of the interviews together with transcripts were subsequently prepared. In both cases the tapes of the interviews extended over three tapes.

[1996] 4 All ER 403, [1997] 1 WLR 257

I shall have to refer later to the correspondence which took place before these interviews were arranged.

The proceedings and the application for production of documents

The first writ in these proceedings was issued in July 1992 and further writs were issued in 1993. A consolidated statement of claim was served on 22 July 1994.

It was alleged in the statement of claim that both Deloitte and Coopers had held themselves out as being firms which had particular experience and knowledge of the banking industry. It was further alleged that both firms were in breach of implied terms of their respective contracts of engagement and were also in breach of the duties owed by them to WSTC in tort. The allegations of breach and of negligence included allegations that in planning and conducting the audits of WSTC and in making their reports to the board and to the shareholders the two firms: (a) had failed to review the business and internal controls of WSTC properly or at all; and (b) had failed to acquire evidence of the assets held by WSTC and in particular had failed to count or arrange for the counting of financial instruments which were recorded as being in WSTC's custody or control.

In summary, it was alleged that the two firms as auditors were in breach of their duties both in contract and in tort in failing to detect that the business of WSTC was being conducted fraudulently. In para 48(1) of the statement of claim it was stated that the net deficiency of shareholders' funds as at 22 July 1994 was estimated as being about £ 98,413,076.

In July and August 1994 correspondence took place between the solicitors acting for the liquidators and the solicitors acting for the two firms (the defendants). The solicitors for the liquidators were seeking discovery and production of a number of documents including the documents which form the subject matter of the present appeal. By a letter dated 18 August 1994 the defendants' solicitors set out the documents for which public interest immunity was claimed.

On 13 September 1994 a summons was issued on behalf of the liquidators seeking the production for inspection of the documents for which public interest immunity was claimed by the defendants. The only documents with which we are presently concerned are those to which I have already referred, namely: the three tapes of the interview with Mr Davies on 13 February 1992; (b) the transcript of that interview; (c) the three tapes of the interview with Mr Ginsberg on 13 February 1992; (d) the transcript of that interview.

The summons for production for inspection of the tapes and transcripts was heard with certain other interlocutory applications by Carnwath J. On 21 December 1994 Carnwath J dismissed the liquidators' application.

The judgment of Carnwath J

Before turning to the arguments before the judge and the judge's judgment I should refer briefly to the rules relating to the discovery and inspection of documents. Under RSC Ord 24, r 2(1) a party to proceedings must make discovery by providing a list to the other party of all documents which are or have been in his possession, custody or power relating to any matter in question between them in the action. By Ord 24, r 9 a party is prima facie required to allow the other party to inspect the documents referred to in his list. But objections to production can be made and the issue will then have to be decided by the court.

Order 24, r 11(2) provides:

'. . . subject to rule 13(1) the Court may, on the application of any party to a cause or matter, order any other party to permit the party applying to inspect the documents in the possession, custody or power of that other party relating to any matter in question in the cause or matter.'

Order 24, r 13 provides:

'(1) No order for the production of any documents for inspection or to the Court, or for the supply of a copy of any document, shall be made under any of the foregoing rules unless the Court is of opinion that the order is necessary either for disposing fairly of the cause or matter or for saving costs.

(2) Where on an application under this Order for production of any document for inspection or to the Court, or for the supply of a copy of any document, privilege from such production or supply is claimed or objection is made to such production or supply on any other ground, the Court may inspect the document for the purpose of deciding whether the claim or objection is valid.'

Before the judge the defendant firms raised a number of objections to the production of the tapes and the transcripts. The two main objections, which were also the objections which were pursued in this court, were that the docu-

ments were protected by the principle of public interest immunity and that in any event it had not been shown that their production was necessary within the terms of r 13.

The judge dealt first with the claim to public interest immunity. Earlier in his judgment he had outlined the circumstances in which copies of the tapes and the transcripts had come into the possession of the defendants. I shall have to refer to the relevant correspondence later. The judge noted that there had been no absolute assurance by the SFO of confidentiality in respect of the interviews and that the SFO had not objected to disclosure of the documents. He referred to some recent authorities, including the decision of the House of Lords in Ex p Wiley [1994] 3 All ER 420, [1995] 1 AC 274, and he rejected the claim of public interest immunity. He also rejected a variant of this claim which had been referred to before him as a form of 'quasi-privilege'.

The judge next turned to consider whether production should be ordered in the light of the test of 'necessary' in Ord 24, r 13. He expressed his conclusion as follows:

'In the present context, in my view, it is relevant that the documents in this case came into existence under statutory compulsion. It is also relevant that they are not themselves part of the story, but are subsequent reconstructions by potential witnesses. Fair disposal under current procedures normally requires that the parties should have the opportunity to hear and question relevant witnesses in person, and that they should have advance notice of what they will say in the form of witness statements. It does not require that they should be assisted by prior interviews by public authorities carried out under statutory powers. Of course, there may be cases where the results of an earlier investigation will be of special value, particularly where the trial is significantly delayed. However I do not see this as an overriding factor in this case. We are dealing with professional witnesses who will be relying to a large extent on their own contemporary notes and other documents. The events in question extended back over seven years prior to the interview. It is unlikely that their recollections will be materially affected by the lapse of the further time to trial. This leaves only the possibility that there may be matters in the interviews which would provide fuel for cross-examination. However, this is pure speculation at least at the present stage . . . on the present evidence I am not persuaded that the production of these documents is necessary for fair disposal of the cause . . .'

Arguments on the appeal on Ord 24, r 13

The argument on behalf of the liquidators was advanced on the following lines.

(1) The general principle underlying discovery was that set out by Brett LJ in Cie Financihre et Commerciale du Pacifique v Peruvian Guano Co (1882) 11 QBD 55 at 63, where he said:

'It seems to me that every document relates to the matters in question in the action, which not only would be evidence upon any issue, but also which, it is reasonable to suppose, contains information which may -- not which must -- either directly or indirectly enable the party requiring the affidavit either to advance his own case or to damage the case of his adversary . . . a document can properly be said to contain information which may enable the party requiring the affidavit either to advance his own case or to damage the case of his adversary, if it is a document which may fairly lead him to a train of inquiry, which may have either of these two consequences . . .' (Brett LJ's emphasis.)

(2) In the present case it was true that the liquidators had been supplied with the witness statements of Mr Davies and Mr Ginsberg but these had been much abridged. The tapes and the transcripts contained accounts given in February 1992 by Mr Davies and Mr Ginsberg of their roles in the audits of the plaintiff. The trial of the action had been fixed for June 1997. Mr Davies and Mr Ginsberg might not give evidence until late 1997, which would be nearly six years after the interview.

(3) The interviews would contain answers to questions posed by experienced investigators who had by then acquired a detailed knowledge of the case. Moreover, as the answers were intended to provide material for evidence at a criminal trial they were likely to be considered and frank. The witness statements on the other hand would have been subjected to some editing.

(4) At the trial of Mr Smith, which concluded in February 1994, the evidence was directed to the events in 1990 and 1991. The interviews, however, would have covered the whole period of the relevant audits.

(5) The tapes and the interviews would have contained expressions of opinion which would have been removed for the purpose of the preparation of the witness statements.

(6) The tapes and transcripts would be a useful source of material for cross-examination and might contain admissions. One of the crucial issues at the trial was whether the auditors had any suspicions about the activities of Mr Smith.

(7) The tapes and transcripts were also likely to disclose some information as to what Mr Smith had said to the SFO.

(8) The tapes and transcripts were clearly necessary for the fair disposal of the action. Without them the liquidators would be left with a sense of unfairness. At this stage the liquidators could not be sure what the tapes and transcripts contained, but they were clearly of direct relevance to the issues in this case and the accounts given by Mr Davies and Mr Ginsberg at the beginning of 1992 were recorded at a time when their recollection of the relevant events was still quite fresh.

(9) In any event the judge could not properly have ruled against the liquidators without inspecting the documents himself. In this context we were referred to passages in the speeches in Science Research Council v Nassi, BL Cars Ltd (formerly Leyland Cars) v Vyas [1979] 3 All ER 673, [1980] AC 1028, and in particular to the speech of Lord Salmon, where he said:

'In my view, it would be impossible for a tribunal to decide whether the disclosure of confidential documents was necessary for fairly disposing of the proceedings without examining the documents.' (See [1979] 3 All ER 673 at 685, [1980] AC 1028 at 1072.)

On behalf of the defendants, on the other hand, it was submitted that the liquidators' application was based on a fundamental misconception that the tests for discovery on the one hand and for production for inspection on the other hand were the same. As Parker LJ explained in Ventouris v Mountain [1991] 3 All ER 472 at 486, [1991] 1 WLR 607 at 622, in a case involving r 13 'the burden is on the applying party to satisfy the court that production is necessary for the purposes specified' (Parker LJ's emphasis). Moreover the court will not inspect the documents itself unless a prima facie case has been made out that the documents are necessary for the fair disposal of the action or for saving costs.

In the present case, it was said, the liquidators had already been provided with copies of the witness statements and knew the evidence which had been given by Mr Davies and Mr Ginsberg at the trial of Mr Smith. The judge's conclusion that the tapes and the transcripts were not necessary was correct, and, moreover, was made by the judge in the exercise of his discretion. The Court of Appeal could not interfere with that discretion unless the judge had acted on some wrong principle or had been clearly wrong. It was relevant, as the judge accepted, that the documents came into existence under statutory compulsion and were merely a subsequent reconstruction of the relevant events. It was a pure speculation to assume that the interviews might provide material for cross-examination. Our attention was drawn to a passage in the judgment of Bingham MR in Taylor v Anderton (Police Complaints Authority intervening) [1995] 2 All ER 420 at 434, [1995] 1 WLR 447 at 462, where he said:

'The crucial consideration is, in my judgment, the meaning of the expression "disposing fairly of the cause or matter". Those words direct attention to the question whether inspection is necessary for the fair determination of the matter, whether by trial or otherwise. The purpose of the rule is to ensure that one party does not enjoy an unfair advantage or suffer an unfair disadvantage in the litigation as the result of a document not being produced for inspection. It is, I think, of no importance that a party is curious about the contents of a document or would like to know the contents of it if he suffers no litigious disadvantage by not seeing it and would gain no litigious advantage by seeing it. That, in my judgment, is the test.'

Accordingly, it was submitted on behalf of the defendants, the judge's decision should not be disturbed. The liquidators might be curious about the contents of the tapes but that was not enough.

The application under Ord 24, r 13: conclusions

I shall consider later the impact of the principles of public interest immunity. At this stage I am concerned with the question whether, subject to any immunity from production, the test laid down in Ord 24, r 13 has been satisfied.

I can start by setting out what I consider to be the correct approach.

(1) The general principles underlying discovery remain those contained in the judgment of the Court of Appeal in the Peruvian Guano case. I anticipate, however, that these principles and the present practice may have to be re-examined in the near future. The scope of discovery in a complex action imposes obligations with regard to the examination and identification of documents which are often extremely expensive properly to fulfil.

