UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

```
-------------------------------------------------- x
TZVI WEISS, et al.,                                :
                                                   :
                    Plaintiffs,                    :
                                                   :
          -against-                                :   CV 05-4622 (CPS) (KAM)
                                                   :
NATIONAL WESTMINSTER, PLC,                         :
                                                   :
                    Defendant.                     :
-------------------------------------------------- x
```

## UNREPORTED DECISIONS CITED IN
## NATWEST'S MEMORANDUM OF LAW IN OPPOSITION TO
## PLAINTIFFS' MOTION TO COMPEL FURTHER DISCOVERY

CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
(212) 225-2000
Attorneys for Defendant
National Westminster Bank Plc

Of Counsel:

Jonathan I. Blackman
Lawrence B. Friedman
Sanjay S. Mody
Kirsten L. O'Connell

**INDEX OF UNREPORTED DECISIONS CITED IN
NATWEST'S MEMORANDUM OF LAW IN OPPOSITION
TO PLAINTIFFS' MOTION TO COMPEL FURTHER DISCOVERY**

British Int'l Ins. Co. v. Seguros La Republica, S.A.,
No. 90 Civ. 2370 (JFK) (FM), 2000 WL 713057 (S.D.N.Y. June 2, 2000)

Buttita v. Asbestos Corp.,
No. A-1610-04T1, 2006 WL 2355200 (N.J. Super. App. Div. Aug. 16, 2006)

Herrera v. Clipper Group, L.P.,
Nos. 97 Civ. 560 (SAS), 97 Civ. 561 (SAS), 1998 WL 229499 (S.D.N.Y. May 6, 1998)

Peninsula Asset Mgmt. (Cayman) Ltd. v. Hankook Tire Co.,
Nos. M8-85 (HB), 5:04-CV-1153, 2005 WL 3046284 (S.D.N.Y. Nov. 14, 2005)

SEC v. Euro Sec. Fund,
No. 98 Civ. 7347 (DLC), 1999 WL 182598 (S.D.N.Y. Apr. 2, 1999)



Not Reported in F.Supp.2d                                    Page 1

Not Reported in F.Supp.2d, 2000 WL 713057 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

**H**
Briefs and Other Related Documents
British Intern. Ins. Co. Ltd. v. Seguros La
Republica, S.A.S.D.N.Y.,2000.Only the Westlaw
citation is currently available.
United States District Court, S.D. New York.
BRITISH INTERNATIONAL INSURANCE
COMPANY LIMITED, Plaintiff,
v.
SEGUROS LA REPUBLICA, S.A., Defendant.
**No. 90Civ.2370 (JFK)(FM).**

June 2, 2000.

MEMORANDUM OPINION AND ORDER
MAAS, Magistrate J.
*1 Presently before the Court is a motion by
plaintiff British International Insurance Company
Limited, formerly known as American Centennial
Insurance Company ("ACIC" or "Plaintiff"), for an
order compelling defendant Seguros La Republica,
S.A., now known as Aseguradora Interraciones,
S.A. ("La Republica"), to furnish certain
post-judgment asset discovery. La Republica
opposes this motion principally on the theory that
Mexican law either renders ACIC's requests
irrelevant or prohibits La Republica's compliance.
As explained below, ACIC's motion is granted in
part and denied in part.

I. BACKGROUND

At all times relevant to this action, ACIC and La
Republica were, and both companies continue to be,
engaged in the business of insurance and
reinsurance. (O'Donnell Cert. dated November 12,
1999 ("O'Donnell Cert.") Ex. A ("Compl.") ¶¶
1-2; Martinez Cert. ¶ 2).

La Republica is a member of Grupo Financiero
Interacciones, S.A. de C.V. ("Grupo Financiero"), a
financial holding company organized under

Mexican law. (Martinez Cert. ¶ 2; Alvarez Cert.
dated November 12, 1999 ("Alvarez Cert. I") ¶¶
4-5).FN1

> FN1. Grupo Financiero has three
> subsidiaries: La Republica; Banco
> Interacciones, S.A., a banking company;
> and Interacciones Casa de Bolsa, S.A. de
> C.V., which is a brokerage house.
> (Martinez Cert. ¶ 2).

This lawsuit stems from reinsurance agreements that
ACIC alleges were memorialized in 26 "facultative"
insurance certificates issued by La Republica to
ACIC. (Compl.¶¶ 7-9).FN2 ACIC claims that La
Republica failed to remit its share of losses that
ACIC paid to its insureds pursuant to the underlying
insurance policies. (Id.).

> FN2. There are two types of reinsurance
> agreements. Under a facultative insurance
> agreement, an insurer cedes all or part of
> the risk under specific insurance policies to
> a reinsurer who may participate in
> litigation or claims adjustment. Under a "
> treaty" insurance agreement, the reinsurer
> must rely on the efforts of the reinsured
> and has no right to participate in the
> management of the claim or suit. *United
> States v. Brennan*, 938 F.Supp. 1111, 1123
> (E.D.N.Y.1996), *rev'd on other grounds*,
> 183 F.3d 139 (2d Cir.1999).

*A. Procedural History*

ACIC filed its complaint in April 1990. In June
1992, the Court ordered La Republica to post $5.7
million in pre-answer security pursuant to Section
1213(c)(1)(A) of the New York Insurance Law.FN3
(O'Donnell Cert. Ex. B at 3). After La Republica
refused to post the required security, (*see id.* Ex. C),
the Court held that a default judgment should be

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 2

Not Reported in F.Supp.2d, 2000 WL 713057 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

entered against La Republica once the extent of ACIC's damages was determined. *See ACIC v. La Republica,* No. 90 Civ. 2370, 1995 WL 731630, at *9 (S.D.N.Y. Dec. 11, 1995).

> FN3. New York Insurance Law § 1213(c)(1) provides that:
> Before any unauthorized foreign or alien insurer files any pleading in any proceeding against it, it shall either:
> (A) deposit with the clerk of the court in which the proceeding is pending, cash or securities or file with such clerk a bond with good and sufficient sureties, to be approved by the court, in an amount to be fixed by the court sufficient to secure payment of any final judgment which may be rendered in the proceeding, but the court may in its discretion make an order dispensing with such deposit or bond if the superintendent certifies to it that such insurer maintains within this state funds or securities in trust or otherwise sufficient and available to satisfy any final judgment which may be entered in the proceeding, or
> (B) procure a license to do an insurance business in this state.

Following an inquest conducted before former Magistrate Judge Leonard Bernikow, and pursuant to his Report and Recommendation, the Court ordered the entry of a default judgment against La Republica in the amount of $11,251,696.35, plus interest to the date of judgment. *See id.,* 1999 WL 301689, at *10 (S.D.N.Y. May 12, 1999). Thereafter, on May 17, 1999, the Clerk of the Court entered a default judgment against La Republica in the amount of $11,801,024.98. (O'Donnell Cert. Ex. E).

Responsibility for certain remaining aspects of this case was reassigned on November 5, 1998, to Magistrate Judge Henry B. Pitman, and on September 29, 1999, to me. I then held a conference on November 4, 1999, to address the progress of post-judgment discovery. By the time of the November conference, ACIC had filed a motion to compel discovery which failed to address the effect of a lawsuit that La Republica had filed in Mexico in late 1995 ("Mexican Action"). In the Mexican Action, which remains pending, La Republica is seeking, *inter alia,* a judicial declaration that the reinsurance agreements relied upon in this suit are null and void.[FN4] (*See* Ramirez Cert. ¶ 2-3; Pl.'s Mem. dated November 12, 1999 ("Pl.'s Mem. I") at 4).

> FN4. La Republica instituted the Mexican Action against nine defendants. ACIC, however, was named only as a third-party defendant. Although the suit has been pending for nearly five years, it appears that none of the defendants and only five of the sixteen third-party defendants (including ACIC) have been served. (*See* Alvarez Cert. dated December 7, 1999 (" Alvarez Cert. II") ¶¶ 6-7).

**\*2** To permit the parties to brief the issues raised by the Mexican Action, I denied the motion to compel and directed ACIC to submit a new set of motion papers. The renewed motion to compel was filed on November 24, 1999. The last submission in connection with that renewed motion was received on April 12, 2000.

More recently, on May 4, 2000, the United States Court of Appeals for the Second Circuit issued two decisions in this case. In a *per curiam* opinion, the Court rejected La Republica's argument that the security requirement of New York Insurance Law § 1213 violated its due process rights. *British Int'l Insur. Co. v. Seguros La Republica, S.A.,* 2000 WL 531466 (2d Cir. May 4, 2000). In an accompanying summary order, the Court rejected several additional claims by La Republica, but nevertheless remanded the case to this Court to determine whether certain of ACIC's legal expenses were reimbursable and whether ACIC had presented proof of $52,987 of the $910,630 that it claims to have paid its insureds. *Id.,* 2000 WL 553188 (2d Cir. May 4, 2000). The issues raised in the summary order appear to fall within the ambit of my assignment to oversee general pretrial matters and report and recommend regarding dispositive motions.[FN5]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 3

Not Reported in F.Supp.2d, 2000 WL 713057 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

FN5. The schedule for addressing these issues is considered *infra*.

### B. *Mexican Action*

As noted above, ACIC's renewed motion requires this Court to consider the effect, of the Mexican action, if any, on discovery. In that action, on November 22, 1995, the Twentieth Civil Court of the Federal District of Mexico entered an Order (" Mexican Order") which states, in part, that
any execution of judgment originating abroad will be subject to the result of [the] trial [of the Mexican Action], as ordered by articles 1347-A section VI of the Commerce Code and 571 section VI of the Civil Procedure Code, applied suppletorily [*sic* ] to the Commercial Legislation, which cause is the subject matter of the legal action filed, until there is a final judgment to the effect of preserving and having invoked articles complied with.

(Ramirez Cert. Ex. A at 3-4).[FN6]

FN6. The translation of the Mexican Order supplied by La Republica is sworn to be a true and correct translation. (*Id.* at 5).

In arriving at this determination, the Mexican court relied upon two provisions of Mexican law. Neither party has furnished the Court with a translation of one of these provisions, Article 571 of the Mexican Code of Civil Procedure. Moreover, there is a dispute as to the correct translation of the second provision, Article 1347-A of the Mexican Civil and Commercial Codes ("Article 1347-A"). According to Westlaw, Article 1347-A provides:
Final judgments and decrees of foreign countries may be enforceable if the following conditions are followed:

(VI) The cause of action that resulted in the foreign judgment is not the subject-matter of a pending action between the same parties in a Mexican tribunal predating the foreign action or letters rogatory to serve the other party have not been processed and delivered to the Foreign Secretariat

or the state authority to effect service of process.

**\*3** Mexican Civil and Commercial Codes art. 1347-A (1996 WL 919809).

ACIC has furnished a somewhat less fluid, but similar, translation of Article 1347-A, which reads as follows:
Judgments and resolutions rendered abroad may be enforceable if the following conditions are met:

VI. That the cause of action which gave origin to them is not the subject matter of pending litigation among the same parties before Mexican Courts and in which the Mexican Court anticipated assumption of jurisdiction or at least that the rotary letters to serve process would have been issued and delivered to the Ministry of Foreign Relations or to the authorities of the State where service of process has to be carried out. The same ruling shall apply when a final judgment has been rendered.

(Alvarez Cert. II ¶ 10).

Finally, La Republica has submitted a verified translation of Article 1347-A which provides as follows:
Judgements and rulings issued abroad may have full force and effect if the following conditions are satisfied:

VI. When the action that gave rise to them is not the subject matter of a lawsuit that is pending between the same parties in Mexican courts and in which the Mexican court has conducted a preliminary hearing or at least has processed and delivered the letters rogatory or request for a subpoena to the Office of the Secretary of Foreign Relations or to the authorities of the state where the summons must be served. The same rules shall apply to final judgments.

(Feb. 29, 2000, letter from Albert E. Fowerbaugh, Jr., Esq., to the Court Attach. at 3). La Republica further contends that the Westlaw version of Article

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2000 WL 713057 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

1347-A "is *not* accurate and should not be relied upon by this Court." (*Id.* at 1)

Following the entry of the Mexican Order, ACIC attempted to appeal it, but the Twentieth Civil Court and Seventh Chamber of the Superior Court of Appeals for the Federal District (Mexico City) stayed that appeal until all the defendants and third-party defendants were served. (Alvarez Cert. II ¶ 8). The appeal later was dismissed. (*Id.*).

ACIC then filed a constitutional complaint in the Eighth Federal Court for Civil Matters seeking to vacate the order of the Twentieth Civil Court staying ACIC's appeal from the Mexican Order. (*Id.* ¶ 9). As part of this separate action, ACIC sought an additional stay to ensure that its constitutional challenge to the Mexican order would be heard first. That application, which also was denied, is the subject of a separate appeal to the Third Collegiate Tribunal in Mexico. (*Id.* ¶ 13).

### C. *Status of Discovery*

In July 1999, ACIC attempted to initiate post-judgment asset discovery, serving 71 interrogatories, 57 document requests, and notices to depose four individuals: Carlos Hank Rhon (the chairman of the board of La Republica and a board member of Grupo Financiero); Carlos Hank Gonzalez (a board member of both entities); Arturo Martinez de la Mora (the chief executive officer of Grupo Financiero and a board member of La Republica); and Marco Cardenas Barquet (the chief executive officer of La Republica). (Pl.'s Mem. I at 6-7).

**\*4** In response to the interrogatories and document requests, La Republica disclosed information concerning its remainder interest in a trust fund in Houston, Texas, valued at approximately $25,000, but objected to every request for information concerning its Mexican assets.[FN7] (*See* O'Donnell Cert., Exs. J, K). La Republica declined, however, to produce any of the noticed witnesses for a deposition. (*Id.* Ex. I).

FN7. It appears that these holdings are substantial. Indeed, La Republica's financial statement for the year ending December 31, 1997, reflects net equity in excess of 86 million Mexican pesos, which is approximately US$9 million at current exchange rates. (*See* O'Donnell Cert. Ex. F).

La Republica contends that any more extensive disclosure would violate several provisions of Mexican law which allegedly prohibit it from disclosing any information to ACIC concerning its Mexican assets. (*See* O'Donnell Cert. Exs. J at 2, K at 2). In addition to the Mexican Order and Article 1347-A, La Republica relies upon Rule 18(IV) of the General Rules for the Constitution and Operation of Financial Groups, and Article 35 of the Financial Groups Law.

According to La Republica, Rule 18(IV) provides that:
It is prohibited [for] the holding company: IV. To disclose information related to its operations or related to the operations of other members of the group, other than to the legally empowered government agencies; such prohibition to include board members, examiners, officers, employees and generally anyone who may execute binding commitments on behalf of the holding company.

(Ramirez Cert. ¶ 8).

According to La Republica, Article 35 states that:
The violation of the precepts of this law and of the rules that are issued in accordance herewith, shall be punished by a fine to be levied by the National Banking and Securities Comission [sic] or the National Insurance and Bonds Commission, each within its respective area of competence, up to five percent of the paid-in capital of the infringing company, such fine to be notified to the Board of Directors of the infringing company.

(*Id.*).[FN8]

FN8. ACIC has supplied its own translations of Rule 18(iv) and Article 35. (

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2000 WL 713057 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

*See* Alvarez Cert. 1 ¶¶ 8-9). The differences between the two translations are insignificant for purposes of this Memorandum Opinion and Order.

La Republica contends that it therefore is prohibited from disclosing any information concerning its " operations" pursuant to these provisions because it is a member of Grupo Financiero, which is a holding company within the meaning of Rule 18(iv). (*See* Ramirez Cert. ¶¶ 8-10; Def.'s Mem. at 9-10). La Republica's Mexican law expert opines that all of the discovery sought by ACIC-including information about La Republica's physical assets-is prohibited because it is part of the operations of Grupo Financiero. (Ramirez Cert. ¶ 8). ACIC's expert concludes, to the contrary, that the discovery sought does not relate to La Republica's operations, and that only Grupo Financiero is barred from making disclosures. (Alvarez Cert. I ¶¶ 10-13).

Although the parties have conferred several times in an unsuccessful attempt to resolve their discovery disputes, (*see* O'Donnell Cert. Exs. M-Q), after which La Republica provided supplemental responses, (*id.* Ex. P), some twenty interrogatories remain in dispute (*id.* Ex. Q). Additionally, La Republica has yet to produce any deposition witnesses. (*See id.* Ex. I). At one point during the parties' discovery discussions, La Republica offered to produce Mr. Martinez de la Mora to provide testimony, pursuant to Fed.R.Civ.P. 30(b)(6), regarding all of La Republica's assets and liabilities, including its assets in Mexico. (*See* O'Donnell Cert. ¶ 2; Hassan Cert. ¶ 4, Ex. F). That offer, however, was subject to several conditions, including ACIC's agreement that his testimony would never be disclosed to any Mexican authorities. (*See id.*). ACIC declined La Republica's proposed compromise, citing concerns about La Republica's good faith. (O'Donnell Cert. ¶ 3).

### D. *Renewed Discovery Motion*

**\*5** ACIC seeks an order: (1) compelling the asset depositions of the four deponents originally noticed in July 1999; (2) granting letters rogatory pursuant to Fed.R.Civ.P. 28(b) in the event that these four

witnesses are not produced; (3) requiring responses to the disputed interrogatories and document requests; and (4) authorizing the service of information subpoenas pursuant to New York CPLR § 5224. (*See* ACIC Notice Mot.). ACIC contends that it is entitled to this post-judgment relief under Rule 69 of the Federal Rules of Civil Procedure.

