UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

TZVI WEISS, et al.

                Plaintiffs,

    -against-

NATIONAL WESTMINSTER BANK, PLC

             Defendant.

Case No. CV 05-4622 (CPS) (KAM)

**PLAINTIFFS' REPLY MEMORANDUM OF LAW
IN SUPPORT OF THEIR MOTION FOR AN ORDER OVERRULING OBJECTIONS
AND COMPELLING FURTHER RESPONSES TO PLAINTIFFS' FIRST SET OF
REQUESTS FOR ADMISSIONS AND RELATED INTERROGATORIES AND
PLAINTIFFS' FIRST REQUEST FOR THE PRODUCTION OF DOCUMENTS**

OSEN & ASSOCIATE, LLC
700 Kinderkamack Road
Oradell, New Jersey 07649
Tel: (201) 265-6400
Fax: (212) 753-3630

KOHN SWIFT & GRAF, P.C.
One South Broad Street
Suite 2100
Philadelphia, PA 19107
Tel: (215) 238-1700
Fax: (215) 238-1968

GLANCY BINKOW & GOLDBERG LLP
430 Park Avenue
New York, New York 10022
Tel: (212) 308-6300
Fax: (212) 308-6570

*Co-Counsel for Plaintiffs*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................................... 1

I.    THE UNITED STATES HAS THE STRONGEST IMAGINABLE INTEREST IN
      SEEKING ENFORCEMENT OF ITS ANTI-TERRORISM LAWS.................................... 2

II.   BY CLEAR CONGRESSIONAL DESIGN, PLAINTIFFS ARE  PRIVATE ATTORNEYS
      GENERAL................................................................................................................................ 3

III.  THE SUPREME COURT'S COMITY ANALYSIS GOVERNS THIS CASE.................... 6

IV.   ENGLISH BANK SECRECY LAW DOES NOT PROHIBIT NATWEST'S
      PRODUCTION OF THE DISCOVERY SOUGHT BY PLAINTIFFS................................ 7

V.    NATWEST IS OBLIGATED TO FOLLOW THE MORE STRINGENT AMERICAN
      LAW ..................................................................................................................................... 10

VI.   LETTERS OF REQUEST ARE NOT VIABLE SUBSTITUTES FOR DIRECT
      DISCOVERY AND SHOULD NOT BE USED TO DELAY THESE PROCEEDINGS .. 11

VII.  DEFENDANT'S ALLEGED GOOD FAITH IS IRRELEVANT TO THE DEFENDANT'S
      COMPLIANCE OBLIGATION.......................................................................................... 14

CONCLUSION............................................................................................................................ 15

## TABLE OF AUTHORITIES

### CASES

*Agency Holding Corp. v. Malley-Duff & Associates, Inc.*,
483 U.S. 143 (1987)……………………………………………………………………5

*Alfadda v. Fenn*,
149 F.R.D. 28 (S.D.N.Y. 1993)…………………………………………………………..7

*Bodner v. Paribas*,
202 F.R.D. 370 (E.D.N.Y. 2000)…………………………………………………12, 13

*Boim v. Quranic Literacy Inst. and Holy Land Foundation For Relief And Development*,
291 F.3d 1000 (7th Cir. 2002)……………………………………………………………5

*British Intern. Ins. Co. Ltd. v. Seguros La Republica, S.A.*,
2000 WL 713057 (S.D.N.Y. Jun. 2, 2000)………………………………………………..6

*First Am. Corp. v. Price Waterhouse LLP*,
154 F.3d 16 (2d Cir. 1998)………………………………………………………..…6, 12

*Gap, Inc. v. Stone Int'l Trading, Inc.*,
1994 WL 38651 (S.D.N.Y. Feb. 4, 1994)………………………………………………..12

*Gen. Atomic Co. v. Exxon Nuclear Co., Inc.*,
90 F.R.D. 290 (D.C. Cal. 1981)………………………………………………………6, 15

*Graco, Inc. v. Kremlin, Inc.*,
101 F.R.D. 503 (N.D. Ill. 1984)………………………………………………...……..11

*Haynes v. Kleinwefers*,
119 F.R.D. 335 (E.D.N.Y. 1988)……………………………………………………12, 13

*Holy Land Foundation for Relief and Development v. Ashcroft*,
333 F.3d 156 (D.C. Cir. 2003)………………………………………………………….1

*Hudson v. Hermann Pfauter GmbH & Co.*,
117 F.R.D. 33 (N.D.N.Y. 1987)………………………………………………………….13

*Humanitarian Law Project v. U.S. Dept. of Treasury*,
--- F. Supp. 2d ----, 2006 WL 3477787 (C.D.Cal. 2006)…………………………..………..1

*In re Air Crash at Taipei, Taiwan*,
211 F.R.D. 374 (C.D. Cal. 2002)………………………………………………......…………6

*In re Automotive Refinishing Paint Antitrust Litigation,*
  358 F.3d 288 (3d Cir. 2004)..........................................................................12

*In re Grand Jury Subpoena dated August 9, 2000,*
  218 F. Supp. 2d 544 (S.D.N.Y. 2002).......................................................5-6, 10

*In re Oil Spill by Amoco Cadiz off Coast of France on March 16, 1978,*
  93 F.R.D. 840 (N.D.Ill 1982)......................................................................6, 14

*In re Perrier Bottled Water Litig.,*
  138 F.R.D. 348 (D. Conn. 1991).......................................................................13

*In re Uranium Antitrust Litig.,*
  480 F. Supp. 1138 (N.D. Ill. 1979)....................................................................6

*Laker Airways Ltd. v. Pan Am. World Airways,*
  607 F. Supp. 324 (S.D.N.Y. 1985)...................................................................13

