UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

TZVI WEISS, et al.

        Plaintiffs,

-against-

NATIONAL WESTMINSTER BANK, PLC

        Defendant.

---

Case No. CV 05-4622 (CPS) (KAM)

## DECLARATION OF AARON SCHLANGER

Aaron Schlanger declares as follows:

1. I am a member of the Bar of this Court and an associate at Osen & Associate, LLC, counsel for Plaintiff Tzvi Weiss, et al. ("Plaintiffs").

2. I submit this declaration and exhibits attached hereto in support of Plaintiffs' Reply Memorandum in Support of Plaintiffs' Motion for an Order Overruling Objections and Compelling Further Responses to Plaintiffs' First Set of Requests for Admissions and Related Interrogatories and Plaintiffs' First Request for the Production of Documents.

3. Attached hereto as Exhibit A is a true copy of the Brief submitted by the United States as Amicus Curiae in Boim v. Quranic Literacy Institute and Holy Land Foundation for Relief and Development, 291 F.3d 1000 (7th Cir. 2002), to the Seventh Circuit U.S. Court of Appeals supporting affirmance of the district court's decision in Boim v. Quranic Literacy Institute and Holy Land Foundation for Relief and Development, 127 F. Supp. 2d 1002 (N.D. Ill. 2001).

I declare under the penalty of perjury that the foregoing is true and correct.

Dated: December 18, 2006
      Oradell, New Jersey

*[signature]*
Aaron Schlanger, Esq. (AS-9372)
OSEN & ASSOCIATE, LLC
700 Kinderkamack Road
Oradell, New Jersey 07649
Telephone:   201-265-6400
Facsimile:    201-265-0303

# Exhibit A

United States Court of Appeals,

Seventh Circuit.

Joyce BOIM and Stanley Boim, individually and as Administrator of the Estate of David Boim, Plaintiffs/Appellees,

v.

QURANIC LITERACY INSTITUTE, and Holy Land Foundation for Relief and Development, Defendants/Appellants.

Nos. 01-1969, 01-1970.

November 14, 2001.

On Appeal from the United States District Court for the Northern District of Illinois

Brief for the United States as Amicus Curiae Supporting Affirmance

Robert D. McCallum, Jr., Assistant Attorney General, Patrick J. Fitzgerald, United States Attorney, Gregory G. Katsas, Deputy Assistant Attorney General, Douglas Letter (202) 514-3602, Appellate Litigation Counsel, Civil Division, Room 9106, U.S. Department of Justice, 601 D St., N.W., Washington, D.C. 20530-0001.

*i TABLE OF CONTENTS

INTERESTS OF THE UNITED STATES ... 2

STATEMENT ... 3

ARGUMENT ... 9

CONCLUSION ... 31

CERTIFICATE OF COMPLIANCE ... 32

CERTIFICATE OF SERVICE

Note: Table of Contents page numbers missing in original document

TABLE OF AUTHORITIES

Cases:

Alexander v. Sandoval, 121 S. Ct. 1511 (2001) ... 21

Central Bank of Denver v. First Interstate Bank of Denver, 511 U.S. 164 (1994) ... 18, 20

Damato v. Hermanson, 153 F.3d 464 (7th Cir. 1988) ... 10, 17

Dames & Moore v. Regan, 453 U.S. 654 (1981) ... 30

Eastern Trading Co. v. Refco, Inc., 229 F.3d 617 (7th Cir. 2000) ... 17

Equal Employment Opportunity Commission v. Illinois, 69 F.3d 167 (7th Cir. 1995) ...

17

Estates of Ungar v. The Palestinian Authority, 153 F. Supp. 2d 76 (D.R.I. 2001) ... 23

*iii* Fassett v. Delta Kappa Epsilon (New York), 807 F.2d 1150 (3d Cir. 1986), cert. denied, 481 U.S. 1070 (1987) ... 18

Harris Trust and Savings Bank v. Salomon Smith Barney Inc., 530 U.S. 238 (2000) ... 22

Halberstam v. Welch, 705 F.2d 472 (D.C. Cir. 1983) ... 10, 18, 23, 24, 25

Humanitarian Law Project v. Reno, 205 F.3d 1130 (9th Cir. 2000), cert. denied, 121 S. Ct. 1226 (2001) ... 8, 27, 28

Itek Corp. v. First National Bank of Boston, 704 F.2d 1 (1st Cir. 1983) ... 30

Klinghoffer v. Palestine Liberation Organization, 739 F. Supp. 854 (S.D.N.Y. 1990) ... 12

Molzof v. United States, 502 U.S. 301 (1992) ... 10

Offshore Logistics, Inc. v. Tallentire, 477 U.S. 207 (1986) ... 12

Rice v. Paladin Enterprises, Inc., 128 F.3d 233 (4th Cir. 1997), cert. denied, 523 U.S. 1074 (1998) ... 17

In re Temporomandibular Joint (TMJ) Implants Products Liability Litigation, 113 F.3d 1484 (8th Cir. 1997) ... 18

United States v. One 1997 E35 Ford Van, 50 F. Supp. 2d 789 (N.D. Ill. 1999) ... 5

United States v. Peoni, 100 F.2d 401 (2d Cir. 1938) ... 17

United States v. Zafiro, 945 F.2d 881 (7th Cir. 1991), affirmed, 506 U.S. 534 (1993) ... 7

Constitution:

