UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
_____

TZVI WEISS, et al.                              :
                                                :    Case No. CV 05-4622 (CPS) (KAM)
                        Plaintiffs,             :
                                                :
            -against-                           :
                                                :
NATIONAL WESTMINSTER BANK, PLC                  :
                                                :
                        Defendant.              :
_____


_____

MOSES STRAUSS, et al.,                          :
                                                :    Case No. CV 06-702 (CPS) (KAM)
                        Plaintiffs,             :
                                                :
            -against-                           :
                                                :
CRÉDIT LYONNAIS, S.A.,                          :
                                                :
                        Defendant.              :
_____


**EXPERT DECLARATION OF ROBERT M. CHESNEY**

1

## I. Scope

Counsel for the plaintiffs in these actions have asked me to render an opinion with respect to two issues. First, I have been asked to offer my opinion regarding the nature and purpose of the terrorism-related executive orders issued by the President pursuant to the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701 *et seq.*, including in particular that creating the Specially Designated Global Terrorist list. Second, I have been asked to offer my opinion regarding the relationship of civil suits under the Antiterrorism Act of 1992, 18 U.S.C. § 2333(a), to the U.S. government's policies and strategic objectives relating to terrorism, with a particular focus on the issue of terrorism financing. Both opinions are offered to assist the court in determining the weight to be accorded the U.S. interest in overcoming assertions of foreign bank secrecy laws.

## II. Summary

Based on my experience as a scholar of U.S. law and policy relating to terrorism, especially insofar as finance and other forms of terrorism support are concerned, I offer the following opinions:

**A.    Terrorism-related designations pursuant to IEEPA serve the fundamental public policy goal of suppressing terrorism by disrupting the financial foundations upon which designated entities depend.**

The Executive Branch has long made use of statutory embargo authority to disrupt the financial stability of enemies of the United States, and in the 1980s it began to employ this authority specifically in response to the growing problem of international terrorism. By the late 1990s, executive orders imposing sanctions pursuant to IEEPA were becoming commonplace, setting the stage for the President in the fall of 2001 to invoke IEEPA in creating the Specially Designated Global Terrorist ("SDGT") regime. According to the President's own statements in promulgating this regime, the SDGT system is explicitly designed to (a) disrupt the financing of foreign terrorist organizations and (b) facilitate the production of financial-sector information relating to this goal, even when foreign financial institutions are involved.

**B.    Section 2333 was intended by Congress to further the overarching policy of suppressing terrorism by obtaining the assistance of "private attorneys general" in exposing, punishing, and deterring those who commit and facilitate terrorist attacks, in addition to providing a mechanism for victim compensation.**

Text, legislative history, scholarly commentary, and government statements all support the conclusion that the Antiterrorism Act of 1992 is not merely a private law mechanism to facilitate victim compensation. Instead, it is a device for enticing private entities and individuals to use their resources to contribute to the overarching U.S.

2

government policy of suppressing terrorism through the disruption of the financial frameworks that support such violence.

The text manifests this intent through its inclusion of treble-damages and attorneys-fee recovery provisions, as well as provisions to ensure that the Attorney General maintains a degree of control over the progress of such suits. The legislative history supports this conclusion in that it is replete with statements by legislative sponsors, executive branch officials, and others to the effect that § 2333(a) serves an important deterrent function in service of the U.S. government's goals. Post-enactment scholarly commentary makes much the same point. Perhaps most significantly, the Justice Department recently stated in litigation that § 2333(a) suits can be "an effective weapon in the battle against international terrorism . . . fight[ing] terrorism by discouraging those who would provide financing for this activity. Thus, the United States has an obvious interest in the proper application of this statute." *Boim v. Quranic Literacy Institute*, Nos. 01-1969, 01-1970 (7th Cir. Nov. 14, 2001) (Brief for the United States as *Amicus Curiae* Supporting Affirmance), at 2.

In light of this evidence, it is my opinion that § 2333(a) was intended to enroll private entities or individuals as "private attorneys general" whose resources could be brought to bear in support of the government's general goal of suppressing terrorism and particular goal of disrupting the financial-support framework for terrorists.

### III. Experience and Qualification

I am an associate professor of law at the Wake Forest University School of Law, specializing in the study of National Security Law. In addition to my academic appointment, I currently hold the following additional titles and positions pertinent to this Declaration:

- Chair-elect of the Section on National Security Law of the Association of American Law Schools;

- Associate Member, Intelligence Science Board;

- Book Review Editor, *Journal of National Security Law & Policy* (peer-reviewed);

- Board of Directors, Center for Law, Ethics, and National Security at Duke Law School; and

- Editor, *National Security Law Report* (the publication of the American Bar Association's Standing Committee on Law and National Security).

I also am the author of a series of articles and book chapters addressing the war on terrorism, many of which are focused in particular on the role of terrorism-support

statutes (including IEEPA).  A complete list of my publications is available in my c.v., which is attached as Exhibit A.  Those that pertain to the topic of this Declaration are:

⋅ *Beyond Conspiracy?  Preventive Prosecution and the Challenge of Unaffiliated Terrorism*, 80 SO. CAL. L. REV. (forthcoming 2007)

⋅ "Anticipatory Prosecution in Terrorism-Related Cases," in THE CHANGING ROLE OF THE AMERICAN PROSECUTOR (Worrall & Nugent, eds.) (SUNY Press) (forthcoming 2007)

⋅ *The Sleeper Scenario: Terrorism-Support Laws and the Demands of Prevention*, 42 HARVARD JOURNAL ON LEGISLATION 1 (2005)

⋅ *Careful Thinking about Counterterrorism Policy* (reviewing PHILIP B. HEYMANN, TERRORISM, FREEDOM, AND SECURITY: WINNING WITHOUT WAR), 1 JOURNAL OF NATIONAL SECURITY LAW & POLICY 169 (2005) (a version of this essay titled "Rhetoric, Practice, and Historical Perspective in the War on Terrorism" appears in 26 NATIONAL SECURITY LAW REPORT 3 (Nov. 2004))

⋅ *Civil Liberties and the Terrorism Prevention Paradigm: The Guilt by Association Critique*, 101 MICHIGAN LAW REVIEW 1408 (2003)

In addition to these publications, in May 2004 I provided written testimony to the Senate Judiciary Committee on the topic of terrorism-support legislation, in connection with an oversight hearing titled "Aiding Terrorists: An Examination of the Material Support Statute."

