UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
_____

TZVI WEISS, et al.                                    :
                                                      :        Case No. CV 05-4622 (CPS) (KAM)
                             Plaintiffs,              :
                                                      :
      -against-                                       :
                                                      :
NATIONAL WESTMINSTER BANK, PLC :
                                                      :
                             Defendant.               :
_____

## EXPERT DECLARATION OF CLIVE WALKER

### 1    *Introduction*

1.1    I am a Professor of Criminal Justice Studies at the School of Law, University of Leeds, Leeds LS2 9JT, United Kingdom. I have been working as a university academic since 1978 and became a professor in 1993 (that title in the UK university system being confined to the most successful and senior academics). I have also practiced as a solicitor of the Supreme Court and hold a current practicing certificate.

1.2    As an academic, my general research theme has been criminal justice, and within that I have made a special study of terrorism and its impact on the law, but I have also written widely on police powers in law. As examples of my work, I have published several books on terrorism, including:

- Walker, C.P., *The Prevention of Terrorism in British Law* (272pp. + xi, Manchester University Press, Manchester, 1986)
- Hogan, G and Walker, C.P., *Political Violence and the Law in Ireland* (342pp. + x, U.K., Manchester University Press, Manchester, 1989).
- Walker, C.P., *The Prevention of Terrorism in British Law*, Second edition 350pp. + xi, U.K., Manchester University Press, Manchester, 1992)
- Walker, C.P., *The Anti-Terrorism Legislation* (xxxvi + 569, Oxford University Press, Oxford, 2002)

I have also published papers on issues around banking and police powers, including:

- "Opening the Vaults - Police Powers and Bank Accounts" (*Criminal Law Review*, pp.723-733, l983).
- Graham, C. & Walker, C.P., "The Continued Assault on the Vaults" (*Criminal Law Review*, pp.185-197, l989).
- Walker, CP, and Cram, I., "Confidentiality of bank accounts" (*Law for Business*, Volume 3.4, pp.157-161, l991).

Annexed to this witness statement is a copy of my resume.

1.3    I have been asked to advise on aspects of English law which may affect the litigation before the New York court relating to the claim by the plaintiffs for discovery from NatWest of records relating to transactions with Interpal. The extent to which English law is relevant to the case is ultimately a matter for the New York courts. It is the general rule in English

common law that questions of procedure are to be determined in accordance with the law of the forum – *lex fori*.[1] I do not profess to be an expert in New York law and therefore shall confine my remarks to English law, which I nevertheless understand may be of relevance to how the New York court approaches these issues.

1.4     The core principles in English law regarding the banker's duty of confidentiality were stated in *Tournier v National Provincial and Union Bank of England*.[2] This case is still seen as of broad relevance to present-day circumstances.[3] The obligation of confidence arises usually as 'one of the implied terms of the contract' and is to the effect that 'the bank enter into a qualified obligation with their customer to abstain from disclosing information as to his affairs without his consent'.[4] The obligation is also couched in wide terms and can extend to 'all the transactions that go through the account'.[5]

1.5     However, the obligation is subject to four exceptions, as formulated by Banks L.J.:[6]

> 'On principle I think that the qualifications can be classified under four heads: (a) Where disclosure is under compulsion by law; (b) where there is a duty to the public to disclose; (c) where the interests of the bank require disclosure; (d) where the disclosure is made by the express or implied consent of the customer.'

Since this statement in common law, many statutory exceptions have been passed in English law (falling with (a)) and public policy (within (b)) does of course shift over time and in different circumstances.

1.6     Arising from this legal background, I am instructed to address the following issues:
- how English law operates exception (a) to *Tournier* when the compulsion comes through a foreign court order;
- the extent to which letters of request might 'easily' or 'expeditiously' be obtained from an English court for the purposes of US litigation.
- what might be considered to be the 'duty to the public' under exception (b) to *Tournier*;
- what is meant by 'the interests of the bank' as in exception (c) to *Tournier*.

## 2     *How the English law operates exception (a) to Tournier when the compulsion comes through a foreign court order*

### *The extent to which letters of request might 'easily' or 'expeditiously' be obtained from an English court for the purposes of US litigation*

2.1     There are many examples of exception (a) which have grown up over the years, mostly relating to criminal investigations or criminal assets investigations as well as the regulation of financial markets. There are also many examples of statutory powers relating to

---

[1]     See *Hamlyn & Co v Talisker Distillery* [1894] AC 202 at p.213 per Lord Watson.
[2]     [1924] 1 KB 461 at p.473.
[3]     Report by the Review Committee, Banking Services (Cm.622, London, 1989) para.5.05; *Lipkin Gorman v Karpnale Ltd* [1989] 1 WLR 1340 (reversed on other grounds at [1991] 2 AC 548).
[4]     [1924] 1 KB 461 at p.484.
[5]     [1924] 1 KB 461 at p.485.
[6]     [1924] 1 KB 461 at p.473.

terrorism investigations (which will be related in the next section). As well as statutory powers, court orders for disclosure are also relevant. The 'law' which founds the compulsion in these cases at common law is in all cases English law – ' the law of the land'.[7]

2.2    The mechanism by which English courts can assist non-English courts in their proceedings where English banks are involved is the Evidence (Proceedings in Other Jurisdictions) Act 1975. It is only that Act which gives the English courts the jurisdiction to make orders to assist foreign courts.[8] The Act implements the (Hague) Convention on the Taking of Evidence Abroad in Civil or Commercial Matters 1970 which allows requests only for 'evidence … intended for use in judicial proceedings, commenced or contemplated'.[9] Evidence can be obtained by the production of documents (section 2(2)(b)) or by other means, subject to section 2(3) by which an order for evidence shall not require any 'steps to be taken' unless they are steps which can be required for obtaining evidence in civil proceedings before the British court which is making the order.

2.3    As to the ease or otherwise of this process, it must again be reiterated that the banker's duty of confidentiality runs deep in English common law, and so the courts undertake a strict scrutiny of foreign claims which apparently infringe the duty. The general picture is that a US based application under the 1975 Act can often be problematic, and there is certainly no assurance that the letter of request will be granted quickly or in the terms as requested. In particular, the different practices on disclosure and discovery between UK and US courts may lead to the rejection of applications which would be viewed as acceptable in the US or to their grant subject to limitations which would be viewed as unduly severe in US practice. This stance is reflected in two aspects of potential relevance to the New York court.

