**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------- x
TZVI WEISS, et al.,                                      :
                                                         :
                       Plaintiffs,                       :
                                                         :
          -against-                                      :   CV 05-4622 (CPS) (KAM)
                                                         :
NATIONAL WESTMINSTER, PLC,                               :
                                                         :
                       Defendant.                        :
-------------------------------------------------------- x
```

### UNREPORTED DECISIONS CITED IN MEMORANDUM
### OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO COMPEL
### <u>PRODUCTION OF DOCUMENTS AND ANSWERS TO INTERROGATORIES</u>

CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
(212) 225-2000
Attorneys for Defendant
National Westminster Bank Plc

Of Counsel:

Jonathan I. Blackman
Lawrence B. Friedman
Sanjay S. Mody

**INDEX OF UNREPORTED DECISIONS CITED IN MEMORANDUM
OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO COMPEL
PRODUCTION OF DOCUMENTS AND ANSWERS TO INTERROGATORIES**

ECDC Envtl., L.C. v. N. Y. New York Marine & Gen. Ins. Co.,
96 Civ. 6033 (BSJ) (HBP), 1998 U.S. Dist. LEXIS 8808 (S.D.N.Y June 4, 1998)

Garnier v. Ill. Tool Works, Inc.,
04-CV-1825 (NGG) (KAM), 2006 U.S. Dist. LEXIS 28370 (E.D.N.Y. May 4, 2006)

In re Grand Jury Subpoenas,
No. M 11-189, 2002 U.S. Dist. LEXIS 17079 (S.D.N.Y. Sept. 11, 2002)

Omega Eng'g, Inc. v. Omega, S.A.,
98 Civ. 2464 (AVC), 2001 U.S. Dist. LEXIS 2016 (D. Conn. Feb. 6, 2001)

Sicurelli v. Jeneric/Pentron, Inc.,
03-CV-4934 (SLT) (KAM), 2006 U.S. Dist. LEXIS 29813 (E.D.N.Y. May 16, 2006)

Trudeau v. Alliance Publishing Group, Inc.,
05 Civ. 1019 (GLS) (RFT), 2006 U.S. Dist. LEXIS 61901 (N.D.N.Y. July 21, 2006)

Weber v. Paduano,
02 Civ. 3392 (GEL), 2003 U.S. Dist. LEXIS 858 (S.D.N.Y. Jan. 14, 2003)

LEXSEE

**ECDC ENVIRONMENTAL, L.C., Plaintiff, -against- NEW YORK MARINE AND GENERAL INSURANCE COMPANY, Defendant.**

**96 Civ. 6033 (BSJ) (HBP)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

**1998 U.S. Dist. LEXIS 8808**

**June 4, 1998, Decided**
**June 5, 1998, Filed**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendant insurer challenged plaintiff insured's assertions of the attorney-client privilege, the work-product doctrine, and the common interest privilege in connection with certain documents that the insured withheld during the litigation of the insurer's denial of coverage under a marine insurance policy.

**OVERVIEW:** The insured filed a diversity action that challenged the insurer's denial of coverage under a marine insurance policy after a chartered barge dumped tons dredge material into the ocean. The court held that: (1) information that was kept confidential and was prepared by the attorneys or their agents to provide legal services to the insured was protected under the attorney-client privilege. (2) Pursuant to Fed. R. Civ. P. 26(b)(3) material that was prepared by the counsel or its agents in anticipation of litigation of the spill was protected by the work-product doctrine. (3) Documents that contained test data and technical assistance were not protected. (4) Documents that conveyed factual information to the insured without legal analysis or advice were not within the attorney-client privilege. And (5) documents between the insured and the port authority that contained no client confidence and disclosed no fact or opinion work product were not privileged under the common interest rule.

**OUTCOME:** The court ordered the insured to produce certain documents that did not qualify under the attorney-client privilege, work-product doctrine, or common interest rule.

**CORE TERMS:** attorney-client, consultant, work-product, disclosure, work product, anticipation of litigation, common interest, withheld, legal advice, privileged, confidence, spoil, hired, environmental, grounding, applicability, confidential, contractors, disclose, proponent, advice, in camera, investigative, originated, insurer, work product privilege, claim of privilege, dredging, anticipated, third-party

**LexisNexis(R) Headnotes**

*Civil Procedure > Federal & State Interrelationships > Erie Doctrine*
[HN1] In a diversity action in which state law supplies the rules of decision, state law controls privilege issues. Fed. R. Evid. 501.

*Evidence > Privileges > Attorney-Client Privilege > Scope*
*Legal Ethics > Client Relations > Confidentiality of Information*
[HN2] Although New York has a statute defining the attorney-client privilege, N.Y. C.P.L.R. 4503, the statute is a mere re-enactment of the common-law rule. Thus, New York law governing the attorney-client privilege is generally similar to accepted federal doctrine, albeit with certain variants.

*Evidence > Privileges > Attorney-Client Privilege > Scope*
*Legal Ethics > Client Relations > Confidentiality of Information*
[HN3] The attorney-client privilege protects confidential disclosures by a client to an attorney made in order to obtain legal assistance. To sustain a claim of privilege, the party invoking it must demonstrate that the information at issue is a communication between client and

counsel or his employee, that it is intended to be and is in fact kept confidential, and that it is made in order to assist in obtaining or providing legal advice or services to the client. The privilege is intended to encourage clients to be forthcoming and candid with their attorneys so that the attorney is sufficiently well-informed to provide sound legal advice. The proponent of the privilege bears the burden of establishing those facts that are essential to a privileged relationship.

*Civil Procedure > Discovery > Methods > General Overview*
*Evidence > Privileges > Attorney-Client Privilege > General Overview*
*Legal Ethics > Client Relations > Confidentiality of Information*
[HN4] The proponent of the privilege may satisfy its burden by submitting evidentiary material as to the challenged elements only. A party asserting a claim of privilege is obligated to prepare an index of withheld documents, which must provide sufficient information to assess the applicability of the privilege or protection. Fed. R. Civ. P. 26(b)(5). Thus, a party challenging an assertion of privilege is given the information necessary to state the grounds of its challenge and is not left to guess at the nature of what's being withheld and why. Since the challenger is given this information, there is no logic or efficiency in requiring the proponent of a privilege or the court to address matters which are not contested by the challenger.

*Civil Procedure > Discovery > Privileged Matters > Work Product > Waivers*
*Evidence > Privileges > Attorney-Client Privilege > Waiver*
*Legal Ethics > Client Relations > Confidentiality of Information*
[HN5] The consequence of disclosure to third parties on the work-product doctrine is substantially different from the consequence of such disclosure on the attorney-client privilege. Voluntary disclosure to a party outside the privilege destroys the attorney-client privilege because it destroys the confidentiality of the communication. Disclosure of material protected by the work-product doctrine, however, results in a waiver of the protection afforded by that doctrine only when the disclosure is to an adversary or materially increases the likelihood of disclosure to an adversary.

*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*

[HN6] disclosure to agents of the client of communications that are otherwise privileged does not result in a waiver, and their communications with counsel are within the privilege so long as all the other requirements of the privilege are met.

*Evidence > Privileges > Attorney-Client Privilege > General Overview*
*Legal Ethics > Client Relations > Confidentiality of Information*
[HN7] The attorney-client privilege may cover communications made to certain agents of an attorney hired to assist in the rendition of legal services.

*Evidence > Privileges > Attorney-Client Privilege > Elements*
*Evidence > Privileges > Attorney-Client Privilege > Scope*
*Evidence > Scientific Evidence > General Overview*
[HN8] Underlying factual data can never be protected by the attorney-client privilege and neither can the resulting opinions and recommendations. There are few, if any, conceivable circumstances where a scientist or engineer employed to gather data should be considered an agent within the scope of the privilege since the information collected will generally be factual, obtained from sources other than the client.

*Evidence > Privileges > Attorney-Client Privilege > General Overview*
*Legal Ethics > Client Relations > Confidentiality of Information*
[HN9] An attorney's communication to a client reporting facts learned by the attorney from a third party is not within the attorney-client privilege unless the information is included in legal analysis or advice communicated to the client.

*Evidence > Privileges > Attorney-Client Privilege > General Overview*
*Evidence > Privileges > Government Privileges > General Overview*
*Legal Ethics > Client Relations > Confidentiality of Information*
[HN10] An investigative report is not privileged merely because an investigation was conducted by an attorney. A lawyer's communication is not cloaked with privilege when the lawyer is hired for business or personal advice, or to do the work of a nonlawyer. Yet it is also the case that, while information received from third persons may not itself be privileged, a lawyer's communication to a

client that includes such information in its legal analysis and advice may stand on a different footing. The critical inquiry is whether, viewing the lawyer's communication in its full content and context, it was made in order to render legal advice or services to the client.

*Evidence > Privileges > Attorney-Client Privilege > General Overview*
*Legal Ethics > Client Relations > Confidentiality of Information*
[HN11] Drafts of documents prepared by an attorney for transmission to third parties are protected by the attorney-client privilege only where the draft document contains confidential information communicated by the client to the attorney that is maintained in confidence. A draft is not privileged simply because it is prepared by an attorney.

*Civil Procedure > Discovery > Methods > Requests for Production & Inspection*
*Civil Procedure > Discovery > Privileged Matters > Work Product > Scope*
[HN12] Fed. R. Civ. P. 26(b)(3) provides: A party may obtain discovery of documents and tangible things otherwise discoverable under subdivision (b)(1) of this rule and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative, including the other party's attorney, consultant, surety, indemnitor, insurer, or agent, only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.

*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*
[HN13] The applicability of the work-product doctrine is exclusively governed by federal law.

*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*
*Evidence > Privileges > Attorney-Client Privilege > Scope*
[HN14] In contrast to the attorney-client privilege, which is intended to encourage full disclosure by the client, the work-product doctrine is intended to preserve a zone of

privacy in which a lawyer can prepare and develop legal theories and strategy with an eye toward litigation, free from unnecessary intrusion by his adversaries. Like the attorney-client privilege, the party asserting the protection of the work-product doctrine bears the burden of proof.

*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*
[HN15] Three conditions must be met to earn work product protection. The material must (1) be a document or tangible thing, (2) that was prepared in anticipation of litigation, and (3) was prepared by or for a party, or by or for his representative.

*Civil Procedure > Discovery > Methods > General Overview*
*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*
[HN16] The text of Fed. R. Civ. P. 26(b)(3) does not limit its protection to materials prepared to assist at trial. To the contrary, the text of the rule clearly sweeps more broadly. It expressly states that work-product privilege applies not only to documents prepared for trial but also to those prepared in anticipation of litigation.

*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*
[HN17] The appropriate test for assessing the second element of the work product test is whether in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation.

*Civil Procedure > Discovery > Methods > General Overview*
*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*
[HN18] As to the third element of the work product doctrine, the language of Fed. R. Civ. P. 26(b)(3) itself grants protection to documents and tangible things prepared by or for another party or by or for the other party's representative, including the other party's attorney, consultant, surety, indemnitor, insurer, or agent.

*Civil Procedure > Discovery > Privileged Matters > Work Product > Opinion Work Product*
[HN19] Finally, where the applicability of the work-product doctrine has been established, factual material

may, nevertheless, be ordered produced upon a showing of substantial need and inability to obtain the equivalent without undue hardship. However, where the material in issue discloses the mental impressions, conclusions, opinions or legal theories of an attorney or other representative of the party, a far greater showing is required to pierce the doctrine's protection, and there is some authority that the protection afforded such opinion work product may be absolute.

*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*
[HN20] Whether material is prepared "in anticipation of litigation" turns on whether the preparing party had a unilateral belief that litigation was likely and whether the belief was reasonable.

*Civil Procedure > Discovery > Methods > General Overview*
*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*
[HN21] Beyond applying to documents prepared by attorneys, the work product privilege applies also to documents prepared by a "party" and "representatives" of that party, including consultants, sureties, indemnitors, insurers and agents. Fed. R. Civ. P. 26(b)(3).

*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*
[HN22] Otherwise protected documents do not lose their work product status merely because they contain factual information. If a document constitutes protected work product, the party possessing the document generally need not produce it , even if the document contains only factual information. However, because the work product privilege does not protect the facts in that document, the party seeking those facts may obtain them through other means of discovery, such as through depositions and interrogatories.

*Evidence > Privileges > Attorney-Client Privilege > Waiver*
*Legal Ethics > Client Relations > Confidentiality of Information*
[HN23] The joint defense privilege or common interest rule is not really a separate privilege. Rather, it is a limited exception to the general rule that the attorney-client privilege is waived when a protected communication is disclosed to a third party outside the attorney-client relationship.

*Evidence > Privileges > Attorney-Client Privilege > General Overview*
*Legal Ethics > Client Relations > Confidentiality of Information*
[HN24] Only those communications made in the course of an ongoing common enterprise and intended to further the enterprise are protected by the joint defense privilege. The need to protect the free flow of information from client to attorney logically exists whenever multiple clients share a common interest about a legal matter. It is therefore unnecessary that there be actual litigation in progress for the common interest rule of the attorney-client privilege to apply.

*Evidence > Privileges > Attorney-Client Privilege > General Overview*
*Legal Ethics > Client Relations > Confidentiality of Information*
[HN25] The common interest rule may apply where multiple parties are represented by multiple counsel so long as the parties share a common interest in a legal matter.

*Civil Procedure > Discovery > Privileged Matters > Work Product > Waivers*
[HN26] The concept underling the common interest rule is inherent in the work-product doctrine's waiver rule.

**COUNSEL:** [*1]  For ECDC ENVIRONMENTAL, L.C., plaintiff: Stuart A. Summit, Phillips Nizer Benjamin Krim & Ballon LLP, New York, NY.

For NEW YORK MARINE AND GENERAL INSURANCE COMPANY, defendant: John J. Hession, Dougherty, Ryan, mahoney, Pellegrino, Giuffra & Zambito, New York, NY.

**JUDGES:** HENRY PITMAN, United States Magistrate Judge.

**OPINION BY:** HENRY PITMAN

**OPINION:**

OPINION AND ORDER

PITMAN, United States Magistrate Judge:

I. Introduction

This matter has been referred to me by the Honorable Barbara S. Jones, United States District Judge, for the resolution of discovery disputes. Presently before me is the parties' dispute concerning certain documents

withheld by plaintiff on the grounds of the attorney-client privilege and work-product doctrine.

On April 9, 1998, I held a conference with counsel and advised them that the materials they had previously submitted were insufficient to permit the Court to make a reasoned determination of their disputes. Defendant had not identified the particular documents to which its particular arguments were directed, and plaintiff had not submitted the evidentiary material essential to sustain a claim of privilege See generally United States v. American Soc'y [*2] of Composers, Authors & Publishers, 1996 U.S. Dist. LEXIS 16201, No. Civ. 13-95, 1996 WL 633220 at *2 (S.D.N.Y. Nov. 1, 1996); Payless Shoesource, Inc. v. 174-176 Canal Street, L.P., 1996 U.S. Dist. LEXIS 22089, 95 Civ. 4993 (JFK)(DFE), 1996 WL 185712 (S.D.N.Y. April 17, 1996); Bowne of New York City, Inc. v. AmBase Corp., 150 F.R.D. 465, 475 (S.D.N.Y. 1993); Grossman v. Schwarz, 125 F.R.D. 376, 390 (S.D.N.Y. 1989). Accordingly, I set a schedule at that time for further submissions by both sides which required the matter to be fully submitted by April 22, 1998. Pursuant to that schedule, both plaintiff and defendant have supplemented their submissions.

II. Background Facts

In order to understand the parties' privilege dispute, it is helpful to review the facts giving rise to this litigation

This is a diversity action challenging defendant's denial of coverage under a marine insurance policy issued to plaintiff. The action has its genesis in events occurring in mid 1995. At that time, plaintiff and its joint venturer entered into a contract with the Port Authority of New York and New Jersey ("Port Authority") under which plaintiff was to dredge a section of New York Harbor adjacent to Staten Island's Howland Hook [*3] Terminal and to dispose of the dredged material, known as "spoils" (the "Howland Hook Project"). The spoils were to be transported by barge from New York to Texas. From Texas, the spoils were to be shipped by rail to Utah for final disposal in a landfill.

In order to perform its contract with the Port Authority, plaintiff entered into a charter party with Sheridan Transportation Company ("Sheridan") under which plaintiff chartered the barge "Patricia Sheridan" to transport the spoils. Pursuant to the requirements of the charter party, plaintiff applied for and was issued a marine insurance policy by defendant to provide liability insurance for plaintiff and its affiliated entities in connection with ocean transport of the spoils. As alleged by plaintiff, the policy requires defendant to indemnify plaintiff for all sums, including legal and investigative costs, resulting from any accident to a chartered vessel for which plaintiff is liable, up to a limit of $ 10,000,000 and subject to a $ 20,000 deductible.

In October, 1995, while off the coast of South Carolina, the Patricia Sheridan encountered rough seas and developed a list. As a result of the list and the ocean conditions, the [*4] master of the tug intentionally grounded the barge near Charleston harbor. Shortly thereafter, approximately 3,000 tons of the 12,000 tons of spoils on board the Patricia Sheridan spilled into the ocean.

This spill gave rise to a number of disputes. First, within days of the grounding, the barge's owner, Sheridan, gave written notice to plaintiff that it would hold plaintiff liable for all damages resulting from the grounding and for all work necessary to enable the Patricia Sheridan to complete its voyage. This dispute is currently in arbitration.

Second, On October 23, 1995 -- ten days after the grounding -- the Army Corps of Engineers wrote to the Port Authority, plaintiff and Sheridan, expressing concern about the environmental and navigational consequences of the spill and directing that certain sampling be done (Ex. F to the Affidavit of Mark C. Kelly, sworn to March 13, 1998 ("Kelly Aff.")).

Approximately seven weeks later, on December 18, 1995, the United States Coast Guard formally ordered plaintiff to remove the spilled material from the harbor bottom (Kelly Aff., Ex. I). On January 4, 1996, plaintiff submitted a plan to the Coast Guard for the remediation of the area. [*5] This plan was rejected by the Coast Guard, and pursuant to Section 106 of the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9606, the Coast Guard issued an Order on January 10, 1996, requiring the dredging of approximately four acres of ocean floor. Although dredging was commenced expeditiously, issues concerning the adequacy of post-dredging testing delayed the completion of the project until August, 1996. Plaintiff claims that it disagreed with the Coast Guard's determination that dredging was necessary. Plaintiff nevertheless complied with the order because noncompliance would have subjected plaintiff to treble damages and CERCLA does not permit a Section 106 order to be challenged until after it has been carried out. See generally 42 U.S.C. § 9606(b)(2)(A).

Finally, plaintiff gave defendant notice of the accident on the day the grounding occurred and sought coverage under the marine insurance policy. Defendant, through it's counsel, formally reserved its rights in January 1996 (Ex. A to the Affidavit of Stuart Summit, sworn to April 22, 1998 ("Summit Aff.")). The following month, defendant disclaimed all coverage, claiming [*6] in principal part that plaintiff had made material misrepresentations and omissions in its application for insur-

ance, thereby invalidating the policy (Summit Aff. Ex. B).

III. Analysis

Defendant challenges plaintiff's assertions of the attorney-client privilege on three different grounds and challenges the assertion of the work-product doctrine on two different grounds. Finally, defendant also challenges plaintiff's assertion of the "common interest privilege."

In addition to plaintiff's documents, the present motion also challenges certain documents that have been withheld by Lawler, Matusky & Skelly, plaintiff's consultants (the "Lawler Matusky Documents").

A. Attorney-Client Privilege

1. Choice of Law

Since this is [HN1] a diversity action in which state law supplies the rules of decision, state law controls privilege issues. Rule 501, Fed.R.Evid.; Dixon v. 80 Pine Street Corp., 516 F.2d 1278, 1280 (2d Cir. 1975); Bowne of New York City, Inc. v. AmBase Corp., supra, 150 F.R.D. at 470. Neither party has addressed the question of which state's law should apply. Since at least two of the law firms representing plaintiff -- Kelly & Roth and Phillips Nizer Benjamin [*7] Krim & Ballon LLP -- are located in New York, I shall apply the law of New York State concerning the privilege. See Golden Trade S.r.L. v. Lee Apparel Co., 143 F.R.D. 514, 521 (S.D.N.Y. 1992).

[HN2] Although New York has enacted a statute defining the attorney-client privilege, N.Y. C.P.L.R. § 4503, the New York Court of Appeals has described the statute as a "'mere re-enactment of the common-law rule.'" Spectrum Sys. Int'l Corp. v. Chemical Bank, 78 N.Y.2d 371, 377, 581 N.E.2d 1055, 1060, 575 N.Y.S.2d 809, 814 (1991), quoting Hurlburt v. Hurlburt, 128 N.Y. 420, 424, 28 N.E. 651, 652 (1891). Thus, "New York law governing the attorney-client privilege is generally similar to accepted federal doctrine, albeit with certain variants . . . ." Bowne of New York City, Inc. v. AmBase Corp., supra, 150 F.R.D. at 470. See also Niesig v. Team I, 149 A.D.2d 94, 101, 545 N.Y.S.2d 153, 156-57 (2d Dep't 1989), aff'd, 76 N.Y.2d 363, 558 N.E.2d 1030, 559 N.Y.S.2d 493 (1990).

[HN3] The attorney-client privilege protects "confidential disclosures by a client to an attorney made in order to obtain legal assistance." Fisher v. United States, 425 U.S. 391, 403, 48 L. Ed. 2d 39, 96 S. [*8] Ct. 1569 (1976). "To sustain a claim of privilege, the party invoking it must demonstrate that the information at issue was a communication between client and counsel or his employee, that it was intended to be and was in fact kept confidential, and that it was made in order to assist in

obtaining or providing legal advice or services to the client." Bowne of New York City, Inc. v. AmBase Corp., supra, 150 F.R.D. at 470-71. "The privilege is intended to encourage clients to be forthcoming and candid with their attorneys so that the attorney is sufficiently well-informed to provide sound legal advice." United States v. Adlman, 68 F.3d 1495, 1499 (2d Cir. 1995). The proponent of the privilege bears the burden of establishing those facts that are essential to a privileged relationship. von Bulow by Auersperg v. von Bulow, 811 F.2d 136, 144 (2d Cir. 1987); In re Grand Jury Subpoena Dated Jan. 4, 1984, 750 F.2d 223, 224 (2d Cir. 1984); In re Horowitz, 482 F.2d 72, 82 (2d Cir. 1973).

Although it is clear that the proponent of the privilege ultimately bears the burden of proving all essential facts necessary to sustain a claim of privilege, the law is not entirely clear [*9] as to how this burden may be discharged where, as here, the proponent has served a detailed index of documents withheld, and the challenger has submitted specific challenges. Apart from the specific challenges made in its motion, defendant does not generally challenge the adequacy of plaintiff's index.

Under these circumstances, it appears that [HN4] the proponent of the privilege may satisfy its burden by submitting evidentiary material as to the challenged elements only. Requiring the proponent to submit evidentiary material to prove all elements of the privilege in response to a specific challenge unduly burdens and wastes the time of both the Court and the parties. A party asserting a claim of privilege is obligated to prepare an index of withheld documents, which must provide sufficient information "to assess the applicability of the privilege or protection." Fed.R.Civ.P. 26(b)(5). Thus, a party challenging an assertion of privilege is given the information necessary to state the grounds of its challenge and is not left to guess at the nature of what's being withheld and why. Since the challenger is given this information, there is no logic or efficiency in requiring the proponent [*10] of a privilege or the Court to address matters which are not contested by the challenger. See generally In re Grand Jury Investigation, 974 F.2d 1068, 1071 (9th Cir. 1992); Bowne of New York City, Inc. v. AmBase Corp., supra, 150 F.R.D. at 474; Golden Trade, S.r.L. v. Lee Apparel Co., 1992 U.S. Dist. LEXIS 17739, 90 Civ. 6291 (JMC), 1992 WL 367070 at *5 (S.D.N.Y. Nov. 20, 1992). Accordingly, I limit my analysis here to the specific challenges made by defendant and the specific responses made by plaintiff.

2. Documents From, or Disclosed to, Consultants

Defendant first claims that the attorney-client privilege has been waived with respect to documents that have been disclosed to third-party independent contractors and documents that originated from such independ-

ent contractors. The documents that are challenged on the basis of disclosure to third-party independent contractors are documents G, P, 24, 34, 52, 74, 82, 84, 86, 87, 102, 103, 112, 137, 138, 146, 147, 148 and 153. The documents that are challenged on the ground that they originated from independent contractors are A, E, H, L, S, 1, 4, 6, 9, 10, 11, 12, 15, 18, 19, 20, 21, 22, 26, 35, 39, 41, 44, 47, 48, 49, 51, 58, 59, 64, 65, 66, 70, [*11] 71, 72, 75, 78, 79, 81, 85, 88, 89, 90, 91, 92, 93, 95, 99, 100, 104, 107, 108, 109, 112, 114, 115, 116, 117, 119, 121, 122, 124, 125, 126, 129, 130, 139, 140, 141, 142, 143, 144, 145, 151, 153, 154 and the Lawler Matusky Documents.

As a threshold matter, defendant's list of documents challenged on the ground of disclosure to or origination from third parties appears inaccurate on its face. According to plaintiff's index of withheld documents, the accuracy of which is not challenged by defendant, several of the challenged documents in this category (E, H, 11 and 49) were not disclosed to or did not originate from any of the alleged third parties identified by defendant. Accordingly, it appears that the factual predicate for defendant's argument does not exist with respect to these documents.

In addition, a large number of the challenged documents in this category are being withheld either solely on the basis of the work-product doctrine or on the basis of the work-product doctrine in addition to the attorney-client privilege. n1 [HN5] The consequence of disclosure to third parties on the work-product doctrine is substantially different from the consequence of such disclosure on the attorney-client [*12] privilege. In re Grand Jury, 106 F.R.D. 255, 257 (D.N.H. 1985); Handgards, Inc. v. Johnson & Johnson, 413 F Supp. 926, 929 (N.D. Cal. 1976) Voluntary disclosure to a party outside the privilege destroys the attorney-client privilege because it destroys the confidentiality of the communication. In re Von Bulow, 828 F.2d 94, 102-03 (2d Cir. 1987); In re Horowitz, supra, 482 F.2d at 81. Disclosure of material protected by the work-product doctrine, however, results in a waiver of the protection afforded by that doctrine only when the disclosure is to an adversary or materially increases the likelihood of disclosure to an adversary. In re Steinhardt Partners, L.P., 9 F.3d 230, 234-35 (2d Cir. 1993); In re Crazy Eddie Sec. Litig., 131 F.R.D. 374, 379 (E.D.N.Y. 1990) ("The [work-product] privilege protects information 'against opposing parties, rather than against all others outside a particular confidential relationship.' . . . Counsel may therefore share work product . . . with those having similar interests in fully preparing litigation against a common adversary.")

n1 Documents A, G, 4, 9, 10, 11, 12, 15, 18, 20, 21, 24, 26, 34, 39, 41, 47, 48, 52, 58, 59, 64,

65, 66, 71, 72, 74, 78, 79, 82, 84, 86, 87, 88, 89, 90, 91, 95, 102, 103, 104, 107, 108, 112, 114, 116, 119, 121, 122, 124, 125, 144, 147, and 148 are being withheld as protected by both the attorney-client privilege and work-product doctrine. Documents 19, 22, 44, 75, 85, 92, 93, 99, 100, 115, 126, 129, 130 and all the Lawler Matusky Documents are being withheld solely on the basis of the work-product doctrine.

[*13]

Plaintiff has submitted an affidavit attesting that all communications with and among the independent contractors identified by defendant were confidential and that the contractors were instructed not to disclose these communications to persons unrelated to plaintiff (Kelly Aff. P 5 & Ex. A). Defendant has offered nothing in rebuttal. Thus, it appears that there can be no genuine issue that plaintiff's disclosure of work product did not result in or increase the risk of disclosure to an adversary. Accordingly, regardless of the validity of plaintiff's assertion of the attorney-client privilege, defendant's disclosure argument does not effect plaintiff's assertion of the work-product doctrine.

Nevertheless, because defendant's categories overlap to some extent, I shall reach the merits of defendant's argument as to all documents in this category.

Based on the nature of their duties and their relationship to plaintiff or its attorneys, the third-party contractors in issue here can be logically divided into three groups: (1) Timothy Dunlap and Peter Dunlap, (2) Andrew Eyer of General Engineering Laboratories, Susan Metzger of Lawler, Matusky & Skelly and Dan Woltering of ENVIRON and [*14] (3) Robert Hughes of Hughes Brothers. n2

n2 Defendant also argues that disclosure of documents to another consultant, C.R. Cushing of C.R. Cushing & Co., waived the attorney-client privilege. However, none of the documents challenged by defendant on the basis of disclosure to consultants were disclosed to Cushing. Accordingly, there is no issue concerning disclosure to Cushing.

a. Timothy and Peter Dunlap

Timothy and Peter Dunlap are the principals of a business development and marketing firm named Innovative Technology Associates (Affidavit of Peter Dunlap, sworn to April 22, 1998 ("Dunlap Aff.) P 5). Although the Dunlaps were not actual employees of plaintiff, they did serve as its agents. From the early

1990's through November 1997, Timothy Dunlap was plaintiff's Director of Business Development, had overall responsible for managing plaintiff's response to the Patricia Sheridan spill, was responsible for selecting and hiring attorneys after the spill to represent plaintiff with respect to anticipated [*15] litigation and authorized counsel to hire consultants to assist counsel in providing strategic and tactical advice with respect to anticipated litigation (Dunlap. Aff. PP 1-4; Affidavit of Stephen Noble, sworn to April 21, 1998 ("Noble Aff.") PP 3-4). Peter Dunlap performed similar duties as the Project Manager for the Howland Hook Project, and both Dunlaps were authorized to use and did use plaintiff stationery (Dunlap Aff. PP 7-10; Summit Aff. PP 10-11 & Ex. D). Defendant offers no evidence to contradict these factual assertions.

The foregoing facts demonstrate that the Dunlaps were not only plaintiff's agents with respect to the Howland Hook Project, they were the principal conduit through which plaintiff communicated with counsel. Since they are agents of the client, [HN6] disclosure to them of communications that are otherwise privileged does not result in a waiver, and their communications with counsel are within the privilege so long as all the other requirements of the privilege are met. United States v. International Bhd. of Teamsters, 119 F.3d 210, 214-15 (2d Cir. 1997); In re John Doe Corp., 675 F.2d 482, 488 (2d Cir. 1982); CSC Recovery Corp. v. Daido Steel Co., 1997 U.S. Dist. LEXIS 16346, [*16] 94 Civ. 9214 (LAP)(THK), 1997 WL 661122 at *3 (S.D.N.Y. Oct. 22, 1997); Golden Trade, S.r.L. v. Lee Apparel Co., supra, 143 F.R.D. at 518; People v. Osorio, 75 N.Y 2d 80, 84, 549 N.E.2d 1183, 1185-86, 550 N.Y.S.2d 612, 614-15 (1989); Stroh v. General Motors Corp., 213 A.D.2d 267, 268, 623 N.Y.S.2d 873, 874-75 (1st Dep't 1995).

Unfortunately, defendant has not specified which documents it challenges solely on the ground of disclosure to Timothy or Peter Dunlap. Based on my review of the index of withheld documents, it appears that documents L, P, S, 6, 9, 10, 15, 18, 21, 26, 34, 35, 39, 41, 44, 47, 48, 49, 51, 52, 58, 59, 64, 65, 66, 70, 71, 72, 74, 78, 79, 81, 82, 84, 86, 87, 90, 91, 102, 114, 116, 117, 119, 122, 138, 139, 140, 141, 142, 144, 146, 147, 148, 151, 153 and 154 were challenged on the basis of disclosure to the Dunlaps only. Since I find that the Dunlaps were agents of plaintiff, their knowledge of and participation in attorney-client communications did not waive the attorney-client privilege as to these documents.

b. Eyer, Metzger and Woltering

These three consultants have relationships to plaintiff significantly different from that of the Dunlaps. [*17]

The Kelly Aff. describes their roles as follows:

5. Four consulting firms assisted ECDC with respect to post-accident claims. They are: General Engineering Laboratories ("GEL"), Lawler, Matusky & Skelly ("Lawler Matusky"), ENVIRON and C.R. Cushing & Co. Each were retained by counsel for a specific purpose, and each understood that it was part of the ECDC defense team and that its communications with counsel (and each other) were privileged and confidential.

GEL

6. Only GEL performed post accident testing of sediment in and near Charleston Harbor. GEL also was involved in preparation of removal plans for Coast Guard review and approval. ECDC has produced all test results performed by GEL, as well as all reports, plans and documents submitted to the Coast Guard. Two documents, at entries 22 and 44, are drafts of proposals to the Coast Guard that were sent to ECDC and counsel for its parent [corporation]. The remaining privileged documents identified as being sent to or received from GEL representatives reflect analysis performed by GEL for use by counsel in challenging the Coast Guard's direction, and later seeking reimbursement of the costs associated with the [*18] § 106 Order and administrative hearing that was scheduled.

Lawler Matusky

7. Lawler Matusky was retained by [plaintiff's lawyers, Kelly & Roth] months after the accident to provide analysis of the Charleston sampling data and advice on negotiations with Coast Guard personnel concerning the § 106 Order. Lawler Matusky worked under the direction of [Kelly & Roth] in its post-accident work. . . .

ENVIRON

8. ENVIRON also was retained by [Kelly & Roth] to provide analysis of Charleston data after all dredging was completed. It has particular expertise in areas such as evaluating dioxins and assessing testing procedures in both sedi-

ments and biota, and in fields of risk assessment and natural resource damages. The entries for documents prepared by and sent to ENVIRON personnel -- entries 75, 85, 93, 99, 112, 121, 124 and 125 -- clearly reflect that the consultant performed its work under the direction of [Kelly & Roth].

(Kelly Aff. PP 5-9).

The documents in this category that were disclosed to or originated with Eyer are A, G, 22, 89, 95, 99, 104, 115, 121, 124, 130 and 137; the documents in this category that were disclosed to or originated [*19] with Metzger or Lawler Matusky are A, 88, 99, 100, 103, 112, 115, 121 and 124 and the documents in this category that were disclosed to or originated with Woltering are A, 75, 85, 93, 99, 112, 121, 124 and 125.

Kelly's affidavit makes clear that Eyer, Metzger and Woltering were consultants to plaintiff's counsel, retained to assist counsel in understanding and responding to the grounding of the barge and its aftermath. They were retained for their expertise concerning the effectiveness of the clean-up. It does not appear that they were retained to explain or analyze any pre-existing confidential information in plaintiff's possession or control.

The seminal case in this Circuit concerning the applicability of the attorney-client privilege to communications disclosed to an attorney's consultant is United States v. Kovel, 296 F.2d 918 (2d Cir. 1961). In Kovel, the subject of a grand jury investigating federal income tax violations (Hopps) had consulted with an attorney. Kovel, a former IRS agent with accounting skills, was employed by Hopps' attorney and apparently had some communications with Hopps regarding the tax consequences of certain transactions. Kovel refused to testify [*20] before the grand jury concerning these conversations and was held in contempt.

The Court of Appeals, by Judge Friendly, reversed the finding of contempt finding that disclosure to Kovel did not necessarily waive the attorney-client privilege.

[The] analogy of the client speaking a foreign language is by no means irrelevant to the appeal at hand. Accounting concepts are a foreign language to some lawyers in almost all cases, and to all lawyers in some cases. Hence, the presence of an accountant . . . While the client is relating a complicated tax story to the lawyer, ought not destroy the privilege, any more than

would that of [a] linguist [in a case where the lawyer and the client did not speak the same language]; the presence of the accountant is necessary, or at least highly useful, for the effective consultation between the client and the lawyer which the privilege is designed to permit. . . . What is vital to the privilege is that the communication be made in confidence for the purpose of obtaining legal advice from the lawyer.

296 F.2d at 922 (emphasis in original). See also United States v. Schwimmer, 892 F.2d 237, 243 (2d Cir. 1989) [HN7] (the attorney-client [*21] privilege may cover "communications made to certain agents of an attorney . . . hired to assist in the rendition of legal services."); von Bulow by Auersperg v. von Bulow, supra, 811 F.2d at 146-47 (no privilege where putative agent unable to demonstrate what communications were made to her in confidence, in her capacity as an agent of attorney, for the purpose of obtaining legal advice).

United States Postal Serv. v. Phelps Dodge Ref. Corp., 852 F. Supp. 156 (E.D.N.Y. 1994), involved facts very similar to those at issue here. In that case, the purchaser of real property sued the vendor alleging breach of certain warranties concerning the removal of toxic waste from the property. The purchaser sought production of communications with third-party consultants hired by the vendor to conduct environmental studies of the soil and to oversee remedial work, and defendant objected, claiming attorney-client privilege.

