# EXHIBIT B

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------X

Tzvi Weiss, Leib Weiss, Malka Weiss,                  CV-05-4622
Yitzchk Weiss, Yeruchaim Weiss, Esther                (CPS)
Deutsch, Larry Carter, Adam Averbach,
David Averbach, Devir Averbach, Julie
Averbach, Maida Averbach, Michael Averbach,           MEMORANDUM
Sean Averbach, Steven Averbach, Tamir                 OPINION
Averbach, Katherine Baker, Anna Beer,                 AND
Harry Leonard Beer, Rebekah Blutstein,                ORDER
Richard Blutstein, Estelle Carroll, Larry
Carter for the Estate of Diane Leslie
Carter, Jacqueline Chambers, Shaun Coffel,
Robert Coulter, Robert L. Coulter, Jr.,
Robert L. Coulter, Sr., Chana Freedman,
Greta Geler, Eugene Goldstein, Lorraine
Goldstein, Michael Goldstein, Richard
Goldstein, Nevenka Gritz, Levana Cohen
Harooch, Barbara Ingardia, Gloria Kushner,
Phyllis Maisel, Dianne Coulter Miller,
Shaina Chava Nadel, Chana Nathansen, Matanya
Nathansen, Matanya and Chana Nathansen,
Shoshana Nathansen, Yehudit Nathansen, Blumy
Rom, Daniel Rozenstein, Eileen Sapadin,
Julia Rozenstein Schon, Eric M. Singer,
Judith Singer, Sarri Anne Singer, Amichai
Steinmetz, Deborah Steinmetz, Jacob Steinmetz,
Natanel Steinmetz, Nava Steinmetz, Orit
Steinmetz, David Toporowitch, Hezekial
Toporowitch, Pearl B. Toporowitch, Rivka
Toporowitch, Yehuda Toporowitch,

                                 Plaintiffs,

        - against -

National Westminster Bank PLC,

                                 Defendant.

------------------------------------X

SIFTON, Senior Judge.

        Plaintiffs, United States citizens, and several estates,

survivors and heirs of United States citizens, who have been

- 2 -

victims of terrorist attacks in Israel, bring this action against defendant, National Westminster Bank, PLC ("NatWest") alleging that defendant is civilly liable for damages payable to them pursuant to 18 U.S.C. §2333(a), because it (1) aided and abetted the murder, attempted murder, and serious bodily injury of American Nationals located outside the United States in violation of 18 U.S.C. §2332; (2) knowingly provided material support or resources to a foreign terrorist organization ("FTO")[1] in violation of 18 U.S.C. 2339B; and (3) unlawfully and willfully provided or collected funds with the intention that such funds be used, or with the knowledge that such funds would be used for terrorist purposes in violation of 18 U.S.C. 2339C. Presently before this Court is defendant's motion to dismiss all claims pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons set forth below the defendant's motion is granted as to the first claim and denied as to the second and third claims.

### STATUTORY BACKGROUND

---

[1] Pursuant to Section 209 of the Immigration and Nationality Act, 8 U.S.C. §1189, the Secretary of State, in consultation with the Secretary of Treasury and the Attorney General may designate an organization as a foreign terrorist organization if:

(a) the organization is a foreign organization;

(b) the organization engages in terrorist activity or terrorism, or retains the capability and intent to engage in terrorist activity or terrorism; and

(c) the terrorist activity or terrorism of the organization threatens the security of United States nationals or the national security of the United States.

- 3 -

All three of the claims made by plaintiffs in their amended
complaint derive from section 2333(a) of the Anti-Terrorism Act
of 1992 which provides civil remedies for the victims of
terrorism. That section provides:

> Any national of the United States injured in his or her
> person, property, or business by reason of an act of
> international terrorism or his or her estate,
> survivors, or heirs, may sue therefor in any
> appropriate district court of the United States and
> shall recover threefold the damages he or she sustains
> and the cost of the suit, including attorney's fees.

18 U.S.C. 2331(a), in turn, defines international terrorism as

activities that:

> (a) involve violent acts or acts dangerous to human
> life that are a violation of the criminal laws of the
> United States or of any State, or that would be a
> criminal violation if committed within the jurisdiction
> of the United States or of any State;
>
> (b) appear to be intended –
>
>> (i) to intimidate or coerce a civilian
>> population;
>>
>> (ii) to influence the policy of a government
>> by intimidation or coercion;
>>
>> (iii) to affect the conduct of a government
>> by mass destruction, assassination or
>> kidnapping; and
>
> (c) occur primarily outside the territorial
> jurisdiction of the United States, or transcend
> national boundaries in terms of the means by which they
> are accomplished, the persons they appear intended to
> intimidate or coerce, or the locale in which their
> perpetrators operate or seek asylum.

Violations of 18 U.S.C. §2339B and §2339C are recognized as

international terrorism under 18 U.S.C. 2333(a). *Boim v. Quranic*

- 4 -

*Literacy Institute and Holy Land Foundation for Relief and Development*, 291 F.3d 1000, 1014-1015 (7th Cir. 2002); *Linde v. Arab Bank*, 384 F.Supp 2d 571, 581 (E.D.N.Y. 2005).

Section 2339B provides that:

Whoever knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so, [is guilty of a crime]. . .  To violate this paragraph a person must have knowledge that the organization is a designated terrorist organization . . . has engaged in terrorist activity . . . or that the organization has engaged in or engages in terrorism.[2]

Section 2339C provides in relevant part that

Whoever . . . by any means, directly or indirectly, unlawfully and willfully provides or collects funds with the intention that such funds be used, or with the knowledge that such funds are to be used in full or in part, in order to carry out . . . [an] act intended to cause death or serious bodily injury to a civilian, or to any other person not taking an active part in the hostilities in a situation of armed conflict, when the purpose of such act, by its nature or context, is to intimidate a population or to compel a government or an international organization to do or to abstain from

_____

[2] Section 2339B(g)(4) in turn defines material support by reference to Section 2339A(b) which provides that:

(1) the term "material support or resources" means any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safe houses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials;

(2) the term "training" means instruction or teaching designed to impart a specific skill, as opposed to general knowledge; and

(3) the term "expert advice or assistance" means advice or assistance derived from scientific, technical or other specialized knowledge.

- 5 -

doing any act, shall be punished as prescribed in subsection (d)(1).[3]

Plaintiffs also contend that liability under 2333(a) may be premised upon a theory of civil "aiding and abetting" of a tort said to be created by the Anti-Terrorism Act.[4] Plaintiffs point to the RESTATEMENT (SECOND) of TORTS §876 (1979) which provides that

> For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he
>
> (a) does a tortious act in concert with the other or pursuant to a common design with him; or
>
> (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other to so conduct himself; or
>
> (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

## FACTUAL BACKGROUND

The following facts are drawn from the plaintiff's amended complaint and assumed to be true for the purposes of this motion pursuant to Rule 12(b)(6).

The Parties

---

[3] Section 2339C(e) further defines the term "provides" as including "giving, donating, and transmitting" and the term "collects" as including, "raising and receiving."

[4] Defendant argues that a criminal aiding and abetting claim cannot be sustained under Section 2333(a). However, plaintiffs' response makes clear that they argue only that 2333(a) be construed to include a tort claim. Accordingly, I do not address a claim that defendant aided and abetted the crime of international terrorism defined by 18 U.S.C. § 2331(a) or the crimes of providing material support or funds to international terrorism in violation of 18 U.S.C. § 2339B and § 2339C.

-6-

*Plaintiffs*

Twelve plaintiffs are individuals who were injured in ten different terrorist attacks that occurred in Israel between March 27, 2002 and August 19, 2003 and who, as a result, experienced physical and mental anguish and emotional distress.[5] Eight plaintiffs are individuals who were killed in those attacks.[6] The remaining plaintiffs were not themselves directly injured in the attacks, but rather, are family members of the victims, and have experienced non-physical injuries including anxiety, severe mental anguish, extreme emotional distress and loss of companionship as a result of their relatives' injuries or death.[7]

*The Terrorist Attacks*

Plaintiffs identify ten separate attacks which caused their injuries. Those attacks are as follows:

> 1. On August 19, 2003, Raed Abdul Hamid Misk, a suicide bomber, detonated explosives on Egged bus No. 2. The Islamic Resistance Movement ("HAMAS") claimed responsibility. Am. Compl. ¶¶5-6.
>
> 2. On June 20, 2003 two unknown individuals perpetrated a shooting attack on Israeli highway Route 60. HAMAS claimed

---

[5] Am. Compl. ¶¶13-23 (Tzvi Weiss), 35-36 (Chana Nathansen), 37-38 (Matanya Nathansen), 40-41 (Yehudit Nathansen),44-45 (Shoshana Nathansen), 85-88, 96 (Eugene Goldstein), 90-96 (Lorraine Goldstein), 136-138 (Sarri Anne Singer), 153-162 (Steven Averbach), 199-202 (Daniel Rozenstein), 211-216 (Jacob Steinmetz), 265, 268-273 (Gloria Kushner).

