UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ X
-

TZVI WEISS, et al.,

                         Plaintiffs,                    **MEMORANDUM
                                                        AND ORDER**

        -against-
                                                        05-CV-4622 (CPS) (KAM)

NATIONAL WESTMINSTER BANK, PLC,

                         Defendant.
                                                        X
-----------------------------------------------------------------------
-
MATSUMOTO, United States Magistrate Judge:

            In the above-referenced matter, referred to the undersigned for general pretrial

supervision pursuant to 28 U.S.C. § 636(b), plaintiffs, United States citizens, and several estates,

survivors and heirs of United States citizens, are victims of terrorist attacks in Israel, allegedly

perpetrated by the Islamic Resistance Movement ("HAMAS").[1]  Plaintiffs have brought this

action against defendant National Westminster Bank PLC ("NatWest"), alleging that the bank is

civilly liable for damages payable to them pursuant to 18 U.S.C. § 2333(a) for: (1) aiding and

abetting the murder, attempted murder, and serious bodily injury of American Nationals located

outside the United States in violation of 18 U.S.C. § 2332; (2) knowingly providing material

support or resources to a foreign terrorist organization[2] in violation of 18 U.S.C. § 2339B; and

_____

        [1]  HAMAS is an acronym for "Harakat al-Muqawama al-Islammiyya," also known as
"The Islamic Resistance Movement." (Doc. no. 28, Amended Complaint, dated 1/5/06, at ¶ 1, n.
1.)

        [2]  Pursuant to 8 U.S.C. § 1189, the Secretary of State may designate an organization a
foreign terrorist organization if:

(3) financing acts of terrorism, in violation of 18 U.S.C. § 2339C.  On September 27, 2006,

Judge Sifton granted defendant's motion to dismiss the first claim, but denied its motion as to the

second and third claims.[3]

Presently before the court are the parties' cross motions to compel.  Plaintiffs

filed a Motion to Compel Responses to Their First Set of Interrogatories and Document Requests

on October 18, 2006.  (See doc. no. 72, Plaintiff's Memorandum of Law in Support of Their

Motion for an Order Overruling Objections and Compelling Further Responses to Plaintiff's

First Set of Interrogatories and Document Requests, October 18, 2006 ("Pls' Motion").)  In

response, NatWest submitted a Memorandum of Law in Opposition to Plaintiffs' Motion (doc.

no. 83, NatWest's Memorandum of Law in Opposition, dated 11/16/06 ("Def's Opp.")),

Declaration of Jonathan I. Blackman and Exhibits (doc. no. 83, Exh. 1), Expert Declaration of

Charles Simon Hollander and Exhibits (doc. no. 83, Exh. 3), Decisions Cited in Declaration of

Charles Simon Hollander (doc. no. 83, Exh. 4), and Unreported Cases Cited in Defendant's

Memorandum of Law (doc. no. 83, Exh. 5).  In reply, plaintiffs submitted a Reply Memorandum

of Law in Support of Their Motion to Compel (doc. no. 84), Declaration of Aaron Schlanger and

Exhibits (doc. no. 84, Attachment 2), Expert Declaration of Robert M. Chesney and Exhibits

(doc. no. 84, Attachment 3), and Expert Declaration of Clive Walker and Exhibits (doc. no. 84,

Attachment 4).

---

(a) the organization is a foreign organization;
(b) the organization engages in terrorist activity or terrorism, or retains the capability and intent to engage in terrorist activity or terrorism;
(c) the terrorist activity or terrorism of the organization threatens the security of United States nationals or the national security of the United States.

[3] *See Weiss v. National Westminster Bank PLC*, 453 F. Supp. 2d 609 (E.D.N.Y. 2006).

On October 18, 2006, NatWest also filed a Motion to Compel Production of Documents and Answers to Its First Set of Interrogatories and Document Requests. (See doc. no. 85, Exh. 2, Defendant's Memorandum of Law in Support of National Westminster Bank PLC's Motion to Compel Production of Documents and Answers to Interrogatories, dated 10/18/06 ("Def's Motion").) In support of its motion, defendant also filed Unreported Decisions Cited in Memorandum of Law in Support of Defendant's Motion (doc. no. 85, Exh. 3), and a Declaration of Lawrence B. Friedman (doc. no. 85, Exh. 4). In response, plaintiffs submitted a Memorandum of Law in Opposition to Defendant's Motion to Compel (doc. no. 86, Plaintiff's Memorandum of Law in Opposition, dated 11/16/06 ("Pls' Opp."), Exhs. 1-3). In reply, defendant filed a Reply Memorandum of Law in Support of its Motion to Compel (doc. no. 87, Exh. 1), Unreported Decisions Cited in Reply Memorandum of Law (doc. no. 87, Exh. 2), and a Declaration of Jonathan I. Blackman (doc. no. 87, Exh. 3).

After considering the foregoing submissions and for the reasons set forth herein, both motions are granted in part and denied in part.

BACKGROUND

Plaintiffs are individuals and estates, survivors and heirs of individuals who were injured or killed in ten separate terrorist attacks, allegedly perpetrated by HAMAS, that occurred in Israel between March 27, 2002 and August 19, 2003.[4] (Doc. no. 28, Amended Complaint, dated 1/5/06 ("Am. Compl."), at ¶¶ 5-285.) Plaintiffs allege that NatWest is a financial

---

[4] In the Amended Complaint, plaintiffs describe in detail the ten attacks and plaintiffs' alleged injuries caused by those attacks. The court need not recite those allegations for the purposes of deciding the instant motions.

institution with its principal place of business in London, the United Kingdom, and is part of the

Royal Bank of Scotland Group.  (*Id.* at ¶ 286.)  Plaintiffs also allege that NatWest conducts

business in the United States and in New York, including at 101 Park Avenue, New York, New

York.[5]  (*Id.* at ¶ 287.)  Plaintiffs further allege that NatWest maintains bank accounts in England

for Interpal, a/k/a Palestinian Relief and Development Fund,[6]  and that although Interpal

describes itself as a charitable organization, it is the "principal clearing house for funds raised

throughout Europe and the Middle East" and funneled to the Union of Good.  (*Id.* at ¶ 316.)  The

Union of Good, plaintiffs maintain, is an organization established by the Muslim Brotherhood

and comprised of more than fifty Islamic charitable organizations worldwide, and is a "principal

fundraising mechanism for HAMAS."  (*Id.* at ¶¶ 310-313.)

   Plaintiffs base their claims on section 2333(a) of the Antiterrorism Act of 1992

(the "ATA"), codified at 18 U.S.C. § 2331 *et seq*, which provides civil remedies for United

---

[5]  Although defendant has not asserted lack of personal jurisdiction as an affirmative
defense (*see* doc. no. 80, Answer to Amended Complaint, dated 11/22/06), defendant states in its
opposition to plaintiffs' motion to compel that NatWest is "an English bank with no branches or
offices in the United States . . . [and] does not conduct business in the United States."  (Def's
Opp. at 1.)  Because defendant did not raise lack of personal jurisdiction as an affirmative
defense in its Answer, the court deems that defense waived and, accordingly, will not consider
the issue of personal jurisdiction in this decision.  *See* Fed. R. Civ. P. 12(h)(1).  Moreover, Judge
Sifton found:

> Defendant, NatWest, is a financial institution with its principal place of business
> in London in the United Kingdom. It is part of the Royal Bank of Scotland Group.
> NatWest conducts business in the United States and in New York, at a number of
> locations, including 101 Park Avenue, New York, NY.

*Weiss*, 453 F. Supp. 2d at 615.

[6]  *See* Office of Foreign Assets Control, Recent OFAC Actions, 8/21/03, available at
http://www.treas.gov/offices/enforcement/ofac/actions/20030821.html.

States nationals injured in international terrorist attacks.  That section states in relevant part:

> Any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the costs of the suit, including attorney's fees.

18 U.S.C. § 2333(a).

"International terrorism," in turn, is defined by 18 U.S.C. § 2331(a) as activities that:

> (a) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State;
>
> (b) appear to be intended –
>
>> (i) to intimidate or coerce a civilian population;
>>
>> (ii) to influence the policy of a government by intimidation or coercion;
>>
>> (iii) to affect the conduct of a government by mass destruction, assassination or kidnaping; and
>
> (c) occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum.

Title 18 U.S.C. § 2339B criminalizes support of formally designated terrorist organizations.  It provides, in relevant part, that:

> Whoever knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so, shall be fined . . . or imprisoned . . . or both . . . .  To violate this paragraph, a person must have knowledge that the organization is a designated

terrorist organization . . . that the organization has engaged or engages in terrorist activity . . . or that the organization has engaged or engages in terrorism.[7]

18 U.S.C. § 2339(a)(1).

Section 2339C, entitled "Prohibitions against the financing of terrorism," prohibits the financing of terrorists, in relevant part as follows:

> Whoever . . . by any means, directly or indirectly, unlawfully and willfully provides or collects funds with the intention that such funds be used, or with the knowledge that such finds are to be used, in full or in part, in order to carry out . . . [an] act intended to cause death or serious bodily injury to a civilian, or to any other person not taking an active part in the hostilities in a situation of armed conflict, when the purposes of such an act, by its nature or context, is to intimidate a population, or to compel a government or an international organization to do or to abstain from doing any act, shall be punished . . . .

18 U.S.C. § 2339C.

In addressing defendant's motion to dismiss in this action, Judge Sifton found that "[v]iolations of 18 U.S.C. § 2339B and § 2339C are recognized as international terrorism under 18 U.S.C. § 2333(a)." *Weiss v. National Westminster Bank PLC*, 453 F. Supp. 2d 609, 613 (E.D.N.Y. 2006)*; see also Linde v. Arab Bank*, 384 F. Supp. 2d 571, 580-581 (E.D.N.Y. 2005) (finding that "plaintiffs have alleged that they were 'injured by reasons of an act of international

---

[7] "Material support or resources" is defined in 18 U.S.C. § 2339A(b)(1) as:

> any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safe houses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials.

terrorism,' as required by Section 2333(a).")"; *Boim v. Quranic Literacy Institute and Holy Land Foundation for Relief and Development*, 291 F.3d 1000, 1014-1015 (7th Cir. 2002).

Plaintiffs allege, "For more than nine (9) years, defendant NatWest has knowingly maintained numerous accounts for Interpal and has collected, received, transmitted, and provided millions of dollars on behalf of Interpal directly to agents of HAMAS . . . ." (Am. Comp. at ¶ 385.) Plaintiffs further allege that NatWest provides Interpal with merchant banking services, and accepted deposits on behalf of Interpal from alleged terrorist organizations. (*Id.* at ¶¶ 350-351, 358-362.) Accordingly, plaintiffs contend that NatWest is civilly liable to them for damages pursuant to 18 U.S.C. § 2333(a), for providing "material support and resources" to an SDGT (in violation of Section 2339B) and providing or collecting funds "with the knowledge that such funds are to be used" to support terrorism (in violation of Section 2339C).


PLAINTIFFS' MOTION TO COMPEL

A.    Plaintiffs' Discovery Requests

On June 30, 2006, plaintiffs served NatWest with their First Request for the Production of Documents. (*See* Plaintiffs' Document Requests, annexed to Pls' Motion as Exhibit B.) At issue are Document Requests Nos. 1-3, 11 and 12, in which plaintiffs request:

- No. 1: All account records maintained by, or in the custody and control of Defendant that concern INTERPAL, including account opening records, bank statements, wire transactions, deposit slips and all correspondence between Defendant and INTERPAL.

- No. 2: All documents and communications by or to Defendant concerning INTERPAL, including all internal reports and the contents of any internal investigations undertaken by Defendant that reference INTERPAL.

- No. 3: All non-privileged documents and communications by or to the

Defendant from or to banking regulatory authorities in the United States, United Kingdom, or the European Union . . . concerning INTERPAL and or accounts maintained by the Defendant on INTERPAL's behalf.

- No. 11: All documents concerning Defendant's freezing of INTERPAL's accounts maintained by NatWest in March of 1996 . . . .

- No. 12: All documents concerning Defendant's freezing of INTERPAL's accounts maintained by NatWest in August and/or September of 2003 . . . .

(*Id.*)

On July 5, 2006, plaintiffs served NatWest their First Set of Requests for Admissions and Related Interrogatories "regarding the authenticity of twenty-five (25) documents that Plaintiffs . . . produced to the Bank." (Pls' Motion at 6; *see also* plaintiff's Requests for Admissions and Interrogatories, annexed to Pls' Motion as Exh. A.) Those documents, plaintiffs allege, "contain information clearly linking [suspected terrorist wire transactions] to NatWest." (Pls' Motion at 6; *see also* Pls' Motion, Exh. C1-25.) Specifically, plaintiffs request that NatWest either admit, deny or set forth in detail the reasons why it is unable to either admit or deny, the truth of the following facts:

- No. 1: Each document is a record of regularly conducted business activity of the Bank within the meaning of Rule 803(6) of the Federal Rules of Evidence.

- No. 2: Each document is an accurate reproduction of an original document maintained in your files.

- No. 3: The document accurately identifies an account or accounts of a customer or customers of defendant.

- No. 4: The document accurately sets forth the details of a transaction processed by defendant.

(*Id.* at Exh. A.)

In response to plaintiffs' discovery demands, NatWest objected to both plaintiffs'

Document Requests and Requests for Admission and Interrogatories on the grounds that, *inter alia*, the requests "seek the disclosure of information subject to applicable English bank customer secrecy laws."  (Pls' Motion, Defendant's Responses and Objections to Plaintiff's First Request for the Production of Documents, Exh. D at 4.)  Specifically, defendant asserted that *Tournier v. National Provincial and Union Bank of England*, 1 K.B. 461 (C.A. 1924) and its progeny prohibit English financial institutions from "disclosing confidential information regarding any existing or former customer, without that customer's prior consent . . . Failure to protect such confidential information constitutes a civil offense under English law and could subject NatWest to liability."  (*Id.*)

Although NatWest also cites British statutory authority in its objections to plaintiffs' discovery requests – specifically, United Kingdom anti-money laundering laws, including Section 333 of the Proceeds of Crime Act 2002 and Section 39 of the Terrorism Act 2000, and the 8th Data Protection Principle of the U.K. Data Protection Act 1998 – NatWest fails to cite or rely on such authority in its memorandum in opposition to plaintiffs' motion to compel. (*See* Pls' Motion, Exh. D.)  Consequently, the court has not considered the foregoing authorities in deciding the plaintiffs' motion.

In order to avoid potential civil liability, NatWest repeatedly requested Interpal to release it from its secrecy obligations.  (*See* Def's Opp at 4.)  Since plaintiffs served their discovery requests on June 30, 2006 and July 5, 2006, NatWest has sent four separate letters to Interpal's counsel: on July 3, July 27, September 14 and September 22, 2006.  (*Id.* at 4-5.) Interpal's counsel responded on September 26, 2006, stating that he "reported the contents of [counsel for NatWest's] letter of 14 September 2006 to [Interpal]" but "[a]s yet . . . I have not

received [Interpal's] instructions further to the same." (*Id.* at 5.)  There is no further response from Interpal in the record as of the date of this order.

Notably, however, during a conference before this court on September 11, 2006, NatWest's counsel reported that the British government had no objections to plaintiffs' discovery requests.  (Pls' Motion at 7.)  Plaintiffs argue that the British government "essentially waived any assertion of secrecy objections it might have, but did not waive any independent privacy assertions Interpal might interpose."  (*Id.* at 7 n.11.)

Plaintiffs now seek to compel NatWest to respond to Document Requests Nos. 1-3, 11 and 12, and Requests for Admission and Related Interrogatories Nos. 1-4.

