```
 1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF NEW YORK
 2

 3     --------------------------------X
                                       :
 4     WEISS, et al.,                  :
                                       :   05-CV-4622
 5                 Plaintiffs,         :
                                       :
 6                 v.                  :
                                       :   225 Cadman Plaza East
 7     NATIONAL WESTMINSTER BANK,      :   Brooklyn, New York
                                       :
 8                 Defendant.          :   September 9, 2008
       --------------------------------X
 9
                    TRANSCRIPT OF CIVIL CAUSE FOR CONFERENCE
10                  BEFORE THE HONORABLE MARILYN D. GO
                      UNITED STATES MAGISTRATE JUDGE
11

12     APPEARANCES:

13     For the Plaintiffs in     MARK S. WORBNER, ESQ.
         Applebaum v. Nat West    Sayles Werbner
14       and Wolf v. Credit       1201 Elm Street
         Lyonnais:                4400 Renaissance Tower
15                                Dallas, Texas  75270

16                                RICHARD D. HEIDEMAN, ESQ.
                                  NOEL J. NUDELMAN, ESQ.
17                                Heideman Nudelman & Kalik PC
                                  1146 19th Street NW
18                                Washington, D.C.  20036

19     For the Plaintiffs in     JOSHUA D. GLATTER, ESQ.
         Weiss v. Nat West and    GARY OSEN, ESQ.
20       Strauss v. Credit        AARON SCHLANGER, ESQ.
         Lyonnais:                Osen LLC
21                                700 Kinderkamack Road
                                  Oradell, New Jersey  07649
22
                                  STEVEN M. STEINGARD, ESQ.
23                                STEPHEN H. SCHWARTZ, ESQ.
                                  Kohn, Swift & Graf, PC
24                                One South Broad Street
                                  Suite 2100
25                                Philadelphia, Pennsylvania  19107

                       (Appearances continue on next page.)
```

```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF NEW YORK
 2

 3    APPEARANCES CONTINUED:

 4
                             ANDREW DAVID FRIEDMAN, ESQ.
 5                           Glancy Binko & Goldberg

 6    For Defendants National   LAWRENCE B. FRIEDMAN, ESQ.
        Westminster Bank and    KIRSTEN O'CONNELL, ESQ.
 7      Credit Lyonnais:        MELISSA JACOBS, ESQ.
                                JONATHAN BLACKMAN, ESQ.
 8                              DORA PARK, ESQ.
                                Cleary Gottlieb Steen &
 9                                Hamilton LLP
                                1 Liberty Plaza
10                              New York, New York  10006

11

12

13    Court Transcriber:        RUTH ANN HAGER
                                Typewrite Word Processing Service
14                              211 North Milton Road
                                Saratoga Springs, New York  12866
15

16

17

18

19

20

21

22

23

24

25
```

Proceedings recorded by electronic sound recording, transcript
produced by transcription service

3

1  [Proceedings began at 10:44 a.m.]

2  THE COURT:  <u>Weiss v. National Westminster Bank</u>, 05-

3  CV-04622, <u>Strauss v. Credit Lyonnais</u>, 06-CV-00702, <u>Applebaum</u>

4  <u>v. Westminster Bank</u>, 07-CV-00916, and <u>Wolf v. Credit Lyonnais</u>,

5  07-CV-0914.

6  Will counsel state their names for the record so

7  their voices can be identified?

8  MR. WORBNER:  Yes, Your Honor.  My name is Mark

9  Worbner from Dallas, Texas, and along with Richard Heideman

10  and Noel Nudelman, we represent the plaintiffs in the

11  <u>Applebaum v. Nat West</u> and the <u>Wolf v. Credit Lyonnais</u> cases.

12  MR. GLATTER:  Good morning, Your Honor.  Joshua

13  Glatter, Osen LLC.  I'm joined by my partner, Gary Osen.  My

14  colleagues, Steven Steingard and Stephen Schwartz from the

15  Kohn Swift firm of Philadelphia, my associate Aaron Schlanger,

16  and my co-counsel, Andrew Friedman of the Glancy Binko firm of

17  New York.  We are counsel to the plaintiffs in both <u>Weiss v.</u>

18  <u>Nat West</u> and <u>Strauss v. Credit Lyonnais</u>.

19  MR. FRIEDMAN:  Good morning, Your Honor.  Lawrence

20  Friedman of Cleary Gottlieb Steen & Hamilton in New York

21  representing defendants, National Westminster Bank P.L.C. and

22  Credit Lyonnais S.A.  With me are my colleagues Kirsten

23  O'Connell, Jonathan Blackman, Melissa Jacobs, Dora Park, and

24  [inaudible].

25  THE COURT:  Since you've all been kind enough to

4

1  send me an agenda, let me tell you I also have an agenda.

2  Just as a procedural issue, I saw that some of the submissions

3  were filed under seal.  I did take the liberty of mentioning

4  this, I think, to Mr. Osen at an earlier conference in the

5  Goldberg case about this.  While I can understand the need to

6  protect the confidentiality of certain submissions, I was just

7  curious why these particular submissions were sealed.

8         MR. GLATTER:  Your Honor, Josh Glatter.  From

9  plaintiffs' perspective it was basically done as a courtesy

10  and out of an abundance of caution to the defendants.  From

11  our perspective, we don't have a real dogma on this to whether

12  or not the defendants' documents are confidential or not, but

13  obviously they have concerns based on both, you know, business

14  issues, as well as customer secrecy concerns.

15        So to the extent that the documents were referring

16  to matters that have been produced under the aegis of the

17  existing confidentiality order in these cases, we thought it

18  best to place them under seal out of an abundance of caution.

19        MR. FRIEDMAN:  Your Honor, it's Lawrence Friedman.

20  It's more in the from of courtesy.  It's requirements of the

21  protective order, because they're referring to information

22  that has been marked highly confidential.  There are two

23  species of information that are referred to in our motions

24  that required them to file under seal.  One of their filings

25  they didn't make under seal but we had to correct it and that

5

1  was the privilege log in connection with the motion for a

2  protective order brought by Mr. Worbner's clients.  Plaintiffs

3  did file all of our attorney/client privilege logs with the

4  Court and obviously that is something that Nat West is very

5  sensitive about and I think everyone would agree should remain

6  under seal.

7        Otherwise, as Mr. Glatter said, the other motions

8  refer to client bank customer information.  We've had

9  litigation in the past before Magistrate Judge Matsumoto

10  concerning the bank secrecy law obligations that Nat West has

11  under UK law and that the credit union has under French law,

12  which required us to bring certain motions and to get orders

13  from the Court, so that we can show them to --

14        THE COURT:  I --

15        MR. FRIEDMAN:  -- the local authorities.  But under

16  those circumstances, Your Honor, I'm aware of the fact how

17  unwielding it can be and how cumbersome it can be to have

18  these documents filed under seal, but we need to be mindful of

19  our bank secrecy obligations in our respective countries.

20        If I could propose a solution that might pique

21  everyone's interest here and that is that redacted copies of

22  filings perhaps could be filed in the public record with the

23  clerk's office after it -- the sealed filings are made.  I try

24  to be as cautious and limited as possible in making sealed

25  copies because I know how difficult it is, but under the

6

1  circumstances attendant to these motions we thought it was

2  necessary.

3         THE COURT:  I can appreciate your concerns about the

4  privacy rights of customers, but most of the customers

5  mentioned in the papers have been mentioned in publicly filed

6  decisions, so it strikes me that your caution is not necessary

7  in these cases, at least with respect to the customers who

8  have been previously mentioned.

9         MR. FRIEDMAN:  Well, Your Honor, the customers have,

10 of course, been identified but, for example, in connection

11 with the protective order motion that we'll discuss today and

12 the cross motion that we'll discuss at a later date in

13 connection with identifying additional entities that are

14 alleged to be relevant to the case under UK bank secrecy law,

15 we're not allowed to disclose in the public record counter

16 parties in transactions that Interpal, our former depositor in

17 navigation, and we're trying to draw a happy medium to avoid

18 the cumbersome nature --

19        THE COURT:  I can appreciate the new names in the

20 protective --

21        MR. FRIEDMAN:  Yes.  The fact that --

22        THE COURT:  -- your function, but --

23        MR. FRIEDMAN:  -- Interpal is referred to in filings

24 related to Nat West or that CBSD is referred to in filings

25 related to Credit Lyonnais, just the identity of the customers

1   is of no moment and I would never file anything under seal or

2   ask my adversaries while -- anything under seal.  But when we

3   start to get into specific transactions, for example, although

4   we're not discussing it today, Mr. Osen's letter in support of

5   the press motion to acquire the production of 30 -- of

6   documents concerning 30-some-odd entities, I know that

7   under -- where he goes through different transactions that

8   were had by Interpal with those entities according to account

9   information that he produced I know that my clients would be

10  very concerned about that being in the public record not for

11  reasons of their own but for reasons relating to UK bank

12  secrecy law.

13          THE COURT:  Well, let me see what I can do because I

14  am -- with the clerk's office.  I think it's possible to file

15  those documents electronically under seal, which I -- it would

16  make it much easier for me anyway and I think for all of you

17  and we'll get back to you on what you should be doing.  So I

18  can look at these documents and know which documents we're

19  referring to.  Just as a matter of housekeeping if you could

20  be kind enough to put the Court document number on whatever

21  courtesy copies you provide me, then I -- I won't have to go

22  back and check every filing to make sure I know which document

23  is which.  I would appreciate it.

24          MR. FRIEDMAN:  Your Honor, if you would like for us

25  to be in touch with the clerk's office to arrange a procedure

1   whereby all parties can make sealed filings with the clerk's

2   office, we'd be happy to do that.

3          THE COURT:  It's -- okay.  It's not a problem.  I'll

4   just send an email around.

5          Now, before I hear you on the specific motions, you

6   know, one of the underlying issues, at least in my mind, that

7   arises in several of the motions is, you know, what was

8   decided before and what is left open.  I only have the benefit

9   of the minute entries.  I guess these -- the proceedings were

10  not recorded, so --

11         MR. FRIEDMAN:  In connection with our protective

12  order motion -- our protective order motions on behalf of the

13  two banks, Your Honor, I'm prepared to address that because

14  I'm very surprised by the allegations that were made in

15  Mr. Osen's opposition letter characterizing -- in my view

16  mischaracterizing what Magistrate Judge Matsumoto decided

17  previously.  I think I can show Your Honor in the course of my

18  presentation that the points that they say were decided on the

19  face of the documents themselves.  The face of the minute

20  orders and on the face of the published opinions were not

21  decided.

22         THE COURT:  Well, I don't think we necessarily have

23  to go through the parsing of past orders, though I have to

24  say -- I mean, this -- this thought came to mind when I read

25  the defendants' motion that -- I mean, the plaintiffs' most

9

1   recent motion yet to be complied with since it raises issues

2   that arguably might have been disposed of in prior rulings,

3   too.  So I don't know if it makes sense to just sit and

4   discuss what we ought to be discussing.  I don't have any of

5   the discovery responses that are the subject of the motions

6   since I presume the only ones I have are from -- were the ones

7   attached to the original set of motions to compel by the

8   plaintiffs that led to several decisions that Judge Matsumoto

9   issued.  So I assumed that there were subsequent responses.  I

10  don't know if it's relevant, it may be, to see what the

11  responses are and which particular requests you're talking

12  about.  I can only look at the minute entries of Judge

13  Matsumoto in the abstract.  I don't have copies of any of

14  those documents.

15          MR. FRIEDMAN:  Your Honor, there are also the

16  published decisions.  For example, this first motion that we

17  have about the other entities that the plaintiffs want

18  documents about, those are the requests that as everyone

19  agrees that are made pursuant to request number ten,

20  plaintiffs' request for documents numbered ten in both the Nat

21  West case and the Credit Lyonnais case.

22          Mr. Osen wrote in his letter, as I anticipated he

23  might, in a footnote in my motion for a protective order he

24  wrote that Judge Matsumoto had already decided the issue as

25  well as I had explained to Mr. Osen in a phone call, yet he

1    went ahead and made the argument that he did -- if you look at

2    Judge Matsumoto's published decisions on the prior compulsion

3    motions, and I can give Your Honor just three citations --

4              THE COURT:  No, I've looked at them.  I've looked at

5    them.

6              MR. FRIEDMAN:  Of course, number ten is [inaudible]

7    of what Judge Matsumoto is deciding so there's been an effort

8    here with respect to plaintiffs.  There's been an effort here

9    to try to present certain of these matters to Your Honor as if

10   they've already been decided and they just haven't.

11             They also refer to the March 13, 2008 order.  I have

12   a copy of -- minute order.  I have a copy of it here.  We all

13   know down in the well on both the plaintiffs and the defense

14   side, but that burden issue that Judge Matsumoto raised was

15   only about their request for wire transfer documents.  It

16   wasn't about documents relating to these entities.  If you

17   look at the words of the minute order that they quote in their

18   letter it says right there it's about wire transfers, so I'm

19   very concerned, Your Honor.  You know, [inaudible] plaintiffs'

20   counsel very well, but the one thing that Your Honor has put

21   her finger on that has concerned me most in coming here this

22   morning is this whole presentation that they've made that some

23   of these issues have already been decided by Judge Matsumoto.

24   I dare say, they never would have made that argument if we

25   were still before Magistrate Judge Matsumoto because she knows

1  what she decided and she knows what she didn't.  When I

2  present my argument I can say for the record the citations

3  where Judge Matsumoto made clear that she wasn't deciding the

4  issues that are now at stake.

