1                UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF NEW YORK

2

3  --------------------------------X
                             :

4  STRAUSS, et al.,         :
                         :  06-CV-00702

5              Plaintiffs,    :
                         :

6                v.            :
                         :  225 Cadman Plaza East

7  CREDIT LYONNAIS, S.A.,   :  Brooklyn, New York
                         :

8             Defendant.     :  September 24, 2008
  --------------------------------X

9

        TRANSCRIPT OF CIVIL CAUSE FOR MOTION HEARING
10        BEFORE THE HONORABLE MARILYN D. GO
            UNITED STATES MAGISTRATE JUDGE

11

12  APPEARANCES:

13  For the Plaintiffs in     MARK S. WERBNER, ESQ.
    Applebaum v. Nat West    Sayles Werbner
14    and Wolf v. Credit      1201 Elm Street
    Lyonnais:             4400 Renaissance Tower
15                     Dallas, Texas  75270

16                     RICHARD D. HEIDEMAN, ESQ.
                     NOEL J. NUDELMAN, ESQ.
17                     Heideman Nudelman & Kalik PC
                     1146 19th Street NW
18                     Washington, D.C.  20036

19  For the Plaintiffs in     JOSHUA D. GLATTER, ESQ.
    Weiss v. Nat West and    GARY OSEN, ESQ.
20    Strauss v. Credit      AARON SCHLANGER, ESQ.
    Lyonnais:             Osen LLC
21                     700 Kinderkamack Road
                     Oradell, New Jersey  07649
22
                     STEVEN M. STEINGARD, ESQ.
23                     Kohn, Swift & Graf, PC
                     One South Broad Street
24                     Suite 2100
                     Philadelphia, Pennsylvania  19107
25
                     (Appearances continue on next page.)

```
 1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF NEW YORK
 2

 3   APPEARANCES CONTINUED:

 4   For Defendants National    LAWRENCE B. FRIEDMAN, ESQ.
        Westminster Bank and    KIRSTEN O'CONNELL, ESQ.
 5      Credit Lyonnais:        MELISSA JACOBS, ESQ.
                                DORA PARK, ESQ.
 6                              Cleary Gottlieb Steen &
                                   Hamilton LLP
 7                              1 Liberty Plaza
                                New York, New York  10006
 8

 9   Court Transcriber:         RUTH ANN HAGER
                                Typewrite Word Processing Service
10                              211 North Milton Road
                                Saratoga Springs, New York  12866
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Proceedings recorded by electronic sound recording, transcript
produced by transcription service

1          THE COURT:  <u>Weiss v. National Westminster Bank, PLC</u>,

2   Docket Number 05-CV-04622; <u>Applebaum v. National Westminster</u>

3   <u>Bank</u>, 07-CV-00916; <u>Strauss v. Credit Lyonnais</u>, 06-CV-00702;

4   and <u>Wolf v. Credit Lyonnais</u>, 07-CV-0914.

5          Will counsel please state their names for the

6   record?  Just state your name so your voices can be

7   identified.

8          MR. WERBNER:  My name is Mark Werbner for the

9   plaintiffs in Applebaum/Wolf cases.

10          MR. HEIDEMAN:  Richard Heideman, also for the

11   plaintiffs.

12          MR. NUDELMAN:  Noel Nudelman for plaintiffs.

13          MR. GLATTER:  Joshua Glatter on behalf of the

14   licensed Strauss plaintiffs, Your Honor.

15          MR. OSEN:  Gary Osen also on behalf of the licensed

16   Strauss plaintiffs.

17          MR. SCHLANGER:  Aaron Schlanger on behalf of the

18   Weiss and Strauss plaintiffs.

19          MR. STEINGARD:  Steven Steingard on behalf of Weiss

20   and Strauss.

21          MR. FRIEDMAN:  Lawrence Friedman on behalf of Nat

22   West and Credit Lyonnais.

23          MS. O'CONNELL:  Kirsten O'Connell on behalf of Nat

24   West and Credit Lyonnais.

25          MS. PARK:  Nora Park on behalf of Nat West and

4

1    Credit Lyonnais.

2              THE COURT:  Let me just tell you what I have decided

3    after conferring with Judge Matsumoto.  She assured me that

4    she had not made any rulings with respect to specific

5    discovery disputes.  She only ruled on general disputes,

6    though she stands by the statement that she generally found

7    the interrogatories and document requests propounded by the

8    plaintiffs to be relevant.  I think we both agree that it

9    would be appropriate to consider these disputes now, so I

10   don't want to discuss any procedural objections.  We'll just

11   start afresh and discuss the merits of the motions today.

12             I think it would make sense to discuss the two scope

13   motions together.  I think the -- from my perspective these

14   two motions raise not only the issue of relevance but just the

15   classic issue of what is discoverable, like -- and the courts

16   are charged in Rule 26 to look at both the burdens, and the

17   costs, and the potential usefulness of the information to be

18   elicited.

19             MR. GLATTER:  Your Honor, Josh Glatter on behalf of

20   Weiss and Strauss.  Your Honor, frankly today we felt that

21   based both upon the oral arguments that we've conducted last

22   week or rather -- I guess, last week in connection with

23   defendant's motions for protective orders and the rather

24   voluminous submissions that it had been presented to the

25   Court, we are frankly prepared with respect to our motion to

5

1   compel to rest upon our papers unless Your Honor has some

2   specific questions that you'd like to present to us --

3          THE COURT:  Okay.

4          MR. GLATTER:  -- to flesh things out further.

5          THE COURT:  Well, I'm not sure there is very much

6   more I need to know, but let me repeat the question that I

7   asked.  Mr. Friedman is standing up, so let me ask you again.

8          I'd like to know specifically what has been

9   produced.  I asked you that before and with respect to the two

10  main entities named in the two sets of complaints, you say

11  you've produced everything.  Were there any temporal limits in

12  the documents that you produced?

13         MR. FRIEDMAN:  Yes.

14         THE COURT:  So you stopped production as of

15  September --

16         MR. FRIEDMAN:  July 4, 2004.  Let me cover both

17  these points, Your Honor, because I think there's some

18  confusion that I don't want to risk having been summoned by

19  Mr. Glatter's letter to Your Honor of last night.  Let me be

20  perfectly clear.  Frankly, I'm a little surprised at some of

21  the things that have been said, so it's necessary for me to

22  clarify, apparently.

23         Nat West has produced everything that it has

24  relating to Interpal covering the period January 1, 1996

25  through September 24, 2004.  There are a couple of straggler

6

1    points that you've alerted plaintiffs to in our -- in letters,

2    but that is what we have produced.   Now, that includes the

3    complete account files.   That includes records of all

4    transactions in the Interpal accounts subject to certain

5    monetary thresholds that the parties have agreed to without

6    prejudice to the plaintiffs coming back and wanting de minimis

7    items.   It includes all correspondence.   It includes

8    everything that the bank has been able to retrieve, everything

9    that the bank has concerning Interpal.

10          Now, the same is true -- let me finish with Nat

11   West.   With respect to the 15 other entities and persons that

12   we have agreed, because plaintiffs have referred to them in

13   their complaints or because they've referred to them in their

14   interrogatories, contrary to what Mr. Glatter said in his

15   letter last night and as I think he knows, we have produced

16   everything that we can find about those 15 in the four

17   departments that we agreed to search in:   the Risk Management

18   Department, Financial Security Department or the Group Fraud

19   invest -- and Security Department, Payment Operations

20   Department, and in the Retail Department.

21          We were accused -- and the reason I wrote my letter

22   yesterday morning we were accused of double-counting because

23   we were accused that we really hadn't searched about these 15

24   entities.   We only searched about these 15 entities only to

25   the extent they concerned Interpal.   That is false.   It is

7

1    absolutely false.

2            Now, Mr. Glatter in his letter last night tried to

3    launch a zinger by saying here's one document about a

4    transaction between Janeen [Ph.] Zakat Committee, which is one

5    of the 15 entities we agreed to produce for, and Human Appeal

6    International, which is another charity customer of Nat West.

7    It is not the subject of any allegations in this case.   Mr.

8    Glatter wrote in his letter last night -- much to my chagrin,

9    because it's just not true -- ah-ha, here's a document

10   concerning the Janeen Zakat Committee, one of the 15 entities

11   you say you've searched for and you haven't given us that

12   document.   But as Mr. Glatter knows, because it's stated right

13   in our requests for admission responses Nat West doesn't keep

14   that kind of document in its files.   It's a confirm of the

15   wire transfer from Unippeal [Ph.] International to Janeen

16   Zakat Committee apparently they obtained from military sources

17   in Israel, the document that was apparently seized in Israel.

18   They handed it back to us and they said -- confirmed that this

19   is a business record and now he's saying he wants a copy of

20   that.

21           But, as I said in the responses to requests for

22   admissions that were attached to my letter of yesterday (a) we

23   don't keep those documents and (b) because we don't keep those

24   documents, there are confirms that are given to customers,

25   they're not business records and we can't confirm their

8

1  business records.

2          Now, at that time a year ago I declined to make that

3  representation with respect to the Janeen Zakat Committee

4  transfer.  I did it with respect to all the others because we

5  did not yet have an agreement to search for documents about

6  Janeen Zakat Committee.  If Mr. Glatter had a question about

7  that given how we've gotten along in these cases so far, I

8  would have expected him to give me a call and ask me about it,

9  rather than sending this letter to Your Honor last night,

10  which really set me back because it's just fundamentally

11  false.  Another reason that document has not been produced is

12  because it's not in the four departments where we've agreed to

13  look.

14          So in sum, Your Honor, with respect to Nat West we

15  have produced everything we can find about Interpal and we

16  have produced everything that we can find in those four

17  departments with respect to the 15 other entities.  Four to

18  Credit Lyonnais.

19          Let me just make one more point.  We agreed -- and

20  Your Honor stated at the last conference -- that we would

21  address burden later if Your Honor found relevance, but I must

22  say with respect to Nat West, as I've told the plaintiffs and

23  we'll address this if -- as I hope we don't -- we get to the

24  burden phase, Your Honor should be aware that it would be

25  virtually impossible for Nat West and I believe it's true for

9

1   Credit Lyonnais, but I also know it for Nat West, to conduct a

2   search of all documents it has anywhere in the bank concerning

3   any transactions that any of its customers had with these 15

4   other entities or with the 30 more that they're now looking

5   for searches on.  I confirmed this with the bank yesterday.

6   Before 2006 the bank did not keep electronic records of the

7   transferees or the counterparties of its customers.  It can

8   search its records based on its customers.

9        So if Your Honor were to rule that documents

10  concerning these 15 entities outside of the four departments

11  where we agreed to search or of documents concerning the 30

12  more that they want us to search for were relevant, I'm going

13  to have to come back to Your Honor and say it is virtually

14  impossible for the bank to do that because what they would

15  need to do is to go through all of the transactions during the

16  period engaged in by any customer.  These are hundreds of

17  thousands, if not millions of customers in 1,600 retail

18  branches, and look for counterparties or transferees in those

19  transactions that might match their lists.

