UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK


```
----------------------------X
                            :
WEISS, et al.,              :    05-CV-4622 (CPS)(MDG)
                            :    07-CV-916 (CPS)(MDG)
            Plaintiff.  :
                            :    May 22, 2009
                            :
            V.              :    Brooklyn, New York
                            :
NATIONAL WESTMINSTER BANK,  :
et al.,                     :
            Defendant.  :
----------------------------X
```


TRANSCRIPT OF CIVIL CAUSE FOR CONFERENCE
BEFORE THE HONORABLE MARILYN D. GO
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:          GARY OSEN, ESQ.
                            AARON SCHLANGER, ESQ.
                            JAMES BONNER, ESQ.


For the Defendant:          LAWRENCE FRIEDMAN, ESQ.
                            YEORA PARK, ESQ.


Audio Operator:


Court Transcriber:          ARIA TRANSCRIPTIONS
                            c/o Elizabeth Barron
                            31 Terrace Drive, 1st Floor
                            Nyack, New York 10960
                            (215) 767-7700


Proceedings recorded by electronic sound recording,
transcript produced by transcription service

1          THE COURT:  Weiss vs. Natwest, docket number 2005-

2     CV-4622, and Applebaum vs. Natwest, docket number 2007-CV-

3     916.  Will counsel please state their names for the record?

4     For the plaintiff?

5          MR. OSEN:  Gary Osen for the Weiss plaintiffs,

6     joined by my colleague, Aaron Schlanger.

7          MR. BONNER:  Your Honor, Jim Bonner for the

8     Applebaum plaintiffs.

9          MR. FRIEDMAN:  Good morning, your Honor, Larry

10    Friedman from Cleary, Gottlieb, Steen & Hamilton, on behalf

11    of National Westminster Bank.  With me are my colleagues,

12    Yeora Park and Kirsten (ui).

13         THE COURT:  I've looked at your motion papers.

14    It's your motion, Mr. Osen.

15         MR. OSEN:  Let me start by doing something which

16    is probably not generally recommended, which is concede a

17    particular point to my adversary.  We agree with Mr.

18    Friedman about one critical point, which is that the

19    relevance of certain materials belonging to RBS is

20    determined by the degree to which you can impute scienter

21    (ph) to the parent group.  And that means that only records

22    which actually sort of percolate up to the group risk level

23    would then impact the scienter of the group risk in its sort

24    of global analysis, if you will, of terror finance risks.

25         I will say that I checked with my colleagues, who

1    are more actively involved in the meet and confer process in

2    this, and no one has any recollection, prior to Mr.

3    Friedman's response of being advised that there were only

4    two customers who were responsive, specifically friends of

5    Alaxa (ph) or Yousef Islam (ph), I'm sorry.

6            So our initial position, your Honor, with respect

7    to that is this:  Mr. Friedman in his letter refers to

8    records that have been produced to date.  That's his

9    phraseology.  We would submit that at the completion of the

10   record production and the search that is currently ongoing,

11   the number of responsive entities may be two, it may be

12   three, it may be five.  We don't sitting here today know the

13   answer to that.  But whatever that universe is, we would

14   evaluate on the basis of the disclosures that are made.

15           With respect to the two which Mr. Friedman has

16   identified, we believe that the friends of Alaxa materials

17   are clearly demonstrably relevant and directly Germain to

18   the allegations in the complaint.  With respect to the

19   artist formerly known as Mr. Stevens, I think we would

20   reserve judgment on that, both because I think it's at least

21   on its face somewhat more tangential and secondly because of

22   at least the prospect of an additional bank secrecy issue

23   relating to the Jersey Isles.

24           Overall, however, I think you know, if I can just

25   briefly emphasize the themes, for us the important issue is

1    of course that because Natwest compliance functions

2    particularly after the merger were consolidated into RBS, we

3    have received documents from RBS continually through the

4    production.  The defendant has identified RBS on its Rule 26

5    disclosure as an entity that has evidence, etc.  I don't

6    think that's seriously in dispute.

7         The only issues for us apart from the identify of

8    those that cross into group compliance function is twofold:

9    (1) is that we deal with it and with all these issues by

10   date certain so that we can at least approach the time frame

11   set forth in our existent scheduling order, and (2) as a

12   side note on burden, to the extent the court wants to

13   explore that further, we do have some additional thoughts on

14   the representations made about the burden to date.

15        MR. FRIEDMAN:  Well, Mr. Osen has certainly

16   narrowed the issues.

