UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

```
------------------------------X  Docket#
STRAUSS, et al.           : 06-CV-702(mdg)
            Plaintiff,    :
                          :
    - versus -            : U.S. Courthouse
                          : Brooklyn, New York
CREDIT LYONNAIS,          :
            Defendant     : December 7, 2009
------------------------------X

------------------------------X
WOLF, et al.,             : 07-CV-914(mdg)
            Plaintiff,    :
                          :
    - versus -            :
                          :
CREDIT LYONNAIS,          :
------------------------------X
```

TRANSCRIPT OF CIVIL CAUSE FOR CONFERENCE
BEFORE THE HONORABLE MARILYN D. GO
UNITED STATES MAGISTRATE JUDGE

**A   P   P   E   A   R   A   N   C   E   S:**

**For the Plaintiffs:**
**Strauss and Weiss:**          **Joshua Glatter, Esq.**
                                **Gary Osen, Esq.**

**Wolf and Applebaum:**         **Joel Israel, Esq.**

**For the Defendant**
**Credit Lyonnais & NatWest:** **Lawrence Freidman, Esq.**


**Official Transcriber:**       **Rosalie Lombardi**
                                     **L.F.**

**Transcription Service:**      **Transcription Plus II**
                                3589 Tiana Street
                                Seaford, N.Y.  11783
                                (516) 358-7352
                                Transcriptions2@verizon.net


Proceedings recorded by electronic sound-recording,
transcript produced by transcription service

2

**Proceedings**

1          THE CLERK:  Weiss v. National Westminster Bank,

2    docket number 05-CV-4622 and Applebaum v. Nat West Bank,

3    docket number 07-CV-916, two cases against Credit

4    Lyonnais, Strauss v. Credit Lyonnais, docket number

5    06-CV-702 and Wolf v. Credit Lyonnais, 07-CV-914.

6          Will counsel appearing please state their names

7    for the record so their voices can be identified.  For

8    the plaintiffs in the Weiss and Strauss cases?

9          MR. GLATTER:  Yes, good afternoon, your Honor.

10   This is Joshua Glatter from Osen, LLC on behalf of the

11   Strauss and Weiss plaintiffs.  I am joined on this call

12   here in New Jersey by my colleagues Gary Osen, Naomi

13   Weinberg, and Aaron Schlanger.

14         Your Honor, one initial question, my

15   recollection which is imperfect is that this conference

16   was convened only in the Credit Lyonnais matter on behalf

17   of Strauss.  Am I mistaken about that?  Was that

18   (inaudible)?

19         THE COURT:  You're not mistaken but as I see,

20   the new scheduling order we need to discuss concerns all

21   four cases.  Am I catching anybody by surprise here?  Are

22   you not prepared?

23         MALE VOICE:  We'll find out, your Honor.

24         MR. GLATTER:  We'll know when we get there,

25   your Honor, but certainly we can, you know, as always

r

### Proceedings

1 prepare to discuss it.

2          THE COURT:  Okay.  Yes and we can also give you

3 more time if you need it.  I apologize but with the

4 change in the Judge handling all of this case, I went

5 through all of the docket sheets and prematurely

6 scheduled the conference only in the Strauss and Wolf

7 cases but I do want to discuss all four cases if the

8 parties are prepared to do so.

9          And counsel for the plaintiffs in the Wolf and

10 Applebaum cases?

11          MR. ISRAEL:  Yes, good afternoon, your Honor.

12 This is Joel Israel from Sayles Werbner and I represent

13 the plaintiffs in both cases.

14          THE COURT:  Okay.  And for the defendants in

15 all four cases?

16          MR. FRIEDMAN:  Good afternoon, your Honor.

17 It's Lawrence Friedman and I am with my colleague, Emily

18 Piccone, Cleary Gottlieb Steen & Hamilton.

19          THE COURT:  Okay.  It took a while for the

20 assignments to settlement out but as you know,

21 Judge Trager will be the district judge handling all of

22 these cases.  And in preparation for my briefing of

23 Judge Trager, I did take a closer look at both the

24 scheduling order and the docket sheets generally in these

25 cases.

4

**Proceedings**

1       So we can first discuss the proposed scheduling

2  order and I have no problems with the proposed dates for

3  the expert reports but I am just wondering if there is a

4  -- if we should talk about the dispositive motions that

5  you are planning to file and whether -- what kind of

6  Daubert motions you think will be filed by either side, I

7  guess.

8          MR. FRIEDMAN:  Well, your Honor, we're

9  exchanging the first -- this is Larry Friedman.  We're

10  exchanging the first round of expert reports this

11  Thursday.

12          THE COURT:  Right.

13          MR. FRIEDMAN:  So it's hard to say what kind of

14  Daubert motions there will be but we wanted to flag that

15  in the schedule.  And with respect to dispositive motions

16  based on what both defendants have seen so far, they

17  intend to move for summary judgment but that's pending

18  what we see in the expert reports.

