1               UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF NEW YORK

2

3    ------------------------------------X
     WEISS, et al.,                      :
4                                        :   05-CV-04622
                        Plaintiffs,      :
5                                        :
                   v.                    :
6                                        :   225 Cadman Plaza East
     NATIONAL WESTMINSTER BANK,          :   Brooklyn, New York
7                                        :
                        Defendant.       :   January 29, 2010
8    ------------------------------------X
     STRAUSS, et al.,                    :
9                                        :
                        Plaintiffs,      :   06-CV-702
10                                       :   07-CV-914
                   v.                    :   07-CV-916
11                                       :
     CREDIT LYONNAIS, S.A.,              :
12                                       :
                        Defendant.       :
13   ------------------------------------X

14
          TRANSCRIPT OF CIVIL CAUSE FOR TELEPHONIC CONFERENCE
15             BEFORE THE HONORABLE MARILYN D. GO
                UNITED STATES MAGISTRATE JUDGE
16

17   APPEARANCES:

18

     For the Strauss and       JOSHUA D. GLATTER, ESQ.
19     Weiss Defendants:        AARON SCHLANGER, ESQ.
                                ARI UNGAR, ESQ.
20                              Osen LLC
                                700 Kinderkamack Road
21                              Oradell, New Jersey  07649

22                              STEPHEN SCHWARTZ, ESQ.
                                Kohn, Swift & Graf, P.C.
23                              One South Broad Street
                                Philadelphia, Pennsylvania  19107

24

25
                                (Appearances continue on next page.)


     Proceedings recorded by electronic sound recording, transcript
     produced by transcription service

```
 1                                                              2

 2

 3    APPEARANCES (Continued):

 4
      For the Strauss and      MARK S. WERBNER, ESQ.
 5      Weiss Defendants:      Sayles Werbner
                               1201 Elm Street 44th Floor
 6                             Dallas, Texas  75270

 7    For Credit Lyonnais:     LAWRENCE B. FRIEDMAN, ESQ.
                               Cleary Gottlieb
 8                             One Liberty Plaza
                               New York, New York  10066
 9
      Court Transcriber:       RUTH ANN HAGER
10                             TypeWrite Word Processing Service
                               211 N. Milton Road
11                             Saratoga Springs, New York  12866

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

1    (Proceedings began at 10:04 a.m.)

2            THE CLERK:   Strauss v. Credit Lyonnais, Docket 06-

3    CV-702 and Wolf v. Credit Lyonnais, Docket number 07-CV-914.

4            Will counsel present please state their names for

5    the record?  For the plaintiffs?

6            MR. GLATTER:  Good morning, Your Honor.  Joshua

7    Glatter, Osen LLC on behalf of the Strauss and Weiss

8    plaintiffs joined on this teleconference by Aaron Schlanger

9    and Ari Ungar.

10           MR. SCHWARTZ:  Stephen Schwartz, Your Honor, from

11   Kohn, Swift & Graf, Philadelphia, Pennsylvania representing

12   the Strauss and Weiss plaintiffs also.

13           MR. WERBNER:  And this is Mark Werbner in Dallas

14   representing the other plaintiffs in these two cases.

15           MR. FRIEDMAN:  Your Honor, this is Lawrence Friedman

16   from Cleary Gottlieb on behalf of Credit Lyonnais and, Your

17   Honor, counsel had all spoken before this conference.  We had

18   understood this conference would also be in the Weiss and

19   Applebaum cases against National Westminster Bank.

20           THE COURT:  Yes.  We also had scheduling issues to

21   discuss in that case.

22           MR. FRIEDMAN:  Yes.  And we're --

23           THE COURT:  Can we discuss them together or shall we

24   just start the tape again and just have one transcript for

25   both -- for all of the cases?

4

1          MR. FRIEDMAN:  I think, Your Honor, we can discuss

2    them together.

3          THE COURT:  Okay.

4          MR. FRIEDMAN:  I spoke yesterday with Mr. Glatter

5    and with Mr. Werbner's colleague, Mr. Israel, and we're

6    prepared to give Your Honor a combined report on where we

7    stand on the Net West cases and the --

8          THE COURT:  Okay.

9          MR. FRIEDMAN:  -- [inaudible].

10          THE COURT:  Okay.  And this -- I assume all the

11    attorneys who entered their appearances already are

12    represent -- the plaintiffs' attorneys were representing -- or

13    the Strauss and Wolf plaintiffs are also representing various

14    plaintiffs in the other two cases, the Net West cases.

