```
              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF NEW YORK



----------------------------X    05-CV-4622(DGT)(MDG)
                            :    07-CV-916 (DGT)(MDG)
MOSES STRAUSS, et al.,      :    07-CV-914 (DGT)(MDG)
                            :    06-CV-702 (DGT)(MDG)
              Plaintiff,    :
                            :    December 9, 2010
                            :
            V.              :    Brooklyn, New York
                            :
CREDIT LYONNAIS, S.A.,      :
                            :
              Defendant.    :
----------------------------X


         TRANSCRIPT OF CIVIL CAUSE FOR CONFERENCE
          BEFORE THE HONORABLE MARILYN D. GO
             UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:          JOSHUA GLATTER, ESQ.
                            AARON SCHLANGER, ESQ.
                            GARY OSEN, ESQ.
                            JAMES BONNER, ESQ.



For the Defendant:          LAWRENCE FRIEDMAN, ESQ.
                            AVRAM MOSKOWITZ, ESQ.



Audio Operator:



Court Transcriber:          ARIA TRANSCRIPTIONS
                            c/o Elizabeth Barron
                            375 Salt Point Turnpike, #5D
                            Poughkeepsie, NY 12603
                            (215) 767-7700


Proceedings recorded by electronic sound recording,
transcript produced by transcription service
```

1          THE COURT:  Weiss versus National Westminster

2    Bank, docket number 2005-CV-4622, consolidated with three

3    other cases, Applebaum versus NatWest as well as Strauss

4    versus Credit Lyonnais, docket number 2006-CV-702

5          Will counsel please state their names for the

6    record?

7          MR. GLATTER:  Good morning, Your Honor.  Joshua

8    Glatter, Osen LLC, on behalf of the Weiss and Strauss

9    plaintiffs.

10         MR. OSEN:  Good morning, Your Honor.  Gary Osen,

11   Osen LLC, on behalf of the Weiss and Strauss plaintiffs.

12         MR. BONNER:  Good morning, Your Honor.  Jim Bonner

13   with (ui).

14         MR. FRIEDMAN:  Good morning, Your Honor.  Lawrence

15   Friedman, Cleary, Gottlieb, Steen and Hamilton, on behalf of

16   Credit Lyonnais.

17         MR. MOSKOWITZ:  Good morning, Your Honor.  Avram

18   Moskowitz (ph), Cleary, Gottlieb, Steen and Hamilton, on

19   behalf of Credit Lyonnais.

20         THE COURT:  I'll let you propose what order we

21   should discuss the issues on our agenda.  I see we have the

22   defendants' request regarding the scheduling and we have

23   general scheduling issues to discuss in the Strauss and Wolf

24   cases, and then also scheduling issues in Weiss.  I owe you

25   a decision on one of my favorite types of motions, the

1    motion for sanctions filed in the Applebaum case.

2              I have finished reading the deposition transcript

3    and it ended up being far more effective as bedtime reading

4    than I anticipated.  We will be issuing a decision but in

5    case any of you are dying to know, I'm going to deny the

6    motion for sanctions.  The transcript did not reflect what I

7    would consider best practices in the conduct of depositions

8    on both sides.  But I would assume the filing of the motion

9    has changed the practices in the taking of depositions.

10             Your Honor, in the Credit Lyonnais cases, we have

11   three issues:  To report to Your Honor the agreement that

12   the parties reached last night; on scheduling for the next

13   step in this case, and then to discuss the proposal that we

14   have made for separating briefing on the Dalbert and summary

15   judgment issues; and also our compulsion motion on the (ui)

16   manuscript.

17             On the National Westminster Bank cases, I can

18   report that the parties came to an agreement last night on a

19   scheduling order, which I believe Mr. Schlanger has with

20   him, for the onset and completion of expert discovery in

21   those cases.

22             First with respect to the Credit Lyonnais cases,

23   Your Honor, with respect to the schedule the parties have

24   agreed to for the next step in this case -- these cases for

25   Dalbert and summary judgment motion practice, it's the

1    exchange of contention interrogatories and the exchange of

2    requests for admission related to the authenticity of

3    documents.

4            And plaintiffs proposed to us a calendar for that

5    last night, which is acceptable to us, and it provides for

6    the exchange of contention interrogatories and requests for

7    admissions related to the admissibility -- authenticity of

8    documents.  I apologize if I said admissibility before, I

9    meant authenticity -- for the exchange to be on January 28th,

10   2011.  And plaintiffs have proposed, and it's acceptable to

11   us, that the responses will be exchanged on April 11, 2011.

12   That's a longer period of time than we had suggested but

13   that's what plaintiffs proposed and it's acceptable to us.

14           THE COURT:  Let me just get some sense, so that I

15   can feel comfortable with the gap in time, of how many -- a

16   guesstimate as to how many documents are going to be

17   involved.

18           MR. FRIEDMAN:  Well, plaintiffs also asked us last

19   night if we had any suggestion for the number of contention

20   interrogatories, and I suggested that we each be limited to

21   25 contention interrogatories, including discrete subparts,

22   in conformity with the rule.

23           As to the authenticity of documents, I think there

24   are threshold issues on the authenticity of plaintiffs'

25   documents that Your Honor is familiar with from the letters

1    that we submitted, and we'll see how we do.  Again, this gap

2    surprises me, especially in light of some of the protests

3    about delay, which I'll come back to.  But as I've said many

4    times before, the plaintiffs' proposed calendar and the

5    defendant calendar is acceptable to me.  Even though I'd be

6    willing to do something more quickly, I'll accept it, and

7    the April 11th exchange date works for me.

8                THE COURT:  I must have mis-heard.  So it's April

9    11th for --

10               MR. FRIEDMAN:  Exchanges of responses to the --

11   we'll do simultaneous --

12               THE COURT:  Are you going to be -- will the

13   defendant be providing a load of documents?

14               MR. FRIEDMAN:  We'll be providing contention

15   interrogatories.

16               THE COURT:  Well, the contention interrogatories.

17   That's --

18               MR. FRIEDMAN:  And responses.

19               THE COURT:  Yes, okay.  So 4/11 is the response

20   date for the contention interrogatories.  But on the

21   authenticity of documents, is there any need for such a long

22   period of time?

23               MR. FRIEDMAN:  It depends on how many documents

24   are at issue.  Under Magistrate Judge Matsumoto's -- one of

25   her first orders in this case, plaintiffs were ordered to

1    produce to us all the documents they intend to rely on in

2    these cases, and I presume that they have.   They can tell

3    us how many documents they anticipate seeking an

4    authenticity stipulation on.

5        We already know from Mr. Naim's (ph) expert

6    report, the retried police officer who is purporting to

7    authenticate some documents, he has hundreds of documents

8    from the Israeli police, court records and things of that

9    nature that he is purporting to authenticate.   And their

10   expert reports have, I dare say, at least a thousand

11   documents (ui).

12       I've not made a count of how many documents I will

13   ask plaintiffs to authenticate but they've seen the lion's

14   share already.

15       MR. GLATTER:  Your Honor, the only thing I guess I

16   would add is we did -- with respect to materials that may be

17   submitted in connection with RFA's limited to authenticity,

18   it may also encompass a universe of material beyond court

19   records and banking documents, including certain videos.

20       There were certain materials, I believe, produced

21   by the bank that in the course of depositions, we requested

22   stipulations as to the documents satisfying the business

23   records standards under both Rule 902 and 801.  For many of

24   the materials, the defendant did agree to that stipulation.

25   There were certain materials that the defendant at that time

1  did not agree to, and it may be appropriate now.

2           We obviously have to go back and review the record

3  and establish whether, through the course of the testimony,

4  at this time, perhaps the defendant will agree that a

5  sufficient foundation has been made and, accordingly, it is

6  appropriate to admit to the authenticity of the documents.

7  But it's a little bit hard for me to sit here today and tell

8  you with precision exactly what the volume of those

9  documents are or what the likelihood of that outcome will

10 be.

11          But I only wanted to say that there is a universe

12 of material beyond the items referenced in Mr. Naim's report

13 that are likely to be appropriate subjects for us to propose

14 RFA's on as to authenticity, which will hopefully streamline

15 the process as we go forward.

16          MR. FRIEDMAN:  I just want to correct something

17 Mr. Glatter said.  He said we tried to stipulate to the

18 authenticity of bank documents.  That's not true.  We

19 stipulated to the authenticity of everything produced from

20 the bank.  The requests for admission that we're talking

21 about are limited to authenticity.

22          He is right that there are bank documents that are

23 not business records that he asked us to agree are business

24 records, but I'm happy to dismiss admissibility questions

25 with him at any time.

1          THE COURT:  The reason I ask is because I gather

2     from Mr. Friedman's comment the large gap in time for the

3     response was at your request.  So if the bank isn't seeking

4     a large number of RFA's as to documents produced by the

5     plaintiffs, it may make sense to shorten the time and -- my

6     suspicions are that you're going to have more documents that

7     are the subject of your RFA's than the defendant will.

8          MR. GLATTER:  That very well may be the case, Your

9     Honor, and I would also add, and I think Mr. Friedman would

10    agree with me, that when we discussed the service and

11    response dates, most of the conversations really treated

12    both potential interrogatories and the requests for

13    admissions, you know, sort of as one block.

