UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK


TZVI WEISS, et al.,             *    Case Nos. 05-CV-4622(DLI)
                                *              07-CV-0916(DLI)
            Plaintiffs,         *
                                *    Brooklyn, New York
     v.                         *    September 15, 2011
                                *
NATIONAL WESTMINSTER BANK,      *
                                *
                                *
            Defendant.          *
                                *
  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

          TRANSCRIPT OF CIVIL CAUSE FOR MOTION HEARING
               BEFORE THE HONORABLE MARILYN D. GO
                UNITED STATES MAGISTRATE JUDGE

APPEARANCES:


For the Applebaum Plaintiffs: JOEL ISRAEL, ESQ.
                              Sayles Werbner
                              1201 Elm Street
                              Dallas, TX  75270


For the Weiss Plaintiffs:    JOSHUA GLATTER, ESQ.
                             AARON SCHLANGER, ESQ.
                             Osen LLC
                             700 Kinderkamack Road
                             Oradell, NJ  07649


For the Defendant:           LAWRENCE B. FRIEDMAN, ESQ.
                             AVI E. LUFT, ESQ.
                             Cleary Gottlieb Steen &
                              Hamilton, LLP
                             1 Liberty Plaza
                             New York, NY  10006


Proceedings recorded by electronic sound recording,
transcript produced by transcription service.


**Fiore Reporting and Transcription Service, Inc.**
**4 Research Drive, Suite 402**
**Shelton, Connecticut 06484 (203)929-9992**

2

1          (Proceedings commenced at 2:11 p.m.)

2          THE CLERK:  Civil cause for motion hearing,

3   Weiss, et al. vs. National Westminster Bank, docket no. 05-

4   4622, Applebaum vs. National Westminster Bank, PLC, docket

5   no. 07-916.

6          Counsel, please state your appearances for the

7   record starting with plaintiff.

8          MR. ISRAEL:  Good afternoon, Your Honor. Joel

9   Israel from Sales Werbner here on behalf of the Applebaum

10  plaintiffs.

11         MR. GLATTER:  Good afternoon, Your Honor. Joshua

12  Glatter, OSEN LLC, on behalf of the Weiss plaintiffs.

13         MR. SCHLANGER:  Aaron Schlanger, OSEN LLC, on

14  behalf of the Weiss plaintiffs.

15         MR. FRIEDMAN:  Lawrence Friedman, Cleary Gottlieb

16  Steen & Hamilton, n behalf of National Westminster Bank.

17         MR. LUFT:  Good afternoon, Your Honor.  Avi Luft

18  of Cleary Gottlieb Steen and Hamilton, LLP on behalf of

19  National Westminster Bank.

20         THE COURT:  Okay. Thank you.

21         Well, we have two motions to deal with.  I've

22  looked at the submissions.  They are, thankfully -- the

23  motions to compel contention interrogatories are thankfully

24  shorter than the last set I had to deal with, so I'll just

25  go through them.

1          Is there anything that the attorneys want -- if

2     you want to have a short argument before I blab on with

3     what my impressions are, I'll give you an opportunity to

4     speak.

5          So I have no preference. We'll start with the

6     defendant's motion to compel.

7          MR. FRIEDMAN:  Sure, Your Honor.

8          THE COURT:  Is there anything you want to add to

9     your papers?

10         MR. FRIEDMAN:  The only thing I would say, Your

11    Honor, very briefly, subject to any questions Your Honor

12    has, is that we chose a template for our interrogatories

13    very deliberately, which is if you contend -- do you

14    contend X?

15    And if you contend X, then tell us the basis for that

16    contention.

17         And the plaintiffs have now told us in their

18    August 26th letter that there are things that we're asking

19    about that they say they have no idea about one way or the

20    other and they also say we can have no idea about one way

21    or the other, and that is the question of what was within

22    the knowledge of the U.K. law enforcement and regulators.

23         And if that is so, as I've explained to

24    plaintiff's counsel, then merely say we're not making that

25    contention.

4

1          And if they say they're not making that

2     contention, then they don't have to say anything more.

3          But if they are making that contention, they

4     can't have their cake and eat it too.  They can't say we

5     are making a contention, but we're not going to tell you

6     what underlies it.

7          And that is the unifying principle between the --

8     unifying principle that runs through three of the

9     contention interrogatories at issue; 17, 18 and 24.  Each

10    of them asks are you contending X with respect to the

11    information that was available to the U.K. law enforcement

12    agencies and regulators in relations to NatWest and respect

13    to 24, the question is are you contending that the U.K.'s

14    decision not to sanction Interpal, or not to bring charges

15    against Interpal, was based on anything other than the

16    merits?

17         And this is extremely, important, Your Honor,

18    because we are going to argue -- and again, this has

19    nothing to do with any notion that these claims are

20    precluded because the U.S. and the U.K. government decided

21    not to proceed against Interpal.

22         It all has to do with Nat West's state of mind

23    and we're entitled to argue that among the reasons why

24    plaintiff's scienter allegations are implausible, is that

25    the U.K. government decided there was no basis charge

1    Interpal.  Decided there was no basis to sanction Interpal

2    and NatWest had relied on that as one of the ingredients

3    for what it did.

4         So therefore, if we are going to argue, as we

5    are, that plaintiff's argument that NatWest knew something

6    that the U.K. government has said to this very day it does

7    not now, if we're going to make the argument that it is

8    implausible that NatWest knew something, that the U.K.

9    government has said that it does not know, then we need to

10   know whether the plaintiffs are going to respond to that by

11   saying well, you can't cite what the U.K. government did

12   because it did not have as much information as you did, so

13   therefore the U.K. government's decisions don't impeach our

14   scienter allegation.

15        If they're going to respond to us in that way,

16   then they must identify what it is they say that the U.K.

17   government didn't have that we should have given them.

18        And the same thing with respect to the decision

19   not to sanction.  And I'm not making that up out of whole

20   cloth, Your Honor. One of their experts, Gary Walters, in

21   paragraph 241 of his report, said I believe NatWest did not

22   make full disclosure to the U.K. government.

23        So therefore, we're entitled to know whether

24   they're going to meet out argument that the U.K.

25   government's decisions render implausible their allegation

1      that we knew more than our own government did.

2              We need to know whether they're going to respond

3      to that by saying it's because we didn't make adequate

4      disclosure to the U.K. government. Then, if so, what that

5      is.

6              If, as Mr. Israel said, in his August 26th

7      letter, we, the plaintiffs, have no idea what the U.K.

8      government knew, then that's fine.  Then tell us you're not

9      making that contention and the issue is moot.

10             Same thing with respect to no. 24, Your Honor.

11     As Your Honor knows, the U.K. government has consistently

12     said we are not going to sanction Interpal.

13             This actually comes up in Parliament from time to

14     time, where members of Parliament seek confirmation that

15     the U.K. government is not going to sanction Interpal and

16     Her Majesty's government confirms that they're not.

17             We need to know whether the plaintiffs are going

18     to respond to our reliance on the U.K. government's

19     decision no to sanction Interpal as something that renders

20     their scienter allegation implausible, because it's

21     implausible that NatWest knew something more than the U.K.

22     government.

23             We need to know whether they're going to respond

24     but that's because the U.K. government, made a political

25     decision, not a decision on the merits.

7

1          And, in fact, one of their experts at his

2     deposition purported to say well, we all know the U.K.

3     government decides things for reasons. He also said that

4     about the French government.

5          I just need to know are you going to argue that

6     the U.K. government's decision was not on the merits and if

7     so, tell me what your basis is for that so that I'm

8     prepared to meet that argument.  That's what contention

9     interrogatories are all about.

10          So that's the theme that runs through the four.

11     Thank you, Your Honor.

12          MR. ISRAEL:  Your Honor, if I may, I think first

13     I can safely clarify for plaintiffs that we're not hiding

14     the ball.  We're not holding back information.  We're not

15     going to later try and use some piece of evidence or

16     documents that we haven't used, or that we haven't produced

17     or that we don't have to somehow prove a point. We're not

18     hiding the ball.

19          But I think what's most enlightening is that in

20     the reply briefs that NatWest filed, they state on the --

21     page 3 in the second paragraph, "NatWest is not seeking

22     discovery from plaintiffs concerning the information that

23     the U.K. authorities had in their possession or what they

24     believed about Interpal.  The former is revealed in the

25     information NatWest repeatedly disclosed to the U.K.

8

1    authorities in those authorities own reports of their

2    investigations, and the latter is confirmed by those

3    authority's repeated decisions not to pursue any charges

4    against or to impose any sanctions against Interpal."

5            What's so important about that passage, Your

6    Honor, is NatWest -- they show clear as day here what

7    they're trying to do.  They're trying to say that what the

8    government -- the entire U.K. government, or specifically

9    at least six or seven different departments had in its

10   possession is what we, NatWest, gave them and then the

11   several different reports that the charity commission filed

12   and what the NatWest -- sorry.  What the U.K. government

13   state of mind was was demonstrated in the few public

14   reports that the government submitted, namely, the charity

15   commission and the few public statements made by government

16   officials in Parliament.

17           NatWest didn't take discovery in this case on

18   what the U.K. government knew, what it had, what it

19   possessed, what its state of mind was, what its reasons

20   were for not designating Interpal, for not indicting

21   Interpal, for not doing anything with regards to Interpal,

22   but they're trying to make the deduction by saying okay, if

23   plaintiffs don't contend, even though we don't know and

24   can't know what the government had, what its state of mind

25   was, therefore, plaintiff's don't know and what we're

1    saying is well, we gave the government this; we gave the

2    government this.  We saw this governmental reports and we

3    know that the government didn't designate.  Therefore, this

4    is what the government had in its possession and this is

5    what the government believed.

6           Well, they can't do that.  They could have taken

7    discovery.  They could have hired an expert.  They didn't

8    hire any experts on the issue of what the U.K. government -

9    - what its knowledge was, how it handles cases like this,

10   what its state of mind was.  But they didn't do any of

11   that.

12          So they're looking for an evidentiary shortcut

13   here and they show that quite clearly here.  They're trying

14   to say that okay; this is what we gave them, and Your

15   Honor, that's why our response to no. 17, which was cross

16   referenced in the other responses, was all we know is this

17   is the information that NatWest had based on the production

18   they gave us, and this is what they gave to the U.K.

19   government.

20          And more specifically what our exhibits to that

21   response included is this is what based on the record we've

22   seen it does not appear NatWest gave to the U.K.

23   government.

24          Did the U.K. government have that information

25   from other sources?  We don't know.  Certainly, in terms of

1    internal correspondence within NatWest we wouldn't think

2    so, but we don't know that.

3         We don't know if all of the -- for instance, one

4    of the suspicious transactions that NatWest customer

5    Interpal conducted as with the Islamic Charitable Society

6    and we know that they reported one specific transfer.

