UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
TZVI WEISS, et al.,                                     :
                                                        :
                              Plaintiffs,               :        Case No. 05-cv-4622 (DLI) (MDG)
                                                        :
               - against –                              :
                                                        :
NATIONAL WESTMINSTER BANK PLC,                          :
                                                        :
                              Defendant.                :
                                                        :
-----------------------------------------------------------X
NATAN APPLEBAUM, et al.,                                :
                                                        :
                              Plaintiffs,               :
                                                        :
               - against –                              :
                                                        :        Case No. 07-cv-916 (DLI) (MDG)
NATIONAL WESTMINSTER BANK PLC,                          :
                                                        :
                                                        :        **Oral Argument Requested**
                              Defendant.                :
                                                        :
                                                        :
-----------------------------------------------------------X

## MEMORANDUM OF LAW OF DEFENDANT NATIONAL WESTMINSTER BANK PLC IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

Attorneys for Defendant National Westminster Bank Plc

December 7, 2011

HIGHLY CONFIDENTIAL

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................... iii

I.  NO REASONABLE JUROR COULD FIND THAT PLAINTIFFS HAVE
    PROVEN THE SCIENTER ELEMENT OF THEIR CLAIMS ........................................ 1

    A.  The Governing Scienter Standards ................................................... 3

    B.  There Is No Evidence On Which A Reasonable Juror Could Find That
        NatWest Acted With The Scienter Required By Sections 2333(a), 2339B
        Or 2339C .......................................................................................... 4

        1.  There Is No Evidence NatWest Knew That Interpal Was Funding
            Hamas or Hamas Terrorism .................................................... 7

            a.  NatWest's observation of Interpal's accounts .............. 7

            b.  NatWest's knowledge based on Israeli government and
                OFAC sanctions ........................................................ 11

        2.  There Is No Evidence NatWest Was "Willfully Blind" ........... 14

    C.  Plaintiffs' Proposed "Expert" Testimony Is Inadmissible To Support Their
        Scienter Allegations ........................................................................ 15

        1.  Walters lacks the requisite qualifications to offer his opinions .............. 15

        2.  Walters does not employ a reliable or verifiable methodology .............. 16

        3.  Walters's opinions are irrelevant ........................................... 18

        4.  Walker lacks the requisite qualifications to offer his opinions
            regarding the Charity Commission ......................................... 19

        5.  Walker does not employ a reliable or verifiable methodology ............... 20

II. NO REASONABLE JUROR COULD FIND THAT PLAINTIFFS HAVE
    PROVEN THE PROXIMATE CAUSATION AND ARTICLE III STANDING
    ELEMENTS OF THEIR CLAIMS ...................................................................... 21

    A.  Plaintiffs Must Prove Both Proximate Causation And Article III Standing ........ 21

    B.  No Reasonable Juror Could Find For Plaintiffs On Either Component Of
        Their Proximate Causation And Standing Contentions ......................... 22

        1.  No Reasonable Juror Could Find That The 13 Charities Were The
            Alter Egos Of Or Controlled By Hamas ................................... 23

            a.  Plaintiffs have not proven alter ego or control status ................. 23

            b.  Plaintiffs cannot rely entirely on "expert" opinions to prove
                alter ego or control status ......................................... 27

        2.  The Mere Transferring Of Funds To The 13 Charities Is
            Insufficient To Prove Proximate Causation ............................. 28

# TABLE OF CONTENTS
## (continued)

Page

C.   Even If Plaintiffs Could Prove That The 13 Charities Were Alter Egos Of
     Or Controlled By Hamas Through Expert Testimony, Levitt's And
     Spitzen's Proposed Testimony Would Be Inadmissible Under Daubert...............32

III.  NATWEST IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS'
      SECTION 2339B CLAIM BECAUSE NO REASONABLE JUROR COULD
      FIND THAT NATWEST PROVIDED FUNDS TO AN FTO ........................................36

IV.   NO REASONABLE JUROR COULD FIND THAT PLAINTIFFS HAVE
      PROVEN THE HAMAS RESPONSIBILITY ELEMENT OF THEIR CLAIMS ..........37

      A.   Shaked's Proposed Testimony Is Not Admissible ..............................................37

           1.   Shaked's Opinion That Hamas Perpetrated The Attacks At Issue Is
                An Improper Subject For Expert Testimony ...........................................38

           2.   Shaked's Proposed Testimony Is An Improper Summary Of
                Inadmissible Hearsay.............................................................................39

           3.   Shaked Is Not Qualified To State Who Is Responsible For
                Perpetrating A Terrorist Attack .............................................................40

           4.   Shaked's Opinion Is Not Based On A Daubert-Sufficient
                Methodology...........................................................................................40

      B.   Kohlmann's Proposed Testimony Is Not Admissible ..........................................43

           1.   Kohlmann Aggregates And Summarizes Inadmissible Hearsay..............43

           2.   Kohlmann Is Not Qualified To Determine Who Is Responsible For
                Perpetrating A Terrorist Attack .............................................................44

           3.   Kohlmann's Proposed Testimony Is Not Based On A Daubert-
                Sufficient Methodology...........................................................................46

      C.   The Documents On Which Shaked And Kohlmann Purport To Rely Are
           Inadmissible Hearsay.........................................................................................47

      D.   Plaintiffs Have Not Authenticated The Documents On Which Shaked And
           Kohlmann Purport To Rely ................................................................................48

CONCLUSION  .........................................................................................................................50

# TABLE OF AUTHORITIES

**Page(s)**

**Rules and Statutes**

31 C.F.R. § 594.304 ..................................................................................... 12

18 U.S.C. § 2333(a) ..................................................................................... passim

Fed. R. Evid. 702 ......................................................................................... 16

**Cases**

24/7 Records, Inc. v. Sony Music Entm't, Inc.,
514 F. Supp. 2d 571 (S.D.N.Y. 2007) ......................................................... 35

Allen v. Wright,
468 U.S. 737 (1984) ..................................................................................... 21-22

Amorgianos v. Nat'l R.R. Passenger Corp.,
303 F.3d 256 (2d Cir. 2002) ........................................................................ 33

Andrews v. Metro N. Commuter R.R. Co.,
882 F.2d 705 (2d Cir. 1989) ........................................................................ 39-40

Be-Lo Stores v. N.L.R.B.,
126 F.3d 268 (4th Cir. 1997) ....................................................................... 49

Berkey v. Third Ave. Ry. Co.,
155 N.E. 58 (N.Y. 1926) .............................................................................. 25

Boim v. Holy Land Found. for Relief and Dev.,
549 F.3d 685 (7th Cir. 2008) (en banc) ...................................................... 4, 15

Daubert v. Merrell Dow Pharm., Inc.,
509 U.S. 579 (1993) ..................................................................................... 15

Dolphin v. Synthes (USA) Ltd.,
2011 WL 1345334 (S.D.N.Y. Mar. 25, 2011) ............................................ 34

ECA, Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.,
553 F.3d 187 (2d Cir. 2009) ........................................................................ 7

Estate of Parsons v. Palestinian Auth.,
715 F. Supp. 2d 27 (D.D.C. 2010), aff'd in part, rev'd in part on other grounds,
651 F.3d 118 (D.C. Cir. 2011) ............................................................... 39, 41, 46

**Page(s)**

Estate of Radcliffe v. Pradera Realty Co.,
2008 WL 53115 (S.D.N.Y. Jan. 2, 2008) .......................................................... 22

Fashion Boutique of Short Hills, Inc. v. Fendi U.S.A., Inc.,
314 F.3d 49 (2d Cir. 2002) ................................................................................ 18

First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba,
462 U.S. 611 (1983) .......................................................................................... 25

Freier v. Westinghouse Elec. Corp.,
303 F.3d 176 (2d Cir. 2002) .............................................................................. 8

Gale v. Napolitano,
2011 WL 809499 (E.D.N.Y. Mar. 2, 2011)........................................................ 4

Global-Tech Appliances, Inc. v. SEB S.A.,
131 S. Ct. 2060 (2011)................................................................................... 4, 14

Goldberg v. UBS AG,
660 F. Supp. 2d 410 (E.D.N.Y. 2009)................................................................ 3

Holder v. Humanitarian Law Project,
130 S. Ct. 2705 (2010)....................................................................................... 28

Humanitarian Law Project v. Reno,
205 F.3d 1130 (9th Cir. 2000)............................................................................ 31

Hygh v. Jacobs,
961 F.2d 359 (2d Cir. 1992) .............................................................................. 27

In re Agape Litig.,
773 F. Supp. 2d 298 (E.D.N.Y. 2011)............................................................. 8, 14

In re Homestore.com, Inc. Sec. Litig.,
347 F. Supp. 2d 769 (C.D. Cal. 2004)................................................................ 50

In re Rezulin Prods. Liab. Litig.,
309 F. Supp. 2d 531 (S.D.N.Y. 2004) ............................................................... 19

In re Rezulin Prods. Liab. Litig.,
369 F. Supp. 2d 398 (S.D.N.Y. 2005) ................................................. 34, 42, 47

Kaplan v. Al Jazeera,
2011 WL 2314783 (S.D.N.Y. June 7, 2011)................................................. passim

Kumho Tire Co. Ltd. v. Carmichael,
526 U.S. 137 (1999) .......................................................................................... 15

**Page(s)**

La Salle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.,
424 F.3d 195 (2d Cir. 2005) ............................................................ 19

Lerner v. Fleet Bank, N.A.,
459 F.3d 273 (2d Cir. 2006) ............................................................ 21, 31

Linde v. Arab Bank,
384 F. Supp. 2d 571 (E.D.N.Y. 2005) ........................................... 4

Lloyd v. Am. Exp. Lines, Inc.,
580 F.2d 1179 (3d Cir. 1978) .......................................................... 48

MAG Portfolio Consult, GMBH v. Merlin Biomed Group LLC,
268 F.3d 58 (2d Cir. 2001) ............................................................. 25

McBrearty v. Vanguard Grp., Inc.,
353 F. App'x 640 (2d Cir. 2009) .................................................... 21

N.L.R.B. v. Deena Artware, Inc.,
361 U.S. 398 (1960) ........................................................................ 25

Nat'l Council of Resistance of Iran v. Dep't of State,
373 F.3d 152 (D.C. Cir. 2004)................................................. 24, 25-26

Pereira v. Cogan,
281 B.R. 194 (S.D.N.Y. 2002) ....................................................... 27

Raskin v. Wyatt Co.,
125 F.3d 55 (2d Cir. 1997) ............................................................. 18

Rothstein v. UBS AG,
647 F. Supp. 2d 292 (S.D.N.Y. 2009) ...................................... 22, 28-30

Rothstein v. UBS AG,
722 F. Supp. 2d 511 (S.D.N.Y. 2011) ........................................... passim

Ryan v. Hunton & Williams,
2000 WL 1375265 (E.D.N.Y. Sept. 20, 2000) .............................. 8

Simon v. E. Ky. Welfare Rights Org.,
426 U.S. 26 (1976) ......................................................................... 22

Slayton v. Am. Express Co.,
604 F.3d 758 (2d Cir. 2010) ........................................................... 7

Strauss v. Crédit Lyonnais,
2006 WL 2862704 (E.D.N.Y. Oct. 5, 2006) .................................. 29, 31

**Page(s)**

Tiffany (NJ) Inc. v. eBay Inc.,
600 F.3d 93 (2d Cir. 2010) .................................................................................... 14

Transamerica Leasing, Inc. v. La Republica de Venez.,
200 F.3d 843 (D.C. Cir. 2000)............................................................................... 25

United States v. Bilzerian,
926 F.2d 1285 (2d Cir. 1991) ............................................................................... 27

United States v. Defreitas,
2011 WL 317964 (E.D.N.Y. Jan. 31, 2011)......................................................... 34

United States v. Diaz,
878 F.2d 608 (2d Cir. 1989) ................................................................................. 18

United States v. Ferrarini,
219 F.3d 145 (2d Cir. 2000) ................................................................................... 3

United States v. Gagliardi,
506 F.3d 140 (2d Cir. 2007) ................................................................................. 49

United States v. Mejia,
545 F.3d 179 (2d Cir. 2008) ................................................................. 32, 38-39, 44

United States v. Paracha,
2006 WL 12768 (S.D.N.Y. Jan. 3, 2006) ....................................................... passim

United States v. Perlmuter,
693 F.2d 1290 (9th Cir. 1982)............................................................................... 50

United States v. Svoboda,
347 F.3d 471 (2d Cir. 2003) ................................................................................... 3

United States v. Williams,
506 F.3d 151 (2d Cir. 2007) ................................................................................. 40

Viscusi v. Procter & Gamble,
2007 WL 2071546 (E.D.N.Y. July 16, 2007)................................................... passim

Weiss v. National Westminster Bank PLC,
453 F. Supp. 2d 609 (E.D.N.Y. 2006) .................................................... 23, 24, 27, 37

Zenith Elecs. Corp. v. WH-TV Broad. Corp.,
395 F.3d 416 (7th Cir. 2005) ............................................................................... 35

**Page(s)**

**Other Authorities**

7 John H. Wigmore, Evidence in Trials at Common Law § 2158
(Chadbourne rev.1978) ............................................................................................... 49

Defendant National Westminster Bank Plc ("NatWest") respectfully submits this memorandum of law in support of its motion for summary judgment.  For the reasons stated below, no reasonable juror could find that plaintiffs have proven the <u>scienter</u>, proximate causation, Article III standing or Hamas responsibility elements of their claims.  Accordingly, there are no triable issues in these lawsuits, and NatWest is entitled to summary judgment.

## I.  NO REASONABLE JUROR COULD FIND THAT PLAINTIFFS HAVE PROVEN THE SCIENTER ELEMENT OF THEIR CLAIMS

Plaintiffs allege that NatWest, a leading international bank, knowingly provided material support and financing in violation of the civil liability provisions of the U.S. Anti-Terrorism Act (the "ATA"), 18 U.S.C. § 2333(a), for 15 terrorist attacks in Israel and the Palestinian Territories between 2002 and 2004 that plaintiffs attribute to Hamas and resulted in injuries to them. Plaintiffs base this allegation on NatWest's provision of routine banking services in the United Kingdom to a lawful, registered UK charity known as Interpal.  According to its public statements, and to NatWest's knowledge, Interpal solicits private donations in the UK to fund humanitarian projects, such as the construction of schools and hospitals, and to provide food and medical relief, in the Palestinian Territories.  Interpal deposited certain of the donations it collected in the UK into its accounts at NatWest in the UK.  From time to time, Interpal instructed NatWest to make wire transfers of funds from these accounts from the UK to local charities in the Palestinian Territories.

