UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------X

TZVI WEISS, et al.,

                    Plaintiffs,

               - against -

NATIONAL WESTMINSTER BANK PLC,

               Defendant.

:
:
:
:
:
:
:
:
:
:
:
:

Case No. 05-cv-4622 (DLI) (MDG)

-----------------------------------------------------------X

NATAN APPLEBAUM, et al.,

                    Plaintiffs,

               - against -

NATIONAL WESTMINSTER BANK PLC,

               Defendant.

:
:
:
:
:
:
:
:
:
:
:
:
:
:

Case No. 07-cv-916 (DLI) (MDG)


**Oral Argument Requested**

-----------------------------------------------------------X

## NATIONAL WESTMINSTER BANK PLC'S STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE PURSUANT TO LOCAL CIVIL RULE 56.1

CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile:  (212) 225-3999

Attorneys for Defendant National Westminster Bank Plc

December 7, 2011

HIGHLY CONFIDENTIAL

## TABLE OF CONTENTS

**Page**

I.    UNDISPUTED MATERIAL FACTS DEMONSTRATING THAT NO
REASONABLE JUROR COULD FIND THAT PLAINTIFFS HAVE PROVEN
THE <u>SCIENTER</u> ELEMENT OF THEIR CLAIMS ........................................ 1

    A.    Background Facts........................................................................... 1

    B.    The Roles Of United Kingdom Law Enforcement Agencies And
Regulators ................................................................................... 3

        (1)    NCIS ................................................................................. 3

        (2)    The Bank of England's Financial Sanctions Unit................... 4

        (3)    The National Terrorist Financial Investigation Unit ("NTFIU") of
Special Branch .................................................................. 4

        (4)    The Charity Commission ..................................................... 4

    C.    NatWest's Account-Opening And On-Going "Know Your Customer"
Procedures For Interpal ................................................................. 6

    D.    The Charity Commission's 1996 Investigation Of Interpal................ 7

    E.    NatWest's 2001 NCIS Disclosures .................................................. 7

    F.    NatWest's 2001-2002 Due Diligence On Interpal's Accounts........................... 10

    G.    NatWest's 2002 NCIS Disclosure Regarding Interpal ....................... 12

    H.    NatWest's May 2003 NCIS Disclosure Regarding ███████████
████████ .................................................................................. 16

    I.    Metropolitan Police Special Branch's 2003 Production Order Regarding
Interpal ....................................................................................... 16

    J.    The Charity Commission's 2003 Investigation Of Interpal And NatWest's
2003 NCIS Disclosure Regarding Interpal ........................................ 16

    K.    NatWest's 2003 Correspondence With The Bank Of England Financial
Sanctions Unit Regarding Interpal .................................................. 20

    L.    NatWest's Semi-Annual Reviews Of Interpal's Accounts................... 21

    M.    Subjective Impressions Of Interpal's Activity By NatWest Employees ............. 23

    N.    OFAC's SDGT Designation Of Interpal.......................................... 25

    O.    Interpal Has Never Been Listed On Any United Kingdom Or European
Terrorist Sanctions List................................................................. 26

    P.    The United Kingdom Parliamentary Proceedings Regarding Interpal ................ 28

    Q.    The Inapplicability Of Israeli Government Sanctions To NatWest's
Conduct In Serving A United Kingdom Customer In The United Kingdom ...... 30

    R.    The Proposed Expert Testimony Of Gary Walters ............................. 33

**TABLE OF CONTENTS**
(continued)

Page

(1)     Walters's qualifications ...................................................... 33

(2)     Relevance of Walters's proposed testimony ............................................ 35

(3)     Walters's methodology ...................................................... 37

(4)     Walters's report contains unsubstantiated statements, mistakes and incorrect factual assertions .......................................... 42

a.     Unsubstantiated statements ............................................ 42

b.     Mistakes and incorrect factual assertions ................................... 45

S.     The Proposed Expert Testimony Of Clive Walker ................................ 49

(1)     Walker's qualifications as an expert on the Charity Commission, UK law enforcement and internal bank policies and procedures ............ 49

(2)     Walker's methodology ........................................................ 51

T.     The Qualifications Of Jon Holland, An Expert Retained By NatWest................ 53

U.     The Qualifications Of Jonathan Burchfield, An Expert Retained By NatWest .......................................................................... 54

V.     The Qualifications Of Michael Hyland, An Expert Retained By NatWest ......... 55

W.     The Qualifications Of Yaron Lipshes, An Expert Retained By NatWest............ 56

II.    UNDISPUTED MATERIAL FACTS DEMONSTRATING THAT NO REASONABLE JUROR COULD FIND THAT PLAINTIFFS HAVE PROVEN THE PROXIMATE CAUSATION AND ARTICLE III STANDING ELEMENTS OF THEIR CLAIMS ................................................. 57

A.     Background Facts.................................................................... 57

B.     Plaintiffs' Admissions That They Are Not Purporting To Prove A Direct Causal Link Between The Identified Interpal Transfers And The 15 Attacks (Or Any Other Attacks) ............................................. 58

C.     Plaintiffs' Fungibility Theory ............................................... 62

D.     Plaintiffs Rely Upon The Proposed Testimony Of Levitt And Spitzen To Prove That The 13 Charities Were The Alter Egos Of And/Or Controlled By Hamas................................................................... 62

E.     The Absence Of Evidence That The 13 Charities Were The Alter Egos Of And/Or Controlled By Hamas ..................................... 64

F.     Levitt's and Spitzen's Opinions Are Inadmissible ............................... 74

(1)     Levitt and Spitzen aggregate hearsay ...................................... 74

(2)     Levitt's and Spitzen's methodologies..................................... 77

(a)     Levitt............................................................... 77

**TABLE OF CONTENTS**
(continued)

**Page**

       (b)     Spitzen.................................................................................. 88

III.   UNDISPUTED MATERIAL FACTS DEMONSTRATING THAT NO
REASONABLE JUROR COULD FIND THAT PLAINTIFFS HAVE PROVEN
THE HAMAS RESPONSIBILITY ELEMENT OF THEIR CLAIMS......................... 95

    A.     Background Facts.............................................................................. 95

    B.     The Relevant OFAC Designations Do Not Attribute Responsibility For
The 15 Attacks To Hamas................................................................. 96

    C.     The Relevant Israeli Designations Do Not Attribute Responsibility For
The 15 Attacks To Hamas................................................................. 98

    D.     Dr. Levitt Does Not Attribute Responsibility For The 15 Attacks To
Hamas ........................................................................................... 98

    E.     Arieh Spitzen Does Not Attribute Responsibility For The 15 Attacks To
Hamas ........................................................................................... 98

    F.     Wayne Geisser Does Not Attribute Responsibility For The 15 Attacks To
Hamas ........................................................................................... 99

    G.     Ronni Shaked Purports To Attribute Responsibility For The 15 Attacks To
Hamas, But His Proposed Testimony Is Inadmissible......................... 99

        (1)    Shaked is not qualified to offer opinions as to who perpetrated a
terrorist attack ......................................................................... 99

        (2)    Shaked's proposed testimony attempts to prove responsibility for
criminal acts through expert testimony, summarizes hearsay
evidence intended to offer a conclusion and opines on the
credibility of the evidence upon which he relies .................................. 101

        (3)    Shaked's proposed testimony is based upon insufficient and
unreliable sources and is not the product of reliable principles and
methods, and Shaked had not applied his methods reliably to the
facts of these cases ................................................................ 102

            (a)    Shaked's reliance upon Hamas claims of responsibility............ 102

            (b)    Shaked's "very high degree of probability" opinion ................. 103

            (c)    Shaked's opinion that Hamas committed the Bus 19 attack...... 103

            (d)    Shaked's opinion that Hamas committed the March 7, 2003
Kiryat Arba attack....................................................................... 114

            (e)    Shaked's failure to analyze the significance of the absence
of evidence concerning responsibility for an attack ................. 116

            (f)    Shaked's failure to consider the timing of claims of
responsibility in relation to when attacks occurred.................... 116

**TABLE OF CONTENTS**
(continued)

Page

(g)  Shaked relies upon information that is not publicly available, and therefore not verifiable ....................................... 117

(4)  The documents upon which Shaked relies are inadmissible hearsay under Israeli evidence law ................................................ 118

(a)  The Israeli civilian court convictions, sentences and related court and police records upon which Shaked relies are inadmissible hearsay under Israeli evidence law ...................... 118

(b)  The convictions rendered by military courts in the Palestinian Territories upon which Shaked relies are inadmissible hearsay under Israeli evidence law and were not rendered in accordance with due process ............................ 122

(c)  The statements attributed to the ISA and other Israeli government agencies upon which Shaked relies are inadmissible hearsay under Israeli evidence law ...................... 132

(d)  The statements attributed to newspaper and magazine articles and website pages upon which Shaked relies are inadmissible hearsay under Israeli evidence law ...................... 133

(e)  The statements attributed to books upon which Shaked relies are inadmissible hearsay under Israeli evidence law ....... 133

(f)  The recordings posted on the internet upon which Shaked relies are inadmissible hearsay under Israeli evidence law ....... 134

(g)  The other video recordings upon which Shaked relies are inadmissible hearsay under Israeli evidence law ...................... 135

H.  Evan Kohlmann Purports To Attribute Responsibility For The 15 Attacks To Hamas, But His Proposed Testimony Is Inadmissible.................................................. 136

(1)  Kohlmann's proposed testimony attempts to prove responsibility for criminal acts through expert testimony and summarizes hearsay evidence ............................................................................................ 136

(2)  Kohlmann opines on the credibility of the evidence upon which he relies................................................................................................... 137

(3)  Kohlmann is not qualified to determine culpability for an attack ......... 138

(4)  Kohlmann is not an expert on Hamas .................................................... 141

(5)  Kohlmann's experience collecting materials from Internet websites does not qualify him as an expert .......................................................... 144

(6)  Kohlmann cannot authenticate the contents of any of the websites upon which he relies .............................................................................. 146

**TABLE OF CONTENTS**
(continued)

                                                                                        Page

 (7) Kohlmann's opinions and testimony are based upon insufficient and unreliable sources and are not the product of reliable principles and methods, and Kohlmann has not applied his methods reliably to the facts of these cases ........................................................................ 147

 (8) Kohlmann's methodology fails to satisfy expert standards and his own usual standards ................................................................ 150

 (9) Kohlmann's conclusions concerning responsibility for the Bus 19 attack ................................................................................... 151

 (10) The documents upon which Kohlmann relies are inadmissible under Israeli evidence law .......................................................... 155

I. The Qualifications Of Brian Jenkins, An Expert Retained By NatWest ........... 157

J. Shaul Naim Purports To Authenticate Documents Upon Which Shaked Relies, But His Proposed Testimony Is Inadmissible ......................................... 163

 (1) Naim is not qualified to authenticate the documents he purports to authenticate ............................................................................. 164

  (a) Generally ....................................................................... 164

  (b) Naim is not qualified to authenticate the documents at issue under the Federal Rules of Evidence ......................................... 165

  (c) Naim is not qualified to authenticate the documents at issue under Israeli evidence law .......................................... 167

 (2) Naim's proposed testimony is based upon insufficient and unreliable sources and is not the product of reliable principles and methods, and Naim has not applied his methods reliably to the facts of these cases .................................................................... 170

 (3) Naim's invention of the term "attack file" ................................. 171

 (4) Naim's extensive revisions to his initial report ........................... 173

K. The Qualifications Of Moshe Azoulay, An Expert Retained By NatWest ........ 173

Pursuant to Local Rule 56.1 of the Local Rules of Civil Practice of the U.S. District Court for the Eastern District of New York, defendant National Westminster Bank Plc ("NatWest") submits the following statement of material facts as to which there is no genuine dispute.  Where indicated, the documents, deposition testimony and other materials cited in this Rule 56.1 Statement are being submitted with this Rule 56.1 Statement as exhibits to the Declaration of Valerie Schuster, dated December 7, 2011 ("Schuster Dec.").

## I.  UNDISPUTED MATERIAL FACTS DEMONSTRATING THAT NO REASONABLE JUROR COULD FIND THAT PLAINTIFFS HAVE PROVEN THE SCIENTER ELEMENT OF THEIR CLAIMS

### A.  Background Facts

1.      NatWest is a financial institution incorporated and headquartered in the United Kingdom.

2.      Interpal a/k/a Palestine Relief & Development Fund a/k/a Palestinians Relief & Development Fund ("Interpal") is a non-profit organization registered in the United Kingdom with the Charity Commission for England & Wales ("Charity Commission").  Interpal was founded in 1994 and currently is headquartered in London.  Interpal states in its Declaration of Trust, which it provided to NatWest, as well as publicly, that it collects funds for humanitarian aid that it transfers to various charitable organizations throughout England and Wales, Jordan, Lebanon and the Palestinian Territories.  Schuster Dec. Ex. 3 (NW008300-55 at NW008320-31); Ex. 4 (http://www.interpal.org.uk/en/about-us).

3.      Interpal opened its first account with NatWest in September 1994. Schuster Dec. Ex. 5 (NW068714-16).

4.      NatWest closed the last of Interpal's accounts in March 2007.  Schuster Dec. Ex. 6 (Hyland Rep. ¶ 8).

5.    From 1996 through 2005, NatWest's Fraud Office, which became known as "Group Investigations and Fraud" and subsequently "Group Security and Fraud" was responsible for, among other activities, reviewing internal Suspicious Activity Reports ("SARs") regarding activity in accounts at NatWest, including Interpal's accounts, and submitting disclosures regarding suspicions of terror financing, as required by United Kingdom law, to the UK National Criminal Intelligence Service ("NCIS").   Schuster Dec. Ex. 7 (O'Hear Tr. at 15:20-16:5); Ex. 8 (Hartley Tr. at 26:7-22); Ex. 9 (Cole Tr. at 33:10-17).

6.    NatWest maintained records of its SARs and NCIS disclosures about Interpal, among other customers, on a database named "Goalkeeper."  NatWest implemented the Goalkeeper system in 1998, replacing a previous system named "Fox."  NatWest developed three versions of the Goalkeeper system between 1998 and 2005.  Schuster Dec. Ex. 10 (Hoseason 7/14/2010 Tr. at 10:4-13); Ex.11 (Baugh Tr. at 19:21-20:2, 23:18-24:10; 25:24-26:3; 57:23-58:2); Ex. 7 (O'Hear Tr. at 52:3-9).

7.    Each time a NatWest employee created an internal SAR, the Fraud Office created a new report in Goalkeeper.  Schuster Dec. Ex. 7 (O'Hear Tr. at 18:6-10, 52:1-16).

8.    From 2002 through 2005, the Money Laundering Prevention Unit of the Corporate Banking Financial Markets Division ("CBFM MLPU") of NatWest had responsibility for ensuring compliance with anti-money laundering and anti-terror financing sanctions for the accounts held within the Corporate Banking Financial Markets Division, which included Interpal's accounts.  Schuster Dec. Ex. 12  (Rodger Tr. at 14:19-15:9; 79:20-22).

9.    CBFM MLPU's responsibilities included, among other activities, distributing names of individuals and entities designated on United Kingdom, European Union and international sanctions lists for bank employees to search against the customer databases and

-2-

reviewing customer accounts whose names appeared similar to those names on the sanctions lists.  Id. (Rodger Tr. at 39:1-40:25).

10.     Responsibility for the oversight of anti-money laundering compliance and terror financing sanctions resided with Group Compliance, headed by David Swanney, until 2002, and thereafter with Group Enterprise Risk, headed by Amanda Holt.  Schuster Dec. Ex. 13 (Holt Tr. at 26:6-19, 28:25-30:17).

11.     During all periods relevant to these cases, it was a crime in the United Kingdom knowingly or intentionally to support or finance terrorism.  Schuster Dec. Ex. 14 (Holland Rep. ¶¶ 3.2-3.50).

**B.   The Roles Of United Kingdom Law Enforcement Agencies And Regulators**

(1)     NCIS

12.     NCIS was established in 1992 to address serious and organized crime in the United Kingdom.  Schuster Dec. Ex. 14 (Holland Rep. ¶ 3.55).

13.     NCIS's role, among other activities, was to receive disclosures concerning suspected terror financing offenses and disseminate them, along with any other relevant intelligence held by NCIS, to the appropriate law enforcement agencies.  Id.

14.     As of 1994, banks in the United Kingdom were required by law to report knowledge or suspicion of terror financing to the authorities.  Id. (Holland Rep. ¶¶ 3.8, 3.28, 3.33-34).  The relevant laws provided for a penalty of imprisonment, fines or both for failure to report a suspicion of terror financing.  Id. (Holland Rep. ¶¶ 3.12, 3.27, 3.36).  English courts have defined "suspicion" as a subjective standard.  Id. (Holland Rep. ¶¶ 3.40-42).  The threshold for reporting a suspicion of terror financing to NCIS was not high, and prudent banks reported all suspicions unless there was a compelling reason not to do so.  Id. (Holland Rep. ¶ 5.20).

15.     Banks did not have a duty under United Kingdom law from 1996 through 2005 to investigate whether the suspicions that formed the basis of their NCIS disclosures was well-founded. Rather, the purpose of the disclosure obligations was to provide intelligence to British law enforcement agencies, which had the responsibility under United Kingdom law to assess the intelligence provided by NCIS disclosures. Id. (Holland Rep. ¶¶ 3.29-3.30); Ex. 15 (Walker Rep. ¶ 3.2.6); Ex. 16 (Walker Tr. at 122:15-123:8).

(2)     The Bank of England's Financial Sanctions Unit

16.     The Bank of England was responsible for administering financial sanctions in the United Kingdom during the relevant period. Schuster Dec. Ex. 14 (Holland Rep. ¶ 8.1).

17.     The Financial Sanctions Unit was responsible until October 2007 for advising the United Kingdom government on whether to designate persons or entities for involvement in terrorism and/or terror financing. Id. (Holland Rep. ¶ 8.19).

(3)     The National Terrorist Financial Investigation Unit ("NTFIU") of Special Branch

18.     The NTFIU of Special Branch in the Metropolitan Police in London was responsible for investigating suspicions of terror financing in the United Kingdom (apart from Northern Ireland). Id. (Holland Rep. ¶ 3.55).

(4)     The Charity Commission

19.     The Charity Commission is a non-Ministerial Government Department in the United Kingdom responsible for registering and regulating charities, including by instituting inquiries and deregistering charities it concludes were not established for and/or are not being operated for charitable purposes. Schuster Dec. Ex. 17 (Burchfield Rep. ¶¶ B.1-9); Schuster Dec. Ex. 14 (Holland Rep. ¶¶ 9.2-9.7).

20.     The Charity Commission collects and makes publicly available information about each registered charity, including the charity's constitutional documents, details regarding each charity's income and expenditures and the charity's key aims, activities and achievements.  In addition, charities earning an annual income over £1 million, such as Interpal, must file an annual return, which provides annually updated details on the charity's contact and trustee information, income, expenditure and other financial information, a summary of the charity's key aims, activities and achievements and confirmation that there are no serious incidents the trustees should report to the Charity Commission and the Trustees' Annual Report. Schuster Dec. Ex. 17 (Burchfield Rep. ¶¶ B.9-12).

21.     As NatWest knew, registration of a charity with the Charity Commission establishes as a matter of United Kingdom law a conclusive, statutory presumption that the charity has been established and is being operated for charitable purposes.  Id. (Burchfield Rep. ¶¶ B.15-17); Ex. 16 (Walker Tr. at 77:7-17); Ex. 1 (Cole Dec. ¶ 4).

22.     A charity that finances terrorist acts would not, under English law, be considered a charity established and/or being operated for charitable purposes.  Schuster Dec. Ex. 17 (Burchfield Rep. ¶ B.18).

23.     Interpal has at all times since it was first registered in 1994 remained a charity registered with the Charity Commission.  Id. (Burchfield Rep. ¶ B.16).

24.     The Charity Commission has significant investigative powers under English law, including the ability to require witnesses to give evidence, order the production of documents, remove trustees and employees of a charity, freeze a charity's funds and de-register a charity.  Id. (Burchfield Rep. ¶¶ B.7-8); Ex. 14 (Holland Rep. ¶¶ 9.6-9.7).

25.     The Charity Commission has a Compliance Assessment and Intelligence Unit, which is responsible for addressing allegations of a charity's links to terrorism. The Charity Commission states that the Compliance Assessment and Intelligence Unit "liaise[s] closely with the relevant law enforcement agencies to ensure a proper investigation of the allegations or suspicions." Schuster Dec. Ex. 17 (Burchfield Rep. ¶ C.3); Ex. 18 (Burchfield Reb. Rep. Ex. A at 6).

26.     The Charity Commission states that it "treat[s] allegations or suspicions of terrorist activities within charities, or involving individuals associated with charities, as a zero tolerance issue." Schuster Dec. Ex. 18 (Burchfield Reb. Rep. ¶ B.3); Ex. 15 (Walker Rep. ¶ 3.1.9).

## C.  NatWest's Account-Opening And On-Going "Know Your Customer" Procedures For Interpal

27.     Abdel Rahman Daya and Essam Yousef Mustafa signed account opening documents for Interpal on September 30, 1994, in which they provided their full names, addresses and telephone numbers. Schuster Dec. Ex. 5 (NW068714-16).

28.     In March 1998, Gerald Matthews, a NatWest employee and Interpal's Relationship Manager at the time, met with Jihad Qundil and Essam Mustafa, two of Interpal's trustees, and wrote in a letter that was maintained in NatWest's relationship file for Interpal that he became "more fully informed of the funds [sic] activities." Matthews informed Qundil that NatWest required positive identification such as a driver's license or passport along with evidence of the addresses for any new signatories for Interpal's accounts. Schuster Dec. Ex. 19 (NW068887).

29.     On September 16, 1998, Jihad Qundil, Ibrahim Brian Hewitt, Mahfuzh Safiee and Essam Mustafa, several of Interpal's trustees at the time, submitted Interpal's "Clubs,

-6-

Societies and Associations Mandate" form to Matthews at NatWest. Schuster Dec. Ex. 20 (NW053453-56).

      30.    In May 1999, Qundil sent to NatWest a list of Interpal's past and present trustees, their dates of appointment and, where applicable, their resignation dates. Schuster Dec. Ex. 21 (NW068708-09).

## D.  The Charity Commission's 1996 Investigation Of Interpal

      31.    On March 6, 1996, The Times of London published an article stating that officers with the United Kingdom Security Service (MI5) were "studying police intelligence on alleged links between Hamas militants" and Interpal. See Schuster Dec. Ex. 22 ("MI5 study 'charity cash link to Hamas,'" The Times, March 6, 1996); Ex. 17 (Burchfield Rep. ¶ D.1.a).

      32.    The Charity Commission subsequently reported that the March 6 article prompted it to open an investigation of Interpal, during which the Charity Commission temporarily froze Interpal's bank accounts, scrutinized Interpal's controls and records and carried out checks of payments from Interpal's bank statements. Schuster Dec. Ex. 23 (NW014516); Ex. 17 (Burchfield Rep. ¶¶ D.1.a-b); Ex. 25 (W_S081305-29).

      33.    The Charity Commission published its conclusions in the Charity Commission's 1996 Annual Report, which was publicly available. The conclusions stated that Interpal was a "well run and committed organization which carried out important work in a part of the world where there is great hardship and suffering" and that allegations that Interpal funded terrorist activities were not substantiated. Schuster Dec. Ex. 17 (Burchfield Rep. ¶ D.1.g); Ex. 24 (Burchfield Tr. at 64:4-15).

## E.  NatWest's 2001 NCIS Disclosures

      34.    Michael Hoseason, head of NatWest's Fraud Office, testified that in 2001, immediately following the September 11 attacks in the United States, "anything and everything

that was vaguely associated with or linked to anything that could possibly be connected to extremism of any description was being reported [to NCIS]" by NatWest.  Schuster Dec. Ex. 10 (Hoseason 7/14/2010 Tr. at 102:24-103:3).

35.     Hoseason also testified that the Fraud Office's role was to disclose suspicions to the authorities, not to act as a police officer or law enforcement agency and investigate its suspicions.  Schuster Dec. Ex. 26 (Hoseason 7/15/2010 Tr. at 275:10-15).

36.     On September 27, 2001, Hoseason submitted NCIS disclosure 140425,



Schuster Dec. Ex. 27 (NW212124); Ex. 10 (Hoseason 7/14/2010 Tr. at 207:2-207:7).  Douglas Hartley, an employee in NatWest's Fraud Office, entered an undated

note into Goalkeeper report 617044 regarding NCIS disclosure 140425, which stated that

"Special Branch are investigating."  Schuster Dec. Ex. 29 (NW052056-66 at NW052059).

       37.     By its own admission, Cryptome.org makes no effort to verify the

authenticity of the documents it publishes or the identity of the sources that submit them.

Cryptome.org's founder, John Young, has publicly stated that "this kind of authentication thing

is a long-running scam.  People should make up their own minds.  Just give them the material,

they will make up their own minds [about whether the documents hosted on Cryptome.org are

authentic]."  Schuster Dec. Ex. 30 (Excerpt from "Reporters' Roundtable: Can You Trust

WikiLeaks?" CNET, Oct. 29, 2010, http://www.cnet.com/8301-30976_1-20021253-

10348864.html, at 10:10-11:47).  Britain's Foreign Office has publicly commented that

information on Cryptome.org is "often 'highly inaccurate.'"  Schuster Dec. Ex. 31 ("Report: Top

international administrator in Bosnia was a British secret service agent," AP Worldstream,

September 1, 2005).

       38.     Hoseason made a further disclosure to NCIS on October 15, 2001, with

reference number 142909, which stated that,



Schuster Dec. Ex. 29

(NW052056-66 at NW052062-66).

39.     NatWest received no responses from any United Kingdom law enforcement agencies or regulators, nor any requests for further information, in response to disclosures 140425 and 142909.  Schuster Dec. Ex. 14 (Holland Rep. ¶ 3.59).

**F.   NatWest's 2001-2002 Due Diligence On Interpal's Accounts**

40.     On November 15, 2001, Olha Leeming, a NatWest employee, sent an internal SAR to NatWest's Fraud Office based on a suspicion of terror funding due to what she perceived to be ▬▬▬▬▬▬▬ received into Interpal's accounts.  Schuster Dec. Ex. 32 (NW052067-73 at NW052072-73).

41.     Leeming testified that her anti-terror finance training instructed her that large credits into a customer's account could be suspicious.  Schuster Dec. Ex. 33 (Leeming Tr. at 20:14-21:24).

42.     Goalkeeper report 647655 was created on November 19, 2001, which attached Leeming's internal SAR.  Schuster Dec. Ex. 32 (NW052067-73).

43.     On December 21, 2001, Douglas Hartley, an employee in NatWest's Fraud Office, noted in Goalkeeper report 647655 that there was a "need to gain a clear understanding of the activities here and full details behind some of the ▬▬ transactions." Hartley noted that he had not yet submitted an NCIS disclosure concerning these activities because he hoped to gain additional information before doing so.  Id. (NW052067-73 at NW052069).

44.     On January 17, 2002, Martin Wiltshear, an employee in NatWest's Fraud Office, followed up on Hartley's December 21 note and sent an email to Belinda Lane, Interpal's Relationship Manager, requesting "details of the most recent due diligence undertaken in respect of the Bank's knowledge of dealings in the US$ account."  Schuster Dec. Ex. 34 (NW013335).

-10-

45.     Lane responded to Wiltshear's email by providing information on Interpal and stating that she had scheduled a January 21, 2002 meeting with Jihad Qundil, Interpal's Secretary, at Interpal's premises, at which she would discuss with Qundil Interpal's use of its U.S. dollar account.  Schuster Dec. Ex. 35 (NW012954).

46.     Hartley entered a note into Goalkeeper report 647655 on February 5, 2002 stating that, because NatWest had made a recent disclosure to NCIS on October 15, 2001, there was "[p]robably no merit in disclosing again at this time . . . ."  Schuster Dec. Ex. 32 (NW052067-73 at NW052069).

47.     Lane met with Qundil at Interpal's premises on March 20, 2002.  (Lane testified that the meeting scheduled for January 21, 2002 likely was deferred until March 20.)  Qundil told Lane that Interpal received donations from the Muslim community mainly around the festivals of Ramadan, just before Christmas and the Haj in March, and disbursed funds to various charities mainly in the West Bank, Gaza and Lebanon.  Qundil also told Lane that Interpal had been investigated fully and cleared of accusations of wrongdoing by the Charity Commission in 1996.  Qundil stated that he would forward the identification information for each of the signatories to Interpal's accounts at NatWest, along with their addresses.  Schuster Dec. Ex. 36 (NW068905-06); Ex. 37 (Lane 6/24/2008 Tr. at 144:12-145:9); Ex. 38 (Lane 6/25/2008 Tr. at 340:23-341:10).

48.     On March 29, 2002, Lane completed further "know your customer" documentation for Interpal's accounts, which included information concerning the driver's licenses, passports and addresses of Qundil and Mahfuzh Safiee, two of Interpal's signatories.  Lane's documentation also included notes on the nature of Interpal's business, which she listed to be the "collection of donations and distribution of funds to charities in Westbank, Gaza, and

-11-

Lebanon." Lane testified that she was never led to believe that Interpal's business was otherwise. The documentation attached Interpal's Trust Deed, several account statements and information about Interpal from the Charity Commission's Central Registry of Charities. Lane noted in the documentation that she had placed Interpal's 2000 Annual Report in the bank's files and that turnover through Interpal's accounts was consistent with the activity reported in Interpal's audited accounts. Schuster Dec. Ex. 3 (NW008300-55); Ex. 38 (Lane 6/25/2008 Tr. at 341:13-342:5).

## G. NatWest's 2002 NCIS Disclosure Regarding Interpal

49. On June 7, 2002, N. Morrison, a NatWest employee, sent an internal SAR to NatWest's Fraud Office based on suspicion of terror financing due to a credit of ███ received from ███ into Interpal's accounts. Morrison's suspicion was based on his perception of a possible connection between this payment and Al Qaeda and the fact that the word ███████████████████████████████ ███████████████████████ Schuster Dec. Ex. 39 (NW052074-91 at NW052087-88).

50. ██████████████████████
████████████████████████
████████████████████████
█████████████████
██████████████████
████████████████████████
████████████████████████
████

-12-

51.     In response to this internal SAR, on June 17, 2002, Charlotte McComas, an employee in NatWest's Fraud Office, created Goalkeeper report 666814 and entered a note referring to the October 15, 2001 NCIS disclosure numbered 142909, regarding Interpal. McComas wrote that the ███████ payment would be reported to NCIS and that she had ███████████████████████████████████████████████████████████████████ ██████████████████████████ Schuster Dec. Ex. 39 (NW052074-91 at NW052077); Ex. 43 (McComas Tr. at 49:7-49:12).



52.     On June 17, 2002, Douglas Hartley submitted NCIS disclosure 207993, ██████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████ Schuster Dec. Ex. 39 (NW052074-91 at NW052089-91).  On August 5, 2002, a note was entered into Goalkeeper report 666814 stating that ██████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ Id. (NW052074-91 at NW052077).

53.     On July 4, 2002, Hartley entered notes into Goalkeeper report 666814 stating that NatWest needed to seek a "detailed report" from the Relationship Manager regarding her knowledge of Interpal.  Id.

54.     On July 9, 2002, Charlotte McComas sent a memorandum to the Relationship Manager, Belinda Lane, attaching Goalkeeper report 666814 and informing her that a decision had been made to report the ███████deposit to law enforcement authorities.  The

-13-

memorandum requested that Lane forward a detailed report on her knowledge of Interpal. <u>Id.</u>
(NW052074-91 at NW052080).

   55. McComas testified that she completed such memoranda requesting further
information from Relationship Managers as part of the ordinary course of her work in the Fraud
Office. Schuster Dec. Ex. 43 (McComas Tr. at 33:10-24).

   56. In response to McComas's request for information on Interpal, Lane sent
McComas a memorandum on July 15, 2002 containing information on Interpal and attaching
some of Interpal's "Know Your Customer" information and Lane's notes from her March 20,
2002 meeting with Qundil. Lane's July 15 memorandum also noted that Qundil and Safiee, two
Interpal trustees, recently had been re-identified themselves in accordance with "Know Your
Customer" procedures, including by providing their respective driver's licenses, passports and
addresses to her. Schuster Dec. Ex. 44 (NW012952); Ex. 20 (NW053453-56); Ex. 36
(NW068905-06).

   57. On August 1, 2002, McComas wrote a letter to Lane requesting further
information on the ██████ payment to Interpal. Schuster Dec. Ex. 39 (NW052074-91 at
NW052082). Lane responded on August 9, 2002, forwarding information she had received from
E. Mustafa, a trustee of Interpal, regarding the payment, including the explanation that the
██████ credit was a donation from ██████████████████████████████
████████████████████████████████████████████████
████████████████ Mustafa provided several pages of supporting documentation,
which explained in further detail the purpose of the donation. <u>Id.</u> (NW052074-91 at NW052081,
NW052082-86); Ex. 45 (NW068227-34).

-14-

58.     Thereafter, on September 10, 2002, Douglas Hartley entered a note into Goalkeeper report 666814 stating that Interpal had informed NatWest, supported by back-up documentation, that the ████████ payment to Interpal was a donation ████████████████ ████████████████ Hartley wrote that in looking at Interpal's ████████ account, there were "a number of subsequent payments ████████ for example, which would tend to substantiate the comments." Schuster Dec. Ex. 39 (NW052074-91 at NW052077).

59.     Tony O'Hear, head of NatWest's Fraud Office at the time, entered a note into Goalkeeper report 666814 on September 17, 2003, that the donor of the ████████ payment, ████████████████████████████████ while not designated by the Bank of England on its terror financing sanctions list at the time of the June 2002 payment, had been so designated by the Bank of England on May 29, 2003, almost one year later.  O'Hear noted that he had spoken to Mark Ashtown at the NTFIU Special Branch, New Scotland Yard, regarding ████████████████████████████████████████████ ████████████████████████████████ █ ████████████ ████████████████████████████████████████ ████████ Id. (NW052074-91 at NW052077); Ex. 7 (O'Hear Tr. at 81:23-83:20; 85:21-86:22).

60.     That same day, September 17, 2003, O'Hear wrote to Dedrei Nell, a NatWest employee who worked in Group Risk Management, about his conversation with Ashtown, further noting that Ashtown ████████████████████████████ ████████████████████████████████ Schuster Dec. Ex. 46 (NW013699). NatWest never received a further request for information from the NTFIU Special Branch concerning this disclosure.

61.     Lane met again with Interpal on January 27, 2003, at Interpal's premises. Lane's interview notes referred to her interview notes dated March 20, 2002, and stated that the details of Interpal's operations remained more or less the same as in 2002.  Schuster Dec. Ex. 47 (NW068903).

**H.  NatWest's May 2003 NCIS Disclosure Regarding** ███████████████

62.     On May 2, 2003, Douglas Hartley submitted NCIS disclosure 276926

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████  See Schuster Dec. Ex. 48 (NW083859-62).

**I.   Metropolitan Police Special Branch's 2003 Production Order Regarding Interpal**

63.     Kevin Shiels, a NatWest employee in the Fraud Office, faxed to Tim Kennelly, a NatWest employee on the Fraud Team at the Enfield Customer Service Center, a production order served on NatWest by the Metropolitan Police Special Branch, dated July 7, 2003.  Shiels requested that Kennelly provide the Fraud Office with the account statements for seven separate Interpal accounts, in order to comply with the production order.  Shiels created Goalkeeper report 704079 on July 7 and appended the production order.  Schuster Dec. Ex. 49 (NW052105-13).

64.     On July 18, 2003, Shiels entered a note into Goalkeeper report 704079 that NatWest had provided to Special Branch the documents covered by the production order.  Id.

**J.  The Charity Commission's 2003 Investigation Of Interpal And NatWest's 2003 NCIS Disclosure Regarding Interpal**

65.     NatWest received an order from the Charity Commission freezing Interpal's accounts on August 26, 2003.  Schuster Dec. Ex. 50 (NW013660-61).

66.     A. E. Chittock, Senior Litigation Officer at NatWest, responded to the

Charity Commission on August 27, 2003 ███████████████████████████████████

███████████████████████████████████████     Schuster Dec. Ex. 51

(NW013659).

67.     The Charity Commission contacted Terry Woodley, Assistant

Relationship Manager for Interpal's accounts, on August 27, 2003, instructing him to ████

████████████████████████████████████████████████████████

██████████████████     Schuster Dec. Ex. 52 (NW013033-35).

68.     Tony O'Hear submitted NCIS disclosure 315666 on August 28, 2003,

which stated ██████████████████████████████████████████████

.

██████████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████.     NCIS disclosure 315666 was appended to

Goalkeeper report 710368.  Schuster Dec. Ex. 53 (NW052114-23 at NW052122-23).

69.     On August 28, 2003, O'Hear entered a note into Goalkeeper report

710368 reporting that he had received a phone call from Detective Sergeant Bennett of the

NTFIU at Special Branch.  O'Hear wrote that Bennett ████████████████████████

████████████████████████████████████████████

-17-

██████████████████████████████████████████████

████ ██████████████████████████████████████████

(NW052114-23 at NW052117).

70.     On August 29, 2003, O'Hear entered a note into Goalkeeper report 710368 that he had spoken to Terry Woodley about ensuring that no items would be paid from Interpal's accounts that ███████████████████████████. O'Hear noted that he would ████████████████████████████████████████████. Id.

71.     While the Charity Commission's freezing order was in effect, O'Hear coordinated with Interpal's Relationship Manager, Belinda Lane, and Assistant Relationship Manager, Terry Woodley, to █████████████████████████████████ ██████████████. Woodley regularly emailed the Charity Commission ████████ ███████. See Schuster Dec. Ex. 54 (NW013052); Ex. 55 (NW013707); Ex. 56 (NW013708); Ex. 57 (NW052574); Ex. 58 (NW067972-74); Ex. 59 (NW068036-38); Ex. 60 (NW068053); Ex. 61 (NW068056); Ex. 7 (O'Hear Tr. at 61:10-21).

