**EXHIBIT 1 TO DECLARATION OF VALERIE SCHUSTER**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

```
-----------------------------------------------------------------------x
TZVI WEISS, et al.,                            :
                                               :   CV 05-4622 (DLI) (MDG)
                                               :
                                               :
                       Plaintiffs,             :
                                               :
                 -against-                     :
                                               :
NATIONAL WESTMINSTER BANK PLC                  :
                                               :
                       Defendant,              :
                                               :
-----------------------------------------------------------------------x
NATAN APPLEBAUM, et al.,                        :
                                               :   CV 07-916 (DLI) (MDG)
                                               :
                                               :
                       Plaintiffs,             :
                                               :
                 -against-                     :
                                               :
NATIONAL WESTMINSTER BANK PLC                  :
                                               :
                       Defendant.              :
                                               :
-----------------------------------------------------------------------x
```

### DECLARATION OF GUY COLE IN SUPPORT OF THE MOTION FOR SUMMARY JUDGMENT BY DEFENDANT NATIONAL WESTMINSTER BANK PLC

1.   I make this declaration in support of the motion for summary judgment by defendant National Westminster Bank Plc ("NatWest"). Unless otherwise stated, I have personal knowledge of the matters set forth below.

2.   I have been employed by NatWest since May 2003. During the period I understand is relevant to these lawsuits, which I understand to be January 1, 1996 to September 25, 2005, I was employed in a unit of NatWest named the Corporate Banking and Financial Markets Money Laundering Prevention Unit ("CBFM MLPU"). Among other activities, the CBFM MLPU was responsible for

ensuring compliance within the Corporate Banking and Financial Markets division with national and multinational anti-money laundering and anti-terror financing sanctions that could apply to NatWest's activities and its provision of banking services to its clients.  My responsibilities included coordinating searches of the division's clients against those sanctions lists.

3.   I understand plaintiffs make certain allegations against NatWest based on Israel's designation of Interpal as an "unlawful association" in 1997 and/or as a "terrorist organization" in 1998 pursuant to Israeli law.  To my knowledge, NatWest had no branches or subsidiaries operating in Israel, and therefore, to my understanding, Israeli sanctions could not have applied to NatWest's activities during the relevant period and were not relevant to my judgments about Interpal.

4.   To my knowledge, Interpal was at all times during the relevant period a charity registered with the Charity Commission for England & Wales ("Charity Commission").  I understood that registration of a charity with the Charity Commission establishes a conclusive, statutory presumption in the United Kingdom that the charity has been established and is being operated for charitable purposes.

I declare under penalty of perjury under the laws of the United States of America that the forgoing is true and correct.

London, England
November 23, 2011

_____
Guy Cole

2

**EXHIBIT 2 TO DECLARATION OF VALERIE SCHUSTER**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------- X
                                :

TZVI WEISS, *et al.*,            :

        Plaintiffs,     :

       - against -     :      CV 05-4622 (DLI) (MDG)

                               :

NATIONAL WESTMINSTER BANK PLC,     :

        Defendant.     :
--------------------------------------------------------- X
NATAN APPLEBAUM, *et al.*,     :

        Plaintiffs,     :

       - against -     :      CV 07-916 (DLI) (MDG)

NATIONAL WESTMINSTER BANK PLC,     :

        Defendant.     :
--------------------------------------------------------- X

## <u>DECLARATION OF JASON A. NOVAK</u>

Jason A. Novak declares as follows:

1.  I am a Digital Forensic Examiner with Stroz Friedberg, LLC ("Stroz Friedberg").  Cleary Gottlieb Steen & Hamilton LLP ("Cleary Gottlieb") has retained Stroz Friedberg on behalf of Cleary Gottlieb's client National Westminster Bank PLC.  I have personal knowledge of the facts set forth below, and, if called upon to do so, would competently testify to these facts.

**Background**

2.   I joined Stroz Friedberg as a full time employee in July 2007.  As a Digital Forensic Examiner I have conducted hundreds of forensic preservations and analyses of various types of digital media, involving data obtained from laptop and desktop computers, cellular telephones, personal digital assistants ("PDAs"), shared network drives, email servers and backup tapes.  I hold a Bachelor of Arts degree in Political Science with a minor in Computer Science from the University of Chicago.  I am an EnCase Certified Examiner.  My curriculum vitae ("CV") is attached hereto as Exhibit A.

3.   Stroz Friedberg is a technical consulting and computer forensics firm that assists its clients in the areas of digital forensics, cybercrime response and electronic discovery, among other things.  Stroz Friedberg is managed by former federal and state prosecutors and former federal special agents with both government and private sector experience in traditional and cyber-based investigations, digital forensics, data preservation and analysis and infrastructure protection.  Much of Stroz Friedberg's staff of digital forensic examiners, electronic security professionals and private investigators joined the company following careers in law enforcement, the intelligence community, consulting and academia.

4.   I submit this declaration to explain my forensic examination of and findings regarding the collection of what I understand to be predominantly Hamas materials that Evan Kohlmann produced on March 3, 2010, December 30, 2010, February 4, 2011, and April 4, 2011 (the "Kohlmann Collection" or the "Collection"), which Stroz Friedberg received from Cleary Gottlieb.

## General Information About The Kohlmann Collection

5.     Cleary Gottlieb delivered the Kohlmann Collection to Stroz Friedberg in encrypted files that, when decrypted, contained seventeen ZIP files.  After the expansion of these files, including ZIP and other compressed files found within the seventeen ZIP files, there were a total of 58,863 files of various types including HTML, JPG, RM, and PDF files.  I understand that these files comprise copies of web sites, web pages, documents, movie files, photo or image files, and other materials Mr. Kohlmann claims to have saved from the Internet.

6.     I have reviewed Evan Kohlmann's September 8, 2009 expert report ("Kohlmann Report"), the affidavits he signed on April 29, 2010 and May 17, 2011 concerning the Kohlmann Collection, and relevant portions of the transcript of his deposition conducted on December 2 and 3, 2010, to provide context to and better understand the Kohlmann Collection.

7.     In Evan Kohlmann's May 17, 2011 declaration he described the Kohlmann Collection as "Hamas-related materials from [his] Database," and refers to the portion of the Kohlmann Collection produced on March 3, 2010 as the "Hamas sub-database."  Neither the March 3, 2010 production of materials nor subsequent productions is a "database" as commonly understood by information technology professionals.  In the information technology context, the term "database" is typically understood to refer to an organized collection of data that is managed using database management system software such as MySQL, Oracle or Microsoft SQL Server.  The Kohlmann Collection is more readily understood as Mr. Kohlmann describes it in his report – as a "digital archive," a set of files, some of which are organized in folders or through specific naming conventions.

8.     The Kohlmann Collection does not contain a  consistent organizational structure.  Rather, I identified at least five different ways in which the materials in the Kohlmann

3

Collection are organized.  First, some folders in the Kohlmann Collection are named for different Internet domains and appear to contain files originating from those domains.  Second, some folders in the Kohlmann Collection are named for different terrorist attacks and appear to contain files with content concerning those attacks.  Third, some folders in the Kohlmann Collection are named for discrete subjects about which Mr. Kohlmann produced information, and appear to contain files with content concerning those subjects.  Fourth, some files in the Kohlmann Collection were not stored within a folder but contain a date and Internet domain in their file name.  Fifth, there are some files in the Kohlmann Collection with file names or in folders that do not contain any information that identifies from where or when the files were saved.

9.   The Kohlmann Collection lacks a uniform preservation methodology.  I observed that a preservation may be of a web site, of a single web page on a web site or of a single file.

## My Analysis

10.   I analyzed the contents of the Kohlmann Collection to determine whether certain information was saved to it, and, if so, when that information was saved by Mr. Kohlmann or his associates.  My analysis focused on three areas.

11.   First, I reviewed the Kohlmann Collection to determine if the URLs – the Uniform Resource Locators, or, in common parlance, the Internet addresses – that are cited in footnotes 98 to 171 (the "Attack Footnotes") in the Kohlmann Report were preserved in the Kohlmann Collection and the dates on which the URLs cited in the Attack Footnotes were preserved by Mr. Kohlmann or his associates (the "Attack Footnotes Analysis").  I understand that the Attack Footnotes are all of the footnotes cited in the Kohlmann Report that purport to pertain to the 15 attacks at issue in the above-captioned litigations.

4

12.   Second, I reviewed the Kohlmann Collection to determine if certain web sites or web pages were preserved and the dates on which they were preserved by Mr. Kohlmann or his associates (the "Hamas Related Domains Analysis").  I focused on the following domains that were identified in the Kohlmann Report on pages 10-28 that he has described as pertaining to Hamas: palestine-info.net; palestine-info.com; palestine-info.org; palestine-info.info; qassamiyoon.com; qassam.org; qassam.net; qassam.ps; kataeb-ezzeldeen.com; ezzedeen.net; alqassam.com; alqassam.ps; alqassam.net; alqassam.info; alqassam.ws; qassam.info; and almoltaqa.ps (the "Hamas Related Domains").

13.   Third, I reviewed the preservations from the Hamas Related Domains to determine which of them Mr. Kohlmann or his associates preserved from archive.org, rather than a then-current and "live" version of a Hamas Related Domain ("Archive.org Analysis").

## My Methodology

14.   For the purpose of my analyses, my unit of measurement was the preservation of a single URL from the Internet, which, depending on the preservation action taken, could be a web site, a web page or a file.

15.   For the Attack Footnotes Analysis, I engaged in a three step search methodology that was based on my general knowledge of how content is saved from web sites and my review of the files in the Kohlmann Collection, which when taken together should identify whether a URL cited in an Attack Footnote was preserved in the Kohlmann Collection. First, when a web page or file is saved from the Internet through a web browser, the default file name is the web page or the file's name on the remote web server.  Therefore, I used excerpts from the actual URLs cited in the Attack Footnotes to perform a keyword search of the file names in the Kohlmann Collection.  In this process I corrected URLs that contained obvious

misspellings or improper format, such as those missing the "." between "www" and the domain name. Second, because some URLs were preserved in the Kohlmann Collection using the WinHTTrack software, which writes log files as part of its web site copying process, I reviewed these log files to determine if URLs cited in the footnotes were saved in the Kohlmann Collection. Third, in the event that neither of the first two search methodologies enabled me to locate the file, I attempted to locate the cited URL on the Internet – to the extent the content addressed by the URL was still available online or in the Internet Archive Wayback Machine – and identified a phrase to search the Kohlmann Collection for the content of the URL in the Kohlmann Collection. I employed this third methodology to take reasonable steps to identify as many citations in the Kohlmann Collection as I could without performing a manual content review of each and every file, with the understanding that the content of a web site or web page is dynamic and may change over time and that these changes may not be documented or initially obvious to a user.

16. For the Hamas Related Domains Analysis, I created a search methodology that, based on my general knowledge and my review of the Kohlmann Collection, would find the files saved from the Hamas Related Domains. I searched the names of files and folders in the Kohlmann Collection to identify preservations of web sites, individual web pages, and files saved from the Hamas Related Domains.

17. To complete my analysis, once I found a preservation in the Kohlmann Collection using either of these three search methodologies, I next determined when the preservation by Mr. Kohlmann or his associates occurred. I did so by analyzing the file system metadata of the preservation. When a user preserves a web page or a file from the Internet "by hand" through his Internet browser, as Evan Kohlmann described how he preserved some of

6

these materials in his April 29, 2010 affidavit, the preservation typically has "File Created" and "Last Modified" file system metadata that reflect the date and time the user preserved the web page or file from the Internet.  The "Last Modified" file system metadata of a file generally remains consistent when the file is copied from one file system to another.   Furthermore, the Kohlmann Collection was produced in a compound file format, "ZIP," which also preserves the "Last Modified" file system metadata of its contents.  As such, when a file is placed into a ZIP file, the ZIP file then copied onto a different piece of digital media and the contents of the ZIP file expanded onto the new digital media, the expanded files on the new digital media have the same "Last Modified" file system metadata as they had on the original digital media prior to being placed into the ZIP file.  In the circumstances present here, the "Last Modified" metadata is the only file system metadata available for the files other than those I refer to in paragraph 21 below, and it is the most accurate and reliable data that is available (absent access to the computer and digital media Mr. Kohlmann and his associates used to copy and store these files) for determining the dates and times at which these preservations were made by Mr. Kohlmann or his associates.

18.   Further, based on my experience and expertise, in these circumstances the "Last Modified" date should be identical to the date on which Mr. Kohlmann or his associates first made the preservation.  The "Last Modified" metadata would not be changed if the preservation was subsequently merely accessed or viewed.  Based on my understanding of how Mr. Kohlmann and his associates created, searched and reviewed the Kohlmann Collection from my reading of the Kohlmann Report and his subsequent affidavits and relevant portions of his deposition transcript and my review of the Kohlmann Collection, I would not expect Mr.

Kohlmann's or his associates' subsequent interactions with a preservation in the Kohlmann Collection to update the Last Modified date of a preservation in the Kohlmann Collection.

19.   An analysis of the embedded metadata of files in the Kohlmann Collection confirms that the file system "Last Modified" dates are the dates on which the files were preserved.  Microsoft Word documents contain embedded metadata, including the dates and times at which a file was created and modified.  The embedded "File Created" and "Last Modified" date of Microsoft Word documents created by Mr. Kohlmann to preserve Hamas related content are contemporaneous with the file system "Last Modified" date preserved in the ZIP files.

20.   I therefore used the "Last Modified" file system metadata of the files in the Kohlmann Collection, other than those I refer to in paragraph 21 below, to determine the dates and times at which these files were preserved by Mr. Kohlmann or his associates.

21.   In addition, the WinHTTrack application, which Mr. Kohlmann or his associates used to preserve some websites, writes log files as part of its execution.  These log files contain the dates on which the application preserved the website.  Where available, I used these logs to determine the dates that files were first preserved by Mr. Kohlmann or his associates.

22.   Finally, for the Archive.org Analysis, I employed a search methodology that would identify any preservations that were saved from archive.org in the Kohlmann Collection. When a web page is retrieved from archive.org, the date and time at which the web page was originally preserved by archive.org and the date and time that the archived web page was retrieved from archive.org by the user are embedded in the code of the retrieved web page.

8

Specifically, the following text is embedded in the footer of a web page collected by and

retrieved from archive.org:

// FILE ARCHIVED ON YYYYMMDDHHMMSS AND RETRIEVED FROM THE
// INTERNET ARCHIVE ON YYYYMMDDHHMMSS.
// JAVASCRIPT APPENDED BY WAYBACK MACHINE, COPYRIGHT INTERNET ARCHIVE.
// ALL OTHER CONTENT MAY ALSO BE PROTECTED BY COPYRIGHT (17 U.S.C.
// SECTION 108(a)(3))

The text "YYYYMMDDHHMMSS" is replaced with the date and time archive.org collected the website

and the date and time the page was retrieved from archive.org respectively.

23.   Therefore, I searched the Kohlmann Collection for the phrase "AND

RETRIEVED FROM THE" and reviewed the files responsive to this phrase to identify

preservations from archive.org.

### My Findings

Attack Footnotes Analysis

24.   The 74 Attack Footnotes contain 53 unique URLs.

25.   Preservations of 15 of the 53 unique URLs were found in the Kohlmann

Collection, and preservations of 38 of the unique URLs were not found in the Kohlmann

Collection.

26.   Fourteen of these 15 URLs were first preserved by Mr. Kohlmann or his

associates on or after March 12, 2009; the remaining URL was first preserved by Mr. Kohlmann

or his associates in 2004.

27.   Therefore, prior to March 12, 2009, only one URL cited in the Attack

Footnotes was preserved by Mr. Kohlmann or his associates.

Hamas Related Domains Analysis

28.   I identified 151 preservations of web sites, web pages or document type files from the Hamas Related Domains.  Of these, 144 are of web sites or web pages with file names or folder information suggesting that they originate from Hamas Related Domains.  The remaining seven files are document type files with file names or folder information suggesting that they originate from Hamas Related Domains.  I was asked not to include preservations of single image and movie type files in this analysis.

29.   The years during which these preservations were made are as follows:

| Year | Preservations of Hamas-related web sites, web pages or document type files | Percentage of Preservations |
|---|---|---|
| 2002 | 1 | 0.66% |
| 2003 | 0 | 0.00% |
| 2004 | 8 | 5.30% |
| 2005 | 9 | 5.96% |
| 2006 | 2 | 1.32% |
| 2007 | 27 | 17.88% |
| 2008 | 1 | 0.66% |
| 2009 | 102 | 67.55% |
| 2010 | 1 | 0.66% |
| *Total* | *151* | *100.00%* |

30.   Therefore, 68.21% of these preservations were made on March 12, 2009 or thereafter, and 94.04% were made in 2005 or thereafter.

31.   The content of web sites or web pages may change over time, and such changes may not be apparent to a user in a current view of a site.  For example, if a web page was published on a date in 2004 but preserved by an individual user on a date in 2009, the preserved version of the web page may not truly depict the contents of  the web page in 2004 and will not necessarily identify any changes that have been made over time.  The historical content of a web site or web page may be available from an Internet archive.

<u>Archive.org Analysis</u>

32.   Of the 151 preservations from the Hamas Related Domains, 105 preservations – or 69.5% – were from archive.org.

33.   Attached as Exhibit B is a chart that lists the the preservations of the web pages, websites, or documents from the Hamas Related Domains and the date that Mr. Kohlmann or his associates preserved that file to the Kohlmann Collection.[1]  The chart also indicates whether a file was preserved from archive.org.

I declare under penalty of perjury that the forgoing is true and correct.

Dated:      New York, NY
            December 2, 2011

_____
            Jason A. Novak

---

[1] For preservations of web pages or documents, the full path to the preserved web page or document is provided. For preservations of web sites, the path to the directory containing the preservation of the web site is provided.

11

# EXHIBIT A

STROZ FRIEDBERG

# JASON A. NOVAK

## DIGITAL FORENSIC EXAMINER

**PROFESSIONAL EXPERIENCE**

**STROZ FRIEDBERG**
**Digital Forensic Examiner**, July 2007 to Present
**Forensic Intern**, June 2005 to September 2005; June 2006 to September 2006
**New York, NY**

Conduct digital forensic acquisitions and analyses of laptops, desktops, servers, and portable devices in civil litigations, criminal matters, and internal investigations. Consult with clients in matters involving spoliation claims, network intrusions, destruction of data, theft of trade secrets, source code review, electronic discovery remediation, and cybercrime response. Develop customized programs for use in the analysis and processing of electronic data. Carry out large-scale electronic discovery involving the preservation, processing, and production of electronic data. Significant cases include:

- Diagnosed numerous problems in a third party electronic discovery platform used by a client in response to a Foreign Corrupt Practices Act investigation. Led the re-processing efforts in the Stroz Review platform, concluding with successful production of responsive data to the Securities and Exchange Commission. Presented Stroz Friedberg methodology to Securities and Exchange Commission as part of the re-processing of the data.

- Developed a program to match electronic stored information as processed by Stroz Discovery to electronic stored information as processed by a third party electronic discovery vendor to move tagging information and attorney work product from the third party electronic discovery vendor's database to the Stroz Discovery database.

- Acted as neutral Consultant to Special Master with regards to spoliation issues in an antitrust litigation.

- Analyzed multiple computers, external hard drives, and server logs to detect spoliation, theft of intellectual property, and unauthorized access of servers by a company's departed employee.

- Recovered and reconstructed deleted photographs from a digital camera to evaluate a defendant's alibi.

- Conducted clean room comparison of C++ and Java source code underlying two high frequency trading platforms in a contentious theft of intellectual property litigation.

- Conducted source code review of a 802.11 wireless data capture software that was the focus of national and international governmental inquiries. Collaborated on an independent technical report documenting the software's functionality.

**STROZ FRIEDBERG**

# JASON A. NOVAK

DIGITAL FORENSIC EXAMINER

- Participated in development of a transaction monitoring database system with statistical models to detect money laundering on behalf of a global bank in connection with a criminal investigation by the Department of Justice and the Federal Reserve.

## TESTIMONY

July 2008: Provided deposition testimony as a digital forensic expert related to alleged spoliation of electronic data in *Annabelle K. Garrett, LLC v. Axiom International Investors, LLC*, Case No. 3:2007cv01341 (D. Connecticut)

## EDUCATION

**UNIVERSITY OF CHICAGO**
B.A. Political Science, minor in Computer Science, 2007
Computer Science Teaching Assistant, Winter 2007

## CERTIFICATIONS

**Encase Certified Forensic Examiner (EnCE), 2010**
Guidance Software

## TRAINING

**STROZ FRIEDBERG, LLC**
**Internal Training Program**
Attend weekly in-house training presentations on digital forensics, cybercrime response, computer security, desktop and network forensics tools, and relevant legal topics.

**SANS INSTITUTE**
**Reverse-Engineering Malware: Malware Analysis Tools and Techniques, 2010**
Attended training course on reverse engineering of malicious software ("malware"), including both behavior and code analysis of malware.

**GUIDANCE SOFTWARE, INC.**
**EnCase Advanced Computer Forensics, 2007**
Attended training course in digital forensic practices and the use of EnCase forensic software, including analysis of NTFS metadata.

08/11

# EXHIBIT B

| Preservation in the Kohlmann Collection | Date Preserved | Archive.org |
|---|---|---|
| **2002** | | |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\qassam.org\qassam | 08/05/2002 | No |
| **2004** | | |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\ezzedeen.net | 03/10/2004 | No |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\ezzedeen.net - web\need_for_the_khilafah TheMuslimNews Mujahideen from Britain say Israelis are Terrorists.htm | 03/10/2004 | No |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\ezzedeen.net - movies | 04/02/2004 | No |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\alqassam.net\Canadian terror sites shut down.htm | 07/26/2004 | No |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\2004-09-01.palestine-info.info.Hamas takes credit for Kvar Sava operation.html | 09/01/2004 | No |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\2004-09-01.palestine-info.info.Hamas takes credit for Kvar Sava operation.doc | 09/01/2004 | No |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\alqassam.info\movies.htm | 10/02/2004 | No |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\alqassam.info\rafah_2_01.html | 12/20/2004 | No |
| **2005** | | |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\alqassam.ws\qassamy1 - the video of the executor of the Kfar Darom operation the martyr Mohammed Baraka - arabic.html | 07/18/2005 | No |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\alqassam.ws\aboutus.htm | 07/23/2005 | No |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\alqassam.ws\salah video\2005-07-27.alhesbah.org.new hamas video on salah shehada - arabic.html | 07/27/2005 | No |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\2005-08-27.alqassam.ws.Message from Hamas Commander Mohammed Deif - arabic.html | 08/29/2005 | No |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\alqassam.ws\QASSAM PHOTO CENTER | 09/26/2005 | No |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\alqassam.ws\movies - mpg | 09/28/2005 | No |
| KOHLMANN005235.zip\2005-10-08.alqassam.ws.statement of unity among palestinian jihadist groups - arabic.html | 10/08/2005 | No |
| KOHLMANN005235.zip\2005-10-08.alqassam.ws.statement of unity among palestinian jihadist groups - english.html | 10/09/2005 | No |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\2005-12-31.alqassam.com.Hamas martyr Bashar Mohammed Soualha who dressed as a woman to launch his attack - 2018 - arabic.html | 12/31/2005 | No |

| Preservation in the Kohlmann Collection | Date Preserved | Archive.org |
|---|---|---|
| **2006** | | |
| KOHLMANN003732.zip\alqassam.ps\merkava.zip\ZIP Volume\info.txt | 11/08/2006 | No |
| KOHLMANN003732.zip\alqassam.ps\mahmoud_abu_habel.rar\RAR Volume\mahmoud_abu_habel\info.txt | 11/12/2006 | No |
| **2007** | | |
| KOHLMANN003732.zip\alqassam.ps\Information Office _ Ezzedeen AL-Qassam Brigades - Palestine.htm | 02/19/2007 | No |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\palestine-info.net\hamas - communiques\2_12_99.htm | 03/29/2007 | Yes |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\palestine-info.net\hamas - communiques\24_11_99.htm | 03/29/2007 | Yes |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\palestine-info.net\hamas - communiques\8_12_99.htm | 03/29/2007 | Yes |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\palestine-info.net\hamas - communiques\9_11_99.htm | 03/29/2007 | Yes |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\palestine-info.net\hamas - glory\index.htm | 03/29/2007 | Yes |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\palestine-info.net\hamas - leaders\emadalmy.html | 03/29/2007 | Yes |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\palestine-info.net\hamas - leaders\emadaql.html | 03/29/2007 | Yes |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\palestine-info.net\hamas - leaders\ghoshe.html | 03/29/2007 | Yes |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\palestine-info.net\hamas - leaders\index.htm | 03/29/2007 | Yes |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\palestine-info.net\hamas - leaders\jamalmans.html | 03/29/2007 | Yes |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\palestine-info.net\hamas - leaders\mashal.html | 03/29/2007 | Yes |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\palestine-info.net\hamas - leaders\mosa.html | 03/29/2007 | Yes |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\palestine-info.net\hamas - leaders\nazzal.html | 03/29/2007 | Yes |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\palestine-info.net\hamas - leaders\ranteesi.html | 03/29/2007 | Yes |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\palestine-info.net\hamas - leaders\salah.html | 03/29/2007 | Yes |

| Preservation in the Kohlmann Collection | Date Preserved | Archive.org |
|---|---|---|
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\palestine-info.net\hamas - leaders\yahya.html | 03/29/2007 | Yes |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\palestine-info.net\hamas - leaders\yaseen.html | 03/29/2007 | Yes |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\palestine-info.net\fatawa\qardawi1.pdf | 03/29/2007 | No |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\palestine-info.net\fatawa\qardawi2.pdf | 03/29/2007 | No |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\palestine-info.net\hamas - leaders\2005\haneya.htm | 03/30/2007 | Yes |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\palestine-info.net\hamas - leaders\khaled_Haj.htm | 03/30/2007 | Yes |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\palestine-info.net\hamas - leaders\khalidalhag.htm | 03/30/2007 | Yes |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\palestine-info.net\hamas - leaders\naji.htm | 03/30/2007 | Yes |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\palestine-info.net\hamas - leaders\rafat1.htm | 03/30/2007 | Yes |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\palestine-info.net\hamas - leaders\talal_albaz.htm | 03/30/2007 | Yes |
| KOHLMANN003732.zip\2007-12-04.alqassam.ps.Abu Obaidah responds to English-language questions about the brigade - 747 - english.html | 12/07/2007 | No |
| **2008** | | |
| KOHLMANN003733.zip\2008-06-23.alqassam.ps.Qassam B - 14 prisoners sentenced to life from Hamas during 2008 - 5199 - arabic.html | 06/24/2008 | No |
| **2009** | | |
| KOHLMANN003732.zip\2007-04-16.almoltaqa.ps.images of grad ceremony from azzam academy - 5818 - english.html | 03/12/2009 | No |
| KOHLMANN003734.zip\2009-02-20.almoltaqa.ps.qassam presents flags of victory - 3384 - english.html | 03/12/2009 | No |
| KOHLMANN003734.zip\almoltaqa.ps - english - Aug 09 | 03/13/2009 | No |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\ezzedeen.net\2004-03-XX.ezzedeen.net.us.php.html | 05/07/2009 | Yes |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\kataeb-ezzeldeen.com\2002-11-29.kataeb-ezzeldeen.com.index.html | 05/07/2009 | Yes |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\kataeb-ezzeldeen.com\2002-12-01.kataeb-ezzeldeen.com.Ads - Tabar3.asp - Donating to Hamas.html | 05/07/2009 | Yes |

| Preservation in the Kohlmann Collection | Date Preserved | Archive.org |
|---|---|---|
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\kataeb-ezzeldeen.com\2002-12-16.kataeb-ezzeldeen.com.fatwa - fatwaasp19 - what good are clerics.html | 05/07/2009 | Yes |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\kataeb-ezzeldeen.com\2002-12-16.kataeb-ezzeldeen.com.fatwa - fatwaasp22 - womens uniform.html | 05/07/2009 | Yes |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\alqassam.net\FW USAT  Islamic grps using Web to recruit, solicit $, se.txt | 05/07/2009 | No |
| KOHLMANN003734.zip\2009-05-07.alqassam.ps.anti-hamas approach fading - 1710 - english.html | 05/08/2009 | No |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\kataeb-ezzeldeen.com\2002-11-18.alqassam.ps.beware of rogue data - 164 - arabic.html | 05/10/2009 | No |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\kataeb-ezzeldeen.com\2002-12-11.kataeb-ezzeldeen.com.bayanat - index.asp.html | 05/10/2009 | Yes |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\qassam.org\2001-12-13.qassam.org.index.html | 05/10/2009 | Yes |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\qassam.org\2002-04-25.qassam.org.hamas - bayanat - tabar3.htm | 05/10/2009 | Yes |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\qassam.org\2002-04-30.ikhwan.net.tabaro cite - 16138 - arabic.html | 05/10/2009 | No |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\qassam.org\2002-05-25.qassam.org.index.html | 05/10/2009 | Yes |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\qassam.org\2002-07-xx.inshad.com.tabaro cite - 1771 - arabic.html | 05/10/2009 | No |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\qassam.org\2002-08-03.qassam.net.we - index.htm | 05/10/2009 | Yes |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\qassam.org\tabaro3 translation.html | 05/10/2009 | No |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\qassam.org\donation.docx | 05/10/2009 | No |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\alqassam.ws\2005-12-10.alqassam.ws.english - Interview - 5.htm | 05/11/2009 | Yes |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\alqassam.ws\2006-02-11.alqassam.ws.english - Interview - 1.htm | 05/11/2009 | Yes |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\ezzedeen.net\2003-02-04.ezzedeen.net.index.html | 05/11/2009 | Yes |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\ezzedeen.net\2004-03-28.ezzedeen.net.index.html | 05/11/2009 | Yes |

| Preservation in the Kohlmann Collection | Date Preserved | Archive.org |
|---|---|---|
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\qassamiyoon.com\2001-12-12.qassamiyoon.com.index.htm | 05/15/2009 | Yes |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\qassamiyoon.com\2-12-2001 - 3_12_2001_3.htm | 05/15/2009 | Yes |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\qassamiyoon.com\2-12-2001 - taqreer.htm | 05/15/2009 | Yes |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\qassamiyoon.com\2-12-2001 - taqreer1.htm | 05/15/2009 | Yes |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\qassamiyoon.com\24-11-01 - about_hanood.htm | 05/15/2009 | Yes |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\qassamiyoon.com\24-11-01 - hamas_bayan.htm | 05/15/2009 | Yes |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\qassamiyoon.com\24-11-01 - hanwod.htm | 05/15/2009 | Yes |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\qassamiyoon.com\24-11-01 - qalwo.htm | 05/15/2009 | Yes |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\qassamiyoon.com\24-11-01 - rantese.htm | 05/15/2009 | Yes |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\qassamiyoon.com\28-11-2001 - naseha_brother.htm | 05/15/2009 | Yes |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\qassamiyoon.com\28-11-2001 - photo.htm | 05/15/2009 | Yes |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\qassamiyoon.com\abdallah-azam - abdallah_azam1.htm | 05/15/2009 | Yes |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\qassamiyoon.com\abdallah-azam - abdallah_azam2.htm | 05/15/2009 | Yes |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\qassamiyoon.com\abdallah-azam - abdallah_azam3.htm | 05/15/2009 | Yes |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\qassamiyoon.com\abed-almo3ty-asar - abed_asar_cv.htm | 05/15/2009 | Yes |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\qassamiyoon.com\abed-hakeem-manama - abed_h_manama_cv.htm | 05/15/2009 | Yes |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\qassamiyoon.com\abed-hamad - abed_hamad_cv.htm | 05/15/2009 | Yes |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\qassamiyoon.com\adea-awadallah - adea_awadallah_cv.htm | 05/15/2009 | Yes |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\qassamiyoon.com\alboum - callery00 - callery0.htm | 05/15/2009 | Yes |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\qassamiyoon.com\alboum - index.htm | 05/15/2009 | Yes |

| Preservation in the Kohlmann Collection | Date Preserved | Archive.org |
|---|---|---|
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\qassamiyoon.com\awad-selmy - awad_selmy_cv.htm | 05/15/2009 | Yes |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\qassamiyoon.com\byanat - 01-12-2001.htm | 05/15/2009 | Yes |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\qassamiyoon.com\byanat - 02-12-2001.htm | 05/15/2009 | Yes |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\qassamiyoon.com\byanat - 04-12-2001.htm | 05/15/2009 | Yes |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\qassamiyoon.com\byanat - 26-11-2001.htm | 05/15/2009 | Yes |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\qassamiyoon.com\byanat - center.htm | 05/15/2009 | Yes |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\qassamiyoon.com\chat - jenen.htm | 05/15/2009 | Yes |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\qassamiyoon.com\document - ayash - center.htm | 05/15/2009 | Yes |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\qassamiyoon.com\emad-aqel - emad_aqel_cv.htm | 05/15/2009 | Yes |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\qassamiyoon.com\emade_zbyde - emad_zbyde_cv.htm | 05/15/2009 | Yes |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\qassamiyoon.com\emade-awadallah - emad_awadallah.htm | 05/15/2009 | Yes |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\qassamiyoon.com\esmael-ashoor - esmael_ashoor_cv.htm | 05/15/2009 | Yes |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\qassamiyoon.com\fady-yosef - fady_yosef_cv.htm | 05/15/2009 | Yes |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\qassamiyoon.com\first1.htm | 05/15/2009 | Yes |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\qassamiyoon.com\hamed-ehjela - hamed_abu_hajla_cv.htm | 05/15/2009 | Yes |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\qassamiyoon.com\hasan-salama - d1f1.htm | 05/15/2009 | Yes |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\qassamiyoon.com\jamal-naser - jamal_naser_cv.htm | 05/15/2009 | Yes |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\qassamiyoon.com\mahmod-madany - mahmod_midany_cv.htm | 05/15/2009 | Yes |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\qassamiyoon.com\majed - majed1.htm | 05/15/2009 | Yes |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\qassamiyoon.com\mhmoud-mrmash - mhmoud_mrmash_cv.htm | 05/15/2009 | Yes |

| Preservation in the Kohlmann Collection | Date Preserved | Archive.org |
|---|---|---|
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\qassamiyoon.com\new - index.htm | 05/15/2009 | Yes |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\qassamiyoon.com\saeed-hotary - saeed_hotary_cv.htm | 05/15/2009 | Yes |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\qassamiyoon.com\security - index.htm | 05/15/2009 | Yes |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\qassamiyoon.com\security - sec_ehda.htm | 05/15/2009 | Yes |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\qassamiyoon.com\shohadaa - persons - merwan_zayeg.htm | 05/15/2009 | Yes |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\qassamiyoon.com\sound - index - 2.htm | 05/15/2009 | Yes |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\qassamiyoon.com\sound - index.htm | 05/15/2009 | Yes |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\qassamiyoon.com\tagrer - tagrer11_12_01.htm | 05/15/2009 | Yes |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\qassamiyoon.com\tagrer - tagrer12_12_01.htm | 05/15/2009 | Yes |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\qassamiyoon.com\tagrer - tagrer14_11_01 - 2.htm | 05/15/2009 | Yes |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\qassamiyoon.com\tagrer - tagrer14_11_01.htm | 05/15/2009 | Yes |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\qassamiyoon.com\tagrer - tagrer23_11_01.htm | 05/15/2009 | Yes |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\qassamiyoon.com\tagrer - tagrer25_11_01.htm | 05/15/2009 | Yes |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\qassamiyoon.com\tagrer - tagrer27_11_01.htm | 05/15/2009 | Yes |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\qassamiyoon.com\video - index - 2.htm | 05/15/2009 | Yes |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\qassamiyoon.com\video - index.htm | 05/15/2009 | Yes |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\qassamiyoon.com\yassen.html | 05/15/2009 | Yes |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\qassamiyoon.com\yehya-ayyash - yehya_ayash.htm | 05/15/2009 | Yes |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\qassamiyoon.com\you - index.htm | 05/15/2009 | Yes |

| Preservation in the Kohlmann Collection | Date Preserved | Archive.org |
|---|---|---|
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\qassamiyoon.com\2001-07-08.ikhwan.net.qassamiyoon website is about to appear - 2647 - arabic.html | 07/08/2009 | No |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\qassamiyoon.com\2001-07-08.ikhwan.net.qassamiyoon website is about to appear - 2648 - arabic.html | 07/08/2009 | No |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\qassamiyoon.com\2001-10-14.ikhwan.net.post about shehada interview on qassamiyoon - 7322 - arabic.html | 07/08/2009 | No |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\qassamiyoon.com\2002-05.qassamiyoon.com.go to new site at qassam.org.html | 07/08/2009 | Yes |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\qassamiyoon.com\byanat - center (copy).htm | 07/08/2009 | Yes |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\qassamiyoon.com\shohadaa - center.htm | 07/08/2009 | Yes |
| KOHLMANN003730.zip\ARCHIVE (1998-2005)\qassamiyoon.com\tagrer - index.htm | 07/08/2009 | Yes |
| KOHLMANN003734.zip\2009-08-16.alqassam.ps.images of mohammed shamali - 1541 - arabic.html | 08/17/2009 | No |
| KOHLMANN003734.zip\2009-08-16.qassam.ps.QB issues bio of Ayman Khalid Abu Sabala.html | 08/17/2009 | No |
| KOHLMANN003734.zip\2009-08-16.qassam.ps.QB issues bio of Mohammed Jibreel Shamali.html | 08/17/2009 | No |
| KOHLMANN003734.zip\2009-08-16.qassam.ps.QB issues msg on Taimiya mosque killings in Rafah - 4517 - arabic.html | 08/17/2009 | No |
| KOHLMANN003734.zip\2009-08-16.qassam.ps.QB issues msg on Taimiya mosque killings in Rafah - english.html | 08/17/2009 | No |
| KOHLMANN003734.zip\2009-08-16.qassam.ps.QB issues photos of Ayman Khalid Abu Sabala.html | 08/17/2009 | No |
| KOHLMANN003734.zip\alqassam.ps - March 2009 | 08/26/2009 | No |
| KOHLMANN003735.zip\Sources\1999-08-26.palestine-info.net.Hamas - Glory - Index.htm | 08/27/2009 | Yes |
| KOHLMANN003735.zip\Sources\1999-08-26.palestine-info.net.Hamas - Leaders - Index.htm | 08/27/2009 | Yes |
| KOHLMANN003735.zip\Sources\alqassam.ws - english - aboutus.htm | 08/28/2009 | Yes |
| KOHLMANN003735.zip\Sources\ezzedeen.net - index - march 04.htm | 08/28/2009 | Yes |
| KOHLMANN003735.zip\Sources\qassam.net - chat - salah.htm | 08/28/2009 | Yes |

| Preservation in the Kohlmann Collection | Date Preserved | Archive.org |
|---|---|---|
| **2010** | | |
| KOHLMANN005226.zip\Palestinian Islamic Jihad (PIJ)\2007-08-18.almoltaqa.ps.sraya al quds videos - 6852 - english.html | 02/13/2010 | No |

**EXHIBIT 3 TO DECLARATION OF VALERIE SCHUSTER**

**FILED UNDER SEAL**

**FOR INTERNAL USE ONLY**
**CORPORATE & COMMERCIAL BANKING ACCOUNT REVIEW CHECKLIST**

**Instructions for Corporate & Commercial Offices**
1. This checklist must be completed when completing the existing customer KYC review process
2. Ensure the RM has signed this form
3. Attach copies of the required documentation to this checklist. The originals (except for the original mandate) should all be filed in a separate account opening customer file at the Corporate/Commercial Office.

HIGHLY CONFIDENTIAL   NW 008300

FOR INTERNAL USE ONLY
**CORPORATE & COMMERCIAL BANKING ACCOUNT REVIEW CHECKLIST**

**Know Your Customer Information Schedule – RM to complete only when not already held in this format.**

**Please answer the following questions, in the space provided, to evidence that we have specific knowledge of our customer's business and how the account(s) will operate:-**



**HIGHLY CONFIDENTIAL**   NW 008301



HIGHLY CONFIDENTIAL    NW 008302

Authorised signatories sheet
(for use with NWB1010 Company Mandate or
NWB1011 Clubs, Societies & Associations Mandate)

HIGHLY CONFIDENTIAL   NW 008303

NW008303

New party identification details?

To **NatWest**

NWB1073

HIGHLY CONFIDENTIAL    NW 008304

NW008304



**INTERPAL**
الصندوق الفلسطيني للإغاثة والتنمية

P.O Box 3333
London, NW6 1RW
Tel· 0181 450 8002
Fax: 0181 450 8004

**Our Ref:** (2001)
**Date:** 16 September 1998

Mr. Gerald Matthews
Natwest Bank PLC.
Islington Business Centre
P O Box 8036
218 Upper Street
London N1 1SP
Fax: 0181-344 1069

Dear Mr. Matthews,

**Re: Clubs, Societies and Associations Mandate**

Please find enclosed the above mandate duly signed and dated. I trust you shall be in touch should you require anything further.

Thank you for your kind attention.

With best wishes,

Yours sincerely;

J. Qundil
Secretary to the Trustees

Registered Charity No 1040094

**HIGHLY CONFIDENTIAL**   NW 008305



**Show Deleted Signatures & Rules Also**

Signatures 1 to 4 of 4



http://samndc01fe/ie5_cbc/search/signatures.asp                                    19/03/02

HIGHLY CONFIDENTIAL    NW 008306

NW008306



HIGHLY CONFIDENTIAL   NW 008307

NW008307



NW008308



HIGHLY CONFIDENTIAL   NW 008309

NW008309



HIGHLY CONFIDENTIAL   NW 008310



insite                    CBFM                    The Royal Bank of Scotland Group

Home > CBFM > Business Operations > Account Opening > Entity Types > Registered Charities

**Printer friendly version**

**Account Opening - Registered Charities**

Authorised charities accounts must be registered on the Central Register of Charities and allocated with a registered charity number by the Charity Commission

Unauthorised charity accounts must not be opened as these are generally used for the purpose of passing stolen or intercepted cheques in the name of the charity concerned  Adherence to the account opening procedures outlined below will remove the opportunities for opening unauthorised accounts.

**Who do I need to identify?**

- Name Identification and address verification must be obtained from a minimum of two officials
- It remains essential as part of your ongoing due diligence to ensure that a full suite of name identification and address verification is held for the appropriate number of individual(s), despite any subsequent mandate changes to the official(s) and signatories

**Neither Corporate Processing Authorities nor Self- Sanctioning may be used to dispense with Name Identification and address verification requirements**

**What must I obtain from the customer?**

- Obtain a copy of the Trust Deed, M&AA or ruling /governing document
- For NatWest customers use a clubs and societies Account Opening Form
- For RBS customers a Consent Form

The Charity Commission and The Inland Revenue Charities Department hold a Central Register of Charities and allocates a registered number to each

- In order to obtain verification of authority for the representative of the Charity to act on their behalf, a telephone call must be made to the Registrar of The Charity Commission, or The Inland Revenue Charities Department to check the Central Register of Charities on.

  - For Charities Registered in England and Wales-The Charity Commission Tel  0870 333 0123
  - For Charities Registered in Scotland-The Inland Revenue Charities Department: 0131 777 4040

In order to confirm:

- The Registered Charity Number.
- The name and address of the Commission's correspondent.
- A file note is to be placed in the customer file detailing the date number called and name of the person spoken to, plus any additional relevant information.

**OR**

**For Charities Registered in England and Wales ONLY**

HIGHLY CONFIDENTIAL    NW 008311

NW008311

### For Charities Registered in England and Wales ONLY

Visit www.charity-commission.gov.uk. The search result will give details of

- The Registered Charity Number
- Name and address of Correspondent
- Objects,
- Date of registration
- Governing document

If appropriate it will also state if the charity has been removed from the register and the reason

A printout of the page should also be kept in the customer file.

### Mandates

For a Charity which is also registered as a Company

- Standard company mandate

For a Charity governed by a Trust Deed and administered by Trustees

- Standard trust mandate

For a Charity governed by Trust Deed and administered by Committee and a Charity governed by Royal Charter it will be necessary to obtain a bespoke mandate. The appropriate wording for the mandate can be obtained from:

- For NW customers - Credit Policy and Development Department. 0207 920 5781 (ITS 8002 5781)
- For Royal Bank of Scotland customers - Credit Documentation Policy Manchester 0161 242 9341 (ITS 7770 59341)
- For Scottish Charities - Group Legal Edinburgh 0131 556 2363

### What must I fill in/carry out myself?

- Account Opening checklist (C&C) (CIB) signed by the Relationship Manager and second level authoriser
- Account Opening Proforma (RBS only)

---

We welcome your feedback concerning all aspects of the intranet

HIGHLY CONFIDENTIAL    NW 008312

NW008312



insite                    CBFM            The Royal Bank of Scotland Group

Home > CBFM > Business Operations > Account Opening > Mandate Changes

Printer friendly version

**Account Opening**

## Mandate Changes

Following the establishment of a business relationship it remains essential as part of your ongoing due diligence to ensure that a full suite of name identification and address verification is held for the appropriate number of individual(s), despite any subsequent changes to the official(s) and signatories.(based on the type of entity)

It is therefore imperative that when signatories are either appointed or removed from the mandate that an additional check is made to ensure that at least the minimum number of individual(s) have been identified and verified in order to comply with Money Laundering Regulations.

It is the responsibility of the Relationship Manager to return to the customer to obtain the necessary evidence of identity where required and place this in the customer file. The additional documentation must be annotated to reflect the date of the mandate changes.

We welcome your feedback concerning all aspects of the intranet.

http://nww.cbs.nwgrp.com/cbs/account/acc_7.asp          19/03/02

HIGHLY CONFIDENTIAL     NW 008313

NW008313

Account Opening

19/03/02

HIGHLY CONFIDENTIAL    NW 008314

NW008314

Account Opening

Page 1 of 2



**Account Opening**

**M&AA (or equivalent)**

This document is only required for overseas registered companies and non-standard companies.

- confirms that the company is properly constituted and trading within its objects
- ensures the Board of Directors is authorised to give the Branch the mandate, which is required to conduct the account.

Ensure the above documents are **originals**, wherever possible. If this is not the case, establish why copies have been tendered.

Check the number of directors is within the limitation of the M & AA. If the number is below the minimum, approach the remaining director/secretary for his/her proposals

Hold the copy on the account opening file.

We welcome your feedback concerning all aspects of the intranet

HIGHLY CONFIDENTIAL    NW 008315

NW008315

Account Opening

19/03/02

HIGHLY CONFIDENTIAL   NW 008316

NW008316



HIGHLY CONFIDENTIAL    NW 008317

NW008317



HIGHLY CONFIDENTIAL    NW 008318

Workstation 1000000031 Printout Time 11:06:58 User ID LANEB Page 1/1

HIGHLY CONFIDENTIAL    NW 008319

NW008319



HIGHLY CONFIDENTIAL   NW 008320

NW008320



Extract from the Central Register of Charities maintained by the Charity Commission for
England and Wales

**Main Charity 1040094**

Click link for
more details

## PALESTINIANS RELIEF AND DEVELOPMENT FUND

**Working Name** INTERPAL

**Charity**   J QUNDIL
**Correspondent** P O BOX 3333
    LONDON
    NW6 1RW

**Telephone**  0208 450 8002
**Fax**  0208 450 8004
**Email Address**  info@interpal.org
**Website**
**Address**  www.interpal.org
**Governing**
**Document**  DECLARATION OF TRUST DATED 29 JULY 1994
**Objects**  1.THE PROVISION OF AID AND ASSISTANCE, SUPPORT GUIDANCE
AND COMFORT TO POOR NEEDY SICK CHILDREN AND WIDOWS AND
THOSE SUFFERING OR DISTRESSED AS A CONSEQUENCE OF CIVIL
OR MILITARY ACTION OR NATIONAL DISASTERS. 2.TO RELIEVE THE
NEED HARDSHIP AND DISTRESS OF PERSONS WHOSE RELATIVES OR
FRIENDS DIED OR WHO ARE MISSING OR DETAINED AS A
CONSEQUENCE OF CIVIL OR MILITARY ACTION.3.THE PROVISION IN
THE INTEREST OF SOCIAL WELFARE OF FACILITIES FOR
RECREATION AND OTHER LEISURE TIME OCCUPATION OF THOSE OF
REFUGEE STATUS OR CONNECTED PERSONS AS MAY HAVE NEED OF
SUCH FACILITIES BY REASON OF THEIR YOUTH OR AGE OR
INFIRMITY OR DISABLEMENT OR SOCIAL AND ECONOMIC
CIRCUMSTANCES.

**Area of Benefit** UNITED KINGDOM AND PALESTINE
(Area prescribed by Governing Document)
**Area of**  Charity Operates inside and outside England and Wales
**Operation**  ASIA-JORDAN
    ASIA-LEBANON
    ASIA-PALESTINE
    EUROPE-UNITED KINGDOM

**Registration**  11 Aug 1994 Registered
**History**
**Classification**

    **What** General Charitable Purposes
    Education/Training
    Medical/Health/Sickness

http://www.charity-commission.gov.uk/regi.../showcharity.asp?remchar=&chyno=104009   27/08/03

HIGHLY CONFIDENTIAL   NW 008321

NW008321

Disability
Relief of Poverty
Environment/Conservation/Heritage
Economic/Community development/Employment

**Who** Other charities/Voluntary bodies
Other defined groups

**How** Makes grants to individuals(includes loans)
Makes grants to organisations(incl. schools, charities etc)

**Mailing & Submissions**

| Mailing Cycle | Financial Year | | Annual Return | | Accounts Received |
|---|---|---|---|---|---|
| | Start | End | Issued | Received | |
| AR6 | 01 Jan 1997 | 31 Dec 1997 | 02 Dec 1997 | 28 Jul 1998 | 28 Jul 1998 |
| AR7 | 01 Jan 1998 | 31 Dec 1998 | 26 Feb 1999 | 08 Oct 1999 | 08 Oct 1999 |
| AR8 | 01 Jan 1999 | 31 Dec 1999 | 15 Mar 2000 | 29 Sep 2000 | 29 Sep 2000 |
| AR00 | 01 Jan 2000 | 31 Dec 2000 | 05 Mar 2001 | 25 Jan 2002 | 25 Jan 2002 |
| AR01 | 01 Jan 2001 | 31 Dec 2001 | 02 May 2002 | 02 Dec 2002 | 02 Dec 2002 |
| AR02 | 01 Jan 2002 (estimated) | 31 Dec 2002 (estimated) | 01 May 2003 | | |

**Financial History**

| Financial Year Start | Financial Year End | Gross Income | Total Expenditure |
|---|---|---|---|
| 01 Jan 1997 | 31 Dec 1997 | £1,628,848 | £1,502,354 |
| 01 Jan 1998 | 31 Dec 1998 | £1,742,098 | £1,556,363 |
| 01 Jan 1999 | 31 Dec 1999 | £1,630,292 | £1,559,100 |
| 01 Jan 2000 | 31 Dec 2000 | £3,301,864 | £2,079,028 |
| 01 Jan 2001 | 31 Dec 2001 | £4,287,935 | £4,003,959 |

Search for charities by charity object or name keywords
Search for charities by the area in which they operate
Search for a charity by its registered number
Notes for users
About the Register of Charities
Copyright Notice, Disclaimer and Privacy Statement

Last Modified: Tuesday, April 16, 2002

|Top
|Home

HIGHLY CONFIDENTIAL    NW 008322

NW008322

NW 008323

HIGHLY CONFIDENTIAL

BASIC REGISTER INDEX                           Charity Commission
BRRRO37                                        Charity Index Report
_____

Registered Number 1040094  Main Name   PALESTINIANS RELIEF AND DEVELOPMENT FUND

Date of Registration      11/08/1994                          Date of Last Amendment
Governing Instrument      DECLARATION OF TRUST DATED 29 JULY 1994
Area of Benefit           UNITED KINGDOM AND OVERSEAS
Civil Area(s).            County                    District                 Place
          1               NATIONAL AND OVERSEAS

Registration Status       REGISTERED                         Charity Category   STANDARD
Charity Type(s),          GRANTMAKER TO INDIVIDUALS SERVICE PROVIDER

Object Codes                                    Description
     68 00     1 THE PROVISION OF AID AND ASSISTANCE, SUPPORT GUIDANCE AND COMFORT TO POOR NEEDY SICK CHIL
     71 00     WIDOWS AND THOSE SUFFERING OR DISTRESSED AS A CONSEQUENCE OF CIVIL OR MILITARY ACTION OR NA
    139.00     DISASTERS. 2.TO RELIEVE   THE NEED HARDSHIP AND DISTRESS OF PERSONS WHOSE RELATIVES OR FRIE
               WHO ARE MISSING OR DETAINED AS A CONSEQUENCE OF CIVIL OR MILITARY ACTION.3.THE PROVISION IN
               OF SOCIAL WELFARE OF FACILITIES FOR RECREATION AND OTHER LEISURE TIME OCCUPATION OF THOSE C
               STATUS OR CONNECTED PERSONS AS MAY HAVE NEED OF SUCH FACILITIES BY REASON OF THEIR YOUTH OF
               INFIRMITY OR DISABLEMENT OR SOCIAL AND ECONOMIC CIRCUMSTANCES.

Income     0          Accounts to be Submitted  Y    Financial Year of Last Accounts        Financial Yea:

Correspondent,             Name       MR E Y MUSTAFA               Address   60 CLARK COURT
                           Status                                           STILTON CRESCENT
                  Telephone Number    081 838 0189                          LONDON

                                                                 Postcode   NW10

Inland Revenue Reference

Bank Details,  Name                                              Address
               Branch
               Sort Code      Account Number
               Account Name
                                                                 Postcode

NW008323

# INTERPAL TRUST DEED

HIGHLY CONFIDENTIAL    NW 008324

NW008324



**Charity Commission, Graeme House, Derby Square, Liverpool, L2 7SB**

Telephone 051 227 3191 ext } 2484
GTN 4127 }

Fax {

MR E Y MUSTAFA                          Our Ref : PJC/1040094/
60 CLARK COURT
STILTON CRESCENT                        Your Ref:      ;
LONDON
NW10                                    Date   : 11 Aug 1994

Dear Mr E·Y·Mustafa

CHARITY : PALESTINIANS RELIEF AND DEVELOPMENT FUND

REGISTERED CHARITY NUMBER: 1040094

I am writing to confirm that the charity named above has
been entered in the Central Register of Charities with
effect from the date of this letter.

The green wallet accompanying this letter contains a
number of leaflets which each of the charity trustees
should read carefully so that they fully understand their
duties and responsibilities - further copies of these
leaflets are available upon request.  Also enclosed is a
print-out showing this charity's entry in the
computerised Central Register.  Please check this and let
me know if there are any inaccuracies.

To keep the details of registered charities accurate, the
Commissioners write to all registered charities each
year, asking for confirmation or updates of each
charity's registered details and for their latest
available accounts.

Please note that section 5 of the Charities Act 1993
requires that the fact that the organisation is a
registered charity must be stated on various documents if
its gross income in its last financial year exceeded
£5000.

All future correspondence regarding this charity will
normally be dealt with by our London office at:  57-60
Haymarket, London, SW1Y 4QX.

Your faithfully

PATRICIA JUNE CHADWICK                          RE 501

*When replying, please quote our reference*

**HIGHLY CONFIDENTIAL**    **NW 008325**

## THIS DECLARATION OF TRUST is made the 29 day of

JuLy ——1994

by ESSAM Y. MUSTAFA of 60 Clark Court, Stilton Crescent, London NW10:   ABDEL

RAHMAN ABOU DAYA of 1a Calthope Street, London WC1X OJP:   DR. ABDUL RAHIM

MASSRULLAH of PO Box 248, Jeddah 21411, Saudi Arabia:  DR. ISSAM MAJID SHAKER

of 1 Tudor Court, North Wembley, Middlesex HA9:   DR. MUSTAFA TULBA of 83

Webheath, Netherwood Street, London NW6:   MAHFUZH SAFIEE of 59 Oak Grove,

London NW2 3NA ('The First Trustees') who together with the Future Trustees

or Trustee of this Deed are referred to as 'The Trustees'.


## W H E R E A S:-

The First Trustees hold FIVE HUNDRED POUNDS (£500) on the Trusts declared in

this deed and it is contemplated that further money or assets may be paid or

transferred to the Trustees upon the same Trusts.


## NOW THIS DEED WITNESSETH as follows:-

A.          ADMINISTRATION

            The Charitable Trust constituted by this deed ('the Charity') and

            its property ('the Trust Fund') shall be administered and managed

            by the Trustees under the name of "PALESTINIANS RELIEF AND

            DEVELOPMENT FUND" or by such other name as the Trustees from time

            to time decide with the approval of the Charity Commissioners for

            England and Wales ('The Commissioners').

HIGHLY CONFIDENTIAL    NW 008326

B.          **THE AREA OF BENEFIT**

The area of benefit of the Charity is the United Kingdom and overseas.   The primary area of operation will however be in Palestine, the West Bank, the Gaza Strip and the Refugee Camps in Jordan and Lebanon.

C         **OBJECTS**

The Trustees shall hold the Trust Fund and its income <u>UPON TRUST</u> to apply the same for the following objects ('the objects') in the area of benefit namely:-

i.         The provision of aid and assistance support guidance and comfort to the poor needy sick children and widows and those suffering or distressed as a consequence of civil or military action or national disasters within the area of benefit including the setting up and maintenance of medical and health centres.

ii         To relieve the need hardship and distress of persons whose relatives or friends died or are missing or detained as a consequence of civil or military action ('connected persons') and to provide protection and promote good health, both mental and physical the relief of poverty and sickness the advancement of education in matters relating to the

HIGHLY CONFIDENTIAL    NW 008327

NW008327

nature of grieving and bereavement of connected persons.

iii     The provision in the interest of social welfare of facilities for recreation and other leisure time occupation of those of refugee status or connected persons as may have need of such facilities by reason of their youth or age or infirmity or disablement or social and economic circumstances.

D       **POWERS**

In furtherance of the objects but not otherwise the Trustees may exercise any of the following powers:-

(i)     To construct maintain and support holy places for refugees and for connected persons;

(ii)     To establish and support development and rehabilitation projects: to seek employment and encourage self-dependency for refugees and for connected persons.

(iii)     To cooperate and coordinate the work of the Charity with national and international organisations working in similar charitable fields to achieve greater benefit for poor and needy people and in particular in Palestine.

3

HIGHLY CONFIDENTIAL   NW 008328

NW008328

(iv)    To provide finance, food, clothing, shelter, medical aid and supplies.

(v)    To obtain collect and receive monies and funds by way of contributions, donations, subscriptions, legacies, endowments, grants or any other lawful method, to invite to accept and receive any gifts or property of any description whether subject to a special Trust or not PROVIDED THAT in raising funds the Trustees shall not undertake any substantial permanent trading activity and shall conform to any relevant statutory regulations.

(vi)    To buy, take on lease or in exchange hire or otherwise acquire any property necessary for the achievement of the objects and to maintain and equip it for use.

(vii)    Subject to any consents required by law to sell lease or otherwise dispose of all or any part of the property comprised in the Trust Fund.

(viii)    Subject to any consents required by law to borrow money and to charge the whole or any part of the Trust Fund with repayment of the money so borrowed.

(ix)    To cooperate with other Charities Voluntary Bodies

4

HIGHLY CONFIDENTIAL  NW 008329

NW008329

and Statutory Authorities operating in furtheran[ce]
of the objects or of similar charitable purposes [and]
to exchange information and advice with them.

(x)        To take such steps by personal or written broadca[st]
           or  television  appeals  or  advertisements  publi[c]
           meetings exhibitions receptions entertainments f[ilm]
           shows sales or booklets advertising matter as [may]
           from   time   to   time   necessary   for   procuri[ng]
           contributions or donations or income for the Fu[nd]
           but so that the Trustees shall not undertake an[y]
           permanent  trading  activities  in  raising  su[ch]
           funds.

(xi)       To procure and print publish issue and distribut[e]
           gratutiously   or   otherwise   any   newspape[rs]
           periodicals books pamphlets leaflets advertisement[s]
           appeals or other literature but so that the Truste[es]
           shall not undertake any permanent trading activi[ty]
           in pursuance of any such powers.

(xii)      To establish or support any Charitable Trust[s]
           Associations or Institutions formed for the object[s]
           or any of them.

(xiii)     To appoint and constitute such advisory committee[s]
           as the Trustees may think fit.

HIGHLY CONFIDENTIAL     NW 008330

trust.

(xviii)    To permit any investments comprised in the Trust Fund to be held in the name of any Clearing Bank, any Trust Corporation or any Stock Broking Company which is a member of the Stock Exchange (or any subsidiary of such a Stock Broking Company) as nominee for the Trustees and to pay any such nominee reasonable and proper remuneration for acting as such.

(xix)    To delegate to any one or more of the Trustees the transaction of any business or the performance of any act required to be transacted or performed in the execution of the Trusts of the Charity and which is within the professional or business competence of such Trustee or Trustees PROVIDED THAT the Trustees shall exercise reasonable supervision over any Trustee or Trustees acting on their behalf under this provision and shall ensure that all their acts and proceedings are fully and properly reported to them.

(xx)    To do all such other lawful things as are necessary for the achievement of the objects.

E    APPOINTMENT OF TRUSTEES

(i)    There shall be not less than five and not more than

HIGHLY CONFIDENTIAL   NW 008331

eleven Trustees.    Every future Trustee shall be appointed by a Resolution of the Trustees passed at a special meeting called under clause L.  ;

(ii)        In selecting persons to be appointed as Trustees the Trustees shall take into account the benefits of appointing a person who through residence occupation employment or otherwise has special knowledge of the area of benefit or who is otherwise able by virtue of his or her personal or professional qualifications to make a contribution to the pursuit of the objects or the management of the Charity.   A high level of commitment will be expected from any appointee.

(iii)       Where any new Trustee is appointed the Trustees shall ensure that any land belonging to the Charity which is not vested or about to be vested in the Official Custodian for Charities or in a Custodian Trustee and all other property of the Charity which is not vested or about to be vested in the Official Custodian for Charities, a Custodian Trustee or a Nominee is effectively vested in the persons who are the Trustees following such appointment.

(iv)        If for any reason the Trustees cannot be appointed in accordance with the foregoing positions the statutory power of appointing new or additional Trustees shall be exercisable.

HIGHLY CONFIDENTIAL   NW 008332

NW008332

F.      ELIGIBILITY FOR TRUSTEESHIP

    (i)      No person shall be appointed as a Trustee:

        (a)      Unless he or she has attained the age of eighteen years or;

        (b)      In circumstances such that had he or she already been a Trustee he or she would have been disqualified from office under the provisions of the following clause.

    (ii)      No person shall be entitled to act as a Trustee whether on a first or on any subsequent entry into office until after signing in the Minute Book of the Trustees a Declaration of Acceptance and willingness to act in the Trusts of the Charity.

G       DETERMINATION OF TRUSTEESHIP

A Trustee shall cease to hold office if he or she:-

    (i)      Is diqualified from acting as a Trustee by virtue of Section 45 of The Charities Act, 1992 (or any statutory or re-enactment or modification of that provision).

HIGHLY CONFIDENTIAL      NW 008333

NW008333

(ii)       Becomes incapable by reason of mental disorder illness or injury of managing and administering his or her own affairs.

(iii)      Misses three consecutive meetings without an acceptable reason and the Trustees resolve that his or her office be vacated, or.

(iv)      Notifies to the Trustees a wish to resign (but only if at least two Trustees will remain in office when the Notice of Resignation is to take effect.

The Trustees may remove any of their numbers from office by service upon him or her of a written notice signed by at least two thirds of all the other Trustees.

H.      **VACANCIES**

If a vacancy occurs the Trustees shall note the fact in their Minute Book at their next meeting.  Any eligible Trustee may be re-appointed.  So long as there shall be fewer than two Trustees none of the powers or discretions hereby or by law vested in the Trustees shall be exercisable except for the purpose of appointing a new Trustee or Trustees.

I.      **ORDINARY MEETINGS**

(i)      The Trustees shall hold at least two ordinary

*16*

HIGHLY CONFIDENTIAL   NW 008334

NW008334

meetings in each year.

(ii)        Notice of every meeting shall be sent by the Secretary to each Trustee.   Any notice posted fourteen clear days before the date of the meeting shall be deemed to have been duly served.

(iii)      Every notice of a meeting shall state the place date and hour of the meeting and the business to be transacted thereat.

(iv)

A Resolution in writing signed by a majority of two thirds of the Trustees but of which notice has been given to all of the Trustees shall be effective as a Resolution passed at a meeting of the Trustees and may consist of one or more documents in similar form signed by one or more of the Trustees.

J.      <u>CALLING MEETINGS</u>

The first meeting of the Trustees shall be called by <u>ABDEL RAHMAN ABOV DAYA</u> or if no meeting has been called within thre emonths after the date of this deed by any two of the Trustees. Subsequent meetings shall be arranged by the Trustees at their meetings or may be called at any time by the Chairman or any two Trustees upon notice being given as herein provided.

**HIGHLY CONFIDENTIAL**   NW 008335

K      CHAIRMAN

The Trustees at their first ordinary meeting shall elect one of their number to be Chairman of their meeting.   Such election shall be by a majority vote if the decision is not unanimous. The term of office of the Chairman will be three Calendar years. The Chairman shall always be eligible for re-election.   If the Chairman is not present within thirty minutes after the time appointed for holding a meeting or there is no Chairman the Trustees present shall choose one of their number to be Chairman of the meeting.

Where a two thirds majority of the Trustees wish to select a new Chairman in place of an existing Chairman the existing Chairman may be relieved of his duties and powers and a new Chairman selected by the Trustees from their number by a two thirds majority if the decision is not unanimous.

L      MEETINGS

(i)      The Chairman shall arrange meetings of the Trustees from time to time where and whenever necessary but in any event the period between two meetings shall not exceed twelve months.

(ii)      A Resolution in writing signed by a majority of two thirds of the Trustees but of which notice has been

12

HIGHLY CONFIDENTIAL    NW 008336

NW008336

given to all of them shall be effective as a
Resolution passed at a meeting of the Trustees and
may consist of one or more documents in similar form
signed by one or more of the Trustees.

(iii)    A special meeting may be called at any time by the
Chairman or any two Trustees upon not less than four
days notice being given to the other Trustees of the
matters to be discussed but if the matters include
appointment of a Trustee or a proposal to amend any
of the Trusts of this Deed then upon not less than
twenty-one days notice being so given.  A special
meeting may be called to take place immediately
after or before an ordinary meeting.

M.    **EXECUTIVE COMMITTEE AND OFFICERS**

(i)    The Trustees may elect from their number an
Executive Committee by a majority vote if the
decision is not unanimous.  The term of office of
the members of the Executive Committee will be three
Calendar years.  Members shall be eligible for re-
election.  The Executive Committee may co-opt not
more than two persons for inside or outside the
Trustees to be members of the Executive Committee as
non-voting members.

(ii)    A high level of commitment will be expected from the

HIGHLY CONFIDENTIAL    NW 008337

Executive Committee. The amount of time and days required of the members of the Executive Committee to work for the Trust will be decided by the Executive Committee from time to time.

(iii)    If any member of the Executive Committee misses three consecutive meetings without an acceptable reason he will cease to be a member of the Executive Committee.

(iv)    The Chairman shall select other office bearers such as the Secretary and Treasurer in consultation with the members of the Executive Committee.

(v)    The members of the Executive Committee are hereby empowered to execute in the names and on behalf of the Executive Committee all assurances or other Deeds or Instruments by giving effect to any decisions resolutions or transactions to which the Executive Committee is a party.

(vi)    The members of the Executive Committee shall only perform the duties and exercise the powers given to them by this Deed PROVIDED THAT those powers shall be exercised only as a majority of the Executive Committee wishes them to act.

(vii)    Where a two thirds majority of the Trustees wish to

*16*

HIGHLY CONFIDENTIAL   NW 008338

select a new Executive Committee in place of an existing Executive Committee the existing Executive Committee may be relieved of their duties and powers and a new Executive Committee selected by the Trustees from their number by a two thirds majority if the decision is not unanimous.

(viii)    The Executive Committee shall be at full liberty to employ and pay any Clerk or other agent or servant to transact all or any business of whatever nature required to be done in pursuance of the Trusts herein declared and contained including the day to day management of the Trust and the receipt and payment of money and shall be entitled to be allowed and paid all charges and expenses so incurred and shall not be responsible for the defaults of any such agent or servant for any loss occasioned by his employment.

(ix)    When employing any agent or servant the Trustees shall only employ those persons who are essential for the effective and efficient administration of the Charity.

(x)    The provisions herein contained shall extend to the employment of those persons who are essential for the effective and efficient administration of any project or aid scheme initiated and co-ordinated by the Trust including medical teams, relief workers,

HIGHLY CONFIDENTIAL    NW 008339

project co-ordinators and teaching staff in pursuance of the Trusts herein declared and contained.

(xi)    The Executive Committee may propose any such rules and regulations as they shall from time to time think fit to be submitted to the Trustees for their approval.

(xii)   In making such rules and regulations the Executive Committee may delegate to anyone working for the Trust such matters relating to the day to day management of the Charity and relating to the day to day management of any project or aid scheme initiated and co-ordinated by the Trust as they shall in their absolute discretion think fit.

(xiii)  The Executive Committee may establish branches in different cities, towns, localities and regions.

N.    <u>QUORUM</u>

At the meetings of the Trustees or Executive Committee there shall be a quorum where a majority of the Trustees or Executive Committee members as the case may be are present.

O     <u>VOTING</u>

16

HIGHLY CONFIDENTIAL    NW 008340

NW008340

Every matter shall be determined by a majority of votes of the
Trustees or Executive Committee as the case may be present and
voting on the question.   The Chairman of the meeting shall have a
casting vote whether he or she has or has not voted previously on
the same question but no Trustee or member of an Executive
Committee in any other circumstances shall give more than one
vote.

P        HONORARY PATRONS

         (i)      There shall be an unlimited number of Honorary
                  Patrons of the Charity chosen by the Trustees in
                  accordance with the decision making procedure whose
                  function shall be to act solely in an advisory
                  capacity and who shall aid and assist by means of
                  suggestions and advice the Trustees in making well
                  informed and effective decisions.

         (ii)     The Trustees shall seek the suggestions and advice
                  of the Honorary Patrons either on an informal basis
                  or by requesting them to attend the meetings of the
                  Trustees where and whenever in their absolute
                  discretion they shall think fit.

Q        REMUNERATION

         (i)      Any Trustee or Honorary Patron for the time being
                  hereof being a Solicitor or other person engaged in

HIGHLY CONFIDENTIAL    NW 008341

NW008341

any profession shall be entitled to charge and be paid all usual professional or other necessary charges for work done by him or his firm in connection with the necessary execution of the Trusts herein declared and contained.

(ii)     Subject to the preceding sub-clause all Trustees and Honorary patrons may not receive any payment for their services from the Funds of the Charity but may be reimbursed for any reasonable expenses incurred in the performance of their duties.

R       <u>MINUTES</u>

The Trustees and the Executive Committee shall keep Minutes in books kept for the purpose of the proceedings at their meetings.

S       <u>ACCOUNTS</u>

The Trustees shall comply with their obligations under the Charities Act, 1992 (or any statutory re-enactment or modification of that Act) with regard to:

(a)     The keeping of accounting records for the Charity;

(b)     The preparation of Annual Statements of Account for the Charity;

18

HIGHLY CONFIDENTIAL     NW 008342

(c)      The auditing or independent examination of the Statements of Account for the Charity, and

(d)      The transmission of the Statements of Account of the Charity to the Commissioners.

T        **ANNUAL REPORT**

The Trustees shall comply with their obligations under the Charities Act, 1992 (or any statutory re-enactment or modification of that Act) with regard to the preparation of an Annual Report and its transmission to the Commissioners.

U        **ANNUAL RETURNS**

The Trustees shall comply with their obligations under the Charities Act, 1992 (or any statutory re-enactment or modification of that Act) with regard to the preparation of an Annual Return and its transmission to the Commissioners.

V        **DISTRIBUTION AND INVESTMENT OF TRUST FUNDS**

(i)      It shall be the overriding duty of the Trust in accordance with the decision making procedure to ensure that funds and gifts collected and received

HIGHLY CONFIDENTIAL   NW 008343

NW008343

by or donated to the Trust are distributed or allocated as soon as possible in accordance with the purposes herein mentioned.

(ii)  Where funds and gifts are accepted on any special trusts or are collected and received to relieve distress and need caused by any specific accident or disaster or for any particular project or scheme initiated and co-ordinated by the Fund then such funds and gifts shall be allocated and distributed accordingly.

(iii)  In the event of there being any surplus after the terms and conditions of a gift have been met or after the distress and needs have been relieved or after the project or scheme have been completed as mentioned in sub-clause (i) above then any such surplus shall be allocated and distributed in accordance with the purposes herein mentioned and in accordance with the decision making procedure.

(iv)  The Trustees may assist anybody or bodies especially other Charitable Organisations whose purposes are the same or similar to those of the Trust financially or otherwise provided such assistance is in accordance with the objects.

(v)  In the event of there being a surplus of funds which

HIGHLY CONFIDENTIAL   NW 008344

cannot immediately be allocated and distributed in accordance with this clause the Trustees may invest such surplus in accordance with the decision making procedure as they in their absolute discretion think fit and subject to any consent required by law.

(vi)     Any income derived from investments made in accordance with the immediately preceding clause is to be allocated and distributed in accordance with the terms of such clause.

(vii)    In accordance with the decision making procedure:

(a)     If for any reason any part of the premises from time to time occupied for the purpose of the Trust become unsuitable or not equired for such purpose the Trustees may with such consent as is by law required sell exchange or lease the same;

(b)     The Trustees may apply the proceeds of the sale of such premises and the rents and profits thereof in the purchase of other land for occupation by the Trust and in fitting equipping and furnishing the same so that the same shall be held and used with and subject to the like

HIGHLY CONFIDENTIAL     NW 008345

powers and provisions and for like purposes as the premises previously used and occupied for the purpose of the Trust.

W.    GENERAL POWER TO MAKE REGULATIONS

Within the limits of this Deed the Trustees shall have full power from time to time to make regulations for the management of the Charity and for the conduct of their business including the calling of meetings, the deposit of money at a Bank and the custody of documents.

X     BANK ACCOUNT

The Trustees may establish and operate both current accounts and deposit accounts with Bankers in the name of the Trustees PROVIDED THAT cheques drawn on such accounts shall not be signed by less than two Trustees.   The Trustees may at a special meeting by a majority decision authorise the Bankers to accept the signatures of such persons as may be nominated by the Trustees even if those persons are not Trustees.

Y.    DELEGATORY POWERS

(1)      Subject as contained in this clause the Trustees shall not be bound in any case to act personally but shall be at liberty to employ any agent or servant to

HIGHLY CONFIDENTIAL    NW 008346

transact all or any business of whatever nature required to be done in pursuance of the Trust including day to day management of the affairs of the Trust and the receipt and payment of monies and shall be entitled to be allowed and be paid all charges and expenses so incurred and shall not be responsible for the defaults of any such agent or servant for any loss occasioned by his employment but nothing in the provisions of this clause shall be construed as conferring on the Trustees the right to delegate any decision concerning the application or the distribution of the income or the capital of the Trust pursuant to the objects.

(ii)     The Trustees shall have power to permit any investments securities or other real or personal property which is for the time being comprised in the Trust to be and remain invested in the name of Nominees instead of in the name of the Trustees upon such terms as to remuneration and all other respects as the Trustees in their absolute discretion think proper with power to delegate such Nominees such of the Trust's powers and discretions by this Deed or by law vested in the Trustees with reference to the property so invested in the name of such Nominees as the Trustees consider expedient so to delegate on condition that any such Nominees shall report to the Trustees in writing fully and properly in respect of

HIGHLY CONFIDENTIAL     NW 008347

NW008347

such acts carried out by them on behalf of the Trustees.

Z       **RECEIPTS**

The receipt of any person purporting to be the Treasurer or other Proper Officer of any Charity shall be a good discharge to the Trustees for any payment or transfer of assets intended tobe made to that Charity.

A.A     **DISCRETION**

Every discretion that this Deed confers on the Trustees shall be an absolute discretion.

A.B     **ALTERATION OF POWERS**

If at any time it appears to the Trustees that either by reason of changes in the law affecting the administration of charitable or other Trusts or of changes in social scientific education or political conditions or by reason of any defect or omission in the preceding provisions of this Deed it will be conducive to the better administeration of the Trust that the Trustees should possess any further or other administrative powers which the Trustees do not or may not possess it shall be lawful for the Trustees by any deed or deeds revocable or irrevocable to supplement or alter or amend the provisions of this Deed to such an extent (but to such an extent only) as in the opinion of the

HIGHLY CONFIDENTIAL      NW 008348

NW008348

Trustees is requisite for the purpose of conferring on the Trustees such further or other administrative powers PROVIDED THAT nothing in this clause shall authorise or be deemed to authorise any departure from or modification of the objects or the application of any part of the Trust or its income or otherwise than in conformity with the Onjects.

A.C        GENERAL PROVISIONS

(i)        The decisions and actions of the Trustees shall at all times be governed by the relevant laws of England and where relief and assistance is extended to beneficiaries in countries other than England the relevant laws of those countries are to be respected and obeyed.

(ii)       In accordance with the decision making procedure:

           (a)        The Trustees may at any time if they in their absolute discretion think fit decide that the Trust should become an incorporated association or a limited company and accordingly take the appropriate steps needed to effect such change.

           (b)        The Trustees may at any time if they in their absolute discretion think fit

HIGHLY CONFIDENTIAL      NW 008349

NW008349

decide to dissolve the Trust and accordingly take the appropriate steps needed to effect such dissolution.

(c)     In the event of the Trust being dissolved the assets of the Trust after payment thereout of all proper debts and liabilities shall not be paid or distributed among the Trustees or Honorary Patrons but shall be given to such other Charitable Organisations or Organisations with objects similar to those of the Trust as the Trustees shall decide.

(iii)   The provisions of this Trust Instrument relating to the administration of the Trust may be altered by the Trustees in accordance with the decision making procedure (and subject to the consent and approval of the Commissioners) where such alteration would result in a more effective and efficient administration of the Trust and any project or scheme initiated and co-ordinated by the Trust.

A.D     <u>TRUSTEES NOT TO BE PERSONALLY INTERESTED</u>

HIGHLY CONFIDENTIAL   NW 008350

(i)     Subject to the provisions of the following sub-clause no Trustee shall acquire any interest in property belonging to the Charity (other than as a Trustee for the Charity or receive remuneration or be interested (otherwise than as a Trustee) in any contract entered into by the Trustees).

(ii)    Any Trustee who is a Solicitor, Accountant or other person engaged in any profession may charge and be paid all the usual professional charges for business done by him or her or his or her firm when instructed by the other Trustees to act in a professional capacity on behalf of the Charity PROVIDED THAT at no time shall a majority of the Trustees benefit under this provision and a Trustee shall withdraw from any meeting of the Trustees at which his or her own instruction or remuneration or that of his or her firm is under discussion.

A.E     MANAGEMENT OF LAND

Subject to any consents which may be required by law the Trustees shall either sell or let any land belonging to the Trust's Charity which is not required to be retained or occupied in furtherance of the Objects.

A.F     LEASES

77

HIGHLY CONFIDENTIAL     NW 008351

The Trustees shall ensure that on the grant by them of any Lease the Tenant shall execute a Counterpart Lease.   Every Lease shall contain a covenant on the part of the Tenant for the payment of rent and a proviso for re-entry on non-payment of rent or non-performance of the covenants contained in the Lease.

A.G     **REPAIR AND INSURANCE**

The Trustees shall keep in repair and insured to their full value against fire and other usual risks all the buildings of the Charity which are not required to be kept in repair and insured by the Tenant and shall also insure suitably in respect of public liability and employers' liability.

A.H     **INDEMNITY**

In the execution of the Trust hereof no Trustee shall be liable for any loss arising by reason of any improper investment made in good faith (so long as such Trustee shall have sought professional advice before making such investment) or for the negligence or fraud of any agent employed by him or by any other Trustee herein in good faith (provided reasonable supervision shall have been exercised) although the employment of such agent was not strictly necessary or by reason of any mistake or omission made in good faith by any Trustee hereof or by reason of any other wilful and individual fraud, wrongdoing or wrongful omission on the part of the Trustee who is sought to be made liable.

28

HIGHLY CONFIDENTIAL     NW 008352

A.I      DISSOLUTION

The Trustees may at any time if they in their absolute discretion think fit decide to dissolve the Trust and accordingly take the appropriate steps needed to effect such dissolution.

A.J      AMENDMENT OF TRUST DEED

(i)      The Trustees may amend the provisions of this Deed PROVIDED THAT:

(a)      No amendment may be made to clause C unless it appears to the Trustees that the Objects can no longer provide a suitable and effective method of using the Trust Fund.

(b)      No amendment may be made to clause C, clause A.D or this clause without the prior consent in writing of the Commissioners, and,

(c)      No amendment may be made which has the effect of the Charity ceasing to be a Charity at law.

(ii)     Any amendment shall be made by deed under the

HIGHLY CONFIDENTIAL     NW 008353

authority of a resolution passed at a special meeting of the Trustees.

(iii)   The Trustees shall promptly send to the Commissioners a copy of any amendment made under this clause.

**IN WITNESS** whereof the parties hereto have hereunto set their respective hands the day and year first before written.

SIGNED as a deed by the said
ESSAM Y MUSTAFA
in the presence of:-

SIGNED as a deed by the said
ABDEL RAHMAN ABOU DAYA
in the presence of:-

SIGNED as a deed by the said
DR. ABDUL RAHIM NASSRULLAH
in the presence of:-

SIGNED as a deed by the said
DR. ISSAM MAJID SHAKER
in the presence of:-

30

HIGHLY CONFIDENTIAL      NW 008354

SIGNED as a deed by the said
DR. MUSTAFA TULBA
in the presence of:-

Mohammad mohammad Mattar

SIGNED as a deed by the said
MAHFUZH SAFIEE
in the presence of:-

WAN JARINA WAN DAUD

HIGHLY CONFIDENTIAL    NW 008355

NW008355

**EXHIBIT 4 TO DECLARATION OF VALERIE SCHUSTER**

Case 1:05-cv-04622-DLI-RML   Document 267-1   Filed 03/22/12   Page 87 of 295 PageID #: 4735

- Home
- The Palestinians

- About Us
  - 
    - The Founding of Interpal
    - How We Work
    - Trustees and Staff
    - Jobs and Volunteers
    - Contact Us
    - FAQs

- Our Work
  - 
    - Humanitarian Aid
    - Medical Aid
    - Educational Aid
    - Community Development
    - Child Sponsorship
    - Clean Water Project
    - Medical Aid Project
    - Educational Aid Project
    - Seasonal Campaigns
    - KTFC Support Interpal

- Get Involved
  - 
    - Volunteer for Us!
    - Spread the Word
    - Have a Date with Us

- News & Events
  - 
    - News
    - Events
    - Newsletter - Sign up

- Media Centre
  - 
    - Photos
    - Videos
    - Downloads

- Donate
  - 
    - Donate Now!
    - Donate Here



Monday, 22 March 2010 03:14

### About Us

Interpal is a non-political, non-profit making British charity that works with international funding partners and partners on the ground to provide relief and development aid to Palestinians in need, mainly in the West Bank, Gaza Strip and the refugee camps in Lebanon and Jordan.



Interpal seeks to help Palestinians overcome the harsh conditions they face resulting from over 60 years of suffering and occupation by:

- providing them with humanitarian aid, emergency aid and protection from the elements
- promoting good health within their communities
- assisting them in the advancement of education
- providing them with the necessary social welfare facilities and services

Interpal is a member of BOND (British Overseas NGOs for Development), the Palestine Platform and is registered and regulated with the Charity Commission (Registered No 1040094).

Case 1:05-cv-04622-DLI-RML   Document 267-1   Filed 03/22/12   Page 88 of 295 PageID #: 4736

Next >

Home | Contact Us | Search | About Us | FAQs | Interpal
Copyright © 2011 - Interpal - Registered Charity No. 1040094

**EXHIBIT 5 TO DECLARATION OF VALERIE SCHUSTER**

**FILED UNDER SEAL**

National Westminster Bank

Date

Clubs, Societies, Charities
and Non-Personal Trusts
Account Opening Form

Interviewer
IIS Phone Number
Sort Code

Account Number

Please complete in
Block Capitals using ink

HIGHLY CONFIDENTIAL

NW 068714
NW068714



HIGHLY CONFIDENTIAL

NW 068715
NW068715



HIGHLY CONFIDENTIAL

NW 068716

NW068716

**EXHIBIT 6 TO DECLARATION OF VALERIE SCHUSTER**

**FILED UNDER SEAL**

.



# WEISS V NATIONAL WESTMINSTER BANK PLC
# APPLEBAUM V NATIONAL WESTMINSTER BANK PLC

## EXPERT REPORT OF MICHAEL HYLAND

## 1.    INTRODUCTION

1.    I am Executive Chairman and Director of MHA Compliance and Training Ltd whose offices are situated at Richmond House, 124 High Street, Cranleigh, Surrey, GU6 8RF.  I am a Fellow of the Chartered Institute of Certified Accountants and a Fellow of the Chartered Institute of Internal Auditors. I have specialised in the subject of how financial institutions address their anti-money laundering (AML) and counter-terrorist financing (CTF) obligations since 1985 following my appointment as Head of Audit and Inspection Services within the UK operations of the Midland Bank Group plc. That specialisation has continued within MHA which was established in 1993. Whilst undertaking the roles within Midland Bank, I was at various times:

- Chair of the British Bankers' Association (hereafter "BBA") Chief Inspector's Committee; Chair of the BBA Money Laundering Working Party; and Chair of the BBA Hostage Prevention Working Party.

- A UK representative on the European Banking Federation Money Laundering Committee.

- A founder member of the UK's Joint Money Laundering Steering Group in 1989, which was then chaired by the Bank of England. I chaired the JMLSG Education and Training sub-group and remained a member of the JMLSG at the explicit request of the Bank of England following my departure from Midland Bank, until 1997.

Whilst acting as Executive Chairman within MHA, I have:

- Undertaken consultancy, advisory and training assignments for the UK Government, the European Commission, the United States Government, the Commonwealth Secretariat, various financial sector regulators, and numerous financial institutions both large and small within the UK, Europe, the Crown

1



Dependencies, Colombia, Sub-Sahara Africa and the Caribbean.

- Continued to chair and lecture at numerous AML/CTF workshops and courses on behalf of the BBA and the Chartered Investment and Securities Institute (CISI).

- Been a contributory author of the AML and Financial Crime Diploma Course Manuals of the International Compliance Association (ICA).

2.   I have been assisted in preparing this report by Sue Thornhill, the Professional Services Director of MHA and an acknowledged financial crime expert who has specialised in the subject since 1987. Ms Thornhill has 37 years experience of working within the financial sector, as Assistant Company Secretary of Rothschild Intercontinental Bank, Senior Assistant Secretary of the Committee of London and Scottish Bankers and as a Financial Crime Director of the British Bankers' Association.  She joined MHA Compliance and Training Ltd as an Executive Director and Principal Consultant in 1997, and continued to act as AML Consultant to the BBA and the UK Joint Money Laundering Steering Group until 2005.  Since 1990 she has undertaken many key roles that contributed directly to the development of the AML/CTF strategies within the UK, the UK Crown Dependencies and internationally , including the following:

- A founder member and Secretary of the Joint Money Laundering Steering Group in 1989 and author of the Joint Money Laundering Steering Group (JMLSG) Guidance Notes for the Financial Sector from their introduction in 1990 to 2005.

- Providing the UK anti-money laundering compliance help-desk from 1990 to 2005 giving advice and guidance to financial sector firms, members of the public, members of Parliament, government departments and the media.

- Representing the UK financial sector on national and European fraud and money laundering committees including the European Banking Federation Money Laundering Committee, and the AML/CFT Steering Groups of the Financial Services Commissions in the Isle of Man, Guernsey and Jersey.

- Undertaken, consultancy, advisory and training assignments for the UK Government, the European Commission, the United States Government, the Commonwealth Secretariat and various financial sector regulators, within Europe, the Crown Dependencies, Colombia, Sub-Sahara Africa and the Caribbean.

---

2



- Served as a member of the FSA Money Laundering Rules Advisory Panel 1999 – 2002 and HM Treasury Group of Money Laundering Experts from 1997 - 2005.

- Been appointed by the Foreign Secretary in 2004 as a member of the team undertaking the Statutory Review of the Gibraltar Financial Services Commission.

- Served as a member of the Financial Services Skills Council Anti-money Laundering Steering Group from 2004-2006.

- Served as principal Author of the course material for the Anti-money Laundering and Financial Crime Diplomas of the International Compliance Association from 2003 to date.

- Acted as AML consultant to the Commonwealth Secretariat from 1997 – 2007.

- Served as a member of the advisory board of the Association of Certified Anti-Money Laundering Specialists (ACAMS) to 2003.

3.   Neither Ms Thornhill nor I have provided expert testimony either in the USA or elsewhere in the past four years.

4.   MHA is being compensated for our work on this matter at the rate of £450 per hour.  I reserve the right to amend and/or supplement my opinions as additional information is presented, including in reports provided by others.


## 2.   SCOPE OF THIS REBUTTAL REPORT

5.   MHA has been retained by the Defendant's attorneys to address certain subjects raised in the Expert Report of Mr Gary Walters submitted on behalf of the Plaintiffs, as set out below in sections 3 - 9

6.   The list of material upon which we have relied in preparing this report is attached as Annex 1.

7.   A list of my and Ms Thornhill's publications during the past ten years is attached as Annex 2.



### 3. USE OF THE TERMS "MONEY LAUNDERING" AND "TERRORIST FINANCING" BY THE UK BANKING SECTOR

8. In paragraphs 19-21 of his report, under the heading of 'Banking Terminology and Practices', Mr Walters describes the terms "money laundering" and "terrorist financing" using generic terminology. I believe that it is more useful for the terms to be described as I know them to have been understood and applied by the UK banking sector – meaning both banks and their regulators – during the period when National Westminster Bank plc (NatWest) maintained accounts for Interpal. I understand this to be 30 September 1994 to 16 March 2007 (the "Relevant Period").

9. The JMLSG Guidance February 1995 described money laundering as *"the process by which criminals attempt to conceal the true origin and ownership of the proceeds of their criminal activities. If undertaken successfully, it also allows them to maintain control over those proceeds and, ultimately, to provide a legitimate cover for their source of income[1]".*

10. Historically, for training purposes, the money laundering process has been described in the UK as taking place in a circular three stage process in which the following three stages may occur simultaneously or, more commonly, they may overlap: **Placement** – the placement of funds generated from crime into the financial system, either directly or indirectly; **Layering** - the process of separating illicit proceeds from their source by creating complex layers of financial transactions designed to disguise the audit trail and provide anonymity; **Integration** – the provision of apparent legitimacy to criminally derived wealth. If the layering process has succeeded, integration schemes place the laundered proceeds back into the economy in such a way that they re-enter the financial system and appear to be normal business funds.

11. Terrorist financing on the other hand is generally a linear process with funds placed into the financial system flowing to a different beneficiary i.e. a terrorist organisation or cell or others supporting terrorist activity.

12. The differences between money laundering and terrorist financing have been described in the following terms[2]:

13. "*There will be considerable overlap between the movement of terrorist funds and the*

---

[1] Paragraph 1.03

[2] JMLSG Guidance Notes December 2001 paragraph 2.34

---

4



*laundering of criminal assets: terrorist groups are known to have well established links with organised criminal activity. However, there are two major differences between the use of terrorist and criminal funds:*

- *often only small amounts are required to commit a terrorist atrocity, thus increasing the difficulty of tracking the funds;*

- *terrorists can be funded from legitimately obtained income and it is not clear to a financial sector firm at what stage legitimate earnings become terrorist assets".*

14.  For these reasons and others, it is commonly understood that it is generally more difficult for a bank to identify suspicions of terrorist financing than suspicions of money laundering.

## 4.    THE OBLIGATIONS PLACED ON BANKS

15.  In respect of Mr Walters' assertion in paragraph 28 of his report that banks had a requirement to "detect" money laundering, no such requirement was either placed on the banking sector during the Relevant Period or incorporated into any bank's internal systems and procedures. Based on my knowledge and experience of the time, it was generally accepted by government, regulators and the banking sector that banks' obligations fell short of detection. Their obligations were to "prevent and forestall" money laundering, which required banks to verify the identity of customers, put in place procedures to recognise suspicious transactions and report them to the authorities, to train their staff to this end and to keep relevant records.

16.  This position was confirmed in the 1993 Guidance Notes[3]  which stated that *"Whilst there is a statutory obligation to establish and maintain procedures for the purpose of deterring and recognising money laundering in the ordinary course of business, there is nothing that requires banks and building societies to install specific systems to **detect** money laundering activities".*

17.  At that time the Bank of England chaired JMLSG and HM Treasury (the sponsoring department for the Money Laundering Regulations) and the Home Office (the sponsoring department for the Criminal law) reviewed the guidance before issue.

---

[3] Paragraph 32



18.   The First, Second and even the Third EC Directive[4], which was implemented in the UK after the Relevant Period makes no reference to "detecting" money laundering. Article 34 covering internal procedures, training and feedback requires in paragraph 1 that:

19.   "*Member States shall require that the institutions and persons covered by this Directive establish adequate and appropriate policies and procedures of customer due diligence, reporting, record keeping, internal control and risk assessment, risk management, compliance management and communication **in order to forestall and prevent operations related to money laundering or terrorist financing**".*

20.   In paragraph 29 of his report, Mr Walters states that "By 1990, banks based or operating in major financial centers had adopted substantial Money Laundering detection and prevention policies and procedures known as Anti-Money Laundering or "AML".  The footnote to this statement advises that "For the purposes of this report, AML compliance comprises those internal policies and procedures, international law, industry standards, red flags and typologies, relevant software, and reporting obligations followed by financial institutions to manage the risks associated with Money Laundering including Terrorist Financing".

21.   Based on my extensive knowledge and experience of global AML developments over two and a half decades, I can state that no such requirements were generally in place within major financial centres by 1990.

22.   The requirements have not been static as might be inferred from Mr Walters' report. AML/CTF obligations have evolved significantly over the last two decades and have continued to evolve since the end of the Relevant Period. The first international recommendations, the Basel Principles, relating to money laundering compliance by the banking sector did not start to emerge until the end of 1988 and subsequent international recommendations were not incorporated or enacted into any country's national legislation or regulations until approximately 1993.

23.   It was not until June 1990 that the Financial Action Task Force first published its 40 Money Laundering Recommendations aimed at governments and it was only in December 1990 that the JMLSG under the chair of the Bank of England published its first anti-money laundering guidance notes for banks.

---

[4] Directive 2005/60/EC of 26 October 2005 on the prevention of the use of the financial system for the purpose of money laundering and terrorist financing



24.     It would appear therefore that Mr Walters' statement refers to the requirements currently in place and not those in place during 1990.

## 5.     THE AML/CTF RISK-BASED APPROACH

25.     In paragraphs 30- 36 of his report, Mr Walters provides a description of the risk-based approach to money laundering and terrorist financing.  However, Mr Walters has failed to acknowledge that a risk-based approach to money laundering was a new concept even in 2001 and was still not recognised in the 2nd EC Directive or the 2003 UK Money Laundering Regulations.

26.     Chapter 1 of the December 2001 JMLSG Guidance provided limited initial advice on applying the risk-based approach in respect of assessing product/service risk; risks associated with the customer base.  Charities were not identified as presenting a higher level of risk.

27.     The Guidance Notes reflected the FSA SYSC Rules, first published in 2001, which require firms to take reasonable care to manage the risk that they might be used to further financial crime. Measures must be taken by senior management to identify, assess, manage and monitor those risks.

28.     The risk-based approach became required within the UK in December 2007 with the implementation of the 2007 Money Laundering Regulations, after the end of the Relevant Period. The Guidance Notes published by the JMLSG in 2006 and 2007 provided the detailed definitive guidance for the UK financial sector in preparation for the 2007 Regulations.

## 6.     THE DEVELOPMENT OF KYC/CDD STANDARDS

29.     The statement by Mr Walters in paragraph 37 that Customer Due Diligence (CDD) and Know Your Customer (KYC) are well established risk-management standards is incorrect. Mr Walters does not provide any indication that customer identification, KYC and CDD principles and requirements have significantly developed over time, particularly during the Relevant Period.  Based on my knowledge and experience, today's standards are not those that would have been applied, or be required to be applied, to NatWest's Interpal accounts and relationship.

30.     The terms KYC and CDD have developed as general concepts and have different

7



meanings depending on the jurisdiction, guidance or regulations that are being applied.  Whilst the term CDD has recently been applied more consistently, the term KYC has never been specifically defined and had different meanings depending on the context in which it was being used.

## Customer identification requirements

31.    The requirement to obtain identification evidence for new customers and not to enter into anonymous relationships was first introduced in the Basel Statement of Principles published in December 1988, the FATF Forty Recommendations published in April 1990 and the First European Money Laundering Directive approved in June 1991.The Money Laundering Regulations 1993 implementing the EC Directive in the UK took effect in April 1994.  Paragraph 33 of the JMLSG Guidance October 1993, which provided the supporting guidance for implementing the Regulations, stated that:

32.    *"Regulations 7 and 9 require banks and building societies to seek satisfactory evidence of identity of a prospective customer (referred to in these Guidance Notes as verification of identity) at the time of opening an account or entering into a business relationship.*

## Know Your Customer (KYC)

33.    By 1997 the concept of identifying a new customer and verifying identity had evolved with verification of identity being the first step in a wider "know your customer process" The June 1997 Guidance Notes stated that:

34.    *"The need for banks and 'building societies to 'know your customers' (KYC) is vital for the prevention of money laundering and underpins all other activities."*

35.    *"When a business relationship is being established, the nature of the business that the customer expects to conduct with the bank or building society should be ascertained at the outset to show what might be expected as normal activity. **This information should then be updated as appropriate and as opportunities arise**. In order to be able to judge whether a transaction is or is not suspicious, banks and building societies need to have a clear understanding of the legitimate business of their customers".*

36.    The KYC concept was further developed in the FSA ML Sourcebook and the February and  December 2001 Guidance Notes in the following terms and which also



introduced the first references to the risk-based approach[5]:

37.    *"The second requirement of knowing the customer is to ensure that sufficient information is obtained on the nature of the business that the customer expects to undertake, and any expected, or predictable, pattern of transactions. A risk based approach will be needed in respect of the extent of the additional information that might be required or validated for this purpose".*

38.    The term KYC started to fall out of use after it was discredited in the USA in the late 1990's when the US Government unsuccessfully attempted to formalise a KYC Rule. A number of FATF members also challenged the development of such requirements in that they would place unacceptable burdens on their financial sectors and erode customer confidentiality. UK firms, however, continued to use the term and develop the concept.

## Customer due diligence

39.    Within the UK, the transition from KYC to CDD was made in the February 2006 guidance notes under the heading of **"What is customer due diligence, and why does it matter?[6]".**

40.    *"The due diligence carried out on new customers is in two distinct parts. As well as verifying his identity, the risk-based approach will lead to a need, in appropriate cases, to obtain additional information in respect of some customers. In this guidance, the additional information collected in respect of customers is referred to as "know your customer" or "KYC" information".*

41.    *"Firms will therefore take a combination of appropriate steps, on the basis of their assessment of the money laundering/terrorist financing risk that each customer or class/category of customer, presents, addressing: **ID** – verifying the customer's identity - determining exactly who the customer is, whose identity needs to be verified (see Section 5.2); and appropriately verifying that customer's identity (see section 5.4): **KYC** – obtaining appropriate additional information (see section 5.6) – understanding the customer's circumstances and business - including, where appropriate, the source of funds, and in some cases the source of wealth and the purpose of specific transactions - and the expected nature and level of transactions;*

---

[5]  Section 4 paragraphs 4.9 to 4.13

[6]  Paragraphs 5.1.5 – 5.1.6



*and keeping such information current and valid".*

## 7.    UK TRANSACTION MONITORING STANDARDS AND PRACTICES

42.    In paragraphs 40-41 of his report, Mr Walters suggests, without context, that a bank needs to monitor its customers' accounts to "properly evaluate actual account activity against reasonably expected transactional activity for its customers" and to "detect anomalies inconsistent with a customer's profile".   These paragraphs fail to recognise that the explicit requirement and ability to monitor a customer's activity are the principal aspects of AML/CTF compliance that have changed most significantly during the past two decades.

43.    A number of factors have driven the changes during the past two decades:

- ▪    Changes to AML/CTF laws, regulations and FSA expectations and the increasing need to observe sanctions lists.

- ▪    Significant advances in available IT support systems, although even today further advances are required to improve effectiveness and efficiency.

- ▪    The need for improved transparency within international payments systems.

44.    A number of these key changes to requirements and practice occurred during the Relevant Period, but others have only occurred subsequently.  In particular, an effective transaction filtering capability only started to become available towards the end of the Relevant Period.

45.    Prior to 2001, because UK laws, regulations and related guidance did not require monitoring, little, if any, proactive monitoring was carried out by banks and other financial services firms.  The December 2003 Guidance Notes first addressed the topic indicating the extent of account monitoring that might be expected to comply with POCA 2002 either manually or by computerised systems taking a risk-based approach.

46.    Subsequent Guidance Notes expanded the requirements from this initial base. JMLSG Guidance in 2006 continued to advise that whilst there was no explicit regulatory requirement for monitoring, manual or automated monitoring systems were expected to be put in place if appropriate. Still throughout the Relevant Period, there was no express legal or regulatory requirement to monitor transactions or accounts.

**Monitoring transactions against the sanctions lists**



47.   Following the September 2001 attacks against the USA and throughout the remainder of the Relevant Period, the UK Sanctions regime was designed to be relatively simple. The Bank of England issued its "Consolidated List" of sanctioned persons and entities (consolidated from the UN, EU and UK lists) as agent for HM Treasury and banks and other firms were prohibited from providing any financial services to those on the list without a licence from HM Treasury. When a new name appeared on the list any bank holding assets or providing services to that named party was required to freeze the account and report to the Bank of England Sanctions Unit.  The regime is the same in 2011 except that HM Treasury is now directly responsible for maintaining and publishing the Consolidated List and reports of matches must be made to the Asset Freezing Unit within HM Treasury.

48.   Prior to 2004/2005 the standard approach within banks was to screen a new customer against the Consolidated List, monitor for updates and every time there was an update compare the updated list to its customer database. This retrospective process was the norm. There was no proactive monitoring of payments and receipts which would have required both the availability of reliable software (see paragraphs 49-50 below) and increased transparency within the international payments systems (see paragraphs 51-55).

## Available IT support systems

49.   By 2000 it was becoming clear to major retail banks undertaking volume-based business in the UK that monitoring for suspicious transactions could not be achieved manually.  In such institutions it was not possible for any one person to have continual oversight of activity of any particular account.  Consequently, although computerised monitoring systems were not a requirement, a number of major banks had taken a policy decision to install transaction monitoring systems for the purpose of recognising situations that had been determined as unusual or potentially suspicious. Royal Bank of Scotland had been one of the first banks to implement such a system and, following the merger, this was extended to NatWest.

50.   However, at this time, monitoring systems were in their infancy and produced many "false positive" exception reports for follow-up by relevant staff.

## Lack of transparency in international payments

51.   While monitoring for outgoing and incoming payments was adversely affected by the absence of an effective payment filtering system during the Relevant Period, the ability



to monitor incoming payments was further affected by the lack of transparency in international payments.

52.     FATF Special Recommendation VII published in October 2001, as part of the special recommendations to combat terrorist financing, aimed to ensure that basic information on the originator of wire transfers transactions was immediately available to:

▪     The investigating agencies and prosecutors for investigation and prosecuting terrorist and criminal assets.

▪     Financial intelligence units for analysing unusual or suspicious activity.

▪     Financial institutions to facilitate recognition and reporting or suspicions.

53.     However SR VII could not be adopted within the international payment systems because of technical restrictions, primarily in respect of the SWIFT messaging system in use internationally at the time. SWIFT subsequently introduced enhanced standards in 2009 to alleviate the problem.

54.     In the meantime, to ensure that SR VII was implemented consistently through the European Payment System, the European Commission published its proposal for Wire Transfer Regulations in July 2005.  The Regulation was approved by the European Parliament on 6 July and came into force on 1 January 2007.  However, implementation in the UK and in many other EU Member States was delayed until 15 December 2007 to coincide with the effective date for implementing the 3rd Directive, after the Relevant Period.

55.     In the absence of the implementation of SR VII, the new SWIFT messaging standards and the European Wire Transfer Regulations, there was no guarantee that incoming wire transfer payments would carry the full and specified information about the originator of the payment. Many incoming payments merely stated "on the instruction of one of our customers". Although the information could be expected to be known by the beneficiary, it was not always available to the receiving bank.

## 8.     NATWEST'S SARS CONCERNING INTERPAL'S TRANSACTIONS

56.     Mr Walters omits to state that Interpal transactions through its NatWest accounts prompted a number of internal suspicion reports by NatWest staff to the Money Laundering Unit and the submission of external SARs to NCIS.

57.     Mr Walters also fails to observe that although the reports were passed to Special



Branch, the unit within the Metropolitan Police with specific responsibility for investigating suspected terrorist financing, none of the disclosure reports prompted the authorities either to serve a production order in response to the reports with a view to obtaining additional information, freeze Interpal's accounts, or take any other action that would have required or prompted NatWest to close out the relationship. Neither did the production order dated 5 August 2003, which appears to have been served on NatWest in response to the US designation of Interpal as a SDGT and the resulting Charity Commission investigation, result in any such action. In short, no evidence of terrorist financing appears to have been detected by law enforcement.

58. There is evidence within the depositions and exhibits and in particular the NatWest Goalkeeper Reports, that Corporate Banking, Finsbury Park Branch and the Payment Section within Manufacturing Division were monitoring both outgoing and incoming transactions on the Interpal accounts during the Relevant Period. This would have been occurring within the constraints of the IT systems support available at the time and reflects the vigilance of the staff themselves. For example:

- November 2001 – An internal SAR raised by Finsbury Park Branch in respect of ███████████████████████████ from blacklisted or high risk countries[7]

- June 2002 – An internal SAR raised by Payment and Trade Operations in respect of a ██████████ transfer in from ██████[8]

- June 2002 – Further internal SAR raised by Payment and Trade Operations in respect of an overseas credit of ██████████ from ██████████████████ ████████████████

59. In paragraphs 85 – 92 of his report, Mr Walters describes the SARs regime, referring explicitly in paragraphs 87-88 to the varying quality of SARs submitted by reporting institutions and, in addition, referring implicitly to the limited resources within the enforcement agencies to respond.

60. While Mr Walters may have intended no implication that NatWest's SARs were poor, having examined a number of goalkeeper records I believe, based upon my experience and expertise in this field during the Relevant Period, that the quality of NatWest's SARs and the ongoing and open communication with the National Terrorist

---

[7] GK2 647044 (*NW 052066*)

[8] GK2 666593 (*NW 052133-39*)

[9] GK2 666814 (*NW 052074-91*)



Financial Investigation Unit (NTFIU) within Special Branch reflected the best practice of peer institutions at the time. In addition there are examples of where NatWest demonstrated their commitment to quality rather than quantity of SARs and recognised the pressures on enforcement by not submitting SARs in respect of suspect transactions where they would not add value to earlier reports.

61.   There is evidence within the Goalkeeper Reports that the Money Laundering Team within Group Investigations and Fraud were evaluating internal SARs, identifying a connection between SARs from different areas and submitting informative SARs to NCIS/SOCA with key enforcement contacts included. In addition, the Money Laundering Team were striving to provide to NCIS/SOCA and the NTFIU with whom it was in close contact, added value intelligence rather than merely yet another SAR. For example:

■   September 2001 an internal SAR evaluated and a SAR submitted to NCIS in October 2001. ████████████████████████████████████ ██████████████████████████████████████████████████ ████████████████████████████████████████████

■   August 2003 an internal SAR evaluated by the Money Laundering Team and not reported on to NCIS. The note of 2 August indicates: "This connection was reported due to a sizeable credit originating from ██████ ...Palestine Development Fund has been the subject of previous disclosures and we are aware that NTFIU are undertaking their own investigations. The payment is consistent with our knowledge of this customer's humanitarian aid activities and a further disclosure is not considered necessary at this stage."[11]

■   August 2003 a SAR submitted to NCIS in respect of OFAC's designation of Interpal. ██████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████ This, according to the Goalkeeper notes, elicited a prompt telephone call from DS Bennett during which he indicated that ████████████████████████████████████████████ ██████████████████████████████████ There was no request to report any similar credit/deposit transactions.

---

[10] Goalkeeper case 617044/ ( NW052062)

[11] Goalkeeper case 666593/ (NW52136)

[12] Goalkeeper case 710358/ (NW 052122) and (NW052117)



## 9.   NATWEST'S RISK MANAGEMENT FUNCTION

62.   As Mr Walters describes in paragraphs 115 - 127 of his report,  NatWest's Risk Management and Legal and Compliance functions went through a number of organisational changes that impacted upon the organisational structure and  the resources assigned to managing the financial crime risks[13].

63.   Although I might agree with Mr Walters' view, as stated in paragraph 118 of his report, that it would have been easier to understand the organisational developments within NatWest during the Relevant Period with the aid of organisation charts showing the position at various times, it is my experience that such documents are rarely retained by the larger banks once they are superseded. Possibly I, as an expert from "within the sector" have found it easier to understand the specifics than an expert "looking in on the sector".

64.   In my opinion the organisational changes within NatWest during the period appear prudent and in line with changing regulatory requirements. From my knowledge and experience of the period, similar developments were occurring in peer organisations.  I do not share the surprise or concern expressed by Mr Walters in paragraph 118 that in 2010 NatWest personnel could not "recall with absolute precision the structure of the organisation at certain points in time".

65.   In addition, I do not agree with the comment made by Mr Walters in paragraph 117 of his report that "the work of financial crime and AML departments closely reflects the intelligence and investigation practice of law enforcement".  From my experience, having been responsible for financial crime matters within a bank of a similar complexity until 1993, and since 1993 having advised and trained many client banks and a number of regulators, I see any such comparison as being entirely invalid. Bankers are bankers not police trained investigators even when working within the financial crime area.

66.   During the Relevant Period banks were required to report suspicions of money laundering or terrorist financing.  However, there never has been a requirement for investigation of the suspicions which is a task for the trained enforcement authorities.

67.   It is acknowledged that UK retail banks did from time to time during the Relevant

---

[13] Financial crime for the purpose of this section of the Report means, money laundering, terrorist financing and sanctions



Period, and thereafter, recruit senior officers from the enforcement agencies. However, such individuals were usually appointed into the Fraud teams to assist and advise upon the response to external fraud attacks where their knowledge and contacts could prove invaluable. They might also be required to advise and support the more significant internal fraud investigations. However, such internal investigations would often be undertaken under internal disciplinary procedures and employment law not criminal law.

68. Further I infer criticism of the organisation and its development from Mr Walters' description in his report. I do not support this criticism.

69. In my opinion, the structure that emerged in 2002 provided a sound regime through which to manage the risks of money laundering, terrorist financing and sanctions faced by a group of the size and complexity of NatWest/RBS. The roles and responsibilities of the various units, whether in Group, Business Divisions or Manufacturing appear to have been clearly specified and understood by unit heads as do the accountabilities in terms of line and functional management.

70. The existence and involvement of the Group Risk Committee in assessing and endorsing policy was in compliance with the FSA's expectation of senior management ownership and involvement in risk management. The introduction of the "Money Laundering Action Group" is an essential element in such a devolved organisation structure to assist communication and avoid the "not invented here" syndrome which is always a risk that needs to be managed at Group level.

71. The key individuals whom appear to have been the unit heads (Foster, Hoseason/O'Hear, Rodger) each had relevant previous experience prior to appointment, and their depositions indicate that they took advantage of the training available at the time which was basically BBA courses. In addition the ongoing involvement of Mr Wickens in an important senior role must certainly have provided valuable continuity.

72. The organisational developments within NatWest were initially being driven by two factors:

73. Firstly the sector-wide restructuring of bank front and back offices. The restructuring of front and back office processes reflected recognition that it was less costly and more effective to remove the majority of back office functions (accounting, cheque clearing payments etc) from "high street" branches and other customer contact centres within individual business divisions into specialised processing centres that provided central support. The processing centres became the core of an "Operations", or as NatWest



referred to it, a "Manufacturing" Division. Such an approach became standard within the UK retail banks during the 1990s.

74.    Secondly, the anticipation of the new regulatory and supervisory regime under the Financial Services Authority which commenced its operations in 1998[14] and the publication of the FSA Handbook of Rules.  The new FSA Rules placed specific requirements on senior management to establish and maintain specific systems and controls to manage risks, including financial crime risks. Against this background, many of the major clearing banks including NatWest restructured.

75.    Teams managing money laundering and terrorist financing matters, which had previously undertaken operational and policy tasks and been located within the Fraud department of an inspection/audit division were split. Policy was transferred into a Legal & Compliance Division and the Fraud department, including operational AML/CTF matters, was transferred into the bank's Operations division - in NatWest terms: Manufacturing.

76.    Mr Wickens explains this move in his deposition[15].  In 1987 he had set up the first Money Laundering section within Fraud Department, but in 2001 he transferred to Group Compliance whilst the operational members of his team remained with Fraud Department.

77.    A further development was taking place at this time which had an impact upon compliance and risk structures within UK major banks. Historically a bank's senior management had given great attention to credit risk (the risk of a borrower defaulting on a loan), but less attention to operational risk. The new FSA Handbook especially the SYSC Rules were placing very clear obligations that senior management must manage and be seen to be managing ALL risks [16] on an integrated basis.  Financial crime was but one of a number of operational risks that needed to be managed.

78.    Against this background, banks were strengthening and formalising their approach to managing operational risks. In consequence resources undertaking policy development in respect of AML/CTF were frequently moved into the enlarging Risk Divisions. Contemporaneously compliance in general was being seen as a function for

---

[14] Although the FSA commenced operations in 1998, if  did not acquire its full legal status until 2000 following enactment of the Financial Services and Markets Act)

[15] Pages 18-22 and 61

[16]  SYSC 3.2.6R



managing regulatory risk and was thus also transferred or consolidated into a Risk Division.

## The structure – pre 2002

79.   As indicated by Mr Walters in paragraph 116 of his report, the Royal Bank of Scotland (RBS) acquired NatWest in March 2000. Thus the reorganisation that took place also reflected the merging of functions within two large global banks. In respect of the Compliance and Risk functions and the AML/CTF units within them, it would appear that the two organisations used the transitional period 2000 – 2002 to work more closely together under an increasingly integrated management team prior to full integration in 2002. Considering the scale of the two organisations and the other external drivers of change referred to above, this period would not, in my view, appear to be unreasonable.

80.   **NatWest -**The AML/CTF unit within NatWest was located within the Fraud Department and was responsible for both policy and operational matters. The Unit was established in 1987 by Mr Wickens and headed by him until his transfer to Group Compliance in 2001. He took his responsibilities for policy with him. The responsibility for processing internal and external SARs etc remained within Fraud Department, which was later renamed Group Investigations and Fraud.[17]  The Fraud department itself moved from an Inspection function to Manufacturing.

81.   **RBS** - There is no explicit information available within the depositions as to the organisation of AML/CTF within RBS between 1987 and 1999. However I would assume, based upon my knowledge of the retail banking sector, and RBS representation on various sector committees, that the AML/CTF unit sat within the bank's Fraud Department. This assumption is supported by reference to AML/CTF operational units being located in both London and Edinburgh and Mr Sludden's deposition.

82.   Mr Sludden, whose deposition indicates that he was an RBS employee, not a NatWest employee as suggested by Mr Walters, advises that between 1999 and 2002, he reported to Mr Munroe who was MLPO within the RBS Compliance Division[18]. The MLPO role was a role defined within the JMLSG Guidance Notes 1993 through to

---

[17] Ian Wickens pages 18 – 22

[18] Sludden page 48

---

18



1999. As MLPO, Mr Munroe would have been responsible for overall policy issues not operational issues such as SAR processing.

## The structure - post 2002

83.   As described in a number of depositions (Wickens, Foster, Holt and Hoseason) the structure that emerged post-2002 comprised the following:

84.   **The Group Financial Crime Unit** - The GFCU was headed up by Mr Foster who reported into Ms Holt, Head of Group Enterprise Risk. Group Enterprise Risk was one of a number of functions within the Group Risk Division.

85.   The Group Financial Crime Unit's role as explained by Mr Foster [19] was to:

- Develop and maintain Group policies which are presented to the Group Risk Committee for approval and subsequently issued to business divisions and manufacturing in the UK and overseas.

- Maintain and issue sanctions lists and oversee checking requirements

- Provide advice and guidance to money laundering resources within business divisions and any area of the Group with a request.

86.   In order to assist communication between the Group and the Divisions, Mr Foster established the "Money Laundering Action Group". Members of the group included representatives from the GFCU, Group Investigations & Fraud (GI&F), and each of the Money Laundering Prevention Units (MLPUs) in divisions. It met regularly, at one stage monthly and at another stage quarterly; there was an agenda and minutes were produced and distributed.[20]

87.   Ms Holt held the FSA Approved Person's Role of Money Laundering Reporting Officer (CF11). She appointed Mr Foster immediately following her assumption of anti-money laundering responsibilities.

88.   **The Money Laundering Team within GI&F** - The original Fraud Department, referred to by Mr Wickens[21], was renamed the Group Investigations and Fraud (GI&F) team.  It was organisationally located within the Manufacturing Division. The Money Laundering

---

[19] Foster pages 18-28

[20] Foster pages 77-78

[21]  Wickens pages 18-22



Unit was headed by Mr Hoseason until 2003[22] when he was succeeded by Mr O'Hear. This unit received and validated internal suspicion reports and reported them on to NCIS as necessary, received court orders as served from time to time, and managed the relationship with NCIS and other enforcement agencies. The unit provided support to a number of different business units including CBFM.

89. **The CBFM Division Money Laundering Prevention Unit -** A Money Laundering Prevention Unit (MLPU) was set up in spring 2002 within the CBFM Business Division. Mr Rodger was appointed as Head of the MLPU and continued to undertake that role throughout the Relevant Period[23]. The MLPU within CBFM was followed by similar operations being set up in other business divisions as the benefit of having one central specialist team within a business division became accepted as the model[24].

90. The role of the MLPU, its reporting lines and headcount as explained by Mr Rodger was to ensure the best degree of compliance over three topics; Sanctions, Money Laundering, Terrorist Financing and Data Protection.

91. Initially Mr Rodger reported to the Head of CBFM Legal and Compliance, but this changed within a short timescale to the Head of CBFM Regulatory Risk and then to Head of CBFM Enterprise Risk, Mr Love. (This reflected the organisational changes at Group level referred to above). In addition to this line accountability, there was a dotted line/functional accountability to Group.

92. The MLPU had commenced operations with Mr Rodger plus one other. This rapidly increased to approximately ten members of staff by 2004.

**Michael Hyland, Chairman, MHA**

**2 March 2011**

---

[22] Hoseason page 26
[23] Rodger page 9
[24] Rodger page 15-16

---



## 10.   ANNEX 1:  DOCUMENTS REFERRED TO IN THIS REPORT

**NatWest Depositions**

1.   Stephen Foster

2.   Amanda Holt

3.   Ian Wickens

4.   Irvine Rodger

5.   Guy Cole

6.   Mike Hoseason

7.   Tony O'Hear

8.   Thomas Alan Sludden


**NatWest Exhibits**

9.   Goalkeeper Case Summaries and suspicion reports relating to Interpal

**Other documents**

10.   Expert Witness Report of Gary Walters 17 December 2010

11.   UK money laundering, terrorist financing and sanctions legislation during the relevant period

12.   JMLSG Guidance Notes for the Financial Sector 1990 – 2006

13.   FSA Handbook of Rules 2000 – 2006 including the FSA ML Sourcebook 2001

14.   First and Second European Directives on the prevention of the use of the financial system for the purpose of money laundering and the Third European Directive on the prevention of the use of the financial system for money Laundering and terrorist financing

15.   The Basel Committee Statement of AML Principles December 1988

16.   The Basel Committee Paper Customer Due Diligence for Banks October 2001

17.   FATF 40 + 9 Recommendations 1990 - 2003



**ANNEX 2**

**MICHAEL HYLAND'S PRINCIPAL PUBLICATIONS DURING THE PREVIOUS 10 YEARS**

18.   BBA/MHA Reporting Officer's Reference Guide - Contributing author to six editions 2001 - 2009

19.   BBA/MHA Fraud Manager's Reference Guide – Contributing author to three editions 2004 - 2007

**SUE THORNHILL'S PRINCIPAL PUBLICATIONS DURING THE PREVIOUS 10 YEARS**

1.   BBA/MHA Reporting Officer's Reference Guide – Principal author for six editions 2001 -2009

2.   BBA/MHA Fraud Manager's Reference Guide – Principal author for three editions 2004 – 2007

3.   AML Code of Best Practice for Commonwealth Countries  - 1997 -2007

EXHIBIT 7 TO DECLARATION OF VALERIE SCHUSTER

FILED UNDER SEAL

O hear, Tony (Vol. 01) - 07/21/2010  8/13/2010  12:00:00 AM

**1**

```
1    UNITED STATES DISTRICT COURT
2    EASTERN DISTRICT OF NEW YORK
3         Action No: 05cv4622(DGT)(MDG)
4    - - - - - - - - - - - - - - - - - - - -
5    TZVI WEISS, et al,
6              Plaintiffs,
7    against
8    NATIONAL WESTMINSTER BANK, PLC.,
9              Defendant.
10   - - - - - - - - - - - - - - - - - - - - -
11   NATAN APPLEBAUM, et al.,
12             Plaintiffs,
13   against
14   NATIONAL WESTMINSTER BANK, PLC.,
15             Defendant.
16
17
18       VIDEOTAPED DEPOSITION OF TONY O'HEAR
19           Wednesday 21 July 2010
20             At:  10:00 am
21             Taken at:
22       Cleary, Gottlieb, Steen & Hamilton LLP
23         55 Basinghall Street, London
24               United Kingdom
25
26
27
28
29       HIGHLY CONFIDENTIAL              2
```

**3**

```
1
2                I N D E X
3    TONY O'HEAR ... ... ... ... ... ... ... ... ...5
4    DIRECT EXAMINATION BY MR. UNGAR: ... ... ... ... ... ..5
5              INDEX OF EXHIBITS
6    O'Hear 1 NW212124 ... ... ... ... ... ... ... ... .32
7    O'Hear 2 Website printout "From ... ... ... ... ... .38
8      Anonymous"
9
10   O'Hear 3 Press Release  ... ... ... ... ... ... ... .65
11
12   O'Hear 4 NW008381-98 ... ... ... ... ... ... ... ... .69
13
14   O'Hear 5 NW008356-366 ... ... ... ... ... ... ... ... .93
15
16   O'Hear 6 NW008367-373 ... ... ... ... ... ... ... ... 124
17
18   O'Hear 7 NW008430-439 ... ... ... ... ... ... ... ... 129
19
20   O'Hear 8 NW068065-66 ... ... ... ... ... ... ... ... 137
21
22   O'Hear 9 NW013939-41 ... ... ... ... ... ... ... ... 147
23
24   O'Hear 10 NW014500-04 ... ... ... ... ... ... ... ... 168
25
26   O'Hear 11 NW013695-97 ... ... ... ... ... ... ... ... 176
27
28
29
30
31
32
33
34
35
```

**2**

```
1             A P P E A R A N C E S
2    For Plaintiff Tzvi Weiss:
3         ARI UNGAR.
4         Osen LLC
5         700 Kinderkamack Road
6         Oradell, NJ 07649
7         Tel: 201 265 6400
8
9    For Plaintiff Tzvi Weiss:
10        AITAN GOELMAN
11        Zuckerman Spaeder LLP
12        1800 M Street, NW, Suite 1000
13        Washington, DC 20036-5807
14        Tel: 202 778 1996
15   For Defendant National Westminster Bank, PLC:
16
17        AVRAM E. LUFT and VALERIE SCHUSTER
18        Cleary, Gottlieb, Steen & Hamilton LLP
19        One Liberty Plaza
20        New York, NY 10006-1470
21            Tel: 212 225 2432
22
23   Also Present:
24
25   COURT REPORTER:
26
27   AILSA WILLIAMS
28   European Deposition Services
29   59 Chesson Rd
30   London, W14 9QS
31   Telephone:  44 (020) 7385 0077
32   VIDEOGRAPHER: FLOYD HUMPHREY
33
34
35
36        HIGHLY CONFIDENTIAL             3
```

**4**

```
1         THE VIDEOGRAPHER:  This is the beginning of
2    tape one, volume one, in the video deposition of
3    Mr. Tony O'Hear, being held at the offices of Cleary,
4    Gottlieb, Steen & Hamilton, 55 Basinghall Street,
5    London.
6         This is being taken on 21 July, 2010, at 10:00
7    am, as indicated on the video screen.  In fact, it is
8    10:06 am, as indicated on the video screen.
9         This deposition is being taken in the matter
10   of Tzvi Weiss et al, National Westminster Bank plc,
11   Natan Applebaum versus National Westminster Bank plc et
12   al, case number 05cv4622 (DGT) (MGT), being heard before
13   the New York Eastern District Court.
14         The court reporter is Ailsa Williams of
15   European Deposition Services.  The videographer is Floyd
16   Humphrey of European Deposition Services.  Would counsel
17   please introduce themselves.
18         MR. UNGAR:  Ari Ungar, Osen LLC, Oradell, New
19   Jersey, United States, on behalf of the Weiss
20   plaintiffs.
21         MR. GOELMAN:  Aitan Goelman of the law firm
22   Zuckerman Spaeder, Washington D.C, for the Weiss
23   Plaintiffs.
24         MR. LUFT:  Avi Luft, Cleary, Gottlieb, Steen &
25   Hamilton LLP, New York office, on behalf of National
```

13

1  Operations, as a team manager, and worked in that Operations
2  environment up to 2002.  That is when I moved into what was
3  known as Group Investigations & Fraud.
4      From 2002 I have worked in the AML environment,
5  Anti-money Laundering environment, albeit doing different
6  roles to the one ultimately which I am doing just now, which
7  is working in the Policy and Advisory section of the Group's
8  Anti-money Laundering Team.
9      Q.  So from 2002 until the present you were in
10  the general rubric of Group Investigations & Fraud, is
11  that right?
12      A.  From 2002 is when I started in Group
13  Investigations & Fraud, as that unit was known at the
14  time.  If I can describe it, it was an operational role
15  which effectively I continued to – although the name of
16  the unit changed over the timeframe, and the bank
17  structures changed, effectively I was doing that
18  operational role up to 2008, and from 2008 until the
19  present day I have been in this Policy and Advisory
20  section of the AML team.
21      Q.  You mentioned that you moved into the
22  Group Investigations & Fraud in 2002?
23      A.  Yes.
24      Q.  Is that right?
25      A.  Yes.

14

1      Q.  Can you be more specific about when in
2  2002 that was?
3      A.  I would need to check.  I couldn't be
4  definite.
5      Q.  Okay.  I would like briefly to look at
6  your earlier positions, just ask you a few questions
7  about them, and then we will move towards closer to the
8  present.  Between 1983 and 1988, you said that you
9  worked in a branch network, is that true?
10      A.  Yes.
11      Q.  And what was your title?
12      A.  Various titles in that timeframe, from
13  office junior, bank teller, ledger supervisor.
14      Q.  Just briefly, what were your
15  responsibilities in that position?
16      A.  As I say, during that 5 years it was
17  different roles, but effectively customer facing,
18  serving the public.
19      Q.  Any other broad responsibilities you had?
20      A.  Cashing cheques, cancelling standing
21  orders, setting up direct debits, answering customer
22  phone calls.  Preparing and sending out letters.
23  Internal reconciliations.
24      Q.  Moving to the 1988 to 1995 time period,
25  you said that you were in Group Internal Audit, is that

15

1  right?
2      A.  Yes.
3      Q.  First of all, was that a promotion from
4  your previous role?
5      A.  Yes.
6      Q.  Could you briefly tell me your
7  responsibilities in that position?
8      A.  As an auditor you were taking individual
9  audit assignments, so you were going out into individual
10  branches and carrying out an independent audit, which
11  basically was a check that all the bank's policies and
12  procedures were being followed in those branches and
13  producing a report thereafter which would highlight any
14  shortcomings that you had identified for line management
15  attention.
16      Q.  And when you mentioned "shortcomings",
17  what are you referring to?
18      A.  So any of the bank's internal policies and
19  procedures.
20      Q.  And then, in 2002, you entered the Group
21  Investigations & Fraud Department, is that right?
22      A.  Yes.
23      Q.  What were your responsibilities in that
24  position?
25      A.  I was in charge of the unit which received

16

1  the internal Money Laundering Suspicion Reports from
2  across the UK bank, so that unit received them and was
3  responsible for assessing them and capturing them on our
4  systems, and making a decision on the merits of
5  reporting them on to law enforcement.
6      Q.  When you say you were in charge of the
7  unit, who else was in that unit at that time?
8      A.  There would have been at one point 50
9  staff working in that unit, not all working on internal
10  Money Laundering Suspicion Reports.  There was an
11  automated system producing alerts that were worked, and
12  we had a small Financial Sanctions unit, so there would
13  have been 45/50 individuals.
14      Q.  And of that 40 or 45 or 50 individuals,
15  approximately how many were on the internal Money
16  Laundering part of that group?
17      A.  Ten, approximately.
18      Q.  Do you remember any of those names?
19      A.  Yes.
20      Q.  Can you tell me the names that you
21  remember?
22      A.  Christine Brannigan, Ewan Philipson,
23  Rachel Fisken, Caroline Turpie.
24      Q.  Is there anybody else that you recall?
25      A.  I can't recall at the moment.

17

1    Q.  You mentioned that you received internal
2  Suspicious Activity Reports, is that true?
3    A.  Yes.
4    Q.  Can you tell me what that is, what are
5  Suspicious Activity Reports?
6    A.  Branch staff -- there is a paper based
7  reporting process where branch staff will report in to
8  Group Investigations & Fraud, as they were known at the
9  time, of any particular situation that gives them cause
10  to suspect that it may involve money laundering.
11    Q.  And when you mention "money laundering",
12  does that also include terror financing?
13    A.  Yes.
14    Q.  When you mention "any particular situation
15  that gives them cause to suspect that it may involve
16  money laundering", is there any written protocol in the
17  bank for the people in the branch network that would
18  identify situations that would constitute situations
19  that should cause them to suspect that there may be
20  money laundering occurring?
21    MR. LUFT:  Objection, foundation.
22    A.  There are documented policies and
23  procedures.
24    Q.  Can you tell me what those procedures are,
25  if you know?

18

1    A.  I would need to see the documents to give
2  you the detail there.
3    Q.  What documents are those?
4    A.  For the internal bank policies and
5  procedures.
6    Q.  You mentioned before that your unit was
7  responsible for capturing on systems the Suspicious
8  Activity Reports.  Can you tell me what systems you are
9  referring to?
10    A.  The system was known as Goalkeeper.
11    Q.  We will talk a bit more about Goalkeeper
12  a little bit later in the deposition.  Finally, you said
13  that it would be your unit that would determine if you
14  should make reports to law enforcement.  Is that
15  correct?
16    A.  Yes.
17    Q.  What branch or branches of law enforcement
18  are you referring to?
19    A.  NCIS, now known as SOCA.
20    Q.  Can you tell me what NCIS stands for?  Is
21  it the National Criminal Intelligence Service?  Does
22  that sound right?
23    A.  That sounds right, yes.
24    Q.  The individuals you mentioned before, it
25  is a little bit hard without the spelling to I think

19

1  repeat all their names, but Christine Brannigan and the
2  other individuals you mentioned, they directly reported
3  to you during that time period, is that correct?
4    A.  Yes.
5    Q.  And did you report to anyone directly in
6  that time period, between 2002 and 2008?
7    A.  I had a number of line managers during
8  that timeframe.
9    Q.  Are you able to tell me within that 6-year
10  period who they were?
11    A.  Initially, it was Mike Hoseason.
12    Q.  I am sorry, can you tell me approximately
13  when, you know, which supervisor was your supervisor?
14    A.  Yes, again it would only be
15  approximations.
16    Q.  That is fine.
17    A.  To 2005.  Thereafter, Mike Smith to 2008,
18  and now Stephen Foster.
19    Q.  Did you have regular meetings with the
20  people that you reported to?  Let's start with
21  Mr. Hoseason.
22    A.  Yes.
23    Q.  About how frequently did you meet with
24  him?
25    A.  It depends.  Face to face or verbally?

20

1    Q.  Let's start face to face.
2    A.  Monthly, as a minimum.
3    Q.  And where did you meet?
4    A.  Edinburgh, in the main Edinburgh office,
5  where I was based.
6    Q.  And how often did you talk, again
7  approximately, verbally?
8    A.  Virtually every day.
9    Q.  Was there typically anyone else present
10  when you met with Mr. Hoseason?
11    A.  Not typically.
12    Q.  Can you tell me the general substance,
13  speaking generally, the types of conversations you had
14  with Mr. Hoseason?
15    MR. LUFT:  Objection, vague and ambiguous.
16    A.  I would describe them as typical line
17  management conversations around team productivity, any
18  particularly complex cases that I needed advice on,
19  staff matters.
20    Q.  In your meetings with Mr. Hoseason, did
21  anyone record what was said at those meetings?  Let's
22  start with the face to face meetings?
23    A.  Not from my recollection.
24    Q.  How about your verbal meetings with
25  Mr. Hoseason?

O hear, Tony (Vol. 01) - 07/21/2010  8/13/2010  12:00:00 AM

49

1  identified?

2      A. I can't recall the specifics of what they

3  told me.

4      Q. Can you tell me in general what you

5  remember, and I am specifically interested in with

6  regard to the terrorist financing you identified, as

7  opposed to the money laundering activity?

8      A. The general tone or overview would be the

9  significant challenges faced by banks in identifying

10  terrorist financing through banking accounts and

11  products.

12      Q. Just so I am clear, was the training that

13  you referenced conducted by law enforcement?

14      A. It would have been badged as an awareness

15  session. Law enforcement would have come in and

16  delivered presentations, delivered key messages to bank

17  staff.

18      Q. Did you have the opportunity to ask

19  questions of law enforcement during that training?

20      A. Yes.

21      Q. Do you remember asking any questions?

22      A. I don't recall the specifics.

23      Q. Were you supplied with written materials

24  in addition, aside from any that you have already

25  mentioned with regard to -- I will withdraw that.

50

1      During the course of your training, were you

2  supplied with written materials in connection with combating

3  terror financing?

4      A. There would have been a number of

5  presentations I attended. Again, I couldn't recall the

6  specifics. On occasion, presentation packs would have

7  been made available, on other occasions, due to the

8  sensitivities, they would have been talked to -- and no

9  physical exchange of paperwork would have taken place.

10      Q. As an employee of RBS, and again, in

11  general, I am referring to the period between when you

12  were in Group Investigations & Fraud, between 2002 and

13  2004, that general time period, what types of things

14  would you look for when you are trying to assess if

15  terror financing might be occurring?

16      A. We would be assessing the activity through

17  the bank account and comparing that closely to what we

18  would expect to see passing through that bank account,

19  from the information that had been supplied by the

20  underlying client.

21      Q. When you reference activity through the

22  bank account, does that mean transactions into and out

23  of the bank account?

24      A. Yes.

25      Q. And when you say that you "compare that

51

1  closely to what we would expect to see passing through

2  that bank account", can you elaborate a bit on that

3  phraseology?

4      A. Taking a personal banking current account,

5  a checking account, where we would expect to see

6  a monthly salary coming in and domestic payments going

7  out over the course of the month, and some ATM traffic,

8  and then comparing that, that is what we would expect to

9  see for that individual, and then actually what is

10  passing through that bank account. So using that

11  example, if there suddenly were large international wire

12  transfers passing through that personal bank account,

13  then that would trigger a question.

14      Q. Would you be looking to see if money was

15  going to or from designated entities, that is entities

16  that had been listed as terrorist organizations?

17      A. We would have been looking at the source

18  of any funds into the account and we would have been

19  looking at the payees on any outgoing.

20      Q. So is that yes, you would be looking, you

21  would take into account whether money was going to or

22  from designated -- or entities that had been designated

23  as terrorists, is that true?

24      A. That would have been something we would be

25  looking to identify, yes.

52

1      Q. Do you know what a Goalkeeper report is?

2      A. Yes.

3      Q. What is a Goalkeeper report?

4      A. Goalkeeper is the system that the Royal

5  Bank uses to store all its internal Money Laundering

6  Suspicion Reports, and its a system that is used to

7  electronically report any cases deemed necessary to law

8  enforcement. Goalkeeper as a system also houses other

9  record types, fraud reports, et cetera.

10      Q. To your understanding, why is the

11  Goalkeeper report filed?

12      A. What do you mean by the term "filed"?

13      Q. Why was a Goalkeeper case opened?

14      A. A Goalkeeper case would be opened, would

15  be created, upon receipt of all internal Money

16  Laundering Suspicion Reports into the unit.

17      Q. And who to your understanding is creating

18  those internal Money Laundering Suspicion Reports that

19  your department receives?

20      A. They could come from a variety of units

21  across the UK bank. It could come in from the branch

22  network, could come in from staff working in operational

23  units.

24      Q. What is your understanding of a criteria

25  that they are supposed to employ to determine whether

O hear, Tony (Vol. 01) - 07/21/2010  8/13/2010  12:00:00 AM

61

1    internal Suspicion Report or any other client, so I
2    didn't have any specific Interpal responsibilities.
3        Q.  I understand that.  Because this case
4    focuses on Interpal, I will be asking you questions
5    about that.  I understand it might not have been
6    theoretically different than other clients, in your
7    mind, as we are discussing it now.  In terms of your
8    exposure to Interpal, what responsibilities did you
9    have, vis-a-vis that customer?
10       A.  There was a period in time when the
11   Charity Commission investigation was underway, where the
12   bank account was frozen, and all the items that were
13   passing through that bank account had to be authorized
14   by the Charity Commission, so there was ongoing
15   communications on a daily basis between the Relationship
16   Management area for the account, myself within Group
17   Investigations & Fraud, and the Charities Commission, to
18   relay the detail of the items that were being presented
19   for payment and passing through the bank account and, as
20   I say, get the authorization from the Charities
21   Commission for those transactions to proceed.
22       Q.  Do you know approximately when those
23   accounts were frozen?
24       A.  Again, without seeing any of the source
25   documentation ...

62

1        MR. LUFT:  You are shaking your head.  The
2    court reporter cannot pick that up, so try to give an
3    audible response to Mr. Ungar's questions.
4        Q.  You mentioned the Charities Commission.
5    We are going to talk about that a little bit later, but
6    can I just ask you now, can you tell me what the
7    Charities Commission is?
8        A.  The Charities Commission is the regulatory
9    authority set up to govern and control the registration
10   of charities within the UK.
11       Q.  Within Group Investigations & Fraud, you
12   were the point person in terms of the handling of the
13   Charities Commission investigation, is that correct?
14       A.  For this particular client, yes, that is
15   fair.
16       Q.  And you had daily communications about
17   Interpal at this time period when the accounts were
18   frozen, is that what you said?
19       A.  Correct.
20       Q.  Were there any written sources that
21   detailed your responsibilities in terms of how to handle
22   your treatment of Interpal in a situation such as this,
23   with the accounts being frozen and your being involved
24   with the Charities Commission?
25       A.  The freezing order was a legal document,

63

1    so in terms of whatever requirements were, it was all
2    outlined within the legally binding document, and in
3    terms of my involvement, conversations would have all
4    been captured on the Goalkeeper records.
5        Q.  Did you take any notes apart from the
6    Goalkeeper records, with regard to those daily
7    communications about the Interpal accounts, again
8    talking about the time period when the accounts had been
9    frozen by the Charities Commission?
10       A.  No.
11       Q.  Do you remember the substance of those
12   conversations?
13       ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
14       ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
15       ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
16       ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
17       ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
18       ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
19       ▮▮▮▮▮▮▮▮▮▮▮
20       Q.  Beyond that conduit role of information,
21   did you apply any judgment in that area in terms of the
22   propriety or – withdraw that.  Was there any
23   application of judgment in this role that you had, being
24   the point person for Group Investigations & Fraud
25   vis-a-vis the Charities Commission, or was it merely

64

1    serving as a conduit between, as a conduit?
2        MR. LUFT:  Objection, vague, compound.
3        A.  The key role in that particular case was,
4    as you say, as a conduit.  I would add, as a member of
5    staff, if there had been – I would have had to comply
6    with Royal Bank policies and procedures, so therefore if
7    I was made aware of anything that I personally became
8    suspicious of then I would have to follow standard bank
9    processes.
10       Q.  Do you remember being suspicious of
11   anything at that time period?
12       A.  No, I don't recall any specific
13   suspicions.
14       Q.  Do you know that the United States
15   Government designated Interpal as a specially designated
16   global terrorist?
17       A.  Yes.
18       Q.  How did you learn that?
19       A.  My recollection is that the reason that
20   the UK Charities Commission had taken the steps it had
21   was a response to the fact that the entity had been OFAC
22   listed.
23       Q.  You mentioned OFAC.  Do you know what that
24   acronym stands for?
25       A.  The Office of Foreign Asset Control.

81

1    back.

2        Q.  Having read this page, do you understand

3    that this is talking about a payment from

4    ███████████████████████████████    Do you

5    see that reflected here?

6        A.  As I see this today, read it today, yes.

7        Q.  But you don't remember that – the only

8    thing you can recall is sitting here today, is that your

9    testimony -- let me withdraw that question.  You do

10   understand that this is the transaction that is being

11   discussed here, right, this transaction involving

12   ████████████████████████████████████████████████

13   Is that right?

14       A.  Sorry, I am not sure.

15       MR. LUFT:  Objection, vague.

16       Q.  Well, we saw on the first page of this

17   report a reference to a payment for 180,939 US dollars,

18   right?

19       A.  Yes.

20       Q.  So this note on page 384 is discussing

21   that payment, true?

22       A.  Yes.

23       Q.  Okay.  Is your testimony that, sitting

24   here today, when you wrote on September 17, 2003 "When

25   completing a further disclosure in this connection see

82

1    Goalkeeper reference 710368 - a review of all linked

2    disclosures was undertaken," let me just ask you about

3    that sentence.  Can you tell me what was meant when you

4    made that note, what you were trying to convey?

5        MR. LUFT:  Are you asking what he recalls or

6    what he thinks sitting here now?

7        Q.  First, do you recall.

8        A.  No, I can't recall.

9        Q.  Sitting here today, can you tell me?

10       A.  Looking at the document today, I am

11   highlighting that this is part of, as was a standard

12   process, when doing a disclosure, you would take into

13   account in your assessment any previous disclosures on

14   the client.

15       Q.  Sitting here today, again you can see that

16   you noted that this payment originated from ███████

17   ██████████████████████████████████████████

18       A.  Yes, as I read this today, yes.

19       Q.  And what did you mean when you said: "This

20   organization, albeit not at the time in June 2002, now

21   appears on a list of named/suspected terrorists"?

22       MR. LUFT:  Again, what he recalls?

23       Q.  I guess I will always be asking if you

24   recall something.  If you don't recall then I will be

25   asking you -- maybe that will streamline things -- if

83

1    sitting here today you can interpret this.

2        MR. LUFT:  Maybe just break it into two parts

3    so the record is clear.

4        MR. UNGAR:  Okay.  I am just trying to make it

5    all easier for Mr. O'Hear.  Do you have a recollection

6    of that statement?

7        A.  No.

8        Q.  Sitting here today, do you have an

9    understanding of that?

10       A.  Yes.

11       Q.  Can you tell me what that is?

12       A.  So this ████████████████ as --

13   so this payment that went into the account of Interpal,

14   and that was reported, that was not a prescribed entity

15   at the time of receipt of those monies, but this if you

16   like retrospective look back has highlighted the fact

17   that at that point in time we identified that they are

18   now proscribed, at that time in September, and having

19   been alerted to that fact we have taken the step of

20   speaking to law enforcement.

21       Q.  I believe you used the word "look back".

22   Do you use that as a term of art?

23       A.  I don't understand that terminology.

24       Q.  Is it a phrase that has a specific meaning

25   "look back" or are you just -- my understanding is in

84

1    the banking world the word "look back" has a particular

2    specified meaning?  I am just trying to understand if

3    you are using it in that sense or if you are using it in

4    a more general sense.

5        A.  Sorry, I am not aware of it having

6    a particular meaning.  I am using it very much in the

7    general sense of it is part of our standard operating

8    processes when you are working on a case that you take

9    full -- take into account previous Goalkeeper records.

10       Q.  Would that have required -- withdrawn.

11   Would that standard operating process have

12   involved you looking at all payments to and from

13   ██████████

14       A.  No.

15       Q.  Why not?

16       A.  We would have looked at the previous

17   records, the previous Goalkeeper records, and each

18   record obviously had a summary and assessment to give me

19   the key facts of each individual disclosure, so our

20   process when you are working on a case would be to

21   review those summaries and assessments.

22       Q.  Then the document says: "GRM 29-05-03"?

23       A.  Yes.

24       Q.  Do you know what that stands for?

25       A.  That would have been, for want of a better

O hear, Tony (Vol. 01) - 07/21/2010  8/13/2010  12:00:00 AM



85

```
1    word, the internal, so within the bank that is the
2    reference number for a particular list that would have
3    been issued by Group Risk Management at that time, and
4    that list would have contained the individuals, the
5    entities that had been named by HMT.
6        Q.  What is HMT?
7        A.  Her Majesty's Treasury.
8        Q.  Is that the Bank of England?
9        A.  Yes, sorry, yes, the list has changed.  At
10   that time it would have been Bank of England.
11       Q.  Is it your understanding, does this
12   reflect that date May 29, 2003, the date that
13   was designated by the Bank of England?
14       A.  I wouldn't know that as a fact.
15       Q.  But you know that it was designated at
16   some point, although it had not been designated at the
17   time of this transaction we are looking at on June 6.
18   Is that what we have established?
19       A.  That is my understanding, reading that
20   customers, yes.
21       Q.  The document goes on:
22           "I have spoken to Mark Ashtown [and it gives
23   his phone number]              [I assume] at NTFIU
24   Special Branch
25
```

87

```
1        A.
2        Q.
3        A.
4        Q.  Did you make any notes of your
5    conversation with Mark Ashtown?
6        A.  Nothing other than what would have been
7    captured on Goalkeeper.  Everything went on to
8    Goalkeeper.
9        Q.  The last sentence reads:
10
11
12
13
14
15
16
17       Q.  In the course of your tenure at Group
18   Investigations & Fraud, you have had various or more
19   than one conversation with law enforcement about
20   customers, is that true?
21       A.  Yes, there would have been numerous
22   conversations.
23       Q.
24
25
```

86

```
1        Do you recall what you were trying to convey
2    when you made that note?
3        A.  Again, just to be clear, I don't recall
4    the conversation.  As I read the document today, it
5    would not have been unusual, having submitted previous
6    disclosures, and having submitted a disclosure on that
7    specific payment, to then be armed with this additional
8    piece of information, to make contact with law
9    enforcement if we knew of the interest, of their
10   interest in the case.
11       Q.  Do you know who Mark Ashtown is?
12       A.  Again, my reading of this document today
13   is that he was a member of law enforcement.  The NTFIU
14   is the National Terrorist Finance Intelligence Unit,
15   from my recollection.
16       Q.  What does Special Branch refer to, do you
17   know?
18       A.  An arm of law enforcement.
19       Q.  How do you know who to contact at the
20   NTFIU?
21       A.  The review of the Goalkeeper records would
22   have given me that individual's records.
23       Q.
24
25
```

88

```
1
2        A.
3        Q.
4
5
6
7    MR. LUFT:  Objection, lack of foundation,
8    calls for speculation.
9        Q.
10
11
12
13
14   MR. LUFT:  Objection, lack of foundation,
15   calls for speculation.
16   MR. UNGAR:  You can answer.
17       A.
18
19
20
21       Q.
22
23
24   MR. LUFT:  Again, if you recall.
25       Q.  Do you recall what you meant when you
```

181

1  uses: "Yes, confirmation received from Tony O'Hear in
2  GI&F who performed investigation for RBS", does that
3  suggest that you performed the investigation for RBS
4  about this subject matter?
5      MR. LUFT:  Objection, document speaks for
6  itself.
7      MR. UNGAR:  You can answer.
8      A.  It is the first time I have seen this
9  document and I am not sure what Ben was alluding to in
10  terms of using the phrase "Investigation for RBS".
11     Q.  Would you characterize his assessment as
12  inaccurate?
13     MR. LUFT:  Objection, lack of foundation.
14     A.  To the extent that you have no reason to
15  believe that Mr. Norrie did not say what we have been
16  talking about, is that fair?
17     MR. LUFT:  Objection, lack of foundation.
18     A.  Clearly it is said in this e-mail document
19  that I have performed an investigation for RBS.  If he
20  is alluding to the work I did as part of the Charities
21  Commission investigation, I would be speculating on
22  that.
23     Q.  I guess my question is, when you read that
24  sentence, do you think that is an accurate assessment of
25  your role?

182

1      MR. LUFT:  Objection, lack of foundation,
2  vague and ambiguous.
3      A.  I am not clear on exactly what you mean.
4      Q.  I am just trying to determine, when Mr.
5  Norrie says: "Yes, confirmation received from Tony
6  O'Hear in GI&F", and he characterizes that you
7  "performed investigation for RBS", do you think that
8  that is correct, you knowing what you did and what your
9  role was, do you think that that is an accurate
10  depiction of your role?
11     A.  That is not the terminology I would have
12  used.
13     Q.  Do you have any idea where Mr. Norrie
14  might have gotten the idea that you performed an
15  investigation for RBS about the subject matter?
16     MR. LUFT:  Objection, foundation, calls for
17  speculation.
18     A.  Clearly there was an investigation by the
19  Charities Commission, in which I played a key touch
20  point for them between the bank and the Charities
21  Commission.  Other than that, I couldn't comment.
22     Q.  But your testimony, and again forgive me
23  if you believe you have answered this question, I don't
24  mean to make you repeat yourself, I endeavour very hard
25  to make sure you don't, but I want to make sure I

183

1  understand.  Your testimony has been that you did not
2  perform any independent investigation of Hamas yourself,
3  in terms of whether payments could have been made from
4  Interpal to Hamas?  Is that fair?
5      MR. LUFT:  Objection, vague, mischaracterizes
6  prior testimony.
7      A.  I wouldn't have carried out an independent
8  review.  I would have reacted to internal Suspicion
9  Reports that have been submitted, if I was involved in
10  so with the exception of the Goalkeeper record that
11  talked about the Charities Commission, I don't think I
12  was actually involved in any of the specific interpal
13  disclosures prior to that Charities Commission
14  investigation, which was where I became involved.
15     Q.  Just in terms of trying to determine what
16  you might have done or what you might not have done, did
17  you ever use the Internet to do any type of research
18  about Hamas?
19     A.  I don't recall getting involved in any of
20  that activity.
21     Q.  Do you recall if at any point you searched
22  to try to determine counterparties of Hamas?
23     A.  I don't recall.
24     Q.  Do you recall if you at any time
25  researched any counterparties of Interpal?

184

1      MR. LUFT:  Objection, vague and ambiguous.
2      A.  I don't recall.
3      Q.  Would you have documented any type of
4  investigation of that type of conduct?
5      A.  If I or any of the team had undertaken
6  that activity then I would expect that to be captured on
7  the Goalkeeper records.
8      Q.  Would you expect it to be captured
9  anywhere else, outside of the Goalkeeper records?
10     A.  No.
11     Q.  In O'Hear Exhibit 11, in Mr. Foster's
12  e-mail, at the bottom of the first page, he uses the
13  language:
14     "We have carried out further checks on the account
15  we hold for Interpal and we have confirmed that payments are
16  not being made to Hamas from those accounts."
17     Do you see that language?
18     A.  Yes.
19     Q.  In the successive e-mail above that from
20  Mr. Norrie to Mr. Foster and Leah Rowland, Mr. Norrie
21  says in part:
22     "There is no indication that any payments
23  have been made to Hamas from the accounts held by RBSG,
24  the Group."
25     Do you see that language towards the middle

**EXHIBIT 8 TO DECLARATION OF VALERIE SCHUSTER**

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
Action No: 05cv4622(DGT)(MDG)
- - - - - - - - - - - - - - - - - - - - - -
TZVI WEISS, et al,
                    Plaintiffs,
against
NATIONAL WESTMINSTER BANK, PLC.,
                    Defendant.
- - - - - - - - - - - - - - - - - - - - - -
NATAN APPLEBAUM, et al.,
                    Plaintiffs,
against
NATIONAL WESTMINSTER BANK, PLC.,
                    Defendant.


VIDEOTAPED DEPOSITION OF DOUGLAS HARTLEY
            Monday 12 July 2010
            At:  10:00 am
            Taken at:
        Cleary, Gottlieb, Steen & Hamilton LLP
            55 Basinghall Street, London
            United Kingdom



            HIGHLY CONFIDENTIAL            2

---

Page 2

```
 1        A P P E A R A N C E S
 2   For Plaintiff Tzvi Weiss:
 3        STEPHEN SCHWARTZ, ESQ.
 4        Kohn, Swift & Graf PC
 5        One South Broad Street, Suite 2100
 6        Philadelphia, Pennsylvania 19107-3304
 7        Tel: 419 246 0528
 8   For Plaintiff Natan Applebaum:
 9        MARK WERBNER
10        Sayles & Werbner
11        4400 Renaissance Tower
12        1201 Elm St.
13        Dallas, Texas 75270
14        Tel: 214 939 8763
15
16   For Plaintiff Tzvi Weiss:
17        AITAN GOELMAN
18        Zuckerman Spaeder LLP
19        1800 M Street, NW, Suite 1000
20        Washington, DC 20036-5807
21        Tel: 202 778 1996
22   For Defendant National Westminster Bank, PLC:
23
24        JONATHAN I. BLACKMAN ESQ. and SUE. H. RHEE
25        Cleary, Gottlieb, Steen & Hamilton LLP
26        One Liberty Plaza
27        New York, NY 10006-1470
28            Tel: 212 225 2000
29
30   Also Present:
31
32   COURT REPORTER:
33
34        AILSA WILLIAMS
35        European Deposition Services
36        59 Chesson Rd
37        London, W14 9QS
38        Telephone:  44 (020) 7385 0077
39            HIGHLY CONFIDENTIAL            3
```

---

Page 3

```
 1   VIDEOGRAPHER: DAVID ROSS
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

Page 4

```
 1            I N D E X
 2   DOUGLAS HARTLEY ... ... ... ... ... ... ... ...5
 3   DIRECT EXAMINATION BY MR. ... ... ... ... ... ...5
 4        SCHWARTZ:
 5
 6   CROSS-EXAMINATION BY MR. WERBNER: . ... ... ... 138
 7
 8        INDEX OF EXHIBITS
 9   Hartley 1 NW000149-232 ... ... ... ... ... ... .59
10   Hartley 2 NW191-801-806 ... ... ... ... ... ... .73
11   Hartley 3 NW008356-66 . ... ... ... ... ... ... .83
12   Hartley 4 NW212124 ... ... ... ... ... ... ... .88
13   Hartley 5 NW008367-73 . ... ... ... ... ... ... .90
14   Hartley 6 NW052416 ... ... ... ... ... ... ... 100
15   Hartley 7 NW008374-80 . ... ... ... ... ... ... 101
16   Hartley 8 NW008381-98 ... ... ... ... ... ... 101
17   Hartley 9 NW008399-411 ... ... ... ... ... ... 117
18   Hartley 10 NW052031-33 ... ... ... ... ... ... 122
19   Hartley 11 NW052034-39 ... ... ... ... ... ... 122
20   Hartley 12 NW052040-45 ... ... ... ... ... ... 122
21   Hartley 13 NW008430-39 ... ... ... ... ... ... 130
22   Hartley 14 NW185976-988 ... ... ... ... ... ... 133
23   Hartley 15 NW052056-66 ... ... ... ... ... ... 144
24
25
26
27
```

Page 25

1    2000. She joined subsequently, I believe, but I don't
2    know when.
3        Q.  And when you left money laundering in
4    2003, was she still there?
5        A.  She was based there in the London office,
6    yes, with me.  Similar to me, when the money laundering
7    work moved, she undertook a change of role similar to
8    myself.  I cannot be specific in terms of whether she
9    was on the Money Laundering Team right up to the shift
10   or whether she had moved of money laundering before
11   then.  I cannot be specific about that.  I can't recall
12   what -- I certainly don't recall the members of the team
13   at the time that the work moved, in the summer of 2003 I
14   think it was.
15       Q.  The six or seven people who worked in the
16   Money Laundering Team, did they perform different roles
17   within the team?
18       A.  No.  They all had a similar role, from
19   memory, which was to review the money laundering
20   suspicion reports that had been received in the post
21   that day and to deal with them as part of our process at
22   the time.
23       Q.  Is that what you did during the time that
24   you were there?
25       A.  I did.  That is what I did to start with,

Page 26

1    having been new to the team, but over a period of time
2    I then took on more of a supervisory position, and also
3    I think I had some line management responsibility as
4    well.  So I would not just supervise in their work but
5    would sort of assess their work and contribute to their
6    end of year reports and appraisals.
7        Q.  Can you describe your duties when you
8    first started at Group Security & Fraud?
9        A.  Again, time scales, impossible to
10   remember, but initially I effectively shadowed Mike
11   Hoseason.  I was looking at the sort of work that he was
12   undertaking, spending time looking at suspicious money
13   laundering, suspicious reports, looking at the sort of
14   thinking that would go into assessing them, and the
15   decision making process about whether it was appropriate
16   for the bank to make formal disclosures to NCIS or not
17   to, as the case may be, and just basically, in the early
18   months, building up my experience and knowledge of the
19   process.  That was certainly the position in the early
20   months and, as I say, after that I then became more
21   hands-on, if you like, and I was left to work under my
22   own steam.
23       Q.  When you got there, March 1, 2000 --
24       A.  Yes.
25       Q.  First of all, do you know a man named Ian

Page 27

1    Wickens?
2        A.  Yes, I know Ian Wickens.
3        Q.  When you got to Group Security & Fraud,
4    March 1, 2000, was Ian Wickens part of that team?
5        A.  He was, yes.
6        Q.  And what was his role at that time?
7        A.  From recollection, his role was more sort
8    of supervisory.  He was involved more in policy, in
9    terms of money laundering.
10       Q.  Was anyone else involved in policy along
11   with him at that time?
12       A.  I can't recall.  I can't recall.
13       Q.  Michael Hoseason was the head of your
14   unit, is that correct?
15       A.  Michael Hoseason, when I joined, was the
16   head of the money laundering, was the manager of the
17   Money Laundering Team.
18       Q.  From 2000 to 2003, when that department
19   moved to Edinburgh, Michael Hoseason was your boss, is
20   that correct?
21       A.  Yes.
22       Q.  Do you know, first of all, the department
23   that you were part of, was that part of a larger
24   department, Group Financial Crime?
25       A.  Yes.

Page 28

1        Q.  Do you know who was the head of Group
2    Financial Crime during that 2000 to 2003 period?
3        A.  I know Neil Trantum was head at some
4    stage, but I can't remember the specific period that he
5    was head.
6        Q.  Do you know whether -- do you know to whom
7    Mr. Hoseason reported as a superior?
8        A.  No, I don't know.  I don't know, no.  He
9    would have either reported to -- I would imagine he
10   would either have reported to --
11       MR. BLACKMAN:  Don't guess.
12       A.  No, I don't know.
13       Q.  I want to clarify something, Mr. Hartley,
14   excuse me.
15       A.  Okay.
16       Q.  You said that the Money Laundering
17   Reporting team was part of a larger group?
18       A.  Yes.
19       Q.  There were six or seven money
20   laundering --
21       A.  Yes.
22       Q.  And maybe 30, I think, was the number I
23   have got here anyway --
24       A.  Yes.
25       Q.  30 people that were part of the Money

EXHIBIT 9 TO DECLARATION OF VALERIE SCHUSTER

FILED UNDER SEAL

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
Action No: 05cv4622(CPS)(MDG)

- - - - - - - - - - - - - - - - - - - - - -

TZVI WEISS, et al,
                    Plaintiffs,
against
NATIONAL WESTMINSTER BANK, PLC.,
                    Defendant.

- - - - - - - - - - - - - - - - - - - - - -

NATAN APPLEBAUM, et al.,
                    Plaintiffs,
against
NATIONAL WESTMINSTER BANK, PLC.,
                    Defendant.

VIDEOTAPED DEPOSITION OF GUY COLE
Tuesday 8 June 2010
At:  9:00 am
Taken at:
Cleary, Gottlieb, Steen & Hamilton LLP
55 Basinghall Street, London
United Kingdom

HIGHLY CONFIDENTIAL                    2

---

Page 3

1                   I N D E X
2    GUY COLE .. ... ... ... ... ... ... ... ... ...5
3    CROSS-EXAMINATION BY MR. ISRAEL: ... ... ... ... 138
4    CROSS-EXAMINATION BY MR. ... ... ... ... ... ... 147
5    BLACKMAN:
6
7              INDEX OF EXHIBITS
8    Cole 1 E-mails NW013939-41 ... ... ... ... ...38
9    Cole 2 E-mails NW066732-39 ... ... ... ... ...44
10   Cole 3 Case Summary NW008356-66 ... ... ... ... ...55
11   Cole 4 Case Summary NW008367-73 ... ... ... ... ...65
12   Cole 5 GI&F Letter dated 27 ... ... ... ... ...66
13       September, 2001
14
15   Cole 6 "Anonymous" from Internet ... ... ... ... ...67
16
17   Cole 7 New York Times Extract . ... ... ... ... ...82
18
19   Cole 8 E-mails NW050050-55 ... ... ... ... ... ...95
20
21   Cole 9 E-mails NW155832 ... ... ... ... ... ... 108
22
23   Cole 10 E-mails NW066807-813 ... ... ... ... ... 111
24
25   Cole 11 E-mails NW066800-806 ... ... ... ... ... 115
26
27   Cole 12 E-mails NW066701-704 ... ... ... ... ... 122
28
29   Cole 13 E-mails NW066705-11 ... ... ... ... ... 126
30
31   Cole 14 E-mails NW181094-97 ... ... ... ... ... 131
32
33   Cole 15 E-mails NW066740-42 ... ... ... ... ... 136
34
35
36
37

---

Page 2

A P P E A R A N C E S
For Plaintiff Tzvi Weiss:
    STEPHEN SCHWARTZ, ESQ.
    Kohn, Swift & Graf PC
    One South Broad Street, Suite 2100
    Philadelphia, Pennsylvania 19107-3304
    Tel: 419 246 0528
For Plaintiff Natan Applebaum:
    JOEL L. ISRAEL
    Sayles & Werbner
    4400 Renaissance Tower
    1201 Elm St.
    Dallas, Texas 75270
    Tel: 214 939 8763

For Defendant National Westminster Bank, PLC:

    JONATHAN I. BLACKMAN ESQ.
    Cleary, Gottlieb, Steen & Hamilton LLP
    One Liberty Plaza
    New York, NY 10006-1470
        Tel: 302 351 9415

Also Present:

COURT REPORTER:

    AILSA WILLIAMS
    European Deposition Services
    59 Chesson Rd
    London, W14 9QS
    Telephone:  44 (020) 7385 0077
    VIDEOGRAPHER: SIMON ADDINSELL

HIGHLY CONFIDENTIAL          3

---

Page 4

1          THE VIDEOGRAPHER: This is the beginning of
2    tape one in volume one of the deposition of Guy Cole,
3    in the matter of Tzvi Weiss et al, plaintiffs, against
4    National Westminster Bank plc, defendants. This is
5    case number 1:05-cv-04622 (DTG) (MDG) and also Natan
6    Applebaum et al, Plaintiffs, against National
7    Westminster Bank plc, this case number being
8    1:07cv00916 (DTG)(MDG). This matter is before the
9    United States District Court, Eastern District of New
10   York.
11          Today's date is 8 June, 2010 the time is
12   9:10 am. This deposition is taking place at the
13   offices of Cleary Gottlieb in London. The court
14   reporter is Ailsa Williams, the videographer is Simon
15   Addinsell, both from European Deposition Services.
16          Could counsel please introduce themselves
17   for the record, stating what company they are with and
18   who they represent in this matter, please.
19          MR. SCHWARTZ: My name is Stephen Schwartz
20   with the law firm of Kohn, Swift & Graf, Philadelphia,
21   Pennsylvania, United States of America, representing
22   the Weiss plaintiffs.
23          MR. ISRAEL:  Joel Israel, Sayles Werbner,
24   here on before of Applebaum plaintiffs.
25          MR. BLACKMAN: Jonathan Blackman, Cleary

Page 33

1  day-to-day activity, but would ensure that our
2  business were correctly reporting their suspicions to
3  that unit, who would then follow actions. James
4  Pickles, who was on the team, he did do some follow
5  work on some goalkeeper cases, which were then
6  referred back from Group Investigations to us to look
7  at, but that was later on. It was more of a business
8  development saying: "Hang on, let's create an
9  investigation. Guy here can give a bit more time."
10  Q. Is it the case that if you reached the
11  point of suspicion you referred it to Group
12  Investigation and Fraud?
13  A. Yes, anybody who has suspicion within
14  the bank should complete a suspicious activity report
15  internally, and the recipient of that would be group
16  security and fraud or group financial crime, whatever
17  their name was at the time.
18  Q. And once your division has referred
19  a matter to Group Investigation and Fraud, is your
20  responsibility for that particular matter finished?
21  A. We as a unit are not responsible. We
22  are only responsible for reporting things. We
23  personally have found ourselves, the business
24  relationship manager, whoever else are responsible to
25  report their suspicions to that function as well, so

Page 34

1  we would not have transparency of all SARs going
2  through from the business to the group financial crime
3  function. So if they referred a case back to us and
4  said: "This is pretty high profile", or "This is
5  really concerning, you might want to look at this",
6  then of course we would, but we are not aware of all
7  the suspicions going from our business to group
8  financial crime. They are the recipient and things
9  are confidential, et cetera.
10  Q. So the ones that come to your unit --
11  let me ask the question this way --
12  A. We would only generate them from our
13  unit or we would have things referred back to us from
14  either the business, because they are not quite sure
15  what they should be doing, or from group financial
16  crime because they think more follow-up work needs to
17  be done.
18  Q. All right. I think what you are
19  saying -- please correct me if I am wrong -- is that
20  you only work on referrals from within CBFM. Is that
21  right? Is that correct?
22  A. Referrals of what?
23  Q. The matters that come to the attention
24  of your MLPU within CBFM come to you from CBFM itself,
25  is that correct?

Page 35

1  A. Yes.
2  Q. But also people within CBFM may refer
3  things to Group Investigation and Fraud, is that
4  correct?
5  A. Yes. It depends what the issue is or
6  the activities.
7  Q. You say it depends on the issue or
8  activities. So what issues and activities would go to
9  them and what issues and activities would go to you?
10  A. Typically, first of all, you know, all
11  SARs have to be reported to group financial crime.
12  They are the nominated function within the RBS group
13  to receive and report those to NCIS.
14  Q. When you say SARs, you are referring to
15  internal --
16  A. Yes, internal suspicion reports, yes.
17  They would go directly to group financial crime.
18  Things that would typically get referred to us would
19  be where predominantly, let's say, where there is
20  a new client and there is an issue with how can we
21  verify that client's identity or, you know, this
22  client is a little bit unusual, what extra checks do
23  you think we should do before we consider taking him
24  on board. There will be risk managers sort of
25  overseeing different units and offices around the

Page 36

1  bank, so like a small branch, wherever, they might
2  have one risk manager locally who would then -- they
3  would refer it to him and if he wanted more assistance
4  then he would ask us a question: "What should I do
5  with this client, because it seems a bit unusual?"
6  You know, ask for advice, basically.
7  So that is really the account opening sort of
8  stage and commencing the relationships. Then during the
9  relationships potentially you might find that a relationship
10  manager has found something unusual, not quite sure how they
11  can make themselves comfortable with that information, so
12  would speak to their local risk manager, who would speak to
13  us, or they might speak to us directly and say: "What do you
14  think? What should I do to try and find out? What should
15  I ask the client? How can we get comfortable with this
16  activity?" So those sort of case by case queries.
17  Q. Do you use the goalkeeper system in the
18  performance of your job?
19  A. At that time?
20  Q. Yes.
21  A. It was a database we had access to, yes.
22  Q. But you did not file anything in the
23  goalkeeper system?
24  A. No, I didn't load data into the system.
25  Q. It was strictly a reference for you?

Page 81

1  is a student's journal at the University of
2  California. My recent experience of Worldcheck has
3  been disappointing."
4        A. So at the University of California --
5  shall I explain to you how Worldcheck works or do you
6  know?
7        MR. BLACKMAN: Go ahead.
8        A. Worldcheck is a database on internet.
9  They trawl the press, public sources, for any
10 information that could be untoward information, like
11 adverse media. Basically, they create an entry based
12 on the entity or person's name in their search, try
13 and add in any basic details they have, like a date of
14 birth or average expected age. Then they have
15 a summary of what the particular concerning
16 information is on that entity or person. Then at the
17 bottom they hold references to the original news
18 sources and cache copies of those news sources. So in
19 relation to this ███████ entity and Worldcheck, the source
20 of their information is only a student journal in the
21 University of California. So a student has written
22 that the US Federal Government and UN have
23 acknowledged this charity aids and abets terrorism.
24 This student wrote that article, not the US Government
25 or UN, and additional checks on the internet did not

Page 82

1  verify their information at all.
2        Q. Can you tell looking at this whether you
3  found any other information in the public domain on
4  ███████?
5        A. Judging it from this page, not. Shall
6  we look at the back, see if there is anything else?
7        Q. Sure.
8        A. It looks like I didn't report anything
9  extra, but this is a copy of the Worldcheck, so a copy
10 of the Worldcheck page so. As I said, you have got
11 the entity, the aliases, associated entities,
12 a summary of what the information was, and then their
13 archive and links to the news sources. So I would
14 have reviewed those.
15       Q. Let's just look at one thing. We are up
16 to Exhibit 7. I am going to ask the reporter to mark
17 as Exhibit 7 a reprint of an article from the New York
18 Times.
19       (Exhibit Cole 7 marked for identification)
20       Why don't you take a minute and read this article
21 through.
22       A. Okay.
23       Q. Mr. Cole, have you had a chance to read
24 this article?
25       A. I have done.

Page 83

1        Q. This appears to be an article from the
2  New York Times dated September 17, 2003, prior to the
3  date of your first researches. Have you ever seen
4  this article before?
5        A. I don't recall whether I have.
6        Q. If you look at the last page of the
7  article, near the bottom, I guess the fourth paragraph
8  up from the bottom, it says:
9        "Although ███████ which is known
10 as ████ has not been charged with a crime in the
11 United States, law enforcement officials in India and
12 the Philippines have accused it of financing terrorism
13 in their countries".
14       Prior to this moment, were you ever aware of
15 the fact that law enforcement officials in India and
16 the Philippines had accused ████ of financing
17 terrorism in their countries?
18       A. Not that I recall.
19       Q. Not that you recall. As part of your
20 researches into Interpal, did you ever research the
21 reason why India and Philippines have accused ████ of
22 financing terrorism in their countries?
23       MR. BLACKMAN: Objection, lack of
24 foundation. He just said he never heard that they
25 did, if they did in fact.

Page 84

1        Q. So the answer is "no"?
2        A. Yes, no.
3        Q. Let's go back to Cole Exhibit 2. Let's
4  look at the second paragraph, Mr. Cole, where you say:
5        "From my trawls for information on the
6  internet, I have not found any information that
7  substantiates beyond opinion that Interpal has made
8  payments to terrorist groups."
9        Do you see that sentence?
10       A. Yes.
11       Q. If you can remember from the time, what
12 would you have considered to be information that
13 substantiated beyond opinion that Interpal had made
14 payments to terrorist groups?
15       A. Well, from that, from my own belief it
16 would be down to one of those entities as
17 a beneficiary being on an official list issued by
18 a Government that I found during -- particularly
19 focused on the Bank of England or EU lists, but I
20 would consider anything. Any unofficial site, you
21 know, somebody's blog is not -- that is an opinion.
22 I would not take that as an official view.
23       Q. But if the name appeared on an official
24 sanction list you would take that as substantiation?
25       A. I would take that as exactly as it was,

Page 85

1    it is them listed on that list, and I would have
2    reported it to the management.  You know, although if
3    there is a payment beneficiary who was on a sanctions
4    list would be in my report and that would be
5    considered by the group there to say, well, you know,
6    (i), if it was on there, would we report it, we would
7    report it to NCIS anyway, and (ii) we would then
8    consider whether we wanted to keep the relationship.
9        Q.  Okay.  So you are saying that finding
10   the name on a sanction list you would have considered
11   substantiation?
12       MR. BLACKMAN:  Objection, misstates the
13   testimony.
14       A.  No.
15       Q.  Does that misstate your testimony?
16       A.  I would say that a source but not the
17   only source.
18       Q.  What other sources?
19       A.  Well, if I found anything from the
20   Metropolitan Police, say, listing them as a terrorist
21   organization, I would look at the sources as they came
22   up and then decide whether these were worthy enough to
23   report up to the management of the bank.
24       Q.  Okay.  Did you review any sanctions
25   lists published by the country Israel?

Page 86

1        A.  I wouldn't -- I have never use the
2    sanction list issued by Israel.  If a name came up for
3    a Google and it came up with that site, then that
4    would have been reviewed, but predominantly the main
5    sanctions list source we used was the KYC check in the
6    third paragraph.
7        Q.  And what is the KYC check?
8        A.  There is an organization called
9    Complinet.  It is an industry source for compliance
10   for regulatory issues and anti-money laundering.  They
11   have direct feeds into the databases of numerous
12   regulators, Government bodies, enforcement agencies,
13   lists of politically exposed people, and basically it
14   is a very easy source to pick up all the major --
15   watch lists and type in the name.  It has got fuzzy
16   logic matching, so it would do variations of names
17   automatically.  On that I am not sure whether it was
18   at the time but I think for instance, like SEBI in
19   India is on it.  I am not sure when it started but the
20   securities exchange board in India is on it with their
21   enforcement actions and things like that.  So it is
22   quite clear.
23       Q.  What about the OFAC lists?  Are they on
24   there?
25       A.  Yes.

Page 87

1        Q.  Do you have an understanding of the
2    purpose of the OFAC list, that is why does OFAC put
3    out a list of sanctioned entities?
4        A.  As in the purpose or the results of that
5    sort of thing?  People are listed under different acts
6    in the US, like I don't know all the acts but dealing
7    with the NME and all those sort of acts, whatever they
8    are called, and there is different listings on there.
9    So you have, you know, there is various programs
10   against countries, against drug traffickers, against
11   terrorists, and each list or each entity there, the
12   programs do vary by, you know, the requirements vary
13   by program.  Some is an asset freeze, some is to
14   reject the funds, et cetera, et cetera.
15       Q.  Okay.  So I believe you have just
16   testified that different OFAC lists have different
17   purposes.  Is that correct?
18       A.  They have different requirements.
19       Q.  Different requirements, and what do you
20   mean by "requirements"?
21       A.  I.e. if you pick up one of the OFAC
22   programs for, let's say, Iran, it will require US
23   institutions or US persons to do this, that and the
24   other, and there is a different program that tells
25   people to do different things.  There is not

Page 88

1    a standard response to the OFAC list.
2        Q.  Okay.  My question, I am trying to find
3    out, do you have an understanding of what OFAC is
4    trying to accomplish by putting out lists?
5        A.  Probably political interests of the US,
6    the Government interests of the US.
7        Q.  Yes.
8        A.  That is what it is trying to achieve,
9    whatever the interests of the US Government are, that
10   is what it is trying to achieve.
11       Q.  Does OFAC have a list of suspected
12   terrorist entities?
13       A.  I don't know whether it uses the word
14   "suspected".  It has got different designations.  So
15   the designation that Interpal had, the FTO lists,
16   there is various lists.
17       Q.  Are you aware of the fact that OFAC --
18   that Interpal was on an OFAC list?
19       A.  Yes.
20       Q.  Do you know whether at this time,
21   May 20, 2004, Interpal was on that OFAC list?
22       A.  I believe it would have been, yes.
23       Q.  In fact, you reference it here, I
24   believe, on page 66733:
25       "I realize due to the US terrorist

Page 141

1      MR. BLACKMAN: Question is vague. I object
2  to it.
3          A. Can you rephrase the question?
4          Q. Yes. Am I correct in stating that you
5  never found it to be fact that Interpal was
6  a terrorist organization, correct?
7          A. Correct, I never saw any activity that
8  made me believe they were a terrorist organization.
9          Q. And what sort of information would it
10  have taken for you to consider Interpal a terrorist
11  organization?
12      MR. BLACKMAN: Objection, calls for
13  hypothetical. Speculation. You may answer if you
14  can.
15          A. The purpose of my reviews was to look at
16  all those beneficiaries and try and find beneficiaries
17  or activity that would demonstrate that they were an
18  organization, and then at that point I would still
19  report it up to the Government authorities, et cetera.
20          Q. But again, in your mind, the US
21  designation was not sufficient, correct?
22          A. For my personal opinion?
23          Q. Correct.
24          A. I think it would give grounds for
25  suspicion, but from me looking at this relationship I

Page 142

1  didn't find anything that further, you know, further
2  evidence that, you know, I approached this in
3  a suspicious mind in those days. I went to find
4  something basically when I looked at this account.
5          Q. One more question on this document.
6  Looking at the second to last paragraph on the first
7  page, starting with "I am content". Do you see where
8  I am talking about?
9          A. Yes.
10          Q. I believe Mr. Schwartz asked you this
11  morning if you knew whether or not NatWest could
12  continue to transact business for Interpal so long as
13  it did not include transactions that included US
14  dollars. Correct?
15          A. Yes, he asked me a similar question to
16  that, yes.
17          Q. Am I correct in restating that your
18  answer to that question was yes, that NatWest could
19  transact business for Interpal after the US
20  designation so long as the transaction did not involve
21  US dollars?
22          A. My belief would be NatWest could
23  continue with its relationship with Interpal, and if
24  it transacted in US dollars, which it would be
25  entitled to do of course, it would have then the

Page 143

1  consequences in the US of transacting in US dollars.
2  I don't think we as a UK bank were banned from dealing
3  in US dollars, but it would not be wise or conducive
4  to the business to do anything in dollars.
5          Q. Did that belief come from your prior
6  training? Did it come from attorneys with NatWest?
7  Where did you gain that understanding?
8          A. I don't recall a specific occasion where
9  I would have got that, from reading the OFAC thing,
10  having it explained to me, but I would not be able to
11  recall a specific occasion.
12          Q. You don't recall who explained it to
13  you?
14          A. Exactly.
15          Q. I want to ask you what I hope is
16  a straightforward question. In the first hour this
17  morning we discussed that you were the surveillance
18  manager, and essentially the second line of monitoring
19  or auditing when you first joined RBS. Correct?
20          A. Yes.
21          Q. If a suspicion of money laundering or
22  terror financing that was going to ultimately come
23  through you started on the branch level, can you give
24  me or can you explain to me the path that that
25  suspicion would follow, in terms of which departments

Page 144

1  or which positions within which departments would
2  review it up until the point it reached your desk?
3          A. The procedure is that it should not come
4  to me. The procedure is as you saw on one of the
5  previous exhibits, Cole 14, staff who have got access
6  to e-mail should send it directly to that mail box at
7  group level. The function for reporting in the bank
8  is within that team, it is not within the divisional
9  team. The only time I would be involved in it would
10  not be to assess the basis of any suspicion reports,
11  it would basically be to give support and guidance to
12  somebody submitting a form or wanting to investigate
13  a client further, so I am not part of the process.
14          Q. Then let's move you out of the process.
15  Can you tell me how the suspicion would be
16  investigated, again starting at the branch level and
17  working its way up?
18          A. Some of it would be speculation, because
19  I don't know all the procedures, but if there is
20  something unusual with a front line person, they will
21  try to make reasonable enquiries with the client and
22  through the accounts to see whether they can find
23  anything that will mitigate those concerns they have
24  and explain them. If they have a suspicion, the
25  suspicion is personal to those individuals, then they

EXHIBIT 10 TO DECLARATION OF VALERIE SCHUSTER

FILED UNDER SEAL

**1**

```
1        UNITED STATES DISTRICT COURT
2        EASTERN DISTRICT OF NEW YORK
3          Action No: 05cv4622(DGT)(MDG)
4    - - - - - - - - - - - - - - - - - - - -
5    TZVI WEISS, et al,
6                    Plaintiffs,
7    against
8    NATIONAL WESTMINSTER BANK, PLC.,
9                    Defendant.
10   - - - - - - - - - - - - - - - - - - - -
11   NATAN APPLEBAUM, et al.,
12                   Plaintiffs,
13   against
14   NATIONAL WESTMINSTER BANK, PLC.,
15                   Defendant.
16
17
18     VIDEOTAPED DEPOSITION OF MIKE HOSEASON VOLUME 1
19            Wednesday 14 July 2010
20              At:  10:00 am
21              Taken at:
22      Cleary, Gottlieb, Steen & Hamilton LLP
23         55 Basinghall Street, London
24              United Kingdom
25
26
27
28
29          HIGHLY CONFIDENTIAL              2
```

**2**

```
1        A P P E A R A N C E S
2    For Plaintiff Tzvi Weiss:
3        STEPHEN SCHWARTZ, ESQ.
4        Kohn, Swift & Graf PC
5        One South Broad Street, Suite 2100
6        Philadelphia, Pennsylvania 19107-3304
7        Tel: 419 246 0528
8    For Plaintiff Natan Applebaum:
9        MARK WERBNER
10       Sayles & Werbner
11       4400 Renaissance Tower
12       1201 Elm St.
13       Dallas, Texas 75270
14       Tel: 214 939 8763
15
16   For Plaintiff Tzvi Weiss:
17       AITAN GOELMAN
18       Zuckerman Spaeder LLP
19       1800 M Street, NW, Suite 1000
20       Washington, DC 20036-5807
21       Tel: 202 778 1996
22   For Defendant National Westminster Bank, PLC:
23
24       JONATHAN I. BLACKMAN ESQ. and SUE. H. RHEE
25       Cleary, Gottlieb, Steen & Hamilton LLP
26       One Liberty Plaza
27       New York, NY 10006-1470
28       Tel: 212 225 2000
29
30   Also Present:
31
32   COURT REPORTER:
33
34       AILSA WILLIAMS
35       European Deposition Services
36       59 Chesson Rd
37       London, W14 9QS
38       Telephone:  44 (020) 7385 0077
39          HIGHLY CONFIDENTIAL              3
```

**3**

```
1    VIDEOGRAPHER: DAVID ROSS
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**4**

```
1              I N D E X
2    MIKE HOSEASON . ... ... ... ... ... ... ... ...6
3    DIRECT EXAMINATION BY MR. . ... ... ... ... ... ...6
4      WERBNER:
5
6    CROSS-EXAMINATION BY MR. GOELMAN: . ... ... ... 155
7
8            INDEX OF EXHIBITS
9    Hoseason 1 NW000149-164 ... ... ... ... ... .47
10   Hoseason 2 NW000233-261 ... ... ... ... ... .74
11   Hoseason 3 NW052140-176 ... ... ... ... ... .80
12   Hoseason 4 NW196915-932 ... ... ... ... ... 100
13   Hoseason 5 NW212124 ... ... ... ... ... ... 101
14   Hoseason 6 NW052016-17  ... ... ... ... ... 120
15   Hoseason 7 NW008356-366 ... ... ... ... ... 124
16   Hoseason 8 NW052067-073 ... ... ... ... ... 140
17   Hoseason 9 NW052074-91  ... ... ... ... ... 151
18   Hoseason 10 NW000285-293 .. ... ... ... ... 157
19   Hoseason 11 37 Page Website ... ... ... ... 207
20     Download "From Anonymous" (No
21     Bates No.)
22
23
24
25
26
27
28
```

9

1     A. No.
2     Q. Was that true for any part of that period?
3     A. Its responsibility was the receipt and
4  assessment of internal Money Laundering Suspicion
5  Reports.
6     Q. Which would include, among other things,
7  suspicions of terror financing, correct?
8     A. Yes.
9     Q. And was that the case throughout that
10  period, that you were in that field, that is 1999 to
11  2003?
12     A. Yes.
13     Q. During that period of time, did you report
14  to Neil Trantum?
15     A. I did, yes.
16     Q. During that time, was Doug Hartley one of
17  the members of your Money Laundering Team?
18     A. He was.
19     Q. Who were the other members of the team?
20     A. I can't remember them individually name by
21  name.
22     Q. Can you recall any of the other people,
23  other than Mr. Hartley?
24     A. There was a gentleman called Garry
25  Meyrick.  There was a Lisa Fertado.  Emma Peek.  Janine

10

1  Connell, Helen Easton.  There were a number of
2  individuals as well in Edinburgh, whose names I don't
3  recall.
4     Q. During the period that you were involved
5  with the Money Laundering Team, were you familiar with
6  reports known as Goalkeeper reports?
7     A. I was.
8     Q. What were those reports?
9     A. The reports on Goalkeeper -- Goalkeeper is
10  a database for recording a number of things, including
11  Money Laundering Suspicion Reports that have been
12  received, and any subsequent reports, disclosures which
13  are made to the authorities.
14     Q. Were those Goalkeeper reports used in the
15  ordinary course of business by the Money Laundering Team
16  during 1999 through 2003?
17     A. They were.
18     Q. Were those Goalkeeper reports items that
19  during your work in that period you had some personal
20  involvement with?
21     A. I would have, yes.
22     Q. What was your role with those?
23     A. Generally, I would be reviewing the cases
24  and in some instances making decisions whether or not to
25  make a report to the authorities.

11

1     Q. Did you ever code with colours the risk in
2  those portions of the Goalkeeper reports that called for
3  that?
4     A. I expect so.
5     Q. Would you also have reviewed those color
6  coded risks on those Goalkeeper reports that had been
7  prepared by people who worked for you?
8     A. Sometimes.
9     Q. Have you in preparation for the deposition
10  refreshed your recollection with some of the Goalkeeper
11  reports that pertained to Interpal?
12     A. I have been shown some of the reports,
13  yes.
14     Q. How recent to this deposition.
15     A. One week ago and again briefly this
16  morning.
17     Q. Did any of those contain your name?
18     A. Yes.
19     Q. How many Goalkeeper reports did you review
20  this morning that contained your name?
21     A. I can't remember.
22     Q. More than one?
23     A. I don't know.
24     Q. There are five colours to choose from on
25  these Goalkeeper reports in describing the bank's

12

1  assessment of the risk, is that true?
2     A. Yes.
3     Q. What is the highest risk that NatWest and
4  Royal Bank of Scotland used to flag a risk of a customer
5  suspected of money laundering or terror financing?
6     A. It would be red.
7     Q. I take it, at least during your work on
8  the Money Laundering Team, you had an understanding of
9  the criteria that the bank used for assigning a colored
10  risk, correct?
11     A. Yes.
12     Q. What was the criteria that your team used
13  and the bank used for assigning a red flag to
14  a customer?
15     A. I can't remember all the criteria.  One of
16  the criteria was the number of occasions on which the
17  entity or individual or record appeared in Goalkeeper.
18     Q. Any other criteria for the red flag that
19  you can remember?
20     A. No.
21     Q. Were you to some extent personally
22  involved during your work on the Money Laundering Team
23  with a customer known as Interpal?
24     A. I do recall that particular entity.
25     Q. And you had to some extent involvement

21

1   MR. BLACKMAN:  The word "proved" does not
2   appear in this thing about amber.  So that was just an
3   example of a completely misleading question, totally
4   inappropriate, mischaracterizing and misstating
5   a document, which you refused to show the witness and,
6   by the way, "red" doesn't say "proved" either,
7   Mr. Werbner.  So I am reading from NW00237, the
8   Goalkeeper II Complex User Guide.  You are entitled to
9   ask questions but I don't think it is fair or proper for
10   you to mislead the witness by asking him about something
11   that is not in a document and says "Isn't it true that
12   ... " So continue your deposition.  Do it properly.
13   MR. WERBNER:  Mr. Hoseason, from your
14   preparation for this deposition, isn't it true that
15   NatWest put red flags on Interpal on numerous internal
16   bank records?
17   MR. BLACKMAN:  Objection to the form of the
18   question.  I don't know what "numerous" means, but you
19   can answer.
20   A.  Your question said the preparation for the
21   deposition, isn't it true that we did something?
22   Q.  Let me repeat the question.  Isn't it
23   true, from your recently looking at Goalkeeper reports
24   concerning Interpal, that your recollection has been
25   refreshed that NatWest put red flags on its customer,

22

1   Interpal?
2   MR. BLACKMAN:  Objection, question has been
3   asked and answered but you can answer it again.  The
4   question did --
5   A.  I have seen documents.  My recollection
6   has not been refreshed to the extent that I could answer
7   the question under oath.  I would have to revisit the
8   document.
9   Q.  But you have seen, and I will be happy to
10   show them to you in a minute, but you know that there
11   are Goalkeeper records of NatWest that have red flags
12   for the Interpal account, true?
13   A.  I would have to refresh my memory by
14   looking at the document.
15   Q.  So is it your sworn testimony that as you
16   sit here right now you cannot say whether or not any of
17   the Goalkeeper records red flagged Interpal?
18   A.  Correct.
19   Q.  Assume for the moment there are such
20   documents, can you explain why NatWest put red flags on
21   Interpal on numerous Goalkeeper records, yet continued
22   to provide Interpal with financial services?
23   MR. BLACKMAN:  Again, I object, as I did to
24   a similar question a while ago.  It is argumentative,
25   but you can answer, and also so far hypothetical, since

23

1   you have not shown him the document, but you can answer
2   the question.
3   A.  There was no reason not to continue to
4   provide financial services to a customer that had a red
5   flag against them.
6   Q.  Explain that?
7   MR. BLACKMAN:  In general terms now or about
8   Interpal?  Can you clarify the question, Mr. Werbner?
9   No, he won't clarify the question.  Mr. Werbner is
10   shaking his head.  He does not wish to clarify the
11   question.  I am going to just object and say the
12   question is unclear whether we are talking about
13   Interpal or customers in general.  To the extent you can
14   answer, given that deliberate unclarity, you certainly
15   may, Mr. Hoseason.
16   A.  So, whether it was Interpal or any other
17   customer who may have had a red flag against them in
18   Goalkeeper, that doesn't mean there was necessarily any
19   reason to stop providing them with financial services.
20   Q.  Well, what did it take during the period
21   that you worked on the Money Laundering Team to stop
22   NatWest from providing a customer with financial
23   services?
24   A.  There were a number of scenarios in which
25   we might cease to provide to the customer or were no

24

1   longer prepared to provide financial services.  That
2   would include physical or verbal abuse directed at
3   members of bank staff, it might include where we were
4   unhappy with the conduct of their account in terms of
5   the operation, continually trying to withdraw funds that
6   they did not have in their account, or where the
7   reputational risk to maintain an account might outweigh
8   the risk of asking them to rebank.
9   Q.  You mentioned, as I understand it, three
10   circumstances.  Are there any others that you can
11   recall?
12   A.  If we knew with absolute certainty that
13   the customer was engaged in any kind of illegal activity
14   then we would also ask them to rebank.
15   Q.  Was that the standard, in the period 1999
16   to 2003, that your Money Laundering Team used before the
17   bank would close a customer's account that was suspected
18   of criminal activity, namely "absolute certainty"?
19   A.  Sorry, can you repeat the question?
20   MR. BLACKMAN:  Object to the form of the
21   question because it misstates and mischaracterizes the
22   prior answer, which also gave at least one point i.e.
23   reputational risk, another reason why an account might
24   be closed, but you can answer.
25   A.  So we would not close an account purely on

Hoseason, Mike (Vol. 01) - 12/08/2010  8/12/2010  12:00:00 AM

25

1  the basis that we had suspicions that they may have
2  engaged in any form of unlawful activity.
3      Q.  What did you mean when you said "absolute
4  certainty" would be a circumstance where the bank would
5  close a customer's account?
6      A.  If we knew for a fact that a customer had
7  been engaged in unlawful activity then we would ask them
8  to rebank.
9      Q.  During your period on the Money Laundering
10  Team from 1999 to 2003, did that occur?
11      A.  I can't recall any specific instances.
12      Q.  Do you recall in general whether that
13  occurred during that period?
14      A.  I don't know.
15      Q.  Who within the Group Crime area would have
16  had the authority to close a customer's account in those
17  circumstances?
18      MR. BLACKMAN:  Objection to the form of the
19  question.  It lacks foundation because it is making an
20  assumption that the Group Crime area would close an
21  account, but you may answer.
22      A.  The Group Crime area, as you describe it,
23  would not themselves close the account.  They would make
24  a recommendation that that be done, if we felt that the
25  appropriate grounds existed.

26

1      Q.  To whom would the Money Laundering Team
2  make such a recommendation to close a customer's account
3  due to suspicions of terror financing?
4      A.  If we were in a position where we were
5  going to make a recommendation, we would make
6  a recommendation to senior management within the
7  business that was responsible for the ownership of that
8  account.
9      Q.  Did your team or group have the authority
10  to close a customer's account because of a suspicion of
11  terror financing without regard to the commercial senior
12  management within the business?
13      A.  No, we didn't.
14      Q.  In the case of Interpal, during 1999 to
15  2003, when you were involved with the Money Laundering
16  Team, did anyone to your knowledge recommend the closure
17  of Interpal's account to the commercial business in
18  charge of their account?
19      A.  Not that I am aware of.
20      Q.  Was there a Goalkeeper II and a Goalkeeper
21  III system at NatWest and Royal Bank of Scotland during
22  the period we are discussing, from 1999 to 2003?
23      A.  I seem to recall there was a Goalkeeper
24  II.  I don't recall a Goalkeeper III.
25      Q.  Do you know approximately at what period

27

1  the Money Laundering Team was using Goalkeeper II versus
2  Goalkeeper III?
3      A.  No.
4      Q.  During some period of 1999 to 2003, when
5  you were on the Money Laundering Team, was Goalkeeper
6  III in use?
7      A.  As I said before, I don't recall there
8  being a Goalkeeper III, so I don't know.
9      Q.  I take it then that you cannot explain the
10  difference, if any, between Goalkeeper II and Goalkeeper
11  III, correct?
12      MR. BLACKMAN:  Objection to the form of the
13  question.  You can answer.
14      A.  That is correct.
15      Q.  Did you -- strike that.  Isn't it true
16  that during your work on the Money Laundering Team
17  looking for, among other things, suspicions of terror
18  financing, the red flags represented that there were
19  serious grounds for concern?
20      MR. BLACKMAN:  I object.  First of all, the
21  question in some form has been asked and answered.
22  Secondly, it misstates the prior testimony.  The witness
23  specifically told you that his job was not to look for
24  terror financing but to respond to suspicious activity
25  reports and, as appropriate, make disclosures and make

28

1  other responses.  So, I mean, I am just going to keep
2  objecting because you seem determined to misstate the
3  testimony, but you can answer.
4      A.  Could I ask you to repeat the question?
5      (Read back)
6      A.  Not necessarily.
7      Q.  What do you mean by that answer?  Please
8  explain?
9      A.  As I mentioned before, red flags could be
10  utilized because a customer or entity had appeared on
11  multiple occasions.  It wouldn't necessarily suggest any
12  heightened degree of risk.
13      Q.  You are not testifying that it is better
14  that a customer appear on a Money Laundering Suspicion
15  Report more times than a customer that appears less, are
16  you?
17      MR. BLACKMAN:  Objection, argumentative.  You
18  can answer.
19      A.  I am not sure I understand the question.
20      Q.  Let me have it read back and if you still
21  don't understand it I will try to clarify.
22      (Read back)
23      MR. BLACKMAN:  Objection to form.  Same
24  objection, you can answer.
25      A.  Could I ask you to rephrase the question?

101

1   question. Compound. You asked him three different
2   questions.
3       A. I see my name on the front page. I can't
4   see anything there that I specifically recall being
5   directly involved with. The issues overall certainly
6   I do recollect.
7       Q. What are the issues?
8       A. Following Suspicion Reports being at an
9   all time high, and the fact that we were getting
10  a number of Suspicion Reports that perhaps had not been
11  adequately researched by the front line, I suspect that
12  was probably a consequence of the general concern or
13  unease at the time about being seen to have fallen short
14  in terms of suspicion reporting.
15      (Exhibit Hoseason 5 marked for identification)
16      Q. I will hand you another document being
17  marked as Hoseason Exhibit 5. For the record, it has
18  Bates number NW212124. Is that your signature on the
19  exhibit?
20      A. It certainly looks like it.
21      Q. Under your signature we have the typed
22  name and it says: "Senior Consultant Group
23  Investigations & Fraud". What is that title? Is that
24  the same as the team leader or is that some other
25  position?

102

1       A. It is effectively the same.
2       Q. What is the date of this document you
3   signed?
4       A. The document is dated 27 September, 2001.
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22      MR. BLACKMAN: Objection to form, you can
23  answer.
24      A. In the days immediately preceding (sic)
25  9/11, anything and everything that was vaguely



103

1   associated with or linked to anything that could
2   possibly be connected to extremism of any description
3   was being reported.
4       Q. So NatWest intensified in a significant
5   way its scrutiny of suspicious terror financing as
6   a result of September 11, 2001, is that correct?
7       A. I would say we intensified the level of
8   reporting.
9       Q. Here in your letter marked Exhibit 5,
10  dated September 27, 2001, you inform the National
11  Criminal Intelligence Service
12
13                                      orrect?
14      A. That is what it says there.
15      Q.
16
17                                      right?
18      MR. BLACKMAN: Objection to the form of the
19  question, totally misstates the last answer. You may
20  answer.
21      A. No.
22
23
24      Q. Did you do that?
25      A. I imagine so.

104

1       Q. What do you mean you imagine so? You are
2   not sure?
3       A.
4
5       Q. I am not asking you if you specifically
6   remember. I have placed before you a letter that you
7   acknowledge you signed to the National Criminal
8   Intelligence Service. Do you have any reason to doubt
9   that, as stated in this letter,
10
11
12      MR. BLACKMAN: Object to the form of the
13  question. It is completely argumentative. You may
14  answer.
15      A. I have no reason to doubt that it didn't
16  happen.
17      Q. And about that same time a Goalkeeper
18  report was done on Interpal, right?
19      MR. BLACKMAN: Objection, lack of foundation.
20  You can answer.
21      A. I would imagine so, but without
22  scrutinizing the Goalkeeper records I couldn't tell you
23  when.
24      Q. In preparation for this deposition you
25  reviewed the Goalkeeper reports for Interpal, didn't



Hoseason, Mike (Vol. 01) - 12/08/2010  8/12/2010  12:00:00 AM

205

1  enough information at the time?  Do you know if that was
2  an option?
3      A.  I don't think it was an option.  It was
4  kind of a failsafe to ensure that we didn't end up
5  submitting a disclosure that had key information
6  missing.
7      Q.  Would NCIS ever reject disclosures because
8  they were incomplete or didn't give enough information?
9      A.  I am not aware they have ever rejected any
10  of our disclosures.
11      Q.  Are you aware of them rejecting
12  disclosures of other banks?
13      A.  I don't know.
14      Q.  I don't know if this is an inaccuracy in
15  LiveNote but it says on line 8 of the previous page: "I
16  think the format, although we were delivering them
17  electronically, the format which the disclosures were
18  made", do you mean you were not delivering them
19  electronically at the time?
20      A.  That is right.  Let me explain.
21  Ultimately we finished up sending the disclosures
22  electronically.  I seem to recall at this time, although
23  we were creating the disclosures, rather than putting it
24  on to a paper based report, we were creating them in
25  Goalkeeper, but because the electronic link was not up

206

1  and running we could not hit the "Go" button.  We had to
2  then print that report and hand deliver it.
3      Q.  Do you remember when the electronic link
4  got up and running?
5      A.  No, I don't.
6      Q.  Was everything that you have submitted,
7  all the disclosures you submitted submitted to the Duty
8  Desk?
9      A.  Yes.  The National Criminal Intelligence
10  Service has a number of departments.  The department
11  that we are required to submit the disclosures to is the
12  Economic Crime Unit, and specifically they go to the
13  Duty Desk.
14      Q.  So that is where all the disclosures go?
15      A.  This is why this would have been addressed
16  as such, so it reached the right person, rather than
17  someone else.
18      Q.  You write in this letter:
19
20
21
22
23
24
25



207

1  due course?
2
3
4
5
6
7
8
9
10      A.  Yes, I think that would be fair.
11      Q.  I want to mark a printout from a website
12  as Hoseason Exhibit 11.
13      (Exhibit Hoseason 11 marked for identification)
14      Unlike most of the exhibits that you will see,
15  this one does not have a Bates stamp because it was not
16  produced by the bank?
17      A.  Okay.
18      Q.  This is one of those relatively long
19  documents.  I am going to ask you just to flip through
20  it and take as much time as you want to get familiar
21  with it.  You don't need to read every word now if you
22  don't want to.
23      A.  Okay.
24      Q.  My first question is do you know what
25  a URL is?

208

1      A.  I think so.
2      Q.  It is an internet address?
3      A.  Um hum.
4      Q.  Can you compare
5              and Hoseason Exhibit 1, please?
6      A.  Yes, they are the same.
7      Q.  And for the record they are
8
9      MR. BLACKMAN:  For the record, you should note
10  that this was downloaded on July 5, 2010.  I note that
11  for the record because in the earlier examination there
12  was some questions about some Goalkeeper reports which
13  similarly have the relevant website and were downloaded
14  at dates long after the document was created.
15      MR. GOELMAN:  The document being Hoseason
16  Exhibit 5, you mean?
17      MR. BLACKMAN:  Or Hoseason Exhibit 9 or any of
18  these downloaded --
19      MR. GOELMAN:  This was done in preparation for
20  the deposition.
21      MR. BLACKMAN:  Yes.
22      MR. GOELMAN:  So stipulated.
23      MR. BLACKMAN:  I am noting it because your
24  friend seemed to deliberately overlook that fact in some
25  of his questions, but I just want the record to reflect

**EXHIBIT 11 TO DECLARATION OF VALERIE SCHUSTER**

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------x
TZVI WEISS, et al.,
        Plaintiffs,
  -against-     Action No. 05-CV
        4622(CPS)(MDG)

NATIONAL WESTMINSTER BANK, PLS,


      Defendant.

----------------------------------------------x
NATAN APPLEBAUM, et al.,

     Plaintiffs,

  -against-

NATIONAL WESTMINSTER BANK, PLC.,

      Defendant.

----------------------------------------------x

* HIGHLY CONFIDENTIAL *

    VIDEOTAPED DEPOSITION of FLEUR BAUGH,
taken before Cheryll Kerr, LSR, Notary
Public and Shorthand Reporter, held at the offices
the offices of Cleary, Gottlieb, Steen &
Hamilton, LLP, located at 55 Basinghall
Street, London, England on Wednesday, the
20th day of May, 2009, at 9:42 a.m.

---

Page 2

1  APPEARANCES:
2  KOHN, SWIFT & GRAF, P.C.
3     Attorneys for Plaintiff Tzvi Weiss
4     One South Broad Street, Suite 2100
5     Philadelphia, Pennsylvania  19107-3304
6
7  BY:  STEPHEN H. SCHWARTZ, ESQ.
8
9  CLEARY GOTTLIEB STEEN & HAMILTON, LLP
10    Attorneys for Defendant National
11    Westminster Bank, PLC
12    One Liberty Plaza
13    New York, New York  10006-1470
14  BY:  JONATHAN I. BLACKMAN, ESQ.
15    PATRICK SHELDON, ESQ.
16
17  OSEN LLC
18    Attorneys for Plaintiff Tzvi Weiss
19    700 Kinderkamack Road
20    Oradell, New Jersey 07649
21
22  BY:  JOSHUA D. GLATTER, ESQ.
23
24  Also Present:  Simon Rutson, Videographer
25
26     *****  *****  *****
27
28
29
30
31
32
33
34
35
36     Highly Confidential

---

Page 3

1           INDEX
2  EXAMINATION BY          PAGE
3  MR. SCHWARTZ         6
4  MR. GLATTER        237
5
6       EXHIBITS
7
8  BAUGH
9  FOR ID    DESCRIPTION       PAGE
10  Exhibit 1  Goalkeeper 2 Complex User Guide,   72
11      Bates No. NW000233 through
12      NW 000261
13  Exhibit 2  Document with Bates No.     73
14      NW000149 through NW000232
15
16  Exhibit 3  Document with Bates No.     74
17      NW000335 and NW000336
18  Exhibit 4  Document with Bates No.    190
19      NW162188 through NW162193
20
21  Exhibit 5  Goalkeeper money laundering  204
22      disclosure record dated 9-27-01
23  Exhibit 6  Document with Bates No.    225
24      NW008367 to NW00873
25
26  Exhibit 7  Document with Bates No.    234
27      NW166235 through NW166251
28  Exhibit 8  Document with Bates No.    247
29      NW001041 through NW001044
30
31  Exhibit 9  Printout from a Financial    257
32      Times article dated May 13, 1996
33  Exhibit 10  1996 Charity Commission report  265
34  Exhibit 11  Document with Bates No.   297
35      NW052806 through NW052811
36
37  (Continued)
38

---

Page 4

1       INDEX (Cont.)
2       REQUESTS
3  DESCRIPTION           PAGE
4
5  Date the Ramses database was first   31
6  implemented at the bank
7  Written instructions for scanning Fox  194
8  information to Goalkeeper 2
9
10  Disclosure referred to in Fin log    223
11  reference 140425
12  Memo or response thereto referred to   232
13    at end of 647655 record
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30

Page 17

1  someone from the bank --
2      A.  Uh-huh.
3      Q.  -- a banker who was considering a
4  transaction, would come to you and ask you to do
5  research on the parties involved in the transaction,
6  is that correct?
7      A.  So primarily I had contact with people
8  within the risk functions, so people that had a
9  compliance-type role who -- who would sort of be
10 advising the business as well about potential new
11 clients or potential transactions;
12     And they would know that I existed and refer a
13 particular transaction or a name or a company to me,
14 and then I would -- I would sort of give them my
15 recommendations.
16     Q.  So what would you be looking for?
17     A.  So with advance fee or sort of high yield
18 investment frauds, I might be looking for the sort
19 of specific terminology that might be associated
20 with those transactions.
21     I might look to see whether or not the names
22 were previously known to the group in connection
23 with that type of approach, and I would also look
24 the at the transaction itself.
25     Often they were for billions of dollars, which

Page 18

1  was an unrealistic type of -- type of amount of
2  money, and then you would give --
3      I would give a recommendation to the business
4  as to whether or not I thought that this could
5  potentially be linked to such a fraud.
6      Q.  In your police work that you did, '91 to
7  '97 --
8      A.  Uh-huh.
9      Q.  -- was there ever any involvement with
10 issues of money laundering?
11     A.  No.  It was primarily fraud, so it was
12 the Fraud Squad.
13     In the latter sort of years, maybe sort of '95,
14 '96, there was a money laundering unit specifically
15 set up within the City of London Police.
16     And I would do some occasional checks for them,
17 but I wasn't involved in any of their investigation.
18     Q.  You were not part of that money
19 laundering --
20     A.  I wasn't, no.
21     Q.  Did you ever have occasion to look into
22 any matters regarding terrorism finance?
23     A.  Not with --
24     Q.  With the police?
25     A.  Not with the City of London Police.

Page 19

1      Q.  Okay.  In the year and a half that you
2  were a Fraud Analyst, did you have any involvement
3  in money laundering issues?
4      A.  No.  That wasn't part of the role.
5      It was primarily fraud advice, but part of what
6  I actually did was help the business devise their
7  due diligence-type strategy, so I would be working
8  alongside compliance people --
9      Q.  Uh-huh.
10     A.  -- who had responsibility for the take-on
11 of clients and the specific requirements, preclient
12 take-on;
13     But very much my work was around looking for
14 fraud and regulatory and reputational risk issues
15 that -- it was designed to complement existing bank
16 processes rather than replace.
17     Q.  Putting aside Goalkeeper for the moment,
18 what did you do after the one and a half years that
19 you were a Fraud Analyst?  Let me rephrase that.
20 Excuse me.
21     In 1998, you began to work on the development
22 of the Goalkeeper 1 software, is that correct?
23     A.  Yes, so I would say --
24     Actually, it was 1997, so towards the end of
25 '97 we -- we started to work on Goalkeeper,

Page 20

1  Goalkeeper 1, then actually started to implement
2  Goalkeeper 1 in 1998.
3      Q.  Were you one of the developers of the
4  software?
5      A.  No, no, no.
6      Q.  So who actually developed the software?
7      A.  No.
8      It was developed in-house by Financial Markets
9  IT.
10     Q.  Financial Markets IT had its own
11 programmers?
12     A.  Yes.  There was a programmer assigned to
13 us.
14     Q.  And who was responsible for the -- the --
15 the substantive approach of Goalkeeper, if you know
16 what I mean?
17         MR. BLACKMAN:  Object to the form of
18     the question.
19         MR. SCHWARTZ:  How would you like me
20     to ask that?
21         MR. BLACKMAN:  It's quite vague,
22     but...
23 BY MR. SCHWARTZ:
24     Q.  Do you know what I'm asking?  It's one
25 thing you told me about the software.

Page 21

1    You told me who did the software. There's also
2 the thinking of how you are going to develop the
3 program to work.
4    So what I'm trying to find out is, who were
5 the -- who put in the banking knowledge?
6    A. So Chris Hill --
7    Q. Uh-huh.
8    A. -- my line manager, who was head of
9 Security and Fraud in Financial Markets, was the
10 project owner for Goalkeeper, so it was his
11 contract.
12    Q. Our understanding is that Goalkeeper 2
13 came to being in around 2000.
14    Is that correct information?
15        MR. BLACKMAN: Object to the form of
16    the question.
17        THE WITNESS: That's correct. Sorry.
18 BY MR. SCHWARTZ:
19    Q. Is it correct that Goalkeeper came into
20 being -- Goalkeeper 2 --
21        (Whereupon, several speakers talk over
22    each other.)
23 BY MR. SCHWARTZ:
24    Q. All right, so let's start over. I will
25 ask the question.

Page 22

1    Did Goalkeeper 2 come into being in the year
2 2000?
3    A. It did.
4    Q. Was Goalkeeper 2 under development -- let
5 me ask it this way:
6    Withdrawn.
7    When did you begin to develop Goalkeeper 2?
8    A. It would have been around 1999.
9    Q. Was there a manual for Goalkeeper 1?
10    A. There could have been a manual, so I
11 would have written some instructions for the people
12 using Goalkeeper 1 for those people that we set up
13 around how to search the system, because it was
14 purely a search engine;
15    But in terms of the types of manual that we
16 wrote for Goalkeeper 1 -- for Goalkeeper 1, that
17 didn't exist.
18    Q. You said that Goalkeeper 1 was purely a
19 search engine?
20    Is that correct?
21    A. That's right.
22    Q. So how did the functionality change from
23 Goalkeeper 1 to Goalkeeper 2?
24    A. So Goalkeeper 2 was a case management
25 system as well, so the search engine in Goalkeeper 2

Page 23

1 remained the same as Goalkeeper 1;
2    But what we did was develop a case management
3 system to sit behind the search engine to enable
4 people to actually look more in depth at the types
5 of records on the system.
6        MR. GLATTER: Sorry.
7        Could I just ask for the response to
8    be read back?
9        (Thereupon, the record was read back
10    by the reporter.)
11        MR. GLATTER: Thank you.
12 BY MR. SCHWARTZ:
13    Q. Do you know whether there was a
14 predecessor to Goalkeeper 1?
15    A. Could you --
16    Q. Clarify?
17    A. -- be a little clearer?
18    Q. Was there a predecessor software at the
19 bank that performed similar functions to the
20 Goalkeeper system?
21    A. There was a case management system used
22 in Fraud Office, which was called Fox.
23    Q. Fox? Okay. Well, that explains a lot.
24 The word "Fox" showed up in all these
25 documents. Did you have somebody named Fox? Okay.

Page 24

1    I know you weren't there, but do you know how
2 long the Fox system was used?
3    A. So I've spoken to people that used the
4 Fox system when they were at Fraud Office at that
5 time.
6    I think Fox was developed in the early '90s, so
7 maybe '9 -- well, '94, '95.
8    Q. And it was a case management and search
9 system?
10    A. It was a case management system.
11    Q. Thank you.
12    A. So the only people that had access to Fox
13 were based in Fraud Office.
14    It didn't have any wider applications for
15 search functionality for anybody else outside of
16 Fraud Office.
17    Q. Okay. Do you know whether any
18 consultants were used in the development of the
19 Goalkeeper system?
20    A. External consultants?
21    Q. Yes. That's what I mean.
22    I mean consultants, not employees of the
23 NatWest Bank.
24    A. Not for Goalkeeper 1.
25    Q. For Goalkeeper 2?

1      A.   For Goalkeeper 2, there was an external
2   consultant who developed the system for us.
3      Q.   Was the external consultant a specialist
4   in software development?
5      A.   He was.
6      Q.   Was there anyone who consulted on the
7   substantive issues, the banking issues?
8      A.   So I was part of the team with my line
9   manager, Chris Hill, and we sort of developed the
10  requirements for the system in conjunction with, for
11  Goalkeeper 2, with people from Fraud Office and
12  people in the businesses who would potentially be
13  using Goalkeeper.
14     Q.   But no one from outside the bank?
15     A.   No one from outside the bank.
16     Q.   Except for the person who was involved in
17  the software development?
18     A.   Yes.
19     Q.   And what was that person's name?
20     A.   His name was David Murphy.
21     Q.   David Murphy?  All right.
22     Now, Goalkeeper 2 comes into being there about
23  1998, we've decided, right?
24     A.   So Goalkeeper 2 --
25     Q.   Two, yes.

1      A.   -- was implemented in 2000.
2      Q.   In 2000?
3      A.   Yes.
4      Q.   Was Goalkeeper 2 developed to address
5   perceived inadequacies in Goalkeeper 1?
6      A.   No.  It --
7      The primary reason for developing Goalkeeper 2
8   was to add the case management part of the system.
9      Q.   You mentioned earlier that the Fox
10  system, I believe, was only available for Fraud
11  officers to use, is that correct?
12     A.   Yes.
13     Q.   The Goalkeeper system, from its
14  initiation --
15     Was it available to a wider group of employees
16  within the bank?
17     A.   It had potential wider applications,
18  because it was an Internet web-based system, so you
19  could give people outside of a particular department
20  access to the system.
21     Q.   And do you know why -- why the bank
22  wanted to give a wider group of employees access to
23  the Goalkeeper system?
24     A.   For Goalkeeper 1, the intention was that
25  specific people identified in compliance-type roles

1   within the Financial Markets business would be able
2   to screen potential new clients through a database
3   of sort of potentially suspect data, so there was
4   the intention that it could be used in that way.
5      Q.   Perhaps I should have mentioned this
6   earlier, but are you aware of the fact that you are
7   testifying today as a representative of the bank, as
8   opposed to Ms. Baugh, personally?
9      A.   I am.
10     Q.   Okay, and you are aware of the fact that
11  a notice was sent to the bank with a list of topics
12  to be discussed today?
13     Are you aware of that?
14     A.   I am.
15     Q.   And have you -- did you see that notice?
16     A.   I've seen that notice, yes.
17     Q.   Did you prepare yourself to testify on
18  all the topics on that notice?
19     A.   I saw the notice yesterday.
20     I've had conversations with Patrick and Jon
21  about the notice, but -- and I have spoken to people
22  about the systems that were in place from the early
23  '90s onwards.
24     Q.   Okay, and you are aware that there was an
25  additional notice with an additional topics that

1   have been sort of attached onto this deposition?
2      You call it Topic 9, or something?  Or
3   Paragraph 9?
4      A.   I am not familiar specifically with --
5   with each of the topics in terms of the numbers, but
6   generally, yes.
7      Q.   Okay.  Well, in addition to the -- what
8   we call the Goalkeeper notice, there was an
9   additional notice having to do with a '94 to '99
10  period, and the bank designated you for a particular
11  topic within that, and then someone else is going to
12  talk about that on Friday.
13     But at the end of the day, I am going to turn
14  the microphone over to my colleague, Mr. Glatter,
15  who is going to question you on that specific topic,
16  okay?
17     But my role is going to be to talk about the
18  Goalkeeper, okay, so that's what we will be doing
19  for the first few hours --
20     A.   Yes.
21     Q.   -- okay?
22     I would like to just talk briefly, if I may,
23  about two other software systems that have shown up
24  in the -- in the documents.  One is the Ramses.  Are
25  you familiar with the Ramses database?

Page 57

1    A.   So an individual from Group Compliance
2  department called Charlie Middleton.
3    Q.   Yes.  Is Mr. Middleton still employed by
4  the bank?
5    A.   He is.
6    Q.   Anyone else?
7    A.   For Corporate Banking, there were a
8  number of representatives, but one of them was
9  Debbie Sears.
10    Q.   None of them were?
11    A.   One of them was Debbie Sears.  Sorry.
12    Q.   Could you spell that, please?
13    A.   D-E-B-B-I-E.  Sears is S-E-A-R-S.
14    Q.   S-E-A-R-S?  Debbie Sears?  Is Ms. Sears
15  still with the bank?
16    A.   To the best of my knowledge, she is.
17    Q.   And she was a representative of Corporate
18  Banking?
19    A.   She was.
20    Q.   Anyone else?
21    A.   Not -- no -- no more names that spring to
22  mind at the moment, yes.
23    Q.   Subsequent to the development of
24  Goalkeeper 2 -- let me ask you first:  When did
25  Goalkeeper 3 replace Goalkeeper 2?

Page 58

1    A.   Goalkeeper 3 became operational at the
2  end of November, 2004.
3    Q.   Four?
4    Between the implementation of Goalkeeper 2 in
5  2000, and the switchover to Goalkeeper 3 in November
6  of 2004, were the banking policies implemented into
7  Goalkeeper 2 -- 2 altered at any time?
8    A.   Can you clarify?
9    Q.   Yes.
10    The Goalkeeper 2 functionality -- correct me if
11  I am incorrect, but it reflects a bank policy of
12  dealing with certain situations, fraud and money
13  laundering?  Is that clear?
14    It's -- the bank implemented the system, so it
15  runs the way the bank thinks it ought to, is that
16  correct?
17    A.   I --
18    Q.   All right.  I am going to ask -- okay.
19    What I'm trying to find out is, did the
20  policies and procedures for the way in which
21  Goalkeeper functioned change between the year 2000
22  and 2004?
23    A.   I -- so in answer to that question, I
24  don't know whether the policies and procedures
25  changed.

Page 59

1    It was implemented in individual divisions on a
2  sort of -- on a divisional basis, so the divisions
3  were actually owned -- the policies and the
4  procedures and the development of the procedures for
5  the use of the database.
6    Q.   So could you give me an example of how
7  one particular department you select -- well, let's
8  say Corporate Banking --
9    A.   Yeah.
10    Q.   -- since we talked about that, how
11  Corporate Banking would implement procedures into
12  the operation of the Goalkeeper 2 system?
13    A.   So Corporate Banking would look at which
14  areas that they wanted to implement the database in,
15  which type of clients potentially they would want to
16  screen, and for -- do the precustomer screening
17  checks on, and they would draft the processes for
18  their staff to follow.
19    For example, their standard users doing
20  searches and their complex users in reviewing any
21  results, they would draft those processes and
22  implement with their staff.
23    Q.   So what could they change about the way
24  the Goalkeeper system ran?
25    A.   They wouldn't change the system itself.

Page 60

1  They might change the way they implemented it and
2  the procedures around it.
3    Q.   In other words, they had --
4    They could change the way particular users used
5  the system?  Is that right?
6    A.   They could choose, yeah, so potentially
7  which client groups, which types of accounts they
8  would actually use the screening for --
9    That's the sort of thing that they would
10  change -- potentially change policy and procedure
11  for.
12    Q.   Okay.  Just a minute.  Just a minute.
13    Who decided who had access to the Goalkeeper
14  system?
15    A.   That was decided at the Project Control
16  Committee meetings.  Each business area would have a
17  business authorizer, so that would be somebody of a
18  senior position, more often than not -- more often
19  than not in a compliance or a risk function who
20  would determine the appropriate people, the
21  appropriate roles for a simple user and complex
22  user.
23    They would then put a form through to the
24  administrators of the Goalkeeper system requesting
25  that specific users be set up, and then IT would set

EXHIBIT 12 TO DECLARATION OF VALERIE SCHUSTER

FILED UNDER SEAL

**Page 1**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
Action No: 05cv4622(DGT)(MDG)

- - - - - - - - - - - - - - - - - - - -

TZVI WEISS, et al,
           Plaintiffs,
against
NATIONAL WESTMINSTER BANK, PLC.,
           Defendant.

- - - - - - - - - - - - - - - - - - - -

NATAN APPLEBAUM, et al.,
           Plaintiffs,
against
NATIONAL WESTMINSTER BANK, PLC.,
           Defendant.


VIDEOTAPED DEPOSITION OF IRVINE RODGER
Thursday 22 July 2010
At: 10:00 am
Taken at:
Cleary, Gottlieb, Steen & Hamilton LLP
55 Basinghall Street, London
United Kingdom


HIGHLY CONFIDENTIAL      2

**Page 2**

```
 1          A P P E A R A N C E S
 2  For Plaintiff Tzvi Weiss:
 3       ARI UNGAR
 4       Osen LLC
 5       700 Kinderkamack Road
 6       Oradell, NJ 07649
 7       Tel: 201 265 6400
 8
 9  For Plaintiff Tzvi Weiss:
10       AITAN GOELMAN
11       Zuckerman Spaeder LLP
12       1800 M Street, NW, Suite 1000
13       Washington, DC 20036-5807
14       Tel: 202 778 1996
15  For Defendant National Westminster Bank, PLC:
16
17       AVRAM E. LUFT and VALERIE SCHUSTER
18       Cleary, Gottlieb, Steen & Hamilton LLP
19       One Liberty Plaza
20       New York, NY 10006-1470
21       Tel: 212 225 2432
22
23  Also Present:
24
25  COURT REPORTER:
26
27       AILSA WILLIAMS
28       European Deposition Services
29       59 Chesson Rd
30       London, W14 9QS
31       Telephone: 44 (020) 7385 0077
32       VIDEOGRAPHER: FLOYD HUMPHREY
33
34
35
36       HIGHLY CONFIDENTIAL        3
```

**Page 3**

```
 1              I N D E X
 2  IRVINE RODGER ... ... ... ... ... ... ... ....6
 3  DIRECT EXAMINATION BY MR. ... ... ... ... ...6
 4  GOELMAN:
 5
 6          INDEX OF EXHIBITS
 7  Rodger 1 NW014458-59 ... ... ... ... ... ... ...30
 8  Rodger 2 NW088194-97 ... ... ... ... ... ... ...38
 9  Rodger 3 NW051168-69 ... ... ... ... ... ... ...47
10  Rodger 4 NW051994-97 ... ... ... ... ... ... ...65
11  Rodger 5 NW012925-38 ... ... ... ... ... ... ...68
12  Rodger 6 NW000130-143 ... ... ... ... ... ... ...74
13  Rodger 7 Press Release ... ... ... ... ... ...83
14  Rodger 8 NW013052 ... ... ... ... ... ... ...89
15  Rodger 9 NW185976 ... ... ... ... ... ... ...91
16  Rodger 10 NW014038-48 ... ... ... ... ... ...91
17  Rodger 11 NW014013 ... ... ... ... ... ... ...94
18  Rodger 12 NW013701 ... ... ... ... ... ... ...95
19  Rodger 13 NW013939-41 ... ... ... ... ... ... 100
20  Rodger 14 NW017151-54 ... ... ... ... ... ... 107
21  Rodger 15 NW018476-83 ... ... ... ... ... ... 149
22  Rodger 16 NW017191-95 ... ... ... ... ... ... 159
23  Rodger 17 NW066847-52 ... ... ... ... ... ... 175
24  Rodger 18 NW067946-47 ... ... ... ... ... ... 189
25  Rodger 19 NW066844-46 ... ... ... ... ... ... 196
26  Rodger 20 NW066807-13 ... ... ... ... ... ... 202
```

**Page 4**

```
 1  Rodger 21 NW066721-23 ... ... ... ... ... ... 213
 2  Rodger 22 NW066795-96 ... ... ... ... ... ... 220
 3  Rodger 23 NW181032-35 ... ... ... ... ... ... 225
 4  Rodger 24 NW066777-79 ... ... ... ... ... ... 233
 5  Rodger 25 NW069060-62 ... ... ... ... ... ... 241
 6  Rodger 26 NW066764-69 ... ... ... ... ... ... 243
```

Page 13

1 it is the case that some firms at the time were not
2 actually complying as well as they could have done, so
3 that is why I was reviewing -- sanctions and terrorism
4 just didn't apply.  This was 2000 --
5        Q.  When you were picked to head the MLPU, and
6 if I say that you will understand I mean Money
7 Laundering Prevention Unit?
8        A.  Yes.
9        Q.  In 2002, did you get any training in
10 Anti-money Laundering or Terror Financing Compliance
11 measures?
12        A.  I got general training, joining various
13 industry courses.  The British Bankers Association held
14 Money Laundering courses and such like, but certainly
15 mostly it was a chance for me just to get stuck in
16 really, because there was things to do.  It was fairly
17 obvious there was things to do.
18        Q.  When you say you joined various industry
19 courses, you mean you enrolled in courses?
20        A.  Yes.  Obviously they advertise courses for
21 Money Laundering professionals, and they are quite
22 regular, so you would say: "Okay, I would like to do
23 that course."
24        Q.  Do you remember any particular courses?
25        A.  They were all generic, nothing was

Page 14

1 specialist.
2        Q.  And these were courses that were provided
3 by the British Bankers Association?
4        A.  Yes.  It could be Linklaters had a course,
5 I was briefly on it.  Again, it was for everyone, it was
6 not specialized.  It was for the market on a generalist
7 kind of basis.  Nothing was bespoke or in depth.
8        Q.  When did you first take one of those
9 courses?
10        A.  I can't recall.
11        Q.  Is that something you have been doing
12 throughout your career or just after you became head of
13 the MLPU?
14        A.  You always maintain your technical
15 knowledge, as things happen, particularly the UK focus,
16 because that is our primary responsibility is UK, but
17 also we need to be aware of developments in other
18 regions of the globe.
19        Q.  When you got the job as head of the MLPU
20 at RBS, what was your understanding of your
21 responsibilities?
22        A.  You said "Head of MLPU at RBS".  That is
23 misleading because it was not RBS, it was what was
24 called Corporate Banking Financial Markets Division of
25 RBS, so it is different from RBS.  My role was to ensure

Page 15

1 the best degree of compliance with three strands which
2 were under my control, which were the sanctions, the
3 money laundering, anti-money laundering and the data
4 protection, which was a bit of an outlier, but that was
5 there as well.
6        Q.  At that point did your responsibility for
7 anti-money laundering also encompass measures to combat
8 terror financing?
9        A.  Yes, terror financing.
10        Q.  Did you receive any particular training in
11 terms of combating terror financing?
12        A.  Not more than what I have already
13 described, like the training courses I did.  When I took
14 the role, there were various courses which are out there
15 in the marketplace, so generalist courses, nothing
16 specific.
17        Q.  You said that you were head of the MLPU
18 for the Corporate Banking and Financial Markets
19 Division, is that right?
20        A.  Yes.
21        Q.  Did each division of RBS have its own MLPU
22 as of 2002?
23        A.  Each division of RBS will have had
24 different arrangements.  The view within CBFM was to
25 create a centralized team, which was a center of

Page 16

1 excellence really effectively for the division.  Other
2 divisions tended to have smaller teams throughout the
3 business.  The CBFM took the view it was better, one
4 centralized team that had overall responsibilities,
5 which I think was the right decision.
6        Q.  When you say it was a center of excellence
7 for the division, what do you mean by that?
8        A.  It was the one team within the division
9 which was the team which was responsible for compliance
10 with AML and sanctions, and can be regarded as the kind
11 of -- it is the one team that is the undoubted authority
12 for compliance, and if there was anything we could not
13 do, we would obviously escalate it to Group or whatever
14 else.
15        Q.  And you believe from your experience that
16 this system with the centralized team is more effective
17 in Anti-money Laundering Compliance than the more
18 diffuse authority that was in the other divisions?
19        A.  Yes, I think so.  Other divisions followed
20 the CBFM approach to have more centralized, so I think
21 it was recorded as being the way forward.  So I don't
22 think there is any part of -- to this day I don't think
23 there is any part of the Group which would want to turn
24 back the clock, having a diffuse way to manage AML,
25 because the skills are fairly specialist and you cannot

4 (Pages 13 to 16)

**Page 25**

1  to understand and make sure that the infrastructure and
2  the controls in place are adequate in order to achieve
3  the aim of reducing financial crime within the UK
4  market.
5      Q. Do you have an understanding of what OFAC
6  is?
7      A. Yes.
8      Q. What is the basis for your understanding?
9      A. It is the Office of Foreign Assets
10  Control. It is a function of the US Treasury. Its role
11  is to oversee the sanctions regime within the US. There
12  is lots of other as well and designated powers in other
13  countries probably. I am not the greatest expert on
14  OFAC, but that is basically what it is.
15      Q. And what is the source of the knowledge
16  that you do have about OFAC? How do you have that
17  understanding?
18      A. The knowledge would have been built up
19  through various contacts over the years, speaking to
20  various persons, and also the training courses I have
21  been referring to would refer to OFAC. So just from
22  a variety of sources. There was not one single event,
23  "This is OFAC", it was all one big new thing. I knew
24  what OFAC was right from the beginning, a fairly
25  prominent organization.

**Page 26**

1      Q. As head of the MLPU between 2002 and --
2  are you still head of the MLPU?
3      A. It has changed its name now, it is
4  Compliance now, but effectively it is the same.
5      Q. As head of the MLPU for a division that
6  has significant US operations, did you have contact with
7  American personnel working in the AML space?
8      A. When the role began back in 2002, it was
9  basically a UK focused role, but with an add-on to have
10  limited degree of oversight over the global regions.
11  The US operations effectively at the time were a New
12  York branch, plus Greenwich Capital. They more or less
13  managed their sanctions and money laundering risks
14  themselves. They didn't require me to add anything to
15  it because they were fully established, but I would have
16  the contact with them to see if there was anything which
17  was relevant that I needed to know about.
18      Q. How frequent was that contact back in say
19  2002/03?
20      A. I would say, 2002/03, once a quarter. Not
21  much. It was not a major part of my role.
22      Q. Did your job as head of the MLPU require
23  you to travel to the United States on business now and
24  again?
25      A. I travelled to New York branch once.

**Page 27**

1      Q. Once in all the time you have been head of
2  the MLPU?
3      A. Yes. Guy Cole, one of the roles which
4  I awarded Guy was that he would have responsibilities
5  for North America region of the world, so he travelled
6  to the US every year, annually.
7      Q. Did he travel to the US for a particular
8  conference or seminar or did he just go to visit the
9  operations in the US?
10      A. He visited the operations, but I recall he
11  did attend a conference in Las Vegas, which was
12  a technical conference. I think it was ACALPS I think,
13  Association of Chartered Anti-money Laundering
14  Professionals, I can't remember. It is an organization
15  such as that, a fairly well regarded conference.
16      Q. Do you know whether when Mr. Cole went to
17  that conference annually?
18      A. No, it was just the once, he only went the
19  once. All the time he was there he went to one
20  conference but he used to review the New York branch on
21  an annual basis.
22      Q. Do you recall the year that Mr. Cole
23  attended that conference in Las Vegas or approximately
24  what year it was?
25      A. I would say it was 2006 or thereabouts.

**Page 28**

1      Q. Do you understand that OFAC places certain
2  restrictions on US persons?
3      A. Yes.
4      Q. Do you know what a US person is, according
5  to American law?
6      A. A US person is a US national or a US
7  resident person. So it can be, if I were working in the
8  US I would be regarded as a US person, if I was there
9  for a year or longer, I imagine I would be regarded as
10  a US resident and I would be captured by these laws. I
11  am not 100 percent certain, but that is my
12  understanding.
13      Q. Are you familiar with USA Patriot Act?
14      A. Yes.
15      Q. Have you ever attended any training or
16  seminars that dealt in any way with the USA Patriot Act?
17      A. Nothing specifically on the USA Patriot
18  Act, although it would have been mentioned in passing in
19  some of the --
20      Q. What is the extent of your familiarity
21  with USA Patriot Act?
22      A. My understanding of the USA Patriot Act
23  will just probably be those provisions which are
24  relevant to my role, which are basically the need to
25  have customer identification programs in place. That is

Page 37

1    Q. Are you thinking of other people within
2  the MLPU?
3       A. Other people within MLPU, more or less
4  other people within MLPU. Mainly it was other people
5  within MLPU that would have regard to, if anything -- if
6  we became aware of any other opinions, strong opinions,
7  they would be taken into account, but basically it was
8  my judgment that brought on what the high risk countries
9  need to be ultimately.
10      Q. You listed before a number of people who
11  worked for you in the MLPU. Did you have a deputy or
12  was there any kind of hierarchy in terms of seniority
13  within your unit?
14      A. I have a very flat structure. I believe I
15  am the manager, I just call myself "manager", nothing
16  more fancy than that, and everyone else are also
17  managers, just I am more equal than the rest of them.
18  And then of that Richard Jones was more equal, was even
19  more equal than the rest of them as well, because he is
20  my deputy.
21      Q. So when you say "senior people within
22  MLPU", you are talking about people that have just been
23  there for longer?
24      A. People that have proved themselves to
25  possess good judgment and got things done, quality of

Page 38

1  work was high, then they would be regarded as senior,
2  they would be in the inner sanctum, whereas the other
3  people might not reach that stage.
4       Q. Okay. I am going to mark another exhibit.
5       (Exhibit Rodger 2 marked for identification)
6       Can you mark that as Rodger 2, please. This is
7  Bates stamped NW88194 through 88197. Again, Mr. Rodger,
8  just take a look at this and tell me after you have had
9  a chance to do that. You don't necessarily need to read
10  every word.
11      A. Okay.
12      Q. Does that appear to be an e-mail from
13  a woman named Dedrei Nell at Group Risk Management to
14  a whole list of people?
15      A. Yes.
16      Q. And is it fair to say that throughout your
17  tenure at RBS the bank used e-mails to communicate
18  internally as part of its regular business process?
19      A. Yes.
20      Q. Do you see your name at the top part of
21  the e-mail list of addressees in the "To" list?
22      A. Yes.
23      Q. And do you know who Dedrei Nell is?
24      A. She worked for Stephen Foster in his AML
25  group, AML team.

Page 39

1    Q. Did you regularly get lists, consolidated
2  lists of sanctions and terrorism names from Ms Nell?
3       A. There would be ad hoc ones and there would
4  be quarterly ones. By definition there would be four
5  a year, plus the ad hoc ones.
6       Q. There would be at least four a year and
7  maybe intervening ones?
8       A. There could be, between each consolidated
9  search, there might be some big desire to search other
10  names, screen other names, in which case these will be
11  added, and then they would be consolidated into the next
12  one.
13      Q. What would CBFM do with these consolidated
14  lists when they received them?
15      A. CBFM customers are recorded in Group
16  systems, which can be searched at Group level, but
17  within the division there are also databases of
18  customers which exist within the division, they cannot be searched at Group
19  level. They need to be searched at divisional level,
20  and that is what these are designed to achieve.
21      Q. Who within CBFM would be doing that
22  searching?
23      A. The process is that we have identified the
24  various databases existing within the division, the
25  databases having been identified within the division, by

Page 40

1  reference to the org chart, you look at the org chart
2  and you would investigate each person, to see are there
3  any customer databases within that person's authority,
4  and you would just keep on investigating it downwards
5  like that, and you end up having a complete 100 percent
6  picture of the databases within the division. Then,
7  when you have identified a database, then you assign
8  someone the responsibility to be in charge of
9  interrogating that database and reporting back to us if
10  there are any matches on these consolidated search
11  requests.
12      Q. You are using the word "you". You say
13  "when you have identified a database you assign
14  someone". When you say "you", are you talking about
15  MLPU?
16      A. Yes, MLPU.
17      Q. So MLPU's role in searching was to figure
18  out what person had access to the relevant database and
19  make sure that the searching was done?
20      A. The MLPU's role is to identify the
21  databases and assign responsibility on someone to search
22  these databases on request.
23      Q. And then, if there was a match, would that
24  information be sent to MLPU for further investigation?
25      A. Matches would be referred to us, yes.

Page 77

1 actual match and needs to be reported to Group and to
2 the authorities?
3       A. So what was the question again, please,
4 sorry?
5       Q. Whether the MLPU would, when they were
6 investigating potential matches to the list, look to see
7 if there were any previous investigations on that
8 particular customer?
9       A. Clearly, if there was an actual match then
10 that would be the case, but if it was a false positive
11 then that wouldn't be required.
12       Q. Do you see on page 142 where it says
13 "Phase 4"?
14       A. Yes.
15       Q. It says: "Objective: to review all the
16 evidence held in respect of names where Phase 3 due
17 diligence has been undertaken."
18       A. Um hum.
19       Q. And then under there it says: "Reference
20 to a 'Cross Business' Panel, or equivalent".
21       A. Yes.
22       Q. Are you familiar with that phrase, a
23 "Cross Business Panel"?
24       A. No.
25       Q. It says here: "A Cross Business Panel

Page 78

1 should consist of appropriately senior representatives
2 from relevant business areas, and the following
3 divisional functions, as appropriate."
4       Then it lists five different divisional functions.
5 Do you see that?
6       A. Yes.
7       Q. Did you in your work as head of the MLPU
8 ever assemble a Cross Business Panel or equivalent that
9 consisted of representatives from those divisional
10 functions?
11       MR. LUFT: Objection, foundation.
12       A. Do I answer?
13       Q. Yes, please.
14       A. Sorry.
15       MR. LUFT: For clarity, if I think you should
16 not answer I will instruct you not to answer.
17       A. Okay, yes. Remind me what the question
18 was, please.
19       Q. Whether you in your work as head of the
20 MLPU ever assembled a "Cross Business Panel or the
21 equivalent" that consisted of representatives from these
22 divisional functions?
23       A. All five functions together, no.
24       Q. Some of those functions?
25       A. Depending on the case, it could well be

Page 79

1 that Legal would be consulted, other times Operational
2 Risk. It depended on the case itself. Obviously, if it
3 was a case there Operations would not have had any
4 insight into it then there was no relevant need for
5 this.
6       Q. Why didn't you ever assemble a Cross
7 Business Panel with representatives from all of those
8 divisional functions?
9       MR. LUFT: Objection, calls for speculation,
10 lack of foundation.
11       Q. You can answer.
12       A. When there are exact matches, it is clear
13 that it is an exact match, in my opinion, there is
14 little benefit from compiling five people to
15 a conference to discuss something, where the answer
16 actually -- the result is clear. If I were to do that I
17 can imagine that that would be communicated to me, there
18 was no benefit to be gained.
19       Q. You can put that exhibit down now, Mr.
20 Rodger. Are you familiar with a CBFM customer called
21 Interpal?
22       A. Yes.
23       Q. Also known as the Palestinian Relief and
24 Development Fund?
25       A. Yes.

Page 80

1       Q. When did you first hear of Interpal?
2       A. When OFAC designated that as a terrorist
3 organization.
4       Q. How did you hear of OFAC's designation of
5 Interpal?
6       A. I can't recall the exact chain of events
7 but what I do recall is communications from the relevant
8 Group function, advising us that Interpal was a customer
9 of CBFM, and that is how I heard about it.
10       Q. Wouldn't CBFM have advised Group that
11 Interpal was a customer?
12       A. No, because this was a hot hot topic. I
13 think -- my memory has been jogged -- that there was
14 a press article that NatWest had an account with
15 Interpal, and that resulted in Group escalating it down.
16       Q. Was this the first time that one of CBFM's
17 customers was designated a terrorist by OFAC?
18       A. I do not recall any other ones.
19       Q. Had you in or about 2003 heard of
20 a customer of any other division of the bank that was
21 designated an SDGT by OFAC?
22       A. No.
23       Q. When you heard of the designation of
24 Interpal, what was your understanding of what such
25 a designation meant?

Page 81

1      MR. LUFT: Objection, vague.
2      A.  OFAC was of the opinion that the account
3  should be closed, if it was in the US.  Obviously, it is
4  a US office, US function, it was a US organization.  If
5  it was based in New York, it would be closed.
6      Q.  Did you understand that, by designating
7  OFAC, the Government of the United States was
8  alleging -- withdrawn.  Did you understand that by
9  designating Interpal as a specially designated global
10  terrorist that the Government of the United States was
11  making clear its belief that Interpal was involved in
12  terrorism?
13      A.  Yes.
14      Q.  Did you talk to anybody at the bank about
15  the effect of an OFAC listing on a customer of CBFM?
16      MR. LUFT: I will just caution you that you
17  should exclude any conversation you may or may not have
18  had with lawyers.  So if it was with a lawyer it is
19  privileged, otherwise you can answer.
20      A.  Can you remind me what the question was?
21      Q.  Whether you talked to anybody at the bank
22  about the effect of OFAC listing a customer of CBFM?
23      A.  I do not recall, but it is likely I would
24  have had -- it would have been referred to.  It would
25  have been referred to when it happened.

Page 82

1      Q.  Okay.  When you say "it would have been
2  referred to"?
3      A.  What I mean by that is that, just talking
4  about it hypothetically, when Interpal got designated,
5  I would have asked the question: "What does this mean
6  for CBFM?"
7      Q.  To whom would you have asked that
8  question?
9      A.  I do not recall.
10      Q.  Your attorney noted that there are
11  questions about communications that you had with
12  lawyers.  He doesn't want you to answer those questions,
13  okay, so I want to ask you if any of these people are
14  lawyers or what position these people held with the
15  bank.  Okay, do you know Steve Arkley?
16      A.  No.  Arkey or Arkley?
17      Q.  Arkley?
18      A.  Arkley, yes.
19      Q.  Who is he?
20      A.  He is a business manager for the
21  commercial business of CBFM.
22      Q.  Not an attorney?
23      A.  No.
24      Q.  Julie Aspinall was one of the people who
25  worked for you?

Page 83

1      A.  Yes.
2      Q.  Not an attorney?
3      A.  No.
4      Q.  Fiona Miller?
5      A.  Someone from Group, not an attorney.
6      Q.  Did you speak or otherwise communicate
7  with any of these people after the OFAC designation of
8  Interpal about the effect of that designation?
9      A.  I do not recall.
10      Q.  Whether or not you recall speaking with
11  these people, do you recall learning what the impact on
12  CBFM of such a designation was?
13      MR. LUFT: Objection, assumes facts not in
14  evidence.
15      A.  I do not recall.
16      Q.  I am going to hand the court reporter
17  a document I will ask be marked Rodger Exhibit 7,
18  please.
19      (Exhibit Rodger 7 marked for identification)
20      For the record, this is a printout from the US
21  Treasury website containing a press release dated August 23,
22  2003.  I am sorry, August 22, 2003.
23      First, Mr. Rodger, have you ever seen this
24  document before, whether on paper or on a computer
25  screen?

Page 84

1      A.  No.
2      Q.  Did you understand when you found out that
3  Interpal had been listed by OFAC as an SDGT that the
4  allegation was that they had raised funds for Hamas?
5      A.  I understood that was the allegation when
6  I read about -- obviously not by just the Interpal being
7  an SDGT, I needed to know more information, but I would
8  have read that was the reason why, so at that point
9  I did know.  Just to clarify, I didn't know
10  straightaway.  I had to know, understand why Interpal
11  was being listed.
12      Q.  Where would you have gone to for more
13  information that you needed?
14      A.  The information would have been public
15  information that Interpal was -- it wouldn't be --
16  public information in the sense that it was in the -- I
17  don't recall.  Group would have -- just to be clear,
18  Group would have advised whether it was -- what the
19  designation meant.  I doubt if it hit the media anyway,
20  so I withdraw the comment that it would have been public
21  information, because I suspect it wouldn't be in the
22  public, so I withdraw that.
23      Q.  In August 2003, were you aware that OFAC
24  had a website?
25      A.  Yes.

Page 85

```
 1        Q.  Did you go to that website after learning
 2   that one of CBFM's customers had been designated
 3   a terrorist by OFAC?
 4        A.  No.
 5        Q.  Why not?
 6        A.  I don't regard that as being material to
 7   the activities of CBFM, MLPU's business in the UK.
 8        Q.  I am sorry, I did not understand that
 9   answer.
10        A.  Maybe I didn't explain it very well.  I
11   didn't regard it as relevant to the UK situation.
12        Q.  You didn't regard what OFAC had concluded
13   about one of your customers to be relevant to CBFM's
14   situation?
15        A.  The designation as such was not -- in
16   actual fact, Interpal was designated by OFAC was
17   material, because obviously we would have regard to what
18   OFAC has to say about a customer, but in terms of
19   taking action -- perhaps I am going ahead of the
20   questions -- with regard to possibly exiting the
21   Interpal account, the relevant authority in the UK is
22   obviously the Bank of England.  That is what I meant.
23   But obviously OFAC would be relevant, but Bank of
24   England is --
25        Q.  But when you learned that OFAC had
```

Page 86

```
 1   designated one of your customers a terrorist, didn't you
 2   want to know why OFAC had so designated the customer?
 3        MR. LUFT:  Objection, misstates his prior
 4   testimony.
 5        A.  The reason for OFAC assessing Interpal as
 6   a terrorist organization, I can't recall exactly what my
 7   train of thought was at the time, but I imagine that
 8   someone on the team would have asked the question.
 9   I would have asked the question of someone on the team
10   to find out a wee bit more.
11        Q.  And how would that person have found out
12   "a wee bit more"?
13        A.  Possibly that person --
14        MR. LUFT:  Objection, calls for speculation.
15   You can go ahead and answer.
16        A.  That person, to be honest, I do not know.
17        Q.  Sitting here today, you don't have any
18   recollection of asking anybody to find out why OFAC had
19   decided to designate one of your customers as
20   a terrorist organization?
21        A.  It was one moment from 9 years ago,
22   whenever it was, I can't recall.
23        Q.  But this was the only occasion during
24   your --
25        A.  Yes, but lots of things happen.  I don't
```

Page 87

```
 1   just exist to wait for this to happen.  If it was the
 2   only thing I had to do, then yes, it would be something
 3   I would recall, but lots of things happen on a daily
 4   basis.
 5        Q.  I am going to ask that -- I know it is
 6   hard but I am going to ask that you wait until I am
 7   finished the question before starting your answer, and I
 8   will try to wait until you are done your answer before
 9   I start a question, so the court reporter can get
10   everything down.  Okay?
11        Would you say that this was an unusual
12   occurrence, to have one of CBFM's customers designated
13   as a terrorist by the United States Government?
14        MR. LUFT:  Objection, vague and ambiguous.
15        A.  The designation of Interpal was an unusual
16   instance.  There were no other instances I can recall.
17        Q.  And was the designation of one of your
18   customers by the United States Government as a terrorist
19   something that, as manager of the MLPU, was significant
20   to your job?
21        MR. LUFT:  Objection, vague and ambiguous.
22        A.  It was something that I needed to know,
23   have knowledge of.
24        Q.  Can you answer my question now?
25        MR. LUFT:  Objection, he did answer the
```

Page 88

```
 1   question.  Is there something you are looking for.
 2        Q.  I want to know if the designation of one
 3   of your customers by the United States Government as a
 4   terrorist was something that as manager of the MLPU was
 5   significant to your job?
 6        MR. LUFT:  Objection, vague and ambiguous.
 7        A.  I do not understand what you mean by
 8   "significant".
 9        Q.  Important?
10        A.  "Important".  It was certainly an
11   important fact to know that OFAC designation, so
12   therefore it was important to me that I was aware of
13   that.  I don't know whether that is answering the
14   question.
15        Q.  Was it important to know, not just the
16   fact of the designation but the reason for the
17   designation?
18        A.  Yes, because the designation implied that
19   the reason for the OFAC's designation was for a purpose
20   and was for a reason, rather, correction, and it was
21   important that I understood that reason.
22        Q.  Can you please mark this as Rodger
23   Exhibit 8.
24        (Exhibit Rodger 8 marked for identification)
25        For the record, this is a one page e-mail Bates
```

Page 113

1    Q.  May 6, 2004, Mr. Cole sends an e-mail to
2  Mr. Norrie.  Do you see, right above where you read
3  before, it says:
4        "The Relationship Manager is aware of the
5  potential terrorism connections with this account, and
6  liaised with Derek Brand during the account freeze."
7        Do you understand the Relationship Manager to be
8  a reference to Belinda Lane?
9    A.  Yes.
10    Q.  Why would CBFM want to keep an account
11  open when it was aware of potential terrorism
12  connections with that account?
13    MR. LUFT:  Objection.
14    A.  The situation regarding Interpal was that
15  it hadn't been listed by Bank of England, and one would
16  presume, which I don't know whether this is the case,
17  Bank of England would have done its own investigation.
18    Q.  But if as the e-mail states the
19  Relationship Manager was aware of the potential
20  terrorism connections, wouldn't that be in itself
21  a reason for the bank to exit the relationship?
22    MR. LUFT:  Objection, foundation.
23    A.  I do not understand what Guy means.
24    Q.  By "Potential terrorism connections"?
25    A.  Yes.

Page 114

1    Q.  So do you disagree with the statement that
2  as of May 6, 2004 Belinda Lane was aware of the
3  "Potential terrorism connections with the Interpal
4  accounts?
5    A.  Belinda will have been --
6    MR. LUFT:  Objection, vague and ambiguous,
7  since he does not understand what that term means.
8    A.  Belinda would have been aware of the OFAC
9  designation.
10    Q.  Um hum.  And do you agree that the OFAC
11  designation was at least enough to alert the bank of
12  potential terrorism connections?
13    MR. LUFT:  Objection, foundation.
14    A.  The bank -- I can't speak for how the bank
15  would have regarded that, to be honest.  All I would say
16  is the bank would be aware of the OFAC designation.
17    Q.  Can you tell me whether you regarded an
18  OFAC designation as enough to be aware of potential
19  terrorism connections with regard to Interpal
20  in May 2004?
21    A.  It is clear to me that OFAC did have
22  concerns, terrorist connection concerns.  Bank of
23  England didn't, because of their reaction not to list
24  it.  So that is the position that we were in, and Bank
25  of England was the relevant authority that would

Page 115

1  determine how we proceed.
2    Q.  Okay.  Did you personally regard an OFAC
3  designation, and with the understanding that the Bank of
4  England had not listed Interpal as of May 2004, did you
5  regard an OFAC designation of Interpal as an SDGT to be
6  sufficient to at least qualify as awareness of
7  a potential terrorism connection?
8    A.  The OFAC designation was material because
9  OFAC had determined that it considered there were
10  terrorist connections, so that was something that would
11  have been considered.
12    Q.  And would it in your opinion have been
13  enough to conclude that there were at least potential
14  terrorism connections with Interpal?
15    MR. LUFT:  Objection, asked and answered.
16    A.  I think the questions -- OFAC may have
17  terrorist connections, recorded them, the bank was aware
18  of these, Bank of England didn't make these connections.
19  So the OFAC designation would be one view of OFAC but
20  the material view was the Bank of England one, being
21  a UK bank.
22    Q.  When you say "the material view of the
23  Bank of England", what do you mean, "the material view"?
24    A.  It was not a very good word, I realized as
25  soon as I said it.  I realized "material" was not the

Page 116

1  right word.  Because NatWest/RBS are both UK banks, as
2  UK banks they need to comply with UK laws.  That is what
3  I meant by "material".  "Salient" might have been
4  a better word.
5    Q.  The salient view is the one of Bank of
6  England, not of OFAC?
7    A.  Being UK banks, yes.
8    Q.  Reading on, it says:
9        "Although diligent in their interaction with the
10  customer, the RM has no ability to filter or efficiently
11  monitor payments".
12        So is it fair to say that not only was CBFM aware
13  of potential terrorism connections with Interpal, it was
14  also aware that it had no ability to filter or efficiently
15  monitor payments made by Interpal?
16    MR. LUFT:  Objection, compound, misstates the
17  document, misstates the prior testimony.
18    Q.  Do you need the question read back to you?
19    A.  Yes, say it again.  There was two
20  questions I think.
21        (Read back)
22    A.  With regard to the first line, "potential
23  terrorist connection allegations", I would say with
24  regard to Interpal, and secondly, for the payments going
25  out, that is correct, realtime payment filtering was not

Page 129

1  testimony, confusing.
2      A. The bank would not keep the account open
3  if it was funding terrorism, end of story, absolutely no
4  doubt.
5      Q. My question was whether you believed
6  in May 2004 that if there was an identifiable reason for
7  the bank to close the account then there wouldn't be the
8  same risk of negative publicity that you talked about
9  for if the bank closed it without an identifiable
10 reason?
11     A. If there was an identifiable reason to
12 close the account then there would be no concerns
13 regarding the Muslim minority. It would be irrelevant,
14 because the key thing is the financing of terrorism.
15     Q. And you did not regard the designation by
16 OFAC of Interpal as an SDGT to be an identifiable reason
17 to close the account. Is that true?
18     A. It was Bank of England did not regard then
19 that designation as being a reason to list Interpal. It
20 was not my decision. I am not GOFI. The resources of
21 Bank of England and OFAC can make that judgment, so all
22 you can do is rely on others that do.
23     Q. Are you saying that the only identifiable
24 reason to close the account would be if Bank of England
25 listed Interpal as a terrorist organization?

Page 130

1      MR. LUFT: Objection, misstates his prior
2  testimony.
3      A. If Bank of England decided to list that
4  account there wouldn't be a debate, the account would be
5  closed. Regardless of any disquiet in the Muslim
6  community, it would be closed, end of story. Without
7  that Bank of England decision, the UK Government
8  presumably did not regard Interpal as being an account
9  worthy of closure, and I don't know the circumstances,
10 but European Union didn't follow OFAC either.
11     Q. If the Bank of England or the European
12 Union had listed Interpal as a terrorist organization,
13 the bank would have been compelled to close the account,
14 true?
15     A. Yes.
16     Q. It wouldn't have required any use of
17 judgment on the bank's part, right?
18     A. Yes.
19     Q. You wouldn't have had any discretion to
20 leave the account open, true?
21     A. Yes.
22     Q. My question is, are there identifiable
23 reasons to close the account, even if you are still
24 legally entitled in the UK to operate the account?
25     MR. LUFT: Objection, vague.

Page 131

1      A. I don't know.
2      Q. Can you look at Mr. Foster's e-mail right
3  above the e-mail we were just looking at. He writes:
4      "Guy, Ben is away all week so I am replying on
5  this. You are correct that filtering is a group wide issue
6  and that is why we have been working with key stakeholders
7  like Payment Operations to develop the policy and
8  capability. This continues and we know that it is a very
9  important element of our counter-terrorism efforts".
10     Would you agree that filtering is a very important
11 element of counter-terrorism efforts?
12     A. Yes.
13     Q. And nevertheless is it true that
14 in May 2004 RBS didn't have filtering capability?
15     MR. LUFT: Objection, mischaracterizes the
16 document.
17     A. RBS Group didn't have filtering
18 technologies back in 2004, not adequate ones.
19     Q. And that was more than two and a half
20 years after the attacks of 9/11?
21     A. Yes.
22     Q. Was that a concern to you, in May 2004?
23     A. The fact that the bank didn't have
24 filtering arrangements in place at that time was not out
25 of line with the other players in the UK market.

Page 132

1      Q. Was the bank's lack of that capability of
2  concern to you, in May 2004, as head of the MLPU?
3      A. I don't recall.
4      Q. Mr. Foster goes on to write Mr. Cole,
5  last sentence in the second paragraph:
6      "You are right to highlight the reputational
7  issues but if management decide they don't want the
8  relationship, there are ways to exit that might not
9  cause a problem."
10     When you received this e-mail from Mr. Foster
11 in May 2004, did you understand him to agree with
12 Mr. Cole that reputational issues to the bank were
13 important?
14     MR. LUFT: Objection, misstates the document.
15     A. I honestly do not recall.
16     Q. Mr. Foster writes:
17     "There are ways to exit that might not cause
18 a problem."
19     Do you see that?
20     A. Yes.
21     Q. Do you know what ways to exit Mr. Foster
22 had in mind?
23     A. Absolutely no idea. I would be
24 interested. I would like to ask that question to
25 Mr. Foster.

Page 133

1    Q. What are the different ways of exiting
2 that were available to the bank in May 2004?
3        MR. LUFT: Objection, foundation.
4    Q. If you know.
5    A. I have no idea. I am completely bemused
6 by that sentence.
7    Q. Can you turn to the next e-mail, the one
8 that Guy Cole wrote to you and others on May 20, 2004,
9 which begins on the first page of Rodger 14.
10    A. The one that begins "You are correct"?
11    Q. No, it begins "We have ascertained..."
12    A. Sorry, yes.
13    Q. I want to refer you to the second
14 paragraph, where it starts with "From my trawls for
15 information..." Do you see that?
16    A. Yes.
17    Q. It says:
18    "From my trawls for information on the
19 Internet I have not found any information that
20 substantiates, beyond opinion, that Interpal has made
21 payments to terrorist groups."
22    Do you see that?
23    A. Yes.
24    Q. What was your understanding as to what
25 Mr. Cole meant by "opinion"?

Page 134

1    A. Quite often on the Internet you will get
2 tittle tattle, and that is probably what he means,
3 unsubstantiated rumor and such like.
4    Q. Okay. "Tittle tattle" was that your --
5    A. Yes, tittle tattle. I will think of
6 something more American friendly -- "gossip".
7    Q. Gossip, okay. Did you regard an OFAC
8 designation as tittle tattle?
9    A. No.
10    Q. Did you regard an OFAC designation as
11 opinion?
12    A. No. Well, yes, in the sense it was an
13 opinion of the US Government.
14    Q. "It appears the perspective taken by
15 Israel towards Interpal and other charities
16 operating/funding schools/orphanages/hostels in
17 Palestine and Gaza, is that these charities perpetuate
18 terrorism, as terrorists know that if they die their
19 dependants will be looked after by charities."
20    Did you understand this reference to be to suicide
21 terrorists who would commit acts of terrorism that they
22 expected to die in?
23    A. I took this to mean any person, any
24 terrorist who dies in the conduct of their terrorism,
25 not specifically any kind of terrorism.

Page 135

1    Q. Mr. Cole writes:
2    "This charity is the predominant UK charity
3 providing relief in this region, it hosted and funded a
4 visit by British MPs to the region in 1998. Looking at the
5 accounts, there are also a large number of small (e.g 2
6 pound) direct debits being paid into the charity's account
7 from UK donators, and so a change of their banking
8 arrangements will probably result in some form of media
9 commentary."
10    Did you understand Mr. Cole to be predicting that
11 the media commentary would be negative towards the bank?
12        MR. LUFT: Objection, assumes facts not in
13 evidence.
14    A. I do not understand what Guy means, but it
15 seems that he would regard it as a negative, but I don't
16 know why.
17    Q. Was that in your understanding a reference
18 to public opinion amongst British Muslims?
19        MR. LUFT: Objection, foundation.
20    A. I don't know.
21    Q. Mr. Cole writes:
22    "I attach a summary of my review of Interpal
23 foreign payments in the last six months. All of the
24 recipients of these payments were checked in Worldcheck, KYC
25 Check and reviewed against available Google information".

Page 136

1    Q. Do you recognize what Worldcheck is?
2    A. That is the Complinet service I was
3 referring to earlier, about all the regulators, and it
4 includes all of them in a searchable tool. So you can
5 work out which entities are actually listed by various
6 organizations, OFAC, EU, Bank of England, MAS, HKMS, you
7 name it.
8    Q. Worldcheck was a function that Complinet
9 provided?
10    A. Yes.
11    Q. What about KYC Check. Are you familiar
12 with that?
13    A. I am not familiar with it, no.
14    Q. He goes on to write:
15    "The background information for ███████
16 ██████ is an unofficial opinion from an Israeli
17 website, and no other reports or recognition of this
18 charity having links to terrorism are recorded on any
19 other websites."
20    Do you see that?
21    A. Yes.
22    Q. When you received this, what did you
23 understand the reference to an "unofficial opinion from
24 an Israeli website" to mean?
25    A. Non-Israeli Governmental.

**EXHIBIT 13 TO DECLARATION OF VALERIE SCHUSTER**

## Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
Action No: 05cv4622(DGT)(MDG)

- - - - - - - - - - - - - - - - - - - - -

TZVI WEISS, et al,
                    Plaintiffs,

against

NATIONAL WESTMINSTER BANK, PLC.,
                    Defendant.

- - - - - - - - - - - - - - - - - - - - -

NATAN APPLEBAUM, et al.,
                    Plaintiffs,

against

NATIONAL WESTMINSTER BANK, PLC.,
                    Defendant.



VIDEOTAPED DEPOSITION OF AMANDA HOLT

Friday 23 July 2010

At:  10:00 am

Taken at:

Cleary, Gottlieb, Steen & Hamilton LLP

55 Basinghall Street, London

United Kingdom


HIGHLY CONFIDENTIAL                2

## Page 2

1    A P P E A R A N C E S
2  For Plaintiff Tzvi Weiss:
3        ARI UNGAR
4        Osen LLC
5        700 Kinderkamack Road
6        Oradell, NJ 07649
7        Tel: 201 265 6400
8
9  For Plaintiff Tzvi Weiss:
10        AITAN GOELMAN
11        Zuckerman Spaeder LLP
12        1800 M Street, NW, Suite 1000
13        Washington, DC 20036-5807
14        Tel: 202 778 1996
15  For the Plaintiffs:
16        STEPHEN LOBEL
17        Finers, Stephens & Innocent LLP
18  For Defendant National Westminster Bank, PLC:
19
20        AVRAM E. LUFT and VALERIE SCHUSTER
21        Cleary, Gottlieb, Steen & Hamilton LLP
22        One Liberty Plaza
23        New York, NY 10006-1470
24              Tel: 212 225 2432
25
26  Also Present:
27        COURT EXAMINER - ADRIAN HUGHES
28
29        COURT REPORTER:
30        AILSA WILLIAMS
31        European Deposition Services
32        59 Chesson Rd
33        London, W14 9QS
34
35        Telephone:  44 (020) 7385 0077
36        HIGHLY CONFIDENTIAL        3

## Page 3

1    VIDEOGRAPHER: FLOYD HUMPHREY
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 4

1              I N D E X
2  AMANDA HOLT ... ... ... ... ... ... ... ... ..8
3  DIRECT EXAMINATION BY MR. . ... ... ... ... ... ..8
4      GOELMAN:
5
6  CROSS-EXAMINATION BY MR. LUFT:  ... ... ... ... 222
7
8  RE-DIRECT EXAMINATION BY MR. ... ... ... ... ... 229
9      GOELMAN:
10          INDEX OF EXHIBITS
11  Holt 1 NW012925-38 ... ... ... ... ... ... ... ...60
12  Holt 2 NW185976 ... ... ... ... ... ... ... ... ..66
13  Holt 3 NW014038-48 ... ... ... ... ... ... ... ...67
14  Holt 4 Press Release ... ... ... ... ... ... ...83
15  Holt 5 NW066682-686 ... ... ... ... ... ... ... ..88
16  Holt 6 NW066667-70 ... ... ... ... ... ... ... ... 107
17  Holt 7 NW066672-76 ... ... ... ... ... ... ... 140
18  Holt 8 NW066820 ... ... ... ... ... ... ... ... 147
19  Holt 9 NW066721-23 ... ... ... ... ... ... ... 150
20  Holt 10 NW018476 ... ... ... ... ... ... ... ... 159
21  Holt 11 NW066687-90 ... ... ... ... ... ... ... 163
22  Holt 12 NW067948 ... ... ... ... ... ... ... 169
23  Holt 13 NW187287 ... ... ... ... ... ... ... 172
24  Holt 14 NW196319-20 ... ... ... ... ... ... ... 179
25  Holt 15 NW181060-63 ... ... ... ... ... ... ... 188
26  Holt 16 NW180811-15 ... ... ... ... ... ... ... 194
27  Holt 17 NW180828-29 ... ... ... ... ... ... ... 200
28  Holt 18 NW180854 ... ... ... ... ... ... ... ... 202

Page 25

1   for a new person to actually head up that function.
2       Q. Is it accurate then that the review that
3   Deloitte performed was actually submitted to the FSA?
4       A. Yes.
5       Q. And in reaction to that the FSA made
6   certain recommendations to RBS?
7       A. The report would have been submitted to
8   both RBS and the FSA, and RBS would have -- RBS agreed
9   to actually act on the recommendations.
10      Q. And one of the recommendations was the
11  creation of this new position which you applied for and
12  were granted?
13      A. That is correct, yes.
14      Q. And then when you got to RBS you initiated
15  a different kind of review or another review of
16  Operational Risk?
17      A. When I got to RBS I was -- trying to think
18  back -- I was largely implementing the recommendations
19  that I had made as part of the previous report, to be
20  perfectly honest, which is a lesson I think that all
21  consultants should have to do, so yes, it was going
22  through almost effectively reinterviewing the existing
23  people that were there and actually deciding what
24  I thought were the Operational Risk processes or
25  Enterprise Risk infrastructure that should be at the

Page 26

1   bank. Enterprise Risk was defined as aspects of risk
2   management that were not already covered by Market,
3   Credit or Liquidity Risk management processes. I had no
4   specific responsibility at that time for Anti-money
5   Laundering or Sanctions in Terrorist Financing.
6       Q. Would Anti-money Laundering and Sanctions
7   in Terrorist Financing fall under that residual category
8   of Enterprise Risk not already covered by Market, Credit
9   or Liquidity Risk.
10      A. It could do, but at the time the people
11  responsible for oversight of those processes at Group
12  were the Group Compliance function, under a man called
13  David Swanney.
14      Q. The people responsible for oversight of
15  which processes?
16      A. Anti-money Laundering, Sanctions and
17  Terrorist Financing, in January 2002.
18      Q. They were in Group Compliance?
19      A. They were in Group Compliance.
20      Q. And what was Mr. Swanney's title, if you
21  recall? Was he Director of Group Compliance?
22      A. Head of Group Compliance.
23      Q. And you were Head of Group Enterprise
24  Risk?
25      A. That is correct.

Page 27

1       Q. Who did you report to?
2       A. The Head of Group Risk, Richard Gossage.
3       Q. Did Mr. Swanney also report to
4   Mr. Gossage?
5       A. No, he didn't. I don't recall who he
6   reported to. I think it was -- this is as far as I can
7   remember, it was Miller Maclean, Group Counsel. He was
8   Head of Legal. His exact title was Head of Legal.
9       Q. Did any of the recommendations that you
10  made when you did your review when you were at Deloitte
11  involve the Anti-money Laundering Compliance function of
12  RBS?
13      A. As far as I recall, no, nothing was that
14  specific.
15      Q. Okay. Do you recall what any of the
16  recommendations you made were?
17      A. To be honest, I am afraid I don't. The
18  focus of the review was around organization and Group
19  policy and procedure. It wouldn't have got down to
20  a specific recommendation around a specific process.
21      Q. When you joined RBS, in early 2002, did
22  you have people who reported to you at the time?
23      A. I did. Without a Group organigram it
24  would be difficult for me to recall, but I certainly had
25  a Head of Group Operational Risk reporting to me.

Page 28

1       Q. Do you recall about how many people were
2   in -- you said you had a Head of Group Operational Risk
3   reporting to you?
4       A. Yes, because Operational Risk was viewed
5   as being a subset of Enterprise Risk.
6       Q. Were there other subsets of Enterprise
7   Risk that reported to you?
8       A. There was the Head of External Risk, but
9   that was an empty box on an organigram, that was for me
10  to recruit, and that is who I did -- sorry that was very
11  bad English -- and I recruited the Head of External
12  Risk.
13      Q. And who did you recruit for that position?
14      A. A man called Andy Brennan. External Risk
15  was defined as, for want of a better phrase "Upstream
16  Risk Management", so looking at the bulk of regulation
17  and legislation that was being developed and coming down
18  the pipeline that the bank would have to comply with,
19  but at that point in time didn't have to comply with,
20  whereas Group Operational Risk was looking at the
21  current bulk of regulations and legislation that the
22  bank had to comply with. So it was viewed as more
23  internally focused, whereas External Risk was more
24  externally focused.
25      Q. Would External Risk be responsible for

1  looking at and trying to predict future legislation and
2  regulation in the Anti-money Laundering and Terror
3  Financing area?
4        A.  Initially, in if you like, February 2002,
5  that would have been done by the Compliance team.
6        Q.  Mr. Swanney?
7        A.  Mr. Swanney.  What the Head of External
8  Risk would have been responsible for was making sure
9  that Group Compliance actually had their eye on that.
10  It was not their -- it was not his area of expertise.
11  We didn't duplicate within the bank, so if Compliance
12  were responsible for Anti-money Laundering, then we were
13  very clear that we would work together very closely, but
14  it was Group Compliance's responsibility.
15        Q.  When you say it was not his area of
16  expertise, are you talking about Mr. Swanney?
17        A.  I am talking about the Head of External
18  Risk, who eventually became Andy Brennan.
19        Q.  Okay.  You said that "initially"
20  in February 2002, the Anti-money Laundering and Terror
21  Financing predicting would have been done by the
22  Compliance team.  By the word "initially", do you mean
23  to say that that changed at some point?
24        A.  That did change later on in 2002, because
25  the responsibility of Compliance passed over to Richard

1  Gossage, the Head of Group Risk.  I genuinely cannot
2  remember exactly when, but in 2002.
3        Q.  And did Mr. Swanney pass over with that
4  function?
5        A.  No, he didn't.  The function passed over
6  but David Swanney I think left the bank at the time.
7        Q.  Okay, and wherever that function arrived
8  in -- did it arrive in Group Enterprise Risk?
9        A.  No, it arrived in Group Risk.
10        Q.  So that was not under your -- that was not
11  part of your remit?
12        A.  Group Compliance was split, I was given
13  responsibility for ensuring that the Know Your Customer
14  requirements were being met, and then subsequently the
15  responsibility for Money Laundering Prevention and
16  Sanctions in Terrorist Financing was formally passed
17  over to Enterprise Risk later on in 2002.  The rest of
18  Compliance, which was renamed Group Regulatory Risk, was
19  passed over to be under Richard Gossage, and there was
20  a new Head of Regulatory Risk recruited.
21        Q.  Do you recall who that was?
22        A.  Stephen Sanders.
23        Q.  When you started at RBS, in early 2002,
24  was Stephen Foster one of the people who reported to
25  you?

1        A.  No, he was not.
2        Q.  Did you hire him at some point?
3        A.  I hired him, yes.
4        Q.  Do you recall when that was?
5        A.  Again, that was in 2002.  It was when
6  I acquired responsibility for Money Laundering
7  Prevention and Sanctions in Terrorist Financing.
8        Q.  And what were Mr. Foster's duties and
9  responsibilities?
10        A.  I don't recall the detail.  There would
11  have been a detailed job spec, but his title was Head of
12  Group Anti-money Laundering.
13        Q.  And do you recall anybody else who
14  reported to you in or around late 2002, in Group
15  Enterprise Risk?
16        A.  Just for clarity, is that with
17  responsibility for Anti-money Laundering and Financial
18  Crime or across the board?
19        Q.  Let start just with responsibility for
20  Anti-money Laundering and Financial Crime?
21        A.  Stephen Foster had responsibility for
22  Anti-money Laundering and Financial Crime.  There was
23  a separate project going on I think.  Towards the end of
24  2002 and 2003, the Joint Money Laundering Steering
25  Group, which is a regulatory body which has members

1  consisting of banks, Government regulators, were
2  revisiting and reviewing all of the regulations for
3  anti-money laundering, so that was a big project to make
4  sure that the bank -- I think RBS was asked to actually
5  represent small banks as part of that Steering Group, so
6  the person I had who looked after representing those
7  banks, as those regulations were being discussed and
8  revised, was a man called Charlie Middleton.  But that
9  was specifically around Anti-money Laundering rather
10  than Sanctions and Terrorist Financing, and those were
11  the only people who reported to me specifically around
12  Financial Crime, Anti-money Laundering, Sanctions and
13  Terrorist Financing.
14        Q.  So I am sure I understand, was
15  Mr. Middleton the RBS representative on this Joint Money
16  Laundering Steering Group?
17        A.  He ran the project for me.  So he looked
18  at any change program that would be required within the
19  bank.  The bank was big -- I felt at the time that the
20  bank was sufficiently large that you needed to have one
21  person looking specifically on the day-to-day making
22  sure the bank was compliant.  That was Stephen Foster.
23  Any changes were a completely separate job, and that was
24  looked at by Charlie Middleton.  He had been part of
25  Group Compliance.  He had had a knowledge of Anti-money

Page 77

1   operational losses.  That was what I mean by a risk based
2   decision.
3        Q.  So a risk based decision necessarily
4   encompasses a weighing of the potential advantages to
5   the bank versus the potential risks of taking
6   a particular action.
7        A.  That is correct.
8        Q.  And in a case where the bank was not
9   legally obligated by the presence of a name on the Bank
10  of England sanctions list, but nevertheless had
11  information suggesting that there was a link to
12  terrorism, would such a weighing of potential advantage
13  versus potential risk to the bank be appropriate?
14       MR. LUFT:  Objection, incomplete hypothetical.
15       A.  I can't say across the board, but I can
16  talk through exactly as far as I recall the thought
17  processes that went through with Interpal.
18       Q.  Okay, but you cannot tell me just as
19  a general matter whether a risk based approach would be
20  appropriate in that kind of scenario?
21       A.  I can recall a very clear statement across
22  the board, whether it was a Regulatory Risk policy or an
23  Enterprise Risk policy, that the bank had zero appetite
24  for regulatory breaches, let alone legislative legal
25  breaches.  So, for want of a better phrase, there was

Page 78

1   a zero risk appetite for not complying with regulation
2   and legislation, as far as the Group could see it and
3   understood it, across the board.  Does that answer your
4   question?
5        MR. GOELMAN:  We have to change the tape.
6   Time to take another break.
7        THE VIDEOGRAPHER:  End of tape one, volume one
8   in the video deposition of Ms Amanda Holt.  Going off
9   record at 12:09 pm.
10       (A short break)
11       THE VIDEOGRAPHER:  This is the beginning of
12  tape two, volume one in the video deposition of
13  Ms Amanda Holt.  Back on the record at 12:18 pm.
14       MR. GOELMAN:  Ms Holt, before we broke or
15  several minutes before we broke you were talking about
16  a meeting that you recalled having with Mr. Rodger at
17  some point after Mr. Foster first alerted you to the
18  fact that Interpal had been listed by OFAC.  Do you
19  recall that?
20       A.  I recall saying that I had either talked
21  or met with Irvine, yes.
22       Q.  So either a phone conversation or an in
23  person meeting?
24       A.  Yes, it could even have been an e-mail,
25  but I definitely remember contacting Irvine.

Page 79

1        Q.  And what was the purpose of you contacting
2   Irvine at that point?
3        A.  To confirm that Interpal was a customer of
4   CBFM, that he knew that there were concerns relating to
5   it, and to discuss what needed to be done to actually
6   determine the next course, the course of action.
7        Q.  What do you recall about the content of
8   that communication between yourself and Irvine Rodger?
9        A.  I can't remember the specific details but
10  I do remember that Irvine or a member of his team did
11  some further investigation of the Interpal account in
12  terms of monies in/monies out.
13       Q.  When you say "some further investigation",
14  what did that encompass, if you recall?
15       A.  I don't recall the detail, other than they
16  went to see exactly how the account was being operated
17  and, as I said, as far as they could, determine where
18  monies were coming in from and where payments were being
19  made, to see if there was any cause for suspicion.
20       Q.  Any cause for suspicion that what?
21       A.  That they were funding terrorism.
22       Q.  And specifically Hamas?
23       A.  Yes.
24       Q.  What do you recall?  Do you recall
25  subsequent communications between Mr. Rodger or anyone

Page 80

1   working for him?
2        A.  Again, I don't recall the detail.  I don't
3   know whether now is the right time to say, but the way I
4   approached this, or any other concern that came to me
5   when I was in this role, was just because something
6   wasn't on a Bank of England list wouldn't actually have
7   meant that I just dismissed things.  The Group as
8   a whole and me as an individual had absolutely no
9   tolerance whatsoever, no risk based decision whatsoever,
10  funding terrorism.  If there was any thought whatsoever
11  that a customer of the bank was funding terrorism or was
12  getting involved in any type of financial crime, that
13  would have been reported straightaway.  It wouldn't
14  necessarily have mattered that they were not on a Bank
15  of England list.  I took my responsibilities very, very
16  seriously, not just because of the financial penalties
17  that went with sanctions and, you know, the terrorist
18  legislation.  If I was responsible for making sure that
19  the bank put in place procedures to detect terrorist
20  financing, then I would have taken those or I took --
21  not would have, I took those responsibilities very
22  seriously.
23       Q.  When you say "not just because of the
24  financial penalties that went with sanctions", what
25  other reasons?

Page 81

1    A. As a matter of personal integrity.  I had
2  a job to do and I do it to the best of my ability, and
3  I felt that is what my team did as well.
4    Q. And is it fair to say you were also aware
5  of the consequences of being wrong about a customer of
6  the bank facilitating terrorism, in terms of what that
7  would mean to the victims of that terrorism?
8    A. Of course.
9    MR. LUFT:  Objection, vague.
10    A. I don't -- as an individual I could never
11  ever condone terrorism.  Okay?  It doesn't matter who is
12  doing it.  That is me as an individual and me as an
13  employee.
14    Q. You testified that if there was any
15  thought whatsoever that a customer of the bank was
16  funding terrorism that would have been reported
17  straightaway.  Did you consider a listing by the United
18  States Department of Treasury of Interpal as a funder of
19  terrorism to be a thought that a customer was funding
20  terrorism?
21    A. By that do you mean was the fact that
22  Interpal was on one of the FATF lists, did that cause me
23  to --
24    Q. OFAC lists?
25    A. OFAC lists, sorry.

Page 82

1    Q. You testified that --
2    MR. LUFT:  Did you finish your answer?
3    A. I was just asking for further
4  clarification, sorry.  By your question, did you mean
5  did I consider the fact that Interpal was on the OFAC
6  list would give me cause to suspect they were funding
7  terrorism?  I didn't understand your question.
8    Q. Let me rephrase it.  You testified that if
9  there was any thought whatsoever that a customer of the
10  bank was financing terrorism, or was getting involved in
11  any type of financial crime, that would have been
12  reported straightaway.  My question was about the phrase
13  "if there is any thought whatsoever", and whether you
14  considered that a listing by OFAC that a bank customer
15  was funding terrorism was sufficient to be "a thought
16  whatsoever" in your estimation?
17    A. I can't speak generally but I can speak
18  specifically about OFAC, which was that was what
19  prompted us, prompted me to ask Irvine to do a detailed
20  review of Interpal, or enhanced oversight, however you
21  want to phrase it, of the Interpal account.  I felt that
22  was above and beyond having a suspicion, because
23  a suspicion would have involved talking to or just
24  reporting to the relevant authorities.  Well, they
25  already would have been aware, so we were doing

Page 83

1  additional work ourselves to get additional information
2  to a greater level of depth.
3    Q. I am going to ask the court reporter to
4  mark this as Exhibit 4, please.
5    (Exhibit Holt 4 marked for identification)
6    For the record, this is a printout from the OFAC
7  Office of Public Affairs website.  Ms Holt, at any point
8  after RBS' customer, Interpal, was designated as a specially
9  designated global terrorist by OFAC, did you take any steps
10  to learn why OFAC believed that Interpal was a supporter of
11  terrorism?
12    A. I don't recall.  I don't recall.
13    Q. Were you aware when you were Head of Group
14  Enterprise Risk that OFAC had a website?
15    A. I don't recall.  I genuinely don't recall.
16    Q. Did you have access to the Internet from
17  your desktop computer?
18    A. I did, yes.
19    Q. Earlier you spoke of your general
20  philosophy of wanting to see things for yourself.  Do
21  you recall that?
22    A. I do, yes.
23    Q. Wouldn't a visit to the OFAC website have
24  been consistent with that approach?
25    A. I can't recall exactly what I did in 2002

Page 84

1  and 2003.
2    Q. Can you turn to page 5 out of 6 of Holt
3  Exhibit 4, please.  At the bottom it says: "Palestinian
4  Relief and Development Fund- Interpal."  Do you see
5  that?  Bottom of page 5 out of 6, it just says:
6  "Palestinian Relief and Development Fund - Interpal."
7  Do you see that?
8    A. I do see that.
9    Q. If you turn over, the first sentence there
10  says:
11    "Interpal, headquartered in the UK, has been
12  a principal charity utilized to hide the flow of money
13  to Hamas."
14    Did you know in 2003 that OFAC had concluded
15  that Interpal was a principal charity utilized to hide
16  the flow of money to Hamas?
17    A. I did know they had concluded that, yes.
18    Q. Did you know, in particular, that OFAC had
19  concluded that Interpal was secretly funding Hamas?
20    MR. LUFT:  Objection, assumes facts not in
21  evidence.
22    Q. I will rephrase that.  When you say that
23  you knew that OFAC had concluded that Interpal was
24  a principal charity used to hide the flow of money to
25  Hamas, is it fair to say you knew that the allegation

Page 117

1    question?
2        A.  Yes.
3        Q.  Putting aside the term "fundraising", were
4    you aware in December 2004 of any activities of CBFM
5    that were coming under the "OFAC microscope"?
6        A.  No, no.  The activities I was aware of
7    CBFM in the US is that it was a very, very large part of
8    the CBFM business, and CBFM was the part of the Group
9    that operated, apart from Citizens, operated in the US,
10   but I was not aware of any fundraising efforts or any
11   part of CBFM that would come under the OFAC microscope,
12   fundraising or otherwise, no.
13       Q.  Can you turn to the front page of this
14   exhibit please, and do you see your e-mail to Mr. Foster
15   and Mr. Love sent at 8:31, or supposedly 8:31 am
16   on December 13?
17       A.  I do.
18       Q.  You write:
19           "From my perspective, I am reassured that we are
20   aware of these customers.  However, the Group's policy is
21   that we will not have customers on the sanctions terrorist
22   lists of the Group covering both UK and US terrorist lists."
23           What did you mean by that when you -- first of
24   all, did you write that on December 13, 2004?
25       A.  I believe I did, yes.

Page 118

1        Q.  And what did you mean when you wrote that:
2    "The Group's policy is that we will not have customers
3    on the sanctions terrorists lists of the Group covering
4    both UK and US terrorist lists"?
5        A.  The group terrorist list included or was
6    sourced from not just the UK, so the Bank of England
7    list, but we also considered EU lists, UN lists and OFAC
8    lists as appropriate.  It was not a consolidated list,
9    a complete amalgam of all the lists.  It was just
10   sourced from all of those lists.  Okay, so --
11       Q.  But there is a consolidated list that took
12   names from the lists that various countries had,
13   correct?
14       A.  Yes, as appropriate.
15       Q.  And when you wrote that "The Group's
16   policy is that we will not have customers on the
17   sanctions terrorists lists of the Group covering both UK
18   and US terrorist lists", did you mean that there was
19   a Group policy that it would not have customers if that
20   customer was listed on either the UK or US terrorist
21   list?
22       A.  No.  There was a Group list that was
23   sourced from UK, US terrorist lists.  It doesn't mean
24   that it was one list that covered the entire Group.
25   That is what I meant by it covered the Group as

Page 119

1    appropriate.  So if a customer was in the UK it would
2    primarily -- it would be covered by the Bank of England,
3    the UN and the EU lists, which were a part of the Group
4    lists.  What that was trying to say is we didn't have
5    separate terrorist lists as maintained by individual
6    countries.  The group had an awareness of what the
7    population of terrorist lists the group was exposed to.
8    This was designed to make sure that we were not ignorant
9    of any name that was on a list across the Group, we as
10   a Group team.
11       Q.  But there was no Group policy that if
12   a customer appeared on the OFAC list, that the bank
13   would sever relationships with that customer?
14       A.  Not automatically, unless it was on the
15   Bank of England, the UN or EU list, no.
16       Q.  You continue:
17           "This is not a 'Cuba' OFAC issue, as this
18   organization is on the terrorist rather than general list."
19       A.  Yes.
20       Q.  What did you mean by that?
21       A.  Operationally, the Group, it was more
22   straightforward to search against names than it was
23   against countries, if that makes sense.  So there were
24   parts of the OFAC list -- it also covered FATF as well,
25   that if a country was put on the list it was more

Page 120

1    operationally difficult.  It didn't mean the Group
2    didn't do it, it was just more operationally difficult
3    to search against countries than it was against
4    customers, because the records of the bank were held by
5    customer name.
6        Q.  Okay.  You continue to say:
7            "However, my understanding is that it is not a cut
8    and dried case either, due to the different stance towards
9    the Palestinian issue between the US and the UK."
10           What did you mean by the different stance towards
11   the Palestinian issue between the US and the UK?
12       A.  I was concerned that it was -- one of the
13   other things I was responsible for was reputational risk
14   comes under Enterprise Risk, so the bank could still
15   suffer damage if there was any reputational issue, and
16   that is what I was talking about in terms of CBFM and
17   the US.  CBFM was expanding in the US and I was very
18   mindful that the Group didn't want to take any action
19   that could have been parochially compliant in the UK but
20   would have been commercially damaging to the US
21   operations.  This was nothing to do with the zero
22   tolerance for not complying with regulation or
23   legislation.  It was a wider remit: how could the bank
24   suffer reputational damage?
25       Q.  And what did you mean by "different stance

1    Bank of England's decision as to whether or not the
2    account is frozen or closed or whatever.
3        Q.  Do you recall any occasions where the bank
4    had a customer that was listed on the Bank of England
5    list but the Bank of England did not require closure of
6    that account?
7        A.  Not off the top of my head.  I know of
8    accounts which were frozen but not closed, on the
9    instruction of the Bank of England.
10       Q.  And those were accounts of persons or
11   organizations who were on the Bank of England list at
12   the time?
13       A.  As far as I recall, yes, because if there
14   were funds in an account, and they were on the sanctions
15   list, you couldn't close the account and transfer the
16   money somewhere else because then you would be accused
17   of transferring funds.  So what you had do was freeze it
18   and treat it as client money and await instruction as to
19   what to do with it.
20       Q.  Do you recall on any of those occasions
21   after freezing the accounts on directions from the Bank
22   of England that the Bank of England subsequently allowed
23   the bank to unfreeze funds and make them available to
24   the account holder?
25       A.  I don't recall.

1        Q.  Were the Interpal accounts still open when
2    you left the bank in 2006?
3        A.  I don't recall, but then I don't recall
4    them being closed.
5        Q.  What would have been sufficient to
6    persuade you in 2005, short of a listing on the Bank of
7    England list, that Interpal was supporting terrorists
8    and the bank should stop doing business with them?
9        MR. LUFT:  Objection, foundation.
10       A.  It comes back again to -- you are asking
11   me to speculate on a time that -- I can only answer your
12   question by saying if I had had a genuine suspicion that
13   Interpal had been funding terrorism from the information
14   that had been provided to me, you would have had very,
15   very clear e-mails, memos to Johnnie, to Fred, to
16   potentially the Bank of England, it doesn't really
17   matter who, saying "I think this relationship, the bank
18   has got to exit this relationship".
19       I don't know whether it has come out from today
20   but I am not one to actually be quiet if I think something
21   needs to be done, you know.  There was a reason why I had
22   a nickname the "Angel of Death".  If I needed it to be
23   raised, it would have been raised.
24       Q.  So is it then fair to say that at the time
25   that you were Head of Group Enterprise Risk at RBS -- I

1    want to get your phrasing right -- you never had any
2    genuine suspicion that Interpal had been funding
3    terrorism?
4        A.  Not cast-iron fact, no.  No, I didn't.  I
5    didn't have anything that would have caused me to say
6    the bank needs to go to the Bank of England and say:
7    "This customer, you need to freeze this account."  There
8    were discussions with the Bank of England as well, so
9    I could have gone to the Bank of England and said "You
10   need to put this organization on your Bank of England
11   list for these reasons", and that was what part of the
12   whole Sanctions and Terrorist Financing process was
13   designed to enable the bank to do.  If I had really
14   thought there was a real issue there I would have raised
15   it.  I was going to say, with anyone who would listen,
16   probably with a lot of people who didn't want to, but
17   I would have raised it.
18       Q.  Did you think the standard for deciding to
19   end a relationship with a customer was that you needed
20   cast-iron facts that they were funding terrorism?
21       MR. LUFT:  Objection, misstates her prior
22   testimony.
23       A.  I felt that I needed evidence.  Whether or
24   not you call that "cast-iron facts".  I felt I needed
25   evidence that wouldn't have been subjected to -- it was

1    not that it wouldn't have been subjected to challenge.
2    In the job I did you expected challenge -- I was going
3    to say every day of the week, several times a day.  I
4    had to feel comfortable standing in front of the people
5    who were going to challenge saying "I absolutely believe
6    we have irrefutable evidence here, that means we are not
7    subject to any particular vested interest that this
8    organization is funding terrorism".  I applied exactly
9    the same standard to any of the customers, not just
10   Interpal.  For any of them, whether it was an unpleasant
11   UK political party or not, you know, you had to.
12       Q.  You have unpleasant political parties
13   here?
14       A.  In my personal view, yes, but my personal
15   view might not be somebody else's personal view.  That
16   was the whole reason why we tried to be as rigorous as
17   we could, because you had the whole spectrum of personal
18   views within the Group.
19       Q.  Okay.  But it is fair to say that in the
20   time that you were at the bank you didn't feel that you
21   had enough evidence to recommend that the bank stop
22   providing services to Interpal?
23       A.  I didn't have that information, yes.
24       Q.  I just want to ask you about one part of
25   this e-mail chain which you are not copied on.  I know

Page 225

1       Q.  And Mr. Goelman read you from portions of
2   this paragraph, correct?
3       A.  He did.
4       Q.  Now, Ms Holt, if Guy Cole determined an
5   allegation regarding Interpal was unreliable, would you
6   have expected that allegation to be passed along to
7   senior management?
8       MR. GOELMAN:  Objection to form and leading.
9       A.  If I have asked somebody to do an
10  investigation, or to do a piece of work, I don't expect
11  to have a complete rundown of "I did this, I did this,
12  I did this, I then decided this was not relevant".  What
13  I am looking for is a summary of the relevant matters,
14  the relevant facts.  So if Guy had actually looked at
15  Worldcheck, he had found something that was on
16  Worldcheck but he had found that the Worldcheck results
17  were unreliable, I would not have expected him to have
18  included that in a briefing.  In fact, it probably would
19  have been unhelpful to include information that was not
20  only not relevant but was actually misleading.
21      Q.  Ms Holt, your position was the Head of
22  Group Enterprise Risk?
23      A.  That is correct.
24      Q.  As the Head of Group Enterprise Risk, in
25  your experience, if the bank believed Interpal was

Page 226

1   funding terrorism, would the potential of negative media
2   attention from exiting have affected the bank's decision
3   as to whether to close the account?
4       MR. GOELMAN:  Objection to the leading.
5       A.  I have no evidence to support this but
6   I never saw any evidence of the bank putting
7   reputational considerations above full compliance with
8   legal and regulatory requirements, so no, they would
9   never have actually said: "Well, on balance, we will not
10  comply because of the regulatory damage", and what is
11  more I certainly would not have either, and that was my
12  job as Group Head of Enterprise Risk.
13      Q.  Based on your experience at RBS, if
14  NatWest believed that Interpal was funding terrorism,
15  would they have kept NatWest on as a client?
16      MR. GOELMAN:  Objection to form and to
17  leading.
18      A.  Could you say the question again?
19      Q.  Sure.  Based on your experience at RBS, if
20  NatWest believed that Interpal was funding terrorism,
21  would they have kept NatWest on as a client?
22      A.  Would they have kept --
23      THE EXAMINER:  Kept who?
24      MR. GOELMAN:  Same objections.
25      A.  NatWest was not a client of RBS.

Page 227

1       MR. LUFT:  Sure, let me clarify.  I am sorry.
2   If the bank, and by the bank I mean NatWest and the
3   entity that owns it, RBS, if the bank believed that
4   Interpal was funding terrorism, would they have kept
5   NatWest -- excuse me -- would they have kept Interpal on
6   as a client?
7       THE EXAMINER:  Yes, you were saying NatWest
8   which was causing the confusion.
9       A.  No, they wouldn't have.  I don't -- well,
10  I have no evidence to prove this but no, I absolutely
11  believe they would not have.  This is the last time I am
12  going to say this but, you know, for what its worth,
13  there is absolutely no way that I would let my job turn
14  me into a person that I despised, because I am the one
15  person I cannot escape from so, for what its worth, if I
16  thought they were funding terrorism, it would have been
17  very hard not to exit.  I would not have kept quiet.
18      Q.  Let me ask you, did you ever believe that
19  Interpal was sending money to Hamas?
20      A.  No, I didn't.
21      Q.  Were you ever told by people at the bank
22  that someone at the bank believed that Interpal was
23  sending money to Hamas?
24      MR. GOELMAN:  Objection to form and to
25  leading.

Page 228

1       A.  Nobody at the bank gave me any evidence
2   that Interpal was paying funds, passing funds to Hamas.
3   Nobody actually who was close and who had done the
4   detailed work came to me and said "Look, Amanda, we
5   cannot find the evidence but really, we believe this is
6   what they are doing."  In fact, they told me completely
7   the opposite.  Also, if somebody had come to me and
8   said: "Look, we cannot prove it but all of the
9   circumstantial evidence makes this really smell, this is
10  not good.  We really believe that Interpal is funding
11  Hamas," there would have been a clear recommendation to
12  exit, not from reputational grounds, purely because
13  there was a really strong and clear and inconclusive
14  suspicion that Interpal was funding terrorism, but
15  nobody ever came to me with that.
16      Q.  Did you and the people that reported to
17  you ever make a decision not to investigate Interpal so
18  as to avoid gaining knowledge of whether Interpal was
19  sending money to terrorists?
20      MR. GOELMAN:  Objection to form, leading.
21      A.  As far as I was concerned, my tenure at
22  the bank, I spent an inordinate effort making sure that
23  we had no ostriches with their heads in the sand.
24  Ignorance is not bliss.  So you had to have as far as
25  possible the full information in front of you to make

Page 229

1    the decision.  Looking the other way was just not an
2    option, for whatever grounds, reputational, commercial
3    or whatever grounds.
4           MR. LUFT:  I have no further questions.
5           RE-DIRECT EXAMINATION BY MR. GOELMAN
6           MR. GOELMAN:  I have just one thing I want to
7    follow up on.  At the beginning of the questioning by
8    the lawyer for yourself and the bank, you testified that
9    you would not consider unsubstantiated allegations
10   sufficient to exit a relationship.
11          A.  No.
12          Q.  Is that right?
13          A.  That is right.
14          Q.  Did you consider the listing of an
15   organization by the United States Department of Treasury
16   as a specially designated global terrorist to be an
17   unsubstantiated allegation?
18          A.  No, I didn't consider it to be
19   unsubstantiated, and I didn't ignore it, but it was one
20   of the many pieces of information that we factored in to
21   make our own decision.  I believe I deliberately didn't
22   ignore that, which is one of the reasons why I didn't,
23   from memory, insisted that all of the OFAC lists were
24   included in the group lists, and we had to get clarity
25   as to how they were going to be treated, so that it

Page 230

1    couldn't look the other way, that it had to be
2    considered.  I would not -- would never completely
3    dismiss it.
4           Q.  But at no point during your tenure at the
5    bank did you personally develop the suspicion that
6    Interpal was funding Hamas?
7           A.  Not on the basis of the information that I
8    had been given.
9           MR. GOELMAN:  Thank you.
10          THE EXAMINER:  Has everyone asked all the
11   questions they require.  Thank you very much, Ms Holt,
12   for giving your evidence through a long day, and thank
13   you for assisting the American court and the trial judge
14   and the English court.  That completes the deposition
15   today and, counsel, thank you very much for your
16   efficient conduct of the examination through the day.
17          MR. GOELMAN:  And thank you.
18          MR. LUFT:  Absolutely, thank you very much.
19          THE VIDEOGRAPHER:  End of tape four, volume
20   one in the video deposition of Ms Amanda Holt.  We are
21   going off the record at 5:30 pm.
22
23
24
25

Page 231

1
2              CERTIFICATE OF DEPONENT
3
4    I, Amanda Holt, hereby certify that I have read the
5    foregoing pages, numbered 1 through 233, of my
6    deposition of testimony taken in these proceedings on 23
7    July, 2010, and, with the exception of the changes
8    listed on the next page and/or corrections, if any, find
9    them to be a true and accurate transcription thereof.
10
11
12
13
14   Signed:  .......................
15   Name:   Amanda Holt
16   Date:   .......................
17
18
19
20
21
22
23
24
25
26
27
28

Page 232

1              CERTIFICATE OF COURT REPORTER
2
3    I, AILSA WILLIAMS, an Accredited LiveNote Reporter with
4    European Deposition Services, London, England, hereby
5    certify that the testimony of the witness Amanda Holt in
6    the foregoing transcript, numbered pages 1 through 233,
7    taken on 23 July, 2010 was recorded by me in machine
8    shorthand and was thereafter transcribed by me; and that
9    the foregoing transcript is a true and accurate verbatim
10   record of the said testimony.
11
12   I further certify that I am not a relative, employee,
13   counsel or financially involved with any of the parties
14   to the within cause, nor am I an employee or relative of
15   any counsel for the parties, nor am I in any way
16   interested in the outcome of the within cause.
17
18
19
20
21   Signed:  .......................
22   AILSA WILLIAMS
23   Dated:   .......................
24
25
26
27
28
29
30
31

**EXHIBIT 14 TO DECLARATION OF VALERIE SCHUSTER**

**FILED UNDER SEAL**

**WEISS V NATIONAL WESTMINSTER BANK PLC; APPLEBAUM V NATIONAL WESTMINSTER BANK PLC**

**EXPERT REPORT OF JON HOLLAND**

1.   **INTRODUCTION**

1.1   My name is Jonathan Royston Holland of Atlantic House, Holborn Viaduct, London EC1A 2FG.   I graduated with a Bachelor of Laws degree from Exeter University in 1985 and was admitted as a Solicitor of the Supreme Court of England and Wales in 1988.   I qualified as a Solicitor-Advocate in 2001.   I am also admitted as a Solicitor of the Supreme Court of Hong Kong (1989); a Barrister and Solicitor of the Australian Capital Territory (1991); and a Barrister of the High Court of Australia (1991).   I am a partner in the law firm of Hogan Lovells, having joined Lovell White & King, one of the predecessor firms which eventually became Hogan Lovells following a series of mergers, in 1986.   I became a partner in 1997.   I am currently co-head of the financial services litigation team in Hogan Lovells worldwide.

1.2   I act for a range of UK and international clients, including sovereign states, central banks and multilateral organisations, in disputes covering the whole range of banking activity, often involving multiple jurisdictions.   I have extensive contentious experience in the High Court and appellate courts in England and overseas and I have been involved in a number of the leading cases in my practice area, including a number of cases in the House of Lords (now the Supreme Court).

1.3   I am a member of the Banking Technique and Practice Committee of ICC UK and the City of London Solicitors' Company.

1.4   I have particular expertise in the field of anti-terrorist financing and anti-money laundering legislation and financial sanctions.   I have advised clients (mainly, but not exclusively, banks) on issues in these areas for many years since my involvement in proceedings brought against the bank alleged to have handled the proceeds of the Brinks Mat robbery in 1983, in which gold bullion worth some £26 million was stolen from Brinks Mat's warehouse at Heathrow Airport.   Although the robbery took place in 1983, the civil proceedings brought by Brinks Mat's insurers to recover the proceeds did not reach court until several years later, by which time the UK had, for the first time, introduced legislation requiring banks and other regulated entities to put in place policies and procedures to detect and prevent money laundering.   I deal with the legislative background in more detail below, but the Brinks Mat proceedings were the first civil proceedings to my knowledge in which a bank's duties under the UK anti-money laundering regime were relevant.

- 2 -

1.5    I am the author of various articles relating to anti-terrorist financing, anti-money laundering and financial sanctions.  Published articles in this area in the past 10 years are:

    (a)    *Suspicious minds: K Ltd v National Westminster Bank* (Bankers' Law, 2007, 1(4), 13-15);

    (b)    *When two worlds collide: financial sanctions in the UK and the US* (P.L.C. Cross-Border Quarterly, 2007, 28 -33);

    (c)    *Changes to the UK anti-money laundering regime: neither serious nor organised* (P.L.C., 2005, 16(7), 16-17);

    (d)    *Money laundering: the new landscape* (P.L.C., 2004, 15(4), 15-21);

    (e)    *Keeping your hands clean* (In-House Lawyer, 2003, 108(Mar) Supp (Disputes 2003), 24-26);

    (f)    *Keeping your hands clean* (Legal Business, 2003, 132(Mar) Supp (Disputes 2003), 24-26);

    (g)    *Money laundering: widening the scope* (P.L.C. 2002, 13(6), 35-42).

1.6    I am regarded by the key directories in the UK and internationally as a leading lawyer in the area of banking litigation and contentious regulatory work and I am regularly invited to speak at conferences on issues relating to my practice area, including anti-terrorist financing, anti-money laundering and financial sanctions.

1.7    I have not previously provided expert testimony in proceedings, either in the US or elsewhere.

1.8    I am being compensated for my testimony at the rate of £750 per hour.  I reserve the right to amend and / or supplement my opinions as additional information is presented, including in reports provided by others.

- 3 -

2.   **SCOPE**

2.1   This report addresses the United Kingdom (**"UK"**) legislation, regulation and associated guidance relating to anti-terrorist financing and financial sanctions between 30 September 1994, when National Westminster Bank plc (**"NatWest"**) first opened an account for Interpal, and 16 March 2007, when Interpal's accounts were closed (the **"Relevant Period"**).  Because of the intersection between the UK's anti-terrorist financing and anti-money laundering regimes, I also address aspects of the latter regime in this report, where necessary.  Although the two regimes have many similarities and have developed to a large extent in parallel with each other, they are obviously aimed at different underlying criminal activity.

2.2   I have not considered whether different legal provisions apply in parts of the UK other than England and Wales.  I should say, though, that I am not aware of any differences in the interpretation and application of the statutory and other regulatory requirements described in this report in other jurisdictions within the UK.

- 4 -

3.    **THE UK ANTI-TERRORIST FINANCING REGIME DURING THE RELEVANT PERIOD**

3.1    By way of background only, it is worth pointing out that, because of the political situation in Northern Ireland, the UK has a long history of legislation directed at preventing terrorism, beginning with the Prevention of Violence (Temporary Provisions) Act 1939. The genesis of the modern regime is much more recent, however, and is derived largely from international initiatives at the level of the European Union ("**EU**") and the United Nations ("**UN**") directed at those who finance or support terrorism, as well as those who carry it out. The UK has been described as having "... *the most extensive counter-terrorism code in western Europe* ..."[1], making the UK "... *the most legally fortified country in Europe* ..."[2].

**PREVENTION OF TERRORISM (TEMPORARY PROVISIONS) ACT 1989**

3.2    As at 30 September 1994, the relevant statute combating terrorist financing was the Prevention of Terrorism (Temporary Provisions) Act 1989 (the "**PTTPA 1989**"). Despite its title, the PTTPA 1989 remained in force[3] until it was repealed on 19 February 2001 by the Terrorism Act 2000[4].

3.3    The PTTPA 1989 established the following criminal offences:

   (a)    **Soliciting, receiving, accepting or having use or possession of funds for terrorism** - Soliciting, receiving or accepting from any other person, or using or possessing, any money[5], intending that it should be applied or used for the commission of, or in furtherance of or in connection with, acts of terrorism or having reasonable cause to suspect that it might be so used or applied[6];

   (b)    **Making available funds for terrorism** - Giving, lending, or otherwise making available any money, or entering into or otherwise being concerned in an arrangement whereby money is to be made available to another person, knowing or having reasonable cause to suspect that it would or might be applied or used for the commission of, or in furtherance of or in connection with, acts of terrorism[7]; and

   (c)    **Assisting in retention or control of terrorist funds** - Entering into or being concerned in an arrangement which facilitated the retention or control of terrorist

---

[1]    *Blackstone's Guide to The Anti-Terrorism Legislation*, Clive Walker, Oxford University Press, 2002, at page 7.
[2]    *Blackstone's Guide to The Anti-Terrorism Legislation*, page 10.
[3]    Section 27(5) provided that the 1989 Act would remain in force until 22 March 1990. The 1989 Act remained in force pursuant to the Prevention of Terrorism (Temporary Provisions) Act 1989 (Continuance) Orders made each year from 1990 to 2000 (UK statutory instruments 1990/633, 1991/549, 1992/495, 1993/747, 1994/835, 1995/816, 1996/891, 1997/807, 1998/768, 1999/906 and 2000/835)
[4]    Section 2(1)(a) and the Terrorism Act 2000 (Commencement No. 3) Order 2001/421
[5]    The PTTPA refers to "money or other property", but I have omitted the references to other property because they are not relevant to this report.
[6]    Section 9(1), as amended by the Criminal Justice Act 1993; version in force from 15 February 1994
[7]    Section 9(2)

- 5 -

funds by or on behalf of another person, whether by concealment, removal from the country, transfer to nominees or by another method. In relation to this offence, the prosecution did not have to prove knowledge, intent or suspicion on the part of the person alleged to have assisted in the retention or control of terrorist funds; instead, it was a defence for the person so charged to prove that they did not know and had no reasonable cause to suspect that the arrangement related to terrorist funds[8].

3.4    The PTTPA 1989 defined terrorism very widely as "*.... the use of violence for political ends ...*" and "*... any use of violence for the purpose of putting the public or any section of the public in fear ...*"[9]. The definition included acts committed outside the UK, provided that the acts would have been offences triable in the UK[10].

3.5    The definition of "terrorist funds" was similarly wide and covered funds which could be used for the commission of, or in furtherance of, or in connection with acts of terrorism; or funds which were the direct or indirect proceeds of the commission of acts of terrorism[11].

3.6    The maximum penalty for these offences was 14 years' imprisonment, or a fine, or both[12].

3.7    Apart from in relation to terrorist offences in Northern Ireland[13], the PTTPA 1989 did not impose an obligation on banks or anyone else to report knowledge or suspicion of offences connected to terrorist financing, but it did provide that disclosing information relating to such offences would not be a breach of any restriction on the disclosure of the information concerned: for example, because the information was subject to a bank's common law duty of confidentiality in relation to a customer's affairs[14]. The PTTPA 1989 also provided that disclosure of information would provide a defence to prosecution under the statute in certain circumstances, provided the person making the disclosure was not prohibited by the Police from continuing with the activity concerned[15]. These provisions were the precursors of the disclosure and consent regimes that were subsequently enacted in relation to anti-terrorist financing and anti-money laundering in the UK and that remain in force today. I deal with these provisions in more detail later in this report.

CRIMINAL JUSTICE ACT 1993

3.8    By amendments introduced to the PTTPA 1989 by the Criminal Justice Act 1993 ("**CJA 1993**") banks and other financial institutions were required to report knowledge or suspicion of terrorist financing generally to the authorities. This obligation was introduced

---

8        Section 11(1) and (2)
9        Section 20(1)
10       Section 9(3) and (4)
11       Section 11(3) and (4)
12       Section 13(1)
13       Section 18
14       Section 12(1), as amended by the Criminal Justice Act 1993; version in force from 15 February 1994
15       Section 12(2)

- 6 -

in order to implement the 1991 EU Money Laundering Directive[16] (the "**First EU Money Laundering Directive**") in the UK.  The relevant provisions took effect on 1 April 1994 and remained in force until 18 February 2001 when they were replaced by similar provisions introduced by the Terrorism Act 2000.

3.9    The amendments to the PTTPA 1989 in April 1994 created a new offence of failing to disclose knowledge or suspicion of offences connected to terrorist financing.  An offence was committed by anyone who:

(a)    knew or suspected that another person was providing financial assistance for terrorism;

(b)    acquired the information on which the knowledge or suspicion was based in the course of his trade, profession, business or employment; and

(c)    failed to disclose the information to the Police as soon as reasonably practicable after it had come to his attention[17].

3.10   It was a defence to this new offence for the person alleged to have failed to disclose their knowledge or suspicion to show that:

(a)    they had a "reasonable excuse" for their failure[18]; or

(b)    if the person was an employee, to show that they disclosed the information to the appropriate person, such as a money laundering reporting officer ("**MLRO**"), within their organisation in accordance with their employer's procedures for making such disclosures[19].

3.11   "Providing financial assistance for terrorism" was defined as doing any act which would have been an offence under PTTPA 1989 as described above, including acts committed outside the UK if they would have been offences if they had been committed in the UK[20].

3.12   The maximum penalty for the new offence was five years' imprisonment, or a fine, or both[21].

3.13   It is worth pausing at this point to observe that this new offence - and the similar offence of failing to report knowledge or suspicion of money laundering (relating to the proceeds of criminal conduct generally) introduced at the same time - was the first time to my knowledge that UK law imposed an obligation on individuals to report knowledge or suspicion of criminal activity.  UK law did not (and still does not) require people to report

---

[16]    91/308/EEC
[17]    Section 18A(1) PTTPA 1989, inserted by section 51, CJA 1993
[18]    Section 18A(3)
[19]    Section 18A(5)
[20]    Section 18A(7)
[21]    Section 18A(11)

- 7 -

criminal conduct - so these new offences attracted considerable attention at the time, particularly within the so-called regulated sector (which included banks) which was also required to put in place, again for the first time, procedures to prevent and detect money laundering in order to comply with the provision of the Money Laundering Regulations 1993 (the "**1993 Regulations**") which also came into force on 1 April 1994[22].

### THE 1993 REGULATIONS

3.14    It is sensible to address the 1993 Regulations at this point because they formed the backdrop to the reporting obligations described above in the sense that they required banks and others in the regulated sector for anti-money laundering (including anti-terrorist financing) purposes to obtain and retain certain information about customers and to put in place procedures to prevent and detect money laundering activity.

3.15    The 1993 Regulations were also enacted in order to implement the First EU Money Laundering Directive in the UK.  They made it an offence for a bank (using banks as shorthand for the regulated sector as a whole) to form a business relationship with a customer (including opening a bank account) unless the bank put in place procedures to:

(a)     Identify the customer by obtaining satisfactory evidence of the customer's identity as soon as reasonably practicable after first contact between the bank and the customer[23].  If satisfactory evidence could not be obtained, the relationship could not proceed[24].   Satisfactory evidence was evidence which was reasonably capable of establishing that the customer was the person he claimed to be and which satisfied the person carrying out the check that the customer was indeed the person he claimed to be[25].

(b)     Retain records of identity and transactions for a specified period[26].

(c)     Establish internal reporting procedures to enable employees to report knowledge or suspicion of money laundering and provide for reports to be made to the authorities in appropriate circumstances[27].

(d)     Train employees on how to recognise money laundering, their obligations and compliance with the bank's procedures from time to time[28].

3.16    The maximum penalty for failing to comply with the 1993 Regulations was two years' imprisonment or a fine, or both[29].  It was a defence to show that the person charged had

---

[22]    SI 1993/1933, Regulation 1(2)
[23]    Regulation 5(1)(a)(i) and 7(1)
[24]    Regulation 7(1)
[25]    Regulation 11
[26]    Regulation 5(1)(a)(ii) and Regulation 12
[27]    Regulation 5(1)(a)(iii) and Regulation 14
[28]    Regulation 5(1)(b) and (c)
[29]    Regulation 5(2)(a)

- 8 -

taken all reasonable steps and exercised all due diligence to avoid committing the offence[30].

3.17   Directors and senior managers could be prosecuted for failings under the 1993 Regulations if the offence was committed with the consent or connivance of, or was attributable to any neglect on the part of, any director or senior manager[31].

**SUBSEQUENT REGULATIONS**

3.18   I do not deal in this report with the Money Laundering Regulations that supplemented and replaced the 1993 Regulations from time to time.  The later Regulations made no material difference for the purposes of this report to the obligations introduced by the 1993 Regulations and described above.

**"TIPPING OFF"**

3.19   A particular area of concern for banks and others in the regulated sector was the intersection between the obligation to report knowledge or suspicion of money laundering / terrorist financing and another new offence introduced at the same time: namely, tipping off.  Although the PTTPA 1989 contained a precursor to the tipping off offences introduced by the CJA 1993 (in section 17(2) PTTPA 1989) the CJA 1993 made committing a tipping off offence more likely.  By amendments to the PTTPA 1989, the CJA 1993 made it an offence for a person who reported knowledge or suspicion of a terrorist financing offence to disclose information to any other person that was likely to prejudice any investigation that might be conducted following that report or to falsify, conceal or destroy material which was likely to be relevant to that investigation[32].  A person making a report to the authorities would sensibly assume (but would not and could not in most cases know for certain) that a Police investigation might follow as a result.  So that person would also sensibly restrict so far as possible any communication with the subject of the report that might constitute tipping off.  In particular, those making reports (including banks) would not tell the subject of a report that a report had been made - and would generally try to carry on with "business as usual" in order not to alert the customer to that fact.  Banks were not assisted by the fact that there was typically little or no response from the Police following the making of a report (even when banks asked for information) and so a bank had no means of knowing whether an investigation was actually underway[33].

3.20   The earliest reported decisions relating to the anti-money laundering regime (including *C v S* [1999] 2 All ER 343 (Court of Appeal) which was a case in which I acted for the bank

---

30   Regulation 5(4)
31   Regulation 6(1)
32   Section 50, substituting new sections 17(2A) and (2B) PTTPA 1989
33   See, for example, *Money Laundering: Review of the Reporting System*, KPMG for NICS, July 2003, paragraph 2.3.6

- 9 -

concerned) addressed the relationship between banks and customers following the making of reports to the authorities. Those cases do not relate specifically to anti-terrorist financing and so I do not address them in detail in this report, but in broad terms they arose (and continue to arise from time to time today) in circumstances where a bank reported knowledge or suspicion of money laundering and was then faced with an instruction from the customer concerned to make a payment from the funds that were the subject of that report. Although the making of the report would generally protect the bank from committing a money laundering offence by making the payment, English common law makes a bank liable in some circumstances to a third party where the bank pays money which does not belong beneficially to the customer. So, if a bank makes a payment from funds in an account in the name of A which the bank knows or suspects represent the proceeds of a fraud carried out by A against B, B can make a claim against the bank, which may have to pay the funds back to B. But if the bank has, in the meantime, reported its suspicion to the authorities, the bank will be concerned that failing to make the payment may alert A to the fact that something is amiss - and might constitute tipping off. The bank is therefore between a rock and hard place: the rock being the risk of incurring civil liability to B and the hard place being the risk of committing a criminal offence if the bank does not comply with A's instructions.

3.21    The issues described in the previous paragraph do not typically arise in relation to terrorist financing, because funds used for terrorism are often not the proceeds of criminal activity. Rather they often represent legitimate, "clean" funds that are applied for an illegal purpose. The point for present purposes is that the introduction of the tipping off offence by the CJA 1993 and the explicit linking of that offence to reports made to the authorities had the (possibly unintended) consequence of restricting the extent to which banks and others in the regulated sector felt able to discuss the concerns underpinning a report with the customer concerned - or to take any action that might alert the customer to the fact that a report had been made.

3.22    In light of what I have said in paragraphs 3.19 to 3.21 above it would have been inappropriate in my view for NatWest to have disclosed to Interpal that NatWest had made disclosures to the authorities from time to time in relation to the operation of Interpal's accounts, or to have acted in a way that might have alerted Interpal to that fact (including, for example, by freezing or closing Interpal's accounts as a result of such disclosures) without first having discussed and agreed any such action with the Police.

- 10 -

**TERRORISM ACT 2000**

3.23    The PTTPA 1989 was replaced by the Terrorism Act 2000 (the "**TA 2000**"), which was passed on 20 July 2000.  The relevant provisions came into force on 19 February 2001[34].

3.24    Like the statute it replaced, the TA 2000 defined "terrorism" very widely as the use or threat of violence which was designed to influence the government, or to intimidate the public, for the purpose of advancing a political, religious or ideological cause.  Terrorist action was action for the above purposes which involved serious violence against a person, endangered a person's life, or involved the use of firearms or explosives[35].  Terrorism as defined by the Act included terrorism which took place outside the UK[36].

3.25    The terrorist financing offences created by the TA 2000 were similar to the offences under the PTTPA 1989 and were as follows:

(a)    Receiving money, intending that it should be used, or having reasonable cause to suspect that it might be used for the purposes of terrorism[37];

(b)    Giving, lending or otherwise making available money, knowing or having reasonable cause to suspect that it would or might be used for the purposes of terrorism[38];

(c)    Entering into or becoming concerned in an arrangement as a result of which money was or would be made available to another person, knowing or having reasonable cause to suspect that it would or might be used for the purposes of terrorism[39]; and

(d)    Money laundering – entering into or becoming concerned in an arrangement which facilitated the retention or control of terrorist property, by or on behalf of another person[40].    Facilitation could be by concealment, removal from a jurisdiction[41], transfer to nominees, or any other means[42].    In relation to this offence, the prosecution did not have to prove knowledge, intent or suspicion on the part of the person alleged to have entered into or been concerned in the arrangement; instead, the person charged would have a defence if they could

---

[34]    Terrorism Act 2000 (Commencement No. 3) Order 2001/421

[35]    Section 1(2) and (3).  Terrorist action also included action which involved serious damage to property, created a serious risk to the health or safety of the public or was designed seriously to disrupt an electronic system to a serious extent

[36]    Section 1(4) - and see section 63 ("*If - (a) a person does anything outside the United Kingdom, and (b) his action would have constituted the commission of an offence under any of sections 15 to 18 if it had been done in the United Kingdom, he shall be guilty of the offence.*")

[37]    Section 15(2)

[38]    Section 15(3) and (4)

[39]    Section 17

[40]    Section 18(1)

[41]    Section 63(2)

[42]    Section 18(1)(a) to (d)

- 11 -

show that they did not know and had no reasonable cause to suspect that the arrangement related to terrorist property[43].

3.26    "Terrorist property" was defined as money (or other property) which was likely to be used for the purposes of terrorism and included the proceeds (direct or indirect) of acts of terrorism[44].

3.27    The maximum penalty for a terrorist financing offence was 14 years' imprisonment, or a fine, or both[45].

3.28    Between 19 February 2001 and 19 December 2001, the TA 2000 essentially restated the offence of failing to disclose knowledge or suspicion of terrorist financing offences in the PTTPA 1989 (as amended by the CJA 1993) as described above, save that "belief" was substituted for "knowledge", which in my view made no material difference to the underlying offence, other than to stress the subjective element in determining whether or not an offence had been committed[46]. Belief is necessarily a more subjective test than knowledge, because it is possible to believe something to be true without knowing whether or not you are right.  And as with the previous statute, a person did not commit any of the terrorist financing offences described above if they either had express consent to continue with the underlying transaction or arrangement from the Police[47] or made a disclosure to the authorities:

(a)    after the person became involved in the relevant transaction or arrangement;

(b)    of their own initiative; and

(c)    as soon as reasonably practicable; and

(d)    the Police did not forbid the transaction or arrangement[48].

3.29    In other words, a person making a report to the authorities was not required by the TA 2000 automatically to desist from the underlying transaction or arrangement - and did not commit an offence by continuing the transaction or arrangement - unless they were told to stop by the Police.  These provisions (both in the TA 2000 and the PTTPA 1989 that preceded it) make sense since the law required a report based on a person's state of mind, which may not reflect the true position.  The point of the disclosure obligations in the anti-terrorist financing legislation described above (and in the legislation aimed at preventing money laundering that developed in parallel with that legislation) was to provide **intelligence** to the Police and other law enforcement agencies.  Those (including

---

43      Section 18(2)
44      Section 14
45      Section 22
46      Section 19
47      Section 21(1)
48      Section 21(2) to (4)

- 12 -

banks) subject to the obligation to disclose their belief or suspicion that another person was involved in terrorist financing were not in any way substituted for the Police and other agencies; nor were they made subject to any duty to investigate whether their belief or suspicion was well founded.  Neither banks nor anyone else in the regulated sector were equipped to do so - and any attempt on their part to do so might well have produced an undesirable outcome by alerting the subject of the report to the fact that they were under investigation before the Police or other law enforcement agencies had had sufficient time to complete their enquiries.

3.30    It was (and is to this day) the responsibility of the Police and other law enforcement agencies to assess the intelligence provided by those making disclosures (including banks) in light of any other intelligence available to (or obtainable by) the agencies concerned and to decide what action (if any) to take having regard to the very wide ranging powers available to them, particularly in relation to the prevention of terrorism. Save as requested or required by the Police, those making disclosures (including banks) are not only under no obligation to make further enquiries themselves once a disclosure has been made, they are positively discouraged from doing so by, amongst other things, the threat of committing a tipping off offence if any enquiries they make prejudice an investigation by the Police.

3.31    The maximum penalty for failing to disclose belief or suspicion of terrorist financing under the TA 2000 was five years' imprisonment or a fine, or both[49].

**ANTI-TERRORISM, CRIME AND SECURITY ACT 2001**

3.32    The provisions of the TA 2000 were amended in relation to banks and others in the regulated sector by the Anti-Terrorism, Crime and Security Act 2001 ("**ATCSA 2001**"), which came into force on 20 December 2001[50].

3.33    The ATCSA 2001 formed part of the UK's response to the terror attacks in the US on 11 September 2001.  It amended the TA 2000 to provide that a person working in the regulated sector (which included banks) would commit an offence if they:

(a)     knew or suspected, **or had reasonable grounds for knowing or suspecting**, that another person had committed a terrorist financing offence (as set out in paragraph 3.25 above);

(b)     the information on which the knowledge or suspicion was based, or which created reasonable grounds for knowledge or suspicion, came to them in the course of a business in the regulated sector; and

---

[49]     Section 19(8)
[50]     The amendments to the TA 2000 came into force pursuant to the Anti-terrorism, Crime and Security Act 2001 (Commencement No. 1 and Consequential Provisions) Order 2001/4019

- 13 -

(c)     did not disclose the information as soon as practicable after the information came to them[51].

3.34    Employees could discharge their disclosure obligation by making a report to their employer's "nominated officer" (generally, the employer's MLRO)[52] who was then required to consider the report and decide whether to make a report to the Police. The MLRO was required to make a report if he or she knew or suspected (or had reasonable grounds to know or suspect) that someone else was involved in terrorist financing[53].

3.35    No offence was committed if an employee had a reasonable excuse for not making a disclosure[54]. Customer confidentiality was not a reasonable excuse because the TA 2000 (as amended by ATCSA 2001 - and like the PTTPA 1989 that preceded both statutes) provided expressly that disclosure would not breach any restriction on the disclosure of information, provided certain conditions were satisfied[55] (these conditions tracked the elements of the failure to disclose offence and so would almost always be satisfied in the case of a proper disclosure).

3.36    The maximum penalty for failing to disclose knowledge or suspicion of terrorist financing was five years' imprisonment or a fine, or both[56].

3.37    The changes introduced by the ATCSA 2001 were significant in legal terms because the test was no longer whether a particular individual charged with the offence **actually** believed or suspected that another person had committed a terrorist financing offence, but whether an entirely hypothetical "reasonable" person in possession of the same facts would have reached that conclusion. In other words, it was no longer a defence for a person charged with failing to disclose to show that they honestly failed to put two and two together and make four if the prosecution could prove (in a courtroom environment - without the external influences and pressures present in "real life" and with the benefit of perfect hindsight) that someone else would have done so. This was a particularly dramatic shift given what I have said above about there being no general obligation to report criminal conduct in UK law at all prior to 1994. As a result of the amendments to the TA 2000 introduced by the ATCSA 2001, those working in the regulated sector were not only required to report belief or suspicion that another person had committed a terrorist financing offence, but would commit a criminal offence if they honestly, but mistakenly (compared to a hypothetical reasonable person), failed to make such a report.

3.38    Not surprisingly, the changes introduced by the ATCSA 2001, coupled with the increased awareness of the risk of terrorism following the attacks in the US on 11 September 2001,

---

[51]     Section 21A(1) to (4)
[52]     Section 21A(7)
[53]     Section 21A(1) to (4)
[54]     Section 21A(5)(a)
[55]     Section 21B
[56]     Section 21A(12)(a)

- 14 -

led to an increase in reports.  In part that reflected increased awareness - but it also reflected concern on the part of those working in the regulated sector that the threshold for potential liability was now much lower, so that it was prudent to err on the side of caution and report anything that might indicate involvement in terrorist financing, without spending too much time analysing whether the underlying information really pointed in that direction[57].  This trend towards so-called "defensive reporting" was exacerbated when the objective test of liability introduced in relation to terrorist financing offences by the ATCSA 2001 was carried over into the obligation to report knowledge or suspicion of money laundering generally by the Proceeds of Crime Act 2002, the relevant provisions of which came into force on 24 February 2003.

**KNOWLEDGE, BELIEF AND SUSPICION**

3.39   I have referred above to the growth of defensive reporting following the introduction of the objective test of liability for reporting knowledge or suspicion of terrorist financing and money laundering generally in 2001 and 2003 respectively, but it is fair to say that the legal threshold for making a report was already fairly low, because the test has always been triggered by "suspicion", which is a necessarily amorphous legal concept and one that is incapable of precise definition.

3.40   There are no reported decisions of the English court on the meaning of "knowledge", "belief" or "suspicion" in the context of the UK anti-terrorist financing legislation described above, but the courts have considered the meaning of these words in the context of the anti-money laundering legislation in force during the Relevant Period and, since the provisions of the relevant statutes are materially identical, these decisions are a reliable guide to the meaning of the same words in the legislation aimed at preventing terrorist financing.

3.41   In *R v Da Silva*[58], a criminal case, the defendant had been convicted of assisting her husband to retain the benefit of criminal conduct, knowing or suspecting that her husband had been engaged in criminal conduct.  She appealed, challenging the direction that the judge had given to the jury on the meaning of "suspicion".  The Court of Appeal held that there was a difference between "suspecting" and "having reasonable grounds to suspect" and that "suspecting" meant that:

> "...the defendant must think that there is a possibility, which is more than fanciful, that the relevant facts exist.  A vague feeling of unease would not suffice.  But the statute does not require the suspicion to be "clear" or "firmly grounded and targeted on specific facts", or based upon "reasonable grounds".

---

[57]   See, for example, *Money Laundering: Review of the Reporting System*, KPMG for NICS, July 2003, paragraph 4.3.4 to 4.3.5

[58]   [2006] EWCA Crim 1654, a Court of Appeal case in relation to section 93A(1) CJA 1988

- 15 -

...

> *The only possible qualification to this conclusion, is whether, in an appropriate case, a jury should also be directed that the suspicion must be of a settled nature; a case might, for example, arise in which a defendant did entertain a suspicion in the above sense but, on further thought, honestly dismissed it from his or her mind as being unworthy or as contrary to such evidence as existed or as being outweighed by other considerations."[59]*

3.42    *K Ltd v National Westminster Bank plc (Revenue and Customs Commissioners and another intervening)*[60], was a civil case brought by a customer against his bank because the bank had reported its suspicion that the customer was involved in money laundering and was therefore unable to process the customer's payment instructions unless and until the bank had actual or deemed consent from the Police to do so.  The case concerned section 328 of POCA 2002, which provides that "*A person commits an offence if he enters into ... an arrangement which he knows or suspects facilitates... the acquisition ... of criminal property...*".  The Court of Appeal endorsed its earlier judgment in *R v Da Silva* and held that:

> *"The existence of suspicion is a subjective fact. There is no legal requirement that there should be reasonable grounds for the suspicion. The relevant bank employee either suspects or he does not. If he does suspect, he must (either himself or through the bank's nominated officer) inform the authorities."[61]*

3.43    Later in this report I deal with the relevance as a matter of English law of guidance issued by the Joint Money Laundering Steering Group (the "**JMLSG**") from time to time.  I mention that guidance here, though, because various versions have addressed the question of what amounts to knowledge, belief or suspicion.

3.44    The guidance published by the JMLSG in 1993 did not define suspicion or knowledge.  It suggested that, when a member of staff reported their suspicion of money laundering (the 1993 Guidance did not refer to suspicions of terrorist financing) to a firm's MLRO, the MLRO should consider all relevant information available within the bank concerning the customer about whom the report was made, including (in the case of a bank) reviewing transaction patterns and volumes through the account, other accounts in the same name, the length of the customer relationship and any identification records.  It advised that a

---

[59]   Paragraphs 16 and 17
[60]   [2006] EWCA Civ 1039
[61]   Paragraph 21

- 16 -

report should be made if the MLRO, having conducted the review, agreed that the initial report gave rise to knowledge or suspicion of money laundering[62].

3.45    The guidance published by the JMLSG in 1997[63] described suspicion (in the context of money laundering, not terrorist financing) as "... *personal and subjective* ..." (the 1997 Guidance pre-dated the introduction of the objective test described above) and said that it "... *falls far short of proof based on firm evidence. However, it is more than the absence of certainty that someone is innocent* ..."[64].

3.46    The 1997 Guidance advised reporting suspicious transactions if, following a review of all relevant information held by the bank concerning the customer, including other transactions through the account and any other accounts held by the customer, the length of the business relationship, and any identification records held, the MLRO decided that there were no "... *facts that would negate the suspicion* ..."[65].   Although the 1997 Guidance advised against making reports as a matter of routine without first conducting an internal enquiry[66], the thrust of the 1997 Guidance was that the threshold for making a report was not high.

3.47    Subsequent guidance published by the JMLSG in 2001 referred to the definition of knowledge in *Baden and Others v Société Générale pour Favoriser le Développement du Commerce et de L'industrie en France S.A.*[67].   In that case knowledge was described as covering a state of mind ranging through:

(a)    actual knowledge;

(b)    wilfully shutting one's mind to the obvious;

(c)    wilfully and recklessly failing to make such enquiries as a reasonable and honest person would make;

(d)    knowledge of circumstances which would indicate facts to an honest and reasonable person; to

(e)    knowledge of circumstances which would put an honest and reasonable person on enquiry.

3.48    In my view, category (c) of this "definition" really describes suspicion, not knowledge, and categories (d) and (e) really describe reasonable grounds for suspicion.   This is

---

[62]   Paragraph 112
[63]   No relevant changes were made in the guidance issued in 1995, so I have not referred to it
[64]   Paragraph 6.01
[65]   Paragraph 6.10
[66]   Paragraph 6.11
[67]   [1992] 4 All E.R. 161, referred to in the  February 2001 Guidance at paragraph 5.2 and in the December 2001 Guidance at paragraph 5.4

- 17 -

supported to some extent by revised guidance published by the JMLSG in 2003, which stated that:

> "*Knowledge means actual knowledge. Any extension to subjective or constructive knowledge, eg wilful blindness, has yet to be determined in a prosecution for an offence of money laundering.*"[68]

3.49    The 2003 Guidance also addressed the introduction of the objective test of liability for reporting knowledge or suspicion of terrorist financing and money laundering generally, which was described as establishing a new way of founding guilt for the purposes of a prosecution:

> "*... when there are proved to be facts or circumstances from which an honest and reasonable person... would have inferred knowledge or formed the suspicion that another was engaged in money laundering.*
>
> *In order not to fall foul of the objective test, it is likely that staff within regulated firms would need to be able to demonstrate, taking a risk-based approach, that they took all reasonable steps in the particular circumstances to know the customer and the rationale for the transaction or the instruction. However, it should be noted that reasonable grounds to suspect cannot be based on generalities or stereotypical images of certain groups or categories of people being more likely to be involved in criminal activity.*"[69]

3.50    Finally, the guidance published by the JMLSG in 2006 repeated that knowledge meant actual knowledge, but went on to say that knowledge could nevertheless be inferred in some cases from the circumstances:

> "*Having <u>knowledge</u> means actually knowing something to be true. In a criminal court, it must be proved that the individual in fact knew that a person was engaged in money laundering. That said, knowledge can be inferred from the surrounding circumstances; so, for example, a failure to ask obvious questions may be relied upon by a jury to imply knowledge. The knowledge must, however, have come to the [bank] (or to the member of staff) in the course of business...* " (emphasis in the original - words not in italics were in italics in the original)[70]

---

[68]    Paragraph 5.4
[69]    Paragraphs 5.7 and 5.8
[70]    Paragraph 7.8

- 18 -

**REPORTING**

3.51    Having described the threshold for submitting a report to the authorities, it is convenient to turn to the reporting process itself and what happened following a report.

3.52    Prior to the relevant provisions of POCA 2002 coming into force on 24 February 2003 the position under both the anti-terrorist financing and anti-money laundering regimes was broadly the same. A person or company (including a bank) would not commit one of the primary terrorist financing or money laundering offences provided they disclosed their knowledge, belief or suspicion (depending on the relevant threshold test under the applicable statute at the time) to the authorities and either received consent to proceed with the underlying transaction or arrangement or were not forbidden from continuing with the transaction or arrangement. I have explained the rationale for that in relation to anti-terrorist financing in paragraph 3.29 above. The rationale in relation to anti-money laundering generally was the same. Accordingly, although (as I have explained in relation to the tipping off offence) the absence of a response from the Police to a report did not necessarily indicate that the Police were **not** investigating the subject of the disclosure, those making disclosures (including banks) would typically assume that they were entitled to and should (given the risk of committing the tipping off offence if they acted otherwise) generally try to carry on with "business as usual" unless and until they were told to stop by the Police or unless it was clear that this would expose them to the risk of claims by third parties of the sort described in paragraph 3.20 above.

3.53    POCA 2002 introduced a more complicated reporting regime in relation to money laundering generally, which included the concept of deemed consent to continue with a transaction or arrangement identified in a report if the person or company making the report did not receive within a specified period of time a notice either that consent was refused or that the authorities needed more time to decide how to proceed[71]. Because these provisions, which gave rise to their own issues, were not carried over into the anti-terrorist financing regime, I do not propose to address them further in this report.

3.54    In practice, the anti-terrorist financing and anti-money laundering disclosure processes overlapped to a significant degree: it was often difficult for those making disclosures to determine whether a suspicious transaction related to money laundering or to terrorist financing - and disclosures were made to the same body and stored on a single database[72].

3.55    Prior to 1 April 2006, disclosures concerning suspected terrorist financing offences (and money laundering offences) were made to the National Criminal Intelligence Service (**"NCIS"**) which was established in 1992 to deal with serious and organised crime in the

---

[71]    POCA 2002, section 335
[72]    *Review of the Suspicious Activity Reports Regime (the SARs Review)*, Sir Stephen Lander, Serious Organised Crime Agency, March 2006, paragraph 6

- 19 -

UK. NCIS was not the body charged with investigating disclosures; rather, it acted as a clearing house for receiving disclosures and disseminating them to the appropriate law enforcement agency, together with any other relevant intelligence held by NCIS in relation to the subject of the report. The relevant team within NCIS for the purposes of this report was the Terrorist Finance Unit. The National Terrorist Financial Investigation Unit, which was part of Special Branch in the Metropolitan Police based at New Scotland Yard in London, was the agency responsible for investigating terrorist financing in the UK (apart from Northern Ireland)[73].

3.56    The Serious and Organised Crime Agency ("SOCA") was created on 1 April 2006 following the merger of NCIS and a number of other law enforcement agencies. Disclosures concerning suspected terrorist financing offences and money laundering offences were made to SOCA after 1 April 2006[74] - although the role of the relevant team within SOCA (the Financial Intelligence Unit (the "FIU")) remained essentially the same as that of NCIS previously: namely, receiving, analysing and disseminating intelligence obtained from disclosures to the relevant law enforcement agency for investigation - and making that intelligence available to all agencies so that it could be searched. The FIU also analysed disclosures to try to identify patterns of terrorist financing and money laundering[75].

3.57    The number of disclosures made annually increased very significantly during the Relevant Period. Between 1994 and 2000, between 13,700 (1995) and 18,408 (2000) disclosures were made each year[76]. By 2005, the number of disclosures had multiplied to around 200,000, of which 65% were made by banks[77] – with the majority being made by high street banks such as NatWest[78]. In part, this tenfold increase reflected the extension of the anti-terrorist financing and anti-money laundering regimes to include accountants, lawyers and others during the Relevant Period. But another reason (and perhaps the main reason) was the increase in disclosures following the introduction of the objective test as I have explained above – and the rise in defensive reporting as a result.

3.58    As a result of the increasing number of disclosures being made year on year, a review of Suspicious Activity Reports in March 2006 considered whether it was appropriate to try to limit the number of reports and focus on quality not quantity because NCIS / SOCA had limited resources. The report concluded that this was inappropriate because:

---

[73]    *Combating the financing of terrorism - a report on UK action* by the Treasury and the Home Office, October 2002, paragraph 3.5
[74]    *The SARs Review*, paragraph 1
[75]    http://www.soca.gov.uk/about-soca/the-uk-financial-intelligence-unit
[76]    *Money Laundering: Review of the Reporting System*, KPMG for NICS, July 2003, paragraph 4.3.1
[77]    *The SARs Review*, paragraph 26
[78]    *Money Laundering Bulletin*, September 2001, page 10

- 20 -

*"In passing TA [2000] and POCA [2002], Parliament determined to set wide definitions of terrorist and criminal property and significant penalties for money laundering, and to retain a low threshold for disclosures, involving "suspicion", not "knowledge" or "belief". The consequence appears to have been the significant growth in reporting already noted. Two conclusions follow. First, it would be improper for SOCA as the FIU to seek, against some concern about reporting volumes, to insert its judgement about the threshold for suspicion in place of the duty to make that judgement laid on the reporters by Parliament. In any event, it is self evident that SOCA would never be better qualified to determine what is suspicious in the context of the reporters' business than the reporters themselves."[79]*

**NATWEST**

3.59    I note that, consistent with the legal obligations I have described above, NatWest made various disclosures to NCIS in the Relevant Period between 27 September 2001 and 28 August 2003. None of these disclosures prompted an instruction from the Police or any other authority telling NatWest to stop dealing with Interpal. Indeed, so far as I can tell (and consistent with my experience at the time) none of the disclosures prompted any response from the Police or other authorities at all (other than acknowledgments of the disclosures or, in one case, a request for additional information, which NatWest supplied). There was therefore no legal impediment as a matter of English law to NatWest maintaining the relationship with Interpal. On the contrary, for the reasons I have explained above, there were good reasons for NatWest to carry on with "business as usual".

---

[79]    *The SARs Review*, paragraph 53

- 21 -

4.    OTHER REGULATORY OBLIGATIONS

4.1    For completeness, I should point out that UK banks have been regulated by the Financial Services Authority ("FSA") since June 1998.  The FSA's statutory responsibilities include combating financial crime[80], including terrorist financing.  It has the power to make regulations for the prevention and detection of money laundering in relation to activities which it regulates, including banking[81].

4.2    The FSA requires firms to have effective anti-money laundering (including anti-terrorist financing) controls.  The FSA published a Money Laundering Handbook (the "ML Handbook"; essentially, the FSA's own anti-money laundering[82] rules) on 1 December 2001.  The ML Handbook contained regulatory requirements, as opposed to the requirements imposed by the criminal law that I have described above[83].

4.3    The key obligations imposed on regulated firms (including banks) for the purposes of this report were obligations to:

(a)    appoint an MLRO to oversee and implement anti-money laundering activities[84];

(b)    ensure that staff were aware of and trained on their anti-money laundering responsibilities[85];

(c)    take reasonable steps to ensure that any member of staff handling transactions which might involve money laundering (or managing staff who did) would promptly report any knowledge or suspicion of money laundering in relation to a customer to the MLRO[86];

(d)    take reasonable steps to give the MLRO access to information about the customer's financial circumstances and the features of the suspicious transaction[87];

(e)    take reasonable steps to ensure that any internal report (ie a report made by a member of staff to the MLRO) would be considered by the MLRO and, if having considered the report and information about the customer, the MLRO suspected

---

[80]    Financial Services and Markets Act 2000, section 6 (this provision came into force on 18 June 2001)
[81]    Section 146, Financial Services and Markets Act 2000 (this provision also came into force on 18 June 2001)
[82]    As at 1 December 2001 "money laundering" was defined in the FSA's Glossary as including offences under section 11 of the PTTPA 1989 (which relates to financial assistance for terrorism) (although this section had been repealed by 1 December 2001).  The definition was amended with effect from 1 December 2002 by the Money Laundering Sourcebook (Amendment) Instrument 2002 to refer to section 18 of the TA 2000.
[83]    ML 1.2.4G
[84]    ML 2.1.1R
[85]    ML 6.2.1R and 6.3.1R
[86]    ML 4.1.2R
[87]    ML 4.2.1R

- 22 -

that a person had been engaged in money laundering, he reported the suspicions to NCIS promptly[88]; and

(f) assess the effectiveness of anti-money laundering systems and controls at least once a year[89].

4.4 The ML Handbook stated that a bank was not required to increase the amount of information it gathered about its clients in the ordinary course of business; instead, the bank was required to use the information that it held in an effective way by making it available to the MLRO[90].

4.5 In practice, the ML Handbook added little or nothing to the requirements of the Regulations in force from time to time. In fact the ML Handbook created a certain amount of confusion because its requirements were not always consistent with the requirements of the Regulations - and the ML Handbook was deleted from the FSA Rulebook with effect from 31 August 2006[91] in favour of "high level standards" requiring firms (including banks) to establish "... *comprehensive and proportionate* ..." systems and controls to "... *identify, assess, monitor and manage money laundering risk* ..." (including risk in relation to terrorist financing)[92].

---

[88]  ML 4.3.2R
[89]  ML 7.2.2E
[90]  ML 4.2.3G
[91]  Money Laundering Provisions Instrument 2006
[92]  SYSC 6.3.1R

- 23 -

5.      **JMLSG GUIDANCE**

5.1     The JMLSG comprises representatives of the leading UK trade associations in the financial services industry. It publishes guidance from time to time on countering money laundering and terrorist financing and complying with financial sanctions with the aim of promoting good practice across the industry.  From the outset, the Money Laundering Regulations and the various statutory provisions imposing obligations on those working in the regulated sector to report knowledge or suspicion of terrorist financing and money laundering offences have included provisions requiring a court dealing with a prosecution for failure to disclose to consider whether the person (or body corporate) charged with the offence complied with any relevant guidance published by a supervisory authority or other appropriate body (which includes the JMLSG) and approved by HM Treasury in deciding whether or not an offence has been committed[93].

5.2     As a matter of law, the JMLSG Guidance from time to time is only relevant to determining whether an individual or a company complied with their legal obligations to a limited extent.  It is only **guidance** on compliance with those obligations and not a definitive description of those obligations. This reflects the fact that the JMLSG Guidance is written by practitioners from across the financial services industry, many of whom are not lawyers.  It reflects the industry's interpretation of the legal obligations - and best practice in the industry.   Any definitive interpretation of those obligations in the event of uncertainty or ambiguity can only come from the court, which is why compliance with the JMLSG Guidance from time to time is only a factor that a court must take into account and not an absolute defence to any prosecution.

5.3     Subject to this important caveat, in my opinion the following extracts from the JMLSG Guidance from time to time during the Relevant Period bear on the issues in these proceedings:

*1993 Guidance*

5.4     The first relevant guidance published by the JMLSG was produced in 1993 to reflect the 1993 Regulations and the amendments to the anti-money laundering regime (but not the anti-terrorist financing regime, which the 1993 Guidance barely addressed) introduced by the CJA 1993.  Separate guidance was produced for mainstream banking, lending and deposit taking (known as the "Red Book"); insurance and retail investment products (known as the "Green Book"); and wholesale, institutional and private client investment business (known as the "Yellow Book").  Only the Red Book is relevant to this report.

---

[93]     See, for example, regulation 5(3) in the 1993 Regulations and section 21A(6) TA 2000 (inserted by the ATCSA 2001)

- 24 -

5.5     The 1993 Guidance was supported by the Bank of England (which regulated banks at the time)[94] but it noted in the Foreword that it set out good industry practice and was not mandatory.  A decision not to comply with the 1993 Guidance did not mean that a bank would breach the 1993 Regulations, although it would need to demonstrate that the processes it had put in place were adequate[95].

5.6     However, the 1993 Guidance noted that:

> "*The Bank of England has informed all authorised banks that failure to install or maintain adequate policies and procedures relating to money laundering would be taken into account in considering whether the Banking Act's minimum criteria for authorisation continued to be met.  It has also advised all authorised banks that the original Guidance Notes issued by the Joint Money Laundering Steering Group [in December 1990] would be used as the minimum standard when assessing anti-money laundering policies, procedures and controls.  This is often done as part of the regular reports on banks' systems undertaken by reporting accountants under Section 39 of the Banking Act.  The Bank now intends to use these revised Guidance Notes as criteria against which it will assess the adequacy of a bank's systems to counter money laundering.*"[96]

5.7     The 1993 Guidance recommended that banks should introduce procedures to enable them to validate and report suspicions promptly and to provide the MLRO with access to systems and records to meet this requirement[97].  However, the 1993 Guidance did not require banks actively to investigate money laundering:

> "*Whilst there is a statutory obligation to establish and maintain procedures for the purpose of deterring and recognising money laundering in the ordinary course of business, there is nothing that requires banks and building societies to install specific systems to detect money laundering activities.*"[98]

5.8     Nor did the 1993 Guidance require banks to investigate or verify a customer's counterparties and associates.  Banks were only required to verify the identity of prospective customers[99].  If a suspicion of money laundering arose during the relationship, the 1993 Guidance recommended that the MLRO review all relevant

---

94   Explanatory Foreword
95   Explanatory Foreword
96   Paragraph 24
97   Paragraph 29
98   Paragraph 32 - and see paragraph 4.2 of the February 2001 Guidance
99   Paragraph 33 to 37 of the 1993 Guidance.  The 1997 Guidance is at paragraphs 4.01 to 4.04; the February 2001, December 2001 and 2003 Guidance is in each case at paragraphs 4.1 to 4.11. The 2006 guidance is at paragraphs 5.1.1 to 5.2.7

- 25 -

information available within the bank concerning the customer about whom the report was made, including reviewing transaction patterns and volumes through the account, other accounts in the same name, the length of the customer relationship and any identification records[100]. The 1993 Guidance also suggested that:

> "...a suspicious transaction will often be one which is inconsistent with a customer's known, legitimate business or personal activities or with the normal business for that type of account. Therefore, the first key to recognition is knowing enough about the customer's business to recognise that a transaction, or series of transactions, is unusual." [101]

5.9 Although the 1993 Guidance mentioned the anti-terrorist financing obligations imposed upon banks, its focus was on anti-money laundering measures. The only passing reference to terrorist financing in the examples given of suspicious transactions was to:

> "Customers who make regular and large payments, including wire transactions, that cannot be clearly identified as bona fide transactions to, or receive regular and large payments from, countries which are commonly associated with the production, processing or marketing of drugs; proscribed terrorist organisations; [tax haven countries]."[102].

*1995 Guidance*

5.10 The guidance published by the JMLSG in 1995 updated the 1993 Guidance to reflect experience, comments and queries from banks and other firms in the regulated sector. It was also supported by the Bank of England[103]. The only changes relevant to this report were:

(a) Further advice in relation to the risk of tipping off. The Guidance advised that preliminary enquiries of a customer (for example, to ascertain the precise nature of a transaction) would not trigger a tipping off risk unless the enquirer knew that an investigation was underway. It cautioned that, if it was known that a report had been submitted to NCIS and it was necessary to make further enquiries, great care should be taken to ensure that the customer did not realise that he had come to the attention of the Police[104].

(b) The inclusion of a warning that a bank could incur liability to a third party if, following a report which demonstrated concern as to the ownership of funds, it

---

[100] Paragraph 112
[101] Paragraph 106
[102] Appendix G, paragraph 4(c)
[103] Explanatory Foreword
[104] Paragraph 17

- 26 -

paid money away to someone other than the true owner[105] (see paragraph 3.20 above).

*1997 Guidance (updated in 1998 and 1999)*

5.11    The JMLSG guidance was revised and consolidated into a single document in June 1997. Further updates were made in August 1998 and April 1999, but they are not relevant to this report. Apart from the limited relevance of what was said in the 1997 Guidance about the level of suspicion required to trigger the obligation to make a report (see paragraphs 3.45 and 3.46 above) the 1997 Guidance is not relevant to this report. In particular, the 1997 Guidance did not address anti-terrorist financing (save that it repeated the reference to proscribed terrorist organisations identified in paragraph 5.9 above).

5.12    Like the 1993 Guidance, the 1997 Guidance advised that an MLRO should review the information the firm already held about a customer in order to decide whether a transaction was suspicious, rather than seek to gather new information about the customer and its counterparties[106]. The 1997 Guidance repeated the advice in the 1993 Guidance set out at paragraph 5.8 above and suggested that:

> *Questions that a financial institution might consider when determining whether an established customer's transaction might be suspicious are:*
>
> - *is the size of the transaction consistent with the normal activities of the customer?*
>
> - *is the transaction rational in the context of the customer's business or personal activities?*
>
> - *has the pattern of transactions conducted by the customer changed?*
>
> - *where the transaction is international in nature, does the customer have any obvious reason for conducting business with the other country involved?"*[107]

5.13    It noted that "*A financial institution would not be expected to know the exact nature of the criminal activity concerned, or that the particular funds passing through the account are definitely those arising from the crime*"[108]. This is obviously consistent with what I have said above about responsibility for investigating money laundering (and terrorist financing) resting with the Police and other law enforcement agencies, not those making disclosures (see paragraphs 3.29 and 3.30 above).

---

[105]    Paragraph 142
[106]    Paragraph 6.10
[107]    Paragraphs 6.02 and 6.03
[108]    Paragraph 2.04

*February 2001 Guidance*

5.14    The JMLSG guidance was updated in February 2001 to reflect developments in international standards and policies for combating money laundering and the publication of the final version of the ML Handbook (although that did not come into force until 1 December 2001).

5.15    In relation to reporting suspicions, the February 2001 Guidance stated that if, having considered all relevant information regarding the financial circumstances of the customer and any significant features of transactions in which the customer had been involved[109], knowledge or suspicion of money laundering remained, a report should be made to the authorities[110]. Any investigation was therefore not directed at whether the underlying suspicion was justified, but at whether the suspicion could be dispelled.

5.16    The February 2001 Guidance set out "*Basic Principles and Objectives of Money Laundering Prevention and Compliance*", which included adopting satisfactory "Know Your Customer" procedures to identify a customer and obtain sufficient information about the customer to identify suspicious transactions[111].

5.17    The Guidance noted, by reference to the ML Handbook in force at the time, that a firm was not required to expand the amount of knowledge it held about a customer in the normal course of business as part of any investigation; rather, it was expected to use its existing knowledge effectively and ensure that it was available to the MLRO[112]. There was nothing in the Guidance to suggest that a firm was required to investigate a customer's counterparties.

*December 2001 Guidance*

5.18    The JMLSG guidance was updated again in December 2001 to reflect the ML Handbook as finally published by the FSA. It included guidance on anti-terrorist financing that was approved by HM Treasury[113] and so would have been taken into consideration in any prosecution[114]. The December 2001 Guidance noted when commenting on the legal requirements in relation to anti-terrorist financing that:

> "... *often only small amounts are required to commit a terrorist atrocity, thus increasing the difficulty of tracking the funds;*

---

[109]    Paragraph 5.26
[110]    Paragraph 5.29
[111]    For example, see Paragraph 1.12(v).
[112]    Paragraph 5.28, referring to FSA guidance at 4.2.3G of the ML Handbook
[113]    Paragraph 2.6
[114]    Terrorism Act 2000, section 21A(6)

- 28 -

> *terrorists can be funded from legitimately obtained income and it is not clear to a financial sector firm at what stage legitimate earnings become terrorist assets.*"[115]

5.19    The December 2001 Guidance recommended that, when suspicion of terrorist financing was reported internally, the MLRO should consider all relevant information available within the bank about the customer which was the subject of the report; this could include reviewing transaction patterns and the value of transactions, the length of the business relationship and the records of identity held by the bank, and connected accounts or relationships[116]. If the MLRO concluded that there were no facts to dispel the suspicion, a report should be made, although it noted that reports should not be submitted as a matter of routine[117].

5.20    This, coupled with what I have said above about the meaning of suspicion as a matter of English law and the rise in defensive reporting after the introduction of the objective test for reporting knowledge or suspicion of terrorist financing by ATCSA 2001, reinforces the fact that the threshold for making a report was not high.  Once there was a whiff of suspicion, a prudent MLRO would make a report unless there were compelling reasons not to do so.

5.21    The December 2001 Guidance included "typologies" drawn from reports published by the Financial Action Task Force (the "**FATF**") between 1997 and 2001[118]. These included a reference to the risk of Islamic charities being used to raise funds for terrorist purposes (although it noted that "*... There should be no assumption that ... donations necessarily bear a relation to terrorist funding...*") and to the risk that UK charities might be used to perpetrate fraud and / or to raise funds for terrorist purposes[119].  The relevant section noted that the Charity Commission in the UK regulated charities and had powers to ensure that they stayed within their legal remit, but added that reporting suggested that not all charitable institutions were regulated to this extent and that there were known cases of charities being used to raise funds for terrorist purposes.  It gave an example of a UK charity said to have been used to perpetrate a fraud.  For the reasons set out above, these extracts did not give rise to any legal obligations on the part of banks and others in the regulated sector, save that a bank that did not have regard to the December 2001 Guidance would not be able to rely on it in any subsequent prosecution.  I note that the commentary about not all charitable institutions being adequately regulated does not apply to Interpal, which was the subject of investigations by the Charity Commission in 1996 and 2003.

---

[115]    Paragraph 2.34
[116]    Paragraphs 5.39 and 5.40
[117]    Paragraphs 5.41 to 5.42
[118]    Appendix B, page 131
[119]    Appendix B, paragraph 7, pages 136 and 138

- 29 -

*2003 Guidance*

5.22    The extracts referred to in the previous paragraph were repeated in updated Guidance issued by the JMLSG in 2003 (and approved by HM Treasury with minor amendments in December 2004[120]) although the typologies (again derived from the FATF) set out in appendix B to the 2003 Guidance also described misuse of non-profit organisations and charities fraud as a potential source of terrorist income[121]. In this regard, I repeat my comments in the previous paragraph in relation to Interpal.

5.23    The main changes for the purposes of this report between the December 2001 Guidance and the 2003 Guidance include:

(a)     advice expressly drawing attention (in relation to legal requirements concerning anti-terrorist financing) to the risk of terrorist funding via charitable donations (subject to the caveat that it might not be clear whether funds were intended for that purpose or were legitimate)[122];

(b)     advice that firms should carry out ongoing monitoring of customer activity, either through manual procedures or through a computer system[123]; and

(c)     advice that firms should keep abreast of public information relating to named terrorists and terrorist organisations.[124]

5.24    So far as reporting obligations were concerned, the 2003 Guidance repeated previous guidance that if, after reviewing information held about the customer (including information about connected accounts or relationships[125]), an MLRO concluded that there were grounds for knowledge or suspicion or reasonable grounds for knowledge or suspicion, the MLRO should disclose the information to the authorities as soon as possible to avoid committing the offence of failing to disclose[126]. It recommended balancing the need to report in a timely way with searching the firm's systems and records for potentially relevant information, a process which could delay reporting[127]. The 2003 Guidance also retained the warning from previous guidance against submitting reports as a matter of routine without making internal enquiries[128].

---

[120]    *Money Laundering Monitor*, Issue 58, February 2005, page 5
[121]    Pages 170 to 172
[122]    Paragraph 2.36(2)
[123]    Paragraph 5.12
[124]    Paragraph 2.39
[125]    Paragraphs 5.35 to 5.38
[126]    Paragraph 5.43
[127]    Paragraph 5.39
[128]    Paragraph 5.44

- 30 -

*2006 Guidance*

5.25   The JMLSG's 2006 Guidance (which was approved by HM Treasury[129]) repeated the advice in relation to anti-terrorist financing from the previous guidance summarised above, but stressed the difficulty of distinguishing terrorist funds from legitimate funds, as follows:

> "... terrorists can be funded from legitimately obtained income, including charitable donations, and it is extremely difficult to identify the stage at which legitimate funds become terrorist property."[130]

5.26   It added, in relation to combating terrorist financing, that:

> "... the obligation on firms is to report any suspicious activity to the authorities.   This supports the aims of law enforcement agencies in relation to the financing of terrorism, by allowing the freezing of property where there are reasonable grounds for suspecting that such property could be used to finance terrorist activity, and depriving terrorists of this property as and when links are established between the property and the terrorists or terrorist activity."[131]

5.27   The 2006 Guidance commented specifically on charities in the context of customer verification on opening an account.   It noted that:

(a)   simply being registered with the UK Charity Commission was not a guarantee of the charity's bona fides, but that registration indicated that the charity was subject to "... some ongoing regulation" ...[132]; and

(b)   terrorists and other criminals had been known to abuse non-profit organisations and referred to the FATF paper "*Combating the abuse of non-profit organisations - International Best Practices*"[133].

5.28   Again, I repeat my comments in paragraph 5.21 above in relation to Interpal in the context of these extracts from the 2006 Guidance.

5.29   The 2006 Guidance also addressed the degree of monitoring that was expected of banks. It described the essentials of a monitoring system as:

(a)   identification of transactions or activities which required further review;

(b)   prompt review of any flags; and

---

[129]   http://jmlsg.org.uk/news/jmlsg-welcomes-hm-treasury-approval-of-new-industry-guidance1
[130]   Paragraph 9 of the Preface (compared to paragraph 2.34 of the December 2001 Guidance)
[131]   Paragraph 11 of the Preface
[132]   Paragraph 5.4.103
[133]   Paragraph 5.4.110

- 31 -

(c)     appropriate action, following that review[134].

5.30    It advised that the key elements of any system were having up to date customer information so that unusual activity would be spotted, and asking appropriate questions to help judge whether a transaction was suspicious[135]. It went on to say that:

> *"Effective monitoring is likely to be based on a considered identification of transaction characteristics, such as:*
>
> - *the unusual nature of a transaction: eg, abnormal size or frequency for that customer or peer group; the early surrender of an insurance policy;*
>
> - *the nature of a series of transactions: for example, a number of cash credits;*
>
> - *the geographic destination or origin of a payment: for example, to or from a high-risk country; and*
>
> - *the parties concerned: for example, a request to make a payment to or from a person on a sanctions list."[136]*

5.31    It is worth noting that, although the 2006 Guidance required banks to monitor accounts for signs of money laundering or terrorist financing in a proactive way, there was nothing in the 2006 Guidance to suggest that, once money laundering or terrorist financing was suspected, a firm should investigate whether those suspicions were correct. Instead, firms were required to disclose their suspicions to the authorities and be careful not to alert the customer to the possibility that they were under investigation. That is consistent with the legal analysis set out in paragraphs 3.19 to 3.21, 3.29 to 3.30 and 3.51 to 3.54 and an accurate reflection of the roles and responsibilities of those involved in the anti-terrorist financing and anti-money laundering regimes in the UK throughout the Relevant Period.

---

[134]    Paragraph 6.3
[135]    Paragraph 6.8
[136]    Paragraph 6.10

- 32 -

6.      **FATF** - AND OTHER INTERNATIONAL BODIES

6.1     I have referred to FATF in the context of the JMLSG Guidance above and so I will briefly explain the relevance of that body to the UK anti-terrorist finance and anti-money laundering regimes.

6.2     FATF is an International body which develops policies to combat money laundering and, since 2001, terrorist financing for consideration by member states when formulating domestic legislation in these areas.  FATF recommendations and other publications (which are directed to member states and not the private sector) do not themselves give rise to legal obligations or liabilities as a matter of English law[137].

6.3     The UK has been a member of FATF since 1990.  The US has also been a member since 1990.  Israel is not a member.

6.4     FATF currently uses five "processes" to combat money laundering and terrorist financing, namely:

        (a)     setting and reviewing standards;

        (b)     assessing Implementation of FATF standards at a national level;

        (c)     monitoring high-risk and non-cooperative jurisdictions, to encourage them to Improve their systems and controls;

        (d)     reviewing particular economic sectors or activities (such as casino gambling) to Identify weaknesses and risks; and

        (e)     Identifying and addressing new threats[138].

6.5     FATF is not a law enforcement or regulatory body.  It Is not involved in Investigations or prosecutions.

6.6     FATF's guidelines and other findings (for example, that a particular jurisdiction's anti-money laundering controls are deficient) do not form part of UK law or regulation and they have no legal effect in the UK, although the UK anti-terrorist financing and anti-money laundering regimes are based on them to some extent.  For example, the UK anti-terrorist financing regime was Influenced by the FATF VIII[139] Recommendations on Combating

---

[137]   *The financial challenge to crime and terrorism*, HM Treasury, the Home Office, SOCA and the Foreign & Commonwealth Office, February 2007. Box 2.2

[138]   *FATF publication: 20 Years of the FATF Recommendations*, page 6

[139]   A ninth special recommendation, in relation to cash couriers, was added on 22 October 2004, but it is not relevant to this case. To avoid confusion, I have referred to the eight recommendations, rather than nine.

- 33 -

Terrorist Financing[140], although when the VIII Recommendations were published in October 2001 the UK was already broadly compliant[141].

6.7     Although the FATF guidelines and findings are not part of UK law, the FSA's ML Handbook required banks to take reasonable steps to obtain and apply FATF findings that a particular jurisdiction had materially deficient anti-money laundering controls. Banks were also required to incorporate such findings into their knowledge of customers and to disseminate them through training[142].   The 2006 JMLSG Guidance also referred banks to the FATF's guidance on money laundering typologies as I have described above for consideration by firms when formulating internal procedures aimed at preventing and detecting terrorist financing and money laundering[143].

*FATF's VIII Recommendations*

6.8     FATF's Special Recommendation VIII relates to the use of non-profit organisations, such as charities, to fund terrorism.  It provides that:

> *"Countries should review the adequacy of laws and regulations that relate to entities that can be abused for the financing of terrorism. Non-profit organisations are particularly vulnerable, and countries should ensure that they cannot be misused:*
>
> (i)     *by terrorist organisations posing as legitimate entities;*
>
> (ii)    *to exploit legitimate entities as conduits for terrorist financing, including for the purpose of escaping asset freezing measures; and*
>
> (iii)   *to conceal or obscure the clandestine diversion of funds intended for legitimate purposes to terrorist organisations."*

6.9     The Interpretative Note for Special Recommendation VIII states that;

(a)     countries should adopt measures to protect the charitable sector from abuse by terrorists, but this should not *"... disrupt or discourage legitimate charitable activities.  Rather, such measures should promote transparency and engender greater confidence in the sector ..."[144]*; and

---

140     Statement by the Chancellor of the Exchequer, Gordon Brown, on 31 October 2001 and *Anti-Money Laundering Strategy*, published by HM Treasury, the Home Office and the Foreign and Commonwealth Office, October 2004, paragraph 2.6
141     *Combating the financing of terrorism - a report on UK action*, published by HM Treasury and the Home Office, October 2002, paragraph 4.22
142     5.1.2R and 5.1.3R; in force until 30 August 2008
143     Paragraph 8.30 and Part II, paragraph 1.47
144     Paragraph 3(b)

(b)    countries should take effective action if there were suspicions that a charity was exploited by terrorists or was involved in terrorist financing - and, if such suspicions exist, the relevant country's first priority should be to investigate and halt such activities; whilst the impact on innocent beneficiaries of the charity's work should be minimised, action should be taken even if they might be affected[145].

*FATF guidance in relation to terrorist financing and charities*

6.10    FATF published *Guidance For Financial Institutions On Detecting Terrorist Financing* on 24 April 2002. This Guidance was described as a "... *first attempt to provide necessary guidance for financial institutions in this area.*"[146] FATF noted that the way in which a financial institution might choose to implement the Guidance would depend on its assessment of the risks, together with the individual factors in any given case[147]. The Guidance did not give rise to any legal obligation in the UK[148]. Like the rest of FATF's guidelines and findings, it had no legal effect here.

6.11    The Guidance noted that, while financial institutions might detect suspicious transactions which might later be shown to be terrorist financing, it was the responsibility of law enforcement to determine whether a transaction was terrorist financing and to decide what to do[149]. It advised on possible characteristics of terrorist financing, although it noted that the existence of one characteristic did not, in itself, mean that a transaction was suspicious[150]. Various points were made in the Guidance in relation to the risk of terrorist financing through charitable organisations.

6.12    FATF also published a report on *Combating the Abuse of Non-Profit Organisations: International Best Practice* on 11 October 2002. This report noted that there were numerous instances of terrorism being financed through charities, either through charities which were simply fronts for terrorist financing, or through legitimate charities whose employees diverted funding[151]. The report set out "best practice" on protecting the charitable sector from attempts to use it to finance terrorism. It stated that:

(a)    supervision of charities was the responsibility of the relevant government, the charitable sector, the charity's supporters, and those served by the charity[152], although law enforcement agencies and bank regulators also had a role[153];

---

[145]    Paragraph 3(c)
[146]    Paragraph 1
[147]    Paragraph 8
[148]    Paragraph 6
[149]    Paragraph 9
[150]    Annex 1, introductory paragraphs
[151]    Paragraph 4
[152]    Paragraph 5
[153]    Paragraph 18

- 35 -

(b)     while different countries might disagree as to whether a particular activity was charitable or not, all should agree that activities which "... *directly or indirectly support terrorism, including actions that could serve to induce or compensate for participation in terrorist acts ...*" were not charitable[154]; and

(c)     charities should use bank accounts, so that they were covered by the controls within the banking system, such as suspicious activity reporting[155].

6.13    In this context, I repeat my comments in paragraph 5.21 above concerning the fact that Interpal was supervised by the Charity Commission throughout the Relevant Period and was the subject of investigations by the Charity Commission in 1996 and 2003.

6.14    Like all the other FATF publications referred to above, the report on *Combating the Abuse of Non-Profit Organisations: International Best Practice* had no legal effect in the UK.

**The Basel Committee on Banking Supervision and the Wolfsberg Group**

6.15    For completeness, I should also mention briefly two other bodies that have published guidance relating to anti-terrorist financing and anti-money laundering from time to time: namely, the Basel Committee on Banking Supervision and the Wolfsberg Group. Since the publications of both these bodies were at an even higher level of generality than the publications by FATF summarised above - and since, like the FATF publications, they had no legal effect in the UK - I do not propose to address them further in this report.

---

- 36 -

7.  **ENFORCEMENT**

7.1     The potential criminal penalties are set out in the sections describing the relevant legislative provisions above. There have been relatively few reported prosecutions in relation to terrorist financing or money laundering, but the English court has emphasised that laundering the proceeds of crime is very serious. In *R v Griffiths and Pattison* the Court of Appeal said that:

> "*Organising the cover-up or laundering the proceeds of crime is always particularly serious, especially if organised or set up as an operation. Custodial sentences are absolutely inevitable in almost every case, if not every case, and this attempt to avoid confiscation* [of a drug dealer's assets] *is also serious.*
>
> *We do not leave the case without underlining to all professional people involved in the handling of money and with an involvement in financial transactions the absolute obligation to observe scrupulously the terms of this legislation and the inevitable penalty that will follow failure so to do.*"[156]

7.2     Separately from the risk of criminal prosecution, the FSA can bring enforcement proceedings in appropriate cases for breaches of regulatory requirements by firms that it regulates, including banks. In a serious case, the FSA can strip a firm (including a bank) of its authorisation to carry out some or all regulated activities. This is an important incentive for firms to comply with their legal and regulatory obligations in relation to anti-money laundering and anti-terrorist financing (and generally).

7.3     The FSA took action against a number of banks and other financial institutions in the Relevant Period in relation to deficiencies in their anti-money laundering procedures. The majority of the fines levied by the FSA have been levied in relation to deficiencies in the customer identification process, but the following fines have been levied in relation to failures to identify possible money laundering or to act promptly once a suspicion of money laundering arose:

(a)     Abbey National plc was fined £2 million on 9 December 2003 for failing to take reasonable steps to ensure that suspicious activity reports were made promptly to the appropriate authorities, which potentially hindered the detection of money laundering (and other failings in relation to the identification of customers)[157]; and

(b)     Bank of Ireland was fined £375,000 on 31 August 2004 for failing to ensure staff understood their anti-money laundering training and to spot that a particular set of

---

[156]     [2006] EWCA Crim 2155, paragraphs 11 and 17
[157]     FSA Final Notice, 9 December 2003

- 37 -

transactions with a total value of £2 million could have been used to launder money[158].

7.4     In the case of Abbey National plc, the FSA considered whether a criminal prosecution would be appropriate, but concluded that it would not.

7.5     Both of these enforcement proceedings focused on the importance of identifying potential money laundering and making reports in a timely fashion.

---

[158]     FSA Final Notice, 31 August 2004

- 38 -

8.  **UK FINANCIAL SANCTIONS**

**STRUCTURE OF THE UK FINANCIAL SANCTIONS REGIME**

8.1  The nature of the UK financial sanctions regime is different from the anti-terrorist financing and anti-money laundering schemes I have described above because it does not depend upon banks and others in the regulated sector identifying potential criminal conduct by reference to external facts and matters. Instead, the Government designates those subject to financial sanctions and publishes such details as are available on a list that is published on the HM Treasury website. The current consolidated list is accessible in various formats from http://www.hm-treasury.gov.uk/fin_sanctions_index.htm. It shows the names of all individuals and entities currently subject to financial sanctions in the UK and is regularly updated through notices published by HM Treasury. Responsibility for administering UK financial sanctions during the Relevant Period rested with the Bank of England until 24 October 2007, under delegated authority from HM Treasury.

8.2  Financial sanctions are imposed through statutory instruments and generally reflect targets designated by the UN, the EU or, less commonly, the UK Government acting unilaterally. Although the EU has the power to impose financial sanctions that are directly effective throughout the EU, domestic UK legislation is still required in order to provide criminal penalties for breaching financial sanctions.

8.3  UK financial sanctions impose obligations on anyone in the UK and UK citizens and companies wherever they are. The requirements of the various regimes are not always the same - and it is necessary to check precisely what steps are required in relation to a person or entity on the financial sanctions list by reference to the particular statutory instrument pursuant to which the individual or entity has been designated. I describe the obligations imposed in relation to persons and entities on the relevant lists for the purposes of this report in detail below.

**UK FINANCIAL SANCTIONS IN RELATION TO TERRORISM AND TERRORIST FINANCING**

8.4  The relevant UK legislation in relation to sanctions against terrorism and terrorist financing during the Relevant Period was:

(a)  the Terrorism (United Nations Measures) Order 2001[159] (**"TUNMO 2001"**), which came into force on 10 October 2001 and which gave effect in the UK to a decision of the UN Security Council in its resolution 1373 made on 28 September 2001, immediately following the terrorist attacks in the US on 11 September 2001; and

---

[159]  SI 2001/3365

- 39 -

(b)     the Terrorism (United Nations Measures) Order 2006[160] (**"TUNMO 2006"**), which came into force on 12 October 2006 and repealed and replaced TUNMO 2001.

**TUNMO 2001**

8.5     There were two primary offences under UK financial sanctions against terrorists:

(a)     Making funds or financial (or related) services available to or for the benefit of:

(i)     a person who commits, attempts to commit, facilitates or participates in the commission of acts of terrorism,

(ii)    a person controlled or owned directly or indirectly by a person in (i), or

(iii)   a person acting on behalf, or at the direction, of a person in (i)[161];

(b)     Contravening a freezing direction given by HM Treasury.  HM Treasury could, if it had reasonable grounds to suspect that a person by, for or on behalf of whom any funds were held was or might be:

(i)     a person who commits, attempts to commit, facilitates or participates in the commission of acts of terrorism,

(ii)    a person controlled or owned directly or indirectly by a person in (i),

(iii)   a person acting on behalf, or at the direction, of a person in (i), or

(iv)    (from 4 June 2003) a person on the list in EU Council Decision 2002/974/EC[162];

direct that those funds were not to be made available to any person, except under the authority of a licence granted by HM Treasury[163].

8.6     Liability for these offences was effectively strict.  It was not a defence for a person charged with an offence to show that they did not know or suspect that they were making funds available to a terrorist.

---

[160]   SI 2006/2657
[161]   Article 3
[162]   Article 4.  It was amended by the Terrorism (United Nations Measures) Order 2001 (Amendment) Regulations 2003. It was amended again on 19 September 2003 by the Terrorism (United Nations Measures) Order 2001 (Amendment No. 2) Regulations 2003 to change the reference to Council Decision 2002/974/EC to Council Decision 2003/480/EC (which repealed Decision 2002/974/EC).  It was amended on three further occasions (on 20 September 2003 by the Terrorism (United Nations Measures) Order 2001 (Amendment No. 3) Regulations 2003, which changed the reference to the Council Decision to Council Decision 2003/646/EC (which repealed Decision 2003/480/EC); and on 28 September 2004 by the Terrorism (United Nations Measures) Order 2001 (Amendment) Regulations 2004, which changed the reference to the Council Decision to Council Decision 2004/306/EC (which repealed Decision 2003/646/EC); and on 29 June 2005 by the Terrorism (United Nations Measures) Order 2001 (Amendment) Regulations 2005, which changed the reference to the Council Decision to Council Decision 2005/221/CFSP (which repealed Decision 2004/306/EC).
[163]   Article 4

8.7    There was an anti-avoidance provision in TUNMO 2001 which made it an offence to engage intentionally in any activities knowing that the object or effect of those activities was to enable or facilitate the commission (by that person or another) of one of the offences described above[164].

8.8    The combined effect of these provisions was that no-one (including a bank) could engage in a financial transaction, such as a payment, with any person who was either designated by HM Treasury or who fell into the categories set out in paragraph 8.5(a))(i) to (iii) above.  This prohibition overrode any contractual or other rights and obligations. So, for example, if a bank was asked by a customer to make a payment from the customer's account to a designated person or entity (whether that person or entity was located in the UK or not) the bank was prohibited from making the payment and had an absolute defence to any contractual or other claim by the customer for refusing to make the payment.

8.9    In addition, if a bank knew or suspected that a customer or person with whom it had business dealings was a person or entity falling within any of the categories described above or had committed an offence under TUNMO 2001, the bank was required to disclose the information on which its knowledge or suspicion was based to HM Treasury as soon as reasonably practicable, failing which it would commit an offence[165].  This obligation overlapped to a significant extent with the reporting obligations imposed on banks and others in the regulated sector by the UK anti-terrorist financing regime that I have described above.  It is unclear what (if anything) HM Treasury thought the additional obligation in TUNMO 2001 added to the existing regime.

8.10   "Terrorism" and "funds" were both very widely defined[166].  The definition of "terrorism" included action outside the UK.

8.11   The maximum penalty for the substantive offences was seven years' imprisonment, or a fine, or both[167].  The maximum penalty for failure to disclose was six months' imprisonment, or a fine, or both[168].

**TUNMO 2006**

8.12   TUNMO 2006 had substantially the same effect in practice as TUNMO 2001, save that it made it an offence to deal with funds or economic resources (which were very widely defined[169]) belonging to, owned or held by anyone falling within the categories described above in relation to TUNMO 2001 or a person designated by the EU or by HM Treasury

---

[164]    Article 5
[165]    Article 7
[166]    Article 2
[167]    Article 10(1)
[168]    Article 10(3)
[169]    TUNMO 2006, Article 2(1)

- 41 -

or to make funds, economic resources or financial services (which were also very widely defined) available to such a person without a licence from HM Treasury. As under TUNMO 2001, the practical effect of these provisions was to freeze the assets of those on the list of suspected terrorists pending further action by the authorities.

8.13 By TUNMO 2006, HM Treasury was given power to designate (thereby freezing that person's funds) anyone who it had reasonable grounds to believe was or might be:

(a) a person who committed, attempted to commit, participated in or facilitated the commission of acts of terrorism;

(b) a person designated by the EU;

(c) a person owned or controlled, directly or indirectly by a designated person; or

(d) a person acting on behalf of or at the direction of a designated person.[170]

8.14 The power to designate an individual (or entity) could be exercised very quickly. In August 2006, for example, HM Treasury designated 19 individuals suspected of a terrorist plot within 24 hours of their arrest, so that their assets were frozen[171].

8.15 HM Treasury was required by TUNMO 2006 to take appropriate steps to co-operate with any domestic or international investigation relating to the funds or financial transactions of a person within the categories set out in paragraph 8.13 above[172].

8.16 Unlike TUNMO 2001, it was a defence under TUNMO 2006 for a person charged with an offence to show that they did not know and had no reasonable grounds to suspect that they were dealing with funds or economic resources of a person or entity subject to TUNMO 2006, or making funds, economic resources or financial services available to such a person[173]. Like TUNMO 2001, TUNMO 2006 contained an anti-avoidance provision[174] and imposed reporting obligations on banks in certain circumstances[175].

8.17 The Bank of England published news releases when individuals or entities were designated in relation to terrorist financing. These news releases typically required financial institutions to "... *check whether they maintain any account for the entity named below ..., if so, they should freeze the accounts and report their findings to the Bank of England.*"[176]

---

[170] Article 4
[171] *The financial challenge to crime and terrorism*, HM Treasury, the Home Office, SOCA and the Foreign & Commonwealth Office, February 2007, Box 2.7
[172] Schedule 1, paragraph 1
[173] Articles 7(4) and 8(3)
[174] Article 10
[175] Schedule 1, paragraph 2(1)
[176] For example, see the Bank of England News Release of 6 December 2001 in relation to the Holy Land Foundation for Relief and Development

- 42 -

8.18    Designation did not have retrospective effect and there was no obligation to review past transactions to check whether customers had had dealings with a designated person. Of course, if a bank knew that a customer had had dealings with a designated person, that might trigger an obligation to make a report under the anti-terrorist financing regime that I have described above.

**THE ROLE OF HM TREASURY**

8.19    HM Treasury was able to (and did) delegate its powers under TUNMO 2001 and TUNMO 2006[177], including its powers to gather information to enable it to police the asset freezing regime (by, for example, requesting information to detect evasion of TUNMO 2001[178] or TUNMO 2006[179]). As I have already mentioned, the Bank of England's Financial Sanctions Unit (the "**FSU**") was responsible for administering the UK's financial sanctions regime until 24 October 2007, i.e., throughout the Relevant Period. I have not been able to locate a statement of the FSU's role and responsibilities, but I believe that they included the responsibility that now rests with the Asset Freezing Unit of HM Treasury to advise the UK Government on whether to designate domestic (ie UK-based) terrorists.

8.20    I mention this because I note that NatWest's Director of Group Risk Management, Richard Gossage, wrote to Tom Dawlings at the FSU on 5 September 2003, following the US Office of Foreign Assets Control's ("**OFAC**") designation of Interpal as a Specially Designated Global Terrorist ("**SDGT**").

8.21    Mr Dawlings replied to Mr Gossage on 3 October 2003

---

[177]    TUNMO 2001, Article 11 and TUNMO 2006, Article 16
[178]    Article 8(1)
[179]    Schedule 1, paragraph 3

- 43 -

8.22   Mr Gossage replied to Mr Dawlings on 28 October 2003 ███████████████



8.23   These exchanges are important because they show that NatWest notified the FSU about Interpal's accounts following Interpal's designation as an SDGT.  Having notified the body responsible for administering financial sanctions in the UK at the time and been told that

███████████████████████████████████████████

███   NatWest was both legally entitled to maintain its relationship with Interpal ███

███████████████████████████████████████████

███████████████████████████ and entitled to draw considerable comfort from the fact that the UK authorities had presumably considered whether Interpal should be designated under TUNMO 2001 and concluded that it should not.  In these circumstances, NatWest was not, as was often the case when disclosures were made to the authorities (and as was in fact the case in relation to NatWest's own disclosures in relation to Interpal as described above) merely proceeding in the absence of an instruction from the Police (or any other authority) to stop dealing with Interpal.  That is a perfectly proper approach for the reasons I have explained previously, but in this case NatWest had the added comfort of having been in direct contact with (a) the Police (in the form of Special Branch); (b) the UK body responsible for supervising Interpal's activities (the Charity Commission); and (c) the UK body responsible for determining whether Interpal should be made the subject of financial sanctions in the UK equivalent to those imposed in the US (the FSU).  And none of those authorities had any objection to NatWest maintaining its relationship with Interpal on the basis set out in the exchanges of correspondence referred to above.

8.24   Against this background, what I understand to be the plaintiffs' criticisms of NatWest's behaviour at the relevant time are completely misconceived, in my opinion, as a matter of English law.  Not only was NatWest **legally** entitled to act as it did; it is hard to see what more NatWest could have done in **practical** terms to draw the attention of the relevant authorities to its relationship with Interpal and to seek guidance on how to proceed.

8.25   Interpal was not a designated person under UK financial sanctions at any time during the Relevant Period, nor is it a designated person at the date of this report.

**JMLSG GUIDANCE**

8.26   The JMLSG Guidance published in the Relevant Period did not address financial sanctions to any great extent.  The earliest reference to financial sanctions was in the

- 44 -

2003 Guidance, which simply noted that firms should have regard to the Bank of England's financial sanctions updates to avoid breaching financial sanctions legislation[180].

8.27    The 2006 Guidance addressed the issue of financial sanctions against terrorists and others, initially under the heading "*Persons firms should not accept as customers*".

8.28    The 2006 Guidance summarised the prohibitions on making funds available to a designated person and made it clear that dealing with a designated person, for example, through an intermediary (the examples given were lawyers or accountants) was a criminal offence[181].   It observed that banks therefore needed to have an appropriate means of monitoring transactions to ensure that they did not breach UK financial sanctions by making payments to designated persons or their agents[182].

8.29    The 2006 Guidance went on to state that:

> "...*firms are likely to focus their resources on areas of their business that carry a greater likelihood of involvement with* [designated persons] *or their agents. Within this approach, firms are likely to focus their prevention and detection procedures on direct customer relationships, and then have appropriate regard to other parties involved.* "[183]

---

[180]    Paragraph 2.39
[181]    Paragraphs 5.2.8 and 5.2.12
[182]    Paragraph 5.2.15
[183]    Paragraph 5.2.14

9.  **THE ROLE OF THE CHARITY COMMISSION**

9.1 Since I have mentioned the Charity Commission above, I will now deal relatively briefly with the relevance of the various steps taken by the Charity Commission in relation to Interpal in the Relevant Period.

9.2 The Charity Commission regulates charities in England and Wales. Its powers are contained in the Charities Acts 1993 and 2006.

9.3 The Charity Commission maintains the register of charities. Its powers include removing charities from the register if it no longer considers their activities to be charitable[184].

9.4 Under English law, a "charity" is a body which is established for charitable purposes **only**. If its purposes extend beyond the charitable to encompass, for example, political aims, it is not a charity. The definition of "charitable purposes" has changed to reflect changing needs and attitudes. Although the Charities Act 2006 was passed near the end of the Relevant Period, the definition of "charitable purposes" in that statute is instructive. Charitable purposes are:

   (a) the prevention or relief of poverty;

   (b) the advancement of education;

   (c) the advancement of religion;

   (d) the advancement of health or the saving of lives;

   (e) the advancement of citizenship or community development;

   (f) the advancement of the arts, culture, heritage or science;

   (g) the advancement of amateur sport;

   (h) the advancement of human rights, conflict resolution or reconciliation or the promotion of religious or racial harmony or equality and diversity;

   (i) the advancement of environmental protection or improvement;

   (j) the relief of those in need by reason of youth, age, ill-health, disability, financial hardship or other disadvantage;

   (k) the advancement of animal welfare;

   (l) the promotion of the efficiency of the armed forces of the Crown, or of the efficiency of the police, fire and rescue services or ambulance services; and

---

[184]     Charities Act 1993, section 3(4)

- 46 -

(m)    other purposes already recognised as charitable under existing law and purposes which are analogous or within the spirit of the above paragraphs[185].

9.5    Although charities can engage in political activity, provided the activity is ancillary to the charity's purely charitable objectives, pursuing political objectives is not regarded as a charitable purpose as a matter of English law[186].

9.6    The Charity Commission is an independent body, but its objectives are laid down by law and include promoting compliance by charity trustees with their legal obligations by exercising control and managing the administration of charities[187]. Its functions include identifying and investigating misconduct or mismanagement within charities and taking remedial or protective action[188].   As a result, it has significant investigative powers, including the power to require witnesses to give evidence and to order the production of documents[189].

9.7    Having commenced an investigation, the Charity Commission has the power to take certain steps, including removing the trustees or employees of a charity[190] and ordering "... *any person who holds any property on behalf of the charity, or of any trustee for it, not to part with the property without the approval of the Commission...*"[191]. In other words, it can remove a charity's management and freeze its funds. It can also restrict the payments that a charity can make without its approval[192]. The Charity Commission can exercise these powers if it considers that there has been any misconduct or mismanagement, or it is necessary or desirable to ensure the charity's property is used appropriately[193].

9.8    There were two investigations by the Charity Commission in the Relevant Period: in or around March 1996 and August / September 2003 respectively. Both investigations were into allegations that Interpal was providing support for Hamas.

9.9    According to the report published at the end of the exercise, the 1996 investigation was prompted by a newspaper report in The Times suggesting that there was a connection between Interpal and Hamas and that there were connections between Interpal and a number of former Hamas militants. Following an extensive investigation described in the report, the Charity Commission concluded that the newspaper article was unsubstantiated and added that:

---

[185]   Charities Act 2006, section 2
[186]   *Tolley's Charities Manual*, paragraph 1.40
[187]   Charities Act 1993, section 1B(3) (as amended by the Charities Act 2006)
[188]   Charities Act 1993, section 1C(2) (as amended by the Charities Act 2006)
[189]   Charities Act 1993, sections 8-11
[190]   Charities Act 1993, section 18(2)(i)
[191]   Charities Act 1993, section 18(1)(iv)
[192]   Charities Act 1993, section 18(1)(iv) to (vi)
[193]   Charities Act 1993, section 18(1)(a) and (b)

- 47 -

*"All of the evidence that we were able to uncover pointed to a well run and committed organisation which carried out important work in a part of the world where there is great hardship and suffering.*

...

*The unfounded allegation that by aiding Palestinian children the charity is in effect nurturing terrorism remains just that."*

9.10 Again according to the report published at the end of the exercise, the 2003 investigation was prompted by OFAC's designation of Interpal as an SDGT on 21 August 2003 (on the basis of allegations that Interpal was providing support for Hamas' political or violent militant activities). At the same time as launching its investigation, the Charity Commission made an order on 22 August 2003 freezing Interpal's accounts with NatWest. This order was made pursuant to the Charity Commission's powers described in paragraph 9.7 above. In other words, Interpal's accounts were not frozen pursuant to any of the UK provisions relating to anti-terrorist funding or anti-money laundering that I have described in this report.

9.11 The Charity Commission concluded that there was no clear evidence to support the allegations underpinning the OFAC designation of Interpal as an SDGT. Its investigation was closed and Interpal's accounts with NatWest were unfrozen on 24 September 2003.

9.12 Given the Charity Commission's statutory remit and extensive investigative powers described above, I consider that NatWest was entitled to draw considerable comfort from the fact that the Charity Commission investigated Interpal in 1996 and 2003 and concluded that there was no clear evidence against it to support the allegations that it provided support to Hamas.

9.13 It goes without saying that, if the Charity Commission had concluded in 1996, 2003 or at any other time that Interpal was providing support to terrorists it could (and in my view inevitably would) have reported the matter to the Police, removed Interpal from the register of charities (thus depriving Interpal of its charitable status) and taken steps to remove its management and freeze its funds. The Charity Commission did not reach that conclusion during the Relevant Period; nor has it reached that conclusion subsequently, since Interpal is still a registered charity in England and Wales at the date of this report.

9.14 For completeness (and although it is just after the Relevant Period) I note that the Charity Commission issued guidance on 29 August 2007 in relation to *"Charities and Terrorism"*[194]. The guidance stated that:

---

[194]  *Operational Guidance: Charities and Terrorism* (OG 96) paragraph 2

- 48 -

(a) The Charity Commission "*would not register an organisation that had support of terrorism as an object*";

(b) "*Use of an existing charity's assets for support of terrorist activity is not a proper use of those assets*";

(c) "*Any links between a charity and terrorist activity are totally unacceptable*"; and

(d) "*Where a charity's activities may give, or appear to give, support or succour to any terrorist activity, we expect the charity's trustees to take all necessary steps immediately to disassociate the charity from the activity*".

- 49 -

10.    **OTHER SANCTIONS REGIMES**

10.1   It appears to form some part of the plaintiffs' case in these proceedings that NatWest was required in some way to give effect in the UK to the sanctions regimes of jurisdictions other than the UK during the Relevant Period, including the US and Israel. That is wrong. As a matter of English law, NatWest was under no legal or other obligation in the UK to apply any sanctions other than those imposed by the UK Government from time to time. That remains the position today.  There are a number of very good reasons for it, including the practical reason that UK financial sanctions not only impose obligations on UK citizens and companies, but also alleviate the potential consequences of complying with those financial sanctions as between a UK bank, say, and its customer. If a bank in the UK refuses (as it must) to make a payment from or to an account in the name of a designated sanctions target under the UK financial sanctions regime, then the bank has an absolute defence to any claim by the customer that the bank is in breach of contract. The bank would have no such defence if it refused to make the payment because the customer concerned was subject to financial sanctions imposed by another jurisdiction, but was not subject to financial sanctions in the UK.  In other words, any sanctions imposed by the US or Israel in the Relevant Period were not only irrelevant as a matter of English law so far as NatWest was concerned, but an attempt by NatWest to give effect to any such sanctions in the UK would have been likely to expose NatWest to legal liabilities to which it would have had no defence.

10.2   This analysis is supported by the JMLSG 2006 Guidance, which noted, in relation to financial sanctions, that:

> "*The Consolidated List* [issued by the Bank of England] *is the definitive list as regards the obligations under UK law.  Firms will not normally have any obligation under UK law to have regard to lists issued by other organisations or authorities.  Depending on the geographical area in which firms, or their customers, do business, however, firms need to be aware of the scope and focus of relevant financial sanctions regimes.  The other websites referred to below may contain useful background information, but all the names that firms legally have to know about are on the Bank of England's list.*"[195]

Jon Holland

Hogan Lovells International LLP

6 December 2010

---

[195]   JMLSG Guidance, January 2006, paragraph 5.2.9

**EXHIBIT 15 TO DECLARATION OF VALERIE SCHUSTER**

**APPLEBAUM. ET AL V NATIONAL WESTMINSTER BANK PLC**

**(CASE NO. 07-CV-916 (DLI) (MDG))**

**WEISS ET AL V NATIONAL WESTMINSTER BANK PLC**

**(CASE NO. 05-CV-4622 (DLI) (MDG))**


**EXPERT REPORT OF CLIVE WALKER**


# 1      Introduction and basis for expertise

1.1     My name is Clive Phillip Walker. I hold the title of Professor of Criminal Justice Studies in the School of Law at the University of Leeds, Leeds LS2 9JT, United Kingdom. My professional experience principally derives from academic activities. I have worked at United Kingdom universities since 1978 and became a professor in 1993. For the sake of explanation to an American audience, it should be underlined that the title of professor in the United Kingdom sector is confined to the highest academic performers and that most academics are never awarded that title. During my academic career, I have served as the Head of School (equivalent of American Dean) of my law school on two occasions – from 2000-2005 and in 2010. This service is again a mark of high esteem both by one's university and by one's colleagues. I have also been appointed as a visiting scholar on several occasions, including at George Washington University and Stanford University. My curriculum vitae is set out at Appendix A.

1.2     During the course of my academic career, the phenomenon of terrorism and its legal treatment and consequences have formed the prime focus of my research work. As indicated in Appendix A, my published portfolio is considerable and I am amongst the leading United Kingdom authors on the laws on terrorism. My outputs include a PhD (University of Manchester, 1982), several books, and many published papers, some in leading US law journals such as the *Stanford Law Review*. I have also engaged on other relevant academic activities relevant to the subject, such as attendance at conferences. My studies of terrorism and the law are wide-ranging and cover

theoretical and philosophical questions, inter-disciplinary political and social aspects, and practical implementation, as well as legal doctrine and analysis. I have undertaken many practical studies. For example, a fellowship was funded in 2009 by the Arts and Humanities Research Council, during which time I conducted extensive interviews with police officers, prosecutors, and judges.

1.3     Key publications of relevance during the last 10 years are:

- Walker, C., *The Anti-Terrorism Legislation* (Oxford University Press, Oxford, 2002) xxxvi + 569 and (Second edition, Oxford University Press, Oxford, 2009) 656pp

- Walker, C., 'Political violence and commercial risk' (2004) 56 *Current Legal Problems* 531-578

- Walker, C., 'Cyber-terrorism: Legal principle and the law in the United Kingdom' (2006) 110 Penn State Law Review 625-665

- Walker, C., 'Keeping control of terrorists without losing control of constitutionalism' (2007) 59 *Stanford Law Review* 1395-1463

- Walker, C., 'The Legal Definition of ''Terrorism'' in United Kingdom Law and Beyond' [2007] *Public Law* 331-352

- Walker, C., '"Know Thine Enemy as Thyself": Discerning Friend from Foe under Anti-Terrorism Laws" (2008) 32 *Melbourne Law Review* 275-301

- Lennon, G., and Walker, C., 'Hot money in a cold climate' [2009] *Public Law* 37-42

- Walker, C., 'Neighbor terrorism and the all-risks policing of terrorism' (2009) 3 *Journal of National Security Law & Policy* 121-168

- Walker, C., 'Conscripting the public in terrorism policing: towards safer communities or a police state?' [2010] *Criminal Law Review* 441-456

- Walker, C., *Terrorism and the Law* (Oxford University Press, Oxford, 2011) 512pp

1.4     As well as my academic research work, I regularly engage in advice work for the police, governmental departments, and parliamentary committees. Regarding the police, I am a principal adviser to the Police National Legal Database (PNLD). The PNLD's aim is to inform and alert through an online legal resource police officers

about the criminal law and criminal procedure. My role is to audit samples of their draft advice, including on terrorism issues. As for governmental departments and parliamentary committees, I am a regular respondent to calls for advice and evidence and have appeared in person before government inquiries and Parliamentary committees on many occasions. A recent example of governmental review where my advice is specifically mentioned in the Home Office's *Review of counter-terrorism and security powers: Summary of responses to the consultation* (Command Paper 8005, London, 2011, p 4).

1.5     My academic and practical work has encompassed detailed studies of terrorism finance. It is an issue which came to the fore in United Kingdom counter-terrorism policy and law in the 1980s, and I have plotted both the laws and the impacts ever since that time. I have also conducted substantial comparative studies of jurisdictions such as the United States and also international law aspects to gain a full picture.

1.6     My qualifications also include the title of Solicitor of the Supreme Court in England and Wales. I engaged in legal practice for a short period (1976-1978). Though I still hold a licence to practice, my expertise relevant to this case derives entirely from my academic rather than practitioner qualifications and experience.

1.7     I have not previously provided expert testimony in proceedings, either in the US or elsewhere. I have previously submitted a declaration in this Action in connection with NatWest's prior objections to disclosure on the ground of UK bank secrecy.

1.8     My remuneration for this testimony is at the rate of £166.67 per hour. This charge is made by my employers, the University of Leeds, and is not a payment made to me. I know of no connections to the plaintiffs, National Westminster Bank plc, Interpal, or counsel for any party that prevents me from providing impartial testimony.

## 2   Scope and methodology

2.1   My remit from my instructing counsel is to review and address the reports and opinions set forth in the reports of two of defendant's putative expert witnesses, Jonathan Burchfield (the "Burchfield Report") and Jon Holland (the "Holland Report") (referred to here occasionally collectively as the "Reports") which purport to comment on the relevant laws in the United Kingdom relating to terrorism finance, including the administration and practical application of those laws..

2.2   In commenting upon the Reports, I express no opinion as to whether or not the law of the United Kingdom is relevant to these lawsuits, which I understand are being brought under United States statute, 18 U.S.C. § 2333(a), contained within the  U.S. Anti Terrorism Act ( the "ATA", 18 U.S.C. §2331 et seq.) and which allege, inter alia, that the Defendant in these cases, National Westminster Bank plc ("NatWest"), violated the ATA's prohibitions contained in §§ 2339B (prohibiting support to a designated Foreign Terrorist Organization), and 2339C (prohibiting the financing of terrorism as defined in that statute.  Nor do I express any opinion as to whether NatWest should be found criminally or civilly liable under any nation's law, including without limitation the U.S. or the UK.

2.2   Both Reports contain a good deal of descriptive material regarding United Kingdom law. My opinions herein, however, concentrate specifically on the Reports and their limitations or omissions. Thus, the absence of comment on a particular topic in this report should not be treated as either actual or inferred assent. There are many issues in United Kingdom law which could be said to be debatably or partially presented to some extent by the Reports, but my analysis and opinions are limited to what I believe to be the most important and potentially material points of difference.

2.4   My opinions are confined to the laws relating to England and Wales only. Most of the terrorism legislation applies equally to the whole of the United Kingdom. As far as financial matters are concerned, there are few differences in the distinct jurisdiction of

Northern Ireland.[1] However, Scottish terminology and processes are more divergent,[2] reflecting that country's separate legal traditions. For purposes of my analysis, I assume that, given the location of the National Westminster Bank plc ("NatWest") and the Palestinians Relief and Development Fund ("Interpal"), that only laws in England and Wales are relevant. To the extent Scottish or other United Kingdom law is relevant, I reserve the right to amend and revise my opinions to the extent necessary.

2.5    The principal sources upon which this opinion is based are the works set out in my CV in Appendix A as well as the manifold references within them. Other sources are in the body of the report, and those sources are fully footnoted.

---

[1]    See Charities Act (Northern Ireland) 2008.
[2]    See Charities and Trustee Investment (Scotland) Act 2005.

# 3    Opinion

### 3.1 Remarks on the Burchfield Report

3.1.1    The Burchfield Report's description of the role of the Charity Commission for England and Wales (the "Charity Commission" or the "Commission") is not as clear as it might be.  Paragraph B1 of the Burchfield Report describes the Commission as a "quasi-judicial" body, though para B8 later mentions that it is "regulatory".

3.1.2    A clearer understanding of the Commission's nature and mission can be obtained from the Commission's own documentation. Thus, the Annual Report 2009/10 of the Charity Commission (2009-10 House of Commons Paper 77, p 22) states that the Mission of the Charity Commission is:

> "Increasing public trust and confidence in charities by
> - enabling charities to maximise their impact
> - enabling compliance with legal obligations
> - encouraging innovation and effectiveness
> - promoting the public interest in charity"

Identical or very similar statements can be located in the previous reports and in the web pages of the Commission. Likewise, the statutory objectives in section 1B(2) and (3) of the Charities Act 1993 (as amended by section 7 of the Charities Act 2006) (and which are detailed in Exhibit C, para 2 of the Burchfield Report) comprise legal compliance (under section 1B(3), "by charity trustees with their legal obligations in exercising control and management of the administration of their charities ") as one objective amongst several as follows:

> "1.The public confidence objective.
> 2.The public benefit objective.
> 3.The compliance objective.
> 4.The charitable resources objective.
> 5.The accountability objective."

3.1.3    The important conclusion to be drawn from this approach, and settling the potential conflict of missions as described in the Burchfield Report, is that the Charity

Commission is a regulatory agency, predominantly focused upon promoting charitable activities and institutions which foster them. Only one out of four elements of the Commission's Mission refers to "enabling compliance with legal obligations", and the statutory compliance objective is only one objective out of five.

3.1.4   It is evident from this stated approach and from the nature of activities disclosed in its annual reports that the Commission might be fairly described as a "green-light" regulator rather than a "red-light" regulator.[3]   Its approach and mission is one of facilitation, as is reflected in words such as "enabling" and "promoting". Even in connection with its work in the legal sphere, its mission statement does not communicate a punitive role – the Commission's role is depicted as "enabling" legal compliance rather than "enforcing" or "imposing" it. Likewise, the statutory compliance requirement is backed by one of the statutory "general functions" of the Commission in section 1C(2), (as detailed in Exhibit C, para 3 of the Burchfield Report) which, without mention of any punitive or prohibitory sanction, refers to "Identifying and investigating apparent misconduct or mismanagement in the administration of charities and taking remedial or protective action in connection with misconduct or mismanagement therein."

3.1.5 The "green light" approach of the Charity Commission and its emphasis on goals of facilitating, enabling, and promoting charity, and thus "enabling" legal compliance can also be evidenced by its six general duties as set forth in the revised Section 1D(2) of the 1993 Act (which are detailed in Exhibit C, para 4 of the Burchfield Report). Section 1D(2), General Duty 2 states that "So far as is reasonably practicable, the Charity Commission must, in performing its functions, act in a way which is compatible with the encouragement of (a) all forms of charitable giving, and (b) voluntary participation in charity work." Furthermore, in performing all its functions, the Commission is required by General Duty 4 to "have regard to the principles of best regulatory practice (including the principles under which regulatory activities should be proportionate, accountable, consistent, transparent and targeted only at cases in which action is needed)." There is no countervailing statement which gives equivalent weight to enforcement or prosecutorial activities.

---

[3]   The terms are adapted from the typology used by Harlow, C., and Rawlings, R., *Law and Administration* (3rd ed., Cambridge University Press, Cambridge, 2009) chap 1.

3.1.6   The Charity Commission's focus on facilitating and supporting the work of charitable organizations (with legal compliance as only one non-exclusive component of that larger aim) is evidenced further and specifically when one considers the very limited number of legal actions taken in the terrorism finance field in comparison to the deficiencies which have been discovered during investigations. The Charity Commission is reported to have investigated seventeen charities as a result of which some trustees were removed under the Charities Act 1993, section 20.[4] Most notable is Abu Hamza, who was removed from the North London Central Mosque (Finsbury Park) in 2003.[5] Importantly, however, the charities themselves were not struck from the register despite the serious deficiencies discovered in that case. The same has applied in other cases where substantial concerns about the presence of particular trustees have been sustained, including the position as trustee of Nagendram Seevaratnam in the Sivayogam charity (described later in this report) and the position as trustee of Dr. Essam Mustafa in Interpal.

3.1.7   In short, the Charity Commission's default stance seems to that of charity ally and not charity policeman. Even where prominent trustees of a particular organization have been removed because of links to terrorism, the Commission has allowed the charity to continue to operate.

3.1.8   Thus, the absence of legal *proceedings* against a charity by the Charity Commission should not be treated as necessarily synonymous with an absence of legal *infraction*. As discussed below, this observation is relevant to both the Commission, as well as other United Kingdom authorities that are relevant to the issue of terror financing.

3.1.9   This finding is not to say that the Commission has failed to acknowledge terrorism and terror financing as a threat to charities, nor to suggest that the Commission has ignored the problem. The Commission has also announced that threats to national security, including terrorism, amount to one of the most serious risks for charities. As reflected in its published *Counter-Terrorism Strategy*, these are issues where the

---

[4]      Gunning, J, 'Terrorism, charities and diasporas' in Biersteker, TJ, and Eckert, SE (eds), *Countering the Financing of Terrorism* (Routledge, London, 2008).

[5]      Charity Commission, *North London Central Mosque Trust* (London, 2004). An inquiry is also pending into the Green Crescent.

Commission applies "zero tolerance" to any connections to proscribed organizations, support for terrorist activity, or the fostering of "criminal extremism".[6] The Commission also has put in place a Proactive Monitoring Unit and a Counter Terrorism Team which forms part of the Intensive Casework Unit in Compliance and Support, as well as issuing Operational Guidance, OG96: *Charities and Terrorism*.[7] However, the point made in the previous paragraph – that an absence of a legal proceeding does not demonstrate, *per se*, the absence of legal infraction – is important to be aware of when considering conduct, statements and recommendations by the Commission.

3.1.10   Therefore, despite the acknowledged dangers of terrorism financing by charities, and despite instituting certain measures aimed at mitigating the dangers, the Commission's overall mission is to encourage and foster a "strong and vibrant sector",[8] otherwise, as noted by one commentator, "[a] wholesale blight on the provision of financial support for humanitarian aid . . . could fuel the destabilization of struggling people abroad and enhance the appeal of terrorist groups to these people".[9]

3.1.11   Thus, even at the points of greatest risk (of financing terrorism), wider policy considerations (in this case, facilitating an active and vibrant charitable services sector) can attenuate a law enforcement mode of approach.

3.1.12   This general point about the overall regulatory stance gives reason to question the later statement in the Burchfield Report, para B17, that

> "The importance of this conclusive, statutory presumption cannot be overemphasised. If any registered charity is, on examination by the Courts or by the Charity Commission, considered not to be a charity established for charitable purposes, then the Charity Commission has an obligation under section 3(4) of the 1993 Act to remove it from the Register of Charities."

---

[6]    (London, 2008) pp 4, 10.
[7]     (London, 2007).
[8]    (London, 2008) pp 2, 7.
[9]    Crimm, NJ, 'High alert' (2004) 45 *William & Mary Law Review* 1341, at 1450–1.

It is submitted in response that the Burchfield Report overemphasizes the significance of a registered charity's enjoyment of its statutory status as a charity.  Though not entirely clear from its discussion, the Burchfield Report seems to at least imply that where a charity (including Interpal) is registered and remains registered, the Charity Commission's failure to de-list it demonstrates that the charity is engaged in appropriate activities. However, not only does the regulatory stance and mission  of the Charity Commission diminish any guarantee that the bodies which the Commission  regulates have not committed legal infractions (or that legal proceedings will be commenced against them by the Commission where such infractions are found), the Burchfield Report also does not, in my view, adequately address other, equally significant considerations, particularly (as explained below) the fact that, separate and apart from the actions (or inactions) of the Commission, financial institutions have special, independent duties to be on guard and to undertake their own independent assessments of terrorism-related risks, including evaluating whether the objects of a charity's munificence are connected to a terrorist organization.

3.1.13   Accordingly, even if the Charity Commission had made a statement about Interpal (or any other charity), absolving it from breach of charities laws by reason of involvement in terrorism based on a given set of circumstances, this verdict applies only for the purposes of the Charity Commission. It does not eliminate financial institutions' independent obligations to monitor and assess and should not be treated as an absolution of the financial sector whose duties may be stricter and affected by different known and future circumstances.  At *most*, the presence or absence of action by the Charity Commission constitutes only one piece of data for a financial institution to consider as part of a wider and continuing duty to assess the risks posed by a customer or a transaction.

3.1.14   The duties of the financial institutions, such as NatWest, are affected by the Terrorism Act 2000, sections 19, 21A and 38B. While section 38B applies also to the Charity Commission (and indeed to every natural and corporate person in the United Kingdom), section 19 applies to a "trade, profession or business", and section 21A *et seq* apply to the regulated sector. The Charity Commission is not listed in Schedule 3A of the Terrorism Act 2000 as being affected by section 21A *et seq*.

3.1.15 Thus, express legal duties are placed upon financial institutions to be on their guard against the taint of terrorism financing, independent of any regulatory duty of the Charity Commission. The evidence of NatWest's actions, as disclosed in the Burchfield Report, also points to this difference, since it is revealed that there were constant SARs issued and inquiries made to official agencies as to the status of Interpal despite what is stated to be a "statutory presumption" in the Burchfield Report para B17.

3.1.16 The same general criticism about the Burchfield Report's over-reliance on the Charity Commission as a guarantor of legality in all respects further arises from the Burchfield Report's depiction of the Commission's approach in para C2, which observes that a "key principle" underscoring the Charity Commission's approach to terrorism is that it will not "register an organisation that had support of terrorism as an object".

3.1.17 Of course, the Commission can be assumed not to be so manifestly indulgent as to "register an organisation that had support of terrorism as an object". But that is not the problem at issue, nor a realistic possibility in any event.

3.1.18 Rather, the question is whether a charitable organization's initial or continued registration by the Charity Commission can be relied upon by a financial institution as a presumption that it need not consider any further whether their customer presents a risk for terrorism financing. For the two reasons explained above – (1) the Commissions' "green light" regulatory role rather than a "red light" law enforcement approach, and (2) a distinct set of independent duties of monitoring and assessment placed on financial institutions - the answer is negative. The key approach of the Charity Commission is regulatory. It especially emphasises the need to encourage registration, such as by mosques,[10] and to work with registered charities to improve their standards of administration, accounting, and diligence. A specialist Faith and Social Cohesion Unit seeks to achieve this objective by engaging with faith communities (primarily Muslim).

---

[10]     Charity Commission, Annual Report 2009-10 (2006-10 HC 77) p 7.

3.1.19 Thus, the approach and mission for the Charity Commission includes efforts to draw within its regulatory umbrella organisations which may be less than perfect in their structures or systems rather than to frighten them away through enforcement activities.

3.1.20  The Burchfield Report details another largely irrelevant scenario at para C3:

> "…if the Commission were to be notified that an individual who is a charity trustee has been 'designated' under the relevant legislation, the Charity Commission will determine whether or not this individual should be suspended or removed as a charity trustee under section H3 of the 1993 Act."

3.1.21  However, the Burchfield Report fails here to provide a clear and comprehensible explanation regarding the term, "designated".

3.1.22.  If a charity is officially designated as linked to terrorism by a national (United Kingdom)[11] or international (European Union or United Nations)[12] authority, then the position is uncomplicated. Once a relevant charity registered in the United Kingdom (or a trustee) becomes designated in this way, financial institutions will of course cease to be able to offer facilities. An example is the Sanabel Relief Agency, which was closed in 2006 following international sanctions listing by the United Nations because of links to the Libyan Islamic Fighting Group.[13]

3.1.23 However, and not discussed in the Burchfield Report, is the fact that there is no certain approach when a body is "designated" by another (non-UK) national authority where that designation is not reflected at an international level. If the Charity Commission were to be notified of such a foreign designation, especially if the notice came via state authorities, then its zero-tolerance approach would suggest that some inquiries should be instituted. For instance, the US designation of Interpal prompted ongoing

---

[11]     See Al-Qaida and Taliban (Asset Freezing) Regulations 2010, SI 2010/1197; Terrorist Asset-Freezing etc. Act 2010.
[12]     See Council Regulations (EC) 2580/2001 (27 December 2001) and (EC) 881/2002 (27 May 2002); UN Security Council Resolution 1267 (15 October 1999).
[13]     *The Guardian* 9 February 2006, p 8 and 25 May 2006 p, 4.

British governmental discussions with the US Treasury, but no details have been published about the nature of information revealed or conclusions derived from it.[14]

3.1.24   The principle that silence on the part of enforcement or prosecuting authorities should not be confused with approbation was confirmed in another context by the decision in *Munim Abdul and Others v Director of Public Prosecutions*.[15] Protestors against a military "homecoming" parade shouted slogans such as "'British soldiers murderers'; 'Baby killers'; 'Rapists all of you'".[16] This counter-demonstration had been notified to the police and was conducted in accordance with police directions, including instructions issued on the day. Five months later, they were prosecuted and later convicted for a public order offence (threatening, abusive or insulting words or behaviour contrary to the Public Order Act 1986, section 5). They claimed that these criminal proceedings amounted to an abuse of process, especially having regard to rights to free expression (under the Human Rights Act 1998). The High Court concluded that the prosecutions were proportionate and made the point that:[17]

> "For the avoidance of doubt, nothing said in this judgment should discourage dialogue with the police in advance of any protest; such dialogue can only help to reduce the risk of untoward events but it cannot guarantee in advance that the words and conduct of protesters will not contravene the law – a fortiori, when nothing has been said in such discussions as to what will be said or exhibited in the course of the protest."

3.1.25   The history of Charity Commission inquiries into Interpal, as recited in the Burchfield Report at para D, is largely a fair depiction of events. However, in my view, the Burchfield Report's analysis fails to properly consider the relevancy and significance of the Commission's 2009 Inquiry Report. The 2009 Inquiry Report of the Charity Commission is arguably the most thorough and comprehensive of all such inquiries, as is conceded in the Burchfield Report para D3. It is therefore inaccurate to read further at para D3 that:

---

[14]   Hansard House of Commons vol 492 col 677wa (12 May 2009), Ian Pearson and vol 496 col 182wa (9 September 2009), Ivan Lewis.
[15]   [2011] EWHC 247 (Admin).
[16]   [2011] EWHC 247 (Admin) para 16.
[17]   [2011] EWHC 247 (Admin) para 52.

> "…all matters which are the subject of these proceedings occurred before this later Charity Commission Inquiry was initiated and that it was initiated after the Charity's account(s) at NatWest was closed. It is therefore not relevant to the current proceedings."

This dismissal is mistaken since, as the Charity Commission's inquiry report states, "The issues of concern in this report were different from the 1996 inquiry".[18] There was no time-limit on how far the investigation could examine retrospective events. This point is also relevant to the quotations given in the Burchfield Report at para E. There are, of course, some substantial criticisms in the 2009 Inquiry Report about due diligence monitoring and choice of trustees which might balance the favourable quotations recited in Burchfield Report para E. Yet they are neither acknowledged nor analyzed by the Report.

3.1.26   Underlining several of the points made in relation to the Burchfield Report, the Charity Commission's Inquiry Report into the charity, Sivayogam, is worthy of consideration and comparison.[19] This charity was registered in 1995 as an organisation which worked with Tamils both in London and in northern Sri Lanka. Activities in the latter inevitably raised questions about its relations with the Liberation Tigers of Tamil Eelam (LTTE – Tamil Tigers) who dominated much of the area until their military defeat in 2009. Concerns surfaced in 2005 when it became apparent that the leading trustee of Sivayogam, Nagendram Seevaratnam, had professed sympathies going back some decades, including an admission of membership before 1991. The Inquiry found that there were problems with the selection and monitoring of local partners in Sri Lanka, that the financial accounting involved interest-free loans and cash transactions which increased risks,[20] and that the said trustee remained a dominant figure who spoke of his support for the LTTE in 2006 and 2007.[21] In what is surely a clear example of its regulatory style, the Charity Commission imposed the sanction of removal as a trustee under the Charities Act 1993, section 18, but otherwise sought to work with the impugned charity to improve its standards and reduce its risks. Even the attempted removal was reversed by the First-Tier Tribunal (Charity), which viewed the trustee's statements as merely "unwise

---

[18]   *Inquiry Report: Palestinian Relief and Development Fund (Interpal)* (London, 2009) para 29.
[19]   *Inquiry Report: Sivayogam* (London, 2010).
[20]   *Inquiry Report: Sivayogam* (London, 2010) paras 74, 107, 115.
[21]   *Inquiry Report: Sivayogam* (London, 2010) para 127.

and unguarded" in circumstances where he had not been "warned that his own statements might be used against him or advised of his right to obtain legal advice".[22] The Tribunal did still accept that he had maintained contact with the LTTE,[23] though that fact did not make it necessary or desirable to remove him,[24] and it also found that the investigation has not properly translated all relevant evidence regarding due diligence. Furthermore, the Tribunal endorsed a "green light" regulatory approach, stating that:[25]

> "If there had remained any legitimate regulatory concerns following a proper examination of the evidence originally provided to it, the Tribunal concludes that it would have been appropriate for the Respondent to work with the charity to improve its processes before considering exercising its regulatory powers. As it was, the Respondent exercised its regulatory powers without considering the evidence with which it had been provided."

3.1.27 Though Seevaratnam later chose to resign,[26] this Inquiry and Tribunal decision again underline that the purposes being served by the Charity Commission and the ways in which it executes them are not at all meant to be equivalent to the strict legal duties of vigilance which have been imposed upon financial institutions in regard to terrorism finance.


## 3.2 Remarks on the Holland Report

3.2.1 I disagree with the Holland Report's statement in the Holland Report para 3.1, that legislation in respect of terrorism finance and property primarily derives from European and United Nations initiatives. Measures in Britain mainly took hold in the 1980s when it was recognised that "Money is a crucial factor in the continuance of

---

[22]  *Nagendram Seevaratnam v Charity Commission for England and Wales and Her Majesty's Attorney General* (Case No: CA/2008/0001, 13 October 2009) para 6.52.

[23]  *Nagendram Seevaratnam v Charity Commission for England and Wales and Her Majesty's Attorney General* (Case No: CA/2008/0001, 13 October 2009) para 6.92.

[24]  *Nagendram Seevaratnam v Charity Commission for England and Wales and Her Majesty's Attorney General* (Case No: CA/2008/0001, 13 October 2009) paras 6.93, 6.117

[25]  *Nagendram Seevaratnam v Charity Commission for England and Wales and Her Majesty's Attorney General* (Case No: CA/2008/0001, 13 October 2009) para 6.75.

[26]  *Inquiry Report: Sivayogam* (London, 2010) para 180.

terrorism....".[27] Accordingly, Part III of the Prevention of Terrorism Act 1989 contained measures which both criminalised the donation and handling of assets for the benefit of terrorist groups and allowed the forfeiture of such assets when such persons are convicted of contravening the offences.[28] There existed in addition even severer confiscation measures in Part VII of the Northern Ireland (Emergency Provisions) Act 1991, some of which reflected measures used in much earlier phases of the conflict. The growing interest in Britain and the strengthening interest in Northern Ireland owe much to drug trafficking legislation which began to appear around the same time.[29] The point may be thus sustained that anti-terrorism financing laws are of long-standing and are historically designed in the same way as other national criminal laws. Financial institutions should therefore be well accustomed to their importance and relevance. Any impression given by the Holland Report para 3.1 that the banks are primarily used to reacting to a model of external designation is not accurate.

3.2.2   The Holland Report at para 3.8 also sets forth misleading statements regarding the supposed novelty of disclosure obligations upon financial institutions. The Holland Report does rightly note that special duties were placed upon institutions within the regulated sector by the Criminal Justice Act 1993 in order to implement the first European Union Money Laundering Directive. But, whilst these duties of disclosure were becoming stricter, they were not entirely new. Rather, there was an offence first enunciated in 1976 and which became the Prevention of Terrorism (Temporary Provisions) Act 1989, section 18, of withholding information about terrorism. This offence was repealed by the Terrorism Act 2000, but it was resurrected within months by section 117 of the Anti-terrorism, Crime and Security Act 2001, which inserts the provision as section 38B into the Terrorism Act 2000. The offence is committed under

---

[27]   Jellicoe Report, *Report of the Operation of the Prevention of Terrorism (Temporary Provisions) Act 1976* (Cmnd.8803, London, 1983) para 213.

[28]   See Walker, C., *The Prevention of Terrorism in British Law* (2nd ed., Manchester University Press, Manchester, 1992) chap 7.

[29]   See Drug Trafficking Offences Act 1986; Criminal Justice Act 1988. The United Nations Convention Against Illicit Traffic in Narcotic Drugs and Narcotic Substances, signed in Vienna in December 1988 was reflected in the Criminal Justice (International Co-operation) Act 1990 and the Criminal Justice Act 1993. There was also consideration in the Hodgson Committee, *The Profits of Crime and Their Recovery* (London, 1984) of comparative laws such as the US Racketeering and Corrupt Organisations Act 1970 (18 USC § 1961)

section 38B(2) of the Terrorism Act 2000 if a person, without reasonable excuse, does not disclose information falling within section 38B(1):[30]

> "This section applies where a person has information which he knows or believes might be of material assistance
>
> (a) in preventing the commission by another person of an act of terrorism, or
>
> (b) in securing the apprehension, prosecution or conviction of another person, in the United Kingdom, for an offence involving the commission, preparation or instigation of an act of terrorism."

3.2.3   The lesson to be drawn (and not adequately set forth in the Holland Report) is that wide duties of disclosure (which apply under section 38B to all people and not just the regulated sector) have been in place for several decades, subject to a break of a few months during 2001. Whilst section 18A of the Prevention of Terrorism (Temporary Provisions) Act 1989 and, later, section 19 of the Terrorism Act 2000 are more specifically targeted, the offence of withholding information about terrorism has been imposed as a special duty for decades and is now replicated in the growing body of legislation about money laundering first in drug trafficking legislation[31] and then more generally. As such, the Holland Report's implicit suggestion that the newer statutes resulted in previously-unknown disclosure obligations should be rejected.

3.2.4   The  Holland Report also fails to provide a full picture with respect to "tipping off" provisions, thus resulting in an unsupportable conclusion in para 3.22 as to what would be considered an "inappropriate" disclosure from NatWest to Interpal.  Paras 3.19 through 3.21 of the Holland Report do fairly and accurately describe the relevant legal regime concerning tipping off.  Disclosures from NatWest to Interpal about the making of SARs or contacts with the authorities would indeed have been unwise, if not unlawful, under what is now the Terrorism Act 2000, section 21D. However, I cannot agree that an independent decision by NatWest to have frozen or closed Interpal's accounts would have amounted, *per se* to "disclosure". Unlike the Proceeds of Crime Act 2002, there is no set moratorium period under the Terrorism Act 2000

---

[30]   For further details, see Walker, C., 'Conscripting the public in terrorism policing: towards safer communities or a police state?' [2010] *Criminal Law Review* 441.

[31]   Drug Trafficking Act 1994, section 52, as inserted by the Criminal Justice Act 1993.

for the police to respond to notices. In the absence of any clear direction by SOCA,[32] a resolution might be possible by reference to procuring a warning under section 21G(2) of the Terrorism Act 2000:

> "A professional legal adviser or a relevant professional adviser does not commit an offence under section 21D if the disclosure
>
> (a) is to the adviser's client, and
>
> (b) is made for the purpose of dissuading the client from engaging in conduct amounting to an offence."

Though the threat of tipping off was mentioned in the summary action in *K. Ltd v. National Westminster Bank plc*,[33] it was avoided by the then corresponding exemption relating to advice as to legal proceedings as the only "sure" way of avoiding an offence. At the same time, the bank in that case had told the client that it could not honour its transactions. So, it was the bank's proposed giving of reasons which would be the tipping off "disclosure" and not inaction *per se*. In *R (UMBS) v Serious Organised Crime Agency*,[34] a bank was asked to make a payment and responded that it was unable to do so. A tax fraud investigation was in fact the reason. The bank was not subject to any allegation of tipping off, even though a prolonged period of inaction had ensued because of the intransigence of SOCA. Thus, a decision by NatWest simply to reject, without comment, a transaction, or exit its relationship with Interpal would not on these precedents constitute "tipping off".

3.2.5   In conclusion, it would be wrong to view the regime in the Terrorism Act 2000, section 21 *et seq*, as discouraging financial institutions in any way from exercising a readiness to issue notifications to the authorities or from being reluctant to proceed with transactions viewed as suspicious. Neither the tipping off offence nor pressure from clients will provide an excuse to override acting on suspicions, including exiting customer relationships.

---

[32]   There was also no client enforcement action, unlike in *Shah v HSBC Private Bank (UK) Ltd* [2010] EWCA Civ 31.

[33]   [2006] EWCA Civ 1039 para 18.

[34]   [2007] EWCA Civ 406.

3.2.6   As noted in *Squirrell Ltd v National Westminster Bank Plc*,[35] the purpose of the money laundering legislation is "not to turn innocent third parties like Natwest into criminals. It is to put them under pressure to provide information to the relevant authorities to enable the latter to obtain information about possible criminal activity and to increase their prospects of being able to freeze the proceeds of crime." The same objective should be underlined in relation to the anti-terrorism legislation, especially given the additional operation of section 38B. The policy is maximum disclosure of intelligence (as is noted in the Holland Report at para 3.29), but that disclosure *per se* does not grant any immunity.

3.2.7   The scale of reporting by the financial and legal sectors is very substantial – so substantial as to be criticised from time to time as excessive. Implementation has been scrutinised by the Lander Committee[36] (referred to obliquely in the Holland Report para 3.58). The Lander Report recommended that the Serious Organised Crime Agency ("SOCA") should deliver regular reports on the functioning of the regime so as to augment dialogue with reporters and end users. Nevertheless, the Report concluded that "the regime was clearly delivering benefits in both the terrorist and money laundering contexts".[37] The system of SARs has also been criticised on two occasions by the House of Lords European Union Committee reports on Money Laundering. The first such report suggested the exclusion from SARs of minor crimes, some case-specific feedback in selected cases, and more limited scope for data retention (currently ten years) and for accessing by different agencies.[38] The second report pointed to the disproportionate retention of 1.5m SARs.[39] These criticisms were firmly rejected by the UK Government.[40] The breadth of the duty is also emphasised by the changes brought about by the Anti-Terrorism, Crime and Security Act 2001, as described in the Holland Report at paras 3.33, 3.37, especially by imposing an objective standard of suspicion. The extent of institutions affected was

---

[35]   [2005] EWHC 664 (Ch) para 16. Once again, a distinction was made for the purposes of tipping off between explaining reasons for inaction and mere inaction: para 4.

[36]   Lander, S, *Review of the Suspicious Activity Reports Regime* (Home Office, London, 2006). See further KPMG, *Review of the Regime for Handling Suspicious Activity Reports* (London, 2003); Newton Report, para D134; HM Treasury, *The Financial Challenge to Crime and Terrorism* (London, 2007) paras 2.39, 2.60.

[37]   Lander, S, *Review of the Suspicious Activity Reports Regime* (Home Office, London, 2006) para 2.

[38]   House of Lords European Union Committee, *Money Laundering and the Financing of Terrorism* (2008–09 HL 132) paras 108, 123, 180, 182.

[39]   (2010-11) HL 11.

[40]   (Cm.7718, London, 2009).

further expanded by the Counter-Terrorism Act 2008, section 77, which inserted a new definition of "employment" in section 22A of the Terrorism Act. That definition now includes "voluntary work", meaning that persons acting for charities may themselves be treated as falling within sections 19 to 21B.

3.2.8   Yet, this encouragement of reporting by financial institutions has been fostered within a spirit of corporatist endeavour on the part of the financial institutions and anti-terrorism authorities. Thus, compared to the vast number of SARs, there has been just one (unreported) prosecution for breach of the reporting requirements under section 21 *et seq* to the end of 2005. There is also a contrast with the treatment of individuals compared to financial institutions in respect of whom it is not true that "There have been relatively few reported prosecutions in relation to terrorist financing or money laundering…" (Holland Report para 7.1). The statistics are as follows for Terrorism Act 2000, Part III, finance offence charges:[41]

| Year | GB | NI |
|------|-----|-----|
| 2001 | 10 | 4 |
| 2002 | 12 | 9 |
| 2003 | 7 | 7 |
| 2004 | 7 | 4 |
| 2005 | 11 | 7 |
| 2006 | 5 | 11 |
| 2007 | 19 | n/a |
| **Total** | 71 | 42 |

Whilst some of the impugned transactions were in cash, others have involved processing through financial institutions, none of which was prosecuted (with one possible exception).

3.2.9   The contrasting fates between financial institutions and individuals and between the heavy imposition on financial institutions of reporting duties and the non-application of sanctions against them betokens a corporatist approach on the part of the financial enforcement authorities towards financial authorities. It echoes the stance which was described in relation to the Charity Commission and charities. Consequently, I disagree with the Holland Report's apparent suggestion at para 9.11 that the

---

[41]   Sources: Carlile Reports; NIO Statistics & Research Branch. 2001 is from 19 February.

Commission's Inquiry Reports offer exoneration or any other form of "safe harbour". Further, I disagree with the following statement in the Holland Report at para 3.59:

> "… none of the disclosures prompted any response from the Police or other authorities at all (other than acknowledgments of the disclosures or, in one case, a request for additional information, which NatWest supplied). There was therefore no legal impediment as a matter of English law to NatWest maintaining the relationship with Internal. On the contrary, for the reasons I have explained above, there were good reasons for NatWest to carry on with "business as usual".

By law, it is for financial institutions such as NatWest to take responsibility for compliance in their businesses with the strict duties imposed on them under anti-terrorism financing legislation and to avoid the suspicion of facilitation of offence where prudent. I accept that repeated SARs do not, *per se*, constitute absolute knowledge on a bank's part that its customer is engaged in criminal activity, and I also accept that, as a general matter, where there is any doubt, a financial institution is best advised to file a report with UK law enforcement. Obviously gauging the degree and depth of suspicion reflected in any given SAR or report to law enforcement requires assessment on a case by case basis (Holland Report para 5.20).

3.2.10 However, para 3.59 of the Holland Report depicts falsely, in my view, the absence of a regulatory crackdown on Interpal as synonymous with a green light for "business as usual" for NatWest. That is not a fair representation of the law.  As noted above in relation to criticisms of the SAR system, the police respond to very few instances of the issuance of a SAR. The official policy across the board in intelligence-gathering activities is "Neither Confirm Nor Deny", a stance which has been upheld as lawful by the courts.[42] And, as noted in my prior discussion above concerning the Burchfield Report, the absence of legal action by the Charity Commission does not equate to the absence of a legal infraction, let alone *per se* constitute an excuse not to continue to apply a risk-management or risk assessment perspective.  It is, at best, merely one other piece of information a bank can consider in evaluating its future relationship with a customer.

---

[42]    *Re Scappaticci* [2003] NIQB 56.

3.2.11  Instead of any implied endorsement of "business as usual", the official policy, as enunciated in HM Treasury, *The Financial Challenge to Crime and Terrorism*,[43] is to emphasise a risk-based approach, by which the more inherently risky the customer or transaction, the more checks and caution are expected. In response to the perils of terrorist infiltration of charities, the Home Office and HM Treasury in their report, *Review of Safeguards to Protect the Charitable Sector (England and Wales) from Terrorist Abuse*,[44] regard the channelling of funds by charities to terrorists as "extremely rare". Nevertheless, they urge the Charity Commission to reinforce awareness of risk factors.

3.2.12  The emphasis on the corporatist management of financial institutions in the United Kingdom has resulted in no sanctions being applied against them in relation to anti-terrorism financing laws. But this level of enforcement of financial sanctions may again be reflective of a heavily corporatist approach rather than perfection in compliance. By way of illustration, it may be noted that British banks were sanctioned by US authorities for trading with Iran, most notably Lloyds TSB which was fined S350m in 2009.[45] Of course, different branches of a multi-national corporation and indeed a multi-national charity may decide to behave differently in different jurisdictions, and must evaluate the risk that they will face legal sanction for their activities in a jurisdiction where they operate, depending on how aggressively that jurisdiction applies its law extraterritorially. But it is again wrong to make assumptions or draw inferences based on non-enforcement. Just as the designation of Interpal in the US gave rise to new suspicions though not to any direct UK legal duty (Holland Report paras 8.20, 10.1), so its subsequent non-designation in the UK should not be treated as a source of "considerable comfort" (para 8.23). The designation of a related branch of one's customer by a closely allied country should normally increase the perception of risk rather than the perception of "comfort" on the part of a linked financial institution.

3.2.13  At para 6.12 and 6.13, the Holland Report details Financial Action Task Force (FATF) "best practices" on protecting the charitable sector from attempts to use it to

---

[43]    (London, 2007) para 1.30.
[44]    (London, 2007) para 2.10.
[45]    See Kittrie, OF, 'New sanctions for a new century' (2009) 30 *University of Pennsylvania Journal of International Law* 789; *Blue Sky One v Mahan Air* [2010] EWHC 631 (Comm).

finance terrorism. It highlights FATF guidance which states that activities which "directly or indirectly support terrorism, including actions that could serve to induce or compensate for terrorist acts" were not charitable. (Holland Report para. 6.12(b)). The Holland Report then reiterates its prior comments at para 5.21 that "[i]n this context" Interpal was supervised by the Charity Commission and was the subject of investigations by the Commission in 1996 and 2003. Given that the Holland Report represents that these FATF publications had no legal effect in the UK (Holland Report 6.14), it is not entirely clear what "context" is being referred to in para. 6.13, though the Holland Report does acknowledge that the UK Financial Services Authority's guidance required banks "to take reasonable steps to obtain and apply FATF findings that a particular jurisdiction had materially deficient anti-money laundering controls", "to incorporate such findings into their knowledge of customers and to disseminate them through training", and referred banks to FATF guidance on money laundering typologies…for consideration by firms when formulating internal procedures aimed at preventing and detecting terrorist financing and money laundering. (Holland Report para 6.7).

3.2.14  To the extent, however, that the Holland Report's comment at para 6.13 is intended to infer that Interpal's supervision by the Charity Commission, and the fact that Interpal had been allowed to continue to operate following three Commission Inquiries, demonstrates that the Commission (or NatWest) complied with FATF's guidance, the suggestion lacks support, particularly given that the Holland Report does not appear to consider the Charity Commission's explicit representations over time regarding the specific scope of its investigations (even in 2009). Moreover, para 6.13 (and the Holland Report generally) fails to evaluate and assess the specific information NatWest collected and evaluated regarding Interpal over time, separate and apart from the Commission's own analysis. Any sound assessment regarding a bank's compliance with "best practices" in general or FATF guidance in particular would need to take into account such further information.


*Clive Walker*

_____

Professor Clive Walker
March 3, 2011

# Appendix A
## CV for Professor Clive Walker, LL.B., Ph.D, Solicitor

**Job Title:** Professor of Criminal Justice Studies

**Direct Dial:** (+44) (0)113 343 5033
**FAX:** (+44) (0)113 343 5056

**Location:** The Liberty Building, School of Law, University of Leeds, Leeds LS2 9JT, UK

**Email:** law6cw@leeds.ac.uk

**Biography**
*Abstract*
LLB 1975, Leeds; PhD 1982, Manchester; Solicitor 1976, Maxwell Prize 1974, Special Hughes Prize 1975. Professor of Criminal Justice Studies, 1993.

Formerly: Lecturer, University of Manchester 1978-83, Lecturer, University of Leeds 1983-89, Senior Lecturer, University of Leeds 1989-92, Director, Centre for Criminal Justice Studies 1987-2000, Head of the School of Law 2000-05, 2010.

Visiting Professorships: University of Louisville, 1993, George Washington University, 1995, University of Connecticut, 2003, Stanford University 2006, University of Washington 2006, University of Melbourne 2007, Institute of Advanced Legal Studies (University of London) 2009.

*Dates of appointment to University of Leeds*
- Lecturer, 1983,
- Senior Lecturer, 1989,
- Reader in Public Law, 1992,
- Professor of Criminal Justice Studies, 1993

*Posts*
- Director of the Centre for Criminal Justice Studies, 1987-2000
- Head of School of Law 2000-2005, 2010

*Previous posts*
- Articled clerk and then solicitor with Emsley Collins & Co.,Solicitors, Leeds (March 1976 - September 1978);
- Lecturer, Faculty of Law, University of Manchester (September 1978 - September 1983)

*Qualifications*
- LL.B. (Hons., First Class) - University of Leeds, 1975;
- Law Society's Qualifying Examinations, Part II (Hons., Second Class, 1976);
- Solicitor of the Supreme Court (admitted 1978);
- Ph.D. (The Prevention of Terrorism in British Law) - University of Manchester, 1982.

**Research Interests**
**Principal Publications on Terrorism and Security**
*Books*

- Walker, C., *The Anti-Terrorism Legislation* (Oxford University Press, Oxford, 2002) xxxvi + 569
- Walker, C. and Broderick, J., *The Civil Contingencies Act 2004: Risk, Resilience and the Law in the United Kingdom* (372 + xxxviipp, Oxford University Press, 2006)
- Weaver, R.L., Kenyon, A.T., Partlett, D.E., Walker, C.P., *The Right to Speak Ill: Defamation, Reputation and Free Speech* (331pp + xvi, Carolina Academic Press, Durham, North Carolina, 2006)
- Walker, C., *The Anti-Terrorism Legislation* (Second edition, Oxford University Press, Oxford, 2009) 656pp
- Walker, C., *Terrorism and the Law* (Oxford University Press, Oxford, 2011) 512pp

*Chapters in books*

- Walker, C., 'The Patten Report and post-sovereignty policing in Northern Ireland' in Wilford, R., (ed.), *Aspects of the Belfast Agreement* (Oxford University Press, Oxford, 2001) pp.142-165
- (with Fitzpatrick, B., and Seago, P. and Wall, D.) - 'The magistrates' courts' in Elites in Criminal Justice by Ryan, M., Savage, S., and Wall, D., *Policy Networks in Criminal Justice* (Palgrave, Basingstoke, 2001) pp.98-121
- Walker, C., and McGuinness, M., 'Risk, political violence and policing the City of London' in Crawford, A., (ed.), *Crime, Insecurity, Safety and the New Governance* (Willan Publishing, Cullompton, 2002) pp.234-259
- Walker, C., 'The criminal courts online' in Wall, D., (ed.), *Crime and the Internet* (Routledge, 2002)
- Walker, C., 'Miscarriages of justice and the correction of error' in McConville, M. and Wilson, G., (ed.), *Handbook of Criminal Justice Process* (Oxford University Press, 2002) pp.505-524
- (with Rogers, WVHR and Milmo, P.) Supplement to Gatley, Libel and Slander (Sweet and Maxwell, London, 2002) pp.111-129
- Walker, C., 'Policy options and perspectives: British perspectives' in van Leeuwen, M., *Confronting Terrorism* (Kluwer, Dordrecht, 2003) 11-35
- Walker C. and Akdeniz, Y., 'The governance of the Internet in Europe with special reference to illegal and harmful conduct' in Wall, D.S., *Cyberspace Crime* (Ashgate, Abingdon, 2003) (reprint)
- Walker, C., 'Fundamental rights, fair trials and the new audio-visual sector' in Wall, D.S., *Cyberspace Crime* (Ashgate, Abingdon, 2003) (reprint)
- (with Rogers, WVHR and Milmo, P.) Gatley, Libel and Slander (10th ed., Sweet and Maxwell, London, 2004) chs.22 (criminal libel), 23 (human rights) (pp.652-751)
- Walker, C., Reports of Special Adviser' in Joint Committee on the Civil Contingencies Bill, Draft Civil Contingencies Bill (2002-03 HL 184 HC 1074) pp.103-116
- Raine, J.W., and Walker, C., Implementing the Human Rights Act into the Courts in England and Wales: Culture Shift or Damp Squib? in Halliday, S., and Schmid, P., *Bringing Rights Home: Socio Legal Perspectives on Human Rights in the National Context* (Hart, Oxford, 2004) pp.111-135
- Walker, C., 'Liability For Acts Of Terrorism: United Kingdom Perspective' in Koch, B. (ed.), *Terrorism, Tort Law and Insurance* (Springer, Vienna, 2004) pp.138-175

- Walker, C., 'The United Kingdom's Anti-terrorism Laws: Lessons for Australia' in Andrew Lynch, Edwina MacDonald and George Williams (eds.), *Law and Liberty in the War on Terror* (Federation Press, Annandale, NSW, 2007) pp.181-195
- Walker, C., 'Cyberterrorism and the law' in Schmalleger, F., and Pittaro, M., *Crimes of the Internet* (Prentice Hall, Englewood Cliffs, New Jersey, 2008) pp.612-644
- Walker, C., 'Terrorism' in Newburn, T., and Neyroud, P., *Dictionary of Policing* (Willan, Cullompton, 2008) pp.274-276
- Walker, C., and McCartney, C., 'Criminal justice and miscarriages of justice in England and Wales' in Huff, C.R., and Killias, M., (eds.), *Wrongful Conviction* (Temple University Press, Philadelphia, 2008) pp.183-211
- Walker, C., 'Emergency powers', 'Habeas corpus and emergency', 'Terrorism' in Cane, P., and Conaghan, J., *The New Oxford Companion to Law* (Oxford University Press, Oxford, 2008) pp.370-371, 515-516, 1162-1163
- Walker, C., 'The pursuit of terrorism with intelligence'' in Moran, J., and Pythian, M., *Intelligence, Security and Policing Post 9/11* (Palgrave MacMillan, Basingstoke, 2008) pp.54-78
- Walker, C., 'Biological attack, terrorism and the law' in Ranstorp, M., and Wilkinson, P., *Terrorism and Human Rights* (Routledge, Abingdon, 2008) pp.159-185
- Walker, C., 'Criminal Libel (chapter 24) ' and 'European Convention (chapter 25) ' in Rogers, WVH, and Milmo, P, *Gatley on Libel and Slander* (11th ed., Sweet & Maxwell, London, 2008) 759-895
- Walker, C., 'Legal aspects of counter-terrorism and intelligence in the prevention of terrorism' in Fernández-Sánchez P.A. (ed.), *International Legal Dimension of Terrorism* (Nijhoff, Leiden, 2009) 149-172
- Walker, C., and Parkinson, J., consulting editors for Staniforth, A., *Blackstone's Counter-Terrorism Handbook* (Oxford University Press, Oxford, 2009)
- Walker, C., 'Keeping control of terrorists without losing control of constitutionalism' in Dyzenhaus, D., *Civil Rights and Security* (Ashgate, Abingdon, 2009) pp.331-400
- Walker, C., and Campbell, K., 'The CCRC as an option for Canada: Forwards or Backwards? in Naughton, M., *The Criminal Cases Review Commission: Hope for the Innocent?* (Palgrave, Basingstoke, 2009) pp.191-204
- Walker, C., 'Fundamental rights, fair trials and the new audio-visual sector' in Barendt, E.,  *Media Freedom and Contempt of Court* (Ashgate, Abingdon, 2009) pp.337-360

*Contributions to Journals etc*
- Walker, C., 'Review of Casey, E., Evidence and Computer Crime, Academic Press, London, 2000' in (2001) 3 *International Journal of Crime Prevention and Community Safety* 87-88
- Walker, C. and Akdeniz, Y., ' Anti-Terrorism laws and data retention: war is over?' in (2003) 54 *Northern Ireland Legal Quarterly* 159-182
- Walker, C., 'Cyberspace downunder: book review of Lim, Y.F., Cyberspace Law' (2003) 2 *Entertainment Law* pp.104-106
- Walker, C., 'Political violence and commercial risk' (2004) 56 *Current Legal Problems* 531-578
- Walker, C., 'Review of Ghosh, T., Prelas, M., Viswanath, D., Loyalka, S., (eds.), *Science and Technology of Terrorism and Counterterrorism* (Marcel Dekker Inc., New York, 2002) (2004) 53 International and Comparative Legal Quaterly 257-258
- Walker, C., 'Terrorism and criminal justice' [2004] *Criminal Law Review* 311-327

- Weaver, R.L., Kenyon, A.T., Partlett, F., Walker, C.P., 'Defamation law and free speech: Reynolds v Times News papers and the British media', (2004) 37 *Vanderbilt Journal of Transnational Law*, 1255-1316
- Walker, C., 'Biological attack, terrorism and the law', *Journal of Terrorism and Political Violence*, (2004) vol.17, 175-200
- Walker, C., and McCartney, C., 'Commentary on *R v Canning*s' [2005] *Criminal Law Review* 126-130
- Walker, C., 'The criminal courts online' (2005) 58 *Criminal Justice Matters* 32-33
- Walker, C., 'Prisoners of "war all the time"' [2005] *European Human Rights Law Review* 50-74
- Walker, C. and Harlow, D., 'The Police National Legal Database: A farewell to the Ways and Means Act?' (2005) 169 *Justice of the Peace* 410-411
- Walker, C. and Whyte, D., 'Contracting out war? Private military companies, law and regulation in the United Kingdom' (2005) 54 *International & Comparative Law Quarterly* 651-689
- Walker, C., 'Fine bandits and powers of entry' (2005) 169 *Justice of the Peace* 668-670
- Walker, C., 'Counter-terrorism laws and the Gulf States' (2006) 2 *Security & Terrorism Research Bulletin* 6-8
- Walker, C., 'Reforming the crime of libel' (2005-2006) 50 *New York Law School Law Review* 169-203
- Walker, C., 'Cyber-terrorism: Legal principle and the law in the United Kingdom' (2006) 110 *Penn State Law Review* 625-665
- Walker, C., Book Review: Ramraj, V., *Global Anti-Terrorism Law and Policy* (Cambridge University Press, 2005) in (2006) 16 *Law and Politics Book Review* pp.457-461
- Walker, C., 'Intelligence and anti-terrorism legislation in the United Kingdom' (2006) 44 *Crime, Law and Social Change* 387-422
- Walker, C., 'Clamping down on terrorism in the United Kingdom' (2006) 4 *Journal of International Criminal Justice* 1137-1151
- Walker, C., 'Anti-Terrorism Orders Out of Control?' (2007) 29 *American Bar Association National Security Law Report* 1-6
- Walker, C., 'Keeping control of terrorists without losing control of constitutionalism' (2007) 59 *Stanford Law Review* 1395-1463
- Walker, C., 'The treatment of foreign terror suspects' (2007) 70 *Modern Law Review* 427-457
- Walker, C., 'The Legal Definition of ''Terrorism'' in United Kingdom Law and Beyond' [2007] *Public Law* 331-352
- Walker, C., 'Pamphleteers, libel awards and free speech' (2007) 1 *HELP Law Review* 36-44
- Walker, C., Book Review: Gross, E., *The Struggle of Democracy against Terrorism* (Virginia University Press, 2006) in (2007) 17 *Law and Politics Book Review* pp.387-394
- Walker, C., Book review of Peter J van Krieken (ed), *Terrorism and the International Legal Order: with special reference to the UN, the EU and cross-border aspects* (2007) 56 *International & Comparative Law Quarterly* 732-733
- Walker, C., 'Police and military forces as responders to civil emergencies' [2007] 2 *Covert Policing Review* 18-35
- Walker, C., 'The CNI: regulatory strengths and weaknesses' [2008] 7.4 *RUSI Homeland Security and Reiliance Monitor* 16-21

- Walker, C., 'The governance of the Critical National Infrastructure' [2008] *Public Law* 323-352
- Doward, J., and Walker, C., 'An unwinnable battle of wills' (2008) 33 *The House Magazine: The Parliamentary* Weekly 12 May 33
- Walker, C., 'Post-charge questioning of suspects' [2008] *Criminal Law Review* 509-524
- Walker, C., '"Know Thine Enemy as Thyself": Discerning Friend from Foe under Anti-Terrorism Laws'' (2008) 32 *Melbourne Law Review* 275-301
- Lennon, G., and Walker, C., 'Hot money in a cold climate' [2009] *Public Law* 37-42
- Walker, C., Book Review: *Civil Liberties* by Conor Gearty [2009] *Public Law* 179-181
- Walker, C., 'Prosecuting terrorism: the Old Bailey versus Belmarsh' (2009) 79 *Amicus Curiae* 21-25
- Walker, C., Book Review: *Executive Measures, Terrorism and National Security: Have the Rules of the Game Changed? by* David Bonner (2009) 15 *European Public Law* 662-665
- Walker, C., 'Neighbor terrorism and the all-risks policing of terrorism' (2009) 3 *Journal of National Security Law & Policy* 121-168
- Walker, C., ' The threat of terrorism and the fate of control orders' [2010] *Public Law* 3-15
- Walker, C., 'Conscripting the public in terrorism policing: towards safer communities or a police state?' [2010] *Criminal Law Review* 441-456
- Walker, C., 'The judicialisation of intelligence in legal process' [2011] *Public Law* 235-236

**EXHIBIT 16 TO DECLARATION OF VALERIE SCHUSTER**

*TZVI WEISS VS.*

*NATIONAL WESTMINSTER BANK, PLC*

---

*CLIVE WALKER*

*June 14, 2011*

---



**126 East 56th Street, Fifth Floor New York, New York 10022**

**PHONE: (212) 750-6434   FAX: (212) 750-1097**

**www.ELLENGRAUER.com**

*Original File 96688.TXT*

*Min-U-Script® with Word Index*

Page 1

```
 1   UNITED STATES DISTRICT COURT
 2   EASTERN DISTRICT OF NEW YORK
     ----------------------------------x
 3   TZVI WEISS, et al.,
 4                       Plaintiffs,
 5        -against-
 6   NATIONAL WESTMINSTER BANK, PLC,
 7                       Defendants.
     ----------------------------------x
 8   NATAN APPLEBAUM, et al.,
 9                       Plaintiffs,
10        -against-
11   NATIONAL WESTMINSTER BANK, PLC,
12                       Defendants.
13   ----------------------------------x
14                   One Liberty Plaza
                     New York, New York
15
                     June 14, 2011
16                   9:29 a.m.
17
18        Videotaped Deposition of CLIVE WALKER,
19   pursuant to Notice, before Sophie Nolan, a
20   Notary Public of the State of New York.
21
22
23        ELLEN GRAUER COURT REPORTING CO. LLC
             126 East 56th Street, Fifth Floor
24              New York, New York 10022
                     212-750-6434
25                   Ref: 96688
```

Page 2

```
 1   A P P E A R A N C E S :
 2
 3   SAYLES WERBNER
 4   Attorneys for Plaintiff
 5        4400 Renaissance Tower
 6        1201 Elm Street
 7        Dallas, Texas  75270
 8   BY:  JOEL L. ISRAEL, ESQ.
 9        PHONE    214-939-8700
10        FAX      214-939-8787
11        E-MAIL   jisrael@swtriallaw.com
12
13
14   CLEARY GOTTLIEB STEEN & HAMILTON, LLP
15   Attorneys for Defendants
16        One Liberty Plaza
17        New York, New York  10006
18   BY:  LAWRENCE FRIEDMAN, ESQ.
19        PHONE    212-225-2266
20        FAX      212-225-3999
21        E-MAIL   lfriedman@cgsh.com
22
23   ALSO PRESENT:
24        DANIEL MACOM, Legal Videographer
25
```

Page 3

```
 1   ------------------- I N D E X --------------------
 2   WITNESS              EXAMINATION BY          PAGE
 3   CLIVE WALKER         MR. FRIEDMAN              7
 4
 5
 6   --------------- E X H I B I T S ----------------
 7   WALKER          DESCRIPTION            FOR I.D.
 8   Exhibit 1       Expert report of Clive      8
 9                   Walker
10   Exhibit 2       Expert Declaration of Clive 22
11                   Walker
12   Exhibit 3       Document Bates stamped      23
13                   Walker 000001 through
14                   Walker 000002
15   Exhibit 4       Document Bates stamped      26
16                   Walker 000003 through
17                   Walker 000004
18   Exhibit 5       Document Bates stamped      27
19                   Walker 000005 through
20                   Walker 000005
21   Exhibit 6       Copy of book entitled       49
22                   Terrorism and the Law
23   Exhibit 7       William & Mary Law Review   58
24                   article
25
```

Page 4

```
 1   ----------- E X H I B I T S (Cont'd) -----------
 2   WALKER          DESCRIPTION            FOR I.D.
 3   Exhibit 8       Book entitled Blackstone's  68
 4                   Guide to the Antiterrorism
 5                   Legislation
 6   Exhibit 9       Expert Report of Gary       70
 7                   Walters
 8   Exhibit 10      Rebuttal Report of Gary     70
 9                   Walters
10   Exhibit 11      Expert Report of Jon Holland 71
11   Exhibit 12      Second Expert Report of Jon 72
12                   Holland
13   Exhibit 13      Expert Report of Jonathan   73
14                   Burchfield
15   Exhibit 14      Second Expert Report of     73
16                   Jonathan Burchfield
17   Exhibit 15      Document entitled "Charities 98
18                   Back on Track 2007 to 2008"
19   Exhibit 16      Document entitled          104
20                   "Counter-terrorism Strategy
21                   July 2008"
22   Exhibit 17      Document entitled, "Charity 107
23                   Commission Operational
24                   Guidance on Charities and
25                   Terrorism"
```

Page 13

1   WALKER
2   conversations.
3   Q.  What law enforcement agencies were
4   they with?
5   A.  There was one -- I think some of
6   them were with the West Yorkshire Police.  The
7   West Yorkshire Police is the local police force
8   for Leeds, which is where I'm based.  It's
9   quite a big police force and of course was
10  particularly involved in the July the 7th --
11  July the 7th, 2005 investigations which were,
12  of course, perpetrated by at least three people
13  based in Leeds.
14      There were also some people -- I
15  can't remember whether they were actually
16  serving or retired from the Metropolitan Police
17  Service down in London.
18  Q.  Have you ever spoken with somebody
19  from the Charity Commission?
20  A.  No.
21  Q.  What further reading did you do?
22  A.  Further to the report?
23  Q.  Yes.
24  A.  I've continued to, as I say,
25  investigate this matter as a -- as an academic

Page 14

1   WALKER
2   which resulted in me doing further work in
3   terms of looking at what I would view as
4   academic databases; doing word searches, if you
5   like, into academic databases and I found a
6   range of specialist journals which I hadn't --
7   which are not, strictly speaking, law journals
8   which is why I hadn't immediately come across
9   them at the time of the report, but are
10  journals specific to the area of volunteering,
11  voluntary services and so on.
12      And having done that deep research,
13  I found a number of extra papers that, again,
14  give me some ideas about names and systems and
15  concerns and so on.
16  Q.  What kinds of systems are you
17  referring to?
18  A.  Well, systems both within
19  charities, within the Charity Commission, and
20  systems within the -- within the police.
21  Q.  Have you ever had any contact with
22  the Charity Commission in any capacity, whether
23  as a law professor or as a solicitor?
24  A.  Yeah.  I should add in terms of my
25  research I've -- part of this report was based

Page 15

1   WALKER
2   on research with the Charity Commission.
3   Q.  But have you ever spoken with
4   anyone from the Charity Commission?
5   A.  If you count e-mail as speaking,
6   then I've spoken.  If you don't, then I
7   haven't.
8   Q.  What kind of e-mails have you --
9   A.  The e-mails are essentially about
10  my applications under the Freedom of
11  Information Act.
12  Q.  I see.
13  A.  For -- largely for the disclosure
14  of inquiry reports and I've always had an
15  individual who's actually contacted me and they
16  sometimes ask why -- why do you want to know
17  this, that kind of conversation in other words.
18  Q.  You've never had any substantive
19  conversation with anyone from the Charity
20  Commission about the nature of their work?
21  A.  Well, I think following on from
22  that I can think of at least one conversation
23  that I had which is -- I queried -- I think it
24  was a statement in one of their annual reports
25  or it may have been one of their policy

Page 16

1   WALKER
2   documents, which was a statement about why --
3   they said to the effect that when they open an
4   investigation they often contact who -- which
5   MP, which member of Parliament, they think
6   might be interested in this matter.
7       And that struck me as a curious
8   statement.  I didn't really understand why they
9   would have that policy.  So I asked them to
10  give me whatever documentation they had about
11  that policy.  And, again, some individual from
12  the Charity Commission contacted me by e-mail.
13      I then, if you like, followed up
14  with a supplementary to say, so you've given me
15  this policy, can you explain why do you adopt
16  this policy and we had a short e-mail exchange
17  to that effect.  I'm sorry, I can't remember
18  the name of the individual.  He certainly
19  wasn't a charity commissioner, but an official.
20  Q.  When did that occur?
21  A.  I think that might be within the
22  last, say, about two -- two or so months ago.
23  Q.  Now, the further cases that you
24  said you looked into, those are all
25  subsequent to -- further recent cases those are

Page 17

WALKER

1    WALKER
2  all subsequent to 2007?
3  A.  I couldn't swear they were all
4  subsequent to 2007, but I think they are mainly
5  of recent origin.  I found one certainly that
6  isn't which was about a Tamil case which was
7  actually before -- I was aware of that case,
8  but I didn't have the inquiry report at the
9  time when I wrote my -- my paper here.
10  Q.  That's the Balucci (phonetic)
11  matter?
12  A.  Sorry?
13  Q.  That's the Balucci matter?
14  A.  Well, I was thinking about the
15  Tamil Rehabilitation Organization I think it's
16  called.
17  Q.  What's the name of that case?
18  A.  It was an inquiry report by the
19  Charity Commission.  So the case, if you like,
20  is the name of the charity.
21  Q.  Have you ever spoken to anyone
22  about that case?
23  A.  No.
24  Q.  Have you ever met Gary Walters?
25  A.  No.

Page 18

WALKER

1    WALKER
2  Q.  Have you ever spoken to Gary
3  Walters?
4  A.  No.
5  Q.  Now, turning back to your report,
6  Exhibit 1, all of the information that you
7  relied upon for your report is identified in
8  the body of your report; correct?
9  A.  Yes, yes.  Well, and you might say
10  the appendix in that my knowledge is based on a
11  cumulative process of research and inquiry
12  which actually goes over 30 years.
13  Q.  During the course of your work on
14  these cases, did you look at any documents
15  produced to the plaintiffs by Nat West?
16  A.  I've seen the -- what is the
17  equivalent of my report here from Mr. Holland
18  and Mr. Burchfield.
19  Q.  But have you seen any documents,
20  historical, contemporaneous documents, produced
21  by Nat West relating to its relationship with
22  Interpal?
23  A.  Unless these were -- I think I
24  received some pleadings that go back to 2006.
25  And so I have those, but I'm -- I'm not sure

Page 19

WALKER

1    WALKER
2  aside from those as were official court
3  documents what you have in mind.
4  Q.  Well, as you sit here, do you
5  recall seeing any documents produced from the
6  files of Nat West itself --
7  A.  Right.
8  Q.  -- stemming from its banking
9  relationship with Interpal?
10  A.  These would be headed Nat West
11  corporate documents, in other words.
12  Q.  Documents coming from the
13  relationship between Nat West and Interpal?
14  A.  Yeah -- I haven't seen any
15  original, if I can put it as exhibits, any
16  original documents in the case.  I've seen
17  essentially court documents.
18  Q.  Okay.  Now appendix A to your
19  report is your CV?
20  A.  Yes, that's right.
21  Q.  And did you write that?
22  A.  Yes, I did.
23  Q.  Is it accurate?
24  A.  Yes, it is.
25  Q.  Is it complete?

Page 20

WALKER

1    WALKER
2  A.  It's complete in terms of the
3  instructions that I was given.  And the
4  instructions were to concentrate on things of
5  relevance in the last ten years.  So, as a CV
6  it's not complete.
7  Q.  Understood.  Now did you prepare
8  this specifically for this purpose or did it
9  previously exist in this form?
10  A.  I think given the instruction that
11  I should look for this purpose in ten years, I
12  think this is specific to this event.
13  Q.  Now, your CV that is available on
14  the university's website, is that accurate?
15  A.  Yes.
16  Q.  Is that complete?
17  A.  Pretty much so.
18  Q.  And you've prepared that?
19  A.  Indeed.
20  Q.  How did you first become involved
21  in these lawsuits?
22  A.  I was contacted in -- it might have
23  been either 2005 or 2006, roundabout then.
24  Q.  By whom?
25  A.  By Gary Osen.

Page 29

1      WALKER
2   review."  Do you see that, "and oral feedback"?
3   A.  Yes, I do see that, yes.
4   Q.  To what does that refer?
5   A.  I'm not sure what the report review
6   actually refers to precisely.  My main work at
7   the initial point of contact with my
8   instructing lawyer, John Israel, was --
9   consisted largely of a telephone conversation,
10   a lengthy telephone conversation.
11      And it had been indicated to me
12   briefly what were the areas that were going to
13   be raised in this telephone conversation and
14   there we had a telephone conversation.  I don't
15   recollect receiving actually a report to review
16   at that stage.  And, as I can't verify this,
17   it's the first time I've seen it and maybe it
18   isn't quite as accurate as I would have written
19   it.
20      But, of course, the main point was
21   to reflect the amount of time taken and to get
22   payment for that time taken and I can verify
23   that accuracy.
24   Q.  Now, other than coming to New York
25   for your deposition today, have you recorded

Page 30

1      WALKER
2   any other time to be compensated subsequent to
3   what's reflected in Exhibit 5?
4   A.  No.  There will be, of course, a
5   further bill pending for the trip to New York.
6   Q.  For the trip to New York?
7   A.  Exactly, yeah.
8   Q.  Now, what did you to prepare for
9   your deposition today?  Did you meet with
10   counsel?
11   A.  I mainly -- to prepare I reread the
12   various court papers.  I looked back at key
13   documents in my research.  Yesterday I met with
14   counsel.
15   Q.  And who was that, Joel?
16   A.  Joel.
17   Q.  And for how long did you meet?
18   A.  I think it would be about two or
19   three hours, two hours probably.
20   Q.  Was anyone else present?
21   A.  No.
22   Q.  Did you look at any documents?
23   A.  No.  We did -- sorry, we did look
24   at the -- particularly my own expert report is
25   what we looked at.

Page 31

1      WALKER
2   Q.  Have you read the transcripts of
3   any other depositions in these lawsuits?
4   A.  I have read the deposition of
5   Mr. Burchfield.
6   Q.  When did you do that?
7   A.  Sorry, when?
8   Q.  When did you do that?
9   A.  I can't remember when first it was
10   sent.  It's of recent origin.  I think it might
11   have been sent to me, I think, recently, about
12   two or three weeks ago, and it was sent as an
13   e-mail.  I downloaded it and read it very
14   briefly at the time it was sent and then I've
15   read it in more detail in more recent times.
16   Q.  Did you read Mr. Holland's
17   deposition?
18   A.  I haven't seen Mr. Holland's
19   deposition.
20   Q.  Did anyone help you prepare your
21   report?
22   A.  No.
23   Q.  Is it fair to say that what you
24   know about the facts of this case stems from
25   your reading of court papers and your

Page 32

1      WALKER
2   discussions with plaintiffs' counsel?
3   A.  Well, that's the prime source.  It
4   would be fair to say also that as an academic
5   researcher, I've read what other, if you like,
6   independent sources exist on not only this
7   litigation, but of course associated litigation
8   of a similar kind.
9   Q.  But I'm speaking about the -- let
10   me be more specific.
11      What you know about the
12   relationship between Interpal and Nat West
13   stems from reading court papers and what you've
14   been told by plaintiffs' counsel because you
15   haven't looked at any of the primary source
16   materials concerning that relationship;
17   correct?
18   A.  I haven't looked at the original
19   source materials.  I haven't looked into the
20   records held by Nat West, for example, or the
21   records held by the Charity Commission other
22   than their reports on the subject or the
23   records held by Interpal, you might say.  But I
24   have looked at secondary sources on the
25   subject.

TZVI WEISS VS.
NATIONAL WESTMINSTER BANK, PLC

CLIVE WALKER
June 14, 2011

Page 33

```
 1       WALKER
 2  Q.  You've looked at secondary sources
 3    concerning the relationship between Nat West
 4    and Interpal?
 5  A.  Yeah, concerning the litigation and
 6    this type of litigation.
 7  Q.  Well, let's focus first on this
 8    litigation.  What secondary sources have you
 9    looked at?
10  A.  I've looked at academic articles,
11    web pages.
12  Q.  Okay.  What academic articles?
13  A.  I've looked at academic articles
14    which relate to the financing of charities and
15    books which -- sorry the financing of
16    terrorism --
17  Q.  Sorry, we're at cross-purposes
18    again.
19  A.  Okay.
20  Q.  What academic articles have you
21    read concerning the facts of these cases, if
22    any?
23  A.  I would have to -- I would have to
24    check.  I can't say that there is an academic
25    article which has as its title this litigation.
```

Page 35

```
 1       WALKER
 2  A.  Yeah.
 3  Q.  Have you learned anything from any
 4    web pages concerning the facts of this case,
 5    these cases?
 6  A.  I can't say that I've learned
 7    anything new.  I've --
 8  Q.  What court --
 9  A.  I've learned probably more people's
10    opinions than facts about the case.
11  Q.  What court papers did plaintiffs
12    give you?  Did they give you the complaint?
13  A.  This I hope.  My hesitation is
14    because this goes back to 2006 and I haven't
15    closely reviewed the papers since that time.  I
16    had a number of court papers, probably the
17    complaint and the -- some of the pleadings at
18    that time in 2006.
19  Q.  Have you received any court papers
20    from plaintiffs counsel since 2006?
21  A.  The papers I've received are the
22    reports by Mr. Holland, Mr. Burchfield and the
23    deposition.  Are they not court papers?
24  Q.  Professor Walker, the deposition
25    will go a lot faster if you just try to focus
```

Page 34

```
 1       WALKER
 2    What I would say is there have been a number of
 3    academic articles which have mentioned this
 4    litigation, as I say, alongside other
 5    litigation against other banks of a similar
 6    nature to this litigation.
 7  Q.  Now, you said you looked at web
 8    pages.
 9  A.  Yeah.
10  Q.  Have you looked at any web pages
11    that have educated you on the facts of the
12    relationship between Nat West and Interpal?
13  A.  I'm not sure what you mean by
14    "educated."  I mean, everything one reads one
15    sees a point of view, but I would say, if this
16    helps you, that reading the details of the
17    court documentation plus the details of the
18    Charity Commission reports I would say is my
19    prime source of information.
20  Q.  Okay.  But you referred earlier to
21    web pages and that, in fact, was the subject of
22    my question.
23  A.  Yeah, sure.
24  Q.  If you could just stick with my
25    question.
```

Page 36

```
 1       WALKER
 2    on my question.
 3  A.  I am trying to focus on your
 4    question.  If you could explain your question
 5    it would help.
 6  Q.  Have you received any court papers
 7    from plaintiff's counsel since 2006?  I'm not
 8    talking about the reports.  I'm not talking
 9    about the deposition.
10       Have you received any papers that
11    you understood were filed with the court since
12    2006?
13  A.  Well, I would count the depositions
14    as court papers.  I would count the expert
15    report as court papers, but aside from them the
16    answer is no.
17  Q.  Okay.  Now, I'd like you to look at
18    your CV that is attached to Exhibit 1 of your
19    report.
20  A.  Sure.
21  Q.  There's no indication here that you
22    purport to be an expert on the Charity
23    Commission; correct?
24       MR. ISRAEL: Objection to form.
25  Q.  Is there any indication here that
```

Page 37

         WALKER
1
2    you purport to be an expert on the Charity
3    Commission?
4    A.   Sorry, I heard an objection.
5        MR. ISRAEL: You can answer.
6    A.   Okay.  Am I an expert on the
7    Charity Commission --
8    Q.   That's not what I asked you.
9    Please, Professor, I asked you --
10   A.   Any indication.
11   Q.   -- is there any indication in your
12   CV that you purported to be an expert on the
13   Charity Commission?
14       MR. ISRAEL: Objection to form.
15   A.   There is evidence in the sense that
16   I purport to be an expert on the subject of
17   terrorism and the law and, as I indicated
18   earlier, this subjective terrorism and the law
19   is an expanding agenda.  And after 9/11 it
20   became part of that agenda that charities may
21   be involved in terrorism and, therefore,
22   since -- particularly since 9/11, I have taken
23   an interest in the activities of the Charity
24   Commission and in my -- certainly in my most
25   recent books have mentioned this -- this issue.

Page 38

         WALKER
1
2    Q.   Do you hold yourself to be an
3    expert on the Charity Commission?
4        MR. ISRAEL: Objection to form.
5    A.   I would, again, repeat that if you
6    talk about the Charity Commission and its
7    dealings with suspected involvement in
8    terrorism finance, I think the answer is yes.
9    Q.   Have you ever practiced as a lawyer
10   before the Charity Commission?
11   A.   No.
12   Q.   You were a clerk and a solicitor at
13   the law firm Emsley Collins & Co. from 1976 to
14   1978; correct?
15   A.   Yes.
16   Q.   And as a clerk, you were what we
17   would refer to as a trainee?
18   A.   Yes.
19   Q.   And as a solicitor, you were a
20   lawyer at that firm?
21   A.   Briefly.
22   Q.   What was the nature of the legal
23   work you did at that firm?
24   A.   It was fairly varied.  I was a new
25   boy, as it were, on the block and so I did lots

Page 39

         WALKER
1
2    of different work.  I think the bulk of the
3    work that I ended up doing was in the field of
4    either civil litigation or what in Britain we
5    would call private client work, such as house
6    conveyance or wills, that kind of thing.
7    Q.   Did you have any professional
8    experience with the Charity Commission while
9    you were at that firm?
10   A.   No, no.
11   Q.   Why did you leave that firm?
12   A.   Sorry?
13   Q.   Why did you leave that firm?
14   A.   I had a strong inclination towards
15   academic work.  This was with me whilst I was
16   at university and might be reflected in the
17   fact, though I say it myself, that I received a
18   first-class degree, which is just a degree of
19   impulsion to study.
20       I did consider at the end of my
21   degree going into post-graduate study doing a
22   Ph.D. and it was a kind of a flip of the coin
23   which I did first or which I preferred.  I was
24   interested equally in doing some practice
25   because that is the, as it were -- the life of

Page 40

         WALKER
1
2    the law is practicing.  That was potentially
3    interesting.
4        But having done two or three years
5    of practice, the -- as it were, the academic
6    side called me back and I began looking for
7    jobs in academic life to fulfill my greater
8    priority to satisfy my academic curiosity than
9    my practitioner curiosity.
10   Q.   You practiced law for two to three
11   years?
12   A.   Yes.
13   Q.   You never practiced charity law?
14   A.   Correct.
15   Q.   You've never worked for the Charity
16   Commission?
17   A.   Correct.
18   Q.   And you've never appeared before
19   the Charity Commission as a lawyer?
20   A.   Correct.
21   Q.   Have you ever taught a course on
22   charity law?
23   A.   I've taught the subject of equity
24   and trust, which I guess has much the same
25   meaning here as it does in the U.K.  And as

TZVI WEISS VS.
NATIONAL WESTMINSTER BANK, PLC

CLIVE WALKER
June 14, 2011

Page 41

WALKER

1 part of that course -- part of that course is
2 about charities law.
3 Q.  When did you last teach that class?
4 A.  I taught it some 20 years ago, I
5 think, would be the last time I taught that
6 class.
7 Q.  Do you have a copy in your files of
8 the syllabus for that course?
9 A.  No.
10 Q.  Have you ever worked for a British
11 law enforcement agency?
12 A.  Yes, I think you could say I have.
13 Q.  What's that?
14 A.  I do work on an episodic basis for
15 an organization called the Police National
16 Legal Database.
17 Q.  What is the Police National Legal
18 Database?
19 A.  The Police National Legal Database
20 is an organization which seeks to compile a
21 database of essentially legal material which is
22 seen as relevant to operational police
23 officers.  And what they do is they try and
24 provide explanations -- short explanations to

Page 41

1     WALKER
2  part of that course -- part of that course is
3  about charities law.
4  Q.   When did you last teach that class?
5  A.   I taught it some 20 years ago, I
6  think, would be the last time I taught that
7  class.
8  Q.   Do you have a copy in your files of
9  the syllabus for that course?
10 A.   No.
11 Q.   Have you ever worked for a British
12 law enforcement agency?
13 A.   Yes, I think you could say I have.
14 Q.   What's that?
15 A.   I do work on an episodic basis for
16 an organization called the Police National
17 Legal Database.
18 Q.   What is the Police National Legal
19 Database?
20 A.   The Police National Legal Database
21 is an organization which seeks to compile a
22 database of essentially legal material which is
23 seen as relevant to operational police
24 officers.  And what they do is they try and
25 provide explanations -- short explanations to

Page 42

1     WALKER
2  operational police officers of issues such as
3  the meaning of offenses, what recent cases
4  might mean and the idea is that this is readily
5  available online in police stations.
6  Q.   Is this a private, not-for-profit
7  organization?
8  A.   No, it's a public organization.  It
9  is part of the -- I think it is now under the
10 heading of the Association of Chief Police
11 Officers, which is a national organization in
12 England, Wales, which is publicly funded by the
13 government.
14 Q.   And you've been employed by this
15 national legal database?
16 A.   I've been engaged is --
17 Q.   Engaged for what?
18 A.   On the basis that I audit the
19 accuracy of their legal statements.
20 Q.   Have you been paid for that work?
21 A.   Yeah -- well, again, it's a similar
22 arrangement to what I'm doing now.  The
23 university has been paid.  I haven't.
24 Q.   And during what years have you done
25 that?

Page 43

1     WALKER
2  A.   Oh, it goes back a long time.  I
3  think it goes back to -- I don't know whether I
4  mentioned this anywhere in my CV.  It goes back
5  to around about the mid-1990s I think is when
6  it started and is kind of an open contract.
7  They give me work as they feel the need for
8  something to be audited.
9  Q.   And you mentioned the Police
10 National Legal Database.
11 A.   Yes.
12 Q.   You mentioned another organization,
13 the Association of National Police Chiefs.
14 What is that called?
15 A.   The Association of Chief Police
16 Officers.  What I said was that -- that is now,
17 I believe, the umbrella organization for the
18 Police National Legal Database.  I don't have
19 any contact directly with the Association of
20 Chief Police Officers.
21 Q.   Have you ever heard of a -- an
22 agency within British law enforcement known as
23 NCIS?
24 A.   Yes, I have, yes.
25 Q.   What does that acronym stand for?

Page 44

1     WALKER
2  A.   The National Criminal Intelligence
3  Service.
4  Q.   And what about the NTFIU, have you
5  ever heard of that?
6  A.   Yes, I have.
7  Q.   What does that acronym stand for?
8  A.   That's the National Terrorism
9  Finance Investigation Unit.
10 Q.   Have you ever worked for NCIS?
11 A.   No.
12 Q.   SOCA?
13 A.   No.
14 Q.   NTFIU?
15 A.   No.
16 Q.   The FSA?
17 A.   No.
18 Q.   Special Branch?
19 A.   No.
20 Q.   The Anti-terrorist Squad?
21 A.   No.
22 Q.   Bank of England?
23 A.   No.
24 Q.   Her Majesty's Treasury?
25 A.   No.

TZVI WEISS VS.
NATIONAL WESTMINSTER BANK, PLC

CLIVE WALKER
June 14, 2011

Page 45

1      WALKER
2  Q.  Have you ever held a position at a
3  commercial or a retail bank?
4  A.  No.
5  Q.  Have you ever taught any courses on
6  banking law?
7  A.  Not -- again it's rather like the
8  question you asked about teaching about
9  charity.  Not directly, not a standalone
10  course, but as part of my teaching on terrorism
11  laws, I do teach about how bankers have to deal
12  with antiterrorism laws and regulations.
13  Q.  Have you ever -- so, if I asked you
14  if you've ever taught a course on banking
15  regulation, you'd give me the same answer?
16  A.  Correct.
17  Q.  Okay.  What course are you
18  referring to?
19  A.  For example, I currently teach a
20  course, two courses, both in undergraduate and
21  post-graduate level, on -- which is entitled
22  Terrorism and the Law.
23  Q.  So you currently teach that in an
24  undergraduate version?
25  A.  Yes.

Page 46

1      WALKER
2  Q.  And in a graduate version?
3  A.  Correct.
4  Q.  And do you have any course outlines
5  or course syllabi for those courses?
6  A.  I do.  Not with me, but I can
7  certainly find them.
8  Q.  Just so we can be sure what --
9  we're talking about the same document, how
10  would you refer to those documents for those
11  two classes?
12  A.  In terms of what I teach, I guess
13  the title would be module outline -- module
14  outline is the document which gives an idea of
15  what -- what is taught.
16  Q.  And you have a module outline for
17  each class, the undergraduate class and the
18  graduate class?
19  A.  Yes, yes.
20  Q.  And when did you start teaching the
21  undergraduate class?
22  A.  I think about five years ago, six
23  years ago.  I can't recall.
24  Q.  And the graduate class?
25  A.  They both started together.

Page 47

1      WALKER
2  Q.  Is there a different module outline
3  for each class for each year or is there --
4  A.  It does vary over years.  You know,
5  sometimes an event occurs and you get
6  interested in a particular subject sometimes.
7  There's no great interest in that area that
8  particular year.  So it does vary year to year
9  what is the precise outline, of course?
10  Q.  Do you have any professional
11  training in banking regulation?
12  A.  Other than the training which goes
13  back to when I became a solicitor, and for that
14  purpose I had to undertake a number of courses
15  at what was then called the Law Society's final
16  exams which included a whole range of
17  commercial experience, and also required me to
18  take what were then called solicitor's accounts
19  exams, where I had to learn how to keep proper
20  accounts of my clients' transactions.
21  Q.  Other than that, you have no
22  professional training in banking regulation;
23  correct?
24  A.  Well, other than that, I would say
25  I have training in terms of what I've learned

Page 48

1      WALKER
2  as an academic which I would view as quite
3  professional in the way that I approach any
4  subject and learn about it.  It's the same as
5  what I've learned about terrorism.
6  Q.  Okay.  I'd like you to look at the
7  section of your CV beginning on page 25
8  entitled "Principal Publications on Terrorism
9  and Security," do you see that?
10  A.  Yes.
11  Q.  Which of these -- do any of these
12  publications refer to the Charity Commission?
13      MR. ISRAEL: Objection to form.
14  A.  I would believe that the,
15  particularly the books regarding terrorism at
16  the top of the list and especially the most
17  recent two books, namely the Antiterrorism
18  Legislation of 2009 and the Terrorism, the Law
19  Book of 2011.
20      I'm pretty sure certainly the
21  latter, which as you can imagine I've just
22  completed and, therefore, have better
23  recollection of its content, although it is
24  300,000 words, so I can't remember every last
25  word of it, does refer to the Charity

Page 49

```
 1      WALKER
 2   Commission.
 3      (Exhibit 6, copy of book entitled
 4      Terrorism and the Law, marked for
 5      Identification.)
 6   Q.  Let me show you what the reporter
 7   has marked as Exhibit 6, which is a copy of
 8   your book Terrorism and the Law.  First, I'll
 9   ask you to confirm that that's what Exhibit 6
10   is.
11   A.  Yes, that's correct.
12   Q.  And this was published earlier this
13   year?
14   A.  Yes, correct.
15   Q.  For what audience is this intended?
16   A.  My publishers would view it as
17   primarily intended for a practitioner.
18   Q.  A legal practitioner?
19   A.  Yes.
20   Q.  Okay.
21   A.  I say my publishers, because it's
22   not entirely my own view of the subject.
23   Q.  We're taking your deposition today,
24   not your publisher's, so for what audience do
25   you intend it?
```

Page 50

```
 1      WALKER
 2   A.  I intended -- I would accept that
 3   publishers are certainly an audience, but I
 4   would say it is also intended for an academic
 5   audience too.
 6   Q.  So, from your perspective the
 7   intended audience for this book is legal
 8   practitioners and academics?
 9   A.  Yes.
10   Q.  I'd like you to look at page 409 of
11   your book.
12   A.  Right.
13   Q.  And in particular section 9.93.
14   A.  Yeah.
15   Q.  You state as follows, "The Charity
16   Commission is reported to have investigated 17
17   charities as a result of which trustees were
18   removed under the Charities Act 1993, section
19   20."
20   A.  Yeah.
21   Q.  "Most notable is Abu Hamza who was
22   removed from the North London Central Mosque
23   Finsbury Park in 2003."  Do you see that?
24   A.  Yes.
25   Q.  Now, you cite for that an
```

Page 51

```
 1      WALKER
 2   article -- I'm sorry, a book published by Jay
 3   Gunning.  Actually, it's an article in a book
 4   by Jay Gunning entitled Terrorism, Charities
 5   and Diasporas; correct?
 6   A.  Correct.
 7   Q.  Now, you read that before you cited
 8   it; correct?
 9   A.  Yes, I did.
10   Q.  Now, if you look at your report
11   Exhibit 1, virtually the same sentence appears
12   in paragraph 3.1.6 on page eight of your
13   report; correct?
14   A.  I'm sorry, 3. --
15   Q.  1.6 on page eight, the same two
16   sentences; correct?
17   A.  Well, the sentence about, "The
18   Charity Commission is reported to investigate,"
19   et cetera is the same sentence, yeah.
20   Q.  Now, the -- Mr. Gunning's article
21   is a source on which you relied in writing your
22   book; correct?
23   A.  Yes.
24   Q.  And your reliance upon it means
25   that you concluded it as a reliable authority;
```

Page 52

```
 1      WALKER
 2   correct?
 3   A.  Yes.
 4   Q.  And the -- you also cite the same
 5   Gunning article in footnote four of your report
 6   on page eight.  So I take it you relied on the
 7   Gunning article in your report and you regard
 8   it as a reliable authority for your report as
 9   well; correct?
10   A.  Yes.
11   Q.  I'd like you to look at paragraph
12   9.95 on page 410 of your book.
13   A.  Okay.
14   Q.  And here you state as follows, "In
15   response to the perils of terrorist
16   infiltration of charities, the home office and
17   HM Treasury in their report, Review of
18   Safeguards to Protect the Charitable Sector
19   England and Wales from Terrorist Abuse, regard
20   the channeling of funds by charities to
21   terrorists as extremely rare.  Nonetheless,
22   they urge the Charity Commission to reinforce
23   awareness of risk factors."
24      Do you see that?
25   A.  Yes.
```

TZVI WEISS VS.
NATIONAL WESTMINSTER BANK, PLC

CLIVE WALKER
June 14, 2011

Page 53

1      WALKER
2  Q.  Now, again, your reliance upon this
3  publication by the home office and HM Treasury
4  indicates that you consider that to be a
5  reliable authority; correct?
6  A.  Yes.  I would more, I think,
7  consider it to be an authoritative source
8  rather than necessarily reliable.  They don't
9  give details as to their views.  They are more
10  in terms of statements of policy rather than
11  evidence-based statements.
12  Q.  So you consider -- you prefer to
13  say that you consider it to be an authoritative
14  source?
15  A.  Yes, yes.
16  Q.  Now, look at paragraph 3.2.11 of
17  your report on page 21 --
18      MR. ISRAEL: 22?
19  Q.  I'm sorry, 22.
20  A.  Right.
21  Q.  You record here the same quotation
22  to this authoritative source that you also have
23  in your book; correct?
24  A.  Yes, yes.
25  Q.  And you believe it is accurate

Page 54

1      WALKER
2  that, as stated here, "The channeling of funds
3  by charities to terrorists is extremely rare";
4  correct?
5  A.  I think you should see that in the
6  context of the fact that there are, I think,
7  around 160,000 charities and relatively few
8  cases or even allegations compared to the
9  figure of 160 so I think extremely rare --
10  160,000 and the number of allegations compared
11  to 160,000 is, therefore, I think, fairly
12  described as extremely rare.
13  Q.  So you believe that the channeling
14  of funds by charities to terrorists is
15  extremely rare?
16      MR. ISRAEL: Objection to form,
17  asked and answered.
18  A.  In the context that I've already
19  stated that there are around 160,000 charities,
20  but of course we should also understand that as
21  indeed the document -- the document in question
22  emphasizes, that one should see that in a risk
23  analysis, if you like, that there are clearly
24  some charities which are far more at risk than
25  others.

Page 55

1      WALKER
2  Q.  Now, if you look at paragraph 9.96
3  of your book on page 410 you wrote as follows,
4  "The Charity Commission has responded by
5  publishing a counter-terrorism strategy which
6  applies zero tolerance to any connections to
7  prescribed organizations, support for terrorist
8  activity or the fostering of criminal
9  extremists.  The Commission has put in place a
10  proactive monitoring unit and a
11  counter-terrorism team which forms part of the
12  intensive case work unit in compliance and
13  support, as well as issuing operational
14  guidance."
15      Do you see that?
16  A.  Yes.
17  Q.  And these sentences are almost
18  exactly the same as what you have in paragraph
19  3.1.9 -- 3.1.9 of your report on pages eight
20  and nine; correct?
21  A.  Those particular sentences, yes,
22  although that may not be the full point of
23  3.1.9.
24  Q.  And you believe this to be
25  accurate; correct?

Page 56

1      WALKER
2  A.  It is accurate that the Charity
3  Commission has done these things; correct.
4  Q.  Correct.  I'd like you to look at
5  paragraph 9.9 further on in 9.96 --
6  A.  Yeah.
7  Q.  -- of your book.  After you state
8  what the Charity Commission has done, you go on
9  to state, "Nevertheless a strong and vibrant
10  sector should be encouraged," referring to the
11  charity sector, "and this understanding stance
12  is welcome since 'a wholesale blight on the
13  provision of financial support for humanitarian
14  aid could fuel the destabilization of
15  struggling people abroad and enhance the appeal
16  of terrorist groups to these people.'"
17      That's what you have in paragraph
18  9.96 of your book; correct?
19  A.  Correct.
20  Q.  And that's almost exactly the same
21  as what you wrote in paragraph 3.1.10 on page
22  nine of your report; correct?
23  A.  Correct.
24  Q.  And in this sentence you quote from
25  a William & Mary Law Review article which you

Page 61

WALKER

1   WALKER
2   is a very kind of black and white statement.  A
3   wholesale blight is a total prohibition, from
4   words such as overzealous, unjustifiable, which
5   are much more nuanced.
6       And, so, I think -- it's hard to
7   remember.  I wrote 300,000 words in my book and
8   the precise nature of the materials that I
9   particularly selected is, of course, a work
10  over many years.
11      But I would say I'm happier with
12  this statement that I selected which I think is
13  much more black and white in terms of a
14  wholesale blight being certainly undesirable
15  rather than these more nuanced statements about
16  overzealous, unwise, those kinds of things.
17  Q.  So --
18  A.  In other words, I didn't quote the
19  rest of those sentences because I think they
20  are sentences that one would like to see
21  probably a bit more context for in order to
22  justify them.
23  Q.  Obviously this is written from the
24  context of the view of the U.S. government and
25  U.S. donors and U.S. charities.

Page 62

1   WALKER
2   A.  Correct.
3   Q.  I take it that the portion from
4   which you quoted you agreed with respect
5   to the U.K. context as well; is that right?
6   A.  The sentence that I selected I
7   would certainly agree that if one has a
8   wholesale crackdown, if I could put it that
9   way, there will be public barbs flowing from
10  that, even though your intention of course is
11  the public good of stopping terrorism finance.
12  Q.  Let's go back to your book and I'll
13  ask you to look at paragraph 9.97 on page 410.
14  And there you wrote the following, "Another
15  type of sanction against suspect charities
16  including Interpal has involved civil
17  litigation to pressure banks to withdraw
18  facilities," and you cite in footnote 176 one
19  of the lawsuits in which you're appearing
20  today, Weiss against National Westminster Bank.
21      Do you see that?
22  A.  Yes, yes.
23  Q.  Now, you understand that the
24  purpose of these lawsuits is to pressure banks
25  to withdraw facilities from charities?

Page 63

1   WALKER
2   A.  I would say that looking at the
3   lawsuits as a whole that might be one of the
4   possible motives.  I'm not saying it's the only
5   motive and I was referring here simply to
6   another type of sanction.  And the litigation,
7   of course, may produce other results in terms
8   of the payment of large sums of damages which
9   may also have consequences.
10  Q.  And by "facilities" you mean
11  banking service --
12  A.  Banking services, correct.
13  Q.  And the provision of bank accounts?
14  A.  Correct, yeah.
15  Q.  Now, in your lexicon as you apply
16  it here, Interpal is a "suspect charity"?
17  A.  Sorry, where did I say that?
18  Q.  You wrote, "Another type of
19  sanction against suspect charities including
20  Interpal has involved civil has litigation to
21  pressure banks to withdraw facilities."
22      So I take it in your lexicon
23  Interpal is a "suspect charity"?
24  A.  In the context of paragraph 997 and
25  the context of paragraph -- of chapter 9, yes.

Page 64

1   WALKER
2   Q.  Okay.  You're aware that Interpal
3   has never been charged with a crime in Britain?
4   A.  Yes.
5   Q.  And you're aware that Interpal has
6   never been subjected to any sanctions in
7   Britain, antiterrorist sanctions; correct?
8   A.  Yes.
9   Q.  And you're aware that British
10  authorities have stated that despite their
11  investigations, they have not found a basis to
12  bring charges against Interpal; correct?
13  A.  They have not brought any charges,
14  that's correct.
15  Q.  But you're aware that they've
16  stated that despite their investigations they
17  have no basis to bring charges against
18  Interpal; correct?
19      MR. ISRAEL: Objection to form.
20  A.  I'm not aware that they stated they
21  have no basis.  I would agree that they have
22  stated that they are not bringing charges.
23  Q.  Now, under British law a suspect is
24  considered innocent until proven guilty;
25  correct?

Page 77

```
 1      WALKER
 2  Q.  Look at page five of
 3  Mr. Burchfield's report and read to yourself
 4  paragraphs 15 and 16.
 5  A.  (Reviewing.)
 6      Okay.
 7  Q.  You agree that because Interpal
 8  remained on the register of charities at all
 9  times from August 11, 1994, National
10  Westminster Bank was entitled to regard
11  Interpal as a charity which is established for
12  charitable purposes; correct?
13  A.  I would agree that it has, that
14  because of section four, as referred to in
15  paragraph five, that there is a conclusive
16  presumption that the body is a charity, has the
17  status of a charity.
18  Q.  Okay.  Now, look at paragraph 3.1.3
19  of your report.  The last sentence on the top
20  of page seven you state the following:  "Only
21  one out of four elements of the Commission's
22  mission refers to enabling compliance with
23  legal obligations and the statutory compliance
24  objective is only one objective of five."
25      Do you see that?
```

Page 78

```
 1      WALKER
 2  A.  Yes.
 3  Q.  So, is it your opinion that the
 4  fact that there are four elements in the
 5  Commission's mission minimizes the importance
 6  of each individual element?
 7  A.  I think this is one piece of
 8  evidence which tries to give a complete picture
 9  of the nature of the Charity Commission and it,
10  of course, is reflected not only in the
11  objectives of the Charity Commission as set out
12  in Section -- I believe Section 1-B of the Act,
13  but also of the functions and the duties of the
14  Charity Commission.
15      And so I think what I'm saying here
16  is it is well to see the issue of compliance in
17  the context of the full picture.
18  Q.  Now I'd like to go back to my
19  question.  Does the fact that there are four
20  elements in the Commission's mission minimize
21  the importance of each individual element?
22      MR. ISRAEL: Objection, asked and
23      answered.
24  A.  I don't think I can answer that
25  except by the way that I've already answered
```

Page 79

```
 1      WALKER
 2  it.  In other words, one must look at the
 3  wording of the particular statement about
 4  compliance which I quote there and also the
 5  full picture of what are the objectives of the
 6  Charity Commission.
 7  Q.  Do you think that the fact that
 8  there are five objectives of the Charity
 9  Commission's work minimizes the importance of
10  each one?
11      MR. ISRAEL: Objection, asked and
12      answered.
13      MR. FRIEDMAN: I'm focusing on the
14      objectives now, not the --
15      MR. ISRAEL: Withdrawn.
16  A.  I think the same could be applied
17  that I've already said to the objectives as
18  could be applied to the duties as could be
19  applied to the functions.
20      In other words, you've got to see
21  the full picture in order to understand the
22  nature of the Charity Commission.
23  Q.  Are you familiar with the Ten
24  Commandments in the Old Testament?
25  A.  Could I recite them, no.  Am I
```

Page 80

```
 1      WALKER
 2  familiar broadly speaking, yes.
 3  Q.  You're aware of the Commandment
 4  Thou Shalt Not Kill?
 5  A.  Yes.
 6  Q.  Is it your opinion that that
 7  Commandment is of lesser importance because it
 8  is one of ten rather than one alone?
 9      MR. ISRAEL: Objection.  I think
10      beyond the scope of his report, but --
11  A.  I'm not sure that I'm equipped to
12  give you a theology lesson and I'm also not
13  sure that the analogy that you're drawing here
14  between the Ten Commandments and the Charities
15  Act of 1996 -- sorry, 1993, is a fair analogy.
16      In other words, what was in the
17  mind of the Almighty when He gave His Ten
18  Commandments may not be in the mind of
19  Parliament when it gave us the Charities Act.
20  They have different status and authority, I
21  would humbly suggest.
22  Q.  Please do not worry about my
23  analogy.  You just need to answer my questions.
24      Is it your opinion that the
25  Commandment Thou Shalt Not Kill would be more
```

Page 81

```
 1       WALKER
 2   important if it were one Commandment standing
 3   alone as opposed to one of ten?
 4       MR. ISRAEL: Same objection.  Asked
 5       and answered.
 6   A.  It's my opinion that the Ten
 7   Commandments are of a different nature to the
 8   Charities Act so I can't really draw any lesson
 9   from the Ten Commandments.  I think my opinion
10   either way, and I'm not sure I've got a clear
11   opinion on that point of theology, is going to
12   assist us today.
13   Q.  Again, Professor, don't worry about
14   my analogies and don't worry about the
15   comparisons I'm trying to draw because, in
16   fact, you don't know what I'm trying to draw.
17   Just answer my question, if you can.
18       Is it your opinion that the
19   Commandment Thou Shalt Not Kill would be more
20   important if it were just standing alone rather
21   than being one of Ten Commandments?
22       MR. ISRAEL: Objection.  The
23       witness has fulsomely answered twice now.
24   A.  I think that I would need to know
25   the context of the Ten Commandments.  I would
```

Page 82

```
 1       WALKER
 2   need to talk to people who are better versed in
 3   theology than I am to give you an answer of an
 4   authoritative kind as an expert of that
 5   question.
 6   Q.  I'm not asking you as an expert in
 7   theology.  I'm asking you as a human being,
 8   Professor Clive Walker, do you believe that the
 9   Commandment Thou Shalt Not Kill is of lesser
10   importance because it's one of Ten Commandments
11   rather than one standing alone?
12       MR. ISRAEL: Objection, asked and
13       answered three times now.
14   A.  I'm not sure I can give you any
15   clear answer.  As I say, I think I'd need to
16   think about the context in which those
17   statements, the Ten Commandments, are given.  I
18   would need to do my research into the theology
19   of the Ten Commandments and then produce a
20   better answer.  My off-the-cuff answer, I don't
21   know.
22   Q.  Look at paragraph 3.1.4 of your
23   report in which you refer to the Charity
24   Commission as a green light regulator rather
25   than a red light regulator.
```

Page 83

```
 1       WALKER
 2   A.  Okay.
 3   Q.  Do you see that?
 4   A.  Yes.
 5   Q.  Have you ever used those terms
 6   before?
 7   A.  Not recently, but my -- as you saw
 8   from my CV, my experience does go back a long
 9   way and as part of my past experience, I
10   taught -- I also taught modules in
11   constitutional and administrative law for 25
12   years or so and I'm pretty sure that certainly
13   during my time of that era of my career, those
14   terms were used.  They are terms which are very
15   familiar to me.  They're also terms which are
16   common in academic discourse about
17   administrative law and about regulators and
18   their stances, their regulatory stances.  So I
19   guess the answer is yes, I have used these
20   terms.
21   Q.  And the source you cite for those
22   terms is a publication in 2009; correct?
23   A.  Correct, yes, yes.  I should add,
24   if I may, that these terms, however, are of
25   longstanding in academic discourse and I simply
```

Page 84

```
 1       WALKER
 2   cited this as the most recent edition of a book
 3   which I think also goes back quite some years.
 4   Q.  Have you ever applied these terms
 5   to the Charity Commission before your report?
 6   A.  No.
 7   Q.  Have you ever heard of anyone else
 8   doing so, applying these terms to the Charity
 9   Commission?
10   A.  Two parts to my answer, one is
11   no --
12   Q.  Just answer yes or -- you've next?
13   A.  I don't want to answer yes or no,
14   if I may.  I want to give you a proper answer
15   rather than a yes or no answer.  Is that okay?
16   Q.  Can you answer yes or no?
17       MR. ISRAEL: The witness can
18       answer --
19   A.  No.  Can I answer properly?
20   Q.  Let's leave out whether it's proper
21   or not.
22   A.  Okay.
23   Q.  Give the answer that you'd like.
24   A.  Okay.  I can't answer, I think,
25   effectively yes or no.  I think the short
```

**Page 85**

WALKER

1  answer in terms of has there been an article
2  that mentions these terms, I can't say for
3  sure, but I'm not aware of any.
4      However, if I could just -- if you
5  can just give me a minute, one of the -- I may
6  not have mentioned this article in the paper,
7  another academic author on the subject of
8  charities, he writes a great deal on the
9  subject, is a fellow called Peter Edge who's at
10  another U.K. university, and I do recollect him
11  using the terms "hard law" and "soft law" which
12  I think have some affinity with the type of
13  concept that I'm putting forward here.
14      He, as I say, would be viewed as a
15  leading academic author on charities law and
16  hard law/soft law could equate, to some extent,
17  to green light/red light.
18  Q.  You think it's fair to characterize
19  what the Charity Commission does as soft law?
20  A.  Yes, yes.
21  Q.  And what is the publication by
22  Peter Edge to which you're referring?
23  A.  I'm sorry, it's not referred to in
24  this paper, but I --

**Page 86**

WALKER

1  Q.  But what is it?
2  A.  Yeah, I can't remember the
3  reference.  I can find you the reference very
4  easily if you need it.  It is an academic paper
5  of recent origin.  I would say the last five
6  years.
7  Q.  Do you possess a copy of it?
8  A.  I don't have a copy.  I can easily
9  get one.  I have recently read the paper, but I
10  can't remember the precise reference.
11  Q.  And is he a reliable authority?
12  A.  Sorry?
13  Q.  Is he a reliable authority?
14      MR. ISRAEL: Objection to form.
15  A.  He is a well-established academic
16  author.  And so to that extent he is, as it
17  were, on an ad homonym basis he is a reliable
18  person.  I can't vouch for every statement that
19  he makes.
20  Q.  Well, you're testifying under oath
21  today.
22  A.  Sure.
23  Q.  And you just adopted a construct --
24  A.  Yes.

**Page 87**

WALKER

1  Q.  -- of hard law versus soft law --
2  A.  Sure.
3  Q.  -- of which you say he is the
4  author.
5  A.  Yes.
6  Q.  Do you view him as a reliable
7  authority?  I assume so because you testified
8  to what he said today.
9      MR. ISRAEL: Same objection.
10  A.  Sure.  On the basis of his
11  analytical construct of hard law/soft law as
12  applied to the Charity Commission, I found his
13  arguments persuasive.
14  Q.  Okay.  Look at paragraph 3.1.7 of
15  your report.  You state that, "The Charity
16  Commission's default stance seems to be --
17  seems to that of charity ally and not charity
18  policeman."
19      What is your basis for that?  What
20  is your factual basis for that statement?
21  A.  Sorry, there is a word missing I
22  see there.  "Seems to be" it should say "that
23  of charity ally and not charity policeman."
24      The factual basis is -- of course

**Page 88**

WALKER

1  it says "in short" and so it's referring to the
2  description given in -- particularly in the
3  previous paragraph 316 of some cases that are
4  mentioned at that point.
5  Q.  You're familiar with an entity
6  known as the Metropolitan Police Service;
7  correct?
8  A.  Yes.
9  Q.  That's the police force in London;
10  correct?
11  A.  Correct.
12      (Exhibit 24, pages from the
13      Metropolitan Police Service website,
14      marked for Identification.)
15  Q.  I'm going to show you what's been
16  marked as Exhibit 24, which I'll represent to
17  you are pages from the Metropolitan Police
18  Service website.
19  A.  Yup.
20  Q.  Do you have any reason to doubt
21  that this is from the Metropolitan Police
22  Service website?
23      MR. ISRAEL: Objection.
24  A.  I would say that I've not seen

Page 101

```
 1      WALKER
 2   yourself which is on page two.
 3   A.   Sorry?
 4   Q.   I'll invite you to read the
 5   introduction in that document.
 6   A.   This document?
 7   Q.   That document, on page two.
 8   A.   Right.
 9   Q.   It has a picture of the three
10   people at the bottom.  Do you see it?
11   A.   Yeah, sure.
12   Q.   Do you want to read that
13   introduction to yourself?
14   A.   (Reviewing.)
15      Okay.  Well, if I simply read this
16   one sentence without having read the whole
17   document, it would appear that they wish to set
18   out in this document the "key themes and wider
19   issues for charity arising from the
20   Commission's compliance work from 2007 to
21   2008."  That's what the statement says.
22   Q.   Look at page 27.
23   A.   Okay.
24   Q.   You'll agree with me that according
25   to this annex during this period of time there
```

Page 102

```
 1      WALKER
 2   were 490 occasions when the Charity Commission
 3   used its compliance powers, including extensive
 4   use of information gathering powers; correct?
 5   A.   Sorry, 490 the final figure on the
 6   table, yes?
 7   Q.   Yes.
 8   A.   Yes, yes.
 9   Q.   And if you look at page 28, annex
10   two, you'll see that across the horizontal axis
11   of this chart in the second segment it lists
12   the statutory powers exercised by the
13   Commission during this period; correct?
14   A.   Correct.
15   Q.   And that includes issuing orders,
16   directions -- and transactions for information
17   for evidence; correct?
18   A.   Correct?
19   Q.   And that includes suspending
20   trustees?
21   A.   Correct.
22   Q.   That includes removing trustees?
23   A.   Correct.
24   Q.   It includes freezing bank accounts?
25   A.   Yes.
```

Page 103

```
 1      WALKER
 2   Q.   It includes appointing interim
 3   managers?
 4   A.   Yes.
 5   Q.   And it includes other orders and
 6   schemes; correct?
 7   A.   Yes.
 8   Q.   And it includes other instances in
 9   which the Commission used no powers; correct?
10   A.   Correct.
11   Q.   I'd like you to look at 3.1.19 of
12   your report.  I'm sorry, 3.1.9 of your report.
13   It's on page eight.
14   A.   Yes.
15   Q.   There in the second sentence you
16   state that, "The Charity Commission has
17   announced that threats to national security,
18   including terrorism, amount to one of the most
19   serious risks for charities," correct?
20   A.   Yes.
21   Q.   And then you go on to say, "As
22   reflected in its published counter-terrorism
23   strategy, these are issues where the Charity
24   Commission applies zero tolerance to any
25   connections to prescribed organizations,
```

Page 104

```
 1      WALKER
 2   support for terrorist activity or the fostering
 3   of criminal extremism.  The Commission has also
 4   put in place a proactive monitoring unit and a
 5   counter-terrorism team which forms part of the
 6   intensive case work unit in compliance and
 7   support as well as issuing operational
 8   guidance, OG 96 charities and terrorism."
 9      Do you see that?
10   A.   Correct, yes.
11   Q.   And that is all accurate, correct,
12   what you wrote here?
13   A.   Yes, yes.
14      (Exhibit 16, document entitled
15      "Counter-terrorism Strategy July 2008,"
16      marked for Identification.)
17   Q.   Now, let me show you what we marked
18   as Exhibit 16, a publication of the Charity
19   Commission entitled "counter-terrorism Strategy
20   July 2008."  This is the document that you
21   refer to in paragraph 3.1.9 of your report;
22   correct?
23   A.   Yes.
24   Q.   And this document, to your
25   knowledge, accurately states the Charity
```

Page 105

1    WALKER
2    Commission's counter-terrorism strategy as of
3    July 2008; correct?
4    A.  Correct.
5    Q.  I'd like you to look at page five.
6    If you look at the middle of the first column,
7    it says, "We have always been vigilant of the
8    risk of potential links between charities and
9    terrorist organizations and people connected to
10   them."
11   A.  Yes.
12   Q.  Do you see that?
13   A.  Yes.
14   Q.  Do you have any factual basis to
15   believe this is untrue?
16       MR. ISRAEL: Objection to form.
17   A.  I think the issue here is a
18   difference between your question taken as a
19   statement about the Charity Commission's stated
20   policy and their actions pursuant to that
21   policy.  So if you were to say to me, is this
22   an accurate statement of the expressed policy
23   papers, then I would say yes that is -- that is
24   accurate, that they have expressed many -- in
25   several papers, repeated papers, that they are

Page 106

1    WALKER
2    vigilant.  I think we used the words earlier --
3    the words we used earlier, zero tolerance, was
4    used, for example.  And that is a repeated
5    stance which is in their papers.
6    Q.  I'll adopt your question.  Is
7    this --
8    A.  However, however, if I may finish.
9    Q.  Sure.
10   A.  I said there are two aspects, but
11   as a statement on paper, I think this is --
12   this is in line with what they say elsewhere,
13   but I may not agree that it is a statement of
14   their practice in pursuance of those papers.
15   Q.  Do you have any factual basis for
16   stating that this was not their practice with
17   respect to Interpal?
18   A.  I think the -- the factual basis
19   that I would have would be drawn from the --
20   essentially drawn from the three reports that
21   the Charity Commission has issued about
22   Interpal.  That would be, I think, my core
23   reason for doubt.
24       But also, of course, I referred
25   earlier to other sources of information about

Page 107

1    WALKER
2    Interpal; for example, the Panorama program on
3    the subject.
4    Q.  That was a television program?
5    A.  Correct.  The BBC Panorama TV
6    program in 2006, I think it was.
7    Q.  So is this an accurate statement of
8    the Charity Commission's policy, what I read to
9    you?
10   A.  This is an accurate statement of
11   what the Charity Commission states to be its
12   policy on paper.
13   Q.  Okay.  And if you turn to page
14   seven this -- the statements of the
15   Commission's role and approach, you understand
16   these to be accurate statements of the
17   Commission's description of its own role and
18   approach; correct?
19   A.  It's a description of its role and
20   what it says its role is on paper.  It's not
21   necessarily a statement of what its approach is
22   in practice.
23       (Exhibit 17, document entitled,
24   "Charity Commission Operational Guidance
25   on Charities and Terrorism," marked for

Page 108

1    WALKER
2    Identification.)
3    Q.  Okay.  Let me show you what's been
4    marked as Exhibit 17, which is downloaded from
5    the Charity Commission website.  It's entitled
6    "Charity Commission Operational Guidance on
7    Charities and Terrorism."
8    A.  Okay.
9    Q.  Have you ever seen this before?
10   A.  Yes.
11   Q.  And you cite this in your report;
12   correct?
13   A.  Correct.
14   Q.  And you believe this to be an
15   accurate statement of the Charity Commission's
16   published operational guidance on charities and
17   terrorism as of August 29, 2007; correct?
18   A.  Yes.
19   Q.  Look again at your report 3.1.15.
20   You state, "It is revealed that there were
21   constant SARs issues and official inquiries
22   made to agencies as to the status of Interpal,"
23   and you're referring here to constant SARs
24   issues and inquiries made by Nat West; correct?
25   A.  Correct.

TZVI WEISS VS.
NATIONAL WESTMINSTER BANK, PLC

CLIVE WALKER
June 14, 2011

Page 109

1     WALKER
2  Q.  And your basis for that statement
3  is what you read in the Burchfield report?
4  A.  Yes, yes.  I'm sorry, I don't know
5  whether it's referenced at B 17, but my only
6  knowledge, as we discussed earlier of Nat
7  West's activities in regard to enforcement
8  authorities is as disclosed in the Burchfield
9  and Holland reports.  So I'm sure I could find
10  it if you give me time.
11  Q.  Okay.  Look at paragraph 3.1.23 of
12  your report.  I'd like you to look at the
13  sentence that begins on the bottom of page 12
14  and carries over to page 13.  You state, "For
15  instance, the U.S. designation of Interpal
16  prompted ongoing British governmental
17  discussions with the U.S. treasury, but no
18  details have been published about the nature of
19  information revealed or conclusions derived
20  from it."
21      Do you see that?
22  A.  Yes.
23  Q.  And you cite as authority for that
24  footnote 14, what is published in Hansard House
25  of Commons, volume 492, column 677 and volume

Page 110

1      WALKER
2  496, column 182; correct?
3  A.  Correct.
4  Q.  You're aware that Her Majesty's
5  Government declined to follow the U.S. in
6  designating Interpal; correct?
7  A.  Correct.
8  Q.  And you're aware that Her Majesty's
9  Government said that all that the U.S.
10  government had shown to it about Interpal was a
11  collection of press cuttings; correct?
12      MR. ISRAEL: Objection to form.
13  A.  I'm not aware of that.  I'd like to
14  refer back to what was stated in the House of
15  Commons debates.  My evidence, as you rightly
16  say, comes from the statements -- the
17  authoritative statements by the relevant
18  ministers in the House of Commons so I would
19  take that to be the statement.  I don't
20  recollect they said that all they received was
21  a set of press cuttings.
22  Q.  The term you just used, "press
23  cuttings" --
24  A.  Sorry, whatever you said is what
25  I --

Page 111

1     WALKER
2  Q.  I said "press cuttings."
3  A.  You did, right.
4  Q.  Have you ever heard the term "press
5  cuttings"?
6  A.  Yes.
7  Q.  And that refers to what we in the
8  United States I believe call press clippings,
9  but the cutting out of articles from
10  newspapers?
11  A.  Sure.
12      (Exhibit 19, May 12, 2009 Hansard
13      House of Commons debate, marked for
14      Identification.)
15  Q.  Let me show you what's been marked
16  as Exhibit 19.  Do you recognize this to be the
17  May 12, 2009 Hansard House of Commons debate
18  cited in footnote 14 of your report?
19  A.  Yes, that's correct, yes.
20  Q.  Let me show you what's been marked
21  as Exhibit 21.
22      (Exhibit 21, Hansard Commons
23      debate, marked for Identification.)
24  Q.  Do you recognize this to be the
25  Hansard Commons debate that you also cited in

Page 112

1      WALKER
2  14 of your report?
3  A.  Yes.
4      (Exhibit 20, Hansard Commons
5      debates print from July 6, 2009, marked
6      for Identification.)
7  Q.  Let me show you Exhibit 20.  This
8  is the Hansard Commons debates print from July
9  6, 2009.  And I'll ask you to focus on what's
10  at the top of the third page and ask you do you
11  agree this is yet another record of discussions
12  in the House of Commons of Interpal?
13  A.  Yes.
14  Q.  Okay.  So we have here three
15  instances in which a member of Parliament asked
16  members of government about discussions between
17  British authorities and U.S. authorities
18  concerning Interpal, spanning from May 2009 to
19  July 2009 to September 2009; correct?
20  A.  Yes.
21  Q.  And you understand that the U.S.
22  designation of Interpal, the U.S. sanctioning
23  of Interpal that was the subject of these
24  discussions, occurred in August of 2003;
25  correct?

TZVI WEISS VS.
NATIONAL WESTMINSTER BANK, PLC

CLIVE WALKER
June 14, 2011

Page 113

```
 1      WALKER
 2  A.  Yes.
 3  Q.  So during a period in May and July
 4  and September of 2009, six years after the U.S.
 5  designated or sanctioned Interpal, members of
 6  Parliament were asking members of Her Majesty's
 7  government about discussions between the
 8  British authorities and the U.S. authorities
 9  concerning the sanctioning of Interpal;
10  correct?
11  A.  Yes.
12      MR. ISRAEL: I don't mean to
13      interrupt, Larry.  I think I got the
14      wrong one.  I have a Daily Telegraph
15      article.
16      MR. FRIEDMAN: Sorry, you got the
17      wrong one.  We'll give it to you when we
18      break.
19  A.  Sorry, I was interrupted.  Could
20  you repeat your question?
21  Q.  So this shows that during a period
22  spanning from May to July to September of 2009,
23  six years after the U.S. sanctioned Interpal,
24  members of Parliament were still asking British
25  authorities about their discussions with U.S.
```

Page 114

```
 1      WALKER
 2  authorities concerning Interpal; correct?
 3  A.  Yes.
 4  Q.  And as you sit here today, to your
 5  understanding, Interpal has never been
 6  sanctioned by the British government; correct?
 7  A.  Correct.
 8  Q.  Go back to your report.  Look at
 9  paragraph 3.1.25 on page 13.  Could you read
10  that to yourself, please.
11  A.  (Reviewing.)
12      Yes.
13  Q.  Now, looking at the text of your
14  paragraph 3.1.25 on page 13 of your report, you
15  state that in paragraph D-3 of Mr. Burchfield's
16  report he concedes that the 2009 report of the
17  Charity Commission is arguably the most
18  thorough and comprehensive of all such
19  inquiries.  Do you see that?
20  A.  In my report?
21  Q.  In your report.
22  A.  Yes, yes.
23  Q.  Let's look at paragraph D-3 of
24  Mr. Burchfield's report to which you refer
25  here.  It's Exhibit 13.  And it's on page 13 of
```

Page 115

```
 1      WALKER
 2  Mr. Burchfield's report.
 3  A.  Right, yes.
 4  Q.  And tell me where it is in this
 5  paragraph that Mr. Burchfield concedes that the
 6  2009 Charity Commission report is arguably the
 7  most thorough and comprehensive?
 8  A.  I took that to be inherent in the
 9  first sentence in paragraph D-3 to the effect
10  that it is a much more long-lasting inquiry
11  into the affairs of the charity.  And by
12  "long-lasting" I would treat that, if I could
13  use the word synonym rather than antonym, as a
14  synonym for more thorough.
15  Q.  And comprehensive?
16  A.  And comprehensive indeed.
17  Q.  So in your terminology, the term
18  "long-lasting" has the same meaning as the term
19  "the most thorough and comprehensive"?
20  A.  I think in the -- I believed in the
21  context in which it was used in paragraph D03,
22  that that was a fair interpretation of the use
23  of that word.  I wouldn't say it's necessarily
24  a fair interpretation in all contexts.
25  Q.  Now, are you aware that Interpal's
```

Page 116

```
 1      WALKER
 2  accounts at Nat West were closed in March 2007?
 3  A.  I'm aware that they were closed.  I
 4  wasn't aware of the precise date.
 5  Q.  I'll represent to you, and I don't
 6  think Joel will disagree --
 7  A.  Okay.
 8  Q.  -- that the accounts were closed in
 9  March of 2007.
10  A.  Okay.
11  Q.  Taking that as a fact, you will
12  agree with me that Nat West did not have access
13  to the Charity Commission's 2009 report at any
14  time when Interpal had accounts at Nat West;
15  correct?
16  A.  Correct.
17  Q.  You'll agree with me that 2009 was
18  two years after 2007?
19  A.  Indeed.
20  Q.  Because Nat West closed the
21  accounts in 2007, it did not have an
22  opportunity to know what the Charity Commission
23  was going to say two years later in connection
24  with Nat West's management of the accounts;
25  correct?
```

Page 117

```
 1      WALKER
 2      MR. ISRAEL: Objection to form.
 3  A.  That raises another issue in that I
 4  don't really know what were the relations
 5  between Nat West and the Charity Commission
 6  from the time when it opened its inquiry.
 7      My understanding was the inquiry
 8  was opened fairly soon after the Panorama
 9  program.  And so, again, as between that period
10  of time when the account was still open, there
11  may have been some contacts in the Charity
12  Commission.  It may indeed, of course, since
13  the accounts were closed still have contacted
14  the Nat West bank.  One hopes it made a
15  thorough investigation.
16  Q.  Let me put the question in a
17  different way.  Your understanding is that this
18  report by the Charity Commission was published
19  in 2009; correct?
20  A.  Correct.
21  Q.  And I will ask you to assume that
22  Nat West's -- that Interpal's accounts in Nat
23  West were closed in March of 2007?
24  A.  Yup.
25  Q.  Taking those premises, Nat West
```

Page 118

```
 1      WALKER
 2  could not have read the 2009 report before it
 3  closed the accounts; correct?
 4  A.  Correct.
 5  Q.  Are you familiar with section
 6  21G(2) of the Terrorism Act 2000?
 7  A.  Broadly speaking, yes, but if you
 8  want to ask me a detailed question, I'd like to
 9  have a look at it, if I may.
10  Q.  Well, you're aware that that
11  provision came into force in December of 2007;
12  correct?
13  A.  Is it possible to see a copy of it?
14  Q.  I don't have one.
15  A.  Right.
16  Q.  I'm just asking you what you know.
17  A.  I recollect that there were changes
18  around about that time because I think it was
19  because of the money laundering directive of
20  2005.  So your general scenario is correct, but
21  you're asking me there a very detailed question
22  without me seeing the precise documentation to
23  verify your precise statement.
24  Q.  Look at paragraph 3.2.4 of your
25  report.
```

Page 119

```
 1      WALKER
 2  A.  Sorry, 3 --
 3  Q.  2.4, pages 17 and 18.
 4  A.  Right.
 5  Q.  You refer there on page 18 to
 6  section 21G(2) of the Terrorism Act 2000;
 7  correct?
 8  A.  Yes, yes.
 9  Q.  I'm going to ask the reporter to
10  mark as Exhibit 25 a chapter or at least part
11  of the Terrorism Act 2000?
12      (Exhibit 25, Section 21G of the
13      Terrorism Act of 2000, marked for
14      Identification.)
15  Q.  You recognize this to be a print of
16  section 21G of the Terrorism Act of 2000;
17  correct?
18  A.  Yes.
19  Q.  And you'll agree with me that this
20  section came into force in December 2000,
21  correct, as indicated on the second page?
22  A.  Yes, yes.
23  Q.  In this paragraph 3.2.4 you refer
24  to a court decision in Kay Limited against
25  National Westminster Bank.  Do you see that?
```

Page 120

```
 1      WALKER
 2  A.  Yes.
 3  Q.  And that arose under the proceeds
 4  of the Crime Act, the Money Laundering Statute;
 5  correct?
 6  A.  Correct.
 7  Q.  And not the Terrorism Act?
 8  A.  Correct.
 9  Q.  And it concerns the issue of
10  disclosures made by professional legal advisors
11  in connection with legal proceedings or
12  contemplated legal proceedings; correct?
13  A.  Correct.
14  Q.  Now, you also refer to another
15  decision in R (UMBS) against SOCA; right?
16  A.  Correct.
17  Q.  And that decision was handed down
18  in May 2, 2007?
19  A.  Yes, and I also believe it was
20  under the proceeds of the Crime Act.
21  Q.  And if Nat West's -- if Interpal's
22  accounts at Nat West were closed in March of
23  2007, Nat West wouldn't have had the
24  opportunity to read this decision before the
25  accounts were closed; correct?
```

Page 121

1       WALKER
2  A.   Sorry.  I wasn't aware of the
3  precise dates of these judgments, but if the
4  judgments were later, then clearly that must be
5  correct.
6  Q.   Okay.  Look at paragraph 3.2.6.
7  You state here that the purpose of U.K.
8  legislation is to put parties like Nat West
9  "under pressure to provide information to the
10  relevant authorities to enable the latter to
11  obtain information about possible criminal
12  activity and to increase their prospects of
13  being able to freeze the proceeds of crime;
14  correct?
15  A.   Correct.
16  Q.   And that accurately reflects your
17  opinion?
18  A.   It's an authoritative statement
19  from a decided case, so it's not just my
20  opinion.  That is the law.
21  Q.   Okay.  And the legislation you
22  referred to here includes the Terrorism Act of
23  2000?
24  A.   I think the case again was a
25  proceeds of Crime Act case.

Page 123

1       WALKER
2  Q.   Was it also true of the Prevention
3  of Terrorism Temporary Provisions Act 1989?
4  A.   Yes.
5  Q.   Was it also true -- is it also true
6  of the Antiterrorism Crime and Security Act of
7  2001?
8  A.   Yes, yes.
9       MR. FRIEDMAN: Let's take a short
10  break.
11  A.   Okay.
12       THE VIDEOGRAPHER: We're now off
13  the record.  The time is 11:52 a.m.
14  June 14, 2011.
15  (Recess taken.)
16       THE VIDEOGRAPHER: This is tape
17  three of the deposition of Mr. Clive
18  Walker.  We're now back on the record.
19  The time is 12:01 p.m.  Today is June 14,
20  2011.
21  Q.   Please look at paragraph 3.2.12 of
22  your report and read it to yourself.
23  A.   (Reviewing.)
24       Okay.
25  Q.   Is it correct that the U.S.

Page 122

1       WALKER
2  Q.   Is this true of Terrorism Act 2000
3  as well, in your view?
4  A.   I think it may be slightly
5  different for the Terrorism Act because one has
6  there also the provision in section 38-B of the
7  Terrorism Act which I think does take, you
8  might say, entirely innocent people and could
9  turn them into criminals.
10       So I think the -- if you like, the
11  statement of -- the stance of the state is
12  rather more hostile in the case of terrorism
13  than it is in the case of proceeds of crime,
14  taking the legislation as a whole.
15  Q.   But does the Terrorism Act of 2000
16  put parties like Nat West under pressure to
17  provide information to the relevant authorities
18  to enable the latter to obtain information
19  about possible criminal activity and to
20  increase their prospects of being able to
21  freeze the proceeds of crime?
22  A.   Yes.
23  Q.   Is that also true of the Criminal
24  Justice Act of 1993?
25  A.   Yes, it was true.

Page 124

1       WALKER
2  designation of Interpal did not give rise to
3  any direct U.K. legal duty for Nat West?
4       MR. ISRAEL: Objection to form.
5  A.   I would treat it more as a piece of
6  evidence than an additional legal duty.  In
7  other words, it affected the exercise of legal
8  duties which already existed rather than gave
9  rise to a new legal duty, but those legal
10  duties were already there.
11  Q.   So it gave rise to no new legal
12  duty?
13  A.   Well, it gave rise to no extra, you
14  might say, legislative duty other than the ones
15  that were already there.  But if you were to
16  use that word "legal duty" in the sense of
17  one's obligations to do under existing, what
18  one has to do under existing duties, then what
19  I'm saying here is that the fact that there was
20  a legal event, if I can put it that way, in the
21  United States namely the designation by the
22  U.S. Treasury in 2003, I would say that that
23  was a very relevant piece of information which
24  should have triggered and I suspect did trigger
25  some concern as to whether legal duties had

Page 125

```
 1      WALKER
 2  been duly observed and were being duly
 3  observed.
 4  Q.   The U.S. designation of Interpal
 5  did not create any legal duty under U.K. law
 6  that did not previously exist; correct?
 7      MR. ISRAEL: Objection.
 8  A.   I think if you confine your
 9  sentence to under U.K. laws being a statement
10  of the list of duties of the law rather than
11  the exercise of those duties, that's correct.
12  Q.   Have you ever read the U.S.
13  Treasury designation of Interpal?
14  A.   Yes.
15  Q.   Have you ever read the OFAC
16  regulations pursuant to which that was issued?
17  A.   Not in detail.
18  Q.   Have you ever read the statute
19  pursuant to which the regulations were issued?
20  A.   Not in detail.
21  Q.   Do you have any legal opinion as to
22  whether the -- whether an OFAC sanction applies
23  to a British bank providing banking services to
24  a British customer in Britain?
25      MR. ISRAEL: Objection.
```

Page 126

```
 1      WALKER
 2  A.   The question asks about applies and
 3  that may be a --
 4  Q.   Let me rephrase it.
 5  A.   Yeah, a difficult word in the
 6  context.
 7  Q.   Do you have an opinion -- do you
 8  have a legal opinion under U.S. law as to
 9  whether an OFAC designation can apply to a
10  British bank's provision of services to a
11  British customer in Britain?  Do you have an
12  opinion of U.S. law as to that?
13      MR. ISRAEL: Objection to form.
14  A.   No, I wouldn't see myself as expert
15  in U.S. law.  I would have opinions about U.K.
16  law, but not U.S. law.
17      (Exhibit 22, letter dated 9/5/03,
18      marked for Identification.)
19      (Exhibit 23, letter dated 10/3/03,
20      marked for Identification.)
21  Q.   Now, let me show you what's been
22  marked as Exhibits 22 and 23 which is
23  correspondence between the Royal Bank of
24  Scotland Group and the Financial Sanctions Unit
25  of the Bank of England.
```

Page 127

```
 1      WALKER
 2  Q.   Have you ever seen either of these
 3  letters before?
 4  A.   No.
 5  Q.   You can put that to one side.  Look
 6  at paragraph 3.2.13 of your report.  You refer
 7  there to the Financial Action Task Force;
 8  correct?
 9  A.   Correct.
10  Q.   You'll agree with me that
11  publications by the Financial Action Task Force
12  are not legally binding in the U.K. except to
13  the extent that they are adopted as part of
14  U.K. legislation; correct?
15  A.   Correct.
16      MR. FRIEDMAN: I'm going to ask the
17  reporter to mark as Exhibit 25 -- 26 a
18  print from the Police National Legal
19  Database website of two pages, the home
20  page and the history page.
21      (Exhibit 26, print from the Police
22      National Legal Database website, marked
23      for Identification.)
24      MR. ISRAEL: Recently printed?
25      MR. FRIEDMAN: Yes.
```

Page 128

```
 1      WALKER
 2  Q.   Do you recognize the first two
 3  pages of this exhibit to be a print of the home
 4  page of the PNLD?
 5  A.   I'd have to say I don't.  I haven't
 6  had any occasion recently to look at the PNLD
 7  website so I've not seen this format before.
 8  Q.   Do you have any reason to doubt
 9  that that's what it is?
10  A.   I have no reason to doubt it.
11  Q.   Okay.  And the last two pages, have
12  you ever seen those before?
13  A.   No.
14  Q.   Do you have any reason to doubt
15  that this is a print of the history page of the
16  PNLD website?
17  A.   No.
18  Q.   Is this the PNLD to which you
19  referred in your testimony earlier today?
20  A.   Yes.
21  Q.   Okay.  And this concerns the
22  database to which you referred in your
23  testimony earlier today; correct?
24  A.   Correct.
25      MR. FRIEDMAN: I'm going to ask the
```

TZVI WEISS VS.
NATIONAL WESTMINSTER BANK, PLC

CLIVE WALKER
June 14, 2011

---

Page 129

```
 1      WALKER
 2   reporter to mark as Exhibit 27, prints
 3   from the website of the Association of
 4   Chief Police Officers.
 5   (Exhibit 27, prints from the
 6   website of the Association of Chief
 7   Police Officers, marked for
 8   Identification.)
 9   Q.  Have you ever seen Exhibit 27
10   before?
11   A.  Well, I have had occasion to look
12   at the Association of Chief Police Officers'
13   website, so I haven't looked at it recently,
14   but I'm sure this looks like the Association of
15   Chief Police Officers' website.
16   Q.   And this is the Association of
17   Chief Police Officers to which you referred in
18   your testimony earlier today?
19   A.   Correct.
20   Q.   And this is the organization under
21   whose umbrella the PNLD is published; correct?
22   A.  I understand so from the PNLD
23   itself.
24   Q.  If you look at the third page of
25   this exhibit, it provides a company number for
```

Page 130

```
 1      WALKER
 2   the Association of Chief Police Officers.
 3      Do you see that at the bottom of
 4   the page?
 5   A.  Yes, yes.
 6   Q.  Company number 3344583; correct?
 7   A.  Yes.
 8   Q.  That indicates that the -- that is
 9   the number by which the Association of Chief
10   Police Officers is registered as a company in
11   England and Wales; correct?
12   A.  I would presume so, yes, in the
13   Register of Companies.
14      MR. FRIEDMAN: I have nothing
15   further today.  Thank you.
16      MR. ISRAEL: No questions.
17      THE VIDEOGRAPHER: This concludes
18   today's deposition of Mr. Clive Walker.
19   We're now off the record.  The time is
20   12:10 p.m.  Today is June 14, 2011.
21   (Time noted:  12:10 p.m.)
22
23
24
25
```

Page 131

```
 1      A C K N O W L E D G M E N T
 2
 3   STATE OF NEW YORK  )
 4                      :ss
 5   COUNTY OF        )
 6
 7   I, CLIVE WALKER, hereby certify
 8   that I have read the transcript of my testimony
 9   taken under oath in my deposition of June 14,
10   2011; that the transcript is a true, complete
11   and correct record of my testimony, and that
12   the answers on the record as given by me are
13   true and correct.
14
15   _____
16   CLIVE WALKER
17
18
19
20   Signed and Subscribed to
21   before me, this   day
22   of      , 2011.
23   _____
24   Notary Public, State of New York
25
```

Page 132

```
 1      C E R T I F I C A T E
 2
 3   STATE OF NEW YORK  )
 4                      )ss.:
 5   COUNTY OF NEW YORK )
 6
 7      I, SOPHIE NOLAN, a Notary Public
 8   within and for the State of New York, do hereby
 9   certify:
10      That CLIVE WALKER, the witness
11   whose deposition is herein before set forth,
12   was duly sworn by me and that such deposition
13   is a true record of the testimony given by
14   such witness.
15      I further certify that I am not
16   related to any of the parties to this action
17   by blood or marriage; and that I am in no way
18   interested in the outcome of this matter.
19      IN WITNESS WHEREOF, I have hereunto
20   set my hand this 22nd day of June, 2011.
21
22
23
24   ------------------
25   SOPHIE NOLAN
```

**EXHIBIT 17 TO DECLARATION OF VALERIE SCHUSTER**

## EXPERT REPORT OF JONATHAN BURCHFIELD

A.   INTRODUCTION

I am a solicitor of the Supreme Court of England and Wales and a Partner of the UK law firm Stone King LLP.   I submit this report in the lawsuits captioned Applebaum, et al v National Westminster Bank plc (case no. 07-cv-916 (DGT) (MDG)) and Weiss et al v National Westminster Bank plc (case no. 05-cv-4622 (DGT) (MDG)), which I understand are pending in the United States District Court for the Eastern District of New York.   A copy of my *curriculum vitae* (which includes a list of all publications I have authored in the past 10 years) is attached to this report as Exhibit A.   I have not previously testified as an expert at trial or by deposition.   I am being compensated for my study and testimony in these cases at the rate of £295 per hour.   The materials upon which I have relied in preparing this report are listed in Exhibit B.

Throughout this report I shall refer to the charity concerned, The Palestinians Relief and Development Fund (registered charity number 1040094, known as Interpal), as "the Charity".

1

B.  THE STATUTORY ROLE OF THE CHARITY COMMISSION FOR ENGLAND & WALES

1.  The Charity Commission for England & Wales (which I shall refer to throughout this report as "the Charity Commission") is a non-Ministerial Government Department, and part of the Civil Service.  It is completely independent of Ministerial influence and also independent from the sector it regulates.  It has a number of quasi-judicial functions where it uses powers similar to those of the High Court.

2.  Since the time of the events which are the subject of these complaints, the Charity Commission's constitution has been altered and its objectives, functions and duties have been set out in detail, by the Charities Act 2006. I shall include, for completeness, those current details within Exhibit C to this report.  However, in this section of my report, I shall focus on the position prior to the implementation of the Charities Act 2006, when the position was governed by the Charities Act 1993 ("the 1993 Act").

3.  At that time, the Charity Commission was an unincorporated body, consisting of a Chief Charity Commissioner, up to four other Charity Commissioners and their officers and staff.  (The 2006 Act converted the Commission into an incorporated body.)  It was nevertheless commonly referred to as "the Charity Commission", rather than as "the Charity Commissioners" and for that reason I shall refer in this report to both the previous unincorporated body and the present incorporated body as "the Charity Commission".

4.  The general function of the Charity Commission, as set out in section 1 (3) of the 1993 Act, was that of "promoting the effective use of charitable resources by encouraging the development of better methods of administration, by giving charity trustees information or advice on any matter affecting the charity and by investigating and checking abuses.

5.  The general object of the Charity Commission, as set out in section 1 (4) of the 1993 Act, was "so to act in the case of any charity (unless it is a matter of altering its purposes) as best to promote and make effective the work of the charity in meeting the needs designated by its trusts; but the

2

Commissioners shall not themselves have power to act in the administration of a charity".

6.   In addition, the 1993 Act (and other related legislation) conferred on the Charity Commission various specific powers and duties in order to enable it to carry out its general function and general object as outlined above and as a consequence of its general function and general object.

7.   In particular it is relevant to these complaints to note some of the Charity Commission's regulatory powers under the 1993 Act, as follows:

a. By virtue of section 8 of the 1993 Act, the Charity Commission "may from time to time institute inquiries with regard to charities or a particular charity or class of charities, either generally or for particular purposes".  This was the power which it exercised in relation to the Charity in 1996, 2003 and 2006 (see section D of my report, below).

b. By virtue of section 18 of the 1993 Act, the Charity Commission is given wide-ranging powers to act after they have instituted such an inquiry under section 8 where the Charity Commission is "satisfied that...it is necessary or desirable to act for the purpose of protecting the property of the charity or securing a proper application for the purposes of the charity of that property or of property coming to the charity".  Those powers include a power to freeze bank accounts, as the Charity Commission did in relation to the Charity after it had opened its various "section 8 Inquiries" into the Charity (see section D of my report, below).

8.   As can be seen, therefore, the Charity Commission has a very wide ranging role, acting as the regulator of the 180,000 or so charities in England and Wales which are registered with it, and with wide-ranging powers to act when it perceives the need to take regulatory action.

9.   Charities registered with the Charity Commission have to provide certain information about the way in which they operate and how they use their resources.   The Charity Commission makes this information available online so that information is publicly available regarding how each charity's money is used. The information which is now required to be filed

by a charity (such as the Charity) with an annual income of over £1 million consists of an annual return containing:

### Part A – Charity information

This information forms part of the charity's entry on the Charity Commission's Register of Charities, and includes key areas such as contact and trustee details as well as income and expenditure.

### Part B - Financial information

This contains detailed financial information about each charity. This section of the annual return needs to be completed by a person who is familiar with the charity's accounts. The information given is displayed on the charity's Register entry in a graphical form to illustrate the income, spending and assets of the charity.

### Part C - Summary information return ("SIR")

The SIR provides an easily accessible summary of a charity's key aims, activities and achievements. It is displayed on the charity's entry on the Charity Commission's Register to help the public understand what the charity does and how it has performed. A charity has to submit Parts A and B of the Annual Return before Part C is made available online.

### Reporting serious incidents

In completing the annual return, trustees must confirm that there are no serious incidents or other matters that they should report and have not already brought to the Charity Commission's attention.

### Trustees' Annual Report ("TAR") and accounts

When charities submit the annual return (which is nowadays filed online), they are required to attach the TAR and accounts.

11.   As a result, the Charity has filed each year with the Charity Commission, with its annual return:

a.   a copy of its accounts and its TAR – the Charity Commission's website currently shows the accounts and TAR for the Charity for the years ended 31st December 2004 to 31st December 2008 inclusive.

4

b.    the Charity's SIR - the Charity Commission's website currently shows the Charity's SIR for 2008 (filed on 26th October 2009).

12.    The Charity Commission maintains a file on each registered charity in which is kept all such filings, together with the constitutional documents for each registered charity – in the case of the Charity, this consists of its Declaration of Trust dated 29th July 1994.

13.    I have included within Exhibit D to this report extracts copied and pasted from the Charity's entry on the Charity Commission's Register of Charities as at 11th October 2010.

14.    Provided that every registered charity maintains its annual filings with the Charity Commission, as detailed above, it needs to take no further action in order to remain on the Charity Commission's Register of Charities.

15.    It should be noted that section 4(1) of the 1993 Act states that: *"An institution shall for all purposes other than rectification of the register be conclusively presumed to be or to have been presumed to be or to have been a charity at any time when it is or was on the register of charities."*

16.    The Charity has remained on the Register of Charities at all times since it was first registered on 11th August 1994 and it has therefore been conclusively presumed to have been a charity since then. All persons or organisations dealing with the Charity since its registration, including National Westminster Bank, have therefore been entitled to regard it as a charity which is established for charitable purposes and is subject to the control of this country's High Court in the exercise of the court's jurisdiction with respect to charities.

17.    The importance of this conclusive, statutory presumption cannot be over-emphasised. If any registered charity is, on examination by the Courts or by the Charity Commission, considered not to be a charity established for charitable purposes, then the Charity Commission has an obligation under section 3(4) of the 1993 Act to remove it from the Register of Charities.

18.    In this case, if it were to be concluded that the real, underlying purpose of the Charity was to fund terrorism, then the Charity would not of course be

established for a validly charitable purpose and it would have to be removed from the Register of Charities.  However, the Charity has been investigated by the Charity Commission on three occasions (see section D below) and it remains on the Register of Charities.   The conclusive, statutory presumption that it is a charity (established for charitable purposes) has therefore continuously applied to it since its first registration in 1994.

C.    THE CHARITY COMMISSION'S APPROACH TO CHARITIES AND TERRORISM

1.    I believe that it will be helpful for me to report on the Charity Commission's current stated approach to terrorist activity and charities, as reported on its website. I do not have access to the Charity Commission's historic publications but do not believe that its current stated approach differs in any significant respect from that adopted previously (although of course World events since the first Inquiry into the Charity in 1996 have led all regulators to review their approach to terrorism and to ensure that it is correct and appropriate). The Charity Commission's current approach rests on three key principles that are applied when it considers charities with potential links to terrorism. It states that these principles were applied before the events of September 11 2001 and have been applied since then.

2.    The key principles are expressed as follows:
      - The Charity Commission would not register an organisation that had support of terrorism as an object;
      - Use of an existing charity's assets for support of terrorist activity is not a proper use of those assets; and
      - Links or alleged links between a charity and terrorism are corrosive to public confidence in the integrity of charity.

3.    The Charity Commission's approach when looking at concerns about charities and links to terrorism, is stated to be:
      - The Charity Commission will deal with allegations of links between a charity and terrorist purposes as an immediate priority; and
      - Where allegations are made, the Charity Commission will liaise closely with the relevant law enforcement agencies to ensure a proper investigation of the allegations or suspicions.

      In practice, I understand that the Charity Commission has nominated individuals who will liaise with law enforcement agencies on specific cases. In some cases, the agency will contact the Charity Commission with information about a specific charity, or an individual who works within a charity. The Charity Commission will then assess that information within its regulatory context, and make a decision as to whether any action by the Charity Commission is necessary. As an example, if the Charity

7

Commission were to be notified that an individual who is a charity trustee has been "designated" under the relevant legislation, the Charity Commission will determine whether or not this individual should be suspended or removed as a charity trustee under section 18 of the 1993 Act.

Where the Charity Commission obtains information about a charity's link to a proscribed organisation, or any other information that may be relevant to a law enforcement agency, I understand that this information is passed to the relevant agency (now under the provisions of section 10A of the 1993 Act, as amended by the 2006 Act, which deals with the disclosure of information by the Charity Commission to "any relevant public authority").

4.    The Charity Commission says that it will:

- Take a balanced approach which is evidence-based and risk-based, targeted and proportionate;
- Work in partnership and collaborate with both the Government and the charitable sector itself;
- Maintain its strategic and operational independence in line with statutory requirement;
- Ensure the way it tackles the risk of terrorist abuse of charities is within its existing approach to regulation;
- Encourage trustees to implement strong governance arrangements, financial management and partnership management. It indicates that charities which implement good general risk management policies and procedures will be better safeguarded against all types of abuse;
- Make clear the responsibilities of charity trustees to safeguard their charity from terrorist abuse;
- Deal with concerns of terrorist involvement or links with charities as a matter of property; and
- Deal proactively, robustly, effectively and swiftly with concerns where there is evidence of terrorist abuse involving charities.

5.    In addition to maintaining close links with the charitable sector, the Charity Commission states that it will work with other government regulators and law enforcement agencies by formalising its protocols and strengthening its operational arrangements. These are intended to clarify and set the framework

8

within which the Charity Commission liaises and works in partnership with other agencies in order to, as it says on its website "*better ensure the disruption of those that seek to exploit charities for terrorist ends. This will include:*

- *providing support in instances which fall within the* [Charity] *Commission's statutory remit, but where there is no immediate regulatory requirement for operational action by the* [Charity] *Commission;*
- *ensuring that all suspicions of terrorist criminal activities within, or affecting, charities, are promptly reported to the Police, either by ourselves or by the charity affected; and*
- *facilitating reciprocal awareness sessions to help other agencies better understand the sector when they are investigating abuse connected with it."*

D.     THE CHARITY COMMISSION INQUIRIES INTO THE CHARITY

1.     The Charity Commission's 1996 Inquiry:

(a)     The Charity Commission conducted an investigation into the activities of the Charity in 1996 and I have read the Charity Commission's report of its investigation conducted under Section 8 of the 1993 Act.   The report indicates that the investigation had been prompted by a newspaper article in The London Times dated 6th March 1996 in which it was stated that there is "*concern that funds* [sent to Palestinian refugee camps by the Charity] *could be diverted to fund terrorist attacks against Israel*".   The article went on to say that questions had been raised "*over alleged links between the charity... and a number of Palestinian refugees described as former Hamas militants living in London*".   Accordingly, the Charity Commission had decided that it would be in the public interest for the activities of the Charity to be investigated and it immediately froze the Charity's bank accounts to ensure that its funds were not moved out of the UK as a result of the Charity Commission's interest.

(b)     The Charity Commission recognises that, where charities under its jurisdiction benefit areas outside of the UK, it is difficult for the Charity Commission to make checks itself in the locations where funds are eventually distributed.   It therefore limited its investigations into satisfying itself whether the trustees of the Charity were "doing all that was reasonable to satisfy themselves that the funds raised were being applied towards charitable purposes".   Accordingly, the Charity Commission reported that it concentrated its work on scrutiny of the Charity's controls and records and carried out test checks of individual payments chosen from copies of the Charity's bank statements which it obtained from the Charity's bankers.

(c)     I consider that it is important to recognise that the role of the Charity Commission in this investigation was to establish whether the funds of the charity were being applied within its charitable objects, and it was not of direct concern to the Commission whether any of those funds were going to supporters of Hamas or, in particular, to the families of suicide bombers.   The Charity Commission stressed that its primary concern was to establish the charitable application of funds and their application to the

relief of poverty and need, and that those funds were not being given *because* of a person's support for Hamas.

(d)     The Charity Commission focused on the Charity's work in the sponsorship of orphans and concluded that the Charity "does not supply and does not have details of how any particular father died".  It concluded in this connection that "the Charity's controls were well organised and they have introduced a custom computer system to ensure that all donations are fully accounted for.  It stated that "We found no evidence of any donations that could not be accounted for"."

(e)     In terms of projects funded by the Charity, the Charity Commission concluded that these projects are "subject to the same controls and checks as all others" of the Charity.

(f)     In terms of the Charity's UK-fundraising, the Charity Commission reviewed the Charity's fund-raising methods and financial control of donations and "found all to be in order, indeed their methods would set an example for many larger charities".

(g)     Accordingly, the Charity Commission concluded in its 1996 Investigation that it could find "no evidence of any pro-terrorist or anti-Israeli propaganda and interviews with the trustees and staff suggested that they were motivated by faith and altruism rather than fanaticism".  It concluded that the press coverage which had spoken about evidence showing that the Charity was funding terrorist activities "has not been substantiated".  On the contrary, all of the evidence found by the Charity Commission, it said, "pointed to a well run and committed organisation which carried out important work in a part of the world where there is great hardship and suffering".  It stressed that what the Charity needs to do "is to take whatever steps they can to ensure that their donations only go to charitable purposes within their objects.  We are satisfied that they do this to the best of their abilities".

(h)     Accordingly, the Charity Commission closed its case file in 1996 following a final visit made to the Charity in order to explain the outcome of the investigation.

11

2.   The Charity Commission's 2003 Inquiry:

(a)   In April 2003 the Charity Commission initiated another statutory Inquiry under Section 8 of the 1993 Act into the affairs of the Charity. It reported that this had been prompted by allegations regarding funding of the "political or violent militant activities of Hamas in Palestine". The Charity Commission carried out a detailed examination of the Charity's practices and record keeping and found that "it had improved its procedures and record keeping since the [Charity] Commission's Inquiry, although these procedures could be further enhanced by introducing a greater degree of independent verification of the work done by Interpal's partners in the region on its behalf". In addition, the Charity Commission was concerned by the nature of the relationship between Interpal and the Al-Aqsa Foundations in the Netherlands which had had their assets frozen under United Nations sanctions in May 2003 for allegedly supporting terrorist activities.   However, the Charity Commission established that the relationship between the Charity and the Al-Aqsa Foundation in the Netherlands revealed that the funds received from that Foundation by the Charity were in respect of humanitarian work already carried out by the Charity and then invoiced to the Al-Aqsa Foundation, and therefore represented a charitable application of funds. Subsequently on 21 August 2003, in a Presidential decree, the Government of the United States of America designated the Charity as a "specially designated global terrorist" organisation for allegedly supporting Hamas' political or violent militant activities. As a result of this, the Charity Commission had concluded that it should open a statutory Inquiry (under section 8 of the 1993 Act) in order to investigate these allegations.

(b)   Accordingly, the Charity Commission used its powers under the 1993 Act and froze the Charity's bank accounts "as a temporary and protective measure" on 26 August 2003 whilst it investigated the allegations. This "freezing" Order nevertheless allowed the Charity to apply to the Charity Commission for release of funds to fulfil its charitable purposes and, in the course of the Charity Commission's Inquiry, the Charity applied for and obtained the release of small amounts of funds for charitable purposes. The Charity Commission reported that it formally requested the US Authorities to provide evidence to support the allegations made against the Charity and requested the US Authorities to provide evidence to support the allegations within a reasonably short period of time.

12

(c)    In the event, the US Authorities were unable to provide evidence to support allegations made against the Charity within the agreed timescale and the Charity Commission concluded that, in the absence of any clear evidence showing that the Charity had links to Hamas' political or violent militant activities, the Charity's bank accounts should be unfrozen and the Inquiry closed.  As a result, the bank accounts of the Charity were "unfrozen" and the Inquiry was closed on 24 September 2003.

(d)    In reporting on its 2003 Inquiry, the Charity Commission stressed that "connections or links between registered charities in England and Wales and terrorist organisations are very rare".  It also made it clear that "where a charity's activities may give, or appear to give, support or succour to any terrorist activity, the Charity Commission expects the Charity's trustees to take immediate steps to disassociate the charity from the activity".  It stressed that "charities should take all necessary steps to ensure their activities could not be misinterpreted".

3.    The Charity Commission's 2006 – 2009 Inquiry:

I have also read the report of the Charity Commission's later and much more long-lasting Inquiry into the affairs of the Charity.  I am advised, however, that all matters which are the subject of these proceedings occurred before this later Charity Commission Inquiry was initiated and that it was initiated after the Charity's account(s) at NatWest was closed. It is therefore not relevant to the current proceedings.

13

E.   REFERENCES TO THE CHARITY COMMISSION IN THE COMPLAINTS

I have reviewed the Fifth Amended Complaint in the Weiss litigation dated January 28, 2008 and the Complaint dated March 2, 2007 in the Applebaum litigation. I should say that I read with horror and sadness of the suffering to the families involved in the events details in the complaints. The vast majority of what is said in the complaints is not relevant to my expert evidence. However, I feel bound to make the following comments on the references made to the Charity Commission on pages 52-53 of the complaint filed in the Applebaum litigation and on pages 63-64 of the complaint filed in the Weiss litigation. I note that these sections of the complaints are in substantially similar form.

(a)   In relation to paragraphs 337 and 489 respectively, the Charity was registered with the Charity Commission on 11 August 1994.

(b)   In relation to paragraphs 339 and 491 respectively, it is incorrect for the complaints to say that the Charity Commission's report indicated that it froze the charity's accounts at NatWest in March 1996 "based on evidence that it channelled money to Hamas". The Charity Commission's report indicates that it opened its Inquiry and froze the Charity's bank accounts on the basis of a newspaper article in the London Times dated 6 March 1996. The Charity Commission subsequently concluded that the press coverage had not been substantiated by its own scrutiny of the Charity and its financial and other papers. Indeed, the Charity Commission's report on its 1996 Inquiry concluded that all of the evidence that it was able to uncover "pointed to a well run and committed organisation which carried out important work in a part of the world where there is great hardship and suffering". In addition, the Charity Commission stated that it was satisfied that the Charity takes "whatever steps they can to ensure that their donations only go to charitable purposes within their objects" and that they "do this to the best of their abilities".

(c)   In relation to paragraphs 342 and 494 respectively of the complaints, it is incorrect for the complaints to say that the Charity Commission unfroze the Charity's bank accounts "ostensibly because the British Government distinguished (at the time) between the military and social or charitable wings of Hamas". Instead, the Charity Commission stated in its report

14

that its Inquiry was closed and the accounts were unfrozen because of the reasons set out in my preceding paragraph.

(d)     I note that paragraphs 344 and 496 respectively of the complaints state that "the Charity Commission finding was that Interpal donated funds [to Hamas] without any evident intent to support terrorism per se, or as the [Charity] Commission put it, without "any pro-terrorist bias"". However, nowhere in the Charity Commission's report does it conclude that the Charity "donated funds [to Hamas]" – instead, the point made by the Charity Commission in its report was that funds may have been given to people who support Hamas. However, the Charity Commission stressed that the only criteria which should be used when deciding how the Charity's funds should be distributed were poverty and need on the part of any intended recipient. The Charity Commission concluded that its scrutiny of the Charity's publicity and documentation "provided no evidence of any pro-terrorist or anti-Israeli propaganda" and that it was satisfied that the trustees of the charity "take whatever steps they can to ensure that their donations only go to charitable purposes within their objects".

(e)     In relation to paragraphs 348 and 500 respectively of the complaints, it is stated that the "March 1996 British investigation...first placed NatWest on notice that it was transferring funds to Hamas". However, I can find nothing in the Charity Commission's report which could be said to have placed NatWest on notice that it was (on behalf of the Charity) transferring funds to Hamas as opposed to transferring funds on behalf of the Charity for application towards its charitable objects.

**Dated:**          **3 December 2010**

**Jonathan Burchfield**

15

**EXHIBIT A**

Jonathan Burchfield's CV



Jonathan qualified as a solicitor of the Supreme Court of England and Wales in 1978 and has practised since then in the field of the law and practice relating to UK charities, an area in which he has specialised exclusively since the early 1990's.

Jonathan became a partner in the London law firm of Turner Kenneth Brown in 1984. He set up that firm's Charity Group in 1994 and then became the Head of the Charity Group of the City of London law firm Nabarro Nathanson following its merger with Turner Kenneth Brown in 1995. He left Nabarro Nathanson in May 2006 when he and other members of the firm's Charity Team joined the firm of Stone King LLP, a firm which has a specialist niche practice in working with charities and non-profit clients and which has been recognised for some years as being in the top three charity law firms of the UK. He focuses on advising charities on all aspects of charity law and practice, particularly on their corporate governance. He regularly speaks and writes on charity matters.

Jonathan stepped down after 12 years' service on the Executive Committee of the Charity Law Association (having acted as its Deputy Chairman for some years). The Association has approximately 900 members, but also accountants and other charity professionals. It is concerned with all aspects of the law relating to charities.

He is a Trustee (and former Chairman) of The Tubney Charitable Trust, a significant UK grant-making charity, and has recently completed a term of trusteeship of Creativity Culture and Education (a charity established by Arts Council England). In addition, he is a Governor (and charity trustee) of St. Edward's School, Oxford, one of the country's leading independent schools and a registered charity. He therefore has significant experience of working as a trustee within charities regulated by the Charity Commission.

In terms of Jonathan's professional experience as a charity lawyer, this has involved on a daily basis either contact with the Charity Commission as the regulator of English and Welsh registered charities or consideration of provisions of the Charities Acts and their impact upon charity clients.  Specific dealings with the Charity Commission during this period are too numerous to mention but include in particular:-

1)    The firm's charity team registers on average 50-60 new charities with the Charity Commission every year and Jonathan has been involved in very many of these new registrations.   That has involved detailed negotiations with the Charity Commission over the status of potential new charities and Jonathan therefore has a detailed understanding of the way in which the Charity Commission deals with such applications.   In particular, the Charity Commission now reviews charities prior to registering them and this "gateway" process requires detailed knowledge of charity law and the practical approach and requirements of the Commission.

2)    Over the years, Jonathan has been involved in numerous statutory Inquiries initiated by the Charity Commission under the Charities Acts.  In many cases this has involved acting on behalf of charities which are the subject of such Inquiries; equally, in other cases, this has involved acting on behalf of Interim Managers appointed by the Charity Commission in relation to charities into which the Commission has instituted inquiries.

3)    It is nowadays the case that the Charity Commission institutes very few formal Inquiries, following a change in its approach and at the same time a reduction in its available resources.  The Commission takes what it calls a "risk-based and proportionate approach to regulating charities".  This means far fewer formal Inquiries but more non-inquiry cases which are referred to as "Regulatory Cases

      As an example, Jonathan is currently dealing with one such case which would have been dealt with by a statutory Inquiry in the past, but where the Charity Commission has been conducting investigations into the client charity for the best part of two years.

In terms of the publications authored by Jonathan over the past 10 years, he is a practising charity lawyer and has not been involved in writing any books for publication in this period.   He has written on average five articles a year for publication in professional journals relevant to charity lawyers, including:
  • Charity Finance

17

- Governance
- Private Client Business
- Trusts & Estates Journal
- The Journal of the Society of Trusts & Estates Practitioners (STEP) and
- Caritas Magazine.

## EXHIBIT B

List of publications relied upon in preparing the Expert Report of Jonathan Burchfield

1.  Papers regarding the Palestinian's Relief and Development Fund ("Interpal"):

    1.1  Declaration of Trust dated 29 July 1994.

    1.2  Entries regarding Interpal as filed on the Charity Commission website at www.interpal.org.uk

    1.3  Filed accounts for Interpal for the years ended 31 December 2004 (the earliest accounts currently available on the Charity Commission's website), 2005, 2006, 2007 and 2008 (the latest accounts currently available on the Charity Commission's website).

2.  The Charity Commission Inquiries:

    1.1  Report of the 1996 Inquiry

    1.2  Report of the 2003 Inquiry

    1.3  Report of the 2006-2009 Inquiry

3.  Charity Commission Publications:

    3.1  Charity Commission Operational Guidance OG96 (29 August 2007 – "Charities and Terrorism")

    3.2  Charity Commission Counter-Terrorism Strategy (July 2008)

    3.3  Risk and Proportionality Framework for the Commission's compliance work (July 2008)

4.  The complaints filed in the Applebaum and Weiss litigation

5.  The Charities Acts 1993 and 2006

19

## EXHIBIT C

1. I set out in this exhibit the current statutory role of the Charity Commission as provided by the amendments which were made to the 1993 Act by the Charities Act 2006.  This Act converted the Commission into an incorporated body called the "Charity Commission for England & Wales" and detailed the Commission's statutory role.  This role is not in essence substantially different from that under the 1993 Act, but it gives greater detail, and expresses in words much of what the Charity Commission would have already regarded as its objectives, general functions and general duties, as follows.

2. The five statutory <u>objectives</u> of the Charity Commission as set out in the revised section 1B (3) of the 1993 Act are now as follows:

   2.1    <u>The public confidence objective</u>, namely to increase public trust and confidence in charities;

   2.2    <u>The public benefit objective</u>, namely to promote awareness and understanding of the operation of the public benefit requirement;

   2.3    <u>The compliance objective</u>, namely to promote compliance by charity trustees with their legal obligations in exercising control and management of the administration of their charities;

   2.4    <u>The charitable resources objective</u>, namely to promote the effective use of charitable resources; and

   2.5    <u>The accountability objective</u>, namely to enhance the accountability of charities to donors, beneficiaries and the general public.

3. The six general <u>functions</u> of the Charity Commission as set out in the revised section 1C (2) of the 1993 Act are now to:

   3.1    Determine whether institutions are or are not charities;

   3.2    Encourage and facilitate the better administration of charities;

   3.3    Identify and investigate apparent misconduct or mismanagement in the administration of charities and take remedial or protective action in connection with misconduct or mismanagement therein;

   3.4    Determine whether public collections certificates should be issued, and remain in force, in respect of public charitable collections;

   3.5    Obtain, evaluate and disseminate information in connection with the performance of any of the Charity Commission's functions or meeting any of its objectives; and to

3.6     Give information or advice, or make proposals, to any Minister of the Crown on matters relating to any of the Charity Commission's functions or meeting any of its objectives.

4.     The six general <u>duties</u> of the Charity Commission as set out in the revised section 1D (2) of the 1993 Act are now as follows:

4.1     So far as is reasonably practicable, the Charity Commission must, in performing its functions, act in a way which is compatible with its objectives and which it considers most appropriate for the purpose of meeting those objectives.

4.2     So far as is reasonably practicable, the Charity Commission must in performing its functions act in a way which is compatible with the encouragement of all forms of charitable giving and voluntary participation in charity work.

4.3     In performing its functions the Charity Commission must have regard to the need to use its resources in the most efficient, effective and economic way;

4.4     In performing its functions the Charity Commission must, as so far is relevant have regard to the principles of best regulatory practice (including the principles under which regulatory activities should be proportionate, accountable, consistent, transparent and targeted only in cases in which action is needed).

4.5     In performing its functions the Charity Commission must, in appropriate cases have regard to the desirability of facilitating innovation by or on behalf of charities; and

4.6     In managing its affairs the Charity Commission must have regard to such generally accepted principles of good corporate governance as it is reasonable to regard as applicable to it.

21

## EXHIBIT D

### Extracts from the Charity Commission's website entry for the Charity as at 11th October 2010

**1040094 - PALESTINIANS RELIEF AND DEVELOPMENT FUND**

## Charity overview

### Activities

INTERPAL IS THE LEADING BRITISH CHARITY FOCUSING ON PROVIDING RELIEF AND DEVELOPMENT AID TO PALESTINIANS IN OUR MAIN AREAS OF OPERATION: THE WEST BANK, GAZA STRIP AND THE REFUGEE CAMPS IN JORDAN AND LEBANON.

*[Breakdown of annual income, expenditure, assets, liabilities and people in year ended 31st December 2008 – not readily possible to copy and paste into this document]*

## Financial history

### Financial summary

| Financial year end (FYE) | Income | Spending | Accounts received | Annual Return received |
|---|---|---|---|---|
| 31 Dec 2008 | £5,069,225 | £5,195,246 | 26 Oct 2009 | 26 Oct 2009 |
| 31 Dec 2007 | £5,064,280 | £2,641,908 | 31 Oct 2008 | 31 Oct 2008 |
| 31 Dec 2006 | £5,205,550 | £3,890,413 | 18 Oct 2007 | 18 Oct 2007 |
| 31 Dec 2005 | £2,390,594 | £3,162,733 | 30 Nov 2006 (30 days late) | 30 Nov 2006 (30 days late) |
| 31 Dec 2004 | £3,102,357 | £3,206,843 | 29 Dec 2005 (59 days late) | 29 Dec 2005 (59 days late) |

## Contact & trustees

### Contact

MR IBRAHIM HEWITT
P O BOX 53389
LONDON
NW10 6WT
Tel: 02089619993
Email: info@interpal.org
Website: www.interpal.org

## Charity trustees

- MR GHASSAN FAOUR
- DR ESSAM MUSTAFA
- MR MOHAMMED RAFIQ VINDHANI

- MR IBRAHIM BRIAN HEWITT
- MR ISMAIL GINWALLA
- MR SHAHAN HUSAIN

22

**Charity framework**

**Date of registration**
11 Aug 1994

**Other names**

- INTERPAL (Working Name )

**Governing document**
DECLARATION OF TRUST DATED 29 JULY 1994

**Charitable objects**
1.THE PROVISION OF AID AND ASSISTANCE, SUPPORT GUIDANCE AND COMFORT TO POOR NEEDY SICK CHILDREN AND WIDOWS AND THOSE SUFFERING OR DISTRESSED AS A CONSEQUENCE OF CIVIL OR MILITARY ACTION OR NATIONAL DISASTERS. 2.TO RELIEVE THE NEED HARDSHIP AND DISTRESS OF PERSONS WHOSE RELATIVES OR FRIENDS DIED OR WHO ARE MISSING OR DETAINED AS A CONSEQUENCE OF CIVIL OR MILITARY ACTION.3.THE PROVISION IN THE INTEREST OF SOCIAL WELFARE OF FACILITIES FOR RECREATION AND OTHER LEISURE TIME OCCUPATION OF THOSE OF REFUGEE STATUS OR CONNECTED PERSONS AS MAY HAVE NEED OF SUCH FACILITIES BY REASON OF THEIR YOUTH OR AGE OR INFIRMITY OR DISABLEMENT OR SOCIAL AND ECONOMIC CIRCUMSTANCES.

**Classification**
**What**
• GENERAL CHARITABLE PURPOSES
• EDUCATION/TRAINING
• MEDICAL/HEALTH/SICKNESS
• DISABILITY
• RELIEF OF POVERTY
• OVERSEAS AID/FAMINE RELIEF
• ACCOMMODATION/HOUSING
• RELIGIOUS ACTIVITIES
• ARTS/CULTURE
• SPORT/RECREATION
• ENVIRONMENT/CONSERVATION/HERITAGE
• ECONOMIC/COMMUNITY DEVELOPMENT/EMPLOYMENT
• OTHER CHARITABLE PURPOSES

**Who**
• CHILDREN/YOUNG PEOPLE
• ELDERLY/OLD PEOPLE
• PEOPLE WITH DISABILITIES
• OTHER CHARITIES/VOLUNTARY BODIES
• OTHER DEFINED GROUPS

**How**
• MAKES GRANTS TO INDIVIDUALS
• MAKES GRANTS TO ORGANISATIONS

**Area of benefit**
UNITED KINGDOM AND PALESTINE

**Where the charity operates**

- THROUGHOUT ENGLAND AND WALES
- JORDAN

- LEBANON

23

- OCCUPIED PALESTINIAN TERRITORIES

Note: This report is compiled from public information that the Charity Commission holds on the Register of Charities on 11 October 2010.

© Crown Copyright 2010