**EXHIBIT 18 TO DECLARATION OF VALERIE SCHUSTER**

## SECOND EXPERT REPORT OF JONATHAN BURCHFIELD

A.   INTRODUCTION

I am a Solicitor of the Supreme Court of England and Wales and a Partner of the UK law firm Stone King LLP.  I submit this second expert report in the law suits captioned <u>Applebaum, et al v National Westminster Bank plc</u> (case no. 07-cv-916 (DLI) (MDG)) and <u>Weiss et al v National Westminster Bank plc</u> (case no. 05-cv-4622 (DLI) (MDG)), which I understand are pending in the United States District Court for the Eastern District of New York.

I have been asked to submit this second expert report in response to the following reports in these matters which I have been asked to review:

i.       Expert Witness Report of Gary Walters
ii.      Export Report of Dr. Matthew Levitt
iii.     Export Report of Arieh Spitzen (English translation from Hebrew)

1

B   THE EXPERT WITNESS REPORT OF GARY WALTERS

1.   Mr. Walters refers to the Charity Commission, and his experience of working with it and similar regulators, at paragraphs 43 – 44, 68 – 74 and on page 2 of Appendix 1 to his report.  In general, Mr. Walters is correct in acknowledging that regulators such as the Charity Commission have a complex task when their roles are both a "help and encouragement" role and a "monitoring and enforcement" role in relation to the organisations they regulate.  It is also fair to acknowledge that there is of course a practical limitation on the extent to which regulators such as the Charity Commission can conduct inquiries into international activities of charities regulated by them.

2.   However, the role of the Charity Commission, and its attitude in fulfilling it, is much more rigorous than Mr. Walters implies.  For example, referring to the Charity Commission's August 2007 publication entitled "Charities and Terrorism" (Charity Commission Operational Guidance 0G96), to which I referred in preparing  my first report and which I attach in its entirety as Exhibit A, the Commission refers to the role and responsibility of its Compliance Assessment and Intelligence  Unit  and its Compliance Investigations Unit – London for addressing allegations of a charity's links to terrorism, or where suspicions otherwise arise, and that "[t]hese teams will liaise closely with relevant intelligence, security and law enforcement agencies to ensure thorough investigation of the allegations or suspicions".

3.   Referring to the Charity Commission's July 2008 publication "Counter-terrorism strategy," which I attach in its entirety as Exhibit B, the Commission describes itself as being "uniquely placed to deal with abuse where it does occur, collaborate with other regulators and agencies and other parts of government and support trustees to protect their charities". The Charity Commission further describes its approach at page 4 as follows:

- "take a balanced approach which is evidence and risk-based, targeted and proportionate;"

- "effective regulation involves putting a strong emphasis on giving support and guidance to charities to prevent problems and abuse occurring in the first place;"

- "it is the responsibility of charity trustees to safeguard their charity from terrorist abuse.  We will support them to do this, and will not prevent  charities  from  carrying  out  legitimate  and  vital humanitarian and other work, within the law;" and

- *"when allegations of terrorist involvement or links with charities arise, we deal with them as a matter of priority.  We will deal pro-actively, robustly, effectively and swiftly when we have evidence or serious suspicions of terrorist abuse involving charities."*

With respect to this last point, in the section of this document referring specifically to the "intervention" strand of the Charity Commission's counter-terrorism strategy, the Commission states as follows:

> *"We will treat allegations or suspicions of terrorist activities within charities, or involving individuals associated with charities, as a zero tolerance issue.  Each case will be assessed promptly and efficiently and acted on proportionately according to the risk posed to the charity, the sector and wider society.  Our investigations will be robust, thorough and informed by intelligence and evidence, aiming to:*

> - *immediately disrupt the activities of those seeking to abuse charity for terrorist ends;*

> - *ensure that the charity, or charitable funds are put to their proper use for the benefit of their beneficiaries; and*

> - *minimise the disruption any incident can cause to the wide sector."*

The above effectively summarises the Charity Commission's approach in this area and, in particular, stresses the Commission's intention to act robustly, in dealing with evidence or serious suspicions of terrorist abuse involving charities.

4.    Similar discussion of the Charity Commission's role, its attitude in fulfilling that role and its approach in this area is included in the Charity Commission's online "toolkit" publication "Protecting Charities from Harm," which was published in December 2009 and is available at http://www.charity-commission.gov.uk/Our_regulatory_activity/Counter_terrorism_work/Compliance_toolkit_index.aspx

In particular, Module 8 of this document, entitled "Charity law duties and responsibilities", confirms that investigating alleged support of terrorism is directly in line with the Charity Commission's role and concerns relating to the lawful exercise by trustees of charities *"of their duties and responsibilities and ensuring charity is protected",* because where a charity provides funding or support to a partner organisation that exposes beneficiaries to activities which, directly or indirectly, promote terrorism,

3

this is likely to amount to misconduct on the part of its trustees in the administration of the charity, aside from the risks of committing criminal offences under UK legislation. *See* Module 8, p. 1.

5.   In my experience, the Charity Commission's approach is as rigorous and exhaustive as it can be within the constraints of its resources.   That rigorous approach was recently demonstrated by the Charity Commission's investigation into the international development charity, Muslim Aid, of which the report on its investigation was published by the Charity Commission on 17 December 2010, a copy of which is included as Exhibit C to this report.  In that case, the Charity Commission "*found no evidence of irregular or improper use of the Charity's funds or any evidence that the Charity had illegally funded any prescribed or designated entities*".  As a result the Charity Commission (see paragraph 22 of its report) "*has given a public assurance that the public allegations of links between the Charity and terrorism are unsubstantiated*".   This report speaks therefore of a regulator which carries out its work independently from Government and in a rigorous way.   In addition, the report highlights the fact that the Commission takes an approach which, to refer back to section B of its counter-terrorism strategy document (Exhibit B) is "*evidence and risk-based, targeted and proportionate*".  The provision of evidence is crucial to the Charity Commission in its role of determining whether a charity is carrying out valid, charitable, humanitarian work, as opposed to supporting terrorism.

C     EXPORT REPORTS OF DR. MATTHEW LEVITT AND OF ARIEH SPITZEN

1.     Whilst much of the contents of these reports are not relevant to my review of the Charity Commission and its role in relation to both the Palestinians Relief and Development Fund (registered charity no. 1040094, "Interpal") and to other UK charities, there are certain points in their reports in which they misunderstand the role of the Charity Commission.

2.     On page 33 of the report of Arieh Spitzen (English translation), Mr. Spitzen says "*Britain itself opened an investigation against Interpal as a result of its being outlawed in the United States, but this investigation did not lead to the conviction of the fund, neither did a further investigation.*" While Dr. Levitt in his report details the three Charity Commission Investigations, he also refers on page 44 of his report to "*the British Government, including the Charity Commission*".  By aligning Britain/the British Government with the Charity Commission, the authors of both these reports are incorrect since they do not fully acknowledge the fact that the Charity Commission is (and in practice operates as) an independent regulator, and is not part of the British Government (although it is part of the UK Civil Service).

3.     It is interesting to note in Dr. Levitt's report that he refers to Interpal, on page 35, as being "*the principal and most important fundraising organisation for Hamas in the United Kingdom*".  As detailed at section D of my first report, the Charity Commission in its 1996 and 2003 Inquiries did not arrive at such a conclusion.

4.     I have been asked also to provide details of the registered charitable status of other UK charities which were listed in the Order signed by the Israel Ministry of Foreign Affairs dated 7th July 2008. I have reviewed their entries on the Charity Commission register and their status is as follows:-

   ▪ Human Appeal International – registered charity 1005733, originally registered 7 November 1991;

   ▪ Humanitarian Relief Foundation – I believe this to be an incorrect reference to a charity which is in fact called Human Relief Foundation, registered no. 1126281, originally registered on 14 October 2008;

   ▪ Muslim Hands – this was originally registered as an unincorporated charity on 6 December 1993 as charity no. 1029742 and was subsequently removed from the register on 8 November 2006. The charity had by then incorporated and its assets and undertaking

had been transferred to a corporate charity under the same name, registered no. 1105056 which was registered on 22 July 2004;

▪ Muslim Aid/Educational Aid for Palestinians – Muslim Aid was registered as a charity on 28 October 1986, registered no. 295224. Educational Aid for Palestinians is a separate registered charity which was registered on 21 December 1993, registered no. 1030807 – its entry on the Charity Commission's website indicates that "no activity took place during last year" and so this may now be a dormant charity.

5.   All these charities have continued to be registered by the Charity Commission since their original registration dates, as detailed above, and continue to be so-registered. As a result, all those dealing with such charities since their registration have had the benefit of the statutory presumption contained within section 4(1) of the Charities Act 1993 which states that :-

*"An institution shall for all purposes other than rectification of the register be conclusively presumed to be or to have been a charity at any time when it is or was on the register of charities."* [1]

This conclusive, statutory presumption that the above organisations are charities (established for charitable purposes) has therefore continuously applied to all of them, as it has done to Interpal, since their registration and all persons dealing with the organisations since then have therefore been entitled under English law to regard them in that light.

Dated: 1st March 2011

*[signature]*

Jonathan Burchfield

---

[1] Incidentally, I note that this statutory reference was incorrectly quoted at paragraph B.15 of my first expert report. The above is the correct reference. I do apologise for not having spotted this error previously.

## **EXHIBIT A**

Charity Commission Operational Guidance

Charities and Terrorism

`

# Charity Commission

OPERATIONAL GUIDANCE

CHARITIES AND TERRORISM

OG 96 – 29 August 2007

**Purpose**        This guidance sets out our position on charities and terrorism, and advises how
to handle cases where we suspect a terrorist organisation is involved.

**For action**     All operational divisions       **For information**       All operational divisions

## Contents

1. Background
2. Principles underlying our handling of allegations of charities' involvement with terrorism
3. The duties of trustees and ways in which terrorist and other criminal groups seek to use charities to further their own ends
4. Case handling issues

| ⚖ | ⊔ | 📇 |
|---|---|---|
| The Law | Refer to a lawyer | Refer to an accountant |

## 1. Background

The Terrorism Act 2000 came into force on 19 February 2001 and was followed by the Terrorism Act 2006 which extended the previous Act and made way for implementation of other international conventions to which the United Kingdom is party. Both Acts have implications for us in relation to all aspects of our casework. We have made a number of public statements on charities and terrorism, and our position is set out on our website.

Under Part II of the 2000 Act, the Secretary of State has the power to proscribe any organisation which he believes 'is concerned in terrorism'.

An organisation is 'concerned in terrorism' if it commits or participates in acts of terrorism, prepares for terrorism, promotes or encourages terrorism, or is otherwise concerned in terrorism either in the UK or abroad.

'Organisation' is defined as including 'any association or combination of persons'. It is against the law to be a member of a proscribed organisation and it is also illegal to assist, raise money for, or send money to one, or anyone who is a member of such an organisation. The effect of proscribing the organisation means that those who support them or profess to be a member of them are committing a criminal offence.

The second schedule of the 2000 Act lists proscribed organisations. Subsequent orders of Secretary of State have added organisations to the original schedule published.

Also, we need to be aware of United Nations (UN) and European Union (EU) legislation that affects us. Both the UN and the EU have lists of designated people or organisations and by operation of EU and UK law financial sanctions may be imposed by HM Treasury's Asset Freezing Unit against those listed.

Our international obligations require us to:

- deny all forms of financial support to terrorists;

- deny the provision of a safe haven to terrorists;

- share information about terrorist offences and threats with other governments;

- ensure that anti-terrrorist laws are of a sufficiently serious nature.

The Asset Freezing Unit maintains a list of designated and proscribed people and organisations by the UN, EU and UK. This list can be found at HM Treasury's website.

Section 4 of this OG offers advice on how to handle cases where we suspect a proscribed organisation has become involved with a charity or an organisation wishing to register as a charity.

The full text of the Terrorism Acts 2000 and 2006 are available on the HMSO website.

The provisions of the Terrorism Act 2000 were further augmented by the Anti-terrorism, Crime and Security Act 2001, the full text of which is also available on the HMSO website. The main effect of the latter Act on charities is to replace sections 24 to 31 of the Terrorism Act 2000 (seizure of terrorist cash). See section 4.3.

Legal opinion is that the Anti-terrorism, Crime and Security Act 2001 does not impose any further duties/penalties on any Commission officers in their work.

The incidence of charity involvement with terrorist organisations is very rare, but we should always be alert to the possibility that it can happen.



## 2. Principles underlying our handling of allegations of charities' involvement with terrorism

The Commission's website contains a statement of our policy and approach to terrorist activity and charities. This policy and this guidance will be reviewed following the results of the Home Office and HM Treasury's public consultation on the "Review of the Safeguards to Protect the Charitable Sector (England and Wales) from Terrorist Abuse".

Our approach rests on 3 key principles that we apply when considering charities with potential links to terrorism. These principles were applied before the events of September 11 2001 and have been applied since.

- We would not register an organisation that had support of terrorism as an object.

- Use of an existing charity's assets for support of terrorist activity is not a proper use of those assets.

- Links or alleged links between a charity and terrorism are corrosive to public confidence in the integrity of charity.

These three key principles have the following practical effects on our work:

- Any links between a charity and terrorist activity are totally unacceptable. 'Links' in

this case might include fundraising or provision of facilities, but also includes formal or informal links to organisations 'proscribed' under the Terrorism Act 2000 and any subsequent secondary legislation. We will assess rigorously any allegation of links between a charity and terrorist activity, and where there are grounds for a statutory inquiry it will be conducted as a matter of the highest priority.

- Where allegations of links to terrorism are made, or where suspicions otherwise arise, they should first be brought to the attention of the Compliance Assessment and Intelligence Unit who will liaise with the Head of Compliance Division and the Compliance Inverstigations Unit - London. These teams will liaise closely with relevant intelligence, security and law enforcement agencies to ensure thorough investigation of the allegations or suspicions.

- Active collaboration between charities and terrorist organisations is a police matter that may lead to very serious criminal charges. Where allegations are made to us or suspicions arise as a result of our work (eg monitoring or casework), we will inform the relevant law enforcement agencies immediately and co-operate fully with the criminal investigation.

- Where a charity's activities may give, or appear to give, support or succour to any terrorist activity, we expect the charity's trustees to take all necessary steps immediately to disassociate the charity from the activity.

- We expect trustees to be vigilant to ensure that a charity's premises, assets, volunteers or other goods cannot be used for activities that may, or appear to, support or condone terrorist activities. Examples include the use of a charity's premises for fundraising or meetings.

- Charities should take all necessary steps to ensure that their activities could not be misinterpreted. We expect trustees of charities to take all necessary steps to ensure that their activities are transparent, for example including transfer of assets abroad. We hold trustees accountable for ensuring that procedures are put in place to ensure that terrorist organisations cannot take advantage of a charity's status, reputation, facilities or assets.

- We expect any person connected with a charity, whether a trustee, employee, volunteer, advisor or beneficiary to bring evidence of a charity's possible links with terrorism to the Commission's attention promptly.

## 3. The duties of trustees and ways in which terrorist and other criminal groups seek to use charities to further their own ends

The involvement of registered charities in the funding or support of terrorist activities is thankfully an uncommon occurrence but **any** links between a charity and terrorist activity are totally unacceptable. Trustees must, therefore, be vigilant, for example to ensure that charities' assets are not used to further terrorist aims, or that a charity's activities might be misinterpreted as supporting terrorism. Trustees, too, have a responsibility to safeguard their charity from terrorist involvement.

3.1 Duties of trustees
3.2 Ways in which terrorist and other criminal groups use charities to further their own ends
3.3 Further considerations for trustees to combat misuse of charitable resource

3.1 Duties of trustees

Trustees should be aware that section 19 of the Terrorism Act 2000 provides that a person who receives information in the course of a trade, profession, business or employment that leads him/her to believe or suspect that another person has committed an offence under sections 15 to 18 (which relate to money or other property being used for the purposes of terrorism) is guilty of an offence if s/he does not disclose this to a constable as soon as is reasonably practicable.

Likewise, section 39 of the Act provides that a person who knows, or has reasonable cause to suspect that a constable is conducting, or proposes to conduct a terrorist investigation, commits an offence if s/he:

- discloses to another anything which is likely to prejudice the investigation; or

- interferes with material which is likely to be relevant to the investigation.

3.2 Ways in which terrorist and other criminal groups use charities to further their own ends

The involvement of registered charities in the funding or support of terrorist activities is thankfully an uncommon occurrence but **any** links between a charity and terrorist activity are totally unacceptable. We must, therefore, be vigilant, for example to ensure that charities' assets are not used to further terrorist aims, or that a charity's activities might be misinterpreted as supporting terrorism. Trustees, too, have a responsibility to safeguard their charity from terrorist involvement.

Terrorists and other criminal groups use charities in many ways to further their own ends. This section does not aim to be an exhaustive list, as terrorists will find ever-new ways to further their aims. Charities which operate in communities and areas where a particular proscribed organisation is dominant may need to be particularly careful. Methods of using charities by terrorist organisations may include:

- using money raised by charities to fund terrorist organisations;

- using charities to smuggle people into countries illegally;

- using residential schools as military recruitment and training centres;

- using charities set up for providing facilities for young people for organisation and

recruitment;

- using charities as a base to spread propaganda; or

- using charities for money laundering purposes.

Trustees should be especially vigilant to ensure that their charity is not inadvertently assisting a terrorist organisation by allowing the charity to be used for money laundering purposes. This is one of the more difficult areas for trustees to deal with, as the type of activity listed in the first three bullet points below may be perfectly legitimate and lawful. Trustees are reminded that unsolicited donations could be suspicious, especially if they are unable to satisfy themselves about the credentials of the people involved, or the propriety of the donation or loan.

- If offered large donations from persons unknown to the trustees, the trustees may wish to make further enquiries before accepting the donation, and may refuse a donation if satisfactory replies to enquiries are not received.

- Donations conditional upon particular individuals or organisations being used to do work for the charity may be refused.

- Offers of donations in cash, for a certain period of time, the charity to receive the interest, but the principal to be returned to the donor at the end of the specified period, may be refused.

- Donations in foreign currencies, with the provision as above, but the principal to be returned to the donor in the form of a sterling cheque, should be refused.

Trustees who become suspicious of a donor's intentions, particularly if they wish to refuse the donation, should seek our advice under s.29 of the 1993 Act, or ask for the authority of a s.26 Order. We could also refer them to the Institute of Fundraising publication Guidance Note: The Acceptance and Refusal of Donations. They may also wish to report their suspicions to ourselves and/or the police.

Charities also need to be alert against fraudulent solicitations via letter, fax or email to charities and trustees inviting them to assist the recovery of a large amount of money, usually, but not exclusively, from a bank account originating in Africa, in return for a large share of the money thus recovered. The aim is to obtain the charity's bank account details or letterheads that can be used for fraudulent activities, or to obtain money from the charity under the pretence that it is needed to assist in the process of recovery.

This action is the so-called '419' (after the relevant section of the Criminal Code of Nigeria), or advance-fee fraud. This activity is on the increase and it is evident that charities remain a prime target.

Our current advice on this topic is that any such approaches should be ignored completely and that the recipient should make no contact with the sender. If any member of staff becomes aware that a charity or individual has received an approach, then we should advise them not to reply and to pass on details of the approach to their local police station. The Serious Organised Crime Agency (SOCA) collects this information from local forces on a regular basis.

3.3 Further considerations for trustees to combat misuse of charitable resources

We should encourage the trustees of charities which operate overseas to familiarise themselves with our guidance Charities working internationally which is available on our

website.

If necessary, we should advise trustees sending money abroad that we do not advocate using the hawala money transfer system. If however, the charity trustees assure us that it is the best way to transport cash in the circumstances prevailing at the time, we should accept it. We should remind them that all overseas money transfers and transfers of goods should be fully documented, with that documentation retained in the UK as part of the accounting records. Such documentation should include the names of the intermediary(y)(ies), the beneficiary, the commission paid, the gross and net value of the transactions and the countries of transaction. In this way, the trustees will be able to provide a clear audit trail to satisfy the public that the charity's funds are being used appropriately.

If you would like further information about the hawala system of money transfer, refer to an accountant.

## 4. Case handling issues

4.1 The role of the **Compliance Investigations Unit - London**
4.2 Registration and charitable status
4.3 Reporting of suspicions

4.1 The role of the Compliance Investigations Unit - London

The Compliance Investigations Unit - London is part of Compliance Division. This is the unit dealing with the Commission's high risk compliance work. Intelligence support is attached to the team. Caseworkers in other areas of Compliance or Charity Services should report any cases that highlight potential misuse of a charity for terrorist purposes to the Compliance Assessment & Intelligence Unit.

4.2 Registration and charitable status

Cases where we have concerns that a new charity has connections with terrorist organisations should be passed to the Compliance Assessment & Intelligence Unit and the Compliance Investigations Unit - London informed. Legal advice should also be sought.

If on this basis we come to the conclusion that the institution is not legally charitable then registration should be refused, or if the institution has already been registered, it should be referred to the Removals section.

4.3 Reporting of suspicions

If there is any suggestion of a link between a charity and a proscribed organisation, it should be reported to the Compliance Assessment & Intelligence Unit. Payments being made from the charity's funds to a proscribed organisation, or other apparent connections between the charity and a proscribed organisation, should always be treated as evidence of a risk to charity property. The Head of Compliance will consider the most appropriate course of action; it will be our normal policy to open a section 8 statutory inquiry in these circumstances. Remedial action may be taken under section 18 of the 1993 Act after the institution of a section 8 statutory inquiry and/or we may consider the institution of civil proceedings under section 32.

Section 10A of the 1993 Act as amended by the Charities Act 2006 gives us a power to report our suspicions to the relevant authorities. It is subject to s.10A(2), which states that the power to disclose is subject to any express restriction imposed on disclosure of information to the Commission. However, there are common law rules which establish

that the confidentiality of information regarding misconduct or iniquity which in the public interest ought to be disclosed will not be protected (**BSC v Granada [1981]** 1 All ER 417 *et al*).

|__| If we become aware that a charity trustee, or someone else involved with a charity is being prosecuted for an offence under one or other of sections 15 – 18 of the Terrorism Act 2000 or under the provisions of the Terrorism Act 2006, we should obtain legal advice. If a person is convicted of such an offence in relation to charity property, any remaining property of that charity may be liable to forfeiture by order of the court. It may be possible for steps to be taken by us to ensure that such property is not forfeited.

Schedule 1 of the Anti-terrorism, Crime and Security Act 2001 relates to the seizure and forfeiture of terrorist "cash". So far as is in practice relevant to charities, the forfeiture provisions apply to "cash" found at any place in the UK. These powers do not depend on anyone being convicted.

|__| Again, we should obtain legal advice if we become aware that any "cash" belonging to a charity has been seized under these powers, as it may be possible to take steps to ensure that the "cash" is not forfeited.

Index to further related information

Crown Copyright

© Crown Copyright

## **EXHIBIT B**

Charity Commission Compliance

Counter-terrorism Strategy July 2008

COMPLIANCE



## Counter-terrorism Strategy

July 2008



Case 1:05-cv-04622-DLI-RML Document 267-2 Filed 03/22/12 Page 18 of 163 PageID #: 4981

## The Charity Commission

The Charity Commission is the independent regulator of charities in England and Wales. Its aim is to provide the best possible regulation of charities in England and Wales in order to increase charities' effectiveness and public confidence and trust. Most charities must register with the Commission, although some special types of charity do not have to register. There are some 180,000 registered charities in England and Wales. In Scotland the framework is different, and the Commission does not regulate Scottish charities.

The Commission provides a wide range of advice and guidance to charities and their trustees, and can often help with problems. Registered charities with a gross annual income or expenditure over £10,000 must provide annual information and accounts to the Commission. The Commission has wide powers to intervene in the affairs of a charity where things have gone wrong.

More information about the Commission together with a range of guidance for charities can be found on our website **www.charitycommission.gov.uk**, or by contacting Charity Commission Direct:

Telephone:      **0845 300 0218**

Typetalk:      **0845 300 0219**

All Commission publications referred to in this publication may be viewed on, or downloaded from, our website.

# Counter-terrorism Strategy

**Contents**

A   Introduction                                                                                   2

B   Key factors relevant to our strategy for safeguarding the sector from terrorist abuse          4

C   The scale and nature of the threat                                                             5

D   The Commission's role and approach                                                             7

E   The Commission's compliance work and the risk and proportionality framework                   9

F   Strategic objective and the Four Strand Approach                                              11

G   Building expertise                                                                            14

H   Measures of success                                                                           15

I   Resources & further information                                                               16



# A

## Introduction

The Charity Commission is established by law as the independent regulator and registrar for charities in England and Wales. Our aim is to provide the best possible regulation of charities in England and Wales in order to increase charities' effectiveness and public confidence and trust in them.

The Commission's objectives, contained in the Charities Act 2006, are to:

- increase public trust and confidence in charities;
- promote awareness and understanding of public benefit;
- promote trustees' compliance with the law in their control and management of charities;
- promote the effective use of charitable resources; and
- enhance the accountability of charities to donors, beneficiaries and the general public.

The Commission is a non-ministerial government department that operates independently. The Charities Act 2006 specifically prohibits the exercise of any Commission function being subject to the direction or control of any Minister or any other government department. We are the regulator for over 190,000 registered charities. There are also about 100,000 other unregistered charities which are subject to differing degrees of regulation and/or support from the Commission. Further information on our role, responsibilities and how the Commission goes about its work is available on the Commission's website at www. charitycommission.gov.uk

The Commission applies a risk-based and proportionate approach to regulation. This means that we engage with charities in a way which will make most difference to them and those who benefit from them. As a modern regulator, the Commission's approach emphasises providing support and guidance and promoting best practice as well as ensuring that charities comply with their legal obligations.

We aim to encourage and support charities to improve their performance by working in partnership with them and with umbrella groups, helping to define and facilitate best practice and sharing this knowledge widely. We put an emphasis on enabling charities to maximise their impact and encouraging innovation, effectiveness and collaborative working across the sector.

England and Wales have benefited from a strong and vibrant charitable sector for hundreds of years. Charities exist to create a better society and operate for a vast range of purposes in many different ways. The 190,000 charities registered with the Commission have an annual income of over £40 billion and assets of a further £70 billion, over 600,000 paid staff and 925,000 trustee positions. The charitable sector is diverse and extends from local village halls to national arts organisations to international disaster relief charities. Each of these organisations is united by a commitment to voluntary action and a desire to make the world a better place. Charities provide mechanisms for constructive debate and social action to build a strong civil society. This is an important protection against extremism. Charities make a vital contribution to society and the national economy, as well as a wider impact around the world which addresses many underlying causes of disaffection that may lead people to turn to extremism or terrorism.

The sector's impact is not just domestic. International charities often work in areas of high risk, where the need can be greatest. Charities can often get to the hard-to-reach places and communities that governments cannot. They can work to empower local people to improve the accountability of their own governments; they deliver essential services in spite of extreme and adverse conditions; and their knowledge of local issues is often better informed than that of public or private bodies because of their closeness to local people and issues.

