**EXHIBIT 101 TO DECLARATION OF VALERIE SCHUSTER**

HIGHLY CONFIDENTIAL

NW 212047
NW212047

## Note C1

# THE POLICY OF THE ROYAL BANK OF SCOTLAND GROUP plc ON UNITED NATIONS AND EUROPEAN UNION SANCTIONS

*This policy was approved by the Group Executive Management Committee on 29 January 2001.*

1. Businesses across The Royal Bank of Scotland Group are legally required to comply with sanctions that have been imposed by the United Nations and the European Union.  In general, the sanctions require financial institutions to ensure that affected customers do not have access to their funds.  These sanctions are directed at a mixture of individuals, corporate entities and organised bodies.  HM Treasury enforces compliance with sanctions legislation through the Bank of England and breach of the sanctions is a criminal offence.

2. The Royal Bank of Scotland Group plc must ensure compliance with current sanctions legislation as set out in the Appendix to this policy.

3. The above body of legislation applies to each of the subsidiary companies and divisions within the Group which operate within the UK.  It is the responsibility of both management and staff within each business unit in these companies and divisions, to ensure adherence to the Group's policy on sanctions compliance and to ensure that its legal obligations are met.

4. The principles behind this policy will apply to each of the Group's overseas subsidiary companies and divisions unless there are exceptional grounds for the policy not being applied in a particular jurisdiction.  Local management will require to ensure that where local sanctions regimes vary from those in the UK, local rules are respected.  It will be the responsibility of business Chief Executives to obtain the agreement of the Director, Group Compliance to the waiver of the requirement to apply this policy in a particular business unit.

5. This policy statement addresses the principles to be followed and implementation of Group sanctions compliance policy.

a)   **Principles to be followed**

The following five key principles must be adopted by businesses across the Group in ensuring that the organisation maintains compliance with all relevant sanctions legislation.

(i)   Each relevant unit within the organisation must ensure that <u>appropriate policies, controls and procedures</u> are introduced and maintained in order to ensure that sanctions legislation is not breached.

(ii)   Appropriate measures must be taken to ensure that when opening an account or entering into a business relationship, evidence of identity is obtained.  If, as a result of that evidence, the business should reasonably be aware that United Nations or European Union sanctions apply, then the business must ensure that appropriate measures are taken to ensure compliance.

HIGHLY CONFIDENTIAL

(iii)   Members of staff employed in any relevant business unit must be aware of the <u>need to report</u>, to the appropriate Local Compliance or Sanctions Monitoring Function, any instances where they believe a customer relationship is being established, or operated, in circumstances where sanctions will apply.

(iv)   Each business unit must create and retain appropriate <u>records relating to customer identification</u> and residency in respect of accounts or other transactions, to which sanctions legislation applies.

(v)   All relevant staff in each business unit must be aware of their responsibility to ensure that the Group does not act in breach of the sanctions legislation and should receive <u>regular training</u> to reinforce this awareness.

b)   **Implementation of the Group's policy on sanctions compliance**

It is the responsibility of the management of all Group companies, acting through individual business units, to ensure that appropriate controls, policies and procedures are in place to enable the business unit to adhere to the Group sanctions compliance policy.

Both staff and management should be aware that they may be personally liable for their failure to adhere to the Group's sanctions compliance policy. This liability may extend to internal disciplinary action or, if found guilty of breaching the legislation, a fine or imprisonment or both.

The Group will ensure that management and staff receive adequate training and guidance on the steps that they are required to take to meet their legal obligations.

**Group Compliance Department**
**January 2001**

HIGHLY CONFIDENTIAL

# **Appendix**

- Sanctions against residents of Iraq, which first came into force on 7 August 1990 and which were replaced on 14 December 2000 by the Iraq (United Nations Sanctions) Order 2000.  The sanctions are set out in the Bank of England's Notice of 14 December 2000.

- Sanctions against residents of Iraq, which came into force on 14 December 2000 and are set out in the Iraq (United Nations Sanctions) (Channel Islands) Order 2000 and in the Iraq (United Nations Sanctions) (Isle of Man) Order 2000.

- Sanctions against the UNITA movement in Angola, which came into force on 12 June 1998 and are set out in United Nations Security Council Resolution Order No:1173 (1998).

- Sanctions against named individuals and companies in Burma (now known as Myanmar), which came into force on 22 May 2000 and are set out in the United Nations Act [1946] Council Regulation (EC) 1081/2000.

- Sanctions against the Taliban movement in Afghanistan, which came into force on 3 May 2000 and are set out in the United Nations Act [1946] Council Regulation (EC) 337/2000.

- Sanctions against named individuals in Federal Republic of Yugoslavia (including Serbia), which came into force on 10 November 2000 and are set out in the United Nations Act [1946] Council Regulation (EC) 2488/2000.  (These repeal Regulations (EC) 1294/1999 and 607/2000 and Article 2 of Regulation (EC) 926/1998).

HIGHLY CONFIDENTIAL

11C18  Compliance Manual - Bank of England Sanctions

HIGHLY CONFIDENTIAL

## Note C2

# UNITED NATIONS AND EUROPEAN UNION SANCTIONS STATEMENT OF ROLES AND RESPONSIBILITIES

### Introduction

*The purpose of this statement is to provide a clear explanation of the action that units and individuals are required to take to ensure that there is adherence to the Group's policy on compliance with sanctions legislation.*

1. UK businesses across The Royal Bank of Scotland Group are required under UK law to comply with sanctions that have been imposed by the United Nations and the European Union. In general, the sanctions require financial institutions to ensure that affected customers do not have access to their funds. These sanctions are directed at a mixture of individuals, corporate entities and organised bodies. HM Treasury enforces compliance with sanctions legislation through the Bank of England and breach of the sanctions is a criminal offence.

2. Although non-compliance with the sanctions legislation carries individual criminal responsibility, it is the responsibility of both management and staff within each business unit to ensure that the Group's policy on sanctions-compliance is being adhered to and that its legal obligations are being met.

3. The purpose of this paper is to detail the roles and responsibilities of those staff within the Group who have specific sanctions-compliance responsibilities. Although it is the primary responsibility of these individuals to ensure that the Group's sanctions-compliance policy is adhered to, this responsibility extends to all staff within the Group.

4. Business Area Senior Management have prime responsibility for ensuring that the sanctions-compliance policy is adhered to and that their business unit is operating in a compliant manner, meeting both its legal and regulatory obligations. Although Business Area Senior Management should design and implement systems and procedures relevant to their own business, Group Compliance Department must be advised of the controls which are to be implemented in order that confirmation can be obtained that the proposed system of controls meets the Group's policy.

5. Sanctions-compliance responsibilities rest on the following:

   - Business Area Senior Management
   - Local Compliance function
   - Group Compliance Department
   - Group Legal Department
   - Centrally Managed Accounts Unit

6. In addition, there will be a monitoring process which will involve relevant business units, Local Compliance functions and Group Compliance Department.

HIGHLY CONFIDENTIAL

11C20  Compliance Manual - Bank of England Sanctions

## Responsibilities

**A)    Business Area Senior Management**

The responsibilities of the senior management in each business area are:

i)     To ensure that appropriate procedures, controls and staff training programmes are established, maintained and amended as necessary in their business area.  This will include ensuring that detailed Roles and Responsibilities are drafted for, and communicated to, all relevant staff.

ii)    To ensure that Local Compliance functions are provided with appropriate information to facilitate their involvement in the communication of policies and standards to staff and in supporting the Group's sanctions-compliance policy proactively.

iii)   To decide, after consultation with Local Compliance functions or Operational Control Units, how the procedures and controls relevant to each business are to be monitored to ensure effective implementation and ongoing operation.  The agreed local responsibilities should be clearly documented, with Group Compliance being provided with details.

iv)    To ensure that regular monitoring procedures are in place and are implemented effectively.  Where control weaknesses are identified, to take all necessary remedial action to address those weaknesses.

v)     To make Compliance declarations, on behalf of the business, in the course of normal Compliance reporting, having undertaken sufficient research to establish that the Group's sanctions-compliance policy, procedures and controls are being adhered to.

**B)    Local Compliance Functions**

Each Local Compliance function has a key role to play in ensuring that appropriate standards are being maintained and that controls and systems, appropriate to the nature of their business, have been established.  The Local Compliance functions' responsibilities are:

i)     To provide guidance and assistance to Business Area Senior Management in the implementation of their responsibilities for sanctions-compliance.

ii)    To establish and implement appropriate controls and procedures to meet the Group's sanctions-compliance policy.

iii)   To ensure that controls and procedures in the business are practical, effective, reviewed regularly and understood by relevant staff.

iv)    To provide guidance to staff in the business so that a satisfactory level of awareness exists and is kept up-to-date.  Staff training and awareness of the controls and procedures which have been implemented is a key element in reducing the risk that the Group will be involved in breaches of the sanctions legislation.  The Local Compliance function should ensure that effective training systems are in place to make staff aware of the legal and regulatory obligations, with this aspect being monitored through the required monitoring process.

NW 212053
NW212053

v)      To liaise with Group Compliance Department on ongoing compliance, and, where appropriate, to make regular reports to the business unit's senior management on weaknesses and controls or breaches of sanctions legislation which have been identified. Group Compliance Department must also be provided with copies of these reports.

## C)  Group Compliance Department

The responsibilities of Group Compliance Department are:

i)      To co-ordinate the creation, with appropriate executive management and board endorsement and support, of Group policy on the steps that the Group will take to meet its legal obligations.  The sanctions-compliance policy, which Group Compliance Department will own, will reflect both the needs of the business and the legal and regulatory obligations that the Group is required to operate under.

ii)     To develop and maintain Group Compliance policy and ensure that this is disseminated throughout the Group, including overseas operations, where appropriate.

iii)    To keep abreast of changes in the law and regulation and, where appropriate, to make representations on behalf of the Group regarding these changes.

iv)     To be the primary point of contact for the Group with the Bank of England and HM Treasury on issues relating to sanctions-compliance.  This is in recognition that other areas within the Group, for example Group Internal Audit and Group Legal Department, will have an interest in these issues.

v)      To conduct regular reviews of the adequacy of the Group's sanctions-compliance policy, the statements of roles and responsibilities and other relevant documentation to ensure that these reflect accurately the current legal, regulatory and business environment.

vi)     To make regular reports to the Group Executive Management Committee, and the Group Audit Committee, on sanctions-compliance related issues and to prepare appropriate reports for the Group Director, Legal and Regulatory Affairs and Group Secretary.

## D)  Group Legal Department

The responsibilities of Group Legal Department are:

i)      To interpret, on behalf of the Group, new and existing sanctions legislation in order to assess its impact on Group businesses and Head Office functions and on existing Group policy.

ii)     To provide advice and guidance to Group Compliance Department, Group Internal Audit and the businesses, as regards the interpretation of United Nations and European Union sanctions legislation.

iii)    To deal with any litigation or other claims against the Group arising from non-compliance with sanctions legislation.

HIGHLY CONFIDENTIAL

11C22  Compliance Manual – Bank of England Sanctions

## **Monitoring Process**

A review process is required to assess the effectiveness of sanctions-compliance controls within each business.  Senior management in each business area should determine how best to conduct this assessment process, bearing in mind the operational environment of the business.  The monitoring process may, for example, be undertaken by a Local Compliance function or by Key Control Checkers.  Business Area Senior Management should make Group Compliance Department aware of the monitoring process which is to be used.  Where appropriate, Group Compliance Department will carry out overview reviews of the monitoring unit to assess the effectiveness of their monitoring of the sanctions-compliance controls.

### A)     **Business Areas**

Business area monitoring units' responsibilities are:

i)      To be satisfied that the Group sanctions-compliance policy has been communicated effectively to, and accepted, understood and applied by staff in their business and by senior management.

ii)     To check that controls and procedures are in place and are effective.  To confirm that staff training programmes have been established and are maintained and amended as necessary.  To ensure that all controls, procedures and training remain current and relevant to the business area.

iii)    To provide periodic reports on the effectiveness of the sanctions-compliance controls in the business to senior management and to Local Compliance functions, where appropriate.

iv)    To ensure that suitable remedial action is taken to address any control weaknesses highlighted as part of the monitoring process.  Where necessary, this will involve undertaking a follow-up review to ensure that Business Area Senior Management have taken appropriate action.

HIGHLY CONFIDENTIAL

**B)**   **Group Compliance Department**

The responsibilities of Group Compliance Department are:

i)     To ensure that, within each business, sanctions-compliance responsibilities are clearly defined, implemented and documented.

ii)    To oversee the Local Compliance functions, where their role includes the monitoring of compliance controls, or the role of the Key Control Checkers.

iii)   To ensure that each business has implemented a suitable monitoring programme and that appropriate remedial action is being taken to address any control weaknesses highlighted. Where necessary, Group Compliance Department will report or escalate any deficiencies in the monitoring process to the relevant senior management.

iv)    To be aware of, and assist in where required, the ongoing development and effective implementation of sanctions-compliance training for all relevant staff.  To set up an effective communication programme to enable the sharing of best practices and to bring relevant sanctions-compliance issues to the attention of appropriate contacts across the Group.

v)     To ensure that Business Area Senior Management report weaknesses and trends, with appropriate frequency, and to receive reports/management information on significant sanctions-compliance issues from the business and Local Compliance functions where appropriate.

January 2001

11C24  Compliance Manual - Bank of England Sanctions

HIGHLY CONFIDENTIAL

# Bank of England Sanctions

**Table of Contents**

This chapter covers the undernoted topics:

| Topic | See Page |
|---|---|
| **United Nations and European Union Sanctions** | |
| List of Countries affected by Bank of England Sanctions: | 11C.1 |
|     Afghanistan (Taliban) | 11C.3 |
|     Angola | 11C.5 |
|     Burma (Myanmar) | 11C.7 |
|     Iraq | 11C.9 |
|     Serbia and Federal Republic of Yugoslavia (FRY) | 11C.13 |
| **Note C1** <br> The Policy of The Royal Bank of Scotland Group plc | 11C.15 |
| **Note C2** <br> Statement of Roles and Responsibilities | 11C.19 |

HIGHLY CONFIDENTIAL

Compliance Manual - Bank of England Sanctions

HIGHLY CONFIDENTIAL

# Bank of England Sanctions

**Introduction**

On instruction from the Government, the Bank of England administers financial sanctions against certain countries. The sanctions restrict the operating of accounts held by a government, person or business affected by the sanctions.

The Bank is therefore obliged to closely monitor the accounts of customers falling within the remit of the sanctions and to take particular care when opening accounts for those who may be affected by the sanctions.

The Bank of England sanctions must be complied with by all financial institutions authorised under the Banking Act 1987.

**Staff are reminded that breach of sanctions legislation is a criminal offence. Either the individual responsible or the Bank could be prosecuted. In some serious cases the Bank will consider taking disciplinary action against the staff concerned.**

The countries currently affected by Bank of England sanctions are:

- Afghanistan (Taliban)
- Angola
- Burma (Myanmar)
- Iraq
- Serbia
- Federal Republic of Yugoslavia.

Branches should be vigilant as to whether or not sanctions should be considered when applying an Overseas Residents Code.

Care must also be taken when completing Non Ordinary Residency Declarations (NORDs).

The extent of the sanctions varies from country to country. Branches must follow the correct procedures according to the restrictions relating to each country as detailed on this and subsequent pages.

If a customer has a connection with Iraq the branch **must** take instruction from the Centrally Managed Account Unit (CMAU) before proceeding.

If a customer has a connection with one of the other countries listed above, instruction **must** be taken from the Operations Support Helpdesk before continuing with the account opening process.

**Failure to contact the CMAU or the Operations Support Helpdesk, or follow the instructions provided may lead to disciplinary action against the member of staff concerned.**

*Continued on next page*

NW 212060
NW212060

# Bank of England Sanctions, Continued

**Introduction**
(cont'd)

Contact details for Operations Support are:

**Operations Support Helpdesk,**
The Broadstone,
50 South Gyle Crescent,
Edinburgh

☎ **0800 389 2255**

**Centrally Managed Accounts Unit**
Operations Support
The Broadstone
50 South Gyle Crescent,
Edinburgh

☎ **0131 523 9947/9948/9949/9950**

**Fax: 0131 523 2125**

HIGHLY CONFIDENTIAL

NW 212061
NW212061

# Afghanistan (Taliban)

| | |
|---|---|
| **Who do the sanctions cover?** | Sanctions cover the Taliban and any undertaking owned or controlled by the Taliban. |

Branches **must** contact the Operations Support Helpdesk if an approach is made to open an account by a resident of Afghanistan or by anyone who has a connection with Afghanistan.  This applies whether the approach is made by an individual, company or other body.

Approaches by solicitors, stockbrokers, accountants etc to open accounts on behalf of the Taliban should also be referred to the Operations Support Helpdesk. Operations Support will advise branches whether the individual or body may be affected by the Sanctions.

If an account is affected by sanctions it should be marked with a no-operations indicator, and the country name detailed in the customers' short name. The appropriate Overseas Residency Code should also be added.

Under **NO** circumstances should a withdrawal be made without receiving authorisation from the Operations Support Helpdesk.

**Failure to contact the Operations Support Helpdesk or follow the instructions provided may lead to disciplinary action against the member of staff concerned.**

**Borrowing**

**No borrowing** of any kind is allowed if an account has been designated or if the Bank is awaiting clarification from the Sanctions Unit regarding the need to block an account. This includes overdrafts, loans, credit card facilities, and mortgages.

**Currency Accounts**

Sanctions apply to Currency accounts as well as Sterling accounts.

HIGHLY CONFIDENTIAL

# Angola

**General**

The Bank is periodically provided with lists, by the Bank of England, of individuals affected by the Sanctions against Angola.  The Sanctions Unit has confirmed that if an Angolan resident wishes to open an account and his/her name is not mentioned in the list provided, the account may be opened.

Residency is established from a passport.

Branches are advised to contact Operations Support Helpdesk if an approach is made to open an account by an Angolan resident, in order that the person's name may be checked against the list.

It is important that, where an individual may be affected by the sanctions, the individual is made aware of the need for the Bank to refer to Sanctions Unit before an account is opened and payments are made into the account.

If an account is affected by sanctions it should be marked with a no-operations indicator, and the country name detailed in the customers' short name. The appropriate Overseas Residency Code should also be added.

Under **NO** circumstances should a withdrawal be made without receiving authorisation from the Operations Support Helpdesk.

**Failure to contact the Operations Support Helpdesk or follow the instructions provided may lead to disciplinary action against the member of staff concerned.**

**Borrowing**

**No borrowing** of any kind is allowed if an account has been designated or if the Bank is awaiting clarification from the Sanctions Unit regarding the need to block an account. This includes overdrafts, loans, credit card facilities, and mortgages.

**Currency Accounts**

Sanctions apply to Currency accounts as well as Sterling accounts.

HIGHLY CONFIDENTIAL

11C6  Compliance Manual – Bank of England Sanctions

HIGHLY CONFIDENTIAL

# Burma (Myanmar)

**Who do the sanctions cover?**

Sanctions affect certain individuals connected with the government and other authorities in Burma (Myanmar).

Branches are advised to contact Operations Support Helpdesk if an approach is made to open an account by a resident of Burma (Myanmar) or by anyone who has a connection with Burma (Myanmar).

Approaches by stockbrokers, solicitors, accountants etc. to open accounts on behalf of such individuals should also be referred to Operations Support. Operations Support will advise branches whether the individual may be affected by the Sanctions.

If an account is affected by sanctions it should be marked with a no-operations indicator, and the country name detailed in the customers' short name. The appropriate Overseas Residency Code should also be added.

Interest may be credited to a blocked account, no other payment **to or from** the account is permitted without receiving authorisation from the Operations Support Helpdesk.

**Failure to contact the Operations Support Helpdesk or follow the instructions provided may lead to disciplinary action against the member of staff concerned.**

**Borrowing**

**No borrowing** of any kind is allowed if an account has been designated or if the Bank is awaiting clarification from the Sanctions Unit regarding the need to block an account. This includes overdrafts, loans, credit card facilities, and mortgages.

**Currency Accounts**

Sanctions apply to Currency accounts as well as Sterling accounts.

HIGHLY CONFIDENTIAL

HIGHLY CONFIDENTIAL

# Iraq

| | |
|---|---|
| **Who do the sanctions cover?** | In 1990 the United Nations imposed financial and economic sanctions against the regime in Iraq. One aspect of these sanctions is the placing of financial restrictions against accounts held in the UK by Iraqi residents. |

Consequently accounts belonging to customers who are Iraqi residents must be maintained in accordance with the 1990 legislation.

Breach of this legislation is a criminal offence. Either the individual responsible or the Bank could be prosecuted. In some serious cases the Bank will consider taking disciplinary action against the staff concerned.

The Bank of England Sanctions affect any individual or body corporate, normally resident in Iraq.

Residency is established from a passport in line with normal account opening procedures.

A branch in Iraq of any business is treated as if the branch were a body corporate resident in Iraq.

**Documents showing an individual may be affected by the Sanctions against Iraq**

All accounts in name of Iraqi residents are held at the Centrally Managed Account Unit (CMAU).

In the case of an individual or body corporate, requesting to open an account where there is an indication of a connection with Iraq, reference must be made to the CMAU. The CMAU will instruct the branch with regard to appropriate documentation to allow a decision to be made on where the account will be opened.

**The branch must follow the instructions and decisions given by the CMAU. Failure to contact the CMAU or follow the instructions provided may lead to disciplinary action against the member of staff concerned.**

If the appropriate documentation confirms that the customer is not an Iraqi resident the CMAU will authorise the branch to open the account without restrictions applying. Details of the passport etc. should be retained in line with normal account opening procedures. No mention of Iraq should be attached to the customer's account either in the short name or Overseas Residency Code if the customer is not classified as an Iraqi resident.

*Continued on next page*

HIGHLY CONFIDENTIAL

# Iraq, Continued

| | |
|---|---|
| **Documents showing an individual may be affected by the Sanctions against Iraq** (cont'd) | Examples of the appropriate documentation showing non-Iraqi residency are detailed below:<br><br>• a British passport<br>• an Immigration Document granting the individual **indefinite** leave to remain in the UK.  Please note that  temporary leave is not the same as indefinite leave<br>• a passport from a country which is not covered by the Bank of England Sanctions. |
| **An individual's documents that indicate he may be an Iraqi resident and therefore affected by the Sanctions** | If none of the above documents are provided and the information provided by the customer shows that he may be an Iraqi resident, the CMAU will approach the Bank of England Sanctions Unit for further guidance.  Branches should tell the customer that an account can be opened, but that the Bank will need to seek permission from the Bank of England Sanctions Unit for any withdrawals to be made from the account.<br><br>It is important that customers are made aware of the need for the Bank to refer to the Sanctions Unit before an account is opened and payments are credited to the account.<br><br>As all accounts for Iraqi residents are now held centrally, the branch should send a fully completed application form and verified photocopies of all documentation provided by the customer as identification. This documentation should include a full copy of the customer's passport and any other relevant information relating to the customer's residency, e.g. correspondence with the Home Office. They should also complete an Income and Expenditure form at this time and send all the information to the CMAU.<br><br>The  CMAU will then contact the Bank of England and if the customer cannot be redesignated as a Non-Iraqi resident they will open an account for the customer at the  CMAU – Sort Code 836111.<br><br>If the Bank of England advises that the customer can be redesignated as a Non-Iraqi resident and is therefore not affected by Sanctions, the documentation will be returned to the branch to open the account for the customer without restriction.  No mention of Iraq should be attached to the customer's account either in the short name or Overseas Residency Code if the customer has been classified by the Bank of England as a non-Iraqi resident. |

*Continued on next page*

HIGHLY CONFIDENTIAL

# Iraq, Continued

| | |
|---|---|
| **An individual's documents that indicate he may no longer be an Iraqi resident and therefore not affected by the Sanctions** | If a customer advises your branch that he/she has an account with the CMAU and now has documentation to prove that he/she is no longer a resident of Iraq, you should contact the CMAU on one of the following numbers :- |

☎ **0131 523 9947/ 9948/ 9949/ 9950**

The CMAU will need to refer the case to the Bank of England. The branch should ask the customer to provide:

- a full copy of their passport (photocopy all pages, including blank ones); and
- any other information, which will enable the Sanctions Unit to establish residency, e.g. visas, correspondence with Home Office, Certificate of Naturalisation etc.

Please note that the customer will need to provide an authenticated translation of any documentation held.

The branch should photocopy and verify the documentation provided and send with a covering memo to the CMAU.

The CMAU will advise the Bank of England Sanctions Unit of the details and await permission for the customer to be redesignated. Once authorisation has been received from the Bank of England, the CMAU will advise the customer. The customer's account will then be transferred to the branch of the customer's choice. The branch will be contacted by the CMAU, and asked to open an account for the customer free from restriction.

| | |
|---|---|
| **Account held at the CMAU 83-61-11** | **All accounts for known Iraqi residents were transferred to the CMAU in Nov/Dec 2000 and all new accounts should be opened at the CMAU.** |

**When a customer advises that their account is held at the CMAU and they wish to withdraw funds, referral should always be made to the CMAU. Under NO circumstances should any withdrawal be made without receiving authorisation from the CMAU. This applies even where Bank of England approval for the withdrawal has been obtained on a previous occasion. The CMAU can be contacted on the following numbers:**

☎ **0131 523 9947/ 9948/ 9949/ 9950**
**Fax 0131 523 2125**

**Failure to contact the CMAU or follow the instructions provided may lead to disciplinary action against the member of staff concerned.**

*Continued on next page*

HIGHLY CONFIDENTIAL

# Iraq, Continued

| | |
|---|---|
| **Account held at the CMAU 83-61-11 (cont'd)** | Pay-ins can be accepted without referral to the CMAU. |

The Unit will have arranged for living expenses to be paid for the customers, where appropriate, by standing order or direct debit. If the customer approaches your branch for their living expenses to be increased you should obtain details of the expenses from the customer e.g. utility bills, food expenses etc. along with any change to the income the customer is proposing to have paid into the account.

At this time the branch should ask the customer if they have any new documentation which may prove he/she is no longer a resident of Iraq. This should be photocopied and verified by the branch and sent to the CMAU.

Particulars of their increased living expenses and any new documentation should be detailed in a quick note and sent with the above to CMAU who will advise the Bank of England Sanctions Unit of the details and await permission for these expenses to be approved. Once authorisation has been received the CMAU will advise the customer. Standing Orders and/or Direct Debits will then be set up on the customer's account as appropriate.  Bills will be paid by the CMAU direct on the customer's behalf. If the customer requires cash, individual cases will be dealt with between the CMAU and respective branch(es) as the occasion arises.

**Borrowing**

**No borrowing** of any kind is allowed if an account has been designated as belonging to an Iraqi resident or if the Bank is awaiting clarification from the Sanctions Unit regarding the need to block an account. This includes overdrafts, loans, credit card facilities, and mortgages.

**Currency Accounts**

Sanctions apply to Currency accounts as well as Sterling accounts.

**Unblocking of Accounts**

Branches do not have authority to decide whether an account should be unblocked. All such requests must be referred to the CMAU who will contact the Bank of England.

HIGHLY CONFIDENTIAL

# Serbia and Federal Republic of Yugoslavia (FRY)

| | |
|---|---|
| **Who do the sanctions cover?** | FRY Sanctions cover the former President of the FRY, Slobodan Milosevic and certain individuals associated with him. |
| | Branches are advised to contact Operations Support Helpdesk if an approach is made by a resident of FRY or Serbia to open an account or by anyone who may have a connection with the former President. |
| | Operations Support will advise branches whether the individual or body may be affected by the Sanctions. |
| | Residency is established from a passport. |
| | Where an individual may be affected by the sanctions, it is important that individual is made aware of the need to refer to Sanctions Unit before an account is opened and payments are made into account. |
| | If an account is affected by sanctions it should be marked with a no-operations indicator, and the country name detailed in the customers' short name. The appropriate Overseas Residency Code should also be added. |
| | Under **NO** circumstances should a withdrawal be made without receiving authorisation from the Operations Support Helpdesk. |
| | **Failure to contact the Operations Support Helpdesk or follow the instructions provided may lead to disciplinary action against the member of staff concerned.** |
| **Borrowing** | **No borrowing** of any kind is allowed if an account has been designated or if the Bank is awaiting clarification from the Sanctions Unit regarding the need to block an account. This includes overdrafts, loans, credit card facilities, and mortgages. |
| **Currency Accounts** | Sanctions apply to Currency accounts as well as Sterling accounts. |

HIGHLY CONFIDENTIAL

11C14   Compliance Manual - Bank of England Sanctions

HIGHLY CONFIDENTIAL

**EXHIBIT 102 TO DECLARATION OF VALERIE SCHUSTER**

- 1

```
1   UNITED STATES DISTRICT COURT
2   EASTERN DISTRICT OF NEW YORK
    ---------------------------------------------x
3   TZVI WEISS, et al.,
4           Plaintiffs,
5       -against-
6   NATIONAL WESTMINSTER BANK, PLC,
7           Defendant.
    ---------------------------------------------x
8   NATAN APPLEBAUM, et al.,
9           Plaintiffs,
10      -against-
11  NATIONAL WESTMINSTER BANK, PLC,
12          Defendant.
    ---------------------------------------------x
13
14          * HIGHLY CONFIDENTIAL *
15
16
17      VIDEOTAPED DEPOSITION OF IAN WICKENS,
18  taken before Cheryll Kerr, a Notary Public
19  and a Shorthand Reporter, held at the offices
20  of Cleary, Gottlieb, Steen & Hamilton, LLP,
21  located at 55 Basinghall Street, London,
22  England on Monday, the 23rd day of June,
23  2008, at 9:36 a.m.
24
25
```

2

```
1   APPEARANCES:
2   KOHN, SWIFT & GRAF, P.C.
        Attorneys for Plaintiff Tzvi Weiss
3       One South Broad Street, Suite 2100
        Philadelphia, Pennsylvania  19107-3304
4
    BY:   STEPHEN H. SCHWARTZ, ESQ.
5
6   SAYLES WERBNER, P.C.
        Attorneys for Plaintiff Natan Applebaum
7       4400 Renaissance Tower
        1201 Elm Street
8       Dallas, Texas  75270
9   BY:   MARK S. WERBNER, ESQ.
10
    CLEARY GOTTLIEB STEEN & HAMILTON, LLP
11      Attorneys for Defendant National
        Westminster Bank, PLC
12      One Liberty Plaza
        New York, New York  10006-1470
13
    BY:   LAWRENCE B. FRIEDMAN, ESQ.
14      PATRICK SHELDON, ESQ.
15
    GLANCY BINKOW & GOLDBERG, LLP
16      Attorneys for Plaintiff Tzvi Weiss
        1430 Broadway, Suite 1603
17      New York, New York  10018
18  BY:   ANDREW FRIEDMAN, ESQ. (OF COUNSEL)
19
    Also Present:  Jackie Sheftali, NatWest;
20  Simon Rutson, Videographer
21
22      *****   *****   *****
23
24
25
```

3

```
1                INDEX
2   EXAMINATION BY            PAGE
3   MR. WERBNER              9
4   MR. A. FRIEDMAN          256
5
6
7           EXHIBITS
8
    WICKENS
9   FOR ID    DESCRIPTION        PAGE
10  No. 1   Document bearing Bates Nos.   142
            NW 017199 through 17204
11
    No. 2   Document bearing Bates Nos.   146
12          NW 16216 through 16228
13  No. 3   Document bearing Bates Nos.   147
            NW 1118 through 1337
14
    No. 4   Document beginning with       164
15          Bates No. NW 14014
16  No. 5   Document bearing Bates Nos.   158
            NW 8367 through 8373
17
    No. 6   Document bearing Bates Nos.   164
18          NW 8381 through 8398
19  No. 7   Document bearing Bates Nos.   166
            NW 13685 through 13686
20
    No. 8   Document bearing Bates Nos.   235
21          NW 8374 through 8378
22  No. 9   Document bearing Bates        235
            No. NW 13197
23
24
25  (Continued)
```

4

```
1   WICKENS
    FOR ID    DESCRIPTION        PAGE
2
    No. 10  Document bearing Bates        236
3           No. NW 13636
4   No. 11  Document bearing Bates Nos.   237
            NW 51994 through 51997
5
    No. 12  Document bearing Bates Nos.   240
6           NW 14465 through 14467
7   No. 13  Document bearing Bates Nos.   241
            NW 50721, 722, 725, 726
8
    No. 14  Document bearing Bates Nos.   242
9           NW 14468 through 14497
10  No. 15  Document bearing Bates Nos.   244
            NW 13969 through 13973
11
    No. 16  Document bearing Bates Nos.   245
12          NW 1082 through 1099
13  No. 17  Document bearing Bates        245
            NW No. 8417
14
    No. 18  Document bearing Bates Nos.   247
15          16216 through 16228
16  No. 19  Document bearing Bates Nos.   248
            16216 through 16228
17
    No. 20  Document bearing Bates        250
18          No. 13659
19  No. 21  Document bearing Bates Nos.   251
            NW 12965 through 12966
20
    No. 22  Document bearing Bates        251
21          No. NW 12976
22  No. 23  Document bearing Bates Nos.   252
            NW 17217 through 17218
23
24
25  (Continued)
```

93

1    could be determined.
2        Q.   What -- what did it say, as best you
3    remember?
4        A.   It -- it defined the two categories of
5    name that was to be checked for.  It then said that
6    you -- it gave some indicative criteria of what you
7    needed to match against in order to say whether it
8    was a true match or not, because it had never been
9    defined in any law that we are aware of.  It's left
10   to the institutions to -- to decide on their own
11   initiative what they regard as what's a match and
12   how are they will go to check it out.
13       But yes, if you get a match according to a
14   number of predefined criteria based on name, first
15   name or initial, date of birth, that sort of stuff,
16   then either discount them completely, because quite
17   clearly on further inquiry they were seen not to be
18   matches, or there was a middle category which had to
19   be recorded -- I think we recorded all these, mind
20   you, but the middle category was one which was, you
21   know, not conclusively discounted, but where on the
22   balance of probability, I think it was not a match,
23   and a record had to be kept of those, but no further
24   action.
25       Then if they were confirmed matches or what

94

1    appeared to be confirmed matches, because even
2    though there was sort of gray areas at the margin,
3    they were reported to our department and ultimately
4    would be reported to the Bank of England, and
5    that --
6        (Informal discussion held off the
7    record.)
8        THE WITNESS:  These names would be
9    reported -- these matches would be
10   reported to the Bank of England and
11   appropriate instructions sought back.
12   BY MR. WERBNER:
13       Q.   What are the defined two categories?
14       A.   Suspected persons one and two.  To be
15   honest, I can't remember the fine detail of -- of
16   what those categories are.
17       Q.   Well, can you remember anything about the
18   two defined categories?
19       A.   You know, at the end of the day, the --
20   they are the names which we are being asked to
21   screen for, whether for financial sanctions
22   purposes -- in other words, nonterrorist related,
23   and terrorist related.
24       Oh, I think what it is, the second category
25   involves names which are published by other external

95

1    authorities which could therefore include NCIS and
2    other bodies, and indeed including overseas, where
3    our local operations would be subject to search
4    lists distributed within their own jurisdictions,
5    which they would be legally required to check, as in
6    the case of our United States subsidiaries were
7    being required to check their fact list.
8        Q.   So let's say as President George Bush or
9    the United States Treasury made announcements,
10   designations of persons or entities that were viewed
11   as terrorist, what mechanism at NatWest was there
12   for tracking that and -- and -- and dealing in any
13   way with that?
14       MR. L. FRIEDMAN:  Object to the form.
15       THE WITNESS:  If the same names got
16   into the list published by the Bank of
17   England, then obviously we were required
18   to act on them.  As far as names which
19   made it into the OFAC list, then United
20   States subsidiaries companies were legally
21   bound to take full note -- note of those.
22   Otherwise, we were not.
23   BY MR. WERBNER:
24       Q.   Well, I am not really asking you for a
25   legal opinion.  I am -- I am asking what NatWest did

96

1    or didn't do, whether legally obligated or not.
2        So with that clarification, my question is
3    simply:  What did NatWest and the Royal Bank of
4    Scotland do, if anything, in regard to persons or
5    entities that the United States government
6    designated as terrorist?
7        MR. L. FRIEDMAN:  Mark, I object to
8    the form.  Can I ask you a clarifying
9    question, Mark?
10       MR. WERBNER:  Okay.
11       MR. L. FRIEDMAN:  I mean, I -- I am
12   not sure what you are getting at.  You
13   might be getting at both things, because
14   in the two questions, first you asked what
15   did NatWest do, if anything, to learn
16   about whether these designations occurred,
17   and then the second was, what did NatWest
18   do upon those designations.
19       Should we break that up?  Because I
20   think you are asking about the logistics
21   of --
22       MR. WERBNER:  Okay.  You wanted to
23   ask me a question.  Is that everything?
24       MR. L. FRIEDMAN:  No, I am seeking a
25   clarification as to what you are asking

**EXHIBIT 103 TO DECLARATION OF VALERIE SCHUSTER**

## Expert Report of John Barker

I am a member of the Bar of the District of Columbia, and of the law firm Arnold & Porter LLP. I submit this report in the lawsuits captioned Weiss, et al. v. National Westminster Bank, PLC (Case No. 05-cv-4622 (DLI)(MDG)) and Applebaum, et al. v. National Westminster Bank, PLC (Case No. 07-cv-916 (DLI)(MDG)), which I understand are pending in the United States District Court for the Eastern District of New York. A copy of my *curriculum vitae* is attached to this report as Exhibit A. A list of my publications during the previous 10 years is attached to this report as Exhibit B. I have not previously testified as an expert at trial or by deposition. I am being compensated for my study and testimony in these cases at the rate of $795 per hour. The materials upon which I have relied in preparing this report are listed in Exhibit C.

1. Plaintiffs' expert Mr. Walters's implication in paragraph 8 of his report that Interpal's designation as a Specially Designated Global Terrorist ("SDGT") by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC") is relevant to what I understand to be plaintiffs' claims in these cases is unfounded. The OFAC regulations pertaining to dealings with SDGTs do not apply to the activities of foreign persons, in this case, a bank organized and conducting business in this case outside the U.S.

2. In this case, the Global Terrorism Sanctions Regulations ("GTSR") and the Terrorism Sanctions Regulations ("TSR") define the jurisdiction of OFAC, the U.S. government agency responsible for enforcing the relevant sanctions. The jurisdictional definitions of the GTSR and the TSR make clear that OFAC jurisdiction did not extend to the banking services that I

understand National Westminster Bank ("NatWest") provided to Interpal in England, including the transferring of funds from Interpal's accounts in England pursuant to Interpal's instructions.

3. Each of the terrorism designations in the OFAC regulations apply only to the activities of U.S. persons (which are defined in the regulations to include any person in the U.S. or the activities of any persons who seek to evade the U.S. regulations through activities conducted in the U.S.) and foreign persons actually located in the U.S. The terrorism regulations do not apply to the activities of foreign persons outside the U.S. In this case, NatWest's activities in England in providing banking services to Interpal would be considered activities of a "foreign person" and thus not subject to OFAC jurisdiction. The GTSR and the TSR are the two primary sets of terrorism sanctions regulations, and they use effectively the same standard to determine jurisdiction.

**The Global Terrorism Sanctions Regulations**

4. Interpal was designated under the GTSR. The GTSR, at 31 C.F.R. Part 594, require "U.S. persons" to "block" property or interests in property owned or held by persons or entities identified by U.S. authorities as having committed terrorist acts or posing a risk of committing terrorist acts, when such property or interests in property are within the U.S. or come within the possession or control of "U.S. persons or their overseas branches." *See* 31 C.F.R. § 594.201(a). The U.S. government lists those persons or entities it has determined to represent a terrorist risk on the Specially Designated Nationals list ("SDN list"). Such persons and entities appear on the SDN list with "[SDGT]" at the end of the entry to indicate that the entity was placed on the list under the GTSR. "Blocking" of property or interests in property under 31 C.F.R. § 594.201(a) means that U.S. persons may not enter into any deal or transaction involving the "blocked" property; that property is effectively frozen. The GTSR prohibit U.S. persons from engaging in

2

any transaction or dealing in property or interests in property of persons appearing on the SDN list.  *See* 31 C.F.R. § 594.204.

5.  The GTSR also prohibit U.S. persons and persons within the U.S. from engaging in any transactions intended to evade or avoid the restrictions the GTSR impose.  *See* 31 C.F.R. § 594.205.  In addition, the prohibitions in Sections 594.201 and 594.204 on engaging in transactions or dealings in property subject to those sections prohibit "U.S. financial institutions" from performing under any existing credit agreements, including, but not limited to, charge cards, debit cards, or other credit facilities issued by a U.S. financial institution to a person whose property or interests in property are blocked under the GTSR.  *See* 31 C.F.R. § 594.410.

6.  The GTSR also have provisions specifically related to banks and financial institutions.  Under the GTSR, "[a]ny payment of funds or transfer of credit in which a person whose property or interests in property are blocked pursuant to Section 594.201(a) has any interest, that comes within the possession or control of a U.S. financial institution, must be blocked in an account on the books of that financial institution."  *See* 31 C.F.R. § 594.504.

7.  These prohibitions apply to "U.S. persons" and "U.S. financial institutions," and are specifically written to be so limited.  This reflects the fact that OFAC's jurisdiction applies to "U.S. persons," a specific term that is defined by the GTSR as "any United States citizen, permanent resident alien, entity organized under the laws of the United States (including foreign branches), or any person in the United States."  31 C.F.R. § 594.315.

8.  Section 594.304 of the GTSR defines a "foreign person" as "any citizen or national of a foreign state (including any such individual who is also a citizen or national of the United States), or any entity not organized solely under the laws of the United States or existing solely in the United States, but does not include a foreign state."

3

9. Finally, the GTSR define "U.S. financial institutions" as "any U.S. person (including its foreign branches) that is engaged in the business of accepting deposits, making, granting, transferring, holding, or brokering loans or credits, or purchasing or selling foreign exchange, securities, commodity futures or options, or procuring purchasers and sellers thereof, as principal or agent; including but not limited to, depository institutions, banks, savings banks, trust companies, securities brokers and dealers, commodity futures and options brokers and dealers, forward contract and foreign exchange merchants, securities and commodities exchanges, clearing corporations, investment companies, employee benefit plans, and U.S. holding companies, U.S. affiliates, or U.S. subsidiaries of any of the foregoing. *This term includes those branches, offices and agencies of foreign financial institutions that are located in the United States, but not such institutions' foreign branches, offices, or agencies.*" 31 C.F.R. § 594.314 (emphasis added).

10. Based on these definitions, the activities of NatWest in providing banking services to Interpal in England were not subject to OFAC jurisdiction. I understand NatWest is a U.K. bank, headquartered in England and organized under U.K. law. It is "an entity not organized solely under the laws of the United States"; it is organized under the laws of the U.K., and therefore falls within the GTSR's definition of a "foreign person." Further, because it is not an "entity organized under the laws of the United States," it is not a "U.S. person" under the GTSR.

11. This is made especially clear by the GTSR's definition of "U.S. financial institutions." Under that definition, NatWest's English operations are not subject to the GTSR. The definition of "U.S. financial institutions" explicitly states that it "includes those branches, offices and agencies of foreign financial institutions that are located in the United States, but not such institutions' foreign branches, offices, or agencies." 31 C.F.R. § 594.314. This statement

4

explicitly excludes the foreign operations of foreign financial institutions from the GTSR's coverage. This is precisely the situation in this case – NatWest is a foreign financial institution (based on the definition of foreign person in section 594.304), and its foreign offices and their operations -- including NatWest's headquarters and operations in England -- are not covered. Any assertion that NatWest's English offices and their operations are subject to OFAC jurisdiction would render the italicized language from section 560.314 quoted above a nullity. Rather, that language explicitly contemplates circumstances in which U.S. branches of a foreign bank are subject to OFAC jurisdiction, while foreign branches and offices of that foreign bank are not.

**The Terrorism Sanctions Regulations**

12. The TSR, like the GTSR, provide for blocking the property or property interests of terrorists appearing on the SDN lists where that property or those property interests are in the U.S. or come into the possession or control of a U.S. person. *See* 31 C.F.R. § 595.201(a). The TSR specifically prohibit "U.S. persons" from dealing in the property of specially designated terrorists. *See* 31 C.F.R. § 595.204. These specially designated terrorists appear on the SDN list with "[SDT]" at the end of the entry to indicate that the entity was placed on the list under the TSR. In addition, U.S. financial institutions are not permitted to transfer money from a blocked account within the U.S. to an account outside the U.S. *See* 31 C.F.R. § 595.503(b). The TSR are approached in an identical manner as the GTSR, and are applied in manner consistent with the GTSR.

13. The TSR definitions of "U.S. person," "foreign person," and "U.S. financial institution" are nearly the same as in the GTSR. The TSR define a U.S. person as "any United States citizen, permanent resident alien, entity organized under the laws of the United States or any jurisdiction within the United States (including foreign branches); or any person in the

5

United States." 31 C.F.R. § 595.315.  Again, because NatWest's English offices (and other non-U.S. branches) are not "organized under the laws of the United States or any jurisdiction within the United States," NatWest is not a U.S. person under the TSR.

14.   The TSR define a "foreign person" as "any citizen or national of a foreign state (including any such individual who is also a citizen or national of the United States), or any entity not organized solely under the laws of the United States or existing solely in the United States, but does not include a foreign state." 31 C.F.R. § 595.304.  This is the same definition as used in the GTSR, and, for the reasons outlined previously concerning the GTSR section, NatWest's offices in England and elsewhere outside the U.S. would be considered "foreign persons" under the TSR.

15.   Finally, the TSR define a "U.S. financial institution" as "any U.S. person (including foreign branches) that is engaged in the business of accepting deposits, making, granting, transferring, holding, or brokering loans or credits, or purchasing or selling foreign exchange, securities, commodity futures or options, or procuring purchasers and sellers thereof, as principal or agent; including, but not limited to, depository institutions, banks, savings banks, trust companies, securities brokers and dealers, commodity futures and options brokers and dealers, forward contract and foreign exchange merchants, securities and commodities exchanges, clearing corporations, investment companies, employee benefit plans, and U.S. holding companies, U.S. affiliates, or U.S. subsidiaries of any of the foregoing. *This term includes those branches, offices and agencies of foreign financial institutions which are located in the United States, but not such institutions' foreign branches, offices, or agencies.*" 31 C.F.R. § 595.316 (emphasis added).  This is the same definition as is used in the GTSR.  As in the GTSR, the definition of "U.S. financial institution" includes the caveat that only the U.S. branches of

foreign financial institutions are subject to OFAC jurisdiction under the TSR. Again, if the activities of the NatWest offices in England were considered to be subject to OFAC jurisdiction, then the italicized language in the definition of "U.S. financial institution" above would have no meaning and be rendered a nullity.

**The Foreign Terrorist Organizations Sanctions Regulations**

16. In October 1997, OFAC promulgated the Foreign Terrorist Organizations Sanctions Regulations ("FTOSR"), 31 C.F.R. Part 597, implementing the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Interpal is not designated a foreign terrorist organization, or "FTO," under the FTOSR, but rather as an SDGT pursuant to the GTSR. Nevertheless, because the FTOSR were promulgated to implement certain portions of AEDPA, the statute under which I understand plaintiffs' claims in this case arise, I analyze the FTOSR here.

17. Section 597.201(a) of the FTOSR prohibits transactions by U.S. financial institutions involving designated foreign terrorist organizations, and blocks the property of these organizations that come within the possession or control of a U.S. financial institution. Under the FTOSR, any U.S. financial institution having notice of the designation of an entity as a foreign terrorist organization by OFAC, by means of an order, directive, instruction, regulation ruling, license or otherwise, must not participate in a transaction that the U.S. financial institution knows to involve that organization. *Id.* The FTOSR are expressly limited to U.S. financial institutions, which is expressly defined to exclude from the regulations' reach, akin to the GTSR and the TSR, "foreign branches, offices, or agencies" of foreign financial institutions. 31 C.F.R. § 597.319. As in the GTSR and the TSR, the definition of "U.S. financial institution" under the FTOSR provides that only the branches of foreign financial institutions that are located in the United States are subject to OFAC jurisdiction under the FTOSR. Thus, the activities of

7

NatWest in providing banking services to Interpal in England were not subject to the FTOSR. Again, if the activities of the NatWest offices in England were considered to be subject to OFAC jurisdiction, then the express language of the definition of "U.S. financial institutions" would have no meaning and be rendered a nullity.

18.   AEDPA included 18 U.S.C. §§ 2339B and 2339C, which I understand have been asserted against NatWest in these cases, through the provisions of 18 U.S.C. § 2333(a).   To prove a claim under section 2339B, a plaintiff must show that an individual or entity "knowingly provide[d] material support or resources to a foreign terrorist organization."   Likewise, to prove a claim under section 2339C, a plaintiff must show that an individual or entity "unlawfully and willfully provide[d] or collect[ed] funds with the intention that such funds be used, or with the knowledge that such funds [were] to be used, in full or in part, to carry out "a terrorist act."

19.   I understand that plaintiffs have alleged in these cases that NatWest violated section 2339B because its provision of banking services to Interpal constituted "knowingly provid[ing] material support to a foreign terrorist organization," namely to HAMAS, to which plaintiffs allege Interpal was providing funds, and that NatWest violated section 2339C because its provision of banking services to Interpal constituted "unlawfully and willfully provid[ing] or collect[ing] funds with the intention that such funds be used, or with the knowledge that such funds [were] to be used, in full or in part, to carry out "one or more terrorist acts to be perpetrated by HAMAS.   I further understand that plaintiffs have suggested in this litigation that the scienter requirements of 18 U.S.C. §§ 2339B and 2339C can be satisfied by NatWest's knowledge of OFAC's designation of Interpal as an SDGT in August 2003, because, plaintiffs assert, (a) as the result of knowing of OFAC's designation of Interpal as an SDGT, NatWest knew that Interpal was providing material support or resources to HAMAS, a designated FTO,

8

and therefore in providing banking services to Interpal after OFAC's designation of Interpal, NatWest knowingly provided material support or resources to HAMAS in violation of 18 U.S.C. § 2339B, and (b) as the result of knowing of OFAC's designation of Interpal as an SDGT, NatWest knew that Interpal was providing or collecting funds for HAMAS, and therefore in providing banking services to Interpal, NatWest provided or collected funds with the intention that such funds be used, or with the knowledge that such funds were to be used, to carry out one or more terrorist acts by HAMAS, in violation of 18 U.S.C. § 2339C. This suggestion is mistaken. In particular, neither the GTSR, the TSR nor the FTOSR provides that the <u>scienter</u> requirements of 18 U.S.C.§ 2339B or 18 U.S.C. § 2339C can be met by an individual's or entity's knowledge of OFAC's designation of an individual or entity as an SDGT. (This is in contrast to the provision in 18 U.S.C. § 2339B that a violation of that statute's prohibition on knowingly providing material support or resources to an FTO can be satisfied by knowledge that the FTO is a designated FTO. Here, I understand plaintiffs have suggested that NatWest's knowing provision of material support or resources to HAMAS can be established by NatWest's knowledge of OFAC's designation of Interpal as an SDGT, not an FTO.) Any contrary conclusion otherwise would be inconsistent with the entire OFAC regulatory framework as described above, particularly as applied to the facts present here.

20. <u>First</u>, as noted above, each of the terrorism designations in the relevant OFAC regulations applies <u>only</u> to the activities of U.S. persons and foreign persons actually located in the U.S. and for conduct that takes place in the U.S. They do not apply to the activities of foreign persons outside the U.S., such as NatWest's provision of banking services to Interpal in England, which are not subject to OFAC jurisdiction under the relevant regulations <u>at all</u>. If OFAC itself, the source of the designations that are made under the OFAC regulations, could not

rely upon the designation of Interpal as an SDGT to place limitations on the activities of NatWest in England, including NatWest's provision of banking services to Interpal in England, then it would be contrary to the entire regulatory framework of the GTSR, TSR and FTOSR to conclude that a private plaintiff suing NatWest under AEDPA could rely upon NatWest's knowledge of OFAC's designation of Interpal as an SDGT as sufficient to establish NatWest's knowledge to support a finding that it violated 28 U.S.C. § 2339B or 18 U.S.C. § 2339C. OFAC's designation of Interpal simply does not apply to the activities of foreign persons outside the U.S., such as NatWest's provision of banking services to Interpal in England, for any purpose. And, moreover, Interpal was designated as an SDGT, not as an FTO. (FTO designations are made by the Secretary of State, not OFAC.)

21. Second, this conclusion is confirmed by section 597.101(c) of the FTOSR, which explicitly states that the FTOSR "do[es] not implement, construe, or limit the scope of any criminal statute, including (but not limited to) 18 U.S.C. §§ 2339B(a)(1) and 18 U.S.C. §§ 2339A . . . ." (Section 2339B(a)(1), which is specifically named as an example by section 597.101(c), defines the criminal conduct proscribed by AEDPA.) This indicates that the regulations do not purport to construe the scienter requirements of AEDPA as being met by OFAC's designation of an entity as an SDGT.

22. Third, transfers otherwise prohibited by the FTOSR will not be deemed "null and void" and will still be enforceable if the U.S. financial institution involved can show to OFAC's satisfaction, among other things, that it "did not have reasonable cause to know or suspect, *in view of all the available facts and circumstances known or available to such institution*, that such transfer required a license or authorization by or pursuant to [the FTOSR] and was not so licensed or authorized . . . ." *See* 31 C.F.R. § 597.202(d)(2) (emphasis added). OFAC considers

"all facts and circumstances" in determining whether a financial institution had knowledge that a particular transaction required a license under the FTOSR. This reconfirms that the relevant OFAC regulations cannot be applied so as to deem even the U.S. financial institutions to which they apply to have knowledge meeting the <u>scienter</u> requirement of 18 U.S.C. §§ 2339B and 2339C simply because an entity is designated on the SDN list.

**Additional Considerations**

23. The OFAC regulations in some places explicitly provide for extraterritorial effect. For example, section 560.205 of the Iranian Transaction Regulations prohibit a person "other than a United States person" from re-exporting U.S.-origin goods, technology, and services if the non-U.S. person knows or has reason to know that the re-export is specifically intended for Iran or the Government of Iran. This provision demonstrates that OFAC knows how to write regulations that specifically cover the activities of non-U.S. persons when OFAC intends that result. In the case of the GTSR, the TSR and the FTOSR, OFAC did not include provisions specifically applicable to persons "other than U.S. persons," but also it made explicit that foreign financial institutions would not be subject to OFAC jurisdiction simply because they operated branches in the U.S.

24. Another example of OFAC regulations with explicit extraterritorial effect are the Cuban Assets Control Regulations ("CACR") at 31 C.F.R. Part 515. The CACR apply to persons "subject to U.S. jurisdiction," which, in addition to U.S. residents, any persons within the U.S., and companies organized under U.S. or state laws, also covers "any corporation, partnership, association, or other organization, wherever organized or doing business, which is owned or controlled by any [U.S. residents or companies organized under U.S. or state laws]." 31 C.F.R. § 515.330(a); *see also* 31 C.F.R. §§ 515.201, 515.204. Therefore, under the CACR, foreign entities that are "owned" or "controlled" by U.S. residents or U.S. companies are subject

11

to OFAC jurisdiction, even if they are organized and operating outside of the U.S. and do not employ any U.S. persons.

25. The Iranian and Cuban regulations demonstrate that regulators know how to draft the OFAC regulations to apply on an extraterritorial basis when that is their goal. The GTSR, TSR and FTOSR are not drafted in such a manner.

**Entities Allegedly Affiliated With Hamas**

26. I understand that plaintiffs' experts have alleged that certain entities are affiliated with Hamas. A full list is contained in Exhibit D.

27. I have noted next to the entries listed in Exhibit D those entities that the U.S. government has identified in the U.S. SDN list as ones the U.S. government has determined to represent a terrorist risk, along with the dates of their listing.

Dated: March ___, 2011

_____
John Barker

Exhibit A

## ARNOLD & PORTER LLP



### John P. Barker
**Partner**

Washington, DC
tel: +1 202.942.5328
fax: +1 202.942.5999
John.Barker@aporter.com

### Practice Focus

John Barker's practice focuses on national security matters including export controls and trade sanctions administered by the Office of Foreign Assets Control at the US Department of the Treasury (OFAC), and compliance with the Foreign Corrupt Practices Act (FCPA). He helps companies and institutions establish compliance plans, obtain export authorizations, and provides representation in enforcement proceedings. He also represents companies before the Committee on Foreign Investment in the United States (CFIUS) in reviews required under the US Exon-Florio statute. Mr. Barker came to the firm from the US Department of State, where he served as the Deputy Assistant Secretary for Nonproliferation Controls and, prior to that, as Deputy Assistant Secretary for Export Controls.

In his most recent position at the State Department, Mr. Barker supervised the development and implementation of US policy on multilateral nonproliferation and security regimes, and nonproliferation sanctions. As the Deputy Assistant Secretary for Export Controls, he supervised the US munitions licensing and defense trade compliance under the International Traffic in Arms Regulations (ITAR) including imposing sanctions on companies for violation of US export control law. He led US negotiating teams to more than 20 countries, supervised audits of defense trade manufacturing facilities, and oversaw the US government's nonproliferation review of dual-use exports subject to the Export Administration Regulations (EAR).

Mr. Barker testified frequently before the US Congress on a wide variety of export control matters including trade sanctions, preventing the transfer of arms and dual-use technology to state sponsors of terrorism, the Export Administration Act, export licensing and compliance, and regulation of the aerospace industry.

Mr. Barker was recognized nationally in *Chambers USA America's Leading Lawyers for Business* for his work on export controls and trade sanctions.

Mr. Barker received his JD from the University of Michigan Law School in 1986, where he was Managing Editor of the *Journal of Law Reform*. After his clerkship with the Honorable James S. Holden of the US District Court for the District of Vermont, he was appointed a Visiting Scholar at the Harvard Center for International Affairs. He also served as a Visiting Fellow at London's International Institute for Strategic Studies. From 1988 to 1993, he was an associate at Graham & James, where he served in the firm's Palo Alto, Tokyo, and San Francisco offices. While at Graham & James he co-authored a Stanford University study on ballistic missile proliferation.

### Rankings

*Chambers USA: America's Leading Lawyers for Business* 2010 for International Trade: Export Controls & Economic Sanctions

*Chambers Global: The World's Leading Lawyers for Business* 2010 for International Trade: Export Controls & Economic Sanctions

**PRACTICE AREAS**

Legislative and Public Policy »
International Trade »
National and Homeland Security »
Foreign Corrupt Practices Act and Global Anti-Corruption (FCPA) »
Financial Services »

**EDUCATION**

JD, University of Michigan Law School, 1986
AB, Dartmouth College, 1983

**ADMISSIONS**

District of Columbia
California (inactive)

*The Best Lawyers in America* 2010 for International Trade and Finance Law

## Articles

John P. Barker. **"Brokering Under the International Traffic in Arms Regulations." (PDF: 3.59 MB)** *Article in the course handbook for Coping with US Export Controls 2008, a Practising Law Institute course,* December 2008.

John P. Barker, Michael E. Ginsberg and Ronald D. Lee. **"Buyer Beware: Successor Liability for Export Violations and Due Diligence Measures to Identify and Mitigate Deal Risks." (PDF: 95 kB)** *The M&A Lawyer,* March 2007.

## Presentations

John P. Barker. **"ITAR Boot Camp: Practical Training on the International Traffic in Arms Regulations."** American Conference Institute, Orlando, FL, October 20, 2009.

John P. Barker. **"American Conference Institute's 12th National Forum on Export Controls." (PDF: 292 kB)** Washington, DC, May 19, 2009.

## Advisories

**"Treasury Department Releases New Iran Financial Sanctions Regulations." (PDF: 226 kB)** Aug 2010.

**"New Iran Sanctions Targeting Oil Industry and International Banking Institutions." (PDF: 301 kB)** Jul 2010.

**"Commerce Department Releases New China Export Control Regulations." (PDF: 164 kB)** Jun 2007.

**"U.S. Enacts Legislation to Promote Nuclear Cooperation with India." (PDF)** Jan 2007.

## Newsletters

*FCPA News and Insights* "Summer 2010.»" Sep 2010.

*FCPA News and Insights* "February 2010.»" Mar 2010.

*FCPA News and Insights* "First Quarter 2009.»" Mar 2009.

Exhibit B

List of Publications of John Barker in the Last 10 Years

Publications

1. West Government Contracts Year In Review Conference, *Conference Briefs*, "Export Controls, Compliance & National Security Concerns:  U.S. Export Controls Under the International Traffic in Arms Regulations and the Export Administration Regulations; and Implementation of National Security Reviews by the Committee on Foreign Investment in the U.S. (CFIUS)" December 2010

2. John B. Bellinger, John P. Barker, Alan Avery, Samuel M. Witten.  "Treasury Department Releases New Iran Financial Sanctions Regulations Targeting Foreign Financial Institutions."  Available at http://www.arnoldporter.com/resources/documents/Advisory_Treasury_Department_Releases_New_Iran_Financial_Sanctions_Regulations_82410.pdf

3. John P. Barker, John B. Bellinger III, Michael E. Ginsberg, Jeffrey H. Smith, Nicholas L. Townsend, and Samuel M. Witten.  "New Iran Sanctions Targeting Oil Industry and International Banking Institutions."  July 2010.  Available at http://www.arnoldporter.com/resources/documents/Advisory-New_Iran_Sanctions_Targeting_Oil_Industry_and_International_Banking_Institutions_07010-1.pdf.

4. John P. Barker and Michael E. Ginsberg. "Managing Compliance with U.S. Treasury Department OFAC Obligations: Even If Your Business is Exclusively Outside the U.S." Global Trade and Customs Journal, Volume 5, Issue 5, 2010.

5. West Government Contracts Year In Review Conference, *Conference Briefs*, "Export Controls, Compliance & National Security Concerns:  Export Controls Under the International Traffic in Arms Regulations and the Export Administration Regulations," December 2009 (also in 2008 edition)

6. John P. Barker.  "Brokering Under the International Traffic in Arms Regulations." *Article in the course handbook for Coping with US Export Controls 2008, a Practicing Law Institute Course,* December 2008 (also in 2005, 2006 and 2007 editions).

7. John P. Barker, Ronald D. Lee, Jeffrey H. Smith, and Michael E. Ginsberg.  "Commerce Department Releases New China Export Control Regulations." June 2007.  Available at http://www.arnoldporter.com/resources/documents/A&PCA-CommerceDeptReleaseNewChinaExportControlRegulations_062907.pdf.

8. John P. Barker, Michael E. Ginsberg and Ronald D. Lee.  "Buyer Beware: Successor Liability for Export Violations and Due Diligence Measures to Identify and Mitigate Deal Risks." *The M&A Lawyer,* March 2007.

9. John P. Barker, Ronald D. Lee, and Jeffrey H. Smith, "<u>U.S. Enacts Legislation to Promote Nuclear Cooperation with India.</u>" January 2007.  Available at http://www.arnoldporter.com/resources/documents/Arnold&Porter%20Advisory-US%20Enacts%20Legistation%20to%20Promote%20Nuclear%20Cooperation%20with %20India.pdf.

Exhibit C

List of Publications Relied Upon in Preparing the Expert Report of John Barker

1. Expert Witness Report of Gary Walters of Forensic Risk Alliance LLC dated December 17, 2010

2. Global Terrorism Sanctions Regulations ("GTSR"), 31 C.F.R. Part 594, including the following:

 a. 31 C.F.R. § 594.201(a)

 b. 31 C.F.R. § 594.204

 c. 31 C.F.R. § 594.205

 d. 31 C.F.R. § 594.410

 e. 31 C.F.R. § 594.504

 f. 31 C.F.R. § 594.315

 g. 31 C.F.R. § 594.304

 h. 31 C.F.R. § 594.314

3. Terrorism Sanctions Regulations ("TSR"), 31 C.F.R. Part 595, including:

 a. 31 C.F.R. § 595.201(a)

 b. 31 C.F.R. § 595.204

 c. 31 C.F.R. § 595.503(b)

 d. 31 C.F.R. § 595.304

 e. 31 C.F.R. § 595.315

 f. 31 C.F.R. § 595.316

4. Foreign Terrorist Organizations Sanctions Regulations ("FTOSR"), 31 C.F.R. Part 597, including:

 a. 31 C.F.R. § 597.201(a)

 b. 31 C.F.R. § 597.319

 c. 31 C.F.R. § 597.101(c)

      d.  31 C.F.R. § 597.202(d)(2)

5. Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), including:

      a.  18 U.S.C. §§ 2339B, 2339C

6. Iranian Transaction Regulations, 31 C.F.R. Part 560, including:

      a.  31 C.F.R. § 560.205

7. Cuban Assets Control Regulations ("CACR"), 31 C.F.R. Part 515, including:

      a.  31 C.F.R. § 515.330(a)

      b.  31 C.F.R. § 515.201

      c.  31 C.F.R. § 515.204

Exhibit D

For all dates of addition to SDN List, see:
http://www.treasury.gov/resource-center/sanctions/Programs/Documents/terror.txt

Al-Ansar Charitable Society - Sudan

**Al-Aqsa Foundation -- added May 29, 2003**

- **Al-Aqsa - Belgium**
- **Al-Aqsa - Denmark**
- **Al-Aqsa - Germany**
- **Al-Aqsa – Pakistan**
- **Al-Aqsa - Sweden**
- **Al-Aqsa Charitable Foundation**
- **Al-Aqsa Charitable Organization**
- **Al-Aqsa Foundation of S.A.**
- **Al-Aqsa International Foundation**
- **Al-Aqsa Islamic Charitable Society**
- **Al-Aqsa Sinabil Establishment**
- **Al-Aqsa Spannmal Stiftelse**
- **Al-Aqsa Islamic Charitable Society – Yemen**
- **Al-Gameyah Al-Khereyah Lenasrat, Al-Aqsa Al-Shareef**
- **Aqssa Society**
- **Charitable Al-Aqsa Establishment**
- **Charitable Society to Help the Noble al-Aqsa**
- **Islamic Charitable Society for al-Aqsa**
- **Mu'assa al-Aqsa al-Khayriyya**
- **Mu'assa Sanabil Al-Aqsa al-Khayriyya**
- **Nusrat al-Aqsa al-Sharif**
- **Sanabil al-Aqsa Charitable Foundation**
- **Sanabil Al-Aqsa Foundation – Sweden**
- **Stichting Al-Aqsa – Holland**

Al-Fujaira Charitable Society – YAE

Al-Islah Society - Ramallah & al-Bireh

Al-Islah Charitable Society

Al-Jam'iya al-Islamiya (Islamic Society) - Gaza

Al-Lod Charitable Society - Palestine

Al-Manasra Jordanian Association - Jordan

Al-Mujama al-Islami (The Islamic Center) - Gaza

Al-Rahma International – Kuwait

Al-Razi Hospital

Al-Tadamun Charitable Society (Jam'iyat al-Tadamun al-Khiriyah al-Islamiya Nablus) (Al-Tadamon Charitable Society) – Nablus

Al-Wafa Charitable Society (Jam'iyat al-Wafa Liraya al-Masnin ) (El-Wafa Rehabilitation & Health Center) – Gaza

Al-Zakat Committee - Palestine

Beit Fajar Zakat Committee (Lajnat Zakaa wa-Sadakat Beit Fajar)

Chairmanship of the World Islamic Charity Association – Kuwait

**Comité de Bienfaisance et de Secours aux Palestiniens (CBSP) -- added August 21, 2003**

Committee for the Support of the Intifada – UAE

Committee for Charity and Support for the Palestinians (ABSPP) - Italy

Dar al-Arqam school

Dar el-Salam Hospital

Emdad Charitable Committee - South Africa

Facts International for Studies and Research

Halhul Zakat Committee

Hebron Library Project ("presumed to be the Al Anwar Ibrahimi Library")

Hebron Zakat Committee

**Holy Land Foundation for Relief and Development -- added December 4, 2001**

Human Appeal International

Humanitarian Relief Foundation

International Islamic Relief Organization (IIRO) - Jordan

International Islamic Relief Organization - Saudi Arabia Palestine Charitable Committee (IIRO) - Saudi Arabia

International Islamic Relief Organization (IIRO) - Jeddah, Saudi Arabia

International Islamic Relief Organization, Eastern Region (a branch of "IIRO") - Saudi Arabia

**Interpal -- added August 21, 2003**

Irfan Fund – Canada

Islamic Aid Committee a.k.a. Islamic Relief Agency (IRA) – Nazareth, Israel

Islamic Charitable Organization - Palestine

Islamic Charitable Society (Al-Jam'iya al-Khariya al-Islamiya) - Hebron

Islamic Development Bank / Al-Aqsa Foundation - Saudi Arabia

Islamic Society – Gaza

Islamic University - Gaza

Islamic Zakat Supporting Committee for Palestinian People - Jordan

Jenin Zakat Committee

Jerusalem Central Zakat Committee (Lajnat Zakat al-Quds al-Markaziva)

Jerusalem Zakat Committee

Muslim Aid/Educational Aid for Palestinians

Muslim Hands

Muslim Young Women's Society (Jam'iyat al-Shabbat al-muslimat)

Nablus Zakat Committee

Orphan Care Association, Bethlehem

**Palestinian Association in Austria (PVOE) -- added August 21, 2003**

Palestine Charitable Committee (IICO) – Kuwait

Qalqiliyah Zakat Committee

Qatar Charitable Society

Ramallah - al-Bireh Zakat Committee (Lajnat al-Zakaa Ramallah wal-Bireh )

Ramallah Zakat Committee

**Sanabil Association for Relief and Development – Lebanon -- added August 21, 2003**

Science and Culture Center (Jam'iyat Markaz al-'ilm wal-thaqafa) - Nuseirat

**The Association de Secours Palestinien (ASP) -- added August 21, 2003**

The Operation Committee for Support of the Intifada in Occupied Palestine - Abu Dhabi

The Quran and Sunna Society (Qalqilya)

The Red Crescent Society of the Emirates – UAE

The Saudi Committee in Support of the Intifada al Quds - Saudi Arabia

The Society of Friends of the Emirates - UAE

The World al-Rahma Organization – Kuwait

The World Islamic Committee/Society for Revival of the Islamic Heritage - Kuwait

The World Assembly of Muslim Youth (WAMY)

Tulkarem Zakat Committee (Lajnat al-Zakaa Tulkarem) (Tulkarm Zakat Committee)

UAE Friends Society – UAE

**Union of Good -- added November 12, 2008**

- **101 Days Campaign**
- **Charity Coalition**
- Union for Good (not designated)
- **Coalition of Good**
- **Etelaf al-Khair**
- **Etilafu el-Khair**
- **I'Tilaf al-Khair**
- **I'Tilaf al-Khayr**

Zakat Fund Committee - Jenin

**EXHIBIT 104 TO DECLARATION OF VALERIE SCHUSTER**



9 of 96 DOCUMENTS

Copyright 2003 Telegraph Group Limited
THE DAILY TELEGRAPH(LONDON)

September 25, 2003, Thursday

**SECTION:** Pg. 02

**LENGTH:** 397 words

**HEADLINE:** Britain rejects Bush's charges against charity

**BYLINE:** By Sean O'Neill

**BODY:**
BRITAIN yesterday rejected claims by America that a London-based charity was a front group for the terrorist group Hamas.

The Charity Commission said the US authorities were unable to substantiate claims that Interpal, which raises pounds 4 million a year, channelled money to Hamas for terrorist and political activities.

Investigators lifted a month-long freeze on Interpal's bank accounts and allowed it to continue operating normally. Last month President George W Bush ordered the US Treasury to "block and freeze" all Interpal's assets and declared that the charity was a "specially designated global terrorist".

The US authorities alleged that Interpal, based in Kilburn, north London, was "the fund-raising co-ordinator of Hamas" and "a principal charity utilised to hide the flow of funds to Hamas".

The Charity Commission carried out an immediate investigation into Interpal's activities and froze its bank accounts. Investigators met US officials to discuss the case but the Americans produced only press cuttings to support their claim that it was a terrorist organisation.

The commission also contacted anti-terrorist, security and intelligence agencies in Britain "to facilitate a thorough investigation".

A commission report on the inquiry stated: "The US authorities were unable to provide evidence to support allegations made against Interpal within the agreed time scale. The commission concluded that in the absence of any clear evidence showing Interpal had links to Hamas's political or violent militant activities, Interpal's bank accounts should be unfrozen and the inquiry closed."

The inquiry disclosed that Interpal had received money from the Dutch-based Al Aqsa Foundation, a charity banned in Britain for its alleged Hamas links.

Interpal, which maintains it is a humanitarian charity, was investigated by the commission in 1996 over claims that its funds were misappropriated for Hamas's terrorist activities and was found to be "a well-run organisation". Ibrahim Hewitt, the chairman of Interpal's trustees, said he was delighted with the commission's decision.

He added: "However, it is disappointing that such unsubstantiated allegations can be made so flippantly."

A US Treasury spokesman declined to criticise the Charity Commission and looked forward to continued partnership with the British authorities.
[PS]News: [ES]

Britain rejects Bush's charges against charity THE DAILY TELEGRAPH(LONDON) September 25, 2003, Thursday

**LOAD-DATE:** September 25, 2003

**EXHIBIT 105 TO DECLARATION OF VALERIE SCHUSTER**

**FILED UNDER SEAL**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| TZVI WEISS, *et al.*, | : | |
| Plaintiffs, | : | |
| | : | Case No. 05-cv-4622 (DLI) (MDG) |
| | : | |
| -against- | : | |
| | : | |
| NATIONAL WESTMINSTER BANK, PLC, | : | |
| | : | |
| Defendant. | : | |
| NATAN APPLEBAUM, *et al.*, | : | |
| Plaintiffs, | : | |
| | : | Case No. 07-cv-916 (DLI) (MDG) |
| -against- | : | |
| | : | |
| NATIONAL WESTMINSTER BANK, PLC, | : | |
| | : | |
| Defendant. | : | |

## PLAINTIFFS' SECOND SUPPLEMENTAL OBJECTIONS AND RESPONSES TO DEFENDANT'S CONTENTION INTERROGATORIES

In accordance with the Court's September 16, 2011 Minute Order, Plaintiffs make these second supplemental responses to certain of Defendant National Westminster Bank PLC's Contention Interrogatories (the "Interrogatories"), dated April 29, 2011, as follows:

## RESERVATION OF RIGHTS AND OBJECTIONS

These responses are made subject to, and without waiver of, the reservation of rights and general and specific objections set forth in Plaintiffs' Responses and Objections to Defendant's Contention Interrogatories, dated July 5, 2011.

## SECOND SUPPLEMENTAL RESPONSES TO INTERROGATORIES

17.     If you contend that United Kingdom law enforcement agencies and regulators, including without limitation NCIS, SOCA, the Charity Commission, Special Branch, the Bank of England, and HM Treasury ("UK Law Enforcement and Regulators") did not have in their possession or could not have requested from Interpal information concerning Interpal and its conduct that NatWest had in its possession, identify all such information, including without limitation an itemization of each and every fact and legal ground, including without limitation each and every document, witness, deposition testimony citation and any other evidence that you rely upon for your contentions.

**ANSWER:**

In addition to the specific objections and response to this Interrogatory set forth in Plaintiffs' Objections and Responses dated July 5, 2011, Plaintiffs further observe that the Interrogatory remains improper, irrelevant, and prejudicial, and seeks to put an improper burden on Plaintiffs. *See, e.g., Dairyland Power Cooperative v. U.S.*, 2008 WL 5122339 (Fed. Cl. June 20, 2008); *U.S. v. Amerigroup Illinois, Inc.*, 230 F.R.D. 538 (N.D.Ill. 2005).

Notwithstanding and without waiver of these objections, and in accordance with the September 16 Order, Plaintiffs supplement their July 5, 2011 response to this Interrogatory as follows: Neither Plaintiffs nor Defendant can possibly know the entirety of information that U.K. law enforcement agencies and regulators had in their possession concerning Interpal, nor has either party presented any information as to what information the U.K. government possessed other than the few documents that NatWest provided to the U.K. authorities and the few public disclosures that the U.K. government made, and thus Plaintiffs do not contend that U.K. law enforcement agencies and regulators had either more or less information than NatWest in their possession concerning Interpal. However, Plaintiffs do contend that Defendant had an obligation to <u>fully</u> and diligently report its suspicions concerning Interpal to United Kingdom law enforcement agencies and regulators and could not – and cannot – assume that U.K. law

enforcement agencies and regulators possessed or currently possess or could have requested greater or more probative information than Defendant.

As the Financial Action Task Force noted in a 2008 Report[1]:

> Financial information has come to be one of the most powerful investigative and intelligence tools available. As money moves through the financial system, it leaves a verifiable trail that can in many cases indicate illicit activity, identify those responsible, and locate the proceeds of criminality that can then be recovered.  Through the development of internationally recognized AML and CFT standards, financial institutions and other designated non-financial entities have taken steps to know their customers and keep records. The value of financial information in counter-terrorist investigations has increased dramatically in recent years.

> Cases above show the investigative value of STRs submitted to FIUs – including those not initially linked to terrorist financing. Investigations draw on information about past transactions and from ongoing monitoring of suspect accounts. Other types of financial reports (including large cash transactions, wire transfers, and cross-border currency movements) can significantly increase the pool of financial information available to investigators.

> Financial information is now used as part of the evidential case to hold criminals and terrorists to account. It also has a key intelligence role – for example by allowing law enforcement to:

>> • Look backwards, by piecing together how a criminal or terrorist conspiracy was developed and the timelines involved.

>> • Look sideways, by identifying or confirming associations between individuals and activities linked to conspiracies, even if overseas – often opening up new avenues for enquiry.

>> • Look forward, by identifying the warning signs of criminal or terrorist activity in preparation.

> Financial information is particularly suited to these tasks in that it is relatively unambiguous, can be processed easily using technology, and easily accessed with little intrusion on the provider.

Plaintiffs are only aware of the information that NatWest possessed, and <u>failed to provide the U.K. government</u>, and have itemized that information in Exhibit E attached to their July 5,

---

[1] Available at: http://www.fatf-gafi.org/dataoecd/28/43/40285899.pdf, pp. 31-32.

2011 response to this Interrogatory.  Plaintiffs neither contend that United Kingdom law enforcement agencies and regulators obtained the information set forth in Exhibit E from other sources or, on the contrary, lacked that information.  Moreover, neither Plaintiffs nor Defendant know what information U.K. law enforcement agencies and regulators may (or may not) have requested from Interpal, nor has either party presented any discovery as to what information the U.K. government may (or may not) have requested from Interpal, and thus Plaintiffs do not contend that U.K. law enforcement agencies and regulators could or could not have requested information from Interpal any particular information that U.K. law enforcement agencies and regulators did not already possess.

18.    If you contend that NatWest had access to more information regarding Interpal and its conduct than did UK Law Enforcement and Regulators, identify with specificity the bases for your contentions, including without limitation, an itemization of each and every fact and legal ground, including without limitation each and every document, witness, deposition testimony citation and any other evidence, that you rely upon for your contentions.

**ANSWER:**

In addition to the specific objections and response to this Interrogatory set forth in Plaintiffs' Objections and Responses dated July 5, 2011, Plaintiffs further observe that the Interrogatory remains improper, irrelevant, and prejudicial, and seeks to put an improper burden on Plaintiffs. *See, e.g., Dairyland Power Cooperative v. U.S.*, 2008 WL 5122339 (Fed. Cl. June 20, 2008); *U.S. v. Amerigroup Illinois, Inc.*, 230 F.R.D. 538 (N.D.Ill. 2005).  Plaintiffs further object that this Interrogatory's use of the term "access" is vague and ambiguous.

Notwithstanding and without waiver of these objections, and in accordance with the September 16 Order, Plaintiffs supplement their July 5, 2011 response to this Interrogatory as follows: Neither Plaintiffs nor Defendant can know the entirety of information to which U.K. law

enforcement agencies and regulators had actual or potential access concerning Interpal, nor has either party presented any evidence as to what information the U.K. government had actual or potential access other than the few documents NatWest provided it and the few public disclosures that the U.K. government made, and thus Plaintiffs do not contend that U.K. law enforcement agencies and regulators had access to more or less information than NatWest concerning Interpal.  Plaintiffs are only aware of the information to which NatWest had access, and <u>failed to provide the U.K. government</u>, and itemized that information in Exhibit E attached to their July 5, 2011 response to Interrogatory No. 17.  As noted in response to Interrogatory No. 17, the Financial Action Task Force has observed that financial institutions provide law enforcement valuable financial information in counter-terrorist investigations and Plaintiffs contend that NatWest <u>failed to provide the U.K. government with certain information in its possession</u>.

20.     If you contend that NatWest was obligated to take any actions or refrain from taking any actions in order to avoid liability, under 18 U.S.C. § 2339B(a)(1) and/or 18 U.S.C. § 2339C, identify with specificity those actions and the legal standard you are applying to support your contentions, including without limitation an itemization of each and every fact and legal ground, including without limitation each and every document, witness, deposition testimony citation and any other evidence, that you rely upon for your contentions.

**ANSWER:**

In addition to the specific objections and response to this Interrogatory set forth in Plaintiffs' Objections and Responses dated July 5, 2011, Plaintiffs further observe that this Interrogatory remains grossly overbroad and burdensome, inasmuch as, read literally, it would require Plaintiffs to identify all foundation evidence, primary and secondary evidence, credibility disputes, documentary evidence, percipient fact witness and expert testimony in order to provide a comprehensive narrative and advocacy argument explicating why Plaintiffs can satisfy the

applicable *mens rea* standards, and why Defendant's explanations to the contrary cannot be credited. As such, this Interrogatory does not narrow the issues for trial or summary judgment, and the information requested can be obtained through less burdensome means (including, without limitation, summary judgment briefing, a final pretrial order, motion in limine practice, and exhibit lists prepared for trial. *See* Fed. R. Civ. P. 26(b)(2)(C)(i)-(iii).) Notwithstanding and without waiver of these objections, and in accordance with the September 16 Order, Plaintiffs supplement their July 5, 2011 response to this Interrogatory as follows:

Defendant was obligated not to provide material support and financial services to an FTO, pursuant to 18 U.S.C. § 2339B(a)(1) and 18 U.S.C. § 2339C. The scienter standard for 18 U.S.C. § 2333(a) can be satisfied upon proving by a preponderance of the evidence that NatWest demonstrated a "conscious and deliberate disregard of the interest of others, in the face of a known risk." *Goldberg v. UBS AG*, 660 F. Supp. 2d 410, 428 (E.D.N.Y. 2009) (citing *Boim v. Holy Land Foundation for Relief and Development* ("*Boim III*"), 549 F.3d 685, 692 (7th Cir. 2008). The scienter standard for 18 U.S.C. § 2339B(a)(1) requires that NatWest "knowingly provide[ ] material support or resources to a designated foreign terrorist organization." *Linde v. Arab Bank, PLC*, 384 F. Supp. 2d 571, 586 (E.D.N.Y. 2005). NatWest's conduct, as described below, violated the applicable legal standards throughout the Relevant Period because, even prior to the U.S. designation of Interpal in August 2003, NatWest either: (1) knew (or would have had to go to considerable effort to avoid knowing) that Interpal was providing funds to HAMAS by means of transfers from its account at NatWest; (2) suspected that Interpal was providing funds to HAMAS by means of transfers from its NatWest account but deliberately avoided confirming such suspicions; or (3) knew there was an appreciable risk that Interpal was providing funds to HAMAS by means of transfers from its NatWest accounts, but, in conscious and deliberate

disregard of the interest of others, continued to facilitate transactions for Interpal in the face of these known risks.

Interpal's relationship with NatWest goes back until at least June of 1987, when Interpal's predecessor, the Palestine & Lebanon Relief Fund, opened accounts with NatWest. The evidence, including thousands of documents and over twenty depositions, demonstrates that NatWest had very substantial and detailed concerns regarding Interpal, suspicions specifically pegged to terrorism, yet NatWest continued to provide material support and financial services throughout the Relevant Period.  The first clear instance of documentary evidence capturing NatWest's substantial and detailed concerns that its customer Interpal was financing terrorism arose in 1992 when the bank composed a report, pursuant to the Money-Laundering-Prevention of Terrorism Act (1989), ███████████████████████████████████████ ████████████████████████████████████████████  These concerns escalated further in 1996 when media reports discussed Interpal's financial support for HAMAS and Israeli government allegations against the customer. Contemporaneously, the U.K. Charity Commission temporarily froze Interpal's accounts.  When the Charity Commission unfroze Interpal's accounts in 1996 (and, again, in 2003), NatWest took no meaningful action thereafter to apply heightened scrutiny to the transactions received by Interpal or transmitted by Interpal.

In September 2001, Michael Hoseason, NatWest's Head of Group Investigations & Fraud, reviewed a report on the Cryptome website described as a South African National Intelligence Agency report (the "Cryptome SANIA Report").  The Cryptome SANIA Report detailed Interpal's support of HAMAS, and set out numerous, significant terrorist financing details that could be verified by reviewing Interpal's customer files maintained by NatWest, including account numbers, executives, funds transfers, and other information that NatWest had

in its own possession. In fact, certain of the entities discussed in the Cryptome SANIA Report (such as ███████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████. Further, as a result of this information, and at several times thereafter, NatWest represented to UK law enforcement ██████████████████████████████

██████████████████████████████ Scant documentation and testimony, however, exists to suggest that NatWest undertook even minimal reviews, including scrutinizing its records and account information in light of the information reflected in the Cryptome SANIA Report. NatWest instead apparently took the position that filing narrow reports (that did not, as discussed in the expert report of Gary Walters, reflect anything close to all information known or available to NatWest regarding Interpal or its counterparties) with law enforcement was the sum total of its responsibilities. Belinda Lane, NatWest's Relationship Manager for Interpal, did meet with Interpal on several occasions; however, even when Interpal informed Ms. Lane that its financing activities had increased due to "9/11" and "terrorism", Ms. Lane took no action and apparently treated those representations as benign in the interests of preserving one of her highest-grossing customers, about whom she claims never to have had even the barest of suspicions.

Furthermore, though throughout the Second Intifada Interpal sent repeated and massive payments to purported Palestinian charities, including many with known and readily discernable ties to HAMAS (*e.g.*, *Al-Mujama Al-Islami* (Islamic Center), *al-Jamaiya al-Islamiya* (Islamic Society), Jenin Zakat Committee, *Al-Islah* Charitable Society, *Al-Salah* Charitable Society, and ██████████████████████████████ NatWest undertook no meaningful investigation into Interpal's multi-million dollar financing scheme, nor did it take any measures to stop Interpal

from sending or receiving funds, despite the fact that compliance employees expressed repeated concerns that Interpal was involved in terrorism financing. Moreover, Group Compliance also acknowledged that NatWest needed to gain a clearer understanding of Interpal's activities and full details behind the sizeable transactions.

For instance, in June 2002, NatWest completed an internal SAR and submitted a disclosure to the National Criminal Intelligence Service ("NCIS") based on a ██████ transfer received by Interpal from ████████████, who purportedly represented ██████ ████████████████████ an alias of ████████████████ which, as NatWest knew, was designated by Germany on July 31, 2002, and both the United States and United Kingdom on May 29, 2003, as a terrorism financing entity. This one transfer, however, was just one out of many transfers made from ████████████ to Interpal totaling over ██████ between ████████████. Nothing in the record indicates that NatWest took any action, following ██████ designation, to investigate and analyze Interpal's relationship with ████████████, despite the fact that, separate and apart from existing concerns regarding Interpal documented since at least 1992, there was an obvious, glaring risk of terror financing given Interpal's relationship with ██████

On August 22, 2003, the United States designated Interpal as a Specially Designated Global Terrorist ("SDGT"), NatWest's only such customer at the time to be so designated. After the U.K. Charity Commission concluded its 2003 nominal follow-up investigation of Interpal, NatWest made a knowing decision to continue providing financial services to Interpal (and its Hamas-controlled counterparties) in spite of both its own independently-documented suspicions and concerns regarding Interpal (indicating NatWest's recognition of the terror financing risks posed by Interpal) now combined with the United States' determination that Interpal was

HAMAS' fundraising coordinator.  Even the U.K. government instructed NatWest in October 2003 ███████████████████████████████████████████████, but in spite of NatWest's representation ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████ evidence demonstrates that no monitoring or other investigations occurred for at least six or seven months, at which point NatWest concluded that it purportedly was incapable of fully monitoring Interpal's accounts.

The evidence also shows that, at all relevant times including during the incidents discussed above in 2002 and 2003, NatWest was aware and had access to the lists of terrorists and terrorist organizations generated by OFAC and other United States government agencies. NatWest was aware of and had access to the websites of OFAC and other relevant United States government agencies, and even had subscriptions to news services that specialized in providing updates of OFAC actions relevant to financial institutions.  As such, NatWest was aware of not merely the fact of designations made by OFAC and other United States government agencies, but the rationale behind these designations.

For example, when OFAC designated Interpal, the Al-Aqsa Foundation, ████████ and other charitable fronts active in raising funds for HAMAS in the West as Specially Designated Global Terrorists, it issued press releases describing the reasons for these designations.  The August 22, 2003 press release characterized Interpal as HAMAS' "fundraising coordinator," "a principal charity utilized to hide the flow of money to HAMAS," and "the conduit through which money flows to HAMAS from other charities."  NatWest learned of OFAC's designations of

Interpal, the Al-Aqsa Foundation, and ▮▮▮▮ among others, as an SDGT shortly after their respective designations, yet failed to adhere to them.

The fact that U.K. law enforcement may have permitted NatWest to continue doing business with Interpal is irrelevant to: (1) whether NatWest independently understood that continued business with Interpal (and its counterparties) posed terrorism and terrorism financing risks; (2) NatWest's state of mind, particularly given that no evidence exists indicating that U.K law enforcement encouraged or required NatWest to continue doing business with Interpal, *see* Defendant's Response to Plaintiffs' Contention Interrogatory No. 10; and (3) whether or not NatWest comprehended that the United States considered Interpal or Interpal's counter-parties connected to terrorism and HAMAS. Furthermore, the record is also clear that NatWest was perfectly capable of independently deciding to exit a relationship based on perceived terrorism risks. *See, e.g.*, Defendant's Response to Plaintiffs' Contention Interrogatory No. 22; NW069055-56; NW066766; NW066764 (indicating independent decision to exit and then re-enter customer relationship with ▮▮▮▮▮▮▮ Defendant has also indicated in its response to Plaintiffs' Contention Interrogatory No. 22 that it closed five accounts on suspicion of terrorism financing, and has not produced any evidence indicating that the closures were demanded by the U.K. government.

Moreover, in 2004 and continuing into 2005, evidence makes clear that NatWest treated the U.S. designation of Interpal as a terrorist and as an agent of the FTO HAMAS (which NatWest knew the U.S. had designated as an FTO since 1997), as the mere "opinion" of the United States, deeming (without basis) the designation a political decision that contrasted with the views of the U.K. Consequently, NatWest even knowingly assisted in Interpal's attempts to circumvent the banking channels of the U.S., which forbade the provision of banking services to

Interpal after its August 2003 designation. Interpal discussed with NatWest whether its name could be left off of transfers through the United States, or whether it could use a different name, *i.e.*, textbook examples of attempted evasion of U.S. laws. After expressing some mild caution about assisting Interpal in its evasion attempts, NatWest internally discussed closing Interpal's U.S. dollar account, ultimately advised Interpal to do so, and then closed the account while willingly transferring the funds into non-dollar accounts, where Interpal continued to receive and transmit funds to HAMAS front organizations. NatWest never informed NCIS or any other governmental authority about Interpal's attempt to enlist NatWest in these efforts to evade U.S. sanctions. Ultimately, despite knowing that HAMAS had been designated as an FTO since 1997, and despite knowing that Interpal had been officially designated as a terrorist entity by the United States based on its status as a principal HAMAS fundraiser, NatWest violated the ATA by not exiting its relationship with Interpal until 2007.

Moreover, NatWest also understood that the Government of Israel considered Interpal a terrorist. *See, e.g.*, NW191804 ("Goalkeeper" internal suspicious activity report attaching 1996 Financial Times article reporting that State of Israel considered Interpal a HAMAS financier). Nevertheless, NatWest, in violation of the ATA, including Sections 2339B and 2339C, was willfully blind or reckless in continuing to transmit funds into the area of benefit despite possessing information indicating that Israel considered Interpal and its counterparties in the Palestinian Territories to engage in terrorist activity.

Evidence to support this contention can be found in the documents and testimony attached as Exhibits A and C to Plaintiffs' July 5, 2011 Objections and Responses.

24.    If you contend that Interpal was not sanctioned by the Bank of England, or identified as a supplier or facilitator of terrorism by UK Law Enforcement and Regulators, for any reason other than their conclusion that the evidence in their possession was insufficient to warrant that action, identify with specificity the bases for your contentions, including without limitation, an itemization of each and every fact and legal ground, including without limitation each and every document, witness, deposition testimony citation and any other evidence, that you rely upon for your contentions.

### ANSWER:

In addition to the specific objections and response to this Interrogatory set forth in Plaintiffs' Objections and Responses dated July 5, 2011, Plaintiffs further observe that the Interrogatory remains improper, irrelevant, and prejudicial, and seeks to put an improper burden on Plaintiffs. *See, e.g., Dairyland Power Cooperative v. U.S.*, 2008 WL 5122339 (Fed. Cl. June 20, 2008); *U.S. v. Amerigroup Illinois, Inc.*, 230 F.R.D. 538 (N.D.Ill. 2005).

Notwithstanding and without waiver of these objections, and in accordance with the September 16 Order, Plaintiffs supplement their July 5, 2011 response to this Interrogatory as follows: Neither Plaintiffs nor Defendant can know the precise reasons why the U.K. government did not sanction Interpal, nor has either party presented any evidence as to those reasons, with the exception of a few public disclosures and the testimony of Dr. Matthew Levitt, who testified that the U.K. government made its decisions for a number of reasons, and publicly acknowledged the shortcomings of its process. Nonetheless, Plaintiffs cannot and do not contend as to what precise reason or reasons the U.K. chose not to "sanction" Interpal except to note that the Bank of England did designate the Al Aqsa Foundation in May 2003 based on "reasonable grounds for suspecting that Al-Aqsa Foundation is or may be a person who commits, attempts to commit, facilitates or participates in the commission of acts of terrorism," and records produced in this litigation demonstrate that: (1) the Al Aqsa Foundation transferred funds to the same Hamas-controlled institutions to which Interpal transferred funds; and (2) ██████████

13

██████ the Al Aqsa Foundation transferred funds to Interpal ██████████████

██████████ As such it is clear that the Bank of England has designated entities for engaging in conduct materially similar to that which Interpal engaged in, but the precise reasons that explain the inconsistency of U.K. designation practices are not known to Plaintiffs, and are irrelevant to the parties' claims and defenses.  Whatever the reasons underscoring U.K decisions to not designate Interpal are not relevant to NatWest's liability under the ATA, including the applicable scienter element.

*See also, e.g.,* the June 2, 2011 Deposition of Dr. Matthew Levitt at 49:18 – 63:2, as well as the information referenced by his testimony (and report), namely a BBC News Report summarized                                                                at http://www.bbc.co.uk/pressoffice/pressreleases/stories/2006/07_july/30/panorama.shtml    and http://news.bbc.co.uk/panorama/hi/front_page/newsid_7915000/7915916.stm.

With respect to the reasons why the U.K. Charity Commission did not de-register Interpal, Plaintiffs rely, in part, on the sworn testimony before the Commission of Inquiry into the investigation of the Bombing of Air India Flight 182, by Mr. Kenneth Dibble, one of the Directors of the Charity Commission[2], who noted in his remarks the limited remit of the Charity Commission's jurisdiction and regulatory authority[3]:

> [in England and Wales] the registration of charities is a recognition of a legal status ... If a body is a charity, it will be a charity irrespective of its registration with the Commission ... So malpractice or lack of comparative [ sic] in charities cannot be dealt with deregistration ... In other jurisdictions, particularly [fiscally] based jurisdictions, a different approach may operate and that's another issue. So lack of compliance does not equate to deregistration in any circumstances.

---

[2] Mr. Dibble is the Executive Director of Legal Services and Compliance with the Commission and has responsibility for the provision and overall management of the Commission's legal services and Compliance and Support function.
[3] Available at: http://www.globalphilanthropy.ca/images/uploads/01_20110309_NITR_with_App_A,_B_and_C.pdf, at pp. A-2/19 – A-3/19.

147570.v2                                              14

A charity can only be de-registered if it ceases in law to be a charity, or it has come to an end of its life, or is dissolved. One exception to that is if the charity is actually a sham organization ... but generally removal is not a compliance response or function. If a charity is committing breaches of trust, whether they are terrorist activities or otherwise, the remedy is to remove and appoint new trustees to make it run properly, it is not de-registration.

Plaintiffs note further that, when describing to NatWest its decision in 1996 to allow

Interpal to continue to operate as a U.K. charity despite the allegations that it was raising money

for HAMAS, the Charity Commission explicitly told NatWest ██████████████████

████████████████████████████████████████████████

This conversation was memorialized in a report, and NatWest was therefore fully on notice of

the questionable objectivity of the Charity Commission's approach to allegations made against

Interpal. *See* Oct. 5, 2010 Deposition of Gerald Matthews at 42:13 – 46:25.

Dated: October 13, 2011

By: _____

Mark S. Werbner
Joel Israel
SAYLES WERBNER PC
4400 Renaissance Tower
1201 Elm Street
Dallas, TX 75270
Telephone: 214.939.8700

Richard D. Heideman
Noel J. Nudelman
Tracy Reichman Kalik
HEIDEMAN NUDELMAN & KALIK, P.C.
1146 19TH Street, NW, 5th Floor
Washington, DC 20036
Telephone: 202.463.1818

James P. Bonner
SHALOV STONE BONNER & ROCCO LLP
485 Seventh Avenue
Suite 1000
New York, NY 10018
Telephone: 212.239.4340

Counsel for *Applebaum* Plaintiffs

ZUCKERMAN SPAEDER LLP
Aitan D. Goelman
Semra A. Mesulam
1800 M Street, Suite 1000
Washington, D.C. 20036

OSEN LLC
Gary M. Osen
Aaron Schlanger
Ari Ungar
Joshua D. Glatter
700 Kinderkamack Road
Oradell, New Jersey 07649
(201) 265-6400

KOHN, SWIFT & GRAF, P.C.
Steven M. Steingard
Stephen H. Schwartz
Neil L. Glazer
One South Broad Street, Suite 2100
Philadelphia, PA 19107
(215) 238-1700

Counsel for *Weiss* Plaintiffs

**CERTIFICATE OF SERVICE**

I, Joel Israel, hereby certify that a true and correct copy of Plaintiffs' Second Supplemental Answers and Objections to National Westminster Bank, PLC's Contention Interrogatories was served via electronic mail on this 13th day of October 2011, on the following:

>  Lawrence B. Friedman, Esq.
>  CLEARY GOTTLIEB STEEN & HAMILTON, LLP
>  One Liberty Plaza
>  New York, NY 10006
>  lfriedman@cgsh.com

_____
Joel Israel

**EXHIBIT 106 TO DECLARATION OF VALERIE SCHUSTER**

Case 1:05-cv-04622-DLI-RML   Document 267-5   Filed 03/22/12   Page 77 of 213 PageID #: 5668

- Accessibility
- Email alerts
- RSS feeds
- Contact us

 www.parliament.uk

Search

- Home
- Parliamentary business
- MPs, Lords & offices
- About Parliament
- Get involved
- Visiting
- Education

- House of Commons
- House of Lords
- What's on
- Bills & legislation
- Committees
- Publications & records
- Parliament TV
- News
- Topics

You are here: Parliament home page > Parliamentary business > Publications and Records > Lords Publications > Lords Hansard > Daily Hansard

**Previous Section**          **Back to Table of Contents**          **Lords Hansard Home Page**

---

**Lord Dholakia:** My Lords, successive Home Secretaries have felt uncomfortable about the forthright reports of Her Majesty's Inspector of Prisons. Will the Minister confirm that prison inspectors provide a close scrutiny of prisons which are the least visible and most neglected of our public services? Will the Minister also confirm her department's commitment to a robust, independent prison inspectorate which is directly accountable to the Home Secretary, and that no changes are contemplated which would undermine those principles?

**Baroness Scotland of Asthal:** My Lords, I am certainly more than happy to confirm that the Government are wholly committed to the maintenance of robust

**6 Oct 2003 : Column 16**

inspections. Like the noble Lord, I give support and credit to all those inspectors who have robustly discharged their duty. No review currently contemplated by the Government intends in any way to undermine the effectiveness of inspections.

**Lord Elton:** My Lords, the post of Chief Inspector of Prisons was created in 1982 in a clause in the Criminal Justice Act of that year which I moved on the advice of the late Lord Whitelaw when he was Home Secretary. It was done at a time when the prison

Case 1:05-cv-04622-DLI-RML   Document 267-5   Filed 03/22/12   Page 78 of 213 PageID #: 5669

population was considered to be totally unacceptably large and the effects of the system in which prisoners were kept totally counter-productive. Now that the prison population is virtually 30,000 larger than at that time—representing an increase of about 85 per cent—does the noble Baroness agree that to enlarge the responsibility of an inspector to take in the duties of the Probation Service would be wholly mistaken?

**Baroness Scotland of Asthal:** My Lords, I make it absolutely plain that the Government have made no final decision about how, if at all, any changes should be made. The noble Lord should recognise that through all the efforts that we are making we are trying to create a criminal justice system which is fit for purpose. The changes that we are making through the national Criminal Justice Bill and through local criminal justice areas in trying to bring people together will, of course, place additional burdens on those who inspect a system which is becoming more integrated. I say to the noble Lord, Lord Elton, that we have made no decision as to how best to fashion a system. However, I absolutely agree with the comments made by the noble Lord and by the noble Lord, Lord Dholakia, that inspection is critical. It must be robust, of high quality and independent if it is to serve any real purpose.

**Lord Dubs:** My Lords, does my noble friend agree that to have such an independent, robust and forthright Chief Inspector of Prisons as Anne Owers, and indeed some of her predecessors, has given many of us confidence in a system that in other respects has given us much cause for anxiety? Although I understand that my noble friend has made some very positive comments, she has also talked about possible changes. Many of us hope that those changes will not diminish the robust independence and strength of the work of Anne Owers and her predecessors.

**Baroness Scotland of Asthal:** My Lords, I should like to reassure my noble friend that any changes which may be made in the future will be made to improve the inspectorate and not to diminish its effectiveness.

**The Lord Bishop of Worcester:** My Lords, I am grateful, as I am sure many of us are, for the Minister's supportive comments about inspection. Does she agree that another aspect of the context which makes inspection doubly important is the very high profile that crime has in the popular mind, and therefore the tendency to a rhetoric of toughness? The word

6 Oct 2003 : Column 17

"robust" is more frequently used about the regimes that people should have rather than about the inspection regime. Does she agree that it is particularly important that we are vigilant at such a time as this and that inspection fulfils the function of keeping our eyes on those whom we do not usually see and keeping our memories open to those whom we are tempted to forget?

**Baroness Scotland of Asthal:** My Lords, I absolutely agree with the right reverend Prelate that it is of real importance for us to have the benefit of inspection so that we can verify whether that which we aspire to achieve is actually being achieved.

**Lord Ackner:** My Lords, in view of the compliments that have been rightly bestowed on previous inspectors, what exactly has motivated the present inquiry?

**Baroness Scotland of Asthal:** My Lords, there has been a review. During that review, it was indicated that there was a level of duplication and a need to refocus the inspection process on the new challenges that are facing the system. We needed to have a holistic approach. Therefore, we needed a review to look again at how to deliver it.

**Lord Carlisle of Bucklow:** My Lords, the noble Baroness has been very careful in her words. She has referred several times to her confidence in "robust" inspection. Does that mean that there will be a continuation of a robust and independent chief inspector who is reportable directly to the Home Secretary?

**Baroness Scotland of Asthal:** My Lords, I cannot specify what form the inspection will take, although a number of models are currently being posited. One model is that there should be no change whatever. Another model is that instead of five inspectors, there should be six. A third model is that the number of inspectors should be reduced from five to three with an overarching commission or commissioner. There are also other models. We have come to no conclusion on which model would be best. We are openly considering them all, because we are absolutely committed to ensuring that the inspection process is the best that we can make it.

**Lord Mayhew of Twysden:** My Lords, does not the recently published book by Sir David Ramsbotham suggest the need for one change: namely, that the reports of the inspectorate should be published at once and not after such delay as Ministers and their officials may think is needed to dissipate the embarrassment of the criticisms that such reports contain?

**Baroness Scotland of Asthal:** My Lords, the noble and learned Lord will know from his past position in the previous government that that is not the reason why the Government take time to consider inspectors' reports. They are serious documents which need serious consideration. The Government have

6 Oct 2003 : Column 18

Case 1:05-cv-04622-DLI-RML   Document 267-5   Filed 03/22/12   Page 79 of 213 PageID #:
5670

continued the previous tradition of doing just that—giving serious consideration. I do not think that that criticism can validly be laid at our door.

# Interpal: Charitable Status

**3.34 p.m.**

**Lord Chalfont** asked Her Majesty's Government:

> Whether the activities of the Palestine Relief and Development Fund—Interpal—are consistent with its charitable status.

**Baroness Scotland of Asthal:** My Lords, this is an operational matter for the Charity Commission as the regulator of charities in England and Wales. However, I understand that the commission has recently concluded a formal inquiry into Interpal which established that there was no evidence to substantiate allegations that it has links to Hamas's political and militant activities. The commission removed restrictions on Interpal's accounts and closed its inquiry on 24th September and published a report on its inquiry which is publicly available.

**Lord Chalfont:** My Lords, I thank the noble Baroness for that reply. Is it not a shame that the legitimate activities of this organisation should have been disrupted by what appear to have been false allegations? On the other hand, will she confirm that the European Union has now prescribed or blacklisted both the political wing of Hamas and its military wing? In the light of that, can we be assured that no charitable funds from this country will go to the Hamas organisation?

**Baroness Scotland of Asthal:** My Lords, I can confirm that that has occurred and that the EU has frozen the assets of Hamas as the noble Lord describes. I should also say that it is a matter for the Charity Commissioners, who behave perfectly properly by investigating any serious allegations, as they have in this case, and putting those issues to rest.

**Lord Wright of Richmond:** My Lords, does the Minister agree that we should not let allegations against Palestinian charities prejudice the work of other charities such as Medical Aid for Palestinians which are doing quite outstanding work to relieve the suffering and deprivation of the Palestinians in the occupied territories?

**Baroness Scotland of Asthal:** My Lords, that is absolutely right. I understand that my noble friend Lady Symons discussed those very issues last week and that this matter was being pursued. I should also say that the matter is properly within the province of the Charity Commissioners, who have demonstrated on each occasion that they are able to act with total propriety.

**Viscount Bridgeman:** My Lords, will the Minister join me in paying tribute to the Charity Commission, as she has just done, for the valuable regulatory work

**6 Oct 2003 : Column 19**

that it does, particularly in cases such as this where there are very sensitive international and political implications?

**Baroness Scotland of Asthal:** My Lords, I have great pleasure in doing so. The noble Lord is absolutely right.

---

[Next Section](#)                    [Back to Table of Contents](#)                    [Lords Hansard Home Page](#)

**EXHIBIT 107 TO DECLARATION OF VALERIE SCHUSTER**

Case 1:05-cv-04622-DLI-RML   Document 267-5   Filed 03/22/12   Page 81 of 213 PageID #: 5672

- Accessibility
- Email alerts
- RSS feeds
- Contact us

 www.parliament.uk

Search

- Home
- Parliamentary business
- MPs, Lords & offices
- About Parliament
- Get involved
- Visiting
- Education

- House of Commons
- House of Lords
- What's on
- Bills & legislation
- Committees
- Publications & records
- Parliament TV
- News
- Topics

You are here: Parliament home page > Parliamentary business > Publications and Records > Committee Publications > All Select Committee Publications > Commons Select Committees > International Development > International Development

**Select Committee on International Development Written Evidence**

---

## Supplementary memorandum submitted by Oxfam

Further to Adam Leach's answer to Oral evidence, Q90, we would also like to put on record that we are very concerned about the unsubstantiated accusations by the US government that the British Muslim charity Interpal is a terrorist organisation. Interpal were eventually cleared when no evidence was forthcoming, but this unnecessary investigation has generated very negative publicity for a *bona fide* charitable organisation and sets a dangerous precedent for other British organisations helping poor communities in Palestine. We would like to see HM government standing up for British NGOs and taking a more independent line on this in future.

Further to Adam Leach's answer to Oral evidence, Q93, in order to achieve real change, the British government should use its influence with the Quartet for Peace to explore alternatives to Israeli occupation. Development aid is not enough on its own, and should be accompanied by international protection mechanisms that will impartially uphold rights of both Israeli and Palestinian civilians under international humanitarian law. Only such an arrangement can ensure an immediate cessation of violence by both sides, restore normal economic activity, and help foster the trust and goodwill that will be needed to reach a final settlement.

*19 November 2003*

Case 1:05-cv-04622-DLI-RML   Document 267-5   Filed 03/22/12   Page 82 of 213 PageID #: 5673

---

Previous    Contents    Next

Commons    Parliament    Lords    Search    Enquiries    Index

---

© Parliamentary copyright 2004                     *Prepared 5 February 2004*

- A-Z index
- Glossary
- Contact us
- Freedom of Information
- Jobs
- Using this website
- Copyright

**EXHIBIT 108 TO DECLARATION OF VALERIE SCHUSTER**

Case 1:05-cv-04622-DLI-RML   Document 267-5   Filed 03/22/12   Page 84 of 213 PageID #:
5675

- Accessibility
- Email alerts
- RSS feeds
- Contact us



[            ]  Search

- Home
- Parliamentary business
- MPs, Lords & offices
- About Parliament
- Get involved
- Visiting
- Education

- House of Commons
- House of Lords
- What's on
- Bills & legislation
- Committees
- Publications & records
- Parliament TV
- News
- Topics

You are here: Parliament home page > Parliamentary business > Publications and Records > Hansard > Commons Debates > Commons Debates by date > Commons Debates - previous sessions > Bound Volume Hansard - Written Answers

Previous Section                              Index                              Home Page

*16 Jan 2006 : Column 975W—continued*

## Embassy Function (Incident)

**Mike Penning:** To ask the Secretary of State for Foreign and Commonwealth Affairs pursuant to the answer of 7 December 2005, *Official Report*, column 1388W, on damages, what the nature was of the incident that led to burns sustained at an embassy function. [40859]

**Mr. Straw:** The incident took place at a barbecue. Lighter fuel was spilled accidentally, ignited and burned the legs of a guest at the function.

## Energy Supplies (Russia)

**Mr. Brady:** To ask the Secretary of State for Foreign and Commonwealth Affairs if he will list the occasions in the past 12 months on which Ministers in his Department have met representatives of the Russian Government to discuss the security of energy supply to the United Kingdom and EU. [41629]

**Mr. Douglas Alexander** *[holding answer 12 January 2006]:* On 4 October 2005, my right hon. Friend the Foreign Secretary took part in bilateral discussions in London with President Putin and senior members of his government during which a substantial

Case 1:05-cv-04622-DLI-RML   Document 267-5   Filed 03/22/12   Page 85 of 213 PageID #: 5676

exchange on energy security issues took place. The energy sector formed an important part of the EU engagement with Russia under the UK Presidency. This was most prominent in discussions held during the EU-Russia Permanent Partnership Council on 3 October 2005, co-chaired by my right hon. Friend, the Secretary of State for Trade and Industry, and also on 4 October during the EU- Russia Summit, hosted by my right hon. Friend the Prime Minister. Energy security will also be a key theme for the Russian G8 Presidency during 2006 and in preparation for this, senior FCO officials met with Russian counterparts in September 2005 in Moscow for economic talks which included discussion of energy supply issues.

## EU Military and Policing Operations

**Michael Gove:** To ask the Secretary of State for Foreign and Commonwealth Affairs what EU *(a)* military and *(b)* policing operations in countries outside the EU (i) are under way, (ii) are planned and (iii) have been carried out since 1997. [40940]

**Mr. Straw:** Since 1997 the European Union has conducted three military operations under the European Security and Defence Policy (ESDP): Operation Concordia in Macedonia (March-December 2003), Operation Artemis in the Democratic Republic of Congo (June-September 2003) and Operation Althea in Bosnia, which was launched in December 2004 and is ongoing. At this moment there are no additional EU military operations being planned.

There have been five ESDP civilian policing missions: the EU Police Mission in Bosnia (January 2003 to present): EUPOL Proxima in Macedonia (December 2003 to December 2005): the EU Police Advisory Team in Macedonia (December 2005 to present): EUPOL Kinshasa in the Democratic Republic of Congo (April 2005 to present): and EUPOL COPPS, the EU Police Mission for the Palestinian Territories. This last was launched on 1 January 2006 and is building on the work of the UK-led EU Coordination Office for Palestinian

*16 Jan 2006 : Column 976W*

Policing Support. Current discussions about the EU's future role in Kosovo have included the possibility of a policing contribution.

There is a range of other ESDP missions currently active covering security sector reform, rule of law, ceasefire monitoring and border monitoring. The EU can also provide support, including military and police resources, to another international organisation, as it is currently doing for the African Union Mission in Sudan operation in Darfur.

Further details on all ESDP missions can be found on the FCO's website at:

http://www.fco.gov.uk/servlet/Front?pagename== OpenMarket/Xcelerate/ShowPage&c =Page&cid= l077042145284.

## Hamas/Interpal

**Mr. Gauke:** To ask the Secretary of State for Foreign and Commonwealth Affairs what assessment he has made of whether there are links between Hamas and Interpal; and if he will make a statement. [42089]

**Dr. Howells:** The Charity Commission has investigated Interpal on several occasions regarding their links with Hamas. They have found insufficient evidence to support taking action against Interpal.

## Iran

**Mr. Drew:** To ask the Secretary of State for Foreign and Commonwealth Affairs what evidence he has received that Iran is removing control seals from nuclear installations. [41830]

**Dr. Howells:** On 10 January, inspectors of the International Atomic Energy Agency (IAEA) confirmed that Iran had started to remove IAEA seals on enrichment-related equipment and material at its enrichment facility in Natanz. The IAEA expected the removal of seals at Natanz and at two related storage and testing locations to be completed by 11 January.

**Mr. Ancram:** To ask the Secretary of State for Foreignand Commonwealth Affairs what progress has been made in securing the return from Iran of the naval and military equipment seized by them in the Shatt-al Arab. [42048]

**Dr. Howells:** We have raised the return of boats and equipment with the Iranian authorities on numerous occasions, at both Ministerial and senior official level, in Tehran and London. The British Ambassador in Tehran did so most recently on 12 December. Our discussions are continuing.

**Mr. Keith Simpson:** To ask the Secretary of State for Foreign and Commonwealth Affairs what assessment he has made of Iran's progress towards ratifying the Additional Protocol; and if he will make a statement. [42507]

**Dr. Howells:** In the 'Tehran Statement' of 12 October 2003, Iran agreed to sign an additional protocol to its Safeguards

Case 1:05-cv-04622-DLI-RML   Document 267-5   Filed 03/22/12   Page 86 of 213 PageID #: 5677

Agreement, and to commence ratification procedures. It further stated that

*16 Jan 2006 : Column 977W*

as a confirmation of its good intentions, the Iranian Government will continue to co-operate with the [International Atomic Energy] Agency (IAEA) in accordance with the Protocol in advance of its ratification".

Iran signed the Additional Protocol on 18 December 2003. In the Paris Agreement of 15 November 2004, Iran again reaffirmed that it would

continue to implement the Additional Protocol voluntarily pending ratification".

Iran has not yet ratified the Protocol. In its most recent resolution on 24 September 2005, the IAEA Board of Governors urged Iran

promptly to ratify and implement in full the Additional Protocol"

and

pending completion of the ratification of the Additional Protocol, to continue to act in accordance with the provisions".

**Mr. Keith Simpson:** To ask the Secretary of State for Foreign and Commonwealth Affairs what assessment has been made of the progress made in the construction of the heavy water research reactor at Arak in Iran; and if he will make a statement. [42508]

**Dr. Howells:** International Atomic Energy Agency (IAEA) Director General Dr. Mohammed El Baradei confirmed in his November 2005 report that the Agency had carried out a design information verification visit to Arak and noted that the civil engineering construction of the reactor building was continuing. In declarations to the IAEA, the Iranian government has stated that the facility should be ready for commissioning in 2014. We are not aware of any change to this timescale.

We have made clear to the Iranians our concerns that this reactor design is not best suited to their declared research needs, but presents significant proliferation concerns in respect of its suitability for the production of weapons grade plutonium. This is why we have suggested to Iran for some time that it should acquire instead a research reactor moderated by light water. We made clear in our comprehensive proposal presented on 5 August 2005 that we would support them in doing this.

**Mr. Keith Simpson:** To ask the Secretary of State for Foreign and Commonwealth Affairs when the return of British military equipment confiscated by Iran in the summer of 2004 was last raised by the UK Government's representative in Tehran; and what the result was of that discussion. [42509]

**Dr. Howells:** We have raised the return of boats and equipment with the Iranian authorities on numerous occasions, at both Ministerial and senior official level, in Tehran and London. The British Ambassador in Tehran did so most recently on 12 December 2005. Our discussions are continuing.

**Mr. Keith Simpson:** To ask the Secretary of State for Foreign and Commonwealth Affairs what his assessment is of the stage that has been achieved by the Iranian government in the development of nuclear weapons technology; and if he will make a statement. [42510]

**Dr. Howells:** Iran is seeking to master enrichment technology. This would give it the capability to produce nuclear weapons grade enriched uranium. Iran's recent notification that it intends to resume research and development activity, including the introduction of

*16 Jan 2006 : Column 978W*

nuclear material into enrichment centrifuges, is contrary to the calls expressed in repeated International Atomic Energy Agency Board resolutions and to Iran's own undertakings, and does nothing to resolve longstanding international concerns over Iranian government intentions.

**Mr. Keith Simpson:** To ask the Secretary of State for Foreign and Commonwealth Affairs pursuant to the answer to the hon. Member for Thurrock of 9 January 2006, *Official Report*, column 193W, on Iran, when he expects the explanatory meeting between Iran and the EU scheduled for 2006 to take place; and if he will make a statement. [42717]

**Dr. Howells:** The E3/EU held exploratory talks with Iran on 21 December aimed at establishing whether a basis could be agreed for resuming negotiations on long-term arrangements for Iran's nuclear programme. We made crystal clear that a resumption of negotiations would only be possible if Iran refrained from any further erosion of its suspension of enrichment related and reprocessing activities, including research and development on enrichment.

Case 1:05-cv-04622-DLI-RML    Document 267-5    Filed 03/22/12    Page 87 of 213 PageID #: 5678

Iran's decision to restart enrichment related activity on 9 January was a clear rejection of the diplomatic process the E3/EU and Iran have been engaged in for over two years with the support of the international community. In addition, it constitutes a further challenge to the authority of the International Atomic Energy Agency (IAEA) and international community. We have, therefore, decided to inform the IAEA Board of Governors that our discussions with Iran have reached an impasse.

---

Next Section                                    Index                                    Home Page

- A-Z index
- Glossary
- Contact us
- Freedom of Information
- Jobs
- Using this website
- Copyright

**EXHIBIT 109 TO DECLARATION OF VALERIE SCHUSTER**

Case 1:05-cv-04622-DLI-RML　Document 267-5　Filed 03/22/12　Page 89 of 213 PageID #: 5680

- Accessibility
- Email alerts
- RSS feeds
- Contact us



[   ]  Search

- Home
- Parliamentary business
- MPs, Lords & offices
- About Parliament
- Get involved
- Visiting
- Education

- House of Commons
- House of Lords
- What's on
- Bills & legislation
- Committees
- Publications & records
- Parliament TV
- News
- Topics

You are here: Parliament home page > Parliamentary business > Publications and Records > Hansard > Commons Debates > Commons Debates by date > Commons Debates - previous sessions > Bound Volume Hansard - Written Answers

Previous Section　　　　　　　　　　Index　　　　　　　　　　Home Page

*6 Feb 2006 : Column 771W—continued*

## European Anti-fraud Office

**Mr. Hayes:** To ask the Secretary of State for Foreign and Commonwealth Affairs what measures are being discussed in the EU to develop the European Anti-fraud Office in preparation for future transformation into the European Public Prosecutor, as referred to in OJ C122, volume 48, 20 May 2005; and if he will make a statement. [48287]

**Mr. Douglas Alexander:** The Official Journal C122, volume 48, 20 May 2005 refers to the European Anti-Fraud Office's June 2003-July 2004 Activity Report. It contains a reference to the potential creation of a European Public Prosecutor's Office under the European Constitutional Treaty. Under the terms of the Treaty, the creation of a European Public Prosecutor would not be automatic, as it would first require the consent of every member state.

No measures are currently under discussion to prepare for a European Public Prosecutor. The UK has made it clear that it remains unconvinced of the need for an EPP, whether under the Constitutional Treaty or the current treaties.

## Hamas

**Mark Simmonds:** To ask the Secretary of State for Foreign and Commonwealth Affairs what assessment he has made of the

Case 1:05-cv-04622-DLI-RML   Document 267-5   Filed 03/22/12   Page 90 of 213 PageID #: 5681

implications of Hamas' victory in the recent elections to the Palestinian Legislature for security in the region. [48109]

**Dr. Howells:** Following its meeting on 30 January, the Quartet (UN, EU, US and Russia) acknowledged the positive role of the Palestinian Authority security forces in helping maintain order during the recent elections.

*6 Feb 2006 : Column 772W*

It expressed its view that progress on further consolidation, accountability and reform remains an important task. We support this position.

Hamas now has a choice to make between the path of democracy and the path of violence. The onus is on Hamas to change their approach to Israel, renounce violence and disarm. We are watching developments closely and taking stock of the situation.

## Interpal

**Mark Simmonds:** To ask the Secretary of State for Foreign and Commonwealth Affairs what recent representations he has received on the activities of Interpal; and if he will make a statement. [47828]

**Dr. Howells:** My right hon. Friend the Foreign Secretary discussed the issue with his Israeli counterpart most recently in July 2005 and I have dealt with parliamentary correspondence on Interpal. In these discussions, it was noted that, following allegations of connections to Hamas, the Charity Commission had investigated Interpal on several occasions and had found insufficient evidence to support taking action against Interpal.

## Iran

**Mr. Keith Simpson:** To ask the Secretary of State for Foreign and Commonwealth Affairs what assessment he has made of the extent to which *(a)* UK and *(b)* EU banks have ceased business with Iran; and if he will make a statement. [48592]

**Dr. Howells:** We are not aware that any UK or EU banks have recently ceased business with Iran. ABN Amro reportedly closed its offices in Iran in October 2004.

According to media reports, UBS said on 22 January that it would no longer deal with individuals, companies or state institutions in Iran, and Credit Suisse Group said on 23 January that it would stop new business with Iran.

**Mr. Keith Simpson:** To ask the Secretary of State for Foreign and Commonwealth Affairs what fora are available to the EU to express its concerns about human rights in Iran to the Iranian Government; and if he will make a statement. [48752]

**Dr. Howells:** Iran's poor human rights record is a long-standing concern of the EU and an important factor in shaping EU policy towards Iran.

During the UK presidency, the EU issued public statements and made representations to the Iranian authorities about human rights violations on more than 15 occasions.

The EU should also be able to discuss human rights concerns within the framework of the EU/Iran Comprehensive Dialogue, established in 1998, and the EU/Iran Human Rights Dialogue, established in 2002. Regrettably, however, these dialogues have not taken place since April 2003 and June 2004 respectively, despite the efforts of successive EU presidencies and the European Commission at both ministerial and official level.

*6 Feb 2006 : Column 773W*

The EU also voices its concerns in international fora. All EU member states co-sponsored the resolution on human rights in Iran adopted by UN General Assembly in December 2005.

**Mr. Keith Simpson:** To ask the Secretary of State for Foreign and Commonwealth Affairs under what conditions negotiations on the EU-Iran Trade and Co-operation and Political Dialogue Agreements would resume; and if he will make a statement. [48754]

**Dr. Howells:** The EU has not taken forward negotiations on the draft EU-Iran Trade and Co-operation Agreement or the draft EU/Iran Political Dialogue Agreement since August 2005 when Iran unilaterally decided to resume uranium conversion activities, in violation of its commitments to the E3/EU and contrary to requests in the International Atomic Energy Agency Board of Governors resolutions.

The EU agreed at the 16 December European Council that whether the EU's long-term relationship with Iran improves or deteriorates will depend on progress by Iran in the EU's areas of concern. These include Iran's attitude towards terrorism, the

Case 1:05-cv-04622-DLI-RML   Document 267-5   Filed 03/22/12   Page 91 of 213 PageID #:
5682

proliferation of weapons of mass destruction, Iran's approach to the Middle East Peace Process, human rights and fundamental freedoms, and regional issues.

# Iraq

**Mr. Jim Cunningham:** To ask the Secretary of State for Foreign and Commonwealth Affairs what assessment he has made of the incidence of corruption in reconstruction projects in Iraq. [47856]

**Dr. Howells:** There have been several comprehensive assessments of financial management of the Iraqi reconstruction effort, the most prominent of which is the series of reports published by the Special Inspector General for Iraq Reconstruction. Given concerns about levels of corruption in Iraq generally, the Government does not fund Iraqi institutions directly. All UK reconstruction programmes are monitored continuously, and where we have had any financial or management concerns we have taken action to address them.

The UK is committed to working with the Iraqi Government, alongside the International Monetary Fund, World Bank and other donors, to improve accountability and transparency in Iraq's public finances. Iraq is making progress in developing its anti-corruption institutions. These now include a Board of Supreme Audit, Inspector Generals resident in each Ministry and a Commission for Public Integrity, which can refer cases to the Central Criminal Court of Iraq. In addition, our efforts include encouraging Iraq to adopt international legal frameworks and standards in natural resource management, including the Extractive Industries Transparency Initiative.

**Adam Price:** To ask the Secretary of State for Foreign and Commonwealth Affairs what representations he has received on the abduction and detention incommunicado of *(a)* Qutaiba Hamdani, *(b)* Uday Nasser *(c)* Badr, *(d)* Yasser Hamad and *(e)* Firaz Imad in Iraq in February 2004. [49368]

*6 Feb 2006 : Column 774W*

**Dr. Howells:** In March 2004, our Representative to the United Nations in Geneva received a copy of a letter from the UN Special Rapporteur for Torture, Mr. Van Boven, which referred to those named in the question. The only other representations we are aware of on behalf of these individuals are those from the hon. Member himself.

**Adam Price:** To ask the Secretary of State for Foreign and Commonwealth Affairs pursuant to the answer of 30 January 2006, *Official Report*, column 122W, on Iraq, whether he has *(a)* requested and *(b)* received information from (i) UK officials, (ii) UK armed service personnel and (iii) Iraqi official sources relating to the whereabouts of Mr. Quitaba Hamdani, Mr. Uday Nasser Badr, Mr. Yasser Hamad and Mr. Firaz Imad referred to in the letter of 12 March 2004 from Mr. van Boven, UN Special Rapporteur on Torture. [49369]

**Dr. Howells:** We have requested information about action taken by UK and US officials at the time of the van Boven letter. We have not approached the UK military or Iraqi officials.

Any reply to the Special Rapporteur's letter would have been sent by the Coalition Provisional Authority (CPA), which was dissolved at the end of June 2004. A search of the CPA's permanent records has taken place without finding the Special Rapporteur's letter or any reply.

At the time of Mr. van Boven's letter there was a great deal of militia activity of the type mentioned in his letter and many reports from different sources urging that they should be investigated. In so far as it was possible in each case full investigations were undertaken and attempts made to stop illegal detention.

---

Next Section                         Index                              Home Page

- A-Z index
- Glossary
- Contact us
- Freedom of Information
- Jobs
- Using this website

Case 1:05-cv-04622-DLI-RML    Document 267-5    Filed 03/22/12    Page 92 of 213 PageID #: 5683

- [Copyright](#)

**EXHIBIT 110 TO DECLARATION OF VALERIE SCHUSTER**

Case 1:05-cv-04622-DLI-RML   Document 267-5   Filed 03/22/12   Page 94 of 213 PageID #:
5685

- Accessibility
- Email alerts
- RSS feeds
- Contact us



[ Search field ]  Search

- Home
- Parliamentary business
- MPs, Lords & offices
- About Parliament
- Get involved
- Visiting
- Education

- House of Commons
- House of Lords
- What's on
- Bills & legislation
- Committees
- Publications & records
- Parliament TV
- News
- Topics

You are here: Parliament home page > Parliamentary business > Publications and Records > Lords
Publications > Lords Hansard > Lords Hansard by Date > Daily Hansard

Previous Section                    Back to Table of Contents                    Lords Hansard Home Page

**2 Mar 2009 : Column WA115**

## Written Answers

### Monday 2 March 2009

### Banking

### Question

*Asked by **Lord Dykes***

To ask Her Majesty's Government whether they have any evidence of a movement of bank lending flows towards normal corporate and personal borrowers, rather than into passive assets, following the recent second tranche of support. [HL1226]

Case 1:05-cv-04622-DLI-RML  Document 267-5  Filed 03/22/12  Page 95 of 213 PageID #: 5686

**The Financial Services Secretary to the Treasury (Lord Myners):** On 19 January, the Government announced measures designed to reinforce the stability of the financial system, to increase confidence and capacity to lend, and in turn to support the recovery of the economy. These build on measures announced on 8 October last year.

The Government intend to negotiate lending agreements with the banks participating in certain facilities. These will have specific and quantified lending commitments, and will be binding and externally audited.

These measures have helped to stabilise the credit market. This is an essential condition for banks to develop greater confidence to lend to creditworthy businesses, homeowners and consumers.

## Banking: Interpal

### Question

Asked by **Lord Hylton**

To ask Her Majesty's Government whether they will ask the government of the United States to remove the restrictions preventing the British-registered charity Interpal from receiving full banking services. [HL1121]

**The Financial Services Secretary to the Treasury (Lord Myners):** The Government recognise the importance of the issues raised and share the concern that aid should reach those who need it most.

Although the general picture on charitable assistance to Gaza is positive, many people have raised concerns about the position of the UK-registered charity Interpal following difficulties with retaining banking services in the UK.

The banking issues affecting the charity are unusual, and are not representative of the wider picture on the ability of UK charities to provide aid to those in need. However, we still share concerns about any interruption to humanitarian aid. While commercial decisions on providing accounts and clearing services are for the banks themselves, we are discussing with relevant parties how best to ensure that charities can retain access to the banking system.

## 2 Mar 2009 : Column WA116

The Treasury has written to the US Government to reiterate the importance we attach to the delivery of effective charitable aid and to strengthen our dialogue with the US on how best we can facilitate legitimate charitable work.

We shall consider making further representations if appropriate.

## British-Irish Parliamentary Assembly

### Question

Asked by **Lord Dubs**

To ask Her Majesty's Government how many reports from the British-Irish Parliamentary Assembly (formerly the British-Irish Inter-Parliamentary Body) they have received in the past five years, and how many reports they have responded to in writing. [HL1377]

**The Lord President of the Council (Baroness Royall of Blaisdon):** The Government have received 14 reports from the British-Irish Inter-Parliamentary Body since February 2003, and have responded to two of these reports in writing. The reports responded to were:

*Enquiry into Special Needs Educational Provision in Britain and Ireland, with Special Reference to Autism* (February 2005); responded to on behalf of the Department for Education and Skills by Lord Adonis, November 2005, and *The Implications of the Introduction of British ID Cards for the Common Travel Area* (April 2006); responded to on behalf of the Home Department by Joan Ryan MP, September 2006, Liam Byrne MP, (April 2008) and Phil Woolas MP, December 2008.

Case 1:05-cv-04622-DLI-RML   Document 267-5   Filed 03/22/12   Page 96 of 213 PageID #: 5687

The other 12 reports were:

*Links between the BIIPB and the Nordic Council* (February 2004);*Delivery of health services to rural populations* (April 2004);*Waste Management* (June 2004);*Truth and Reconciliation for Northern Ireland* (January 2005);*European Funding programmes and Developing Understanding across Borders* (March 2005);*European Funding in Socially Deprived Areas of Northern Ireland* (April 2006);*Challenges and Opportunities facing the Small Farm Sector* (April 2006);*Life Chances for Young People from the Economically Deprived Areas of Belfast* (2006);*Barriers to Trade* (January 2007);*The Irish Community in Britain* (2007);*Renewable Energy except Nuclear* (2007); and *The Integration of Recently Arrived Migrants to Northern Ireland, Ireland and Wales* (2008).

A copy of these reports and the responses of Her Majesty's Government can be found on the British-Irish Inter-Parliamentary Body's website at www.biipb.org.

## 2 Mar 2009 : Column WA117

## Business Support

### Questions

#### Asked by **Lord Wakeham**

To ask Her Majesty's Government what assessment they have made of the increase in the availability of bank finance to businesses as a result of the recent reductions in the bank rate. [HL594]

To ask Her Majesty's Government whether they will encourage banks and other financial institutions to increase the finance they have available to lend to businesses by borrowing from the private sector at reasonable rates and over long periods. [HL595]

**The Financial Services Secretary to the Treasury (Lord Myners):** Decisions by the private sector on whether and how to raise bank finances are matters for private sector businesses and lenders. The recent cuts in interest rates announced by the Bank of England's Monetary Policy Committee are expected to have a positive effect on inter-bank lending and credit markets more generally. As credit conditions ease, the banks should pass on savings to their customers wherever they can. The Chancellor has met with the CEOs of the major UK banks to make this clear.

On 14 January 2009, the Government announced a package of support to address the cash flow, credit and capital needs of smaller businesses. This package implements and builds upon the commitments the Government made in the Pre-Budget Report. Details are available at www.businesslink.gov.uk/realhelp/finance.

On 19 January 2009, the Government also announced a package of measures designed to reinforce the stability of the financial system, to increase confidence and capacity to lend, and in turn to support the recovery of the economy. Details are available at www.hm-treasury.gov.uk/press_05_09.htm.

## Children: Domestic Violence

### Question

#### Asked by **Baroness Miller of Chilthorne Domer**

To ask Her Majesty's Government whether their definition of domestic violence includes violence against children; and, if not, whether they plan to change their definition in the light of the link between child protection and domestic violence. [HL1425]

**The Parliamentary Under-Secretary of State, Home Office (Lord West of Spithead):** Children are not covered in the current government definition because they are already covered by child protection legislation and procedures. The Government recognise the strong links between child protection concerns and domestic violence and changes to the existing definition will be considered in

Case 1:05-cv-04622-DLI-RML   Document 267-5   Filed 03/22/12   Page 97 of 213 PageID #: 5688

our national domestic violence delivery plan for 2009-10.

**2 Mar 2009 : Column WA118**

# China

## *Question*

#### Asked by **Lord Dykes**

To ask Her Majesty's Government how much of the recent talks with the Chinese Prime Minister was devoted to climate change issues; and how much was devoted to the world economic downturn. [HL1228]

**Lord Davies of Oldham:** My right honourable friend the Prime Minister had three sets of formal talks with Premier Wen and the visiting ministerial delegation. Climate change and the world economic downturn were discussed extensively at all these meetings. My right honourable friend the Prime Minister also co-chaired a breakfast meeting with leading economists to discuss the global economy and agreed a joint statement on the economic crisis which can be found at www.number10.gov.uk/Page18220.

My right honourable friend the Secretary of State for Energy and Climate Change (Ed Miliband) also covered climate change during a separate discussion with Zhang Ping, director of the National Development and Reform Commission.

# Drugs: Cannabis

## *Question*

#### Asked by **Lord Taylor of Warwick**

To ask Her Majesty's Government why the order giving police the power to issue penalty notices for possession of cannabis was not brought forward in time to coincide with the recent upgrading of cannabis to a class B drug. [HL1176]

**The Parliamentary Under-Secretary of State, Home Office (Lord West of Spithead):** As the department responsible for cannabis reclassification and the associated policing response the Home Office will respond to this Question. The legislation on introducing penalty notices for disorder (PND) is owned by the Ministry of Justice.

An order adding 21 new offences to the penalty notice for disorder (PND) scheme under the Criminal Justice and Police Act 2001 was laid before Parliament by the Ministry of Justice on 15 December 2008. This order included adding the offence of possession of cannabis to the scheme. In view of concerns raised over certain aspects of other offences, such as taxi touting, this order was withdrawn on 19 January 2009.

On 20 January 2009 the Government laid a further order that proceeded with adding cannabis possession to the PND scheme. In view of the parliamentary timetable, the earliest possible date that the offence could come into force was 28 January 2009.

**2 Mar 2009 : Column WA119**

# Fire and Rescue Service

## *Questions*

#### Asked by **Lord Greaves**

To ask Her Majesty's Government how many firefighter posts in England are filled on a retained basis; and what proportion that is of the total number of firefighters. [HL1648]

Case 1:05-cv-04622-DLI-RML   Document 267-5   Filed 03/22/12   Page 98 of 213 PageID #: 5689

**The Parliamentary Under-Secretary of State, Department for Communities and Local Government (Baroness Andrews):** As at 31 March 2008 there were 14,166 retained duty system firefighters in England, this is 31 per cent of all firefighters.

*Asked by **Lord Greaves***

To ask Her Majesty's Government how many fire stations in England are crewed on a retained basis (a) wholly, and (b) in part; and what proportion that is of the total. [HL1649]

**Baroness Andrews:** The number and type of fire stations in England is set out below.

As at 31 March 2008 there were 774 wholly retained duty system fire stations in England, 54 per cent of all fire stations. Day-crew stations may be crewed by both wholetime and retained firefighters, while wholetime—other duty system and nucleus stations utilise both wholetime and retained firefighters.

| Fire stations in England as at 31 March 2008 | |
|---|---|
| Type of fire station | Number |
| Wholetime 2:2:4 shift | 551 |
| Day-crew | 97 |
| Wholetime—other duty system | 14 |
| Nucleus | 3 |
| Retained duty system | 774 |
| Total | 1,439 |

*Asked by **Lord Greaves***

To ask Her Majesty's Government how many fire call-outs in England and what proportion of the total each year are by tenders and appliances that are crewed on a retained basis. [HL1650]

**Baroness Andrews:** A total of 294,000 fires were attended, by fire and rescue services in England, in the year ending 31 March 2008.

Information on the crewing of tenders and appliances that attend fire incidents is not held centrally and can only be provided at disproportionate cost.

*Asked by **Lord Greaves***

To ask Her Majesty's Government what assessment they have made of the position of retained firefighters under the proposals being considered by the Council of Ministers and the European Parliament for amending the Working Time Directive; and what is their position on those proposals. [HL1651]

## 2 Mar 2009 : Column WA120

**Baroness Andrews:** Implementation of the working time directive, by setting a 48-hour maximum to the working week, could seriously impact on firefighters working the retained duty system in view of the substantial numbers who work full time for a primary employer. The UK Government therefore place great importance on retaining their opt-out from the directive, a position that was acknowledged by the European Union Council of Ministers in June when it agreed in the common position that it should be retained, and will continue to defend it.

The amendments to the common position voted by the European Parliament on 17 December are the latest step in a complex negotiation; a process of conciliation between both parties, the presidency and the Commission is now under way. Officials from my department are in contact with a range of fire and rescue service stakeholders to ensure that the potential impact is understood; and working with the Department for Business, Enterprise and Regulatory Reform, which has the UK lead on the working time directive, to inform the ongoing debate and ensure MEPs and EU member states are briefed appropriately.

## Gaza

Case 1:05-cv-04622-DLI-RML   Document 267-5   Filed 03/22/12   Page 99 of 213 PageID #:
5690

## *Question*

### Asked by **Lord Dykes**

To ask Her Majesty's Government whether they will make representations to the Government of Israel proposing that the compensation settlement by the Government of Israel to the family of James Miller following his shooting in May 2003 should provide a precedent for similar payments to any Gazan civilian victims of the recent military action. [HL1264]

**Lord Davies of Oldham:** The agreement between the family of James Miller and the Government of Israel was a private settlement between the parties. Any other compensation matters are a matter for the Israeli Government.

## Health: Drugs

### *Question*

### Asked by **Lord Taylor of Warwick**

To ask Her Majesty's Government what action will be taken following the claim in the Daily Mail of Professor David Nutt, chairman of the Advisory Council on the Misuse of Drugs, that "taking ecstasy is no more risky than riding a horse". [HL1395]

**The Parliamentary Under-Secretary of State, Home Office (Lord West of Spithead):** As stated in the other place on Monday 9 February, my right honourable friend the Home Secretary spoke to Professor David Nutt, Chair of the Advisory Council on the Misuse of Drugs, to express her considerable concern about his recent article published in the *Journal of Psychopharmacology*.

**2 Mar 2009 : Column WA121**

Professor Nutt apologised for these comments and at my right honourable friend's request, subsequently issued a public apology for any offence the article may have caused and to those who have lost friends and family due to ecstasy misuse.

## House of Lords: Pensions

### *Question*

### Asked by **Lord Pearson of Rannoch**

To ask the Chairman of Committees whether, in view of the decision of the Sub-Committee on Lords' Interests in 2006 (Priv 2006—07/1), the debate on 19 July 2007 (*Official Report*, House of Lords, cols. 402—18) and recent events, he will re-submit to the Committee for Privileges the suggestion that members of the House of Lords in receipt of a European Union pension should declare that interest in debates about European Union matters. [HL1753]

**The Chairman of Committees (Lord Brabazon of Tara):** No. However, if the noble Lord writes to me with a specific proposal, and explaining why he thinks the Committee should now revisit its previous decisions on this matter, I shall be happy to put his letter before the Committee.

## Housing

### *Questions*

### Asked by **Lord Ouseley**

To ask Her Majesty's Government how much borrowing by local authorities will be permitted for the provision of newly built or acquired social housing for letting in 2009—10 and subsequent years up to 2012. [HL1613]

**The Parliamentary Under-Secretary of State, Department for Communities and Local Government (Baroness Andrews):** Under the prudential system, local authorities are free to borrow for any kind of capital spending without government permission, provided that they and their auditors are satisfied that they can afford to service the debt.

### Asked by **Lord Hanningfield**

Case 1:05-cv-04622-DLI-RML   Document 267-5   Filed 03/22/12   Page 100 of 213 PageID #: 5691

To ask Her Majesty's Government what was the total number of new homes built in 2008; what was the number built in the Eastern region; and how this is broken down on a county basis in the Eastern region. [HL1627]

---

Next Section                         Back to Table of Contents                         Lords Hansard Home Page

- A-Z index
- Glossary
- Contact us
- Freedom of Information
- Jobs
- Using this website
- Copyright

**EXHIBIT 111 TO DECLARATION OF VALERIE SCHUSTER**

- Accessibility
- Email alerts
- RSS feeds
- Contact us



www.parliament.uk

[Search]

- Home
- Parliamentary business
- MPs, Lords & offices
- About Parliament
- Get involved
- Visiting
- Education

- House of Commons
- House of Lords
- What's on
- Bills & legislation
- Committees
- Publications & records
- Parliament TV
- News
- Topics



You are here: Parliament home page > Parliamentary business > Publications and Records > Hansard > Commons Debates > Daily Hansard - Written Answers

Previous Section                          Index                          Home Page



**12 May 2009 : Column 675W**—continued

# Banks: Ireland

**Bob Spink:** To ask the Chancellor of the Exchequer if he will insure monies invested by British nationals in *(a)* the Bank of Ireland and *(b)* Anglo-Irish Bank. [270351]

**Ian Pearson:** Deposits with Bank of Ireland and Anglo Irish Bank are subject to the Irish Deposit Guarantee scheme.

**James Brokenshire:** To ask the Chancellor of the Exchequer whether arrangements for the protection of deposits made in UK banks apply to UK holders of deposits in banks in the Republic of Ireland; and if he will make a statement. [270940]

**Ian Pearson:** The EC Deposit-guarantee Schemes Directive (94/19/EC) sets the minimum terms on which depositors are protected throughout the European Union and European economic area. Some member states have introduced higher limits.

Arrangements for depositors in Irish banks are a matter for the Irish Government.

Deposits in Irish banks are covered up to a level of €100,000 by the Irish deposit guarantee scheme, under the terms of the Deposit Guarantee Schemes Directive. In addition to the protection of the Irish Deposit Guarantee Scheme, the Irish Government announced on 30 September 2008 that it would guarantee certain deposits with Irish banks, including all retail deposits, until 29 September 2010.

**James Brokenshire:** To ask the Chancellor of the Exchequer whether his Department has had discussions with representatives of the Government of the Republic of Ireland on arrangements to protect deposits made by UK citizens with banks in the Republic of Ireland; and if he will make a statement. [271418]

**Ian Pearson:** Treasury Ministers and officials have discussions with a wide variety of organisations and international partners. As was the

✓   case with previous Administrations, it is not the Government's practice to provide details of all such discussions.

## 12 May 2009 : Column 676W

## Departmental Correspondence

**Bob Spink:** To ask the Chancellor of the Exchequer what procedure his Department follows for dealing with complaints received *(a)* by e-mail, *(b)* by post, *(c)* by telephone and *(d)* via his Department's website. [274516]

**Angela Eagle:** HM Treasury's complaints procedure is set out on the HMT website under:

> http://www.hm-treasury.gov.uk/about_complaints.htm

## Departmental Stationery

**Sarah Teather:** To ask the Chancellor of the Exchequer how much his Department has spent on branded stationery and gifts for *(a)* internal and *(b)* external promotional use in each of the last five years. [273773]

**Angela Eagle:** I refer the hon. Member to the answer I gave on 4 February 2008, *Official Report*, column 828W, to the hon. Member for Fareham (Mr. Hoban).

## Fiscal Policy

**Dr. Kumar:** To ask the Chancellor of the Exchequer whether the Government plan to bring forward proposals for a second package of fiscal stimulus measures for the UK economy. [274089]

**Ian Pearson:** The Government have taken decisive action in response to the global economic crisis. The Budget in April announced targeted fiscal support for those most affected by the downturn and to ensure a sustained and sustainable recovery. These measures build on the fiscal stimulus announced in the PBR, along with the support provided by allowing the UK's relatively powerful automatic fiscal stabilisers to operate in full.

## Furnished Holiday Lettings Scheme

**Mr. Ellwood:** To ask the Chancellor of the Exchequer what discussions he has had with *(a)* the Secretary of State for Culture, Media and Sport and *(b)* representatives of the tourism industry before reaching decisions on the changes to the Furnished Holiday Lettings scheme announced in Budget 2009. [274682]

**Ian Pearson:** The changes to the Furnished Holiday Lettings rules were made following advice that the different treatments of furnished holiday accommodation in the UK and in the rest of the EEA may not be compliant with European Law. The decision to repeal the rules was taken in order to remove the unfair advantage that landlords of furnished holiday accommodation have over other landlords.

## Industrial Health and Safety

**Bob Spink:** To ask the Chancellor of the Exchequer how much his Department spent on compliance with requirements of health and safety at work legislation in each of the last five years; and if he will make a statement. [274534]

## 12 May 2009 : Column 677W

**Angela Eagle:** This information is not available in the format requested, and could be provided only at disproportionate cost.

## Interpal

**Dr. Starkey:** To ask the Chancellor of the Exchequer what requests he has made to the US administration for details of the evidence on the basis of which the US authorities designated Interpal as a global terrorist organisation in 2003. [273733]

**Ian Pearson:** The US Department of Treasury issued a press notice on 22 August 2003, explaining the reasons why the US authorities designated Interpal.

HM Treasury officials are in ongoing discussions with their US counterparts about how best we can work together to facilitate legitimate charitable work, while protecting against the abuse of charities by those involved in terrorist finance. As part of this dialogue, the Treasury has asked the US authorities to consider if any further information can be made available about the basis for Interpal's designation.

## Landfill Tax

**Mr. Roger Williams:** To ask the Chancellor of the Exchequer how much revenue accrued to the Exchequer from landfill tax in each of the last three years; and if he will make a statement. [274924]

**Angela Eagle:** Total tax receipts for 2006-07 to 2008-09 are published by HM Revenue and Customs at:

> http://www.hmrc.gov.uk/stats/tax_receipts/table1-3a.pdf

## Members: Correspondence

**John Penrose:** To ask the Chancellor of the Exchequer when he plans to reply to the hon. Member for Weston-super-Mare's letters of 2 December 2008 and 27 February 2009 sent on behalf of his constituent, Mr. Adrian Pritchard. [270093]

**Ian Pearson:** A reply has been sent to the hon. Member.

## Natural Gas: Finance

**Mr. Crabb:** To ask the Chancellor of the Exchequer whether the cost of cushion gas used in gas storage infrastructure is considered to be capital expenditure for taxation purposes; and if he will make a statement. [267119]

**Angela Eagle** *[ holding answer 26 March 2009]:* Cushion gas may be described as the volume of gas intended for long-term use in a gas storage facility, necessary to maintain pressure and to enable redelivery of the stored gas. As such, it is not acquired with a view to being re-sold as an incident of the storage trade, but with a view to being retained long-term as a fixed asset of the business. In those circumstances, the cost of acquiring it is normally capital expenditure for taxation purposes. However, the answer can depend on the particular facts of the case so if, for example, there is systematic evidence of the buying and selling of recoverable cushion gas (perhaps allied to an accounting treatment of the gas as trading stock) this may point to the expenditure being revenue expenditure for tax purposes.

## 12 May 2009 : Column 678W

## State Retirement Pensions

**Tom Brake:** To ask the Chancellor of the Exchequer if he will make it his policy to freeze the rate at which pension years can be bought back at the rate applicable before 6 April 2009 in respect of persons who have attempted to buy back one or more years and have not had their application processed by the deadline. [273716]

**Ian Pearson:** HM Revenue and Customs have agreed that if a customer has requested a pension forecast before 6 April 2009 but receives the forecast after that date, it will accept payment of class 3 contributions at the pre 6 April 2009 rates, provided the payment is made within one calendar month of the customer receiving the forecast.

## Tax Evasion

**Dr. Evan Harris:** To ask the Chancellor of the Exchequer what estimate he has made of revenue lost to the Exchequer as a result of tax evasion in 2008-09. [273635]

**Mr. Timms:** There are no estimates of the revenue lost specifically to tax evasion. HMRC published the latest available estimates of tax losses in the Autumn Performance Report 2008:

http://www.hmrc.gov.uk/about/autumn-report-2008.pdf

The estimates given in this report include evasion with other causes of losses.

# WORK AND PENSIONS
## Departmental ICT

**John Thurso:** To ask the Secretary of State for Work and Pensions what steps he has taken to reduce the level of carbon dioxide emissions arising from the operation of ICT systems in his Department under the Greening Government ICT Strategy. [273567]

**Jonathan Shaw:** The Department does not own the equipment used to provide its ICT systems. The equipment is provided as part of a managed service by the Department's IT suppliers.

The Department has made great inroads in reducing its carbon footprint through active management of its IT services, since the end of 2005 when it re-aligned its contracts with BT and EDS. This work is continuing.

In the summer of 2008 the Department announced its strategy to re-compete its existing contracts over a five year period. A key element of this future contracting strategy is to contractually commit the IT providers to reduce the carbon footprint of the services they deliver to the Department.

The Department, along with others represented on the Chief Information Officers Council (CIO), have produced a "CIO Green ICT Roadmap" to deliver against the 18 target improvement areas outlined in the Greening Government ICT Strategy. A full report of the CIO Council Green ICT Roadmaps will be made available later in June featuring the action plans of all Departments involved in the council against the 18 steps.

## 12 May 2009 : Column 679W

## Incapacity Benefit

**Ann Winterton:** To ask the Secretary of State for Work and Pensions what the 10 most common medical conditions in respect of which incapacity benefit claimants received the benefit were in each of the last five years. [270499]

**Jonathan Shaw:** The classification identifies some conditions separately while others are grouped together in 'other' or 'miscellaneous'

categories. Some of these grouped categories are among those with the highest caseload numbers. The level of detail of the supporting documentation may determine whether a case is allocated to a more specific category, or has to be put in a grouped category. Because of these grouped categories, we cannot be certain what the 10 most common medical conditions among incapacity benefit/severe disablement allowance claimants are, only the most common conditions are separately identified.

## Incapacity Benefit: Heart Diseases

**Ann Winterton:** To ask the Secretary of State for Work and Pensions how many incapacity benefit claimants had a recorded diagnosis which was or included a heart condition in each of the last five years; and how much was paid in such benefits to such claimants in each of these years. [270501]

**Jonathan Shaw:** Having a heart condition does not of itself confer entitlement to incapacity benefits. Until October 2008 the medical assessment of incapacity for work was the personal capability assessment. This assesses the effects of a person's condition on their ability to carry out a number of everyday activities relevant to work.

The information requested is in the following table.

| *Estimated incapacity benefits expenditure on claimants whose diagnosis includes heart condition (nominal terms)* | |
|---|---|
| | *£ million* |
| 2003-04 | 363 |
| 2004-05 | 338 |
| 2005-06 | 317 |
| 2006-07 | 296 |
| 2007-08 | 279 |
| *Notes:* | |
| 1. Incapacity benefits includes incapacity benefit and severe disablement allowance payable to working-aged adults. | |
| 2. Figures include incapacity related income support expenditure for incapacity benefit claimants. | |
| 3. Expenditure figures are rounded to the nearest £ million. Estimates are based on information from the Work and Pensions Longitudinal Study land published DWP benefit expenditure tables. | |
| 4. DWP benefit expenditure tables can be accessed at: | |
| http://www.dwp.gov.uk/asd/asd4/expenditure.asp | |

## 12 May 2009 : Column 680W

| *Estimated incapacity benefits case loads of claimants whose diagnosis includes heart condition (nominal terms)* | |
|---|---|
| | *All* |
| August 2004 | 76,130 |
| August 2005 | 70,130 |
| August 2006 | 64,730 |
| August 2007 | 59,120 |
| August 2008 | 53,550 |
| *Notes:* | |
| 1. Case load figures are rounded to the nearest 10. | |
| 2. Causes of incapacity are based on the International Classification of Diseases, 10th Revision, published by the World Health Organisation. | |
| 3. To qualify for incapacity benefit/severe disablement allowance, claimants have to undertake a medical assessment of incapacity for work called the personal capability assessment. Therefore, the medical condition recorded on the claim form does not itself confer entitlement to benefit. | |
| *Source:* | |
| DWP Longitudinal Study | |

## Jobcentre Plus: Standards

**Mrs. May:** To ask the Secretary of State for Work and Pensions what guidance his Department has issued to Jobcentre Plus on the priorities for processing different benefit claims within target timeframes. [271690]

**Mr. McNulty:** No guidance has been issued to Jobcentre Plus as there are no set priorities between different benefits. In 2008-09 Jobcentre Plus exceeded all of its targets for clearing claims for incapacity benefit, income support and jobseeker's allowance, despite a

large increase in the numbers of people claiming jobseeker's allowance, implementing the new employment and support allowance, and maintaining historically low levels of fraud and error.

## Jobcentre Plus: Vacancies

**Mr. Clappison:** To ask the Secretary of State for Work and Pensions what his most recent estimate is of the ratio of jobseekers to vacancies in each *(a)* region, *(b)* local authority area, *(c)* Jobcentre Plus area and *(d)* parliamentary constituency. [262243]

**Mr. McNulty:** The information has been placed in the Library, and provides separate data for unfilled and notified vacancies to give the fullest picture of the number of Jobcentre Plus vacancies. The labour market is dynamic and many new vacancies are filled so quickly they do not appear in the statistics for live unfilled vacancies, which are based on a snapshot of the vacancies available on a particular day.

The coverage of these figures relates only to Jobcentre Plus notified and unfilled vacancies. Many vacancies come up through other recruitment channels and the proportion accounted for by Jobcentre Plus is likely to vary over time, according to the occupation of the vacancy and industry of the employer, and by local area. Estimates of the number of unfilled job vacancies across the economy as a whole are available from the monthly ONS Vacancy Survey, based on a sample of some 6,000 enterprises. However, the ONS survey is currently designed to provide national estimates only.

It should be noted that a simple comparison of Jobcentre Plus advertised vacancies to local areas is not the best measure of the work opportunities available to jobseekers. People will tend to look for work in a wider geographical area than a parliamentary constituency.

Next Section         Index         Home Page

- A-Z index
- Glossary
- Contact us
- Freedom of Information
- Jobs
- Using this website
- Copyright

**EXHIBIT 112 TO DECLARATION OF VALERIE SCHUSTER**

- Accessibility
- Email alerts
- RSS feeds
- Contact us



# www.parliament.uk

[ Search ]

- Home
- Parliamentary business
- MPs, Lords & offices
- About Parliament
- Get involved
- Visiting
- Education

- House of Commons
- House of Lords
- What's on
- Bills & legislation
- Committees
- Publications & records
- Parliament TV
- News
- Topics



You are here: Parliament home page > Parliamentary business > Publications and Records > Hansard > Commons Debates > Daily Hansard - Written Answers

Previous Section                    Index                                    Home Page

6 July 2009 : Column 545W—continued

## Aung San Suu Kyi

**Mr. Andrew Smith:** To ask the Secretary of State for Foreign and Commonwealth Affairs what recent representations he has made to the government of Burma on the continued detention of Aung San Suu Kyi. [284305]

**Mr. Ivan Lewis** [holding answer 3 July 2009]: My right hon. Friend the Prime Minister has expressed UK's deep concern over the arrest and trial of Aung San Suu Kyi, commenting that it shows the Burmese regime is intent on finding any pretext to extend her unlawful detention. He released a statement on the morning of her arrest on 14 May 2009 condemning the actions of the regime. On receiving news of her arrest, our embassy in Rangoon also immediately registered its concern with the Burmese authorities. Our ambassador contacted them again on 18 May 2009 and the following days to seek access to her trial.

Former Foreign and Commonwealth Office Minister Bill Rammell raised the arrest and trial of Aung San Suu Kyi, the detention of over 2,100 political prisoners and the implications for a genuine transition to democracy in Burma with EU and Asian partners at the EU-Association of South East Asian Nations (ASEAN) Summit and Asia-Europe Meeting in the region at the end of May. He spoke directly to Burmese Ministers to express the UK's outrage at their actions.

Most recently, the Prime Minister issued a statement on Aung San Suu Kyi's birthday, 19 June 2009, reiterating his call for her release. Our embassy in Rangoon transmitted a message from the Government to the Burmese Ministry of Foreign Affairs early on 1 July 2009 expressing our continued concern about Aung San Suu Kyi's trial and urging the regime to co-operate with the UN General Secretary upon his visit.

## Bermuda: Politics and Government

**Mr. Hague:** To ask the Secretary of State for Foreign and Commonwealth Affairs pursuant to the answer of 22 June 2009, *Official Report*, columns 629-30W, on Afghanistan: detainees, what the role of the *(a)* government and *(b)* Governor of Bermuda is in respect of Bermudese foreign affairs; and if he will make a statement. [283326]

**David Miliband:** The Governor has responsibility for the conduct of any business of the Bermuda Government with respect to the external affairs of Bermuda in

**6 July 2009 : Column 546W**

accordance with section 62 of the Bermuda Constitution. The Government of Bermuda have been delegated, subject to certain conditions, authority under a 1968 General Entrustment to negotiate and conclude agreements in certain specified areas with other countries. Other entrustments have also been issued at various times authorising specific negotiations.

# Chernobyl: Children

**Mr. Wallace:** To ask the Secretary of State for Foreign and Commonwealth Affairs (1) what progress has been made in discussions with his Belarusian counterpart on arrangements for visits to the UK by children who grew up near Chernobyl; [278169]

(2) for what reasons the Government has not concluded a bilateral agreement with Belarus on safeguarding the status of children connected with Chernobyl. [278170]

**Mr. Woolas** *[holding answer 4 June 2009]:* I have been asked to reply.

On 22 May, the United Kingdom entered into a bilateral agreement with the Belarusian Government to secure the resumption of organised visits by Chernobyl-affected Belarusian children to the United Kingdom. Parliament was notified of this agreement by written ministerial statement, laid on 11 June 2009, *Official Report*, columns 48-49WS, available at:

http://www.publications.parliament.uk/pa/cm200809/cmhansrd/cm090611/wmstext/90611m0001.htm #09061143000079

# Departmental Databases

**Mr. Watson:** To ask the Secretary of State for Foreign and Commonwealth Affairs what information databases his Department *(a)* maintains and *(b)* uses which do not contain personal information. [284399]

**Chris Bryant:** The Foreign and Commonwealth Office (FCO) and its network of diplomatic posts overseas use a large number of databases, of varying size and complexity. The most significant of these are managed centrally.

These databases support a wide range of activities across the organisation, from the processing of passport applications and recording consular assistance to British citizens overseas, to managing the FCO's financial and personnel administration across the whole network of FCO departments and posts overseas. Each post normally also holds local business and official contacts databases.

Many of the FCO databases may contain personal information about our staff and members of the public who have sought our assistance, but all personal information held on FCO databases is strictly protected in accordance with the Data Protection Act 1998 and the Freedom of Information Act 2000.

# Departmental Pay

**John McDonnell:** To ask the Secretary of State for Foreign and Commonwealth Affairs which *(a)* sections of his Department and *(b)* non-departmental public bodies for which he is responsible have requested money saved from efficiency savings to be used for increased pay in their 2009 pay offers to staff. [282892]

## 6 July 2009 : Column 547W

**Chris Bryant:** Efficiency savings are not used for increased pay in the 2009 pay offer to staff. Efficiency savings are either redirected back into frontline services or to enable the Foreign and Commonwealth Office to live within its comprehensive spending review settlement.

# Diplomatic Missions

**Mr. Stewart Jackson:** To ask the Secretary of State for Foreign and Commonwealth Affairs pursuant to the written ministerial statement of 18 June 2009, *Official Report*, column 25WS, on diplomatic missions, what discretion local authorities have to withdraw public services from diplomatic missions which do not pay the national non-domestic rates billed to them. [283916]

**Chris Bryant:** National non diplomatic rates (NNDR) for diplomatic premises is paid in full to local authorities by the Valuation Office Agency (VOA). The VOA then bills individual missions for the portion which covers services from which missions directly benefit. This is currently calculated as 6 per cent. of the total bill.

As diplomatic missions do not pay NNDR direct to local authorities, it would not be appropriate for local authorities to withdraw services from those diplomatic missions which have NNDR debts.

**Mr. Stewart Jackson:** To ask the Secretary of State for Foreign and Commonwealth Affairs pursuant to the written ministerial statement of 18 June 2009, *Official Report*, column 25WS, on diplomatic missions, on what date the Zimbabwe mission last paid a bill for national non-domestic rates; and how many months of non-domestic rates arrears the sum given in the statement represents. [283917]

**Chris Bryant:** The Valuation Office Agency's records indicate that the Zimbabwean mission's debt has been accumulating since 2000-01. Since that time they have only paid one year's beneficial portion of national non-domestic rates, for the year 2006-07. The sum given in the written ministerial statement represents eight years' accumulated debt.

## Interpal

**Jo Swinson:** To ask the Secretary of State for Foreign and Commonwealth Affairs whether his Department has had discussions with the Quartet representative on the designation by the US administration of the charity Interpal as a terrorist organisation. [284463]

**Mr. Ivan Lewis:** We have not discussed Interpal with the quartet representative.

Our officials are in discussion with their US counterparts about how to facilitate legitimate charitable work while protecting against any risk of funds being misused by terrorists. These discussions have included reference to the Interpal's status in the US as a designated organisation.

## Israel: Internally Displaced Persons

**Richard Burden:** To ask the Secretary of State for Foreign and Commonwealth Affairs what reports he has received on the eviction of families from the Sheikh Jarrah district of East Jerusalem; what representations he has made to the Israeli Government on the matter; and if he will make a statement. [284949]

### 6 July 2009 : Column 548W

**Mr. Ivan Lewis:** We are extremely concerned by the continued eviction notices served on Palestinian families in East Jerusalem and have pressed the Israeli Government to suspend these eviction notices immediately. We have supported an EU presidency statement expressing the EU's deep concern about the issue of eviction notices to the al-Rawi and Hanoun families in East Jerusalem and calling for the al-Kurd family to be allowed to return to their home.

Additionally, my right hon. Friend the Foreign Secretary made the UK's concerns clear in his statement to the UN Security Council on 11 May 2009 and it was also discussed during the EU Foreign Ministers' meeting on 15 June 2009. The UK will continue to raise this with Israeli officials both in public and in private.

## Ministerial Policy Advisers

**Daniel Kawczynski:** To ask the Secretary of State for Foreign and Commonwealth Affairs how many members of his Department are based in 10 Downing Street as foreign policy advisers to the Prime Minister. [284026]

**Chris Bryant** *[holding answer 3 July 2009]:* There are currently three members of the Foreign and Commonwealth Office based in 10 Downing street working as foreign policy advisers to my right hon. Friend the Prime Minister.

## Peru: Rain Forests

**Mr. Hurd:** To ask the Secretary of State for Foreign and Commonwealth Affairs what recent discussions his Department has had with the government of Peru on the protection of rainforest in that country. [284214]

**Chris Bryant:** We have frequent discussions with the Peruvian Government as part of our close and friendly bilateral relationship. This includes with Peru's Environment Minister on his commitment made at Poznan in December 2008 to reduce Peru's deforestation to zero by 2019. We have offered our support to the Peruvian Government as they seek to strengthen Peru's legal framework for protecting the Amazon.

## Terrorism: Compensation

**Mr. Lidington:** To ask the Secretary of State for Foreign and Commonwealth Affairs whether the Government plans to introduce a compensation scheme for British victims of terrorism overseas; and if he will make a statement. [282500]

**Tessa Jowell:** I have been asked to reply as Minister for Humanitarian Assistance.

An inter-departmental working group is putting together detailed proposals on financial support for victims of terrorist attacks overseas. The group will report to Ministers shortly.

### 6 July 2009 : Column 549W

# DEFENCE
## Afghanistan: Detainees

**Mr. Tyrie:** To ask the Secretary of State for Defence pursuant to the statement of 26 February 2009, *Official Report*, columns 394-97W, on Records of detention (review conclusions), what the names of each of the two individuals transferred from Iraq to Afghanistan in 2004 are; at what US detention facilities they *(a)* have been and *(b)* are being held; what steps the Government has taken to verify US assurances on the treatment of the two individuals; whether the UK has the power to demand (i) access to and (ii) the return of the two individuals; on what date officials were first made aware of (A) the intention to transfer the two individuals and (B) the transfer itself; what international law applies to people held on behalf of other coalition forces; and if he will make a statement. [283335]

**Mr. Bob Ainsworth** *[holding answer 30 June 2009]:* It is not the practice of this Department to release personal information, such as the names of these two individuals. The individuals were initially held at a US detention facility in Baghdad before they were transferred to US detention facilities at Bagram Air Base in Afghanistan. As my predecessor made clear in his statement, when this information came to light officials immediately engaged with their US counterparts and were assured that the individuals are held in a humane, safe and secure environment that meets international standards that are consistent with applicable cultural and religious norms. I am satisfied that these

assurances are reliable; although there is no formal legal power for the UK to demand access to the individuals, close relationships with the US satisfy me that this is not required. After 31 December 2008 the UK has no power of detention in Iraq so demanding the return of these two individuals would not be practical nor possible.

The review examined the available historical records, which suggest that British officials became aware of an intention to transfer in March 2004, although this was some days after the initial capture had occurred. British officials had learned by mid-June 2004 that the individuals had been transferred to Afghanistan.

What particular international law provisions apply will depend on the operational theatre and the circumstances; I am not in a position to make general statements on what legal provisions may apply as each operational theatre is different.

# Afghanistan: Peacekeeping Operations

**Mr. Hancock:** To ask the Secretary of State for Defence what estimate he has made of the proportion of improvised explosive devices in Afghanistan triggered by *(a)* weight, *(b)* command wire and *(c)* remote detonation by electronic signal in (i) 2007 and (ii) 2008. [283548]

**Mr. Bob Ainsworth:** I am withholding the information as its disclosure would, or would be likely to, prejudice the capability, effectiveness or security of the armed forces.

## 6 July 2009 : Column 550W

**Nick Harvey:** To ask the Secretary of State for Defence how many locally employed translators are working for the armed forces in each region of Afghanistan. [283553]

**Mr. Kevan Jones:** The armed forces employ nine locally employed translators in Afghanistan. Of these six are in Kabul and three in Helmand Province.

The armed forces also employ 397 locally employed interpreters. Of these six are based in Kandahar, 32 in Kabul and 359 in Helmand Province.

# Air Force: Training

**Nick Harvey:** To ask the Secretary of State for Defence how many training flights in each type of aircraft have been undertaken by RAF pilots in each training area in each of the last 10 years. [283661]

**Bill Rammell:** The information requested is not held centrally and could be provided only at disproportionate cost. Available information related to low flying training is published annually in the report, "The Pattern of Military Low Flying across the United Kingdom". The report relating to the training year 2008-09 will be published, and placed in the Library of the House, before the summer recess.

# Armed Forces: Afghanistan

**Mr. Ellwood:** To ask the Secretary of State for Defence what the maximum number is of members of the armed forces who may be deployed to serve in Afghanistan. [284242]

**Mr. Bob Ainsworth** *[holding answer 3 July 2009]:* The endorsed force level for UK military operations in Afghanistan is 8,300.

The Prime Minister announced on 29 April 2009, *Official Report*, column 869, the deployment of additional troops to Afghanistan to provide extra security during the Afghan election period. This has temporarily increased troop numbers in Afghanistan to 9,000.

# Armed Forces: Health Services

**Willie Rennie:** To ask the Secretary of State for Defence (1) on how many occasions Ministers in his Department have met Scottish Executive Health Ministers to discuss the care of soldiers and veterans in each year since 1999; [282935]

(2) on how many occasions Ministers in his Department have met Scottish Executive Health Ministers to discuss the sharing of best practice between the Defence Medical Services and NHS Scotland in the last two years; and what other mechanisms are in place to ensure that best practice between those services is shared. [283201]

**Mr. Bob Ainsworth:** Details of topics discussed during meetings between Ministers are not held centrally. Both my predecessor and the Under-Secretary of State have met with Shona Robison, on 14 May 2009 and 23 April 2009 respectively to discuss a variety of issues.

Next Section                                    Index                                    Home Page

- A-Z index
- Glossary
- Contact us
- Freedom of Information
- Jobs
- Using this website

Case 1:05-cv-04622-DLI-RML   Document 267-5   Filed 03/22/12   Page 112 of 213 PageID #:

- <u>Copyright</u>

**EXHIBIT 113 TO DECLARATION OF VALERIE SCHUSTER**

Case 1:05-cv-04622-DLI-RML   Document 267-5   Filed 03/22/12   Page 114 of 213 PageID #: 5705

- Accessibility
- Email alerts
- RSS feeds
- Contact us



| | Search |

- Home
- Parliamentary business
- MPs, Lords & offices
- About Parliament
- Get involved
- Visiting
- Education

- House of Commons
- House of Lords
- What's on
- Bills & legislation
- Committees
- Publications & records
- Parliament TV
- News
- Topics

You are here: Parliament home page > Parliamentary business > Publications and Records > Hansard > Commons Debates > Daily Hansard - Written Answers

Previous Section                                    Index                                    Home Page

**15 July 2009 : Column 477W**—continued

## Teachers: Rarely Cover Guidance

**Mr. Sanders:** To ask the Secretary of State for Children, Schools and Families (1) what additional support he plans to provide to teachers to help facilitate the continuation of educationally valuable visits or trips in light of the rarely cover guidelines; [285910]

(2) what assessment he has made of the effect on the conduct of school trips of his Department's rarely cover guidance; [285912]

(3) what recent discussions he has had on the application of his Department's rarely cover guidance; with whom such discussions were held; and on what dates these discussions took place; [285913]

**Michael Gove:** To ask the Secretary of State for Children, Schools and Families if he will place in the Library a copy of the guidance he has issued to schools on the requirement that teachers rarely cover for absent colleagues; what guidance he has issued to schools on the implementation of rarely cover guidelines for school trips; and what definition of rarely cover is used in the context of such guidance. [285722]

Case 1:05-cv-04622-DLI-RML   Document 267-5   Filed 03/22/12   Page 115 of 213 PageID #: 5706

**15 July 2009 : Column 478W**

**Tim Farron:** To ask the Secretary of State for Children, Schools and Families (1) what estimate his Department has made of the number of school excursions which were cancelled owing to a failure to provide sufficient levels of staff cover in the last 12 months; [286079]

**Tim Farron:** (2) what steps his Department has taken to ensure that the requirement that teachers rarely cover for absent colleagues does not adversely affect learning activities outside the classroom. [286081]

**Mr. Coaker:** The Secretary of State and my predecessor, the right hon. Member for South Dorset (Jim Knight) have discussed the issues of rarely cover individually with our social partners on the Workforce Agreement Monitoring Group on a number of occasions over the last few months.

General guidance on the rarely cover provisions was issued at the end of April. A copy of this has been placed in the House Libraries. It makes clear that teachers should, from September 2009, be required to cover for absent colleagues only rarely, in circumstances that are not foreseeable.

Since April, the Department has been working hard with social partners to produce additional guidance on the rarely cover provisions. This will include guidance on learning outside the classroom which is designed to help schools plan effectively for these activities, which we all agree are an important part of the curriculum. The additional guidance, which will be subject to a period of consultation, will be issued shortly and a copy will be placed in the House Libraries.

No estimate has been made of the number of learning outside the classroom activities that have been cancelled because of a lack of cover over the last 12 months and where schools take note of the new guidance, we do not anticipate that the rarely cover provisions will result in reduced opportunities for learning outside the classroom in the future.

## Truancy: Yorkshire and the Humber

**Mr. Graham Stuart:** To ask the Secretary of State for Children, Schools and Families how many parents in each local authority area in Yorkshire and the Humber appeared in court on charges related to the unauthorised absence of their child from school in each of the last five years; and if he will make a statement. [280689]

**Mr. Coaker:** The Ministry of Justice collects and publishes data for England and Wales on prosecutions brought against parents under the Education Act 1996 for the offence under s444(1) of failing to secure their child's regular attendance at school; and for prosecutions under s444(1A), the aggravated offence of knowing that their child is failing to attend school regularly. It is possible, because of the way courts record data, that some s444 data are also collected under the more general heading of various offences under the Education Act 1996.

The information on the number of parents prosecuted by local authorities in Yorkshire and the Humber for failing to secure their children's regular school attendance between 2003 to 2007 (latest available data) is detailed in the table. Data are collected on the basis of police

**15 July 2009 : Column 479W**

force regions and not local authority areas. Court proceedings data for 2008 will be available in the autumn of 2009.

| *Number of persons proceeded against at magistrates courts for offences under the Education Act 1996 S.444[1] , Yorkshire and Humberside region, broken down by police force area, 2003 to 2007[2, 3]* | | | | | |
|---|---|---|---|---|---|
| | *2003* | *2004* | *2005* | *2006* | *2007* |
| Humberside | 65 | 29 | 208 | 224 | 225 |
| North Yorkshire | 19 | 21 | 24 | 34 | 53 |
| South Yorkshire | 463 | 375 | 333 | 455 | 483 |
| West Yorkshire | 162 | 218 | 63 | 19 | 9 |
| Yorkshire and Humberside | 709 | 643 | 628 | 732 | 770 |

[1] Includes the following;
(a) Failure to secure regular attendance at school. (Education Act 1996 S.444 (1)(8)).
(b) Parent knows that their child is failing to attend school regularly and fails without reasonable justification to cause him or her to attend school. (Education Act 1996 S.444(8)(1a)(8a) added by Criminal Justice and Court Services Act 2000 S.72).
[2] The statistics relate to persons for whom these offences were the principal offences for which they were dealt with. When a defendant has been found guilty of two or more offences the principal offence is the offence for which the heaviest penalty is imposed. Where the same disposal is imposed for two or more offences, the offence selected is the offence for which the statutory maximum penalty is the most severe.

Case 1:05-cv-04622-DLI-RML   Document 267-5   Filed 03/22/12   Page 116 of 213 PageID #: 5707

(3) Every effort is made to ensure that the figures presented are accurate and complete. However, it is important to note that these data have been extracted from large administrative data systems generated by the courts and police forces. As a consequence, care should be taken to ensure data collection processes and their inevitable limitations are taken into account when those data are used.
*Source:*
Evidence and Analysis Unit-Office for Criminal Justice Reform, Ministry of Justice

## Youth Crime Priority Areas: Finance

**James Brokenshire:** To ask the Secretary of State for Children, Schools and Families how much additional funding has been allocated by his Department to the 69 local authority areas identified as Youth Crime Priority Areas: and over what period that funding will be provided. [285554]

**Mr. Coaker:** The Youth Crime Action Plan (YCAP), published in July 2008, sets out the Government's plans for tackling offending by young people. It is supported by close to £100 million over the three year period from 2008-09 to 2010-11, in addition to the existing investment in children's and youth services, to support local authorities in making inroads into youth crime locally.

69 local authority areas (and two in Wales) have been identified as "priority areas" under YCAP. In 2008-09, under YCAP, the 69 local authorities in England each received £65,000 to implement an intensive package of activity set out in YCAP.

Each of the 69 local authority areas in England will receive £350,000 this financial year (2009-10) and £350,000 in 2010-11 to deliver the intensive package of activity to help reduce youth crime. In addition, the two Welsh areas will receive £175,000 in each of the two years to fund those aspects of the intensive package that are not devolved.

This year, building on the success of the Home Office enforcement campaign in 2008/09 we will provide funding to the 69 areas to develop a co-ordinated plan of activity to tackle alcohol related youth crime. Areas will
**15 July 2009 : Column 480W**
be provided with a grant of up to £20,000 (£1.4 million in total) to kick start activity to begin before the summer and last at least throughout the summer holidays.

## TREASURY
## Banks: Iceland

**John Mann:** To ask the Chancellor of the Exchequer what meetings his Department's officials have had on the recovery of local authority investments in Icelandic banks since 1 May 2009. [286393]

**Sarah McCarthy-Fry:** Treasury Ministers and officials have meetings and discussions with a wide variety of organisations in the public and private sectors as part of the process of policy development and delivery. As was the case with previous Administrations, the Government do not disclose the outcome or results of all such meetings and discussions.

## Departmental Data Protection

**Jenny Willott:** To ask the Chancellor of the Exchequer (1) how many attempts were made to gain unauthorised access to each *(a)* database and *(b)* ICT system run by his Department in 2008-09; and if he will make a statement; [286558]

(2) how many successful attempts were made to gain unauthorised access to each *(a)* database and *(b)* ICT system run by his Department in 2008-09; and if he will make a statement. [286559]

**Sarah McCarthy-Fry:** It is not in the interests of the UK's national security for Departments to confirm information on the number of attempts, successful or otherwise, to gain unauthorised access to departmental systems or databases. Such disclosure could undermine the integrity and security of departmental systems and thereby expose them to potential threats.

HM Treasury is bound by the mandatory requirements of the Security Policy Framework in relation to information security, including managing the risk of unauthorised access to ICT systems.

## Departmental Training

**Mr. Philip Hammond:** To ask the Chancellor of the Exchequer what training courses have been attended by special advisers in his Department in the last 12 months: and at what cost. [279390]

Case 1:05-cv-04622-DLI-RML   Document 267-5   Filed 03/22/12   Page 117 of 213 PageID #: 5708

**Sarah McCarthy-Fry:** There is no central provision for training special advisers.

## Financial Services: Regulation

**Mr. Dai Davies:** To ask the Chancellor of the Exchequer what assessment he has made of the implications for his Department's policies on the banking and financial services sector of the paper presented on 8 May 2009 to the Federal Reserve Bank of Chicago Conference on reforming financial regulation by the executive director for financial stability of the Bank of England. [286815]

### 15 July 2009 : Column 481W

**Sarah McCarthy-Fry:** The Government's approach to reforming regulation of financial services is set out in the Government's paper 'Reforming Financial Markets', published on 8 July 2009.

## Hedge Funds

**Harry Cohen:** To ask the Chancellor of the Exchequer pursuant to the oral statement of 8 July 2009, *Official Report,* columns 969-87, on reforming of financial markets, what his definition is of systematically important hedge funds; and which hedge funds fall into this category. [286628]

**Sarah McCarthy-Fry:** A financial institution can be said to be of systemic importance when its failure could cause serious disruption to the financial system. In order to more closely monitor the systemic impact of hedge funds the Government are working with the Financial Services Authority to put in place a system of enhanced surveillance that can gather relevant and timely information on the funding, leverage, investment strategies and, in some cases, investment positions of individual funds managed from the UK.

## Interpal

**Jo Swinson:** To ask the Chancellor of the Exchequer pursuant to the answer to the hon. Member for Milton Keynes South West, *Official Report,* column 677W, on Interpal, whether he has received evidence from the US Administration on the basis for the allegations made against Interpal in its press notice of 22 August 2003. [284469]

**Sarah McCarthy-Fry:** As set out in the Treasury's written answer of 12 May 2009, *Official Report,* column 677W, HM Treasury officials are in discussions with their US counterparts about how to facilitate legitimate charitable work, while protecting against the abuse of charities by those involved in terrorist finance. As part of this, HM Treasury continue to discuss the specific case of Interpal with the US authorities.

## Members: Correspondence

**Ann Winterton:** To ask the Chancellor of the Exchequer when he plans to respond to the letter of 5 March 2009, ref 6/00178/2009, on the banking industry and pensions from the hon. Member for Congleton on behalf of her constituents Mr. and Mrs. Brian Evans. [280715]

**Sarah McCarthy-Fry:** A reply has been sent to the hon. Member.

## Operational Efficiency Programme: Met Office

**Julia Goldsworthy:** To ask the Chancellor of the Exchequer with which other public sector bodies the Operational Efficiency Programme project team plans to work in its review of the Met Office. [284655]

**Mr. Byrne** *[holding answer 7 July 2009]:* As part of the joint work on the Trading Funds Review which preceded the Operational Efficiency Programme (OEP), the Met Office has had initial engagement with public sector bodies including the Department of Energy and Climate Change, the Department for Environment, Food
### 15 July 2009 : Column 482W
and Rural Affairs, and the Natural Environment Research Council. The Met Office OEP review team is currently reviewing which further public sector bodies to consult with as part of the next phase of work.

## Pay: North East

**Mr. Hepburn:** To ask the Chancellor of the Exchequer what the rate of average earnings growth was in *(a)* Jarrow constituency,

Case 1:05-cv-04622-DLI-RML   Document 267-5   Filed 03/22/12   Page 118 of 213 PageID #: 5709

*(b)* South Tyneside and *(c)* the North East in each year since 1997. [286343]

**Angela E. Smith:** I have been asked to reply.

The information requested falls within the responsibility of the UK Statistics Authority. I have asked the authority to reply.

*Letter from Karen Dunnell, dated July 2009:*

> As National Statistician, I have been asked to reply to your recent Parliamentary Question asking what the rate of average earnings growth was in (a) Jarrow constituency, (b) South Tyneside and (c) the North East in each year since 1997. (286343)

> ONS's primary indicator of average earnings growth is the Average Earnings Index. As this does not produce regional estimates, the Annual Survey of Hours and Earnings has been used (ASHE). The ASHE, carried out in April each year, is the most comprehensive source of information on the levels of earnings in the United Kingdom. It is a sample of all employees who are members of pay-as-you-earn (PAYE) schemes.

> The sample sizes for more detailed geographies can be small and this affects the quality of the resulting estimates, which are subject to a margin of uncertainty.

> ASHE results are available from 1997 and so annual growth rates are available from 1998. I attach a table showing the annual percentage change in median gross weekly earnings for the specified geographies for full-time employees in each year since 1998.

| *Annual percentage change of median gross weekly earnings for full-time employee jobs*[1] | | | |
|---|---|---|---|
| | *Jarrow parliamentary constituency* | *South Tyneside local authority* | *North East* |
| 1998 | 8.2 | 8.7 | 1.0 |
| 1999 | 3.2 | -0.4 | 3.8 |
| 2000 | 0.3 | 7.1 | 4.9 |
| 2001 | 7.8 | 4.5 | 1.3 |
| 2002 | -3.5 | -7.2 | 3.3 |
| 2003 | -7.2 | 1.8 | 1.1 |
| 2004 | 6.6 | 14.5 | 7.0 |
| 2005 | 0.9 | -2.8 | 3.7 |
| 2006 | 4.0 | 3.8 | 3.7 |
| 2007 | -0.4 | -0.6 | 2.4 |
| 2008 | 4.8 | 6.7 | 4.0 |
| [1]Full-time employees on adult rates whose pay for the survey pay-period was not affected by absence. *Source:* Annual Survey of Hours and Earnings, Office for National Statistics. 1998 to 2008. | | | |

- A-Z index
- Glossary
- Contact us
- Freedom of Information
- Jobs
- Using this website
- Copyright

**EXHIBIT 114 TO DECLARATION OF VALERIE SCHUSTER**



- Accessibility
- Email alerts
- RSS feeds
- Contact us

# www.parliament.uk

[ Search ] Search

- Home
- Parliamentary business
- MPs, Lords & offices
- About Parliament
- Get involved
- Visiting
- Education

- House of Commons
- House of Lords
- What's on
- Bills & legislation
- Committees
- Publications & records
- Parliament TV
- News
- Topics



You are here: Parliament home page > Parliamentary business > Publications and Records > Hansard > Commons Debates > Daily Hansard - Written Answers

Previous Section                      Index                              Home Page

**9 Sep 2009 : Column 1965W**—continued

## Papua: Political Prisoners

**Lembit Öpik:** To ask the Secretary of State for Foreign and Commonwealth Affairs what recent reports he has received on the imprisonment of Papuan democracy activist Buchtar Tabuni; what steps his Department has taken in response to such reports; and if he will make a statement. [289219]

## 9 Sep 2009 : Column 1966W

**Mr. Ivan Lewis:** Buchtar Tabuni was sentenced to three years' imprisonment for "provocation" on 3 July 2009. Prosecutors had pressed for a sentence of ten years for treason but this was rejected by the judges.

Our embassy in Jakarta have been following the trial of Buchtar Tabuni and previously met his lawyers to investigate allegations of physical abuse. They were unable to verify these claims.

My predecessor, my hon. Friend the Member for Harlow (Bill Rammell), raised continuing UK parliamentary and public concern at the human rights situation in Papua with Indonesian Foreign Minister Wirajuda when he met him in Jakarta on 10 February 2009 and again at the Asia Europe meeting in Hanoi in May. There is frustration in Papua over poor implementation of the Special Autonomy Law of 2001. However, while problems do remain, it is important to recognise that real improvements have been made in Indonesia's human rights situation in recent years. Our embassy staff make regular visits to Papua to discuss human rights issues with a wide range of interlocutors. The last visit was on 17-18 June 2009.

## Peacekeeping Operations: Private Sector

**Daniel Kawczynski:** To ask the Secretary of State for Foreign and Commonwealth Affairs pursuant to the answer to the Lord Toms of Cheltenham of 5 May 2009, *Official Report, House of Lords*, column WA106, on private military companies, how many personnel of private military companies are operating under contracts with his Department. [276800]

**Mr. Ivan Lewis:** The Foreign and Commonwealth Office holds a number of contracts with private military and security companies (PMSCs) to provide services such as close protection, static guarding and police mentoring. We do not hold contracts with individual personnel of those companies nor is there a centrally held record of how many personnel are employed by them providing services to the Government. Additionally a number of overseas posts hold contracts with PMSCs locally. To establish the number of personnel working for the companies operating under contracts with us would therefore be a wide ranging exercise, the cost of which would be disproportionate.

## Scotland

**Stewart Hosie:** To ask the Secretary of State for Foreign and Commonwealth Affairs whether his Department plans to make a submission to the Scottish Executive's National Conversation consultation on Scotland's constitutional future. [288955]

**Chris Bryant:** The Foreign and Commonwealth Office has not submitted evidence to the Scottish Government's National Conversation.

## Sri Lanka: Human Rights

**Mr. Burstow:** To ask the Secretary of State for Foreign and Commonwealth Affairs what assessment he has made of the human rights situation in Sri Lanka since the end of the conflict in the country; and if he will make a statement. [288580]

### 9 Sep 2009 : Column 1967W

**Mr. Ivan Lewis:** We are increasingly concerned about the treatment of Internally Displaced Persons (IDPs) in Sri Lanka, especially the lack of freedom of movement in the camps and the restrictions put on protection activities, including ensuring the safety of the IDPs, reuniting unaccompanied children with their families and registration of the IDP population as a whole. We also remain concerned at continuing reports of abductions, disappearances, violence and intimidation against the media, all of which appear to affect Tamil communities disproportionately. We continue to raise these issues regularly with the government of Sri Lanka and call upon them to take decisive action to tackle human rights abuses.

**Mr. Burstow:** To ask the Secretary of State for Foreign and Commonwealth Affairs what recent representations he has made to the Sri Lankan government on the treatment of Tamils in camps; and if he will make a statement. [288581]

**Mr. Ivan Lewis:** We take every available opportunity to urge the Sri Lankan government to ensure the internally displaced persons (IDPs) held in camps in northern Sri Lanka are treated in accordance with international standards. These include providing basic facilities such as food, water, shelter and medicine as well as issues such as freedom of movement, reuniting family members and ensuring the early return of IDPs to their homes.

My right hon. Friend the Prime Minister discussed the humanitarian situation in IDP camps with President Rajapakse on 18 May 2009, as did my right hon. Friend the Foreign Secretary with Foreign Minister Bogollagama on 5 June 2009. My noble Friend, the then Minister for Africa, Asia and the UN, Lord Malloch-Brown, raised the issue with the Sri Lankan Minister for Trade and External Development when they met on 19 June 2009. Our High Commissioner to Sri Lanka continues to raise our concerns with the Sri Lankan government at every opportunity.

I also refer the hon. Member to the written ministerial statement made by the Minister of State, Department for International Development, my hon. Friend the Member for Harrow, West (Mr. Thomas), on 14 July 2009, *Official Report*, columns 12-13WS, which contains further information on the latest humanitarian situation in Sri Lanka.

## Sudan: Politics and Government

**Mr. Drew:** To ask the Secretary of State for Foreign and Commonwealth Affairs what representations he has made to the Government of Sudan on the abduction of opposition politicians and activists in that country. [290915]

**Chris Bryant:** The UK regularly raises human rights issues with the Government of Sudan through the European Union, the Assessment and Evaluation Committee, the National Elections Commission and in bilaterals. In particular, we have raised the importance of protecting freedom of expression and the political space for campaigning by all parties in the run up to the elections in 2010.

### 9 Sep 2009 : Column 1968W

## Sudan: Prisoners

**Mr. Drew:** To ask the Secretary of State for Foreign and Commonwealth Affairs what discussions he has had with (a) the Irish government and (b) the Sudanese government on the kidnapping from Northern Darfur of two aid workers from the charity GOAL. [288694]

**Mr. Ivan Lewis:** My right hon. Friend the Foreign Secretary spoke with the Irish Foreign Secretary regarding the kidnapping on 14 July 2009. Our Ambassador to Sudan has discussed the issue with the Sudanese Foreign Minister and Minister for Humanitarian Affairs. Our Embassy in Khartoum continues to work closely with Irish officials in Sudan.

We strongly condemn all acts of violence against aid workers, and call on all parties, including the government of Sudan, to ensure the safety of aid workers in the region.

## Thailand: Aviation

**Mr. Morley:** To ask the Secretary of State for Foreign and Commonwealth Affairs what reports he has received of progress made by the Thai authorities in their inquiry into the September 2007 air crash involving British citizens; and what recent discussions he has had with the Thai authorities on the date of publication of the report on the inquiry. [290894]

**Chris Bryant:** An interim investigation report was published by the Thai authorities in June and we circulated an English translation of this report to the families of those involved in this tragic accident. The final report is in the process of being translated into all the relevant languages, including English. It will then be submitted to the International Civil Aviation Organisation who have 60-days upon receipt to verify the documents. The finalising of the report was delayed following the accident in Koh Samui this year in which four British nationals were injured, as the same body is responsible for investigating both incidents. We expect it to be several months before the final report is published.

Our embassy in Bangkok is monitoring the progress of the investigation and we will alert the hon. Member and the families concerned as soon as the report is made public.

## USA: Terrorism

**Dr. Evan Harris:** To ask the Secretary of State for Foreign and Commonwealth Affairs what recent representations he has made to the US administration on its designation of Interpal as a global terrorist organisation; and if he will make a statement. [289236]

**Mr. Ivan Lewis:** Officials are in ongoing discussions with their US counterparts about how to facilitate legitimate charitable work while protecting against any risk of abuse by terrorist financiers.

This has included the case of Interpal and its status as a US designated organisation.

### 9 Sep 2009 : Column 1969W

## Western Sahara: Human Rights

**Paul Flynn:** To ask the Secretary of State for Foreign and Commonwealth Affairs if he will take steps to ensure that the matter of human rights abuses in the Non-Self Governing Territory of Western Sahara related to calls for a referendum is raised with Morocco by EU officials in the next meeting of the sub-committee on Human Rights, Democratisation and Governance. [289057]

**Mr. Ivan Lewis:** The UK considers the EU-Morocco Association Agreement Sub Committee on Human Rights, Democratisation and Governance to be an essential element of the EU-Morocco relationship. We have been engaged in the planning for the meeting on 24 July 2009 through our Missions in Rabat and Brussels. The agenda was agreed by member states on 13 July 2009, and will include, among other issues, women's rights, freedom of expression and the rights of detainees. Discussions will not exclude the territory of Western Sahara.

The EU engages regularly with the Moroccan Government on human rights issues at a local level with our EU colleagues by raising individual cases of concern as appropriate.

**Paul Flynn:** To ask the Secretary of State for Foreign and Commonwealth Affairs if he will make it his policy that there be a field presence from the Office of High Commissioner for Human Rights in the Western Sahara. [289058]

**Mr. Ivan Lewis:** The Government believe that greater openness and transparency on human rights by all the parties would create a significantly better environment for political dialogue between the parties. We support the call by the UN Secretary General, in his latest report, for the parties to remain engaged in a continuous and constructive dialogue with the Office of the UN High Commissioner for Human Rights (OHCHR) and to make progress on the human dimension of the conflict. If, as the result of such dialogue, a mechanism were to be established to allow OHCHR to further add value, for example by assisting and reporting on the situation in Western Sahara, the Government would support it.

## WPC Yvonne Fletcher

**Mr. Lidington:** To ask the Secretary of State for Foreign and Commonwealth Affairs whether he has received a recent request from members of the family of WPC Yvonne Fletcher for a meeting with Ministers; and if he will make a statement. [290920]

**Chris Bryant:** Although my right hon. Friend, the Foreign Secretary has not received a request, he has offered to meet the family of WPC Fletcher to discuss the Government's efforts to move the investigation forward.

Libya has accepted responsibility for WPC Fletcher's murder and paid compensation to her family. Despite their promises to do so, and the UK's repeated requests, Libya has not allowed the Metropolitan Police Service to return to Libya to continue the investigation.

We attach the highest importance to securing Libyan cooperation with the investigation and push this with the Libyan authorities at every available opportunity.

### 9 Sep 2009 : Column 1970W

## ENERGY AND CLIMATE CHANGE
## Carbon Emissions

**Simon Hughes:** To ask the Secretary of State for Energy and Climate Change what his latest estimate is of the UK's carbon footprint. [288713]

**Joan Ruddock:** The latest estimate for the total carbon dioxide (CO2) emitted from the UK is 542.6 Mt in 2007. A provisional estimate for the total CO2 emitted from the UK in 2008 is 531.8 Mt.

The latest estimate for the total greenhouse gas emissions emitted from the UK is 636.6 Mt in 2007. A provisional estimate for the total greenhouse gas emissions emitted from the UK in 2008 is 623.8 Mt.

# Climate Change

**Mr. Dai Davies:** To ask the Secretary of State for Energy and Climate Change how many copies of the departmental pamphlet, The Road to Copenhagen: Taking International Action on Climate Change, have been printed; to whom they have been distributed; what the cost of printing and distribution has been; and what steps he plans to take to promote the proposals in the pamphlet before the Copenhagen summit. [288564]

**Joan Ruddock:** I can confirm that the overall cost of the Road to Copenhagen leaflet was approximately £34,000 exclusive of VAT. This includes design, typesetting, printing and distribution of 46,000 copies. The leaflet is being distributed in hard copy or electronic format to a range of outlets, including educational establishments, public libraries, Citizens Advice bureaux, trade unions, business-related outlets, MPs and other key stakeholders.

# Climate Change: South East

**Sandra Gidley:** To ask the Secretary of State for Energy and Climate Change what assessment has been made of the financial effects of climate change at the present rate on (a) the ceremonial county of Hampshire and (b) the South East. [288895]

**Joan Ruddock:** In 2005, the regional climate change partnerships working with the UK Climate Impacts Programme published 'Measuring Progress'. The report assessed the impacts of climate change by region including the South East and included some indicative assessments of the impacts on activities from climate change. The Government have now begun the Adaptation Economic Assessment, which will analyse the high level economic costs and benefits of adapting to climate change in the UK. The project will include information by English region, including the South East, but not by individual county boundary. It is due to report in 2012.

**Sandra Gidley:** To ask the Secretary of State for Energy and Climate Change what plans he has to assist people in the (a) ceremonial county of Hampshire and (b) the South East to adapt their domestic circumstances to take account of the effects of climate change. [288897]

**Joan Ruddock:** The aim of the Government's Adapting to Climate Change Programme is to help people adapt to the effects of climate change by providing robust evidence on the effects of climate change and embedding
**9 Sep 2009 : Column 1971W**
adaptation into policies, plans and programmes. The programme seeks to achieve this by building capacity in organisations who are the most able to take long term adaptation decisions. This includes local government via mechanisms such as National Indicator 188-Planning to Adapt to Climate Change within the local government performance framework to enable them to support individuals to adapt to future climate changes through local programmes.

On 18 June, the Government published the latest UK Climate Projections. These projections show the potential changes in climate for the UK for a range of probabilities, climate variables and emissions scenarios. These data are freely available to all to make their own assessments of the likely effects of climate change. To support organisations in using the projections, the Government are providing a training package, Projections in Practice from July to March 2010. The programme will include a series of national events for specific sectors and will also include from September a programme of events in each region including the South East. To support adaptation locally and regionally, we have established a local and regional programme managed by a board of key local and regional organisations. The regional climate change partnership, Climate South East, is represented on the board. The board manages a small programme of projects to develop guidance and tools to help local authorities, regional climate change partnerships and others to support communities to take account of the effects of climate change. Further information on the board is located on the Government's Adapting to Climate Change Programme website:

www.defra.gov.uk/adaptation

# Damian McBride

**Mr. Maude:** To ask the Secretary of State for Energy and Climate Change on what date he last met Mr. Damian McBride in the course of his official duties. [287404]

**Joan Ruddock:** There have been no such meetings.

# Departmental Electronic Equipment

**Mr. Philip Hammond:** To ask the Secretary of State for Energy and Climate Change with reference to the answer of 26 November 2008, *Official Report,* column 2142W, on departmental electronic equipment, how much (a) his Department and (b) its agencies have spent on (i) flat screen televisions, (ii) DVD players and (iii) stereo equipment since November 2008. [289164]

**Joan Ruddock:** The Department has spent £7,289 on flat screen televisions, some of which had built-in DVD players and £68 on stand-alone DVD players. The Department has procured no stereo equipment.

The Department has no agencies.

- A-Z index
- Glossary
- Contact us
- Freedom of Information
- Jobs
- Using this website
- Copyright

**EXHIBIT 115 TO DECLARATION OF VALERIE SCHUSTER**

Case 1:05-cv-04622-DLI-RML   Document 267-5   Filed 03/22/12   Page 126 of 213  PageID #: 5717

- Accessibility
- Email alerts
- RSS feeds
- Contact us



[Search field] [Search]

- Home
- Parliamentary business
- MPs, Lords & offices
- About Parliament
- Get involved
- Visiting
- Education

- House of Commons
- House of Lords
- What's on
- Bills & legislation
- Committees
- Publications & records
- Parliament TV
- News
- Topics

You are here: Parliament home page > Parliamentary business > Publications and Records > Hansard > Commons Debates > Daily Hansard - Written Answers

Previous Section                              Index                              Home Page

**6 Apr 2010 : Column 1220W**—continued

The data are taken from NNDR returns submitted by billing authorities.

Comparisons across regions and years may not be valid as the rateable values for individual properties, and hence actual rates bills, vary greatly. Changes in the figures for the years around 2000-01 are affected by transfers of properties from the central list to local lists, transfers of crown properties to local lists and the adjustments made to the multiplier at the time of the 2000 revaluation to take account of losses from appeals. Changes in the figures for the years around 2005-06 are also affected by adjustments made to the multiplier at the time of the 2005 revaluation.

**Justine Greening:** To ask the Secretary of State for Communities and Local Government with reference to the answer of 6 July 2009, *Official Report*, column 605W, on non-domestic rates, what projection has been made of the *(a)* change in rateable value on the ratings list resulting from rateable value appeals and *(b)* the amount of fees payable by those appealing against their rateable value in (i) 2009-10 and (ii) 2010-11. [323091]

**Barbara Follett:** No projection has been made of the change in rateable value on the ratings list resulting from appeals. However, for the purpose of modelling the 2010 transitional relief scheme, my Department has made an assumption about the total reduction in RV as a result of appeals.

The assumptions used for this modelling are detailed in the consultation document titled "The transitional arrangements for the

Case 1:05-cv-04622-DLI-RML   Document 267-5   Filed 03/22/12   Page 127 of 213 PageID #: 5718

non-domestic rating revaluation 2010 in England". The methodology and assumptions can be found on page 49 of the consultation. A copy of the consultation document is available at the following link:

> http://www.communities.gov.uk/publications/localgovernment/nndrrevaluation2010

There are no fees payable to valuation officers for making proposals challenging rateable values. Nor are there hearing fees payable should the proposal become an appeal to the Valuation Tribunal for England. Many ratepayers choose to employ the services of a professional representative to handle their rating liability. This is a personal matter between ratepayer and representative.

## Non-Domestic Rates: Valuation

**Grant Shapps:** To ask the Secretary of State for Communities and Local Government what the *(a)* address, *(b)* 2005 rateable value and *(c)* 2010 rateable value is of each hereditament with a special category code of public houses/pub restaurants (national scheme). [324511]

**Barbara Follett:** The Valuation Office Agency has published the current 2005 and draft 2010 Rating Lists on the internet at:

> www.voa.gov.uk

Search facilities within the site (using the 'Agent' access, which is open to any individual) allows the identification of properties within billing authorities by SCAT code. Public houses/pub restaurants (national scheme) are identified by SCAT 226.

## Piers: Repairs and Maintenance

**Andrew Rosindell:** To ask the Secretary of State for Communities and Local Government how much has been spent restoring seafront piers in each year since 1997. [325603]

**Ms Rosie Winterton:** The information requested is not collected by this Department and could be obtained only at disproportionate cost.

## 6 Apr 2010 : Column 1221W

## Public Houses

**Andrew Rosindell:** To ask the Secretary of State for Communities and Local Government (1) what recent discussions he has had with pub landlords on the effects of the recession on their businesses; [325597]

(2) whether he has visited any pubs on official business in the last 12 months; [325599]

(3) what assistance his Department has provided to pubs during the recession. [325600]

**John Healey:** Since the Prime Minister asked me to lead work across Government to help and support Britain's community pubs in January, I have made a number of visits to pubs and had various discussions with landlords. I have also had discussions with cross-party groups and other organisations directly concerned with the pub industry.

On 19 March 2010, I published the Government's package of measures to support community pubs. Our plans fall into three main categories:

> Business support

> Industry standards and consumer choice

> Community and local authority action.

Further details on our package of measures can be found on our website:

> http://www.communities.gov.uk/news/corporate/1511255

In addition to this package of measures described above, Planning Policy Statement 4: 'Planning for Sustainable Economic Growth' (published in December 2009) provides policy tools for local authorities to take into account the importance of pubs to the

Case 1:05-cv-04622-DLI-RML   Document 267-5   Filed 03/22/12   Page 128 of 213 PageID #: 5719

local community when a planning application is made that would result in its loss and enables them to refuse planning permission where people's day to day needs are not safeguarded.

## Public Sector

**Mr. Dunne:** To ask the Secretary of State for Communities and Local Government if he will place a copy of the final report from each Total Place pilot in the Library. [325328]

**Barbara Follett:** The reports of the 13 pilot areas have been published online and are available through the Total Place website at:

http://www.localleadership.gov.uk/totalplace/news/pilots-final-reports/

## Tenant Services Authority: Pay

**Mr. Stewart Jackson:** To ask the Secretary of State for Communities and Local Government how many full-time equivalent staff work in the Tenant Services Authority communications team; and what the cost to the public purse was of that team on the latest date for which figures are available. [313092]

**Mr. Ian Austin:** The Tenant Services Authority employs 3.7 full-time equivalent staff in its press office and public affairs teams. The total cost to the public purse of employing these staff in the 12 months since TSA was established on 1 December 2008 was £171,300.

## 6 Apr 2010 : Column 1222W

## Unitary Councils

**Andrew Rosindell:** To ask the Secretary of State for Communities and Local Government how many local authorities have *(a)* applied for and *(b)* been accepted for unitary status in each year since 1997. [325601]

**Ms Rosie Winterton:** Since 1997, 26 proposals for unitary structures were submitted in January 2007 following the Invitation to Councils in England issued in October 2006. A further Invitation for unitary structures in Bedfordshire was issued in November 2007 and one proposal was received in response to it. From these proposals, nine unitary councils were established on 1 April 2009, and orders creating a further two on 1 April 2011, Exeter and Ipswich, have now been made following their approval by Parliament.

## World Urban Forum

**Mr. Dai Davies:** To ask the Secretary of State for Communities and Local Government who represented his Department at the World Urban Forum in Rio de Janeiro in March 2010; and whether his Department allocated funding to that forum. [324605]

**Ms Rosie Winterton:** No one from the Department for Communities and Local Government attended this year's World Urban Forum in Rio de Janeiro; nor was any money allocated to the event.

## Written Questions: Government Responses

**Grant Shapps:** To ask the Secretary of State for Communities and Local Government when he plans to answer questions *(a)* 323248, *(b)* 323249 and *(c)* 323251 on the MIPIM international property conference, tabled by the hon. Member for Welwyn Hatfield on 16 March 2010. [325232]

**Barbara Follett:** I have now replied to the hon. Member's questions.

## CABINET OFFICE
## Business: Cardiff

**Jenny Willott:** To ask the Minister for the Cabinet Office how many small businesses have *(a)* closed and *(b)* opened in (i) Cardiff Central constituency and (ii) Cardiff in each of the last five years. [325320]

**Angela E. Smith:** The information requested falls within the responsibility of the UK Statistics Authority. I have asked the authority to reply.

Case 1:05-cv-04622-DLI-RML   Document 267-5   Filed 03/22/12   Page 129 of 213 PageID #: 5720

*Letter from Stephen Penneck, dated March 2010:*

As Director General for the Office for National Statistics, I have been asked to reply to your recent Parliamentary Question concerning how many small businesses have (a) closed and (b) opened in (i) Cardiff Central constituency and (ii) Cardiff in each of the last five years. [325320]

Annual statistics on business births, deaths and survival are available from the ONS release on Business Demography at:

www.statistics.gov.uk

Information on the number of enterprise deaths by parliamentary constituency is only available from 2005 onwards. The table below contains the latest statistics available on small enterprise birth and deaths in Cardiff over the past five years.

## 6 Apr 2010 : Column 1223W

| *Count of enterprise birth and deaths for Cardiff unitary authority and Cardiff, Central parliamentary constituency from 2004-08 with less than 50 employment (small)* | | | | |
|---|---|---|---|---|
| | *Births* | | *Deaths* | |
| | *Cardiff* | *Cardiff, Central* | *Cardiff* | *Cardiff, Central* |
| 2004 | 1,370 | 385 | 1,155 | n/a |
| 2005 | 1,310 | 390 | 1,040 | 325 |
| 2006 | 1,135 | 335 | 1,020 | 295 |
| 2007 | 1,085 | 300 | 1,055 | 295 |
| 2008 | 1,120 | 345 | 960 | 290 |
| *Note:* <br> A small business is defined as an enterprise with less than 50 employment | | | | |

## Departmental Private Detectives

**Mr. Maude:** To ask the Minister for the Cabinet Office with reference to the answer of 15 January 2009, *Official Report*, column 873W, on private detectives, how much her Department spent on hiring or commissioning individuals from the panel of independent investigators in each of the last five years. [312258]

**Tessa Jowell:** My Department has incurred no costs in hiring or commissioning individuals from the panel of independent investigators.

## Government Communications Review

**Mr. Stewart Jackson:** To ask the Minister for the Cabinet Office which recommendations made in the report of the Phillis Review on Government communication have not been implemented to date. [323450]

**Tessa Jowell:** Government communications have changed fundamentally over the past five years. Substantial progress has been made towards implementing the findings of the Phillis Review and all the key recommendations have been taken forward, except for Recommendation 10.1 calling for on camera lobby briefings, which was not implemented. Briefings are off the camera but on the record, a record of the briefings is available on the PM's website the same day.

## Ministerial Policy Advisers: Bullying

**Mr. Stewart Jackson:** To ask the Minister for the Cabinet Office how many complaints against special advisers alleging bullying or harassment have been made by civil servants since 1997. [323452]

**Tessa Jowell:** The Cabinet Office does not hold this information for the civil service. This information may be held by the individual employing Departments.

The civil service has a zero tolerance policy on bullying and harassment.

## Opposition

Case 1:05-cv-04622-DLI-RML    Document 267-5    Filed 03/22/12    Page 130 of 213 PageID #: 5721

**Mr. Hurd:** To ask the Minister for the Cabinet Office whether her Department has undertaken costings of the policies of the *(a)* Conservative Party and *(b)* Liberal Democrat Party at the request of Ministers or special advisers in the last 36 months. [324242]

## 6 Apr 2010 : Column 1224W

**Tessa Jowell:** I refer the hon. Member to the answer given by the Exchequer Secretary to the Treasury, my hon. Friend the Member for Portsmouth, North (Sarah McCarthy-Fry), on 30 March 2010, *Official Report,* column 1044W.

## Union of Good

**Mr. Crabb:** To ask the Minister for the Cabinet Office what investigations the Charity Commission has carried out into links between humanitarian charities based in the UK and the Union of Good in the last 12 months. [325224]

**Angela E. Smith:** The information requested falls within the responsibility of the Charity Commission. I have asked the Commission to reply.

*Letter from Andrew Hind, dated 29 March 2010:*

As the Chief Executive of the Charity Commission I have been asked to respond to your written question on what investigations we have carried out into links between humanitarian charities based in the UK and the Union for Good in the last twelve months.

In 2009 we published a report of our statutory inquiry into the Palestinians Relief and Development Fund, registered charity number 1040094 (known as Interpal). Among other issues, the inquiry considered the relationship between this charity and the Union for Good, which we understand to be a coalition of UK and overseas organisations working with Palestinians and in the Occupied Palestinian Territories. The inquiry concluded that the charity's membership of the Union of Good was not appropriate, and directed the charity to take a number of actions, including to disassociate itself from membership of the Union for Good.

At the time this inquiry report was published, the Charity Commission was aware of concerns that had been raised that other charities, registered in England and Wales, were said to be members of the Union for Good. We investigated these concerns and concluded that, on the evidence then before us, this was not the case.

The Commission is continuing to monitor Interpal's compliance with the requirements of the Commission.

I will arrange for a copy of the statement of results of the inquiry on the charity Interpal to placed in the Library of the House. We would be very happy to meet you to discuss this area of our work further.

I hope this is helpful.

---

Next Section                                        Index                                        Home Page

- A-Z index
- Glossary
- Contact us
- Freedom of Information
- Jobs
- Using this website
- Copyright

## EXHIBIT 116 TO DECLARATION OF VALERIE SCHUSTER

### FILED UNDER SEAL

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| TZVI WEISS, *et al.*, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | Case No. 05-cv-4622 (DLI) (MDG) |
| | : | |
| -against- | : | |
| | : | |
| NATIONAL WESTMINSTER BANK, PLC, | : | |
| | : | |
| Defendant. | : | |
| | : | |
| NATAN APPLEBAUM, *et al.*, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | Case No. 07-cv-916 (DLI) (MDG) |
| -against- | : | |
| | : | |
| NATIONAL WESTMINSTER BANK, PLC, | : | |
| | : | |
| Defendant. | : | |

**PLAINTIFFS' OBJECTIONS AND RESPONSES
TO DEFENDANT'S CONTENTION INTERROGATORIES**

Plaintiffs in the above-captioned case ("Plaintiffs"), by their undersigned counsel, object and respond pursuant to Rules 26, 33 and 36 of the Federal Rules of Civil Procedure to Defendant National Westminster Bank PLC's Contention Interrogatories (the "Interrogatories"), dated April 29, 2011, as follows:

**RESERVATION OF RIGHTS**

1.      To the extent Plaintiffs answer any of the Interrogatories, they do so without conceding the materiality, admissibility or relevance of any such answers.

2.      Plaintiffs reserve all objections to the use of their responses. All such objections may be interposed by Plaintiffs at the time of trial or as otherwise required by the rules or orders of the Court.

3.      Plaintiffs reserve the right to amend, supplement or withdraw their answers and objections.

4.      Insofar as an answer by Plaintiffs may be deemed to be a waiver of any privilege or right, such waiver shall be deemed to be a limited waiver with respect to that particular answer only.

## GENERAL OBJECTIONS

Each of Plaintiffs' responses is subject to the following General Objections, and each such General Objection is incorporated by reference in Plaintiffs' answers to each of the Interrogatories as if fully set forth therein, unless such answer specifically states that it is made notwithstanding such objections (in which case such objections are reserved but not relied upon to withhold information).

1.      Plaintiffs object to all definitions, instructions and requests in the Interrogatories that purport to impose obligations beyond those required or permitted by Rule 34 of the Federal Rules of Civil Procedure and Local Civil Rule 26.3 of the Eastern District of New York.

2.      Plaintiffs object to the Interrogatories to the extent they seek information neither relevant nor calculated to lead to the discovery of admissible evidence.

3.      Plaintiffs object to the Interrogatories to the extent they are vague, ambiguous, overly broad or unduly burdensome.  Specifically, to the extent that particular Interrogatories request "all facts, witnesses and documents," thus requiring an itemization of each and every fact and

legal ground, including without limitation each and every document, witness, deposition testimony citation and any other evidence, for central and complex issues in dispute, those Interrogatories are overly broad and unduly burdensome.  Contention interrogatories, "insofar as they seek every fact, every piece of evidence, every witness, and every application of law to fact rather than, for example, certain principal or material facts, pieces of evidence, witnesses and legal applications supporting the identified allegations, are overly broad and unduly burdensome." *Ritchie Risk-Linked Strategies Trading (Ireland), Ltd. v. Coventry First LLC*, No. 09 Civ. 1086 (VM)(DF), 2010 WL 5174749, *2 (S.D.N.Y. Dec. 7, 2010).   Contention interrogatories are intended to narrow the issues in dispute for trial or summary judgment, *Wechsler v. Hunt Health Sys., Ltd.*, No. 94 Civ. 8294 PKL, 1999 WL 672902, at *1 (S.D.N.Y. Aug. 27, 1999), and many of these Interrogatories are instead designed, improperly, to "[be] a vehicle for requiring an adversary to regurgitate all factual information obtained in discovery." *Tribune Co. v. Purcigliotti*, No. 93 Civ. 7222, 1997 WL 540810, at *1 (S.D.N.Y. Sept. 3, 1997) (internal citation omitted).  *See also United States v. District Council of NYC,* 1992 WL 208284, at *16 (S.D.N.Y. Aug. 18, 1992) (observing that contention interrogatories requiring party to "marshal all its proof" are often pointless and highly burdensome); *Hiskett v. Wal-Mart Stores, Inc.*, 180 F.R.D. 403, 405 (D. Kan. 1998) ("Interrogatories should not require the answering party to provide a narrative account of its case. . . . The court will generally find them overly broad and unduly burdensome on their face to the extent they ask for "every fact" which supports identified allegations or defenses.").

4.    Plaintiffs object to the Interrogatories to the extent that the discovery sought therein can and should, pursuant to Fed. R. Civ. P. 26(b)(2)(C)(i), be obtained from some other source that is more convenient, and less burdensome.

146027 v5

3

5.      Plaintiffs object to each and every Interrogatory to the extent it seeks information that is not relevant to a claim or defense of any party, as required by Fed. R. Civ. P. 26 and 33.

6.      Plaintiffs object to each and every Interrogatory to the extent it is so vague and unclear in identifying information requested as to be impermissible under Fed. R. Civ. P. 26 and 33.

7.      Plaintiffs object to each and every Interrogatory to the extent it is vague, ambiguous, overly broad or unduly burdensome, and/or seeks information without reference to a time period or subject matter and thus is outside the scope of permissible discovery under Fed. R. Civ. P. 26 and 33.

8.      Plaintiffs object to each and every Interrogatory to the extent it purports to impose a burden on Plaintiffs to identify all information in the public domain and not in Plaintiffs' exclusive possession, custody or control.  Such a request is beyond the scope of permissible discovery, would impose undue burden upon Plaintiffs, and is an attempt to require Plaintiffs to prepare Defendant's case and defenses.  Such information is as available to Defendant as it is to Plaintiffs.

9.      Plaintiffs object to each and every Interrogatory to the extent it purports to seek information not presently in the possession, custody, or control of Plaintiffs but in the possession of third parties.

10.     Plaintiffs object to each and every Interrogatory to the extent it seeks information protected from disclosure by the attorney-client privilege, the work product doctrine or any other applicable privilege, law or rule, in that such material is not properly discoverable under Fed. R. Civ. P. 26 and 33.  The inadvertent disclosure of any privileged or otherwise protected information shall not be deemed or construed to constitute a waiver of any claim or privilege or

other protection as to such information, and Plaintiffs reserve the right to request the return and/or destruction of any such information inadvertently produced in response to the Interrogatories.

11.     Any response by Plaintiff that references NatWest and its employees should be read to include the Royal Bank of Scotland ("RBS") and its employees after the 2000 acquisition of NatWest by RBS, and the use of NatWest and/or RBS should not be read as a limitation.

12.     Any response by Plaintiffs to any Interrogatory shall not be deemed or construed in any way to be an adoption, admission or agreement by Plaintiffs of or to any such definition or term used by Defendant in the Interrogatories, or the materiality, admissibility or relevance thereof.

## RESPONSES TO INTERROGATORIES

1.     If you contend that NatWest knowingly provided material support or resources to HAMAS with the scienter necessary to render NatWest liable for damages to plaintiffs pursuant to 18 U.S.C. §2333(a) as a result of NatWest's violation of 18 U.S.C. 2339B(a)(1), identify with specificity the bases for your contentions, including without limitation identification of the scienter standard you are applying to support your contentions, the names of any NatWest employees you contend had the requisite knowledge to establish scienter on the part of NatWest, the names of any NatWest employees you contend made the decision knowingly to provide material support or resources to HAMAS, and an itemization of every fact and legal ground, including without limitation each and every document, witness, deposition testimony citation and any other evidence, that you rely upon for your contentions.

   **ANSWER:**

   Pursuant to General Objection No. 3, Plaintiffs object to Interrogatory No. 1 to the extent that this Interrogatory requests "an itemization of each and every fact and legal ground, including without limitation each and every document, witness, deposition testimony citation and any other evidence" for Plaintiffs' contention that NatWest "knowingly provided material support or resources to HAMAS with the scienter necessary to render NatWest liable for damages to

146027.v5                                          5

plaintiffs pursuant to 18 U.S.C. § 2333(a) as a result of NatWest's violation of 18 U.S.C. § 2339B(a)(1)," because it is overly broad and unduly burdensome.  The issue of NatWest's scienter at the time it transferred funds to HAMAS-controlled organizations in the Palestinian Territories was a principal subject of the overwhelming majority of the depositions of fact witnesses in these cases.  As such, this interrogatory inevitably calls for a regurgitation of "all factual information obtained in discovery."

Read literally, this Interrogatory would require Plaintiffs to identify all foundation evidence, primary and secondary evidence, credibility disputes, documentary evidence, and percipient fact witness and expert testimony in order to provide a comprehensive narrative and advocacy argument explaining why Plaintiffs can satisfy the applicable *mens rea* standards, and why Defendant's explanations to the contrary cannot be credited.  As such, this Interrogatory does not narrow the issues for trial or summary judgment, and the information requested can be obtained through less burdensome means (including, without limitation, summary judgment briefing, a final pretrial order, motion in limine practice, and exhibit lists prepared for trial.  *See* Fed. R. Civ. P. 26(b)(2)(C)(i)-(iii)).

Subject to and without waiving the foregoing Reservation of Rights and the General Objections, Plaintiffs state that, by knowingly providing financial services to HAMAS, NatWest provided material support to a designated Foreign Terrorist Organization under the Antiterrorism and Effective Death Penalty Act of 1996 in violation of 18 U.S.C. § 2339B(a)(1), and that NatWest is civilly liable for damages to Plaintiffs for their injuries pursuant to 18 U.S.C. § 2333(a).

The scienter standard for 18 U.S.C. § 2333(a) can be satisfied upon proving by a preponderance of the evidence that NatWest demonstrated a "conscious and deliberate disregard

of the interest of others, in the face of a known risk." *Goldberg v. UBS AG*, 660 F. Supp. 2d 410,

428 (E.D.N.Y. 2009) (citing *Boim v. Holy Land Foundation for Relief and Development* ("*Boim

III*"), 549 F.3d 685, 692 (7th Cir. 2008).   The scienter standard for 18 U.S.C. § 2339B(a)(1)

requires that NatWest "knowingly provide[ ] material support or resources to a designated

foreign terrorist organization." *Linde v. Arab Bank, PLC*, 384 F. Supp. 2d 571, 586 (E.D.N.Y.

2005).

  NatWest's conduct meets both *mens rea* standards.   Interpal's relationship with NatWest

goes back until at least June of 1987, when Interpal's predecessor, the Palestine & Lebanon

Relief Fund, opened accounts with NatWest.   The evidence, including thousands of documents

and over twenty depositions, demonstrates that NatWest had very substantial and detailed

concerns regarding Interpal; suspicions specifically pegged to terrorism.   The first clear instance

of documentary evidence capturing NatWest's substantial and detailed concerns that its customer

Interpal was financing terrorism arose in 1992 when the bank composed a report, pursuant to the

Money-Laundering-Prevention of Terrorism Act (1989), ██████████████████████

████████████████████████████████████████████████████

██████████████ These concerns escalated further in 1996 when media reports discussed Interpal's

financial support for HAMAS and Israeli government allegations against the customer.

Contemporaneously, the U.K. Charity Commission temporarily froze Interpal's accounts.   When

the Charity Commission unfroze Interpal's accounts in 1996 (and, again, in 2003), NatWest took

no meaningful steps to apply heightened scrutiny to the transactions received by Interpal or

transmitted by Interpal.

  In late 2000, after the failure of the Camp David summit between Israel and the

Palestinian Authority, the Second Intifada broke out and a wave of terrorist attacks was

unleashed against Israeli civilians.  As these attacks gained attention through worldwide media coverage, including outlets in the U.K. seen by numerous NatWest compliance employees, NatWest saw a sharp increase in contributions to Interpal's accounts at NatWest, and subsequent large payments (including some payments over ▮▮▮▮▮▮) by Interpal to Palestinian charities about whom NatWest admittedly knew very little and admittedly suspected were involved in terrorism financing.

In September 2001, Michael Hoseason, NatWest's Head of Group Investigations & Fraud, reviewed a report on the Cryptome website described as a South African National Intelligence Agency report (the "Cryptome SANIA Report"). The Cryptome SANIA Report detailed Interpal's support of HAMAS, and set out numerous, significant terrorist financing details that could be verified by reviewing Interpal's customer files maintained by NatWest, including account numbers, executives, funds transfers, and other information that NatWest had in its own possession.  In fact, certain of the entities discussed in the Cryptome SANIA Report (such as ▮▮▮▮▮▮▮▮▮▮) had also been identified in NatWest's 1992 suspicious activity report. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮ Further, as a result of this information, and at several times thereafter, NatWest represented to UK law enforcement ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Scant documentation and testimony, however, exists to suggest that NatWest undertook even minimal reviews, including scrutinizing its records and account information in light of the information reflected in the Cryptome SANIA Report.  NatWest instead apparently took the position that filing narrow reports (that did not, as discussed in the expert report of Gary Walters, reflect anything close to all information known or available to NatWest regarding Interpal or its counterparties) with law enforcement was the sum

146027.v5

8

total of its responsibilities.  Belinda Lane, NatWest's Relationship Manager for Interpal, did meet with Interpal on several occasions; however, even when Interpal informed Ms. Lane that its financing activities had increased due to "9/11" and "terrorism", Ms. Lane apparently treated those representations as benign in the interests of preserving one of her highest-grossing customers, about whom she claims never to have had even the barest of suspicions.

Furthermore, though throughout the Second Intifada Interpal sent repeated and massive payments to purported Palestinian charities, including many with known and readily discernable ties to HAMAS (*e.g.*, *Al-Mujama Al-Islami* (Islamic Center), *al-Jamaiya al-Islamiya* (Islamic Society), Jenin Zakat Committee, *Al-Islah* Charitable Society, *Al-Salah* Charitable Society, and ███████████████████████████ NatWest undertook no meaningful investigation into Interpal's multi-million dollar financing scheme, nor did it take any measures to stop Interpal from sending or receiving funds, despite the fact that compliance employees expressed repeated concerns that Interpal was involved in terrorism financing.  Moreover, Group Compliance also acknowledged that NatWest needed to gain a clearer understanding of Interpal's activities and full details behind the sizeable transactions.

For instance, in June 2002, NatWest completed an internal SAR and submitted a disclosure to the National Criminal Intelligence Service ("NCIS") based on a ███████ transfer received by Interpal from ████████████████ who purportedly represented ██████ ██████████████████████ an alias of ██████████ which, as NatWest knew, was designated by Germany on July 31, 2002, and both the United States and United Kingdom on May 29, 2003, as a terrorism financing entity.  This one transfer, however, was just one out of many transfers made from █████████████ to Interpal totaling over███████ between ████████████ Nothing in the record indicates that

NatWest took any measures, following ██████████ designation, to investigate and analyze Interpal's relationship with ███████████████████ despite the fact that, separate and apart from existing concerns regarding Interpal documented since at least 1992, there was an obvious, glaring risk of terror financing given Interpal's relationship with ████████

On August 22, 2003, the United States designated Interpal as a Specially Designated Global Terrorist ("SDGT"), NatWest's only such customer at the time to be so designated. After the U.K. Charity Commission concluded its 2003 nominal follow-up investigation of Interpal, NatWest made a knowing decision to continue providing financial services to Interpal (and its Hamas-controlled counterparties) in spite of both its own documented suspicions and concerns regarding Interpal (indicating NatWest's recognition of the terror financing risks posed by Interpal) now combined with the United States' determination that Interpal was HAMAS' fundraising coordinator. Even the U.K. government instructed NatWest in October 2003 █ ████████████████████████████████████████████████████████ but in spite of NatWest's representation ███████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████ the evidence demonstrates that no monitoring or other investigations occurred for at least six or seven months, at which point NatWest concluded that it purportedly was incapable of fully monitoring Interpal's accounts.

Moreover, in 2004 and continuing into 2005, evidence makes clear that NatWest treated the U.S. designation of Interpal as a terrorist, and as an agent of the FTO HAMAS (which NatWest knew the U.S. had designated as an FTO since 1997) as the mere "opinion" of the United States, deeming the designation a political decision that contrasted with the views of the

U.K.  Consequently, NatWest even knowingly assisted in Interpal's attempts to circumvent the banking channels of the U.S., which forbade the provision of banking services to Interpal after its August 2003 designation.  Interpal discussed with NatWest whether its name could be left off of transfers through the United States, or whether it could use a different name, *i.e.*, textbook examples of attempted evasion of U.S. laws.  After expressing some mild caution about assisting Interpal in its evasion attempts, NatWest internally discussed closing Interpal's U.S. dollar account, ultimately advised Interpal to do so, and then closed the account while willingly transferring the funds into non-dollar accounts, where Interpal continued to receive and transmit funds to HAMAS front organizations.  Ultimately, despite knowing that HAMAS had been designated as an FTO since 1997, and despite knowing that Interpal had been officially designated as a terrorist entity by the United States based on its status as a principal HAMAS fundraiser, NatWest did not exit its relationship with Interpal until March 2007 – after the District Court in this case denied Defendant's motion to dismiss the *Weiss* complaint.

Evidence to support this contention can be found in the documents and testimony attached as Exhibit A.

2.     If you contend that NatWest knowingly provided material support to HAMAS with the scienter necessary to render NatWest liable for damages to plaintiffs pursuant to 18 U.S.C. § 2333(a) as the result of NatWest's violation of 18 U.S.C. § 2339C, identify with specificity the bases for your contentions, including without limitation identification of the scienter standard you are applying to support your contentions, the names of any NatWest employees you contend had the requisite knowledge to establish scienter on the part of NatWest, the names of any NatWest employees you contend made the decision willfully to provide or collect funds with the intention or knowledge required by § 2339C(a)(1), and an itemization of each and every fact and legal ground, including without limitation each document, witness, deposition testimony citation and any other evidence, that you rely upon for your contentions.

**ANSWER:**

Pursuant to General Objection No. 3, Plaintiffs object to Interrogatory No. 2 to the extent that this Interrogatory requests "an itemization of each and every fact and legal ground, including without limitation each and every document, witness, deposition testimony citation and any other evidence" for Plaintiffs' contention that NatWest "knowingly provided material support or resources to HAMAS with the <u>scienter</u> necessary to render NatWest liable for damages to plaintiffs pursuant to 18 U.S.C. § 2333(a) as a result of NatWest's violation of 18 U.S.C. § 2339C," because it is overly broad and unduly burdensome. The issue of NatWest's culpable state of mind at the time it transferred funds to HAMAS-controlled organizations in the Palestinian Territories was a principal subject of virtually all of the depositions of fact witnesses in this case. As such, this interrogatory inevitably calls for a regurgitation of "all factual information obtained in discovery."

Read literally, this Interrogatory would require Plaintiffs to identify all foundation evidence, primary and secondary evidence, credibility disputes, documentary evidence, and percipient fact witness and expert testimony in order to provide a comprehensive narrative and advocacy argument explicating why Plaintiffs can satisfy the applicable *mens rea* standards, and why Defendant's explanations to the contrary cannot be credited. As such, this Interrogatory does not narrow the issues for trial or summary judgment, and the information requested can be obtained through less burdensome means (including, without limitation, summary judgment briefing, a final pretrial order, motion in limine practice, and exhibit lists prepared for trial. *See* Fed. R. Civ. P. 26(b)(2)(C)(i)-(iii)).

Subject to and without waiving the foregoing Reservation of Rights and the General Objections, Plaintiffs further state that, by knowingly providing financial services to HAMAS, NatWest violated 18 U.S.C. § 2339C, and is liable for damages to Plaintiffs pursuant to 18

U.S.C. § 2333(a). The scienter standard for 18 U.S.C. § 2339C requires that NatWest had the "knowledge or intent that the resources given to terrorists are to be used in the commission of terrorist acts." *Linde*, 384 F. Supp. 2d at 586 n.9. That section does *not* require "the specific intent to aid or encourage the particular attacks that injured plaintiffs." *Id.* The scienter requirement for 18 U.S.C. § 2333(a) is set out in response to Interrogatory No.1.

NatWest's conduct meets both *mens rea* standards as set forth in response to Interrogatory No. 1 above. Evidence to support this contention can be found in the documents and testimony attached as Exhibit A.

3. If you contend that NatWest is liable for damages to plaintiffs pursuant to 18 U.S.C. § 2333(a) on any ground other than as the result of NatWest's violation of 18 U.S.C. § 2339B(a)(1) and/or 18 U.S.C. § 2339C, identify with specificity the bases for your contentions, including without limitation identification of the scienter standard you are applying to support your contentions and an itemization of each and every fact and legal ground, including without limitation each document, witness, deposition testimony citation and any other evidence, that you rely upon for your contentions.

ANSWER:

Subject to and without waiving the foregoing Reservation of Rights and the General Objections, Plaintiffs state that they preserve all claims previously dismissed by the Court including all claims based on common law theories of aiding and abetting and accessorial liability on appeal. However, for purposes of trial, Plaintiffs do not intend to assert that NatWest is liable on any theory not recognized by the Court's prior rulings in this litigation.

4. If you contend that NatWest knew that HAMAS is a "designated terrorist organization," and/or that it knew HAMAS has engaged or engages in terrorist activity or terrorism, as those terms are defined in 18 U.S.C. § 2339B, identify with specificity the bases for your contentions, including without limitation an itemization of the date(s) as of which you contend NatWest had such knowledge, the names of any NatWest employees you contend had such knowledge, and each and every fact and legal ground, including without limitation each and every document,

witness, deposition testimony citation and any other evidence, that you rely upon for your contentions.

**ANSWER:**

Subject to and without waiving the foregoing Reservation of Rights and the General Objections (including the fact that this Interrogatory does not contain a definition of "knowledge"), Plaintiffs state that as a bank with U.S. branches, NatWest was obligated to, and did, monitor terrorist designations made by the U.S. government, and knew (or would have had to go to considerable effort to avoid knowing) that HAMAS was a "designated terrorist organization" from at least 1995, when the United States designated HAMAS as a Specially Designated Terrorist ("SDT") and again, on October 8, 1997, when the United States Department of State designated HAMAS a FTO. NatWest also knew that HAMAS engaged in terrorist activity and terrorism from at least the mid-1990s onward, when HAMAS engaged in its first widely publicized campaign of suicide bombings targeting Israeli civilians. These attacks generated headlines all over the world, including in the U.K., and even the 1996 Charity Commission report concerning Interpal referenced HAMAS' violent wing. Evidence in the record demonstrates that NatWest retained copies of at least certain media reports referencing HAMAS and HAMAS terrorism.

A similar wave of suicide bombings and other terrorist attacks targeting civilians in Israel erupted in late 2000, after the failure of peace negotiations between Israel and the Palestinian Authority. Many of these attacks, including the majority of the most highly-publicized ones, were perpetrated by HAMAS, which publicized and claimed credit for its role in the attacks, a role that was widely reported around the world, including in the U.K. As with the earlier eruption of HAMAS terrorism, numerous NatWest current and former employees testified learning about this wave of terrorist attacks through reports in the media.

146027 v5

14

Evidence to support this contention can be found in the documents and testimony attached as Exhibit B.

5.     If you contend that NatWest knew that Interpal was providing funds to HAMAS by means of Interpal's transfers from the accounts it maintained with NatWest, identify with specificity the bases for your contentions, including without limitation the names of any NatWest employees you contend had such knowledge, and an itemization of each and every fact and legal ground, including without limitation each and every document, witness, deposition testimony citation and any other evidence, that you rely upon for your contentions.

**ANSWER:**

Pursuant to General Objection No. 3, Plaintiffs object to Interrogatory No. 5 to the extent that this interrogatory requests "an itemization of each and every fact and legal ground, including without limitation each and every document, witness, deposition testimony citation and any other evidence" for Plaintiffs' contention that NatWest knew that Interpal was providing funds to HAMAS because it is overly broad and unduly burdensome. The issue of NatWest's awareness that its customer Interpal was transferring money to HAMAS from Interpal's accounts at NatWest was a principal subject of the overwhelming majority of the depositions of fact witnesses in these cases. As such, pursuant to General Objection No. 3, this Interrogatory inevitably calls for a regurgitation of "all factual information obtained in discovery." Moreover, the Interrogatory is vague to the extent that NatWest does not provide a legal definition of "knowledge."

Subject to and without waiving the foregoing Reservation of Rights and the General and Specific Objections, and as delineated in response to Interrogatory No. 1, Plaintiffs state that the evidence demonstrates that NatWest either: (1) knew (or would have had to go to considerable effort to avoid knowing) that Interpal was providing funds to HAMAS by means of transfers from its account at NatWest; (2) suspected that Interpal was providing funds to HAMAS by

means of transfers from its NatWest account but deliberately avoided confirming such suspicions; or (3) knew there was an appreciable risk that Interpal was providing funds to HAMAS by means of transfers from its NatWest accounts, but, in conscious and deliberate disregard of the interest of others, continued to facilitate transactions for Interpal in the face of these known risks.  Evidence to support this contention can be found in the documents and testimony attached as Exhibit A.

6.      If you contend that NatWest was willfully blind with respect to whether Interpal was providing funds to HAMAS by means of Interpal's transfers from the accounts it maintained with NatWest, identify with specificity the bases for your contentions, including without limitation identification of the legal standard you are applying to support your contentions, the names of any NatWest employees you contend were willfully blind, and an itemization of each and every fact and legal ground, including without limitation each and every document, witness, deposition testimony citation and any other evidence, that you rely upon for your contentions.

    **ANSWER:**

    Pursuant to General Objection No. 3, Plaintiffs object to Interrogatory No. 6 to the extent that this Interrogatory requests "an itemization of each and every fact and legal ground, including without limitation each and every document, witness, deposition testimony citation and any other evidence" for Plaintiffs' contention that NatWest was willfully blind with respond to whether Interpal was providing funds to HAMAS, because it is overly broad and unduly burdensome. The issue of NatWest's awareness that its customer Interpal was transferring money to HAMAS from Interpal's accounts at NatWest was a principal subject of the overwhelming majority of the depositions of fact witnesses in this case.  As such, pursuant to General Objection No. 3, this Interrogatory inevitably calls for a regurgitation of "all factual information obtained in discovery."  Moreover, the Interrogatory is vague to the extent that NatWest does not provide a definition of "willfully blind."

146027 v5                                            16

Subject to and without waiving the foregoing Reservation of Rights and the General Objections, and as delineated in response to Interrogatory No. 1, Plaintiffs state that, to the extent that NatWest did not actually know that Interpal was providing funds to HAMAS by means of transfers from its account at NatWest, this was due to NatWest's willful blindness (or recklessness with regard) to that fact.  Evidence to support this contention can be found in the documents and testimony attached as Exhibit A.

Additionally, in the unlikely extent that NatWest did not actually know that Interpal was providing funds to HAMAS by means of transfers of its accounts at NatWest, this was due to NatWest's deliberate failure to confirm that the transfers it performed on behalf of Interpal to Islamist organizations in Lebanon, Gaza and the West Bank were going to HAMAS-controlled organizations.  If, in the face of its suspicions and concerns, NatWest had performed even cursory research on Interpal's counterparties, it would have learned of their affiliations with HAMAS, as described in Plaintiffs' response to Interrogatory No. 11.  Given the suspicions NatWest long maintained regarding Interpal, NatWest's failure to do so reflects a deliberate, conscious decision to avoid confirming its suspicions, rather than oversight, gross or simple negligence, or mistake.  Moreover, NatWest was aware of the significant increase in transfers to the West Bank and Gaza after the outbreak of the Second Intifada, and of the fact that the Palestinian territories were a high-risk jurisdiction for terrorism, yet continued to facilitate transactions for Interpal, and, other than filing occasional materially incomplete reports with UK regulators and law enforcement, took no other steps to stem the flow of incoming or outbound funds from or to Interpal.  Assuming without conceding that, even with all these warning signs, NatWest did refrain from conducting any additional research into Interpal's Palestinian counterparties or Interpal itself, NatWest's conduct constitutes a willful disregard of a known

17

risk. Correspondingly, given NatWest's suspicions and intentional decision to avoid confirming its suspicions, Defendant thus averted its eyes from the obvious danger posed by its execution of these transfers. Even in 2004, after the U.S. designation of Interpal as HAMAS' primary fundraiser, NatWest demonstrated almost total indifference to the identities of Interpal counter-parties.

7.     If you contend that NatWest knew that Interpal was providing funds for one or more acts of terrorism by means of Interpal's transfers from the accounts it maintained with NatWest, identify with specificity the bases for your contentions, including without limitation the names of any NatWest employees you contend had such knowledge, and an itemization of each and every fact and legal ground, including without limitation each and every document, witness, deposition testimony citation and any other evidence, that you rely upon for your contentions.

**ANSWER:**

In addition to the foregoing Reservation of Rights and the General Objections, Plaintiffs also object to Interrogatory No. 7 as impermissibly vague, ambiguous, and overly burdensome since it asks about NatWest's knowledge that Interpal was providing funds for "one or more acts of terrorism" and nowhere defines "act of terrorism." As such this Interrogatory impermissibly seeks contentions as to pure law. Subject to and without waiving the forgoing Specific and General Objections, and the reservation of rights, Plaintiffs state that they contend that *any* violation of 18 U.S.C. § 2339B is an act of international terrorism, *see, e.g. Goldberg v. UBS AG,* 690 F. Supp. 2d 92, 113-14 (E.D.N.Y. 2010), and that by knowingly providing financial services to HAMAS, Defendant provided material support to a designated Foreign Terrorist Organization under the Antiterrorism and Effective Death Penalty Act of 1996, in violation of 18 U.S.C. § 2339B(a)(1). To the extent that Defendant seeks through Interrogatory No. 7 to artificially separate and distinguish the provision of funds to a Foreign Terrorist Organization from the

provision of funds for the commission of a specific act of terrorism, Plaintiffs note the Supreme

Court's decision in *Holder v. Humanitarian Law Project*, 130 S.Ct. 2705, 2725 (2010):

> "Material support" is a valuable resource by definition. Such support frees up other resources within the organization that may be put to violent ends. It also importantly helps lend legitimacy to foreign terrorist groups—legitimacy that makes it easier for those groups to persist, to recruit members, and to raise funds—all of which facilitate more terrorist attacks. "Terrorist organizations do not maintain *organizational* 'firewalls' that would prevent or deter . . . sharing and commingling of support and benefits." McKune Affidavit, App. 135, ¶11. "[I]nvestigators have revealed how terrorist groups systematically conceal their activities behind charitable, social, and political fronts." M. Levitt, Hamas: Politics, Charity, and Terrorism in the Service of Jihad 2–3 (2006). "Indeed, some designated foreign terrorist organizations use social and political components to recruit personnel to carry out terrorist operations, and to provide support to criminal terrorists and their families in aid of such operations." McKune Affidavit, App. 135, ¶11; Levitt, *supra*, at 2 ("Muddying the waters between its political activism, good works, and terrorist attacks, Hamas is able to use its overt political and charitable organizations as a financial and logistical support network for its terrorist operations").

> Furthermore, *see* Plaintiffs' response to Interrogatory Nos. 1 and 5.

8.     If you contend that NatWest was willfully blind with respect to whether Interpal was providing funds for one or more acts of terrorism by means of Interpal's transfers from the accounts it maintained with NatWest, identify with specificity the bases for your contentions, including without limitation identification of the legal standard you are applying to support your contentions, the names of any NatWest employees you contend were willfully blind, and an itemization of each and every fact and legal ground, including without limitation each and every document, witness, deposition testimony citation and any other evidence, that you rely upon for your contentions.

**ANSWER:**

In addition to the foregoing Reservation of Rights and General Objections, Plaintiffs also

object to Interrogatory 8 as impermissibly vague, ambiguous, and overly burdensome since it

asks about NatWest's willful blindness to whether Interpal was providing funds for "one or more

acts of terrorism" and nowhere defines "act of terrorism."   As such this Interrogatory

impermissibly seeks contentions as to pure law.   Moreover, the Interrogatory is vague to the

extent that NatWest does not provide a definition of "willfully blind."  Subject to and without

waiving the foregoing Reservation of Rights and the Specific and General Objections, Plaintiffs

state that they contend that *any* violation of 18 U.S.C. § 2339B is itself an act of international

terrorism, *see, e.g. Goldberg,* 690 F. Supp. 2d at 113-14, and that by providing financial services

to HAMAS and being willfully blind (or reckless in regard) to that fact, the Defendant provided

material support to a designated Foreign Terrorist Organization under the Antiterrorism and

Effective Death Penalty Act of 1996, in violation of § 2339B(a)(1).  Furthermore, *see* Plaintiffs'

response to Interrogatory Nos. 1 and 6.


9.      If you contend that plaintiffs have standing to seek relief from NatWest for the injuries
they allegedly sustained, for each such plaintiff identify with specificity the bases for your
contentions, including without limitation identification of the bases for your contention that such
plaintiffs' injuries are "fairly traceable," as that term is used in <u>Denney v. Deutsche Bank AG</u>,
443 F.3d 253, 263 (2d Cir. 2006), to the challenged actions of NatWest and that NatWest's
alleged actions "materially increase[d] the probability," as that term is used in <u>Huddy v. F.C.C.</u>,
236 F.3d 720, 722-23 (D.C. Cir. 2001), that such plaintiff would be injured, and an itemization
of each and every fact and legal ground, including without limitation, each and every document,
witness deposition testimony citation and any other evidence, that you rely upon for contentions.

**ANSWER:**

In addition to the foregoing Reservation of Rights and General Objections, Plaintiffs also

object to Interrogatory No. 9 to the extent that the terms: (1) "fairly traceable," as it is used in

*Denney v. Deutsche Bank AG*, 443 F.3d 253, 263 (2d Cir. 2006); and (2) "material[] increase [in]

probability," as it is used in *Huddy v. F.C.C.*, 236 F.3d 720, 722-23 (D.C. Cir. 2001), are both

efforts to illustrate the general principle of causation, a requirement for constitutional standing

under *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992), and neither articulation is the

causation standard applicable to this action. *See Strauss*, 2006 WL 2862704, at *18 ("[t]aking

into account the legislative history of these statutes and the purpose behind them, however, it is

clear that proximate cause may be established by a showing only that defendant provided material support to, or collected funds for a terrorist organization which brought about plaintiffs' injuries. Congress intended these provisions to impose, 'liability at any point along the causal chain of terrorism.' S.Rep. No. 102-342 at 22."); *Weiss v. National Westminster Bank Plc,* 453 F. Supp. 2d 609, 631 (E.D.N.Y. 2006). *Accord Boim* ("*Boim III*"), 549 F.3d at 698-700; *Goldberg v. UBS, AG,* 660 F. Supp. 2d at 429; *Linde v. Arab Bank, PLC,* 384 F. Supp. 2d at 583.

Subject to and without waiving the forgoing Specific and General Objections, Plaintiffs do contend that their injuries were proximately caused by Defendant's actions. In enacting the material support statute "Congress made an express finding of fact that, 'foreign organizations that engage in terrorist activity are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct.'" *Weiss,* 453 F. Supp. 2d at 631; *Strauss,* 2006 WL 2862704, at *18. Plaintiffs have met the operative causation standard in this action. As set forth in response to Interrogatory No. 11 below (and incorporated herein), Plaintiffs' evidence clearly demonstrates that NatWest provided material support to HAMAS, a Foreign Terrorist Organization. Moreover, Plaintiffs submit that it was entirely foreseeable that providing material support to HAMAS over a period of more than ten years, and transferring approximately $29 million to and from HAMAS-affiliated entities during that time (*see* Reports of Wayne D. Geisser dated November 19, 2009 and December 28, 2010), materially increased the risk that Plaintiffs would be injured by HAMAS.

10.     If you contend that the injuries allegedly sustained by one or more plaintiffs were caused "by reason of" any act or omission by NatWest, as that term is used in 18 U.S.C. § 2333(a), identify with specificity the bases for your contentions, including without limitation an itemization of each and every fact and legal ground, including without limitation each and every document, witness, deposition testimony citation and any other evidence, that you rely upon for your contentions.

**ANSWER:**

Subject to and without waiving the foregoing Reservation of Rights and General Objections, Plaintiffs state that the phrase "by reason of," as it appears in 18 U.S.C. § 2333(a), ("[a]ny national of the United States injured in his or her person, property, or business by reason of an act of international terrorism"), encompasses support for the Foreign Terrorist Organization(s) responsible for the "act of international terrorism" in question. *See Strauss*, 2006 WL 2862704, at *17-18, citing *Linde*, 384 F. Supp. 2d at 585 ("holding that in order to prevail on claims under 2333(a) it was sufficient for plaintiffs to show that 'the Bank provided these services to the particular group responsible for the attacks giving rise to their injuries.'"); *Weiss*, 453 F. Supp. 2d at 631. Plaintiffs contend that their injuries were caused by reason of acts of international terrorism perpetrated by HAMAS, *see Linde*, 384 F. Supp. 2d. at 581, and that because NatWest provided material support to HAMAS, their injuries were caused "by reason of" acts or omissions by NatWest which, because they are violative of 18 U.S.C. §§ 2339B and 2339C, are themselves acts of international terrorism. Responses to Interrogatory No. 9 above and No. 11 below (incorporated by reference herein) identify evidence supporting Plaintiffs' contentions that NatWest provided support to HAMAS in violation of § 2339B independently constituting acts of international terrorism, and that HAMAS in turn is responsible for acts of international terrorism in which Plaintiffs were injured and their loved ones killed.

11.     If you contend that one or more of the persons or entities to which Interpal transferred funds from the accounts it maintained with NatWest were, at the time of such transfers, *alter egos* of and/or controlled by HAMAS, identify with specificity the bases for your contentions, including without limitation an itemization of each and every fact and legal ground, including without limitation each and every document witness, deposition testimony citation and any other evidence, that you rely upon for your contentions.

**ANSWER:**

In addition to the foregoing Reservation of Rights and General Objections, Plaintiffs also object to Interrogatory 11 because it constitutes a demand for a recitation of facts and information that have already been shared with Defendant during the course of discovery. As composed, responding to this Interrogatory would require Plaintiffs to restate literally hundreds of pages of expert written and deposition testimony and exhibits thereto, including the expert reports of Arieh Spitzen and Dr. Matthew Levitt. As such this Interrogatory is overly burdensome, oppressive, and harassing. Contention interrogatories "should not simply [be] a vehicle for requiring an adversary to regurgitate all factual information obtained in discovery." *Tribune Co.,* 1997 WL 540810, at *1. (internal citation omitted). As such, this Interrogatory does not narrow the issues for trial or summary judgment, and the information requested can be obtained through less burdensome means (including, without limitation, summary judgment briefing, a final pretrial order, motion in limine practice, and exhibit lists prepared for trial. *See* Fed. R. Civ. P. 26(b)(2)(C)(i)-(iii)).

Subject to and without waiving the foregoing Reservation of Rights and the Specific and General Objections, Plaintiffs state that the following counterparties, each of which NatWest transferred money to on behalf of its customer Interpal, were at the relevant time alter egos of and/or controlled by HAMAS: ██████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████

The testimony, reports, and exhibits of Plaintiffs' experts, particularly those of Dr. Matthew Levitt and Arieh Spitzen, comprehensively address the subject of this Interrogatory. Evidence supporting Plaintiffs' contention can be found in evidence produced by Plaintiffs during discovery conducted in this matter to date, including but not limited to the testimony and evidence cited below:

- Expert Report of Dr. Matthew Levitt at 30-31; 33-34; 38; 50-51; 58-60; 61-65; 65-68; 68-72; 72-75; 75-78; 78-81; 81-83; 84-87; 87-90; 90-91, and all documents cited therein;

- Expert Report of Arieh Spitzen at 24-30; 30-38; 39-51; 52-64; 65-73; 74-77; 78-90; 91-101; 102-109; 110-118; 119-126; 127-134; 135-142; 143-149; 150-154, and all documents cited therein.

12.     If you contend that any of the funds Interpal transferred from the accounts it maintained with NatWest was used in any way to finance one or more of the attacks by reason of which you contend one or more plaintiffs was injured, identify with specificity the bases for your contentions, including without limitation an itemization of each and every fact and legal ground, including without limitation each and every document, witness, deposition testimony citation and any other evidence, that you rely upon for your contentions.

**ANSWER:**

Subject to and without waiving the foregoing Reservation of Rights and the General Objections, Plaintiffs state that they do not contend that any of the funds Interpal transferred from the accounts it maintained with NatWest to HAMAS was used specifically to finance any of the terrorist attacks that injured Plaintiffs and/or killed their loved ones. Plaintiffs state further that they have no burden to so prove. *See Strauss*, 2006 WL 2862704, at *18 ("[b]ecause money is fungible, it is not generally possible to say that a particular dollar caused a particular act or

paid for a particular gun. If plaintiffs were required to make such a showing, 2333(a) enforcement would be [so] difficult that the stated purpose would be eviscerated. Rather, where the provision of funds to a terrorist organization is a substantial factor in carrying out terrorist acts, it is thus the proximate cause of the terrorist attacks engaged in by the organization."). *See also Linde v. Arab Bank, PLC*, 384 F. Supp. 2d 571, 585 (E.D.N.Y. 2005) (holding that in order to prevail on claims under § 2333(a) it was sufficient for plaintiffs to show that the "Bank provided these services to the particular group responsible for the attacks giving rise to their injuries."); *Goldberg*, 660 F. Supp. 2d at 430 ("Common sense requires a conclusion that Congress did not intend to limit recovery to those plaintiffs who could show that the *very dollars* sent to a terrorist organization were used to purchase the implements of violence that caused harm to the plaintiff. Such a burden would render the statute powerless to stop the flow of money to international terrorists, and would be incompatible with the legislative history of the ATA."). As set forth in the reports of Dr. Matthew Levitt and Arieh Spitzen, *see* Response to Interrogatory 11 above, aid provided to groups that are part of the HAMAS *Da'wa*, including those groups to whom NatWest transferred money, is integral to HAMAS' activities, and terrorist activities, including HAMAS terrorist activities constituting violent acts carried out against innocent civilians. Thus, the funds that NatWest transferred on behalf of its customer Interpal, including after Interpal was designated a Specially Designated Global Terrorist, contributed to HAMAS' activities, including its suicide bombings and other violent attacks against innocent civilians. As noted by the United States Supreme Court in *Holder v. Humanitarian Law Project*, 130 S.Ct. 2705, 2727 (2010):

> In analyzing whether it is possible in practice to distinguish material support for a foreign terrorist group's violent activities and its nonviolent activities, we do not rely exclusively on our own inferences drawn from the record evidence. We have before us an affidavit stating the Executive Branch's conclusion on that question.

The State Department informs us that "[t]he experience and analysis of the U. S. government agencies charged with combating terrorism strongly suppor[t]" Congress's finding that all contributions to foreign terrorist organizations further their terrorism. McKune Affidavit, App. 133, ¶8. *See Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, ----, 129 S.Ct. 365, 376-377, 172 L.Ed.2d 249 (2008) (looking to similar affidavits to support according weight to national security claims). In the Executive's view: "Given the purposes, organizational structure, and clandestine nature of foreign terrorist organizations, it is highly likely that any material support to these organizations will ultimately inure to the benefit of their criminal, terrorist functions— regardless of whether such support was ostensibly intended to support non-violent, non-terrorist activities." McKune Affidavit, App. 133, ¶8.

Plaintiffs, however, cannot state with particularity which dollars among the approximately ▮▮▮▮▮ NatWest provided to Hamas were specifically "used to finance" the particular violent acts that injured Plaintiffs and/or killed their loved ones.

13.   If you contend that any designation or sanctioning by the Office of Foreign Assets Control of the United States Treasury Department ("OFAC") of Interpal or any of the persons or entities to which Interpal transferred funds from the accounts it maintained with NatWest is relevant to any of plaintiffs' claims, for each such designation or sanctioning identify with specificity the bases for your contentions, including without limitation an itemization of each and every fact and legal ground, including without limitation each and every document, witness, deposition testimony citation and any other evidence, that you rely upon for you contentions.

**ANSWER:**

Plaintiffs object to this Interrogatory on grounds that it is not a proper Interrogatory because the question of whether certain evidence is "relevant" is a matter of evidentiary judgment that will depend on the trial presentation and, implicitly, trial strategy. As such the Interrogatory is vague, ambiguous, and overly burdensome. Read literally, it would require Plaintiffs to identify all foundational evidence, primary and secondary evidence, credibility disputes, documentary evidence, as well as percipient fact and expert witness testimony in order to provide a comprehensive narrative and advocacy argument explaining how U.S. designations and sanctions could be, in some sense, relied upon by Plaintiffs in connection with any

146027 v5                                          26

applicable *mens rea* element of their claims, including how such materials might address explanations, hypotheses, and arguments offered by Defendant in support of its defenses, or the credibility of various fact and expert witnesses' testimony, opinions, inferences, or assumptions. As such, it will not help limit the issues for trial or dispositive motion practice. Moreover, the information requested by this Interrogatory can be obtained through more efficient, less burdensome means, including summary judgment briefing, motion in limine practice, or a final pre-trial exhibit list. *See* Fed. R. Civ. P. 26(b)(2)(C)(i)(-(iii). Plaintiffs are construing this Interrogatory in accordance with the instructions set forth in Magistrate Judge Go's Minute Order of June 17, 2011 in *Strauss v. Credit Lyonnais*, 06-CV-702 (Docket No. 262), which limited the scope of certain of identically-proffered Interrogatories served by Credit Lyonnais, S.A., including No. 14 therein. Subject to and without waiver of these objections, Plaintiffs respond as follows:

Plaintiffs may rely on U.S. designations of Interpal and/or its counterparties and co-conspirators (including without limitation HAMAS, the Al-Aqsa Foundation, ███ the *Al-Salah* Islamic Association, ████████████ and the Union of Good) to demonstrate *mens rea* with regard to the following areas:

- Whether or not NatWest had notice of HAMAS' status as a terrorist, including but not limited to its status as a Foreign Terrorist Organization, Specially Designated Terrorist, or Specially Designated Global Terrorist.

- Whether or not NatWest had notice of Interpal's status as a terrorist, including but not limited to its status as a Specially Designated Global Terrorist.

- Whether or not NatWest had notice of Interpal's counter-parties' and co-conspirators' status as terrorists, including but not limited to any counter-party or co-conspirator's status as a Specially Designated Global Terrorist, or agent, affiliate, alter ago, conspirator, or aider and abettor of a Foreign Terrorist Organization.

- Whether NatWest actually knew that HAMAS was a terrorist organization, or engaged in acts of international terrorism, terrorist activity, terrorism, or the financing of terrorism.

- Whether NatWest knew there was a high probability that Interpal or Interpal's counter-parties were connected to HAMAS, but deliberately decided not to confirm that fact.

- Whether NatWest knew that HAMAS had been designated as a terrorist organization, and deliberately disregarded that fact while continuing to provide financial services to Interpal knowing that the services would assist HAMAS.

- Whether NatWest consciously disregarded substantial unjustifiable risks with respect to Interpal and its counter-parties, and whether such risks were of a nature and degree that, considering the nature and purpose of NatWest's conduct and the circumstances known to it, such conduct involved a gross deviation from the standards of conduct that a law-abiding person or entity in NatWest's situation would have observed.

- Whether NatWest was generally aware of its role as part of HAMAS' illegal activity, and whether NatWest knowingly and substantially assisted HAMAS' illegal conduct.

Specifically, the evidence shows that, at all relevant times, NatWest was aware (or would have had to go to considerable effort to avoid becoming aware) of and had access to the lists of terrorists and terrorist organizations generated by OFAC and other United States government agencies. NatWest was aware of and had access to the websites of OFAC and other relevant United States government agencies, and even had subscriptions to news services that specialized in providing updates of OFAC actions relevant to financial institutions. As such, NatWest was aware of not merely the fact of designations made by OFAC and other United States government agencies, but the rationale behind these designations.

For example, when OFAC designated Interpal, the Al-Aqsa Foundation█████ and other charitable fronts active in raising funds for HAMAS in the West as Specially Designated Global Terrorists, it issued press releases describing the reasons for these designations. The August 22, 2003 press release characterized Interpal as HAMAS' "fundraising coordinator," "a

principal charity utilized to hide the flow of money to HAMAS," and "the conduit through which money flows to HAMAS from other charities." NatWest learned of OFAC's designations of Interpal, the Al-Aqsa Foundation, and Sanabil, among others, as an SDGT shortly after their respective designations.

Evidence to support this contention can be found in the documents and testimony attached as Exhibit C.

14. If you contend that any designation or sanctioning by any agency, instrumentality or officer of the government of Israel or the Israeli military of Interpal or any of the persons or entities to which Interpal transferred funds from the accounts it maintained with NatWest is relevant to any of plaintiffs' claims, for each such designation or sanctioning identify with specificity the bases for your contentions, including without limitation, an itemization of each and every fact and legal ground, including without limitation each and every document, witness, deposition testimony citation and any other evidence, that you rely upon for your contentions.

**ANSWER:**

Plaintiffs object to this Interrogatory on the grounds set forth in response to Interrogatory No. 13. Read literally, this Interrogatory would require Plaintiffs to identify all foundational evidence, primary and secondary evidence, credibility disputes, documentary evidence, as well as percipient fact and expert witness testimony in order to provide a comprehensive narrative and advocacy argument explaining why Israeli designations and sanctions could, in some sense, be relied upon by Plaintiffs in connection with any applicable *mens rea* elements of their claims, including how such designations might address explanations, hypotheses, and arguments offered by Defendant in support of its defenses, or the credibility of various fact and expert witnesses' testimony (including NatWest's case-in-chief putative expert witnesses Moshe Azoulay and Yaron Lipshes), opinions, inferences, or assumptions. As such, it will not help limit the issues for trial or dispositive motion practice. Moreover, the information by this Interrogatory can be

obtained through more efficient, less burdensome means, including summary judgment briefing, motion in limine practice, or a final pre-trial exhibit list. *See* Fed. R. Civ. P. 26(b)(2)(C)(i)(-(iii). Plaintiffs are construing this Interrogatory in accordance with the instructions set forth in Magistrate Judge Go's Minute Order of June 17, 2011 in *Strauss v. Credit Lyonnais*, 06-CV-702 (Docket No. 262), which limited the scope of certain of identically-proffered Interrogatories served by Credit Lyonnais, S.A., including No. 15 therein.  Subject to and without waiver of these objections, Plaintiffs respond as follows:

Plaintiffs may rely on Israeli designations of Interpal and/or its counterparties and co-conspirators to demonstrate *mens rea* with regard to the following areas:

- Whether or not NatWest had notice of HAMAS' status as a terrorist.

- Whether or not NatWest had notice of Interpal's status as a terrorist.

- Whether or not NatWest had notice of Interpal's counter-parties' and co-conspirators' status as terrorists.

- Whether NatWest actually knew that HAMAS was a terrorist organization, or engaged in acts of international terrorism, terrorist activity, terrorism, or the financing of terrorism.

- Whether NatWest knew there was a high probability that Interpal or Interpal's counter-parties were connected to HAMAS, but deliberately decided not to confirm that fact.

- Whether NatWest knew that HAMAS had been designated as a terrorist organization, and deliberately disregarded that fact while continuing to provide financial services to Interpal knowing that the services would assist HAMAS.

- Whether NatWest consciously disregarded substantial unjustifiable risks with respect to Interpal and its counter-parties, and whether such risks were of a nature and degree that, considering the nature and purpose of NatWest's conduct and the circumstances known to it, such conduct involved a gross deviation from the standards of conduct that a law-abiding person or entity in NatWest's situation would have observed.

- Whether NatWest was generally aware of its role as part of HAMAS' illegal activity, and whether NatWest knowingly and substantially assisted HAMAS' illegal conduct.

Specifically, the evidence will show that the Government of Israel designated Interpal as an "unlawful organization" in 1997 and as a "terrorist organization" in 1998 because of evidence that Interpal raised funds for HAMAS.  Israel also designated many of Interpal's co-conspirators and counterparties at various times while NatWest was continuing to execute transfers to these groups.  Given NatWest's knowledge of the eruption of the Second Intifada beginning in late 2000, including the wave of terrorist attacks targeting Israeli civilians, NatWest's stated terrorist financing suspicions with regard to Interpal and its counterparties about whom NatWest acknowledged knowing very little, a multitude of red flags pointing to terror financing concerns, and the significant rise in Interpal's transfers after the outbreak of the Second Intifada, which Interpal attributed to "terrorism," NatWest at the very least knew of the high likelihood that the Government of Israel's terrorist designations were an important source of information.

However, with the exception of information obtained in 2005, NatWest purports to have made no attempt to discover if Interpal or any of its counterparties had been designated by Israel. In fact, NatWest employees diminished Israeli (and U.S.) attitudes toward Interpal and other HAMAS-related entities as politically-motivated and of a different ideology than those in the U.K. Yet, as explained in response to Interrogatory No. 1 above, NatWest maintained longstanding suspicions regarding Interpal and certain of Interpal's counterparties, suspicions that specifically reflected terror financing concerns.  Thus, NatWest's failure to obtain, discover, and analyze Israeli designations for Interpal or its counterparties, despite the fact that outbound transactions facilitated by NatWest for Interpal were sent into a geographic conflict zone presenting specific security and terrorism risks for the State of Israel, reflects a conscious, deliberate decision on NatWest's part to avoid confirming said suspicions.

146027 v5

31

Evidence to support this contention can be found in the documents and testimony attached as Exhibit D.

15.    If you contend that any of the opinions expressed in the reports submitted by Gary Walters, dated December 17, 2010 and March 4, 2011, is relevant to any of plaintiffs' claims, identify with specificity the opinions you contend are relevant and the bases for your contentions that those opinions are relevant, including without limitation an itemization of each and every fact and legal ground, including without limitation each and every document, witness, deposition testimony citation and any other evidence, that you rely upon for your contentions.

**ANSWER:**

Plaintiffs object to this Interrogatory on the grounds set forth in response to Interrogatory No. 13.  This Interrogatory is vague and ambiguous, burdensome, and does not seek the application of law to fact but instead only seeks questions of pure law.  This Interrogatory is also unduly burdensome because read literally it would require Plaintiffs to virtually regurgitate and restate Mr. Walters' reports and deposition testimony, as well as the testimony of Defendant's fact witnesses (which is set forth in detail in Mr. Walters' March 4 report) and Defendant's putative case-in-chief and rebuttal expert witnesses, including Messrs. Holland, Burchfield, Hyland and Barker.  Further, this Interrogatory improperly requires Plaintiffs to identify all foundational evidence, primary and secondary evidence, credibility disputes, documentary evidence, as well as percipient fact and expert witness testimony in order to provide a comprehensive narrative and advocacy argument explaining various ways that Mr. Walters' opinions and testimony are relevant.  As such, it will not help limit the issues for trial or dispositive motion practice.  Moreover, the information requested by this Interrogatory can be obtained through more efficient, less burdensome means, including summary judgment motion practice, or motion in limine practice (including any motion challenging the admissibility of Mr. Walters' testimony on grounds of relevance, or any alleged failure to satisfy Fed. R. Evid. 702-705, *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993), or *Kumho Tire Co. v.*

*Carmichael*, 526 U.S. 137 (1999)).  *See* Fed. R. Civ. P. 26(b)(2)(C)(i)(-(iii).  Subject to and without waiver of these objections, Plaintiffs respond as follows.

Mr. Walters' report relates to the following elements of Plaintiffs' case:

- Describing, explaining, and defining, from the perspective of a former U.K. law enforcement official, various banking terms and processes, and the banking compliance and risk management function specifically, including without limitation concepts of money laundering, terrorist financing, Know Your Customer, Customer Due Diligence, internal and external suspicious activity reporting, and electronic wire transfer transactions;

- Describing regulatory and law enforcement oversight in the U.K. pertaining to financial crimes, including terrorist financing, and distinctions between different categories of regulators and law enforcement agencies (such as the U.K. Charity Commission) during the relevant time period;

- Describing how U.K. regulators and law enforcement worked with banks and other financial institutions to collect, track, report, and monitor information pertinent to financial crimes, including terrorist financing; and

- In rebuttal to the reports of Jonathan Burchfield and Jon Holland, rebutting the opinion that NatWest could not have done more in practical terms to draw the attention of the relevant authorities to its relationship with Interpal and to seek guidance in how to proceed, as well as describing, from a law enforcement perspective, whether NatWest ignored facts and evidence linking Interpal to terrorist financing.  This includes:

  o From the perspective of a former U.K. law enforcement official who routinely worked with banks on financial crimes, assessing, explaining, and analyzing NatWest's treatment of Interpal and its accounts in a manner that will be comprehensible to the Court and lay jurors;

  o From the perspective of a former U.K. law enforcement official, evaluating and assessing the quality, completeness, and accuracy of NatWest's reports to regulators and law enforcement;

  o To the extent NatWest contends that its conduct generally or specifically complied with a given set of practices (whether minimal or aspirational) with regards to reporting terrorist financing suspicions to U.K. law enforcement, evaluating the accuracy of such statements and (where Mr. Walters disagrees with such representations) ascertaining the degree and extent of any deviations;

  o Evaluating whether, objectively (and thus without regard to NatWest's or any NatWest employee's subjective state of mind), NatWest's conduct in

connection with Interpal reflects a deviation from expected banking practice from the perspective of U.K. law enforcement, and, if so, whether such deviation is immaterial, subject to reasonable dispute and interpretation, or is instead, material, gross, and not subject to reasonable dispute; and

o   Offering opinions the jury and Court can consider together with other evidence in assessing whether NatWest consciously disregarded substantial unjustifiable risks with respect to Interpal and its counter-parties, and whether such risks were of a nature and degree that, considering the nature and purpose of NatWest's conduct and the circumstances known to it, involved a gross deviation from the standards of conduct that a law-abiding person or entity would have observed in NatWest's situation, and which U.K. law enforcement would have expected from a bank.

16.    If you contend that the findings (or any portion thereof) contained in OFAC's statement designating Interpal as a Specially Designated Global Terrorist were correct or accurate, identify with specificity the bases for your contentions, including without limitation an itemization of each and every fact and legal ground, including without limitation each and every document, witness, deposition testimony citation and any other evidence, that you rely upon for your contentions.

**ANSWER:**

In addition to the foregoing Reservation of Rights and General Objections, Plaintiffs also

object to Interrogatory No. 16 because it constitutes an overbroad, vague, and ambiguous

demand for a comprehensive recitation of facts and information that have already been shared

with Defendant during the course of discovery.   Among other things this Interrogatory is

impermissibly vague, overbroad, and burdensome because the U.S. Treasury Department's

August 22, 2003 statement designating Interpal also included extended discussion of HAMAS,

HAMAS leaders, and other charitable organizations forming part of HAMAS' fundraising

network.   Read literally this Interrogatory would thus require Plaintiffs to virtually regurgitate

and restate Dr. Levitt's, Mr. Spitzen's, and Mr. Geisser's reports and deposition testimony.

Subject to and without waiving the foregoing Reservation of Rights and the Objections,

Plaintiffs state that the findings contained in OFAC's statement designating Interpal as a

Specially Designated Global Terrorist were correct and accurate. The testimony, reports, and exhibits of Plaintiffs' experts, particularly those of Dr. Matthew Levitt and Arieh Spitzen, comprehensively address the subject of this Interrogatory. Furthermore, as evidenced in the expert reports of Wayne Geisser and attached exhibits, the record makes clear that the massive quantities of funds Interpal sent to the Palestinian Territories (facilitated by NatWest) to notorious HAMAS-controlled and affiliated entities and organizations confirms OFAC's representation that Interpal was a primary fundraiser for HAMAS. Evidence supporting Plaintiffs' contention can be found in evidence produced by Plaintiffs during discovery conducted in this matter to date, including but not limited to the testimony and evidence cited below:

- Expert Report of Dr. Matthew Levitt at 26-32; 35-44; 50-51; 53-55; 58-60; 61-65; 65-68; 68-72; 72-75; 75-78; 78-81; 81-83; 84-87; 87-90; 90-91, and all documents cited therein; and

- Expert Report of Arieh Spitzen at 24-30; 30-38; 39-51; 52-64; 65-73; 74-77; 78-90; 91-101; 102-109; 110-118; 119-126; 127-134; 135-142; 143-149; 150-154, and all documents cited therein.

17.    If you contend that United Kingdom law enforcement agencies and regulators, including without limitation NCIS, SOCA, the Charity Commission, Special Branch, the Bank of England, and HM Treasury ("UK Law Enforcement and Regulators") did not have in their possession or could not have requested from Interpal information concerning Interpal and its conduct that NatWest had in its possession, identify all such information, including without limitation an itemization of each and every fact and legal ground, including without limitation each and every document, witness, deposition testimony citation and any other evidence that you rely upon for your contentions.

**ANSWER:**

In addition to the General Objections, Plaintiffs object to this Interrogatory on the grounds that it is not a proper Interrogatory because neither private party, much less the U.K. government itself, can know precisely what information an entire government possesses, and the

146027 v5                                35

knowledge of U.K. law enforcement agencies and regulators, or U.K. law as a whole, is irrelevant to this lawsuit, which is focused on NatWest's knowledge (or conscious or reckless avoidance of knowledge) and the information NatWest possessed or had access to concerning Interpal. Moreover, pursuant to General Objection No. 3, Plaintiffs object to Interrogatory No. 17 to the extent that this Interrogatory requests "an itemization of each and every fact and legal ground, including without limitation each and every document, witness, deposition testimony citation and any other evidence" for Plaintiffs' contention as to what information NatWest and the U.K. government possessed, because it is overly broad and unduly burdensome. NatWest produced over 35,000 documents in discovery, and the knowledge as to Interpal that NatWest gained (or consciously or recklessly avoided gaining) from those documents constituted the overwhelming majority of the depositions of fact witnesses in this case. As such, this Interrogatory inevitably calls for a regurgitation of "all factual information obtained in discovery." Subject to and without waiver of these objections, Plaintiffs respond as follows:

Based on the over 35,000 documents produced by NatWest in discovery, and the deposition testimony of current and former employees, NatWest failed to disclose to U.K. law enforcement and regulators a multitude of pertinent information that was in NatWest's possession (or which NatWest had access to) concerning Interpal and its conduct, and which included banking records Interpal could not have provided the U.K. government even if requested such as those evidenced by the expert reports of Wayne Geisser and attached exhibits.

Evidence to support this contention can be found in the documents and testimony attached as Exhibit E.

18. If you contend that NatWest had access to more information regarding Interpal and its conduct than did UK Law Enforcement and Regulators, identify with specificity the bases for your contentions, including without limitation, an itemization of each and every fact and legal

ground, including without limitation each and every document, witness, deposition testimony citation and any other evidence, that you rely upon for your contentions.

**ANSWER:**

Plaintiffs object to this Interrogatory on grounds that it is not a proper Interrogatory because neither party can know precisely to what information a government had access, and the knowledge of U.K. law enforcement agencies and regulators, or U.K. law as a whole, is irrelevant to this lawsuit, which is focused on NatWest's knowledge and the information it possessed concerning Interpal; whether NatWest had access to the same, equal, or reduced information as compared to U.K. Law Enforcement and Regulators is not relevant to a determination of whether NatWest provided material support to HAMAS with the requisite mental state. Moreover, pursuant to General Objection No. 3, Plaintiffs object to Interrogatory No. 18 to the extent that this Interrogatory requests "an itemization of each and every fact and legal ground, including without limitation each and every document, witness, deposition testimony citation and any other evidence" for Plaintiffs' contention as to what information NatWest and the U.K. government possessed, because it is overly broad and unduly burdensome. NatWest produced over 35,000 documents in discovery, and the knowledge as to Interpal that NatWest gained (or consciously or recklessly avoided gaining) from access to those documents constituted the overwhelming majority of the depositions of fact witnesses in this case. As such, this Interrogatory inevitably calls for a regurgitation of "all factual information obtained in discovery." Subject to and without waiver of these objections, Plaintiffs respond as follows:

See Plaintiffs' Response to Interrogatory No. 17. Evidence to support this contention can be found in the documents and testimony attached as Exhibit E.

19.    If you contend that any of the information contained in the Charity Commission's May 30, 1996 or September 24, 2003 reports concerning Interpal was incorrect in any respect, identify that information with specificity and identify with specificity in what respect you contend that information is incorrect, including without limitation, an itemization of each and every fact and legal ground, including without limitation each and every document, witness, deposition testimony citation and any other evidence, that you rely upon for your contentions.

**ANSWER:**

Pursuant to General Objection No. 3, Plaintiffs object to Interrogatory No. 19 to the extent that this Interrogatory requests "an itemization of each and every fact and legal ground, including without limitation each and every document, witness, deposition testimony citation and any other evidence" for Plaintiffs' contention as to information concerning Interpal, because it is overly broad and unduly burdensome.  As such, this Interrogatory inevitably calls for a regurgitation of "each and every document, witness, deposition testimony citation and any other evidence."  Moreover, Plaintiffs' response to this Interrogatory should not be read in part or whole as an admission as to the authority of the Charity Commission, nature and scope of its investigations of Interpal, or relevance as to its conclusions.  Plaintiffs also object that the Interrogatory is vague and ambiguous because "information contained in" the reports does not clarify whether the Interrogatory refers to discrete facts set forth in the reports, operating assumptions of the investigator(s), conclusions and recommendations documented in the reports, or anything else.  Subject to and without waiver of these objections, Plaintiffs respond as follows:

The Charity Commission's 1996 report, by its express language, made a false distinction between funds being paid to HAMAS under the guise of charity and funds given to HAMAS for its other activities.  Consequently, the entire premise of the Commission's investigation was incorrect, artificially limited in scope, and reflected a failure to gather and analyze necessary information concerning Interpal's HAMAS connections in any guise, whether or not under the

purported aegis of transmitting funds supposedly limited to HAMAS' "charitable/social welfare" activities, as opposed to other activities.  Furthermore, the 1996 Charity Commission report stated that due to "circumstances in the area of benefit" the Commission was precluded from making its own check in the geographic area (the Palestinian Territories) where Interpal's funds were distributed, and instead focused on Interpal's controls and records, and test checks of individual payments.  Thus, the Charity Commission's heavy reliance on Interpal's internal records with no confirmation or independent analysis of the beneficiaries renders its analysis and conclusions unreliable.  Moreover, the Charity Commission's 1996 Report explicitly stated that "allegations that Interpal's funds were going to supporters of HAMAS and the families of suicide bombers was not of direct concern so long as the funds were being applied within the objects of the charity," further noting that the Commission expected a large number of beneficiaries might be HAMAS supporters.  As such the entire focus of the Charity Commission's 1996 report rested on a fundamentally flawed premise as far as ascertaining Interpal's risk profile for terror finance was concerned.

Similarly, the Charity Commission's limited 2003 report focused on funds being paid to HAMAS for its political or violent military activities. Thus, again, as far as ascertaining Interpal's (and its counterparties') terror financing risk profile, the 2003 Report is fundamentally flawed, erroneous, and resting upon the false premise that so long as funds transfers to "political" or "violent military activities" were not overtly discernible, processing of such funds by Interpal did not pose risks warranting maintaining an account freeze, or other actions by the Commission.

The narrow nature of the 1996 and 2003 Charity Commission reports stands in marked contrast to the Charity Commission's 2009 report concerning Interpal, which is far lengthier and in-depth by comparison to the two-page 2003 report, and which, in addition to acknowledging

the limited scope of the Commission's prior investigations, analyzed whether Interpal's counterparties promoted HAMAS's ideology and violent activities, Interpal's membership in the Union of Good, whether Interpal trustee Essam Mustafa had links to HAMAS or the Union of Good, and Interpal's oversight of its beneficiaries. The failure of the prior Charity Commission's reports to analyze these issues, despite their obvious significance to assessing Interpal for terrorism-related risks, renders them fundamentally flawed, unreliable, and erroneous. In support of Plaintiffs' contention, *see* Plaintiffs' responses to Interrogatory Nos. 11 and 16 above, and the evidence cited therein.

20. If you contend that NatWest was obligated to take any actions or refrain from taking any actions in order to avoid liability, under 18 U.S.C. § 2339B(a)(1) and/or 18 U.S.C. § 2339C, identify with specificity those actions and the legal standard you are applying to support your contentions, including without limitation an itemization of each and every fact and legal ground, including without limitation each and every document, witness, deposition testimony citation and any other evidence, that you rely upon for your contentions.

**ANSWER:**

Pursuant to General Objection No. 3, Plaintiffs object to Interrogatory No. 20 to the extent that this Interrogatory requests "an itemization of each and every fact and legal ground, including without limitation each and every document, witness, deposition testimony citation and any other evidence" for Plaintiffs' contention that NatWest "was obligated to take any actions or refrain from taking any actions in order to avoid liability, under 18 U.S.C. § 2339B(a)(1) and/or 18 U.S.C. § 2339C" because it is overly broad and unduly burdensome. The issue of NatWest's conduct, or lack thereof, and its scienter in engaging in such conduct, was a principal subject of the overwhelming majority of the depositions of fact witnesses in this case. As such, this Interrogatory inevitably calls for a regurgitation of "all factual information obtained in discovery."

146027.v5                                          40

Read literally, this Interrogatory would require Plaintiffs to identify all foundation evidence, primary and secondary evidence, credibility disputes, documentary evidence, percipient fact witness and expert testimony in order to provide a comprehensive narrative and advocacy argument explaining why Defendant's conduct violated the applicable sections of the ATA. As such, this Interrogatory does not narrow the issues for trial or summary judgment, and the information requested can be obtained through less burdensome means (including, without limitation, summary judgment briefing, a final pretrial order, motion in limine practice, and exhibit lists prepared for trial. *See* Fed.R.Civ.P. 26(b)(2)(C)(i)-(iii)).

Subject to and without waiving the foregoing Reservation of Rights and the General Objections, Plaintiffs state that Defendant was obligated not to provide material support and financial services to an FTO, pursuant to 18 U.S.C. § 2339B(a)(1) and 18 U.S.C. § 2339C. In support of Plaintiffs' contention, see Plaintiffs' response to Interrogatory No. 1 above. Evidence to support this contention can be found in the documents and testimony attached as Exhibit A.

21.    If you contend that the Cryptome Report, attached as Exhibit A to the stipulation dated August 25, 2010, is a true and accurate copy of an authentic document authored by the South African National Intelligence Agency, identify with specificity the bases for your contentions, including without limitation, an itemization of each and every fact and legal ground, including without limitation each and every document, witness, deposition testimony citation and any other evidence, that you rely upon for your contentions.

**ANSWER:**

Plaintiffs object to this Interrogatory on grounds that it is not a proper Interrogatory because questions as to the authenticity of documents are improper and irrelevant in this instance as to NatWest's knowledge concerning the existence of the Cryptome SANIA Report and the verifiable accuracy of the information documented in the Cryptome SANIA Report based on

information in NatWest's possession or to which NatWest had access.   As such, this Interrogatory will not narrow the issues for trial or dispositive motion practice.

Subject to and without waiving the foregoing Reservation of Rights and the Objections, Plaintiffs state that the parties stipulated to the authenticity of the Cryptome SANIA Report, which expressly represents that the document published by Cryptome is a South African National Intelligence Agency document prepared for the South African President, as acknowledged by Michael Hoseason. *See* July 14 and 15, 2010 deposition transcripts of Michael Hoseason at pp. 213 and 289.   No evidence in the record indicates that NatWest did not consider the Cryptome SANIA Report a genuine document.

Plaintiffs further state that they do contend that a trier of fact can reasonably conclude that the Cryptome SANIA Report is what it purports to be in satisfaction of Fed. R. Evid. 901. The Report was published by Cryptome.org, an organization specifically dedicated to publishing documents concerning national security and intelligence gathering.   Cryptome.org provided extensive details concerning the document, including identifying footnotes, recipients, and page breaks.   The summary of the report describes in detail the process used to generate the report, observing that the briefing document was prepared for the South African President, Thabo Mbeki, during 1998 in response to a Muslim uprising in South Africa's Western Cape Province, and further stating that the report was drawn up on the relayed order of then-current South African Minister of Intelligence, Joe Nhlanhla, by the section of the South African National Intelligence Agency reporting directly to the Office of the President.   Cryptome.org also documented the source material for the report, stating that it drew upon information provided by the declared CIA head of station in Pretoria under a bilateral agreement with the SANIA and the

Israeli intelligence representative at a time that Israel's Mossad (Central Institute for Intelligence and Special Duties) was completing a reorganization.

Further, information contained in the Cryptome SANIA Report concerning Interpal's recipients is consistent with information reflected in NatWest's internal records, and which NatWest could have confirmed in 2001, including transfers coming from ███████ to Interpal (examples of transfers from ████████████ include a ███ ransfer of ██████ from ██████████ (NW012764) and an ████████████ transfer of ██████ from ██████████ (NW008973)), information concerning Interpal's senior leadership and trustees, and connections to known terrorist financiers such as the ████ ████████████████and ████████████████████ ████████████████████████████ ████████████████████████████ ████████████████████

22.     If you contend that at any time after August 22, 2003, the United Kingdom government had less information about Interpal and any purported affiliation Interpal had with HAMAS than did the United States government, identify with specificity every item of information you contend the UK government did not have that you contend the U.S. government did have, whether the U.S. government shared that information with the UK government, and your basis for believing that this information is accurate, including without limitation an itemization of each and every fact and legal ground, including without limitation each and every document, witness, deposition testimony citation and any other evidence, that you rely upon for your contentions.

**ANSWER:**

Plaintiffs object to this Interrogatory on grounds that it is not a proper Interrogatory because neither private party, much less the governments themselves, can know with precision what information an entire government possesses. Plaintiffs further object that the knowledge of the United Kingdom government (individually or in comparison to the United States) is

irrelevant to this lawsuit, which is focused on NatWest's knowledge (or conscious or reckless avoidance thereof) and the information NatWest possessed concerning Interpal, and as such this Interrogatory will not narrow the issues for trial or dispositive motion practice. Moreover, pursuant to General Objection No. 3, Plaintiffs object to Interrogatory No. 22 to the extent that this Interrogatory requests "an itemization of each and every fact and legal ground, including without limitation each and every document, witness, deposition testimony citation and any other evidence" for Plaintiffs' contention as to what information the U.K. and U.S. governments possessed, because it is overly broad and unduly burdensome.

Subject to and without waiving the foregoing Reservation of Rights and the General Objections, Plaintiffs do not contend that the United States government had more or less information than the United Kingdom government.

23.   If you contend that political or public relations considerations played any role in NatWest's decision not to close Interpal's accounts prior to March 16, 2007, including considerations pertaining to NatWest's experience with the accounts that ███████████ maintained with NatWest, identify with specificity the bases for your contentions, including without limitation, an itemization of each and every fact and legal ground, including without limitation, each and every document, witness, deposition testimony citation and any other evidence, that you rely upon for your contentions.

**ANSWER:**

In addition to the foregoing Reservation of Rights and General Objections, including General Objection No. 3, Plaintiffs also object to Interrogatory No. 23 because it fails to define the scope and meaning of "political or public relations considerations," including whether the Interrogatory is focused on considerations internally within NatWest, externally with Interpal, the U.K. government, and/or certain segments of the British population, or considerations

beyond those geographical and group parameters, and such failure renders the Interrogatory vague and ambiguous.

Subject to and without waiving the foregoing Reservation of Rights and the Objections, Plaintiffs state that they do contend that political and public relations considerations played a role in NatWest's decision not to close Interpal's accounts. Internally, NatWest demonstrated the impact of political views in its assessment of terrorist financing suspicions pertaining to Interpal at least as early as 1996, when it characterized and diminished allegations against Interpal as coming from "Jewish sources," and this continued through the time of Interpal's U.S. designation as a SDGT, when NatWest expressly discussed the fact that politics was involved in its decision to maintain Interpal's accounts in spite of the designation.

NatWest's dismissive attitude toward U.S. and Israeli designations and terrorism concerns continued into 2004, and on numerous occasions throughout the relevant time period Belinda Lane and other employees emphasized the value of having Interpal as a customer, and their desire to maintain Interpal's accounts and to appease Interpal. From a public relations perspective, NatWest considered the impact of closing Interpal's accounts, as demonstrated by its reaction to inquiries it received from individuals regarding Interpal's U.S. designation.

Moreover, after NatWest decided to close the accounts of another customer, ███████ ███████ based on more limited suspicions of terrorist financing, NatWest succumbed to public and political pressure in reversing its decision and reopening ███████████ accounts. During the time period in which those accounts were closed and reopened, NatWest compliance employees referenced the "correct" decision to maintain Interpal as a customer and to minimize its U.S. designation, and the decision to avoid succumbing to the "political" designation of Interpal made by the U.S.

Evidence to support this contention can be found in the documents and testimony attached as Exhibit F.

24.     If you contend that Interpal was not sanctioned by the Bank of England, or identified as a supplier or facilitator of terrorism by UK Law Enforcement and Regulators, for any reason other than their conclusion that the evidence in their possession was insufficient to warrant that action, identify with specificity the bases for your contentions, including without limitation, an itemization of each and every fact and legal ground, including without limitation each and every document, witness, deposition testimony citation and any other evidence, that you rely upon for your contentions.

     **ANSWER:**

     Plaintiffs object to this Interrogatory on grounds that it is not a proper Interrogatory because the knowledge and decisions made by the Bank of England and U.K. law enforcement agencies and regulators with regard to Interpal is irrelevant to this lawsuit, which is focused on NatWest's knowledge (or conscious or reckless avoidance of knowledge), the information NatWest possessed (or had access to) concerning Interpal, and the material support NatWest provided to the FTO HAMAS. Moreover, pursuant to General Objection No. 3, Plaintiffs object to Interrogatory No. 24 to the extent that this Interrogatory requests "an itemization of each and every fact and legal ground, including without limitation each and every document, witness, deposition testimony citation and any other evidence" for Plaintiffs' contention, because it is overly broad and unduly burdensome.

     Subject to and without waiver of these objections, see Plaintiffs' response to Interrogatory No. 22.

Dated:  July 5, 2011          By: /s/ Joel Israel
                                  Mark S. Werbner
                                  Joel Israel
                                  SAYLES WERBNER PC
                                  4400 Renaissance Tower

1201 Elm Street
Dallas, TX  75270
Telephone:  214.939.8700

Richard D. Heideman
Noel J. Nudelman
Tracy Reichman Kalik
HEIDEMAN NUDELMAN & KALIK, P.C.
1146 19TH Street, NW, 5th Floor
Washington, DC  20036
Telephone:  202.463.1818

James P. Bonner
SHALOV STONE BONNER & ROCCO LLP
485 Seventh Avenue
Suite 1000
New York, NY 10018
Telephone: 212.239.4340

Counsel for *Applebaum* Plaintiffs

ZUCKERMAN SPAEDER LLP
Aitan D. Goelman
Semra A. Mesulam
1800 M Street, Suite 1000
Washington, D.C. 20036

OSEN LLC
Gary M. Osen
Aaron Schlanger
Ari Ungar
Joshua D. Glatter
700 Kinderkamack Road
Oradell, New Jersey 07649
(201) 265-6400

KOHN, SWIFT & GRAF, P.C.
Steven M. Steingard
Stephen H. Schwartz
Neil L. Glazer
One South Broad Street, Suite 2100
Philadelphia, PA 19107
(215) 238-1700

Counsel for *Weiss* Plaintiffs

## CERTIFICATE OF SERVICE

I, Joel Israel, hereby certify that a true and correct copy of Plaintiffs' Answers and Objections to National Westminster Bank, PLC's Contention Interrogatories was served via electronic mail on this 5th day of July 2011, on the following:

Lawrence B. Friedman, Esq.
CLEARY GOTTLIEB STEEN & HAMILTON, LLP
One Liberty Plaza
New York, NY 10006

/s/ Joel Israel_____
Joel Israel

146027.v5

48

**EXHIBIT 117 TO DECLARATION OF VALERIE SCHUSTER**

<u>Expert Report of Yaron Lipshes</u>

I submit this report in the lawsuits captioned <u>Weiss, et al. v. National</u>

<u>Westminster Bank Plc</u> (Case No. 05-cv-4622 (DGT)(MDG)) and <u>Applebaum, et al. v.</u>

<u>National Westminster Bank Plc</u> (Case No. 07-cv-916 (DGT)(MDG)), which I understand are

pending in the United States District Court for the Eastern District of New York.  A copy of

my *curriculum vitae* is attached to this report as <u>Exhibit A</u>.  I have not published during the

last 10 years.  I have not previously testified as an expert at trial or by deposition, other than

my deposition on September 23 and 24, 2010 in <u>Strauss, et al. v. Crédit Lyonnais</u> and <u>Wolf, et</u>

<u>al. v. Crédit Lyonnais</u>.  My employer, the law firm of Caspi & Co., is being compensated for

my study and testimony in these cases at the rate of $350 per hour.

The materials upon which I have relied in preparing this report are identified below.

### 1. **Factual Assumptions:**

In preparing the analysis I present in this report, I assume the following facts to

be true.

(a) National Westminster Bank Plc ("NatWest") is a bank incorporated in the

United Kingdom.  From September 1994 through the date of the last attack listed in

<u>Exhibit B</u>, NatWest maintained no branches, subsidiaries or other places of business in Israel.

(b) From September 1994 through the date of the last attack listed in <u>Exhibit B</u>,

Interpal maintained bank accounts at a NatWest branch in the United Kingdom.  Between

April 1996 and the date of the last attack listed in <u>Exhibit B</u>, NatWest executed from the

United Kingdom certain funds transfers from Interpal's accounts in the United Kingdom,

pursuant to instructions NatWest received from Interpal.  NatWest executed these transfers

either directly to the transferees' bank accounts that were identified by Interpal in its transfer

instructions, or via correspondent banks.  Many, if not all, of the correspondent banks through

which these transfers were made, and many, if not all, of the bank branches to which these transfers were made, are not located within Israel.

(c) Interpal was declared by Israel's Ministry of Defence to be an "unlawful association" in a declaration that was published in Israel's official gazette, the *Rashumot*, and therefore became legally effective in Israel, on May 11, 1997. Interpal was declared by the government of Israel to be a "terrorist organization" in a declaration that was published in Israel's official gazette, the *Rashumot*, and therefore became legally effective in Israel, on February 19, 1998.

(e) Plaintiffs' claims are based on injuries they allege arise from the attacks at the locations listed in Exhibit B. Plaintiffs allege these attacks occurred by reason of NatWest's conduct in hosting Interpal's bank accounts in the United Kingdom and in making the transfers from Interpal's accounts to certain transferees' accounts.

**2.  Relevant potential violations of Israeli law.**

Based upon plaintiffs' allegations and the factual assumptions listed above, NatWest's hosting of bank accounts for Interpal and the bank's transfers of funds pursuant to Interpal's instructions could expose NatWest to criminal liability under one or more of the Israeli laws I describe below, but only upon proof beyond a reasonable doubt sufficient to satisfy: (a) the requirements of these laws; (b) the requirements I describe in Section 3 below for establishing the criminal liability of a corporation under Israeli law; and (c) the requirements I describe in Section 4 below for supporting the extraterritorial application of these laws to persons or entities outside the State of Israel, and conduct outside the State of Israel.

a. Prevention of Terrorism Ordinance

The Prevention of Terrorism Ordinance defines as a "terrorist organization" a body of persons, the operations of which include acts of violence liable to cause human death or injury, or the threat of such acts.

From an administrative law perspective, the government is authorized to confiscate property of a "terrorist organization" and to close places that serve the activities of the organization.

From a criminal law perspective, the ordinance defines several offences that relate to a "terrorist organization." For example, activity in a "terrorist organization," membership in a "terrorist organization," and under certain circumstances support for a "terrorist organization," are all crimes under this ordinance.

Article 4 of the Prevention of Terrorism Ordinance establishes a list of offences that pertain to the support of a "terrorist organization." Article 4(f) states that where a person, including a corporation, places an article at the disposal of another with the objective that this article serves a "terrorist organization," or a member of a "terrorist organization" while that member is executing an operation on behalf of the organization, that person commits the criminal offence of supporting a "terrorist organization."

Article 8 of the ordinance grants the government of Israel the power to declare an entity a "terrorist organization." Such a declaration becomes effective in Israel as of the date of the declaration's publication in the *Rashumot*. Such a declaration creates a rebuttable presumption that the organization is a "terrorist organization" in any legal proceeding.

There are two means by which the organization in question can be deemed to be a "terrorist organization" for the purpose of establishing a criminal offence under the Prevention of Terrorism Ordinance. The first is if there has been a formal declaration by the government of Israel that the organization is deemed a "terrorist organization" (Such a

declaration can be rebutted in any court proceeding in which it is offered to establish that an entity is a "terrorist organization."). The second is by proof beyond a reasonable doubt that the organization in question committed acts of violence liable to cause human death or injury, or the threat of such acts.

NatWest could be deemed to have directly violated Article 4 of the Prevention of Terrorism Ordinance only upon proof beyond a reasonable doubt that: (i) it hosted an account that was owned by a customer that is, or is associated in some way with, a "terrorist organization"; and (ii) it acted with the requisite intent, in particular (a) it was aware that its customer is, or is associated with, a "terrorist organization," that is, a body of persons the operations of which are acts of violence that are liable to cause the death or injury of persons, or the threat of such acts of violence, and (b) it intended to serve (1) the "terrorist organization," or (2) a member of the "terrorist organization" in conducting an act on behalf of the organization. According to my view this knowledge requirement cannot be satisfied if the bank merely suspected that its customer is a "terrorist organization" and then knowingly refrained from clarifying those suspicions.[1] I say this because Article 4 of the Prohibition of Money Laundering Law, more fully discussed below, which refers to banks, requires proof beyond a reasonable doubt that performance of a transaction with the type of property to which this law applies constitutes an offence only if the accused actually knew that the property is prohibited. This requirement stems from the fact that banks routinely work with customers' property, and the legislators' concern that incriminating the activities of banks based solely on suspicion would adversely impact the banking system and impede the proper functioning of the economy.[2]

---

[1] Article 20(c)(1) of the Israeli Penal Code establishes the "turning a blind eye" presumption, according to which a person who suspects that certain circumstances or behavioral elements exist, and then knowingly refrains from clarifying that suspicions, is perceived as actually knowing of those circumstances or behavioral elements.

[2] See, in this regard, the words of Adv. Freddy Weider, CEO of the Association of Banks in Israel, in a discussion that was held at a meeting of the Constitution, Law, and Justice Committee of the Fifteenth Knesset in

NatWest also could be deemed to have aided and abetted its customer's violation of Article 4 of the Prevention of Terrorism Ordinance only upon proof beyond a reasonable doubt that: (i) at the request of its customer, the bank transferred funds from the customer's account to an entity that is, or is associated in some way with, a "terrorist organization"; (ii) the bank acted with the requisite intent, in particular (a) the bank was aware that the customer was involved in the commission of an offence under Article 4 of the Prevention of Terrorism Ordinance, as described, (b) the bank was aware that its actions had the ability to aid its customer in the commission of an offence under Article 4 of the Prevention of Terrorism Ordinance, and (c) the bank intended to assist its customer to complete that offence. The intention to assist element can be satisfied by proof that the bank was aware that its actions were virtually certain to facilitate the offense.[3]

---

2000, which was dedicated to completing the deliberations of the proposed Prohibition of Money Laundering Law prior to is second and third parliamentary readings:

> "Article 4 – I cannot add much to what has been said. This is a very serious article. Offence against this article is seven years imprisonment. The property under discussion is property in all its incarnations and transactions made with the property. I speak for the banks, but, in my opinion, this does not only pertain to the banks, but to the public at large.
>
> The upshot of the article is that a person who handles property must always investigate every transaction that he makes and be suspicious, and banks have tens of thousands of employees that deal with property every day, and they would need, for every bit of property that they handle, to take the measures of investigators and of the suspicious and concerned, because otherwise they will not be able to make any transactions.
>
> One of the proposed solutions its substantive knowledge that the property at hand is of a prohibited type. This must be adopted, because otherwise it will disrupt the economy's business-economic work and will turn us into a society where everyone is always suspicious of everyone else, and I am not sure that that is the kind of society that we wish to be.
>
> Therefore, in Article 4, we are emphatically in favor of substantive knowledge. I do not think that there is a need to protect someone who has substantive knowledge and still deals with this kind of property. He is not entitled to protection. But to say that in order for him to be entitled to protection he would need to take thousands of measures to verify that the property is not the third cousin of some property that someone once laundered, is an unreasonable solution."

Protocol of Meeting of Constitution Law and Justice Committee. Aug. 10, 2000.

The position of Adv. Weider was accepted by the committee and by the lawmakers, and in order to prevent the significant disruption of the banking system and the functioning of the business economy, it was clarified in Article 4 of the Prohibition of Money Laundering Law that only one who has substantive knowledge that the property that he worked with is prohibited property, that originated in an offence, commits the offence of transacting with prohibited property.

[3] See CA 320/99 Roe v. The State of Israel, IsrSC 55(3)22.

b. <u>Defence (Emergency) Regulations</u>

The Defence (Emergency) Regulations were promulgated in 1945. Upon the establishment of the State of Israel in 1948, the Emergency Regulations were incorporated into Israeli domestic law, pursuant to Section 11 of the Government and Law Arrangements Ordinance of 1948. The section of the Emergency Regulations restricting immigration was cancelled at that time, but the rest remained in effect, subject to annulment or being superseded by actions of the cabinet or by legislation. Today, and in light of Israel's adoption more than 15 years ago of the quasi-constitutional Basic Law: Human Dignity and Liberty – a statute which solidly anchors the basic rights of the individual – the application, interpretation and use of the Emergency Regulations is to be determined in light of the identity of the State of Israel as a Jewish and democratic state and of the modern liberal-Israeli judicial context. *HCJ 6893/05 Parliament Member Levy v. State of Israel, P.D 59 (2), 876.*

Part VII of the Emergency Regulations addresses "unlawful associations." Under Article 84(2) of the Emergency Regulations, the declaration by the Ministry of Defence of a body of persons to be an "unlawful association" in turn means that, among other things, no one may perform any operation with the property or deposit of an "unlawful association," unless it first obtains permission to do so from the Minister of Finance. Further, Article 85(1)(f) of the Emergency Regulations provides that a person or entity in possession of an account it knows belongs to an "unlawful association" can be liable for a criminal offence. An entity can be deemed to be an "unlawful association" for the purpose of establishing a criminal offence under the Emergency Regulations as the result of either: (a) a formal declaration by the Ministry of Defence, a declaration that becomes effective in Israel as of the date of its publication in the *Rashumot*; or (b) proof beyond a reasonable doubt that the association in question, by its constitution or propaganda or otherwise advocates, incites or encourages any of the following unlawful acts, that is to say --

-7-

(i) the overthrow by force or violence of the constitution of Israel or the Government of Israel;

(ii) the bringing into hatred or contempt of, or the exciting of disaffection against, the Government of Israel or any of its ministers in his official capacity;

(iii) the destruction of or injury to property of the Government of Israel; or

(iv) acts of terrorism directed against the Government of Israel or against servants of the Government of Israel.

NatWest could be deemed to have directly violated Article 85(1)(f) of the Emergency Regulations only upon proof beyond a reasonable doubt that: (i) the bank hosted an account that was owned by, or is associated in some way with an "unlawful association," and (ii) the bank knew that it hosted that account and it knew that the account's owner is, or is associated in some way with, an "unlawful association." As stated above with respect to the Prevention of Terrorism Ordinance, in my view this knowledge requirement cannot be satisfied if the bank merely suspected that the owner of the account is an "unlawful association," and then knowingly refrained from clarifying those suspicions. This conclusion is particularly appropriate for an offence under the Emergency Regulations, because as described above, the High Court of Justice has stated that the Emergency Regulations should be interpreted in the context of the basic principles of the Israeli legal system, and in accordance with the development of this system over the years.

NatWest also could be deemed to have aided and abetted its customer's violation of Article 85 of the Emergency Regulations only upon proof beyond a reasonable doubt that: (i) at the request of the bank's customer, the bank transferred funds from the customer's account to an entity that is, or is associated in some way with, an "unlawful association," (ii) the bank acted with the requisite intent, in particular (a) the bank was aware that the customer was involved in a commission of an offence under Article 85 of the of the

Emergency Regulations, as described, (b) the bank was aware that its actions had the ability to aid its customer in the commission of an offence under Article 85 of the Emergency Regulations, and (c) the bank intended to assist its customer to complete that offence. The intention to assist element can be satisfied by proof that the bank was aware that its actions were virtually certain to facilitate the offense.[4]

c. <u>Prohibition of Money Laundering Law</u>

Under Article 3(a) of the Prohibition of Money Laundering Law, anyone who gives, receives, holds or executes a bank transaction with monies or entitlements that originated, directly or indirectly, in an underlying offence, or that served in executing an underlying offence or that enabled the execution of an underlying offence ("Prohibited Property"), with the objective of disguising or hiding their origins, the identity of their rightful holders, their location, or the actual transaction with them, commits an offence of prohibition of money laundering. For this purpose, an underlying offence includes an offence under the Emergency Regulations and the Prevention of Terrorism Ordinance (an "Underlying Offence").

Article 4 of the Prohibition of Money Laundering Law, entitled "Prohibition of Performing a Prohibited Transaction with Property," states that anyone who gives, receives, holds, or executes a bank transaction with prohibited property in excess of NIS 400,000, at current exchange rates, approximately USD 107,000, whether in a single transaction or the aggregation of multiple transactions within a period of three months, with knowledge that the property is prohibited, commits the offence of transacting with prohibited property, and is subject to up to seven years imprisonment. "Knowledge" for this purpose means actual knowledge. Article 4 of the Prohibition of Money Laundering Law states that knowledge

---

[4] See footnote 3, above.

-9-

does not include turning a blind eye, which in this context means knowingly refraining from clarifying suspicions of money laundering.

NatWest could be deemed to have violated Article 3(a) of the Prohibition of Money Laundering Law only upon proof beyond a reasonable doubt that: (i) the bank engaged in a sale, transfer, gift, receipt, possession, exchange, bank transaction, investment, bond or brokerage transaction, or the granting of credit on the property with its customer and that it performed this transaction on a Prohibited Property; and (ii) the bank knew the transaction involved Prohibited Property;[5] and the bank's objective was to conceal or mask the origin of the property, the identity of its rightful holders, its location, its movements, or the very fact of doing a transaction with it.

Similarly, NatWest could be deemed to have violated Article 4 of the Prohibition of Money Laundering Law only upon proof beyond a reasonable doubt that: (i) the bank engaged in a sale, transfer, gift, receipt, possession, exchange, bank transaction, investment, bond or brokerage transaction, or the granting of credit on the property with its customer and that it performed this transaction on a Prohibited Property, provided that the cumulative amount of money at stake exceeded 400,000 NIS, whether in a single transaction or in the aggregate over three months; and (ii) the bank actually knew the transaction involved Prohibited Property.

Article 6 of the Prohibition of Money Laundering Law, entitled "Limitation of Criminal Liability," establishes that a person shall not bear criminal liability in accordance with Article 4 of that law if he reports to the police, prior to or immediately after executing the transaction, or submitted a report regarding the transaction to the Money Laundering

---

[5] Regarding awareness of the fact that the property originated in an offence, Article 5 of the Prohibition of Money Laundering Law establishes that it is sufficient that the perpetrator of the offence knew that the property is Prohibited Property, even if he did not know which particular offence the property is connected with.

Prohibition Authority, in compliance with the regular rules of reporting established in the Prohibition of Money Laundering Law.[6]

>       d. Combating Criminal Organizations Law

The Combating Criminal Organizations Law, 5763-2003, was enacted in 2003 and, by its terms, became effective on June 9, 2003. In accordance with the principle of forbidding retroactive criminalization, statutorily expressed in Clause 3 of the Penal Code, entitled "No Retroactive Penalty," this law criminalizes only those offences carried out after the law became effective, meaning from June 9, 2003 onward.

Section 2(A)(2) of the Combating Criminal Organizations Law, entitled "Active in a Criminal Organization", provides that whoever directly or indirectly finances activities of a criminal organization or receives financing for the purpose of operating the organization, or directs the distribution of funds in a Criminal Organization, in a manner which promotes the criminal activity of the Criminal Organization, commits the offence of acting in a Criminal Organization.

"Criminal Organization" is defined as an incorporated or unincorporated association of people acting in an organized, systematic and continuous manner for the commission of offences which, under the laws of Israel, fall within the category of a felony or the offences specified in the First Schedule to the law, except offenses falling within the category of a felony specified in the Second Schedule to the law. For this purpose, it is irrelevant: (i) whether the members of the organization know the identity of the other members; (ii) whether the composition of the members of the organization is fixed or changing; (iii) whether the aforesaid

---

[6] Another piece of legislation that is now, after its enactment, relevant to the factual background described above is the Prohibition of Terrorism Financing Law 5765-2005 ("Prohibition on Terrorist Financial Law"), which establishes specific criminal offences that pertain to the financing of terror activities. However, because the Prohibition of Terrorist Financing Law was published and became valid only in 2005 and the last of the attacks on which Plaintiffs' claims are based occurred in 2004, I do not address the offences included in such law.

offences are committed or intended to be committed in Israel or abroad, provided however that they constitute offenses both under the laws of Israel and under the laws of the place in which they were committed, or that under Israeli law, the Israeli penal laws apply to them, even if they are not offences under the laws of that place; or (iv) whether the organization also commits lawful acts and whether it also acts for lawful purposes.

NatWest could be deemed to have aided and abetted its customer's violation of Article 2(A)(2) of the Combating Criminal Organizations Law only upon proof beyond a reasonable doubt that: (i) at the request of its client, the bank transferred funds from the customer's account to a "Criminal Organization," as defined in the Combating Criminal Organization Law; (ii) the bank acted with the requisite intent, in particular (a) the bank knew that the customer was involved in committing an offence under Section 2(A)(2) of the Combating Criminal Organization Law; (b) bank was aware that its actions had the ability to aid its customer in the commission of an offence under Article 2(A)(2) of the Combating Criminal Organization Law; and (iii) the bank intended to assist its customer to complete that offence. The intention to assist element can be satisfied by proof that the bank was aware that its actions were virtually certain to facilitate the offense.

### 3. Establishing the criminal liability of a corporation.

Article 23 of the Penal Law defines the circumstances under which criminal liability may be imposed on a corporation pursuant to the laws addressed above. According to Article 23(a)(2) of the Penal Law, where an offence requires the presence of *mens rea* – as is true of all four of the laws discussed above – criminal liability may be imposed on a corporation for that offence only if the person who allegedly committed criminal acts on behalf of the corporation is such that, in light of his functions, powers and responsibility in managing the corporation's affairs, the act that he committed and his *mens rea* can be seen as

the act and *mens rea* of the corporation itself. This is known as the "Organ Doctrine." Under the Organ Doctrine, a corporation will not bear criminal responsibility for an offence committed by any of its employees unless the perpetrator of the offence is a senior person within the corporation and in whom the corporation has placed such broad powers and responsibilities that acts committed by that person can be viewed as the acts of the corporation itself. In this regard, the Supreme Court has written: "It is customary to call the organ that operates in the name of the corporation the 'alter ego' of the corporation, its brain or its nerve center."[7] An additional requirement established by caselaw is that, to impose criminal liability on a corporation, the acts of the organ be such that they further the interests of the corporation and, conversely, do not harm them and are not intended to harm them.[8]

It is therefore insufficient for imposing criminal liability on a bank that minor employees or even mid-level employees of the bank perpetrated one or more of the offences described above. Rather, it would be necessary to show that sufficiently senior employees of the bank were involved in the activities and were aware of the relevant circumstances. Additionally, it should be assessed whether the actions of these persons were intended to further the interests of the bank. Where the actions harmed the interests of the bank or were directed against them, criminal liability for them cannot be attributed to the bank.

### 4. Extraterritorial application of the foregoing criminal laws to a "foreign offence."

To the extent that the transfers from Interpal's accounts at NatWest to Interpal's transferees did not pass through correspondent banks in Israel and were not made to transferees' accounts at bank branches located in Israel, any offence committed by NatWest under any of the four laws I address in Section 2 of this report would be a "foreign offence," to which Israeli Penal Law would apply only if the prosecutor proved beyond a reasonable

---

[7] CA 5734/91 *State of Israel v. Leumi and Co. Investment Bank,* IsrSC 49(2) 4, 21.

[8] Ibid. See also SCC (Jerusalem) 856/05 *State of Israel v. Norden Petroleum (1998) Ltd.* (published in Nevo).

doubt further elements in addition to those he would need to prove beyond a reasonable doubt to establish the underlying offences, as described below.

Not all offences under the Israeli Penal Law can be prosecuted in Israel. Specifically, certain "foreign offences" are outside the purview of Israeli law. Chapter 3 of the preliminary part of the Penal Law establishes the applicability of Israeli criminal law to offences with regard to the place where the offence was committed. Article 7 of the Penal Law states that if an offence was not committed in whole or in part in the territory of Israel, and does not concern a charge that the accused was involved in preparation for, or an attempt or conspiracy to commit an offence in Israel, the offence constitutes a "foreign offence." In contradistinction to the applicability of Israeli criminal law to "domestic offences," which is clear and immediate, the applicability to "foreign offences" is not trivial. In the absence of the territorial justification which justifies the prosecution of domestic offences, other rationales are required and other elements must be proven beyond a reasonable doubt to justify holding a person or entity responsible in Israel for offences committed, in their entirety, outside the territory of the State. These rationales and elements are specified in Articles 13 and 14 of the Penal Law.

Israeli law would treat as a "foreign offence" any offence committed by NatWest under the criminal laws I describe in Section 2 of this report based on NatWest's conduct in hosting accounts for Interpal and/or based on the bank's conduct in executing the funds transfers from Interpal's accounts, either as a primary violator of these laws or as an aider and abettor of Interpal's violations of those laws, to the extent that none of these acts was committed in whole or in part in the territory of Israel. NatWest could be prosecuted for such an offence only in conformity with the requirements of Articles 13 and 14 of the Penal Law.

Specifically, any such offence would have occurred, if at all, only (a) where NatWest hosted Interpal's accounts, to my understanding in the United Kingdom, (b) where the bank initiated the funds transfers, to my understanding also in the United Kingdom, and/or (c) where those funds were received by the transferees. Offences committed in the Palestinian Authority territories by a person or entity not an Israeli citizen are considered under Israeli law to be "foreign offences." During the Six-Day War in 1967, Israel captured, among other areas, East Jerusalem and the West Bank (the West Bank is sometimes referred to in Israel as Judea and Samaria) from Jordan and the Gaza Strip from Egypt. Israel evacuated its forces from certain parts of the West Bank in the wake of the Oslo Peace Accords of 1993 and unilaterally disengaged from the Gaza Strip in 2005. The West Bank (excepting certain neighborhoods in East Jerusalem, which were annexed to the State of Israel) and Gaza Strip are not considered territorially part of the State of Israel when considering the application of Israeli law.[9]

The laws that apply (or applied) in these areas divide into two juridical systems: general-territorial and individual-personal. The general-territorial system comprises local law – that is, the law that applied before the Israeli conquest in 1967 (e.g., Jordanian, Egyptian), and various orders issued by Israeli Defence Forces Military Governors when Israel was present in the relevant areas – and laws that the Palestinian Authority promulgated in the areas under its control after implementation of the Oslo Peace Accords of 1993.[10] Israeli domestic law is not (nor was) part of this system of laws.[11]

In addition, there exists (or existed) also an individual-personal system of rules. These rules comprise Israeli domestic law and apply only to Israeli citizens who live

---

[9] See Amnon Rubenstein & Barak Medina, Constitutional Law of the State of Israel – Basic Principles, at 972-28. See also HCJ 61/80 Haetzni v. State of Israel, , P.D 34 (3), 595, HCJ 26/2/94 Shaar v. Commander of IDF Forces in the areas of Judea and Samaria, , P.D 48(3), 675.

[10] See Proclamation in the Matter of Governance and Law Management (West Bank area) (No. 2), 1967; HCJ 5666/03, Worker's Lire v. National Labor Court in Jerusalem (published in Nevo).

[11] See HCJ 2612/94, Shaar v. Commander of IDC Forces in Judea and Samaria, P.D. 48(3), 675.

(or lived) in the Palestinian Authority territories.[12]  Under this system, domestic Israeli law

applies on a personal basis only and supplements the general-territorial system.[13]

        In light of the foregoing, an offence committed in the Palestinian Authority

territories by a person or entity not an Israeli citizen is considered under Israeli law to be a

"foreign offence."  As to any offence committed in the Gaza Strip after 2005, Israeli law

would not apply at all, other than to consider it a foreign offence, as Israel has no presence

there since then.

        I understand plaintiffs allege that NatWest's conduct was a substantial factor in

the sequence of causation leading to the 15 attacks that are the subject of these lawsuits as

shown in Exhibit B.  I have considered whether the fact that 10 of these attacks occurred

within Israel (the balance having occurred in the Palestinian Authority or in Gaza, see Exhibit

B) could support the conclusion that one or more of the offences of which NatWest could

theoretically be accused as described in Section 2 of this report could constitute a case of

preparation for an attempt or conspiracy to commit an offence in Israel, and therefore would

not be a foreign offence.  Under the circumstances present here, a conclusion that NatWest is

liable for having prepared, attempted or conspired to commit any such attack would require

proof beyond a reasonable doubt that NatWest knew the attack was planned, and intended and

desired that the attack be completed.  Article 300 of the Penal Code defines murder as

"premeditatedly causing the death of a human being."  An attempt to commit an offence is

defined in Article 25 of the penal code as follows: "A person attempts to commit an offence

if, in a purpose to commit it, he makes an act which is more than mere preparation yet the

offence was not completed." Conspiracy to commit an offence requires for the conspirators to

reach an agreement in order to achieve a joint goal, and for that joint goal to be an illegal

---

[12] Israel evacuated its citizens from the Gaza Strip in 2005.  Since then, Israeli law is presumed not to apply there at all.

[13] See HCJ 5666/3, Line of the Workers v. National Labor Court in Jerusalem Takdin-Supreme Court 2007(4), 109.

-16-

one.[14] If the requirements of the offences mentioned above, i.e. murder, attempted murder and conspiracy to commit murder, cannot be proven beyond a reasonable doubt in relation to NatWest, the fact that certain attacks took place in Israel is not relevant to my analysis.

As stated above, because any offence based on transfers that did not pass through or to bank branches located in Israel committed by NatWest under any of the four laws discussed in Section 2 of this report would be a "foreign offence," NatWest could be held liable for such an offence only upon proof beyond a reasonable doubt that satisfies the requirements of Articles 13 and 14 of the Penal Law, as well as proof beyond a reasonable doubt that satisfies the requirements of the underlying offences I describe in Section 2.

     a. Article 13

Article 13 of the Penal Law, entitled "Offences against the State or the Jewish Nation," adopts a justification for the applicability of the Penal Code to offences committed outside the territory of Israel known as the principle of "protective applicability."[15] It provides in pertinent part as follows:

> (a) Israeli penal law shall apply to foreign offences against:
>> (1) the security, foreign relations or secrets of the State;
>> (2) the governmental system of the State;
>> (3) the proper functioning of the authorities of the State;
>> (4) the property and economy of the State and its transport or communication links with other countries;
>> (5) the property, rights and proper functioning of any association or body specified in, or designated under, the provisions of subsection (c).
>
> (b) Israeli penal law shall apply also to foreign offences against:
>> (1) the life, person, health, freedom or property of an Israeli national, resident of Israel, or public servant as such;

---

[14] See Yaakov Kedmi, On the Criminal Law, The Penal Code, Part one, pp. 279.

[15] See S. Z. Feller, Elements of Criminal Law, Vol I, The Harry Sachar Institute for Legislative Research and Comparative Law, the Hebrew University of Jerusalem, Faculty of Law, 5744-1984, p. 274 ("Feller").

(2) the life, person, health, freedom or property of any Jew as such or the property of any Jewish institution as such.

(c) "Association or body," for the purposes of subsection (a)(5) means:

(1) the World Zionist Organization;

(2) the Jewish Agency for Eretz-Israel;

(3) the Keren Kayemet Le-Israel;

(4) the Keren Ha-Yesod - United Israel Appeal;

(5) an inspected body, within the meaning of the State Comptroller Law (Consolidated Version), 5718-1958.

The Minister of Justice may, with the approval of the Constitution, Legislation and Juridical Committee of the Knesset, designate by regulations, further associations or bodies for the purposes of this section.

The well known commentator, Prof. Schneur Zalman Feller, explains the rationale of Article 13 as protection of values upon which the very existence of the State is conditioned, values such as its sovereignty, security, and territorial integrity, which justifies the application of Israeli law even to offences committed outside of Israel:

> The first degree link between the offences and the state, which can justify and mandate extraterritorial application of the criminal norm of the transgression is expressed in the plane of the unique social value that is put at risk by its execution, and which is counted amongst the political and economic bases of the state and its prestige. These are offences that endanger the sovereignty of the state, its territorial integrity, its security, its ability to defend itself and wage war, its economy, its prestige, and similar value upon which its very existence depends.[16] (emphasis added, my translation)

Because the value that underlies the protective applicability is fundamental and crucial to the existence of the State, this principle applies itself where an offence is committed outside the State of Israel, but it must be proven beyond a reasonable doubt that the intention and objective of the person or entity charged with committing the offence was to damage the State, whether directly by striking the security or sovereignty of the State, or indirectly by striking some of its citizens, residents, or co-nationals of the State, where there are such.[17]

---

[16] Ibid. at 274.

[17] P.H. 1011/08 State of Israel v. Sahla Mahand (unpublished); P.H. 1079/07 State of Israel v. Elamor Fait (unpublished).

The protective applicability principle is considered to be a particularly weighty principle, to the point that it allows one to ignore two important legal principles: "double criminality" and "double jeopardy." Thus, where an offence was committed outside of Israel with the objective of harming the very existence of the State, the State will have the power to prosecute the perpetrator in Israel, even when the perpetrator's actions did not constitute an offence under the laws of the country where he executed them, and if they did, even if he was already acquitted or convicted of the offence in the country where he executed it.

In light of the foregoing, I have considered whether and to what extent the Israeli Penal Code, and in particular the offences I describe above in Section 2 under the Prevention of Terrorism Ordinance, Emergency Regulations, the Prevention of Money Laundering Law, and the Combating Criminal Organizations Law, could apply to the conduct of NatWest in conformity with the principles of extraterritoriality outlined above. I conclude that, under Article 13 of the Penal Law, NatWest could be held liable only upon proof beyond a reasonable doubt that the alleged offence placed the existence of the State of Israel at risk, by harming its security, economy, sovereignty, foreign relations, and the like, and that this result was the deliberate goal of NatWest in acting as it did.

Thus, a prosecutor would need to prove beyond a reasonable doubt that: (a) the bank's hosting of Interpal's accounts and/or the bank's execution of Interpal's instructions to transfer funds from Interpal's accounts to entities also outside of Israel, harmed Israeli state security, foreign relations or secrets or the governmental system of Israel, the proper functioning of State authorities, the property and economy of the State, the property rights, proper functioning of the associations identified above, or the life, person, health, freedom or property of an Israeli national, resident or public servant as such, or the life, person, health, freedom or property of any Jew because of their Jewishness; and (b) in hosting these accounts and/or executing these transfers, NatWest had the objective, intent or motive to cause such

harm to the security of the State of Israel or some of its citizens or residents, or Jews because of their Jewishness, and that it hosted these accounts and/or made the transfers requested by its customer in furtherance of that objective or motive.  As noted above, these requirements under Article 13 of the Penal Law are in addition to the elements of the underlying offence that the prosecution would also need to prove beyond a reasonable doubt in order to establish the liability of NatWest, as described above in Section 2 of this report.

      b. Article 14

Article 14 of the Israeli Penal Law expresses a second rationale for applying the Penal Law to offences committed outside the territory of the State – passive personal applicability.[18]  Article 14 sets the following requirements for extraterritorial application:

> (a) Israeli penal law shall apply to foreign offenses against the life, person, health or freedom of an Israeli national or resident of Israel the maximum punishment for which is imprisonment for one year or more.
> (b) Where the offense is committed within the territory under the jurisdiction of another state, Israeli law shall apply to it only if:
> > (1) it is an offence also under the law of that state;
> > (2) under the law of that state there is no defense to criminal liability for that offence;
> > (3) the person concerned has not already been acquitted of it in that state and, if he has been convicted of it there, has not served the penalty imposed on him for it.
> (c) There shall not be imposed for that offence a heavier penalty than could have been imposed under the law of that state. (my translation)

In contrast to protective applicability under Article 13, which requires a showing that the intention or motive of the accused is to harm the State or some of its citizens or residents, or Jews because of their Jewishness, passive personal applicability seeks to protect the State's residents and citizens even when they are outside its boundaries, and

---

[18] See Feller, *Supra* note 23 at 279.

regardless of whether the intention or motivation underlying the offence has anything to do with the identity of the State:  As Professor Feller has explained:

> When the victim of the offence is a citizen of the state or even a permanent resident therein, the state is committed to him, to some degree or another, even when he is outside its boundaries, <u>and even when this aspect of his affiliation was not the motivation for the perpetration of the offence against him in any way, in other words – when the victim happens to be connected as stated to the state, and was injured as an individual and not because of his affiliation to the state and in order to essentially harm it.</u>[19] (emphasis added, my translation)

The value that underlies the principle of passive personal applicability is considered less weighty than the one that underlies the principle of protective applicability.[20] Accordingly, Article 14 cannot be used to override certain safeguards in the criminal law. One such safeguard is the principle of "double criminality" – a foreign offence that harmed Israeli citizens outside the territory of the State will establish, pursuant to Article 14, an offence under Israeli law only if it constitutes an offence under the law of the state where the offence was committed. Another such safeguard is the principle of "double jeopardy" – if the perpetrator of the offence stood trial for an offence in the country where the offence was committed, and was acquitted or convicted of it and bore the full punishment imposed on him, Article 14 may not be used to apply to him the penal laws of the Israel.

Under the circumstances present here, applying the Israeli Penal Law to NatWest under Article 14 for hosting the accounts of Interpal and/or making transfers pursuant to Interpal's instructions would require proof beyond a reasonable doubt, in addition to the elements of the underlying offense, as described in Section 2 of this report, (which also would need to be proven beyond a reasonable doubt), that:

- hosting the accounts or transferring funds pursuant to Interpal's instructions harmed, or was capable of harming, the life, body, health, or liberty of an Israeli citizen or resident

---

[19] Feller, Supra note 23, at 279.

[20] Feller, Supra note 23, at 245.

- the penalty set for the offence at issue under Israeli law is at least one year (this condition is satisfied by the violations I describe in Section 2 above)
- in the countries where the offence was committed the bank's conduct constitutes an offence as well, and there is no safeguard from criminal liability for the bank in those jurisdictions
- the bank was not acquitted of this offence abroad and, if convicted, it has not yet borne the penalty, and
- if the bank is convicted in Israel, the penalty imposed on it may not exceed the maximum penalty that it would have been possible to impose on it for these offences in the country where the offence was committed.

Whether NatWest's conduct constitutes an offence with respect to the transfers made to accounts in foreign countries would need to be determined according to the laws of those jurisdictions. However, it should be noted that under the circumstances present here, for those transfers that NatWest made to bank accounts in the Palestinian Authority territories pursuant to the instructions of Interpal, an Israeli prosecutor could not, in order to satisfy the requirements of Article 14 of the Penal Law, rely upon the Israeli Ministry of Defence's declaration that Interpal is an "unlawful association" or upon the Israeli government's declaration that Interpal is a "terrorist organization," or that certain of Interpal's transferees are "unlawful associations" or "terrorist organizations," to support a finding that NatWest's execution of the transfers requested by Interpal to these transferees constituted criminal offences at the point of destination of these transfers because, for the reasons stated above, the Palestinian Authority territories were and are not considered part of Israel and these Israeli government declarations had and have no effect there. The relevant declarations regarding these transferees are the ones issued by the IDF Governor with jurisdiction over the place where the relevant account was maintained. To the extent that an IDF Governor's declaration with respect to an Interpal transferee was made after the date of Interpal's last transfer to that entity, according to the principle of legality, that declaration would not apply retroactively.

**5.   Considerations governing the exercise of prosecutorial discretion with respect to foreign offences.**

Article 9(b) of the Israeli Penal Law provides that there shall be no prosecution of foreign offences in Israel, whether under Article 13 or Article 14 of the Penal Law, except by the Attorney General of the government, and only after the Attorney General perceives that the prosecution is of "public interest." Notably, Article 62 of the Criminal Procedure Law [Consolidated Version] 5742-1982, which prioritizes the general considerations pertaining to prosecution (not necessarily with regard to foreign offences) establishes that "[i]f the prosecutor sees that he has been given investigative material with sufficient evidence to indict a certain person, he shall prosecute him, unless he reasons that the trial has no public interest." Thus, the considerations for prosecution of foreign offences are distinct from those pertaining to domestic offences in the following ways. First, the decision to prosecute foreign offences is made by the agent at the head of the general prosecution, the Attorney General of the government, whereas the decision to prosecute domestic offences can be made by any prosecutor. Second, an indictment may be filed for a foreign offence only when the Attorney General reasons that there is a basis in public interest to do so. In contrast, an indictment for a domestic offence will not be filed only when the prosecutor reasons that there is no public interest.

To date, and to my knowledge, no bank, Israeli or foreign, has ever been prosecuted for security offences such as offences of the Prevention of Terrorism Ordinance and the Emergency Regulations, even in instances where Israeli law enforcement authorities were reported to have information that banking organizations were involved in financing terror activities aimed against the State of Israel. For example, in February 2004, Israeli security forces entered the main branches of banking organizations that operated in the West Bank and confiscated deposits said to have belonged to associations that were outlawed and

monies that were transferred to the accounts in these branches from foreign bodies that were also outlawed. Nevertheless, there were no reported criminal investigations of the banking organizations, and there were no reported prosecutions of them for the holding of these accounts.

Further, it bears noting that the administration of Israeli banking organizations is regulated by, amongst others, the Prohibition of Money Laundering (The Banking Organizations' Requirement regarding Identification, Reporting, and Record-Keeping for the Prevention of Money Laundering and the Financing of Terrorism) Order, 5761–2001 (the "Order"). In 2006, after the enactment of the Prohibition of Terrorist Financing Law, the Order was amended, and Chapter C1, entitled "Checking the Identification Details Against the List" was added. According to that Chapter, all Israeli banking organizations are obligated to conduct ongoing checks of the customer accounts that they manage against a "list of terrorist organizations" first published by the State of Israel in 2005. More specifically, these banks are required to check the names of their customers, and their customers' transaction counterparties, against this list. This list contains the following organizations:

- "Terrorist organizations," so designated according to the Prevention of Terrorism Law.
- "Unlawful associations," so designated according to the Emergency Regulations.
- Organizations that have been determined, outside of Israel, to be terrorist organizations, and for which the government of Israel has decided to adopt this determination and to declare them as such.

It may therefore be concluded that, according to the Israeli administrative standard that is directed to all Israeli banking organizations, it is sufficient for an Israeli bank to check the customer accounts that it manages against the list of terrorist organizations published by the government of Israel. In contrast, Israeli banks have no obligation to check the accounts that they manage against any other list prepared by any other state, with respect to declarations that have not been recognized by the State of Israel.

In light of the above, it is reasonable that, among other considerations, in deciding whether to prosecute a foreign offence in this context, the Attorney General would assess whether, during the relevant period, Interpal or any of its transferees was designated by the United Kingdom or the European Union in the lists of terror organizations they have published. If these entities were not included on these lists, that would tend to weigh against a decision to prosecute Interpal, because the bank would not have been violating United Kingdom or EU sanctions in providing banking services to Interpal, assuming there is no evidence that the bank knew that Interpal and/or its transferees were financing terrorism.

Another consideration that the Attorney General will weigh is that of reciprocity, that is, the ramifications that the decision that he or she makes regarding the prosecution of foreign banking organizations for foreign offences committed outside the State of Israel would have on possible decisions by foreign law enforcement agencies to prosecute Israeli banking organizations in their countries for offences that they committed in Israel in violation of foreign law. In light of the fact that there is only a partial overlap between the lists of terror organizations maintained by the countries of the world, by way of illustration in the present context, prosecuting a British bank for providing banking services to an entity that has not been designated a terror organization by the United Kingdom or the EU, and for executing the customer's transfer orders to entities that have not been so designated, would create the risk that Israeli banking organizations could be prosecuted in a foreign country for holding accounts in Israel belonging to organizations that are not prohibited by Israel, but are prohibited by the prosecuting foreign country. An Attorney General who wishes to protect the stability of the Israeli banking system will consider this factor when assessing whether it is in the public interest to prosecute a foreign banking organization that does not even have a branch or other business in the State of Israel for holding in their branches outside of Israel

accounts that belong to associations that are unlawful in Israel and/or making transfers

pursuant to their customers' instructions from those accounts.

Dated:  December 21, 2010
Tel Aviv, Israel

_____
Yaron Lipshes

# Exhibit A

**YARON LIPSHES**
ylipshes@caspilaw.com

**ACADEMIC EDUCATION**

**TEL AVIV UNIVERSITY**, Tel Aviv, Israel, Buchman School of Law
LL.B. Degree, (*magna cum laude*), March 1999
**Honors & Activities:**
- Criminal Clinical Seminar (Graduated with honors)
- Staff Editor of *Plilim – Israel Journal of Criminal Justice*
- Volunteer at *Ha-lev – Movement to Fight Poverty in Israel*
- Voted - Best teaching assistant lecturer at Tel Aviv University, Faculty of Law, Constitutional Law Course, 2003

**TEL AVIV UNIVERSITY**, Tel Aviv, Israel, The Eitan Berglas School of Economics
B.A. in Economics, March 1999

**PROFESSIONAL EDUCATION**

Attended wide variety of professional courses for continuing legal education (CLE), supervised by Israel's Ministry of Justice, on such subjects as: international law, extraterritorial applicability, internet crimes, corporate crimes, etc. Attended intensive professional training program organized by Israeli Police, on subject of money laundering and assets confiscation.
Graduate of a human rights course, attended by Israeli and Palestinian lawyers, sponsored by the USAID.

**LEGAL EXPERIENCE**

**CASPI & CO. ADVOCATES & NOTARIES**
*Senior associate ,White Collar Department,* June 2007 – present
Senior-most associate in team handling the defense of Israel's former prime minister in a bribe and corruption investigation; Leading attorney in several cases, including such charges as embezzlement, theft, money laundering, bribe and breach of trust, securities fraud, and taxation.

Preparing legal opinion: extraterritorial applicability of Israeli security law, insider trading; duties of banks to report to government enforcement agencies.

**ISRAEL SECURITIES AUTHORITY**
*Legal advisor to Investigations Department,* January 2005 – January 2007
Supervised and handled all legal work of the investigations department; representation of department in all its court litigations; advised on following: one of the largest cases investigated in the last years concerning Israel's largest bank, regarding breaches of trust funds law; numerous cases of insider trading, securities fraud and price manipulation and financial crimes; several cases regarding misleading  reports of public companies; several cases regarding fraud in transactions between public companies and its controlling shareholders; a large case concerning corruption and bribe involving an Israeli public company.

Member of the Israel Securities Authority (ISA) senior legal advisers' staff; Member of the ISA's enforcement committee; Member of the ISA's alternative enforcement committee; Member of the ISA committee on prospectus reforms; Member of the ISA's delegation to the United States (2004); ISA's representative to the Israeli Ministry of Justice - Committee on Reform in the Israeli Search and Detention act.

**TEL AVIV DISTRICT ATTORNEY'S OFFICE (Taxation & Economics)**
*Assistant to the District Attorney, Securities Department,* October 1999 – December 2004
Participated in a fraud and theft case, concerning embezzlement perpetrated against several European banks;  Prepared indictment concerning one of Israel's largest corruption and bribe affairs; support police investigation concerning governmental corruption allegedly perpetrated by an Israeli minister, including participation in interrogation in Europe; Led a precedent setting case in court, concerning fraud committed by a trust fund manager; member of team handling a precedent-setting case re regulation of transactions between public companies and its controlling shareholders; Prepared indictment and led in court case against founders of a project which failed to comply with the prospectus requirement; Prepared indictments and led in court several cases against offenders who perpetrated securities frauds;

**MILITARY SERVICE**

*Reserve service – Defense attorney in IDF ATTORNEY'S OFFICE*
*Compulsory service: Sergeant – non- commissioned office Intelligence Branch*

1

**TEACHING**

> ***Teaching Assistant of* PROFESSOR BARUCH BRACHA**
> **TEL AVIV UNIVERSITY, FACULTY OF LAW**
> ***Constitutional Law Course***, October 2002 – January 2009
> Prepared lesson plans and lectured on course topics. Wrote and evaluated course materials and examinations.

> ***Teaching Assistant of* PROFESSOR MEIR DAN-COHEN**
> **TEL AVIV UNIVERSITY, FACULTY OF LAW**
> ***Theory of Law Course***, October 2001 – August 2002
> Prepared lesson plans and lectured on course topics. Wrote and evaluated course materials and examinations

> ***Teaching Assistant of* PROFESSOR CHAIM GANZ**
> **TEL AVIV UNIVERSITY, FACULTY OF LAW**
> ***Theory of Law Course,*** October 1998-2001
> Wrote and evaluated course materials and examinations.

**BAR ADMISSION**

> Member, Israel Bar Association, November 2000

**LANGUAGES**

> Hebrew (native speaker), English (fluent)

# Exhibit B

**List of Attacks**

| Serial Num | Date of Attack | Attack Details |
|---|---|---|
| 1 | March 27, 2002 | Park Hotel  - Netanya, Israel |
| 2 | May 7, 2002 | Sheffield Club - Rishon Letsion, Israel |
| 3 | July 31, 2002 | Hebrew University– Jerusalem, Israel |
| 4 | January 29, 2003 | Shooting On Road #60 – West Bank (occupied territories) |
| 5 | March 5, 2003 | Egged Bus # 37 – Haifa, Israel |
| 6 | March 7, 2003 | Kiryat Arba, Hebron – West Bank (occupied territories) |
| 7 | April 30, 2003 | Mike's Place - Tel Aviv, Israel |
| 8 | May 18, 2003 | Egged Bus # 6 – Jerusalem, Israel |
| 9 | June 11, 2003 | Egged Bus # 14A – Jerusalem, Israel |
| 10 | June 20, 2003 | Shooting On Road #60 – West Bank (occupied territories) |
| 11 | August 19, 2003 | Egged Bus #2 – Jerusalem, Israel |
| 12 | September 9, 2003 | Caffe Hillel – Jerusalem, Israel |
| 13 | October 22, 2003 | Tel Rumeida, Hebron – West Bank (occupied territories) |
| 14 | January 29, 2004 | Egged Bus # 19 – Jerusalem, Israel |
| 15 | September 24, 2004 | Neve Dkalim - Gaza Strip (occupied territories) |

**EXHIBIT 118 TO DECLARATION OF VALERIE SCHUSTER**

Login  | Contact Us | Site Map



Services    Industries    Technology

## About FRA

Founded in 1999, Forensic Risk Alliance (FRA) is a full service consulting firm specializing in Forensic Accounting, Financial Investigation, Litigation Support, and Electronic Discovery. FRA is comprised of forensic accountants, financial analysts, database & IT experts, and litigation support specialists. We have fluency in German, Chinese, French, Spanish, Italian, Portuguese, and English.

FRA assists businesses and institutions to resolve complex and high risk financial, legal and regulatory challenges. We offer a variety of solutions that encompasses the complete e-discovery life cycle. We offer collection services, data culling, a custom review platform, jurisdictional processing and hosting, data privacy, and dedicated project management.

From our offices in the United States and Europe we have serviced and supported clients in nearly every major jurisdiction across the globe. Recent projects have taken us to Canada, Israel, Germany, Switzerland, France, the Netherlands, the UK, the US, Spain, Denmark, Norway, Sweden, Belgium, the Philippines, Indonesia, Thailand, the PRC, Nigeria, Iraq, the UAE, Jordan, Brazil and Australia.

<u>Professional Services</u>

- Forensic Accounting
- E-discovery, data collection, mining and hosting
- Damages analysis and profiling
- Database programming, audits and reviews
- Mass claims validation, assessment, processing and analysis

<u>Practice Area Experience</u>

- White Collar Crime
- Regulatory and Internal Investigations
- Multi-jurisdictional litigation
- Class action – securities, human rights, employment, product liability
- Bankruptcy
- Due diligence and bespoke compliance systems assessment and design – internal monitoring, pre-acquisition, post-acquisition etc. (including FCPA, OFAC, Sherman Act, AML)
- Insurance (special expertise in long-tail and/or international claims)

If you wish to request further information, please contact us by <u>email</u>, <u>telephone</u> or post.

About FRA    Our People    Office and Data Center Locations    Career

EXHIBIT

PENGAD 800-631-6989

11

6/8/11  SC

**Anti-Corruption Blog:**

The FCPA and other anti-corruption legislation from a European perspective

**New Releases:**

EDReviewer™ 5.0
Our hosted e-discovery solution that provides a time critical, flexible and cost effective platform for the review of litigation data and documents.

**Global Insight**

News and Information or Forensic Risk Issues
Facilitation payments and new Bribery Act

Privacy Policy | Legal Notice

© 2011 Forensic Risk Alliance. All rights reserved.