EXHIBIT 119 TO DECLARATION OF VALERIE SCHUSTER

FILED UNDER SEAL

*TZVI WEISS, et al. VS.*
*NATIONAL WESTMINSTER BANK, PLC*

---

*GARY WALTERS*
*June 8, 2011*

---



**Ellen Grauer**
**COURT REPORTING** Co. LLC

126 East 56th Street, Fifth Floor New York, New York 10022
PHONE: (212) 750-6434   FAX: (212) 750-1097
www.ELLENGRAUER.com

*Original File 96687.txt*
*Min-U-Script® with Word Index*

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

GARY WALTERS
June 8, 2011

Page 1

```
 1  UNITED STATES DISTRICT COURT
 2  EASTERN DISTRICT OF NEW YORK
    --------------------------------x
 3  TZVI WEISS, et al.,
 4                    Plaintiffs,
 5      -against-
 6  NATIONAL WESTMINSTER BANK, PLC,
 7                    Defendants.
    --------------------------------x
 8  NATAN APPLEBAUM, et al.,
 9                    Plaintiffs,
10      -against-
11  NATIONAL WESTMINSTER BANK, PLC,
12                    Defendants.
    --------------------------------x
13
14                    One Liberty Plaza
                      New York, New York
15
16                    June 8, 2011
                      9:30 a.m.
17
18          Videotaped Deposition of
19  GARY WALTERS, before Shari Cohen, a Notary
20  Public of the State of New York.
21
22
23      ELLEN GRAUER COURT REPORTING CO. LLC
            126 East 56th Street, Fifth Floor
24           New York, New York 10022
                  212-750-6434
25                 REF: 96687
```

Page 3

```
 1    A P P E A R A N C E S (CONT'D):
 2
 3  CLEARY GOTTLIEB STEEN & HAMILTON LLP
 4  Attorneys for Defendants
 5  One Liberty Plaza
 6  New York, New York  10006
 7    BY: LARRY FRIEDMAN, ESQ.
 8  JAMIE RIETEMA, ESQ.
 9  VALERIE SCHUSTER, ESQ.
10  PHONE  212-225-2432
11  FAX    212-225-3999
12  EMAIL  lfriedman@cgsh.com
13
14
15    ALSO PRESENT:
16  DAN MACOM, Videographer
17
18
19
20
21
22
23
24
25
```

Page 2

```
 1  A P P E A R A N C E S:
 2
 3  STONE BONNER & ROCCO LLP
 4  Attorneys for Plaintiffs
 5        260 Madison Avenue
 6        New York, New York  10016
 7  BY:   JAMES P. BONNER, ESQ.
 8        PHONE  212-239-4340
 9        FAX    212-239-4310
10        EMAIL  jbonner@lawssb.com
11
12
13  SAYLES WERBNER
14  Attorneys for Plaintiffs
15        4400 Renaissance Tower
16        1201 Elm Street
17        Dallas, Texas  75270
18  BY:   JOEL L. ISRAEL, ESQ.
19        PHONE  214-939-8700
20        FAX    214-939-8787
21        EMAIL  jisrael@swtriallaw.com
22
23
24
25
```

Page 4

```
 1  ------------------ I N D E X ------------------
 2  WITNESS              EXAMINATION BY        PAGE
 3  GARY WALTERS         MR. FRIEDMAN       7, 302
 4                       MR. BONNER            300
 5
 6
 7  -------------- DOCUMENT REQUESTS --------------
 8  PAGE    52   Curriculum Vitae of Jeremy Hibbert
 9
10
11  --------- INFORMATION TO BE FURNISHED ---------
12  PAGE   165   Location of statements in
13               deposition transcript
14
15
16  --------------- E X H I B I T S ---------------
17  EXHIBIT        DESCRIPTION            FOR I.D.
18  Exhs. 1-43     Documents                   7
19  Exhibit 44     Document, Bates labeled   250
20               NW 13698
21
22     (Exhibits 15, 19, 21, 26 and 41 not used)
23
24
25            (EXHIBITS TO BE PRODUCED)
```

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

GARY WALTERS
June 8, 2011

Page 9

```
1      WALTERS
2   would maybe reword it slightly, but the basis
3   of the report is my report and reflects my
4   opinions.
5   Q.  What are the one or two typing
6   changes?
7   A.  I would have to go right back
8   through it to check.  I'm not sure if it's in
9   this one or the second report there was a
10  date, for instance, that was wrong.
11  Q.  In the second category that you
12  referred to, is there anything of substance
13  that you believe in this report is incorrect?
14  A.  No, I don't believe there is.
15  Q.  All of the information you
16  relied upon in forming your opinions in this
17  report is identified in the report, correct?
18  A.  The report was written based on
19  documents I received and are marked in the
20  report, but it was also on my general
21  experience, general reading, general
22  knowledge from my experience so I haven't --
23  it would be impossible to document every
24  document that I have ever read on these
25  topics.
```

Page 11

```
1      WALTERS
2   detective sergeant.
3   Q.  What borough was that?
4   A.  The borough of Hounslow.
5   Q.  Did your CV exist in this form
6   before it was included in your report?
7   A.  No, it didn't.
8   Q.  This CV was prepared
9   specifically for this report?
10  A.  Yes, it was.
11  Q.  Have you ever prepared a CV
12  before?
13  A.  No, I haven't.
14  Q.  I'm going to show you what's
15  been marked as Exhibit 2 and ask if you can
16  identify this as your second report in these
17  cases?
18  A.  This is my second report.
19  Q.  And your signature appears on
20  page 37?
21  A.  Yes, it does.
22  Q.  Exhibits 1 and 2 contain all of
23  the opinions you intend to express in these
24  cases, correct
25  A.  Subject to what we discuss here
```

Page 10

```
1      WALTERS
2   Q.  Annex 1 is an introduction to
3   FRA and your CV, correct?
4   A.  That's correct, yes.
5   Q.  Is annex 1 correct, is it
6   accurate?
7   A.  I believe it to be accurate
8   although I did -- I think on reviewing it I
9   noticed I seem to have missed and I do
10  apologize I seem to have missed 1990 to '94
11  in my career.  There's a gap.
12  Q.  What took place during those
13  years?
14  A.  During those years between 1990
15  and 1992 I was promoted to sergeant and at
16  that time in the metropolitan police that
17  covers London there was a policy that
18  detectives should return to uniform for a
19  period of time so I went to a borough as a
20  uniformed officer for a short period although
21  I dealt -- whilst there I dealt with a lot of
22  crime and then got seconded onto a major
23  investigation from which I then spent two
24  years, I moved from there in I believe '92 to
25  '94 I worked at a different borough as a
```

Page 12

```
1      WALTERS
2   today these are my opinions, yeah.
3   Q.  Appendix 1 to your second
4   report identifies all of the documents on
5   which you relied in writing this report,
6   correct?
7   A.  That's correct.
8   Q.  Does this include all of the
9   documents you reviewed?
10  A.  No, I looked at -- I was
11  supplied with all of the documents that had
12  been supplied -- to my understanding that
13  were supplied by the defendants and as I have
14  said there is also numerous things I have
15  read outside of this particular case and from
16  my experience.
17  Q.  Things you read before your
18  work on this case?
19  A.  Yeah and since then things that
20  I read that don't directly relate to this
21  case, but in the general area may become
22  relevant.
23  Q.  Let's focus on the first
24  category you referred to.  Did you review all
25  of the documents that Nat West produced in
```

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

GARY WALTERS
June 8, 2011

**Page 13**

1 WALTERS
2 these cases?
3 A. Yes.
4 Q. What other materials did you
5 look at in connection with preparing your
6 report to which you just referred?
7 A. In preparing my reports I
8 looked at some websites, I looked at --
9 refreshed my memory on some general reading
10 in order to try and make sure that what I was
11 saying was accurate and correct.
12 Q. What websites did you look at?
13 A. There is a number that I tried
14 to mark them in the report, for instance, the
15 metropolitan police website itself in order
16 to be sure of dates although my knowledge of
17 the metropolitan police is very good. I
18 didn't want to make statements which later I
19 found I just made an error.
20 Q. What general reading did you
21 do?
22 A. Well, I read numerous articles,
23 publications in relation to anti-money
24 laundering, in relation to terrorist
25 financing, in relation to financial crime

**Page 14**

1 WALTERS
2 generally. I'm currently reading a new
3 publication that only got published last week
4 in this field.
5 Q. What are the publications you
6 read on terrorist financing?
7 A. Most of the publications that I
8 read that relate to money laundering
9 generally they relate to terrorist financing
10 as well, they are generally banded together
11 very closely.
12 Q. What are those publications?
13 A. Often they are websites that
14 I'm referred to through contacts, through
15 people I know.
16 Q. What are their names, not the
17 people, the websites?
18 A. I can't recall.
19 Q. Can you recall the names of any
20 publications you are referring to in
21 anti-money laundering or counter terrorism?
22 A. No, I don't keep a record of
23 everything I read.
24 Q. What about publications
25 relating to financial crime, can you remember

**Page 15**

1 WALTERS
2 the names of any of those?
3 A. No, I can't recall.
4 Q. Appendix 2 lists all the
5 depositions that you referred to in your
6 rebuttal report, correct?
7 A. Yes.
8 Q. Are these all of the deposition
9 transcripts that you reviewed?
10 A. No, I reviewed the deposition
11 transcripts that were taken.
12 Q. You reviewed every deposition?
13 A. Yes.
14 Q. How did you first become
15 involved in these lawsuits?
16 A. I was asked by FRA whether I
17 would be happy to be a testifying witness in
18 this case.
19 Q. Who from FRA asked you that?
20 A. I was initially approached by
21 Tobie Duthie.
22 Q. How did he come to ask you?
23 A. FRA Tobie Duthie I have known
24 for a while and he had asked me for a period
25 of time whether I would like to come and work

**Page 16**

1 WALTERS
2 with FRA and I have to say I never really
3 found time to go talk with him at any length
4 about what I was going to do or not do in
5 relation to my post police life, but we saw
6 each other on occasions and eventually I had
7 a bit more time and I went to see him and
8 therefore he explored the possibility of me
9 consulting with FRA.
10 Q. How did you first come to meet
11 Mr. Duthie?
12 A. I met Mr. Duthie socially
13 originally.
14 Q. When was that approximately?
15 A. Five years ago.
16 Q. When did you leave the
17 metropolitan police?
18 A. December '09.
19 Q. Why did you leave the
20 metropolitan police?
21 A. Sorry?
22 Q. Why did you leave the
23 metropolitan police?
24 A. I completed 30 years service
25 and I retired.

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

GARY WALTERS
June 8, 2011

Page 17

WALTERS
2 Q. Was your retirement completely
3 voluntary?
4 A. Completely voluntary.
5 Q. When did Mr. Duthie first ask
6 you to consult with FRA, was it before you
7 ended your police career or after?
8 A. In terms of actually -- we had
9 a few as I say very brief conversations about
10 what I was planning to do when I left, but it
11 was after I left that he said look, can we
12 find some time and have a proper conversation
13 about it and in terms of -- and that time I
14 was busy doing a lot of things and I -- so
15 probably about -- we intended meeting, but
16 just didn't seem to find the time, probably
17 six months after I left the police.
18 Q. So that's around the middle of
19 2010?
20 A. Yeah, as I said it's around
21 then.
22 Q. Did the possibility of your
23 work on these cases come up in that first
24 conversation?
25 A. He was non specific about

Page 18

WALTERS
2 cases.
3 Q. When did the subject of your
4 working on this case first come up, these
5 cases?
6 A. I think it was a couple of
7 months after our first conversation. I don't
8 think we discussed it at what I would call a
9 proper meeting.
10 Q. After the middle of 2010?
11 A. Yes, I believe so.
12 Q. When did you join FRA as a
13 consultant?
14 A. I think I agreed to join them
15 in -- would have probably been August I
16 suppose or something.
17 Q. I'll show you in a moment that
18 your first time sheet entry for work on these
19 cases is September 24, 2010. Does that
20 enable you to be any more specific as to when
21 you started working with FRA?
22 A. It would have been to work on
23 this so instead of August it was probably
24 September then.
25 Q. The first work that you did

Page 19

WALTERS
2 with FRA was your work on these cases?
3 A. Yes.
4 Q. Have you done any other work
5 with FRA since joining the company?
6 A. I have had a number of meetings
7 with them on general matters in terms of
8 money laundering and corruption, bribery and
9 attended things on their behalf really like
10 the book launch the other day was as a
11 consultant to them I said I would go and
12 attend, but no major pieces of work.
13 Q. Have you worked on any client
14 engagements? Have you worked on any matters
15 for clients of FRA other than these cases?
16 A. No.
17 Q. When you say meetings with FRA
18 on general matters, you are talking about
19 internal meetings?
20 A. Internal meetings.
21 Q. To speak with your colleagues
22 at FRA about those matters?
23 A. Yes.
24 Q. Other than a book launch, what
25 other things have you attended on behalf of

Page 20

WALTERS
2 FRA?
3 A. I think that's the only thing
4 outside internal meetings where I've
5 specifically been -- specifically sort of
6 representing them.
7 Q. Do you work full-time for FRA?
8 A. No, I don't.
9 Q. What percentage of -- what else
10 do you do besides working for FRA?
11 A. I have a number of other firms
12 in investigation and security who I meet with
13 and I have a couple of them who have asked me
14 to do some work on cases.
15 Q. What are the names of those
16 firms?
17 A. I'm just trying to think. I'm
18 not avoiding. I'm just trying to think here
19 whether I feel comfortable disclosing who I'm
20 working for, quite small firms.
21 Q. They are investigation and
22 security firms in the U.K.?
23 A. One is in the U.K. and one is
24 abroad.
25 Q. Where abroad?

