TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

GARY WALTERS
June 8, 2011

Page 165

WALTERS

1       WALTERS
2   about it being allocated and in fact my
3   recollection as I sit here is that different
4   people had different views of even what red
5   means.
6   Q.  You read that in deposition
7   testimony?
8   A.  I believe I did, yes.
9   Q.  What we'll do is we'll leave a
10  place in the transcript which your lawyers
11  will give you to review and you can fill in
12  where you found that in the deposition
13  transcripts, okay?
14  A.  Okay.
15      TO BE FURNISHED:_____
16  Q.  Look at paragraph 18 of your
17  rebuttal report.  You refer here to
18  understood and published terrorist financing
19  red flags, do you see that?
20  A.  Yes.
21  Q.  What do you mean by published,
22  in other words, where are the terrorist red
23  flags that you have in mind in saying this,
24  where are they published?
25  A.  Again, this was from my

Page 166

WALTERS

1       WALTERS
2   experience in the police dealing with money
3   laundering and when they overlapped with
4   terrorist financing matters from the
5   standards of FATF and others and from
6   documents that I read across the PISTE from
7   conferences when they were discussed.
8   Q.  Do you have any of the
9   documents that you are referring to from
10  conferences that published these red flags?
11  A.  I'm not sure.
12  Q.  Did you consult any of those
13  documents in writing your report?
14  A.  No, I didn't.  This is from my
15  knowledge of dealing with a lot of cases and
16  conversations and reviews of even documents
17  published internally in banks.
18  Q.  What banks?
19  A.  As I said earlier I don't
20  believe I can answer that.
21  Q.  What FATF standards were you
22  referring to as being a source of published
23  red flags?
24  A.  The typologies that they
25  published which I've read on various

Page 167

WALTERS

1       WALTERS
2   occasions over the years.
3   Q.  Did you read those in the
4   course of your work on this report?
5   A.  I may have reflected on them.
6   Q.  Did you read them?
7   A.  I possibly read them at
8   different times, yeah.
9   Q.  You possibly read them at
10  different times while you were working on
11  your report?
12  A.  Yeah, I think I might have done
13  that.
14  Q.  On the internet?
15  A.  On the internet.
16  Q.  You say you might have.  Do you
17  remember doing it?
18  A.  I don't remember specifically
19  which documents.
20  Q.  Red flags you say you learned
21  from your dealings with the police?
22  A.  Yes.
23  Q.  Have those been published
24  anywhere?
25  A.  My red flags?

Page 168

WALTERS

1       WALTERS
2   Q.  Pardon me?
3   A.  My red flags?
4   Q.  You said red flags that you
5   know of from your dealings with the police,
6   have they been published anywhere?
7   A.  I haven't published them.  I'm
8   not aware where they might be.
9   Q.  Let's look at your first red
10  flag.  "Use of a charitable association's
11  account to aggregate relatively small
12  donations and then funnel funds by way of
13  relatively large wire transfers to a small
14  number of foreign beneficiaries both
15  individuals and businesses located in a high
16  risk jurisdiction with a massive and well
17  known terrorist problem."  That information
18  was made known by Nat West to law enforcement
19  in its disclosures, correct?
20  A.  I don't know if all of that was
21  put in that way.
22  Q.  Let me show you what's been
23  marked as Exhibit 17, a document bearing Nat
24  West production numbers 8362 to 8366 and ask
25  you do you recognize this as Nat West's NCIS

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

GARY WALTERS
June 8, 2011



**Page 169**

1　　WALTERS
2　disclosure concerning Interpal of August 22
3　-- I'm sorry.  Let me just get the date
4　because I gave it to you.  October 15, 2001.
5　Let me put the question again.
6　　Do you recognize this as a copy
7　of Nat West's disclosure to NCIS concerning
8　Interpal dated October 15, 2001?  Have you
9　seen this before?
10　A.  Yes.
11　Q.  You recognize this to be the
12　NCIS disclosure that Nat West made on October
13　15, 2001?
14　A.  Yes, appears to be.
15　Q.  This discloses
16
17
18　　　　　　　correct?
19　A.  Yes.
20　Q.  And it shows
21
22
23
24　A.  Yes.
25　Q.  And it says

**Page 170**

1　　WALTERS
2
3
4
5　　　　　　correct?
6　A.  Yes.
7　Q.  So what is it in your first red
8　flag that this disclosure does not reveal?
9　A.  Beyond what I was just looking
10　beyond the individuals it's going to, it is a
11　report on that first red flag.
12　Q.  What do you mean beyond what I
13　was just looking beyond the individuals, is
14　it a report of the first red flag or no?
15　A.  I said beyond both individuals
16　and businesses it reports on in terms of
17　beneficiaries.
18　Q.  The fact that the transfers are
19　being made to individuals and businesses is
20　not in itself a red flag, correct?
21　A.  It's a red flag and it's been
22　reported as a suspicion to law enforcement.
23　Q.  FRA makes transfers to
24　businesses and individuals, correct?
25　A.  Yes.

**Page 171**

1　　WALTERS
2　Q.  That's not a red flag, is it?
3　A.  If FRA was a charitable
4　association aggregating small amounts of
5　funds which it then aggregated into big
6　amounts going to high risk territories, it
7　would become a red flag.
8　Q.  Standing alone the fact that an
9　entity makes transfers to businesses and
10　individuals is not in and of itself a red
11　flag?
12　A.  It's not on itself a red flag.
13　Q.  Okay, so anyone who read this
14　would have the information contained in your
15　first red flag other than the fact that
16　transfers were being made to individuals and
17　businesses, correct?
18　A.  Yes, they would see there is a
19　red flag and it's been identified and it's
20　raised suspicion and the suspicion has been
21　reported to law enforcement.
22　Q.  Now the second red flag is,
23　"Involvement of multiple nationals of
24　countries associated with terrorist
25　activity."  That red flag is disclosed here

**Page 172**

1　　WALTERS
2　as well, correct?
3　A.  To some extent it appears to,
4　yes.
5　Q.  The countries associated with
6　terrorist activity is covered by the
7　reference to
8　　　　　　correct?
9　A.  Yes.
10　Q.  Let's go to your third red
11　flag.  "Charity/relief organizations --
12　A.  Just to qualify my last answer,
13　it doesn't actually -- it's a very small
14　point, but I just want to clarify,
15
16
17　Q.  If you look at the text it
18　says, '
19
20
21　doesn't it say that?
22　A.  Yes, sorry.
23　Q.  Where does it refer to
24　A.  The actual country of receipt
25　so I was looking at those pages.

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

GARY WALTERS
June 8, 2011



Page 173

1   WALTERS
2 Q.  Right.  Let's go to your third
3   red flag. "Charity/relief organizations
4   linked to the transactions on both sides."
5   That is disclosed here as well, correct, a
6   charity Interpal
7                              correct?
8 A.  That's correct.
9 Q.  Your fourth red flag is, "Mix
10  of cash deposits and monetary instruments."
11  That is disclosed here as well, correct?
12 A.  Yes.
13 Q.  Let's look at your fifth red
14  flag.  "Non specific beneficiaries in a
15  location experiencing major incidents of
16  terrorism."  That red flag is disclosed in
17  Nat West's NCIS disclosure by reference to
18
19
20                       correct?
21 A.  Yes, it is.
22 Q.  So again anyone who read this
23  disclosure would have in hand the information
24  that you describe as a red flag?
25 A.  Yes.

Page 175

1   WALTERS
2   known to law enforcement.
3 Q.  Is it your testimony, Mr.
4   Walters, that law enforcement did not know of
5   media coverage associating Interpal with
6   terrorism?
7      MR. BONNER: Objection to form.
8 A.  I have to say I really can't
9   say what media the officer who would have or
10  officers or staff who would have received and
11  read this may not have read articles
12  specifically about Interpal.
13 Q.  There's a lot of articles in
14  the British press that you have seen about
15  the Charity Commission investigations of
16  Interpal based on allegations that Interpal
17  was funding Hamas terrorism in Palestine,
18  correct?
19 A.  That I have seen?
20 Q.  Yes.
21 A.  Yes.
22 Q.  Do you have any reason to doubt
23  that law enforcement saw those press reports?
24      MR. BONNER: Objection to form.
25 A.  I can't know because this from

Page 174

1   WALTERS
2 Q.  Let's look at your seventh red
3   flag.  "Media coverage associating the
4   customer with terrorism that was public
5   knowledge in the U.K."  I skipped one.
6   Number six.  Let's look at your sixth red
7   flag.  "Wire transfers as the principal
8   service utilized by the defendant's
9   customer."  That is disclosed here as well,
10  isn't it?
11 A.  Yes, it is.
12      MR. ISRAEL: Outward payment.
13      MR. FRIEDMAN: Joel, we are not
14  taking your deposition.
15      MR. ISRAEL: Just looking at the
16  document.
17 Q.  Let's look at your red flag
18  number seven. "Media coverage associating
19  the customer with terrorism that was public
20  knowledge in the U.K." By definition that was
21  known to law enforcement, correct, because it
22  was media coverage that was public knowledge,
23  correct?
24      MR. BONNER: Objection to form.
25 A.  That doesn't mean that it's

Page 176

1   WALTERS
2   my experience in the police and dealing with
3   these things this was submitted and would
4   have been seen by an individual perhaps two
5   and I don't know what those particular people
6   would have seen in the media. I would be
7   speculating completely.
8 Q.  Is it your testimony that NTFIU
9   did not know that the Charity Commission was
10  investigating Interpal twice based on
11  allegations that Interpal was funding Hamas
12  terrorism in Palestine?  Is it your testimony
13  that the NTFIU did not know about those
14  investigations?
15 A.  No, it isn't.
16 Q.  You believe that they did know
17  about those investigations, correct?
18 A.  Without reference back into the
19  records on dates --
20 Q.  Nat West made disclosures about
21  those investigations, correct?
22 A.  Yes.
23 Q.  Let's look at your eighth red
24  flag. "Interpal was designated a specially
25  designated global terrorist (SDGT) by OFAC in

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

GARY WALTERS
June 8, 2011

Page 177

```
1      WALTERS
2   2003."
3
4
5   Q.  I'm showing you what's been
6   marked as Exhibit 18 which bears the Nat West
7   production numbers 52122 through 123.  You
8   recognize that as Nat West's August 28, 2003
9   disclosure to NCIS
10
11              correct?  Correct?
12  A.  Yes.
13  Q.  This disclosure also references
14
15              correct?
16  A.  Yes.
17  Q.  This also discloses that Nat
18  West
19
20
21          correct?
22  A.  Could you repeat that?
23  Q.  This also discloses that Nat
24  West                           e
25              correct?
```

Page 178

```
1      WALTERS
2   A.  It does.
3   Q.  It also discloses that Interpal
4
5          correct?
6   A.  Yes.
7   Q.  And it also
8
9
10                  correct?
11  A.  That's correct.
12  Q.  It also says,
13
14              do you see that?
15  A.  Yes.
16
17
18
19
20  A.  Yes, I do.
21
22      ?
23
24
25
```

Page 179

```
1      WALTERS
2
3
4
5
6
7
8
9
10                              was
12  explicitly disclosed to Scotland Yard by Nat
13  West, correct?
14  A.  Yes.
15  Q.  Let's look at your red flag
16  number nine.  I have a specific question for
17  you about this red flag.  What's your basis
18  for saying that it's a red flag if a customer
19  sends money to a name that is similar to the
20  name of a designated entity if in fact the
21  beneficiary is not the same entity as the one
22  that's designated?
23  A.  Within the guidelines and
24  standards that are applied to this field of
25  work, it is recognized and acknowledged that
```

Page 180

```
1      WALTERS
2   people use different variations of names and
3   false identities, the very nature of the work
4   says and including in most bank policies they
5   recognize this as an issue to require further
6   examination if it looks the same.  Red flags
7   don't mean that there is crime in the broader
8   sense going on.  What it does is it draws
9   attention and raises concern that needs
10  addressing and in doing that when you've got
11  similar names to one that's on a designated
12  list, then for me that is a flag a bit like
13  -- that is a red flag that says here's a
14  concern, we need to examine it and we need to
15  make sure that that's not the same
16  organization who swapped a letter.  Also
17  applicable when different languages are used
18  to come into the equation where when it's
19  translated into English perhaps it's twisted
20  or hyphens are put in where they are not and
21  variations on a name.
22  Q.  It's your understanding that
23  the Al Aqsa Foundation is on the OFAC SDN
24  list?
25  A.  Yes.
```