(2) In a case, however, where the court is asked to make an order for the production of documents for inspection it is clear that an order is not to be made unless the court 'is of opinion that the order is necessary either for disposing fairly of the cause or matter or for saving costs'.

[1996] 4 All ER 403, [1997] 1 WLR 257

(3) It is for the party making the application for production to satisfy the court that the test of necessity is satisfied (see Ventouris v Mountain [1991] 3 All ER 472 at 486, [1991] 1 WLR 607 at 622 per Parker LJ).

(4) In considering the application the court should bear in mind the words of Bingham MR in Taylor v Anderton [1995] 2 All ER 420 at 434, [1995] 1 WLR 447 at 462 that the 'purpose of the rule is to ensure that one party does not enjoy an unfair advantage or suffer an unfair disadvantage in the litigation as the result of a document not being produced for inspection'.

(5) In addition the court is entitled to take into account whether the documents are confidential and, if so, whether the necessary information could be obtained by some other means. In Science Research Council v Nassi discovery was sought, in the context of a complaint of discrimination, of the records of other persons interviewed for the post for which the complainant had applied. In giving guidance on the matter, Lord Wilberforce said ([1979] 3 All ER 673 at 679-680, [1980] AC 1028 at 1065-1066):

'There is no principle in English law by which documents are protected from discovery by reason of confidentiality alone. But there is no reason why, in the exercise of its discretion to order discovery, the tribunal should not have regard to the fact that documents are confidential, and that to order disclosure would involve a breach of confidence . . . The ultimate test in discrimination (as in other) proceedings is whether discovery is necessary for disposing fairly of the proceedings. If it is, then discovery must be ordered notwithstanding confidentiality. But where the court is impressed with the need to preserve confidentiality in a particular case, it will consider carefully whether the necessary information has been or can be obtained by other means, not involving a breach of confidence . . . In order to reach a conclusion whether discovery is necessary notwithstanding confidentiality the tribunal should inspect the documents. It will naturally consider whether justice can be done by special measures such as "covering up", substituting anonymous references for specific names, or, in rare cases, hearing in camera.'

We were also referred to a passage to the same effect in the judgment of Parker LJ in Dolling-Baker v Merrett [1991] 2 All ER 890 at 895, [1990] 1 WLR 1205 at 1211. As Bingham LJ explained in Ventouris v Mountain [1991] 3 All ER 472 at 485, [1991] 1 WLR 607 at 622:

'While the court's ultimate concern must always be to ensure the fair disposal of the cause or matter, it need not be unmindful of other legitimate concerns nor is it powerless to control the terms on which production and inspection may be ordered.'

(6) The court should examine the facts of the individual case and in particular should consider: (a) the central issues in the action; (b) the nature of the documents; and (c) the information which the documents are likely to contain.

This was the approach which was adopted by Arden J in Kaufmann v Credit Lyonnais Bank (1995) Times, 1 February, where she set out the material which she thought that the applicants for production would hope to find in the documents sought.

(7) The judge has a discretion whether or not to inspect the documents. But if the party seeking discovery shows that the production of the documents may be necessary for the fair disposal of the action an order should normally only be refused after the court has examined the documents and considered them in the light of the material already in the applicant's possession. Indeed, as is apparent from the speech of Lord Wilberforce in Science Research Council v Nassi [1979] 3 All ER 673 at 680, [1979] 3 WLR 762 at 769-770 the court will need to inspect the documents where relevance is admitted but it is asserted that the documents are confidential. Similarly, inspection is likely to be the only safe course where it seems probable that the documents contain a version of events given soon after their occurrence and at a time when the recollection of the witness would have been fresh.

I turn then to apply these propositions to the facts of the present case.

I have well in mind the passage in the judgment of Asquith LJ in Bellenden (formerly Satterthwaite) v Satterthwaite [1948] 1 All ER 343 at 345 as to the limited circumstances in which an appellate court can interfere with a judicial discretion. It seems to me, however, with the greatest respect to the judge, that, unless protected by some immunity, these tapes and transcripts are undoubtedly likely to contain material necessary for the fair disposal of this action. In the months preceding the interviews, as is apparent from the documents to which I shall shortly refer, an internal inquiry was carried out by Coopers into the events leading up to the liquidation of WSTC. In February 1992 therefore Mr Davies and Mr Ginsberg must have had the matters which will be relevant to the issues in these proceedings at their fingertips. The tapes are likely to include not only matters of fact but expressions of opinion. Moreover, they are likely to pro-

vide an insight into the state of knowledge of the auditors in the period leading up to the collapse of WSTC. I would therefore allow the appeal.

In my judgment the judge misdirected himself in failing to inspect the documents. I consider that this court is therefore entitled to exercise its own discretion.

I must turn next therefore to the matters raised by the respondent's notice.

Public interest immunity: the argument

It was argued on behalf of the defendant firms that the tapes and the transcripts were protected from production by the principles of public interest immunity. Before I consider this argument in detail it is necessary to refer to the legislative background against which the tapes and the transcripts came into existence and to some of the correspondence which took place in 1992 and 1994.

The SFO was established by the 1987 Act. Section 1(3) of the 1987 Act provides: 'The Director may investigate any suspected offence which appears to him on reasonable grounds to involve serious or complex fraud.' Section 2 of the 1987 Act sets out the 'investigation powers' of the director. Section 2(2) (as amended) is in these terms:

'The Director may by notice in writing require the person whose affairs are to be investigated ("the person under investigation") or any other person whom he has reason to believe has relevant information to answer questions or otherwise furnish information with respect to any matter relevant to the investigation at a specified place and either at a specified time or forthwith.'

Section 3 is concerned with the disclosure of information obtained by the SFO. Section 3(4) provides:

'Without prejudice to his power to enter into agreements apart from this subsection, the Director may enter into a written agreement for the supply of information to or by him subject, in either case, to an obligation not to disclose the information concerned otherwise than for a specified purpose.'

By s 3(5), information can be disclosed to 'any competent authority'. By s 3(6) competent authorities include the Official Receiver but do not include other liquidators.

I turn next to the correspondence.

In 1991 Coopers carried out a review of the work that had been done earlier on the auditing of the accounts of WSTC. This review was referred to in a letter from the defendants' solicitors to the SFO dated 10 January 1992 when it was said that all the files in their possession had been collected 'partly to assist them in undertaking internal reviews of their own work and partly to facilitate inspection by members of the SFO in due course'. Later in the letter the solicitors wrote:

'We should be grateful if you would confirm that the liquidators of [the bank] have not been shown or provided with copies of any of the documents which the SFO have received from our clients pursuant to the Section 2 Notice. Could you please also confirm that the SFO will not give such access or provide any such copies in the future.'

The SFO replied on 17 January 1992. The writer said: 'I can confirm that documents obtained under section 2 of the Criminal Justice Act 1987 are treated as confidential.'

The defendants' solicitors returned to the question of confidentiality shortly before the interviews took place. On 11 February 1992 they wrote:

'We note that documents obtained under Section 2 of the Criminal Justice Act 1987 are treated by your office as confidential. Nonetheless, we should still be grateful to receive the specific confirmations requested in the last paragraph of our letter.'

As far as I have seen there was no reply by the SFO to that request for 'specific confirmations'.

The interviews took place on 13 February 1992. Three weeks later, on 6 March 1992, the SFO wrote to the defendants' solicitors to inform them that draft witness statements had been prepared following the interviews. The letter continued:

'As you will see, I have attempted to keep both statements as short as possible and, to the maximum extent possible, have restricted the contents to matters of fact, as opposed to matters of opinion . . . As agreed at the interviews on 13 February, I also enclose copies of the tapes of the interviews and unchecked copies of the transcript of these interviews.'

[1996] 4 All ER 403, [1997] 1 WLR 257

Finally, I should refer to the correspondence which took place in October 1994 between the solicitors acting for the liquidators and the SFO. In a letter dated 4 October 1994 the liquidators' solicitors referred to the fact that a claim to immunity had been made. The letter to the SFO continued:

'In advance of receiving details of the claim, it would be most helpful if you could confirm the following points to me: (1) Were the documents that have been disclosed to [the plaintiffs] (as on the attached schedule) disclosed to the defence? (2) Does the Crown believe that public interest immunity exists to cover these classes of documents?; and (3) Has any claim for public interest immunity been made by the Crown in respect of these particular documents?'

On 7 October 1994 the SFO replied:

'1. All matters referred to in your schedule were disclosed to the defendant as part of the prosecution's duty in the criminal trial. 2. The documents referred to in the schedule as between prosecution and defence: I do not believe that PII could be claimed in respect of these documents. 3. I am not aware of any claim to public interest immunity having been made by the prosecution at any stage in these proceedings in respect of the documents referred to in your schedule.'

I come now to the arguments advanced on behalf of the defendants.

It was submitted that the principles which preclude the disclosure of documents on the grounds of the public interest apply broadly to three categories of documents. (a) Documents which contain state secrets or which are concerned with such matters as national security or the workings of central government. (b) Documents which contain information disclosed to public bodies on a confidential basis, where knowledge of the possibility of wider disclosure might inhibit the free flow of information or discourage candour. (c) Documents containing information disclosed to public bodies under compulsion of law.

It was submitted that the transcripts and tapes fell into category (c).

Counsel drew our attention to passages in the speech of Lord Mustill in Smith v Director of Serious Fraud Office [1992] 3 All ER 456 at 463-464, [1993] AC 1 at 30 where he referred to the several immunities which are commonly grouped under the title of 'a right to silence'. These immunities are of great importance and they are all concerned with the protection of citizens against the abuse of powers by those investigating crimes.

In the present case, it was emphasised, the tapes and transcripts came into existence by reason of the special powers conferred on the SFO by the 1987 Act. The 1987 Act contained detailed provisions setting out the use which the SFO might make of the information which was provided to it and the persons to whom that information might be disclosed.

The fact that copies of the tapes and transcripts were in the hands of the defendants did not remove the public interest immunity. If the immunity ceased to exist when documents reached the hands of witnesses, it would be likely that in future witnesses would be careful to decline to accept such documents.

I have not been persuaded by these submissions.

Lord Mustill's analysis of the right of silence was concerned with the protection of an individual from self-incrimination. The tapes and transcripts came into existence for the purpose of the trial of Mr Smith and perhaps some of the companies which were being investigated. Mr Davies and Mr Ginsberg were witnesses for the prosecution. As Lord Woolf underlined in Ex p Wiley [1994] 3 All ER 420 at 446, [1995] 1 AC 274 at 305: 'The recognition of a new class-based public interest immunity requires clear and compelling evidence that it is necessary.' The trial of Mr Smith has been concluded. It is unnecessary to decide whether the records of these interviews have any public interest immunity in the hands of the SFO, though it is to be noted that the SFO do not claim such an immunity. But I can see no basis on which the auditors can claim such an immunity for the copies of the tapes and transcripts in their hands.

I am satisfied that the claim to public interest immunity is without foundation. I would therefore allow the appeal and reject the matters raised in the respondent's notice.

In these circumstances I would direct that the matter should be referred back to the judge so that he can inspect the documents himself.