La Republica, on the other hand, contends that the requested discovery should be denied as irrelevant because ACIC will not be able to enforce its default judgment in Mexico prior to a final resolution of the Mexican Action. La Republica also claims that any order compelling the requested discovery would require La Republica's directors to violate Mexican law. Finally, La Republica argues that ACIC's use of information subpoenas pursuant to New York State law would be improper because Rule 69 prohibits a judgment creditor from utilizing *both* federal and state asset discovery procedures in the same action. (*See* Def.'s Mem. at 12-14).

### II. *DISCUSSION*

### A. *Relevance of Requested Information*

Rule 69 of the Federal Rules of Civil Procedure, which governs post-judgment asset discovery, provides, in part, that:
In aid of the judgment or execution, the judgment creditor or a successor in interest when that interest appears of record, may obtain discovery from any person, including the judgment debtor, in the manner provided in these rules or in the manner provided by the practice of the state in which the district court is held.

Under the Rule, a judgment creditor is entitled to a wide range of discovery concerning the assets and liabilities of a judgment debtor. *See, e.g., Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.,* No. 88 CV 3039, 1993 WL 50528, at *1 (E.D.N.Y. Feb. 23, 1993)("The scope of [Rule 69] post-judgment discovery is broad."); *S.E.C. v. Tome,* No. 81 Civ. 1836, 1987 WL 9415, at *1 (S.D.N.Y. Apr. 3, 1987)(same). A judgment creditor is

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 6

Not Reported in F.Supp.2d, 2000 WL 713057 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

therefore ordinarily entitled to "a very thorough examination of a judgment debtor with respect to its assets," *Greyhound,* 1993 WL 50528, at *1 (internal quotation marks omitted), including " discovery [of] the identity and location of any of the judgment debtor's assets, wherever located." *Minpeco v. Hunt,* No 81 Civ. 7619, 1989 WL 57704, at *1 (S.D.N.Y. May 24, 1989)(quoting *National Service Industries, Inc. v. Vafla Corp.,* 694 F.2d 246, 250 (11th Cir.1982)).

La Republica concedes that, as a judgment creditor, ACIC is entitled to extensive information about La Republica's assets. (*See* Def.'s Mem. at 7.) It nevertheless maintains that the information that ACIC seeks concerning La Republica's assets in Mexico is not relevant because ACIC is barred from executing its judgment against any such assets until the Mexican Action has been resolved. (*Id.* at 7-9). In advancing this argument, La Republica appears to equate the concept of relevance with the likelihood of a prompt recovery. However, even if a judgment debtor is destitute, there is arguably no information concerning its financial situation which is of greater potential relevance to a judgment creditor than the identity and location of the debtor's assets. The fact that a judgment creditor may have difficulty reaching those assets is not determinative of relevance. Indeed, if the relevance of post-judgment discovery proceedings were to be judged by the likelihood of a prompt recovery against a judgment debtor's assets, few, if any, seemingly indigent debtors would ever be subject to post-judgment asset depositions. Moreover, whenever post-judgment asset discovery was sought, the Court would inevitably become mired in debates about the likelihood that the party seeking discovery could eventually locate any unencumbered assets. In short, at the enforcement stage, the Court would routinely be required to second-guess its own previously-entered judgments. This, in effect, is what La Republica now asks this Court to do. La Republica has not cited any authority, however, which would require this result.

*6 Additionally, it is clear that the Mexican Order does not limit ACIC's right to secure discovery of La Republica's assets in Mexico. Indeed, the Order does not even refer to discovery. Instead, it simply

requires that any *enforcement* of the default judgment be deferred until the Mexican Action is resolved. Requiring that La Republica submit to asset depositions before a final determination of the Mexican Action is therefore wholly consistent with the language of the Mexican Order.

The Mexican Order also relied upon Article 1347-A as authority for its delay in the enforcement of the default judgment in this case. The parties have presented various contradictory translations of that statute, and each has presented legal arguments based upon the version that it favors. Suffice it to say, there is no need to resolve the alleged conflicts among the various translations of Article 1347-A because, like the Mexican Order, Article 1347-A addresses only the issue of enforcement. Since ACIC is not presently seeking to enforce its default judgment, Article 1347-A is inapplicable.

Finally, even if Article 1347-A were somehow controlling, La Republica would not be entitled to avoid or delay discovery on the theory that the Mexican courts ultimately may render the judgment in this action unenforceable in Mexico. Indeed, if this action did not involve a second lawsuit in a foreign country, La Republica would be able to reverse this Court's judgment only by successfully prosecuting an appeal. Absent the entry of a stay, however, ACIC would be entitled to conduct asset discovery during the pendency of that appeal. *See National Serv. Indus., Inc. v. Vafla Corp.,* 694 F.2d 246, 250 (11th Cir.1982)("discovery in aid of [a judgment's] execution is not precluded by the filing of an appeal"); *Tome,* 1987 WL 9415, at *1 (permitting asset discovery while a judgment is being appealed). In this case, since it failed to post the security required by the Court, La Republica is not in a position to seek a stay pending the outcome of the Mexican appeal. More importantly, it does not appear that any of the Mexican courts have been asked, much less agreed, to stay any discovery. Accordingly, as would be true during the pendency of an appeal, the mere possibility that the judgment in this case might, as a practical matter, eventually be rendered unenforceable by another court should not bar ACIC from seeking timely information regarding La Republica's assets.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                        Page 7

Not Reported in F.Supp.2d, 2000 WL 713057 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

### B. *Potential Conflict With Mexican Law*

La Republica raises the separate, but nevertheless related, claim that any response to the ACIC discovery requests that disclosed its Mexican assets would run afoul of Rule 18(iv) of the General Rules for the Constitution and Operation of Financial Groups and Article 35 of the Financial Groups Law because La Republica is a subsidiary of the Grupo Financiero holding company. This requires the Court to resolve a disputed question of foreign law.

*7 Under Fed.R.Civ.P. 44.1, the determination of the effect of a foreign law presents a question of law for the Court which may "consider any relevant material or source" without regard to its admissibility under the Federal Rules of Evidence. *See* Fed.R.Civ.P. 44.1; *In re Euromepa, S.A.,* 154 F.3d 24, 28 n.2 (2d Cir.1998). Among other sources, the Court may consider the opinions of experts, but it is not bound by their testimony, even if uncontradicted. *Batruk v. Mitsubishi Motors Corp.,* Nos. 94 Civ. 7593, 8677, 1998 WL 307383, at *3 (S.D.N.Y. June 19, 1998)(Wood, J.); *In re Arbitration Between: Trans Chem. Mach. Ltd. and China Nat'l Import and Export Corp.,* 978 F.Supp. 266, 275 (S.D.Tex.1997), *aff'd,* 161 F.3d 314 (5th Cir.1998); *Curtis v. Beatrice Foods Co.,* 481 F.Supp. 1275, 1285 (S.D.N.Y.)(Pollack, J.), *aff'd,* 633 F.2d 203 (2d Cir.1980); 9 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2444, at 646 (2d ed.1995).

The evidence presented to the Court on this issue consists of certifications by the parties' foreign law experts, who are experienced Mexican attorneys. La Republica's expert, Geraldo Ramirez Omelas, opines that the disclosure of any information about La Republica's physical assets would likely concern its "operations" and is therefore prohibited by Rule 18(iv). (Ramirez Cert at ¶ 8.) Mr. Ramirez further opines that the disclosure of any information about La Republica's dealings with other members of Grupo Financiero or Grupo Financiero itself is also prohibited. (*Id.*). Not surprisingly, ACIC's foreign law expert, Victor Alvarez de la Torre, takes the opposite view, stating that the term "operations" in Rule 18(iv) is "linked" to the "main financial, banking or insurance activities" of financial

institutions, that Grupo Financiero is therefore only precluded from disclosing information regarding its holding of shares in its subsidiaries, and that La Republica may freely disclose any information not relating to its actual insurance and reinsurance operations. (Alvarez Cert. I ¶¶ 11-13).

In the course of rendering their opinions, neither party's expert has cited any case law or other sources which would lend credence to his representations regarding the manner in which Rule 18(iv) should be applied. Accordingly, their competing opinions add little, if anything, to the plain language of the Rule, and essentially cancel each other out.

In these circumstances, it is appropriate for the Court to reach its own determination as to the scope of the disclosure permitted by Mexican law. My reading of La Republica's English language rendition of Rule 18(iv) suggests that only a "holding company" and its officers, directors, and employees are prohibited from making disclosures regarding the holding company's operations or those of its constituent companies. Therefore, La Republica, and its officers, directors, and employees, are not barred from making disclosures regarding the nature, extent and whereabouts of *La Republica's* assets, including any such assets that may be held by Grupo Financiero or its constituent companies. The four depositions noticed by ACIC consequently are proper because each of the proposed deponents is an officer, director or employee of La Republica. The fact that several of the deponents also hold a second position or title at Grupo Financiero does not diminish their ability to testify about *La Republica's* assets based upon their affiliation with La Republica.

*8 Several further observations concerning La Republica's foreign law objections to the asset discovery sought by ACIC are appropriate. First, as ACIC correctly notes, La Republica's offer to produce Mr. Martinez de la Mora, the chief executive officer of Grupo Financiero, to testify as a Rule 30(b)(6) witness in this case substantially undermines La Republica's foreign law objection. Although La Republica indicates that the witness was proffered merely because he was present at a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                      Page 8

Not Reported in F.Supp.2d, 2000 WL 713057 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

November 3, 1999, pretrial conference in this case, (
*see* Dec. 15, 1999, letter from Michael R. Hassan,
Esq., to the Court at 2), La Republica cannot have it
both ways. If Article 18(iv) broadly prohibits
disclosures by *anyone* affiliated with a holding
company, La Republica should not be in a position
to offer Mr. Martinez de la Mora (or any of the
other proposed deponents) "as a compromise." (*See
id.*).

Second, Article 35 imposes a financial penalty of "
up to five percent" of an infringing company's
paid-in capital for any improper disclosures. La
Republica has not established that it would, in fact,
be required to pay a substantial fine for the sorts of
disclosure sought by ACIC in this case. Moreover,
any fine that La Republica may face could
obviously have been avoided by posting the security
previously required by this Court. Since La
Republica failed to post that security, the quandary
that it allegedly now faces is entirely its own doing.

Third, "[t]he party relying on foreign law has the
burden of showing that such law actually bars [the]
production" or testimony at issue. *United States v.
Vetco Inc.,* 691 F.2d 1281, 1289 (9th Cir.1981). "In
order to meet that burden, the party resisting
discovery must provide the Court with information
of sufficient particularity and specificity to allow
the Court to determine whether the discovery sought
is indeed prohibited by foreign law." *Alfadda v.
Fenn,* 149 F.R.D. 28, 34 (S.D.N.Y.1993). Here,
apart from the conclusory assertions of its foreign
law expert, La Republica has not offered any
corroborative detail to establish that its
interpretation of Rule 18(iv) is the correct one.
Accordingly, it has not met its burden.

Finally, even if this Court were to conclude that La
Republica would violate Mexican law by disclosing
its Mexican assets to ACIC in this action, the
blanket denial of ACIC's motion to compel would
not necessarily be the result. Rather, in such
circumstances, courts in this country typically
analyze several factors relevant to principles of
international comity to determine the respective
interests of the United States and the country whose
citizens are being asked to respond to the discovery
requests. *Madanes v. Madanes,* 186 F.R.D. 279,

285 (S.D.N.Y.1999)(Francis, M.J.). The United
States Supreme Court has indicated that those
factors are:
(1) the importance to the ... litigation of the
documents or other information requested;
(2) the degree of specificity of the request;
**\*9** (3) whether the information originated in the
United States;
(4) the availability of alternative means of securing
the information; and
(5) the extent to which noncompliance with the
request would undermine important interests of the
United States, or compliance with the request would
undermine important interests of the state where the
information is located.

*Societe Nationale Industrielle Aerospatiale v.
United States District Court,* 482 U.S. 522, 544
n.28, 107 S.Ct. 2542, 96 L.Ed.2d 461 (1987)
(quoting tentative draft of Restatement of Foreign
Relations Law of the United States (Revised) §
437(1)(c), subsequently adopted as Restatement
(Third) of Foreign Relations Law of the United
States, § 442(1)(c)). The last of these factors is of
the greatest importance in determining whether to
defer to the foreign jurisdiction. *Madanes,* 186
F.R.D. at 286; *see Garpeg, Ltd. v. United States,*
583 F.Supp. 789, 795 (S.D.N.Y.1984)(Sweet, J).

In this case, the information sought by ACIC
obviously is critical to its ability to collect on its
default judgment against La Republica. Indeed, as
La Republica concedes, all of its substantial assets
other than its interest in a $25,000 trust fund are
located in Mexico. Therefore, unless ACIC secures
information concerning La Republica's Mexican
assets, it will not be able to enforce its judgment. Of
far greater importance for present purposes, absent
such disclosure ACIC will not even be able to test
La Republica's representation that all of its other
assets are located exclusively in Mexico. It follows
that the documents sought by ACIC are not only
relevant, but "crucial." *See Richmark Corp. v.
Timber Falling Consultants,* 959 F.2d 1468, 1475
(9th Cir.1992).

Turning to the second factor, ACIC has filed an
extensive set of interrogatories and document
requests, as well as four notices of deposition.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 9

Not Reported in F.Supp.2d, 2000 WL 713057 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

Nevertheless, with the possible exception of the deposition notices, La Republica has not objected that any of these discovery requests are impermissibly overbroad. Rather, their only general objections to disclosure were that Mexican law and the Mexican Order precluded compliance, that some of the requests sought privileged information, and, inexplicably, that La Republica did not wish to respond "unless and until [ACIC] withdraws its Motion to Compel Discovery." (*See* O'Donnell Cert. Exs. J [La Republica's Answers and Objections to Interrogatories] at 2, K [La Republica's Responses and Objections to Documents Requests] at 2). Thus, having failed to complain about any alleged overbreadth or burdensomeness, La Republica has waived such objections. *See* Fed.R.Civ.P. 33(b)(4), 34(b); *Mills v. Energy Transp. Corp.,* No. 96 Civ. 4828, 1997 WL 795793, at *1 (S.D.N.Y. Dec. 30, 1997).

The third factor-location of the information-augurs against disclosure since all of ACIC's asset inquiries are apparently directed to information and people located in Mexico. This factor, however, is fully counterbalanced by the fourth factor-the unavailability of alternative means of obtaining substantially equivalent information. *See Richmark,* 959 F.2d at 1475-76; *Vetco,* 691 F.2d at 1290.

*10 The final factor requires the Court to weigh the competing interests of the United States and the foreign jurisdiction. As noted, this is obviously the most important consideration. Here, the United States obviously has a great interest in the solvency of its insurance companies, one element of which is ensuring that their reinsurers honor their financial commitments. *See Dean Constr. Co. v. Agricultural Ins. Co.,* 42 Misc.2d 834, 249 N.Y.S.2d 247 (Sup.Ct. Nassau County 1964)("public policy of [New York] State is to afford residents protection against the obstacles encountered in pursuing their legal rights against alien insurers in foreign forums" ), *aff'd,* 22 A.D.2d 82, 254 N.Y.S.2d 196 (2d Dept.1964). On the other hand, Mexico apparently has an interest in restricting access to information about the "operations" of its holding companies. The level of that interest is difficult to gauge in this case since the Mexican government has not taken any steps to object to the discovery sought by

ACIC. Similarly, La Republica has not adduced any evidence suggesting why Rule 18(iv) was promulgated or the precise national interest that it is intended to serve. As noted above, the willingness of La Republica to produce a Rule 30(b)(6) witness to testify about its Mexican assets suggests that the terms of Rule 18(iv) are not applied inflexibly, and that holding companies and their constituent companies retain the ability to "deal" when faced with a discovery request that arguably violates Mexican law.

In these circumstances, where the balance of the national interests does not militate strongly against disclosure and all but one of the remaining factors tip the other way, principles of international comity plainly are not offended by ordering disclosure of the information sought by ACIC. The concerns expressed by La Republica can also be accommodated to a certain extent by requiring that the first asset deposition be taken pursuant to Rule 30(b)(6). Although ACIC questions La Republica's good faith, if the witness or witnesses proffered pursuant to the Rule are able to provide adequate information concerning La Republica's Mexican assets, it may not be necessary to require all four proposed deponents to testify. This determination, however, obviously cannot be made at this stage.

### C. *Request for Information Subpoenas*

In addition to the foregoing discovery, ACIC seeks an order authorizing the issuance of information subpoenas pursuant to Rule 5524 of the New York Civil Practice Law and Rules. Rule 69 of the Federal Rules of Civil Procedure provides in the disjunctive that a judgment creditor may obtain discovery "in the manner provided in these rules *or* in the manner provided by the practice of the state in which the district court is held." (Emphasis added). This requires a judgment creditor to opt for one set of procedures or the other. *F.D.I.C. v. LeGrand,* 43 F.3d 163, 171-72 (5th Cir.1995); 13 James Wm. Moore et al., Moore's Federal Practice § 69.04[2], at 69-15 (3d ed. 1999) ("Once the judgment creditor makes a clear election to use either the federal or state discovery methods, only that body of law (federal or state) and not the other,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2000 WL 713057 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

will apply."). Having elected to pursue discovery under the Federal Rules of Civil Procedure, and having moved to compel that discovery, ACIC can no longer seek discovery under the CPLR. ACIC's request for the issuance of information subpoenas consequently must be denied.