*Madanes v. Madanes,*
  186 F.R.D. 279 (S.D.N.Y. 1999).......................................................................6

*Minpeco, S.A. v. Conticommodity Serv., Inc.,*
  116 F.R.D. 517 (S.D.N.Y. 1987).......................................................................6

*National Westminster Bank, PLC v. U.S.,*
  69 Fed.Cl. 128 (Fed.Cl. 2005).........................................................................10

*Remington Prod., Inc. v. North Am. Philips Corp.,*
  107 F.R.D. 642 (D. Conn. 1985)..................................................................12, 14

*Rotella v. Wood,*
  528 U.S. 549 (2000)..........................................................................................5

*Société Nationale Industrielle Aérospatiale v. U.S. District Court for the Southern District of Iowa,* 482 U.S. 522 (1987)..........................................................6, 10, 11, 13

*Société Internationale Pour Participations Industrielles et Commerciales, S.A., v. Rogers,*
  357 U.S. 197 (1958).......................................................................................14

*U.S. v. Chase Manhattan Bank, N.A.,*
  584 F. Supp. 1080 (S.D.N.Y. 1984)................................................................7, 8

*U.S. v. First Nat'l City Bank,*
  396 F.2d 897 (2d Cir. 1968)............................................................................11

*Valois of Am., Inc. v. Risdon Corp.*
    183 F.R.D. 344 (D.Conn. 1997)……………………………………………………………13

*Weiss v. National Westminster Bank PLC*,
    453 F. Supp. 2d 609 (E.D.N.Y. 2006)……………………………………………………..9, 11

*Williams v. Mohawk Indus., Inc.*,
    465 F.3d 1277 (11th Cir. 2006)…………………………………………………………...5

**STATUTES AND REGULATIONS**

Exec. Or. 13224, 66 Fed. Reg. 490709 (Sep. 23, 2001)……………………………………..1, 2, 3

Fed. R. Civ. P. 12(b)(6)……………………………………………………………………………9

Fed. R. Civ. P. 33(c)………………………………………………………………………………5

Fed. R. Civ. P. 37…………………………………………………………………………………8

18 U.S.C. § 1964(c)………………………………………………………………………………4

18 U.S.C. § 2333(a)…………………………………………………………………...2, 4, 5, 9

18 U.S.C. § 2334…………………………………………………………………………………4

18 U.S.C. § 2339B………………………………………………………………………………9

18 U.S.C. § 2339C………………………………………………………………………………..9

3 C.F.R. 786 (2001)…………………………………………………………………………...1, 3

31 C.F.R. Part 594………………………………………………………………………………...1

69 Fed. Reg. 30361 (May 27, 2004)……………………………………………………………1

**MISCELLANEOUS**

ABA Model Rules of Professional Conduct Rule 1.6(b)(2)………………………………………8

*Antiterrorism Act of 1990*, Hearing before the Subcommittee on Courts and Administrative
Practice, Senate Committee on the Judiciary, 101st Cong. 2d Sess. (1990)……………………4, 5

*International Convention for the Suppression of the Financing of Terrorism*,
    G.A. Res. 109, U.N. GAOR, 54th Sess., Supp. No. 49, at 408, U.N. Doc. A/54/49
    (Vol. I) (1999), *entered into force* April 10, 2002..................................................9

*National Westminster Bank Plc v. Grant Prideco, Inc.*,
    2002 WL 32768637 (S.D.N.Y. Dec. 16, 2002)..................................................10

*Price Waterhouse (a firm) v. BCCI Holdings (Luxembourg) SA*,
    Chancery Division [1992] BCLC 583..................................................8

*Restatement (Third) of Foreign Relations Law of the United States* § 442 (1987).........6, 10, 14

Ronald E. Myrick, *Obtaining Evidence Abroad for Use in United States Litigation*,
    15 Suffolk Transnat'l L.J. 1, 27 (Fall 1991)..................................................13

Statement of Senator Charles Grassley introducing Antiterrorism Act of 1990,
    136 Cong. Rec. S4568-01, 1990 WL 49302 (1990)..................................................4

*Tournier v. National Provincial and Union Bank of England*,
    1 K.B. 461 (1924)..................................................7, 9

## PRELIMINARY STATEMENT

The singular operative fact of this case is that Interpal, NatWest's customer, is a Specially Designated Global Terrorist ("SDGT").[1]   The President has declared that Interpal provides support for HAMAS, a Foreign Terrorist Organization ("FTO").   Defendant's memorandum ("Def. Mem.") neither mentions nor explains that it is demanding that this Court protect the confidentiality of financial transactions between Interpal and HAMAS – the type of transactions that the President blocked and froze because of HAMAS' support for what President Bush described as "despicable act[s] of terror."[2]   Acknowledging that fact alone would dispatch Defendant's assertion that the U.S. interest before the Court is merely "the generalized U.S. interest in discovery." Def. Mem. at 16. Once it is clear that the "customer" at the center of the dispute is a **designated terrorist**, the terrorist's interests in concealing its account information and continuing to conduct its "business" – a business deemed expressly criminal under U.S. law[3] – are entitled to absolutely *no* weight in a U.S. court.

The NatWest transfers itemized in Plaintiffs' Requests for Admission involve several hundred thousand dollars transferred through various jurisdictions, including New York, from Interpal to alleged HAMAS front organizations.   As Plaintiffs' expert, Professor Robert

---

[1]      Except as otherwise set forth herein, abbreviated, capitalized, or defined terms have the same scope and meaning as set forth in Plaintiffs' opening memorandum of law in support of this Motion. Interpal, a/k/a Palestinian Relief and Development Fund, NatWest's customer, is an alleged HAMAS charitable front organization designated by the U.S. Government as an SDGT. *See* 69 Fed. Reg. 30361 (May 27, 2004); U.S. Treasury Press Release of August 22, 2003 (available at http://www.treas.gov/press/releases/js672.htm).