United States Constitution, First Amendment ... 6, 8, 9, 27, 28

*iv* Statutes:

18 U.S.C. § 2 ... 7

18 U.S.C. (1988 ed.) § 2331 ... 15

18 U.S.C. § 2331(1) ... 4

18 U.S.C. § 2333(a) ... passim

18 U.S.C. § 2336 ... 12, 30

18 U.S.C. § 2337 ... 12, 30

18 U.S.C. § 2339A ... 6, 7, 8, 16

18 U.S.C. § 2339B ... 6, 7, 8, 16, 27, 29

28 U.S.C. § 517 ... 1

Death on the High Seas Act, 46 U.S.C. § 761 ... 12

Securities Act of 1934, Section 10(b) ... 20

Pub. Law No. 101-519, 104 Stat. 2250 (1990) ... 11

Pub. Law No. 102-572, 106 Stat. 4506 (1992) ... 11

Regulations:

60 Fed. Reg. 5081 (1995) ... 27

62 Fed. Reg. 52649 (1997) ... 27

*v* 66 Fed. Reg. 49079 (2001) ... 28

66 Fed. Reg. 51088 (2001) ... 27

Order:

Executive Order 12947 ... 27

Executive Order 13224 ... 28

Rules:

Fed. R. App. P. 29(a) ... 1

Legislative Materials:

136 Cong. Rec. 7592 (1990) ... 14

137 Cong. Rec. 8143 (1991) ... 11, 15

Antiterrorism Act of 1990, Hearing before the Subcommittee on Courts and Administrative Practice, Senate Committee on the Judiciary 101st Cong. 2d Sess. (1990) ... 11-12

S. Rep. No. 102-342 (1992) ... 11, 15

Miscellaneous:

Restatement (Second) of Torts, §876(b) (1979) ... 10, 20, 22

**\*1** Pursuant to this Court's order of September 24, 2001, as well as 28 U.S.C. § 517 and Federal Rule of Appellate Procedure 29(a), the United States files this brief as amicus curiae, supporting affirmance of the district court's order denying the motion to dismiss by defendants/appellants. In our view, the district court properly denied the motion to dismiss, but we do not fully support the reasoning of the district court.

**\*2** As explained below, the United States believes that in the statutory provision at issue (18 U.S.C. § 2333(a)), Congress established a cause of action in federal court to be defined by common law tort principles, under which United States nationals can sue

those who injure them through acts of international terrorism. In light of Congress' intent, the district court here properly denied the motion to dismiss at this early stage of the litigation because the allegations of the complaint, when fairly read, could state a cause of action against the defendants/appellants under the recognized civil tort doctrine of aiding/abetting liability. In addition, the district court correctly rejected the argument that Section 2333(a) is unconstitutional if it provides liability under the allegations in the complaint.

The Government takes no position here on whether plaintiffs ultimately should prevail on their claims in this litigation; that question can be answered only after further appropriate proceedings in the district court.

## INTERESTS OF THE UNITED STATES

The United States greatly appreciates the Court's invitation to file an amicus brief here. As the legislative history of Section 2333(a) shows, the Government believes that this provision can be an effective weapon in the battle against international terrorism; it fights terrorism by discouraging those who would provide financing for this activity. Thus, the United States has an obvious interest in the proper application *3 of this statute. Furthermore, we support the district court's conclusion that defendants' constitutional attack against Section 2333(a) is wrong.

## STATEMENT

1. This interlocutory appeal arises from a civil suit brought by the plaintiffs/appellees Joyce and Stanley Boim stemming from their allegation that their son David was murdered by Hamas terrorists in the Middle East in 1996. The Boims filed this action under 18 U.S.C. § 2333(a), which provides:

Any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefore in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees.

Several of the defendants named by the Boims moved to dismiss the complaint, arguing that Section 2333(a) does not provide a cause of action against them because they were not directly involved in David Boim's murder.

The Boims' complaint pursues defendants/appellants Quranic Literacy Institute ("Quranic Institute") and the Holy Land Foundation for Relief and Development ("Holy Land Foundation") - two non-profit entities organized and operating in the United States - under two theories. First, the Boims contend that two Hamas operatives committed an act of international terrorism by murdering their son, and that Quranic Institute and Holy Land Foundation are liable for aiding and abetting that tort *4 by giving funds to Hamas. Second, the Boims assert that, by providing material support to Hamas, these defendants have themselves committed acts of "international terrorism," which is statutorily defined (18 U.S.C. 2331(1)) as

activities that - (A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State;
(B) appear to be intended -
(i) to intimidate or coerce a civilian population;
(ii) to influence the policy of a government by intimidation or coercion; or
(iii) to affect the conduct of a government by assassination or kidnapping; and
(C) occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished * * *.
[FN1]

> FN1. This provision was slightly amended by Section 802 of the USA Patriot Act of 2001 (Pub. Law No. 107-56; 115 Stat. 272, 376 (2001)). Subsection (1)(B)(iii) has been amended to read: "by mass destruction, assassination, or kidnapping."

The Boims allege that Hamas is a Palestinian terrorist organization depending heavily on contributions from the United States and Europe, with "command and control centers" in the United States coordinating fundraising and money laundering, and channeling funds to Hamas operatives in the West Bank and Gaza. The complaint *5 asserts "on information and belief" that the Quranic Institute and the Holy Land Foundation are among "Hamas' main fronts in the United States. These organizations' purportedly humanitarian functions mask their core mission of raising and funneling money and other resources to Hamas operatives in support of their terrorist campaigns." Supp. App. 15. [FN2]

> FN2. The United States has asserted in other proceedings that the Quranic Institute was involved in the early 1990s in laundering money to provide support for Hamas terrorist activities. See United States v. One 1997 E35 Ford Van, 50 F. Supp.2d 789, 795 (N.D. Ill. 1999) (civil forfeiture action against Quranic Institute and others).