I appear frequently at conferences and symposia to discuss legal and policy issues arising out of the war on terrorism, and also frequently am quoted on these topics in media outlets including the *New York Times,* the *Washington Post*, and various *National Public Radio* programs.  My c.v. lists my presentation and other conference appearances, as well as a sampling of my most recent news media contributions.

I recently have been asked to appear as an expert witness on the topic of terrorism-related statutes and practice in the United States – particularly with respect to terrorism-support crimes – before the Commission of Inquiry into the Bombing of Air India Flight 182, an official but independent body established under Canada's *Inquiries Act*.  The Commission is designed to serve functions comparable to that served in our country by the 9/11 Commission.  Other than that, however, I have never previously served, or attempted to serve, as an expert witness in any context.

I am a 1997 graduate, *magna cum laude*, of Harvard Law School.  I am a 1994 graduate, *magna cum laude*, of Texas Christian University.  In addition to these degrees, I also have completed the National Security Law Institute program at the University of Virginia, and the Law of War course at the Judge Advocate General's Legal Center and School in Charlottesville, Virginia.

4

After graduation from law school, I served as law clerk to the Honorable Lewis A. Kaplan of the United States District Court for the Southern District of New York, and then as law clerk to the Honorable Robert D. Sack of the United States Court of Appeals for the Second Circuit.  Following these clerkships, I was a litigation associate at the law firm Davis Polk & Wardwell in New York City.  I was appointed to the faculty of Wake Forest University School of Law in 2002.

## IV. Preparation for this Declaration

Prior to November 2006, I had not read any document created for this litigation or filed with this Court in connection with this litigation, nor had I been involved in any way in the representation of any party to this litigation.

I reviewed the following materials in preparation for this declaration:

· Robert M. Chesney, *The Sleeper Scenario*, 42 Harv. J. on Legis. 1 (2005)
· CIVIL LITIGATION AGAINST TERRORISM (John Norton Moore, ed. 2004)
· Pub. L. No. 65-91, 40 Stat. 411 (1917) (codified as amended at 50 U.S.C. app. §§ 1-44)
· Act of Mar. 9, 1933, Pub. L. No. 73-1, 48 Stat. 1 (1933)
· 50 U.S.C. § 1701-1705
· Exec. Order No. 12, 543, 3 C.F.R.  181 (1986)
· Exec. Order No. 12,947, 3 C.F.R. 319 (1995)
· Exec. Order No. 13,099, 3 C.F.R. 208 (1998).
· Exec. Order No. 13,129, 3 C.F.R. 200 (1999).
· The 9/11 Commission Report, at 185.
· Exec. Order No. 13,224, 3 C.F.R. 786 (2001)
· "U.S. Designates Five Charities Funding HAMAS and Six Senior HAMAS Leaders as Terrorist Entities," Dep't of the Treasury News Release, JS-672, Aug. 22, 2003.
· 136 Cong. Rec. S4568-01.
· Hearing on S. 2465 before the Subcommittee on Courts and Administrative Practice, Senate Judiciary Committee, 101st Cong., 2d Sess., July 25, 1990, S.hrg. 101-1193
· Statement of Senator Grassley, Oct. 1, 1990, 136 Cong. Rec. S 14279, 14284 (Amendment No. 2921).
·Pub. L. No. 101-519, 104 Stat. 2250.
· Jennifer A. Rosenfeld, Note, *The Antiterrorism Act of 1990: Bringing International Terrorists to Justice the American Way*, 15 SUFF. TRANSN'L L. J. 726 (1992)
· 136 Cong. Rec. S 14279 (Oct. 1, 1990) (statement on attachment of amendment to the military construction appropriations bill for fiscal 1991)
· Federal Courts Study Committee Implementation Act, S. Rep. 102-342, July 27, 1992, 102nd Cong., 1st Sess.
· Pub. L. No. 102-27, § 402
· S. Rep. 102-342
· 137 Cong. Rec. S 4511-04 (Apr. 16, 1991).
· H. Rep. 102-1040

・ Pub. L. 102-572, Title X, 106 Stat. 4506, 4522 (Oct. 29, 1992).
・ Walter W. Heiser, *Civil Litigation as a Means of Compensating Victims of International Terrorism*, 3 S. Diego Int'l L. J. 1 (2002).
・ Seth N. Stratton, Note, *Taking Terrorists to Court: A Practical Evaluation of Civil Suits against Terrorists under the Anti-Terrorism Act*, 9 Suff. J. Tr. & App. Adv. 27 (2004)
・ Rudolph Lehrer, Comment, *Unbalancing the Terrorists' Checkbook: Analysis of U.S. Policy in Its Economic War on International Terrorism*, 10 Tul. J. Int'l & Comp. L. 333 (2002)
・ *Boim v. Quranic Literacy Institute*, Nos. 01-1969, 01-1970 (7th Cir. Nov. 14, 2001), Brief for the United States as *Amicus Curiae* Supporting Affirmance

## V. Analysis

The opinions summarized above in Part II are derived from the discussion and analysis that follows below.

### A.    The Significance of "Designations" Under the International Emergency Economic Powers Act

The capacity of the executive branch to "designate" foreign entities and individuals to be either "Specially Designated Terrorists" or "Specially Designated Global Terrorists" plays a crucial role in the government's efforts to suppress terrorism. This authority empowers the executive branch to freeze the assets of designated entities, to embargo them economically, and otherwise to undermine the economic support structure that is the lifeblood of terrorism.  Designated entities face a vast range of legal disabilities, and fairly may be said to have been "outlawed" for purposes of U.S. law.  In the case of the Specially Designated Global Terrorist list, the President's purpose in crafting the sanctions regime expressly includes the goal of suppressing terrorism financing and, relatedly, to compel domestic and foreign financial institutions to disclose information relating to such activity.  In both cases, moreover, the sanctions regime is supported by the force of federal criminal law.