2.4    First, the English courts will not grant the application unless convinced that it is strictly required for the litigation and that the litigation serves proper purposes. Thus, in *Rio Tinto Zinc v Westinghouse Electric Corporation*,[10] it was made clear that the court should refuse to cooperate where the evidence sought was not necessarily for use as admissible evidence at trial but might assist in the investigation of the case. The plaintiff must show, according to *Arab Monetary Fund v Hashim (no.5)*,[11] that there is a real prospect that disclosure will further these purposes of the litigation. Therefore, English law emphasises that particular documents be specified. Ulterior purposes outside the litigation are also deprecated, but when they are specified by foreign statute, the English court may be more compliant, as in *Bank of Crete SA v Koskotas (no.2)*.[12]

2.5    Second, even when the foreign request is specific and pertinent to the litigation, claims of confidentiality may still be raised, and the court has discretion to consider on the balance of convenience the interests favouring disclosure in the foreign litigation as against the interests favouring domestic (English law) banking confidentiality.[13] In pursuance of this balancing, the courts may refuse the application or may allow it conditionally by demanding: that the plaintiff pay the bank's expenses and pay the damages which may arise as a result of

7    *Parry-Jones v Law Society* [1969] 1 Ch 1 at p.9 per Lord Diplock.
8    *Refco Capital Markets Ltd v Credit Suisse First Boston Ltd, Also known as: Genira Trade & Finance Inc v Refco Capital Markets Ltd, Refco Capital Markets Ltd v CS First Boston and Standard Bank (London) Ltd* [2001] EWCA Civ 1733 at para.1.
9    (Cmnd.6727, London, 1977) art.1(2).
10   [1978] AC 547.
11   [1992] 2 All ER 911.
12   [1993] 1 All ER 748.
13   *Re State of Norway's Application* [1987] QB 433.

disclosure; and that the plaintiff provides undertakings as to the purposes to which the documents should be used.

2.6    In addition to these court interpretations under the 1975 Act, and in several aspects strengthening them, account must also be taken of the reservation to the Hague Convention entered by the United Kingdom Government under article 23:

'A Contracting State may at the time of signature, ratification or accession, declare that it will not execute Letters of Request issued for the purpose of obtaining pre-trial discovery of documents as known in Common Law countries.'

The United Kingdom's declaration provides:

'In accordance with Article 23 Her Majesty's Government declare that the United Kingdom will not execute Letters of Request issued for the purpose of obtaining pre-trial discovery of documents. Her Majesty's Government further declare that Her Majesty's Government understand 'Letters of Request issued for the purpose of obtaining pre-trial discovery of documents' for the purposes of the foregoing Declaration as including any Letter of Request which requires a person:
a. to state what documents relevant to the proceedings to which the Letter of Request relates are, or have been, in his possession, custody or power; or
b. to produce any documents other than particular documents specified in the Letter of Request as being documents appearing to the requested court to be, or to be likely to be, in his possession, custody or power.'

2.7    It should be noted that all that is promised are 'particular documents'. Virtually the same language appears in section 2(4) of the Evidence (Proceedings in Other Jurisdictions) Act 1975:

'(4) An order under this section shall not require a person
(a) to state what documents relevant to the proceedings to which the application for the order relates are or have been in his possession, custody or power; or
(b) to produce any documents other than particular documents specified in the order as being documents appearing to the court making the order to be, or to be likely to be, in his possession, custody or power.'

2.8    Underlying the reservation is an established British perception that American discovery practices are 'excessive and constitute an invasion of sovereignty', as noted by Viscount Dilhorne in *Rio Tinto Zinc Corp. v. Westinghouse Electric Corp.*[14] American discovery is often seen as going well beyond the purposes of the suit and the parties to the suit,[15] amounting to what is commonly and disparagingly called in the English courts a 'fishing expedition'. Cases which illustrate the point include *X AG and others v A Bank*,[16] where the court determined the balance of convenience to be in favour of continuance of an injunction against disclosure against the London branch of the defendant bank in the face of a US court subpoena which, by English standards, were considered excessive. The Court of Appeal, in *Refco Capital Markets Ltd v Credit Suisse First Boston Ltd, Also known as:*

---

14    [1978] AC 547 at p.631.
15    This distinction between the jurisdictions was established as long ago as *Radio Corp. of America v. Rauland Corp.* [1956] 1 Q.B. 618.
16    [1983] 2 All ER 464.

*Genira Trade & Finance Inc v Refco Capital Markets Ltd, Refco Capital Markets Ltd v CS
First Boston and Standard Bank (London) Ltd,*[17] also spoke in most hostile terms about US
legal practices.

2.9     To avoid such rejection, requests under the 1975 Act must relate to specific
documents and not classes of documents, and the documents must be evidently relevant as
admissible evidence at trial. The courts will not support a roving enquiry in which a party is
seeking to 'fish out' material which might lead to obtaining admissible evidence at the trial
such as through seeking to establish what the party or a  witness knows and what documents
the party or witness possesses. What is a 'particular' document is given a strict construction:
*Re Asbestos Insurance Coverage Cases.*[18]

2.10    Even where the courts do not condemn the request as a 'fishing expedition', they may
refuse where the application is viewed as otherwise oppressive. In *First American
Corporation and Others v. Zayed and Others, Clifford and Another v. First American
Corporation and Others,*[19] the Court of Appeal recognised the need to help the US District
Court in the proceedings arising from fraud but nonetheless felt that the order would be
oppressive where the first plaintiffs held themselves free to use any information they might
obtain from those witnesses in a civil action for fraud in which the witnesses or their firm
were defendants. The message is again the need to be very clear and precise about the
purposes of disclosure.

## 3      *What might be considered to be the 'duty to the public' under exception (b) to Tournier;*

3.1     The English courts remain as cautious about disclosure under *Tournier* (b) as under
(a).[20] Nevertheless, this head of exception affords banks a basis for disclose where precise
statutory duties or powers are absent. Examples of use in recent years include

*   assistance to an inquiry by the disclosure of confidential documentation, such as the
    inquiry into the collapse of the BCCI Bank in *Price Waterhouse v BCCI Holdings
    (Luxembourg)*[21] or the inquiry into dealings in hotels in the Bahamas by an ex-premier in
    *Douglas v Pindling;*[22]
*   inquiries into the detection or prevention of wrongdoing or preventing a miscarriage of
    justice (as also mentioned in the *Price Waterhouse* case)[23];

3.2     It can be readily established that there exists a duty to the public to assist the
authorities both home and abroad to combat international terrorism. The broadest statement
that international cooperation between the United Kingdom and other countries is vital is
found in the statement of counter-terrorism strategy which was issued by the Home Office as
a paper, Countering International Terrorism, in August 2006, which contains the statement
that:[24]

17      [2001] EWCA Civ 1733 at para.1.
18      [1985] 1 W.L.R. 331.
19      [1999] 1 W.L.R. 1154.
20      *C v S (Money Laundering: Discovery of Documents) (Practice Note)* [1999] 1 W.L.R. 1551 at p.1555.
21      [1992] BCLC 583.
22      [1996] AC 890.
23      [1992] BCLC 583 at p.601.
24      Home Office, Countering International Terrorism (Cm.6888, London, 2006) para.17.

'We also share a common interest with many other countries in combating terrorism, so work with other governments and through international organisations is an important part of protecting the UK and its interests.'

Such is the public interest, and financial institutions have an important role to play in the furtherance of this public interest since it has been long accepted in UK policy that 'Money is a crucial factor in the continuance of terrorism...'.[25] Not only is this policy on terrorism a governmental and inter-governmental interest, it is also brought home to everyone by a series of statutory offences and duties, which bear especially heavily upon banks.