The Court rejected the assertion of privilege, finding that the consultants had been retained primarily to provide technical services and not to interpret confidential client information. After noting that the consultants did not fall within any category previously held [*22] to be a Kovel agent, the Court explained:

[The consultants] were hired by defendants to formulate a remediation plan acceptable to the [New York State Department of Environmental Control] and to oversee remedial work at the Property. Their function was not to put information gained from defendants into usable form for their attorneys to render legal advice, but rather, to collect information not obtainable directly from defendants. . . .

* * *

Defendants have made a claim of attorney-client privilege that goes well beyond the "outer boundary" of the privilege. Unlike the computer study at issue in [Federal Trade Comm'n v. TRW, Inc., 202 U.S. App. D.C. 207, 628 F.2d 207 (D.C. Cir. 1980)] which arguably was undertaken to assist the attorneys in litigation, the studies and work performed by Hart and Conestoga-Rovers clearly served other purposes. Moreover, these consultants based their opinions on factual and scientific evidence they generated through studies and collected through observation of the physical condition of the Property, information that did not come through client confidences. Such [HN8] underlying factual data can never be protected by the attorney-client [*23] privilege and neither can the resulting opinions and recommendations. There are few, if any, conceivable circumstances where a scientist or engineer employed to gather data should be considered an agent within the scope of the privilege since the information collected will generally be factual, obtained from sources other than the client.

852 F. Supp. at 161-62. See also Occidental Chem. Corp. v. OHM Remediation Serv. Corp., 175 F.R.D. 431, 436-37 (W.D.N.Y. 1997) (following Phelps Dodge re communications with environmental consultant); In re Grand Jury Matter, 147 F.R.D. 82, 85-86 (E.D. Pa. 1992) (rejecting claim of attorney-client privilege concerning communications with environmental consultant hired to assist client in achieving regulatory compliance).

In this case, Eyer, Metzger, Woltering and their respective firms, were hired to perform services identical to those performed by the consultants in Phelps Dodge, namely analysis of test data and technical assistance concerning the clean-up. This conclusion is confirmed by my in camera review of the documents themselves. None of the withheld documents contain technical information from plaintiff transmitted [*24] to a consultant to "translate" for the benefit of plaintiff's attorneys. To the contrary, most of the documents appear to relate to test data that was either not confidential or did not originate with plaintiff.

Thus, I find that Eyer, Metzger, Woltering and their respective firms are not consultants within the attorney-client privilege, and that disclosure to them of documents A, G, 22, 75, 85, 88, 89, 93, 95, 99, 100, 103, 104, 112, 115, 121, 124, 125, 130, 137 waived the attorney-client privilege to the extent it was applicable.

c. Hughes

Hughes' was plaintiff's marine broker. According to plaintiff's counsel, Mark Kelly:

> Mr. Hughes has been a client of my firm since 1987. I represent both ECDC and Hughes Brothers with respect to the Howland Hook dredging project. The three documents in the logs [disclosed to Hughes] reflect confidential communications with me (or my partner, Bill Roth) as counsel for both ECDC and Mr. Hughes and are therefore, I believe, subject to the attorney-client privilege. In addition, as noted above, ECDC personnel did not have maritime experience, and retained Mr. Hughes for his expertise. All discussions with Mr. Hughes following the grounding [*25] of the Patricia Sheridan were strictly in defense of claims by Sheridan, and were had with him solely in his capacity as agent for ECDC.

(Kelly Aff. at 14-15 (unnumbered paragraph). Defendant has offered no evidence to the contrary.

Defendant challenges only two documents on the basis of their disclosure to Hughes: 12 and 143.

Since Hughes was plaintiff's agent, his role is indistinguishable from the Dunlap's. Accordingly, disclosure of communications to him did not waive the attorney-client privilege.

2. Documents from Counsel Communicating "Mere Facts"

Defendant next challenges a number of documents on the ground that they communicate "mere facts" from counsel, not involving counsel's opinions or legal advice. Defendant claims that such communications are not privileged. The documents in this category are 0, 25, 35, 45, 56, 82, 153 and 154. n3

> n3 Although defendant also includes Document M in this category, Document M is a draft of a letter to a third party and is more appropriately considered in the category of draft documents prepared by counsel. See pages 26-28, below.

[*26] [HN9]

An attorney's communication to a client reporting facts learned by the attorney from a third party is not within the attorney-client privilege unless the information is included in legal analysis or advice communicated to the client. As the New York Court of Appeals explained in Spectrum Sys. Int'l Corp. v. Chemical Bank, supra, 78 N.Y.2d at 379, 581 N.E.2d at 1061, 575 N.Y.S.2d at 815:

> Nor is [HN10] [an investigative] report privileged merely because an investigation was conducted by an attorney; a lawyer's communication is not cloaked with privilege when the lawyer is hired for business or personal advice, or to do the work of a nonlawyer ( People v Belge, 59 A.D.2d 307, 308-09, 399 N.Y.S.2d 539). Yet it is also the case that, while information received from third persons may not itself be privileged (see, Kenford Co. v. County of Erie, 55 A.D.2d 466, 390 N.Y.S.2d 715), a lawyer's communication to a client that includes such information in its legal analysis and advice may stand on a different footing. The critical inquiry is whether, viewing the lawyer's communication in its full content and context, it was made in order to render legal advice or services to the client.

[*27]

See Kenford Co. v. County of Erie, 55 A.D.2d 466, 469, 390 N.Y.S.2d 715, 718 (4th Dep't 1977) (Cardamone, J.) ("It has long been settled that information received by the attorney from other persons and sources while acting on behalf of a client do not come within the attorney-client privilege."); see also Carte Blanche (Singapore) Pte., Ltd. v. Diners Club Int'l, Inc., 130 F.R.D. 28, 33 (S.D.N.Y. 1990) ("The [attorney-client] privilege gives way when the attorney merely communicates information obtained from independent sources."); Standard Chartered Bank v. Ayala Int'l Holdings Inc., 111 F.R.D. 76, 80 (S.D.N.Y. 1986) ("The [attorney-client] privilege does not protect facts which an attorney obtains from independent sources and then conveys to his client."); Barber v. Town of Northumberland, 88 A.D.2d 712, 713, 451 N.Y.S.2d 291, 293 (3rd Dep't 1982) ("If the subject sought to be disclosed is information obtained by an attorney and conveyed to a client or witness by the attorney, it will not be protected as privileged.")

I have reviewed in camera the documents challenged by defendant in this category. I find that documents O, 45, 56 (duplicate of document [*28] O), 82, 153 and 154 are not within the attorney-client privilege. These documents merely convey factual information to plaintiff without any legal analysis or legal advice. The documents convey unprotected information concerning the status of clean-up efforts, billing by third-party vendors and other similar information. Documents 25 and 35, on the other hand, are protected by the attorney-client privilege because they evidence counsel's advice and analysis.

Accordingly, documents O, 45, 56 (duplicate of document O), 82, 153 and 154 are not protected communications within the attorney-client privilege; documents 25 and 35 are within the privilege.

3. Draft Documents

Defendant next contends that drafts of documents that do not contain confidential information supplied by the client are not within the attorney-client privilege. Defendant challenges documents M, 53, 103 and 114 on this ground. All these documents have been withheld on the grounds of both the attorney-client privilege and work-product doctrine.

[HN11] Drafts of documents prepared by an attorney for transmission to third parties are protected by the attorney-client privilege only where the draft document contains confidential [*29] information communicated by the client to the attorney that is maintained in confidence. In re Grand Jury Subpoena, 731 F.2d 1032, 1037 (2d Cir. 1984); Asset Value Fund Ltd. Partnership v. Care Group, Inc., 1997 U.S. Dist. LEXIS 17968, 97 Civ. 1487 (DLC)(JCF), 1997 WL 706320 at *6 (S.D.N.Y. Nov. 12, 1997); In re Kidder Peabody Sec. Litig., 168 F.R.D. 459, 474 (S.D.N.Y. 1996); Sequa Corp. v. Gelmin, 1994 U.S. Dist. LEXIS 14005, 91 Civ. 8675 (CSH), 1994 WL 538124 at *3 (S.D.N.Y. Oct. 3, 1994); United States Postal Serv. v. Phelps Dodge Ref. Corp., supra, 852 F. Supp. at 162-63; Bowne of New York City, Inc. v. AmBase Corp., supra, 150 F.R.D. at 490. A draft is not privileged simply because it is prepared by an attorney. Bowne of New York City, Inc. v. AmBase Corp., supra, 150 F.R.D. at 490.

I have reviewed the four documents in issue in camera. No client confidences are apparent from the documents themselves, and plaintiff has submitted no evidentiary material suggesting the presence of confidential client information that was ultimately maintained in confidence. Since plaintiff bears the burden of proving these elements, its claim of attorney-client privilege must fail.

Accordingly, I find that Documents M, [*30] 53, 103 and 114 are not within the attorney-client privilege.

B. The Work-Product Doctrine

1. Applicable Standards

The scope of the work-product doctrine is set forth in [HN12] Fed.R.Civ.P. 26(b)(3):

> [A] party may obtain discovery of documents and tangible things otherwise discoverable under subdivision (b)(1) of this rule and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.

[HN13] The applicability of the work-product doctrine is exclusively governed by federal law. Bowne of New York City, Inc. [*31]   v. AmBase Corp., supra, 150 F.R.D. at 471.

[HN14] In contrast to the attorney-client privilege, which is intended to encourage full disclosure by the client, the work-product doctrine "is intended to preserve a zone of privacy in which a lawyer can prepare and develop legal theories and strategy 'with an eye toward litigation,' free from unnecessary intrusion by his adversaries." United States v. Adlman, 134 F.3d 1194, 1196 (2d Cir. 1998). Like the attorney-client privilege, the party asserting the protection of the work-product doctrine bears the burden of proof. In re Grand Jury Subpoena Dated December 19, 1978, 599 F.2d 504, 510 (2d Cir. 1979).

[HN15] "Three conditions must be met to earn work product protection. The material must (1) be a document or tangible thing, (2) that was prepared in anticipation of litigation, and (3) was prepared by or for a party, or by or for his representative." In Re Grand Jury Subpoenas Dated December 18, 1981 & January 4, 1982, 561 F. Supp. 1247, 1257 (E.D.N.Y. 1982) (McLaughlin, J.). Accord Weinhold v. Witte Heavy Lift, Inc., 1994 U.S. Dist. LEXIS 4559, 90 Civ. 2096 (PKL), 1994 WL

132392 at *2 (S.D.N.Y. April 11, 1994); 1 M.Silberberg, Civil Practice in the Southern  [*32]    District of New York, § 15.04 at 15-11 (1995).

The Court of Appeals for the Second Circuit has recently explained that the second element of this test does not limit the doctrine to documents prepared primarily or exclusively to assist in litigation:

> [HN16] The text of Rule 26(b)(3) does not limit its protection to materials prepared to assist at trial. To the contrary, the text of the Rule clearly sweeps more broadly. It expressly states that work-product privilege applies not only to documents "prepared . . . for trial" but also to those prepared "in anticipation of litigation." If the drafters of the Rule intended to limit its protection to documents made to assist in preparation for litigation, this would have been adequately conveyed by the phrase "prepared . . . for trial." The fact that documents prepared "in anticipation of litigation" were also included confirms that the drafters considered this to be a different, and broader category. Nothing in the Rule states or suggests that documents prepared "in anticipation of litigation" with the purpose of assisting in the making of a business decision do not fall within its scope.

United States v. Adlman, supra, 134 [*33]  F.3d at 1198-99. Thus, [HN17] the appropriate test for assessing the second element of the test is whether "'in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation.'" United States v. Adlman, supra, 134 F.3d at 1202, quoting 8 C.Wright, A. Miller & R. Marcus, Federal Practice & Procedure § 2024 at 343 (1994).

[HN18] As to the third element, the language of Rule 26(b)(3) itself grants protection to documents and tangible things prepared "by or for another party or by or for the other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)." As the Supreme Court noted in United States v. Nobles, 422 U.S. 225, 238-39, 45 L. Ed. 2d 141, 95 S. Ct. 2160 (1975):

> The [work-product] doctrine is an intensely practical one, grounded in the realities of litigation in our adversary sys-

tem. One of those realities is that attor-
neys often must rely on the assistance of
investigators and other agents in the com-
pilation of materials in preparation for
trial. It is therefore necessary that the doc-
trine [*34] protect material prepared by
agents for the attorney as well as those
prepared by the attorney himself.

[HN19] Finally, where the applicability of the
work-product doctrine has been established, factual ma-
terial may, nevertheless, be ordered produced "upon a
showing of substantial need and inability to obtain the
equivalent without undue hardship." Upjohn Co. v.
United States, 449 U.S. 383, 400, 66 L. Ed. 2d 584, 101
S. Ct. 677 (1981). However, where the material in issue
discloses the mental impressions, conclusions, opinions
or legal theories of an attorney or other representative of
the party, a far greater showing is required to pierce the
doctrine's protection, and there is some authority that the
protection afforded such opinion work product may be
absolute. See generally Upjohn Co. v. United States,
supra, 449 U.S. at 400-02; Hickman v. Taylor, 329 U.S.
495, 510-13, 91 L. Ed. 451, 67 S. Ct. 385 (1947); United
States v. Adlman, supra, 134 F.3d at 1204.

2. Documents Purportedly Not Prepared In Anticipa-
tion of Litigation

Plaintiff first challenges the assertion of the work-
product doctrine with respect to documents C, D, G, H, I,
J, M, N, O, T, U, V, W, X, 4, [*35] 9, 10, 11, 12, 13,
14, 16, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 32, 34,
36, 37, 44, 45, 46, 47, 48, 49, 50, 52, 53, 56, 58, 59, 61,
62, 64, 65, 66, 67, 68, 71, 72, 74, 75, 78, 79, 80, 82, 84,
85, 86, 87, 88, 89, 90, 91, 92, 93, 94, 95, 99, 100, 102,
103, 104, 106, 107, 108, 110, 112, 114, 116, 119, 121,
122, 123, 124, 125, 126, 129, 130, 147, 149, 157, 158,
159 and the Lawler Matusky Documents.

The documents in issue are all dated after the Octo-
ber 1995 grounding of the Patricia Sheridan and were
circulated among plaintiff's counsel, the consultants and
plaintiff. Each particular document is summarized in
plaintiff's privilege log. For the most part, the documents
are communications concerning the status of clean-up
efforts, responses to inquiries from the Coast Guard and
lawyers' analyses of particular factual and/or legal issues.
Plaintiff has not attempted to justify the assertion of the
work-product doctrine with respect to each individual
document. The principal factual assertions supporting
plaintiff's claims of work product are set forth in the
Kelly and Muller Affidavits which generally allege that
retention of the consultants was necessary for counsel to
provide legal [*36] advice to plaintiff, that the consult-
ants' work assisted counsel "in connection with an 'inves-
tigative endeavor' in anticipation of litigation" and that

counsel regarded their communications with counsel as
protected by the work-product doctrine (Muller Aff. PP
4-7; Kelly Aff. PP 5-26). Based on my in camera review
of the documents, plaintiff's characterization of them is
generally accurate.

Similar assertions of work product have been upheld
by several courts. For example, in Bituminous Cas. Corp.
v. Tonka Corp., 140 F.R.D. 381 (D. Minn. 1992), an
insurance company sought a declaratory judgment that
certain pollution clean-up costs were not covered claims.
Prior to the insurer's litigation, the Minnesota Pollution
Control Agency ("MPCA") contacted Tonka concerning
the site in issue, and Tonka's counsel retained an envi-
ronmental consultant to respond to the MPCA's inquiries.
Tonka was able to resolve the issue with the MPCA
without litigation.

Tonka, in response to the insurance company's re-
quest for production, objected and asserted the work-
product doctrine with respect to tis communications with
the environmental consultant. The Court upheld this ob-
jection, stating: [*37]

> In February, 1985, Tonka's counsel
> retained Barr Engineering and apparently
> hired other consultants to conduct investi-
> gations and prepare reports responsive to
> MPCA directives. This court finds that the
> consultants' preliminary drafts of docu-
> ments which were ultimately submitted to
> the MPCA and the underlying data for
> those documents are the fruits of counsel's
> investigative endeavors. It follows that
> communications among Tonka, its coun-
> sel and consultants necessary to facilitate
> the investigative and remedial process fall
> under the scope of counsel's investigative
> endeavor. The key issue with respect to
> the applicability of the work product doc-
> trine is whether counsel's investigation
> and Tonka's subsequent remedial meas-
> ures were conducted in the course of
> Tonka's ordinary business or in anticipa-
> tion of litigation.

> The court finds that the documents
> the insurers seek, which were generated
> after the MPCA's February 5, 1985, re-
> quest to Tonka's lawyer, were generated
> in anticipation of litigation with the
> MPCA. The documents were not gener-
> ated in the ordinary course of Tonka's
> business as is argued by the insurers. . . .

* * *

Page 13

Any action that a company takes in response to [*38] the MPCA's requests before and after designation of responsible party status are . . . made under the strong prospect of future litigation over issues such as the propriety of the designation of responsible party status, the scope of the clean up and the adequacy of the clean up. The fact that Tonka was able to avoid actual litigation with the MPCA in this case does not mean that the efforts undertaken by Tonka's counsel and its consultants were not done in anticipation of litigation.

140 F.R.D. at 389-90.

Similarly, in Atlantic Richfield Co. v. Current Controls, Inc., 1997 U.S. Dist. LEXIS 13082, 93-CV-0950E(H), 1997 WL 538876 (W.D.N.Y. Aug. 21, 1997), the Court upheld a work-product objection to a request for communications with an environmental consultant retained after EPA and the New York State Department of Environmental Protection had commenced an investigation. The Court found that Atlantic Richfield ("ARCO") had sustained its claim of work product because

[ARCO's] affidavits establish that when the subject documents were prepared, ARCO held a subjective belief that litigation over contamination at the site might ensue. In light of the surrounding circumstances -- including the EPA's [*39] activities and the nature of environmental law, which often leads to litigation involving numerous parties with past or present associations with contaminated property -- that belief was objectively reasonable. See Maertin v. Armstrong World Industries, Inc., 172 F.R.D. 143, 149 (D.N.J. 1997) (finding that the party asserting the work product privilege had demonstrated (1) that the documents at issue were prepared with a subjective belief that litigation might ensue and (2) that that subjective belief was objectively reasonable).

1997 WL 538876 at *2. See also Rexford v. Olczak, 176 F.R.D. 90, 91 (W.D.N.Y. 1997) [HN20] ("'Whether material is prepared "in anticipation of litigation" turns on whether the preparing party had a unilateral belief that litigation was likely and whether the belief was reason-

able.'"), quoting Chiquita Int'l Ltd. v. M/V Bolero Reefer, 1994 U.S. Dist. LEXIS 7455, 93 Civ. 0167 (LAP)(JCF), 1994 WL 263603 at *2 (S.D.N.Y. June 7, 1994).

Other cases reaching similar results with respect to the work of environmental consultants include Martin v. Bally's Park Place Hotel & Casino, 983 F.2d 1252 (3rd Cir. 1993); In re Pfohl Bros. Landfill Litig., 175 F.R.D. 13 (W.D.N.Y. 1997) [*40] and Chemcentral/Grand Rapids Corp. v. EPA, 1992 U.S. Dist. LEXIS 15149, 91 C 4380, 1992 WL 281322 at *4 (N.D. Ill. Oct. 6, 1992). n4

n4 Although Occidental Chemical Corp. v. OHM Remediation Serv. Corp., 175 F.R.D. 431 (W.D.N.Y. 1997) reached an opposite result, the Court in that case based its holding on the theory that a document must be prepared exclusively for litigation in order to constitute work product. 175 F.R.D. at 435. United States v. Adlman, supra, 134 F.3d 1194, expressly rejected this requirement.

In light of the foregoing authorities, plaintiff's assertions of the work-product doctrine are, for the most part, justified. The documents in issue were all prepared after the Patricia Sheridan had run aground and after she had accidentally discharged approximately 3,000 tons of spoils dredged from the bottom of New York harbor. Given the magnitude of the spill and the fact that the spoils originated from a major urban harbor that has been actively used by all types of vessels for more than three hundred years, litigation [*41] would be a certainty unless clean up efforts were properly managed. See generally 42 U.S.C. § 9607(a). Since the documents, for the most part, relate to the issues that would be at the core of the anticipated litigation, I find that they were prepared because of the anticipated litigation.

A few documents do not, however, meet this standard. Documents W and X are correspondence between the Port Authority and counsel for plaintiff in which the former requests copies of certain documents and the latter transmits same. No legal analysis is included in these letters nor do they disclose, even indirectly, plaintiff's strategy, tactics or research concerning anticipated litigation.

Similarly, four Lawler Matusky documents are not protected by the work-product doctrine. Document 3-31 is merely a cover letter transmitting a Lawler Matusky invoice; it discloses nothing about the substance of Lawler Matusky's work. Document 3-37 is a fax transmittal page which briefly summarizes the content of an attached letter. Since the attached letter has already been

produced, the minimalist summary contained in document 3-37 discloses no new information; it cannot be fairly characterized as prepared [*42] in anticipation of litigation. n5 Document 3-45 is merely the fax transmittal page and final draft of an affidavit executed by a Lawler Matusky principal. The affidavit is executed and has been served and filed in this action. Again, the transmittal page contains no comment concerning the affidavit or the action and cannot be characterized as prepared in anticipation of or as a result of the litigation. And document 3-46 merely transmits, without comment, a copy of an exhibit to the affidavit contained in Document 3-45.

> n5 Document 3-37 has some illegible handwriting. Since the handwriting is illegible, there is no basis for finding that it discloses work product.

Accordingly, all documents challenged in this category, with the exception of documents W and X and Lawler Matusky Documents 3-31, 3-37, 3-45 and 3-46, are entitled to the protection of the work-product doctrine.

3. Documents That Allegedly Do Not Reflect the Thought Processes and Mental Impressions of ECDC's Attorneys

Defendant next challenges [*43] plaintiff's assertion of work-product with respect to a group of documents on the ground that the documents do not reflect the thought processes, impressions and opinions of plaintiff's counsel. The documents in this category are 17, 75, 85, 93, 99, 100, 115, 124, 126, 129, 130, 150, 157, 158 and 159.

As noted above, the work-product doctrine is not limited to documents prepared by an attorney or documents that reflect an attorney's mental processes:

> It is of no consequence that most of the subject documents were prepared by non-attorneys. [HN21] Beyond applying to documents prepared by attorneys, the work product privilege applies also to documents prepared by a "party" and "representatives" of that party, including consultants, sureties, indemnitors, insurers and agents. See Fed.R.Civ.P. 26(b)(3); see also Martin v. Bally's Park Place Hotel & Casino, 983 F.2d 1252, 1260-62 (3d Cir. 1993) (applying the work product privilege to documents prepared by an environmental consultant); Bituminous Cas.

Corp. v. Tonka Corp., 140 F.R.D. 381, 387-389 (D. Minn. 1992) (same); Westhemeco Ltd. v. New Hampshire Ins. Co., 82 F.R.D. 702, 708 (S.D.N.Y. 1979) (applying the privilege [*44] to documents prepared by the defendant's investigator and noting that it was irrelevant whether the investigator was hired by the defendant or by the defendant's attorney).

It is equally inconsequential that the information contained in the subject documents -- e.g., test results and cost figures -- is primarily factual. It is true, as the moving defendants point out, that the work product privilege does not protect facts. See Bowne [150 F.R.D. at 471] (the privilege "does not protect from disclosure the underlying facts known to the party or his counsel, even if acquired in anticipation of litigation"). That does not mean, however, that [HN22] otherwise protected documents lose their work product status merely because they contain factual information. If a document constitutes protected work product, the party possessing the document generally need not produce it -- even if the document contains only factual information. However, because the work product privilege does not protect the facts in that document (the privilege protects documents, not facts), the party seeking those facts may obtain them through other means of discovery, such as through depositions and interrogatories. [*45] See [Martin v. Bally's Park Place Hotel & Casino, 983 F.2d 1252, 1262 (3d Cir. 1993); Maertin v. Armstrong World Indus., Inc., 172 F.R.D. 143, 150-51 (D.N.J. 1997); Arkwright Mutual Ins. Co. v. National Union Fire Ins. Co. of Pittsburgh, Pa., 1994 U.S. Dist. LEXIS 13216, 90 Civ. 7811 (AGS), 1994 WL 510043 at *8 (S.D.N.Y. Sept. 16, 1994)]. Thus, while this decision precludes the moving defendants from obtaining the subject documents, it does not preclude them from seeking the information contained in those documents by, for example, serving interrogatories on ARCO and/or by deposing the consultants.

Atlantic Richfield Co. v. Current Controls, Inc., supra, 1997 WL at *3.

Accordingly, defendant has not articulated a valid ground to challenge the documents listed in this category.

C. Joint-Defense Privilege

Lastly, defendant challenges plaintiff's assertion of the joint-defense privilege with respect to documents N, U, V, W, X, Y, 114, 139, 140 146, 150 and 154. Except for documents V, 114, 139, 140 and 145, these documents are all communications between plaintiff's counsel and the Port Authority's counsel concerning efforts to remove the spoil from Charleston Harbor, defendant's decision [*46] to refuse coverage and efforts to seek reimbursement from the Environmental Protection Administration pursuant to 42 U.S.C. § 9606. Defendant claims that the documents are not privileged because the Port Authority and plaintiff did not share a common attorney and did not share a common interest. According to defendant, the Port Authority and plaintiff were potential adversaries with respect to the consequences of the grounding of the Patricia Sheridan, and that fact alone defeats any claim of privilege.

[HN23] The joint defense privilege or common interest rule is not really a separate privilege. Rather, it is a limited exception to the general rule that the attorney-client privilege is waived when a protected communication is disclosed to a third party outside the attorney-client relationship. See United States v. United Tech. Corp., 979 F. Supp. 108, 111 (D. Conn. 1997). As explained in United States v. Schwimmer, supra, 892 F.2d at 243-44:

The joint defense privilege, more properly identified as the "common interest rule," . . . has been described as "an extension of the attorney client privilege," Waller v. Financial Corp. of Am., 828 F.2d 579, 583 n.7 (9th Cir. 1987). [*47] It serves to protect the confidentiality of communications passing from one party to the attorney for another party where a joint defense effort or strategy has been decided upon and undertaken by the parties and their respective counsel. See United States v. Bay State Ambulance and Hosp. Rental Serv., 874 F.2d 20, 28 (1st Cir. 1989). [HN24] Only those communications made in the course of an ongoing common enterprise and intended to further the enterprise are protected. Eisenberg v. Gagnon, 766 F.2d 770, 787 (3rd Cir.), cert. denied, 474 U.S. 946, 106 S Ct. 342, 88 L. Ed. 2d 290, 106 S. Ct.

343 (1985); Matter of Bevill, Bresler & Schulman Asset Management Corp., 805 F.2d 120 (3d Cir. 1986). The need to protect the free flow of information from client to attorney logically exists whenever multiple clients share a common interest about a legal matter," Capra, 20 Trial Lawyers Quarterly at 21 (citation omitted), and it is therefore unnecessary that there be actual litigation in progress for the common interest rule of the attorney-client privilege to apply, United States v Zolin, 809 F.2d 1411, 1417 (9th Cir. 1987), vacated in part on other grounds, 842 F.2d 1135 (9th [*48] Cir. 1988) (en banc), aff'd in part and vacated in part on other grounds, 491 U.S. 554, 109 S. Ct. 2619, 105 L. Ed. 2d 469 (1989) . . . .

[HN25] The common interest rule may apply where multiple parties are represented by multiple counsel so long as the parties share a common interest in a legal matter. Walsh v. Northrop Grumman Corp., 165 F.R.D. 16, 18 (E.D.N.Y. 1996); Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A., 160 F.R.D. 437, 447 (S.D.N.Y. 1995).

Since the joint defense rule operates to prevent a waiver of the attorney-client privilege, its applicability or inapplicability does not affect the applicability of the work product doctrine. n6 Since plaintiff claims that the work-product doctrine protects document N, U, V, X, 114 and 150, defendant has again failed to articulate a colorable basis to compel the disclosure of these documents. I have reviewed these documents in camera and find that, documents N, U, V, 114 and 150 appear on their face to have been prepared in anticipation of litigation. Document X is a letter from plaintiff's counsel to the Port Authority's counsel transmitting copies of certain documents requested by the latter. It contains [*49] no client confidences and discloses no fact or opinion work product. Accordingly, document X is not privileged and should be produced.

n6 As noted at pages 11-12, above, disclosure to a third party waives the work-product doctrine only where the disclosure results in, or increases the likelihood of, disclosure to an adversary. Thus, [HN26] the concept underling the common interest rule is inherent in the work-product doctrine's waiver rule.

As to the remaining documents in this category, document W is a request from the Port Authority's counsel to plaintiff's counsel requesting copies of certain documents. It is the document to which document X responds, and like document X it contains no client confidences or fact or opinion work product. Thus, document W should be produced.

Document Y is a letter from the Port Authority's counsel to plaintiff's counsel addressing the willingness of the Port Authority to participate in proposed litigation. It is claimed to be protected solely under the "Joint Defense/Common Interest" [*50] privileges. However, as noted above, there really is no such privilege. Even if I construe plaintiff's assertion of privilege as an assertion of the attorney-client privilege and the common interest rule, the assertion is unavailing. The purpose of the common interest rule is to permit a client to share confidential information with the attorney for another who shares a common legal interest. Upon my in camera review, I conclude that document Y is a communication from counsel to counsel that contains no identifiable client confidences provided for the purpose of obtaining legal advice. Accordingly, document Y should be produced.

Documents 139 is a letter from a non-attorney agent of plaintiff to an employee of the Port Authority. Since it is not a communication with counsel for another party sharing a joint legal interest, it is not within the common interest rule. Walsh v. Northrop Grumman Corp., supra, 165 F.R.D. at 18-19. Thus, document 139 should be produced. Document 140 should also be produced as it is a duplicate of document 139.

Document 146 is a letter from plaintiff's counsel to the Port Authority's counsel that contains no client confidences and cannot, therefore, [*51] be characterized as protect by the attorney-client privilege. Since document 146 is not protected by the attorney-client privilege, the common-interest rule has no application. Document 146 should be produced.

Finally, document 154 is a mere transmittal letter containing no legal advice or client confidence. It should be produced. Willemijn Houdstermaatschaapij BV v. Apollo Computer Inc., 707 F. Supp. 1429, 1443 (D. Del. 1989).

IV. Conclusion

Defendant has successfully challenged all the grounds on which documents W, X, Y, 139, 137, 140, 146, 153, 154, 3-31, 3-37, 3-45 and 3-46 have been withheld. Accordingly, plaintiff is ordered to produce these documents within ten (10) business days of the date of this Opinion and Order. All other documents are exempt from discovery pursuant to the attorney-client privilege and/or the work-product doctrine.

Dated: New York, New York

    June 4, 1998

    SO ORDERED

    HENRY PITMAN

    United States Magistrate Judge

LEXSEE

**JAY A. GARNIER, Plaintiff, -against- ILLINOIS TOOL WORKS, INC., et al., Defendants.**

**04-CV-1825 (NGG)(KAM)**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK**

**2006 U.S. Dist. LEXIS 28370**

**May 4, 2006, Decided**

**PRIOR HISTORY:** Garnier v. Ill. Tool Works, Inc., 2006 U.S. Dist. LEXIS 22361 (E.D.N.Y., Apr. 24, 2006)

**CORE TERMS:** certification, discovery, deposition, undue hardship, work product, work product doctrine, legal theories, work-product, impressions, anticipation of litigation, information contained, in camera, commencement, undersigned, disclosure, expensive, tangible

**COUNSEL:** [*1] For Jay A. Garnier, Plaintiff: Charles E. Joseph, Joseph & Herzfeld, LLP, New York, NY.

For Illinois Tool Works Inc., doing business as Hobart Corporation, Don Stairs, Paul Todoro, Robert Todoro, Michael Meyer, Defendants: Michael R. DiChiara, Grotta, Glassman & Hoffman, Roseland, NJ; Jed L. Marcus, Grotta, Glassman & Hoffman, P.C., Roseland, NJ; Michael Raymond DiChiara, Corporation Counsel of the City of New York, Law Department, New York, NY.

**JUDGES:** KIYO A. MATSUMOTO, United States Magistrate Judge.

**OPINION BY:** KIYO A. MATSUMOTO

**OPINION:**

**OPINION & ORDER**

MATSUMOTO, United States Magistrate Judge:

In the above-referenced employment discrimination action, referred to the undersigned for general pretrial supervision pursuant to 28 U.S.C. § 636(b), plaintiff seeks to compel production of a certification made by defendants' employee, Clarence Crawford, Branch Manager of defendants' Birmingham, Alabama facility, which was obtained by defendants' counsel following the commencement of this litigation and which purportedly concerns "plaintiff's employment and allegations of dis-

crimination and harassment." (See Doc. No. 62, Letter from Charles Joseph, Esq. [*2] to the undersigned dated Mar. 15, 2006 ("Pl. 3/15/06 Ltr."), Ex. A, Defendants' Privilege Log, at 1.) Defendants have agreed to make Mr. Crawford available for an interview or deposition by plaintiff's counsel. (See Doc. No. 65, Letter from Jed Marcus, Esq. dated Mar. 22, 2006.) Plaintiff claims that due to his limited resources, it is not "financially viable" to depose Mr. Crawford. (Doc. No. 78, Letter from Charles Joseph, Esq. dated Apr. 12, 2006, at 1.) Defendants, who have furnished a copy of the Mr. Crawford's certification for *in camera* review, oppose plaintiff's request on grounds that any statement made by Mr. Crawford to defendants' counsel is protected by the work product doctrine. (Doc. No. 65 and Doc. No. 74, Letters from Jed Marcus, Esq. dated Mar. 22 and Apr. 7, 2006, respectively.) For the reasons set forth below, plaintiff's request for an order compelling production of Mr. Crawford's certification is denied.

**DISCUSSION**

The work product doctrine provides qualified protection from discovery of "documents and tangible things . . . prepared in anticipation of litigation" unless the party seeking discovery demonstrates a "substantial need of the materials [*3] in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means." Fed. R. Civ. P. 26(b)(3). The purpose of this doctrine is to protect from disclosure materials reflecting "the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation." Id.

"[T]hree conditions must be met to earn work product protection. The material must (1) be a document or a tangible thing, (2) that was prepared in anticipation of litigation, and (3) was prepared by or for a party, or by or for his representative." In re Grand Jury Subpoenas

Dated December 18, 1981 & January 4, 1982, 561 F. Supp. 1247, 1257 (E.D.N.Y. 1982). The burden of establishing all three elements of the work product privilege rests with the party invoking the privilege. In re Grand Jury Subpoena, 599 F.2d 504, 510 (2d Cir. 1979).

Here, the three elements of the tripartite test set forth above are satisfied. First, the Crawford certification constitutes a document. [*4] Second, it was prepared following the commencement of this litigation, and upon the directive of defendants' litigation counsel. (See Letter of Jed Marcus, Esq. dated Mar. 22, 2006, at 2.) Third, it was prepared for defendants by one of their employees.

"Even where the applicability of the work product doctrine has been established, factual material may be ordered produced 'upon a showing of substantial need and inability to obtain the equivalent without undue hardship.'" In re Omeprazole Patent Litig., 2005 U.S. Dist. LEXIS 6112, No. M-21-81, 2005 WL 818821, at *9 (S.D.N.Y. Feb. 18, 2005) (quoting Upjohn Co. v. United States, 449 U.S. 383, 400, 101 S. Ct. 677, 66 L. Ed. 2d 584 (1981)); In re Grand Jury Proceedings, 219 F.3d 175, 190-191 (2d Cir. 2000) ("A party seeking discovery of attorney work-product must show "substantial need," for fact work-product. As for work-product that shows 'mental impressions, conclusions, opinions, or legal theories of an attorney, . . . at a minimum such material is to be protected unless a highly persuasive showing [of need] is made.") (internal citations and quotation marks omitted).

"Substantial need is not evaluated in a vacuum, and in order to overcome [*5] work product protection, [plaintiff] must demonstrate that [he] cannot obtain the substantial equivalent of the information [he] seeks." E.E.O.C. v. Carrols Corp., 215 F.R.D. 46, 52 (N.D.N.Y. 2003) (citing Pillsbury, 888 F.2d 8, 12). That does not mean that a party seeking the document must show an absolute impossibility, but rather that it is significantly more difficult, time-consuming or expensive to obtain the information from another source. SEC v. Thrasher, 1995 U.S. Dist. LEXIS 1355, 92 Civ. 6987, 1995 WL 46681, at *9 (S.D.N.Y. Feb. 7, 1995).

The Court has reviewed, in camera, the Crawford certification and has determined that although its disclosure to plaintiff will not reveal defense counsel's mental impressions, conclusions, opinions, legal theories or thought processes, plaintiff has not demonstrated that he is unable to obtain the substantial equivalent of the information contained in the Crawford certification through other discovery devices. While the Court is sympathetic to plaintiff's financial condition, plaintiff has not demonstrated why he is unable to conduct a deposition of Mr. Crawford upon written questions [*6] pursuant to Fed. R. Civ. P. 31, or why he cannot take Mr.