[6] Am. Compl. ¶¶30 (Tehilla Nathansen), 120 (Alan Beer), 225 (Janis Ruth Coulter), 238 (Diane Carter), 246 (Benjamin Blutstein), 259 (David Gritz), 276 (Esther Bablar), 283 (Hannah Rogen).

[7] For the sake of brevity, and because the details of plaintiffs' injuries are not at issue in this motion, they are omitted here.

- 7 -

responsibility.   Am. Compl. ¶¶80-83.

3. On June 11, 2003, Abdel Madi Shabnet, a HAMAS operative dressed as an ultra-Orthodox Jew detonated a bomb on Egged bus #14A.   Am. Compl. ¶¶117-118

4. On May 18, 2003, Bassem Jamil Tarkrouri, also dressed as an Orthodox Jew detonated a bomb on a commuter bus heading to Jerusalem. HAMAS claimed responsibility.   Am. Compl. ¶¶148-151

5. On April 30, 2003, at the instruction of HAMAS, Asif Muhammad Hanif detonated explosives in Mike's Place, a Tel Aviv restaurant.   Am. Compl. ¶¶195-196

6. On January 29, 2003 two unidentified masked men perpetrated a shooting attack on Israeli highway Route 60. On information and belief HAMAS was responsible for the attack.   Am. Compl. ¶¶209-210

7. On July 31, 2002 a bomb planted inside the Frank Sinatra cafeteria at Hebrew University's Mount Scopus campus in Jerusalem by Mohammed Odeh exploded. HAMAS claimed responsibility.   Am. Compl. ¶¶220-224

8. On May 19, 2002, a suicide bomber detonated a bomb in an open air market in Netanya, Israel. Both HAMAS and the Popular Front for the Liberation of Palestine claimed responsibility.   Am. Compl. ¶¶266-268.

9. On May 7, 2002 a Palestinian suicide bomber detonated a bomb in the Sheffield Club, an unlicensed social club and gaming parlor located in Rishon Letzion.   Am. Compl. ¶¶274

10. On March 27, 2002, a HAMAS suicide bomber detonated a bomb in the Park Hotel in Netanya.

*Defendant*

Defendant, NatWest, is a financial institution with its principal place of business in London in the United Kingdom. It is part of the Royal Bank of Scotland Group. NatWest conducts business in the United States and in New York, at a number of locations, including 101 Park Avenue, New York, NY.

- 8 -

*HAMAS*

In December 1987, Sheik Ahmed Yassin formed HAMAS as an offshoot of the Muslim brotherhood, a radical Islamic group founded in Egypt prior to World War II. The complaint alleges, and I assume it to be true for purposes of this motion that HAMAS operatives plan, assist and conduct acts of international terrorism in Israel, the West Bank, and the Gaza strip.

HAMAS's infrastructure in the Palestinian Authority Controlled Territory (the "PACT") is alleged to be comprised of two interwoven components: a terrorist apparatus and a group of religious and social institutions responsible for, among other things, recruiting and training terrorists. This collection of charitable and social institutions is commonly referred to by HAMAS as the "Dawa." In order to raise funds for its operations, it is alleged that HAMAS has established or taken control of other charitable and social institutions across the PACT and abroad, including the Orphan Care Society of Bethlehem ("Orphan Care Society"), Al-Islah Charitable Society in Ramallah-Al-Bireh ("Al-Islah"), the Ramallah Al-Bireh Charitable Society ("Ramallah Society"), the Jenin Charitable Committee ("Jenin Committee"), the Hebron Islamic Association ("Hebron Association"), Tulkarem Charity Committee ("Tulkarem Committee), Al-Mujama al-Islami, the Islamic Charitable Society in the Gaza Strip ("Islamic Charitable Society") and the Muslim Youth Association of Hebron ("Muslim

-9-

Youth Association"). Each of these groups is said to be run by
HAMAS agents, controlled by HAMAS and to collect and distribute
funds on behalf of HAMAS. One of the roles of these groups is
alleged to be their involvement in the channeling of funds to pay
expenses and otherwise assist the families of terrorist
operatives who are arrested, injured or killed. These entities
are also said to assist with the provision of housing subsides to
the families of suicide bombers when their homes are demolished
by the Israeli army after the bomber's identity has been
confirmed.

It is alleged that HAMAS receives most of its financing
through donations coordinated by prominent Saudi and Gulf State
charities and a global network of charities known as the Union of
Good operated by the Muslim Brotherhood. The Union of Good, known
in Arabic as I'Tilafun Al-Khayr, was established by the Muslim
Brotherhood in October 2000, immediately following the outbreak
of the ongoing violent Palestinian-Israeli confrontation,
commonly known as the "Second Intifada." Its primary purpose is
said to be to provide financial support for HAMAS and its agents
in the PACT. According to the complaint the Union of Good is
comprised of more than fifty Islamic charitable foundations
worldwide, including the Palestinian Relief and Development Fund
("Interpal") and the Al-Aqsa Charitable Foundation ("Al-Aqsa").
The Union of Good is alleged to use Interpal as its primary

- 10 -

clearing house for funds raised throughout Europe and the Middle East; charitable donations to the Union of Good are in part collected and distributed through Interpal.

*Terrorist Connections and Designations of Relevant Parties*

*HAMAS*

On January 23, 1995, then President Clinton issued Executive Order No. 12947, finding that "grave acts of violence committed by foreign terrorists that threaten to disrupt the Middle East peace process constitute an unusual and extraordinary threat to national security, foreign policy, and economy of the United States." The order identified certain groups, including HAMAS, as "specially designated terrorist organizations" and froze all property and interests in property of the designated terrorist organizations in the United States.

On October 8, 1997, by publication in the Federal Register, the United States Secretary of State designated HAMAS a FTO pursuant to Section 219 of the Immigration and Nationality Act and the Antiterrorism and Effective Death Penalty Act of 1996. The designation of HAMAS as a FTO has been renewed every two years since.

Following the September 11, 2001 terrorist attacks on the United States, President Bush issued Executive Order No. 13224 which designated HAMAS as a "Specially Designated Global

- 11 -

Terrorist" ("SDGT") and froze all property and interests in property of HAMAS in the United States.

In December 2001 HAMAS was placed on a list of persons, groups and entities subject to Common Foreign Security Policy ("CFSP") financial sanctions. This list is compiled and maintained by the European Banking Federation, the European Savings Banks Group, the European Association of Co-operative Banks and the European Association of Public Banks (the "EU Credit Sector Federations).

On September 12, 2003, the European Union designated HAMAS, including its "social" wing, as a terrorist organization.

*Interpal*

In March 1996, the Charity Commission, established by law as a regulator and registrar for charities in England and Wales, froze Interpal's accounts at NatWest based on evidence that the accounts had been used to channel money to HAMAS. These allegations were published in numerous British newspapers at the time, including *The Guardian* and *The Times* of *London*. According to plaintiffs an investigation by the Charity Committee ultimately distinguished between the military wing of HAMAS and its social and charitable wing. Thereafter, the Commission, finding no "pro-terrorist" bias in Interpal's distribution of funds, unfroze Interpal's accounts at NatWest.

- 12 -

In May 1997 the government of Israel declared Interpal an "unlawful organization" because of its support for HAMAS. Notice of the designation was placed in the official Israeli publication, the *Announcements and Advertisements Gazette*.

In January 1998 the Israeli Government designated Interpal a terrorist organization. Notice was again published in the *Announcements and Advertisements Gazette*.

The 2001 version of Interpal's website declared that it "works closely with" the Orphan Care Society and the Jenin Zakat Committee and directed persons wishing to make "international donations" to donate to the Holy Land Foundation ("HLF").

On an unspecified date prior to July 30, 2003 the government of Israel designated the World Assembly of Muslim Youth (WAMY), a Saudi "charity" said to have well known ties to HAMAS and Al Qaeda an unlawful organization because of its support for HAMAS. One of Interpal's officers, Mahfuzh Safiee, is alleged to be an officer of the European branch of WAMY.

On August 22, 2003, the US government designated Interpal as an SDGT.

On August 26, 2003 the Charity Commission again froze the accounts of Interpal pending a second investigation. After an investigation, including consideration of the evidence which caused the US government to designate Interpal a SDGT, the accounts were unfrozen.