B.      Applicability Of English Bank Secrecy Laws

       1.      Defendant gave adequate notice of the existence and applicability of British bank secrecy laws.

As a preliminary matter, the court first addresses plaintiffs' contention that NatWest failed to give adequate notice of its discovery objections based on foreign law, and failed to demonstrate that the foreign law applies to the requested discovery.  (*See* Pls' Motion at 8-9.)  Rule 44.1 of the Federal Rules of Civil Procedure provides, "A party who intends to raise an issue concerning the law of a foreign country shall give notice by pleadings or other reasonable written notice."  The party must "provide the opposing party with reasonable notice that an argument *will be raised*."  *Rationis Enters. Inc. of Panama v. Hyundai Mipo Dockyard Co.*, 426 F.3d 580, 585-86 (2d Cir. 2005) (emphasis added).  Once a discovery motion is made, the objecting party faces a higher burden "of demonstrating that such law *actually bars* the production or testimony at issue . . . ."  *Alfadda v. Fenn*, 149 F.R.D. 28, 34 (S.D.N.Y. 1993)

(emphasis added).  "In order to meet that burden, the party resisting discovery must provide the Court with information of sufficient particularity and specificity to allow the Court to determine whether the discovery sought is indeed prohibited by foreign law."  *Id.*  The party must describe, "*inter alia*, the provisions of the foreign law, the basis for its relevance, and the application of the foreign law to the facts of the case."  *Rationis*, 426 F.3d at 586.

In this case, NatWest gave sufficient notice of its argument that English bank secrecy laws apply to plaintiffs' requested discovery.  In its responses to both plaintiffs' Document Requests and Requests for Admissions and Related Interrogatories, NatWest noted that *Tournier* and its progeny prevent banks from disclosing customer information, and that U.K. anti-money laundering laws, including Section 333 of the Proceeds of Crime Act 2002 and Section 39 of the Terrorism Act 2000, as well as the U.K. Data Protection Act 1998, could subject the bank to civil liability.  (Pls' Motion, Exh. D at 4-5.)  NatWest's objections to discovery constituted adequate written notice that it was invoking foreign law.  *See Alfadda*, 149 F.R.D. at 34; *compare In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 209 (2d Cir. 2003) (holding that defendant had failed to comply with Rule 44.1 because defendant never raised the applicability of foreign laws during district court proceedings).

In its objection to plaintiffs' motion to compel, NatWest also adequately supported its position that "the discovery sought is indeed prohibited by foreign law."  *Alfadda*, 149 F.R.D. at 34.  In his expert declaration for NatWest, Charles Simon Hollander explains:

> The principle of banker-client confidentiality under English law is set out in the well-known case of *Tournier v. National Provincial and Union Bank of England*.  The Court of Appeal held that a banker had a duty to keep the customer's affairs confidential, and that confidentiality included an obligation not to reveal details as to the state of the customer's account.  The right to confidence is that of the

customer (and thus cannot be waived by the bank).

(Expert Declaration of Charles Simon Hollander in Support of NatWest's Opposition to Plaintiffs' Motion to Compel, dated 11/10/06 ("Hollander Decl."), at ¶ 6.)  Hollander continues, "The principles set out in *Tournier* are as relevant today as they were when the case was decided in 1924" (*id.* at ¶ 7), and cites several examples where English courts have enjoined banks from producing such confidential customer information when having been ordered to do so by foreign courts (*see id.* at ¶¶ 7, 12-13).

Here, plaintiffs seek precisely the sort of information protected by the principle established in *Tournier*: admissions regarding the authenticity of wire transfer records and, *inter alia*, "[a]ll account records maintained by, or in the custody and control of Defendant that concern INTERPAL, including account opening records, bank statements, wire transactions, deposit slips and all correspondence between Defendant and INTERPAL."  (Pls' Motion, Exh. D, Request No. 1.)   NatWest has met both its burden of placing plaintiffs on notice of its objection based on English law, and demonstrating that the foreign law applies to the requested discovery.

     2.    <u>British bank secrecy laws are not rendered inapplicable by plaintiff's possession</u>
              <u>of documents and information in the United States.</u>

Plaintiffs further argue unavailingly that British bank secrecy obligations do not apply to documents already in plaintiffs' possession and located in the United States.  (*See* Pls' Motion at 10-11.)  Plaintiffs rely on *In re Lernout & Hausie Sec. Litig.*, 218 F.R.D. 348 (D. Mass. 2003), *adopted and amended to correct clerical error*, 2004 WL 3217802 (D. Mass. July 2, 2004), for the proposition that once a party has seen the documents at issue, the producing party can no longer withhold those documents on foreign confidentiality grounds.  In *Lernout*,

plaintiffs brought suit against KPMG-B, a Belgian entity, in the United States. *See id.* at 349. During the United States litigation, plaintiffs also became civil claimants in separate criminal proceedings against KPMG-B pending in Belgium. *See id.* at 350. As part of the criminal case, Belgian prosecutors gave plaintiffs access to workpapers for the years 1998-2001, a subset of the documents plaintiffs were seeking in their U.S. litigation. *See id.* Plaintiffs were allowed to review the workpapers, but were not allowed to copy them, and filed a motion to compel production of those same papers in their federal action. *See id.* KPMG-B objected to producing the documents on the grounds that the documents were protected by the Belgian Criminal Code, which prevents auditors and "all other persons whose state or profession renders them depositories of the secrets entrusted to them" from disclosing those secrets. *Id.* The court found that although certain exceptions to the Belgian Code applied, "the most compelling argument . . . is that in light of their recent review of the audit workpapers in Belgium, such documents have already been disclosed, [and] are therefore no longer confidential . . . ." *Id.* at 350-51. Moreover, plaintiffs may "eventually . . . receive copies of these documents from the Belgian prosecutors." *Id.* at 351. The court therefore granted plaintiff's motion to compel, noting, "It seems absurd that plaintiffs should have to resort to the time-consuming and uncertain process of letters rogatory to obtain documents they have already seen . . . ." *Id.*

Here, NatWest correctly points out that *Lernout* is inapposite for two reasons: first, the issue for the *Lernout* defendants was maintaining the confidentiality of documents already authenticated, not admitting to the authenticity of confidential information; and second, KPMG-B was forced to turn over the documents in the Belgian proceeding, unlike NatWest, which has never allowed plaintiffs to review documents, much less voluntarily produced them.

Plaintiffs also contend that English laws do not apply to documents located in the United States. Plaintiffs cite Restatement (Third) of Foreign Relations Law of the United States § 442, which provides:

> (1)(a) A court or agency in the United States . . . may order a person subject to its jurisdiction to produce documents, objects, or other information relevant to an action or investigation, even if the information or the person in possession of the information is *outside the United States*.

> (b) Failure to comply with an order to produce information may subject the person to whom the order is directed to sanctions . . . .

> (c) In deciding whether to issue an *order directing production of information located abroad*, and in framing such an order, a court or agency in the United States should take into account the importance to the investigation or litigation of the documents or other information requested; the degree of specificity of the request; whether the information originated in the United States; the availability of alternative means of securing the information; and the extent to which noncompliance with the request would undermine the important interests of the United States, or compliance with the request would undermine the important interests of the state where the information is located.

> (2) If disclosure of *information located outside the United States* is prohibited by a law, regulation, or order of a court or other authority of the state in which the information or prospective witness is located, . . .

> (c) a court or agency may, in appropriate cases, make findings of fact adverse to a party that has failed to comply with the order for production . . . .

(Emphasis added.) Plaintiffs point to the phrases "outside the United States" (§ 442(1)(a));

"order directing production of information located abroad" (§ 442(1)(c)); and the courts' power

to impose sanctions for failure to comply with an order for "disclosure of information located

outside the United States" even if prohibited by foreign law (§ 442(2)) as evidence that Section

442 applies only to those documents physically located abroad.

Plaintiffs further note that in *Societe Nationale Industrielle Aerospatiale v. U.S. District Court for the Southern District of Iowa*, 482 U.S. 522 (1987), the defendants, two French manufacturers, did not object to producing "material or information that was located in the United States," but only that which was located in France and subject to French blocking statutes. *Aerospatiale*, 482 U.S. at 526 n.4. Plaintiffs here assert that because the Court in *Aerospatiale* considered "the scope of the district court's power to order *foreign discovery* in the face of objections by foreign states," domestic discovery from foreign sources is accorded less protection. *Id.* at 544 n.28 (emphasis added).

Plaintiffs' reasoning is flawed. First, Restatement § 442(1)(c) identifies as a factor whether the "information *originated* in the United States," not whether the information currently is located in the United States. Simply because Section 442 and the Court in *Aerospatiale* address documents located outside the United States does not mean that documents obtained involuntarily from, or without the consent of, a foreign corporation, and now located in the United States, should be accorded any less protection. Furthermore, as NatWest's expert states, "[T]he account is held in England and thus the relevant contractual relationship between banker and customer is governed by English law." (Hollander Decl. at ¶ 5.) The court is unaware of any precedent which ignores the bank-customer relationship simply because the documents at issue are currently located in the United States. *See Maxwell Communication Corp. v. Societe Generale*, 93 F.3d 1036 (2d Cir. 1996) (deferring to British bankruptcy laws because the American interests were "not very compelling," and, although one wire transfer was routed through the British bank's New York office, the wire transfers "at the heart of such a suit .

. . related primarily to England.")

The mere possession by plaintiffs in the United States of some of the disputed documents does not dispose of the discovery dispute. Accordingly, the court next considers the factors set forth in the Restatement (Third) of Foreign Relations Law and in *Minpeco v. Conticommodity Servs., Inc.*, 116 F.R.D. 517, 523 (S.D.N.Y. 1987).


C.       The Factors In Rst § 442(1)(c) and *Minpeco* Compel NatWest to Produce the Requested Information

In determining whether to compel production of documents located abroad from foreign parties, courts in the Second Circuit consider the following five factors elucidated by the Supreme Court in *Aerospatiale* and set forth in Restatement of Foreign Relations Law of the United States § 442(1)(c):

> (1) the importance to the . . . litigation of the documents or other information requested;
>
> (2) the degree of specificity of the request;
>
> (3) whether the information originated in the United States;
>
> (4) the availability of alternative means of securing the information; and
>
> (5) the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine the important interests of the state where the information is located.

*British Int'l Ins. Co., Ltd. v. Seguros La Republica, S.A.*, No. 90 Civ. 2370, 2000 WL 713057, at *8-9 (S.D.N.Y. June 2, 2000) (citing *Aerospatiale*, 482 U.S. at 544 (quoting tentative draft of Restatement of Foreign Relations Law of the United States (Revised) § 437(1)(c), subsequently

adopted as Restatement (Third) of Foreign Relations Law of the United States, § 442(1)(c))).

Courts in the Second Circuit also consider "the hardship of compliance on the party or witness from whom discovery is sought [and] the good faith of the party resisting discovery."[8]  *Minpeco*, 116 F.R.D. at 523; *Reino De Espana v. American Bureau of Shipping*, No. 03 Civ. 3573, 2005 WL 1813017, at *3 (S.D.N.Y. Aug. 1, 2005).   Having already considered the third factor – noting that the information sought by plaintiffs' discovery requests did not originate in the United States – the court will consider the remaining factors, beginning with the first.

      1.     <u>The requested information is crucial to the litigation.</u>

      Consistent with the Federal Rules of Civil Procedure, Restatement § 442(1)(c) requires that the court examine the relevance of the requested discovery to the litigation:

> In deciding whether to issue an order directing production of
> information located abroad, and in framing such an order, a court or
> agency in the United States should take into account the importance to
> the investigation or litigation of the documents or other information

-------------------------------------------

[8]  Defendant cites the four factors in *Minpeco* as the relevant foreign discovery analysis. (*See* Def's Opp. at 14.)  However, the court in *Minpeco* identified *seven* factors relevant to a foreign discovery analysis, and then highlighted four of those as the "*principal* factors." *Minpeco*, 116 F.R.D. at 522-523 (emphasis added).  The court did not hold that those four factors were the only relevant inquiries.  In fact, the Southern District in *In re Grand Jury Subpoena Dated August 9, 2000*, 218 F. Supp. 2d 544, 554 (S.D.N.Y. 2002) explained,

> [T]he Second Circuit applies a balancing test distilled from the Restatements of
> the Foreign Relations Law of the United States, and has endorsed consideration of
> the [*Minpeco*] factors . . . . The [*Minpeco*] analysis is broad, and may encompass
> additional considerations – whether they are enumerated separately or considered
> as part of the four *Minpeco* factors.

Therefore, this court will follow Second Circuit cases which apply all factors enumerated by the Supreme Court, the Restatement and *Minpeco*.  *See Reino De Espana*, 2005 WL 1813017, at *3 (considering all seven factors); *Madanes v. Madanes*, 186 F.R.D. 279, 285-286 (S.D.N.Y. 1999); *British Int'l Ins. Co. Ltd.*, 2000 WL 713057, at *8-9.

requested . . . .

Rst. § 442(c).

In this case, plaintiffs seek documents and information revealing NatWest's knowledge of Interpal's alleged terrorist connections and the extent of the bank's financial services in support of Interpal's alleged terrorist acts. Indeed, NatWest concedes that "the documents and information sought by plaintiffs are undeniably of potential importance to the outcome of this litigation." (Def's Opp. at 21.) The information plaintiffs seek regarding the Interpal account(s) is crucial and thus relevant to plaintiffs' claims under 18 U.S.C. §§ 2333(a), 2339B and 2339C, which require plaintiffs to demonstrate that (1) they were injured by an act of international terrorism (pursuant to Section 2331(a)); (2) defendant "knowingly provided material support and/or resources" to a designated terrorist (in violation of Section 2339B); and (3) defendant "willingly provid[ed] or collect[ed] funds" used to carry out terrorist acts (in violation of Section 2339C). *See* 18 U.S.C. §§ 2339B, 2339C; *see also Linde*, 384 F. Supp. 2d at 588.

Rule 26(b)(1) of the Federal Rules of Civil Procedure provides, "Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party . . . . Relevant information need not be admissible at trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1). Because the scope of civil discovery in the United States is broader than that of many foreign jurisdictions, some courts have applied a more stringent test of relevancy when applying the Federal Rules to foreign discovery. *See Aerospatiale*, 482 U.S. at 542, 546 (noting that the requested documents were "vital" to the litigation, and advising U.S. courts that "[w]hen it is

necessary to seek evidence abroad, the district court must supervise pretrial proceedings particularly closely to prevent discovery abuses."); *see also Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468, 1475 (9th Cir. 1992) ("[W]here the outcome of the litigation 'does not stand or fall on the present discovery order,' . . . courts have generally been unwilling to override foreign secrecy laws") (quoting *In re Westinghouse Elec. Corp. Uranium Contracts Litig,*, 563 F.2d 992, 999 (10th Cir. 1972)); Rst. § 442, comment (a) (the discovery must be "directly relevant and material"); *but see Compaigne Francaise D'Assurance Pour Le Commerce Exterieur v. Phillips Petroleum Co.*, 105 F.R.D. 16, 32 n. 8 (S.D.N.Y. 1984) ("In ordering production of these documents, this Court does not need to find, nor can it find at this point, that the requested documents are 'vital' . . . ."); *Graco, Inc. v. Kremlin, Inc.*, 101 F.R.D. 503, 515 (N.D. Ill. 1984) (noting that *Aerospatiale* indicated that the requested discovery should be  "vital," but declining to articulate a standard).