5          THE COURT:  In her published decision.

6          MR. FRIEDMAN:  In the published decision.

7          THE COURT:  Okay.  But these conferences came

8  after --

9          MR. FRIEDMAN:  There's one minute order that the

10  plaintiffs rely on.  I can hand up a copy of it if Your

11  Honor --

12         THE COURT:  I have the documents.

13         MR. FRIEDMAN:  What -- it's the March 13, 2008

14  minute order and, again, on this first motion, our motion for

15  a protective order with respect to the additional entities the

16  plaintiffs want documents about, it says right in the words of

17  the minute order.  It says, "Thus, defendants have yet to

18  produce certain responsive documents.  Plaintiffs stated that

19  they seek wire transfer records during a specific time

20  periods."  Magistrate Matsumoto ordered us to meet and confer

21  with respect to burden objections as to those barred

22  transfers.

23         Again, I was astonished to read in Mr. Osen's letter

24  of last Thursday that they're now saying that that minute

25  order limited us to burden objections with respect to the

1   entities.  It's not --

2             THE COURT:  Well, that --

3             MR. FRIEDMAN:  -- [inaudible] --

4             THE COURT:  That's all set forth in your

5   submissions.  I can readily go -- figure out what happened by

6   talking to Judge Matsumoto.

7             MR. FRIEDMAN:  I would really invite Your Honor to

8   do that.  Your Honor, I was not able to address that in my

9   submissions --

10            THE COURT:  But I do have one question that might

11  assist me since I didn't see any letter that preceded that

12  conference, so if there are letters that raised the topic

13  earlier that might help elucidate the --

14            MR. FRIEDMAN:  That's a very interesting point, Your

15  Honor, because that was a conference that we had on other

16  subjects.  I think it might have even been our settlement

17  conference.

18            THE COURT:  Yes.

19            MR. FRIEDMAN:  Magistrate Matsumoto -- we were all

20  there right across the hall -- at the end of the conference,

21  Magistrate Matsumoto said, "Are there any open discovery

22  issues?"

23            THE COURT:  Okay.  Well, I don't -- I really don't

24  want to hear any more about that.  Well, I'll confer with her.

25  It just doesn't make sense for us to figure out what she had

1    decided and what she hadn't.  I'll -- I will look at the

2    docket entries very carefully and I'll talk to her.

3             MR. FRIEDMAN:  I think that would be good, Your

4    Honor.

5             MR. WORBNER:  Your Honor, if I could add, I think

6    Your Honor had it right.  For purposes of resolving

7    defendants' motions for protective order, it does not require

8    an extended exegesis of the published decisions by Judge

9    Matsumoto.  Our point, which I think is made abundantly clear

10   in our letters, is one that, one, based on our reading of

11   particular relief that plaintiffs requested with respect to

12   the document request in their totality as crafted, the order

13   addresses them on the issue of relevance; secondly, and more

14   importantly, I think that our letter makes it clear that we're

15   entirely prepared to address substantively Mr. Friedman's

16   arguments as to why he's entitled to protective order and it

17   need not turn on an extended analysis of --

18            THE COURT:  Okay.

19            MR. WORBNER:  -- the decisions.

20            THE COURT:  Okay.  So I'll hear you on the

21   substantive arguments and --

22            MR. WORBNER:  Thank you.

23            THE COURT:  -- so that I make myself clear.  I mean,

24   obviously I still have a lot to learn about these cases so I

25   will not make any decision on the record today, but I will

14

1   listen to you carefully.  I'm familiar with what you have

2   provided and certainly with all the published decisions and

3   some of the submissions.

4         MR. FRIEDMAN:  Thank you, Your Honor.  So I will --

5   Lawrence Friedman.  I will address the defendants' motions for

6   protective order with respect to the additional entities as to

7   which plaintiffs request documents.  The other brief motion

8   that we'll be addressing today is the motion by plaintiffs for

9   an order vitiating the attorney/client privilege with respect

10  to privilege logs.

11        Your Honor, on this motion for a protective order --

12  and there is a corresponding cross motion which we're not

13  discussing today -- Credit Lyonnais seeks a protective order

14  against plaintiffs' request number ten.  Nat West also seeks a

15  protective order against plaintiffs' request number ten.  To

16  the extent they insist that Credit Lyonnais and Nat West

17  search for and produce documents relating to entities that

18  plaintiffs have never demonstrated, have never made an

19  appropriate presentation are relevant to this case.

20        Now, there are two entities at issue with respect to

21  Credit Lyonnais and there are seven entities at issue with

22  respect to Nat West.  For Your Honor's convenience, I prepared

23  a list of the entities that are at stake if I may hand up.

24  I'll give a copy to Your Honor's law clerk, as well as to my

25  adversaries. The first page is in respect to Credit Lyonnais

15

1   and the second page is with respect to Nat West.

2           As Your Honor will see, there are 15 entities that

3   Credit Lyonnais has already conducted searches for or agreed

4   to conduct searches for and there are two entities as to which

5   we seek a protective order.  With respect to Nat West, there

6   are 14 entities that Nat West has searched for or agreed to

7   search for documents relating to those entities and that there

8   are seven that are at issue.  I suspect Your Honor is already

9   familiar enough with the plaintiffs' allegations to know that

10  these entities and in some cases the individuals are the so

11  called Zakat Committees in the Palestinian territories that

12  are alleged to be in the chain of financing running from a

13  bank's customer, whether it's Interpal or CBSP [Ph.] to

14  financing the Hamas -- allegedly Hamas terrorist attacks in

15  which the plaintiffs were injured.

16          As to the substance, Your Honor, in summary -- and

17  I'll get into some of the detail in a moment -- unless and

18  until plaintiffs identify these entities as being relevant to

19  this case, either in their pleadings or in the interrogatory

20  responses that -- in the interrogatory responses that we're

21  entitled to on these issues, they simply have not shown that

22  these entities are relevant.  Instead, they're in search of

23  claims that they haven't yet made as opposed to claims they

24  have made.  It's directly contrary to what Your Honor said is

25  prohibitive by Rule 26 in Your Honor's Dunkin' Donuts decision

1   this spring.

2           THE COURT:  I hate it when you cite my decisions.

3           [Laughter.]

4           MR. FRIEDMAN:  It's a correct one, Your Honor.  If

5   Your Honor looks at Mr. Osen's letter in opposition to this

6   motion for a protective order, he goes on to say, "Well, I've

7   explained to Mr. Friedman how this entity is relevant or have

8   made representations in emails and letters to Mr. Friedman as

9   to how this entity is relevant."  But Magistrate Judge

10  Matsumoto ruled in a published decision, and I'll give the

11  cite in a moment, that pursuant to our interrogatories,

12  interrogatory number two in the [inaudible] May cases,

13  interrogatory number four in the Nat West cases, plaintiffs

14  are obligated to disclose all of the facts that they're

15  relying on.  In their interrogatory responses to date, they

16  have disclosed certain entities that they allege are in a

17  chain of financing between CBSP and Hamas or between Interpal

18  and Hamas and those are the entities we searched for.  In some

19  cases, we've even gone beyond that.

20          But now, they are asking Credit Lyonnais to search

21  with respect to 15 more entities.  They're asking Nat West to

22  search for four -- I'm sorry -- you're asking Credit Lyonnais

23  to search for two more entities.  They're asking Nat West to

24  search for seven more.  In the cross motion that we'll be

25  discussing in a couple of weeks, they ask for 30 some odd more

1  entities.  The searches should be done and it's conspicuous.

2  I would like to hear an explanation from plaintiffs as to why

3  they don't identify these entities in their interrogatory

4  responses as they are required to do.

5           Unless and until they do so and subject to burden

6  considerations they can write me all the letters in the world

7  or send me all the emails in the world saying, we think

8  they're relevant.  We think they're relevant.  I submit that

9  pursuant to the Court's prior order and pursuant to our

10  interrogatory responses if they believe these entities are

11  relevant then they should put it in the interrogatory

12  responses and they should incur the obligations that are

13  associated with putting it in their interrogatory responses.

14  The fact that they refused to do so and I've expressly invited

15  them to do so is telling and suggests that they don't have a

16  basis for saying that these entities are truly relevant.

17           Now, as a threshold matter, Your Honor, as we were

18  discussing a few moments ago, plaintiffs seek to avoid Your

19  Honor giving independent screening to this issue by saying

20  that Magistrate Judge Matsumoto previously ruled that these

21  requests are relevant in full.  Let me give Your Honor just

22  three simple cites in which Magistrate Judge Matsumoto made

23  clear in prior decisions in which plaintiffs say relevant was

24  already decided it makes clear that she was not addressing

25  request number ten.  That is the request on which this is

1   based.

2           THE COURT:  I think you've already sent me a letter.

3           MR. FRIEDMAN:  Those cites are in my letter.  Your

4   Honor, if I may, I will refer Your Honor again to the March

5   13, 2008 minute order because plaintiffs now quite

6   surprisingly say, well, this was all decided in the March 13,

7   2008 minute order in which Magistrate Judge Matsumoto limited

8   the defendants the burden objections.  But within the very

9   text of that minute order, as reproduced in Mr. Osen's letter,

10  it makes plain that what we were talking about there were

11  burden objections to wire transfer documentation which burden

12  objections, I'm pleased to report, the parties were able to

13  resolve.

14          But it just pains me, Your Honor, having been

15  present when that matter was discussed and having seen that

16  minute order that day and knowing that all counsel here should

17  recollect that what we were talking about there was wire

18  transfers.  It pains me, although I understand the vigor with

19  which plaintiffs are making their argument.  It pains me that

20  that representation would be made to Your Honor in Mr. Osen's

21  leter that this was decided in the March order.

22          Your Honor, just focusing on the substance, what's

23  at issue for Credit Lyonnais are requests that we search for

24  and produce documents about two entities after having already

25  searched for and produced documents about 15 entities.  This

1  is beyond the searches and productions that we've done about

2  CBSP.  You know, the case really concerns CBSP, just like the

3  Colberg [Ph.] case, concerns ASP [Ph.], the Nat West case

4  concerns Interpal.  The Credit Lyonnais case concerns CBSP.

5  We've produced everything that we have relating to CBSP.

6          Then the plaintiffs came to us and said, well, you

7  should produce documents about the following Zakat Committees

8  that we believe were involved in the chain of transactions

9  between CBSP and the terrorist attacks.  We propounded

10 interrogatories in which we asked -- and it was interrogatory

11 number two for Credit Lyonnais -- tell us all of the factual

12 bases for allegation that there was a causal connection

13 between what CBSP did and the attacks in which plaintiffs were

14 injured.  Meaning, among other things, identify all of the

15 Zakat Committees that you allege were involved in the chain of

16 fund transfers that led to the terrorist attacks running from

17 between CBSP to those attacks.

18         In those interrogatory responses -- and I have

19 copies I could provide to Your Honor if Your Honor wishes --

20 there were several Zakat Committees identified and we

21 therefore went in and searched for and produced everything we

22 had relating to those Zakat Committees.  None of the two that

23 are listed on my chart that are at issue on this protective

24 order motion with respect to Credit Lyonnais, the [inaudible]

25 Charitable Society or the [inaudible] Charity Committee were

1    listed as those interrogatory responses.  Moreover, Judge

2    Matsumoto ruled -- and this is at 242 FOD at 233-35, that in

3    response to these interrogatories plaintiffs must identify all

4    of the facts on which they rely.

5            So, Your Honor, as I wrote in my letter I said to

6    plaintiffs' counsel, we've searched for documents related to

7    all of these entities that you've identified in your

8    interrogatory responses as being involved in the chain of

9    transfers.  Now you want me to search for more.  We found out

10   in their cross motion they want us to search for 19 more in

11   addition to the two at issue here today.  I said to them, as I

12   put forth in my letter, if you believe these entities are

13   relevant list them in your interrogatory responses, but

14   they've refused to do so.  They haven't done so.

15           THE COURT:  Okay.

16           MR. FRIEDMAN:  That's very tough.  Your Honor, they

17   cannot have it both ways.  They cannot say these are relevant,

18   but not put their money where their mouth is and put it in

19   their interrogatory responses, otherwise it's a fishing

20   expedition.

21           I won't go over the same [inaudible] details with

22   respect to Nat West but it's the same issue.  We have

23   completed searches at great burden with respect to 14

24   entities.  There are seven more that are issued in the

25   protective order motion as Your Honor will hear in a couple of

21

1   weeks.  They want searches for 16 more in their cross motion,

2   yet they will not list any of these in their interrogatory

3   responses.

4         I'd like to make one last point on this protective

5   order motion, Your Honor, and that is with respect to burden.

6   Mr. Osen in his letter criticized defendants for not making

7   factual submissions with respect to burden.  Your Honor, when

8   we submitted this letter, I was operating under Rule 37.3,

9   which I understood to limit me to a three-page letter to bring

10  matters at issue to Your Honor's attention.  If Your Honor

11  wishes, we can submit declarations from each of Credit

12  Lyonnais and Nat West attested to the burden that they would

13  face from what will turn out to be when all of the motions are

14  argued requests for between 30 and -- searches for between --

15  for documents relating between 30 and 40 different entities.

16  Credit Lyonnais and Nat West have already borne substantial

17  burdens, substantial expense in searching their files with

18  respect to all of these entities.  But we keep getting list

19  after list after list saying more searches, more searches,

20  more searches, and they just have not satisfied the threshold

21  relevance factor.

22        THE COURT:  Well, just one question on the list

23  after list.  You're not really talking about entities that

24  weren't originally listed in document request number ten, are

25  you?