20        So everyone should just be clear that for the

21  reasons we've stated quite clearly to Your Honor, we think

22  that given the way these claims pleaded, given the boundaries

23  of Rule 26, given the claims that have been made and the

24  interrogatory responses that have been provided these -- none

25  of these entities is the subject of properly relevant

10

1  discovery.

2          The further point is just to show how far afield

3  this goes.  The bank would -- if it even tried, would spend

4  months if not years trying to identify all of the

5  counterparts.  I suspect as with our banks here in the United

6  States until [inaudible] and achieve the state that it's now.

7  In the last couple of years they just didn't keep records

8  about counterparties so they just couldn't do it, which I

9  think is a further testament to how far afield this is.

10          To answer Your Honor's question in respect to Credit

11  Lyonnais --

12          MR. WERBNER:  Excuse me.

13          MR. FRIEDMAN:  -- Credit Lyonnais --

14          THE COURT:  Wait, wait.

15          MR. WERBNER:  May I just make a suggestion?  I'm not

16  meaning to interrupt, but I wanted to be heard on Nat West.  I

17  don't -- I thought it -- I want to give you the opportunity to

18  consider whether it's easier for you, now that Mr. Friedman is

19  finished with Nat West, to let me say something about Nat West

20  before.  Then he goes back to Credit Lyonnais or do you want

21  us to --

22          THE COURT:  Okay.  I think that's fair enough, but I

23  do have just one question.  Since production was made on a

24  rolling basis has that production been completed?

25          MR. FRIEDMAN:  Has the production that I just

11

1  described been completed?

2       THE COURT:  Yes.

3       MR. FRIEDMAN:  Yes, with two exceptions, two very

4  small exceptions that I'm aware of.  As we've continued to

5  impress plaintiffs, there are some wire transfer documents

6  that I think are still in the process -- some wire transfer

7  backup copies that are still in the process of being retrieved

8  on archives downloaded -- or uploaded from dates.  They have

9  all the records of -- they indicated every transaction that

10 ever occurred in the Interpal account, but they have requested

11 as to certain transactions, certain backup documentation,

12 which are being retrieved from archives.  I think most of

13 those have been produced, but there might be a couple of

14 stragglers.

15      The other thing that we're in the process of doing

16 in response to their request is a function of the fact that

17 we're dealing with two sets of plaintiffs who were injured in

18 attacks spanning different periods of time.  Weiss and Strauss

19 attacks and earlier than the Wolf and Applebaum attacks and

20 there is what we've agreed to give all plaintiffs' counsel,

21 all documents to the latest date, which is September 24, 2004.

22 We're in the process of checking the bank's policies about

23 anti-money laundering and anti-terror funding.  This is not an

24 issue before the Court on these motions, but in addition to

25 all of the banking records, all the transaction records, there

12

1  are also extensive document requests in movant's production

2  about bank policies concerning anti-terror financing and anti-

3  money laundering.  We're updating those -- the production of

4  those policies through the end date in 2004.  I don't know of

5  any differences that there are going to be, but the reason for

6  this is that when we first made the production of the policies

7  it was only with respect to the Weiss dates, not with respect

8  to the outcome [inaudible], but other than that, Your Honor,

9  to my knowledge everything has been produced.

10       THE COURT:  Before you speak, Mr. Werbner, let me --

11  and I say this to give Mr. Friedman an opportunity to respond

12  because my view about the end date that the defendants have

13  selected just doesn't make sense, certainly, with respect to

14  the two specific accounts at issue.  It would strike me that

15  documents created after September 26, 2004 might have bearing

16  on the knowledge of the two banks from before.

17       MR. FRIEDMAN:  Your Honor, I understand that.  I saw

18  in Mr. Werbner's letter of Monday he abandoned the original

19  rationale for the post-hac production, the idea that because

20  we closed the accounts in 2007, which is the basis for which I

21  explained in my letter and I can go into it if Your Honor

22  wishes me to, they want to compare our knowledge base as of

23  that date the knowledge base before the attacks and

24  [inaudible] and I explained that that's based on a false

25  premise.

13

1          So picking up on Your Honor's point, Mr. Werbner in

2     his letter earlier of Monday said something akin to what Your

3     Honor just said and he said that documents after the date of

4     the last attack "may very well discuss why Nat West took

5     certain actions prior to that date."  On what basis?  I

6     frankly think the way Your Honor put it, it comes as no

7     surprise I think is better that there are documents after that

8     date that may refer to what the bank did prior to that date

9     months ago to try to avoid what brings us here today.

10          I offered to the plaintiffs that I will look for and

11     produce to them documents after the date that refer to what

12     the bank knew and did before the date of the last attack and

13     they turned me down and they said, no, they want everything

14     because everything may shed light on what happened before.

15          I understand Your Honor's point that documents post

16     the date of the last attack to the extent they refer to what

17     the bank knew and what it did before the date of the last

18     attack, that we can provide.  But for the reasons I've stated

19     in my letters given again as plaintiffs admit, the question is

20     what did Nat West knew -- know and when did it know it.

21     According to the logic Judge Sifton applied in the <u>Fissel</u>

22     [Ph.] decision and I think according to the law, what happened

23     after the last injury that was caused is not relevant.

24          THE COURT:  Well --

25          MR. FRIEDMAN:  What's relevant is what they knew

14

1 beforehand.

2       Now, to the extent there is a document after the

3 last attack that refers to what they knew before the last

4 attack, I've offered to give them.

5       THE COURT:  Well, I think perhaps what's difficult

6 in the situation and certainly for a party conducting

7 discovery is that it doesn't want to be completely dependent

8 on the sifting by its adversary.  Perhaps this is one area --

9 I'll just state this general principle.  I think documents

10 after September 2004 would be relevant, but only certain types

11 of documents and I'm not familiar with how the files are kept.

12 I would think -- and this may address your burden concerns --

13 is that a lot of these wire transfers become of less

14 significance with the passage of time, but the internal bank

15 documents may continue up until the time that the account was

16 closed provide some facts relating to the knowledge of the

17 bank before September of 2004.

18       MR. FRIEDMAN:  Your Honor, if I could just make two

19 points.  First of all, I think carrying it through to the date

20 the account was closed would be grossly excessive.  That

21 brings us beyond the date that these lawsuits began in 2005.

22 We would face a horrible burden, a truly horrible burden in

23 going through all of the documents after these lawsuits were

24 filed because as Your Honor can imagine after the lawsuits

25 were filed --

1          THE COURT:  Well --

2          MR. FRIEDMAN:  -- lawyers became involved in

3     everything that the bank was doing with a view towards what

4     should the bank do with this account if these lawsuit goes

5     forward.  As I've described to Your Honor in my letters what

6     the bank ultimately decided to do is that it couldn't tolerate

7     additional litigation, so it told Interpal to "rebank," as

8     they put it, move it to another bank until these lawsuits were

9     resolved.

10          Well, on the first point, Your Honor, obviously any

11    document production relies on the good faith of counsel in

12    sifting through the documents.  If there are internal

13    documents that shed light on what the bank knew before the

14    date as of which liability is being attached, which is the

15    date of the injury, I can understand Your Honor's point.  But

16    given everything that the bank wrote based on information it

17    learned after that date is just not relevant and is --

18          THE COURT:  Well --

19          MR. FRIEDMAN:  -- going to lead to a fishing

20    expedition about the information that the bank learned after

21    the fact.

22          THE COURT:  Well, Mr. Friedman, the fact that a

23    document is written after this cutoff that you've selected

24    doesn't mean that it doesn't contain information regarding the

25    knowledge of the bank before that date, so it -- it just

16

1  doesn't make sense.  Then no court should listen to a

2  jailhouse confession because, you know, the murder has been

3  done.  You know, it's not going to have relevance on the

4  defendant's motive because, you know, it was made after any

5  statements made after the fact.

6          MR. FRIEDMAN:  Your Honor, to the extent -- I

7  offered them months ago.  If Your Honor so rules, Your Honor

8  will so rule.  To the extent a document refers to what the

9  bank knew before the fact, like a jailhouse confession, then

10 that would fit within what Your Honor is saying, but the bank

11 is continually learning new information.

12         I predict that if Your Honor requires us to produce

13 documents discussing information that the bank learned after

14 the cutoff, then it's not going to be relevant and that's not

15 going to lead to anything productive in this case.  I'm glad

16 that it appears to be agreed that the -- and this is what

17 Mr. Werbner wrote in his letter -- the issue is what did the

18 bank know as of the date of the injury.  Obviously, what the

19 bank knew after the date of the last injury can't be causally

20 linked, as it needs to be, to the injury.

21         Again, if we're talking about the document that

22 refers to what the bank knew before the cutoff I can

23 understand that, but there's a constant chain of information.

24 In fact, Your Honor, it's kind of ironic.  The bank is accused

25 of not being diligent and of not following up.  I think

1  they've already seen in the documents before the cutoff that

2  the bank was constantly making inquiries.  If it's information

3  that they learned after the cutoff, that's not going to move

4  this case along.

5       MR. PLATTER:  Your Honor, if I can respond briefly.

6  Mr. Werbner, I apologize.  I'll address the -- last, but not

7  least, I'll address the issues concerning my letter of last

8  evening.  After that I think that's easily resolved, but I

9  think Your Honor has it exactly right with respect to the

10 relevance issue here.

11      Everyone in this room has had a lot of experience

12 with complex litigation.  Certainly once in awhile you get a

13 document that said Colonel Mustard knew that he did it in the

14 dining room with a candlestick.  That's rarely the case

15 unfortunately in this kind of litigation.  If it were, life

16 would be a lot easier.

17      Generally, even on the question of state of mind

18 it's usually something that can only be assessed through a

19 quantum of circumstantial information.  Some of it may be what

20 might ordinarily look like some --

21      THE COURT:  Okay.  I don't need to hear that you

22 agree with my assessment.  I just want some practical --

23      MR. GLATTER:  Yeah, I can --

24      THE COURT:  -- information on how the files are

25 kept.  I think it may even make sense to have production post

1  September 2004 on a two-tier basis because I agree that once

2  the lawsuits were commenced -- or I should say once -- well,

3  I -- were they well publicized when they were commenced?

4           MR. FRIEDMAN:  Yes, they were, Your Honor.

5           THE COURT:  Okay.  Okay.  So -- because otherwise,

6  you know --

7           MR. FRIEDMAN:  I think they were accompanied with a

8  rather memorable meeting.

9           THE COURT:  Okay.  That the -- that it may make

10  sense to limit production of documents after the commencement

11  date of the earliest lawsuit, the Weiss case --

12           [Simultaneous voices.]

13           THE COURT:  Let me just hear from Mr. Werbner first

14  and --

15           MR. WERBNER:  Thank you, thank you.

16           THE COURT:  -- regarding what types of documents --

17           MR. WERBNER:  Thank you.

18           THE COURT:  -- you would expect to be produced from

19  what departments or whatever.  I'm not sufficiently -- I don't

20  care what the bank operations --

21           MR. WERBNER:  Yes.  I mean, they took -- up until

22  this newfound understanding, an extremely rigid and short

23  cutoff to September of '03 -- and I want to explain to even so

24  much as an interrogatory, Your Honor, when we said who were

25  the people --

1          THE COURT:  Okay.  It's '03.  I'm sorry.  I wrote

2    down '04 here.  I think Mr. Friedman --

3          MR. FRIEDMAN:  No, it's '04.

4          THE COURT:  '04.

5          MR. WERBNER:  Well, but wasn't it for up until a

6    week or two ago '03?