17        THE COURT:  I will narrow the issue.

18        MR. FRIEDMAN:  I suspect.  Your Honor, as we made

19   plain, our view on relevance is based on plaintiff's

20   relevance theory and Mr. Osen has confirmed that he agrees

21   with it.  The two customers have been identified -- if I

22   understand Mr. Osen, what Mr. Osen is saying this morning is

23   asking that the subpoena be enforced to the extent of the

24   Friends of Alaxa customer file, and I can well understand

25   the relevance of that.

1          With respect to the burden issue, again as Mr.

2    Osen has limited this to Friends of Alaxa, as a practical

3    matter, I have to acknowledge that if your Honor engaged in

4    the same analysis as then magistrate Judge Matsumoto engaged

5    in with respect to an English bank and English customer,

6    even though here we do have a different circumstance that

7    it's a nonparty, and we have a different circumstance that

8    it involves a customer that's not accused to being in the

9    causal chain leading to plaintiff's injuries, I will

10   recognize that your Honor would probably strike the balance

11   on English bank secrecy in the same vein  Magistrate Judge

12   Matsumoto did.

13          I will say that we -- if your Honor rules that the

14   Friends of Alaxa should be produced, we will need what I

15   think will be a stipulated word akin to what we've entered

16   into previously to make the record that Natwest is producing

17   its file under court compulsion, so that there's a record

18   for English purposes why this is being done and I detect

19   from Mr. Osen's nod that that will be acceptable to have an

20   order requiring us to produce that file on the same terms as

21   we've agreed to in the past.

22          THE COURT:  Excuse me for interrupting, I didn't

23   really focus on the nature of the organizational structure.

24   Mr. Osen mentioned that there was a Natwest, there was a

25   merger of Natwest into the RBS?

```
1              MR. FRIEDMAN:  No.  Well --

2              THE COURT:  When did this relationship start?

3              MR. FRIEDMAN:  I believe it was around 2000 but I

4    can't say that with certainty.  There is the RBS group your

5    Honor, which is the umbrella, and under the RBS group is

6    Natwest, RBS which is a separate bank, RBSI, and Coats (ph)

7    and Ulster bank, and other entities.  So RBS was never, RBS

8    Bank was never merged into the RBS group, Natwest was never

9    merged into the RBS group.

10             People refer to it colloquially as a merger

11   because it was a major acquisition for Natwest to be a part,

12   but it's under the umbrella of Natwest group.  But I

13   understand plaintiff's relevance theory and I appreciate Mr.

14   Osen's agreement that plaintiff's theory of relevance is

15   that knowledge is to be imputed to Natwest based on what was

16   known at the level of the group level departments that

17   provide shared services to the banks in the group.

18             And, therefore, as I argued in my letter and which

19   Mr. Osen is agreeing with, the only -- since the alleged

20   imputation of knowledge in Natwest is based on a conduit of

21   the group level departments, the only customer records that

22   would relevant would be for customers that came to the

23   attention of group level departments and to date we have

24   identified two.

25             The second issue was burden.  Your Honor, I well
```

1    recognize that if your Honor requires that we produce only

2    the Friends of Alaxa customer file, which is what Mr. Osen

3    is now asking for, that the burden of argument is lessened

4    than if it was what the subpoena calls for on its face,

5    which is a group-wide search of six banks on two or three

6    continents.  So I well recognize that burden shakes out.

7    The bank secrecy issue --

8            THE COURT:  Actually, my question is partially

9    directed towards the relevance and burden.  Because if the

10   relationship did not begin until 2000, and the subpoena

11   seeks documents from 1996, I'll first hear from Mr. Osen as

12   to whether or not that is an appropriate time period because

13   the court does have a duty to make sure that the discovery

14   processes are narrowly tailored.

15           MR. OSEN:  Right, your Honor.  I think the issue

16   has to be bifurcated between what you might call the red

17   flag stage vs. the underlying documentation question.  And

18   I'll walk it through with a practical example.  Stipulating

19   for purposes of this discussion that the acquisition of

20   Natwest took place in 2000 give or take, end of 2000,

21   formalized early 2001, what have you.

22           Effectively, RBS operates the group risk

23   management, group security for all of its component parts,

24   or at least for Natwest, we know definitively.  And that

25   means that when there's a let's say, alert for Interpol

1    related to terror financing in 2002, it doesn't go to a

2    Natwest department, it goes to an RBS department.

3              THE COURT:  Right.  No, I --

4              MR. OSEN:  Okay, so that part is the sort of

5    foundational level.