19          Just so your Honor knows, the fact discovery in

20  the Credit Lyonnais cases is virtually complete.  We have

21  two remaining depositions in Paris this week and next.

22  And there are a few more documents that the -- we owe the

23  plaintiffs but I think it's fair to say that it's

24  virtually complete.

25          The NatWest cases are farther behind, just by

5

**Proceedings**

1   virtue of the original schedule which contemplated that

2   NatWest generally would be about six or seven months

3   behind and our document production has slowed that up and

4   we proposed to plaintiffs a revised scheduling order in

5   the NatWest cases in September and we're waiting to get a

6   response from them.

7           But again focusing on the Credit Lyonnais

8   cases, it's hard to say what kind of Daubert motions you

9   would see from Credit Lyonnais until we see plaintiff's

10  expert reports and the dispositive motion I anticipate

11  will be a summary judgment motion at the close of expert

12  discovery.

13          MR. GLATTER:  Your Honor, Josh Glatter on

14  behalf of the Strauss plaintiffs.

15          Just in response, I concur with Mr. Friedman

16  with respect to expert reports in the sense of knowing on

17  our end what sort of Daubert or Cumo Tire (sic) motion we

18  might file is a little bit difficult to determine until

19  we've had an opportunity to review the reports and depose

20  the witnesses and assess what, if anything, is

21  appropriate on that score.

22          I do want to point out with respect to the --

23  where fact discovery stands independent of expert reports

24  and depositions, Mr. Friedman is generally correct that

25  as what's on the table now is largely complete with two

6

**Proceedings**

1  depositions scheduled to proceed through Hague Convention

2  channels in Paris beginning later this week.

3          However, and this is probably something your

4  Honor took note of in looking at the proposed scheduling

5  order in Credit Lyonnais, you'll note that there's an

6  August 31, 2000 deadline -- date rather for deadline for

7  completion of all fact discovery.

8          THE COURT:  Yes, yes.

9          MR. GLATTER:  And that then has a number of

10  sort of carve-outs from that date and a number of them

11  are still items that we do need to be following-up with

12  defendants on from a logistics stand point to see where

13  things are because I think we still are not clear on

14  whether we've reached a sort of point of conclusion yet.

15          I can walk you through them specifically if you

16  would like, Judge.

17          THE COURT:  I would actually.

18          MR. GLATTER:  That's fine.  With respect to --

19  and obviously I will walk it through and Mr. Friedman may

20  have his own response and comments, so if I can just walk

21  him through and then I will await Mr. Friedman's

22  comments.

23          First, the deadline contemplates responses and

24  related production to letters of request under the Hague

25  Convention.  That references the two depositions that I

7

**Proceedings**

1   referred to that are scheduled to kick off in Paris; one

2   is for Mr. Odren (ph.) and the other one for Mr. Sole

3   (ph.), who were former employees of the bank.

4           The second item, item B, are documents that the

5   defendant is producing pursuant to the Court's order of

6   April 24, 2009 and that reflected the one month sort of

7   test for November 2000 statements for all incoming

8   transfers.  We took a look into the correspondence

9   between the parties today.  The production of that

10  material had still been rolling and I believe the last

11  correspondence we got on that point was in early October

12  from defendant's counsel that said that they had -- there

13  was still some -- Aaron what was the phrasing -- some

14  external archived material that they were still reviewing

15  and would be producing on a rolling basis.  So I am not

16  sure where things stand.

17          THE COURT:  Okay.  Let me just interrupt at

18  this point because I was lulled into thinking that that

19  one month test of -- documents from that one month period

20  for the parties to figure out the limits or whether or

21  not any limits ought to be placed or, you know, a

22  monetary threshold ought to be placed on the documents

23  had already been resolved.  So you haven't even gotten to

24  that point?

25          MR. FRIEDMAN:  We have, your Honor, I think

**Proceedings**

1   Mr. Glatter omitted a more recent development.  It took

2   several months for the bank to collect from external

3   archives, the one test month and I think it was four or

4   five months and we still didn't get them all.

5            So on the third week of October, I had a meet

6   and confer telephone call with Mr. Goldman and

7   Mr. Schlanger and we exchanged some emails and I hoped to

8   send to them tomorrow a letter reporting on where we

9   stand on the non-binding agreement that we reached as to

10  what we would focus on for the rest of the months because

11  it became clear that it would -- and I am not

12  exaggerating, it would literally take years if we applied

13  the same no threshold approach to the full year that we

14  did to that one test month.

15           So Mr. Goldman told me what he would like us to

16  focus on in looking at the rest of the year and I -- as I

17  said, I expect to give him a report on that tomorrow and

18  the agreement that we had from that meet and confer is

19  non-binding, so if there's more that he wants, he will

20  let me know.  But it really is quite an exhaustive

21  exercise and it does take a very substantial amount of

22  time.