15          MR. GLATTER:  Yes, Your Honor.

16          MR. SCHWARTZ:  Yes, Your Honor.

17          THE COURT:  So noted.  All right.  Since you've

18    had -- I assume you've had the benefit of completing the

19    depositions that were still left in the Strauss cases that we

20    discussed at the last conference?

21          MR. FRIEDMAN:  Yes, Your Honor.  We had in mid-

22    December the two last Credit Lyonnais depositions had been

23    requested.  There's one nonparty deposition requested by the

24    plaintiffs which is still outstanding that we have to work out

25    a date for and then we proceeded to exchange the first round

5

1    of expert reports on December 10.  And if Your Honor would

2    like, I can report to Your Honor what the parties propose to

3    do.

4              THE COURT:  Yes.

5              MR. FRIEDMAN:  From here on out.

6              THE COURT:  Okay.  Yes.  That is certainly one of

7    the scheduling issues we need to discuss in these two cases.

8              MR. FRIEDMAN:  Okay.  Your Honor, the parties did

9    exchange expert reports on the 10th.  The plaintiffs delivered

10   to us five expert reports.  One of them had exhibits that were

11   just completed a week or so ago and we had -- Credit Lyonnais

12   served three expert reports.

13             We've been working cooperatively with plaintiffs

14   since then to deal with the fact that the plaintiff's experts

15   have cited to many, many sources, more than 2,000 sources in

16   fact involving hundreds of archived web pages and things of

17   that nature and only a small number of those were actually

18   exhibits to the reports.  So we're -- we've been working

19   towards an agreement and, happy to say, we've been working

20   very cooperatively towards an agreement pursuant to which

21   plaintiffs will provide to us the materials that we can't

22   locate.  We've been working very hard to locate as many of

23   these 2000 or so materials as we can, but there's some --

24   especially ones on archived web pages and obscure articles and

25   books and things of that nature that we're working with

6

1   plaintiffs to get copies of and we're also working towards an

2   agreement under which the parties will share the cost of

3   translating these documents.  They're overwhelmingly in Hebrew

4   and in Arabic and the Arabic documents present a particular

5   translation difficulty.

6           The net effect is that we need a little bit more

7   time to conclude our agreement but based on my conversations

8   with plaintiffs counsel yesterday, we're expecting soon to

9   make proposal to Your Honor that will push the next date, the

10  date for rebuttals of the December 10 reports out at least 60

11  days because we first have to get the materials and we think

12  it will take about a month or so to translate them and then we

13  have to prepare -- each side has to prepare whatever rebuttal

14  reports they will have.  So that would push the February 12th

15  date out perhaps to a date in mid-April.  And as I said, we

16  expect to have an agreement pretty soon as to what that will

17  require.

18          On the February 16 reports which were a couple of

19  expert reports from the plaintiffs' side and one from the

20  defense side that the parties under the scheduling order had

21  carved out from the December 10 date, I received a request

22  from plaintiff's counsel last night to push that back two

23  weeks which -- just subject to checking with my client this

24  morning I'm prepared to agree to.  So the net effect is that

25  the parties are going to be proposing shortly to Your Honor

7

1    due dates to replace the February 12 and February 16 dates to

2    complete the exchange of all expert reports and we can then

3    proceed subject to the agreement of the parties to expert

4    depositions.

5             THE COURT:  Okay.  Well, and that also push back

6    the -- I guess the Court then would push back the rebuttal

7    expert reports, too.

8             MR. FRIEDMAN:  Right.  That's what we're talking

9    about --

10            THE COURT:  The April 15th --

11            MR. FRIEDMAN:  -- now.

12            THE COURT:  The April -- no, the April 13th date on

13   the third page of the scheduling order.