14          And much of what drives the proposed response date

15    on our end does also turn upon the -- well, two things:

16    certainly the response to contention interrogatories, which

17    depending on what contention interrogatories the defendants

18    serve on us and vice versa, may implicate a fairly broad

19    range of materials.

20          And, secondly, I think that was also designed for

21    both sets of discovery requests, to build in enough time

22    that we would be able to meet and confer and advise the

23    Court of any interim issues that might come up with respect

24    to any motion practice that might be germane to those

25    discovery areas, although again, we haven't specifically

```
 1   discussed them.

 2           MR. FRIEDMAN:  Your Honor, as I said, the dates

 3   are ones that we agreed to.  And as a defendant, I don't

 4   want to act like a plaintiff.  But if that's the gap they

 5   want, that's the gap that I'll accept.  I just don't want to

 6   hear accusations coming back that I'm seeking to foster

 7   delay.

 8           MR. GLATTER:  No such accusation is being made

 9   today, Your Honor.

10           MR. FRIEDMAN:  Well, it was made yesterday.

11           THE COURT:  I think you're anticipating the worst.

12   Why don't we just shorten the time?  You already have Mr.

13   Friedman's agreement to a longer deadline, but let's just

14   try to wrap this up.  If you are -- I'm going to shorten the

15   time a little bit and move it up.  That also gets you out --

16   gets this discovery completed, you know, well in advance of

17   all the holidays that will be popping up in April.

18           MR. GLATTER:  And this is with respect to the

19   request for admissions, Your Honor?

20           THE COURT:  Well, the response dates for -- for

21   everything.

22           MR. GLATTER:  For the requests for admissions as

23   supposed to the contention interrogatories?

24           THE COURT:  You want that long date for the

25   contention interrogatories?
```

1          MR. GLATTER:  We may.  Obviously, it's difficult

2    to --

3          THE COURT:  Let's pick a shorter date and if it is

4    totally unmanageable and you get two thousand documents and

5    contention interrogatories with more subparts than you've

6    contemplated, then we'll talk about it.

7          MR. FRIEDMAN:  I would suggest, Your Honor, if it

8    works for Mr. Glatter, that we cut it back by two weeks, to

9    March 28th.

10          THE COURT:  I think that's --

11          MR. GLATTER:  I'm sorry, what date, Mr. Friedman?

12          MR. FRIEDMAN:  March 28th.

13          MR. GLATTER:  March 28th?  That's acceptable, Your

14    Honor.

15          MR. KNAPP:  Your Honor, the next issue our

16    proposal, which I presume Your Honor  has read about.

17          THE COURT:  It's very interesting.

18          MR. FRIEDMAN:  Let me just say that Your Honor has

19    read what I've written and I tried to write everything I

20    have to say.  But reflecting on it, let me just say, Your

21    Honor, that plaintiffs made a strategic choice to put so

22    many eggs in the experts basket.  And on two of the three

23    elements on which we intend to seek summary judgment,

24    they're not presenting any fact witnesses at all, they're

25    just presenting experts.

1    (Ui) responsibility for the attacks, which is an

2    element of the claim, and proximate causation, however you

3    define it.   Mr. (ui) and Mr. Coleman, who are proposing to

4    get before the jury and say, we think Hamas committed these

5    attacks.   Your Honor knows why we think that's (ui).   And

6    they're proposing to put Mr. Spitzin (ph) and Dr. Levitt

7    (ph) in front of the jury to say, we think Hamas controlled

8    these entities (ui).

9         My point and my only point (ui) is they made a

10   strategic decision to put their eggs on those two elements,

11   as well as scienter, in the experts basket.   Having made

12   that strategic decision, they should not be heard to

13   complain when we want to address the expert admissibility

14   issues on a separate basis, because they will be in large

15   part case dispositive.

16        I am frankly surprised at how plaintiffs have

17   tried to prove those two elements.   And if I may, Judge

18   Sifton, at the very first status conference in this case,

19   said to the plaintiffs in this very courthouse, how are you

20   going to prove Hamas's responsibility for the attacks?   And

21   one of their co-counsel said, well, Hamas claims

22   responsibility for these attacks.   And Judge Sifton said,

23   well, Hamas claims responsibility for a lot of things.   Are

24   you going to bring in people who are going to really talk

25   about this?   I think it was Professor (ui) said, yes, we're

1    going to bring in Israeli terrorist experts, we're going to

2    have police, we're going to have this, we're going to have

3    that.

4              They have none of that.  They've put their eggs in

5    the experts baskets.  And bottom line, it would be more

6    efficient for the parties and for the Court to have the

7    expert admissibility issues resolved first.  I will then be

8    able to frame my briefs knowing what the universe of

9    admissible evidence is.  They can frame their opposition

10   briefs and the Court can decide summary judgment, having

11   first decided the universe of admissible evidence.

12             If we have to do them all at once, not only are we

13   going to seek -- need to seek and to have enormous

14   extensions of this Court's page limits for briefing, but it

15   really will be nightmarish, to use Mr. Glatter's term in his

16   letter of Tuesday, because we'll have to present (ui) to

17   summary judgment under multiple scenarios of evidentiary

18   admissibility, and we shouldn't have to do that.

19             Everybody agrees that the Court needs to decide

20   admissibility before it decides summary judgment.  So why

21   not do it in sequence?  It's not going to take a substantial

22   additional amount of time, and we should do it in a way that

23   will burden the Court the least and that will be more likely

24   to result in a just adjudication of these lawsuits.

25             MR. GLATTER:  Your Honor, in the spirit of how Mr.

```
1   Friedman commenced his remarks, I also will endeavor not to
2   jut repeat that which has been set forth in my letter.
3   That's something you've pointed out to me in the past.  I
4   just want to summarize three key points that explain why we
5   believe that Mr. Friedman's proposed sequencing is not the
6   appropriate sequencing for this case.
7              First, it's inefficient.  The reason it's
8   inefficient is because the very multiple evidentiary -- how
9   did he phrase it -- the multiple scenarios of evidentiary
10  admissibility will only become more confusing in a
11  subsequent summary judgment stage, rather than evaluating it
12  as a single whole in terms of the entire record of the case.
13             For example, there are multiple levels that have
14  to be analyzed for any expert:  Number one, whether or not
15  the expert's methodology is reliable; number two, whether
16  the evidence he's relying upon is or is not inadmissible in
17  the first instance.
18             Our position would be, and we're not going to take
19  Your Honor's time today to go through a preview of motion in
20  limine practice, but much of the evidence that Mr. Friedman
21  characterized in his letter as inadmissible will satisfy
22  various hearsay exceptions and exemptions.  And under I
23  believe it's Rule 703 of the Federal Rules of Evidence, once
24  that threshold determination is made, even assuming it's
25  inadmissible, the test as to whether or not the expert can
```

1    introduce that ostensibly inadmissible material, rather than

2    simply rely on it, is essentially a 401/403 test.  Is it

3    more probative than prejudicial?  It's a different sort of

4    test than were it to come in through a percipient fact

5    witness.

6         And for that reason, we think -- that's why we

7    cited Judge Sifton's Cohen (ph) case.  We think it's likely

8    that the Court can look at the record, look at much of the

9    evidence that has been assessed at the deposition phase, in

10   the documents themselves, and be able to determine, first,

11   the summary judgment sufficiency test, as to whether or not

12   there are material disputes as opposed to Dalbert's test of

13   whether or not the expert is using reliable methods and

14   satisfies its standard.

15        THE COURT:  Well, I guess -- and I was actually

16   going to interrupt Mr. Friedman on that, is that it's not

17   clear to me, and you can confirm this, that even if the

18   defendants were to prevail on every aspect of their Dalbert

19   motion, that you still would be -- that you still would

20   pursue this case, that you would have a response to any

21   summary judgment motion.

22        MR. GLATTER:  Your Honor, given that -- my

23   response is that, if that hypothetical unfortunate scenario

24   were to come, I don't agree, with all due respect, that it

25   would be the case that we would be forced to abandon these

1    claims because it's a very nuanced analysis.

2             For example, the Court might conclude that certain

3    of the experts' opinions are appropriate but not others.

4    The Court might also conclude -- and it's an important point

5    that we raised with Mr. Friedman sometime back with respect

6    to several of our experts.  It's very likely -- and I assume

7    these matters would be resolved by Judge Trager -- that the

8    Court might conclude that certain experts might be able to

9    present particular evidence as a percipient fact witness,

10   based on certain things that they personally know, but not

11   necessarily be able to provide expert opinions on all

12   matters.  It's a very complex analysis.

13            THE COURT:  I think that's apparent just from

14   reading the defendants' synopsis of the expert reports, that

15   a court could come to the conclusion that some parts of the

16   experts' testimony would be admissible, even if they agreed

17   with your analysis that the expert --

18            MR. FRIEDMAN:  It could be.  But to give my answer

19   to Your Honor's question, would the plaintiff still have a

20   case if we won on the Dalbert issues, obviously, it depends

21   on which issues we win on and which we don't.

22            But let's focus first on proximate causation.

23   They need to show -- and we can disagree about what the

24   precise legal standard is, but they need to show that the

25   monies that were transferred by Credit Lyonnais customer

 1   CBSP somehow are proximately -- are causally related on a

 2   proximate basis to these attacks.

 3          They have no evidence on that, except for what is

 4   presented by the two experts, Mr. Spitzin and Dr. Levitt.