7         Did they give the U.K. government all of the

8    other transfers that Interpal conducted with that

9    particular entity?  We haven't seen any record of that.

10        Did the U.K. government have other information

11   related to those transfers?  We don't know.

12        THE COURT:  Actually, Mr. Israel, the

13   interrogatory -- at least interrogatory 17, talks about

14   whether or not you contend they had documents beyond what

15   NatWest had.  So --

16        MR. ISRAEL:  Sure.  Your Honor, and that's why we

17   gave them all we could.

18        THE COURT:  Well --

19        MR. ISRAEL:  All we know is what NatWest had and

20   didn't give.  We don't know, as we've said, we don't know

21   what the U.K. government had beyond that.  We don't know

22   what it could have gotten from Interpal.

23        And so, again, the problem here is, as Mr.

24   Friedman eloquently said back at the June hearing in Credit

25   Lyonnais, when the issue was Hamas attribution, which

1       clearly plaintiffs carry the burden of proof, clearly

2       there's reams of evidence on that in this case.  He said

3       Credit Lyonnais isn't prepared to take a position.

4               Well, respectfully, that issue is at the core of

5       this case.  I mean, that's a fundamental issue in this

6       case.

7               The issue of what the U.K. government had, what

8       its state of mind was.  We contend that's irrelevant to

9       NatWest's state of mind.

10              But we're even more ill equipped than Credit

11      Lyonnais contended it was to respond to these contention

12      interrogatories because, frankly, we did not -- we did not

13      propound discovery on what the -- I'm sorry.  We did not

14      produce discovery on what the U.K. government had --

15              THE COURT:  Well, am I hearing you say that the

16      answer is no?

17              MR. ISRAEL:  The answer is we don't know.  The

18      answer is we're not equipped to take a position --

19              THE COURT:  Well, couldn't you just say the

20      answer is no based on what you do know?

21              Mr. ISRAEL:  Well, I would repeat Mr. Friedman's

22      concern in the Credit Lyonnais case that using this as a

23      sound bite, where we're made some sort of admission, where

24      we don't think NatWest has met any sort of burden where it

25      could contend what the government knew and what its state

12

1    of mind was and what documents it possessed and so they're

2    going to then say to Judge Irizarry and say to a jury well,

3    plaintiffs has said -- have acknowledged that they don't

4    know -- that they're not contending what the U.K.

5    government had.

6         They're not contending that the U.K. government

7    had more information than NatWest or what its state of mind

8    was and why it didn't designate Interpal and, therefore,

9    he's what we're telling you and therefore, they've

10   established it conclusively because we didn't have any

11   information to rebut it.

12        So really the roles are reversed here, except we

13   contend not on an issue that goes to the core of this case,

14   but an irrelevant issue as to the state of mind of the

15   government.

16        MR. FRIEDMAN:   Your Honor, if I may, your

17   question put the finger on it.  Mr. Israel is confusing

18   facts and contentions.

19        I'm not asking him to give me facts. I'm saying

20   are you contending X and Your Honor put your finger on it.

21   You said isn't the answer no.  He's repeatedly saying the

22   answer is no, they are not going to contend X.  It is not -

23   - the plaintiffs don't have the freedom to say I'm not

24   going to tell you what I'm contending, and I'm not asking

25   him for facts. The Credit Lyonnais analogy is completely

1      inapt.

2              There they asked us --

3              THE COURT:  I don't even want to hear about that.

4              MR. FRIEDMAN:   Okay.  Your Honor -- and again, I

5      am not making this up out of whole cloth.  Their expert,

6      Gary Walters, said in his report that we made inadequate

7      disclosure to the U.K. government.

8              And when I deposed him, he confirmed that it's

9      his view that we made inadequate disclosure to the U.K.

10     government.

11             Of course, when I went through every fact that he

12     said was not disclosed, I was able to establish that it

13     does appear in one of our disclosures.

14             So again, with respect -- with great respect for

15     Mr. Israel, he does not have the freedom to say I'm not

16     going to tell you what I contend or not.  I'm asking do you

17     contend that NatWest had more information -- had

18     information about Interpal that was not available -- was

19     not in the possession of the U.K. authorities or could not

20     be obtained by them from Interpal.

21             He can't say I pass. He has to say yes, I do

22     contend that or I don't contend it.  And that's why we're

23     here.

24             MR. ISRAEL:  Your Honor, I would just say to

25     that, if an improper interrogatory, we don't have to

1    contend or not.

2            And I would add to that, in terms of Mr. Walters,

3    what Mr. Walters said, which is exactly what we're saying,

4    is simply NatWest should have disclosed this information

5    and we'll set aside the dispute over the facts and whether

6    or not they were disclosed.

7            But he's not testifying as to --

8            THE COURT:  Well, that's interrogatory 18.  Let's

9    focus on 17.

10           MR. ISRAEL:  Sure.  Sure.  Sure.

11           MR. FRIEDMAN:   The reason I need to know, Your

12   Honor, is, again, I need to know if they are going to make

13   a certain argument in response to my argument.

14           My argument, again, is the authority said we do

15   not know that Interpal is funding Hamas or Hamas terrorism.

16   And I am entitled to argue that the fact that the U.K.

17   authorities say that they did not know this renders

18   implausible plaintiff's argument that NatWest did know it.

19           One way plaintiffs could respond to my argument

20   is ah-ha.  That syllogism doesn't work because you may have

21   had information that the U.K. authorities did not have

22   available to them.

23           So I need to know whether they're going to make

24   that argument and what their basis is for making that

25   argument and, again, if they're not making that contention,

1    then we're done.

2              MR. GLATTER: Your Honor, this is Josh Glatter.

3    Just if I can add a few comments to my colleague, Mr.

4    Israel's points.

5              As he noted, the threshold question is whether or

6    not the interrogatory itself is proper before one gets to

7    the secondary question of whether the defendant is entitled

8    to supplementation.

9              There are two things that I think the court

10   should keep in mind in evaluating what decision to reach

11   with respect to all three of these interrogatories.

12             One of them is that many years ago Judge Sifton

13   held with respect to the *mens rea* prong --

14             THE COURT:  Well, I --

15             MR. GLATTER:  -- that the standard to be applied

16   is whether it was considered a terrorist by the standards

17   of the United States.

18             So there's a question --

19             THE COURT:  That's not exactly what he said and

20   his decision was rendered in the context of a motion to

21   dismiss, which given the procedural posture of the case at

22   the time that he rendered decision, you know -- it is not

23   directly applicable to the issue we're discussing today.

24             And I'm not -- I will look -- I have looked at

25   the interrogatory. I'm happily out of the business of

16

1      drafting discovery requests, but --

2              MR. GLATTER:  But my point, Judge, was that it's

3      just that the argument that's being put forward by

4      defendant is, I was going to say -- I'd say minimally is a

5      questionable premise legally and ultimately that will be a

6      legal determination as to whether or not reliance upon a

7      foreign regulator's assessment of the customer and the

8      customer's connections to an FTO.

9              And so that fundamentally turns on the legal

10     questions that will be sorted out either --

11             THE COURT:  Well --

12             MR. GLATTER:  -- at summary judgment or pretrial

13     motion practice.

14             The second thing which Judge Sifton has

15     consistently held is that the standard for *mens rea* is

16     recklessness, criminal recklessness, as that's been defined

17     under the model penal code.

18             And so in terms of the suggestion that NatWest

19     did not have existential knowledge that the allegations

20     concerning Interpol were correct based on the views of this

21     foreign regulator, and to the extent that's being used to

22     channel a demand for a supplemental response to these

23     interrogatories, or for that matter, to interrogatory 20,

24     I'd submit is incorrect, or at least has to be evaluated

25     under the actual *mens rea* standard.

1          THE COURT:  I would have reread his decision a

2     little more carefully if I thought it had bene necessary

3     but I think given the procedural posture of the motion, a

4     motion to dismiss based on the allegations of the

5     complaint, I read his holding far narrower and he was

6     simply saying that NatWest doesn't win by claiming reliance

7     on the British authorities.

8          MR. GLATTER:  Nor do we claim that now and I

9     think I made clear in my reply letter that that's a strong

10    mischaracterization that I think should not distract the

11    court.

12         All of this bears on our state of mind, which is

13    at the heart of the case, and we're entitled to know what

14    their contentions are about our state of mind.

15         MR. ISRAEL:  Your Honor, if I can add one further

16    point, since we're focused on no. 17.

17         You know, the second part of this is what

18    information the government could have possessed -- sorry --

19    could have requested from Interpal and so what Interpal had

20    in its possession, certainly there, if nothing else, we

21    can't know what the government could have done with regards

22    to Interpal.

23         We can't know what information Interpal

24    possessed, you know, and that's why we prepared the exhibit

25    to this response because, again, we tried to include

1    information that we hadn't seen that NatWest had provided

2    the government and that we didn't think Interpal was likely

3    to possess; you know, 17-page transfer confirmations and

4    those sort of things.

5           Obviously, internal correspondence, but you look

6    at this closer on this second part with regards to

7    Interpal, there's just no way for either party to know.

8           MR. ISRAEL:  Again, Your Honor, I can make this

9    very easy.

10          If their position is, as stated in the August

11   26th letter, that they don't have the basis to make this

12   contention, then they should say they're not making this

13   contention.

14          But that's not what they did.  In their

15   interrogatory response they said we do make this

16   contention.  They say there's a multitude -- what was the

17   wording they used?  A multitude of pertinent information

18   that was in NatWest's possession that wasn't disclosed.

19   Well, you can't have it both ways.

20          Now, they did contradict themselves in their

21   letter to Your Honor and they said we don't know one way or

22   the other.

23          I hate to repeat myself, but if they don't know

24   one way or the other, then the answer to the interrogatory

25   is no.  We'll stop.

19

```
 1          THE COURT:  I agree with -- if you -- if the

 2    answer is maybe yes, you can say maybe yes, but you've got

 3    to refine your response and the list.

 4          Based on what I've heard and what I've read, you

 5    clearly do have information regarding what NatWest did

 6    provide, so simply attaching a list of all the documents

 7    regarding Interpal that NatWest may have doesn't suffice to

 8    be as an answer if your answer is, you know, you have

 9    reason to believe -- you may make that contention.

10          MR. ISRAEL:  I think, respectfully, Mr.

11    Friedman's confusing the two issues in terms of what

12    NatWest provided the U.K. government, versus -- did not

13    provide the U.K. government versus what the U.K. government

14    actually had and that's where the disconnect is, Your

15    Honor, and that's why our answer is, frankly, we don't

16    know.

17          MR. FRIEDMAN:   The answer is --

18          THE COURT:  Well, I mean, you can break your

19    answer into two parts.  There are two parts; did not have

20    in their possession and could not have requested from

21    Interpal information concerning Interpal and the other part

22    is, you know, whether or not it had -- I mean, it is

23    actually one phrase, but it is also whether or not they

24    didn't have in their possession documents that NatWest had

25    in its possession is one -- is whether or not it could have
```

1    been requested -- requested Interpal information and

2    whether or not NatWest had documents. I think you could

3    break it down to be more specific.