Plaintiffs allege that Interpal is not a legitimate charity, but instead secretly funds Hamas, contending that the charities that received wire transfers from Interpal's NatWest accounts were <u>alter egos</u> of or controlled by Hamas, and that Hamas perpetrated the 15 attacks at issue. Plaintiffs seek to attribute responsibility for these attacks and plaintiffs' injuries to NatWest under the ATA by alleging – as the <u>scienter</u> requirements of the ATA demand – that NatWest

knew or was "willfully blind" to whether the funds Interpal transferred from its NatWest accounts would be used by the transferees to finance Hamas, and that NatWest intended these funds would be used to perpetrate Hamas terrorist attacks.

Plaintiffs have presented no admissible evidence to create a triable case on these allegations. Despite years of discovery, there is no admissible evidence that NatWest knowingly provided material support to foster the murder and maiming of innocent civilians by Hamas terrorists, let alone that NatWest intended this result. Rather, the indisputable evidence shows that NatWest did <u>not</u> know Interpal was funding Hamas or Hamas terrorism (if it indeed were). Taken in the light most favorable to plaintiffs, the evidence shows only that NatWest at times <u>suspected</u> Interpal of terror financing, and as UK law requires of UK banks when they have such suspicions, it filed no fewer than five suspicious activity reports with UK law enforcement authorities during the relevant period, which NatWest obviously would <u>not</u> have done – because aiding terror financing is a crime in the UK – if it knew Interpal were financing Hamas terrorism and wished to hide that fact. Moreover, these law enforcement authorities assured NatWest they were investigating Interpal and gave NatWest guidance for making further disclosures, with which NatWest also complied. The undisputed evidence also shows NatWest sought guidance regarding Interpal from the regulator in charge of UK terror financing sanctions, the Bank of England, which explicitly instructed NatWest ███████████████████████████████ ███████████████████████████████████████████████████████████████

███████ Finally, the undisputed evidence shows NatWest knew that, after extensive investigations of Interpal, aided by NatWest's disclosures, the Charity Commission for England and Wales (the "Charity Commission"), Interpal's official regulator, and the UK police authorities dedicated to fighting terror financing, had found no evidence – and still to this day

have found no evidence – that Interpal funded Hamas or Hamas terrorism.  Hence, there is no

competent evidence whatsoever that NatWest knew, rather than suspected, that Interpal was

financing Hamas terrorism, or that it was "willfully blind" to any such misconduct.  Accordingly,

the Court should grant NatWest summary judgment on this ground alone.

A.      **The Governing Scienter Standards**

Plaintiffs must prove that NatWest had the requisite scienter under both section 2333(a)

of the ATA and either section 2339B or section 2339C.  See Goldberg v. UBS AG, 660 F. Supp.

2d 410, 427-28 (E.D.N.Y. 2009).  Under section 2333(a), plaintiffs must prove that NatWest is

guilty of "'intentional misconduct'" and acted with "'malice'" and an "evil motive."  Kaplan v.

Al Jazeera, 2011 WL 2314783, at *4 (S.D.N.Y. June 7, 2011) (citation omitted).[1]

If plaintiffs can prove that NatWest acted with the scienter required by section 2333(a),

they must also prove that NatWest acted with the scienter required by either section 2339B or

section 2339C.  Under section 2339B, plaintiffs must prove that NatWest "'knowingly

provide[d] material support or resources to a foreign terrorist organization'," or "FTO."  Under

section 2339C, plaintiffs must prove that NatWest acted "'willfully'" and intended that the funds

Interpal transferred from its NatWest accounts would be used to carry out terrorist attacks.

Goldberg, 660 F. Supp. 2d at 414 nn.3-4, 427.

The "knowingly" standard requires plaintiffs to prove NatWest acted "intentionally,

voluntarily, and deliberately," United States v. Ferrarini, 219 F.3d 145, 155 (2d Cir. 2000), and

the "willfully" standard requires proof NatWest knew its conduct was unlawful and intended to

do what the law forbids.  United States v. Svoboda, 347 F.3d 471, 482 (2d Cir. 2003).

---

[1]  As plaintiffs concede, mere negligence is insufficient to establish NatWest's liability.  See Goldberg v. UBS AG,
No. 08-civ-375 (CPS) (MDG), Plaintiffs' Memorandum of Law in Opposition to Defendant UBS AG's Motion to
Dismiss the Complaint, at 34 (E.D.N.Y. Apr. 22, 2009), Dkt. No. 65.

Plaintiffs also contend – and NatWest accepts for the limited purpose of this motion – they can prove NatWest's scienter if it was "willfully blind" to whether it was funding Hamas terrorism. The Supreme Court recently confirmed that "willful blindness" requires proof that: "(1) the defendant must subjectively believe that there is a high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact." Global-Tech Appliances, Inc. v. SEB S.A., 131 S. Ct. 2060, 2070 (2011) (emphasis added). The requirement of "deliberate action" to avoid learning a fact the defendant subjectively believes is highly probable to exist is decidedly narrower than liability based on either recklessness or negligence grounds. Id.[2]

Summary judgment with respect to the scienter element of a claim is appropriate where, as here, the record lacks any specific admissible evidence to support a finding of scienter. See, e.g., Gale v. Napolitano, 2011 WL 809499, at *8 (E.D.N.Y. Mar. 2, 2011) ("The summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion.") (citations omitted).

**B.      There Is No Evidence On Which A Reasonable Juror Could Find That
        NatWest Acted With The Scienter Required By Sections 2333(a), 2339B Or 2339C**

There is no evidence on which a reasonable juror could find that NatWest knew or was willfully blind to whether Interpal was funding Hamas terrorism. To the contrary, the record shows that NatWest at times was suspicious about Interpal's conduct, and dutifully disclosed its

---

[2]  Plaintiffs have argued in their opposition to the motion for summary judgment by Crédit Lyonnais in the parallel Strauss and Wolf lawsuits that a mere showing of "recklessness" will satisfy the ATA's scienter requirements. See Strauss v. Crédit Lyonnais, No. 06-CV-702 (DLI) (MDG), Plaintiffs' Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment, at 15-16 (E.D.N.Y. Oct. 14, 2011). Plaintiffs are wrong. The very precedents they cite for this contention show that courts in this context have defined "recklessness" to require that the defendant has "disregard[ed] a risk of harm of which he is aware," which is precisely what the Global-Tech willful blindness standard requires. See, e.g., Boim v. Holy Land Found. for Relief and Dev., 549 F.3d 685, 694 (7th Cir. 2008) (en banc) ("Boim III"). Thus, mere recklessness is not sufficient to meet the ATA's scienter requirement, as Judge Gershon expressly ruled in Linde v. Arab Bank, 384 F. Supp. 2d 571, 585 n.8 (E.D.N.Y. 2005).

suspicions and the factual bases for them to the UK National Criminal Intelligence Service

("NCIS") pursuant to the bank's legal obligations in the UK, which NatWest obviously would

not have done if it knew Interpal was funding Hamas – which was a crime in the UK – and was

attempting to hide that fact, as plaintiffs suggest.  Defendant's Statement Pursuant to Local Civil

Rule 56.1 ("56.1 St.") ¶¶ 12-15, 34-39, 49-62, 68.  NCIS and the UK police authorities to which

NCIS forwarded NatWest's disclosures responded by ███████████████████████████

███████████████████████████████████████████████████████████████████████

████  See 56.1 St. ¶¶ 52, 59-60, 63-64, 69.  As NatWest knew, none of these authorities – even

to this day – ever made any allegations, let alone brought any charges, that Interpal was funding

Hamas or Hamas terrorism.  In short, NatWest reported its suspicions as the law required,

whether they were well-founded or not, but received ███████████ of them at all.

NatWest also knew that the Charity Commission twice investigated Interpal, in response

to allegations that it was funding Hamas terrorism, and NatWest actively assisted the

Commission's second investigation by providing detailed information concerning Interpal's

accounts.  56.1 St. ¶¶ 31-33, 47, 65-76.  Furthermore, NatWest knew the Charity Commission

reported after both investigations that it had found no evidence that Interpal was funding Hamas

or Hamas terrorism, and it instructed NatWest in 2003 tha███████████████████

████████████56.1 St. ¶¶ 33, 75-76.  Further, NatWest knew that Interpal remained at all

times registered with the Charity Commission as a lawful charity, a fact that, as NatWest also

knew, creates a conclusive statutory presumption under UK law that Interpal had been

established and was being operated for charitable purposes, as it could not be if it were funding

Hamas or Hamas terrorism.  56.1 St. ¶¶ 21-23.

Moreover, after the U.S. Treasury Department Office of Foreign Assets Control ("OFAC") named Interpal as a Specially Designated Global Terrorist ("SDGT") in August 2003 for the purposes of OFAC's U.S. asset freezing regulations, NatWest sought guidance from the Financial Sanctions Unit of the Bank of England – the UK counterpart to OFAC – as to ███████ ████████████████████████████████ In response, the Bank of England explicitly advised NatWest ████████████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████ 56.1 St. ¶¶ 77-79.  NatWest thereafter monitored Interpal's account activity on a semi-annual basis, which revealed no evidence that Interpal was funding Hamas.  56.1 St. ¶¶ 80-87.

This indisputable record of NatWest's disclosures of its suspicions about Interpal to the UK authorities responsible for combating terror financing, the responses NatWest received from these authorities, NatWest's knowledge of the findings by the Charity Commission, NatWest's disclosures to and the explicit ███████████ it received from the Bank of England's Financial Sanctions Unit (collectively, "UK Law Enforcement and Regulators") and NatWest's own monitoring of Interpal establish the very antithesis of a bank engaged in "intentional misconduct," that knows its customer is engaged in financing terrorism and willfully seeks to aid that wrongdoing or that is willfully blind to that illegality, as the scienter provisions of the ATA require.

It is also undisputed that, to this date, neither NatWest's home government in the UK nor the European Union has ever sanctioned Interpal in any respect.  56.1 St. ¶ 108.  To the contrary, after extensive investigations of Interpal,[3] UK Law Enforcement and Regulators have not only

---

[3] The Charity Commission conducted a third investigation of Interpal after the period relevant to these lawsuits, in 2009.  56.1 St. ¶ 107.

rejected allegations that Interpal was funding Hamas, but also rejected OFAC's explicit requests that the UK sanction Interpal. 56.1 St. ¶¶ 33, 75, 78, 104-08. Thus, NatWest's conduct not only demonstrates precisely the opposite of what plaintiffs must prove to satisfy the scienter element of their ATA claims, but given the undisputed facts, plaintiffs' allegations would require them to prove that NatWest knew more about Interpal's purported criminality than did UK Law Enforcement and Regulators, who, despite their vast investigative and intelligence resources, far exceeding those of NatWest, have never accused Interpal of any such misconduct. Plaintiffs have not done this. Consequently, they have fallen far short of presenting a triable case that a major international bank, without any alleged motive,[4] knowingly aided and abetted the murder of innocent civilians when it provided banking services to Interpal.

1.  There Is No Evidence NatWest Knew That Interpal Was Funding Hamas Or Hamas Terrorism

In the face of this evidence, plaintiffs attempt to create a triable case on scienter by alleging NatWest knew Interpal was funding Hamas based on (a) circumstantial inferences drawn from NatWest's observation of Interpal's accounts, as reflected in NatWest's internal Suspicious Activity Reports ("SARs") and its disclosures to UK Law Enforcement and Regulators, and (b) NatWest's knowledge that Israel and OFAC had sanctioned Interpal. A reasonable juror could not find for plaintiffs on either of these allegations.

a.  NatWest's observation of Interpal's accounts. NatWest's observation of Interpal's accounts, which resulted in its SARs and disclosures to UK Law Enforcement and Regulators, evidence only NatWest's suspicions about Interpal – which UK Law Enforcement and Regulators have never confirmed, despite multiple investigations – not NatWest's knowledge.

---

[4] It is well-settled that where, as here, a plaintiff fails to show a motive for misconduct requiring proof of scienter, courts will require even stronger evidence of scienter than would otherwise be required. See Slayton v. Am. Express Co., 604 F.3d 758, 776 (2d Cir. 2010) ("[W]here the plaintiffs do not allege facts supporting a motive . . . their circumstantial evidence of actual knowledge must be correspondingly greater."); ECA, Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co., 553 F.3d 187, 198-99 (2d Cir. 2009) (same).

"Mere suspicion, whatever its reasonableness, cannot be equated with knowledge . . . ." Freier v. Westinghouse Elec. Corp., 303 F.3d 176, 205-06 (2d Cir. 2002).[5]

NatWest's SARs and disclosures to UK Law Enforcement and Regulators reflect its compliance with its UK legal obligations to report suspicious transactions by its customer, not its knowledge that its customer was in fact acting illegally. It is undisputed that UK law required that NatWest report any suspicions of terror financing to NCIS, subject to imprisonment, fines or both for failure to make such a report, the prospect of which meant the threshold for reporting a suspicion was low, as NatWest's SARs and disclosures illustrate. See 56.1 St. ¶ 14. For instance, bank official Michael Hoseason testified that when he disclosed to NCIS ██████████ ██████████████████████████████████████████, immediately following the September 11 attacks, "anything and everything that was vaguely associated with or linked to anything that could possibly be connected to extremism of any description was being reported." 56.1 St. ¶ 34. Similarly, NatWest's SARs regarding Interpal in November 2001 and June 2002 were based on its employees' training that █████████████████████████████ █████████ not on any knowledge or even any suspicion that Interpal was funding Hamas.[6]

NatWest's May and August 2003 NCIS disclosures likewise evidence only suspicion, and certainly not any knowledge that Interpal was funding Hamas terrorism. The May 2003 NCIS disclosure focused on suspicion not of Interpal, █████████████████████████████████ ████████████████████████████████████████████

---

[5] See also In re Agape Litig., 773 F. Supp. 2d 298, 309-13 (E.D.N.Y. 2011) (holding that awareness of suspicious activity in a bank account did not constitute actual knowledge by the bank of a fraud); Ryan v. Hunton & Williams, 2000 WL 1375265, at *9 (E.D.N.Y. Sept. 20, 2000) ("[a]llegations that Chemical [Bank] suspected fraudulent activity . . . do not raise an inference of actual knowledge of [the underlying] fraud.").

[6] Thus, Olha Leeming filed a SAR regarding Interpal on November 19, 2001 after Interpal had received ████████ ██████ from ████████ not because she suspected that Interpal was funding Hamas, but rather because she had been taught that a ████████ could be suspicious. 56.1 St. ¶¶ 40-41. NatWest's June 17, 2002 NCIS disclosure also was based on ████████ Interpal received from ████████ and a NatWest employee's association of ████████ with al Qaeda, not any suspicion that Interpal was funding Hamas terrorism. 56.1 St. ¶ 49.