72.     O'Hear wrote to Woodley on September 17, 2003, stating that an NCIS disclosure had been submitted in June 2002 concerning █████████████████████ ███████████████ following Interpal's receipt of a ████████ payment (the payment referred to in paragraphs 51-60, above) and asking Woodley to check if funds had been received by Interpal from █████████████████████████████ during the prior 12 months. Schuster Dec. Ex. 62 (NW012976).

73.     On September 19, 2003, Woodley faxed to Jane Edwards at NatWest's International Banking Center and Noreen Bullock at NatWest's Enfield Customer Service Team a request to obtain Interpal's account statements for the prior 12 months so that the debits could

-18-

be reviewed in connection with the Charity Commission's investigation.  Woodley does not recall whether he received the account statements, but believes he would have followed up on his request if he had not received them.  Schuster Dec. Ex. 63 (Woodley Dep. Ex. 46); Ex. 64 (Woodley Dep. Ex. 47); Ex. 65 (Woodley Tr. at 147:13-22, 184:12-185:21).

74.     O'Hear testified that he played a "key touch point role" between NatWest and the Charity Commission during the time of the Charity Commission's 2003 investigation by ███████████████████████████████████████████████████████ ████████. Schuster Dec. Ex. 7 (O'Hear Tr. at 182:18-21).

75.     The Charity Commission completed its investigation of Interpal and published its inquiry report on September 24, 2003.  The Charity Commission explained in its inquiry report that it had completed a detailed examination of Interpal's practices and record-keeping, and that it had found no clear evidence that Interpal had links to Hamas' political or violent militant activities and that, accordingly, the Charity Commission was lifting the freeze on Interpal's accounts.  The Charity Commission also reported that it had investigated Interpal's relationship with the Al-Aqsa Foundation and concluded that funds Interpal had received from the Al-Aqsa Foundation were for humanitarian work already carried out by Interpal and invoiced to the Al-Aqsa Foundation.  Schuster Dec. Ex. 66 (Report of the Charity Commission's 2003 Inquiry on Interpal); Ex. 67 (NW012942); Ex. 68 (NW012943-45); Ex. 69 (NW013641-44); Ex. 70 (NW013701); Ex. 71 (NW013702); Ex. 72 (NW013703); Ex. 73 (NW013944-45); Ex. 74 (NW013946-47); Ex. 17 (Burchfield Report ¶¶ D.2a-d).

76.     The Charity Commission informed NatWest on September 24, 2003 that it ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████

-19-

███████████████████████████████████████████████ Schuster Dec.

Ex. 67 (NW012942).

**K.  NatWest's 2003 Correspondence With The Bank Of England Financial Sanctions Unit Regarding Interpal**

> 77.    On September 5, 2003, Richard Gossage, Director of Group Risk

Management of RBS, wrote to Tom Dawlings of the Financial Sanctions Unit of the Bank of

England ████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████

(NW013674-77).

> 78.    On October 3, 2003, Dawlings responded to Gossage, noting that the

██████████████████████████████████████████████

████████████████████████████   ████████████████

█████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

79.     On October 28, 2003, Gossage responded to Dawlings that ████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████     ████████████████████████

## L.   NatWest's Semi-Annual Reviews Of Interpal's Accounts

80.     After learning about OFAC's designation of Interpal, Amanda Holt, Head
of Group Enterprise Risk, contacted Irvine Rodger, Head of the CBFM MLPU, to confirm that
Rodger knew that Interpal was a customer of CBFM and that there were concerns relating to
Interpal, and to discuss a course of action in light of that information.  Schuster Dec. Ex. 13 (Holt
Tr. at 78:14-79:6).  The OFAC designation prompted Holt to ask the CBFM MLPU to complete
a detailed review of Interpal "to get additional information to a greater level of depth."  Id. (Holt
Tr. at 82:8-83:2).

81.     On May 20, 2004, Guy Cole, an employee in the CBFM MLPU,
completed a thorough review of the beneficiaries of Interpal's foreign payments for the prior six
months.  His review did not reveal any evidence that Interpal had made payments to any terrorist
groups during that period.  Schuster Dec. Ex. 78 (NW016767-74).

82.     Cole completed reviews of Interpal's beneficiaries after May 2004 on a
semi-annual basis.  On each occasion, Cole checked each of Interpal's beneficiaries against
available information in the Worldcheck and KYC Check databases, as well as information
available through Google.  Id.  Worldcheck and KYC Check are industry databases that collect

-21-

and summarize information available in news articles and other public sources, as well as information from government bodies, regulators and enforcement agencies, about entities and individuals, including whether those entities and individuals are on sanctions lists. Schuster Dec. Ex. 79 (NW066721-23); Ex. 80 (NW066740-42); Ex. 9 (Cole Tr. at 81:8-82:1; 86:7-22); Ex. 12 (Rodger Tr. at 136:1-7).

  83. Stephen Foster, Head of Anti-Money Laundering in Group Risk Management, testified about the semi-annual reviews of Interpal's accounts, as follows: "Under the specific circumstances of Interpal, where we had had Charities [Commission] investigations, we had had an internal review to decide whether we would hold the account, and we had had some Suspicious Activity Reports, so we had done a lot of work to assess the risk to the organization of holding this account, we decided, even though we had been given permission to continue holding the account from the Bank of England, that we would monitor the activity of the account. We thought it was the prudent thing to do." Schuster Dec. Ex. 81 (Foster Tr. at 201:18-202:2).

  84. In December 2004, Holt, Foster, Graeme Wyles, Director of Risk for Commercial Banking, Kevin Love, Global Head of Enterprise Risk for Corporate Banking and Financial Markets, Alan Dickinson, Managing Director of Corporate Banking and Head of Core Corporate Bank, Irvine Rodger, Head of CBFM MLPU, and John Cameron, Chief Executive of Corporate Banking and Financial Markets, discussed the bank's relationship with Interpal, including the rationale for maintaining the relationship, the steps being taken to monitor Interpal's accounts and the bank's regulatory position in light of OFAC's designation of Interpal. See Schuster Dec. Ex. 82 (NW066667-71); Ex. 83 (NW066672-76); Ex. 84 (NW066677-81);

Ex. 85 (NW066691-95); Ex. 86 (NW066807-13); Ex. 87 (NW066820-21); Ex. 88 (NW066844-46); Ex. 89 (NW066847-52).

85.     Cole completed his second semi-annual review of Interpal's payments on December 16, 2004.  Cole reviewed Interpal's payments for the prior six months and checked Interpal's beneficiaries against the United Kingdom and U.S. financial sanctions and terror financing lists, the Complicheck and Worldcheck databases and information available on Google and found that none of Interpal's payments had been made to an entity or individual designated by the United Kingdom or the U.S.  Schuster Dec. Ex. 90 (NW066696-700); Ex. 79 (NW066721-23); Ex. 91 (NW066788-94); Ex. 86 (NW066807-13); Ex. 87 (NW066820-21).

86.     NatWest determined that there was no evidence showing that Interpal had funded any terrorist groups, and decided to maintain the customer relationship.  Schuster Dec. Ex. 79 (NW066721-23); Ex. 87 (NW066820-21).

87.     Cole completed his third semi-annual review of Interpal's payments on its accounts for the prior six months on July 6, 2005.  Cole once again found no evidence that Interpal had made payments or transfers to designated terrorist groups.  He noted that Interpal had made a payment to an entity that subsequently had been designated by the Bank of England, and therefore that he would review Interpal's account activity going forward on a quarterly, rather than semi-annual basis, but recommended that the bank's relationship with Interpal be maintained, given that he did not "believe there ha[d] been an increase in the risk of INTERPAL funding terrorism."  Schuster Dec. Ex. 92 (NW066701-04); Ex. 93 (NW066705-11); Ex. 94 (NW066712-16); Ex. 80 (NW066740-42).

**M.  Subjective Impressions Of Interpal's Activity By NatWest Employees**

88.     Amanda Holt, head of Group Enterprise Risk, testified that she and Group Enterprise Risk as a whole had "no tolerance whatsoever" for funding terrorism.  "If there was

any thought whatsoever that a customer of the bank was funding terrorism or was getting involved in any type of financial crime, that would have been reported straightaway." Schuster Dec. Ex. 13 (Holt. Tr. at 79:24-80:22). She was never aware of any evidence that Interpal was funding Hamas. At no point during her tenure at the bank did she suspect that Interpal was funding Hamas. Id. (Holt Tr. at 214:5-216:11, 227:21-228:15, 230:4-230:8)

89.     Holt testified as follows: "[I] spent an inordinate effort making sure that we had no ostriches with their heads in the sand. Ignorance is not bliss. So you had to have as far as possible the full information in front of you to make the decision. Looking the other way was just not an option, whatever grounds, reputational, commercial or whatever grounds." Id. (Holt Tr. at 228:21-229:3).

90.     Michael Hoseason, head of NatWest's Fraud Office, testified that if NatWest knew Interpal was engaged in any kind of illegal activity, the bank would have closed its accounts. Schuster Dec. Ex. 10 (Hoseason 7/14/2010 Tr. at 24:12-25:8).

91.     Belinda Lane never had any concerns or suspicions about Interpal. Schuster Dec. Ex. 37 (Lane 6/24/2008 Tr. at 170:23-171:14); Ex. 38 (Lane 6/25/2008 Tr. at 397:23-398:6). To the best of her knowledge, the charities to which Interpal was disbursing funds were providing relief to refugees in Israel, the West Bank, Gaza and Lebanon. Schuster Dec. Ex. 38 (Lane 6/25/2008 Tr. at 341:13-342:5, 344:10-14).

92.     Guy Cole, a member of the CBFM MLPU, who conducted semi-annual reviews of Interpal's accounts beginning in May 2004, testified that he "never saw any activity that made [him] believe [Interpal] w[as] a terrorist organization." Schuster Dec. Ex. 9 (Cole Tr. at 141:4-141:8).

-24-

93.     Irvine Rodger, head of the CBFM MLPU, testified that if the bank knew that Interpal was funding terrorism, it would have closed Interpal's accounts. Schuster Dec. Ex. 12 (Rodger Tr. at 129:2-4).

94.     NatWest understood that it had made disclosures about Interpal to NCIS on numerous occasions, that the Charity Commission had investigated and cleared Interpal in 1996 and 2003 of charges that Interpal funded Hamas and that the United Kingdom had declined to designate Interpal as an entity that funded terrorism. Schuster Dec. Ex. 26 (Hoseason 7/15/2010 Tr. at 375:4-12); Ex. 81 (Foster Tr. at 120:7-25, 131:3-16).

## N.  OFAC's SDGT Designation Of Interpal

95.     OFAC listed Interpal as a Specially Designated Global Terrorist ("SDGT") for purposes of OFAC's asset freezing regulations on August 21, 2003. Schuster Dec. Ex. 95 (http://www.treasury.gov/resource-center/sanctions/Programs/Documents/terror.pdf at 6-7).

96.     OFAC's press release announcing Interpal's designation stated that "[t]he United States government has credible evidence" that Interpal was raising funds on behalf of Hamas. Schuster Dec. Ex. 96 (Hoseason Dep. Ex. 25 at 5-6).

97.     The United States did not designate any of the transferees of funds from Interpal's accounts as SDGTs before August 21, 2003. Schuster Dec. Ex. 95 (http://www.treasury.gov/resource-center/sanctions/Programs/Documents/terror.pdf at 2-7).

98.     As a matter of United Kingdom law, OFAC's regulations cannot be applied in the United Kingdom and did not give rise "to any direct UK legal duty." Schuster Dec. Ex. 14 (Holland Rep. ¶ 10.1); Ex. 15 (Walker Rep. ¶ 3.2.12); Ex. 16 (Walker Tr. at 125:4-11).

99.     Accordingly, as a matter of United Kingdom law, NatWest was under no obligation to take into account Interpal's entry on the OFAC SDGT list.  Schuster Dec. Ex. 14 (Holland Rep. ¶ 10.1).

100.     NatWest did not apply U.S. OFAC regulations, or any other national sanctions regimes other than those of the United Kingdom and the European Union, to its provision of banking services in the United Kingdom on behalf of United Kingdom customers. NatWest understood that OFAC regulations applied only to "U.S. persons."  Schuster Dec. Ex. 13 (Holt Tr. at 118:1-119:15); Ex. 81 (Foster Tr. at 41:16-42:21, 43:14-44:1, 44:15-45:14, 172:7-173:4, 174:10-19); Ex. 12 (Rodger Tr. at 28:1-12).

101.     NatWest understood that designations pursuant to the OFAC regulations, and any other sanctions regimes besides those of the United Kingdom, European Union and the United Nations, did not apply to the banking services NatWest provided to Interpal in the United Kingdom.  Schuster Dec. Ex. 81 (Foster Tr. at 172:7-173:4, 233:11-15); Ex. 12 (Rodger Tr. at 80:23-81:5, 85:15-22); Ex. 97 (Trantum Tr. at 92:10-25); Ex. 13 (Holt Tr. at 118:1-119:15).

102.     Accordingly, NatWest did not believe that OFAC's designation of a customer to which NatWest provided banking services in the United Kingdom caused NatWest to "know" that OFAC's grounds for designating Interpal were correct.  See Schuster Dec. Ex. 13 (Holt Tr. at 229:14-230:8); Ex. 12 (Rodger Tr. at 114:17-116:7).

**O.  Interpal Has Never Been Listed On Any United Kingdom Or European Terrorist Sanctions List**

103.     At all times during the relevant period, NatWest applied to its provision of banking services to customers in the United Kingdom the laws relating to the freezing of assets and financial resources of certain persons and entities designated by the United Kingdom, the European Union and the United Nations.  See Schuster Dec. Ex. 98 (NW000084-111); Ex. 99

-26-

(NW000112-43); Ex. 100 (NW196319-58); Ex. 101 (NW212047-73); Ex. 102 (Wickens Tr. at 95:15-22); Ex. 97 (Trantum Tr. at 92:17-25); Ex. 81 (Foster Tr. at 41:16-42:1, 43:14-44:1, 44:15-45:14); Ex. 13 (Holt Tr. at 118:1-119:15); Ex. 14 (Holland Rep. ¶¶ 10.1-10.2); Ex. 103 (Barker Rep. ¶¶ 3, 16-22).

104.    The United Kingdom government and the U.S. government had discussions about the imposition of terror financing sanctions against Interpal.  Schuster Dec. Ex. 15 (Walker Rep. ¶ 3.1.23); Ex. 16 (Walker Tr. at 109:11-110:3).

105.    The British newspaper The Daily Telegraph published an article on September 25, 2003 stating that United Kingdom officials met with U.S. officials to discuss Interpal "but the Americans produced only press cuttings to support their claim that it was a terrorist organization."  Schuster Dec. Ex. 104 ("Britain rejects Bush's charges against charity," The Daily Telegraph, September 25, 2003 at 1).

106.    During the relevant period, neither the United Kingdom nor the European Union included Interpal on their respective lists of persons subject to the freezing of assets or supervision of their financial transactions.  Schuster Dec. Ex. 14 (Holland Rep. ¶ 8.25); Ex. 16 (Walker Tr. at 64:2-7).

107.    The Charity Commission conducted a third investigation of Interpal after the relevant period, in 2009.  Schuster Dec. Ex. 17 (Burchfield Rep. ¶ D.3).

108.    To date, neither the United Kingdom nor the European Union has ever accused Interpal of funding Hamas or of any involvement in terror financing, or included Interpal on any of its sanctions lists.  Schuster Dec. Ex. 14 (Holland Rep. ¶ 8.25).

109.    Plaintiffs do not contend NatWest had access to more information than United Kingdom law enforcement agencies and regulators, including NCIS, the Charity

-27-

Commission, Special Branch and the Bank of England, concerning Interpal.  Schuster Dec. Ex. 105 (Plaintiffs' Second Supp'l Resp. to Cont. Interrog. no. 18).

## P.   The United Kingdom Parliamentary Proceedings Regarding Interpal

110.    On October 6, 2003, a member of the United Kingdom Parliament asked a member of the government about Interpal's status in the United Kingdom.  The government representative responded that the Charity Commission had "recently concluded a formal inquiry into Interpal which established that there was no evidence to substantiate allegations that it has links to Hamas's political and militant activities.  The commission removed restrictions on Interpal's accounts and . . . published a report on its inquiry which is publicly available." Schuster Dec. Ex. 106 (Lord Chalfont - Interpal: Charitable Status, HL Deb, 6 Oct. 2003, vol 653, col18 at 3).

111.    On November 19, 2003, the British charity Oxfam submitted a statement to the United Kingdom Parliament regarding its concerns about the accusations made by the U.S. government against Interpal.  Oxfam stated its concern "about the unsubstantiated accusations by the US government that the British Muslim charity Interpal is a terrorist organization" and noted that "Interpal were eventually cleared when no evidence was forthcoming . . . ."  Schuster Dec. Ex. 107 (Supplementary memorandum submitted by Oxfam to the House of Commons Select Committee on International Development, 19 Nov. 2003 at 1).

112.    On January 16 and February 6, 2006, members of the United Kingdom Parliament asked the Secretary of State for Foreign and Commonwealth Affairs for the United Kingdom for an assessment of the links between Hamas and Interpal.  The Secretary of State responded that the Charity Commission had investigated Interpal on several occasions regarding their links with Hamas and found insufficient evidence to support taking action against Interpal.

-28-

Schuster Dec. Ex. 108 (Hamas/Interpal, HC Deb, 16 Jan. 2006, vol 441, col976W at 2); Schuster Dec. Ex. 109 (Interpal, HC Deb, 6 Feb. 2006, vol 442, col772W at 2).

113.    On March 2, 2009, a member of the United Kingdom Parliament asked the Financial Services Secretary to the Treasury whether the government would ask the U.S. to remove its restrictions on Interpal.  The Financial Services Secretary responded that the Treasury shared concerns about "any interruption to humanitarian aid" and while "commercial decisions on providing accounts and clearing services are for the banks themselves," the government was "discussing with relevant parties how best to ensure that charities can retain access to the banking system."  Schuster Dec. Ex. 110 (Banking: Interpal, 708 H.L. 2 Mar. 2009, col. WA115 at 2).

114.    On May 12, 2009, a member of the United Kingdom Parliament asked the Chancellor of the Exchequer about discussions with the U.S. regarding the basis for OFAC's designation of Interpal.  The Chancellor of the Exchequer responded that Treasury officials were "in ongoing discussions with their US counterparts about how best we can work together to facilitate legitimate charitable work, while protecting against the abuse of charities by those involved in terrorist finance."  He stated that the Treasury had "asked the US authorities to consider if any further information c[ould] be made available about the basis for Interpal's designation."  Schuster Dec. Ex. 16 (Walker Tr. at 111:15-113:11); Ex. 111 (Walker Dep. Ex. 19 at 2).

115.    On July 6, July 15 and September 9, 2009, members of the United Kingdom Parliament asked the Chancellor of the Exchequer and the Secretary of State for Foreign and Commonwealth Affairs whether they had received evidence from the U.S. government regarding the basis for OFAC's designation of Interpal, and what recent

-29-

representations the government had made to the U.S.   The Chancellor of the Exchequer and the

Secretary of State responded that Treasury officials were "in discussions with their US

counterparts about how to facilitate legitimate charitable work, while protecting against the

abuse of charities by those involved in terrorist finance," and that they continued to discuss

Interpal with the U.S. authorities.  Schuster Dec. Ex. 112 (Walker Dep. Ex. 20 at 3); Ex. 16

(Walker Tr. at 111:15-113:11); Ex. 113 (Interpal, HC Deb, 15 July 2009, vol 496, col481W at 4);

Ex. 114 (Walker Dep. Ex. 21 at 3).

116.    On March 29, 2010, the Charity Commission represented to members of

the United Kingdom Parliament that it continued to monitor Interpal's compliance with the

requirements of the Charity Commission.  Schuster Dec. Ex. 115 (Union of Good, HC Deb, 6

Apr 2010, vol 508, col1224W at 5).

**Q.  The Inapplicability Of Israeli Government Sanctions To NatWest's Conduct In
Serving A United Kingdom Customer In The United Kingdom**

117.    The Israeli government designated Interpal as an "unlawful organization"

in 1997 and a "terrorist organization" in 1998.  Schuster Dec. Ex. 116 (Plaintiffs' Resp. to Cont.

Interrog. no. 14).

118.    During all periods relevant to these lawsuits, NatWest had no branches or

subsidiaries operating in Israel, and therefore understood that Israeli sanctions did not apply to

NatWest's activities.  Schuster Dec. Ex. 1 (Cole Dec. ¶ 3).

119.    As a matter of Israeli law, NatWest could be prosecuted in Israel under the

Prevention of Terrorism Ordinance for hosting Interpal's accounts in the United Kingdom or

facilitating a transfer of funds from Interpal in the United Kingdom to an entity outside Israel but

designated by Israel as a "terrorist organization" only upon proof beyond a reasonable doubt that

NatWest acted with the requisite intent, in particular that: (a) NatWest was aware that Interpal

was, or was associated in some way with, a "terrorist organization"; (b) NatWest was aware that its actions had the ability to aid Interpal in the commission of an offense; and (c) NatWest intended to assist Interpal to complete that offense. Schuster Dec. Ex. 117 (Lipshes Rep. at 4-5).

120. NatWest could be prosecuted in Israel under the Defense (Emergency) Regulations for hosting Interpal's accounts in the United Kingdom or facilitating a transfer of funds from Interpal in the United Kingdom to an entity outside Israel but designated by Israel as an "unlawful association" only upon proof beyond a reasonable doubt that: (a) NatWest knew that it hosted an account that was owned by, or transferred funds to an entity that is, or is associated in some way with, an "unlawful association"; (b) NatWest was aware that its actions had the ability to aid its customer in the commission of an offense under the Defense (Emergency) Regulations; and (c) and the bank intended to assist its customer to complete that offense. Id. (Lipshes Rep. at 7-8).

121. NatWest's hosting of Interpal's accounts in the United Kingdom or its facilitation of a transfer of funds from Interpal in the United Kingdom to an entity outside Israel but designated by Israel under the Prevention of Terrorism Ordinance or the Defense (Emergency) Regulations could be prosecuted only as a "foreign offense," to the extent that the transfers did not pass through correspondent banks in Israel and were not made to transferees' accounts at bank branches located in Israel, because none of these acts was committed in whole or in part in the territory of Israel, and because there is no evidence that NatWest was involved in the preparation for, or an attempt or conspiracy to commit, an offense in Israel. Id. (Lipshes Rep. at 12-16).

122. NatWest could be held liable for a "foreign offense" under the Prevention of Terrorism Ordinance or the Defense (Emergency) Regulations only upon proof beyond a

reasonable doubt that, in addition to the elements of the underlying violation of the Prevention of

Terrorism Ordinance or the Defense (Emergency) Regulations, NatWest's actions constituted an

"Offence against the State or the Jewish Nation" under Article 13 of the Israeli Penal Law, which

would require proof beyond a reasonable doubt that NatWest's intention and objective was to

damage the security or sovereignty of Israel or some of its citizens, residents or co-nationals of

the state.  Id. (Lipshes Rep. at 16-19).

123.    Alternatively, NatWest could be held liable for a "foreign offense" under

the Prevention of Terrorism Ordinance or the Defense (Emergency) Regulations only upon proof

beyond a reasonable doubt under Article 14 of the Israeli Penal Law that, in addition to the

elements of the underlying violation of the Prevention of Terrorism Ordinance or the Defense

(Emergency) Regulations:

- hosting Interpal's accounts or transferring funds pursuant to Interpal's instructions harmed, or was capable of harming, the life, body, health or liberty of an Israeli citizen or resident;

- the penalty set for the offense at issue under Israeli law is at least one year;

- in the countries where the offense was committed – under the circumstances here, either the United Kingdom as the place where the accounts were maintained and the place from which the transfers were initiated, and/or Jordan, Lebanon and/or the Palestinian Territories as the places to which the transfers from Interpal's accounts were made – the bank's conduct constitutes an offense as well, and there is no safeguard from criminal liability for the bank in those jurisdictions;

- the bank was not acquitted of this offense abroad and, if convicted, it has not yet borne the penalty; and

- if the bank were convicted in Israel, the penalty imposed on it may not exceed the maximum penalty that it would have been possible to impose on it for these offenses in the country where the offence was committed.

Id. (Lipshes Rep. at 20-21).

124.     Moreover, for those transfers that NatWest made to bank accounts in the Palestinian Territories pursuant to the instructions of Interpal, an Israeli prosecutor could not, in order to satisfy the requirements of Article 14 of the Penal Law, rely upon the Israeli Ministry of Defence's declaration that Interpal is an "unlawful association" or upon the Israeli government's declaration that Interpal is a "terrorist organization," or that certain of Interpal's transferees are "unlawful associations" or "terrorist organizations," to support a finding that NatWest's completion of the transfers requested by Interpal to these transferees constituted criminal offenses at the point of destination of these transfers, because the Palestinian Territories were and are not considered part of Israel, and these Israeli government declarations had and have no effect there.  The relevant declarations regarding these transferees are issued by the Israel Defense Forces Governor with jurisdiction over the place where the relevant account was maintained.  Id. (Lipshes Rep. at 21).

R.  **The Proposed Expert Testimony Of Gary Walters**

(1)  Walters's qualifications

125.     Walters describes himself as a former police officer and part-time consultant with "Forensic Risk Alliance" ("FRA"), a firm that advertises itself as specializing in forensic accounting, electronic discovery, financial investigation, litigation support and electronic discovery.  Schuster Dec. Ex. 119 (Walters Tr. at 21:7-22:6; 23:20-23); Ex. 118 (Walters Dep. Ex. 11).

126.     Walters purports to opine on NatWest's "management of the Interpal account," but he has no education or professional training concerning the internal policies and procedures of United Kingdom banks.  Schuster Dec. Ex. 121 (Walters Reb. Rep. ¶ 5); Ex. 119 (Walters Tr. at 85:13-86:23).

127.    Walters has no professional experience investigating a bank's conduct in relation to terror financing.  Rather, he worked in a section of the Metropolitan Police responsible for money laundering investigations.  Schuster Dec. Ex. 119 (Walters Tr. at 60:19-65:10, 70:19-23, 76:12-77:23, 78:16-79:2).

128.    Walters has no professional experience investigating a charity accused of terror financing.  Id. (Walters Tr. at 113:17-20).

129.    Walters has no professional experience reviewing suspicious activity reports relating to terror financing and never reviewed any of the reports that NatWest filed with respect to Interpal during his police career.  Id. (Walters Tr. at 74:20-75:4, 75:24-76:9).

130.    Walters achieved only the third highest rank of eleven possible ranks in the Metropolitan Police rank structure.  Id. (Walters Tr. at 82:21-84:9); Ex. 120 (Walters Dep. Ex. 10).

131.    Walters has never published anything, on any topic.  Schuster Dec. Ex. 119 (Walters Tr. at 90:25-91:6).

132.    Walters copied portions of his reports from the reports that Frances McLeod submitted in Strauss v. Crédit Lyonnais, S.A., 06-cv-702 (DLI) (MDG) and Wolf v. Crédit Lyonnais, S.A., 07-cv-914 (DLI) (MDG).  Id. (Walters Tr. at 36:17-37:11).

133.    None of Walters' FRA colleagues, who researched and wrote portions of his reports, has any relevant experience.  Walters is not aware of any experience his co-authors (Cassie Searles, Toby Duthie and Lucile Mourey) have with relevant U.S. or United Kingdom banking regulations outside of FRA's work for plaintiffs in these and the Strauss and Wolf lawsuits.  Id. (Walters Tr. at 46:21-24 [Searles]; 49:2-5 [Mourey]; 51:2-5 [Duthie]).  Nor do they have any experience with the internal policies and procedures of United Kingdom or U.S. banks,

-34-

id. (Walters Tr. at 47:13-48:4 [Searles]; 49:10-13 [Mourey]), or any education or professional training in U.S. or United Kingdom banking regulations or policies and procedures. Id. (Walters Tr. at 46:25-47:4; 48:5-8 [Searles]; 49:6-9 [Mourey]; 51:6-52:2 [Duthie]). Nor do they have prior experience, education or professional training in United Kingdom or U.S. anti-money laundering or anti-terrorism finance laws or regulations. Id. (Walters Tr. at 47:5-12; 48:9-17 [Searles]; 49:25-50:15 [Mourey]; 52:3-11 [Duthie]).

134.    The only formal higher education Walters has received was a three or four month part-time program for which he attended class one night every two or three weeks to receive a diploma in fighting money laundering. Id. (Walters Tr. at 57:16-58:16).

135.    Walters began working as a part-time consultant for FRA after being asked to do so by a social friend in mid-2010. Id. (Walters Tr. at 15:14-17:21).

136.    The only work that Walters has done as part of a client matter for FRA is his work on behalf of plaintiffs in these lawsuits. Id. (Walters Tr. at 18:25-19:23).

137.    Walters is employed full-time in his family farming business. Id. (Walters Tr. at 21:7-22:6).

(2) Relevance of Walters's proposed testimony

138.    Walters is not opining that NatWest knew or believed that Interpal was financing terrorism or Hamas. Id. (Walters Tr. at 93:21-94:13).

139.    Walters is not a lawyer and is not opining as to the requirements of United Kingdom law. Id. (Walters Tr. at 94:14-95:11).

140.    Walters analyzed NatWest's conduct against the "global banking standards published by Basel, Wolfsberg and FATF." He also analyzed NatWest's conduct against "international banking standards and international AML and CTF standards," and "minimum banking standards," which include publications by the Basel Committee on Banking

-35-

Supervision, the Wolfsberg Group and the Financial Action Task Force ("FATF"), as well as unspecified "U.N. related material" that he found on the internet. Id. (Walters Tr. at 97:3-99:19, 130:8-133:11); Ex. 121 (Walters Reb. Rep. ¶¶ 8, 145, 192, 200).

141. FATF is an international body which publishes recommendations for consideration by member states. FATF publications are not directed at the private sector and do not give rise to legal obligations or liabilities as a matter of English law. Schuster Dec. Ex. 14 (Holland Rep. ¶ 6.2); Ex. 119 (Walker Tr. at 127:10-15).

142. Wolfsberg Group guidelines and recommendations issued by the Basel Committee on Banking Supervision have no legal effect in the United Kingdom. Schuster Dec. Ex. 14 (Holland Rep. ¶ 6.15).

143. Walters purports to analyze NatWest's conduct against that of a "standard Terrorist Financing investigation," Schuster Dec. Ex. 121 (Walters Reb. Rep. ¶ 5), which he defined as a "standard Terrorist Financing investigation" conducted by the police, not by a bank, based on his experience conducting money laundering, not terror financing, investigations. Schuster Dec. Ex. 119 (Walters Tr. at 136:13-137:6).

144. Walters identified six factors that purportedly made the Cryptome Report credible, which he claims NatWest could have verified: "[(1)] the account numbers were accurate; [(2)] the report lists six of the key figures within Interpal by name; [(3)] the report was correct about the relationship between Interpal and Al-Aqsa . . .; [(4)] additional transfers from ███████████████████ identified in a Goalkeeper Report as representing ████████████ . . .; [(5)] the report was correct about the connection between Interpal and ██████ . . . [and (6)] a thorough review would have shown outflows from Interpal's accounts to organizations such as ██████████████████████████

██████████████████████████████████████████████

████████████████████ Schuster Dec. Ex. 121 (Walters Reb. Rep. ¶¶ 49-50).

145.     Walters admitted that NCIS could have verified the first two factors:
Interpal's account numbers at NatWest and the names of six of the key figures within Interpal.
Schuster Dec. Ex. 119 (Walters Tr. at 224:22-227:21).

146.     Walters admitted that as to the third and fourth factors, Al-Aqsa
Foundation was not designated by either the U.S. or the United Kingdom as a terrorist entity
until May 2003, one and a half years after NatWest received the Cryptome Report. Id. (Walters
Tr. at 227:22-228:12).

147.     Walters admitted that as to the fifth factor, ███████ has never been
designated by either the United Kingdom or the United States as a terrorist entity. Id. (Walters
Tr. at 229:8-11).

148.     Walters admitted that as to the sixth factor, seven of the entities have
never been designated as terrorist entities in the United States or United Kingdom, and the other
entities were not designated until 2003. Id. (Walters Tr. at 228:4-7, 229:8-11, 229:17-230:8).

(3)  Walters's methodology

149.     Walters purports to apply the "global banking standards published by
Basel, Wolfsberg and FATF," but he could not identify which specific Basel, Wolfsberg and
FATF standards he was referring to, and does not know whether he has read all of the standards.
He did not maintain copies of those standards he read, but rather viewed them on the internet.
Id. (Walters Tr. at 97:3-99:19); Schuster Dec. Ex. 121 (Walters Reb. Rep. ¶¶ 145, 192).

150.     Walters's report describes how he purportedly "identif[ied] those facts and
materials pertinent to a standard Terrorist Financing investigation" and then "identified specific

-37-

deviations to make an assessment of whether they amounted to major deviations, and delineated the significant deviations." Schuster Dec. Ex. 121 (Walters Reb. Rep. ¶ 5).

151.    Walters admitted that he had never previously used the term "standard Terrorist Financing investigation" prior to his work on behalf of plaintiffs in these lawsuits. Schuster Dec. Ex. 119 (Walters Tr. at 135:18-22).

152.    Walters cannot identify any authority that used or defined the term "standard Terrorist Financing investigation" before he included that term in his report in these lawsuits. Id. (Walters Tr. at 135:23-136:12).

153.    Walters admitted that the terms "deviation," "significant deviation" and "major deviation," as he used them in his report, are subjective to him. He defined the terms based on his experience investigating money laundering, not terror financing. He cannot identify any authority that defines the terms "deviation" and "major deviation," or that differentiates a "deviation" from a "significant deviation" and a "major deviation." He cannot recall what the difference is between a "significant deviation" and a "major deviation," as he used the terms in his report. Id. (Walters Tr. at 138:19-139:2, 141:12-20, 142:15-143:25).

154.    Walters identified four "risk factors" that purportedly made Interpal a high-risk customer: "[(1)] Interpal presented high country risk because its activity was connected to a high-risk jurisdiction: the Palestinian Territories. In addition, its stated purpose was to remit funds to high-risk jurisdictions: the Palestinian Territories, Jordan and Lebanon[; (2)] Interpal also presented high customer risk. It is a charity, and undertakes transactions with other charities . . . [; (3)] In terms of service risk, Interpal "engaged in the high-risk practice of using its NatWest accounts to aggregate small deposits and send wire transfers of larger amounts to entities abroad, including many in the Palestinian Territories[; and (4)] Interpal sometimes even

-38-

received funds from organizations to which it sent funds . . . ."   Schuster Dec. Ex. 121 (Walters Reb. Rep. ¶¶ 12-15).

155.    Walters could not identify any publication that formed the basis for his opinion that each of the four "risk factors" indicates that a bank should treat a customer as "high risk."  Walters admitted that he applied his own subjective definition of the first "risk factor," "high risk jurisdictions."  He does not know whether the Palestinian Territories and Jordan had ever appeared on FATF's list of high risk jurisdictions.  Schuster Dec. Ex. 119 (Walters Tr. at 149:24-150:22).  He testified that the basis for his analysis of the "risk factors" was his "experience" with the Basel, FATF and Wolfsberg standards and his "dealings" with banks and regulators, whom he has declined to identify purportedly on the basis of confidentiality.  Id. (Walters Tr. at 153:2-8, 161:10-16, 166:18-20).

156.    Walters cannot identify any objective basis for stating that Yemen in 2003 was a "high-risk" jurisdiction.  Id. (Walters Tr. at 261:10-262:10).

157.    Walters states that Interpal presented "high customer" risk because it is a charity, but admits that according to his criteria, charities such as Guide Dogs for the Blind, the Royal National Life Boat Institution, the Prince's Trust and the Police Benevolent Fund also present a "high customer" risk.  Id. (Walters Tr. at 153:9-160:7).

158.    According to Walters, the purported "red flags" on which he bases his opinions are "[(1)] Use of a charitable association's account to aggregate relatively small donations and then funnel funds by way of relatively large wire transfers to a small number of foreign beneficiaries, both individuals and businesses, located in a high-risk jurisdiction with a massive and well-known terrorism problem[; (2)] Involvement of multiple nationals of countries associated with terrorist activity[; (3)] Charity/relief organizations linked to the transactions on

both sides[; (4)] Mix of cash deposits and monetary instruments[; (5)] Non-specific beneficiaries in a location experiencing major incidents of terrorism[; (6)] Wire transfers as the principal service utilized by the Defendant's customer[; (7)] Media coverage associating the customer with terrorism that was public knowledge in the UK[; (8)] Interpal was designated a Specially Designated Global Terrorist (SDGT) by OFAC in 2003[; (9)] Interpal sent funds to and received funds from various organizations on the OFAC SDN list ▮▮▮▮ or with a name similar to a SDGT on the OFAC SDN list (Al-Aqsa Foundation, El-Wafa Charitable Society), listed by the Bank of England as suspected terrorism funders ▮▮▮▮, and outlawed by Israel (Jenin Zakat Committee, ▮▮▮▮[; (10)] Beneficiaries in locations not in direct relation to Interpal's stated purpose (transfers to ▮▮▮▮▮[; (11)] Beneficiaries were themselves charities, which constitutes significant customer risk[; (12)] Beneficiaries were sometimes also benefactors, like ▮▮▮▮, for example[; (13)] Different NatWest employees, at different times, in different departments identified Interpal as engaging in activity indicative of Terrorist Financing, thereby providing objective evidence of the suspicious nature of Interpal's conduct[; (14)] Interpal was investigated by the Charity Commission in 1996 and in 2003, and each time the accounts were frozen[; and (15)] Interpal payments were of ongoing interest to Special Branch[.]" Schuster Dec. Ex. 121 (Walters Reb. Rep. ¶ 18); Ex. 119 (Walters Tr. at 165:16-166:7).