The Commission recognises the importance of a healthy, accountable and independent sector overseas. The Commission's International Programme[1] has an important, continuing role to help create this by supporting the development of effective local regulation.

This document is the Commission's strategy for delivering its regulatory response to the threat of terrorist abuse in the charitable sector. It presents our overall approach and sets out our aims for the future. The strategy builds on our existing work and expertise in this area and applies our overarching regulatory principles as well as our risk and proportionality framework for compliance work. The risk of terrorist exploitation does not apply equally across the sector and a 'one size fits all' approach is not appropriate or proportionate. Our strategy and approach reflects this.

The strategy, which is set out in more detail at section F, has a four strand approach comprising:

1   Awareness                 2   Oversight

3   Co-operation              4   Intervention

---

[1] The International Programme is largely funded by the Foreign and Commonwealth Office's Global Opportunities Fund.

Case 1:05-cv-04622-DLI-RML Document 267-2 Filed 03/22/12 Page 22 of 163 PageID #: 4965

# B

## Key factors relevant to our strategy for safeguarding the sector from terrorist abuse

The Commission's existing approach to regulation provides an important context to our strategy. The Commission will continue to:

- take a balanced approach which is evidence and risk-based, targeted and proportionate;

- work in partnership and collaboration with government and the charitable sector itself; and

- maintain its strategic and operational independence in line with its statutory remit.

- The key factors relevant to our strategy for safeguarding the sector from terrorist abuse are:

- actual instances of terrorist involvement and abuse of charities are extremely rare but are completely unacceptable;

- the way we tackle the risk of terrorist abuse of charities falls squarely within our existing approach to regulation;

- effective regulation involves putting a strong emphasis on giving support and guidance to charities to prevent problems and abuse occurring in the first place;

- we believe that the most effective way for the sector to minimise its exposure to the risk of terrorist abuse is through implementing strong governance arrangements, financial management and partner management. Charities which implement good general risk management policies and procedures will be better safeguarded against a range of potential misuses;

- it is the responsibility of charity trustees to safeguard their charity from terrorist abuse. We will support them to do this, and will not prevent charities from carrying out legitimate and vital humanitarian and other work, within the law;

- we are uniquely placed to deal with abuse where it does occur, collaborate with other regulators and agencies and other parts of government and support trustees to protect their charities; and

- when allegations of terrorist involvement or links with charities arise, we deal with them as a matter of priority. We will deal proactively, robustly, effectively and swiftly when we have evidence or serious suspicions of terrorist abuse involving charities.

The Commission believes firmly that its success as the civil regulator of charities is largely based on the respect and trust placed in it by the public and charities themselves. The value of this trust cannot be over-estimated; it is one of the most effective regulatory advantages we rely on.

The Commission is committed to complying with its duty to have regard to the principles of best regulatory practice including its activities being proportionate, accountable, consistent, transparent and targeted only at cases in which action is needed. Proportionate means not only taking action that is commensurate to the risk of harm but also looking at what other options there are for achieving the same outcome which are less interventionist.

As a public body, the Commission is conscious of its duty to act compatibly with the Human Rights Act 2000 and to promote good race relations under the Race Relations Act 1976 as amended.

4

C

# The scale and nature of the threat

Terrorism is a serious and continuing threat both to UK society, UK interests abroad and the wider international community. This threat applies to the charitable sector as much as any other sector.

The true scale of charitable funds being diverted for terrorist purposes, charity links with terrorist activities and other abuse is not known but, as the Home Office Review acknowledges, "actual instances of abuse have proven very rare". Our own experience indicates that the number of cases in which there is evidence to prove charities have been involved in directly, indirectly, deliberately or unwittingly supporting terrorist activity is very small. However, such abuse is completely unacceptable, and the impact of even one proven case involving a charity is potentially significant for public trust and confidence in that charity and the sector in general.

We have always been vigilant about the risk of potential links between charities and terrorist organisations and people connected to them. Charities are highly valued in society for a number of reasons which can also make them susceptible to unscrupulous abuse. Charities:

- enjoy high levels of public trust because of their voluntary and altruistic nature;

- reach into all parts of society and are diverse in nature. Because of this reach, large numbers of people come into close contact with charities, including those who may abuse them, through their services, the use of their property and through their trustees and volunteers;

- have a global presence, often in conflict areas, or in areas with little infrastructure, and frequently move money, goods and people to these areas;

- often have complex global financial operations dealing with multiple donors and currencies. They can operate cash-intensively, either in the collection or disbursement of funds, and may deal in cash and alternative remittance systems where no formal banking infrastructure exists;

- can pass funds to other organisations based overseas rather than deliver their services directly;

- are often engines for social change that attract people committed to making change happen; and

- are powerful vehicles for bringing people together for a common purpose and collective action, and may inadvertently provide a ready made social network and platform of legitimacy for terrorists or terrorist sentiments.

In addition, charities are subject to different and, in some cases, weaker levels of regulation in different parts of the world.

For all these reasons, terrorists may seek to exploit and corrupt charities for their own purposes.

We also recognise that all parts of the UK economy, particularly the financial sector, are tightening their safeguards and strengthening their defences against terrorist abuse. As avenues for terrorists to exploit in these sectors are closed off, there is an increasing risk of attention focusing on others, including the charitable sector. This increases the threat to the sector. There is a clear need for the Commission to support charities in continuing work to step up their vigilance, risk assessment and management practices, particularly for charities working internationally in high-risk areas of the world.

It is recognised that the government and the Commission needs to better understand the nature and scale of the terrorist threat to charities. Further analysis of the specific risks charities face and where they are most vulnerable is crucial in assisting charities to protect themselves from abuse. The Commission, in partnership with the sector and other government agencies, will seek to provide further clarity on this. We have significant and wide-ranging experience from our compliance casework in this area which we will analyse and draw on, and we will link this to expert knowledge within the sector and from the counter-terrorism community. We will reassess our strategies as we become better-informed about the nature of the threat and the risk to charities.

# D

## The Commission's role and approach

We are uniquely placed to contribute to protecting charities from abuse from terrorism, and strengthening safeguards to minimise the risk they face from terrorist abuse. We have a clear role to play in taking regulatory action independently, and, where appropriate, in conjunction with the work of law enforcement agencies who deal with the criminal aspects of this abuse. We are well placed to liaise with them, other regulators and agencies and with other parts of government, and to support trustees themselves to protect their charities from abuse. This position is primarily a result of our:

- independent regulatory role and oversight of the charitable sector;

- broad and unique knowledge of the sector, its diversity and the way it operates;

- access to protective and remedial powers which can be applied to disrupt abuse and protect charity assets and beneficiaries whilst also enabling legitimate activity to continue; and

- hard-earned credibility and the trust and confidence placed in us by the sector and the general public.

The way we tackle the terrorist threat to charities fits within our existing approach to regulation. We act robustly, swiftly and decisively where deliberate wrongdoing, criminality and serious abuse, including terrorist abuse, takes place, or where there is a risk that abuse may occur. Effective regulation places a strong emphasis on giving support and guidance to charities, helping to identify best practice - in partnership with the sector - and making charities aware of the standards to which they should aspire. This prevents problems arising in the first place and reduces the need for us to intervene later.

The effectiveness of our approach depends on striking the right balance between the provision of advice and guidance and, where necessary, intervention based on evidence and proportionality. We aim to regulate in a way which effectively addresses abuse and risk while minimising the regulatory burden and, as far as possible, enabling the continuing flow of funds for legitimate charitable activity.

It is important that the Commission and government work hard to ensure one of the consequences of taking greater steps to prevent the risk of abuse is not to stop legitimate charities, operating within the law, from undertaking valuable work. This could harm international aid in areas of high risk and would have a negative impact on beneficiaries. Great humanitarian need often exists in the same places where there is conflict or where it is thought terrorist groups, or those connected with them, operate. It would be profoundly undesirable if an unintended consequence of a counter-terrorist strategy were to make it impossible for legitimate overseas aid charities to be involved in providing aid, or make it impossible for any charity to provide aid in particular parts of the world. This is a difficult and complex challenge for charities, the Commission and government.

We recognise that many charities face particularly challenging dilemmas when operating in specific areas of the world. Political and legal contexts can complicate matters and organisations that are considered to be terrorist, or linked to terrorists, can exercise significant influence or control in some areas; for example, in the different and difficult contexts in Sri Lanka and the Occupied Palestinian Territories. This is further complicated by the differing stances taken by members of the international

community to certain organisations, which often impose varying conditions on the aid they provide to these areas. Charities need assistance to see how they can overcome the practical difficulties they face in carrying out their work in these areas, while ensuring they comply with the law and do not support terrorism directly or indirectly. We will continue to work with government and the sector to clarify how humanitarian aid can continue in such areas while remaining within the law.

We must also be alert to the unintended risk that a higher burden of regulation may encourage money to be donated to unregistered organisations or to others overseas and therefore beyond the regulatory scope of the Commission.

The Commission can make a particularly important contribution to tackling the terrorist threat to charities through an emphasis on prevention. We believe that we will have the greatest impact on minimising the sector's exposure to the risk of terrorist abuse by encouraging and supporting the development in charities of robust, accountable and transparent governance, strong financial management and good general risk management policies and procedures. We aim to build a greater awareness of the risks charities face from terrorism and promote the steps that should be taken to minimise the risks and lead to the prevention and early detection of terrorist abuse. We will promote a keen awareness of risks and responsibilities and the knowledge by charity trustees of what to do if and when suspicions are aroused. We will expect all charities to effectively manage risk and strengthen safeguards against all abuse, including abuse by terrorists.

The Commission is committed to supporting work to develop effective strategies and procedures for preventing and dealing with the risks of terrorist abuse of charities. For example, we will work to define a 'know your beneficiary' principle and set out expectations of how it should be applied by charities. We recognise that many charities, including those

working overseas in high risk areas, already have good standards in place to minimise the risks from terrorist abuse and a great deal of experience in working in complex operating environments. We will also draw on our own extensive operational casework experience when developing guidance and advice. We enjoy a good working relationship with the sector and aim to further develop this relationship to build on existing safeguards and facilitate the identification and sharing of existing best practice.

Charities are subject to the provisions of UK anti-terrorism legislation and the obligations that flow from it. The Commission will work with government to provide clear guidance on charities' legal obligations under the Terrorism Act 2000 and other financial sanctions legislation.

As well as ensuring charities know about their legal obligations, adding value to charities' work and enhancing public understanding will be important drivers for the Commission when producing new or revised guidance. We will continue to make a distinction between what charities 'must' do according to legal requirements and what they 'should' do to meet common standards of good practice. We recognise the importance of being clear about this distinction in any guidance we produce.

The Commission is committed to working in partnership to co-ordinate more effectively with other regulators and law enforcement agencies in the UK and internationally in order to prevent and disrupt terrorist finance abuse. In some circumstances we will be best placed to take the lead in disrupting terrorist abuse of charities through our compliance operations and by using our civil regulatory powers. In others, we can help ensure other agencies better understand the sector when they are investigating abuse connected with it. We can also use our knowledge of the charitable sector to provide information and analysis of trends and the risks facing the sector, and to complement knowledge and analysis carried out by the sector itself in relation to the terrorist threat.

# E

## The Commission's compliance work and the risk and proportionality framework

Charities must comply with the law. When trustees act reasonably and honestly we respond flexibly and will take this into account in deciding whether to take regulatory action against trustees, and in assessing how to support trustees to put the charity back on a secure footing. Deliberate wrongdoing, criminality and serious abuse, including terrorist abuse, will be dealt with rigorously and decisively based on the evidence and targeting the core of the abuse. Where possible we will ensure that legitimate charitable activity can continue both during an investigation and afterwards. Regulatory action inhibiting the flow of funds must be justified by evidence that this is a necessary and appropriate step to take. An effective compliance and enforcement function in the Commission is, therefore, of vital importance.

The Commission's Compliance and Support function is responsible for the delivery of our 'compliance objective' involving regulatory work with charities where their assets, services or beneficiaries are at serious risk of abuse or damage. This includes risks to the reputation of individual charities and, by extension, concerns about public confidence in charities generally and the effective regulation of the sector. Its function is to identify and investigate apparent misconduct or mismanagement in the administration of charities and to resolve difficulties encountered, either by providing support to trustees or, where necessary, intervening to protect the charity by using the Commission's legal powers. The Commission's Compliance function also disseminates lessons learned from casework experience to the sector and the public to promote good practice and to minimise risk.

As part of a risk-based and proportionate approach to regulation, we have developed a risk and proportionality framework for our compliance work. This ensures that our decisions and actions are appropriate and consistent, and that our resources are targeted where we can have the greatest impact. Our approach recognises that we cannot eliminate or seek to control all risks as a regulator. We do not have the capacity to do so. It would also place an unacceptable regulatory burden on charities and would stifle the innovation and adaptability that characterises the sector. Our approach allows us to deliver effective, timely, proportionate and targeted regulation. It ensures that our intervention is appropriate, and that it properly reflects the seriousness of the problem and the potential impact of failing to regulate it. In addition, it allows us to identify, at an early stage, charities that may be facing problems and provide them with support or advice to mitigate or avoid those problems – moving from reactive to proactive casework. We will take an evidence-based approach based on continuous evaluation and research into how serious problems arise in charities, where the current risks lie, and emerging trends and changes to those risks.

When assessing whether to engage and how quickly, the Commission uses an approach which is based on levels of tolerance and identifies a number of 'zero-tolerance' issues. When we have concerns that such issues have or potentially may arise in a charity, they receive immediate attention in the Compliance and Support function due to the risks they pose to the public, beneficiaries and the integrity and reputation of charities. Using our risk and proportionality framework we rapidly assess the

9

most appropriate and proportionate course of action to take. This means we determine whether we will engage further with the issue, the level of priority and attention we will give it and where in the Commission it will be dealt with. Any action we take will be based on the particular circumstances, the seriousness and scale of the problem and the available evidence. When 'zero-tolerance' issues may or have arisen, it does not automatically mean that we will intervene using our powers in the affairs or administration of a charity. In the context of our response to the Review, the relevant 'zero-tolerance' issues are:

• connections to proscribed organisations;[2]

• charity links to or support for terrorism, financial or otherwise;

• misuse of charity to foster criminal extremism;

• fraud and money laundering; and

• sham charities.

These issues will be subject to review and modification.

When charities, or those connected with them, have committed a criminal offence this is a matter for law enforcement agencies and we will refer suspicions of criminal activities, including terrorism, to them as appropriate. This is in line with our general approach to issues of criminality within, or associated with, charities.

---

[2] Those which are criminalised under the Terrorism Act 2000, as amended by the Anti-Terrorism Crime and Security Act 2001, and appearing on the UK, EU and UN lists of designated organisations.

# F

# Strategic objective and the Four Strand Approach

Our overarching objective for the Commission's counter-terrorism strategy is:

"To identify, disrupt and prevent terrorist and other serious abuse of the charitable sector. We will do this ourselves and in co-operation with other relevant agencies through:

• *support - encouraging and enabling the sector to build its awareness and strengthen its safeguards and defences;*

• *supervision - through proactive regulatory oversight; and, where necessary,*

• *intervention - using the Commission's legal powers of protection and remedy."*

The strategy has a four-strand approach for identifying and minimising the risk of terrorist exploitation of charities. This reflects a balance between support and guidance, prevention and compliance intervention. We will continue to build and strengthen our compliance work and develop expertise in this area. We will, in particular, consolidate our working relationships with other regulators and law enforcement agencies while maintaining our independence. In addition, we will seek to proactively monitor this high-risk area with an eye to early intervention, particularly where guidance is not followed and requirements are not met. We will put great emphasis on preventative work, seeking to clarify legal requirements and to support and build best practice in collaboration and partnership with the sector. The four strands are:

## F1. Awareness

We will work in close co-operation with the sector to build on charities' existing safeguards to minimise the risk of terrorist abuse. We aim to:

• analyse risk factors and build a shared understanding of risks so that different profiles of charities are made aware of their potential vulnerabilities to the threat of terrorist abuse;

• produce periodic bulletins for the sector and the wider public providing key, up to date information on the evolving terrorist risk to charities, informed by our risk profiling work, our casework experience, the outcomes of research and analysis and, where possible, by information from other regulators and law enforcement agencies;

• develop a 'toolkit', in partnership with the sector, to assist charity trustees and their advisors in undertaking risk assessment to better identify and minimise the risk of terrorist abuse and to disrupt those that seek to exploit charities for terrorist purposes. This will build upon already embedded good practice within the sector and learn from those charities that already have significant experience of managing these risks in their activities;

• provide updated advice and guidance including: our Operational Guidance on *Charities and Terrorism* (OG96) and our guidance on *Charities Working Internationally; guidance on charities'* legal obligations including under the Terrorism Act 2000, other financial sanctions legislation and relevant EU legislation; guidance on proscribed and designated lists – what they are and how to use them; guidance on 'good governance' and financial controls, including raising funds, transmission of funds overseas and verifying the end use of funds; and in defining 'know your' principles for due diligence and the minimum standards we expect charities to reach in applying them;

• promote guidance and best practice advice widely through outreach work and tailored communications; and

• signpost to other sources of information, advice and guidance provided by sub-sector groups and other parts of government.

Ensuring charities understand their legal obligations, adding value to charities' work and enhancing public understanding will be important principles for this aspect of our work.

## F2. Oversight and supervision

We will take a more proactive approach to analysing trends and profiling risks and vulnerabilities in the sector in relation to the threat from terrorism. We will monitor the sector in areas we recognise as high risk in order to identify, at an early stage, those charities that may be facing problems, so that we can alert them to the risks and provide them with advice and support. We will monitor the sector in order to anticipate and react to concerns affecting it.

Charities identified as potentially at risk will be followed up through casework to give them guidance in putting adequate systems in place for minimising and managing that risk. On-site visits will be appropriate in certain circumstances as part of our risk-based approach to regulation; on occasion, we will make these visits overseas.

Our intelligence led Proactive Monitoring Unit will undertake this work. By producing and updating risk profiles and specific risk indicators the Commission will be better able to carry out preventative work in relation to charities' vulnerability to terrorism and other high risk areas. These risk indicators will be regularly reviewed in the context of our risk and proportionality framework for our compliance work, and in light of developments within the sector, our own operational experience, and information and risk typologies developed by other government agencies involved in counter-terrorism work.

## F3. Co-operation

In addition to maintaining close links with the charitable sector, we will work with other government regulators and law enforcement agencies by formalising our protocols and strengthening our operational arrangements. These will clarify and set the framework within which the Commission liaises and works in partnership with another agency to better ensure the disruption of those that seek to exploit charities for terrorist ends. This will include:

- providing support in instances which fall within the Commission's statutory remit, but where there is no immediate regulatory requirement for operational action by the Commission;

- ensuring that all suspicions of terrorist criminal activities within, or affecting, charities, are promptly reported to the Police, either by ourselves or by the charity affected; and

- · facilitating reciprocal awareness sessions to help other agencies better understand the sector when they are investigating abuse connected with it.

## F4. Intervention

We will deal proactively, robustly, effectively and swiftly when we have evidence or serious suspicions of terrorist abuse involving charities.

We will treat allegations or suspicions of terrorist activity within charities, or involving individuals associated with charities, as a zero tolerance issue. Each case will be assessed promptly and efficiently and acted on proportionately according to the risk posed to the charity, the sector and wider society. Our investigations will be robust, thorough and informed by intelligence and evidence, aiming to:

- immediately disrupt the activities of those seeking to abuse charity for terrorist ends;

- ensure that the charity, or charitable funds are put to their proper use for the benefit of their beneficiaries; and

- minimise the disruption any incident can cause to the wider sector.

We will increase our capacity to deal with work involving terrorist abuse by developing a pool of counter-terrorism expertise with specialist, trained and skilled staff to deal with these kinds of cases. These staff will be trained in specialist financial investigation and other relevant skills. We will improve the security of our own infrastructure to ensure we are able to link into the rest of government in this area.

**Counter-terrorism Strategy - the Four Strand Approach**



.

# G

## Building expertise

The Commission is in a unique position to inform the debate on charity-related terrorism issues. We are committed to building upon the expertise and knowledge base of our staff. Our staff have deep and wide-ranging knowledge of charity law, regulation and best practice as well as being aware of the day to day difficulties charities face in doing their work. This expertise will be used to facilitate and raise awareness amongst other agencies involved in counter-terrorism work, and those professionals that advise charities. The Commission is also committed to learning from those agencies, so that as new trends emerge and threats and risks evolve the Commission's staff are informed and equipped to respond and deal with them appropriately.

# H

## Measures of success

Benchmark indicators of success are set in the wider context of the Commission's statutory objectives. Our headline indicators of success for each strand of our counter-terrorism strategy are:

### Awareness:

- publish, promote and invite feedback on the Commission's draft counter-terrorism strategy following completion of the government's consultation process.

- within the first six months, engage with and listen to the sector in order to identify and agree an appropriate range of guidance and best practice 'products' that will be most useful to revise or develop for the sector. This will include:

- guidance on charities' legal obligations under the UK's anti-terrorism legislation and will cover the background to the various designation and financial sanctions regimes. The issues arising for charities from these regimes will focus on the risks and implications of working with designated organisations appearing on the UK, EU and UN lists and also of designations by foreign governments.

- defining 'know your' principles, which will clarify minimum standards for due diligence in relation to a charity's beneficiaries, partner organisations and donors. This will assist in identifying and forestalling funding connections either to proscribed terrorist organisations or to designated persons, groups or entities or to recipients whose activities may give support to terrorism.

- set priorities for the production of guidance and publicly set out a timetable for their delivery, aiming to consult on and publish the first elements of a 'toolkit' of guidance and best practice within 12 months.

### Oversight:

- develop and establish a proactive monitoring capability in the Commission within 12 months.

- undertake risk profiling to identify and proactively monitor high-risk sub-sectors within the broader charitable sector.

- undertake targeted, proactive casework informed by risk profiling, including on-site visits where appropriate.

### Co-operation:

- establish strong relationships with other key regulators, law enforcement and other government agencies including (i) putting in place formal agreements and operating protocols, and (ii) a structured programme of strategic liaison, within 12 months of finalising our strategy.

- closely monitor and control the exchange of relevant information with other regulators and agencies.

### Intervention:

We will aim for the timely and appropriate resolution of cases where we do intervene.

As part of our annual public reporting on the Commission's compliance work we will report on:

- our use of powers of protection and remedy on cases involving possible links to terrorism;

- the impact of our intervention, including the protection of charity property and assets, and significant and necessary improvement in charity governance;

- the amount of charity funds protected or redirected by Commission action; and

- the wider lessons learned from our compliance casework in this area.

We will not measure success in terms of increased numbers of investigations, as this can be misleading.

## Resources & further information

The additional £1 million funding contribution from HM Treasury for 2007-08 along with some redirected Commission resource will allow us to invest in awareness and outreach work, and to further develop and strengthen capacity in our Compliance function for casework involving possible or alleged links to terrorism in charities. In future years the additional £1 million per annum will be built into our funding baseline.

**For further information please contact:**

David Walker

Head of Outreach and Development Compliance and Support

Tel: 020 7674 2529

Email: David.Walker@charitycommission.gsi.gov.uk

**<u>EXHIBIT C</u>**

Charity Commission Regulatory Case Report

Muslim Aid

# Regulatory Case Report

**Muslim Aid**
Registered Charity Number 295224

**CHARITY COMMISSION**

This is a Regulatory Case Report of an investigation by the Charity Commission ('the Commission') concerning Muslim Aid ('the Charity') following public allegations that the Charity had made payments to organisations that are "allegedly linked to terrorist groups"[1]. The Charity denied these allegations.

Support by a charity for terrorism is unlawful and therefore unacceptable. An allegation of such support, whether true or not, needs to be assessed by the Commission as it may impact not just on the work and reputation of the charity but also on public trust and confidence in charities generally.

This report focuses on the allegation of direct support for a designated organisation that justified the need for the Commission's regulatory engagement.

Accordingly, having regard to the principles of best regulatory practice the Commission has decided to publish this Regulatory Case Report[2].

This report also identifies issues for the wider sector.

The date of the publication of this report is 17 December 2010.

## The Charity

1. The Charity was registered as a charity on 28 October 1986. It is established by a trust deed dated 30 November 1985.

2. Its objects are:

   *"To relieve the poor, the elderly, children, and all those who are in need in any part of the world as a result of natural disasters, such as floods, earthquakes, droughts, famines, epidemics, poverty and plagues, to relieve those who are refugees fleeing from war zones and war victims."*

---

1   The Daily Telegraph 2 March 2010
2   More information on Regulatory Case Reports can be found on the Commission's website under the heading 'Our regulatory activity'.

3.  The Charity's income in the year ending 31 December 2009 was £44.0m and its expenditure was £42.4m.

4.  The Charity operates in over 70 countries worldwide working through its 13 field offices and local partner organisations. As well as providing emergency relief the Charity's activities include providing long-term sustainable development programmes such as: healthcare and nutrition, shelter and construction, education, and economic empowerment and micro-finance schemes.

## Source of Concern

5.  On 1 March 2010 the Commission's Press Office was contacted by a journalist alleging that in 2005 the Charity had made payments to two organisations he considered to be linked to Hamas[3]. On 2 March 2010 a national newspaper[4] published an article stating that the Charity had paid funds to two organisations "*allegedly linked to terrorist groups*", such as Hamas. This included an organisation that the article stated had been designated by the US Government as a "*sponsor of terrorism*".

6.  A subsequent article by the same journalist in a related national newspaper[5] dated 28 March 2010 expanded on these allegations. It contended the Charity had channelled funds to a number of named groups which it asserted were linked to Hamas.

7.  The Commission carried out an independent assessment of the issues raised and the evidential basis for the allegations made to determine whether the matter was of regulatory concern and required its intervention. The Commission identified that, of the organisations named in the articles as being funded or otherwise supported by the Charity, one – the Al-Ihsan Charitable Society[6] - is designated in the UK[7]. The Commission therefore focussed its consideration on the Charity's relationship, if any, with this organisation. The Commission was not provided with sufficient evidence to support the allegation that other named organisations funded by the Charity had the alleged links, and consequently did not carry out further investigations into payments to them. Given the seriousness of the allegations made, the Commission required material evidence in support of those claims in order for it to consider taking regulatory action[8].

8.  The Commission's own scrutiny of the Charity's accounts for the year ending 31 December 2005 showed that the Charity had set aside (but not yet paid) £13,998 for the Al-Ihsan Charitable Society in that financial year. The Charity's audited accounts for the following year did not state explicitly whether the funds had subsequently been paid, although they did contain a substantial prior year adjustment.