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

GARY WALTERS
June 8, 2011

Page 21

WALTERS

2 A.  Hong Kong.
3 Q.  Does any of that work involve
4 terror finance?
5 A.  Not that I have spoken to them
6 about, no.
7 Q.  What percentage of your working
8 time since you left the police at the end of
9 2009 has been devoted to your work with FRA
10 as opposed to work apart from FRA?
11 A.  On the consultancy -- I have
12 some other work interests that are not
13 related to this work whatsoever.
14 Q.  First why don't you tell me
15 about those?
16 A.  Another position.  I work for
17 my family company.
18 Q.  What is that?
19 A.  It's a small firm engaged in
20 farming basically.
21 Q.  During calendar year 2010 and
22 thus far in 2011 can you apportion for me on
23 a percentage basis the amount of working time
24 you've spent on FRA as opposed to the two
25 investigation and consulting firms as opposed

Page 22

WALTERS

2 to your family company?
3 A.  The family company stuff I
4 would have to say is I don't keep hours, it's
5 full-time in terms of my time, but it's very
6 flexible.  In terms of consulting and what I
7 would call my consultancy side FRA has
8 probably been 80 percent.
9 Q.  Of your consultancy work?
10 A.  Yes.
11 Q.  Your consultancy work as a
12 percentage of the whole is what of your
13 working time?
14 A.  I'm never good with time.
15 Q.  An approximation will do.
16    MR. BONNER:  What time frame
17 you talking about?
18    MR. FRIEDMAN:  Since he's left
19 the police.
20 A.  Since I've left the police I
21 was very busy, you know, I mean I find that
22 very difficult.  I'm not being awkward, but I
23 find that very difficult to answer because I
24 had six months of doing nothing on
25 consultancy whatsoever beyond a small -- I

Page 23

WALTERS

2 also would say just for clarity, forgive me,
3 going back, I also lecture for another
4 company that's in international training on
5 accountability and ethics in relation to
6 grand corruption, bribery, money laundering,
7 financial crime.
8 Q.  What's the name of that
9 company?
10 A.  That's RIPA.
11 Q.  What does that stand for?
12 A.  I really can't recall.  They
13 are part of a bigger group.
14 Q.  They are in the U.K.?
15 A.  They are in the U.K.
16 Q.  How many lectures have you
17 given?
18 A.  I think since I left the police
19 two.
20 Q.  So am I right that you're not a
21 full-time employee of FRA, you're a
22 consultant to FRA?
23 A.  I'm a consultant to FRA.
24 Q.  Is it your understanding you
25 were retained by FRA specifically to provide

Page 24

WALTERS

2 consulting services on these cases?
3 A.  No, my understanding is I'm
4 retained by them as a general consultant on
5 all these types of matters.
6 Q.  What is your compensation from
7 FRA?
8 A.  In general consultancy terms?
9 Q.  Yes.
10 A.  400 pounds a month.
11 Q.  Regardless of how much time you
12 spend?
13 A.  Regardless of how much time I
14 spend.
15 Q.  There's no premium on top of
16 that if you spend additional time, if you
17 spend a lot of time?
18 A.  Because it's quite new and a
19 new field for both, certainly for me, it was
20 felt that we would start there and then
21 review it on a case by case basis and on a
22 project basis if other projects came in in
23 terms of lectures, conferences so we would
24 decide it on an on-going basis.
25 Q.  Let me show you what's been

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

GARY WALTERS
June 8, 2011

---

Page 33

1 WALTERS
2 to assist here that I believe that would have
3 been back to how do we map out and show what
4 -- and set out in a helpful manner what had
5 gone on here so where had the bank deviated
6 from what I would have expected.
7 Q. Is there a document referred to
8 as the deviations analysis?
9 A. Not that I'm aware of.
10 Q. With whom did you discuss this
11 deviations analysis?
12 A. Casie was engaged in these
13 discussions and I know Lucille was engaged in
14 these discussions. I think I spoke to Tobie
15 Duthie and it was trying to drill down to how
16 can I, you know, how can I best set out to
17 make it understandable and clear what I felt
18 had gone on and what my opinions were and how
19 I found those opinions.
20 Q. Have you ever met Lucille?
21 A. Yes, I've met Lucille on a
22 number of occasions.
23 Q. Where does she work?
24 A. She now works in Paris, in the
25 Paris office.

---

Page 34

1 WALTERS
2 Q. Where did you meet her?
3 A. I met her in London.
4 Q. Did you meet with her
5 face-to-face during the course of your work
6 on these cases?
7 A. Yes, I did.
8 Q. How many times?
9 A. I really can't recall how many
10 times we worked together.
11 Q. More than five?
12 A. I would be guessing. I really
13 don't know.
14 Q. Look at page 7 that bears the
15 production number in the lower right hand
16 corner 15, says Walters 15. You see the
17 entry for yourself on 22 September 2010, the
18 third entry on the page?
19 A. Yes.
20 Q. What's the meaning of your
21 entry "U.K. rules and environment"?
22 A. It would be the U.K. rules and
23 environment.
24 Q. What does that refer to and
25 just to be clear, Mr. Walters, I'm not trying

---

Page 35

1 WALTERS
2 to quibble with you, but rather than telling
3 me what it would be, if you recall tell me
4 what it was?
5 A. I don't recall.
6 Q. Look at the next page, Walters
7 16, you will see the bottom half of the page
8 there are entries for you for November 9,
9 November 10, November 11 and November 12
10 where the entry is research?
11 A. Yes.
12 Q. Do you see that? What research
13 did you do -- withdrawn. What research does
14 this reflect?
15 A. It would reflect reviewing
16 documents. It would reflect the reading of
17 these documents and making sure that I'm
18 happy with the content of the report.
19 Q. That you are happy with the
20 content of your reports?
21 A. Yes.
22 Q. By documents you are referring
23 to documents produced by Nat West?
24 A. Yeah.
25 Q. Can you tell me the process by

---

Page 36

1 WALTERS
2 which your first and second reports was
3 drafted?
4 A. I approached it as you would
5 expect coming from my background in terms of
6 reviewing the documents, evaluating them,
7 assessing them, analyzing them and then
8 deciding, you know, making some decisions or
9 formulating opinions as I went along and then
10 looking for what else we could do to as I
11 said, you know, set it out in an orderly and
12 useful document.
13 Q. I'm sorry, my question was a
14 bit more narrow so let me be more precise.
15 Did you write both of these reports?
16 A. I wrote the reports, yes.
17 Q. They are your -- from draft to
18 final product everything that's in these
19 reports you wrote?
20 A. I did. This is my report. I
21 did have some bits I took from documents I've
22 read and one document I read was the CL, FRA
23 CL report which is --
24 Q. Ms. McLeod's report?
25 A. Yes, so I had that document

---

Ellen Grauer Court Reporting Co. LLC

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

GARY WALTERS
June 8, 2011

Page 37

1    WALTERS
2    which covered some of the same ground.  I
3    wasn't going to rewrite sections that I was
4    happy with.  It didn't seem -- if I was happy
5    with what had been written, then I took it
6    and then I considered it my report.
7    Q.  Meaning that if you took
8    something from Ms. McLeod's report that you
9    were happy with, you considered it your
10   report?
11   A.  Yes.
12   Q.  Everything in these two reports
13   you either drafted or took from Ms. McLeod's
14   report?
15   A.  Or it came from the research
16   that was being done by Lucille where I took,
17   you know, she might have typed it, I would
18   probably change it.
19   Q.  So there's language in these
20   reports that Lucille was the first
21   draftsperson of?
22   A.  Potentially.  I can't recall
23   whether I -- but I'm not going to change a
24   sentence if it has the meaning that I want to
25   have.

Page 38

1    WALTERS
2    Q.  I just want to be clear.  There
3    is language in the report that originated
4    with text that Lucille gave to you and which
5    you then reviewed, changed what you wanted to
6    and put into your report?
7    A.  There were, you know, there
8    were occasions when we were sitting working
9    together.  She types a lot faster than I do so
10   she would type it and I would have a look at
11   it so in that way did she write that or did I
12   write that.
13   Q.  Did you receive text that ended
14   up in either of your reports from any person
15   other than Lucille?
16       MR. BONNER:  And Ms. McLeod,
17   right?
18       MR. FRIEDMAN:  We'll come to
19   that.
20   A.  I can't recall.
21   Q.  Do you think if there was
22   anyone else who gave you text that you would
23   recall it?
24   A.  I sit here trying to be helpful
25   and I hoped I would recall it and I can't

Page 39

1    WALTERS
2    recall.
3    Q.  Did you interact with
4    plaintiff's counsel on the drafts of your
5    reports or only with other people at FRA?
6       MR. BONNER:  Just in answering
7    that --
8    Q.  You can answer that yes or no.
9       MR. BONNER:  That's a yes or no
10   answer.
11   A.  Yes.
12   Q.  You did interact with
13   plaintiff's counsel?
14   A.  Yes.
15   Q.  Can you give me the names of
16   plaintiff's counsel you interacted with?
17   A.  I had a number of conference
18   calls and I didn't always know -- catch all
19   the names over the telephone line about who I
20   was talking to.
21   Q.  Do you remember any of the
22   names you were speaking to?
23   A.  I remember speaking to Mr.
24   Israel, Mr. Bonner. I think on one we were
25   joined by -- one there was about five people

Page 40

1    WALTERS
2    on the conference call. Mr. Osen on one
3    call.
4    Q.  You can answer this yes or no,
5    were those calls with respect to your work
6    generally or specifically with respect to
7    drafts of your reports?
8    A.  What do you mean by work
9    generally?
10   Q.  Let me be more specific.  Were
11   these discussions about your drafts,
12   commenting on your drafts, you can answer
13   that yes or no?
14   A.  I can't be absolutely sure.
15   Q.  Have you ever met Ms. McLeod?
16   A.  Yes, I have.
17   Q.  Again, just to make sure I'm
18   clear, all the language that appears in your
19   reports originates either with you, something
20   that Lucille Mourey typed or something that
21   you took with whatever revisions you thought
22   appropriate from Ms. McLeod's report; is that
23   correct?
24   A.  I do apologize, but I wouldn't
25   like to say with any -- and I don't think I

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

GARY WALTERS
June 8, 2011

Page 45

WALTERS

1      WALTERS
2  conclusions." So the way in which this
3  report was written is different from the
4  first one, you wrote all the words of this
5  report?
6  A.  This report was prepared in the
7  same way as the first report so I apologize.
8  It probably should say written under
9  supervision.
10  Q.  Was the other person the new
11  person you were referring to named Hibbert?
12  A.  No, I don't believe so.
13  Q.  Berger?
14  A.  Could have been Berger.
15  Q.  I'm going to take you back to
16  Exhibit 4.  Look at the first page.  I know
17  you said you haven't seen this before, but do
18  you think this is accurate that through
19  December 31, 2010 you devoted 419.75 hours to
20  this matter?
21  A.  I have to say it's the first
22  time I have seen it.  I don't know.
23  Q.  You don't know whether that's
24  accurate or not?
25  A.  No.

Page 46

WALTERS

1      WALTERS
2  Q.  Look at Exhibit 5, the next
3  invoice.  You see that that shows that from
4  January 1 and February 27, 2011 you devoted
5  74-and-a-half hours to this matter.  Do you
6  see that?
7  A.  Yes, I do.
8  Q.  Is that accurate?
9  A.  One of the things I'm really
10  not good at is time keeping in terms of my
11  time is just -- I'm just not good at it.
12  Q.  So is this accurate?
13  A.  I believe it to be accurate.
14  It's the first time I have seen it, but I
15  believe it to be accurate.
16  Q.  Let me show you what's been
17  marked as Exhibit 6 which Ms. McLeod
18  identified as the CV of Casie Searles.  Have
19  you ever seen this before?
20  A.  No, I haven't.
21  Q.  Do you know of any professional
22  experience she has concerning the regulation
23  of banks in the U.K.?
24  A.  No, I don't.
25  Q.  Do you know of any education or

Page 47

WALTERS

1      WALTERS
2  professional training she has on the
3  regulation of banks in the U.K.?
4  A.  No, I don't.
5  Q.  Do you know of any professional
6  experience she has relating to counter terror
7  financing?
8  A.  No, I don't.
9  Q.  Do you know of any education or
10  professional training she has on that
11  subject?
12  A.  No, I don't.
13  Q.  Do you know of any professional
14  experience she has concerning the internal
15  policies and procedures of banks in the U.K.?
16  A.  Well, having said -- the only
17  thing I and again I would have to
18  qualify the word do I know, I would have --
19  my understanding is that she worked on and I
20  could be wrong, but my understanding is that
21  she worked on the CL matters so she would
22  have developed some understanding from that
23  particular matter.
24  Q.  But other than that, do you
25  know of any professional experience she has

Page 48

WALTERS

1      WALTERS
2  had concerning the policies and procedures of
3  banks in the U.K.?
4  A.  No, I don't.
5  Q.  Do you know of any education or
6  professional training she's had on that
7  subject?
8  A.  No, I don't.
9  Q.  Do you know of any professional
10  experience she's had concerning U.K.
11  anti-money laundering laws or regulations?
12  A.  No, I don't.
13  Q.  Same question about U.K.
14  anti-terror financing laws or regulations?
15  A.  No, I don't.
16  Q.  Again, you have never met her?
17  A.  No.
18  Q.  Let me show you what's been
19  marked as Exhibit 7 which Ms. McLeod
20  identified as the CV of Lucille Mourey.  Have
21  you ever seen this before?
22  A.  No, I haven't.
23  Q.  You first met her in connection
24  with your work on these reports?
25  A.  That's correct, yes.