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

GARY WALTERS
June 8, 2011

Page 181

```
 1      WALTERS
 2 Q.  It's your understanding that
 3 the El Wafa Charitable Society is on the OFAC
 4 SDN list?
 5 A.  It is.
 6 Q.  What's the basis for that
 7 understanding?
 8 A.  I think later I quote the
 9 Treasury websites, U.S. Treasury websites.
10 Q.  Stating that the El Wafa
11 Charitable Society is an SDN?
12 A.  I'm not sure what it states.
13 Q.  To your understanding that it's
14 designated?
15 A.  It's my understanding that it's
16 designated.
17 Q.  Let's look at your red flag
18 number ten. "Beneficiaries in locations not
19 in direct relation to Interpal's stated
20 purpose (transfers to ▊▊▊▊▊▊▊▊▊▊."
21 What transfers do you understand Interpal
22 made to ▊▊▊▊
23 A.  I'm afraid I can't recall.
24 Q.  Nat West disclosed to law
25 enforcement that there was at least one
```

Page 182

```
 1      WALTERS
 2 transfer to ▊▊▊▊, correct?
 3 A.  I haven't got that disclosure
 4 here in front of me.  Do you have a copy?
 5 Q.  Are you aware that there was
 6 ever a transfer to ▊▊▊▊?
 7 A.  I believe there was a transfer
 8 to ▊▊▊▊
 9 Q.  Let me show you what's been
10 marked as Exhibit 20 which bears Nat West
11 production numbers 52089 through 91.  Do you
12 recognize this as the NCIS disclosure that
13 Nat West made on June 17, 2002?  Do you
14 recognize this?
15 A.  Yes.
16 Q.  This discloses a transfer to
17 Interpal's accounts from ▊▊▊▊ correct?
18 A.  From ▊▊ yes.
19 Q.  As you sit here, do you believe
20 that there is evidence of a transfer having
21 been made to ▊▊▊▊?
22 A.  I would need to go back and
23 check.
24 Q.  You agree that anyone who read
25 the NCIS disclosure would know that there was
```

Page 183

```
 1      WALTERS
 2 transfer to Interpal from ▊▊▊▊ correct?
 3 A.  Yes.
 4 Q.  Why don't you just put that one
 5 in a separate pile Exhibit 20 because we will
 6 come back to it.  Look at your red flag
 7 number 11. "Beneficiaries were themselves
 8 charities which constitute significant
 9 customer risk", do you see that?
10 A.  Yes.
11 Q.  Anyone who read the October 15,
12 2001 NCIS disclosure that we looked at
13 together would know that fact, correct?
14 A.  They would.
15 Q.  Look at your red flag number 12
16 which is, "Beneficiaries were sometimes also
17 benefactors like ▊▊▊▊ for example." What
18 makes that a red flag?
19 A.  If someone is sending money in
20 one direction and then it comes back in the
21 other direction, that should raise a concern
22 that what is the motivation behind that
23 transfer unless there were clear reasons
24 within the customer profile that have already
25 documented why that will be happening.
```

Page 184

```
 1      WALTERS
 2 Q.  You know that ▊▊▊▊ s
 3 ostensibly at least a charity, correct?
 4 A.  I understand that to be the
 5 case.
 6 Q.  Interpal is a charity?
 7 A.  Yes.
 8 Q.  So monies going between
 9 Interpal and ▊▊▊▊ would be monies going
10 between two charities, correct?
11 A.  Yes.
12 Q.  Look at red flag number 13.
13 A.  Can I just qualify my last
14 answer that when that red flag is raised as
15 with other red flags it's a reason to examine
16 the threat and then mitigate any risk and
17 make decisions based on knowledge of customer
18 and knowledge of customer, knowledge of
19 business as to is there a reason for it and
20 then explore what that may be.
21 Q.  When you say that you are
22 applying red flags that you learned of when
23 you were with the Metropolitan Police
24 Service, you would expect that law
25 enforcement authorities who learned of these
```

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

GARY WALTERS
June 8, 2011

Page 185

WALTERS

1
2  red flags from Nat West would apply the same
3  learning about these red flags that you
4  gained when you were in the Metropolitan
5  Police Service, correct?
6  A.  Not everybody within the
7  metropolitan police gained all my experience.
8  Q.  But you would expect that
9  people at NCIS would be aware of the red
10  flags of terrorism, correct, of terrorist
11  financing?
12  A.  I would expect them to be aware
13  of the knowledge, yes.
14  Q.  You would expect that your
15  former colleagues in the NTFIU would be aware
16  of what you understand to be the red flags of
17  terrorist financing, correct?
18  A.  I would expect them to be
19  aware.
20  Q.  You would expect -- that's
21  fine.  Look at your red flag number 13.
22  "Different Nat West employees at different
23  times and different departments identified
24  Interpal as engaging in activity indicative
25  of terrorist financing thereby providing

Page 186

WALTERS

1
2  objective evidence of the suspicious nature
3  of Interpal's conduct." Based on your review
4  of the record, Nat West repeatedly disclosed
5  that it had suspicions that Interpal was
6  engaging in terrorist financing, correct?
7  A.  Over quite a long period one of
8  them prompted by the OFAC listing.  The other
9  two you have given me here are spread over
10  six months, meanwhile there was a lot of
11  other activity and the other individual
12  suspicions being raised in different
13  departments and being put forward were not
14  past on, don't seem to be examined.
15  Q.  I don't think that's right, but
16  we'll come back to that because I think you
17  missed a few in your report, but we'll come
18  back to it.  Let's look at red flag number
19  14.  "Interpal was investigated by the
20  Charity Commission in 1996 and in 2003 and
21  each time the accounts were frozen." That
22  was known to U.K. law enforcement, correct?
23  A.  Yes.
24  Q.  You omit here the fact that
25  both times the accounts were unfrozen as

Page 187

WALTERS

1
2  well, correct?
3  MR. BONNER: Objection to form.
4  Q.  When the investigations
5  concluded?
6  MR. BONNER: Objection.
7  A.  Yes.
8  Q.  The last red flag you list is,
9  "Interpal payments were of on-going interest
10  to special branch." Do you see that?
11  A.  Yes.
12  Q.  Special branch was aware of the
13  fact that Interpal's payments were of
14  on-going interest to itself, correct?
15  A.  I would have expected so, yes.
16  Q.  Special branch was the part of
17  the Metropolitan Police Service that you
18  identified as being responsible for
19  investigating terrorist financing, correct?
20  A.  Yes.
21  Q.  Have you ever asked anyone
22  associated with Her Majesty's Government
23  about why the government has not sanctioned
24  Interpal?
25  A.  No, I haven't.

Page 188

WALTERS

1
2  Q.  Have you ever asked anyone
3  associated with U.K. law enforcement as to
4  why no charges have ever been brought against
5  Interpal?
6  A.  No, I haven't.
7  Q.  Look at paragraph 26 of your
8  rebuttal report.  I'd like you to look at the
9  first sentence.  It says, "The fact that
10  special branch demonstrated 'active interest'
11  should have been picked up by the defendant
12  as a significant red flag." From your review
13  of the record, Nat West was aware that
14  special branch demonstrated active interest
15  in Interpal because special branch said that
16  to Nat West, correct?
17  A.  Yes.
18  Q.  Look at paragraph 34 of your
19  rebuttal report.  I'd like you to read that
20  to yourself.  What is your basis for stating
21  that these transfers bore, "no apparent
22  relationship to Interpal's stated purposes or
23  geographic areas of focus"?
24  A.  Because the documents that I
25  examined in relation to Interpal, the bank's

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

GARY WALTERS
June 8, 2011

**Page 189**

WALTERS

1    WALTERS
2    documents, I cannot see a link to this person
3    and why he would be sent money when he's in
4    Russia.
5    Q.   What was the purpose of these
6    transfers?
7    A.   I don't know that.  I can't
8    recall that.
9    Q.   You haven't seen anything
10   indicating what the purpose of these
11   transfers were?
12   A.   I can't recall.
13   Q.   You say here that the transfers
14   have no apparent relationship to Interpal's
15   stated purpose so you must have reached a
16   conclusion as to what the purpose was in
17   order to be able to say that it bore no
18   apparent relation to Interpal's stated
19   purpose so my question is what did you
20   understand the purpose of these transfers to
21   be?
22   A.   These transfers, I don't recall
23   why these transfers were made.
24   Q.   So you have no idea why these
25   transfers were made?

**Page 190**

WALTERS

1    WALTERS
2    A.   These ones, no.
3    Q.   You haven't seen anything in
4    the record that indicates to you why these
5    transfers were made?
6    A.   I can't recall.
7    Q.   If you did see something in the
8    record that indicated why these transfers
9    were made, you wouldn't have made this
10   statement, right, because you would have then
11   seen what the relationship was and been able
12   to comment on it, correct?
13   A.   I can't recall what the
14   relationship is and I can't recall that
15   particular point.
16   Q.   You can't recall what the
17   purpose was?
18   A.   No.
19   Q.   I'm going to show you what's
20   been marked as Exhibit 22 which are bank
21   transfer documentation relating to these
22   transfers and my question is have you ever
23   seen these documents before?
24   A.   Yes, I have.
25   Q.   You reviewed these documents in

**Page 191**

WALTERS

1    WALTERS
2    the course of your work?
3    A.   Yes.
4    Q.   You recognize them?
5    A.   Yes.
6    Q.   Do these documents indicate to
7    you what the purpose of these transfers was?
8    A.   It indicates on here a student
9    grant.
10   Q.   What's the basis -- does that
11   refresh your recollection that the purpose of
12   these transfers was a student grant?
13   A.   I can see it shows student
14   grant.
15   Q.   What's your basis for saying
16   that a student grant bears no apparent
17   relationship to Interpal's stated purposes?
18   A.   Transactions as I recall were
19   rare to ███ to people in ███ so the
20   geographic location was education, I recall
21   educational matters in their charitable
22   status. It is not normal on this account to
23   send money out to an individual in ███
24   Q.   If the individual were a
25   Palestinian being educated in ███, would

**Page 192**

WALTERS

1    WALTERS
2    that make these transfers within your
3    understanding of the stated purpose of
4    Interpal?
5    A.   The red flag exists and
6    examining it can satisfy that the suspicion
7    that gets raised can be, I'm trying to think
8    of a word, can be reduced or negated.
9    Q.   You understood from your
10   research of the record in this case that
11   Interpal gave educational grants to
12   Palestinians, correct?
13   A.   They are engaged in educational
14   purposes, yes.
15   Q.   Did you ever consider the fact
16   that this person was the recipient of an
17   educational grant from Interpal?
18   A.   If money is being transferred
19   for nefarious purposes, they would not
20   normally write anything but something that
21   would fit the picture.
22   Q.   That wasn't my question.
23   A.   You cannot look at it -- you
24   can look at it in isolation, but I think you
25   need to draw all of the background

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

GARY WALTERS
June 8, 2011

Page 193

WALTERS

1 information.
2 Q. Mr. Walters, you really need to
3 answer my question.  Did you consider --
4 MR. BONNER: Just because Larry
5 insinuates that you are not answering
6 the question doesn't mean you are not
7 answering his question.
8 Q. My question is the following.
9 Did you ever consider -- did you Gary Walters
10 ever consider the fact that this person was
11 the recipient of an educational grant from
12 Interpal, yes or no?
13 A. My experience and training and
14 background leads me to retain a very open
15 mind about what things are and what the
16 reasons are.  In this particular case we are
17 dealing with a very unusual payment by wire
18 transfer to a country that has no apparent
19 link, no obvious link because they don't make
20 these payments on a regular basis to an
21 individual and they have in their report said
22 student grant, but it would require further
23 examination to find out whether that was in
24 the very nature of money laundering. It's

Page 194

WALTERS

1 made to look clean with reasonable
2 explanation.
3 Q. You think this is a red flag of
4 money laundering?
5 A. For money laundering red money
6 laundering or counter terror financing.  My
7 experience is it doesn't tend to be flagged
8 out as this is either criminal money or
9 terrorist money being sent.  They will find a
10 cover that says this is going to a student.
11 I don't know who that person is.
12 Q. I want to make sure that I
13 understand you carefully because you are
14 under oath.
15 A. I am.
16 Q. Before I asked you today you
17 remember seeing that this document indicated
18 that the money was being paid to ████████
19 ████████████ for a student grant?
20 A. Yes, I do.
21 Q. You don't refer to that in the
22 paragraph in which you discuss this payment,
23 do you?
24 A. Well, when I was examining all

Page 195

WALTERS

1 the material, I was looking at what did Nat
2 West do about it, not what would Gary Walters
3 do about it.  I took a view that they sent
4 money off to an individual in an obscure --
5 ██████ is not an obscure location, but in a
6 location they would not normally transfer
7 money to.  The reason for the transfer is a
8 student grant, that's what's been put down.
9 Whether that is or is not what it's about is
10 a different matter. I don't draw judgment on
11 that because I'm not investigating that.  I'm
12 not asking the questions that I feel from all
13 my experience that when this red flag comes
14 up it should be questioned. When the red flag
15 appears it should be dealt with and analyzed
16 and assessed and evaluated and an
17 investigation of some kind conducted in order
18 that a decision could be reached is this
19 suspicious or not suspicious.
20 Q. Mr. Walters, in your report in
21 paragraph 34 you describe these transactions
22 as having "no apparent explanation", correct?
23 MR. BONNER: No apparent
24 relationship.