**JUDGMENTBY-2:** SIMON BROWN LJ

**JUDGMENT-2:**

[1996] 4 All ER 403, [1997] 1 WLR 257

SIMON BROWN LJ: On 13 February 1992 the defendants' audit partner, Mr Davies, and manager, Mr Ginsberg, were interviewed by the Serious Fraud Office (the SFO) with regard to the collapse of the plaintiff bank. Copies of the tapes and transcripts of those interviews (the documents) were, as earlier requested, sent to them on 6 March 1992. The liquidators, unsurprisingly, wish to see them. This interlocutory appeal concerns whether or not they may.

The relevancy of the documents to the issues raised in the action is not in dispute. The defendants, however, object to their production for inspection. The central question arising is whether or not that objection is soundly based. Carnwath J held that it was, on the ground that production is not necessary for disposing fairly of the action. Against that ruling the plaintiff appeals. The defendants for their part by respondent's notice challenge the judge's rejection of their alternative objection on public interest immunity grounds.

Although I agree with all that Neill LJ has said and gratefully adopt his detailed exposition of the facts, the arguments, and the main provisions of the Criminal Justice Act 1987 in play, I would nevertheless wish to add a short judgment of my own.

The appeal: is production necessary here?

The directly relevant words in RSC Ord 24 are these:

'. . . 11. -- (1) If a party . . . (b) objects to produce any document for inspection . . . then, subject to rule 13(1), the Court may, on the application of the party entitled to inspection, make an order for production of the documents in question for inspection . . .

13. -- (1) No order for the production of any documents for inspection . . . shall be made under any of the foregoing rules unless the Court is of opinion that the order is necessary either for disposing fairly of the cause or matter or for saving costs.

(2) Where on an application under this Order for production of any document for inspection . . . objection is made to such production . . . the Court may inspect the document for the purpose of deciding whether the . . . objection is valid.'

I take the basic principles governing the proper application of these rules to be as follows.

(1) The burden lies upon the party holding the documents to show that they are not discoverable, ie not relevant. (There is, I repeat, no present issue as to that.)

(2) The burden lies on the party seeking inspection to show that that is necessary for the fair disposal of the action. (I need not refer further to the question of 'saving costs', the other limb of r 13(1), that not being relevant here.)

(3) If no element of confidentiality (or, of course, public interest immunity -- but that only becomes relevant on the cross-appeal) is asserted in the documents, routinely they will be produced for inspection without the need for a r 13 hearing on the issue of necessity. As Lord Scarman said in Air Canada v Secretary of State for Trade (No 2) [1983] 1 All ER 910 at 924, [1983] 2 AC 394 at 444:

'It may well be that, where there is no claim of confidentiality or public interest immunity or any objection on the ground of privilege, the courts follow a relaxed practice, allowing production on the basis of relevance. This is sensible, bearing in mind the extended meaning given to relevance in Compagnie Financihre et Commerciale du Pacifique v Peruvian Guano Co (1882) 11 QBD 55.'

(4) If, however, confidentiality is asserted or any other ground of objection arises, r 13 assumes relevance and it becomes necessary to decide whether inspection is necessary for the fair disposal of the action. As Lord Scarman had earlier said in Science Research Council v Nassi, BL Cars Ltd (formerly Leyland Cars) v Vyas [1979] 3 All ER 673 at 699, [1980] AC 1028 at 1089:

'The only complicating factor is the confidential nature of relevant documents in the possession of the party from whom redress is sought. The production of some of these may be necessary for doing justice to the applicant's case. If production is necessary, they must be produced. The factor of confidence however militates against general orders for discovery and does impose upon the tribunal the duty of satisfying itself, by inspection if need be, that justice requires disclosure.'

(5) Disclosure will be necessary if: (a) it will give 'litigious advantage' to the party seeking inspection (see Taylor v Anderton (Police Complaints Authority intervening) [1995] 2 All ER 420 at 434, [1995] 1 WLR 447 at 462 per Bing-

ham MR); (b) the information sought is not otherwise available to that party by, for example, admissions, or some other form of proceeding (eg interrogatories) or from some other source (see eg Dolling-Baker v Merrett [1991] 2 All ER 890 at 899, [1990] 1 WLR 1205 at 1214); and (c) such order for disclosure would not be oppressive, perhaps because of the sheer volume of the documents (see eg Nassi [1979] 3 All ER 673 at 688, [1980] AC 1028 at 1076 per Lord Edmund-Davies).

(6) If a prima facie case is made out for disclosure, then as several of the speeches in Nassi make plain, the court will first inspect the documents: (a) to ensure that inspection is indeed necessary (that very safeguard of itself making the court generally readier to accept that the threshold test for disclosure is satisfied) and (b) assuming it is, to see if the loss of confidentiality involved can be mitigated by: (i) blanking out parts of the documents, and/or (ii) limiting disclosure to legal advisers only.

Those basic principles I have sought to distil from all the many authorities which were placed before us. Several passages in the various judgments are relevant; it would however be wearisome and, I think, ultimately unproductive to cite them.

Turning to the present appeal, the first question to ask must be this: were these principles properly recognised and applied by the judge below? If they were, the evaluation of the relevant factual considerations was essentially a matter for him and this court would inevitably be most reluctant to interfere.

Mr Hapgood QC for the appellant criticises the judge's approach in two particular respects. First and foremost for acceding to Mr Croxford QC's argument, repeated before us, derived essentially from this court's decision in Dolling-Baker v Merrett, to the effect that the court's task under r 13 is to strike a balance between the likely utility of the documents at trial and, in this particular instance, the defendants' legitimate concern as to their intrinsic confidentiality. Second, he criticises the judge for relying, at least in part, on Macmillan Inc v Bishopsgate Investment Trust Ltd [1993] 4 All ER 998, [1993] 1 WLR 1372, a decision of this court which he says is of no help but rather, in the present circumstances, calculated to mislead the court. Let me take each in turn.

(1) Dolling-Baker v Merrett

The relevant passage in Carnwath J's judgment below is as follows:

'In the normal case, therefore, where documents are shown to be relevant, particularly if they are contemporary with the matters in dispute, the court will require little persuasion that their production is necessary in the interests of fair disposal. However, as Dolling-Baker shows, in special cases the court can and should take into account the genesis of the document, and may balance its likely utility in the trial against other factors: in that case the "implied obligation" of privacy. In the present context, in my view, it is relevant that the documents in this case came into existence under statutory compulsion.'

The first point that Mr Hapgood takes in this regard is that no question of confidentiality arises in the present case at all. The fact that these documents came into existence under statutory compulsion is, he submits, nothing to the point: these are the defendants' documents, containing their own account of matters within their own knowledge, in their possession at their own request. The whole process of discovery is by definition an invasion of confidentiality and day after day it requires parties routinely to disclose their private documents. Only when third party confidentiality of one sort or another is involved -- for example through an implied undertaking to disclose to arbitration proceedings as in Dolling-Baker v Merrett itself, or an employer's duty to employees as in Nassi -- does there arise the element of special confidentiality relevant for r 13 purposes. This submission I would reject. Whatever may be the impact of statutory compulsion upon the public interest immunity claim here, in my judgment it suffices at least to found a proper assertion of confidentiality in the documents.

It by no means follows, however, that such confidentiality then falls to be weighed against the likely utility of these documents to the plaintiff in the manner adopted by the judge. On this point rather I could accept Mr Hapgood's submissions to the contrary. As stated, once it is recognised that inspection of the documents may give 'litigious advantage' to the party seeking it, then, assuming, as is here plain, that the information they contain is not otherwise going to be available to that party, and that disclosure would not be oppressive, the threshold test for inspection is made out and the court can only properly refuse disclosure if, having itself first inspected the documents, it concludes that they will not after all assist him. Confidentiality at this point is frankly immaterial (save as to possible partial blanking out or limiting inspection to legal advisers), unless only 'the probative value of [the] documents [is] . . . clearly . . . so slight as to render unjustifiable an order for their inspection' (see Nassi [1979] 3 All ER 673 at 688, [1980] AC 1028 at 1076 per Lord Edmund-Davies). 'Probative value' in this context, having regard to the Peruvian Guano principle, must refer to the

documents' overall use in the proceedings. Nothing short of such a finding -- one which in effect destroys the contended for 'litigious advantage' -- would justify a refusal to order inspection.

What above all needs to be emphasised is that there is no balancing exercise to be performed under r 13. The weighing of loss of confidentiality on the one hand against litigious disadvantage on the other is, obviously, difficult enough at the best of times: these are wholly disparate interests not readily matched against one another. Such a task is, of course, necessary if and when a prima facie claim to public interest immunity is made out. It is not, however, desirable to introduce this difficulty in some diluted form into the present type of r 13 proceedings; that rather is wholly unnecessary and inappropriate (see Nassi [1979] 3 All ER 673 at 681, [1980] AC 1028 at 1066 per Lord Wilberforce).

(2) Macmillan v Bishopsgate Investment Trust

Macmillan was a case where a plaintiff unsuccessfully sought to subpoena a witness to produce documents whilst that witness was giving evidence for the defendant, the plaintiff hoping that such documents might provide fuel for cross-examination.

As Mr Hapgood points out, very different considerations arise in Ord 38 proceedings of that nature, not least because there is no Peruvian Guano dimension to such a case. The position there is, perhaps, more akin to that regarding the disclosure of documents by third parties in criminal proceedings: see R v Reading Justices, ex p Berkshire CC [1996] 1 Cr App R 239.

In referring (twice) to Macmillan, in terms suggesting that he found it a useful analogy, Carnwath J, it is said, allowed himself to become deflected from the true question, the question whether the documents here in question might assist the preparation of the plaintiffs' case in any material way whatever? I acknowledge that possibility, but, were this criticism to stand alone, would not myself find it a sufficient basis for concluding that the judge so misdirected himself in law as to entitle, indeed require, this court to exercise a fresh discretion in the matter. Having regard, however, to the judge's error, as I see it, on the Dolling-Baker v Merrett question, I conclude that that is indeed now the position.

As to how our discretion ought now to be exercised in the matter, I agree entirely with all that Neill LJ has said. Two authorities in particular are closely in point: Arbuthnott v Fagan (1994) Independent, 11 July, [1994] CA Transcript 841 and Kaufmann v Credit Lyonnais Bank (1995) Times, 1 February. An ample prima facie case is here made out on the facts for the matter to be remitted to the judge below so that he may inspect the documents in line with the sixth and last of the basic principles I earlier sought to identify.

The respondent's notice -- are these documents protected by public interest immunity?

There is little I wish to say on this part of the case.

Clearly it is necessary first to disentangle two questions. (i) Do these documents attract public interest immunity in the hands of the SFO? (ii) Do they attract public interest immunity in the defendants' own hands?