## III. CONCLUSION

**\*11** For the reasons stated above, it is hereby ORDERED that:
1. By June 30, 2000, the Defendant shall make one or more witnesses available pursuant to Fed.R.Civ.P. 30(b)(6) to testify about the assets of La Republica held in Mexico. If La Republica fails to comply with this directive, or if the Rule 30(b)(6) witness(es) cannot provide sufficient detail concerning those assets, La Republica shall make Carlos Hank Rhon, Carlos Hank Gonzalez, Arturo Martinez de la Mora, and Marco Cardenas Barquet available by July 31, 2000, for asset depositions in Mexico. If any of the witnesses required by this paragraph are not made available, ACIC may apply for letters rogatory to secure their testimony.
2. By June 29, 2000, La Republica shall provide ACIC with complete answers to all outstanding interrogatories and document requests unless they call for privileged information, in which event it shall provide the privilege log required by Local Rule 26.2.
3. ACIC's request for information subpoenas is denied.
4. The Court will hold a further conference on July 11, 2000, at 10 a.m. to discuss, among other issues, the additional proceedings or papers required by the summary order recently entered by the Court of Appeals.

SO ORDERED.

S.D.N.Y.,2000.
British Intern. Ins. Co. Ltd. v. Seguros La Republica, S.A.
Not Reported in F.Supp.2d, 2000 WL 713057 (S.D.N.Y.)

Briefs and Other Related Documents (Back to top)

• 2002 WL 33139055 () Supplemental Declaration of Arturo Martinez De La Mora (May 31, 2002) Original Image of this Document (PDF)
• 2002 WL 33145508 () (Deposition) (May 23, 2002) Original Image of this Document (PDF)
• 2002 WL 33139054 () Declaration of Charles W. Wolfram (Apr. 5, 2002) Original Image of this Document with Appendix (PDF)
• 2001 WL 35013138 () Deposition Upon Oral Examination of Arturo Martinez De La Mora (Jan. 8, 2001) Original Image of this Document (PDF)
• 2000 WL 34538401 () Certification of William Gilmartin (Dec. 22, 2000) Original Image of this Document (PDF)
• 2000 WL 34936007 () Certification of William N. Edwards (Dec. 22, 2000) Original Image of this Document (PDF)
• 2000 WL 34936011 () Certification of William Gilmartin (Dec. 22, 2000) Original Image of this Document (PDF)
• 2000 WL 34500459 (Trial Motion, Memorandum and Affidavit) Certification of Thomas J. Perry in Support of Motion for Summary Judgment (Sep. 15, 2000)
• 2000 WL 34500454 (Trial Motion, Memorandum and Affidavit) Certification of Dorothy M. Fuller (Aug. 04, 2000)
• 2000 WL 34500450 (Trial Motion, Memorandum and Affidavit) Certification of William N. Edwards (Jul. 26, 2000)
• 2000 WL 34538400 () Certification of William N. Edwards (Jul. 26, 2000) Original Image of this Document (PDF)
• 2000 WL 34500445 (Trial Motion, Memorandum and Affidavit) Certification of William Gilmartin (Jan. 01, 2000)
• 1999 WL 34522153 () Certification of Victor Alvarez De La Torre in Support of Plaintiff's Motion to Compel Discovery. (Dec. 9, 1999) Original Image of this Document (PDF)
• 1999 WL 34522150 () Certification of Victor Alvarez De La Torre in Support of Plaintiff's Motion to Compel Discovery. (Nov. 17, 1999) Original Image of this Document (PDF)
• 1997 WL 34460524 () (Partial Testimony) (Jul. 24, 1997) Original Image of this Document (PDF)
• 1997 WL 34460525 () (Partial Testimony) (Jul. 24, 1997) Original Image of this Document (PDF)
• 1:90cv02370 (Docket) (Apr. 6, 1990)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 11

Not Reported in F.Supp.2d, 2000 WL 713057 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

• 1990 WL 10506776 () Certification of Gerardo Ramirez Ornelas (1990) Original Image of this Document (PDF)
• 1990 WL 10506777 () Declaration (1990) Original Image of this Document (PDF)
• 1990 WL 10506808 () (Deposition) (1990) Original Image of this Document (PDF)
• 1988 WL 1507492 () (Partial Testimony) (Aug. 18, 1988) Original Image of this Document (PDF)
• 1988 WL 1507502 () (Deposition) (Aug. 18, 1988) Original Image of this Document (PDF)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-04622-DLI-RML   Document 83-5   Filed 12/18/06   Page 16 of 48 PageID #: 1807



Not Reported in A.2d                                                                                                  Page 1

Not Reported in A.2d, 2006 WL 2355200 (N.J.Super.A.D.)
**(Cite as: Not Reported in A.2d)**

---

**C**
Buttita       v.       Asbestos       Corp.
Ltd.N.J.Super.A.D.,2006.Only the Westlaw citation
is currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
**\*1** Superior Court of New Jersey,Appellate Division.
Susan M. BUTTITTA, Individually and as
Executrix to the Estate of Mark Buttitta,
Plaintiff-Respondent,
v.
ASBESTOS CORPORATION LTD.,
Defendant-Appellant,
andAllied-Signal, Inc, Allied Corporation, Alma
Products Co., Asbestos Fibre Corp., Borg-Warner
Corp., Borg & Beck, C.L. Zimmerman Co., General
Motors Corp., Honeywell International, Inc., a
Successor in Interest to Allied Signal, Inc, and as a
Successor in Interest to Honeywell International,
Inc., and Bendix, Lake Asbestos of Quebec, Inc.,
National Gypsum Co., Raymark Industrial Division,
Union Carbide Corp., and Union Insulating Co.,
Defendants.
Argued telephonically March 7, 2006.FN1

---

> FN1. This appeal was calendared for
> argument on March 1, 2006, and was
> adjourned by the court at the request of
> counsel to a telephonic argument.
> Decided Aug. 16, 2006.

SYNOPSIS

On appeal from the Superior Court of New Jersey,
Law Division, Bergen County, Docket Number
BER-L-9592-02.

Deborah M. Knight, admitted pro hac vice, argued
the cause for appellant (Goldfein & Joseph,
attorneys; Pearl Pham, of counsel; Julie B. Master,
on the brief).
Richard D. Catenacci argued the cause for

respondent (Connell Foley, attorneys; Mr.
Catenacci, of counsel; Ryan A. McGonigle, on the
brief).

Before Judges FALL, PARKER and C.S. FISHER.
PER CURIAM.
**\*1** Plaintiff Susan M. Buttitta, individually and as
executrix of the estate of her husband Mark Buttitta,
commenced this wrongful death action against
Asbestos Corporation, Ltd. (ACL) and numerous
other defendants, alleging that her husband's illness
and death were the result of his exposure to asbestos
while he was employed at a General Motors
Corporation (GM) facility in Englewood between
1970 and 1973; his exposure to asbestos dust from
his father, who was employed by GM at its
Bloomfield and Englewood facilities from 1952
through the 1970s; and his exposure to asbestos
dust from his brother, who was employed by GM in
Englewood between 1970 and 1971. Mark Buttitta
contracted mesothelioma and died on December 21,
2002, at the age of forty-nine.

ACL, which has also been known as "Societe
Asbestos Limitee," was incorporated under
Canadian law in 1925, and was engaged in the
mining and milling of raw chrysotile asbestos fiber,
a natural mineral substance, but not a product, from
1925 to 1986. ACL sold its raw chrysotile asbestos
fiber F.O.B. Thetford Mines, Quebec Canada.

On leave granted, ACL appeals from an order
entered in the Law Division on June 10, 2005,
striking its answers and defenses, without prejudice,
for failure to provide discovery as required by prior
court orders, and requiring ACL to pay certain
counsel fees and expenses. The following factual
and procedural history is relevant to our
consideration of the arguments advanced on appeal.

On or about November 22, 2002, prior to Mark
Buttitta's death, he and his wife, Susan Buttitta,
filed a complaint in the Law Division against
various defendants, including ACL. Subsequently,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                  Page 2

Not Reported in A.2d, 2006 WL 2355200 (N.J.Super.A.D.)
**(Cite as: Not Reported in A.2d)**

the complaint was amended three times and a fourth amended complaint was filed on September 16, 2004. After her husband's death, Susan Buttitta continued the lawsuit individually and as executrix of her late husband's estate. The amended complaint asserts claims of negligence, wrongful death, and products liability due to the decedent's alleged exposure to asbestos while employed for co-defendant GM, in Englewood, New Jersey, from 1970 to 1973.

Mark Buttitta's father, Frank Buttitta, Sr., was employed by GM in Bloomfield, New Jersey, and Englewood, New Jersey, from about December 3, 1952 throughout the 1970s. Mark Buttitta's brother, Frank Buttitta, Jr., was employed by GM in Englewood, New Jersey, during portions of 1970 and 1971. Plaintiff alleges decedent was exposed to asbestos dust from his father and brother, their clothing, and from the co-workers he car pooled with to the GM facility.

On October 6, 2004, ACL filed its answer to plaintiff's fourth amended complaint. In its defenses, ACL raised Canadian law. In particular, ACL asserted that the claims in plaintiff's complaint were "subject to the laws and regulations of the Dominion of Canada and the Province of Quebec, and recognition of plaintiff's claims for relief would offend the Comity of Nations." Furthermore, ACL contended that plaintiff's claims were "subject to the laws and regulations of the Province of Quebec and the Dominion of Canada, and their claims for relief must be determined under the laws of those jurisdictions."

**\*2** This appeal concerns ACL's responses to certain interrogatory questions, and ACL's contention that it was prohibited from providing certain information because it was bound by the Quebec Business Concerns Records Act (QBCRA) which, according to ACL, prohibits the removal of that information from Canada. ACL contends that if forced to violate the provisions of the QBCRA it would be subject to criminal penalties. ACL also argued that the information sought in the interrogatories in question was overly broad and vague. ACL contends that it " never sold any of its raw chrystotile asbestos fiber to any of plaintiff's alleged exposure sites."

Because the Law Division did not develop the record by analyzing the discovery issues presented through application of the factors set forth in *Societe Nationale Industrielle Aerospatiale v. United States District Court for Southern District of Iowa,* 482 *U.S.* 522, 107 *S.Ct.* 2542, 96 *L. Ed.*2d 461 (1987) (*Aerospatiale* ) and *Restatement (third) of Foreign Relations Law of the United States,* § 442 (1987) (*Restatement* ), we are constrained to vacate the June 10, 2005 order and remand the matter for reconsideration consistent with this opinion. The following procedural history and analysis informs our decision.

On June 2, 2003, plaintiff served the first set of interrogatories to all defendants. Plaintiff requested general and specific information concerning the defendants' business, asbestos milling and marketing, and activities regarding asbestos products.

On or about July 30, 2003, ACL answered plaintiff's first set of interrogatories. ACL set forth a preliminary statement and general objections to plaintiff's requests. In particular, ACL objected to discovery and production of certain documents because the QBCRA, Chapter D-12 of the Revised Statutes of Quebec (1977), prohibited such disclosure. ACL also objected to the purported vagueness and overly broad nature of plaintiff's requests.

By letter dated August 27, 2003, plaintiff outlined alleged deficiencies in ACL's answers to the first set of interrogatories. Specifically, plaintiff objected to ACL's responses to questions numbered 5, 11(g), 21, 24, 46, and 53, contending that the answers provided were evasive, non-responsive, incomplete, or deficient.

Interrogatory questions numbered 5, 11(g), 21, 24, 46, and 53 read as follows:
5. State whether you have controlled, purchased, or in any way acquired any controlling interest in any corporation or business entity which has mined, manufactured, produced, processed, compounded, sold, supplied, distributed and/or otherwise placed asbestos or asbestos containing products in the stream of commerce. If so, state:

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Page 3

Not Reported in A.2d, 2006 WL 2355200 (N.J.Super.A.D.)
**(Cite as: Not Reported in A.2d)**

a. The name and address of said corporation or business entity;
b. The dates you controlled, purchased or acquired any interest; and
c. The nature of the business as it pertains to asbestos.

* * * *
**\*3** 11. If your answer to any of subparts of the preceding interrogatory regarding asbestos is in the affirmative, state:
a. The trade, brand name, and/or generic name of such asbestos milled or marketed in any form or quantity between 1950 and 1975;
b. The date(s) such asbestos was first placed on the market, including the date(s) such asbestos was first marketed;
1. On an experimental basis;
2. On a test basis;
3. For sale.
c. The date(s) such asbestos:
1. Ceased to be produced; or
2. Was recalled from the market, if ever.
d. A description of the chemical composition of such asbestos, including the type and/or grade of asbestos;
e. A description of the physical appearance and nature of such asbestos, including any color coding, distinctive marking and/or logo on the packaging or container;
f. A detailed description of the intended use of such asbestos;
g. Identify to whom such asbestos has, at any time, been sold. As to each such, state:
1. The names of each such company, governmental agency or entity, distributor, supplier or manufacturer;
2. The inclusive dates of each such sale, and the amount (quantity) and the trade brand name of such asbestos sold;
3. The manner of shipment (e.g.boat, rail, etc.)
4. Whether you have any records indicating such sale or shipment and, if so, the name, address and job classification of each person who currently has possession of such records.
5. Either (1) attach all documents evidencing the information sought in this Interrogatory and its subparts to your answers to these Interrogatories, or

(2) attach disks containing such data, or (3) describe such documents with sufficient particularity that they may be made the subject of a request for production of documents.

* * * *
21. Has defendant ever been a member of or affiliated with any trade groups, professional associations or organizations? If so, identify each such group, association or organization and set forth the inclusive dates of defendant's membership in each.

* * * *
24. Has your company ever been a member of, affiliated with or provided funding for the industrial Hygiene Foundation? If so, indicate when your company was a member or affiliated with this organization and set forth the dates, if applicable, when you provided funding to this organization.

* * * *
46. As to any asbestos containing products or asbestos mined, converted, fabricated, produced, compounded, manufactured, processed, sold or distributed by defendant, state whether any was shipped, distributed or sold to, either directly or through a third party to: (a) General Motors, including all divisions, affiliates, predecessors and successors; (b) any General Motors facility in New Jersey, including all divisions, affiliates, predecessors, and successors; and (c) Multi-Chevrolet, Rahway, New Jersey.

* * * *
**\*4** 53. Prior to 1975, did any person file a Workers Compensation claim for asbestos-related injury against this defendant or against any Workers' Compensation insurance carrier which provided coverage for this defendant? If so, state the total number of such claims and, for the first 20 such claims state:
a. The date of such claim;
b. The name of the claimant;
c. The case number;

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                           Page 4

Not Reported in A.2d, 2006 WL 2355200 (N.J.Super.A.D.)
**(Cite as: Not Reported in A.2d)**

d. The court in which the claim was filed;
e. The identity of this defendant's custodian of documents evidencing such claims.

ACL answered those interrogatory questions, as well as question number 4, in the following manner:
*Response No. 4:* From 1925 to 1986, ACL's sole business activity was the mining and milling of raw chrysotile asbestos fiber, a naturally occurring mineral substance and not a product. ACL's raw chrysotile asbestos fiber was sold F.O.B Thetford Mines, Quebec, Canada. Further, ACL has never sold any of its raw chrysotile asbestos fiber to any of plaintiff's alleged exposure sites.
*Response No. 5:* Objection; vague, ambiguous, irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving said objections, see defendant's response to Interrogatory No. 4 above, which is incorporated by reference herein.

* * * *

*Response No. 11:* Objection; overbroad, unduly burdensome, irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving said objections, see defendant's response to Interrogatory No. 4 above, which is incorporated by reference herein. By way of further response, ACL states that raw chrysotile asbestos is a hydrous magnesium silicate (H4, Mg3, Si2, O2) and is generally white or off-white in color. ACL's fiber was packaged in plastic polyethylene or paper bags. Prior to the use of paper and/or plastic bags, jute bags were used. The bags bore the printed name of the company, and a statement of weight, fiber grade and the initials of the mine from which it was obtained.
ACL labeled packages containing its asbestos fiber with the words:

Caution Contains Asbestos Fibre Avoid Creating
Dust Breathing Asbestos Dust May Cause Serious
Bodily Harm

This label has been prescribed for use by the United

States Department Of Labor, Occupational Safety and Health Administration pursuant to 29 *C.F.R.* § 1910.1001. It was promulgated in 1972. Prior to that time and commencing in January 1970, ACL labeled bags of raw asbestos fibre with the notice:
Caution-This bag contains chrysotile asbestos fibre. Persons exposed to this material should use adequate protective devices as inhalation of this material over long periods may be harmful.
In 1980, the following wording was put on the bags:

WARNING

Contains Asbestos Fibres Avoid Creating Dust
Breathing Asbestos Dust May Cause Cancer And
Other Fatal Diseases Smoking Greatly Increases
The Lung Cancer Risk

**\*5** There are literally thousands of uses for raw chrysotile asbestos fiber and ACL's fiber was sold to sophisticated purchasers and/or users.

* * * *

*Response No. 21:* Objection; overbroad, unduly burdensome, irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving said objections, ACL was, at one time, an associate member of the Quebec Asbestos Mining Association ("QAMA") and an associate, non-voting member of the Asbestos Textile Institute ("ATI"). The exact dates of membership are unknown.

* * * *

*Response No. 24:* See defendant's response to Interrogatory No. 21 above, which is incorporated by reference herein.

* * * *

*Response No. 46:* Objection; overbroad; unduly burdensome, irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Defendant objects to this interrogatory to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2006 WL 2355200 (N.J.Super.A.D.)
**(Cite as: Not Reported in A.2d)**

the extent that it is not limited in time or scope to plaintiff's alleged exposure. Subject to and without waiving said objections, ACL states that it has never sold or supplied any of its raw chrysotile asbestos fiber, which is not a product, to any of the plaintiff's alleged exposure sites.