[2]      Statement on Executive Order 13224, Whitehouse: Office of the Press Secretary, Aug. 22, 2003, available at http://www.whitehouse.gov/news/releases/2003/08/20030822-2.html.

[3]      Providing material support to SDGTs is prohibited pursuant to Executive Order 13224, 3 C.F.R. 786 (2001), and its implementing regulations in 31 C.F.R. Part 594.   The legality of the SDGT regulations has been upheld by the D.C. Court of Appeals in *Holy Land Foundation for Relief and Development v. Ashcroft*, 333 F.3d 156, 166 (D.C. Cir. 2003) ("there is no First Amendment right nor any other constitutional right to support terrorists"); *but cf. Humanitarian Law Project v. U.S. Dept. of Treasury*, --- F. Supp. 2d ----, 2006 WL 3477787 (C.D. Cal. 2006) (donors' vagueness challenge to President's designation standard for organizations "otherwise associated with" an SDGT). Here, the Department of Treasury designated the Defendant's customer, Interpal, *itself* as the SDGT, not an organization "otherwise associated" with an SDGT.

Chesney, attests in the accompanying Declaration, Interpal's designation as an SDGT on August 22, 2003,[4] subjected it "to a relatively comprehensive economic embargo enforceable by federal criminal penalties." Chesney Decl. at 8. Despite this embargo, NatWest *continues* to facilitate transfers to Interpal even *after* President Bush publicly disclosed Interpal's linkage to HAMAS. Given the Presidential mandate to embargo Interpal transactions, "and the manifest purpose of these embargo regimes to suppress terrorism financing (and to increase the sharing of financial sector information on this subject)," Professor Chesney concludes, "it is difficult to see how designated entities would remain entitled in a U.S. court to the benefit of bank secrecy laws from *any* jurisdiction" for their transactions. *Id.* (emphasis added)

## I. THE UNITED STATES HAS THE STRONGEST IMAGINABLE INTEREST IN SEEKING ENFORCEMENT OF ITS ANTI-TERRORISM LAWS

On this Motion, NatWest bears the burden of: (1) asserting with particularity the alleged foreign interest in preventing discovery; and (2) establishing that foreign interests outweigh U.S. interests. NatWest cannot make that showing without at least candidly identifying the U.S. interest in this case. Instead of addressing the relevant statute, 18 U.S.C. § 2333(a) of the Anti-Terrorism Act ("ATA"), or the ATA's legislative history, NatWest conclusorily dismisses the U.S. interest as "no more than what it is in any civil action," and then, again – without ever stating what the interest is – simply declares *ex nihilo* that the "generalized U.S. interest" in this case "is outweighed by England's specific interest in preserving bank customer secrecy." Def. Mem. at 15-16. NatWest's conclusory assertions willfully fail to recognize that foreclosing terrorists' access to the banking system is not merely a "generalized U.S. interest." It is a *primary* interest.

---

[4]     Statement on Executive Order 13224 (available at
http://www.whitehouse.gov/news/releases/2003/08/20030822-2.html); U.S. Treasury Press Release of August 22, 2003 available at http://www.treas.gov/press/releases/js672.htm.

Specifically, on September 23, 2001 President Bush signed Executive Order No. 13224,[5]

prohibiting transactions with any individuals or organizations listed as SDGTs, and announced in

the White House Rose Garden that:

> Today, we have launched a strike on the financial foundation of the global terror network
> ... [T]he American people must understand this war on terrorism will be fought on a
> variety of fronts, in different ways. The front lines will look different from the wars of the
> past ... This executive order means that United States banks that have assets of these
> groups or individuals must freeze their accounts. And United States citizens or businesses
> are prohibited from doing business with them. We know that many of these individuals
> and groups operate primarily overseas, and they don't have much money in the United
> States. So we've developed a strategy to deal with that. **We're putting banks and
> financial institutions around the world on notice, we will work with their
> governments, ask them to freeze or block terrorist's ability to access funds in
> foreign accounts.** If they fail to help us by sharing information or freezing accounts, the
> Department of the Treasury now has the authority to freeze their bank's assets and
> transactions in the United States. We have developed the international financial
> equivalent of law enforcement's "Most Wanted" list. And it puts the financial world on
> notice. **If you do business with terrorists, if you support or sponsor them, you will
> not do business with the United States of America.**[6] (emphasis added)

The President's remarks concerning Executive Order No. 13224 demonstrate that the

interests in this case are not simply those involved in a common civil action; they are interests at

the heart of the U.S.'s struggle to prevent terror financing. *See* Chesney Decl. at 2, 7-9. It is

painfully ironic that the Defendant argues that the U.S. interests in suppressing and, as President

Bush stated, "*sharing information*" about terror financing, are outweighed by the privacy

interests of a specially designated terror *financier*.

## II.   BY CLEAR CONGRESSIONAL DESIGN, PLAINTIFFS ARE PRIVATE ATTORNEYS GENERAL

The Defendant argues – with more than a touch of condescension – that Plaintiffs "are

---

[5]   3 C.F.R. 786 (2001).

[6]   "President Freezes Terrorists' Assets: Remarks by the President, Secretary of the Treasury O'Neill and
Secretary of State Powell on Executive Order," White House: Office of the Press Secretary, Sep. 24, 2001.
Available at: http://www.whitehouse.gov/news/releases/2001/09/20010924-4.html.

not 'private attorneys general' responsible for enforcing the nation's antiterrorism laws" because "[t]hat sovereign function is entrusted to the U.S. government." Def. Mem. at 15.   But Congress's enactment of Section 2333(a) created a procedurally privileged (*see* 18 U.S.C. § 2334) civil remedy for victims of terrorism, demonstrating that Congress entrusted enforcement to *both* the government and the victims.   Indeed, and as affirmed by Professor Chesney, Congress carefully calibrated public and private enforcement to assure that private lawsuits by victims under the ATA's civil remedy provisions are both consistent with, and complementary to, public enforcement efforts. Chesney Decl. at 11.