For this Court's current purposes, the central part of the Boims' allegations are that: funds collected in the United States were sent to Hamas operatives for the purpose of financing terrorist activities. * * * Hamas operatives in the West Bank and Gaza used the money wired from the United States to buy weapons and carry out terrorist attacks, including the attack on David Boim. Funds were drawn from a pool of such funds by Hamas military organizers to finance training, weaponry, lodging, false documentation/identification, communications equipment, facilities, lethal substances, explosives, personnel, transportation, and other material support. * * * Upon information and belief among the expenditures paid for by this pool of money were the vehicle, machine guns, and ammunition used to kill David Boim, and the training of Hinawi, Al-Sharif, and other Hamas operatives involved in this attack. (Supp. App. 22) [emphasis added]

*6 In the face of these allegations, defendants Quranic Institute and Holy Land Foundation urged a narrow interpretation of Section 2333(a), which would deny liability against entities that provided funds to Hamas, but did not otherwise participate in David Boim's murder. Defendants also argued that Section 2333(a) is unconstitutional insofar as it imposes liability on them, since they claim a First Amendment right to associate with Hamas.

2. The district court denied defendants' motion to dismiss, in an opinion published at 127 F. Supp.2d 1002.

The district court first rejected defendants' narrow view of the statute. The court found that the statutory scheme "reaches beyond the violent act itself to the individuals who knew about the violent act and participated in the preparation of the plan to commit the violent act." Id. at 1014-15. The court also concluded, however, that merely contributing money to Hamas does not fit within the statutory language defining "international terrorism." Ibid.

The district court then looked to two later-enacted criminal provisions, 18 U.S.C. § 2339A (passed in 1994), and 18 U.S.C. § 2339B (passed in 1996) to determine the reach of Section 2333(a). Those provisions respectively criminalize the provision of material support for specified criminal offenses likely to be committed by terrorists,

and the provision of material support to designated Foreign Terrorist *7 Organizations for any purposes. [FN3] The district court seemed to conclude that conduct covered by Sections 2339A and 2339B falls within the definition of acts of "international terrorism," and is therefore civilly actionable under Section 2333(a). 127 F. Supp.2d at 1015-16.

> FN3. Both of these provisions were amended by the USA Patriot Act of 2001, although not in ways that should affect this case. See Sections 805, 810(c) and (d), and 811(f) (Pub. Law No. 107-56; 115 Stat. 272, 377, 380, 381 (2001)).

Nevertheless, the district court stated that, to reach the organizational defendants' actions that occurred before Sections 2339A and 2339B were enacted, plaintiffs must succeed on their theory of aiding and abetting liability. The court ruled that the scopes of Sections 2331(1) and 2333(a) are co-extensive, both covering "international terrorism," and that aiding and abetting international terrorism "is itself a criminal violation." 127 F. Supp.2d at 1018. The court therefore determined that the Boims will have to prove the elements of aiding and abetting liability "including knowledge and intent * * *." Ibid. In so ruling, the court cited a criminal aiding/abetting liability case, United States v. Zafiro, 945 F.2d 881, 887 (7th Cir. 1991), affirmed, 506 U.S. 534 (1993). [FN4]

> FN4. Criminal aiding/abetting liability is provided for by statute in 18 U.S.C. § 2: "Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."

*8 The district court also held that plaintiffs had pled sufficient facts to meet civil pleading requirements. 127 F. Supp.2d at 1018-19. And, in response to defendants' argument that plaintiffs were attempting to avoid causation requirements, the court ruled that plaintiffs "will have to prove that the funding at issue in the instant case was 'material.'" Id. at 1020.
Finally, the district court rejected the argument that imposing liability on the defendants here would violate asserted First Amendment rights. "The court has already found that the complaint contains extensive allegations concerning the alleged funding to Hamas and does not seek to impose liability for mere political association or belief." Id. at 1020. The court so found because it concluded that plaintiffs will have to establish either violations of 18 U.S.C. §§ 2339A or 2339B, or prove that defendants aided and abetted terrorist acts, including a specific intent to fund Hamas' military wing. On this point, the court relied on the Ninth Circuit's decision in the Government's favor in Humanitarian Law Project v. Reno, 205 F.3d 1130, 11133 (9th Cir. 2000), cert. denied, 121 S. Ct. 1226 (2001), holding that there is no constitutional right to provide funds to designated foreign terrorist organizations.
Defendants Quranic Institute and Holy Land Foundation appeal from the district court's denial of the motion to dismiss.