A review of the origins and evolution of the Executive Branch's designation authority serves to place the scope and significance of that power in context, and to illustrate the centrality of the designation process to U.S. counterterrorism policy.

The current legal framework has its roots in legislation enacted by Congress in the midst of World War I: the Trading with the Enemy Act of 1917, or TWEA.  *See* Pub. L. No. 65-91, 40 Stat. 411 (1917) (codified as amended at 50 U.S.C. app. §§ 1-44).  TWEA both directly criminalized certain forms of commerce with states engaged in belligerence against the U.S., and also delegated to the President the authority to regulate or even prohibit certain transactions with both enemy and allied states during times of war. *See* 50 U.S.C. app. § 3.  In the 1930s, Congress expanded this authority – what we might call the President's foreign embargo authority – by removing the requirement of a wartime context.  *See* Act of Mar. 9, 1933, Pub. L. No. 73-1, 48 Stat. 1 (1933).  In the period that

followed, the Executive Branch frequently invoked this authority, though always with reference to foreign states rather than private entities or individuals.

In the 1970s, a reform-minded Congress adjusted the President's foreign embargo authority to some degree by replacing the relevant provisions of TWEA with a new statute known as the International Emergency Economic Powers Act ("IEEPA").  *See* 50 U.S.C. § 1701 *et seq.*  IEEPA works in the following fashion.  First, the President's authority is conditioned upon the formal declaration of a national emergency arising out of "any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States."  50 U.S.C. § 1701(a).  Once such a declaration has been issued, IEEPA delegates to the President the authority to impose an array of economic disabilities.  *See id.* § 1702(a).  Among other things, IEEPA specifies that the President may prohibit (or otherwise regulate) any transactions or dealings involving the property of foreign states or foreign nationals, subject to certain exceptions.  *See id.* § 1702(a)(1)(B) and (c).[1]  IEEPA further specifies that the President may promulgate regulations to carry this authority into effect.  *See id.* § 1702(a).

IEEPA authority was used in connection with the problem of international terrorism as early as 1986, when President Reagan used it to impose an embargo on Libya in reaction to its state-sponsorship of such activity.  *See* Exec. Order No. 12, 543, 3 C.F.R.  181 (1986).  Over the years that followed, however, the locus of the terrorist threat began to shift more clearly toward the activities of relatively independent, non-state organizations, particularly those hostile to Israel and to U.S. efforts to produce a peaceful settlement of disputes in the Middle East.  This eventually led to the first use of IEEPA authority to impose embargo-like restraints on foreign non-state actors, in January 1995.

In Executive Order 12,947, President Clinton wrote that "grave acts of violence committed by foreign terrorists that disrupt the Middle East peace process constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States," and on that basis declared a national emergency requiring the imposition of IEEPA sanctions.  3 C.F.R. 319 (1995).  Attached to his order was an annex listing twelve foreign terrorist organizations (including HAMAS) subject to sanctions, and the order itself authorized the Secretary of State to designate additional organizations to be subject to sanctions.[2]  E.O. 12,947 § 1.  Collectively, entities designated under this order were known as "Specially Designated Terrorists," or "SDTs," and the sanctions they faced included blocking of their U.S. assets and a prohibition on persons in the U.S. providing them funds, goods, or services of any kind.  Notably, 50 U.S.C. § 1705 criminalizes violations of orders and regulations promulgated under IEEPA, including a maximum sentence of ten years' imprisonment.

---

[1] IEEPA also authorizes the President to seize foreign assets when the U.S. has come under armed attack.  *See* 50 U.S.C. § 1702(a)(1)(C).
[2] The Treasury Secretary was separately authorized to designated groups subject to the control of already-designated entities.  *See id.*

The SDT list was expanded in 1998 to include Usama bin Laden and al Qaeda, among others.  *See* Exec. Order No. 13,099, 3 C.F.R. 208 (1998).  Then, in 1999, President Clinton declared a separate national emergency in connection with the Taliban in Afghanistan, and imposed a separate IEEPA sanction regime as to that organization and its leader, Mohammed Omar.  *See* Exec. Order No. 13,129, 3 C.F.R. 200 (1999).  The latter action resulted in the seizure of some $34 million in Taliban bank accounts in the U.S., as well as some $215 million in gold deposits held by the Federal Reserve Bank of New York on behalf of the Afghan Central Bank.  *See* The 9/11 Commission Report, at 185.

The next major IEEPA development occurred two weeks after the 9/11 attacks, when President Bush promulgated Executive Order 13,224.  *See* 3 C.F.R. 786 (2001). Declaring a national emergency with respect to both the 9/11 attacks and the prospect of further attacks, the President imposed an array of economic sanctions comparable to those described above with respect to the SDT list.  Notably, however, the President prefaced his order by explaining that "because of the pervasiveness and expansiveness of the financial foundation of foreign terrorists, financial sanctions may be appropriate for those foreign persons that support or otherwise associate with these foreign terrorists." *See id.*  He also added his finding "that a need exists for further consultation and cooperation with, *and sharing information by*, United States and *foreign financial institutions* as an additional tool to enable the United States to combat the financing of terrorism."  *See id.* (italics added).

As with the SDT order in 1995, the 2001 IEEPA order both directly identified embargoed entities and also delegated to cabinet officials the authority to designate additional entities for inclusion in the future on the new list – known as the "Specially Designated Global Terrorist" list, or "SDGT."  Pursuant to the latter authority, the Treasury Department on August 22, 2003, identified six foreign individuals and six foreign charities – including Interpal and Commite de Bienfaisance et de Secours aux Palestiniens – as sufficiently related to HAMAS to warrant designation as SDGTs.  *See* "U.S. Designates Five Charities Funding HAMAS and Six Senior HAMAS Leaders as Terrorist Entities," Dep't of the Treasury News Release, JS-672, Aug. 22, 2003, available at http://www.ots.treas.gov/docs/4/48937.html.