3.3     There are many aspects of restrictions in UK law upon the financing of terrorism. First, various offences arise with regard to organisations which are proscribed under Part II of the Terrorism Act 2000. Persons who provide support to such an organisation commit an offence under section 12. The commission can come about through an number of distinct forms of involvement. For example, forbidden by section 12(1) is the act of inviting support for the organisation.

3.4     The current list of proscribed organisations includes Hamas-Izz al-Din al-Qassem Brigades (HIDQ), which is listed in the Terrorism Act 2000 (Proscribed Organisations) (Amendment) Order 2001 (S.I. no.1261), which came into force on the 29 March 2001. This specific reference to the Izz al-Din al-Qassem Brigades is meant to distinguish between military and political wings of Hamas.

3.5     The United Kingdom courts must also distinguish under Part II between political and military wings. For example, in the only reported prosecution, *Sheldrake v Director of Public Prosecutions; Attorney General's Reference (No 4 of 2002),*[26] the defendant was accused of belonging to the Hamas-Izz al-din al Qassem Brigades. The evidence was taken from his statements that he was prepared to take a bomb to a public place; that he had been a member of Hamas from either 1997 or 1998, but said that he had left in 1999 because he had discovered that it was involved in the killing of innocent civilians and that during his time as a member he had received training in the use of firearms and explosives and had been involved in attacks on the Israeli Army; that he described Hamas as a military organisation and its members who died in the Palestinian cause as martyrs.

3.6     Part III of the Terrorism Act 2000 has a significantly wider scope, since it is not confined to proscribed organisations but applies to financing and other support activity around terrorist property for the purposes of 'terrorism'. 'Terrorism' is defined by section 1 of the Terrorism Act 2000:[27]

'(1) In this Act "terrorism" means the use or threat of action where

(a) the action falls within subsection (2),

(b) the use or threat is designed to influence the government or an international governmental organisation or to intimidate the public or a section of the public, and

---

[25]     Report of the Operation of the Prevention of Terrorism (Temporary Provisions) Act 1976 (Cmnd.8803, London, 1983) para 213.

[26]     [2004] UKHL 43.

[27]     As amended by the Terrorism Act 2006 s.34.

(c) the use or threat is made for the purpose of advancing a political, religious or ideological cause.

(2) Action falls within this subsection if it

(a) involves serious violence against a person,

(b) involves serious damage to property,

(c) endangers a person's life, other than that of the person committing the action,

(d) creates a serious risk to the health or safety of the public or a section of the public, or

(e) is designed seriously to interfere with or seriously to disrupt an electronic system.

(3) The use or threat of action falling within subsection (2) which involves the use of firearms or explosives is terrorism whether or not subsection (1)(b) is satisfied.

(4) In this section

(a) "action" includes action outside the United Kingdom,

(b) a reference to any person or to property is a reference to any person, or to property, wherever situated,

(c) a reference to the public includes a reference to the public of a country other than the United Kingdom, and

(d) "the government" means the government of the United Kingdom, of a Part of the United Kingdom or of a country other than the United Kingdom.

(5) In this Act a reference to action taken for the purposes of terrorism includes a reference to action taken for the benefit of a proscribed organisation.'

3.7    It should be emphasised that, in the interests of international comity, the UK law adopts a wide purview and is prepared to depict a terrorist attack on a government anywhere in the world as contrary to UK law (section 1(4)(d)). This stance is followed up by a number of extra-territorial offences. In this way, political violence in Palestine or Israel which falls within section 1(1) could be depicted as 'terrorism' under UK law. This stance is applied to the financing of terrorism under Part III of the Terrorism Act.

3.8    Those who in any way support such activities through the manipulation of 'terrorist property' (defined widely under section 14) may commit offences under Part III of the Terrorism Act 2000 as follows:

• Initial fund-raising or donations are criminalised by section 15 of the Terrorism Act 2000.

• By section 16 of the Terrorism Act, a person commits an offence if (1) he uses money or other property for the purposes of terrorism or (2) possesses money or other property, and intends that it should be used, or has reasonable cause to suspect that it may be used, for the purposes of terrorism.

• By section 17 ('Funding arrangements'), a person commits an offence if (a) he enters into (in other words, is part of the initiation of), or becomes concerned in (in other words, joins in some existing relationship or transaction), an arrangement as a result of which money or other property is made available or is to be made available to another, and (b) he knows or has reasonable cause to suspect that it will or may be used for the purposes of terrorism.

• By section 18 ('Money laundering'), a person commits an offence if he enters into or becomes concerned in an arrangement which facilitates the retention or control by or on behalf of another person of terrorist property. By use of the term, 'terrorist property', the

section catches funding purposes which do not directly relate to terrorism, such as payments to the relatives of paramilitary prisoners. In respect of section 18, proof of *mens rea* is even easier: the burden is switched to the defendant to prove that he did not know and had no reasonable cause to suspect that the arrangement related to terrorist property. Section 118 (where the person adduces evidence which is sufficient to raise an issue with respect to the matter, the court or jury shall assume that the defence is satisfied unless the prosecution proves beyond reasonable doubt that it is not) does not apply to this defence, so it is for the defendant to prove it on balance unassisted by any presumption in his favour.

3.9    There are also specific statutory duties imposed by UK law upon financial institutions which require them to make disclosures to the authorities, thereby overriding any underlying duty of confidentiality. These duties are again not reliant upon proscription of the organisation:

- By section 19(1), where a person believes or suspects that another person has committed an offence under any of sections 15 to 18 on the basis of information which comes to his attention in the course of a trade, profession, business or employment, an offence is committed if he does not disclose to a police officer as soon as is reasonably practicable his belief or suspicion, and the information on which it is based. The width of the duty is striking; it is sufficient to have a subjective belief or suspicion which can only be safely suppressed if the intermediary has a 'reasonable excuse' under subsection (3) for not making the disclosure. This defence is not subject to section 118, consequently, the full legal and evidential burdens fall on the defence. Furthermore, under section 15(7), the duty has a global reach since a person shall be treated as having committed an offence under one of sections 15 to 18 if (a) he has taken an action or been in possession of a thing, and (b) he would have committed an offence under one of those sections if he had been in the United Kingdom at the time when he took the action or was in possession of the thing.

- An even stricter duty to disclose is imposed on the 'Regulated Sector' by Schedule 2 Part 3 of the Anti-terrorism, Crime and Security Act 2001. This duty, under what is deemed to be section 21A of the Terrorism Act, is promulgated instead of the duty in section 19 (Schedule 2 paragraph 5(3), inserting section 19A). The 'Regulated Sector' is defined by Schedule 3A as including a business accepting deposits (such as banks and building societies). The 2001 Act then inserts an offence as section 21A of the Terrorism Act. A person commits an offence if (i) he knows or suspects or has reasonable grounds for knowing or suspecting, that another person has committed an offence under any of sections 15 to 18 and (ii) the information came to him in the course of a business in the regulated sector and (iii) he does not disclose the information or other matter to a police constable or a nominated officer of his employer as soon as is practicable after it comes to him, unless there is reasonable excuse not to disclose or the information is subject to legal privilege. This objective standard is said to be justified by the '[g]reater awareness and higher standards of reporting in the financial sector'.[28] Given the objective standard of criminal liability which is imposed, in deciding whether a person committed an offence under this section the court must consider whether he followed any guidance by the relevant supervisory body (which, for banks, means the Bank of England). The offence has extra-territorial effect. By sub-section (11): a person is to be taken to have committed an offence if (a) he has taken an action or been in possession of a thing, and (b) he would have committed the offence if he had been in the United Kingdom at the time when he

---

28      Home Office, Regulatory Impact Assessment: Terrorist Property (2001) para.8.

took the action or was in possession of the thing. Under section 21B, any disclosure within section 21A is not to be taken to breach any legal restriction on the disclosure of information (however imposed).