Crawford's oral deposition via telephone and arrange for a sound recording pursuant to Fed. R. Civ. P. 30(b).

It is true that those devices may be more expensive than the production of Mr. Crawford's certification; however, the devices do provide an alternative means for plaintiff to obtain the substantial equivalent and, perhaps more, without undue hardship and without impinging upon defendants' work product. See Carrols, 215 F.R.D. at 52 (substantial need not shown where information contained in questionnaires mailed by the E.E.O.C. to defendant employer's employees could be obtained through other discovery devices); In re Int'l Sys. & Controls Corp., 693 F.2d 1235, 1241 (5th Cir. 1982) (noting that although expense may be considered in determining undue hardship, "in the ordinary case, the cost of one or a few depositions is not enough to justify discovery of work product") (citation omitted); Tribune Co. v. Purcigliotti, 1998 U.S. Dist. LEXIS 5155, 93 Civ. 7222, 1998 WL 175933 at *4 (S.D.N.Y. Apr. 14, 1998) ("'Substantial [*7] need' cannot be shown where persons with equivalent information are available for deposition.") (citing Pillsbury, 888 F.2d at 12); Atlantic Richfield Co. v. Current Controls, 1997 U.S. Dist. LEXIS 13082, No. 93-CV-0950, 1997 WL 538876, at *3 (W.D.N.Y. Aug. 21, 1997) (noting that the party seeking facts in a privileged document may obtain those facts through other means of discovery, such as through depositions); Pine Top Ins. Co., v. Alexander & Alexander Services, Inc., 1991 U.S. Dist. LEXIS 14610, No. 85 Civ. 9860, 1991 WL 221061, at *2 (S.D.N.Y. Oct. 7, 1991) ("The undue hardship test is generally not satisfied merely by the expense of obtaining the materials."); Castle v. Sangamo Weston, Inc., 744 F.2d 1464, 1466-67 (11th Cir. 1984) (trial court abused its discretion when it compelled production of otherwise privileged documents where party had not demonstrated that it could not obtain the information it sought by deposing witnesses whose statements were contained in the documents); Gay v. P.K. Lindsay Co., 666 F.2d 710, 713 (1st Cir. 1981) ("[I]t seems well-settled that there is in general no justification for discovery of the statement [*8] of a person contained in work product materials when the person is available to be deposed."). Accordingly, plaintiff's motion to compel production of Mr. Crawford's certification is denied.

## CONCLUSION

For the reasons set forth above, plaintiff's motion to compel Mr. Crawford's certification is denied.

**SO ORDERED.**

Dated: May 4, 2006

Brooklyn, NY

/s/

KIYO A. MATSUMOTO                                   United States Magistrate Judge

LEXSEE

**In re GRAND JURY SUBPOENAS dated March 19 and August 2, 2002**

**No. M 11-189**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

**2002 U.S. Dist. LEXIS 17079**

**September 11, 2002, Decided
September 12, 2002, Filed**

**DISPOSITION:** [*1] Government's motion to compel granted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** A grand jury investigated allegations that a New York corporation bribed senior officials in a foreign country. Petitioner government sought to compel compliance with two grand jury subpoenas issued to respondent law firm, attorneys for the corporation and its principal. The subpoenas sought banking records for 30 specified accounts at four Swiss banks. The law firm objected.

**OVERVIEW:** The records were not protected by the work product doctrine, as they were merely pre-existing documents gathered in anticipation of litigation. The bank records were the pre-existing records of third parties, created and maintained in the ordinary course of business by those third parties without any reference to litigation whatsoever. The banks at issue were not agents of the law firm. If possessed by the banks, the records would be wholly unprotected, as the work product rule had no application to a document prepared by and in the hands of a third person who was neither a party to nor interested in the action. Moreover, disclosing the records would not provide the government with any meaningful information about the law firm's work product or its clients' defenses.

**OUTCOME:** The government's motion to compel was granted.

**CORE TERMS:** work product, subpoena, grand jury, work product doctrine, gathered, anticipation of litigation, motion to compel, discovery, proffer, legal theories, work-product, discoverable, pre-existing, disclosing, course of business, requesting party, zone of privacy, oral argument, third parties, acquisition, third-party, impressions, non-party, intrusion, possessed, telephone, ordering, redacted, genuine, secrecy

**LexisNexis(R) Headnotes**

*Civil Procedure > Counsel > General Overview*
*Civil Procedure > Discovery > Methods > General Overview*
*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*
[HN1] The work product doctrine provides qualified protection from disclosure for documents and other tangible things prepared in anticipation of litigation or for trial. Fed. R. Civ. P. 26(b)(3). In particular, the work product doctrine protects materials reflecting the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation. Fed. R. Civ. P. 26(b)(3).

*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*
[HN2] The work product doctrine is intended primarily to protect the role an attorney plays in the adversarial process. The doctrine seeks to preserve a zone of privacy in which a lawyer can prepare and develop legal theories and strategy with an eye toward litigation, free from unnecessary intrusion by his adversaries.

*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*
*Criminal Law & Procedure > Discovery & Inspection > Discovery by Defendant > Tangible Objects*
*Criminal Law & Procedure > Preliminary Proceedings > General Overview*

[HN3] Although most often applied in civil cases, the work product doctrine's role in assuring the proper functioning of the criminal justice system is even more vital. Fed. R. Civ. P. 26 obviously does not apply to grand jury subpoenas, and Fed. R. Crim. P. 16, which protects reports, memoranda, or other internal defense documents made by the defendant, or the defendant's attorneys or agents in connection with the investigation or defense of the case, posits a pre-trial proceeding in which there is a known defendant.

*Civil Procedure > Discovery > Privileged Matters > Work Product > Scope*
[HN4] The work product protection rule has been applied to grand jury proceedings in much the same formulation as in other contexts. The United States Court of Appeals for the Second Circuit has warned that broad categorical statements about the scope of the work product privilege are risky, however, as individual applications are highly fact specific, and analysis should proceed cautiously, case by case.

*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*
*Evidence > Privileges > Attorney-Client Privilege > Elements*
*Evidence > Privileges > Attorney-Client Privilege > Scope*
[HN5] Work product immunity may be asserted by either the client or the attorney, as the work-product doctrine is distinct from and broader than the attorney-client privilege. The party asserting the privilege bears the burden of proof. Further, in the grand jury context, a privilege ought to be strictly confined within the narrowest possible limits consistent with the logic of its principle.

*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*
[HN6] On the issue of whether material was prepared "in anticipation of litigation," the United States Court of Appeals for the Second Circuit has held that the proper inquiry is whether the documents were prepared because of existing or expected litigation. Under this test, documents are deemed prepared in anticipation of litigation if in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation. The "because of" formulation does not, however, protect documents that are prepared in the ordinary course of business or that would have been created in essentially similar form irrespective of the litigation. Hence, the attorney-work-product doctrine gener-

ally does not shield from discovery documents that were not prepared by the attorneys themselves, or their agents, in the course of or in anticipation of litigation.

*Civil Procedure > Discovery > Privileged Matters > Work Product > Opinion Work Product*
[HN7] Under certain circumstances, an attorney's selection and ordering of documents to show to his client prior to deposition may be protected as work product, even though the documents themselves were subject to discovery. The court deemed the "selection and compilation of documents by counsel" to be opinion work product because the case involved extensive document discovery and selecting and ordering a few documents out of thousands would mean that, if produced, counsel could not help but reveal important aspects of his understanding of the case.

*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*
[HN8] Where a request is made for documents already in the possession of the requesting party, with the precise goal of learning what the opposing attorney's thinking or strategy may be, even third-party documents may be protected under the work product doctrine.

*Civil Procedure > Discovery > Methods > General Overview*
*Civil Procedure > Discovery > Privileged Matters > Work Product > Fact Work Product*
*Civil Procedure > Discovery > Privileged Matters > Work Product > Opinion Work Product*
[HN9] Protection for work product is not absolute; it may be overcome if the party seeking discovery shows that it has a "substantial need" for the materials and is unable without "undue hardship" to obtain the substantial equivalent of the materials by other means. Fed. R. Civ. P. 26(b)(3). When the material in question is core work product, consisting of an attorney's mental impressions, conclusions, opinions, or legal theories, as opposed to ordinary fact work product, a highly persuasive showing of need is required to overcome the protection.

*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*
[HN10] The work product rule has no application to a document prepared by and in the hands of a third person who is neither a party to nor interested in the action, and a non-party witness may not invoke work-product protection.

*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*
*Civil Procedure > Pretrial Matters > Subpoenas*
[HN11] Work product protection applies to facts, not merely the opinions and strategies of lawyers. Limits upon work product protection do not allow the government to ask counsel with impunity, "What facts have you discovered in your investigation?" Such a broad inquiry is impermissible, as it is likely aimed at, and cannot help but to uncover, legal strategy that is properly within an attorney's zone of privacy.

*Civil Procedure > Discovery > Privileged Matters > Work Product > Opinion Work Product*
[HN12] The collection of evidence without any creative or analytic input by an attorney or his agent, does not qualify as work product. The mere acquisition of documents from an unrelated third-party does not by itself impose upon them the status of work product. At its core, the work-product doctrine exists to shelter the attorney's preparation and analysis of the case. Even if the lawyer's synthesis of the documents were to constitute work product, the mere acquisition of such documents from a non-party does not create such a characteristic.

*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*
[HN13] Qualifying the selection of records for work product protection depends upon the existence of a real, rather than speculative, concern that the thought processes of counsel in relation to pending or anticipated litigation would be exposed.

**COUNSEL:** Peter G. Neiman, Esq., Assistant United States Attorney, Philip E. Urofsky, Esq., Senior Trial Attorney, Department of Justice, JAMES B. COMEY, United States Attorney, New York, New York, for Southern District of New York.

James E. D'Auguste, Esq., Mark J. MacDougall, Esq., Heather J. Pellegrino, Esq., AKIN, GUMP, STRAUSS, HAUER & FELD, L.L.P., New York, New York, for Corporation.

**JUDGES:** DENNY CHIN, United States District Judge.

**OPINION BY:** DENNY CHIN

**OPINION:**

**MEMORANDUM DECISION**

**CHIN, D.J.**

A grand jury in this district is investigating allegations that a New York corporation (the "Corporation") bribed senior officials in a foreign country (the "Republic"). n1 The Government seeks to compel compliance with two grand jury subpoenas issued to the law firm Akin, Gump, Strauss, Hauer & Feld, L.L.P. ("Akin, Gump"), attorneys for the Corporation and its principal, John Doe. The subpoenas seek banking records for thirty specified accounts at four Swiss banks. Akin, Gump has objected, arguing that any bank records it possesses were gathered as part of its representation of its clients and disclosing them would necessarily reveal elements of [*2] its legal strategy.

> n1 This proceeding is closed pursuant to Fed R. Crim. P. 6(e)(5). The motion papers were sealed, and oral argument was heard in a closed courtroom. Accordingly, I have used pseudonyms and redacted or altered certain material to preserve the secrecy of the grand jury proceedings.

For the reasons that follow, I conclude that the records are not protected by the work product doctrine, as they are merely pre-existing documents gathered in anticipation of litigation and disclosing them will not provide the Government with any meaningful information about Akin, Gump's work product or its clients' defenses.

**BACKGROUND**

**A. The Investigation**

The Government has been investigating Doe and the Corporation for several years, and the grand jury that issued the subpoenas is still in session. Akin, Gump has represented John Doe and the Corporation for more than three years.

The Government has asked authorities in Switzerland for assistance in obtaining records from Swiss banks pursuant [*3] to a mutual legal assistance treaty ("MLAT") between the two countries. These MLAT requests, first made in June 2000, cover most of the same records as the subpoenas at issue here. The relevant accounts apparently belong to the Republic or its officials, not to John Doe or the Corporation.

Both sides have submitted material ex parte. The Government's submission described its particular need for the records in light of the transactions it suspects occurred in accounts protected by strict Swiss bank secrecy laws. Akin, Gump presented evidence to support its argument that the selection and compilation of the records constituted attorney work product that, if disclosed, would reveal strategic elements of the defense the firm is developing for its clients.

On November 3, 2000, Akin, Gump made a "factual proffer" to the Government regarding six of the accounts. The letter reserved all rights, including the attorney work product privilege.

## B. The Subpoenas

The March 19, 2002 subpoena seeks all records for the six accounts Akin, Gump referenced in the November 3, 2000 proffer letter. A subsequent subpoena, dated August 2, 2002, seeks records for twenty-four additional accounts. [*4] Both subpoenas concern bank records from the four Swiss institutions where the thirty accounts were maintained -- account statements, wire transfer records, and the like. The subpoenas are not directed at reports, memoranda or any other material created by Akin, Gump, and are restricted to "records created or maintained by the banks for the specified accounts." (Gov't Reply at 5-6 n.4).

## C. Motion to Compel

This proceeding began when the Government filed a motion to compel in Part I on August 14, 2002. The matter was referred to me as I had another motion to compel concerning the same grand jury under consideration. See In re Grand Jury Subpoena dated Aug. 9, 2000, 218 F. Supp. 2d 544, Opinion (Redacted) dated Sept. 6, 2002. I heard oral argument on the instant motion to compel on September 5, 2002. Ruling from the bench, I granted the motion at that time. On September 9, 2002, I entered an order and provided a stay until September 18, 2002. This decision further explains my reasoning.

### DISCUSSION

### I. Applicable Law

#### A. Work Product Doctrine

[HN1] The work product doctrine provides qualified protection from disclosure for documents and other tangible things [*5] "prepared in anticipation of litigation or for trial." Fed. R. Civ. P. 26(b)(3); see generally Hickman v. Taylor, 329 U.S. 495, 91 L. Ed. 451, 67 S. Ct. 385, 34 Ohio Op. 395 (1947). In particular, the work product doctrine protects materials reflecting "the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation." Fed. R. Civ. P. 26(b)(3).

[HN2] The work product doctrine is intended primarily to protect the role an attorney plays in the adversarial process. The doctrine seeks "to preserve a zone of privacy in which a lawyer can prepare and develop legal theories and strategy 'with an eye toward litigation,' free from unnecessary intrusion by his adversaries." United

States v. Adlman (II), 134 F.3d 1194, 1196 (quoting Hickman, 329 U.S. at 510-11).

[HN3] Although most often applied in civil cases, the doctrine's "role in assuring the proper functioning of the criminal justice system is even more vital." United States v. Doe (In re Grand Jury Proceedings), 219 F.3d 175, 190 (2d Cir. 2000) (quoting United States v. Nobles, 422 U.S. 225, 238, 45 L. Ed. 2d 141, 95 S. Ct. 2160 (1975)). [*6] Rule 26 of the Federal Rules of Civil Procedure "obviously does not apply to grand jury subpoenas," and Rule 16 of the Federal Rules of Criminal Procedure, which protects "reports, memoranda, or other internal defense documents made by the defendant, or the defendant's attorneys or agents in connection with the investigation or defense of the case," "posits a pre-trial proceeding in which there is a known defendant." In re Grand Jury Subpoena, 599 F.2d 504, 509 (2d Cir. 1979).

Nevertheless, [HN4] the work product protection rule has been applied to grand jury proceedings in much the same formulation as in other contexts. See, e.g., In re Grand Jury Proceedings, 219 F.3d at 190-91 (discussing Fed. R. Civ. P. 26 and civil cases in grand jury context); In re Grand Jury Proceedings, 2001 U.S. Dist. LEXIS 15646, No. M-11-189 (LAP), 2001 WL 1167497, at *13 (S.D.N.Y. Oct 03, 2001). The Second Circuit has warned that "broad categorical statements about the scope of the work product privilege are risky," however, "as individual applications are highly fact specific," and "analysis should proceed cautiously, case by case." Doe v. United States (In re Grand Jury Subpoena Dated October 22, 2001), 282 F.3d 156, 161 (2d Cir. 2002). [*7]

[HN5] Work product immunity may be asserted by either the client or the attorney, In re Grand Jury Subpoena Duces Tecum, 112 F.3d 910 (8th Cir. 1997) (citing In re Sealed Case, 219 U.S. App. D.C. 195, 676 F.2d 793, 809 & n. 56 (D.C. Cir. 1982), as "the work-product doctrine is distinct from and broader than the attorney-client privilege." United States v. Nobles, 422 U.S. at 238 n.11. The party asserting the privilege bears the burden of proof. See In re Grand Jury Proceedings, 219 F.3d at 182 (attorney client privilege); In re Grand Jury Subpoenas Dated March 9, 2001, 179 F. Supp. 2d 270, 283 (S.D.N.Y. 2001) (same). Further, in the grand jury context, a privilege "ought to be strictly confined within the narrowest possible limits consistent with the logic of its principle." United States v. Int'l Bd. of Teamsters, 119 F.3d 210, 214 (2d Cir. 1997) (quoting In re Horowitz, 482 F.2d 72, 81 (2d Cir. 1973)); see also In re Grand Jury Subpoenas Dated March 9, 2001, 179 F. Supp. 2d at 283; In re Grand Jury Subpoena Duces Tecum Dated March 24, 1983, 566 F. Supp. 883, 885 (S.D.N.Y. 1983) [*8] ("Privileges are carefully and narrowly construed in the context of the subpoenas of a grand jury ....").

## B. The *Sporck* Exception

[HN6] On the issue of whether material was prepared "in anticipation of litigation," the Second Circuit has held that the proper inquiry is "whether the documents were prepared 'because of' existing or expected litigation." United States v. Adlman (II), 134 F.3d at 1198. Under this test, documents are "deemed prepared in 'anticipation of litigation' if 'in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation.'" Strougo v. BEA Assocs., 199 F.R.D. 515, 520-21 (S.D.N.Y. 2001) (quoting United States v. Adlman (II), 134 F.3d at 1202). The "because of" formulation does not, however, protect "documents that are prepared in the ordinary course of business or that would have been created in essentially similar form irrespective of the litigation." United States v. Adlman (II), 134 F.3d at 1202. Hence, "the attorney-work-product doctrine generally does [*9] not shield from discovery documents that were not prepared by the attorneys themselves, or their agents, in the course of or in anticipation of litigation." In re Grand Jury Subpoenas Dated Oct. 22, 1991, and Nov. 1, 1991, 959 F.2d 1158, 1166-67 (2d Cir. 1992) (noting also that under Fed. R. Crim. P. 16(b)(2) "except for scientific or medical reports, documents made by a defendant's attorneys or their agents in connection with the case are not discoverable") (emphasis added).

There exists a narrow "selection and compilation" exception to this general rule. The exception was first set out in Sporck v. Peil, 759 F.2d 312 (3d Cir. 1985). That court held that [HN7] under certain circumstances, an attorney's selection and ordering of documents to show to his client prior to deposition may be protected as work product, even though the documents themselves were subject to discovery. The court deemed the "selection and compilation of documents by counsel" to be opinion work product because the case involved "extensive document discovery" and "selecting and ordering a few documents out of thousands" would mean that, if produced, "counsel could not help but reveal [*10] important aspects of his understanding of the case." Sporck, 759 F.2d at 316 (citation omitted).

The Second Circuit has acknowledged the rule but has never applied it, although other district courts have done so. See, e.g., Santiago v. Miles, 121 F.R.D. 636, 638-40 (W.D.N.Y. 1988) (applying exception to protect printouts of data from computer, otherwise discoverable, which were prepared at direction of counsel). The Second Circuit phrased the exception in specific and conditional language, noting that [HN8] "where a request is made for documents already in the possession of the requesting party, with the precise goal of learning what the opposing attorney's thinking or strategy may be, even

third-party documents may be protected." In re Grand Jury Subpoenas, 959 F.2d at 1166 (emphasis added).

## C. Overcoming Work Product Protection

[HN9] Protection for work product is not absolute; it may be overcome if the party seeking discovery shows that it has a "substantial need" for the materials and is unable without "undue hardship" to obtain the substantial equivalent of the materials by other means. Fed. R. Civ. P. 26(b)(3); see United States v. Adlman (II), 134 F.3d 1194, 1202-03 (2d Cir. 1998); [*11] see also In re Grand Jury Subpoenas, 959 F.2d at 1166 ("equities might not favor the application of the Sporck exception if the files from which documents had been culled by [counsel] were not otherwise available ... or were beyond reasonable access") (citing Gould, Inc. v. Mitsui Mining & Smelting Co., 825 F.2d 676, 680 (2d Cir. 1987)). When the material in question is "core work product, consisting of an attorney's mental impressions, conclusions, opinions, or legal theories," as opposed to "ordinary fact work product," a "'highly persuasive showing of need'" is required to overcome the protection. McGrath v. Nassau Co. Health Care Corp., 204 F.R.D. 240, No. 00 Civ. 6454, 2001 WL 1549260, at *3 (E.D.N.Y. Nov. 30, 2001) (quoting In re Grand Jury Proceedings, 219 F.3d 175, 190 (2d Cir. 2000)). It remains an open question in this circuit whether "opinion work product is ever discoverable upon a showing of necessity and unavailability by other means." United States v. Adlman (II), 134 F.3d at 1204.

## II. Application

### A. Pre-existing Bank Records Are Not Attorney Work Product

The bank records [*12] at issue are not protected by the work product doctrine. They are the pre-existing records of third parties, created and maintained in the ordinary course of business by those third parties without any reference to litigation whatsoever. Because I conclude that the records are not covered by the work product doctrine, the Government need not show "substantial need of the materials." United States v. Adlman (I), 68 F.3d 1495, 1502 (2d Cir. 1995).

The banks at issue are not agents of Akin, Gump. If possessed by the banks, the records would be wholly unprotected, as [HN10] "the work product rule has no application to a document prepared by and in the hands of a third person who is neither a party to nor interested in the action," Polycast Tech. Corp. v. Uniroyal, Inc., 1990 U.S. Dist. LEXIS 12444, 87 Civ. 3297 (CSH) (JCF), 1990 WL 138968, *2 (citing 8 Charles A. Wright, Arthur R. Miller, and Richard L. Marcus, Federal Practice and Procedure § 2024), and "a non-party witness may not invoke work-product protection." Ramsey v.

NYP Holdings, Inc., 2002 U.S. Dist. LEXIS 11728, 00 Civ. 3478 (VM) (MHD), 2002 WL 1402055, at *6 (S.D.N.Y. June 27, 2002).

Akin, Gump argues that any bank records it possesses [*13] are not protected by virtue of their content, but because they were gathered by the firm to assist in the representation of clients who were likely subjects of a grand jury investigation. This central argument proposes that the mere act of obtaining the relevant documents in anticipation of criminal proceedings is protected, because to reveal which records were obtained, and which records were not, will necessarily reveal "the thought processes of counsel ... [and] the defense's litigation strategy." (Akin, Gump Mem. at 6). I reject this contention, as virtually any material collected by an attorney would merit protection under this low standard.

Akin, Gump relies heavily on the word "obtain" as it appears in several cases concerning the work product doctrine. See, e.g., Hickman, 329 U.S. at 511; United States v. Adlman (II), 134 F.3d at 1202; Akin, Gump Mem at 4. In context, the word was likely chosen to refer to witness statements obtained by counsel, such as those at issue in Hickman. In addition, the word retains some vitality as part of the work product standard, for there are times when attorneys obtain documents they did not themselves [*14] produce but that are prepared by non-attorney agents, such as investigators. These documents, produced "on [a client's] behalf," may qualify as attorney work product protection. United States v. Nobles, 422 U.S. at 239 n.13. In any event, the word has never been used to suggest that merely by gathering pre-existing materials, even as part of a far-ranging and diligent investigation, an attorney transforms them into work product.

It is certainly true that [HN11] work product protection applies to facts, not merely the opinions and strategies of lawyers. In re Grand Jury Subpoena, 282 F.3d at 162 (quashing subpoena directing attorney to testify against client). As the Second Circuit discussed, limits upon work product protection do not allow the Government to ask counsel with impunity, "What facts have you discovered in your investigation?" Id. Such a broad inquiry is impermissible, as it is likely aimed at, and cannot help but to uncover, legal strategy that is properly within an attorney's "zone of privacy." Here, the subpoenas do not seek "all facts" or even "all banking records" gathered by Akin, Gump's investigation. The subpoenas identify a limited [*15] number of accounts and ask only for records created or maintained by the banks themselves.

### B. The *Sporck* Exception Does Not Apply

The Sporck selection and compilation exception clearly does not apply here. That case and those that have

followed it were marked by requests aimed at a small part of extensive discovery already available to the requesting party. This case does not compare. Here, the Government has already identified all the bank accounts of interest, and is requesting all of the bank documents Akin, Gump might possess. Indeed, Akin, Gump may have first learned of the Government's focus on these specific accounts from the MLAT requests two years ago. In producing the documents, Akin, Gump can use an organizational scheme that reveals nothing about its mental processes. For example, the documents can simply be organized chronologically within each account. I am not persuaded that the Government will learn anything useful from the mere fact that Akin, Gump gathered some, none, or all the records for certain accounts. In any event, any such information -- which would be subject to varying interpretations -- is de minimus.

Further, Akin, Gump already [*16] revealed to the Government by its proffer that it possessed records for six of the accounts at issue. While I am not convinced the proffer waived the privilege in its entirety, the firm cannot now complain that the Government will learn something new when it discovers that Akin, Gump actually possesses the records of those accounts that the firm proffered to the Government.

I conclude that even a subset of the records here is "evidence of neutral and objective facts" and such "materials assembled during routine investigations by counsel do not receive" work product protection. Zucker v. Sable, 72 F.R.D. 1, 3 (S.D.N.Y. 1975) (Werker, J.). [HN12] "The collection of evidence without any creative or analytic input by an attorney or his agent, does not qualify as work product." Riddell Sports, Inc. v. Brooks, 158 F.R.D. 555, 559 (S.D.N.Y. 1994). "The mere acquisition of documents from an unrelated third-party does not by itself impose upon them the status of work product. At its core, the work-product doctrine exists to shelter the attorney's preparation and analysis of the case. Even if the lawyer's synthesis of the documents were to constitute work product, [*17] the mere acquisition of such documents from a non-party does not create such a characteristic." Id. (citing Bohannon v. Honda Motor Co., 127 F.R.D. 536, 540 (D. Kan. 1989)).

As the Second Circuit has cautioned, [HN13] qualifying the "selection" of records for protection "depends upon the existence of a real, rather than speculative, concern that the thought processes of ... counsel in relation to pending or anticipated litigation would be exposed." Gould, 825 F.2d at 680. Akin, Gump has failed to demonstrate such a genuine concern.

Akin, Gump also fails to distinguish the Second Circuit case most on point. In re Grand Jury Subpoenas Dated Oct. 22, 1991, and Nov. 1, 1991, 959 F.2d 1158

(2d Cir. 1992). That case concerned a grand jury sub-poena directed at telephone billing records for certain lines gathered by the law firm Paul, Weiss, Rifkind, Wharton & Garrison. The court required production be-cause the Government sought all telephone records relat-ing to particular clients for a five-year period -- not a select group that counsel considered relevant. To the extent that Akin, Gump argues that it may only possess a "subset" of records, [*18] it is not clear how the Gov-ernment could easily discern how counsel arrived at that set. After all, the Government has represented that its two-year-old MLAT requests have not borne fruit; the Government will thus have nothing with which to com-pare Akin, Gump's production.

Akin, Gump asserts that this case is different be-cause "none of the documents were obtained by Akin Gump from Mr. [Doe], [the Corporation], or any officer or employee of [the Corporation]." (Akin, Gump Mem. at 2). This distinction is not significant; it might even cut both ways. Akin, Gump implies that this fact distin-guishes this case from one where a client is merely at-tempting to immunize material by turning it over to counsel, and the firm argues strenuously that the records are genuine fruits of its independent investigation. If the documents were provided directly by a client, however, that fact might indicate a greater risk of improperly dis-closing the kind of attorney work product at the heart of the privilege's protection.

Moreover, Sporck is also inapplicable because the Government has shown that the "equities [do] not favor the application of the Sporck exception [as] the files from [*19] which documents had been culled by [coun-sel are] not otherwise available [and are] beyond reason-able access." Gould, 825 F.2d at 680. I am satisfied that the intrusion into defense counsel's files here is strictly limited. The accounts are specified, and only records maintained or created by the banks are sought. I also accept the Government's assurance that it is motivated by a substantial need for the production -- no party disputes the relevance to the grand jury investigation -- because it is unlikely the information will be otherwise available from the banks or other sources. n2

n2 The bank records are presumably in Swit-zerland; the account holders are officials of a for-eign government. In addition, the Government submitted evidence that direct subpoenas upon United States branches of foreign banks -- so-called "Bank of Nova Scotia" subpoenas -- are no longer used by the Government following a 1987 Memorandum of Understanding negotiated be-tween Switzerland and the United States to better implement the Swiss/ United States MLAT.

[*20]

**CONCLUSION**

As I previously held, the Government's motion to compel is granted. The September 9, 2002 order is modi-fied to allow Akin, Gump seven business days from to-day, i.e., an additional two days to seek appellate review. Accordingly, Akin, Gump must comply with the subpoe-nas dated March 19 and August 2, 2002 no later than September 20, 2002.

SO ORDERED.

Dated: New York, New York

September 11, 2002

DENNY CHIN

United States District Judge

LEXSEE

**OMEGA ENGINEERING, INC., Plaintiff, v. OMEGA, S.A., Defendant.**

Civil No. 3:98cv2464(AVC)

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT

2001 U.S. Dist. LEXIS 2016

February 6, 2001, Decided

**SUBSEQUENT HISTORY:** Magistrate's recommendation at, Costs and fees proceeding at Omega Eng'g, Inc. v. Omega, SA, 2004 U.S. Dist. LEXIS 27908 (D. Conn., Mar. 24, 2004)

**DISPOSITION:** [*1] OEI's motion to compel (document no. 39) GRANTED.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff in an action for damages and injunctive relief for breach an agreement for the use of trademarks, moved to compel discovery responses from defendant, asserting that the responses defendant had filed were incomplete and deficient, some were unsigned, and that objections raised were unjustified.

**OVERVIEW:** The agreement between the parties governed the worldwide use of any trademark consisting of or containing the word OMEGA or the Greek letter U. Because the agreement was effective worldwide, a wide scope for discovery was necessary. In general, defendant had failed to comply with the rules concerning objections and assertions of privilege and had submitted responses without verified signatures. The court determined an award of fees and costs to plaintiff was appropriate.

**OUTCOME:** Plaintiff's motion to compel was granted to the extent defendant had not already complied with discovery. Defendant's objections for privilege required a specific log as set forth by local rule. Defendant's objections for overbreadth, vagueness or on relevance grounds were largely unjustified, and it was obligated to respond promptly to interrogatories it had previously ignored.

**CORE TERMS:** interrogatory, trademark, discovery, overly broad, attorney-client, discovery of admissible evidence, reasonably calculated to lead, work-product, burdensome, apparatus, anywhere, privileged, discovery

request, subject matter, preparation, revealing, unduly, motion to compel, registration, propounded, measuring, sufficient information, affirmative defense, objecting party, applicability, consisting, incomplete, world-wide, inspection, responsive

**LexisNexis(R) Headnotes**

*Civil Procedure > Discovery > Disclosures > Mandatory Disclosures*
*Civil Procedure > Discovery > Methods > Interrogatories > General Overview*
[HN1] See Fed. R. Civ. P. 37(a)(2)(B).

*Civil Procedure > Discovery > Disclosures > Mandatory Disclosures*
*Civil Procedure > Discovery > Methods > General Overview*
[HN2] See Fed. R. Civ. P. 37(a)(3).

*Civil Procedure > Discovery > Methods > General Overview*
*Civil Procedure > Discovery > Privileged Matters > General Overview*
*Civil Procedure > Discovery > Relevance*
[HN3] See Fed. R. Civ. P. 26(b)(1).

*Civil Procedure > Discovery > Methods > General Overview*
*Civil Procedure > Discovery > Relevance*
*Evidence > Relevance > General Overview*
[HN4] Information that is reasonably calculated to lead to the discovery of admissible evidence is considered relevant for the purposes of discovery. The term "reasonably calculated" as used in Fed. R. Civ. P. 26 means any possibility that the information sought may be rele-

vant to the subject matter of the action. A party may not object to a discovery request on the grounds that the information sought will be inadmissible at trial so long as the material requested could lead to other information that may be relevant to the subject matter of the action.

*Civil Procedure > Discovery > Methods > Interrogatories > General Overview*
*Civil Procedure > Discovery > Relevance*
*Civil Procedure > Discovery > Undue Burdens*
[HN5] A party may object to a discovery request if it is overly broad or unduly burdensome. To assert a proper objection on this basis, however, one must do more than simply intone the familiar litany that the interrogatories are burdensome, oppressive or overly broad. Instead, the objecting party must show specifically how, despite the broad and liberal construction afforded the federal discovery rules, each request is not relevant or how each question is overly broad, burdensome or oppressive by submitting affidavits or offering evidence revealing the nature of the burden. The objecting party may not leave it to the court to sift each interrogatory to determine the usefulness of the answer sought. To the contrary, the detail in the complaint defines the liberal guidelines for determining the relevance of the discovery requests, and the burden is on the party resisting discovery to clarify and explain its objections and to provide support for those objections.

*Civil Procedure > Counsel > General Overview*
*Civil Procedure > Discovery > General Overview*
*Evidence > Privileges > Attorney-Client Privilege > Scope*
[HN6] A party may also object to a discovery request where the information sought is subject to the attorney-client privilege or the work-product doctrine. Fed. R. Civ. P. 26(b)(5). The party asserting the privilege and resisting discovery has the burden of establishing that privilege. Blanket assertions of privilege have been held insufficient to satisfy this burden. Instead, a party must supply opposing counsel with sufficient information to assess the applicability of the privilege or protection, without revealing information which is privileged or protected.

*Civil Procedure > Discovery > Privileged Matters > General Overview*
[HN7] Pursuant to U.S. Dist. Ct., D. Conn., R. 9(d)(1), a party claiming privilege in response to a document request shall, for each document to which the privilege applies, provide a log indicating: (1) the type of document; (2) the general subject matter of the document; (3)

the date of the document; (4) the author of the document; and (5) each recipient of the document.

*Civil Procedure > Discovery > Methods > Interrogatories > General Overview*
*Contracts Law > Negotiable Instruments > Enforcement > Joint & Several Instruments*
[HN8] See Fed. R. Civ. P. 33(b)(2).

*Civil Procedure > Discovery > Methods > Interrogatories > General Overview*
[HN9] Answers to interrogatories not signed by the party making them constitutes a violation of the discovery rules.

*Civil Procedure > Discovery > Disclosures > Sanctions*
*Civil Procedure > Discovery > Methods > General Overview*
*Civil Procedure > Discovery > Misconduct*
[HN10] Interrogatories should not be read or interpreted in an artificially restrictive or hypertechnical manner to avoid disclosure of information fairly covered by the discovery request, and to do so is subject to appropriate sanctions under Fed. R. Civ. P. 37(a).

*Civil Procedure > Discovery > Methods > Interrogatories > General Overview*
*Civil Procedure > Discovery > Relevance*
[HN11] Where an agreement is worldwide in scope, a party's world-wide activities which are allegedly in violation of the agreement, are reasonably calculated to lead to the discovery of admissible evidence within the liberal meaning of the Federal Rules of Civil Procedure.

*Civil Procedure > Discovery > Methods > General Overview*
*Civil Procedure > Discovery > Misconduct*
[HN12] See Fed. R. Civ. P. 37(a)(4)(A).

*Civil Procedure > Discovery > Methods > General Overview*
*Civil Procedure > Discovery > Misconduct*
[HN13] Fed. R. Civ. P. 37(a)(4)(A) does not require a court to find bad faith before awarding reasonable attorney's fees. Instead, the court may order the losing party to pay reasonable expenses so long as such an award complies with the requirements of Rule 37(a).

**COUNSEL:** For OMEGA ENGINEERING, INC., plaintiff: Peter W. Peterson, Robert Curcio, DeLio & Peterson, New Haven, CT.

For OMEGA, SA, defendant: Arthur T. Fattibene, Paul A. Fattibene, Southport, CT.

For OMEGA, SA, defendant: Jess M. Collen, Collen Law Associates, Ossining, NY.

**JUDGES:** Alfred V. Covello, Chief, U.S.D.J.

**OPINION BY:** Alfred V. Covello

**OPINION:**

### RULING AND ORDER ON THE PLAINTIFF'S MOTION TO COMPEL

This is an action for damages and injunctive relief brought by the plaintiff, Omega Engineering, Inc. ("OEI") pursuant to common law tenets concerning breach of contract. OEI's complaint alleges that the defendant, Omega, S.A. ("OSA"), breached an agreement entered into by the parties with respect to the use of "any trademark consisting of or containing the word OMEGA or the Greek letter U . . . ." OEI brings the within motion, pursuant to Fed. R. Civ. P. 37, n1 requesting the court to compel OSA to "provide full and complete answers to [OEI's] interrogatories" and to produce all materials sought in connection with its document requests. In addition, OEI asks the court to award it costs incurred in the preparation of the instant [*2] motion. As set 2forth in more detail below, OEI's motion (document no. 39) is GRANTED.