- 13 -

In recent months the plaintiffs allege they have discovered that the Union of Good's fund-raising campaign entitled, "101 Days Campaign" solicits, via its website, donations for HAMAS and directs prospective donors to make such donations via Interpal's NatWest account. In a interview published on the 101 days website, Dr. Harnass stated that Interpal is one of Orphan Care Society's largest sources of donations. Interpal's website also states that"

> any donation that is made to INTERPAL though this web page is distributed with the knowledge and approval of the other members of the Union of Good directly to the charities in Palestine that are implementing the work creation programs.

*Holy Land Foundation*

On May 6, 1997 the government of Israel designated HLF a HAMAS front organization and declared that HLF "deals in the practice of transferring monies to families of HAMAS activists who carry out deadly attacks."

On December 4, 2001 the U.S. Secretary of Treasury determined that HLF was subject to Executive orders Nos. 12947 and 13224 because HLF "acts for or on behalf of" HAMAS. Accordingly, HLF was designated a specially designated terrorist ("SDT") under Executive Order 12947 and an SDGT under Executive Order NO. 13224.

- 14 -

That same month the Counsel of the European Union designated HLF a terrorist entity under Article 2(b) and Regulation (EC) No. 2850/2001.

In December 2001 HLF was placed on a list of persons groups and entities subject to CFSP financial sanctions.

*Union of Good*

The Union of Good is headed by Dr. Yussaf al-Qaradawi, a well known Muslim scholar. The board of directors includes three senior HAMAS figures: Sheikh Hamid al-Bitawi, Dr. Essam Salhoub and Bassam Jarrar.

In November of 1999, Dr. Yussaf al-Qaradawi was placed on the U.S. Watch list and was forbidden to travel to the United States.

On November 7, 2001 the Al Taqwa Bank, of which Dr. al-Qaradawi is a leading shareholder and principal, was officially designated as a SDGT.

Also in 2001, Dr. al-Qaradawi publicly described the activities of the Islamic charitable societies as a "new type of jihad, financial jihad, through which financial support is guaranteed to the martyr's families, Palestinian prisoners and detainees, and every Palestinian whose property is damaged during conflict."

- 15 -

In March 2002, Dr. al-Qaradawi is alleged to have authorized women to commit suicide attacks.

In April 2002, Dr. al-Qaradawi appeared on *Al Jazeera* to extol "jihad and martyrdom" against Israelis and to denounce the US designation of HAMAS as a terrorist organization.

*Jenin Committee and Tulkarem Committee*

In February 2002 the Israeli Government declared the Jenin Committee and the Tulkarem Committee unlawful organizations because they regularly transfer or provide money for the benefit of the families of HAMAS "martyrs," and of HAMAS prisoners in Israeli jails and deported HAMAS members.

In a July 2004 criminal indictment of the Holy Land Foundation in the Northern District of Texas both the Jenin Charity Committee and the Tulkarem Charity Committee were identified as HAMAS controlled organizations.

*Orphan Care Society*

The Orphan Care Society was outlawed by the Government of Israel in February 2002. It is alleged that most of its chief functionaries, including its director, Dr. Ghassan Harmass, are HAMAS terrorists.

*Al-Aqsa*

- 16 -

On July 31, 2002 German authorities closed the Al-Aqsa Foundation in Germany because of its support for HAMAS.

In January 2003 Sheik Mohammed Ali Hasan al-Moayad, the head of Al-Aqsa's Yemen branch, was arrested in Germany at the request of the US Department of Justice and the Federal Bureau of Investigation. He was subsequently convicted of providing material support to HAMAS in violation of 18 U.S.C. §2339B.

In April 2003, Dutch authorities blocked Al-Aqsa Foundation assets in the Netherlands based on information that funds were being provided by the foundation to organizations supporting terrorism in the Middle East.

On May 29, 2003 the US government designated Al-Aqsa as a SDGT, accusing the organization of funneling funds, including money donated for charitable purposes, to HAMAS.

*Interpal's Accounts at NatWest*

Plaintiffs allege that for more than nine years the defendant has knowingly maintained numerous accounts for Interpal and transferred and received money between these accounts and various HAMAS front organizations. The accounts are said to include U.S. Dollar Account Number 140-00-04156838, Euro Account Number 60720508524882, and Sterling Account Number 60082295142940. Plaintiffs also allege that NatWest provides Interpal with merchant banking services, directly and through

- 17 -

another Royal Bank of Scotland subsidiary, thereby making it possible for Interpal to maintain merchant accounts with MasterCard, Visa and other credit card companies.

Plaintiffs identify three specific occasions on which NatWest accepted deposits on behalf of Interpal from alleged terrorist organizations:

> (1) In April 2000 Natwest accepted a deposit of $66,000.00 for Interpal from HLF.

> (2) In January 2001 NatWest accepted deposits totaling $70,000,000 on behalf of Interpal from the Al-Aqsa organization in Yemen.

> (3) On March 27, 2003, NatWest deposited at least two payments to Interpal totaling 295,000 Euros from the Dutch branch of the Al-Aqsa Foundation.

Plaintiffs also allege that NatWest transferred funds to various HAMAS front organizations on the following occasions:

> (1) On February 19, 2003, Natwest transferred £21,404 to the Tulkarem Committee.

> (2) On July 30, 2003 NatWest transferred £73,757 to the Jenin Committee, debiting Interpal's Sterling account number 600822-95142940. This transaction is said to have been financed by WAMY.

> (3) On November 5, 2003, NatWest transferred £32,329 to the Jenin Committee also from Interpal's Sterling account.

Finally, plaintiffs allege that NatWest engages in a British government program, "Give as You Earn," which allows British citizens to have donations withdrawn directly from their paychecks and deposited in designated charities and has used

- 18 -

this device to collect funds for Interpal's Sterling account.

*NatWest's Regulatory Obligations*

All banks which have international operations or relationships with correspondent banks have a duty, based on international banking norms, to adopt know-your-customer ("KYC"), anti-money laundering ("ATL") and anti-terrorist financing ("ATF") standards, as defined and enforced by the Financial Action Task Force ("FATF") and its supporting governments. The Untied Kingdom is a participant in the FATF, and accordingly, NatWest is bound by these standards.

These standards are set forth in written principles issued by FATF and the Basel Group of Bank Supervisors. They include a due diligence obligation to monitor publicly accessible information relating to "high risk" customers, including charities collecting funds from the public. With respect to its customers, this obligation exists independently of any particular transaction.

In April 2002 an FATF report entitled "Guidance for Financial Institutions in Detecting Terrorist Financing" informed NatWest, and other financial institutions that:

> Regardless of whether the funds in a transaction are related to terrorists for the purposes of national criminal legislation, business relationships with such individuals or other closely associated persons or entities could, under certain circumstances, expose a

- 19 -

financial institutions to significant reputational, operational, and legal risk. This risk is even more serious if the person or entity involved is later shown to have benefitted from the lack of effective monitoring or willful blindness of a particular institution.

On July 16, 2002 the Royal Bank of Scotland, NatWest's parent company, adopted new "Know-Your-Customer" guidelines and the so-called Wolfsberg Principles for the Suppression of Terror Financing, committing NatWest to implement "procedures for consulting applicable lists and taking reasonable and practicable steps to determine whether a person involved in a prospective or existing business relationship appears on such a list." At the same time, NatWest's parent company publicly acknowledged that "funds used to support terrorism do not derive exclusively from criminal activities and differ from those associated with most existing money laundering offences" and committed itself to "the ongoing monitoring of individual transactions on customer accounts."

Plaintiffs allege that under the 2002 Royal Bank of Scotland Group's statement of principles for fighting crime and the financing of terrorism NatWest has an affirmative duty to monitor publicly available information and allegations about its customer's parent organizations as well as publicly available information concerning HAMAS controlled entities to which customers transferred money.