Given plaintiffs' allegations regarding NatWest's provision of financial services to Interpal for more than nine years, including accepting deposits from alleged terrorist organizations on behalf of Interpal (Am. Comp. ¶¶ 350-51, 358-62), the court finds that the discovery sought is both relevant and crucial to the litigation of plaintiffs' claims.  Because the documents and information sought by plaintiffs are highly relevant and important to the claims and defenses in this action, the court finds that this second factor weighs heavily in plaintiffs' favor.

2.    The discovery requests are narrowly tailored.

Rst. § 442(1)(c) also provides, "[A] court or agency in the United States should take into account . . . the degree of specificity of the request . . . ."  Although the parties have

agreed to brief only the issue of English bank secrecy laws at this time (*see* Def's Opp. at 28), and not issues such as relevance or overbreadth, the court, having determined that the requests seek relevant information, must also examine the specificity of the discovery requests in performing an analysis under Rst. § 442.

Here, the court finds that the requested documents are relevant, vital and narrowly tailored to the litigation. *See Compaigne Francaise*, 105 F.R.D. at 32 n.8; *Graco*, 101 F.R.D. at 515. As noted above, at issue are Document Requests Nos. 1-3, 11 and 12, and Requests for Admissions and Interrogatories Nos. 1-4. Those requests are sufficiently focused on the vital issues in this case: whether and to what extent NatWest knowingly provided "material support and resources" to Specially Designated Terrorist Organizations, and/or "financial services" to a terrorist organization. 18 U.S.C. §§ 2339B, 2339C. Plaintiffs' discovery requests seek, *inter alia*, documentation of the defendant and Interpal's relationship, the nature and extent of the services the defendant provided to Interpal, the collection or distribution of funds by NatWest that may have been used by Interpal and/or its associates to support terrorism, and NatWest's knowledge of Interpal's alleged terrorist connections. Plaintiffs require this information to establish liability pursuant to 18 U.S.C. §§ 2339B, 2339C. *Cf. Trade Dev. Bank v. Continental Ins. Co.*, 469 F.2d 35, 40-41 (2d Cir. 1972) (denying defendant's discovery requests for the identities of Swiss bank account customers because such identities were irrelevant to whether a bank employee had used customer accounts "in furtherance if his fraudulent scheme"); *In re Two Grand Jury Subpoenas Duces Tecum Served Upon Union Bank of Switzerland*, 158 Misc. 2d 222, 226 (Sup. Ct. 1993) (denying the government's discovery requests, in part, because the District Attorney "conceded that the subpoenaed material is not crucial to his Grand Jury

presentation.").  Plaintiffs have established that their discovery demands are specifically tailored to their claims.

      3.      <u>Availability of alternative methods: plaintiffs are not required to seek discovery through the Hague Convention.</u>

Section § 442(1)(c) of the Restatement also requires the court to consider the "availability of alternate means of securing the information . . . ."  The court notes that plaintiffs do not have direct or ready access to Interpal's Nat West records through means other than discovery demands.  Only NatWest can provide plaintiffs with responses to their requested discovery.

NatWest argues that plaintiffs "can obtain their requested discovery easily and expeditiously by utilizing letters of request, directed at NatWest and/or Interpal, under the Hague Convention."  (Def's Opp. at 24.)  Both the United Kingdom and the United States are signatories to the Hague Convention, which provides internationally agreed-upon means for conducting discovery in foreign states and which defendant here urges plaintiffs to use.  As a signatory to the Hague Convention, the United Kingdom generally has agreed to produce documents sought by foreign courts by responding to letters rogatory from the requesting party.[9]

The United States Supreme Court, however, has determined that parties seeking discovery need not resort to the Hague Convention as their first and only means for securing foreign discovery, and that United States district courts retain jurisdiction to compel foreign discovery.  The Court stated, "We . . . decline to hold as a blanket matter that comity requires resort to Hague Evidence Convention procedures without prior scrutiny in each case of the

_____

[9] *See* Hague Conference on Private International Law, available at: http://hcch.e-vision.nl/index_en.php?act=conventions.status&cid=41.

particular facts, sovereign interests, and likelihood that resort to those procedures will prove effective." *Aerospatiale*, 482 U.S. at 544. Addressing the applicability of French blocking statutes, the Court continued,

> It is clear that American courts are not required to adhere blindly to the directives of [a foreign blocking statute]. Indeed, the language of the statute, if taken literally, would appear to represent an extraordinary exercise of legislative jurisdiction by the Republic of France over a United States district judge, forbidding him or her to order any discovery from a party of French nationality, even simple requests for admissions or interrogatories that the party could respond to on the basis of personal knowledge . . . . Extraterritorial assertions of jurisdiction are not one-sided.

*Id.*

Moreover, resort to the Hague Convention, contrary to defendant's assertions, is not necessarily "speed[y]" and "expeditious[]." (Def's Opp. at 24.) As plaintiffs' expert notes,

> [T]here is certainly no assurance that the letter of request will be granted quickly or in the terms as requested. In particular, the different practices on disclosure and discovery between US and UK courts may lead to the rejection of applications which would be viewed as acceptable in the US or to their grant subject to limitations which would be viewed as unduly severe in US practice.

(Walker Decl. at ¶ 2.3.)

Therefore, plaintiffs in this case need not seek discovery through the Hague Convention, but, instead, may appropriately seek from this court an order compelling discovery. The court notes, however, that although plaintiffs are not required to resort to the Hague Convention, they are not discouraged from doing so.

4. <u>The interests of the United States and United Kingdom in combating terrorism outweigh the British interest in preserving bank customer secrecy.</u>

The comity factor – requiring analysis of the competing interests of the United States and the United Kingdom – "is of the greatest importance in determining whether to defer to the foreign jurisdiction." *Id.* The court finds that this factor weighs strongly in favor of plaintiffs. The interests of the United States and the United Kingdom in combating terrorist financing, as evidenced by the legislative history of the ATA, codified at 18 U.S.C. § 2331 *et seq*, Presidential Executive Orders and both countries' participation in international treaties and task forces aimed at disrupting terrorist financing, outweighs the British interest in preserving bank customer secrecy. The United Kingdom has an interest in granting plaintiffs' discovery requests, as it signed international treaties in order to facilitate international cooperation to combat terrorism, and requires its banks to monitor customer ties to terrorists.

Moreover, as NatWest's own expert admits, British conflict of laws dictate that the rules of the forum apply to discovery disputes, and thus, the discovery principles, codified in the Federal Rules of Civil Procedure and as articulated by courts in the Second Circuit, apply here. Finally, as discussed below, even if the comity analysis weighed in favor of NatWest, the bank may nonetheless produce the requested information based on an exception to English bank secrecy established in *Tournier.*

(a) <u>The United States's interest</u>

"The extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine the important interests of the state where the information is located," is the most important of the five factors in Rst. § 442(1)(c). *See British Int'l Ins. Co., Ltd.*, 2000 WL 713057, at *9; *Madanes v. Madanes*,

186 F.R.D. 279, 286 (S.D.N.Y. 1999); *Minpeco*, 116 F.R.D. at 522.

Axiomatically, the United States has "a substantial interest in fully and fairly adjudicating matters before its courts." *Minpeco*, 116 F.R.D. at 523-524; *see also Alfadda*, 149 F.R.D. at 34; *In re Westinghouse*, 563 F.2d at 999. When that interest is combined with the United States's goals of combating terrorism, it is elevated "to nearly its highest point." *Dammarell v. Islamic Republic of Iran*, No. Civ. A. 01-2224, 2005 WL 756090, at *20 (D. D.C. March 29, 2005) (finding that injuries resulting from "a state-sponsored terrorist attack on a United States embassy and diplomatic personnel . . . heighten the interest of a domestic forum and diminish the interest of the foreign state.")

The legislative history of the ATA, Executive Orders signed by two United States Presidents, and the participation by the United States in international treaties and a task force, reveal this country's profound and compelling interest in combating terrorism at every level, including disrupting the financial underpinnings of terrorist networks. Section 2333(a) was first introduced in the wake of *Klinghoffer v. Palestine Liberation Organization*, 739 F. Supp. 854 (S.D.N.Y. 1990), in which heirs of an American national killed in a terrorist attack in the Mediterranean sued the Palestinian Liberation Organization. (*See* Brief of United States as Amicus Curiae Supporting Respondents, *Boim v. Quranic Literacy Inst. and Holy Land Found. for Relief and Dev.*, 291 F.3d 1000, at *6 (7th Cir. 2002) (No. 01-1969), annexed as Exh. A to the Declaration of Aaron Schlanger in Support of Plaintiffs' Reply Memorandum, dated 12/18/06.) The *Klinghoffer* court concluded that it had subject matter jurisdiction because United States admiralty laws applied to plaintiff's tort claims. *See Klinghoffer*, 739 F. Supp. 858-59. As plaintiffs' expert explains, "[T]he narrowness of the grounds on which [jurisdiction]

was resolved[,] made it clear to observers that legislation would be needed to expand federal court jurisdiction in order to facilitate comparable suits by other victims of terrorism outside the United States." (Chesney Decl. at 9.)

To address the concern regarding federal jurisdiction, Senator Charles Grassley introduced the Anti-Terrorism Act of 1990 in April of that year. (*See id*) Senator Grassley,

> proposed the creation of 18 U.S.C. § 2333(a), which in relevant part would provide that "[a]ny national of the United States injured in his person, property, or business by reason of an act of international terrorism may sue therefore in any appropriate district court of the United States . . . ."

(Chesney Decl. at 9 (quoting 136 Cong. Rec. S4568-01).) Alan Kreczko, a State Department official, testified before the Senate Judiciary Committee's Subcommittee on Courts and Administrative Practice that the proposed Antiterrorism bill would "add to the arsenal of legal tools that can be used against those who commit acts of terrorism against U.S. citizens abroad." (*Id.*) Similarly, when Senator Grassley introduced the bill on the floor of the Senate, he explained that it would "strengthen our ability to both deter and punish acts of terrorism . . . . We must make it clear that terrorists' assets are not welcome in our country. And if they are found, terrorists will be held accountable where it hurts them most: at their lifeline, their funds." (*Id.* at 12.) Congress passed the Antiterrorism Act of 1990 and the bill was enacted as Pub. L. No. 101-519, § 132(b)(4), 104 Stat. 2250, 2251. (*See id.*) Due to a procedural error, the Antiterrorism Act of 1990 was repealed in April 1991, and re-introduced and reenacted in the same form, becoming the Antiterrorism Act of 1992. (*See id.* at 12-13.)

On January 23, 1995, then-President Clinton issued Executive Order No. 12947, Prohibiting Transactions with Terrorists who Threaten to Disrupt the Middle East Peace Process,

60 Fed. Regis. 5,079 (Jan. 23, 1995), pursuant to the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701 *et seq.* President Clinton found that "grave acts of violence committed by foreign terrorists that disrupt the Middle East peace process constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States." 60 Fed. Regis. at 5,079. He identified twelve foreign terrorist organizations, including HAMAS, for designation as "Specially Designated Terrorists" and froze the property and interests in property of these organizations in the United States. *Id.* at 5,081.

Executive and Congressional interests in freezing terrorist financing continued through the next decade. The national interests in thwarting terrorist financing became paramount when applied to recognized terrorist organizations, particularly in the wake of the September 11, 2001 terrorist attacks. Two weeks after the September 11 terrorist attacks, President Bush issued Executive Order 13224, Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism, 66 Fed. Reg. 49,079 (Sept. 23, 2001), pursuant to his powers under the IEEPA, and specifically targeted terrorist financing. Executive Order 13224 increased the array of financial sanctions enforceable against foreign terrorist organizations. *See* 66 F.R. 49079. By prohibiting transactions with any organizations designated an SDGT, the President stated,

> We're putting banks and financial institutions around the world on notice, we will work with their governments, ask them to freeze or block terrorist's ability to access funds in foreign accounts. If they fail to help us by sharing information or freezing accounts, the Department of the Treasury now has the authority to freeze their bank's assets and transactions in the United States.[10]

---

[10] "President Freezes Terrorists' Assets: Remarks by the President, Secretary of the Treasury O'Neill and Secretary of State Powell on Executive Order," White House: Office of the

Citing "the pervasiveness and expansiveness of the financial foundation of foreign terrorists," the President blocked persons and organizations from "assist[ing], sponsor[ing], or provid[ing] financial, material, or technological support for, or financial or other services to or in support of" persons or organizations designated as "Specially Designated Global Terrorists" ("SDGTs"). 66 Fed. Reg. 49,079-49,080. The President annexed a list of SDGTs to his order, and gave the Secretary of State, in consultation with the Secretary of the Treasury and the Attorney General, the power to designate additional persons and/or entities as SDGTs. *See id.* at 49,080.

Congress also has expressed its concern with global terrorist financing in general, and with the particular role of charities in raising and transferring funds to terrorist organizations. In a 2002 hearing before the Senate Subcommittee on International Trade and Finance, Chairman Evan Bayh stated:

> Cutting off the financing of terrorist organizations is a critically important component of the war against terror and to protect America . . . . This hearing has been called to send a very clear signal that . . . we will do everything humanly possible to stop this illicit financial activity, and that we will expect our allies to do the same.

(Pls' Motion at 16, quoting Statement of Chairman Evan Bayh, *The Role of Charities and NGOs in the Financing of Terrorist Activities, Before the U.S. Senate, Committee on Banking, Housing and Urban Affairs, Subcommittee on International Trade and Finance*, August 1, 2003, at 1-2.)

Thereafter, during a 2003 Congressional House hearing, Representative Sue Kelly stated that the President's decision to freeze key assets of HAMAS leaders and certain related international charities "sends a clear message to the world that organizations linked to this

---

Press Secretary, Sep. 24, 2001, available at:
http://www.whitehouse.gov/news/releases/2001/09/20010924-4.html.

heinous group will not be tolerated." (Pls' Motion at 6, quoting Statement of Chairwoman Sue W. Kelly, *Hearing on The HAMAS Asset Freeze and Other Government Efforts to Stop Terrorist Funding, Before U.S. House of Representatives Subcommittee on Oversight and Investigation, Committee on Financial Services*, September 24, 2003, at 1-2.)

The American interest in disrupting terrorist networks with global assistance from American allies is particularly apparent here. On August 22, 2003, the United States Department of the Treasury designated "five Hamas related charities and six senior Hamas leaders as Specially Designated Global Terrorists . . . [ froze] any assets in the U.S. and prohibit[ed] transactions with U.S. nationals." Significantly, the Department of the Treasury specifically identified Interpal as an SDGT and froze all of its domestic assets. The Treasury Department explained, "Interpal, headquartered in the UK, has been a principal charity utilized to hide the flow of money to HAMAS." (*See* "U.S. Designates Five Charities Funding Hamas and Six Senior Hamas Leaders as Terrorist Entities," Dep't of the Treasury News Release, JS-672, 8/22/03 (*http://www.ots.treas.gov/docs/4/48937.html*); *see also* Expert Declaration of Robert M. Chesney, in Support of Plaintiffs' Motion to Compel, dated 12/18/06 ("Chesney Decl."), at 7-8.) Accordingly, not only does the United States have a demonstrated interest in halting terrorist financing, both domestically and internationally, but the United States has also explicitly found that NatWest's client, Interpal, is a "principal" conduit for those funds. (*Id.*) Thus, NatWest's noncompliance with plaintiffs' discovery requests "would undermine the important interests of the United States." Rst. § 442(1)(c). Moreover, the United States Treasury Department expressed its intention to seek assistance from the United Kingdom and other allies in stating, "The United States will continue to work with our allies to encourage the recognition of Hamas

as a terrorist organization and to shut down their sources of funding and support." (Dep't of the Treasury News Release, JS-672, 8/22/03, *supra*.)