1          MR. FRIEDMAN:   Indeed I am, Your Honor, and that

2    underscores the temerity of saying Judge -- Magistrate Judge

3    Matsumoto already decided because most of these entities were

4    not even on the list at the time.  We received requests number

5    ten, then we received something called Schedule B, then we

6    received something called Schedule A-1, so we are talking in

7    part about entities that were not on the original document

8    requests at all.

9          Now, again, as Your Honor can read in the published

10   versions of these decisions, Magistrate Judge Matsumoto said

11   she wasn't addressing request number ten.  She listed the

12   request she was addressing and the number ten does not appear.

13   But beyond that, the lists have been supplemented and

14   supplemented.

15         Now, I understand why the lists have been

16   supplemented because they've been supplemented as documents

17   have been produced and as discovery has taken place.  We have

18   agreed and have searched for and produced documents with

19   respect to supplemented names if the plaintiffs will go on

20   record and say these are relevant and here's why.  But merely

21   saying to me over the phone or email or even in a letter to

22   Your Honor, we think they're relevant, we think they're

23   relevant, if they really believe that they can put that into

24   interrogatory responses.  We can draw the inference from their

25   failure to do so, but they don't have the facts.

1       MR. WORBNER:  Thank you, Your Honor.  I -- based on

2  our discussion earlier, I don't think there is really any need

3  unless Your Honor would like to parse again through the prior

4  decision of Judge Matsumoto's earlier orders in May.  What I'd

5  prefer to do is just simply address what are principally

6  relevancy arguments that have been proffered by defense

7  counsel today.

8       I do think, however, that part of what makes the

9  earlier orders important is the fact that the defendant has

10  not and did not under Rule 37.3 address in any meaningful

11  fashion question your authority.  Today's argument has been

12  entirely relegated to the issue of relevancy with a broad

13  representation that should the Court so desire, the defendant

14  will be prepared to make a proffer with respect to the

15  technical burdens that would be imposed upon it.  With all due

16  respect to defense counsel, I don't think that that's what

17  Rule 37.3 contemplates.  There is no dispute between the

18  parties that the defendants have raised burden objections and

19  have indicated -- and indicated prior to filing this motion

20  their intention to press ahead with that objection, but

21  sitting here today both the plaintiffs and for the Court we're

22  left entirely vague on exactly what would be entailed on that

23  score, which brings us back to the fundamental question we

24  have today.

25       THE COURT:  We'll address burden later on, but it

24

1  would strike me that the real burden is to have to make -- to

2  renew searches time and time again and really prob -- we could

3  probably address that issue in prospective motions by just

4  setting a cutoff date on any supplementation of any list or --

5  and, you know, have a protocol for approaching when a search

6  should be made.  Obviously, the defendants have already agreed

7  that it is -- they may be obligated to make the search in

8  certain instances, but it doesn't make sense to make the

9  defendant to go back -- go back.  Are you talking about a

10  search done electronically?

11       MR. FRIEDMAN:  Some of them are done electronically,

12  but many of them are not.  For example, with respect to wire

13  transfers, there are paper records that would have to be

14  rooted out.  With respect to account statements, there are

15  records that will have to be rooted out, but they've asked for

16  all documents that we have relating in four departments of Nat

17  West relating to these entities and one department of Credit

18  Lyonnais relating to these entities.  But they're not, by any

19  means, all electronic.  Especially as we go back in time --

20       THE COURT:  Okay.  All right.  But in any event, I

21  assume that there would be some economy of effort if there was

22  just one remaining search should the defendants be required to

23  make one remaining search.  Is that correct?

24       MR. FRIEDMAN:  There would be such economies, but

25  we've already been through that.

25

1          MR. GLATTER:  Your Honor, the list of individuals

2     and entities that ultimately might comprise the entire Hamas

3     network is an incredibly large one.  In theory, for relevancy

4     purposes we might be entitled to, but plaintiffs here are

5     interested in getting this case to trial as quickly as we can.

6     So the process that we've engaged in with the defendants

7     through meet and confers and presenting issues to the Court is

8     really designed to streamline it.  We, in fact, have had

9     exchanges concerning a final discovery cutoff date and what

10    would be necessary predicates to establish that.  We recognize

11    that in coming up with those dates that it will ultimately

12    require some finality in terms of the entities that are

13    proposed and the level of searches that would have be done.

14          Again, also always recognizing that discovery is an

15    organic process and it's an involving process and ones that

16    what turns up in a -- only a document production may very well

17    warrant additional discovery, but it's hard to say in the

18    abstract.

19          The fundamental dispute that we had today, though,

20    is really what the scope of relevancy is.  I think it boils

21    down as follows.  The defendants' position is it's not

22    relevant unless it relates to CBSP.  our position is, no,

23    that's not correct because that's not the claim that we pled.

24    Our principal claim that's at issue in this dispute is

25    plaintiffs' claims under 18 U.S.C. 233(a), the ATA civil

26

1  remedy provision that are predicated on 233.9(b).  233.9(b) is

2  a criminal statute that provides that a defendant is liable

3  where no one provides material support to a designated foreign

4  terrorist organization.  FTO is a specific term that applies

5  to a particular designation applied by various agencies in the

6  U.S. government, principally the State Department.

7          Each bank's customer here is not an FTO.  It is what

8  we refer to as a specially designated global terrorist, an

9  SBGT.  In the case of Nat West, that SBGT is Interpal and in

10  the case of Credit Lyonnais it is CBSP.  Each of those

11  customers, which the bank does not dispute, was its customer

12  and it transmitted funds on its behalf.  In the case of Nat

13  West it continued to make those transmittals after Interpal

14  had been designated as an SBT, was designated not because it

15  engages in terrorism generally, but because they operate as

16  fundraisers for Hamas.

17          That's important to keep in mind in analyzing this

18  dispute because the -- we have the intake of funds coming in

19  through the bank's customers, but equally important and

20  relevant are where the money is going to.  That's what turns

21  on the -- that's the issue that turns on the entities at issue

22  here.  In fact, Mr. Friedman's submission to Your Honor is not

23  entirely correct as a technical matter.  With respect to

24  Credit Lyonnais there are two entities that we refer to as

25  Zakat Committees, charitable committees operating in the

1    Palestinian control territories, which we allege are, in fact,

2    Hamas-controlled entities.  Their leadership often reflects

3    senior Hamas leadership.  They act as the distribution nation

4    underground that wins hearts and minds of the Palestinian

5    population that ultimately is a foreseeable step in the

6    causational chain leading to the plaintiffs' injuries.

7            However, the seven entities at issue at Nat West are

8    not Zakat Committees as is reflected in submission.  Those are

9    seven entities that are all members of what the complaint

10   describes as the union of the good -- two are nonmembers.

11   Thank you.  My partner -- they're all -- they're Hamas SGDTs

12   and in several cases, five of them are actually designated as

13   SGDTs.  I believe three of them were so designated

14   contemporaneously with Interpal.  That establishes what we're

15   talking about here.  The complaint makes that abundantly clear

16   that where the plaintiffs have a right to remedy, it's a

17   function of whether or not when the bank transmitted money,

18   that it wasn't doing so.  It is knowing that it is materially

19   supporting the FTO.  The complaint is under a Rule 8 standard.

20   It's not a number Rule 9(b) standard let alone more Draconian

21   pleading standards applicable to some type of statutes that

22   rendered it plausible or even the standard proceeded probably

23   that based on what was known at that time was plausible not at

24   the bank providing no Intifada material support for an SBGT,

25   that's not the point.  It's did it do so knowing that it was

1   supporting an FTO, which for discovery purposes under Rule 26

2   unquestionably are -- allow us to probe the totality of the

3   defendants' connections to Hamas, to the FTO organization at

4   issue based on relevance on who the customer is and what we

5   know as now absent discovery and who the bank transmitted

6   money to amplified by the fact that much of that money was

7   transmitted by these SGBTs, but it may very well be that if an

8   ordinary person came off on the street and said, please send

9   and wire dollars to Zakat Committee X in the Gaza Strip.  That

10  in and of itself would render it plausible that the bank had

11  violated material support statutes and minimally provide

12  plaintiffs with an opportunity to probe the totality of the

13  Hamas connections.

14          I think that Mr. Friedman understands that he can't

15  really claim that we're limited for purposes of discovery to

16  what's pled in the Rule 8 complaint so the second argument is

17  that somehow by virtue of our responses to early

18  interrogatories that operates as a functional bar to what

19  we're entitled to probe.  First and foremost, I think he needs

20  to read the language in the precise contention interrogatories

21  a little bit more carefully.  What the interrogatory says,

22  which he quotes -- I'm quoting from the -- it is an August

23  28th letter concerning [inaudible], the language in the

24  interrogatories to each bank is materially identical is he

25  wanted to know the factual basis for, one, "The identity of

29

1   persons and/or entities that perpetrated the attacks and

2   caused collective injuries."

3           THE COURT:   Okay.   What number are you talking

4   about?

5           MR. GLATTER:   If you look at page 2 of Mr.

6   Friedman's August 28th letter.

7           THE COURT:   Oh, okay, his quote but -- okay.

8           MR. GLATTER:   WORBNER:   I'm calling it

9   interrogatories.

10          THE COURT:   Yes, were the contention -- I know the

11  con -- I don't have a copy of the contention interrogatories

12  in front of me.   Were they ever attached as a document to an

13  earlier motion?

14          MR. GLATTER:   I honestly don't quite -- Your Honor,

15  I think we can hand up a copy of the -- interrogatory number

16  four [inaudible].

17          MALE SPEAKER:   That's number four.   Number four

18  in -- no?   Number two in the -- no?   It's number four.   The

19  letter responses -- this cites it.   Number two in [inaudible].

20          MR. GLATTER:   I'm sorry.   Number two.   But it's --

21  the language is identical other than the -- it's --

22  [inaudible].   What does that interrogatory provide?   It says,

23  "Provide a factual basis for the plaintiffs' allegations

24  concerning (1) the identity of persons or entities that

25  perpetrated the attacks that caused plaintiffs' injuries."

1   That's easy; the answer is Hamas.

2          The second problem, which is really what a lot of

3   his argument centers on says, "How and in what forms and by

4   the means searched persons or entities received material

5   support and/or resources from Credit Lyonnais."  It does not

6   say from Hamas; it says from Credit Lyonnais.  Therefore, our

7   response to that interrogatory was entirely appropriate.  We

8   were not -- it will not be appropriate for us to speculate as

9   to which customers additional SBGTs Credit Lyonnais or Nat

10  West has as customers or whether it's transmitting money to

11  other Hamas-controlled entities or Hamas itself.  That would

12  be a fishing expedition on our part.  What we did was based on

13  the information we had to date on our investigation and what

14  was in the public record identify those Zakat Committees and

15  those entities which we knew at that time.

16          The bottom line is that the interrogatory does not

17  serve as any kind of a bar on our entitlement to probe beyond

18  that as to whether or not the defendant has provided

19  additional material support to other Hamas entities.  This

20  interrogatory, Your Honor, is fundamentally concerned with the

21  issue of causation but in terms of what our discovery rights

22  are, they turn not only on causation and, frankly, if we were

23  to learn tomorrow that Credit Lyonnais maintained an account

24  for Sheikh Yassin, the founder and senior leader of Hamas,

25  that would be highly relevant causation.  But they also turn

1   on establishing what the defendants' mens rea is.  What is its

2   knowledge.  We also take it this is -- you're entitled to

3   demonstrate knowledge via the conscious avoidance of

4   knowledge.  Therefore, the interrogatory, which -- frankly I

5   don't even think it'd be fair to characterize it as a

6   contention interrogatory.  The Court, Judge Matsumoto, knowing

7   that it arguably could be a contention interrogatory because

8   it does touch upon the application of legal theory to fact but

9   it can't seriously be taken as a contention interrogatory with

10  a preclusive effect before a single shred of deposition

11  testimony has been taken and before there's been complete

12  document production.

13          We're entitled -- the bottom line, Your Honor, is to

14  establish this defendants' connection to the far terrorist

15  organization.  It cannot be narrowed simply to the issue of

16  the one particular customer that was known about or the

17  entities to whom that customer transferred funds to.

18          The last thing that I would note on this point,

19  Judge -- and, again, if you have any questions I'm happy to

20  address them -- is that even if one were to take the position

21  that under Rule 26 this was not relevant to the claims or

22  defenses of the parties, which I can't see how it is, Rule 26

23  also provides that a good for cause showing that a party may

24  seek discovery of a subject matter of the complaint and I

25  don't think there's any doubt here that their subject matter

1  of this complaint is the bench connections to Hamas.  I don't

2  think that there's a serious argument to be made that we are

3  entitled to learn whether or not the bank has other customers

4  that could be designated by United States Treasury and other

5  agencies, especially global -- designated global terrorists

6  because they have connections with Hamas.  I mean, frankly I

7  think that for the bank to argue that it's too burdensome for

8  it to determine whether or not any of its customers are SBGTs

9  is very, very troubling.

10            MR. FRIEDMAN:  Your Honor, when this tape-recording

11  is transcribed we will see that Mr. Glatter has now

12  articulated his clients' claims as being something completely

13  different from what is pleaded in their Fifth Amendment

14  complaint in Weiss and in Strauss.

15            What he said, and I tried to get the exact words

16  down, is he said this case is about Credit Lyonnais'

17  connection to Hamas.  He said, this case is about Nat West's

18  connection to Hamas and he said, therefore, they're entitled

19  to take discovery about the entire Hamas network.  Your Honor,

20  with respect to Mr. Glatter that is utterly preposterous.