7          THE COURT:  No, no.  That's a different issue.

8          MR. WERBNER:  Okay.  But anyhow --

9          THE COURT:  That's a different issue.

10          MR. WERBNER:  -- up until '04 to the point where if

11   we said who was the account manager for Interpal during this

12   period during the time the account was opened, they gave the

13   name of the people and said, Belinda Lane from this date in

14   1999 through September 30th of '04.  I mean, I literally went

15   to London and was deposing people and I thought -- I mean, I

16   didn't pick up on the sophistry of it that she estopped on

17   September 34 [sic] every document from her personnel file,

18   every email that she wrote or everything else just fell off

19   the cliff.

20          THE COURT:  Well, that's clear.  That's clear.

21          MR. WERBNER:  And so what's practically involved is

22   just because the lawsuit maybe there was a flurry of

23   attorney/client communications, there's still an

24   attorney/client privilege.  There's still a work product.

25   That should define the scope.

1          I mean, the mere fact that a -- I mean, they issued

2   a press release and they said, well, we're closing the account

3   because of the litigation environment in the U.S.   But

4   specifically transactions -- I mean, they continued for three

5   years to provide financial services to a customer that was

6   designated by the U.S. Government, so the --

7          THE COURT:  Well, Mr. Werbner, tell me how those

8   transactions may yield relevant evidence on Nat West's state

9   of mind before September 2004.

10          MR. WERBNER:  Well, for example, if they transferred

11  on September 25th all the money that had built up into that

12  account, let's say, to the well known head of Hamas, I mean,

13  if that money -- if they decided to --

14          THE COURT:  Well, how about September 25, 2005?

15          MR. WERBNER:  I would still believe their -- the

16  jury can infer that there will -- that they're doing someone

17  with notoriety as a Hamas representative may be an inference

18  from which they can confer that the people that were less

19  notorious were people that were nonetheless known to them.

20          In the case of Nat West, internal documents, Your

21  Honor, were saying back in '01 or '02 we suspect terror

22  funding is going on in this account.  Responses were written

23  by Belinda Lane, Terry Woodly [Ph.], and other businesspeople

24  saying, this is a very profitable account.  We need to tread

25  lightly.  We don't want to be rude.  You know, the fact that

21

1    there are cash deposit, but clearly we're going to show the

2    jury.  I mean, they can answer it however they think it's

3    effective.  We can point to the jury to show that they were

4    specifically being told by the left hand of the bank that this

5    looks like terror funding and it was itemized in the documents

6    and that there was push-back from the businesspeople.

7            Consequently, you know, how they interacted with

8    that customer unless it becomes too remote -- I mean, I

9    understand, but this account was opened in 1990.  Interpal

10   became a customer in 1990 and there were key events going on

11   with Hamas.  I mean, Hamas was only formed in 1988 -- in

12   December of 1988.  Interpal is formed and there were meetings

13   in the early '90s, the FBI has described and which is part of

14   the documentation, where this international fundraising

15   organization where there would be the Holy Land and the United

16   States, there was going to be Interpal and the UK, and French,

17   that the FBI where they designated Hamas and later Interpal

18   talked about this worldwide fundraising apparatus that was

19   part of Hamas's means of accomplishing their goal.

20           So we think very much -- because some of these

21   things are confusing.  In other words, to say this Zakat or

22   that Zakat and --

23           THE COURT:  Well, wait, wait.  We haven't gotten to

24   Zakat.  I mean, I -- let me just tell you --

25           MR. WERBNER:  [Inaudible] --

22

1          THE COURT:  Wait, wait, wait.  Just a second.  Let's

2    just stay focused on this iss -- on this particular issue as

3    to the end date.  I think we have two other scope issues to

4    address.

5          MR. WERBNER:  Right.

6          THE COURT:  One is the plaintiff's desire to extend

7    the beginning date and the third issue is the Zakats that the

8    defendants claim were not identified in the plaintiff's

9    discovery responses.

10         MR. WERBNER:  On the end date --

11         THE COURT:  So let's just talk about the end date.

12         MR. WERBNER:  On the end date --

13         THE COURT:  Let -- Mr. Werbner, it just strikes me

14   that some of these transactions after a certain point in time

15   and perhaps even a month after this end date would become --

16   would be -- would not be terribly probative but the bank's

17   internal documents may continue to reflect the bank's

18   knowledge.

19         MR. WERBNER:  My last -- I hear exactly what you're

20   saying.  Of course, the emails and the communications are one

21   category, but in what you're just saying I would say it with

22   one sentence:  follow the money.  I mean, I believe in a

23   financial case, which this obviously is, a follow the money,

24   and I believe that --

25         THE COURT:  Well, Mr. Werbner, if there were a well

23

1   known Hamas subsidiary or what -- I'm still not into the

2   lingo.  I apologize.  But let -- that sent a large amount of

3   money to the Interpal -- through the Interpal account in

4   December of 2004, but never had anything to do with that

5   account before that time or anything to do with Nat West, how

6   could that have any bearing on Nat West's knowledge?

7           MR. WERBNER:  I would say it goes to the weight and

8   it might not.  Your Honor, I'm not saying that I would win the

9   debate for the jury.  In other words, let me give you an

10  analogy.  Let's say that we're talking about Al-Qaeda and we

11  claim that ABC is a front for them.  In the core period of

12  activities we have the sort of shady alter ego dispute, but at

13  the tail end when the account is being closed after the

14  terrorism has stopped, let's say, that they wire the money to

15  the Osama Bin Laden Construction Company in Yemen.  I mean,

16  it's possible that that would not necessarily mean that three

17  years earlier these alleged alter egos were necessarily

18  connected, but I would argue especially for what's

19  discoverable, not necessarily admissible, if there's a close

20  enough period in time, there could be an inference that the

21  jury could place.

22          I mean, when we're talking about --

23          THE COURT:  Okay.  Thank you.

24          MR. WERBNER:  Yes.

25          MR. FRIEDMAN:  Your Honor, could I just address a

24

1   couple of discrete things that --

2              MR. WERBNER:  Yeah.

3              MR. FRIEDMAN:  -- Mr. Werbner said?

4              THE COURT:  Well, let Mr. Glatter finish up quickly.

5   Please don't rehash what -- we don't have that much time.  I

6   can give you a little more than the hour, I promise, but we

7   have a lot to cover.

8              MR. GLATTER:  I understand, Your Honor, and we will

9   proceed accordingly.

10             Just to amplify Mr. Werbner's comments, one of the

11  things to keep in mind here is the fact that if the bank was

12  knowingly providing services to Interpal after the date of the

13  designation, concededly after the date of the last attack,

14  then a jury would want to take that into account in assessing

15  the credibility of its representations as to what it knew in

16  the private periods.

17             Now, it may be that there are arguments that can be

18  raised to counterveil but that has nothing to do with the

19  discovery issue at hand from sort of, again, a benefit of the

20  doubt perspective for discovery purposes.  The fact that even

21  after the entity was designated and after the date of the

22  lawsuit, that is a relevant fact the jury can consider.

23             Secondly, one of the things we have to keep in mind

24  and one of the things Your Honor asked about is where would

25  this information be kept, where would we be looking for it

25

1   after the 2004 cutoff date that defendant posed.  That would

2   traditionally be found in security and fraud and mismanagement

3   and payment ops and in the customer file.

4          Now, those are all categories that the defendant

5   agreed to search for and ties into a different issue as to

6   whether we have a right to seek a more expansive bank-wide

7   search, but when the cutoff date is at 2004 at least within

8   those departments as to the transactional documents

9   themselves, those are relevant areas of common sense as to

10  where you would find the information and appropriate to be

11  searched.

12          Finally, and I guess it's sort of a --

13          THE COURT:  Okay.  Now, what types of -- so you're

14  arguing that the transactional documents would be relevant?

15          MR. GLATTER:  Yes, Your Honor.  Certainly --

16          THE COURT:  Right.

17          MR. GLATTER:  -- for Rule 26 purposes.  Whether --

18  as Mr. Werbner said, whether or not ultimately the defendant

19  can present an argument on a motion in limine as to whether or

20  not they're somehow too confusing or too attenuated for the

21  issues at hand from a Federal Rules of Evidence perspective is

22  not a function of either, one, whether it relates to the claim

23  or defenses of the parties or certainly whether or not it

24  relates to the subject matter of this action, particularly as

25  it relates to Interpal, so I think that covers the point.

26

1            The other thing I would add is that really somewhat

2    to the initial period is that because the account was open in

3    1990 when the account was then closed at the later period

4    post-complaint, traditionally a bank when examining will do a

5    look-back period to the initiation of the account.  So in

6    terms of both documents that are generated after 2000 or

7    whether their internal memorandum, which Your Honor doesn't

8    seem to find controversial, or more transactional documents

9    with respect to what the bank is looking back at for the prior

10   period that also is relevant and certainly tied to the subject

11   matter of the action.

12            THE COURT:  Now, just one point.  Would you agree

13   that perhaps to minimize the burden after the commencement of

14   these lawsuits that internal documents that -- between the --

15   to and from the legal department and outside counsel of --

16   could be exempt from production and perhaps without a

17   privilege log, would you consent to that?

18            MR. GLATTER:  Well, Your Honor, that's -- without a

19   privilege log, I think that's difficult for one particular

20   reason.  You have an entity that is ostensibly knowingly

21   providing services to an SBGT post-designation, which raises

22   certain issues of potentially criminal conduct.  It seems to

23   me that minimally what we would have to do is be able to come

24   up with a privilege log that the parties and the Court could

25   very carefully assess the nature of those communications tied

27

1   to the fact that neither communication of fact is privileged

2   as a general matter simply because it is communicated to a

3   lawyer.

4          MR. WERBNER:  If it's lawyer to lawyer I would

5   agree.  I mean, I don't -- they don't need to list Larry

6   Friedman sending a letter to the general counsel --

7          THE COURT:  Okay.  Well, I'm just trying to carve

8   out a privilege having -- or to minimize the creation of a

9   privilege log because it can be quite burdensome.  Anything to

10  outside counsel after the commencement of the lawsuit would

11  you agree should -- needn't be --

12         MR. GLATTER:  Where I would start is I think I --

13         THE COURT:  -- put in a privilege log?

14         MR. GLATTER:  I think what would probably be the

15  safest way is to start with receiving the privilege lot with

16  respect to internal communication among counsel.  Again,

17  because you're dealing with foreign banks I don't know offhand

18  exactly what scope of --

19         THE COURT:  And you're not answering my question.

20  I'm trying to --

21         MR. GLATTER:  Another -- I apologize, Your Honor.

22         THE COURT:  Is just promote the production -- of the

23  speedy production of documents and perhaps --

24         MR. GLATTER:  So as long as it is without what --

25         THE COURT:  -- minimize what's required in a

1  privilege log and wouldn't you agree that it would make sense

2  to exclude documents to and from outside counsel after the

3  commencement of this lawsuit?