6              THE COURT:  I think you don't even have to address

7    anything after the -- any records after the date of the

8    acquisition.

9              MR. OSEN:  Understood, your Honor.

10             THE COURT:  Okay, so I'm really focusing on

11   records before the date of the acquisition.

12             MR. OSEN:  Right.  So now --

13             THE COURT:  And also, I don't know about the other

14   banks under the RBS umbrella because I don't know if any of

15   those banks would have been acquired some time after 200.

16             MR. FRIEDMAN:  But I'm afraid it would be germane,

17   your Honor, because Friends of Alaxa is a customer only of

18   RBS.  It's the only bank, so we're just talking about one

19   customer of one bank.

20             THE COURT:  Alright then, we're really just

21   talking -- my question is really how far back should the

22   search go?

23             MR. OSEN:  Understood, your Honor.  I think the

24   answer is that once you have a group risk issue, whether

25   it's Friends of Alaxa or anybody else that percolates, let's

1    say in 2002, the question then becomes how does one assess

2    the risk and analysis for that file the way a bank or

3    forensic review would do.  And that goes back to the

4    original KYC of the customer when the account is opened, it

5    goes to any other transactions that might be part of a look

6    back at the account.

7           So for example, to use an illustration.  In 2004

8    RBS made the tactic transfer to an entity in the Palestinian

9    territories that gets blocked by an Israeli bank because

10   it's on the Israeli unlawful designation list.  And that

11   creates a record inside RBS saying this transaction was

12   flagged for terrorism concerns, what do we do, et cetera.

13          We would argue, your Honor, that records that

14   customer going back even earlier before 2000 are pertinent

15   and relevant for a number of reasons:  (1) because they

16   contained the KYC information on the customer, (2) because

17   they also contained potentially evidence of other transfers

18   to the same entities that are the cause of the original

19   group level concern at a later point.

20          When banks review their customer and the risk

21   levels that they encounter, when they have an issue, they

22   are supposed to go back and assess the customer as a whole

23   both from a KYC standpoint and from the standpoint of

24   whether there are other similar problematic transactions or

25   anything else that might raise a flag once the original flag

1   has been raised.  So the transaction that may trigger a RBS

2   risk analysis is in 2002 but it's the entirety of the file

3   that then tells you what they should have been looking at.

4           MR. FRIEDMAN:  In regard to that may be right, we

5   should also note -- and through the wonders of e-mailing,

6   I'm checking when Friends of Alaxa became a customer of RBS

7   because this may be moot depending on when they did become a

8   customer.  But they're not dealing with this in a vacuum

9   your Honor, we're dealing with it in the context of burden,

10  of balancing relevance and burden.

11          And your Honor having ordered in September that

12  only a customer file be produced, we've since been frankly

13  had our arms twisted a bit to avoid petition motion

14  practiced by agreement to a broader definition of customer

15  file.  And I think given the burden and relevance balance

16  that needs to be struck, that your Honor should require the

17  production only occur as of the time that RBS came under

18  this umbrella, that RBS came under the shared services.  And

19  Mr. Osen can come back to your Honor if there is something

20  that he finds in the documents from that period forward

21  suggesting it's necessary to go farther back.

22          But whereas your Honor had originally required in

23  this context that we produce only a customer file, we're now

24  being asked to produce account statements, backups for

25  certain wire transfers, e-mails that are available on the

1   computers of the relationship manager and assistant

2   relationship manager.  So Mr. Osen's argument may be all

3   well and good in theory, but taken in a vacuum and balancing

4   the relevance and the burden I think at least in the first

5   instance your Honor should take their theory as it's

6   presented and requires production only to occur with respect

7   to records from when the account came under the supervision

8   of the group departments going forward.  And as I said, I

9   am --

10          THE COURT:  I think you're really -- it's not

11  appropriate to apply my limitations for the sale because

12  when I made my discovery burdens last September, it was with

13  the expectation that we were dealing solely with the

14  knowledge of Natwest.  So that the records of these other

15  entities were more tangential and now that we know that we

16  have to go up one level in determining knowledge, it would

17  strike me that the same kind of search that was permitted

18  with respect to Interpol should apply here.

19          MR. FRIEDMAN:  So, your Honor, we can provide that

20  file.  As I said, I think this may be moot because I'm not

21  quite sure when Friends of Alaxa became a customer.  But

22  again, subject to stipulated order for the record, we will

23  gather the same information for Friends of Alaxa.