23           I think when Mr. Goldman and I spoke about this

24  towards the end of October, I got a very good sense from

25  him as to what he wants to focus on and I think what I am

9

**Proceedings**

1  going to deliver to him tomorrow will comply with that.

2  But again, if he wants more, he'll come back to me.

3        MR. GLATTER:  Mr. Friedman stole my thunder a

4  little bit.  I was actually getting to the point that

5  independent of the technical issue of whether all

6  documents have been produced for that November month,

7  that there had been a series of meet and confers between

8  counsel in terms of trying to them scope out what a

9  broader production might look like since the November

10  test month was designed to help focus the parties minds

11  on how to put some reasonable parameters around it.

12        The next item -- unless does your Honor have

13  any other further questions on that point?

14        THE COURT:  Yes, okay.  All right.  All right.

15  So I guess it's -- we won't spend any more time talking

16  about that but that is potentially an open issue then.

17        MR. FRIEDMAN:  That's right.

18        THE COURT:  Okay.

19        MR. GLATTER:  Potentially, yes, Judge.

20        THE COURT:  All right.

21        MR. GLATTER:  There's a reference in that

22  August 31, 2000 deadline to a deposition of Memory which

23  is a third party, that plaintiffs initially issued a

24  subpoena to which defendants have issued a counter cross-

25  subpoena.  My understanding, and Larry, I don't know

**Proceedings**

1   where things stand on it, is that Memory's counsel is

2   still having some discussions with Mr. Friedman regarding

3   the scope of Credit Lyonnais' subpoena to that entity.

4   So I think that still has to get hammered out on that end

5   with respect to the topics they've identified.

6           MR. FRIEDMAN:  Yes, I think that will be

7   resolved very shortly.

8           MR. GLATTER:  Right.

9           THE COURT:  And so what's --

10          MR. FRIEDMAN:  And then the deposition --

11          THE COURT:  -- you're contemplated deposition.

12          MR. FRIEDMAN:  Yes, the deposition can be

13  taken.  I am hoping to negotiate something with Memory's

14  counsel which will moot my cross subpoena to which he

15  objected and then plaintiff's deposition can go forward.

16          THE COURT:  Where was the subpoena issued?

17          MR. FRIEDMAN:  The subpoena -- well that's an

18  interesting point, your Honor.  The subpoena was issued

19  out of Washington, D.C., along with -- actually the

20  plaintiff's subpoena might have been issued out of this

21  court improperly but Memory didn't object to it because

22  they're based in Washington.

23          Then when it came time for me to cross

24  subpoena, I had to do it out of Washington.  And if

25  there's to be motion practice, Memory is insisting that

**Proceedings**

1   the motion practice be in the Washington, D.C. court.

2           So I think as a technical matter because Memory

3   is not located in the eastern district or the southern

4   district --

5           THE COURT:  No, I know that.  I am acutely

6   aware of the problems --

7           MR. FRIEDMAN:  But in any event, your Honor --

8           THE COURT:  -- that arise.

9           MR. FRIEDMAN:  -- I'm hoping we will not need

10  to darken your doorstep with this because I am hoping

11  that we can negotiate the scope of my cross subpoena so

12  that that deposition can go forward.  And it should be a

13  very quick deposition.

14          THE COURT:  Okay.

15          MR. GLATTER:  I actually think our subpoena

16  also emanated out of D.C.  I think that -- but I think

17  Mr. Friedman's correct that there had been some dispute

18  with the deponent as to where litigating its enforcement,

19  if that became necessary, was.  But in any event, let me

20  just continue ticking off the items in that -- on the

21  August 31 carve out.

22          THE COURT:  Okay.

23          MR. GLATTER:  With the plaintiff's production

24  of his additional Israeli court records, my understanding

25  is on our end that that's been completed.  Items 3,

**Proceedings**

1   plaintiff's proposed production to Credit Lyonnais and

2   NatWest of documents that Arab Bank produced is actually

3   not applicable by virtue of a resolution that was

4   independently worked out between the litigants in both

5   cases.

6          THE COURT:  Right, I recall that.

7          MR. GLATTER:  Okay.

8          THE COURT:  That was a subject of one of our

9   conferences before.

10          MR. GLATTER:  With respect to item 4, any

11   depositions that may be scheduled pursuant to the parties

12   letter agreement dated June 29, 2009, we had a series of

13   meet and confers with Mr. Friedman and his colleagues,

14   really working off the Rule 26(a)(1) disclosures to try

15   to give, to the extent that we can, a preview of where --

16   you know, who is likely to be called so that defendants

17   could have some idea of who they may want to depose.

18          One of the things that came up in that

19   discussion which I guess is obvious, is that we had not

20   yet reached a point, nor really could we, that we would

21   make a formal 26(a)(3) trial witness disclosure and I

22   suppose certainly from Mr. Friedman's end, once

23   ultimately we reach resolution as to who the list will be

24   from a trial witness stand point, there may be certain

25   individuals that he will want to depose and I think we

13

**Proceedings**

1  have an agreement in principle between the parties to

2  meet and confer on that point once we have reached a

3  little bit better clarity in that regard and to the

4  extent that the schedule needs to be adjusted mildly to

5  accommodate that, I am sure we'll be able to work that

6  out.