14            MR. FRIEDMAN:  Yes.  Yes.

15            THE COURT:  Okay.

16            MR. FRIEDMAN:  It's the --

17            THE COURT:  That's two weeks, right.

18            MR. FRIEDMAN:  If the February 16 reports are pushed

19   back two weeks then the --

20            THE COURT:  Two weeks.

21            MR. FRIEDMAN:  -- April 13th date should be pushed

22   back two weeks, too.

23            THE COURT:  Okay.

24            MR. GLATTER:  That's correct, Your Honor.  Josh

25   Glatter for the Strauss plaintiffs.  Mr. Friedman's

1    representations are entirely accurate, Your Honor.  There's

2    just two other points I wanted to advise, one on general

3    discovery and one specific to the expert reports, just so that

4    Your Honor has a full picture of where things stand.  With

5    respect to expert reports in addition to materials that the

6    experts have cited defendant's counsel, as is often the case,

7    has also requested prior reports and testimony that the ex --

8    the experts that we have already identified and served opening

9    reports are have given in prior litigation.  And we have also

10   been working diligently and cooperatively with defense

11   counsel, with the experts to try to obtain that material and

12   provide it to the extent that we can.  Sometimes it's the

13   function of getting it from the expert directly but often

14   particularly for experts that have testified in federal

15   terrorism litigation.

16          It's a function of also getting in touch with often

17   prosecutors both in the U.S. and abroad to advise them of the

18   request to -- and to learn whether or not there may be any

19   particular confidentiality issues or protective order issues

20   in those other cases that we then need to alert Mr. Friedman

21   about and we've been doing that.  And as we've been receiving

22   materials it's actually being Bates numbered now and that will

23   be produced on a rolling basis.  And that also -- the process

24   there because to some extent the -- I can say that the

25   prosecutors and other lawyers have been very cooperative in

1  getting back to us quickly on it.  But just the mechanics of

2  getting the material, getting an answer, sometimes it has to

3  be run up the flag pole at DOJ or DHS and then just

4  producing -- mechanically producing the material does also --

5  it's another moving part that the parties are trying to

6  account for in the ultimate revised scheduling proposal.

7         The other more general discovery issue I just wanted

8  to remind Your Honor about purely for overall purposes is that

9  in our last call one of the -- with Your Honor in our last

10  status conference one of the issues that came up was the

11  question as to ultimately what the parties would do, what

12  positions they would take with documents that used to exist

13  but for one reason or another are no longer present.  And

14  my -- I apologize because my colleague, Mr. Goelman, has been

15  discussing this directly with Mr. Friedman but was unable to

16  be on the call today.

17         My understanding, and Mr. Friedman will correct me

18  if I'm incorrect, is that I believe Mr. Goelman in a letter

19  made a request to explore the possibility of a forensic

20  examination of some of I guess the hard drives or backup to

21  see if that might flesh out the issue.  I suppose that might

22  also -- that might also potentially generate a request for a

23  follow-up 30(b)(6) deposition.

24         Again, the point is not to -- today to say whether

25  that should or shouldn't proceed.  I just wanted to alert Your

10

1   Honor.  In fact, that's one of the other areas that the

2   parties are discussing and I expect that however it resolves,

3   you know, either cooperatively or not will be something that

4   will be reflected in the ultimate scheduling order.  But,

5   again, Mr. Friedman, if I'm mischaracterizing any of that I

6   greatly appreciate your correcting the record.

7           MR. FRIEDMAN:  No.  You're not, Josh.  And we're

8   considering Aitan's request to have a forensic search done of

9   an email server in France.  We're first determining if that

10  server exists and then we're also determining whether it's

11  accessible but you've accurately reported it.

12          So the upshot on the Credit Lyonnais case, Your

13  Honor, is that because of the volume of materials that have

14  been cited by the experts and the time it's taking to get them

15  and to interpret them, I'm confident we're going to be able to

16  reach agreements on all this and in the next week or so we'll

17  submit a revised calendar to Your Honor.