 5   And they are not percipient witnesses.

 6          THE COURT:  Excuse me for interrupting, but I

 7   think ultimately, because of the intertwined nature of the

 8   two motions, it may be most effective to just file

 9   essentially this letter, which would be a pre-motion letter

10   for a <u>Dalbert</u> hearing.  And really, there's no evidentiary

11   hearing here, I would think, because you've already deposed

12   all of these experts, in conjunction with your pre-motion

13   letters for summary judgment.  That way, the Court will see

14   it all laid out and figure out whether or not to stagger the

15   motions.

16          MR. FRIEDMAN:  And that goes to Judge Trager.

17          THE COURT:  That would go to Judge Trager.

18          MR. FRIEDMAN:  That's fine, Your Honor.

19          THE COURT:  I tried to talk to him about it but we

20   really -- I had to do some homework last night to just be

21   able to talk to you today, reviewing the file, and he really

22   has had less contact with this case than I have.

23          MR. FRIEDMAN:  That's fine, Your Honor.  I had

24   raised it now because Your Honor had said a year ago that

25   you wanted to ask us about that.  So if I understand the

1    Court correctly, when we filed our pre-motion letter on

2    summary judgment, which we still believe in the efficiency

3    of staggered briefing, we will propose that to Judge Trager

4    in our pre-motion letter.

5              THE COURT:  Right.  In hearing you -- both sides

6    make their arguments today, I think probably staggering

7    makes sense, but the staggering is not to determine the

8    Dalbert motion first.  It's to have you file your motion

9    first, have the plaintiff's response, and then you can file

10   your Dalbert motion.  At least appellate courts seem to

11   think that trial judges are able to sort out what's

12   admissible and what isn't.

13             MR. FRIEDMAN:  We will see how Judge Trager wishes

14   to sort it out.

15             THE COURT:  Right.

16             MR. FRIEDMAN:  My objective, if you'll pardon the

17   pun, is to avoid summary judgment briefs that are staggering

18   in themselves, by having staggered procedures where the

19   admissibility questions, the key admissibility questions

20   could be decided first.

21             But I hear Your Honor.  When we finish with the

22   contention interrogatories and then we agree on a schedule

23   thereafter, in our pre-motion letter to Judge Trager, again,

24   if we still believe in the wisdom of this procedure, we will

25   propose it.  And who knows; by then we may be able to come

1    to some agreement as to how to most efficiently present this

2    to Judge Trager.

3              THE COURT:  Okay.

4              MR. GLATTER:  That is fine with plaintiffs, Your

5    Honor.  Thank you.

6              MR. FRIEDMAN:  The last issue we have is Mr.

7    Shakhed's (ph) manuscript.  Your Honor, as I noted in nmy

8    letter Your Honor, and I hope that serves as the prod to

9    plaintiffs that it was intended to be, we have four other

10   letters with multiple document requests that were made of

11   plaintiffs' experts at their depositions, including

12   documents that we were previously told did not exist.  But

13   once we deposed witnesses, the witnesses confirmed they did

14   exist.

15             I haven't gotten any responses to those.  The one

16   I did was with respect to Mr. Shakhed's manuscript.  And Mr.

17   Glatter told me he won't produce the manuscript and,

18   frankly, Mr. Glatter asked me, did I have any authority for

19   the production of a manuscript.  I can't believe that's

20   serious.

21             One of the credentials that Mr. Shakhed touts is

22   that he writes books about Hamas.  Well, he has a new book

23   about Hamas, and I just can't imagine anyone seriously

24   saying that that manuscript is not discoverable.  It is

25   discoverable.  We're entitled to know what he's written for

1   publication that might be inconsistent with his opinions.

2            We've already found other articles and materials

3   he's written, where he expresses opinions that are

4   inconsistent with the opinions he expresses in this case.

5   Maybe the manuscript will generate further evidence in that

6   regard.  I don't think they need any more time, I don't

7   think I need to file a formal motion to compel, and I think

8   they should produce it.

9            MR. GLATTER:  Your Honor, just in brief response.

10  One thing that's important to reiterate regarding that

11  manuscript, which I may have mis-heard -- I didn't hear Mr.

12  Friedman mention, is that it presently is an unpublished

13  manuscript.

14           We actually spoke with the witness -- my

15  colleagues have spoken with the witness.  The manuscript is

16  still in progress.  He has not completed it yet and he

17  apparently still has several chapters to write.

18           So whatever -- setting aside the fact that, as I

19  mentioned in my letter, Mr. Shakhed's report did not reflect

20  that he either considered or relied upon his manuscript in

21  order to issue his opinions, and that is the standard for

22  disclosure at least reflect in 26(a)(2)(b).  So at best,

23  what we're talking about here is (ui) Rule 26(c) discovery.

24           We believe that it is prejudicial at this time to

25  force him to turn over something that's an unpublished,

1   private work in progress, which is not and has not been

2   testified (ui), on the sole ground of, essentially, we need

3   to probe it for consistency and bias.  And therefore, we ask

4   Your Honor that this is not the appropriate time to have

5   that produced, absent a stronger showing by the defendant.

6   They've had a full and fair opportunity to probe the bases

7   and the -- not only what he's relied upon but what he's

8   considered and perhaps not relied upon.  And they've had a

9   full, seven-hour deposition with him.

10          He has published books on Hamas in the past.  If a

11  later time comes and they believe it's appropriate after the

12  book is published, they will be able to obtain it and talk

13  to us at that time, if they think that there's some further

14  discovery they need when we put our final Rule 26(a)(3)

15  trial witness list together, then we can discuss it at that

16  time.  But it's premature now, Your Honor, and that's how we

17  see it.

18          MR. FRIEDMAN:  May I respond briefly?

19          THE COURT:  Go ahead.

20          MR. FRIEDMAN:  Just because an expert chooses not

21  to rely on something doesn't inoculate prior -- Your Honor,

22  I asked him on page 58 of his deposition transcript:

23          "Question:  Do you have a manuscript prepared of

24  that book?

25          "Answer:  Most of the chapters, yes.

1          "Question:  Does the book address what

2  organization was responsible for particular attacks?

3          "Answer:  We're talking about Hamas.  It's

4  ideology, changes of ideology.  We're talking about the

5  terrorist activity of Hamas vis a vis their ideology.

6          "Question:  So the book does not address the

7  question of whether or not Hamas was not responsible for a

8  particular attack?

9          "Answer:  I'm mentioning what Hamas did.

10          "Question:  Do you address in the book the

11  question of whether or not Hamas was responsible for a

12  particular attack?"

13          Mr. Glatter objected to the form.

14          "Answer:  Yes."

15          Whether he has five chapters done, ten chapters

16  done or 27 chapters done, the man has written something for

17  publication.  I'm entitled to get a copy of it.

18          MR. GLATTER:  Your Honor, again, I don't want to

19  belabor the point.  If and when the book is published, if

20  Mr. Friedman and his colleagues believe that there is

21  material in that book that permits them to cross-examine and

22  impeach Mr. Shakhed and matrix it against his report and his

23  deposition testimony, they will have an ability to do that.

24  It's an incomplete, unpublished manuscript.  It's not

25  something that he relied upon in issuing his opinions, it's

1    not something that he considered in issuing his opinions

2    because if he had, it would have had to have been listed

3    within his report.

4            MR. FRIEDMAN:  I left something out, Your Honor,

5    I'm sorry, just two questions and answers.

6            "Question:  You have this manuscript on your

7    computer?

8            "Answer:  But I'm not going to give it.

9            "Question:  We'll see.

10           "Answer:  I hope you will buy the book."

11           We shouldn't have to wait until it's published.

12   If it exists, it exists, and I'm entitled to see it.

13           MR. GLATTER:  Your Honor, under that standard, let

14   me give a (ui) contrast, for example.  One of the expert

15   witnesses that the defendant proposed as a rebuttal expert

16   is a gentleman by the name of John Barton (ph), who is a

17   partner I believe with Arnold and Porter, right?

18           MR. FRIEDMAN:  Yes.

19           MR. GLATTER:  Who offered certain opinions

20   regarding OFACT (ph) regulations.  He has published a series

21   of articles and bulletins and client bulletins.  Under the

22   standard that Mr. Friedman is elucidating today, in theory,

23   I should be entitled to know every bit of advice he's ever

24   given a client with respect to the OFACT regulations to

25   matrix whether it's consistent with the opinions he offers

1   in his report.  I should be able to obtain drafts of --

2         THE COURT:  Mr. Glatter, you know that there are

3   other considerations there.

4         MR. GLATTER:  Of course, Judge.

5         MR. OSEN:  Your Honor, if I may, just one point.

6   I don't want to belabor this more than we already have, but

7   since Mr. Friedman is quoting the transcript, on page 59 of

8   the transcript, he asks:

9         "Does it address any of the attacks that are at

10  issue in your report?"

11        And the answer the witness gave was, "No, because

12  I put all my emphasis on 1996, the two buses, number 18 and

13  then 1978 (ui), and then I'm going to other thing, not the

14  special operations of Hamas."

15        MR. GLATTER:  Then proceeded to explain what

16  special operations meant.

17        MR. FRIEDMAN:  The reason it's still important is

18  the following:  And if you want me to get into this in front

19  of Her Honor, I will.