4                MR. ISRAEL:  Okay.

5                THE COURT:  You know, to the extent that you're

6    going to argue that NatWest didn't disclose information to

7    the U.K. government that it could not have otherwise

8    obtained from Interpal, then you should respond

9    accordingly.

10               Okay.  18, which really --

11               MR. FRIEDMAN:   I think it's the same theme, Your

12   Honor.

13               THE COURT:  It's basically the same.

14               MR. FRIEDMAN:   If their answer to 17 is yes,

15   then the answer is 18 is also yes and they need to tell us

16   what they're talking about.

17               THE COURT:  But I do think your Exhibit E is not

18   a responsive document.  It's a -- you really -- I assume,

19   have more information at hand that would help you narrow

20   the list and help you better identify the documents than

21   what you have in Exhibit E.

22               MR. ISRAEL:  We would agree, Your Honor.  18

23   follows after 17.  There's similarities in the two.

24               THE COURT:  And then 24.

25               MR. ISRAEL:  Again, Your Honor, we would argue

1          that 24 is different and specifically ask why U.K. law

2          enforcement chose to do what it did.  Was it based on

3          evidence in its possession?  Was it based on any other

4          reason and there's absolute no evidence in this case as to

5          why the U.K. government did not designate Interpal, again,

6          other than a few lines of public testimony given by several

7          individuals in Parliament.  We don't know why the U.K.

8          government chose not to designate Interpal.  We don't know

9          why it chose not to indict Interpal.  It did not. I mean,

10         there' no dispute over that.

11               But again, this gets into the state of mind of

12         the U.K. government, which we still feel is irrelevant and

13         make the interrogatory improper, but even beyond that,

14         again, neither party can simply know why the U.K. law

15         enforcement, which is seven different departments, made

16         some sort monolithic decision to designate or not to

17         designate and why they did so.

18               MR. FRIEDMAN:   Then, Your Honor, the answer to

19         the interrogatory is no, because --

20               MR. ISRAEL:  Your Honor --

21               MR. FRIEDMAN:   Excuse me.  Because we are going

22         to say -- we already have said not the straw man, that

23         because the U.K. didn't indict and didn't sanction, that

24         gets us off the hook.

25               Rather, we're going to say look. You're saying

22

1    that NatWest knew X. To this day, the U.K. government, with

2    all of their resources, say they still don't know X.  That

3    makes your allegation about what we know implausible,

4    because it's implausible and it impeaches your allegation

5    that this bank would know more than, as Joel just describes

6    -- as Mr. Israel just described, the seven agencies of the

7    U.K. government.

8            We are entitled to know the following:  Are

9    plaintiffs going to respond to that by saying well, the

10   U.K. government's decision not to indict and not to

11   sanction is not indicative of anything because it was based

12   on political considerations, or because it was based on

13   what the queen had for breakfast that day.

14           We're entitled to know if they're going to say if

15   it was based on anything other than the merits.

16           If, as I just heard Mr. Israel say, they're not

17   going to make that contention, then we're done.

18           MR. ISRAEL:  You -- I'm sorry, Mr. Friedman.  I

19   don't want to interrupt you again.

20           In this case, Your Honor, with respect to

21   interrogatory 24, it's I think -- respectfully it's even

22   further appeals from the party's claims and defenses in 17

23   and 18.

24           17 and 18 at least are touching upon comparisons,

25   or relative access, or possession, vis-a-vis the defendant.

23

1        This one is purely asking for us to essentially

2   speculate as to a variety of potential reasons, of which I

3   can personally think of many, as to why the British

4   government did or did not decide to take particular action

5   involving Interpal.

6            THE COURT:  Well --

7            MR. FRIEDMAN:   And obviously we would reserve

8   our right at trial,  or at any time up to it, to seek to

9   preclude introduction of evidence on this issue because it

10  could be very prejudicial and confusing to a jury.

11           But with respect to the interrogatory I think

12  because this one is not even really touching at all upon

13  the defendant, it is therefore not related to the party's

14  claims and defenses, notwithstanding Mr. Friedman's heroic

15  effort to link it up to scienter, and as such flunks the

16  basic test of Rule 26.

17           THE COURT:  Well, I'll answer that -- I'll

18  respond.  There is a connection because if your expert is

19  saying politics and whatever other factors may have played

20  into the decision not to designate Interpal and whatever

21  evidence your expert had presumably is evidence that might

22  be generally available to the public and hence NatWest,

23  that would factor into the argument that you would make

24  about the scienter of NatWest with respect to its

25  transactions with Interpal.

24

1           MR. ISRAEL:   Your Honor, in that regard we can

2     certainly double check it.  But my recollection is that

3     although certain of our punitive case-in-chief experts may

4     have narrated the fact that the U.K. government has not to

5     date sanctioned Interpal or taken any other action or

6     agreed to with the U.S. or Israeli designations, I don't

7     believe any of them have proffered opinions in their

8     reports as to why that's the case.

9           It may be that at a deposition one of the

10    defendant's lawyers may have asked them to solicit their

11    opinion on that score, but that does not -- the fact that

12    they may have allowed them to answer wouldn't mean that we

13    were proffering that as evidence in the case.

14          MR. GLATTER:   First of all, one of their

15    experts, Mr. -- or Dr. Levitt, did say that he believes the

16    British government had other reasons, but he refused to

17    disclose to us what he thought those were.

18          But it doesn't matter whether their experts have

19    said it or not.  If their experts haven't said it, that's

20    another reason why they shouldn't be able to make this

21    contention, because they haven't ventilated it in

22    discovery.

23          THE COURT: So is your -- wait.  So is your

24    answer no? Is that what I'm hearing you say, Mr. Glatter?

25          MR. GLATTER:   It is my answer that I do not

1    contend one way or the other why the U.K. government --

2            THE COURT:  It's not one way or the other.  Do

3    you contend or don't you contend?  If you don't contend,

4    you don't contend.

5            MR. GLATTER:  In other words, the lack of

6    contention is not, therefore, a concession and --

7            THE COURT:  It is -- that's right.

8            MR. GLATTER:   Correct. And I think I -- subject

9    to concurrence with my colleagues, I think that's pretty

10   much where we --

11           THE COURT:  We'll take it as a no, hopefully.

12           MR. FRIEDMAN:   All right.  Well, that should

13   moot no. 24, because I understand the plaintiffs are not

14   contending that the decision not to sanction Interpal was

15   for any reason other than on the merits.

16           MR. GLATTER:   But, Your Honor, just for purposes

17   of record preservation, the fact that we don't contend it

18   is a different matter from whether or not the defendant

19   chooses to open the door on that issue in their case in

20   chief, our ability to rebut it would not be cut off by our

21   failure to affirmatively contend it in respect to this

22   interrogatory

23           MR. FRIEDMAN:   Well, that can't be, Your Honor,

24   because that would throw contention interrogatories out the

25   window. That would mean that I could be surprised at trial

1    as to one of their contentions and frankly, Mr. Glatter, in

2    deciding whether to make a contention or not, I'm entitled

3    to know what your rebuttal would be in response to that

4    contention.

5          So it's really -- if anyone is reading this

6    transcript a year or so from now, it's really remarkable

7    that plaintiffs are being so squirrely in refusing to be

8    pinned down on this and it leads me to think that I need to

9    press farther and Your Honor should press farther in

10   finding out what's going on here.

11         The question is very simple; are you making this

12   contention or not?  And I am telling you that I may make

13   that contention, but whether I do or not is not excuse for

14   plaintiffs to avoid the issue.

15         MR. ISRAEL:  Your Honor, there's nothing

16   squirrely about believing this interrogatories are

17   improper. Obviously, if the court feels differently then

18   that's one thing, but there's nothing squirrely about our

19   position here.  There's nothing squirrely about what we're

20   trying to do other than thinking, again, these

21   interrogatories are improper and irrelevant.

22         MR. FRIEDMAN:   I'm just reacting to Mr.

23   Glatter's response  that he reserves the right to make this

24   contention if I make the contrary contention and he can't

25   do that.

1          MR. GLATTER:  Your Honor, there's I think a

2     material different between asking whether or not plaintiffs

3     affirmatively contend something versus our ability to rebut

4     a contention that the defendant plans to make.  Those are

5     two distinct issues.

6          MR. FRIEDMAN:   There's no difference, Your

7     Honor.  And if there were such a difference, then we would

8     have a trial by ambush.  We don't have trial by ambush.

9     One of the ways we avoid trial by ambush is allowing for

10    contention interrogatories.  This contention interrogatory

11    says -- asks, do you contend X?  They've got to answer yes

12    or no.

13          It's not a conditional yes or no. It's yes or no.

14    Their version of the truth is their version of the truth.

15    I'm asking what their version of the truth is.  Their

16    version of the truth doesn't change depending on what I

17    say.  It is what it is.

18          MR. GLATTER:   Your Honor, I don't agree with Mr.

19    Friedman's representations on that score. I think perhaps,

20    however, to save everyone time, it's fair to say that our

21    response to this interrogatory -- it's obviously without

22    waiver of our rights to seek to move in limine on any

23    grounds that we think are appropriate closer to the time of

24    trial.

25          If we believe, in other words, that Mr. Friedman

1    has mischaracterized -- or rather not Mr. Friedman, but

2    NatWest is mischaracterizing or distorting the import of

3    response to a contention interrogatory, obviously, that's

4    something either this court of Judge Irizarry can assess at

5    the appropriate time.

6              MR. FRIEDMAN:   So I take it the answer to the

7    contention interrogatory is no.

8              MR. GLATTER:   As I said --

9              THE COURT:  I just want to hear --

10             MR. GLATTER:   As I said earlier, Your Honor we

11   are not going to affirmatively contend or speculate as to

12   the reasons why the British government has not taken a

13   particular action against Interpal.

14             MR. FRIEDMAN:   I am concerned only because I've

15   had the pleasure of spending so much time with Mr. Glatter

16   and know how careful a lawyer he is. I'm concerned about

17   his answering the question by saying we will not

18   affirmatively contend. I think we need to know that they

19   will either contend it or not contend it; either

20   affirmatively or defensively.

21             I need to know so that I can decide what

22   contentions I'm going to bring forward and what they're

23   going to say in response.