-8-

████ 56.1 St. ¶ 62.  The August 2003 disclosure reported that ██████████████████

███████████████████████████████████████████████████████████████

(the Charity Commission having previously investigated and cleared Interpal, as NatWest knew,

in 1996).  56.1 St. ¶¶ 31-33, 47, 68.  Far from covering anything up, NatWest requested that its

August 2003 disclosure ████████████████████████████████████

█████████████████████████████████████████████████████

██████████████████████████████ 56.1 St. ¶ 68.  The NTFIU

subsequently informed NatWest ████████████████████████████

███████████████████████████████████████████████████████████

████ , which NatWest subsequently did.  56.1 St. ¶¶ 69-70.  Further, on September 17, 2003,

the NTFIU informed NatWest that ███████████████████████████████████

██████████████████ 56.1 St. ¶¶ 59-60.  Seven days later, the Charity

Commission lifted its freezing order on Interpal's accounts, reporting it had found no evidence

that Interpal was funding Hamas, and instructed NatWest ██████████████████

████████████ .  56.1 St. ¶¶ 75-76.  This echoed the Charity Commission's conclusion in

1996 that Interpal was a "well run and committed organization which carried out important work

in a part of the world where there is great hardship and suffering."  56.1 St. ¶ 33.[7]

It is also undisputed that, after OFAC designated Interpal in 2003, NatWest sought

guidance from the Bank of England's Financial Sanctions Unit (the "FSU"), OFAC's UK

counterpart, ███████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████ St. ¶¶ 77-78.  This response

---

[7] As part of both Charity Commission investigations, the Commission froze Interpal's accounts at NatWest, and NatWest ████████████████ from Interpal's accounts with the Commission during the pendency of its 2003 freezing order.  56.1 St. ¶¶ 32, 65, 68, 70-71, 74.

confirmed to NatWest that the FSU itself, as the regulator responsible for deciding whether to place Interpal on the UK's terror financing sanctions list, did not know that Interpal was funding Hamas terrorism.

It is also undisputed that NatWest then undertook enhanced monitoring of Interpal, in the form of semi-annual reviews of the activity in Interpal's accounts, beginning in May 2004.[8]  56.1 St. ¶¶ 80-83.  During each review, NatWest checked the names of each of Interpal's transferees against available information in on-line databases.  56.1 St. ¶ 82.  No review revealed any evidence that Interpal had used its accounts to fund Hamas.  56.1 St. ¶¶ 81, 85, 87.  Further, in December 2004, several NatWest executives evaluated Interpal and concluded NatWest still did not have evidence that Interpal was using its accounts at NatWest to fund Hamas, and therefore decided that the bank should maintain those accounts.  56.1 St. ¶ 84.  Again, none of this evidence reasonably supports the conclusion that NatWest knew Interpal was funding Hamas.

In addition, the deposition testimony of numerous percipient witnesses also confirms NatWest did not know that Interpal was funding Hamas, and if NatWest had known of any such funding, it would have closed Interpal's accounts.  For example:

- Amanda Holt, head of Group Enterprise Risk, never saw any evidence that Interpal was funding Hamas and if she had seen such evidence, she would have recommended closing its accounts.  56.1 St. ¶ 88.

- Likewise, Michael Hoseason, head of NatWest's Fraud Office, testified that if NatWest knew Interpal was engaged in any kind of illegal activity, it would have closed Interpal's accounts.  56.1 St. ¶ 90.

- Belinda Lane, Interpal's Relationship Manager, never suspected Interpal of financing terrorists.  56.1 St. ¶ 91.

- Guy Cole, a member of the Money Laundering Prevention Unit of the Corporate Banking Financial Markets Division (the "CBFM MLPU"), and who conducted

---

[8] Plaintiffs' purported expert Gary Walters makes overblown assertions regarding the fact that NatWest told the Bank of England in October 2003 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ but did not begin doing so until May 2004.  See Schuster Dec. Ex. 121 (Walters Reb. Rep. ¶ 127).  In fact, in May 2004 NatWest reviewed Interpal's prior six months of activity and found no evidence that Interpal was funding Hamas.  56.1 St. ¶ 81.

the semi-annual reviews of Interpal's accounts beginning in May 2004, "never saw any activity that made [him] believe [Interpal] w[as] a terrorist organization." 56.1 St. ¶ 92.

- Irvine Rodger, head of the CBFM MLPU, testified that if the bank knew that Interpal was funding terrorism, it would have closed Interpal's accounts. 56.1 St. ¶ 93.

Further, as noted above, and as NatWest knew, Interpal was at all times registered with the Charity Commission, which provided a conclusive, statutory presumption that Interpal had been established and was being operated for charitable purposes, whereas if Interpal were financing Hamas, it would not enjoy that status. 56.1 St. ¶¶ 21-23.

In light of the foregoing – the contents of NatWest's internal SARs and disclosures to UK Law Enforcement and Regulators, the responses and assurances about Interpal that NatWest received from UK Law Enforcement and Regulators, NatWest's knowledge of the Charity Commission's investigations of and findings concerning Interpal, and NatWest's own observations and its analyses of transactions in Interpal's accounts – there is absolutely <u>no</u> evidence whatsoever that NatWest <u>knew</u> Interpal was funding Hamas or Hamas terrorism. To the contrary, the evidence demonstrates that NatWest dutifully reported its suspicions, complied with UK Law Enforcement and Regulators' instructions, took heed of their assurances, and never concluded – just as, to this day, UK Law Enforcement and Regulators have never concluded – that Interpal was funding Hamas or Hamas terrorism.

   b.  <u>NatWest's knowledge based on Israeli government and OFAC sanctions</u>.  There is also no evidence that would allow a reasonable juror to conclude NatWest knew that Interpal was funding Hamas or Hamas terrorism based on either Israel's or OFAC's sanctions against Interpal.  It is undisputed that NatWest had no branches or subsidiaries operating in Israel and

-11-

therefore understood – correctly – that Israeli sanctions did not apply to its activities.  56.1 St. ¶ 118.[9]

As for OFAC, plaintiffs contend NatWest had the requisite scienter because, as of August 22, 2003, NatWest knew that OFAC had designated Interpal, for purposes of OFAC's asset freezing regulations, as an SDGT that was funding Hamas.  Plaintiffs thus seek a "shortcut" to proving scienter by equating knowledge of an OFAC SDGT designation with knowledge of terrorist activities for purposes of ATA liability.  But as a matter of law, NatWest's knowledge of OFAC's designation of Interpal could not vest NatWest with knowledge that OFAC's grounds for designating Interpal were true, for the purpose of satisfying plaintiffs' burden to prove NatWest's scienter under the ATA.  A contrary conclusion would impermissibly result in applying OFAC's designation extraterritorially to a UK bank's conduct in the UK, directly contrary to those regulations' more limited reach.

Indeed, plaintiffs' own expert admits that OFAC's designation of Interpal did not give rise to "any direct UK legal duty . . . ."  56.1 St. ¶ 98.  Rather, OFAC designates SDGTs pursuant to Executive Order 13224, which by its own terms applies only to "U.S. persons" and "U.S. financial institutions," which are defined to exclude the foreign offices of non-U.S. banks, such as NatWest in the UK in its dealings with Interpal.  See 31 C.F.R. § 594.304.  Further, Section 1 of that Order applies only to "all property and interests in property . . . that are in the United States or that hereafter come within the United States, or that hereafter come within the possession or control of United States persons."  Section 2 likewise applies only to "any transaction or dealing by United States persons or within the United States."  Because OFAC itself could not rely on its SDGT designations of Interpal to limit NatWest's activities in the UK,

---

[9]  Under Israeli law, Israeli sanctions did not apply extraterritorially to restrict NatWest's conduct with respect to a UK customer in the UK absent additional conclusions concerning NatWest's intentions, for which there is no evidence.  56.1 St. ¶¶ 117-24.

it would be contrary to the express terms and the entire framework of OFAC's regulations to conclude that private ATA plaintiffs can rely on NatWest's knowledge of that designation to prove that NatWest "knew" the factual basis for OFAC's inapplicable designation was "true."

The ATA's express terms also contradict plaintiffs' contention that NatWest's knowledge of OFAC's designation of Interpal caused NatWest to "know" that OFAC's finding was true. Section 2339B(a)(1) automatically criminalizes a defendant's provision of material support or resources to an entity upon proof that the defendant knows the Secretary of State has designated the entity as an FTO, a separate category from a SDGT designated by OFAC, which involves fewer legal requirements than an FTO designation. This provision demonstrates that Congress understood precisely how to make a U.S. terrorist designation conclusive for purposes of establishing ATA liability when it so intended. Had Congress intended for an OFAC SDGT designation to establish <u>scienter</u> for purposes of the ATA merely upon an accused's knowledge of that designation, it would have so provided, just as it did with respect to knowledge of an organization's designation as an FTO.

Moreover, it is undisputed that NatWest <u>believed</u> – correctly – that OFAC's designation of Interpal was irrelevant to NatWest's conduct in relation to Interpal in the UK, and accordingly NatWest did not subjectively consider itself to be bound by OFAC's determination. 56.1 St. ¶¶ 101-02. In particular, it is undisputed NatWest knew that the UK government expressly disagreed with OFAC's conclusions, because press articles revealed that OFAC sought to convince the UK to designate Interpal, and the UK refused, based on its perception of the poor quality of OFAC's (undisclosed) evidence. <u>See</u> 56.1 St. ¶ 105. Members of Parliament have continued to request since 2003 the "credible evidence" OFAC cited as the basis for its designation of Interpal, but have not received it. 56.1 St. ¶¶ 96, 110-15. In sum, plaintiffs'

-13-

attempted shortcut to proving NatWest's purported scienter by relying on NatWest's knowledge of OFAC's SDGT designation is unsustainable as a matter of law.

2.   There Is No Evidence NatWest Was "Willfully Blind"

Likewise, there is no evidence from which a reasonable juror could conclude that NatWest was "willfully blind" to whether Interpal was funding Hamas. In particular, there is no evidence that (a) NatWest subjectively believed there was a high probability that Interpal was funding Hamas or Hamas terrorism, and (b) NatWest took deliberate actions to avoid learning such facts. Global-Tech, 131 S. Ct. at 2070. To the contrary, NatWest's internal SARs, its disclosures to UK Law Enforcement and Regulators and its monitoring of Interpal's accounts are the very antithesis of willful blindness. They demonstrate NatWest did not subjectively believe Interpal was engaged in either activity, as demonstrated by the testimony of employees with knowledge of Interpal, see supra pp. 10-11, and that it reported the suspicions it did have to UK Law Enforcement and Regulators, which it would not have done if it were attempting to hide such a belief, or to avoid learning such facts.[10]

Further, plaintiffs cannot show that NatWest was willfully blind to the allegation that Interpal was funding Hamas or Hamas terrorism because, separately from the authorities' own investigations, NatWest did not exhaustively investigate each item of information it disclosed to NCIS beyond what was necessary to make its disclosures, especially when it was not the bank's policy to do so for any of its customers. See, e.g., In re Agape Litig., 773 F. Supp. 2d 298, 320 (E.D.N.Y. 2011) (holding that bank did not consciously avoid knowledge of misconduct, even though it knew of allegations of the misconduct, because it was bank policy not to investigate such allegations). NatWest reported the bases for its suspicions consistently with its standard

---

[10] Indeed, NatWest had a strong incentive to ensure there was no evidence that Interpal was funding Hamas or Hamas terrorism, because it would not be in the commercial interest of any bank to gain a reputation for facilitating terrorism. Cf. Tiffany (NJ) Inc. v. eBay Inc., 600 F.3d 93, 109 (2d Cir. 2010) (holding that private market forces gave eBay a strong incentive not to be "willfully blind" to the sale of counterfeit goods on its website).

practice. See, e.g., 56.1 St. ¶¶ 34-36, 38.  For example, with respect to one transfer about which

NatWest was suspicious, it followed its policy of requesting further information from the

customer about the payment's purpose, and received several pages of documentation

demonstrating that the payment was for charitable and humanitarian projects.  56.1 St. ¶¶ 54-57.

NatWest was not obligated under UK law to conduct any further investigation of the allegations.

56.1 St. ¶¶ 15, 35.  In light of all of the actions NatWest took to address and report its suspicions,

no reasonable juror could conclude that NatWest deliberately avoided learning that Interpal was

funding Hamas.[11]

**C.     Plaintiffs' Proposed "Expert" Testimony Is Inadmissible To Support Their Scienter Allegations**

In Viscusi v. Procter & Gamble, 2007 WL 2071546, at *6 (E.D.N.Y. July 16, 2007), this

Court applied the tests that the proposed testimony of plaintiffs' experts Gary Walters and Clive

Walker must satisfy under Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993), and

Kumho Tire Co. Ltd. v. Carmichael, 526 U.S. 137 (1999), in order for their opinions to be

admissible.  As in that case, where the Court excluded a purported expert, here the proposed

testimony fails to meet these tests, and the Court should exclude it.

1.  Walters lacks the requisite qualifications to offer his opinions.  Walters purports to

opine on NatWest's "management of the Interpal account," but neither he nor any of the co-

authors of his report has the necessary experience or credentials in relevant UK banking

---

[11] Plaintiffs have suggested that NatWest had the requisite scienter under the Seventh Circuit's ruling in Boim III,
549 F.3d 685 (7th Cir. 2008) (en banc), because they allege NatWest knew there was a "risk" that Interpal was
funding Hamas but consciously and deliberately disregarded that risk.  Boim III, however, defines scienter under the
ATA to require "actual knowledge" by the defendant that "there is a substantial probability that the organization
engages in terrorism but [the defendant] does not care."  Boim III, 549 F.3d at 693-94.  The court explained that it is
not sufficient to show "that the average person or a reasonable person would realize that the organization he was
supporting was a terrorism organization, if the actual defendant did not realize it.  That would just be negligence."
Id. at 693.  Here, plaintiffs' contentions amount to, at most, negligence, even under the Boim III standard.  The
evidence shows NatWest did not actually know there was a "substantial probability" that Interpal engaged in
terrorism because it knew that its own government, after several investigations, had reached the opposite conclusion.
Nor did NatWest disregard any such risk, as is evidenced by its many disclosures, requests for guidance and
monitoring of Interpal's accounts.

regulations, standards or practices. 56.1 St. ¶¶ 126-37. Walters concedes that he has no relevant education or professional training concerning the internal policies and procedures of UK banks and no experience investigating charities accused of terror financing. 56.1 St. ¶¶ 127-28. Rather, he worked as a police officer in a section of the London Metropolitan Police responsible for investigating money laundering, not terror financing. 56.1 St. ¶ 127. Walters has never published anything on any topic, and his only higher education was a short evening program on anti-money laundering. 56.1 St. ¶¶ 131, 134. Currently, he works part-time for a litigation support firm (for which his work here is his first and only assignment), and full-time in his family farming business. 56.1 St. ¶¶ 135-37.