159.    Walters believes that his 15 purported "red flags" are "understood and published," but he is unable to identify where those "red flags" have been published. Schuster Dec. Ex. 119 (Walters Tr. at 165:16-166:7). He testified that he had identified those 15 purported published red flags based on: (1) his experience as a police officer; (2) FATF standards; and (3) documents he received from conferences. Id. (Walters Tr. at 165:16-166:20).

However, he is unsure whether the "red flags" he had identified based on his experience in the police had been published. Id. (Walters Tr. at 167:20-168:8). Similarly, he could not identify which FATF standards are sources of published red flags. When asked whether he read the FATF standards that he identified as being a source of published "red flags" when writing his report, he responded that he "possibly read them at different times . . . on the internet" but did not remember specifically which publications he had read. Id. (Walters Tr. at 166:21-167:19). Finally, he admitted that he did not consult any of the purportedly published documents from conferences while writing his report. Id. (Walters Tr. at 166:8-17).

160. Walters conceded that 13 of his 15 purported "red flags" were either known to UK law enforcement authorities from the information NatWest provided in its NCIS disclosures or were public knowledge, and that law enforcement authorities would have been aware generally of the "red flags" of terrorism. Id. (Walters Tr. at (1) 168:9-171:21, (2) 171:22-172:25, (3) 173:2-8, (4) 173:9-12, (5) 173:13-25, (6) 174:6-11, (7) 174:17-176:22, (8) 176:23-179:4, (9) 181:17-183:3, (10) 183:6-14, (11) 185:20-186:14, (12) 186:18-23 and (13) 185:8-19, 187:8-15).

161. As to the ninth red flag, Walters could not identify the basis for stating that sending funds to and receiving funds from organizations that have a name similar to a sanctioned entity is a "red flag," other than generally referring to "the guidelines and standards that are applied to this field of work." Id. (Walters Tr. at 179:15-180:21).

162. As to the twelfth "red flag," Walters could not identify the basis for stating that two charities sending money to one another is a "red flag." Id. (Walters Tr. at 183:15-184:20).

-41-

163.   Walters admitted that he has no education in applying his purported methodology. Id. (Walters Tr. at 144:6-9).

164.   Walters admitted that he has never seen his methodology applied anywhere other than in the report FRA submitted by plaintiffs in the Strauss and Wolf actions. Id. (Walters Tr. at 144:10-13).

(4)   Walters's report contains unsubstantiated statements, mistakes and incorrect
      factual assertions

a.   Unsubstantiated statements

165.   Walters opines, without identified support, that NatWest's "lack of full and frank reporting and its failure to undertake other conventional steps designed to uncover and report potential Terrorist Financing activity directly and negatively affected the assessment of the account risk and decisions that law enforcement or other regulators were making with regard to their response in terms of investigation or other action." Schuster Dec. Ex. 121 (Walters Reb. Rep. ¶ 10).

166.   Walters never spoke with any law enforcement agencies about Interpal, nor did he have access to any law enforcement files regarding Interpal in relation to his work on these cases.  When asked whether he had any actual knowledge as to whether NatWest's actions or lack of actions negatively affected law enforcement's assessments of Interpal, he responded, "I can't speculate on matters I don't know." Schuster Dec. Ex. 119 (Walters Tr. at 125:4-20, 144:14-146:20).

167.   Walters never saw any evidence that NCIS expected more from NatWest's disclosures, nor that NatWest failed to answer any follow-up questions posed by NCIS, nor any evidence that any law enforcement agency ever complained to NatWest about the extent or

-42-

quality of the information it had provided concerning Interpal. Id. (Walters Tr. at 148:25-149:10, 215:1-12, 217:18-23, 219:19-22).

168.    Walters is not aware of any disciplinary action that has ever been taken against NatWest for failing to fulfill its obligations with respect to Interpal by any United Kingdom authority. Id. (Walters Tr. at 217:24-218:5).

169.    Walters states, without identified support, that NatWest's receipt of the Cryptome Report, which alleged links between Interpal and Hamas, was a "red flag." Schuster Dec. Ex. 121 (Walters Reb. Rep. ¶¶ 35, 37). Walters admits that ██████████████████ █████████████████████████████████████████████████████████████ ████████████████████████████████████████████, and that United Kingdom law enforcement agencies had the ability to obtain from NatWest any additional information they needed in order to investigate the allegations contained in the Cryptome Report. Schuster Dec. Ex. 119 (Walters Tr. at 203:17-206:7, 217:7-11).

170.    Walters states, without identified support, that "[i]n the full circumstances of this case, there is, in my view, clear suspicion of Money Laundering activity." Schuster Dec. Ex. 121 (Walters Reb. Rep. ¶ 171). At his deposition, Walters conceded that he does not recall seeing any internal or external communications in which NatWest stated that it suspected Interpal of engaging in money laundering. Schuster Dec. Ex. 119 (Walters Tr. at 289:9-13).

171.    Walters states, without identified support, that NatWest granted a 2003 BBC news report, which reported that the Charity Commission had dropped its investigation of Interpal, "unquestioned credibility and weight while discounting more credible sources of adverse information concerning Interpal, including the OFAC list." Schuster Dec. Ex. 121 (Walters Reb. Rep. ¶ 221). He could not identify his basis for stating that NatWest relied on the

BBC report. Schuster Dec. Ex. 119 (Walters Tr. at 298:14-17). He conceded that NatWest had received a letter from the Charity Commission informing NatWest ███████ ████████████████████████████████████████████████████ ████████████████████████████████████████ ███████████████ Id. (Walters Tr. at 298:18-299:25); Ex. 122 (Walters Dep. Ex. 43).

 172. Walters states, without identified support, that "NatWest's effort to dismiss the importance of OFAC listings deviates materially from standard banking practice . . . ." Schuster Dec. Ex. 121 (Walters Reb. Rep. ¶ 200). When shown the Bank of England's instructions to NatWest in October 2003 ██████████████████████████████████ ████████████████████████████ he conceded that the Bank of England was not instructing NatWest to engage in a major deviation from international banking standards. Schuster Dec. Ex. 119 (Walters Tr. at 294:10-25).

 173. Walters opines that he "cannot understand why a further disclosure was not submitted to law enforcement in the standard manner [in September 2003, regarding the payment of ████████ to Interpal]." Schuster Dec. Ex. 121 (Walters Reb. Rep. ¶¶ 165-167). Walters admits the NTFIU informed NatWest ███████████████████████ ████████████████████████████████████████████████████ When asked whether he believes NatWest should have made a further disclosure, despite being told by NTFIU ██████████████████ Walters responded, "I would have thought they would have having confirmed the information and I haven't had a chance to look at – I can't find the date there, but I would have in normal course events I would have expected that when they got the feedback from their own staff that this payment came from this particular organization

that they would have submitted a SAR with that information.  Having decided not to do that and then telephone [sic] and spoken, I can understand why they then didn't submit one." Schuster Dec. Ex. 119 (Walters Tr. at 263:21-264:6, 265:22-267:15).

         b.     <u>Mistakes and incorrect factual assertions</u>

      174.     Walters admits he made a mistake in writing that a ███ transfer from Interpal to an individual in ███ had "no apparent explanation," when the wire transfer documentation reveals that the apparent purpose of the wire transfer was ███████ <u>Id.</u> (Walters Tr. at 188:18-196:22).

      175.     Walters opines in his report that he has seen no evidence of communication between NatWest and the Charity Commission during the Charity Commission's 1996 investigation of Interpal. <u>Id.</u> (Walters Tr. at 198:7-14); Ex. 121 (Walters Reb. Rep. ¶ 30). Walters testified that he reviewed all of the documents produced by NatWest in this action, but when shown evidence of a telephone call between NatWest and the Charity Commission in March 1996, he testified, "I don't recall this document." Schuster Dec. Ex. 119 (Walters Tr. at 12:24-13:3, 198:15-201:14); Ex. 123 (Walters Dep. Ex. 23).

      176.     Walters states in his report that he has seen no evidence of any action or due diligence being taken between November 2001 and July 2002 about gaining a "'clear understanding of the activities and full details behind some of [Interpal's] ███ transactions.'" Schuster Dec. Ex. 121 (Walters Reb. Rep. ¶¶ 55, 63); Ex. 119 (Walters. Tr. at 233:19-235:3). However, when shown Belinda Lane's due diligence notes dated between November 2001 and July 2002, he conceded that he had seen those documents. Schuster Dec. Ex. 119 (Walters Tr. at 235:4-236:13, 238:15-239:25); Exs. 124-25 (Walters Dep. Exs. 29-30).

177.     Walters states in his report that he has seen no evidence of "significant KYC or due diligence" by NatWest after the date of OFAC's designation of Interpal.  Schuster Dec. Ex. 121 (Walter Reb. Rep. ¶¶ 86, 91).  However, when shown Guy Cole's May 2004, December 2004 and July 2005 semi-annual reviews of Interpal's accounts, he conceded that he had seen those documents and that they analyze Interpal's accounts after the date of OFAC's designation.  Schuster Dec. Ex. 119 (Walters Tr. at 280:19-282:18); Exs. 126-28 (Walters Dep. Exs. 38-40).

178.     Walters states in his report that he has seen no evidence of guidance on "balanc[ing] the risk of tipping off with the need for further information" being provided to the Relationship Manager, Belinda Lane.  Schuster Dec. Ex. 121 (Walters Reb. Rep. ¶ 57).  However, when shown Belinda Lane's testimony that she had been trained annually in anti-tipping off policy, he conceded that he had read that testimony.  Schuster Dec. Ex. 119 (Walters Tr. at 241:22-242:24); Ex. 129 (Walters Dep. Ex. 31 at 234:6-21).

179.     Walters states in his report that he has seen no responses to Damien Connor's August 26, 2003 email that circulated the Sanctions and Terrorist Financing Search request.  Schuster Dec. Ex. 121 (Walters Reb. Rep. ¶ 109).  However, when shown the responses to Damien Connor's August 26, 2003 email at his deposition, he conceded that there were nine responses to that email.  Schuster Dep. Ex. 119 (Walters Tr. at 286:9-287:9); Ex. 130 (Walters Dep. Ex. 42).

180.     Walters states in his report that NatWest's October 15, 2001 NCIS disclosure █████████████████████████████████████████████████████████████████ ████████████████ Schuster Dec. Ex. 121 (Walters Reb. Rep. ¶ 39).  The October 15, 2001 NCIS disclosure begins, █████████████████████████████████████ Schuster Dec.

Ex. 131 (Walters Dep. Ex. 17). 

Schuster Dec. Ex. 119 (Walters Tr. at 209:20-213:9, 214:9-25).

181.    Walters states in his report that Michael Hoseason acted as NatWest's Money Laundering Reporting Officer ("MLRO"). Schuster Dec. Ex. 121 (Walters Reb. Rep. ¶ 43). Walters admitted during his deposition that Michael Hoseason was not NatWest's designated MLRO. He could not recall who was the designated MLRO. Schuster Dec. Ex. 119 (Walters Tr. at 220:15-24, 224:10-15).

182.    Walters states in his report that NatWest undertook a review in July 2002 of Interpal "eight months after the first SAR was submitted, which constitutes a very significant deviation from the Bank's general obligation to take action in a timely manner." Schuster Dec. Ex. 121 (Walters Reb. Rep. ¶ 64). He conceded at his deposition that NatWest conducted its July 2002 review of Interpal's accounts in response to a payment Interpal had received ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮ Schuster Dec. Ex. 119 (Walters Tr. at 245:5-16); Exs. 132-33 (Walters Dep. Exs. 32-33).

183.    Walters states in his report that NatWest made the decision not to disclose a payment of ▮▮▮▮ from ▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮ Schuster Dec. Ex. 121 (Walters Reb. Rep. ¶¶ 161-162). Walters conceded during his deposition that NatWest did disclose this payment to NCIS on June 17, 2002. Schuster Dec. Ex. 119 (Walters Tr. at 248:22-249:5).



184.     Walters states in his report that Interpal received a ▉▉▉▉ transfer from ▉▉▉▉▉▉▉▉▉ on ▉▉▉▉▉.  Schuster Dec. Ex. 121 (Walters Reb. Rep. ¶ 105).  He conceded that the transfer was from an entity named ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉, ▉▉▉▉▉▉▉▉▉▉▉ not an entity named ▉▉▉▉▉▉▉▉  Schuster Dec. Ex. 119 (Walters Tr. at 257:4-258:2); Ex. 134 (Walters Dep. Ex. 35 at NW012142).  He conceded that the entity ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ is not listed as an alias for ▉▉▉▉▉▉▉ on either the OFAC or Bank of England sanctions lists.  Schuster Dec. Ex. 119 (Walters Tr. at 258:3-260:19); Exs. 135-36 (Walters Dep. Exs. 27-28).  When asked the basis for referring to ▉▉▉▉▉▉▉▉▉▉▉▉▉▉ ▉▉▉▉▉▉▉ as ▉▉▉▉▉▉▉ he responded, "I shortened it to that."  Schuster Dec. Ex. 119 (Walters Tr. at 260:20-261:4).

185.     Walters states in his report that NatWest also received a transfer from "an individual who appears to be linked to ▉▉▉▉▉▉▉▉▉."  Schuster Dec. Ex. 121 (Walters Reb. Rep. ¶ 105).  Walters admitted during his deposition that ▉▉▉▉▉▉ name is not listed as an alias for ▉▉▉▉▉▉ on either the OFAC or Bank of England sanctions lists.  Schuster Dec. Ex. 119 (Walters Tr. at 261:5-9).

186.     Walters states in his report that NatWest "specifically failed to take notice of the ongoing Police interest in the account."  Schuster Dec. Ex. 121 (Walters Reb. Rep. ¶ 84).  In the same paragraph of his report, Walters states that NatWest "was clearly aware of the ongoing Police inquiry and interest in the account."  Id.  He admitted that NatWest informed NCIS in 2003 that there was on-going police interest in Interpal's accounts.  Schuster Dec. Ex. 119 (Walters Tr. at 277:23-278:8).

-48-

187.    Walters opines in his report that NatWest "had several clear opportunities to discuss its potential options with law enforcement and to obtain clear guidance; NatWest failed, however, to take action on such opportunities." Schuster Dec. Ex. 121 (Walters Reb. Rep. ¶ 86). Upon being shown NatWest's correspondence with the Bank of England in September 2003, in which NatWest ████████████████████████████████████████████ ████████████████████, Walters conceded that NatWest did take action on such an opportunity. Schuster Dec. Ex. 119 (Walters Tr. at 122:25-125:3, 126:8-20, 129:23-130:7, 278:9-280:18); Ex. 137 (Walters Dep. Ex. 37).

188.    Walters states in his report that Irvine Rodger, "as head of the Money Laundering Prevention Unit within the Corporate Banking Financial Markets' division, which included Interpal within its customer responsibility, should have understood that the designation of Interpal by OFAC meant that the U.S. Government was making clear its belief that Interpal was involved in funding terrorism." Schuster Dec. Ex. 121 (Walters Reb. Rep. ¶ 87). Walters conceded at his deposition that Irvine Rodger testified that he did understand that the OFAC designation meant that the U.S. government was making clear its belief that Interpal was involved in funding terrorism. Schuster Dec. Ex. 119 (Walters Tr. at 284:23-285:24).

## S.   The Proposed Expert Testimony Of Clive Walker

### (1)   Walker's qualifications as an expert on the Charity Commission, UK law enforcement and internal bank policies and procedures

189.    Walker has never spoken with anyone employed by the Charity Commission, and has never written to such a person other than by emailing the Charity Commission requests for the disclosure of inquiry reports under the Freedom of Inquiry Act and engaging in a short email exchange that occurred after he submitted his report. Schuster Dec. Ex. 16 (Walker Tr. at 13:18-20, 15:3-16:22).

-49-

190.   Walker has no professional experience working with the Charity Commission.  Id. (Walker Tr. at 38:9-11, 40:15-20).

191.   Walker has never taught a course on charity law, other than a course he last taught 20 years ago on equity and trust, which he testified had a section about charities and law and for which he did not retain a copy of the syllabus.  Id. (Walker Tr. at 40:23-41:10). Rather, Walker is a professor of criminal justice studies.  Schuster Dec. Ex. 15 (Walker Rep. ¶ 1.1.).

192.   Walker has never authored any publications focused on the Charity Commission.  He has only published texts on terrorism and the law that contain brief mentions of the Charity Commission.  Schuster Dec. Ex. 16 (Walker Tr. at 48:6-49:2).

193.   Walker has never worked for a British law enforcement agency.  Id. (Walker Tr. at 41:11-42:19, 44:10-25, 129:9-130:13); Ex. 138 (Walker Dep. Ex. 27).

194.   Walker has never worked for any commercial or retail bank.  Schuster Dec. Ex. 16 (Walker Tr. at 45:2-4).

195.   Walker has never taught any courses on banking law.  He testified that his course named "Terrorism and the Law" includes a section on "how bankers have to deal with antiterrorism laws and regulations," but his outlines for that course do not contain any reference to banking laws or regulations.  Id. (Walker Tr. at 45:5-47:9); Ex. 139 (Walker000007-11); Ex. 140 (Walker000012-15).

196.   Walker has no professional training in banking regulation other than the training that qualified him to practice as a solicitor and what he has learned as an academic. Schuster Dec. Ex. 16 (Walker Tr. at 47:10-48:5).

(2) <u>Walker's methodology</u>

197.    Walker had never applied the terms "red light regulator" and "green light regulator" to the Charity Commission before he used those terms in his report in these lawsuits. <u>Id.</u> (Walker Tr. at 84:4-6).

198.    Walker could not identify any authority who had ever applied the terms "red light regulator" or "green light regulator" to the Charity Commission. <u>Id.</u> (Walker Tr. at 84:4-85:4).

199.    Walker testified that the academic Peter Edge, a leading author on charities law, applied the terms "soft law" and "hard law" to the Charity Commission. Walker testified that "soft law" equates somewhat to "green light regulator." <u>Id.</u> (Walker Tr. at 85:5-87:14).

200.    Peter Edge's article does not characterize the Charity Commission as applying "soft law," rather than "hard law." Instead, Edge's article describes the Charity Commission's "extensive powers," including suspending and removing a charity's trustees, officers, agents or employees, appointing additional trustees, and freezing the assets of the charity. Edge states that the Charity Commission "works closely with the police, and reports any criminal offense it uncovers during its work to the police . . . ." Schuster Dec. Ex. 141 (Peter Edge, "Hard Law and Soft Power: Counter-Terrorism, the Power of Sacred Places, and the Establishment of an Anglican Islam," 12 Rutgers J.L. & Relig. 358 (2010) at Walker000023).

201.    Walker states in his report that the Charity Commission does not give equivalent weight to its enforcement or prosecutorial activities and to its activities facilitating, enabling and promoting charity. Schuster Dec. Ex. 15 (Walker Rep. ¶ 3.1.5).

202.    But Walker conceded in his deposition testimony that the Charity Commission listed 490 occasions between 2007 and 2008 when it exercised its compliance

powers, including by issuing orders and directions for information and evidence, suspending

trustees, removing trustees, freezing bank accounts and appointing interim managers. Schuster

Dec. Ex. 16 (Walker Tr. at 101:24-103:7); Ex. 142 (Walker Dep. Ex. 15).

203.    Walker also conceded that the Charity Commission states that it applies

"zero tolerance" to issues of connections between charities and terrorist activity. Schuster Dec.

Ex. 15 (Walker Rep. ¶ 3.1.9); Ex. 16 (Walker Tr. at 103:15-104:13).

204.    Walker further conceded that the Charity Commission "has also put in

place a Proactive Monitoring Unit and a Counter Terrorism Team which forms part of the

Intensive Casework Unit in Compliance and Support . . . ." Schuster Dec. Ex. 15 (Walker Rep. ¶

3.1.9); Ex. 16 (Walker Tr. at 104:3-104:13).

205.    Walker also conceded that the Charity Commission's stated policy is that

is has "always been vigilant about the risk of potential links between charities and terrorist

organisations and people connected to them." Schuster Dec. Ex. 16 (Walker Tr. at 105:5-

107:12); Ex. 143 (Walker Dep. Ex. 16). When asked for basis for his opinion that the Charity

Commission's actions do not reflect its stated policies, he stated, "[T]he factual basis that I

would have would be drawn from the — essentially drawn from the three reports that the Charity

Commission has issued about Interpal. That would be, I think, my core reason for doubt. But

also, of course, I referred earlier to other sources of information about Interpal; for example, the

[BBC's] Panorama program on the subject." Schuster Dec. Ex. 16 (Walker Tr. at 105:5-107:12).

206.    Walker agrees that the "channeling of funds by charities to terrorists is

extremely rare." Id. (Walker Tr. at 53:25-54:12); Ex. 15 (Walker Rep. ¶ 3.2.11).

207.    Walker did not review any documents produced by NatWest. Schuster

Dec. Ex. 16 (Walker Tr. at 18:13-19:17, 31:23-35:18, 109:4-9). Walker's knowledge of the facts

underlying these lawsuits comes from his reading of plaintiffs' complaints, his discussions with plaintiffs' counsel, academic articles that mention these cases and unspecified web pages that contain "people's opinions" about these cases. Id. (Walker Tr. at 18:19-24, 31:23-35:18). Walker testified about the web pages he had read, "I've learned probably more people's opinions than facts about the case." Id. (Walker Tr. at 35:3-10).

208.    Walker opines in his report that Jonathan Burchfield "fails to properly consider the relevancy and significance of the Commission's 2009 Inquiry Report." Schuster Dec. Ex. 15 (Walker Rep. ¶ 3.1.25). Walker conceded that he was not aware when he wrote his report that NatWest closed Interpal's accounts in 2007, two years before the Charity Commission published its 2009 report on Interpal. Schuster Dec. Ex. 16 (Walker Tr. at 115:25-116:19, 117:16-118:4).

209.    Walker states in his report that Jonathan Burchfield "conceded" that the Charity Commission's 2009 Inquiry Report on Interpal is "arguably the most thorough and comprehensive of all such inquiries . . . ." Schuster Dec. Ex. 15 (Walker Rep. ¶ 3.1.25). He admitted that Burchfield did not opine that the Charity Commission's 2009 report was the "most thorough and comprehensive," but rather that he interpreted Burchfield's use of the term "long-lasting" to mean "the most thorough and comprehensive." Schuster Dec. Ex. 16 (Walker Tr. at 114:13-115:14).

T.    **The Qualifications Of Jon Holland, An Expert Retained By NatWest**

210.    Jon Holland is a solicitor and partner in the law firm Hogan Lovells, where he is co-head of the financial services litigation team. Schuster Dec. Ex. 14 (Holland Rep. ¶ 1.1).

211.    Holland is a member of the Banking Technique and Practice Committee of ICC UK and the City of London Solicitors' Company. Id. (Holland Rep. ¶ 1.3).

-53-

212.    Holland has authored numerous publications on the subjects of anti-terror financing, anti-money laundering and financial sanctions.  Id. (Holland Rep. ¶ 1.5).

213.    Holland has particular expertise in the fields of anti-terror financing and anti-money laundering, on which he has advised clients since 1983.  Id. (Holland Rep. ¶ 1.4).

214.    Holland is regarded by the key directories in the United Kingdom and internationally as a leading lawyer in the area of banking litigation and contentious regulatory work.  Id. (Holland Rep. ¶ 1.6).

215.    Holland is regularly invited to speak at conferences on issues relating to anti-terror financing, anti-money laundering and financial sanctions.  Id.

**U.   The Qualifications Of Jonathan Burchfield, An Expert Retained By NatWest**

216.    Jonathan Burchfield is a solicitor and partner in the law firm Stone King LLP, which specializes in working with charities and non-profit organizations and has been recognized as one of the top three charity law firms in the United Kingdom.  Schuster Dec. Ex. 17 (Burchfield Rep. Ex. A).

217.    From 1995 through 2006, Burchfield was Head of the Charity Group of the law firm Nabarro Nathanson.  Id.

218.    From 1984 through 1995, Burchfield was a partner in the law firm Turner Kenneth Brown, where he established that firm's Charity Group.  Id.

219.    As a charity lawyer, Burchfield has had on a daily basis either contact with the Charity Commission or consideration of the provisions of the laws affecting charities in the United Kingdom.  Id.

220.    Burchfield has been involved in registering many new charities with the Charity Commission every year.  Id.

221.    Burchfield has been involved in numerous statutory inquiries initiated by the Charity Commission.  Id.

222.    Burchfield served for 12 years on the Executive Committee of the Charity Law Association, for which he also acted as Deputy Chairman for several years.  Burchfield has significant experience working as a trustee of charities regulated by the Charity Commission, including for The Tubney Charitable Trust, a significant grant-making charity in the United Kingdom, Creativity Culture and Education, a charity established by Arts Council England and St. Edward's School, Oxford, one of the United Kingdom's leading independent schools.  Id.

223.    Burchfield has written numerous articles for publication in professional journals relevant to charity lawyers.  Id.

## V.    The Qualifications Of Michael Hyland, An Expert Retained By NatWest

224.    Michael Hyland is Executive Chairman and Director of MHA Compliance and Training Ltd, where he specializes in the counter-terrorist and anti-money laundering obligations placed on financial institutions.  Schuster Dec. Ex. 6 (Hyland Rep. ¶ 1).

225.    Prior to MHA, Hyland was Head of Audit and Inspection Services within the United Kingdom operations of the Midland Bank Group plc.  Id.

226.    Hyland was a founding member of the United Kingdom's Joint Money Laundering Steering Group in 1989, of which he remained a member at the explicit request of the Bank of England until 1997.  Id.

227.    Hyland is a Fellow of the Chartered Institute of Certified Accountants and a Fellow of the Chartered Institute of Internal Auditors.  Id.

228.    Hyland has served on numerous anti-money laundering committees in the United Kingdom, including with the British Bankers' Association and the European Banking Federation Money Laundering Committee.  Id.

-55-

229.    Hyland has chaired and lectured at numerous counter-terror financing and anti-money laundering workshops and courses.  Id.

230.    Hyland's co-author, Sue Thornhill, is the Professional Services Director of MHA, and previously worked as Assistant Company Secretary of Rothschild Intercontinental Bank, Senior Assistant Secretary of the Committee of London and Scottish Bankers and as a Financial Crime Director of the British Bankers' Association.  Id. (Hyland Rep. ¶ 2).

231.    Thornhill was a founding member and Secretary of the Joint Money Laundering Steering Group and author of the Joint Money Laundering Steering Group Guidance Notes for the Financial Sector from 1990 to 2005.  Id.

232.    Hyland and Thornhill have authored a number of reference guides on counter-terror financing and anti-money laundering.  Id. (Hyland Rep. Annex 2).

**W.  The Qualifications Of Yaron Lipshes, An Expert Retained By NatWest**

233.    Yaron Lipshes is an Israeli lawyer specializing in white collar crime at the law firm Caspi & Co. Advocates & Notaries in Tel Aviv, Israel.  Schuster Dec. Ex. 117 (Lipshes Rep. Ex. A at 1).

234.    Lipshes joined Caspi & Co. in 2007.  Id.

235.    Lipshes received his law degree *magna cum laude* from the Tel Aviv University.  Id.

236.    While at Caspi & Co., Lipshes has worked on several high-profile criminal cases in Israel, including the defense of Israel's former Prime Minister in a bribe and corruption investigation, and other various cases involving charges of embezzlement, theft, money laundering, bribe and breach of trust, securities fraud and taxation.  Id.

237.    Also while at Caspi & Co., Lipshes has prepared legal opinions concerning the extraterritorial applicability of Israeli securities law, insider trading and the duties of banks to report to government enforcement agencies.  Id.

238.    From 2005 to 2007, Lipshes served as a legal advisor to the Investigations Department of the Israel Securities Authority.  In that capacity, Lipshes supervised all legal work of the investigations department, and represented the department in litigation.  Id.

239.    From 1999 to 2004, Lipshes served as an Assistant District Attorney in the Securities Department of the Tel Aviv District Attorney's Office.  In that capacity, Lipshes participated in a number of high-profile fraud, theft and corruption cases.  Id.

240.    Lipshes completed compulsory service in the intelligence branch of the Israel Defense Forces ("IDF") and performs reserve service as a defense attorney in the IDF attorney's office.  Id.

## II. UNDISPUTED MATERIAL FACTS DEMONSTRATING THAT NO REASONABLE JUROR COULD FIND THAT PLAINTIFFS HAVE PROVEN THE PROXIMATE CAUSATION AND ARTICLE III STANDING ELEMENTS OF THEIR CLAIMS

### A. Background Facts

241.    Plaintiffs' claims arise from 15 attacks between March 27, 2002 and September 24, 2004 that plaintiffs allege were perpetrated by Hamas.

242.    Plaintiffs' claims against NatWest are based upon their allegation that Nat West provided material support to Hamas, a Foreign Terrorist Organization.  Schuster Dec. Ex. 116 (Plaintiffs' Resp. to Cont. Interrog. nos. 9-11).

243.    Plaintiffs' allegation that NatWest provided material support to Hamas is based upon certain funds transfers (the "Identified Interpal Transfers") from Interpal's NatWest accounts to certain charitable organizations in the Palestinian Territories that plaintiffs claim are alter egos of and/or controlled by Hamas (the "13 Charities"), which are described in the expert

-57-

reports of Dr. Matthew Levitt and Arieh Spitzen. Id. (Plaintiffs' Resp. to Cont. Interrog. nos. 9, 11).

244.    The Identified Interpal Transfers are listed in the November 19, 2009 expert report of Wayne Geisser (the "Geisser 2009 Report" or "Geisser 2009 Rep."). Schuster Dec. Exs. 144, 145, 146 (Geisser 2009 Rep. at 4 and Exs. C-D).

245.    In addition to the Identified Interpal Transfers, the Geisser 2009 Report also lists transfers to ███████████ Id. Plaintiffs do not allege that ███████████ is an alter ego of and/or controlled by Hamas. Schuster Dec. Ex. 116 (Plaintiffs' Resp. to Cont. Interrog. nos. 9, 11).

246.    Although Geisser also issued a December 2010 report (the "Geisser 2010 Rep.") that lists transfers between Interpal and entities other than the 13 Charities that were made into or out of Interpal's Nat West accounts, plaintiffs do not claim that any of those entities are alter egos of and/or controlled by Hamas. Id. (Plaintiffs' Resp. to Cont. Interrog. no. 11); Ex. 147 (Geisser 2010 Rep.).

247.    The Identified Interpal Transfers made to the 13 Charities were made between ███████████ and ███████████ (the "Relevant Transfer Period"). Schuster Dec. Ex. 146 (Geisser 2009 Rep., Ex. D).

**B.  Plaintiffs' Admissions That They Are Not Purporting To Prove A Direct Causal Link Between The Identified Interpal Transfers And The 15 Attacks (Or Any Other Attacks)**

248.    Plaintiffs admit they "do not contend that any of the funds Interpal transferred from the accounts it maintained with NatWest to HAMAS was used specifically to finance any of the terrorist attacks that injured Plaintiffs and/or killed their loved ones." Schuster Dec. Ex. 116 (Plaintiffs' Resp. to Cont. Interrog. no. 12).

249.   Plaintiffs do not allege, and there is no evidence in the record, that any of the Identified Interpal Transfers were used to finance any other terrorist attacks.

250.   Plaintiffs do not allege, and there is no evidence in the record, that any of the Identified Interpal Transfers were provided to Hamas's military wing.

251.   Plaintiffs rely upon the expert reports of Levitt and Spitzen to prove the existence of a proximate causal relationship between the Identified Interpal Transfers and the 15 attacks and plaintiffs' Article III standing in these lawsuits.  Id. (Plaintiffs' Resp. to Cont. Interrog. nos. 9-11).

252.   Levitt's expert report in plaintiffs' pending companion lawsuits against Crédit Lyonnais, S.A. ("CL") addresses the same 12 charities (the "12 Charities")[1] that his expert report in these lawsuits addresses.  Schuster Dec. Ex. 148 (Levitt NW Tr. at 19:12-17).

253.   Levitt offers no evidence that any funds transferred by Interpal through its NatWest accounts was used to perpetrate the 15 attacks.

254.   Levitt does not opine that any of the 12 Charities participated in any of the 15 attacks.  Schuster Dec. Ex. 149 (Levitt CL Tr. at 62:14-63:10).

255.   Levitt does not opine that any of the 12 Charities planned the 15 attacks. Id. (Levitt CL Tr. at 63:19-64:3).

256.   Levitt does not opine that any of the 12 Charities trained the perpetrators of the 15 attacks.  Id. (Levitt CL Tr. at 64:4-16).

257.   Levitt does not opine that any of the 12 Charities provided logistical support for the 15 attacks.  Id. (Levitt CL Tr. at 65:15-25).

---

[1] Levitt addresses only 12 charities in his report, in contrast to Spitzen, who addresses the same 12 charities as does Levitt and the ▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒  See infra ¶¶ 278-282.

-59-

258.    Levitt does not opine that any of the 12 Charities requested that someone carry out any of the 15 attacks. Id. (Levitt CL Tr. at 66:2-17).

259.    Levitt does not opine that any of the 12 Charities was the cause of any of the 15 attacks. Id. (Levitt CL Tr. at 70:12-71:12).

260.    Levitt does not opine that any of the 12 Charities recruited the perpetrators of the 15 attacks. Id. (Levitt CL Tr. at 71:13-72:11).

261.    Levitt does not opine that any of the perpetrators of the 15 attacks were recruited from any of the 12 Charities. Id. (Levitt CL Tr. at 72:12-73:6).

262.    Levitt testified that, with regard to what he refers to as the Hamas da'wa network of social welfare institutions, in which he includes the 12 Charities, it was "possible though it's less common" that "money could be raised by a charity where the pitch is [to] give to educational needs and then the money actually is diverted to purchase bullets or what have you." Schuster Dec. Ex. 148 (Levitt NW Tr. at 37:2-11).

263.    Levitt testified that it was "less common" for money that was transferred from Interpal to a charity in the West Bank to be used for military activity. Id. (Levitt NW Tr. at 42:18-43:12).

264.    Levitt testified with regard to transfers from Interpal to charities in the West Bank that "[t]here are instances where monies that were raised for purportedly charitable purposes are then used or law enforcement believes they were used in a particular attack, but those are more rare." Id. (Levitt NW Tr. at 43:13-17).

265.   Spitzen's expert report in the pending companion lawsuits against CL addresses the same 13 charities (the "13 Charities")[2] that his expert report in these lawsuits addresses.  Schuster Dec. Ex. 150 (Spitzen NW Tr. at 36:5-9).

266.   Spitzen does not opine that any of the 13 Charities planned any of the 15 attacks.  Schuster Dec. Ex. 151 (Spitzen CL Tr. at 98:18-25).

267.   Spitzen does not opine that any of the 13 Charities participated in any of the 15 attacks.  Id. (Spitzen CL Tr. at 98:8-17); Ex. 150 (Spitzen NW Tr. at 81:12-23).

268.   Spitzen does not opine that any funds transferred by Interpal through its NatWest accounts were used to perpetrate the 15 attacks.  Id. (Spitzen NW Tr. at 79:4-12).

269.   Spitzen does not opine that any of the 13 Charities were the cause of any of the 15 attacks.  Schuster Dec. Ex. 151 (Spitzen CL Tr. at 102:7-16).

270.   Spitzen does not opine that any of the 13 Charities transferred funds to the perpetrators of the 15 attacks.  Id. (Spitzen CL Tr. at 96:16-24).

271.   Spitzen does not opine that any of the 13 Charities trained the perpetrators of the 15 attacks.  Id. (Spitzen CL Tr. at 99:2-10).

272.   Spitzen does not opine that any of the 13 Charities requested that someone carry out any of the 15 attacks.  Id. (Spitzen CL Tr. at 99:11-19).

273.   Spitzen does not opine that any of the 13 Charities recruited the perpetrators of the 15 attacks.  Id. (Spitzen CL Tr. at 112:8-16).

274.   Spitzen offers no evidence that any of the funds Interpal transferred through its NatWest accounts to the 13 Charities were transferred to Hamas's military wing.

---

[2] The 13 Charities include the 12 Charities and the ███████████████████.

## C.  <u>Plaintiffs' Fungibility Theory</u>

275.    Plaintiffs contend that, in order to prove their Article III standing in these

lawsuits, they will prove that "NatWest provided material support to HAMAS, a Foreign

Terrorist Organization."  Schuster Dec. Ex. 116 (Plaintiffs' Resp. to Cont. Interrog. no. 9).

276.    Plaintiffs contend that in order to prove proximate causation in these

lawsuits under 18 U.S.C. § 2333(a), they will prove that "their injuries were caused by reason of

acts of international terrorism perpetrated by HAMAS, . . . and that because NatWest provided

material support to HAMAS, their injuries were caused 'by reason of' acts or omissions by

NatWest which, because they are violative of 18 U.S.C. §§2339B and 2339C, are themselves

acts of international terrorism."  <u>Id.</u> (Plaintiffs' Resp. to Cont. Interrog. no. 10).

277.    Plaintiffs contend they have no burden to prove that any of the funds

Interpal transferred from its NatWest accounts were used to specifically finance the 15 attacks

because money is fungible, and therefore plaintiffs need only show that these funds were

provided to Hamas.  <u>Id.</u> (Plaintiffs' Resp. to Cont. Interrog. no. 12).