---

3   The UK Government's view is that there are two wings to Hamas: the political wing and the military wing. Since 2001 the military wing, Hamas Izz al-Din-al-Qassem Brigades has been proscribed under the Terrorism Act 2000 as a terrorist organisation. Since 2003 Hamas in its entirety has been designated in the UK following a European Union regulation. Further guidance about proscribed and designated organisations and terrorism legislation is available in the Commission's toolkit Protecting Charities from Harm at: http://www. charitycommission.gov.uk/Our_regulatory_activity/Counter_terrorism_work/Compliance_toolkit_index.aspx.
4   The *Daily Telegraph*. This article was not posted online by the newspaper.
5   The *Sunday Telegraph*. This article was subsequently posted online. The Commission understands it is no longer available on the *Sunday Telegraph's* publicly available online archives.
6   Also known as Elehssan
7   A 'designated individual or entity' is an individual or group which faces financial restrictions in the UK. HM Treasury maintains the consolidated list of these individuals and entities which can be designated following certain United Nations resolutions, European Union regulations, or by HM Treasury. Trustees may commit a criminal offence if they make funds or economic resources available to designated entities without a licence from HM Treasury. In the case of the Al-Ihsan Charitable Society, financial restrictions were imposed by the UK but not the UN or EU. The Al-Ihsan Charitable Society was designated in the UK on 27 June 2005.
8   See paragraph 21.

2

9. If the trustees of a charity make funds available to a designated entity without a licence from HM Treasury they risk committing a criminal offence. Additionally, funding any such organisation would raise concerns for the Commission about whether the trustees had properly discharged their duties and responsibilities under charity law and were ensuring the charity is properly safeguarded. The Commission therefore had a regulatory interest in verifying whether or not the funds set aside by the Charity had subsequently been paid or were going to be paid to the Al-Ihsan Charitable Society.

## Issues Examined

10. The Commission opened a regulatory compliance case on 3 March 2010 to investigate the regulatory concerns it had identified from the allegations made.

11. The scope of the investigation had two aims:

a) to establish whether the Charity had made payments to the Al-Ihsan Charitable Society in breach of financial sanctions; and

b) to ensure that the trustees are managing and mitigating risks to the Charity by ensuring appropriate policies are in place and implemented to safeguard the Charity and its beneficiaries from harm, including links to terrorist abuse.

12. During the course of its investigation the Commission carried out a books and records inspection to review how the Charity's due diligence and monitoring procedures were applied in 2005 and more recently. It also carried out checks on a random sample of the Charity's partners against the list of proscribed organisations and consolidated list of financial sanctions targets in the UK.

# Timescale of the Regulatory Compliance Case

13. The Regulatory Compliance Case opened on 3 March 2010 and the Commission's substantive investigations concluded on 2 September 2010. The Regulatory Compliance Case was closed with the publication of this report on 17 December 2010.

# Findings

14. The Charity provided funding to the Al-Ihsan Charitable Society of £2,500 in 2002 and £3,000 in 2003 as part of its Qurbani[9] programme. These payments were made before financial sanctions were imposed on the Al-Ihsan Charitable Society in the UK.

15. In February 2005 the Charity approved in principle a payment of £13,998 to the Al-Ihsan Charitable Society for the provision of a dentist chair and related equipment. A funding agreement was entered into in March 2005.

---

9   'Qurbani' is an animal sacrifice carried out by Muslims during Eid ul-Adha as an act of worship to Allah and to provide for the poor.

3

16. The Al-Ihsan Charitable Society was designated by the US Office of Foreign Asset Control as a 'Specially Designated Global Terrorist' on 4 May 2005. It was subsequently designated in the UK on 27 June 2005 under the Terrorism (United Nations Measures) Order 2001[10] and entered on the consolidated list of financial sanctions targets in the UK. From that date it became a criminal offence in the UK to make funds available to the Al-Ihsan Charitable Society without a licence from HM Treasury (in addition to other financial restrictions imposed).

17. The investigation found that, although the Charity had set aside funds of £13,998 for the Al-Ihsan Charitable Society, these were not subsequently paid. This was as a result of the financial sanctions imposed on the Al-Ihsan Charitable Society after the decision to provide funding had been made.

18. The investigation also found that the Charity has in place due diligence and monitoring procedures which cover application, selection and monitoring of partners, and risk assessment. These procedures were updated in 2007. The Commission's books and records inspection sampled a number of project files and identified inconsistencies in the extent of information held about different funding applications and projects. It was not clear whether the variations identified were the result of short falls in the application of the Charity's due diligence and monitoring procedures or inconsistencies in record-keeping.

## Conclusions

19. On the evidence examined by the investigation, the Commission concluded that the Charity had not illegally funded the Al-Ihsan Charitable Society.

20. The Charity was unable to demonstrate conclusively through its record keeping that it had followed its own due diligence and monitoring procedures consistently. When the Charity's due diligence and monitoring procedures are applied robustly, these should be recorded to enable the trustees to evidence that they are fulfilling their legal duties when selecting and monitoring partners.

21. Within the scope of this investigation the Commission found no evidence of irregular or improper use of the Charity's funds or any evidence that the Charity had illegally funded any proscribed or designated entities.

---

10  The Al-Ihsan Charitable Society's entry on the consolidated list of financial sanctions targets in the UK was last updated on 1 September 2010 and the designation remains in place.

## Impact of Commission Intervention

22. By publishing this report the Commission has given a public assurance that public allegations of links between the Charity and terrorism are unsubstantiated.

23. The Commission has provided regulatory advice and guidance to assist the Charity's trustees to further strengthen the way the Charity's due diligence and monitoring procedures are applied and recorded.

## Actions Required of the Trustees

24. The trustees intend to review how the Charity's due diligence and monitoring procedures are applied and recorded and will inform the Commission of any changes they intend to make as a result of this.

## Issues for the wider sector

Charities and Terrorism

25. Trustees must ensure they and their charity comply with the law, including counter-terrorism laws. Trustees risk committing a criminal offence if they have financial dealings with someone who is a designated financial sanction target in the UK.

26. Different countries are likely to have their own legislation dealing with terrorism. They are also likely to hold their own lists of terrorists and banned terrorist organisations (although they may refer to these by different names). These country lists have no direct legal effect in the UK, unless the people or organisations are also designated or proscribed in the UK. Nevertheless, charity trustees must take their existence into account and assess the risks which arise to their charity and its activities. This is particularly important where the charity has a physical presence, or works in, or supports projects in the particular country.

27. Further guidance about the effect of UK terrorism legislation on charities and trustees' duties in this area is available in the Commission's Compliance toolkit *Protecting Charities from Harm* at: http://www.charitycommission.gov.uk/Our_regulatory_activity/Counter_terrorism_work/Compliance_toolkit_index.aspx.

Working internationally and due diligence

28. When working internationally, charities often operate through local partners rather than establishing their own delivery infrastructure in their country or region of operation. Working through or with a local partner can be an effective way of delivering significant benefits direct to a local community. It does not, however, shift or alleviate responsibility for ensuring the proper application of the charity's funds by the local partner. That responsibility always remains with the charity trustees, forming part of their duties and responsibilities under charity law. The need to implement risk strategies therefore remains critical.

5

29. When choosing local partners to work with, trustees must conduct adequate due diligence checks to ensure that:

 a) the activities they intend to carry out through their local partners are in furtherance of their charity's purposes;

 b) their partners are and continue to be appropriate for the charity to work with; and

 c) the trustees have taken reasonable steps to monitor the use of funds to make sure that:

  i. their partners can and will apply their funds for proper charitable purposes; and

  ii. the funds reach their partners and end beneficiaries.

30. In order for trustees to fulfill their duties, the charity's due diligence processes should include:

 a) realistic and reasonable risk management strategies and procedures to identify and mitigate risks to the proper use of funds;

 b) a comprehensive and consistently applied selection process. This includes checks to be conducted on prospective and existing partners to enable the trustees to satisfy themselves that their relationship with an organisation would not expose the charity's assets or reputation to undue risks;

 c) a written agreement, to be put in place before any funding is sent. This is to set out how the partnership will work and how results will be demonstrated and monitored; and

 d) properly implemented methods to monitor how partners operate and demonstrate that money or resources given have reached their partners and beneficiaries as intended.

31. If these points are not featured in a charity's due diligence processes it may be difficult for its trustees to demonstrate that they have fulfilled their legal duties. It is also essential that a written record is kept of how the trustees have applied these points in relation to individual partners, and their decision making process.

32. Charities should establish their own benchmarks for the extent and quality of the information they require about their local partners to be satisfied that their trustees are acting in accordance with their duty to safeguard the charity's funds. The degree of detail required by trustees as part of their due diligence checks should be proportionate to the risks present in the area the partner is operating. It may be that different partners require differing levels of oversight and monitoring depending on: particular risks arising from the region in which it operates; the amount of funds committed; the length of the charity's relationship with them; the strength of their governance; and the partner's track record for delivering projects. Trustees working in regions where a terrorist organisation is known to operate must take adequate steps to assess the risks resulting from these factors.

**EXHIBIT 19 TO DECLARATION OF VALERIE SCHUSTER**

**FILED UNDER SEAL**

**Islington Business Centre**

PO Box No 8036
218 Upper Street
London
N1 1SP

Telephone:    0181 344 1068
Facsimile     0181 344 1069

Gerald Matthews   Ext: 2602
David Mudge       Ext: 2611

Your ref: 95142940/600822
Our ref:  BM/GRM/LIG-W.

Mr J Qundil
Palestinian Lebanon Relief Fund - Interpal
P.O. Box 3333
LONDON    NW6 1RW

**♻ NatWest**

18 March 1998

Dear Mr Qundil

I was pleased to have the opportunity of meeting Mr Mustafa and yourself last week and becoming more fully informed of the funds activities.

As we discussed the Bank is agreeable in principle ██████████████████████████
████████████████████████████████████████████████████████████████

I understand from our telephone conversation that you are still involved in negotiations in this respect and look forward to hearing from you as these progress so that we may be ready to process the documentation as soon as you require this.

As also discussed I am also enclosing a fresh mandate form for your completion and return. With regard to any new signatories we require positive identification to be produced such as a driving licence or passport along with two evidences of address which can be either a utility bill less than three month's old along with a Bank statement.

Please feel free to telephone me if there are any points which require clarification.

Yours sincerely

Gerald R Matthews
BUSINESS MANAGER

Part of NatWest UK

National Westminster Bank Plc
Registered Number 929027 England
Registered Office: 41 Lothbury
London EC2P 2BP

Regulated by the Personal Investment
Authority and IMRO for investment
business

Member of the NatWest and Gartmore
Marketing Group, advising on the life
assurance, pensions and unit trust
products only of that Marketing Group

HIGHLY CONFIDENTIAL

NW 068887
NW068887

**EXHIBIT 20 TO DECLARATION OF VALERIE SCHUSTER**

**FILED UNDER SEAL**

Case 1:05-cv-04622-DLI-RML   Document 267-2   Filed 03/22/12   Page 46 of 163 PageID #: 4989

Clubs, Societies and Associations mandate   18|9   NWB1011



HIGHLY CONFIDENTIAL

NW 053453
NW053453

**Authorised signatories sheet**
(for use with NWB1010 Company Mandate or
NWB1011 Clubs, Societies & Associations Mandate)

To NatWest   New party identification details.   NWB1073



HIGHLY CONFIDENTIAL

NW 053455
NW053455



**INTERPAL**
الصندوق الفلسطيني للإغاثة والتنمية

P.O. Box 3333
London, NW6 1RW
Tel: 0181 450 8002
Fax: 0181 450 8004

**Our Ref:** (2001)
**Date:** 16 September 1998

Mr. Gerald Matthews
Natwest Bank PLC.
Islington Business Centre
P O Box 8036
218 Upper Street
London N1 1SP
Fax: 0181-344 1069

Dear Mr. Matthews,

**Re: Clubs, Societies and Associations Mandate**

Please find enclosed the above mandate duly signed and dated. I trust you shall be in touch should you require anything further.

Thank you for your kind attention.

With best wishes,

Yours sincerely;

J. Qundil
Secretary to the Trustees

Registered Charity No  1040094

HIGHLY CONFIDENTIAL

NW 053456
NW053456

**EXHIBIT 21 TO DECLARATION OF VALERIE SCHUSTER**



# INTERPAL
الصندوق الفلسطيني للاغاثة والتنمية

P.O. Box 3333
London, NW6 1RW
Tel: 0181 450 8002
Fax: 0181 450 8004
e-mail: info@interpal.org
**Our Ref:** (2918)
**Date:** 24 June 1999

Mr. David Mudge
Natwest Bank PLC.
Islington Business Centre
P O Box 8036
218 Upper Street
London N1 1SP
Fax: 0181-344 1069



Dear Mr. Mudge,

### Re: INTERPAL Trustees

Thank you for our letter of 21 June 1999. Enclosed is the current list of INTERPAL's past and present Trustees, their dates of appointment and where applicable their resignation dates. Please accept the same as a copy of the Deed/s of each Trustee's appointment and where applicable their resignation. For your information a copy was sent to the bank on 20 May 1999 at Mr. Gerald Matthews' request. As you can see, there have been no changes to the information already provided.

Please do not hesitate to contact me should you require anything further.

Yours sincerely;

Y Qundil
Secretary to the Trustees

Registered Charity No. 1040094

HIGHLY CONFIDENTIAL



**INTERPAL**

الصندوق الفلسطيني للإغاثة والتنمية

P.O. Box 3333
London,  NW6 1RW
Tel: 0181 450 8002
Fax: 0181 450 8004
**Our Ref:** IBT/06/99
**Date:** 24 June 1999

# INTERPAL Board of Trustees
*Up-to-date List*

Please accept this as the current up-to-date list of the INTERPAL Board of Trustees as at 24 June 1999:

| Name | Date of Appointment | Date of Resignation |
|---|---|---|
| Mr. Essam Y. Mustafa (Founder) | July 1994 | --- |
| Mr. Mahfuzh Safiee (Founder) | July 1994 | --- |
| Dr. Issam Shaker (Founder) | July 1994 | --- |
| Mr. Ghassan Faour | 16 September 1997 | --- |
| Mr. Ismail Ginwala | 21 September 1996 | --- |
| Mr. Ibrahim Brian Hewitt | 21 September 1996 | --- |
| Mr. Shahan Izzat Husain | 21 september 1996 | --- |
| Dr. Abdul Karim Vania | 2 December 1997 | --- |
| Dr. Abdul Rahim Nassrullah (Founder) | July 1994 | 21 September 1996 |
| Dr. Mustafa Telha (Founder) | July 1994 | 16 September 1997 |
| Mr. Abdel Rahman Abou Daya (Founder) | July 1994 | 28 February 1998 |

Signed;



J. Qundil
Administration Manager &
Secretary to the Trustees



Registered Charity No. 1040094

HIGHLY CONFIDENTIAL

NW 068709
NW068709

**EXHIBIT 22 TO DECLARATION OF VALERIE SCHUSTER**



1 of 1 DOCUMENT

Copyright 1996 Times Newspapers Limited
The Times

March 6, 1996, Wednesday

**SECTION:** Overseas news

**LENGTH:** 384 words

**HEADLINE:** MI5 study 'charity cash link to Hamas'

**BYLINE:** By Stewart Tendler and Christopher Walker

**BODY:**

MI5 OFFICERS are studying police intelligence on alleged links between Hamas militants and a Palestinian fund-raising organisation registered in London with the Charity Commissioners.

Police sources believe up to Pounds 1 million a year is being raised by the Palestinians Relief and Development Fund, also known as Interpal. Some of the cash is transferred from funds raised in other countries, passed through London banks and sent to Palestinian refugee camps.

Special Branch officers are concerned about the final destination of the cash. Money may go to Hamas schools and projects in the Palestinian refugee camps but there is concern that funds could be diverted to fund terrorist attacks against Israel.

The information collected by Special Branch officers also raises questions over alleged links between the charity, based in Cricklewood, north London, and a number of Palestinian refugees described as former Hamas militants living in London.

At the centre of the group is a refugee described by intelligence sources as an alleged former high-ranking member of the military wing of Hamas. He is now understood to be seeking political asylum in Britain.

The man has been in this country for four or five years and there are up to a dozen other former members of the military group in Britain.

Michael Heseltine, the Deputy Prime Minister, disclosed that Hamas activists are being monitored in Britain. Standing in for John Major, he told MPs: "We are carefully monitoring the situation of Hamas activists."

Yesterday a spokesman for Interpal said it had nothing to do with Hamas and was solely a charitable organisation.

Since Hamas was founded in the occupied Gaza Strip in 1987, the Islamic Resistance Movement has expanded into a well-financed welfare and guerrilla group. Its wings are notionally split in a way similar to Sinn Fein and the Provisional IRA.

According to a senior Israeli army officer who has studied the group, Hamas can count on about $60 million (Pounds 40 million) a year in private donations. About 85 per cent of it is used to run schools, medical centres, hospitals, youth clubs and mosques.

"Without the support and activity of the civilian wing, the military wing could not exist," the officer said.

**LOAD-DATE:** March 7, 1996

## EXHIBIT 23 TO DECLARATION OF VALERIE SCHUSTER

### FILED UNDER SEAL



NW014516

**EXHIBIT 24 TO DECLARATION OF VALERIE SCHUSTER**

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

Case No. 05-CV-4622(DLI)(MDG)
----------------------------------x
TZVI WEISS, et al.,

       Plaintiffs,

    -against-

NATIONAL WESTMINSTER BANK, PLC,
         Defendant.
----------------------------------x
Case No. 07-CV-916(DLI)(MDG)
NATHAN APPLEBAUM, et al.,
       Plaintiffs,
    -against-
NATIONAL WESTMINSTER BANK, PLC,
         Defendant.
----------------------------------x

      260 Madison Avenue
      New York, New York
      May 20, 2011
      9:00 a.m.

    VIDEOTAPED DEPOSITION of JONATHAN R.
BURCHFIELD, taken by the Plaintiffs, held at
the aforementioned time and place, before
Sherri Flagg, a Registered Professional
Reporter, Certified LiveNote Reporter, and
Notary Public.

Page 2

1
2   A P P E A R A N C E S :
3
   Attorneys on Behalf of Plaintiffs:
4
   SAYLES WERBNER P.C.
5     4400 Renaissance Tower
      1201 Elm Street
6     Dallas, Texas 75270
      (214) 939-8711
7
8   BY:  MARK S. WERBNER, ESQ.
      mwerbner@swtriallaw.com
9
10  Attorneys on Behalf of Defendant
     National Westminster Bank, and the Witness:
11
   CLEARY GOTTLIEB STEEN & HAMILTON LLP
12    City Place House
      55 Basinghall Street
13    London, EC2V 5EH
      (020) 7614-2245
14
   BY:  JONATHAN I. BLACKMAN, ESQ.
15    jblackman@cgsh.com
16      -and-
17    2000 Pennsylvania Avenue, NW
      Washington, D.C. 20006-1801
18    (202) 974-1887
19  BY:  VALERIE SCHUSTER, ESQ.
      vschuster@cgsh.com
20
21
   A L S O  P R E S E N T :
22
     David Levy, Cleary Gottlieb
23    Deverell Write, Videographer
24
25

Page 3

1        - J. BURCHFIELD -
2      *  *  *
3    (Exhibit 1: Expert Report of
4  Jonathan Burchfield, was marked for
5  identification.)
6    (Exhibit 2: Second Expert Report of
7  Jonathan Burchfield, was marked for
8  identification.)
9    (Exhibit 3: Stone King Terms of
10  Engagement 9/10/10 (#NW 217432-434), was
11  marked for identification.)
12    (Exhibit 4: Website bio of Vicki
13  Bowles (#NW 217555), was marked for
14  identification.)
15    (Exhibit 5: A non-exhaustive list of
16  publications authored by J. Burchfield
17  (#NW 217435), was marked for
18  identification.)
19    (Exhibit 6: Interpal Report of an
20  investigation under S 8 of Charities Act
21  1993 (#W_S081305-329), was marked for
22  identification.)
23    (Exhibit 7: Charity Commission
24  Palestinians Relief and Development Fund,
25  was marked for identification.)

Page 4

1        - J. BURCHFIELD -
2    (Exhibit 8: Inquiry Report
3  (Interpal), was marked for
4  identification.)
5      *  *  *
6    VIDEO TECHNICIAN:  We're on the    08:59:55
7  record.  Today's date is May 20th, 2011.  08:59:56
8  The time on the video monitor is 8:59 a.m. 08:59:59
9    This is the beginning of Tape No. 1  09:00:03
10  in the videotape deposition of Jonathan   09:00:06
11  Burchfield in the case of Weiss, et al.  09:00:09
12  versus National Westminster Bank, Plc;   09:00:15
13  Case No. 05-CV-4622.            09:00:18
14    This case is filed in the U.S.     09:00:21
15  District Court for the Eastern District of 09:00:23
16  New York.                  09:00:25
17    My name is Deverell Write and I    09:00:25
18  represent Veritext Reporting.  At this   09:00:27
19  time will counsel please state their    09:00:29
20  appearances.                09:00:31
21    MR. WERBNER:  My name is Mark     09:00:31
22  Werbner from Dallas, Texas.  I represent  09:00:33
23  those Plaintiffs in the matter that I've  09:00:36
24  filed a notice of appearance.       09:00:38
25    MR. BLACKMAN:  Jonathan Blackman and 09:00:39

Page 61

- J. BURCHFIELD -

1        - J. BURCHFIELD -
2    And that's what I refer to in my report.        10:12:55
3        Q.    Do any of those statutes        10:13:00
4    specifically direct or place the Charity        10:13:04
5    Commission in the role of looking for terror    10:13:13
6    financing within the 180,000 or so charities?    10:13:19
7        A.    There's no specific reference to    10:13:23
8    terror financing.  But the general function is    10:13:27
9    to promote the effective use of charitable    10:13:30
10   resources, and one of the ways it does that or    10:13:32
11   is required to by statute is by investigating    10:13:35
12   and checking abuses.  And that area would be an    10:13:39
13   area of abuse if it existed.        10:13:41
14       Q.    Among others?        10:13:43
15       A.    Among others, absolutely.        10:13:45
16       Q.    Are you expressing or intending to    10:13:46
17   give opinions or conclusions in this case about    10:13:50
18   the duties and obligations of a bank in Great    10:13:54
19   Britain relating to suspicions of terror    10:14:05
20   financing?        10:14:07
21       A.    No, that's not my role.        10:14:07
22       Q.    Is there a difference between the    10:14:09
23   Charity Commission removing a trustee of the    10:14:25
24   charity and the Commission deregulating the    10:14:29
25   charity?        10:14:32

Page 62

- J. BURCHFIELD -

1        - J. BURCHFIELD -
2        A.    Yes.        10:14:33
3        Q.    What is that?        10:14:33
4        A.    A charity is run by a group of    10:14:34
5    charity trustees.  If the Charity Commission    10:14:40
6    removes one of those trustees, then the other    10:14:45
7    trustees who remain will continue to administer    10:14:47
8    the charity.  So it hasn't been deregistered.    10:14:50
9        Whereas, if a charity's        10:14:55
10   deregistered, then it comes to an end and is no    10:14:57
11   longer regulated by the Charity Commission.    10:15:01
12       Q.    Are you aware of any instances where    10:15:05
13   the Charity Commission has removed trustees due    10:15:09
14   to sufficient evidence of a link to terror    10:15:16
15   financing but yet remained the charity --    10:15:22
16   allowed the charity to remain as a registered    10:15:27
17   charity?        10:15:31
18       A.    I don't recall such a case.        10:15:35
19       Q.    Are there any publications or stated    10:15:38
20   positions of the Charity Commission in regard    10:15:40
21   to such a circumstance?        10:15:45
22       A.    I've referred in my reports to the    10:15:47
23   published documents issued by the Charity    10:15:51
24   Commission relating to its -- relating to its    10:15:56
25   role in relation to such issues.        10:15:57

Page 63

- J. BURCHFIELD -

1        - J. BURCHFIELD -
2        Q.    So whatever's in the report would be    10:16:00
3    the extent of the answer you would give --    10:16:03
4        A.    Yes.        10:16:07
5        Q.    -- about a circumstance like that?    10:16:08
6        A.    Yes, it would.        10:16:09
7        MR. WERBNER:  Why don't we take a    10:16:09
8    break.        10:16:12
9        VIDEO TECHNICIAN:  The time on the    10:16:14
10   video monitor is 10:15 a.m.  We're off the    10:16:15
11   record.  This ends Tape No. 1.        10:16:19
12       (Recess taken.)        10:16:24
13       (Exhibit 10: The Telegraph, "Charity    10:25:22
14   watchdog loses its bite", was marked for    10:25:22
15   identification.)        10:26:47
16       VIDEO TECHNICIAN:  We are back on    10:28:18
17   the record.  The time on the video monitor    10:28:19
18   is 10:27 a.m.  This starts Tape No. 2.    10:28:20
19   BY MR. WERBNER (continuing):        10:28:24
20       Q.    Mr. Burchfield, we're going to look    10:28:25
21   at Exhibit 10 in a moment, and I'm glad you at    10:28:27
22   least began some review of it.        10:28:30
23       Before we go there, my information    10:28:31
24   is that the 1996 Charity Commission report was    10:28:34
25   not publicly published and that what we've    10:28:40

Page 64

- J. BURCHFIELD -

1        - J. BURCHFIELD -
2    provided was obtained during the lawsuit.    10:28:44
3    There's some redactions to it.        10:28:48
4        Do you have any information as to    10:28:50
5    whether the 1996 Charitable Commission report    10:28:51
6    was publicly published or not?        10:28:57
7        A.    My information, if I may refer you    10:29:01
8    to the later -- this is Exhibit 8.        10:29:03
9        Q.    All right.        10:29:10
10       A.    If you refer to Annex 2 of        10:29:11
11   Exhibit 8, that contains a summary of the    10:29:20
12   inquiry, the 1996 inquiry which was published    10:29:27
13   in the Charity Commission's Annual Report for    10:29:31
14   its -- on its work in 1996.  So there was    10:29:35
15   public information there regarding its inquiry.    10:29:40
16       Q.    What page are you on?        10:29:46
17       A.    I'm on page 46.        10:29:48
18       Q.    Have you looked at the 1996 Annual    10:29:55
19   Report of the Charity Commission to see what    10:30:00
20   was said there about the Interpal?        10:30:03
21       A.    No.  I've simply referred to this --    10:30:13
22   this report.        10:30:16
23       Q.    And where does it say what you said?    10:30:18
24   Is it in the heading or is there anything in    10:30:22
25   the text?        10:30:25

**EXHIBIT 25 TO DECLARATION OF VALERIE SCHUSTER**



# Interpal

(Registered charity 1040004)

## Report of an investigation conducted under S 8 of the Charities Act 1993.

W_S081305

W_S081305

Interpal - Registered Charity No 1040094.