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

GARY WALTERS
June 8, 2011

Page 49

WALTERS

2 Q.  Do you know of any professional
3 experience she has concerning the regulation
4 of banks in the U.K.?
5 A.  No, I don't.
6 Q.  Do you know of any professional
7 education or training she has on those
8 subjects?
9 A.  No, I'm unaware of any.
10 Q.  Do you know of any professional
11 experience she has concerning the internal
12 policies and procedures of U.K. banks?
13 A.  I don't know about that.
14 Q.  Do you know of any education or
15 professional training she has on that
16 subject?
17 A.  Again, similar to the last one
18 I understand that she worked on the other
19 matter and developed a degree of
20 understanding, but in terms of education, no,
21 I don't.
22 Q.  Credit Lyonnais you know is a
23 French bank?
24 A.  Yes.
25 Q.  Do you know of any professional

Page 50

1 WALTERS
2 experience that Lucille Mourey has in U.K.
3 anti-money laundering laws?
4 A.  No.
5 Q.  Do you know of any education or
6 professional training she has concerning U.K.
7 anti-money laundering laws?
8 A.  No.
9 Q.  Do you know of any professional
10 experience she has with respect to U.K.
11 anti-terror financing laws or regulations?
12 A.  No.
13 Q.  Do you know of any education or
14 professional training she has in that area?
15 A.  No.
16 Q.  Let me show you what's been
17 marked as Exhibit 8 which has been given to
18 us by counsel with the representation that
19 it's the CV of Mr. Duthie.  By the way, you
20 said earlier that you knew Mr. Duthie
21 socially.  Could you be more specific as to
22 -- I don't mean to pry, but how you knew him
23 socially?
24 A.  We met on social occasions
25 through mutual people.

Page 51

1 WALTERS
2 Q.  Do you know of any professional
3 experience that Mr. Duthie has concerning the
4 regulation of banks in the U.K.?
5 A.  No, I don't.
6 Q.  Do you know of any education or
7 professional training he has in that area?
8 A.  Well, he worked for a bank, he
9 would have undergone the money laundering
10 training as people in banks undergo it, would
11 have received all the what I would call
12 standard variable fees perhaps, but he would
13 have received some training and understanding
14 of money laundering and counter terror
15 financing from his professional experience.
16 Q.  You don't know that, do you?
17 A.  No, I don't know that for
18 certain.
19 Q.  What bank did he work for?
20 A.  I understand he worked for
21 Deutsche Bank.
22 Q.  As an investment banker, not a
23 commercial banker, correct?
24 A.  It's a regulated financial
25 institution and people are required under

Page 52

1 WALTERS
2 that to have money laundering training.
3 Q.  Do you know of any professional
4 experience he's had with U.K. anti-money
5 laundering or counter terror financing laws
6 other than his training?
7 A.  No, I don't.
8 Q.  Do you know of any education or
9 professional training he's had in those areas
10 other than what you just alluded to?
11 A.  No, I don't.
12 Q.  Do you know someone by the name
13 of Jeremy Hibbert?
14 A.  I don't believe that I know him
15 very well.  I might have been introduced to
16 him, but I don't know him.
17 Q.  His name shows up on the time
18 sheets as having worked on your reports.  Did
19 you interact with him at all in connection
20 with the drafting of your reports?
21 A.  Not that I'm aware of.
22       RQ       MR. FRIEDMAN: Jim and Joel,
23 consistent with our prior practice we
24 will submit a letter after the
25 deposition of a document request, but

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

GARY WALTERS
June 8, 2011

Page 57

WALTERS

1   WALTERS
2   services and I'm compensated -- in addition
3   to that I'm compensated for specific work
4   including this on a project based hourly
5   rate.
6   Q.   What's the hourly rate?
7   A.   150 pounds an hour.
8   Q.   Turn again to appendix 1 to
9   Exhibit 1 again which you identified as
10   introduction to FRA and your CV.  Did you
11   write the CV portion of this document?
12   A.   Yes, I did.
13   Q.   You mistakenly omitted four
14   years of your career?
15   A.   I did, yeah.
16   Q.   Did you attend university?
17   A.   I didn't.
18   Q.   You received a diploma in
19   anti-money laundering from the Cass Business
20   School?
21   A.   Yes, I did.
22   Q.   In what year?
23   A.   In 2006 I believe that was.
24   Q.   For how long did you
25   participate in the program to get that

Page 58

1   WALTERS
2   diploma?
3   A.   I think that was an evening
4   study diploma, part-time diploma and I think
5   it was a three or four month program.
6   Q.   How many nights a week?
7   A.   I think it was a night every
8   two or three weeks. It was a post graduate
9   diploma.
10   Q.   You attended class one night
11   every two to three weeks for three or four
12   months?
13   A.   Yes and then there was course
14   work and study to do in the mean time and a
15   series of essays to write and an examination
16   at the end of it.
17   Q.   Have you ever heard of an
18   organization known as the Association of
19   Certified Money Laundering Specialists or
20   ACMLS?
21   A.   I would have to say it doesn't
22   spring out to me as one I'm particularly
23   aware of.  There are numerous numerous
24   different bodies who represent industry
25   anti-money laundering people.

Page 59

1   WALTERS
2   Q.   From 2003 to 2009 you were
3   detective inspector within the economic and
4   specialist crime command of the MPS in
5   London?
6   A.   That's correct.
7   Q.   From 2005 to 2009 during that
8   period that you were a detective inspector,
9   you were operational head of the money
10   laundering investigation team, right?
11   A.   During that period I was, yes.
12   Q.   What do you mean by operational
13   head?
14   A.   I had responsibility for a
15   number of teams.  Trying to think how best to
16   describe it within the -- to make it
17   understandable within policing from the U.K.
18   Operational work I would describe as
19   investigations both proactive and reactive,
20   responsible for what the officers do on a
21   day-to-day basis so driving operational
22   activity. I don't know if that explains it.
23   Q.   Was there another head of the
24   MLIT other than the operational head?
25   A.   It's a hierarchal organization

Page 60

1   WALTERS
2   so there are -- I had bosses and they had
3   bosses, but in terms of anything my team did,
4   I took full responsibility and had
5   responsibility for them and the work.
6   Q.   How big was the team?
7   A.   The money laundering team
8   started at about -- when I took it over it
9   had about 15 people on it, in fact, had just
10   under that because it had some vacancies so
11   post it was about 15.  It then increased in
12   size over time quite rapidly.  They took
13   resources from elsewhere and gave them to me.
14   Q.   That was part of the economic
15   and specialist crime command, correct?
16   A.   Yes, the economic and
17   specialist crime command as the name suggests
18   deals with all sorts of economic crime.
19   Q.   I'm going to show you what's
20   been as Exhibit 9 which are screen shots from
21   the Metropolitan Police Service website that
22   we've downloaded in the last couple of days.
23   Do you recognize the first page to be the
24   home page of the Metropolitan Police Service
25   website?

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

GARY WALTERS
June 8, 2011

**Page 61**

WALTERS

1
2  A.  I haven't seen that website
3  recently, but I have no reason at all to not
4  believe it's that.  They change it quite
5  regularly.
6  Q.  If you look at the fourth page
7  of this exhibit, do you recognize this to be
8  the page of the website that shows the
9  branches of the Metropolitan Police Service?
10 A.  I believe it to show the
11 different branches, yes.
12 Q.  It shows among other branches
13 the branch that you were a part of economic
14 and specialist crime command branch, correct?
15 A.  Correct.
16 Q.  It also shows in the second
17 entry a command named the counter
18 terrorism command formerly the anti-terrorist
19 branch and special branch, correct?
20 A.  Yes, it does.
21 Q.  This is the same special branch
22 that you referred to in your first report,
23 correct?
24 A.  Yes.
25 Q.  The anti-terrorism branch is

**Page 62**

WALTERS

1
2  the same as the anti-terrorist squad that you
3  referred into your reports, correct?
4  A.  Yes.
5  Q.  The NTFIU was developed within
6  special branch and the anti-terrorist squad
7  to bring particular focus onto the
8  investigation of terrorist funding within the
9  U.K., correct?
10 A.  I'm sorry, could you just
11 repeat how you worded that.
12 Q.  The NTFIU was developed within
13 special branch and the anti-terrorist squad
14 to bring particular focus onto the
15 investigation of terrorist funding within the
16 U.K., correct?
17 A.  To give it its own unit to deal
18 with those matters, yes.  Some of these units
19 overlap.  This is simplified as I can
20 understand why it is a simplified description
21 of the different units.  For instance, I
22 actually prepared head command of the arts
23 and antiques unit which sits actually within
24 the economic and specialist crime command so
25 there's more overlap here than this suggests.

**Page 63**

WALTERS

1
2  Q.  Could you look at paragraph 62
3  of your report, Exhibit 1.  I just asked you,
4  Mr. Walters, whether the NTFIU was developed
5  within special branch and anti-terrorist
6  squad to bring particular focus onto the
7  investigation of terrorist funding within the
8  U.K.  You see those are the very words that
9  appear in your report?
10 A.  Yes.
11 Q.  That's accurate, isn't it?
12 A.  Yes.
13 Q.  If you look at the next page of
14 Exhibit 1, the website pages, this describes
15 the counter terrorism command, correct?
16 A.  Yes.
17 Q.  Look at the middle of the page,
18 you see it says counter terrorism command is
19 responsible for, do you see that?
20 A.  Yes.
21 Q.  The first bullet point says
22 "bringing to justice those engaged in
23 terrorist domestic extremism and related
24 offenses", do you see that?
25 A.  Yes.

**Page 64**

WALTERS

1
2  Q.  That includes terrorist
3  financing, correct?
4  A.  Yes.
5  Q.  If you look at the next page,
6  that describes the economic and specialist
7  crime command, correct?
8  A.  Yes.
9  Q.  That's the command in which you
10 served, correct?
11 A.  Yes.
12 Q.  The entry on the next page
13 under, sorry, on this page, the next to last
14 entry under the heading what we do, the next
15 to last entry is a description of the money
16 laundering investigation team, do you see
17 that?
18 A.  Down at the bottom of that
19 page?
20 Q.  Yes.
21 A.  Yes.
22 Q.  That's the team you headed, yes
23 or no?
24 A.  Yes, that was the -- it's
25 changed.  I say yes.  These things are

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

GARY WALTERS
June 8, 2011

Page 65

1   WALTERS
2   permanently evolving and changing and I do
3   know because I still speak to people that
4   it's changed a great deal so I don't know
5   when this was written.
6   Q.   This is the name of the team
7   you headed -- this is the team that you
8   headed in your last years with the MPS,
9   correct?
10  A.   Yes.
11  Q.   Go back to your CV in Exhibit
12  1.  Turn to page 2, please, the discussion of
13  the money laundering investigation team.  The
14  end of the first paragraph in that section it
15  says, "Some of MLIT's investigations
16  overlapped with terrorism cases and the
17  financing of terrorism", do you see that?
18  A.   Yes.
19  Q.   The terrorism cases and the
20  financing of terrorism that your team's
21  investigation overlapped with, those other
22  cases were handled by the NTFIU, correct?
23       MR. BONNER: Objection to form.
24  A.   Perhaps I can clarify that for
25  you.