Page 196

WALTERS

1 A. Bearing no apparent
2 relationship to Interpal's stated purposes or
3 geographic area of focus.
4 Q. Read on, sir.  They are your
5 words. Should have been seen minimally as
6 unusual transactions with no apparent
7 explanation so my question stands you
8 described these transactions as having "no
9 apparent explanation", correct?
10 A. Yes, I did.
11 Q. The documents that you just
12 testified under oath you saw before do reveal
13 an apparent explanation namely a student
14 grant, correct, yes or no?
15 A. That is an apparent explanation
16 so yes.
17 Q. Therefore your statement in
18 your report that these transactions had no
19 apparent explanation was a mistake, correct?
20 A. I'd accept that I made a
21 mistake there.  I apologize.
22 Q. Look at your report paragraph
23 67 and 68. Read those to yourself.  Have you
24 read those?

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

GARY WALTERS
June 8, 2011

Page 197

```
 1      WALTERS
 2 A.  Yes.
 3 Q.  As reflected in your quotation
 4    from Nat West's SAR about ███████
 5    contributions Nat West expressly disclosed
 6    this to law enforcement, correct?
 7 A.  They did make a disclosure,
 8    yes.
 9 Q.  So if this were as you indicate
10    in paragraph 68 another red flag against the
11    Interpal account Nat West explicitly
12    disclosed it to law enforcement, correct?
13 A.  My experience of examining
14    suspicious activity reports that are sent to
15    the police if it's not fully set out could
16    make it difficult to identify all of the side
17    issues to one particular report.
18 Q.  Did you learn from anyone at
19    law enforcement that they had any difficulty
20    identifying any side issues concerning
21    Interpal?
22 A.  No.
23 Q.  Let me go back to my prior
24    question.  If this were as you indicate in
25    paragraph 68 another red flag against the
```

Page 198

```
 1      WALTERS
 2    Interpal account, your words, Nat West
 3    explicitly disclosed it to law enforcement,
 4    correct?
 5 A.  They did disclose it to law
 6    enforcement.
 7 Q.  I'd like you to look at
 8    paragraph 30 of your report.  I'd like you to
 9    look at the last two sentences.  Is it
10    accurate that you saw no documentation of
11    communication between Nat West and the
12    Charity Commission in connection with the
13    1996 investigation?
14 A.  I can't recall seeing any.
15 Q.  Let me show you what's been
16    marked as Exhibit 23 which bears the Nat West
17    production number 16498 and ask you did you
18    ever see that document before?
19 A.  I don't recall this document.
20 Q.  This contradicts what you said
21    in your report, right, this is communication
22    between Nat West and the Charity Commission
23    concerning the 1996 investigation, correct?
24 A.  In terms of this I would accept
25    that in order for the bank to have been
```

Page 199

```
 1      WALTERS
 2    informed that they needed to place a stop on
 3    the account as a better expression they would
 4    have received some contact in order to inform
 5    them.
 6 Q.  You're aware that the bank was
 7    also informed that the freeze was lifted when
 8    the Charity Commission concluded its
 9    investigation, correct?
10 A.  And they would have been
11    informed that it's been lifted.
12 Q.  I'd like you to look at
13    paragraph 37 of your report.
14 A.  When I said in paragraph 30 I
15    would have expected to find communication, I
16    was talking about rather more than a stop the
17    account and you can open the account.
18 Q.  Do you know whether Nat West
19    and Charity Commission personnel spoke to one
20    another during the course of the
21    investigation?
22 A.  I haven't got details of who
23    spoke to who.  I would presume that they
24    would have done, but I have not seen any
25    record.
```

Page 200

```
 1      WALTERS
 2 Q.  You have not seen it in
 3    writing?
 4 A.  I have seen a letter that we
 5    referred to earlier where it says there has
 6    been discussions.
 7 Q.  Do you have any reason to
 8    believe that's untrue?
 9 A.  No, but I would have expected
10    to have seen more documentation about
11    discussions during meetings.
12 Q.  Here you say there was no
13    communication, but you just told me that you
14    read -- you said there's no documentation of
15    communication, but you did read that there
16    were discussions between the Charity
17    Commission and Nat West, correct?
18        MR. BONNER: Objection to form.
19 Q.  You did see documentary
20    evidence that there were discussions,
21    correct?
22 A.  If I read my paragraph I say I
23    would have, well, you have to take the whole
24    paragraph I think.  I didn't see any
25    documentation of any due diligence or account
```

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

GARY WALTERS
June 8, 2011

Page 201

WALTERS

1
2  monitoring being undertaken at the time the
3  account was frozen and from my experience I
4  would have expected, for example, an
5  assessment as to all the account activity
6  preceding the freezing order. I would have
7  also expected to find documentation of
8  communication between the defendant and
9  Charity Commission and even special branch.
10  The lack of documentation -- I'm not saying
11  there's no documentation, but in any event I
12  haven't seen anything that indicates there
13  was any investigation of its own around that
14  '96 investigation.
15  Q.  When you were the operational
16  head of the MLIT of the Metropolitan Police
17  Service, did you have occasion during the
18  course of your money laundering
19  investigations to speak with bank personnel?
20  A.  Yes, I did.
21  Q.  Often?
22  A.  Often.
23  Q.  Did you write an internal memo
24  every time you spoke to bank personnel?
25  A.  In relation to investigations

Page 202

WALTERS

1
2  there was always a record kept of the details
3  of investigation.
4  Q.  Did you always write a record
5  of your communications with banks?
6  A.  In relation to specific
7  investigations, yes.
8  Q.  Otherwise?
9  A.  If I wasn't talking about
10  specific cases, not always.
11  Q.  Did you ask the banks to write
12  a record of every one of your communications
13  with them?
14  A.  My experience was that banks
15  and others would often keep records of
16  communications with me.
17  Q.  It's not my question. My
18  question was did you ask the banks to write
19  records of their communication with you?
20  A.  On specific investigations or
21  general meetings?
22  Q.  When you had a conversation
23  with a banker during the course of one of
24  your money laundering investigations, did you
25  ever tell the banker I want you for your own

Page 203

WALTERS

1
2  records to write an internal memo of this
3  communication?
4  A.  I didn't specifically ask them
5  to keep a record.
6  Q.  Let's look at paragraph 37 of
7  your report.
8  A.  Just to clarify that last one
9  to go on, my own experience was that banks
10  would sometimes write to me to confirm the
11  meetings that I had with them.
12  Q.  Look at paragraph 37 of your
13  report.  That indicates that you're aware
14  that Nat West reported ██████████ rt to
15  NCIS, correct?
16  A.  Yes.
17  Q.  Let me show you what's been
18  marked as Exhibit 24.  You recognize this to
19  be Nat West's disclosure to NCIS of
20  ████████ correct?
21  A.  Yes.
22  Q.



Page 204

WALTERS



TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

GARY WALTERS
June 8, 2011



Page 205

**WALTERS**

Page 207

1   WALTERS
2   transcript at pages 202 and 203, do you see
3   that?
4   A.  Yes.
5   Q.  You read Mr. Hoseason's
6   transcript in order to be able to say that,
7   correct?
8   A.  I did, yes.
9   Q.  I'm going to show you what's
10  been marked as Exhibit 25 which is the
11  transcript of Mr. Hoseason and ask you to
12  turn to page 203.  Let me read to you the
13  testimony that I would like you to focus on.
14  Line 8.
15     "Question:  Can you explain why
16  you would have felt that there was
17  some urgency to convey this
18  information to NCIS?
19     "Answer: It was very shortly
20  after the events of 11 September.  We
21  were making a significant number of
22  disclosures to NCIS at the time.  As I
23  think I mentioned before, we were very
24  concerned not to fall short in terms
25  of our reporting obligations.  The

Page 206

**WALTERS**

8   MR. FRIEDMAN: Let's take a
9   break.
10  THE VIDEOGRAPHER: We're now
11  off the record.  The time is 3:18
12  p.m., June 8, 2011.
13  (Recess taken.)
14  THE VIDEOGRAPHER: This is tape
15  five of the deposition of Mr. Gary
16  Walters.  We are now back on the
17  record.  The time is 3:27 p.m., June
18  8, 2011.
19  Q.  Mr. Walters, I would like you
20  to look again at paragraph 37 of your report.
21  Specifically your statement as follows.
22  Further, Mr. Hoseason used a letter in this
23  instance referring to Exhibit 24 because he
24  felt the need for urgency to convey the
25  information.  You cite Mr. Hoseason's

Page 208

1   WALTERS
2   reason I suggested that we sent this
3   letter was because with a certain
4   amount of further review to be done,
5   we were not in a position to put
6   together anything more meaningful at
7   the time.  The form itself, the
8   disclosure form, did not really suit
9   putting that kind of information into
10  it so it was more expedient to produce
11  a short letter like this."
12  Do you see that?
13  A.  I do.
14  Q.  Did you read that testimony
15  before you wrote your report?
16  A.  Yes, I did.
17  Q.  You have no reason to doubt
18  that that is a truthful explanation for the
19  urgency that Mr. Hoseason felt, correct?
20  A.  Well, I know from the letter
21  that in the letter itself Mr. Hoseason
22  informs them that as I state in my report he
23  does say

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

GARY WALTERS
June 8, 2011



Page 209

```
 1      WALTERS
 2  [redacted]                    so, you know, to
 3  that extent I can understand that he wants
 4  law enforcement to be informed that there is
 5  a significant event related to the account
 6  and as I understand he said himself he wanted
 7  to let law enforcement know as he puts it
 8  that they are on top of the situation.
 9  Q.  He wanted to do it as soon as
10  he could, correct?
11  A.  Well, he says we are currently
12  undertaking a thorough review so I would
13  imagine that if that's right then they would
14  have been actively doing it there and then.
15  Q.  I'd like you to go back to
16  Exhibit 17 which we looked at this morning,
17  I'm sorry, which we looked at before the
18  break.  Do you have that in front of you?
19  A.  I have.
20  Q.  I would like you to look at
21  paragraph 39 of your report.  In the first
22  sentence of paragraph 39 you say that [redacted]
23  [redacted]      disclosure, Exhibit 24, made no
24  mention of -- I'm sorry, in the first
25  sentence of paragraph 39 you say that [redacted]
```

Page 211

```
 1      WALTERS
 2  A.  Yes.
 3  [redacted]
 4  [redacted]
 5  [redacted]
 6  [redacted]
 7  [redacted]
 8  [redacted]
 9  [redacted]
10  [redacted]
11  [redacted]
12  [redacted]
13  [redacted]
14  [redacted]
15  [redacted]
16  [redacted]
17  [redacted]
18  [redacted]
19  [redacted]
20  [redacted]
21  [redacted]
22  [redacted]
23  [redacted]
24  [redacted]
25  [redacted]
```

Page 210

```
 1      WALTERS
 2  [redacted]
 3  [redacted]
 4  [redacted]
 5  Q.  Look at the first sentence of
 6  the disclosure in Exhibit 17.  It begins with
 7  the following.
 8  [redacted]
 9  [redacted]
10  [redacted]
11  [redacted]                    , do you see that?
12  A.  I do.
13  [redacted]
14  [redacted]
15  [redacted]
16  [redacted]
17  [redacted]
18  [redacted]
19  [redacted]
20  [redacted]
21  [redacted]
22  [redacted]
23  [redacted]
24  [redacted]
25  [redacted]
```

Page 212

```
 1      WALTERS
 2  [redacted]
 3  [redacted]
 4  [redacted]
 5  [redacted]
 6  [redacted]
 7  [redacted]
 8  [redacted]
 9  [redacted]
10  [redacted]
11  [redacted]
12  [redacted]
13  [redacted]
14  [redacted]
15  [redacted]
16  [redacted]
17  [redacted]
18  [redacted]
19  [redacted]
20  [redacted]
21  [redacted]
22  [redacted]
23  [redacted]
24  [redacted]
25  [redacted]
```

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

GARY WALTERS
June 8, 2011



Page 213

```
1   WALTERS
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 215

```
1      WALTERS
2   Q.  Have you seen any evidence that
3   Nat West failed to answer any follow up
4   questions posed by NCIS?
5   A.  Not that I recall, no.
6   Q.  Have you seen any communication
7   from NCIS saying we would have expected that
8   you would have told us something more and put
9   it in context? Did you see anything that said
10  that?
11  A.  No, I haven't seen anything
12  that says that.
13  Q.  In fact, you're aware of
14  subsequent communications from NCIS and NTFIU
15  that say to Nat West
16
17  correct?
18      MR. BONNER: Objection to form.
19  A.  I think we need to go and refer
20  to where that is in my report or the
21  documents.  I would like to see the
22  documents.
23  Q.  You're aware, we will look at
24  the documents, but you're aware that on a
25  couple of occasions after Exhibit 17 Nat West
```

Page 214