Assuming, without deciding, that despite the House of Lords decision in Re Arrows Ltd (No 4), Hamilton v Naviede [1994] 3 All ER 814, [1995] 2 AC 75, question (i) falls to be answered Yes -- as this court's decision in Lonrho plc v Fayed (No 4) [1994] 1 All ER 870, [1994] QB 775 strongly suggests -- it is nevertheless in my judgment plain that the answer to question (ii) is No. On this second question, indeed, I regard Lonrho as decisive. Mr Croxford submits that only a Secretary of State -- and not, therefore, the SFO -- can disclose documents prima facie within a recognised public interest immunity class, a submission founded upon a passage in Lord Woolf's speech in R v Chief Constable of West Midlands Police, ex p Wiley, R v Chief Constable of the Nottinghamshire Constabulary, ex p Sunderland [1994] 3 All ER 420 at 438, [1995] 1 AC 274 at 296. Let me assume that is so. I nevertheless fail to see how it assists the defendants here. Rather it begs the very question which falls for determination: the question whether, given that the documents are already in the defendants' hands -- and given too, as is clearly the case, that the nature of these particular documents is not such (as, for example, in fields like national security or international relations) that public interest immunity must inevitably cover the documents in whosesoever hands they may be -- public interest immunity attaches to the documents in the first place. In my judgment it does not.

In the result, therefore, I too would allow the appeal and dismiss the respondent's notice.

**JUDGMENTBY-3:** WAITE LJ

**JUDGMENT-3:**

[1996] 4 All ER 403, [1997] 1 WLR 257

WAITE LJ: I agree with both judgments.

**DISPOSITION:**

Appeal allowed. Respondent's notice dismissed.

**SOLICITORS:**

Allen & Overy; Barlow Lyde & Gilbert

.

8

8 of 8 DOCUMENTS

X AG and others v A bank

QUEEN'S BENCH DIVISION (COMMERCIAL COURT)

*[1983] 2 All ER 464, [1983] Com LR 134, [1983] 2 Lloyd's Rep 535*

**HEARING-DATES:** 24, 25, 26, 27 JANUARY 1983

27 JANUARY 1983

**CATCHWORDS:**

Conflict of laws -- Contract -- Proper law of contract -- Swiss company having account with London branch of New York bank -- Relationship between bank and customer commencing in London -- Whether proper law of banking contract English law or New York law.

Conflict of laws -- Foreign order -- Enforcement -- New York subpoena -- Swiss company having account with London branch of American bank -- New York court issuing subpoena against bank to produce documents relating to company held by London branch of bank -- Production of documents likely to constitute breach of banking contract and breach of bank's duty of confidentiality -- Whether private interest of confidentiality between banker and customer should prevail over duty of disclosure to foreign court -- Whether court should restrain bank from disclosing documents.

Injunction -- Balance of convenience -- Bank -- Confidential information between bank and customer -- Bank seeking to comply with foreign subpoena to produce in foreign court documents belonging to customer -- Disclosure of documents likely to harm customer beyond adequate compensation -- Bank fearing it would be liable to proceedings in foreign court for contempt of court if documents not produced -- Whether court should grant injunction restraining bank from complying with subpoena.

**HEADNOTE:**

The plaintiffs, X, a multinational corporation incorporated under Swiss law and based in Switzerland, and Y, an American subsidiary of X incorporated in Switzerland but having a major branch in New York, were both companies concerned in the marketing of oil, metals and fertilizers. X conducted its business wholly outside the United States and all its books and records were kept in Switzerland. Y handled business emanating from and destined for New York, but its other business was operated from Switzerland. Both plaintiffs had accounts with the London branch of the defendant, an American bank, that branch being used for a major part of the plaintiffs' general banking operations. In 1977 investigations were commenced by the United States Department of Justice into the crude oil industry as a result of which the investigators wished to produce before a federal grand jury documents belonging to the plaintiffs. When the plaintiffs refused to produce certain documents, on the ground that they were not subject to the jurisdiction of the United States courts, a subpoena was served on the bank to produce all documents relating to any accounts maintained by the plaintiffs at the bank's London branch. The bank declared its intention to comply with the subpoena, whereupon the plaintiffs sought and were granted injunctions in the High Court to restrain the bank from producing the documents, on the grounds that if the bank were to produce the documents it would thereby be in breach of the duty of confidentiality it owed to the plaintiffs. An order was then obtained in the New York District Court, ex parte and in camera, requiring the bank to comply with the subpoena. In proceedings by the plaintiffs to continue the injunction, the bank conceded that it was under a duty of confidentiality towards the plaintiffs and that disclosure of the documents under the subpoena would constitute a breach of that duty but it claimed that the subpoena required the production of all bank records over which the bank had control regardless of their location and that if the bank failed to comply with the subpoena it would, as a United States corporation, be subject to proceedings for contempt of court in the United States. The bank contended (i) that the proper law of the banking contract was New York law and therefore, since New York law governed both the subpoena and the contract, the order of the New York court relating to the subpoena should prevail over the contract, (ii) that, as a matter of law, an English court would not compel performance of, or enforce, a con-

tract if performance of the contract required the doing of an act which violated the law of the place of performance, at least where the person required to do the act was resident in or amenable to the law of the place of performance, and, therefore, since the contract was to be performed at least partly in New York, an English court would not compel the bank to perform its contractual obligation of confidentiality to the plaintiffs when to do so violated the law of New York, (iii) that an English court would not prevent a party to a contract from doing an act in the place where the contract was to be performed when that party was obliged to do that act by the law of that place, and that as a matter of policy an English court should decline to impede legitimate proceedings in other jurisdictions or orders (such as the subpoena) issued in the course of such proceedings when directed to a person within the jurisdiction of the foreign court, and that the primary effect of the United States order was in New York and only incidentally in London, (iv) that the public policy of respecting the order of a foreign court should prevail over requiring a banker to preserve confidentiality in relation to his customer's accounts and dealings, and (v) that in any event the subpoena should prevail over the duty of confidentiality because the bank had a genuine and legitimate interest of its own in obeying a subpoena issued under the law of the country to which it was subject and avoiding the genuine and not unreasonable possibility of being held in contempt of court.

Held -- (1) Since instructions in relation to the plaintiffs' bank accounts were received and acted on in London, since the relationship of banker and customer was centred in London and since the plaintiffs had contemplated that their transactions with the bank would be governed by English law, it followed that English law was the proper law of the banking contract between the plaintiffs and the bank, not only because the branch with which the contracts were originally made was in London, but because that was where the relationship began and where the contract was made in circumstances such that the contract was to be taken to have had English law as its proper law from its inception (see p 474 h to p 475 b, post).

(2) It did not follow from the fact that the production of the documents had been ordered to be made in New York pursuant to the subpoena that confidentiality on the part of the bank could be said to have been rendered unlawful in New York, because a subpoena requiring disclosure was to be contrasted with legislation or a judgment requiring disclosure, since failure to produce the documents might be excused if an adequate excuse was produced and, furthermore, the subpoena and the subsequent order had been obtained without any form of hearing on the merits or inter partes (see p 475 g to j, p 476 a and p 480 e f, post).

(3) In determining whether the injunctions should be continued the court had to determine the balance of convenience, having regard to (a) the fact that the order of the New York court would take effect in London in breach of both a private interest, namely a contract between a banker and a customer, and the public interest in maintaining the obligation of confidentiality imposed on banks conducting business in the City of London, (b) the effect of the subpoena of the New York court and the fact that under the United States doctrine of foreign government compulsion the New York court would not hold the bank liable in contempt for complying with an injunction issued by a foreign court (i e the English court) which had jurisdiction over the branch where the documents were located (i e London) and would treat the English injunction as being an adequate excuse for the non-production of the documents, (c) the fact that, although the court would not be 'enforcing' a foreign revenue or penal law if the New York subpoena was permitted to be enforced in London, nevertheless the mere fact of not impeding the subpoena would involve a measure of assistance and approbation of the subpoena since, in particular, it would involve the court tolerating a breach of that obligation of confidentiality which in the ordinary course it would maintain in the public interest, and (d) the fact that there was no evidence that delay in producing the documents caused by continuing the injunctions would be significant. Accordingly, the balance of convenience was between, on the one hand, impeding the New York court in the exercise in London of powers which, by English standards, were excessive without in so doing causing detriment to the bank, and, on the other hand, causing very considerable commercial harm to the plaintiffs by not continuing the injunctions. In the circumstances the balance of convenience clearly favoured the plaintiffs and accordingly the injunctions would be continued (see p 471 e f, p 473 a b d and h j, p 474 e to g, p 476 j to p 477 b, p 478 c to e and j and p 479 a to d and j to p 480 d and f g, post) American Cyanamid Co v Ethicon Ltd [1975] 1 All ER 504 applied Tournier v National Provincial and Union Bank of England [1923] All ER Rep 550, British Nylon Spinners Ltd v Imperial Chemical Industries Ltd [1952] 2 All ER 780, Regazzoni v K C Sethia (1944) Ltd [1957] 3 All ER 286, Rio Tinto Zinc Corp v Westinghouse Electric Corp [1978] 1 All ER 434 and British Steel Corp v Granada Television Ltd [1981] 1 All ER 417 considered.

**NOTES:**

For jurisdiction of the court to grant injunctions to restrain enforcement of a foreign judgment, see 8 Halsbury's Laws (4th edn) para 730, and for cases on the subject, see 11 Digest (Reissue) 641--642, 1747--1753.

**CASES-REF-TO:**

American Cyanamid Co v Ethicon Ltd [1975] 1 All ER 504, [1975] AC 396, [1975] 2 WLR 316, HL.
British Nylon Spinners Ltd v Imperial Chemical Industries Ltd [1952] 2 All ER 780, [1953] Ch 19, CA.
British Steel Corp v Granada Television Ltd [1981] 1 All ER 417, [1981] AC 1096, [1980] 3 WLR 774, Ch D, CA and HL.
Cable (Lord), Re, Garratt v Waters [1976] 3 All ER 417, [1977] 1 WLR 7.
Kleinwort Sons & Co v Ungarische Baumwolle Industrie AG and Hungarian General Creditbank [1939] 3 All ER 38, [1939] 2 KB 678, CA.
NWL Ltd v Woods, NWL Ltd v Nelson [1979] 3 All ER 614, [1979] 1 WLR 1294, HL.
Ralli Bros v Compaatnia Naviera Sota y Aznar [1920] 2 KB 287, [1920] All ER Rep 427, CA.
Regazzoni v K C Sethia (1944) Ltd [1957] 3 All ER 286, [1958] AC 301, [1957] 3 WLR 752, HL affg [1956] 2 All ER 487, [1956] 2 QB 490, [1956] 3 WLR 79, CA.
Rio Tinto Zinc Corp v Westinghouse Electric Corp, RTZ Services Ltd v Westinghouse Electric Corp [1978] 1 All ER 434, [1978] AC 547, [1978] 2 WLR 81, HL.
Tournier v National Provincial and Union Bank of England [1924] 1 KB 461, [1923] All ER Rep 550, CA.
US v First National City Bank (1968) 396 F 2d 897.