* * * *

*Response No. 53:* Objection; overbroad; unduly burdensome, irrelevant, and not reasonably calculated to lead to the discovery of admissible evidence. Since plaintiff is not alleged to have been an employee of answering defendant, its internal operating procedures regarding its own employees are immaterial, irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Further, the Workers' Compensation system in effect in the Province of Quebec is so different from any system that would be applicable here, that any comparison between the two would be completely irrelevant, immaterial and not calculated to lead to discovery of admissible evidence. Additionally, ACL cannot divulge the names of any claimants without their consent as this would violate the "ARPPIPS."

ACL did not formally respond to plaintiff's August 27, 2003 letter. Plaintiff filed a motion to compel discovery on January 21, 2004. On February 18, 2004, ACL served supplemental answers to the first set of interrogatories. In response to number 11(g), ACL objected to it on overbreadth and irrelevance grounds, but stated it had no records of any sales to: General Motors Corporation, Edgewater, New Jersey; General Motors Corporation, Englewood, New Jersey; Multi-Chevrolet, Union, New Jersey; and General Motors Corporation, Bloomfield, New Jersey. ACL raised the same objections to number 46, but answered that it "never sold any of its raw chrysotile asbestos fiber to any General Motors facility in New Jersey, including all divisions, affiliates, predecessors and successors; or to Multi-Chevrolet in Rahway, New Jersey."

*6 On February 25, 2004,[FN2] the trial court entered an order compelling ACL to provide more specific responses to plaintiff's interrogatories no later than February 20, 2004.

FN2. The return date of the motion was February 6, 2004.

On March 8, 2004, plaintiff sent ACL a letter advising of "continuing deficiencies" in its supplemental answers to plaintiff's first set of interrogatories, namely numbers 11(g) and 46. In regard to number 11(g), plaintiff contended that ACL was "continuing its pattern of evasion" in responding that it has no record of the requested sales; plaintiff explained the interrogatory requested the identity of parties to whom such products were in fact sold. Plaintiff raised similar objections to the answer provided to number 46, explaining that although ACL responded that it did not ship, distribute, or sell to certain GM locations, plaintiff was interested in ACL's distribution to any and all General Motors facilities.

ACL responded to plaintiff in a letter dated March 15, 2004, stating that any information requested in interrogatory numbers 11(g) and 46 that did not relate to the facilities involved in the instant litigation was irrelevant. ACL contended that it had provided information responsive to these interrogatories, and that further requests were " nothing more than a fishing expedition for information that is irrelevant to this litigation."

Counsel exchanged e-mails in regard to the interrogatory responses on March 22, 2004. Then, on March 23, 2004, plaintiff filed another motion to compel discovery; ACL filed opposition. In its reply, plaintiff contended that ACL had been improperly attempting to limit the interrogatory responses to the work sites of decedent, his brother, and his father, and requested that ACL be ordered to provide information on the supply of fiber material to GM or any other defendants.

On May 11, 2004, the trial court granted plaintiff's motion, ordering: (1) ACL to provide specific and fully responsive answers to plaintiff's first set of interrogatories, including numbers 11(g) and 46, by providing the requested information and documents by May 21, 2004; (2) all defendants to provide plaintiff and ACL with all locations at which raw asbestos fiber was received, delivered, distributed, used in manufacturing, or purchased, no later than

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2006 WL 2355200 (N.J.Super.A.D.)
**(Cite as: Not Reported in A.2d)**

May 14, 2004; (3) ACL and its counsel jointly and severally to pay plaintiff's reasonable expenses, including attorney fees, incurred in obtaining the order; (4) counsel for plaintiff to submit a certification within ten days of the order setting forth its legal fees and costs, and; (5) counsel for ACL to object, if necessary, to plaintiff's certification of costs within five days of its submission.

On May 20, 2004, plaintiff submitted a letter to the court requesting $1,622.00 in legal fees in connection with the motion to compel discovery. ACL objected to the application for an award of counsel fees and costs, and requested additional time to comply with the order to compel. On June 15, 2004, the trial court ordered ACL to reimburse plaintiff $1,622 for counsel fees and costs incurred in obtaining the order to compel answers within thirty days.

*7 On July 1, 2004, ACL served its supplemental responses to plaintiff's first set of interrogatories. In essence, ACL incorporated GM's answer to question 13 of plaintiff's first set of interrogatories, in which GM stated that it had purchased chrysotile fiber for its drum and disc brake linings from ACL, among others. Additionally, as adopted by ACL, GM stated:
GM cannot identify each and every entity to which it supplied any asbestos-containing friction products during the extensive period requested by plaintiffs. GM does not keep records that would allow it to determine the amount of asbestos-containing friction products it sold in the region, or any other geographic or chronological categorization. For the lengthy and historic period this request covers, GM supplied replacement parts, which may have included some asbestos-containing friction products, to authorized dealerships and distributors in existence during the relevant period.... GM cannot identify dealerships unless they are currently in operation because it does not keep track or keep a database on closed dealerships.... In addition, GM's information about authorized dealerships and distributors does not provide data specific to sales of asbestos-containing friction products as defined in this request.

By letter to plaintiff's counsel dated July 14, 2004, counsel for ACL confirmed a telephone conference of that date explaining that the "supplemental answers are the best we can do without violating Quebec law and complying with New Jersey law."

In response, on or about July 21, 2004, plaintiff filed a motion pursuant to *R.* 4:23-5(a), seeking an order suppressing ACL's answer for failure to comply with discovery and requiring it to pay attorneys' fees. On August 11, 2004, ACL filed a cross-motion on short notice seeking an order quashing the objected-to interrogatories or, alternatively, entry of a protective order.

On August 27, 2004, the trial court conducted a hearing on these motions. Plaintiff argued that ACL had acted in bad faith and engaged in gamesmanship, wasting the court's time. ACL argued that the QBCRA prohibited the disclosure of any information pertaining to documents in Quebec, and maintained that it had attempted to answer and supplement those answers in good faith because it had to use documents already in the United States.

On September 20, 2004, the trial court denied plaintiff's motion, finding that the QBCRA was inapplicable and that notions of comity did not require the court to consider the QBCRA as a barrier, potential or otherwise, to ACL's compliance. The court stated that it would enter an order if, by September 24, 2004, the documents requested were not provided or explained, at which time the court would suppress ACL's answer. The court also imposed a $100 penalty for each day the counsel fees and costs contained in the June 15, 1004 order remained unpaid. Specifically, the motion judge explained that:
I don't believe that law has an efficacy in international law. It couldn't possibly have. If Canadian companies wish to transact business with the United States companies and make profits by it, then they're going to have to abide by the international laws that would compel every country to transact business, who does such transactions of business, to also be subject to the discovery rules in the jurisdiction where they're making those profits.
*8 Quebec is not a separate entity. The vote didn't go their way. So, it must be Canadian law that we

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                      Page 7

Not Reported in A.2d, 2006 WL 2355200 (N.J.Super.A.D.)
**(Cite as: Not Reported in A.2d)**

look to, not Quebec law.


* * * *
The Court is satisfied there is absolutely nothing
preventing the defendant ACL from producing the
documents that would specify what was the amount
of the fibers that were sold to any location in the
United States in the years that I have already
specified had to be produced.

The trial court ordered ACL: (1) to respond fully to
interrogatory numbers 11(g), 46, and 47, no later
than September 24, 2004; (2) to pay reasonable
expenses, including counsel fees incurred by
plaintiff to obtain the order, in the amount of $500;
(3) to pay to counsel for plaintiff the counsel fees
previously awarded in the amount of $1,622.00,
and; (4) to pay $100 per day for each continuing
day ACL fails to comply with the court order on
reimbursement of counsel fees. The trial court also
ordered that if ACL failed to make timely payment
of the ordered counsel fees, plaintiff could submit a
certification to that effect and request that ACL's
answers and defenses be suppressed.

ACL moved before this court, pursuant to *R.*
2:5-6(a), seeking leave to appeal from the trial
court's interlocutory September 20, 2004 order. In
an order issued on December 7, 2004, we denied
that motion.

On February 24, 2005, plaintiff filed a motion
seeking enforcement of the June 15, 2004, and
September 20, 2004 orders. The trial court held a
case management conference on March 3, 2005,
addressing discovery issues and plaintiff's motion.
On March 8, 2005, ACL filed two motions in
support of applications for *pro hac vice* admission.
Plaintiff opposed the applications on the basis ACL
had failed to demonstrate "good cause." On April 1,
2005, the court held a case management conference
and a hearing on the pending enforcement motion.
The trial court ruled that ACL owed $21,000 in
fines for the delay in paying plaintiff's counsel, and
that until that amount was paid, ACL's defenses
would be stricken. The trial court also ruled that
until interrogatory numbers 11(g), 46, and 47 were
properly answered, ACL's answer would remain

stricken. The trial court stated the motions for *pro
hac vice* admission were "not in the case at the
moment," but could be raised again "if they are
back in the case at some point."

In an order issued on April 22, 2005, the trial court
memorialized its April 1, 2005 decision, which
ordered ACL: (1) to fully respond to interrogatory
numbers 11(g), 46, and 47; (2) to pay to counsel for
plaintiff counsel fees previously awarded in the sum
of $1,622 and $500; and (3) to pay counsel for
plaintiff the amount of $100 per day previously
awarded for each of the 189 days that ACL had
failed to comply with the court order, totaling
$21,022. The trial court ordered that ACL's answers
and defenses would be stricken until the total of
$21,022 was paid to counsel for plaintiff, no later
than May 20, 2005. Lastly, the trial court denied the
applications for *pro hac vice* admission, without
prejudice, on April 26, 2006.

**\*9** On April 20, 2005, ACL moved for
reconsideration, seeking an order reinstating its
pleadings and defenses. Plaintiff opposed ACL's
motion for reconsideration by way of a letter dated
May 4, 2005. The trial court held a hearing on the
reconsideration motion on May 13, 2005. The court
denied ACL's motion, and stated that no further
applications would be entertained until ACL
complied with the court's prior orders.

The motion judge found it "a little astounding, shall
we say, that the defendant, ACL, is still relying on
this Quebec Records Act, which has nothing to do
with this case or with these proceedings." The judge
found the QBCRA had "zero to do with any kind of
discovery that was requested in this case. The
express words of the Quebec Records Act excludes
anything that's the subject of the-of an act of the
Parliament of Canada." The motion judge further
explained that she had "superficially investigated
international treaties between the United States and
Canada" and found there was nothing that would
preclude providing that documentation to courts in
the United States.

On June 10, 2005, the trial court entered an order
memorializing its ruling that: (1) ACL's answers
and defenses shall remain stricken without

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2006 WL 2355200 (N.J.Super.A.D.)
**(Cite as: Not Reported in A.2d)**

prejudice; (2) ACL shall pay counsel for plaintiff the attorneys' fees previously awarded in the amount of $1,622 and $500, and; (3) ACL shall pay the amount of $100 per day for the 189 days ACL failed to comply with the court's order, totaling $21,022. On June 29, 2005, plaintiff filed another motion seeking assessment of attorneys' fees and costs.

On July 8, 2005, ACL filed a motion seeking amendment of the June 10, 2005 order. Plaintiff filed a cross-motion, seeking entry of a judgment for payment of previously-ordered attorneys' fees and costs.

On July 25, 2005, we granted ACL's motion for leave to appeal from the June 10, 2005 order. After its application for a stay pending appeal was denied by the trial court, we issued an order on September 19, 2005, granting ACL's motion for a stay.

On appeal, ACL presents the following arguments for our consideration:
*POINT I*
THE TRIAL COURT ERRONEOUSLY FAILED TO CONSIDER THE OBLIGATIONS IMPOSED ON ACL BY THE QUEBEC BUSINESS RECORDS CONCERNS ACT, WHICH PROHIBITS PRODUCTION OF RECORDS OR INFORMATION DERIVED FROM THOSE RECORDS OUTSIDE OF QUEBEC AND CONTINUES TO IMPOSE CONTEMPT SANCTIONS.
*POINT II*
ACL COMPLIED WITH ITS DISCOVERY OBLIGATIONS WITHIN THE CONFINES OF THE QBCRA BY PROVIDING DISCOVERY ANSWERS RELEVANT TO THE SUBJECT LITIGATION.
*POINT III*
THE TRIAL COURT FAILED TO TAKE A REASONABLE AND BALANCED APPROACH AND ABUSED ITS DISCRETION.

ACL contends the trial court's order of June 10, 2005 violates basic principles of international comity, since compliance with the trial court's order would force ACL to violate the QBCRA and subject it to criminal penalties. Specifically, ACL

contends that the general principles of international comity have been clearly delineated by the United States Supreme Court in *Hilton v. Guyot,* 159 *U.S.* 113, 16 *S.Ct.* 139, 40 *L. Ed.* 95 (1895), and adopted by the New Jersey Supreme Court in *Fantony v. Fantony,* 21 *N.J.* 525, 533 (1956). The application of such principles to this case, argues ACL, dictates that we vacate the trial court's June 10, 2005 order. In *Hilton, supra,* the United States Supreme Court stated, in pertinent part:**10** "Comity" in the legal sense, is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other. But it is the recognition which one nation allows with in its territory to the legislative, executive, or judicial acts of another nation, having due regard both to the international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws.
[159 *U.S.* at 163-164, 16 *S.Ct.* at 143, 40 *L. Ed.* at 108.]

In *Silverman v. Berkson,* 141 *N.J.* 412 (1995), our Supreme Court addressed the extraterritorial subpoena power of a New Jersey agency, holding that a New Jersey agency may subpoena a nonresident who has engaged in purposeful conduct in New Jersey and that a New Jersey court may enforce such a subpoena. *Id.* at 414. Although this case presents different facts, both cases present similar questions with respect to the extraterritorial powers of our courts. The Court stated that:In deciding whether to exercise enforcement jurisdiction, courts should "balance the interests it seeks to protect against the interest of any other sovereign that might exercise authority over the same conduct." Because each sovereign has an interest in the welfare of its citizens, we would add, in this context, that a court must consider (1) the extent and nature of the hardship that inconsistent enforcement actions would impose ...; (2) the extent to which the required conduct is to take place in the territory of another state; (3) the residence of the person subpoenaed; and (4) the extent to which enforcement by action of either state can reasonably be expected to achieve compliance with the rule prescribed by that state.
[*Silverman, supra,* 141 *N.J.* at 429 (quoting *Republic of Phil. v. Westinghouse Elec. Corp.,* 43 *F.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Page 9

Not Reported in A.2d, 2006 WL 2355200 (N.J.Super.A.D.)
**(Cite as: Not Reported in A.2d)**

3d 65, 76 (3rd, Cir.1994).]

In *Aerospatiale, supra,* 482 *U.S.* at 524, 107 *S.Ct.* at 2546, 96 *L. Ed.*2d at 472, the Court confronted the question of to what extent a federal district court must employ the procedures set forth in the Hague Convention when litigants seek answers to interrogatories, document production, and admissions from a foreign adversary over whom the district court has personal jurisdiction. *Aerospatiale* concerned two French corporations engaged in the business of designing, manufacturing, and marketing air crafts. *Id.* at 525, 107 *S.Ct.* at 2546, 96 *L. Ed.*2d at 472. One of their air crafts crashed in Iowa, injuring the pilot and a passenger. *Ibid.* The individuals injured brought separate suits in federal district court in the District of Iowa, alleging multiple product liability claims. *Ibid.* The French corporations answered the complaints, without questioning the jurisdiction of the federal district court, and the cases were consolidated and referred to a magistrate. *Ibid.*

Initial discovery was conducted. However, when plaintiff sought a second request for the production of documents and answers to interrogatories, the French corporations filed a motion seeking a protective order. *Ibid.* In their motion, they alleged that because the corporations were French, and that the discovery sought could only be found in a foreign state, the Hague Convention dictated the procedures to be followed for pretrial discovery. *Id* . at 525-526, 107 S.Ct. at 2546, 96 *L. Ed.*2d at 472-473. They further contended that under French penal law, the defendants could not respond to discovery requests that did not comply with the Hague Convention. *Ibid.* The magistrate denied the motion, ruling that permitting the Hague Convention to overrule the Federal Rules of Civil Procedure would frustrate the interests of the court in protecting United States citizens, particularly in products liability cases. *Id.* at 526-527, 107 S.Ct. at 2547, 96 *L. Ed* .2d at 473.

**\*11** On appeal, the Court concluded that the magistrate had properly refused to grant the broad protective order requested by the defendants, but held that
American courts, in supervising pretrial

proceedings, should exercise special vigilance to protect foreign litigants from the danger that unnecessary, or unduly burdensome, discovery may place them in a disadvantageous position. Judicial supervision of discovery should always seek to minimize its costs and inconvenience and to prevent improper uses of discovery requests. When it is necessary to seek evidence abroad, however, the district court must supervise pretrial proceedings particularly closely to prevent discovery abuses.... In addition, we have long recognized the demands of comity in suits involving foreign states, either as parties or as sovereigns with a coordinate interest in the litigation. American courts should therefore take care to demonstrate due respect for any special problem confronted by the foreign litigant on account of its nationality or the location of its operations, and for any sovereign interest expressed by a foreign state.
[*Aerospatiale, supra,* 482 U.S. at 546, 107 S.Ct. at 2557, 96 *L. Ed.*2d at 485.]