As the original bill's sponsor explained, the private treble damage civil remedy was intended to act as an incentive to private litigants to use their resources to "go after terrorists: This bill establishes an express cause of action to gain compensation as fruit of their efforts." *See* Statement of Senator Charles Grassley introducing Antiterrorism Act of 1990, 136 Cong. Rec. S4568-01, 1990 WL 49302 (1990). Deputy Legal Adviser Alan Kreczko testified for the U.S. State Department that the proposed civil provision of 18 U.S.C. § 2333(a) "is a welcome addition to our arsenal against terrorists." *See Antiterrorism Act of 1990*, Hearing before the Subcommittee on Courts and Administrative Practice, Senate Committee on the Judiciary, 101st Cong. 2d Sess., at 12 (1990) ("Antiterrorism Hearing"). The U.S. Department of Justice ("DOJ") agreed. Its representative testified that the ATA's creation of the civil remedy "would supplement our criminal law enforcement efforts ..." *Id.* at 25.

Defendant avoids addressing the ATA's legislative history, particularly as it concerns § 2333(a), but that history unambiguously empowers private attorneys general, as do civil RICO and the federal antitrust laws' private rights of actions.[7] Section 2333(a) is not merely a means

---

[7]      *Compare* to the *Racketeer Influenced and Corrupt Organizations Act* (RICO), 18 U.S.C. § 1964(c), which permits private enforcement of the law "not merely to compensate victims but to turn them into prosecutors, 'private

of compensating tort victims, but also a critical tool in enforcing national anti-terrorism policy. The DOJ was thus clearly correct when it asserted more recently in a Section 2333(a) lawsuit that "[a]s the legislative history of Section 2333(a) shows, the Government believes that this provision can be an effective weapon in the battle against international terrorism; it fights terrorism by discouraging those who would provide financing for this activity." *Amicus Curiae* brief submitted by the DOJ in *Boim v. Quranic Literacy Inst. and Holy Land Foundation For Relief And Development*, 291 F.3d 1000 (7th Cir. 2002) attached as Exhibit A to the Schlanger Declaration.

Perhaps NatWest honestly subscribes to its "greedy plaintiffs' lawyer defense" and genuinely believes that "bringing a civil lawsuit against NatWest is *not* combating terrorism but seeking money damages from what their lawyers perceive is a deep-pocketed defendant."[8] Def. Mem. at 1. If so, NatWest's quarrel is with Congress rather than Plaintiffs or their counsel, because it is Congress that explicitly targeted "businesses who support, encourage and supply terrorists who are likely to have reachable assets."[9] Antiterrorism Hearing, at 126.

---

attorneys general,' dedicated to eliminating racketeering activity... The provision for treble damages is accordingly justified by the expected benefit of suppressing racketeering activity, an object pursued the sooner the better." *Rotella v. Wood*, 528 U.S. 549, 557-58 (2000). *See also, Agency Holding Corp. v. Malley-Duff & Associates, Inc.*, 483 U.S. 143, 151 (1987) (civil RICO was designed "to bear the pressure of 'private attorneys general' on a serious national problem for which public prosecutorial resources are deemed inadequate; the mechanism chosen to reach the objective in ... RICO is the carrot of treble damages"); *Williams v. Mohawk Indus., Inc.*, 465 F.3d 1277, 1290 (11th Cir. 2006) ("It is consistent with civil RICO's purposes to expand enforcement beyond federal prosecutors with limited public resources to turn victims ... into prosecutors as private attorneys general").

[8]     In addition to its rather unsubtle "greedy plaintiffs' lawyer defense," NatWest also tries to color the instant motion by hinting that Plaintiffs are abusing the discovery process. Defendant falsely states that Plaintiffs are "refusing to produce *any* liability-related documents of their own on the purported ground of attorney work product." Def. Mem. at 2. As Defendant well knows, Plaintiffs have declined at this time to answer premature contention interrogatories, *see* Fed. R. Civ. P. 33(c), but are producing both liability and damages documents on a rolling basis and are not withholding any underlying factual documents on the basis of attorney work product.

[9]     Defendant also discounts the substantial U.S. interests in this case by arguing that "in cases in which courts compel discovery that otherwise would violate foreign secrecy law, the party ordered to comply with discovery requests is typically accused of misconduct in the United States." Def. Mem. at 16 n. 13. This is not an accurate characterization of the law. Courts routinely require foreign discovery even when the alleged misconduct took place abroad. *See, e.g., In re Grand Jury Subpoena dated August 9, 2000*, 218 F. Supp.2d 544, 554 (S.D.N.Y. 2002)

## III.    THE SUPREME COURT'S COMITY ANALYSIS GOVERNS THIS CASE

Defendant claims that "plaintiffs cite the wrong standard for resolving foreign discovery disputes in this Circuit," Def. Mem. at 14, and asserts that the proper test was set forth in *Minpeco, S.A. v. Conticommodity Serv., Inc.*, 116 F.R.D. 517, 523 (S.D.N.Y. 1987).  But any comity analysis applicable to a discovery request in a federal statutory cause of action is governed by federal common law, upon which the United States Supreme Court has the final word.  Defendant simply ignores the Supreme Court's opinion in *Société Nationale Industrielle Aérospatiale v. U.S. District Court for the Southern District of Iowa*, 482 U.S. 522, 543 n. 28 (1987), which adopted the more modern and *discovery-specific* comity analysis now codified in § 442 of the *Restatement (Third) of Foreign Relations Law of the United States* (1987).  As the Supreme Court held, "[t]he nature of the concerns that guide a comity analysis is suggested by the [tentative draft of the *Restatement* that was later codified as Section 442]."  This Court should adopt the same analysis employed by the Supreme Court, as well as other courts in this Circuit.  *See, e.g., British Intern. Ins. Co. Ltd. v. Seguros La Republica, S.A.*, 2000 WL 713057, *9 (S.D.N.Y. Jun. 2, 2000); *Madanes v. Madanes*, 186 F.R.D. 279, 285-86 (S.D.N.Y. 1999). [10]