ARGUMENT

*9 The district court properly denied the motion to dismiss here, and correctly rejected defendants' argument that they could not be held liable unless they directly participated in David Boim's murder. As validly construed, Section 2333(a) provides liability under standard, common law tort principles, and those principles include aiding/abetting liability in appropriate circumstances; i.e., when the defendant

knowingly and substantially assisted tortious conduct by the principal.
These conclusions are demonstrated by the text of Section 2333(a) and its history. Thus, close attention to the language and legislative development of Section 2333(a) provides the answer to the statutory issues raised in this appeal.
In addition, when the conditions for standard civil aiding and abetting are met, there can be no serious constitutional question about imposing liability; neither the First Amendment nor any other part of the Constitution guarantees a right to fund a foreign terrorist organization, especially when it is a natural consequence that the money donated will be used to commit terrorist acts such as murder.
1. The text of Section 2333(a) supports the view that, at bottom, the Boims' suit should be analyzed primarily as a standard tort case. The statutory language provides that "[a]ny national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefore" 18 U.S.C. § 2333(a). This text contains all of *10 the elements of a traditional tort: breach of a legal duty (i.e., commission of an act of "international terrorism"); personal or economic injury; and an appropriate causal connection between the breach and the injury.
Section 2333(a) precisely specifies the range of possible plaintiffs, but simply does not address - and thus in no way restricts - the range of possible defendants. Any such restrictions therefore must arise, if at all, from background tort principles that Congress presumably intended to incorporate. See, Molzof v. United States, 502 U.S. 301, 305-07 (1992) (meaning of statutory language determined by background common law principles against which Congress legislates).
As explained below, far from limiting the range of defendants who may be sued, the relevant background principles here plainly extend tort liability not only to defendants who actually commit a tort, but also those who aid and abet in its commission. See, e.g., Restatement (Second) of Torts, §876(b)(1979)(describing tort liability for concerted action); Damato v. Hermanson, 153 F.3d 464,472 n.10(7th Cir. 1988)(applying civil tort aiding/abetting liability); Halberstam v. Welch, 705 F.2d 472, 477-88 (D.C. Cir. 1983) (same).
Construed against the relevant tort-law backdrop, the text of Section 2333(a) thus strongly suggests that Congress intended to preserve - not abrogate - settled *11 principles of civil liability for aiding and abetting. This conclusion is confirmed by the development of Section 2333(a), to which we now direct the Court's attention.
2. The history of Section 2333(a) is unusual. This provision was originally enacted by Congress in 1990, as the Antiterrorism Act of 1990, which was appended to a bill dealing with military spending and construction. See Pub. Law No. 101-519; 104 Stat. 2250 (1990). It was repealed in 1991, after this statute had been in existence for about five months, because the Conference Committee on the 1990 legislation had intended to delete the provision before passage, but had not done so because of a clerical error; Congress had therefore passed Section 2333(a) in 1990, by apparent mistake. See S. Rep. No. 102-342, at 22(1992); 137 Cong. Rec. 8143(1991)(Sen. Grassley).
Section 2333(a) was shortly thereafter reintroduced as part of the Antiterrorism Act of 1992, which was part of larger legislation reforming the federal courts. It was enacted then in identical form to its prior version. See Pub. Law No. 102-572, 106 Stat. 4506(1992). At both times, Senator Grassley was a principal sponsor of Section 2333(a). Given this process, the history of both the 1990 and 1992 legislation is relevant here.
Representatives of the Departments of State and Justice testified in favor of Section 2333(a) in 1990. (Both agencies sought changes to the original bill, in order *12 to protect ongoing criminal cases and investigations from interference by civil litigation, and to make clear that foreign states could not be sued under this provision; each of these safeguards was accomplished. See 18 U.S.C. §§ 2336 and 2337.)
The testimony of then-Deputy Legal Adviser Alan Kreczko reveals that the State Department agreed with Senator Grassley's goal of expanding the then-recent decision

in Klinghoffer v. Palestine Liberation Organization, 739 F. Supp. 854 (S.D.N.Y. 1990). See Antiterrorism Act of 1990, Hearing before the Subcommittee on Courts and Administrative Practice, Senate Committee on the Judiciary, 101 st Cong. 2d Sess., at 1, 12, 17(1990).

In Klinghoffer, the family of a U.S. citizen murdered during a terrorist attack on a cruise ship in the Mediterranean Sea sued various entities in tort under state law, general maritime law, and the Death on the High Seas Act, and the defendants filed third party complaints to bring the PLO into the case. The district court found that the Klinghoffer family claims against the PLO were cognizable in federal court under federal admiralty jurisdiction and the Death on the High Seas Act (46 U.S.C. § 761) because the tort there - the murder of Klinghoffer - occurred in navigable waters. See 739 F. Supp. at 858-59. [FN5]

> FN5. Liability under the Death on the High Seas Act is defined by federal case law developed under the statute. See Offshore Logistics, Inc. v. Tallentire, 477 U.S. 207 (1986).

**\*13** Building on the Klinghoffer litigation, Congress and the State Department wanted through Section 2333(a) to ensure that torts from terrorist activity would be actionable even if they occurred on land in a foreign country: "This bill * * * expands the Klinghoffer opinion. Whereas that opinion rested on the special nature of our admiralty laws, this bill will provide general jurisdiction to our Federal courts and a cause of action for cases in which an American has been injured by an act of terrorism overseas. The bill is a welcome addition to our arsenal against terrorists." Hearing, at 12 (Kreczko testimony).

A former high-level Department of Justice attorney and General Counsel of the United States Information Agency, Joseph A. Morris, also testified at the 1990 hearings in favor of Section 2333(a). Morris too favored ensuring that Klinghoffer would apply to land-based terrorism. Most importantly for the Court's purposes today, Morris explained that "American victims seeking compensation for physical, psychological, and economic injuries naturally turn to the common law of tort. American tort law in general would speak quite effectively to the facts and circumstances of most terrorist actions not involving acts of state by foreign governments." Hearing, at 83.