As noted above, designation as an SDT or SDGT subjects a foreign entity to a relatively comprehensive economic embargo enforceable by federal criminal penalties, and at least in the latter case the policy expressed by the President in structuring this regime is explicitly directed towards suppressing the financing of terrorism.  Given the resulting mandate of the federal government to block the assets of and to embargo designated SDTs and SDGTs, and the manifest purpose of these embargo regimes to suppress terrorism financing (and to increase the sharing of financial sector information on this subject) it is difficult to see how designated entities would remain entitled in a U.S. court to the benefit of bank secrecy laws from any jurisdiction.

8

**B.      Section 2333(a) as an Extension of U.S. Counterterrorism Policy**

The sanctions regime described above is not the only mechanism through which federal law seeks to facilitate the long-standing U.S. government policy of suppressing terrorism through disruption of the financial support upon which terrorist organizations depend.  Since the early 1990s, federal law also has relied on private attorneys general to pursue the same aim, via 18 U.S.C. § 2333(a), as well as to pursue the equally significant aims of deterring terrorism and compensating the victims of terrorism.  The discussion below – touching on text, legislative history, scholarly commentary, and the most recent statement on the topic by the Justice Department itself – demonstrates this relationship.

*1. The Origins of § 2333*

In April 1990, Senator Chuck Grassley introduced S. 2465, the "Anti-Terrorism Act of 1990."  *See* 136 Cong. Rec. S4568-01.  Senator Grassley had ten co-sponsors, and S. 2465 would go on to enjoy strong bipartisan support in Congress.  The bill had been developed in coordination with the State Department, and subject to certain qualifications discussed below it received support from the administration of President George H.W. Bush.

As Senator Grassley explained in his introductory remarks, the spur for the legislation was the lawsuit against the Palestinian Liberation Organization ("PLO") filed by the survivors of Leon Klinghoffer, a wheelchair-bound American citizen who had been murdered during the hijacking of the cruise ship *Achille Lauro* in 1985.  The court in that case ultimately concluded that it did have jurisdiction to consider Klinghoffer's tort claims in light of the applicability of U.S. admiralty laws to the peculiar fact pattern there in issue, but the closeness of that question – and the narrowness of the grounds on which it was resolved – made it clear to observers that legislation would be needed to expand federal court jurisdiction in order to facilitate comparable suits by other victims of terrorism outside the United States.  To address this concern, S. 2465 proposed the creation of 18 U.S.C. § 2333(a), which in relevant part would provide that "[a]ny national of the United States injured in his person, property, or business by reason of an act of international terrorism may sue therefore in any appropriate district court of the United States . . . ."

From the beginning, it was clear that the legislation aimed not merely to address the issue of victim compensation but also to harness the initiative and resources of the private sector in pursuit of the larger aims of U.S. counterterrorism policy.  In the course of introducing the bill, Senator Grassley explained that it "will serve as a further incentive to those with the deep pockets, such as the airline industry, to spend resources and go after terrorists: This bill establishes an express cause of action to gain compensation as fruit of their efforts."  More specifically, § 2333(a) provided that a successful plaintiff "shall recover threefold the damages he sustains" in addition to "the cost of the suit, including attorney's fees."

In the summer of 1990, the Senate Judiciary Committee's Subcommittee on Courts and Administrative Practice held a hearing on the subject of S. 2465.  Witnesses included Alan J. Kreczko (Deputy Legal Adviser, Department of State) and Steven R. Valentine (Deputy Assistant Attorney General, Civil Division, Department of Justice), as well as several family members of persons killed in terrorist attacks and a handful of outside experts.  Much of the hearing focused on the question of whether and to what extent it would be wise to clarify that suits under § 2333(a) could not be brought against foreign governments or the officials thereof (as opposed to suits against private entities and individuals), and a considerable amount of time also was spent rehearsing the recent history of terrorist acts against U.S. persons overseas and the nature of the government's responses to the problem.  Along the way, however, participants repeatedly took the opportunity to clarify their understanding that § 2333(a) was to be more than just a mechanism for victim compensation; it was also to be a mechanism for deterring terrorists and disrupting their financial foundations, and thus formed an integral part of U.S. counterterrorism policy.

The first witness, Alan Kreczko from the State Department, began his testimony by drawing an explicit connection between civil suits under § 2333(a) and the larger goals of U.S. counterterrorism policy: S.2465, he said, was "a bill that will add to the arsenal of legal tools that can be used against those who commit acts of terrorism against U.S. citizens abroad." *Id.* at 11.  He explained that the State Department endorsed the bill "as a useful addition to our efforts to strengthen the rule of law against terrorists" (subject to the caveat that the Department wished for the bill to be amended to preclude suits against foreign governments and government officials) and twice more he repeated his opening statement remark regarding § 2333(a)'s place in the "arsenal" of counterterrorism tools. *Id.* at 11, 12.

Mr. Kreczko did not merely assert this connection, however, but also elaborated the four-fold sense in which civil suits under § 2333(a) would further U.S. government policy:

> "The existence of such cause of action may deter terrorist groups [1] from maintaining assets in the United States, [2] from benefiting from investments in the United States, and [3] from soliciting funds from within the United States.  In addition, [4] other countries may follow our lead and implement complementary national measures, thereby increasing obstacles to terrorist operations." *Id.*

In his written statement accompanying this testimony, Mr. Kreczko elaborated these points, explaining that "the possibility of civil damages may well serve as an economic disincentive to terrorism." *Id.* at 17.  And in that statement he also added a fifth public-policy rationale in support of § 2333(a), depicting it as a safety-net to ensure at least some degree of punishment in circumstances where the strict standards of criminal prosecution cannot be met:

> "Moreover, the bill may be useful in situations in which the rules of evidence or standards of proof preclude the U.S. government from effectively prosecuting a

criminal case in U.S. courts.  Because a different evidentiary standard is involved in a civil suit, the bill may provide another vehicle for ensuring that terrorists do not escape justice."  *Id.* at 18.