3.10    These measures under Part III apply not only to the part of Hamas proscribed under Part II (in other words, the Izz al-Din al-Qassem Brigades) but to all parts of Hamas and to any organisation or person who can be shown to be aiding Hamas. This assertion can be made with confidence because of the condemnation of these wider aspects of Hamas both by the European Union and the United Nations and their impact in UK law

- As regards the European Union, by Council Regulation (EC) No.2580/2001 of 27 December 2001 on specific restrictive measures directed against certain persons and entities with a view to combating terrorism,[29] the European Council has provided that (by Article 2) all funds, other financial assets and economic resources belonging to, or owned or held by, a natural or legal person, group or entity included in the list referred to in paragraph 3 shall be frozen; no funds, other financial assets and economic resources shall be made available, directly or indirectly, to, or for the benefit of, a natural or legal person, group or entity included in the list referred to in paragraph 3; and it shall be prohibited to provide financial services to, or for the benefit of, a natural or legal person, group or entity included in the list referred to in paragraph 3. By Article 3, the participation, knowingly and intentionally, in activities, the object or effect of which is, directly or indirectly, to circumvent Article 2 shall be prohibited. By Council Decision 2003/646/EC implementing Article 2(3) of Regulation No.2580/2001, issued on 14 September 2003, Hamas as a whole is placed on the list of those to whom Regulation 2580/2001 applies whereas, previously, only Hamas-Izz al-Din al-Qassem appeared on that list. Later Council Decisions reflect this change.[30] As far as UK law is concerned, there is therefore a binding and directly applicable obligation in Community law to freeze all funds and other financial assets and economic resources of Hamas, and not to make any funds, other financial assets and economic resources available to Hamas. This change was notified in the UK by the Bank of England to all financial institutions:[31] 'Financial institutions are requested to check whether they maintain any accounts for the entity named below and, if so, they should freeze the accounts and report their findings to the Bank of England.'

- This change was quickly followed up by Her Majesty's Treasury issuing on 22 September 2003 a Notice under article 4 of the Terrorism (United Nations Measures) Order 2001 in respect of Hamas (including Hamas-Izz al-Din al-Qassem), which was also notified to financial institutions by the Bank of England.[32] The Terrorism (United Nations Measures) Order 2001 (Amendment No.3) Regulations 2003[33] came into force on 20 September 2003. As a result, the Treasury may, where they have reasonable grounds for suspecting that the person by, for or on behalf of whom any funds are held is or may be on the list of natural and legal persons, groups and entities in Article 1 of Council Decision 2003/646/EC, direct by notice that those funds are not to be made available to any person, in the absence of a licence granted by the Treasury. The Bank of England, as agent for Her Majesty's Treasury, by its notice, further directed financial institutions that any funds which they hold for or on behalf of Hamas must not be made available to any person, except under the authority of a licence granted by the Treasury. As a result, it is a

---

29    (28.12.2001 L 344/70).

30    For the latest, see Council Decision 2006/379/EC of 29 May 2006.

31    http://www.bankofengland.co.uk/publications/news/2003/097.htm, 15 September 2003.

32    http://www.bankofengland.co.uk/publications/news/2003/101.htm, 22 September 2003. The notice is at http://www.bankofengland.co.uk/publications/financialsanctions/sancnotice030922.pdf.

33    2003 SI no.2430.

criminal offence to make funds available to Hamas (contrary to Article 4(9) of the Terrorism (United Nations Measures) Order 2001).[34] The relevant instrument is now the Terrorism (United Nations Measures) Order 2006.[35] These regulations give effect not only to UN Security Council Resolution 1373 adopted by the Security Council of the United Nations on 28th September 2001 relating to terrorism but also to Regulation (EC) No.2580/2001 (since the EU does not have legal competency to enforce its own measures in pursuit of the UN Resolution). The implementation of UN Security Council Resolution 1373 also involves the specific listing of suspect persons or organisations. Under the terms of the Order, it is an offence (additional to any in the Terrorism Act) to make funds available for the benefit of listed terrorists or to facilitate such offences. Since the listing system reflects the EU versions (but can be wider), Hamas was listed on 15 September 2003, adding to the listing of Hamas-Izz al-Din al-Qassem, which had taken place on 2 November 2001.[36]

3.11   In conclusion, there can be no doubt that countering terrorism involves a statutory public duty imposed upon banking institutions in the UK (i) not to assist in any way the proscribed Hamas-Izz al-Din al-Qassem Brigades and also (ii) not to assist in any financial way Hamas or any entity related to Hamas.

3.12   It is clear that a bank can be described as having a 'public duty' to disclose its suspicions of dealings with 'terrorist property' and can thereby be released from its normal legal obligations of confidence by reference to head (b) of *Tournier*. The English common law (as opposed to the foregoing statutory provisions) relating to heading (b) envisages a discretion/power/right to disclose at the bank's own election. According to the Government Response to the Report by the Review Committee on Banking Services, 'The statutory route [under *Tournier* (a)] *requires* information from the banker; this exception *permits* him to disclose.'[37] Thus, Price Waterhouse in the above case wished to cooperate with the inquiry and sought declarations that it was not precluded from doing so. The cooperation of the banks in *Douglas v Pindling* was, however, demanded rather than volunteered, and one might argue that the compulsion was ultimately justified under exception (a) to *Tournier*, on the basis of the summonses issued under section 10 of the Bahamian Commissions of Inquiry Act. The same argument could apply, *pari passu*, to banks with regard to disclosures about their dealings related to Hamas by reference to the statutory duties concerning terrorism. In this way, the financial institutions in these cases were confirmed as having a discretion to disclose without the consent of their clients, and this was even treated as a duty, overriding the wishes of the bank in *Douglas v Pindling*.

3.13   It might be argued that such a duty could only arise in the public interest where there is the need to assist a public inquiry and not private litigation. However, the *Price Waterhouse* case is a precedent for a wider duty. The public interest in the effective regulation and supervision of authorised banking institutions arose in that case in circumstances where there was an unenforceable request by a non-statutory inquiry.

---

34   2001 SI no.3365.
35   2006 SI no.2657.
36   See Consolidated List of Financial Sanctions Targets in the UK, 13 December 2006, http://www.bankofengland.co.uk/publications/financialsanctions/regimes/terrorism.htm.
37   Banking Services: Law and Practice (Cm.1026, London, 1990) para.2.14.