> n1 [HN1] Rule 37(a)(2)(B) provides, in pertinent part, that: "if . . . a party fails to answer an interrogatory submitted under Rule 33, or . . . in response to a request for inspection submitted under Rule 34, fails to respond that inspection will be permitted as requested . . . , the discovering party may move for an order compelling an answer, or . . . an order compelling inspection in accordance with the request." Fed. R. Civ. P. 37(a)(2)(B). [HN2] Rule 37(a)(3) provides that: "for the purposes of this subdivision an evasive or incomplete disclosure, answer, or response is to be treated as a failure to disclose, answer, or respond." Fed. R. Civ. P. 37(a)(3).

### FACTS

In 1994, OEI entered into an agreement with OSA, which, at the outset, states that

both parties . . . are desirous of coming to an arrangement for the avoidance of future interference worldwide between their respective fields of commercial operation under their [*3] rights in respect of trademarks consisting of or including the word OMEGA an/or the Greek letter U or containing elements colourably resembling either of thos [sic] two elements. n2

Under the contract, "[OEI] agreed to withdraw certain [trademark] oppositions against [OSA,]" and both parties agreed to amend certain definitions of goods in their respective trademark applications.

> n2 For the sake of convenience, the court refers the agreement's description of these marks as the "OMEGA marks."

Among other things, the agreement prohibits OEI from using, registering, or applying to register any trademark containing the OMEGA marks with respect to "computer controlled measuring, timing and display apparatus, unless intended for science or industry." Similarly, the agreement prohibits OSA from using, registering, or applying to register any trademark containing the OMEGA marks with respect to "apparatus industrially and/or scientifically employed for measuring or controlling variable parameters such [*4] as temperature, pressure, force, load, vibration, electrical conductivity, liquid level, acidity, humidity, strain and flow." The agreement also requires OSA not to object to OEI's use or registration of any trademark containing the OMEGA marks with respect to these same apparatus. By its terms, the agreement is effective in all countries of the world.

On December 17, 1998, OEI filed this action in federal court alleging that OSA had breached the 1994 agreement by:

> 1) objecting "to the use or registration by [OEI] of [OEI's] trademarks consisting of the [OMEGA marks]" with respect to "apparatus industrially and/or scientifically employed for measuring or controlling variable parameters[;]" and
>
> 2) "filing, prosecuting and maintaining . . . opposition and cancellation actions against [OEI's] trademark application and registrations[.]"

On September 27, 1999, OSA answered the complaint, asserting some fourteen affirmative defenses.

On July 10, 2000, the court granted in part and denied in part OEI's motion to strike OSA's affirmative defenses; eleven of the fourteen affirmative defenses survived the court's ruling.

Between August 10, 1999 and February 14, 2000, OEI [*5] propounded on OSA three sets of interrogatories and three sets of document requests.

On July 7, 2000, OEI filed the within motion, pursuant to Fed. R. Civ. P. 37, seeking an order compelling OSA to: 1) provide full and complete answers to OEI's interrogatories, and 2) produce all materials requested in OEI's requests for production of documents.

## DISCUSSION

OEI argues, in general, that OSA's responses to its discovery requests are incomplete and deficient. OSA, on the other hand, contends that its responses are complete, and that OEI's requests are irrelevant, overly broad, or protected by a privilege.

[HN3] Rule 26(b)(1) of the Federal Rules of Civil Procedure states, in pertinent part, that "parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action . . . ." Fed. R. Civ. P. 26(b)(1). [HN4] Information that is reasonably calculated to lead to the discovery of admissible evidence is considered relevant for the purposes of discovery. See Daval Steel Prods. v. M/V Fakredine, 951 F.2d 1357, 1367 (2d Cir.1991). The term "reasonably calculated" as used in Rule 26 means "any possibility that the [*6] information sought may be relevant to the subject matter of the action." Morse/Diesel, Inc. v. Fidelity & Deposit Co., 122 F.R.D. 447, 449 (S.D.N.Y. 1988). A party may not object to a discovery request on the grounds that the information sought will be inadmissible at trial so long as the material requested could lead to other information that may be relevant to the subject matter of the action. See id.

[HN5] A party may object to a request if it is "overly broad" or "unduly burdensome." 8A Charles A. Wright, Arthur R. Miller & Richard L. Marcus, Federal Practice and Procedure § 2174, at 297 (2d ed. 1994). To assert a proper objection on this basis, however, one must do more than "simply intone [the] familiar litany that the interrogatories are burdensome, oppressive or overly broad." Compagnie Francaise D'Assurance Pour Le Commerce Exterieur v. Phillips Petroleum Co., 105 F.R.D. 16, 42 (S.D.N.Y. 1984). Instead, the objecting party must "show specifically how, despite the broad and liberal construction afforded the federal discovery rules, each [request] is not relevant or how each question is overly broad, burdensome or oppressive by submitting

[*7] affidavits or offering evidence revealing the nature of the burden " Id. (internal citations and quotation marks omitted). The objecting party may not leave it to the court to "sift each interrogatory to determine the usefulness of the answer sought." Id. To the contrary, the detail in the complaint defines the liberal guidelines for determining the relevance of the discovery requests, and the burden is on the party resisting discovery to clarify and explain its objections and to provide support for those objections. Id.

[HN6] A party may also object to a discovery request where the information sought is subject to the attorney-client privilege or the work-product doctrine. See Fed. R. Civ. P. 26(b)(5). "The party asserting the privilege and resisting discovery has the burden of establishing that privilege." Burns v. Imagine Films Entertainment, Inc., 164 F.R.D. 589, 593 (W.D.N.Y. 1996). "Blanket assertions" of privilege have been held insufficient to satisfy this burden. See Burns v. Imagine Films Entertainment, Inc., 164 F.R.D. 589, 593 (W.D.N.Y. 1996). Instead, a party "must supply opposing counsel with sufficient information to assess the applicability [*8] of the privilege or protection, without revealing information which is privileged or protected." Id. Finally, [HN7] pursuant to D. Conn. L. Civ. R. 9(d)(1), a party claiming privilege in response to a document request shall, for each document to which the privilege applies, provide a log indicating: 1) the type of document; 2) the general subject matter of the document; 3) the date of the document; 4) the author of the document; and 5) each recipient of the document. See D. Conn. L. Civ. R. 9(d)(1).

### A. Verification of Interrogatories

OEI first argues that OSA has failed to have one of its officers or agents verify its responses to OEI's interrogatories. OSA responds that "verification was never reasonably in dispute[.]" The court is unclear how this could be so given the motion before it. In addition, the court notes that over four months after OEI filed this motion complaining about the lack of verification, OSA still had not produced signatures for two out of three sets of interrogatories. [HN8] Rule 33 explicitly states that "answers [to interrogatories] are to be signed by the person making them[.]" Fed. R. Civ. P. 33(b)(2); see Nagler v. Admiral Corp., 167 F. Supp. 413, 415 (S.D.N.Y. 1958) [*9] (noting that [HN9] answers to interrogatories not signed by the party making them constitutes a violation of the discovery rules). Accordingly, the court orders OSA to sign its responses to OEI's interrogatories in compliance with Rule 33(b)(2) within 21 days of this order.

### B. Interrogatories Nos. 4-6

As indicated by OEI's reply brief, since the filing of the within motion, OSA has provided more complete answers to these interrogatories. Accordingly, the court does not address OEI's arguments relating to these requests.

## C. Interrogatories Nos. 7 and 8

These interrogatories ask OSA to: 1) identify each person who participated in the preparation of the answers to any interrogatory that has been propounded on it by OEI; and 2) identify the "custodian and location of each of the documents from which the answers to these interrogatories have been obtained or which have been requested in [OEI's] current or future" document requests. OSA has objected on the ground that these interrogatories are "overly broad, vague and ambiguous." In its opposition, OSA states that its complaint with respect to these interrogatories stems from the fact that they seek the requested information [*10] as related to "current or future requests."

The court notes, at the outset, that OSA's objections are not properly supported. See Compagnie Francaise D'Assurance Pour Le Commerce Exterieur v. Phillips Petroleum Co., 105 F.R.D. 16, 42 (S.D.N.Y. 1984). Also, rather than answer these interrogatories insofar as they relate to sets of interrogatories and document requests that had already been propounded on OSA, OSA inappropriately chose not to respond at all. See Fed. R. Civ. P. 33(b)(2) (noting that objecting party "shall answer to the extent the interrogatory is not objectionable."). Further, the court notes that the Federal Rules Advisory Committee has expressly disapproved of employing such gamesmanship in discovery requests:

> [HN10]
> Interrogatories . . . should not be read or interpreted in an artificially restrictive or hypertechnical manner to avoid disclosure of information fairly covered by the discovery request, and to do so is subject to appropriate sanctions under [Rule 37(a)].

8A Charles A. Wright, Arthur R. Miller & Richard L. Marcus, Federal Practice and Procedure § 2177, at 317 (2d ed. 1994) (quoting Advisory Committee Notes). Interrogatories [*11] Nos. 7 and 8 represent the most standard of discovery requests in that they simply seek: 1) the names of individuals who participated in the preparation of the interrogatory answers; and 2) the identity of any document used for that same purpose. In light of the above, the court hereby orders OSA to respond to these interrogatories to the extent they relate to discovery requests that have been propounded on OSA by OEI. Also,

the court orders OSA to supplement its response to these interrogatories, in compliance with Fed. R. Civ. P. 26(e), to the extent that answers to future discovery requests make its response to Interrogatories Nos. 7 and 8 incomplete. See Fed. R. Civ. P. 26(e).

## D. Interrogatory No. 9

This interrogatory seeks the identity, description and location of documents "in the possession or control of [OSA] that are relevant to any statements in [OEI's] complaint that are disputed by the [OSA]." OSA objects, on the grounds that the interrogatory is "overly broad and unduly burdensome, vague and ambiguous, and/or seeks information which is protected by the attorney-client privilege and/or work product doctrine[.]" The mere incantation of these words [*12] is insufficient to carry OSA's burden with regard to this objection. See Compagnie Francaise D'Assurance Pour Le Commerce Exterieur v. Phillips Petroleum Co., 105 F.R.D. 16, 42 (S.D.N.Y. 1984). Accordingly, OSA is ordered to respond. In the event that the information sought through this interrogatory is protected by the attorney-client privilege or the work-product doctrine, OSA is ordered to supply OEI with "sufficient information to assess the applicability of [that] privilege or protection, without revealing information which is privileged or protected." Burns v. Imagine Films Entertainment, Inc., 164 F.R.D. 589, 593-94 (W.D.N.Y. 1996).

## E. Interrogatory No. 10.

This interrogatory asks OSA to explain "for each affirmative defense . . . the basis of the defense, including facts supporting the defense, . . . the reasons such facts . . . support such defense, and the person(s) most knowledgeable about the facts and reasons supporting such defense." OSA objects on the grounds that the interrogatory is "vague and over broad, particularly to the extent that it refers to 'the defense', while the question is prefaced by a request for 'each affirmative [*13] defense' and seeks . . . the basis of 'the defense.'" Subject to this objection, OSA provided a limited response that improperly incorporated unspecified answers to earlier interrogatories. See Trabon Eng'g Corp. v. Eaton Mfg. Co., 37 F.R.D. 51, 60 (N.D. Ohio 1964) (observing that answers to interrogatories that refer to other answers are insufficient).

Again, the court disapproves of OSA's overly strict interpretation of this very basic discovery request. In addition, it concludes that OSA's limited response is inadequate and hereby orders OSA to provide the factual basis (as opposed to the legal basis) for each affirmative defense it has asserted. See Harlem River Consumers Coop., Inc. v. Associated Grocers of Harlem, Inc., 64 F.R.D. 459, 461-62 (S.D.N.Y. 1974) (noting that parties

are entitled to know the factual content of opponent's claims with a reasonable degree of precision). The court further concludes that OEI's privilege objection is not properly supported. See Burns v. Imagine Films Entertainment, Inc., 164 F.R.D. 589, 593 (W.D.N.Y. 1996). To the extent OSA contends that any of the information sought by this interrogatory is protected [*14] by the attorney-client privilege or the work-product doctrine, OSA is ordered to supply OEI with "sufficient information to assess the applicability of [that] privilege or protection, without revealing information which is privileged or protected." See id. at 593-94.

## F. Interrogatories Nos. 11-14

These interrogatories seek: 1) the identity of "all apparatus industrially or scientifically employed for measuring . . . variable parameters" which contain the OMEGA marks and which have been "sold by [OSA], anywhere in the world," since the agreement between the parties was signed in 1994; 2) the identity of all pending applications and registrations for any trademarks containing the OMEGA marks, that are "owned by, filed by, issued to, obtained by or renewed by [OSA] since OSA signed the 1994 agreement, anywhere in the world;" and 3) the identity of all industrial and/or scientific timers under any trademark containing the OMEGA marks "sold by [OSA,] anywhere in the world," since OSA signed the 1994 agreement. OSA objects to all four requests, contending that they are "irrelevant [and] overly broad . . . insofar as they relate to 'anywhere in the [*15] world.'"

The court notes, however, that the 1994 agreement, which is the basis of this action, explicitly states that its terms are effective "in all countries of the world." [HN11] Because the agreement is worldwide in scope, OSA's world-wide activities, which are allegedly in violation of the agreement, are reasonably calculated to lead to the discovery of admissible evidence within the liberal meaning of the federal rules. See Morse/Diesel, Inc. v. Fidelity & Deposit Co., 122 F.R.D. 447, 449 (S.D.N.Y. 1988) (noting that "reasonably calculated" in Rule 26(b)(1) means "any possibility that the information sought may be relevant to the subject matter of the action"). Further, these interrogatories, far from being irrelevant, ask for information directly bearing on OSA's alleged breach of the 1994 agreement. Indeed, the language of the interrogatories is taken almost verbatim from the 1994 agreement, which serves as the basis of this action. The court struggles to think of a request more "reasonably calculated to lead to the discovery of admissible evidence." Accordingly, OSA shall respond to Interrogatories Nos. 11-14 in their current form, without any further narrowing [*16] of their scope.

## G. Document Request No. 28

Through this request, OEI seeks all documents and things identified in OSA's response to Interrogatory No. 10. OSA responds to this request by referring to its objection to Interrogatory No. 10, which states that the request is unduly burdensome or that the information sought is protected by the existence of a privilege. See Section E, supra.

As with OSA's objection to Interrogatory No. 10, the court concludes that OSA has not carried its burden of demonstrating that this document request is unduly burdensome or overly broad. Compagnie Francaise D'Assurance Pour Le Commerce Exterieur v. Phillips Petroleum Co., 105 F.R.D. 16, 42 (S.D.N.Y. 1984). The court also concludes that OSA has not properly supported its privilege objection. See Burns v. Imagine Films Entertainment, Inc., 164 F.R.D. 589, 594 (W.D.N.Y. 1996). To the extent any material responsive to this or other document requests is protected by the attorney-client privilege or the work-product doctrine, OSA shall provide OEI with a log indicating: (1) the type of document; (2) the general subject matter of the document; (3) the date of the [*17] document; (4) the author of the document; and (5) each recipient of the document. See D. Conn. L. Civ. R. 9(d)(1); see also Fed. R. Civ. P. 26(b)(5). Accordingly, OSA is ordered to produce all documents, not otherwise privileged, that are responsive to this request.

## H. Document Requests Nos. 29-38

OSA offers the exact same objection to each of these requests. It argues that they are "irrelevant, overly broad and not reasonably calculated to lead to the discovery of admissible evidence" because they refer to apparatus sold by OSA, or trademark applications owned/filed by OSA "anywhere in the world." Again, the 1994 agreement that serves as the basis for this action is world-wide in scope. Consequently, OSA's world-wide activities allegedly in violation of that agreement are "reasonably calculated to lead to the discovery of admissible evidence." See Morse/Diesel, Inc. v. Fidelity & Deposit Co., 122 F.R.D. 447, 449 (S.D.N.Y. 1988). Aside from its problem with the geographic scope, OSA has provided no other basis for its objection. See Burns v. Imagine Films Entertainment, Inc., 164 F.R.D. 589, 593-94 (W.D.N.Y. 1996). Accordingly, the court [*18] orders OSA to produce documents responsive to Document Requests Nos. 29-38 in their current form, without any further narrowing of their scope.

## I. Document Requests 1-5, 10-12, 13-15, 17-19, 21, 24-27

As indicated by OEI's reply brief, since the filing of the within motion, OSA has provided more complete responses to these requests. Accordingly, the court does not address OEI's arguments relating to these requests.

## J. Expenses and Costs

OEI also argues that the court should award it costs incurred in connection with the preparation of the within motion because OSA's objections were not justified.

[HN12] Rule 37(a)(4)(A) of the Federal Rules of Civil Procedure states that:

> if [a motion to compel] is granted . . . the court shall, after affording an opportunity to be heard, require the party whose conduct . . . necessitated the motion . . . to pay the moving party the reasonable expenses incurred in making the motion, including attorney's fees, unless the court finds that . . . the opposing party's nondisclosure, response or objection was substantially justified, or that other circumstances make an award of expenses unjust.

Fed. R. Civ. P. 37(a)(4)(A). [HN13] [*19] This rule does not require the court to find bad faith before awarding reasonable attorney's fees. See Messier v. Southbury Training Sch., 1998 U.S. Dist. LEXIS 20315, No. 3:94-CV-1706, 1998 WL 841641, at *5 (Dec. 2, 1998). Instead, the Court may order the losing party to pay reasonable expenses so long as such an award complies with the requirements of Rule 37(a). See id.

An award of expenses is warranted in this case as the court concludes that OSA's objections were largely unjustified. For instance, in response to a majority of OEI's requests, OSA merely recited the same "form" objection stating that the requests were either: 1) "irrelevant," "overly broad," or "not reasonably calculated to lead to the discovery of admissible evidence;" or 2) subject to the attorney-client privilege or work-product doctrine. When asserting either of these objections, OSA failed to provide any evidentiary basis for its response. See Resps. to Interrogs. Nos. 7-9 and 11-14; Resps. to Reqs. for Docs. Nos. 1-5, 10-12, 17-19, 21, 24, 26, 30-38. n3 Also, as noted earlier, many of OEI's requests objected to on relevance grounds were directly related to OSA's alleged breach of the 1994 agreement, which is [*20] at the heart of this dispute. Finally, the court con-

cludes that OSA's use of strained and overly technical interpretations of OEI's interrogatories to avoid its obligation under the broad discovery rules resulted in OEI incurring unnecessary expense. See, e.g., Resps. to Interrogs. Nos. 7, 8, and 10. Accordingly, the court will make an award of fees and costs following the parties' submission on this issue as detailed immediately below.

> n3 While in some cases, OSA cited the requests' allegedly broad scope -- "anywhere in the world" -- as the reason for its objection, the court concludes that this basis was not justified given the breadth of the 1994 agreement at issue in this case. See Sections F and H, supra.

## CONCLUSION

Based on the foregoing, OEI's motion to compel (document no. 39) is GRANTED. The court orders that:

> 1) OSA shall provide full and complete responses to interrogatories nos. 7-14 and document requests nos. 28-38 within 21 days of this order;
>
> 2) OSA shall provide [*21] OEI with a privilege log, in compliance with D. Conn. L. Civ. R. 9(d)(1), for all documents that it contends are subject to the attorney-client privilege or the work-product doctrine within 21 days of this order;
>
> 3) OSA shall sign its responses to OEI's interrogatories in compliance with Rule 33(b)(2) within 21 days of this order;
>
> 4) OEI shall serve a copy of this Ruling and Order on OSA forthwith; and
>
> 5) OEI shall serve and file by, February 21, 2001, affidavits which set forth with specificity the expenses it incurred in preparing its motion to compel. OSA shall have 21 days from the date of service of OEI's affidavits to file any opposition.

It is so ordered this 6th day of February, 2001 at Hartford, Connecticut.

Alfred V. Covello, Chief U.S.D.J.

LEXSEE 2006 U.S. DIST. LEXIS 29813

**ROBERT SICURELLI et al., Plaintiffs, -against- JENERIC/PENTRON INC. et al.,
Defendants.**

**03-CV-4934 (SLT) (KAM)**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW
YORK**

*2006 U.S. Dist. LEXIS 29813*

**May 16, 2006, Decided**

**PRIOR HISTORY:** *Sicurelli v Jeneric / Pentron, Inc ,
2005 U S Dist LEXIS 38943 (E.D.N.Y., Dec 30, 2005)*

**COUNSEL:** [*1] For Dr. Robert Sicurelli, Dr., Dr.
Samuel Masyr, Dr., Plaintiffs: Bradford James Badke,
Michael S. Burling, Ropes & Gray LLP, New York, NY;
Gloria Fuentes, Ropes & Gray, New York, NY.

For Jeneric/Pentron Inc., Defendant: Andrew C. Ryan,
Cantor Colburn, LLP, South Bloomfield, CT; William J.
Cass, Cantor Colburn, LLP, Bloomfield, CT; Charles D.
Donohue, Drinker Biddle & Reath LLP, New York, NY;
Gloria Fuentes, Ropes & Gray, New York, NY.

For Pentron Clinical Technologies, LLC, Pentron Corpo-
ration, Inc., Defendants: Charles D. Donohue, Drinker
Biddle & Reath LLP, New York, NY.

For Jeneric/Pentron Inc., Counter Claimant: Charles D.
Donohue, Drinker Biddle & Reath LLP, New York, NY.

For Dr. Samuel Masyr, Dr., Dr. Robert Sicurelli, Dr.,
Counter Defendants: Michael S. Burling, Ropes & Gray
LLP, New York, NY; Gloria Fuentes, Ropes & Gray,
New York, NY.

For Coltene/Whaledent, Inc., Cross Claimant: Michael F.
Sarney, Katten Munchin Rosenman LLP, New York,
NY.

For Pentron Clinical Technologies, LLC, Pentron Corpo-
ration, Inc , Cross Defendants: Charles D. Donohue,
Drinker Biddle & Reath LLP, New York, NY.

For Jeneric/Pentron Inc., Cross Defendant: Andrew C.
Ryan, [*2] Cantor Colburn, LLP, South Bloomfield,
CT. Charles D. Donohue, Drinker Biddle & Reath LLP,
New York, NY.

**JUDGES:** KIYO A. MATSUMOTO, United States
Magistrate Judge.

**OPINION BY:** KIYO A. MATSUMOTO

**OPINION:**

**MEMORANDUM & ORDER**

MATSUMOTO, United States Magistrate Judge:

This patent infringement action has been referred to
the undersigned for general pretrial supervision. Pres-
ently before the Court is the motion of Jeneric/Pentron,
Inc., Pentron Clinical Technologies, LLC and Pentron
Corporation, Inc. (collectively, "Jeneric/Pentron") to
compel the production of certain documents, in plaintiffs'
possession. The documents were subpoenaed by Jen-
eric/Pentron from Hi-Rel Laboratories, Inc. ("Hi-Rel"),
an entity which purportedly conducted scanning electron
microscopy ("SEM") tests of Jeneric/Pentron's dental
posts which are the subject of this litigation. Specifically,
in addition to all documents and things considered by
plaintiffs' expert, Dr. Anthony Storace, in formulating his
opinion and expert report, Jeneric/Pentron seeks produc-
tion of "any and all documents and things, including . . .
photographs . . . exchanged between [plaintiffs' litigation
counsel] Ropes & Gray and Hi-Rel . . . [*3] . [,]" and
any and all documents that mention, refer or relate to the
instant law suit or any of the parties thereto. (Doc. No.
183, Affirmation of Michael Burling, Esq. dated Apr. 3,
2006 ("Burling Aff."), Ex. D, Subpoena to Hi-Rel,
Schedule A, PP4-6.)

Plaintiffs do not oppose the production of all materi-
als considered by Dr. Storace in formulating his opinion
and expert report. Instead, plaintiffs assert the work
product privilege as to other documents relating to Hi-
Rel's testing, specifically, testing commissioned by plain-
tiffs both prior to and following the commencement of

this litigation. (See generally, Doc. No. 182, Plaintiffs' Memorandum of Law in Opposition to Motion to Compel ("Pls. Opp'n MOL").) Plaintiffs also dispute Jeneric/Pentron's contention that all materials prepared by or otherwise exchanged between plaintiffs and Hi-Rel, regardless of whether such materials were considered by Dr. Storace, should be produced because they have been placed "at issue." (Id. at 6-10.) Dr. Storace has declared under oath:

> I have no knowledge of the testing conducted by Hi-Rel with Dr. Sicurelli and Ropes & Gray, and I did not consider it in forming my opinions in [*4] this case. No person at Hi-Rel made reference in my dealings with them to any previous work having been performed for Dr. Sicurelli, Dr. Masyr, or Ropes & Gray. I have produced all materials that I considered in forming my opinions in the above-captioned matter.

(Burling Aff., Ex. A, Declaration of Dr. Anthony Storace dated Mar. 30, 2006 ("Storace Decl."), PP8-9.)

For the reasons set forth below, the Court finds that (i) documents relating to plaintiffs' pre-litigation SEM testing, and plaintiffs' litigation counsel's SEM testing, of Jeneric/Pentron's dental posts are protected by the work product privilege; (ii) Jeneric/Pentron has not demonstrated the requisite "substantial need" for the privileged materials sufficient to overcome work product protection; and (iii) plaintiffs have not otherwise placed such materials "at issue" so as to have waived work product protection. Accordingly, Jeneric/Pentron's motion to compel is denied without prejudice.

## DISCUSSION

The work product doctrine provides qualified protection from discovery of "documents and tangible things . . . prepared in anticipation of litigation" unless the party seeking discovery demonstrates a "substantial [*5] need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means." *Fed. R. Civ. P. 26(b)(3)*. The purpose of this doctrine is to protect from disclosure materials reflecting "the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation." Id.

### A. Applicability of the Work Product Doctrine

"[T]hree conditions must be met to earn work product protection. The material must (1) be a document or a tangible thing, (2) that was prepared in anticipation of litigation, and (3) was prepared by or for a party, or by or for his representative." *In Re Grand Jury Subpoenas Dated Dec 18, 1981 & Jan. 4, 1982, 561 F. Supp. 1247, 1257 (E.D.N.Y. 1982)*. The burden of establishing all three elements of the work product privilege rests with the party invoking the privilege. *In re Grand Jury Subpoena Dated Dec. 19, 1978, 599 F.2d 504, 510 (2d Cir. 1979)*. There is no dispute regarding the first and third prongs of this tripartite [*6] test.

With respect to the second prong -- whether the document was prepared in anticipation of litigation -- this Court has previously determined that one of the SEM tests was "commissioned by and for plaintiffs in their anticipation of litigation against Jeneric," prior to the commencement of this litigation ("pre-litigation testing"). Sicurelli v. Jeneric/Pentron, No. 03-CV-4934, slip op. at 13-14 (E.D.N.Y. May 3, 2005) ("May 2005 Order"). This Court ruled that the documents relating to that test were "developed by the plaintiffs in the context of the plaintiffs' potential litigation against Jeneric . . . and [were] protected from disclosure as plaintiffs' work product and may not be disclosed . . . without plaintiffs' consent." Id.; see also Jeneric/Pentron, No. 03-CV-4934, slip op. at 9 (E.D.N.Y. June 16, 2005) ("Order on Reconsideration") (on reconsideration, holding that documents relating to the results of SEM testing of dental posts commissioned by plaintiffs were work product "because the record established that plaintiffs commissioned the test to aid them in their anticipated litigation").

Moreover, the Court finds that documents relating to the results of the [*7] SEM tests commissioned by plaintiffs' litigation counsel, Ropes & Gray, LLP, and conducted during the course of litigation, also qualify as work product. A review of plaintiffs' privilege log regarding "Withheld Documents Submitted by Third-Party Hi-Rel Laboratories, Inc.," indicates that plaintiffs' litigation counsel commissioned tests in connection with the instant action on September 9, 2004, nearly one year after the filing of the Summons and Complaint on September 26, 2003, and that Hi-Rel provided the results of its testing to plaintiffs' counsel on or about December 9, 2004. (See Doc. No. 178, Affirmation of William J. Cass, Esq. ("Cass Aff."), at Ex. A, Privilege Log.) Accordingly, plaintiffs have satisfied the elements necessary to establish the applicability of the work product privilege to the disputed documents.

### B. Substantial Need for the Protected Documents

"Even where the applicability of the work product doctrine has been established, factual material may be ordered produced 'upon a showing of substantial need

and inability to obtain the equivalent without undue hardship.'" *In re Omeprazole Patent Litig., 2005 U.S. Dist. LEXIS 6112, No. M-21-81, 2005 WL 818821,* [*8] *at *9 (S.D.N.Y. Feb. 18, 2005)* (quoting *Upjohn Co. v. United States, 449 U.S. 383, 400, 101 S. Ct. 677, 66 L. Ed. 2d 584 (1981)); In re Grand Jury Proceedings, 219 F.3d 175, 190-191 (2d Cir. 2000)* ("A party seeking discovery of attorney work-product must show substantial need, for fact work-product. As for work-product that shows mental impressions, conclusions, opinions, or legal theories of an attorney, . . . at a minimum such material is to be protected unless a highly persuasive showing [of need] is made.") (internal citations and quotation marks omitted).

"Substantial need is not evaluated in a vacuum, and in order to overcome work product protection, [defendant] must demonstrate that it cannot obtain the substantial equivalent of the information it seeks." *E.E.O.C. v. Carrols Corp., 215 F.R.D. 46, 52 (N.D.N.Y. 2003)* (citing *Horn & Hardart Co. v. Pillsbury Co., 888 F.2d 8, 12 (2d Cir. 1989)).* That does not mean that a party seeking the document must show an absolute impossibility, but rather that it is significantly more difficult, time-consuming or expensive to obtain the information from another source. *Securities & Exch. Comm'n. v. Thrasher, 1995 U.S. Dist. LEXIS 1355, 92 Civ. 6987, 1995 WL 46681,* [*9] *at *9 (S.D.N.Y. Feb. 7, 1995).*

Jeneric/Pentron has not demonstrated why it could not and cannot now obtain the substantial equivalent of the information contained in the protected documents. As the Court indicated in its May 3, 2005 order, Jeneric/Pentron could have conducted its own SEM tests of its dental posts and, indeed, could have commissioned Hi-Rel to do so, just as it could have deposed the Hi-Rel employee that conducted the tests. See *Tribune Co. v. Purcigliotti, 1998 U.S. Dist. LEXIS 5155, 93 Civ. 7222, 1998 WL 175933 at *4 (S.D.N.Y. Apr. 14, 1998)* ("'Substantial need' cannot be shown where persons with equivalent information are available for deposition.") (citing *Pillsbury, 888 F.2d at 12); Atlantic Richfield Co. v. Current Controls, Inc., 1997 U.S. Dist. LEXIS 13082, No. 93-CV-0950, 1997 WL 538876, at *3 (W.D.N.Y. Aug. 21, 1997)* (noting that the party seeking facts in a privileged document may obtain those facts through other means of discovery); *ECDC Env't v. New York Marine and Gen. Ins. Co., 1998 U.S. Dist. LEXIS 8808, 96 Civ. 6033, 1998 WL 614478, at *15-16 (S.D.N.Y. June 4, 1998)* ("[B]ecause the work product privilege does not protect the facts in that document (the privilege [*10] protects documents, not facts), the party seeking those facts may obtain them through other means of discovery, such as through depositions and interrogatories."). It is true that other discovery devices may be more expensive or burdensome than the production of the protected

documents; however, the discovery devices do provide an alternative means for Jeneric/Pentron to obtain the substantial equivalent and, perhaps more, without undue hardship and without impinging upon plaintiffs' work product. See *In re Int'l Sys. & Controls Corp., 693 F.2d 1235, 1241 (5th Cir. 1982)* (noting that although expense may be considered in determining undue hardship, "in the ordinary case, the cost of one or a few depositions is not enough to justify discovery of work product") (citation omitted).

## C. "At Issue" Waiver

Jeneric/Pentron also contends that plaintiffs have waived any claim over the Hi-Rel documents by placing their tests of Jeneric/Pentron's dental posts "at issue." (See Doc. No. 197, Jeneric/Pentron's Memorandum of Law in Support of Motion to Compel ("Def. MOL"), at 5-8.) Specifically, Jeneric/Pentron asserts that because plaintiffs, their counsel and Dr. [*11] Storace each retained Hi-Rel to conduct tests on the allegedly infringing dental posts, plaintiffs have placed at issue all of Hi-Rel's tests relative to those dental posts.

Jeneric/Pentron correctly asserts that "waiver of work product protection may result from a party's injection of an issue into the litigation that, in fairness, requires the party to disclose otherwise protected material." *Ruotolo v. City of New York, 2005 U.S. Dist. LEXIS 5958, No. 03 Civ. 5045, 2005 WL 823015, at *2-3 (S.D.N.Y. Apr. 7, 2005)* (citing *In re Grand Jury Proceedings, 219 F.3d 175, 182 (2d Cir. 2000)).* Courts have found that an "at-issue" waiver has occurred when the following factors are present:

> (1) assertion of the privilege was the result of some affirmative act, such as filing suit, by the asserting party; (2) through this affirmative act, the asserting party put the protected information at issue by making it relevant to the case; and (3) application of the privilege would have denied the opposing party access to information vital to [its] defense.

*Ruotolo, 2005 U.S. Dist. LEXIS 5958, 2005 WL 823015, at *2-3* (citing *Granite Partners v. Bear, Stearns & Co., Inc., 184 F.R.D. 49, 54 (S.D.N.Y. 1999)).* [*12]

While plaintiffs' assertion of work product protection is the direct result of their commencement of this action, thus satisfying the first factor, the Court is not convinced that, with respect to the second factor, plaintiffs have placed the protected documents "at issue" by

making them relevant to this case. Whether plaintiffs have placed their pre-litigation testing and the testing commissioned by their counsel at issue depends upon whether that information was considered by Dr. Storace in formulating his expert opinion and report or whether plaintiffs otherwise intend to rely on that information.

*Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure*, which governs disclosures by expert witnesses, mandates the disclosure of, among other things, "the data or other information *considered* by the witness in forming the opinions . . . ." (Emphasis added). "[T]he requirement of disclosure applies not only to information actually relied upon by a testifying expert, but also to information that was not relied upon, but considered by the expert . . . ." *Schwab v. Philip Morris USA, Inc., 2006 U.S. Dist. LEXIS 11047, No. 04-CV-1945, 2006 WL 721368, at [*13]   *2 (E.D.N.Y. Mar 20, 2006)* (citing *Construction Indus. Servs Corp v. Hanover Ins Co., 206 F.R.D. 43, 50 (E.D.N.Y. 2001)).*

The party resisting disclosure bears the burden of showing that an expert did not consider certain documents in forming his opinion. See *Schwab, 2006 U S Dist. LEXIS 11047, 2006 WL 721368, at *3* (citation omitted). "[T]his burden cannot generally be satisfied by the expert's representations alone . . . . The burden is met when the documents could not have been considered by the expert in forming his opinion, as when they are reviewed by the expert only after he has testified. . . . It can also be met when the party opposing disclosure presents the court with affidavits and deposition testimony clearly establishing that the testifying witness never read, reviewed, or considered the subject documents in forming his opinions." Id. (citations and internal quotation marks omitted).

The results of pre-litigation testing and testing conducted by plaintiffs' counsel following the commencement of this action are not at issue because they could not have been considered by Dr. Storace in forming his opinion. Dr. Storace's declaration reflects that he was [*14]  not aware of the existence of other tests until March 2006, approximately five months following the conclusion of his work with Hi-Rel and the preparation of his report, in November 2005. Thus, Dr. Storace could not have "considered" these tests for purposes of *Rule 26(a)(2)(B)* disclosure requirements. (See Storace Decl. PP5-9; Cass Aff., Ex. D, Expert Report of Anthony Storace dated Nov. 17, 2005.)

In its reply brief relative to this motion, Jeneric/Pentron asserts that Roger Devaney, the Hi-Rel employee who allegedly performed the tests ordered by Dr. Storace, as well as the pre-litigation testing commissioned by plaintiffs and later by plaintiffs' counsel in September 2004, acted as an "agent" of Dr. Storace, or as

a non-testifying expert, whose knowledge about Jeneric/Pentron's posts was disclosed to Dr. Storace, and thereby informed Dr. Storace's expert opinion. Jeneric/Pentron contends that "Roger Devaney's prior consulting relationship with Plaintiff's [sic] counsel may have influenced the sample preparation and photography of the FibreKor samples used in Dr. Storace's report. It is therefore critical for Pentron to examine the extent to which the opinion of Dr. Storace [*15]  may have been based on or influenced by Roger Devaney's earlier tests and/or experiments." (Doc. No. 184, Jeneric/Pentron's Reply Brief in Support of Motion to Compel ("Def. Reply MOL"), at 7.)