DISCUSSION

- 20 -

Defendant seeks dismissal of plaintiffs' amended complaint for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6). In considering a motion pursuant to Rule 12(b)(6), a court should construe the complaint liberally, "accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor," *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002)(citing *Gregory v. Daly*, 243 F.3d 687, 691 (2d Cir. 2001)), although "mere conclusions of law or unwarranted deductions" need not be accepted. *First Nationwide Bank v. Helt Funding Corp.*, 27 F.3d 763, 771 (2d Cir. 1994). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Villager Pond, Inc. V. Town of Darien*, 56 F.3d 375,378 (2d Cir. 1995). Dismissal is appropriate only when it "appears beyond a doubt that the plaintiff can prove no set of facts which would entitle him or her to relief." *Sweet v. Sheahan*, 235 F.3d 80,83 (2d Cir. 2000). Additionally, a complaint should be dismissed under Fed. R. Civ. P. 12(b)(6) if the Court finds that the plaintiff's claims are barred as a matter of law. *Conopco, Inc. v. Roll Intern.*, 231 F.3d 82, 86 (2d Cir. 2000). A Court is permitted to take into account the contents of documents attached to or incorporated in the

- 21 -

complaint. *Colmas v. Harsett*, 886 F.2d 8,13 (2d Cir. 1989).[8]

*IMPROPER PLAINTIFFS*

Defendant argues initially that the claims of Matanya Nathansen, Julie Averbach, Amichai Steinmetz, Nava Steinmetz, Orit Steinmetz, Netanel Steinmetz and Nevenka Gritz must be dismissed because these plaintiffs have failed to allege in so many words that they are U.S. nationals or the heirs or survivors of U.S. nationals as required by Section 2333(a). However, it is not necessary that plaintiffs specifically use the terms "heirs" or "survivors" in alleging their relationship to U.S. nationals. Rather, it is sufficient for plaintiffs to allege a familial relationship, such as that of child, parent, spouse, or sibling of a U.S. national. *Estates of Ungar ex rel. Strachman v. Palestinian Authority*, 304 F.Supp.2d 232, 264 (D.R.I. 2004).

In the present case, plaintiff Matanya Nathansen, a citizen of Israel, sues as the father of U.S. citizen Tehilla Nathansen. Julie Averbach, an Israeli citizen, sues as the wife of U.S. citizen Steve Averback. Amichai, Nava, Orit and Netanel Steinmetz sue as the children of U.S. citizens Jacob and Deborah Steinmetz, and Nevenka Gritz, a French citizen, sues as the mother of U.S. citizen David Gritz. Accordingly, these plaintiffs have sufficiently alleged that they are the heirs or survivors of U.S.

---

[8] Payment slips confirming the transfers of Interpal funds to the Jenin Zakat Committee and the Tulkarem Zakat Committee were attached to the amended complaint.

- 22 -

nationals and may sue under 2333(a).

Defendant further argues that the claims of those plaintiffs injured in the sixth and ninth attacks must be dismissed because the complaint fails to allege that those attacks were carried out by HAMAS or any other identified terrorist organization. The complaint alleges only that a "Palestinian suicide bomber" carried out the Ninth Attack. Plaintiffs now state that HAMAS was responsible for the Ninth Attack but that due to a typographical error the Complaint omitted this allegation which they seek leave to amend. Plaintiffs are granted leave to amend their complaint within thirty days of the date of this order to correct the typographical error.

The complaint alleges that HAMAS is "believed" to be responsible for the Sixth attack. Where, as here, plaintiffs lack actual personal knowledge of a alleged fact, but possess some information and believe that it is true, it is sufficient for such fact to be pled, "upon information and belief." 5 Wright, Miller & Cooper, Federal Practice and Procedure § 1224. Assuming they in fact have such information they are granted leave to amend to explicitly plead that fact.

*FIRST CLAIM*

In the first claim plaintiffs allege that NatWest aided and abetted the murder or serious bodily injury of U.S. nationals in

- 23 -

violation of 18 U.S.C. §2332 by its provision of services to Interpal.

Defendant argues that no liability on a theory of aiding and abetting exists under 2333(a). In support, defendant cites the Supreme Court decision in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 166 (1994) for the proposition that absent explicit statutory language there is no implied liability based on aiding and abetting. Plaintiffs point to the Seventh Circuit's decision in *Boim*, 291 F.3d at 1018-21, and the opinion of Judge Gershon in *Linde*, 384 F.Supp. 2d at 583 (adopting the *Boim* reasoning and its conclusion) distinguishing *Central Bank* and holding that aiding and abetting liability is available under 2333(a).[9] However, I need not resolve the parties dispute over whether there is aiding and abetting liability under 2333(a), because, as discussed below, even assuming there is aiding and abetting liability plaintiffs have not sufficiently alleged facts supporting an aiding and abetting claim.

---

[9] As the *Boim* court explained:

The *Central Bank* analysis provides guidance but is not determinative here for a number of reasons. First, *Central Bank* addressed extending aiding and abetting liability to an implied right of action, not an express right of action as we have here in section 2333. Second, Congress expressed an intent in the terms and history of section 2333 to import general tort law principles, and those principles include aiding and abetting liability. Third, Congress expressed an intent in section 2333 to render civil liabiity at least as extensive as criminal liability in the context of terrorism cases, and criminal liability attaches to aiders and abettors of terrorism. *see* 18 U.S.C. §2. Fourth, failing to extend section 2333 liability to aiders and abettors is contrary to Congress's stated purpose of cutting off the flow of money to terrorists at every point along the chain of causation.

- 24 -

The Restatement (Second) of Torts §876(b) provides that, "[f]or harm resulting to a third person from the tortious conduct of another, one is subject to liability if he . . . knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself." The mere maintenance of a bank account and the receipt or transfer of funds do not, however, constitute substantial assistance. *Williams v. Bank Leumi Trust Company*, 1997 WL 289865, *5 (S.D.N.Y. 1997)("the mere fact that all the participants in the alleged scheme used accounts at Bank Leumi to perpetrate it, without more, does not rise to the level of substantial assistance necessary to state a claim for aiding and abetting liability."); *Renner v. Chase Manhattan Bank*, 2000 WL 781081, *12 (S.D.N.Y. 2000)(same); *Nigerian Nat'l Petroleum Corp. v. Citibank, N.A., 1999 WL 558141,* *8 (S.D.N.Y. 1999)(repeated execution of wire transfers for millions of dollars did not constitute substantial assistance); *Ryan v. Hunton & Williams*, 2000 WL 1375265, *9 (E.D.N.Y. 2000)("The affirmative acts of opening accounts, approving various transfers and then clsoing the accounts . . . do not constitute substantial assistance," notwithstanding allegation that bank was on notice); *Dickens v. Chemical Bank*, 573 F.Supp 1129, 1132 (S.D.N.Y. 1983)("the simple act of maintaining a checking account" does not constitute substantial assistance). Thus, for example, in *In re Terrorist*

- 25 -

*Attacks on Sept. 11, 2001*, 349 F.Supp.2d at 833, the court "found no basis" under 2333(a) aiding and abetting liability "for injuries funded by money passing through [a bank] on routine banking business." Because the sum total of plaintiffs allegations concerning defendant's substantial assistance to terrorists consists of allegations that "defendant NatWest has knowingly maintained numerous accounts for Interpal" and through these accounts "has collected, received, transmitted, and provided millions of dollars on behalf of Interpal directly to agents of HAMAS in the PACT, plaintiffs have not alleged sufficient basis for an aiding and abetting claim. Accordingly, plaintiffs aiding and abetting claim is dismissed with leave to amend within thirty days if plaintiffs can allege some action or inaction beyond the mere maintenance of accounts and processing of transfers with knowledge and with the intent to have the venture go forward and succeed.

*SECOND CLAIM*

In claim two plaintiffs allege that NatWest knowingly provided material support or resources to a FTO in violation of 18 U.S.C. §2339(B)(a)(1). Natwest argues that count two must be dismissed because plaintiffs have not sufficiently alleged (1) that the support was provided *directly* to an FTO; (2) that the support was material; or (3) that NatWest provided support with knowledge that the FTO was an FTO.

- 26 -

*Requirement that Support be Direct*

NatWest argues that plaintiffs claim under 2339B must be dismissed because plaintiffs have failed to adequately allege that NatWest provided material support *directly* to an FTO, but rather have alleged only that NatWest provided material support to organizations with ties to an FTO, specifically HAMAS.

In *National Council of Resistance of Iran v. Department of State*, 251 F.3d 192, 200 (D.C.Cir. 2001), the DC Circuit explained that an organization could not escape FTO status merely by adopting an alias. Using the mathematical metaphor of the transitive property, the court explained that, "[l]ogically, indeed mathematically, if A equals B and B equals C, it follows that A equals C. If the NCRI is the [MEK] and the [MEK] is a foreign terrorist organization, then the NCRI is a foreign terrorist organization also." Thereafter, in *National Council of Resistance of Iran v. Department of State II,* 373 F.3d 152 (D.C. Cir. 2004) the D.C. Circuit clarified that the transfer of FTO status from one organization to another is not limited by the transitive property. The court explained:

> Just as it is silly to suppose "that Congress empowered the Secretary to designate a terrorist organization . . . only for such periods of time as it took such organization to give itself a new name, and then let it happily resume the same status it would have enjoyed had it never been designated" NCRI, 251 F. 3d at 200, so too is it implausible to think that Congress permitted the Secretary to designate an FTO to cut off its support in and from the United States, but did not authorize the Secretary to prevent that FTO from

- 27 -

marshaling all the same support via juridically
separate agents subject to its control. For instance,
under NCRI's conception, the Government could designate
XYZ organization as an FTO in an effort to block United
States support to that organization, but could not,
without a separate FTO designation, ban the transfer of
material support to XYZ's fund-raising affiliate, FTO
Fundraiser, Inc. The crabbed view of alias status
advanced by NCRI is at war not only with the
antiterrorism objective of AEDPA, but common sense as
well.