Furthermore, the United States has consistently demonstrated its commitment to combating terrorist financing and to enlisting the help of foreign nations. In furtherance of that goal, the United States and other nations, including the United Kingdom, have committed to international cooperation. Both the United States and the United Kingdom are signatories to the United Nations' International Convention for the Suppression of the Financing of Terrorism, which recommends that nations "adopt[] effective measures for the prevention of the financing of terrorism . . . ."[11] Both countries are also members of the Financial Action Task Force (the "FATF"), which likewise seeks international cooperation in combating terrorist financing.[12]

Similarly, the United Kingdom has demonstrated its common national interests with the United States in thwarting terrorist financing by signing and joining the same convention and task force. The Preamble to the U.N. Resolution recognizes that the signatory states are:

> deeply concerned about the worldwide escalation of acts of terrorism in all its forms and manifestations, . . . [and] convinced of the urgent need to enhance international cooperation among States in devising and adopting effective measures for the prevention of the financing of terrorism, as well as for its suppression through the prosecution and punishment of its perpetrators . . . .[13]

---

[11] International Convention for the Suppression of the Financing of Terrorism, G.A. Res. 109, U.N. GAOR, 54th Sess., Supp. No. 49, at 408, U.N. Doc. A/54/49 (Vol. I) (1999), *entered into force* April 10, 2002; available at http://www.un.org/law/cod/finterr.htm.

[12] Financial Action Task Force on Money Laundering, The Forty Recommendations, June 20, 2003 (incorporating the amendments of October 22, 2004), available at http://www.fatf-gafi.org/dataoecd/7/40/34849567.PDF

[13] *Supra*, note 11, at Preamble.

The U.N. Resolution made it "an offense . . . [to] provide[] or collect[] funds . . . in the knowledge that they are to be used . . ." for terrorist acts.[14]

The FATF, an international body which "sets standards and develops and promotes policies to combat . . . terrorist financing . . ," issued forty recommendations to its members on June 20, 2003. Recommendation 36 provides,

> Countries should rapidly, constructively and effectively provide the widest possible range of mutual legal assistance in relation to money laundering and terrorist financing investigations, prosecutions, and related proceedings. In particular, countries should . . . [n]ot refuse to execute a request for mutual legal assistance on the grounds that laws require financial institutions to maintain secrecy or confidentiality.[15]

In denying NatWest's motion to dismiss plaintiffs' second and third claims, Judge Sifton recognized the overriding national interest in eliminating financial support of terrorism. He found, "Congress intended these provisions [under Section 2333(a) of the ATA] to impose, 'liability at any point along the causal chain of terrorism.'" *Weiss*, 453 F. Supp. 2d at 631 (quoting S. Rep. No. 102-342 at 22). "In enacting the material support statute Congress made an express finding of fact that, 'foreign organizations that engage in terrorist activity are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct.'" *Id.* (quoting Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. 104-32, § 301(a)(7), 110 Stat. 1214, 1247 (1996).) Judge Sifton further found that "even the 'provision of basic banking services may qualify as material support'" for liability under 18 U.S.C. § 2339B. *Id.* at 625 (quoting *Linde*, 384 F. Supp. 2d at 588).

---

[14] *Supra*, note 11, at Article 2.

[15] *Supra,* note 12.

Similarly, in *Linde*, Judge Gershon denied defendant's motion to dismiss as to a majority of plaintiffs' claims pursuant to 18 U.S.C. § 2333(a), and found that Congress intended to broadly apply the provisions in the Anti-Terrorism Act. *See Linde*, 384 F. Supp. 2d at 587. As in this case, the *Linde* plaintiffs were U.S. citizens injured in terrorist attacks in Israel, allegedly perpetrated by HAMAS. *See id.* at 575. Pursuant to 18 U.S.C. § 2333(a), plaintiffs sued Arab Bank, a Jordanian financial institution, for knowingly providing financial services for several charities alleged to be HAMAS fronts, in violation of 18 U.S.C. §§ 2339A-C. *See id.* at 578-579. The court found that "Section 2333 does not limit the imposition of civil liability only to those who directly engage in terrorist acts." *Id.* at 582. The court determined, "None of these provisions [i.e., Sections 2339A-C] . . . requires specific intent to commit specific acts of terrorism." *Id.* at 586.

NatWest attempts to counter the weight of the foregoing authority by criticizing plaintiffs, by arguing that, in seeking to enforce these national interests, plaintiffs have anointed themselves "'private attorneys general' responsible for enforcing the nation's antiterrorism laws." (Def's Opp. at 15.) As noted above, the Antiterrorism Act of 1990 was introduced in response to Congressional concern that private plaintiffs would not be able to maintain a cause of action against terrorist organizations. (*See supra* at 24-25; Chesney Decl. at 9-12.) Indeed, Section 2333(a) provides, "Any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, . . . may sue therefor in any appropriate district court of the United States." 18 U.S.C. § 2333(a). As an additional incentive to "harness the initiative and resources of the private sector in pursuit of the larger aims of U.S. counter terrorism policy" (Chesney Decl. at 9), Congress provided that plaintiffs "shall recover

threefold the damages he or she sustains and the cost of the suit, including attorney's fees" (18 U.S.C. §2333(a)).

Furthermore, comment (e) to Rst. § 442 provides, "*In private actions*, it is open to a court in the United States to invite the United States attorney or other appropriate official to advise it of the interests of the U.S. government." (Emphasis added.) The Department of Justice ("DOJ") has provided such advice. In an amicus brief before the Seventh Circuit, the DOJ stated that after the *Klinghoffer* decision, "Congress and the State Department wanted through Section 2333(a) to ensure that torts from terrorist activity would be actionable even if they occurred on land in a foreign country." (*See* Brief of United States as Amicus Curiae Supporting Respondents, *Boim*, 291 F.3d 1000, at *13, Schlanger Decl., Exh. A.) The government quoted Joseph H. Morris, former Department of Justice attorney and General Counsel of the United States Information Agency, who testified at the 1990 Congressional hearings regarding § 2333(a) as follows:

> American victims seeking compensation for physical, psychological, and economic injuries naturally turn to the common law of tort. American tort law in general would speak quite effectively to the facts and circumstances of most terrorist actions not involving acts of state by foreign governments.

(*Id.*) The government also noted that Senator Grassley, sponsor of the bill, explained its necessity: "Unfortunately, victims who turn to the common law of tort or Federal statutes, find it virtually impossible to pursue their claims because of reluctant courts and numerous jurisdictional hurdles . . . ." (*Id.*) Therefore, Congress has explicitly granted private parties the right to pursue common tort claims against terrorist organizations and those that provide material support or financing to terrorist organizations. *See*, *e.g.*, *Minpeco*, 116 F.R.D. at 523 (finding a

private right of action in enforcing antitrust and commodities fraud laws to ensure the stability of

U.S. financial markets, and noting, "[I]t is difficult to imagine a private commercial lawsuit

which could be more infused with the public interest."). Certainly, private tort actions directed

at compensating victims of terrorism and thwarting the financing of terrorism vindicate the

national and international public interest.

(b)     The United Kingdom's interest.

Pursuant to Rst. § 442, the court should also weigh "the extent to which . . .

compliance with the [discovery] request would undermine the important interests of the state

where the information is located." The Supreme Court explained,

> 'Comity,' in the legal sense, is neither a matter of absolute obligation,
> on the one hand, nor of mere courtesy and good will, upon the other.
> But it is the recognition which one nation allows within its territory to
> the legislative, executive or judicial acts of another nation, having due
> regard both to international duty and convenience, and to the rights of
> its own citizens or of other persons who are under the protection of its
> laws.

*Maxwell*, 93 F.3d at 1046 (citing *Hilton v. Guyot*, 159 U.S. 113 (1895)).

In this case, there is a "true conflict of laws" because adhering to this court's

discovery order would seemingly violate British bank secrecy laws. *Cf. In re United Pan-

Europe Commc'ns N.V.*, No. 03 Civ. 1060, 2004 WL 48873, at *4 (S.D.N.Y. Jan. 9, 2004)

("[N]o true conflict between American and Dutch law is presented because ultimately the

Agreement is governed by English law – not Dutch or American law."). Comment (c) to Rst. §

442 provides guidance for this analysis:

> In making the necessary determination of foreign interests under
> Subsection (1)(c), a court or agency in the United States should take
> into account[,] . . . . *expressions of interest by the foreign state*, as
> contrasted with expressions by the parties; . . . the significance of

-33-

disclosure in the regulation by the foreign state of the activity in question; . . . *indications of the foreign state's concern for confidentiality prior to the controversy in connection with which the information is sought* . . . . [and] the long-term interests of the United States generally in international cooperation in law enforcement and judicial assistance, in joint approach to problems of common concern, in *giving effect to formal or informal international agreements*, and in orderly international relations.

(Emphasis added.)  Comment (e) to the same section states that, because Section 442 applies to pretrial procedures, "somewhat less deference to the law of the other state may be called for."

Pursuant to Rule 44.1 of the Federal Rules of Civil Procedure, "The court, in determining foreign law, may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence.  The court's determination shall be treated as a ruling on a question of law." Fed. R. Civ. P. 44.1. "Among other sources, the Court may consider the opinions of experts, but it is not bound by their testimony, even if uncontradicted."  *British Int'l Ins. Co. Ltd.*, 2000 WL 713057, at *7 (further citations omitted).  Therefore, the court will consider the expert opinions submitted by both parties, and the English laws cited therein.  As an initial matter, as noted above, NatWest's British law expert concedes that under British conflicts law, the law of this forum applies.

Furthermore, the court notes that in conferences before the court, defendant advised that the British government indicated that it does not object to plaintiffs' discovery requests.  (*See* Pls' Motion at 7.)  Thus, where the British government's interest in its bank secrecy laws is not asserted, the court need not consider those interests here.  *See United States v. First National City Bank*, 396 F.2d 897, 904 (2d Cir. 1968) (ordering production of bank records despite the application of German bank secrecy laws in part because the German government did not object); *cf. Minpeco*, 116 F.R.D. at 523 (although "the Court of Appeals has

twice indicated that a foreign government's failure to express a view in such a context militates against finding that strong national interests of the foreign country are at stake," the court denied plaintiffs' motion to compel where "the Swiss government has submitted to the court two official statements in this case which express its general position as to the importance of Swiss banking secrecy laws to the interests of Switzerland . . . ."); *Societe Internationale Pour Participations Industrielles et Commerciales v. Rogers*, 357 U.S. 197, 200-201 (1958) (declining to order production where the Swiss government confiscated the records to prevent their discovery).

Nonetheless, although the United Kingdom has expressed no position regarding the enforcement of its bank secrecy laws, like the United States, Britain has also expressed and demonstrated a profound and compelling interest in eliminating terrorist financing. That Britain has an interest in thwarting the financing of terrorism by imposing monitoring and reporting obligations on its banks regarding customers who finance, or may be suspected of financing, terrorist acts around the world is established by the fact that the United Kingdom has signed international treaties that mandate such monitoring and disclosure. Along with the United States, the U.K. is a signatory to the United Nation's International Convention for the Suppression of the Financing of Terrorism. Article 12 of the Convention provides,

> 1. States Parties shall afford one another the greatest measure of assistance in connection with criminal investigations or criminal or extradition proceedings in respect of the offenses set forth in article 2, including assistance in obtaining evidence in their possession necessary for the proceedings.

> 2. States Parties may not refuse a request for mutual legal assistance on the ground of bank secrecy.[16]

Although Article 12 prescribes assistance and cooperation among signatory nations, plaintiffs'

---

[16] *Supra*, note 11, at Article 12.

action seeking discovery from a bank alleged to be providing material support to terrorists and compensation for victims of international terrorist attacks is not inconsistent with the British and American interests in international efforts to detect and fight global terror.

The United Kingdom is also a participant in the Financial Action Task Force, which "calls upon all countries to take the necessary steps to bring their national systems for combating . . . terrorist financing into compliance with the new FATF Recommendations."[17] Judge Sifton has determined that all banks, including NatWest, having international operations or relationships with correspondent banks have a duty to adopt know-your-customer, anti-money laundering and anti-terrorist financing standards as defined and enforced by the FATF. *See Weiss*, 453 F. Supp. 2d at 619. Recommendation 36 states, "Countries should rapidly, constructively and effectively provide the widest possible range of mutual legal assistance in relation to . . . terrorist financing investigations, prosecutions and related proceedings."[18]

On December 27, 2001, the European Union adopted Council Regulation (EC) No. 2580/2001, which states that:

> 1.    (a) all funds, other financial assets and economic resources belonging to, or owned or held by, a natural or legal person, group or entity included in the list [of designated terrorists] shall be frozen;
>
> (b) no funds, other financial assets and economic resources shall be made available, directly or indirectly, to, or for the benefit of, a natural or legal person, group or entity included in the list . . . .
>
> 2.    . . . . [I]t shall be prohibited to provide financial services to, or for the benefit of, a natural or legal person, group or entity

---

[17]  *Supra* at n.12 .

[18]  *Id.*

included in the list . . . .[19]

On September 14, 2003, the EU amended the list of designated terrorist organizations to include

HAMAS.[20]

The U.K. notified all British financial institutions of the EU's designation of

HAMAS on September 15, 2003, stating:

> The Bank of England, as agent for Her Majesty's Treasury, advises
> that there is as a result [of the 9/13/03 decision] a binding and directly
> applicable obligation in Community law to freeze all funds, other
> financial assets and economic resources of Hamas, and not to make
> any funds, other financial assets and economic resources available to
> Hamas.  Financial institutions are requested to check whether they
> maintain any accounts for [Hamas] and, if so, they should freeze the
> accounts and report their findings to the Bank of England.[21]

Seven days later, the Bank of England "directed financial institutions that any funds which they

hold for on behalf of Hamas must not be made available to any person . . . ."[22]

Recently, the United Kingdom's Home Office issued a paper entitled Countering

International Terrorism, which states: "We . . . share a common interest with many other

---

[19]  European Union, Council Regulation (EC) No. 2580/2001/EC of 27 Dec. 2001,
available at:
http://eur-lex.europa.eu/smartapi/cgi/sga_doc?smartapi!celexapi!prod!CELEXnumdoc&lg=EN&
numdoc=32001R2580&model=guichett.

[20]  European Union, Council Decision 2003/646/EC of 14 Sept. 2003, available at:
http://europa.eu.int/smartapi/cgi/sga_doc?smartapi!celexapi!prod!CELEXnumdoc&lg=EN&num
doc=32003D0902&model=guichett. For an updated list, *see* European Union, Council Decision
2006/379/EC of 29 May 2006, available at: http://eur-
lex.europa.eu/LexUriServ/site/en/oj/2006/1_144/1_14420060531en00210023.pdf.

[21]  News release, Terrorist Financing: List of Suspects, 9/15/03, available at:
http://www.bankofengland.co.uk/publications/news/2003/097.htm.

[22]   News release, The Terrorism (United Nations Measures) Order 2001, 9/22/03,
available at:
http://www.bankofengland.co.uk/publications/financialsanctions/sancnotice030922.pdf.

countries in combating terrorism, so work with other governments and through international

organisations is an important part of protecting the UK and its interests." (Hollander Decl. at ¶

3.2, quoting Home Office, Countering International Terrorism (Cm. 6888, London, 2006) ¶ 17.)