21  What this case is about with respect to Credit Lyonnais is an

22  allegation that Credit Lyonnais knew that its customer CBSP

23  was financing Hamas and that Credit Lyonnais followed CBSP's

24  instructions to affect transfers to the Zakat Committees and

25  individuals with the intention of causing terrorist attacks to

33

1  occur.  There's a causal change here that's alleged in the

2  complaint.  The allegations are not that Credit Lyonnais is

3  connected to Hamas.  It's not that Nat West is connected to

4  Hamas.  The plaintiffs' lawyers forget that they represent

5  people who are injured in specific attacks and there's a chain

6  that they allege of the bank knowing that its customer was

7  involved in financing people who were responsible for

8  perpetrating these attacks.  That's why interrogatory number

9  4.2 is worded the way it is.  Plaintiffs are not alleging that

10 the bank is liable because it has connection to Hamas -- the

11 Hamas network worldwide.  They're not alleging that there is

12 anything actionable other than what the banks did that

13 resulted in the attacks in which their clients were injured,

14 so therefore, I'm not saying discovery is bound by CBSP.  We

15 didn't refused to search for documents related to all these

16 entities down the chain.  To the contrary, we have searched

17 for and produced documents about a lot of these entities down

18 the chain.

19        Same thing with Nat West.  We're not saying that the

20 allegations are limited to Interpal.  You've alleged a chain

21 of financing that resulted in your clients being murdered or

22 injured.  You have to stick with that chain.  It is not

23 actionable -- it is not actionable under these statutes unless

24 there is an injury that occurs for which you are making a

25 claim.

34

1          THE COURT:  Excuse for interrupting --

2          MR. FRIEDMAN:  That's the --

3          THE COURT:  -- but let me just get clear in my mind

4    exactly what was produced regarding these entities that's

5    you've -- Interpal and so forth and also, you know, what's

6    left to be produced.

7          MR. FRIEDMAN:  Sure.

8          THE COURT:  Setting aside the specific entities and

9    individuals to whom transfers were made.

10         MR. FRIEDMAN:  Well, with respect to the depositers,

11   Interpal and CBSP, we believe we've produced or are in the

12   process of producing because we learn more and we also get

13   supplemental requests, everything related to their accounts

14   with the banks, account statements, deposit information,

15   transfer information, customer relationship files, everything

16   that we have related to Interpal, the alleged conduit for

17   account financing through Nat West, and CBSP, the alleged

18   conduit with Credit Lyonnais.  Everything we have relating to

19   these entities we intend to have produced.

20         We then were told in the interrogatory responses

21   that the recipients of the funds that led to the attacks in

22   which our clients were injured were the 15 entities that we've

23   searched for for Credit Lyonnais and the 14 entities we've

24   searched for for Nat West.  So we've searched for and produced

25   documents in certain agreed departments of the banks with

1   respect to those entities.

2          What is at issue now are additional entities that

3   have not been identified as being causally related -- have not

4   been identified as being in the chain that led to the

5   plaintiffs' injury and Mr. Glatter admitted it.  He got -- he

6   came up before Your Honor and --

7          THE COURT:  Okay.  Well, I --

8          MR. FRIEDMAN:  -- [inaudible] network.

9          THE COURT:  My question is really more basic than

10  that.  It's -- you say you've produced everything about those

11  two accounts.  Has -- have they all -- have all the documents

12  been produced so that it is now clear where all the funds --

13  who were recipients of all the funds that were -- that flowed

14  through these accounts?

15         MR. FRIEDMAN:  The only transaction documents that

16  have not been produced are wire transfer documents and certain

17  deposit information where we have agreements back and forth

18  about getting those documents to the plaintiffs.  There are

19  some that are in archives, paper archives and electronic

20  archives at Nat West, and some that are in paper and

21  electronic archives of Credit Lyonnais.  We've produced most

22  of them, but as I've explained to plaintiffs' counsel, there

23  are some that are being retrieved from the archives that are

24  still on their way.  They have all -- and they've had for more

25  than a year, I believe, all of the account statements.  They

1  know every transaction.  What they then did was ask for

2  backup, deposits and withdrawals.  What we're still working

3  on, but I think we have most of it already to them, what we're

4  working on is the b1ackup documentation that underlies the

5  account statements.

6          MR. GLATTER:  Your Honor, my colleague Mr. Osen will

7  address some of the particulars regarding the state of

8  document discovery, but there is one point that Mr. Friedman

9  made I know we addressed in one of our letters to you, but

10  I -- it bears repeating.

11          Mr. Friedman suggests that the standard here is

12  whether or not the bank knew that when it was providing

13  services to Interpal or CBSP that it was funding terrorist

14  acts.  That is just simply incorrect.  That is not what

15  233.9(b) requires and it's explicit in these past -- to close

16  the loop between a terrorist act and terrorist organizations

17  generally.  That's critical to keep in mind because it very

18  much affects the relevant scope of discovery as to the bank's

19  knowledge.

20          The bank could say, well, yes, we knew they were a

21  terrorist --

22          THE COURT:  I --

23          MR. GLATTER:  -- [inaudible] felt that this fund was

24  going to a hospital.

25          THE COURT:  I read Judge Sifton's decision in this

37

1   case and --

2          MR. GLATTER:  Thank you, Judge.

3          THE COURT:  -- certainly I'm familiar with the

4   statute and other contexts.

5          MR. OSEN:  Your Honor, if -- I'll try to keep the

6   speeches to a minimum.  On just the mechanics of discovery,

7   which is I think what you were most interested in, Mr.

8   Friedman is correct with respect to account statements and the

9   like.  One of the problems that we've had and which we've

10  discussed with counsel deals with the fact that, for example,

11  account statements that indicate 50 wire transfers for a given

12  period of time, maybe three or four of them are actually

13  identified in the account statement, in other words, would say

14  [inaudible] Zakat Committee, the other 47 simply indicate

15  money has been moved but doesn't indicate to whom.

16          So we have worked with defense counsel to try and

17  obtain in a phased form the underlying documentation that

18  would indicate who exactly was getting the money and the same

19  is largely true for who was paying in the money.  We've set

20  reasonable parameters in consultation with defense counsel so

21  that they don't have to look for a document from 1994 that's

22  for $7.00.  We've tried to make it as reasonable and as

23  convenient as possible under the circumstances.

24          Now, as far as the customer records are concerned

25  and the account records, we recently received access to the --

1   what purports to be the complete CBSP customer file.  We

2   anticipate due to circumstances that are not defense counsel's

3   fault, but we had to postpone the review of the Interpal

4   customer file due to a happy occasion on the defense side of

5   the table.  So we anticipate that in the next week or so the

6   Interpal customer file will also be accounted for.

7          Where it gets a little bit hazier, Your Honor, is

8   with respect to both the Zakat Committees that were originally

9   called for, that is, the ones that the defendant searched for

10  previously and obviously the list of entities that are subject

11  to the various cross motions here for the lists of both

12  recipients of Interpal and CBSP monies and the other side,

13  which is, I believe in the case of the Nat West seven or

14  six -- seven entities, those are principally not entities who

15  would have been recipients of money, but would have been the

16  fundraisers who transferred money.

17         To give just one example not to jump the gun on the

18  protect -- I'm sorry, on the motion to compel, but what we've

19  seen in the course of the document production to date is that

20  many of the so called SBGTs or Hamas fundraisers cross

21  pollinate, that is, CBSP will donate and transfer money to

22  Interpal.  Other union good entities will donate to Interpal

23  or Interpal will make donations to them so that whether that's

24  benign or money laundering remains to be seen, but essentially

25  all of these entities are inter-related.  While we haven't

1    alleged that Interpal and -- sorry, that Nat West or Credit

2    Lyonnais conspires with them, conspiracy being a different

3    matter, it's clear that we've alleged that the union of good

4    and Hamas SBGTs and so forth were in concert to raise money

5    and to move it around.

6              THE COURT:  Okay.

7              MR. FRIEDMAN:  Your Honor, if I may, that's all well

8    and good but we still don't have an explanation as to why this

9    information is not described to us in discovery responses as

10   Magistrate Judge Matsumoto ordered.  You know, Mr. Glatter

11   only read part of the interrogatory.  Let me just read the

12   whole interrogatory.  It asks that "We be provided with a

13   description as to how and in what forms and by what means such

14   persons and/or entities receiving material support and all our

15   resources from CL and, three, how and by what means such

16   material support and/or resources proximally caused

17   plaintiffs' injuries."  Let me just take what Mr. Glatter --

18   what Mr. Osen just said, which has never been described to us

19   before, that some of these entities are not recipient of funds

20   but they are fundraisers who work in this [inaudible]

21   terrorist world and are responsible for facilitating the

22   fundraising.

23              Well, most people should have been identified to us

24   in response to interrogatory number four, because they are

25   people who are in the chain of proximate causation between

40

1   Credit Lyonnais and the attacks that occurred as the way

2   Mr. Osen just described it.  Again, I wonder if they really

3   want discovery, if they really want discovery, if they really

4   believe they're entitled to discovery with respect to these --

5   what will ultimately be 30-some-odd additional entities why

6   don't they answer our interrogatories and lay this all out and

7   describe how these entities fit?  They've done it before; they

8   can do it again.  The court has ordered them to do it.  There

9   must be something up as to why they don't do it.

10          Let me just make one last point and then subject to

11   anything further that the Court has, I will be done.  First of

12   all, I hope I don't have to reiterate to everyone, but I have

13   had to reiterate it in the past, that my clients have

14   unmeasurable sympathy for the plaintiffs as victims.  To put

15   it bluntly, they don't have sympathy for them as plaintiffs

16   because the plaintiffs are alleging that these banks knowingly

17   advanced the cause of Hamas and they would view that as

18   outrageous.  It certainly is not supported by the evidence

19   that we've seen before.  But I do think we have to recognize

20   that we are in a lawsuit, a lawsuit in a court with rules.

21   You can't comme into court and say, I think you're helping

22   Hamas.  You have to say, I represent someone who has a claim

23   and here's the chain that goes from that person back to you.

24   This they have not done.

25          MR. GLATTER:  Your Honor, I don't want to belabor

41

1    the point, but I think that Mr. Friedman sets the cart before

2    the horse here.   The question is ultimately whether at the end

3    of the day after the conclusion of discovery plaintiffs might

4    provide a more full explanation as to the totality of this

5    bank's connections to Hamas that demonstrates proximate

6    causation.   That's not really a controversial point and that's

7    what a contention interrogatory is generally used for because

8    we have a conclusive effect.   These contentions

9    interrogator -- these interrogatories we were required to

10   answer them because at that point discovery was essentially at

11   a standstill.   They represent the starting line.   They weren't

12   the finish line.   What Mr. Friedman's arguments on what may or

13   may not result in proximate causation, they're at best

14   appropriate on a motion for summary judgment at the conclusion

15   of discovery after review by expert and fact witness

16   testimony.   They may be appropriate to pitch to a jury in

17   explaining whether it's foreseeable or not.   It may somehow be

18   relevant in motion in limine practice, which again, is very

19   hard to assess in the abstract.

20        But what the gravivum of what Mr. Friedman is

21   arguing is that unless plaintiffs can tell you in advance

22   before we've seen their documents whether or not the bank

23   actually had some connection to other entities in the Hamas

24   network that somehow demonstrates a lack of relevancy.   At

25   best, it may suggest that interrogatories may need to get

42

1  supplemented at some point, but that has nothing to do with

2  the scope of relevancy here.

3         THE COURT:  I think that's what he's asking for.

4         MR. GLATTER:  What?  Preclusive effect?

5         THE COURT:  No, the interrogatories be supplemented.

6         MR. GLATTER:  The question is when and why would it

7  make sense to do that in advance of production of a limited

8  number of -- as I began my remarks, Your Honor, the universe

9  of Hamas entities is enormous.  It is a lot bigger than the

10 specific entities and individuals that we've identified.  A

11 number of these people -- it shouldn't even be controversial.

12 They have been listed as specially designated global

13 terrorists by the United States Government.  It is

14 inconceivable that it's even burdensome for the defendant to

15 assess whether or not those people are its customers or have

16 been its customers in the past.

17        MR. WORBNER:  May I add just one --

18        MR. GLATTER:  Please, Mr. Worbner.

19        MR. WORBNER:  -- patent point, Your Honor, very

20 briefly.  Because my client's answered these interrogatories

21 two and four.  I didn't then and I don't understand now those

22 contention interrogatories to be seeking and eliciting

23 something like the identity of these seven.  Where I do think

24 they belong would be in Rule 26 disclosures.  Some of these

25 entities in question I understand are already in the Rule 26

43

1   disclosures.  I would acknowledge that those that aren't that

2   could easily be and would promptly will be supplemented.

3   That's the place where we're asked to identify all people that

4   might and so forth.  Of course, a better crafted interrogatory

5   could be, but I understood this interrogatory number two and

6   four very broad -- I mean, I had no idea that it was seeking

7   anything other than and to ask it in the form of a legal

8   conclusion, a proximate cause or whatever, where we had

9   disputes even about what proximate cause, the full extent of

10  that.  So I'm happy to supplement Rule 26 disclosures or in

11  response to other interrogatories that are more on point to

12  this, but I don't think that that detracts from, nor should

13  delay us in getting the discovery, because I will supplement

14  this week --

15          MR. FRIEDMAN:  Your Honor, if I may respond to that.

16  Mr. Worbner just said that he didn't understand these

17  interrogatories asking him to identify the entities involved.

18  I have and can hand up to the Court the responses to these

19  interrogatories that Mr. Worbner signed on December 10, 2007

20  where he gave a list, but the list is of the entities that we

21  searched not the entities that they now want to search.  So

22  this revelation that he didn't understand he was supposed to

23  identify these things is contradicted by the document.