4       MR. GLATTER:  With the proviso that it would

5  obviously be without waiver to request such privilege log

6  after production log?  Yes, we would be willing to agree to

7  that as an initial matter, Your Honor.

8       MR. FRIEDMAN:  Your Honor, a couple of points

9  addressing the last point.  Your Honor, the first lawsuit was

10  filed September 25, 2005, exactly a year after the last

11  attack.  Even if Your Honor bought all the arguments that have

12  been made to you as to why things two years, three years, four

13  years after the date -- the documents that -- by their

14  [inaudible] documents created 2007 would be relevant, it would

15  just be completely unworkable to have a production of

16  documents after this lawsuit -- these lawsuits were commenced

17  in September 2005.  Although I understand Your Honor trying to

18  carve out communications of outside counsel or communications

19  of inside counsel, I can tell Your Honor because counsel were

20  brought in as soon as these cases were filed that there were a

21  lot of things that people were doing as part of work product

22  and as part of attorney/client privilege where obviously the

23  communications may not be directed to counsel.

24       I'm telling Your Honor in order to effectively

25  represent my client and vindicate its right to assert these

1   privileges and protections, we would have to go through every

2   single document, every email, everything that exists except

3   perhaps for the core transaction documents that are generated

4   by systems in the files.  Although I continue to believe that

5   anything beyond the date of the last attack does not refer to

6   the bank's state of mind before the last date -- before the

7   last attack, although I continue to believe that that is not

8   relevant and it's a fishing expedition, I think going beyond

9   one year after the date of the last attack would be quite

10  egregious because of the remoteness of it and because of the

11  privilege issue.

12          Your Honor, let me just make a couple of other

13  discrete points in response to what Mr. Werbner said.  One of

14  the things that makes it very difficult and challenging to

15  litigate Mr. Werbner and Mr. Glatter is that they're very good

16  lawyers.  Another thing that makes it challenging is they say

17  things to the Court that are just not so and they just pull

18  them out of thin air.  These accounts were not open in 1990.

19  These accounts were opened in 1994.

20          Second of all, there was no press release related to

21  the closing of the accounts.  I think that they're pulling in

22  facts from matters involving Credit Lyonnais and applying them

23  here and they're just saying to Your Honor things that just

24  aren't so.

25          Now, Mr. Werbner said there's correspondence that

1  shows that the bank had a suspicion of terror financing and I

2  think he said that deliberately in an effort to bring Your

3  Honor around to their perspective of the case.  I want to make

4  clear, as I made clear to Magistrate Judge Matsumoto several

5  times, the statute does not turn on suspicions; the statute

6  turns on knowledge.  In fact, it's a good thing that the bank

7  had suspicions about whether Interpal was engaged in terror

8  financing because that's a defense to the quasi-scienter

9  theory that they're coming up with that the bank consciously

10 avoided knowing what Interpal was doing.

11         Of course, the bank was diligent.  Of course, the

12 bank had suspicions, but it reported those suspicions and

13 based on its investigations and, more importantly, based on

14 the investigations conducted by is government, which has more

15 resources than the bank it concluded, as its government

16 concluded, that we don't know that they're engaged in

17 terrorism.  Thank goodness, there are countries in this world

18 where people don't act on suspicions; they act on the basis of

19 knowledge.  So this business that the bank is to be condemned

20 because it had suspicions --

21         THE COURT:  Well, I --

22         MR. FRIEDMAN:  -- the bank is to be congratulated

23 because it had suspicions.  But back to the point, Your Honor.

24         THE COURT:  You know, as you know Judge Sifton did

25 address this issue of knowledge and obviously in the context

31

1   of a motion to dismiss, but once we're talking about discovery

2   I don't think we're dealing with narrow issues of facts and

3   knowledge.  It actually is broader because that's what Rule 26

4   provides.

5          MR. FRIEDMAN:  Understood, Your Honor, but Rule 26

6   says and the adversary committee notes say that discovery is

7   bounded by what is relevant to the claims and defenses in the

8   case and because of the approximate causation element, it's

9   just not possible that what the bank learned for the first

10  time after the date of the last attack could be proximally

11  related.

12         THE COURT:  And --

13         MR. FRIEDMAN:  So Your Honor has focused on what did

14  the -- what is after the date of the last attack that

15  discusses what the bank knew beforehand.  If Your Honor goes

16  in that direction, I would well understand.  To acquire

17  production of documents -- I mean, search perhaps for a year,

18  perhaps for less, but certainly no more than a year because

19  that would also put us into the period after these lawsuits

20  were filed, but the subject matter of the documents needs to

21  be documents that reveal, documents that refer to, as Mr.

22  Werbner said in his letter of Monday, documents that discuss

23  what the bank knew before the cutoff date.  If it's

24  information that first came to the bank after the cutoff date

25  under Rule 26, it can't be relevant to the claims.

1            MR. WEBNER:  What's the harm in -- I would just

2   add --

3            THE COURT:  Wait, wait, stop.

4            MR. WEBNER:  -- one more --

5            THE COURT:  No, I've really heard enough of this.

6            MR. WEBNER:  All right.

7            THE COURT:  You know, I don't think -- I think what

8   you're saying, Mr. Friedman, is really conflating the

9   approximate causation issue, which I think is a very tough

10  issue for the plaintiffs in these cases and the initial

11  element of knowledge and they're entitled to discovery.  I'm

12  trying to ask the plaintiffs for guidance on this and also

13  from you, Mr. Friedman.

14           It strikes me from your comments that production of

15  the transaction documents might actually be easier than the

16  internal bank documents.

17           MR. FRIEDMAN:  It would be, Your Honor.  If Your

18  Honor would like us to produce the Interpal transaction

19  records for a year after the cutoff date, the December 2005, I

20  will discuss that with my client, but I can recommend that we

21  do that.

22           THE COURT:  Well, I --

23           MR. FRIEDMAN:  It would be easier than going through

24  these bank documents and see what they say in relation to what

25  Your Honor's ruling is.

1          THE COURT:  Well, but clearly the -- I think the

2     internal bank documents are more likely if they do contain any

3     info -- they are more likely to contain information regarding

4     the bank's knowledge prior to September of 2004.

5          You know, it comes more attenuated and I was asking

6     the plaintiffs for some guidance.  I don't need speeches.  I

7     just need some guidance on where you think the look -- ought

8     to be --

9          MR. FRIEDMAN:  Customer file.  The customer file is

10    what I wanted to say.  In the -- they have a customer file,

11    which the account relationship manager maintains that they put

12    in emails, they put in wire transfers, they put in meeting

13    notes with the customer when they go to their office.  That is

14    the sort of desk file and most of the important things were in

15    there are in there.

16         THE COURT:  Okay.  Is it likely that the customer

17    file would not contain communications related -- that might be

18    protected under the attorney/client or --

19         MR. FRIEDMAN:  Okay.  Certainly -- I know that

20    the -- after these lawsuits were filed they certainly do.

21    Your Honor, if Your Honor rules that they're entitled to the

22    customer file to anything in the customer file after the

23    cutoff, that --

24         THE COURT:  Well, you know that I'm going to rule

25    that they're entitled to information after this cutoff.

1        MR. FRIEDMAN:  I know that.  I understand that, Your

2   Honor, but I'm just -- I'm trying to answer Your Honor's

3   question.  If Your Honor rules that the customer file --

4   anything in the customer file after the cutoff that refers to,

5   that discusses, that relates to what the bank knew before the

6   September 24, 2004 date, I would understand that but, again,

7   as Your Honor just said, the watch word for producing this

8   documentation has to be that it has to refer to, discuss or

9   relate to what the bank knew before the cutoff.  That I well

10   understanding.

11        MR. WERBNER:  Well, it sounds -- we're real

12   concerned.  We --

13        THE COURT:  I've already expressed --

14        MR. WERBNER:  -- did for what reasons -- okay.

15        THE COURT:  I think, you know, it sounds as if that

16   there will be fewer problems for the bank to produce the

17   customer files through the commencement of this lawsuit, so --

18   for one year, but I do think -- I think Mr. Glatter had

19   mentioned there are --

20        MR. GLATTER:  I'll [inaudible] --

21        THE COURT:  -- four -- three other files, Group

22   Security --

23        MR. GLATTER:  Yes, Your Honor.  Group Security,

24   Fraud, Risk Management, and Payment Operations.  Also, just on

25   one minor note, I misspoke earlier with respect to the --

1   Interpal's account opening in 1990.  What I meant to say --

2   and I apologize -- is that my understanding is that Interpal

3   as an entity commenced in approximately 1990, hence, the

4   earlier look back.  My apologies.

5           MR. FRIEDMAN:  So, Your Honor, if it's the -- and

6   again, I need to consult with my client and I'm not agreeing

7   to this, but just to make sure I understand.

8           THE COURT:  You don't have to agree to it.  I don't

9   need your client's agreement.

10          MR. FRIEDMAN:  I know that.

11          THE COURT:  I --

12          MR. FRIEDMAN:  I know that.  I'm just trying to

13  clarify what we're talking about.

14          THE COURT:  Quite frankly, you know, and I'm not --

15  as I've said many times today, sufficiently conversant with

16  how these records are kept, I do think that the transactional

17  documents become less probative the further in time from this

18  cutoff date that you initially imposed, Mr. Friedman, so that

19  I'm willing to consider a shorter date.  I will hear from you

20  as to why it would be unduly burdensome to do that.

21          MR. FRIEDMAN:  Well, I'm just trying to understand

22  what it is that we're now talking about.  Are we not

23  talking --

24          THE COURT:  I think all internal bank communications

25  through September 25th of 2005 -- I want to craft a further

1    search beyond this period.  I'm asking for some guidance and

2    we're going to carve out the need for any privilege log with

3    respect to communications with outside counsel and --

4              MR. FRIEDMAN:  Let me just on --

5              THE COURT:  -- any communications responding to

6    requests of outside counsel.

7              MR. FRIEDMAN:  On the question -- just to make sure

8    I'm clear that -- the record is clear and I understand, we're

9    talking about all internal bank communications through

10   September 25, 2005 that refer to or were linked to or

11   discussed the bank's knowledge before that period or in more

12   general?

13             MR. WEBNER:  This is --

14             MR. FRIEDMAN:  That's --

15             MR. WEBNER:  -- an ongoing thing.  It was very

16   clear what you said and --

17             MR. FRIEDMAN:  You know --

18             MR. WEBNER:  I found --

19             [Simultaneous voices.]

20             THE COURT:  No, no, no, no, wait.

21             MR. WEBNER:  I'm asking for what I think is clear

22   as --

23             THE COURT:  Okay.

24             MR. WEBNER:  The way the bank is protected is

25   because of the one-year cutoff.  Any documents that relate to

1   Interpal and the bank's involvement with Interpal through

2   September of '05 in terms of where the money is going, what

3   they know the customer to be, who they think is running it,

4   anything that pertains to the things we've described but

5   instead of -- we've already crafted discovery.  It's that same

6   stuff, but instead of this arbitrary --

7             THE COURT:  Okay.

8             MR. WERBNER:  -- September 30 it's being extended,

9   period.