24          I do need to disagree with Mr. Rosen on timing.

25  In his letter to your Honor, he made a point of asking for a

1    June 15 deadline for the electronic records from four group

2    level departments.  As I had said to Mr. Osen shortly before

3    he wrote that letter, we think we can do that by the end of

4    June.  So the difference between June 15 and June 30 is not

5    that great.  We produced all the electronic records we have,

6    there is one more batch of electronic records that we need

7    to look for.

8            The July 15 date obviously was untenable if we had

9    to go through six banks but I'm not equipped to represent to

10   your Honor today when we can produce these materials for

11   Friends of Alaxa.  The person who is in charge of this is

12   having her deposition taken by one of Mr. Osen's colleagues

13   as we speak.  But I will speak to that witness as soon as

14   she comes off the deposition and ask her if that file can be

15   put together.

16           I will tell you that that file should be put

17   together as promptly as possible, and just let Mr. Osen as

18   to whether he can actually get it done.  July 15 may be

19   realistic but I don't really feel it would be right for me

20   to argue the point because now that Mr. Osen is limited to

21   this one file, I don't know what my client can do.

22           THE COURT:  That makes sense to stagger the

23   production of the customer file.

24           MR. FRIEDMAN:  Well, that's what we always do.  We

25   always -- for example, other customers of Natwest that have

1  been identified we produce the customer files and the

2  transactional records are following.  We really are doing

3  this as quickly as we can.

4         THE COURT:  Let me suggest that you might be able

5  to speed up production, and I may be wrong in even making

6  this assumption given the issues that arose with respect to

7  the redactions, but if you err on the side of not redacting

8  and rely on the confidentiality that's in place, you might

9  be able to speed up the production.

10        MR. FRIEDMAN:  Right, there are -- I hear your

11  Honor but that's not what slows us up.  What slows us up is

12  getting the personnel in place and getting the electronic

13  searches done in place.  But we're doing the best we can.

14  So what Mr. Osen asked for is ready by June 15, I expect

15  we're going to have by the end of June and everything is

16  being done on a rolling basis.  And I'll give Mr. Osen a

17  call in the next few days to tell him what I'm told we can

18  do with the Friends of Alaxa file and we'll get it out.

19        MR. OSEN:  Your Honor ,at the risk of sort of

20  ruining the spirit of agreement here, if I can just go back

21  before we get to the actual deadlines, return to the

22  original issue on two points.

23        (1) I want to make clear that our position -- your

24  Honor has ruled one way or the other, but our position is

25  that we're not simply asking for the Friends of Alaxa file.

1  We're asking for Friends of Alaxa file based on the fact

2  that at the moment up until this point in the production

3  there are only two entities that are involved.

4        THE COURT:  I understand, I think Mr. Friedman

5  understands.  And I certainly do.

6        MR. OSEN:  I just want to be clear about that for

7  the record.

8        THE COURT:  I think we've established some ground

9  rules and actually related to that from the last conference

10  we had, have you reached some sort of agreement on

11  transactions, you know that the threshold transactions?

12        MR. FRIEDMAN:  Well, we're going through the

13  process of generating that one month that your Honor told

14  us.  We're awaiting that.

15        MR. OSEN:  Your Honor, the other thing is, if I

16  may approach for a moment, I'll give a copy.  It's related

17  to this whole question of how the process works with dates

18  and so forth.  This is a copy of a record we received from

19  the defendant last Friday.  I don't know if the time this

20  was created whether they called this yet a goalkeeper record

21  or not so I won't characterize it, except to say that it's

22  somewhat similar to the later iterations of the group risk

23  records that were created by RBS.  This one presumably was

24  produced by Natwest in its prior iteration.  And it's a

25  11:00:05 money laundering disclosure for the Palestine and

1   Lebanon Relief Fund which is the predecessor name and

2   formulation of Interpal (ph).

3          MR. FRIEDMAN:  By the way, your Honor, I object to

4   this theme being brought up because it's not within the

5   scope of what was raised for today, but I just want to note

6   what Mr. Osen just said about being the predecessor to

7   Interpal is wrong.  And in fact, I have a document --

8   because I likely suspected he would try to quibble this with

9   your Honor, I have a document from the English government

10  pointing out that they're a separate entity from Interpal.