7            But we've done the best that we can based on

8  the disclosures to date to try to at lest corral the

9  universe of potential people that would fall within that

10  scope.

11            THE COURT:  Okay.

12            MR. FRIEDMAN:  Your Honor, if I may, it's

13  actually as I know, Josh will agree, it's a little firmer

14  than that.  There were a couple of categories of dozens

15  of people who were listed in their disclosures.  We

16  reached an agreement, memorialized in the letter that's

17  referenced that if any of those people is identified as a

18  trial witness, we will have the opportunity to depose

19  them, so that we did not waste everybody's time and money

20  with deposing people who would not be trial witnesses.

21            MR. GLATTER:  That's right.

22            MR. FRIEDMAN:  And that's what the letter says.

23            MR. GLATTER:  Yes.

24            THE COURT:  I guess my concern would be if the

25  plaintiffs end up producing affidavits from any of these

14

**Proceedings**

1  witnesses in opposition to your summary judgment motion

2  which I assume will likely be filed, absent Judge Trager

3  persuading you not to file the motions.  But in any

4  event, is there a possibility, Mr. Glatter, that you

5  would be producing affidavits in opposition to any

6  summary judgment motion?

7          MR. GLATTER:  I'm going to -- as a general

8  matter, I guess it's hard to say that with any degree of

9  definitiveness until I know exactly what grounds the

10  defendant intends to seek summary judgment.  But on that

11  score, let me defer to my colleague, Mr. Osen, who may

12  have a more specific comment with respect to at least

13  that potentiality.

14          MR. OSEN:  Yes, I think your Honor in general

15  what Mr. Glatter said is correct.  And as Mr. Friedman

16  knows, most of the people on the Rule 26 disclosure which

17  was detailed in our exchange of correspondence are first

18  (inaudible) acknowledge concerning the actual attacks in

19  question, so that for the most part, it's obviously

20  subject to what could theoretically occur in the context

21  of summary judgment.

22          I wouldn't anticipate affidavits in that regard

23  since their knowledge primarily goes to the fact that

24  events occurred, rather than the more complex issues of

25  who was responsible and so on.

**Proceedings**

1          THE COURT:  Okay.

2          MR. OSEN:  The only exception I could think of

3    which again at this stage is a little premature, is that

4    there may be some issues concerning authentication of

5    documents or chain of custody issues which have not yet

6    come up but which may down the road come up.

7          THE COURT:  Okay.  Well that's one of the items

8    on your proposed scheduling order and I found that

9    curious.  I don't know if this is an appropriate time to

10   discuss this.  Is the identification -- does witness

11   deposition issue related to the authentication admissions

12   that you're planning to try to resolve or will try to

13   address in requests for admissions reflected further down

14   your proposed scheduling order?

15         MR. GLATTER:  Your Honor, Josh Glatter again.

16         We baked that date into the proposed schedule

17   recognizing that that may be one vehicle wherein we tried

18   to satisfy any 901 or 902 requirements in connection with

19   documentary evidence.  That said, I don't -- it's not

20   really a discussion we have had with any degree of

21   specifics with defense counsel, other than in connection

22   with some depositions getting some stipulations on

23   business records exception.  But certainly as a general

24   matter, to the extent that defendant will be interested

25   in sitting down and seeing if we can arrive at a mutually

**Proceedings**

1  acceptable stipulation with respect to authenticity of

2  documents, at least from a facial 901 perspective, that's

3  certainly something that we would be happy to entertain

4  and, you know, avoid the time and delay and always a

5  logistical headaches in connection with formal RFAs.  But

6  I don't know that we've really reached the point yet that

7  we've had those kind of discussions that we're talking

8  about specific documents.  So just from a scheduling

9  stand point, we thought it wiser to include a lock in

10  date for that, so that it retained -- it remained an

11  option.

12          And I should also add that RFAs may extend

13  beyond simply authenticity issues but that's certainly

14  one means that I have experienced in the past of

15  resolving them, so we've incorporated it.  Does that

16  answer your question?  I am not sure that that's --

17          THE COURT:  My concern is that if you get to

18  the stage of responding to a summary judgment motion, I

19  don't want the parties to be entering a satellite

20  discovery dispute over authenticity of documents.

21          MR. GLATTER:  Well from -- I guess from my -- I

22  mean, not having an encyclopedic knowledge of the kind of

23  evidentiary standards and Rule 56 relief, but my

24  recollection is that so long as the material is in a form

25  that could be admissible at trial, then one need not

**Proceedings**

1   necessarily per se satisfy a hearsay exemption or an

2   authenticity issue at that time.  So I don't know that

3   the prospect of a Rule 56 motion on potential grounds

4   that might implicate authenticity concerns necessarily

5   mandates that a satellite discovery dispute be played out

6   to its fullest extent, you know, prior to resolution of

7   the motion.