18          THE COURT:  Okay.  All right.  Then we'll see when

19  our next conference will be in one of these cases, but I -- as

20  you know, I had wanted to see if we could tighten up the

21  schedule a little bit with respect to any contemplated Daubert

22  motions but I -- you won't be getting the reports until the

23  end of February at this point or actually at the beginning of

24  March.  Right?

25          MR. FRIEDMAN:  Actually, the exchange of reports I

1  think that we're now contemplating in light of the time that

2  will be needed for all these documents will be in April or May

3  and --

4           THE COURT:  Oh, April 27th.

5           MR. FRIEDMAN:  Yeah.

6           THE COURT:  That's the -- okay, the rebuttal -- the

7  final rebuttal actually.

8           MR. FRIEDMAN:  Yeah.  That's right.  Then I remember

9  Your Honor's proposal that we then talk about Daubert motion

10  practice.  I in my view we're going to have to have

11  depositions of a couple of the experts in order to fully ripen

12  the Daubert issues, but perhaps we could [inaudible] Your

13  Honor for that --

14          THE COURT:  Well, okay.  I was hoping that after you

15  get the reports you would be in a better position to see if

16  there -- there were any reports that merited a Daubert motion

17  in the first place and perhaps just to eliminate any doubts as

18  to whether or not there would be motions --

19          MR. FRIEDMAN:  That's fine, Your Honor.  That's

20  fair.

21          THE COURT:  -- as to certain aspects.  I think that

22  that would also serve a useful function in trying to clarify

23  remaining discovery that needs to be done and seeing if we can

24  get the issues resolved.  You know, the substantive motions

25  filed more quickly anyway.

12

 1          MR. FRIEDMAN:  Right.

 2          THE COURT:  But we'll see.

 3          MR. FRIEDMAN:  I think that's fair, Your Honor.

 4          THE COURT:  Okay.

 5          MR. FRIEDMAN:  And on the -- if I may on the Nat

 6  West cases --

 7          THE COURT:  Yes.

 8          MR. FRIEDMAN:  The parties in the last -- plaintiffs

 9  proposed a revised scheduling order to us on Wednesday and we

10  negotiated that through and have provided it to our client and

11  am expecting that next week we'll be able to submit an agreed

12  proposal to Your Honor.

13          THE COURT:  So how far behind is that case in

14  discovery?

15          MR. FRIEDMAN:  Well, what the plaintiffs have

16  proposed is that the fact discovery deadline in those cases be

17  the end of September.

18          THE COURT:  My restrained response to that is wow.

19  Is there a reason for that?

20          MR. FRIEDMAN:  There is -- I --

21          THE COURT:  For the delay.  I'm just trying to get a

22  handle on what's left in fact discovery.

23          MR. SCHWARTZ:  Well, in that case, Your Honor --

24  this is Mr. Schwartz -- we still have -- we've only taken a

25  few depositions.  There's a lot to go.  There are still some

1   outstanding document issues so we actually thought that

2   September was rather an aggressive schedule.

3          MR. GLATTER:  And, Your Honor, this is Joshua

4   Glatter again to amplify Mr. Schwartz's comment.  To some

5   degree why we perceived it as a more aggressive schedule is at

6   least from our concedingly subjective perspective that West --

7   the Nat West case implicates a broader set of facts and

8   frankly bank customers than is the case in Credit Lyonnais

9   where to date it's really been focused upon CBST.  So there is

10  a -- simply is a mechanical exercise.  There's a larger

11  universe theoretically of witnesses that might need to be

12  taken for customers apart from Interpal and the counterparties

13  connected to them.

14         It's, of course, possible that -- the other thing I

15  would add is that one desire that we have, though, is that it

16  may very well be that when document production is complete

17  we're in a scenario where when a witness is put on the table

18  it obviates the need as is sometimes occurred in the parallel

19  litigation to then request that the witness be put back on the

20  table as new documents come in because it's how the Royal Bank

21  of Scotland integrates its anti-money laundering and

22  procedures at the parent company level, but there may be a

23  number of witnesses that are in a position to respond to

24  questions concerning a multiplicity of customers rather than

25  simply Interpal.  So all -- so the idea being to build enough

1   time into the schedule so that when the depositions go it may

2   be that they proceed at a relatively fast pace but they are

3   teed up to be as efficient as possible.  Again, that --

4            MR. WERBNER:  Your Honor -- Your Honor, this is Mark

5   Werbner in Dallas for the Wolf and Applebaum plaintiffs.  I'll

6   stand by what my colleague have said.  I'm not precisely sure

7   but that seems like an awfully long time to me.  It would seem

8   that it may be setting it shorter and then if there are

9   complications or problems we could come back to the Court.