20        In his report, among one of Mr. Shakhed's more

21  fantastic statements was, Hamas has never claimed credit for

22  an attack it did not commit.  At his deposition, I showed

23  him a book he published in 1994.  I think it was 1994, maybe

24  2004, in which he goes through in great length Hamas's

25  claims of responsibility at the highest levels of Hamas for

having committed a terrorist attack -- terrorist act.   In

that instance, it was the kidnaping of an Israeli officer.

        So the man said in his report in this case, Hamas

has never claimed credit for something that it didn't do,

which I'm sure the plaintiffs are going to rely on to say

that Hamas's claims of responsibility, although hearsay,

nonetheless should be admissible because they're reliable.

        We've already showed that in one of this man's

other books, he completely contradicted that broad

declaration.  I anticipate that I will find similar

contradictions in his new book, and whether they concern the

attacks at issue here or not doesn't matter.

        Finally, the man has in his c.v. as one of the

reasons why he is an expert in the field he purports to talk

about the fact that he's published two books.  He now has a

third one.  We should see it.

        THE COURT:  Tell me, if you find the draft to be a

trove of information, are you going to depose him further

and use that as further ammunition in any potential Dalbert

motion, or are you just simply going to use the information

to challenge his credibility?

        MR. FRIEDMAN:  I don't know what it says so I

can't say, Your Honor.  But the notion that the moment of

publication is somehow magical and someone can be impeached

only as of the date of publication but not before then is

preposterous.  The man said he has this manuscript, it's

going to be published, he identified the publisher.  The

notion that I should have to wait until the publisher

decides to release the book -- it's his writing.  Either it

is or it isn't.  And if he wants to say, well, yes, that's

in my draft but I was planning to take it out before it was

published, he can say that.

          But to me, it's just beyond question.  The man has

written something for publication.  He's purporting to

express opinions in the same field.  I'm as entitled to see

it as I am entitled to see something that has been

published.  No one would doubt it.  I doubt Mr. Glatter

would question it.  Of course, I'm entitled to see something

that a witness has published.  Well, if there's something

that he's written and it's on the eve of publication, it's

poised for publication, I'm entitled to see it as well.

          Plus, we have a protective order.  I can assure

Mr. Shakhed and I can assure Mr. Glatter that I'm not going

to ruin the market for his book.  I am not Julian Assange,

I'm not going to put it on the internet.  I'm not going to

somehow adversely impact his ability to sell this book.  We

can mark it under the protective order and I will not

disclose it to anyone, not even to my client.  But I'm

entitled to see it.

          MR. GLATTER:  Your Honor, just two points in

1   response and then my colleague, Mr. Osen, may have some

2   collateral points on this.

3          First, Mr. Shakhed's testimony made it quite clear

4   that when he referred to Hamas claiming credit, he was

5   talking about a particular type and category of claim.

6          Secondly, to reiterate, we're talking about an

7   unpublished manuscript that has not been completed, that

8   there are still chapters to write.  Mr. Shakhed has not

9   proffered his qualifications to testify in this case because

10  he has a book that will soon come out on the matter.  He

11  pointed out two books that he already has published, and

12  those have been disclosed.

13         He didn't say, nor should any expert to my

14  knowledge say, at some point, a publisher may agree to

15  publish the manuscript that we're still working through.

16  And, therefore, on that basis, I am qualified to testify as

17  an expert under the Federal Rules of Evidence.  That would

18  be a little strange.

19         And, again, recognizing also that Mr. Shakhed is

20  obviously not my client, there are privacy concerns here.  I

21  should add, Mr. Friedman did, when we had the discussion,

22  represent to me that they would keep it as a confidential

23  matter, and that's not a surprise and we appreciate that.

24  But it doesn't fully resolve the problem here.

25         And, again, if Mr. Shakhed was relying upon or

1    considering his unfinished work for his -- for these present

2    attacks, that would have been something to be disclosed

3    (ui).

4              MR. FRIEDMAN:  Mr. Glatter said something that

5    implicates another part of the deposition, so I'll just tell

6    Your Honor.

7              "Question:  Have you written a third book?

8              "Answer:  I'm in the process of finishing it.

9              "Question:  You're now in the process of finishing

10   it?

11             "Answer:  It will be on press in a few months.

12   But the last year, I didn't work on it, and I have to renew

13   my work now."

14             Again, the expert does not make the decision as to

15   what he can be impeached with and what he can't be impeached

16   with by putting it on his c.v. or not.  If his credentials

17   are -- in fact, in Mr. Glatter's letter to Your Honor on

18   Tuesday night, Mr. Glatter said, how can they say that Mr.

19   Shakhed is just a newspaper reporter; he's written a learned

20   treatise on Hamas.  Well, he's written a second learned

21   treatise on Hamas.

22             THE COURT:  I've heard enough.

23             MR. OSEN:  Your Honor, can I just add one thing

24   because it's practical.  I'm not getting into the (ui) of

25   this.

1          Mr. Shakhed, it's not really a secret, is also

2    going to be designated in the NatWest case as well.  He will

3    submit a report in that case as well.  So from simply a

4    practical standpoint, he will presumably be deposed in some

5    fashion in that case as well.  And at that point, his

6    manuscript may very well be at least, if not published,

7    final, to the point where, even if it hasn't come off the

8    presses, there may be a final version that doesn't reflect

9    drafts or changes or iterations he may make, but will in

10   fact be the unpublished, final manuscript.

11         At that point, you know, from my standpoint, I'd

12   like him to turn it over, just as I'd like his book to have

13   already been published, since it adds one more credential

14   and so on.  It seems to me that that's really the time at

15   which to worry about it.

16         THE COURT:  I think if we had another year of

17   discovery, I would agree with the plaintiffs, but we're

18   finishing up discovery.  I will require the draft to be

19   turned over.  It will be subject to attorney's eyes only and

20   it may or may not be useful.

21         But to the extent that there are any -- there is

22   any information there that you think would be relevant to

23   your Dalbert motion, then you can have a further deposition.

24   But otherwise, you will await the final publication, and I'm

25   going to require the defendant to buy a copy of his book --

1          MR. FRIEDMAN:  Thank you, Your Honor.

2          THE COURT:  -- when it is published.

3          MR. FRIEDMAN:  So I presume the plaintiffs will

4    give that over to us promptly, and they can mark it highly

5    confidential under our protective order.

6          The last item we have, Your Honor, is the only

7    item we --

8          THE COURT:  Wait.

9          MR. GLATTER:  I'm sorry, just on this point.  It's

10   a housekeeping matter but it's relevant to an upcoming

11   deposition.  We understand your order and we will

12   communicate with Mr. Shakhed immediately and arrange for

13   production.

14         THE COURT:  And then, obviously, if there is

15   questioning about the draft, that part will be sealed until

16   publication of the book.

17         MR. GLATTER:  That's understood and appreciated,

18   Your Honor.

19         The question that I have is -- and it actually may

20   be germane to another discovery issue that came up in Mr.

21   Coleman's deposition.  You asked Mr. Friedman quite

22   logically whether or not he intended to seek to re-depose

23   Mr. Shakhed on -- once the manuscript is produced.  And

24   understandably, Mr. Friedman said that he's not certain yet

25   because he hasn't had a chance to review it.

1          Next Thursday, we are scheduled to depose (ui)

2     Jenkins (ph).  He is a rebuttal expert that the defendants

3     have designated, who is seeking to rebut the opinions of

4     four of plaintiffs' experts; specifically, Mr. Shakhed, Mr.

5     Coleman, Mr. Spitzin and Mr. Levitt.  All four of them are

6     what we have described as attribution experts.

7          On the same score, during Mr. Coleman's deposition

8     -- and we haven't set this up -- we haven't advised Your

9     Honor of this yet but I'll let you know now.  There were two

10    requests that were placed to us at that deposition, which at

11    the deposition, we had not been able to agree to.  One of

12    them was a request for work that Mr. Coleman did for my firm

13    in a consultant capacity, in what I represented was an

14    unrelated matter involving (ui) litigation.

15         And the other item was a request that is a little

16    bit complicated and Mr. (ui) can I'm sure help fill in the

17    details of it, but a request that Mr. Coleman turn over his

18    -- a physical copy of his entire proprietary database,

19    rather than what we have turned over, which is voluminous

20    but is a narrow set of materials that he in fact looked at

21    and relied upon in issuing his opinion concerning the

22    authenticity and credibility of certain statements made by

23    Hamas.

24         I am very reticent to -- and I had some

25    discussions with defense counsel on this score -- to proceed

1  to depose a rebuttal expert going to two of my experts,

2  without knowing whether or not they do intend to reopen, for

3  example, Mr. Shakhed's deposition upon review of that

4  material, question him further.

5         And then at least I am in a position, from an

6  efficiency standpoint, to know the entirety of my witnesses'

7  testimony before I examine Mr. Jenkins.  And I think that's

8  fair and that's fairly standard.  Naturally -- and I should

9  add that Mr. Luft (ph) and I, for reasons unrelated to the

10 discovery request, did have some discussions generally as to

11 whether or not Mr. Jenkins's deposition could be postponed

12 past the 16th, until about the third week of January.  He

13 advised me that at that time, Mr. Jenkins's schedule didn't

14 permit it, and we continued to keep it calendared for next

15 week.

16         But it's almost inevitable that until we have

17 resolution of any further discovery and depositions that

18 we're going to be taking from our people, that I can't

19 imagine a scenario where it would be likely that we wouldn't

20 then want to reopen the deposition for a rebuttal expert

21 going directly to those opinions, including the specific

22 reasons why Mr. Friedman is very interested in seeing Mr.