24             MR. GLATTER:   I suppose the problem with this is

25   that, as Mr. Israel alluded to earlier, our fundamental

1    position is that whether the U.K. government did or did

2    not, or have some particular subjective reasons why it

3    chose not to take action against Interpal is utterly

4    irrelevant to this case.

5            Now it may be that at the end of the day somebody

6    disagrees, but because we believe that's irrelevant and may

7    take certain positions with respect to evidence that's

8    sought to be introduced by the defendant in those regards,

9    I have to issue a reservation of rights here.

10           MR. FRIEDMAN:   I understand --

11           MR. GLATTER:   And, again, I'm being asked

12   through the vehicle of the contention interrogatory whether

13   or not we affirmatively contend X.  The fact that we

14   affirmatively contend X, as Your Honor agreed before, is

15   not a concession that, in fact, they did it for the reasons

16   that Mr. Friedman, or Mr. Luft, or NatWest's in-house

17   counsel might suggest.

18           That's an issue that has to wait --

19           THE COURT:  Well, let me just ask Mr. Friedman, I

20   assume you are going to say that the British government

21   didn't designate Interpal for -- after a very careful

22   examination, et cetera, and that your reasonably relied

23   on that.

24           MR. FRIEDMAN:   What I'm going to say, Your

25   Honor, is here is the admissible evidence of what the

30

1    British government said.  It is a fact that the British

2    government said this.  It is a fact that the British

3    government didn't sanction and didn't bring criminal

4    charges -- any charges against Interpal to this very day.

5              It is a fact that NatWest was aware of that. It

6    is a fact that, as Your Honor knows from the

7    correspondence, that NatWest asked the British government

8    what are you going to do and the British government said we

9    have no plans to sanction them or to bring charges against

10   them.  Yes.

11             And NatWest -- that was part of what NatWest

12   relied upon in acting as it did.  It used the British

13   government as its most relevant authoritative source on

14   this and the British government said it had no basis to

15   bring charges.

16             And I'm also going to argue, subject to hearing

17   what they would say in response, that the very fact that

18   the British government decided not to sanction and not to

19   charge to his very day, parenthetically, in one of the few

20   instances in which the Blair government declined to follow

21   what the then U.S. government asked them to do in relation

22   to the war on terror, which is also significant in and of

23   itself, yes, that that impeaches plaintiff's scienter

24   allegation.

25             And I am entitled to know whether they will

1    respond that the British government's decisions are

2    something that are -- are something that is irrelevant and

3    unreliable because it was based on factors separate from

4    the British government's assessment of the merits.

5            That's my interrogatory and I'm entitled to know

6    whether they're going to make that argument and if so, what

7    their basis for it is.

8            THE COURT:  Well, I think what Mr. Friedman is

9    saying is they want to know that you're going to attack the

10   legitimacy of the determination made by the British

11   government in making your argument that NatWest should have

12   known, or that it didn't actually rely, or that it didn't

13   reasonably rely on the determination of the British

14   government.

15           MR. FRIEDMAN:   Your Honor --

16           THE COURT:  And that's why I said you could say

17   you don't contend, but you could still respond to some of

18   the defendant's contentions regarding its scienter without

19   implicating the merits of the decision by the U.K.

20   government.

21           MR. ISRAEL: Understood, Your Honor.  And Mr.

22   Friedman just exemplified the problem with these

23   interrogatories, understanding we're probably ready to move

24   on, but we hadn't heard about the Blair government and its

25   view towards what the U.S. does and its rare decision to

1    buck the U.S.

2              MR. FRIEDMAN:  That was just an editorial comment

3    in Brooklyn on a Thursday afternoon.  That's not --

4              THE COURT:  That's (inaudible).  All I'm just

5    saying is if you say now you're not prejudiced, you're not

6    constrained in attacking the defendant's reliance on the

7    British government's decision.  But if you do say no, you

8    are constrained in attacking how that decision was made.

9              And so it's really more a focus on whether or not

10   you're going to attack the decision making process and the

11   ultimate decision as opposed to attacking NatWest's

12   reliance on that determination.

13             MR. GLATTER:  But, Your Honor, I think that this

14   highlights a very serious problem with the interrogatory,

15   which is it's one thing to say that's not something I

16   contend.

17             And it's another thing to say that's not

18   something I contend and, therefore, it should be inferred

19   from that that the reason that the British government took

20   this action is because it was -- because, in fact, the

21   evidence in the British government's possession was

22   insufficient to warrant that action.

23             Those are two different -- it's one thing to say

24   that's a not a contention I'm making in my case in chief.

25   It's another thing to say it's not a contention I'm making

1    and, therefore, you should infer that I agree with the

2    supposition baked into this interrogatory.  That's our

3    concern.

4            And that's why I made my remark abut reserving

5    rights in terms of if the defendant is able, or intends to

6    present evidence and suggests that the evidence was

7    insufficient in the U.K. government's -- I don't know how

8    they'd be able to do that, because I don't know how they

9    know why or what the U.K. government in its entire guise

10   knew or --

11           THE COURT:  You're worried about the defendant

12   taking that contention?

13           MR. GLATTER:  Correct.  If the defendant -- in

14   other words, the fact that I don't make the contention does

15   not, therefore, mean that I should -- if the defendant so

16   contends that the U.K. government did not sanction Interpal

17   because the evidence in its possession was insufficient,

18   that I do not have an ability to rebut that if -- and if

19   that is even allowed into evidence on relevancy grounds.

20           MR. FRIEDMAN:  Your Honor, he's arguing the

21   relevancy of this. I'm not asking him to concede that the

22   British government was right.  I'm asking him to tell me

23   are you going to argue that the British government made its

24   decision based on factors other than its perception of the

25   merits.  That's it.

34

1           MR. GLATTER:  And if I say -- well, again, if I

2      say I am not going to argue that in my case in chief, Mr.

3      Friedman's position seems to be that I also cannot respond

4      to it if it's raised in the defendant's case in chief, and

5      that's troubling.

6           THE COURT:  All right.

7           MR. FRIEDMAN:   And my response is that case in

8      chief rebuttal doesn't matter.  Are you making the

9      contention --

10          MR. GLATTER:  Which is --

11          MR. FRIEDMAN:   Excuse me.  He keeps --

12          THE COURT:  Mr. Friedman, let me get down to a

13     practical level.  The concern is that you will be making

14     that contention.

15          MR. FRIEDMAN:   I will.

16          THE COURT:  You will.

17          MR. FRIEDMAN:   I will be contending that the

18     British government's decision was based on its perception

19     of the merits, that I'm going to be presenting the British

20     government's position and there it is.

21           And I am entitled to know whether they're going

22     to try to impeach that decision with an argument that those

23     who published that decision based their decision on

24     something other than their perception of the merits.  And

25     that's all it is.

1          And plaintiffs I've heard say repeatedly this

2     afternoon, we are not going to make that contention

3     affirmatively, but we reserve the right to make that

4     contention in response, and they can't do that.

5          Contention interrogatories are not divided among

6     case in chief contention interrogatories and rebuttal.

7          I'm entitled to know whether they're going to

8     make that argument at any time.

9          MR. GLATTER:   Your Honor, in the hopes of

10    truncating this discussion, I don't know what a rebuttal

11    contention is.

12         My point was that to the extent that the

13    defendant intends to present that argument and that

14    evidence, obviously, we reserve our rights to object to it

15    and we reserve our rights to rebut it in some fashion at

16    trial, if it comes to that.

17         I thought that I had saved everybody time by

18    saying --

19         THE COURT:   Well, I guess it can come to that.

20    You're referring to (indiscernible) that he will make that

21    contention (indiscernible).

22         MR. GLATTER:   But if ultimately he wants at

23    trial to wield a response to a contention interrogatory

24    somehow precluding us from offering any rebuttal, anything

25    to suggest to a jury that there might have been other

1    reasons for that, if and only if that is allowed into

2    evidence, I would presume that all parties reserve their

3    rights as to the introduction of the contention

4    interrogatory into evidence and that will be dealt with at

5    a later time. I'm not quite sure why we have to have the

6    fight today.

7         MR. FRIEDMAN:   Your Honor, Mr. Glatter, with all

8    due respect -- and I don't mean this to be pejorative --

9    did just a complete 180.  He has been saying -- he and Mr.

10   Israel have been saying for 20 minutes, we're not going to

11   make that contention because who knows why they decided

12   what they did.

13        Well, respectfully, they do know why they

14   decided, or what they say is the reasons they decided

15   because these decisions are not just yes or no decisions.

16        We have the Charity Commission reports, we have

17   statements by Her Majesty's government. So there is

18   evidence.

19        Mr. Glatter, after telling Your Honor for 20

20   minutes we're not making this contention, just did a 180

21   and told Your Honor we are going to make this contention in

22   response to their making the contention that Friedman says

23   he's going to make and I'm entitled to know -- and what I'm

24   now hearing is the answer to the contention interrogatory

25   is yes and if it's yes, then I'm entitled to have discovery

1    as to what are the bases for saying the decision was based

2    on anything other than the British government's perception

3    of the facts.

4              THE COURT:  (Indiscernible) if you're going to

5    challenge that contention (indiscernible).

6              MR. ISRAEL:   Okay.  So that I understand Your

7    Honor's ruling, in other words, if at any time we believe

8    that there might have been other reasons beyond the

9    evidence in hand, then those should be identified in the

10   responses.

11             THE COURT:  (Indiscernible).

12             MR. ISRAEL:   Okay. I understand, Your Honor.

13   Thank you.

14             MR. FRIEDMAN:   And on our motion, Your Honor,

15   that leaves contention interrogatory no. 20, which asks the

16   plaintiffs to list, as supplemented by our meet and confer

17   in bullet points, the actions that they believe the bank

18   should have taken or should have refrained from taking to

19   avoid liability.

20             Their response is that that is inviting

21   speculation and it invites them to provide an answer on

22   something in which they don't bear the burden of proof and

23   I just don't understand that.

24             It's not speculative because we're saying if you

25   contend there are actions that we should have taken or

1    should have refrained from taking, please tell us what

2    those actions are. It's no speculation.  We want them to

3    answer only with the actions they plan to contend we should

4    have taken or refrained from taking.

5           And as to burden of proof, if there are actions

6    they say we should taken or refrained from taking, they

7    bear the burden of proving that.

8           A simple analogy, Your Honor, if someone is sued

9    for failure to maintain a sidewalk and part of the case is

10   you should have done X, Y and Z in order to maintain the

11   sidewalk better, then the plaintiff has to identify what

12   the remedial actions are.  The same thing here.

13          MR. ISRAEL:  Your Honor, if I may, I think Mr.

14   Friedman partially cites our issues with this

15   interrogatory.