2. Walters does not employ a reliable or verifiable methodology. Federal Rule of Evidence 702 requires that expert testimony: (1) be "based upon sufficient facts or data;" (2) be "the product of reliable principles and methods;" and (3) "appl[y] the principles and methods reliably to the facts of the case." Fed. R. Evid. 702. Walters's opinions do not satisfy those requirements for at least three reasons. First, he admits that his "deviations" analysis against purported "minimum banking standards" is his own invention and is unbounded by any objective criteria that are generally accepted, peer reviewed or verifiable. 56.1 St. ¶¶ 150-153. Walters purports to apply to NatWest's behavior the "global banking standards" published by the Basel Committee on Banking, the Wolfsberg Group and the Financial Action Task Force ("FATF"), but he cannot identify which of these standards he applied, and does not even know whether he has read all of them. 56.1 St. ¶ 149. He also concedes that "deviation," "significant deviation" and "major deviation" are subjective terms, and he defined them based on his experience investigating money laundering, not terror financing. 56.1 St. ¶ 153. Further, Walters purports to assess NatWest's conduct against what he describes as a "standard Terrorist Financing

-16-

investigation," but admits that he has never used and never seen any authority use that term. 56.1 St. ¶¶ 150-52.[12]

Second, Walters's analysis of purported "red flags" and "risk factors" of terror financing is speculative, internally inconsistent and unquestionably flawed. It is axiomatic that expert testimony that is speculative is inadmissible under the Federal Rules of Evidence and Daubert and its progeny. See Viscusi, 2007 WL 2071546, at *6 ("[E]xpert testimony should be excluded if it is 'speculative or conjectural.'") (citation omitted). Walters's opinion that there were "red flags" and "risk factors" associated with Interpal's accounts, and accordingly NatWest must have been aware Interpal was engaging in terror financing, is rank speculation that is contradicted by the evidence. Walters asserts that his purported "red flags" are "understood and published," but he is unable to identify where they have been published. 56.1 St. ¶ 159. Similarly, Walters cannot identify any publication that identifies the "risk factors" he contends the bank disregarded. 56.1 St. ¶ 155. Walters further states that Interpal presented a high risk in part because Interpal dealt with "high-risk jurisdictions," but he admits that he applied his own subjective definition of that term. 56.1 St. ¶ 155. He also states that Interpal presented "high customer risk" because it is a charity, but admits that by his definition of "high customer risk," every charity, including Guide Dogs for the Blind and the Police Benevolent Fund, presents "high customer risk." 56.1 St. ¶ 157. Underscoring just how speculative Walters's conclusions are, he offers no explanation as to why, if he is correct that NatWest ignored what he describes as 15 "red flags" of Interpal's involvement in terror financing, UK law enforcement authorities have never accused Interpal of financing terrorism, despite the fact that, as Walters concedes, they have long been aware of no fewer than 13 of those purported 15 "red flags." 56.1 St. ¶ 160.

---

[12] Further, as noted below, Walters admitted he compared NatWest's conduct to a "standard terrorist financing investigation" as it might be conducted by the police, not a bank, which renders his entire analysis irrelevant. See p. 19, infra; 56.1 St. ¶ 143.

Third, Walters's report is so replete with unsubstantiated statements, mistakes and incorrect factual assertions as to be utterly unreliable.  Courts should exclude expert opinions where they are so rife with errors that they cannot be considered reliable.  See Raskin v. Wyatt Co., 125 F.3d 55, 67-68 (2d Cir. 1997).  That is certainly true of Walters's opinions.  For instance, Walters opines, without identified support, that NatWest's behavior "negatively affected" UK authorities' assessments and decisions concerning Interpal.  56.1 St. ¶ 165.  But he admits he has no personal knowledge as to whether that is true.  56.1 St. ¶ 166.  Walters also states that many of his opinions are based on the absence of certain documents or testimony, but when confronted with those very documents and testimony at his deposition, Walters conceded that either he had seen them or that he did not recall them.  See 56.1 St. ¶¶ 175-79.  Further, his opinions contain a number of blatant mistakes.  See 56.1 St. ¶¶ 174-88.

Finally, Walters also concedes he has no education in applying his purported methodology, nor has he ever seen his purported methodology applied anywhere other than in the report his litigation support firm submitted in the lawsuits against Crédit Lyonnais.  56.1 St. ¶¶ 163-64.  In fact, Walters admits that he copied portions of his report from that prior report. 56.1 St. ¶ 132.

3. Walters's opinions are irrelevant.  Expert evidence must be relevant to be admissible, and part of the Court's "gatekeeping function" is to exclude irrelevant expert testimony.[13]  There are two implicit requirements to the relevance test reflected in Federal Rule of Evidence 401: "(1) [t]he evidence must be probative of the proposition it is offered to prove, and (2) the proposition to be proved must be one that is of consequence to the determination of the action." United States v. Diaz, 878 F.2d 608, 614 (2d Cir. 1989) (citations omitted).

---

[13] See Fashion Boutique of Short Hills, Inc. v. Fendi U.S.A., Inc., 314 F.3d 49, 60 (2d Cir. 2002); Viscusi, 2007 WL 2071546, at *5.

Applying these principles here, Walters's opinions are irrelevant for at least two reasons. First, as plaintiffs have conceded,[14] an opinion as to a corporation's state of mind is not a proper subject of expert testimony. See In re Rezulin Prods. Liab. Litig., 309 F. Supp. 2d 531, 546-47 (S.D.N.Y. 2004). Walters admits that he is not opining that NatWest knew or believed Interpal was financing terrorism or Hamas, and therefore his opinion could demonstrate only that NatWest acted negligently, not that NatWest had the necessary scienter. 56.1 St. ¶ 138. Second, Walters's opinion that NatWest's management of Interpal's accounts had "major deviations" from a "standard Terrorist Financing investigation" is irrelevant, because he concedes that he assessed NatWest's conduct against a "standard Terrorist Financing investigation" conducted by the police, not by a bank. 56.1 St. ¶¶ 143, 150. Even if the standards of a police investigation were applicable to NatWest, which they are not, his analysis would not show NatWest knew that Interpal was funding Hamas.

4. Walker lacks the requisite qualifications to offer his opinions regarding the Charity Commission. The Court should exclude Clive Walker's opinions regarding the Charity Commission because Walker is a professor of criminal justice studies, not an expert on charity law or the Charity Commission. 56.1 St. ¶ 191. Courts routinely reject experts who do not have sufficient practical knowledge of the industry standards on which they opine, even if they have expertise in a different field. See, e.g., La Salle Bank Nat'l Ass'n v. Nomura Asset Capital Corp., 424 F.3d 195, 211 (2d Cir. 2005). Walker admits:

- He has never taught a course on charity law. (He claims he taught one course 20 years ago that included a section on charities – an assertion that he is unable to verify.) 56.1 St. ¶ 191.

- He has never written about the Charity Commission. 56.1 St. ¶ 192.

---

[14] See Linde v. Arab, PLC, No. 04-civ-2799 (NG) (VVP), Letter from Gary M. Osen to Hon. Nina Gershon, at 4 & n.7 (E.D.N.Y. Dec. 3, 2010), Dkt. No. 708.

- He has no professional experience working with the Charity Commission and has never spoken or communicated with anyone employed by the Charity Commission, other than by email requests for the disclosure of inquiry reports under the Freedom of Inquiry Act. 56.1 St. ¶¶ 189-90.

5. <u>Walker does not employ a reliable or verifiable methodology</u>. Walker's opinions do not satisfy any of the reliability requirements of FRE 702 and <u>Daubert</u>. Walker admits his view of the Charity Commission as a "green light regulator" (which he describes as focusing on facilitating charities), rather than a "red light regulator" (which he describes as focusing on "enforcing" legal compliance), is his own construct. 56.1 St. ¶¶ 197-98. The one authority he identified as having applied a similar analysis to the Charity Commission directly contradicts Walker's view. 56.1 St. ¶¶ 199-200.[15]

Walker's methodology with respect to his opinion on the Charity Commission's role in relation to Interpal is particularly flawed because Walker did not review any documents concerning that subject. 56.1 St. ¶ 207. Rather, his knowledge of the facts comes from "secondary sources," including the complaints, discussions with plaintiffs' counsel, articles mentioning these cases and internet sites he could not identify, conceding "I've learned probably more people's opinions than facts about the case." 56.1 St. ¶ 207.[16]

In sum, neither Walters's nor Walker's opinions is admissible to support plaintiffs' scienter allegations. They cannot substitute for plaintiffs' lack of proof on the indispensable <u>scienter</u> element of their claims.

---

[15] Walker testified that the academic Peter Edge is a leading author on charity law who published an article characterizing the Charity Commission as a "soft law" regulator, which Walker claimed is equivalent to "green light regulator." 56.1 St. ¶¶ 199-200. Edge's publication however, does not refer to the Charity Commission as a "soft law" regulator, but rather, directly contradicts Walker's opinions by describing the Charity Commission's "extensive powers" and its treatment of allegations of links between charities and terrorist activities "as an immediate priority." 56.1 St. ¶ 200.

[16] Walker also opines that NatWest's expert Jonathan Burchfield "fails to properly consider the relevancy and significance of the Commission's 2009 Inquiry Report." 56.1 St. ¶¶ 208-09. But Walker conceded that when he wrote his report, he was not aware that NatWest had closed Interpal's accounts in 2007, two years before the Charity Commission published its 2009 report. 56.1 St. ¶¶ 208-09.

**II.    NO REASONABLE JUROR COULD FIND THAT PLAINTIFFS HAVE PROVEN THE PROXIMATE CAUSATION AND ARTICLE III STANDING ELEMENTS OF THEIR CLAIMS**

**A.     Plaintiffs Must Prove Both Proximate Causation And Article III Standing**

Plaintiffs must prove under section 2333(a) of the ATA that NatWest's provision of routine banking services to Interpal proximately caused the terrorist attacks by which plaintiffs were injured. Rothstein v. UBS AG, 722 F. Supp. 2d 511 (S.D.N.Y. 2011) ("Rothstein II"). Section 2333(a) expressly requires that plaintiffs' injuries be "by reason of an act of international terrorism." 18 U.S.C. § 2333(a) (emphasis added). The "by reason of" requirement – which Congress incorporated from the Clayton Act and the civil liability provisions of the RICO statute – "has typically been construed to be synonymous with proximate cause – and proximate cause narrowly defined at that," Rothstein II, at 513 (citing McBrearty v. Vanguard Grp., Inc., 353 F. App'x 640, 641-42 n.1 (2d Cir. 2009)) (emphasis added), and holds "plaintiffs to a more stringent showing of proximate cause than would be required at common law," requiring that "the alleged violation led directly to the plaintiff's injuries," Lerner v. Fleet Bank, N.A., 459 F.3d 273, 285, n.5 (2d Cir. 2006) (citation omitted); McBrearty, 353 F. App'x at 641-42, n.1 (quoting Anza v. Ideal Steel Supply Corp., 547 U.S. 451, 461 (2006)). Plaintiffs therefore must prove that NatWest's conduct was "'a substantial factor in the sequence of responsible causation,'" Lerner, 318 F.3d 113, 123 (2d Cir. 2003) (citation omitted), and it was "reasonably foreseeable that [NatWest's] conduct [was] likely to result in violent criminal acts." Kaplan, 2011 WL 2314783, at *7.

Similarly, to demonstrate they have Article III standing to bring their claims, plaintiffs must prove that their injuries are "fairly traceable to [NatWest's] allegedly unlawful conduct," Allen v. Wright, 468 U.S. 737, 758 (1984), which requires "at a minimum [they] show a proximate causal relationship between [NatWest's conduct] and the commission of terrorist acts

that caused plaintiffs' injuries." Rothstein v. UBS AG, 647 F. Supp. 2d 292, 294 (S.D.N.Y. 2009) ("Rothstein I"). This causal relationship cannot be "too attenuated," Allen, 468 U.S. at 751, or be the result of an "extended chain of inferences," Rothstein I, at 294. Nor can it be "purely speculative," or involve an "injury that results from the independent action of some third party not before the court." Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 41-42 (1976). Otherwise, the Court does not have Article III jurisdiction to hear plaintiffs' claims.

Accordingly, to withstand summary judgment on the proximate causation and Article III standing elements of their claims, plaintiffs must prove there is "a proximate causal relationship between" NatWest's processing of funds transfers on behalf of Interpal and Hamas's alleged "commission of the terrorist attacks that caused plaintiffs' injuries." Rothstein I, at 294.[17] Summary judgment on proximate causation is appropriate where, as here, the alleged chain of causation is either speculative or the link between the defendant's alleged conduct and the plaintiffs' injuries is too remote or attenuated. See Estate of Radcliffe v. Pradera Realty Co., 2008 WL 53115, at *3 (S.D.N.Y. Jan. 2, 2008).

**B.      No Reasonable Juror Could Find For Plaintiffs On Either Component Of Their Proximate Causation And Standing Contentions**

Plaintiffs concede they cannot show that any funds NatWest transferred on behalf of Interpal were used for, or in any way facilitated, any of the 15 attacks at issue (or any other terrorist attacks). 56.1 St. ¶¶ 248-74. Instead, plaintiffs have stated they plan to prove that NatWest transferred funds to Hamas, a designated FTO, and these funds proximately caused the 15 attacks, by contending: first, that 13 charities in the Palestinian Territories that received transfers from Interpal's accounts (the "13 Charities") were alter egos or under the control of Hamas, such that these transfers in effect were made to Hamas; and second, merely showing

---

[17]  As shown in Point IV below, plaintiffs have failed to present admissible evidence that Hamas perpetrated the attacks at issue. See infra pp. 37-50.

these transfers were thereby indirectly made to Hamas suffices to prove they were "a substantial factor in the sequence of responsible causation" and that it was "reasonably foreseeable" to NatWest that these transfers would lead to the attacks.  Plaintiffs allege they can establish this second prong through a "fungibility" theory, which posits that because money is fungible – meaning that providing funds for one use makes other funds available for another use – it was reasonably foreseeable to NatWest that transfers to <u>any</u> of these charities for <u>any</u> purpose would provide the funds to finance the 15 attacks, or would cause other funds <u>not</u> transferred by Interpal to become available for that purpose.  56.1 St. ¶¶ 275-77.  As shown below, no reasonable juror could find for plaintiffs on either component of their proximate causation/standing theory, and accordingly NatWest is entitled to summary judgment on this ground alone.[18]

1.  No Reasonable Juror Could Find That The 13 Charities Were The <u>Alter Egos Of Or Controlled By Hamas</u>

a.  <u>Plaintiffs have not proven alter ego or control status</u>.  Plaintiffs base their assertion that NatWest provided funds to Hamas entirely on their theory that the 13 Charities "were at the relevant time alter egos of and/or controlled by Hamas." 56.1 St. ¶¶ 241-44.[19]  To support this allegation, plaintiffs offer neither fact witnesses nor any admissible documents, but instead rest completely on the proposed "expert" testimony of Dr. Matthew Levitt and Arieh

---

[18] If plaintiffs cannot prove the first component of their proximate causation and standing contentions – that Interpal's transferees are to be treated as if they <u>were</u> Hamas (which, as shown below, they cannot) – the Court need not consider the second component of plaintiffs' contentions, because in that event there would be no basis for deeming NatWest's transfers to have been made to an FTO or for Hamas terrorism.