## D.  <u>Plaintiffs Rely Upon The Proposed Testimony Of Levitt And Spitzen To Prove That The 13 Charities Were The Alter Egos Of And/Or Controlled By Hamas</u>

278.    Plaintiffs contend that the following 13 Charities were during the Relevant

Transfer Period "alter egos of and/or controlled by Hamas": Al-Mujama al-Islami-Gaza (the

Islamic Center-Gaza); Al- Jam'iya al-Islamiya-Gaza (the Islamic Society-Gaza); Al-Salah

Islamic Association-Gaza (Jam'iyat al-Salah al-Islamiya-Gaza); Al-Wafa Charitable Society-

Gaza (Jam'iyat al-Wafa al-Khiriya-Gaza); Islamic Charitable Society-Hebron (Al-Jam'iya al-

Khiriya al-Islamiya al-Khalil); Jenin Zakat Committee (Lajnat al-Zakaa Jenin); Nablus Zakat

Committee (Lajnat al-Zakaa Nablus); Al-Tadamun Charitable Society-Nablus (Jam'iyat Al-

Tadamun al-Khiriya al-Islamiya Nablus); Tulkarem Zakat Committee (Lajnat al-Zakaa

Tulkarem); Ramallah-al Bireh Zakat Committee (Lajnat al-Zakaa Ramallah wal-Bireh); Al-Islah

Charitable Society-Ramallah & Al-Bireh (Jam'iyat al-Islah al-Khiriya al-Ajithamiya Ramallah

al-Bireh); Beit Fajar Zakat Committee (Lajnat al-Zakaa Beit Fajar); and Jerusalem Central Zakat

Committee (Lajnat al-Zakaa al-Markaziya al-Quds). Id. (Plaintiffs' Resp. to Cont. Interrog. no.

11).

279.    Plaintiffs rely upon the expert reports and proposed testimony of Levitt

and Spitzen to prove that the 13 Charities were "alter egos of and/or controlled by Hamas." Id.

280.    Plaintiffs cite no other evidence other than the expert reports, documents

cited in those expert reports and proposed testimony of Levitt and Spitzen in support of

plaintiffs' contention that the 13 Charities were "alter egos of and/or controlled by Hamas." Id.

281.    According to Levitt's December 30, 2010 expert report, plaintiffs asked

him to provide expert testimony about, among other things, whether all of the 13 Charities

except the ████████████████████ "were, in fact, controlled by, or alter-egos of,

Hamas at the time [NatWest] transferred funds to them." Schuster Dec. Ex. 152 (Levitt NW

Rep. at 1); Ex. 148 (Levitt NW Tr. at 11:8-19) (correcting sentence).

282.    According to Spitzen's November 30, 2010 expert report, plaintiffs asked

him to provide expert testimony with respect to, among other things, whether the 13 Charities

"were, in fact, under the control of Hamas or identified with Hamas at the time that National

Westminster Bank transferred funds to them." Schuster Dec. Ex. 153 (Spitzen NW Rep. at 1).

283.    Plaintiffs do not rely upon the November 2009, August 2010 or December

2010 expert reports of Wayne Geisser (the "Geisser Reports"), which summarize the Identified

Interpal Transfers based upon NatWest's banking records, as expert opinion evidence that the 13

Charities were "alter egos and/or controlled by Hamas." See Schuster Dec. Ex. 154 (CL 56.1

Response ¶ 288).

284.    Geisser testified that his firm used the same process and methodology to

create the portions of the Geisser Reports as to NatWest transactions as it used to create the

portions of the Geisser Reports as to CL transactions. See Schuster Dec. Ex. 155 (Geisser Tr.

51:4-21).

**E.   The Absence Of Evidence That The 13 Charities Were The Alter Egos Of And/Or Controlled By Hamas**

285.    Hamas was founded in 1987. See Schuster Dec. Ex. 156 (Weiss Fifth Am.

Cmpl. ¶ 442); Ex. 157 (Applebaum Cmpl. ¶ 290).

286.    Hamas was designated a Specially Designated Terrorist ("SDT") on

January 23, 1995. See Schuster Dec. Ex. 156 (Weiss Fifth Am. Cmpl. ¶¶ 449-50); Ex. 157

(Applebaum Cmpl. ¶¶ 297-98).

287.    The U.S. Secretary of State designated Hamas as a Foreign Terrorist

Organization ("FTO") on October 8, 1997. See Schuster Dec. Ex. 156 (Weiss Fifth Am. Cmpl.

¶ 452); Ex. 157 (Applebaum Cmpl. ¶ 300).

288.    Hamas was designated a Specially Designated Global Terrorist ("SDGT")

after September 11, 2001. See Schuster Dec. Ex. 156 (Weiss Fifth Am. Cmpl. ¶ 453-54); Ex.

157 (Applebaum Cmpl. ¶ 301-02).

289.    None of the 13 Charities has ever been designated as an SDT or an FTO

by the United States government.

290.    None of the 13 Charities was designated as an SDGT by the United States

government during the Relevant Transfer Period.

-64-

291.    Only one of the 13 Charities, the Al-Salah Society, has ever been designated as an SDGT by the United States government, and it was so designated on August 7, 2007.  Schuster Dec. Ex. 153 (Spitzen NW Rep. at 65).

292.    The U.S. government's designation of the Al-Salah Society was made nearly two years after the last of the Identified Interpal Transfers occurred.  Id. (Spitzen NW Rep. at 65); Ex. 146 (Geisser 2009 Rep., Ex. D).

293.    The 12 Charities were licensed by the Israeli Military Authority prior to the establishment of the Palestinian Authority in 1993.  Schuster Dec. Ex. 149 (Levitt CL Tr. at 202:9-17).

294.    Ten of the 13 Charities predated Hamas's founding in 1987.  Schuster Dec. Ex. 153 (Spitzen NW Rep. at 39 (Al-Mujama al-Islami founded in 1973), 52 (Al-Jam'iya al-Islamiya in 1976), 65 (Al-Salah Islamic Society in 1978), 74 (El Wafa Charitable Society in 1980), 78 (Islamic Charitable Society–Hebron in 1962), 91 (Jenin Zakat Committee in 1985), 102 (Nablus Zakat Committee in 1977), 110 (Al-Tadamun Charitable Society in 1956), 119 (Tulkarem Zakat Committee in 1981), 127 (Ramallah–al Bireh Zakat Committee in 1977)); Ex. 152 (Levitt NW Rep. at 59 (Al-Mujama Al-Islami in 1978), 61 (Al-Jam'iya Al-Islamiya in 1976), 67 (El Wafa Charitable Society in 1980), 81 (Ramallah–Al Bireh Zakat Committee in 1978)); Ex. 149 (Levitt CL Tr. at 56:21-57:5,123:21-124:5).

295.    During the Relevant Transfer Period, the 12 Charities were required to be registered with the Palestinian Authority.  Schuster Dec. Ex. 149 (Levitt CL Tr. at 203:3-203:8).

296.    During the Relevant Transfer Period, the 12 Charities were formally subordinate to ministries within the Palestinian Authority government.  Schuster Dec. Ex. 151 (Spitzen CL Tr. at 158:2-159:15).

297.     During the Relevant Transfer Period, the 12 Charities each had a board of directors.  Schuster Dec. Ex. 149 (Levitt CL Tr. at 212:4-213:17).

298.     During the Relevant Transfer Period, the Palestinian Authority had to approve the elections of the members of the board of directors of the 12 Charities.  Id. (Levitt CL Tr. at 204:17-205:14).

299.     During the Relevant Transfer Period, the books and records of the 12 Charities were overseen by Palestinian Authority ministries.  Id. (Levitt CL Tr. at 206:4-21).

300.     During the Relevant Transfer Period, the 13 Charities each had a board of directors.  Schuster Dec. Ex. 151 (Spitzen CL Tr. at 160:4-8).

301.     The boards of some of the 13 Charities included non-Hamas members, as well as Hamas members.  Id.  (See Spitzen CL Tr. at 166:14-170:8).

302.     Levitt does not know whether all of the members of the boards of the 12 Charities were Hamas members, but stated that it "varies" as to what percentages of the boards tend to be Hamas members.  Schuster Dec. Ex. 149 (Levitt CL Tr. at 213:18-214:18).

303.     Neither Spitzen's nor Levitt's report identifies all of the board members of the 13 Charities during the Relevant Transfer Period.

304.     The only board members identified in Spitzen's report are either Hamas members or those he considers to be aligned with Hamas.

305.     Spitzen's report does not analyze whether there were members of the boards of the 13 Charities who were not members of Hamas.

306.     Levitt's report does not analyze whether there were members of the boards of the 13 Charities who were not members of Hamas.

307.   Neither Spitzen's nor Levitt's report analyzes whether any of the board members of the 13 Charities who were associated with Hamas actually controlled the charity for the purpose of serving Hamas.

308.   Neither Levitt nor Spitzen have offered any evidence of "commingling" of funds between the 13 Charities and Hamas.

309.   Each of the 13 Charities maintained its own bank accounts.  Schuster Dec. Ex. 151 (Spitzen CL Tr. at 233:23-234:4); Ex. 149 (Levitt CL Tr. at 168:5-13).

310.   The bank accounts of the 13 Charities were maintained in their own names or the names of the treasurer or the head of the entity.  Schuster Dec. Ex. 151 (Spitzen CL Tr. at 233:23-234:4).

311.   According to the Geisser Reports, none of the bank account numbers associated with the 13 Charities to which Interpal transferred funds from its NatWest accounts was shared among any of the 13 Charities.  Schuster Dec. Ex. 146 (Geisser 2009 Rep., Ex. D).

312.   Spitzen does not know how much money was required for the daily operations of the 13 Charities.  Schuster Dec. Ex. 151 (Spitzen CL Tr. at 233:14-22).

313.   Levitt testified that there is no central Hamas treasury from which Hamas funds social programs.  Schuster Dec. Ex. 149 (Levitt CL Tr. at 170:24-171:11).

314.   With regard to the reference in his report that "Hamas deems legitimate the mingling of these funds" for social welfare and terrorist activities, Schuster Dec. Ex. 152 (Levitt NW Rep. at 13), Levitt testified that it was "possible though it's less common" that "money could be raised by a charity where the pitch is to give to educational needs and then the money actually is diverted to purchase bullets or what have you."  Schuster Dec. Ex. 148 (Levitt NW Tr. at 37:2-11).

-67-

315.    Levitt testified that it was "less common" for money that Interpal transferred to a charity in the West Bank that was intended for charitable uses to be used for military activity.  Id. (Levitt NW Tr. at 42:18-43:12).

316.    When asked about whether funds sent to a charity in the West Bank by Interpal would have been diverted from the charity and used for military activity, Levitt stated that "[t]here are instances where monies that were raised for purportedly charitable purposes are then used or law enforcement believes they were used in a particular attack, but those are more rare."  Id. (Levitt NW Tr. at 42:18-43:17).

317.    Neither Levitt nor Spitzen has provided any evidence that any of the 13 Charities disregarded corporate formalities or shared any offices or property.

318.    Neither Spitzen nor Levitt has analyzed whether any of the 13 Charities engaged in any activities on behalf of Hamas, instead of in furtherance of their own charitable goals.

319.    Spitzen admitted that he did not try to determine which decisions and actions taken by the 13 Charities were taken and made by individuals because of their roles at the 13 Charities and what decisions were made by them as members of Hamas.  Schuster Dec. Ex. 151 (Spitzen CL Tr. at 204:14-205:16).

320.    Spitzen is unaware of any written instruction from Hamas directing any of the 13 Charities to take a specific action.  Id. (Spitzen CL Tr. at 170:25-171:21).

321.    Neither Levitt's nor Spitzen's report identifies evidence of any written instruction from Hamas directing any of the 13 Charities to take a specific action.

322.    Neither Spitzen's nor Levitt's report identifies any evidence of any oral directions by Hamas to the 13 Charities.

-68-

323.   Neither Spitzen's nor Levitt's report identifies any actual transactions between Hamas and the 13 Charities.

324.   Neither Spitzen's nor Levitt's report shows that any transactions between the 13 Charities and Hamas were not at arms' length.

325.   Neither Spitzen's nor Levitt's report identifies any transfers from the 13 Charities to Hamas.

326.   Neither Spitzen's nor Levitt's report identifies any transfers from Hamas to the 13 Charities.

327.   The only examples that plaintiffs have cited as evidence in Spitzen's report that the 13 Charities "transferr[ed] money to HAMAS operatives" are (a) Spitzen's statements that certain Hamas terrorists studied at or were active in schools run by the Islamic Charitable Society-Hebron; (b) Spitzen's statement that the "second in importance in the organizational hierarchy" of the Jenin Zakat Committee was convicted for transfers to family members of Hamas operatives; and (c) Spitzen's statement that a book-keeper of the al-Tadamun Charitable Society was convicted for transferring funds to a senior Hamas operative, when Spitzen also notes that the same book-keeper was fired by the Palestinian Authority from his job with al-Tadamun and forced to sign a document stating that he would never take part in al-Tadamun due to his ties with Hamas.  See Schuster Dec. Ex. 154 (CL 56.1 Response ¶ 337) (citing Spitzen CL Rep. at 79, 87, 106); Schuster Dec. Ex. 153 (Spitzen NW Rep. at 85-86, 93, and 115) (corresponding to Spitzen CL Rep. at 79, 87, and 106).

328.   Neither Spitzen nor Levitt's report shows that Hamas loaned money to or guaranteed the loans of any of the 13 Charities.

329.    Levitt is unaware of any instances in which Hamas loaned money to, or guaranteed the loans of, any of the 12 Charities. Schuster Dec. Ex. 149 (Levitt CL Tr. at 224:21-226:6).

330.    Spitzen testified that Hamas does not publicize its association with any charitable entities operating in the Palestinian Territories. Schuster Dec. Ex. 158 (Spitzen Arab Bank Tr. at 96:4-10).

331.    Levitt's report states that NatWest "transmitted funds at the behest of [Interpal] to entities and individuals in the Palestinian Territories or abroad who are controlled by, affiliated with, fundraise for, serve as alter egos or departments of, or otherwise support Hamas." Schuster Dec. Ex. 152 (Levitt NW Rep. at 3).

332.    Levitt testified that his phrase "entities and individuals" refers to the 12 Charities or an individual at one of the 12 Charities. Schuster Dec. Ex. 149 (Levitt CL Tr. at 133:13-134:7).

333.    Levitt testified that he did not determine which of the 12 Charities fit into which of the categories identified in paragraph 331 above – "controlled by," "affiliated with," "fundraise for," "alter ego," "department of" and "otherwise supports." Id. (Levitt CL Tr. at 141:4-142:20).

334.    Levitt testified that the categories identified in paragraph 331 were "meant to show the spectrum of variation" as opposed to showing that an organization fits into one category as opposed to another. Id. (Levitt CL Tr. at 141:14-142:20).

335.    When asked what he meant when he referred to each of the categories along his "spectrum," Levitt defined each category as follows:

> (a)    "controlled by": "[S]ome persons, well, some entities that are affiliated with Hamas are a little more independent and they may

-70-

have a Hamas guy who worked there and is able to take advantage on behalf of the organization and others I think we cite one in the report that the other end of the extreme and of course there's plenty in the middle are actually founded by Hamas for the express purpose of raising and/or serving as a means of transferring funds you could have either of those extremes or of course pretty much anyone in the middle." Id. (Levitt CL Tr. at 138:10-24).

(b)    "affiliated with": "I don't know that I had a specific definition other than to be able to demonstrate in some of these cases you have groups that may be legally independent entities. Like I said, you don't have the shingle hanging out the front door, but they do in fact have affiliations with Hamas and as we get into the report as I'm sure you are well aware there's all kinds of affiliations we get into. You know, Hamas operatives working for the charity or the charity being led by Hamas operatives, etc. so this is meant to capture those types of affiliations." Id. (Levitt CL Tr. at 134:24-135:17).

(c)    "fundraise for": "Fundraise for means raises money for." Id. (Levitt CL Tr. at 135:18-22).

(d)    "alter ego": "Some of these the way Hamas uses entities like this is to further the overall – some overall mission or objective of Hamas and therefore they can serve as an alter ego of the organization even if they are never listed on the organizational chart as such, but could be fulfilling a mission for the core entity and therefore is serving as an alter ego for it." Id. (Levitt CL Tr. 136:3-21). When asked to expound upon this, Levitt clarified that "you can have a situation where a person or entity who's affiliated with Hamas is doing something on behalf of the organization and that fulfills a need or an objective of the organization and in that sense maybe only in that particular act or maybe on a larger scale could be acting as an alter ego for." Id. (Levitt CL Tr. at 137:5-17).

(e)    "department of": "There are in fact entities that you could describe as departments, actual departments or branches of Hamas that the Hamas structure does involve various committees including fundraising committee, education committee and some of the charities that are affiliated with Hamas do interact with and do in some cases actually function as part of the activities of those committees." Id. (Levitt CL Tr. at 137:18-138:9).

(f)    "otherwise supports": "[I]n some cases Hamas has recruited through these institutions or used these institutions for the benefit of some other logistical support and those other types of support

-71-

beyond the strict provision of monies are also very important of course." Id. (Levitt CL Tr. at 138:25-139:14).

336.     Spitzen testified that from 2001 to 2009 he served as Commander of the Palestinian Affairs Department ("PAD") within the Israeli Ministry of Defense.  Schuster Dec. Ex. 151 (Spitzen CL Tr. at 123:3-13).

337.     Spitzen bases his qualifications as an expert on his experience at the PAD. Schuster Dec. Ex. 153 (Spitzen NW Rep. at 2).

338.     Spitzen testified that Israel declares an organization to be illegal only after "a very long procedure that goes through a very detailed judicial examination" of the evidence to determine whether the organization meets "all the criteria" for being outlawed.  Schuster Dec. Ex. 151 (Spitzen CL Tr. at 132:3-24).

339.     Spitzen's 18-step methodology for determining whether a charity is an alter ego or under the control of Hamas is different from that used by Israel to declare an organization illegal based upon its involvement with Hamas.  Id. (Spitzen CL Tr. at 131:4-132:24).

340.     Levitt testified that the 12 Charities, and Spitzen testified that the 13 Charities, all perform charitable work in the Palestinian Territories.  Schuster Dec. Ex. 149 (Levitt CL Tr. at 340:24-341:12); Ex. 151 (Spitzen CL Tr. at 281:18-282:7).

341.     Spitzen's report lists multiple examples of the 13 Charities performing charitable work in the Palestinian Territories.  Schuster Dec. Ex. 153 (Spitzen NW Rep. at 48-49 (Al-Mujama al-Islami), 60-61 (Al-Jam'iya al-Islamiya), 70-71 (Al-Salah Islamic Society), 75-76 (El Wafa Charitable Society), 85 (Islamic Charitable Society–Hebron), 96-97 (Jenin Zakat Committee), 106-07 (Nablus Zakat Committee), 116 (Al-Tadamun Charitable Society), 123 (Tulkarem Zakat Committee), 132 (Ramallah–al Bireh Zakat Committee), 140 (Al-Islah

Charitable Society), 146 (Beit Fajar Zakat Committee), 152 (Jerusalem Central Zakat

Committee)).

        342.    Spitzen testified that the 13 Charities provided the social services they said

they were providing.  Schuster Dec. Ex. 151 (Spitzen CL Tr. at 281:18-282:7).

        343.    USAID, an agency of the U.S. government, approved several of the 13

Charities to receive USAID funding in December 2002.  Schuster Dec. Ex. 159 (Matthew Levitt,

"Better Late Than Never: Keeping USAID Funds out of Terrorist Hands," Washington Institute

for Near East Policy, Policy Watch # 1277 (August 24, 2007) (noting that USAID cleared main

charity committees in Jenin, Hebron, Tulkarem, Nablus, and Al-Tadhoman to receive funding)).

        344.    USAID, foreign government agencies and U.S. and foreign NGOs and

corporations have funded certain of the 13 Charities, or institutions that Spitzen and Levitt claim

were controlled by certain of the 13 Charities, both during and after the Relevant Transfer

Period.  Schuster Dec. Ex. 160 (Matthew Levitt, "How Not to Fund Hamas:  Scrutinize Those

Who Receive U .S. Aid," New York Daily News, February 4, 2009 (stating that USAID

provided more than $140,000 to the "Hamas-controlled" Islamic University of Gaza)); Ex. 153

(Spitzen NW Rep. at 39 n.146 (claiming *Al-Mujama al-Islami* took over Islamic University of

Gaza in 1983 and transformed it into its "main power base, and later that of Hamas")); Ex. 161

("Enter Hamas: The Challenges of Political Integration," International Crisis Group Middle East

Report No. 49, January 18, 2006, at 23 n.190 (noting that the Salah Association received funds

from USAID in 2004), 24 ("The British Council, the cultural arm of the UK government, was

one of several donors implementing projects at the Islamic University in Gaza"), 24 n.197

(noting that Islamic University of Gaza received $ 1 million in funding from Intel and ANERA, a

U.S. NGO, for computers)); Ex. 162 (Emanuel Schäublin, Role and Governance of Islamic

Charitable Institutions: The West Bank Zakat Committees (1977-2009) in the Local Context,
Centre on Conflict, Development, and Peacebuilding Working Paper (2009), at 25 (noting that
Al Razi hospital in Jenin received funding from the governments of Italy and Canada), 31
(noting that French, Italian and Canadian governments have helped medical institutions, such as
clinics and hospitals, of zakat committees to build specialized sections), 31 (noting that UNDP
and ANERA cooperated with zakat committees to distribute food and medication until 2006);
Ex. 153 (Spitzen NW Rep. at 96 (claiming that Al Razi hospital was founded by and is currently
operated by the Jenin Zakat Committee)); Ex. 163 (Jeroen Gunning, "Terrorism, charities and
diasporas: Contrasting the fundraising practices of Hamas and al Qaeda among Muslims in
Europe," in Countering the Financing of Terrorism (Thomas J. Biersteker & Sue E. Eckert eds.
2008), at 100 ("Save the Children, USAID, Médecins sans Frontiéres, and Medical Aid for
Palestine are among the international, non-Islamic charities that have contributed at one time or
another to charities affiliated with Hamas, precisely because they have observed that
contributions reach their intended destination.")).

**F.   Levitt's and Spitzen's Opinions Are Inadmissible**

(1)   Levitt and Spitzen aggregate hearsay

345.   Levitt's report repeatedly cites to the "Watson Memorandum" as support
for assertions Levitt makes about certain of the 12 Charities and their members.  Schuster Dec.
Ex. 152 (Levitt NW Rep. at 15 n.88; 21 n.122; 23 n.133; 37 n.209; 68 nn.424-25; 70 nn.437-39,
442-43, 445-50; 71 nn.451, 453-54; 73 nn.466-70; 84 nn.567-72; 85 nn.574-78, 582-84).

346.   Spitzen's report repeatedly cites to the "Watson Memorandum" as support
for the assertions he makes about certain of the 13 Charities and their members.  Schuster Dec.
Ex. 153 (Spitzen NW Rep. at 84 n.446; 85 n.449; 95 nn.508, 512; 120 nn.678, 685; 129 nn.744,
747; 130 n.756).

347.   The "Watson Memorandum" is dated November 5, 2001 and purportedly was prepared by Dale Watson, Assistant Director, Counterterrorism Division of the U.S. Federal Bureau of Investigation.  Schuster Dec. Ex. 149 (Levitt CL Tr. at 144:7-144:19, 247:13-248:13).

348.   The "Watson Memorandum" repeatedly cites, paraphrases or quotes statements that it attributes to representatives of the government of Israel ("GOI") in its discussion of the particular entities it addresses, which includes some of the 13 Charities. Schuster Dec. Ex. 164 (Levitt CL Dep. Ex. 4 at 29, 32, 34, 38).

349.   Levitt's report repeatedly cites the testimony of an anonymous witness who testified at the U.S. government's retrial of the Holy Land Foundation, who was identified at that retrial under the pseudonym "Avi."  Schuster Dec. Ex. 152 (Levitt NW Rep. at 71 n.452; 75 n.484, 487; 76 nn.489; 77 nn.495, 498, 501, 506; 78 nn.510-12; 81 n.543; 83 nn.554-55).

350.   According to Levitt, he cannot reveal the true identity of "Avi."  Schuster Dec. Ex. 149 (Levitt CL Tr. at 228:4-13).

351.   "Avi" testified as an expert witness at the Holy Land Foundation retrial concerning findings purportedly made by the Israel Defense Forces concerning certain of the 12 Charities.  Schuster Dec. Ex. 152 (Levitt NW Rep. at 71 n.452; 78 nn.510-12).

352.   Levitt testified that he never discussed with "Avi" his testimony at the Holy Land Foundation trial.  Schuster Dec. Ex. 149 (Levitt CL Tr. at 227:7-11).

353.   Levitt's report repeats or summarizes information from the testimony of "Avi" as to what Israel Defense Forces personnel purportedly found on the premises of certain of the 12 Charities.  Schuster Dec. Ex. 152 (Levitt NW Rep. at 71 n.452; 78 nn.510-12 (asserting that propaganda materials were found at the Nablus Zakat Committee based only on "Avi's" testimony that this occurred)).

-75-

354.    Levitt's report paraphrases or quotes directly from the testimony of "Avi" as support for assertions he makes about certain of the 12 Charities. Id. (Levitt NW Rep. at 76 n.489; 77 n.506).

355.    Spitzen's report repeatedly cites to exhibits introduced into evidence at the Holy Land Foundation retrial. Schuster Dec. Ex. 153 (Spitzen NW Rep. at 62 nn.315, 317; 83 nn.436, 438; p. 84 nn.439, 443; 88 nn.467-68, 470; 98 nn.533; 99 nn.536, 538, 539; 100 nn.540-42, 544; 101 n.545; 107 nn.590-92; 108 n.595; 127 nn.727-29; 130 nn.755, 757; 133 nn.775-77; 134 n.782; 152 nn.886, 889).

356.    Spitzen's report cites to exhibits introduced into evidence at the Holy Land Foundation retrial as support for assertions he makes about certain of the 13 Charities and their members. Id. (Spitzen NW Rep. at 62 nn.315, 317; 83 nn.436, 438; p. 84 nn.439, 443; 88 nn.467-68, 470; 98 nn.533; 99 nn.536, 538, 539; 100 nn.540-42, 544; 101 n.545; 107 nn.590-92; 108 n.595; 127 nn.727-29; 130 nn.755, 757; 133 nn.775-77; 134 n.782; 152 nn.886, 889).

357.    Spitzen testified that he did not visit any of the 13 Charities between 2000 and 2004. Schuster Dec. Ex. 151 (Spitzen CL Tr. at 160:13-15).

358.    Spitzen cites to exhibits introduced into evidence at the Holy Land Foundation retrial for assertions as to what Israel Defense Forces found on the premises of certain of the 13 Charities. Schuster Dec. Ex. 153 (Spitzen NW Rep. at 88 nn.467-68, 470; 98 n.533; 99 n.536; 107 nn.590-92; 108 n.595).

359.    Levitt repeatedly quotes directly from a November 28, 2002 German Intelligence Service (BND) letter as support for assertions he makes about the 12 Charities and their purported connections to Hamas. Schuster Dec. Ex. 152 (Levitt NW Rep. at 64-65, 67, 72, 75, 80-81, 83, 90 and 91); Ex. 165 (Levitt CL Dep. Ex. 8).

360.    Levitt's report repeatedly cites reports published by the Center for Special Studies/Intelligence and Terrorism Information Center ("C.S.S."), an Israeli NGO, as support for assertions he makes about the 12 Charities and their purported connections to Hamas.  Schuster Dec. Ex. 152 (Levitt NW Rep. at 78-80 nn.516, 519, 521-25, 528-31).

361.    Spitzen repeatedly cites to information reported by C.S.S.  Schuster Dec. Ex. 153 (Spitzen NW Rep. at 63 n.320; 78 n.394; 95 nn.505, 507; 111 nn.607-10; 116 nn.659-60; 117 nn.661, 664; 124 nn.718, 720, 722; 141 nn.824-25).

(2)    Levitt's and Spitzen's methodologies

(a)    Levitt

362.    When asked to explain his research methods, Levitt confirmed that he previously testified that he tells analysts to "exploit all sources, looking at books, talking to other scholars, journals, keeping on top of information and ... the most important thing is conducting primary field research – going out and interviewing people, meeting people, spending time in the region."  Schuster Dec. Ex. 149 (Levitt CL Tr. at 87:14 -88:4).

363.    Levitt testified that he has never visited any of the 12 Charities.  Id. (Levitt CL Tr. at 110:21-23).

364.    Levitt testified that he did not review any of the audited books and records of any of the 12 Charities.  Id. (Levitt CL Tr. at 206:4-7).

365.    Levitt testified that he has never spoken with any members of the 12 Charities.  Id. (Levitt CL Tr. at 110:24-111:4).

366.    Levitt testified that he has not spoken with any Hamas members who are not incarcerated.  Id. (Levitt CL Tr. at 111:5-10).

367.    With respect to one of the reasons why he did not meet with the 12 Charities, Levitt testified that "for the purpose of this type of analysis where you are trying to

-77-

figure out if illicit activity is in fact happening when you already have information suggesting

that it is, it's kind of like asking if a person who's researching organized crime asks Al Capone

are you a crime boss." Id. (Levitt CL Tr. at 111:21-112:21).

        368.   The following sources cite field research on some of the same 12 Charities

on which Levitt opines, including primary source interviews.  Schuster Dec. Ex. 163 (Jeroen

Gunning, "Terrorism, charities and diasporas: Contrasting the fundraising practices of Hamas

and al Qaeda among Muslims in Europe," in Countering the Financing of Terrorism (Thomas J.

Biersteker & Sue E. Eckert eds. 2008), at 99 (noting that charities considered to be affiliated with

Hamas are organizationally independent from the political and resistance wings)); Ex. 166

("Islamic Social Welfare Activism In The Occupied Palestinian Territories: A Legitimate

Target?"  International Crisis Group Middle East Report No. 13 (April 2, 2003) at 11 (noting that

funding for charities considered to be affiliated "is anything but centralised" and questioning

what "affiliation" of charities means in political context in Palestinian territories)); Ex. 167

(Jonathan Benthall, The Palestinian Zakat Committees 1993-2007 and Their Contested

Interpretations, Program for the Study of International Organization(s) Occasional Paper 1/2008,

Geneva: Graduate Institute of International and Development Studies, at 8-9 (criticizing the idea

that charitable organizations affiliated with Hamas "are in effect its subsidiaries")); Ex. 162

(Emanuel Schäublin, Role and Governance of Islamic Charitable Institutions: The West Bank

Zakat Committees (1977-2009) in the Local Context, The Centre on Conflict, Development, and

Peacebuilding Working Paper (2009), at 11-14 (citing several scholars for the proposition that

charities considered to be affiliated with Hamas are largely autonomous entities)).

369.    Levitt's report states that Hamas's social welfare activities help provide "logistical and operational support for weapons smuggling, reconnaissance, and acts of terror from suicide bombings to rocket fire." Schuster Dec. Ex. 152 (Levitt NW Rep. at 2).

370.    Levitt's report does not cite any authority for this claim. Id.

371.    The portions of Levitt's report that plaintiffs have identified as authority to support this claim do not identify a specific instance in which one of the 12 Charities provided "logistical and operational support for weapons smuggling, reconnaissance, and acts of terror from suicide bombings to rocket fire," or in which a leader of one of the 12 Charities used the charity for any such purposes. See Schuster Dec. Ex. 154 (CL 56.1 Response ¶ 386 (identifying Levitt CL Rep. at 13-20)); Ex. 152 (Levitt NW Rep. at 13-20 (corresponding to Levitt CL Rep. at 13-20)).

372.    Levitt's report states that "Hamas prizes its hospitals because it can use them to build grassroots support, procure chemicals necessary to making explosives and facilitate terrorist attacks." Schuster Dec. Ex. 152 (Levitt NW Rep. at 86).

373.    Levitt's report does not cite any authority for this claim. Id. (Levitt NW Rep. at 86).

374.    Levitt's report does not identify any specific instances in which a hospital built grassroots support or procured chemicals necessary to making explosives and facilitating terrorist attacks.

375.    Levitt is not aware that any of the 12 Charities "procur[ed] chemicals to make explosives for terrorist attacks." Schuster Dec. Ex. 149 (Levitt CL Tr. at 201:10-13).

376.    Levitt testified that his report did not provide a citation for this statement, adding it is "a general statement." Id. (Levitt CL Tr. at 201:14-21).

377.   Levitt's report states that "Hamas aid does in fact buy the support of those who benefit from its largesse" via social welfare activities, and also states, "For example recipients are unlikely to turn down requests to participate in the *da'wa*'s logistical support activities by allowing their homes to serve as safe houses for Hamas fugitives moving from place to place to avoid capture." Schuster Dec. Ex. 152 (Levitt NW Rep. at 20-21).

378.   Levitt's report does not cite any authority for these claims. Id.

379.   Levitt's report does not connect these assertions to any of the 12 Charities. Id.

380.   Levitt states in his report that "Hamas deems legitimate the mingling of these funds, as it considers the social services it provides a jihadist extension of its terrorist attacks." Id. (Levitt NW Rep. at 13).

381.   Levitt's report does not cite any authority for this claim. Id.

382.   The portions of Levitt's report that plaintiffs have identified as authority to support Levitt's claim that "Hamas deems legitimate the mingling of funds" do not identify specific instances of mingling of funds between the 12 Charities and Hamas, except for one instance in which it is stated that the head of one of the charities, the Al-Islah Charitable Association, confessed to laundering funds through the charity for suicide bombings. Schuster Dec. Ex. 154 (CL 56.1 Response ¶¶ 390, 397 (identifying Levitt's CL Report at 7, 13, 21-24, and 87)); Ex. 152 (Levitt NW Rep. at 7, 13, 21-25, and 89-90 (corresponding to CL Report at 7, 13, 21-24, and 87)).

383.   Levitt testified that each of the 12 Charities had its own bank accounts. Schuster Dec. Ex. 149 (Levitt CL Tr. at 168:5-13).

384.    When asked for a specific example of an instance in which any of the 12 Charities used money that was given to them to buy weapons, Levitt could not do so. Id. (Levitt CL Tr. at 168:14-21).

385.    Levitt testified that there is no central Hamas treasury or repository for funds for military, political and social programs. Id. (Levitt CL Tr. at 170:24-171:11).

386.    The example Levitt used in his CL report to support the assertion that Hamas "deems legitimate the mingling of these funds" was, according to Levitt's CL report, a webpage of the Muslim Brotherhood, described in an article Levitt cited from the International Institute for Counter-Terrorism. Schuster Dec. Ex. 168 (Levitt CL Rep. at 13).

387.    The source Levitt cited in his CL report for this example did not contain anything about alleged legitimization of the mingling of military and social service funds. Schuster Dec. Ex. 169 (Levitt CL Dep. Ex. 7).

388.    Levitt subsequently identified another source for this assertion in his report in these lawsuits. Schuster Dec. Ex. 152 (Levitt NW Rep. at 13 n.80).

389.    The new source is a web page of the Israel Defense Forces, which does not refer to any "mingling" of funds. Schuster Dec. Ex. 170 (Levitt NW Dep. Ex. 4).

390.    Levitt states in his report: "As the following excerpt from the Charity Commission's report indicates, the Commission's analysis was not predicated upon the question of whether Interpal funded Hamas, but instead addressed the narrower question of whether the funds were directed toward 'charitable' activities rather than other activities (including violent operations) Hamas involved itself with: 'The allegation that funds were going to Hamas and in particular the families of suicide bombers was not of direct concern so long as the funds were being applied within the object of the charity. In the area of benefit we anticipate that a large

number of people will support Hamas. Relief cannot be denied to them because of that support but we needed to ensure, to the best of our abilities, that funds were not being given because of a person's support of Hamas.'" Schuster Dec. Ex. 152 (Levitt NW Rep. at 40-41) (emphasis added).

391.    Levitt's report cites as support for this claim the 1996 Charity Commission report. Id. (Levitt NW Rep. at 40-41 n.230); Ex. 148 (Levitt NW Tr. at 75:4-18) (correcting footnote).

392.    The 1996 Charity Commission Report actually states as follows: "The allegation that funds were going to <u>supporters of Hamas</u> and in particular the families of suicide bombers was not of direct concern so long as the funds were being applied within the objects of the charity. In the area of benefit we anticipate that a large number of people will support Hamas. Relief cannot be denied to them because of that support but we needed to ensure, to the best of our abilities, that funds were not being given *because* of a person's support of Hamas." Schuster Dec. Ex. 171 (Levitt NW Dep. Ex. 8 at WS 081307) (emphasis added).

393.    Levitt admitted at his deposition that his purported quotation from the 1996 Charity Commission Report in his report in these lawsuits was mistaken, and that the phrase "supporters of Hamas" should have appeared in place of the word "Hamas" in the first sentence of his purported quotation. Schuster Dec. Ex. 148 (Levitt NW Tr. at 76:10-77:13).

394.    Levitt testified that his CL Report served as a template for his NatWest report. Id. (Levitt NW Tr. at 20:20-23).

395.    Levitt testified that he prepared his NatWest report after his deposition in the lawsuits against CL. Id. (Levitt NW Tr. at 21:13-16).

-82-

396.    Levitt testified that when preparing his NatWest report he had an opportunity to make any changes to his CL report that he considered appropriate, and that he did make changes for his NatWest report. Id. (Levitt NW Tr. at 20:24-21:8).

397.    Levitt testified that to the best of his knowledge he corrected all the items in his CL Report he was aware of and that he believed needed correction. Id. (Levitt NW Tr. at 21:9-12, 22:9-17).

398.    Levitt testified that when preparing his NatWest report he had the opportunity to add any additional points to his CL Report that he thought were relevant to his NatWest report, including any additional support for any of his opinions. Id. (Levitt NW Tr. at 22:18-23:3).

399.    Levitt testified that when preparing his NatWest report he had the opportunity to remove any statement or source from his CL Report that he no longer thought was appropriate to include. Id. (Levitt NW Tr. at 23:4-9). ·

400.    Levitt testified that it is important to consider different perspectives as part of his general methodology. Schuster Dec. Ex. 149 (Levitt CL Tr. at 90:17-20).

401.    Levitt testified that governments have information that he, as a private citizen, is unaware of, because they have an ability to collect information beyond what he can collect and because of their "sources and methods and their interest in focusing on groups that are engaged in terrorism." Id. (Levitt CL Tr. at 99:15-101:3).

402.    Levitt testified that the Charity Commission conducted three reviews of Interpal, in 1996, 2003 and 2009. Schuster Dec. Ex. 148 (Levitt NW Tr. at 50:23-51:10).