Page 2          The Investigation

Page 4          The Charity

Page 5          Child Sponsorship

Page 7          Projects

Page 9          Fund-Raising

Page 11         Conclusions

Annex 1     Register Print

Annex 2     Child sponsor report forms

Annex 3     Flow chart - Operation of the sponsor programme

Annex 4     Zakats participating in child sponsorship

Annex 5     Fund - raising guidelines

Annex 6     Fund - raising forms

Annex 7     Project report forms

1

W_S081306

W_S081306

### Scope and reasons for the investigation

Our investigation into the activities of Interpal was prompted by a newspaper article in the Times dated 6 March 1996. The article stated that there was a probable connection between the charity Interpal and the group Hamas, it was suggested that the charity part funded that group. The article went on to say that the charity also had connections with a number of former Hamas militants.

Government. Accordingly it was decided that it would be in the public interest for the activities of the charity to be investigated. We also immediately froze the charity's bank accounts to ensure that its funds were not moved out of the UK as a result of our interest.

Where a charity has an area of benefit outside of the UK it is difficult for the Charity Commission to make checks ourselves in the locations where funds are distributed. In this case circumstances in area of benefit precluded any such visit. We therefore had to satisfy ourselves that the trustees of the charity were doing all that was reasonable to satisfy themselves that the funds raised were being applied towards charitable purposes. To this end we decided to concentrate on scrutiny of the charity's controls and records, and test checks of individual payments chosen from copies of the charity's bank statements which were obtained from their bankers.

The allegation that funds were going to supporters of Hamas and in particular the families of suicide bombers was not of direct concern so long as the funds were being applied within the objects of the charity. In the area of benefit we anticipate that a large number of people will support Hamas. Relief cannot be denied to them because of that support but at the same time we needed to ensure, to the best of our abilities, that funds were not being given *because* of a person's support for Hamas. In other words poverty and need should be the only criteria used when deciding how the charity's funds should be distributed.

2

W_S081307

W_S081307

We organised our scrutiny of the charity's activities under three main headings, child sponsorship, project sponsorship and fund-raising.

On our first visit to the charity we were accompanied by one of our accountants and accountancy support has been available throughout our investigation .

3

W_S081308

W_S081308

## The Charity

The charity has been registered under number 1040094 since August 1994. It was registered as a result of advice given to the trustees regarding the operation of a separate organisation, The Palestine and Lebanon Relief Fund.

The charity's area of benefit is the United Kingdom and overseas and its objects are :-

1.    the provision of aid and assistance, support guidance and comfort to poor needy sick children and widows and those suffering or distressed as a consequence of civil or military action or national disasters.

2.    To relieve the need hardship and distress of persons whose relatives or friends died or who are missing or detained as a consequence of civil or military action.

3.    The provision in the interest of social welfare of facilities for recreation and other leisure time occupation of those of refugee status or connected persons as may have need of such facilities by reason of their youth or age or Infirmity or disablement or social and economic circumstances.

Although the charity has a wide area of benefit it confines its activities to Palestine and Palestinian refugees.

4

W_S081309

W_S081309

## CHILDREN'S SPONSORSHIP

Sponsorship of orphans is perhaps the charity's main activity although it involves less cash than its project work. Sponsorship is provided by both companies and individuals, the majority of whom are residents in the UK. Some moneys do however come from outside of the UK and during our visits to the charity we saw records of sponsorship moneys received from various European countries.

Typically a donor will sponsor an individual child but some wealthy individuals and companies do sponsor more. The total number of children under sponsorship is about 1300 and the normal rate of sponsorship is £25. Donors who choose not to pay by direct debit are asked to pay £30 per month to take into account additional administration costs. In terms of regular sponsorship some £32,500 per month is therefore sent to refugee camps in the West Bank, Gaza, Jordan and Lebanon.

A flow chart showing the operation of the sponsor programme is at Annex 3. Potential donors are asked to specify the age and sex of orphan that they wish to sponsor. Details of a number of orphans are sent to the donor and a choice is made. From evidence seen it is clear that the charity does not supply and does not have details of how any particular father died. It does not represent children as being the sons or daughters of a man who belonged to any particular organisation.

Sponsorship takes place via any one of 46 local charity committees or Zakats. A list of those in current use is at Annex 4. We understand that all of these Zakats are registered and controlled by local authorities. A payment for all of the children under the responsibility of a particular Zakat is sent to the Zakat's bank account on a monthly basis. The Zakat distributes the sponsorship money to the child's guardian or mother ( to a Muslim an orphan is a child without a father)

5

W_S081310

W_S081310

and receives a signature or thumb print in receipt of the money. These receipts are then sent back to Interpal to prove that the cash has been distributed correctly. In addition each child, or their guardian if they are too young, is encouraged to send a letter and a picture to the sponsor several times a year. Once a year the Zakat produces a progress report on each child. These reports and letters are sent to the donor via Interpal. The donor is thus kept informed of how their sponsorship money is being spent. Two specimen reports are at Annex 2.

During our visits to the charity we looked at a number of individual donations and traced them through the system. In each case we were able to verify that the cash had reached its intended destination and that receipts had been received. The charity's controls were well organised and they have introduced a custom computer system to ensure that all donations could be accounted for. We found no evidence of any donations that could not be accounted for.

5

W_S081311

W_S081311

## Projects

The majority of projects are funded by the charity after the event. A Zakat will approach Interpal and ask it to fund a particular project. The trustees consider each application and if it is acceptable to them they agree to fund it, but only after they have received evidence that the event or project has taken place. Typically projects are funded by loans from local business or by the allowance of credit for goods such as food stuffs. An exception to this method is when the charity makes collections for a particular, normally religious, project. One example of this are the Ramadan project where Muslims pledge money to feed the poor at the end of fasting. Another is the Qurbani project where Muslims pay to have a sheep slaughtered in their name to celebrate the end of the pilgrimage to Mecca (Hajj). The meat from the sheep is canned and distributed to the poor. In this year the budget for Qurbani was $250,000 and the actual slaughter and canning took place in Ireland.

We looked at a number of projects which in the main concerned the distribution of food. As well as looking at evidence offered by the trustees we also looked at the documentation for a number of projects chosen by us from a sample of payments shown on the charity's bank accounts. We found the paperwork to be most comprehensive. Every project had a detailed report produced by the local Zakat committee and these reports were usually supported by photographic evidence and letters of thanks. We were told that a number of projects were visited each year by members of Mosques to ensure that their community's donations were being used correctly. We saw no documentary evidence of this because these donors apparently have to pay for their own fares. We did however see a number of photographs taken by and of the donors. We were told that typically these donors would not be Palestinians.

Some project funds are received from individuals outside of the UK. These funds frequently come from countries that have no diplomatic relations with Israel and they are passed through Interpal's dollar account to enable the funds to reach the area of benefit. These donations differ from other fund-raising activities in that the donor may put forward a particular project that they wish

W_S081312

W_S081312

Interpal to undertake on their behalf. Other than this difference these projects are subject to the same controls and checks as all others.

8

W_S081313

W_S081313

## UK Fund-raising

The charity raises funds in the UK in two main ways. As stated above child sponsorship is paid by donors on a regular and set basis. The charity also raises funds by public appeals and religious donations in Mosques.

The charity employs a full-time member of staff who is responsible for all UK fund-raising activities. Routine fund-raising is instigated when this individual, or a local (unpaid) agent, approach a Mosque committee and ask to make a collection. The charity is normally asked to make a presentation to the committee making it clear what their objectives are and it has a fund-raising pack which is used for this purpose. We have obtained a copy of the pack, it does not contain any political statements.

Actual collections are made by volunteers who are paid only fully documented expenses. The collections are typically made after Friday prayer and are taken in a large custom made compartmentalised plastic box. The Muslim faith provides that some donations are made for specific purposes and can only be used for those purposes. Other purposes are more general and it is from these general donations that the charity's running expenses can be met. The main heading of the collections are Fitrana, Zakat, Sadaqu, Lillah and Interest.

Donations are counted on the spot in the presence of Mosque committee members and the volunteer issues a receipt. The cash is paid into the charity's bank account using a paying-in book issued for that purpose. The volunteer keeps a daily financial and a collection summary. These documents plus a copy of the receipt and any expenses claims are sent to the charity for checking.

Volunteers are all vetted before they are allowed to start collecting and references are always taken up. The volunteers have dated identity badges and letters of authority. Guidelines for volunteers are shown at Annex 5 and some specimen forms at Annex 6.

9

W_S081314

W_S081314

During our visits to the charity we looked at their fund-raising methods and financial control of donations. We found all to be in order, indeed their methods would set an example for many larger charities.

W_S081315

W_S081315

## Conclusions

The charity Interpal claims to be independent and non-profit making. All of the evidence that we have obtained suggests this to be true. Scrutiny of the charity's publicity and documentation provided no evidence of any pro-terrorist or anti-Israeli propaganda and interviews with the trustees and staff suggested that they were motivated by faith and altruism rather than fanaticism.

We carried out a range of financial checks. At times we were hampered by documents in Arabic but enough of the evidence was in English for us to carry out our work effectively. Where we considered a document to be particularly important we used a translation bureaux to obtain an English copy. Test checks of payments from the charity's bank accounts all provided evidence of an appropriate end use for its funds.

Although press coverage spoke about evidence being made available to the Government which showed that the charity was funding terrorist activities this has not been substantiated. All of the evidence that we were able to uncover pointed to a well run and committed organisation which carried out important work in a part of the world where there is great hardship and suffering. It would be impossible, and inappropriate, for the charity to ensure that its funds only go to supporters of the Israelis in this volatile area of conflict. The unfounded allegation that by aiding Palestinian children the charity is in effect nurturing terrorism remains just that. In addition Interpal stress that they do not differentiate between the race or creed of children that they sponsor. What they do need to do is to take whatever steps they can to ensure that their donations only go to charitable purposes within their objects. We are satisfied that they do this to the best of their abilities.

It is recommended that this case is now closed, a final visit is made to Interpal by senior staff to explain the outcome of the investigation, and that a press release is drafted and copied to DNH and the Home Office (F4 Division).

11

W_S081316

W_S081316

During the course of our inquiry we were surprised to find evidence that the Palestine and Lebanon Relief Fund ( PLRF) was still in operation. We had understood that the organisation ceased to exist when Interpal became registered. Although PLRF is not registered we are satisfied that we have jurisdiction over its funds and we have opened a separate investigation into its activities.

W_S081317

W_S081317

Charity Details

```
-------------------------------Name(s)-(Z)-------------------------------
Number   1040094      | PALESTINIANS RELIEF AND DEVELOPMENT FUND
                      | INTERPAL
File at  LN           -------------------------------------------------------------------------
Rrn Date 11-AUG-94  Last Amended Date 16-MAY-96      Removed
Correspondent Details
Name     MR E Y MUSTAFA                   Status (Z) TRUSTEE
Address  60 CLARK COURT
         STILTON CRESCENT
         LONDON

Postcode NW10 8DJ           Telephone Number   0181 452 1197
G.I. (Z) DECLARATION OF TRUST DATED 29 JULY 1994
Objects  1.THE PROVISION OF AID AND ASSISTANCE, SUPPORT GUIDANCE AND
 (Z)     COMFORT TO POOR NEEDY SICK CHILDREN AND WIDOWS AND THOSE
         SUFFERING OR DISTRESSED AS A CONSEQUENCE OF CIVIL OR MILITARY
         ACTION OR NATIONAL DISASTERS. 2.TO RELIEVE   THE NEED HARDSHIP
         AND DISTRESS OF PERSONS WHOSE RELATIVES OR FRIENDS DIED OR WHO
         ARE MISSING OR DETAINED AS A CONSEQUENCE OF CIVIL OR MILITARY
         ACTION.3.THE PROVISION IN THE INTEREST OF SOCIAL WELFARE OF
         FACILITIES FOR RECREATION AND OTHER LEISURE TIME OCCUPATION OF
         THOSE OF REFUGEE STATUS OR CONNECTED PERSONS AS MAY HAVE NEED
         OF SUCH FACILITIES BY REASON OF THEIR YOUTH OR AGE OR INFIRMITY
         OR DISABLEMENT OR SOCIAL AND ECONOMIC CIRCUMSTANCES.
AoB.(Z)  UNITED KINGDOM AND OVERSEAS
-------------------------------Civil-Areas-(Z)-------------------------------
NATIONAL AND OVERSEAS

Account Details
Financial Year ends  31/12       Submit    Y    Financial Year of  1994
Last Income (Return) 0           Accounts?      Last Accounts

Classifications
Category   STANDARD                 Status  REGISTERED
Remarks (Z)
----------Object-Codes-(Z)----------      ----------Charity-Types----------
68.00    CHARITIES OPERATING OVERSEAS   | FUND RAISER
         FOR THE IMPROVEMENT OF         |
         CONDITIONS OF LIFE             |
71.00    CHARITIES OPERATING OVERSEAS IN| GRANTS TO INSTITUTIONS
         CONNECTION WITH THE PROVISION  |
         OF MEDICAL FACILITIES,         |
         EDUCATION AND RESEARCH;        |
         PRESERVATION AND PROMOTION OF  |
         GOOD HEALTH, ASSISTANCE TO SICK|
         PERSONS - GENERAL              |
139.00   ASSISTANCE TO SPECIAL CLASES   | GRANTMAKER TO INDIVIDUALS
         AND THEIR DEPENDANTS (ALL FORMS|
         OF ASSISTANCE).  PERSONS OTHER |
         THAN THOSE DEFINED IN CODES    |
         130-138, 140-149 AND 150-153   |

----------Subsidiaries-(Z)----------      ----------Amalgamated-from-(Z)----------

    Use 'Detail' for full
    details

Amalgamated into
```

W_S081318

W_S081318

Number         Name (Z)

I.R. Ref                                    Housing Assoc. Ref.
Forces(Z)

Time Charity Details
Expires              Disposal of Assets within    months after this date

Banking Details
Name
Address


Postcode
Branch                                      Sort Code
A/C No.                   A/C Name (Z)

Current Mailing Cycle:
Mail?   Y
------------------------------------------------------------------------
                          Mailing History
   Mailing Id     Date Mailed    Date Returned    Date Accounts Received
   AR4            30 Aug 1995    27 Mar 1996
------------------------------------------------------------------------

Action by
Reg'tion MED    Authorisation PJC    Last Amendment TAPE    Removal

W_S081319

W_S081319



ORPHANS PROGRAM - INTERPAL - LONDON

INTERPAL ORPHANS SECTION

- INFORMATION LEAFLETS
- STANDING ORDER M.
- ORPH. APP. FORM
- P.P.ENVELOP THANKS LETTER

CHILDREN APPEAL ORGANIZED BY INTERPAL

INQUIRES ABOUT THE ORPHANS PROGRAM AND HOW TO SPONSOR AN ORPHAN

SPONSORING BODY WEATHER INDIVIDUALS OR ORGANIZATIONS

- THANKS LETTER
- RECEIPT VOUCHER
- ORPHAN'S REPORT
- ORPHAN'S LETTER

- STANDING ORDER
- CHEQUE OR CASH
- GIFTS TO THE ORPH.
- LETTER TO THE ORPH.

BANK

STANDING ORDER M. CHEQUES & CASH

INTERPAL ORPHANS SECTION

- ORPH. APP. FORM
- ORPH. GIFTS
- ORPH. LETTER
- ORPH. REPORT
- RECEIPTS

- NEW SPONSORSHIPS
- SPONSOR'S LETTER
- SPONSOR'S GIFTS
- ORPHAN'S FUNDS

ISLAMIC ASSOCIATIONS AND ZAKAT COMMITTEES INSIDE PALESTINE & LEBANON & JORDAN

ORPHANS

W_S081320

W_S081320

| M_CODE | COM_NAME | COM_TEL1 | COM_FAX1 |
|---|---|---|---|
| 1 | ZAKAT TOBASS COMMITTEE | 972-9-6748dd | 972-6-6748dd |
| 2 | ZAKAT KHAN YUNIS COMMITTEE | 972-7-852932 | |
| 3 | ZAKAT & SADAQAT COMMITTEE - RAMALLA | 972-2-9985371 | 972-7-8524d3 |
| d | ZAKAT NABLOUS COMMITTEE | 972-9-385630 | 972-2-9952391 |
| 5 | SOC. OF ISLAMIC SCIENCE & CULT. COM | 972-2-836912 | |
| 6 | ISLAMIC CHARITABLE SOCIETY - HEBRON | 972-2-929166 | 972-2-835170 |
| 7 | JENIN ZAKAT COMMITTEE | 972-6-503068 | 972-2-828504 |
| 9 | AL-SALAH ISLAMIC ASSOCIATION-GAZA | 972-7-820638 | 972-6-502652 |
| 10 | AL-SANABIL - SAIDA LIBANON | 009617720275 | 972-7-830881 |
| 11 | JARACH CAMP | | |
| 12 | AL-BIR WAL-IHSGAN CAMP | | |
| 13 | AZMI AL-MUFTI CAMP | | |
| 14 | MA'DAB CAMP | | |
| 15 | SOOF CAMP | | |
| 16 | AL-WAHADAT CAMP | | |
| 17 | AL-RASIFIA CAMP | | |
| 18 | JABAL AL-NADHEEF | | |
| 19 | AL-HUSSAIN CAMP | | |
| 20 | AL-ZARKAA CAMP | | |
| 21 | HITTEEN CAMP | | |
| 22 | AL-BAK'AA CAMP | | |
| 23 | ISLAMIC RELIEF COMMITTEE-UM-ALFAHM | 972-6-568061 | 972-6-568104 |
| 24 | ISLAMIC SOCIETY- GAZA | 972-7-823088 | 972-7-823088 |
| 25 | GOWAILAH CAMP | | |
| 31 | AL HAI'A AL-ISLAMIAH LIRI'AYA-LIBAN | | |
| 40 | THE MERCY ASSOCIATION FOR CHILDREN | | |
| 41 | AL-BIR COMMITTEE - AL-KOORA-JORDAN | 972-7-822208 | 972-7-823660 |
| 42 | AL-BIR COMM. ALSHOONA SHAMALIA -JOR | | |
| 43 | AL RAMTHA ISLAM. CENTER - JORDAN | | |
| 44 | HAIAT AL AAMAL AL KHAIRIA - JORDAN | 009626604842 | |
| 45 | PALESTINE SUPPORT COMMITTEE-JORDAN | 009626-604842 | 009626-604842 |

W_S081321

W_S081321

## Interpal Guidelines for Volunteers.

Volunteers are kindly requested to read and adhere to the following guidelines

1. **Fund Raising materials**

   <u>Receipt Books:</u> All receipt books (and other Interpal material) in the posession of the volunteer are his/her responsibility.  All efforts must be made for their safe keeping.  They are to be returned and accounted for at the end of the campaign.  Cancelled receipts must be kept intact for the record.

   <u>Funds:</u> For safety reasons, collected money must be deposited regularly at the bank and large amounts must not be allowed to build up in the posession of the volunteer.  Money handed to other Interpal representatives for depositing must be signed for by the recepient.

2. **Appearance**

   Volunteers must present themselves in a respectable manner and I.D. tags must be clearly worn at times of collection or distribution.

3. **Receipting of collected money**

   All monies collected must be properly receipted with accurate records kept in the counterfoil  including the type/project of any specific donation.  Money collected from mosques should be counted and receipted at the mosque in the presence of a member of the committe or a mosque representative.

4. **Expenses**

   Out of pocket expenses must be properly receipted.  No money will be paid out for unreceipted items.  Money must **never** be taken from donations to cover any expenses.  Expenses must be recorded in the attached expense form and accounts will be setteled at the end of the campaign.

5. **Reports and Records**

   Every effort must be made to complete the mosque report forms as fully as possible.  The other forms must also be completed accurately on a  day-to-day basis.  This information will be of most value in planning future campaigns.  Regular contact must be maintained with the head office to notify them of any developments and to provide them with details about mosques collected from so that *'thank you'* letters can be promptly sent out to them.

**Important Notes**

   * Interpal's mission is a purely humanitarian one.  Volunteers must focus their efforts on presenting the special needs and requirements of the widows orphans and needy families in the refugee camps.

   * It is the responsibility of the area team leader to make sure all the above is fully complied with.

   * This file is the property of Interpal.  It must be returned to the head office at the end of the campaign.

*Interpal - P.O. Box 3333 London NW6 1RW.  Tel: 0181 450 8002.*

W_S081322

W_S081322

## MOSQUE COLLECTION SUMMARY

| Date | Name of Mosque | Amount Collected | Name of Volunteer | Comments |
|------|----------------|------------------|-------------------|----------|
| / / | | £ - | | |
| / / | | £ - | | |
| / / | | £ - | | |
| / / | | £ - | | |
| / / | | £ - | | |
| / / | | £ - | | |
| / / | | £ - | | |
| / / | | £ - | | |
| / / | | £ - | | |
| / / | | £ - | | |
| / / | | £ - | | |
| / / | | £ - | | |
| / / | | £ - | | |
| / / | | £ - | | |
| / / | | £ - | | |
| / / | | £ - | | |
| / / | | £ - | | |
| / / | TOTAL: | £ - | | |

Signature of Volunteer ...................................................................................

Date ......./......./.........

Interpal - P.O. Box 3333, London, NW8 1RW. Tel: 0181 450 8002. Reg. Charity No. 1040094

## DAILY FINANCIAL LOG

| Date | Collections Made | | | No. of Mosques Collected From | Total Deposits at bank / Given to: |
|------|--------|--------|--------|------|------|
| | Team 1 | Team 2 | Team 3 | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| TOTAL: | | | | | |

Name ........................................................

Date ........................................................

Signature ................................................

**PLEASE ATTACH ANY PAYING IN SLIPS**
Interpal - P.O. Box 3333, London, NW6 1RW. Tel:
0181 450 8002. Reg. Charity No. 1040094

W_S081324

W_S081324

## EXPENSE FORM

Name of Volunteer ................................................................................

Area Covered ................................................................................

| Item Claimed For | Details - Brief description of Activities | Date | Amount |
|---|---|---|---|
| | | | £ |
| | | | £ |
| | | | £ |
| | | | £ |
| | | | £ |
| | | | £ |
| | | | £ |
| | | | £ |
| | | | £ |
| | | | £ |
| | | | £ |
| | | | £ |
| | | | £ |
| | | | £ |
| | | | £ |
| | | | £ |
| | | TOTAL: | £ |

Signature of Person Making Claim: ................

Date ................................................................

Method of payment

**PLEASE ATTACH ALL RECEIPTS**
NB. Payments Will not be made for Items not receipted

Interpal - P.O. Box 3333, London, NW6 1RW. Tel: 0181 450 9002. Reg. Charity No. 1040094

W_S081325

W_S081325



**INTERPAL**

الصندوق الفلسطيني للاغاثة والتنمية

P.O. Box 3333
London, NW6 1RW
Tel: 0181 450 8002
Fax: 0181 450 8004

In The Name Of Allah, Most Gracious, Most Merciful

Ref:Rec/Don/16778
Date: 16th May 1995

Edinburgh
ove

Dear Brother Abdul Rahman,

*Assalamu Alaikum Wa Rahmatullahe Wa Barakatuh*

Thank you very much for your letter and kind and continued support. May Allah (SWT) reward and bless you for your great efforts to help the poor and needy in Palestine and else where.

To enable me to issue the required certificates it would be most appreciated if you could fill in the enclosed representative form as well as provide us with 3 references including one from your local Mosque. This is required as a matter of policy by the Board of Trustees.

Please forgive us for any short comings but we assure you we will do our best in future.

With best wishes and kindest regards,

Yours in Islam, -

J.Qundil
Secretary to the Trustees

Enc. -Letter of thanks and receipt to Central Mosque
-Representative Form - S.A.E.

Registered Charity No. 1040094

W_S081326

W_S081326

## Register of Businessmen and Potential Doners

Our Ref:[_____]

*Please complete this form, giving as much information as possible, and return it to our address in the enclosed s.a.e. May Allah SWT reward and bless you for your cooperation and continued support; it is most appreciated.*

Name(title): _____

Nature of Business: _____

Address: _____

_____

_____ Post Code: _____

Contact Nos.: _____

Comment :(Please suggest the best way to approach?) _____

_____

_____

Do you mind if we mention your name?   ☐ Yes   ☐ No

---

Name(title): _____

Nature of Business: _____

Address: _____

_____

_____ Post Code: _____

Contact Nos.: _____

Comment :(Please suggest the best way to approach?) _____

_____

_____

Do you mind if we mention your name?   ☐ Yes   ☐ No

Interpal - P.O. Box 3333, London, NW8 1RW. Tel: 0181 450 8002. Reg. Charity No. 1040094

W_S081327

W_S081327

## DISTRIBUTION REPORT FORM

**INTERPAL**
الصندوق الفلسطيني للإغاثة والتنمية

P.O. Box 3333
London, NW6 1RW
Tel: 0181 450 8002
Fax: 0181 450 8004

Allocation No:                    Beneficiary/Location                    Amount:

**BOTH SIDES OF THIS FORM SHOULD BE COMPLETED BY THE RECIPIENT ORGANISATION AND RETURNED ONCE AID HAS BEEN DISTRIBUTED**

Date Form Completed:                    Your Ref No:

1. Name of Project:

2. Project Nature: (please tick one)

General Relief ☐            Emergency Relief ☐            Sponsorship Programme ☐
Eid Gifts ☐                Zakat ul Fitr ☐              Qurban ☐
Feed the Fasting ☐         Mosque Construction ☐         Long Term Development ☐

3. Location Town and areas that received the aid:

TOTAL COST OF PROJECT                    £

Funded by:
Interpal's contribution to the project:        Interpal .................. £
Contributions from other donors (Name):                                 £
                                                                        £

Duration of the Project:
Actual Project Start date:            End Date:            On-going ☐

Project Beneficiaries: Please give the number of beneficiaries for each of the following groups:

Refugee Camps ☐        Gen. Community ☐        Families ☐        Elderly ☐
Widows ☐               Children ☐              Orphans ☐         Students ☐

TOTAL NO. OF INDIVIDUAL BENEFICIARIES:

Registered Charity No: 1040094

W_S081328

W_S081328

PAGE 2 OF 2 - REF:

**7 Project Type - Funding for:** *Please tick all that apply*

☐ Food
☐ Shelter
☐ Clothes/Domestic
☐ Water

☐ Sanitation
☐ Health
☐ Education/Vocational
☐ Transport

☐ Community Service
☐ Livestock
☐ Fisheries
☐ Crop Production

☐ Income Generation
☐ Legal Assistance
☐ Agency Support Costs
☐ Other *

\* Please specify

**8 Project Details & Costs** *(From Interpal's Contribution)*

| Items purchased or services paid for and duration of service | Quantity or weight | Unit Price | Total amount (Local currency) |
|---|---|---|---|
| 1 | | | |
| 2 | | | |
| 3 | | | |
| 4 | | | |
| 5 | | | |
| *[Please complete on a separate sheet if necessary]* | | Sub-total: *(i)* | |

**9 Project Expenses**

| | |
|---|---|
| Transport Cost | |
| Rent | |
| Salaries | |
| Volunteer Expenses | |
| Publicity Costs | |
| Admin/Management Fees | |
| Sub-total: *(ii)* | |
| Overall Total *(i) + (ii)* | |

**10 Documentation and Publicity Material:** We request that at least one of the following forms of documentation should accompany this report, showing aid being distributed or a programme being implemented. Please indicate here the documentation you have sent.