Page 66

1   WALTERS
2   Q.   Before you clarify it.  This
3   says that your team's investigations
4   overlapped with cases in the terrorism and
5   terrorist financing area, correct?
6   A.   Yes.
7   Q.   My question is if you look at
8   this in terms of a ven diagram, I gather
9   there's a shaded area of overlap.  What's the
10  other -- what group within the MPS was the
11  other circle?  Who was conducting the other
12  investigations into -- who was conducting the
13  investigations into terrorism and financing
14  with which your team overlapped?  What was
15  the name of that group?
16       MR. BONNER: Objection to form.
17  Go ahead, you can answer.
18  A.   Sometimes there wasn't anybody
19  investigating that field of crime.
20  Q.   And other times?
21  A.   If I could finish.
22  Q.   Sure.
23  A.   The background to the offenses
24  that we would be dealing with would indicate
25  that perhaps there was terror financing

Page 67

1   WALTERS
2   involved, but it didn't mean that anybody
3   else was investigating terror financing.  If
4   I could just go back to the overlaps that
5   occurred in other fields of work there was a
6   specialist team and going back to your
7   previous page about the metropolitan police,
8   the dedicated, for example, the dedicated
9   check and plastic crime unit had
10  investigators, but we often dealt with cases
11  that in some ways they could have been
12  dealing with.
13  Q.   Understood.
14  A.   There was nobody investigating
15  it so we dealt with those issues.
16  Q.   I understand.  When there was a
17  case that involved terrorism and financing
18  terrorism, the counter terrorism team would
19  have primary responsibility for that,
20  correct?
21  A.   I would meet with them and
22  discuss the cases and I would -- and then a
23  decision would be made who would investigate
24  it.
25  Q.   Did your team have

Page 68

1   WALTERS
2   responsibility for cases that involved only
3   terrorism and terrorist financing?
4   A.   Again, I pause before answering
5   because it's really not that simple because
6   occasionally we would start out
7   investigations, for instance, with a cash
8   seizure under the cash seizure provisions
9   where circumstances would lead us or
10  intelligence would lead us and we would
11  recover money and at that stage we often
12  didn't know what we were dealing with beyond
13  it was suspicious and we would take action.
14       If that money turned out to be,
15  for instance, linked to major drug dealing, I
16  would go and see the teams that were focused
17  on drug crime and discuss with them does this
18  assist them in their investigations, do they
19  want to take it over, what would they like to
20  do and how would they like us to proceed and
21  then we would be in a dialogue.
22       In the same way if there is
23  indication of terrorist financing or anything
24  that may overlap, I would meet with the
25  anti-terrorist squad offices who I knew very

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

GARY WALTERS
June 8, 2011

Page 69

WALTERS

1  WALTERS
2  well because some of them had come from
3  exactly my background and discussed with them
4  this is what we are dealing with, this is
5  what we know so far and then we would keep
6  them in the loop.
7  Q.  In these instances of overlap
8  that are described in the sentence that
9  overlap was -- the folks involved in the
10  overlap in addition to your team were people
11  from the anti-terrorist squad, correct?
12  A.  Sorry, could you say that
13  again.
14  Q.  What I'm getting at is in this
15  area of overlap, in these instances of
16  overlap that's described in this sentence,
17  the other personnel outside of your team that
18  you would work with would be the
19  anti-terrorism squad of people, correct?
20  A.  Yes.
21  Q.  Did any of these overlapping
22  investigations involve questions relating to
23  banking practices, the practices of U.K.
24  banks?  Let me be more specific.
25  A.  I'm sorry.

Page 70

WALTERS

1  WALTERS
2  Q.  It was a bad question.  Let me
3  be more specific.  In these overlapping
4  investigations that you were involved with,
5  did you ever have occasion to have experience
6  with questions relating to the internal
7  practices of U.K. banks?
8  MR. BONNER: Objection to form.
9  You can answer.
10  A.  In just about -- in most cases
11  that we dealt with that's my team and the
12  anti-terrorist unit there was -- I'm trying
13  to think where there wasn't a regulated
14  entity be it banks, lawyers, accountants,
15  other regulated bodies, but normally banks.
16  Majority of cases money is moved through
17  banks which always brought up issues with the
18  regulation of banks.
19  Q.  Did you ever have occasion to
20  investigate a bank's conduct in relation to
21  terrorist financing?
22  A.  I'd have to say I can't recall
23  a specific case where that happened.
24  Q.  If you look further down on
25  page 2, I'm sorry, if you look at the next

Page 71

WALTERS

1  WALTERS
2  sentence of what we were just looking at, the
3  second paragraph on page 2, it says, "He
4  regularly interacted with the national
5  terrorist financing intelligence unit."
6  Actually it says, "As such he regularly
7  interacted with the national terrorist
8  financing intelligence unit", do you see
9  that?
10  A.  Yes.
11  Q.  Do the words as such meaning
12  that in these overlapping cases you dealt
13  with the NTFIU?
14  A.  Yes.
15  Q.  The last section on this
16  page --
17  A.  Just to clarify that answer if
18  I may.  I also dealt with them in a more
19  generic way around meeting with them in
20  relation to generic anti-money laundering and
21  regulatory issues and met with them at
22  conferences and talks where we would discuss
23  what's going on within the arena and what
24  messages effectively corporately we needed to
25  or try to put across to the people we were

Page 72

WALTERS

1  WALTERS
2  meeting with so we just didn't purely
3  duplicate each other.
4  Q.  Let's look at the last section
5  on page 2 carry over to page 3 which
6  describes a case involving Sri Lankan --
7  funds relating to Sri Lanka and the Tamil
8  Tigers, do you see that?
9  A.  Yes.
10  Q.  Is there any other instance
11  that you recall in which you cooperated with
12  the NTFIU on a specific investigation other
13  than the one listed here?
14  A.  I should just clarify in giving
15  my answers that I feel both legally and duty
16  bound in some circumstances to be careful
17  with how I answer because I'm subject to the
18  Official Secrets Act and subject to
19  confidential information I obtained during my
20  time in the police so to qualify in that way
21  I dealt on a number of cases.
22  This one I feel able to talk
23  about in more detail because it went to
24  court, there were court hearings and it was
25  easier to deal with.

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

GARY WALTERS
June 8, 2011

---

Page 73

1      WALTERS
2 Q.  Is there any other case in
3 which you cooperated with the NTFIU that you
4 could describe in detail or are you not
5 permitted to?
6 A.  Not that I can describe in
7 detail.
8 Q.  Look at page 3 of your CV under
9 the heading SAR assessment.  It says here
10 that another team within economic and
11 specialist crime was the financial
12 intelligence development unit which received
13 SARs, correct?
14 A.  Yes.
15 Q.  Was there one FIDU for the
16 whole economic and specialist crime command
17 or was there an FIDU for different areas
18 within the command?
19 A.  No, there was one.  Again, it
20 was a very rapidly changing set up, but I'll
21 try and help you.  I would say that there was
22 one financial intelligence development unit
23 that sat within the intelligence unit of the
24 economic and specialist crime command and
25 that was the point of contact for the daily

---

Page 74

1      WALTERS
2 receipt of all the SARs impacting London on
3 behalf of the whole metropolitan police.
4 Q.  So that was the unit for all of
5 the SARs received from London no matter the
6 topic of the SAR?
7 A.  It wouldn't receive -- there
8 was a -- within the overall system and this
9 takes us on to SOCA who are the U.K. central
10 point and SARs would have a degree of
11 assessment and may well be allocated
12 elsewhere depending on the topics so it's not
13 all SARs.  For instance, tax matters would go
14 to Her Majesty's custom and revenue so in
15 that way they would seek to allocate and
16 certainly one of the areas where they would
17 look to put SARs would be anti-terrorist
18 would go to those responsible for
19 investigating the anti-terrorist matters.
20 Q.  So SARs relating to
21 anti-terrorists would not go to the FIDU
22 within the economic and specialist crime
23 department, it would go to the counter
24 terrorism command, correct?
25 A.  That's correct.

---

Page 75

1      WALTERS
2 Q.  That includes SARs relating to
3 terror financing, correct?
4 A.  That's correct.
5 Q.  Look at your report, paragraph
6 85.  The SARs -- and paragraph 86.  The SARs
7 you are referring to here are the SARs that
8 were sent to the economic and specialist
9 crime command, correct?
10 A.  Yes.
11 Q.  Now look at paragraph 92 and
12 please read that to yourself.  You were
13 referring there to matters that did not go to
14 the counter terrorism command in the first
15 instance, but went to your command and you
16 referred them to the counter terrorism
17 command, correct?
18 A.  Yes, that's the kind of example
19 where I would have it and following a bit of
20 often either my assessment or having had some
21 more work done on it that I would want to
22 make sure the information also went
23 elsewhere.
24 Q.  During your career, did you
25 review any of the SARs that Nat West filed

---

Page 76

1      WALTERS
2 with respect to Interpal during your police
3 career?
4 A.  No.
5 Q.  Those according to your
6 understanding would have gone to the counter
7 terrorism command, correct?
8 A.  Or its equivalent at the time.
9 Q.  I understand.
10 A.  I would have referred it
11 straight there.
12 Q.  You were never a member of the
13 NTFIU, correct?
14 A.  I was never a member of it, no.
15 Q.  You were never a member of
16 special branch?
17 A.  I was never a member of special
18 branch, no.
19 Q.  You were never a member of the
20 anti-terrorist squad?
21 A.  No, I worked with them, but I
22 was not a member.
23 Q.  You were never a member of the
24 counter terrorism command?
25 A.  No, I wasn't.

---

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

GARY WALTERS
June 8, 2011

---

Page 77

WALTERS

1
2  Q.  You never worked for the FSA?
3  A.  No, again, I worked with the
4  FSA on a number of matters, but I was never
5  in the FSA.
6  Q.  On money laundering matters?
7  A.  On money laundering and
8  regulation matters, yes.
9  Q.  You never worked for the NCIS?
10  A.  I was never a member of NCIS,
11  but again, I regularly worked on cases
12  alongside them.
13  Q.  Involving money laundering?
14  A.  Involving money laundering,
15  yes.
16  Q.  You never worked for SOCA?
17  A.  No, they came into being from
18  NCIS very similar, but I was never a member
19  of SOCA.
20  Q.  You never worked for the
21  Charity Commission?
22  A.  Never worked for the Charity
23  Commission.
24  Q.  You worked with the Charity
25  Commission on money laundering matters?

---

Page 78

WALTERS

1
2  A.  I had one particular case with
3  money laundering matters where I worked with
4  the charity.
5  Q.  The Shah case?
6  A.  No, that was the Baluchi case.
7  Q.  You submitted a witness
8  statement in that case?
9  A.  On Baluchi?
10  Q.  Yes.
11  A.  I can't recall.  I can't
12  recall.
13  Q.  You did in the Shah case?
14  A.  In the Shah case I submitted a
15  couple of witness statements.
16  Q.  You ever work for Her Majesty's
17  Treasury?
18  A.  No, I worked very close with
19  them, again, but not worked for them.
20  Q.  On money laundering matters?
21  A.  On related financial crime
22  matters, yes.
23  Q.  Did you ever work for the
24  Financial Sanctions Unit of the Bank of
25  England?

---

Page 79

WALTERS

1
2  A.  No, I didn't.
3  Q.  Look at paragraph 78 of your
4  first report.  Is that accurate?
5  A.  I believe it is, yeah.
6  Q.  Paragraph 79, is that accurate?
7  A.  I believe it is, yes.
8  Q.  Based on your experience, were
9  the members of special branch with whom you
10  worked competent?
11      MR. BONNER: Objection to form.
12  A.  In my career I worked with them
13  on a number of different things at different
14  times and there's different people.  I find
15  it very difficult to answer that.  There were
16  different people with different levels of
17  skill.  Some of them I worked with had skills
18  in different areas so very difficult to
19  answer that.
20  Q.  Do you know someone named Mark
21  Ashtown?
22  A.  I can't recall whether I met
23  him or not.
24  Q.  Bob Stevens?
25  A.  Again, I can't recall if I met

---

Page 80

WALTERS

1
2  him or not.
3  Q.  Neil Bennett?
4  A.  I can't recall whether I met
5  him or not.
6  Q.  Did you ever report to --
7  withdrawn.  When you were in the Metropolitan
8  Police Service, was there a mechanism whereby
9  if you thought one of your colleagues was not
10  doing his or her job competently you could
11  report that to your superior or a superior?
12  A.  There were routes to address
13  performance issues.
14  Q.  Did you ever raise any
15  performance issues relating to people you
16  worked with in special branch?
17  A.  No, I didn't.
18  Q.  The anti-terrorist squad?
19  A.  No.
20  Q.  The NTFIU?
21  A.  I probably need to qualify that
22  a little bit because there are many ways of
23  raising performance issues and I from
24  addressing it directly myself if I was
25  witness to anything, from verbal advice there

---

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

GARY WALTERS
June 8, 2011

---

Page 81

WALTERS

2 and then even if it wasn't somebody directly
3 in my area of work or speaking quietly to
4 their own line managers and seniors.
5 Q. Did you ever make a formal
6 report about anyone from NTFIU or the
7 anti-terrorist squad or special branch?
8 A. No, I don't believe I did.
9 Q. NCIS?
10 MR. BONNER: Formal report you
11 talking about?
12 A. Formal report?
13 Q. Yes.
14 A. No.
15 Q. Did you ever make an informal
16 report complaining about the competence of
17 people in any of those areas?
18 A. I don't recall making a
19 complaint, but I would provide feedback to
20 their senior officers and/or colleagues
21 around where I perhaps felt that performance
22 might be an issue, but informally.
23 Q. Do you recall any specific
24 instance in which you did that with respect
25 to a member of special branch?

---

Page 82

WALTERS

2 A. I can't recall any specific
3 issues, no.
4 Q. Anti-terrorist squad?
5 A. No.
6 Q. NTFIU?
7 A. No.
8 Q. Anyone in the counter terrorism
9 command?
10 A. No, I can't recall any specific
11 issues.
12 Q. SOCA?
13 A. I can't recall any specific
14 issues.
15 Q. Charity Commission?
16 A. Again, I would have to say I
17 don't recall any specific issues.
18 Q. FSA?
19 A. I can't recall any specific
20 issues.
21 Q. The highest rank you achieved
22 at Scotland Yard was detective inspector,
23 correct?
24 A. Yes, it was. I was on
25 different occasions temporary detective chief

---

Page 83

WALTERS

2 inspector and acting chief inspector.
3 Q. When the chief inspector
4 position was empty?
5 A. Either when it was -- it was
6 either, yeah, vacant in some way or covering
7 for people and that happened elsewhere as
8 well.
9 Q. Thereafter you were restored to
10 detective inspector?
11 A. Yes.
12 Q. Let me show you what's been
13 marked as Exhibit 10 which is something else
14 we took from the MPS website. If you look at
15 the second page, there is a description at
16 the bottom of the rank structure of the MPS,
17 do you see that?
18 A. Yes, I do.
19 Q. Is that accurate?
20 A. Yes, it is.
21 Q. Was it accurate during 2005 to
22 2009?
23 A. Yes, it was.
24 Q. Was it accurate during 2003 to
25 2009?