```
1   WALTERS
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23           --
24  |
```

Page 216

```
1      WALTERS
2   recorded having spoken with Mark Ashtown and
3   others about
4
5                              correct?
6      MR. BONNER: Objection to form.
7   A.  From recollection those
8   communications were not related to these
9   disclosures.  These are other matters.
10  Q.  They are related to Interpal,
11  correct?
12  A.  They are related to Interpal,
13  but not this particular instance.
14  Q.  You haven't seen anything where
15  anyone from law enforcement said to Nat West
16  in substance we need more disclosure about
17                    , have you?
18  A.  I think to set it into context
19  the activity drivers for want of a better
20  term for law enforcement is that judgments
21  would be made, there would be a trust with
22  the banks, it consistently happened a trust
23  with the banks that this is all the
24  information that's available so that's my
25  experience and then you make a judgment on
```

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

GARY WALTERS
June 8, 2011

Page 217

WALTERS

1 what resources you could put into it from law
2 enforcement based on trust that the bank has
3 provided you with all the information having
4 done a full review of all the accounts as
5 they've stated in their letter.
6 Q. Have you ever seen a
7 communication from law enforcement asking Nat
8 West for more information about
9
10 A. No.
11 Q. Have you ever seen a
12 communication from law enforcement to Nat
13 West after Exhibit 17 asking for more
14 detailed information about
15
16 A. Could you just --
17 Q. Did you ever see any
18 communication from law enforcement subsequent
19 to Exhibit 17 asking Nat West to provide more
20 detail
21
22 A. No, I haven't.
23 Q. Are you aware of any
24 disciplinary action that's ever been taken

Page 218

WALTERS

1 against Nat West for failing to fulfill its
2 obligations with respect to Interpal by any
3 U.K. authority?
4 A. No, I'm not.
5 Q. Look at paragraph 39 of your
6 report again. The first line you say that
7 with reference to what we've marked as
8 Exhibit 17 that Mr. Hoseason "finally made a
9 disclosure to NCIS on 15 October 2001."
10 That's what you wrote, correct?
11 A. That's what I wrote, yes.
12 Q. By the word finally, you are
13 referring to the time interval between
14 September 27 and October 15, correct?
15 A. When I examined the
16 documentation when there is a letter and
17 documents from -- included in Mr. Hoseason
18 himself saying that -- stressing that he did
19 this because he felt it needed bringing to
20 urgent attention we are currently undertaking
21 a thorough review and I would be -- I feel
22 that there was over two weeks to return a
23 suspicious activity report that is reduced to
24 a few lines is not indicative of a full

Page 219

WALTERS

1 report and I don't consider that that should
2 have taken as long. It was not my experience
3 that things should take that long.
4 Q. Have you seen any evidence in
5 the record that NCIS expressed any
6 displeasure with the time that it took?
7 A. I have seen no record of that.
8 Q. Have you seen any record that
9 NCIS expressed any displeasure with the
10 contents of the report in Exhibit 17?
11 A. NCIS were making decisions
12 based on the receipt of the material that Nat
13 West delivered to them and that would drive
14 their decision making around what is the
15 state of this case, what are the
16 opportunities around this case.
17 Q. I will ask my question again.
18 Have you seen any record that NCIS expressed
19 any displeasure with the contents of the
20 report in Exhibit 17?
21 A. No, I haven't.
22 Q. Look at paragraph 43. In that
23 paragraph you identify Mike Hoseason as the
24 MLRO of Nat West, correct?

Page 220

WALTERS

1 A. Yes.
2 Q. What's your basis for that?
3 A. Because Mr. Hoseason as I put
4 it in this instance he's fulfilling the
5 functions of the MLRO.
6 Q. But in paragraph 43 you say
7 that Mr. Hoseason was Nat West's "nominated
8 officer or money laundering reporting officer
9 (MLRO)"?
10 MR. BONNER: I think to be
11 fair, Larry, it says who acted as, not
12 who was.
13 MR. FRIEDMAN: Right.
14 Q. Was Mr. Hoseason to your
15 understanding with the benefit of Mr.
16 Bonner's advice, was he to your understanding
17 the designated MLRO of Nat West?
18 A. No, he wasn't.
19 Q. He was not, who was?
20 A. I would have to go back
21 through. As I sit here, I can't recall. I
22 could go back to the structure chart and
23 remind myself of the names.
24 Q. Did you ever hear the name

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

GARY WALTERS
June 8, 2011

Page 221

WALTERS

1   WALTERS
2   David Swanney?
3   A.  I have heard the name David
4   Swanney.
5   Q.  Was he the MLRO?
6   A.  I would need to go back to the
7   structure chart.
8   Q.  Was Richard Gossage the MLRO?
9   A.  I would need to go back to the
10  structure chart because as I put in there in
11  banks different staff members fulfill the
12  actions of the nominated officer or money
13  laundering reporting officer.  The nominated
14  officer is -- my understanding is you can
15  only have one nominated officer who takes
16  responsibility, but it is the actions that
17  people are taking and in this case I have
18  clearly said that in this instance Mr.
19  Hoseason is acting as the money laundering
20  reporting officer.
21  Q.  In your parlance whoever files
22  an SAR at one point or another is in that
23  instance acting as the MLRO?
24  A.  For me they are acting on
25  behalf of the MLRO and fulfilling the

Page 222

WALTERS

1   WALTERS
2   functions for that purpose.  The
3   responsibility would remain with the MLRO.
4   Q.  In paragraph 43 you wrote not
5   that Mr. Hoseason was acting on behalf of the
6   MLRO, but that he was acting as the MLRO,
7   correct?
8   A.  I'm happy with my wording that
9   he was acting as the MLRO.
10  Q.  Then let's go back.  Was Mr.
11  Hoseason ever acting as the MLRO?
12  A.  For me he was acting as the
13  MLRO.
14  Q.  Because he filed the suspicious
15  activity report?
16  A.  He was reviewing it and dealing
17  with it and submitting reports.  His actions
18  are those of the MLRO.
19  Q.  So again you told me no before,
20  but I'll ask again to make sure I'm clear, in
21  your lexicon if someone is preparing,
22  reviewing and filing a SAR, that makes that
23  person the MLRO for that point in time,
24  correct?
25      MR. BONNER: Objection to form.

Page 223

WALTERS

1   WALTERS
2   A.  They are not -- for the purpose
3   of this report, you know, I'm talking about
4   this particular instant and the actions he
5   took, not necessarily the responsibilities
6   that he took.
7   Q.  Okay, but you just told me two
8   answers ago that because of the
9   responsibilities he took in relation to this
10  report you believe he was the MLRO?
11  A.  I didn't believe he was the
12  MLRO.
13  Q.  You believe he was acting on
14  behalf of the MLRO?
15  A.  Acting on behalf of the MLRO
16  and conducting the actions of the MLRO.
17  Q.  Here you say he was acting as
18  the MLRO, correct?
19  A.  Which to me means he's
20  fulfilling the actions hence the word acted
21  as the nominated officer.  I don't know -- at
22  that moment I don't know as I sit here at
23  that moment who was the official MLRO, but in
24  this particular instance he was conducting
25  the actions of the MLRO.

Page 224

WALTERS

1   WALTERS
2   Q.  Are you a plaintiff in this
3   case?
4   A.  No, I'm not.
5   Q.  You are appearing on behalf of
6   the plaintiff, correct?
7   A.  I'm here to assist the court.
8   Q.  You are not a plaintiff?
9   A.  No.
10  Q.  The U.K. banking regulations
11  require that banks name someone as an MLRO,
12  correct?
13  A.  Yes.
14  Q.  Was Mr. Hoseason ever so named?
15  A.  I don't believe so.
16  Q.  Look at paragraph 49 of your
17  report.  You state that one factor that gave
18  credibility to the cryptome report was that
19  it listed six of the key figures within
20  Interpal by name, correct?
21  A.  Yes.
22  Q.  Look at Exhibit 17 which is the
23  second disclosure that Nat West made to NCIS.
24  
25

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

GARY WALTERS
June 8, 2011



Page 225

1   WALTERS
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 226

1   WALTERS
2
3
4   Q.   You've never met anyone at NCIS
5   who doesn't know how to read English, have
6   you?
7   A.   No.
8   Q.   Going back to paragraph 49,
9   another factor that you say gives the
10   cryptome report credibility is that it listed
11   Interpal's account numbers, correct?
12   A.   Yes.
13   Q.   Exhibit 17, the NCIS disclosure
14
15
16
17
18   Q.   If NCIS had any doubts about
19   that, it could have asked Nat West to provide
20   NCIS with the account numbers, correct?
21   A.   It could have asked and it
22   could have got a production order.
23   Q.   Either way?
24   A.   They could have gone to court
25   and opened an investigation into this.

Page 227

1   WALTERS
2   Q.   Could have picked up the
3   telephone, correct?
4   A.   I'd be speculating.  There is
5   many things that could have happened.
6   Q.   When you were at the
7   Metropolitan Police Service, did NCIS have
8   telephones?
9   A.   Yes.
10   Q.   Did they have computers?
11   A.   Yes.
12   Q.   Did they have pens, paper and
13   pencils?
14   A.   They did.
15   Q.   When they wanted a production
16   order, they asked for one from the court,
17   correct?
18   A.   You apply for a production
19   order of the court, yes.
20   Q.   They knew how to do that?
21   A.   Yes.
22   Q.   You say in paragraph 49 that
23   another factor that gives credibility to the
24   cryptome report was the fact that Interpal
25   had received transfers from what you refer to

Page 228

1   WALTERS
2   as Al Aqsa entities, correct?
3   A.   Yes.
4   Q.   You are aware that the Al Aqsa
5   Foundation was not designated by either the
6   U.S. or U.K. until May of 2003, correct?
7   A.   Yes.
8   Q.   That's 11 months after the
9   cryptome report, I'm sorry, that's a
10   year-and-a-half after the cryptome report was
11   disclosed by Nat West to NCIS, correct?
12   A.   Yes.
13   Q.   You say another fact that gives
14   credibility to the cryptome report was that
15   Interpal received funds from          correct?
16   A.   Yes.
17   Q.   You're aware that          has
18   never been designated by either the U.S. or
19   the U.K., correct?
20   A.   I'm not sure of that.
21   Q.   You're not sure of that?
22   A.   No.
23   Q.   In paragraph 18 of your report
24   on page 4 in your ninth red flag you note
25   that          was outlawed by Israel, correct?

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

GARY WALTERS
June 8, 2011

---

Page 229

WALTERS

1
2   A.   Yes.
3   Q.   Do you believe that if ▮▮▮▮ had
4   been designated by the U.K. or by the U.S.
5   that you or whoever else wrote this paragraph
6   would have indicated that?
7   A.   Absolutely.
8   Q.   You infer that ▮▮▮▮ was never
9   designated by the U.K. or the U.S., correct?
10  A.   To my knowledge it's never been
11  designated.
12  Q.   When you were a member of the
13  Metropolitan Police Service, did you ever
14  enforce Israeli law in England?
15  A.   No.  Not that I'm aware of or
16  not that I can recall.
17  Q.   If you look at paragraph 50 of
18  your report you refer to the fact that a
19  thorough review would have shown outflows
20  from Interpal to Al Mujama, Al Islami, ▮▮▮▮
21  Al Islah Charitable Society, Islamic Society
22  Al Khalil, El Wafa Charitable Society and the
23  Jenin Zakat Committee, right?
24  A.   Yes.
25  Q.   Has any of those entities ever

---

Page 230

WALTERS

1
2   been designated in the U.K. or the U.S.?
3   A.   If I heard you correctly and
4   recall the different ones you used, then no,
5   not that I'm aware of.
6   Q.   ▮▮▮▮ was not designated
7   until 2003, correct?
8   A.   That's correct.
9   Q.   Two years after the disclosure,
10  correct?
11  A.   That's correct.  Can I just say
12  that when analyzing this information to see
13  what opportunities existed or what perhaps
14  should have been done, this kind of research
15  would assist in providing the bank with the
16  opportunity to judge whether that cryptome
17  report raises the threat level or actually
18  has no credibility and this information was
19  readily available to the bank as internal
20  information in terms of the amounts and
21  transfers.  Then would be if it was submitted
22  to law enforcement would be able to be
23  assessed by law enforcement.
24  Q.   When you just said that, Mr.
25  Walters, were you responding to a question

---

Page 231

WALTERS

1
2   because I didn't hear that I asked a
3   question.
4       MR. BONNER: Come on, Larry,