**INTRODUCTION:**

Interlocutory applications

By writs issued on 15 and 22 November 1982, the first plaintiffs, X AG, and the second plaintiffs, Y AG, severally brought actions against the defendants, an American bank, seeking a declaration that by virtue of the contract between the plaintiffs as customer and the branch of the defendants as bank, the defendants owed the plaintiffs a duty of secrecy and confidence in respect of the plaintiffs' accounts with the branch, all transactions thereon, all securities in respect thereof and all documents and information relating thereto, and an injunction restraining the defendants by themselves, their servants or agents or otherwise howsoever from passing to the head office of or to any other office or branch of the defendants or to any person any information or documents relating in any way whatsoever to any accounts maintained by the defendants in the name of the plaintiffs in London, any transactions thereon or connected therewith or any securities in respect thereof. By a writ issued on 19 November 1982 the third plaintiffs, Z Inc, sought an injunction in similar terms. On 25 November 1982 Lloyd J granted ex parte the injunctions sought and on 20 December 1982 they were renewed by Mustill J. The proceedings were adjourned for the hearing of full argument by the parties. The applications were heard in chambers but judgment was given by Leggatt J in open court. The facts are set out in the judgment.

**COUNSEL:**

Peter Cresswell and Ali Malek for the first and second plaintiffs.

Jonathan Hirst for the third plaintiffs.

Andrew Longmore for the bank.

**PANEL: LEGGATT J**

**JUDGMENTBY-1:** LEGGATT J

**JUDGMENT-1:**

LEGGATT J. There is before me an application in each of three actions. At the request of the parties, this judgment is given in open court. This is another of those cases in this court in which felicity must give way to celerity, in which the urgency of the matter must outweigh the desirability of reserving judgment in deference to the importance which both sides understandably ascribe to it. I shall refer to each of the plaintiffs by initials, arbitrarily selected, that is to say as the 'X company', the 'Y company' and the 'Z company', and the defendants, who are the same in each of the three applications, I shall refer to as 'the bank'. Although I cannot direct, I shall certainly expect that that anonymity will be preserved in any report of this judgment. The bank has its head office in New York and it is with the London branch of the bank that these applications are immediately concerned. The applications in the three actions have been heard together and all applications are in similar form. In short, they raise the question whether injunctions already is-

sued should be continued to trial so as to prevent obedience by the London branch of the bank to subpoenas issued in New York requiring production by the London branch of documents relating to an account of each of the three plaintiffs, who are customers of the bank, two of the plaintiffs being incorporated in Switzerland and one in Panama. The X company was formed under the laws of Switzerland in the early 1970s. It has over 40 offices located in some 30 different countries throughout the world. The Y company, which is a subsidiary of the X company, is also incorporated in Switzerland and has a major branch in New York. The Z company is a company associated with the X company, incorporated in Panama, but having its headquarters, like the X company, in Switzerland. The X company and its subsidiary, the Y company, are concerned in the marketing of crude oil and oil products, ferrous and non-ferrous ores and metals, and also fertilizers. Both the X company and the Z company conduct their business wholly outside the United States they have no presence there, that is to say no employees nor any business conducted there, and all the books of both companies, together with their records, are kept in Switzerland. The Y company, on the other hand, handles business emanating from and destined for New York, but its other business is operated from its headquarters in Switzerland and, in particular, through use of its London account with the London branch of the bank. Accounts have been maintained by the plaintiffs with the bank for some time now, in the case of the X company since 1975, of the Y company since 1978 and of the Z company since 1980.

The relationship enjoyed by the X company with the bank is explained in an affidavit by a gentleman who is, in effect, the company secretary of that plaintiff. He asserts that the company did not, in forming its relationship with the bank, contemplate that United States law would govern the banking relationship for the reason that, since that relationship would be centred in London, it was naturally contemplated that it would be subject to English law. It is a relationship which has grown over the years and the London branch of the bank is used by the X company for a major part of its general banking affairs, including loans, deposits, letters of credit, guarantees, confirmations, credit references and presentments. All the instructions from the X company emanate from Switzerland or via an English subsidiary of the X company. The X company uses the London branch as its centre for worldwide dollar denominated banking arrangements and that deponent asserts, in common with those who have sworn affidavits on behalf of the other plaintiffs, that the X company would not have placed any business with the London branch of the bank unless it was confident that its business secrets would remain secure in accordance with the stringent standards observed in London. This is of particular consequence in the context of letters of credit, because the documents held in the London branch in relation to letters of credit would contain instructions received from the X company or its London subsidiary and include--

'the application for the credit, the terms and conditions upon which it is to be opened and paid, the terms of the underlying transaction, the buyer, the documentary conditions for the transaction, the place of presentment and expiration, and countless other commercial and proprietary items'.

It is said that the London branch files, that is to say the files of the London branch of the bank, also contain not only instructions concerned with general banking matters, investments and business facilities, but multifold data communicated to and shared with the branch in reliance on what the deponent terms 'the sanctity of the professional and confidential relationship between a customer and a bank carrying on business in London'.

In response to this aspect, an affidavit has been sworn by the general manager of the London branch of the bank. After explaining that the plaintiffs are, like many of the bank's customers, large, multinational corporations, whose banking requirements transcend national boundaries, he explains that the bank provides a co-ordinated worldwide service to its customers through its international department, so as to meet the customers' requirements. This deponent says:

'However complex and geographically widespread a customer's requirements may be his banking relationship with [the bank] will be subject to overall direction, co-ordination and control from a relationship manager at one location. The relationship manager is usually based at [the New York office of the bank] or at the particular location of [the bank] where the customer has its head office or main management centre.'

He concludes this passage by saying that, so far as the bank is concerned, its banking relationship with the plaintiffs is centred in New York.

With this passage I must, however, contrast the affidavit of the gentleman who appears to be the relevant relationship manager himself. He says that he is a vice-president of the bank presently assigned to the London branch and he declares: 'I am responsible for managing [the bank's] business relationship with numerous commodity customers at' the London branch, including those of the plaintiffs.

It seems to me that, by way of application of the principles described in the first affidavit sworn on behalf of the bank, it is the second deponent who is to be identified as the relationship manager and he at all events is physically present in London for most of the time, as it would appear. Whatever may be said in the affidavit of the first deponent to the effect that the bank's banking relationship with the plaintiffs is centred in New York, it seems to me that it can only be as

a matter of internal administration of the bank and then only in a limited sense which does not detract from the fact that the bank maintains its own relationship manager in London.

In the main affidavit sworn on behalf of the bank, namely that of its first deponent, he says in a later passage that the plaintiffs must be fully aware of the worldwide context in which their English dealings are conducted and of their own and the bank's close connections with New York. He then says:

'Unlike a domestic U.K. customer of an English bank in London the plaintiffs (with the possible exception of [the Z company]) must, in my belief, have anticipated that their dealings with [the bank] would be subjected to the necessary incidents of an overall international relationship having close connections with New York.'

I have some difficulty with that statement. First of all, it appears to me that the reference to the dealings being subject to the necessary incidents of an overall international relationship begs the question of what incidents are to be regarded as necessary, and, second, I am not sure that I understand the meaning of the phrase 'dealings . . . would be subjected to the . . . incidents of an overall international relationship'.

This part of the deponent's affidavit concludes by saying that in the much wider context of dealings between the bank and the plaintiffs--

'the bank must, notwithstanding its efforts and obligations to provide a full service to very valued customers, have regard to and comply with the legal obligations of the country in which it is incorporated and in which its head office is based and where its relationship with the plaintiffs is centred.'

Comment about the relationship between the bank and the plaintiffs I have already made but it is noteworthy that in that passage there is nothing said about the bank having regard to or complying with the legal obligations of the country in which its branch is situated. Nor, indeed, is there any reference to any regard that might be paid to the welfare of the bank's customers, although it is fair to say, and I say it now, that if there may appear in affidavits sworn on behalf of the bank to be a dearth of reference to the bank's concern for the welfare of its customers that may be, having regard to the doctrine which it is said may be material in New York, that the bank must be in a position to show that it has made what are termed 'good faith efforts' to comply with the requirements of the subpoenas served on it and too much concern for the welfare of customers might be misconstrued as a lack of good faith in the efforts being made by the bank to do what the subpoenas require it to do.

The subpoenas are apparently the product of an investigation begun in about 1977 in the United States of the crude oil industry by various agencies there. It does not seem that the X company and its associated companies in the first instance were in any way concerned. Certain it is that no charges in consequences of any investigation undertaken over the years have ever been preferred against any of the plaintiffs. At the end of 1981 the Department of Justice in particular started an inquiry into crude oil trading of the Y company in the United States and one of the plaintiffs, I think the Y company, was served with a subpoena, in pursuance of which some 75,000 documents have been produced to the Department of Justice. But, notwithstanding the production of those documents, there was on 15 April 1982 a subpoena served on the X company, which was thereafter considered by its board. On 1 June 1982 the board, on the advice of Swiss and United States lawyers, decided not to comply with that subpoena. The X company believed that it was not and is not subject to the jurisdiction of the United States and that for the best of all reasons: that it is not conducting any business in the United States. Proceedings were therefore instituted to quash this subpoena. On 25 August the United States District Court for the Southern District of New York refused to quash the subpoena and on 13 September the same court held the X company to be in contempt for its failure to comply with the subpoena. On 15 October X company's appeal against the findings of the District Court was heard, but a decision on that appeal is still awaited. Meanwhile, on 8 October a subpoena had been served on the bank and it is with that subpoena that I am particularly concerned. It was followed by certain correspondence between those acting for the bank and solicitors for the plaintiffs, and, the bank having declared its intention to comply with the subpoena, injunctions were applied for. On 12 November Staughton J granted an ex parte injunction to the X company, restraining the defendants in relation to the X company on 26 November Lloyd J continued that injunction and granted injunctions in respect of the Y company and the Z company in similar terms and on 20 December all three injunctions were continued by Mustill J. It seems that on the same day a subpoena was served on the Z company itself, which, for the first time, became directly implicated in the investigation. On 11 January the bank's subpoena or the effect of it was indorsed by an order made on that day by the United States District Court for the Southern District of New York.

It is necessary to look in a little more detail at the terms of the subpoena. It is addressed to the bank, for the attention of 'Any officer or authorised custodian of records', and it commands the person addressed to attend before what is called the Grand Inquest of the body of the people of the United States of America for the Southern District of New York 'to testify and give evidence in regard to an alleged violation' of two Titles of the United States Code, which are specified

[1983] 2 All ER 464, [1983] Com LR 134, [1983] 2 Lloyd's Rep 535

in the subpoena. I have been told that they relate respectively to conspiracy to commit an offence or defraud the United States and to an attempt to evade or defeat tax. The subpoena requires the person addressed to produce what is then set out in an extensive rider. The rider reads:

'For the period of January 1st 1979 through December 31st 1981 [in other words a period of three years] any and all books, records and other documents regarding all accounts (including the known accounts listed below) and transactions of the following companies, to include, but not be limited by, all bank statements (with debit and credit advices), loan documents, letters of credit (including bills of lading, invoices, contracts and other subsidiary documents), correspondence, internal memoranda, signatory and/or authorisation documents'

and there are then specified the account of the X company in London, the account of the Z company in London and the account of the Y company in London, in each case being, presumably, the account of that company held by the bank's London branch. The subpoena concludes by saying in its printed form that 'for failure to attend and produce the said documents you will be deemed guilty of contempt of court and liable to penalties of the law'. The order of the United States District Court, Southern District of New York, which was made on 11 January was one expressed to be in the matter of a grand jury subpoena directed to the bank, a reference no doubt to the subpoena which I have just recited. The order says that, the bank having been subpoenaed to appear before a federal grand jury to produce various documents and the bank having failed to produce various records maintained in its London branch as a result of a restraining order (as it is called) issued by the High Court of Justice, Queen's Bench Division—

'and upon representation that it is necessary for the better enforcement of said Grand Jury subpoena, and the court being satisfied that the production of the documents requested by the subpoena is necessary in the best interests of justice and the Grand Jury investigation, it is hereby ordered and adjudged that [the bank] produce all the documents . . . relating to any accounts [of the X company, the Y company and the Z company] maintained in its London, England, branch.'