The Court declined to articulate specific rules to guide trial courts, *ibid.,* but in a footnote addressed the issue of what effect the French blocking statute had on the Court's decision to uphold the magistrate's decision. In stating that the blocking statute did not alter its conclusion, the Court recognized that:[i]t is well settled that such [blocking] statutes do not deprive an American court of the power to order a party subject to its jurisdiction to produce evidence even though the act of production may violate that statute. Nor can the enactment of such a statute by a foreign nation require American courts to engraft a rule of first resort onto the Hague Convention, or otherwise to provide the nationals of such a country with a preferred status in our courts. It is clear that American Courts are not required to adhere blindly to the directives of such a statute. Indeed, the language of the statute, if taken literally, would appear to represent an extraordinary exercise of legislative jurisdiction by the Republic of France over a United States district judge, forbidding him or her to order any discovery from a party of French nationality, even simple requests for admissions or interrogatories that the party could respond to on the basis of personal knowledge. It would be particularly incongruous to recognize such a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2006 WL 2355200 (N.J.Super.A.D.)
**(Cite as: Not Reported in A.2d)**

preference for corporations that are wholly owned by the enacting nation. Extraterritorial assertions of jurisdiction are not one-sided. While the District Court's discovery orders arguably have some impact in France, the French blocking statute asserts similar authority over acts to take place in this country. *The lesson of comity is that neither the discovery order nor the blocking statute can have the same omnipresent effect that it would have in a world of only one sovereign. The blocking statute is thus relevant to the court's particularized comity analysis only to the extent that its terms and its enforcement identify the nature of the sovereign interest in the non disclosed of specific kinds of material.*
**\*12** [*Id.* at 544, n. 29, 107 S.Ct. at 2556, 96 *L. Ed.* 2d at 484 (citations omitted; emphasis added).]

The Court directed that the district courts could find their guide to a comity analysis within the *Restatement of Foreign Relations Law of the United States (Revised)* § 437(1)(c) (Tentative Draft No .7, 1986) (approved May 14, 1986), now codified in *Restatement (Third) of Foreign Relations Law of the United States,* § 442 (1987) (*Restatement* ). *Id.* at 544, 107 S.Ct. at 2556, 96 *L. Ed.*2d at 484. The *Restatement* states that(1)(a) A court or agency in the United States, when authorized by statute or rule of court, may order a person subject to its jurisdiction to produce documents, objects, or other information relevant to an action or investigation, even if the information or the person in possession of the information is outside the United States.


\* \* \* \*
(c) In deciding whether to issue an order directing production of information located abroad, and in framing such an order, a court or agency in the United States should take into account [1] *the importance to the investigation or litigation of the documents or other information requested;* [2] *the degree of specificity of the request;* [3] *whether the information originated in the United States;* [4] *the availability of alternative means of securing the information;* and [5] *the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine*

*important interests of the state where the information is located.*
[*Restatement,* § 442(1)(a), (c) (emphasis added).]

The *Restatement* also sets forth a reasonableness requirement in enforcement by a domestic court over a foreign entity to comply with the court's rules. *See* §§ 431(2), 403(1).

Here, ACL contends the trial court failed to make a comity analysis using the factors articulated in the *Restatement,* and gave no consideration to the barrier the QBCRA imposed on ACL in producing the discovery.

In order to determine whether the trial court should have given deferential consideration to the QBCRA it is necessary to examine the factors articulated in *Aerospatiale* and the *Restatement* in light of the facts of this case, as disclosed by the record on appeal.

As for the first *Aerospatiale* factor-concerning the importance of the information requested-we find it significant that ACL attempted to answer plaintiff's interrogatories without running afoul of the QBCRA. By incorporating defendant GM's response as its own, ACL essentially admitted to supplying asbestos products to defendant GM. By admitting to selling asbestos to GM, arguably plaintiff acquired the information the requested discovery sought to obtain. However, plaintiff contends that the adopted answers do not supply the information regarding any other parties to whom ACL may have sold asbestos products. On remand, the trial court should consider the relevancy of this additional information in the context and balancing of the other factors.

**\*13** As for the second *Aerospatiale* factor-the degree of specificity of the discovery requests-plaintiff's requests are quite broad. It could reasonably be concluded that plaintiff's discovery requests are really an attempt by plaintiff to identify more defendants. For example, Interrogatory 5, asks ACL if it has "acquired any controlling interest in any corporation or business entity which has mined, produced, processed, compounded, sold, supplied, distributed and/or otherwise placed asbestos or

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2006 WL 2355200 (N.J.Super.A.D.)
**(Cite as: Not Reported in A.2d)**

asbestos containing products in the stream of commerce." Other requests are similarly broad. The comments to the *Restatement* suggest that:

Before issuing an order for production of documents, objects, or information location abroad, the court ... should scrutinize a discovery request more closely than it would scrutinize comparable requests for information located in the United States. ... Given the difficulty in obtaining compliance, and the resistance of foreign states to discovery demands originating in the United States, it is ordinarily reasonable to limit foreign discovery to information necessary to the action-typically, evidence not otherwise readily obtainable-and directly relevant and material.

[*Restatement* § 442, comment 1.]

Here, the motion judge did not engage in such an analysis.

The third *Aerospatiale* factor-concerning the origination of the information-weighs in favor of ACL, since the information sought by plaintiff did not originate in the United States, but in Canada.

As for the availability of alternative means for securing the information-the fourth *Aerospatiale* factor-the record is unclear whether the information sought by plaintiff is available from other sources within the United States or whether plaintiff attempted to obtain such information from alternative sources. Whether GM could reasonably be that alternative source is an issue that should be explored and considered on remand.

Under the fifth *Aerospatiale* factor, the court must consider what important interest of the United States would be undermined should ACL comply with the mandates of the QBCRA. Since this case is a products liability action, clearly there is an important interest in protecting United States citizens from harmful products, including harmful foreign products. Such an interest in protecting citizens from harm, arguably trumps the QBCRA, particular in light of fact that it seems the enactment of the QBCRA, as well as many other blocking statutes, was done in attempt to prevent the long arm reach of the United States' anti-trust statutes. *See Hunt v. Lac d'Amiante du Quebec*, 4 *S.C.R.*

289, 328 (1993) (Supreme Court of Canada referencing the legislative history of the statute as a defense to U.S. antitrust statutes and recognizing how the blocking statues have ended up harming individuals not originally intended); *Restatement* § 442, n. 1. ("To a considerable extent, the hostility to United States discovery practices reflects dislike of aspects of substantive American law, notably United States antitrust law ..."). However, the issue of whether plaintiff had an available remedy in a workers' compensation action should also be considered in the calculus.

**\*14** Because the record was not fully developed, our brief discussion of these *Aerospatiale* factors does not provide a definitive answer as to whether the QBCRA is entitled to deference by the trial court concerning the discovery issues in this case. However, it is clear that we must remand the matter to the Law Division for consideration and analysis in light of these factors. Even if a consideration and weighing of the *Aerospatiale* factors results in a conclusion that ACL must comply with the discovery demand, on remand the trial court must also consider whether less severe methods of compliance are available, such as proceeding in accordance with the requests for admission procedures pursuant to *R.* 4:22-1 to -2.

Plaintiff argues that the QBCRA is not entitled to any deferential consideration under the comity principles of international law because Quebec is not a foreign state. Plaintiff relies on *American Industrial Contracting, Inc. v. Johns-Manville Corporation*, 326 *F.Supp.* 879 (W.D.Pa.1971), where the federal district court for the Western District of Pennsylvania directed two Quebec-based companies to answer certain interrogatories. There, the Quebec-based defendants had filed a motion for reconsideration, arguing that the QBCRA prevented them from complying with the court's order directing them to provide answers. *Id.* at 880. In denying defendants' motion, the district court ruled that "[t]he province of Quebec is not a State within the meaning of the doctrines of international law. These doctrines only apply to nations in the international sense such as the United States and Canada." *Id.* at 881. Plaintiff also cites *Lyons v. Bell Asbestos Mines, Ltd.*, 119 *F.R.D.* 384

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                 Page 12

Not Reported in A.2d, 2006 WL 2355200 (N.J.Super.A.D.)
**(Cite as: Not Reported in A.2d)**

(D.S.C.1988), for the proposition that the QBCRA, a legislative pronouncement of a province of Canada, "is not entitled to deference under the principles of international law." Lyons, 119 *F.R.D* at 388. Plaintiff also cites to *Young Women's Christian Ass'n of National Capital Area, Inc. v. Allstate Ins. Co. of Canada,* 1994 *U.S. Dist.* LEXIS 16826 (D.D.C.1994), as support for the contention that foreign blocking statutes are not entitled to deferential consideration under the comity principles of international law.

Although we may consider these cited cases for guidance, they are not controlling authority. In *Societe Internationale Pour Participations Industrielles Commerciales, S.A. v. Rogers (Rogers),* 357 *U.S.* 197, 78 *S.Ct.* 1087, 2 *L. Ed.*2d 1255 (1958), the United States Supreme Court held that a district court could not dismiss a plaintiff's complaint because the plaintiff had failed to produce foreign documents on the ground that production would subject it to criminal prosecution in Switzerland. In reaching this conclusion, the Supreme Court stated:
The findings below, and what has been shown as to petitioner's extensive efforts at compliance, compel the conclusion on this record that petitioner's failure to satisfy fully the requirements of this production order was due to inability fostered neither by its own conduct nor by circumstances within its control. It is hardly debatable that fear of criminal prosecution constitutes a weighty excuse for non production, and this exercise is not weakened because the laws preventing compliance are those of a foreign sovereign.
***15** [*Id.* at 211, 78 S.Ct. at 1095, 2 *L. Ed.*2d at 1266-67.]

In *Arthur Andersen & Co. v. Finesilver,* 546 *F.*2d 338 (10th Cir.1976), the Tenth Circuit Court of Appeals expanded on Rogers, stating that Rogers " does say that a discovery order mandating violation of foreign law is invalid. It only indicates that the foreign law question goes to the imposition of a sanction for noncompliance with local law." *Id.* at 342. The Tenth Circuit ultimately ruled that international comity does not prevent a domestic court from ordering action that violates foreign law. In holding so, the court relied on the *Restatement.*

*Ibid. See Restatement* § 442(1)(a).

Plaintiff further argues that assuming arguendo the QBCRA was entitled to the benefits of the comity analysis, our courts still are not required blindly to adhere to the mandates of foreign law. In *Lyons, supra,* the district court noted that comity does "not compel blind obedience to the legislative enactments of foreign jurisdictions." 119 *F.R.D.* at 388. The court recognized that
"in the realm of international discovery .... the exercise of judicial power should be tempered by a healthy respect for the principles of comity." *In re Anschuetz & Co., GmbH.,* 754 *F.*2d 602, 614 (5th Cir.1985). Nonetheless, "[a] state having jurisdiction to prescribe or enforce a rule of law is not precluded from exercising its jurisdiction *solely* because such exercise requires a person engage in conduct subjecting him to liability under the law of another state having jurisdiction with respect to that conduct." *United States v. First National City Bank,* 396 *F.*2d 897, 901 (2d Cir.1968) (emphasis original), quoting Restatement (Second) of Foreign Relations Law of the United States § 39(1)(1965).
Clearly, "the dilemma is the accommodation of the principles of the law of the forum with the concepts of due process and international comity." *Arthur Anderson & Co. v. Finesilver,* 546 *F.*2d 338, 341 (10th Cir.1976). This dilemma has been particularly apparent in the context of "blocking" statutes such as the QBCRA, which engender diametrical conflict between the purpose of the *Federal Rules of Civil Procedure* to foster full and open discovery and the intent of the blocking statute to preclude disclosure of otherwise discoverable information and documentary evidence.
[Lyons, *supra,* 119 *F.R.D.* at 388.]

We agree with plaintiff that a trial court does not have to blindly accord deference to a foreign blocking statute. *See Aerospatiale, supra,* 482 *U.S.* at 544, n. 29, 107 *S.Ct.* at 2556, 96 *L. Ed.*2d at 484 ( "It is well settled that such [blocking] statutes do not deprive an American court of the power to order a party subject to its jurisdiction to produce evidence even thought the act of production may violate that statute"). This, however, does not mean a trial court has the right to ignore or dismiss the fact that there is such a statute and what effects it

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                      Page 13

Not Reported in A.2d, 2006 WL 2355200 (N.J.Super.A.D.)
**(Cite as: Not Reported in A.2d)**

may pose on a foreign defendant.

**\*16** The QBCRA provides that
no person shall, pursuant to or under any
requirement issued by any legislative, judicial, or
administrative authority outside Quebec, remove or
caused to be removed, or send or cause to be sent,
from any place in Quebec to a place outside
Quebec, any document or resume or digest of any
document relating to any concern.
[*Que.Rev.Stat.,* ch.278, § 2 (1964).]

A document is defined as "any account, balance
sheet, statement of receipts and expenditure, profit
and loss statement, statement of assets and
liabilities, inventory, report and any other writing or
material forming part of the records or archives of a
business concern." *Id.* at § 1.

Upon violation of § 2 of the act, the QBRCA
further provides that
[e]very person who has furnished, or has received
from the judge an order to furnish, an undertaking
or security and who infringes the provisions of
section 2 shall be guilty of contempt of court in
addition to any obligation provided by the
undertaking or security furnished or ordered by the
judge.
[*Que.Rev.Stat.,* ch.61, § 5 (1992).]

ACL alleges that § 5 provides that anyone guilty of
violating the QBCRA shall be guilty of contempt of
court and liable to one-year's imprisonment. We
note, however, that although ACL might be subject
to contempt of court, the one-year imprisonment
term is no longer in the statute. *Id.* § 5. Therefore,
the consequences ACL faces by complying with
discovery are considerably less than what ACL
contends in its brief.

Furthermore, Section 4 of the QBCRA provides that
whenever the Attorney General or a person having
any interest has
reason to believe that a requirement has been or is
likely to be made for the removal or sending out of
Quebec of a document relating to a concern [such
person] may apply to a judge of Court of Quebec, in
the judicial district where the concern in question is
located, for an order requiring any person, whether

or not designated in the requirement, to furnish an
undertaking or security to ensure that such person
will not remove or send out of Quebec the
document mentioned in the said requirement.
[*Que.Rev.Stat.,* ch.40, § 4 (1999).]

Additionally, anyone given notice of such petition,
and who removes such documents shall be guilty of
contempt of court. *Que.Rev.Stat.,* ch.61, § 5.
Section 4 of the QBCRA empowers the Attorney
General to apply to the courts of Quebec for an
order precluding removal of documents. This
section indicates that the QBCRA is not
self-enforcing, but requires that the Attorney
General or a person having an interest in the action
make such petition to acquire an order prohibiting
the removal of the documents from the province.
*See Lyons, supra,* 119 *F.R.D.* at 387. Here, it
appears from the record that ACL has not petitioned
either the Canadian Attorney General or the
Canadian courts for such an order. The failure to
seek such petition raises concerns whether ACL
raises the QBCRA as a defense to complying with
discovery in good faith.

**\*17** However, in support of its position, ACL points
to numerous Canadian cases that have given the
QBCRA a very broad and liberal interpretation. In
*Gulf Oil Corporation v. Gulf Canada Ltd., et al.,* 2
*R.C.S.* 39 (1980), the Supreme Court of Canada
refused to compel answers to letters rogatory issued
by U.S. District Courts based on Canadian public
policy. The court found that when there is an
attempt to enforce a foreign law in a Canadian court
in the face of a conflicting statute, which in this case
was the Uranium Information Securities
Regulations, public policy dictates Canadian law
prevail. *Id.* at 61-62.

It is necessary, however, to compare this case to the
1993 Supreme Court of Canada decision in *Hunt v.
Lac d'Amiante du Quebec Ltee,* 4 *S.C.R.* 289
(1993). In *Hunt,* the Supreme Court of Canada held
the QBCRA was constitutionally inapplicable to the
other provinces within Canada. *Id.* at 331. The
conclusion reached by the court rested on the
grounds that if such practice was permissible under
the Canadian Constitution, it would effectively
immunize business concerns located in Quebec

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2006 WL 2355200 (N.J.Super.A.D.)
**(Cite as: Not Reported in A.2d)**

Page 14

from ever having to produce discovery for litigation
in other provinces. *Id.* at 330.

Both plaintiff in her brief and the trial court during
the August 27, 2004 motion hearing relied on *Hunt*
to support the conclusion that New Jersey need not
enforce the QBCRA.

The motion judge, in ordering ACL to produce the
documents, stated:
It is patently clear from the 1993 Canadian Supreme
Court case that the law of Quebec concerning
documents and how it affects discovery in any
business commercial litigation is simply not going
to be upheld.
It wasn't upheld for any litigation in Canada and the
Supreme Court intimated that anyone pressing the
issue on international law, especially where there
has been not one single word concerning invoices,
vouchers, customs, duty forms, all of which
are-already had to be within the United States of
America's domain, therefore, couldn't possibly be
subject to the Quebec law that you are citing.
I don't believe that law has any efficacy in
international law. It couldn't possibly have. If
Canadian companies wish to transact business with
the United States companies and make profits by it,
then they're going to have to abide by the
international laws that would compel every country
to transact business, who does such business, to also
be subject to the discovery rules in the jurisdiction
where they're making those profits.
Quebec is not a separate entity. The vote didn't go
their way. So, it must be Canadian law that we look
to, not Quebec law.
And since defense Counsel was, in fact, the attorney
of record on the last such claim before Canadian
Supreme Court and knows that the only thing that
would be possible to try and prevent the-the
discovery that has been requested for a year and a
half here by plaintiff's Counsel, would be for
defendant's Canadian Counsel to refer this matter to
the Attorney General of-of Quebec or Canada and
ask the Court to prevent his discovery. That's the
only possible way this could have happened. They
knew that since 1993.

\* \* \* \*

**\*18** The Court is satisfied there is absolutely
nothing preventing the defendant ACL from
producing the documents....

ACL attempts to distinguish *Hunt* on the grounds
that the Supreme Court of Canada did not disturb its
previous ruling in *Gulf Oil* with regards to the
discovery of documents in Quebec by jurisdictions
outside of Canada, and that therefore the holding of
*Gulf Oil* is the applicable law in this case.