---

(compelling disclosure during a bribery investigation of foreign officials *outside the United States*, despite possible criminal sanctions for violating foreign secrecy laws); *In re Oil Spill by Amoco Cadiz off Coast of France on March 16, 1978*, 93 F.R.D. 840, 843-44 (N.D. Ill 1982) (imposing sanctions for good faith failure to disclose documents regarding oil spill *outside the United States*); *General Atomic Co. v. Exxon Nuclear Co., Inc.*, 90 F.R.D. 290, 309 (D.C. Cal. 1981) (imposing sanctions for failure to disclose documents regarding an international uranium cartel *outside the United States*); *In re Air Crash at Taipei, Taiwan*, 211 F.R.D. 374, 379 (C.D. Cal. 2002) (ordering disclosure of documents regarding an airplane crash *outside the United States*); *In re Uranium Antitrust Litig.*, 480 F. Supp. 1138, 1156 (N.D. Ill. 1979) (ordering disclosure of documents regarding international antitrust violations *outside the United States*).

[10]    *First American Corp. v. Price Waterhouse LLP*, 154 F.3d 16, 22 (2d Cir. 1998), cited by NatWest, is inapposite. *First American Corp.* only affirmed the lower court's decision to balance the competing interests of two sovereigns.  It did not endorse one balancing test over another. Indeed, the *First American Corp.* court did not even mention the Supreme Court's decision in *Aérospatiale*, which, as discussed *supra*, explicitly endorsed the *Restatement (Third)* § 442 factors.

## IV.   ENGLISH BANK SECRECY LAW DOES NOT PROHIBIT NATWEST'S PRODUCTION OF THE DISCOVERY SOUGHT BY PLAINTIFFS

At bottom, Defendant fails even to demonstrate any need to apply the Supreme Court's comity analysis because it does not establish (as it must) that English law enforcibly precludes it from complying with the requested discovery. *See Alfadda v. Fenn*, 149 F.R.D. 28, 34 (S.D.N.Y. 1993) ("the party relying on the foreign law as an excuse bears the burden of demonstrating that such law actually bars the production or testimony at issue"). English confidentiality laws provide no ironclad confidentiality guarantees, and actually permit disclosure in the public interest in this case.

First, Mr. Hollander, Defendant's own foreign law expert, admits, "determination of what disclosure should be ordered is ultimately a question for the New York court because matters of discovery against *parties* to the action are under English conflicts of law rules governed by the *lex fori*, the law of the forum." Hollander Decl. at ¶ 4. (emphasis added)

Second, Defendant relies primarily on the English decision in *Tournier v. National Provincial and Union Bank of England*, 1 K.B. 461 (1924), to assert bank secrecy, but studiously *ignores* the applicability of the exceptions in that case. Tellingly, Defendant avoids addressing "exception (c)" of *Tournier*: when "***the interests of the bank require disclosure***." *Id.* at 473 (emphasis added).[11]  As discussed more fully in the accompanying declaration of Plaintiffs' English law expert, Professor Clive Walker, "exception (c)" applies when "the bank is directly involved in litigation in English law either as claimant or defendant." Walker Decl. ¶ 4.1. Although foreign bank secrecy is not actually a "privilege," *Tournier's* "exception (c)" is comparable to the exception to the U.S. attorney-client privilege enabling an attorney to waive

---

[11]   *See also United States v. Chase Manhattan Bank, N.A.*, 584 F. Supp. 1080, 1084 (S.D.N.Y. 1984) (citing *Tournier* and compelling production).

such privilege in order to rebut charges against the attorney.[12]  Mr. Hollander, however, offers *no* basis for concluding that NatWest has no objective interest in producing the records sought. He instead speculates that this exception does not apply because "NatWest is not the party *seeking or desiring* to make disclosure." Hollander Decl. ¶ 9 (emphasis added).  NatWest's expert offers no case citation to support this circular, subjective standard that apparently depends on NatWest's "*desire.*"  Nor does Mr. Hollander balance, or even reference, the potential sanctions a non-producing party potentially faces under Fed. R. Civ. P. 37.

Here, NatWest is not merely a bank caught in a dispute with some third party.[13]  Rather, it *is* the defendant in the matter at bar. If this Court orders production of the requested records, and if NatWest refuses to comply with such an Order, Defendant will risk sanctions under Fed. R. Civ. P. 37. These sanctions include civil contempt, attorneys' fees, adverse findings of fact, or even default.    These serious consequences suggest Defendant's objective "interest" in disclosure in its own defense, yet NatWest's English law expert fails to address any of them.

Third, Mr. Hollander also ignores the "public interest and crime exception" embodied in English bank secrecy law.[14]  In *BCCI Holdings*, cited above, the English court held:

> The courts have ... *always refused to uphold the right to confidence when to do so would be to cover up wrongdoing.* In *Gartside v. Outram*, (1856) 26 LJ Ch 113 it was said that there could be no confidence in iniquity.  This approach has been developed in the modern authorities to include cases in *which it is in the public interest that the confidential information should be disclosed.*

*Id.,* BCLC 583. (emphasis added) [15]

---

[12]    *See* ABA Model Rules of Professional Conduct Rule 1.6(b)(2).