**\*14** Professor Wendy Perdue also testified at the hearings and noted that a meaningful remedy for victims must include authorizing suits not just against those committing terrorist acts, who are unlikely to have assets in the United States, but also against "the organizations, businesses and nations who support, encourage and supply terrorists who are likely to have reachable assets." Hearing, at 126. Professor Perdue cautioned that the language of Section 233 3(a) was not clear as to whether it allowed recovery against such groups. Ibid.

Senator Grassley raised this point with Morris, who responded that the bill as drafted will indeed "bring all of the substantive law of the American tort law system" into play. Id. at 136. Morris went on to note that in criminal law there is a doctrine of vicarious liability, and "[t]he tort law system has similar rules where liability attaches to those who knowingly or negligently make it possible for some actor grievously to injure somebody else. As Section 2333(a) of this bill is drafted, it brings all of that tort law potential into any of these civil suits." Ibid.

When Senator Grassley introduced the Antiterrorism Act of 1990 on the Senate floor, he emphasized that the bill was warranted because "[u]nfortunately, victims who turn to the common law of tort or Federal statutes, find it virtually impossible to pursue their claims because of reluctant courts and numerous jurisdictional hurdles." 136 Cong. Rec. 7592 (1990). He also noted that "[t]his legislation will serve as an **\*15** appropriate civil counterpart to the criminal statute." Ibid. Accord id. at 7594 (Sen.

Heflin).

Senator Grassley was referring to the existence of then-Section 2331 of Title 18, which at that time provided criminal liability for terrorist acts against a U.S. national while outside the United States. See 18 U.S.C. (1988 ed.) § 2331 (now codified at 18 U.S.C. § 2332). That criminal statute specifically provided for punishment for those who were part of a terrorist conspiracy; i.e., concerted activity.

After the repeal of Section 2333(a) mentioned above, Senator Grassley reintroduced the provision in 1991, and explained that his bill "removes the jurisdictional hurdles in the courts confronting victims and it empowers victims with all the weapons available in civil litigation * * *. The [Antiterrorism Act] accords victims of terrorism the remedies of American tort law * * *" 137 Cong. Rec. 8143 (1991).

The Senate report on Section 2333(a) explained the events surrounding the provision's earlier passage and repeal. Significantly, the report emphasized that, by imposing "liability at any point along the causal chain of terrorism, it would interrupt, or at least imperil, the flow of money." S. Rep. 102- 342, at 22. The Senate report also explained that the substance of actions under Section 2333 (a) "is not defined by the statute, because the fact patterns giving rise to such suits will be as varied and *16 numerous as those found in the law of torts. * * * This section extends the same jurisdictional structure that undergirds the reach of American criminal law to the civil remedies that it defines." Id. at 45.

In sum, the development of Section 2333(a) makes it clear that Congress acted to give terrorism victims a sure civil cause of action that would incorporate the law of torts in general, and the tort principles of aiding/abetting liability in particular. Accordingly, Section 2333(a) must be construed by reference to those principles.

3. Given Congress' goal, the district court here erred to the extent it looked to 18 U.S.C. §§ 2339A and 2339B - criminal provisions passed several years after Section 2333(a) - in determining the scope of Section 2333(a), and in apparently restricting aiding/abetting liability to the criminal version of that doctrine. [FN6] Instead, under Section 2333(a), U.S. victims of "international terrorism" (as defined in Section 2331(1)) can sue not only those who actually commit the acts of terrorism, but also *17 persons or entities who would be liable for those acts under civil tort principles of aiding/abetting.

> FN6. We note that the district court seems to have inadvertently misconstrued both of these criminal provisions as covering only support that is "material," in the sense of substantial or considerable. See 127 F. Supp.2d at 1016, 1019-20. This is a misunderstanding of those provisions. The term "material support or resources" is a term of art defined in Section 2339A(b), and relates to the type of assistance provided (i.e., funds, virtually all goods, and some services), rather than whether it is substantial or considerable. Indeed, the goal of Section 2339B would be severely undermined if Foreign Terrorist Organizations designated by the Secretary of State were allowed to raise money in the United States through small amounts from each donor.

This Court and its sister Circuits have recognized the important distinction between criminal and civil aiding/abetting liability. As Judge Learned Hand explained, the intent standard in the civil tort aiding/abetting context is that the wrongful conduct be the natural consequence of the defendant's original act, while criminal intent to aid and abet requires that the defendant have a "purposive attitude" toward the commission of the offense. See Damato, 153 F.3d at 472 n. 10 (endorsing definition of aiding/abetting liability set out by Judge Hand in United States v. Peoni, 100 F.2d 401,

402 (2d Cir. 1938)); Rice v. Paladin Enterprises, Inc., 128 F.3d 233, 251 (4th Cir. 1997)(same), cert. denied, 523 U.S. 1074(1998). Accordingly, the civil doctrine of aiding and abetting is significantly broader than its criminal counterpart. See Equal Employment Opportunity Commission v. Illinois, 69 F.3d 167, 170 (7th Cir. 1995) (noting that criminal aiding and abetting "requires even more" than the "substantial and knowing assistance" necessary for civil aiding/abetting liability). See also Eastern Trading Co. v. Refco, Inc., 229 F.3d 617, 622-24 (7th Cir. 2000).