Following Mr. Kreczko, Deputy Assistant Attorney General Steven Valentine offered the views of the Justice Department regarding S. 2465.  Echoing the State Department's position, Mr. Valentine offered a robust endorsement of § 2333(a):

"The department strongly supports the fundamental objectives of Senate bill 2465.  They are of great importance to the United States.  The enactment of Senate bill 2465 would bring to bear a significant new weapon against terrorists by providing a means of civil redress for those who have been harmed by terrorist acts. . . .  Senate bill 2465 would supplement our criminal law enforcement efforts by creating [such a remedy.]"  *Id.* at 25.[3]

In similar fashion, Joseph A. Morris, the President and General Counsel of the Lincoln Legal Foundation, testified that "by its provisions for compensatory damages, treble damages, and the imposition of liability at any point along the causal chain of terrorism, [§ 2333(a)] would interrupt, or at least imperil, the flow of terrorism's lifeblood: money."  *Id.* at 85.  Mr. Morris acknowledged that execution of judgments might prove difficult, but nonetheless thought the "bill would enhance the war against terrorism."  *Id.*  "Even if the bill had no greater impact than to deter terrorists from choosing American targets and from keeping their assets where Americans might reach them," he elaborated, "it would make profound contributions to the antiterrorism struggle.  Drying up terrorism's financial support in the United States would be an important step forward."  *Id.*

To be sure, there was one significant objection to the original version of the bill which, if left unaddressed, might have undermined the conclusion that § 2333(a) suits should be seen as part-and-parcel of U.S. counterterrorism policy.  As explained in particular by Mr. Valentine, the Justice Department was concerned that § 2333(a) suits might interfere with ongoing criminal investigations or prosecutions in terrorism-related cases, particularly in light of the prospect of third-party discovery requests seeking access to the fruits of the government's investigation.  Accordingly, Mr. Valentine recommended amending the legislation to authorize the Attorney General, upon a proper showing of need, to obtain a stay of civil litigation under § 2333(a) in order to preserve the integrity of such ongoing proceedings.  *See id.* at 26.  *See also id.* at 44-45 (testimony of John De Pue, Criminal Division, Department of Justice).  This suggestion eventually gave rise to 18 U.S.C. § 2336, subsection (b) of which authorizes stays of discovery in this scenario and subsection (c) of which authorizes the Attorney General to intervene in a § 2333-based action to stay all proceedings.  Congress thus specifically addressed the

---

[3] Mr. Valentine did not follow Mr. Kreczko's lead in specifying the particular ways in which § 2333(a) suits would advance U.S. counterterrorism policy, except to specify in his written statement that such suits not only would address victim compensation but also would "have a deterrent effect on the commission of acts of international terrorism against Americans."  *Id.* at 34.

concern that a § 2333 suit might run contrary to the larger goals of the government's counterterrorism agenda.

### 2. Enactment, Repeal, and Re-enactment

In the wake of this hearing, in late September 1990, the Subcommittee on Courts and Administrative Practice favorably reported the Antiterrorism Act bill.  *See* Statement of Senator Grassley, Oct. 1, 1990, 136 Cong. Rec. S 14279, 14284 (Amendment No. 2921).  Rather than proceed on a stand-alone basis, however, Senator Grassley redirected his efforts by attaching the legislation as an amendment to a large military construction bill.  *See id.*  In the course of introducing the amendment, Senator Grassley explained that it had strong bipartisan support and support from the State Department, and that the bill would "strengthen our ability to both deter and punish acts of terrorism." *Id.*  He concluded by emphasizing in particular the connection between § 2333 and the overall goal of suppressing terrorism finance:

> "We must make it clear that terrorists' assets are not welcome in our country. And if they are found, terrorists will be held accountable where it hurts them most: at their lifeline, their funds.  With the Grassley-Hefflin bill, we put terrorists on notice: To keep their hands off Americans and their eyes on their assets."  *Id.*

The Senate agreed to the amendment without further debate, and the amended bill went on to be enacted as Pub. L. No. 101-519, 104 Stat. 2250.  The Antiterrorism Act of 1990 thus became law in November 1990.  *See* Pub. L. No. 101-519, § 132(b)(4), 104 Stat. 2250, 2251.  The new legislation prompted relatively little academic commentary, though one law review note that did examine it in detail emphasized the extent to which § 2333(a) was designed not just for victim compensation but also as a deterrent mechanism contributing to the counterterrorism agenda.  *See* Jennifer A. Rosenfeld, Note, *The Antiterrorism Act of 1990: Bringing International Terrorists to Justice the American Way*, 15 SUFF. TRANSN'L L. J. 726, 728 & n. 7 (1992) (discussing deterrent effect); *id.* at 737 nn. 36, 38 (same); *id.* at 741 (same); *id.* at 746 (same).

Strangely, however, it soon became known that the Antiterrorism Act of 1990 had not properly been enacted in the first place.  As explained in a subsequent Senate Report, the version of the military construction bill including the Grassley-Hefflin amendment had gone on to conference, where the conferees eventually had agreed to delete it in order to facilitate reconciliation of the Senate and House bills.  *See* Federal Courts Study Committee Implementation Act, S. Rep. 102-342, July 27, 1992, 102nd Cong., 1st Sess., at 22.  "The enrolling clerk, however, erred and the provisions were included in Public Law 101-519 of November 5, 1990." *Id.*  This error was soon detected, leading to the repeal of the Antiterrorism Act of 1990 in April of 1991.  *See id.*; *see also* Pub. L. No. 102-27, § 402 (repealing the Antiterrorism Act of 1990).