Consequently, the court expressed the duty in wide terms and in circumstances unrelated to any public inquiry – that, quite simply, 'there could be no confidence in iniquity.'[38]

## 4      *What is meant by 'the interests of the bank', as in exception (c) to Tournier?*

4.1      The most obvious case under this exception will be where the bank is directly involved in litigation in English law either as claimant or defendant. For example, where a bank is sued in debt by the customer or wishes to sue the customer for a debt; it must refer the court to the account details in order to conduct the litigation.[39] It may also act in circumstances going beyond the direct financial affairs in which it is involved, for example to protect its own reputation.[40]

4.2      The courts have interpreted *Tournier* (c) as not imposing a 'duty' to disclose[41] but as affording to banks a 'liberty' to disclose, at the election of the bank.[42]

*Clive Walker*

Dated: December 18, 2006
    Leeds, UK

_____

**CLIVE WALKER**

---

38      Cases cited do not relate to public inquiries: *Gartside v Outram* (1856) 26 LJ Ch 113; *Lion Laboratories Ltd v Evans* [1985] QB 526; *Francome v Mirror Group Newspapers Ltd* [1984] 1 WLR 892.

39      [1924] 1 KB 461 at p.473.

40      *Sunderland v Barclays Bank Ltd.* (1938) *Law Decisions Affecting Bankers* 163, (1938) *The Times* 25 November.

41      *Pharaon and others v Bank of Credit and Commerce International SA (in liquidation) (Price Waterhouse (a firm) intervening); Price Waterhouse (a firm) v Bank of Credit and Commerce International SA (in liquidation) and others* [1998] 4 All ER 455.

42      *Eckman and others v Midland Bank Ltd and another* [1973] QB, 519.

## ANNEX – RESUME

## Professor Clive Walker, *LL.B., Ph.D, Solicitor*

| | |
|---|---|
| **Job Title:** | Professor of Criminal Justice Studies |
| **Direct Dial:** | 0113 343 5022 |
| **Extension:** | 35022 |
| | G.04, 18 Lyddon Terrace |
| | School of Law |
| **Location:** | University of Leeds |
| | Leeds LS2 9JT |
| | UK |
| **Email:** | law6cw@leeds.ac.uk |

### Biography
*Abstract*
- LLB 1975, Leeds; PhD 1982, Manc; Solr 1976, Maxwell Prize 1974, Special Hughes Prize 1975. Professor of Criminal Justice Studies, 1993.
- Formerly: Lecturer, University of Manchester 1978-83, Lecturer, University of Leeds 1983-89, Senior Lecturer, University of Leeds 1989-92, Director, Centre for Criminal Justice Studies 1987-2000, Head of the School of Law 2000-05.
- Visiting Professorships: University of Louisville, 1993, George Washington University, 1995, University of Connecticut, 2003, Stanford University 2006, University of Washington 2006.
- Special interests: Civil Liberties, Public Law, Terrorism and the law, Police Powers, Media and the law.

*Dates of appointment to University*
- Lecturer, 1983,
- Senior Lecturer, 1989,
- Reader in Public Law, 1992,
- Professor of Criminal Justice Studies, 1993

*Posts*
- Director of the Centre for Criminal Justice Studies, 1987-2000
- Head of School of Law 2000-2005

*Previous employment*
- Articled clerk and then solicitor with Emsley Collins & Co., Solicitors, Leeds (1976 - 1978);
- Lecturer, Faculty of Law, University of Manchester (1978 - 1983)

*Qualifications*
- LL.B. (Hons., First Class) - University of Leeds, 1975;
- Law Society's Qualifying Examinations, Part II (Hons., Second Class, 1976);
- Solicitor of the Supreme Court (admitted 1978);
- Ph.D. (The Prevention of Terrorism in British Law, University of Manchester, 1982)

### Research
### Publications
*Books*
- Walker, C.P., *The Prevention of Terrorism in British Law* (272pp. + xi, U.K., Manchester University Press, 1986)
- Hogan, G and Walker, C.P., *Political Violence and the Law in Ireland* (342pp. + x, U.K., Manchester University Press, 1989).
- Walker, C.P., *The Prevention of Terrorism in British Law*, Second edition 350pp. + xi, U.K., Manchester University Press, 1992)
- Walker, C.P. and Starmer, K, (eds), *Justice in Error* (Blackstone Press, London, 1993). The Introduction, Chapter 5 and the commentaries to each chapter are written by myself.
- Walker, C.P. (ed.), *Crime, Criminal Justice and the Internet* (92pp + iv, Sweet & Maxwell, London, 1998) (see "Editorial", pp.1-4, and (with Yaman Akdeniz), "The Governance of the internet in Europe with special reference to illegal and harmful content ", pp.5-18.

- Walker, C.P. and Starmer, K., (ed.), *Miscarriages of Justice* (402pp + xxx, Blackstone Press, London, 1999) (chapters 1, 2, 6, 8 , 10, 16)
- Akdeniz, Y., Walker, C., and Wall, D., *The Internet, Law and Society* (Longman, London, 2000) 416pp. I am the principal author of chapter 1, "The Internet, Law and Society", the joint author of chapter 14, "Whisper who dares: encryption, privacy rights and the new world disorder"; and the sole author of chapter 6, "Cyber-constitutionalism and digital democracy" and chapter 8, "Criminal justice processes and the Internet"
- *The Anti-Terrorism Legislation* (Oxford University Press, Oxford, 2002) xxxvi + 569
- Weaver, R.L., Kenyon, A.T., Partlett, D.E., Walker, C.P., *The Right to Speak Ill: Defamation, Reputation and Free Speech* (331pp + xvi, Carolina Academic Press, Durham, North Carolina, 2006)
- Walker, C. and Broderick, J., *The Civil Contingencies Act 2004: Risk, Resilience and the Law in the United Kingdom* (372 + xxxviipp, Oxford University Press, 2006)