While Jeneric/Pentron correctly points out that a non-testifying expert, who "is generally immune from discovery[,]" *Schwab, 2006 U.S. Dist. LEXIS 11047, 2006 WL 721368, at *2*, may be subject to the disclosure requirements of *Rule 26(a)(2)(B)* if the non-testifying expert's opinion or knowledge informed the testifying expert's opinion, see *2006 U.S. Dist. LEXIS 11047, [WL] at *3*, here, the alleged influence of Mr. Devaney on Dr. Storace's opinion and report is speculative. None of the cases cited by Jeneric/Pentron stand for the proposition that documents not seen, considered nor known about by a testifying expert need be disclosed where such documents are otherwise privileged. There is no indication that Roger Devaney's earlier tests or experiments influenced the preparation and photography of Jeneric/Pentron's posts discussed in Dr. Storace's report. Instead, the record reflects that Dr. Storace provided Mr. Devaney with detailed instructions regarding how he wanted the tests to be conducted and how the posts were to be photographed.  [*16]  There is no indication that Mr. Devaney deviated from these instructions.

With respect to the third factor in determining if there has been an "at issue" waiver -- whether application of the work product privilege will deny defendants access to information vital to their defense -- the Court is not convinced that nondisclosure of the protected documents will deprive defendants of such "vital" information. As previously mentioned, although the documents themselves are privileged, the underlying facts contained therein are not, and thus, Jeneric/Pentron may avail itself of other discovery devices to obtain those facts. See *Atlantic Richfield, 1997 U S Dist. LEXIS 13082, 1997 WL 538876, at *3.*

Accordingly, the Court does not find that the record before this Court requires plaintiffs to produce documents protected by the work product privilege. To the extent Jeneric/Pentron has not received any Hi-Rel documents related to Dr. Storace's requested tests, all such documents shall be produced within one week of the date of this order. Of course, if plaintiffs intend to rely on the protected documents, they shall be timely

provided to all parties. At present, however, plaintiffs have not indicated that [*17] they will rely on the documents they now claim are privileged.

### D. Admissibility of Evidence

The parties also dispute the admissibility of certain evidence which may be proffered at trial, including but not limited to Dr. Storace's report. (See Def. Reply MOL, at 2-5; Doc. No. 187, Plaintiffs' Sur-Reply Brief in Opposition to Motion to Compel, at 1-7.) The Court declines to make any determination as to the admissibility of evidence at trial at this stage in the litigation. The parties may make any motions regarding the admissibility of evidence at trial before the trial court at the appropriate time.

### CONCLUSION

For the foregoing reasons, Jeneric/Pentron's motion to compel is denied without prejudice.

**SO ORDERED.**
Dated: May 16, 2006

Brooklyn, New York

/s/

KIYO A. MATSUMOTO

United States Magistrate Judge

LEXSEE

**KEVIN TRUDEAU, an individual, ALLIANCE PUBLISHING GROUP, INC., a Delaware corporation, and SHOP AMERICA (USA) L.L.C., an Illinois limited liability corporation, Plaintiffs, - v - NEW YORK STATE CONSUMER PROTECTION BOARD; TERESA A. SANTIAGO, in her official and individual capacity; CAROLINE QUARTARATO, in her official and individual capacity, and JON SORENSEN, in his official and individual capacity, Defendants.**

Civ. No. 1:05-CV-1019 (GLS/RFT)

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF NEW YORK

2006 U.S. Dist. LEXIS 61901

**July 21, 2006, Decided**

**PRIOR HISTORY:** Trudeau v. New York State Consumer Prot. Bd., 2006 U.S. Dist. LEXIS 26308 (N.D.N.Y, May 4, 2006)

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiffs, an author and related companies, asserted claims against defendants, the New York State Consumer Protection Board and its members, seeking damages and other relief for alleged First Amendment violations, defamation, and tortious interference. Defendants sought (1) further discovery regarding plaintiffs' economic damages and (2) the return of privileged documents.

**OVERVIEW:** Plaintiffs alleged that they suffered lost profits because defendants wrongfully caused television and cable stations to terminate infomercials advertising the author's book. Although the author's tax return was relevant to establishing economic loss, defendants did not show a compelling need for the tax return because defendants could gain the financial information through less intrusive sources. Accordingly, the court ordered the author to provide a net worth statement. The court ruled that defendants' request for information regarding an action in which the author sought damages for lost business opportunities against a publisher of infomercial rankings was calculated to lead to admissible evidence because the lost revenues on the sale of the author's book was the sine qua non of both cases. A cable operator letter that defendants' attorney drafted to facilitate settlement constituted work product under Fed. R. Civ. P. 26(b)(3), and the privilege was not waived because the letter was not carelessly disclosed. Because of defen-

dants' extreme carelessness in providing multiple copies of an email to plaintiffs, the court concluded that the email's confidentiality was waived.

**OUTCOME:** The court denied defendants' application for the author's tax return, granted defendants' application for documents related to a separate action filed by the author, ordered defendants to provide a new privilege log, ordered plaintiffs to return a cable operator letter, and ordered that plaintiffs did not have to return a confidential email and an unprivileged letter.

**CORE TERMS:** disclosure, attorney-client, log, work product doctrine, discovery, waived, privileged, email, work product, lawsuit, financial information, station, confidential, disclose, qualified immunity, tax return, forfeiture, settlement, cable, cable operator, third party, net worth, impressions, waive, preliminary injunction, attach, deposition, listing, privileged document, subject matter

**LexisNexis(R) Headnotes**

*Civil Procedure > Discovery > Disclosures > General Overview*
*Tax Law > Federal Tax Administration & Procedure > Audits & Investigations > Disclosure of Information (IRC secs. 6103-6104, 6108-6110, 6713, 7213, 7216, 7431, 7435) > Confidentiality of Returns & Return Information*
[HN1] Routine discovery of tax returns is not the rule but rather the exception. Tax returns have been considered confidential, pursuant to 26 U.S.C.S. § 6103. Courts

within the Second Circuit have found personal financial information to be presumptively confidential or cloaked with a qualified immunity. Thus, courts grappling with whether personal tax returns and personal financial information should be disclosed must balance the countervailing policies of liberal discovery set forth in the Federal Rules of Civil Procedure against maintaining the confidentiality of such documents.

*Civil Procedure > Discovery > Disclosures > General Overview*
[HN2] The courts within the Second Circuit have fashioned a reasonable standard to be employed before directing the release of tax information. This standard has a two pronged test: (1) the court must find that the requested tax information is relevant to the subject matter of the action; and (2) the court must find that there is a compelling need for this information because the information contained therein is not otherwise readily obtainable. The showing of a compelling need for the information within the tax returns falls upon the party making the demand for this form of disclosure. But once a compelling need has been shown, there is no justifiable reason to deny this pretrial financial discovery.

*Civil Procedure > Discovery > Disclosures > General Overview*
[HN3] A party whose tax returns may be the subject of a demand to disclose, especially when the demanding party may have made the requisite showing, has the burden in this discourse to provide alternative sources for this sensitive information. Conversely, if the information contained in the tax return is otherwise available from other less intrusive sources, compelled discovery of the return should be denied. Garnering this financial information by a deposition is one alternative source. Another approach would have the party disclose relevant financial information by providing an affidavit of net worth, wealth, and income.

*Civil Procedure > Discovery > Privileged Matters > General Overview*
[HN4] A proponent of a privilege log must make the claim expressly and shall describe the nature of the documents, communications, or things not produced or disclosed in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the applicability of the privilege or protection. Fed. R. Civ. P. 26(b)(5). In this respect, and in order to evaluate and facilitate the determination of whether a privilege exists, courts generally require compliance with this statutory mandate that an adequately detailed privi-

lege log be provided. Without an adequately detailed privilege log, the courts are hamstrung in attempting to decipher the presence and the extent of the claimed privilege. To constitute an acceptable privilege log, at a minimum, it should provide facts that would establish each element of the claimed privilege as to each document and identify each document and the individuals who were parties to the communications, providing sufficient detail to permit a judgment as to whether the document is at least potentially protected from disclosure. Other required information, such as the relationship between individuals not normally within the privileged relationship, is then typically supplied by affidavit or deposition testimony.

*Civil Procedure > Discovery > Privileged Matters > General Overview*
[HN5] When a party fails to comply with the requirements of Fed. R. Civ. P. 26(b)(5) when submitting a privilege log, which is inadequate as a matter of law in that the log just does not provide sufficient information to support the privilege, the claim of privilege may be denied.

*Evidence > Privileges > Attorney-Client Privilege > General Overview*
[HN6] The attorney-client privilege is a longstanding, common law privilege recognized in New York and by the federal courts under Fed. R. Evid. 501.

*Civil Procedure > Discovery > Privileged Matters > Attorney-Client Privilege*
*Evidence > Privileges > Attorney-Client Privilege > General Overview*
[HN7] The attorney-client privilege rule has been immortalized as a legal doctrine for eons to encourage full engagement between a party and her attorney so that full and frank communication exists to impart all the information an attorney may need in order to give sage and cogent advice on the matter. Stated another way, its essential purpose is to encourage clients to be fully forthcoming with their attorney and to receive, in return, advice which will protect the client's legal rights. The free-flow of information and the twin tributary of advice are the hallmarks of the privilege. For all of this to occur, there must be a zone of safety for each to participate without apprehension that such sensitive information and advice would be shared with others without their consent.

*Civil Procedure > Discovery > Privileged Matters > Attorney-Client Privilege*
*Evidence > Privileges > Attorney-Client Privilege > Elements*
*Evidence > Procedural Considerations > Burdens of Proof > Allocation*

[HN8] When determining if there is in fact an attorney-client privilege present to cloak both a client's communication and the corresponding legal advice, a court needs to ascertain that this safety net attaches to only those communications (1) where legal advice of any kind is sought, (2) from a professional legal advisor in his or her capacity as such, (3) the communication relates to that purpose, (4) made in confidence, (5) by the client, and (6) are at his or her insistence permanently protected, (7) from disclosure by the client or the legal advisor, (8) except if the protection is waived. This privilege further attaches to the advice rendered by the attorney. The burden of proving each element of the privilege rests on the party claiming the protection.

*Civil Procedure > Discovery > Privileged Matters > Attorney-Client Privilege*
*Evidence > Privileges > Attorney-Client Privilege > Scope*

[HN9] Contrary to modern yet ill-informed perceptions, the attorney-client privilege is often narrowly defined, riddled with exceptions, and subject to continuing criticism. Grand as the privilege stands in our legal lexicon, it is nonetheless narrowly defined by both scholars and the courts. The attorney-client privilege is not given broad, unfettered latitude to every communication with a lawyer, but is to be narrowly construed to meet this narrowest of missions.

*Civil Procedure > Discovery > Privileged Matters > Attorney-Client Privilege*
*Evidence > Privileges > Attorney-Client Privilege > Scope*
*Evidence > Privileges > Government Privileges > General Overview*

[HN10] The case law generally assumes the existence of a governmental attorney-client privilege in civil suits between government agencies and private litigants. That is, the legal maxim is substantial in presuming that the rationale supporting the attorney-client privilege applicability to private entities has general relevance to governmental entities as well.

*Civil Procedure > Discovery > Privileged Matters > Work Product > Scope*

*Evidence > Privileges > Attorney-Client Privilege > General Overview*

[HN11] Whenever the attorney-client privilege is raised in on-going litigation, concomitantly the work product doctrine is virtually omnipresent. They are inseparable twin issues, and when one is advanced, surely the other will follow. The work product privilege is more broad than the attorney-client privilege.

*Civil Procedure > Discovery > Privileged Matters > Work Product > Scope*

[HN12] The work product privilege exists to protect attorneys' mental impressions, opinions, and/or legal theories concerning litigation. Indeed, the work product privilege is designed to protect an adversarial system of justice. This doctrine establishes a "zone of privacy" in which a lawyer can prepare and develop theories and strategies with an eye towards litigation free from unnecessary intrusion by his or her adversaries.

*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*
*Evidence > Procedural Considerations > Burdens of Proof > Allocation*

[HN13] The burden, albeit not a heavy one, of establishing that the work product doctrine applies rests with that party's attorney who is claiming the protection.

*Civil Procedure > Discovery > Privileged Matters > Work Product > Scope*
*Civil Procedure > Discovery > Privileged Matters > Work Product > Waivers*

[HN14] The work product doctrine, as well as the attorney-client privilege, does not extend to every document generated by an attorney; it does not shield from disclosure everything a lawyer does. The doctrine is generally invoked as soon as the attorney, in responding to a request for production of documents, serves upon the requesting party a privilege log asserting this and any other relevant privilege or provides notification that it will not be disclosed for this reason. Fed. R. Civ. P. 26(b)(5) & 34(b). Failure to timely provide the privilege log or objection constitutes a waiver of any of the asserted privileges. Even if a party follows these steps, the security of the work product doctrine is not assured. There must be the omnipresent concern that revealing the attorney's mental processes is real and not just speculative.

*Civil Procedure > Discovery > Privileged Matters > Work Product > Scope*
[HN15] See Fed. R. Civ. P. 26(b)(3).

*Civil Procedure > Discovery > Privileged Matters > Work Product > Opinion Work Product*
[HN16] The work product doctrine classifies documents into two categories: "non-opinion" work product and "opinion" work product. The distinction between these two categories turns on the effort employed in obtaining disclosure pursuant to Fed. R. Civ. P. 26(b)(3). For "non-opinion" work product, the party seeking this information must show a substantial need for the document and undue hardship to acquire the document or its substantial equivalent by other means. On the other hand, "opinion" work product requires a higher protection to the extent that the requesting party has to demonstrate extraordinary justification before the court will permit its release. At a minimum, such "opinion" work product should remain protected until and unless a highly persuasive showing is made.

*Civil Procedure > Discovery > Privileged Matters > Work Product > Fact Work Product*
[HN17] In most instances, the work product doctrine does not extend to facts. Generally, non-privileged facts should be freely discoverable.

*Civil Procedure > Discovery > Privileged Matters > Work Product > Scope*
*Civil Procedure > Discovery > Privileged Matters > Work Product > Waivers*
[HN18] Where a party faces the choice of whether to engage in a particular course of conduct virtually certain to result in litigation and prepares documents analyzing whether to engage in the conduct based on its assessment of the likely result of the anticipated litigation, it should be concluded that the preparatory documents should receive protection under Fed. R. Civ. P. 26(b)(3). The crux being that a document which has been prepared because of the prospect of litigation will not lose its protection under the work product doctrine, even though it may assist in business decisions. But this protection will not be extended, under any circumstances, to records that are prepared in the ordinary course of business. Even though the work product doctrine protects the impressions, opinions, theories, and strategies of an attorney, Rule 26(b)(3) makes clear that the document at issue, either obtained or prepared by or for a party, or by or for his representative, may be cloaked by this doctrine as well. The exchange of documents and ideas with those whose expertise and knowledge of certain facts can help the attorney in the assessment of any aspect of the litigation does not invoke a waiver of the doctrine.

*Civil Procedure > Discovery > Privileged Matters > Attorney-Client Privilege*
*Evidence > Privileges > Attorney-Client Privilege > Waiver*
[HN19] A waiver that occurs when a client's communication(s) or the legal advice given was shared, in some form or fashion, with a third party may be done explicitly or implicitly, or rather, intentionally or inadvertently. When communications between a party and her attorney occur in the presence of a third party, the attorney-client privilege may be waived. Yet, a disclosure to a third party does not waive the privilege unless such disclosure is inconsistent with the maintenance of secrecy and if the disclosure substantially increases the possibility of an opposing party obtaining the information. For example, an exemption from the waiver accrues if such communications are shared with an agent of the attorney, which may include investigators and accountants retained to assist the attorney in rendering legal advice and instruction.

*Civil Procedure > Discovery > Privileged Matters > Work Product > Waivers*
[HN20] The work product doctrine is not absolute. Such protection, like any other privilege, can be waived and the determination of such a waiver depends on the circumstances. In most respects, the discussion of a third party waiver is virtually the same for both the attorney-client privilege and the work product doctrine. A voluntary disclosure of work product, for some or any inexplicable benefit, to a third party, especially if the party is an adversary, may waive the immunity. Once a party allows an adversary to share in an otherwise privileged document, the need for the privilege disappears, and may disappear forever, even as to different and subsequent litigators. As an illustration, when a party makes a strategic decision, no matter how broad and sweeping or limited, to disclose privileged information, a court can find an implied waiver. Moreover, a party cannot partially disclose a privileged document nor selectively waive the privilege and then expect it to remain a shield. However, there is no per se rule that all voluntary disclosures constitute a waiver of the work product doctrine because there is no way the court can anticipate all of the situations when and how such disclosure is required. There are times when a waiver can be broad and other times when it has to be narrowly construed. Each case must be judged on its own circumstances and merits.

*Civil Procedure > Discovery > Privileged Matters > Work Product > Waivers*

[HN21] In the context of an inadvertent disclosure of a privileged document, such oversight does not necessarily mean a privilege is waived unless the producing party's conduct was so careless as to suggest that it was not concerned with the protection of the asserted privilege. Some courts within the Second Circuit have created a standard to evaluate the mishap disclosure: The court must assess whether the procedures followed in maintaining the confidentiality of the documents were so lax, careless, inadequate or indifferent to consequences as to constitute a waiver. Inadvertent production will not waive the privilege unless the conduct of the producing party or its counsel evinced such extreme carelessness as to suggest that it was not concerned with the protection of the privilege. Although this rule sounds rather definitive on the law pertaining to disclosure and waiver, however, where a party makes an effort to demonstrate that such divulgence should not constitute a waiver, a flexible balancing test has been devised: (1) the reasonableness of the precautions taken by the producing party to prevent inadvertent disclosure of privileged documents; (2) the volume of discovery versus the extent of the specific disclosure issue; (3) the length of time taken by the producing party to rectify the disclosure; and (4) the over-arching issue of fairness.

*Civil Procedure > Discovery > Privileged Matters > General Overview*
*Evidence > Privileges > General Overview*
[HN22] In certain circumstances a party's assertion of factual claims can, out of consideration of fairness to the party's adversary, result in the involuntary forfeiture of privileges for matters pertinent to the claims asserted. The application of "at issue" waiver is primarily due to the fact that the party asserting the privilege has placed a contention at issue.

*Evidence > Privileges > Attorney-Client Privilege > Waiver*
[HN23] If the advice of counsel is placed in issue by either a claim, defense, or testimony it is deemed waived. Moreover, it is not the filing of the lawsuit that matters but the relevance of the contention that controls.

*Civil Procedure > Discovery > Privileged Matters > Attorney-Client Privilege*
*Civil Procedure > Discovery > Privileged Matters > Work Product > Waivers*
*Evidence > Privileges > Attorney-Client Privilege > Waiver*
[HN24] For purposes of "at issue" waiver, forfeiture of a privilege turns on the consideration of fairness, or, more

correctly cast, unfairness to the adversary. This unfairness to the adversary is having to defend against a privilege holder's claim without access to pertinent privilege material that might refute the claim. Thus, in the circumstances where a party contends facts to an adjudicating authority (a court, jury or decision maker) then relies upon the privilege to deprive its adversary of access to the material that might disprove, impeach, effectively contest, rebut or undermine the party's contention, such would be unfair. Or, where the privilege holder intends to visit prejudice upon his opponent or disclose only select portions of the privileged communication for self serving purposes in order to promote a claim in the litigation that in fairness may require examination of this protected communication, then the privilege may be forfeited. The fairness doctrine will not allow the privilege to stand when the proponents seek to use it for a purpose that is inconsistent with the privilege. What the court is attempting to avoid is the wielding of the attorney-client privilege and the work product doctrine as both a shield and a sword. It is the unfairness that is the crucible for the forfeiture.

*Civil Procedure > Discovery > Privileged Matters > General Overview*
*Evidence > Privileges > General Overview*
[HN25] In resolving whether an "at issue" forfeiture has occurred, courts within the Second Circuit have resorted to the following test: (1) assertion of a privilege was a result of some affirmative act, such as filing suit, (2) through the affirmative act, the asserting party puts the protected information at issue by making it relevant to the case, and (3) the application of the privilege would have denied the opposing party access to information vital to the defense.

*Civil Procedure > Discovery > Privileged Matters > General Overview*
*Evidence > Privileges > General Overview*
[HN26] A court may consider the following in ascertaining whether an "at issue" forfeiture is applicable: (1) the very subject of privileged communication is critically relevant to the issue litigated, (2) there is a good faith basis for believing such essential privileged information exists, and (3) there is no other source of direct proof.

*Civil Procedure > Discovery > Privileged Matters > General Overview*
*Evidence > Privileges > General Overview*
[HN27] Because of the fragility of broad generalizations and sometimes per se rules, in the context of determining fairness, it is more prudent to decide the at issue waiver

on a case by case basis, which depends primarily on the specific context in which the privilege is asserted or on its own particular facts. The forfeiture should be narrowly construed and tailored to remedy the unfairness or prejudice.

*Civil Procedure > Discovery > Privileged Matters > General Overview*
*Evidence > Privileges > General Overview*
[HN28] When a number of documents are claimed to be privileged, there is no wholesale waiver but rather a specific inquiry as to each document.

*Civil Procedure > Discovery > Privileged Matters > General Overview*
[HN29] Fed. R. Civ. P. 26(b)(5) mandates that the party asserting a privilege shall make the claim expressly and shall describe the nature of the documents. This Rule requires a specific, denoted objection to a specific document and not a comprehensive, imprecise command. Pat, generic, non-specific objections, intoning the same boilerplate language are inconsistent with both the letter and the spirit of the Federal Rules of Civil Procedure.

*Civil Rights Law > Immunity From Liability > Defenses*
*Torts > Public Entity Liability > Immunity > Qualified Immunity*
[HN30] Qualified immunity will shield government officials from liability for civil damages when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. This also applies insofar as it was objectively reasonable for the government officials to believe that their acts did not violate those rights. The objectively reasonable test will be met if officials of reasonable competence could disagree on the legality of the defendant's actions. In order for the constitutional right to be clearly established, three elements must be met: (1) that the right in question be defined with reasonable specificity; (2) that the decisional law of the Supreme Court of the United States and applicable circuit court support the existence of the right in question; and (3) that under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

**COUNSEL:** [*1] ANDREW A. JACOBSON, ESQ., DANIEL J. HURTADO, ESQ., DAVID J. BRADFORD, ESQ., JENNER, BLOCK LAW FIRM, Attorneys for Plaintiffs, Chicago, IL.

DANIEL MACH, ESQ., JENNER, BLOCK LAW FIRM, Attorneys for Plaintiffs, Washington, D.C.

KEVIN LAURILLIARD, ESQ., WILLIAM A. HURST, ESQ., MCNAMEE, LOCHNER LAW FIRM, Attorneys for Plaintiffs, Albany, NY.

MICHAEL J. GRYGIEL, ESQ., HISCOCK, BARCLAY LAW FIRM, Attorneys for Plaintiffs, Albany, NY.

LORI J. VAN AUKEN, ESQ., WINSTON, STRAWN LAW FIRM, Attorneys for Plaintiffs, New York, NY.

ROGER W. KINSEY, ESQ., BRIDGET ERIN HOLOHAN, ESQ., JAMES B. MCGOWAN, ESQ., Assistant Attorney Generals, HON. ELIOT SPITZER, Attorney General for the State of New York, Attorney for Defendants, Albany, NY.

**JUDGES:** RANDOLPH F. TREECE, United States Magistrate Judge.

**OPINION BY:** RANDOLPH F. TREECE

**OPINION:**

### MEMORANDUM-DECISION and ORDER

Presently before this Court is a series of Letter-Motions and Letter-Briefs pertaining to a host of discovery conflicts, with the most contentious issue being whether Defendants' disclosure of privileged documents was either inadvertent, intended, or due to carelessness. n1 Before we address each of these discovery disagreements, [*2] the disputes must be put into context, therefore, a brief recitation of the facts in this case is warranted.

> n1 Because of the sensitive and confidential nature of some of the documents to be discussed herein, by a series of Text Orders, the Court granted the parties permission to submit their respective Letter-Motions and Letter-Briefs in traditional format for an *in camera* review. Text Orders, dated Mar. 29, 2006 & Apr. 14, 2006. We further advised the parties that after our review of the documents' content some of them may not remain under seal, which said public release may be a part of this Order. Text Order, dated Mar. 29, 2006.

> It should be noted that subsequent Letter-Briefs were not filed under seal in the traditional format. *See* Dkt. Nos. 88, State Defs.' Lt.-Brief, dated Jun. 16, 2006 & 91, Pls.' Lt.-Brief, dated June 23, 2006.

On August 11, 2005, a Complaint was filed in this matter based upon the allegation that the New York State Consumer Protection Board ("CPB") threatened to contact certain [*3] television stations in regards to Plaintiff Trudeau's book entitled "Natural Cures 'They' Don't Want You to Know About." The nature of the cause of action pled at that time was that CPB violated Plaintiffs' First Amendment Rights. Dkt. No. 1, Compl. at PP 3 & 6-9. That same day, in conjunction with the filing of the Complaint, a Motion for a Temporary Restraining Order ("TRO") was filed by Plaintiffs. Dkt. No. 2, TRO. Because of Plaintiffs' failure to comply with the Federal Rules of Civil Procedure and the Local Rules for the Northern District of New York, the application for a TRO was denied without prejudice. See Text Order, dated Aug. 15, 2005. Then, on August 16, 2005, an Emergency Motion for TRO was filed (Dkt. No. 6), which was opposed by Defendants (Dkt. Nos. 13-14). Prior to the Hearing, which was held on August 30, 2005, Defendants were told to "refrain from contacting broadcasting stations regarding plaintiffs' subject advertisement and maintain the status quo until the hearing." Deadlines for Mot., dated Aug. 17, 2005. At the August 30th Hearing, Judge Sharpe denied the Motion for TRO. Dkt. No. 15, Oral [*4] Order, dated Aug. 30, 2005.

On August 31, 2005, Plaintiffs filed a Motion for Preliminary Injunction and another Motion for TRO. Dkt. No. 17. That same day, after much re-consideration, Plaintiffs' Application for the TRO was granted as follows:

> (1) The defendants are hereby enjoined from directly contacting any cable or broadcast station in order to induce such station to refuse to carry, or cease to carry, plaintiffs' advertisements for the Natural Cures book authored by Kevin Trudeau; and (2) The defendants are hereby enjoined from publishing or disseminating the letter attached as Exhibit A to the TRO application, or any letter substantially similar in content, as a means of indirectly contacting cable or broadcast stations (see "Dear cable station/broadcast station,"); *however,* (3) Nothing in the language of this TRO shall operate to preclude defendants from communicating with the public concerning the views expressed by the State Consumer Protection Board[.]

Dkt. No. 20, Order, dated Aug. 31, 2005, at pp. 2-3.

The Hearing for the Application for a Preliminary Injunction was scheduled for September 6, 2005. *Id.* at p. 3. On September 1, 2005, Defendants [*5] filed a Cross Motion to Dismiss and Opposition to the Motion for Preliminary Injunction. Dkt. No. 25. On September 5, 2005, Plaintiffs filed an Emergency Motion for TRO to *Restore the Status Quo.* Dkt. No. 37. At the September 6th Hearing, Judge Sharpe granted Plaintiffs' Motion for a Preliminary Injunction consistent with the language in the initial order and denied the Defendants' Cross Motion to Dismiss. Oral Order, dated Sept. 6, 2005; *see also* Dkt. No. 42, Minute Entry, dated Sept. 6, 2005. The Hearing for the Emergency Motion for TRO to *Restore the Status Quo* was scheduled for September 27, 2005, and on that date, Judge Sharpe denied Plaintiffs' Application. Dkt. No. 58, Minute Entry, dated Sept. 27, 2005.

On October 5, 2005, Plaintiffs filed their Motion for Leave to Amend and Supplement their Complaint (Dkt. Nos. 59, 62, 67 & 68), which was likewise opposed by Defendants (Dkt. Nos. 61, 70 & 71). By a Memorandum-Decision and Order, dated May 4, 2006, this Court granted in part and denied in part Plaintiffs' Motion. Dkt. No. 83. Nonetheless, Plaintiffs were permitted to file an Amended and Supplemented Complaint as follows to add: (1) another Plaintiff, Shop America [*6] (USA) L.L.C.; (2) another Defendant, Caroline Quartararo, Deputy Executive Director of the Consumer Protection Board ("CPB"); (3) claims for monetary damages against Teresa Santiago, Caroline Quartararo, and John Sorensen in their individual capacities for acts undertaken in their official capacities; (4) state law defamation claims against Santiago, Sorensen, and Quartararo; (5) claims for tortious interference against Santiago; and (6) a supplemental violation of Plaintiffs' First Amendment Right. n2 On June 2, 2006, an Amended Complaint was served and filed. Dkt. No. 87.

> n2 The May 4, 2006 Memorandum-Decision and Order was affirmed by Judge Sharpe. Dkt. No. 94, Order, dated July 19, 2006.

## I. DISCUSSION

### A. Discovery as to Damages

Originally, when this action was first commenced, Plaintiffs only sought a declaratory judgment and a preliminary injunction. Dkt. No. 1, Compl. Now, with the advent of the Amended Complaint, Plaintiffs seek compensatory and punitive damages, on both the federal and state [*7] cause of actions, as to all of the Defendants.

Dkt. No. 87, Am. Compl. There is no equivocation in the Plaintiffs' prayer for relief on behalf of Plaintiff Trudeau, as well as the other Plaintiffs, that they are seeking compensatory and punitive damages for being defamed and having their business relationships tortiously interfered with by Defendants. *Id.* at pp. 32-33 (*see* specifically, *inter alia,* PP (i), (1), (n)). Preliminarily, the projected damages are $ 2,000,000, but may rise to $ 20,000,000. CPB's Lt.-Brief, dated Mar. 29, 2006.

Defendants made a request for Production of Documents from all of the Plaintiffs seeking all documents "upon which [they will] rely upon to calculate the economic loss." *Id.* at p. 1. In response thereto, Plaintiffs provided Shop America's general ledger, Alliance Publishing's balance sheet, and a document from non-party Mercury Medial relating to historical book sales. Pls.' Lt.-Brief, dated Apr. 17, 2006, at pp. 1-2; Dkt. No. 91, Pls.' Lt.-Brief, dated Jun. 23, 2006, at p. 1 (listing the documents presented to Defendants). Notwithstanding these disclosures, CPB finds the disclosures wholly inadequate. In terms of discovering information [*8] on economic damages, Defendants further seek Trudeau's tax returns and information regarding another lawsuit.

Plaintiffs seem to rely upon two basic arguments to limit the scope of disclosure, at least at this juncture, which seem in conflict with the broad claim for compensatory and punitive damages as to all Plaintiffs. First, Plaintiffs state in their Letter-Brief that the nature of the loss in this case is the lost profits as a result of CPB having wrongfully caused a number of TV and cable stations (possibly ten) to terminate the infomericals at issue in this litigation, and second, calculating the damages will require expert consultations, which has not yet occurred. Dkt. No. 91 at pp. 2 & 3 ("[T]he only economic damages at issue so far in this case are the projected lost profits resulting from lost book sales."); *see also* CPB's Lt.-Brief, Attach. 1 (schedule showing average weekly income and projected lost income as of Dec. 9, 2005, of 10 radio stations). Both prongs of this argument may have some validity as to Shop America and Publishing Alliance, however, such blanket objections appear to be inapplicable to Trudeau who is seeking possibly $ 20,000,000 in damages as [*9] to the defamation cause of action. CPB claims that Plaintiffs have failed to provide any shred of discovery demonstrating economic harm or damage as to Trudeau. Nonetheless, the sole damage discovery issue we will address in this Memorandum-Decision and Order will be Trudeau's tax returns and information related to the lawsuit *Trudeau v. Jordan Whitney.* n3

n3 In a recent and brief telephone conference, this Court recalls Plaintiffs stating that they have provided all of the Shop America and Publishing Alliance financial records in their possession at this time, and are relying upon information to be gathered from the non-party Mercury Media to calculate their respective lost profits. With the assistance of an expert, Plaintiffs proffers that they may be able to identify more accurately the lost profits. Since Plaintiffs are representing that they have disclosed all that they have in their possession, it is our understanding the Defendants will await further disclosure, which they may attempt to gather directly from Mercury Media.

In this context, which was initially a part of this critical debate for disclosure, the issue was whether Plaintiffs could be compelled to direct non-party Mercury Media to disclose further information to support their tabulation of lost profits. Again, based upon the brief telephone conference, Defendants will retreat from demanding this information now from Plaintiffs since they will be deposing Mercury Media. It is expected that Mercury Media will produce all of the relevant data at its deposition. However, Defendants reserved their right to renew their request for this information after evaluating the disclosures to be rendered by Mercury Media. Hence, these two disclosure issues will not be covered by this Memorandum-Decision and Order.

Similarly, Defendants had demanded copies of 900 studies Trudeau purportedly consulted or reviewed in writing his book, to which Plaintiffs strenuously object. It is the Court's understanding that the parties have entered into a compromise on this Demand in that Plaintiffs have agreed to provide a list of these 900 studies, which is acceptable to Defendants.

[*10]

1. Discovery of Tax Returns

[HN1] Routine discovery of tax returns is not the rule but rather the exception. *Sec. Exch. Comm'n (S.E.C.) v. Cymatcolor Corp.,* 106 F.R.D. 545, 547 (S.D.N.Y. 1985) (finding that courts are reluctant to direct such disclosures). For nearly the past thirty-five years, tax returns have been considered "confidential," pursuant to 26 U.S.C. § 6103. *Gates v. Wilkinson,* 2005 U.S. Dist. LEXIS 5523, 2005 WL 758793, at *1 (N.D.N.Y. Apr. 5, 2005). Moreover, courts within the Second Circuit have found personal financial information to be presumptively confidential or cloaked with a qualified immunity. *Dew v. 39th St. Realty 2001 U.S. Dist. LEXIS 4631, 2001 WL 388053, at *2 (S.D.N.Y. Apr. 16, 2001)* ("[T]here is

a qualified immunity with respect to the disclosure of tax returns[.]"); *McMenamin v. Kingson,* 1999 U.S. Dist. LEXIS 955, 1999 WL 47199, at *3 (S.D.N.Y. Feb. 2, 1999) (presumptively confidential); *see also Moustakis v. City of New York,* 1996 U.S. Dist. LEXIS 13268, 1996 WL 517689, at *1 (S.D.N.Y. Sept. 11, 1996) (concluding that even though tax returns are not privileged, as a "matter of policy," courts "should be cautious in ordering their disclosure"). [*11] Thus, courts grappling with whether personal tax returns and personal financial information should be disclosed must balance the countervailing policies of liberal discovery set forth in the Federal Rules of Civil Procedure against maintaining the confidentiality of such documents. *United States v. Bonanno Organized Crime Family of La Cosa Nostra,* 119 F.R.D. 625, 627 (E.D.N.Y. 1988); *see also S.E.C v. Cymaticolor Corp.,* 106 F.R.D. at 547.

[HN2] The Courts within the Second Circuit have fashioned a reasonable standard to be employed before directing the release of tax information. *Gates v. Wilkinson,* 2005 U.S. Dist. LEXIS 5523, 2005 WL 758793, at *1 (finding that the standard should be "more stringent" than the relevancy standard found in FED. R. CIV. P. 26(b)(1)). This standard has a two pronged test: (1) the court must find that the requested tax information is relevant to the subject matter of the action; and (2) that there is a compelling need for this information because the information contained therein is not otherwise readily obtainable. *Id.; E.E.O.C. v. First Wireless Group, Inc.,* 225 F.R.D. 404, 406 (E.D.N.Y. 2004); [*12] *Hamm v. Potamkin,* 1999 U.S. Dist LEXIS 594, 1999 WL 249721, at *2 (S.D.N.Y. Apr. 28, 1999); *Hazeldine v. Beverage Media,* 1997 U.S. Dist. LEXIS 8971, 1997 WL 362229, at *4 (S.D.N.Y. June 25, 1997); *Moustakis v. City of New York,* 1996 U.S. Dist. LEXIS 13268, 1996 WL 517689, at *1; *Gummowitz v. First Fed Sav. & Loan Ass'n of Roanoke,* 160 F.R.D. 462, 463 (S.D.N.Y. 1995) (citing *S.E.C. v Cymaticolor Corp.,* 106 F.R.D. at 547); *Russell v Del Vecchio,* 764 F.Supp. 275, 276 (E.D.N.Y. 1991); *United States v. Bonanno,* 119 F.R.D. at 627. The showing of a compelling need for the information within the tax returns falls upon the party making the demand for this form of disclosure. *Laurin v. Pokoik,* 2004 U.S. Dist. LEXIS 4066, 2004 WL 2724767 (S.D.N.Y. Nov. 30, 2004); *United States v Bonanno,* 119 F.R.D. at 627 (the burden of establishing relevance falls upon the party seeking the tax return). But once a compelling need has been shown, there is no justifiable reason to deny this pretrial financial discovery. *Hamm v. Potamkin,* 1999 U.S. Dist. LEXIS 594, 1999 WL 249721, at *2 (citing *Hazeldine v Beverage Media,* 1997 U.S. Dist. LEXIS 897, 1997 WL 36229, at *3 (noting that [*13] "allowing pre-trial discovery avoids the inefficiency of a discovery delay")); *Tillery v. Lynn,* 607 F. Supp. 399, 402-03 (S.D.N.Y. 1985).