*Id.* at 157-158. Accordingly, the Court held that "ordinary

principles of agency law are fairly encompassed by the alias

concept under AEDPA," *Id. at 157,* and that "the requisite

relationship for alias status is established at least when one

organization so dominates and controls another that the latter

can no longer be considered meaningfully independent from the

former." *Id.* at 158. Factors to be considered include whether the

organizations share leadership, *Id.* at 159, whether they

commingle finances, publications, offices, and personnel, *Id.,*

and whether one operates as a division of the other. *NLRB v.*

*Deena Artware, Inc.,* 361 U.S. 398, 403 (2960).

In the present case, plaintiffs allege that NatWest provides

financial services to the Jenin Committee, the Tulkarem

Committee, HLF, Al-Aqsa, and Interpal. The plaintiffs further

allege that the Jenin Committee, and the Tulkarem Committee are

controlled by HAMAS and run by HAMAS agents. Plaintiffs further

allege that these charities have as their purpose the support of

HAMAS, which is accomplished by paying expenses for and assisting

- 28 -

with the provision of housing subsides to the families of suicide bombers whose homes are demolished by the Israeli army after the bomber's identity has been confirmed. In regard to HLF, plaintiffs allege that it is a HAMAS front organization acting on behalf of HAMAS. Plaintiffs again allege that HLF's purpose is to support HAMAS by transferring monies to families of HAMAS activists who carry out suicide attacks. Thus, plaintiffs have alleged that the Jenin Committee, Tulkarem Committee and HLF are either controlled by or operated on behalf of HAMAS, that their purpose is to support HAMAS by providing support to suicide bombers and that the Jenin Committee and the Tulkarem Committee are run by HAMAS agents. These allegations are sufficient, on a motion to dismiss, to show that the organizations are agents of HAMAS, an FTO.

Plaintiffs allege that Al-Aqsa provides significant funding to HAMAS and that the Union of Good[10] uses Interpal as its principal clearing house for funds raised throughout Europe and the Middle East. Thus, while plaintiffs have alleged that these organizations provide financial support to HAMAS (which might subject them to suit under Section 2339B), and that they support the goals of HAMAS, plaintiffs have not alleged that the organizations are controlled by HAMAS or that they are run on

---

[10] Plaintiffs do not allege that the provision of material support to the Union of Good constitutes a violation of Section 2339B.

- 29 -

behalf of HAMAS. Merely providing financial support and supporting the terrorist objective of an FTO does not suffice to show that an organization is so dominated and controlled so as to have lost its independent identity. Accordingly, plaintiffs Section 2339B claims cannot rely on NatWest's material support to Interpal or Al-Aqsa.

*Requirement that Support be Material*

Liability under 2339B requires that the support or resources provided to the FTO be "material." Material support or resources is in turn defined by Section 2338A(b) as:

> any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, *financial services*, lodging, training, expert advice or assistance, safe houses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel . . ., and transportation, except medicine or religious materials. [18 U.S.C. §2339B(g)(4) (incorporating the definition of material support or resources used in Section 2339A(b))](emphasis added).

NatWest argues that the term "financial services" does not encompass what it calls "routine banking services" such as opening and maintaining bank accounts, collecting funds, transmitting funds and providing merchant account credit card services.[11] Where, as here, a statute does not define a relevant

---

[11] NatWest is only alleged to have opened and maintained accounts and to have provided merchant account credit card services to Interpal. In regard to the Jenin Committee, the Tulkarem Committee and HLF NatWest is only alleged to have collected and transmitted funds.

- 30 -

term, a court looks to its ordinary meaning. *see e.g. Rousey v. Jacoway*, 125 U.S. 1561, 1562 (2005). Where a term has no one unambiguous meaning a court next looks to evidence of congressional intent such as legislative history and the structure of the statute in question. No legislative history specifically discusses the meaning of the term "financial services."

Defendant argues that Congress's enactment of the reporting provisions in Section 2339B(a)(2) and the civil penalty provisions in Section 2339B(b) indicate that Congress could not have intended to make a bank's mere maintenance of a customer account or the provision of other basic banking services grounds for a "material support" criminal prosecution and hence civil liability under Section 2333(a).

Section 2339B(a)(2) requires that

Except as authorized by the Secretary, any financial institution that becomes aware that it has possession of, or control over, any funds in which a foreign terrorist organization, or its agent, has an interest, shall – (A) retain possession of, or maintain control over such funds; and (B) report to the Secretary the existence of such funds in accordance with regulations issued by the Secretary.

Section 2339B(b) provides civil liability for the failure to maintain possession of such funds or for failure to report the existence of such funds:

Any financial institution that knowingly fails to comply with subsection (a)(2) shall be subject to a civil penalty in an amount that is the greater of – (A)

> $50,000 per violation; or (B) twice the amount of which
> the financial institution was required under subsection
> (a)(2) to retain possession or control.

Defendant argues that Congress would not have created civil
liability for violation of the reporting provisions if the mere
maintenance of accounts and provision of basic banking services
was a criminal violation of 2339B(a)(1), since the two statutes
would be duplicative. However, Congress might have intended to
create criminal and civil liability for banks that are providing
basic banking services to FTOs and to impose additional duties on
banks to report and freeze any assets of FTO's in their
possession. The mere existence of the reporting provision does
not determine the meaning of the term "financial services."

       NatWest contends, however, that the case law of this Circuit
dictates that basic banking services such as account maintenance
be excluded from the definition of financial services. NatWest
argues that in *In re Terrorist Attacks* on *September 11, 2001*, 349
F.Supp.2d 765 (S.D.N.Y.), on *reconsideration in part*, 392
F.Supp.2d 539 (S.D.N.Y. 2005), the court found that allegations
that the banking defendants raised, facilitated and transferred
money to terrorist organizations and maintained accounts for
terrorist organizations did not qualify as "material support"
because "there exists no basis for a bank's liability for
injuries funded by money passing through it on routine banking
business." *Id.* at 833. However, defendant misconstrues the

*Terrorist Attacks* decision. In holding that there could be no liability on the basis of "routine banking business" that court did not mean that the provision of basic banking services could never give rise to bank liability. Rather the court relied on the routine nature of the banking services to conclude that the defendant bank had no knowledge of the client's terrorist activities. *Id.* at 835 ("Providing routine banking services, *without having knowledge* of the terrorist activities, cannot subject Arab Bank to liability")(emphasis added); *Linde v. Arab Bank*, 384 F.Supp 2d 571, 587-588 (E.D.N.Y. 2005)("given plaintiff's allegations regarding the knowing and intentional nature of the Bank's activities there is nothing 'routine' about the services the Bank is alleged to provide"). Where "the Bank knows that the groups to which it provides services are engaged in terrorist activities" even the provision of basic banking services may qualify as material support." *Linde*, 384 F.Supp. 2d at 588.

*Requirement that Support be Provided Knowingly*

Finally, NatWest argues that plaintiffs have not, and cannot allege that any provision of material support by it to an FTO was done *knowingly*, as required by Section 2339B. Defendant argues that under 2339B a defendant has knowingly provided material support to a terrorist organization only if it *knew* of the

- 33 -

organization's terrorist activities and *intended* to have them
succeed. NatWest relies in this respect on a Florida district
court's decision in *United States v. Al-Arian*, 308 F.Supp. 2d
1322 (M.D.Fla. 2004) for this proposition. However, that decision
departs from the majority of existing authority and is not
persuasive. *U.S. v. Paracha*, 2006 WL 12768 (S.D.N.Y. 2006);
*Linde,* 384 F.Supp.2d at 571; *U.S. v. Sattar*, 314 F.Supp.2d 279
(S.D.N.Y. 2004); *U.S. v. Hammoud*, 381 F.3d 316, 328 (4th Cir.
2004); *Humanitarian Law Project v. U.S. Dep't of Justice*, 352
F.3d 382, 404-405 (9th Cir. 2003), *reh'g en banc granted*, 382
F.3d 1154 (9th Cir. 2004); *U.S. v. Marzook*, 383 F.Supp.2d 1056
(N.D.Ill. 2005).

The requirement that the defendant have specifically
intended to further terrorist activities finds no basis in the
statute's language which requires only that the defendant
"knowingly provide material support or resources to a foreign
terrorist organization" but makes no mention of any specific
intent.