Therefore, pursuant to international treaties and British law, the United Kingdom

has required that British banks, including NatWest, be subject to several regulatory obligations

that require the investigation of bank clients' potential links to known terrorists, and the

disclosure of activities of customers suspected to be engaged in terrorist activities. (*See*

Hollander Decl. at ¶ 3.9.) For example, Judge Sifton noted that the FATF imposes obligations

on banks to adopt anti-terrorist financing procedures:

> These standards are set forth in written principles issued by FATF and
> the Basel Group of Bank Supervisors. They include a due diligence
> obligation to monitor publicly accessible information relating to 'high
> risk' customers, including charities collecting funds from the public . .
> . . In April 2002, an FATF report . . . informed NatWest, and other
> financial institutions that, "Regardless of whether the funds in a
> transaction are related to terrorists for the purposes of national
> criminal legislation, business relationships with such individuals . . .
> could . . . expose a financial institutions [sic] to significant
> reputational, operational and legal risk" . . . . On July 16, 2002, the
> Royal Bank of Scotland, NatWest's parent company, adopted new
> "Know-Your-Customer" guidelines and the so-called Wolfsberg
> Principles for the Suppression of Terror Financing, committing
> NatWest to implement "procedures for consulting applicable lists and
> taking reasonable and practicable steps to determine whether a person
> involved in a prospective or existing business relationship appears on
> such a list." . . . [T]he Royal Bank of Scotland's statement of
> principles for fighting crime and the financing of terrorism require that
> NatWest monitor publicly available information and allegations about
> the organizations from which its customers receive funds, and to
> which its customers transfer funds.

*Weiss*, 453 F. Supp. 2d at 619 (quoting Am. Comp. ¶¶ 408-411); *see also* Hollander Decl. at ¶

3.9 (listing U.K. regulations requiring financial institutions to disclose activities of their

customers who they suspect are engaged in terrorist or criminal activities). Indeed, as plaintiffs' expert asserts, "It can be readily established that there exists a duty to the public to assist the authorities both [in the U.K.] and abroad to combat international terrorism." (Walker Decl. ¶ 3.2.)

The banks' obligations are even more relevant here, where the British government has already demonstrated an interest in HAMAS and Interpal. The U.K. Terrorism Act of 2000 proscribes many activities related to the financing of terrorism, and imposes liability on those who provide support to designated terrorist organizations and, more generally, those who provide financial backing for the purposes of terrorism. (*See* Walker Decl. at ¶¶ 3.3-3.6.) The current list of designated terrorist organizations identified in the British Terrorist Act includes Hamas-Izz as-Din as-Qassem Brigades, the military wing of HAMAS. (See id. at ¶ 3.4.) In addition, plaintiffs allege that the Charity Commission, "established by law as a regulator and registrar for charities in England and Wales, froze Interpal's accounts at NatWest in March 1996, based on evidence that it channeled money to HAMAS." (Am. Compl. at ¶ 338.) The Charity Commission ultimately released Interpal's accounts at NatWest because, plaintiffs assert, although it found that Interpal donated to HAMAS, the Charity Commission differentiated between HAMAS' charitable wing and pro-terrorist activity wing, a distinction the American government does not make. (*See id.* at ¶ 343-344.)

The United Kingdom, like the United States, has a strong national interest in enforcing domestic and international anti-terrorism laws. The U.N. Convention for the Suppression of the Financing of Terrorism, the FATF Recommendations and the European Union Regulation all criminalize supporting terrorists through finance. The U.N. Resolution and

the FATF also explicitly direct the member countries to cooperate with each other in legal proceedings against suspected terrorist financing groups, further underscoring the mutual national interest in fighting global terrorist financing. Moreover, the European Union formally designated HAMAS as a terrorist organization in 2003, and the United Kingdom codified the E.U. Resolution and FATF Recommendations, requiring its banks to monitor any assets potentially available to HAMAS. Furthermore, the British government has specifically investigated Interpal's relationship, through NatWest, to HAMAS. Notably, as in *First National*, Britain has waived its objections to NatWest's disclosure of Interpal's banking records, and NatWest "is not arguing that the Court should defer to the privacy interests of Interpal." (Def.'s Opp. At 18.) Thus, as indicated by comment (c) to Rst. § 442, because Britain has not "express[ed] interest" in precluding this discovery and has waived any "concern for confidentiality;" granting plaintiffs' motion to compel would "give effect to formal . . . international agreements." Accordingly, ordering NatWest to provide plaintiffs with discovery would not "undermine the important interests of the state where the information is located," but rather, enforce them. Rst. § 442; *cf. Minpeco*, 116 F.R.D. at 523 (denying discovery where foreign state objected); *Societe Internationale*, 357 U.S. at 200-201 (denying discovery where foreign state confiscated the documents).

In addition to Britain's demonstrated interest in thwarting terrorist financing, the court finds that an order compelling production is nevertheless warranted. NatWest relies on *Tournier v. National Provincial and Union Bank of England*, 1924 1 KB 461 for the British common law principle that "England has an obvious and undeniable national interest in protecting customer privacy and enforcing its internal banking laws with respect to English

banks in NatWest's position." (Def's Opp. at 16.) NatWest differentiates the *Tournier* principle

from blocking statutes, which are "designed solely to protect domestic parties from foreign

discovery," and are typically granted little weight. (*Id.*) *See also Minpeco*, 116 F.R.D. at 528

(denying motion to compel and stating, "It is also worth noting that this is not a situation in

which the party resisting discovery has relied on a sham law such as a blocking statute to refuse

disclosure."); *Aerospatiale*, 482 U.S. at 544 ("It is clear that American courts are not required to

adhere blindly to the directives of [a blocking] statute.")

      Although the *Tournier* principle protecting bank customer secrecy differs from

blocking statutes, defendant's reading of *Tournier* is unavailing for two reasons: (1) the case

does not apply to foreign courts; and (2) NatWest may produce plaintiffs' requested discovery

under *Tournier* exception (d). First, as defendant's own expert notes, *Tournier* is not applicable

to these proceedings: "English law recognizes that determination of what disclosure should be

ordered is ultimately a question for the [United States District Court in] New York because

matters of discovery against parties to the action are under English conflicts of law rules

governed by the *lex fori*, the law of the forum." (Hollander Decl. at ¶ 4.) Plaintiffs' expert

agrees, "The extent to which English law is relevant to the case is ultimately a matter for the

New York [federal] courts." (Expert Declaration of Clive Walker in Support of Plaintiffs'

Motion to Compel, dated 12/18/06 ("Walker Decl."), at ¶ 1.3.) Accordingly, this court need not

look to English law in deciding the instant motion to compel, as this court is the final arbiter of

"what disclosure should be ordered." (Hollander Decl. at ¶ 4.)

      Second, the *Tournier* court identified four exceptions to the principle of bank

customer secrecy: "(a) Where disclosure is under compulsion by law; (b) where there is a duty to

the public to disclose; (c) where the interests of the bank require disclosure; and (d) where the disclosure is made by the express or implied consent of the customer." (*Id.* at ¶ 8.) Exception (d) militates in favor of plaintiffs because Interpal has expressed no interest in preserving its bank account confidentiality.[23] As plaintiffs note, "[I]t is hard to credit Interpal's privacy interest in this instance," because Interpal "post[s] its account information at NatWest on its website and specifically encourages donations to account numbers at NatWest . . . ." (Pls' Motion at 20.) Moreover, Interpal advertises not only its bank account numbers on its web site, but also its intention to direct donations to the Union of Good:

> Any donation that is made to INTERPAL through this web page is distributed with the knowledge and approval of the other members of the Union for Good directly to the charities in Palestine that are implementing the work creation programs.

(Am. Compl at ¶ 318 (citing http://www.interpal.org/web/101.htm).) Accordingly, instead of taking steps to preserve any confidential relationship with NatWest and protect from disclosure its account number and the use to which funds are directed, Interpal has publicized its fund raising activities and connections to and account with NatWest and the so-called charities to which it directs funds.

---

[23] The court notes that there is a certain inconsistency in NatWest's argument that plaintiffs do not have standing as "private attorneys general" to enforce the anti-terrorism laws of the United States, while, in the next breath, NatWest advocates on behalf of the United Kingdom. NatWest claims, "[P]laintiffs have no plausible ground to claim to represent the interests of a foreign sovereign." (Def's Opp. at 19.) However, NatWest then asserts, "[T]he relevant interest for present purposes is not <u>Interpal's</u> privacy interest but rather <u>England's</u> interest as embodied in the <u>Tournier</u> principle of bank customer confidentiality. NatWest is not arguing that the Court should defer to the privacy interest of Interpal, but rather that it should accord "due respect" to the English interest . . . ." (*Id.* at 18) (emphasis in original). Defendant cannot advocate on behalf of one sovereign and simultaneously decry its opponent for doing the same.

Indeed, Interpal has not responded to NatWest's four attempts to contact Interpal and obtain Interpal's consent to respond to plaintiffs' discovery requests. (*See* Def's Opp. at 4-5.) As noted above, in deciding whether to order discovery of bank records located abroad, courts may properly consider a country's failure to assert a national interest in the enforcement of its bank secrecy laws. Similarly, there is no reason that a court may not also consider a bank customer's failure to object to the disclosure of its bank records after notification that those records are sought in a federal civil action. Thus, the court reasonably assumes that if Interpal objected to the production by NatWest of information regarding Interpal's accounts, Interpal would have so stated. Although Interpal's disinterest in protecting its rights to bank secrecy may not constitute a waiver of that right, Interpal's lack of response demonstrates a lack of interest in preserving its right to financial secrecy. (Def's Opp. at 4-5.) Moreover, the United States Department of Treasury's designation of Interpal as a Specially Designated Global Terrorist organization and the Department's decision to freeze Interpal's American accounts, strongly militates against honoring Interpal's unasserted bank privacy interest.

   5.   <u>NatWest will not face substantial hardship by complying with plaintiffs' requests.</u>

In addition to the five factors prescribed in the Restatement, under the analysis suggested in *Minpeco*, courts may also consider the hardship a foreign party might suffer if compelled to respond to a discovery order issued by a federal court in the United States. *See Minpeco*, 116 F.R.D. at 522-523; *In re Grand Jury Subpoena Dated August 9, 2000*, 218 F. Supp. 2d 544, 554 (S.D.N.Y. 2002).

NatWest argues that, because the "English law prohibition on disclosure of bank customer secrecy is valid and enforceable," it would face substantial hardship by complying with

plaintiffs' requests.  (Def's Opp. at 19.)  The fact that the bank would be violating a civil law rather than committing a criminal offense, NatWest continues, "does not render its hardship insubstantial."  (*Id.* at 20 n. 16.)  NatWest also asserts that "the professional and reputational consequences if NatWest were to betray its customer's confidence" would be "equally severe" as the consequences for violating English laws.  (*Id.* at 19-20.)

"[I]n examining the hardship on the party from whom compliance is sought, courts . . . look at the likelihood that enforcement of the foreign law will be successful." *Minpeco*, 116 F.R.D. at 526.  In denying a motion to compel, the *Minpeco* court found that in the event of enforcement proceedings, the successful defense of the Swiss bank, from which discovery was sought, was "highly speculative" because the statutory defenses available to it were inapplicable.  *Id.*  The court also found that because the bank was not a party to the litigation, the hardship likely to be imposed upon it "weigh[ed] more heavily in the balance." *Id.; see also Alfadda*, 149 F.R.D. at 38-39 ("[A]ny potential hardship faced by a primary defendant in litigation may be weighed less heavily by the court.").

By contrast, in *First National*, the court examined the likelihood that the German bank would suffer significant civil penalties, but found both that the chance was "slight and speculative," and that the bank had "a number of valid defenses."  *First National*, 396 F.2d at 905.  The court also noted that the German government had not "expressed any view on this case or indicated that, under the circumstances presented here, enforcement of the subpoena would violate German public policy or embarrass German-American relations."  *Id.* at 904.

Although NatWest has demonstrated that British bank secrecy laws are actually enforced (*See* Hollander Decl. at ¶¶ 7, 12-16), the bank has failed to demonstrate that either

Interpal or the English government would likely seek to sanction the bank for complying with a United States court order compelling disclosure of documents and information regarding Interpal's accounts. Interpal has shown no interest in protecting, much less asserting, its privacy right, based upon its lack of response to NatWest's four letters. (*See* Def's Opp. at 4-5.) Unlike in *Minpeco*, NatWest both is a party to the litigation, and, as in *First National*, has represented that the British government has "no objections to plaintiffs' discovery requests." (Pls' Motion at 7); *see Minpeco*, 116 F.R.D. at 526; *First National*, 396 F.2d at 904; *In re Grand Jury Subpoena*, 218 F. Supp. 2d at 549 (ordering production despite submissions by the foreign state's Ministry of Justice stating that the requested discovery was "strictly confidential" and would violate the state's civil and criminal statutes). Despite NatWest's assertion that the "professional and reputational consequences" would be equally as severe, "if NatWest were to betray its customer's confidence," as the consequences of violating British law, Judge Sifton has noted that the FATF, of which Britain is a member, has warned NatWest and other financial institutions that they could be exposed "to significant operational and legal risk" if they engage in business relationships with "high risk" customers such as charities collecting funds related to terrorist activities. *Weiss*, 453 F. Supp. 2d at 619.

Moreover, courts have determined that less hardship will confront foreign litigants facing civil penalties rather than criminal sanctions. *See First National*, 396 F.2d at 901 (according the possibility of civil sanctions less weight than the possibility of criminal prosecution); *Minpeco*, 116 F.R.D. at 524 ("[C]ourts in this circuit have considered the foreign nation's interest in prohibiting disclosure weaker . . . where the consequence of disclosure is at most civil liability."). Finally, on February 14, 2006, the court entered a confidentiality order in

this case (doc. no. 46), which further lessens NatWest's potential hardship.  *See Ssangyong v. Vida Shoes Int'l, Inc.*, No. 03 Civ. 5014, 2004 WL 1125659, at *13 (S.D.N.Y. May 20, 2004) (finding that the possibility of hardship "will be greatly lessened if [the court] make[s] a strict confidentiality order."); *Trade Dev. Bank v. Continental Ins. Co.*, 469 F.2d 35, 41 n.3 (2d Cir. 1072).

NatWest has not demonstrated any likelihood that it will be pursued civilly if it responds to plaintiffs' discovery requests, particularly where the British interest in preventing terrorist financing through monitoring and reporting is so clearly demonstrated.  If Interpal does seek to sue the bank, NatWest, like the bank in *First National*, will have a valid defense under exception (d) to the *Tournier* doctrine:  "where the disclosure is made by the express or implied consent of the customer."  (Hollander Decl. at ¶ 8.)

5.      NatWest has acted in good faith.

The last factor courts in this Circuit consider in determining whether to order production is "the good faith shown by the party resisting discovery."  *Minpeco*, 116 F.R.D. at 528; *see also Reino De Espana*, 2005 WL 1813017, at *9.  "Generally, courts only consider the good faith of a party resisting discovery in deciding whether to impose sanctions after a production order is violated . . . . The Second Circuit, however, has also considered good faith at the order stage."  *Compagnie Francaise*, 105 F.R.D. at 31 (citing *Trade Development Bank*, 469 F.2d at 40-41).  Bad faith delays and dilatory tactics will weigh against the objecting party. *Societe International*, 357 U.S. at 208.  In this case, NatWest has made at least four efforts to contact Interpal for its consent to comply with plaintiffs' discovery requests.  (*See* Def.'s Opp. at 4-5.)  By sending four letters to Interpal and its counsel, the defendant has made "good faith[,]

diligent efforts" to secure discovery.  *Reino De Espana*, 2005 WL 1813017, at *9.