24          Now, Mr. Glatter said I'm putting the cart before

25  the horse.  He said, we shouldn't have to show things are

44

1   relevant until we get the documents.  Excuse me.  We should

2   show that your requests seek relevant information before they

3   will be enforced.

4          MR. GLATTER:  Your Honor, I believe -- and if -- I

5   apologize if I wasn't clear.  We need not demonstrate right

6   now a trial level of causation.

7          THE COURT:  No.

8          MR. GLATTER:  With respect to the standard of

9   relevancy under the main [inaudible] Rule 26 and not under

10  supplemental subject matter problem.

11         THE COURT:  No, I --

12         MR. GLATTER:  The old -- I'm sorry, Your Honor.

13         THE COURT:  No, I understand.

14         MR. GLATTER:  The only other thing I would add is

15  again I think from [inaudible] perspective, what the

16  defendants are presenting is as follows, that having

17  maintained accounts for specially designated global terrorists

18  so designated because of their relationship with Hamas and in

19  the case of at least one bank doing it after the designation

20  came down, they should be somehow given the benefit of the

21  doubt as to whether or not they maintained connections, do

22  business or had information in their possession concerning

23  other entities in the Hamas network.  With all due respect to

24  Mr. Friedman, I don't think that's the doubt -- benefit of the

25  doubt that they're entitled to at this point and production --

45

1   what we should be talking about is how we proceed with

2   production and come up with a discovery deadline that makes

3   sure that there is some finality to the process.

4        MR. FRIEDMAN:  If I may respond very, very briefly

5   to that, the statute does not make it actionable to be

6   connected to an SBGT.  It makes it actionable to provide

7   support for terrorism knowing that what you're doing that.

8   The mere fact that the United States Government names Interpal

9   and SBGT does not mean that Nat West knew that its customer

10  was a terrorist entity.  That's what this case is all about.

11  What did Nat West know and when did it know it.  The United

12  States Government when it makes a proclamation like this does

13  not put knowledge in the head of someone abroad that that

14  proclamation is true, especially when its own government is

15  telling it over and over again we disagree with what the

16  United States has said.

17        We're not saying contrary to what Mr. Glatter wrote

18  yesterday that we should be exonerated because we complied

19  with our local law.  What we're saying is how can you say that

20  we knew they were terrorists when our own government

21  repeatedly told us that they didn't know they were terrorists.

22  The United States may have said they were terrorists.  The

23  Israelis may have said they were terrorists, but there are

24  countries that deem people terrorists in other circumstances,

25  which doesn't mean that we know that they're terrorists.

1          If the case rises or falls on whether Interpal and

2    CBSP was an SBGT, then the case will be very different than

3    what it is today.  There is an obligation under the statute.

4    It's an element of the statute.  Your Honor is familiar with

5    Judge Sifton's decisions.  They need to prove that we knew we

6    were supporting terrorists.  The SBGT designation is not a

7    proxy for that.

8          MR. GLATTER:  Your Honor, with all due respect I

9    think a number of these arguments, the ones that are

10   ultimately pitched to the jury box, they're not really

11   relevant to the narrow issues as to whether the defendant is

12   entitled to a protective order --

13         THE COURT:  All right.  I --

14         MR. GLATTER:  -- [inaudible] these searched for the

15   entities.

16         THE COURT:  Certainly as Judge Sifton made clear in

17   his decision, that's an issue yet to be decided but not on a

18   motion to dismiss.  It's been alleged as sufficient.

19         MR. GLATTER:  [Inaudible] to the attorney/client

20   privilege.

21         THE COURT:  Yes, I was going to say that it is and I

22   think probably actually the best way to proceed because if I

23   have to reach the burden issue too is for us to -- for me to

24   plow through the documents a little more carefully and confer

25   with Judge Matsumoto.  We could have a telephone conference

47

1   and then perhaps complete the briefing schedule and give the

2   defendants, if necessary, a fuller opportunity to brief the

3   question of burden in connection with the next -- on with the

4   next motion that -- not the privilege motion, but the

5   plaintiffs' motion yet to be fully briefed and then I'll even

6   give you a chance to do a reply, too, if you desire to.

7          MR. FRIEDMAN:  There are -- just to be clear, there

8   are three motions left to be fully briefed.  One is the cross

9   motion to compel, which is the flip side of what we've just

10  been discussing with respect to --

11         THE COURT:  Yes.

12         MR. FRIEDMAN:  -- more entities, then there's the

13  plaintiffs' motion to require Nat West to respond with a

14  broader responsiveness period and then there's the motion to

15  compel Credit Lyonnais to produce certain documents about

16  watching this.  When we're done, we can agree on a calendar

17  for our opposition to all of those motions.

18         MR. GLATTER:  Your Honor, I'd only point out that to

19  the extent that you initially address and rule favorably for

20  plaintiffs on what are fundamentally relevancy concerns, it

21  may be -- again, ultimately it's going to be defendants'

22  call -- that that -- they may make a conclusion at that point

23  that they do not want to press ahead with burdensome issues

24  that are not particularly germane to relevancy.  I don't know

25  that that's ultimately their call.  So it may be a function

48

1   that if we can get past that threshold concern we may be able

2   to proceed with discovery and obviate the need to extend the

3   process for further motion practice.

4          THE COURT:  Well, that's what I said.  I need to

5   just digest what's been said and, if necessary, ask for fuller

6   briefing on the remaining motions to be briefed, so --

7          MR. GLATTER:  Okay.  Thank you, Your Honor.

8          THE COURT:  Move on to the privilege motion, the

9   implied waiver.  I just have a passing comment and I assume

10  based on the submissions there's no dispute as to the

11  identification of the particular documents that are deemed

12  privilege and we don't need to get into a dispute over which

13  law applies in determining this motion.

14         MR. WORBNER:  Your Honor, on behalf of the

15  plaintiffs I'm going to present the motion.  To answer your

16  question on behalf of plaintiffs, I would say we acknowledge

17  and accept that these are based on the privilege log on their

18  face attorney/client privilege and that they're adequately

19  described.

20         We would ask, though, that the Court at least

21  consider an in camera inspection because we think that -- and

22  maybe we had some confusion when we say "waiver."  I think

23  forfeiture would be my preferred term, forfeiture of the

24  attorney/client privilege we think has occurred by virtue of a

25  specific factual position that the banks are taking.  But

49

1   it -- I hope that answered your question that we're satisfied

2   with the log.  I think just the issue is do these cases

3   recognize an exception and is this proper case for the

4   application of that.

5            THE COURT:  Okay.

6            MR. WORBNER:  May I approach the ledge or --

7            THE COURT:  Wherever you're comfortable.

8            MR. WORBNER:  Your Honor, I heard the Court several

9   times say that you've read the opinions and -- but you want to

10  dig into some of the documents.  I would like just to take one

11  minute to set what the Applebaum fact case is, you know,

12  because it's highly pertinent to the time frame of these

13  documents.  As you know, it was the United States Government's

14  action on August 25th of '03 designating both the Nat West

15  customer Interpal and Credit Lyonnais CBSP as Hamas terrorist

16  financiers that we consider very highly critical.

17           The Applebaums, who are the lead main plaintiffs,

18  though there unfortunately are many other families who are

19  also Hamas victims, Applebaum was a doctor and his 20-year-old

20  daughter who on September 9, 2003, the night before that 20-

21  year-old girl was to be married, her father who was born in

22  Cleveland and a doctor here had moved his family to Israel.

23  They had guests in from the United States for this wedding the

24  next day.  About 11:00 o'clock at night, they went in

25  Jerusalem where they lived to Café Hillel in a little quaint

50

1   sort of part of the town to get pastries, really just to pick

2   them up and take them back to their apartment where all the

3   family was, and a Hamas terrorist exploded in that café,

4   killed seven people, including those two Americans.  Now, I'm

5   not saying that in the way of jury argument.  I'm saying that

6   to highlight in particular in the Applebaum case the

7   importance of the timing of that attack.

8           Now, the other plaintiffs, there are a fact --

9   another couple of plaintiffs after that designa --

10          THE COURT:  I'm really acutely aware of the question

11  of timing.

12          MR. WORBNER:  All right.  So the key issue is when

13  this designation was made by the United States Government if

14  up to that point the bank didn't already know and understand

15  that its customer was involved in Hamas terror financing and

16  in the case of Nat West, Your Honor, in a document that's been

17  produced there were documents before August of '03 that said

18  on a national level, we have suspicions that Interpal is

19  engaged in terror financing.  The word is "terror funding."

20          So we believe that the bank knew that there were

21  these concerns.  That was their own particular concern.  In

22  fact, there was -- putting the calendar surveillance, it was

23  highly pertinent to their state of mind what they thought and

24  how they responded on that designation.  Mr. Friedman just

25  said, and we've cited in here -- it's stated in their papers

1   under their motion to dismiss -- they say that, you know, we

2   did not really consider the President of the United States and

3   the U.S. Government's designation to be reliable or accurate

4   or truthful.  We really discounted it, didn't believe it.  We

5   relied on the UK Charitable Commission, who allegedly made us

6   feel like they had a clean bill of health.

7           Our position is, Your Honor, that the UK Charity

8   Commission did not give them a clean bill of health.

9   Basically -- and I won't go through all the machinations, but

10  there is a genuine dispute about how much clean bill of health

11  the UK Charity Commission could cause reasonably in someone's

12  mind.  There's also a genuine dispute about how concerned one

13  would be by virtue of the U.S. designation.

14          In that designation that was made by the U.S.

15  Government and circulated within the banks, it was not just a

16  name of Interpal or CBSP popping up on a list.  It was a

17  several paragraph document in that designation that described

18  the history of their customers and who was doing it, where

19  they were sending money, so it was pretty elaborate about

20  that.

21          We believe that they have -- that it is highly at

22  issue and highly relevant how they responded as a bank.  These

23  are not attorney/client communications that we're seeking, as

24  counsel said, vitiate or intrude or invade that were

25  communications relating to the lawsuit or related to claims by

52

1  victims or even related to liability or exposure of the bank.

2  These were simply at communications within the bank as to that

3  designation.  We're not -- I mean, we're not even interested

4  is what these emails say is, well, we don't think it applies

5  in the UK legally or -- it's not the legal conclusions and the

6  legal analysis that we think is highly relevant.  What we want

7  to see are the extent of the communications conveyed to

8  businesspeople who were involved in the decisions whether to

9  keep the account open or not as to whether it added to or

10  subtracted from their state of mind about their customer.  If

11  they're passing on that, well, we're concerned because the

12  U.S. Government is stating, and they have evidence, and

13  they've found, and they believe that this is elaborate

14  financing, those are all things that go to the heart of the

15  disputed issue.

16          Nowhere in the -- and we shouldn't be deprived of

17  that.  I mean, we have no other way to get that very unique --

18  and what we're looking for is really about a 30-day period,

19  say, from August 23rd through September 25th.  There was some

20  confusion as to the span of time that we were seeking, but

21  that's the span I would ask the Court.  Why September 25th?

22  That's the day after this period where Interpal -- I mean, Nat

23  West had sort of frozen the accounts.

24          Now, in these papers and in other places Nat West

25  said that when that government designation came out on August

53

1  23rd, we froze all four or five of Interpal's accounts.  I was

2  in London a few weeks ago with Mr. Friedman when we deposed

3  three or four of those bankers from Nat West.  Clearly, the

4  testimony was that they froze only the U.S. dollar accounts

5  that they were maintaining for Interpal at Nat West.  They

6  never stopped carrying on -- that's what the witness said.  I

7  don't know if it's been corrected in an errata sheet or

8  something else.  There were a lot of changes, I believe, in

9  some of them, but that clearly is what she said.

10        But regardless, that bank, Nat West, throughout that

11  period is obviously putting their customer under scrutiny and

12  going.  We've already had suspicions because of where the

13  money was coming and where the money was going that this may

14  be terror funding.  We had the United States of America

15  designating in some detail that this is a Hamas front and we

16  have in that very tight 30-day time frame 60-some

17  communications of emails.

18        We would urge the Court, Your Honor -- I hate to

19  burden the Court already with more, but these emails could

20  be -- I don't want to say explosive, but extremely, extremely

21  critical to the core issue.  We should not be put to rebutting

22  or impeaching their defense.

23        Their defense is, you know, that designation that

24  the plaintiffs talk so much about just wasn't accurate or

25  reliable.  We should not be deprived of the communications

54

1    with the critical people.  These were communications when we

2    look at the log that are -- that involve extremely important

3    people in the bank, people who were on the anti-money

4    laundering.  You remember I said that earlier, even before the

5    U.S. designation there were memos.  The actual branch is

6    like -- it's out there with just a few people.  It was the

7    national anti-money laundering and anti-fraud committee of Nat

8    West that had been already flagging and red flagging activity

9    by Interpal.  So these are the very same people who will be

10   witnesses in the case, that we will not be able to impeach or

11   cross-examine about their state of mind including right up

12   through September when some of the plaintiffs were killed.

13   They want us to show the proximate cause and show the state of

14   mind without having access to the most relevant issue at the

15   most relevant time.

16          I think the Second Circuit in the Eastern District

17   has recognized that the attorney/client privilege, though

18   respected should have very limited scope.  There's no public

19   policy purpose to be served in this case.  These are not yet

20   legal advice and we're not intruding on trial strategy or

21   known impressions.  If the Court could either review in camera

22   or order the production, they can redact a legal analysis.  We

23   don't need to have a trial about whether there was extra

24   territorial application.  I think it's all conceded that as to

25   where their state of mind came from, you know, this could be.