10            MR. FRIEDMAN:  I'm just saying --

11            THE COURT:  I agree.

12            MR. FRIEDMAN:  -- [inaudible].

13            THE COURT:  Mr. Glatter?

14            MR. GLATTER:  Your Honor, I would just -- let me

15   raise -- again, documents that explicitly refer to knowledge,

16   we -- to us not being an acceptable limitation, it's --

17            THE COURT:  Right.  No, no.  Either they're going to

18   produce the entire customer file and all documents, the

19   internal documents relating to Interpal from these four

20   documents.

21            MR. GLATTER:  I would also make one other

22   observation, Your Honor, because a lot of the discussion this

23   morning has been framed with respect to the knowledge or

24   state-of-mind problem under the statute, but there's also a

25   causation problem.

38

1              Now, I'm sure Mr. Friedman would point out that

2    obviously to the extent a transaction goes after the last date

3    of the attack, that is not proximally the cause --

4              MR. FRIEDMAN:  [Inaudible] one?

5              MR. GLATTER:  However --

6              MR. FRIEDMAN:  I read the documents.

7              MR. GLATTER:  But in terms of the scope of

8    documents --

9              MR. FRIEDMAN:  All the documents that --

10             THE COURT:  I've said this --

11             MR. FRIEDMAN:  Well, I understood --

12             THE COURT:  The entire customer file --

13             MR. GLATTER:  Right.  And my --

14             THE COURT:  -- plus searches of --

15             MR. GLATTER:  Four departments.  Thank you, Your

16   Honor.

17             THE COURT:  -- those four departments.

18             MR. GLATTER:  It was -- I was not clear on that

19   point.  Thank you.

20             THE COURT:  Now, the knowledge of the bank had come

21   more attenuated after this date, but I will hear proposals

22   from you if you have any after the September cutoff date, but

23   I want the attorneys to -- I don't want to hear any more

24   argument.  We'll move on to the next issue.

25             I guess we might -- since we're talking about time,

1   changing the start date.  It strikes me that conditions do

2   change and it's a volatile situation.  I mean, who would have

3   dreamed 20 years ago that PLO status would change to what it

4   is now?  I understand that production has been made from 1996,

5   so why do you need to move it up?

6          MR. FRIEDMAN:  Well, because we think that what's

7   happening at the very inception, the know your customer -- I

8   mean, specifically there are know-your-customer requirements

9   at the beginning of an account relationship.

10          THE COURT:  Well, was that policy in effect before

11  1996, the know your customer?

12          MR. FRIEDMAN:  It did.  Yes.

13          THE COURT:  I know --

14          MR. FRIEDMAN:  Maybe not in every permutation, but

15  the concept in banking of know your customer, maybe not with

16  getting two IDs and so forth and so on, but definitely the

17  banks as a matter of practice just didn't open the account and

18  not do anything, so we found in many of these cases there's

19  very important documents at the inception.

20          MR. GLATTER:  If I could also add one other point,

21  Your Honor, which is that Hamas itself was officially

22  designated by the Israeli government as an unlawful

23  association in 1989.  Accordingly, given that the entity here

24  was transferring money to the West Bank and Gaza Strip, which

25  are two of the more volatile areas of the world, that -- when

40

1   doing that look-back period at the end of the period given

2   that one would think the Israeli government has a particular

3   acumen for understanding Hamas and those entities and

4   individuals which support it, that also justifies the prior

5   period.

6           MR. WERBNER:  The U.S. did in '95.

7           THE COURT:  Now, what did the area documents

8   produced reflect?

9           MALE SPEAKER:  Mr. Osen could address that more

10  specifically.

11          MR. OSEN:  It's a little bit hard to answer, Your

12  Honor, for two reasons.  One, the records we received from

13  1996 on contain approximately four or five documents from

14  1996, period.  The other records either no longer exist or

15  never existed.  We don't know.  So there's only a very small

16  paper trail from 1996, another document or two from 1997, but

17  the total universe of internal correspondence that is relevant

18  to these issues before 2000 is maybe ten documents in total.

19          With respect to the wire transfers and that, it's

20  even more difficult because those are the wire transfers for

21  which we have the least amount of backup documentation.  What

22  I mean by that, Your Honor, specifically is documents that

23  actually indicate where the money went to as opposed to

24  account statements that indicate debits and credits

25  generically.

1          So the long and short of it, Your Honor, is there's

2    very little in the record production that has any probative

3    value from the 1996 to 2000 --

4          THE COURT:  Primarily because very little was

5    produced.

6          MR. OSEN:  Well, produced whether those documents

7    ever existed and were destroyed as part of document retention

8    policies or lack thereof.  We can only state to what there

9    actually is.

10         MR. FRIEDMAN:  I suspect it will be even less

11   probative in the prior period.  First of all, let's remember

12   these accounts were first opened in 1994 and they're seeking,

13   Your Honor, to give them a look back to 1990, which makes no

14   sense.

15         THE COURT:  Well, obviously it doesn't make sense.

16   Obviously, it doesn't make sense.

17         MR. FRIEDMAN:  To the -- whatsoever.  But again,

18   Your Honor, taking their pleadings and I present this to Your

19   Honor in the letter that I know Your Honor has read, there

20   is -- there is no allegation of the bank having scienter until

21   1997.  Perhaps conclusively this statute wasn't even enacted

22   until April 1996, so how could anything before that date be

23   relevant to whether that statute was violated?

24         THE COURT:  It's not rele -- well, it's -- it may be

25   relevant to knowledge.  I don't -- I mean, I don't think

1   there's likely to be very much there.  Why don't you just

2   produce the customer file from the time it was opened?

3              MR. FRIEDMAN:  Customer file from 1990 --

4              MR. GLATTER:  Your Honor, just on that point but,

5   again, not to repeat what's in our papers obviously I would

6   also point out that our request will extend the time period,

7   also ties to our general position regarding relevancy and that

8   while it may -- that necessarily when Interpal itself opened

9   an account or not.  To the extent Your Honor agrees with us

10  that the expanded scope is beyond simply Interpal or in the

11  case of Credit Lyonnais CBSP, then the prior period may very

12  well be relevant to other customers or entities the bank does

13  business with.

14             THE COURT:  Arguably relevant.  It becomes more

15  attenuated the further removed from time.  You know, we're

16  dealing with a time frame of sometime between 2001 and 2000 --

17  you know, September of 2004 what the bank knew.

18             MR. OSEN:  Your Honor, that's true except for one

19  fact which you wouldn't necessarily know off the top of your

20  head, which is that one of the central allegations in the

21  complaint is that due to reports in 1996 that Hamas was

22  funding -- being funded through Interpal, that account was

23  frozen in 1996 by the British government.  The Charan

24  Commission [Ph.] issued a report in 1996, so actually the

25  knowledge that the bank possessed and the published reports at

43

1    that time are actually part of an overall analysis.  The only

2    thing else I would add is that when we look at this from a

3    forensic accounting standpoint the way a bank examiner would,

4    they would look at it from the totality of the record.

5              MR. FRIEDMAN:  Of course, what Mr. Osen omits, as he

6    always does, is that in 1996 the account was unfrozen and the

7    British government concluded that there was no basis for

8    concluding that Interpal was financed.  I understand Your

9    Honor's order produce the relationship --

10             THE COURT:  Anyway --

11             MR. FRIEDMAN:  -- filed back to 1994 and I

12   understand Your Honor's order.

13             THE COURT:  Okay.  Okay.  The last issue are the

14   Zakats that were not mentioned in the plaintiffs'

15   interrogatory responses.  Now, I'm going to ask the plaintiffs

16   where you got these names from.

17             MR. WERBNER:  With respect to the -- well, again,

18   there are --

19             THE COURT:  The Zakats that are the subject of your

20   motion to compel.

21             MR. GLATTER:  Well --

22             MR. WERBNER:  Josh?

23             MR. GLATTER:  Let me just clarify for a second, Your

24   Honor.  Are you referring to all the entities or simply the

25   Zakats because --

44

1          THE COURT:  All of the entities.

2          MR. GLATTER:  Okay.

3          THE COURT:  But why don't you start with the Zakats?

4          MR. GLATTER:  There are two basic categories.  There

5  are the union of goods related entities and then the Zakats.

6  The Zakats are on the receiving end.  We allege that they're

7  Hamas front organizations in the Gaza Strip and the West Bank.

8  The list is a compilation of organizations that have been

9  designated as unlawful organizations by Israel for their

10  connections to Hamas, have been identified in U.S. indictments

11  of third parties in connection with Hamas fundraising, and

12  violations of a material support statute, so it's a -- it's

13  the short narrow list of principle Zakats.  Also primarily,

14  those that we've seen in the transactions records to have been

15  the primary recipients of Interpal and CBSP's large

16  [inaudible].

17          THE COURT:  Okay.  So you have records of transfers

18  made from the Interpal account to these entities?  Is that

19  what you're telling me?

20          MR. GLATTER:  Correct.  For the most part.  There

21  may be one or two where they're -- where they are on a

22  government list, but they are not -- we have yet seen a

23  transaction for them.  But again, the only thing else I would

24  add is that the universe of entities that are connected to

25  Hamas and the Palestinian-controlled territories, numbers

1  perhaps two or three hundred, we've condensed that to a much

2  shorter list, [inaudible].

3        MR. FRIEDMAN:  Your Honor, if I may, I would like

4  Mr. Osen to tell us which of these more than 30 entities are

5  listed in the transaction records.  It's my understanding it's

6  very few of them.  If they are listed -- if they are entities

7  that had transactions with Interpal or CBSP, then it was their

8  responsibility.  When I posed an interrogatory asking them to

9  identify the entities in the proximate cost of -- proximate

10 chain of causation of those who were involved in these attacks

11 that give rise to these claims, it was their responsibility to

12 identify them and they didn't.

13       So, number one, I think there are not a lot of these

14 entities that transacted with Interpal or CBSP, but number

15 two, as the result of plaintiffs' failure despite our repeated

16 requests to identify them, any of these entities in their

17 interrogatories they are telling us we don't have a good-faith

18 basis to allege that these entities were involved in the

19 funding of the attacks that injured our clients.

20       Again, they don't have roaming authority to police

21 support for Hamas.  They represent clients who were injured or

22 murdered in attacks and they have to establish that the

23 discovery relates to those attacks.  I did not ask that

24 interrogatory lightly.  I asked it very deliberately and

25 Magistrate Judge Matsumoto said that they needed to provide

1   all of the facts on which they base their claims.

2           I'm frankly surprised that we're having this debate.

3   If Rule 26 is limited, as it is, to evidence that is relevant

4   to the claims plaintiffs have told us who the entities are

5   that they think were in the chain of causation leading to

6   these attacks because the bulk of these more than 30 entities,

7   by their own definition, they can't say were involved in the

8   attacks.  It's just ipso facto can't be relevant.