11         MR. OSEN: I'm only going based on the SDGT

12  designation, your Honor.  But I'm limiting my point to

13  actually page 4, I'm sorry page 5 of the document.  In the

14  middle of the page, it indicates other accounts known to be

15  held.  If you see that.  And underneath it, it says Ulster

16  Bank, College Green, Dublin, Ireland.

17         Ulster Bank, I don't know if it was true in 2000

18  or when but it's currently within the RBS group.  It was

19  perhaps not part of the RBS group at the time that this

20  precursor goalkeeper record existed.  But this is an example

21  of what I discussed earlier so that a retroactive search and

22  analysis.

23         That is, when you have a customer in 2002 or 2004,

24  who raises some kind of flag.  In the case of Interpol, it's

25  designated by the United States government or what have you.

1    The records and analysis that may be done of all accounts

2    whether held by Natwest or other entities within the group,

3    then becomes relevant again when you're looking at the

4    customer.

5            And so just as prior iterations of Interpol were

6    relevant for analysis of Interpol, so, too, other accounts

7    in what turned out to be sister banks of the group become

8    relevant.  It's very hard when you're sort of going down the

9    rabbit hole of the money trail to arbitrarily cut it off at

10   1995, 1999 or even in fact to 1990.

11           We had always understood, and I recognize the

12   distinction Mr. Friedman is trying to make, that Interpol

13   started in 1994 and that's why we had the relevant time

14   period we have in our things.  But when you see that it was

15   in its prior iteration a customer of the bank going back at

16   least on this record to 1990, that's material we regard not

17   only as relevant but because it may have generated as it did

18   here other issues or concerns at an earlier time, the whole

19   picture is not set by arbitrary cut offs but by what the

20   record actually leads you to.

21           MR. FRIEDMAN:  I don't what point Mr. Osen is

22   trying to make other than the scope of discovery can evolve

23   as documents are produced, and I acknowledge that and we're

24   going through a real example of that today.  I understand an

25   issue has been made in the depositions that are going on

1   this week about the bank's relationship with this entity,

2   which again, I have a report that Mr. Osen is familiar with

3   -- in fact, (ui) marked as the exhibit this week, I

4   understand, which makes the point that these are separate

5   charities.  And I agree with Mr. Osen that the relevance

6   analysis changes as documents are produced.  Again, that's

7   what brings us here today.

8          THE COURT:  Well, I think that there is currently

9   no dispute.  I just hope your making -- I have to say we do

10  have a date of 1992 that is the date of the antiterrorism

11  act, that I would think would set, would help us to the

12  extent that you want to expand.

13         MR. OSEN:  The date of 1992, your Honor, in terms

14  of the civil provision --

15         THE COURT:  I realize that. I may be --

16         MR. OSEN:  But if you're just looking at the

17  document, your Honor, as an example, and I'm not trying to

18  argue my case here, but if you look at page 4 of the

19  document where they list transactions that raise suspicions,

20  et cetera, they are from 1992.  That doesn't go to the

21  question of whether a transfer in 1992 would be the

22  proximate cause of injury.  It goes to how the bank

23  understood the risk level of the client going through time.

24         THE COURT:  I understand that.  It was the same

25  kind of passing comment that you just made.

1      MR. FRIEDMAN:  So I think, your Honor, we should

2 submit a stipulated order for the production of the Friends

3 of Alaxa file and we'll go to it.

4      THE COURT:  Okay.

5      MR. OSEN:  That's fine, your Honor.  If I may

6 return now to Mr. Friedman's point about the schedule.

7 Obviously, we have no problem setting a date of I think you

8 said June 30th instead of June 15.  That's not the issue.

9 For us the question is a little bit more complex because I

10 assume what Mr. Friedman's referring to by June 30th is the

11 production of materials, the electronic records and the,

12 what he previously defined as the customer file for Natwest

13 customers.

14      We have a stipulation in place which comports

15 closer to what we understand customer files to mean and we

16 sort of resolved that dispute as Mr. Friedman alluded to.

17 But that's the heart of the matter if you will in terms of

18 the production.  And I'll give you just by way of an

19 illustration they've produced to us maybe 50, 60 pages for a

20 Natwest customer called Muslim Aid, which presumptively is

21 in the physical customer file at the branch.

22      We've had our stipulation in place that will give

23 us the account records, the wire transfers up to certain

24 limits etc. for that.  That's really where the meat of the

25 matter is and those records which are the account

1  statements, the wire transfers, where the money went to etc.

2  is what we're really concerned about.  So it's not the date

3  of production of these sort of minimalist customer folder in

4  the bank branch but the heart of the material that we have

5  sought since last year.