8          Typically, even under Rule 901, authenticity is

9   ultimately an issue for the trier of fact as to what

10   weight it wants to give, so long as one has satisfied the

11   threshold prima fascia determination.  So that's sort of

12   my perspective on it sitting here now but you know,

13   Mr. Friedman may have a different perspective on that.

14          MR. FRIEDMAN:  For once I can't say that I do.

15   I am not sure how much of that I followed but let me just

16   say, your Honor, that with respect to depositions that

17   might be necessary once we received affidavits in

18   response to a summary judgment motion, let me just make

19   this a little more concrete, your Honor.

20          THE COURT:  Yes.

21          MR. FRIEDMAN:  It's not merely an authenticity

22   issue, although I expect there will be authenticity

23   issues. For example, plaintiffs are relying on a lot of

24   documents that supposedly were seized by the Israeli

25   military and we're not really sure, and posted on the

**Proceedings**

1    internet.  We don't -- we're not really sure where those

2    documents came from.

3          But more substantively, going back to this list

4    of people who we might need to depose if they're

5    identified as trial witnesses, as I've discussed with Mr.

6    Glatter and with Mr. Osen, many of the more important

7    people on that list or at least more important to me, are

8    former Israeli government and intelligence officials who

9    I assume would be proffered, if at all, on matters much

10   more substantive than authenticity of documents.

11         In that event, if in response to a defense

12   summary judgment motion we see declarations from these

13   folks talking about things other than the authenticity of

14   documents, obviously deposing them pursuant to Rule 56(f)

15   could be quite central.  But time will tell as to what we

16   will see in opposition to the summary judgment motion and

17   what trial witnesses we'll see having been identified.  I

18   for one am glad that the parties were able to reach an

19   agreement on this, so that we would not need to have

20   depositions of people whose testimony we wouldn't be

21   seeing either in written or -- in written form or at a

22   trial.

23         THE COURT:  Well, Rule 56(f) is ordinarily

24   relied upon by a party opposing a motion for summary

25   judgment.  So procedurally, I don't know if you would be

### Proceedings

1    in a position to argue otherwise.

2             MR. FRIEDMAN:  Well, we'll come to that but I

3    think with us having a written agreement between the

4    parties that if people are proffered as witnesses, we get

5    to depose them, that the plaintiffs -- I don't know if

6    they would even argue that we are not entitled to depose

7    them when they're offered on paper.  But we'll see.

8             MR. GLATTER:  I agree with that; we'll see.

9             THE COURT:  Okay.

10             MR. GLATTER:  Your Honor?

11             THE COURT:  Maybe once we get closer to that

12    point, we can discuss the procedures to try to facilitate

13    the taking of the depositions.

14             MR. FRIEDMAN:  Right.

15             THE COURT:  Because I --

16             MR. FRIEDMAN:  And I also think it will be a

17    function, your Honor, of what issues are teed up on

18    summary judgment.

19             THE COURT:  Right.  Obviously.  And -- go

20    ahead.

21             MR. GLATTER:  Your Honor, actually one -- I

22    apologize for asking, I just don't -- I am in a

23    conference room right now, I don't know whether or not

24    Judge Trager has his own chambers rules that requires the

25    parties that are filing a motion such as a summary

**Proceedings**

1  judgment motion to essentially preview it in connection

2  with a letter.  It's not a uniform rule for all judges.

3      THE COURT:  He does require it and that's what

4  initially triggered in part my review of the status of

5  these cases.

6      MR. FRIEDMAN:  I think, your Honor, after we

7  finish expert discovery, I for one will know a lot more

8  about where we're heading thereafter, once I see what the

9  plaintiffs are offering by way of expert testimony.

10      MR. GLATTER:  I agree that that would probably

11  be my position if I were in Mr. Friedman's place.  And

12  the reason I asked about Judge Trager's chambers rule is

13  that that process may in and of itself help, you know,

14  flush out any logistical issues that come up in the

15  ultimate briefing that's -- our schedule obviously

16  contemplates a briefing schedule but Judge Trager may

17  have to modify it based on his own preferences and the

18  process that leads up to it may help lay out any

19  logistical -- address any logistical hurdles be it

20  depositions of witnesses by affidavits or similar items.

21      THE COURT:  No, fair enough.  I think once the

22  defendants file a request for a premotion conference,

23  that should alert all of the plaintiffs as to the issues

24  that you would have to address and perhaps at that

25  juncture, you could give notice of your intention to

21

**Proceedings**

1  submit affidavits from any of these witnesses on the

2  26(a) disclosures.

3          MR. GLATTER:  Absolutely or perhaps when the

4  discovery is done, the defendant will decide it simply

5  did not want to proceed with summary judgment but I guess

6  we'll see.  Hope spring's eternal.