10  I'm 55 and I'm a little worried at this pace I may not make it

11  to the end.

12           [Laughter.]

13           MR. FRIEDMAN:  Your Honor, this is Larry Friedman.

14  You know, this is an issue for the plaintiffs.  They proposed

15  September 30 and we can live with it.  I'll just note that it

16  was Mr. Werbner's colleague who proposed that to me on

17  Wednesday.

18           THE COURT:  How much document production is left, if

19  any?

20           MR. FRIEDMAN:  From our perspective, Your Honor,

21  from Nat West very little, if any.  You know, the -- what had

22  happened if I may -- and again, I'm not trying to -- certainly

23  it's not my intent to criticize how anyone from the

24  plaintiffs' side has handled this.  And as I've said, they

25  proposed the end of September and I don't object to it but the

1   Nat West depositions have pretty much frozen for the last six

2   months or so while the plaintiffs have focused on completing

3   the Credit Lyonnais depositions and I think that has a lot to

4   do with it.

5          And as Mr. Glatter alluded to, there was an order

6   that Your Honor issued last year requiring that documents

7   about customers other than Interpal be produced, but as far as

8   we're concerned these depositions can start up again.  And if

9   the plaintiffs feel they need till the end of September it's

10  not -- I don't really have standing to object to that.

11         MR. GLATTER:  Your Honor, Josh Glatter again and I

12  guess if it's slightly awkward conversation because, as Mr.

13  Friedman and Mr. Schwartz commented, the schedule has been --

14  had been presented -- intended to be presented on a mutually

15  consensual basis but to illuminate at least some of the open

16  document issues on our end which we have been -- and to be

17  clear, we've been coordinating with Mr. Friedman and his

18  colleague, Mr. Sheldon.  Some of it relates to pure technical

19  issues in trying to get certain data in connection with

20  counterparties who are not customers at the bank try to work

21  out some protocols to be able to access that where -- not to

22  get too technical on it, but my understanding is that one of

23  the interfaces with the -- with the software doesn't

24  necessarily permit text searching.  We've been cooperatively

25  working with Mr. Sheldon to try to figure out ways that we can

1  present other information that may allow extraction of that

2  information out of the database.  There is also I think --

3  there's been some other materials  -- and I should add that

4  the parties have not been sitting on their heels in that

5  regard while trying to help accelerate that process.  To the

6  extent that Nat West and RBS have been able to do it, they've

7  been providing extracted data from the raw database on a

8  rolling basis.

9        Again, the point being to put it in practical terms

10  that if there are documents one of the things we've seen are

11  documents where communications concerning Interpal may also

12  reference other customers that may or may not have been on the

13  bank's radar for one reason or another.  And our preference is

14  to make sure that when we talk to the witnesses involved that

15  we have complete document production on those customers or

16  counter-parties so that the witness isn't being asked in one

17  set of depositions about Interpal and then being put back on

18  the table weeks or months later to return to another customer.

19

20        There are a few other technical document discovery

21  issues which some of my other colleagues including Mr. Turner

22  have raised with Mr. Friedman and Mr. Sheldon.  I have to

23  admit off the top of my head I can't recall them specifically.

24  Again, it's something that -- certain instances were viewed as

25  a schedule to meet and confer on them.  But again, the overall

1  point is it may very well be that document discovery is close

2  to being complete for present purposes.  There are some things

3  we want to run down but all that went into the parties setting

4  down September as a fact discovery cutoff date.

5          And the only other thing I would add on that --

6  and -- is that based on our experience in Credit Lyonnais

7  where we've had to -- both parties at one time or another have

8  needed to extend the discovery schedule.  Nothing is ever

9  perfectly predictable but to the extent we can we try to

10  arrive at an end date that we thought in good faith would

11  hopefully obviate or at least mitigate the need to come back

12  to the Court later on for one reason or another.  Again, can't

13  predict that with absolute certainty but that has been the

14  intention of the parties in crafting the schedule.