23 Shakhed's manuscript.

24         So from a logistics standpoint, I think that it

25 would be appropriate, if it's going to be produced, that we

1   have some indication as to whether or not he is going to

2   seek to re-depose Mr. Shakhed.  It may be -- for example, if

3   Mr. Shakhed is going to be re-deposed on issues that weren't

4   covered already in the Credit Lyonnais case, one simple

5   avenue might be to then depose Mr. Jenkins after Mr.

6   Shakhed's testimony has been captured in both cases.  And

7   Mr. Jenkins, to the extent he feels he needs to issue a

8   supplemental report based on the additional material or the

9   additional testimony that may be elicited, I have no

10  objection to that.

11          Frankly, I think it would be a lot more efficient,

12  and I'll have the whole universe of information in front of

13  me, frankly in both cases, for us to be able to respond to

14  that.  As a matter of fact, with respect to the Coleman

15  issue, Mr. Coleman's report is actually captioned in both

16  cases.

17          So I hope Your Honor understands, and I apologize

18  for the lengthy narrative, the logistics concern we have,

19  and perhaps we can address that today, so that it's

20  equitable for all the parties.

21          MR. FRIEDMAN:  Your Honor, I'll let Mr. Luft fill

22  in the details about this logistics issue, but let me just

23  point out exactly what is going on here.

24          They failed to produce documents that they should

25  have produced.  Your Honor instructs them to produce the

1    documents.  And now they say, well, because we haven't

2    produced them yet and because you haven't seen them yet, and

3    because you may want to re-depose the author, we don't want

4    to take a deposition of the rebuttal witness next week.

5         That is the person who doesn't act properly and

6    fails to produce a document that they should have produced

7    trying to take advantage of it, frankly for a reason I don't

8    understand.  Mr. Glatter has been asking us for a week now,

9    can we put off Mr. Jenkins next week, can we put off Mr.

10   Jenkins next week?  Now I'm going to act like a plaintiff,

11   even though I'm a defendant.

12        Mr. Jenkins's deposition has been put off several

13   times.  Mr. Jenkins works in California.  Plans are in place

14   for Mr. Jenkins to come here and to be deposed next week.

15   Mr. Glatter keeps asking us, can't we put this off, can't we

16   put this off, and I don't understand why.

17        And now to say because Her Honor has said you can

18   see another document from Mr. Shakhed, and I don't know

19   whether you want to re-depose Shakhed again, although I

20   think Your Honor said we will question Shakhed again in the

21   NatWest case.

22        THE COURT:  Right.

23        MR. FRIEDMAN:  And although we learned --

24        THE COURT:  There will be no deposition of Shakhed

25   in this case unless it is purely to assist the defendants in

1    presenting their <u>Dalbert</u> motion.

2            MR. FRIEDMAN:  That's what I understood Your Honor

3    to say.  And now with Coleman, Mr. Luft deposed Mr. Coleman

4    last week, and we learned that he did consult parts of his

5    database that we previously got in a letter from Mr.

6    Glatter's colleague, saying that he did not consult.  So we

7    said now we're entitled to see the database.

8            Mr. Glatter -- Your Honor, in the middle of the

9    deposition, Mr. Glatter said, well, it looks like we've got

10   to produce the database, maybe we should continue the

11   deposition and you shouldn't finish.  And we said no, he's

12   here, we want to finish the deposition.

13           So they didn't produce the database, they

14   represented to us falsely that the full database was not

15   consulted.  Now it's clear, although we haven't raised this

16   before Your Honor yet in writing, as we'd like to, that we

17   are entitled to the full database, and the party that is in

18   the wrong for failing to produce the document now says,

19   well, if you're going to get the database, then maybe you're

20   going to get to depose my guy again after you look at it.

21   And, therefore, I shouldn't need to depose your guy next

22   week.

23           That's just wrong and it's also totally improper,

24   in light of the fact that Mr. Jenkins's deposition has been

25   adjourned repeatedly, there are arrangements in place for

1   him to be deposed next week.  He is one of the world's

2   leading counter-terrorism experts.  He travels the world as

3   you and I commute between Brooklyn and New York, and this is

4   just wrong.  This is just wrong.

5              MR. GLATTER:  May I respond?  First, I should --

6              THE COURT:  Let me just sort out in my mind what

7   it is that you're concerned about.  One is the premature

8   deposition of Jenkins because he might rely on information

9   yielded in any continued deposition of Shakhed?

10             MR. FRIEDMAN:  Their view is that we may want to

11  depose Coleman again.

12             THE COURT:  Okay.  I just want to sort out exactly

13  what it is Mr. Glatter is asking for.  Are you asking for a

14  delay in the deposition of Mr. Jenkins in part because of a

15  concern that if there is a continued deposition of Shakhed

16  based on whatever may excite the defendant over the

17  manuscript produced, that Jenkins may change his opinion and

18  want to -- so that you don't want to depose him on any

19  additional information regarding Shakhed that may influence

20  his opinion?

21             MR. GLATTER:  Your Honor, among other things, I

22  would want to know the entirety of the information that Mr.

23  Jenkins has considered for review before he is deposed.  And

24  given that he is -- whether it's Shakhed or any other

25  expert, that the defendants have put in discovery requests

1   which presumably they would ask their rebuttal expert to

2   evaluate, I'm entitled to know exactly what information is

3   elicited from my expert in that case before I go in to

4   question their rebuttal expert.

5          I should add, by the way, with respect to my most

6   recent request to adjourn Mr. Jenkins's deposition from next

7   Thursday to anytime between December 23rd and the 30th of

8   January, it's a fairly innocuous reason.  I explained that

9   my colleague, Mr. Osen, actually had to do some business

10  travel overseas that week, and if he could be accommodated,

11  that would be appreciated.  If not, then we would keep the

12  calendar as is.

13         I did not know how Your Honor was going to rule

14  with respect to Mr. Shakhed's manuscript, and you were

15  pointing out to Mr. Friedman the question as to whether he

16  will -- Mr. Shakhed will be re-deposed for any purpose,

17  whether it's limited to an assessment of Mr. Shakhed's

18  appropriateness under Dalbert standards or whether it's

19  testimony that might be elicited at trial, it's important

20  for me to know the entirety of that testimony before I am

21  deposing a gentleman who has been designed to rebut that

22  very witness.

23         With respect to Mr. Coleman, what I should point

24  out quite specifically -- there's a lot of nuance, but

25  during the course of Mr. Coleman's deposition, early on in

1  the first day -- it was broken.  We were given a two-day

2  period for nine hours to accommodate certain requests the

3  defendants had based on what we would describe as a sub-

4  database that had been produced to them, which constituted

5  the universe of material that Mr. Coleman looked at.

6      And upon his testifying that subsequent to reading

7  Mr. Jenkins's report, he reviewed and looked at some

8  additional materials, which he had not looked at at the time

9  he signed his report, during a break, I spoke with defense

10 counsel and I said, look, we're prepared to produce those

11 additional materials to you, the ones you didn't have

12 because he didn't know he'd be looking at them until he saw

13 the rebuttal report.

14      And in light of that, I made a recommendation that

15 we adjourn the deposition, that we make at least that

16 additional production of what he in fact looked at, and that

17 they could then continue it at a time that we would agree

18 upon, and then we would also meet with him for -- to come up

19 with a new and mutually acceptable date for Mr. Jenkins's

20 deposition.  That seemed to be in everyone's interest.  The

21 defendant declined that recommendation and that's what it

22 was entitled to do.

23      The defendants' larger request has been for Mr.

24 Coleman to produce a physical copy of his entire proprietary

25 database, which his testimony indicates includes very

1    sensitive information concerning on-line passwords that he

2    has, anonymous names he uses, often for work that has

3    nothing to do with this case but for consultancy work he

4    does, often for the United States government, military

5    commissions, et cetera.

6         We have tried to explore, and in fact made

7    representations to defense counsel, some ways of

8    accommodating their interest in knowing what the abstract

9    universe of material is in that database, without actually

10   turning a physical copy over.  Because it's -- the best

11   analogy I can come up with, Your Honor, is West Law.  Mr.

12   Coleman has a very large database with a lot of material.

13   He runs searches and he comes back with hits, and he looks

14   at what the hits are.  So just as you and I might run a

15   search on say all feds --

16        THE COURT:  I understand your point.

17        MR. GLATTER:  Therefore, we explored, for example,

18   again with the suggestion that perhaps the deposition be

19   postponed, so they had clarity and had transparency, once

20   the testimony made some things clearer, that we for example

21   come up with a way for them to propose searches they would

22   like the witness to run, to personally observe, and then

23   once they've done that, they could continue the deposition.

24        At that time, they declined that suggestion.  I

25   suggested other -- that they could come to us with any

1    alternatives with respect to -- short of turning over a

2    physical copy of two terrabites of data, much of which he

3    did not look at and has not looked at for this case, and to

4    date, we haven't been able to come up with any understanding

5    there.

6         But because that issue looms out there and because

7    these are two very important witnesses with respect to the

8    plaintiffs' case, as highlighted by the very fact of the

9    sequencing that Mr. Friedman requested, that brought us

10   before Your Honor today on that ground, again, it's a

11   housekeeping matter but an important one that we'd like to

12   get some guidance from Your Honor on.