16          I think fundamentally our biggest problem with

17   this interrogatory, as you'll recall, interrogatories no. 1

18   and 2, which are identical to the ones that were proffered

19   by Credit Lyonnais, lists all the reasons -- if you think

20   that the respective bank violated Section 2339(b) and

21   2339(c) of the ATA, essentially, what's your basis?

22   Essentially lay out your whole theory of the case.

23          And really that's what no. 22 is doing also.

24   It's just flipping it in reverse. Instead of saying why did

25   you violate it, what could you have done to avoid violating

39

1       it?

2               So in response to no. 1, based on what the court

3       ordered with Credit Lyonnais we gave the five-page

4       narrative.  We reviewed every single deposition, every

5       single page of paper that was produced by Nat West and was

6       produced by plaintiffs in this case to identify what we

7       thought was irrelevant documents and testify.

8               And so we acted entirely in accordance with Your

9       Honor's instructions and frankly, no. 20 just seems to be

10      another way of trying to skin the cat.  It's just asking

11      the same question in reverse.

12              It's entirely over broad.  It's entirely improper

13      and would require a case-by-case analysis of transactions,

14      of internal correspondence.

15              You know, Mr. Friedman says that we can just

16      provide bullet points, which in terms of setting up the

17      document makes it sound simpler, but there's really --

18      using bullet points doesn't make it any easier.

19              I mean, the entire response to everything NatWest

20      should have done to avoid -- could have done, shouldn't

21      have done to avoid being liable under the ATA, it's

22      massive, just as it was in no. 1 and no. 2.  And there's

23      really no difference.

24              We did -- we understook the effort and we spent

25      dozens of hours to look through the record and to provide

1      the response that we did.

2              And if you look at our response to no. 1, we laid

3      out a lengthy narrative, which is just as applicable to

4      this response as it was no. 1 and to no. 2.

5              And so it's just unclear -- what are they asking

6      for separate from what Your Honor ordered us to do in

7      Credit Lyonnais, which is really the same thing here.

8              THE COURT:  There are -- you could be challenging

9      their failure to institute certain bank policies and

10     procedures that might enable the bank to -- really to

11     ascertain that something was happening that should have

12     made them aware of what was going on with Interpal and

13     (indiscernible) customer policy that was in effect at the

14     time.  I don't know. I have no idea.

15             You know, it is a difficult question to answer

16     because to a certain extent when you're asking about

17     omissions, you might not be able to identify all the

18     omissions, but I think you need to make a good faith effort

19     to try to any (indiscernible) that you may need contending

20     that the bank didn't -- that they didn't (indiscernible) on

21     your radar screen.

22             Aren't you going to contend they didn't follow

23     the know your customer policy and failed to take whatever

24     measures were necessary?

25             MR. GLATTER:  Well, Your Honor, as defense

1    counsel's often apt to remind us, this is obviously not a

2    negligence case.

3           So the question from our standpoint and the

4    problem -- a lot of the problem here focuses on the term

5    "avoid."

6           Our position, which I think is reflected in the

7    response and the supplemental response is that the

8    defendant is obligated under 2239(b) not to provide

9    material support to a foreign terrorist organization.

10          And under the applicable mens rea standard that I

11   alluded to earlier, is that when they -- when they --

12   whether or not that means they consult with a barrister or

13   how they decide to go about investigating suspicions is not

14   our burden, is not our issue.

15          Our issue, which we'll demonstrate, is did the

16   defendant, with a culpable mental state, provide material

17   support to Hamas, a foreign terrorist organization.

18          Ultimately, ways in which they could have avoided

19   doing that is not something that we bear the burden of

20   demonstrating.

21          It's not particularly relevant to the claim and

22   if you were to take word "avoid" out and you were to flip

23   this interrogatory to say if you contend that we're liable

24   under 2239(b), tell us why, that would pretty much convert

25   it into a blockbuster interrogatory, the kind that's

1    typically prohibited by courts.

2           And this kind of combines the problems with that

3    approach with adding in an irrelevant consideration, one

4    that isn't our burden, as to how from a business judgment

5    standpoint they could have best gone about assuring that

6    they weren't pipelining funds to a U.S. designated foreign

7    terrorist organization, and that's why we believe that the

8    response that's been provided is sufficient and shouldn't

9    require us to engage again in exercises in speculation as

10   to what the best method the defendant could have considered

11   using to make sure it didn't run afoul of that legal

12   prohibition.

13          MR. FRIEDMAN:   I think Your Honor knows that

14   that's not what we're asking them do and invite Mr. Glatter

15   to read the interrogatory and the response, because the

16   response is merely a tautology.

17          The question asks if you contend there are

18   actions we should have taken, or there are actions we

19   should have refrained from taking in order to avoid

20   liability under these statutes, identify what they are.

21          Their answer is tautological and they say you

22   shouldn't have violated the statute.

23          You can't respond to contention interrogatories

24   like that just by saying you shouldn't have violated the

25   statute.  You shouldn't have put yourself in a position

1      where you would get sued.

2              This interrogatory does not ask them to speculate

3      on what we did.  It doesn't ask them to speculate on what

4      we should have refrained from doing.

5              It says if -- if -- if you contend there are

6      actions we should have taken or actions that we did take

7      that we should have refrained from taking, as a result of

8      which in both instances you claim we're liable under the

9      statute, tell us what those actions are.

10             I can't imagine anything that is more elemental

11     to a contention interrogatory than to ask that question.

12             MR. ISRAEL:  Your Honor, again, though I think

13     that's you looked no. 1, is because Mr. Glatter said really

14     the reverse of no. 20 is no. 1, which, again, Your Honor,

15     ordered us to provide a response, which we did.

16             We gave five pages of a narrative which would be

17     directly responsive to no. 20.

18             And that's why we -- we didn't, as Mr. Friedman

19     said, just object and use some tautology, but we referenced

20     our response to no. 1, which provided this narrative.

21             THE COURT:  Well, I think (indiscernible)what the

22     defendant wants is to identify a series of transfers which

23     identifies --

24             MR. ISRAEL:  But there are hundreds -- there are

25     thousands in this case.

44

1          THE COURT:  You don't have to identify all of

2     them.  You could say transfers beginning such and such a

3     date to such and such entities.

4          MR. ISRAEL:  You know, again, the concern comes

5     back to I guess the concern we had with interrogatory 1 and

6     2 where providing all of the information in such a

7     blockbuster interrogatory would be massive and near

8     impossible from what your -- if what I understand Your

9     Honor's asking us to do is generally were there transfers

10    to certain entities that NatWest should not have

11    undertaken.

12          Were there -- well, that's the example Your Honor

13    gave, then perhaps it becomes more limited, but again, our

14    concern with interrogatories 1 and 2, which is the same

15    here, is NatWest then waves this in front of a jury.  Waves

16    this in front of yourself or Judge Irizarry and says see,

17    here.  This is the totality of plaintiff's response, and in

18    such a massive interrogatory that implicates thousands of

19    document and reams of testimony, that's impossible.

20          And so they're trying to then cut us off,

21    regardless of what we say that this is plaintiff's answer.

22    They're stuck within these four corners.

23          We're not trying to hide the ball.  We're not

24    trying to hide our contention.  That's why our response to

25    no. 1 was rather vigorous, and we spent a lot of time

1        preparing the narrative and the exhibit.

2                But if we're asked to beyond that in no. 20, then

3        we're back in the position of the bank trying to limit us

4        when they asked an improper interrogatory.

5                It's just difficult to know how we could respond

6        to such an interrogatory that literally involves hundreds,

7        thousands of transfers dating over a period of -- really

8        over ten years.

9                THE COURT:  (Indiscernible).

10               MR. FRIEDMAN:   If one of the bullet points is

11       that we shouldn't have made transfers from one day to

12       another, that's one of the bullet points.  But there might

13       be other bullet points.

14               And again, I'm not asking them to make things up.

15       They know what their contentions are.  They're obligated to

16       list them.

17               So if Mr. Israel -- if one of the actions you say

18       you  should have taken is to block transfers X, Y and Z,

19       that's one of your bullet points.

20               But if there are other things you say that we

21       should have done, or that we did do that we shouldn't have

22       done, in order to avoid a trial by ambush, I'm entitled to

23       know what those are.

24               MR. GLATTER:   Your Honor, I'd respectfully

25       submit that again that essentially converts this, or frames

1     this interrogatory as a blockbuster interrogatory.

2             It's essentially saying tell us why we're liable.

3     Tell us why you're going to win at trial, and that's not a

4     proper us of contention interrogatories which is supposed

5     to be a lot more specific.

6             Issues about block transfers about obviously set

7     forth in expert reports.  Those issues can be framed more

8     succinctly at summary judgment, should that occur.

9             And, again, the bottom line is that the

10    defendant, as a legal matter, is obligated to avoid

11    providing financial services to Hamas.

12            How it chooses to go about making sure it

13    fulfills that legal obligation is the defendant's business,

14    not ours, and is not something that we should respectfully

15    be put in the position of having to speculate about.

16            THE COURT:  All right.

17            MR. GLATTER:   And that is what the

18    interrogatory, as crafted and frankly I believe as

19    designed, is asking us to do.

20            THE COURT:  Well, I would think that -- and it

21    ties into the example that I gave you that there might be

22    some point in time that you would say very clearly

23    transfers should have been made or (indiscernible).

24            MR. ISRAEL:  There are many points in time, Your

25    Honor. I think that's --

```
 1            THE COURT:  Okay.  But that's (indiscernible)

 2    identify all the transactions.

 3            MR. ISRAEL:  Again, we just want to have a clear

 4    understanding because I think Your Honor and plaintiffs

 5    both are struggling with what information exactly we'd be

 6    expected to provide in response to this interrogatory. I'm

 7    still not sure.

 8            I understand transfers generally what the court

 9    said, but you get into reports they should have filed, when

10    they should have filed them, when they should have retained

11    more KYC information, which frankly, you know, probably

12    should have happened more often continuously.

13            THE COURT:  Well, you don't have --

14            MR. ISRAEL:  It's just endless --

15            THE COURT:  -- identify each subsequent point in

16    time. You could say as of such and such a date, and, you

17    know, periodically whenever. I would think that after the

18    obligation arises to make inquiry that it would continue to

19    some point in time (indiscernible).

20            Or if you say (indiscernible) such and such a

21    date there was reason to proceed --

22            MR. FRIEDMAN:   Your Honor, I guess I would only

23    ask, and I apologize if I'm reiterating a point Mr. Israel

24    made, how is that information not already captured in the

25    response and attachments to interrogatory no. 1, which asks
```

1    if we contend that we knowingly -- NatWest knowingly

2    provided material support or resources to Hamas that the

3    scienter is sufficient to render it liable for damages

4    under 2339(b)(A)(1), please specify the basis for those

5    contentions.