[19] To the extent plaintiffs have identified transfers between Interpal and other persons or entities other than the 13 Charities through Interpal's NatWest accounts, they cannot rely on those transfers to prove NatWest's liability because plaintiffs do not claim that any persons or entities other than the 13 Charities were <u>alter egos</u> of and/or controlled by Hamas.  56.1 St. ¶¶ 245-46.  <u>See</u> <u>Weiss v. National Westminster Bank PLC</u>, 453 F. Supp. 2d 609, 623 (E.D.N.Y. 2006) (holding that plaintiffs cannot rely on the provision of material support to Interpal and other organizations that plaintiffs did not allege were controlled by or operated on behalf of Hamas, because "[m]erely providing financial support and supporting the terrorist objective of an FTO does not suffice to show that an organization is so dominated and controlled so as to have lost its independent identity.").

Spitzen. 56.1 St. ¶¶ 278-82.[20]  Yet even if this testimony were admissible under FRE 703 and Daubert – and as shown below it is not, see infra pp. 32-36 – neither witness has established there was an alter ego or control relationship between the 13 Charities and Hamas under the governing legal tests.  To the contrary, both make several concessions proving that no such findings can be made.

Judge Sifton addressed the test for establishing whether the 13 Charities were so controlled by Hamas that they were effectively one and the same in the context of addressing whether one entity should be considered an "alias" of another.  Weiss, 453 F. Supp. 2d at 623.  Quoting then-Circuit Judge Roberts's decision in Nat'l Council of Resistance of Iran v. Dep't of State, 373 F.3d 152 (D.C. Cir. 2004), Judge Sifton wrote that "'the requisite relationship for alias status is established at least when one organization so dominates and controls another that the latter can no longer be considered meaningfully independent from the former.'"  Id.  Echoing Judge Roberts's methodology, Judge Sifton stated that the "[f]actors to be considered include whether the organizations share leadership, whether they commingle finances, publications, offices, and personnel, and whether one operates as a division of the other."  Weiss, 453 F. Supp. 2d at 623 (citations omitted).  Similarly, alter ego status requires a showing that "'the owner exercised complete domination over the corporation with respect to the matter at issue . . . ,'" which turns on such factors as: "(1) disregard of corporate formalities; (2) inadequate capitalization; (3) intermingling of funds; (4) overlap in ownership, officers, directors, and personnel; (5) common office space, address and telephone numbers of corporate entities; (6) the degree of discretion shown by the allegedly dominated corporation; (7) whether the dealings between the entities are at arms length; (8) whether the corporations are treated as independent

---

[20] Levitt addresses 12 of the 13 Charities.  Spitzen addresses the same 12, plus ▮▮▮▮▮▮▮▮▮▮▮▮ 56.1 St. ¶¶ 278-82.  Plaintiffs also rely on the proposed testimony of accountant Wayne Geisser, but solely to summarize the relevant transfers based upon NatWest's banking records.  56.1 St. ¶¶ 283-84.

profit centers; (9) payment or guarantee of the corporation's debts by the dominating entity, and (10) intermingling of property between the entities." MAG Portfolio Consult, GMBH v. Merlin Biomed Group LLC, 268 F.3d 58, 63 (2d Cir. 2001) (citation omitted).  Plaintiffs must therefore address these factors in order to prove that the 13 Charities were alter egos of or controlled by Hamas.[21]

But while both Levitt and Spitzen incant the terms "alter ego" and "control," neither does so based on any analysis of these well-settled factors or any other pertinent legal test.  Further, they have made several concessions about the 13 Charities that establish these charities were not alter egos of or controlled by Hamas.  For example, they admitted that most of the 13 Charities pre-dated the founding of Hamas, and each was registered with the Palestinian Authority, which oversaw the charities and audited them, including by approving each charity's election of its board members. 56.1 St. ¶¶ 285-96, 298-99.  Further, they conceded that each charity had its own board of directors, some of which included non-Hamas members. 56.1 St. ¶¶ 297, 300-02.  Yet neither Levitt nor Spitzen analyzed the presence of non-Hamas board members and employees at each entity, and neither offered any analysis of whether any entity's board members who were associated with Hamas actually controlled the entity for the purposes of serving Hamas. 56.1 St. ¶¶ 303-07.  Nor has Levitt or Spitzen offered any evidence of any "commingling" of funds between the 13 Charities and Hamas. 56.1 St. ¶¶ 308-16.[22]  To the contrary, both admitted that the 13 Charities had their own bank accounts. 56.1 St. ¶¶ 309-12. Contra Nat'l Council, 373 F.3d at 159 (determination that one organization was an alias of an

---

[21] Importantly, the precedents cited in Judge Sifton's and then-Circuit Judge Roberts's opinions as providing the basis for their alias test in the terrorism context all concern corporate veil piercing or specifically rely on corporate veil piercing law.  See e.g., Berkey v. Third Ave. Ry. Co., 155 N.E. 58 (N.Y. 1926); N.L.R.B. v. Deena Artware, Inc., 361 U.S. 398, 403 (1960); First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba, 462 U.S. 611, 628-30 (1983); Transamerica Leasing, Inc. v. La Republica de Venez., 200 F.3d 843, 848 (D.C. Cir. 2000).

[22] Levitt admitted that his references in his report to Hamas's "commingling" of funds does not mean that funds provided to a charity in the Palestinian Territories were then commingled with funds used for other purposes. 56.1 St. ¶¶ 314-16.

FTO was supported by evidence of common office space, commingled bank records and signed blank checks and because both organizations had the same overall leader and operated "in a day-to-day way as a single unit").

Nor does Levitt or Spitzen offer any evidence that any of the 13 Charities disregarded any corporate formalities or shared any offices or property. 56.1 St. ¶ 317. Further, neither analyzes whether the charities ever took any specific actions on behalf of or at the direction of Hamas, instead of in furtherance of their own charitable goals. 56.1 St. ¶¶ 318-22. Likewise, neither identifies any actual transactions between Hamas and the 13 charities, much less shows that any such transactions were not at arm's length. 56.1 St. ¶¶ 323-27. Nor does either show that Hamas loaned money to or guaranteed the loans of any of the charities. 56.1 St. ¶¶ 328-29. And perhaps most importantly, both Spitzen and Levitt admit that all 13 Charities provided the charitable services they undertook to provide with the funds they received from donations, such as the funds they received from Interpal. 56.1 St. ¶¶ 340-44.

Indeed, in his deposition testimony, Levitt confirmed that, contrary to plaintiffs' core contention, he is not in fact opining that the 13 Charities are alter egos of or controlled by Hamas, conceding instead that: (1) he is opining only that the 13 Charities were "controlled by, affiliated with, fundraise for, serve as alter egos or departments of, or otherwise support Hamas;" (emphasis added) and (2) he did not analyze and could not identify into which of these categories each of the 13 Charities falls. 56.1 St. ¶¶ 331-34. Moreover, Levitt admitted that to fall within one of his five categories, a charity need only: (1) have employed Hamas members; (2) be a place where Hamas has "recruited" members; or (3) be a place where a Hamas member could misuse his position in the organization to somehow benefit Hamas, regardless of whether the organization itself was involved in or facilitated any of these actions, and regardless of whether

Hamas had any power to direct the charity's actions. 56.1 St. ¶ 335. Obviously, these "criteria" are inadequate to establish an alter ego or control relationship between a charity and Hamas. Indeed, given Judge Sifton's ruling in this case that "[m]erely providing financial support and supporting the terrorist objective of an FTO does not suffice to show that an organization is so dominated and controlled so as to have lost its independent identity," Weiss, 453 F. Supp. 2d at 623, any allegations that any of these entities were simply "affiliated with," "fundraise for" or "otherwise support Hamas," as Levitt claims, cannot satisfy plaintiffs' burden.

Based on these undisputed facts, no reasonable juror could conclude that any of the 13 Charities was an alter ego or controlled by Hamas.

> b.   **Plaintiffs cannot rely entirely on "expert" opinions to prove alter ego or control status.** Even if Levitt and Spitzen had based their opinions on the relevant factors and not their own subjective standards, and even if Levitt had actually purported to offer an alter ego or control opinion, their testimony would be inadmissible because experts cannot offer legal conclusions that are for the trier of fact to resolve based upon admissible evidence. Here, Levitt's and Spitzen's proposed testimony as to alter ego and control issues intrudes both on the jury's function to resolve an ultimate legal question in the case and the court's role in instructing the jury as to the law. Pereira v. Cogan, 281 B.R. 194, 199 (S.D.N.Y. 2002) (striking part of an expert's report that "seeks to define the term 'alter ego,' which is a subject on which the jury will need to be instructed for the purposes of deciding" alter ego status).[23] And Spitzen's and Levitt's opinions are the only evidence plaintiffs offer to show that the 13 Charities were alter egos of or

---

[23] See also United States v. Bilzerian, 926 F.2d 1285, 1294- 95 (2d Cir. 1991) (expert cannot "usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it"); Hygh v. Jacobs, 961 F.2d 359, 364 (2d Cir. 1992) ("Even if a jury were not misled into adopting outright a legal conclusion proffered by an expert witness, the testimony would remain objectionable by communicating a legal standard—explicit or implicit—to the jury." (citation omitted)).

controlled by Hamas, other than the unauthenticated hearsay documents on which they purport to rely. 56.1 St. ¶¶ 278-82. These contentions fail on this ground alone.

### 2. The Mere Transferring Of Funds To The 13 Charities Is Insufficient To Prove Proximate Causation

Plaintiffs seek to prove a proximate causal relationship between Interpal's funds transfers and the 15 attacks <u>first</u> by proving the 13 Charities that received these transfers were <u>alter egos</u> of or controlled by Hamas, and <u>second</u> by contending these "deemed" transfers to Hamas were "a substantial factor" leading to the attacks because the transferred funds were fungible, such that it was reasonably foreseeable to NatWest that they <u>could</u> be used for the attacks or <u>could</u> cause other funds <u>not</u> transferred by Interpal to become available to finance the attacks. As shown above, plaintiffs cannot satisfy even the first component of their theory.

Further, as a matter of law, the second component of plaintiffs' theory cannot satisfy section 2333(a)'s proximate causation and Article III standing requirements. Where, as here, plaintiffs do not allege the defendant knowingly provided support or financing <u>directly</u> to an FTO or for terrorist acts, but rather did so only <u>indirectly</u> – here, according to plaintiffs, through Interpal and the 13 Charities – the law is clear that relying merely on the fungibility of funds is <u>not</u> sufficient to prove the proximate causation or standing that section 2333(a) requires. <u>Rothstein I</u>, at 294-95; <u>Rothstein II</u>, at 518. <u>Rothstein</u> concerned a section 2333(a) claim against Swiss bank UBS by victims of terrorist attacks, based on allegations that UBS had transferred funds to Iran that fostered, purportedly as the result of the fungibility of those funds, Iran's financing of Hamas and Hezbollah attacks. Judge Rakoff rejected the plaintiffs' attempt to prove proximate causation and standing by means of the same fungibility theory plaintiffs rely on here, including by distinguishing the Supreme Court's recent ruling in <u>Holder v. Humanitarian Law Project</u>, 130 S. Ct. 2705 (2010), which endorsed a fungibility rationale to uphold the

constitutionality of criminalizing aid to an FTO under the <u>criminal</u> provisions of the ATA

without any showing that the aid directly supported terrorist acts.  As Judge Rakoff emphasized,

<u>Holder</u> concerned only the <u>criminal</u> provisions of the ATA which, as is typical of criminal

prohibitions, have <u>no</u> proximate causation element at all, and do <u>not</u> require proof of Article III

standing.  By contrast, under section 2333(a)'s civil liability provision, proof of both proximate

causation and Article III standing are "indispensable element[s]." <u>Rothstein II</u>, at 515-16.  Thus,

as Judge Rakoff ruled, <u>Holder</u> is "silent" with respect to both section 2333(a)'s proximate

causation element and the Article III standing requirement that every <u>civil</u> litigant must satisfy,

and did not "alter traditional Article III standing requirements or well-established definitions of

the concept of proximate causation that serve as a limit on who may be held liable for what

actions," and "are the *sine qua non* of every private civil action brought in a federal court."

<u>Rothstein II</u>, at 518.  Accordingly, on remand to consider the applicability of <u>Holder</u>, Judge

Rakoff re-applied his prior ruling in <u>Rothstein I</u> that section 2333(a)'s "by reason of"

requirement is "synonymous with proximate cause – and proximate cause narrowly defined at

that," <u>Rothstein II</u>, at 513, and required that the plaintiffs "at a minimum allege facts that show a

proximate causal relationship between UBS's transfer of funds to Iran and Hamas' and

Hezbollah's commission of the terrorist acts that caused plaintiffs' injuries."  He concluded that

they had failed to do so, because the "extended chain of inferences" upon which they relied were

"far too attenuated" and far too speculative.  <u>Rothstein I</u>, at 294; <u>Rothstein II</u>, at 513.[24]

      Here, plaintiffs' and their experts' omissions and admissions detailed above preclude

them from satisfying the <u>Rothstein</u> tests.  Indeed, plaintiffs' proximate causation and Article III

---

[24] Judge Rakoff distinguished plaintiffs' related lawsuit against Crédit Lyonnais as involving allegations of "direct involvement between the defendant banks and the terrorist organizations or 'fronts' those organizations directly controlled," <u>Rothstein I</u>, at 294, but he did so based on Judge Sifton's description of plaintiffs' claims in addressing Crédit Lyonnais's dismissal motion. <u>Strauss v. Crédit Lyonnais</u>, 2006 WL 2862704, at *11 (E.D.N.Y. Oct. 5, 2006). As demonstrated above, with discovery now complete, plaintiffs have confirmed that NatWest's alleged knowing support to Hamas was <u>indirect</u>, through the 13 Charities.

standing contentions here are even <u>more</u> attenuated and <u>more</u> speculative than those advanced by the <u>Rothstein</u> plaintiffs. Plaintiffs admit they do <u>not</u> contend that <u>any</u> of the funds Interpal transferred to the 13 Charities were used to finance <u>any</u> of the 15 attacks. 56.1 St. ¶ 248. And both Spitzen and Levitt admit they have <u>no</u> evidence that <u>any</u> of the 13 Charities was the cause of any of the attacks, participated in or planned any of the attacks or trained or recruited or provided logistical support or transferred money to any of the attackers. 56.1 St. ¶¶ 253-61, 266-74. And conclusively, Levitt completely contradicted plaintiffs' fungibility-based theory by admitting that when a foreign charity such as Interpal sends a charitable donation to a Hamas-affiliated charity, it is "<u>less common</u>" and "<u>more rare</u>" for that donation to be used for a purpose other than the charitable one for which it was intended, including terrorism. 56.1 St. ¶¶ 262-64 (emphasis added). <u>This is the very antithesis of the required proof that it was "reasonably foreseeable" that NatWest's conduct was "likely" to cause the attacks at issue.</u> <u>Kaplan</u>, 2011 WL 2314785, at *7 (emphasis added).