403.    Levitt testified that Interpal is currently, and was throughout the time period covered in his report, a registered charity in England. Id. (Levitt NW Tr. at 49:18-50:3).

-83-

404.     Levitt cites the fact that Interpal was designated by OFAC as an SDGT on August 22, 2003 as evidence that Interpal is "the principal and most important fundraising organization for Hamas in the United Kingdom." Schuster Dec. Ex. 152 (Levitt NW Rep. at 35-40).

405.     Levitt's report does not mention that 11 of the 12 Charities have never been designated as an SDGT.

406.     The only one of the 12 Charities to be designated an SDGT, the Al-Salah Society, was so designated on August 7, 2007. Id. (Levitt NW Rep. at 65).

407.     The U.S. government's designation of the Al-Salah Society was made nearly two years after the last of the Identified Interpal Transfers occurred. Schuster Dec. Ex. 146 (Geisser 2009 Rep., Ex. D).

408.     Levitt repeatedly cites in his report Ziad Abu Amr, a Palestinian "academic" and "government minister." Schuster Dec. Ex. 152 (Levitt NW Rep. at 5 n.14; 6 n.21; 7 n.26; 8 n.33; 9 nn.41-42, 44-46; 11 n.68; 12 n.69; 59 nn.344, 352; 60 n.358).

409.     Levitt testified that Ziad Abu Amr "wrote one of the earlier and better books on Islamic movements in the Palestinian territories including on Hamas." Schuster Dec. Ex. 149 (Levitt CL Tr. at 338:5-14).

410.     Levitt does not mention in his report, but conceded at his deposition he previously knew, that Abu Amr, unlike Levitt, had examined the books of one of the 12 Charities (the Al-Islah Society) and found there was nothing amiss. Id. (Levitt CL Tr. at 339:3-340:4).

411.     Levitt testified that, as part of his method of research, it is important to seek information from different perspectives. Id. (Levitt CL Tr. at 90:17-20).

412.    Levitt testified that, as part of his research methodology, it was important for him to vet the information he was considering.  Id. (Levitt CL Tr. at 92:25-93:12).

413.    Levitt has not corroborated the information contained in the "Watson Memorandum."  Id. (Levitt CL Tr. at 244:13-245:14).

414.    When asked if he knew what the authors of the "Watson Memorandum" did to verify the information that they received from the Government of Israel, Levitt testified: "Specifically, no."  Id. (Levitt CL Tr. at 245:15-246:2).

415.    Levitt testified that after the "Watson Memorandum" was published, he learned that one of the sources that it cited was found to be fabricated and was completely discredited.  Id. (Levitt CL Tr. at 243:8-244:12).

416.    Levitt never asked "Avi" to identify the sources for the statements he made in his testimony at the Holy Land Foundation retrial, and upon which Levitt relied.  Id. (Levitt CL Tr. at 231:9-14).

417.    Levitt never asked "Avi" what evidence he considered but chose not to rely upon in offering his testimony.  Id. (Levitt CL Tr. at 231:15-18).

418.    Levitt had never seen the German BND Report he cites until he obtained a copy through plaintiffs' counsel.  Id. (Levitt CL Tr. at 234:24-235:6).

419.    Levitt did not conduct an academic review of the BND Report to determine if the information it contains is reliable.  Id. (Levitt CL Tr. at 235:18-236:22).

420.    Levitt describes the C.S.S. as an Israeli "think tank" that is "not wholly independent" and "very public about the fact that it is tied to the Israeli military."  Id. (Levitt CL Tr. at 248:19-249:11).

-85-

421.     Levitt testified that he rarely cited C.S.S. analyses due to concerns he has about their quality. Id. (Levitt CL Tr. at 249:12-16).   However, Levitt does cite C.S.S. analysis in his expert report in these lawsuits, and not merely documents made available by C.S.S. Schuster Dec. Ex. 152 (Levitt NW Rep. at 30-31 n.179; 79 n.519; 88 n.605).

422.     Levitt's NatWest report includes a paragraph that does not appear in his CL Report, stating that "[n]ot only does Hamas's da'wa network allow it to capture broad popular support in the Palestinian Territories, but research also indicates that it has the effect of making Hamas attacks more deadly.  There appears to be a robust relationship between Hamas's decision to provide comprehensive social services, and its concomitant lethality as an organization when compared to other terrorist organizations lacking anything comparable to Hamas's *da'wa* network." Id. (Levitt NW Rep. at 22).

423.     Levitt's report cites Radical, Religious and Violent: The New Economics of Terrorism by Eli Berman as support for this opinion. Id. (Levitt NW Rep. at 22 n.126).

424.     Berman's analysis of this issue is an economic analysis.  Schuster Dec. Ex. 148 (Levitt NW Tr. at 135:11-13).

425.     Levitt is not an economist and did not conduct his own independent economic analysis of the issues Berman analyzes. Id. (Levitt NW Tr. at 135:14-18).

426.     Levitt did not conduct any economic or quantitative tests to test and verify Berman's analysis, and testified that doing so would not have been possible because Levitt did not have Berman's data set. Id. (Levitt NW Tr. 135:19-136:8).

427.     Levitt did not take any steps to check whether the data Berman relied upon was accurate or reliable because he did not have access to Berman's data set and because he

could give Berman's analysis "more credence" since it was "a peer reviewed study published in a university press." Id. (Levitt NW Tr. at 138:20-139:11).

428.    When told that Berman states that between 2002 and 2007 the Al Aqsa Martyrs Brigade was only responsible for six attacks and three deaths, and asked whether this statement seemed accurate, Levitt testified that it did not. Id. (Levitt NW Tr. at 139:12-22).

429.    The March 4, 2011 expert report of Brian Michael Jenkins (the "Jenkins Report" or "Jenkins NW Rep.") notes that Levitt's report contains no analysis of any other factors that may contribute to a terrorist organization's "lethality." Schuster Dec. Ex. 172 (Jenkins NW Rep. at 65).

430.    The Jenkins Report notes that Levitt's report contains no evaluation of whether there is any empirical basis for Berman's assertion that "organizations such as Hamas produce operatives with a much higher 'defection constraint.'" Id. (Jenkins NW Rep. at 65-66); Ex. 152 (Levitt NW Rep. at 22).

431.    Berman's book states that "Hamas is *not* a terrorist organization using social service provision as a front to disguise its other activities, as is sometimes claimed." Schuster Dec. Ex. 173 (Eli Berman, Radical, Religious, and Violent: The New Economics of Terrorism, (Cambridge, MA: MIT Press, 2009) at 131-32) (emphasis in original).

432.    Berman cites Levitt as stating that certain social service organizations are a front for Hamas, and opines that Levitt "ignores the fact that the religious and social service provision networks predate the terrorist wing." Id. (Eli Berman, Radical, Religious, and Violent: The New Economics of Terrorism, (Cambridge, MA: MIT Press, 2009) at 264 n.17).

433.    Levitt's report in these lawsuits does not mention Berman's criticism of Levitt's views.

(b)     Spitzen

434.    Spitzen's report states that his methodology for "evaluating the level of

Hamas's control of a specific organization" was to examine 18 factors:

(1)   The organization's history.

(2)   The organization's leadership (the personal identity of key figures).

(3)   Ideology and platform (based on interviews with the leadership, the organization's web sites, charters and declarations of [sic] intention).

(4)   Those employed by or members of the organization (in key positions) who have ties with Hamas.

(5)   Ties with other Islamist organizations in the Palestinian Territories.

(6)   Ties with other organizations throughout the world, particularly organizations considered to be affiliated with the Muslim Brotherhood.

(7)   The identification of the organization as Hamas-related by Hamas itself.

(8)   Israeli actions against the organization based on its Hamas/terrorist identity.

(9)   Actions of the Palestinian Authority against the organizations based on its Hamas/terrorist identity.

(10)  American, European or other Western Government action against the organization based on its Hamas/terrorist identity.

(11)  External sources of funding associated with Hamas.

(12)  Academic or other analyses of the organization.

(13)  Involvement of the organization or its leadership in the Hamas election campaign in 2006.

(14)  The cessation of the flow of funds to the organization as a result of replacement of its administrative board in 2007 by the Palestinian Authority.

(15)  News stories or other media reports identifying the organization with Hamas.

(16)  Findings from searches of the organization's offices that attest to the organization's connections with Hamas and its identification with Hamas's ideology, including support for terror.

-88-

(17) Identification of the organization with Hamas by the population among whom it operates.

(18) The nature of the organization's activities (for example in supporting the families of suicide terrorists and Hamas prisoners, etc...) and its being part of the civilian cover framework supporting terror.

Schuster Dec. Ex. 153 (Spitzen NW Rep. at 4-5).

435. Spitzen has conceded that he has used his 18 factor test as he presents it here only in these lawsuits and the other pending lawsuits against CL and Arab Bank. Schuster Dec. Ex. 158 (Spitzen Arab Bank Tr. at 429:20-23, 437:22-438:9).

436. Spitzen has conceded that his 18 factor test as he presents it here has been used only by him. Id. (Spitzen Arab Bank Tr. at 431:7-21).

437. Spitzen concedes that his 18 factor test has never been published in any treatise and he did not rely on any treatise when he developed his test. Id. (Spitzen Arab Bank Tr. at 433:4-7, 434:22-435:5).

438. Spitzen concedes that his 18 factor test has never been peer reviewed. Id. (Spitzen Arab Bank Tr. 437:22-438:9).

439. Spitzen testified that he selected his 18 factors based on the materials he had available to him while working on his engagement in these lawsuits, which excluded classified information. Schuster Dec. Ex. 151 (Spitzen CL Tr. at 270:21-271:11).

440. Spitzen states in his report that for some of the 13 Charities "all of the criteria [of his 18 factor test] exist and the identification with Hamas is clear," but for others "only some of the criteria existed" and "those were tested against other possibilities (options) and a decision about the identity of the organization as Hamas was achieved after weighing all of the information." Schuster Dec. Ex. 153 (Spitzen NW Rep. at 7).

441.    Spitzen's report does not state for which of the 13 Charities all of the criteria existed, and for which only some criteria existed.

442.    Spitzen's report concludes that Hamas controls 11 of the 13 Charities. Id. (Spitzen NW Rep. at 51, 64, 73, 90, 101, 109, 118, 126, 134, 142, 149).

443.    Spitzen testified that "the conclusions regarding some of the entities are more cut and dry" but "[s]ome other entities, they are more careful – cautious." Schuster Dec. Ex. 151 (Spitzen CL Tr. at 235:13-23).

444.    Spitzen's report does not state which of his conclusions regarding the 13 Charities were "more cut and dry" and which "were more careful."

445.    Spitzen testified that his analysis does not give equal weight to the absence of a particular factor as to one charity in comparison to the presence of that same factor as to a different charity. Id. (Spitzen CL Tr. at 263:25-264:24).

446.    Spitzen testified that he did not need to find that a minimum number of the 18 factors exists with respect to a particular entity in order for him to conclude that the entity was controlled by Hamas because "it's not a question of quantity, but rather a question of quality." Id. (Spitzen CL Tr. at 265:13-266:2).

447.    Spitzen testified that "[s]ometimes two criteria may be sufficient to determine that an organization is a Hamas organization." Id. (Spitzen CL Tr. at 265:13-22).

448.    Spitzen testified that "not every factor has equal weight." Id. (Spitzen CL Tr. at 257:19-258:2).

449.    Spitzen testified that before examining the evidence concerning one of the 13 Charities, he did not determine the weight each of the 18 factors should be given compared to other factors. Id. (Spitzen CL Tr. at 269:15-25).

450.    Spitzen testified that he is only able to identify to which factors he attributed the greatest weight "in the context of each and every organization." Id. (Spitzen CL Tr. at 258:13-259:7).

451.    Spitzen testified that "[t]he material that [he] found regarding each one of the organizations, that was what gave the weight or ascribed the weight to the [factor]." Id. (Spitzen CL Tr. at 259:15-259:23).

452.    The factors "Involvement of the organization or its leadership in the Hamas election campaign in 2006" and "The cessation of the flow of funds to the organization as a result of replacement of its administrative board in 2007 by the Palestinian Authority" concern information about events that occurred after the Relevant Transfer Period. Schuster Dec. Ex. 153 (Spitzen NW Rep. at 5).

453.    Spitzen testified that it would be possible to conclude that an entity was under the control of Hamas if the only one of the 18 factors that was satisfied was that "all the entire leadership of the organization is Hamas — are Hamas people and they are members of the parliament." Schuster Dec. Ex. 151 (Spitzen CL Tr. at 266:3-18).

454.    When asked what he meant when he stated that an organization was controlled by Hamas, Spitzen testified that an entity is under the control of Hamas if it is an inseparable part of Hamas and identifies with it. Id. (Spitzen CL Tr. at 146:16-19).

455.    When asked if he meant anything else when he stated that an organization was controlled by Hamas, other than an organization being an inseparable part of Hamas and identified with Hamas, Spitzen stated "I could also maybe add the fact that there are organizations in which the leadership or official leadership of the organization and the board of trustees are almost identical [with Hamas]." Id. (Spitzen CL Tr. at 147:24-148:23).

456.    Spitzen testified that "the moment that one of the . . . 13 organizations is headed by a senior Hamas member, Hamas is the one that's running the day-to-day operations. Hamas is the one who's giving the instructions." Id. (Spitzen CL Tr. at 180:24-181:15). Spitzen testified that an entity is headed by a senior Hamas member when it has a Hamas member in a "key position." Id. (Spitzen CL Tr. at 181:23-182:18).

457.    Spitzen testified that he defines a person with a "key position" as anyone who has "the right to sign checks or any documents" who decides "what this association is going to do and how" and who runs the entity's day-to-day operations. Id. (Spitzen CL Tr. at 183:11-184:5).

458.    Spitzen testified that he did not visit any of the 13 Charities between 2000 and 2004. Id. (Spitzen CL Tr. at 160:13-15).

459.    With respect to Spitzen's factor "Those employed by or members of the organization (in key positions) who have ties with Hamas," Schuster Dec. Ex. 153 (Spitzen NW Rep. at 4), all of the board members identified in Spitzen's report are either Hamas members or those he considers to be aligned with Hamas.

460.    With respect to the factors "Ties with other organizations throughout the world, particularly organizations considered to be affiliated with the Muslim Brotherhood" and "External sources of funding associated with Hamas," Spitzen relies upon the fact that Interpal provides funding to one of the 13 Charities as evidence that the charity is controlled by Hamas. Id. (Spitzen NW Rep. at 50, 62, 72, 76, 88, 99, 108, 118, 125, 133, 141, 147, 153). Spitzen also relies upon this conclusion that the charities are controlled by Hamas as evidence that Interpal is providing funding to Hamas. Id. (Spitzen NW Rep. at 32-33).

461.    Spitzen relies upon the factor "The nature of the organization's activities (for example in supporting the families of suicide terrorists and Hamas prisoners, etc...) and its being part of the civilian cover framework supporting terror" as grounds to conclude that a particular charity is part of the Hamas civilian "cover," or da'wa.  The statement "being part of the civilian cover framework supporting terror" is his conclusion, not evidence.  Id. (Spitzen NW Rep. at 5).

462.    Spitzen testified that in performing his analysis for his NatWest report, he did not change his methodology from the methodology he used to reach his conclusions in his CL report.  Schuster Dec. Ex. 150 (Spitzen NW Tr. at 46:18-23).

463.    According to Spitzen's report, plaintiffs also asked him to provide expert testimony with respect to "whether ██████████, who according to the Nihill & Riedley report I reviewed, received several transfers from Interpal via NatWest on several occasions is a blood relative of Ahmed Harb Ahmad al-Kurd, the long time head of Al-Salah Islamic Society in Gaza."  Schuster Dec. Ex. 153 (Spitzen NW Rep. at 2).

464.    Spitzen's report states that Interpal made ████ bank transfers totaling ████ to ████████████ between ████ and ████ and that these transfers were made as a ██████████ and received by the beneficiary in ████████████ Id. (Spitzen NW Rep. at 68).

465.    Spitzen's report states that "[a]fter analyzing the name of the beneficiary, ██████████, as it appears in the money transfers, it seems that he was probably the son of Ahmad Harb Ahmad al-Kurd."  Id.

466.    Spitzen was not asked to opine as to who directed the transfer of funds from Interpal to ██████████ Schuster Dec. Ex. 150 (Spitzen NW Tr. at 57:23-58:3).

467.     Spitzen has no knowledge of whether Ahmad al-Kurd, the Al-Salah Society or Hamas had anything to do with the transfers from Interpal to ████████████. Id. (Spitzen NW Tr. at 61:3-21).

468.     Spitzen is not opining concerning the use of the funds that were allegedly transferred to ████████████. Id. (Spitzen NW Tr. at 58:4-9).

469.     Spitzen has no knowledge that the transfers from Interpal to ████████████ ████ were used for terrorism. Id. (Spitzen NW Tr. at 61:22-62:2).

470.     Spitzen has no information that ████████████ is in any way connected to terrorism. Id. (Spitzen NW Tr. at 76:17-21).

471.     Spitzen's report states that "[a]pparently, the full name of ████████████ contains two more names, indicated by the letters 'A' and 'H.' It is highly probable that these letters represent the names 'Ahmad' and 'Harb', respectively. Put together, we get the full name: ████████████" Schuster Dec. Ex. 153 (Spitzen NW Rep. at 69).

472.     Spitzen's report does not cite any authority or provide any basis for these statements.

473.     Spitzen has never studied genealogy as a profession and has never been hired as a genealogist. Schuster Dec. Ex. 150 (Spitzen NW Tr. at 58:16-20).

474.     Spitzen testified that it is possible that the "A" in ████████████ could stand for "Abdullah" and the "H" could stand for "Hakim." Id. (Spitzen NW Tr. at 75:18-76:9).

475.     Spitzen testified that there was a passport number associated with the wire transfer, but because he did not have access to the Palestinian census, he "couldn't check that it was, indeed, the same person." Id. (Spitzen NW Tr. at 66:9-13).

476. Spitzen testified that he does not know for a certainty that the  who received the transfers from Interpal is related to Ahmad al-Kurd of the Al-Salah Society. Id. (Spitzen NW Tr. at 70:8-11).

477. Spitzen's report states that in Arab and Muslim countries, the name █████  "would mean that ████ is son of █████ and grandson of ████████ ██████ father), and is a member of the ██████family." Schuster Dec. Ex. 153 (Spitzen NW Rep. at 69).

478. Spitzen's report cites as support for this claim various websites that "mention two other sons of Ahmad al-Kurd, using their full names, which include their father's name: Hamza Ahmad Harb al-Kurd and Suhaib Ahmad al-Kurd (the name of the grandfather does not appear)." Id. (Spitzen NW Rep. at 69 n.350).

479. Spitzen could not recall seeing any specific references in his research to Ahmad al-Kurd having a son named ██████ or having sons other than the two sons he references in footnote 350 of his report, neither of whom is named ████████ Schuster Dec. Ex. 150 (Spitzen NW Tr. at 74:15-75:9).

## III. UNDISPUTED MATERIAL FACTS DEMONSTRATING THAT NO REASONABLE JUROR COULD FIND THAT PLAINTIFFS HAVE PROVEN THE HAMAS RESPONSIBILITY ELEMENT OF THEIR CLAIMS

### A. Background Facts

480. Because plaintiffs allege that Interpal was financing Hamas, and that NatWest's purported knowledge of (or willful blindness to) that financing proximately caused the 15 attacks at issue, an indispensable element of plaintiffs' proof is that Hamas in fact perpetrated each of those 15 attacks. See Schuster Dec. Ex. 156 (Weiss Fifth Am. Cmpl.); Ex. 157 (Applebaum Cmpl.); Linde v. Arab Bank, PLC, 384 F. Supp. 2d 571, 585 (E.D.N.Y 2005) ("As to plaintiffs' claims premised on their second factual theory – i.e., that the Bank's

provision of financial services constitutes material support to, or financing of, foreign terrorist organizations – plaintiffs acknowledge that they will have to prove that the Bank provided these services to the <u>particular group responsible for the attacks giving rise to their injuries</u>") (emphasis added).

481.    Plaintiffs rely for this element of their claims on the proposed expert testimony of Ronni Shaked, Evan Kohlmann, Shaul Naim, Levitt, Spitzen and Geisser and certain of the documents upon which these individuals rely or, in the case of Naim, purport to authenticate.  Schuster Dec. Ex. 174 (Plaintiffs' Resp. to CL Cont. Interrog. no. 13); Ex. 175 (Plaintiffs' Supp. Resp. to CL Cont. Interrog. no. 13).

**B.   The Relevant OFAC Designations Do Not Attribute Responsibility For The 15 Attacks To Hamas**

482.    None of the OFAC designations of Interpal or any of the 13 charities attributes responsibility for any particular terrorist attack to Hamas.  Schuster Dec. Ex. 176 (31 C.F.R. Ch. V, App'x A at 603, 690 (2010)).

483.    The August 22, 2003 U.S. Department of the Treasury press release accompanying OFAC's designation of CBSP, Interpal, the Association de Secours Palestinien and the Sanabil Association for Relief and Development states the following with respect to four of the 15 attacks:

- "By claiming responsibility for the despicable act of terror on August 19, Hamas has reaffirmed that it is a terrorist organization committed to violence against Israelis and to undermining progress toward peace between Israel and the Palestinian people, President Bush stated."

- "During 2002, more than 370 persons – including 10 US citizens – were killed in Israel, the West Bank and the Gaza Strip by acts of terrorism.  HAMAS was responsible for carrying out more than 50 of these attacks, including shootings, suicide bombings, and standoff mortar-and-rocket attacks against civilian and military targets.  The group was responsible

for the most deadly Palestinian terrorist attack of the year – the suicide bombings of a Passover gathering at a Netanya hotel that killed 29 Israelis, including one dual US-Israeli citizen. HAMAS's bombing of a cafeteria on the Hebrew University campus, which killed nine, including five US citizens, demonstrated its willingness to stage operations in areas frequented by students and tourists, including US citizens."

- "On June 8 and June 11 HAMAS took credit for attacks against Israelis. The organization also took credit for four suicide bombings in a 24-hour period during the weekend preceding May 20th."

- "On August 19th, a suicide bomber detonated his bomb in the back of a double-length city bus near the border between east and west Jerusalem. According to a CNN report, HAMAS said that it was committed to the cease-fire, but also claimed responsibility, stating that the man was a member of its military wing, the Izzedine al-Qassam Brigades, and the attack came in revenge for the killing of two of its members."

Schuster Dec. Ex. 96 (Hoseason Dep. Ex. 25).

484.     The August 2003 press release does not attribute responsibility for the August 19, 2003 or May or June 2003 attacks to Hamas, and instead states only that Hamas claimed credit for these attacks.

485.     OFAC designates an entity based upon its conclusion that the evidence supporting that designation is sufficient to satisfy an "arbitrary and capricious" standard in a U.S. court. Schuster Dec. Ex. 177 (Aufhauser Testimony at 23).

486.     David D. Aufhauser, former General Counsel of U.S. Department of the Treasury, testified before the U.S. Senate on September 25, 2003 that OFAC has "a lesser standard for proceeding under IEPA and under the powers given to OFAC, which basically is an 'arbitrary and capricious' standard. That is a standard that is alien in many parts of the world. For that reason, you frequently have to try to share and develop more evidence than otherwise

-97-

you think is required.  A lot of the dialogue officially is to convince them that this is enough for them to act." Id.

## C. The Relevant Israeli Designations Do Not Attribute Responsibility For The 15 Attacks To Hamas

487. Interpal and certain of the entities to which Interpal transferred funds from Interpal's accounts at NatWest were designated by the Israeli government as "unlawful associations" and/or "terrorist organizations."  Schuster Dec. Ex. 178 (Rashumot Publications).

488. None of the Israeli designations of Interpal or any of the 13 charities attributes responsibility for any terrorist attack to Hamas. Id.

## D. Dr. Levitt Does Not Attribute Responsibility For The 15 Attacks To Hamas

489. Plaintiffs proffer Dr. Matthew Levitt as an expert witness whom they have requested to offer opinions regarding whether certain entities that received transfers of funds from Interpal's accounts at NatWest were "controlled by, or alter-egos of, Hamas" at the time NatWest transferred funds to them.  Schuster Dec. Ex. 152 (Levitt NW Rep. at 1); Ex. 148 (Levitt NW Tr. at 11:8-19) (correcting sentence).

490. Levitt does not purport to offer any opinions in his report regarding Hamas's responsibility for any of the attacks at issue in these cases.  Schuster Dec. Ex. 152 (Levitt NW Rep. at 1).

## E. Arieh Spitzen Does Not Attribute Responsibility For The 15 Attacks To Hamas

491. Plaintiffs proffer Arieh Spitzen as an expert witness whom they have requested to offer opinions regarding whether certain entities that received transfers of funds from Interpal's accounts at NatWest were "under the control of Hamas or identified with Hamas at the time that National Westminster Bank transferred funds to them."  Schuster Dec. Ex. 153 (Spitzen NW Rep. at 1).

-98-

492.    Spitzen does not purport to offer any opinions in his report regarding Hamas's responsibility for any of the attacks at issue in these cases.  Id.

**F.   Wayne Geisser Does Not Attribute Responsibility For The 15 Attacks To Hamas**

493.    Plaintiffs proffer certified public accountant Wayne Geisser as an expert witness who has purported to review and summarize certain categories of transactions that NatWest processed on behalf of Interpal.  Schuster Dec. Ex. 147 (Geisser 2010 Rep. at 1-5).

494.    Geisser does not purport to offer any opinions in his report regarding Hamas's responsibility for any of the attacks at issue in these cases.  Id.

**G.   Ronni Shaked Purports To Attribute Responsibility For The 15 Attacks To Hamas, But His Proposed Testimony Is Inadmissible**

495.    Plaintiffs proffer Ronni Shaked as an expert witness who purports to opine that Hamas perpetrated the 15 attacks at issue in these cases.  Schuster Dec. Ex. 179 (Shaked NW Rep. at 2-3).

(1)  Shaked is not qualified to offer opinions as to who perpetrated a terrorist attack

496.    Shaked has worked as a reporter for Israel's *Yediot Ahronot* daily newspaper since 1982, id. (Shaked NW Rep. at 1), and in that capacity has written news articles about certain of the 15 attacks.

497.    Shaked does not have any professional training in determining which terrorist organization is responsible for perpetrating an attack, and he has never before served as an expert in any capacity on that subject.  Schuster Dec. Ex. 180 (Shaked CL Tr. at 22:6-23:13).

498.    Shaked has none of the training, skills and tools for determining which terrorist organization is responsible for perpetrating an attack, which reside with Israeli police, prosecutors and judges, none of whom Shaked has ever been a member.  Id. (Shaked CL Tr. at 23:7-29:3).

-99-

499.    Shaked has no academic training in determining responsibility for a terrorist attack. Id. (Shaked CL Tr. at 40:10-44:23, 47:14-52:14).

500.    Shaked's academic studies have focused on the sociological aspects of the Israeli-Palestinian conflict, in particular by pursuing courses in the sociology and political science departments, writing a thesis from a sociological point of view to obtain his master's degree and pursuing a Ph.D. in the field of "searching the ethos of conflict of the Palestinian society," using "tools from psychology [and] social psychology." Id.

501.    Shaked worked for the Israel Security Agency ("ISA") between 1969 and 1982. Schuster Dec. Ex. 179 (Shaked NW Rep. at 1).

502.    During the time Shaked worked at the ISA, Hamas did not exist. Schuster Dec. Ex. 180 (Shaked CL Tr. at 45:18-46:4).

503.    Shaked's responsibilities at the ISA did not include determining responsibility for terrorist attacks. Schuster Dec. Ex. 179 (Shaked NW Rep. at 12-13); Ex. 180 (Shaked CL Tr. at 22:10-24).

504.    Shaked has published one book about Hamas and he is working on another. Schuster Dec. Ex. 179 (Shaked NW Rep. at 1); Ex. 180 (Shaked CL Tr. at 57:2-58:2).

505.    Nothing in any of the books Shaked has published relates to determining how it has been determined that Hamas has perpetrated a particular terrorist attack, except for his statement in his published book that Hamas did not commit the 1992 kidnapping of an Israeli military officer for which it had claimed credit. Schuster Dec. Ex. 180 (Shaked CL Tr. at 58:6-59:24, 60:6-25, 62:5-15,  88:23-95:2); Ex. 181 (Shaked CL Dep. Exs. 9A and 9B).

(2) Shaked's proposed testimony attempts to prove responsibility for criminal acts through expert testimony, summarizes hearsay evidence intended to offer a conclusion and opines on the credibility of the evidence upon which he relies

506.     Shaked relies on Hamas claims of responsibility to prove that Hamas committed the attacks at issue in these lawsuits.  Schuster Dec. Ex. 180 (Shaked CL Tr. at 203:19-204:3, 217:17-22, 223:2-7); Ex. 179 (Shaked NW Rep. at 28, 42-43, 52-53, 59, 66-67, 72-73, 78-79, 85, 91, 98, 102-04, 110-11, 121-122, 124-26, 128-29).

507.     Shaked quotes or summarizes the contents of Hamas websites and publications or interviews in which Hamas operatives purportedly claimed responsibility for the attacks at issue and concludes, for 13 of the 15 Attacks, that those claims of responsibility "suffice to lead to the conclusion that Hamas carried out the terrorist attack."  Schuster Dec. Ex. 179 (Shaked NW Rep. at 41, 51, 57, 65, 71, 77, 83, 89-90, 97, 101, 108-09, 120, 127).

508.     Shaked states that Hamas's declarations of responsibility, statements from other sources about the attacks and records from Israeli civilian and military courts "leav[e] no doubt" that Hamas perpetrated 14 of the 15 Attacks.  Id. (Shaked NW Rep. at 41, 51, 57, 65, 71, 77, 83, 90, 97, 101, 109, 120, 127, 139); Ex. 180 (Shaked CL Tr. at 75:4-12).

509.     For the September 24, 2004 attack in Neve Dekalim, Shaked concludes that Hamas was "apparently involved in the planning and perpetration" of the attack, and that there is only a "high degree of probability" that Hamas was responsible for the terrorist attack, but that he "cannot definitively state" that the attack was carried out by Hamas.  Schuster Dec. Ex. 179 (Shaked NW Rep. at 16, 122).

510.     Shaked has not personally investigated any of the attacks at issue in these lawsuits or examined any forensic evidence in connection with these attacks.  See Schuster Dec. Ex. 180 (Shaked CL Tr. at 23:7-25:10, 216:18-217:4).

(3) Shaked's proposed testimony is based upon insufficient and unreliable sources and is not the product of reliable principles and methods, and Shaked had not applied his methods reliably to the facts of these cases

(a)    Shaked's reliance upon Hamas claims of responsibility

511.    Shaked agrees that terrorist groups have multiple motivations for claiming responsibility, and they claim responsibility even when they are not involved in the final perpetration of an attack and deny responsibility for attacks they committed. Id. (Shaked CL Tr. at 80:5-83:12, 83:19-84:12, 111:14-25).

512.    Shaked wrote in a 2010 manuscript of a book he is seeking to have published that terrorist groups are rivals, and compete to be the first to assume responsibility for attacks against Israel, among other reasons to gain support. Schuster Dec. Ex. 182 (Shaked NW Dep. Exs. 11 and 11A).

513.    The example of the rivalry among terrorist groups Shaked cites in his 2010 manuscript is the January 29, 2004 attack on Bus 19 at issue in this case. He wrote that both Hamas and the Al Aqsa Martyrs' Brigades of Fatah each claimed responsibility for this attack. Id. (Shaked NW Dep. Exs. 11 and 11A); Schuster Dec. Ex. 183 (Shaked NW Tr. at 42:24-46:8).

514.    In his published book about Hamas, Shaked wrote that Hamas did not commit the 1992 kidnapping of an Israeli military officer for which it had claimed credit, thereby contradicting his statement in his report that Hamas has "not taken responsibility for a terrorist attack that it did not commit." Schuster Dec. Ex. 179 (Shaked NW Rep. at 5); Ex. 180 (Shaked CL Tr. at 88:6-95:2); Ex. 181 (Shaked CL Dep. Exs. 9A and 9B).

515.    Shaked testified that Hamas makes a "[f]alse declaration to deny something when they need it." Schuster Dec. Ex. 180 (Shaked CL Tr. at 120:9-13).

-102-

(b)     Shaked's "very high degree of probability" opinion

516.    Shaked concludes "with a very high degree of probability" that Hamas was "involved in the recruiting, planning and perpetration" of 14 of the 15 attacks at issue in these cases.  Schuster Dec. Ex. 183 (Shaked NW Tr. at 50:13-52:8); Ex. 179 (Shaked NW Rep. at 16).

517.    Shaked could not provide a particular source for the "very high degree of probability" standard he uses.  Schuster Dec. Ex. 183 (Shaked NW Tr. at 52:9-57:19).

518.    Shaked could not explain the "very high degree of probability" standard in terms of simple percentages.  Id. (Shaked NW Tr. at 57:20-58:19).

519.    When asked what he meant by "very high degree of probability," Shaked responded that "[w]hen we examine the Hamas attacks especially suicide attacks, we can establish with a very high degree of certainty based on a methodology who perpetrated the attack because in such cases the Hamas itself does not hide the facts and they praise and they brag and they glorify their operation."  Id. (Shaked NW Tr. at 51:14-52:3).

(c)     Shaked's opinion that Hamas committed the Bus 19 attack

520.    Shaked asserts that "[t]he many detailed declarations which were issued by Hamas with regard to the terrorist attacks on the No. 19 bus, the boasting about the suicide bomber within the organization, and the repeated public declarations in which Hamas expressed its pride in the performance of the terrorist attack on the No. 19 bus and other attacks – all of these confirm that Hamas carried out the terrorist attack" and that "[e]ven if the preparations were shared, it seems that Hamas was the dominant entity in the last stages of the operation."  Schuster Dec. Ex. 179 (Shaked NW Rep. at 139).

521.    Shaked relies on the "many detailed declarations" of Hamas's responsibility for the Bus 19 attack, as well as the purported "evidence" Hamas submitted in

-103-

support of those claims, such as the photographs of the suicide bomber Ali Muneer Ja'ara with Hamas paraphernalia and references to Ja'ara in Hamas's so-called "Book of Martyrs." Id. (Shaked NW Rep. at 128-39).

522.   Shaked concludes that "it seems that Hamas was the dominant entity in the last stages of the operation," but offers no factual basis for this statement. Id. (Shaked NW Rep. at 139).

523.   Shaked testified that the suicide bomber Ali Muneer Ja'ara wished to commit a suicide bombing and initially contacted members of Hamas, who photographed him wearing Hamas paraphernalia and videotaped him reading a last will and testament. Schuster Dec. Ex. 180 (Shaked CL Tr. at 172:11-24); Ex. 179 (Shaked NW Rep. at 128-132).

524.   Shaked agrees that Ja'ara's collaboration with Hamas members resulted in a failed attempt at a suicide bombing two weeks prior to the attack on Bus 19. Schuster Dec. Ex. 180 (Shaked CL Tr. at 172:2-173:18); Ex. 179 (Shaked NW Rep. at 135, 138); Ex. 185 (Azoulay NW Reb. Rep. at 136, 139); Ex. 184 (Shaked CL Dep. Exs. 17A and 17B at 208).

525.   Shaked also agrees that after the failed attempt two weeks prior to the Bus 19 attack, Ja'ara contacted members of another terrorist group, Hamas's rival the Al Aqsa Martyrs Brigades (the "AAMB"), which equipped Ja'ara with a new bomb and drove him to the location where he successfully perpetrated the attack on Bus 19. Schuster Dec. Ex. 180 (Shaked CL Tr. at 172:2-173:18); Ex. 179 (Shaked NW Rep. at 137); Ex. 185 (Azoulay NW Reb. Rep. at 136-137).

526.   Shaked admitted in his deposition testimony that Hamas's rival the AAMB and not Hamas helped Ja'ara perpetrate the attack on Bus 19, and Hamas was involved

only with the prior failed attempted attack in which Ja'ara participated. Schuster Dec. Ex. 180 (Shaked CL Tr. at 77:2-10, 182:25-183:16).

      527.    Shaked stated in his report that the AAMB published a press release initially claiming responsibility for the Bus 19 attack, but that the Fatah group of which the AAMB is a part subsequently denied any responsibility for this attack and that the AAMB has "never repeated" this claim of responsibility on its website. Shaked testified that his only sources for these observations were statements by Hamas about what Hamas claims Fatah said, not any Fatah sources. Id. (Shaked CL Tr. at 156:3-158:17); Ex. 179 (Shaked NW Rep. at 128 n. 420).

      528.    Shaked did not mention in his report the fact that the AAMB specifically claimed responsibility for the Bus 19 attack on its website one year after the attack, directly contradicting what Shaked states in his report. Schuster Dec. Ex. 183 (Shaked NW Tr. at 86:21-89:17); Ex. 185 (Azoulay NW Reb. Rep. at 124, 138); Ex. 186 (Azoulay NW Reb. Rep., Annexes B5 and B6); Ex. 187 (Kohlmann CL Tr. at 392:19-394:13).

      529.    After being presented with this claim, Shaked admitted that the AAMB repeated its claim of responsibility for the Bus 19 attack on its website one year after the attack was committed. Schuster Dec. Ex. 183 (Shaked NW Tr. at 89:12-17).

      530.    Shaked includes in his report a picture that purports to be of Ja'ara with his written "will," which is the same document that Kohlmann attached to the appendix of his report. Schuster Dec. Ex. 179 (Shaked NW Rep. at 132); Ex. 188 (Kohlmann App'x p. 336).

      531.    Ja'ara's name appears in this will in a different color ink in comparison to the balance of the text, and appears to be written in different handwriting. Schuster Dec. Ex. 185 (Azoulay NW Reb. Rep. at 122).

532.    There is no indication in Shaked's report that Shaked considered that this "will" might have been a forgery.

533.    Shaked does not cite a third will executed by the suicide bomber Ja'ara in the name of the AAMB, which is posted on the internet at http://palissue.com/saqer/ mp66/Ghad-Garah/images/ali.jpg.