☐ Official Receipt   ☐ Letter of thanks
☐ Photographs   ☐ video   ☐ Newspapers   ☐ Other   ☐ Please specify

11 Name of Official:
Official Stamp:

Position:
Signature:
Date:

**Follow up:** For Interpal Official use only.

Sections completed:   1 ☐   2 ☐   3 ☐   4 ☐   5 ☐   6 ☐   7 ☐   8 ☐   9 ☐   10 ☐   11 ☐
Comments:-

W_S081329

W_S081329

EXHIBIT 26 TO DECLARATION OF VALERIE SCHUSTER

FILED UNDER SEAL

232

```
1        UNITED STATES DISTRICT COURT
2          EASTERN DISTRICT OF NEW YORK
3            Action No: 05cv4622(DGT)(MDG)
4    - - - - - - - - - - - - - - - - - - - - -
5    TZVI WEISS, et al,
6              Plaintiffs,
7    against
8    NATIONAL WESTMINSTER BANK, PLC.,
9              Defendant.
10   - - - - - - - - - - - - - - - - - - - - - -
11   NATAN APPLEBAUM, et al.,
12             Plaintiffs,
13   against
14   NATIONAL WESTMINSTER BANK, PLC.,
15             Defendant.
16
17
18      VIDEOTAPED DEPOSITION OF MIKE HOSEASON, VOLUME 2
19             Thursday 15 July 2010
20             At:  9:30 am
21             Taken at:
22      Cleary, Gottlieb, Steen & Hamilton LLP
23         55 Basinghall Street, London
24            United Kingdom
25
26
27
28
29        HIGHLY CONFIDENTIAL            233
```

234

```
1    VIDEOGRAPHER: DAVID ROSS
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

233

```
1              A P P E A R A N C E S
2    For Plaintiff Tzvi Weiss:
3        STEPHEN SCHWARTZ, ESQ.
4        Kohn, Swift & Graf PC
5        One South Broad Street, Suite 2100
6        Philadelphia, Pennsylvania 19107-3304
7        Tel: 419 246 0528
8    For Plaintiff Natan Applebaum:
9        MARK WERBNER
10       Sayles & Werbner
11       4400 Renaissance Tower
12       1201 Elm St.
13       Dallas, Texas 75270
14       Tel: 214 939 8763
15
16   For Plaintiff Tzvi Weiss:
17       AITAN GOELMAN
18       Zuckerman Spaeder LLP
19       1800 M Street, NW, Suite 1000
20       Washington, DC 20036-5807
21       Tel: 202 778 1996
22   For Defendant National Westminster Bank, PLC:
23
24       JONATHAN I. BLACKMAN ESQ. and SUE. H. RHEE
25       Cleary, Gottlieb, Steen & Hamilton LLP
26       One Liberty Plaza
27       New York, NY 10006-1470
28          Tel: 212 225 2000
29
30   Also Present:
31
32       COURT REPORTER:
33
34       AILSA WILLIAMS
35       European Deposition Services
36       59 Chesson Rd
37       London, W14 9QS
38       Telephone:  44 (020) 7385 0077
39          HIGHLY CONFIDENTIAL            234
```

235