---

Page 84

WALTERS

2 A. Yes, I think it has not changed
3 for many years.
4 Q. You were in the third position
5 from the bottom of the page, you were an
6 inspector with the prefix detective as
7 described in the text at the bottom of the
8 page, correct?
9 A. Yes.
10 Q. Look at page 2 of your CV again
11 in Exhibit 1. Read to yourself the first
12 paragraph under the heading Charity
13 Commission?
14 A. Yes.
15 Q. Did you work with the Charity
16 Commission on any case other than the Baluchi
17 case?
18 A. During my full service I have
19 dealt with numerous crimes relating to
20 charities. Sometimes -- often my office, you
21 know, maybe I need to be more specific. I
22 would have offices investigating these cases
23 and I would be in charge of the case.
24 There's an element of supervision sometimes,
25 but I had a number of dealings and I can't

---

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

GARY WALTERS
June 8, 2011

Page 85

WALTERS

1    WALTERS
2    recall how many. I dealt with an awful lot of
3    crime, but particularly around frauds where
4    the Charity Commission or charities were
5    engaged and when that happened we would try
6    to engage with the Charity Commission because
7    we feel that they needed to know.
8    Q.   Did you ever have any --
9    withdrawn.  Did you ever work directly with
10   the Charity Commission other than in the
11   Baluchi case?
12   A.  I didn't, no.
13   Q.   Have you ever been employed by
14   a commercial or retail bank?
15   A.   No, I haven't.
16   Q.   Do you have any professional
17   training or education in bank policies?
18   A.   Beyond the diploma?
19   Q.   Correct.
20   A.   No formal education.
21   Q.   Do you have any professional
22   training on bank policies other than the
23   diploma?
24   A.   No formal training, no.
25   Q.   Other than the diploma,

Page 86

1    WALTERS
2    everything you know about the internal
3    policies and procedures of British banks
4    comes from your work with the MPS, correct?
5    A.  Yes, that's correct.
6    Q.   Other than your diploma,
7    everything that you know about the regulation
8    of British banks comes from your work with
9    the MPS, correct?
10   A.   That's correct, yes.  Again,
11   just so I qualify it just a fraction, I was
12   employed by the MPS. In a lot of fields I
13   would undertake background work so I was
14   employed by the MPS so I would inform myself
15   as it were through reading and speaking to
16   people.
17   Q.   Other than your diploma,
18   everything that you know about the regulation
19   of British banks comes from your work or
20   reading you did in connection with your
21   service with the Metropolitan Police Service,
22   correct?
23   A.  Thank you, yes.
24   Q.   Based on your experience, do
25   you agree that U.K. law enforcement agencies

Page 87

WALTERS

1    WALTERS
2    have more access to intelligence sources than
3    do private banks?
4    MR. BONNER: Objection to form.
5    A.  From my experience in working
6    with banks they are all very different, but
7    from my experience banks had databases at
8    times the police did not have and the police
9    had databases that banks didn't have.
10   Q.   What about governmental
11   intelligence sources, in your experience who
12   had greater access to those, U.K. law
13   enforcement authorities or banks?
14   A.   I think I would have to ask you
15   to qualify governmental -- what are
16   governmental intelligence sources?
17   Q.   Th intelligence information
18   gained by Her Majesty's Government, in your
19   experience who had greater excess to that
20   information, U.K. law enforcement or banks?
21   A.  Again, both those expressions
22   of governmental intelligence sources and law
23   enforcement are both very sweeping and to
24   some extent I would have to say within the
25   intelligence world would the banks depending

Page 88

1    WALTERS
2    on what's been worked on, I don't know if
3    banks have access to data that I'm unaware or
4    intelligence I'm unaware of.
5    Q.   You are familiar with an entity
6    known as MI5?
7    A.  I am, yes.
8    Q.   You are familiar with an entity
9    known as MI6?
10   A.   Yes.
11   Q.   In your experience did you come
12   across any instance in which MI5 or MI6
13   shared information with a bank that it did
14   not share with law enforcement agencies?
15   A.  I'm trying to think whether I
16   need to qualify my or whether I can answer
17   that.  I don't think I can answer that
18   question.
19   Q.   Why not?
20   A.  Because of confidentiality
21   issues.
22   Q.   Were you ever disciplined
23   during your career at the MPS?
24   A.  No.
25   Q.   Were you ever demoted from a

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

GARY WALTERS
June 8, 2011

---

Page 89

1  WALTERS
2  position when you were with the MPS?
3  A.  No.
4  Q.  Let me show you what's been
5  marked as Exhibit 11 which is something taken
6  from the FRA website.  Have you ever seen
7  this before?
8  A.  I have seen their website, yes.
9  Q.  You have seen this?
10  A.  I believe that I would have
11  seen this, yes.
12  Q.  Do you have any reason to
13  believe that FRA's website -- this page from
14  FRA's website is inaccurate?
15      MR. BONNER: Objection to form.
16  A.  Can I have a moment to read it?
17  Q.  Please.
18  A.  Yes.
19  Q.  Do you have any reason to
20  believe that anything here is inaccurate?
21  A.  Not that I'm aware of, no.
22  Q.  Other than Ms. McLeod and her
23  colleagues' work on the CL report, were you
24  aware of any other work that FRA has done in
25  the area of terror financing?

---

Page 90

1  WALTERS
2  A.  No, I'm not.
3  Q.  Let me show you what's been
4  marked as Exhibit 12 which is also a download
5  from the FRA website.  Have you ever seen
6  this before?
7  A.  I can't recall reading it,
8  but --
9  Q.  Let me show you what's been
10  marked Exhibit 13, another download from the
11  FRA website.  Have you ever seen this before?
12  Have you ever seen this before?
13  A.  I don't recall seeing it.
14  Q.  Let me show you what's been
15  marked Exhibit 14 which is another download
16  from the FRA website.  Have you ever seen
17  that?
18  A.  Yes, I have.
19  Q.  When did you first see it?
20  A.  When I agreed with them that I
21  would work as a consultant for them.
22  Q.  Is this accurate in all
23  respects?
24  A.  I believe it is, yes.
25  Q.  You can put that aside.  You

---

Page 91

1  WALTERS
2  have never written anything that's been
3  published, correct?
4  A.  In terms of?
5  Q.  An article, a book?
6  A.  No.
7  Q.  Look at page 5 of your CV which
8  is part of Exhibit 1.  Read to yourself the
9  section on publications and speaking
10  engagements.
11  A.  Yes.
12  Q.  Is that accurate?
13  A.  I believe it is, yes.  If I
14  could qualify that.  One of the things in
15  reflecting on this when I was working I was
16  not good at capturing all the things I was
17  doing and all of the cases I was involved in
18  and all of the lessons coming out of all of
19  those cases because I was focused on the work
20  in hand and in my career so I had numerous
21  speaking engagements at different levels, but
22  I don't have a record of all the ones that I
23  went to.
24  Q.  Do you have any materials,
25  written materials for any of your speaking

---

Page 92

1  WALTERS
2  engagements, for example, notes or outlines
3  or brochures?
4  A.  No.
5  Q.  You have nothing?
6  A.  No.  If I'm asked to go and
7  speak to people, I will bespoke a
8  presentation depending on who I'm speaking
9  to, what the messages are, what messages are
10  coming across.
11  Q.  Do you have copies of any of
12  your presentations you have given?
13  A.  I may -- I still have I think
14  some copies of some power points that I have
15  given.
16  Q.  Where do you have those, in
17  your home?
18  A.  Yes.
19  Q.  Do you have anything else
20  relating to the presentations you have given?
21  A.  Not that I can recall.
22  Q.  Have you ever served as an
23  expert witness in a court proceeding before
24  this one in any country?
25  A.  No.

---

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

GARY WALTERS
June 8, 2011

Page 93

WALTERS

1
2  Q.  Have you ever been asked to
3  serve as an expert witness in any court
4  proceeding in any country before these cases?
5  A.  Not that I can recall, no.
6  Q.  Other than the Shah case, have
7  you ever testified as a fact witness either
8  through written testimony or oral testimony?
9  A.  I have given evidence in an
10  awful lot of cases.
11  Q.  Criminal cases?
12  A.  Criminal cases in the U.K.
13  Q.  Cases that you were involved in
14  investigating as a member of the MPS?
15  A.  That's correct.
16  Q.  Have you ever testified in a
17  case other than one of those cases?
18  A.  All the testimony I've given
19  has been on cases I've been involved in
20  some way.
21  Q.  Mr. Walters, you're not
22  offering the opinion that Nat West knew that
23  Interpal was financing terrorism, are you?
24  MR. BONNER:  Objection to form.
25  A.  That's not in my opinions.

Page 94

WALTERS

1
2  Q.  You're not offering the opinion
3  that Nat West knew that Interpal was
4  providing funds to Hamas, correct?
5  A.  That's not in my opinions.
6  Q.  You are not offering the
7  opinion that Nat West believed that Interpal
8  was financing terrorism, are you?
9  A.  That's not in my opinions.
10  Q.  You are not offering the
11  opinion that Nat West believed Interpal was
12  funding Hamas, correct?
13  A.  Yeah, that's correct.
14  q.  You are not offering any
15  opinions to the requirements of U.K. law, are
16  you?
17  MR. BONNER:  Objection to form.
18  A.  I'm just thinking I'm not a
19  lawyer, but I have worked with the law for 30
20  years as a law enforcement officer.  I have
21  an awareness of the law, but in forming my
22  opinions I cannot divorce it completely from
23  what knowledge I do have of the law, but when
24  forming those opinions on the circumstances
25  that I looked at and the information that I

Page 95

WALTERS

1
2  have looked at I'm bringing that awareness as
3  well as what I experienced on a regular basis
4  when dealing with financial crime in
5  particular.
6  Q.  But you're not offering a legal
7  opinion as to what U.K. law requires, are
8  you?
9  MR. BONNER:  Objection to form.
10  A.  I'm not offering a legal
11  opinion.
12  Q.  Look at your rebuttal report
13  paragraph 192.  Why don't you read that
14  paragraph to yourself.
15  A.  Can I just go back before we
16  move on to clarify something in an issue that
17  came up earlier.  When you presented to me
18  the list of ranks within the Metropolitan
19  Police Service, as I described earlier it's a
20  hierarchal structure, it's a rank structure
21  that's been around for a long time, but the
22  roles performed by people at the different
23  ranks are extremely different and varied with
24  areas of responsibility that vary
25  accordingly.

Page 96

WALTERS

1
2  Policing is increasingly a
3  complex area so the answer I gave or as you
4  pointed out if you'd like it's the third rank
5  up or the 10th or 20th rank down which ever
6  way you care to put it, but the roles and
7  responsibilities can vary greatly between
8  people of the same rank and in the roles I
9  was playing as a detective inspector, I had
10  big areas of responsibility and dealing with
11  matters that arguably would normally be dealt
12  with by chief officers because I regularly
13  met chief officers from other countries and
14  dealt with them at that sort of level so I
15  just wanted to clarify that point.
16  It's not as simple as someone
17  is down here or up there.  It's a more
18  complex equation.
19  Q.  The areas of responsibility
20  that you had are as stated in your CV plus
21  the four years that you supplemented this
22  morning, correct?
23  A.  On occasions I was also asked
24  to deal with sort of to represent the
25  metropolitan police at times on broader

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

GARY WALTERS
June 8, 2011

Page 97

1      WALTERS
2  topics.
3  Q.  Understood.  Look at paragraph
4   192 of your rebuttal report.
5  A.  Thank you.
6  Q.  Read that to yourself, please.
7   You see you refer to the global banking
8   standards published by Basel, Wolfsberg and
9   FATF, do you see those?
10  A.  I do.
11  Q.  When did you first read those?
12  A.  When I first -- when did I
13   first --
14  Q.  Read those?
15  A.  Read those terms?
16  Q.  Read those standards if ever?
17  A.  I can't recall.
18  Q.  Have you ever read what you
19   describe as the global banking standards
20   published by Basel, Wolfsberg and FATF?
21  A.  I have read a great deal of
22   material on -- I have read material from all
23   three in relation to both, not so much
24   with Basel, but in relation to the Wolfsberg
25   group I was asked to attend a meeting of one

Page 98

1      WALTERS
2  of their working groups to discuss both
3  anti-money laundering policies, procedures
4  and that definitely, you know, also included
5  counter terror financing.
6   In relation to FATF, I had a
7  lot of dealings with FATF and their matters.
8  I can't recall with any of them when I first
9  became aware of them.
10  Q.  That wasn't my question.  My
11   question was when did you first read the
12   standards that you are referring to here?
13  A.  I can't recall.
14  Q.  Did you ever read them?
15  A.  I have read them.  Whether I
16   read them all or not I don't know.
17  Q.  What are the Basel standards
18   that you are referring to specifically?
19  A.  I can't tell you.
20  Q.  What are the Wolfsberg
21   standards you are referring to specifically?
22  A.  I can't tell you.
23  Q.  What are the FATF standards you
24   are referring to specifically?
25  A.  I cannot give them off rope.