5   please, he's perfectly
6   responsive all day long.  He was
7   trying to elucidate the record, but
8   you don't need to be condescending
9   like that.
10      MR. FRIEDMAN: I'm not
11  condescending.
12      MR. BONNER: Yes, you were.
13      MR. FRIEDMAN: And he was not
14  responding to a question and I move to
15  strike it.
16      MR. BONNER: Then move to
17  strike it.  You don't need to take that
18  tone of voice with him, Larry.
19      MR. FRIEDMAN: Can you please
20  stop.
21      MR. BONNER: No, I'm not going
22  to stop.
23  Q.   Mr. Walters, I will ask you
24  questions and you can answer them.  If I
25  don't ask a question, then you need not say

---

Page 232

WALTERS

1
2   anything.  You could say whatever you want, I
3   can't physically stop you from saying
4   whatever you want, but it's just going to
5   prolong the deposition if you say something
6   when I haven't asked a question.
7   A.   Okay, I apologize.
8   Q.   Don't apologize.
9       MR. BONNER: There's no reason
10  to apologize.  It was perfectly
11  responsive to the question and he's
12  been responding all day, Larry.
13  Please don't take that tone, it's not
14  proper.
15      MR. FRIEDMAN: There's no tone,
16  Jim, and it can't be responsive to the
17  question because there was no question
18  as the record will reflect.
19      MR. BONNER: I think that as
20  we've seen throughout the course of
21  the day from time to time if
22  information occurred to Mr. Walters
23  and he wanted to try to supplement the
24  record to make his answers a little
25  more clear, but if you don't want to

---

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

GARY WALTERS
June 8, 2011

Page 233

WALTERS

1    WALTERS
2    have a clear record, that's up to you,
3    Larry, and you could have a record
4    that's unclear, but there's nothing
5    about what he did that's the least bit
6    improper.
7        MR. FRIEDMAN: I disagree, but
8    are you done or you want to say
9    something more?
10       MR. BONNER: I'm pretty much
11   finished, but you seem to be the guy
12   that wants to have the last word so go
13   ahead, say the last word and we will
14   move on.
15       MR. FRIEDMAN: Are you five or
16   12 or 15?
17       MR. BONNER: I figured you
18   would have to have the last word.
19   Q.  Mr. Walters, let's go back to
20   your deposition. Could you look at paragraph
21   55. I'd like you to focus on the last
22   sentence. Is it correct that you have seen
23   no documentation of action taken by Nat West
24   to understand Interpal's activities between
25   November 19, 2001 and July 2002? Do you want

Page 234

1        WALTERS
2    me to put the question again?
3    A.  What I haven't seen is any
4    documented review that sets out how they
5    gained an understanding of the activities and
6    full details behind the sizeable
7    transactions.
8    Q.  You say, "I have seen no
9    documentation of any such action being taken
10   before July 2002", correct?
11   A.  In relation to that particular
12   comment by Mr. Hoseason, yes.
13   Q.  And the comment is, "I think we
14   need to gain a clear understanding of the
15   activities here and full details behind some
16   of the sizeable transactions", correct?
17   A.  Yes.
18   Q.  So your testimony is that you
19   have seen no documentation of any action
20   being taken between November 2001 and July
21   2002 about gaining a clear understanding of
22   the activities and full details behind some
23   of the sizeable transactions?
24   A.  My recollection is that the
25   sort of documentation that would inform me on

Page 235

1        WALTERS
2    that would be some kind of analysis against
3    the account in that sort of way.
4    Q.  Let me show you what's been
5    marked as Exhibit 29 which bears the
6    production number Nat West 12954. Did you
7    look at that before you wrote your report or
8    before you signed your report?
9    A.  I believe I did.
10   Q.  That's an e-mail exchange --
11   those are e-mails involving Belinda Lane who
12   was the relationship manager for the Interpal
13   accounts and Martin Wiltshear dated January
14   2002, correct?
15   A.  Yes.
16   Q.  You will agree with me that
17   January 2002 is between November 2001 and
18   July 2002, correct?
19   A.  Yes.
20   Q.  Let me show you what's been
21   marked as Exhibit 30 which bears the Nat West
22   production number 13637. Did you look at
23   this before you signed your report?
24   A.  I believe I did, yes.
25   Q.  This is Belinda Lane's notes of

Page 236

1        WALTERS
2    a meeting that she had with Interpal
3    concerning its activities and its banking,
4    correct?
5    A.  That's what it appears to be,
6    yes.
7    Q.  It's dated March 20, 2002,
8    correct?
9    A.  It is.
10   Q.  You will agree with me that
11   March 2002 is between November 2001 and July
12   2002, correct?
13   A.  It is.
14   Q.  Why don't you read paragraph 63
15   of your report to yourself?
16   A.  I think I need to -- bearing in
17   mind -- I'm bearing in mind what you said
18   about questions, that you asked a question
19   about clarify something.
20   Q.  Do you want to clarify an
21   answer that you gave?
22   A.  I want to clarify, yes, I do.
23   Q.  What answer are you clarifying?
24   A.  To explain what I was looking
25   for around documentation between these dates.

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

GARY WALTERS
June 8, 2011

Page 237

WALTERS

1
2  Q.  I didn't ask you what you were
3  looking for. I was asking you to look at
4  these documents before and I asked you whether you
5  saw them before you signed your report and I
6  asked you to verify the dates?
7  A.  But in terms of analysis
8  there's another date on this document when it
9  was sent in October 2005 from somebody so
10 what I don't know is whether there was any
11 proper analysis done on the account as
12 reflected.
13 Q.  I can explain that to you.  I
14 can explain the 2005 date to you, Mr.
15 Walters, so that you have no
16 misunderstanding. That was after this lawsuit
17 was commenced and the documents were gathered
18 for the purpose of production to plaintiffs
19 so that fax number reflects the gathering of
20 documents for production to the plaintiffs in
21 the case. It doesn't reflect a business
22 related communication in 2005.
23 A.  But this doesn't reflect to me
24 -- the customer meeting doesn't reflect that
25 anyone but Belinda Lane has seen it.

Page 238

WALTERS

1
2  Q.  I understand.  I didn't ask you
3  that question.
4  A.  It's a note to herself.
5  Q.  In your experience would a
6  relationship manager prepare a note like this
7  and not give it to anyone?
8  A.  It could sit as a file note
9  writing a memo so anywhere.
10 Q.  Did you read Ms. Lane's
11 deposition testimony about who she gave this
12 to?
13 A.  I can't recall this particular
14 document being discussed.
15 Q.  You could put that to one side.
16 Look at paragraph 63 of your report.  The
17 first sentence you say that you have not seen
18 any evidence that Nat West implemented KYC
19 procedures with respect to Interpal, do you
20 see that?
21 A.  Yes, I do.
22 Q.  Did you have Exhibit 30 in mind
23 when you signed a report containing that
24 statement?
25 A.  I would have expected to see

Page 239

WALTERS

1
2  more.
3  Q.  Going back to Exhibit 29, you
4  see that in Mr. Wiltshear's January 17, 2002
5  e-mail he asks Ms. Lane to provide him with
6  more background information concerning
7  Interpal because there was a concern about
8  terrorist funding, correct?
9  A.  Yes.
10 Q.  Above that is a response from
11 Belinda Lane where among other things she
12 says that she's going to meet with Mr.
13 Qundil at Interpal, correct?
14 A.  Yes.
15 Q.  Exhibit 30 is a note of Ms.
16 Lane's meeting thereafter with Mr. Qundil at
17 Interpal, correct?
18 A.  It would appear not to be the
19 meeting she held on 21st of January because
20 it's dated the 20th of March.
21 Q.  Did you read her testimony
22 about why that meeting was delayed until
23 March?
24 A.  I can't recall what the
25 explanation was.

Page 240

WALTERS

1
2  Q.  Based on your experience
3  dealing with bankers with Ms. Lane having
4  told Mr. Wiltshear that she's going to have a
5  meeting with Mr. Qundil in response to Mr.
6  Wiltshear's request for more background on
7  Interpal, do you think -- would you expect
8  that Ms. Lane having had a meeting and
9  writing a memo of the meeting would not have
10 provided to Mr. Wiltshear, but would have
11 just put it in her file?
12 MR. BONNER: Objection to form.
13 A.  What she sent -- in document 29
14 she sent Mr. Wiltshear some information, but
15 she might have -- I'm speculating. I have to
16 say that she may or may not have.
17 Q.  Would you expect that she would
18 have given your experience dealing with
19 bankers?
20 A.  I don't think I can speculate
21 on that.
22 Q.  Despite your experience with
23 bankers for you to say that if one banker
24 asked another to get some information and the
25 other went and got that information and wrote

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

GARY WALTERS
June 8, 2011

Page 241

WALTERS

1
2  it down in a memo, you think it would be
3  speculative despite your experience with
4  bankers to say that that memo would not have
5  been shown to anybody?
6      MR. BONNER: Objection to form.
7  A.  Would not have what?
8  Q.  Would have been shown to
9  somebody?
10      MR. BONNER: Objection.
11  A.  Within this case there are a
12  couple of other instances where people said
13  they would do things and then nothing
14  happened for a long time.
15  Q.  Look at paragraph --
16  A.  I would have expected bankers
17  to have done what they said they would do.
18  Q.  Look at paragraph 57 of your
19  rebuttal report.  Why don't you read that to
20  yourself.
21  A.  Yes.
22  Q.  You see that there was no
23  guidance given to Ms. Lane with respect to
24  balancing the risk of tipping off with the
25  need for further information, correct?

Page 242

WALTERS

1
2  A.  I haven't seen it or I don't
3  recall seeing it.
4  Q.  Did you read her deposition
5  testimony?
6  A.  I did.
7  Q.  Do you remember that she
8  testified about her training on tipping off?
9  A.  I don't recall that particular
10  thing.  Perhaps I could read it.
11  Q.  Let me show you what's been
12  marked as Exhibit 31 which is the deposition
13  transcript of Belinda Lane and ask you to
14  look at page 234, line 6 through 21.  I'll
15  ask you to read that to yourself.  Did you
16  read that testimony before you signed your
17  report?
18  A.  I'm still reading.
19  Q.  Sorry.
20  A.  Just trying to get it into
21  context here.
22  Q.  Did you read that before you
23  signed your report?
24  A.  Yes, I did.
25  Q.  You could put that aside.

Page 243

WALTERS

1
2  A.  In a case like this that's a
3  one off case, just to finish my answer from
4  the last one, I read that, but in this one
5  it's a specific very special account and I
6  would have anticipated that she would have
7  received some bespoke guidance on what to ask
8  and what to not to ask.
9      MR. FRIEDMAN: I move to strike
10  everything after yes, I did.
11  Q.  Look at paragraph 64 of your
12  rebuttal report.
13      MR. BONNER: Paragraph 64,
14  right?
15  Q.  Your reference to the first SAR
16  is to the SAR ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
17  ▮▮▮▮▮▮▮▮▮ correct?
18  A.  I believe so, yes.  Yes.
19  Q.  Look at paragraph 161 of your
20  report.  You write, "Suspicions of links to
21  terrorist financing was raised again by
22  payment of ▮▮▮▮▮▮▮▮▮ rom ▮▮▮▮▮▮▮▮▮
23  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
24  ▮▮▮▮▮▮▮▮ which led to an SAR being
25  filed submitted internally stating possible

Page 244

WALTERS

1
2  umbrella for funding terrorism in the Middle
3  East (NW 00834 to 380)", do you see that?
4  A.  I do.
5  Q.  Did you look at that document
6  before you signed your report containing that
7  paragraph?
8  A.  Yes.
9  Q.  Let's mark as Exhibit 32 the
10  document you cite and let's mark as Exhibit
11  33 a goalkeeper report dated three days
12  later.  Putting those in front of you.  Do
13  you recognize Exhibit 32 to be the document
14  you reference in paragraph 161?  Question is
15  do you recognize Exhibit 32 as the document
16  you reference in paragraph 161?
17  A.  Obviously there is a page been
18  taken out.
19  Q.  It's because it's a blank page,
20  but in paragraph 161 you refer to a document
21  bearing the production numbers 8374 to 380
22  and Exhibit 2 has the same production
23  numbers, correct?
24  A.  Yes.
25  Q.  You recognize Exhibit 33 as a

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

GARY WALTERS
June 8, 2011



Page 245