I am told that this order was obtained ex parte and in camera and there is no evidence about what material, if any, was available to the district judge when the order was made.
The predicament in which the bank in consequence finds itself is obvious. The subpoena is binding on it. United States law obliges the bank to comply with it. It involves the relevant documents (when I say 'relevant' I mean relevant in the sense of being those documents which are identified in the subpoena) being produced to the court and there is by way of indorsement of the subpoena an express order of the court also binding on the bank. On the other hand, there are now current in this country injunctions prohibiting the bank from obeying that subpoena, being a subpoena supported by the order of a competent court of the United States.
There is no dispute that the bank is subject to a duty of confidentiality. Apparently the nature of the duty is no different in New York from the duty to which it is regarded as subject in London. For convenience, I would describe the duty as arising from an implied term of the contract governing the relationship of banker and customer and as being that, subject to certain qualifications which it may be material to consider, a banker shall not without the consent of the customer disclose to any other person any document or other information obtained by the banker in the course of that relationship.
There is no dispute that disclosure of the documents to the grand jury would constitute or create a breach of that duty. It would be so, as it appears from the evidence, not merely in the technical sense of the grand jury itself constituting a third person to whom disclosure of confidential documents would constitute a breach of that confidentiality, but also in the far wider and more material sense that, as it would appear, there is in practice no secrecy in relation to matters entrusted to grand juries. I have this on the authority of Mr Marvin Frankel, now advising the plaintiffs in New York, who himself has served as a district judge there and is the author of a book entitled The Grand Jury: An Institution on Trial (1977). Apart from the fact that that work refers expressly to leaks which are common of material entrusted to grand juries, Mr Frankel refers in his affidavit to disconcerting matters arising in this very case, because he says that the United States attorney—

'sought and obtained the District Court's acceptance of a secret affidavit and documentary exhibits, characterised as decisive against [the X company's] motion to quash [the subpoena served on them, but not shown to the X company's attorneys] on the plea that to do so would reveal the government's theory of the case and identity of co-operating witnesses to the possible prejudice of the government's investigation.'

But, says Mr Frankel—

'almost immediately following the argument of an appeal in that case . . . newspapers at several places in the United States were publishing supposedly secret information about this very matter and attributing the revelations both to identified "secret" witnesses, and, more importantly, to "government sources" '

and he exhibits a copy of an article which in lurid terms contains or purports to contain such revelations.

The other matter which is not in dispute is the nature and the extent of the harm which the plaintiffs would suffer were such breach of confidentiality to occur in this case. The damage which the X company would sustain is described as immediate, irreparable and incalculable, and similar descriptions are given to that which would be suffered by the other plaintiffs in like circumstances.

For the purpose of explaining himself the deponent in relation to the X company takes by way of example letters of credit. He says that for those translations in which the X company--

'is the purchaser of commodities, and in which a letter of credit is opened by [the London branch of the bank] 'for the benefit of [the X company's] supplier, and for those transactions in which [the X company] is the seller, and in which [the London branch of the bank] either confirms a letter of credit opened by [the X company's] customer or collects on a letter of credit under which [the X company] is the beneficiary [the London branch of the bank] receives all of the shipping and title documents including bills of lading and invoices. From these documents the following information may be obtained: (a) the name of [the X company's] supplier or customer (b) the type of commodity bought or sold (c) the quantity of the commodity bought or sold (d) the price at which the commodity was bought or sold and (e) the relevant shipping information. In many cases it would be possible to determine from such information [the X company's] margin on a particular transaction and, where [the X company] acts as intermediary, to identify the trading parties on both sides of a transaction.'

Engaged in various trades, as the X company is, this would have very serious repercussions. For example, it is said that the X company operates in and trades with countries which are in politically sensitive areas of the world, with the result that their governments or their agencies often prefer to trade through an intermediary in order not to reveal the buying and selling strategies for particular commodities or, in some instances, the fact that the governments or their agencies may have entered into such transactions contrary to some policy which publicly may have been professed on the governments' behalf. Many transactions, it is said on the X company's behalf, are concluded with governments or governmental agencies in countries in which the commodity in question is one of the chief sources of foreign exchange revenue and for that reason alone the details of such transactions are highly confidential. Similarly, damage might well be caused if knowledge of the trading patterns of the X company were to reveal, for example, that there was stockpiling of particular strategic materials by any of the Western customers. There might be revealed a breach of some restriction imposed on particular Middle Eastern, Latin American or Iron Curtain countries on the dealing with other particular countries in respect of certain materials. Finally, and perhaps most obviously, disclosure of information of the character held by the London branch of the bank would put the X company at a severe disadvantage in relation to its competitors in that it would allow what the deponent calls 'a window into the X company's commercial secrets'. The X company's suppliers and customers, its pricing decisions, its margins and its delivery dates would all be liable to become public knowledge and an analysis of such information would obviously enable competitors to tell much, and, as it may be, all that they need to know, about the X company's operating methods, resources and strategy. That those consequences would be liable to occur is not controverted.

A review of the evidence in this case must include reference in particular to the expert evidence sworn on each side.

The bank relies on an affidavit of an attorney who is a member of a New York law firm, Mr Connick. After asserting that the federal grand jury subpoena requires the production of all bank records over which the bank has control, regardless of their location, and citing authority for that proposition, the deponent states:

'[Should the bank] fail to comply with the subpoena it would be subject to proceedings under the Federal Rule of Criminal Procedure 17(g) which reads: "Failure by any person without adequate excuse to obey a subpoena served upon him may be deemed a contempt of the court from which the subpoena issued" . . .'

He then refers to the leading case of US v First National City Bank (1968) 396 F 2d 897, in which the United States Court of Appeals for the Second Circuit dealt with the question of a New York bank's obligation to comply with a grand jury subpoena. He remarks that, after balancing certain factors, the court ordered compliance with this subpoena 'despite the apparently conflicting law of the nation where the records were kept, West Germany', and he says that a recent decision of the United States District Court for the Southern District of New York has affirmed the validity of that case with respect to process issued by United States government investigators. The case in which that affirmation was made was one in which the court ordered a Swiss bank to comply with informational demands of the Securities and Exchange Commission, despite the possibility of criminal prosecution in Switzerland for such compliance. Conservatively, the

deponent remarks that there are some factual differences between those two cases and the present, and he says that, for that reason, as well as the uncertainty of the outcome of the balancing test, it is impossible to predict with certainty what the United States attorney or the federal courts would do should the High Court continue the outstanding injunctions against the bank in this matter. However, he says that it is 'entirely possible' that a bank officer in New York would be summoned to appear before the United States District Court and directed to produce the documents, that on the basis of the balancing test the District Court would not recognise the High Court's injunction as an adequate excuse for failure to produce such documents, and that if thereafter the bank refused to produce the documents the District Court would imprison the bank officer and impose a daily fine on the bank until the documents were produced. He does, however, end his affidavit by saying:

'Should the High Court continue the outstanding injunctions [the bank] would have no choice but to oppose vigorously any contempt proceeding in New York and to incur additional substantial legal expenses toward that end.'

I am bound to say that had the matter ended there I should have been left in very great doubt whether the bank stood in any real jeopardy in New York. Although it might have understandable apprehension so long as the subpoena remained outstanding and not complied with, my feeling must stem quite simply from the fact that no suggestion is made how the prohibition of this court on the production of relevant documents would not constitute an adequate excuse for failure by the person to whom the subpoena was addressed to produce the documents in question.

But the matter does not end there, because a substantial affidavit has been sworn on behalf of the plaintiffs by Professor Lowenfeld, Professor of Law at the Law School of New York University. He is a person of the greatest academic distinction and one of the leading authorities in the particular field of law with which this case is concerned. He is, indeed, an associate reporter of the American Law Institute's current revision of the Restatement of the Foreign Relations Law of the United States. His principal responsibility in that capacity is for Part IV of the Restatement, concerning jurisdiction and judgments, and including in particular the sections concerning resolution of conflicting exercises of jurisdiction, which are the subject of the present dispute.

The professor says that he believes it highly unlikely that a United States bank or its officers would be held in contempt for conduct in compliance with the order of a British court in the circumstances stated, that is an injunction restraining the transfer or disclosure of records kept in London in respect of a bank account maintained by a non-American corporation at the bank's London branch. He declares himself quite certain 'that no United States court has ever held a bank or other party in contempt in such circumstances', assuming, as he does, that there is no suggestion of wrongdoing by the bank either in transferring overseas records ordinarily kept in New York or in any way assisting the depositor in a scheme of concealment or non-disclosure.

After reciting the basic rule in the event of conflict between commands of the courts of different jurisdictions, which apparently is that no one is to be put in the position of fearing punishment irrespective of whether he does or does not do an act, the professor cites authority for that proposition.

The authorities include one which it behoves me to mention and that is British Nylon Spinners Ltd v Imperial Chemical Industries Ltd [1952] 2 All ER 780, [1953] Ch 19. That case is of general importance in this matter for the comments of Evershed MR where he said ([1952] 2 All ER 780 at 783--784, [1953] Ch 19 at 27):

'. . . the courts of this country will, in the natural course, pay great respect and attention to the superior courts of the United States of America, but I conceive that it is none the less the proper province of English courts, when their jurisdiction is invoked, not to refrain from exercising that jurisdiction if they think that it is their duty so to do for the protection of rights which are peculiarly subject to their protection. In so saying, I do not conceive that I am offending in any way against the principles of comity . . .'

Looking at that case, it is convenient also to mention the comment of Denning LJ ([1952] 2 All ER 780 at 784, [1953] Ch 19 at 28): 'The writ of the United States does not run in this country, and, if due regard is had to the comity of nations, it will not seek to run here.'

There is, as would appear from the professor's affidavit, a doctrine in the United States, or at any rate in New York, known as the doctrine of foreign government compulsion, which depends, as he explains, on a prohibition in one state conflicting with a command in another. The professor considers the case mentioned in Mr Connick's affidavit, US v First National City Bank (1968) 396 F 2d 897. He describes how the District Court held that the defence based on German law in that case was speculative, based at most on possible exposure to civil liability or loss of standing in the financial community, and that on appeal the district judge's holding was affirmed, with the court pointing out in detail the distinction between the Swiss bank secrecy law, which was a mandatory law, backed by criminal sanction, and German law, for breach of which there was at most a civil liability.