ACL also relies on *Renault v. Bell Asbestos Mines,
Ltd.,* No. 09-000564-761 and *Savard v. Asbestos
Corporation Limited,* No. 500-02-048902-90, a
Quebec appellate court case and a provincial court
case, respectively, as additional support for a broad
interpretation of the QBCRA. In both of these
cases, the courts prohibited removal of information
from Quebec gleaned from documents located in
Quebec. In *Savard,* specifically, the court ordered
the defendant to furnish an undertaking that they
would not transport documents out of Quebec.

Furthermore, ACL argues that in *Asbestos
Corporation Limited v. Eagle Picher Industries and
Attorney General of the* Province of Quebec, No.
500-09-01246-825, the Court of Appeals for the
Province of Quebec clarified the proscriptions
contained in the QBCRA. There, a New Jersey
plaintiff filed suit against the defendant alleging an
asbestos-related disease due to exposure to
asbestos. In the course of the litigation, the plaintiff
sought certain documents from the defendant. *Ibid.*
The defendant filed a motion contesting production
of such documents based on § 2 of the QBCRA.
The New Jersey trial court granted the defendant's
motion in part, restricting the production of the
number of documents, specified that the documents
need only be available for inspection and not
copying, and ordered that such inspection take place
at the defendant's head office in Montreal. *Ibid.*
Thereafter, the defendant sought relief from the
Canadian courts. The Superior Court in Quebec had
ordered the defendant to comply with the American
order, on appeal; however, the Quebec Court of
Appeals found that the Superior Court went too far,
and that the Superior Court judge should have
refused to order the defendant to exhibit the
documents in question to the plaintiff or its

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2006 WL 2355200 (N.J.Super.A.D.)
**(Cite as: Not Reported in A.2d)**

attorneys. The Court of Appeals found that even the inspection of the documents at the defendant's head office in Montreal was tantamount to the documents being removed from Quebec.

Plaintiff further argues that the Canadian cases cited by ACL contravene the public policy of the State of New Jersey and are not entitled to consideration. We agree that, although we may consider these Canadian decisions for guidance, they are not controlling or binding.

There is no consensus among American courts concerning the validity, scope, and reach of the QBCRA, and there is no controlling New Jersey case law.

In *Juzwin v. Asbestos Corporation Limited, et al.,* No. 87-3876 (D.N.J.1989), the court sustained the defendant's objections to discovery requests based on the QBCRA. In doing so, the judge found that the discovery requests were "an attempt by the plaintiff to draw adverse consequences from ACL's compliance with the Quebec blocking statute of which plaintiff was well aware before the requests were even served. Under these circumstances ... it [was] appropriate for ACL to comply with the Quebec blocking statute ."

**\*19** In *State of Maryland v. Keene Corp.,* No. 1108600 (Cir. Ct. Anne Arundel, MD 1986), the state court balanced the considerations of discovery against the QBCRA to protect the defendant, ACL, from the consequences of the blocking statute. The court ordered that the State pursue its discovery within the United States and that the defendant was not required to produce the documents from Quebec until it was clear that the information sought was not available in the United States.

In *Jenness v. Turner & Newall, Ltd., et al.,* No.C83-61-L, (D.N.H.1984), the district court found that the defendants' fear that responding to discovery requests would violate the QBCRA was well founded and that defendants had made a good faith effort to comply with discovery. Therefore, the court ordered defendants to answer the interrogatories from information located outside of Quebec, and ruled that the defendants need not

answer if the information exists only in Quebec.

Other courts, however, have held that the QBCRA is not entitled to deference by the American courts. In *Young Women's Christian Ass'n, supra,* the District Court for the District of Columbia held that the QBCRA was not entitled to deference. 1994 U.S. Dist. LEXIS at 7. The court noted that, "[f]irst of all, the 'blocking statutes' are local laws and not national laws. Consequently, they are not entitled to any deferential consideration under the comity principles of international law." *Ibid.*

In *Lyons v. Bell Asbestos Mines, supra,* the defendants failed to respond to discovery requests relying on QBCRA. The District Court for the District of South Carolina stated:
As noted by another court confronted with discovery objections predicated on the QBCRA, " the exact reason for the Quebec legislation is not clear." *American Industrial Contracting, Inc. v. John-Manville Corp.,* 326 F.Supp. 879, 880 (W.D.Pa.1971). "At first blush, it would seems its purpose is to require that a Quebec corporation keep its business records intact in the province." *Id.* Based on this construction, "it is not at all clear that compliance with plaintiffs' demand would contravene the Quebec statute." *Petruska v. John-Manville,* 83 *F.R.D.* 32, 26 (E.D.Pa.1979). " There is no indication that the statute would be offended if defendants were to make copies of the requested documents and submit those, with a sufficient showing of authenticity, to plaintiff's counsel...." *Id.* The statute's proscription could likewise be avoided if defendant was to make the requested documents available in Quebec. (citation omitted).
Additionally, there has been no showing that the QBCRA would be violated if defendant answered plaintiffs' interrogatories under oath without removing the documents themselves. "The interrogatories .... do not require the removal of any documents from the Province of Quebec...." *American Industrial, supra,* at 880. *Accord Wilder v. Amatex Corp.,* No. 82 CVS 953 (N.C.Super .Ct. Dec. 21, 1983). In *Wilder,* the court "reviewed the provisions of Chapter 278, Section 2 of the Laws of Quebec .... and .... determined that the answer of the Interrogatories propounded by Plaintiff does not

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 16

Not Reported in A.2d, 2006 WL 2355200 (N.J.Super.A.D.)
(Cite as: Not Reported in A.2d)

require the removal of any documents, photocopies, or other records in violation of the aforesaid Law of Quebec...." *Wilder,* slip op. at 1.

*20 Moreover, even assuming that plaintiffs' discovery requests here fall within the ambit of section 2 of the QBCRA, defendant has not alleged the pendency of an order precluding removal of the requested documents under section 4. "The statute is not self-enforcing but requires a petition by the Attorney-General ['procureur general'] to a district judge for an order requiring the documents not be sent out of the province." *American Industrial, supra,* at 880. As in *Petruska,* "there is no suggestion that the 'procureur general' has filed ' une requete adressee a un juge de district en vertu de l'article 4,' with respect to the documents sought by plaintiff in this case." *Petruska, supra,* at 36. Consequently, "defendants' professed anxiety about the jeopardy which compliance would entail .... seems, at least on the present record, somewhat far-fetched." *Id.*

Thus, defendant has failed to make an adequate showing that the QBCRA is in fact applicable to plaintiffs' discovery requests in the instant case. Even assuming that the statute would preclude the transfer of original documents out of Quebec, this court is not convinced that the statute would be contravened by the production of photocopies outside Quebec or by the inspection of documents within Quebec. Moreover, aside from defendant's failure to respond to plaintiffs' requests for production, defendant has also declined to answer plaintiffs' interrogatories, which would not entail the removal of documents or copies thereof from Quebec. Finally, defendant has not alleged that a restraining order under section 4 of the QBCRA is pending. Under these circumstances, defendant has failed to meet its evidentiary burden in establishing that the provisions of the QBCRA would apply to the discovery sought by plaintiffs in their cases. [119 *F.R.D.* at 387.]

In *Central Wesleyan College v. W.R. Grace & Co.,* 143 *F.R.D.* 628 (1992), the District Court for the District of South Carolina, relying on *Lyons, supra,* found the QBCRA was not entitled to deferential consideration under the principles of international law. *Id.* at 645.

In *American Industrial, supra,* the District Court for the Western District of Pennsylvania found that QBCRA did not protect the defendant, a Canadian corporation, from answering interrogatories. 326 *F.Supp.* at 880-881. In finding such, the court determined that United States public policy demands the defendant answer interrogatories despite the defendant's reliance on the QBCRA. *Ibid.* Furthermore, the court deemed "the province of Quebec [is] not a state within the meanings of the doctrines of international law. [And that t]hese doctrines [of comity] only apply to nations in the international sense such as the United States and Canada." *Ibid.*

In *Petruska, supra,* the District Court for the Eastern District of Pennsylvania held that an American court has the power to direct a Canadian Corporation properly subject to the court's jurisdiction to comply with discovery. 83 *F.R.D.* at 36. "Nevertheless, [the court determined] it would hardly seem prudent for a court to exercise its power in a fashion disruptive of the public policy of another country (or political subdivision thereof) unless it was apparent that no less intrusive measure would serve the compelling litigation needs of the forum." *Ibid.* Therefore, the court decided that while the defendant was obligated to produce the documents, it may prefer to do so in Quebec and not the United States. *Ibid.*

*21 Although none of these cases are binding, they do offer guidance. The courts and judges involved all found either that the QBCRA did or did not diminish a defendant's responsibilities to provide discovery and documents under the laws of the United States. Unlike the record before us, however, these decisions were reached after careful consideration of the QBCRA and the facts of those cases. Although it may be appropriate to apply the QBCRA in this case, a more careful consideration and balancing of the parties' interests, including the *Aerospatiale* comity considerations, should have been conducted. As the United States Supreme Court has said, and what has been summarized by the American Law Institute:

"[W]hen a state has jurisdiction to prescribe and its courts have jurisdiction to adjudicate, adjudication should (subject to generally applicable rules of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2006 WL 2355200 (N.J.Super.A.D.)
**(Cite as: Not Reported in A.2d)**

evidence) take place on the bass of the best information available.... [Blocking] statutes that frustrate this goal need not be given the same deference by courts of the United States as substantive rules of law at variance with the law of the United States." *See Restatement* § 437, Reporter's Note 5, pp. 41, 42. "On the other hand, the degree of friction created by discovery requests . .. and the differing perceptions of the acceptability of American-style discovery under national and international law, suggest some efforts to moderate the application abroad of U.S. procedural techniques, consistent with the overall principle of reasonableness in the exercise of jurisdiction." *Id.,* at 42.
[*Aerospatiale,* 482 U.S. at 544, n. 29, 107 S.Ct. at 2556, 96 *L. Ed.*2d at 484.]

Here, the motion judge did not consider the factors set forth in *Aerospatiale,* nor consider whether there were any alternative means in which the information could have been obtained from ACL, or whether that information was indeed relevant in light of the admission that it had supplied raw chrystotile asbestos fiber to GM. Moreover, document inspection could have been ordered to take place in Quebec in order to lessen the offense to the QBCRA or, alternatively, the court could have ordered plaintiff to first seek this discovery within the United States before mandating ACL turn over documents located in Quebec. We are thus constrained to vacate the June 10, 2005 order and remand the matter for reconsideration consistent with this opinion.

Reversed and remanded.

N.J.Super.A.D.,2006.
Buttitta v. Asbestos Corp. Ltd.
Not Reported in A.2d, 2006 WL 2355200 (N.J.Super.A.D.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.                                                                Page 1

Not Reported in F.Supp., 1998 WL 229499 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

▷
Briefs and Other Related Documents
Herrera v. Clipper Group, L.P.S.D.N.Y.,1998.Only
the Westlaw citation is currently available.
United States District Court, S.D. New York.
Peony HERRERA, Plaintiff,
v.
The Clipper Group, L.P., Clipper Asset
Management Corporation, CEP Partners, L.P.,
Clipper Capital Corporation, Clipper Capital
Partners, L.P., Clipper Capital Associates, L.P.,
Robert Calhoun and Clipper Capital Associates,
Inc., Defendants.
Peony HERRERA, Plaintiff,
v.
Robert CALHOUN and Bela Schwartz, Defendants.
**No. 97-CIV-560 (SAS), 97-CIV-561 (SAS).**

May 6, 1998.

Allan R. Freedman, Esq., N.Y., Avrom S. Fischer,
Esq., Brooklyn, for Plaintiff.
Mark A. Jacoby, Esq., Ross E. Morrison, Esq.,
Weil, Gotshal & Manges LLP, New York, for
Defendants.

OPINION AND ORDER
SCHEINDLIN, D.J.
*1 Plaintiff Peony Herrera filed complaints on
January 24, 1997, alleging, *inter alia,* that
defendants discriminated against her in violation of
Title VII of the Civil Rights Act of 1964, 42 U.S.C.
§ 2000e *et seq.* ("Title VII"). Defendants in 96
Civ. 560 (hereinafter "defendants" or "the Clipper
entities") filed an Answer and Counterclaims on
October 7, 1997; this pleading included claims for
misappropriation and breach of fiduciary duty.
Defendants now move for an order (1) granting
their application for attorneys' fees and costs
associated with this motion, (2) disqualifying
plaintiff's counsel and (3) precluding plaintiff from
using at trial certain documents she obtained from
defendants outside the discovery process. For the

following reasons, this motion is granted in part and
denied in part.

I. Factual Background

On May 23, 1997, defendants served their first
document discovery request. Plaintiff responded
by producing over 3,000 pages of documents, many
of which defendants recognized as having come
from their files. *See* Affidavit of Mark A. Jacoby,
defendants' counsel ("Jacoby Aff.") at ¶¶ 5-6.
Some of the documents produced contained
confidential and/or privileged information, such as
internal financial records and legal advice from
defendants' counsel. *See* Jacoby Aff. at ¶ 7;
Reply Affidavit of Mark A. Jacoby ("Jacoby Rep.
Aff.") at Ex. A, B. At deposition, plaintiff testified
that these items were copies of documents she had
made while in defendants' employ as part of an
effort to collect evidence for this suit. She had
obtained the documents from defendants' files, their
internal mail, and even from their managers' desk
drawers. *See* Deposition of Peony Herrera, January
19, 1998 ("Herrera Dep.") at 16-29, 76. Plaintiff
admitted that this practice, which had persisted over
a considerable period, had not been revealed to, or
authorized by any supervisor. *See id.* at 71. When
asked by a supervisor, in fact, plaintiff had lied
about her activities. *Id.* at 109.[FN1]

> FN1. The relevant excerpt from plaintiff's
> deposition testimony reads as follows:
> Q: Can you recall the substance of [the
> conversation with your supervisor], if not -
> A: The essence of the conversation had
> something to do with documents and that I
> think he was confirming whether or not
> [another supervisor] had spoken to me
> about copying or taking documents.
> Q: He asked you if [the other supervisor]
> had spoken to you about taking Clipper
> documents; is that correct?

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                           Page 2

Not Reported in F.Supp., 1998 WL 229499 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

A: That's correct.
Q: And did he also ask you if you had taken any Clipper documents?
A: Yes, he did.
Q: And what did you say?
A: "Of course not."
Herrera Dep. at 109.

Nor did plaintiff's candor increase once this action commenced. Defendants' first discovery request included a demand for "[a]ll documents which are the property of Defendants that have been removed by Plaintiff from Defendants' premises or the premises of her employment at any time ...." Jacoby Aff. Ex. B at p. 6. In her response, plaintiff denied that any such documents existed. *See* Jacoby Aff. Ex. F. at p. 9.

Plaintiff claims that she has not revealed the contents of the documents to anyone other than her counsel. *See* Herrera Aff. at ¶¶ 7-8. In her affidavit opposing this motion, however, she revealed the terms of a settlement agreement defendants reached with another Title VII plaintiff. *See id.* at ¶ 19.

II. Discussion

A. The Propriety of Plaintiff's Actions

Remarkably, plaintiff maintains that she was justified in appropriating thousands of pages of her employer's confidential files for her personal use. The first issue that must be addressed, therefore, is whether her actions are sanctionable. It has long been recognized that courts have inherent equitable authority "over their own process, to prevent abuses, oppression, and injustices." *International Products Corp. v Koons,* 325 F.2d 403, 408 (2d Cir.1963) (quoting *Gumbel v. Pitkin,* 124 U.S. 131, 144, 8 S.Ct. 379, 31 L.Ed. 374 (1888)). This authority includes the power to sanction parties " who attempt[ ] to use in litigation material improperly obtained outside the discovery process." *Fayemi v. Hambrecht and Ouist, Inc.,* 174 F.R.D. 319, 323 (S.D.N.Y.1997); *Shell Oil Refinery v. Shell Oil Co.,* 143 F.R.D. 105; 108 (E.D.La.1992),

*amended by,* Civ. A. No. 88-1935, 1992 WL 275426 (E.D.La. Sept.29, 1992), *amended by,* Civ. A. No. 88-1935, 144 F.R.D. 73 (E.D.La.1992) (plaintiff sanctioned for improperly obtaining proprietary documents from one of defendant corporation's employees).

**\*2** There is no question here but that the documents produced by plaintiff were improperly obtained. The discovery process is not meant to be supplemented by the unlawful conversion of an adversary's proprietary information. *See, e.g., Fayemi,* 174 F.R.D. at 325 (plaintiff's unauthorized appropriation of employer's confidential records for use in employment discrimination suit "clearly wrongful"); *Lipin v. Bender,* 84 N.Y.2d 562, 569, 620 N.Y.S.2d 744, 644 N.E.2d 1300 (1994) (plaintiff's theft and subsequent use of clearly privileged memorandum written by defendant's counsel warranted dismissal of complaint). Moreover, plaintiff's behavior was not the product of a momentary lapse of judgment, but of a calculated strategy, carried out over an extended period. *Cf. Sigmon v. Parker Chapin Flattau & Klimpl,* 901 F.Supp. 667, 683 (S.D.N.Y.1995) (court declined to sanction plaintiff with dismissal or limitation of damages despite her "questionable" decision to open and copy non-privileged files left in her office in a box with her name on it). As such, it demonstrates contempt for the discovery process, as well as for plaintiff's duty of loyalty to her employer.[FN2] Sanctions are therefore appropriate.