[13]    "A sharp distinction has been drawn between the position of those who are litigants and those who are not." *Price Waterhouse (a firm) v. BCCI Holdings (Luxembourg) SA*, Chancery Division [1992] BCLC 583.

[14]    *See Chase Manhattan Bank, N.A.*, 584 F. Supp. at 1084 (chastising party's foreign law expert for failing to address exceptions).

[15]    The *Price Waterhouse* court overruled customer secrecy so that documents could be produced to assist in uncovering an international bank's alleged fraudulent conduct. *See* Walker Decl. at ¶ 3.1.

As reflected amply by the fact that Plaintiffs' Complaint survived Defendant's motion to dismiss under Fed. R. Civ. P. 12(b)(6), Plaintiffs sufficiently alleged NatWest's "wrongdoing" and "iniquity." In his detailed opinion, Judge Sifton observed that "[v]iolations of 18 U.S.C. § 2339B and § 2339C are recognized as international terrorism under 18 U.S.C. 2333(a)" and upheld the Complaint based on these statutes. *See Weiss v. National Westminster Bank PLC*, 453 F. Supp. 2d 609, 613 (E.D.N.Y. 2006). NatWest's customer is a Specially Designated Global Terrorist. NatWest is alleged to have knowingly transferred funds on behalf of that "customer" to HAMAS, an FTO that orchestrated murderous attacks on the Plaintiffs.[16] Permitting NatWest to assert the waivable privacy interest of an SDGT would cover up NatWest's own potentially criminal conduct. Accordingly, English law's "public interest and crime exception" should be harmonized with the U.S.'s antiterrorism law enforcement interests. At a *minimum*, as noted by Professor Walker:

> a bank can be described as having a "public duty" to disclose its suspicions of dealings with "terrorist property" and can thereby be released from its normal legal obligations of confidence by reference to head (b) of *Tournier*.

Walker Decl. at ¶ 3.12.

This conclusion is bolstered by: (a) the United Kingdom's endorsement of the FATF Recommendations to refrain from asserting bank secrecy in terrorism cases; and (b) its signing of the *International Convention for the Suppression of the Financing of Terrorism*,[17] by which the United Kingdom waived its right under Article 12(2) of the Convention to "refuse a request for mutual legal assistance on the ground of bank secrecy." Although the Convention clearly

---

[16]     Professor Walker notes that transferring funds to HAMAS violates Part III, Section 17-18 of the Terrorism Act and is therefore also illegal under English law. Walker Decl. at ¶ 3.8 and 3.11.

[17]     International Convention for the Suppression of the Financing of Terrorism, G.A. Res. 109, U.N. GAOR, 54th Sess., Supp. No. 49, at 408, U.N. Doc. A/54/49 (Vol. I) (1999), *entered into force* April 10, 2002; available at http://www.un.org/law/cod/finterr.htm.

9

contemplates information-sharing by governments, NatWest identifies nothing in the Convention limiting such sharing to governments or their executive branches *alone*. This is particularly the case when the requested information is the subject of a rule-based, judicially supervised demand essential to the U.S. Judicial Branch's adjudication of terror-financing claims.

## V.   NATWEST IS OBLIGATED TO FOLLOW THE MORE STRINGENT AMERICAN LAW

The *Restatement*'s comity analysis endorsed by the Supreme Court in *Aérospatiale* does not consider the hardship on a defendant to be a relevant balancing factor. Even if it was relevant, however, NatWest's protestations of hardship do not, and cannot, overcome the critical interests Plaintiffs and the United States have in obtaining full and complete discovery of information concerning material support to a terrorist organization. In any case, Defendant has no one but itself to blame for the legal predicament it now faces because it "assume[d] the risk of conflicting legal imperatives,"[18] when it voluntarily subjected itself to U.S. courts' jurisdiction.

NatWest tries to dodge its self-created predicament by claiming that it "does *not* conduct business in the United States," Def. Mem. at 20 (emphasis added), and therefore should not be subject to the hardship of U.S. discovery. However, Defendant's conduct of business in the U.S. is evidenced in U.S. court opinions and its own annual report.[19] A party with such a history "must confront ... the need to 'surrender to one sovereign or the other the privileges received therefrom' or, alternatively, a willingness to accept the consequences." *U.S. v. First Nat'l City*

---

[18]     *In re Grand Jury Subpoena*, 218 F. Supp. 2d at 563.

[19]     *See, e.g., National Westminster Bank Plc v. Grant Prideco, Inc.*, NatWest Complaint, 2002 WL 32768637 (S.D.N.Y. Dec. 16, 2002) ("NATWEST is a corporation organized and existing under the laws of the United Kingdom with its principal place of business in London, England. NATWEST maintains an office for the transaction of business at 101 Park Avenue, New York, NY"); *see also National Westminster Bank, PLC v. U.S.*, 69 Fed. Cl. 128, 130 (Fed. Cl. 2005) ("NatWest [has] conducted business in the United States in both branch and subsidiary form"). Additionally, Defendant's 2005 Annual Report at p. 83 lists as one of its "Principal Offices" an address at 600 Steamboat Road Greenwich Connecticut 06830 USA This Report is available at: http://www.investors.rbs.com/downloads/NatWest2005_ReportAccount.pdf.

*Bank*, 396 F.2d 897, 905 (2d Cir. 1968). As noted by Judge Sifton, despite NatWest's repeated references to English law, "defendant has pointed to no case law, nor can this Court find any, which holds that an American Court must decline to apply the laws of this country to a defendant over which the court has jurisdiction because the laws of the defendant's own country are more lenient." *Weiss*, at *19.