Because Section 2333(a) imposes civil liability and because Congress plainly intended to incorporate civil tort law principles, that is what Section 2333(a) embodies. Thus, to determine liability under this section, a court must look to civil aiding/abetting *18 jurisprudence, which is summarized in the seminal D.C. Circuit opinion in Halberstam v. Welch, 705 F.2d 472 (D.C. Cir. 1983). See Central Bank of Denver v. First Interstate Bank of Denver, 511 U.S. 164, 181 (1994)(describing Halberstam as "a comprehensive opinion on the subject"). Accord In re Temporomandibular Joint (TMJ) Implants Products Liability Litigation, 113 F.3d 1484,1495-96(8th Cir. 1997) (relying on Halberstam discussion of civil aiding/abetting liability); Fassett v. Delta Kappa Epsilon (New York), 807 F.2d 1150, 1162- 64 (3d Cir. 1986) (same), cert. denied, 481 U.S. 1070 (1987).

This application of Section 2333(a) accomplishes Congress' purpose. As the plaintiffs/appellees have pointed out, defendants' contrary restrictive reading of the statute would mean that Congress created a largely hollow remedy if it merely allows suits against terrorists who pull the trigger or plant the bomb. Obviously, such persons will rarely have more than minimal assets to attach, and will likely not be dissuaded in advance by the threat of a later civil suit. By contrast, organizations that fund terrorist entities are much more likely to have assets they wish to protect, and will thus be far more concerned about later legal actions holding them liable for terrorist acts. Liability under Section 2333(a) should be imposed "at any point along the causal chain of terrorism, [because] it would interrupt, or at least imperil, the flow of money." S. Rep. 102-342, at 22. Consequently, the statutory reading we urge better *19 advances Congress' goal of providing compensation for, and deterrence against, acts of international terrorism.

While Section 2333(a) is defined by civil tort principles, the subsequent enactments of Sections 2339A and 2339B reinforce the conclusion that Section 2333(a) cannot plausibly be limited to those who personally commit acts of "international terrorism." Section 2339A makes it unlawful to provide "material support or resources" to any person "knowing or intending that they are to be used" in preparing or carrying out certain specified terrorism-related crimes. Section 2339B makes it unlawful to "knowingly provide] material support or resources," for any reason, to an entity designated as a "foreign terrorist organization."

These provisions demonstrate that Congress intended to impose even criminal liability not only on those who personally commit acts of terrorism, but also on those who significantly assist such acts. There is no textual or structural justification for construing the civil-liability provision in Section 2333 (a) to sweep far more narrowly in this regard than its criminal counterparts, and it would be strange to impute such an unusual intent to Congress.

4. In their appellate briefs, the defendants/appellants have fought the possible imposition of aiding/abetting liability under Section 2333(a), arguing that, in light of the Supreme Court's decision in Central Bank of Denver v. First Interstate Bank, 511 *20 U.S. 164,175-191(1994), they cannot be held liable for aiding and abetting under this section without an express statement from Congress on this point. In Central Bank of Denver, the Supreme Court refused to imply a private right of action for aiding/abetting liability for violations of Section 10(b) of the Securities Act of 1934. That decision is inapposite here.

In Central Bank of Denver, the Supreme Court focused on the lack of a statutory private right of action under Section 10(b), and the fact that the Court has nevertheless implied such causes of action. Under such circumstances, the Court held

that liability must be limited to instances in which the statutory text of Section 10(b) proscribes private conduct. See 511 U.S. at 175-78. The Court also looked to surrounding provisions in the securities laws, noting that their express rights of action specify a range of liable defendants not including aiders and abettors (see id. at 178-81), and that, in other securities provisions, Congress "chose to impose some forms of secondary liability, but not others." See id. at 184.

Nevertheless, citing the Restatement (Second) of Torts, § 876(b)(1979), the Central Bank of Denver Court recognized that "[t]o be sure, aiding and abetting a wrongdoer ought to be actionable in certain instances." 511 U.S. at 177. Moreover, the Court ultimately concluded that the existence of a private right of action for aiding and abetting is a question of statutory intent. See id. at 182.

**\*21** None of the interpretive considerations addressed in Central Bank of Denver is relevant here. Section 2333(a) provides an express, not implied, right of action for U. S. victims of international terrorism. And, Section 2333(a) is not a statute regulating commercial transactions or imposing liability for violations of such a statute; it instead imposes liability for violent criminal acts that are malum in se.

Further, in contrast to the express rights of action under the securities laws, Section 2333(a) nowhere restricts the class of potentially liable defendants to those who actually commit the prohibited acts. In addition, Congress did not selectively choose to impose only some forms of secondary liability in related statutory provisions. Finally, the legislative history of Section 2333(a), detailed above, confirms that the cause of action under this provision is to be governed by standard tort principles, including specifically those of concerted action liability.

For all of these reasons, giving Section 2333(a) its intended breadth is in no way inconsistent with Central Bank of Denver, or with other Supreme Court cases dealing with the scope of private rights of action. See Alexander v. Sandoval, 121 S. Ct. 1511, 1519-21 (2001) (finding that provision allowing private enforcement of Title VI of the Civil Rights Act of 1964 does not provide a cause of action for private enforcement of agency regulations implementing that statute).