Following this unusual turn of events, Senator Grassley immediately reintroduced the legislation, this time as S. 740.  *See* S. Rep. 102-342, at 22; 137 Cong. Rec. S 4511-04 (Apr. 16, 1991).  It passed by voice vote within days, and the accompanying Senate

Report both related and incorporated the legislative history described above.  *See* S. Rep. 102-342, at 22.  *See also* H. Rep. 102-1040 (House Report accompanying companion legislation, H.R. 2222).  Without further significant developments, the Antiterrorism Act was reenacted in the same form as described above, this time as the Antiterrorism Act of 1992.  *See* Pub. L. 102-572, Title X, 106 Stat. 4506, 4522 (Oct. 29, 1992).

### 3. Acknowledging the Public-Private Link

The 1992 version of § 2333(a), like its predecessor, has generated relatively little scholarly commentary with respect to the purposes served by the legislation.  What has been written, however, reinforces the conclusion that civil suits under § 2333(a) are designed not just to compensate victims but also to enroll private sector individuals and entities as "private attorneys general" contributing to the government's policy of deterring and punishing terrorism.

Writing in 2002, for example, Professor Walter Heiser of the University of San Diego School of Law observed that authority to sue was about much more than victim compensation:

"Private parties have successfully utilized civil litigation as a means of neutralizing domestic hate groups.  The question now is whether they can achieve similar success with respect to international terrorists.  Success in this context is measured by two basic goals: compensating victims of international terrorism, and deterring future wrongful acts on the part of international terrorist organizations and their state sponsors."

Walter W. Heiser, *Civil Litigation as a Means of Compensating Victims of International Terrorism*, 3 S. Diego Int'l L. J. 1,3 (2002).

In the same vein, a student note published in 2004 explained that "[m]otivated by notions of justice and economic compensation, plaintiffs may pour resources toward finding and seizing terrorist assets, which may bolster the ongoing government efforts to do the same.  The ATA has the potential to create 'private attorneys general" empowered to find and rout out terrorists, which may, in turn allow the government to harness private resources to aid its efforts."  Seth N. Stratton, Note, *Taking Terrorists to Court: A Practical Evaluation of Civil Suits against Terrorists under the Anti-Terrorism Act*, 9 Suff. J. Tr. & App. Adv. 27, 54 (2004).  The note added:

"Moreover, the burden of establishing civil liability against those persons or groups who directly or indirectly support terrorism may be easier to meet than the burden of proving criminal liability. . . .  While enforcement of civil law does not bring with it the same set of powerful tools, as does enforcement of criminal laws, pursuing civil claims certainly adds some new tools to society's arsenal to fight terrorism.  Aggressively pursuing the financial assets that sustain terrorism on both civil and criminal fronts may tighten the stranglehold on terrorism." *Id.*

The connection between § 2333(a) and post-9/11 terrorism policy was drawn out particularly clearly in a comment published in 2002, which noted that "[t]he Bush Administration is currently waging an 'economic war' against those who provide financial assistance to terrorist groups."  Rudolph Lehrer, Comment, *Unbalancing the Terrorists' Checkbook: Analysis of U.S. Policy in Its Economic War on International Terrorism*, 10 Tul. J. Int'l & Comp. L. 333, 334-35 (2002).  After discussing the government-driven aspects of this effort – including the designation process that I describe above – the author went on to observe that "[t]he U.S. government is not alone in tracking the massive financial network that has supported terrorist attacks on U.S. citizens abroad," and that the "families of victims of specific terrorist acts have repeatedly attempted to collect damages from foreign states, as well as purported business and charitable organizations, that have contributed to such terrorist activity."  *Id.* at 352.[4]

Finally, we also have clear, recent evidence from the Justice Department itself regarding how it perceives the link between § 2333(a) and the government's counterterrorism agenda.  In its opening statement to the Seventh Circuit, in an *amicus* brief submitted in support of the plaintiffs in *Boim v. Quranic Literacy Institute*, Nos. 01-1969, 01-1970 (7th Cir. Nov. 14, 2001), the Department explicitly identified § 2333(a) as a component of the government's counterterrorism agenda:

> "As the legislative history of Section 2333(a) shows, the Government believes that this provision can be an effective weapon in the battle against international terrorism; it fights terrorism by discouraging those who would provide financing for this activity.  Thus, the United States has an obvious interest in the proper application of this statute."  *Boim*, Brief for the United States as *Amicus Curiae* Supporting Affirmance, at 2.

Accordingly, the text, history, and subsequent interpretation of § 2333(a) uniformly support the conclusion that it was intended by Congress to fulfill not only the important public policy goal of victim compensation, but also to reinforce the U.S. government's policy of deterring and disrupting the activities of terrorist organizations through assaults on their financial foundations.

Dated:  December 18, 2006
Winston-Salem, NC                                       **ROBERT M. CHESNEY**

---

[4] *See also* Jack Goldsmith & Ryan Goodman, "U.S. Civil Litigation and International Terrorism," *in* CIVIL LITIGATION AGAINST TERRORISM (John Norton Moore, ed. 2004), at 109, 141-45 (extensive discussion of the extent to which civil suits promote the goals of counterterrorism policy).