*Chapters in books*
- "New Developments in the Prevention of Terrorism" in J. Hayes and P. O'Higgins (eds.), *Lessons from Northern Ireland* (Belfast, S.L.S., l990) pp.143 - 175.
- "The role and powers of the Army in Northern Ireland" in Hadfield, B., *Northern Ireland: Politics and Constitution* (1992, Open University Press, Buckingham.) 110 - 129
- "Terrorism" in Bridge, J.W. et al, *UK Law in the Mid-1990s* (UK Comparative Law Series, 1994) pp.170-220
- "The governance of special powers" in Gearty, C., and Tomkins, A., *Understanding Human Rights* (Mansell, London, 1996) 611-643
- " The impact of new technologies: the right of the individual and the public interest in legal proceedings" in Institute of European Media Law, *Fundamental Rights and New Information Technologies in the Audiovisual Sector* (Jehle Rehm, Munich, 1996) 83-105 "
- Criminal Libel (chapter 22) " and "European Convention (chapter 23) " in Rogers, WVH, and Milmo, P, *Gatley on Libel and Slander* (9th ed., Sweet & Maxwell, London, 1998) 533-610 and Supplement to Gatley, Libel and Slander (Sweet and Maxwell, London, 2002) pp.111-129
- "Annotations on the Criminal Justice (Terrorism and Conspiracy) Act 1998 in Current Law Statutes Annotated, Sweet & Maxwell, London, 1998, chap.40 pp.40-1 to 40-27
- "The courts and the Internet" in Gibson, R., and Ward, S., (eds.), *Reinvigorating Democracy* (Ashgate, Aldershot, 2000) pp.81-106
- "Emergency cases" in Doran, S., and Jackson, J., (eds.), *The Judicial Role in Criminal Proceedings* (Hart Publishing, London, 2000) pp.223-243
- "The Patten Report and post-sovereignty policing in Northern Ireland" in Wilford, R., (ed.), *Aspects of the Belfast Agreement* (Oxford University Press, Oxford, 2001) pp.142-165
- (with Fitzpatrick, B., and Seago, P. and Wall, D.) - "The magistrates' courts" in Elites in Criminal Justice by Ryan, M., Savage, S., and Wall, D., *Policy Networks in Criminal Justice* (Palgrave, Basingstoke, 2001) pp.98-121
- Walker, C., and McGuinness, M., "Risk, political violence and policing the City of London" in Crawford, A., (ed.), *Crime, Insecurity, Safety and the New Governance* (Willan Publishing, Cullompton, 2002) pp.234-259
- Walker, C., "The criminal courts online" in Wall, D., (ed.), *Crime and the Internet* (Routledge, 2002)
- Walker, C., "Miscarriages of justice and the correction of error" in McConville, M. and Wilson, G., (ed.), *Handbook of Criminal Justice Process* (Oxford University Press, 2002) pp.505-524
- (with Rogers, WVHR and Milmo, P.) Supplement to Gatley, Libel and Slander (Sweet and Maxwell, London, 2002) pp.111-129
- Walker, C., 'Policy options and perspectives: British perspectives' in van Leeuwen, M., *Confronting Terrorism* (Kluwer, Dordrecht, 2003) 11-35
- Walker C. and Akdeniz, Y., 'The governance of the Internet in Europe with special reference to illegal and harmful conduct' in Wall, D.S., *Cyberspace Crime* (Ashgate, Abingdon, 2003) (reprint)
- Walker, C., 'Fundamental rights, fair trials and the new audio-visual sector' in Wall, D.S., *Cyberspace Crime* (Ashgate, Abingdon, 2003) (reprint)
- (with Rogers, WVHR and Milmo, P.) Gatley, Libel and Slander (10th ed., Sweet and Maxwell, London, 2004) chs.22 (criminal libel), 23 (human rights) (pp.652-751)
- Walker, C., Reports of Special Adviser' in Joint Committee on the Civil Contingencies Bill, Draft Civil Contingencies Bill (2002-03 HL 184 HC 1074) pp.103-116
- Raine, J.W., and Walker, C., Implementing the Human Rights Act into the Courts in England and Wales: Culture Shift or Damp Squib? in Halliday, S., and Schmid, P., *Bringing Rights Home: Socio*

*Legal Perspectives on Human Rights in the National Context* (Hart, Oxford, 2004) pp.111-135
- Walker, C., 'Liability For Acts Of Terrorism: United Kingdom Perspective' in *European Centre For Tort And Insurance Law Liability For Acts Of Terrorism* (Springer, Vienna, 2004) pp.138-175

*Contributions to Journals etc*
- "Film Censorship - The Effects of the Criminal Law Act 1977" (*Law Society's Gazette*, Vol. 75, pp. 992-993, 1978, this article was the subject of comment in *The Guardian*, 19 October, 1978).
- "A Question of Contributory Negligence" (*New Law Journal*, Vol. 129, pp. 674-676, 1979).
- "Police Surveillance by Technical Devices" (*Public Law*, pp.184-217, 1980).
- " Shooting to Kill - Some of the Issues in *Farrell v. Secretary of State for Defence*" (*Modern Law Review*, Vol.43, pp. 591-594,.1980).
- "An Exploration of the 'Right to Silence'" (*Anglo American Law Review*, Vol. 9, pp. 257-278, 1980).
- "Prisoners in Parliament - Another View" (*Public Law*, pp. 389-394, 1982).
- "Access to Information in Central and Local Government" (*Anglo-American Law Review*, Vol. 11, pp. 38-56, 1982).
- "Public Rights to Information in Central and Local Government" (*Local Government Review*, Vol. 146, pp. 931-933, 955-956, 963, 1982).
- "Opening the Vaults - Police Powers and Bank Accounts" (*Criminal Law Review*, pp. 723-733, 1983).
- "The Jellicoe Report on the Prevention of Terrorism (Temporary Provisions) Act 1976 (*Modern Law Review*, Vol. 46, pp. 484-492, 1983).
- "Members of Parliament and Executive Security Measures" (*Public Law*, pp. 537-549, 1983).
- Book Review: The Policing Revolution by S. Manwaring-White (*Public Law*, pp. 694-695, 1983).
- "Freedom of Information - A Little Local Difficulty" (*Local Government Review*, Vol. 148, pp. 287-294, 1984).
- "Arrest and Rearrest" (*Northern Ireland Legal Quarterly*, Vol.35, pp. 1-27, 1984).
- "Prevention of Terrorism (Temporary Provisions) Act 1984" (*Modern Law Review*, Vol. 47, pp. 704-713, 1984).
- Book Review: The Use and Abuse of Emergency Legislation in Northern Ireland by D.P.J. Walsh (*Northern Ireland Legal Quarterly*, Vol. 35, pp. 407-409, 1984).
- "Emergency Arrest Powers" (*Northern Ireland Legal Quarterly*, Vol. 35, pp. 145-155, 1985).
- "Scandalising in the Eighties" (*Law Quarterly Review*, Vol. 101, pp. 359-384, 1985).
- "Irish Republican Prisoners - Political Detainees, Prisoners of War or Common Criminals?" (*Irish Jurist*, Vol. xix, pp.189-225, 1984 but appearing in 1986).
- Book Review: Police Powers in England and Wales by L.H. Leigh (*Northern Ireland Legal Quarterly*, Vol. 37, pp.300-303, 1986).
- Book Review: Police Powers and the Individual by St.J.Robilliard and J. McEwan (*Northern Ireland Legal Quarterly*, Vol. 38, pp. 202-205, 1987).
- "Review of the Prerogative: The Remaining Issues" (*Public Law*, pp. 62-84, 1987).
- "The Public Order Act 1986" (*Local Government Review*, Vol.151, pp. 364-369, 1987).
- Book Review: Emergency Powers in Peacetime by D. Bonner (*Dublin University Law Review*, pp. 126-128, 1986 but appearing in 1988).
- "Elected representatives and the democratic process in Northern Ireland" (*Modern Law Review*, Volume 51, pp. 605-622, 1988).
- Book Review: The 1986 Annual on Terrorism by Y. Alexander (*International and Comparative Law Quarterly*, Volume 37, pp. 1021-1022, 1988).
- Walker, C.P. & Brogarth, D. "Court Reporting and Open Justice" (*New Law Journal*, pp. 909-916, 1988)
- Walker, C.P. & Brogarth, D., "Televising the Courts" (*Justice of the Peace*, Volume 153, pp. 637-640, 1989).
- "Army Special Powers on Parade" (*Northern Ireland Legal Quarterly*, Vol. 39, pp. 1-35, 1989).
- Graham, C. & Walker, C.P., "The Continued Assault on the Vaults" (*Criminal Law Review*, pp. 185-197, 1989).
- Cram, I., and Walker, C.P., "Taxi deregulation: safe in their hands (*Local Government Review*, Volume 153, pp. 968-969, 1989).
- Walker, CP, and Cram, I., "D.N.A. Profiling and the Law" (*Criminal Law Review*, pp. 479-493, 1990).
- "Police and community in Northern Ireland" (*Northern Ireland Legal Quarterly*, Volume 40, pp. 105-142, 1990).
- Book Review: Data Protection Law in Ireland by R. Clark (*Irish Law Times*, Volume 8, pp. 187-188,

1990).