Nonetheless, [HN3] the party whose tax returns may be the subject of a demand to disclose, especially when the demanding party may have made the requisite showing, has the burden in this discourse to provide alternative sources for this sensitive information. *Bujnicki v Am. Paving & Excavating, Inc.,* 2004 U.S. Dist. LEXIS 8869, 2004 WL 1071736, at *14 (W.D.N.Y. Feb. 25, 2004) (cited in *Gates v. Wilkinson,* 2005 U.S. Dist. LEXIS 5523, 2005 WL 758793, at *2); *Patrick Carter Assoc., Inc. v. Rent Stabilization Ass'n,* 1992 U.S. Dist. LEXIS 9382, 1992 WL 167387, at *2 (S.D.N.Y. Jun. 26, 1992). Conversely, if the information contained in the tax return is otherwise available from other less intrusive sources, compelled discovery of the return should be denied. *Gates v. Wilkinson,* 2005 U.S. Dist. LEXIS 5523, 2005 WL 758793, at *2. Garnering this financial information by a deposition is one alternative source. *Id.* (citing, *inter alia, Hazeldine v. Beverage Media,* 1997 U.S. Dist. LEXIS 897, 1997 WL 36229, at *4). Another approach would have the party disclose relevant financial information [*14] by providing an affidavit of net worth, wealth, and income. *Hamm v. Potamkin,* 1999 U.S. Dist. LEXIS 594, 1999 WL 249721, at *2-3 (finding that the tax return provides the most reliable source of relevant financial information, but the substitution of a sworn net worth statement and income may suffice). n4

> n4 It is this Court's view that the substitution of a net worth statement is reasonable for both compensatory and punitive damages disclosure.

In terms of the facts of our case, the financial information contained within the tax return is relevant to the respective claims made by Trudeau. Contrary to the Plaintiffs' position, a quest for a sizable award for compensatory damages premised upon any of the claims set forth within the Amended Complaint, particularly the cause of action sounding in defamation, makes Trudeau's financial circumstances relevant, and the Defendants should not have to wait until expert disclosure to find out how his losses will be calculated. There should be some pretrial financial information disclosure [*15] prior to the final stage of discovery, that is, expert disclosure. *See* Dkt. No. 66, Uniform Pretrial Scheduling Order, dated Nov. 30, 2005. Apparently, Defendants attempted to gain some of this information by a deposition but to little avail. Dkt. No. 88 at p. 1. Still, there remains less intrusive sources not yet denied to Defendants upon which we should be able to refer to before we pour over sensitive tax information. n5 The second prong of the standard, requiring a showing of compelling need for the financial information **within** the tax return, has not been met, at least not yet. Therefore, Plaintiff Trudeau shall be required to provide to the Defendants a net worth state-

ment, listing assets and liabilities, and gross and net income for the years 2003 to 2005. *Hamm v. Potamkin,* 1999 U.S. Dist. LEXIS 594, 1999 WL 249721, at *2-3; *Hazeldine v. Beverage Media,* 1997 U.S. Dist. LEXIS 897, 1997 WL 36229, at *4.

> n5 The Honorable David R. Homer, United States Magistrate Judge, cogently noted that there is other significant personal and sensitive information disclosed in a tax return, which may not be relevant to the financial information being sought. For example, Judge Homer identifies the social security numbers of the taxpayers, medical and other deductions, and spousal financial information, *inter alia,* which may not be relevant to the litigation. *Gates v. Wilkinson,* 2005 U.S. Dist. LEXIS 5523, 2005 WL 758793, at *8, n.3.

[*16]

Initially, our visceral reaction would be to agree with Trudeau that his charitable contribution to a foundation set up by his accountant is not relevant and hence not subject to discovery. Yet, we realize that the Defendants may be faced with the stark reality that Trudeau could divert his revenue sources, such as the Natural Cures Book's profits, directly to the foundation without possibly reporting the earning of such income on his tax return or reflecting such data on his net worth statement, thereby being able to indicate a greater financial loss by the alleged actions of the Defendants. n6 Nonetheless, all other information regarding the foundation would be irrelevant. In order to prevent any concealment of Trudeau's revenue streams, we direct that, at a minimum, Trudeau disclose the extent of his contribution to this foundation and the nature of its primary source. If Trudeau does not make any contributions to this foundation, he will be required to so advise Defendants.

> n6 The relevant colloquy on the foundation, in part, reads as follows:

>> Q: Mr. Trudeau, you've made the statement, I believe, that you're going to give away your fortune?
>> A: . . . Oh, I made that statement, yes.
>> Q: And what's the funding level for that?
>> A: Don't know the answer.
>> Q: Who would know the answer?
>> A: Probably my accountant . . . [Mark Lane].

Dkt. No. 91, Attach. Trudeau's Dep.

[*17]

Defendants are not prejudiced in that they may renew their application for the tax returns if these disclosures provide scant and inadequate foundation for the calculation of losses.

2. Discovery of Documents Related to Another, Independent Litigation

On the heels of this litigation, Trudeau has initiated a separate lawsuit against Jordan Whitney in a California state court. It appears that Jordan Whitney periodically publishes rankings on infomercials, which helps in gauging the success of a product or infomerical producer. It further appears that Trudeau claims that Jordan Whitney has misrepresented the success of the Natural Cures infomercial, which has damaged "Trudeau's reputation," and seeks $ 20,000,000 in damages. Under these circumstances, Defendants believe that they are entitled to inquire into whether Plaintiffs have been damaged by them or by the actions of a non-party, Jordan Whitney. Defs.' Lt.-Brief, dated Mar. 29, 2006, at p. 3. Plaintiffs' elementary retort to this request for information is that "the damages Trudeau seeks in that case -- lost business opportunities to appear in and produce infomercials for third parties -- are completely distinct from the [*18] economic damages sought in this case, namely lost book sales." Pls.' Lt.-Brief, dated Apr. 12, 2006, at p. 4.

Even without the benefit of reviewing the Jordan Whitney pleadings, evidently, the request for this information is more than "tangentially" relevant to this case as suggested by Plaintiffs. In this instant case, much like the action against Jordan Whitney, Trudeau is seeking damages for a besmirched reputation albeit by a different cause of action. Here, it is defamation. In the California case, Trudeau seeks damages primarily "for lost business opportunities," but we are confident that damages will be for much more than that, and in our litigation, he seeks broad compensatory and punitive damages for harm to his good name, which will include economic loss from lost book sales. Most telling in terms of the nature of the California lawsuit is Plaintiffs' press release on that lawsuit: "Trudeau alleges in the lawsuit that such **false** listing have [sic] skewed the public's and sales industry's **perception** of Trudeau's infomercial that promotes his book . . . . Having infomercial information and rankings accurately reported to the public **is essential to understanding** [*19] **how a product or in my case, a book, is actually received by the public.**" Defs.' Lt.-Brief, Mar. 29, 2006, Attach. 1 (news release) (emphasis added). Remarkably, in a material respect, both lawsuits deal with the public's perception of the Natural Cures Book, and it is not lost on this Court that the infomercial

is only one vehicle to promote the book. Rather than being distinct, damages in both seem to collide, if not merge, because the lost revenues on the sale of the book will be the *sine qua non* of both cases.

Moreover, Plaintiffs have not committed themselves to restrict or limit their damages in either case to the finite and compartmentalized economic losses suggested by them above, nor would we expect them to do so. Moreover, since presumably the relevant time frame for each of these lawsuits overlap, there is a possibility for a double recovery and the regrettable situation of one defendant being blamed for damages caused essentially by another. Under these circumstances, Defendants' request for information about the California State lawsuit, particularly as to the calculation of damages, is germane to the subject matter of this case. We also find that any fear that [*20] the California State case will unnecessarily accelerate in any manner, as suggested by Plaintiffs, is untenable. Weighing the liberality of the federal discovery rules, supported by our opinion that the Defendants' discovery request is calculated to lead to admissible evidence, Plaintiffs are directed to provide those documents related to this request, including calculations of damages, to the Defendants.

B. Attorney-Client Privilege and Work Product Doctrine

Both parties have presented a number of interlocking issues on whether documents now in the possession of the Plaintiffs are indeed Defendants' privileged documents, and if found to be such, whether the manner in which Plaintiffs received those documents constitutes a waiver of any privilege that may have attached. Pursuant to the Court's directions, the documents in questions were attached to Plaintiffs' Letter-Brief, dated April 12, 2006, which was submitted *in camera. In re John Doe Corp*, 675 F.2d 482, 489-90 (2d Cir 1982) (finding that *in camera* submission provides a method of judicial resolution without revealing confidential information). However, the scope of our review has been limited. The [*21] Court conducted a telephone conference in June 2006 with the parties wherein the Court was informed that only three documents are now at the heart of this controversy. We will commence our discussion with an analysis of the various principles of law and then we will review the facts and circumstances that implicate these legal principles.

1. Privilege Log

The first issue for us to address is the adequacy of the Defendants' Privilege Logs. Both parties submitted as an attachment to their respective Letter-Brief samples of the Defendants' Privilege Logs, which were presented to the Plaintiffs. Plaintiffs stake the position that these Logs fail to comport with statutory requirements and because

of the inadequacy of the Logs this Court should deem all of the documents listed therein waived for all purposes. Controverting Plaintiffs' position, Defendants defend the adequacy of the Logs, however, if the adequacy of the Logs is found to be unsatisfactory, Defendants argue vociferously that such a drastic remedy of deeming all of the documents listed in the Logs as waived is unwarranted. At least, in terms of the adequacy of the Logs, we agree with the Plaintiffs' assessment.

[HN4] A proponent [*22] of a privilege log must "make the claim expressly and shall describe the nature of the documents, communications, or things not produced or disclosed in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the applicability of the privilege or protection." FED. R. CIV. P. 26(b)(5). n7 In this respect, and in order to evaluate and facilitate the determination of whether a privilege exists, courts generally require compliance with this statutory mandate that an adequately detailed privilege log be provided. *United States v. Constr. Prod. Research, Inc.,* 73 F.3d 464, 473 (2d Cir. 1996) (citations omitted). Without an adequately detailed privilege log, the courts are hamstrung in attempting to decipher the presence and the extent of the claimed privilege. To constitute an acceptable privilege log, at a minimum, it should provide facts that would establish each element of the claimed privilege as to each document, *Strougo v. BEA Assocs.,* 199 F.R.D. 515, 519 (S.D.N.Y. 2001), and "identify each document and the individuals who were parties to the communications, [*23] providing sufficient detail to permit a judgment as to whether the document is at least potentially protected from disclosure. Other required information, such as the relationship between individuals not normally within the privileged relationship, is then typically supplied by affidavit or deposition testimony." *United States v. Constr. Prod. Research, Inc ,* 73 F.3d at 473. [HN5] When a party fails to comply with the requirements of Rule 26(b)(5) when submitting a privilege log, which is inadequate as a matter of law in that the log just does not provide sufficient information to support the privilege, the claim of privilege may be denied. *Johnson v. Bryco Arms,* 2005 U.S. Dist. LEXIS 2938, 2005 WL 469612, at *3-4 (E.D.N.Y. Mar. 1, 2005) (citing *United States v. Constr. Prod. Research, Inc.,* 73 F.3d at 474).

n7 Defendants contend that it is the Plaintiffs and not them who should have the burden of going forward to identify the apparent deficiencies in the Logs. Defendants' contention is misplaced. Since the Defendant are asserting the privilege, it remains always the Defendants' burden to provide the necessary information to support their assertion. *See also infra* Part. II.B.2.

[*24]

Here, the Defendants' Privilege Logs are woefully inadequate and the "dearth of information [within the Logs] is so [in]complete that the listing[s] [therein are] the functional equivalent of no listing at all." *A.I.A. Holdings, S A v. Lehman Bros*, 2000 U.S. Dist. LEXIS 15141, 2000 WL 1538003, at *3 (S.D.N.Y. Oct. 17, 2000). The Privilege Logs' deficiencies are glaring inasmuch as

> . there are no descriptions as to the identities of the sender and recipient of the documents;
>
> . the date sent or received is not evidently clear;
>
> . the descriptions of the claimed privilege documents are much too meager or cursory to adequately identify the document; and
>
> . the type of privilege being asserted is not identified at all, rendering it an ordeal to recognize that indeed the described documents is or should be cloaked with a privilege.

*United States v Constr. Prod Research Inc.,* 73 F.3d at 474; *Strougo v. BEA Assoc.,* 199 F.R.D. at 519.

Considering the deficiencies of Defendants' Privilege Logs, the Plaintiffs are correct that the Court could declare all of the purported privileges waived. And, yet, adjudging these documents as waived [*25] would be too austere a remedy when the deficiencies can be readily rectified at this juncture of the litigation. *Export-Import Bank of United States v. Asia Pulp & Paper Co , Ltd.,* 232 F.R.D. 103, 111 (S.D.N.Y. 2005) (although finding the privilege log inadequate, the court directed that a new privilege log be promulgated). Furthermore, the Court is able to decode enough information from the Logs, when supplemented by the Defendants' submissions in support of the privilege, to appreciate, at least, the disputation on the privilege. Hence, the Court will not adopt the Plaintiffs' importune to waive *carte blanche* the privileges due to Defendants' failure to comply with the Federal Rules. If any waivers are applicable, it will be determined on the merits, document by document, and not completely on the failure to provide sufficient information within the Logs.

Therefore, the Court will require the Defendants to submit new, more descriptive logs to Plaintiffs containing the following information: (1) the identity of each

person listed as author and their role in preparing the documents; (2) the identity of each recipient, the role in which they received the documents [*26] and whether they are a party or non-party; (3) a more elaborate description of the specific document, or specific portion of the document, which is claimed to be protected by any privilege, without revealing the substance of the privileged communication; (4) identify any bate stamp number or any other identifiable notation; and, (5) identify the type of privilege being asserted (i.e., attorney-client privilege, work product, deliberative process, executive privilege).

2. Attorney-Client Privilege

[HN6] The attorney-client privilege is a longstanding, common law privilege recognized in New York and by the federal courts under FED. R. EVID. 501. It is one of those "bedrock principle[s] of our justice system [which has been sustained] for hundred[s] of years," dating back to the 1600s. *See* AM. LAW INST. - ABA - ATTORNEY-CLIENT PRIVILEGE (May 15, 2005) at p. 87; *United States v. Bilzerian,* 926 F.2d 1285, 1292 (2d Cir. 1991) (citing 8 J. WIGMORE, EVIDENCE, at § 2290, at pp. 542-44 (McNaughton rev. 1961) (the privilege being the oldest known - "[the] most ancient of confidential communication privileges")). [HN7] This rule has been [*27] immortalized as a legal doctrine for eons to encourage full engagement between a party and her attorney so that full and frank communication exists to impart all the information an attorney may need in order to give sage and cogent advice on the matter. *Swidler Berlin v. United States,* 524 U.S. 399, 403, 118 S. Ct. 2081, 141 L. Ed. 2d 379 (1998); *United States v. Schwimmer,* 892 F.2d 237, 243 (2d Cir. 1989) ("[The] communications between attorney and client endures as the oldest rule of privilege known to the common law."). Stated another way, its essential purpose is to encourage clients to be fully forthcoming with their attorney and to receive, in return, advice which will protect the client's legal rights. *Upjohn Co. v United States,* 449 U.S. 383, 389, 101 S. Ct. 677, 66 L. Ed. 2d 584 (1981); *Asian Vegetable Research & Dev Ctr v Inst of Int'l Educ.,* 1996 U.S. Dist. LEXIS 307, 1996 WL 14448, at *4 (S.D.N.Y. Jan. 16, 1996) (citing, *inter alia, In re Horowitz,* 482 F.2d 72, 81 (2d Cir.), *cert. denied,* 414 U.S. 867, 94 S. Ct. 64, 38 L. Ed. 2d 86 (1973)). The free-flow of information and the twin tributary of advice are the hallmarks of the privilege. For all of this to occur, there must be a zone of safety [*28] for each to participate without apprehension that such sensitive information and advice would be shared with others without their consent. *In re Grand Jury Subpoena Duces Tecum etc ,* 406 F. Supp. 381, 386 (S.D.N.Y. 1975) ("The sine qua non of the attorney-client-privilege is . . . a confidence reposed . . . .").

[HN8] When determining if there is in fact an attorney-client privilege present to cloak both the client's communication and the corresponding legal advice, a court needs to ascertain that this safety net attaches to only those communications (1) where legal advice of any kind is sought, (2) from a professional legal advisor in his or her capacity as such, (3) the communication relates to that purpose, (4) made in confidence, (5) by the client, and (6) are at his or her insistence permanently protected, (7) from disclosure by the client or the legal advisor, (8) except if the protection is waived. *United States v. Int'l Bhd. of Teamsters,* 119 F.3d 210, 214 (2d Cir. 1997) (citing *In Re Grand Jury Subpoena Duces Tecum,* 731 F.2d 1032, 1036 (2d Cir.1984)); *Madanes v Madanes,* 199 F.R.D. 135, 143 (S.D.N.Y. 2001) [*29] (citing, *inter alia, United States v. Richard Roe, Inc. (In re Richard Roe, Inc ),* 68 F.3d 38, 39-40 (2d Cir.1995) & quoting *United States v. Kovel,* 296 F.2d 918, 921 (2d Cir.1961)); *see also* 8 WIGMORE, EVIDENCE § 2292. This privilege, as previously stated, further attaches to the advice rendered by the attorney. *In re Six Grand Jury Witnesses,* 979 F.2d 939, 943-44 (2d Cir. 1992). The burden of proving each element of the privilege rests on the party claiming the protection. *In re Horowitz,* 482 F.2d at 82.

[HN9] Contrary to modern yet ill-informed perceptions, the attorney-client privilege is often "[n]arrowly defined, riddled with exceptions, and subject to continuing criticism." *United States v Schwimmer,* 892 F.2d at 243. Grand as the privilege stands in our legal lexicon, it is nonetheless narrowly defined by both scholars and the courts. *Univ. of Pa v E.E.O C.,* 493 U.S. 182, 189, 110 S. Ct. 577, 107 L. Ed. 2d 571 (1990). n8 The attorney-client privilege is not given broad, unfettered latitude to every communication with a lawyer, but is to be narrowly construed to meet this narrowest of missions. *Fisher v. United States,* 425 U.S. 391, 403, 96 S. Ct. 1569, 48 L. Ed. 2d 39 (1976) [*30] ("However, since the privilege has the effect of withholding relevant information from the factfinder, it applies only where necessary to achieve its purpose."); *see also In re Horowitz,* 482 F.2d at 81 (privilege ought to be "strictly confined within the narrowest possible limits consistent with the logic of its principle") (quoting 8 WIGMORE § 2292 at 70); *United States v Int'l Bhd of Teamsters,* 119 F.3d at 214.

---

n8 There is the general maxim that the public, particularly within the judicial forum, is entitled to be exposed to "everyman's evidence." 8 WIGMORE, EVIDENCE § 2317 (McNaughton rev. ed. 1961). The quest is for the truth of the matter to flow forward before the court, and "[t]he suppression of truth is a grievous necessity at best . . . [only justified] when the opposed private interest is supreme." *In re Megan-Racine As-*

socs., Inc., 189 B.R. 562, 570 (Bankr. N.D.N.Y. 1995) (citing *McMann v. Sec and Exch. Comm'n,* 87 F.2d 377, 378 (2d Cir. 1937)). But since the attorney-client privilege "stands in derogation of the public's right to everyman's evidence, . . . it ought to be strictly confined within the narrowest possible limits consistent with the logic of the principle." *In re Grand Jury Proceedings v. John Doe,* 219 F.3d 175, 182 (2d Cir. 2000) (citing *United States v. Int'l Bhd. of Teamsters,* 119 F.3d at 214).

[*31]

[HN10] The case law generally assumes the existence of a governmental attorney-client privilege in civil suits between government agencies and private litigants. *United States v. Doe (In re Grand Jury Investigation),* 399 F.3d 527, 532-33 (2d Cir. 2005) (citing, *inter alia, In re Lindsey,* 332 U.S. App. D.C. 357, 158 F.3d 1263, 1268 (D.C. Cir. 1998) ("Courts, commentators, and government lawyers have long recognized a government attorney-client privilege in several contexts.")). That is, the legal maxim is substantial in presuming that the "rationale supporting the attorney-client privilege applicabil[ity] to private entities has general relevance to governmental entities as well." *Id.* at 533 (ultimately finding that this rule has the same force in effect in criminal law as it does in civil cases).

3. Work Product Doctrine

[HN11] Whenever the attorney-client privilege is raised in on-going litigation, concomitantly the work product doctrine is virtually omnipresent. They are inseparable twin issues, and when one is advanced, surely the other will follow. The work product privilege is more broad than the attorney-client privilege. *In re Grand Jury Proceedings,* 219 F.3d 175, 190 (2d Cir. 2000). [*32] [HN12] This privilege exists to protect attorneys' mental impressions, opinions, and/or legal theories concerning litigation. *Horn & Hardart Co. v. Pillsbury Co ,* 888 F.2d 8, 12 (2d Cir. 1989). Indeed, the work product privilege is designed to protect an adversarial system of justice and has been analyzed in that context by the Supreme Court in *Hickman v. Taylor,* 329 U.S. 495, 510-11, 67 S. Ct. 385, 91 L. Ed. 451 (1947). This doctrine establishes a "zone of privacy" in which a lawyer can prepare and develop theories and strategies with an eye towards litigation free from unnecessary intrusion by his or her adversaries. *United States v Adlman* ("*Adlman I*"), 68 F.3d 1495, 1500-01 (2d Cir. 1995) (citing *United States v. Nobles,* 422 U.S. 225, 238, 95 S. Ct. 2160, 45 L. Ed. 2d 141 (1975) & *Hickman v Taylor,* 329 U.S. 495, 67 S. Ct. 385, 91 L. Ed. 451); *see also In re Minebea Co., Ltd.,* 143 F.R.D. 494, 499 (S.D.N.Y. 1992). Of course [HN13] the burden, albeit not a heavy one, of establish-

ing that the work product doctrine applies rests with that party's attorney who is claiming the protection. [HN14] The work product doctrine, as well as the attorney-client privilege, "does not extend to every document [*33] generated by the attorney; it does not shield from disclosure everything a lawyer does." *Rattner v Netburn,* 1989 U.S. Dist. LEXIS 6876, 1989 WL 223059, at *6 (S.D.N.Y. June 20, 1989). The doctrine is generally invoked as soon as the attorney, in responding to a request for production of documents, serves upon the requesting party a privilege log asserting this and any other relevant privilege or provides notification that it will not be disclosed for this reason. FED. R. CIV. P. 26(b)(5) & 34(b). Failure to timely provide the privilege log, as discussed above, or objection constitutes a waiver of any of the asserted privileges. Even if a party follows these steps, the security of the work product doctrine is not assured. There must be the omnipresent concern that revealing the attorney's mental processes is real and not just speculative. *Gould Inc v. Mitsui Mining & Smelting Co , Ltd., 825 F.2d 676, 680 (2d Cir. 1987).*

FED. R. CIV. P. 26(b)(3) provides a relevant rule on the discovery of work product material. It reads in part:

> [A] [HN15] party may obtain [*34] discovery of documents and tangible things otherwise discoverable under subdivision (b)(1) of this rule and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the court shall protect against the disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.

It is important to note that [HN16] the work product doctrine classifies documents into two categories: "non-opinion" work product and "opinion" work product. The distinction between these two categories turns on the effort employed in obtaining disclosure pursuant to Rule 26(b)(3). For "non-opinion" work product, the party seeking this information must show [*35] a substantial need for the document and undue hardship to acquire the document or its substantial equivalent by other means. On the other hand, "opinion" work product requires a higher protection to the extent that the requesting party has to demonstrate extraordinary justification before the court will permit its release. *Strougo v BEA Assocs , 199 F.R.D. 515, 521 (S.D.N.Y. 2001)* (citing *In re Sealed Case,* 219 U.S. App. D.C. 195, 676 F.2d 793, 809-10 (D.C. Cir. 1982)); *see also Upjohn Co. v. United States,* 449 U.S. at 401. At a minimum, such "opinion" work product should remain protected until and unless a highly persuasive showing is made. *In re Grand Jury Proceedings,* 219 F.3d at 191; *United States v. Adlman ("Adlman II"),* 134 F.3d 1194, 1204 (2d Cir. 1998). In a similar vein, [HN17] in most instances, the work product doctrine does not extend to facts. Generally, non-privileged facts should be freely discoverable. *Compare In re Savitt/Adler Litig.,* 176 F.R.D. 44, 48 (N.D.N.Y. 1997) with *Doe v United States (In re Grand Jury Subpoena Dated October 22, 2001),* 282 F.3d 156, 161 (2d Cir. 2002). n9

> n9 We note however that the Plaintiffs do not advance the argument that there is a substantial hardship which would permit disclosure pursuant to the guidelines set forth in Rule 26(b)(3). This analysis may still become pertinent.

[*36]

"[W]here [HN18] a party faces the choice of whether to engage in a particular course of conduct virtually certain to result in litigation and prepares documents analyzing whether to engage in the conduct based on its assessment of the likely result of the anticipated litigation, [it should be] conclude[d] that the preparatory documents should receive protection under Rule 26(b)(3)." *Adlman II,* 134 F.3d at 1196. The crux being that a document which has been prepared because of the prospect of litigation will not lose its protection under the work product doctrine, even though it may assist in business decisions. *Adlman I,* 68 F.3d at 1502; *Strougo v. BEA Assocs.,* 199 F.R.D. at 521. But this protection will not be extended, under any circumstances, to records that are prepared in the ordinary course of business. *Adlman I,* 68 F.3d at 1502. Even though the work product doctrine protects the impressions, opinions, theories, and strategies of an attorney, Rule 26(b)(3) makes clear that the document at issue, either obtained or prepared by or for a party, or by or for his representative, may be cloaked by this doctrine as [*37] well. *Id.* This maxim makes sound sense considering how complex litigation can be and the undeniable need for others to assist in developing all that is necessary to prosecute or defend a lawsuit. Obviously, impressions and strategies are not

always created in a vacuum, but, rather are generated in cogent discourse with others, including the clients and agents. Further, the exchange of such documents and ideas with those whose expertise and knowledge of certain facts can help the attorney in the assessment of any aspect of the litigation does not invoke a waiver of the doctrine. *United States v Nobles,* 422 U.S. at 239; *Adlman I,* 68 F.3d at 1502.

4. Waiver of Attorney-Client Privilege and Work Product Doctrine

There are circumstances, and permutations thereof, that cause waivers upon waivers to these less than sacrosanct rules. Cynthia B. Feagan, Comment, *Issues of Waiver In Multiple-Party Litigation. The Attorney-Client Privilege and the Work Product Doctrine,* 61 UMKC L. REV. 757 (1993); Edna Selan Epstein, *The Attorney-Client Privilege and the Work-Product Doctrine,* (4th ed. 2001). Considering that the attorney-client [*38] privilege protects communications and the work product doctrine protects tangible items which may contain strategies, impressions, and attorney's opinions, both the privilege and the doctrine may be waived in various ways including sharing such documents with a third party. *In re Pfohl Bros Landfill Litig.,* 175 F.R.D. 13, 22-28 (W.D.N.Y. 1997) (survey of the various types of implicit and explicit waivers); *see also* Feagan, Comment, *Issues of Waiver in Multiple-Party Litigation,* 61 UMKC L. REV. at 775-77. We need not now address all of the potential waivers and exceptions to the attorney-client privilege and the work product doctrine, but it is necessary in the context of this case to first draw upon those waivers which invariably cause lawyers the greatest angst, and may be problematic in this case. *See In re Pfohl Bros. Landfill Litig.,* 175 F.R.D. 13.

*a  Third Party Waiver*

[HN19] The waiver to which we speak is whether the client's communication(s) or the legal advice given was shared, in some form or fashion, with a third party. A waiver such as this may be done explicitly or implicitly, or rather, intentionally or inadvertently. [*39] 6 JAMES M. MOORE ET AL, MOORE'S FEDERAL PRACTICE § 26.49[5] (3d ed. 2005); *In re Pfohl Bros. Landfill Litig,* 175 F.R.D. at 24-26. Obviously, when communications between a party and her attorney occur in the presence of a third party, the privilege may be waived. *United States v. Am. Tel. and Tel Co,* 206 U.S. App. D.C. 317, 642 F.2d 1285, 1298-99 (D.C. Cir. 1980). Yet, a disclosure to a third party does not waive the privilege unless such disclosure is inconsistent with the "maintenance of secrecy" and if the disclosure "substantially increases the possibility of an opposing party obtaining the information." *GAF Corp. v Eastman Kodak Co,* 85 F.R.D. 46, 51-52 (S.D.N.Y. 1979). For ex-

ample, an exemption from the waiver accrues if such communications are shared with an agent of the attorney, which may include investigators and accountants retained to assist the attorney in rendering legal advice and instruction. *United States v. Schwimmer,* 892 F.2d 237, 243 (2d Cir. 1989) (accountant); *United States v McPartlin,* 595 F.2d 1321, 1336-37 (7th Cir. 1979) (investigator); *United States v. Kovel,* 296 F.2d 918, 921-24 (2d Cir. 1961) [*40] (disclosures to an accountant does not waive attorney-client privilege).

As noted above, [HN20] the work product doctrine is not absolute either. Such protection, like any other privilege, can be waived and the determination of such a waiver depends on the circumstances. *United States v. Nobles,* 422 U.S. at 239-40. In fact, in most respects, the discussion of a third party waiver is virtually the same for both the attorney-client privilege and the work product doctrine. A voluntary disclosure of work product, for some or any inexplicable benefit, to a third party, especially if the party is an adversary, may waive the immunity. *In re Steinhardt Partners, L.P ,* 9 F.3d 230, 234-37 (2d Cir. 2000); *see also In re Grand Jury Proceedings,* 219 F.3d at 191; *Strougo v. BEA Associates,* 199 F.R.D. at 521-22. Once a party allows an adversary to share in an otherwise privileged document, the need for the privilege disappears, and may disappear forever, even as to different and subsequent litigators. *In re Steinhardt Partners,* 9 F.3d at 235 (citing *United States v Nobles,* 422 U.S. at 239). As an illustration, [*41] when a party makes a strategic decision, no matter how broad and sweeping or limited, to disclose privileged information, a court can find an implied waiver. *In re Grand Jury Proceedings* 219 F.3d at 190-92. Moreover, a party cannot partially disclose a privileged document nor selectively waive the privilege and then expect it to remain a shield. *Id* at 191. However, there is no *per se* rule that all voluntary disclosures constitute a waiver of the work product doctrine because there is no way the court can anticipate all of the situations when and how such disclosure is required. *In re Steinhardt Partners,* 9 F.3d at 236 (*i.e.,* privilege not waived if shared with someone of common interest). There are times when a waiver can be broad and other times when it has to be narrowly construed. Each case must be judged on its own circumstances and merits. *See Strougo v. BEA Associates,* 199 F.R.D. at 521-22.

[HN21] In the context of an inadvertent disclosure of a privileged document, as just stated, such oversight does not necessarily mean a privilege is waived unless "the producing party's conduct was so careless as [*42] to suggest that it was not concerned with the protection of the asserted privilege." *Atronic Int'l, GMBH v SAI Semisspecialists of Am , Inc ,* 232 F.R.D. 160, 163 (E.D.N.Y. 2005) (citation omitted). To emphasize this

point, some courts within the Second Circuit have created a standard to evaluate the mishap disclosure:

> [T]he Court must assess whether the procedure[s] followed in maintaining the confidentiality of the document[s] [were] . . . so lax, careless, inadequate or indifferent to consequences as to constitute a waiver." *Martin v. Valley Nat'l Bank,* 1992 U.S. Dist. LEXIS 11571, 1992 WL 196798, at *2 (S.D.N.Y. Aug. 6, 1992). Inadvertent production will not waive the privilege unless the conduct of the producing party or its counsel evinced such extreme carelessness as to suggest that it was not concerned with the protection of the privilege. *See Lloyds Bank PLC v Republic of Ecuador,* 1997 U.S. Dist. LEXIS 2416, 1997 WL 96591, at *3 (S.D.N.Y. Mar. 5, 1997) (quoting *Desai v. American Int'l Underwriters,* 1992 U.S. Dist. LEXIS 6894, 1992 WL 110731, at *1 (S.D.N.Y. May 12, 1992)).

*United States Fid. & Guar. Co. v. Braspetro Oil Servs. Co ,* 2000 U.S. Dist. LEXIS 7939, 2000 WL 744369, at *5 (S.D.N.Y. June 8, 2000) [*43] (internal quotations marks omitted) (alterations in original).

Although this rule sounds rather definitive on the law pertaining to disclosure and waiver, however, where a party makes an effort to demonstrate that such divulgence should not constitute a waiver, a flexible balancing test has been devised: (1) the reasonableness of the precautions taken by the producing party to prevent inadvertent disclosure of privileged documents; (2) the volume of discovery versus the extent of the specific disclosure issue; (3) the length of time taken by the producing party to rectify the disclosure; and (4) the overarching issue of fairness. *Atronic Int'l,* 232 F.R.D. at 164 (quoting *United States v Rigas,* 281 F. Supp. 2d 733, 738 (S.D.N.Y. 2003)).

### b. At Issue Waiver

It is well settled law that [HN22] in "certain circumstances a party's assertion of factual claims can, out of consideration of fairness to the party's adversary, result in the involuntary forfeiture of privileges for matters pertinent to the claims asserted." *John Doe Co v United States,* 350 F.3d 299, 302 (2d Cir. 2003) (citing, *inter alia,* [*44] *United States v. Bilzerian,* 926 F.2d 1285 (2d Cir. 1991)). The application of "at issue" waiver is primarily due to the fact that the party asserting the privilege has placed "a contention at issue." *Id.* (citing, *inter*

*alia, Worthington v. Endee,* 177 F.R.D. 113, 116-117 (N.D.N.Y. 1998) and 6 JAMES WM. MOORE ET. AL, MOORE'S FEDERAL PRACTICE § 26.70[6][c] (3d ed. 1997)). n10

> n10 It is now an established principle of law that [HN23] if the advice of counsel is placed in issue by either a claim, defense, or testimony it is deemed waived. *Rhone-Poulenc Rorer Inc. v Home Indem. Co.,* 32 F.3d 851 (3d Cir. 1994); *United States v Bilzerian,* 926 F.2d 1285. Moreover, it is not the filing of the lawsuit that matters but the relevance of the contention that controls. *Remington Arms Co. v. Liberty Mut. Ins Co ,* 142 F.R.D. 408 (D. Del. 1992).

[HN24] Forfeiture of the privilege turns on the consideration of fairness, or, [*45] more correctly cast, unfairness to the adversary. This unfairness to the adversary is "*having to defend* against a privilege holder's claim without access to pertinent privilege material that might refute the claim." *John Doe Co. v. United States,* 350 F.3d at 304 (emphasis in original). Thus, in the circumstances where a party contends facts to an "adjudicating authority" (a court, jury or decision maker) then relies upon the privilege "to deprive its adversary of access to [the] material that might disprove, [impeach], [effectively contest], [rebut] or undermine the party's contention," such would be unfair. *Id.* at 302 & 303; *In re von Bulow,* 828 F.2d 94, 102 (2d Cir. 1987) (assertion during a judicial proceeding). n11 Or, where the privilege holder intends to visit prejudice upon his opponent or disclose only select portions of the privileged communication for "self serving purposes" in order to promote a claim in the litigation that in fairness may require examination of this protected communication, then the privilege may be forfeited. *United States v. Bilzerian,* 926 F.2d at 1292 & 1293 ("[For example, [*46] the court] cannot sanction the use of the privilege to prevent effective cross examination on matters reasonably related to those introduced in direct examination."). The Fairness Doctrine will not allow the privilege to stand when the proponents seek to use it for a purpose that is inconsistent with the privilege. What the court is attempting to avoid is the wielding of the attorney-client privilege and the work product doctrine as both a shield and a sword. *In re Grand Jury Proceedings,* 219 F.3d at 182; *United States v. Bilzerian,* 926 F.2d at 1292 (citing *In re von Bulow,* 828 F.2d at 103). It is the unfairness that is the crucible for the forfeiture. *John Doe Co. v United States,* 350 F.3d at 306 (citing *In re von Bulow,* 828 F.2d at 102).