Such a reading in fact clashes with Congress's intent. When
Congress enacted section 2339B, section 2339A already prohibited
the act of providing material support or resources to further
illegal terrorist activities when done by an individual "knowing
or intending that they are to be used in preparation for, or in
carrying out" enumerated terrorist activities. See Violent Crime

- 34 -

Control and Law Enforcement Act of 1994, Pub.L. 103-322,
§120005(a), 108 Stat.2022 (Sept. 13, 2004). Congress's choice to
omit the word "intending" from 2339B, while using it in 2339A
suggests that Congress did not wish for 2339B to include an
intent requirement. *Paracha*, 2006 WL 12768; see also, *Securities
Industry Ass'n v. Board of Governors of Federal Reserve System,*
716 F.2d 92, 96 (2d Cir. 1983)(quoting *FTC v. Sun Oil Co.*, 371
U.S. 505, 514-15 (1963) (terms carefully employed by Congress in
one place, and excluded in another, should not be implied where
excluded)).

This reading of Section 2339B is further supported by its
legislative history which reflects that it was enacted in
response to Congress's concern that terrorist organizations could
raise funds "under the cloak of a humanitarian or charitable
exercise," and, accordingly, was meant to "severely restrict the
ability of terrorist organizations to raise much needed funds for
their terrorist acts within the United States." H.R. Rep. 104-
393, at 43 (1995). Because "Congress determined that foreign
organizations that engage in terrorist activity are so tainted by
their criminal conduct that any contribution to such an
organization facilitates that conduct . . . Congress was
compelled to attach liability to all donations to foreign
terrorist organizations" regardless of the giver's intent. *Boim*,
291 F.3d at 1027 (7th Cir. 2002). Thus, "[r]eading in this

- 35 -

additional requirement, as defendant urges . . . would contravene the fundamental concepts of statutory construction." *Marzook*, 383 F. Supp. 2d at 1070.

Moreover, Congress signaled its rejection of the *Al-Arian* reading of 2339B when it amended 2339B in 2004 to include the statement that, "[t]o violate this paragraph a person must have knowledge that the organization is a designated terrorist organization . . . or that the organization has engaged in or engages in terrorist activity . . or terrorism. Pub.L. 108-458, § 6603(c). Although, this case concerns the pre-2004 version of 2339B, the amendment was not intended to change the knowledge standard under 2339B, but only to clarify the standard which Congress had always intended to apply. *Linde*, 384 F.Supp.2d at 587, n. 10; *Humanitarian Law Project v. Gonzales*, 380 F.Supp.2d 114, 1147 (C.D. Cal. 2005).

Defendant contends, however, that plaintiffs' claims must be dismissed even if 2339B requires only that defendant have known that it was providing support to an FTO or to a terrorist organization. Defendant argues that government designations of the Jenin Committee, Tulkarem Committee and HLF as terrorist organizations, news reports to that effect, and the obligation of the bank to "know" its customers under "know your customer" rules do not suffice to show that the bank knew of the terrorist designations (1) because the designations were unreliable, having

been made by the government of Israel and (2) because the
designations occurred after the bank engaged in the relevant
financial services.[12]

NatWest provided financial services to three organizations
which plaintiffs allege NatWest knew were terrorist groups: the
Jenin Committee, the Tulkarem Committee, and HLF. Plaintiffs
allege that NatWest had knowledge of these groups terrorist
activities because in 1997 the Israeli government designated HLF
a HAMAS front group and in 2002 designated Jenin and Tulkarem
unlawful organizations because of their support for HAMAS.
Plaintiffs argue that defendant must have had knowledge of these
designations prior to its April 2000 transfer of funds to HLF,
and Feb 2003, July 2003 and November 2003 receipt of funds from
the Jenin Committee and the Tulkarem Committee because NatWest's
had an obligation under the Wolfsberg principles to implement
"procedures for consulting applicable lists and taking reasonable
and practicable steps to determine whether a person involved in a
prospective or existing business relationship appears on such a
list." http://www.wolfsberg-principles.com/financing-
terrorism.html. NatWest argues, however, that the Wolfsberg
Principles define "applicable lists" as "lists of known or

---

[12] Because defendant is correct that designations of organizations as
terrorist groups which occurred after the relevant bank transfers cannot
demonstrate that NatWest had knowledge of the group's terrorist identity when
it provided material support to an FTO, those designations are not discussed
here.

suspected terrorists issue by competent authorities having
jurisdiction over the relevant financial institution."[13] Since it
is undisputed that Israel does not have jurisdiction over
NatWest, defendant argues that it had no obligation to consult
Israeli lists of terrorists. Even if the Wolfsberg principals do
not mandate that NatWest investigate and consider Israeli
designations of HLF, the Jenin Committee and the Tulkarem
Committee, the Royal Bank of Scotland's statement of principles
for fighting crime and the financing of terrorism require that
NatWest monitor publicly available information and allegations
about the organizations from which its customers receive funds,
and to which its customers transfer funds.[14] Thus, drawing all
inferences in favor of the plaintiff, NatWest pursuant to its
obligations, investigated the identify of HLF, the Jenin
Committee and the Tulkarem Committee and learned of their

---

[13] Defendant relies here on parts of the Wolfsberg Principles, and later
on parts of the Charity Commission's report not contained in the complaint.
Where a [party] has relied on the terms and effect of a document in drafting
the complaint, and that document is thus integral to the complaint, a court
may consider its contents even if it is not formally incorporated by
reference. *Broder v. Cablevision Systems Corp.*, 418 F.3d 187, 196 (2d Cir.
2005)(citations omitted). Thus, as plaintiff concedes, I may consider the full
contents of the two documents.

[14] Moreover, the FATF "Guidance for Financial Institutions in Detecting
Terrorist Financing" provides that there are "[s]everal sources of information
exist that may help financial institutions in determining whether a
potentially suspicious or unusual transaction could indicate funds involved in
the financing of terrorism and thus be subject to reporting obligations under
national anti-money laundering or anti-terrorism laws and regulations. The
FATF Guidelines specifically mention lists maintained by the United Nations,
the FATF, the United States, and the European Union. While the FATF does not
specifically mention Israeli government designations or the Israeli
"Announcements and Advertisements Gazette." It also does not claim that the
list it provides is exhaustive.

- 38 -

terrorist identities prior to receiving and transferring funds to
and from them.[15]

*THIRD CLAIM*

In their third claim plaintiffs allege that defendant
"unlawfully and willfully provide[d] or collecte[d] funds with
the intention that such funds be used or with the knowledge that
such funds are to be used, in full or in part," in order to carry
out a terrorist act. 18 U.S.C. §2339C. Defendant argues that this
claim must be dismissed because (1) routine banking transactions

---

[15] After oral argument in this case, Judge Glasser issued his opinion in
*Stutts v. The De Dietrich Group, et al.*, 03-CV-4058 (ILG). In *Stutts* members
of the U.S. armed forces sued, *inter alia*, defendant banks, alleging that by
providing letters of credit to manufacturers in the 1980's the banks enabled
the manufacturers to sell chemicals to Iraq, which Saddam Hussein used to
manufacture chemical weapons, which he stockpiled in Iraq which were then
bombed during the 1991 Gulf War, releasing toxic emissions, which plaintiffs
thereafter inhaled, causing them injury.

By letter dated June 30, 2006 defendants argue that *Stutts* supports the
argument that allegations that a defendant obtained knowledge from press
reports and other widespread information is insufficient to satisfy the
knowledge requirement of the ATA. However, *Stutts* is distinguishable. First,
while in *Stutts*, the plaintiffs alleged only that defendants "knew or
reasonably should have known" that as a result of the banking services they
provided, the regime would use chemical weapons and endanger all who opposed
the regime. According to Judge Glasser, "issuers of letters of credit are
'third parties ignorant of the specifics of the transactions' who merely deal
in documents describing the terms of the credit extended," *Id.* citing *Oie v.
Citibank, N.A.*, 957 F.Supp. 492, 503 (S.D.N.Y. 1997), who have no reason to be
aware of the activities of the recipients of the letters of credits. In the
present case, NatWest had reason to know of the activities of its clients
because of its legal and self-imposed obligations to know its customers.