However, "notwithstanding [a litigant's] good faith, [the court is] not precluded from issuing a production order."  *Id.* at *8 (citing *Compaigne*, 105 F.R.D. at 32).  The court notes that the bank's third and fourth attempts to contact Interpal (letters dated September 14 and 22, 2006) were made following court orders to do so (*see* orders dated September 11 and 20, 2006).  (*See* Pl's Motion at 7; Def.'s Opp. at 4-5); *see also Reino De Espana*, 2005 WL 1813017, at *8.  Therefore, "[w]hile evincing a measure of good faith, the Court is not convinced that [defendant's] efforts, [are] sufficient to tilt the balance in its favor," and against disclosure.  *Reino De Espana*, 2005 WL 1813017, at *8.


D.    Plaintiffs Are Not Entitled To An Order Deeming The Requests For Admissions Admitted.

Pursuant to Rst. § 442(1)(b) and (2)(c), plaintiffs seek an order "deeming plaintiffs' requests for admission admitted" and "the documents authenticated and admitted." (Pls' Motion at 28-29.)[24]  Section 442(1)(b) provides,

> Failure to comply with an order to produce information may subject the person to whom the order is directed to sanctions, including finding of contempt, dismissal of a claim or defense, or default judgment, or may lead to a determination that the facts to which the order was addressed are as asserted by the opposing party.

_____

[24]  Plaintiffs also request the court to order the discovery authenticated and admitted pursuant to Fed. R. Civ. P. 36(a), asserting that Rule 36 "permits this Court to enter a 'deeming sanction' or, alternatively, to issue an order requiring Defendant to answer the discovery requests."  (Pls' Motion at 29, n. 32.)  Although Rule 36 allows a party to "apply for an order compelling disclosure or discovery[,]" it does not mention a "deeming sanction."  Fed. R. Civ. P. 36(a).  Instead, Rule 36(a) provides that a matter is admitted if a party fails to answer or object, or if the court determines that an answer does not comply with the requirements of Rule 36.  *See id.*  Because the record lacks any factual basis to sanction NatWest and because plaintiffs fail to cite any authority for the court to issue a "deeming" sanction, the court declines to do so.

Section 442(2)(c) provides,

> a court or agency may, in appropriate cases, make findings of fact adverse to a party that has failed to comply with the order for production, even if that party has made a good faith effort to secure permission from the foreign authorities to make the information available and that effort has been unsuccessful.

As NatWest correctly notes, these sections apply only in the event that a party has failed to comply with a court order. Accordingly, the court may not order the discovery requests admitted and authenticated, pursuant to Rst. §§ 442(1)(b) and (2)(c). The court, however, orders that NatWest respond to the plaintiffs' Requests for Admissions by May 24, 2007.

Plaintiffs also request that the court order NatWest "to produce all documents sought by Plaintiffs in their First Request for the Production of Documents." (Pls' Motion, Proposed Order, ¶ 6.) Defendant objects on the grounds that it has asserted objections other than English bank secrecy law, and that those objections are not the subject of the pending motion. (Def's Opp. at 28.) However, in performing the analysis as to whether English bank secrecy laws apply and prevent NatWest from complying with plaintiff's discovery requests, the court has already determined that plaintiffs' discovery requests are relevant and narrowly tailored to the issues in this case (*see supra*, part C, 1 and 2). In addition, postponing motion practice regarding NatWest's relevance or other objections to plaintiffs' requests would only serve to prolong the discovery phase in this case. It is well within the court's authority to order the production of documents and maintain control of its docket. *See Landis v. North Am. Co.*, 299 U.S. 248, 254 (1936) (noting that there exists a "power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants."); *Rapture Shipping Ltd. v. Allround Fuel Trading B.V.*, No. 06 Civ. 5296, 2006

WL 2474869, at *3 (S.D.N.Y. Aug. 28, 2006) (dismissing case "as part of [the court's] broad

power to maintain control over its docket."); *LaSala v. Needham & Co., Inc.*, 399 F. Supp. 2d.

421, 427 (S.D.N.Y. 2005).

Although Nat West invoked British Statutory authority in its objections to

plaintiffs' discovery, specifically, United Kingdom anti-money laundering laws, including

Section 333 of the Proceeds of Crime Act 2002 and Section 39 of the Terrorism Act 2000, and

the 8th Data Protection Principle of the U.K. Data Protection Act 1998, Nat West, in its

submissions, inexplicably did not discuss those authorities in support of its position.

Accordingly, the court orders that NatWest respond to plaintiffs' Request for the Production of

Documents and Requests for Admissions and Related Interrogatories no later than <u>May 24, 2007</u>.

To the extent NatWest withholds documents and responses based on the foregoing British

statutory authority, NatWest shall provide a privilege log identifying those documents and

responses and the basis for withholding them, by <u>May 24, 2007</u>.


<u>CONCLUSION</u>

All factors enumerated in Rst. § 442(1)(c), *Aerospatiale* and *Minpeco* weigh in

favor of plaintiffs. Most importantly, the mutual interests of the United States and the United

Kingdom in thwarting terrorist financing outweighs the British interest in preserving bank

customer secrecy – especially where Britain has not expressed an interest in bank secrecy and

has acted upon its own interest in international cooperation to detect, monitor and report

customer links to terrorist organizations, and freeze funds used for terrorist financing. Notably,

the United Kingdom has shown a specific interest in Interpal, having investigated its connections

-49-

to HAMAS and frozen its accounts once before. In addition, the requested discovery originated outside of the United States, is crucial to this litigation and is specifically tailored to the issues in this case. Plaintiffs do not have viable alternative means of securing the discovery, as the Hague Convention can be costly and time-consuming, and only NatWest or Interpal have access to the requested records. Moreover, although NatWest has made good faith efforts to provide the requested discovery, NatWest will not face substantial hardship by complying with plaintiffs' discovery requests. Finally, although plaintiffs are not entitled to an order deeming the Requests for Admissions admitted, as NatWest has not violated a court order, the plaintiffs are entitled to NatWest's responses to its Requests for Admissions and other discovery demands.

Accordingly, by <u>May 24, 2007</u>, NatWest shall produce all documents responsive to plaintiffs' Document Requests and respond to plaintiffs' Requests for Admissions and Related Interrogatories. To the extent NatWest withholds documents and responses based on the British statutory authority cited in its discovery responses but not discussed in its response to plaintiffs' motion, NatWest shall provide a privilege log identifying those documents and responses and the basis for withholding them, by <u>May 24, 2007</u>. NatWest shall also identify in the privilege log those documents and responses withheld from production on the basis of asserted attorney-client and/or attorney work-product privileges.

### DEFENDANT'S MOTION TO COMPEL

On July 5, 2006, NatWest served plaintiffs with its First Set of Interrogatories and Initial Request for the Production of Documents. (*See* Declaration of Lawrence B. Freidman, dated 10/18/06 ("Friedman Decl."), Exh. B.) Plaintiffs responded to both on August 14, 2006

(*see id.*, Exhs. A and C), and asserted two principal objections: that the requests seek attorney work product and Interrogatory Number 4 is a "premature contention interrogatory." (*Id.*, Exh. A.) Pursuant to Fed. R. Civ. P. 37(a), NatWest seeks an order overruling plaintiffs' objections and compelling plaintiffs to provide answers to NatWest's Interrogatories and produce documents in response to NatWest's Document Requests.

At issue are Interrogatories Numbers 1 and 3-5, and Document Requests numbers 1, 4 and 7-19. NatWest's disputed interrogatories and responses are as follows:

- Interrogatory No. 1: Identify the persons and entities that supplied, directly or indirectly, or otherwise participated, directly or indirectly, in obtaining on behalf of Plaintiffs the documents called for by Request Numbers 1, 4 and 7-18 in NatWest's Initial Request for the Production of Documents, dated July 5, 2006.

- Response to No. 1: Plaintiffs object to this Interrogatory as being overbroad, burdensome, irrelevant to the claim or defense of any party and not reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs specifically object to the terms "directly" and "indirectly" in this interrogatory as being vague. Plaintiffs further object to this Interrogatory on the grounds that it seeks investigatory materials protected by the attorney work product doctrine. The methods and sources by which Plaintiffs' attorneys have and/or may choose to prepare their case are protected from disclosure and do not constitute factual information to which NatWest is entitled.

- Interrogatory No. 3: Identify all expert witnesses on whom Plaintiff intends to rely at trial.

- Response to No. 3: Plaintiffs object to this Interrogatory as being vague, overbroad, burdensome, and premature at this time as discovery has recently commenced and Plaintiffs are not in a position to determine which expert witnesses will be called to testify at trial. Plaintiffs further object to this request to the extent it seeks investigatory materials protected by the attorney work product doctrine. Plaintiffs will disclose expert witnesses in accordance with Fed. R. Civ. P. 26(a)(2)(c).

- Interrogatory No. 4: Explain in detail the factual bases for Plaintiffs' allegations concerning (i) the identity of persons and/or entities that perpetrated the attacks that caused Plaintiffs' injuries, (ii) how and in what forms and by what means such persons and/or entities received material support and/or resources from NatWest; and (iii) how and by what means such material support and/or resources proximately caused Plaintiffs' injuries.

- Response to No. 4: Plaintiffs object to Interrogatory No. 4 as unduly vague and overbroad and on the basis of General Objection A as a premature contention interrogatory.[25] Plaintiffs also object to this Interrogatory to the extent it calls for a legal conclusion. Plaintiffs further object to this Interrogatory to the extent it seeks investigatory materials protected by the attorney work product doctrine.

- Interrogatory No. 5: Identify all persons who assisted in preparing responses to these Interrogatories and all documents considered, read, referred to, discussed or reviewed in preparing responses to these Interrogatories.

- Response to No. 5: Plaintiffs object to this Interrogatory as being vague, overbroad, burdensome, harassing, irrelevant to the claim or defense of any party, and not reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs further object to this Interrogatory to the extent it seeks investigatory materials protected

---

[25] Plaintiffs' General Objection A provides,

Plaintiffs object to responding to Defendant's Interrogatories as being premature to the extent they are contention interrogatories. While such interrogatories are generally permitted, the obligation to respond should be postponed until the end of the discovery period, absent a showing by the requesting party of a particular need. *See generally In re Convergent Technologies Security Litig.*, 108 F.R.D. 328, 338 (N.D. Cal. 1985); *see also Manual for Complex Litig.*, 3rd, § 21.33 at p. 62 (2000) (Contention interrogatories may serve a useful purpose in narrowing issues for trial "especially when served after adequate opportunity for relevant discovery.") Plaintiffs have not completed any discovery with NatWest. Therefore, Plaintiffs will not be in a position to offer full and useful answers to contention interrogatories until Defendant produces responsive documents to Plaintiffs' requests. Responding to contention interrogatories at this stage of the litigation poses an undue burden on Plaintiffs, who will be forced to answer the Interrogatories a second time after the production of discovery is complete. Defendant will not be prejudiced by the delay because it has full access to information about its own behavior.

by the attorney work product doctrine.

(*Id.*, Exh. B.)

Plaintiffs objected to all of defendant's interrogatories on the ground that the interrogatories are overbroad and seek material protected by the attorney work product doctrine. Plaintiffs contend that Interrogatory No. 1 "seeks investigatory materials protected by the attorney work product doctrine. The methods and sources by which Plaintiffs' attorneys have and/or may choose to prepare their case are protected from disclosure and do not constitute factual information to which NatWest is entitled." (*Id.*, Exh. A.) In response to Interrogatory No. 3, plaintiffs assert that it "seeks investigatory materials protected by the attorney work product doctrine[,]" but that they "will disclose expert witnesses in accordance with Fed. R. Civ. P. 26(a)(2)(C)." (*Id.*) In response to Interrogatory No. 4, plaintiffs object both on the ground that it seeks attorney work product and that it is a "premature contention interrogatory." (*Id.*) In response to Interrogatory No. 5, plaintiffs again object that it seeks attorney work product. (*See id.*)

NatWest's Document Requests seek:

- No. 1: All documents upon which Plaintiffs rely in support of their allegations in the Complaint . . . .

- No. 4: All documents concerning the acts that caused Plaintiffs' injuries . . . .

- No. 7: All documents concerning NatWest.

- No. 8: All documents concerning Interpal.

- No. 9: All documents concerning any relationship between NatWest and Interpal.

- No. 10: All documents concerning the Union of Good.

- No. 11:  All documents concerning any relationship between NatWest and the Union of Good.

- No. 12:  All documents concerning NatWest's alleged relationship to the acts that caused Plaintiffs' injuries . . . .

- No. 13:  All documents concerning NatWest's alleged knowledge of Interpal's alleged role in the acts that caused Plaintiffs' injuries.

- No. 14:  All documents concerning NatWest's alleged knowledge of the Union of Good's alleged role in the acts that caused Plaintiffs' injuries.

- No. 15:  All documents concerning the alleged relationship between Interpal and the Union of Good.

- No. 16:  All documents concerning the alleged relationship between Interpal and HAMAS.

- No. 17:  All documents concerning the alleged relationship between the Union of Good and HAMAS.

- No. 18:  All documents obtained by or on behalf of Plaintiffs concerning the allegations in the Complaint from any governmental authority.

- No. 19:  All documents referred to or relied upon in Plaintiffs' Initial Disclosures, dated June 16, 2006.

(*Id.*, Exh. C.)

In response to the above document requests, plaintiffs agreed to produce "non-objectionable, non-privileged documents responsive to" the Requests, but also objected to the above Requests on the ground, *inter alia*, that they "seek documents protected by the attorney work-product doctrine."  (*Id.* at 4.)  Plaintiffs explained:

Documents concerning the methods by which Plaintiffs' attorneys have prepared, and/or may have choose [sic] to prepare, their case are protected from disclosure and will not be produced in response to this Request.  Plaintiffs need only provide Defendant with relevant facts,

not information surrounding any interviews conducted, for such
information has the potential for insights into Plaintiffs' attorney work
product concerning the preparation of their case.

(*Id.*)  Plaintiffs did not provide a privilege log with their responses to defendant's interrogatories

and document requests, as required by Fed. R. Civ. P. 26(b)(5) and Local Civil Rule 26.2.

NatWest now seeks an order compelling plaintiffs' response to its Document

Requests, and Requests for Admissions and Related Interrogatories.

The Work Product Doctrine

The attorney work product doctrine protects from discovery "documents and

tangible things . . . prepared in anticipation of litigation or for trial by or for another party or by

or for that other party's representative . . . ."  Fed. R Civ. P. 26(b)(3).  The rationale was

established in order "to preserve a zone of privacy in which a lawyer can prepare and develop

legal theories and strategy 'with an eye towards litigation,' free from unnecessary intrusion by

his adversaries."  *United States v. Aldman*, 134 F.3d 1194, 1996 (2d Cir. 1998) (quoting

*Hickman v. Taylor*, 329 U.S. 495, 510-511 (1947)).  "Three conditions must be fulfilled in order

for work product protection to apply. 'The material must (1) be a document or a tangible thing,

(2) that was prepared in anticipation of litigation, and (3) was prepared by or for a party, or by

his representative.'"  *In re Veeco Instruments, Inc. Securities Litig.*, No. 05-MD-01695, 2007 WL

724555, *4 (S.D.N.Y. Mar. 9, 2007) (quoting *A.I.A. Holdings, S.A. v. Lehman Bros., Inc.*, No. 97

Civ. 4978, 2002 WL 31556382, at *4 (S.D.N.Y. Nov. 15, 2002)) (further citations omitted).