55

1    We're not saying there was strict liability simply because of

2    the designation.  We're saying that that designation was a

3    basis upon which their knowledge could be based especially

4    coming on to other things it had.

5          So we can redact legal things that might be

6    confusing to the jury or legal analysis but those things that

7    say who is Interpal, you know, who are they associated with.

8    For all we know, the legal department is saying, we've

9    reviewed the activities in their account and we see that

10   they're conveying money to X, Y and Z.  The fact that there's

11   that communication and there's a lawyer on one end of the

12   communication shouldn't make it off limits in a case of this

13   character.  Thank you, Your Honor.

14         MR. FRIEDMAN:  Your Honor, Mr. Worbner didn't say

15   one word about why there was an implied waiver or why the

16   privilege that he admits applies to these documents should be

17   overcome.  He said these documents are extremely critical to

18   the core issue, but the core issue is not what Nat West

19   communicated with its lawyers, not what Nat West said to its

20   lawyers and not what the lawyers said to Nat West.

21         As Mr. Worbner himself put it, the issue is what did

22   Nat West know about Interpal and when did it know it.  We have

23   produced to them all the documents that we have.  We have

24   produced to them all the portions of documents that contain

25   privileged communications that we have that show what Nat West

56

1  knew and when it knew it.  But these documents as described on

2  the log are documents in which Nat West is seeking legal

3  advice from internal and external counsel or receiving advice

4  from internal or external counsel.

5        As Magistrate Judge Grubin said in the Standard

6  Charter v. Ialla, which is on all fours with this, to be sure

7  as in every lawsuit it would be useful and convenient to

8  obtain privileged material and the substance of a party's

9  confidential communications with its attorneys might reveal

10 some of what defendant knew, but those are not reasons to

11 avoid the attorney/client privilege.

12       There is nothing in these documents that reflects

13 factual knowledge that is not covered by other documents that

14 have been produced to them.  These are pure legal

15 communications, soliciting advice and receiving advice.

16       Let me just digress for one minute because

17 Mr. Worbner --

18       THE COURT:  Before you digress just a couple

19 questions.  What other documents were produced?  That

20 obviously is one of the considerations.

21       MR. FRIEDMAN:  Sure.  There are hundreds and

22 hundreds of emails and memos in which the banker's report,

23 we've done a study, this is what we find, this is what we know

24 about Interpal.  Mr. Worbner is quite right.  They did have

25 suspicions that Interpal was engaged in terrorist financing

57

1  and they investigated those suspicions and they concluded that

2  they couldn't say that Interpal was engaged in terror

3  financing.  Same thing with the English government.  By the

4  way, Mr. Worbner said we never froze the English accounts.  Of

5  course, he knows that we did freeze all the English accounts

6  because the UK Government issued a freeze of Interpal a couple

7  of days after the SBGT designation, but it concluded that

8  there was no basis for concluding that Interpal was involved

9  in financing Hamas terrorism and lifted that freeze.  What Mr.

10 Worbner was referring to was that there was an account that

11 was denominated in dollars and that remained frozen because of

12 the SBG designation, but I'm sure he did not intend to

13 misspeak in that way.

14         Your Honor, there are hundreds and hundreds of

15 memos, emails, communications between the people involved in

16 anti-money laundering and anti-terror financing about what

17 they knew about Interpal.  There is the relationship file,

18 most of which they already have.  There's very little -- well,

19 we're producing to them a few documents that we didn't find in

20 the file the first time, but they're not related to this issue

21 here.  There are transitional documents.  But they have --

22 they know their customer files.  They have everything that the

23 branch knew about Interpal.

24         What we're talking about here is pure

25 attorney/client material, which does not disclose facts in and

1   of itself.  You know, Mr. Worbner is hypothesizing and he's

2   guessing.  Maybe the documents say, well, we know this about

3   Interpal or we know that about Interpal.  They have all the

4   documents that describe what the bank knew or thought it knew

5   about Interpal.  To the extent any of that is repeated in the

6   requests for legal advice, they already have it.  It's just

7   like the Standard Charter case where the Court said that the

8   privilege is so important, it's such a high burden to overcome

9   the privilege that even if there's factual material that

10  factual material will not overcome the privilege.

11          I am representing to Your Honor that having reviewed

12  these documents there is no factual material in these

13  documents that is not otherwise disclosed.  It's the requests

14  for legal advice and it is the rendering of legal advice.

15          The fundamental point that separates the parties

16  here, Your Honor, is that as we explained in our letter

17  defendant -- plaintiffs are treating this as if it's a case in

18  which we've rejected reliance on the advice of counsel where

19  we've rejected what our knowledge of the law is as in the

20  Bilzarian [Ph.] case or as in the qualified immunity cases

21  that they rely on.

22          What is at issue in this case is not the legal

23  advice that we requested and received.  What is at issue in

24  this case is what did we know about Interpal and when did we

25  know it.  There was nothing in the [inaudible] communications

59

1    that there on what Nat West knew about Interpal that is not

2    otherwise disclosed in the materials that we have produced.

3    In fact, the irony is that we're accused of using the

4    privilege as a sword and shield because we redacted documents

5    so that we limited what we were holding back on the

6    attorney/client privilege to what really was privileged.  If

7    there was factual material, we did not redact it and we

8    produced it and to prove that no good deed goes unpunished and

9    to prove that consistency is not a limitation on the arguments

10   that are being made here were then accused of engaging in

11   selective disclosure.

12          The case law that plaintiffs relied upon holds that

13   there's an at-issue waiver only if the party has injected

14   reliance on the legal advice into the case and we have not

15   done it.  I don't know if Your Honor has had an opportunity to

16   look at Magistrate Judge Grubin's decision in Standard Charter

17   v. Ialla, but as we quoted what was at issue in that case is

18   the communications that the parties exchanged with one

19   another.  Magistrate Grubin went at length to say what is

20   relevant in that case is what the parties said to each other,

21   not what they said to their lawyers.  The same principle

22   applies here.  We have already produced to them the

23   information that we have about what Nat West knew and when it

24   knew it.

25          So not only has Mr. Worbner not articulated a basis

60

1    for a finding of implied waiver.  There is no basis for a

2    finding of implied waiver.  While he says that he would like

3    to have these documents, these documents are core, that the

4    courts have told us is not a basis for vitiating the privilege

5    that applies here.

6          Your Honor, may I just add one other point just as a

7    factual matter because I don't want Your Honor leaving the

8    bench today with a mistaken impression as to the facts at

9    issue here.  I read that Mr. Worbner made the illusion to some

10   factual matters that he did because they're really not

11   pertinent, but I just wanted to alert Your Honor that if Your

12   Honor were to look for this under Google, Your Honor would see

13   that it's a matter of public record.

14         After the United States made its SBGT designation of

15   Interpal a delegation came from the Bush administration to

16   Downing Street to try to persuade the British Government that

17   it should join the U.S. Government in condemning Interpal as a

18   Hamas financier.  The press reports indicate that the parties

19   had a meeting, but there's a statement that was made by the

20   British Government after that meeting that -- after that

21   meeting occurred in which the British Government, the Prime

22   Minister's office said, we met with the United States, we

23   listened to what they had to say, all they showed us were

24   press cuttings in their term.  All they showed us were hearsay

25   news articles of Interpal.  We cannot conclude that Interpal

61

1   is financing Hamas terrorism based on that.

2          Now, Your Honor, forgive the digression, but I do

3   think that that is extremely important here because with

4   reports about the tragedy that befell plaintiffs with reports

5   about what the U.S. Government says imposed, that's not what

6   this case is about, but that's the issue at hand.  There's no

7   showing of implied waiver.  The case law teaches us there is

8   no implied waiver in these circumstances and the motion to

9   pierce the attorney/client privilege should be denied.

10          MR. WORBNER:  Your Honor, briefly I think Mr.

11   Friedman's remarks really closed the -- and narrowed our

12   dispute.  I heard him say and represent very clearly that

13   there is absolutely nothing in these documents other than pure

14   core legal analysis and that --

15          THE COURT:  That's not what he said.  He said that

16   all the factual materials in these documents --

17          MR. WORBNER:  Well, that's my second point.

18          THE COURT:  -- are --

19          MR. WORBNER:  He said and -- I -- two points.  That

20   these are legal analysis and that wherever outside this time

21   frame and including this time frame, I guess, he said he

22   personally reviewed all these emails and that there's no

23   factual statements in there.  It's just legal analysis.

24          THE COURT:  That's not what he said.  He said that

25   there are no factual materials in the documents and the

62

1   privilege log that are not otherwise reflected in documents

2   produced.

3            MR. WORBNER:  All right.  All right.  I accept that

4   as a fuller statement of it.  But the point is, he's seeming

5   to say if there was we would produce it.  If there was

6   something that's there on their state of mind, if there was

7   something that added or subtracted from their knowledge

8   factually, we would produce it.  That's the point I'm trying

9   to get to however express words you heard it is -- and the

10  record reflects is fine.

11           So my point is simply to ask the Court to please

12  either make an in camera review or have counsel submit a

13  detailed declaration to that effect, because I want to tell

14  you this, Your Honor.  Twice before we went to London in

15  writing orally, it was represented that we had the entire

16  customer file for Interpal.  Twice.  We said we just want to

17  have the original here.  Later they said, well, we found that

18  there was 100 pages or so missing.  That's what you've

19  elicited today is still coming to us.

20           I'm not casting aspersion as to how that happened,

21  whether it was intentional, but twice it was represented that

22  the entire bank's customer file had been produced and it

23  hadn't been.  This log was created a long time ago.  Your

24  Honor, Terry Woodley [Ph.] is a name that you see in here over

25  and over.  A lot of these are involving Terry.  He was the

1   branch account manager or assistant account manager who we've

2   requested to depose, who's no longer at the bank.  In other

3   words, these are not from one lawyer reporting to another

4   lawyer in the legal department.  Some of them may be like

5   that, but Terry Woodley -- and if you look at the ones between

6   August 22nd and September 25th, you see a large number of

7   Terry Woodley being involved.  These -- he is a key witness as

8   a branch manager handling the account as to what he knew.

9   He's writing some of these.  If he's writing -- I mean, I just

10  really with all honor to my opponent, I can't be satisfied on

11  his conclusion when he says there was hundreds of others --

12  there have been thousands of documents produced, but there is

13  no more than a dozen, Your Honor.  No more than a dozen that

14  reflect suspicions about Interpal being engaged in terror

15  financing.  Now, that's a lot, I think, but there -- it's not

16  like this is just cumulative.  He can't be arguing that these

17  things are just cumulative.  If the account manager is

18  reporting back factually what they know, that would -- about

19  the -- about Interpal --

20          THE COURT:  So you're really focusing on the emails

21  from bank employees to counsel whether in-house or outside

22  counsel?

23          MR. WORBNER:  Yes.  Yes, Your Honor.

24          MR. FRIEDMAN:  Your Honor, if I may, first of all,

25  you know, it's -- Your Honor was in private practice before.

64

1    You know, it's very difficult to get up especially in front of

2    a judge who is new to the case and to respond to these kinds

3    of things that was said.  But as Mr. Worbner knows, what he

4    told you about two letters concerning the Interpal customer

5    file is outright false.  It was about Credit Lyonnais and the

6    CBSP file and those letters were about -- in those letters I

7    said that --

8              THE COURT:  I really don't want to hear a response

9    to that.

10             MR. FRIEDMAN:  Your Honor, Terry Woodley was the

11   assistant manager of -- was the assistant relationship manager

12   for the Interpal account.  It's no accident that we see a lot

13   of communications around the time of not just the US SBGT

14   designation but the Charity Commission issuing a freeze order

15   and launching a new investigation.  Counsel were consulting

16   with their clients.  Clients were consulting with their

17   counsel.  Requests went out for advice.  Advice was rendered.

18   It's as if Mr. Worbner doesn't understand what the

19   attorney/client privilege is about.  It is precisely when

20   clients are seeking advice about challenged conduct --

21             THE COURT:  Well --

22             MR. FRIEDMAN:  -- that they seek out legal advice.

23   It is entirely to be expected that at a critical time in the

24   facts underlying this case that clients would be communicated

25   with counsel.  The fact that those communications occur to say

1   that that somehow supports a waiver is to turn the privilege

2   upside down.  It means -- it would mean that anytime someone

3   is accused of wrongdoing in connection with something as to

4   which they consulted counsel, the privilege wouldn't apply.

5   That turns the law upside down.

6          MR. WORBNER:  No one [inaudible] --

7          THE COURT:  No, I -- I don't want a response to

8   that.  Now, I mean, you do acknowledge that there are factual

9   statements in these emails, don't you, Mr. Friedman?

10         MR. FRIEDMAN:  I can't recite which emails have

11  factual statements, but I do know that any fact that was

12  reported as to what Nat West knew, I believe, is otherwise

13  disclosed.  On top of that, the law says -- and this is right

14  from Magistrate Judge Grubin's decision in the Standard

15  Charter v. Ialla case is that even to the extent there are

16  factual -- there's factual material in the communications that

17  was not otherwise revealed, that is just something to be taken

18  into account in striking a balance as to whether to sustain

19  the privilege or not.  But I believe that any factual material

20  communicating knowledge that is contained in these

21  communications is otherwise disclosed in the record.

22         THE COURT:  Well, but if it's factual material then

23  it's not by definition protected by the attorney/client

24  privilege.