9           The fact that entities were indicted by the U.S. --

10  and by the way, the one case that went to trial it was

11  [inaudible]; it's being retried now -- and the fact is --

12          MR. WEBNER:  It wasn't acquittal.  It was a hung

13  jury --

14          MR. FRIEDMAN:  We --

15          MR. WEBNER:  -- or we wouldn't be retrying it.

16          MR. FRIEDMAN:  Well, there was acquittal -- there

17  was --

18          MR. WEBNER:  Which is --

19          MR. FRIEDMAN:  There was acquittal of most of the

20  defendants.

21          And, Your Honor, if -- and the fact that Israel

22  lists these entities is real -- is obviously a state of work

23  with these things, but you don't even have to go there.  If

24  there are entities that transacted with Interpal and CBSP --

25  and to my knowledge it's very few of those entities -- they

1  would be relevant only if plaintiffs can place them as being

2  in the chain underlying these attacks.  To have the banks now

3  after having produced everything they have in Interpal and

4  everything they had for about the 15 or the 14 entities that

5  plaintiffs have identified to have to go back would be

6  grossly, grossly unfair.

7          If Your Honor does rule they are relevant, as I

8  said, last time and as I say again this morning, I'm going to

9  have to make a burden proffer that is going to show that

10  because of the way the bank's systems are set up, the only way

11  they can identify entities that are counterparties to their

12  customers is by going through every customer account.  It just

13  doesn't make any sense for them to have to do that when

14  plaintiffs have not identified in any of these entities as

15  being relevant to their claims.

16          THE COURT:  Go ahead, Mr. Osen.

17          MR. OSEN:  Well --

18          THE COURT:  You're to be commended for your

19  restraint.

20          MR. OSEN:  I'd like to get back to the union-of-good

21  entities as well, because I think that's the second part, but

22  let me just deal with the Zakat communities for a moment.

23          Firstly, contrary to Mr. Friedman's recollection,

24  the vast majority of these entities are the principal

25  beneficiaries of Interpal and CBSP's transactions.

1          Secondly, as I indicated a moment ago, for many of

2     these earlier periods of time we simply don't know who

3     received the money.  We have indications they transferred

4     money but not to who, so it was --

5          THE COURT:  From the Interpal account information?

6          MR. OSEN:  From both, yes, Your Honor.

7          THE COURT:  You don't have information as to where

8     the funds went?

9          MR. OSEN:  Well, let me explain.  If we get, for

10    example, from Mr. Friedman a 1996 account statement for the

11    customer --

12         THE COURT:  Oh, all right.

13         MR. OSEN:  -- it indicates that there were

14    transactions but it doesn't indicate in most cases where the

15    money came from or went to.  The underlying what he refers to

16    as "backup documents," which are the actual internals telling

17    you who accepted or who -- obviously that's the most critical

18    information to us, not whether they balanced their book that

19    month, but who they got money from and who they accepted.  So

20    in many cases, we don't yet have that underlying information

21    from the bank.

22         Moreover, obviously Mr. Friedman has gone at great

23    lengths in many letters trying to tie specific Zakat

24    committees to the particular attacks.  Clearly what we were

25    talking about is whether or not these entities are controlled

1  by alter egos of Hamas.  If they are, the plaintiffs contend,

2  and Judge Sifton seems to agree, that transfers to Hamas would

3  be part of the casual chain because Hamas is the perpetrator

4  of the attacks, not the Zakat Committee, which fund raise.

5          As far as the union-of-good entities and the SGDTs,

6  number one, we've in all of our complaints alleged that

7  Interpal and CBSP are part of the union of goods.  In fact, on

8  their own web sites they referred to themselves as part of a

9  union of good, an umbrella organizations for Islamic charities

10 around the globe that specifically fundraise for Hamas.  Many

11 of those entities are also specially designated global

12 terrorists, not simply the ones that happen to bank with

13 Credit Lyonnais and Nat West.  That includes the Al-Aqsa

14 Foundation in Germany.  It includes the Al-Aqsa Foundation in

15 Yemen, which donated a considerable amount of money to

16 Interpal.

17         It also obviously includes all of the principal

18 SBGTs who were the senior leadership of Hamas for which

19 Mr. Friedman does not want to produce records, Sheikh Hashim,

20 Dr. Rantissi, the who's who of the top leadership that have

21 been designated.  And finally --

22         MR. FRIEDMAN:  The former top.

23         MR. OSEN:  The former, many of whom are tragically

24 deceased.  In addition, there are a number of other union-of-

25 good entities that actually bank with Nat West or did.  They

50

1   also, as indicated by our exhibit, have transferred funds to

2   the same Zakat committee.

3          Now, what Nat West did in transferring funds on

4   behalf of a variety of union-of-good entities is clearly

5   relevant and what their due diligence was and AML practices

6   were for a whole host of all -- I must stress, Your Honor --

7   inter-connected entities.  Let me just give you one example.

8          In 1996 and 1997 the record shows that a primary --

9   one of the principal donors to Interpal was CBSP, the

10  defendant -- the customer in the other case.  Yet, Mr.

11  Friedman says it's not relevant for us to get CBSP records in

12  the Interpal case.  So I don't want to belabor the point, Your

13  Honor.  I think --

14         THE COURT:  Okay.  I understand.

15         MR. FRIEDMAN:  Your Honor, if I may --

16         MR. WERBNER:  If I may add one rebuttal about this

17  interrogatory number two, I said at the last hearing that I

18  was -- that I did not ever read that interrogatory two or four

19  that would be causing a listing of every Zakat that we claimed

20  was Hamas related.

21         Subsequent to that hearing, as I've stated, I

22  supplemented my Rule 26 disclosures and made sure that I had

23  listed as Zakat Hamas fronts that we believed were associated

24  those.  do that because I have a good-faith belief in that.  I

25  believe that unquestionably demonstrates the relevance.  I --

1   until there's a ruling on that interrogatory, I mean, I don't

2   read it that way.  It was a contention interrogatory that I

3   still don't see, but if I'm wrong then the Court can order us

4   to supplement that.  You look at that interrogatory.

5          But for today's purpose in deciding whether those

6   things are somewhere in a complaint or interrogatory or in the

7   disclosures, it can't be questioned that they've been properly

8   put on notice that we consider those relevant Hamas fronts.

9   If we're derelict in the interrogatory -- I don't think we

10  are -- we'll have to supplement that.

11         THE COURT:  Okay.  Could you just wait a minute?

12  We'll take a quick break.

13         MR. FRIEDMAN:  Yes, ma'am.

14         THE COURT:  I need to just attend to a short

15  criminal matter.

16         MR. FRIEDMAN:  Yes, Your Honor.

17         [Off the record.]

18         THE COURT:  Wait just a second.

19         MR. OSEN:  Okay.

20         THE COURT:  It's Mr. Friedman's turn.

21         MR. OSEN:  Okay.

22         THE COURT:  Your Honor, in response to what Mr. Osen

23  just had to say, they have the backup documentation to the

24  extent that they know who the counterparties to the

25  transactions are.  It's already been produced.  Credit

52

1   Lyonnais has produced absolutely everything and Nat West has a
2   few wire transfer documents to produce, but what he said to
3   you is just not true.  They know who all the counterparties
4   are.

5           Now, they get up before you and they say, you know,
6   we think that these are all part of Hamas.  The Israelis think
7   these are all part of Hamas so, therefore, they're relevant.
8   Your Honor, we're addressing, we're defending the case as
9   pleading.  We're defending the case as described to us in
10  discovery and none of these entities are identified as being
11  relevant to the plaintiffs' claims and they already have
12  received in discovery the information to identifying these
13  entities if they believe they are relevant.

14          With respect to Mr. Werbner's supplemental
15  disclosures, supplemental disclosures means only that you
16  believe that these entities may have relevant documents.  I
17  have asked them for months if these entities you believe
18  participated in the perpetration of these attacks.  If you
19  believe these entities are involved in the causal chain of
20  funding that goes from Nat West or Credit Lyonnais to these
21  attacks then put them in your interrogatory responses.
22  Mr. Werbner just as he did two weeks ago comes before Your
23  Honor and says, I didn't know I was supposed to list them in
24  my responses.  Well, he did list a few of them and we are --
25  we have searched for them.  We have produced documents

53

1   concerning the ones that he listed, so the notion that he

2   didn't know that he had to do that is belied by his own

3   responses.

4          Again, if Your Honor rules that these are relevant

5   despite the fact that they're not referred to in the

6   pleadings, despite the fact that they're not referred to in

7   the interrogatory responses and, therefore, by definition are

8   not relevant to this case, I've got to make a burdensome issue

9   to Your Honor because my clients tell me that there's no way

10  that they could comb the entire bank to find transactions with

11  these entities.

12         THE COURT:  Mr. Osen?

13         MR. OSEN:  Your Honor, we can address, I guess, till

14  the cows come home the issue of interrogatories and contention

15  interrogatories whether they cover causation only or

16  fundraising more broadly.  I'm content to rest on the papers,

17  but if you have any other questions, we'll address them.

18         THE COURT:  Okay.  Well, you know, the --

19  Mr. Friedman is correct that the submissions -- I mean,

20  discovery is limited to what's relevant to the claims and

21  defenses.  I don't agree with him that the plaintiffs

22  necessarily need to be bound by what is pled because the last

23  thing we want in this court is to cause an increase in the

24  number of allegations and complaints.  I mean, that's not what

25  Rule 8 provides for and I do view as -- I wouldn't say

1  illustrative, but certainly the naming of Interpal or CBSP as

2  being an identification of the main means in which the two

3  defendant banks have provided material -- or alleged to have

4  provided material support.

5         However, when you're starting to talk about just

6  discrete transactions it does become a little more remote.  I

7  think, though, Mr. Osen says that some of those entities that

8  are listed on the motion to compel did receive transfers from

9  Interpal.

10        MR. OSEN:  Certainly, Your Honor.

11        THE COURT:  And you would agree that it would make

12  sense to search for those?

13        MR. FRIEDMAN:  The last time I looked at it there

14  were a couple of those.  I don't agree it makes sense to

15  search for the ones that transacted with Interpal, but if Your

16  Honor orders that I understand -- but I need to be able to

17  make my burden showing to Your Honor because communicating

18  with Nat West as recently as yesterday they reaffirmed to me

19  that, for example, ABC Zakat, ABC Zakat is not their customer.

20  So the only way they would have documents about ABC Zakat

21  would be because it was a counter party to a transaction with

22  somebody else that they would literally -- and I know this

23  sounds extreme, but they would literally have to go through

24  the accounts of everyone in the bank to see if anyone had ABC

25  Zakat as a counter party.

1          If Mr. Osen wants to give me a list of those

2    entities that transacted business with Interpal or with CBSP,

3    then I can have the bank -- I don't think any of this is

4    [inaudible], but I can have Nat West search in the same four

5    departments that we searched for before and we can have Credit

6    Lyonnais search in the Financial Security Department.  That

7    would be understandable, but having a bank-wide search for any

8    document relating to these entities just won't work.