6          And, you know, right now, as we are currently

7  scheduled, we have a December 18 fact discovery cut off and

8  October 23rd deadline for motions to compel.  And you can see

9  where, you know, Mr. Friedman's representation of a search

10  is that a single person at RBS is conducting the searches.

11  That presumably, when they get to the level of account

12  records and so on, they have more people working on it, but

13  regardless, for our purposes, we only care about date

14  certain of completion so that we can analyze the records and

15  come back.

16          THE COURT:  Well, I think he was talking about a

17  different search.

18          MR. FRIEDMAN:  I was, your Honor.  And I think we

19  should not be negotiating in front of your Honor production

20  schedules.

21          THE COURT:  Well ,I think --

22          MR. FRIEDMAN:  Mr. Osen's letter --

23          THE COURT:  Mr. Friedman, I'm just trying -- I

24  think he was asking and let me just clarify in my mind what

25  production on June 30th.

1          MR. FRIEDMAN:  And that was the point I was going

2     to make, your Honor.  In his letter, Mr. Osen asks that a

3     deadline be set of June 15th for the electronically stored

4     records from four departments.  That we do believe we can

5     complete by June 30th.

6          And with respect to the customer files, we have

7     produced the customer files for all of the seven customers

8     where there are files that have been found.  Not all types

9     of accounts had customer files.  There are three customers

10    for whom we found files and we've produced them.  There are

11    four customers for whom we haven't found customer files.

12         The next point is account statements, and we

13    expect to produce the account statements quickly.  Let me

14    just also take exception to Mr. Osen's statement that these

15    are documents they requested last year.  We just reached a

16    stipulation about the other things that we produced a couple

17    of weeks ago.  We're going to produce the account statements

18    shortly, as quickly as we can.

19         The plaintiffs have agreed in the stipulation that

20    they're going to identify the outgoing wire transfers that

21    they're interested in and we're going to look for those

22    records.  We've agreed to produce backup records for

23    incoming wire transfers above a certain threshold.  That has

24    to be done manually.  It's not being done by one person but

25    it has to be done manually because it's going to take some

1   time.  And we -- the fourth category we've got the e-mails,

2   which we've already started searching through.

3           So what will be produced on June 30 is the

4   remaining electronically stored records from the four

5   departments, I believe there's one department left to go.

6   And that's all that Mr. Osen put on the table for today.

7   The other categories of documents are the subject of our

8   recent stipulation, first account statements we expect to

9   produce those shortly, I can't say exactly when but they are

10  being prepared.  They will then look at those and identify

11  the outgoing wire transfers for which there is a record.

12          At the same time, we have people engaging in the

13  manual review of the account statements for the incoming

14  wire transfer records.  I have already been warned that that

15  manual review and then looking for the records based on the

16  manual review will take some time.  And we're getting the e-

17  mails together.  We are doing this as quickly as we can and

18  our agreement to these additional categories of documents is

19  just a couple of weeks old.  It's not something that dates

20  back to last year.

21          THE COURT:  Well, I take it Mr. Osen is expressing

22  some concern that there will only be one person --

23          MR. FRIEDMAN;  No, no.

24          THE COURT:  But I think enough has been said about

25  this.  Is there anything else?

1          MR. OSEN:  Your Honor, my point is not really to

2    disparage the efforts of the defendant in collecting the

3    records or the challenge involved in reconstructing the

4    files.  It's more an issue of having a date fixed that will

5    allow us to platform everything else that we need to do in

6    the schedule from there.  That's really it.  And --

7          THE COURT:  Well I think what you need to do is

8    find out from Mr. Friedman after you've had an opportunity

9    to confer with your client as to when you expect completion

10   the production.

11         MR. FRIEDMAN:  I will do that, your Honor.

12         MR. OSEN:  That's it, your Honor.

13         THE COURT:  Okay.

14         MR. OSEN:  Have a good holiday.

15         THE COURT:  You too.  You'll call me when you need

16   to schedule --

17         MR. FRIEDMAN:  We'll submit the stipulated order

18   with the Friends of Alaxa production.

19         THE COURT:  Alright.

20         MR. OSEN:  Have a good weekend, your Honor.

21         THE COURT:  You too.

22         * * * * * * * * * * * *

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18      I certify that the foregoing is a correct transcript

19   from the electronic sound recording of the proceedings in

20   the above-entitled matter.

21

22

23

24

25   ELIZABETH BARRON                        June 11, 2009