7          THE COURT:  Okay.  Well I will raise another

8  hope spring's eternal issue at the end of this

9  conference.

10          MR. GLATTER:  Okay, Judge.  Your Honor, the

11  last item on the August 31 carve outs are additional

12  documents are being produced by Credit Lyonnais or

13  information provided in response to my letter to

14  Mr. Friedman of August 17.

15          My colleague, Mr. Goldman, what that references

16  is a very long epic letter that we sent to defense

17  counsel trying to wrap up a number of potentially open

18  items with respect to prior discovery requests that were

19  outstanding and getting clarification as to whether or

20  not we had really completed any production or not.  And

21  my colleague, Mr. Goldman, led those discussions and to

22  the extent I leave anything out, he can correct my

23  comments.

24          But my sense is that we more or less, at least

25  in terms of affirmative production were satisfied with

**Proceedings**

1   the resolution of that discussion.  There may be a few

2   open items we're waiting for confirmation on in the

3   laundry list that was sent over.

4           I know that one over arching issue for us that

5   will probably have to internally and then with defendant

6   come up with a process to address, are not the issue of

7   future documents to be produced but documents that once

8   existed but for one reason or another, no longer exist

9   because that has certain potentially important

10  implications both substantively and evidentiarily

11  speaking.

12          And in terms of how we kind of skin the cat in

13  that regard, you know, whether it's potentially through

14  some sort of 30(b)(6) deposition that might address

15  document destruction policies, through some forensic

16  examination of arguably fragmentary material, it's hard

17  to say sitting here right now, I don't want to be accused

18  of suggesting anything that we haven't really had a

19  chance to hash out with defense counsel yet.  But it is

20  as a general matter, an open item for us.  It's one

21  that's important because as you know, your Honor, from

22  prior conferences that we've had, emails for certain very

23  important witnesses are no longer available because --

24  once those witnesses stop working at (inaudible) --

25          THE COURT:  Right.

23

### Proceedings

1        MR. GLATTER:  And then moved on to Credit

2    Agricole (ph.) and so there are both sort of legal and

3    frankly, strategic judgments that we have to make in

4    terms of deciding where we go in light of that reality.

5        THE COURT:  I guess it's premature to be

6    discussing this issue but I do want to discuss this issue

7    as soon as we can.  What's your estimate on the last date

8    that document production will be completed?

9        MR. FRIEDMAN:  Well, your Honor, I think

10   there's one category in Mr. Glatter's August 17 letter

11   that we still need to respond to and I expect to do so

12   shortly.  There are no other documents that I am aware of

13   that are pending except with respect to the account back

14   up which we discussed under item B.

15        But I should know within a week or so whether

16   there are any other additional documents to produce in

17   response to this one open category from Mr. Glatter's

18   letter.  So that should be wrapped up very quickly.

19        MR. GLATTER:  And, your Honor, with respect to

20   the documents that once existed but no longer exist, it

21   may be the case, I obviously won't swear to it but that

22   the depositions that are proceeding for the two witnesses

23   in Paris will at least be one additional factor in

24   helping to clarify what sort of discovery or other

25   process needs to be engaged in with respect to that

24

**Proceedings**

1   universe of now no longer available material.

2          MR. FRIEDMAN:  Yes.

3          MR. GLATTER:  We will obviously see depending

4   on how the testimony shakes out in France.

5          MR. FRIEDMAN:  Your Honor, I don't want to

6   belabor the point but I will remind Mr. Glatter that

7   among the first two depositions that they took were of

8   two 30(b)(6) witnesses who addressed document retention

9   policies and now the plaintiffs are asking us well for

10  those documents that you're not producing, tell us why

11  you're not producing them.  Either they did exist or they

12  didn't exist and if they did exist, what happened to

13  them.  And that's a very difficult question for any human

14  being to answer in most cases.

15          The 30(b)(6) witness about email retention

16  testified a couple of years ago about why ceratin emails

17  are no available pursuant to the company's policy but

18  you'll understand that when my client is asked okay, you

19  say that there are no documents responsive to this

20  category, why is that and did any such documents ever

21  exist, they kind of scratch their head and say well if I

22  don't have the documents, how do I know whether they

23  existed or they didn't exist?  And that's true in most

24  cases.

25          But if Mr. Glatter has more he wants to pursue

**Proceedings**

1  on that, our meet and confers are usually very fruitful.

2      MR. GLATTER:  That's correct, your Honor, and I

3  should also add Mr. Friedman is correct that early in the

4  litigation, I believe two 30(b)(6) depositions were

5  conducted concerning document retention policies and

6  destruction policies.  That, however, occurred long

7  before frankly the bulk of document production had even

8  been underway and certainly before many, many other more

9  specific document requests and related questions have

10  been issued.