15          THE COURT:  Well, I haven't really kept track of how

16  many revised scheduling orders I've signed in these cases but

17  I think it never hurts to err on the side of a tighter

18  schedule.  It would strike me at least with respect to the

19  depositions since you do have witnesses with knowledge about

20  multiple customers that you could try to sort out which

21  witnesses would be more likely to have knowledge about more

22  customers and save those witnesses for later on.  I assume

23  some of these witnesses would have overlapping knowledge about

24  the more major customers, *i.e.*, major in terms of this

25  litigation, and get those people deposed first and perhaps you

18

1    could dispense with having to have very many questions, if

2    any, of the later witnesses on Interpal and some of the other

3    customers.  Does that make sense?

4         MR. GLATTER:  Your Honor, Josh Glatter speaking for

5    the Strauss plaintiffs.  I think that it does.  That's

6    actually been something that internally we have been

7    discussing really more from the perspective of Interpal to see

8    whether we can collectively have confidence that there are

9    certain witnesses that are essentially -- their testimony

10   would very likely be segregated to Interpal specific issues

11   and that certainly there's no reason why those can't be teed

12   up relatively sooner enrolling and as well as some follow-on

13   30(b) deponents both at the company level and now really at

14   the parent level beyond the ones that have been taken.

15        I -- one of the issues that one of my colleagues had

16   raised with defense counsel -- and again, it's just a subject

17   that's still under discussion is in the absence of org charts

18   for the banks whether or not that we might be able to come up

19   with a 30(b)(6) witness that might provide some degree of

20   substitution for that.  Again, I don't want to represent that

21   that's necessarily the way to handle it or not but it is a

22   type of witness that is under discussion and if we reach

23   agreement on it is, again, probably somebody that could roll

24   without, you know, having a domino effect on the remainder of

25   the discovery and deposition schedule.

1          THE COURT:  So having said that, don't you think you

2     could tighten up the schedule a little bit, at least the

3     deadline for completion of fact discovery in the Nat West

4     cases?

5          MR. GLATTER:  Your Honor, speaking of mine,

6     since it's I think pretty clear that that is what Your Honor

7     would like us to try to do, what I would suggest is that the

8     parties and -- we'll meet and confer again with Mr. Friedman

9     in the early part of next week and see if we can structure

10    something that reflects that.

11         THE COURT:  Okay.  And perhaps you should confer

12    with Mr. Werbner before you do that.

13         MR. GLATTER:  Oh, absolutely.

14         MR. WERBNER:  Thank you, Your Honor.

15         THE COURT:  Okay.  All right.  So you'll send me a

16    proposed scheduling order in the Nat West cases, what, in two

17    weeks?  I'm not going to put a deadline because I -- that's

18    unrealistic but I -- I do want to have some sort of control

19    date.

20         MR. GLATTER:  Your Honor, Josh Glatter.  Again,

21    because Mr. Friedman obviously knows what his clients and

22    potentially prospective witnesses' schedules are and where

23    things may stand on some of the open document production

24    issues, I certainly think that we should be in a position to

25    do it by then.  But obviously, I -- you know, I don't want to

20

1   put words in his mouth or before he's had an opportunity to

2   confer with his client to see, you know, how long it would

3   take on their end to, you know, be able to come back with some

4   reasonable certainty that the schedule is feasible in that

5   regard.

6               MR. FRIEDMAN:  Well, Your Honor, we can -- counsel

7   can discuss this --

8               THE COURT:  Right.

9               MR. FRIEDMAN:  -- separately but it's not really my

10  call.  It's --

11              THE COURT:  Let me --

12              MR. FRIEDMAN:  -- the time that they think they need

13  and I don't even know who the witnesses are that they have in

14  mind but, again, Mr. Werbner's associate sent me something on

15  Wednesday that said September 30 and I didn't feel that I

16  could say no if they felt they needed that amount of time.