13        My view of it is that we should run those issues

14   down with our experts.  To the extent that the scheduling

15   logistics can be accommodated for the NatWest schedule as

16   well, where as Mr. Osen pointed out, these experts either

17   have (ui) reports in both cases or will shortly be producing

18   additional reports, that seems to be one vehicle of handling

19   it.  There may be other ones.

20        But I suggest to Your Honor that if there is a

21   significant chance that they would want to re-depose or re-

22   open the depositions of our case in chief experts, it is

23   appropriate that we know that decision, have that testimony

24   scheduled and taken, and thereafter, depose the rebuttal

25   expert, rather than what will inevitably be a seriatim re-

1   deposition of the rebuttal expert.  Thank you.

2              MR. MOSKOWITZ:  Your Honor, if I may respond

3   because, unfortunately, there are just certain falsehoods in

4   what Mr. Glatter just said.

5              He keeps talking about, this is a nuanced issue.

6   There's not much nuance here.  Mr. Coleman has a database

7   where he keeps -- downloads things from the internet that he

8   finds about terrorism.  He used this database, as he said in

9   his report, to find materials that he used to give his

10  report.

11             When I read this, I called Mr. Glatter and his

12  firm and I said, we're going to need to see this database

13  because if he's relying on this and if he's going to testify

14  that there is and is not information that he's forming his

15  opinions on, including, well, I didn't find anything of this

16  so I don't think anyone ever said anything like this, that's

17  certainly going to be relevant to me and I'm going to need

18  to know that.

19             Then over a period of time, it's set forth in

20  letters, information sent to me saying, no, he did not

21  search his entire database, he absolutely did not look in

22  his other files, he just looked at his Hamas files.  Then I

23  sat down and I said, okay, but when I depose him, I don't

24  want to find out something different because it's going to

25  cause a huge problem.

1          We set it down for his deposition.  I asked him

2     and one of the first things he said to me was, oh, no, you

3     can't just search part of my database, you have to search

4     all of my database.  And in doing so, he said, and because I

5     searched my entire database, I know I didn't get any hits

6     from PIJ, which is Palestinian Islamic Jihad, I know I

7     didn't get any hits from Al Aksa (ph).  And I said to him,

8     well, how can I know that from the material you gave me?  He

9     goes, you can't.  I said, so I just have to take your word

10    for it?  He goes, I guess so.

11         This is the exact issue which I highlighted to

12    them was the exact concern I have.  Now, the fact that after

13    he read Mr. Jenkins's report and Mr. Jenkins pointed out

14    that he never -- based on what he said, never did any work

15    to consider if anyone else claimed responsibility for these

16    attacks, Coleman, that he now -- Coleman went back after the

17    fact and did a separate search is not the issue.  I didn't

18    ask for the materials that he looked at before after he his

19    report, I wanted to know what he looked at for his opinion.

20         And that goes directly to the issue of postponing

21    Mr. Jenkins's deposition.  Mr. Jenkins wrote a rebuttal

22    report to the opinions that Mr. Shakhed and Mr. Coleman

23    offered in this case.  That's what they wanted to depose him

24    on.  Now, instead, they're trying to use their failure to

25    produce as a sword.  What they're saying now is, even though

1    certainly none of Mr. Jenkins's opinions are informed by

2    this information he's never seen and the manuscript he's

3    never seen or a database he didn't have access to, they

4    should be able to now put off his deposition, which

5    conveniently coincides with another request they have to put

6    off his deposition, so that they can then go forward and see

7    if, based on what we find, which as Mr. Friedman said,

8    largely goes to impeachment, or if there's other

9    information, we might have to depose him again.

10          Even if we did feel the need to depose, for

11   Dalbert reasons, these individuals again, it wouldn't change

12   what Mr. Jenkins's opinion is.  If, for some reason, after

13   seeing all this, Mr. Jenkins feels the need to supplement

14   his opinion, that's something else, but that's four steps

15   removed and certainly nothing that should affect the fact

16   that he's ready to be deposed next week on the opinion he

17   offered in this case.  And the fact that they failed to make

18   adequate production of materials they should have produced

19   before he gave his opinion certainly shouldn't enure to

20   their benefit, so they can put off his deposition now.

21          THE COURT:  Look, I don't want to hear anymore.

22   I've heard enough.

23          Two terrabites is an incredible amount of data.

24   You haven't provided any information on how that database is

25   kept.  Obviously, I don't think the defendant would object

1  to withholding any personal documents, passwords and

2  contracts.  You'll provide a list of documents that are

3  really essentially personal documents, documents relating to

4  -- that might be confidential work that he's performed for

5  another client.

6          In many databases -- in most computers, you can

7  search for documents by dates of accessing.  Is that

8  possible?

9          MR. GLATTER:  Your Honor, the answer is, I don't

10  know.  We did provide the defendant with a substantive (ui)

11  a sworn declaration by Mr. Coleman, describing in techno-

12  language that I don't personally understand the protocols as

13  to how material gets on the general database, and from

14  there, how he created a sub-database of the specific

15  materials that he relied upon to discover whether or not

16  (ui) what he describes as authentic (ui) claims of

17  responsibility, to whether or not those claims of

18  responsibility are credible and reliable.  And at his

19  deposition, Mr. Coleman explained what he meant by credible

20  and reliable.

21          Without burdening Your Honor with a subjective

22  summary of the deposition, there was limited questioning as

23  to sort of the overall protocols of how -- exactly how

24  information gets in there and how the search -- how one goes

25  about searching.  The practical point is, once the request

1    came up, once it became clear that at least as to the

2    rebuttal expert's report, that Mr. Coleman had done

3    additional searching through his database to identify

4    information (ui), if something had come back to him, he

5    would have looked at it.  I believe his testimony was that

6    he didn't get any hits through these two other terrorist

7    organizations' material.

8         That's when I proposed early on, to avoid the kind

9    of issues that I was concerned about, that we adjourn the

10   deposition, that we meet and confer further, and that we

11   arrange for additional discovery of Mr. Coleman, which he

12   was amenable to doing.  Mr. Coleman is presently overseas, I

13   believe in Bosnia.  And, frankly, I would have to speak with

14   him.  I understand Your Honor's direction in terms of how

15   material gets redacted, two terrabites of data, how it's

16   indexed and whether or not he's able to easily identify what

17   materials would be problematic and what the redaction

18   protocols would be.

19        That's a subject for another discussion, probably

20   one that we need to have some people with greater

21   technological facility than me.  But, again --

22        THE COURT:  If there are documents that he never

23   accessed, that he hasn't accessed in the last three years, I

24   would think that there's absolutely no relevance to his

25   opinion.

1          MR. GLATTER:  Well, I think --

2          THE COURT:  So I think you need to confer with him

3    and perhaps -- just go forward with the deposition.  The

4    defendant can find out how that database is organized and

5    then deal with the production subsequently.  But to narrow

6    it to what he conceivably may have looked at and not

7    considered, because that happens, I'm sure.

8          MR. GLATTER:  Once I get in touch with him -- Your

9    Honor's point is if you think it's appropriate for Mr.

10   Coleman to sit for further deposition so that the defendant

11   has additional time to explore the sort of global universe

12   of information that's within his database and how that

13   thereafter relates to what he ultimately extracts out of it

14   to review and reach the opinions he has, I'm sure we can

15   reach that arrangement.

16         I think it's very important, though, for me to

17   know that testimony, which I can't predict.  I'm not the

18   witness.  Before I depose a rebuttal expert, because it's

19   very important for me to know whether their rebuttal expert

20   understands what Mr. Coleman has done, has not done, what he

21   is opining, what he's not opining, what his methodology is

22   and isn't --

23         THE COURT:  Well, in the first instance, you have

24   to produce those additional documents that he did look at.

25         MR. GLATTER:  Yes, and we've represented -- yes,

1   and we --

2          THE COURT:  You have to produce them now, so that

3   to the extent that counsel is going to forward it to Mr.

4   Jenkins, which I assume will be the case, then you can

5   question Jenkins about it.

6          MR. GLATTER:  Absolutely.  Specifically in terms

7   of materials that he -- what I'll call his files (ui)

8   Islamic jihad and Al Aksa Martyrs Brigade, we made an

9   affirmative representation on the record that Mr. Coleman

10  would create a DVD of those specific files.  He would

11  extract them out of his general database and forward it to

12  the defendants.  I will get in touch with him and let him

13  know that that needs to be done promptly.

14         MR. MOSKOWITZ:  Your Honor, and if Mr. Jenkins,

15  after receiving that material, supplements the expert report

16  that he served on them months ago, then we will cross that

17  bridge when we come to it.  But as Mr. Luft said, they're

18  now trying to use the fact that they did not produce what

19  you're now telling them they need to produce, and the fact

20  that Jenkins has not yet considered it as a basis to put off

21  Jenkins's deposition for next week on the report that he

22  served months ago and has been set for a long time and we

23  have this window in Mr. Jenkins's travel schedule, where

24  he's going to be deposed next week.

25         Your Honor should not allow them to put off Mr.

1    Jenkins's deposition for next week on the contingency that

2    when they produce what they should have produced months ago,

3    he may supplement his report based on that additional

4    information.  If that happens, we'll deal with it at that

5    time.  But to say that Mr. Jenkins's deposition on his

6    report from months ago should be adjourned because they

7    failed to produce something just has thing completely

8    backwards.