6            And both through the narrative in the responsive

7    and the attachments, the response proceeds to do that.

8            So I think minimally there's an obvious

9    redundancy here.

10           THE COURT:  That wouldn't be the first time that

11   that happens in a discovery request.

12           MR. ISRAEL:   Well, that's why we referenced

13   interrogatory no. 1 --

14           THE COURT:  Look.  You can reference it, but

15   you've heard what I've said, so we'll move on.

16           On the plaintiff's motion to compel --

17           MR. GLATTER:   Your Honor, before you move to the

18   -- only because it may be tied -- I know Your Honor

19   received a letter briefing from both myself and Mr.

20   Friedman regarding a request to produce certain documents,

21   which were referenced in Mr. Friedman's motion to compel.

22   So I don't know if you want to take that up now or --

23           THE COURT:  That's fine.  I can --

24           MR. FRIEDMAN:   Your Honor, I --

25           THE COURT:  Let me tell you exactly why I ruled

1       the way I did back in 2008.

2              It was one of my earlier rulings in this case and

3       it wasn't clearly expressed in my original minute order,

4       but I made a very clear finding as to relevance and what I

5       didn't say expressly in my order is that it was -- I was

6       considering the arguments of the bank as to burdensomeness

7       and also the plaintiff's desire for discovery, which beyond

8       that cutoff date when the account was terminated, which I

9       had no problems with, but we all agreed that the relevance

10      of that information became more attenuated.

11             So it really -- that one-year cut off date was

12      alluded to originally by the plaintiffs in one of their

13      letters, even though they sought a longer cutoff date -- I

14      think through the present or through 2007.

15             MR. FRIEDMAN:   It was through the present.

16             MR. GLATTER:   Originally through the present --

17             THE COURT:  Yes. But you had talked about a one-

18      year date -- one year time frame and then you were -- and

19      then you changed.

20             So after considering the arguments, what weighed

21      heavily into my setting of that deadline originally was the

22      fact that the plaintiffs were willing to consider the one-

23      year.  It was clear to me that they were entitled to

24      discovery beyond the 2004 date and weighing the

25      burdensomeness to the defendant against the marginal

1        relevance, I thought that was a reasonable cut off date.

2             Now I'm going to grant the motion because it's

3        not burdensome for the defendants at this point to produce

4        the report and I don't want any future dispute that arises,

5        in case there is any kind of reference to the report by the

6        defendants, because I'm sure you will regale Judge Irizarry

7        with this nice history of things that the bank did and I

8        don't -- it's not burdensome.

9             MR. FRIEDMAN:  But Your Honor, first of all, we

10       are not going to rely on it in our defense and if anything,

11       our citation of in connection with the litigation over

12       these contention interrogatories makes it relevant only to

13       the litigation of the contention interrogatories, not on

14       the merits of the case.

15            But how is it relevant?  Your Honor, the

16       plaintiffs contend that NatWest had a certain state of mind

17       as of the date of the last attack, September 25 or

18       September 24th, 2004.

19            How is it relevant what the bank said to the

20       British government two years later?

21            THE COURT:  We went over this three years ago.

22       Documents as of -- after September, 2004 may have bearing

23       on your state of mind prior to 2004 and that happens all

24       the time.

25            MR. FRIEDMAN:   Well, what I'd like to do, Your

51

1    Honor, if I may propose this course, I can represent to

2    Your Honor that these disclosures that were made to the

3    British government don't say anything about the events

4    previously.

5         All they say is Interpal has presented a check

6    from someone else who was designated as an SDGT and we want

7    you to know about that. And then whey they represented the

8    check there was another disclosure made.

9         If Your Honor believes that -- as Your Honor just

10   said, these may have relevance to the relevant time period,

11   which ends September, 2004, I would like to submit these

12   disclosures to Your Honor in camera and Your Honor can

13   confirm that they don't say anything about the prior

14   period. They just talk about the fact that these checks --

15   it's two documents -- that these checks were presented in

16   2006.  That's all they say.

17        THE COURT:  The relevant time period goes beyond

18   September --

19        MR. FRIEDMAN:   Your Honor, it couldn't because

20   they're alleging --

21        THE COURT:  I take it back.  The relevant time

22   period does end September, 2004, but the discovery that

23   would arguably yield admissible evidence post dates

24   September, 2004 and that's what I ruled before and I'm --

25   if anything, you're going to make me reconsider my ruling

1        and think maybe the cut off date was too early.  But I'm

2        not going to do that.

3                MR. FRIEDMAN:  I'm just inviting Your Honor to -

4        -

5                THE COURT:  I'm not going to do that.  Just

6        provide it.

7                MR. FRIEDMAN:  All right. We'll provide the two

8        reports.

9                MR. GLATTER:  Your Honor, I just have one

10       clarification.  I understand Your Honor's order.  As you

11       may recall, we also did request to put the disclosures in

12       context and for the very reasons that you just mentioned

13       that they're -- from an -- the likelihood of leading to

14       admissible evidence, communications and documents that

15       concern those disclosures.

16               And I'm not sure whether or not your order

17       contemplates production of those materials as well. I'd

18       respectfully argue that they absolutely are, particularly

19       when one considers that the entity that --

20               THE COURT:  Mr. Glatter, I mean, based on what

21       Mr. Friedman says, I'm going to require him to produce

22       those reports and if you really feel there's some relevance

23       that can be gleaned from the supporting documents, then

24       you'll come back to me.

25               MR. GLATTER:  I understand, Your Honor.  Thank

1    you.

2          MR. FRIEDMAN:   The last issue, Your Honor, I

3    think is their motion to compel, their contention

4    interrogatory 22.

5          MR. ISRAEL:  That's correct, Your Honor, and I'll

6    be brief.

7          We know at this point that NatWest is going to

8    say it had proper policies and procedures with regards to

9    suspicions of terrorist financing and if those suspicions

10   led it to believe it should close an account, it would have

11   done so.

12         We know it's going to argue that with regards to

13   Interpal it followed its procedures and policies properly.

14   It determined that it did not need to close those accounts

15   and, therefore, it did not do so.

16         But as it acknowledges in the specific contention

17   interrogatory, NatWest also takes a position that it did

18   close accounts and, therefore, there is apparently a

19   standard that NatWest followed when they decided to close

20   these other accounts.

21         This is really a narrow, simple issue and we're

22   really not asking for much information  We narrowed the

23   scope of our request -- of the contention interrogatory

24   significantly with Mr. Friedman in just asking for the

25   basis, the specific basis, and that's significant because

1    the key compliance employee at NatWest during this time,

2    Mr. Hossesan (ph), one of the primary policy employees

3    during this time, Ms. Gale, they both testified that sure,

4    on a case by case basis, they might assess these accounts,

5    but both of them said that they needed to see the criminal

6    conviction, or they needed to see a U.K. designation.  They

7    needed to see some finite piece of data to convince them to

8    close these accounts.

9         The only way we can test their position that

10   they're saying that NatWest thoroughly followed its

11   procedure for Interpal and decided not to close those

12   accounts, and that decision was proper in accordance with

13   its own policy setting aside anything else, is by testing

14   how they treated these other customers, where obviously

15   they decided okay, we need to close these accounts.

16        And with Friends of Al Aqsa, for instance, one of

17   apparently at least five customers that NatWest did decide

18   to close, and temporarily in this case -- in fact, Friends

19   of Al Aqsa, there was no designation.  There was no

20   criminal conviction.

21        It was simply the case that in late 2004

22   NatWest decided to close the Friends of Aqsa accounts on

23   suspicions of terror financing.

24        They reversed that decision a few weeks later

25   when they received a lot of pressures and they decided it

1    wasn't worth it and they reopened the accounts.  And the

2    actual reasons we can -- you know, that's irrelevant in

3    terms of why they decided to reopen the account.

4            But they decided to close the account without any

5    criminal conviction, without any U.K. designation, which is

6    contrary to the testimony of Mr. Hossesan and Ms. Gale and

7    Mr. Friedman -- excuse me. NatWest's letter

8    mischaracterized saying that Mr. Hossesan simply said well,

9    it was a case by case basis.

10           He ultimately said sure.  They look at the facts

11   of each case, but he gave us specific reasons he could

12   think of why they would close customer's accounts and for

13   NatWest to take the position that this somehow is not

14   relevant, Interpal obviously -- Interpal's accounts weren't

15   in a vacuum.  It wasn't the one account of NatWest it just

16   focused on with tunnel vision.

17           Certainly, there are these other accounts that it

18   decided to close at the same time it was continuously

19   deciding to keep Interpal's accounts open, in spite of what

20   we contend were continuing alarm bells that should have

21   gone off.

22           And so again the only way that we can test, based

23   on NatWest's own policies, what would actually lead it to

24   close accounts, because it didn't do so for Interpal, is by

25   looking at these comparatives.

1    And that's why when we had these meet and confer

2    sessions with Mr. Friedman we said if -- whether it was

3    five customers, seven customers, however many it was, if it

4    was because each was designated by Her Majesty's Treasury,

5    fine.  Say that.

6    And we're not asking for -- we're not getting

7    into provide us with the account documents. Provide us with

8    the transactional records.

9    We're not getting into any of that.  These aren't

10   requests for production.

11   This is simply NatWest is contending that even

12   though it didn't close Interpal's accounts on suspicion of

13   terror financing, it did decide to close others.  And we

14   simply want to know why.

15   MR. FRIEDMAN:   Your Honor, Mr. Israel's argument

16   just proved why this is irrelevant.  This case is not about

17   whether NatWest acted consistently with its policies or

18   consistently with its actions in other instances in

19   deciding not to close Interpal's accounts.  That's not what

20   this case is about.

21   Mr. Israel just said the only way we can test --

22   the only way we can test.  Test what?  What is it issue in

23   this case is not whether we should have closed the

24   accounts. It's not a negligence case.  We're not on trial

25   for failing to follow our own policies.

1          The only relevant test is did we know, or as they

2     argue, were we willfully blind to whether Interpal --

3     Interpal -- Interpal was financing Hamas or Hamas

4     terrorism.

5          What we did with other customers has nothing to

6     do with this at all and this is a complete fishing

7     expedition.

8          If it turns out that other customers were closed,

9     or were not closed, or there were reasons that the

10    customers were closed, reasons that the customers were not

11    closed, so what?  It's completely irrelevant. It has

12    nothing to do with the issue at hand.

13         And there's a bit of a shell game going on here.

14    They're saying the want to know about this so that they can

15    test NatWest's reasons for not closing Interpal.

16         This case is not about the legitimacy of

17    NatWest's reasons for not closing Interpal.  It's whether

18    NatWest knew or was willfully blind to whether Interpal was

19    funding Hamas or Hamas terrorism.  So it's just completely

20    irrelevant.