Consistent with this dispositive admission, Levitt and Spitzen both also conceded that the 13 Charities actually provided the social services that they said they were providing. 56.1 St. ¶¶ 340-42. And <u>none</u> was at the relevant time designated in the U.S. as a terrorist organization. 56.1 St. ¶¶ 285-92. Finally, it is undisputed that Hamas did not publicize its purported association with any of these charities, which further belies the notion it was "reasonably foreseeable" that transfers to them would result in terrorist attacks. 56.1 St. ¶ 330.

Accordingly, any allegation that there is <u>any</u> connection between <u>any</u> of the 13 Charities and the 15 attacks – <u>let alone the type of direct, substantial and foreseeable connection the law requires</u> – is pure speculation, and certainly "far too attenuated" and "speculative" to make plaintiffs' claims triable. <u>Rothstein I</u>, at 294.

-30-

Even if the Court were to conclude that plaintiffs' claims should be considered as if plaintiffs were alleging that NatWest provided direct assistance to an FTO – although that is not what plaintiffs now contend or could contend, 56.1 St. ¶¶ 242-43 – plaintiffs would still need to show that NatWest's conduct was a "substantial factor in the sequence of responsible causation" and it was "reasonably foreseeable" that NatWest's conduct would result in terrorist attacks. Lerner, 318 F.3d at 123; Kaplan, 2011 WL 2314783, at *7.  As shown above, based on plaintiffs' and Levitt's and Spitzen's failures of proof and their concessions, no reasonable juror could reach that conclusion.

Rather, plaintiffs are disregarding all traditional standards of proximate causation, and particularly the "proximate cause narrowly defined" that an ATA civil claim requires, Rothstein II, at 513, and instead are relying on Judge Sifton's statement – when he addressed Crédit Lyonnais's dismissal motion – that "proximate cause may be established by a showing only that defendant provided material support to, or collected funds for a terrorist organization which brought about plaintiffs' injuries." Strauss, 2006 WL 2862704, at *18; 56.1 St. ¶¶ 275-77.  This reliance is misplaced, because Judge Sifton's statement is predicated on the Ninth Circuit's reasoning in addressing the criminal provisions of the ATA in Humanitarian Law Project v. Reno, 205 F.3d 1130, 1136 (9th Cir. 2000), which pre-dated both the Supreme Court's Holder decision in that same lawsuit, and Judge Rakoff's unassailable ruling that these precedents are irrelevant to a section 2333(a) claim because they endorse a fungibility rationale only under the criminal provisions of the ATA – which do not require a showing of proximate causation or Article III standing – and not under section 2333(a)'s civil liability provision, which has an explicit "by reason of" proximate causation element and requires the plaintiff to prove his standing to sue the defendant.  See supra pp. 28-29.  As Judge Rakoff stated in Rothstein II,

-31-

Holder – and likewise Reno before it – does not hold that the concept of fungibility can be used

to relax Article III standing and proximate causation requirements under section 2333(a),

because that would "strain [those] traditional principles . . . beyond their breaking point, creating

a dangerous precedent that even the most remote and tenuous connections to organizations with

some undefined relationship to undefined terrorist groups could subject potential defendants to

ATA liability." Rothstein II, at 518; see also Kaplan, 2011 WL 2314783, at *7 n.5 (dismissing

civil ATA claim where plaintiffs had not pled proximate causation, and rejecting argument that

Holder had relaxed proximate causation under section 2333(a)).

Accordingly, as Rothstein II confirms, fungibility alone, without the type of concrete

evidence plaintiffs have failed to present, is insufficient to prove proximate causation and

standing under section 2333(a).

**C.    Even If Plaintiffs Could Prove That The 13 Charities Were Alter Egos Of Or
        Controlled By Hamas Through Expert Testimony, Levitt's And Spitzen's Proposed
        Testimony Would Be Inadmissible Under Daubert**

As shown in Point I above, as part of its "gatekeeping function," the Court must exclude

irrelevant expert testimony. See supra p. 18. Neither Spitzen's nor Levitt's proposed testimony

is relevant, because as shown above, neither addresses the relevant legal factors for determining

alter ego or control status, nor could either of them do so as a matter of law. See supra

pp. 23-27.

The Court also must exclude both opinions because they merely and impermissibly

aggregate hearsay. 56.1 St. ¶¶ 345-61. FRE 703 permits experts to rely on certain types of

inadmissible evidence as the basis for their opinions, but they cannot simply aggregate

inadmissible hearsay and transmit it to the jury. See United States v. Mejia, 545 F.3d 179, 197

(2d Cir. 2008). "Otherwise, the expert is simply repeating hearsay evidence without applying

any expertise whatsoever, a practice that [would] circumvent the rules prohibiting hearsay." Id.

(internal citations omitted).  Neither Levitt nor Spitzen relies on hearsay to synthesize that information to reach an expert opinion, but rather only to summarize it.  That is an abuse of FRE 703.  Mere repetition of hearsay evidence through an expert is of particular concern where, as here, the party offering the expert "will offer no fact witness on these issues that the defendant could test through cross-examination," United States v. Paracha, 2006 WL 12768, at *23 (S.D.N.Y. Jan. 3, 2006).

Moreover, as shown above, see supra p. 16, an expert's opinions must be the product of the same properly applied methods and reliable principles that other experts in the field would use outside the courtroom, and must be reliable at every step, from the facts they rely on, to the methods by which they apply those facts to reach opinions, to how they apply the facts and methods to the matter being litigated.  Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 267 (2d Cir. 2002).  Yet neither Levitt's nor Spitzen's opinion is "based on sufficient facts or data" or is the "product of reliable principles or methods properly applied."  Viscusi, at *6.  The Court must "undertake a rigorous examination of . . . how the expert applies the facts and methods to the case at hand," and exclude opinions that are "connected to existing data only by the *ipse dixit* of the expert."  Also, an expert opinion cannot be based upon insufficient data or an inadequate methodology that does not support the conclusion reached by the expert.  Amorgianos, 303 F.3d at 266-67 (emphasis added).  Neither Levitt's nor Spitzen's opinion meets these standards.

Levitt testified that an analyst must "exploit all sources, looking at books, talking to other scholars, journals, keeping on top of information and . . . the most important thing is conducting primary field research – going out and interviewing people, meeting people, spending time in the

region." 56.1 St. ¶ 362 (emphasis added).  But Levitt did almost none of that here.[25]  His report

is virtually barren of any primary sources – he has never visited any of the charities, reviewed

their records or spoken to any of their members.  Levitt contends this research would be futile,

but others have conducted primary field research of the very same charities, and reached

conclusions that are contrary to those Levitt reached based on hearsay.  56.1 St. ¶¶ 363-68.[26]

Further, Levitt makes sweeping assertions about the involvement of charities with

terrorism without citing any support, or tying them in any way to the 13 Charities.  56.1 St. ¶¶

369-89, 394-99.  Similarly, many of Levitt's accusations are based on sources he misquotes or

mischaracterizes, invariably in ways that bolster his conclusions.  56.1 St. ¶¶ 380-99, 394-99.

Levitt also fails to consider alternative explanations, which demonstrates the unreliability

of his analysis under <u>Daubert</u>.  <u>See</u> <u>In re Rezulin Prods. Liab. Litig.</u>, 369 F. Supp. 2d 398, 425

(S.D.N.Y. 2005).  He cites only evidence that would appear to support his views, while ignoring

contrary sources, including those possessing vastly more information.  56.1 St. ¶¶ 400-10.[27]

Finally, despite Levitt's own admonitions about the importance of vetting sources, he vetted

<u>none</u> of the sources that he cites most heavily.  56.1 St. ¶¶ 411-30.[28]

---

[25] That Levitt may otherwise be qualified as an expert does not excuse his unreliable methodology here.  Courts repeatedly have excluded the testimony of an otherwise qualified expert where the testimony he or she offered was unreliable.  <u>See, e.g.</u>, <u>Dolphin v. Synthes (USA) Ltd.</u>, 2011 WL 1345334, at **5-7 (S.D.N.Y. Mar. 25, 2011).  And when this Court qualified Levitt as a prosecution expert in <u>United States v. Defreitas</u>, 2011 WL 317964 (E.D.N.Y. Jan. 31, 2011), the government had disclaimed having him offer <u>any</u> opinions, rather than "background information regarding" terrorist groups (<u>id.</u> at n.5).

[26] When asked to explain why he conducted no primary field research, Levitt claimed that talking to members of these charities about Hamas would be like "ask[ing] Al Capone are you a crime boss," confirming that he simply assumed his conclusion that these charities are tied to Hamas, a clear methodological flaw.  56.1 St. ¶ 367.

[27] For instance, in addition to ignoring the views of many of his peer scholars who have conducted primary research, Levitt ignores the findings and actions of the British government, which he admits has more information than he does and which has never found Interpal to be linked with terrorists.  56.1 St. ¶¶ 400-03.  Similarly, while treating OFAC's designation of Interpal as conclusive evidence, Levitt ignores that OFAC never designated 12 of the 13 Charities and designated the remaining one in 2007, over two years after the last relevant transfer.  56.1 St. ¶¶ 404-07.

[28] To note just one example, which Levitt specifically added to his NatWest report and which did not appear in his Crédit Lyonnais report, Levitt repeats the theory of an economist that there is a correlation between Hamas's

-34-

Spitzen employs no accepted, peer reviewed or verifiable methodology. Instead, he invented his own "18 factor test" to determine if the 13 Charities are alter egos of or controlled by Hamas, selecting his factors to match the types of information he collected. 56.1 St. ¶¶ 434-39. An expert's methodology must be subject to objective testing to be reliable, and he cannot simply "rely on his instinct" in coming to conclusions. See 24/7 Records, Inc. v. Sony Music Entm't, Inc., 514 F. Supp. 2d 571, 576 (S.D.N.Y. 2007) But that is precisely what Spitzen did here. He improperly selected factors designed to reach his desired conclusion and employed them inconsistently to ensure that result.

Also, Spitzen admitted that if evidence of any of his 18 factors was absent, he simply ignored that factor. 56.1 St. ¶ 445. Thus, despite ascribing importance to the presence of a factor for one charity, he gave the absence of that same factor no weight for another. That obviously skews his analysis. Further, there was no minimum number of factors that he needed to find were satisfied. 56.1 St. ¶ 446. Accordingly, if he found only two of his 18 factors were satisfied, he did not conclude that two factors were present and 16 were not, but rather that only two was sufficient. 56.1 St. ¶ 447.

Moreover, Spitzen applied no objective standard to weight his 18 factors. 56.1 St. ¶¶ 440-50. Instead, for each charity he gave individual weights to the factors based on the amount of evidence he had for each, and he deemed the most significant factor the one for which he perceived he had the most evidence. 56.1 St. ¶¶ 449-51. In a reliable methodology, only the evidence being analyzed can be variable, not the methodology that is applied to it. See Zenith Elecs. Corp. v. WH-TV Broad. Corp., 395 F.3d 416, 419 (7th Cir. 2005).

---

provision of social services and its concomitant "lethality" as an organization, without having conducting any analysis of his own or verifying the reliability of the underlying data, portions of which Levitt himself admitted at his deposition appeared to be flawed. 56.1 St. ¶¶ 422-30. Levitt also omits that the economist he cites disputes Levitt's conclusion that the charities are "fronts" for Hamas. 56.1 St. ¶¶ 431-33.

Further, Spitzen relied on facts occurring several years after the relevant transfers occurred. 56.1 St. ¶ 452. And certain of his factors lack any meaningful substance – for instance, despite placing heavy reliance upon whether persons he deemed "key" figures at these charities were also Hamas members (except when there was no evidence of that factor), he did not consider whether they actually directed the charity's policy or operations. 56.1 St. ¶¶ 453-58. And he focused only on those employees who reportedly were associated with Hamas, while ignoring those who were not. 56.1 St. ¶ 459. And certain of his conclusions are entirely circular.[29]

## III.   NATWEST IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' SECTION 2339B CLAIM BECAUSE NO REASONABLE JUROR COULD FIND THAT NATWEST PROVIDED FUNDS TO AN FTO

As shown above, see supra p. 3, to succeed on their section 2339B claim, plaintiffs must prove that NatWest knowingly provided material support or resources to Hamas, a designated foreign terrorist organization, or "FTO." At the dismissal motion stage of these cases, Judge Sifton ruled that plaintiffs' complaints adequately alleged support of an FTO by alleging that the 13 Charities were alter egos of or controlled by Hamas, and therefore were agents of a

---

[29] For instance, he claims that entities are controlled by Hamas because of "[e]xternal sources of funding associated with Hamas" or because of "[t]ies with other organizations throughout the world," when he also states that the reason he concludes the external sources of funding or other organizations are tied to Hamas is that they fund these entities. 56.1 St. ¶¶ 460-61.

Finally, independent of his analysis as to whether the 13 Charities were "controlled by" Hamas, Spitzen purports to offer a separate opinion as to whether another Interpal transferee is a relative of a leader of one of the charities, an opinion that is not only wholly irrelevant to this case but further demonstrates Spitzen's utter lack of a reliable methodology in reaching his conclusions. He purports to opine that ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ who is listed as having received approximately ▇▇▇▇▇ in transfers in ▇▇▇▇ for a ▇▇▇▇▇ from Interpal through its NatWest accounts, is "probably" the son of Ahmad Harb Ahmad al-Kurd, the head of one of the 13 Charities, based solely on Spitzen's analysis of the name ▇▇▇▇▇▇▇▇▇. But Spitzen's analysis is predicated on his unsupported ipse dixit statement that it is "highly probable" that the ▇▇▇▇ in this name refers to "Ahmad" and "Harb," even though Spitzen admitted that these letters could very well stand for other common Muslim names (Abdul Hamid, for example), and even though Spitzen further admitted that websites he has reviewed specifically listing two sons of Ahmad al-Kurd do not even mention a son named ▇▇▇▇ or a third son at all. In any event, this "opinion" is wholly irrelevant to the issues in these lawsuits, and Spitzen confirmed that he has no knowledge whether Ahmad al-Kurd, the relevant charity or Hamas had anything to do with these transfers and is not opining as to the purpose of these transfers. 56.1 St. ¶¶ 463-79.

designated FTO. Weiss, 453 F. Supp. 2d at 623 (citing Nat'l Council, 373 F.3d at 157-59). But as shown above, see supra pp. 23-27, plaintiffs have presented no admissible evidence from which a reasonable juror could conclude that the 13 Charities were alter egos of or controlled by Hamas, which precludes proof of the Article III standing and proximate causation elements of plaintiffs' claims, including under section 2339B. For the very same reasons, NatWest also is entitled to summary judgment on that claim because plaintiffs have presented no admissible evidence from which a reasonable juror could find that NatWest provided support to an FTO.