534.    The URL for this third will is no longer accessible.  However, a copy of the webpage and an English translation are attached as Annexes B3 and B4 to the Rebuttal Report of Moshe Azoulay.  Schuster Dec. Ex. 189 (Azoulay NW Reb. Rep., Annexes B3 and B4).

535.    According to this will, Ja'ara committed the attack on behalf of the AAMB, Martyr Ayman Jouda Unit.  Schuster Dec. Ex. 185 (Azoulay NW Reb. Rep. at 123-4); Ex. 189 (Azoulay NW Reb. Rep., Annexes B3 and B4).

536.    One of the Hamas claims of responsibility for the Bus 19 attack that Shaked cites states that Hamas carried out the attack in revenge for the Israel Defense Forces operation at a location named Al-Zeytoun.  Schuster Dec. Ex. 179 (Shaked NW Rep. at 129).

537.    According to the court sentence of Kaid El Nashash upon which Shaked relies, Ja'ara's failed attempt to commit the attack allegedly orchestrated by Hamas occurred two weeks before the Bus 19 attack, on or about January 15.  Schuster Dec. Ex. 184 (Shaked CL Dep. Exs. 17A and 17B at 208).

538.    The Al-Zaytoun operation was a battle between the Israel Defense Forces and Islamic Jihad activists that occurred on January 28, 2004 in the Al-Zeytoun neighborhood of Gaza.  Schuster Dec. Ex. 185 (Azoulay NW Reb. Rep. at 123); Ex. 190 (Azoulay NW Reb. Rep., Annex B2).

539.    The actual Bus 19 attack then took place on January 29, 2004, only one day after the Al-Zaytoun operation.  Schuster Dec. Ex. 179 (Shaked NW Rep. at 128).

540.    The Al-Zaytoun operation, which Hamas claimed to be Ja'ara's motivation to commit the Bus 19 attack, occurred after the date of Ja'ara's failed attempt to commit the attack allegedly orchestrated by Hamas.  Schuster Dec. Ex. 180 (Shaked CL Tr. at 172:2-173:18); Ex. 185 (Azoulay NW Reb. Rep. at 123).

541.    Shaked did not reveal in his report that his conclusion that Hamas perpetrated the Bus 19 attack is contradicted by a newspaper article Shaked wrote one day after the Bus 19 attack, in which he identified the bomber as a member of the AAMB and asserted that Hezbollah, not Hamas, was responsible for this attack.  Schuster Dec. Ex. 180 (Shaked CL Tr. at 202:18-203:18); Ex. 191 (Shaked CL Dep. Exs. 22A and 22B).

542.    Shaked states in his report that "it appears that Ja'ara was not really a member of the Al-Aqsa Martyrs' Brigades."  Schuster Dec. Ex. 178 (Shaked NW Rep. at 133).  This statement contradicts an announcement from the Israeli Prime Minister's Office that Shaked also cites, which states that "[t]he suicide bomber who committed the attack, Ali Munir Jaara, 23 years old, a resident of the Al Aida refugee camp near Bethlehem, was a member of the Al-Aqsa Martyrs' Brigades, the military wing of the Fatah."  Schuster Dec. Ex. 192 (copy of http://www.pmo.gov.il/PMO/ Communication/IsraelUnderAttack/Jerusalem2/Jerusalem.htm).

543.    Shaked states in his report that "[a]fter the terrorist attack, [Nufal] Adawin informed Hamas headquarters of the role which he had played in recruiting and training Ja'ara. It is possible that Adawin even inflated his role, in an attempt to receive additional, and perhaps even greater, funding for future terrorist attacks on behalf of Hamas."  Schuster Dec. Ex. 179 (Shaked NW Rep. at 137).  Shaked's statement is contradicted by Adawin's and Mahmoud

-107-

Azia's interrogation statements, upon which Shaked also relies, which indicate that Adawin did not inform Hamas headquarters of anything, but rather merely told Azia that he was responsible for the attack, a statement which Adawin later admitted was false. Schuster Dec. Ex. 193 (Shaked NW Rep., App'x 1076-91 at 1079); Ex. 194 (Shaked NW Rep., App'x 1019-22 at 1021).

544.    In Adawin's statement to the police, upon which Shaked also relies, he admitted that "the truth is that the Tanzim Fatah carried out this suicide bombing and not I," referring to the AAMB. Schuster Dec. Ex. 195 (Shaked CL Dep. Exs. 19A and 19B).

545.    There is no evidence in any of the documents that Shaked reviewed that Hamas ever funded Adawin in his attempt to perpetrate the Bus 19 bombing. To the contrary, according to Adawin's testimony and Kaid el Nashash's sentence, the attempted attack was self-financed by selling private property belonging to Nashash. Schuster Dec. Ex. 185 (Azoulay NW Reb. Rep. at 138); Ex. 184 (Shaked CL Dep. Exs. 17A and 17B at 208); Ex. 195 (Shaked CL Dep. Exs. 19A and 19B).

546.    Shaked also states in his report that "Adawin took Ja'ara by car toward the intended location for the terrorist attack; however, as they approached the Tunnel Road (south of Jerusalem), they encountered a Palestinian security forces roadblock." Schuster Dec. Ex. 179 (Shaked NW Rep. at 135). This statement contradicts the interrogation statement of Adawin from August 30, 2004, which Shaked omitted from the version of this statement attached to his report as Supplemental Appendix No. 1 pages 1076-91, and which indicates that Adawin and Ja'ara travelled to Jerusalem by foot and not by car as stated by Shaked. Schuster Dec. Ex. 196 (Azoulay NW Reb. Rep., Annex B8).

547.     Shaked did not refer to other documents that attribute responsibility for the Bus 19 attack to the AAMB, including an Intelligence and Terrorism Information Center (ITIC) bulletin dated January 1, 2006; a report of the Homeland Security Department of the RAND organization; and a 2010 Counterterrorism Calendar posted on the website of the U.S. National Counterterrorism Center. Schuster Dec. Ex. 185 (Azoulay NW Reb. Rep. at 140-42); Exs. 197-99 (Azoulay NW Reb. Rep., Annexes B9-B11); Ex. 183 (Shaked NW Tr. at 89:18-91:2, 92:18-94:16, 97:9-98:10, 102:7-21).

548.     Shaked states in his report that he reviewed documents from the investigation of the Bus 19 attack. Schuster Dec. Ex. 179 (Shaked NW Rep. at 137).

549.     Shaked states in his report that these documents indicate Hamas members were "convicted of involvement in the terrorist attack" on Bus No. 19. Id. (Shaked NW Rep. at 133-34).

550.     Shaked also states in his report that "judiciary proceedings in Israel have imposed partial responsibility on Hamas . . . ." Id. (Shaked NW Rep. at 136).

551.     Shaked reviews in his report the sentences issued against Nufal Adawin and Muhamed Azia, who he states were involved in perpetrating the Bus 19 attack on behalf of Hamas. Shaked also reviews the sentences of Abed AlRahman Yusef Mukadad, Ahmed Abu Radab and Halmi Abed AlKarim Muhammad Hamash, the members of the AAMB who he concludes were convicted of "involvement" in the attack, while Mukadad was also convicted of preparing the bomb used in the attack. Id. (Shaked NW Rep. at 133-35); Ex. 185 (Azoulay NW Reb. Rep. at 135).

552.     Both Adawin's and Nashash's sentences indicate that they were not convicted for perpetrating the Bus 19 attack. Further, in connection with the Bus 19 attack,

Adawin was charged with the failure to prevent an offense, not perpetrating an offense. Schuster Dec. Ex. 184 (Shaked CL Dep. Exs. 17A and 17B at 208); Ex. 204 (Shaked CL Dep. Exs. 18A and 18B at 212-13); Ex. 180 (Shaked CL Tr. at 186:15-193:8).

553.    Shaked does not mention a third sentence contained in the police investigation file for this attack that NatWest's expert Moshe Azoulay was permitted to review, of Abu Karandal. Schuster Dec. Ex. 179 (Shaked NW Rep. at 133-35); Ex. 185 (Azoulay NW Reb. Rep. at 135).

554.    According to the court sentences NatWest's expert Moshe Azoulay was permitted to review in the Israel Police investigation file for the Bus 19 attack, the role of the AAMB in this attack was not one of merely, as Shaked states, being "involved" in the attack, but rather of taking the initiative to perpetrate this attack, procuring explosives for it, preparing the bomb for it and mobilizing the carrier, Ja'ara, and transporting him to the area of the attack. Schuster Dec. Ex. 185 (Azoulay NW Reb. Rep. at 135-36).

555.    Contrary to Shaked's statement that "even were the preparations made jointly, it seems that Hamas was the dominant organization in the final stages of the operation," the sentences of the AAMB members that Azoulay was permitted to review in the Israel Police file for the Bus 19 attack indicate that it was they, and not members of Hamas, who were dominant in and responsible for all stages of carrying out the attack. Id. (Azoulay NW Reb. Rep. at 135-37).

556.    Azoulay's review of the Israel Police file indicates that the Bus 19 attack was not carried out in stages. According to the contents of the Israel Police investigation file that Azoulay was permitted to review, there were two different and separate events. The first event

in which the file indicates Hamas members (Adawin and Azia) were involved was the attempted attack that failed. Id. (Azoulay NW Reb. Rep. at 136-37).

557. In reference to the failed event in which Hamas members Adawin and Azia were involved, Adawin declared in his statement to the police that "I wanted to send Ali Ja'ara to commit a suicide attack in Jerusalem but it didn't happen." Schuster Dec. Ex. 193 (Shaked NW Rep., App'x 1076-91 at 1076).

558. The second event was the January 29, 2004 attack on Bus 19, which succeeded. The contents of the Israel Police investigation file that Azoulay was permitted to review indicate that this attack was carried out in whole, starting with the planning stage through to completion of the operation, by members of the AAMB, together with unorganized military activists. Schuster Dec. Ex. 185 (Azoulay NW Reb. Rep. at 136-37).

559. There is no indication in the Israel Police investigation file for the Bus 19 attack that Azoulay was permitted to review that anyone involved in the attack was a member of Hamas. Id. (Azoulay NW Reb. Rep. at 136-37).

560. Adawin was convicted and sentenced only with respect to the attempted attack, and not the actual Bus 19 attack. Id. (Azoulay NW Reb. Rep. at 137); Ex. 204 (Shaked CL Dep. Exs. 18A and 18B at 212-13); Ex. 180 (Shaked CL Tr. at 189:18-193:8).

561. Had the court believed that the Bus 19 attack involved a single ongoing offense, it would have convicted Adawin of intentionally causing the deaths of the victims of the Bus 19 attack and sentenced him to life imprisonment for each of these deaths, as it did with respect to those who were convicted of the actual perpetration of the Bus 19 attack. Schuster Dec. Ex. 185 (Azoulay NW Reb. Rep. at 137).

-111-

562.     The sentences copied from the Israel Police investigation file that Azoulay was permitted to review indicate that there is no substantiation for the conclusion that the January 29, 2004 Bus 19 attack was perpetrated by Hamas. Id. (Azoulay NW Reb. Rep. at 135-36).

563.     The contents of the file Azoulay was permitted to review demonstrate that Shaked relies upon documents that are not in the Israel Police investigation file, and does not credit documents that are found in that file. Id.

564.     The military indictment that accuses Abdel Rahman Mukadad of responsibility for preparing the bomb for the Bus 19 attack, attached to the Naim Report, does not accuse Mukadad of being a member of Hamas. Id. (Azoulay NW Reb. Rep. at 120).

565.     Further, according to Shaked, Mukadad was a member of the AAMB. Schuster Dec. Ex. 179 (Shaked NW Rep. at 135).

566.     Likewise, the military indictment that accuses Ahmad Salah of being the person responsible, together with Mukadad, for preparing the bomb that was used in the Bus 19 attack and for recruiting the suicide bomber, attached to the Naim Report as Exhibit A for the Bus 19 attack, accuses Salah not of being a member of Hamas, but rather of being a member of the AAMB. Schuster Dec. Ex. 185 (Azoulay NW Reb. Rep. at 120, 136).

567.     The military indictment that accuses Muhamad Ma'ali of leading the suicide bomber to Jerusalem to perpetrate the Bus 19 attack, attached to the Naim Report as Exhibit D for the Bus 19 attack, does not accuse Ma'ali of being a member of Hamas. Id. (Azoulay NW Reb. Rep. at 120-21).

568.     According to Shaked, Ma'ali was also a member of the AAMB and not Hamas. Schuster Dec. Ex. 179 (Shaked NW Rep. at 138).

-112-

569. Likewise, the military indictment that accuses Ali Muhamad Abu Halail of being the person responsible for initiating and planning the Bus 19 attack, attached to the Naim Report as Exhibit B for the Bus 19 attack, does not accuse Halail of being a member of Hamas. Schuster Dec. Ex. 185 (Azoulay NW Reb. Rep. at 121).

570. According to Shaked, Abu Halail was a member of the AAMB and not a member of Hamas. Schuster Dec. Ex. 179 (Shaked NW Rep. at 138).

571. The military indictment cited in footnote 450 of Shaked's report accuses Hilmi Abd al-Karim Muhammad Hamash of being a member of the AAMB, and of being the person who directly recruited the suicide bomber, Ja'ara, who committed the Bus 19 attack and for causing the death of all the victims of the attack. Schuster Dec. Ex. 200 (Shaked NW Rep., App'x 1066-75).

572. According to Shaked, Hamash was convicted for perpetrating the Bus 19 attack as a member of the AAMB. Schuster Dec. Ex. 179 (Shaked NW Rep. at 135).

573. Shaked later admitted in his deposition testimony that none of the Hamas members he identified was convicted of actually perpetrating the Bus 19 attack, and that each of the AAMB members Shaked identified were all convicted of intentionally causing the death of those killed in the Bus 19 attack. Schuster Dec. Ex. 180 (Shaked CL Tr. at 186:15-202:3).

574. These findings also indicate that Hamas's claim of responsibility for the Bus 19 attack is inconsistent with the findings of the military court concerning this attack. See Schuster Dec. Ex. 185 (Azoulay NW Reb. Rep. at 131, 142-144)

575. Several of the sources cited by Shaked contradict both his and plaintiffs' expert Evan Kohlmann's claim that Hamas's claim of responsibility for the Bus 19 attack is credible.

-113-

576.     Certain Israel Security Agency reports and conclusions cited by Shaked in his expert report state that the AAMB and not Hamas claimed responsibility for the Bus 19 attack.  Schuster Dec. Ex. 179 (Shaked NW Rep. at 132-33, 139); Ex. 185 (Azoulay NW Reb. Rep. at 119).

577.     The Israeli Foreign Ministry website publication cited by Shaked states that both Fatah and Hamas claimed responsibility for the Bus 19 attack.  Schuster Dec. Ex. 201 (copy of http://www.mfa.gov.il/MFA/MFAArchive/2000_2009/2004/1/Suicide+bombing+ of+Egged+bus+no+19+in+Jerusalem+-.htm).

(d)     Shaked's opinion that Hamas committed the March 7, 2003 Kiryat Arba attack

578.     Shaked initially opined in his report submitted in the companion lawsuits against CL that two Hamas terrorists, Fadi Ziad al-Fakhuri and Safian al-Haraz, were among the perpetrators of the attack in Kiryat Arba in March 7, 2003.  Schuster Dec. Ex. 202 (Shaked CL Rep. at 71-75).

579.     In his initial CL report, Shaked relied upon Hamas claims of responsibility, photographs and the wills of the attackers, along with the indictment and conviction of a purported co-conspirator.  Id.

580.     In his initial CL report, Shaked stated that Fadi Ziad al-Fakhuri and Safian al-Haraz were responsible for this attack because that is what he read on websites he attributes to Hamas and in an indictment of an alleged co-conspirator.  Id.

581.     Subsequently, Shaked offered a different analysis in his supplemental report as to which individuals were responsible, based upon his conclusion that both the indictment and the Hamas statements he had originally relied upon were inaccurate.  Schuster Dec. Ex. 203 (Shaked CL 3/7/03 Attack Rep. at 1-3).

-114-

582.    In his supplemental CL report, Shaked stated that the attack was "probably not" committed by the individuals he originally identified, but it "most likely" was committed by two others. Id. (Shaked CL 3/7/03 Attack Rep. at 1, 4).

583.    Shaked explained in his deposition testimony that he changed his opinion because, upon "reading the documents again," he discovered facts that he could not reconcile with his original theory that al-Fakhuri and al-Haraz had committed the attacks. Id. (Shaked CL 3/7/03 Attack Rep. at 1-3); Ex. 180 (Shaked CL Tr. at 205:13-206:5).

584.    Shaked testified that there were several inaccuracies in the indictment, the Hamas websites and the Hamas "Book of Martyrs" he initially relied upon. Schuster Dec. Ex. 180 (Shaked CL Tr. at 209:23-216:17).

585.    Shaked also stated that his revision of his opinion concerning this attack was based in part upon his "talking with people." Id. (Shaked CL Tr. at 207:7-208:12).

586.    Shaked admitted that the only persons he spoke to regarding the Kiryat Arba attack were a "sports businessman" friend, a stone merchant friend and a Hamas member serving in the Palestinian Authority's legislative council. Schuster Dec. Ex. 183 (Shaked NW Tr. at 113:21-118:12).

587.    Shaked stated in his supplemental CL report that "the only definitive way" to confirm the identities of the perpetrators "would be to obtain the forensic reports for the dead terrorists," which he has not done. Schuster Dec. Ex. 203 (Shaked CL 3/7/03 Attack Rep. at 3); Ex. 180 (Shaked CL Tr. 216:18-217:4).

588.    Shaked further testified that "even today Hamas[,] even today[,] have misunderstanding who did that operation." Id. (Shaked CL Tr. at 19:3-15).

589.    Shaked further testified that "[w]e are dealing with terrorism. We are dealing with things that are not always clear at the time that it happened. We are dealing with [an] organization that even themselves they don't know exactly what happen[ed] and how it's happened[,] therefore sometimes there is [ ] new evidence coming." Id. (Shaked CL Tr. at 18:7-19).

>    (e)    Shaked's failure to analyze the significance of the absence of evidence concerning responsibility for an attack

590.    For 14 of the 15 attacks, Shaked proposes to testify that he has "no doubt" that Hamas committed the attacks, regardless of whether he has relied upon multiple different types of "evidence" (such as videotaped wills, photographs of the attackers in Hamas clothing, or convictions of Hamas members who aided the attacker) or just one type of "evidence" (a Hamas claim of responsibility and nothing else). Schuster Ex. 179 (Shaked NW Rep. at 41, 51, 57, 65, 71, 77, 83, 88-90, 97, 101, 108-09, 120, 127, 139).

>    (f)    Shaked's failure to consider the timing of claims of responsibility in relation to when attacks occurred

591.    Hamas's purported "official announcement" claiming responsibility for the May 7, 2002 attack was published in June 2008, more than six years after the attack took place. Id. (Shaked NW Rep. at 42).

592.    Shaked opines that Hamas withheld the suicide bomber's name to protect his family. Id. (Shaked NW Rep. at 43); Ex. 180 (Shaked CL Tr. at 217:17-222:25).

593.    Hamas also purportedly issued a late "official announcement" claiming responsibility for the April 30, 2003 attack at Mike's Place, when that announcement was first published on March 8, 2004. Schuster Dec. Ex. 179 (Shaked NW Rep. at 78-79).

594.    Hamas also purportedly issued late claims of responsibility for the January 29, 2003 roadside shooting on Road 60 in 2004 and on February 15, 2006. Id. (Shaked NW Rep. at 59).

595.    According to Jenkins, late claims of responsibility must be discounted in an analysis of responsibility, absent a compelling explanation for the delay. Schuster Dec. Ex. 172 (Jenkins NW Rep. at 49-50). Indeed, in June 2008, according to one scholar Hamas's military wing claimed responsibility for a number of previously unclaimed attacks "in an apparent effort by . . . senior leaders to undermine a ceasefire with Israel." Id. (Jenkins NW Rep. at 49) (citing Beverly Milton-Edwards and Stephen Farrell, Hamas: The Islamic Resistance Movement, Cambridge, UK: Polity Press (2010), pp. 129-130).

(g)    Shaked relies upon information that is not publicly available, and therefore not verifiable

596.    Shaked relies upon confidential police records he claims to have received from a "special connection" in the Israeli police that are not available to the public. Schuster Dec. Ex. 180 (Shaked CL Tr. at 132:23-134:9).

597.    Shaked relies upon confidential court files he claims to have received from Hamas defense lawyers that are not available to the public. Id. (Shaked CL Tr. at 135:14-137:19).

598.    Shaked relies upon confidential documents he claims to have received from a friend at a Tel Aviv court that are not available to the public. Id. (Shaked CL Tr. at 140:10-141:23).

(4) The documents upon which Shaked relies are inadmissible hearsay under Israeli evidence law

(a)     The Israeli civilian court convictions, sentences and related court and police records upon which Shaked relies are inadmissible hearsay under Israeli evidence law

599.     Shaked relies upon convictions issued by Israeli civilian courts in relation to the following attacks:  May 7, 2002; March 5, 2003; and September 9, 2003.  Schuster Dec. Ex. 179 (Shaked NW Rep. at 46-47, 68-70, 116).

600.     Shaked also relies upon Israeli civilian court indictments, testimony and other court and police records throughout his report.

601.     Under Israeli law, (a) verdicts and sentences issued by Israeli courts, (b) verdicts and sentences issued by military courts in the Palestinian Territories, (c) indictments submitted to courts in Israel or to military courts, (d) testimony of accused persons and others given to the Israel Police, (e) evidence collected by the police or the ISA for filing in a criminal procedure, (f) reports of the Israeli Police and the Institute of Forensic Pathology in Israel and (g) press announcements issued by different government offices in Israel and military inquiries, would all be inadmissible as hearsay in a civil lawsuit in an Israeli court seeking damages from a defendant that was not a party to the investigations or prosecutions from which these documents originate, and seeking relief on the ground that the defendant had some responsibility for the attacks that are the subjects of these documents.  Thus, they could not be received in evidence as proof of the matters asserted in those documents, unless and to the extent any of these documents qualified under an exception to the rule of Israeli law that generally excludes such hearsay evidence.  Schuster Dec. Ex. 205 (Azoulay NW Rep. at 14-16); Ex. 185 (Azoulay NW Reb. Rep. at 16-17, 65-67).

-118-

602.    A basic premise of Israeli evidence law is that a judgment that was rendered in one trial cannot serve as evidence in another trial, unless there is a specific provision of law that explicitly permits it.  Schuster Dec. Ex. 205 (Azoulay NW Rep. at 18-20).

603.    Article 42A of the Israeli Evidence Ordinance permits a civil defendant to submit a criminal judgment as evidence in a subsequent civil trial so long as the following requirements are met:  (a) the judgment is final and convicting; (b) the judgment was issued by an Israeli court; (c) the only admissible section of the judgment is the verdict; and (d) the defendants in the civil case are legally responsible for the actions of the person convicted in the criminal judgment according to one of four categories of legal responsibility established by law.  Id. (Azoulay NW Rep. at 21-24, 41-43).

604.    The third condition for the admissibility of a criminal judgment as evidence in a civil lawsuit requires either that the convicted person is a party in the civil lawsuit, or the judgment is offered against a party that was not a party to the criminal proceeding but is a "proxy" or someone whose liability for the alleged damages in the civil lawsuit arises from the liability of the convicted person, including whoever is obligated to pay the judgment debt of the convicted person.  Id. (Azoulay NW Rep. at 41).

605.    The term "proxy" refers to a legal link, or a link of closeness between the convicted person and the proxy such as the link between a benefactor and a beneficiary.  Id. (Azoulay NW Rep. at 42).

606.    The second alternative – someone whose liability for the alleged damages in the civil lawsuit arises from the liability of the convicted person – refers to a situation in which a third party is liable (or exempt from liability) for the action of the convicted person, including whoever is obligated to pay his judgment debt.  Thus, for instance, in certain cases, where there

-119-

is an employee–employer relationship, an employer is liable for the criminal actions of his or her employee. Similarly, in the case of a relationship between an insurer and a policy holder, the insurer must pay for the actions of the policy holder. Id. (Azoulay NW Rep. at 42).

607.    The Israeli civilian court judgments Shaked relies upon would be admissible against NatWest in an Israeli court under Article 42A of the Evidence Ordinance as affirmative proof that the attacks to which they pertain were perpetrated by Hamas despite the fact that NatWest was not one of the parties that was convicted only if it were shown that NatWest was the proxy of the convicted person, was an entity whose liability arises from the liability of the convicted person or was an entity that is obligated to pay the judgment of the convicted person. Id. (Azoulay NW Rep. at 48-49).

608.    There is no evidence that NatWest knew any of the persons who are the subject of the Israeli civilian court judgments Shaked relies upon in his report, or that there were personal, legal, commercial or any other relations between NatWest and any of these persons.

609.    There is no evidence that NatWest was obligated to pay any debt of the convicted persons.

610.    There is no evidence that NatWest knew that there was an association between the entities to which funds were transferred from Interpal's accounts with NatWest and the convicted persons.

611.    There is no evidence that NatWest knew and foresaw that the entities to which funds were transferred from Interpal's accounts with NatWest would use the funds they received to support Hamas, and that these funds would be used to finance terror.

612. There is no evidence that any of the convicted persons actually received funds or other support from any of the entities to which funds were transferred from Interpal's accounts with NatWest.

613. Accordingly, there is no evidence that NatWest is the legal proxy of the convicted persons, because there is no evidence that they acted on behalf of NatWest and/or with its consent and/or support. There is no evidence that NatWest is among those obligated to pay the judgment debt of the convicted persons because there is no evidence of any connection and/or legal association between the parties, which could result in such an obligation. Furthermore, there is no evidence of any outstanding judgment debt of the convicted persons under which NatWest is obligated. Schuster Dec. Ex. 205 (Azoulay NW Rep. at 49-50).

614. There is no legal or any other link, direct or indirect, between the convicted persons and NatWest. Id. (Azoulay NW Rep. at 54); Ex. 185 (Azoulay NW Reb. Rep. at 65-68).

615. If NatWest were sued in a civil lawsuit in an Israeli court on the ground that it had some responsibility for the attacks that are the subject of the criminal convictions Shaked relies upon, under Article 42A of the Evidence Ordinance none of these convictions, nor any of the other documents related to the convictions that Shaked cites in his report, would be admissible in evidence against NatWest for the truth of the matters asserted in those documents. They would all be excluded as inadmissible hearsay. Schuster Dec. Ex. 205 (Azoulay NW Rep. at 54); Ex. 185 (Azoulay NW Reb. Rep. at 65-71).

616. The Israeli civilian court convictions and related documents cited by Shaked also do not satisfy the criteria of any other exceptions to the rule excluding hearsay evidence under the Evidence Ordinance or caselaw, and therefore would not be admissible

-121-

evidence against NatWest for the truth of the matters asserted in those documents. Schuster Dec. Ex. 205 (Azoulay NW Rep. at 55-63).

617.    These documents do not qualify under the Evidence Ordinance as "institutional records," "public certificates," "military certificates," "powers of attorney" or other "private documents." Id. (Azoulay NW Rep. at 55-63).

618.    These documents do not qualify under Article 20 of the Evidence Ordinance as "expert opinions," with the potential exception of certain documents that Shaked cites as "police ballistic reports" in connection with the Route 60 shooting attacks. Id. (Azoulay NW Rep. at 60-61); Ex. 179 (Shaked NW Rep. at 63 n. 247). These expert opinions could be admissible only if the expert who prepared them presents himself to the court as an expert witness and is subject to cross-examination with respect to the contents of the report. Schuster Dec. Ex. 205 (Azoulay NW Rep. at 60-61).

    (b)    The convictions rendered by military courts in the Palestinian Territories upon which Shaked relies are inadmissible hearsay under Israeli evidence law and were not rendered in accordance with due process

619.    Shaked relies upon convictions issued by military courts in the Palestinian Territories in relation to the following attacks: March 27, 2002; May 7, 2002; January 29, 2003; March 5, 2003; March 7, 2003; June 11, 2003; June 20, 2003; August 19, 2003; September 9, 2003; October 22, 2003; and January 29, 2004. Schuster Dec. Ex. 179 (Shaked NW Rep. at 36-37, 46-47, 61-63, 68-70, 76, 95-96, 100, 106-07, 116, 127, 133-35).

620.    As described above, one of the requirements under Article 42A of the Israeli Evidence Ordinance that a civil defendant must satisfy to introduce into evidence a criminal conviction as evidence in a civil trial is that the judgment was issued by an Israeli court. Schuster Dec. Ex. 205 (Azoulay NW Rep. at 21-24).

-122-

621.    A court located outside of the borders of the State of Israel and governed by another law, including the military courts in the Palestinian Territories, is not within the scope of Article 42A, and criminal convictions rendered by these courts cannot be submitted as evidence in a civil lawsuit under Article 42A of the Evidence Ordinance because:  (a) a military court in the Palestinian Territories is not considered a court upon which a judicial authority is conferred in Israel under Israel's Basic Law: The Judiciary; (b)  Israel's Law of Military Jurisdiction does not apply to the military courts in the Palestinian Territories; (c) the military courts in the Palestinian Territories do not derive their authority from Israeli law, and instead were established by virtue of a decree issued by the military commander-in-chief in those territories; (d) consistent with the Supreme Court's prior caselaw, Article 42A must be interpreted narrowly in order to avoid creating an exception that weakens the defendant's defense in a civil proceeding; and (e) accepting a criminal judgment of a court that has no jurisdiction in Israel as evidence in a civil lawsuit in an Israeli court would severely harm constitutional rights and is not consonant with the basic principles of the Israeli legal system that the laws of the State of Israel apply only in areas under the jurisdiction of the State.  Id. (Azoulay NW Rep. at 24-40).

622.    At the request of the Israeli Supreme Court, the Attorney General of the State of Israel submitted an opinion to the Court that addresses the issue of whether the provisions of Article 42A of the Evidence Ordinance should be applied to a criminal judgment rendered by a military court in the Palestinian Territories.  Id. (Azoulay NW Rep. at 40).

623.    The Attorney General concluded that, for the reasons described above, the provisions of Article 42A of the Evidence Ordinance should not be applied to a criminal judgment rendered by a military court in the Palestinian Territories.  Id.

-123-

624.    Plaintiffs present Professor Emanuel Gross as an expert who purports to opine that the findings and conclusions contained in a conviction by a military court in the Palestinian Territories may be admissible under Article 42A of the Evidence Ordinance in a civil lawsuit in an Israeli court seeking damages from a defendant that, although not a party to the criminal proceedings before the military court, is alleged to bear liability for plaintiffs' alleged damages.  Schuster Dec. Ex. 206 (Gross NW Rep. at 25).

625.    Gross reaches this conclusion in part because he claims in his report that proceedings before military courts in the Palestinian Territories closely resemble the proceedings before Israeli courts.  Id. (Gross NW Rep. at 14-16).

626.    Gross further opines that the admission in civil cases in Israel of convictions issued by military courts in the Palestinian Territories does not severely harm constitutional rights or jeopardize basic principles of the Israeli legal system.  Id. (Gross NW Rep. at 18-21).

627.    Gross further opines that criminal proceedings before military courts in the Palestinian Territories are consistent with American notions of fairness, most notably, the guarantee of "due process."  Id. (Gross NW Rep. at 21-24).

628.    Gross's opinion with respect to the practices of military courts in the Palestinian Territories is based solely upon his experience in these courts through 1980, which is decades before the military court convictions upon which Shaked relies.  Gross does not offer opinions about the potential gap between the procedures and practices of military courts in 2004 through 2006.  Schuster Dec. Ex. 207 (Gross CL Tr. at 28:18-31:2).

629.    A 2004 amendment to the Israeli Order Regarding Security Provisions (the "2004 Amendment") altered the composition of the committee that selects judges in military

-124-

courts in the Palestinian Territories and the qualifications required for individuals to be appointed judges. Id. (Gross CL Tr. at 31:8- 35:18, 96:21-97:11); Ex. 208 (Gross CL Dep. Exs. 2A and 2B).

630.    Gross testified that, both before and after the 2004 Amendment, the military courts in the Palestinian Territories are run by military personnel. Schuster Dec. Ex. 207 (Gross CL Tr. at 18:21-19:11).

631.    Gross testified that, both before and after the 2004 Amendment, judges and prosecutors in military courts in the Palestinian Territories are subordinate to, and dependent for advancement on, military commanders. Id. (Gross CL Tr. at 81:16-82:2, 99:20-100:5).

632.    Gross testified that, both before and after the 2004 Amendment, there is no requirement that individuals serving as judges in military courts in the Palestinian Territories have prior experience or training as judges, or experience in criminal law or procedure. Id. (Gross CL Tr. at 34:5-35:18, 74:11-75:8).

633.    Gross testified that five of the seven members of the committee that appoints judges in military courts in the Palestinian Territories are military officers. Id. (Gross CLTr. at 42:17-19).  Because the selection committee is entitled to act with a quorum of five, a selection could be made by a group consisting entirely of military officers. Id. (Gross CL Tr. at 42:20-43:3).  The sixth member of the committee is chosen by a military officer. Id. (Gross CL Tr. at 43:14-21); Ex. 208 (Gross CL Dep. Exs. 2A and 2B).

634.    Gross testified that more than 80 percent of convictions in military courts are based upon confessions. Schuster Dec. Ex. 207 (Gross CL Tr. at 57:11-58:13).

635.    Gross testified that military courts in the Palestinian Territories are not required to implement Israeli criminal law. Id. (Gross CL Tr. at 51:2-6, 52:16-53:6).

636.    Gross testified that the military commander of the territory where the military court trial is held had the authority to intervene in a military court verdict by acquitting the accused or cancelling the verdict and scheduling a new trial. Id. (Gross CL Tr. at 78:5-79:5). The military has never had the ability to cancel an acquittal and require a new trial in Israeli civilian courts. Id. (Gross CL Tr. at 80:8-11).

637.    Gross previously wrote in a book he published in 2004, entitled The Struggling of Democracy Against Terrorism: Legal and Moral Dimensions that "many see the judicial proceedings that the state of Israel conducts in the occupied territories as a general effort and attempt to negate the well known adage that 'military justice is to justice as military music is to music.'" Gross testified that this statement was "sort of a folklore" when he wrote it. Id. (Gross CL Tr. at 69:12-70:4, 82:3-83:24); Ex. 209 (Gross CL Dep. Exs. 3A and 3B at 464).

638.    Gross also wrote that "the state of Israel chose to preserve the legislative guarantees of the accused standing trial and to constrict as much as possible the influence of the judicial forum upon the procedural rights of the accused." Id. (Gross CL Dep. Exs. 3A and 3B at 464). Gross testified that this statement refers to attempts to prevent trying a person within Israel, where he might receive more constitutional protections than if he were tried in a military court in the Palestinian Territories. Gross testified that this statement was accurate at the time he wrote it. Schuster Dec. Ex. 207 (Gross CL Tr. at 69:12-70:4, 84:9-21).

639.    Gross also wrote that "[t]he question is why did the state of Israel work to reduce the influence of the judicial forum and not to neutralize this influence absolutely, why is there still a gap? It cannot be ignored that this influence still exists because the judges are not professional judges -- the composition is a mix of a professional judge and army officers with no judicial training." Gross testified that this statement was accurate at the time he wrote it.

-126-

Schuster Dec. Ex. 209 (Gross CL Dep. Exs. 3A and 3B at 464); Ex. 207 (Gross CL Tr. at 84:22-86:7).

640.    Gross also wrote that, "the right of the detainee according to the Decree [establishing military courts in the Palestinian Territories] to be brought before a judge is different from the right of an Israeli citizen in the areas of the State of Israel to be brought before a judge. While in Israel the detainee must be brought before a judge within 24 hours of the arrest, the fact is that according to the Decree, in the military system it is possible to arrest a person and only to obtain the warrant of arrest after 96 hours. The more serious harm is that a police officer is authorized to issue an arrest warrant within 7 days. There is nothing similar in the laws that apply in Israel - there an arrest warrant is only issued by a judge." Gross testified that this statement was accurate at the time he wrote it, and that the periods for detention were not changed with the 2004 amendment. Schuster Dec. Ex. 209 (Gross CL Dep. Exs. 3A and 3B at 464); Ex. 207 (Gross CL Tr. at 86:8-87:20).

641.    Gross also wrote that "[a]nother gap exists between the procedures of law that apply in the courts in Israel and the Decree regarding Security Provisions about the right of a detainee to meet with a lawyer: the law that applies in the courts in Israel allows postponement of the meeting between the detainee suspected of security violations and his lawyer up to 10 days with the authorization of the officer in charge and up to 21 days with the authorization of the president of the district court subject to a right of appeal to the Supreme Court. On the other hand according to the Decree about Security Provisions the person in charge of investigations is permitted to postpone the meeting between the detainee and his lawyer up to 15 days on grounds of the security needs in the region or for the needs of the investigation and the authority is entitled to extend this period by another 15 days. Therefore, it is possible that the meeting can be

-127-

delayed up to 30 days!" Gross testified that this statement was accurate at the time he wrote it, and that it continued to be accurate until at least 2006. Schuster Dec. Ex. 209 (Gross CL Dep. Exs. 3A and 3B at 465); Ex. 207 (Gross CL Tr. at 87:21-89:3).

642. Gross also wrote that "[t]hese discrepancies and their ramifications as we will see immediately, certainly emphasize the existence of a departure from the balance between security needs and the rights of a accused to a fair trial and to the protection of constitutional safeguards that guarantee a fair trial: the organization B'Tselem presented in 1989 a report that was based on observations made by lawyers for the organization concerning trials in the military courts. The report's findings reflect the dangers discussed here: 'The serious situation, in which a majority of hearings are delayed by about a month because of the failure to bring accused detainees or due to the failure of witnesses for the prosecution to appear violates the basic right of a person not to be punished by prolonged detention prior to his guilt being established in a fair judicial proceeding. The punishment therefore precedes the conviction and the court seems to only determine the date of the end of the punishment, and does not act as the decision-maker on the question of guilt or innocence.'" Gross testified that this statement was accurate at the time he wrote it, and that a departure from that balance continued through at least 2006. Schuster Dec. Ex. 209 (Gross CL Dep. Exs. 3A and 3B at 465); Ex. 207 (Gross CL Tr. at 89:8-91:8).