```
1                I N D E X
2    MIKE HOSEASON ... ... ... ... ... ... 237
3    CROSS-EXAMINATION BY MR. GOELMAN ... ... ... ... 237
4        (Cont.)
5
6    CROSS-EXAMINATION BY MR. ... ... ... ... ... ... 430
7        BLACKMAN:
8    FURTHER CROSS-EXAMINATION BY MR. ... ... ... ... 439
9        GOELMAN:
10
11          INDEX OF EXHIBITS
12   Hoseason 12 NW013279 ... ... ... ... ... ... 253
13   Hoseason 13 NW009755-757 ... ... ... ... ... ... 264
14   Hoseason 14 NW012772 ... ... ... ... ... ... 270
15   Hoseason 15 NW191801-806 ... ... ... ... ... ... 279
16   Hoseason 16 NW052874-86 ... ... ... ... ... ... 317
17   Hoseason 17 NW012954 ... ... ... ... ... ... 322
18   Hoseason 18 NW008374-380 ... ... ... ... ... ... 327
19   Hoseason 19 Bank of England News ... ... ... ... 342
20       Release (No Bates No.)
21
22   Hoseason 20 NW009934-42 ... ... ... ... ... ... 347
23
24   Hoseason 21 NW012129-152 ... ... ... ... ... ... 354
25
26   Hoseason 22 NW012108-128 ... ... ... ... ... ... 357
27
28   Hoseason 23 NW051994-997 ... ... ... ... ... ... 361
29
30   Hoseason 24 NW012925-38 ... ... ... ... ... ... 365
31
32   Hoseason 25 "Press Room, US ... ... ... ... ... 376
33       Department of the Treasury",
34       (No Bates Nos.)
35
36   Hoseason 26 NW088194-197 ... ... ... ... ... ... 384
37
```

272

1 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
2 ▓▓▓ where ▓▓▓▓▓▓▓▓ was located?
3 A. ▓▓▓▓▓▓▓▓▓▓▓▓
4 Q. If you had had this document reflecting this
5 ▓▓▓ transfer between Interpal and ▓▓▓▓▓▓
6 ▓▓▓▓▓ would you have considered that corroborative of
7 the allegations in the South African report?
8 MR. BLACKMAN: Same objection.
9 A. No.
10 Q. Why not?
11 A. All it corroborates is that they are making
12 payments to ▓▓▓▓▓▓▓▓▓▓ that that organization
13 are based in ▓▓▓▓▓▓▓▓▓▓▓ It does
14 not corroborate the purpose that the funds are being put to.
15 Q. What do you mean by "the purpose"?
16 A. The allegations that you are talking about
17 relate to allegations of terrorist financing.
18 Q. And so it doesn't corroborate that the ▓▓▓
19 was going to buy bombs and bullets. Is that what you mean?
20 A. It doesn't.
21 MR. BLACKMAN: Object to form. You may answer.
22 A. It doesn't corroborate the fact that or how
23 the funds were going to be used, does it?
24 Q. Okay, I understand what you mean. Does it
25 corroborate at least that there is a connection between▓▓

273

1 ▓▓▓▓▓▓▓▓ and Interpal?
2 MR. BLACKMAN: Objection to the form of the
3 question. You may answer.
4 A. It demonstrates that Interpal are making
5 payments to that organization or have made a payment to that
6 organization, yes.
7 Q. And is Hoseason Exhibit 14 something that you
8 had available to you when you were purportedly conducting
9 your thorough review in the fall of 2001?
10 A. If we asked for it, yes.
11 Q. Can you turn to page 24 of 37 of Hoseason 11.
12 MR. BLACKMAN: Can we take a break maybe? We have
13 been going about an hour.
14 MR. GOELMAN: Sure.
15 THE VIDEOGRAPHER: Going off the record at 10:36
16 am, as indicated on the video screen.
17 (A short break)
18 THE VIDEOGRAPHER: Back on the record at 10:45 am.
19 MR. GOELMAN: Can you please turn to page 24 of
20 37, Hoseason 11.
21 A. Yes.
22 Q. I am going to refer you to the middle of the
23 page where it says:
24 "Hamas, through Interpal, operate on an
25 international basis through a global network of Al-Aqsa

274

1 structures.  (Hamas = Interpal = Al-Aqsa)."
2 A. I see that, yes.
3 Q. If there is evidence of numerous transfers
4 between Interpal's accounts at NatWest and
5 Al-Aqsa foundations in various countries, would you have
6 considered that to be corroborative of the reliability of
7 Hoseason 11?
8 MR. BLACKMAN: Object to the form of the question.
9 A. No.
10 MR. BLACKMAN: It is hypothetical. It also lacks
11 foundation.
12 MR. GOELMAN: It is hypothetical. I didn't want
13 to have to show him numerous additional bank documents,
14 which I am willing to do.
15 MR. BLACKMAN: You can do whatever you want.
16 MR. GOELMAN: Okay.
17 MR. BLACKMAN: When you use the word "Al-Aqsa", as
18 you know, there are numerous organizations with those
19 particular words in their title, and I trust you will
20 differentiate amongst them in your question.
21 MR. GOELMAN: I understand your objection. You
22 answered my question that you said you would not have found
23 that to be corroborative of the reliability for reporting.
24 Can you tell me why not.
25 A. For the same reasons as I have stated before.

275

1 If there were evidence of transactions between any of these
2 then that would evidence movement of funds but it would not
3 necessarily evidence the purpose to which the funds were
4 put.
5 Q. And what kind of evidence would you need to
6 have -- strike that.
7 When you talk about evidence of the purpose to
8 which the funds were put, what kind of evidence would
9 demonstrate that purpose?
10 ==A. I am not a police officer or a prosecutor of==
11 ==any kind.  So our role was to establish whether there are==
12 ==reasonable grounds to suspect, and where we feel that there==
13 ==are then we are required to make a disclosure to the==
14 ==authorities. We are not there to investigate to the nth==
15 ==degree. That is a job for law enforcement.==
16 Q. I understand that, but when you talk about
17 evidence of the purpose to which the funds were put, what do
18 you mean by that phrase?
19 A. As I stated previously, the allegation here is
20 that these funds were being utilized to fund terrorist
21 activity. There is no evidence in there in this document to
22 support that.
23 Q. There is no evidence in Hoseason 11 to support
24 that?
25 A. That is correct.

372

1    Q. Why not?

2    A. Because at that point the department with the

3    responsibility for dealing with the sanctions and designated

4    individuals and entities was not mine, it was Group Risk

5    Management.

6    Q. And when did that responsibility change?

7    MR. BLACKMAN: Objection to form, lack of

8    foundation.

9    MR. GOELMAN: Was that responsibility once your

10   department's?

11   A. No.

12   Q. So earlier you had talked about your unit's

13   ability to recommend terminating a customer if there was, I

14   think you said "Clear evidence of criminality", correct?

15   A. Yes.

16   Q. Did you consider -- and you still had that

17   authority in August 2003, correct?

18   A. We could certainly still recommend that

19   customers were asked to rebank, yes.

20   Q. At the time that you learned that OFAC (sic)

21   was designated by OFAC, you still were in a position where

22   you could recommend that the bank quit the relationship,

23   true?

24   A. I could have done, but the decision based on

25   the information that had come to light was not mine to make.

373

1    It rested with Group Risk Management.

2    Q. Could you not have made a recommendation to

3    the banking business line that retained the relationship

4    that they terminate the customer?

5    A. I would suggest it would not have been within

6    my remit to have done so.

7    Q. Why not?

8    A. As I have already stated twice, the

9    responsibility for dealing with sanctions issues sat with

10   Group Risk Management, not my department. It was suspected.

11   Q. What was suspected?

12   A. The designation is that they were suspected of

13   being a terrorist organization.

14   Q. So in your view the OFAC designation did

15   nothing to change the level of suspicion that the customer

16   was involved in terrorism, is that fair?

17   A. I think it reinforced the basis of our earlier

18   suspicion, yes.

19   Q. And why wouldn't that be enough for you to

20   recommend terminating the client?

21   A. Because the responsibility for dealing with

22   sanctions rested with Group Risk Management.

23   Q. So your authority to recommend termination of

24   a client extended to all types of criminality except for

25   customers who were listed on a sanctions list?

374

1    MR. BLACKMAN: Objection to form but you can

2    answer, if you can follow the question.

3    A. The authority, as you describe it, was not

4    written down, designated, categorized in the way you

5    describe.

6    Q. Were you comfortable with NatWest continuing

7    to provide banking services to a customer that you knew had

8    been designated by OFAC as a specially designated global

9    terrorist?

10   MR. BLACKMAN: I am going to object. You are

11   asking him personally as someone who was not, as he has just

12   testified, so I am not coaching, not responsible for making

13   the decision about how to deal with sanctions.

14   MR. GOELMAN: I am asking him was he personally

15   comfortable with that.

16   A. I was comfortable with leaving it in the hands

17   of the area of the bank that was responsible for it, yes.

18   Q. And when they didn't --

19   A. That is where the expertise rests, sanctions

20   related issues, that is where the expertise rested.

21   Q. Wouldn't you say that you had as much

22   expertise as anyone in the bank about allegations of

23   Interpal's connections with terrorist financing?

24   A. We are talking here about expertise in

25   relation to sanctions.

375

1    Q. I am talking about expertise in relation to

2    a customer that numerous Suspicious Action Reports where

3    terrorist financing had been filed against them?

4    A. But we are talking about a customer where we

5    had suspicions of about a customer who we had disclosed to

6    the authorities on, as you put it, more than one occasion or

7    numerous occasions I think you said. Our customer had not

8    been designated by the Bank of England. This was another

9    Government's designation. On that basis it was a sanctions

10   issue, and to be dealt with by Group Risk Management, who

11   had responsibility for -- where responsibility for

12   compliance with sanctions rested.

13   Q. You testified yesterday and again today that

14   your understanding of the specially designated global

15   terrorist issued by OFAC as involving people who were

16   suspected of terrorist financing, is that right?

17   A. Yes.

18   Q. What is the basis of that understanding?

19   Where are you deriving that understanding of what the SDGT

20   list of OFAC is?

21   A. I can't remember where I have learned that.

22   Q. Was it from OFAC itself?

23   A. I can't remember.

24   Q. Did you ever attend any Compliance seminars

25   where OFAC Compliance was discussed?

**EXHIBIT 27 TO DECLARATION OF VALERIE SCHUSTER**

**(letter from NatWest to NCIS, 1 page)**

**FILED UNDER SEAL**

**EXHIBIT 28 TO DECLARATION OF VALERIE SCHUSTER**

24 September 2001

EXHIBIT

HOSGASON 11

7.14.10 AW

From Anonymous

The briefing document below was prepared for the South African President, Thabo Mbeki, during 1998 in response to the Muslim uprising in the Western Cape Province to protest the decline in Law and Order under his administration, principally organized drug dealing, murder, prostitution and rape (South Africa has the highest murder, rape and HIV-infection statistics globally). An amalgamation of devout Muslim groups with some Christians, part of Mbeki's African National Congress (ANC) 'Alliance' with the Communist Party (SACP), formed an organization, People Against Gangsterism and Drugs (PAGAD). Mbeki was a member of the SACP Politbureau.

The report examines international Muslim militancy and its presence locally. It was drawn up on the relayed order of the Minister of Intelligence, Joe Nhlanhla (since suffered a stroke), by the section of the National Intelligence Agency (NIA) that reports directly to the Office of the President.

This section also monitors the democratic opposition in South Africa (communications, foot and vehicular surveillance and records sexual conduct videographically), journalists (their detention, recruitment and expulsion in the case of one foreign accredited writer) and his own Cabinet (Deputy President Jacob Zuma and Public Works Minister Jeff Radebe with whose wife he is close. Radebe was Mbeki's colleague on the Central Committee of the SACP, along with Govan Mbeki, the President's father who is recently deceased).

Mbeki had grown anxious at the loss of mulatto support in Western Cape where they are the electoral majority. The legislative capital is in Cape Town. He was convinced that they were being organized by Hamas and Islamic Jihad. His concerns where triggered on the advice of the Muslim-Communists, Essop Pahad (Deputy Minister in his office and confidant), the brother of Essop, Aziz (Deputy Minister of Foreign Affairs), Dullah Omar (Minister of Justice, now Minister of Transport) and Kadar Asmal (Minister of Water Affairs and Forestry, now Education Minister). These Muslim-Communists were alarmed at the eroding support for the ANC-SACP in the Western Cape and escalating use of force by PAGAD against the drug gangs and their leaders and their street propaganda against the ANC-SACP. Coinciding with American aerial bombing of Iraq, PAGAD cells were believed to be behind the bombing of the Plant Hollywood restaurant in Cape Town, a symbol of the United States. PAGAD refutes the allegations claiming NIA and Security Police provocateurs were responsible. PAGAD has been a priority target for the Mbeki apparatus and several of its members have been indicted on serious criminal charges while investigating the bombings in Cape Town. Among these was the arrest by traffic police of an NIA agent who was transporting pipe bombs from Johannesburg (Jhb)

Case 1:05-cv-04622-DLI-RML Document 267-2 Filed 03/22/12 Page 93 of 163 PageID #: 5036

to Cape Town. Criminal trials against PAGHAD are in progress in the Western Cape.

PAGAD is not organizationally linked with the International Islamic Militants who prefer to keep South Africa a rear base for military training, convalescence, fund raising, media and proselytizing. They have an understanding with the ruling ANC-SACP. PAGAD arose out of the local, mostly Islamic opposition to criminality and the contradictions within the ANC-SACP.

The NIA briefing was not well received by the President's Office, in part for mentioning the presence of militants (page 34) at the two Islamic Conference held in consecutive years in the Muslim ghetto, Laudium, near Pretoria, the executive capital. Present under protection of the NIA, the South African Secret Service (SASS), the Security Police (SAPS) and the President's Office were Hamas, Al Qaeda, Islamic Jihad, Taliban, Islamic Salvation Front (Algeria), Hezbollah and Chechen rebels at the time engaged against the Russian military in Grozne. The surveillance against Muslim extremists mentioned in the report, with the exception of those in PAGAD was suspended. Embassy surveillance against Islamic states supportive of terrorism remained intermittent or non existent, the preferred focus remaining on the following diplomatic premises and staffers by the NIA Counter Espionage (NIA (CE)) section headed by a mulatto Hilton "Tim" Dennis (in order of priority):

1. USA
2. Israel
3. United Kingdom
4. France
5. Germany
6. Italy
7. Portugal

After Nhlanhla's stroke and the public discovery of an NIA (CE) surveillance camera aimed at the German embassy in Pretoria, Dennis was promoted by Mbeki to head the SASS, the South African equivalent of the CIA. In this role Dennis has strengthened links with Libya's Musa/Moosa Kusa (wanted for conspiracy in the downing of a French airliner over Africa). Kusa heads Mohammar Ghadafi's Jamahirya Security Organization and is a frequent guest of SASS in Pretoria.

Mbeki believes himself adept at handling both the internal contradictions of the ANC-SACP and international politics, particularly between African-based Islamic fundamentalism and the West. South Africa holds both the chair the Non Aligned Movement and the British Commonwealth. Relations with the United States were easier under the Clinton Administration and his Under Secretary of State for Africa, Suzan Rice. Symbolically Mbeki's power to persuade the US embassy to lower its flag to half staff in mourning for the death of the head of the SACP in April 1993 was viewed across the continent as an indicator of his growing influence over Washington, the more so

when it was learned that Ambassador, Princeton Lyman, had to lower the flag himself after the US Marine non-commissioned guards refused to do so. The later establishment of a USA-SA bi-national commission was considered a crowning diplomatic achievement by the ANC-SACP until it was ended earlier this year by US Vice President Richard Cheney.

Rice's successor, Walter Kanstiener, who wished to be Ambassador to South Africa wants the bi-national commission resurrected. Previously he had drafted a glowing background brief paper on Mbeki for President-elect Bush before their meeting with at the Bush ranch near Austin, Texas. Communist and ANC leaders who organized the two Islamic Conferences in Pretoria were concerned that that Kantstiener's book "South Africa: Revolution or Reconciliation" (1988) indicated a strong Republican Party perspective. In his work Kanstiener attacked the ANC-SACP as a group of "violent revolutionaries" engaged in an "unjustified" and "Marxist" struggle without a mandate from the people. Further he urged each American to "resist the temptation to become (...) a romantic revolutionary supportive of violent revolutionary tactics". His subsequent shift in perspective and sudden U-turn on dealing with the South African government was attributed by the Hamas, Taliban and Hezbollah supporters in the ANC-SACP government to his benefiting from the privatization deal last year (since stalled on implementation) for American companies to buy out the South African state telecommunications company, Telkom. Kanstiener is to direct the diplomatic effort the United States makes in Africa to defeat Islamic terrorist networks alongside Mbeki's administration.

The NIA briefing report provides insight into the international, clandestine organization of Islamic extremists. Based on composite source documents from the NIA/SASS archive, it outlines the type of structure and organization Washington intends confronting during the second phase of the "New War on Terrorism". Also the networking between Islamic militant organizations is mentioned in some detail. Much of the information was provided by the declared, CIA head of station in Pretoria under the bi-lateral agreement with NIA/SASS and the Israeli intelligence representative at a time the Mossad (Central Institute for Intelligence and Special Duties) was completing its re-organization.

---

*Cover Page*

SECRET

National Intelligence Agency

THE GENERAL MANAGER SPECIAL PROJECTS

[no handling instruction: single recipient]

HAMAS (ISLAMIC RESISTANCE MOVEMENT) AL-MUJII AL ISLAMIYAJ

[index redacted] [ideography retained]

*Page 1*

HAMAS (ISLAMIC RESISTANCE MOVEMENT) / AL- MUJII AL ISLAMIYAJ

HAMAS is a Palestinian based organisation which was formed with the purpose of fighting for the Palestinian people because of the oppression they experienced by the Jewish state and Palestinian government.

BACKGROUND

Prior to the formation of HAMAS, the Muslim Brotherhood (MB) felt the need for an internal organization to oppose Israeli occupation. Several cell structures, such as "al-Majd" (intelligence) and "al-Mujahidun" (commando) which was formed in 1983, were formed to fill this void. Israeli forces however managed to infiltrate and crack several of these units soon after their formation. On 1987-12-14 Ahmed YASSIN formed the PALESTINIAN ISLAMIC RESISTANCE MOVEMENT as an offshoot of the MB. HAMAS structures took over the secret MB cell structures which were already in place, including "al-Majd" (intelligence) and "al-Mujahidun" (commando).

HAMAS was formed from two previous groups started by Sheikh YASSIN:

- the ISLAMIC COMPOUND;

- the ISLAMIC AID SOCIETY;

- se rved as the principle instrument for the activities of the MUSLIM BROTHERHOOD (founded in Egypt in 1928) in Palestine, setting up a network of kindergartens, schools, seminaries and mosques, and the ISLAMIC AID SOCIETY, all of which were used to recruit Palestinians who regarded the PLO leadership as tainted and corrupt.

HAMAS was found by Sheik Ahmad YASSIN on 14 December 1987, shortly after the uprising in Palestinian refuge camps in the Gaza strip (a few days after the INTIFADA began).

*Page 2*

HAMAS is supported by the smaller ISLAMIC JIHAD and the POPULAR FRONT.

HAMAS is an outgrowth of the EGYPTIAN IKHWAN ORGANISATION. HAMAS also has recruited members of the former followers of the DFLP.

HAMAS is a fanatical splinter group that also attracted Palestinian recruits after the 1982 Israeli invasion of Lebanon. Working behind the scenes was the fundamentalist regime in IRAN which sought to create a sympathetic movement among Palestinians in Southern Lebanon.

The Israeli government used the HAMAS to undermine those arguing for negotiations between Israel and the PLO. The Israeli authorities saw the Israeli military tolerated the HAMAS until 1988 when the HAMAS influence spread to the Israeli-controlled WEST BANK and GAZA STRIP. Here it was argued, was an organisation whose existence denied ARAFAT's claim to represent all Palestinians. The HAMAS is now regarded as the "SWORN DESTROYER OF ISRAEL" and the Israeli's are now too aware of the danger the HAMAS poses.

In 1983, Sheikh YASSIN was arrested for establishing a military wing for the movement, known as AL-MUJAHEDIN AL FALESTINIIN (THE PALESTINIAN FIGHTERS), and for have hidden weapons in his home.

At the start of the Palestinian uprising, INTIFADA, in December 1987, Sheikh YASSIN brought together the AL-MUJII/AL-MUJAHEDIN groups under the umbrella of a group called the HAMAS.

In 1989 the HAMAS movement was outlawed by the Israeli government authorities.

On 20 December 1992, since the beginning of the INTIFADA, HAMAS and Arafat's FATAH FACTION of the PLO joined forces "AGAINST THE ISRAELI OPPRESSION IN ORDER TO BRING BACK DEPORTED BROTHERS". HAMAS also capitalises on Palestinian frustrations.

*Page 3*

IRAN believes that the HAMAS to be the group most able to thwart US policies for peace in the Middle East.

### IDEOLOGY

In August 1988 HAMAS published the "ISLAMIC CHARTER" within which it defines itself as the Palestinian branch of the Muslim Brotherhood. HAMAS ideology as reflected is basically identical with that of the main stream brotherhood. However in the course of the INTIFADA its priorities have changed and this is manifest in the charters articles: HAMAS gives priority to the Islamic Charter of Palestine and emphasizes the need for immediate entering the "JIHAD" stage and sees this as the only solution for the Palestinian problem. On this bases they consider any Jewish target whether it be military or civilian, local or abroad as justified for action.

HAMAS strives to raise "THE BANNER OF ALLAH OVER EVERY INCH OF PALESTINE" which was considered to be "PART OF THE ETERNAL ISLAMIC HERITAGE".

The HAMAS sees itself as the spearhead of a mass movement fighting against the "WARMONGERING JEWS" and "WORLD ZIONISM".

HAMAS reject all initiatives and so-called peaceful solutions and international conferences on the issue of Palestine. It considers these to be "A WASTE OF TIME AND VAIN ENDEAVOURS" -- no part of the territory may be given up.

In 1992 IRAN steered HAMAS towards a closer alliance with the SHIITE HEZBOLLAH movement in Lebanon.

In short HAMAS has the following aims and objectives:

　　i) Establishing an Islamic state;

*Page 4*

　　ii) Liberating Palestine;

　　iii) Liberation of West Bank and Gaza Strip;

　　iv) Islamization of society;

　　v) Establishing the legitimacy of the armed struggle;

　　vi) Continuation of the INTIFADA;

　　vii) Preserving national unity between all Palestinians regardless of religion;

　　viii) Activating Arab and Muslim backing for the Palestinian cause;

　　ix) Release of detainees;

　　x) Establishing political legitimacy;

　　xi) Rejection of expulsion policy;

　　xii) The complete withdrawal of Israeli forces from the occupied territories;

　　xiii) Disarming ail Jewish settlers and dismantling of settlements;

　　xiv) The deployment of international peacekeeping forces on the green line;

xv) End to detention and brutalization of civilians and detainees;

xvi) End to occupational policies, such as travel restrictions, corruption, prostitution, etc;

xvii) Free general elections; and

xviii) Representation in negotiations for Palestine.

## POLITICAL OBJECTIVES

The HAMAS refuses to accept the legitimacy of a permanent Jewish presence in Palestine. HAMAS strategy remained one of "wearing down the enemy, confusing him so that he does not grow comfortable and reminding the world that there is a homeland under occupation".

## STRUTURE/STRENGTH

Based in the GAZA and WEST BANK.

In February 1993 HAMAS claimed the allegiance of up to 40% of the Palestinians in the

*Page 5*

HAMAS' leadership in the Gaza Strip is rather independent in its decision-making, though there is a certain degree of coordination with the West Bank. The importance of the latter has increased in the course of the uprising, also because most of the senior activists in the Gaza Strip were arrested (late September – October 1988) Hebron has emerged as the old-new centre of HAMAS activity.

Sheikh Ahinad YASSIN the spiritual leader of HAMAS' to a great extent shapes the movement's concepts and determines the main characteristics of its activity. It appears, that the next generation of leaders has started to emerge particularly on the West Bank.

Based upon this, signs of a split are emerging at the top of the HAMAS structure between pragmatists and conservatives over which political and military strategy will be best. Sheikh Ahmed YASSIN said he was prepared to call for the end of all military activities, including suicide attacks if Israel agreed to withdraw from the West Bank including Jerusalem and the Gaza Strip. His view is shared by Muza Abu MARZOUK. This marks the first time HAMAS is willing to discuss a cease-fire with Israel (officially HAMAS does not recognize Israel). Supporters of the conservative trend include Khalid MESHAAL, Abdelaziz RANTISSI and the military wing of HAMAS, Ezzedin al-Qassatn, who support the jihad to establish an Islamic state. But YASSIN changed his position again afterwards.

Mohammed Jamal NATSHI (Security-General of HAMAS, NATSHI also acts as spokesperson in Al Khalil (Hebron)[1]. Abdul Aziz RANTISI is one of the more militant HAMAS spokesmen inside the Gaza Strip.

---

[1] Information received from Intelligence Unit Gauteng 1997-09-01.

HAMAS is controlled and guided by the world wide MUSLIM BROTHERHOOD's MAJIS AL-SHURA (Council of Sages), particularly the Jordanian branch.

*Page 6*

The Jordanian Council once included Mussa Muhammad Abu-MARZOOK.

Musa Abu MARZOUK (Chief of HAMAS' Political Bureau/Committee)[2]. Abu-MARZOOK's position has been taken over by Khaled MASHA'L (resides in Jordan).

---

[2] MARZOOK was in prison in the United States and deported to Jordan.

Other prominent activists residing in Jordan includes Muhummas SIAM and Khiri AL-AA'.

The Political committee or "POLITBUREAU" (main base is in Jordan) of HAMAS directs its strategic policy which deals mainly with foreign relations with other movements and organizations, government bodies and various Islamic clerical bodies. Subordinate to the political committee are 5 main frameworks:

i) HAMAS infrastructure in the occupied territories (HAMAS as part of the Muslim Brotherhood, adopted a similar organizational structure comprising of two parallel organizational frameworks:

a) Clandestine -- The internal clandestine operation is divided into 5 main apparatuses:

1) Military Apparatus who is responsible for military activities operates the EZZIDIN AL-QASSAM (formerly called ABDALLAH AZAM) that has head quarters in both Libya and Iran with its training base in Sudan numbering around three thousand personnel. This structure operate independently from the main HAMAS operations. This military wing operate in cells of two to three persons per cell. EZZEDIN AL QASSAM BRIGADES (HAMAS military wing) has approximately 100 members, and has carried out numerous bloody attacks on Israeli soldiers, citizens and Palestinians who collaborated

with the Jewish state. Ezzidin Al-Qassam is headed by Ibrahim MAKADMEH[3].

---

3 MAKADMEH disappeared in October 1997. It is believed that he may be detained by the Palestinian Authority, although he is wanted by both the Palestinian and Israeli security services.

*Page 7*

2) Security Apparatus who is responsible for collecting intelligence, counterintelligence among other organizations in the territories, interrogation and surveillance of collaborators, guarding people and documents. This apparatus is responsible for securing the activities of the other apparatuses. It is very active in prisons.

3) "Activity" Apparatus who is responsible for uprising related activities.

4) Israeli Arabs -- HAMAS views Israeli Arabs as its fifth column.

5) Dawa Apparatus is responsible for recruiting and training activists, and operating all the movements institutional civilian activities. HAMAS consider this apparatus as the most important -- it is manned by the most qualified people with the highest budget.

b) Overt or public. As mentioned Dawa are being considered as the focus point of this organization -- it is mostly carried out by lawful institutions. Overt public activities have two main overall objectives:

1) Controlling and shaping religious life based upon fundamentalism. To this end HAMAS has taken control of, and or established charity committees and foundations, mosques, educational institutions (from kindergarten to academic institutes), it has recruited clerics and senior Waqf officials to establish the Palestinian Association of Religious Sages (which has pretensions of being some kind of supreme religious authority).

2) Acquiring power bases and positions of power in Palestinian politics and society. HAMAS built its own 'super' institutions to establish independent and separate systems in the following spheres:

- Health

- "Medical Science Association"

- Education

- "Islamic Association for Culture and Sciences" and

- Economics

- "Palestinian Beit El-Mal Society".

HAMAS has also nominated its own candidates in elections for civilian bodies and institutions, such as trade bureaus, trade unions, workers

*Page 8*

committees and student councils, with the purpose of gaining control. To achieve these goals, HAMAS established:

- A Financial system based on a wide source of Islamic financial resources, bodies to syphon funds in the Persian Gulf, the United States and Britain and supervision over funds transferred from the 'outside' to the 'inside'.

- A sophisticated Propaganda machine, that includes a news agency ('QUDS PRESS) in Britain with offices in the territories and Jerusalem; an official (FALESTIN EL-MOUSLIMA) and unofficial (SAWT EI-KHAK WAEL-KHOURIA, newspaper of the ISLAMIC MOVEMENT Israel); propaganda mouthpieces through local and international publishing houses and libraries. Through its civilian activities, HAMAS has succeeded in establishing its own institutions that are separate and independent of both the civil administration and currently of the Palestinian Authority. These institutions provide medical, educational, welfare and cultural services to a large part of the population. These institutions provide to the population's daily needs that created a direct affiliation between the movement and service recipients. This resulted in an increase in recruits.

HAMAS has inter alia the following departments:

i) Shura Council

ii) Leading bureau, that encompasses several technical departments:

* Administrative;
* Information;
* Charity;
* Political;
* Security;

*Page 9*

* Military

Each department has its own subdivision. In Palestine each region is comprised of families and branches. They are answerable to an administrative centre.

HAMAS members fall into four distinct categories:

    i) INTELLIGENTSIA -- The intelligence unit has the following directives:

        a) Surveillance of collaborators and drug dealers;

        b) Castigate informers, prostitutes and drug dealers (verbal to execution);

        c) Distribution of information leaflets;

        d) Warn people against Israel recruitment policies and collaboration;

        e) Write and disburse communiqués;

        f) Manage logistics; and

        g) Monitor crime in the occupied territories.

    ii) COMMANDO UNITS:

        a) Establish usar (families) and underground cells;

        b) Gather information on the IDF and their activities for use in future operations;

        c) Conduct training sessions; and

        d) Carry out military operations.

    iii) SHEIKS (religious leaders)

    iv) YOUNG LEADERSHIP CANDIDATES

    v) ACTIVISTS

Both the intelligence and command units operate inside the territories and Israel. The "al Maktab al-l'Lami (Information Department)" and the "al-Maktub al-Siyassi (Political Department)" operate from outside the borders. The information department, located in

Jordan, is responsible for preparing and disseminating press releases and publications. The political department deals with HAMAS' foreign relations.

*Page 10*

Based upon an analysis HAMAS' overt and clandestine activities the following conclusion can be made:

* Most of HAMAS' personnel and material resources are channelled into overt public activities (for example Dawa), and only a small share of these resources are utilized in clandestine activities.

* The military activity depends on the public and religious sphere in order to spot possible activists, to educate and train these activists and to collect material and aid.

* All of HAMAS' activities (religious or military) is directed and financed by the HAMAS directorate overseas, mainly in Jordan, Britain and the United States.

## HAMAS' INTERNATIONAL STRUCTURE

HAMAS' overseas infrastructure is based on directorates: The Political Bureau; the Internal Committee; and the Propaganda Committee, in addition to nationwide local bodies in various countries.

## INTERNAL COMMITTEE

Its main function is to direct HAMAS activities in the territories, including the civilian apparatuses and infrastructure. The Committee acts on a number of levels:

i) Political level that guide the HAMAS directorate in the territories on the peace process, autonomy, and the Palestinian Authority.

ii) Terrorist level that provide long-distance control, it also direct aid to the terrorist apparatus.

iii) The Civilian level direct the civilian infrastructure to form an alternative to the PLO.

iv) Financial aid -- transferring funds to overall HAMAS activities and infrastructure in an orderly and controlled manner.

*Page 11*

The Committee is header by Imad Al-ALAMI, who operates from Damascus. The following sections are under his control:

i) Secretariat and Communications -- operates in London under Hafez AJAJ. This section is responsible for communications between the Western countries and the territories, it also does the bookkeeping, including the balancing of the budget and deals with transferring funds.