Page 99

1      WALTERS
2  Q.  Have you read any of those
3   during the course of your engagement in these
4   cases?
5  A.  Yes, I have.
6  Q.  Where did you do that?
7  A.  I did that during my general
8   background reading.
9  Q.  Who gave them to you?
10  A.  I took it off the internet.
11  Q.  Off the Basel website?
12  A.  I can't recall.  I really can't
13   recall.  It's not just -- I can't recall.
14  Q.  Did you retain copies of any of
15   these standards in your files?
16  A.  No.
17  Q.  You read them on the internet,
18   you didn't print them out?
19  A.  No.
20  Q.  But as you sit here, you can't
21   identify specifically any of the Basel,
22   Wolfsberg or FATF standards you are referring
23   to?
24  A.  In terms of FATF I have a
25   better knowledge because it's closer to the

Page 100

1      WALTERS
2  work that I was doing than Basel or
3  Wolfsberg.
4  Q.  What specifically by title what
5  are the FATF standards that you are referring
6  to here, can you tell me?
7  A.  The 40 plus 9 recommendations.
8  Q.  Anything else?
9  A.  They have accompanying guidance
10  notes.
11  Q.  You read the 40 plus 9 in
12  connection with your work on these matters?
13  A.  I read all of those on a number
14  of occasions before.
15  Q.  Did you read them in connection
16  with your work on these matters?
17  A.  I refreshed my memory about
18  them.
19  Q.  Did you read them?
20  A.  Yes.
21  Q.  The guidance notes, did you
22  read those in connection with your work on
23  these matters?
24  A.  Some.  I can't recall all.
25  Q.  You read them on the internet,

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

GARY WALTERS
June 8, 2011

Page 113

WALTERS
2  Q.  Cases that you worked on during
3  your career?
4  A.  Yes.
5  Q.  With the MPS?
6  A.  Yes, where I would meet people
7  from regulated businesses and we would
8  discuss issues.
9  Q.  Did any of your cases involve
10  charities other than the Baluchi case?
11  A.  Over the years there's a number
12  of cases that involved charities in different
13  ways and that doesn't just include my time on
14  economic and specialist crime.  This is
15  charities get exploited or abused in
16  different ways by different people.
17  Q.  Did you ever have a case
18  involving a charity and suspicions of terror
19  financing?
20  A.  No, I didn't.
21  Q.  Look at paragraph 193 of your
22  rebuttal report.  You refer here to arbitrage
23  between legal jurisdictions.  What do you
24  mean by that?
25  A.  This was a subject that came up

Page 114

WALTERS
2  in various times in discussions with banks
3  and other regulated entities and people
4  within the regulators.  It was including when
5  working with government, other government
6  departments and legislators where what I mean
7  is with increased globalization there is a
8  threat that corporations or people can decide
9  where they are going to base themselves where
10  they are subject to less strict scrutiny and
11  regulation which will allow them to operate
12  less transparently than else where so easier
13  regulation to manage and so what I mean is
14  the global standards and practices everybody
15  that I dealt with consistently agreed needed
16  to be enforced in such a way that
17  institutions could not just decide they
18  wanted to go else where and develop a
19  financial center for instance somewhere that
20  had no regulation.
21  Q.  To your knowledge Nat West has
22  always been based in the U.K., correct?
23  A.  To my knowledge, yes.
24  Q.  Is it your understanding that
25  banks have to apply the counter terrorist

Page 115

WALTERS
2  designations of every country in the world
3  regardless of where the banks are located and
4  what countries a transaction might involve?
5  MR. BONNER: Objection to form.
6  A.  My experience in speaking with
7  financial institutions and regulators was
8  that it wasn't just about the legal
9  requirements, it was also the spirit of the
10  legislation and standards that had been
11  bought in and the discussions taking place to
12  try and deal with the globalization issue and
13  to have the standards so consistent.
14  Consistent agreement I found in discussions
15  was that people would work to implement the
16  highest standards that they operated in and
17  in doing that and operating with different
18  standards in different places and the
19  legislation that applied, sometimes it could
20  create tensions in terms of legally they
21  would have problems, but they would work to
22  the spirit of operating across the globe in a
23  way that satisfied all of the requirements in
24  areas that they operated.
25  Q.  To your understanding

Page 116

WALTERS
2  considering the legal requirements, is a
3  British bank in its provision of services to
4  a British customer required to follow the
5  United States counter terrorist designations?
6  A.  I'm not a lawyer and I don't
7  opine on the legal issues.
8  Q.  To your understanding given the
9  spirit of the legislation that you refer to,
10  must a British bank serving a British
11  customer in Britain abide by the counter
12  terrorist designations made by the United
13  States?
14  MR. BONNER: Objection to form.
15  You can answer.
16  A.  My experience in this --
17  Q.  I'm asking for your
18  understanding.
19  A.  My understanding is that
20  British institutions would take due note of
21  the standards being applied and the
22  legislation that's applied anywhere they were
23  doing business that could effect them in some
24  way.
25  Q.  My question was different.  My

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

GARY WALTERS
June 8, 2011



Page 121

```
 1      WALTERS
 2   would take note of any listing and it's
 3   another piece of the jigsaw that has to be
 4   assessed.
 5   Q.   You're aware from your review
 6   of the file that Nat West expressly notified
 7   NCIS and the Bank of England of the fact that
 8   Interpal had been designated in the U.S. in
 9   August of 2003, correct?
10   A.   Yes.
11   Q.   You're aware that Her Majesty's
12   Government decided not to designate Interpal,
13   correct?
14   A.   At that time, yes.
15   Q.   Interpal has never been
16   designated in the U.K., correct, to this day?
17   A.   I genuinely can't recall.
18   Q.   You will recall that when Nat
19   West wrote to the Bank of England
20
21
22
23
24                      correct, yes or no?
25   A.   I don't think I can answer that
```

Page 122

```
 1      WALTERS
 2   with a yes or no.
 3   Q.   Didn't you read that in the
 4   letter that Mr. Dawlings sent to Mr. Gossage?
 5   A.   I think there is -- perhaps we
 6   could refer to those sections in my report.
 7   Q.   I'm just asking whether you
 8   remember that Mr. Dawlings wrote that to Mr.
 9   Gossage that
10
11   A.   I can't remember the exact
12   wording.
13   Q.   Let me ask you this --
14   A.   Because if I could just qualify
15   that, I don't recall the exact wording.  If
16   you could produce it, but I don't think
17   anyone would know --
18
19
20
21
22
23
24
25   Q.   Let me show you what's been
```

Page 123

```
 1      WALTERS
 2   marked as Exhibit 37.  Have you ever seen
 3   that before?  It's a letter that Mr. Gossage
 4   of Nat West wrote to Mr. Dawlings of the Bank
 5   of England Financial Sanctions Unit on
 6   September 5, 2003.  It also contains Mr.
 7   Gossage's response and then it contains a
 8   reply by Mr. Dawlings.  Have you ever seen
 9   these letters before?
10   A.   If I could just have a moment
11   to refresh myself.  Yes.
12   Q.   You have seen these and you
13   considered them in connection with your
14   reports, correct?
15   A.   Yes, I did.
16   Q.   In the first letter from Mr.
17   Gossage to Mr. Dawlings
18
19                      , correct?
20   A.   That's correct, yes.
21   Q.   And he concludes
22
23
24                                  er
25                              do you
```

Page 124

```
 1      WALTERS
 2   see that?
 3   A.   Yes.
 4   Q.   If you look at Mr. Dawlings
 5   response
 6
 7
 8
 9
10                      you see that?
11   A.   Yes.
12
13
14
15
16
17
18
19
20
21   Q.   Mr. Dawlings says, '
22
23
24
25   You read that in connection with your work in
```

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

GARY WALTERS
June 8, 2011

---

Page 125

1   WALTERS
2   preparation for your report?
3   A.  Yes, I did.
4   Q.  In connection with your work on
5   the report, have you spoken with anyone from
6   any U.K. law enforcement authorities about
7   Interpal?
8   A.  Not at all, no.
9   Q.  Have you spoken with HMT?
10  A.  No.
11  Q.  SOKA?
12  A.  No.
13  Q.  FSA?
14  A.  No.
15  Q.  Anyone at all associated with
16  Her Majesty's Government?
17  A.  No.
18  Q.  Or U.K. law enforcement
19  authorities?
20  A.  No.
21  Q.  Are you aware of any plans
22  since October 3, 2003 to designate Interpal
23  as a terrorist entity under U.K. law?
24  A.  No, I'm not.
25  Q.  I notice that you did not list

---

Page 126

1   WALTERS
2   this document among those you listed in
3   Appendix 1 to your second report as documents
4   you relied upon in your report.  Why is that?
5   A.  I have made a mistake I think.
6   I do apologize.  It's referenced in the
7   report itself.
8   Q.  Look at paragraph 86 of your
9   second report.  In paragraph 86 among other
10  things you say that in the second sentence
11  that Nat West "had several clear
12  opportunities to discuss its potential
13  options with law enforcement and to obtain
14  clear guidance.  Nat West failed however to
15  take action on such opportunities."  Didn't
16  Nat West take such an opportunity in this
17  letter that Mr. Gossage wrote to Mr.
18  Dawlings?
19  A.  If I go back to the letter in
20  simple terms he did.
21  Q.  Okay.
22  A.  But the information that was
23  sent without knowing what else was shared
24  isn't the full amount of information in the
25  hands of the World Bank of Scotland.

---

Page 127

1   WALTERS
2   Q.  You understand that United
3   States authorities made presentations to Her
4   Majesty's Government on the reasons why the
5   U.S. wished for the U.K. to designate
6   Interpal, correct?
7   A.  I have not got any detailed
8   knowledge about it, but I could believe that
9   they were having discussions.
10  Q.  Her Majesty's --
11  A.  -- about that.
12  Q.  About that, correct?  About
13  that subject?
14  A.  I don't know of those
15  discussions.
16  Q.  But you read of them?
17  A.  I can't recall.
18  Q.  Her Majesty's Government
19  declined to follow the U.S. designation,
20  correct?
21  A.  At this stage, yes.
22  Q.  Meaning as of June 8, 2011?
23  A.  As far as I'm aware, yes.
24      MR. BONNER: Just one thing to
25  clarify about the list of documents.

---

Page 128

1   WALTERS
2       MR. ISRAEL: I think it's
3   actually listed in Appendix 1. 14506
4   was also produced as 14551.
5       MR. FRIEDMAN: Thank you.  It's
6   a different production number?
7       MR. ISRAEL: Yes.
8       MR. FRIEDMAN: It's the same
9   document, okay.
10  Q.  Look at paragraph 194 of your
11  rebuttal.  You say here that an international
12  bank has an obligation to adopt the most
13  stringent international standards available.
14  Does that mean that a bank needs to apply the
15  terrorist designations of all of the
16  countries of the world to transactions that
17  go through that bank, yes or no?
18      MR. BONNER: Objection to form.
19  A.  What I'm saying here is my
20  experience was that everybody agreed, all the
21  people in banking and others around the
22  anti-money laundering and counter terrorism
23  financing agenda was that this was a global
24  issue and the engagement in a consistent way
25  was going to be the most effective method to

---

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

GARY WALTERS
June 8, 2011



Page 129

WALTERS

1  WALTERS
2  prevent terrorism and from that there was if
3  not a legal obligation to me then a practical
4  obligation which I'm not a lawyer and that
5  built expectations on the parts of people
6  that the highest standards would be applied
7  by global groups across all the jurisdictions
8  they were dealing.
9  Q.   When you say higher standards,
10  do you mean that if a global banking group is
11  in two countries, it needs to apply the
12  designations of -- the terrorist designations
13  of both countries to all transactions that go
14  through that group?
15      MR. BONNER: Objection to form.
16  A.  I don't say that they have to
17  apply the designation, but as I say here they
18  have to give what I'm calling proper weight
19  to a designation.  Proper weight I know --
20  I'll leave it there.  Wherever the
21  designation is it has to be taken into
22  account.
23  Q.  Look again at Mr. Dawlings'
24  letter that's part of Exhibit 37.
25

Page 130

WALTERS

1  WALTERS
2
3
4
5
6
7
8  Q.  Look at paragraph 200 of your
9  rebuttal report, please.  In the middle of
10  that paragraph you refer to international
11  banking standards and international AML and
12  CTF standards.  Are you referring to anything
13  more than what you've already described in
14  your testimony today?
15      MR. BONNER: Objection to form.
16  Q.  Are there any additional
17  standards you are referring to beyond what
18  you described?
19      MR. BONNER: Objection to form.
20  A.  I believe we've covered the
21  standards we are talking about.
22  Q.  Look at paragraph 8 of your
23  rebuttal report.  You refer in paragraph 8 to
24  "minimum banking standards published during
25  the relevant period."  Are you referring to

Page 131

WALTERS

1  WALTERS
2  the FATF, Wolfsberg and Basel standards?
3  A.  I'm using it again as an open
4  term, a non specific term.  The standards as
5  I understood them from all my dealings with
6  institutions, regulatory authorities and
7  others engaged in this work.
8  Q.  Not quite, Mr. Walters, because
9  I know the sentence comes from Ms. McLeod's
10  report, but you use the word published.  You
11  refer to the minimum banking standards
12  published during the relevant period.  It's
13  not your understanding that banks publish
14  their internal policies publicly, correct?
15  A.  They wouldn't publish them.
16  Q.  So what published minimum
17  banking standards are you referring to here
18  or are you just adopting Ms. McLeod's
19  definition?
20      MR. BONNER: Objection to form.
21  A.  In using this I was including
22  the general standards that I would now
23  acknowledge are not necessarily published in
24  terms of public publications or published
25  publicly, but, you know, the standards even

Page 132

WALTERS

1  WALTERS
2  internal within a bank are published within
3  that bank.
4  Q.  What standards that were
5  published publicly are you referring to here?
6  A.  It would be the ones we've
7  spoken of, Basel, FATF and including in that
8  I would say the broader U.N. related
9  material.
10  Q.  What U.N. related material?
11  A.  I forget the -- the U.N.
12  published or there was a convention and I
13  forget the actual title of it related to
14  suppression of terrorism.
15  Q.  Did you ever read that?
16  A.  I've read parts.
17  Q.  When?
18  A.  I can't recall.  I probably
19  read different parts at different times when
20  it's come up in cases or debate.
21  Q.  Where, where did you read it?
22  A.  I'd normally find these things
23  either on the internet or in discussions with
24  people around these topics.
25  Q.  You don't remember the title of

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

GARY WALTERS
June 8, 2011

---

Page 133

1    WALTERS
2    the convention?
3    A.  As I sit here now, no.
4    Q.  Did you read it in connection
5    with your work on these cases?
6    A.  I can't recall.
7    Q.  Did you read the U.N.
8    convention in connection with your police
9    work?
10   A.  I can't recall when I have seen
11   parts of it.
12   Q.  Did you ever investigate anyone
13   for violating the U.N. convention?
14   A.  No.
15   Q.  Did you ever investigate anyone
16   for violating the FATF principals?
17   A.  I think you would have to -- I
18   think we get into an area of what is
19   investigating a breach of FATF principals.
20   Q.  Are FATF principals --
21   A.  Because they are not
22   legislation as I understand it.  They are
23   standards.  Did I have debates about whether
24   even countries are compliant with those
25   standards, yes, I did, on various occasions.