```
 1       WALTERS
 2   goalkeeper report that was created three days
 3   later, correct?
 4   A.  Yes.
 5   Q.  You see from page 8377 in
 6   Exhibit 32 that this payment occurred on ▓
 7   ▓
 8   A.  Yes.
 9   Q.  And you see that on page 8387
10   in Exhibit 33 that Nat West informed Belinda
11   Lane that it would report this to the
12   authorities on July 9, 2002, correct?
13   A.  Sorry, could you take me back
14   to that reference?
15   Q.  8387 in Exhibit 33?
16   A.  Yes.
17   Q.  In paragraph 161 you say that
18   this payment was from ▓
19   ▓
20   ▓.  You agree with me that this payment
21   was in fact from ▓ correct?  Mr.
22   Walters, this payment was received from a ▓
23   ▓ correct?
24   A.  I'm having a bit of a slow
25   brain moment.  I do apologize.  Exhibit 32
```

Page 246

```
 1       WALTERS
 2   relates to a payment received in the account
 3   the ▓ Exhibit 33 makes
 4   reference to a payment originating from the
 5   ▓
 6   ▓
 7   Q.  What you recall from reading
 8   the record is that the payment was received
 9   from ▓ Nat West wrote a letter to
10   Interpal asking for more information about
11   the payment which is at 8389 in Exhibit 33
12   and Interpal responded that the payment was
13   from ▓
14   ▓ correct, and
15   that's at 8390, do you see that?
16   A.  What I'm reading is that
17   suspicion was raised about this payment and
18   they wrote to Interpal to ask about it and
19   had a reason put forward.
20   Q.  Including that a payment was
21   made on behalf of ▓
22   ▓
23   ▓ correct?
24   A.  Yes.
25   Q.  That letter stating that at
```

Page 247

```
 1       WALTERS
 2   8390 is dated August 6, 2002, correct?
 3   A.  Yes.
 4   Q.  Go back to Exhibit 32 which is
 5   the document that you reference in paragraph
 6   161 of your report and that shows that Nat
 7   West made a disclosure to NCIS about this
 8   payment on July 4, 2002, correct?
 9   A.  Sorry, Exhibit --
10   Q.  Exhibit 32, that's the document
11   that you cite in paragraph 161 of the report
12   that you signed and if you look at page 8383,
13   it's in 33, I'm sorry, I erred, if you look
14   at Exhibit 33 in the goalkeeper report on the
15   third page which is 8383, that shows that an
16   NCIS disclosure was made, correct?
17   A.  My reading is the disclosure
18   took place quite a long time afterwards.
19   Q.  I have to show you another
20   exhibit that will give you the date.  Showing
21   you Exhibit 34 which bears the Nat West
22   production numbers 52074 through 52091.  If
23   you look at the last three pages bearing
24   production numbers 52089 through 91, that
25   shows you the NCIS disclosure about this
```

Page 248

```
 1       WALTERS
 2   payment was made on June 17, 2002, correct,
 3   do you see that?
 4   A.  Which page, sorry?
 5   Q.  52089, the third to last page
 6   of this exhibit, this shows that the NCIS
 7   disclosure about this transaction was made on
 8   June 17, 2002, correct, do you see that?
 9   A.  17 of June.
10   Q.  2002, correct, do you see that?
11   A.  I do.
12   Q.  You see that this was given the
13   NCIS identification number 666814, correct,
14   if you look at the top of page 52089?
15   A.  Yes.
16   Q.  Now go back to Exhibit 33 which
17   is the goalkeeper report about this payment.
18   You see there that it too bears the same NCIS
19   identification number in the first box
20   666814, correct?
21   A.  Yes, I can see that.
22   Q.  In paragraph 162 you say a
23   decision was made -- of your report you say
24   "A decision was made yet again not to
25   disclose this information to law
```

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

GARY WALTERS
June 8, 2011

---

Page 249

1    WALTERS
2    enforcement." Exhibit 34 demonstrates that
3    Nat West did disclose this payment to NCIS in
4    June of 2002, correct?
5    A.  That is how I now read it, yes.
6        MR. FRIEDMAN: Let's take a
7    break.
8        THE VIDEOGRAPHER: We are now
9    off the record. The time is 4:34
10   p.m., June 8, 2011.
11       (Recess taken.)
12       THE VIDEOGRAPHER: This is tape
13   six of the deposition of Mr. Gary
14   Walters. We are now back on the
15   record. The time is 4:46 p.m. Today
16   is June 8, 2011.
17       MR. BONNER: Before you get
18   started, Larry, Gary just wanted to
19   clarify his last answer.
20       MR. FRIEDMAN: Gary wants to
21   clarify his last answer.
22   Q.  Go ahead.
23   A.  The submission of the SAR
24   doesn't mention what's on the other reports
25   about it being for ▓▓▓▓▓▓▓▓▓▓

---

Page 250

1    WALTERS
2
3    Additionally in this particular instance I
4    know during the case Mr. Holland took issue
5    with me about tipping off and in this case
6    they have gone straight to the customer and
7    asked inquiries.
8    Q.  If you look at Exhibit 33, it
9    shows that Nat West learned about the payment
10   being made by ▓▓▓▓▓▓▓▓▓▓▓▓
11   ▓▓▓▓▓▓▓▓▓▓▓▓ n a
12   letter responding to Nat West's inquiry in a
13   letter from Interpal dated August 6, 2002,
14   correct?
15   A.  Yes.
16   Q.  That was after the SAR was
17   filed, correct?
18   A.  Yes.
19       MR. FRIEDMAN: I'm going to ask
20   the reporter to mark as Exhibit 44 a
21   document bearing production number NW
22   13698.
23       (Exhibit 44, Document, Bates
24   labeled NW 13698, marked for
25   Identification.)

---

Page 251

1    WALTERS
2    Q.  Have you ever seen this before?
3    A.  Yes, I have.
4    Q.  This is an e-mail from Mr.
5    O'Hear dated September 27, 2003, correct?
6    A.  Yes.
7    Q.  To a colleague in group risk
8    management, correct?
9    A.  Yes.
10   Q.  And the subject is Interpal,
11   correct?
12   A.  Yes.
13   Q.  It reads as follows. The
14   second paragraph. "I have today spoken to
15   Mark Ashtown of the NTFIU special branch New
16   Scotland Yard.▓▓▓▓▓▓▓▓▓▓▓▓▓▓
17   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
18   ▓▓▓▓▓▓▓▓▓)". You
19   understand, Mr. Walters, that refers to the
20   payment we've just been discussing?
21   A.  Yes, I do.
22   Q.  Then the e-mail goes on to say
23   the following. "I advised Interpal and
24   confirmed the source of this payment to be
25   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

---

Page 252

1    WALTERS
2    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓
3    ▓▓▓▓▓▓▓▓▓▓▓▓▓
4    ▓▓▓▓▓▓▓▓▓▓▓▓
5    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
6    ▓▓▓▓▓▓▓ations
7    ▓▓▓▓▓▓▓▓▓▓▓▓▓
8    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓
9    ▓▓▓▓▓▓▓▓▓▓ Do you
10   see that?
11   A.  I do.
12   Q.  In fact, if you look at Exhibit
13   32, sorry, 34, I apologize, and the page that
14   bears production number 52077, you see that
15   Mr. O'Hear put the same information in the
16   goalkeeper system and he wrote as follows.
17   "When completing a further disclosure on this
18   connection, see goalkeeper reference 710368.
19   A review of all link disclosures was taken.
20   The ▓▓▓▓▓▓ payment of ▓▓
21   originated from ▓▓▓▓▓▓▓▓▓▓▓▓
22   ▓▓▓▓▓▓▓▓▓▓▓▓▓ This
23   organization albeit not at the time in J▓▓
24   ▓▓▓▓ now appears on a list of names suspected
25   terrorists" and there are initials GRM

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

GARY WALTERS
June 8, 2011

---

Page 257

1      WALTERS
2   records.
3   Q.   You can put that to one side.
4   Let me show you what's been marked as Exhibit
5   35 which bears the Nat West production
6   numbers 12129 through 12152.  If you look at
7   paragraph 105 of your rebuttal report these
8   are the documents that you refer to with
9   respect to a ███████ transfer that Interpal
10  received, correct?
11  A.   Yes.
12  Q.   You say that these documents
13  were received from ████████████, correct?
14  A.   Let me just look at that.
15  Q.   I'm just asking about 105.  In
16  105 you say this was a ████████ transfer from
17  ████████ correct?
18  A.   Yes.
19  Q.   Look at Exhibit 35.  Based on
20  your experience in dealing with banking
21  records you can see on the document that
22  bears the production number 12142 that the
23  name of the entity is actually ████████████
24  ████████████████████████████████████
25  ████████, correct?

---

Page 258

1      WALTERS
2   A.   Yes.
3   Q.   I'm going to show you what
4   we've marked as Exhibits 27 and 28 which are
5   the OFAC designation of Al Aqsa Foundation
6   and the Bank of England designation Al Aqsa
7   Foundation both in May of 2008.  Here's 27
8   which is the OFAC designation of Al Aqsa
9   Foundation and 28 which is the Bank of
10  England designation.  Keep in front of you
11  that document from Exhibit 35 that identifies
12  the name of the recipient of this transfer,
13  do you see that?  You have it in front of
14  you, Mr. Walters, that's good.  Look at
15  Exhibit 27 which is the OFAC designation of
16  the Al Aqsa Foundation.  Have you ever seen
17  this document before?
18  A.   I'm not sure.  I think so, yes.
19  Q.   Do you see that on the first
20  page under the heading a/k/a's it lists
21  aliases of the Al Aqsa Foundation?
22  A.   Yes.
23  Q.   You are familiar with the
24  phrase a/k/a meaning also known as, correct?
25  A.   I am.

---

Page 259

1      WALTERS
2   Q.   Do you see in that list the
3   name that appears in the wire transfer
4   documentation for Exhibit 35 as the source of
5   this payment to Interpal?  Does that name
6   appear there?
7   A.   I'm just finishing reading.
8   Sorry.  There are very similar names here.
9   Q.   But does that name appear?
10  A.   There's a different spelling of
11  ████████████ I don't know if I pronounced
12  that correctly.
13  Q.   That entity is listed in the
14  OFAC release as Muwasa Sanabil Al Aqsa Al
15  Kherevah, correct?
16  A.   Yes.
17  Q.   Does the name of the entity
18  that transferred funds to Interpal appear in
19  the OFAC designation, Exhibit 27?
20  A.   I can't see that the name
21  appears.
22  Q.   Now look at the Bank of England
23  designation Exhibit 28.  You will agree with
24  me that the next to last page of this
25  document lists the designated entity and its

---

Page 260

1      WALTERS
2   aliases, correct, do you see that?
3   A.   I can see it lists them.
4   Q.   Again, you agree with me that
5   the name of the entity that transferred
6   ████████ to Interpal does not appear on this
7   Bank of England sanctions list either,
8   correct?
9      MR. BONNER: Objection to form.
10  A.   It is recognized and documented
11  that people transferring money don't always
12  use directly the same names if they are
13  trying to cover it up.
14  Q.   My question is a little bit
15  different.  Actually a lot different.  Do you
16  see the name of the transferor to Interpal in
17  the Bank of England designation?
18     MR. BONNER: Objection to form.
19  A.   Not a direct match, no.
20  Q.   In paragraph 105 of your report
21  you refer to the transferor as ████████████
22  rather than by its true name as reflected in
23  the document that you identified for that
24  information ████████████████████████████
25  ████████████████████████████████████████

---

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

GARY WALTERS
June 8, 2011



Page 261

1      WALTERS
2   Where did you get the name ▮▮▮
3   from?
4  A.  I shortened it to that.
5  Q.  You also don't see ▮▮▮
6   name on either the OFAC designation list or
7   the Bank of England designation list,
8   correct?
9  A.  That's correct.
10 Q.  Look at paragraph 108 of your
11  report.  You say there that at this time in
12  2003 ▮▮▮ was a high risk jurisdiction, do
13  you see that?
14 A.  Yes.
15 Q.  What's your basis for referring
16  to ▮▮▮ there as a high risk jurisdiction?
17 A.  I believe in 2003 there were
18  various difficulties in the Middle East.
19 Q.  Is it your subjective
20  determination that it was a high risk
21  jurisdiction?
22 A.  Subjective is an interesting
23  word.  I draw on my experience and knowledge
24  to assess these documents.
25 Q.  Nat West -- FATF publishes

Page 262

1      WALTERS
2   lists of high risk jurisdictions, right?
3  A.  They do.
4  Q.  Has ▮▮▮ ever been listed?
5  A.  I'm not aware.
6  Q.  Do you know of any other entity
7   that publishes lists of high risk
8   jurisdictions other than FATF?
9  A.  As I sit here now I'm not
10  aware.
11 Q.  Look at paragraph 165 of your
12  report.  Read that to yourself.
13 A.  Yes.
14 Q.  This relates to the telephone
15  call that Mr. O'Hear made to Mr. Ashtown that
16  we read about in Exhibit 44, correct?
17 A.  Yes, it does.
18 Q.  Also in Exhibit 34?
19 A.  Yes.
20 Q.  You say, "This additional
21  information was passed to law enforcement,
22  but not officially disclosed."  By that you
23  mean it was disclosed in a telephone call?
24 A.  Yes, I do and not through the
25  normal suspicious activity reporting regime.

Page 263

1      WALTERS
2  Q.  In that telephone call
3   according to what you see before you, Mr.
4   Ashtown told Mr. O'Hear ▮▮▮
5   ▮▮▮
6   ▮▮▮
7   correct?
8  A.  I'm not sure without going back
9   the exact wording, ▮▮▮
10  ▮▮▮
11 Q.  Have you ever seen that NTFIU
12  special branch ever subsequently told Nat
13  West that it should make additional
14  disclosure on this subject?
15 A.  My experience would be that
16  this is just in relation to this verification
17  of the information that they had and not an
18  on going expansion into you don't need to
19  bother with anything else.
20 Q.  My question was a little bit
21  different.  In fact a lot different.  Have
22  you seen any evidence that following this
23  conversation between Mr. Ashtown and Mr.
24  O'Hear anyone in law enforcement asked Nat
25  West to make a written disclosure on this

Page 264

1      WALTERS
2   subject?
3  A.  On this particular bit?
4  Q.  Yes.
5  A.  Not on this particular
6   transaction.
7  Q.  As you understand the record,
8   Nat West called special branch, called the
9   NTFIU special branch and ▮▮▮
10  ▮▮▮
11  ▮▮▮
12  ▮▮▮
13  ▮▮▮?
14 A.  Yes.
15 Q.  He also said that
16  ▮▮▮
17  ▮▮▮ correct?
18 A.  Yes.
19 Q.  He also said ▮▮▮
20  ▮▮▮
21  ▮▮▮ correct?
22 A.  Yes.
23 Q.  You're criticizing Nat West for
24  not submitting an updated disclosure on this,
25  correct?

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

GARY WALTERS
June 8, 2011



Page 265

1        WALTERS
2   A.   Where is my criticism here?
3   Q.   You say in paragraph 165, "My
4   reading of this comment is that Mark Ashtown
5   did not require a SAR on that particular
6   payment at that time. I can see no basis to
7   conclude that there was no requirement to
8   report suspicions as they arose based on any
9   different factors." Aren't you criticizing
10  Nat West for filing a SAR on this subject?
11  A.   On that particular transaction
12  I don't see a criticism there of Nat West.
13  Q.   Thank you.
14  A.   I would like to clarify.  How
15  do you see a criticism of Nat West?
16  Q.   If you tell me that you do not
17  mean to imply a criticism of Nat West I can
18  move on.
19  A.   On that one instant.
20  Q.   Yes.
21  A.   Yes.
22  Q.   Look at paragraph 167.  You
23  wrote as follows.  The above demonstrates
24  that the defendant still suspected the
25  account as being involved in terrorist

Page 266

1        WALTERS
2   financing after having spoken to special
3   branch about the ███████ payment.
4   Then you cite the document.  You go on to say
5   given the number of SARs as well as the
6   investigations by law enforcement in August
7   2003, I cannot understand why a further
8   disclosure was not submitted to law
9   enforcement in the standard manner.  With
10  respect to this payment, NTFIU told Nat West
11  █████████████████████
12  ██████████████████
13  A.   They did.
14  Q.   Let's go to paragraph 75.
15  A.   Can I extend that just to say
16  that I would have expected, of course, I can
17  read what happened and understanding that
18  they telephoned, but what I'm saying is the
19  normal process would have been to submit a
20  SAR.
21  Q.   So the normal process for Nat
22  West would have been despite the statement by
23  the representative of the Metropolitan Police
24  Service section responsible for terrorist
25  financing that ██████████████

Page 267

1        WALTERS
2   the bank nonetheless should have made a
3   written disclosure, that's your opinion?
4   A.   I would have thought they would
5   have having confirmed the information and I
6   haven't had a chance to look at -- I can't
7   find the date there, but I would have in
8   normal course events I would have expected
9   that when they got the feedback from their
10  own staff that this payment came from this
11  particular organization that they would have
12  submitted a SAR with that information. Having
13  decided not to do that and then telephone and
14  spoken, I can understand why they then didn't
15  submit one.
16  Q.   At the time they learned that
17  information in the letter from Interpal in
18  August of 2002, ████████ had not yet been
19  designated by the U.K. or the U.S., correct?
20  It wasn't designated by them until May 2003,
21  correct?
22  A.   I believe you're right.
23  Q.   Then after the designation
24  occurred in May 2003, Nat West made the
25  disclosure by telephone to NTFIU and NTFIU

Page 268

1        WALTERS
2   said ███████████████████████████
3   ██████ correct?
4   A.   I got that down as September
5   2003, isn't it?
6   Q.   After the designation occurred
7   in May 2003, Nat West made the disclosure to
8   NTFIU in September 2003 and NTFIU said ████
9   ███████████████████████████████████
10  ████e, correct?
11  A.   Yes.
12  Q.   They also said ██████████████
13  ████████████████ correct?
14  A.   Who said that?
15  Q.   Mark Ashtown.
16  A.   He didn't say if our views
17  change, did he? He said ██████████████████
18  █████████████████████████████
19  ████████████████████
20  ███████████████
21  █████████████
22  Q.   Now do you have any information
23  that NTFIU was ever back in touch before it
24  eventually served a production order?
25  A.   I have seen nothing in the

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

GARY WALTERS
June 8, 2011



**Page 277**