[1983] 2 All ER 464, [1983] Com LR 134, [1983] 2 Lloyd's Rep 535

The professor then proceeds to consider the special rules concerning the discovery of documents.  He says that it has been the pattern, although not followed in all cases, for United States courts faced with discovery requests or subpoenas calling for the production of documents located abroad to issue an order to produce and, if a foreign prohibition against production is asserted, to order the party before the court to make a good faith effort to secure release or waiver from the prohibition, but, if no release from the prohibition has been obtained, to dismiss petitions for contempt.

Certain authorities for that proposition are considered, including the other recent case in the United States District Court referred to by Mr Connick, on which the professor comments that the bank there in question was held to have failed to make a good faith effort to comply with the request for production.  In addition, the government of the state where the records were kept had not acted to prevent the bank from complying with the subpoena or, in other words, in that case the bank was not subject to an injunction in the manner that the bank in the present case is.  The professor expresses some doubt whether that case was properly decided and summarises the matter by reference to his current draft of para 420 of the Restatement of Foreign Relations Law, which deals specifically with requests for disclosure and foreign government compulsion.  Sub-paragraph (2) of that paragraph reads, so far as is material:

'(a) the person to whom the order is directed may be required by the court to make a good faith effort to secure permission from the foreign authorities to make the information available (b) the court may not ordinarily impose the sanction of contempt, dismissal, or default on the party that has failed to comply with the order for production, except in cases of deliberate concealment or removal of information or of failure to make a good faith effort in accordance with paragraph (a).'

It has been explained that the restatement is intended to be declaratory of existing law in the United States.

In those circumstances, the professor summarises his conclusion by saying that an injunction by a foreign court having jurisdiction over the branch where the documents are located--

'would, I believe, come within the foreign compulsion defence, provided (a) the bank at all times acted in good faith as defined and (b) disobedience of the injunction would subject the branch and its officers to serious sanction.'

I accept that conclusion.  It represents, in my judgment, an accurate summary of the law of New York so far as applicable, from which it follows that the bank, having properly pursued its good faith efforts to relieve itself from the consequences of an injunction in this country, ought not to be held liable for contempt in any proceedings brought to that end in New York.

It is convenient to consider the arguments of counsel addressed to me by reference to these matters by following the structure of counsel's argument for the bank.  He was content in offering his propositions of English law to assume at the outset that English law is the proper law.  Advocate that he is, he left until the end any suggestion that the proper law should be regarded as being anything other than English law.  When he came to it he argued that the law of New York should apply to the transaction as a whole for the reason that that was the law with which, so he bravely asserted, the contract has its closest and most real connection in each case.

I unhesitatingly reject that submission.  It seems to me, for such reasons as counsel advanced on behalf of the first and second of the plaintiffs, concurred in by counsel for the third of the plaintiffs, that English law is the proper law, not only because the London branch with which the contracts were initially made is in London, but because that is where the relationship started and where the contract was made in circumstances where that contract must be taken to have had a proper law from its inception.  Instructions in relation to the account are received and acted on in London.  The reality of the matter, as it appears to me, whatever comments to a contrary effect may be made on behalf of the bank, is that the relationship between banker and customer is in truth centred in London.  The plaintiffs all say, and I accept the truth of their assertions, that they contemplated that their transactions with the bank would be governed by English law.  For all those reasons, quite apart from the more general description of the contract as being one which has its closest and most real connection with English law, I hold that English law is, indeed, the proper law of the contract.

The first proposition of counsel for the bank was that as a matter of English law an English court will not compel performance of or enforce a contract if performance requires the doing of an act which violates the law of the place of performance, at any rate where the doer is resident in or amenable to the law of the place of performance nor will an English court prevent a party to a contract from doing an act in the place where the contract is to be performed when he is obliged to do that act by the law of that place.

In pursuing this argument, counsel for the bank contended that the contract cannot be enforced in so far as it requires confidence to be respected in the United States.  Thereby he raised the curious concept of confidentiality which no longer was.  This seems to me to be a true example, if one were prepared to envisage it, of the curate's egg, that is to say good in parts.  The reality of the matter is that once confidence escapes, like air from a punctured tyre, the confidence is no more.  But in aid of this argument counsel for the bank relied on Ralli Bros v Compaatnia Naviera Sota y Aznar

[1920] 2 KB 287 esp at 290, 299, [1920] All ER Rep 427 esp at 431, 435 per Lord Sterndale MR and Scrutton LJ. That was a case involving a contract which was to be performed partially in Spain and it was held pro tanto to be invalid in the event that performance was unlawful in Spain. The argument is that this contract is to be performed, at least in part, in the United States and, as counsel for the bank characterises it, it requires violation of United States law, by which he means the keeping of confidentiality, with the result that the bank should not be restrained from doing the act of disclosure as being one which it is required to do in the place where the contract is to be performed. In aid of this he relied also on Re Lord Cable, Garratt v Waters [1976] 3 All ER 417, [1977] 1 WLR 7, in which it was held that where compliance with an injunction would expose the relevant trustees to serious risk of penal consequence the injunction would not issue.

In opposition to this argument counsel for the first and second plaintiffs relied in particular on Kleinwort Sons & Co v Ungarische Baumwolle Industrie AG and Hungarian General Creditbank [1939] 3 All ER 38, [1939] 2 KB 678. That was a case in which an English bank opened an acceptance credit for a Hungarian firm. When the credit expired the Hungarian firm refused to pay in London on the ground that under Hungarian legislation it was illegal for them to remit money abroad. But it was held that this was no defence to the bank's claim. English law was the proper law of the contract, the money was payable in London and the Hungarian law could not affect the legality of a contractual promise in fact governed by Hungarian law but not to be performed in Hungary.

In my judgment it does not follow from the fact that the production has been ordered pursuant to a subpoena that secrecy can be said to have been rendered unlawful, especially in circumstances where it is no doubt the argument, even if perhaps it be only a fiction, that security is still preserved in respect of grand jury proceedings. The fact is that confidentiality is not rendered illegal by a subpoena requiring disclosure, which is to be contrasted with some form of legislation to that end and I have in mind in particular that from the terms of the relevant procedural rule failure to produce the documents may be excused if the excuse be adequate.

Counsel for the first and second plaintiffs remarked that, since a foreign judgment may be a good defence to an action in England when the judgment is in favour of the defendant and finally conclusive on the merits, he could envisage that an argument might be advanced which sought to equate a subpoena with a judgment and so, indeed, it proved, because counsel for the bank duly contended that, if need be, he would argue that the subpoena operates as a defence, final and conclusive as it is in the absence of challenge.

It seems to me that there is no analogy for present purposes between a judgment and a subpoena and, in particular, there is no suggestion whatever that the obtaining of this subpoena or the order which has subsequently indorsed it has involved any form of hearing on the merits. Certainly it has not as yet involved any form of hearing inter partes.

Next, counsel for the bank argued that as a matter of the policy of English law an English court should decline any invitation to impede legitimate proceedings in other jurisdictions and orders such as the subpoena issued in the course of proceedings, especially where directed to a person within the jurisdiction of the foreign court.

For this he admits that it is difficult to find precise authority. He asserts it as a matter of common sense dictated by international comity, and he seeks to found on the well-established rule of English law that it will not enforce a contract to do something illegal in another country. He relies on Regazzoni v K C Sethia (1944) Ltd [1957] 3 All ER 286, [1958] AC 301, which is authority for the proposition that public policy will avoid at least some contracts which violate the laws of a foreign state. He says that properly regarded it is wrong to think of this subpoena as being extra-territorial in its effect. At that stage he meets Rio Tinto Zinc Corp v Westinghouse Electric Corp [1978] 1 All ER 434, [1978] AC 547, much relied on by counsel for the first and second plaintiffs. That was a case, according to counsel for the bank, which merely affords guidance as to the interpretation of the Evidence (Proceedings in Other Jurisdictions) Act 1975 and, having regard to the narrow way in which particular comments were expressed, should be regarded as applicable only to attempts made by means having extra-territorial effect to make United Kingdom companies amenable to the investigation of a foreign court. The case was, indeed, concerned with the use that might be made in this country of letters rogatory and a possible conversion of the letters rogatory into a request for evidence for the purposes of a grand jury investigation. Counsel for the bank says that the primary effect of the United States order in the present case is in New York and only incidentally in London, with the result that it does not represent any invasion of United Kingdom sovereignty and all that is at issue is a matter of private law.

Counsel for the first and second plaintiffs contends that the case is what he terms 'vitally relevant'. He says that it shows how a subpoena is to be regarded here and, in particular, by reference to submissions there made by the Attorney General, what the attitude would be of the United Kingdom government. In that case the Attorney General had submitted that the government considers that the wide investigatory procedures under the United States anti-trust legislation against persons outside the United States who are not United States citizens constitutes an infringement of a proper jurisdiction of sovereignty of the United Kingdom.

[1983] 2 All ER 464, [1983] Com LR 134, [1983] 2 Lloyd's Rep 535

Both counsel read to me with great emphasis a passage from the speech of Lord Wilberforce where he said ([1978] 1 All ER 434 at 448, [1978] AC 547 at 617):

'The intervention of Her Majesty's Attorney-General establishes that quite apart from the present case, over a number of years and in a number of cases, the policy of Her Majesty's Government has been against recognition of United States investigatory jurisdiction extra-territorially against United Kingdom companies. The courts should in such matters speak with the same voice as the executive . . . they have, as I have stated, no difficulty in doing so.'

Counsel for the bank relied on that for its specific application to United Kingdom companies which he said is absent here and counsel for the first and second plaintiffs relied on it as betokening the attitude which Her Majesty's government may be expected to take about the use in this country by the United States of the investigatory jurisdiction of the relevant character. Counsel for the bank concludes his argument under this head by asserting that if the English law issued a subpoena it would expect what he calls 'credence' to be given to its order and that it must be a matter of discretion whether or not that is accorded to it.

It seems to me that the proper use which I should make of the Westinghouse case is to regard it in the circumstances not as definitive either way, but as raising one important factor which I ought to take account of in determining whether this is a case in which the injunction should be continued. The factor that is involved in the exercise of jurisdiction by the United States court in this case is that its order would take effect in London for the production of documents in breach of what might be termed a private interest in the sense that what is directly involved is a contract between banker and customer. But this indubitably is also a matter of public interest, because it raises issues of wider concern than those peculiar to the parties before me.

The third proposition of counsel for the bank is that public policy is not defeated by the rule of private law between banker and customer that the banker should preserve confidentiality in relation to the customer's accounts and dealings. He says that it is not uncommon for confidentiality to be displaced in favour of a higher interest. The bank has to do a balancing act to see whether confidence or the order of a foreign court should take precedence.