FN2. It is a well established principle of New York law that an employee " 'is prohibited from acting in any manner inconsistent with [her] agency or trust and is at all times bound to exercise the utmost good faith and loyalty in the performance of [her] duties." ' *Doubleclick, Inc. v. Henderson,* No. 116914/97, 1997 WL 731413, at *6 (N.Y.Co.Ct. Nov.7, 1997) (quoting *Lamdin v. Broadway Surface Adv. Corp.,* 272 N.Y. 133, 138, 5 N.E.2d 66 (1936)). The duty of loyalty requires an employee to act "solely for the benefit of the [employer] in all matters connected

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 3

Not Reported in F.Supp., 1998 WL 229499 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

with the [employment]." *In re Ivan F. Boesky Sec. Litig.,* 36 F.3d 255, 265 (2d Cir.1994) (internal quotation marks omitted). An employee who discloses confidential information to third parties to further her own interests at the expense of her employer-i.e. one who behaves as plaintiff did-falls far short of this standard. *See id.*

Plaintiff's efforts to resist this conclusion are meritless. First, she argues that her access to the documents in question demonstrates that they were not truly confidential. *See* Affidavit of Peony Herrera ("Herrera Aff.") at ¶ 4 ("The documents which I produced were not treated as confidential by the Clipper defendants. The documents were all kept in the files of the accounting and administrative support staff which were not locked and which were never secured."). Unsurprisingly, she cites no authority to support this novel theory, which ' amounts to an assertion that anything not nailed down can permissibly be stolen. *See Furnish v. Merlo,* No. 93-1052-AS, 1994 WL 574137, at *6 (D.Or.1994) (plaintiff's appropriation of her employer's confidential documents wrongful: "Simply because [plaintiff] had a key, did not take originals ... and had work-related access to the documents does not mean that she was authorized to copy the documents, remove them from [the] office, and give them to her attorneys."); *Lipin,* 84 N.Y.2d at 570, 620 N.Y.S.2d 744, 644 N.E.2d 1300 (rejecting plaintiff's argument that defendant's counsel waived attorney-client privilege by leaving privileged documents on a table in plaintiff's presence). The confidentiality of a document is not waived by its owner's failure to keep it under lock and key.

Second, plaintiff contends that she was given " implied permission" by her superiors to copy the documents. Plaintiff's Memorandum in Opposition to Defendants' Motion for Preclusion and Disqualification ("Pl's Mem.") at 14. This argument is predicated on a meeting Herrera and her then-counsel had with a supervisor and defendants' counsel on June 14, 1996 in which Herrera attempted to demonstrate that minority employees were being treated unfairly using charts

containing company-generated salary and bonus information. *See* Herrera Aff. at ¶ 13. The fact that her access to defendants' files was not restricted subsequent to this meeting, she argues, shows that her employers consented to her behavior.

**\*3** Plaintiffs' admission that she lied about her behavior when questioned by a supervisor, however, is hardly consistent with this theory. In any event, defendants do not dispute that plaintiff had personal knowledge of salary information-she could not have performed her job duties without such knowledge. *See* Reply Affidavit of Bela R. Schwartz in Support of Defendants' Motion for Preclusion and Disqualification ("Schwartz Rep. Aff.") at ¶ 6; Herrera Aff. at ¶ 14. The fact that she used the information known to her to press her discrimination complaint therefore did not put defendants on notice that she was misappropriating documents. Finally, if defendants had responded to plaintiff's charges by limiting her access to documents necessary for the performance of her duties, they would have left themselves extremely vulnerable to a Title VII retaliation claim. *See Davis v. State Univ.,* 802 F.2d 638, 641 (2d Cir.1986) (employer's retaliatory animus demonstrated by evidence that adverse employment decision was made shortly after plaintiff brought discrimination claim). In these circumstances, defendants' inaction cannot be interpreted as tolerance of plaintiff's behavior.

Plaintiff also argues that her actions were made necessary by defendants' covert destruction of documents relevant to her claim.[FN3] However, she provides no evidence to support her assertion that any such destruction occurred. She points to the fact that defendants produced only 300 documents in response to her discovery request, whereas she produced over 3,000, and argues that the difference must have been the result of a coverup. *See* Herrera Aff. at 16. She does not, however, dispute defendants' assertion that they declined to produce those documents they knew were already in plaintiff's possession. *See* Defendants' Response to Plaintiff's Request for Production of Documents at 2-3. Defendants' failure to produce documents she had already taken fails to demonstrate malfeasance on the part of defendants.[FN4]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 4

Not Reported in F.Supp., 1998 WL 229499 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

FN3. In the exercise of its inherent equitable powers, a court may certainly consider any improper acts of a party seeking sanctions. *See Fayemi,* 174 F.R.D. at 326-27 (plaintiff not sanctioned for his wrongful appropriation of documents where defendant attempted to destroy those documents after being put on notice that the documents were relevant to plaintiff's suit).

FN4. Plaintiff also contends that improper destruction of documents can be inferred from a conversation she had in November, 1995 with one of her supervisors. In that discussion, plaintiff cited several examples illustrating her claim that minority women in the defendants' employ had been subject to disparate treatment in terms of pay. The supervisor responded by asserting that each of the differences plaintiff identified was justified by non-discriminatory considerations. Plaintiff now contends that these explanations were false. This suggests that defendants must have destroyed documents, plaintiff argues, because the supervisor would not have made the misstatements he made had he believed that any contradictory documentary evidence existed. *See* Herrera Aff. at ¶¶ 20-21. This is pure speculation, and highly counter-intuitive speculation at that: The supervisor's allegedly false statements could have been contradicted by the testimony of the women in question (who were presumably quite aware of their job duties and compensation). Given that the documents in question may have been the only source of support for the supervisor's statements, defendants would have had little incentive to destroy them.

B. Appropriate Sanctions

1. Costs of the Motion

Defendants first suggest that plaintiff should be

required to compensate them for the costs of bringing this motion. A court's inherent equitable authority includes the power to assess attorneys' fees and costs when a party before it has " 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons." ' *First Nat'l Supermarkets, Inc. v. Retail, Wholesale & Chain Store Food Employees Union Local 338,* 118 F.3d 892, 898 (2d Cir.1997) (quoting *Chambers v. NASCO, Inc.,* 501 U.S. 32, 45-46, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991)). An imposition of sanctions pursuant to this power must be accompanied by specific factual findings regarding (1) the misconduct in question and (2) the proportion of the adversary's fees that is attributable to that misconduct. *See Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.* 98 F.3d 13, 21 (2d Cir.1996).

I have little trouble concluding that plaintiff here acted in bad faith. First, she deliberately subverted the discovery rules of this court by secretly misappropriating thousands of pages of documents, many of which contained clearly confidential information. Second, she lied about this course of conduct, both to her supervisors and in her response to defendants' discovery request. Finally, she disclosed defendants' confidential information in a publicly-filed affidavit. As discussed above, plaintiff proffers no colorable arguments to support her assertion that these acts were justified. Rather, it is apparent that they were motivated by a desire to evade the discovery process in order to gain a tactical advantage in this litigation. *See United States v. International Bhd. of Teamsters,* 948 F.2d 1338, 1345 (2d Cir.1991) (acts are sanctionable when they are "entirely without color, and are taken for reasons of harassment or delay or for other improper purposes") (internal quotation marks omitted)). It is also clear that the costs of this motion are, in their entirety, attributable to plaintiff's misconduct. *Cf. Ostano Commerzanstalt v. Telewide Systems, Inc.,* 880 F.2d 642, 650 (2d Cir.1989) (action remanded when district court awarded plaintiffs' attorneys all their fees, though sanctionable acts only related to one of the exhibits presented at trial). I therefore find that the expenses defendants incurred in making this motion should be borne by plaintiff.[FN5]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                          Page 5

Not Reported in F.Supp., 1998 WL 229499 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

> FN5. Defendants should present plaintiff with an invoice for the expenses incurred in making this motion. If the parties cannot agree on the proper amount of compensation, defendants must submit a fee application to the Court no later than June 15, 1998.

### B. Disqualification of Counsel

**\*4** Defendants next request that plaintiff's counsel be disqualified from representing plaintiff in these actions. This sanction is necessary, they argue, to prevent plaintiff's counsel from acting as "unsworn witnesses" at trial, particularly with regard to defendants' breach of fiduciary duty and misappropriation counterclaims. As the Second Circuit has explained:

An attorney acts as an unsworn witness when his relationship to his client results in his having first-hand knowledge of the events presented at trial. If the attorney is in a position to be a witness, ethical codes may require him to withdraw his representation. Even if the attorney is not called, however, he can still be disqualified, since his performance as an advocate can be impaired by his relationship to the events in question. For example, the attorney may be constrained from making certain arguments on behalf of his client because of his own involvement, or may be tempted to minimize his own conduct at the expense of the client. Moreover, his role as advocate may give his client an unfair advantage, because the attorney can subtly impart to the jury his first-hand knowledge of the events without having to swear an oath or be subject to cross-examination.

*United States v. Locascio,* 6 F.3d 924, 933 (2d Cir.1993) (citations omitted). Defendants suggest that both the dangers described in this passage will be present if plaintiff's counsel are allowed to remain in the case. First, counsel may be tempted to minimize their own role in plaintiff's appropriation of documents in order to avoid disciplinary sanctions. Second, counsel may be able to prejudice defendants by conveying to the jury their own views of the propriety of plaintiff's conduct without undergoing the rigors of cross-examination.

The problem with these arguments is that here, unlike in *Locascio,* there are virtually no factual issues left to be resolved with regard to the claims in question.[FN6] Plaintiff has admitted taking the documents without authorization. At least some of those documents were clearly confidential. The only potentially disputed issue of fact remaining on defendants' breach of fiduciary duty and misappropriation counterclaims, therefore, would appear to be the extent of defendants' damages, a subject upon which plaintiff's counsel would have no first-hand knowledge. Similarly, plaintiff's counsel would appear to have little ability to minimize their role in plaintiff's activities even if they were tempted to do so for fear of disciplinary proceedings: They concede that they were fully aware of their client's behavior from its inception.

Thus, while plaintiff's counsel have first-hand knowledge of relevant information, this knowledge is unlikely to lead to a situation at trial that would cause prejudice to either party. *See United States v. Isaacson,* 853 F.Supp. 83, 87-88 (E.D.N.Y.1994) (defendant's counsel not disqualified when defendant's admissions rendered potential conflict of interest unlikely). In these circumstances, granting defendants the "drastic remedy" of disqualification would be inappropriate. *Locascio,* 6 F.3d at 934.

> FN6. *See* 6 F.3d at 933 (defendant's counsel disqualified when he possessed personal knowledge of *disputed* facts). The other cases cited by defendants are identical in this regard. *See United States v. McKeon,* 738 F.2d 26, 35 (2d Cir.1984); *United States v. Cruz,* 94 Cr. 313, 1995 WL 463107, at \*2 (S.D.N.Y. Aug.4, 1995).

### C. Preclusion

**\*5** Defendants also suggest that plaintiff should be precluded from using any non-public business information contained in the documents she misappropriated. In many cases, preclusion is an appropriate sanction when evidence has been wrongfully obtained. *See, e.g., Shell Oil,* 143 F.R.D. at 108-09. Here, however, the sanction I have already imposed-reimbursement to defendants

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Page 6

Not Reported in F.Supp., 1998 WL 229499 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

for the costs of this motion-is a sufficiently severe punishment to deter plaintiff from engaging in future misdeeds. Moreover, granting the relief requested would be sure to lead to innumerable disputes as to whether particular items of information were publicly available, and if not, whether plaintiff nevertheless obtained them from an untainted source. Finally, plaintiff could have properly obtained the clear majority of the documents through the discovery process had she consented to a reasonable confidentiality agreement. Preclusion would therefore not merely punish her, but would grant defendants a windfall strategic advantage as well. Without knowing what value the information at issue has for plaintiff's case, I am reluctant to grant them this advantage.

For all these reasons, I decline to prohibit plaintiff from using otherwise discoverable information in these actions, in spite of her improper efforts in obtaining it.

### III. Conclusion

In secretly copying thousands of pages of documents belonging to defendants, at least some of which were clearly confidential, plaintiff improperly attempted to evade this court's discovery rules. She exhibited further bad faith in lying to a supervisor about her behavior, responding falsely to defendants' request for documents, and disclosing confidential information in a publicly-filed document. Furthermore, the justifications she now offers for her actions are entirely without merit.

Plaintiff is therefore ordered to compensate defendants for the costs incurred in making this motion. Her counsel, however, are not disqualified from representing her in these actions, and she is not precluded from using in these actions any non-privileged information she obtained from defendants.

SO ORDERED:

S.D.N.Y.,1998.
Herrera v. Clipper Group, L.P.
Not Reported in F.Supp., 1998 WL 229499 (S.D.N.Y.)

Briefs and Other Related Documents (Back to top)

• 1997 WL 34506056 () Reply Affidavit in Further Support of Defendants' Motions to Dismiss (Jun. 19, 1997) Original Image of this Document (PDF)
• 1997 WL 34582277 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Defendants' Motion to Dismiss (May 2, 1997) Original Image of this Document (PDF)
• 1997 WL 34582279 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Defendant Robert Calhoun's Motion to Dismiss (May 2, 1997) Original Image of this Document (PDF)
• 1997 WL 34606360 () Affidavit in Support of Defendant Robert Calhoun's Motion to Dismiss (May 1, 1997) Original Image of this Document (PDF)
• 1:97cv00560 (Docket) (Jan. 24, 1997)
• 1:97cv00561 (Docket) (Jan. 24, 1997)
• 1997 WL 34582276 (Trial Pleading) Complaint with Jury Demand (1997) Original Image of this Document (PDF)
• 1997 WL 34582278 (Trial Pleading) Complaint with Jury Demand (1997) Original Image of this Document (PDF)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                                                    Page 1

Not Reported in F.Supp.2d, 2005 WL 3046284 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Peninsula Asset Management (Cayman) Ltd. v. Hankook Tire Co., Ltd.S.D.N.Y.,2005.Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
PENINSULA ASSET MANAGEMENT (CAYMAN) LTD., Karen Chongah Han, and No Joon Park, Plaintiffs,
v.
HANKOOK TIRE CO., LTD. and Yang-Rae Cho, Defendants.
**No. M8-85(HB), 5:04CV1153.**

Nov. 14, 2005.

*MEMORANDUM & ORDER*
BAER, J.
**\*1** Plaintiffs Peninsula Asset Management (Cayman) Ltd., Karen Chongah Han and No Joon Park, (collectively "Peninsula" or "plaintiffs") move to hold non-party respondent Financial Supervisory Service ("FSS") in contempt for failure to comply with a subpoena duces tecum. For the following reasons, Peninsula's motion for contempt is DENIED.

*BACKGROUND*

The subpoena before this Court relates to an action pending in the Northern District of Ohio. In that action, plaintiffs contend that Hankook Tire Company, Ltd. and Yang-Rae Cho ("defendants") induced them into engaging in illegal currency transactions. (*See* 5:04 CV 1153 (N.D.Ohio), Order dated Sept. 26, 2005, at 1-2). FSS is a quasi-governmental entity that regulates Korean financial institutions and financial markets. FSS investigated the defendants in connection with the transactions at issue in the underlying litigation. On March 22, 2005, plaintiffs served a subpoena on FSS' New York office, requesting that FSS appear for a deposition and produce documents related to

its investigation of defendants. On April 14, 2005, FSS filed a motion to quash the subpoena. On June 15, 2005, this Court denied the motion to quash, finding that FSS was not entitled to sovereign immunity. (*See* Order dated June 15, 2005). On August 25, 2005, after FSS still refused to comply with the subpoena, Peninsula filed the instant motion for contempt. Oral argument was held before this Court on November 2, 2005.

*DISCUSSION*

"A court's inherent power to hold a party in civil contempt may be exercised only when (1) the order the party allegedly failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the party has not diligently attempted in a reasonable manner to comply." *New York State Nat'l Org. for Women v. Terry,* 886 F.2d 1339, 1351 (2d Cir.1989). FSS argues that it is prevented from complying with plaintiffs' subpoena by a provision of the Korean statute that created FSS, the Act on Establishment of Financial Supervisory Organizations (the "Act"). Section 35(2) of the Act provides that FSS' employees "shall neither reveal to outsiders nor use for other purposes any information obtained in the course of their duties." Section 68(1) states that violations of section 35(2) are punishable by substantial fines and imprisonment.

In deciding whether to compel foreign entities to engage in discovery practices arguably prohibited by foreign law, courts must determine whether comity requires deference to the foreign law. *See First American Corp. v. Price Waterhouse, L.L.P.,* 154 F.3d 16, 22 (2d Cir.1998). In making this determination, courts examine four factors: 1) "the competing interests of the nations whose laws are in conflict;" 2) "the hardship that compliance would impose on the party or witness from whom discovery is sought;" 3) "the importance to the litigation of the information and documents

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 2

Not Reported in F.Supp.2d, 2005 WL 3046284 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

requested;" and 4) "the good faith of the party resisting discovery." *Id.*

**\*2** Here, the parties disagree as to whether the Act actually prevents FSS from complying with plaintiffs' subpoena. FSS has produced an affidavit from the chairman of the Financial Supervisory Commission ("FSC"), FSS' parent agency, stating that it is FSS' position that the Act prohibits compliance. (Jeung-Hyun Yoon Aff., dated September 15, 2005). In addition, FSS has submitted an affidavit from a Korean former judge opining that, while plaintiffs' subpoena would present a somewhat novel question of Korean law, a Korean court could not order disclosure under similar circumstances. (Seong Taek Shin Aff., dated September 15, 2005).