## VI.   LETTERS OF REQUEST ARE NOT VIABLE SUBSTITUTES FOR DIRECT DISCOVERY AND SHOULD NOT BE USED TO DELAY THESE PROCEEDINGS

Defendant concedes (as it must) that "resort[ing] to Hague Convention procedures is not mandatory under U.S. law," Def. Mem. at 2, but then dismisses Plaintiffs' employment of proper discovery requests by effectively urging this Court to "[r]equir[e] *plaintiffs* ... to employ letters of request" first. *Id.* at 25. (emphasis added) NatWest's argument turns the Federal Rules of Civil Procedure and relevant interpretive decision on their heads.

First, the Supreme Court in *Aérospatiale* not only refused to mandate resort to letters of request, but flatly rejected *any* rule that the discovering parties "first resort to those procedures." 482 U.S. at 542-43. Indeed, the Supreme Court emphasized that a federal court could "refuse to insist upon the use of Convention procedures before requiring responses to simple interrogatories *or requests for admissions*." *Id*. at 545-46. (emphasis added)

Second, to paraphrase the court in *Graco, Inc. v. Kremlin, Inc.*, 101 F.R.D. 503, 527 (N.D. Ill. 1984), foreign law "is not [the Plaintiffs'] problem; and it is not the court's problem; it is [Defendant's] problem." Defendant, not Plaintiffs, bears the burden of demonstrating the necessity of the Hague Convention. This is because the Supreme Court has declined "to rule as a blanket matter that comity requires resort to the Hague Evidence Convention procedures," even when a party risks prosecution for complying with U.S. discovery. *Aérospatiale*, 482 U.S. at

11

544.[20]  NatWest fails entirely to meet its burden.

"Although the text of the Hague Convention itself makes no distinction between parties and non-parties … courts commonly look to the status of the person from whom discovery is sought as one factor in determining whether to apply the provisions of the treaty." *Gap, Inc. v. Stone Int'l Trading, Inc.*, 1994 WL 38651, at *1 (S.D.N.Y. Feb. 4, 1994).  NatWest is a party to this litigation. It is not an "innocent bystander," reducing any justification to resort to the Hague Convention's cumbersome procedures. Furthermore, as discussed *infra*, courts often find that parties resisting discovery on the ground of foreign law that do not make a sincere effort to obtain exemptions from foreign authorities lack good faith.[21]  NatWest received Plaintiffs' discovery requests nearly five months ago, yet it first addresses the issuance of letters of request now.  If NatWest genuinely believed in the Hague Convention's utility, it would have commenced obtaining foreign court's authorization months ago.[22]  At this late date, "[r]equiring resort to the Hague Convention would consume precious time, and needlessly delay the resolution of this proceeding." *Bodner*, 202 F.R.D. at 376. *Accord Haynes v. Kleinwefers*, 119 F.R.D. 335, 338 (E.D.N.Y. 1988).

Indeed, the Supreme Court has declined to rule on the necessity of the Hague Convention

---

[20]    *See also Bodner v. Paribas*, 202 F.R.D. 370, 372 (E.D.N.Y. 2000) ("a party seeking the application of the Hague Convention procedures to discovery, rather than the Federal Rules…bears the burden of persuasion"); *In re Automotive Refinishing Paint Antitrust Litigation*, 358 F.3d 288, 305 (3d Cir. 2004) (collecting cases and observing that the requesting parties "bear the burden of persuasion as to the optional use of the Convention procedures").

[21]    *See Remington Prod., Inc. v. North Am. Philips Corp.*, 107 F.R.D. 642, 653 (D. Conn. 1985) (party resisting disclosure who failed to make reasonable efforts to apply to appropriate governmental authority for exemption to statute acted in bad faith).

[22]    There is no guarantee an English court will ever approve the discovery requests. The United Kingdom has made a specific reservation to the Hague Convention that it will "not execute Letters of Request issued for the purpose of obtaining pre-trial discovery of documents." United Kingdom Reservations to the Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters *available at*: http://www.hcch.net/index_en.php?act=status.comment&csid=564&disp=resdn. *See First Am. Corp. v. Price Waterhouse LLP*, 154 F.3d at 22 ("English court refused to enforce the letter of request, because First American was seeking pretrial discovery not provided for under the Hague Convention or British law").

procedures because "[i]n many situations *the Letter of Request procedure authorized by the [Hague] Convention would be unduly time consuming and expensive, as well as less certain to produce needed evidence than direct use of the Federal Rules.*" *Aérospatiale*, 482 U.S. at 542-43. (emphasis added)[23]  NatWest's wishful but weak-kneed prognosis that resort to the Hague Convention "*may* yield the same evidence, and more promptly, than resort to the federal discovery rules," Def. Mem. at 26 (emphasis added), is unsupportable.  Indeed, a Hague Convention letter "can take as long as eighteen months before a final Order on a contested request is made."[24]  NatWest's claim also ignores the obvious fact that Interpal – Natwest's terrorist customer – shows no signs of cooperating with these or any other legal proceedings. NatWest concedes that Interpal has refused to cooperate, Def. Mem. at 4-5, but nevertheless, asks this Court to assume that Interpal will not intervene in any Hague Convention proceedings.