**\*22** Indeed, this case is considerably closer to the Supreme Court's decision in Harris Trust and Savings Bank v. Salomon Smith Barney Inc., 530 U.S. 238 (2000). There, the Court interpreted ERISA to reach more than the immediate wrongdoer, and allowed an action for restitution against a third party who would have been liable under the common law of trusts. Id. at 245-53. The Court found it significant that ERISA Section 502(a)(3) does not limit, or even mention, the class of potential defendants; the section instead focuses on redressing an act or practice that violates ERISA. 530 U.S. at 246. Similarly, here, the focus of Section 2333(a) is on the conduct that violates federal law (an act of international terrorism) and on providing appropriate redress.

Moreover, in Harris Trust, the Court found (530 U.S. at 247-49) its interpretation reinforced by ERISA Section 502(l), concerning imposition of civil penalties. Yet, Section 502(l) was enacted 15 years after Section 502(a)(3). In the case at bar, as noted above, even though later enacted, the terms of criminal liability in Sections 2339A and 2339B, can in the same way help give meaning to Section 2333(a) because these provisions make it unlawful to lend material assistance to terrorist organizations in certain circumstances.

5. Under the civil aiding/abetting principles described in Halberstam, the district court here correctly denied the motion to dismiss. Accord **\*23**Estates of Ungar v. The Palestinian Authority, 153 F. Supp.2d 76, 94, 97-98 (D.R.I. 2001)(rejecting motion to dismiss allegations that Palestinian Authority is liable under Section 2333(a) for providing various forms of support to Hamas).

In Halberstam, the D.C. Circuit canvassed general aiding and abetting law, including Section 876 of the Restatement (Second) of Torts, dealing with liability for persons acting in concert. That court noted that civil aiding/abetting liability depends upon: (1) a showing that the party whom the defendant aids must perform a wrongful act that causes an injury; (2) "the defendant must be generally aware of his role as part of an

overall illegal or tortious activity at the time that he provides assistance; and (3) the defendant must knowingly and substantially assist the principal violation." 705 F.2d at 477. Further, aiding/abetting "focuses on whether a defendant knowingly gave 'substantial assistance' to someone who performed wrongful conduct, not on whether the defendant agreed to join the wrongful conduct." Id. at 478.

The D.C. Circuit additionally made clear in Halberstam that the defendant does not have to participate in, or even know about, the specific bad act carried out that harms the victim. Rather, as Judge Hand had earlier noted, the central question turns on foreseeability and natural consequences. Id. at 483- 85. Thus, in Halberstam, the defendant(Hamilton) was civilly liable under an aiding/abetting theory for the death of Halberstam after he was killed by a burglar (Welch), who lived with Hamilton. *24 Hamilton had not participated in Halberstam's murder or indeed even in Welch's many burglaries; "Hamilton and Welch did not commit burglaries together but their activities were symbiotic," because Hamilton knew about Welch's illegal activities and assisted him in various ways (e.g., filing a tax return that hid burglary profits). Id. at 486- 87. As the D.C. Circuit concluded, "it was a natural and foreseeable consequence of the activity Hamilton helped Welch to undertake. It was not necessary that Hamilton knew specifically that Welch was committing burglaries. Rather, when she assisted him, it was enough that she knew he was involved in some type of personal property crime at night - whether as a fence, burglar, or armed robber made no difference - because violence and killing is a foreseeable risk in any of these enterprises." Id. at 488.

Given these principles, which describe federal common law, denial of the motion to dismiss here was appropriate. Plaintiffs have alleged that the Quranic Institute and Holy Land Foundation knowingly provided funds to Hamas, which were used for terrorist purposes. The requirements for aiding/abetting liability appear to be met because we understand the complaint to say that the defendants/appellants were aware of the terrorist actions of Hamas, and had a "core mission of raising and funneling money and other resources to Hamas operatives in support of their terrorist *25 campaigns." Supp. App. 15. Moreover, they allegedly provided money to a pool used by Hamas to purchase the vehicle, machine gun, and ammunition used to kill David Boim. Supp. App. 22.

As Halberstam makes clear, there is no requirement that the Boims demonstrate that the Quranic Institute and Holy Land Foundation participated in David Boim's shooting, or even knew about it. Rather, plaintiffs must prove that these defendants helped Hamas (and, through it, Hinawi and Al-Sharif) in some knowing and substantial way, and that it was a natural consequence that the funds these entities were providing would lead to terrorist acts, such as David Boim's murder.

In sum, we do not believe it sufficient for liability under Section 2333(a) to show simply that defendants provided funds to a terrorist group, and that group later committed an act of international terrorism injuring a U.S. national. However, the provision of funds could be enough if the provider was "generally aware" of the principal's terrorist activity, and if the provision of funds "substantially assist[ed]" the terrorist act in question. See Halberstam, 705 F.2d at 477.

As in tort law in general, the results under Section 2333(a) will vary depending upon the specific facts in any individual case. Nevertheless, we agree with the district court here that adequate allegations have been raised in plaintiffs' complaint to defeat a motion to dismiss at this stage.

*26 6. To the extent plaintiffs contend alternatively that, merely by giving money to Hamas, defendants/appellants themselves committed an act of "international terrorism" covered by Section 2331(1) and are therefore liable under Section 2333(a), we do not agree in the circumstances of this case.