**Exhibit A**

# ROBERT M. CHESNEY
## Associate Professor of Law

Wake Forest University School of Law
P.O. Box 7206, Winston-Salem, North Carolina 27109
phone: (336) 758-5723
email: robert.chesney@wfu.edu
faculty webpage: http://www.law.wfu.edu/x1600.xml
ssrn author page: http://ssrn.com/author=119080
blog: www.natseclaw.com

## PROFESSIONAL EMPLOYMENT

Wake Forest University School of Law, Winston-Salem, North Carolina
      Associate Professor of Law      (Fall 2005 – present)
      Assistant Professor of Law      (Fall 2002 – Spring 2005)
      Subjects Taught:                National Security Law, Constitutional Law I;
                                      Constitutional Law II; Evidence; Civil Procedure II
      Awards:                         Jurist Award for Excellence in Teaching (2003-04)
                                      (elected by graduating class)

Intelligence Science Board
      Consultant (Fall 2006 - present)

Davis Polk & Wardwell, New York, New York
      Litigation Associate (1999-2002)

United States Court of Appeals for the Second Circuit
Chambers of Hon. Robert D. Sack
      Law Clerk (1998-1999)

United States District Court for the Southern District of New York
Chambers of Hon. Lewis A. Kaplan
      Law Clerk (1997-1998)

## EDUCATION

### Degrees

J.D., 1997, Harvard Law School
      *Magna cum Laude*

B.S., 1994 (Political Science and Psychology), Texas Christian University
      *Magna cum Laude*

**Additional Training**

Joint Readiness Training Center (anticipated Spring 2007) (JRTC is a combined-arms, full-spectrum training facility; planning is underway to have me attend a rotation in the company of a JAG officer assessing performance of JAG personnel)

Law of War, The Judge Advocate General's Legal Center and School, Charlottesville, VA (July 11-15, 2005)

12th Annual National Security Law Institute for Professors and Government Practitioners, Center for National Security Law at the University of Virginia School of Law (June 6-18, 2004)

## PUBLICATIONS, PRESENTATIONS, & TESTIMONY

**Forthcoming Articles**

*Beyond Conspiracy?  Preventive Prosecution and the Challenge of Unaffiliated Terrorism*, 80 SO. CAL. L. REV. (forthcoming 2007) (describing scope of the Justice Department's capacity to prosecute at an early stage in the context of suspects not affiliated with designated terrorist groups)

*The Origins and Scope of the Military and State Secrets Doctrine*, __ GEO. WASH. L. REV. (forthcoming 2007) (exploring the contours of the military and state secrets doctrine as it relates to civil litigation arising out of counterterrorism activities of the U.S. government)

*Unraveling Deference:* Hamdan*, the Judicial Power, and Executive Treaty Interpretations*, __ IOWA L. REV. (forthcoming 2007) (criticizing the unsettled state of the doctrine of judicial deference to executive branch treaty interpretations)

*The Law of War and Theo-Ideological Commitments of Extremist Movements* (forthcoming 2007 in connection with a conference on "sacred violence" at Case Western Reserve University)

**Recent publications**

*Leaving Guantánamo: The Law of International Detainee Transfers*, 40 UNIVERSITY OF RICHMOND LAW REVIEW 657 (2006) (exploring the constitutional, statutory, and international legal issues that arise when GTMO detainees oppose transfer to the custody of their own government on the ground that they face an unacceptable risk of torture, with particular attention to questions of domestic judicial enforceability; the article includes an extended analysis of Geneva Convention issues relating to detainee status) (draft available at http://ssrn.com/abstract=827604)

*The Sleeper Scenario: Terrorism-Support Laws and the Demands of Prevention*, 42 HARVARD JOURNAL ON LEGISLATION 1 (2005) (describing the origins and evolution of terrorism-support legislation, assessing the standard civil liberties critiques of them, and proposing legislative

reforms to enhance their scope while addressing some civil liberties concerns) (draft available at http://ssrn.com/abstract=587442)

*Careful Thinking about Counterterrorism Policy* (reviewing PHILIP B. HEYMANN, TERRORISM, FREEDOM, AND SECURITY: WINNING WITHOUT WAR), 1 JOURNAL OF NATIONAL SECURITY LAW & POLICY 169 (2005) (discussing the use of the "war" label with respect to counterterrorism policy, in historical perspective) (a version of this essay titled "Rhetoric, Practice, and Historical Perspective in the War on Terrorism" appears in 26 NATIONAL SECURITY LAW REPORT 3 (Nov. 2004)) (available at http://www.mcgeorge.edu/jnslp/media/01-01/08%20Chesney%20Master.pdf)

*Democratic-Republican Societies, Subversion, and the Limits of Legitimate Political Dissent in the Early Republic*, 82 NORTH CAROLINA LAW REVIEW 1525 (2004) (examining the controversy surrounding the Democratic-Republican Societies for the light it sheds on competing conceptions of representative government and freedom of political association in the mid-1790s) (available online at http://ssrn.com/abstract=465820)

*The Proliferation Security Initiative and Interdiction of Weapons of Mass Destruction on the High Seas*, 13 NATIONAL STRATEGY FORUM REVIEW 5 (Fall 2003), *also appearing in* 25 NATIONAL SECURITY LAW REPORT 5 (Oct. 2003) (discussing the international law implications of WMD interdiction on the high seas)

*Civil Liberties and the Terrorism Prevention Paradigm: The Guilt by Association Critique*, 101 MICHIGAN LAW REVIEW 1408 (2003) (discussing the significance of the material support laws to the post-9/11 terrorism prevention paradigm and assessing the guilt-by-association objection to them, in the context of reviewing two recent books on antiterrorism law and policy) (available online at http://ssrn.com/abstract=396503)

### Pre-faculty publications

*Old Wine or New? The Shocks-the-Conscience Standard and the Distinction Between Legislative and Executive Action*, 50 SYRACUSE LAW REVIEW 981 (2000) (exposing doctrinal confusion concerning the analytical framework to be applied in the context of substantive due process claims)

*National Insecurity: Nuclear Material Availability and the Threat of Nuclear Terrorism*, 20 LOYOLA OF LOS ANGELES INTERNATIONAL AND COMPARATIVE LAW JOURNAL 29 (1997) (discussing the national security threat posed by insufficient controls on fissile material in the Former Soviet Union and the risk that terrorist groups or rogue states might obtain such materials, and assessing America's legislative response as of 1997)

### Presentations and Conference Participation

"Current Developments in Guantanamo Detainee Litigation," organizer and moderator of panel presentation at the annual meeting of the Southeast Association of American Law Schools (July 2007)

"International Humanitarian Law and the Global Jihad Movement," to be presented at Case School of Law in connection with a conference titled "Sacred Violence: Religiously-Based Terrorism and the Uses and Limits of Government Intervention" (March 30, 2007)