- Cram, I., and Walker, C.P. "Taxi deregulation after Ghafoor: still safe in their hands" (*Local Government Review*, Volume 155, pp. 145-146, l991).
- Walker, CP, and Cram, I., "Confidentiality of bank accounts" (*Law for Business*, Volume 3.4, pp. 157-161, l991).
- Walker, CP, and Cram, I., "Educational Institutions and the Data Protection Act l984 (*Education and the Law*, Volume 3.3, pp. 111-118, l991).
- Book Review: State support of International Terrorism: Legal, Political and Economic Dimensions by J.F. Murphy (*Conflict Quarterly*, Volume XI, pp. 82-85, l991).
- Walker, C.P., Cram, I.G. and Brogarth, D., "The reporting of Crown Court proceedings and the Contempt of Court Act 1981" (1992) 55 *Modern Law Review* 647 - 669
- Walker, CP, and Cram, I., "Taxi deregulation and the courts" (*Anglo American Law Review*, 20, pp. 482-499, l991)
- "The detention of suspected terrorists in the British Islands" (1992) 12 *Legal Studies* 178 - 194
- Book review: The Northern Ireland Question: Myth and Reality by Roche, P.J. and Barton, B. (eds.) (1992) 43 *Northern Ireland Legal Quarterly* 199 - 201
- Book review: Regulating the Media by Gibbons, T., (1992) 43 *Northern Ireland Legal Quarterly* 205 - 207
- "Paramilitary displays and the prevention of terrorism legislation" (1993) *Juridicial Review* 90-94
- Mulcahy, A., Brownlee, I.D.B. and Walker, C.P., An evaluation of Pre-Trial Reviews in the Bradford and Leeds Magistrates' Courts (1993) 33 *Home Office Research Bulletin* 10-14.
- Walker, CP and Reid, K, "The offence of directing terrorist organisations" [1993] *Criminal Law Review* 669-677
- "Review article, Vecher, A., Terrorism in Europe" (l993) 13 *Legal Studies*, 415-423.
- Mulcahy A; Brownlee I D; Walker C P; "PTRs, court efficiency and justice" (1994) 33 *Howard Journal of Criminal Justice* 109-124
- Mulcahy A; Brownlee I D; Walker C P; "PTRs and court efficiency in magistrates' courts" (1994) 158 *Justice of the Peace* 234-237, 250-251
- "A realistic call for a lasting peace?" (1994) 12 *Irish Law Times* 80-84
- "Book review, Kirk and Harwood, Serious Fraud" (1994) 110 *Law Quarterly Review* pp.152-154
- Walker, CP and Weaver, RL, "A peace deal for Northern Ireland? The Downing Street Declaration", (1994) 8(2) *Emory International Law Review* 817-844
- "Legal education in England and Wales" (1993-94) 72 *Oregon Law Review* 943-951.
- Walker, CP and Stockdale, R, "Forensic science and miscarriages of justice", (1995) 54 *Cambridge Law Journal* 69-99
- "Book review, McCrudden and Chambers, Individual Rights and the Law in Britain" (1995) 14 *Civil Justice Quarterly* 146-148
- "The governance of special powers" (1995-96) 38 *University of Leeds Review* 115-148
- "Review in error" (1995) 35 *British Journal of Criminology* 661 - 663
- "Review article: Emeregency Law in Ireland by Colm Campbell" (1995) 15 *Legal Studies* (Butterworths) 311-322.
- "Fundamental rights, fair trials and the new audio-visual sector", *Modern Law Review* (1996, vol.57 pp.517-539)
- "Anti-terrorism laws for the future", *New Law Journal* (1996, vol.146, pp.586-588, 657-658)
- (with Nick Taylor), "Bugs in the System", *Journal of Civil Liberties* (1996, vol.1 pp.105-124)
- "Book review, Hill, JB,Weapons Law" (1996) 24(4) *International Journal of the Sociology of Law* 445-448
- (with D Wall, "Imprisoning the poor" *Criminal Law Review* (1997, pp.173-186)
- "Internal cross-border policing" *Cambridge Law Journal*, (1997, vol.56, pp.114-146)
- Book Review: McGonagle, M., Law and the Media (Round Hall, 1997), *International and Comparative Legal Quarterly* (1997, vol.47, pp.739-740)
- "Constitutional governance and special powers against terrorism", *Columbia Journal of Transnational Law* (1997, vol.35, pp.1-62)
- (with Nick Taylor), "The Anglo-Irish Parliamentary Body" *Northern Ireland Legal Quarterly* (1997, vol.48, pp.338-366).
- " Cybercontempt: fair trials and the internet", *Oxford Yearbook of Media and Entertainment Law* (1997-8, vol.3, pp.1-29)
- (with Ben Fitzpatrick), "The Independent Commissioner for the Holding Centres: a review" *Public*

*Law*, (1998, pp.106-124)