n11 Often the scope of *In re von Bulow,* which is a seminal case on this issue, is overstated in terms of the breadth of "at issue" forfeiture. The case actually stands for a limited version of a waiver or forfeiture of the attorney-client privilege. von Bulow granted permission to his attorney to make certain disclosures in a book about his infamous criminal case. Many revelations and privileged discussions were publicly disclosed in this best selling book. It would appear then that these revelations would have forever waived the attorney-client privilege in a subsequent civil lawsuit. However, the Second Circuit did not find these *extrajudicial disclosures* of the attorney-client communication to be a *carte blanche* waiver of the protection. Rather, the Second Circuit held that these extrajudicial disclosures, which were not used in a judicial proceeding and did not prejudice his adversary, did not constitute a waiver of the privilege as to the **undisclosed** portion of the attorney-client communications. *In re von Bulow,* 828 F.2d at 102. The extrajudicial disclosures of privileged information "results only in [a] waiver of the communication revealed, but not of related communications." *In re Grand Jury Proceedings,* 219 F.3d at 189 (citing *In re von Bulow,* 828 F.2d at 102-03). The *von Bulow* Court went on to say that had this been a "subject matter waiver" the results would have been much different and the reach of the waiver may have touched on all privileged conversations. *In re von Bulow,* 828 F.2d at 102-03.

[*47]

[HN25] Resolving whether an "at issue" forfeiture has occurred may appear initially easy, but we know, from experience, that it can be a vexing exercise for a court. Nonetheless, the test that the courts within the Second Circuit have resorted to in order to facilitate this nettling analysis is:

> (1) assertion of the privilege was a result of some affirmative act, such as filing suit, (2) through the affirmative act, the asserting party puts the protected information at issue by making it relevant to the case, and (3) the application of the privilege would harm the opposing party access to information vital to the defense.

*Bank Brussels Lambert v Credit Lyonnais (Suisse),* 1995 U.S. Dist. LEXIS 14808, 1995 WL 598971, at *3

(S.D.N.Y. Oct. 11, 1995) (citing *Hearn v. Rhay,* 68 F.R.D. 574, 581 (E.D. Wash. 1975)). n12

> n12 There are other criteria which [HN26] a court may consider in ascertaining whether an "at issue" forfeiture is applicable: (1) the very subject of privileged communication [is] critically relevant to the issue litigated, (2) there is a good faith basis for believing such essential privileged information exists, and (3) there is no other source of direct proof. *Bank Brussels Lambert v. Credit Lyonnais (Suisse),* 1995 U.S. Dist. LEXIS 14808, 1995 WL 598971, at *5.

[*48]

[HN27] Because of the fragility of broad generalizations and sometimes *per se* rules, in the context of determining fairness, it is more prudent to decide the at issue waiver on a case by case basis, which "depends primarily on the specific context in which the privilege is asserted" or on its own particular facts. *John Doe Co. v United States,* 350 F.3d at 302 & 305 (citing *In re Grand Jury Proceedings,* 219 F.3d at 183. The forfeiture should be narrowly construed and tailored to remedy the unfairness or prejudice. *In re Grand Jury Proceedings,* 219 F.3d at 188. It is further axiomatic, [HN28] when a number of documents are claimed to be privileged, that there is no wholesale waiver but rather a specific inquiry as to each document.

C. Document Review

As mentioned above, our review is limited to three documents: 1) Cable Operator Draft; 2) Jon Sorenson's Email, dated September 7, 2005; and 3) August 30, 2005 Letter. Plaintiffs cast a general pall over the claim of privilege by asserting that such is waived because of the careless nature in which the documents were disclosed to them. Additionally, in regard to the "cable operator" draft [*49] letter and Sorenson's email, dated September 7, 2005, Plaintiffs contend that such document presents an at issue waiver.

Defendants cannot find any comfort relying upon the blanket statement set forth in their response to the Plaintiffs' Demand to Produce that "they expressly reserve all privileges, including attorney-client privilege and work-product rule." Such broadly constructed instruction is of debatable value and flies in the face of the mandate set forth in [HN29] Rule 26(b)(5) that "the party [asserting the privilege] shall make the claim expressly and shall describe the nature of the documents . . . ." This Rule requires a specific, denoted objection to a specific document and not a comprehensive, imprecise command. Furthermore, "[s]uch pat, generic, non-specific objections, intoning the same boilerplate lan-

guage are inconsistent with both the letter and the spirit of the Federal Rules of Civil Procedure." *King-Hardy v. Bloomfield Bd. of Educ*, 2002 WL 32506294, at *4 (D. Conn. Dec. 8, 2002) (quoting *Obiajulu v. City of Rochester, Dep't of Law*, 166 F.R.D. 293, 295 (W.D.N.Y. 1996)).

Weighing the four factors to determine whether a waiver will [*50] be found, we make the following overarching judgments. In terms of the reasonableness of Defendants' precaution not to disclose the documents, we note that none of the documents were marked "confidential" and were produced several times. The Defendants' subsequent justification on this reasonableness standard is lacking. n13 Although months had elapsed before Defendants were even aware that such disclosure had occurred, they claim that once they were notified that the documents were indeed in the hands of Plaintiffs they acted swiftly to reclaim the documents, which is uncontroverted by Plaintiffs. On this factor, the Court gives Defendants the benefit of the doubt.

> n13 Most of the Defendants' arguments in this regard are misplaced. They wastefully spent more time casting aspersions upon what Plaintiffs may or may not have done with respect to these documents and Plaintiffs' production of documents, rather than focus on justification for their omissions. They would have been better served had they remained focused on the true issue at hand. If Plaintiffs were not properly complying with discovery, Defendants should have sought the court intervention.

[*51]

Next, in terms of the volume of documents, we remain uncertain as to the overall size of the document production, but we know that the Privilege Logs list approximately 200 documents. Considering the nature of this litigation, we presume that a voluminous set of documents were disclosed, nonetheless, we are now tussling over just three purportedly privileged documents. In this respect, we further know through Defendants' admission that multiple copies of the documents have been forwarded to Plaintiffs, but they also proffer a justification or an excuse. That justification claims that one set of documents was sent redacted; then, after a stipulation between the parties or a protective order, the previous production was sent again, this time unredacted. Yet, not all productions are accounted for by this explanation because the Court counted, at least, three different sets for the same documents. Nonetheless, if this is the case, the dispute over three documents may minimize the no-

tion of extreme carelessness to one of probable inadverence.

Lastly, which weighs most favorably for the Defendants, there may be only limited prejudice to Plaintiffs. Although this may be an overall view, [*52] we will still, nevertheless, scrutinize the three documents in the framework of the "carelessness" balancing test. Each document will be judged under its own circumstances and merit.

### 1. Cable Operator Letter

There is an undated letter, apparently a draft, which will be referred to as the cable operator letter, inasmuch as the subject matter of the letter identifies the potential audience to which it would be addressed. The author of this letter is not identified on the letter. Plaintiffs presumed that it was drafted by Defendant Santiago but we now know that Roger Kinsey, Assistant Attorney General ("AAG"), drafted this letter. Plaintiffs assert *seriatim* that any privilege that may attach to this letter is waived because of the careless way it was produced and, moreover, the letter raises an at issue waiver. The at issue waiver involves the contention that Defendants have placed the subject matter of the draft letter at issue with their qualified immunity defense.

Attorney Kinsey provided to this Court, *in camera*, a detailed affirmation explaining how and why such composition came into existence. Kinsey avers that during the initial stages of this litigation, Plaintiffs [*53] approached Defendants to engage in settlement negotiation. Immediately after the District Judge granted a preliminary injunction in this case, he thought that such settlement would invariably include a retraction letter to various cable operators, so he drafted such a proposed letter. However, interest in settlement faded. Kinsey continues asseverating that he placed a version of this draft, into a manila folder marked "Versions Of The Letter," that contained copies of the August 31, 2005 Letter, some of them marked up. It was the manila folder with a wayward copy of the cable operator letter which was inadvertently disclosed therein that was shared with Plaintiffs. It is Kinsey's conviction that this draft letter constitutes work product for the perceptible reason it was meant for settlement purposes only. This draft was also presented to Defendant Santiago at her deposition by Plaintiffs. Obviously, from the record provided, Santiago could not identify the document and was unaware of its intended purpose, though she could surmise such purpose after reading it during the deposition.

This Court accepts Kinsey's affirmation that: (1) he is the author; (2) the intended purpose of the [*54] letter was to facilitate settlement; (3) although not employing the words confidential, the draft was placed in a folder in such a way that it was meant to be considered confiden-

tial and not revealed to his adversary; and (4) Santiago had not seen the document before. Knowing that Kinsey is an attorney, we find that the draft letter contains impressions and strategies of this lawyer, and, therefore, work product, which did not lose its cloak of protection solely because the matter may have been discussed with his clients. Further, we find, as to this draft, that the disclosure was not made voluntarily and weighing the four factors, the equities tilt in favor of Defendants, primarily because of the element of overarching fairness; the document was not carelessly disclosed.

Plaintiffs are grasping at straws by postulating that the document has been placed at issue through the Defendants' assertion of the qualified immunity defense. No interpretation of the circumstances support such reasoning. First, neither the document itself nor any notation thereon mentions any qualified immunity defense n14 and the content of the draft is not a contention at issue. Second, this is a draft intended [*55] solely for the purpose of settlement, which ostensibly is legal strategy, and it had not been presented in any pleading or motion to a court. This proposed prophylactic remedy has not been placed in issue. Thus, it has not be interjected into this litigation in such a matter that it places itself, under the Fairness Doctrine, diametrically opposite to the Defendants' stated defense of qualified immunity. Third, Plaintiffs extrapolate that the content of Sorenson's email, dated September 7, 2005, *see infra* Part II.B.2, is an admission relevant to Defendants' claim of qualified immunity. Defendant Sorensen's role and purported admissions, if any, are not pertinent to this inquiry. Fourth, Plaintiffs presented the draft to Santiago at her deposition, which she acknowledged that she had not seen before. Sorensen's and Santigao's purported role is totally irrelevant to this critique. Such disclaimer and lack of recognition by either of them does not amount, under any reasonable view, a waiver, of any sort, of the privilege. And, fifth, the assertion that the "draft letter at issue raises questions of whether at least someone at the CPB, perhaps its counsel, held the view that the August 31, 2005 letter, [*56] [the heart of this litigation] was potentially coercive and violative of Mr. Trudeau's First Amendment rights," is untenable in light of the facts and circumstances shared with the Court. Because this draft letter was contemplated in terms of settlement, its relevance at trial, or even as it may pertain to the qualified immunity defense, is dubious at best. Settlement matters are not interposed at trial. In the total scheme of events, Defendants have not wielded this document as both a shield and a sword. In sum, we find that this document is work product, the work product doctrine has not been waived, and the document should be returned to Defendants. *See supra* Parts II.B.2 & 4.b.

n14  [HN30] Qualified immunity will shield "government officials from liability for civil damages when their conduct does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *African Trade & Info. Ctr., Inc. v. Abromaitis,* 294 F.3d 355, 359 (2d Cir. 2002) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)); *see also Mollica v. Volker,* 229 F.3d 366, 370 (2d Cir. 2000). This also applies "insofar as it was objectively reasonable for [the government officials] to believe that their acts did not violate those rights." *Mollica,* 229 F.3d at 370 (internal quotation marks and citations omitted); *see also Anderson v. Creighton,* 483 U.S. 635, 641, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987). The objectively reasonable test will be met "if [officials] of reasonable competence could disagree' on the legality of the defendant's actions." *Lennon v Miller,* 66 F.3d 416, 420 (2d Cir. 1995) (quoting *Malley v. Briggs,* 475 U.S. 335, 341, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986) (further citation omitted)). In order for the constitutional right to be clearly established, three elements must be met: "1) . . . [that] the right in question [be] defined with reasonable specificity; 2) [that] the decisional law of the Supreme Court and applicable circuit court support the existence of the right in question; and 3) [that] under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful." *Mollica,* 229 F.3d at 371 (internal quotation marks and citations omitted) (alterations in original).

[*57]

2. Jon Sorenson's Email, dated September 7, 2005

Applying the flexible balancing test to this document militates against Defendants' protestation that this confidential document was not waived, except for the overwhelmingly conspicuous nature of the email. Without question, this email is a review of Judge Sharpe's ruling and a legal strategy discussion between CPB's managers and their interagency counsel, Lisa Harris. A plain reading of this document transmits but only one interpretation -- that it is either an attorney-client or deliberative process discussion, the absence of an attorney-client privileged notation thereon notwithstanding. *Export-Import Bank of United States v. Asia Pulp & Paper Co., Ltd,* 232 F.R.D. 103, 112 (S.D.N.Y. 2005). In our view, Plaintiffs had, or should have, realized its transparent nature, and immediately held the document as confidential for further discussion with Defendants before taking full advantage of the disclosure misadven-

ture. n15 And, yet, the fulcrum of this balancing test leans heavily in favor of a waiver because of the extreme carelessness on the part of the Defendants. There are four iterations of this documents disclosed [*58] to Plaintiffs, with only one being served pursuant to a protective order. We find that Defendants did not employ reasonable precaution in this situation, the volume of documents does not provide sufficient cover for Defendants' error, and Defendants' reaction to the fortuitous disclosure evidently was not prompt enough, since the proverbial cat is out of the bag, and the damage has been done. *See supra* note 15; *see also* Part II.B.3.a. These facts and the reasonable inferences lead to only one conclusion, that is, this document's confidentiality is waived. *Atronic Int'l, BMBH v. SAI Semisspecialists,* 232 F.R.D. 160, 161 (E.D.N.Y. 2005) (finding that two emails, although privileged, were, nonetheless, waived due to inadvertent and careless disclosure).

n15 The virtual horse has already left the barn tolling improbable consequences upon the Defendants. Plaintiffs abruptly and shrewdly shared this email, a document received in discovery, openly and notoriously with cable operators knowing full well that this is an internal agency discussion between agency heads and counsel. In the caption, immediately following Lisa Harris' name, is the nomenclature "counsel" ("Lisa Harris/COUNSEL/NYSCPB"). It is unfathomable that Plaintiffs could not have perceived that this was not possibly a privileged document. There is no plausible reason why they could not have waited until they confirmed or refuted the privileged character of the email before sharing it with the world. The rush to judgment, without inquiry of the Defendants, to create favorable inclinations with the cable companies and take advantage of this inadvertence, was in violation of the spirit of ABA Formal Opinion 05-437 and, in this Court's view, rather unctuous practice. Rather than wait and determine the nature and aim of this email, Plaintiffs thrusted this email into the public domain, solely for the purpose of gaining sway over these cable operators. In their zeal, they identified one of the Defendants as the author, probably in order to heighten its value. There should be some type of rejoinder to Plaintiffs' tactical move. They may not be subject to sanctions, since ABA Formal Opinions are solely guidance, but neither can this act be countenanced. An admonishment, albeit through a footnote, is fitting.

[*59]

Before we move on to the next document, we are required to make the following observations as to this email. First, this email is a legal strategy/settlement/deliberative process document, which has no relevance, or even admissibility at trial. We do not find persuasive Plaintiffs' perspective that this document constitutes an at issue waiver. It does not and, in essence, it is of nominal legal value. Plaintiffs' utilization of the document has already visited prejudice to the Defendants, which cannot be retracted, however, there is little fear that our ruling finding a waiver will generate further injury to them. *See supra* note 15.

3. August 30, 2005 Letter

This Letter, addressed to Roger Kinsey, was drafted with Defendant Santiago's initials over the signature line. We are uncertain whether such correspondence was ever forwarded to Kinsey. The apparent nature of the document is similarly vague. Deliberating solely upon the content set forth within the four corners of this document, it is not manifested therein that this document qualifies as an attorney-client privileged document. Weighing the criteria used to determine if a communication is truly an attorney-client document, [*60] we find that it does not. *United States v. International Bhd of Teamsters,* 119 F.3d 210, 214 (2d Cir. 1997).

This document does not seek any "fully informed" legal advice. Rather, the document foretells CPB's then future action, and thus Santiago, the client, is merely stating facts. Stating facts to an attorney does not deserve confidentiality. *See supra* Part II.B.2. There is no indicia which would indicate that this correspondence is being made in confidence. As we all know, not every correspondence forwarded to an attorney from her clients is cloaked with the privilege. *Id.* Based upon these findings alone, we declare that this document is not entitled to the attorney-client privilege, which finding obviates the need for us to ponder whether the privilege was waived. Therefore, we find that this document need not be returned to Defendants. *Id.*

**III. CONCLUSION**

Accordingly, it is hereby

**ORDERED,** that Defendants' Application for Plaintiff Trudeau's tax return is **denied,** at this time, however, Trudeau shall provide to the Defendants a net worth statement listing assets and liabilities, and gross and net income for the years 2003 to 2005; and [*61] it is further

**ORDERED,** that Defendants' Application for all information pertaining to the charitable foundation is **denied,** however, Trudeau shall disclose the extent of his contribution into this foundation and the nature of its primary source. In the event Trudeau does not make any

2006 U.S. Dist. LEXIS 61901, *

contribution to this foundation, he shall so advise the Defendants; and it is further

**ORDERED,** that Defendants' Application for documents related to the *Trudeau v Jordan Whitney* litigation is **granted;** and it is further

**ORDERED,** that Defendants shall provide Plaintiffs with a new privilege log consistent with this Memorandum-Decision and Order; and it is further

**ORDERED,** that, based upon the Court's finding that the cable operator letter is privileged and said privilege was not waived, Plaintiffs shall return to the Defendants the cable operator letter; and it is further

**ORDERED,** that Plaintiffs do not have to return the Sorenson email and the August 30, 2005 letter; and it is further

**ORDERED,** that the Clerk of the Court **shall file under seal** Plaintiffs' Letter-Brief, dated April 27, 2006, with Attachments, Defendants' Letter-Brief, dated May 10, 2006, with [*62] Attachments, and Roger Kinsey, Esq., Affirmation, dated May 10, 2006, with Attachments; and it is further

**ORDERED,** that the Clerk of the Court shall enter on the case docket Defendants' Letter-Brief, dated March 29, 2006, and Plaintiffs' Letter-Brief, dated April 12, 2006; and it is further

**ORDERED,** that all mandates herein shall be complied with within thirty (30) days of the date of this Order.

IT IS SO ORDERED.

Albany, New York

July 21, 2006

RANDOLPH F. TREECE

United States Magistrate Judge

LEXSEE

**CHARLOTTE C. WEBER, Plaintiff, -against- DANIEL PADUANO; NANCY PADUANO; 19 EAST 72ND STREET CORP.; and BROWN HARRIS STEVENS RESIDENTIAL MANAGEMENT, LLC, Defendants.**

**02 Civ. 3392 (GEL)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

**2003 U.S. Dist. LEXIS 858**

**January 14, 2003, Decided**
**January 22, 2003, Filed**

**SUBSEQUENT HISTORY:** Summary judgment granted by, Claim dismissed by Weber v. Paduano, 2003 U.S. Dist. LEXIS 21288 (S.D.N.Y., Nov. 20, 2003)

**DISPOSITION:** [*1] Plaintiff's motion to compel production of discovery documents granted in part and denied in part.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** In an action to recover damages arising from an apartment fire, plaintiff resident moved to compel production of certain documents defendants withheld as protected by the work product doctrine or attorney-client privilege. Defendants were the building's owner, a management company, and two residents of the apartment where the fire occurred.

**OVERVIEW:** Plaintiff resident sought the production of a number of investigative reports and claim file documents compiled during the course of the insurance investigation of the fire, performed on behalf of the two residential defendants, and also documents created in connection with the insurance policies of the owner and management company. She also sought an order compelling various third parties to comply with subpoenas. The parties opposing production, on whom the burden of proof as to privilege rested, were required to demonstrate by specific and competent evidence that the documents were created in anticipation of litigation. The court found in favor of plaintiff resident as to the majority of the documents because it was not shown that the work product doctrine applied. Even if the withheld documents were work product, plaintiff resident would have been entitled to almost all of the documents because she had substantial need for them, and would have suffered un-

due hardship if denied access. The documents concerned facts that were at the heart of her case, since she alleged that the fire was the result of the defendants' collective negligence.

**OUTCOME:** The motion to compel production was granted with respect to the majority of the documents.

**CORE TERMS:** work product, log, insurer, anticipation of litigation, attorney-client, subpoena, subrogation, third-party, first-party, discovery, investigative, withheld, insured, work product doctrine, lawsuit, privileged, liability insurance, documents relating, undue hardship, correspondence, preparation, course of business, progress, authored, prepare, pertain, third parties, law firm, investigate, apartment

**LexisNexis(R) Headnotes**

*Civil Procedure > Discovery > Methods > General Overview*
*Civil Procedure > Discovery > Privileged Matters > General Overview*
*Civil Procedure > Discovery > Relevance*
[HN1] The Federal Rules of Civil Procedure provide for broad discovery. As an initial matter, parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party. Fed. R. Civ. P. 26(b)(1). At the same time, however, the Rules endeavor to preserve a zone of privacy in which lawyers, insurers, and other representatives of litigants may develop legal theories and strategies uninhibited by the possibility that an adversary may become privy to the resulting documents, by protecting certain work product prepared for the litigation.

*Civil Procedure > Discovery > Methods > Requests for Production & Inspection*
*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*
[HN2] See Fed. R. Civ. P 26(b)(3).

*Civil Procedure > Discovery > Methods > Requests for Production & Inspection*
*Civil Procedure > Discovery > Privileged Matters > Work Product > Scope*
[HN3] The work product doctrine does not constitute a true privilege, as it affords only qualified protection to the materials within its scope, allowing discovery of the documents if the party seeking production can establish substantial need and undue hardship.

*Civil Procedure > Federal & State Interrelationships > Erie Doctrine*
*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*
[HN4] While state law generally provides the rules of decision for questions of privilege in diversity actions, federal law governs the applicability of the work product doctrine in all actions in federal court.

*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*
[HN5] In order to be protected as work product, the materials must be (1) documents or tangible things, (2) that were prepared in anticipation of litigation, and (3) were prepared by or for a party, or by or for his representative. Documents prepared in anticipation of litigation are those that, in light of the nature of the document and the factual situation in the particular case can fairly be said to have been prepared or obtained because of the prospect of litigation. Thus, documents that were prepared in the ordinary course of business or that would have been created in essentially similar form irrespective of the litigation are not protected by the work product doctrine.

*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*
[HN6] The determination as to whether materials are protected under this definition is necessarily fact-specific. This is even more true where the documents in question were created by or for an insurance company in the course of its investigation, since the very business of the producing party is to evaluate claims that may ultimately ripen into litigation. This is equally the case

whether the documents were created during an investigation pursuant to a third-party policy, the very nature of which is anticipating litigation, or pursuant to a first-party policy, since a first-party insurer must anticipate that the denial of a claim may lead to a lawsuit. Thus, courts presented with work product disputes in the insurance context must be careful not to hold that documents are protected from discovery simply because of a party's ritualistic incantation that all documents created by insurers are made in preparation for litigation, and mindful of the fact that insurer-authored documents are more likely than attorney-authored documents to have been prepared in the ordinary course of business, rather than for litigation purposes.

*Antitrust & Trade Law > Exemptions & Immunities > Professional Sports > Sports Broadcasting Act*
*Evidence > Privileges > General Overview*
*Evidence > Procedural Considerations > Objections & Offers of Proof > Timeliness*
[HN7] In the insurance context, it is particularly important that the party opposing production of the documents, on whom the burden of proof as to privilege rests, demonstrate by specific and competent evidence that the documents were created in anticipation of litigation. A party withholding insurance documents may not rest on conclusory allegations of privilege, but must establish, by objective evidence, that the author of the document anticipated litigation at the time that the document was created, and would not have created the document in essentially the same way had the prospect of litigation not existed.

*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*
[HN8] The work product doctrine most strongly protects the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case.

*Civil Procedure > Discovery > Methods > Requests for Production & Inspection*
*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*
[HN9] Where the documents at issue consist of factual materials and analyses of facts, the policy of the Federal Rules of Civil Procedure of liberal discovery weighs more heavily in favor of allowing discovery, since production of the documents is less likely to inhibit a party's preparation for litigation.

*Civil Procedure > Discovery > Privileged Matters > Work Product > Scope*

[HN10] Because automatically granting protection to all documents prepared by liability insurers would contravene the United States Court of Appeals for the Second Circuit's holding that courts should avoid protecting documents created in the ordinary course of business--a directive that requires careful delineation of the scope of protection on a case-by-case basis--the courts in the Southern District of New York that have considered work product protection in the context of liability insurance documents have declined to follow any per se rule.

*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*

[HN11] The assumption that a liability insurer anticipates that a lawsuit will result from every accident in which its insureds are involved fails to take into account the possibility that the insurer will decide to avoid litigation by paying the third-party claim. Consequently, the liability insurer's documents, like those authored by carriers of other types of insurance, may be protected from discovery only if they were prepared in furtherance of a sufficiently identifiable resolve to litigate. That resolve may be particularly difficult to identify in the liability insurance context, but the difficulty of determining the insurer's intentions does not relieve a parties of their burden of demonstrating, by specific evidence, that each document was prepared in anticipation of litigation.

*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*
*Insurance Law > Claims & Contracts > Notice to Insurers > General Overview*

[HN12] The point at which an insurance company begins to prepare for litigation can often be determined by using the insurer's documented course of action to reconstruct its deliberative process. While the actions that an insurance company takes immediately after being notified of a potential claim are almost always part of its ordinary business of claim investigation, at a certain point its activity shifts from the ordinary course of business to anticipation of litigation.

*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*

[HN13] Investigations into the causes and effects of an accident, undertaken soon after the event itself, are generally considered part of an insurance company's ordinary course of business.

*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*

[HN14] The institution of a lawsuit does not relieve the party opposing production of its burden of demonstrating that the documents would not have been prepared but for the litigation.

*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*

[HN15] Blanket assertions of work product protection as to entire files, rather than specific documents, are never sufficient to prevent discovery, since the party opposing discovery must establish that each document is work product.

*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*
*Insurance Law > Claims & Contracts > Subrogation > General Overview*

[HN16] An insurer's retaining a law firm and having it conduct its own investigation of a claim is a significant factor in determining when the insurer anticipates litigation, but is not determinative. On the other hand, an insurer does not have an identifiable resolve to litigate until it has made a decision regarding subrogation. Until that point, an investigation into the potential for subrogation is simply part of an insurer's ordinary practice of investigating all issues arising from an accident involving its insureds, and documents created as part of this process would have been created in the same form regardless of the insurer's eventual decision as to litigation.

*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*

[HN17] Documents created immediately after the occurrence of an accident that may give rise to an insurance claim are almost always created as part of the insurance company's normal practice of investigating claims.

*Civil Procedure > Federal & State Interrelationships > Erie Doctrine*
*Evidence > Privileges > Attorney-Client Privilege > Elements*
*Legal Ethics > Professional Conduct > Opposing Counsel & Parties*

[HN18] In federal diversity actions in New York federal courts, issues of attorney-client privilege are governed by New York law. Under New York law, the attorney-client privilege protects confidential communications made between the attorney or his employee and the client in the course of professional employment, N.Y. C.P.L.R.

4503(a) (2002), and the party asserting the privilege bears the burden of establishing the elements of the privilege. When the communication at issue originated with the attorney rather than the client, the party opposing production must establish that the communication was made for the purpose of facilitating the rendition of legal advice or services, and that it is predominantly of a legal character, consisting of more than facts known to third parties.

*Civil Procedure > Discovery > Privileged Matters > General Overview*
[HN19] Where the document is predominantly legal in character, the fact that it may contain nonprivileged information does not destroy its immunity.

*Civil Procedure > Discovery > Privileged Matters > General Overview*
[HN20] Information received by the attorney from other persons and sources while acting on behalf of a client does not come within the attorney-client privilege.

*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*
[HN21] Under certain circumstances, the failure to provide a privilege log can result in a waiver of privilege as to the documents that have not been produced. While a party is obligated to provide a privilege log for those documents within its control, however, it does not have to log those documents that it does not have the power to produce itself, since it cannot be compelled to produce them.

*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*
[HN22] The mental impressions at the core of the work product doctrine are those involving the progress of, and preparation for, the litigation, not the mental impressions of an examiner conducting the insurer's ordinary business of valuing claims.

*Civil Procedure > Discovery > Privileged Matters > Work Product > Scope*
[HN23] The United States Court of Appeals for the Second Circuit does not distinguish between first-and third-party insurance for purposes of work product protection.

*Civil Procedure > Discovery > Privileged Matters > General Overview*

*Evidence > Privileges > General Overview*
[HN24] When faced with claims of privilege, courts often undertake in camera review in order to supplement the parties' privilege logs and determine the content of the documents. However, in camera review of the documents, while potentially helpful to the determination of privilege, is not to be routinely undertaken as a substitute for a party's submission of an adequate record for its privilege claims, especially where the court would have to examine a large quantity of documents.

*Civil Procedure > Discovery > Privileged Matters > Work Product > General Overview*
[HN25] A substantial need for work product materials exists where the information sought is crucial to the determination of whether the defendant could be held liable for the acts alleged, or carries great probative value on contested issues.

**COUNSEL:** John Linsenmeyer, (LisaAnne Rega Biccochi, on the brief), Morgan, Lewis & Bockius LLP, New York, NY, for Plaintiff.

Monroe Weiss, (Lawrence Lambert, on the brief), Lambert & Weiss, New York, NY, for Daniel Paduano and Nancy Paduano, Defendants.

Bennett R. Katz, (Allison A. Snyder, on the brief), Ohrenstein & Brown, LLP, New York, NY, for 19 East 72nd Street Corp. and Brown Harris Stevens Residential Management, LLC, Defendants.

**JUDGES:** GERARD E. LYNCH, United States District Judge.

**OPINION BY:** GERARD E. LYNCH

**OPINION:**

OPINION AND ORDER

GERARD E. LYNCH, District Judge:

In this action to recover damages arising from an apartment fire, plaintiff Charlotte Weber ("plaintiff" or "Weber") has moved to compel the production of certain documents that the defendants have withheld as protected by the work product doctrine or attorney-client privilege. Plaintiff seeks the production of a number of investigative reports and claim file documents compiled during the course of the insurance investigation of the fire, performed on behalf of defendants Daniel and Nancy Paduano (collectively, the "Paduano defendants"), [*2] and also documents and correspondence created in connection with the insurance policies of defendants 19

East 72nd Street Corporation and Brown Harris Stevens Residential Management, LLC (collectively, the "building defendants"). Plaintiff also seeks an order compelling various third parties to comply with subpoenas seeking the production of documents related to the insurance investigations. For the reasons discussed below, plaintiff's motion will be granted with respect to the majority of the documents.

## BACKGROUND

On March 19, 2001, a fire occurred in the Paduano defendants' apartment, which was located directly below plaintiff's apartment. As a result, plaintiff's apartment and possessions were severely damaged, and she sustained losses allegedly totaling $ 750,000. (Compl. P 27.) On May 2, 2002, plaintiff filed this action against the Paduanos, as well as 19 East 72nd Street Corporation and Brown Harris Stevens Residential Management (respectively, the apartment building's owner and managing agent). (Pl. Mem. at 1.) She alleges that all four defendants were negligent in allowing the fire to occur, and that the Paduano defendants breached the terms of their lease by refusing [*3] to indemnify her for her losses. (Compl. PP 18-56.) In discovery, plaintiff sought from the defendants all documents relating to the fire, the resulting damages, and the investigations undertaken by the insurance companies. (Biccochi Aff. P 3.) The defendants have withheld many of these documents, asserting that they constitute work product created in anticipation of litigation or materials protected by attorney-client privilege. Plaintiff subsequently served third-party subpoenas on the Paduano defendants' insurer and the investigators who investigated the fire on the insurers' behalf, seeking any reports and other documents generated in the course of investigation and claims evaluation. (Paduano Defs. Mem. at 4-5.) The Paduano defendants objected to the subpoenas insofar as compliance would require the production of protected materials. (Id. at 5.) Both sets of defendants have described the documents for which they assert work product protection or attorney-client privilege in a series of privilege logs, discussed in detail below.

Immediately after the fire, the defendants' insurers began investigating the causes and extent of the fire, generating the reports and claim documents [*4] that plaintiff now seeks. The Paduanos are insured by Great Northern Insurance Company, a division of Chubb Group of Insurance Companies ("Chubb"), and their policy includes both first-party loss and third-party liability coverage. (Id. at 1-2.) The day after the fire, Chubb retained P.M.R. Consultants ("P.M.R.") to conduct an investigation into the fire. (Id. at 3.) Several months later, on August 15, Chubb retained Public Investigation Service, Inc. ("P.S.I.") to conduct additional investigations. (Id.) Chubb placed the investigative report created by

P.M.R. and the two reports written by P.S.I. in the Paduanos' liability claim file, and apparently gave copies to the Paduanos. (Id. at 4.) The Paduano defendants contend that these documents were created in anticipation of litigation, and are protected as work product under Fed. R. Civ. P. 26(b)(3). These three documents make up the entirety of a privilege log produced by the Paduano defendants in response to plaintiff's request for documents pertaining to the fire (the "Paduano Liability File Privilege Log 1"), attached as Exhibit 1 to the Affidavit of LisaAnne Rega Biccochi.

The Paduano defendants also assert work [*5] product protection as to several other documents in the liability claim file that Chubb maintains for them, which are listed on another privilege log, attached as Exhibit K to the Affidavit of Lawrence Lambert (the "Paduano Liability File Privilege Log 2"). These documents, unlike the three investigative reports, are not in the Paduano defendants' possession, but have remained in Chubb's liability file. Plaintiff seeks production of these documents through a third-party subpoena served on Chubb. The documents fall into two categories: (1) eighteen liability claim files representing claims against the Paduanos made by other residents of the apartment building as a result of the fire; and (2) the notes of Chubb's liability claims adjuster, Keegan Lee, who was in charge of the Paduanos' file, and related correspondence about the Paduanos' coverage. (Lambert Aff. P 21.) The Paduano defendants assert work product protection as to all of these documents. (Id. Ex. K.)

Weber also seeks several documents relating to the fire that are maintained in Chubb's first-party claim file on the Paduanos. In connection with the Paduanos' first-party insurance coverage, Chubb retained the law firm [*6] Cozen and O'Connor on March 20, 2001, to "pursue [its] subrogation interests" and conduct an investigation. (Paduano Defs. Mem. at 3; Lambert Aff. Ex. D.) Cozen and O'Connor then hired Affiliated Engineering Laboratories, Inc. to investigate the fire. (Paduano Defs. Mem. at 3.) These investigations resulted in correspondence between Cozen and O'Connor, Chubb, Affiliated, and P.M.R., dated between March and June of 2001, all of which was placed into Chubb's first-party file on the Paduanos. (Biccochi Aff. Ex. 2.) These documents are not in the Paduanos' possession, but Chubb has withheld them at the Paduano defendants' request. The Paduanos have asserted work product protection, and where applicable, attorney-client privilege, as to these documents in a third privilege log (the "Paduano First-Party Privilege Log"), attached as Exhibit 2 to the Biccochi Affidavit. Plaintiff challenges the assertion of both privileges.

The building defendants have also withheld a number of documents as work product, but produced a privilege log only after being ordered to do so by the Court on

October 11, 2002. The building defendants have a third-party liability policy through OneBeacon Insurance [*7] (administered by Crawford & Co. Inc. and Vanderbilt Properties), and a first-party policy through Travelers Insurance Company, and their privilege log includes documents created pursuant to both policies. (Katz Affirm. P 5.) The documents listed in the privilege log (the "Building Defendants' Privilege Log"), attached as Exhibit 3 to the Biccochi Affidavit, are mostly notes and correspondence between the two insurers regarding the interpretation of the policies and the evaluation of the damage to the Paduanos' apartment, created between March 20, 2001, and September 2002, four months after the litigation began. (Biccochi Aff. Ex. 3.) The building defendants have subsequently produced to plaintiff some of the documents listed on the log, but plaintiff challenges the assertion of work product protection as to the remaining documents. n1

n1 Plaintiff does not seek the documents numbered 6, 9, 10, and 11, which the building defendants have withheld not as work product, but as protected by attorney-client privilege. Plaintiff does not challenge the assertion of attorney-client privilege as to these documents. (Biccochi Aff. Ex. 3; Pl. Mem. at 5.)

[*8]

Plaintiff has served third-party subpoenas on Affiliated and P.M.R., in addition to Chubb, seeking all documents relating to the fire (Pl. Mem. at 2), presumably attempting to obtain the documents that defendants had refused to produce. The Paduano defendants objected to all three subpoenas, but, as noted above, produced privilege logs only for the documents in Chubb's possession. Plaintiff then filed the instant motion to compel defendants to produce virtually all of the documents listed in their privilege logs, and to obtain a ruling that the third-party subpoenas do not require the production of privileged documents. (Pl. Mem. at 1.)

DISCUSSION

I. Applicable Law

[HN1] The Federal Rules of Civil Procedure provide for broad discovery. As an initial matter, "parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party ...." Fed. R. Civ. P. 26(b)(1). At the same time, however, the Rules endeavor to "preserve a zone of privacy" in which lawyers, insurers, and other representatives of litigants may develop legal theories and strategies uninhibited by the possibility that an adversary may become privy to the resulting [*9] documents, by protecting certain work product prepared for the litigation. United States v. Adlman, 134 F.3d 1194, 1196 (2d Cir. 1998). Fed. R. Civ. P 26(b)(3) provides that

[HN2] a party may obtain discovery of documents and tangible things otherwise discoverable ... and prepared in anticipation of litigation or for trial by or for that other party's representative ... only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means.