Based in part on Judge Glasser's decision in *Stutts,* the defendants in
*Linde v. Arab Bank, plc*, (a case before Judge Gershon raising similar issues
to those raised in this case) requested that Judge Gershon certify her
decision denying their motion to dismiss for interlocutory appeal. Plaintiffs
argue that the fact that Judge Gershon denied the motion for interlocutory
appeal indicates that she does not consider *Stutts* relevant to the issues
raised in this case. However, because, as discussed above, Judge Glasser's
opinion can be distinguished from the present case, I need not consider the
effect of Judge Gershon's denial of a motion for interlocutory appeal in *Linde*
on the significance of Judge Glasser's opinion in *Stutts* to this case.

do not constitute providing or collecting funds and (2)
plaintiffs have not sufficiently alleged the defendant acted
*knowingly* and *intentionally*.

*Meaning of Providing and Collecting Funds*

Defendant argues that the statutory terms "provide" and
"collect" cannot encompass NatWest's maintenance of bank
accounts, and processing of deposits and withdrawals but requires
active donations to terrorist organizations or active fund-
raising on behalf of a terrorist organization.

Section 2339C defines "providing" to include "giving,
donating and transmitting" and "collecting" to include both
"raising and receiving." 18 U.S.C. §2339C(e)(4), (5). Defendant
points to the rule of *noscitur a sociis* as mandating that the
intention behind a group of words must be the same and that the
meaning of each word be gathered from its context or by reference
to the meaning of words listed with it. *Washington State Dep't of
Soc. & Health Servs. v. Guardianship Estate of* Keffeler, 537 U.S.
371, 384-85 (2003). Defendant argues accordingly that because
"transmit" is grouped with "give" and "donate," it must be
understood as having a similar meaning to those words, and should
be construed to mean "to make a present or gift of."[16] Similarly,
defendant argues that "receive" must be understood to have the

---

[16] Defendant cites to the Merriam-Webster dictionary as defining "give"
as "to make a present of" and "donate" as "to make a gift of." *Merriam-Webster
Online,* http://www.m-w.com.

- 40 -

same meaning as "raise." Pointing to the Merriam-Webster
definition of "raise" as "to get together for a purpose,"
defendant argues that liability under Section 2339C exists only
when an entity "actively raises funds." *Merriam-Webster Online,*
*http://www.m-w.com.*

However, the *noscitur a sociis* rule is generally "intended
to prevent ascribing to one word a meaning so expansive that it
conflicts with other terms of the provision. " *Dolan v. U.S.*
*Postal Service*, 126 S.Ct. 1252, *1262 (U.S. 2006). It "does not
require [the Court] to construe every term in a series narrowly
because of the meaning given to just one of the terms," where,
as here, nothing in the text demands such a limited
construction. *Id.* at 1262 (quoting *Gustafson v. Alloyd Co.*, 513
U.S. 561, 586 (1995) (Thomas, J. dissenting)). Thus, the rule
cannot be applied to eviscerate the meaning of any statutory
term. A separate rule of statutory interpretation recognizing
that "distinct words have distinct meanings" mandates that "all
of the words used in a legislative act are to be given force and
meaning" *Jama v. Immigration and Customs Enforcement*, 543 U.S.
335, 355 (2005)(citations omitted); *U.S. v. Roberts*, 2006 WL
751879, *3 (2d Cir. 2006). The interpretations urged by
defendant would render the terms "transmit" and "receive"
meaningless because they would give those words identical
meanings to those of other words already in the statute. To

"receive" accordingly must mean more than to collect. According to Merriam-Webster to "receive" is "to come into possession of; to act as a receptacle or container for," and this includes not only actively collecting funds but also passively receiving them. *Merriam-Webster Online, http://www.m-w.com.* Similarly, "transmit" must mean more than merely to give or donate. Merriam Webster defines "transmit" as "to send or convey from one person or place to another." *Merriam-Webster Online, http://www.m-w.com.* By transferring funds from Interpal to the Jenin Committee, the Tulkarem Committee and HLF, NatWest conveyed the funds from one organization to another, and indeed, one place to another. Thus, the term "transmit" encompasses the mere passing on of funds.

Defendant argues that the legislative history of 2339C supports the conclusion that it is not directed at the maintenance of bank deposit accounts or other basic banking services, but has the limited focus of preventing the collecting or raising of money for terrorist purposes. H.R.Rep. No. 107-307, at 6-7 (2001); 147 Cong. Rec. E2397 (daily ed. Dec. 19, 2001)(2339C "implements the International Convention for the Suppression of the Financing of Terrorism, which requires signatories to prosecute or extradite people who contribute to, or collect money for, terrorist, groups"); *Implementation of the International Convention for the Suppression of Terrorist*

- 42 -

*Bombings and the International Convention for the Suppression of the Financing of Terrorism; Hearing on H.R. 3275 Before the Subcomm. On Crime of the H.Comm. on the Judiciary,* 107th Cong. 10 (2001), (statement of Samuel M. Witten, Acting Deputy Legal Adviser, Dep't of State)("the convention will obligate States to criminalize conduct related to the raising of money and other assets to support terrorist activities). While the referenced legislative history focuses on the more active participants in terrorist fund-raising, this focus on the worst offenders does not indicate that Congress meant to limit the scope of 2339C to such offenders.

The sole New York district court to specifically consider the issue to date found that allegations, like the ones here, that a bank received funds as deposits and transmitted funds to terrorist organizations were sufficient to create liability under 2339C. *Linde,* 384 F.Supp. 2d at 588 (holding that "the banking activities of receiving deposits and transmitting funds between accounts" where the "the accounts (and funds) belong to groups engaged in terrorist activity" or are "charity fronts that operate as agents of HAMAS" creates liability under 2339C).

*Meaning of Knowing and Intentional*

Defendant argues that 2339C, like 2339B requires that a defendant have acted both with knowledge of an organization's

terrorist purposes and with an intent to further that cause. However, because the statute on its face allows for liability where a defendant provides or collects funds "with the intention that such funds be used *or* with the knowledge that such funds are to be used for terrorist purposes" it is not necessary for plaintiffs to allege that defendant intended to transmit or receive the funds for terrorist purposes. 18 U.S.C. §2339C (emphasis added); *Linde,* 384 F.Supp.2d at 586, n. 9("2339C only require[s] knowledge or intent that the resources given to terrorists are to be used in the commission of terrorist acts," but not "the specific intent to aid or encourage the particular attacks that injured plaintiffs."); *but see, Boim v. Quranic Literacy Inst. & Holy Land Foundation*, 291 F.3d 1000, 1023-24 (7th Cir. 2002).

Defendant argues however, that even under a knowledge requirement, plaintiff cannot show that defendant knew of any organization's terrorist purposes. However, for the reasons set forth above in the discussion of liability under Section 2339B, plaintiffs have sufficiently alleged that defendant knew of the Jenin Committee's, Tulkarem Committee's and HLF's terrorist purposes. Plaintiffs allege that the Al-Aqsa foundation was shut down by the German Authorities in July 2002, that its head, Shiek Mohammed Ali Hasan al-Moayad, was arrested, prosecuted and convicted of providing to material support to HAMAS, that in

- 44 -

April 2003, Dutch authorities blocked Al-Aqsa Foundation assets in the Netherlands because it was providing funds to terrorist groups in the Middle East and that on May 29, 2003 the U.S. government designated the Al-Aqsa Charitable Foundation an SDGT because it channeled funds to HAMAS. Since, as discussed above, NatWest had an obligation to investigate its customers and those organizations to which those customers transferred or from which they received funds, one may infer that NatWest knew of Al-Aqsa's terrorist activities.[17]

Plaintiffs have alleged that NatWest knew Interpal was a terrorist organization because in March 1996 the Charity Commission froze its accounts based on evidence that it channeled money to HAMAS. Reports to this effect were published in British newspapers in 1996. In May of 1997 the government of Israel designated Interpal an unlawful organization and in 1998 designated it a terrorist organization. Both designations were published in the official Israeli publication the *Announcements and Advertisements Gazette*. In 2001 Interpal's website reflected that it worked with the known terrorist organizations the Orphan Care Society, the Jenin Committee and directed persons wishing

---

[17] Because the first public identification of Al-Aqsa as a terrorist organization occurred in July 2002, plaintiffs have only alleged that NatWest had knowledge of Al-Aqsa's terrorist identity when it deposited funds in March 2003. They have not alleged that NatWest knew of Al-Aqsa's terrorist identity when the group deposited funds in January 2001. Thus, liability for those terrorist attacks which occurred prior to March 2003 (the sixth-tenth attacks) cannot be premised on Section 2339C.

- 45 -

to make donations to donate to HLF. These allegations suffice as allegations that NatWest knew of Interpal's terrorist activities prior to any of the specific transactions or terrorist attacks alleged in this case.

Defendant argues, however, that the Charity Commission's unfreezing of Interpal's accounts after completing an investigation and concluding that Interpal espoused "no . . . pro-terrorist or anti-Israeli propaganda" and that trustees and staff "were motivated by faith and altruism rather than fanaticism" precludes any allegation that NatWest knew of Interpal's terrorist identity, since NatWest justifiably relied on the Charity Commission's findings.