"The party asserting work product protection 'bears the burden of establishing its applicability to

the case at hand.'"  *Veeco*, 2007 WL 724555 at *4 (quoting *In re Grand Jury Subpoenas Dated

March 19, 2002 and August 2, 2002*, 318 F.3d 379, 384 (2d Cir. 2003)).

The work product doctrine, however, is not absolute. Even where the applicability of the work product doctrine has been established, factual material may be ordered "upon a 'showing that the party seeking discovery has substantial need of the materials . . . and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means' . . . ." *In re Grand Jury Subpoenas*, 318 F.3d at 383 (quoting Fed. R. Civ. P. 26(b)(3)). The rule that otherwise protected factual material may be discoverable "distinguishes between matters revealing the thought processes of a party's representative and factual information obtained in anticipation of litigation. Substantial protection is afforded the first category. Limited protection is afforded the second." *In re Savitt/Adler Litig.*, 176 F.R.D. 44, 46 (N.D.N.Y. 1997).

Work product protection typically applies only to "documents and tangible things," and not to facts within the documents. *In re Savitt*, 176 F.R.D. at 47-48; *ECDC Envtl., L.C. v. New York Marine and Gen. Ins. Co.*, No. 96 CIV. 6033, 1998 WL 614478, at *16 (S.D.N.Y. June 4, 1998) ("[B]ecause the work product privilege does not protect facts in that document (the privilege protects documents, not facts), the party seeking those facts may obtain them through [means other than document requests], such as through depositions and interrogatories.").

Interrogatories which seek to discover facts regarding an attorney's mental thought process seek improper work product information. "Although the work product doctrine is most commonly applied to documents and things, unjustified disclosure of the opinions or mental processes of counsel may occur when questions are posed which seek information at depositions or in interrogatories." *United States v. Dist. Council of New York City and Vicinity*

*of the United Brotherhood of Carpenters and Joiners of Am.*, No. 90 Civ. 5722, 1992 WL

208284, at *7 (S.D.N.Y. Aug. 18, 1992).  In *United Brotherhood*, the court found,

> How a party, its counsel and agents choose to prepare their case, the
> efforts they undertake, and the people they interview is not factual
> information to which an adversary is entitled.  Disclosure of this
> information would inevitably teach defendants which individuals the
> [plaintiff] considered more or less valuable witnesses and how it was
> preparing for trial.

*Id*. at *10.  Similarly, in *Commonwealth of Massachusetts v. First National Supermarkets, Inc.*,

112 F.R.D. 149 (D. Mass. 1986), the court distinguished between interrogatories seeking

discoverable facts and those seeking attorney work product, finding a "distinction between

asking the identity of persons with knowledge, which is clearly permissible, and asking the

identity of persons contacted and/or interviewed during an investigation, which is not."  *First

National*, 112 F.R.D. at 152.  Likewise, in *Morgan v. City of New York*, No. 00 Civ. 9172, 2002

WL 1808233, at *3 (S.D.N.Y. Aug. 6, 2002), the court directed plaintiff to answer an

interrogatory requesting the identity of "every person whom Plaintiff believes has knowledge of

any facts concerning Plaintiff's claims in this litigation[,]" but not an interrogatory requiring

plaintiff to "[i]dentify every person whom Plaintiff or her agents have contacted, interviewed or

communicated with concerning Plaintiff's allegations in this case."  *See also Seven Hanover

Assocs., LLC v. Jones Lang LaSalle Americas, Inc.*, No. O4 Civ. 4143, 2005 WL 3358597, at *1

(S.D.N.Y. Dec. 7, 2005) ("Defendant is free to ask for the names of persons with knowledge of

the facts, but it is not entitled, through plaintiffs, to the identification of who among such

knowledgeable individuals may have been interviewed by plaintiffs' attorney."); *Donson Stores,

Inc. v. American Bakeries Co.*, 72 Civ. 3991, 1973 WL 791, at *3 (S.D.N.Y. Apr. 2, 1973)

(striking the clause "including your counsel" from the interrogatory requesting, "State whether

you, including your counsel, made any investigation regarding any possible violations of any company policy . . . ."). The court applies the foregoing to the disputed discovery demands.

<u>Interrogatories Nos. 1 and 5.</u>

In this case, Interrogatory No. 1 requests that plaintiffs "identify the persons or entities that supplied . . . or otherwise participated . . . in obtaining on behalf of Plaintiffs the documents called for" by NatWest's Document Requests Nos. 1, 4 and 7-18. Interrogatory No. 1 does not seek documents or tangible material or information that would intrude upon the attorney work product doctrine. Rather, Interrogatory No. 1 seeks the sources of documents requested in defendant's Document Requests Nos. 1, 4 and 7-18. The parties were obligated, in their mandatory initial disclosures, to provide copies or a description by category and location of all documents in a party's possession, custody or control as mandated by Fed. R. Civ. P. 26(a)(1). Defendant's request, that plaintiffs disclose the sources of documents that they may use to support their claims, does not seek thought processes, opinions or mental processes of plaintiffs' counsel. Plaintiffs' response to Interrogatory No. 1 must provide the defendant with information that will allow defendant the opportunity to seek documents from the same sources from which plaintiffs obtained documents, irrespective of whether plaintiffs also produce copies of documents they obtained from these sources. Accordingly, plaintiffs shall respond to Interrogatory No. 1 because disclosure of the information sought will not "teach defendants which individuals the [plaintiffs] considered more or less valuable witnesses and how [they are] preparing for trial." *United Brotherhood*, 1992 WL 208284 at *10.

Interrogatory No. 5 requests that plaintiffs "identify all persons who assisted in preparing responses to these Interrogatories and all documents considered . . . ." The cases

relied upon by NatWest in support of its motion to compel responses to Interrogatory No. 5 are

inapposite. For example, in *In re Savitt/Adler*, the court did not rule that interrogatory responses

are never entitled to work product protection, but rather, that the interrogatories at issue did not

seek work product because they sought facts that supported plaintiffs' allegations and those facts

were not prepared by a party or a party's representative. *See Savitt*, 176 F.R.D. at 48.

As in *First National*, defendant does not seek simply "identities of persons with

knowledge" of the facts regarding plaintiffs' claims, a request to which th ecourt would have

ordered a response. Rather, defendant seeks the identities of those who actually participated in

plaintiffs' case preparation, including the preparation of responses to the Interrogatories,

including Interrogatory No. 5. *First National*, 112 F.R.D. at 152. Thus, as the court determined

in *Morgan*, requiring plaintiffs to reveal the identities of individuals who assisted them with their

interrogatory responses could easily reveal "every person whom Plaintiff[s or their] agents have

contacted, interviewed or communicated with concerning Plaintiff[s'] allegations in this case,"

or even which persons plaintiffs believe to have the most relevant information. *Morgan*, 2002

WL 1808233 at *3. Accordingly, NatWest's motion to compel a response to Interrogatory No. 5

is denied because it seeks information regarding individuals who assisted plaintiffs' counsel with

the preparation of their interrogatory responses, which is protected work product. *See Seven*

*Hanover*, 2005 WL 3358597 at *1; *Morgan*, 2002 WL 1808233 at *3; *Donson Stores*, 1973 WL

at *3. Plaintiffs should, however, identify and produce the non-privileged documents upon

which they relied in preparing their interrogatory responses. If plaintiffs claim work product

protection for any of the documents, they must sustain their burden of establishing that the

documents were prepared by counsel or reveal their counsels' mental impressions, opinions, conclusions or legal theories.

The court grants defendant's motion to compel plaintiffs to respond further to NatWest's Interrogatory Nos. 1 and 5 to the extent plaintiffs must identify the sources of documents called for in defendant's document requests and the documents upon which plaintiffs relied in preparing their responses to the interrogatories, and produce responsive, non-privileged documents. The court denies defendant's motion to compel a response to Interrogatory No. 5 to the extent it seeks the identities of individuals upon whom plaintiffs relied to assist in the preparation of their interrogatory responses.

Interrogatory No. 3.

Defendant's Interrogatory No. 3 requests that plaintiffs "[i]dentify all expert witnesses on whom Plaintiff intends to rely at trial." (Friedman Decl., Exh. B.) Plaintiffs responded:

> Plaintiffs object to this Interrogatory as being vague, overbroad, burdensome, and premature at this time as discovery has recently commenced and Plaintiffs are not in a position to determine which expert witnesses will be called to testify at trial. Plaintiffs further object to this request to the extent it seeks investigatory materials protected by the attorney work product doctrine. Plaintiffs will disclose expert witnesses in accordance with Fed. R. Civ. P. 26(a)(2)(C).

Rule 26(a)(2)(C) of the Federal Rules of Civil Procedure provides that expert disclosures "shall be made at the times and in the sequence directed by the court. In the absence of other directions from the court . . . , the disclosures shall be made at least 90 days before the trial date."

First, as discussed, *supra*, work product protection does not extend to facts within a document or to identities of people with relevant knowledge. *See ECDC Envtl.*, 1998 WL 614478 at *16 ("[T]he privilege protects documents, not facts. . . ."); *First National*, 112 F.R.D. at 152. The work product doctrine also does not protect identities of expert witnesses on whom plaintiffs intend to rely at trial. *See Morgan*, 2002 WL 1808233 at *3 (directing plaintiff to answer an interrogatory requesting the identity of "every person whom Plaintiff believes has knowledge of any facts concerning Plaintiff's claims in this litigation."); *Seven Hanover*, 2005 WL 3358597 at *1. Nor are the experts' opinions, or the bases and reasons therefor, nor the data and information considered by the expert witnesses protected by the work product doctrine. Fed. R. Civ. P. 26(a)(2)(B).

Notwithstanding the foregoing, however, plaintiffs are not obligated at this time to disclose the identities of experts pursuant to Fed. R. Civ. P. 26(a)(2)(C) because the court has not set a date by which expert reports, disclosures and discovery must be provided. *See Sheehan v. Metropolitan Life Ins. Co.*, No. 01 Civ. 9182, 2003 WL 22290230, at *4 (S.D.N.Y. Oct. 6, 2003) (Because "[n]o trial date has yet been set, nor has the Court directed a time frame for submission of expert disclosures," the parties were not precluded from submitting expert reports within the time allowed by Fed. R. Civ. P. 26(a)(2)(C)); *cf. Millenium Expressions, Inc. v. Chauss Marketing, Ltd.*, No. 02 Civ. 7545, 2006 WL 288353, at *2 (S.D.N.Y. Feb. 6, 2006) (denying introduction of plaintiff's expert report even though it was served within the 90 day period provided by Rule 26(a)(2)(C), because plaintiff failed to comply with the court's discovery deadline); *Brenton v. Consol. Rail Corp.*, No. 00 CV 0742E, 2006 WL 1888598, at *2 (W.D.N.Y. July 7, 2006) (finding Rule 26(a)(2)(C) inapplicable because the court had set a

discovery deadline).  Accordingly, in the absence of a further court order, plaintiffs shall identify the experts on whom they intend to rely at trial, at least 90 days before the trial date.

Interrogatory No. 4.

NatWest's Interrogatory No. 4 asks plaintiffs to "explain in detail the factual basis" for their allegations regarding "(i) the identity of persons and/or entities that perpetrated the attacks that caused Plaintiffs' injuries, (ii) how and in what forms and by what means such persons and/or entities received material support and/or resources from NatWest; and (iii) how and by what means such material support and/or resources proximately caused Plaintiffs' injuries."  Plaintiffs assert that Interrogatory No. 4 is a "contention interrogatory," which would require plaintiffs "to identify evidence that they may use to prove two essential elements of their claim – i.e., that NatWest provided 'material support' to known terrorist organizations and that its conduct was a 'proximate cause'" of plaintiffs' injuries.  (Pls' Opp. at 9-10.)

Contention interrogatories involve "an opinion or contention that relates to fact or the application of law to fact."  Fed. R. Civ. P. 33(c).  Such interrogatories "may ask another party to indicate what it contends, to state all the facts on which it bases its contentions, to state all the evidence on which it bases its contentions, or to explain how the law applies to the facts." *McCarthy v. Paine Webber Group, Inc.*, 168 F.R.D. 448, 450 (D. Conn. 1996).  These interrogatories are distinct from those that "request identification of witnesses or documents that bear on the allegations."  *Id.*.  "[I]interrogatories seeking the identity of witnesses and interrogatories seeking the location of documents or other tangible evidence may be sought while discovery is still in its infancy."  *Fischer & Porter Co. v. Tolson*, 143 F.R.D. 93, 96 (E.D.Pa. 1992).

Pursuant to Fed. R. Civ. P. 33(c), a court may postpone a response to contention interrogatories until discovery is closer to completion:

> An interrogatory otherwise proper is not necessarily objectionable merely because an answer to the interrogatory involves an opinion or contention that relates to fact or the application of law to fact, but the court may order that such an interrogatory need not be answered until after designated discovery has been completed or until a pre-trial conference or other later time.

Fed. R. Civ. P. 33(c). Rule 33(c) "protects the responding party from being hemmed into fixing [its] position without adequate information." *Roth v. Commonwealth*, No. CIV-79-36E, 1988 WL 43963, at *4 (W.D.N.Y. May 4, 1988).

Some courts in this district have found contention interrogatories premature where no "significant discovery has taken place." *County of Suffolk v. Lilco*, No. 87 CV 0646, 1988 WL 69759, at *1 (E.D.N.Y. June 13, 1988). As Judge Lindsay recently noted, "[N]othing in Rule 33 of the Federal Rules of Civil Procedure or the Local Rules for the Eastern District of New York prohibits a party from interposing contention interrogatories at an early stage of discovery, although there is considerable support for doing so." *Protex Int'l Corp. v. Vanguard Products Group, Inc.*, No. CV 05-5355, 2006 WL 3827423, at *2 (E.D.N.Y. Dec. 27, 2006). She held, "The burden imposed on Protex in responding to these requests outweighs the likelihood that useful information will be produced when Protex has not had discovery of [defendant's] documents." *Id.*; *see also Shannon v. New York Transit Auth.*, No. 00 CIV. 5079, 2001 WL 286727, at *3 (S.D.N.Y. Mar. 22, 2001) (finding that because only document discovery had occurred, the contention interrogatories were premature); *Roth*, 1988 WL 43963 at *5 (finding that half of defendants' interrogatories were "contention interrogatories and need not be answered until the substantial completion of pretrial discovery."); *McCarthy*, 168 F.R.D. at

450 (denying defendant's motion to compel answers to interrogatories because "substantial discovery . . . remains to be completed" and "defendant has not shown why any relevance of the information . . . outweighs the burden its collection would impose on plaintiffs at this time while discovery is ongoing"); *Fischer*, 143 F.R.D. at 96 (denying defendants' motion to compel responses to contention interrogatories because "substantial discovery remains to be conducted . . .").

NatWest argues that because this District has not adopted the Southern District of New York's Local Rule 33.3, it more readily allows contention interrogatories early in the proceedings. S.D.N.Y. Local Civil Rule 33.3 specifically prohibits interrogatories other than those seeking the identity of witnesses or location of documents until 30 days prior to the end of discovery, or "(1) if they are a more practical method of obtaining the information sought than a request for production or a deposition, or (2) if ordered by the court." S.D.N.Y. Local Civil Rule 33.3.

Absent a similar rule in the Eastern District of New York, the court, in its discretion, may order responses to contention interrogatories, even in the early stages of discovery, where responses would assist in clarifying plaintiffs' allegations and identifying witnesses without imposing undue burdens on the responding party. In *Convergent Bus. Systems, Inc. v. Diamond Reporting, Inc.*, No. CV-88-2329, 1989 WL 92038, at *1 (E.D.N.Y. Aug. 3, 1989), the court found "nothing improper *per se*" about interrogatories which "track the allegations of defendants' antitrust claims and seek all documents in support of the various allegations." The court further noted:

> Defendants' . . . assertion that contention interrogatories are
> inappropriate where the complaint is detailed is . . . unavailing.