25         MR. FRIEDMAN:  No, it is, Your Honor.  If I --

66

1          THE COURT:  Unless -- now, I -- you know, because

2  you have done that.  You have disclosed documents reflecting

3  factual statements and redacting privileged material.

4          MR. FRIEDMAN:  Even if I hired Your Honor as counsel

5  and as part of equipping Your Honor to render advice to me, I

6  lay out the facts of my problem to you in a communication,

7  it's still privileged and --

8          THE COURT:  All right.  Okay.  That confidence --

9  okay.  I mean, from --

10          MR. FRIEDMAN:  The mere fact that there's

11  communication, but is there anything that is in these

12  documents that is independent, that it is a fact that was

13  developed for the first time in connection with the

14  solicitation of legal advice?  Absolutely not.  What facts are

15  referred to for the purpose of obtaining or receiving legal

16  advice are facts that are otherwise disclosed.  But there's --

17  contrary to Mr. Worbner's hypothesis, there's no independent

18  development of facts and exchange of facts in these

19  consultations with counsel.  It's clients reporting to their

20  counsel, here's the situation.  It's counsel saying to the

21  clients, here's my advice.  It is classic attorney/client

22  privileged information.

23          MR. WORBNER:  Your Honor, if I can respond just on

24  the narrow issue of material that might presumptively be

25  privileged, but nevertheless might be voided by virtue of the

67

1  at issue exception, there's a couple of things to keep in

2  mind.  What we've heard a lot, both with respect to this

3  motion and the one that preceded it is the bank's

4  representation that what it did was following the advice of

5  its home country.  It's also conceded the fact that its home

6  country here, France had represented --

7           THE COURT:  No, look.  That came to mind and

8  certainly I read your argument.  I haven't -- quite frankly, I

9  haven't plowed through the defendants' submissions in support

10 of their motion to dismiss, so I --

11          MR. FRIEDMAN:  Your Honor, just to be clear because

12 this straw man gets erected day after day after day, we are

13 not saying that all we did is follow the advice of our home

14 country.  We're saying that we did not know that our customer

15 was financing Hamas terrorism and we did not intend in serving

16 our customer to finance Hamas terrorism.

17          One of the ingredients of that is what we knew from

18 our own government and if our government with all its

19 resources didn't tell us we believe these are terrorists, that

20 made it all the more difficult -- all the more unlikely that

21 we would conclude they're terrorists.  I wish they would stop.

22 We are not saying that because the British said it's okay,

23 it's okay, or the French said it's okay, it's okay.  We are

24 saying that we consulted with our home governments and one of

25 the constituent elements of our knowledge with respect to our

1  customers is what our governments told them.  You know what?

2  The SBGT designation could be wrong, too.

3          THE COURT:  Look, I -- that's right.  Unfortunately,

4  that's not anything we have to decide in this case, which

5  governmental agency is correct in its assessment.  I mean, all

6  we're discussing at this point is a fairly narrow discovery

7  issue and it's the extent of Nat West and Credit Lyonnais'

8  knowledge of the activities of these two account holders,

9  really.

10          MR. WORBNER:  Two uniquely points, Your Honor.  I

11  think one is very important.  Counsel said there's nothing in

12  this 30-day period that if there -- if it is factual, if

13  there's anything different than what would have been before,

14  there -- or words to that effect, he's based -- there is

15  something that is uniquely in those emails and that is the

16  bank's knowledge once it is hearing that the U.S. has declared

17  its customer a Hamas financier and that its own government is

18  freezing that customer's funds to all banks.  How the bank

19  responded to that was not in anything that would have been in

20  there previously and --

21          THE COURT:  Okay.  I understand.

22          MR. WORBNER:  Okay.

23          THE COURT:  I really and I'm hesitant to ask for

24  production of documents that were produced in discovery, but

25  perhaps it might help shed some light as to what was produced

1   if the defendants produced copies of documents reflecting what

2   Nat West and Credit Lyonnais knew during this one-month time

3   period as designated by the plaintiffs.  I don't know how

4   voluminous this is but certainly, for instance, the

5   communications from Mr. Woodley or notes or any documents --

6          MR. WORBNER:  May I make a suggestion?  I'm happy --

7   if the -- to have them all, but at the depositions, round one

8   of the bankers there must have been about 30, 40 documents

9   marked as deficit.  Those were the key ones in terms of what

10  the bank was knowing about Interpal, so alternatively the

11  Court might want to see the deposition exhibits, as opposed to

12  everything that was produced.

13         MR. FRIEDMAN:  Your Honor, I have no problem with

14  Your Honor looking at the deposition exhibits, but with

15  respect -- I have a problem with Your Honor asking me to

16  identify the documents that I know of that bear on the issues

17  they're trying to prove.  That's my work -- that's my --

18         THE COURT:  No, no, no.

19         MR. FRIEDMAN:  That's my work product.

20         THE COURT:  But -- well, no.  No, no.  I -- you have

21  said that you've produced hundreds of emails which contain the

22  actual materials that would otherwise be -- that are also --

23  that contain all factual materials set forth in the

24  documents -- that identify the privilege logs, so, you know.

25         MR. FRIEDMAN:  In other words --

70

1         THE COURT:  I hesitate to ask because the last thing

2  I want to do is be -- to spend my evenings reading these

3  documents, so I think perhaps the plaintiffs' offer is a

4  start.  If -- I just need to get a handle on what --

5         MR. FRIEDMAN:  [Inaudible] the depositions to Your

6  Honor and we can go from there.

7         THE COURT:  If you want to supplement --

8         MR. FRIEDMAN:  We're going to --

9         THE COURT:  I'm let -- giving you the opportunity to

10  do so.  You have to stand beside -- behind what you've just

11  said, Mr. Friedman.

12         MR. FRIEDMAN:  I understand that, Your Honor, but

13  I -- if Your Honor wants me to go through the factual record

14  and to pick out the documents and to give Your Honor the

15  copies to my adversaries, the documents that I believe show

16  what my clients knew and when they knew it, that's my work

17  product.  You're asking me to lay out my defense.  What I --

18         THE COURT:  Let me just ask you for the documents

19  created by Mr. Woodley in the bank's files for this time

20  period -- in this one-month time period.

21         MR. FRIEDMAN:  Including the privilege documents.

22         MR. WORBNER:  No.

23         THE COURT:  No, no.

24         MR. FRIEDMAN:  The other -- but you're --

25         THE COURT:  The documents that you have produced.

71

1          MR. FRIEDMAN:  But, Your Honor, that's apples and

2    oranges.  Mr. Worbner has --

3          THE COURT:  But setting aside, you know --

4          MR. FRIEDMAN:  Mr. Worbner asked --

5          THE COURT:  It's very old documents.

6          MR. FRIEDMAN:  I didn't say nor could I say that Mr.

7    Woodley -- that we've produced documents written by Mr.

8    Woodley about the facts.  The mere fact that Mr. Woodley

9    corresponded with counsel is not inconsistent with that.  I

10   don't know whether there are any documents that are of a

11   factual nature that were written by Mr. Woodley.  That has

12   nothing to do with whether his correspondence with counsel are

13   privileged.  They could be documents written by someone else

14   or documents put together by someone else.  It just -- it

15   doesn't make sense to me that because he's picked out a name

16   from the privilege lot that if I can't show that that person

17   has written factual documents that I produced that somehow

18   that impeaches the privilege.  Mr. Woodley is there with the

19   file.  He's forwarding things on to counsel so that counsel

20   can give advice.  That has nothing to do with whether Mr.

21   Woodley has written about these factual materials previously.

22          I can give Your Honor the deposition exhibits and

23   then we can go from there and see what Your Honor wishes to

24   do.  I don't -- excuse me.  I don't see that it's proper to

25   have me go through the chronology of all the documents and

72

1   explain to Your Honor and give to Your Honor all the documents

2   that I think reflect what my client knew and when it knew it

3   because that's laying out my work product --

4            THE COURT:  Well, that's why --

5            MR. FRIEDMAN:  -- to the plaintiffs.

6            THE COURT:  -- I just talked about the documents in

7   terms of this one-month period and I --

8            MR. FRIEDMAN:  I can put together documents from

9   this one period, but let me also say that what was going on

10  during this one-month period was having lawyers render advice

11  based on the entire history before them so that the fact that

12  a document may not have been created that's of a factual

13  nature within that one-month period is artificial and doesn't

14  tell us anything.

15           MR. WORBNER:  Your Honor, with all due respect, I

16  hear a lot of back pedaling.  I mean, when -- counsel did not

17  rest his initial decision on the idea that regardless of

18  what's in these documents they're protected by the

19  attorney/client privilege, counsel bolstered his argument by

20  saying in effect they would just be cumulative because all

21  these things that showed the bank's state of mind had been

22  produced earlier.  Counsel bolstered his argument by saying

23  that they have produced privileged material where it was

24  factual in nature and essentially redacted the pure legal, you

25  know, communication.  So when called to account on that, I

1   mean, I would ask that -- and there's only probably a dozen,

2   but from August 22nd to September 25th, the emails that

3   involve Mr. Woodley, the assistant relationship manager for

4   Interpal, we tendered to the Court with the deposition

5   exhibits and I think you will clearly find --

6           THE COURT:  Emails on the privilege log.  Is that

7   what you're suggesting?

8           MR. WORBNER:  Yes.  I think that would put to

9   rest -- and I will not appeal or challenge or whine, as I'm

10  known to do, if you look at --

11          THE COURT:  Yeah, I think that's actually a pretty

12  good suggestion.  Only the emails by Mr. Woodley.

13          MR. FRIEDMAN:  Well, why Mr. Woodley?  I don't

14  understand why they're so fixated on Mr. Woodley.

15          THE COURT:  I'm fixated on it because it's the only

16  name I remember from the privilege log, but no.  I mean, it's

17  the one name that came up.  You know, I -- the names on the

18  privilege log have very little meaning to me at this juncture.

19          MR. GLATTER:  Your Honor, may the Court indulge me

20  in just a remark to just kind of get back to basics here?  My

21  understanding is that every witness who was asked what do you

22  know about Interpal answered the question and that every

23  document other than a communication from the client to the

24  attorney and back was produced.  The privilege protects

25  communications in confidence from a client to a lawyer seeking

74

1  legal advice.  Those communications inevitably involve

2  transmission of factual information.  The privilege doesn't

3  protect the underlying facts.  The course of the discovery has

4  drawn that distinction and they've been given without any hold

5  back by the witness, what he knows.

6          I remember, and you may recall in practice, we've

7  been at depositions where lawyers say to a witness when you're

8  answering the question, you know, omit facts you learned from

9  your lawyer or omit facts he told your lawyer, which is

10 impermissible.  The facts are the facts.  But what is put into

11 the communication is what's privileged and the witness --

12         THE COURT:  Well, I --

13         MR. GLATTER:  -- can answer as to the facts.  He

14 doesn't answer as to what he told his lawyer whether it's a

15 fact or request for legal advice or both combined, which is

16 typically what happens.  With all respect, my friends here

17 seem to just be blowing through that distinction.  No one held

18 back any facts.  What's been held back are privileged

19 communications.

20         MR. WORBNER:  Your Honor, there's something very

21 important.  Terry Woodley is no longer with the bank.  We have

22 asked for his deposition.

23         THE COURT:  Well --

24         MR. WORBNER:  He's in a foreign country.  Many

25 others are -- we are being told --

1          THE COURT:  Mr. Worbner, maybe you won't be quite as

2     excited to hear that there's -- Terry Woodley is the author of

3     one email on this privilege log, so --

4          MR. WORBNER:  Not a big deal.

5          THE COURT:  Okay.  So --

6          MR. GLATTER:  There's seven documents, I think, Your

7     Honor, that referenced Mr. Woodley.

8          THE COURT:  He's cc'd on a few and there are few

9     emails to him, but he is the author of only one email on this

10    log, which I think Mr. Worbner said earlier is -- you know,

11    what -- it -- you're most concerned about was -- what they

12    knew -- what they communicated to counsel as to factual

13    materials they knew, so --

14         MR. WORBNER:  I'll look at the list.  If there --

15    there may not be, but if there's any other Interpal business

16    account person, not a lawyer but someone who was handling the

17    account that communicated, I think if we look it's only

18    Woodley.

19         THE COURT:  Well, why don't you just look through

20    the list now so we can --

21         MR. WORBNER:  Okay.  Well --

22         THE COURT:  -- just get this over with?

23         MR. WORBNER:  I was just as -- was looking at that,

24    Your Honor, to see if there's any others.  It would be a very

25    different --

1        THE COURT:  And then let me just suggest to --

2  excuse me for interrupting to the defense counsel that you'll

3  provide me with a set of the deposition exhibits and then you

4  can provide me with in camera review without designating what

5  documents so you don't have to worry about waiving your work

6  product.  Any documents that may -- that you've produced that

7  contain factual materials also contained in this email written

8  by Mr. Woodley that would not otherwise be reflected in the 30

9  exhibits produced at the deposition.

10        MR. WORBNER:  Your Honor, on page 6 of the log the

11 "From" column shows relationship.  You see those two that say

12 "Relationship Unit"?  It doesn't show to whom.  They're notes,

13 but those would be writings, I presume, of people like Mr.

14 Woodley -- maybe even Mr. Woodley, but since they are not

15 lawyered notes but a businessperson notes, I would like the

16 Court to look at them whether the Court deems them

17 appropriate.

18        I don't see the other names of people who authored

19 to the legal department or people in the anti-money laundering

20 unit.  In other words, businesspeople, the anti-fraud section.