9          THE COURT:  Well, before you answer, Mr. Osen, I do

10   think it does make sense whatever search I will require Nat

11   West to conduct be the last search.  I think it's -- I

12   mentioned this in passing at the last conference, but I think

13   it -- it does -- it should be more cost efficient -- correct

14   me if I'm wrong, Mr. Friedman -- to make one last search of X

15   number of entities, and you'll have the names, and that will

16   be it.

17          MR. FRIEDMAN:  That makes sense, Your Honor.

18          THE COURT:  Okay.

19          MR. FRIEDMAN:  If you go beyond these four documents

20   in Nat West, I'm going to make a showing to Your Honor that it

21   just can't be done.  It cannot be done.

22          THE COURT:  Well, I think they're primarily

23   interested in transactions or are you also interest -- I guess

24   internal bank communications because --

25          MR. FRIEDMAN:  Well --

1      THE COURT:  -- wouldn't -- you tell me whether or

2  not the documents reflect that one transaction would trigger

3  interest of some of these departments that Mr. Friedman

4  mentioned.

5      MR. OSEN:  Well, let me suggest as a starting point

6  that obvious --

7      THE COURT:  No, I think we need to not only have a

8  starting point.  WE just need to define the scope of the

9  search and the end point --

10      MR. OSEN:  Right.

11      THE COURT:  -- and into the list.  It will be

12  whatever the list is.  It may make sense to have a list after

13  the bank completes it.  The production I've required on the

14  end date and then you'll just come up with a list.  If we have

15  to, we'll argue again over the scope of the list, but I -- you

16  know, you do have to have some good-faith basis for coming up

17  with these names.

18      MR. OSEN:  Well, I don't -- Your Honor, I don't have

19  any concern about the good-faith basis for the names.  It's

20  the smallest conceivable universe of alleged Hamas fundraisers

21  and recipients and fund organizations.  The total list is well

22  into the hundreds of entities that are part of the network.

23  We've tried to narrow it down to those that have been

24  designated by the United States Government as specially

25  designated global terrorists, fellow members of the union of

1  good, and even then only the British ones, not the worldwide

2  operations, and to a very small subset of Hamas Zakat

3  committees in the West Bank and Gaza Strip, who are

4  principally identified through defendant's own papers as those

5  who received funds from them.

6              So I'm not concerned about the list itself.

7              THE COURT:  Funds from Interpal.  Okay.

8              MR. OSEN:  Correct.  Or Credit Lyonnais, not --

9              MR. FRIEDMAN:  But -- I'm sorry.

10             MR. OSEN:  I'm sorry.  With that, I also recognize

11  that the burden addressing plaintiffs' substance if burdened

12  we're not concerned or interested in having them search every

13  branch that they've ever had and every archive they've ever

14  had.  I think historically when we had our initial discussions

15  with Mr. Friedman on the subject, we originally broached the

16  possibility of having them search for those records, both

17  transactional and correspondence, et cetera, that was in

18  electronic form to simplify their burden and so forth.  That

19  was rejected and is part of the reason we're standing before

20  Your Honor.

21             I think the most obvious thing to note is -- and the

22  threshold where I started to say where we start in this

23  process is those entities that are listed to the extent they

24  are customers, account holders of Nat West would be the

25  logical point.

58

1          MR. FRIEDMAN:  That's [inaudible].

2          MR. OSEN:  And, Your Honor, just so you have some

3   background, it's a matter of public record that some of these

4   Zakat committees, Janeen and Fulcarim [Ph.], for examples,

5   maintained other accounts in London, not that we know of with

6   Nat West, but with other banks.  So that it's not so

7   farfetched for even seemingly remote Gaza or West Bank

8   entities to have had accounts overseas and London.

9          So with that, it seems to me that if Mr. Friedman's

10  client has as a customer another union-of-good member then we

11  want, you know, the whole enchilada, as it were, for that

12  cust --

13         MR. FRIEDMAN:  The whole megillah.

14         MR. OSEN:  The whole megillah.  Thank you.

15         THE COURT:  This is Brooklyn, as you know.

16         MR. OSEN:  However, with respect to those who are

17  not their customers, it seems that a far more circumscribed

18  universe of materials would be reasonable, that is, a search

19  of the kind that we're talking about for either electronic

20  records or those that appear in the group fraud or AML risk

21  management -- each bank has a different name for it.

22         MR. WERBNER:  And they had software called the

23  Goldkeeper where they keep -- at that centralized anti-money

24  laundering and they can day-to-day search, you know, those

25  that are being identified.  So those -- there are electronic

1    tools specifically that it would be used for.

2            MR. FRIEDMAN:  I would like to propose if we're

3    going down this route at all, as it seems we are, that we do

4    what Your Honor suggested supplemented by something that

5    Mr. Osen suggested.

6            First of all, once they get the transaction records

7    through September 25, 2005, they then let me know which --

8            THE COURT:  One final list.

9            MR. FRIEDMAN:  Yeah, one final list.  Again, with

10   all due respect to my adversaries, they keep saying that the

11   Israelis have said this about these entities, U.S. has said

12   this about these entities, but the key is do these -- do they

13   have a good-faith basis for saying any of these entities have

14   a connection to Nat West or Credit Lyonnais.  So if they get

15   the transaction records through September 2005, they can give

16   me, then, a final list.  I can then try to discussed with them

17   a way of searching for documents that would not involve

18   something that the banks just can't do.  Mr. Osen referred

19   to -- well, let's go --

20           THE COURT:  He had two suggestions for searches.

21   One is --

22           MR. FRIEDMAN:  Customers.  One is --

23           THE COURT:  If their customers would provide the --

24           MR. FRIEDMAN:  Off of which list?

25           THE COURT:  -- customer --

1          MR. FRIEDMAN:  Off of which list?

2          THE COURT:  The final list that they provide.

3          MR. FRIEDMAN:  Okay.

4          THE COURT:  And then as to noncustomers, you'll just

5   make a search of your electronic records.

6          MR. FRIEDMAN:  Well, I don't know if I can agree

7   that we're going to [inaudible].  There was a reason that I

8   objected to it in our meet and confer.  Mr. Werbner mentioned

9   the Goldkeeper reports.  Those are searchable.  That, I think,

10  can be done, but I need the final list and in order to come up

11  with the final list I need to give you the transaction

12  records.

13         MR. WERBNER:  I think we can do it at production

14  based on the one we have and within seven days or so we can

15  have the final list.

16         MR. FRIEDMAN:  Yeah, we have the final list.

17         THE COURT:  Okay.  So you can just provide -- I'm

18  giving you one last chance.  I think that's the simplest way

19  to address the [inaudible] issue --

20         [Simultaneous voices.]

21         THE COURT:  What?

22         MR. WERBNER:  How long will it take to gives us the

23  documents through September of '05?  I mean --

24         MR. FRIEDMAN:  The transaction documents?  I will

25  get on the phone when they get [inaudible] --

61

1          MR. WERBNER:  [Inaudible] --

2          THE COURT:  Well, let --

3          MR. WERBNER:  It may be worth waiting if we're

4  talking 30 days.  If we're talking four months --

5          THE COURT:  Well, I was going to suggest 30 days.

6          MR. FRIEDMAN:  I'll let them know.  Oh, the

7  transaction records --

8          THE COURT:  Well, what I've ordered.

9          MR. FRIEDMAN:  I will let them know.

10         MR. WERBNER:  Your Honor, before we leave on the --

11  we did not see a cover letter that counsel submitted in

12  camera.  I presume that was submitted.

13         THE COURT:  There was a cover letter.

14         MR. WERBNER:  Oh, well, we did not -- or I

15  overlooked it.

16         THE COURT:  I had actually asked that you do provide

17  some sort of notice that you were providing it, but they --

18         MR. WERBNER:  I overlooked it.  I didn't see --

19         MR. GLATTER:  I didn't serve the cover letter,

20  but --

21         THE COURT:  Yes.

22         MR. GLATTER:  -- the cover letter is in camera.  The

23  cover letter describes to --

24         THE COURT:  No, no.  I was going to suggest you just

25  have a cover letter to me -- I'm sorry.  So that the

1  plaintiffs would know.

2          MR. GLATTER:  The record --

3          THE COURT:  That's all right.

4          MR. GLATTER:  -- in respect that I made -- the

5  submission [inaudible].

6          THE COURT:  Yes, the -- we do have a submission.

7  We've gone through them.

8          MR. WERBNER:  Was that under advisement, then, your

9  review of those?

10          THE COURT:  Yes, but let me just finish up.  Are we

11  through with the last topic?

12          MR. OSEN:  I just wanted to be clear.  When we

13  submit our final list, the final list to Mr. Friedman, is it

14  the Court's order that with respect to those entities for

15  which [inaudible] pulled the customer account that they will

16  produce for those or did I mishear the process here?  I just

17  want to make sure --

18          THE COURT:  No, no, no.  With respect to the end

19  date discovery, I'm asking the defendants to make their

20  production by -- within a month, October 24.

21          MR. FRIEDMAN:  The transaction records I can, Your

22  Honor.  I'm not sure that I can, so I don't want to make a

23  representation that --

24          THE COURT:  Well, I'm ordering you to do so and you

25  can discuss a schedule with the plaintiffs and then make a

63

1  proposal to --

2           MR. FRIEDMAN:  Thank you, Your Honor.

3           THE COURT:  -- extend that schedule if necessary.

4           Now, so when are you going to produce the final

5  list?

6           MR. OSEN:  Well, if I heard --

7           MALE SPEAKER:  Thirty days --

8           MR. GLATTER:  Ten days [inaudible].

9           MR. OSEN:  Ten days after we receive the production.

10          THE COURT:  Okay.  So you can live with just the

11  production of the transactional records.  We don't hear any

12  promises from --

13          MR. WERBNER:  Well, you ordered 30 days and if they

14  are able to do it, then we'll live with ten days.  If it turns

15  out to be less than that, we may depending on -- we may need

16  to wait for the balance.  I mean, it's hard to know.  I would

17  like to see the order say they're going to do what they --

18          THE COURT:  Well, let me give you a little more time

19  for the final list.

20          MR. WERBNER:  Okay.

21          THE COURT:  And then -- because I don't want you to

22  be hasty about it and --

23          MR. WERBNER:  Last --

24          THE COURT:  And perhaps you could then have an

25  opportunity to confer with the defendants and allay

64

1    Mr. Friedman's concern, if that's possible, and --

2              MR. OSEN:  Your Honor, my colleague, Mr. Steingard,

3    raised an important point.  The added production only applies

4    to National Westminster Bank, so with respect to Credit

5    Lyonnais, there is no further shoe to drop, as it were.  So we

6    can proffer our list with respect to Credit Lyonnais, you

7    know, conferred by -- I would say, two weeks is probably

8    reasonable.

9              THE COURT:  Okay.

10             MR. FRIEDMAN:  And the Nat West list, final list,

11   how long after you get the production?

12             MR. WERBNER:  About 21 days after you comply with

13   the production.