11      And in terms of -- I'll just clarify, we're not

12  talking in abstraction -- we know because of certain

13  materials that were produced from the defendant's former

14  New York branch that there appear to have been emails

15  that were generated by certain employees in France

16  because their New York counterparts actually had their

17  own responses that came from France.  Whether or not

18  additional written or email communications on the French

19  side existed between say for example, Mr. Black and

20  Mr. Marsaud (ph.) that weren't copied to New York but

21  nevertheless existed at some time that might have fleshed

22  it out, our understanding is that if they did, they can't

23  be produced at this time and you know, it's a little bit

24  of a tricky issue but ultimately as I said, you know,

25  when I began this conversation that does have some

**Proceedings**

1  potentially important ramifications from an evidentiary

2  stand point and that's something that once we're

3  completed with our depositions in France, we will sit

4  down and after we've internally conferred, come back to

5  defendants and try to see if we can establish something

6  reasonable to resolve it one way or the other.

7  　　　　THE COURT:  Okay.  Well I will wait to see if

8  you can.  Clearly, I mean I don't -- I agree with

9  Mr. Glatter that depositions taken before much of the

10  discovery will necessarily be sufficient to address the

11  concerns he raises but we'll see what arises and what you

12  can't resolve.  Okay?

13  　　　　MR. GLATTER:  That covers all of the items on

14  the August 31 carve outs, your Honor.

15  　　　　THE COURT:  Okay.  Maybe what makes sense is we

16  should either have a conference at the conclusion of fact

17  -- I mean at the conclusion of expert discovery or

18  perhaps even just after the exchange of expert reports,

19  and also at some point have some sort of a deadline for

20  the parties to address any issues that may arise from the

21  production of documents; a final deadline so we don't'

22  have any of these issues hanging.

23  　　　　MR. FRIEDMAN:  That's fine, your Honor.  The

24  last expert reports are due to be exchanged under this

25  proposal on April 13.

**Proceedings**

1   THE COURT:  Okay.

2   MR. OSEN:  I would -- this is Gary Osen,

3   your Honor.

4   I would suggest at the Court's convenience that

5   perhaps we schedule a holding date some time in January

6   after these depositions have concluded in France and

7   after at least the initial exchange of reports have

8   occurred.  By then we will presumably have conferred with

9   Mr. Friedman on a number of the outstanding issues and

10   there will either be a resolution and we can cancel such

11   a conference and reschedule it for -- that will sort of

12   give us a date to target for any outstanding (inaudible).

13   MR. FRIEDMAN:  That's fine with me, your Honor.

14   Because of a trial calendar, I would ask that it be in

15   late January.

16   THE COURT:  Okay.  Well that's fine.  January

17   29 at 10 o'clock?

18   MR. GLATTER:  Right now, your Honor, I think

19   that's okay for us, at least speaking for th Strauss

20   plaintiffs.

21   MR. ISRAEL:  And that's fine with Wolf, too,

22   your Honor.

23   MR. FRIEDMAN:  That's fine with me, your Honor.

24   THE COURT:  Okay.  And as you know, as long as

25   I have sufficient notice, I am happy to change the date

28

**Proceedings**

1  and time.  All right.

2         Then I will  approve the proposed schedule up

3  through the deadline for completion of all discovery and

4  maybe some time after the conclusion of expert reports

5  we'll -- I want, if you decide that you need to file

6  Daubert motions to inquire of the parties whether or not

7  those motions should be filed before the dispositive

8  motions.

9         But in any event, the deadline for filing of

10  dispositive motions will be converted into a deadline for

11  filing requests for a premotion conference.  So, we'll --

12  we can address that a little further on after we see what

13  -- after the parties have made their preliminary exchange

14  of the expert reports.  So, okay.

15         Is there anything else that we need to discuss

16  in the Strauss and Wolf cases?

17         MR. GLATTER:  Speaking for the Strauss

18  plaintiffs, nothing further, your Honor.  Only one

19  housekeeping question, the January 29, 2010 conference,

20  that's going to be at 10 a.m., Judge?

21         THE COURT:  Yes.

22         MR. GLATTER:  And is that going to be in person

23  or by phone?

24         THE COURT:  Whatever is convenient for you.  I

25  am happy to conduct it by telephone, since it will

Transcription Plus II       Rosalie Lombardi

**Proceedings**

1   essentially be a scheduling conference but if you want to

2   come in person, that's fine too.

3           MR. GLATTER:  I'm always happy to make a trip

4   to Brooklyn, your Honor, but I defer to my colleagues on

5   the call.

6           THE COURT:  Go ahead.

7           MR. GLATTER:  Mr. Friedman, do you have a

8   preference or --

9           MR. FRIEDMAN:  Whatever works.

10          THE COURT:  Okay.  I will put my calendar as

11  being by telephone and if you want to come in person,

12  you're more than welcome to.  Just let us know ahead of

13  time.