17  But I think Mr. Glatter should consult with his colleagues,

18  talk about how many witnesses they're talking about, who they

19  are and, you know, we can then agree on a deadline.

20              THE COURT:  Okay.  Well, what -- let me just

21  encourage you to send me a proposed schedule by the 18th.

22              MR. FRIEDMAN:  Okay.

23              THE COURT:  Which I think should give you enough

24  time.  And if you can't, call my law clerk Josh to alert him

25  when I can expect it.

21

1              MR. FRIEDMAN:  Okay.

2              THE COURT:  Okay.  And then we --

3              MR. FRIEDMAN:  And I think, Your Honor, if I may

4   within the same time frame we can submit a revised schedule

5   for the Credit Lyonnais cases, too.

6              THE COURT:  Okay.

7              MR. GLATTER:  Yes.  I agree, Your Honor.

8              THE COURT:  Okay.

9              MR. FRIEDMAN:  All right.

10             THE COURT:  So it sounds as if perhaps the -- we

11  should have a next conference in the Credit Lyonnais cases

12  sometime in the middle of May after you've had a chance to

13  look at the rebuttal expert reports.

14             MR. FRIEDMAN:  That's fine, Your Honor.

15             THE COURT:  Okay.  Let's see.  How about May 17th?

16             MR. FRIEDMAN:  That's fine with me, Your Honor.

17             MR. GLATTER:  That's fine for the Strauss plaintiffs

18  and Weiss plaintiffs, Your Honor.

19             MR. WERBNER:  That looks good.  And this is Mark

20  Werbner.  That looks good.

21             THE COURT:  Okay.  How about 2:00?

22             MR. FRIEDMAN:  Shall we do that by phone again, Your

23  Honor?

24             THE COURT:  You're more than welcome to do so by

25  phone.

22

 1          MR. WERBNER:  That will be fine.

 2          THE COURT:  Okay.  Do you anticipate any disputes

 3   arising in either set of cases?

 4          MR. WERBNER:  I'll defer to Mr. Friedman.

 5          [Laughter.]

 6          MR. FRIEDMAN:  Well, I'm not aware, Your Honor, of

 7   any at this moment --

 8          THE COURT:  Okay.

 9          MR. FRIEDMAN:  -- but again, I'm not the one seeking

10   discovery so it's --

11          MR. WERBNER:  That would be why there would be

12   discovery issue.

13          MR. FRIEDMAN:  So it's -- I appreciate Mr. Werbner

14   deferring to me but it's not really my call.

15          THE COURT:  Okay.

16          MR. GLATTER:  Your Honor, I think we've reached the

17   legal equivalent of checking in poker [Ph.], but off the top

18   at least on the Credit Lyonnais side is the sense there isn't

19   anything particularly live other than some of the issues

20   mentioned earlier that are still meet and conferring on.  In

21   the case of Nat West it's again some -- a few other open-ended

22   issues that I think are still under consideration but I think

23   it's fair to say that they haven't developed to the point that

24   they predict motion practices with any degree of certainty

25   though.

23

1        THE COURT:  I don't want to encourage you to engage

2  in motion practice, but obviously you know how to reach me.

3  And if you do, you'll tell me what your proposed schedule for

4  the response will be so I know when to schedule the next

5  conference if we need an earlier conference than May 17th.

6        MR. FRIEDMAN:  Okay.

7        THE COURT:  Okay?

8        MR. FRIEDMAN:  Thank you, Your Honor.

9        MR. WERBNER:  Thank you, Your Honor.

10       MR. GLATTER:  Thank you, Your Honor.

11       THE COURT:  Have a good day.

12       MR. WERBNER:  Bye-bye.

13       THE COURT:  Bye-bye.

14       (Proceedings concluded at 10:35 a.m.)

15             * * * * * *

16

17

18

19

20

21

22

23

24

25

24

1          I certify that the foregoing is a court transcript

2    from an electronic sound recording of the proceedings in the

3    above-entitled matter.

4

5

6    _____

7                              Ruth Ann Hager

8    Dated:   February 1, 2010