9            MR. GLATTER:  Your Honor, I'm prepared to, if Your

10   Honor thinks it make sense, obviously to keep the deposition

11   calendar for next week.  The concerns that are driving this

12   are what I've laid out in the last several minutes, the fact

13   that we now have a service date for contention

14   interrogatories and a response date for those contention

15   interrogatories, which will, among other things, touch upon

16   expert evidence presented by both sides.

17           I want to avoid the prospect of seriatim

18   depositions and continually coming back for a need to reopen

19   it, which has happened more than once in this case.  I'm not

20   casting any aspersions on why it's happened but it has

21   happened, and recognizing that this is a situation that is

22   fraught with that risk.  I wanted to identify for Your Honor

23   -- again, I think that it most likely makes sense to make

24   sure that our case in chief experts that are being rebutted,

25   that their testimony is fully captured.  If Your Honor

1    thinks that it makes sense to continue the structure as it

2    is, then obviously, we'll proceed.

3           THE COURT:  Obviously, the defendant is at risk in

4    having to produce a supplemental expert report by Jenkins

5    and to produce him for a deposition.  You're on a very tight

6    schedule, I agree.

7           MR. FRIEDMAN:  Right.  The point is, Your Honor,

8    that it's their production failure and this is the bed they

9    made, and they should lie in it.

10          THE COURT:  Look, it may or may not be quite as

11   significant.  I'm not prepared to say any more about that.

12   Get the documents produced right away.  See if he can

13   produce documents that he accessed within a given time

14   period.  You can discuss what is an appropriate time period.

15          MR. GLATTER:  Your Honor, I should say, he has

16   produced all documents that he reviewed out of his database.

17   In other words, if he runs a search for whatever the search

18   parameters are -- and they -- we certainly invited them to

19   ask him, what searches did you run?  I don't believe those

20   questions -- what were the specific searches that you ran.

21   I don't believe that was asked.  He didn't state it.

22          THE COURT:  Well, taking your analogy, like West

23   Law, you get a lot of hits.

24          MR. GLATTER:  Right.

25          THE COURT:  And probably 50% of the cases you

1    find, you discard.  But you may wade through them a little

2    bit before deciding to discard.  So those documents that you

3    don't want to consider may or may not be relevant.

4             MR. GLATTER:  And I should add, we've already

5    produced what I've described as a sub-database.  That

6    database included all the documents that were provided and

7    appendixed to his report, all the documents that are in what

8    he describes as his Hamas file, in terms of his database's

9    protocol, which include a much larger universe of material

10   concerning Hamas in various ways that don't -- that he

11   didn't actually consider or rely upon with respect to his

12   opinions on the 18 specific attacks that his report related

13   to.

14             So already, we actually did produce, in accordance

15   with the kind of scenario that Your Honor just described.

16   What we're talking about here is if, again, the question is

17   whether or not typing in the search terms -- that runs back

18   also hits for an attack issued in a file that -- it may be

19   in a file that he has for the Al Aksa Martyrs Brigade, for

20   PIJ, for Al Qaeda, for the Fark (ph) in Colombia.  That's a

21   different issue.  That wasn't what he was asked to do.

22             And that fundamentally drove -- why I don't want

23   to characterize this as a production failure on our part --

24   why we explained to them originally why Mr. Coleman was not

25   prepared to turn over a physical copy of his entire

1    database, as opposed to already having gone to considerable

2    effort to provide these sub-database materials and is

3    actually much larger than what he's considered, relied on or

4    physically looked at, in terms of arriving at his opinions.

5         MR. FRIEDMAN:  Your Honor, I just think we've had

6    more than enough and I just want clarity as to the documents

7    that they are going to produce because -- and I want to be

8    clear.  He produced to us a file which had his Hamas

9    material.  My concern has always been that if you take off

10   the blinders and don't look just at Hamas, that there are

11   other things.  And this is what he told me at his

12   deposition, that in fact, whatever other material he had on

13   other terrorist groups, those are the searches that I would

14   like to know.

15        I would like to know -- there are 15 attacks in

16   question.  We certainly have a question -- there's a

17   question before this Court of who committed those attacks.

18   If there's any material in this database that he would have

19   looked at which would have related to who committed these 15

20   attacks, it's relevant.

21        Moreover, Your Honor, I don't believe Mr. Coleman

22   is a qualified expert, for reasons we set forth in our --

23   I'm not going to get into that.  But the point is, the basis

24   that he sets himself forth as an expert for the most part is

25   the quality of this database and the materials that he has.

1  That is what he cites as the reason that he has expertise.

2  Certainly we should be able to know what's in there.

3          THE COURT:  As I suggested, he'll obviously

4  produce promptly the data that he claims he did look at.

5  And what I would suggest as a guide is to just include with

6  those documents any documents he accessed in that same time

7  period.

8          MR. GLATTER:  I guess part of the confusion is

9  access.

10          THE COURT:  Well, I think most computers can do

11  that for you.  They can sort out the files.  In fact, that's

12  one of my --

13          MR. GLATTER:  My understand is -- and, again, I

14  would just ask Your Honor's permission to at least confer

15  with the witness and the requisite technical people.  My

16  understanding is it's not so simple as -- it's not like West

17  Law, where you say, I'm going to limit my search to all feds

18  and put a restriction (ui).

19          THE COURT:  Well, I assume this is a fairly recent

20  review by him.

21          MR. GLATTER:  The review -- there were two

22  reviews, as I understand it.  One was the review he did

23  looking for authentic -- what he describes as authentic

24  Hamas claims of responsibility, which he conducted that

25  review before he issued his report in I guess it was July.

1   It's clear that at that time, he did not conduct a review

2   for authentic PIJ claims of responsibility, authentic Al

3   Aksa Martyrs Brigade claims of responsibility.

4          If the defendant believes that his decision not to

5   do so and the search protocols that he did somehow impact

6   the reliability of his methodology, then that's an argument

7   that they can make.  It's one that is somewhat indicated in

8   their rebuttal expert's report.

9          But he didn't do -- it was only when Mr. Jenkins

10  issued a report that commented about what he described as

11  potentially competing claims of certain attacks, that at

12  that time, Mr. Coleman then ran a search, put in restrictors

13  that would have at that point allowed his database to pop up

14  -- obtain hits, had their been any, for authentic claims of

15  responsibility from the Al Aksa Martyrs Brigade and PIJ for

16  particular attacks, Mr. Coleman testified he didn't get any

17  hits back.  So what he did is he ran a search through the

18  database that would have identified if those organizations'

19  web sites had come back with hits to him.  He didn't find

20  anything and he testified as such on the record.

21         That's a different issue, in other words, than

22  turning over two terrabites of data that include all the

23  information on Al Qaeda --

24         THE COURT:  I'm not going to require the full

25  database --

```
 1              MR. GLATTER:  I'm sorry?

 2              THE COURT:  I'm not requiring the full database to

 3    be turned over.

 4              MR. GLATTER:  Thank you, Your Honor.

 5              THE COURT:  I'm proposing -- and I think it is

 6    possible.  You pick a date, whether it's from the date of

 7    the first report or from Jenkins's report, and see if you

 8    can fish out all the documents that he accessed in the

 9    database, carving out whatever truly proprietary and private

10    documents, or you make another proposal as to how to get to

11    the documents.

12              MR. MOSKOWITZ:  Relating to his opinions and

13    representations in this case.

14              MR. FRIEDMAN:  But, Your Honor, that begs the

15    question.  The man has a database, he runs a search through

16    the database.  Several of the attacks, as Mr. Shakhed

17    concedes, competing terrorist groups made competing claims

18    of responsibility for several of the attacks here.  We're

19    entitled to know what it is in Mr. Coleman's database

20    relating to that.

21              Every time Your Honor rules, Mr. Glatter pipes up

22    and says but this, but this, but this.  We're entitled to

23    know what is in his database relating to the groups that are

24    at issue here, and it's not just Hamas.  We don't want data

25    about Colombian terrorists, we don't want data about Bosnian
```

1    terrorists.

2          We should try to talk this through, but Mr.

3    Glatter keeps trying to slip words to Your Honor, to get

4    Your Honor's agreement, to suggest that we're only entitled

5    to see the parts of the database that Mr. Coleman relied

6    upon, and I think Your Honor has made clear that the

7    standard is not what he relied upon, it's what he accessed.

8    And, therefore, we're entitled to the parts of the database

9    that are relevant to the analysis he purported to do with

10   respect to the 15 attacks at issue here.

11         And that is not, not limited to what he actually

12   relied upon because, Mr. Glatter, if it were, you would not

13   be agreeing to produce anything more, and you are agreeing

14   to produce something more.  It's what he accessed that is

15   relevant to the analysis that he did here.

16         MR. GLATTER:  I don't want to beat what is

17   probably now a very dead and tired horse on the subject.

18   Probably what makes the most sense is, I think defense

19   counsel and plaintiffs' counsel should sit and confront

20   exactly what the universe of material is that is appropriate

21   to produce, and then we can confirm with Mr. Coleman, among

22   others, to find out from a technological standpoint the

23   turnaround time to extract and produce it to them, because

24   clearly Your Honor agrees.