21         MR. ISRAEL:  But Your Honor, the credibility of

22    the testimony of these witnesses who said they had to have

23    some genuine suspicion and what exactly was a genuine

24    suspicion, which apparently they never had with Interpal in

25    spite of the U.S. designation, in spite of everything that

1    went on, again, what we saw with Friends of Al Aqsa is

2    apparently there was a lesser standard for that customer.

3              MR. FRIEDMAN:  Well, I'm surprised --

4              THE COURT:  Well, wait.  Stop.  Stop.

5              MR. FRIEDMAN:  -- that Mr. Israel would say that

6    --

7              THE COURT:  Stop.  Stop.

8              MR. FRIEDMAN:  -- because we did suspect them.

9              THE COURT:  Mr. Friedman, why didn't you just

10   follow up with discovery after the Hossesan deposition?

11             MR. ISRAEL:  Well, Your Honor, for instance, with

12   Mr. Hossesan's deposition, I believe the cut off to proffer

13   written discovery was March of '010. We deposed Ms. Gale in

14   later October of '010.  She was the last one, because she

15   was a Hague witness.  She happened well after the close of

16   discovery and then we moved onto experts.

17             I mean, frankly, that's why we're not saying --

18   we're obviously not asking at this late date for documents.

19

20             MR. FRIEDMAN:  Mr. Israel, please.  You made

21   follow up requests --

22             MR. ISRAEL:  Can I finish?

23             MR. FRIEDMAN:  You made --

24             MR. ISRAEL:  Can I finish?  As much as you --

25             MR. FRIEDMAN:  But, Your Honor, they --

```
 1              THE COURT:  Let him finish, Mr. Friedman.

 2              MR. ISRAEL:  I mean --

 3              MR. FRIEDMAN:   What he's saying is just not

 4     true.

 5              THE COURT:  Stop.  Stop.  Mr. Friedman --

 6              MR. ISRAEL:  Let's not put on a show here and act

 7     amused. I mean, let's not make this into a game.

 8              THE COURT:  You'll get your chance to speak.

 9              MR. ISRAEL:  Well, Your Honor, again, you're

10     correct.  We didn't ask for documents pertaining to these

11     accounts and, frankly, we took -- Your Honor was quite

12     clear a long time ago in terms of the account information

13     that we could ask for and I think we actually made a list

14     and that's why we didn't come back and say give us -- we're

15     not going to undertake this. You know, give us all the

16     transactions, the thousands of transaction for this

17     customer at this late date and then we'll conduct a

18     comparison.  We're asking simply why did you close the

19     account.  That's it.

20              Which it's astounding to us -- I mean, Mr.

21     Friedman's amused.  We're frankly astounded that given that

22     there were at least five accounts that were closed on

23     suspicions of terror financing and they can't find them

24     now?

25              And this Goalkeeper system -- this self acclaimed
```

60

1    Goalkeeper system, which was designed to record all

2    suspicions and be able to search those suspicions, they

3    can't search for terror financing and find which accounts

4    were closed?  That's just unbelievable.

5           MR. FRIEDMAN:   I'm sad for a couple of reasons,

6    Your Honor.  I'm sad because Mr. Israel is just saying

7    things that are just not true.

8           First of all, the document that refers to the

9    five accounts was produced to Mr. Israel in 2009.  They

10   never made any follow up request about those five accounts.

11          THE COURT:  Just correct me if I'm wrong, but I

12   gather they're all accounts involving the same customer?

13          MR. FRIEDMAN:   I don't know one way or the other

14   and that's another reason that this is saddening, Your

15   Honor, because there is considerable burden in trying to

16   identify what these documents are. Believe me, if there

17   weren't, we would have told them.

18          Discovery ended more than a year ago.  This

19   document was produced in 2009.

20          THE COURT:  I know that.

21          MR. FRIEDMAN:   This is grossly untimely and it's

22   not a question of stonewalling them. It's a question of now

23   a year after discovery ending, two years after this

24   document is produced, having to go back and look for this

25   information again is just not fair.

1          Now as I represented to the court, and I can

2     represent again today, we have looked into the Goalkeeper

3     system and this information is not self evident.  It would

4     have to be an extensive granular search of documents in the

5     Goalkeeper system which would take a substantial amount of

6     time in order to extract this information.

7          And with plaintiffs having sat on this for two

8     years, we should not be required to do that.  Enough is

9     enough, especially when considered in light of the

10    irrelevance of this information.

11         MR. ISRAEL:  Well, Your Honor, a few points.

12    First, we'd certain take the position that it was made

13    relevant by the testimony of NatWest, which happened last

14    summer and into last fall.

15         It think the other thing is looking at your

16    September '08 order, where you did ask us to make a final

17    list of entities for which we wanted written discovery and,

18    frankly, in accordance with that we didn't then receive

19    this document in the Summer of 2009 and ask for the account

20    file because you gave us this final date and we respected

21    that, certainly, and had no problem with that.

22         But that's why, again, we're not asking for the

23    account file.

24         Again, if NatWest is saying that -- I don't know

25    whether it's had so many accounts its closed on suspicions

1    of terror financing, or there are so few, how can it not

2    know this information?  It's simply astounding to us.

3           Again, the Friends of Al Aqsa file showed that

4    the testimony of Mr. Hossesan and Ms. Gale was not

5    accurate.

6           And so we want to know about these other

7    customers as well.

8           MR. FRIEDMAN:  We are not saying -- it's tough,

9    Your Honor, when just complete misstatements just get made

10   again, and again, and again.

11          We're not saying we don't have this information.

12   We're saying to ask us to go through the effort to get this

13   information two years after the document was produced, one

14   year after discovery ended is wrong.  This information may

15   be in the bank's filed, but it would take a tremendous

16   effort to find it.

17          And I've been on the phone with my client over

18   the last three weeks trying to figure out if there is a

19   non-unduly burdensome way in which to extract this

20   information and there isn't.

21          THE COURT:  Well, you did offer to continue

22   making a reasonable search for this information.  What does

23   that mean?

24          MR. FRIEDMAN:  What that means, Your Honor, is

25   if Your Honor directs us to do so, we can continue to look

1       in the Goalkeeper system.  And there are ways -- they're

2       very burdensome ways, but there are ways, but there are

3       ways we can continue to look in the Goalkeeper system.

4            But if we have to go back to -- which is an electronic

5       system.

6                 If we have to go back to hard copy documents that

7       are all stored in boxes in remote locations -- and these

8       are boxes that we went through four or five years ago to

9       produce documents in response to their request and to tell

10      my client that I now have to go to Iron Mountain and get

11      these boxes back, we can continue to think of strategies

12      for extracting this information from the Goalkeeper

13      database, but anything beyond that would just be

14      unreasonable.

15                MR. GLATTER:  Your Honor, if I could just make

16      two points.  One is given that these are terror financing

17      suspicions, while, of course, this is not a negligence

18      case.  It is a little troubling to hear that it would be

19      that problematic to be able to find something, given the

20      threat level represented by the suspicion.

21                But secondly, we spent no small amount of time

22      this afternoon discussing why it was appropriate to have

23      the plaintiffs supplement their contention interrogatories

24      based on the premise that it was quite relevant to be able

25      to point out the action, or inaction, by the British

1    government is somehow suggestive of the defendant's

2    scienter or mens rea, with respect to its decision to

3    continue doing business with Interpal.

4              I respectfully suggest that it's -- if that is

5    relevant, then it is extremely relevant to know how the

6    defendant winds up treating in house its own terrorism

7    suspicion files that its identified, particularly when

8    those entities, such as Friends of Al Aqsa, have not

9    apparently wound up on the radar of the British government

10   to the same degree as Interpal.

11             One, I would submit that the later is far more

12   relevant than the former.

13             MR. FRIEDMAN:   Your Honor, if I may, just one

14   sentence.  Thinking about this this morning I was wondering

15   what kind of arguments plaintiffs would make and I was

16   going to say are they going to say that if what we're

17   looking for is relevant, then this is relevant? And sure

18   enough, Mr. Glatter did.

19             The material difference, of course, is that what

20   we're asking about all relates to Interpal.  What they're

21   asking about relates to five other customers.

22             Your Honor, if Your Honor thinks that this is

23   relevant, we can continue to look in Goalkeeper and that's

24   where we are.

25             MR. ISRAEL:  Your Honor, I would just submit, our

1    one concern again is having an understanding of what the

2    reasonable search is.

3           Again, we laid out we're not -- goalkeeper

4    obviously isn't in any of our systems.  We had a few

5    corporate representatives who testified about it and to the

6    best we could, we laid out where it would seem like they

7    could find this information.  Obviously, we don't know

8    that.

9           So what we're simply trying to make sure of is a

10   reasonable search, again, seeming like it -- seemingly

11   impossible to us that NatWest could not find this

12   information within its system.

13          We just want to make sure that reasonable means

14   that they're doing everything they can within this

15   goalkeeper system to try to find this information.

16          We're not asking about going to Chicago or

17   wherever the -- however many boxes are held.  We're asking

18   about the goalkeeper system here.

19          THE COURT:  Okay.  I have no problems requiring

20   the defendant to continue search on the goalkeeper system.

21          MR. FRIEDMAN:   Okay.  We'll do that.

22          THE COURT:  Because, you know, to the extent that

23   the treatment was consistent with how NatWest treated other

24   customers, I mean that arguably is relevant and I'm not

25   going to make any arguments for either side, you know, as

1    to what value you can make -- I mean, what you can make of

2    this kind of information.

3           At the most basic level you need to provide the

4    information.

5           I'm a little surprised that it appears -- I mean,

6    do you have the account numbers that were closed, or am I

7    just misreading --

8           MR. FRIEDMAN:   No, we don't.

9           THE COURT:  Those account numbers deal with a Al

10   Aqsa.

11          MR. FRIEDMAN:   The first step is identifying the

12   account numbers.  The first step in going through

13   Goalkeeper, because -- but we do not have the account

14   numbers.  If we did, we wouldn't be arguing about this.

15          THE COURT:  Okay.  I'll ask you to continue

16   searching.

17          MR. FRIEDMAN:   The Goalkeeper system.

18          Your Honor, the last point is we had agreed that

19   we would set a schedule today for the submission of pre-

20   motion --

21          MR. ISRAEL:  Mr. Friedman, without cutting you

22   off, I wanted to get a sense of how long we're going to

23   talk about the supplemental responses, because we had

24   discussed the dates, and I just wanted to make sure in

25   light of the timing we're talking about for supplemental

1    responses that it still makes the schedule work.

2              MR. FRIEDMAN:   Well, you tell me.  The last time

3    we submitted our pre-motion conference letters before there

4    were supplemental responses.  I'm happy to do that.