## IV. NO REASONABLE JUROR COULD FIND THAT PLAINTIFFS HAVE PROVEN THE HAMAS RESPONSIBILITY ELEMENT OF THEIR CLAIMS

Apart from their failure to present a triable case on the other necessary elements of their claims, plaintiffs have failed to proffer any admissible evidence on which a reasonable juror could find the final link in the chain of causation, namely, that Hamas perpetrated the attacks at issue. Rather than attempting to prove this element through witnesses with personal knowledge of these attacks or other admissible physical or documentary evidence, plaintiffs are instead resting entirely on the cynical and impermissible shortcut of proposed "expert" testimony by Ronni Shaked, an Israeli newspaper reporter, Evan Kohlmann, a compiler of predominantly Al Qaeda-specific information published on the internet, and Shaul Naim, a retired Jerusalem police officer, and the inadmissible hearsay on which these three "experts" rely. Without these three inadmissible "expert" opinions, plaintiffs are left only with unauthenticated hearsay documents, thereby precluding them from proving Hamas perpetrated the 15 attacks.

### A. Shaked's Proposed Testimony Is Not Admissible

For each of the attacks, Shaked simply collects hearsay evidence of Hamas responsibility for the attacks – including newspaper articles, claims published on websites Shaked attributes to Hamas, interviews of purported Hamas members, propaganda literature, Israeli government press

releases, non-public police reports that Shaked claims to have obtained through police contacts
he has fostered as a newspaper reporter, unauthenticated Israeli civilian and military court
records and the like – and then paraphrases or reproduces them verbatim, accepting them all as
true.  His opinions are therefore entirely inadmissible for each of four reasons.

### 1.  Shaked's Opinion That Hamas Perpetrated The Attacks At Issue Is An Improper Subject For Expert Testimony

Hamas's role in the 15 attacks is "a fact that must be proven by competent evidence," and
not by the "shortcut" of an "expert pronounce[ment]" of guilt. Mejia, 545 F.3d at 195 (emphasis
in original); see also Paracha, 2006 WL 12768, at **21-24.  The Second Circuit's Mejia ruling is
squarely on point.  The prosecution proffered a police officer as an expert witness to opine that
the defendants had committed the alleged crimes. Mejia, 545 F.3d at 184, 186-88.  The Second
Circuit vacated the resulting convictions, ruling that the prosecution could not rely on an expert
as a "shortcut" to prove guilt "just by having an expert pronounce that unspecified deaths . . .
have been homicides committed by" the defendants. Id. at 195-96; see also Paracha, 2006 WL
12768, at **18, 21 (permitting an expert to testify only about a terrorist group's origins and
structure but not about the "background and alleged activities" of specific alleged co-
conspirators, because such testimony "is properly admitted through fact witnesses, not an
expert").

Here, plaintiffs are attempting to use Shaked for the same improper "shortcut" that Mejia
condemns.  Relying solely on hearsay documents, Shaked repeatedly declares they "leav[e] no
doubt" that Hamas perpetrated these attacks. 56.1 St. ¶¶ 495, 506-10.  That is precisely what
Mejia holds even a qualified expert cannot testify: she cannot serve as a "chronicler of the recent
past" by "transform[ing] into the hub of the case, [and] displacing the jury by connecting and
combining" the evidence "into a coherent, discernible, internally consistent picture of the

-38-

defendant's guilt." Mejia, 545 F.3d at 190-91.  While an expert may "speak to the operation, symbols, jargon, and internal structure" of criminal organizations, Shaked's conclusions that Hamas perpetrated specific attacks is the type of determination of criminal responsibility that Mejia forbids.  Mejia, 545 F.3d at 190; see Paracha, 2006 WL 12768, at **18, 21.

       2.     **Shaked's Proposed Testimony Is An Improper Summary Of Inadmissible Hearsay**

As shown above, see supra pp. 32-33, an expert may not simply aggregate hearsay and "transmit that hearsay to the jury." Mejia, 545 F.3d at 197.  "Otherwise, the expert is simply repeating hearsay evidence without applying any expertise whatsoever, a practice that [would] circumvent the rules prohibiting hearsay." Id. at 197 (internal quotation marks and citation omitted); see also Paracha, 2006 WL 12768, at **21-24.  That is why, in a prior ATA lawsuit, the court excluded proposed testimony from plaintiffs' expert Levitt that provided a list of attacks "'claimed by or attributed to'" a terrorist group, ruling that "to say the attack was 'claimed by'" that group "is not to say that it was actually committed by" that group and, in any event, "[e]xpert opinions may be based on hearsay, but they may not be a conduit for the introduction of factual assertions that are not based on personal knowledge." Estate of Parsons v. Palestinian Auth., 715 F. Supp. 2d 27, 32-33 (D.D.C. 2010), aff'd in part, rev'd in part on other grounds, 651 F.3d 118 (D.C. Cir. 2011).

Shaked's summarizing of hearsay documents and his acceptance of them as true makes him merely a hearsay delivery vehicle, blatantly abusing FRE 703 and contravening both Mejia and Parsons.  Here, all of Shaked's proposed testimony repeats what he has read or heard from hearsay sources.[30]

---

[30] Further, because Shaked is simply repeating hearsay he has read or heard, he could not help a jury to understand the evidence or determine a fact in issue, as FRE 702 requires.  Expert testimony is proper only "where the subject matter is beyond the ken of the average juror," Mejia, 545 F.3d at 191 (internal quotation marks and citation omitted), and not for "lay matters which a jury is capable of understanding and deciding without the expert's help."

Finally, permitting Shaked to summarize hearsay will preclude NatWest from adequately testing the opinions he grounds in that hearsay through cross-examination. That is why the Paracha court refused to permit plaintiffs' expert Kohlmann to testify about alleged terrorist activities based on his summaries of inadmissible hearsay. Paracha, 2006 WL 12768, at **21-24.

> 3.   Shaked Is Not Qualified To State Who Is Responsible For Perpetrating A Terrorist Attack

Attributing responsibility for committing a terrorist attack obviously requires specialized training, knowledge, experience and skill. See, e.g., United States v. Williams, 506 F.3d 151, 158-62 (2d Cir. 2007). But rather than present a witness who has those credentials, plaintiffs have instead offered a newspaper reporter to aggregate hearsay statements about these attacks. By his own admission, Shaked's education and experience do not provide him with any distinctive knowledge, education or skill to analyze who has committed an attack, let alone the attacks at issue here. 56.1 St. ¶¶ 496-505. Shaked's only remotely relevant experience appears to be that he has written news articles about certain of the attacks, 56.1 St. ¶ 496, but that certainly does not make him an expert in determining responsibility for them. If anything, Shaked's experience as a newspaper reporter demonstrates he is a mere hearsay delivery vehicle and a "chronicler of the recent past," precisely what Mejia condemns.

> 4.   Shaked's Opinion Is Not Based On A Daubert-Sufficient Methodology

Shaked's opinions rest simply on his summary of hearsay sources with no genuine expert analysis. By his own admission, he has not personally investigated these attacks, examined any forensic evidence concerning them or otherwise done what a competent analyst would do. 56.1 St. ¶ 510. To the extent he employs any "methodology," it cannot be tested or subjected to peer

---

Andrews v. Metro N. Commuter R.R. Co., 882 F.2d 705, 708 (2d Cir. 1989) (citation omitted).

review and it has never been accepted in any relevant expert community.  It therefore fails FRE 702's reliability requirement.  His opinions are "'connected to existing data only by the *ipse dixit* of the expert,'" mandating that they be excluded, because "'there is simply too great an analytical gap between the data and the opinion proffered.'"  Viscusi, 2007 WL 2071546 at *6 (citations omitted).

Moreover, Shaked's "methodology" is demonstrably unreliable.  He principally cites hearsay claims of responsibility attributed to Hamas, simply quoting or summarizing them and then, with no analysis, concluding that they "suffice" to prove Hamas perpetrated the attacks.  56.1 St. ¶¶ 506-07.  That is an improper summary of inadmissible hearsay, and it is also methodologically unsound.  As Parsons emphasizes, "to say the attack was 'claimed by'" a group "is not to say that it was actually committed by" that group.  Parsons, 715 F. Supp. 2d at 33.  Further, as explained in the expert report of Brian Michael Jenkins – who unlike Shaked is a recognized expert in this field, 56.1 St. ¶¶ 787-803 – a terrorist group's claim of responsibility for an attack is a form of propaganda and proves "only that someone has made the claim."  56.1 St. ¶¶ 807-09.  As Jenkins states, and as Shaked agrees, terrorist groups have multiple political and financial motivations to claim responsibility, and Hamas has published false claims of responsibility for attacks and false denials of responsibility.  56.1 St. ¶¶ 511-15, 812-13, 815, 817.  That is why a responsible analyst cannot take claims of responsibility at face value.[31]

Shaked did not perform any analysis of the reliability of the Hamas claims on which he relies, nor is he competent to do so.  Instead, he has simply accepted Hamas's claims as stated.  Yet he wrote just last year that terrorist groups are rivals, and compete to be the first to assume

---

[31] Shaked's proposed testimony that Hamas has "never taken responsibility for a terrorist attack that it did not commit" is contradicted by his published assertion that Hamas did not commit the 1992 kidnapping of an Israeli military officer for which it claimed credit. 56.1 St. ¶ 514. Shaked similarly contradicted his reliance on claims of responsibility when he testified that Hamas makes a "false declaration to deny something when they need it." 56.1 St. ¶ 515. Shaked's repeated contradictions are the hallmarks of an unreliable witness with an unreliable methodology. Viscusi, 2007 WL 2071546, at *8.

responsibility for attacks against Israel, among other reasons to gain political support.  56.1 St. ¶¶

512-13.  Ironically, the example of this rivalry he cited is the Bus 19 attack at issue in these

cases, yet in his proposed testimony he relies on Hamas's claim of responsibility for this attack

while ignoring the competing claim by Hamas's rival, the Al Aqsa Martyrs Brigades (the

"AAMB"), and numerous court rulings and official pronouncements attributing this attack to the

AAMB.  56.1 St. ¶¶ 513, 520-22, 527-29, 542-77.

      Further, Shaked's conclusions are manifestly unreliable, and his conclusions do not "flow

reliably from [his] premises."  Rezulin, 369 F. Supp. 2d at 426.  He selectively cites documents

that support the conclusions he desires, he reaches conclusions that are not supported by the

sources he cites, he fails to account for alternative explanations and, as described above, he

places blind faith in information without ever evaluating its veracity.  For example, Shaked

asserts in his report that Hamas perpetrated the Bus 19 attack, but his conclusion is fatally

infected by the following mistakes, material omissions and internal contradictions:

- According to Shaked, the suicide bomber, Ali Muneer Ja'ara, wished to commit a suicide bombing and initially contacted members of Hamas who photographed him wearing Hamas paraphernalia, but Shaked agrees that Ja'ara's collaboration with Hamas members ended with a prior failed attempt at a suicide bombing, at which point Ja'ara then contacted members of Hamas's bitter rival, the AAMB, which equipped him with a new bomb and drove him to the location where he perpetrated the Bus 19 attack.  56.1 St. ¶¶ 523-26.

- Shaked admitted that he discounted the AAMB's immediate claim of credit for this attack based upon a Hamas report that the AAMB subsequently denied responsibility, not any AAMB source, but this is contradicted by the fact that, as Shaked conceded, the AAMB again claimed responsibility for this attack one year later.  56.1 St. ¶¶ 527-29.

- Shaked also failed to consider: (i) indications that the written "will" of Ja'ara that appears in Shaked's report is a forgery; (ii) another will credited to Ja'ara, which was written in the name of the AAMB, not Hamas; (iii) the fact that Hamas's claim of credit states the Bus 19 attack was committed to avenge an Israeli army operation that occurred after the date as of which, according to Shaked, Hamas's involvement with Ja'ara ended; (iv) several Israeli and U.S. reports attributing the Bus 19 attack to the AAMB, not Hamas; and (v) perhaps most stunningly, a

-42-

newspaper article Shaked himself wrote one day after the attack, in which he identified the bomber as a member of the AAMB and asserted that Hezbollah, not Hamas, was responsible for this attack. 56.1 St. ¶¶ 530-42, 547, 575-77.

- Shaked also cites to evidence he contends he obtained from Israeli police and court files, but misrepresents that these documents indicate Hamas members were "convicted of involvement in the terrorist attack" on Bus 19; when challenged, he admitted that none of the Hamas members he identified was convicted of perpetrating this attack, and instead, each of the AAMB members he admitted was involved in the attack was convicted of murder. 56.1 St. ¶¶ 548-73.[32]

Finally, Shaked's proposed testimony suffers from other fatal flaws, including his failing to account for the instances in which Hamas purportedly issued a claim of responsibility long after an attack took place. 56.1 St. ¶¶ 591-94. But as Jenkins explains, late claims of responsibility "must be discounted in an analysis of responsibility, absent a compelling explanation for the delay." 56.1 St. ¶ 595.

## B.   Kohlmann's Proposed Testimony Is Not Admissible

Kohlmann relies exclusively on claims of responsibility for the 15 attacks that he asserts he has collected from internet websites he attributes to Hamas, and concludes that the claims "demonstrate [Hamas's] culpability" for the 15 attacks. 56.1 St. ¶¶ 670-77, 730-34, 753-56. This proposed testimony is also inadmissible, for many of the same reasons addressed above.

### 1.   Kohlmann Aggregates And Summarizes Inadmissible Hearsay

Like Shaked, Kohlmann's opinion is an improper "expert pronounce[ment]" of guilt, contrary to Mejia and Paracha. See supra pp. 39-40. The Paracha opinion, which precludes

---

[32]  Shaked's analysis of the March 7, 2003 Kiryat Arba attack likewise demonstrates his failure to apply reliable principles and methods to his analysis and to reliably apply his "methodology" to the facts. Shaked initially opined in his first report prepared for plaintiffs' companion lawsuits against Crédit Lyonnais that two Hamas terrorists were responsible for this attack. Later, in his supplemental report in the lawsuits against Crédit Lyonnais and in his report for these lawsuits against NatWest, he simply changed his mind, stating that the attack "most likely" was committed by two other persons. 56.1 St. ¶¶ 578-82. Shaked explained that he changed his opinion after "reading the documents again" and "talking to people." But he then admitted the only persons he spoke to were a "sports businessman" friend, a stone merchant friend and a Hamas member serving in the Palestinian Authority's legislative council. Shaked also admitted that "even today Hamas . . . have misunderstanding who did that operation," and that "the only definitive way" to confirm the identities of the perpetrators "would be to obtain the forensic reports for the dead terrorists," which he has not done. 56.1 St. ¶¶ 583-89.