643. Gross also wrote that, "[t]he words of the reserve duty military judge Aryeh Cox emphasizes even more the danger within the military judicial system: 'It's clear that this court is not a natural and regular court, but some kind of solution that the military government found for the purpose of enforcing the government of occupation. The work that is done there is not purely judicial: in practice, the entire situation in the military courts in Gaza seems like something that is not from this world. Hundreds of family members outside, dozens

of prisoners inside, most of them very young, and the impression is that they have lost faith in the system and do not even try to defend themselves. They confess to everything. Their defense attorneys, who in many cases are pathetic figures, also resign themselves to the situation and in fact do the work of middlemen for purposes of punishment. I found a complete symbiosis between the prosecution, the judges and the lawyers. With the accused on the sidelines, everything is handled with stoic resignation. We found accused, we also found suitable offenses for them, and what's left to do now is to find even more suitable punishments for them.'" Gross testified that this statement was accurate at the time he wrote it, and that his statement regarding the "danger within the military judicial system" existed both before and after the 2004 Amendment. Schuster Dec. Ex. 209 (Gross CL Dep. Exs. 3A and 3B at 465); Ex. 207 (Gross CL Tr. at 91:9-95:14).

644. Gross also wrote that, "[t]here is no more doubt that evidence in the field has shown that the primary influence exerted by the character of the judicial forum on the rights of the accused is a result of its composition - in the military court, where the judges in it are appointed by a military officer, it follows that the judges and the prosecutors who serve in the Military Advocate's Unit are subordinate to one commander and are dependent on one authority for their advancement, and likewise, the whole system of the separation of powers between the judges and the prosecutors that exists in regular civil courts disappears when it comes to a military court: 'In military courts, for example, the ties between the judge and the prosecutor are close, sometimes only a thin wall separates between the prosecutors room and the judge's room. They are really enmeshed. Because the separation of powers is a basic principle of every judicial system, its absence constitutes one of the main reasons for the fact that the element of adjudication in the territories is not pure.'" Schuster Dec. Ex. 209 (Gross CL Dep. Exs. 3A and

3B at 465-66, quoting Dr. Shay Leibowitz, "No Just Trial in the Territories, Word of a Judge" Hadashot Supplement (11 Oct. 1991)).  Gross testified that this statement was accurate at the time he wrote it.  Schuster Dec. Ex. 207 (Gross CL Tr. at 95:16-96:15, 101:23-103:6).

    645. Gross also wrote, "[f]rom observations that the organization B'Tselem conducted during the same time period it appears that the majority of the trials are not based on witness testimony while convictions are based on confessions by the accused.  This finding casts great doubt on the conclusion that proceedings before military courts indeed lead to a just trial, notwithstanding the provisions we have already discussed that apply the rules of procedures and evidence prevailing in Israeli law to the military courts.  'Contrary to the civil court system, the ability of a military judge in the territories to check whether he indeed carries out a just trial and whether the accused committed all the violations that were carried out, is nil, because generally there is a total and wholesale confession for each violation.  This deprives the judge of the ability to examine whether the person standing in front of him committed the violations, in whole or in part, or whether he is innocent.  That is, the judge cannot actually unearth the truth and conduct a just trial. In this area of violations there is another factor, fundamental and no less complex from those that follow it.  The investigators discover most of the violations using 'informers.'  People confess everything, and from confession to confession they incriminate other people.  This is very dangerous and uncertain to decide the fate of a person on the basis of an 'informer.'  And indictments are presented on the basis of these informers.  This is a chain reaction: informer, indictment, confession, punishment.  And if we mention punishment, the level of punishment too does not give rise to equal justice.  When a Jew kills an Arab he can receive a year in prison.  When an Arab throws a stone and no damage is caused, he receives a similar penalty.  This is not a just trial.'"  Gross testified that this statement was accurate at the time he wrote it and that it

-130-

remained true after the 2004 Amendment, except that "three qualified judgments should now be more able to certify the veracity, the truth than only one professional judge." Schuster Dec. Ex. 209 (Gross CL Dep. Exs. 3A and 3B at 466); Ex. 207 (Gross CL Tr. at 110:14-21, 111:18-113:7).

646.    Gross also wrote, "[t]his is the practical result of a military trial that is different in composition from a regular civil trial, even when it purports to apply procedures that are similar to the procedures that apply in the regular civil courts - the outcome is deep erosion in the basic right of every defendant to a fair trial. Such an outcome contradicts the tenets of a democratic state." Gross testified that this statement was accurate at the time he wrote it, and that the only change in that observation with respect to 2005 and 2006 would be as a result of the 2004 Amendment regarding the qualification and appointment of judges. See Schuster Dec. Ex. 209 (Gross CL Dep. Exs. 3A and 3B at 466); Ex. 207 (Gross CL Tr. at 113:21-114:16).

647.    Gross also wrote that "[w]hat will be the result in a case where not only is the component that is judged (terrorists) different from the component that sits in the regular civil system, but also where the law allows application of different judgment and evidence arrangements that work for the good of only one side – the prosecution - as the president of the USA teaches? This result will not be able to stand against the basic rules of a genuine democratic government that seeks justice and truth, and the result will be known in advance and the chasm between it and something that's close to the truth is deep." Gross testified that this statement was accurate at the time he wrote it, and that the only change in that observation with respect to 2005 and 2006 would be as a result of the 2004 Amendment regarding the qualification and appointment of judges. Schuster Dec. Ex. 209 (Gross CL Dep. Exs. 3A and 3B at 466); Ex. 207 (Gross CL Tr. at 114:21-116:10).

-131-

648.     One of the assumptions upon which Gross's opinions are based, which was provided to him by plaintiffs' counsel, is that NatWest "knew or consciously or recklessly ignored information regarding Interpal's and Interpal's counterparties' connections to HAMAS, or, at the very least, was aware of the public information connecting Interpal and Interpal counterparties to Hamas." Schuster Dec. Ex. 206 (Gross NW Rep. at 4); Ex. 207 (Gross CL Tr. at 126:25-128:23).

649.     Gross testified at his deposition in the parallel proceedings against CL that without this assumption, and if the evidence showed that the bank had no knowledge about "the identity of the founder who stands behind the front," his opinion regarding the admissibility of convictions of military courts in the Palestinian Territories may change. Schuster Dec. Ex. 207 (Gross CL Tr. at 127:18-128:17, 197:2-18).

   (c) The statements attributed to the ISA and other Israeli government agencies upon which Shaked relies are inadmissible hearsay under Israeli evidence law

650.     Shaked cites in his report statements in various documents he attributes to the Israel Security Agency (ISA), the Israeli Ministry of Foreign Affairs and other government agencies in support of his opinion that Hamas is responsible for the attacks at issue in these cases. Schuster Dec. Ex. 185 (Azoulay NW Reb. Rep. at 1-16).

651.     None of these documents that he attributes to the Israel Security Agency (ISA), the Israeli Ministry of Foreign Affairs and other government agencies contain factual data received by Shaked himself, using his own senses. All of these documents rely upon factual data and/or assessments of third parties. Id. (Azoulay NW Reb. Rep. at 17).

652.     All of the statements in these documents upon which Shaked relies are hearsay evidence that would be inadmissible under the Evidence Ordinance of Israel as proof of their contents in a civil lawsuit in an Israeli court seeking damages from a defendant concerning

the matters these documents purport to describe, and do not satisfy the criteria for any of the exceptions to the rule that renders this hearsay evidence inadmissible, as set forth in the Evidence Ordinance or by case law. Id. (Azoulay NW Reb. Rep. at 17-40).

       (d)    **The statements attributed to newspaper and magazine articles and website pages upon which Shaked relies are inadmissible hearsay under Israeli evidence law**

653.    Shaked cites in his report statements in various newspaper and magazine articles and website pages as support for his opinion that Hamas is responsible for the attacks at issue in these cases. Id. (Azoulay NW Reb. Rep. at 40-57).

654.    These statements are inadmissible hearsay under the Israeli Evidence Ordinance and may be received in evidence only to prove the actual publication of the articles and not their contents. Id. (Azoulay NW Reb. Rep. at 58).

655.    Information obtained from websites is also inadmissible under the Israeli Evidence Ordinance as evidence of the truth of their contents. Id. (Azoulay NW Reb. Rep. at 58).

656.    None of the newspaper and magazine articles or website pages Shaked cites satisfies the criteria for any of the exceptions to the rule that renders this hearsay evidence inadmissible, including the exception for institutional records, as set forth by the Evidence Ordinance or by case law. Id. (Azoulay NW Reb. Rep. at 57-65).

       (e)    **The statements attributed to books upon which Shaked relies are inadmissible hearsay under Israeli evidence law**

657.    Shaked cites in his report statements in various books as support for his opinion that Hamas was responsible for the attacks at issue in these cases. Id. (Azoulay NW Reb. Rep. at 71-77).

-133-

658. These statements are inadmissible hearsay evidence under the Israeli Evidence Ordinance as proof of their contents. Id. (Azoulay NW Reb. Rep. at 77-78).

(f) The recordings posted on the internet upon which Shaked relies are inadmissible hearsay under Israeli evidence law

659. Shaked cites in his report the contents of various audio and video recordings as support for his opinion that Hamas is responsible for the attacks at issue in these cases. Id. (Azoulay NW Reb. Rep. at 78).

660. Under the Israeli Evidence Ordinance, a recording can be received in evidence if it satisfies three tests:

a. the technical test – regarding the credibility and authenticity of the medium itself;

b. the substantiality test – whether the terms for admissibility of the contents of the recording have been met; and

c. the formality test – whether the recording meets the conditions stipulated in the Secret Taping Law.

Id. (Azoulay NW Reb. Rep. at 78-79).

661. The audio and video recordings cited by Shaked do not satisfy the technical test because Shaked has not presented the original version of the recorded event. Instead, he has presented only what he purports to be a copy of an original recording that was posted on internet websites by unidentified persons. Shaked has offered no information concerning whether the posted copy is an accurate, complete or true copy of the original recording. Id. (Azoulay NW Reb. Rep. at 80).

662. Further, Shaked has presented no testimony from the makers of these recordings, who could verify that whatever is heard or seen in the recordings was indeed said by the speaker who was recorded. Id. (Azoulay NW Reb. Rep. at 80).

-134-

663.    Further, there is no evidence that the voice heard in the video recordings is the voice of whoever is shown to be speaking, and the manner in which these videos were recorded and edited raises doubts as to the identity of the speaker who is heard and whether the words he is speaking are indeed his own. Id. Viewing these recordings demonstrates they have undergone editing and processing after they were recorded. Id. (Azoulay NW Reb. Rep. at 81).

664.    Further, Shaked has not offered any evidence as to the identity of the person who made, edited or posted these recordings. Nor has he offered any evidence as to when they were recorded and/or edited. Id. (Azoulay NW Reb. Rep. at 81).

665.    The audio and video recordings cited by Shaked also do not meet the criteria for permitting the admission of a "computer output." Id. (Azoulay NW Reb. Rep. at 82).

666.    Second, under the substantiality test, because the contents of the recordings are hearsay, the party seeking to submit them as proof of their contents must demonstrate that they qualify under one of the exceptions to the rule disqualifying hearsay testimony, according to the Evidence Ordinance and/or the caselaw. The recordings cited by Shaked do not satisfy any of the relevant exceptions to the rule that renders hearsay testimony inadmissible. Id. (Azoulay NW Reb. Rep. at 83-87).

(g)    The other video recordings upon which Shaked relies are inadmissible hearsay under Israeli evidence law

667.    Shaked also relies upon other video recordings, including of interviews he conducted or in which he otherwise participated and a British documentary broadcast on Israeli television, as support for his opinion that Hamas is responsible for the attacks at issue in these cases. Id. (Azoulay NW Reb. Rep. at 87-88).

-135-

668.    The contents of these recordings are inadmissible hearsay under Israeli law unless they qualify under one of the exceptions to the rule that renders hearsay testimony inadmissible under the Evidence Ordinance and/or caselaw.  Id. (Azoulay NW Reb. Rep. at 88).

669.    These video recordings do not satisfy any of the relevant exceptions to the rule disqualifying hearsay testimony.  Id. (Azoulay NW Reb. Rep. at 89-90).

## H.  Evan Kohlmann Purports To Attribute Responsibility For The 15 attacks To Hamas, But His Proposed Testimony Is Inadmissible

670.    Plaintiffs present Evan Kohlmann as an expert witness who purports to opine that Hamas has claimed responsibility through websites that he attributes to Hamas and other media for the 15 attacks at issue in these cases.  Schuster Dec. Ex. 210 (Kohlmann Rep. at 9).

### (1)  Kohlmann's proposed testimony attempts to prove responsibility for criminal acts through expert testimony and summarizes hearsay evidence

671.    Kohlmann relies upon what he contends are "authentic claims of responsibility" that Hamas has purportedly distributed through websites and internet newsletters and forums he attributes to Hamas, which he contends "demonstrate [Hamas's] culpability" in the execution of each of the 15 attacks.  Id. (Kohlmann Rep. at 45).

672.    For each of the attacks in question, Kohlmann collects statements and other materials from websites or internet newsletters and forums he attributes to Hamas and reproduces verbatim or paraphrases or summarizes those statements.  Id. (Kohlmann Rep. at 31-45); Ex. 187 (Kohlmann CL Tr. at 106:7-16).

673.    For each of the 15 attacks, Kohlmann quotes or summarizes the claims of responsibility he found on websites or internet newsletters and forums he attributes to Hamas and concludes that these claims of responsibility "demonstrate [Hamas's] culpability in the execution of" these attacks.  Schuster Dec. Ex. 210 (Kohlmann Rep. at 31-45).

-136-

674.     Kohlmann testified that if he saw a single claim of responsibility for an attack on a Hamas website, that alone was sufficient to demonstrate that it was "more likely than not" that Hamas was culpable in the attack's execution. Schuster Dec. Ex. 187 (Kohlmann CL Tr. at 215:16-216:12, 340:7-341:12).

675.     Other than what Kohlmann learned regarding the "Mike's Place" attack while working on another project independent of his work on these lawsuits, Kohlmann testified he is not aware of what Hamas's role actually was in perpetrating any of the other 14 attacks. With regard to these attacks, he testified he knows "what Hamas claims to have done." Id. (Kohlmann CL Tr. at 405:7-406:23).

676.     Kohlmann testified that he did not consider any evidence other than the materials that appear on websites that he attributes to Hamas. Id. (Kohlmann CL Tr. at 106:7-16).

677.     Kohlmann testified that "based upon the sources that I specifically was asked to look at, the evidence that I gathered I believe indicates that it's more likely than not that Hamas was culpable in some way for the 15 attacks" at issue. Id. (Kohlmann CL Tr. at 77:11-20).

(2)  Kohlmann opines on the credibility of the evidence upon which he relies

678.     Kohlmann opines that what he purports to be Hamas claims of responsibility appearing on websites he attributes to Hamas "demonstrate its culpability in the execution of particular terrorist attacks" including the 15 attacks at issue, and that Hamas has never "issued any rejection or credible denial of its culpability" for the 15 attacks. Schuster Dec. Ex. 210 (Kohlmann Rep. at 45).

-137-

679.    Kohlmann testified that "generally speaking Hamas has a very good record in terms of its credibility in terms of claiming credit for these operations."  Schuster Dec. Ex. 187 (Kohlmann CL Tr. at 101:20-102:18).

680.    Kohlmann testified that "even a single claim of responsibility on its own on an official credible website, forum, electronic venue, that itself is credible and authentic" provided a sufficient basis for him to conclude that Hamas was culpable for a terrorist attack.  Id. (Kohlmann CL Tr. at 191:19-192:13).

681.    Kohlmann testified that he is opining, based upon his opinions as to the credibility of claims of responsibility that he attributes to Hamas, that Hamas "more likely than not" participated in the commission of the 15 attacks at issue.  Id. (Kohlmann CL Tr. at 86:4-6, 193:2-14, 194:10-16, 195:13-25).

(3)   Kohlmann is not qualified to determine culpability for an attack

682.    Kohlmann has never before been proffered as an expert in determining whether Hamas was responsible for committing a terrorist attack.  Id. (Kohlmann CL Tr. at 245:2-5).

683.    Kohlmann has no advanced degree other than a law degree.   Schuster Dec. Ex. 211 (Kohlmann Rep. Ex. 1).

684.    Kohlmann has no advanced degree in the study of terrorism.  Id.

685.    Kohlmann has no advanced degree in the study of Hamas.  Id.

686.    Kohlmann has never been a member of a law enforcement agency and has never graduated from a law enforcement academy.  Schuster Dec. Ex. 187 (Kohlmann CL Tr. at 160:8-18).

687.    Kohlmann has never been trained as an intelligence agent, been part of the military or received any training from the military.  Id. (Kohlmann CL Tr. at 160:19-161:6).

-138-

688.   Kohlmann has never been a prosecutor or a judge.  Id. (Kohlmann CL Tr. at 162:3-14).

689.   Other than coursework in college that included the "elements of forensic evidence in a social studies context," Kohlmann has never received any formal training in forensic science through a formal academic process.  Id. (Kohlmann CL Tr. at 168:15-170:5).

690.   Kohlmann has never received any formal training in examining photographs for tampering and doctoring outside of being trained in how to use Adobe Photoshop.  Id. (Kohlmann CL Tr. at 168:15-17, 171:12-172:9).

691.   None of Kohlmann's "major papers," as listed in his *curriculum vitae*, has as its principal subject how to determine who perpetrated a terrorist attack.  Id. (Kohlmann CL Tr. at 232:3-15); Ex. 211 (Kohlmann Rep. Ex. 1).

692.   Kohlmann testified that his "expertise with Hamas communiq[ués] and Hamas propaganda" is from the material that has been released through Hamas websites and that he is not "immediately familiar with the vast body that exists beyond the electronic world." Schuster Dec. Ex. 187 (Kohlmann CL Tr. at 334:9-335:21).

693.   Kohlmann proposed to offer expert testimony regarding the Al Qaeda terrorist group in the United States v. Ahmed Omar Abu Ali (E.D. Va. 2005) case, but the court excluded his testimony.  Schuster Dec. Ex. 212 (Kohlmann CL Dep. Ex. 9 at 24:6-29:10).

694.   Kohlmann testified that his understanding of the reason the court excluded his proposed testimony in the Abu Ali case is that the government submitted "paperwork" late, not because the court concluded he lacked the necessary credentials.  Schuster Dec. Ex. 187 (Kohlmann CL Tr. at 261:25-287:12).

-139-

695.     The transcript of the <u>Daubert</u> hearing in the <u>Abu Ali</u> case indicates that the court rejected Kohlmann's proposed testimony on the ground that he lacked the necessary qualifications to provide that testimony.  Schuster Dec. Ex. 212 (Kohlmann CL Dep. Ex. 9 at 9:13-19, 13:1-9, 28:1-10, 28:16-20).

696.     In reference to the expert testimony Kohlmann proposed to offer in the <u>Abu Ali</u> case, the court stated that simply reading about Al Qaeda on the Internet "doesn't make him an expert on Al Qaeda[.]" <u>Id.</u> (Kohlmann CL Dep. Ex. 9 at 9:13-19).

697.     The court in <u>Abu Ali</u> also stated that "I have difficulty with the idea that someone who has never done any real law enforcement or intelligence work where he has infiltrated terrorist cells or worked with terrorists or had contact with them is going to come in here and tell the jury that based upon what he's read on the Internet and his – his own writings that he thinks that this al-Fak'asi cell and Qahtani cell belong to al-Qaeda, if that's all you have, it's not going to happen in this courtroom." <u>Id.</u> (Kohlmann CL Dep. Ex. 9 at 13:1-9).

698.     Even after reading the order excluding his proposed testimony in the <u>Abu Ali</u> case and the <u>Abu Ali</u> transcript, Kohlmann stated that if asked in the future to testify as to the reasons why he was excluded, he would again testify that his understanding was that the government submitted his paperwork late.  Schuster Dec. Ex. 187 (Kohlmann CL Tr. at 271:3-273:21, 278:23-282:17).

699.     Kohlmann repeatedly claimed that he is not trained in reading legal documents, and therefore could not state whether the reasons stated in the <u>Abu Ali</u> transcript about his qualifications were the reasons why he was excluded in that case.  <u>Id.</u> (Kohlmann CL Tr. at 273:3-275:3, 275:25-276:8, 283:8-287:12).

-140-

700.   Although Kohlmann claimed at his deposition that the <u>Abu Ali</u> transcript was a legal document that he is not trained to understand, in his report Kohlmann specifically cites and quotes from three separate legal opinions in lawsuits in which he was accepted as an expert, and those quotes all relate to Kohlmann's purported qualifications as an expert, precisely the same topic addressed in the transcript of the <u>Abu Ali</u> case in which Kohlmann was excluded. Schuster Dec. Ex. 210 (Kohlmann Rep. at 4); Ex. 187 (Kohlmann CL Tr. at 275:7-276:15).

701.   Kohlmann graduated from the University of Pennsylvania Law School with a *Juris Doctorate* degree in 2004.  Schuster Dec. Ex. 211 (Kohlmann Rep. Ex. 1).

702.   When asked to confirm whether he read case law in law school, Kohlmann stated that "I may have read case law in law school, but honestly law school was six years ago.  I don't recall most of what happened there."  Schuster Dec. Ex. 187 (Kohlmann CL Tr. at 287:13-15, 288:25-289:7).

(4)   <u>Kohlmann is not an expert on Hamas</u>

703.   The principal focus of Kohlmann's research has been Al Qaeda.  <u>Id.</u> (Kohlmann CL Tr. at 125:14-19, 126:6-21, 150:10-21); Ex. 213 (Kohlmann CL Dep. Ex. 5 at 86:24-87:3).

704.   According to Kohlmann, his work with respect to Al Qaeda involves more than just reviewing materials on the internet – he has, instead, interviewed individuals associated with Al Qaeda; spoken at "great length" with other experts who study Al Qaeda; presented "training courses" on Al Qaeda; published papers in "scholarly and other" journals about Al Qaeda; traveled abroad "frequently" to discuss the issue of Al Qaeda with foreign governments; spoken "regularly" about Al Qaeda in "various different public arenas"; and worked with a United Nations team involved in combating Al Qaeda and its financing.  Schuster Dec. Ex. 187 (Kohlmann CL Tr. at 130:2-131:20).

-141-

705.    Kohlmann has been qualified as an expert in U.S. courts to testify in cases involving alleged support to Al Qaeda. Id. (Kohlmann CL Tr. at 237:23-239:8).

706.    Kohlmann believes that Hamas and Al Qaeda are "vastly different from each other." Id. (Kohlmann CL Tr. at 127:24-129:22).

707.    Kohlmann initially testified that he had been proffered as an expert on Hamas in several U.S. cases, including U.S. v. Ali Asad Chandia, U.S. v. Hassan Abu Jihaad, U.S. v. Mohamed Shnewer et al. and U.S. v. Oussama Kassir (as listed on his CV). Id. (Kohlmann CL Tr. at 240:18-242:6). Kohlmann testified that he was "100% positive" that he was proffered as an expert in Hamas in Shnewer, and "sure" that he was proffered as such in Oussama Kassir. Id. After being presented with the government's proffers of his testimony in those cases at his deposition, Kohlmann conceded that he was not proffered as an expert in Hamas in any of them. Id. (Kohlmann CL Tr. at 314:22-322:25); Ex. 214 (Kohlmann CL Dep. Ex. 11 at 995:14-17); Ex. 215 (Kohlmann CL Dep. Ex. 12 at 47:3-49:12); Ex. 216 (Kohlmann CL Dep. Ex. 13 at 5829:1-4); Ex. 217 (Kohlmann CL Dep. Ex. 14 at 704:6-11).

708.    Kohlmann claims to have devoted a small portion of his time to researching Hamas. Schuster Dec. Ex. 187 (Kohlmann CL Tr. at 151:4-153:2).

709.    Kohlmann has never visited Israel or the Palestinian Territories. Id. (Kohlmann CL Tr. at 139:19-23).

710.    Kohlmann has never interviewed any members of Hamas, except for one instance in which he participated in a telephone interview with a Hamas member conducted by a colleague of his at the Investigative Project in Washington, D.C., where Kohlmann worked during school. Id. (Kohlmann CL Tr. at 138:13-139:23); Ex. 211 (Kohlmann Rep. Ex. 1).

-142-

711.    Kohlmann has never published a book about Hamas. Schuster Dec. Ex. 187 (Kohlmann CL Tr. at 222:23-25).

712.    Kohlmann has never worked with the United Nations specifically regarding Hamas. Id. (Kohlmann CL Tr. at 139:24-140:11).

713.    Kohlmann has never traveled abroad to speak with foreign governments where the primary focus of those governments' inquiries was Hamas. Id. (Kohlmann CL Tr. at 140:17-141:14).

714.    Kohlmann could not recall any instance of being asked by a foreign government to give presentations to academics and government officials specifically regarding Hamas. Id. (Kohlmann CL Tr. at 142:9-15).

715.    Kohlmann's *curriculum vitae* does not identify a "major paper" that he published that focused on Hamas.  Schuster Dec. Ex. 211 (Kohlmann Rep. Ex. 1); Ex. 187 (Kohlmann CL Tr. at 223:2-224:15, 229:7-232:2).

716.    Kohlmann testified that the "principal subject" of three of his "major papers" was Hamas.  Schuster Dec. Ex. 187 (Kohlmann CL Tr. at 223:5-224:15).  With regard to the first paper, although Kohlmann initially claimed that a "significant part of it" contained a discussion of Hamas, when confronted with the actual document, he testified that it did not refer to Hamas at all.  The other two papers were summaries of Congressional testimony in which Kohlmann included references to Hamas as part of discussions about Al Qaeda financing.  Id. (Kohlmann CL Tr. at 223:5-224:15, 229:7-232:2).

717.    Kohlmann represented to a court in Denmark that he had given evidence about Hamas in a case in New York.  Kohlmann testified that he "believe[d] [he] was referring to the Rafiqsabir case."  Kohlmann conceded in his deposition testimony in these lawsuits that the

-143-

transcript of his testimony in the case to which he was referring in his representation to the Danish court does not mention Hamas at all.  Id. (Kohlmann CL Tr. at 252:15-254:8).

718.    Kohlmann has never before been proffered as an expert in "how likely it is that the underlying statements [on Hamas websites] are truthful."  Id. (Kohlmann CL Tr. at 244:13-25).

> (5)  Kohlmann's experience collecting materials from Internet websites does not qualify him as an expert

719.    Kohlmann claims that his relevant "expertise" includes "the use of the internet by Hamas and other terrorist organizations in the Palestinian territories."  Id. (Kohlmann CL Tr. at 324:9-325:20, 334:9-335:21).

720.    Kohlmann claims to have amassed "one of the largest digital collections of terrorist multimedia and propaganda in the world"; that he "compare[s] and contrast[s] particular sources in question with other analogous sources contained in my digital archive"; and that in preparing his report, he reviewed his own collection, certain Internet archives and the current versions of certain websites he contends are affiliated with Hamas.  Schuster Dec. Ex. 210 (Kohlmann Rep. at 3, 5, 7).

721.    Kohlmann testified that with the exception of work he did at the Investigative Project until late 2003, which was saved on its database, his Hamas sub-database is a fairly accurate record of the Hamas websites he reviewed and that there were no sites that he "was reading [and] didn't save information off of or . . . didn't create copies of" because "every Hamas website that [he] was familiar with, every Hamas websites that was available to [him] – [he] would regularly save material" from.  Schuster Dec. Ex. 187 (Kohlmann CL Tr. at 471:21-474:4, 480:24-481:14)

722. Kohlmann opined about the "credibility" of Hamas claims of responsibility, testifying that "a single credible claim alone is enough to believe that it's more likely than not that Hamas was engaged in some level of culpability in a particular attack." Id. (Kohlmann CL Tr. at 193:2-21).

723. Kohlmann testified that he was qualified to opine about whether a claim was credible because "[i]f you study the Hamas websites, if you collect the Hamas websites, if you study them for a period of, I don't know, seven, eight, nine years, you start to learn about lessons how the websites operate [ ], the credibility or truthfulness of the statements offered there and about whether or not Hamas regards posting false information as something that should be avoided." Id. (Kohlmann CL Tr. at 198:2-11).

724. Kohlmann also testified that it was "because of [his] experience in studying Hamas propaganda and their claims of responsibility from the web that are issued through their internet website" that he was able to conclude that a single "credible" claim alone was enough for him to conclude that it was "more likely than not that Hamas was engaged in some level of culpability in a particular attack." Id. (Kohlmann CL Tr. at 192:14-193:21).

725. An independent forensic analysis of Kohlmann's collection of website postings relating to Hamas establishes that Kohlmann did not collect contemporaneously with their publication the claims of responsibility on which he relies in these lawsuits. Rather, an independent forensic analysis of Kohlmann's collection of purportedly Hamas websites confirms that he saved more than 94 percent of these websites in 2005 or thereafter — long after all of the 15 attacks at issue took place — and he saved more than 68 percent of these websites after plaintiffs hired him to testify in these lawsuits. This forensic analysis also confirms that although his report cites 53 unique URLs pertaining to the relevant attacks, 38 of these URLs were not

-145-

found in the collection, and 14 of the 15 remaining URLs were preserved by Kohlmann after he was hired by plaintiffs in these lawsuits. Schuster Dec. Ex. 2 (Novak NW Dec. ¶¶ 10-12, 15-17, 21, 24-30).

> (6) **Kohlmann cannot authenticate the contents of any of the websites upon which he relies**

726. Kohlmann asserts that his analysis is based upon the presence on the internet of what he considers to be an authentic Hamas claim of responsibility on websites he attributes to Hamas. Schuster Dec. Ex. 210 (Kohlmann Rep. at 45); Ex. 187 (Kohlmann CL Tr. at 51:23-52:9, 191:24-192:13, 194:10-195:25, 197:4-17, 203:20-204:21, 217:3-24, 340:7-341:12, 404:10-405:6, 428:25-429:9).

727. For each of the 15 attacks, Kohlmann does not know who posted any of the claims of responsibility on websites he attributes to Hamas or whether the individuals who posted the claims had first-hand knowledge of the information they were posting. Schuster Dec. Ex. 187 (Kohlmann CL Tr. at 381:24-387:16).

728. Kohlmann did not download most of the statements that he attributes to Hamas until after he was retained by plaintiffs. Schuster Dec. Ex. 2 (Novak NW Dec. ¶¶ 16-17, 21, 28-30).

729. Any statements that Kohlmann downloaded after they were originally published may not truly depict the web page as it appeared when it was first published. Id. (Novak NW Dec. ¶ 31).

(7) Kohlmann's opinions and testimony are based upon insufficient and unreliable sources and are not the product of reliable principles and methods, and Kohlmann has not applied his methods reliably to the facts of these cases

730.    Kohlmann has not personally investigated any of the 15 attacks at issue or examined any forensic evidence concerning them. Schuster Dec. Ex. 187 (Kohlmann CL Tr. at 434:2-23).

731.    For each of the 15 attacks, Kohlmann quotes or summarizes the claims of responsibility he found on websites or internet newsletters and forums he attributes to Hamas and concludes in his report that such claims of responsibility "demonstrate [Hamas's] culpability in the execution of" these attacks. Schuster Dec. Ex. 210 (Kohlmann Rep. at 31-45).

732.    Kohlmann testified that if "you have a single document on an official credible Hamas website which has been issued by Hamas in order to claim credit for a particular operation[,] either in the form of a communi[qué], in the form of the Glory Record or in the form of an official magazine put out by the al-Qassam Brigades, that alone is sufficient to indicate that more likely than not there is a degree of culpability on the part of Hamas." Schuster Dec. Ex. 187 (Kohlmann CL Tr. at 215:16-216:12).

733.    Kohlmann testified that he did not examine whether the facts stated on websites he attributes to Hamas were trustworthy and accurate because "[m]y expert report was judging on the basis that my experience with Hamas websites indicates that in the majority of case[s] that the Hamas communi[qués,] while maybe not entirely accurate word for word[,] have strong indications of culpability, more likely than not they were involved, that means that in these cases when there's a claim of responsibility by default on a Hamas site and it's a credible Hamas site and authentic Hamas site by default that means it's more likely than not that Hamas played some role in carrying out the attack." Id. (Kohlmann CL Tr. at 340:7-341:12).

-147-

734.    Other than what Kohlmann learned regarding the "Mike's Place" attack while working on another project independent of his work on these lawsuits, Kohlmann testified he is not aware of what Hamas's role actually was in perpetrating any of the other 14 attacks. With regard to these attacks, he testified he knows "what Hamas claims to have done." Id. (Kohlmann CL Tr. at 405:7-406:23).

735.    Kohlmann testified that terrorist groups may issue a claim of credit for propaganda purposes. Id. (Kohlmann CL Tr. at 323:2-7).

736.    Kohlmann testified that terrorist groups have various motivations for making claims of credit for attacks, including helping them with recruitment, financing, to inspire others to join them and inspiring others to take action similar to the group's actions. Id. (Kohlmann CL Tr. at 323:8-324:4).

737.    Kohlmann testified that additional motivations for a group claiming credit include earning public support and achieving glory or praise for the group. Id. (Kohlmann CL Tr. at 325:21-326:4).

738.    Kohlmann testified that in doing his work on his report in this case, he only accounted for these motivations "generally, but not specifically" and that he "did not assess claim by claim, because that's not what I was tasked to do." Id. (Kohlmann CL Tr. at 326:5-20).

739.    Kohlmann testified that some terrorist groups falsely deny responsibility for attacks they committed and that he was "aware [Hamas] denied culpability in certain instances." Id. (Kohlmann CL Tr. at 343:24-344:20).

740.    Kohlmann testified he was aware that there are certain attacks for which more than one group made a claim of responsibility, and that there have been attacks for which

-148-

Hamas has claimed credit and other groups also claimed credit. Id. (Kohlmann CL Tr. at 345:13-346:4).

741.    Prior to signing his report, Kohlmann did not determine whether anyone else claimed credit for an attack for which he opined Hamas had claimed credit. Id. (Kohlmann CL Tr. at 346:5-24).

742.    Kohlmann testified that his "observation based upon studying ... the process by which Hamas releases information through its internet website" is that "the more times that Hamas states something, the more confident its leadership [is] that it was actually behind that attack." Id. (Kohlmann CL Tr. at 187:3-188:21).

743.    With respect to the "evidence" submitted in support of claims he attributes to Hamas, Kohlmann testified that he "did not engage in a technical analysis" to determine that the photos he relied upon were not doctored. Id. (Kohlmann CL Tr. at 367:19-370:14).

744.    Kohlmann did not engage "in a specific technical analysis" to verify that a will posted in connection with a particular attack was in fact the actual will of the person who committed the attack. Although he noted that he saw a photograph in which the individual depicted was holding a handwritten copy of his will, and that he saw videos related to two attacks in which the individuals depicted purported to read their wills, Kohlmann "didn't do anything specific" to determine if the person holding up the will was actually the person alleged to be the attacker. Id. (Kohlmann CL Tr. at 370:18-374:8).

745.    Kohlmann could not say whether the wills he cited were written for a specific attack, because he was not sure whether they indicated a target or when an attack would take place. Id. (Kohlmann CL Tr. at 374:9-375:19)

746.    Kohlmann cited the attackers' "biographies" which contained information gathered posthumously, including from the families of the deceased.  However, in determining the reliability of these biographies, Kohlmann did not consider that statements of family members may not be accurate, even though Hamas provided payments to the families of suicide bombers, because he does not "think it has any impact on the reliability whether or not Hamas pays." Id. (Kohlmann CL Tr. at 375:20-378:23).

747.    Jenkins emphasizes that these are all relevant considerations in assessing the evidence, because photos may be doctored, biographical material may be assembled after an attack and families of suicide terrorists may obtain social and economic rewards if they cooperate with a terrorist group and provide them with the information they seek.  Schuster Dec. Ex. 172 (Jenkins NW Rep. 31-33).

(8)    Kohlmann's methodology fails to satisfy expert standards and his own usual standards

748.    Kohlmann states in his report that "to determine the provenance of particular secondary or tertiary sources, I engage in a traditional social science method known as 'comparative analysis,'" which requires him "to compare and contrast particular sources in question with other analogous sources contained in my digital archive, searching for common threads and themes." Schuster Dec. Ex. 210 (Kohlmann Rep. at 5).

749.    Kohlmann testified that in his work for plaintiffs in these cases, "I did not do a comparative analysis of different sources and I didn't do an analysis of the individual facts in the communi[qués] to see whether or not they comported with exactly what Israeli police or Israeli government or other sources might have determined." Schuster Dec. Ex. 187 (Kohlmann CL Tr. at 342:16-343:23).

-150-

750.    Kohlmann testified that he did not look to what other sources apart from Hamas have said with regard to who carried out these attacks because he "was not asked to do that as part of this project."  Id. (Kohlmann CL Tr. at 202:14-203:19).

751.    For the purposes of writing his report, once Kohlmann determined that Hamas claimed responsibility on a website that he attributed to Hamas, he did not check whether any other group also claimed credit for the attack because "[t]hat was not part of my initial tasking."  Kohlmann did not examine the purported websites of other terrorist organizations to look for other claims of responsibility until after he reviewed the rebuttal report of Brian Jenkins. Id. (Kohlmann CL Tr. at 56:8-14, 77:11-20, 346:5-24, 366:4-21).