ii) Planning and Research -- operates in London under Mouhamad Kazam SAWALHA (former head of the terrorist apparatus in the territories), who engages in political activities, propaganda and financial coordination relating to terrorist activities.

iii) Security -- operates from London under Maher Gawad SALEH.

iv) Recruitment -- operates from Amman under Khaled El-MASHA'L (Abu-MARZOOK's deputy).

v) Students -- operates from Sudan under Alaa RIFATI. It engages in students administrative matters around the world.

## 2. PROPAGANDA COMMITTEE

This body manages all HAMAS' propaganda in the territories and abroad. It operates from Amman under HAMAS spokesman Ibrahim GHOUSHA.

The Committee operates in two main spheres:

i) Verbal Propaganda -- Conferences, events and media interviews. Verbal propaganda is broadcast by the Arab radio stations.

ii) Written Propaganda -- Publications, newspapers and pamphlets. For example HAMAS's weekly newspaper AL RISALAH, with editor Ghazi HAMAD.

The Committee uses 2 communication channels for this purpose:

i) 'QUDS PRESS NEWS AGENCY with branches in the territories and throughout the world whose purpose is to collect information, feed the media,

*Page 12*

mainly its own press and publications.

ii) 'FALASTIN Al-MUSLIMA' gathers information in Jordan and published

Case 1:05-cv-04622-DLI-RML   Document 267-2   Filed 03/22/12   Page 105 of 163 PageID #: 5048

and distributed in Britain. This movement also distributes newspapers in other countries and is known to be the most prominent propaganda tool and leadership mouthpiece. Propaganda work is also done in mosques, religious centres and universities.

## 3. FINANCE COMMITTEE

The Finance Committee is the central financial body that authorizes and distributes the HAMAS budget. It operates in Jordan, Britain, the United States and in Saudi Arabia under the control of the MUSLIM BROTHERHOOD.

The Committee raises funds through foundations and representations throughout the world, some of it is earmarked for apparatus' activities and some for the civilian infrastructure.

HAMAS' financial sources are divided into a number of main groups:

i) International Islamic communities

ii) Non-Islamic charity bodies throughout the world

iii) Private donors

iv) Official donors.

Funds are distributed from source to syphon funds serving mainly HAMAS around the world. Many of these are primary funds like the INTERNATIONAL PALESTINIAN RELIEF AND DEVELOPMENT FUND -- INTERPAL (former PALESTINE RELIEF AND WELFARE FUND) in London and the HOLYLAND FOUNDATION in Texas. Other are secondary funds in Germany, France and Jordan.

Funds are transferred from the different sources through the syphon funds to the territories through one or more of the following channels:

*Page 13*

i) Bank transfers to banks in Jordan or the territories;

ii) Money changes -- deposits overseas are cashed in the territories against receipts;

iii) Couriers mainly from Jordan and the United States; or

iv) A combination of any of the above mentioned 3 channels in order to blur the traces.

There are two main channels via which funds are transferred:

i) Apparatus funds -- Authorization is given in the United States, the funds are transferred from Britain to Jordan, or directly to the territories in coordination with Hafez AJAJ to Riad ABU-AL-ABD (Imam AL-ALAMI's deputy).

ii) Civilian infrastructure funds -- Requests for funds are made directly by HAMAS-related institutions in the territories to the financial institutions abroad, who authorize, collect and transfer the allocated funds to each institution.

Transfer of funds:

i) From EUROPE -- Funds are transferred from Europe through two secondary foundations which are responsible for raising funds:

a) AL-AQSA Foundation in Germany, which raises funds in the Netherlands and Belgium;

b) CBSP FOUNDATION in France, which raises funds in Austria and Switzerland.

- F unds from Scandinavia are directly transferred to INTERPAL in Britain.

- F inances are directed in Britain.

ii) From the United States

a) Funds from the United States are transferred through the HOLYLAND FOUNDATION in Richardson, Texas and other branches throughout the United States.

b) Funds that are directed by the foundation in the United States originated in the JERUSALEM FOUNDATION in Canada, in various Islamic

*Page 14*

institutions in the United States for example MERCY INTL, the SAAR FOUNDATION, and a fund in Brazil that is responsible for fundraising in South America.

c) The HOLYLAND FOUNDATION also invests in a number of its own projects.

d) A bank account in the name of T.A.I.T. (a company) channels funds to HAMAS apparatuses and infrastructure in the territories.

iii) From the Gulf States

a) Most of the Islamic financial institutions with the MUSLIM BROTHERHOOD operate in the Gulf States (Saudi Arabia, Kuwait and the United Arab Emirates).

b) Money from the Gulf are mainly channelled according to the world wide deployment of branches of those institutions. For example the El' MOUNASERA FUND in Kuwait transfers funds via INTERPAL in Britain (its overseas branch). The AMMAN-based charitable works authority in the UAE transfers funds through the authority's branch in Jordan. Official funds are transferred from Saudi Arabia to the territories through INTERPAL in Britain and the HOLYLAND FOUNDATION in the United States.

c) Gulf funds are unofficially divided into Muslim or private funds, except for Saudi Arabia, where the source of some of the funds transferred to HAMAS is official.

iv) From Iran

a) Iran transfers a few million dollars annually to HAMAS, as well as assistance in the form of training and weapons.

b) Although the route through which the money is channelled is not known, funds are raised by HAMAS representatives in Lebanon, Syria and Jordan through the Iranian embassies.

c) Iran also transfers money to HAMAS via the FALLEN SOLDIERS FUND in Lebanon (a financial body that serves HEZBOLLAH).

*Page 15*

v) From Africa

a) Pro-HAMAS financial activity in Africa is centred in Sudan through the head office of the ISLAMIC RELIEF AGENCY (ISRA).

b) ISRA transfers money to the territories through its Jordan branch, headed by Walid KASEGH to the ISRA's representative in the

territories, Gamil HAMAMI (head of the ISLAMIC ASSOCIATION FOR CULTURE AND SCIENCES).

vi) From the Far East

a) Funds are transferred from HAMAS in Malaysia, Indonesia, India, Philippines, Hong Kong and Thailand.

b) Funds are transferred from Malaysia to the MEDICAL SCIENCE ASSOCIATION in the territories headed by ABD AL-WADOUD TAMIMI.

It is widely assumed that money for HAMAS comes largely from IRAN and rich Islam orientated benefactors in the GULF STATES, but HAMAS also raises considerable funds within the territories, particularly the GAZA STRIP.

The ISLAMIC REFORM SOCIETY raises money for HAMAS through charity organisations and also on a social-security/welfare system.

The Saudi Arabians have diverted financial support from the PLO to HAMAS, although the Saudis deny such assistance is being given.

Funding also comes from Muslim communities abroad -- USA, UK and FRANCE.

Late December 1992 - early January 1993 IRAN and HAMAS representatives signed a draft agreement on IRANIAN financial, political, moral and military support for HAMAS.

The organisations main funding cones from Iran and Saudi Arabia, while additional funding

*Page 16*

comes from fundamentalist Muslim organisations in the West (30% of the organisations funds come from such organisations). The main organisation collecting funds in South Africa is AL-AQSA, based in Johannesburg.

4. HAMAS CLANDESTINE INFRASTRUCTURE

HAMAS' clandestine infrastructure abroad is aimed at training a hard core of activists for religious and nationalist activities and some for the PLO. This infrastructure operates tinder cover of overt activity, including propaganda and education. Clandestine activists are also involved in overt activities.

The infrastructure is headed by one person who is responsible for the national network.

Subject to him are the regional heads who operate cells of 3-5 activists in their region. The level of secrecy is so high that cells do not know of each others activities.

Cell activists are usually recruited in mosques from amongst the overall population of HAMAS activists and supporters who turn up for regular activities. Candidates for clandestine activity are spotted in the crowd and directed towards cell activities.

Activities include mainly religious studies, nationalist lectures and other general subjects.

Investigations revealed that many of the activists belonging to HAMAS secret cells in the United States had undergone terrorist training.

HAMAS has an office in Sudan from where HAMAS members travel to various African countries including South Africa, to forge closer links with the Muslim communities in these countries.

The leader of HAMAS in Sudan is Imad-Eddin EL-AYYOUBY[4].

---

4 EL-AYYOUBY is a Syrian national with a B.Sc degree in Argucultural Engineering

*Page 17*

According to information received from Port Elizabeth HAMAS is an unified leading bureau that resorts to a higher authority namely the "Shura council" that is directly elected.

* Security and military systems are formed as part of the technical system of the structure.

MILITARY OPERATIONS

HAMAS members receive military training in HAMAS bases in Sudan, Libya and Iran. The main provider of military aid is the Iranian Presidential Guard.

According to HAMAS operators there are no differences between military and civilian targets.

Mosques serve as a focal point for terrorist activities: As DLB's; for transferring weapons and messages; and for the training of people for suicide missions.

LOCATION

HAMAS recruits are being trained in LEBANON, SUDAN and IRAN.

In 1992 the Iranian government has pledged its full support to HAMAS, and pledged to train thousands of HAMAS fighters in urban guerilla warfare although Iran has not recognised HAMAS as the "SOLE LEGITIMATE REPRESENTATIVE OF THE PALESTINIAN PEOPLE" (the PLO's traditional title).

LINKS

HAMAS has close ties with:

i) PFLP

*Page 18*

ii) PFLP-GC (Ahmed JIBRIL)

The overtures of PFLP-GC towards HAMAS on the basis of their common basic opposition to any political negotiations and compromises with Israel, have led to a certain level of ties between them, despite the basic differences in their policies. It was the PFLP-GC that initiated and pushed for cooperation with HAMAS. After Abu JIHAD's assassination, contacts between the two organizations somewhat improved and this was manifest in covert coordinations, particularly on the subject of the political process.

iii) DFLP -- which have tended to reject the idea of a compromise with Israel.

iv) PLO -- relations with the PLO has been less positive as the two have been jostling for supremacy in Gaza's refugee camps and towns for several years. But none of the official statements made by senior HAMAS activists since tile beginning of the uprising have questioned the PLO's status as the legal representative of the Palestinian people.

The HAMAS Charter stresses its being a unifying body and expresses its willingness to place its members at the disposal of the PLO as 'soldiers' once the organization abandons the secular path. The 'conflict' is based upon the fact that HAMAS advocates a "total solution" to the dispute with the Jews, to be achieved through the liberation of all of Palestine by means of jihad (and not by political negotiations), and the establishment of an Islamic society and regime.

Palestinian Authority (PA) -- based upon the PA crackdown on HAMAS (the closing of 16 of HAMAS's institutions and the arrest of 100 of HAMAS's activists during the raid of September 1997), it is a possible trend that HAMAS will turn against the PA. Even within tile military wing there is a

splinter group, called the "Secret Cells" led by Sheikh Ibrahim MAKADMEH, who openly advocates the assassination of top Palestinian officials.

v) HAMAS has good connections with the PALESTINIAN NATIONALIST ELEMENTS

*Page 19*

in the REJECTIONIST FRONT (anti-peace talks).

vi) HAMAS has strong links with the powerful MUSLIM BROTHERHOOD in JORDAN, its main base. HAMAS headquarters in JORDAN is situated in the ISLAMIC MOVEMENT PARLIAMENTARY OFFICE in AMMAN under the protection of the MUSLIM BROTHERHOOD.

vii) In 1993 Ibrahim GHOSHESH claimed that HAMAS also established close ties in TURKEY, PAKISTAN and NORTH AMERICAN countries, indeed "everywhere where there is an Islamic power".

## STRATEGIC INFORMATION

HAMAS members receive military training in the Sudan from the NIF. They send approximately 1000 members for training at one time. In mid 1991 HAMAS began attacking both military and civilian Israeli targets.

In April 1993, the USA government declared HAMAS as a terrorist group in its annual terrorist report citing its increasing use of lethal tactics such as fire-arms and car bombs, and its responsibility for attacks on Israeli civilian and military targets.

## HAMAS WORLD-WIDE INFRASTRUCTURE

Jordan -- The main centre for HAMAS activity outside the territories. It includes the offices of the Movement's three Central Committees and directs terrorist activity and intensive financial activity. Activities are based on the local MUSLIM BROTHERHOOD infrastructure where it greatly influences the movement.

Syria -- The main thrust of the movement includes aiding the terrorist apparatus by transferring weapons, money and activists. The movements representative also engages in political activity

*Page 20*

including contact with Syria's regime and other Palestinian organizations.

Lebanon -- Most of the activities involve military and political connections with

HEZBOLLAH through HAMAS' representative Moustafa LIDAWI, political activity and transfer of funds from Iran.

Iran -- Activities manifest through military training and the supplying of funds and weapons for attacks. These support are channelled though Osam HAMDAN, the HAMAS representative in Iran.

Sudan -- HAMAS' activities focus on military training. Based upon widespread religious and nationalist student activities in Khartoum, Sudan is a fertile ground for HAMAS activities.

Egypt -- Egypt host an infrastructure of collaborators who help with the smuggling in and out of HAMAS activists. There is also a pro-HAMAS financial activity in Egypt.

Yemen -- Through the influence of Mouhamad SIAM (the HAMAS representative in Yemen), HAMAS make use of a broad student infrastructure and other political activities.

Libya -- Assists wanted HAMAS activists staying in Libya, who are on their way to the territories. Libya also transfer funds to HAMAS.

Saudi Arabia -- HAMAS' financial activities is based in Saudi Arabia through official and non-official institutions and private sources.

Kuwait and the UAE -- HAMAS activities centre around the transferring of funds from institutions and non-official sources.

Britain -- HAMAS infrastructure in Britain centre around financial activities, propaganda and Internal Committee activities, through a wide basis of activists and institutions.

*Page 21*

Germany -- HAMAS activities includes fundraising, propaganda and clandestine activities *[text missing]* the call for training to be used in terrorist activities was uncovered. Host the AL-AQSA FUND responsible for Western Europe.

France --. An organization known as CBSP is responsible for HAMAS propaganda and fund raising.

Belgium and the Netherlands -- HAMAS fundraising through the AL-AQSA FUND based in Germany.

Spain -- The SYRIAN MUSLIM BROTHERHOOD based in Madrid provide an infrastructure for HAMAS.

Greece -- HAMAS has an activist infrastructure in Athens and Pairs. Greece also host the LEBANESE GAMILYA EL-ISLAMIYA activists.

Scandinavia -- HAMAS activities in Denmark is limited to the providing of funds. It is also known that Sweden host an Islamic Palestinian infrastructure.

India -- HAMAS has an activist/student infrastructure in India that has an input in terrorist activities. HAMAS is also using India as a springboard for HAMAS activists that received military training in Afghanistan.

Malaysia -- A HAMAS cell operates in coordination with the JERUSALEM MEDICAL SCIENTIFIC ASSOCIATION. On a previous occasion HAMAS attempted to open an official office for financial purposes.

Philippines and Thailand -- Most of HAMAS' activities is of a financial nature.

Australia -- Based upon information received in 1994 HAMAS has a cell in Canberra that have

*Page 22*

access to weaponry as well as intelligence referring to Jewish interests in Australia.

South America -- HAMAS has infrastructures in Venezuela, Brazil and the Border Triangle. Brazil channels funds to HAMAS through the HOLYLAND FOUNDATION.

Canada -- The HAMAS infrastructure in Canada forms part of the infrastructure in the United States. The JERUSALEM FUND operating in Ontario is a source of funds for the HOLYLAND FOUNDATION in the United States.

HAMAS FRONT ORGANIZATIONS

HAMAS, with the aim of achieving operational independence from secular bodies in the occupied territories established and controls several front organizations throughout the world. Most of these organizations are used to collect funds to sponsor HAMAS operatives who are busy with military and religious training and who are hiding from prosecution in other countries. Funds are also used to establish new cell structures and command structures around the globe and to fund military and social programmes in Palestine and other countries.

The most important of these HAMAS front organizations are the INTERNATIONAL PALESTINE RELIEF AND DEVELOPMENT FUND (INTERPAL) based in London.

Other smaller front organizations include the HOLY LAND FOUNDATION based in Texas in the UNITED STATES OF AMERICA.

*Page 23*

## 1. INTERNATIONAL PALESTINE RELIEF AND DEVELOPMENT FUND (INTERPAL)

ADDRESS:
112 Criclewood Lane
Box 3333
London NW2 2DP
London NW6 1RW
TEL 01814508002
FAX 01814508004

BANK PARTICULARS

NATIONAL WESTMINSTER BANK with the following INTERPAL accounts:

i) INTERPAL Main STG Account: 95142940

ii) INTERPAL Administrative Account: 95142983

iii) INTERPAL Children Account: 95142975

iv) INTERPAL Zakaat Fund: 95142967

v) INTERPAL Interest Money Account: 95142959

vi) INTERPAL US Dollar Account 140-00-04156838

IMPORTANT FIGURES[5]:

i) Abd El Rahman Mouhmad Abou DAYA (Chairman)

ii) Essam Yossef MUSTAFA (International liaison = responsible for South Africa)

iii) M Safi'a

iv) M Tulaba

v) A Saker

---

5 It is important to note that the most prominent members are from the Gulf states, in

particular Saudi Arabia.

*Page 24*

   vi) Abed (Abd) El Rahim NASSERALLA

      •Me mber of the Trustees of INTERPAL

      •Origi nally from Saudi Arabia

      •Ac cording to information (IS) NASSERALLA is the covert head of INTERPAL.

      •Co uld be identical to "MISRALA" mentioned in the report[6] from Port Elizabeth.

---

6 Report nr. 1843 (1997-10-30) -- According to the report Agmat Sharief NOEL had contact with Sheikh MISRALA.

INTERPAL could be described as the HAMAS fund in Western Europe.

HAMAS through INTERPAL operate on an international basis through a global network of AL-AQSA structures (HAMAS = INTERPAL = AL-AQSA).

i) In Western Europe the base of AL-AQSA is in Germany with sub-bases in the Netherlands and Belgium.

AL-AQSA INTERNATIONAL FOUNDATION AAIF/AIF

The AL-AQSA INTERNATIONAL FOUNDATION 's head office is London and it supports HAMAS's terror campaign against Israel and regard Yasser ARAFAT as a sell-out.

An information note was sent from the AL-AQSA Foundation, P.O. Box 2364, Islamabad, Pakistan (tel : 92-51-261091, fax: 261092) to all relevant Muslim organisations in South Africa. (in the information note the suicide bombings are condoned, because it is not against the teachings of Islam. The QURAN is used as justification for the suicide bombings. The Quran states that any Muslim who offers his life for the good of Islam and Allah, or to sow dissention and confusion within enemy ranks, will be assured a place in heaven. This is in contract with normal Islamic teachings which condemns suicide as being against the patience and religious virtues as preached in the Quran.)

*Page 25*

AL-AQSA is active in South Africa since 1992, with the visit of Sheikh Muhammed Mahmoud SEYOM (the former Imam of the Grand AL-AQSA MOSQUE in Jerusalem, in 1988 he was banned to SUDAN where he opened a similar office) was accompanied by Abu YUSUF (director of the "PALESTINE AND LEBANON RELIEF FUND"). Abu YUSUF opened a few mosques and addresses in Walmer Estate, Woodstock.

This organisation is a front for HAMAS in South Africa. The political wing of HAMAS are in control of this office. It is important to note that South Afican Al-Aqsa International foundation forms part of a network: AIF ISLAMABAD - AIF JORDAN - AIF SOUTH AFRICA.

AL-AQSA INTERNATIONAL FOUNDATION offices in South Africa:

AMOCA GARDENS BUILDING
2de Floor Mint Ave 40 (- 14)
Fordsburg Johannesburg

P O BOX 421082
FORDSBURG 2033
Fax : (011) 8342918

South African AL-AQSA INTERNATIONAL FOUNDATION board of Trustees exist out of the following individuals:

•W hadan Amin Aref KHUNFUR a Abu Ahmed

•S AI GABRIELS

•Dr. E M uhammed - Muntuz UL - Moulana Mumzal AL HAQ.

*Page 26*

This front organisation has a bank account at First National Bank, Industria account nr 9000028878. Funds are deposit in South Africa by supporters of HAMAS, where after these funds are being transferred to HAMAS in their struggle against Israel.

Funds are being channelled from the USA through AIF to organisations who:

•W ho oppose the government;

•W here Muslims are in the minority

•W here Islam is under threat; and

• W here Muslims fight against an illegitimate government or system.

Abdul ACHMAD member of HAMAS (exiled Palestinian. AL-AQSA INTERNATIONAL FOUNDATION, AMOCA GARDENS Building, Johannesburg). Asked for financial assistance for HAMAS in Israel, during a meeting of "THE COMMITTEE TO STOP THE HOLOCAUST AGAINST MUSLIMS".

During a meeting (1996-03-04, Bosmont Mosque, Jhb) of militant leaders[7], Abu ACHMED was introduced as the HAMAS contact person in South Africa. Abdul ACHMAD member of HAMAS (exiled Palestinian).

---

7 Militant leaders included: Sheik Murshid DAVIDS Sheik YAHYAN Iqbal JAS SAT Sheik ISMAIL Sheik Iqbal JHAZBHAY Abu ACHMED Bilaal MOTSAU, Abu ACHMED was introduced as the HAMAS contact person in South Africa.

During a meeting (1996-03-04, Bosmont Mosque, Jhb) of militant leaders, Whadan Amin Aref KHUNFUR a Abu ACHMED[8] was introduced as the HAMAS contact person in South Africa.

---

8 Whadan Amin Aref KHUNFUR @ Abu AHMED was in 1993 in Sudan from where he travelled to South Africa.

*[Symbol @ as written.]*

ACHMED would be responsible for receiving news from Palestine

*Page 27*

about HAMAS activities, and counter measures from the Israeli government. This information will be locally used to counter Jewish propaganda.

* According to Bilaal MOTSAU, HAMAS problem would become known to Muslims all over South Africa, with the help of ACHMED.

* This would enable Muslims in South Africa to understand the problem and come up with constructive ideas on how to solve them.

* Those present were instructed to tell their followers that they should put everything into the struggle to protect Islam against the "total onslaught".

* ACHMED is in contact with Murshid DAVIDS (Vereeniging) and Sheik YAHYAH

(Berea).

AL-AQSA has embarked on a petition campaign amongst the Muslim Community of South Africa, which commenced on 1996-05-17 at most Mosques in the country. The purpose of this campaign is to request the United Nations via the South African Government from having the leader of HAMAS extradited from the USA. That if the United Nations fails to prevent the extradition then the South African Muslim Community will use other means to stop the extradition.

During June 1996 a delegation of HAMAS's political wing led by Dr.Rusdie DIAD OSMAN @ Abu Mohammed visited South Africa[9] which is presently visiting South African Muslim businessmen, and requesting financial assistance from them.

---

9 Dr. Rusdie DIAB OSMAN is a Jordanian national (passport: 92/51261092). He is also the head of the AL-AQSA INTERNATIONAL FOUNDATION in Islamabad and the director of Population Science at the University of Islamabad, Pakistan.

Prof. OTHMAN has informed the Muslim community of Kwa Zulu/Natal that HAMAS is presently in need of financial and material assistance from the South African Muslim community and that the time is not yet right for South African Muslims to be used physically in the fight against the Jews.

*Page 28*

1996-07-11 : OTHMAN visited the Muslim community of Pietermaritzburg at the Muslim mosque in Nirvana, Pietersburg and asked Muslims not only for financial and material assistance but also to participate in the Holy War.

OTHMAN tasked JUSUF (teacher at the Pietersburg mosque) to identify individuals for military training and to send them to NATAL from where they will be send to PAKISTAN.

* Iman IBRAHIM (black teacher in Seshego) volunteer for military training.

OTHMAN also visited LouisTrichardt,Venda and Tzaneen.

Sheik Yusuf ABDUL from the Westbank, Israel visited South Africa. ABDUL was the speaker at a HAMAS meeting at the Mayfair Jumma Masjid, c/o Hanover Street and 11 Ave, Mayfair on 1996-07-10.

ABDUL called on Muslims in South Africa to be part of the struggle against Zionism. He also asked Muslims to assist HAMAS financially in their struggle against Israel. Funds should be paid in at the offices of AL-AQSA INTERNATIONAL FOUNDATION,

Fordsburg, Johannesburg.

Finally he called on Muslims in South Africa to put more pressure on Jewish missions in South Africa.

1997-02-01 : Wahdan Ahmed KHUNFHUR returned from Saudi Arabia to South Africa. During a feedback meeting on 1997-02-06 KHUNFHUR mentioned that funds for the AIF and other extremist organisations in South Africa will be channelled from INTERPAL in England to the "World Assembly of Muslim Youth (WAMY)" in Saudi Arabia to South Africa through front companies.

- The AIF expect Mounir JARADA @a Abu Achmed EL-RAGHMAN (the head of HAMAS military operations in Sudan) after Ramhadaan (February 1997) to assist in military training in South Africa.

*Page 29*

1997-03 : Sheikh Yahyah Ibrahim ADAM (Sudanese) are involved in AIF activities.

1997-08-10/17 : The delegation to Israel and Palestine will consist out of the following individuals:

Aref Amin KHUNFHUR @a Abu AHMED

Ebrahim GABRIEL

Shafiq MORTON

Hamid ADAM

Ismael Abobaker KALLA

Shokat THOKAN

Ghora ARBEE

Solly DANGOR

Moosa DAYA

Abu Baber DAWJEE

Asim KHAN

Faried SAALe

Yusuf PATEL

Abid DAWRAY

\* Asim KHAN of Al-Aqsa is assisting Abobaker DAWJEE of KwaZulu/Natal who is the coordinator for the visit.

\* The HAMAS contact person in Jerusalem is Najah BAKIRAT @ Abu MALIK[10].

---

10 Born in 1958. ID nr: 08043368; Passport nr: 20638471 (issued in September 3, 1995). Former leader of the "ISLAMIC HERITAGE".

\* After the tour Ismail KALLA planned to visit the USA to met with members of Crescent International and other Muslim organizations i.c.w Anwar HADDAM (FIS).

1997-08-21/25 : Amin Aref KHUNFUR, Salim FIQIRI and Mohammed Asim KHAN met

*Page 30*

with Qibla and IUC members during their visit in the Western Cape, these individuals include:

Hamid ADAM

Ebrahim GABRIEL

Nazeem MOHAMMED (met at the offices of the MJC)

Shaffiqq MORTON

Moulana MOHAMMED HUSSEIN

1997-08-29 : Salim FIQIRI[11] is currently staying at the safe-house of Al-Aqsa International Foundation (Adamson Centrum 202, Crownweg 54, Fordsburg).

---

11 Salim FIQIRI was involved in the first military activities in South Africa military training camp in Mpumalanga (1997-07-11/13). FIQIRI is a Palestinian citizen, stayed 8 years in Turkey, and studied at the University in Karachi and the University in Sudan.

According to information Salim FIQIRI plan to leave SA for 2 months (Istanbul,

Turkey).

Mohamed Aasim KHAN[12] (South African citizen working at the office of A1Aqsa) arranged for a telephone for FIQIRI.

---

12 ID 7305295 13208403; Address India Crescent 11, Mayfair.

1997-08-29 : Abid DAWRAY (Kimberley - Islamic Research Centre) contacted Amin Aref KHUNFUR @a Abu AHMED in connection with 2 HAMAS members who are on their way to the Al-Aqsa office in Johannesburg (train) from Cape Town. Route to SA:

Libya Mauritania

Ivory Coast

Namibia.

1997-09-03 : Mufti Nizamudeen SHAAMZI (head legal advisor of the Taliban in Afghanistan) gave a lecture[13] at the Mayfair Mosque. Moulana Ebrahim BHAM (Jumaitul Ulama) acted as interpreter, BHAM also met with Amin Aref KHUNFUR @a Abu AHMED and Salim FIQIRI prior to the lecture.

---

13 SHAAMZI mainly concentrated on the legal aspects of the Shari'a, as the only legitimate law. Muslims cannot live in a society governed by Western laws.

*Page 31*

PARA-MILITARY TRAINING

1997-07-11/13 : Para-military training conducted on a farm in Mpumalanga (owned by Dr. Faried SALEY). The following individuals were involved:

Asim KHAN (AIF/HAMAS office in Fordsburg);

Imad Ahmed AL-AYOUBI

Wadah KHUNFUR @ Abu AHMED (Director-General)

Yusuf PATEL (Hospitaal Str 1, Baberton)

Salim FIQIRI (International Islamic Federation of Student Organizations

IIFSO, Istanbul, Turkey).

## AL-AQSA INTERNATIONAL FOUNDATION: KWAZULU/NATAL

1996-07 : Prof. OTHMAN has informed the Muslim community of Kwa Zulu/Natal that HAMAS is presently in need of financial and material assistance from the South African Muslim community and that the time is not yet right for South African Muslims to be used physically in the fight against the Jews.

1996-07-11 : OTHMAN tasked JUSUF (teacher at the Pietersburg mosque) to identify individuals for military training and to send them to NATAL from where they will be send to PAKISTAN.

* Iman IBRAHIM (black teacher in Seshego) volenteer for military training.

1997-01 : The Al-Aqsa fundraising campaign is planned for KwaZulu/Natal during January 1997.

* A Palestinian delegation (members of HAMAS political wing) will arrive in South Africa via the A1-Aqsa head office in London to hold talks at Mosques in KwaZulu/Natal.

1997-01-06/22 : The AL-AQSA delegation will visit mosques in Durban, Stanger, Umzinto, Pietermaritzburg, Escort and Newcastle and consist of:

- Asi m JETHAM (Al-Aqsa International Foundation, Fordsburg; Tel: (011) 836 2918)

*Page 32*

- I mad ALAYOUBI (Al-Aqsa International Foundation, Fordsburg; Tel: (011) 836 2918)

- S heikh Raid SALAAH (from Umul Faham in Palestine) A B DAWJEE (031) 902 4523 & (031) 902 9174 was responsible for the arrangements.

1997-04-23 : Wahdan Abu Ahmed KHUNFUR[14] (Director-general of AIF) left for KwaZulu to contact "Maktoor" (the latter will receive $100 000 to smuggle to Palestine). The money will be deposited by Isam Yusuf MUSTAFA Q Abu Yusuf in London office of the PALESTINE RELIEF AND DEVELOPMENT FUND (INTERPAL). From where it will be send to Palestine.

---

14 Blue VW Jetta: PRN 925 T.

## AL-AQSA INTERNATIONAL FOUNDATION : WESTERN CAPE

1996-12-18 : During an Al-Aqsa meeting in Fordsburg it was decided that Sheikh Ebrahim GABRIELS will be responsible for Al-Aqsa activities in the Western Cape. During the meeting GABRIELS said that a delegation should visit Palestine as soon as possible to engineer better communication.

* AIF communicate with GABRIELS per fax (021) 6968502 at the MUSLIM JUDICIAL COUNCIL (Cape Athlone).

1996-12-28 : Ganief HENDRIKS (Western Cape) contacted Wandwa Abu Ahmad KUNFHUR (Palestine) the director general of Al-Aqsa International Foundation in Fordsburg to send a Khari from Palestine to the Western Cape during the month of RAMADAAN.

1997-01-10 : The IUC fund-raising under Ganief HENDRIKS to help Muslims in Rustenburg was successful, but according to HENDRIKS Rustenburg do not need the money. HENDRIKS

*Page 33*

negotiate with the IUC to channel the funds to the AIF. It is a known fact that 10% of funds are channeled to "IZ AL-DIN AL QASSEM" (the military wing) who channel these funds to cells.

## FUNDRAISING IN SOUTH AFRICA

AL-AQSA INTERNATIONAL FOUNDATION normally embarks on two (2) fundraining campaigns per year in South Africa. The fundraising campaigns are launched each year during the Islamic month of RAMADAAN,

The Al-Aqsa fundraising campaign is planned for KwaZulu/Natal during January 1997.

A Palestinian delegation (members of HAMAS political wing) will arrive in South Africa via the Al-Aqsa head office in London to hold talks at Mosques in KwaZulu/Natal.

## HAMAS IN SOUTH AFRICA (STRATEGIC OVERVIEW)

According to information HAMAS members in South Africa does not recognise the MUSLIM YOUTH MOVEMENT (MYM) as the official organ representing the Muslim youth in South Africa. HAMAS is of the opinion that the MYM have lost their control of the youths representation. Based upon this situation HAMAS, with the help of the INTERNATIONAL ISLAMIC FEDERATION OF STUDENT ORGANIZATIONS (IIFSO) are busy to establish institutions for the Muslim youth in South Africa to take over the role of the MYM. These youth centres are implemented in Pretoria and Cape

Town.

*Page 34*

HAMAS

According to information Uman SHUBAIJHA attended the Islamic Conference in Laudium in April 1996 on behalf of HAMAS.

SHUBAIJHA reportedly stated that a HAMAS office would be opened in Pretoria once 5 000 members have been recruited.

After the conference, Sheikh Thaafier NAJAAR was appointed to coordinate the recruitment of Hamas members in South Africa. (NAJAAR is an executive member of the AFRICA MUSLIM PARTY and a member of the ISLAMIC COUNCIL OF SOUTH AFRICA - ICSA).

Active recruitment drives have allegedly already been launched at the

* University of Durban-Westville (UDW)

* University of the Witwatersrand (Wits) , confirmed, headed by Yusuf MOOSA (member of the MUSLIM STUDENTS ASSOCIATION - MSA) and Naeem (member of the MSA and the MUSLIM YOUTH MOVEMENT).

At this stage, the recruitment is done secretively and is progressing very slowly.The students currently targeted for recruitment are mainly MSA or MYM members who support the ISLAMIC UNITY CONVENTION.

* University of Cape Town (UCT)

* Recruitment has also started in Lenasia and Laudium and is being conducted by Ismail PATEL (member of the Lenasia branch of the CALL OF ISLAM - COI) and Yusuf AHMED (attached to CRESCENT INTERNATIONAL).

Additional to the recruitment drive, two unidentified foreign members of Hamas reportedly reside in Gauteng and are awaiting a third member, Khalu NOUTAR (also believed to be a

*Page 35*

member of EZEDEEN AL-QASSAM - the military wing of Hamas) to arrive in South Africa. The eventual plan is to open an office, once the recruitment drive has proven to be successful.

Sheikh Abu ABDULA, a representative of HAMAS and alleged deputy general of HAMAS (residing in Dewsbury, London) visited South Africa to promote HAMAS as an organisation, recruit new members and to collect funds for both HAMAS and the ISLAMIC JIHAD.

ABDULA visited PE from 4-5 July 1996 and was hosted by Moulana Adam Bin ADAM (imam of Mansoor Mosque), Moulana Sali BABOO (attached to the Bloemendaal Mosque) and Ansar MIA (attached to the Malabar Mosque).

During a closed meeting with these individuals ABDULA stated that HAMAS has decided to open an office in PE under cover of the AL-AQSA INTERNATIONAL FOUNDATION (AIF). The HAMAS office will be opened next to the Mansoor Mosque.

Yunus AMOD (executive member of the MYM) and Mohamed LOMBARD (chairperson of the Malabar Mosque) will be involved in this initiative.