---

Page 134

1    WALTERS
2    Q.  Did you ever investigate anyone
3    for violating any Basel principals?
4    A.  Again, it was more generic
5    debate at meetings around standards.
6    Q.  When you were with the police?
7    A.  When I was with the police.
8    Q.  Did you ever investigate anyone
9    for violating Wolfsberg principals?
10   A.  Again, generic conversations or
11   discussions rather than individual either
12   countries, institutions or people.
13   Q.  Do you have a copy of the JMLSG
14   guidance notes?
15   A.  No, I don't.
16   Q.  Do you have a copy of any FSA
17   money laundering source book?
18   A.  No, I don't.
19   Q.  Have you ever looked at an FSA
20   money laundering source book?
21   A.  Yes, I have.
22   Q.  When you were with the police?
23   A.  When I was with the police.
24   Q.  Have you ever read the money
25   laundering regulations 1993?

---

Page 135

1    WALTERS
2    A.  I believe I have when I was
3    with the police.
4    Q.  Have you ever read the money
5    laundering regulations of 2003?
6    A.  I believe I have when I was
7    with the metropolitan police.
8    Q.  Look at paragraph 5 of your
9    rebuttal report.  In this paragraph you use
10   the term "standard terrorist financing
11   investigation."  You see that?
12       MR. BONNER: Where is it, how
13   far down?
14   Q.  Do you see that term, it's
15   eight lines down, Mr. Walters, in paragraph
16   5?
17   A.  Yes.
18   Q.  Have you ever used that term
19   before your work on these cases?
20   A.  No, I don't believe I have.
21   Well, I would have to qualify that.  I would
22   say I don't believe I have.
23   Q.  Have you ever seen that term
24   used anywhere other than in your report?
25   A.  I can't recall.

---

Page 136

1    WALTERS
2    Q.  Did you get that term from any
3    other source before using it in your report?
4    A.  I can't recall.
5    Q.  You signed this report three
6    months ago, correct?
7    A.  That's correct.
8    Q.  Have you ever heard of anyone
9    else using the term standard terrorist
10   financing investigation?
11   A.  Not that I can recall any
12   specific instances.
13   Q.  What do you mean by the term
14   standard terrorist financing investigation?
15   A.  Although every single
16   investigation is different, the investigation
17   of crime usually follows particular paths so
18   a terrorist financing investigation would
19   normally follow what I would describe as a
20   standard investigative procedure.
21   Q.  You're talking about a police
22   procedure?
23   A.  Process and procedure, yes.
24   Q.  You're talking about a standard
25   police process and procedure, correct?

---

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

GARY WALTERS
June 8, 2011

Page 137

1    WALTERS
2  A.  Yes, a methodology to
3  investigate this.
4  Q.  Conducted by the police based
5  on your experience with the MPS?
6  A.  Yes.
7  Q.  Did you ever lead a terrorist
8  financing investigation with the MPS?
9  A.  I led investigations that had
10  some terrorist issues one of which I've set
11  out there.
12  Q.  The Sri Lanka case?
13  A.  Yes.
14  Q.  Terrorist financing
15  investigations during your tenure with the
16  MPS were the responsibility of the counter
17  terrorism command, correct?
18  A.  In its various forms, yes.
19  Q.  If you read on in paragraph 5
20  in the last sentence you say to the extent
21  that Nat West did not and I'll fill in the
22  words follow a standard terrorist financing
23  investigation, "I identified specific
24  deviations to make an assessment of whether
25  they amounted to major deviations and

Page 138

1    WALTERS
2  delineated the significant deviations. I
3  also provided and reference the bases in the
4  record from my conclusion that there were
5  indeed major deviations", do you see that?
6  A.  Yes, I do.
7    MR. BONNER: Objection to form.
8    MR. FRIEDMAN: Did I misquote
9  it?
10    MR. BONNER: I think so.
11    MR. FRIEDMAN: How so.  What do
12  you mean?
13    MR. ISRAEL: It says to the end
14  of the preceding sentence to
15  determine whether the defendant in
16  fact operated the Interpal accounts
17  as expected.
18    MR. FRIEDMAN: I see.
19  Q.  What do you mean by a
20  deviation, what do you mean by a major
21  deviation and what's the difference between
22  the two?
23  A.  They are subjective. That would
24  be a subjectivity on my part to try and
25  describe how far off normal or the standards

Page 139

1    WALTERS
2  would this be and I think that's, yeah.
3  Q.  What standards were you just
4  referring to?
5  A.  The standards that I would have
6  expected from my experience to have seen.
7  Q.  Of the bank?
8  A.  Yeah.
9  Q.  But you've never investigated a
10  bank for involvement in terror financing,
11  correct?
12  A.  No.
13  Q.  That's correct, you have never
14  done that?
15  A.  That's correct.
16  Q.  Is this related to the
17  deviations analysis that we saw in the FRA
18  time sheets that was done in connection with
19  your work?
20  A.  Deviations is a term that I got
21  from FRA, but to me it does describe what
22  we're looking at here and I'm happy to use
23  it.
24  Q.  Did you refer in applying this
25  methodology to anything other than what was

Page 140

1    WALTERS
2  provided to you by FRA?
3    MR. BONNER: Objection to form.
4  A.  My knowledge.
5  Q.  Anything else?
6  A.  Not that I can recall.
7  Q.  Have you ever before in your
8  life, in your professional life conducted an
9  analysis as to whether a bank's operation
10  from an account -- operation of an account
11  deviated from the standards you describe?
12  A.  Yes.
13  Q.  Tell me about that?
14  A.  I think confidentiality
15  precludes me from talking about it.
16  Q.  It was during the course of
17  your work with the MPS?
18  A.  Yes.
19  Q.  In connection with a money
20  laundering investigation?
21  A.  In relation to money laundering
22  on a number of occasions, yes.
23  Q.  You say you got the term
24  deviation from FRA?
25  A.  Yes.

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

GARY WALTERS
June 8, 2011

Page 141

```
1      WALTERS
2  Q.  Did you get the term major
3  deviation from FRA?
4  A.  Well, only in terms of using
5  subjective terms it's a way of saying this
6  one is slightly off course and this one is
7  well off course.
8  Q.  Subjectively?
9  A.  A subjective term.
10 Q.  Based on your assessment?
11 A.  Based on my opinion, yes.
12 Q.  Did you consult any
13 publications on this subject as to what
14 differentiates a deviation from a major
15 deviation?
16 A.  No, I didn't.
17 Q.  Are you aware of any standards
18 that FRA used in distinguishing between a
19 deviation and a major deviation?
20 A.  Not that I can recall, no.
21 Q.  You read Ms. McLeod's testimony
22 about her deviation analysis with respect to
23 Credit Lyonnais?
24 A.  Yes.
25 Q.  Did you follow the same
```

Page 142

```
1      WALTERS
2  methodology she did?
3      MR. BONNER: Objection to form.
4  A.  I don't know.
5  Q.  You also use the term
6  significant deviations. Is there any
7  difference between a significant deviation
8  and a major deviation as you use the terms?
9  A.  I think I would -- I think we
10 would need to look through all of the
11 circumstances and the individual times when
12 there are deviations to reflect on which ones
13 were -- why I would use a particular
14 adjective in a particular circumstance.
15 Q.  In this paragraph you use three
16 terms that I want you to focus on; specific
17 deviations, significant deviations and major
18 deviations. Please tell us what's the
19 difference between those three?
20 A.  It's really setting out that
21 there are and I would have -- it's setting
22 out that there are some that I think are
23 clearly specific things that have happened,
24 major things and significant things.
25 Q.  Based on your subjective
```

Page 143

```
1      WALTERS
2  analysis?
3  A.  Subjective analysis, yes.
4  Q.  What is the difference between
5  significant and major according to your
6  subjective analysis?
7  A.  I can't really recall why I
8  have it worded in this way. If you ask me
9  now --
10 Q.  What did you mean in your
11 report? If you don't recall?
12 A.  I was trying to explain that in
13 my analysis I'm going to identify what
14 happened that was a deviation from what I
15 would have expected and how major that is.
16 Whether I use a term major there and then
17 significant, you know, how significant it was
18 in relation to the background and the
19 context.
20 Q.  What is the greater deviation,
21 a significant deviation or a major deviation
22 as you use the terms in your report that you
23 wrote?
24 A.  I think I would put major
25 deviation as the more serious.
```

Page 144

```
1      WALTERS
2  Q.  Do you have any professional
3  education in applying this type of
4  methodology?
5  A.  Sorry, can you repeat that?
6  Q.  Do you have any professional
7  education in applying this kind of
8  methodology?
9  A.  No.
10 Q.  Have you ever seen this
11 methodology applied anywhere other than in
12 Ms. McLeod's CL report?
13 A.  No.
14 Q.  I may have asked you this
15 earlier, but I just want to make sure. In
16 the course of your work on these cases did
17 you look at any NCIS records?
18 A.  NCIS records?
19 Q.  Did you have access to any
20 files of NCIS?
21 A.  At various times and in various
22 ways, yes.
23 Q.  For work on this case?
24 A.  On this case, no, not at all.
25 Q.  SOCA?
```

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

GARY WALTERS
June 8, 2011

**Page 145**

1   WALTERS
2   A.   No.
3   Q.   NTFIU?
4   A.   No.
5   Q.   Special branch?
6   A.   No.
7   Q.   HMT?
8   A.   No.
9   Q.   I'm sorry, I think I asked you
10   this, but just to make sure, you never spoke
11   with any of these agencies about Interpal,
12   correct?
13   A.   That's correct.
14   Q.   Look at paragraph 10 of your
15   report.  Read that to yourself.
16   A.   Yes.
17   Q.   Based on your testimony that
18   you did not consult any law enforcement
19   documents and never spoke with any law
20   enforcement agencies about Interpal, you
21   really don't know whether anything that Nat
22   West did or didn't do negatively effected
23   their assessments, correct?
24       MR. BONNER:  Objection to form.
25   A.   I had a lot of experience in

**Page 146**

1   WALTERS
2   assessing intelligence and information that
3   would be passed to the police and there was a
4   reliance on taking that information and
5   making an assessment as to what are the
6   police or other authorities going to do about
7   it and I believe it would have been helpful
8   if all of the information available had been
9   given in a much more as I describe it full
10   and frank way to allow people who are
11   responding to educate that response and to be
12   better informed.
13   Q.   But because you've never spoken
14   with them and never looked at their records,
15   you don't know whether anything Nat West did
16   or didn't do actually negatively effected
17   their assessments, do you, you don't know
18   that?
19   A.   I can't speculate on matters I
20   don't know.
21   Q.   Look at paragraph 241.  Read
22   that to yourself.  Likewise, Mr. Walters,
23   because you haven't spoken with law
24   enforcement, you haven't looked at their
25   records, you don't know whether they were

**Page 147**

1   WALTERS
2   able to properly and fully assess Interpal's
3   conduct, do you?
4       MR. BONNER:  Objection to form.
5   Q.   You don't know that, do you?
6       MR. BONNER:  Objection.
7   A.   I have seen material here that
8   I don't know, but I don't believe was
9   available to the officers making the
10   assessments or the people making at
11   assessments.  When we were speaking about the
12   letter to Mr. Dawlings and Mr. Gossage, he
13
14
15
16
17
18
19
20
21
22
23                                       so if
24   that was the only document I had been looking
25   at I would make an assessment based on that

**Page 148**

1   WALTERS
2   sole document so in that way even within that
3   small example I don't think we can isolate
4   individual bits of information and expect
5   people to be able to make well informed
6   decisions and I'm not guessing what or
7   speculating on what decisions, but it would
8   definitely effect -- it must effect the
9   decision making.
10   Q.   Have you read all of the NCIS
11   and NTFIU disclosures that Nat West made
12   about Interpal?
13   A.   The ones that have been
14   submitted, yes.
15   Q.   Have you seen any evidence that
16   any law enforcement agency asked Nat West for
17   any information that it did not provide?
18   A.   There was a production order
19   served, but what I haven't identified and it
20   is the documents that were given in response
21   and I haven't identified the communication
22   that Mr. Dawlings speaks about following
23   discussions between RBS groups, special
24   branch and the Charities Commission.
25   Q.   Have you seen any evidence that

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

GARY WALTERS
June 8, 2011

Page 149

1    WALTERS
2  any law enforcement agency ever complained to
3  Nat West about the extent or quality of the
4  information it was provided?
5  A.   From my experience in dealing
6  with these --
7  Q.   I asked you if you have seen
8  any evidence of that?
9  A.   I haven't seen any evidence of
10  that.
11  Q.   Go to paragraph 12 of your
12  report.  Could you read that to yourself.
13      MR. FRIEDMAN: Sorry, should we
14  break for lunch now given the time?
15      MR. BONNER: If you are moving
16  on to something different.
17      MR. FRIEDMAN: Let me just ask
18  about paragraph 12.
19  Q.   You write here that the
20  Palestinian territories Jordan and Lebanon
21  were to use your phrase "high risk
22  jurisdictions", correct?
23  A.   Yes.
24  Q.   What do you mean by the term
25  high risk jurisdictions?