```
1        WALTERS
2    contact, it's not written down, but go and
3    find out some more and I think that for me
4    when I have been doing major cases, there is
5    far more full and frank and accurate detailed
6    effectively analysis done by the regulated
7    entity to assist and inform decision making
8    around their suspicions because it's their
9    suspicions that are motivating it.
10       MR. FRIEDMAN: I move to strike
11   as non-responsive.
12 Q.   Let me read to you the question
13   again. Nat West told NCIS
14
15              correct?
16 A.   Sorry, Nat West.
17 Q.   In Exhibit 18 Nat West informs
18   NCIS
19                    correct?
20 A.   They informed NCIS
21
22 Q.   You are looking at the wrong
23   document.  Look at Exhibit 18.  In Exhibit 18
24   Nat West informed
25
```

**Page 278**

```
1        WALTERS
2    correct?
3 A.   Yes.
4 Q.   In fact, Nat West asked NCIS
5
6
7              correct?
8 A.   They did.
9 Q.   Please take a look at Exhibit
10   37 which is the Bank of England Nat West
11   correspondence that we looked at this
12   morning.  Exhibit 37 shows that after the
13   OFAC designation in addition to making a
14   disclosure to NCIS
15
16                    and in addition to speaking
17   to Detective Sergeant Bennett, Nat West also
18   wrote to the Financial Sanctions Unit of the
19   bank in England to ask as Mr. Gossage wrote,
20
21
22
23              correct?
24       MR. BONNER: Objection to form.
25 A.   I can read that it says
```

**Page 279**

```
1        WALTERS
2
3
4
5
6
7 Q.   Then in the response of Mr.
8    Dawlings from the Bank of England's Financial
9    Sanctions Unit he wrote, '
10
11
12
13
14   correct?  You see that Mr. Dawlings wrote
15   that to Mr. Gossage, correct?
16 A.   He does go on a bit further in
17   the letter though to expand it that
18
19
20
21
22
23 Q.   He said that too, right?
24 A.   Yes.
25
```

**Page 280**