It is an argument which he considerably elaborated, starting first with British Steel Corp v Granada Television Ltd [1981] 1 All ER 417 at 455, [1981] AC 1096 at 1168--1169, relying in particular on a passage from the speech of Lord Wilberforce where he says:

'. . . as to information obtained in confidence, and the legal duty, which may arise, to disclose it to a court of justice, the position is clear. Courts have an inherent wish to respect this confidence, whether it arises between doctor and patient, priest and penitent, banker and customer, between persons giving testimonials to employees, or in other relationships. A relationship of confidence between a journalist and his source is in no different category nothing in this case involves or will involve any principle that such confidence is not something to be respected. But in all these cases the court may have to decide, in particular circumstances, that the interest in preserving this confidence is outweighed by other interests to which the law attaches importance. The only question in this appeal is whether the present is such a case.'

Counsel for the bank relies on that passage as showing that there is a process of weighing to be undertaken. Counsel for the first and second plaintiffs, on the other hand, points out that it expressly relates to information obtained in confidence, and the legal duty which may arise to disclose it to a court of justice and is, therefore, directly within one of those qualifications to which the obligation of confidentiality is normally treated as subject.

The scope of the obligation was reviewed in Tournier v National Provincial and Union Bank of England [1924] 1 KB 461, [1923] All ER Rep 550. To understand the argument in this case it is necessary to read some short passages from the judgments of each of the Lords Justices. First, Bankes LJ considered in a classic passage what the qualifications are of the contractual duty of secrecy implied in the relationship of banker and customer, remarking that there appeared to be no authority on the point. He said ([1924] 1 KB 461 at 473, [1923] All ER Rep 550 at 554):

'On principle I think that the qualifications can be classified under four heads: (a) Where disclosure is under compulsion by law (b ) where there is a duty to the public to disclose (c) where the interests of the bank require disclosure (d ) where the disclosure is made by the express or implied consent of the customer.'

In referring in particular to examples of the third class, he mentioned the issue by a bank of a writ claiming payment of an overdraft stating on the face of the writ the amount of the overdraft. In a comparable passage Scrutton LJ gave a similar example (see [1924] 1 KB 461 at 481, [1923] All ER Rep 550 at 558--559), whilst Atkin LJ expressed himself somewhat more widely, saying ([1924] 1 KB 461 at 486, [1923] All ER Rep 550 at 561):

'It is difficult to hit upon a formula which will define the maximum of the obligation which must necessarily be implied. But I think it safe to say that the obligation not to disclose information such as I have mentioned is subject to the

qualification that the bank have the right to disclose such information when, and to the extent to which it is reasonably necessary for the protection of the bank's interests, either as against their customer or as against third parties in respect of transactions of the bank for or with their customer, or for protecting the bank, or persons interested, or the public, against fraud or crime.'

Counsel for the bank remarks that this duty is not absolute. He treats the first three of Bankes LJ's qualifications or exceptions as only examples of public policy. He says that the case does not constitute a statute and does not fall to be construed as such, and he says that what are given by the Lords Justices are no more than indications of occasions when the confidence is to be displaced. The contention is that an English court will respect the order of a foreign court. If it finds the order to be in conflict with the private law of confidentiality the English court will, so it is submitted, proceed with caution to uphold the order of the foreign court unless there is compelling reason not to do so.

It seems to me that, even if it be right to regard the exercise which has to be undertaken here ultimately as being a balancing exercise, it must involve an evaluation of the relevant order of the foreign court. It would be necessary for this court in particular to consider the nature, scope, quality and effect of the foreign order and to analyse it with some care, because the fact is that to allow that order to take effect on a bank conducting its business in the City of London would be, as it would appear, to allow a fairly large cuckoo in the domestic nest. But I say 'would be necessary' because the balance with which I am immediately concerned in this interlocutory matter is the balance of convenience and not the performance of that balancing act which counsel for the bank has in mind.

The balancing act which he urges on me he seeks to support by three arguments. The first is that it is in the public interest that affairs of multinational companies should be investigated across borders in a proper case. That must be so, although I would add: with due regard to the public interest in the preservation of banking confidence.

Second, he says that it is no answer for the plaintiffs to point to internal English considerations, as he characterises the basis of the argument, for example, in the case [1978] 1 All ER 434, [1978] AC 547, to which I have already referred. He says that that case and those like it only apply to English internal policy, which may have to yield to some of the ways in which a foreign court may govern its own procedures. An English court, so he acknowledges, may have jurisdiction, but in its discretion should not exercise it against the bank. In that way he is able to dispose of difficulties such as are raised by an article of Dr Mann ((1964) 111 Hague Recueil 146), where he said:

'In those cases in which the enforcing state asserts a prerogative right and demands obedience to it abroad, an additional point of some significance is involved. The enforcing state . . . cannot achieve respect for its prerogative rights in foreign countries by proceedings taken there. It is precluded, a fortiori, from achieving its ends indirectly by having orders made in its own territory, which are to take effect abroad and thus attribute to themselves a power equal to that of an order which the foreign country could, but refuses, to make. The crux of the matter lies in the fact that the enforcing state requires compliance with its sovereign commands in foreign countries where its writ does not run and where it cannot be made to run by clothing it into the form of judgments of courts, whether they be its own or those of the foreign country.'

I consider that, on a true view, the effect of the foreign order is at any rate one factor of which I am entitled to take account in exercising my discretion whether or not to grant or to continue the injunction sought.

Third, counsel for the bank, in contending for the balancing act to be performed by means of gauging the effect of public policy, says that it is natural that the bank should wish to obey the law of the United States, especially since it is quite possible in the light of the American cases that the bank will be liable for contempt in the United States and he made some limited submissions about the American cases designed merely to show that the bank's fear is not fanciful. But as to that I have considered the evidence of the American lawyers and it appears to me that the reality of the bank's fear is for present purposes a matter for my determination.

Counsel for the bank says that it is irrelevant that the subpoena was made in aid of foreign criminal or revenue matters, because that consideration does not justify any impediment being made by English courts to the legitimate processes of United States courts. Although it is true that the English court will not enforce foreign revenue or penal law, he says that the English court is not being invited to undertake enforcement in this case, but merely not to impede and at the heart of many of the submissions of counsel for the bank is the suggested distinction between enforcement on the one hand and not impeding on the other. He relies, for example, on Regazzoni v K C Sethia (1944) [1956] 2 All ER 487, [1956] 2 QB 490, which is authority for the proposition that, if two people agree to break the laws of a foreign friendly country, the court will not enforce the agreement, the application being that by implication the parties here, so he contends, have agreed to keep confidential what has been rendered illegal by the law of the place of performance.

I think that this submission is attended by a certain unreality. The fact is that the gamekeeper is invited to turn a blind eye whilst the poacher takes a brace of pheasants, or three peasants. In this context, it appears to me that not impeding involves a measure of assistance and, indeed, approbation, because, in particular, it would involve this court tolerating a

[1983] 2 All ER 464, [1983] Com LR 134, [1983] 2 Lloyd's Rep 535

breach of that obligation of confidentiality which, as I have pointed out, in the ordinary course must be maintained in the public interest.

The fourth argument on which counsel for the bank relies is that, if Tournier v National Provincial and Union Bank of England [1924] 1 KB 461, [1923] All ER Rep 550, to which I have referred, does indeed contain the whole law on the topic without elaboration and public policy is irrelevant, the subpoena should still prevail over the duty of secrecy, because the bank has a genuine and legitimate interest of its own to obey the subpoena since it is issued pursuant to the law of the country to which it is subject and the fear of being held in contempt is genuine and not unreasonable. Suffice to say that the protection which the bank seeks appears to me to be different in character from that which was contemplated in the Tournier case, where the circumstances before the court were totally different.

Counsel for the bank was not content to accept that American Cyanamid Co v Ethicon Ltd [1975] 1 All ER 504 esp at 510, [1975] AC 396 esp at 407--408 per Lord Diplock would necessarily have effect in this case. Alternatively, if it did take effect, he argued that it must be with an important cast on it, which he sought to derive from NWL Ltd v Woods [1979]3 All ER 614 at 625, [1979] 1 WLR 1294 at 1306, where Lord Diplock said:

'. . . there is the risk that if the interlocutory injunction is granted but the plaintiff fails at the trial the defendant may in the meantime have suffered harm and inconvenience which is similarly irrecompensable. The nature and degree of harm and inconvenience that are likely to be sustained in these two events by the defendant and the plaintiff respectively in consequence of the grant or the refusal of the injunction are generally sufficiently disproportionate to bring down, by themselves, the balance on one side or the other . . .'

With an eye to what might occur between this date and the date of trial in the actions out of which these applications arise, I must proceed to consider the matters rendered material by the American Cyanamid case, with the comment in mind that I have just read from the later speech of Lord Diplock in the NWL case.

These being interlocutory applications, I intend to deal with them strictly in conformity with the principles enunciated in the American Cyanamid case, whilst taking account, as is implicit in what I have said, of the fact that contempt proceedings, if any be taken, will probably fall to be dealt with before a trial of the present actions and also of the fact that production of any documents to which the grand jury may be entitled and which might prove useful to it would be delayed by my continuing the injunctions sought, although there is no evidence that delay of such a period as would be involved in their review of this particular aspect of the investigation, already running for some time, will prove significant.

I can summarise in a sentence the balance of convenience as I see it. On the one hand, there is involved in the continuation of the injunction impeding the exercise by the United States court in London of powers which, by English standards, would be regarded as excessive, without in so doing causing detriment to the bank: on the other hand, the refusal of the injunctions, or the non-continuation of them, would cause potentially very considerable commercial harm to the plaintiffs, which cannot be disputed, by suffering the bank to act for its own purposes in breach of the duty of confidentiality admittedly owed to its customers.

That represents the balance of convenience, against the background that indisputably there is a serious issue to be tried. Damages would not constitute an adequate remedy for the plaintiffs. I am not satisfied that the bank will suffer any detriment, even allowing for the probability that any contempt proceedings that might be brought would be dealt with before the trial of the actions. In those circumstances, it appears to me that the balance of convenience clearly favours the plaintiffs.

If and in so far as it is necessary for me to pay any regard to the merits of the matter at this stage, I am firmly on the side of the plaintiffs. I have considered the position of the plaintiffs separately, but I am not satisfied that the case is so much stronger against the Y company that I should be justified in distinguishing between it and the other plaintiffs. The circumstances in relation to either that company or the others may change and further evidence may put a different complexion on the matter.

I would not leave these applications without remarking that I do not see this as a matter of conflict between jurisdictions. I can fully understand that the United States District Court would wish to see where the line is in practice drawn by the courts of this country but, having been drawn where it has, I find it hard to believe that the bank is in any danger of being held to be in contempt, since the adequacy of the excuse that it makes for non-production of the documents sought is now obvious indeed. Any sanction imposed now on the bank would look like pressure on this court, whereas, as it seems to me, it is for the New York court to relieve against the dilemma, in which it turns out to have placed its own national, by refraining from holding it in contempt if contempt proceedings are issued.

For those reasons, I shall continue the injunctions now running against the defendants.

**DISPOSITION:**

[1983] 2 All ER 464, [1983] Com LR 134, [1983] 2 Lloyd's Rep 535

Interlocutory injunctions continued until trial or further order.

**SOLICITORS:**

Allen & Overy (for the bank); Simmons & Simmons (for the first and second plaintiffs); Norton Rose Botterell & Roche (for the third plaintiffs).