FSS has adequately shown that the Act prevents its compliance with this subpoena. While it is not clear from the face of the statute whether it bars compliance with civil subpoenas, plaintiffs have provided no reason to second guess Mr. Shin's conclusion that the Act would in fact prevent a Korean court from ordering compliance under similar circumstances.[FN1] Nonetheless, having reached this conclusion, I still must determine whether comity requires adherence to the Korean law. I find that it does.

> FN1. Plaintiffs argue that Korea's Official Information Disclosure Act ("OIDA"), the Korean equivalent of our Freedom of Information Act, allows disclosure of the information sought here. However, Article 9(I)(5) of OIDA provides that " information pertaining to matters such as audit, supervision, inspection, tests [and] regulations" are exempt from disclosure. ( *See* Seong Taek Shin Aff. ¶ 17).

FSS argues that Korea has a strong national interest in protecting the confidentiality of FSS' investigations. FSS asserts that it would be unable to adequately perform its investigative function if internal documents generated during such investigations were subject to disclosure to private litigants. FSS has submitted a letter from the

Korean embassy in Washington to the U.S. State Department, dated September 14, 2005, expressing concern over the enforcement of this subpoena against FSS. Plaintiffs respond that FSS' purpose is in fact to ensure "transparency" in Korean financial markets, and that withholding information regarding its investigation of defendants is contrary to that purpose.[FN2]

> FN2. Plaintiffs also argue that the position of the Korean embassy should be disregarded because this matter has engendered some political controversy in Korea. In support of their position, plaintiffs have provided a transcript of a hearing in the Korean National Assembly in which one lawmaker expressed concern over FSS refusal to comply with this subpoena. However, this Court cannot disregard the stated position of the Korean embassy, whether or not some members of the Korean government disagree with that position.

The Korean government has a clear interest in maintaining the integrity of its investigative processes, and has asserted that interest here. The United States has a general interest in ensuring compliance with discovery rules, and in ensuring that plaintiffs have access to discoverable information. However, there are necessarily limits on plaintiffs' ability to discover relevant information. The Korean Act creates a privilege akin to our law enforcement privilege. The Korean national interest in the unimpeded function of regulatory bodies trumps the United States' interest in ensuring compliance with discovery obligations.

This is especially so, where, as here, the information sought is possessed by a non-party to the underlying litigation. *See Minepco v. Conticommodity Services, Inc.,* 116 F.R.D. 517, 530 (S .D.N.Y.1987) (fact that foreign entity is a non-party witness should be considered in determining whether to order compliance with subpoena). FSS is neither a plaintiff in this suit, seeking to avail itself of access to U.S. courts while shielding its files from discovery, *cf. Reino de*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 3046284 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 3

*Espana v. American Bureau of Shipping,* 03 Civ. 3573, 2005 WL 1813017, *9 (S.D.N.Y. Aug. 1, 2005) (finding that Spain may not rely on foreign privilege to prevent discovery in action it initiated in U.S. courts), nor is FSS a defendant. While doubtless plaintiffs would very much like access to FSS' internal files, plaintiffs are free to seek discovery from defendants directly.

**\*3** Furthermore, it appears that FSS has made a good faith effort to comply with plaintiffs discovery demands. FSS has requested leave to comply from its headquarters in Seoul, and that permission was denied. In addition, prior to the subpoena, FSS produced some documents relating to its investigation of the defendants to the plaintiffs.[FN3] Because Korean law prevents FSS from complying with plaintiffs' subpoena, and since, in this instance, Korea's interest in compliance with its law trumps the United States' interest in compliance with this subpoena, this Court will not force FSS to disobey the Korean Act. Since FSS has diligently attempted to comply with this Court's prior Order, plaintiffs' motion for contempt is denied.

> FN3. While plaintiffs maintain that FSS waived reliance on the Korean Act by providing these documents, FSS asserts that the documents provided reveal only that an investigation was conducted and its outcome, rather than details of the investigative process itself.

### CONCLUSION

For the foregoing reasons, plaintiffs' motion for contempt is DENIED. The Clerk of the Court is directed to close this motion and remove this matter from my docket.

SO ORDERED.

S.D.N.Y.,2005.
Peninsula Asset Management (Cayman) Ltd. v. Hankook Tire Co., Ltd.
Not Reported in F.Supp.2d, 2005 WL 3046284 (S.D.N.Y.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 1999 WL 182598 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 1

**H**
Briefs and Other Related Documents
S.E.C. v. Euro Sec. FundS.D.N.Y.,1999.Only the
Westlaw citation is currently available.
United States District Court, S.D. New York.
SECURITIES AND EXCHANGE COMMISSION,
Plaintiff,
v.
EURO SECURITY FUND, Coim SA, and One or
More Unknown Purchasers of Call Options and
Common Stock of Elsag Bailey Process Automation
N.V., Defendants.
**No. 98 CIV. 7347(DLC).**

April 2, 1999.

Daniel J. Hurson, Douglas J. Davison, Securities
and Exchange Commission, Washington, DC,
Robert B. Blackburn, Securities and Exchange
Commission, New York, Counsel for plaintiff.
Robert J. Costello, Ebonette Bates, Gibney,
Anthony & Flaherty, LLP, New York, for
Defendants Coim S.A. and Francesco Marotta.

OPINION AND ORDER
COTE, District J.
**\*1** Plaintiff Securities and Exchange Commission ("
SEC") brings this insider trading action against a
number of individual and institutional defendants
alleging violations of Section 10(b) of the Securities
Exchange Act of 1934 ("Exchange Act"), 15 U.S.C.
§ 78j(b), including Rule 10b-5 thereunder, and
Section 14(e) of the Exchange Act, 15 U.S.C. §
78n(e), including Rule 14e-3 thereunder. The SEC
now moves for a default judgment or, in the
alternative, for an order to compel against defendant
Coim SA ("Coim"). The SEC also moves for an
order to compel against defendant Francesco
Marotta ("Marotta"). [FN1]

> FN1. A motion to compel was also
> originally also brought against defendant

Euro Security Fund. Nonetheless, at the
request of the parties, the Court has
adjourned the briefing schedule of that
motion pending settlement negotiations.

BACKGROUND
The First Amended Complaint filed November 17,
1998, contains the following relevant factual
allegations. Coim is an investment entity that listed
an address in Lugano, Switzerland on its brokerage
application. Marotta is an Italian national residing
in Switzerland and the principal of Coim. On
October 14, 1998, ABB Asea Brown Boveri ("ABB
"), a Swiss company, announced a tender offer for
Elsag Bailey Process Automation, N.V. ("Elsag").
Elsag is a Netherlands corporation with
headquarters in the Netherlands and a regional
office in Wickliffe, Ohio. Elsag's stock is registered
pursuant to Section 12(b) of the Exchange Act and
trades exclusively on the New York Stock
Exchange ("NYSE"). In the days immediately prior
to the announcement, Coim and Marotta, while in
the possession of material nonpublic information
with respect to ABB's tender offer, purchased or
caused the purchase of 101,000 shares of Elsag
stock through an account at Schroder & Co., Inc., a
United States broker dealer.

On October 19, 1999, the Court entered a
Temporary Restraining Order Freezing Assets and
Granting Other Relief ("TRO"). Coim was named
as a defendant in the TRO, which among other
items provided for expedited discovery and
required defendants to provide asset identification
information. On October 21, 1998, the SEC served
a deposition notice on Coim that called for the
deposition of Coim and production of documents by
October 26, 1998. Coim failed to appear for the
deposition or to produce any documents. Nor did it
file any objection. After a preliminary injunction
hearing, on November 10, 1998, this Court entered
an Order for a Preliminary Injunction and Asset
Freeze ("Preliminary Injunction") against many of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                   Page 2

Not Reported in F.Supp.2d, 1999 WL 182598 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

the defendants, including Coim. The Preliminary Injunction required Coim to provide asset identification information within three days of service. Individual defendant Marotta was added to this action through the filing of the First Amended Complaint on November 13, 1998.

On December 22, 1998, Coim and Marotta filed an answer. That answer describes Coim as a "stock brokerage company" and alleges that Coim purchased 100,000 shares for an entity called Angelus Trading, Inc. and only purchased 1,000 shares for its own account. The answer also states that Marotta is the one-hundred percent owner of Coim. On January 13, 1999, the SEC served a Rule 30(b)(6) notice of deposition and request for production of documents on Coim. It also served a notice of deposition and production of documents on Marotta. Both sought compliance by January 21, 1999. At a conference before this Court on January 22, 1999, the SEC notified counsel for Coim and the Court of its intent to file a motion to compel.

**\*2** To date, Coim has been the subject of two orders of this Court requiring discovery and two formal discovery requests from the SEC. As an individual defendant, Marotta received a formal discovery request from the SEC over two months ago. In addition, the SEC certifies that it has made, in good faith, numerous other less formal attempts by phone and in writing to confer with counsel for Coim and Marotta in order to resolve these disputes. In an attempt to compromise, the SEC has also proposed the taking of depositions outside the United States under the Federal Rules of Civil Procedure.

Coim and Marotta have not appeared for depositions or produced any documents. Coim and Marotta claim that they have been willing to proceed with discovery but only under the Hague Convention on Taking Evidence Abroad and Swiss law and allege that the SEC has unreasonably refused to pursue this avenue of discovery. The only information produced by Coim or Marotta is a letter to the Swiss Federal Banking Commission, which was then forwarded to the SEC, stating that Angelus Trading is a British Virgin Islands Company that manages the assets of a member of a wealthy family and that it has a bank account in Milan, Italy. Swiss

counsel to Coim has also told the SEC that the owner of the account gave her son the authority to trade. Neither the woman nor her son have been identified.

### DISCUSSION

Rule 37(a), Fed.R.Civ.P., authorizes a party "upon reasonable notice to other parties and all persons affected thereby" to move before the Court for an order compelling discovery or disclosure. "The motion must include a certification that the movant has in good faith conferred or attempted to confer with the party not making the disclosure in an effort to secure the disclosure without court action." Rule 37(a)(2)(A), Fed.R.Civ.P. Rule 37(d) creates a similar remedy with respect to the failure of a party or party officer, director, or managing agent to appear for a properly noticed deposition.

In addition, Rule 37(b)(2) authorizes a Court to impose such sanctions "as are just" against the party that fails to comply with a Court's discovery orders so long as the sanctions relate to the particular claim to which the discovery order was addressed. *See Daval Steel Products v. M/V Fakredine,* 951 F.2d 1357, 1366 (2d Cir.1991). The sanctions listed in Rule 37(b) can be triggered by any "clearly articulated order of the court requiring specified discovery," and not just by an order to compel pursuant to Rule 37(a). *Id.* at 1363. Among the sanctions provided for in Rule 37(b) is "[a]n order ... rendering a judgment by default against the disobedient party." Rule 37(b)(2)(C), Fed.R.Civ.P.

"Although entry of a default judgment is an extreme measure, discovery orders are meant to be followed. A party who flouts such order does so at his peril." *Bambu Sales, Inc. v. Ozak Trading Inc.,* 58 F.3d 849, 853 (2d Cir.1995) (internal quotations omitted). Courts have found entry of a default judgment to be appropriate where a party intentionally fails to provide material discovery. *See, e.g., id.; Sieck v. Russo,* 869 F.2d 131, 134 (2d Cir.1989).

**\*3** In response to the SEC's application for a motion to compel and a default judgment, Coim and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 4 of 5

Not Reported in F.Supp.2d                                                                              Page 3

Not Reported in F.Supp.2d, 1999 WL 182598 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Marotta make a barrage of arguments that basically reduce to the following: they should not be required to provide discovery under the Federal Rules but instead discovery should be taken pursuant to the Hague Convention on the Taking of Evidence Abroad and Swiss law. They assert that providing the discovery sought could violate Swiss law, and that "whether it is proper to make this revelation should in the first instance be decided by Swiss authorities." Specifically, defendants argue that any depositions should be taken in Switzerland pursuant to Swiss law. Coim and Marotta's position is untenable under the clear law in this circuit.

"It is well established the a court has the *power* to impose discovery under the Federal Rules of Civil Procedure when it has personal jurisdiction over the foreign party." *Societe Nationale Industrielle Aerospatiale v. United States District Court,* 482 U.S. 522, 553 n. 4 (1987) (Blackmum, J. concurring) (emphasis in original). "The Hague Convention is not the exclusive means for obtaining discovery from a foreign entity. Nor is the Convention necessarily the means of first resort." *First American Corp. v. Price Waterhouse LLP,* 154 F.3d 16, 21 (2d Cir.1998) (internal citation omitted). Rather than requiring application of the Hague Convention, international comity only requires that
"American courts ... take care to demonstrate due respect for any special problem confronted by the foreign litigant on account of its nationality or the location of its operations, and for any sovereign interest expressed by a foreign state."

*Id.* (quoting *Societe Nationale,* 482 U.S. at 546).

Out of concern for comity, courts have weighed the following factors where the law of a foreign jurisdiction requires conduct inconsistent with that of the Federal Rules, to determine whether the Hague Convention should be applied:
(1) the competing interests of the nations whose law are in conflict, (2) the hardship of compliance on the party or witness from whom discovery is sought, (3) the importance to the litigation of the information and documents requested, and (4) the good faith of the party resisting discovery.

*Minpeco, S.A. v. Contimcommodity Servs., Inc.,* 116 F.R.D. 517, 523 (S.D.N.Y.1987). *See also First American,* 154 F.3d at 22 (citing *Minpeco* with approval). Courts also consider whether the person from whom discovery is sought is a party or non-party. *Id.*

In this case, the Court does not face a situation that requires application of comity principles because the Court is not presented with any real conflict at all. It appears that neither Coim nor Marotta is a bank or registered broker in Switzerland.[FN2] Coim and Marotta have not identified a single specific requirement of Swiss law that conflicts with the discovery sought by the SEC. They have similarly not related the possible requirements of Swiss law to any of their discovery failures. Coim and Marotta have provided no proof of Swiss law whatsoever, failing even to identify the status of Coim under Swiss law or the financial regulations to which it is subject. Illusory references to foreign secrecy without any specifics are insufficient to create a conflict; this Court is therefore not required to apply comity principles. *See Alfadda v. Fenn,* 149 F.R.D. 28, 34 (S.D.N.Y.1993) ("party relying on foreign law bears the burden of demonstrating that such law actually bars the production or testimony at issue").

> FN2. Coim's obfuscation along these lines is suggested by the following statement in its brief: "Coim's activities, even though not those of a bank, are governed by the Swiss Federal Banking Commission."

*\*4 Even if comity interests were weighed, however, they would provide no succor for the defendants. With respect to a weighing of national interests, the United States possesses a keen interest in its securities markets and the SEC is the regulator appointed by Congress to protect the integrity of those markets. *See SEC v. Banca Della Svizzera Italiana,* 92 F.R.D. 111, 117 (S.D.N.Y.1981) (requiring discovery in insider trading case even where disclosure may result in violation of Swiss law). The trading at issue in this action occurred on a United States exchange in stock registered under the Exchange Act. On the Swiss side, Coim and Marotta have provided no evidence of Swiss

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 1999 WL 182598 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

interests besides a generic appeal to "Swiss secrecy. " They have also provided no evidence that the Swiss government or any agency thereof regards its sovereignty or regulatory domain as threatened by the SEC's actions in seeking discovery. *Cf. Alfadda,* 149 F.R.D. at 35. With respect to the second factor, defendants have provided no specific evidence of unfair hardship from application of the Federal Rules. With respect to the third factor, the SEC's ability to proceed is crippled by a total lack of production, particularly with respect to asset identification; Coim and Marotta do not argue that discovery under the Hague Convention would be a viable option in this particular case, rather, they seem to view the Convention as a way to avoid altogether production of information, such as the identification of assets, necessary to the conduct of this action. With respect to good faith, it is worth noting that any potential conflict would appear to justify only partial disclosure; it would not justify the complete failure to participate in discovery. As a result, defendants' good faith desire to participate in discovery in any fashion is seriously in question.

Discovery in this action is therefore unquestionably proper under the Federal Rules. Defendants do not contest that in the six-month history of this litigation, Coim has totally failed to comply with two Orders of this Court and that both Coim and Marotta have failed to comply with the SEC's requests regarding discovery. Coim does not contest that the previous Orders of this Court clearly identified the discovery required. Instead, COIM and Marotta attempt to excuse their failure to provide discovery based on the comity principles just analyzed. Although never seriously in dispute, the Court has now made clear that those principles do not absolve Coim and Marotta of their discovery obligations under the Federal Rules, particularly in an insider trading action where the United States interests are so clear. Coim and Marotta must promptly comply with discovery requests or face a default in this action. Although the Court believes it would be possible to enter a default judgment against Coim at this stage in discovery, since there is no question that Coim willfully failed to provide material discovery, the Court will give both defendants a final opportunity to bring themselves into compliance before resorting to this sanction.

*Cf. Daval Steel,* 951 F.2d at 1366 ("Although formal warnings often precede the imposition of serious sanctions, this court has never considered warnings an absolute condition precedent.").

**\*5** As a result, within two weeks of this Opinion and Order, Coim and Marotta are hereby ordered to appear for depositions to be conducted under the Federal Rules of Civil Procedure. Per the SEC's offer, these depositions may take place outside of the United States. COIM and Marotta shall also respond prior to their depositions to all other outstanding discovery requests and provide the information requested therein. Failure by either COIM or Marotta to comply with this Opinion and Order shall result in an entry of default judgment.

SO ORDERED:

S.D.N.Y.,1999.
S.E.C. v. Euro Sec. Fund
Not Reported in F.Supp.2d, 1999 WL 182598 (S.D.N.Y.)

Briefs and Other Related Documents (Back to top)

• 2:98cv07347 (Docket) (Oct. 19, 1998)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.