There is no need to delay this litigation any further because of NatWest's belated, cagey, and self-serving preference for foreign procedures that will likely result in protracted, obstructionist litigation in Great Britain.  "In short, discovery here should be governed by the Federal Rules, because *they are the most effective method of discovery available.*" *Bodner*, 202 F.R.D. at 376. (emphasis added)

---

[23]    Defendant cites a number of decisions outside of this District purportedly supporting resort to Hague Convention procedures. These cases were either decided before the Supreme Court's *Aérospatiale* decision, (*see Laker Airways Ltd. v. Pan Am. World Airways*, 607 F. Supp. 324 (S.D.N.Y. 1985)), were subsequently rejected by other courts, (*see, e.g., Haynes v. Kleinwefers*, 119 F.R.D. 335, 338 (E.D.N.Y. 1988) (concluding that *Hudson v. Hermann Pfauter GmbH & Co.*, 117 F.R.D. 33 (N.D.N.Y. 1987) was "wrongly decided" and/or should "be read more narrowly,")) or expressly adopt a minority view that has not been accepted in this district. *See In re Perrier Bottled Water Litig.*, 138 F.R.D. 348, 353-54 (D. Conn. 1991) (applying Hague Convention procedures, but noting that courts "have not generally concluded that the procedures set forth by the Convention should be utilized"); *see also Valois of Am., Inc. v. Risdon Corp.*, 183 F.R.D. 344, 349 (D. Conn.1997) (rejecting *In re Perrier*'s preference for the Hague Convention).

[24]    Ronald E. Myrick, *Obtaining Evidence Abroad for Use in United States Litigation*, 15 Suffolk Transnat'l L.J. 1, 27 (Fall 1991). As Professor Walker further notes, British courts may "refuse to cooperate where the evidence sought was not necessarily for use as admissible evidence at trial," Walker Decl. at ¶ 2.4, and may even shift costs requiring that "the plaintiff pay the bank's expenses and pay the damages which may arise …" *Id.* at ¶ 2.5.

13

## VII. DEFENDANT'S ALLEGED GOOD FAITH IS IRRELEVANT TO THE DEFENDANT'S COMPLIANCE OBLIGATION

NatWest professes that it "has at all times acted in good faith" and "has made every effort to provide the discovery sought by plaintiffs without violating its own secrecy obligations under English law." Def. Mem. at 22-23. Defendant's statement is, at best, doubtful given its failure to even attempt to secure letters of request months ago. *See Remington Prod., Inc., supra.*[25] Moreover, NatWest's alleged good faith does not excuse its failure to comply with its discovery obligations. In the seminal case of conflict between U.S. discovery orders and foreign bank secrecy restrictions, *Société Internationale Pour Participations Industrielles et Commerciales, S.A., v. Rogers*, 357 U.S. 197 (1958), the Supreme Court held that "the willfulness or good faith of [the party resisting discovery] can hardly affect the fact of noncompliance and are relevant *only* to the path which the District Court might follow in dealing with petitioner's failure to comply." *Id.* at 208 (1958). (emphasis added)

Even in tracing that path, this Court "possesses wide discretion to proceed in whatever manner it deems most effective" and "would be justified in drawing inferences unfavorable to [the resisting party] as to particular events." *Id.* at 213. *Société Internationale*'s holding was, in fact, codified in *Restatement (Third)* § 442(2). Section 442(2) expressly contemplates that a court may "make findings of fact adverse to a party that has failed to comply with the order for production, *even if that party has made a good faith effort to secure permission from the foreign authorities to make the information available and that effort has not been successful.*" *Id.* § 442(2)(c). (emphasis added)[26] Such relief is not punitive. It instead attempts, to the extent

---

[25] Incredibly, NatWest has also, so far, even refused to produce its organizational charts and bank procedures manuals.

[26] *See also In re Oil Spill by Amoco Cadiz off Coast of France on March 16, 1978*, 93 F.R.D. at 843-44 (making findings of fact against the party resisting discovery, even if its noncompliance was in good faith).

possible, to place the parties in the position that they would have occupied but for the non-compliance with the discovery process. In tailoring the remedy to findings that are reasonably possible had the information been disclosed, the remedy permits the litigation to go forward on at least the "second best" available information.[27]

## CONCLUSION

For the reasons discussed, this Court should grant Plaintiffs' motion and overrule NatWest's objections.

Dated: December 18, 2006
Oradell, New Jersey

Respectfully submitted,

OSEN & ASSOCIATE, LLC
Gary M. Osen (GO-5790)
Joshua D. Glatter (JG-0184)
Peter Raven-Hansen, Of Counsel
700 Kinderkamack Road
Oradell, New Jersey 07649
Tel: (201) 265-6400

KOHN SWIFT & GRAF, P.C.
Robert A. Swift
Steven M. Steingard
One South Broad Street
Suite 2100
Philadelphia, PA 19107
Tel: (215) 238-1700

GLANCY BINKOW & GOLDBERG LLP
Andrew D. Friedman
Of Counsel
430 Park Avenue
New York, New York 10022
Tel: (212) 308-6300

---

[27] *See, e.g., Gen. Atomic Co.*, 90 F.R.D. at 307-09 (holding that party's own unauthenticated documents in the possession of the other party would be deemed admissible into evidence as a partial remedy to overcome the prejudice caused by the assertion of foreign secrecy laws).

## CERTIFICATE OF SERVICE

I, Aaron Schlanger, hereby certify that I am over the age of 18 years, am employed by the law firm of OSEN & ASSOCIATE, LLC and that on December 18, 2006, I caused the attached Plaintiffs' Reply Memorandum in Support of their Motion for an Order Overruling and Compelling Further Responses to Plaintiffs' First Set of Requests for Admissions and Related Interrogatories and Plaintiffs' First Request for the Production of Documents to be served in accordance with the Federal Rules of Civil Procedure, and/or the Court's Local Rules, and/or the Rules on Electronic Service, upon the following counsel by indicated means:

### Counsel for Defendant National Westminster Bank By Electronic Mail

Lawrence B. Friedman, Esq.
(lfriedman@cgsh.com)
Jonathan I. Blackman, Esq.
(jblackman@cgsh.com)
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006

Aaron Schlanger