Section 2331(1) may have a broad reach and cover instances in which an individual provides funds to a terrorist, such as when those funds, even if small, are a key part of a terrorist enterprise. But this Court need not decide today the precise boundaries of Section 2331(1) because, even if the contribution of funds to Hamas by the Quranic Institute and the Holy Land Foundation constituted an "act of international terrorism,"

and even if plaintiffs prove that Hamas orchestrated the murder of David Boim, it would not necessarily follow that plaintiffs could recover damages from them. A plaintiff in a Section 2333(a) suit must prove that he has been injured "by reason of an act of international terrorism." 18 U.S.C. § 2333(a).

Therefore, under the Boims' alternative theory of liability against defendants/appellants directly under Sections 2331(1) and 2333(a), they would have to prove that their son's murder occurred "by reason of" the defendants' contributions to Hamas. Hence, treating the provision of funds to Hamas by the defendants as an act of international terrorism in and of itself would not relieve the *27 plaintiffs of the necessity under Section 2333(a) to establish a causal link between the donations and David Boim's murder.

7. We also believe that the district court was clearly correct in holding that Section 2333(a), as construed in the way described in this brief, would in no way violate First Amendment rights. As the Ninth Circuit held in Humanitarian Law Project, there is no First Amendment right of association to provide material support to foreign terrorist organizations. 205 F.3d at 1133. Accordingly, the Quranic Institute and Holy Land Foundation have no valid claim that their rights would be harmed by the Boims' suit, since they have no constitutional right to provide money to Hamas in the first place. This point is no less correct even though the defendants/appellants provided funds to Hamas before it first became illegal to do so in 1995. [FN7] The fact remains that *28 there was plentiful information at that time that Hamas was engaging in terrorist activities, and the First Amendment does not protect the rights of U.S. persons or entities to send money overseas to groups carrying out terrorism. Moreover, it is difficult to see how a serious argument can be made that the Constitution is violated by a statute providing that, under standard tort principles, an individual or entity is civilly liable for aiding and abetting the commission of murder against a U.S. citizen.

> FN7. The tape of the oral argument in this case reveals that there was possibly some confusion about the different provisions prohibiting donation
>
> of funds to Hamas. The President first in Executive Order 12947 in 1995, made it illegal for U.S. persons to provide financial assistance to Hamas. 60 Fed. Reg. 5081 (1995). That Executive Order has been renewed several times. Separately, in 1997, under the Antiterrorism and Effective Death Penalty Act of 1996, the Secretary of State designated Hamas as a Foreign Terrorist Organization. See 62 Fed. Reg. 52649 (1997). It is thus illegal to provide any material support to Hamas under this statute also. See 18 U.S.C. § 2339B. That designation has been renewed periodically. See 66 Fed. Reg. 51088 (2001). In addition, pursuant to Executive Order 13224, in a further effort to combat terrorist financing after the events of September 11, 2001, Hamas has been designated once again, and financial dealings with it by U.S. persons have been forbidden under that order as well. See 66 Fed. Reg. 49079 (2001).

The "specific intent to further illegal aims" standard advocated by the defendants/appellants and their amici would allow civil liability under Section 2333(a), or the related criminal provisions, only if the defendants specifically intended actual terrorist acts. If this theory were correct, defendants would have a constitutional right to donate funds to Usama bin Laden's al-Qaida group, so long as the funds were meant by the donor for "political" or "humanitarian" activities.

This reading of the First Amendment right of association is obviously wrong. As the

Ninth Circuit explained in Humanitarian Law Project in rejecting just such a claim there, "[m]aterial support given to a terrorist organization can be used to promote the organization's unlawful activities, regardless of donor intent." 205 F.3d at 1134. In so ruling, that court recognized: an express finding by Congress that any *29 contribution to a foreign terrorist organization facilitates its terrorist conduct; that terrorist organizations do not maintain open books; that even contributions earmarked for peaceful purposes can be used to make the decision to engage in terrorism more attractive; and that, "[m]ore fundamentally, money is fungible; giving support intended to aid an organization's peaceful activities frees up resources that can be used for terrorist acts." 205 F.3d at 1136.

Upholding the constitutionality of 18 U. S.C. § 233 9B, the Ninth Circuit ruled that "the federal government clearly has the power to enact laws restricting the dealings of United States citizens with foreign entities"; that the Government has a substantial and legitimate interest in preventing the spread of international terrorism; and that the Government's interest in preventing such terrorism is unrelated to suppressing freedom of expression. 205 F.3d at 1135. The Ninth Circuit's decision is clearly correct, and this Court should also deny defendants/appellants' rather startling claim of a supposed constitutional right to provide substantial and knowing assistance to Hamas as it carries out terrorist acts.

8. We finally wish to allay any overarching concerns the Court might have that allowing suits such as this one to proceed will interfere with federal law enforcement efforts against terrorists or entities that support them. As noted earlier, Congress reacted to the possible problems identified by the State and Justice Departments in *30 1990, and enacted protections for the Executive Branch. See 18 U.S.C. §§ 2336 and 2337. Finally, this Court inquired at oral argument what would happen if the Government had taken steps to freeze defendants' assets that plaintiffs seek. As the federal courts have recognized, the courts lack power to enforce judgments against assets frozen by the President. See, e.g., Dames & Moore v. Regan, 453 U.S. 654 (1981); Itek Corp. v. First National Bank of Boston, 704 F2d 1,9-10 (1st Cir. 1983).

Thus, there is no conflict between the current suit and overarching Executive Branch concerns.

## *31 CONCLUSION

For the foregoing reasons, the order by the district court denying defendants' motion to dismiss should be affirmed.

Boim v. Quranic Literacy Institute
2001 WL 34108081