"The Military Commissions Act of 2006: The Litigation Ahead," presented at the Air Force Judge Advocate General's annual conference (October 2006)

"The Impact of the Military and State Secrets Doctrine on Terrorism-Related Litigation," presented at George Washington University Law School (October 2006)

"Anticipatory Prosecution and the Challenge of Unaffiliated Terrorism," faculty workshop at the University of Iowa College of Law (September 2006)

"Anticipatory Prosecution and the Challenge of Unaffiliated Terrorism," presentation at the Annual Meeting of the Southeast Association of American Law Schools (July 2006)

"*Hamdan v. Rumsfeld* and *al Odah v. Bush*: An Overview," presentation to the National Security Studies program at Syracuse University (April 25, 2006)

"Judicial Deference to Executive Branch Treaty Interpretations," faculty workshop at the University of North Carolina-Chapel Hill School of Law (April 21, 2006)

"The Impact of the Detainee Treatment Act on GTMO Habeas Litigation," faculty colloquium presentation at the University of Richmond School of Law (February 28, 2006)

"Detainee Status Law," presentation for graduate students at the Judge Advocate General's Legal Center and School, Charlottesville, VA (Jan. 12, 2006)

"Disaggregating American Exceptionalism," presentation given for the Section on International Law, Association of American Law Schools 2006 Annual Meeting, Washington, DC (Jan. 6, 2006)

"Judicial Deference to Executive Treaty Interpretations," presentation at the annual workshop of the International Law in Domestic Courts Interest Group of the American Society of International Law, at Vanderbilt University School of Law (Dec. 13, 2005)

Moderator, "Beyond Article II Courts: Military Tribunals, Status Review Tribunals, and Immigration Courts," Symposium: Secret Evidence and the Courts in the Age of National Security, Cardozo School of Law (Dec. 5, 2005)

"Leaving Guantànamo," presented to the Law of War course at the U.S. Army Judge Advocate General Legal Center and School (July 15, 2005).

"GTMO Transfer Litigation," presented at the Law & Society Annual Meeting (June 4, 2005).

19

"The Changing Legal Architecture of National Security," presented to the NORAD-USNORTHCOM 2005 Staff Judge Advocate's Conference (April 19, 2005).

"Law of Armed Conflict and Salient Distinctions Among the Guantanamo Detainees," presented to the National Security Studies program at Syracuse University (April 12, 2005).

"Prosecution Patterns in the War on Terrorism, 2001-2003," presented at "Strategies for the War on Terrorism: Taking Stock," a conference sponsored by Duke University School of Law's Center for Law, Ethics, and National Security (April 8, 2005).

"Terrorism Prosecutions Since 9/11," presented at the 2004 Jim Wright Symposium: Conflict and the Politics of Fear, sponsored by Texas Christian University (Oct. 15, 2004)

"Antiterrorism Prosecutions and the Demands of Prevention," presented at the South East Association of American Law Schools' Annual Meeting at Kiawah Island (Aug. 2004)

"Detention of Terrorists and the Rule of Law," presented to the National Security Studies program at Syracuse University (March 30, 2004)

"Antiterrorism Prosecutions and the Demands of Prevention in Post-9/11 America," presented at a conference of terrorism law experts from America, Spain, Italy, and Columbia hosted by Florida International University (March 12, 2004)

"Before the Alien & Sedition Acts: Washington and the Democratic-Republican Societies," presented during "Law, Loyalty, and Treason," a symposium sponsored by the University of North Carolina Law Review (October 2003)

### Testimony

Written testimony before the Senate Judiciary Committee regarding "Oversight Hearing: Aiding Terrorists – An Examination of the Material Support Statute" (May 5, 2004) (available at http://judiciary.senate.gov/testimony.cfm?id=1172&wit_id=3394)

## PROFESSIONAL ACTIVITIES & AFFILIATIONS

American Bar Association, Standing Committee on Law and National Security, THE NATIONAL SECURITY LAW REPORT
   Editor (2006-present)

THE JOURNAL OF NATIONAL SECURITY LAW AND POLICY (a peer-selected journal)
   Editorial Board (Book Review Editor)

Section on National Security Law, Association of American Law Schools
   Chair-elect (2006-07)

The National Security Law Listserv

Founder and Moderator

Section on New Law Teachers, Association of American Law Schools
Chair (2006-07)

Center for Law, Ethics, and National Security (Duke University)
Board Member (2005-to present)

Licenses
Texas State Bar
New York State Bar (retired status)

## MEDIA APPEARNCES

The following is a representative sample of recent media appearances:

- Dan Eggen, "Justice Department's Brief On Detention Policy Draws Ire Critics Say Law Could Allow Indefinite Jail Terms," Wash. Post, Nov. 15, 2006, at A3
- Ari Shapiro, "Study: Fewer Prosecutions Resulting from FBI Work," NPR Morning Edition, Nov. 6, 2006
- Dan Eggen, "Treason difficult to prove, legal experts say," Wash. Post, Oct. 13, 2006
- Rudolph Bush, "Hamas-case trial to start; Bridgeview man accused in terror case," Chi. Trib., Oct. 12, 2006
- Ari Shapiro, "Critics ready for new detainee treatment bill," NPR Morning Edition, Sep. 26, 2006
- Martin Kaste, "Judges show skepticism in federal secrecy cases," NPR All Things Considered, Sep. 26, 2006
- Jonathan Gurwitz, "Expert on national security law ponders fate of wiretap program," S.A. Expr.-News, Sep. 24, 2006
- Ari Shapiro, "Bush seeks approval of Guantanamo commissions," NPR Morning Edition, Sep. 7, 2006
- Jay Weaver, "Government's case against terror suspect faces obstacles," Miami Her., Aug. 28, 2006
- Scott Shane, "Invoking secrets privilege becomes a more popular legal tactic by U.S.," N.Y. Times, June 4, 2006