- (with Yaman Akdeniz), "UK Government policy on encryption: trust is the key?" *Journal of Civil Liberties*, (1998, pp.110-116)
- (with Akdeniz, Y.) "UK Law Online: the legal system on the Internet", *Amicus Curiae* (1998, vol.11, p.6)
- (with Ian Brownlee) "The Urban Crime Fund and total geographic policing initiatives in West Yorkshire", *Policing and Society* (1998, vol.8, pp.125-152)
- (with Kiron Reid), "Military aid in civil emergencies: lessons from New Zealand", *Anglo American Law Review* , (1998, vol.27, pp.133-168)
- (with Yaman Akdeniz), "Virtual democracy", *Public Law*, (1998, pp.489-506)
- "Book review, O'Rawe, M., and Moore, L., Human Rights on Duty: Principles for Better Policing – International Lessons for Northern Ireland", (1999, vol.1 *Crime Prevention and Safety: An International Journal* pp.81-83)
- (with John Bell), "Les regles de 'public interest immunity'" (1999, vol.36 *Revue Francaise de Droit Constitutionel* pp. 847-850)
- (with Yaman Akdeniz and Nicholas Bohm, "Internet Privacy: cyber-crimes versus cyber-rights" (1999, *Computers & Law*, vol.10 pp.34-39)
- (with Adam Crawford), "Crime Institute Profile: Centre for Criminal Justice Studies", *European Journal on Criminal Policy and Research*, (1999, vol.7, pp.121-129)
- (with Ben Fitzpatrick), "Holding Centres in Northern Ireland, the Independent Commissioner and the rights of detainess" *European Human Rights Law Review* (1999, pp.27-45) - this was reproduced in the Sixth Annual Report of the Commissioner (Sir Louis Blom Cooper)
- "The commodity of justice in states of emergency", *Northern Ireland Legal Quarterly*, (1999, vol.50, pp.164-185)
- "The bombs in Omagh and their aftermath: the Criminal Justice (Terrorism and Conspriacy Act 1998)", *Modern Law Review* (1999, vol.62, 879-902)
- Walker, C., "Review of Angel, J., Telecommunications Law Handbook, Blackstone Press, 1997" in (1999) 50 *Northern Ireland Legal Quarterly* 279-281
- Seago, P., Walker, C., and Wall, D., 'The professionalisation of local courts' justice' (2000) 38 *Criminal Justice Matters* 16-18
- James, A., Taylor, N., and Walker, C., "The Reform of Double Jeopardy" [2000] *Web Journal of Current Legal Issues* (http://webjcli.ncl.ac.uk/2000/issue5/james5.html, 13pp)
- Seago, P., Walker, C., and Wall, D., "The development of the professional magistracy in England and Wales" [2000] *Criminal Law Review* 631-651
- James, A., Taylor, N., and Walker, C., "The Criminal Cases Review Commission" [2000] *Criminal Law Review* 140-153
- Walker, C., Review of Understanding Miscarriages of Justice: Law, the Media and the Inevitability of Crisis edn by Nobles, R., and Schiff, D., (Oxford: Oxford University Press, 2000) in (2000) 20 *Legal Studies* 615-623
- Fitzpatrick, B., Seago, P., Walker, C., and Wall, D., "New courts management and the professionalisation of summary justice in England and Wales" (2000) 11 *Criminal Law Forum* 1-22
- Walker, C., "Review of International Review Of Law Computers & Technology Special Issue: Crime And Criminal Justice (Volume 12, Issues 1-3) Edited By Richard Jones And Gerald Quirchmayr, Carfax, Abingdon, UK (2000) 8 *International Journal Of Law And Information Technology* 214
- Casey, E., Evidence and Computer Crime, Academic Press, London, 2000" in (2001) 3 *International Journal of Crime Prevention and Community Safety* 87-88 Walker, C., "Briefing on the Terrorism Act 2000" (2000) 12 *Terrorism and Political Violence* 1-36
- Walker, C., and Weaver, R., "The United Kingdom Bill of Rights" (2000) 33 *University of Michigan Journal of Law Reform* 497-560
- Akdeniz, Y., Taylor, N., and Walker, C., "Regulation of Investigatory Powers Act 2000: Bigbrother.gov.uk" [2001] *Criminal Law Review* 73-90
- Walker, C., "Review of Casey, E., Evidence and Computer Crime, Academic Press, London, 2000" in (2001) 3 *International Journal of Crime Prevention and Community Safety* 87-88
- Walker, C. and Akdeniz, Y., ' Anti-Terrorism laws and data retention: war is over?' in (2003) 54 *Northern Ireland Legal Quarterly* 159-182
- Walker, C., 'Cyberspace downunder: book review of Lim, Y.F., Cyberspace Law' (2003) 2 *Entertainment Law* pp.104-106
- Walker, C., 'Political violence and commercial risk' (2004) 56 *Current Legal Problems* 531-578

- Walker, C., 'Review of Ghosh, T., Prelas, M., Viswanath, D., Loyalka, S., (eds.), *Science and Technology of Terrorism and Counterterrorism* (Marcel Dekker Inc., New York, 2002) (2004) 53 International and Comparative Legal Quaterly 257-258
- Walker, C., 'Terrorism and criminal justice' [2004] *Criminal Law Review* 311-327
- Weaver, R.L., Kenyon, A.T., Partlett, F., Walker, C.P., "Defamation law and free speech: Reynolds v Times News papers and the British media", (2004) 37 *Vanderbilt Journal of Transnational Law*, 1255-1316
- Walker, C., 'Biological attack, terrorism and the law', *Journal of Terrorism and Political Violence*, (2004) vol.17, 175-200
- Walker, C., and McCartney, C., 'Commentary on *R v Cannings*' [2005] *Criminal Law Review* 126-130
- Walker, C., 'The criminal courts online' (2005) 58 *Criminal Justice Matters* 32-33
- Walker, C., 'Prisoners of "war all the time"' [2005] *European Human Rights Law Review* 50-74
- Walker, C. and Harlow, D., 'The Police National Legal Database: A farewell to the Ways and Means Act?' (2005) 169 *Justice of the Peace* 410-411
- Walker, C. and Whyte, D., 'Contracting out war? Private military companies, law and regulation in the United Kingdom' (2005) 54 *International & Comparative Law Quarterly* 651-689
- Walker, C., 'Fine bandits and powers of entry' (2005) 169 *Justice of the Peace* 668-670
- Walker, C., 'Counter-terrorism laws and the Gulf States' (2006) 2 *Security & Terrorism Research Bulletin* 6-8
- Walker, C., 'Reforming the crime of libel' (2005-2006) 50 *New York Law School Law Review* 169-203
- Walker, C., 'Cyber-terrorism: Legal principle and the law in the United Kingdom' (2006) 110 *Penn State Law Review* 625-665
- Book Review: Ramraj, V., *Global Anti-Terrorism Law and Policy* (Cambridge University Press, 2005) in (2006) 16 *Law and Politics Book Review* pp.457-461
- 'Intelligence and anti-terrorism legislation in the United Kingdom' (2006) 44 *Crime, Law and Social Change* 387-422

## Other research related activites
*Research Grants and awards*
- Reporting of Crown Court proceedings and the Contempt of Court Act 1981 (1988 -1990) (Leverhulme Trust)
- Pre-trial reviews in the Magistrates' Courts (1990 - 93) (Home Office)
- Urban Crime Fund (1992-94) (West Yorkshire Police Authority)
- Police National Legal Database Consortium (1994 -)
- Commercial victims and political violence (1994-) (Airey Neave Trust)
- The role and appointment of stipendiary magistrates (1995-2000) (Lord Chancellor's Department)
- UK Law Online: The UK Legal System on the Internet (1997-) (Hamlyn Trust)
- The Impact on Courts and the Administration of Justice of the Human Rights Act 1998 (2000-02) (Lord Chancellor's Department)

*Membership of societies*
- British Academy of Forensic Sciences (1995)
- Committee on the Administration of Justice, Northern Ireland (1987)
- Committee of Heads of Law Schools Executive Committee (2005)
- Forensic Science Society (1995)
- JUSTICE (1998)
- Law Society of England and Wales and Solicitor of the Supreme Court (1978)
- Society for Computers and Law (1999)
- Society of Public Teachers of Law (1978)
- Socio-Legal Studies Association (1994)

*Editorships*
- Deputy editor, *Legal Studies* (1994-98)
- Board of editors, *Journal of Civil Liberties* (1995-)
- Board of editors, *International Journal of Risk Management* (1998-)
- Board of editors, *Entertainment Law* (2001-)