Thus, [HN3] the work product doctrine does not constitute a true privilege, as it affords only qualified protection to the materials within its scope, allowing discovery of the documents if the party seeking production can establish substantial need and undue hardship. Mount Vernon Fire Ins. Co. v. Try 3 Bldg. Servs., 1998 U.S. Dist. LEXIS 16183, No. 96 Civ. 5590 (MJL), 1998 WL 729735, at *4 (S.D.N.Y Oct. 16, 1998); 8 Charles Alan Wright et al., Federal Practice and Procedure § 2022, at 324 (2d ed. 1994).

[HN4] While state law generally provides the rules of [*10] decision for questions of privilege in diversity actions, "federal law governs the applicability of the work product doctrine in all actions in federal court." Mount Vernon, 1998 U.S. Dist. LEXIS 16183, 1998 WL 729735, at *4; see also, e.g., United Coal Companies v. Powell Constr., 839 F.2d 958, 966 (3d Cir. 1998). [HN5] In order to be protected as work product, the materials must be (1) documents or tangible things, (2) that were prepared in anticipation of litigation, and (3) were prepared by or for a party, or by or for his representative. Id. Documents prepared in anticipation of litigation are those that, "in light of the nature of the document and the factual situation in the particular case ... can fairly be said to have been prepared or obtained *because of* the prospect of litigation." Adlman, 134 F.3d at 1202 (emphasis in original). Thus, documents that were prepared in the ordinary course of business or that "would have been created in essentially similar form irrespective of the litigation" are not protected by the work product doctrine. Id.

[HN6] The determination as to whether materials are protected under this definition is necessarily fact-specific. [*11] This is even more true where, as here, the documents in question were created by or for an insurance company in the course of its investigation, since

"the very business of the producing party is to evaluate claims that may ultimately ripen into litigation." Arkwright Mutual Ins. Co. v. National Union Fire Ins. Co.,1994 U.S. Dist. LEXIS 17768, No. 90 Civ. 7811 (AGS), 1994 WL 698298, at *2 (S.D.N.Y. Dec. 13, 1994). This is equally the case whether the documents were created during an investigation pursuant to a third-party policy, the very nature of which is anticipating litigation, or pursuant to a first-party policy, since a first-party insurer must anticipate that the denial of a claim may lead to a lawsuit. See, e.g., 6 Moore's Federal Practice § 26.70[c], at 26-214 (3d ed. 1998) (stating that case-by-case approach to liability insurance documents is appropriate). Thus, courts presented with work product disputes in the insurance context must be careful not to hold that documents are protected from discovery simply because of a party's "ritualistic incantation" that all documents created by insurers are made in preparation for litigation, and mindful of the fact that insurer-authored [*12] documents are more likely than attorney-authored documents to have been prepared in the ordinary course of business, rather than for litigation purposes. American Ins. Co. v. Elgot Sales Corp., 1998 U.S. Dist. LEXIS 14822, No. 97 Civ. 1327 (RLC) (NRM), 1998 WL 647206, at *1 (S.D.N.Y. Sept. 21, 1998) (discussing need for limiting principle to avoid allowing "virtually the entirety of an insurance company's files" to be exempt from discovery). Overprotecting insurance documents would hinder the broad discovery contemplated by the Rules, while doing little to foster uninhibited deliberation concerning insurance claims, since insurers have a duty -- as well as business incentive -- to carefully investigate every potential claim, whether or not it will likely erupt into litigation. See, e.g., Fine v. Bellefonte Underwriters Ins. Co., 91 F.R.D. 420, 422 (S.D.N.Y. 1981).

Thus, [HN7] in the insurance context, it is particularly important that the party opposing production of the documents, on whom the burden of proof as to privilege rests, demonstrate by specific and competent evidence that the documents were created in anticipation of litigation. Harrigan v. Electronic Pre-Press Systems, Inc., 1992 U.S. Dist. LEXIS 6698, No. 90 Civ. 4081 (MEL), 1992 WL 121438, at *3 (S.D.N.Y. May 15, 1992) [*13] . A party withholding insurance documents may not rest on conclusory allegations of privilege, but must establish, by objective evidence, that the author of the document anticipated litigation at the time that the document was created, and would not have created the document in essentially the same way had the prospect of litigation not existed. Adlman, 134 F 3d at 1202.

II. The Paduano Defendants' Privilege Logs

The documents that the Paduano defendants seek to withhold as work product are predominantly analyses of the circumstances surrounding the fire and explanations of the Paduanos' coverage under their policies. The Paduano defendants do not assert, in their logs, briefs, or affidavits, that any of the documents at issue contain the mental impressions of their attorneys or Chubb's attorneys (with the exception of those documents for which they assert the attorney-client privilege), or Chubb's internal strategy as to how to handle any potential litigation arising from the fire. Thus, these documents are outside of the "core" of materials that are most strongly protected by the work product doctrine. In re Leslie Fay Companies, Inc. Securities Litigation, 161 F.R.D. 274, 279 (S.D.N.Y. 1995) [*14] (internal citations omitted) (stating that [HN8] the work product doctrine most strongly protects "the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case"). [HN9] Where, as here, the documents at issue consist of factual materials and analyses of facts, the Rules' policy of liberal discovery weighs more heavily in favor of allowing discovery, since production of the documents is less likely to inhibit a party's preparation for litigation. See Upjohn Co. v. United States, 449 U.S. 383, 398-401, 66 L. Ed. 2d 584, 101 S. Ct. 677 (1981).

A. Documents Listed in the Paduano Liability File Privilege Logs 1 and 2

The Paduano defendants have provided plaintiff with two separate privilege logs listing different documents maintained in Chubb's liability file on the Paduanos, asserting that each document is work product. The listed documents include three investigative reports, produced between April and August 2001; eighteen liability insurance files of third parties; and notes made by the claims adjuster in charge of the Paduanos' file. Because the Paduano defendants have provided the Court with little or no concrete [*15] evidence as to Chubb's intent or deliberative processes, the Court finds that the defendants have failed to satisfy their burden with respect to all of the contested documents.

As a threshold matter, the Paduano defendants argue that all documents created in furtherance of a liability insurance policy are, as a matter of law, created in anticipation of litigation. (Paduano Defs. Mem. at 3, 11.) The authority cited for this proposition, however, derives from state law, which the Paduanos apparently believe furnishes the rule of decision for work product disputes. (Id. at 6.) Under New York law, there is authority that all documents generated by a liability insurance carrier are considered work product, because "liability insurance coverage entails the defense and settlement of claims made against the insured by third parties and is in essence 'litigation insurance.'" Gentile v. Wakeel, 135

Misc. 2d 301, 514 N.Y.S.2d 878, 878 (Sup. Ct. Oneida Co. 1987) (citing Kandel v. Tocher, 22 A.D.2d 513, 256 N.Y.S.2d 898, 900 (1st Dep't 1965) (Breitel, J.)).

As noted above, however, the scope of work product protection is determined by federal, not state, [*16] law. [HN10] Because automatically granting protection to all documents prepared by liability insurers would contravene the Second Circuit's holding in Adlman that courts should avoid protecting documents created in the ordinary course of business -- a directive that requires careful delineation of the scope of protection on a case-by-case basis -- the courts in this district that have considered work product protection in the context of liability insurance documents have declined to follow any per se rule. See, e.g., Insurance Co. of North America v. M/ V Savannah, 1995 U.S. Dist. LEXIS 15247, No. 94 Civ. 8846 (CSH), 1995 WL 608295, at *1 (S.D.N.Y. Oct. 17, 1995); American Ins. Co., 1998 U.S. Dist. LEXIS 14822, 1998 WL 647206, at *1. Liability insurance carriers, like first-party insurers, prepare documents in the ordinary course of their business -- a business that includes more than simply preparing for litigation. Liability insurers promise to pay third-party claims against their insured if the insured is liable, and presumably do not litigate to avoid paying a third-party claim when their own investigations have led them to conclude that the insured is indeed liable. Thus, [HN11] the assumption that a liability [*17] insurer anticipates that a lawsuit will result from every accident in which its insureds are involved fails to take into account the possibility that the insurer will decide to avoid litigation by paying the third-party claim. Consequently, the liability insurer's documents, like those authored by carriers of other types of insurance, may be protected from discovery only if they were prepared "in furtherance of a sufficiently identifiable resolve to litigate." Fine, 91 F.R.D. at 423. That resolve may be particularly difficult to identify in the liability insurance context, but the difficulty of determining the insurer's intentions does not relieve the Paduano defendants of their burden of demonstrating, by specific evidence, that each document was prepared in anticipation of litigation.

The Paduano defendants have not proffered sufficient evidence to demonstrate that the documents in the privilege logs are work product. [HN12] The point at which an insurance company begins to prepare for litigation can often be determined by using the insurer's documented course of action to reconstruct its deliberative process. See, e.g., Fine, 91 F.R.D. at 422. While the [*18] actions that an insurance company takes immediately after being notified of a potential claim are almost always part of its ordinary business of claim investigation, "at a certain point [its] activity shifts from the ordinary course of business to anticipation of litigation." Id. Here, the Paduano defendants have proffered evidence

that Chubb began to investigate the causes of the fire one day after it occurred, hiring P.M.R. that day, and retaining P.S.I. in August. (Paduano Defs. Mem. at 3.) These actions are consistent with an insurer's normal business practice of claims investigation. There is little other objective evidence of Chubb's deliberative process as to the Paduanos' liability insurance.

With respect to the three investigative reports listed on the Paduano Liability File Privilege Log 1, [HN13] investigations into the causes and effects of an accident, undertaken soon after the event itself, are generally considered part of an insurance company's ordinary course of business. See, e.g., Insurance Co. of North America, 1995 U.S. Dist. LEXIS 15247, 1995 WL 608295, at *1. Absent any evidence indicating that one or more of the reports was produced after Chubb began to prepare for litigation [*19] rather than in its ordinary business of investigating potential insurance claims, none of the documents can be considered work product. n2

n2 Even under the New York rule cited above, it is not clear that work product protection would extend to the documents in question. The very cases applying a per se rule to liability insurers' investigations note that "the rule in cases involving insurance coverage with respect to losses such as a fire is very different," and that when a fire insurer "retains an expert to investigate a fire loss, that expert's report will be discoverable unless the carrier can make a showing that at the time the report was prepared, the insurer had rejected the insured's claim or had reasonable grounds for disclaiming it." Gentile, 514 N.Y.S.2d at 878 (citations omitted). Chubb was a first-party as well as liability insurer of the Paduanos, and undertook an immediate investigation into the causes of the fire. That Chubb chose to place the investigative report in the liability claim file is not sufficient evidence, if it is evidence at all, to refute the inference that it investigated the fire in the ordinary course of business. See Spectrum Systems Int'l Corp. v. Chemical Bank, 78 N.Y.2d 371, 381, 575 N.Y.S.2d 809, 581 N.E.2d 1055 (1991) ("A party's own labels are obviously not determinative of work product.").

[*20]

The documents listed in the Paduano Liability File Privilege Log 2 are also not work product. The claims adjuster's notes and correspondence, dated between March 2001 and the present, relate to "liability coverage under the policy," "comments regarding claims made by

third parties," and "fire investigation." (Lambert Aff. Ex. K.) These labels do not on their face indicate that the notes were prepared in anticipation of litigation rather than as part of the normal course of investigating the claim and determining whether the Paduanos would be covered under their policy. See Bogan v. Northwestern Mutual Life Co., 163 F.R.D. 460, 466 (S.D.N.Y. 1995) (finding that notations on privilege log contradicted assertion that documents were work product). Even those notes authored after the filing of this lawsuit are not necessarily work product, since [HN14] the institution of a lawsuit does not relieve the party opposing production of its burden of demonstrating that the documents would not have been prepared but for the litigation. In re Kidder Peabody Securities Litigation, 168 F.R.D. 459, 467 n.6 (S.D.N.Y. 1996). Without any evidence to assist the Court in drawing [*21] the line between business and litigation, the Court cannot conclude that any of these documents are work product.

Finally, the eighteen liability claim files kept by Chubb in its liability file on the Paduanos must also be produced. Rather than detailing the substance of each allegedly protected document within the claim files, the Paduano defendants have simply asserted that each file, in its entirety, is protected. (Lambert Aff. Ex. K.) [HN15] Blanket assertions of work product protection as to entire files, rather than specific documents, are never sufficient to prevent discovery, since the party opposing discovery must establish that each document is work product. Condon v. Stephan Machinery Corp., 1990 U.S. Dist. LEXIS 7357, No. 90 Civ. 0283 (PKL), 1990 WL 311599, at *2 (S.D.N.Y. June 18, 1990). In addition, the Paduano defendants have not produced any evidence as to when the documents were created, their contents, and their part in Chubb's deliberative process. As the Court cannot determine whether these files were prepared in anticipation of litigation, the Paduano defendants have failed to meet their burden of establishing work product protection. Chubb must respond to Weber's third-party subpoena [*22] by producing all of the documents listed on the Paduano Liability File Privilege Log 2.

B. Documents Listed in the Paduano First-Party Privilege Log

1. Documents Withheld as Work Product

The Paduano defendants have also objected to the production of a number of documents contained in Chubb's first-party policy file on them, all of which constitute correspondence between Chubb, Cozen and O'Connor, Affiliated, and P.M.R. The Paduano defendants contend that all of this material is privileged work product, as Chubb began to prepare for the possibility of a lawsuit in connection with the Paduanos' first-party coverage as soon as it learned of the fire's occurrence.

(Paduano Defs. Mem. at 3, 11.) They have not proffered any evidence to support this claim with respect to the documents in the first-party file, however, and thus have not satisfied their burden of establishing work product protection.

One day after the fire occurred, Chubb hired the law firm of Cozen and O'Connor to "pursue [its] subrogation interests," (id. at 3; Lambert Aff. Ex. D), n3 and the Paduano defendants argue that this establishes that Chubb immediately anticipated litigation. (Paduano Defs. Mem. [*23] at 3.) [HN16] An insurer's retaining a law firm and having it conduct its own investigation of a claim is a "significant factor in determining when the insurer anticipates litigation," but is not determinative. Mount Vernon, 1998 U.S. Dist. LEXIS 16183, 1998 WL 729735, at *7; Westhemeco Ltd. v. New Hampshire Ins. Co., 82 F.R.D. 702, 708 (S.D.N.Y. 1979). The fact that Cozen and O'Connor was hired to investigate the potential for subrogation does suggest that, soon after the fire occurred, Chubb was at least considering the possibility that it might be able to sue a third party to recover the losses suffered by the Paduanos. On the other hand, an insurer does not have an "identifiable resolve to litigate," Fine, 91 F.R.D. at 423, until it has made a decision regarding subrogation. Until that point, an investigation into the potential for subrogation is simply part of an insurer's ordinary practice of investigating all issues arising from an accident involving its insureds, and documents created as part of this process would have been created in the same form regardless of the insurer's eventual decision as to litigation. American Ins. Co., 1998 U.S. Dist. LEXIS 14822, 1998 WL 647206, at *2 [*24] (holding that documents authored after law firm was retained to investigate subrogation, but before subrogation decision was made, were not created in anticipation of litigation). Here, Cozen and O'Connor was retained immediately after the fire, to conduct an "initial investigation regarding subrogation" (Lambert Aff. Ex. D), indicating that Chubb had not yet decided to attempt to subrogate the Paduanos' losses. Since insurance companies often hire attorneys as part of the normal claim investigation process, before litigation is anticipated and before a subrogation decision has been made, see, e.g., Fine, 91 F.R.D. at 422-23, the retention of Cozen and O'Connor does not by itself establish that documents subsequently created by Chubb, and documents created for Cozen and O'Connor by Affiliated, were work product.

n3 It appears that Cozen and O'Connor was retained only in connection with the Paduanos' first-party policy, and not in connection with the liability policy, as the Paduano Liability Privilege Logs do not contain any documents generated by

Cozen and O'Connor. (Biccochi Aff. Ex. 1; Lambert Aff. Ex. K.)

[*25]

The Paduano defendants have not presented any evidence as to when, or if, Chubb made a decision on subrogation, and so it is impossible to determine whether any of these documents were prepared in anticipation of litigation with third parties. Most of the documents pertain to "investigation of [the] fire," suggesting that they were created as part of Chubb's customary investigation, rather than specifically in preparation for any lawsuit. The one letter from Cozen and O'Connor to Chubb whose subject is described as "subrogation of loss" is dated May 1, 2001, just over a month after the fire. Without more information about the contents of the letter, or affidavits or other evidence regarding when a decision as to subrogation was made, the Court cannot conclude that the Cozen and O'Connor letter, or any of the other documents, was created in furtherance of an identifiable resolve to litigate. American Ins. Co., 1998 U.S. Dist. LEXIS 14822, 1998 WL 647206, at *2; see also Adlman, 134 F.3d at 1202.

There are no other objective benchmarks in the investigative process that indicate the point at which Chubb turned its attention to potential litigation. Since Chubb did not deny the [*26] Paduanos' claim (Pl. Mem. at 7), the presumption that the denial of the insureds' claim marks the beginning of litigation preparation does not apply here. See, e.g., Mount Vernon, 1998 U.S. Dist. LEXIS 16183, 1998 WL 729735, at *6 (stating that some courts presume that denial of a claim marks the point at which litigation is anticipated, and listing cases). In addition, all of the documents listed on the privilege log were created well before this litigation began, between March and June 2001. [HN17] Documents created immediately after the occurrence of an accident that may give rise to an insurance claim are almost always created as part of the insurance company's normal practice of investigating claims. Fine, 91 F.R.D. at 422. Here, all of the documents were authored within three months of the fire, suggesting that they were not prepared in anticipation of litigation.

Since the Paduano defendants have not proffered any evidence establishing that the documents generated by P.M.R., Affiliated, Cozen and O'Connor, and Chubb were created in anticipation of litigation, the documents listed on the Paduano First-Party Privilege Log are not protected as work product.

2. Documents Withheld [*27] on Grounds of Attorney-Client Privilege

The Paduano First-Party Privilege Log lists three pieces of correspondence to or from Cozen and O'Con-

nor, for which the Paduano defendants assert attorney-client privilege in addition to work product privilege. (Biccochi Aff. Ex. 2.) Plaintiff seeks these documents to the extent that they are related to the investigative reports. (Pl. Mem. at 3 n.1.) Two of the letters are from Cozen and O'Connor to Chubb, and one is from Affiliated to Cozen and O'Connor. (Biccochi Aff. Ex. 2.) The Paduano defendants have satisfied their burden of establishing that the two letters between Cozen and O'Connor and Chubb are privileged, but have not established that the Affiliated letter is a confidential communication.

[HN18] In federal diversity actions such as this one, issues of attorney-client privilege are governed by New York law. Bank Brussels Lambert v. Credit Lyonnais (Suisse), S.A., 210 F.R.D. 506, 508 (S.D.N.Y. 2002). Under New York law, the attorney-client privilege protects "confidential communication[s] made between the attorney or his employee and the client in the course of professional employment," N.Y. C.P.L.R. § 4503(a) (McKinney [*28] 2002), and the party asserting the privilege bears the burden of establishing the elements of the privilege. Arkwright Mutual Ins. Co. v. National Union Fire Ins., 1994 U.S. Dist. LEXIS 13216, No. 90 Civ. 7811 (AGS), 1994 WL 510043, at *4 (S.D.N.Y. Sept. 16, 1994). When the communication at issue originated with the attorney rather than the client, the party opposing production must establish that the communication was made "for the purpose of facilitating the rendition of legal advice or services," and that it is "predominantly of a legal character," consisting of more than facts known to third parties. Spectrum Systems Int'l Corp. v. Chemical Bank, 78 N.Y.2d 371, 377-78, 575 N.Y.S.2d 809, 581 N.E.2d 1055 (1991) (internal citations omitted).

Document III is a letter from Cozen and O'Connor to Chubb, dated May 1, 2001, concerning "subrogation of loss." (Biccochi Aff. Ex. 2.) Since Cozen and O'Connor was hired specifically to examine the potential for subrogation claims arising out of the fire (Lambert Aff. Ex. D), it is possible to infer from the privilege log's description that Cozen and O'Connor sent this letter for the purpose of giving legal advice or discussing its legal [*29] opinions. [HN19] Since the document is predominantly legal in character, the fact that it may contain nonprivileged information does not destroy its immunity, Spectrum Systems, 78 N.Y.2d at 378, and so the description on the privilege log is a sufficient basis on which to conclude that this letter is protected by the attorney-client privilege.

Document V is a letter sent by Cozen and O'Connor to Chubb on May 7, 2001, which the Paduano defendants state pertains to the investigation of the fire. (Biccochi Aff. Ex. 2.) The law firm conducted its own investigation into the causes of the fire as part of its examination of the potential for Chubb to subrogate the Paduanos' losses.

The fire investigation was therefore a component of Cozen and O'Connor's larger task of analyzing the legal issues arising in connection with the Paduanos' coverage, and the substance of the firm's advice to Chubb regarding its subrogation rights was, to some extent, dependent on the results of that investigation. Thus, the stated subject matter of Cozen and O'Connor's retainer, and the relationship between the investigation and the legal issues implicated by the subrogation question, make it possible [*30] to infer that any discussion of the fire investigation would be adjunct to, and intertwined with, the firm's legal advice to Chubb. See id. at 380 (recognizing that attorney's discussion of an investigative report could "relate[] and integrate[] the facts with the law firm's assessment of the client's legal position"). Therefore, the privilege log's description is a sufficient basis on which to conclude that Document V is predominantly legal in character, and is protected by the attorney-client privilege.

Finally, Document IV is a letter from Affiliated to Cozen and O'Connor dated May 2, 2001, also concerning the investigation of the fire. (Biccochi Aff. Ex. 2.) Since Affiliated is not a law firm, the letter cannot have been sent primarily for the purpose of giving legal advice. In addition, insofar as the letter pertains to Affiliated's investigation and its results, it is not protected by the attorney-client privilege, since [HN20] "information received by the attorney from other persons and sources while acting on behalf of a client does not come within the attorney-client privilege." Kenford Co. v. County of Erie, 55 A.D.2d 466, 390 N.Y.S.2d 715, 718 [*31] (4th Dep't 1977) (Cardamone, J.); see also Spectrum Systems, 78 N.Y.2d at 379. There is no indication that the report contains any statements made by the client to the investigator acting as an assistant to the lawyer. Cf. United States v. Kovel, 296 F.2d 918, 921-23 (1961) (holding that statements of client to accountant assisting lawyer in providing legal services were privileged). Given the lack of evidence that the letter references any of Cozen and O'Connor's legal opinions, or contains any confidential information, the Court concludes that it is not privileged.

C. Chubb Documents Not Listed on the Paduano Defendants' Privilege Logs

Plaintiff asserts that Chubb is in possession of "at least one" other investigative report that the Paduano defendants have not listed on any of their privilege logs, but have not produced. (Pl. Mem. at 13, 16.) Thus, plaintiff argues, the Paduanos have waived any privilege as to these documents. The Paduanos, for their part, state that they have produced all documents they considered non-privileged, and listed on their privilege logs all those documents for which they assert any privilege. (Paduano Defs. [*32] Mem. at 12.)

Plaintiff bases her assertion on evidence that an Investigator Russo examined the scene of the fire and interviewed Mrs. Paduano (id. at 16; Biccochi Aff. Ex. 4 at 4), noting that no documents authored by Investigator Russo have been logged or produced, and speculating that other, similar, documents might exist. She produces no evidence suggesting that Russo's investigation led to the creation of any documents, however, and thus has not established the existence of any document that has not been either logged or produced. The Court has no basis to find that the Paduano defendants have not complied with their discovery responsibilities in good faith. If at a later stage in the litigation, the Paduano defendants attempt to rely on documentary evidence that they have improperly failed to produce or include in their privilege logs, plaintiff may bring the matter to the Court's attention, and the Paduanos will not be permitted to make use of any documents that they have wrongfully withheld. Fed. R. Civ. P. 37(c). Plaintiff has not, however, established any basis to believe that any Chubb document exists that has not been either produced or listed in a privilege log, and [*33] accordingly the motion to compel production of such hypothetical documents is denied.

D. Documents in the Possession of P.M.R. and Affiliated

In addition to Chubb, plaintiff has served third-party subpoenas on Affiliated and P.M.R., seeking "all documents relating to the fire," including photographs and evidence taken from the scene of the fire, and subsequently prepared reports and notes. (Pl. Mem. at 2; Lambert Aff. Exs. H, I.) n4 The Paduano defendants have not produced privilege logs for the documents in the possession of P.M.R. and Affiliated, but have objected to the subpoenas, arguing that the production of the documents sought would lead to the disclosure of protected work product. (Paduano Defs. Mem. at 4-5.) Plaintiff asserts that the Paduano defendants have waived work product protection as to these documents (Pl. Mem. at 13), as Fed. R. Civ. P. 26(b)(5) requires that a party must describe the documents for which privilege is claimed on a privilege log.

n4 The parties have provided the Court with copies of the subpoenas served on Chubb and P.M.R., but not on Affiliated. (Lambert Aff. Exs. H, I.) Given that the Chubb and P.M.R. subpoenas are virtually identical, however, the Court will assume that the Affiliated subpoena follows the same pattern.

[*34]

[HN21] Under certain circumstances, the failure to provide a privilege log can result in a waiver of privilege

as to the documents that have not been produced. See, e.g., Strougo v. BEA Assocs., 199 F.R.D. 515, 521 (S.D.N.Y. 2001). While a party is obligated to provide a privilege log for those documents within its control, however, it does not have to log those documents that it does not have the power to produce itself, since it cannot be compelled to produce them. Arkwright, 1994 U.S. Dist. LEXIS 13216, 1994 WL 510043, at *15 (stating that plaintiff had not waived privilege by failing to provide privilege log for third-party documents not in its control); see also Fed. R. Civ. P. 30(a). Here, there is no indication that documents possessed by P.M.R. and Affiliated, investigators hired by Chubb and Cozen and O'Connor, have ever been in the control of the Paduano defendants. P.M.R. and Affiliated have no direct relationship with the Paduanos, and unlike Chubb, have no involvement in the Paduanos' defense of this action. Thus, while the Paduano defendants were able to produce privilege logs for the documents in Chubb's possession, they were not responsible for logging the documents [*35] in the possession of P.M.R. and Affiliated, and have not waived work product protection as to these documents.

The lack of privilege logs does prevent the Court from determining whether its rulings on the Chubb subpoena and the documents withheld by the Paduanos apply to the documents sought in these subpoenas, however. To the extent that the documents sought in these two subpoenas are the same documents sought from the Paduanos and Chubb, then the above discussion applies, and the documents are not work product. To the extent that any of the P.M.R. and Affiliated documents are similar to the documents in the possession of Chubb and the Paduano defendants, the parties should work out a reasonable solution in light of the Court's rulings on the logged documents.

III. Documents Withheld by the Building Defendants

A. Documents Withheld as Work Product

Plaintiff also seeks a number of documents described on the building defendants' privilege log as work product. (Biccochi Aff. Ex. 3.) These documents, like those withheld by the Paduano defendants, are apparently not "mental impressions" at the core of the work product doctrine, Leslie Fay, 161 F.R.D. at 279, [*36] but are mostly reports on the damages from the fire and clarifications of the building defendants' policy coverage. n5 Like the Paduano defendants, the building defendants have not proffered any evidence to support their contention that these documents were prepared in anticipation of litigation. Indeed, the privilege log itself suggests that many of the documents were prepared as part of the customary insurance investigation into potential claims against the building defendants, since most of the docu-

ments were created immediately following the fire, and are labeled "evaluation of damages" or "evaluation of policy coverage." n6 (Biccochi Aff. Ex. 3.) In addition, the building defendants state that the withheld documents concern "the valuation of claims and the scope of policy coverage therefor, the strategy for handling claims and the cause and origin of the fire." (Katz Affirm. P 8.) n7 There is also no evidence as to the insurers' deliberative processes, whether or not any of the building defendants' claims were denied, when and if counsel was retained in anticipation of litigation, or any other evidence of benchmarks in the progression from claim to litigation that could enable [*37] the Court to infer that subsequent documents were prepared in anticipation of litigation. Thus, none of the documents listed on the Building Defendants' Privilege Log can be considered work product.

> n5 The building defendants do state that some of their "computerized claims progress notes," listed as the fifth entry on their privilege log, contain the claims examiner's "mental impressions concerning the valuation of claims." (Katz Affirm. P 13.) [HN22] The mental impressions at the core of the work product doctrine are those involving the progress of, and preparation for, the litigation, not the mental impressions of an examiner conducting the insurer's ordinary business of valuing claims. Thus, the building defendants have not asserted that any of the documents constitute the type of material that is most strongly protected by the work product doctrine. See Upjohn Co., 449 U.S. at 398-401.

> n6 The one entry whose description could suggest that the listed documents were created in anticipation of litigation is labeled "computerized claims progress notes." Some of these notes apparently pertain to the "nature of claims likely to result in litigation." (Biccochi Aff. Ex. 3.) These notes are not separately described in the entry, however, but are listed with other notes pertaining to different subjects, so there is no way of knowing when these notes were written, or by whom. It is entirely possible that an insurer would evaluate the potential for lawsuits to arise from an accident as part of its customary evaluation of a claim, before it specifically anticipates litigation, or has formed a resolve to litigate. Given the lack of evidence as to when or why these notes were created, the building defendants have not established that there notes can be considered work product. See Condon, 1990 U.S. Dist. LEXIS 7357, 1990 WL 311599, at *2 (indi-

cating that party could not successfully assert privilege without listing details as to each withheld document so that the court could determine when and why they were created).

[*38]

n7 The building defendants, like the Paduano defendants, appear to believe that state law controls the scope of work product protection, and that therefore all materials prepared in the process of evaluating claims pursuant to liability insurance are protected. (Katz Affirm. P 9.) Since, as noted above, [HN23] the Second Circuit does not distinguish between first-and third-party insurance for purposes of work product protection, the building defendants would have to establish that the documents would not have been created in essentially the same manner for ordinary business purposes in order to avoid producing them. Adlman, 134 F.3d at 1202.

This conclusion applies even to those documents that were created after the litigation began. The fifth entry on the building defendants' privilege log lists "computerized claims progress notes," which are dated between March 2001 and September 2002, and apparently have a variety of authors and institutional origins. (Biccochi Aff. Ex. 3.) As discussed above, even documents created after the institution of litigation must be proven to have been [*39] created because of the lawsuit. Kidder Peabody, 168 F.R.D. at 467 n.6. Since the building defendants have not proffered any evidence as to these materials, they cannot be protected as work product.

B. Documents Withheld on Grounds of Attorney-Client Privilege

The building defendants also assert the attorney-client privilege as to the "computerized claims progress notes" listed as the fifth entry on their privilege log, because some of the notes were authored by their attorney, Bennett Katz, and pertain to "attorney analysis of liability and damage issues." (Biccochi Aff. Ex. 3.) The entry on the privilege log does not distinguish between the attorney-authored notes and those withheld on grounds of work product protection alone, however, so it is impossible to determine, without more specific descriptions of each document, which privilege pertains to each document. Nevertheless, as plaintiff does not seek any of the documents for which the building defendants have asserted attorney-client privilege (Pl. Mem. at 5, 17), the building defendants should not have to produce Mr. Katz's notes. The remainder of the claims progress notes

in the entry are not protected [*40] as work product, and so the building defendants must turn over all of the notes except for those written by Mr. Katz, as to which they assert attorney-client privilege.

IV. In Camera Review of the Allegedly Privileged Documents

[HN24] When faced with claims of privilege, courts often undertake in camera review in order to supplement the parties' privilege logs and determine the content of the documents. However, in camera review of the documents, while potentially helpful to the determination of privilege, is "not ... to be routinely undertaken ... as a substitute for a party's submission of an adequate record for its privilege claims," especially where, as here, the Court would have to examine a large quantity of documents. Bowne, Inc. v. AmBase Corp., 150 F.R.D. 465, 475 (S.D.N.Y. 1993) (internal citations omitted). The Paduano defendants and the building defendants simply have not produced sufficient evidence from which the Court can conclude that the bulk of the documents may be privileged. Given the scanty factual showing in the defendants' privilege logs and motion papers, in camera review of the documents, even had the defendants provided them to the Court, is not warranted.

V. Plaintiff's [*41] Substantial Need for the Documents

Even if the defendants had satisfied their burden of establishing that the withheld documents are work product, Weber would be entitled to almost all of the documents because she has substantial need for them, and would suffer undue hardship if denied access to the materials. Fed. R. Civ. P. 26(b)(3) (providing that work product protection can be overcome by showing of substantial need and undue hardship). The bulk of the documents listed on the Paduano Liability File Privilege Log 1, the Paduano First-Party Privilege Log, and the Building Defendants' Privilege Log, are investigative reports and other documents relating to the causes of the fire and the extent of the damages it caused. These documents concern facts that are at the heart of plaintiff's case, since she alleges that the fire was the result of the defendants' collective negligence.

Plaintiff has substantial need for these documents because they contain information that is essential to her theory of why the fire occurred and why the defendants are responsible. [HN25] "A substantial need for work product materials exists where the information sought ... is 'crucial' to the determination of [*42] whether the defendant could be held liable for the acts alleged, or carries great probative value on contested issues," National Congress for Puerto Rican Rights v. City of New York, 194 F.R.D. 105, 110 (S.D.N.Y. 2000) (internal citations omitted), as is clearly the case here.

The Paduano defendants argue, however, that the information in these documents is already available to plaintiff, since her experts could simply review the reports created by the Fire Department and Crawford Investigation Services, all of which are in plaintiff's possession. (Paduano Defs. Mem. at 14.) Contrary to the Paduanos' assertions, the reports sought by plaintiff are apparently more thorough and elaborate than the Crawford and Fire Department reports, and contain information that may be essential to establishing whether or not the building defendants failed to properly maintain the apartment building. The Crawford report contains summaries of an on-site investigation of the room in which the fire started and interviews with witnesses (Biccochi Aff. Ex. 4), and the Fire Department reports are similar, consisting of a very brief summary of an inspection of the premises, and short interviews [*43] with witnesses (Lambert Aff. Ex. B). In contrast, the Affiliated report apparently describes a structural investigation of the building, and an electrical engineering analysis (id. Ex. E; Pl. Mem. at 22), and the P.M.R. reports appear similar (Lambert Aff. Ex. C), suggesting that these documents in particular might be necessary to plaintiff's theory of the building defendants' liability. While it is unclear whether every document described on defendants' logs as pertaining to the investigation of the fire and its damages contains information is not otherwise available to plaintiff, the fact that several of the insurers' reports are more elaborate than those already available to plaintiff suggests that the documents in the defendants' and insurers' possession are not simply duplicative of the Crawford and Fire Department reports. See National Congress for Puerto Rican Rights, 194 F.R.D. at 110 (suggesting that if all documents sought were duplicative of material publicly available, plaintiff would not have brought the motion to compel). Thus, production of these documents would not simply provide Weber with information she already has, but will furnish her with [*44] information necessary to the preparation of her case.

Plaintiff has also demonstrated that she will suffer undue hardship in obtaining the equivalent of the materials she seeks, because her experts cannot now produce their own evaluations of the fire and its damages. Since the fire occurred over a year ago and the damage has long since been repaired, plaintiff has no means of obtaining information as to the causes of the fire, other than through reviewing the reports created by the defendants' insurers in the immediate aftermath of the fire. See id. (finding undue hardship where replication of information sought would be difficult and costly). While the Paduano defendants assert that plaintiff should have hired her own investigator to evaluate the cause of the fire in the immediate aftermath of the fire (Paduano Defs. Mem. at 13), it is unreasonable to require a victim of a fire to begin to prepare for litigation within days or weeks of the fire, when she might not yet suspect negligence, or anticipate that the issues raised by the fire might not be resolved amicably. Thus, as plaintiff has established both substantial need and undue hardship, she would be entitled to production [*45] of the documents relating to the investigation of the fire, even if the defendants had established that those documents were work product.

CONCLUSION

The Paduano defendants are directed to produce the documents listed on the Paduano Liability File Privilege Log 1, within 30 days of the date of this Opinion and Order. Chubb is directed to comply with plaintiff's subpoena, and to produce the documents listed on the Paduano Liability File Privilege Log 2 and the Paduano First-Party Privilege Log, with the exception of Documents III and V, within 30 days. Affiliated and P.M.R. are directed to comply with plaintiff's subpoenas seeking documents relating to the fire, also within 30 days, to the extent that any of the responsive documents have been listed on the Paduano defendants' privilege logs, and ruled upon in this Opinion and Order. The building defendants are directed to produce the documents listed on their privilege log, with the exception of those documents in entry number 5 for which attorney-client privilege is asserted, and the documents numbered 6, 9, 10, and 11, within 30 days.

SO ORDERED:

GERARD E. LYNCH

United States District Judge

Dated: January 14, 2003