Plaintiffs respond that because the British government and the Charity Commission's definition of a terrorist organization differs materially from the American definition of a terrorist organization a finding by the Charity Commission does not establish that Interpal was something other than a terrorist organization under American law. The British distinguish in the case of an organization able to establish a wall between a terrorist wing of an organization and a charitable wing. In contrast, the American government has refused to make such a distinction because "even contributions earmarked for peaceful purposes can be used to give aid to the families of those killed while carrying out terrorist acts, thus making the decision to

- 46 -

engage in terrorism more attractive." *Humanitarian Law Project
v. Reno*, 205 F.3d 1130, 1136 (9th Cir. 2000). This different
approach is highlighted by the fact that in 2003 the United
Stated Government designated Interpal an SDGT, but even after
examining the evidence against Interpal provided to it by the
United States government, the Charity Commission again found
that Interpal was not a terrorist organization. Thus, the
Charity Commission's report does not establish as a matter of
law and beyond dispute that Interpal was not a terrorist
organization.

Defendant, in its Reply, raises for the first time the
argument that because Section 2339C was not enacted until June
25, 2002, any of defendant's actions prior to that date cannot be
actionable, and any plaintiffs injured in attacks prior to that
date must have their claims dismissed. However, because
plaintiffs have not had the opportunity to respond to this
argument I will not address it at this time.

*PROXIMATE CAUSE*

Section 2333(a), under which all of plaintiffs' claims are
brought provides for recovery by individuals injured "by reason
of" international terrorism. Defendant correctly argues that
principles of statutory interpretation demand that this language
be read as requiring plaintiffs to show that defendant's actions

- 47 -

were the proximate cause of plaintiffs' injuries. That is, because courts have previously interpreted the phrase "by reason of" to require proximate cause, and Congress must be presumed to "know[] the interpretation federal courts had given the words earlier Congresses had used," in using the words "by reason of" Congress must have "intended them to have the same meaning that courts had already given them." *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 268 (1992).

A showing of proximate cause requires plaintiffs to show that defendant's actions were "a substantial factor in the sequence of responsible causation," and that the injury was "reasonably foreseeable or anticipated as a natural consequence." *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 123 (2d Cir. 2003). Defendant argues that plaintiffs cannot prevail merely by showing that defendant provided material assistance or funding to the terrorist organization responsible for perpetrating the attacks which injured the plaintiffs. Rather, defendants argue, plaintiffs must allege, for example, that the funds supplied by the defendant were used to buy the specific weapons and train the specific men who killed or injured the plaintiffs.

However, taking into account the legislative history of these statutes and the purpose behind them, proximate cause is not so limited. Congress intended these provisions to impose, "liability at any point along the causal chain of terrorism." S.

Rep. No. 102-342 at 22. In enacting the material support statute

Congress made an express finding of fact that, "foreign

organizations that engage in terrorist activity are so tainted by

their criminal conduct that any contribution to such an

organization facilitates that conduct." Antiterrorism and

Effective Death Penalty Act of 1996, Pub. L. 104-32, §301(a)(7),

110 Stat. 1214, 1247 (1996). As the Ninth Circuit has noted,

"money is fungible; giving support intended to aid an

organization's peaceful activities frees up resources that can be

used for terrorist acts." *Humanitarian Law Project v. Reno,* 205

F.3d at 1136; *see also Linde,* 384 F.Supp.2d at 585 (holding that

in order to prevail on claims under 2333(a) it was sufficient for

plaintiffs to show that "the Bank provided these services to the

particular group responsible for the attacks giving rise to their

injuries.").[18]

---

[18] Defendants again point to Judge Glasser's recent opinion in *Stutts* (see footnote 15) in support of the argument that plaintiffs have not adequately alleged proximate cause. In *Stutts* Judge Glasser held that the plaintiffs could not satisfy the proximate cause requirement of the ATA because it was not reasonably foreseeable that the provision of letters of credit to chemical manufacturers in the 1980's, when the United States was not yet at war with Iraq, would cause injury to US forces *inside* (not outside) Iraq in 1991. As Judge Glasser wrote:

> What the plaintiffs essentially ask the Court to accept is that by providing letters of credit to manufacturers of chemicals, the Bank Defendants should have perceived the risk that those chemicals would be sold to Iraq; that Saddam Hussein would use those chemicals to manufacture lethal weapons; that those weapons would be stockpiled in a location that would one day be bombed by coalition forces; that the bombs would hit and detonate those weapons; that the detonation would cause the toxic emissions to be released; that those emissions would permeate the atmosphere; that the plaintiffs would be present in that atmosphere, inhale those emissions and sustain the injuries alleged. To attribute such

Defendant argues however, that at least some of the transactions in question occurred too far before the injury to plaintiffs to be the proximate cause of their injuries. While the lapse of time may factor into the proximate cause inquiry, given the fungible nature of money and the fact that it is difficult to say when the particular dollar given to a terrorist is actually used, I cannot conclude as a matter of law that NatWest's transaction in 2000 could not be the proximate cause of an attack that occurred less than two years later in 2002. While defendant is correct that a transaction which occurred after a terrorist attack cannot be the proximate cause of that attack,[19] because each attack was preceded by at least one relevant transaction by NatWest, plaintiffs have sufficiently alleged that each attack was proximately caused by NatWest.[20]

---

foresight to the Banks is to attribute a prescience that is beyond human ken.

*Stutts* at \*35-36. In contrast, in the present case, NatWest is charged with reasonably having foreseen that funds provided directly to known terrorist groups would be used to perpetrate terrorist attacks. This insight hardly requires, to use Judge Glasser's phrase, "a prescience that it beyond the human ken."

[19] Accordingly, NatWest's transfer to Jenin on November 5, 2003 cannot be the proximate cause of any of plaintiffs' injuries because it occurred after all of the attacks on plaintiffs.

[20] As explained above, plaintiffs have sufficiently alleged that NatWest had knowledge of each organization's terrorist activities prior to the following transactions: (1) the April 2000 transaction with HLF; (2) the February 2003 transaction with the Tulkarem Committee; (3) the March 2003 transaction with Al-Aqsa; (4) the July 2003 transaction with the Jenin Committee; and (5) the November 2003 transaction with the Jenin Committee. The April 2000 HLF transaction occurred before any of the attacks in this case and accordingly creates liability under §2339B and §2339 for all the attacks. The February 2003  transaction with the Tulkarem Committee creates liability under

- 50 -

*PRINCIPALS OF INTERNATIONAL COMITY*

Defendant argues generally that international comity, "the
recognition which one nation allows within its territory to the
legislative, executive or judicial acts of another nation,"
*Hilton v. Guyot*, 159 U.S. 113, 163 (1895) demands that liability
not be imposed on a British bank for maintaining a customer who
has twice been found by the British Charity Commission not to be
affiliated with any terrorist organizations. However, defendant
has pointed to no case law, nor can this Court find any, which
holds that an American Court must decline to apply the laws of
this country to a defendant over which the court has jurisdiction
because the laws of the defendant's own country are more lenient.
If the laws of the United States and the British laws were in
"true conflict," in other words, if it was impossible to comply
with the laws of both, then this Court would engage in a
balancing analysis which would consider whether the British
interests outweigh Congress's interest in enacting the laws at
issue here. *In re Maxwell Communications Corp.*, 93 F.3d 1036,
1049-50 (2d Cir. 1996). However, in the present case, the laws of
the United States and of the United Kingdom are not in conflict.

§2339B and §2339 only for attacks 1-5. The March 2003 transaction with Al-Aqsa
creates liability under §2339 for attacks 1-5. The July 2003 transaction with
the Jenin Committee creates liability under §2339B and §2339 only for the
first attack. As explained in the preceding footnote, the November 2003 Jenin
Committee transaction creates no liability because it occurred after all of
the relevant attacks.

- 51 -

Although British Law does not require that NatWest cease to provide banking services to Interpal or that it cease transactions with HLF, Al-Aqsa, the Jenin Committee and the Tulkarem Committee, it also does not mandate that NatWest continue providing such services. Accordingly, NatWest is free, and, indeed, obligated, to follow the more stringent American law. Principles of international comity do not demand otherwise.

### CONCLUSION

For the reasons set forth above, defendant's motion to dismiss is granted as to the first claim, and denied as to the second and third claims.

The Clerk is directed to furnish a filed copy of the within to the parties.

SO ORDERED.

Dated :   Brooklyn, New York
          September 27, 2006

                    By:/s/ Charles P. Sifton (electronically signed)
                       United States District Judge