> Information in a complaint is not a substitute for answers to
> interrogatories which unlike the allegations of a complaint can be used
> as affirmative evidence at trial and for impeachment and cross-
> examination purposes.

*Id.* However, although the court did not specifically address the status of discovery, discovery

was well-underway when plaintiffs moved to compel: defendants had produced "a mass of

documents" and the parties had conducted several depositions. *See id.* Moreover, defendants

failed to "prove how and why providing the answers would be oppressive." *Id.* at *2.

In this case, subpart (i) of NatWest's Interrogatory No. 4 is not a contention

interrogatory because it simply requests discoverable factual information: the identity "of

persons and/or entities that perpetrated the attacks that caused Plaintiffs' injuries . . . ." (*Id.*)  *See*

*McCarthy*, 168 F.R.D. at 450 (distinguishing contention interrogatories from those that request

the identities of people with knowledge).  Subparts (ii) and (iii) of NatWest's Interrogatory No. 4

arguably are contention interrogatories to the extent that they request plaintiffs to state their

contentions as to the application of law to fact.  *See* Fed. R. Civ. P. 33(c).  Subpart (ii) requests

"how and in what forms and by what means such persons and/or entities [identified in subpart

(i)] received material support and/or resources from NatWest," and subpart (iii) seeks "how and

by what means such material support and/or resources proximately caused Plaintiffs' injuries."

(Freidman Decl., Exh. A.)  *See McCarthy*, 168 F.R.D. at 450 (finding that the "proposed

interrogatories . . . seek to elicit the contentions and allegations of plaintiffs"); *Roth*, 1988 WL

43963 at *4-5 (noting that contention interrogatories are "those that ask the adverse party to state

all the *facts* or all the *evidence* upon which he *bases* some specific contention . . . .") (emphasis

in original).

Because this district has not adopted Southern District Local Rule 33.3, the court declines to impose a blanket rule that contention interrogatories are inappropriate until the parties have completed, or are close to completing, discovery. *See Convergent Bus. Systems*, 1989 WL 92038 at *1. Requiring plaintiffs in this case to answer subparts (ii) and (iii) at this early stage in discovery would not be futile because plaintiffs presumably have sufficient facts to support the allegations in their complaint and are under an ongoing obligation to supplement their discovery responses. *See* Fed. R. Civ. P. 26(e). Although NatWest has not produced any documents to plaintiffs, only one deposition has occurred and responses to the documents and interrogatories about which the parties object will be provided following entry of this order, the plaintiffs are ordered to disclose the facts and documents that support their allegations. Therefore, unlike in *Protex*, it is not premature to require plaintiffs to answer subparts (ii) and (iii). By <u>May 24, 2007</u>, plaintiffs shall respond to Interrogatory No. 4.

<u>NatWest's Document Requests.</u>

In order for a document to qualify as work product, it must have been "prepared in anticipation of litigation, [and] . . . by or for a party, or his representative." *Veeco*, 2007 WL 724555 at *4. The "mere incantation" of work product protection is insufficient to establish the privilege. *Omega Eng'g, Inc. v. Omega, S.A.*, 98 Civ. 2462, 2001 WL 173765, at *3 (D. Conn. Feb. 6, 2001). Instead, "[t]he burden is on the party resisting discovery to explain its objections and to provide support therefore." *Shannon*, 2001 WL 286727 at *1. The burden cannot be "discharged by mere conclusory or ipse dixit assertions." *von Bulow v. von Bulow*, 811 F.2d 136, 146 (2d Cir. 1987).

The party asserting the privilege must not only sufficiently assert the basis for the privilege, but must also timely produce a privilege log.  Fed. R. Civ. P. 26(b)(5) provides,

> When a party withholds information otherwise discoverable under these rules by claiming that it is privileged or subject to protection as trial preparation material, the party shall make the claim expressly and shall describe the nature of the documents, communications, or things not produced or disclosed in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the applicability of the privilege or protection.

Similarly, Local Rule 26.2 directs that parties asserting privilege shall disclose the type of document, general subject matter of the document, date, and any other information "sufficient to identify the document for a subpoena duces tecum, including . . . the author of the document, the addressees of the document . . . and the relationship of the author, addressees, and recipients to each other."  Local Civil Rule 26.2.

Failing to include sufficiently descriptive information may result in waiver of the privilege.  *See OneBeacon Ins. Co. v. Forman Intern., Ltd.*, No. 04 Civ. 2271, 2006 WL 3771010, *6  (S.D.N.Y. Dec. 15, 2006) ("Courts in this Circuit have refused to uphold a claim of privilege where privilege log entries fail to provide adequate information to support the claim."); *United States v. Constr. Prods. Research, Inc.*, 73 F.3d 464, 473 (2d Cir. 1996); *Chase Manhattan Bank, N.A. v. Turner & Newall, PLC*, 964 F.2d 159, at 166 (2d Cir. 1992) ("[T]he failure to comply with [Rule 26] may result in a finding that the privilege has been waived."); *Grossman v. Schwarz*, 125 F.R.D. 376, 386-87 (S.D.N.Y. 1989) ("failure to comply with the explicit requirements of [Rule 26] will be considered presumptive evidence that the claim of privilege is without factual or legal foundation");  *NextG Networks of NY, Inc. v. City of New*

*York*, No. 03 Civ. 9672, 2005 WL 857433, at *2 (S.D.N.Y. Apr. 13, 2005); *Bowne of New York City, Inc. v. Ambrase Corp.*, 150 F.R.D. 465, 474-75 (S.D.N.Y. 1993).

Failing to timely provide a privilege log may also result in waiver. *See Smith v. Franklin Hosp. Medical Center No.*, 04-CV-3555, 2005 WL 2219294, at *2 (E.D.N.Y. Sept. 25, 2005) (quoting *FG Hemisphere Associates, L.L.C. v. Republique Du Congo*, No. 01 Civ. 8700, 2005 WL 545218, at *6 (S.D.N.Y. Mar. 8, 2005) ("As other judges in this District and I have repeatedly held, the unjustified failure to list privileged documents on the required log of withheld documents in a timely and proper manner operates as a waiver of any applicable privilege") (citations omitted)); *Lugosch v. Congel*, No. Civ. 1:00-CV-0784, 2006 WL 931687, at *15 (N.D.N.Y. Mar. 7, 2006) ("Failure to timely provide the privilege log or objection constitutes a waiver of any of the asserted privileges."); *Kitevski v. City of New York*, No. 04 Civ. 7402, 2006 WL 680527, at *4 (S.D.N.Y. Mar. 16, 2006) ("The City has failed to provide a privilege log, and has failed to present any justification for that failure. It has, therefore, waived any privilege with respect to the . . . records by failing to properly identify the documents, and assert the privilege."); *Smith v. Conway Org., Inc.*, 154 F.R.D. 73, 76 (S.D.N.Y. 1994).

In this case, plaintiffs have generally asserted work product prrotection. Not only have plaintiffs failed to provide a privilege log, plaintiffs also have failed to demonstrate either that the documents NatWest seeks were prepared "in anticipation of litigation," or that they were prepared by a party's representative. Fed. R. Civ. P. 26(b)(3); *see also Weber v. Paduano*, No. 02 Civ. 3392, 2003 WL 161340, at *6 (S.D.N.Y. Jan. 22, 2003) (finding that "defendants have not proffered sufficient evidence to demonstrate that the documents in the privilege logs are

work product."); *In re Savitt*, 176 F.R.D. at 48 (finding that plaintiffs failed to demonstrate that the documents sought privileged information and were prepared in anticipation of litigation).

Further, plaintiffs have failed to explain how any of the documents qualify for work product protection – for example, that certain documents consist of notes taken by an attorney in anticipation of litigation, or are memoranda discussing plaintiffs' legal theories.  *See Aldman*, 134 F.3d at 1202 (holding that documents must be prepared "because of the prospect of litigation" in order to qualify as work product).  The absence of such a showing precludes the court from affording work product protection to the documents.  *See Securities & Exch. Comm'n. v. Thrasher*, No. 92 Civ. 6987, 1995 WL 46681, at *3 (S.D.N.Y. Feb. 7, 1995) (refusing to grant work product protection to notes taken by the SEC because the Commission failed to "offer testimony with regard to the interview notes, much less establish the precise purpose of the notes, whether a decision had been made to litigate at the time they were created . . . and whether the notes were treated with the requisite confidentiality.").

Moreover, defendant asserts, and plaintiffs do not dispute, that most of the requested documents were prepared by third parties and not plaintiffs or their representatives. NatWest states, "[P]laintiffs' counsel has referred to certain 'investigative reports' prepared by the Israeli government and its agencies, and subsequently obtained by plaintiffs, as a source for certain of their allegations against NatWest.  Plaintiffs have not produced any of these materials to date in this litigation."  (Def's Motion at 10.)  It is well-settled that parties "cannot avoid disclosure based upon the simple fact that counsel obtained certain documents from third parties. The information in question does not fall within the protection of the work-product doctrine."  *In re Automotive Refinishing Paint Antitrust Litig.*, No. MDL 1426, 2006 WL 1479819, at *7

(E.D.Pa. May 26, 2006); *see also Compaigne Francaise*, 105 F.R.D. at 41 ("Documents prepared by third parties contemporaneous with the events to which the documents relate cannot fairly be deemed to have been prepared in anticipation of litigation."); *In re Grand Jury Subpoenas Dated March 19 and August 2, 2002*, No. M-11-189, 2002 WL 31040322, at *4 (S.D.N.Y. Sept. 12, 2002) (denying work product protection to bank records because "[t]hey are the pre-existing records of third parties, created and maintained by those third parties without any reference to litigation whatsoever."); *Aldman*, 134 F.3d at 1202 (holding that work product does not protect "documents that are prepared in the ordinary course of business or that would have been created in essentially similar form irrespective of the litigation.").

NatWest's Substantial Need for the Requested Documents.

"Even where the applicability of the work product doctrine had been established, factual material may be ordered produced 'upon a showing of substantial need and inability to obtain the equivalent without undue hardship.'" *In re Omeprazole Patent Litig.*, 2005 WL 818821 at *9 (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 400 (1981)). "A substantial need for work product materials exists where the information sought is 'essential' to the party's defense, is 'crucial' to the determination of whether the defendant could be held liable for the acts alleged, or carries great probative value on contested issues." *Nat'l Congress for Puerto Rican Rights v. City of New York*, 194 F.R.D. 105, 110 (S.D.N.Y. 2000). Undue hardship

> does not mean that the movants must prove that obtaining the
> information elsewhere is absolutely impossible or that they must prove
> the required element beyond a reasonable doubt. All that is needed is a
> showing that it is likely to be significantly more difficult,
> time-consuming or expensive to obtain the information from another
> source than from the factual work product of the objecting party.

*Thrasher*, 1995 WL 46681 at *9.

In *Thrasher*, the court found that defendants, alleged to have committed insider trading, adequately overcame the SEC's work product objections. *See id.* The SEC asserted work product protection for notes taken during interviews with the only people who witnessed and participated in the insider trading at issue. Since the time of those interviews, one witness died and the others invoked their Fifth Amendment right not to testify. *See id.* at *8. Therefore, defendants could not discover the same information through other less-invasive means, such as through depositions or interrogatories. *See id.* Accordingly, the court found that the defendants "met their burden" of overcoming the work product privilege because they had a substantial need for the interview notes and could not obtain the information elsewhere. *Id.* at *9; *see also In re Savitt*, 176 F.R.D. at 48 (finding that because "critical information [regarding the bases of plaintiffs' complaint] is in the sole possession of an adversary, [defendant] satisfied its burden of establishing both substantial hardship and undue burden); *cf. United Brotherhood*, 1992 WL 208284 at *10 (finding that defendants failed to demonstrate substantial need because they "have knowledge of the universe of people who have information relevant to the issues in this case. Indeed, [those people] are either mentioned in the Supplemental Complaint or have been identified . . . .").

Here, NatWest has substantial need for the documents and, for the most part, cannot obtain the equivalent from another source without undue hardship. For example, documents obtained by plaintiffs from Israeli sources concerning the relationship between Interpal and those alleged to have carried out the terrorist attacks, including HAMAS and the Union of Good, are "essential" to NatWest's defense and "crucial" to a determination of liability. *First Nat'l*, 194 F.R.D. at 110. Likewise, as in *In re Savitt*, although NatWest has access to its

own financial documents, it is entitled to learn what NatWest documents plaintiffs have obtained, and more importantly, NatWest does not have access to government officials and/or sources who have assisted and provided plaintiffs with information regarding terrorist networks and Interpal's connection to them. *See In re Savitt*, 176 F.R.D. at 48. As plaintiffs themselves note, several of those sources do not wish "their identities to be made public, or even to be disclosed confidentially to a party alleged to have a relations with Specially Designated Global Terrorists." (Pls' Opp. At 20.) However, it is likely that the plaintiffs rely on these same sources to allege that NatWest has a connection to the attacks that caused plaintiffs' injuries. Consequently, their information and documents may not be used by plaintiffs as a sword and, to the extent they seek protection from disclosure, as a shield. Therefore, unlike in *In re Grand Jury*, "unfairness" exists regarding access to relevant, material information. Contrary to plaintiffs' suggestion that this case is analogous to a products liability case (*see* Pls' Opp. at 23-24), in which the manufacturer presumably has access to its product's distributors and sellers, here, NatWest is entitled to have access to the information and documents upon which plaintiffs rely to establish the chain of parties who allegedly received and used Interpal's funds to cause plaintiffs' injuries.

Not only have plaintiffs failed to establish that the attorney work product protects the disputed documents, NatWest has demonstrated substantial need for plaintiffs' document responses and its own inability to obtain the same information without undue hardship and, thus, has overcome any work product privilege that may have protected the documents. Accordingly, plaintiffs are ordered to produce responsive documents by May 24, 2007.[26]

---

[26] Because the court has ordered plaintiffs to produce NatWest's requested documents, the court does not reach defendant's argument that plaintiffs have waived work product

<u>CONCLUSION</u>

NatWest's Interrogatory No. 1 does not seek attorney work product. Second, Interrogatory No. 5 in part seeks privileged attorney work product to the extent it seeks the identities of individuals who assisted in the preparation of responses to the interrogatories. Plaintiffs must identify the documents upon which they relied in responding to the interrogatories. Third, Interrogatory No. 3 does not seek attorney work product, but plaintiffs may defer responding to Interrogatory No. 3 until 90 days before trial, in accordance with Fed. R. Civ. P. 26(a)(2)(C), unless otherwise directed by the court. Fourth, plaintiffs shall respond to NatWest's Interrogatory No. 4, to the extent they are able, and shall supplement their responses, pursuant to Fed. R. Civ. P. 26(e). Finally, by <u>May 24, 2007</u>, plaintiffs shall produce all documents responsive to NatWest's Document Requests Nos. 1, 4 and 7-19 because they failed to demonstrate that the requested documents are protected attorney work product. Furthermore, even if the work product privilege did apply, NatWest has overcome its application by demonstrating substantial need for the information.

**SO ORDERED.**

Dated: May 14, 2007
        Brooklyn, New York

                            _____/s/_____
                            KIYO A. MATSUMOTO
                            United States Magistrate Judge

_____

protection as to those documents by placing them "at issue." (Def.'s Motion at 13-14.)