21 For example, Mr. Hosen [Ph.] is one of those and Mr. Steven

22 Foster [Ph.].  Those people were the authors before the August

23 '03 designation writing to the account manager saying that he

24 really need to keep an eye on the branch on Interpal, the

25 customer, because it looks to us from some of the computer

1  parameters that we've set up that the money is going to or

2  from it looks like terror financing.

3        So again, at stage one I could live --

4        THE COURT:  No, no.  You're just going to identify

5  the people because I'm going to read -- review the exhibits

6  once and I will read the emails once.

7        MR. WORBNER:  Then I would like -- yes, ma'am.  Then

8  I would like on my list to include as the author, not the

9  recipient, but as the author Mr. Michael Hoseason [Ph.] and

10  Steven Foster because those were people involved pre-'03 in

11  talking about their suspicions about Interpal.

12        MR. FRIEDMAN:  Your Honor, just again, as

13  Mr. Blackman said, we've blown through what the issue at stake

14  here is.  The plaintiffs have made an allegation of implied

15  waiver on the basis that what was communicated with the

16  lawyers is at issue in this case and it's not at issue in this

17  case.

18        Now, Mr. Hoseason --

19        THE COURT:  The bank's knowledge is at issue and I

20  don't want to -- I mean, I will but certainly I'm sure in your

21  memorandum of law -- or memoranda -- I just have the Weiss

22  memo here.  There are many arguments addressed towards the --

23  addressing the question of proximate causation and, you know,

24  most of which is Judge Sifton treated in one of his footnotes,

25  so rather -- you know, I think we might -- because it -- we're

78

1    not talking about a huge number of emails.

2         MR. FRIEDMAN:  Your Honor, Mister --

3         THE COURT:  I'm the last judge to offer ordinarily

4    to conduct an in camera inspection, but it seems to be the

5    simplest way of dealing with this issue and just remove --

6         MR. FRIEDMAN:  I can understand what you're -- the

7    direction Your Honor is coming from with respect to

8    Mr. Woodley, but those of us who know the record know exactly

9    what Mr. Worbner just did.  He said, oh, and by the way, throw

10   in Hoseason and Foster.  Well, Hoseason and Foster are in the

11   group -- fraud group.  They're in the anti-terror financing

12   and anti-money laundering group.  They don't have contact with

13   Interpal.  They don't develop facts.  So what Mr. Worbner is

14   doing to Your Honor is kind of pulling the wool over Your

15   Honor's eyes quite frankly by saying, oh, just throw in these

16   two additional names.  That's not a big deal.

17        Foster and Hoseason are at the core of the

18   consultations with legal advice.  If we have to put all of

19   those materials together and explain to Your Honor the

20   privileged nature of them when they have made not even a close

21   showing of implied waiver --

22        THE COURT:  I'm not asking for an explanation about

23   the privileged nature.  I'm simply going to read the factual

24   contents -- pull out the factual material and make sure that

25   what you've said that the documents -- that all that material

79

1   has already -- is contained in the documents produced --

2           MR. FRIEDMAN:  I'm happy to do as Your Honor

3   requests, but unless Your Honor knows what factual material we

4   have produced correspondent to those factual matters, Your

5   Honor can't make that determination.

6           THE COURT:  Well, that's true but, you know,

7   according to the plaintiffs, the most probative materials are

8   not reflected in the exhibits that were marked for the

9   deposition, but I'm --

10          MR. FRIEDMAN:  [Inaudible] selected.

11          THE COURT:  Hum?

12          MR. FRIEDMAN:  [Inaudible] selected.

13          THE COURT:  No, I know that.  I know that.  So I'm

14  giving you the opportunity and -- to produce additional

15  documents without identifying them.  You will just tell me

16  what -- that these documents were produced and you might

17  give --

18          MR. WORBNER:  Can I just have one more point, Your

19  Honor?

20          THE COURT:  Oh, this --

21          MR. WORBNER:  That is that, again, a premise that my

22  friends have here, which is just wrong.  Their premise seems

23  to be if the document is really important and has information

24  that we'd really like to know that somehow bears on waiver of

25  the privilege, it doesn't.  This is not a work product

1  objection.  There's no exception to the attorney/client

2  privilege for a need or can't get elsewhere.  The

3  attorney/client privilege unless waived --

4          THE COURT:  That's the problem.  You can't get it

5  elsewhere.  It may or may not be critically relevant to the

6  issues litigated.  I don't think you're seriously disputing

7  that, you know, but you're just maintaining that the

8  importance of the privilege outweighs any disclosure because

9  other documents have been produced, but this is --

10          MR. WORBNER:  No.  I think what we're really saying

11  is on the critical distinction between facts which are

12  discoverable and communications in confidence with an attorney

13  which are privilege unless waived, we have produced facts.

14  What is in the privileged communications may also be facts,

15  but those facts are not different than the facts that have

16  been discovered, but --

17          THE COURT:  I understand that.

18          MR. WORBNER:  But I would add, Your Honor, even if

19  they were -- even if for some reason Mr. X -- and I'm not

20  familiar with these documents as Mr. Friedman is -- if Mr. X

21  for some odd reason imparted a fact only in confidence to his

22  lawyer, that he never told anybody else, that I would submit

23  is core privilege.  That's why we have the attorney/client

24  privilege.  You you can ask Mr. X what did you know and that's

25  fine, but you can't ask Mr. X what did you tell your lawyer.

1   That's just the basic distinction.  If Mr. X happens to be

2   Mr. Woodley who is no longer an employee, you go to the Court

3   and Your Honor, I'm sure, will sign a letter of request and

4   they can take Mr. Woodley's deposition and they can ask

5   Mr. Woodley what did you know and he has to answer that

6   question.

7          MALE SPEAKER:  Your Honor --

8          MR. WORBNER:  But they can't -- please let me

9   finish -- but they can't ask them, what did you tell your

10  lawyer because that's the basic distinction between facts on

11  the one hand and communications with the lawyer on the other.

12         MALE SPEAKER:  Your Honor, in our letter brief we

13  cite the Second Circuit and Eastern District.  Even Judge

14  Matsumoto, I believe, who have reflected that in decisions the

15  attorney/client privilege is not inviolate.  It's not

16  automatic --

17         THE COURT:  Well, I understand that.  I understand

18  that.

19         MALE SPEAKER:  Secondly, this cry of the harm would

20  be different and this case would be different.  I think your

21  decision would very well be different if in these 30 days

22  between August of '03 and September 25 of '03 a claim had been

23  made against the bank by any victim of Hamas terrorism or by

24  any governmental entity or by anybody else accusing the bank

25  of somehow aiding and abetting Hamas by virtue of its banking

1   relationship with Interpal.  There was no such thing, so these

2   were communications not in the face of any accusation against

3   the bank.  These were communications that were part of the

4   whole res justi [Ph.] of the bank's scrutiny over Interpal and

5   how an administrative action by the U.S. Government and by the

6   British Charity Commission should affect their thinking.

7   That's why we want to see what facts are stated in there.

8   Nothing previously produced -- the only thing you're going to

9   see in those deposition exhibits or any other exhibits were

10  the Mr. Hoseason and Mr. Foster saying to Mr. Woodley and the

11  other woman who -- woman who was the account manager, Belinda

12  Lane [Ph.], that's her name -- the only other things were

13  post-season Foster writing to Woodley and Brenda Lane saying,

14  watch this account.  Based on what we're seeing appear in the

15  anti-fraud section, it looks like terror financing.  There's

16  an Intifada going on.  All the money is being sent.  It's a

17  big sharp increase.  There's a lot of cash deposits.

18          THE COURT:  Well, I understand.  All right.

19          MR. FRIEDMAN:  First of all, none of that's true.

20  Thank God, I live in a country where suspicion is not fact.

21          But secondly, the notion that the only thing the

22  bank was concerned about is getting a lawsuit from people

23  injured in terrorist attacks is ludicrous.  The bank has it's

24  own regulatory obligations --

25          THE COURT:  Well, I --

83

1          MR. FRIEDMAN:  -- and it consulted with its English

2    counsel about what its obligations were under English law in

3    light of this.  I mean, there's a self-centered aspect to this

4    argument that is incredible that if -- that the only thing the

5    bank was concerned about was being accused by victims of Hamas

6    attacks.  The bank has its own regulatory obligations and it

7    consulted with its own counsel and it had internal

8    consultations for the purpose of consulting with counsel.  It

9    wasn't about getting ready for this lawsuit.  That doesn't

10   mean it didn't happen.

11          THE COURT:  I don't want to hear any more argument.

12   I think this is certainly an important case, as you all

13   recognize, and critical to the plaintiff's claim -- third

14   claim in the Nat West case is the extent of Nat West's

15   knowledge.  I am sensitive to the attorney/client privilege.

16   I think perhaps more so than many of the judges who have

17   opined on this, but -- on various aspects of the privilege,

18   but the key is whether or not given the importance of this

19   case -- I cannot believe after I wade through the defendant's

20   submissions in both cases that I'm not going to find that

21   there -- that something has been put at issue -- that would be

22   covered by the at-issue documents -- doctrines.  But anyway,

23   let's just get past that and I will conduct the review.  You

24   provide the 30 exhibits or however many there are.

25          Actually, other than on the first page of the

1  privilege log, Mr. Foster and Mr. Hoseason do not -- second

2  page -- do not appear and -- as authors of any of the emails.

3  Mr. Woodley --

4           MALE SPEAKER:  Those are off of the second one on

5  page 2 of [inaudible].

6           THE COURT:  What?

7           MALE SPEAKER:  On page 2 --

8           THE COURT:  Yeah, the second page of the privilege

9  log.  Yes.

10           MALE SPEAKER:  Yes.  There is one by Fost -- oh, I'm

11  sorry.

12           THE COURT:  No, I said other than on page 2.

13           MALE SPEAKER:  I apologize.

14           THE COURT:  Then we have Mr. Woodley's email on page

15  4 and a couple emails from the relationship unit, so you'll

16  produce those for examination.  I am --

17           MR. FRIEDMAN:  Produce the emails authored by

18  Mr. Woodley, Mr. Hoseason, Mr. Foster.

19           THE COURT:  Yes.

20           MR. FRIEDMAN:  To in camera.

21           THE COURT:  Yes.  You'll produce the deposition

22  exhibits and then in camera simply -- with a cover letter

23  simply identifying the number of documents you want me to look

24  at.  I hope you will be quite judicious in your selection

25  since I love reading documents and will hold it against you in

1  the future, but I learn from the documents.  Any documents

2  containing factual materials not otherwise contained in the

3  documents that were marked for exhibit.

4       MR. WORBNER:  Point of order, Your Honor, if I may.

5  I don't want to take a lot of time.  I'm in Dallas, a little

6  further than some of the other counsel.  We happen to be

7  coming back for a hearing before Magistrate Judge Pohorelsky

8  on September 23rd in a belated but different case and that's

9  Air Bank [Ph.].  I mentioned that to Mr. Friedman and he said

10 he was available on the 24th of September.  That may be

11 impossible for Your Honor, but to say --

12      THE COURT:  When are you meeting with Judge

13 Pohorelsky?  On the 23rd?

14      MR. WORBNER:  On the 23rd, I think, at 10:00 a.m. or

15 10:30.

16      MR. FRIEDMAN:  Well, I'm in a dep --

17      THE COURT:  I see.

18      MR. FRIEDMAN:  As I told Mr. Worbner before, I'm in

19 a deposition a full day on the 23rd.

20      THE COURT:  Well, I --

21      MR. FRIEDMAN:  But could do it on the 24th.

22      THE COURT:  If we started early on -- I'm on

23 arraignment duty that day, so --

24      MR. WORBNER:  If it can't be done, I understand.

25 I --

1          THE COURT:  I've kept that date clear because I'm

2     handling criminal arraignments, but I won't let you carry on

3     for as long as I've let you today.

4          [Laughter.]

5          MR. FRIEDMAN:  So we'll come in on the 24th and

6     argue the remaining three motions.

7          MR. WORBNER:  Is that enough time for the briefing?

8          MR. FRIEDMAN:  Well, I can put in my opposition

9     papers, my opposition letters next week, so that will be

10    enough time.

11         THE COURT:  Okay.  All right.  All right.

12         MR. FRIEDMAN:  I appreciate that.  By my quick

13    count, there's 12 emails of the three people, but I may be off

14    by one, but it looked like 12.

15         MR. WORBNER:  Well, we'll take a look.

16         THE COURT:  Okay.

17         MR. WORBNER:  So what --

18         THE COURT:  You don't have to write anything about

19    the factual materials.  I mean, if you think you need to

20    provide a little explanation for some of the documents I'll be

21    happy to receive it, but sometimes less is more.  You know, I

22    have a very, very specific task in mind.

23         MR. FRIEDMAN:  What time on the 24th, Your Honor?

24         THE COURT:  9:30 or 9:00.  Whatever --

25         MR. WORBNER:  Early will be as fine for me.  I mean,

87

1   I'll be here on the 23rd, so it doesn't matter.

2           THE COURT:  Why don't we start on the 24th at 9:30?

3           MALE SPEAKER:  9:30?

4           MALE SPEAKER:  9:30.

5           MR. WORBNER:  9:30 is fine, Your Honor.

6           MR. FRIEDMAN:  Thank you, Your Honor.

7           MR. WORBNER:  Thank you very much, Your Honor.

8           [Proceedings concluded at 12:52 p.m.]

9                   *  *  *  *  *  *

88

1          I certify that the foregoing is a court transcript

2    from an electronic sound recording of the proceedings in the

3    above-entitled matter.

4

5

6    _____

7                              Ruth Ann Hager

8    Dated:   September 10, 2008

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25