14             MR. FRIEDMAN:  And then --

15             THE COURT:  November 13th?

16             MR. FRIEDMAN:  And then what do we need to do with

17   the entities on that list?  What is it that Your Honor is

18   ordering us to produce with respect to the entities --

19             THE COURT:  Entire file if they are customers and --

20             MR. FRIEDMAN:  The entire customer file --

21             THE COURT:  Right.  As --

22             MR. FRIEDMAN:  -- for customers.

23             THE COURT:  And then the search of the electronic

24   records with respect to noncustomers.  Right?  Okay.

25             MR. WERBNER:  Where do you see us on the in camera?

65

1   Not -- I mean, is that --

2         THE COURT:  I --

3         MR. WERBNER:  If we had some --

4         THE COURT:  I am going to have an ex parte

5   conference with the defendants.  I think for those of us

6   coming with totally uninformed eyes looking at these emails, I

7   can't claim complete credit for that look.  There are more

8   facts that are raised than were addressed by the defendants

9   and I would like to give the defendants an opportunity to --

10         MALE SPEAKER:  [Inaudible]

11         THE COURT:  Yes.  We look at these issues from a

12   different perspective and so -- well, I'll --

13         MR. WERBNER:  You know, I'll stick my nose where it

14   doesn't belong.  We're scheduling some depositions for about

15   30, 40 days out.

16         THE COURT:  Oh, yeah.  No, we'll get to this --

17         MR. WERBNER:  We're in good shape there.

18         THE COURT:  We should get to this sooner rather than

19   later.  I'll set a date with Mr. Friedman after we set our

20   next date where we're going.

21         MR. FRIEDMAN:  Thank you, Your Honor.

22         THE COURT:  So in the best of all worlds, if there's

23   a final list on November 13th I assume the defendants could

24   comply?  This is actually with respect to Nat West and you'll

25   be on a shorter schedule with respect to Credit Lyonnais,

1  which -- so I don't really need to put a deadline for this.

2  I'll just put one final deadline of November 13th and

3  hopefully -- well, maybe it does make sense since we have the

4  same set of attorneys for both cases.  Actually, it's one,

5  two -- I'll give you three weeks.  How about October 15th for

6  the final list in the Credit Lyonnais cases?  Okay.

7          MR. WERBNER:  Great.

8          THE COURT:  Now, so given what's being required to

9  be produced, Mr. Friedman, it's -- I assume it's fair to think

10 that your client might be able to make production within 30

11 days after you get the final list?

12         MR. FRIEDMAN:  Obviously, it depends on the length

13 of the list, Your Honor, but I can't say that that's fair

14 because it takes quite a bit of time for the banks to get

15 these together.

16         THE COURT:  Look, you'll work it out with the

17 plaintiffs.

18         MR. FRIEDMAN:  We will work it out.

19         THE COURT:  And then maybe -- well, what other

20 discovery do you contemplate after --

21         MR. WERBNER:  We are going to Paris between October

22 22nd and October 30th for -- and we've been trying to --

23         THE COURT:  Picked a great time.

24         MR. WERBNER:  Yes, ma'am.  And we need a magistrate

25 there, but --

1        THE COURT:  Okay.  Let me check my calendar.

2        MR. WERBNER:  And if you prefer London, we're trying

3    to schedule --

4        THE COURT:  Okay.  Well, anyway, I'm not -- I just

5    want to know what other discovery you're contemplating after

6    the production of these documents because --

7        MALE SPEAKER:  Paper discoveries you mean?

8        THE COURT:  Any discovery.

9        MR. WERBNER:  Well, that's what I mean.  We're

10    taking -- we have depositions of these bank people at the end

11    of October and beginning of November.

12        THE COURT:  Well, let me just set an arbitrary --

13    and I consider it arbitrary because we have some uncertainty

14    here in the production end of discovery deadline.

15        MR. WERBNER:  We have a draft scheduling order.  I

16    don't know where --

17        MR. FRIEDMAN:  We've been working on a draft

18    scheduling order and, as I --

19        THE COURT:  Well --

20        MR. WERBNER:  Discovery [inaudible].

21        MR. FRIEDMAN:  And we haven't discussed it in quite

22    some time, but they -- plaintiffs had proposed a discovery

23    cutoff date -- fact discovery cutoff date for the end of

24    February.

25        THE COURT:  Well, that was what I was going to

1   propose.

2           MR. FRIEDMAN:  But I think if Your Honor will allow

3   us to confer with one another and we'll work out everything we

4   can on a complete scheduling order, because we've really made

5   progress on it, and then we'll report back to Your Honor.

6           MR. WERBNER:  But give us a -- I would suggest along

7   those lines if you told us to submit if possible agreed, if

8   not as close to possible agreed to you within seven days, ten

9   days --

10          THE COURT:  Sure.  I --

11          MR. WERBNER:  It's been circulated and I just want

12  some sort of --

13          THE COURT:  What else is in the schedule?

14          MR. FRIEDMAN:  Well, what it provides for is fact

15  discovery, expert discovery, summary judgment motion practice,

16  circulation of questionnaires prior to -- what it provides for

17  is the completion of liability and discovery and expert

18  discovery -- the circulation questionnaires as to the hundred-

19  plus plaintiffs so that if the Court does not grant summary

20  judgment to the defendants of liability [inaudible] quickly

21  depose the plaintiffs to the extent --

22          THE COURT:  All right.

23          MR. FRIEDMAN:  -- to the extent deemed appropriate.

24  It's a very good schedule that has been put together and I

25  think --

1          THE COURT:  Okay.  I --

2          MR. FRIEDMAN:  -- just because of my travel plans I

3  think within two weeks we can report back to Your Honor.

4          THE COURT:  All right.  Fine.  Okay.  You'll submit

5  a proposed schedule.  Does it make sense to have an interim

6  conference or -- shall -- I'll just set an end to discovery

7  conference and --

8          MR. OSEN:  There is -- there are a couple of

9  outstanding issues that mercifully have not been in front of

10 Your Honor yet, but may --

11         THE COURT:  Well, thank you.

12         MR. OSEN:  -- very well percolate with respect to

13 employee files, the production of witnesses.  I think

14 Mr. Werbner has asked for employee files and prospective

15 witnesses, et cetera, through the subject [inaudible].

16         MR. FRIEDMAN:  The interim conference, in short,

17 might be beneficial.

18         MR. WERBNER:  We -- you were gracious last time --

19         THE COURT:  Can I make a suggestion at least with

20 respect to the employee files because it might just expedite

21 the depositions.  It's just to provide the employment history

22 within the bank.

23         MR. FRIEDMAN:  We can do that, Your Honor, but

24 that's -- Mr. Osen is alluding to and I don't suggest we

25 discuss this because I think we should have a meet and confer

70

1    on that.

2            THE COURT:  Okay.

3            MR. FRIEDMAN:  But the French cannot produce

4    personnel files of their employees due to French privacy laws

5    and [inaudible] --

6            MR. OSEN:  [Inaudible] secret.

7            MR. FRIEDMAN:  And we really have an issue with that

8    that we need to discuss.  I can produce the employment history

9    within the bank for each person they've asked for [inaudible]

10   letter.

11           THE COURT:  Okay.

12           MR. WEBNER:  I was just going to -- you were very

13   gracious last time because I was up here from Dallas for a

14   related hearing yesterday before Magistrate Pohorelsky.  He

15   set a follow-up conference for December 10.  I don't know if

16   that's too late or too soon for you and I can come up before,

17   but just so that you know, I know for sure I'm going to be

18   back here on December 109 at 11:00 o'clock and I can do it the

19   day before or that day, the day after if this works for

20   everyone else.

21           MR. OSEN:  That's fine.

22           THE COURT:  Whatever your pleasure.

23           MR. WEBNER:  Thank you.

24           THE COURT:  What would work better?  In the

25   afternoon or -- yeah, I think probably --

71

1          MR. WERBNER:  Two o'clock or something on the 10th

2    or --

3          THE COURT:  Okay.

4          MALE SPEAKER:  I'm sorry, the 9th or the 10th?

5          MR. WERBNER:  Isn't there a hearing on the 10th?

6          MALE SPEAKER:  Hearing is on the 10th at 11:00.

7          THE COURT:  Okay.

8          MALE SPEAKER:  Going to do 9th at 2:00?

9          MR. WERBNER:  I was going to say, the 10th at 2:00.

10         MALE SPEAKER:  Okay.

11         MR. WERBNER:  Then we'll just, you know, but I'm

12   flexible if anybody else needed the day before or after.

13         MR. OSEN:  One other --

14         THE COURT:  Okay.  Well, you know, maybe you could

15   even just send me -- we can discuss the schedule at that

16   conference and just set the final schedule at that conference

17   and we'll need to --

18         MR. FRIEDMAN:  But we'll get to you in two weeks so

19   that you have it in advance if we can.

20         THE COURT:  Or get it to me closer to the conference

21   date.

22         MR. FRIEDMAN:  Okay.

23         THE COURT:  You'll have a much better handle on

24   what --

25         MR. FRIEDMAN:  Okay.

1          THE COURT:  -- is a logical schedule.

2          MR. OSEN:  One last housekeeping matter, Your Honor,

3    there was one other motion, which I'm happy to rest our papers

4    on, but it had to do with the watch list.  And as I say, we

5    don't have to discuss it, but I wanted to draw your attention

6    to the fact that there was the additional motion.

7          THE COURT:  Okay.  That's --

8          MR. FRIEDMAN:  If Your Honor hasn't seen the papers

9    on that --

10         THE COURT:  Yeah, I didn't focus on that.  I have to

11   apologize.

12         MR. FRIEDMAN:  I think it makes sense for me to

13   address it but, you know, I noted in my papers that as to the

14   Israeli watch list, Credit Lyonnais has said -- I think

15   they've testified or they will testify but they don't refer to

16   the Israeli watch list because they're not subject to

17   regulation and Israel -- and they've never referred to the

18   Israeli watch list.

19         As to the U.S. watch lists, again, I think this

20   overlaps with their point about the entities.  We pointed out

21   that there are over 7,000 persons and entities on the U.S.

22   watch list, most of which have nothing to do with the Middle

23   East, let alone Hamas.  They are even U.S. terror entities on

24   that list.

25         Plaintiff suggested in their reply letter that

73

1  they're not looking for documents concerning the entities on

2  the list.  They're just looking for documents about the lists

3  and Credit Lyonnais has already produced everything it has and

4  they can examine witnesses on that subject and see if there's

5  anything more.

6          THE COURT:  Okay.  I'll take a closer look.

7          MR. WERBNER:  [Inaudible] --

8          THE COURT:  I'll take a closer look and --

9          MR. FRIEDMAN:  Thank you, Your Honor.

10          THE COURT:  -- if I need further argument we can

11  just have it by telephone.

12          MR. FRIEDMAN:  Thank you, Your Honor.

13          MR. WERBNER:  Thank you, Your Honor.

14                      *  *  *  *  *  *

15

16

17

18

19

20

21

22

23

24

25

74

1        I certify that the foregoing is a court transcript

2   from an electronic sound recording of the proceedings in the

3   above-entitled matter.

4

5

6                        _____

7                               Ruth Ann Hager

8   Dated:   September 24, 2008

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25