14          MR. GLATTER:  Thank you, Judge.

15          THE COURT:  There is one last procedural issue

16  that I want to ask about these cases and that is a

17  consolidation of the two Credit Lyonnais cases and the

18  two NatWest cases.  I don't know if the parties have

19  talked about it.  There has been no formal consolidation

20  order entered and certainly at least for purposes of the

21  summary judgment motions, I would assume that there's no

22  reason not to have one motion be filed with respect to

23  the two Credit Lyonnais cases and one motion as to the

24  NatWest cases.

25          MR. FRIEDMAN:  That's fine with the two

30

**Proceedings**

1  defendants, your Honor.  Obviously, the Credit Lyonnais

2  and NatWest cases can't be consolidated across because of

3  the very different issues and the different pace at which

4  they're proceeding.  But I have no -- I would expect that

5  summary judgment motion practice in Strauss and Wolf

6  would come together and same in Weiss and Applebaum.

7          MR. GLATTER:  Your Honor, speaking -- Josh

8  Glatter again -- for the Strauss plaintiffs, I think that

9  that's the case as well.  The only thing that I would

10  note just from a docket management stand point is that

11  long ago when the cases were -- by the cases I am

12  referring to the Strauss and Wolf case, were in a

13  slightly staggered pattern and there was a dispute

14  between the two plaintiffs constituencies that came up in

15  the context of a renewed motion under bank secrecy by the

16  defendants with a later filed case.  And there were some

17  issues between the plaintiff's parties in terms of how

18  that was going to play out.  And Judge Matsumoto

19  ultimately entered an order that at least de facto

20  created some degree of administrative consolidation

21  between the cases and once we resolved our disputes

22  between our two camps, things have been proceeding pretty

23  nicely ever since.

24          So I don't know unless again from the Court's

25  docket stand point that we need to do any more formal

31

**Proceedings**

1  consolidation order beyond the schematic that's been in

2  place now once that latter bank secrecy motion was

3  resolved by Judge Matsumoto.  But to the extent that for

4  the Court's statistics, it's helpful to have that in

5  place.  I don't think that poses an issue for us.

6           MR. ISRAEL:  And not for us either, your Honor,

7  speaking for the Wolf plaintiffs.  There's been a few

8  small issues for each case that have come up here and

9  there but certainly on the big issues the drafting of

10 motions and then heading towards trial, that would be

11 fine.

12          THE COURT:  Okay.

13          MR. GLATTER:  It's not a situation where we

14 have five related cases with things only being filed in

15 one.  It's essentially per case, only two captioned

16 cases.  So it hasn't really been a problem for us for

17 both letters and filings to just simply add the second

18 caption and agree to sign off on the pleadings but --

19          MR. OSEN:  Gary Osen, your Honor.

20          Put, I think succinctly, I think Judge Trager

21 (inaudible) one opposition brief from both plaintiff

22 group.

23          THE COURT:  All right.  I think there would be

24 some usefulness in having some clarity and I did pull

25 Judge MAtsumoto's -- I guess there was a stipulation on

**Proceedings**

1  coordinated discovery that had been submitted to her.

2  But these cases are wrongly noted on the docket sheet,

3  and all four cases are noted as being consolidated.

4  Obviously, they are not but that was the only designation

5  we could provide, so that we would all have the ease of

6  being able to file submissions in the main case, the

7  Weiss case, and have them spread to all of the other

8  cases.  And I don't really care one way or the other but

9  I will just note on the docket sheet that when -- that

10  the parties agree that the two NatWest cases will be --

11  any motions filed in the two NatWest cases for summary

12  judgment will be addressed in one motion addressing both

13  cases.  And the same for the NatWest cases.  Okay.

14        MR. GLATTER:  That's fine, your Honor.

15        THE COURT:  Okay.  Maybe what makes sense with

16  respect to the NatWest case is to discuss those cases in

17  the January conference or are there issues that we need

18  to discuss today that might help?

19        MR. GLATTER:  Speaking for the Weiss

20  plaintiffs, your Honor, no, not today and we do agree

21  that just setting it down on January 29 makes a good deal

22  of sense.

23        MR. ISRAEL: Your Honor, for the Applebaum

24  plaintiffs, Joel Israel, I would agree.  I think we will

25  be over the next month, month and a half, really in a

33

## Proceedings

1   good position by then to give a good sense of things.

2              MR. FRIEDMAN:  I would agree with that, your

3   Honor.

4              THE COURT:  Okay.  Then I will wait to receive

5   a proposed revised scheduling order before that

6   conference.  And will address any remaining issues,

7   procedural issues that need to be addressed at the

8   January 29 conference in those two cases.

9              MR. FRIEDMAN:  Thank you, your Honor.

10             THE COURT:  Okay.

11             MR. GLATTER:  Thank you, your Honor.

12             MR. ISRAEL:  Thank you, your Honor.

13             THE COURT:  Bye.

14                  (Matter concluded)

15                       -o0o-

16

17

18

19

20

21

22

23

24

25

34

# C E R T I F I C A T E

I, ROSALIE LOMBARDI, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **9th** day of **December** , 2009.

*Rosalie Lombardi*
Rosalie Lombardi
Transcription Plus II