25         The only request that was on the table and why

1   I've had to raise this has been, have him produce a physical

2   copy of the entire two terrabites of data.  Presumably,

3   they're willing to discuss redaction in some sense of the

4   material that's within there.  I don't know how one does

5   that.  And in light of the fact that that was the proposal,

6   that was the request that was made, and for the reasons I've

7   explained today and Mr. Coleman's own reasons, we didn't

8   believe we were in a position to literally turn over several

9   DVD's that constitute the entire database, I presented the

10  issue today.

11           There is a -- what we have represented on the

12  record is, whatever the files are that Mr. Coleman would

13  have targeted with respect to his review of materials issues

14  in Mr. Jenkins's report, even though he didn't get back any

15  hits, we'll turn it over.  They will basically have his PIJ

16  and his Al Aksa Martyrs Brigade files.

17           There may be some larger universe of material that

18  Your Honor believes is appropriate for the defendant to have

19  access to, to review, to have their rebuttal expert review,

20  to see whether or not it supports or perhaps detracts from

21  the current opinions that he's offering.  And it probably

22  makes sense for us to have a discussion about that, to see

23  if we can agree on those parameters.

24           Unfortunately, like I said, the only request that

25  was on the table was for physical production of the whole

1    thing, and that's problematic.  Your Honor recognizes that,

2    and I think I do -- I think with all due respect, Mr.

3    Coleman deserves to be consulted on this, so at least he has

4    an idea and can give an honest representation as to what the

5    turnaround time would be for that, because it's his

6    database, it's his proprietary search engine that extracts

7    material out of it.  I don't even know how to spell it, let

8    alone how it works, so that's a discussion that needs to be

9    had, and he's in Bosnia right now.

10            MR. FRIEDMAN:  We'll discuss that with plaintiffs,

11   Your Honor, although it's their expert and --

12            THE COURT:  Well, I have to say, to the extent

13   that your expert will be able to utilize their expert's

14   database to beef up his opinion, I am a little concerned

15   because, you know --

16            MR. FRIEDMAN:  He's not going to do that, Your

17   Honor.

18            THE COURT:  That's right.  The real question is,

19   what Mr. Coleman accessed.

20            MR. FRIEDMAN:  Exactly.

21            THE COURT:  I think it's possible.  The problem is

22   that -- my main concern is that the data that's stored on

23   the computer will only show the last date that information

24   was accessed and not necessarily -- if information was

25   accessed more recently, we don't know whether or not it was

1  accessed in July or August.  But you'll discuss what's

2  technologically feasible and what's a good way to get the

3  information that would give you some sense of what Mr.

4  Coleman did look at.

5         MR. FRIEDMAN:  And if Mr. Jenkins thereafter

6  supplements his report and looks at this and feels it's

7  necessary to supplement his report and there has to be

8  another deposition, we'll deal with that.  To pick up Mr.

9  Osen's theme earlier with respect to Mr. Shakhed, maybe by

10 then, we'll be into the NatWest expert discovery.  But,

11 again, we'll go forward with Mr. Jenkins's deposition next

12 week.  We'll consult with them about what the possibilities

13 are to define what we need and what we're entitled to from

14 Mr. Coleman's database.  And if we can't reach an agreement

15 on that, we will try to set up a call with Your Honor.

16        On one last point in the Credit Lyonnais cases, so

17 that I don't need to run back to Your Honor right away

18 necessarily, again, as I noted in my letter yesterday, we've

19 written five letters to plaintiffs about documents we need

20 from their experts.  The only objection we've gotten so far

21 is -- concerns Mr. Shakhed's manuscript, on which Your Honor

22 has now ruled.

23        Mr. Bonner's firm gave us all the documents we

24 asked for with respect to Mr. Naim, but we have four letters

25 outstanding, dating back to October 27, relating to Mr.

1   Berjeras (ph), Ms. McCloud (ph), Mr. Shakhed as well.  The

2   fourth witness -- the subject of the letter -- Mr. Gross as

3   well.

4           Again, I don't need a date from Mr. Glatter today

5   but, again, these letters date back to October 27 and I

6   would like responses, either with objections that I can

7   bring to Your Honor or with the documents themselves.  We've

8   got to get moving.  Again, I don't want to sound like a

9   plaintiff, I'm a defendant, but we've got to get moving.

10          MR. BONNER:  My only response, Your Honor, is that

11  they vary in degree of complexity.  Mr. Friedman is entirely

12  correct that you're entitled to answers.  And as soon as we

13  hear back from all precincts, we will do so as quickly as

14  possible.

15          THE COURT:  I don't quite appreciate what you're

16  saying.

17          MR. BONNER:  Well, for example, Your Honor, some

18  things are not necessarily in the possession of the expert,

19  but they've made inquiries as to whether they can obtain a

20  copy of a record.

21          THE COURT:  All right.

22          MR. BONNER:  So we're just trying to put our

23  answers in as completely and as fast as we can.  He correct

24  that he's entitled to responses.  We're just trying to put

25  it all together.

1          THE COURT:  Well, could I ask you perhaps to come

2    up with objections sooner?

3          MR. BONNER:  Absolutely.

4          THE COURT:  That way, to the extent that there are

5    any disputes, they can be framed fairly quickly and

6    addressed.

7          MR. BONNER:  To sort of put a little disclaimer

8    in, since there are different lawyers working on each one of

9    them, I don't want to presume to represent as to the total

10   universe.  But my best understanding is that for the most

11   part, they're not objections.  I will try and identify from

12   my co-counsel whether there are any specific issues.  We'll

13   raise them Mr. Friedman.  For the rest, it's a logistical

14   question.

15         THE COURT:  Okay.  So you'll raise it -- you'll

16   discuss objections that you may have to the requests within

17   -- today is the 9th, so by the 23rd.  That gives you two

18   weeks.

19         MR. BONNER:  Yes, absolutely, Judge.

20         THE COURT:  Okay.

21         MR. FRIEDMAN:  Finally, Your Honor, I have here

22   the new scheduling order, proposed scheduling order, to

23   which the parties have agreed --

24         THE COURT:  Okay.

25         MR. FRIEDMAN:  -- in the NatWest cases --

1              THE COURT:  Okay.

2              MR. FRIEDMAN:  -- which I can hand up or Mr.

3    Schlanger can hand up.  And this is the schedule to which

4    the parties have agreed for the completion of all discovery

5    in the NatWest cases.  Fact discovery is done.  We're going

6    to exchange the first round of expert reports at the end of

7    this month.  Again, this is on the understanding -- my

8    understanding from Mr. Schlanger as confirmed this morning,

9    that we're not going to get the thousands of pages of

10   foreign language documents that we haven't seen before, so

11   that we can move rapidly to rebuttal reports and

12   depositions.  The schedule should be workable.

13             THE COURT:  I don't know how many of these orders

14   I've signed.

15             MR. GLATTER:  It's always good to be optimistic,

16   Your Honor.

17             THE COURT:  Okay.  I see an end date, so I'm

18   happy.

19             MR. FRIEDMAN:  Thank you, Your Honor.

20             THE COURT:  Anything else?

21             MR. FRIEDMAN:  We wish the Court a good holiday.

22             THE COURT:  Yes.  Just to have some sort of

23   control date, once you get the responses to the RFA's and

24   the contention interrogatories, which was now set for March

25   28th, the next step, I would assume, would be the pre-motion

1    letters.

2            MR. FRIEDMAN:  Right.  I think perhaps --

3            THE COURT:  Does it makes sense to set the date

4    now or do you want to propose -- send me a letter regarding

5    the dates within a week or so after you get the responses?

6            MR. FRIEDMAN:  I think the parties will agree on

7    dates for exchanging pre-motion letters after March 28th.

8            MR. GLATTER:  Yes.

9            THE COURT:  Okay.  Let me just put a date so we

10   can subtract --

11           MR. FRIEDMAN:  She we have -- if Your Honor does

12   not mind, should we set a date for a telephone conference

13   promptly after March 28th, so we can tell Your Honor exactly

14   what we propose to do?

15           THE COURT:  That's fine.  That may be easier.

16           MR. FRIEDMAN:  So anytime the week of April 4th?

17           THE COURT:  April 4th.  Okay.

18           MR. GLATTER:  Right now, that looks fine.

19           THE COURT:  Okay, let me call up.  I forgot to

20   bring my calendar.

21           MR. GLATTER:  I'm just checking our calendar

22   for --

23           (Pause in Proceedings)

24           THE COURT:  The 6th?

25           MR. FRIEDMAN:  That's okay.

1          MR. GLATTER:  The 6th is fine, Your Honor.

2          THE COURT:  You pick a time.

3          MR. GLATTER:  If it's going to be a telephone

4    conference, I'm pretty flexible.  Should we keep it at

5    11:00?

6          THE COURT:  Well, if you're flexible, let's have

7    it a little earlier.  I like to get --

8          MR. GLATTER:  9:30, Your Honor, 10:00?

9          THE COURT:  9:30?  Good.

10         MR. FRIEDMAN:  Thank you, Your Honor.

11         MR. GLATTER:  Thank you, Your Honor.  Have a good

12   holiday.

13         THE COURT:  You, too.  And then at the next

14   conference, we'll discuss our next date for the Weiss cases.

15         MR. FRIEDMAN:  Thank you, Your Honor.

16         MR. GLATTER:  Thank you, Your Honor.

17                   *  *  *  *  *  *  *  *  *

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18     I certify that the foregoing is a correct transcript

19 from the electronic sound recording of the proceedings in

20 the above-entitled matter.

21

22

23

24

25 ELIZABETH BARRON                    December 13, 2010