5              MR. ISRAEL:  We did and I think we can still do

6    that. Again, we're balancing this out against -- not this

7    case. We have summary judgment briefing in the other case,

8    so we just want to make sure from a scheduling standpoint -

9    -

10             THE COURT:  Well, why don't we talk about the

11   dates for production and then that might inform the setting

12   of the deadlines for the pre-motion letters.

13             MR. FRIEDMAN:   I suspect, to be on the safe

14   side, I should have three weeks to do what more I an on

15   Goalkeeper knowing how long it's taken to get to where they

16   are.

17             So that would be --

18             THE COURT:  October 6th.

19             MR. FRIEDMAN:   October 6th.

20             MR. ISRAEL:  Your Honor, I guess in light of what

21   else is going on with these cases and what we may or may

22   not have to do with no. 20 I guess we'd ask for maybe

23   October 13th, just to extend it out an extra week.

24             MR. FRIEDMAN:   No objection.

25             Do the dates for the pre-motion letter still work

1    for you?

2              MR. ISRAEL:  Yes, I think that's fine.

3              THE COURT:  What are the dates for the pre-motion

4    letters?

5              MR. FRIEDMAN:   Well, I'm told there will be no

6    plaintiff's summary judgment motion, unlike in the Credit

7    Lyonnais cases, so we propose to submit our pre-motion

8    letter to Judge Irizarry on September 28th.

9              THE COURT:  28th?

10             MR. FRIEDMAN:   September 28th.  And plaintiffs

11   will submit their response on October 7, and I believe last

12   time Your Honor communicated those dates to Judge Irizarry,

13   who proposed conferences dates to us.

14             MR. ISRAEL:  I guess one thing we didn't talk

15   about was page length, which is different, because in

16   Credit Lyonnais we're dealing with two issues; sequencing

17   and the substance.

18             MR. FRIEDMAN:   I'm happy to abide by Judge

19   Irizarry's three-page rule.

20             MR. ISRAEL:  That's fine.

21             Your Honor, after the Credit Lyonnais motion to

22   compel hearing you submitted a minute order.  I'm kind of

23   going through your rulings.  Do you plan to do the same

24   here?

25             THE COURT:  I try to do that.  It's difficult

1      enough trying to remember my past rulings. I try to forget

2      them and I hate Westlaw and Lexis for picking up decisions

3      I'd rather not see again.

4              But let's just talk about administrative matters

5      first.

6              One is just a simple one, which is -- I don't

7      know if you've noticed the four cases that all of you are

8      involved in are linked on the docket sheet and there have

9      been no formal consolidation agreements -- orders with

10     respect to the two sets of cases.

11             I assume the parties don't object to

12     consolidating the two NatWest cases and the two Credit

13     Lyonnais cases.

14             MR. ISRAEL:  For purposes of trial?

15             THE COURT:  Yes.

16             MR. ISRAEL:  Well --

17             THE COURT:  Why don't you think about it.  I

18     would think it makes sense.  We initially basically have

19     treated these -- all four cases as consolidated for

20     discovery cases, but the two sets of cases have gone their

21     separate ways.

22             What I will do on the docket sheet, in case you

23     find some value in it, is to not -- de-link the four cases

24     at this point.

25             MR. FRIEDMAN:   I think that's been done, Your

70

1    Honor. We received notices this week that this was done.

2              THE COURT:  No, no. They -- who --

3              MR. FRIEDMAN:   We received a notice from the

4    clerk's office that the two NatWest cases would be linked

5    and the two Credit Lyonnais cases would be linked.

6              THE COURT:  Okay.  Well, then my assistant acted

7    more quickly than I thought.

8              MR. FRIEDMAN:   But that the four cases would not

9    be linked together.

10             THE COURT:  Right.  And so that will enable you

11   and Strauss to file -- to just make one filing in the two

12   cases and you were always able to do that in the Weiss case

13   anyway; link it to any other case.

14             Now on the protective order, what I will do is

15   simply amend I think Section 4(f), dealing with the

16   ceiling.

17             I am issuing an order, you know, as required by

18   the Second Circuit in *Lugosh,* to make specific findings as

19   to the ceiling of the underlying documents;  the bank

20   documents and the tracking documents and I'll roll into

21   that the personal information of the plaintiffs.

22             So I do have a question about that, so that we

23   don't have to keep going back and amending the definitions

24   for what can be sealed.

25             I am not touching the original agreements in your

1    designation of what's confidential.  I am simply defining

2    the scope of documents that can be filed under seal and

3    what information should be redacted in the order to be

4    issued.

5         So you'll abide by whatever agreements you have

6    on designations.  That's not a concern of the court and it

7    makes it a lot easier, so that we don't have to superimpose

8    on the past designations the more limited category;

9    hopefully, more limited categories that we've discussed

10   regarding sealing.

11        I did discuss the matter with Judge Irizarry.

12   Her preference is just simply to have documents that are

13   clearly sealed and documents that are not.

14        I know you've already served the initial set of

15   motion papers, right, in Strauss. So maybe what you could

16   do is have filings -- separate filings for documents that

17   are either redacted or filed under seal.  Does that make it

18   too difficult?

19        So, for instance, your memoranda of law will be

20   publicly filed with redactions.  If you have supporting

21   affidavits, with sealed exhibits, don't -- I don't want the

22   affidavits to be completely sealed. I don't know if you

23   have the capacity to seal just the exhibit. I'll have to

24   check.

25        We'll work this out with the -- discuss just the

1    logistics of doing this and when you did public file the

2    redacted documents, as you can see from the notice that we

3    filed it, it was very backwards since there was no rhyme or

4    reason to your attachments.

5            So try to be more organized in how you file

6    exhibits and attachments.  Don't -- I know it's more

7    onerous for you to file them separately.  If you can group

8    them, that's okay, but don't have one exhibit overlapping

9    into another filing -- filed document, because I know there

10   are restrictions on the length of documents you can file.

11           But anyway, if we need a less on that we'll just

12   talk privately with you later about it.

13           Now, the most difficult aspect of the

14   confidentiality order is the redactions that need to be

15   undertaken and I've forgotten to bring down the proposed

16   redactions that both sides submitted.

17           What is telling is in the few cases where there's

18   an overlap in suggested redactions, that the plaintiffs are

19   actually redacting more than what the defendants had

20   proposed.

21           I do have a question about the -- one of the

22   experts who did the number crunching and I know --

23           MR. GLATTER:  Mr. Geiser?

24           THE COURT:  No.  It's a two-name -- Nealy and --

25           MR. GLATTER:  Mr. Geiser is the witness from

73

1    Nigel and Riley.

2         THE COURT:  Okay.  Anyway, I don't think it's a

3    surprise if I can share with the plaintiff that you did

4    propose -- submit some proposed redactions as to some of

5    the plaintiff's expert reports.

6         So I -- they provide actually a good basis for us

7    to talk about what redactions would be appropriate and you

8    had actually redacted all references to Nigel and Reilly in

9    your -- in one of the reports.

10        A lot of the footnotes -- I can understand

11   redactions relating to customers that -- or transferees who

12   were never identified publicly before, but as to some of

13   the sources of information, a lot of it came from the

14   expert report of Nigel and Reilly and I don't know why that

15   was --

16        MR. GLATTER:   If I understand, Your Honor, just

17   so I have it clear it my mind.

18        I think what you're referring to is the fact that

19   certain of our other experts, for example, Dr. Matthew

20   Levitz, may have referenced certain transactions processed

21   by Credit Lyonnais, or by NatWest, as the case may be, and

22   identified by Bates number -- identified within -- I guess

23   in the Nigel and Reilly report, where it referenced

24   transfer --

25        THE COURT:  Could you just hold on a sec? Maybe

1    it will be easier if I have Josh go up and if you don't

2    mind, I'll share your proposed redactions?

3            MR. FRIEDMAN:   I honestly don't know what Your

4    Honor's referring to.

5            THE COURT:  I had asked for representative

6    documents that you might be filing and you would mark the

7    places that you think ought to be redacted.

8            And I gave you the option of filing them -- of

9    submitting theme ex parte and both sides did.

10           So I wanted to -- I would like to look at the

11   expert reports with you and talk through some of the

12   redactions to get a better handle on --

13           MR. FRIEDMAN:   If I may, Your Honor, I don't

14   think this is -- that I'm equipped to do it now because I

15   would have to have others of my colleagues who did the

16   redactions --

17           MR. GLATTER:   I believe in our case I think Mr.

18   Goldman's office submitted the redactions and so I can

19   certainly give it the college try --

20           THE COURT:  Okay.  Then maybe we need to --

21           MR. FRIEDMAN:   If we could have a telephone

22   conference, if Your Honor wishes --

23           THE COURT:  I'd actually like to talk to you

24   before completing my order, because the toughest part of

25   the order is --

```
 1            MR. FRIEDMAN:   Can I suggest this to Your Honor.

 2    If you would like to just give us a call, or have Mr.

 3    Prushesky just give us a call.

 4            THE COURT:  Well, I'd like to have it together

 5    and perhaps to have the -- okay.  Then why don't we do that

 6    and you'll tell him who we need to talk to.

 7            And if you think it would be useful to have a

 8    joint -- another -- a conference by telephone, I'll do

 9    that.

10            MR. FRIEDMAN:   Yes, why don't we do that, if

11    Your Honor proposes to us a time for a telephone

12    conference, we can do that.

13            Because, Your Honor, I think the best thing to do

14    -- another reason to do it that way is that if I can have

15    in front of me that submission that we made, and unredacted

16    versions of that submission, I can tell Your Honor exactly

17    why we did what we did.

18            THE COURT:  Well, why don't you come to chambers

19    after this -- you sent me many, many copies.

20            I hopefully won't be getting documents from you

21    in the future but as far as I'm concerned, if you ever send

22    more documents, you can always -- you only need to send me

23    one set because you don't need to do it for every -- for

24    each of the cases.

25            But in any event, why don't we come - I'll show
```

76

1    Mr. Friedman what you sent. I have many copies of that.  So

2    if that's -- if you feel it's all right for me to share it

3    with the plaintiff's counsel, then I'll give you a set.

4              MR. FRIEDMAN:   Okay.

5              THE COURT:  But you just marked where the

6    redactions would be, I think. So it's a good working

7    document to -- so I'll met you upstairs.

8         (Proceedings concluded at 3:45 p.m.)

9         I, CHRISTINE FIORE, Certified Electronic Court

10   Reporter and Transcriber and court-approved transcriber,

11   certify that the foregoing is a correct transcript from the

12   official electronic sound recording of the proceedings in

13   the above-entitled matter.

14

15   *Christine Fiore*

16   _____            September 18, 2011

17        Christine Fiore, CERT

18

19

20

21

22

23

24