Kohlmann's proposed testimony there, is instructive.  The court allowed Kohlmann to testify only about Al Qaeda's origins and structure (a topic, unlike Hamas, on which his work has focused), but not the "alleged activities" of specific alleged co-conspirators, because that "is properly admitted through fact witnesses, not an expert."  Paracha, 2006 WL 12768, at **18, 21-24.  Kohlmann's proposed testimony here is what Paracha prohibited.

Also like Shaked, Kohlmann is proposing to offer merely his own summary of the inadmissible hearsay appearing on purported Hamas websites he has elected to credit, an unmistakable abuse of FRE 703.  For each attack, he simply collects indisputably hearsay statements from these websites, reproduces those statements verbatim or simply paraphrases them and accepts them as true.  56.1 St. ¶¶ 670-73.  This makes him the type of hearsay delivery vehicle Mejia forbids.  Mejia, 545 F.3d at 197-98.  And the average juror has the same ability as Kohlmann to read websites.

Kohlmann also opines that the purported Hamas claims of responsibility he cites are "credible."  56.1 St. ¶¶ 678-81.  That is plainly impermissible.  See Paracha, 2006 WL 12768, at **18, 23.

2.     Kohlmann Is Not Qualified To Determine Who Is Responsible For
        Perpetrating A Terrorist Attack

By his own admission, Kohlmann's education and experience do not provide him with any distinctive knowledge, education or skill to determine who has committed a terrorist attack.  56.1 St. ¶¶ 682-91.  Instead, his knowledge appears to be almost entirely derived from what he has read on the internet, 56.1 St. ¶ 692, but that does not make him an expert in determining responsibility for an attack.  As one court stated in excluding Kohlmann's proffered testimony

about Al Qaeda, simply "reading" about Al Qaeda on the internet "doesn't make him an expert on Al Qaeda[.]"[33]

Further, Kohlmann admits he has no expertise concerning Hamas. Rather, he focuses on Al Qaeda, and he admits that Hamas and Al Qaeda "are vastly different from each other." 56.1 St. ¶¶ 685, 703-06. Kohlmann appears to have done almost no work concerning Hamas, except in this litigation. 56.1 St. ¶¶ 707-18.[34]

Moreover, Kohlmann admits he knows nothing about who wrote the website postings he cites, who posted them or any details regarding them, other than what he (and anyone else) could read on a computer screen. 56.1 St. ¶¶ 726-27. And while Kohlmann claims that his relevant "expertise" consists of "comparative analysis" pursuant to which he "compare[s] and contrast[s] particular sources in question with other analogous sources contained in my digital archive," he conceded that he performed no such analysis here. 56.1 St. ¶¶ 748-52.

Further, when asked how he determines the credibility of a claim posted on the internet, he merely pointed to his collection of downloads, claiming that his contemporaneous viewing of these postings on a daily basis equips him to judge their credibility.[35] 56.1 St. ¶ 721-24. But obviously, merely viewing a website posting cannot qualify someone to opine that the posting is

---

[33] 56.1 St. ¶¶ 693, 695-97 (Transcript of United States v. Ahmed Omar Abu Ali (E.D. Va. 2005)). Strikingly, Kohlmann has repeatedly misrepresented the reason why the Abu Ali court excluded him, testifying that it did so because the government submitted "paperwork" late, not because he lacked the necessary credentials. Even after seeing the transcript of the Daubert hearing in that case, Kohlmann testified that if asked under oath, he would stick to his false "late paperwork" excuse. 56.1 St. ¶¶ 694-99.

[34] Kohlmann repeatedly tried to bolster his credentials concerning Hamas through a series of direct misrepresentations and exaggerations about his experience. For instance, after testifying that Hamas was the "principal subject" of three of his "major papers," he later conceded two were actually summaries of testimony in which he included references to Hamas as part of discussions about Al Qaeda. 56.1 St. ¶ 716. And when confronted with the third paper, he conceded that it does not refer to Hamas at all. Id. Also, Kohlmann specifically misrepresented that he has been proffered as an expert on Hamas in several U.S. cases. 56.1 St. ¶ 707. But when he was confronted with records from those cases, he conceded that he was not proffered as an expert in Hamas in any of them. Id. Kohlmann also misrepresented to a court in Denmark that he had given evidence on Hamas in a case in New York, but, as he now admits, his testimony in the New York case does not mention Hamas. 56.1 St. ¶ 717.

[35] Kohlmann admitted that it would be his normal practice to analyze whether claims were accurate, but here plaintiffs told him not to do so. 56.1 St. ¶ 752.

credible. And an independent forensic analysis of Kohlmann's collection has established that
Kohlmann <u>did not</u> – contrary to his deposition testimony – review and collect the claims of
responsibility on which he relies contemporaneously with their publication, which is his stated
basis for insisting he is uniquely qualified to opine about their credibility. 56.1 St. ¶ 725.
Instead, he saved more than <u>94 percent</u> of the relevant websites in 2005 or thereafter – long after
all of the attacks occurred – and he saved more than <u>68 percent</u> of these websites after plaintiffs
hired him to testify in these lawsuits. <u>Id.</u> This indicates not only that Kohlmann testified falsely
about the origins of his collection of website postings, but also that, far from having any
particular expertise, he has simply acted as litigation support for plaintiffs, collecting most of his
materials <u>after</u> plaintiffs hired him, as any layperson could do. 56.1 St. ¶¶ 721-25, 728.[36]

  3.  Kohlmann's Proposed Testimony Is Not Based On A
      <u>Daubert-Sufficient Methodology</u>

  As with Shaked, Kohlmann's opinion that Hamas committed the attacks at issue is based
merely on his summary of inadmissible hearsay with no true expert analysis – he merely
reproduces or reviews what appears on websites he attributes to Hamas and then accepts those
statements as true. 56.1 St. ¶¶ 730-33. He confirmed that he is not aware of Hamas's <u>actual</u> role
in any of these attacks, if any, and knows nothing more than "what Hamas claims to have done."
56.1 St. ¶ 734. But as the <u>Parsons</u> court emphasized, obviously "to say the attack was 'claimed
by'" a group "is not to say that it was actually committed by" that group. <u>Parsons</u>, 715 F. Supp.
2d at 32-33. Kohlmann's approach is particularly defective because he also acknowledged that
claims of responsibility can be propaganda, and Hamas has published false denials of
responsibility for attacks. 56.1 St. ¶ 735-40.

---

[36] Kohlmann's repeated false testimony under oath is a methodological flaw in itself, and renders his opinions unreliable.

Further, Kohlmann's description of his methodology does not match the "intellectual rigor ... of an expert in the relevant field." Viscusi, 2007 WL 2071546, at *6 (citation and quotation omitted). As Jenkins confirms:

- "No accepted methodology for analyzing culpability for a terrorist attack would credit a claim of responsibility by itself as reliable proof of responsibility";

- There is "no accepted methodological basis" for Kohlmann's statement that the more times Hamas claims responsibility, the more likely it is legitimate; and

- Kohlmann fails entirely to evaluate the quality of evidence Hamas presented in support of its claims; why certain claims were issued weeks, months, or in some cases even years after the relevant attack;[37] and evidence related to other groups' involvement in the attacks. 56.1 St. ¶¶ 675-77, 730-34, 743-47, 749-61, 766-74, 824-27.

Finally, Kohlmann's conclusions fail to account for alternative explanations, as they must. Rezulin, 369 F. Supp. 2d at 426. Kohlmann selectively cites documents that support the conclusions he desires, reaches conclusions that are not supported by the sources he cites, fails to account for alternative explanations and, as described above, places blind faith in information he contends was provided by Hamas without evaluating its veracity. Kohlmann's analysis of the January 29, 2004 Bus 19 bombing is illustrative of the fatal flaws of his approach. 56.1 St. ¶¶ 753-74. His opinion consists of quoting verbatim or paraphrasing, with no analysis, the purported Hamas claims of responsibility posted on websites. He confirmed that he did not seek to determine Hamas's actual role because that is "not part of what I was tasked to do" by plaintiffs, and he never saw (or looked for) the rival claims issued by the AAMB. Id.

**C.     The Documents On Which Shaked And Kohlmann Purport To Rely Are Inadmissible Hearsay**

All of the documents on which Shaked and Kohlmann purport to rely are inadmissible hearsay, which is why plaintiffs are attempting to channel these documents through their

---

[37] For instance, Hamas's claim of responsibility for the May 7, 2002 attack was published in June 2008 – more than six years after the attack took place. 56.1 St. ¶ 821. As Jenkins explains, late claims of responsibility "must be discounted in an analysis of responsibility, absent a compelling explanation for the delay." 56.1 St. ¶ 823.

purported experts, in a clear abuse of FRE 703.[38] This is particularly true of the Israeli civilian and military court convictions on which Shaked relies (and Naim purports to authenticate, as discussed below). While in certain instances the Federal Rules of Evidence will permit a foreign felony conviction to be received in evidence in a later civil lawsuit, we have found no reported precedent allowing over a hearsay objection what plaintiffs propose here – attempting to establish a civil defendant's liability with a hearsay criminal conviction of a third party, here purported Hamas members, who had no pre-existing legal relationship with the civil defendant (for example, an employee-employer relationship) and where the civil defendant did not participate in the underlying criminal proceeding. Tellingly, an Israeli court would not receive such a criminal conviction in evidence under these same circumstances. 56.1 St. ¶¶ 599-623. Further, the convictions on which Shaked relies that were issued by military courts in the Palestinian Territories are also inadmissible because, as one of plaintiffs' other experts conceded in his writings before plaintiffs engaged him for these lawsuits, these courts do not satisfy the necessary due process requirements for their verdicts to be received in a U.S. court. 56.1 St. ¶¶ 619-47. See Lloyd v. Am. Exp. Lines, Inc., 580 F.2d 1179, 1189-90 (3d Cir. 1978). And once again, even Israeli courts would not receive these convictions in a similar lawsuit. 56.1 St. ¶¶ 619-23.

**D.  Plaintiffs Have Not Authenticated The Documents On Which Shaked And Kohlmann Purport To Rely**

None of the documents on which Shaked and Kohlmann purport to rely is admissible because plaintiffs have not met their burden to properly authenticate them. Shaul Naim, a retired Jerusalem police officer now in private law practice, who plaintiffs proffer as a purported

---

[38] Notably, although many of these documents are products of the Israeli government, military or courts, an Israeli court would exclude them as inadmissible hearsay in a lawsuit similar to those here. 56.1 St. ¶¶ 599-669, 775-86. These purportedly "official" documents should be afforded no better treatment in this Court than they would receive in the legal system of their country of origin.

-48-

"expert" to authenticate certain of the purported police and court records on which Shaked relies, meets none of the tests for authenticating these documents, and he is not even qualified to offer an authenticity opinion under FRE 702. Naim cannot authenticate these documents under:

- FRE 901(b)(1), because he did not maintain any of them and he has no personal knowledge of them. See, e.g., United States v. Gagliardi, 506 F.3d 140, 151 (2d Cir. 2007). Instead, most were given to him by plaintiffs' counsel, and plaintiffs refused to allow Naim to testify concerning the origins of these documents. 56.1 St. ¶¶ 844, 847. He obtained at least some of the remaining documents from personal contacts with the Israeli police, but he cannot be sure of their origin, because he did not personally copy them. 56.1 St. ¶¶ 848-50.

- FRE 901(b)(3), because plaintiffs have proffered no authenticated specimens for comparison. See Be-Lo Stores v. N.L.R.B., 126 F.3d 268, 279 (4th Cir. 1997). Naim also admitted that when he signed his report, he had not compared the documents plaintiffs' counsel gave to him with any true originals. 56.1 St. ¶¶ 844-46.

- FRE 901(b)(4), because he has made no showing of any "distinctive characteristics" that would establish their authenticity. Instead, he states only that these documents "appear" to him to be authentic. 56.1 St. ¶¶ 828-32, 851.

- FRE 901(b)(7), because he has not shown that any of them are recorded or filed in a public office where items of this nature are kept, he did not retrieve the documents himself and he cannot attest to their chain of custody, and he has not proven that the contents are an accurate transcription of the originals and that the originals are genuine. See Wigmore on Evidence, § 2158, at 772-73.

- FRE 902(3), because he is not their custodian or an official who is authorized to attest to their authenticity.

- FRCP 44(a)(2), because he was neither their custodian or an official authorized by law to certify or acknowledge their authenticity.[39]

Nor is Naim qualified to offer an authenticity opinion. He has never had any role with the military courts, the Israeli civilian courts or the Israel Police outside the Jerusalem district. 56.1 St. ¶¶ 833-38. And his purported authenticity opinions are not the product of an adequate methodology under Daubert. Naim testified that "[w]hen I say it's authentic, I express what I thought was what the document looked like when I saw them. . . . [T]hey appeared – on the face

---

[39] Naim cannot even authenticate these documents under the laws of Israel, whose courts, police and military purportedly are the source of all of them. 56.1 St. ¶¶ 852-65.

. . . to be authentic." 56.1 St. ¶ 830.  But an expert may not, as Naim does here, rely on an "'aura of authenticity'" surrounding the documents he is addressing, <u>United States v. Perlmuter</u>, 693 F.2d 1290, 1293 (9th Cir. 1982), without reference to any objective factors.[40]

Likewise, Kohlmann cannot properly authenticate the websites on which he relies. Printouts of websites are not self-authenticating, and instead require an affidavit of authenticity from someone with personal knowledge of the site.  <u>In re Homestore.com, Inc. Sec. Litig.</u>, 347 F. Supp. 2d 769, 782-83 (C.D. Cal. 2004).  Kohlmann has no personal knowledge that these documents are what he claims them to be.  56.1 St. ¶¶ 726-29.[41]

Without the inadmissible proposed testimony of Shaked or Kohlmann or the inadmissible hearsay documents on which they rely, there is no admissible evidence on the basis of which a reasonable juror could find that Hamas committed the 15 attacks at issue.  NatWest is entitled to summary judgment on this ground alone.

## CONCLUSION

The Court should grant NatWest summary judgment.

Dated:  New York, New York
       December 7, 2011

               CLEARY GOTTLIEB STEEN & HAMILTON LLP

               By: _____
                  Lawrence B. Friedman, A Member of the Firm

               One Liberty Plaza
               New York, New York 10006
               (212) 225-2000

               Attorneys for Defendant National Westminster Bank Plc

---

[40] Furthermore, Naim recently confirmed that he obtained access to the documents not given to him by plaintiffs' counsel under false pretenses.  He falsely told the Israel Police that plaintiffs' claims are being pursued against Hamas and against banks in the U.S. that are holding money deposited by Hamas.  56.1 St. ¶¶ 868-71.

[41] Moreover, as shown above, he did not even download most of the website statements that he attributes to Hamas until long after they were first published, which precludes him from showing that these statements accurately represent what was posted before he saw and saved them.  56.1 St. ¶¶ 725, 728-29.