752.    As part of his usual "methodology" for determining whether a claim on a website Kohlmann attributes to Hamas is in fact true, Kohlmann would perform an additional check beyond the claim itself.  Kohlmann testified that he did not do any such additional check for purposes of his report in these cases, nor did he perform any research beyond examining purported Hamas claims of responsibility concerning the 15 attacks at issue, apart from the research he had done concerning two of the attacks that he had performed on a prior project. Instead, he did not assess the veracity of the claims upon which he relies based upon what plaintiffs asked him to do.  Id. (Kohlmann CL Tr. at 200:24-202:7, 203:5-19, 206:13-23).

(9)  Kohlmann's conclusions concerning responsibility for the Bus 19 attack

753.    Kohlmann's analysis of the January 29, 2004 Jerusalem bombing of Bus 19 on pages 43-44 of his report consists of his quoting and summarizing materials he found on websites he attributes to Hamas.  Schuster Dec. Ex. 210 (Kohlmann Rep. at 43-44).

754.    Based upon the materials Kohlmann analyzed in connection with the Bus 19 attack, Kohlmann concludes in his report that Hamas distributed "authentic" claims of

-151-

responsibility for the attack which "demonstrate its culpability in the execution" of this attack. Id. (Kohlmann Rep. at 45).

755.    Outside of any analysis as to whether the claims were made on Hamas websites, Kohlmann does not analyze in his report the quality of any of the evidence regarding the Bus 19 attack on these websites. Id. (Kohlmann Rep. at 43).

756.    Kohlmann did not seek to determine what role Hamas actually played in perpetrating this attack because that was "not part of what I was tasked to do" by plaintiffs and, consequently, he does not know what Hamas did or did not actually do. Schuster Dec. Ex. 187 (Kohlmann CL Tr. at 402:10-403:11).

757.    Kohlmann also describes in his report how one of the websites he attributes to Hamas criticized a rival claim of responsibility for this attack made by Hamas's rival, the Al Aqsa Martyrs Brigades (the "AAMB"), and how those websites also stated that the AAMB subsequently rejected any ties to the attack. Schuster Dec. Ex. 210 (Kohlmann Rep. at 43-44).

758.    Kohlmann's report includes no other information as to what the AAMB sources said, outside of the information that Kohlmann claims appears on a website he attributes to Hamas. Id.

759.    Kohlmann did not search the internet for a rival AAMB claim of responsibility for the Bus 19 attack before he submitted his report. Schuster Dec. Ex. 187 (Kohlmann CL Tr. at 346:5-24).

760.    Kohlmann did not analyze whether the AAMB perpetrated the Bus 19 attack. Id. (Kohlmann CL Tr. at 64:18-65:12); Ex. 210 (Kohlmann Rep. at 43-44).

761. Kohlmann testified that he was unaware that the AAMB claimed responsibility for the Bus 19 attack on its website one year after the attack occurred. Schuster Dec. Ex. 187 (Kohlmann CL Tr. at 388:11-395:15); Ex. 185 (Azoulay NW Reb. Rep. at 124); Ex. 186 (Azoulay NW Reb. Rep., Annexes B5 and B6).

762. The Israel Police investigation file for the Bus 19 attack that NatWest's expert Moshe Azoulay was permitted to review shows that members of the AAMB were found guilty of perpetrating the attack. See supra ¶¶ 553-54, 558.

763. According to Kohlmann's report, Hamas claimed responsibility for the Bus 19 attack by posting communiqués on websites that Kohlmann attributes to Hamas. Schuster Dec. Ex. 210 (Kohlmann Rep. at 43).

764. According to Kohlmann's report, Hamas also published the last will and testament and an "in-depth biography" and pictures of the attacker on websites that Kohlmann attributes to Hamas. Id.

765. There is no indication in the Israel Police investigation file for the Bus 19 attack that NatWest's expert Moshe Azoulay was permitted to review that anyone involved in the attack was a member of Hamas. See supra ¶¶ 555, 559, 562.

766. Kohlmann attaches as an appendix to his report a document that purports to be Ja'ara's last will and testament, consisting of a photo of the alleged handwritten will of Ja'ara posted on a website that Kohlmann attributes to Hamas. Schuster Dec. Ex. 188 (Kohlmann Rep. App'x p. 336); Ex. 185 (Azoulay NW Reb. Rep. at 122).

767. At his deposition, Kohlmann agreed that in the alleged handwritten will Ja'arah's name was written in different ink from the rest of the document, but he testified that he

-153-

did not consider that in his analysis for his report. Schuster Dec. Ex. 187 (Kohlmann CL Tr. at 414:21-415:17).

768. Kohlmann testified that when reviewing the alleged handwritten will he noticed that there were portions that were crossed out, but he could not recall whether he "attempted to determine the substantive nature of what was in the text." Id. (Kohlmann CL Tr. at 416:18-418:24).

769. Kohlmann also cites a different, "typed" version of Ja'ara's will posted on a website that Kohlmann attributes to Hamas. Schuster Dec. Ex. 218 (Kohlmann CL Dep. Exs. 18 and 19); Ex. 210 (Kohlmann Rep. at 43 n. 166.); Ex. 187 (Kohlmann CL Tr. at 412:12-16, 414:4-13); Ex. 185 (Azoulay NW Reb. Rep. at 122).

770. Kohlmann did not compare either will to any other sources. Schuster Dec. Ex. 185 (Azoulay NW Reb. Rep. at 122).

771. Kohlmann's report also quotes from another claim of responsibility posted on a website Kohlmann attributes to Hamas that reports the Bus 19 attack was perpetrated to avenge the Al-Zaytoun operation. Id. (Azoulay NW Reb. Rep. at 123); Ex. 210 (Kohlmann Rep. at 43).

772. The claim of responsibility issued by Hamas that states that Hamas committed the Bus 19 attack in retaliation for the Al-Zaytoun operation is inconsistent with Nashash's court sentence that indicates that Ja'ara's involvement with Hamas ended before the Al-Zaytoun operation took place. See supra ¶¶ 536-540.

773. Kohlmann does not cite the third will executed by the suicide bomber Ja'ara in the name of the AAMB, as described above. See supra ¶¶ 533-35.

774. Kohlmann also does not cite a U.S. National Counterterrorism Center report that attributes the Bus 19 attack to the Al Aqsa Martyrs' Brigades. Schuster Dec. Ex. 185 (Azoulay NW Reb. Rep. at 124-25); Ex. 219 (Azoulay NW Reb. Rep., Annex B7).

(10) The documents upon which Kohlmann relies are inadmissible under Israeli evidence law

775. The claims contained in the websites upon which Kohlmann relies would be deemed inadmissible as hearsay in a civil lawsuit in an Israeli court seeking damages from a defendant on the ground that it had some responsibility for the attacks that are the subjects of these claims under the Israeli Evidence Ordinance. Schuster Dec. Ex. 185 (Azoulay NW Reb. Rep. at 115-16).

776. Under the Israeli Computers Law, printed web pages are classified as "computer output." Id. (Azoulay NW Reb. Rep. at 115).

777. Under Section 36 of the Israeli Evidence Ordinance, computer output may be regarded as an "institutional record," which would be admissible only upon proof that:

    a. in the course of its regular conduct, the institution entered a record of an event "proximate to its occurrence" (Section 36 (a) (1) of the Ordinance); and

    b. "the method of collection of data on the subject of the record and the record's editing attest to the truth of its content" (Section 36 (a)(2) of the Ordinance).

Id. (Azoulay NW Reb. Rep. at 116).

778. When the record is a computer output, the following must also be proven:

    a. the method of generating the record attests to its credibility (Section 36(a)(3)(a) of the Ordinance); and

    b. The institution regularly employs reasonable security measures to protect against an infiltration to the content of the computer materials and from failures in the computer's operation. (Section 36(a)(3)(b) of the Ordinance).

Id.

779.    The above are aggregate conditions that require proof by an expert in computerized security systems and by a person that may attest to the actual entry of the record. Id.

780.    The computer outputs on which Kohlmann bases his opinions do not fulfill any of the requirements under Section 36 of the Israeli Evidence Ordinance.  Id.

781.    Kohlmann describes how over time the websites he cites were "attacked" and became unavailable, and how they were repeatedly recreated, in each instance under a new name and a new URL.  Id. (Azoulay NW Reb. Rep. at 117).

782.    Kohlmann's statements above regarding the websites he cites suffice to indicate these websites have experienced an insufficient level of security to allow their contents to be received in evidence under the Israeli Evidence Ordinance.  Id.

783.    Status as an "institutional record" is normally granted to more reliable sources of information, such as bank, university and other institutional websites, and even then, the party that wishes to submit those records must satisfy the aggregate conditions required by the Israeli Evidence Ordinance.  Id.

784.    The Israeli Evidence Ordinance also requires proof by means of testimony from an expert in the field of computerized systems security that the "institution" maintains computerized information security at such a level as to justify trusting its contents.  Id.  (Azoulay NW Reb. Rep. at 117-18).

785.    Plaintiffs have presented no such testimony, and Kohlmann cannot serve as such a witness because he has no personal acquaintance with these systems and their procedures.  Schuster Dec. Ex. 187 (Kohlmann CL Tr. at 382:8-387:16).

786.    The spokesman announcements and other publications on the Israeli

Foreign Ministry's and Prime Minister's office websites that Kohlmann cites would also be

deemed inadmissible as hearsay under Israeli law because:

a.    they do not satisfy the requirements of the Evidence Ordinance and
of caselaw to be recognized as institutional records; and

b.    they cannot be submitted without supporting testimony from a
witness on behalf of the entity that published these materials
concerning the manner in which these documents were compiled
and the means of website security.

Schuster Dec. Ex. 185  (Azoulay NW Reb. Rep. at 119).

**I.    The Qualifications Of Brian Jenkins, An Expert Retained By NatWest**

787.    Jenkins currently serves as Senior Advisor to the President of the RAND

Corporation.  Schuster Dec. Ex. 220 (Jenkins NW Rep. Ex. A).

788.    RAND is a non-profit federally-contracted research center devoted to

research on issues of national interest.  Schuster Dec. Ex. 172 (Jenkins NW Rep. at 2 n.1).

789.    Jenkins initiated the RAND Corporation's research program on

international terrorism in 1972.  Schuster Dec. Ex. 220 (Jenkins NW Rep. Ex. A).

790.    From 1972 to 1989, Jenkins directed RAND's research on political

violence.  Id.

791.    From 1986 to 1989, Jenkins was also Chairman of RAND's Political

Science Department.  Id.

792.    From 1989 to 1998, Jenkins was the Deputy Chairman of Kroll

Associates, an international investigative and consulting firm.  Id.

793.    In 1983, Jenkins served as an advisor to the Long Commission, which was

convened to examine the circumstances and response to the bombing of the U.S. marine barracks

in Lebanon.  Id.

-157-

794.    In 1984, Jenkins assisted the Inman Panel in reviewing the security of American diplomatic facilities abroad and in 1985-86, he served as a member of the Committee of the Embassy of the Future, which established new guidelines for the construction of U.S. diplomatic posts.  Id.

795.    In 1989, Jenkins served as an advisor to the national commission established to review terrorist threats following the bombing of PanAm 103.  Id.

796.    In 1993, Jenkins served as a member of the team engaged by the New Jersey-New York Port Authority to review threats and develop new security measures for the World Trade Center.  Id.

797.    In 1996, President Clinton appointed Jenkins to the White House Commission on Aviation Safety and Security.  Id.

798.    Jenkins also is the Director of the National Transportation Security Center at the Mineta Transportation Institute, and since 1997 has directed the institute's continuing research on protecting surface transportation against terrorist attacks.  Id.

799.    Jenkins has served as a consultant to or carried out assignments for several government agencies, including the U.S. Departments of State, Defense and Homeland Security and the U.S. Nuclear Regulatory Commission.  Id.

800.    As part of its international project to create a global strategy to combat terrorism, the Club of Madrid appointed Jenkins in 2004 to lead the international working group on the role of intelligence.  Id.

801.    Jenkins has written extensively about intelligence collection, and methods of intelligence analysis.  Id.

-158-

802.    Jenkins is the author of *International Terrorism: A New Mode of Conflict*, the editor and co-author of *Terrorism and Personal Protection*, co-editor and co-author of Aviation Terrorism and Security, and a co-author of *The Fall of South Vietnam*.  His book *Unconquerable Nation: Knowing Our Enemy, Strengthening Ourselves* was published in 2006. His latest book, *Will Terrorists Go Nuclear?* was published in September 2008.  Schuster Dec. Exs. 220-21 (Jenkins NW Rep.,\ Exs. A-B).

803.    Jenkins is also the author of over 200 articles, book chapters and published research reports on conflict and crime.  Schuster Dec. Ex. 221 (Jenkins NW Rep. Ex. B).

804.    According to Jenkins, to be accepted, academic research requires critical peer review.  Schuster Dec. Ex. 172 (Jenkins NW Rep. at 7).

805.    According to Jenkins, the role of a peer review is to make a reasoned judgment about the content and conclusions of the document under review and to make sure the underlying analysis is methodologically sound.  Id. (Jenkins NW Rep. at 8).

806.    According to Jenkins, the criteria for that judgment include the validity of its arguments, its factual accuracy, the appropriateness of its methods, its objectivity, its thoroughness and the soundness of its logic.  According to Jenkins, a reviewer may not always agree with the authors on issues, but should insist that alternative arguments be discussed, or at least acknowledged.  Id.

807.    Shaked and Jenkins agree that a terrorist group's claim of responsibility for an attack is a form of propaganda.  Id. (Jenkins NW Rep. at 17); Ex. 187 (Shaked CL Tr. at 79:17-80:8).

-159-

808.    Shaked, Jenkins and Kohlmann agree that there are multiple motivations for a group to claim responsibility for an attack.  Schuster Dec. Ex. 172 (Jenkins NW Rep. at 17); see supra ¶¶ 511, 736-37.

809.    Taking these considerations into account, Jenkins explained that, a terrorist group's claim of responsibility proves "only that someone has made the claim." Schuster Dec. Ex. 172 (Jenkins NW Rep. at 17).

810.    The Popular Resistance Committees (PRC), the Popular Front for the Liberation of Palestine (PFLP), the Al-Aqsa Martyrs' Brigades (AAMB), the Palestinian Islamic Jihad (PIJ) and the Izz ad-Din al-Qassam Brigades (the military wing of Hamas) are among the major terrorist groups that claimed responsibility for terrorist attacks during the Second Intifada. Id. (Jenkins NW Rep. at 11-16).

811.    There were numerous unclaimed terrorist attacks during the Second Intifada.  Id. (Jenkins NW Rep. at 16).

812.    There are multiple motivations for terrorist groups such as Hamas to make claims of responsibility, including competition with other groups, recruiting new members, obtaining funding and gaining public support.  Id. (Jenkins NW Rep. at 17-18); Ex. 187 (Kohlmann CL Tr. at 323:2-324:5, 325:21-326:4); Ex. 180 (Shaked CL Tr. at 80:5-83:12).

813.    Jenkins and Shaked agree that terrorist groups at times take credit for attacks they did not commit, deny or fail to take credit for attacks they did commit and issue competing claims of responsibility.  Schuster Dec. Ex. 172 (Jenkins NW Rep. at 20-26); Ex. 180 (Shaked CL Tr. at 111:14-25, 121:20-122:8).

814.    Kohlmann agrees that there is "literature that speaks to" the phenomenon of terrorists making false claims of credit for attacks they did not commit, and agrees that

-160-

terrorist groups at times falsely deny responsibility for attacks, and that for some attacks more than one group has made a claim of responsibility. Schuster Dec. Ex. 187 (Kohlmann CL Tr. at 332:14-333:7, 343:24-344:20, 345:13-22).

815.    Hamas has made claims of responsibility that have been proven false. Schuster Dec. Ex. 172 (Jenkins NW Rep. at 21-22); Ex. 180 (Shaked CL Tr. at 88:18-95:2).

816.    Kohlmann testified that he is "aware [Hamas has] issued claims of responsibility which have [been] brought into question." Schuster Dec. Ex. 187 (Kohlmann CL Tr. at 334:9-335:7).

817.    Hamas has denied responsibility for attacks when other groups claimed that Hamas committed those attacks. Schuster Dec. Ex. 172 (Jenkins NW Rep. at 22-24); Ex. 180 (Shaked CL Tr. at 112:8-115:3); Ex. 187 (Kohlmann CL Tr. at 343:24-344:20).

818.    According to Jenkins, a responsible analyst cannot take claims of responsibility at face value, but instead must undertake a rigorous analysis of the claims in conjunction with all other available evidence. Schuster Dec. Ex. 172 (Jenkins NW Rep. at 28-34).

819.    According to Jenkins, Hamas, like other Palestinian groups, had a powerful incentive to make claims of responsibility for terrorist attacks during the Second Intifada. It considered itself under strong popular pressure, and had to hold the allegiance of its constituents. Although various Palestinian factions cooperated at times, Hamas was in competition with other Palestinian factions. Hamas wanted to attract other action-prone militants. Hamas had to signal continued strength and operational capability in the face of determined Israeli efforts to destroy it. Id. (Jenkins NW Rep. at 34).

820.    According to Jenkins, Shaked's own narrative of the Bus 19 attack – in which he concedes that Hamas's rival the AAMB and not Hamas helped Ja'ara perpetrate this attack, and Hamas was involved only with a prior failed attempted attack – demonstrates that Hamas's claims of responsibility are unreliable and that even the "evidence" a group submits in support of their claims (such as photographs of the bombers or videotaped wills) can be misleading.  Id. (Jenkins NW Rep. at 41).

821.    Hamas published several claims of responsibility for certain of the attacks at issue in these cases months or years after the attack took place.  For example, the official Hamas announcement claiming responsibility for the May 7, 2002 attack was published by Hamas in June 2008.  Id. (Jenkins NW Rep. at 49-51); Ex. 179 (Shaked NW Rep. at 42); Ex. 210 (Kohlmann Rep. at 33).

822.    Shaked's only explanation as to why Hamas waited so long to publish its claim of responsibility for the May 7, 2002 attack is that Hamas withheld a suicide bomber's name to protect his family, but no one from Hamas told him that this is true.  Schuster Dec. Ex. 179 (Shaked NW Rep. at 43); Ex. 180 (Shaked CL Tr. at 217:17-222:15).

823.    According to Jenkins, late claims of responsibility "must be discounted in an analysis of responsibility, absent a compelling explanation for the delay."  Indeed, in June 2008, according to one scholar Hamas's military wing claimed responsibility for a number of previously unclaimed attacks "in an apparent effort by . . . senior leaders to undermine a ceasefire with Israel."  See supra ¶ 595.

824.    Kohlmann engages in no analysis of the delayed claim of responsibility for the May 7, 2002 attack except to repeat the Hamas statement on the website he attributes to

Hamas that the delay in the claim was to "preserve the integrity of the muhjahideen." Schuster Dec. Ex. 210 (Kohlmann Rep. at 33-34).

825. Kohlmann posits that it is a "reasonable assumption" that the "more occasions Hamas claims responsibility for an individual operation" the more likely it is that its claim is legitimate. Id. (Kohlmann Rep. at 8).

826. According to Jenkins, "there is no accepted methodological basis for this position" because "repetition is not confirmation." Schuster Dec. Ex. 172 (Jenkins NW Rep. at 43).

827. According to Jenkins, "[n]o accepted methodology for analyzing culpability for a terrorist attack would credit a claim of responsibility by itself as reliable proof of responsibility." Id. (Jenkins NW Rep. at 43).

**J. Shaul Naim Purports To Authenticate Documents Upon Which Shaked Relies, But His Proposed Testimony Is Inadmissible**

828. Naim stated in his report that the collection of documents for each attack he included in his report "are authentic records of Israeli law enforcement (including judicial agencies and offices)." Schuster Dec. Ex. 222 (Naim NW Rep. at 7).

829. Naim stated in his report that the collection of documents for each attack he included in his report "appear, in my professional opinion, to be authentic records maintained by Israeli Law Enforcement, (including police officers, prosecutors, courts, or military officials), depending on where the relevant document(s) were maintained." Id. (Naim NW Rep. at 6, n.1).

830. Naim testified that "[w]hen I say it's authentic, I express what I thought was what the document looked like when I saw them. . . . [T]hey appeared – on the face they appeared to be authentic." Schuster Dec. Ex. 223 (Naim CL Tr. at 13:2-11).

-163-

831.    Naim stated in his report that "[i]n making this determination, I relied on my three decades of experience in working in the police investigation field with these types of documents on a daily basis to ensure that the documents were authentic, official records." Schuster Dec. Ex. 222 (Naim NW Rep. at 7).

832.    Naim testified that "you can know when you read material if you read authentic material or not[,] otherwise it's as if the 30 years [of police work] did not exist." Schuster Dec. Ex. 223 (Naim CL Tr. at 82:21-24).

      (1)  Naim is not qualified to authenticate the documents he purports to authenticate

      (a)    <u>Generally</u>

833.    Naim served as a lawyer in the Jerusalem police district's litigation and investigations branches until 2006. Schuster Dec. Ex. 222 (Naim NW Rep. at 3-4).

834.    Of the 14 relevant attacks Naim addresses in his report, only six are identified as occurring in the Jerusalem police district. <u>Id.</u> (Naim NW Rep. at 6).

835.    Accordingly, most of the police records Naim purports to authenticate were not created by the police office in Jerusalem in which Naim previously worked or by the courts in that district. The remainder of the attacks occurred outside of the Jerusalem district and the judicial and law enforcement records pertaining to those attacks were created in entirely different districts. <u>Id.</u>

836.    Naim had worked in his own private law practice for four years when he signed his report. Schuster Dec. Ex. 223 (Naim CL Tr. at 83:3-20, 192:6-9); Ex. 222 (Naim NW Rep. at 4).

837.    Most of Naim's private law practice involves litigating traffic and minor criminal cases.  Schuster Dec. Ex. 223 (Naim CL Tr. at 138:21-139:13); Ex. 222 (Naim NW Rep. at 4).

838.    Naim has never prosecuted cases in military courts in Israel or the Palestinian Territories, and his sole experience practicing in a military court in the Palestinian Territories was his representation of one client only last year.  Schuster Dec. Ex. 223 (Naim CL Tr. at 139:14-142:24).

(b)    Naim is not qualified to authenticate the documents at issue under the Federal Rules of Evidence

839.    Naim has no personal knowledge of any of the documents he purports to authenticate.  Id. (Naim CL Tr. at 13:12-17, 18:11-19:3, 46:14-47:15, 52:23-53:8).

840.    Naim indicates in his report that he participated in the investigation of six of the attacks at issue in these cases.  Schuster Dec. Ex. 222 (Naim NW Rep. at 6).

841.    Naim does not indicate whether he examined as part of his involvement in the investigations of these six attacks any of the documents he purports to authenticate.  Id. (Naim NW Rep. at 6).

842.    Naim's name does not appear on any of the documents attached to his report related to these five attacks or any of the nine other attacks he purports to address.  Schuster Dec. Ex. 185 (Azoulay NW Reb. Rep. at 108).

843.    Naim did not have any official responsibility for maintaining, and did not maintain any of the documents he purports to authenticate.   Schuster Dec. Ex. 223 (Naim CL Tr. at 13:12-17, 18:11-19:3, 46:14-47:15, 52:23-53:8, 80:13-81:21).

844.    Most of the documents Naim purports to authenticate were first given to him by plaintiffs' counsel, not by any officials who are responsible for maintaining those documents. Id. (Naim CL Tr. at 13:12-17, 52:23-53:8).

845.    When he signed his report, Naim had made no effort to verify that the documents plaintiffs gave to him were authentic, for example by comparing them against true originals. Id. (Naim CL Tr. at 53:18-54:7).

846.    Naim compared certain of the military court documents that plaintiffs' counsel gave to him against what he saw in military court files to which he obtained access from court personnel, but only after signing his initial report in which he purported to opine that these documents are authentic. Id. (Naim CL Tr. at 68:13 20).

847.    Plaintiffs refused to allow Naim to answer any questions concerning the origins of the documents that plaintiffs' counsel provided to him. Id. (Naim CL Tr. at 90:14-21).

848.    Naim obtained the documents from plaintiffs' counsel for all but three attacks: the October 22, 2003 attacks at Tel Romeida, the March 7, 2003 attack at Kiryat Arba and the April 30, 2003 attack at Mike's Place. Id. (Naim CL Tr. at 26:8-27:5).

849.    For at least one of the three attacks for which Naim did not obtain the documents from plaintiffs' counsel, he received the documents from his personal contacts with the Israeli police . Id. (Naim CL Tr. at 18:11-19:3). They are not publicly available. See infra ¶ 867.

850.    Naim did not personally copy the documents he received from his police contacts. Schuster Dec. Ex. 223 (Naim CL Tr. at 46:14-47:15).

851.    Naim has not made any showing with respect to the "appearance, contents, substance, internal patterns, or other distinctive characteristics" of the documents he purports to authenticate.

        (c)    Naim is not qualified to authenticate the documents at issue under Israeli evidence law

852.    Naim's experience as a police officer and a lawyer does not qualify him under Israeli law to authenticate the documents that he purports to authenticate here. Schuster Dec. Ex. 185 (Azoulay NW Reb. Rep. at 98, 106-07).

853.    Naim is not competent to authenticate any judgments under Paragraph 11 of the Israeli Execution Regulations because he has not presented an original judgment or a true copy certified and signed by the secretariat of the court that issued the judgment. Id. (Azoulay NW Reb. Rep. at 98-99); Ex. 223 (Naim CL Tr. at 13:12-17, 52:23-53:8).

854.    Section 23 of the Israeli Evidence Ordinance permits a court to accept as evidence a certificate about a record in an official document that is signed by the civil servant who made the record or the recorded act or received the information about the record or by the person in charge of the unit where that civil servant worked. Schuster Dec. Ex. 185 (Azoulay NW Reb. Rep. at 99-100).

855.    Naim is not competent to authenticate any record under Section 23 of the Israeli Evidence Ordinance because he is not a civil servant who is currently an employee of the state. Id. (Azoulay NW Reb. Rep. at 99-100); Ex 223 (Naim CL Tr. at 83:3-20).

856.    Section 32 of the Israeli Evidence Ordinance provides that the authenticity of a public certificate may be proven by submitting:

        (1)    The original;

        (2)    Its verified copy;

-167-

(3)  Its copy printed by the official printer;

(4)  Its copy certified with the official seal or with the signature of the officer that possesses the official custody;

(5)  Its copy certified with the official seal of the institution that possesses the official custody;

(6)  Its certified copy with the seal or the signature of a minister or of another functionary of equal status, or of a functionary that holds a rank and position that satisfies the court, concerning the document's credibility; or

(7)  The copy certified with the institution's official seal, if the credibility of the certificate satisfies the court, considering the nature of the document and of the certifying institution.

Schuster Dec. Ex. 185 (Azoulay NW Reb. Rep. at 100-01).

857.  Naim has not authenticated any public certificates in compliance with Section 32 of the Israeli Evidence Ordinance because the documents listed in and attached to his reports do not satisfy any of the above conditions or other stated conditions regarding the verification of a public certificate.  Id.

858.  Naim cannot authenticate any documents pursuant to Section 32 of the Israeli Evidence Ordinance because he did not copy the documents from originals himself and did not verify that the copies are true copies of the originals.  Schuster Dec. Ex. 223 (Naim CL Tr. at 46:14-47:11, 53:18-22); Ex. 185 (Azoulay NW Reb. Rep. at 100-01).

859.  Section 41 of the Israeli Evidence Ordinance provides that a copy of a document that satisfies the terms of Section 36 of the Israeli Evidence Ordinance as an institutional record may be proven to be authentic with a certificate that proves that the copy was made from the original and that it is a true copy.  Schuster Dec. Ex. 185 (Azoulay NW Reb. Rep. at 101-02).

-168-

860.    Naim cannot authenticate copies of documents under Sections 36 and 41 of the Evidence Ordinance or provide proof of an institutional record by its copy, because he has not proven that these documents are institutional records, and because he has not fulfilled the requirement of certifying that the copies are true copies. Id. (Azoulay NW Reb. Rep. at 102-04).

861.    Regulation 5(a) of the Regulations of the Hague Convention states that the following individuals are entitled to authenticate documents for the purposes of the convention: "(a) Ministry of Foreign Affairs, registrar in the Magistrate's Court or civil servant appointed by the Minister of Justice according to Article 45 in Notary Law -1976, will be – each of them – the competent authority to issue in Israel certificates according to the Convention." Id. (Azoulay NW Reb. Rep. at 100-04).

862.    Naim has not authenticated any documents in accordance with Regulation 5(a) of the Regulations of the Hague Convention because he has not provided any of the types of official certificates those regulations require. Id. (Azoulay NW Reb. Rep. at 104).

863.    Articles 7 and 12 of the Israeli Notary Law permit a notary to certify the authenticity of a copy of a document, if the original document has been submitted to the notary and he has compared the two documents and found them to be identical. Id. (Azoulay NW Reb. Rep. at 104-05).

864.    Naim cannot authenticate documents under Article 7 of the Israeli Notary Law because he is not a notary. Id. (Azoulay NW Reb. Rep. at 104-06); Ex. 223 (Naim CL Tr. at 191:25-192:2).

865.    Naim cannot authenticate documents under Article 12 of the Israeli Notary Law because there is no evidence that he has compared the copies he has provided with the

-169-

original versions and found them to be identical. Schuster Dec. Ex. 185 (Azoulay NW Reb. Rep. at 105-06).

> (2) Naim's proposed testimony is based upon insufficient and unreliable sources and is not the product of reliable principles and methods, and Naim has not applied his methods reliably to the facts of these cases

866.     With respect to the January 29, 2004 attack on Bus 19, Naim includes documents in his report that expert witness Moshe Azoulay did not find in the police file for this attack that the Jerusalem police provided to him for his review; conversely, Naim does not include certain documents that Azoulay did find in the police file he reviewed. Id. (Azoulay NW Reb. Rep. at 128-34); Ex. 222 (Naim NW Rep. at 24).

867.     Contrary to Naim's statements that all of the files he is authenticating are publicly available, Schuster Dec. Ex. 223 (Naim CL Tr. at 41:6-42:18, 44:12-25, 60:7-12, 170:17-172:17, 176:21-177:2), when Azoulay attempted to search for and retrieve several of the court and police investigation files for different attacks referenced in Naim's report, only certain files with respect to two attacks (the Bus 19 attack and the Café Hillel attack) were made available to him, and those files were different from the files Naim reports he was given. Schuster Dec. Ex. 185 (Azoulay NW Reb. Rep. at 128-34); Ex. 224 (Azoulay Supp. Reb. Rep. at 2-5).

868.     Naim submitted several written requests to the Israel Police for access to review police files related to the attacks at issue in these cases. Schuster Dec. Ex. 225 (Naim NW Dep. Exs. 7 and 7A); Ex. 226 (Naim NW Tr. at 75:21-76:15).

869.     In these requests, Naim offered "reasons" for claiming to be entitled to access these documents that are indisputably false. For example, Naim stated to the Israel Police that plaintiffs are pursuing claims against Hamas, that the claims are also against a number of banks in the U.S. that are holding money deposited by Hamas, and that plaintiffs seek to

-170-

"remove this money from the banks and transfer it to the families of the dead and injured Americans and Israelis who were the victims of attacks that took place in Israel between 2000 and 2005." Schuster Dec. Ex. 225 (Naim NW Dep. Exs. 7 and 7A); Ex. 226 (Naim NW Tr. at 75:21-76:15).

870.    Plaintiffs are pursuing their claims against NatWest, a British bank, not against Hamas and not against a bank in the U.S.

871.    Moreover, plaintiffs are seeking damages from NatWest, not funds that were allegedly deposited by Hamas into a NatWest account.

(3) Naim's invention of the term "attack file"

872.    Throughout his initial report in the CL cases, Naim used the term "Attack File" to refer to "police and court files, and their contents, concerning certain attacks." Schuster Dec. Ex. 227 (Naim CL Rep. at 5-12).

873.    In his supplemental report in the CL cases and in his report in the NatWest cases, Naim admitted that the term "Attack File" is one he created himself, as an "internal reference for the collection of documents of each attack in the Report for which I am opining that such documents appear, in my professional opinion, to be authentic records . . . ." Schuster Dec. Ex. 228 (Naim CL Supp. Rep. at 2); Schuster Dec. Ex. 222 (Naim NW Rep. at 6 n.1).

874.    Naim applied the term "Attack File" to describe all of the Israeli law enforcement and court materials that were collected for each relevant attack. Schuster Dec. Ex. 222 (Naim NW Rep. at 6 n.1).

875.    Naim applied the term "Attack File" to all of these documents, regardless of whether Naim obtained them from plaintiffs' counsel or third parties. Id.

876.    Naim applied the term "Attack File" to many different types of documents from many different sources, including police investigation files, court files, Israel Security

-171-

Agency memoranda and indictments. Id. (Naim NW Rep. at 6 n.1, 14-24); Ex. 185 (Azoulay NW Reb. Rep. at 91-92).

877. Naim stated in his report that after an investigation has been completed, the entire original "Attack File" is sent to prosecutors for evaluation in order to determine whether there is sufficient evidence for filing an indictment, yet Naim then contradicts that statement by including in the "Attack Files" he purports to describe numerous court records, including sentences and verdicts which, by their nature, could not have existed at the time the investigative file was sent to prosecutors. Schuster Dec. Ex. 222 (Naim NW Rep. at 12, 14-24).

878. Naim includes documents in his "Attack Files," such as Israeli Security Agency memoranda, that Naim states are not included in "Attack Files." Id. (Naim NW Rep. at 10 n. 6).

879. There is no legal or formal term or concept of an "Attack File" in Israel. Schuster Dec. Ex. 185 (Azoulay NW Reb. Rep. at 91).

880. Records relating to specific attacks are generated by various law enforcement agencies in different geographic areas, under different legal systems, at different points in time and for very different reasons. These records are unique to each of these entities, and do not all contain the same documents. Id. (Azoulay NW Reb. Rep. 91-92).

881. It is inaccurate to assert that the entire police investigation file is always included in the court file. Id. (Azoulay NW Reb. Rep. 94-95).

882. No law enforcement file, regardless of the authority, is guaranteed to be a complete file that contains all of the documents generated with respect to a specific attack. Id.; Schuster Dec. Ex. 226 (Naim NW Tr. at 46:16-47:12).

-172-

(4)  Naim's extensive revisions to his initial report

883.    After signing his first report in the CL cases on December 10, 2009, Naim

submitted a supplemental report in those cases in which he conceded that, when he signed his

initial report, purporting to attest to the authenticity of almost 2,000 pages of documents, he

included on that list documents that were not even in his possession at that time, and many of

which were never subsequently provided in these lawsuits.  Schuster Dec. Ex. 228 (Naim CL

Supp. Rep. at 2).

884.    In addition to purporting to authenticate documents as an expert witness in

these lawsuits, Naim also performed consulting work for plaintiffs' counsel.  Schuster Dec.

Ex. 223 (Naim CL Tr. at 96:12-98:16); Ex. 226 (Naim NW Tr. at 17:14-21:10).

K.  **The Qualifications Of Moshe Azoulay, An Expert Retained By NatWest**

885.    Moshe Azoulay received an LL.B. in Law and Philosophy from Tel Aviv

University in 1993.  Schuster Dec. Ex. 229 (Azoulay NW Rep., Annex A).

886.    Azoulay was admitted to the Bar of Israel in 1995.  Id.

887.    From 1972 to 1978, Azoulay served as a Major in the Armored and

Infantry Forces of the Israel Defense Forces.  Id.

888.    From 1979 to 1988, Azoulay served in Special Operations at the Israeli

Security Agency, where he was responsible for, among other things, counter terrorism

operations.  Id.

889.    From 1979 to 1984, Azoulay served in the Reserve Service of the Israel

Defense Forces.  From 1989 to 2009, he served in the Reserve Service of the Mossad and the

Israel Security Agency.  Id.

890.    On March 11, 2010, Moshe Azoulay submitted written requests to the

attorney in charge of Freedom of Information at the Israel Police to review and copy all of the

-173-

documents contained in the investigation files of four attacks at issue in these lawsuits: the January 29, 2004 attack on Bus 19; the April 30, 2003 attack at Mike's Place restaurant; the October 22, 2003 attack at Tel Rumeida; and the September 24, 2004 attack at Neve Dekalim. Schuster Dec. Ex. 185 (Azoulay NW Reb. Rep. at 127-28).

891.    On May 10, 2010, the Jerusalem police granted Azoulay's request to review the investigation file for the January 29, 2004 Bus 19 attack. Id. (Azoulay NW Reb. Rep. at 129).

892.    On June 6, 2010, Azoulay reviewed and copied the entire investigation file for the January 29, 2004 Bus 19 attack at the Jerusalem police office, with the exception of certain forensic documents, medical records, pictures of the attack, internal police memos and the investigation log book, all of which the police prohibited Azoulay from copying. Id. (Azoulay NW Reb. Rep. at 129-31).

893.    None of the documents that the police permitted Azoulay to copy was included among the documents produced by plaintiffs. Id. (Azoulay NW Reb. Rep. at 132-33).

894.    None of the documents that the police permitted Azoulay to copy was cited in or attached to the Naim, Shaked or Kohlmann reports. Id. (Azoulay NW Reb. Rep. at 133).

895.    None of the persons whose court sentences for perpetrating the Bus 19 attack that Azoulay was permitted to copy was accused or found to be a member of Hamas. Id.

896.    Contrary to what Naim contends in his reports, the police investigation files to which he refers are not freely available to the public. Review of these files is subject to the consent of investigation officers and such consents are not routinely given and/or are not given at all. Id.

897.    Further, the permission Azoulay received to review the investigation file for the Bus 19 attack was only limited and did not allow Azoulay to fully read and/or copy all of the material contained in the file which in turn did not contain a single document previously produced by plaintiffs or Naim. Id. (Azoulay NW Reb. Rep. at 128-31).

Dated:  New York, New York
        December 7, 2011

CLEARY GOTTLIEB STEEN & HAMILTON LLP

By: _____
      Lawrence B. Friedman
      A Member of the Firm

One Liberty Plaza
New York, New York 10006
(212) 225-2000
Attorneys for Defendant National Westminster Bank Plc

-175-