Apart from the meeting with the mentioned Muslim leaders, ABDULA also paid a visit to the paramilitary camp at Greenbushes, where he mentioned that the facility was to basic and needed to be upgraded.

It is not clear if ABDULA's visit and the planned establishment of the HAMAS office is by any means connected to the initiative of Sheikh Thaafier NAJAAR (Executive member of the AFRICA MUSLIM PARTY, member of the Islamic Council of South Africa and Imam at the Muir. Steet Mosque in Cape Town) to establish a HAMAS office and recruit HAMAS members at universities.

Sheik Yusuf ABDUL from the Westbank, Israel visited South Africa. ABDUL was the speaker at a HAMAS meeting at the Mayfair Jumma Masjid, c/o Hanover Street and 11 Ave, Mayfair on 1996-07-10.

ABDUL called on Muslims in South Africa to be part of the struggle against Zionism. He also asked Muslims to assist HAMAS financially in their struggle against Israel. Funds should be paid in at the offices of AL-AQSA INTERNATIONAL

*Page 36*

FOUNDATION, Fordsburg, Johannesburg.

Finaly he called on Muslims in South Africa to put more pressure on Jewish missions in SouthAfrica.

ii) Mohammed Ali ZAKEY (from Egypt and visit SA regularly to recruit members for HAMAS in Libya and Iran. Contact tel nr. 092955321436), involved in para-military training ISLAMIC MILITARY JIHAD, Lenasia.

HAMAS : CAPE TOWN

1996-11 : HAMAS plan to open an office in Cape Town and use two base offices from where they operate:

- S ILK PUBLISHERS, Langmarkstreet, Cape town.

- QILB A offices, Barkley Sentrum, Athlone.

Other Hamas members active in South Africa:

    \* Abdul ZAHAR (orginaly from London, received his training in Sudan) involved with IMPACT INTERNATIONAL.

    \* Haroon KALLA (from the MUSLIM INSTITUTE in Sudan, also associated with the GLOBAL ISLAMIC MOVEMENT).

HAMAS INVOLVEMENT IN PORT ELIZABETH

Individuals involved in HAMAS activities:

    \* LUCKMAAN[15] (originally from Port Elizabeth)

---

    15 LUCKMAAN received his religious training at the Muslim training camp in Greenbushes, Port Elizabeth).

    \* Dr. Yusaf PEER (Chairperson of Border Islamic Society).

    \* Shahied MEERA[16] (originally from KWZulu/Natal). The purpose of Asief KAHAAR's visit was to inform Muslim leaders on the activities of Hamas:

*Page 37*

    - The  aims and objectives of HAMAS;

    - Mo  sque activities;

    - P  olitical and informational activities; and

    - HAM  AS's network through institutions

---

16 MEERA received military training in Pakistan.

The following Muslim leaders from Port Elizabeth accompanied KAHAAR on his visit to East London and Queenstown:

* Sulliman Umar DOUGLAS[17] (he is a Palestiniaan and a member of IGWAAN NOEL MUSLIMEEN);

* bubaker Mohammed (originates from the former Ciskei);

* Yusuf BHANJEE (executive member of PADAV);

* Moulana ADAM (Imam at the Masjied Mansoor in Malabar, Port Elizabeth); and

* Moulana Nazier DESAI (Amir of South African Mujahideen).

---

17 DOUGLAS hosted KAHAAR at no. 32 Saulstreet, Gelvanpark, Port Elizabeth during his stay in Port Elizabeth.

1997-08-27 : Information indicates the involvement of HAMAS[18] in Port Elizabeth through Dr. HABBAS as the contact person.

---

18 HAMAS members will attempt to forge ties with the N'Mujahideer) members, which could improve their paramilitary capabilities.

Agmat Sharief NIDEL under the directive of Mogamed ZAHAR[19].

---

19 Mogamed ZAHAR is identical to Mahmoud Khaled EL-ZAHER - Medical doctor and lecturer at the Islamic University in Gaza (this university is known as a strategic base of HAMAS). - HAMAS spokesperson in the Gaza Strip.

Information received during a Padav executive meeting on 1997-10-25 indicate that Sheikh CARLOO was asked for a progress report and stated that Agmat SHARIEF (member of

Page 38

Hamas present at the meeting) was in contact with Sheikh MISRALA[20] over the past

view weeks and that they have pledged to support Padav in the fight for Muslim unity. He continued to say that there were talks that Hamas fighters could come hide away in South Africa when it becomes to 'hot' for them abroad and vice versa for South African Mujahideen. Through the involvement of LAGERDIEN @ CAT it was decided that Padav delegation would meet with senior Hamas members to formalize this agreement.

- Durin g the same meeting it was mentioned that a top Hamas operative from Egypt.

- Agm at SHARIEF had also been in contact with a Hamas commander Sheikh Nabir BEHARI (who looked forward to meet with South African Muslims).

---

20 Could be identical to Abd El Rahin NASSERALLA Hamas member in Saudi Arabia and "silent" head of INTERPAL.

HAMAS INVOLVENT IN CAPE TOWN

HAMAS members (through AL-AQSA) have contact with members of the ISLAMIC UNITY CONVENTION and QIBLA.

According to Faisal BODI in London the following South Africans were trained in Sudan by Hamas and Hezbollah operatives, who are currently in Cape Town:

Taufique ALI

Riaz GAMEELDIEN

Shamsudien ARIEFDIEN

Moeaath GABIER.

EXHIBIT 29 TO DECLARATION OF VALERIE SCHUSTER

FILED UNDER SEAL

## Case Summary



| | Money laundering disclosure | | CIFAS | NCIS |
|---|---|---|---|---|
| Delete Case | | | | |

| **Case Summary** | Record Data | Subject Data | Notes & Conclusion | Key Corresp |

**Incident Data**

| | | | |
|---|---|---|---|
| Control Authority | Group Financial Crime 1 | Status | Open **Source: [GK2:617044]** |
| Review Date | | by | |
| Remote Delivery Channel | N | High Profile | Y 27 Sep 2001 00:00 |
| Created on | 27 Sep 2001 00:00 | by | HoseasonM |
| Last Modified on | 07 Feb 2002 00:00 | by | RBS_Meyrgab |

**Linked Cases**

| | |
|---|---|
| 276995 | Address auto-linked |
| 618425 | NONE |
| 647655 | NONE |
| 666593 | NONE |
| 666814 | NONE |
| 704079 | Account auto-linked |
| 708047 | Address auto-linked |
| 710368 | NONE |
| 710397 | Address auto-linked |
| 753294 | Address auto-linked |
| 772682 | Address auto-linked |
| 1748664 | Personal auto-linked |
| 1975700 | Business auto-linked |
| 2333235 | Business auto-linked |
| 2400867 | Business auto-linked |

Maintain Links

| Queries | Refer To | Tel No. | Business | Unable to contact ? |
|---|---|---|---|---|
| | | | NONE | Yes |

| **Money laundering disclosure Record** | | | |
|---|---|---|---|
| Submitting Branch | 600822/GI&F | Submitted By | MIKE HOSEASON |
| Submitting Unit Sortcode | | Contact No | |
| Submitting Department | None | Legislation | POTA |

HIGHLY CONFIDENTIAL                                                                NW 052056



**Estimated Laundering Total**   386730   <Unknown>

**Reason(s) for Suspicion**

Suspected terrorist funding

Please see attachments and/or Case Notes where available for further information

Other (see Summary and Assessment field)

| Transactions  GBP  100000.00 | | | | | Add |
|---|---|---|---|---|---|
| **Date** | **Type** | | **Amount** | **Currency** | Edit |
| | | | | | Edit |
| | | | | | Edit |
| | | | | | Edit |

**Set All Risk Ratings to the the same value of:-**   Amber | Blue | Green | Indigo | Red

| Personal Data | | | | | | | Add |
|---|---|---|---|---|---|---|---|
| **Surname** | **Forenames** | **Date Of Birth** | **Sex** | **Key Information** | **Risk** | **Adj** | |
| | | | | NONE | Red | Red | Edit |
| | | | | NONE | Green | Green | Edit |
| | | | M | NONE | Red | Red | Edit |
| | | | | NONE | Red | Red | Edit |
| | | | | NONE | Red | Red | Edit |
| | | | | NONE | Green | Green | Edit |

| Business Data | | | | | | Add |
|---|---|---|---|---|---|---|
| **Business/Org Name** | **Company Ref. No.** | **Legal Jurisdiction** | **Key Information** | **Risk** | **Adj** | |
| | | | NONE | Green | Green | Edit |
| | | | NONE | Green | Green | Edit |
| | | | NONE | Green | Green | Edit |
| | | | NONE | Green | Green | Edit |
| | | | NONE | Green | Green | Edit |
| | | | NONE | Green | Green | Edit |
| | | | NONE | Green | Green | Edit |
| | | | NONE | Red | Red | Edit |
| | | | NONE | Green | Green | Edit |

| Telephone Data | Add |
|---|---|
| -None- | |

HIGHLY CONFIDENTIAL                                                 NW 052057

UID Case Summary

| Address Data | | | | | | Add |
|---|---|---|---|---|---|---|
| **Bldg No. & Name** | **Street** | **Town** | **Postcode** | **Risk** | **Adj** | |
| 60 CLARK CRT | STILTON CRES | LONDON | NW10 8DJ | Red | Red | Edit |
| PO BOX 3333 | | | NW6 1RW | Red | Red | Edit |

| Account Data | | | | | | | Add |
|---|---|---|---|---|---|---|---|
| **Account Name** | **Account No.** | **Sortcode** | **Account Type** | **Currency** | **Risk** | **Adj** | |
| ▓▓▓▓▓▓▓▓▓▓ | | | | | Green | Green | Edit |
| PAL REL & DEV FUND INTERPAL FAMILIES | 95145397 | 60-08-22 | Current (Non Personal) | British Pound | Green | Green | Edit |
| PAL REL & DEV FUND INTERPAL ADMIN | 95142983 | 60-08-22 | Current (Non Personal) | British Pound | Green | Amber | Edit |
| PAL REL & DEV FUND INTERPAL CHILDREN | 95142975 | 60-08-22 | Current (Non Personal) | British Pound | Green | Amber | Edit |
| PAL REL & DEV FUND ZAKAT | 95142967 | 60-08-22 | Current (Non Personal) | British Pound | Green | Green | Edit |
| PAL REL & DEV FUND INTEREST | 95142959 | 60-08-22 | Current (Non Personal) | British Pound | Green | Amber | Edit |
| INTERPAL UNION FOR GOOD | 140 00 08537933 | 60-08-22 | Currency Account | US Dollar | Green | Green | Edit |
| ▓▓▓▓▓▓▓▓▓▓ | | | | | Green | Green | Edit |
| ▓▓▓▓▓▓▓▓▓▓ | | | | | Green | Green | Edit |
| PAL REL & DEV FUND PARENT | 140 00 04156838 | 60-08-22 | Currency Account | US Dollar | Green | Green | Edit |

| Miscellaneous Data | Add |
|---|---|
| **-None-** | |

| Case Notes | | | | Add |
|---|---|---|---|---|
| **Type** | **Date** | **User** | **Text** | |
| Case notes | 07 Feb 2002 | Migrated | Finlog ref: 140425. Special Branch are investigating. DH | View |
| Summary and Assessment | 07 Feb 2002 | Migrated | Account ▓▓▓▓▓ Regular credits to the account, mainly BGC' | View |
| Conclusion | 07 Feb 2002 | Migrated | On the basis of the information available to us at the prese | View |

| Key Correspondence | | | | Add |
|---|---|---|---|---|
| **No Documents have been uploaded** | | | | |

| NCIS Disclosures | **Author** | **Date** | | |
|---|---|---|---|---|
| NCIS Disclosure 142909 (R) | ConnellJ | 15 Oct 2001 | Amend NCIS Number | |

| **No CIFAS Reports** |
|---|

HIGHLY CONFIDENTIAL

NW 052058

Case notes History for Case 617044

Page 1 of 1

| **1. User:** | Migrated | **On:** | 07 Feb 2002 00:00 | Print | Copy | Delete |
|---|---|---|---|---|---|---|
| **Note:** | Finlog ref: 140425. Special Branch are investigating. DH | | | | | |

HIGHLY CONFIDENTIAL

NW 052059

Summary and Assessment History for Case 617044                                    Page 1 of 1

**1. User:** Migrated          **On:**          07 Feb 2002 00:00          Print     Copy     ~~Delete~~

**Note:** Account ▮▮▮▮ Regular credits to the account, mainly BGC's made up of small individual cheques. One large cheque of ▮▮▮▮ drawn on ▮▮▮▮ and a chaps credits from the ▮▮▮▮ and ▮▮▮▮ from ▮▮▮▮ Small withdrawals made by of cheques to ▮▮▮▮ and ▮▮▮▮ and a overseas payment to ▮▮▮▮ Regular credits to the account, small individual cheques of ▮▮▮▮ Account 95142975 as above, mainly ▮▮ credits, no withdrawalsAccount 95142983 Account fed by 95142959, sample of cheques issued shows a number of cheques to ▮▮▮▮ Account 95142959 small deposits only, transfers to 95142983Account 95145397 Small deposits only, no further deposits since ▮▮▮▮ USD$ 04156838 -Considerable funds held, a sample of outward payments shows beneficiaries to be:

▮▮▮▮ . All the payments went to ▮▮▮▮ . A further payment has been sent to the ▮▮▮▮ for Interpal Orphans ▮▮▮▮ No balance held & last entry ▮▮▮▮ Credit of ▮▮▮▮ made from (?)funds still held on the account.USD$ 08537933 1 credit received from ▮▮▮▮

HIGHLY CONFIDENTIAL

NW 052060

| **1. User:** Migrated | **On:** | 07 Feb 2002 00:00 | Print | Copy | Delete |
| --- | --- | --- | --- | --- | --- |

**Note:** On the basis of the information available to us at the present time, it is considered that the above incident / activity may constitute or involve money laundering and consequently a disclosure has been made to the National Criminal Intelligence Service or other appropriate authorities. Please see attached documents for further information concerning the financial disclosure. This information may be of relevance when considering any business approaches or dealings with the above named parties.

HIGHLY CONFIDENTIAL

NW 052061

## NCIS Disclosure for Case 617044 ( Received )

Close          Print

**Core NCIS details created on 15 Oct 2001 by ConnellJ        [ Submitted by HoseasonM on 15-OCT-01 ]**

| | | | |
|---|---|---|---|
| Disclosure Type | Terrorism | Submitting Branch Address | Natwest |
| Disclosure Date | 15 Oct 2001 | | Group Investigations & Fraud |
| Branch / Outlet | Finsbury Park | | |
| Branch Code | 60-08-22 | | |
| Trust Indicator | N | | |
| Further Information | Y | | Postcode |

Text

HIGHLY CONFIDENTIAL



HIGHLY CONFIDENTIAL



HIGHLY CONFIDENTIAL



HIGHLY CONFIDENTIAL



**EXHIBIT 30 TO DECLARATION OF VALERIE SCHUSTER**

**Excerpt from "Reporters' Roundtable: Can you trust WikiLeaks?" CNET, Oct. 29, 2010, http://www.cnet.com/8301-30976_1-20021253-10348864.html, at 10:10-11:47.**

<u>Rafe Needleman</u>

Tell us your aim in launching Cryptome.  When did you launch it and why?

<u>John Young</u>

Well, it was to publish information that people had access to that wanted to make it public, but did not want to be identified with it.  And that came from the CypherPunks mail list.  There were quite a number of very capable people who wanted to release information about what was coming into American society, technologically speaking.  As the cold war wound down, it was going to be converted from military and espionage uses to commercial uses.  And so they wanted to get this out to the public and so we set up a site to publish that information, because we could claim ignorance as we have no skills in that area, but we were certainly willing to set up a site and publish other people's materials.  So that was our first exposure to this whole world of communication security and espionage technology, which has now spread throughout the world, and now heavily in use by commerce to spy on the public.

<u>Rafe Needleman</u>

Now, one of the things that I was reading about you is that you make no efforts to verify the accuracy or the source of your documents.  Could you talk about that a little bit?

<u>John Young</u>

Yeah, everyone lies about that, in journalism in particular.  The whole notion of verification, authentication and responsibility is just snake oil, the thing that you do to get people to believe your product.  WikiLeaks, of course, does that far more than anybody else.  So this kind of authentication thing is a long-running scam.  People should make up their own minds.  Just give them the material, they will make up their minds.  But this laying on of editorial commentary and interpretation, that's fiction, it should be called fiction.  We actually call it, where I come from, "bullshit"; and, of course, WikiLeaks is a master "bullshitter."

**EXHIBIT 31 TO DECLARATION OF VALERIE SCHUSTER**



1 of 1 DOCUMENT

Copyright 2005 Associated Press
AP Worldstream

September 1, 2005 Thursday

**SECTION:** INTERNATIONAL NEWS

**DISTRIBUTION:** Europe; Britian; Scandinavia; England

**LENGTH:** 265 words

**HEADLINE:** Report: Top international administrator in Bosnia was a British secret service agent

**DATELINE:** SARAJEVO, Bosnia-Herzegovina

**BODY:**

The top international administrator in Bosnia, Lord Paddy Ashdown, was in the 1970s an agent for the British MI6 secret service, according to a report published on the Internet and picked up by local media.

Ashdown's name was among 276 alleged MI6 agents identified by the Web site Crytome.org, which said the British diplomat worked for the secret service while based in Geneva in 1974. The information was reported by the Oslobodjenje and Dnevni Avaz newspapers on Thursday.

Ashdown's spokesman, Mario Brkic, declined comment "on such speculation."

Ashdown, a longtime British lawmaker, took over the duties of the top international administrator in Bosnia - called here the High Representative of the International Community - in May 2002.

Ashdown has wide powers in the country, and can impose laws and fire local politicians as high as presidents of the country if he feels they are obstructing Bosnia's peace.

The Cryptome list also includes the former head of Ashdown's public relations office, Julian Braithwaite, stating that he was an MI6 agent in Sarajevo in 2002.

A spokesman for Britain's Foreign Office said the government had a policy of neither confirming nor denying whether any individual works in intelligence, in order to protect those who do.

"The posting of these names is highly irresponsible," the spokesman said, declining to be identified in keeping with government policy. While he would not comment on Cryptome.org's naming of Ashdown, he said the Web site's lists were often "highly inaccurate."

Report: Top international administrator in Bosnia was a British secret service agent AP Worldstream September 1, 2005 Thursday

On the Net:

http://cryptome.org/mi6-list-276.htm

**LOAD-DATE:** September 2, 2005

EXHIBIT 32 TO DECLARATION OF VALERIE SCHUSTER

FILED UNDER SEAL



## Case Summary

### Money laundering suspicion

Delete Case     CIFAS   NCIS

| Case Summary | Record Data | Subject Data | Notes & Conclusion | Key Corresp |

**Incident Data**

| | | | | | **Linked Cases** |
|---|---|---|---|---|---|
| Control Authority | Payment Operations | Status | Open | Source: [GK2:647655] | 617044 NONE |
| Review Date | | by | | | Business 710397 auto-linked |
| Remote Delivery Channel | N | High Profile | Y 06 Feb 2002 00:00 | | Maintain Links |
| Created on | 19 Nov 2001 00:00 | by | ReavleyL | | |
| Last Modified on | 05 Feb 2002 00:00 | by | RBS_HartIda | | |

**Queries**     Refer To     Tel No.     **Business**     **Unable to contact ?**

NONE     Yes

**Money laundering suspicion Record**

| | | | |
|---|---|---|---|
| Submitting Branch | | Submitted By | OLNA LEEMING |
| Submitting Unit Sortcode | | Contact No | 780676841 |
| Submitting Department | Payment & Trade Operations | Legislation | DTA 94 |
| Estimated Laundering Total | 200000 <Unknown> | | |

**Reason(s) for Suspicion**

High non cash turnover

Suspected terrorist funding

| Transactions  GBP  0.00 | | | | | Add |
|---|---|---|---|---|---|
| Date | Type | | Amount | Currency | |
| | | | | | Edit |
| | | | | | Edit |

**Set All Risk Ratings to the the same value of:-**   Amber  Blue  Green  Indigo  Red

| Personal Data | | | | | | | Add |
|---|---|---|---|---|---|---|---|
| Surname | Forenames | Date Of Birth | Sex | Key Information | Risk | Adj | |
| | | | | NONE | Red | Red | Edit |
| | | | M | NONE | Red | Red | Edit |

| Business Data | | | | | | Add |
|---|---|---|---|---|---|---|
| Business/Org Name | Company Ref. No. | Legal Jurisdiction | Key Information | Risk | Adj | |
| PALESTINE & LEBANON RELIEF FUND | | UNITED KINGDOM | NONE | Red | Red | Edit |

HIGHLY CONFIDENTIAL

NW 052067

NW052067

UID Case Summary

Page 2 of 2

| Telephone Data | | | | | | | Add |
|---|---|---|---|---|---|---|---|
| **Phone No.** | **Owner** | | | **Type** | **Risk** | **Adj** | |
| | PALESTINE & LEBANON RELIEF FUND | | | Other | Red | Red | Edit |

| Address Data | | | | | | Add |
|---|---|---|---|---|---|---|
| **Bldg No. & Name** | **Street** | **Town** | **Postcode** | **Risk** | **Adj** | |
| 130 | GLENGALL RD | LONDON | NW6 7HH | Red | Red | Edit |

| Account Data | | | | | | | Add |
|---|---|---|---|---|---|---|---|
| **Account Name** | **Account No.** | **Sortcode** | **Account Type** | **Currency** | **Risk** | **Adj** | |
| PALESTINE & LEBANON RELIEF FUND | 04156838 | 60-06-22 | Current (Non Personal) | British Pound | Green | Green | Edit |

| Miscellaneous Data | Add |
|---|---|
| -None- | |

| Case Notes | | | | Add |
|---|---|---|---|---|
| **Type** | **Date** | **User** | **Text** | |
| Case notes | 05 Feb 2002 | Migrated | 21/12 - According to ISS records there is an LRS Manager at | View |
| Summary and Assessment | 05 Feb 2002 | Migrated | This account is a charitable account for people affected by | View |
| Conclusion | 05 Feb 2002 | Migrated | From the information available at the date of this record, i | View |

| Key Correspondence | | | | | |
|---|---|---|---|---|---|
| **Upload Doc Title** | **Author** | **User** | **Date** | | Add |
| Suspicion report | ReavleyL | GK2 | 21 Nov 2001 | View | Edit |
| Suspicion report | ReavleyL | GK2 | 21 Nov 2001 | View | Edit |

**No NCIS Disclosures**

**No CIFAS Reports**

HIGHLY CONFIDENTIAL

NW 052068

NW052068

**1. User:** Migrated     **On:**     05 Feb 2002 00:00          Print     Copy     Delete

**Note:** 21/12 - According to ISS records there is an LRS Manager at Islington Business Centre who (hopefully!) looks after this customer. With ███████ turnover during 2001 I think we need to gain a clear understanding of the activities here and full details behind some of the sizeable transactions. I have not sent the disclosure as yet in the hope that we can get some meaningful info in the short term. DH17 Jan memo sent to Rm for background info in particular the activity seen on the usd account.mw5/2/02 - Existing case for this customer discovered somewhat belatedly. Probably no merit in disclosing again at this time but it won't do any harm for the RM to follow through our recent request as the KYC/DD info appears deficient. DH

HIGHLY CONFIDENTIAL

NW 052069

NW052069

| 1. **User:** Migrated | **On:** | 05 Feb 2002 00:00 | Print | Copy | Delete |

**Note:** This account is a charitable account for people affected by the troubles in Lebanon & Palestine. Funds are received into a US Dollar account by international transfer from various locations in the Middle East and at the moment a large balance has acumulated without outward transfer. Given the current volatile situation in Palestine we are concerned that as the sources of funds cannot be verified, there may be a vulverability for terrorist funding.

HIGHLY CONFIDENTIAL

NW 052070

NW052070

Conclusion History for Case 647655

| **1. User:** Migrated | **On:** | 05 Feb 2002 00:00 | Print | Copy | Delete |
|---|---|---|---|---|---|

**Note:** From the information available at the date of this record, it is considered that there are insufficient grounds to make a financial disclosure. Please see attached documents for further information relating to the suspicion report. This information may be of relevance when considering any business approaches or dealings with the above named parties.

HIGHLY CONFIDENTIAL

NW 052071

NW052071

FORMS USED IN CONNECTION
WITH THE PREVENTION OF
MONEY LAUNDERING ACTIVITIES

GA-7655

FORM A   From CITY, BC

19 NOV 2001

## SUSPICION REPORT FORM (ACCOUNT-HOLDING CUSTOMERS)

| Branch/Department | | | Sort Code 60 06 22 |
|---|---|---|---|
| Surname/Business Name: PALESTINE + LEBANON RELIEF | | Forename/s: Ahmo | |
| Mid: Forename: | Nationality (if known): | | Date of Birth: |
| Address (include Postcode): 130 GLENGALL ROAD LONDON NW6 7HH | | Additional/Previous Addresses: | |
| Telephone No: 020 845 2119 7 | | | |
| No & Country of issue of Passport or other ID document seen/source of introduction/reference taken: | | Companies - Date & County of Incorporation/Registered No: | |
| Account No(s): | Account Type: | | Date Opened: |
| Date when Relationship with Bank started: | | | |
| Stated Occupation: | | | |
| Name & Address of Employer: | | | |
| Additional Associated Names: | Date of Birth: | In A/C: | Address, esp P/Code/Passport No etc |

| Transaction Details | | | Account No: | |
|---|---|---|---|---|
| Date | Amount | Dr/Cr | Source/Dest: | |

████████████████████████████████████████

Introduced December 1996          PMIS (Cust Operations and Controls - Volume 3)          (continued)

SG/7

HIGHLY CONFIDENTIAL

NW 052072

NW052072

..8 - Forms Used in Conjunction with Fraud and Money Laundering Activities          2

...sons for Suspicion

[redacted]

Security and Safe Custody held (brief details only)

Boxes and Parcels held

Special signing instructions (eg third party mandates)

(if a company, partnership, etc attach copy of mandate)
Other accounts known to be held (including Building Societies)

Status Enquiries received

| Nature of Suspected Offence (tick as appropriate, but may be left blank) | Drug Trafficking |
| | Terrorism |
| | Other Crime |

Branch/Department Ref:     Name of Contact:        Tel/ITS:
                           OLNA LEEMING        Ext No: 7 8067
Signed                     Senior Officer/Manager: PAYMENTS MANAGER Date 15/11/01
                                                    STEWART HARDY.

(continued)

...870 Version

HIGHLY CONFIDENTIAL                                    NW 052073

NW052073

EXHIBIT 33 TO DECLARATION OF VALERIE SCHUSTER

FILED UNDER SEAL

1    UNITED STATES DISTRICT COURT

2    EASTERN DISTRICT OF NEW YORK

3    ----------------------------------------------x

4    TZVI WEISS, et al.,

5              Plaintiffs,

6        -against-       Action #05CV4622(CPS)(MDG)

7    NATIONAL WESTMINSTER BANK, PLS,

8              Defendant.

9    ----------------------------------------------x

10   NATAN APPLEBAUM, et al.,

11             Plaintiffs,

12       -against-

13   NATIONAL WESTMINSTER BANK, PLC.,

14             Defendant.

15   ----------------------------------------------x

16

17

18            * HIGHLY CONFIDENTIAL *

19

20            VIDEOTAPED DEPOSITION of OLHA LEEMING,

21       taken before Cheryll Kerr, LSR, Notary Public

22        and Shorthand Reporter, held at  the offices

23       the offices of Cleary, Gottlieb, Steen &

24       Hamilton, LLP, located at 55 Basinghall

25       Street, London, England on Thursday, the

26       21st day of May, 2009, at 9:38 a.m.

27

28



**18**

1   Was it hundreds?
2       A.   I would have to guess.
3       I really don't know.  A lot, but I couldn't
4   give you a number.
5           MR. BLACKMAN:  Just for clarity, was
6   this any particular part of the bank that
7   you're talking about?
8           Was it a particular type of
9   customers, or retail?
10          THE WITNESS:  No.  We would have all
11  of them.
12          MR. BLACKMAN:  Yeah?
13          THE WITNESS:  Yeah.
14  BY MR. SCHWARTZ:
15      Q.   This covered the whole bank?
16  This encompassed all the payments for all the
17  departments, all the branches coming into the bank?
18      A.   Yeah.
19      Q.   Did you receive any training to do your
20  job in Inward Payments?
21      A.   Yes.
22      Q.   Could you tell -- tell us, please, about
23  your training?
24      A.   It was on-the-job training, so you would
25  sit with somebody else and they would show you what

**19**

1   to do.
2       You would work with them for a while, and then
3   you would sort of start taking bits over until you
4   were competent to perform all the roles.
5       Q.   Did you receive -- if I use the term --
6   withdrawn.
7       If I use the term "money laundering," do you
8   know what I'm talking about?
9       A.   Yes, I do.
10      Q.   If I use the term "terror financing," do
11  you know what I am talking about?
12      A.   Yeah.
13      Q.   Did you receive training in money
14  laundering prevention at any time during your
15  tenure?
16      A.   Yes.
17      Q.   Could you please describe the training
18  you received?
19      A.   Yeah, we have ongoing training.  It's
20  called Access to Learning.
21      It's computer-based, and we go on and we read
22  sort of a script and look at case histories and
23  things, you know, things like hypothetical case
24  histories.
25      Then you take a -- a test at the end of it, and

**20**

1   then you print off your scores, put it with your --
2   we like a regular reading folder, so we have --
3       There's lots of things that we read about on
4   a -- you know, quarterly basis.
5       Q.   So you continue to receive training on an
6   ongoing basis?
7       A.   Yes.
8       Q.   Have you received any training in
9   anti-terror financing?
10      A.   Specifically?  I mean ...
11      Q.   Well, have you received any training
12  separate from your money laundering training?
13      A.   No, not --
14      Q.   Is anti-terror finance training part of
15  the money laundering training you received?
16      A.   Yes.
17      Q.   Can you tell me, please, how you
18  implement anti-money laundering and anti-terror
19  financing into what you do on a daily basis?
20      A.   Okay.  I mean, it's -- we wouldn't look
21  at anti-money laundering or anti-terror financing as
22  a separate issue.
23      I mean, we would look at potentially suspicious
24  credits coming into an account, so we wouldn't -- at
25  my stage of the job, you wouldn't bracket what you

**21**

1   thought the money would be for.
2       There was no -- you know, we didn't -- we
3   weren't sort of taught to look at what it could be
4   for.  We just looked to see if anything was
5   potentially suspicious or out of the ordinary, and
6   then we would report that.
7       Q.   What is it that makes a payment
8   suspicious?
9       A.   Well, there's various different things.
10  [redacted]
11  [redacted]
12  [redacted]
13  [redacted]
14      It's something that kind of seems out of the
15  ordinary, really.
16      Q.   What would make something seem out of the
17  ordinary?
18  [redacted]
19  [redacted]
20  [redacted]
21  [redacted]
22  [redacted]
23  [redacted]
24  [redacted]
25      Q.   Do you have a group of NatWest or NatWest

**EXHIBIT 34 TO DECLARATION OF VALERIE SCHUSTER**

**LANE, Belinda, Bus Mgr**

| | |
|---|---|
| **From:** | Wiltshear, Martin (RBS) |
| **Sent:** | Thursday 17 January 2002 09:51 |
| **To:** | LANE, Belinda, Bus Mgr |
| **Subject:** | Palestine Lebanon & Relief Fund |

Belinda,

Unsurprisingly, we have been sent a Money Laundering Suspicion Report on the above connection. It is based on the face that large US$ payments are being are coming and going from the Middle East in the USD a/c 0415838. The concern is obviously terrorist funding especially given the volatile climate of the area.

I would be therefore be grateful if you would kindly provide me with some background info on this connection with details of the most recent due diligence undertaken in respect of the Bank's knowledge of dealings in the US$ account.

I appreciate your assistance in this matter and look forward to hearing from you.

Regards

**Martin Wiltshear**
**Group Investigations & fraud**
*Ground floor*
*Regents House*
*London*
*tel - 0207 615 7244*
*fax - 0207 615 7287*

1

HIGHLY CONFIDENTIAL

**EXHIBIT 35 TO DECLARATION OF VALERIE SCHUSTER**

**LANE, Belinda, Bus Mgr**

To:          Wiltshear, Martin (RBS)
Subject:     RE: Palestine Lebanon & Relief Fund

- Acc opened with Bank 10/94
- Large funds have always been held on various current accs as, due to religious reasons they are unable to earn interest
- Registered charity no 1040094 - 8 trustees
- Provide charitable relief to refugees in Israel, West Bank & Gaza and Lebanon - developed out of former charity which provided relief to Kuwait
- Main donors are Muslim communities in the Uk, USA and Saudi Arabia
- Very much seasonal in that receipts usually at Ramadam and Easter
- Main contact is the secretary Mr Jehad Qundil izo
- Authorised signatories are Ibrahim Brian Hewitt, E Mustafa, J Qundil and Mahfouzh Safie - instructions are any 2 to sign
- Next meeting is Monday 21 January with Mr Qundil at the business premises when I will discuss present operations and use of the $ acc

Any further guidance in how to approach this would be welcomed - ITS 2332-2602

Belinda Lane
Senior Business Manager

        ——Original Message——
        From:       Wiltshear, Martin (RBS)
        Sent:       Thursday 17 January 2002 09:51
        To:         LANE, Belinda, Bus Mgr
        Subject:    Palestine Lebanon & Relief Fund

        Belinda

        Unsurprisingly, we have been sent a Money Laundering Suspicion Report on the above connection. It is bases on the face that large US$ payments are being are coming and going from the Middle East in the USD a/c 04156838. The concern is obviously terrorist funding especially given the volatile climate of the area.

        I would be therefore be grateful if you would kindly provide me with some background info on this connection with details of the most recent due diligence undertaken in respect of the Bank's knowledge of dealings in the US$ account.

        I appreciate your assistance in this matter and look forward to hearing from you.

        Regards

        **Martin Wiltshear**
        **Group Investigations & fraud**
        *Ground floor*
        *Regents House*
        *London*
        *tel -  0207 615 7244*
        *fax - 0207 615 7287*

1

HIGHLY CONFIDENTIAL

**EXHIBIT 36 TO DECLARATION OF VALERIE SCHUSTER**

**FILED UNDER SEAL**

## SYNOPSIS OF CUSTOMER MEETING

| | |
|---|---|
| DATE | 20 MARCH 2002 |
| CUSTOMER | INTERPAL |
| ATTENDEES | BELINDA LANE , JIHAD QUNDIL |
| LOCATION | CUST'S PREMISES, CRICKLEWOOD |

- Nature of operations has remained the same ie charity which receives donations from the muslim community mainly around the 2 religious festivals – Ramadan just before xmas (60% of income rec'd during this period) and Haj (Pilgramage) in March. A core mailing list of approx 12000 is maintained. Assistance is then provided to various charities mainly in the Westbank, Gaza and Lebanon which can comprise of food parcels aswell as cash. There is also a summer campaign specifically on behalf of muslim orphans.
- Since further troubles in this area of the world commenced in Sept 2000 there have been a number of emergency campaigns for assistance which resulted in donations almost doubling in 2000 from ████████████████████
- ████████████████████████ often representing payment for Qurbani which is a sacrificial ceremony carried out on their behalf by Interpal
- JQ raised the issue of terrorism and mentioned that they had received a number of calls from the media – he pointed out that they were confident that they would not encounter any problems as they were fully investigated by the Charities Commission in 1996 and found to be clear.
- Presently 7 staff – stakeholder scheme now in place with First Ethical
- Lease on the trading premises has now expired and they are looking for a f/h in the Park Royal area – will fund from own resources, the sale of several inv properties in Wales and short-term loans from other charities
- Income has continued at a similar level in 2001


- Know your customer – JQ to forward ID for each of 4 signatories together with addresses to enable us to undertake cr searches
- Interested in Bankline and Autopay – also discussed pymt mgr but not attractive given costs
- I will raise possibility of exchange rate business in my letter
- Also interested in direct debit originator service and details of charges provided

HIGHLY CONFIDENTIAL

<u>**Rm4 Action**</u>

- **Please diarise for receipt of id etc**
- **Please obtain autopay and bankline brochure to accompany my letter**
- **Tf this acc to us from Islington**
- **Order TAFs on all accounts for full transmission review**

HIGHLY CONFIDENTIAL