Page 150

1    WALTERS
2  A.   The amount of terrorism going
3  on in those regions and as I would understand
4  from my general knowledge that those issues
5  would make those high risk jurisdictions.
6  Q.   That's your subjective
7  definition?
8  A.   That's my subjective
9  definition.
10  Q.   You're aware that FATF from
11  time to time has published a list of high
12  risk jurisdictions, correct?
13  A.   Yes.
14  Q.   Palestine and Jordan have never
15  appeared on that list, correct?
16  A.   I'm not aware of who's been on,
17  who's been off and when they've changed it.
18  It changes over time.
19  Q.   You're using your own term, you
20  are not using the FATF term high risk
21  jurisdiction?
22  A.   Yes.
23      MR. FRIEDMAN: Why don't we
24  break for lunch.
25      THE VIDEOGRAPHER: We are now

Page 151

1    WALTERS
2  off the record.  The time is 1:06 p.m.
3  June 8, 2011.
4      (Luncheon recess taken at
5      1:06 p.m.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 152

1    WALTERS
2  A F T E R N O O N  S E S S I O N
3      (Time Noted: 2:04 p.m.)
4
5  G A R Y  W A L T E R S, resumed and testified
6  as follows:
7
8  CONTINUED EXAMINATION
9      BY MR. FRIEDMAN:
10      THE VIDEOGRAPHER: This is tape
11  four of the deposition of Mr. Gary
12  Walters.  We are now back on the
13  record.  The time is 2:04 p.m.  Today
14  is June 8, 2011.
15  Q.   Mr. Walters, please look at
16  paragraph 13 of your rebuttal report.  You
17  state here that the fact that Interpal was a
18  charity made it a high customer risk,
19  correct?
20  A.   That's right, that's correct,
21  yes.
22  Q.   Based on your review of the
23  record, U.K. law enforcement knew that
24  Interpal was a charity, correct?
25  A.   Yes, that's correct.

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

GARY WALTERS
June 8, 2011

Page 153

WALTERS

1
2  Q.  What's your basis for stating
3  that all charities are high risk customers?
4  A.  From my experience from the
5  various standards that get published that
6  we've spoken about, the dealings I had with
7  banks and regulators there is -- charities
8  are recognized as presenting a high risk.
9  Q.  You're familiar with a charity
10  in England known as Guide Dogs for the Blind?
11  A.  Yes.
12  Q.  Do you consider that a high
13  risk customer because it's a charity?
14  A.  Every charity would need to be
15  assessed separately.  In my work I looked at
16  a number of other high risk -- recognized
17  high risk entities and the risk exists so it
18  requires some examination to assess what's
19  the level of risk for each individual
20  circumstance.
21  Q.  My question is the following.
22  Is Guide Dogs for the Blind a high risk
23  customer for a U.K. bank, yes or no?
24  A.  I think as a charity it still
25  exists as a high risk entity, but an

Page 154

WALTERS

1
2  examination of it and its dealings because I
3  think you can't look at any one particular
4  risk element in isolation.
5  Q.  Is Guide Dogs for the Blind a
6  high risk customer?
7  A.  I have not assessed Guide Dogs
8  for the Blind.
9  Q.  You said all charities are high
10  risk customers. You said Guide Dogs for the
11  Blind is a charity, am I right, therefore
12  according to your analysis Guide Dogs for the
13  Blind is a high risk customer?
14  MR. BONNER: Objection to form.
15  A.  As I explained I think per se
16  all charities are recognized as being
17  vulnerable to money laundering and counter
18  terror financing in the same way as all
19  casinos are seen as a high risk entity. That
20  doesn't mean that all casinos are engaged in
21  money laundering or terror financing.  It
22  doesn't mean that all politically exposed
23  persons are high risk people.  It doesn't
24  mean that they are engaged in money
25  laundering, terror financing or corruption.

Page 155

WALTERS

1
2  Q.  Therefore as you use the term
3  Guide Dogs for the Blind is a high risk
4  customer?
5  A.  In a simple assessment -- I
6  think I have to stick with my explanation
7  that per se all charities carry a risk of
8  money laundering and counter terror
9  financing.
10  Q.  You say in your report that
11  charities present a high customer risk,
12  correct?
13  A.  Yes.
14  Q.  Your report is truthful,
15  correct?
16  A.  Yes.
17  Q.  Guide Dogs for the Blind is a
18  charity, correct?
19  A.  Yes.
20  Q.  Therefore Guide Dogs for the
21  Blind presents a high customer risk to a
22  bank, correct?
23  A.  As I said in my previous
24  answers, all charities are recognized as
25  presenting a high risk.

Page 156

WALTERS

1
2  Q.  Including Guide Dogs for the
3  Blind?
4  A.  Including all charities so
5  Guide Dogs for the Blind being a charity
6  would present a risk.
7  Q.  A high customer risk?
8  A.  Would present a high customer
9  risk.
10  Q.  Are you familiar with a charity
11  known as the Royal National Life Boat
12  Institution?
13  A.  Yes, I am.
14  Q.  It's a charity devoted to
15  funding rescues at sea, correct?
16  A.  Yes, it is.
17  Q.  That's a charity?
18  A.  It is.
19  Q.  So therefore in your estimation
20  the Royal National Life Boat Institution as a
21  bank customer is a high risk customer,
22  correct?
23  A.  I'll answer the same way as I
24  answered before that when you have a charity,
25  there is a high risk of it being vulnerable

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

GARY WALTERS
June 8, 2011

Page 157

WALTERS

1 to money laundering or counter terrorist
2 financing and in your assessment -- in any
3 assessment you should consider that risk.
4 Q. That includes the Royal
5 National Life Boat Institution as a charity,
6 correct?
7 A. In terms of looking at them
8 from a risk perspective, I don't think that
9 you can isolate that all the recommendations
10 and standards say charities carry a high
11 risk.
12 Q. You wrote here the fact that an
13 entity is a charity banks recognize as
14 presenting a high customer risk, correct?
15 A. Yes.
16 Q. The Royal National Life Boat
17 Institution is a charity, correct?
18 A. Yes.
19 Q. So therefore as you use these
20 terms the Royal National Life Boat
21 Institution is a high risk customer to a
22 bank, correct?
23 A. In doing its assessment the
24 bank should take into account that it's a

(numbered 2–25)

Page 159

WALTERS

1 Q. What's the largest?
2 A. I don't know for certain, but I
3 would expect it's the Police Benevolent Fund.
4 Q. Police Benevolent Fund?
5 A. Yes.
6 Q. That's a charity?
7 A. It is a charity. I believe
8 it's a charity.
9 Q. Does it have bank accounts do
10 you think?
11 A. I believe so.
12 Q. In your view its bankers should
13 regard that charity as presenting a high
14 customer risk because it's a charity?
15 A. When they first review it, they
16 should be looking and saying that's a
17 charity, it's fungible. Mitigating the risk
18 is then what's important.
19 Q. You wrote, "Banks recognize as
20 presenting high customer risk a charity",
21 correct?
22 A. Yes.
23 Q. The Police Benevolent Fund is a
24 charity?

(numbered 2–25)

Page 158

WALTERS

1 charity and therefore there is a risk of it
2 being a route for money laundering and
3 counter terrorism financing.
4 Q. A high customer risk?
5 A. Yeah, high customer risk. I'm
6 still happy to say it's a high customer risk.
7 Q. Are you familiar with a charity
8 in the U.K. known as the Prince's Trust?
9 A. I am.
10 Q. It's a charity?
11 A. It is.
12 Q. Therefore as you use these
13 terms a bank should regard the Prince's
14 Trust as presenting a high customer risk,
15 correct?
16 A. Yes.
17 Q. Look at paragraph 14 and read
18 that to yourself. Before you do that, can I
19 just ask you another question. Isn't there a
20 charity in the U.K. for the benefit of
21 retired members or injured members of the
22 Metropolitan Police Service?
23 A. I think there is a number of
24 charities.

(numbered 2–25)

Page 160

WALTERS

1 A. It is.
2 Q. Therefore its bankers should
3 recognize it as presenting a high customer
4 risk, correct?
5 A. And then review it accordingly
6 and assess it against all the other criteria.
7 Q. Did you read paragraph 14 to
8 yourself yet?
9 A. I did.
10 Q. These facts that you describe
11 here were based on your review of the record
12 known to U.K. law enforcement when it
13 investigated Interpal, correct?
14 A. Could you repeat that question?
15 Q. The fact that you identify here
16 that Interpal aggregated small deposits, sent
17 wire transfers of larger amounts to entities
18 abroad including many in the Palestinian
19 territories, etc., etc., those facts based on
20 the disclosures that you read were known to
21 U.K. law enforcement, correct?
22 A. Not all of the information that
23 I have looked at was known to U.K. law
24 enforcement. When I was looking at this I

(numbered 2–25)

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

GARY WALTERS
June 8, 2011

Page 161

1      WALTERS
2    approached it using my experience from within
3    the metropolitan police, I examined the
4    various records and I then analyzed it,
5    assessed it, analyzed it and drew conclusions
6    from that.  This particular paragraph is
7    broken down in more detail throughout the
8    report.
9    Q.   We'll come back to that then.
10   What is your basis for stating that the use
11   of wire transfers presents a service risk?
12   A.   From my experience in dealing
13   with banks and all the discussions I have had
14   with regulators, with bankers, with other
15   regulated businesses, with MLROs and within
16   the general standards published.
17   Q.   Look at paragraph 22 of your
18   report.  Read that to yourself.  Do you
19   believe that the goalkeeper system
20   consistently assigned a red rating to
21   Interpal?
22   A.   Yes.
23   Q.   What is your basis for that?
24   A.   Having looked at the records
25   submitted, my recollection and as recorded

Page 162

1      WALTERS
2    here is that there was a red rating on those
3    goalkeeper records.
4    Q.   You read Mr. O'Hear's
5    deposition testimony?
6    A.   I did.
7    Q.   I'm going to show you what's
8    been marked as Exhibit 16 which is a
9    transcript of Mr. O'Hear's deposition
10   testimony.  I'm going to ask you to turn to
11   page 75.  I'm going to read you some
12   testimony starting at 75, 19 and going on to
13   78, 13.
14       "Question: In the box below
15   risk it says red.  Could you tell me
16   first of all do you have an
17   understanding of what that refers to?
18       "Answer: My understanding is
19   that that is part of the goalkeeper
20   system functionality so when you key
21   in the name, then there is system
22   calibration working in the background
23   that allocates these risk factors,
24   these risk ratings, call it what you
25   will. My recollection is that

Page 163

1      WALTERS
2    functionality was not in use within
3    the department at that time.  I'm not
4    even aware that it's in use now so
5    these were system driven."
6        Did you read that testimony
7    before?
8    A.   Yes, I believe I did.
9    Q.   There is question and answer as
10   follows.
11       "Question: When you say that
12   it was not used, this red indication,
13   for lack of a better word are you
14   saying that when group's
15   investigations and fraud did not make
16   use of this indication in terms of
17   how --
18   A.   Sorry, I lost you. Where are
19   you now?
20   Q.   78, line 5.
21   A.   Thank you.
22   Q.   "Question: When you say it
23   was not used, this red indication,
24   for lack of a better word are you
25   saying then that group investigations

Page 164

1      WALTERS
2    and fraud did not make use of this
3    investigation in terms of how it
4    characterized the customer that it
5    was describing in the report?
6        "Answer: In terms of its
7    assessment for money laundering and
8    terror financing cases, yes."
9        Do you see that?
10   A.   Yes.
11   Q.   Have you read all that
12   testimony that I just read to you, have you
13   read that before?
14   A.   Yes, I believe I have.
15   Q.   Doesn't that indicate to you
16   that Interpal was not assigned a red rating
17   because that functionality was not in use at
18   the time?
19       MR. BONNER: Objection to form.
20   A.   Can I just re-read what you
21   read to me. I don't have the references on
22   the documentation, but also I'm sure I read
23   other people saying that they were applied
24   and they don't talk about it being system
25   driven and it's not being used.  They talk