```
1        WALTERS
2 Q.   And Mr. Dawlings also wrote,
3
4
5
6    correct?
7 A.   That's correct.
8 Q.   You understand the reference to
9
10
11
12              correct?
13 A.   That's correct.
14 Q.   Again, special branch was the
15   service of the Metropolitan Police Service
16   responsible for counter terror financing,
17   correct?
18 A.   Yes, it is.
19 Q.   Look at paragraph 86 of your
20   report.  In the last sentence you say the
21   following.  "Moreover in my review of the
22   defendant's documents I have not seen any
23   documentation of any significant KYC or due
24   diligence being undertaken by the bank after
25   the OFAC designation of Interpal", correct?
```

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

GARY WALTERS
June 8, 2011

Page 281

1   WALTERS
2   A.  Yes.
3   Q.  In paragraph 91 you say, "In my
4   review of the defendant's documents I have
5   not identified any documentation of any
6   significant KYC or due diligence being
7   undertaken by the defendant after the OFAC
8   designation of Interpal", correct?
9   A.  Which paragraph is that, sir?
10  Q.  91.
11  A.  That's correct.
12  Q.  Let me show you Exhibits 38, 39
13  and 40.  38 bears the Nat West production
14  numbers 16767 through 16774, 39 bears the Nat
15  West production numbers 66721 through 23 and
16  40 bears the production numbers Nat West 667
17  to 740.  Please take a look at these three
18  exhibits.  Have you seen these before?
19  A.  Yes.
20  Q.  These documents reflect reviews
21  of all payments made from Interpal's accounts
22  at Nat West by Guy Cole after the OFAC
23  designation, correct?
24  A.  Let me have a moment to read
25  it, please.

Page 283

1   WALTERS
2   expected that this would have taken place a
3   lot sooner than it did.
4   Q.  Okay.
5   A.  My experience would be when
6   there's a matter like this is that the sort
7   of research and review and due diligence
8   would take place immediately.
9   Q.  These documents show that Nat
10  West conducted semi-annual reviews of
11  Interpal's accounts into 2005, correct?
12  A.  There's one semi-annual review
13  that's recorded here.
14  Q.  In 2005?
15  A.  In 2005.
16  Q.  That's Exhibit 40?
17  A.  On 40, yes.
18  Q.  I'll represent to you just so
19  you are not unclear about this issue that
20  that is because of the agreement between the
21  parties on the cut off date for document
22  productions it did not extend into 2006.  I
23  didn't want you to be uncertain about why
24  there's nothing for 2006.
25  A.  Thank you very much.

Page 282

1   WALTERS
2   Q.  These documents reflect the
3   fact that after OFAC's designation of
4   Interpal Nat West conducted on an on-going
5   basis semi-annual reviews of all payments in
6   Interpal's accounts, correct?
7   MR. BONNER: Objection to form.
8   A.  There is a record here of a
9   semi-annual report.
10  Q.  It also shows that Nat West
11  also made a retrospective analysis of all
12  payments in Interpal's accounts as well,
13  correct?
14  A.  There is some analysis done.
15  Q.  Had you read these documents
16  before you signed your report containing
17  paragraphs 86 and 91?
18  A.  I had.
19  Q.  Now look at paragraph 127.
20  A.  I was just pausing to frame the
21  rest of that answer.
22  Q.  I asked if you looked at it and
23  you said you had?
24  A.  I had.  My opinion as I voiced
25  it in the report is that I would have

Page 284

1   WALTERS
2   Q.  Look at paragraph 127 of your
3   report.  In paragraph 127 you say among other
4   things that as of April 21, 2004 no
5   additional due diligence had been completed,
6   correct?
7   A.  It refers in my report to a
8   previous chain of e-mails.  I don't want to
9   take things out of context.  Maybe I should
10  remind myself what the previous chain of
11  e-mails were.
12  Q.  Look at Exhibit 38.
13  A.  Yeah.
14  Q.  That contains a report of due
15  diligence conducted by Mr. Cole dated May 20,
16  2004, correct, as well as May 17, 2004?
17  A.  38 is some research done by Guy
18  Cole.
19  Q.  In May of 2004?
20  A.  In May 2004.
21  Q.  In May 2004, correct?
22  A.  May 2004.
23  Q.  Look at paragraph 87 of your
24  report, Mr. Walters.  I would like you to
25  read the second sentence and let me read it

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

GARY WALTERS
June 8, 2011

---

Page 285

WALTERS

1     WALTERS
2 aloud.  Mr. Roger, Irvin Roger as head of the
3 money laundering prevention unit within the
4 corporate banking financial markets division
5 which included Interpal within its customer
6 responsibility should have understood that
7 the designation of Interpal by OFAC meant
8 that the U.S. Government was making clear its
9 belief that Interpal was involved in funding
10 terrorism.  Do you see that?
11 A.  Yes.
12 Q.  Is it your understanding that
13 Mr. Roger did not understand that the
14 designation of Interpal by OFAC meant that
15 the U.S. Government was making clear its
16 belief that Interpal was involved in funding
17 terrorism?
18 A.  I understood that he would
19 understand it.
20 Q.  You based on your reading of
21 his deposition testimony know that he
22 testified that he did understand that,
23 correct?
24 A.  Yes.
25 Q.  Look at paragraph 109 of your

---

Page 286

WALTERS

1     WALTERS
2 report.  Read that to yourself.
3 A.  Yes.
4 Q.  You state here among other
5 things that you have seen no responses to
6 Damien Connors' August 26, 2003 e-mail,
7 correct?
8 A.  Yes.
9 Q.  Let me show you what's been
10 marked as Exhibit 42 which contains a number
11 of documents.  Aren't those all responses to
12 Damien Connors' August 26, 2003 e-mail?
13     MR. BONNER: I think to be
14 clear, Larry, it says I've not
15 identified a response to that e-mail
16 from CBFM.
17     MR. FRIEDMAN: Can you read the
18 rest of the sentence, Jim?
19     MR. BONNER: Sure.  I can read
20 the whole thing I guess.  I have not
21 identified a response to that e-mail
22 from CBFM nor from the rest of the
23 defendant's organization.
24     MR. FRIEDMAN: By the word
25 defendant, you understand he's

---

Page 287

WALTERS

1     WALTERS
2 referring to Nat West?
3     MR. BONNER: Correct.
4     MR. FRIEDMAN: Okay.
5 Q.  Look at Exhibit 42.  Doesn't
6 that contain multiple responses to Mr.
7 Connors' August 26, 2003 e-mail?
8 A.  My reading of them is there are
9 nine responses.
10     MR. FRIEDMAN: Let's take a
11 short break and then we will finish
12 up.
13     THE VIDEOGRAPHER: We are now
14 off the record.  The time is 5:52
15 p.m., June 8, 2011.
16     (Recess taken.)
17     THE VIDEOGRAPHER: This is tape
18 seven of the deposition of Mr. Gary
19 Walters.  We are now back on the
20 record.  The time is 6:01 p.m., June
21 8, 2011.
22 Q.  Mr. Walters, did you speak with
23 plaintiff's counsel about your testimony
24 during that break, yes or no?
25 A.  Yes.

---

Page 288

WALTERS

1     WALTERS
2 Q.  Look at paragraph 171 of your
3 report.  Mr. Walters, did you speak with
4 plaintiff's counsel about your testimony
5 during that break, yes or no?
6 A.  Yes.
7 Q.  Look at paragraph 171 of your
8 report.  What's your basis for stating there
9 that Nat West had clear suspicion of money
10 laundering activity in regard to Interpal's
11 account?  Let me put the question again.
12 Look at paragraph 171 of your rebuttal
13 report.  What's your basis for stating that
14 there is in your view a clear suspicion of
15 money laundering activity in Interpal's
16 accounts?
17 A.  Because of all the red flags
18 that appear and that raises -- each one
19 raises separate suspicion.
20 Q.  In your opinion, did Nat West
21 have a suspicion of money laundering?
22 A.  Yes.
23 Q.  Have you seen any evidence that
24 Nat West had a suspicion of money laundering?
25 A.  In that it is money laundering

---

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

GARY WALTERS
June 8, 2011

Page 289

WALTERS
2 with a -- money laundering in the broader
3 term.
4 Q. Meaning what?
5 A. Suspicious activity.
6 Q. Nat West disclosed suspicions
7 of involvement in terror financing, correct?
8 A. Yes.
9 Q. Have you seen any internal or
10 external communications in which Nat West
11 stated that it suspected Interpal of engaging
12 in money laundering?
13 A. Not that I can recall.
14 Q. Look at paragraph 174 of your
15 second report. Read that to yourself. Is it
16 your opinion that Nat West should not have
17 closed Interpal's U.S. dollar accounts?
18 A. I think they should have
19 engaged in more communication when they were
20 considering doing that.
21 Q. Do you believe that Nat West
22 should not have closed Interpal's U.S. dollar
23 account?
24 A. I believe they should have
25 engaged in far more communication before

Page 290

WALTERS
2 doing so.
3 Q. We can do this all day and my
4 question is do you believe they should not
5 have closed the accounts?
6 A. I believe that they should have
7 communicated far better with law enforcement
8 before they chose to do that.
9 Q. But do you believe they should
10 have closed the accounts?
11 A. I believe they should have
12 communicated before doing so.
13 Q. Do you think that Nat West
14 acted inconsistent with your perception of
15 banking practice when it closed the accounts?
16 A. When it closed the --
17 Q. Accounts, the U.S. dollar
18 accounts?
19 A. I think it was -- I do think it
20 was unusual to close them in the way that
21 they closed them.
22 Q. Do you think it was unusual to
23 close them full stop regardless of whether
24 they communicated about that fact with law
25 enforcement?

Page 291

WALTERS
2 A. Closing accounts is something
3 that banks do on a regular basis.
4 Q. Here your understanding is that
5 Nat West closed the accounts to avoid
6 inadvertently having a violation of the OFAC
7 regulations, correct?
8 A. The OFAC designation was
9 clearly causing difficulty and issue as I
10 found documented in the communication that I
11 reviewed.
12 Q. Is it your understanding that
13 the purpose of an OFAC designation is to
14 create opportunities for freezing funds?
15 A. An OFAC designation is to
16 inform people of the belief that these are
17 engaged in terrorism and it would involve
18 restricting movement of funds and removing
19 the money from terrorism.
20 Q. The purpose of an OFAC
21 designation is to prevent the movement of
22 funds from occurring, not to create
23 opportunities for freezing those funds if the
24 movements do occur, correct?
25 A. Well, the OFAC listing is part

Page 292

WALTERS
2 of the overall anti-terrorism strategy.
3 Q. OFAC wishes by its regulations
4 to your understanding to prevent movements of
5 funds from occurring involving designated
6 entities when those movements are within the
7 jurisdiction of the OFAC regulations,
8 correct?
9 A. I believe that's a reasonable
10 summary of my understanding.
11 Q. A reasonable summary of what?
12 A. My understanding of it.
13 Q. Look at paragraph 190 of your
14 report. You write here among other things
15 that Nat West closed the dollar accounts
16 quote in order to overcome in internal quotes
17 potential issues with the U.S., correct?
18 A. That was my understanding of
19 it, yes.
20 Q. Another way of putting it is
21 that Nat West did this to avoid violating the
22 OFAC regulations, correct?
23 A. The OFAC listing was causing
24 Nat West difficulties in a number of
25 different ways. By taking the OFAC issue out

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

GARY WALTERS
June 8, 2011

Page 293

```
1       WALTERS
2   of the equation it would make their task of
3   managing the account easier.
4   Q.  Let me ask you a question.  I'm
5   going to give you a hypothetical.  I'm
6   driving on the highway and there is a 55 mile
7   an hour speed limit and I'm making sure that
8   I'm not driving more than 55 miles an hour.
9   Would you say that I'm trying to overcome the
10  law against speeding?
11      MR. BONNER: Objection to form.
12  Q.  Or would you say that I'm
13  trying to comply with the law against
14  speeding?
15      MR. BONNER: Same objection.
16  A.  I think that that circumstance
17  you've just set out, an example you set out,
18  is an over simplification, a complete over
19  simplification of the issues that we have
20  here.
21  Q.  That's why your lawyer
22  objected, but I'm just asking you, don't
23  worry about how I may try to relate it to Nat
24  West.  I'm just asking you if I make sure
25  that I'm going 55 miles an hour or lower in a
```

Page 294

```
1       WALTERS
2   55 mile an hour zone, would you say that I'm
3   trying to overcome the law against speeding
4   or that I'm trying to comply with the law
5   against speeding?
6   A.  Removing it from this very case
7   and relating it to this case in anyway I
8   would say you are complying with the
9   legislation.
10  Q.  Take a look at Exhibit 37 again
11  which is the Bank of England correspondence.
12  Look at the letter from Mr. Gossage to Mr.
13  Dawlings.  Sorry, look at the letter from Mr.
14  Dawlings to Mr. Gossage.
15  A.  Yes.
16  Q.  Do you understand Mr. Dawlings
17  to be instructing Nat West to engage in a
18  major deviation from international banking
19  standards?
20  A.  I'm sorry, repeat that again.
21  Q.  Do you understand Mr. Dawlings
22  to be instructing Nat West to engage in a
23  major deviation from international banking
24  standards?
25  A.  No.
```

Page 295

```
1       WALTERS
2   Q.  Look at paragraph 143 of your
3   report, your second report.  Read that to
4   yourself.  What do you mean by the phrase,
5   "manipulate the process"?
6   A.  Let me read it again.  I need
7   to review all the preceding correspondence
8   that that paragraph talks about.
9   Q.  Before you can tell me what you
10  meant by the words "manipulate the process"?
11  A.  Well, where I say that I'm
12  saying it's about the internal communication
13  in Mr. Cole's testimony and that's the
14  preceding matters.
15  Q.  So tell me what you meant by
16  the phrase manipulate the process?
17  A.  This leads back to the letter
18  from the Bank of England that the response
19  back to the Bank of England from Mr. Gossage
20  states that [redacted]
21
22
23
24
25
```

Page 296

```
1       WALTERS
2   [redacted]
3   [redacted] so that was sent off to the
4   Bank of England.  The issue for the defendant
5   was that what they said they would be doing
6   there, it appears that they then didn't do or
7   couldn't do from the examination of the
8   documents.
9   Q.  It did do it several months
10  later, correct?
11  A.  The conversations several
12  months later there was a degree of review
13  months later, but the fact is they stated
14  [redacted]
15
16  [redacted] My recollection of
17  the documentation and I haven't read all of
18  this particular section prints in 131 Mr.
19  Cole states the RM which is the relationship
20  manager I'm presuming has no ability to
21  filter or effectively monitor payments.  He
22  states we should be weary of their payments
23  from their accounts with us, but in reality I
24  believe there's very little we can
25  effectively do to prevent payments being made
```

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

GARY WALTERS
June 8, 2011

---

Page 297

WALTERS

1  WALTERS
2  without a payment filtering system. That's in
3  May 2004, quite some time after they
4  reassured ██████████████████
5  Q.  Thereafter Mr. Cole did a
6  review, correct?
7  A.  Mr. Cole did some inquiries,
8  but the group risk handbook of Nat West has
9  got in it a list of -- their own policy is
10 that, for instance, account activity for the
11 previous two years would be reviewed and I
12 think that kind of review would have been
13 beneficial to the decision making and he
14 suggests the semi-annual review so when they
15 couldn't comply with their own policy which
16 was linked to the OFAC listing and difficult
17 it is really to their client if the money
18 wasn't moved, they sought to remove that
19 difficulty which will be not standard
20 operation of the process that they -- it's
21 manipulating the process they documented they
22 should be doing.
23 Q.  Did you read the handbook to
24 which you just referred?
25 A.  I did.

---

Page 299

1  WALTERS
2  informing the bank ██████████████
3  ████████████████████████████
4  correct?
5  A.  Yes.
6  Q.  It informs Nat West through its
7  parent Royal Bank of Scotland that the
8  ████████████████████████████
9  ████████ correct?
10 A.  Yes.
11 Q.  It informed the bank that the
12 ████████████████████████████
13 ████████████████████████████
14 ████████████████████████████
15 ████████████ correct?
16 A.  Yes.
17 Q.  It reports to the bank ████████
18 ████████████████████████████
19 ████████████ correct?
20 A.  Yes.
21 Q.  It ████████████████████████
22 ████████████████████████████
23 ████████████████████████████
24 correct?
25 A.  Yes.

---

Page 298

1  WALTERS
2  Q.  The whole thing?
3  A.  I did.
4  Q.  You believe you understood it?
5  A.  It was divided up in a way that
6  made some of it quite difficult because it
7  appears to have some bits repeated.  There
8  were bits where different bits were put in at
9  different dates, but I feel I understood it
10 and I quote it in my report.
11 Q.  Look at paragraph 221 of your
12 report.
13 A.  Yes.
14 Q.  What's your basis for stating
15 that Nat West relied on the BBC report?
16 A.  I would need to review the
17 source document.
18 Q.  Let me show you what's been
19 marked as Exhibit 43 which bears the Nat West
20 production number 12942.  Have you seen that
21 before?
22 A.  Yes, I believe I have.
23 Q.  That's a letter from the
24 Charity Commission to Nat West, actually to
25 Royal Bank of Scotland, Nat West's parent,

---

Page 300

1  WALTERS
2  MR. FRIEDMAN: I have nothing
3  further at this time.  As I said
4  before, we will be requesting some
5  documents.
6  MR. BONNER: I just have a few
7  questions for Mr. Walters.  I think
8  probably the best thing to do is to
9  keep looking straight ahead even
10 though I'm speaking to you.
11 EXAMINATION BY
12 MR. BONNER:
13 Q.  You recall that during Mr.
14 Friedman's examination, Mr. Walters, there
15 was some discussion of the methodology that
16 you employed in reaching the conclusions that
17 you express in your reports?
18 A.  Yes.
19 Q.  Did you employ a consistent
20 methodology in reaching those conclusions?
21 A.  Yes, I did.
22 Q.  Could you just tell me in
23 general terms what the methodology was that
24 you employed in reaching the conclusions
25 expressed in your report?

---