**EXHIBIT 120 TO DECLARATION OF VALERIE SCHUSTER**



Metropolitan Police Servi...

www.met.police.uk/about/organisation.htm

METROPOLITAN POLICE Working together for a safer London

Search Enter your search Go

home | recruitment | your right to information | crimes | contacts | ask the met | news | local info | about the met | young people | sitemap

MPS Home >

**About the Met**
- Home
- Leadership
- Structure
- Mission and Values
- Performance
- Corporate Social Responsibility
- Strategy and Plans
- Branches of the Met

**Related links**
- History
- Annual Report
- Volunteer cadets
- Metropolitan Special Constabulary
- Met Volunteer Programme
- Employer Supported Policing
- FoI Publication Scheme
- About the website

## Structure of Policing in London

- Organisational structure of the Met
- Territorial Policing: London's local police
- Olympic and Paralympic Games Policing
- Specialist Crime Directorate
- Specialist Operations
- Central Operations
- Administration and support
- Other London police forces
- The Met's rank structure
- Police staff

### The organisational structure of The Met

The Metropolitan Police Service is a large organisation with a complex command structure that reflects the diverse range of tasks it is expected to undertake. This page attempts to give a brief introduction to the main elements of The Met together with links that will take you to more detailed information.

- More about the Commissioner and the Management Board
- Metropolitan Police Service organisational chart [PDF- 453kb]

### Territorial Policing: London's local police

Following a recent restructuring, most of the day-to-day policing of London is the responsibility of 33 borough operational command units (BOCUs). You can find out more about these units in the section on local policing.

- Local policing web pages

### Olympic and Paralympic Games Policing

Over 70% of the Olympic and Paralympic Games will take place in London in 2012. The Met has a key role in planning and delivering an operation that, with partners, will keep the Games safe and secure. This is in addition to managing a range of other events and maintaining our service for Londoners and the thousands of visitors to the Capital.

- Olympic and Paralympic Games Policing section of the website

### Specialist Crime Directorate

In addition to policing London's streets, the Met has various specialist units dedicated to reducing all aspects of serious and specialist crime.

The intention of Specialist Crime Directorate is to place a renewed emphasis on working collaboratively with communities, boroughs and partners to identify effective solutions to serious crime problems. We are dedicated to providing a highly skilled and professional service to Londoners and visitors to London.

- Specialist Crime Directorate section of the website

### Specialist Operations

The Met has various specialist units that work across the capital or which fulfill a national role.

A number of these are grouped into a section of the organisation known as Specialist Operations. They deal with tasks such as intelligence, security, protection of politicians, embassies and royalty, and the investigation of certain categories of serious crimes, including racial and violent crime and terrorism.

EXHIBIT
10
6/8/11 SL
PENGAD 800-631-6989



Metropolitan Police Servi...

www.met.police.uk/about/organisation.htm

### Specialist Operations

The Met has various specialist units that work across the capital or which fulfill a national role.

A number of these are grouped into a section of the organisation known as Specialist Operations. They deal with tasks such as intelligence, security, protection of politicians, embassies and royalty, and the investigation of certain categories of serious crimes, including racial and violent crime and terrorism.

- Specialist Operations section of the website

### Central Operations

Central Operations consists of a number of specialist units that provide a broad range of policing functions. These units effectively provide an integrated, collaborative and community focussed service to London.

With Capital City Policing at the forefront of our responsibilities, we also have the remit for delivering the security arrangements for the 2012 Olympic and Paralympic Games in London.

- Central Operations section of the website

### Support

An organisation the size of the Metropolitan Police Service could not function without various management, administration and support functions. For this reason The Met has thousands of staff, including police officers as well as civilians, who work behind the scenes to ensure that the front line units can do their job. Their functions include recruitment, training, personnel management, provision of information technology, publicity and communications. Some functions, such as vehicle maintenance and aspects of information technology and telecommunications, have been contracted out to the private sector.

### Other London police forces

The Met works in conjunction with neighbouring forces but has particularly close relationships with the other forces that police in London:

- The British Transport Police, who are responsible for policing on the rail and tube systems;
- The City of London Police, who cover the area within the boundaries of the Corporation of London;

In addition, The Met works in conjunction with the other emergency services. The following links provide information on some of those services:

- The London Fire Brigade
- The London Ambulance Service
- The London Emergency Services Liaison Panel

### Rank

The rank structure of Metropolitan Police officers is as follows:

- Commissioner
- Deputy Commissioner
- Assistant Commissioner
- Deputy Assistant Commissioner
- Commander
- Chief Superintendent
- Superintendent
- Chief Inspector
- Inspector
- Sergeant
- Constable

The prefix detective; is given to officers who have been assigned to investigative work after completing the appropriate selection and training. Detective ranks parallel uniformed ranks and range from Detective Constable to Detective Chief Superintendent.

- Shoulder badges for these ranks

**Police staff**

The Met's Police staff has a structure similar to that for civil servants working in government departments. However numbered grades, which would be familiar to civil servants, have recently been replaced by a more flexible system based on pay bands and specific job descriptions.

**EXHIBIT 121 TO DECLARATION OF VALERIE SCHUSTER**

**FILED UNDER SEAL**



FORENSIC RISK ALLIANCE

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

CV-05-4622 (DLI)
CV-07-00916 (DLI)

TZVI WEISS and others
NATAN APPLEBAUM and others
Plaintiffs

-against-

NATIONAL WESTMINSTER BANK PLC
Defendant

Rebuttal Report of Expert Witness Gary Walters

4 March 2011

Subject: Money Laundering and Terrorist Financing
On behalf of: Plaintiffs

---

TZVI WEISS and others
NATAN APPLEBAUM and others
-against-
NATIONAL WESTMINSTER BANK PLC

**Contents**

**1. Introduction** ..... 1

Material on which I base my conclusions ..... 1

Methodologies ..... 2

Opinions ..... 2

**2. The Defendant's Management of the Interpal Account** ..... 3

Failure to Take Action Based Upon Known Substantial Risk Factors ..... 3

Failure to Follow Up on Recognized Red Flags ..... 5

Failure to Properly Monitor the Account Activity and to Comply with the Obligation to Perform Ongoing KYC ..... 15

Failure to Properly Report to Authorities and Seek Consent ..... 22

Failure to Implement a Consistent and Efficient Organizational Structure ..... 30

**3. Conclusions** ..... 36

Appendices

1. List of all bates numbers/ranges referenced in the Expert Rebuttal Report
2. List of all Depositions referenced in the Expert Rebuttal Report

---

---

TZVI WEISS and others
NATAN APPLEBAUM and others
-against-
NATIONAL WESTMINSTER BANK PLC

# 1. Introduction

1. I have been instructed by the Plaintiffs' attorneys to review and comment on the December 6, 2010 expert report of Jon Holland and the December 3, 2010 expert report of Jonathan Burchfield.

2. In particular, I have been instructed based on my law enforcement experience, to address the following questions/issues:

   - Do I agree with Mr. Holland's opinions as to National Westminster Bank PLC's ("NatWest" or "Defendant") conduct with regards to Interpal, including his conclusory statement that "it is hard to see what more NatWest could have done in practical terms to draw the attention of the relevant authorities to its relationship with Interpal and to seek guidance on how to proceed"?
   - From a law enforcement perspective, did NatWest ignore any key facts linking Interpal to Terrorist Financing suspicions?
   - Do I agree with the contents of the report submitted by Mr. Burchfield?

3. I have been instructed to address these issues in the context of the Defendant's relationship with Interpal and the transactions that the Defendant carried out on behalf of Interpal. I have been asked to consider the period between 1990 and 2005; in particular, I have focused my review between 1992 (when the Plaintiffs allege that the Defendant became suspicious of the Interpal account) and 2004 (when the last of the attacks relevant to the Plaintiffs' claims took place). This report is in addition to the December 17, 2010 report and appendices I submitted in these cases, and I will reference material from that report where appropriate.

**Material on which I base my conclusions**

4. The data or other information considered by me to form the basis of this report include:

   - The Complaints
   - All NatWest documents supplied by Plaintiffs' counsel (where specific documents are relied upon or otherwise referenced in this report, bates numbers and/or ranges have been cited where relevant). See list of all bates numbers/ranges referenced in this report attached as Appendix 1
   - All deposition transcripts supplied by Plaintiffs' counsel. See list of all depositions referenced in this report attached as Appendix 2

---

---

**Methodologies**

5. I reviewed and analyzed documents produced by the Defendant (and testimony given by witnesses for the Defendant) concerning the Defendant's management of the Interpal account. I then undertook an analysis, based on my knowledge and experience working with banks in the criminal investigation and Terrorist Financing context, and considered the events as set out in the documents and/or described in testimony based on the facts significant to the Defendant's conduct and Mr. Holland's assessment of that conduct. I subsequently made an assessment of the Defendant's management of the account in order to identify those facts and materials pertinent to a standard Terrorist Financing investigation to determine whether the Defendant in fact operated the Interpal accounts as expected. To the extent the Defendant did not, I identified specific deviations to make an assessment of whether they amounted to major deviations, and delineated the significant deviations. I also provided and referenced the bases in the record for my conclusion that there were indeed major deviations.

**Opinions**

6. In his report, Mr. Holland states:

> *It is hard to see what more NatWest could have done in practical terms to draw the attention of the relevant authorities to its relationship with Interpal and to seek guidance on how to proceed. (Holland, para 8.24)*

7. From my experience working very closely with banks on numerous Money Laundering and Terrorist Financing cases, and with banks and other businesses in many other types of criminal investigations, there was, in my opinion, a great deal more that the Defendant could and should have done in practical terms.

8. Specifically, my opinion is that the Defendant's management of the Interpal account, in light of all the facts known to the Defendant at the time (as reflected in documents and statements provided by the Defendant and its witnesses), failed to comply with even minimum banking standards published during the relevant period. There were a series of quite major deviations from minimum standard practice in the evidence I have reviewed.

9. Interpal was identified as a high-risk customer and there were Terrorist Financing suspicions as early as 1992. The number of red flags relating to the threat of the account being compromised to launder money and finance terrorism increased consistently over time. Yet, knowing that this high-risk customer was using the bank primarily to wire transfer funds to unknown entities in a jurisdiction experiencing ongoing and severe terrorism problems, the Defendant failed to provide complete, and in many cases, any, reports of the relevant facts to law enforcement authorities, as the minimum banking standards required.

10. In my opinion, the Defendant's lack of full and frank reporting and its failure to undertake other conventional steps designed to uncover and report potential Terrorist Financing activity directly and negatively affected the assessment of the account risk and decisions that law enforcement or other regulators were making with regard to their response in terms of investigation or other action.

---

## 2. The Defendant's Management of the Interpal Account

### Failure to Take Action Based Upon Known Substantial Risk Factors

#### Risk Factors in Defendant's Records and Testimony Point to Terrorist Financing

11. As discussed in my December 17 report, banks adopt a risk-based approach to evaluate prospective customers, to monitor those customers on an ongoing basis, and to systematically monitor funds flowing into and out of their institutions. The most commonly used risk criteria are country risk, customer risk, and service risk. Interpal presented high-risk for all three of these criteria.

12. Interpal presented high country risk because its activity was connected to a high-risk jurisdiction: the Palestinian Territories. In addition, its stated purpose was to remit funds to high-risk jurisdictions: the Palestinian Territories, Jordan and Lebanon. Moreover, Interpal received and sent funds to other high-risk jurisdictions (such as [REDACTED] on a regular basis.

13. Interpal also presented high customer risk. It is a charity, and undertakes transactions with other charities, factors that banks recognize as presenting high customer risk.

14. In terms of service risk, Interpal engaged in the high-risk practice of using its NatWest accounts to aggregate small deposits and send wire transfers of larger amounts to entities abroad, including many in the Palestinian Territories. The amounts of funds that Interpal transferred, the portion of the customer's funds on deposit that it transferred, the percentage of the customer's overall business with the Bank that was represented by the wire transfers, and most significantly the destination of the wire transfers (to a high-risk jurisdiction), all elevated significantly the service risk associated with Interpal's NatWest account.

15. Interpal sometimes even received funds from organizations to which it sent funds, such as [REDACTED] Receiving funds from <u>and</u> sending funds to the same organization constitutes high service risk.

#### Interpal's Risk Profile Indicated a Strong Probability of Terrorist Financing

16. Applying minimum industry standards and all of the risk factors applicable to customer risk profile evaluation, including country risk, customer risk, and services risk, Interpal was clearly a very high-risk customer. As Mr. Holland discussed in his report, and as I was aware during my time in law enforcement, FATF, the G7 and the United Nations have all addressed the misuse of charities for the financing of terrorism since the 1990s.

17. As identified by Mr. Holland, because of the numerous terrorists attacks the UK suffered, terrorism was a very well known phenomenon in the UK as early as 1883, with the creation of the Special Irish Branch of the Criminal Investigation Department, Metropolitan Police, which later became Special Branch. UK banks were therefore very much aware of Terrorist Financing risks and red flags long before 9/11.

18. Most of the understood and published Terrorist Financing red flags applied to Interpal:

- Use of a charitable association's account to aggregate relatively small donations and then funnel funds by way of relatively large wire transfers to a small number of foreign beneficiaries, both individuals and businesses, located in a high-risk jurisdiction with a massive and well-known terrorism problem (NW018476-483)
- Involvement of multiple nationals of countries associated with terrorist activity
- Charity/relief organizations linked to the transactions on both sides
- Mix of cash deposits and monetary instruments
- Non-specific beneficiaries in a location experiencing major incidents of terrorism
- Wire transfers as the principal service utilized by the Defendant's customer
- Media coverage associating the customer with terrorism that was public knowledge in the UK
- Interpal was designated a Specially Designated Global Terrorist (SDGT) by OFAC in 2003
- Interpal sent funds to and received funds from various organizations on the OFAC SDN list [redacted] or with a name similar to a SDGT on the OFAC SDN list (Al-Aqsa Foundation, El Wafa Charitable Society), listed by the Bank of England as suspected terrorism funders [redacted], and outlawed by Israel (Jenin Zakat Committee, [redacted]
- Beneficiaries in locations not in direct relation to Interpal's stated purpose (transfers to [redacted]
- Beneficiaries were themselves charities, which constitutes significant customer risk
- Beneficiaries were sometimes also benefactors, like [redacted] for example
- Different NatWest employees, at different times, in different departments identified Interpal as engaging in activity indicative of Terrorist Financing, thereby providing objective evidence of the suspicious nature of Interpal's conduct
- Interpal was investigated by the Charity Commission in 1996 and in 2003, and each time the accounts were frozen
- Interpal payments were of ongoing interest to Special Branch

19. I consider the red flags to be so compelling that the failure to take prompt and strong actions with regard to the Interpal accounts, and to properly and consistently report suspicions of Terrorist Financing to UK authorities, amounts to a major deviation from industry standards.

20. Spanning all of my years in law enforcement, particularly my experience investigating hundreds of Money Laundering cases and dealing with Suspicious Activity Reports (SARs), I do not recall seeing an account that has so many applicable red flags, including suspicions raised by staff members independent of previous information available to the Money Laundering Reporting Officer (MLRO), where the account was not subjected to intense scrutiny, robust action and

closure, or alternatively subjected to intense scrutiny, consent authority and regular communication with law enforcement.

**Failure to Follow Up on Recognized Red Flags**

21. Most of those red flags were identified by the Defendant during the course of account operation. However, the Defendant consistently failed to take action on those red flags, and therefore failed to comply with its obligations to report its suspicions appropriately on each occasion that suspicion was raised, to perform ongoing due diligence and Know Your Customer (KYC) research or to take other steps to mitigate the risk.

22. Importantly, review of the documentary and testimonial record in this case indicates that NatWest consistently recognized and acknowledged that Interpal was a high-risk customer. Among other things, NatWest's "Goalkeeper" compliance case management system appears to have consistently assigned a "RED" rating ("Extreme caution is advised") (NW000237) for Goalkeeper Reports generated in connection with Interpal. (*See*, *e.g.*, NW162188-193; NW008356-366; NW008367-373).

23. These practical steps were readily available to the Defendant and it failed to apply them to the operation of the Interpal account.

**1992 – Failure to Take Action after First Suspicions of Terrorist Financing**

24. In the SAR from 1992, the Defendant appears to have appropriately identified [REDACTED] transactions as red flags. Reasons for suspicion noted are: [REDACTED] (NW191801-806) The Defendant appears to have acted appropriate in terms of flagging these transactions and then assessing and subsequently identifying the need to report the activity to the UK law enforcement agencies. The SAR is clearly marked as having been submitted under the Prevention of Terrorism Act 1989 and was being dealt with by I.T. Wickens of the Fraud Department. It appears to have been authorised by the Defendant's Audit Department.

25. As a result of this communication, I would have expected the Interpal account to have undergone a high level of account activity monitoring. The suspicion that the account was involved in Terrorist Financing raised the risk profile substantially. Further KYC, account monitoring and communication with Special Branch would, in my experience, have mitigated the risks and allowed a full review of the account, which based on all available evidence could have resulted in closure of the accounts, further reporting to authorities, or some other material change that would mitigate the risk of the account being used to support terrorism.

26. The fact that [REDACTED] should have been picked up by the Defendant as a significant red flag. I have not seen any documentation or evidence to suggest that there was any substantial action undertaken by the Defendant in response. In that situation, I would have expected to see gathering of material such as KYC history and any manager's reports, undertaking of enhanced KYC research such as obtaining information on beneficiaries and active, open and ongoing dialogue between the Audit Department, Special Branch and the Relationship Manager at NatWest.

27. In his report, Mr. Holland raises the issue of "tipping off". I concur with his general view that banks must be conscious of this issue when dealing with customers who have engaged in suspicious conduct. I have dealt with numerous cases where this issue has been raised. In such cases, communication between the bank and law enforcement has consistently resulted in a mutually beneficial and agreed plan of action, particularly where the identity of the investigating officer is known to the bank.

28. One of my cases that has been well reported is Shah and Anor v HSBC Private Bank (UK) Limited [2010] EWCA Civ 31. In that matter, the bank initiated good, on-going communication with law enforcement in an effort to deal with a number of points, particularly the "tipping off" issue. Although that case arose after the relevant time period, the steps that we initiated to avoid tipping off were consistent with historical practices with which I am familiar. That case helps to illustrate that there were practical options available to the Defendant that, in my opinion, would have been mutually beneficial to the bank and law enforcement in this case. In the case of Shah, the bank initiated meetings with law enforcement to discuss potential lines of activity. Present were interested parties to represent the bank's issues including its legal advisors, compliance department and business department.

**1996 – Failure to Take Action following First Charity Commission Investigation**

29. In 1996, the Charity Commission ordered all Interpal accounts to be frozen.

30. However, I have not seen documentation of any due diligence or account monitoring being undertaken by the Defendant at the time of the account being frozen. I would have expected, for example, an assessment as to the account activity preceding the freezing order. I would also have expected to find documentation of communication between the Defendant and the Charity Commission, and even Special Branch. The lack of documentation suggests that the Defendant did not undertake any investigation of its own during or after the 1996 investigation.

31. Moreover, the Defendant seems to have taken the Charity Commission decision that Interpal was a "well run" charity as proof that Interpal's account was cleared of any Terrorist Financing suspicions. As discussed in my December 17 report, the Charity Commission is not a law enforcement agency, and in my experience, its investigations are focused on verifying that "the funds were being applied within the objects of the charity". It would typically verify that Interpal was indeed a charity, that Interpal was keeping correct records of its transactions, and that it was doing transactions related to its stated purpose (sending funds to Palestine). The Charity Commission's main concern is the "correct running" of charities in terms of distributing collected funds to independent beneficiaries and, in my experience, as supported by the statement of Mr. Burchfield, the Charity Commission's limited investigation capacities prevented it from going far beyond making sure that collected funds were distributed to the independent beneficiaries. No proof to the contrary suggests that the Charity Commission investigated the uses to which the recipients of Interpal's payments put the funds transferred from Interpal. Thus, consistent with the Charity Commission's general practices, there is no evidence in the record that suggests that the Commission fully investigated Interpal's links to Terrorist Financing.

32. I had a number of dealings with the Charity Commission most notably in the case of R v. Baluchi (2003 - 2005). In this case, a number of legitimate charities were exploited by Mr. Baluchi who

had registered his fabricated charities with the Charity Commission. The case exposed a number of systematic weaknesses in the Charity Commission's registration and regulatory processes. These included a lack of any process to conduct due diligence on applicants for registration and, having had the details of Mr. Baluchi's abuse of the system brought its attention, a lack of proactive investigative capacity.

33. Therefore, my professional experience leads me to conclude that in 1996, the Defendant failed to properly react to the freezing of the accounts and the Charity Commission investigation. I have seen no meaningful Interpal account review undertaken by the Defendant until 2001.

34. In addition to the aforementioned indicia of potential anomalous activity associated with the Interpal account, from [REDACTED] NatWest facilitated Interpal's transfer of [REDACTED] (via [REDACTED] wire transfers) from its NatWest accounts to [REDACTED] an individual apparently living in [REDACTED] Such transactions[1] – bearing no apparent relationship to Interpal's stated purposes or geographic areas of focus – should have been seen minimally as unusual transactions with no apparent explanation. The fact that there is no evidence indicating that NatWest performed any due diligence in connection with these transfers further evidences NatWest's failure to properly monitor Interpal's accounts.

**2001 – Failure to Verify Troubling Information and to Take Appropriate Action**

35. As outlined by Mr. Holland, post 9/11 there was an immediate and far greater awareness as to the dangers of Terrorist Financing. It is in this context that the Defendan[REDACTED]

36. [REDACTED]

37. [REDACTED]

38. [REDACTED]

[1] See Nihill & Riedley, PC, Expert Report of November 19, 2009, Exhibits C and D.

39.

40.

41.

42. Mr. Holland comments at some length on the fact that there was no duty on the bank to do any more than report its suspicion to law enforcement (Holland, paras 3.29 – 3.30). Further, he states,

> *Nor were they made subject to any duty to investigate whether their belief or suspicion was well founded. Neither banks nor anyone else in the regulated sector were equipped to do so. (Holland, para 3.29)*

43. The process within the Defendant's organization was for SARs to be made to a central team, the members of which acted as the Defendant's Nominated Officer or Money Laundering Reporting Officer (MLRO). That person, in this instance Mr. Hoseason, would review the report, conduct a review of available information and decide whether the suspicion should be reported to law enforcement. In my view, this process was the Defendant investigating whether the suspicion was well founded.

44. To the extent that the Defendant would review the internal SAR, the Defendant had equipped itself with staff, who according to their testimony, were trained to identify Money Laundering and Terrorist Financing. Furthermore, the Defendant had equipped them with certain resources to conduct reviews, such as the Goalkeeper system.

45. Contrary to the view of Mr. Holland, my experience dealing with large banks and the documentation concerning NatWest that I have reviewed suggests that the Defendant either commanded or had access to sufficient anti-money laundering (AML) and counter terrorist financing (CTF) resources to conduct an in depth investigation of Interpal's conduct and to

report any suspicious activity to law enforcement authorities. However, it is my opinion that, in this case, the Defendant failed to use the available resources effectively.

46. On this point, Mr. Holland refers to the Guidance issued by the JMLSG warning against firms:

> *Submitting reports as a matter of routine without making internal enquiries (Holland, para 5.24)*

47. From within law enforcement, I had an expectation, founded on my knowledge and experience working closely with banks, that such internal enquiries and reviews were conducted to provide well informed disclosures.

48. If such a review had been undertaken, it would have convinced any reasonable bank that there was at least a high likelihood it was facilitating banking linked to a terrorist organization. I think that [redacted] shows most clearly that the Bank did not apply its resources to prevent the suspected ongoing use of its facilities by terrorists, but disclosed to law enforcement defensively, without any further follow-up on the issue, to protect itself against possible future risks.

49. An effective review would have given significant credibility to the Cryptome report, as much of the information that appeared in the report could have been verified by information held by the Defendant: the account numbers were accurate; the report lists six of the key figures within Interpal by name[2]; the report was correct about the relationship between Interpal and [redacted] (at least [redacted] transfers from [redacted] entities to Interpal totalling over [redacted] including [redacted] before the Cryptome report; additional transfers from [redacted] identified in a Goalkeeper Report as representing [redacted] (NW008385)[3]); and the report was correct about the connection between Interpal and [redacted] (at that time, the Defendant's own records showed receipts by Interpal from [redacted] of more than [redacted] and [redacted] and receipts of very large sums by Interpal from [redacted] continued through [redacted] with more than [redacted] sent by [redacted] between [redacted]

50. In addition, a thorough review would have shown outflows from Interpal's accounts to organizations such as [redacted] (an organization reported as the central charity of HAMAS since the 1980s[4]), [redacted] (reported as "belonging to HAMAS and/or supporting it and strengthening its infrastructure"[5] in February 2002), [redacted] (an entity that was the third-largest recipient of Interpal's funds in 2002 and that was designated an SDGT by OFAC in August 2003[6] and listed by the Bank of England on its Terrorist Financing: List of Suspects in May 2003[7]). Such payments continued to be made after the SAR disclosure. In fact, between [redacted] and [redacted] Interpal made over [redacted] transfer orders totalling about [redacted] from its NatWest accounts to such entities as those mentioned above and the [redacted] was listed as a terrorist organization in the

---

2 See NW013279, Interpal Board of Trustees as of June 24, 1999
3 Between [redacted] approximately [redacted] in transfers were made from [redacted] and [redacted] to Interpal.
4 See, e.g. "Islam's Voice in Gaza", Time magazine, 02/01/88.
5 http://www.shabak.gov.il/English/EnTerrorData/Reviews/Pages/Dawa%E2%80%93Hamas-report.aspx
6 http://www.ustreas.gov/offices/enforcement/ofac/actions/20030821.shtml
7 www.hm-treasury.gov.uk/d/boe_terr290503.pdf

---

US on 5 September 2001[8], and by the UN on 6 October 2001[9]), and the [redacted] Nonetheless, I have not seen any evidence that these transactions were being effectively monitored.

51. Mr. Holland asserts in his report that the Defendant was only required to deal with information held within its own business, ignoring standard banking practice to include publicly available information as part of its due diligence. Indeed, the Defendant identified material from outside its own records using its investigation resources. However, its assessment of such material was, in my view, inconsistent and flawed.

52. Throughout this case there is a lack of consistency regarding the evaluation of sources and the relative weight given to material being examined and assessed or analysed by the Defendant. For example, although giving weight to internet articles taken at face value carries risks, the same does not apply to such information if the research verifies it as being reliable. In my experience and as promoted by Mr. Holland in his report, especially when in doubt, all available information should be fully reported and assessments and analysis should be conducted by law enforcement investigators.

**2001-2002 – Failure to Take Action in a Timely Manner Despite Several Suspicious Activity Reports**

53. Between November 2001 and June 2002, three SARs about Interpal were filed within the Defendant's organization, which objectively shows the Defendant's staff had increased awareness and suspicions.

54. However, those SARs were not properly disclosed to the authorities, and were not followed by any ascertainable increased due diligence or account monitoring. Some suspicions were only disclosed verbally to NCIS, which was not standard practice at the time, especially in the post-9/11 context.

55. On 19 November 2001, Olhar Leeming had filed a Goalkeeper Report (GK2-647655, NW008367-8371) because of "high non cash turnover and suspected terrorist financing". This report refers to [redacted] Doug Hartley, who reported to Mr. Hoseason, noted: "with [redacted] turnover during 2001 I think we need to gain a clear understanding of the activities here and full details behind some of the [redacted] transactions." Yet I have seen no documentation of any such action being taken before July 2002, when Charlotte McComas (Money Laundering Team, Group Investigation & Fraud) requested clarifying information from Interpal and Interpal's Relationship Manager, Belinda Lane (NW008387-392).

56. Mr. Holland makes reference to the difficulties that banks face in discussing potential Terrorist Financing concerns with the customer:

> *The point for present purposes is that the introduction of the tipping off offence by the CJA 1993 and the explicit linking of that offence to reports made to the authorities had the (possibly unintended) consequence of restricting the extent to*

---

[8] http://www.ustreas.gov/offices/enforcement/key-issues/protecting/charities_execorder_13224-p.shtml
[9] http://www.un.org/News/Press/docs/2001/afg150.doc.htm

---

---

*which banks and others in the regulated sector felt able to discuss the concerns underpinning a report with the customer concerned (Holland, para 3.21)*

57. In requesting information from Interpal, the Defendant appears to have decided that they balanced the risk of tipping off with the need for further information, although no guidance on this point was provided to the Relationship Manager.

58. As outlined above, I have dealt with numerous cases where the concerns of the bank can be addressed by communicating with the relevant law enforcement officer to mitigate the risk of tipping off.

59. On 17 January 2002, two months after the first SAR, Martin Wiltshear of NatWest's Group Investigation and Fraud division wrote to the Interpal Relationship Manager, Ms. Lane, explaining the filing of the SAR and requesting "details of the most recent due diligence." (NW012954)

60. As outlined above, Mr. Holland makes a number of references to "tipping off" (Holland, para 3.19 onwards) and how the risk of tipping off would preclude any action on the part of the Bank. From my experience, it was normal practice for banks to review and update their KYC information and conduct internal enquiries to enhance their due diligence as part of the MLRO assessment as to whether a suspicion required disclosure to law enforcement. Because those steps do not require any contact with the customer or other external parties, they do not present any danger of "tipping off."

61. In a number of investigations, including the Shah case referred to above, where a bank was concerned regarding "tipping off", I had meetings with bank representatives to agree to the extent of any enquiries and what could be told to the customer. In this case, contrary to Mr. Holland's view, if the Defendant had actually been concerned about tipping off Interpal, I would have expected them to contact the investigating officer to agree to a course of action. I have seen no evidence that the Defendant ever contacted the investigating authorities to discuss such protocols, which plainly in my view were warranted if the Defendant planned on maintaining its relationship and processing transactions for Interpal.

62. The request for recent due diligence indicates that Mr. Wiltshear still had suspicions about the Interpal account and the ongoing risk of Terrorist Financing activities needed to be mitigated by up to date due diligence. The request for more due diligence information is keeping with standard AML practice and reinforces my view that a further SAR should have been properly disclosed to law enforcement fully informing them of the internal SARs and the lack of detailed and recent due diligence that had been identified that prevented proper mitigation of the risks identified.

63. The Defendant does seem to have decided that up to date KYC procedures should be undertaken, but I have not seen any evidence that NatWest implemented those measures. Mr. Hartley, who reported to Mr. Hoseason, expresses concerns about KYC/due diligence that "appears deficient" (NW008369). This should have fostered immediate action from the Defendant as, notwithstanding any suspicious activity, insufficient KYC would have been in breach of industry guidance.

64. NatWest undertook this review in July 2002 (NW008387), eight months after the first SAR was submitted, which constitutes a very significant deviation from the Bank's general obligation to take action in a timely manner. Moreover, the first SAR was issued only a few weeks after the

---

---

Cryptome report, when the Defendant should have had acute awareness and suspicions of Interpal.

65. Further, the extent of the investigation made by Ms. McComas and Ms. Lane was extremely limited. They seem to have accepted Interpal's explanation that the funds were coming from an "aid agency" (NW008390), without questioning it further. In my experience, much more thorough due diligence should have been undertaken, notwithstanding Mr. Holland's references to the risk of tipping off. In May 2002, the manual "The Policy of the Royal Bank of Scotland Group plc On Sanctions and Terrorist Financing" was adopted. (NW000080-111) This manual clearly described what would be considered KYC and due diligence efforts consistent with normal banking practice; the Defendant's actions at the time and going forward were not consistent with that policy.

66. Between August 2002 and August 2003, Interpal made numerous transfer orders from its NatWest accounts. Those transactions were apparently not monitored, even if they were made with entities that had been, or could have been, identified in SARs provided to law enforcement.

67. A fourth Interpal-related SAR was filed on 2 May 2003. Another customer, [REDACTED] was suspected of Money Laundering and Terrorist Financing:

> [REDACTED] *On the basis of the information available to us at the present time, it is considered that the above incident/activity may constitute or involve money laundering and consequently a disclosure has been made to the NCIS and other appropriate authorities.... This information may be of relevance when considering any business approaches or dealings with the above named parties. (NW083850-851 and NW083853-555)*

68. Interpal was one of the entities [REDACTED] was making payments to and, as stated by the SAR, this information should have been considered as another red flag against the Interpal account. I have seen no documentation of an investigation of Interpal's accounts at the time of the SAR relating to [REDACTED]

69. From my experience I would have expected the SAR for [REDACTED] to have set out for law enforcement officers the relevance and importance of the Interpal link to ongoing suspicions of Terrorist Financing. An alternative would have been to have made Interpal the focus of the SAR, with [REDACTED] a related party.

70. These options would have presented law enforcement with relevant information held by the Defendant regarding Interpal placed into context. This, in turn, would have allowed law enforcement to make decisions on potential intervention or allocation of resources to further investigate the suspicions.

71. In this case, a SAR was submitted that reported a very low percentage of the red flags raised by the Interpal account. The Interpal account was still making payments to unknown high-risk entities on a regular basis and in my view consent should have been sought to make those payments if the Defendant had been aware of them in advance. Alternatively, the Defendant should have submitted SARs in each case to ensure law enforcement had timely updates regarding Interpal's suspicious activity if the payments had been made without prior notice.

---

72. On 7 July 2003, Ms. Lane, the Relationship Manager, prepared a review of the account and Interpal. (NW013636) Her review described Interpal's charitable status, the large sums that Interpal remitted to a high-risk area and the previous reports that the Defendant made to the authorities. These are all red flags from a Money Laundering and Terrorist Financing perspective, but she appears unaware of the implications. Ms. Lane does mention KYC, but there is no detail regarding the extent to which it was completed. Indeed, Ms. Lane even states in her deposition that she does not recall doing a KYC on Interpal. (Lane, pg 236) This was the case even though Interpal's Jihad Qundil informed Ms. Lane in March 2002 that the size and frequency of Interpal's deposits in 2001 and 2002 had increased because of "9/11", and that Interpal's credit balances would increase because of terrorism, an explanation Ms. Lane deemed "logical". (Lane, pgs 90, 153–154)

73. In my experience, the high-risk of Money Laundering and Terrorist Financing, as well as the various SARs issued in the previous months should have alerted Ms. Lane to the need for updated KYC and ongoing due diligence. However, I have seen no documentation that such action was taken.

74. When Ms. Lane submitted her Relationship Manager's review, it went to staff with far more experience regarding AML procedures and investigation. Owing to Ms. Lane's longstanding relationship with the account, including its direct affect on her performance review and remuneration, I would have expected a more experienced investigator to have undertaken a more objective and thorough review.

**2003 – Failure to take Proper Action following Police Investigation, Charity Commission Investigation and OFAC Designation**

75. On 5 August 2003, the Defendant received a Production Order to produce records relating to the Interpal account. (NW008417) For the police to obtain an Order under the Terrorism Act there must be a terrorism related investigation being conducted.

76. On 22 August 2003, the US government designated Interpal as a SDGT.[10]

77. On 26 August 2003, a freezing order on Interpal's accounts was issued by the Charities Commission. (NW013660-661)

78. Those three acts constitute very significant red flags that the Defendant should have identified and acted appropriately on.

79. The Production Order is an order issued by a Court requiring the bank to provide responsive material in its possession. It is often unclear as to the nature or target of the investigation as a Production Order served on a bank can be broad and may include accounts through which suspected funds have passed even where the account itself may be "innocent" and not the subject of suspicion by the investigator. However, in my experience, law enforcement will often share with the nominated bank employee details of the investigation as this can expedite the enquiries and permit the bank to gather the relevant information.

[10] http://www.ustreas.gov/offices/enforcement/key-issues/protecting/charities_execorder_13224-i.shtml

---

80. On 27 August 2003, an Interpal Goalkeeper Report was created. It includes internal notes regarding steps the Defendant took after Interpal's OFAC designation and contact with NCIS, including a disclosure on 28 August. (NW008430-8439)

81. The Goalkeeper Report mentions the Charity Commission's investigation and ultimately the unfreezing of the accounts, stating that "The trustees are now free to operate the bank accounts without any further recourse to the Commission."

82. Once again, the Defendant seems to have taken the Charity Commission's decision that Interpal was a "well run" charity as proof that Interpal was cleared of any Terrorist Financing suspicions.

83. From my experience in law enforcement, the closing of an investigation does not necessarily mean that there are no grounds for ongoing suspicion, nor does it mean that the investigation cannot be reopened if more information comes to light. An investigation can be considered dormant if there are no resources being allocated to proactively investigate. This can sometimes happen where resources are prioritised into other activity or the opportunity to progress meaningful lines of enquiry have diminished.

84. The Defendant specifically failed to take notice of the ongoing Police interest in the account. Indeed, in the SAR submitted on 28 August 2003, [redacted] (NW008438) From my experience, this indicates that the [redacted]. This is evidence that the Defendant was clearly aware of the ongoing Police inquiry and interest in the account.

85. Such Police interest in the account is a major red flag for the Defendant. In my experience, Police interest of this type would, on its own, have required a bank following customary banking practices to start taking immediate action to monitor the account and perform extensive KYC and due diligence efforts. As Mr. Holland states in his report, the bank would have been aware of the risk of tipping off. As described above, however, NatWest could have easily mitigated and avoided the risk of tipping off.

86. Mr. Holland expressed the view that the Defendant had done all that it could in practical terms to draw attention to its relationship with Interpal and seek guidance on how to proceed (Holland, para 8.24). In my view, the Defendant had several clear opportunities to discuss its potential options with law enforcement and to obtain clear guidance; NatWest failed, however, to take action on such opportunities. Moreover, in my review of the Defendant's documents, I have not seen any documentation of any significant KYC or due diligence being undertaken by the bank after the OFAC designation of Interpal.

87. When Interpal's OFAC listing was brought to the attention of Irvine Rodger, Interpal was apparently the only NatWest customer that was an OFAC-listed SDGT. (Rodger, pgs 72-73) Mr. Rodger, as head of the Money Laundering Prevention Unit within the Corporate Banking Financial Markets' division, which included Interpal within its customer responsibility, should have understood that the designation of Interpal by OFAC meant that the US Government was making clear its belief that Interpal was involved in funding terrorism. (Rodger, pgs 72-73)

---

88. Mr. Rodger, however, took the view that "the OFAC designation would be one view of OFAC but the material [which he later clarified meant 'salient'] view was the Bank of England one, being a UK bank." (Rodger, pgs 115-116)

89. In my view, the OFAC listing is a very big red flag to any MLRO and would precipitate further urgent investigation even with no other red flags being present. Timely information available from within the Bank that would have been brought to light by a thorough internal investigation and review, including analysing the account activity including reassessing previous suspicions in light of more up-to-date information (such as the listing of previously related parties on suspected terrorist financing lists). This would have proved extremely valuable to law enforcement and could have resulted in the timely closure of the Interpal account. Through the use of the SARs disclosure regime of the FIU, the resulting financial intelligence could have been made available to the wider anti-terrorism interests in a more useful format. This would have been another practical step that the Defendant could have, and in my view should have, undertaken.

**Failure to Properly Monitor the Account Activity and to Comply with the Obligation to Perform Ongoing KYC**

**Failure to Comply with the Obligation to Perform Ongoing KYC**

90. As discussed in greater detail in my December 17 report, KYC is a well-established risk-management standard that obligates a bank at all times to have a clear and concise ongoing understanding of its customers and their business.

91. In my review of the Defendant's documents, I have not identified any documentation of any significant KYC or due diligence being undertaken by the Defendant after the OFAC designation of Interpal.

92. Indeed, Ms. Lane testifies that she does not recall doing any KYC on Interpal. (Lane, pg 236)

93. This constitutes a major deviation not only from standard practice, but also from the Defendant's own policy.

94. Indeed, "Phase 3" of the Defendant's policy (NW014495) clearly states the following objective, "To screen in depth those names where "Phase 2" due diligence suggests more work is needed." It goes on to state the information to be reviewed. The provided list would supply an excellent source of information upon which to make decisions and would meet the standard practice for AML and CTF.

95. Phase 3 concludes, "Having completed the phase 3 due diligence, a meeting of a 'Cross Business' Panel (Phase 4), or equivalent, should be called with representatives from the relevant business area and (as appropriate) Operations, Audit, Compliance, Legal and Operational Risk." (NW014496) I have seen nothing in the documentation to indicate that any such meeting took place.

96. The above practical actions advocated within the Defendant's own policies would have better informed the Defendant's decision making and law enforcement.

---

**Inadequate Use of Search Lists**

97. In Section 8 of his report, Mr. Holland sets out the UK Financial Sanctions regime. I agree with his view that this regime is different from the anti-money laundering and anti-terrorist financing regimes. However, I would go further; from a law enforcement perspective they are not only different, but distinctly separate and have limited overlap.

98. The fact that Interpal and its related parties did not appear on any sanctions list for some of the time period relevant to this case cannot preclude the possibility that there may still be Terrorist Financing and/or Money Laundering involving the account during the earlier time period.

99. In 2003, the Defendant prepared lists of organisations that were on recognised sanctions lists and terrorist lists to circulate to the bank's different departments, divisions and business units so that they could search all banking records for ties to possible Terrorist Financing.

100. These sanctions lists related to entities that can be listed for different reasons. They may be subject to trade embargoes, suspected of criminal conduct or be facing "political" sanctions. From my experience, this practice of circulation is in line with both industry standard practice and the Defendant's AML policy. This "list searching" is separate from the requirement to identify and report suspicions of Money Laundering and Terrorist Financing and does not replace it. This point concurs with the report of Mr. Holland.

101. However, the Defendant failed to properly use the lists that it created to undertake proper KYC and due diligence efforts. In my experience, when the Defendant identified links between Interpal and listed entities, it should have conducted more KYC/due diligence steps, including the monitoring of payments.

102. For example, Interpal had a close relationship with [redacted] On 29 May 2003, the US Government designated [redacted] as a SDGT, accusing the organization of funnelling funds, including money donated for charitable purposes, to HAMAS. On the same date, the Bank of England designated the [redacted] as a HAMAS front. On 30 May 2003, Lisa Moore (GI&F) issued a Goalkeeper Report (NW051994-97) stating:

> *Chancellor Gordon Brown ordered an immediate freeze on all assets held in UK firms belonging to the* [redacted]

103. On 29 March 2003, this information was circulated to relevant Defendant employees by Dedrei Nell (Group Risk Management), asking them to

> *Ensure that the necessary Due Diligence is completed and the result (nil or positive return) is return to Group Risk Management by 16 June 2003. (NW050722-751)*

104. Guy Cole (CBFM Compliance MLPU) responded to that request on 16 June 2003 stating:

> *CBFM has had nil return for the names contained on [the list] (NW050721)*

105. However, on [redacted] Interpal had received a [redacted] ransfer from [redacted] (NW012129-152), which the Defendant failed to identify, despite the use of search lists. One week later, again after the designation, Interpal received a [redacted] transfer from an individual who appears to be linked to [redacted] (NW012108-128, NW008381). The Defendant should have identified [redacted] as an entity linked to Interpal, reported the transfer to law enforcement, and performed proper due diligence on that relationship. Unless

---

the Defendant could prove that [redacted] was not linked to the listed entity, it ran a distinct and real risk of facilitating Terrorist Financing for [redacted] through the Interpal account.

106. In my experience, particularly after 9/11, if banks could not ascertain whether or not a transaction matched to an entity on a sanctions list, the banks would block the transaction and file a report about it. Mr. Holland alludes to this practice in his report as one of the reasons for increased disclosures at that time. The default presumption was, is and must always be, that unless a bank can determine that the hit is a false positive, the final determination concerning whether the match is genuine belongs to the authorities responsible for such matters. As such, if the Defendant were unsure whether [redacted] was linked with the [redacted] and the US designation of [redacted] confirmed the link[11], NatWest should have reported the transaction to the authorities. Mr. Hoseason agrees that it would make sense for an organization listed on a sanctions list to try and elude that ban by using an alternate name. (Hoseason, pg 355) Mr. Hoseason also acknowledged that the designation "is certainly not something that we would be enthusiastic about", and that "it would certainly heighten our suspicion." (Hoseason, pg 346) Yet, he does not know if the Defendant ever disclosed to the authorities a [redacted] transfer from the [redacted] to Interpal sent ten days before [redacted] designation. (Hoseason, pg 351, NW009934-942)

107. This need for reporting is in keeping with Mr. Holland's assertions that it is the duty of banks to report suspicions and for law enforcement to "assess the intelligence provided" and "to decide what action (if any) to take." (Holland, para 3.30)

108. Given standard practice, the context at the time and [redacted] being a high-risk jurisdiction, I would have expected the Defendant to have sought "counter confirmatory material", to satisfy NatWest that the relevant transaction did not occur with the "listed" name. (NW014490)

109. On 26 August 2003, Damien Connor, Group Risk Management, circulated the Sanctions and Terrorist Financing Search request. (NW012925-933) Importantly, included in the document is the OFAC listing for Interpal. This circulation went across the Group and included a return to certify that searches had taken place before 12 September 2003. I have not identified a response to that email from CBFM nor from the rest of the Defendant's organization. Particularly in light of the disclosure of the SAR, which showed that the Defendant was aware of the OFAC designation, I would have expected to see direct responses to that circulation.

110. Indeed, the Group Policy sets out "Search Procedure Guidance" and emphasizes that any deviation from the process must be reported to Group Risk for approval. (NW014486)

111. Section 7 on the Group Regulatory Handbook states, "On receipt of a positive return, GRR will advise businesses in writing of any further action to be taken, e.g. freezing bank accounts." (NW014487) I would have expected to see such guidance from GRR, notwithstanding the Charity Commission's freezing of the account. Indeed, as mentioned above, the Charity Commission is not a law enforcement agency and has rather limited resources, which in my experience would have precluded it from looking beyond the running of the charity in keeping with its objects. Mr. Holland and Mr. Burchfield both refer to the comfort the Defendant could take from the attention being paid to Interpal and the results of the enquiries. I do not take

[11] See http://www.treasury.gov/press-center/press-releases/Pages/js439.aspx

issue with the Defendant taking due notice of the Charity Commission's activity, but in keeping with my statement earlier regarding the evaluation and assessment of information, the findings of the Charity Commission should have been viewed in context of Terrorist Financing risk and consideration given to the full findings of the enquiries.

**Inadequate Account Monitoring**

112. Mr. Holland makes reference to there being no obligation on banks to conduct enquiries beyond information held by the bank. In particular, he makes reference to the 1993 JMLSG Guidance, whereby

> *MLRO should consider all relevant information available within the bank concerning the customer including reviewing transaction patterns and volumes (Holland, para 3.44)*

113. The FSA requires that banks have systems and controls in place to fulfil their obligations to comply with the Money Laundering regulations. There are also industry published guidelines that set out recommended practice. The actual means to meet those obligations are a matter for individual businesses to assess and implement.

114. After the OFAC designation, the Defendant clearly understood the need to monitor Interpal's accounts as identified in their correspondence with the Bank of England (see below), but failed to take proper action in a timely manner.

115. On 5 September 2003, Richard Gossage (Director, Group Risk Management), wrote to the Bank of England (NW014500-504)

116. On 3 October 2003, the Bank of England (Tom Dawlings) responded,

117.

118. On 28 October 2003, Mr. Gossage replied, stating that:

119.

---

[redacted]

120. On 17 September 2003, Tony O'Hear requested that Tony Woodley conduct a review of the Interpal account for any payments from [redacted] paid in to the account over the previous 12 months. (NW012976) This followed the SAR submitted in June 2002. I have not identified any documentation of that review being made.

121. On 22 September 2003, Mr. Hartley circulated a Significant Case Commentary – High Profile Report. (NW014025-36) This report is redacted, which makes analysis of the document difficult. Interpal is listed as a "Money Laundering Significant Case". The only information that I can see in the report is that the charity:

[redacted]

122. The fact that the report is qualified as "high profile" and "significant" shows the high-risk level associated with the Interpal account. Senior managers across a number of different divisions at the Defendant's organization received this information. However, I have seen no responses.

123. On 9 October 2003, following the letter from the Bank of England, Stephen Foster (head of AML in Group Compliance) sent an email to Ben Norrie, Mike Hoseason, Tony O'Hear and Derek Brand to discuss any indications of payments being made to HAMAS in the past, and measures to take in order to monitor the account. (NW013939-941)

124. Mr. O'Hear responds to the email that no payments have been made to HAMAS. He only mentions a payment received from [redacted] which has been investigated and cleared. However, I have not seen any documentation detailing the scope and findings of that investigation. Thus, the representation that the transaction was investigated and cleared remains unsubstantiated.

125. Mr. Foster responds that the Defendant needs to make sure that no future payment is made to HAMAS and asks whether the account is being monitored and what filtering technology is available. [redacted]

126. Moreover, I have seen no proof of anyone following up on that request. Fiona Miller designated CBFM Compliance (Mr. Cole and Mr. Rodger) as the persons responsible for implementing that monitoring (NW013939), but this idea was not revisited for another six months, even though in his letter to the Bank of England, Mr. Gossage stated:

[redacted]

---

---

127. On 21 April 2004, six months after the previous chain of emails, Mr. Norrie circulated an e-mail (NW017173-178) regarding the Interpal account and [redacted] (NW016745-746 and NW017179-190) Mr. Norrie asked the recipients whether any monitoring or enhanced due diligence had been done. Mr. Sludden confirmed that no additional due diligence had been completed. This is an extreme deviation from [redacted] and from the Defendant's obligation to act in a timely manner.

128. In his report, Mr. Holland references that the Bank communicated with the Bank of England's Financial Sanctions Unit, the Charity Commission and the Police. (Holland, paras 8.22 – 8.23) The communication with the Bank of England [redacted] Amanda Holt, head of Group Enterprise Risk, even testified that if she had "cast iron fact" of genuine suspicion that Interpal had been funding terrorism, she could have gone to the Bank of England and told it to put Interpal on its list and frozen the account. (Holt, pgs 214-216)

129. From my experience in law enforcement, [redacted] Mr. Rodger claimed that UK law enforcement did not have concerns with Interpal because the entity was not designated by the Bank of England. (Rodger, pgs 187–188) That statement is quite erroneous since "law enforcement" certainly is not limited to the Bank of England and suspicions are not limited to designated entities. Particularly here, the Defendant's lack of monitoring would have hampered law enforcement's ability to confirm its suspicions.

130. In May 2004, Mr. Cole, CBFM Regulatory Risk, emailed Mr. Norrie, Group Risk Management, regarding the Interpal account and expressed his view that the Bank cannot effectively filter or monitor payments. This sets off a string of emails regarding the Interpal account. (NW018476-483 and NW017179-190)

131. In this chain of emails, Mr. Cole states:

> *The RM has no ability to filter or efficiently monitor payments. (NW017186)*
>
> *We should be wary of their payments from their accounts with us, but in reality I believe there is very little we can effectively do to prevent payments being made without a payment filtering system... (NW017180)*

132. [redacted] Mr. Rodger even acknowledged that the deficiencies in the filtering system meant that after 9/11, he does not know if the Defendant could have intercepted a payment from one of its customers to Osama Bin Laden. (Rodger, pgs 105–106)

133. In my experience, the Defendant could have found a way to monitor payments in and out of the accounts, but there was no system for doing it. In my opinion, the monitoring of the account is necessary to identify suspicious activity even in a case where the account itself is not under

---

suspicion as there are occasions when money is laundered through "clean" accounts. Therefore, close control and monitoring of this account should have been expedited, [redacted]

134. Instead of doing the type of account monitoring required by customary banking standards, the Defendant started to review individual transactions. On 17 May 2004, Mr. Cole reviewed the payments for the last six months on the Interpal accounts, and identified payments that warranted further investigation. (NW017181)

135. Mr. Cole identifies a number of red flags with regard to the level of risk associated with the Interpal account: Interpal is a charity; small donations are accumulated into an account and transferred out of the jurisdiction; and the transfers are made to unidentified beneficiaries in a jurisdiction that is high-risk from an AML perspective and a terrorism perspective. (NW017179-180) This shows once again that the Defendant was aware of the risks, but failed to take action that could be considered appropriate to properly mitigate those risks.

136. In my experience, reviewing payments over the last six months is not equivalent to monitoring an account and should not be considered as such. When reviewing the account payments, the Defendant did not take into consideration the overall account disposition over time. The Defendant looked at payments in isolation and not in overall context. The Defendant also did not look at funds received over time. This constitutes a major deviation from industry practice, as well as from the Defendant's own policy.

137. Section 5 of Group Risk Handbook (NW014491) gives some detail on the extensive searches required on those with category 2 names (Interpal). The Handbook contains the comment, "This approach has been taken on the basis that the authorities may be interested in anything we have to offer that would build a picture of recent movements of these individuals or entities."

138. For entities falling in category "c", which would include Interpal following its OFAC listing in August 2003, NatWest prescribed a long list of data to research. This includes "account activity for the previous two years" [Emphasis added]. (NW014492) For Category 2 names, the Handbook states in Section 12, "the likelihood is that relationships will remain in category 'c' and will be referred to the authorities". Interpal was indeed reported to the authorities, but I have seen no proof that the Defendant researched or in any way reviewed the account activity for the previous two years.

139. If the Defendant had taken the account history as a whole, they could have identified long lasting relationships with designated organizations such as [redacted]

140. Mr. Cole concludes his analysis by saying:

> *I am content to leave the Sterling and Euro accounts operating with a semi annual review taking place for foreign payments made from the accounts. [...] I assume you are happy with the approach, unless I hear otherwise. (NW017180)*

141. Mr. Foster questions the fact that semi-annual reviews are sufficient, but there is no documentation of any action being taken.

---

142. Mr. Cole testified that:

> *This is probably the only case where this scenario existed... [T]his is the only client I ever monitored in this regard, so it is not standard procedure. (Cole, pg 58)*

143. It is clear from the internal communication and Mr. Cole's testimony, and from the [lack of] actions taken by the Defendant that the practical application of the published policies in the bank was proving impossible. By its own admissions, the Defendant was not engaging in the standard practice, as outlined in its own written policies. In the face of increasing red flags, I believe that the Defendant began to manipulate the process to maintain the account and failed to take proper consideration of available intelligence that indicated the account was suspected of Terrorist Financing.

144. In my opinion, the Defendant has consistently failed to effectively monitor the account. NatWest's policy sets out a review process that I would have expected to see completed in this case and

**Failure to Properly Report to Authorities and Seek Consent**

145. The global banking standards that assist in preventing Money Laundering and Terrorist Financing provide information that plays a number of important roles within the intelligence chain; from tactical intelligence that can direct particular investigations to strategic intelligence that can drive policy. For example, FATF and similar bodies use information from banks to provide the typologies that are published to provide banks with intelligence to assist their ongoing efforts to prevent and detect Money Laundering and Terrorist Financing.

146. As I discussed in my December 17 report, it is in the nature of intelligence that the importance of a piece of information cannot always be identified immediately after its discovery or submission for evaluation. It is often the case that the relevance of particular information only becomes apparent when analyzed against other information.

147. The increasingly global nature of crime and terrorism required even more international intelligence sharing. Again, the variety of intelligence products meant that such sharing would take place at tactical and strategic levels, that is intelligence would be shared to prompt action such as the arrest of suspects or freezing of particular accounts (tactical) or it would assist with the preparation of FATF and other International Reports to assist in reducing Money Laundering or Terrorist Financing opportunities (strategic).

148. Within the sphere of AML, the UK developed the FIU within NCIS as the single point of receipt for SARs. From the FIU, SARs could be sent to the most appropriate agency and could be analyzed from a national strategic perspective.

149. Globalization of financial crime and terrorism led to an increasing need to share the intelligence between national FIU's as part of complying with the wider FATF Recommendations.

150. I agree with Mr. Holland that, notwithstanding the extensive experience of the UK in dealing with terrorism, the reporting of Terrorist Financing suspicions was increased following 9/11. 9/11 also brought into focus the already apparent need to deal with the intelligence on an international basis for both strategic and tactical reasons. FATF quickly introduced the nine additional specific counter terrorism recommendations to reinforce this message.

---

151. An increase in submitted SARs following 9/11 gives a clear indication as to the practical effect within the banks, as commented on by Mr. Holland. In that context, it is my opinion that the Defendant consistently failed to properly disclose its suspicions to the authorities in a timely manner.

152. As mentioned earlier, the SAR submitted by the Defendant in 1992 [redacted] was common during the early 1990s as there were relatively few people responsible for AML and CTF measures, both in law enforcement and at financial institutions. Therefore, during this period, it was common for collaborative working relationships to develop and it was common practice for both sides to share intelligence on a confidential basis.

153. By 2001 however, [redacted] of CTF and AML concerns was no longer considered sufficient, and the Defendant should have officially disclosed any suspicions in writing, which it consistently failed to do, as detailed below.

154. On 19 November 2001, suspicious Interpal account activity was reported internally. Specifically, NatWest identified [redacted] going into the Interpal accounts. As per standard practice, a back office Bank employee submitted a SAR that was sent to Group Intelligence and Fraud for that group to assess and investigate before making a decision as to whether to disclose to law enforcement. (NW008367-373)

155. Notwithstanding the previous disclosure to NCIS [redacted] and a case note added to the file that states, "Given the current volatile situation in Palestine we are concerned that as the source of funds cannot be verified; there may be vulnerability to terrorist funding", a decision was made by the Defendant not to disclose the new information to law enforcement.

156. Taking into account the timing (immediately post 9/11), the public coverage (e.g. Cryptome report), correspondence with NCIS and the recent suspicious account activity, the Defendant should have officially disclosed the information to the authorities and formally filed a SAR.

157. The stated suspicion was "Terrorist Financing" and it was submitted through the bank system to those responsible internally for deciding whether a SAR should be formally filed with law enforcement authorities. The Defendant concluded that no filing was necessary. That decision is inexplicable in my view given the correspondence with NCIS on the matter of Interpal and its links with HAMAS as per the Cryptome report.

158. Mr. Hartley records:

> *Existing case for this customer discovered somewhat belatedly. Probably no merit in disclosing again at this time but it won't do any harm for the RM to follow through our recent request as the KYC/DD info appears deficient. (NW008369)*

159. In my view, and as referenced by Mr. Holland in his report, this should have been disclosed to law enforcement. Applicable banking standards required the Defendant to identify and report suspicious activity. The reporting regime is designed to provide law enforcement with intelligence that can be analysed against other intelligence held by law enforcement.

---

160. Six months later, on 14 June 2002, a Bank employee submitted an additional SAR regarding Terrorist Financing following another suspicious transaction involving the Interpal account. (NW008374-380)

161. Suspicion of links to Terrorist Financing were raised again by a payment o[redacted] from [redacted] which led to a SAR being submitted internally stating, "Possible umbrella for funding terrorism in Middle East." (NW008374-380)

162. A decision was made, yet again, not to disclose this information to law enforcement. However, information on the internal SAR indicates law enforcement was investigating the payment. This record is redacted so analysis is limited. What is clear is the fact that the investigation of this one transaction lagged 14 months between the time of the transfer on [redacted] and Mr. Hoseason's completion of the Goalkeeper Report on August 22, 2003, a length Mr. Hoseason acknowledged was extraordinarily long without explanation. (Hoseason, pg 330)

163. Prior to this SAR, Interpal received about [redacted] rom [redacted] plus another [redacted] thereafter. [redacted] was designated as a SDGT by the US government in May 2003. Even after this designation, both [redacted] and its representative [redacted] appear to have continued to send funds to Interpal's account held by the Defendant. (NW012129-152, NW012108-128, NW008381) Mr. Hoseason's deposition testimony reaction to this transferring of funds with a designated entity was:

> *"Certainly not comfortable with it, no." (Hoseason, pg 360)*

164. From my experience, given the high-risk nature of the Interpal account and the increasing number of red flags that raised suspicion, I cannot understand the rationale behind the decision not to disclose this information to the authorities.

165. A third internal report was made on 17 June 2002, by a different member of staff, regarding the same payment. That internal report indicates that the level of suspicion was very high at this point. (NW008381-386) This additional information was passed to law enforcement, but not "officially" disclosed. Mr. O'Hear records:

> *I have spoken to Mark Ashtown at NTFIU Special Branch [redacted] NW008384)*

My reading of this comment is that Mark Ashtown [redacted] I can see no basis to conclude that there was no requirement to report suspicions as they arose based on any different factors.

166. On 17 September 2003, Mr. O'Hear, Group Intelligence and Fraud, e-mailed Ms. Nell, Group Risk Management, confirming to her that he had spoken to an officer in Special Branch [redacted] The officer [redacted] Mr. O'Hear reported [redacted] (NW013699)

---

---

167. The above demonstrates that the Defendant still suspected the account as being involved in Terrorist Financing after having spoken to Special Branch about [REDACTED] (NW008374-380) Given the number of SARs, as well as the investigations by law enforcement in August 2003, I cannot understand why a further disclosure was not submitted to law enforcement in the standard manner. These facts do, however, highlight the number of Terrorist Financing red flags and suspicions that the Interpal account raised in the minds of NatWest staff.

168. Moreover, even when such disclosure took place, I do not have full details of the information disclosed to the authorities, which makes it very hard to evaluate the quality of the information the Defendant passed on to the authorities. For example, I do not know if the SAR about [REDACTED] referred to the full history of Interpal, which, for any reviewing law enforcement official, would have explained the full context of the suspicion and highlighted the potential risks.

169. Further, in [REDACTED] case, it can be noted that the Defendant had very little grounds for suspicions, but disclosed it to the authorities anyway. In my experience, that is in line with what would be expected from a bank. I do not understand why the Defendant would not act consistently with that approach with respect to its assessment of all Interpal-related activity.

170. By this time, the Proceeds of Crime Act 2002 had been implemented. That statute placed further obligations upon banks dealing with suspicious activity. In simple terms under the Proceeds of Crime Act, there is an obligation for banks to seek consent of law enforcement to make any foreseen transactions on an account suspected of Money Laundering.

171. There is an argument, as put by Mr. Holland, that in cases of Terrorist Financing there is no obligation to seek consent. In the full circumstances of this case, there is, in my view, clear suspicion of Money Laundering activity. Even if there was no reason to suspect Terrorist Financing, there would still be suspicion that the account was being used to launder money, in which case there would be a need to seek consent to transact. In law enforcement I dealt with a number of cases where it was unclear whether the suspicious activity was Money Laundering or Terrorist Financing, or a combination of both.

172. In my opinion, the history of the Interpal account dictated that every individual transaction needed to be assessed and that NatWest had to make a disclosure or seek law enforcement consent to complete any transactions that were viewed as suspicious. Because NatWest could not perform that monitoring, it should have reported its suspicions against the account as a whole and disclosed the fact that it could not control payments.

173. The OFAC listing presented the Defendant, and Interpal, with serious obstacles to clearing any US dollar transactions through the US. The Defendant was also mindful of its operational plan in the US, as it was focused on expanding US operations through its subsidiary, Citizens Bank, and did not want any rogue accounts to cause distractions or challenges in the US. (Foster, pg 158) In order to "overcome" these issues, Interpal decided to remove the main US dollar account from Bankline, writing to the Defendant on 25 January 2004 to inform the Defendant of this decision and to submit the relevant forms. (NW017110) On 22 December 2004, there was an email chain wherein the Defendant identifies its need to close Interpal's US dollar accounts because of the US restrictions. (NW066797)

---

---

174. From an AML perspective on a global basis, closing the US dollar accounts reduced the opportunities for the US to freeze funds that it believed were being utilized to support terrorism. It also reduced the US's opportunity to monitor suspicious activity to develop further intelligence on suspicious money flows. The Defendant chose not to enter into a dialogue with OFAC or US lawyers regarding the closing of the Interpal US dollar account.

175. The documentary record reveals a December 31, 2004 memo authored by Ms. Lane (NW068901) documenting a phone call Ms. Lane had with Interpal officer Jihad Qundil. According to the memorandum, Mr. Qundil advised Ms. Lane that Interpal had located an Indian charity maintaining a USD account in London with another bank (Canara Bank). Because NatWest had previously requested that Interpal close its USD account, Mr. Qundil wanted to send Interpal's NatWest USD account funds balance to the Indian charity, but because of "previous problems" (presumably the fact that Interpal had been designated as an SDGT by the United States) Mr. Qundil "required assurance that the money would not be returned nor sent out of this country via America." Ms. Lane's memo indicates that she advised Mr. Qundil that Interpal's USD funds would not leave the UK, but would instead be moved through internal transfers. Thus, Ms. Lane's memorandum indicates NatWest's comprehension that Interpal wanted to transfer US dollars, and specifically sought to structure transactions in a manner that would avoid the funds being processed through the US.

176. Ms. Lane's memorandum does indicate that she advised Mr. Qundil that the money would be transferred at Interpal's own risk, and that she could not confirm whether the US would be made aware of a USD transfer. However, she also advised Mr. Qundil that the funds could be withdrawn in cash (though she acknowledged that Mr. Qundil might face difficulty paying the cash over the counter into another account). She also advised Mr. Qundil that Interpal could convert the USD into pounds sterling. (NW068901)

177. On January 26, 2005, Interpal requested that the Defendant route funds to [REDACTED] a British-based charity organization that is a member of the Union of Good. (NW200986-NW201000) Interpal's request to NatWest explicitly stated: "[w]e have no problem with you effecting the transfer provided you can guarantee that the funds are safely transferred to our partner's USD account in the UK strictly via the UK only, and does not involve routing through the US." (NW068331) Thus, Interpal once again explicitly communicated to NatWest its desire and intention to transmit US funds structured in a manner to avoid detection by US authorities.

178. On February 7, 2005, NatWest issued to Interpal a [REDACTED] payable to [REDACTED] (NW068330) Two days later, and more than two years after the US designated Interpal as an SDGT, Interpal transferred [REDACTED] to [REDACTED]

179. The transaction was processed [REDACTED] However, NatWest was aware that Interpal desired to conduct USD transactions in a manner that would avoid notifying the US government that a designated SDGT was initiating the USD transfers. By providing Interpal with the account balance in the form of a draft, NatWest appears to have enabled Interpal to accomplish its goal.

180. Furthermore, despite the fact that Interpal had been designated as a SDGT by the US in 2003, there is no evidence I have seen indicating that NatWest performed even so much as any basic due diligence on [REDACTED] From my perspective as a former law enforcement officer, given

---

---

Interpal's designation, given the fact that NatWest believed Interpal was a high-risk customer, and given Interpal's explicit and repeated statements to NatWest that it sought to place US dollar transfers in a manner that would avoid their being processed in that currency's home jurisdiction (the US), at a minimum UK law enforcement would expect NatWest to carefully scrutinize [redacted] the counterparty to this highly suspicious and troubling transaction.

181. By 2004, the Proceeds of Crime Act 2002 had placed an obligation to seek consent from law enforcement to conduct any suspicious transactions, as outlined above and by Mr. Holland's report. In this instance I would have expected the Defendant to seek consent from law enforcement to undertake the above transaction. Further, I would have expected the Defendant to seek consent to close the US dollar account. In my experience, seeking consent to exit relationships is a regular occurrence when a bank is closing an account suspected of being involved in Money Laundering or Terrorist Financing.

182. The intelligence from such a disclosure could be passed from the UK's FIU to its US counterpart to ensure that the overall intelligence picture remains informed and up to date with the joint aim of preventing terrorism.

183. By consistently failing to comply with its obligation to disclose suspicions and seek consent from the authorities, NatWest reduced the opportunity for law enforcement to develop intelligence regarding Interpal's links to terrorism and potentially develop an intervention strategy to prevent Terrorist Financing.

184. The Defendant's mindset is exemplified in a 2004 email written by Mr. Rodger, who states that:

> *The rationale for not exiting is that UK law enforcement does not have any concerns with Interpal, the Charity Commission which undertook a thorough review after Interpal was listed by OFAC could find nothing wrong either and the Bank of England has chosen not to follow the US lead. There is a suspicion that the US is being over-zealous in the Middle East (witness Commercial Bank of Syria). (NW066847-850)*

185. I do not understand how Mr. Rodger can state that "UK law enforcement does not have any concerns with Interpal". Clearly, from the documentation I have seen, [redacted] Neither the Charity Commission nor the Bank of England, as Mr. Holland and Mr. Burchfield state, are law enforcement agencies. The Defendant's inconsistent and irreconcilable conduct in closing suspicious accounts is further evidenced in Mr. Hoseason's testimony. Mr. Hoseason testified that NatWest would close an account if it "knew with absolute certainty that the customer was engaged in any kind of illegal activity." (Hoseason, pg 24) During his time on the Defendant's Money Laundering Team between 1999 and 2003, he does not recall this ever happening, perhaps in part because Mr. Hoseason clarifies "absolute certainty" as being "convicted in a court of law." (Hoseason, pgs 24–25, 32) In my view, such a threshold of proof is flatly inconsistent with the level of risk tolerance I would expect of any financial institution; "absolute certainty" is not a reasonable standard for concluding that a customer relationship ought to be exited. Nor, in my professional experience, is it the case that only a criminal conviction establishes the basis to exit a customer relationship.

---

---

186. Other testimony offered by Mr. Hoseason further demonstrates the unreasonable, illogical, and untenable standards of "absolute certainty" Mr. Hoseason claims the Defendant required in order to evaluate risk. When asked what degree of proof NatWest would require to establish that funds sent to Interpal by the US-based [redacted] (itself an SDGT criminally convicted in the US in 2008 for US anti-terrorism law violations), Mr. Hoseason testified:

> *A: So if I had been supplied with clear evidence that demonstrated that those funds were subsequently utilized to buy bullets, as you put it, then that would be clearer evidence. (Hoseason, pg 278)*
>
> *Mr. Hoseason was thereafter asked to clarify his testimony.*
>
> *Q: Okay. Short of that, short of evidence that the funds were used to buy bullets or explosives, is there anything else that you would consider to be proof of the nefarious purposes of the transfers?*
>
> *A: "No." (Hoseason, pgs 278–279)*

187. In my professional opinion and experience, Mr. Hoseason's suggestion that "absolute certainty" is the measuring stick for risk tolerance is baseless. Financial institutions do not assess risks, including Money Laundering or Terrorist Financing risk, based exclusively on either the customer being "convicted in a court of law" or based on "absolute certainty." Nor do law enforcement agencies and officers expect financial institutions to engage in risk tolerance analyses calibrated to "absolute certainty" or "criminal convictions"; indeed, doing so would not only expose banks (and the general public) to the danger of Money Laundering (including Terrorist Financing) in advance of a conviction or "absolute certainty", but would also hamper law enforcement's ability, in coordination with financial institutions, to monitor threats at an early stage. As far as I am aware none of the relevant legislation or guidance refers to "absolute certainty" in any respect.

188. Mere suspicion is not enough, in Mr. Hoseason's mind, to close an account, and he considered the designation by the US government of Interpal as an SDGT to be merely a suspicion. (Hoseason, pg 37) Nonetheless, Mr. Hoseason acknowledges the statement (in NW180856-857) that the Defendant did close five other accounts with potential links to terrorism between 2003-04, and isn't aware of any of those customers being convicted in a court of law of supporting terrorism. (Hoseason, pgs 422-23) Nor is he aware of NCIS ordering any of those accounts be closed. (Hoseason, pgs 439-440)

**Closing of the USD account**

189. As mentioned above, the OFAC listing presented the Defendant, and Interpal, with difficulties arising through any US dollar transactions being cleared through the US, which led to Interpal's request to close its USD account, which the Defendant accepted.

190. On 25 January 2004, Interpal contacted NatWest to inform them of Interpal's decision to close the US dollar accounts. (NW017110) The Defendant recognized the fact that making payments in the US would break the law in the US and agreed to close the account, in order to "overcome" potential issues with the US.

---

191. In May 2004, Mr. Cole identified issues regarding the operation of Interpal's US Dollar account:

> *Consideration will need to be given regarding the operation of the US Dollar account, as funds from this account will get frozen if they are transferred via a US domiciled/owned counterparty. (NW017180)*

192. Indeed, it is almost certain that USD payments would have been cleared through the US.[12] In that case, it is clear that the Defendant should have, in accordance with the global banking standards published by Basel, Wolfsberg and FATF, adopted US standards and frozen all USD payments from Interpal, instead of simply closing the USD account and operating the Sterling and Euro ones normally.

193. This exemplifies why global financial institutions should not simply adhere to one jurisdiction's law or seek to arbitrage between legal jurisdictions. They have to adhere to the highest standards rather than the most convenient ones. The procedures that NatWest followed in closing out the Interpal account constituted a very major deviation from recommended best banking practices.

194. The documents that I have reviewed demonstrate that NatWest consistently failed to give proper weight to the OFAC designation of Interpal. NatWest's disregard for that designation constitutes a flagrant deviation from an international bank's obligation to adopt the most stringent international standards available. In my experience, and this has been a consistent theme at conferences, classes and industry meetings, financial institutions are expected to adopt the highest standards applicable across the multiple jurisdictions in which they operate.

195. In deposition testimony, some compliance employees felt otherwise. Mr. Foster, Head of AML in Group Compliance, in his deposition discussed the OFAC issue and stated:

> *The OFAC list did not apply in the UK. Therefore we were allowed to hold an account for Interpal, technically. (Foster, pg 172)*

196. As Mr. Foster stated, the Defendant's policy required branches of the Bank in other countries to follow UK law and, if more stringent, whatever local requirements they had. Thus, branches in the US were required to follow both UK and US law, but branches in the UK only had to follow UK law. The consequence of this was that if a US customer was designated by the Bank of England but not OFAC, the customer's account had to be closed, but if a UK customer was designated by the US, no action was required. (Foster, pg 224) Or in Mr. Foster's words, Interpal's US designation "doesn't necessarily mean it is a terrorist organization, that it is actually financing terrorism." (Foster, pg 210)

197. In response to a member of Mr. Foster's team, Rob Davies, raising the inconsistency of maintaining a relationship with a customer while having to block US dollar payments of that customer, Mr. Rodger dismisses Mr. Davies as a "junior person" about whom "I would wonder to what extent he actually understood it, the issue at hand." (Rodger, pg 148)

[12] http://www.radixconsulting.com/offshoredollarclearing.pdf

---

198. Mr. Hoseason's boss, Neil Trantum, testified that:

> *the OFAC list is for dollar payments, it is a US thing. In the UK that is not necessarily the be-all and end-all .... For non-dollar payments, OFAC has no bearing in the UK. (Trantum, pgs 91-92)*

199. However, other NatWest employees do seem to acknowledge that OFAC designations were important, and needed to be considered in connection with risk analysis. Ms. Holt (Defendant's Head of Group Enterprise Risk) initially testified (during defense counsel's own questioning), "I would not consider an unsubstantiated allegation sufficient to exit a relationship, no." (Hoseason, pg 223). However, this testimony was general, and did not explicitly address OFAC designations. Ms. Holt was thereafter asked (during plaintiffs' counsel's further examination) whether she considered OFAC's designation of Interpal to be "an unsubstantiated allegation", and testified in response:

> *No, I didn't consider it to be unsubstantiated, and I didn't ignore it, but it was one of the many pieces of information that we factored in to make our own decision. I believe I deliberately didn't ignore that, which is one of the reasons why I didn't, from memory, insist [sic] that all of the OFAC lists were included in the group lists, and we had to get clarity as to how they were going to get treated, so that it couldn't look the other way, that it had to be considered. I would not – would never completely dismiss it. (Holt, pgs 229-233)*

200. In my opinion, NatWest's effort to dismiss the importance of OFAC listings deviates materially from standard banking practice, and diminishing or dismissing its importance would be regarded with (at a minimum) concern and scepticism by UK law enforcement. Indeed, and as exemplified in Ms. Holt's testimony above, at least some of the Defendant's own staff recognized that OFAC designations were information warranting serious consideration in assessing how to treat an account. Moreover, the closing of the USD account to avoid any issue with US law enforcement (yet continuing to process transactions and maintain a relationship with that customer in other currencies) reflects an objectively major deviation from both international banking standards and international AML and CTF standards, particularly given that fact that, independent of OFAC's designation, the record demonstrates that NatWest had long held serious concerns about Interpal. Concerns specifically reflecting Terrorist Financing suspicions. From a risk tolerance standpoint, NatWest's conduct frames why global financial institutions cannot adhere to one law or seek to arbitrage between legal jurisdictions. They have to adhere to the highest standards rather than the most convenient ones.

201. Moreover, though the question of UK criminal or regulatory liability is beyond the remit of this Report, in my professional opinion, and based on my professional experience, given the totality of the circumstances in place (including but not limited to Ms. Holt's tacit recognition of the importance OFAC designations played in assessing risk, so much so that they were included within Group lists) NatWest's decision to shut Interpal's USD accounts, yet continue to process transactions at Interpal's direction or for Interpal's benefit, gives me great cause for concern.

**Failure to Implement a Consistent and Efficient Organizational Structure**

202. As outlined above, I fundamentally disagree with the assertion of Mr. Holland that there were no practical steps that the Defendant could have taken. In my opinion, one of the reasons for

---

the Defendant's failure to take proper action on the red flags is that they consistently failed to implement a consistent and efficient organizational structure, which even resulted in failure to comply with NatWest's own internal/published policies when dealing with the Interpal account.

203. Mr. Holland refers to the 2001 Money Laundering Handbook, which highlights the expectation for a firm "... to use its existing knowledge effectively and ensure that it was available to the MLRO." (Holland, para 5.17) In my view, the lack of a consistent and efficient structure precluded compliance with this industry guidance.

204. From my review of the documents and the testimonies, it is my opinion that the organizational structure of the Defendant (as outlined in my December 17 report) was not clear even to its own personnel. The structure changed constantly, which kept the Defendant from building consistent and reliable reporting lines. There were a lot of dotted reporting lines, which made each staff member's responsibilities difficult to understand and blurred.

205. Mr. Holland makes reference to the demands placed on banks by increasing guidance, regulation and legislation in relation to AML and CTF. As a number of the Defendant's employees testified, this resulted in more staff being deployed within this field and the development of policy and process. This increase was especially marked with regard to CTF due to the increased number of terrorist incidents, the increasingly global nature of those incidents and the globalisation of banking services. 9/11 brought this increased activity into particularly sharp focus. The overall increased regulatory demands were in turn met by increased resource both on the legislative and regulatory side, as well as in terms of the internal resource (both personnel and systems) on the side of the financial institutions.

206. Throughout this report, I have pointed out situations in which the Defendant has not complied with its own policies. For example: NatWest did not follow the procedures to monitor/review the account; it did not follow Group procedure regarding the OFAC list; and it did not consistently disclose suspicious activity to law enforcement.

207. The 2003 JMLSG Guidance, as highlighted by Mr. Holland, specifically included; advice on the risks of terrorist funding presented by charitable donations, advice that firms should carry out ongoing monitoring of customer activity, and, advice on keeping abreast of public information on terrorists and terrorist organisations. (Holland, para 5.23)

208. The analysis of available information by the Defendant's personnel who decided to maintain the operation of the Interpal accounts was misdirected and improperly focused upon political issues.

209. This is particularly evident in May 2004, when Mr. Cole, CBFM Regulatory Risk, emails Mr. Norrie, Group Risk Management, regarding the Interpal account. This sets off a string of emails regarding Interpal. (NW018476-483)

210. In that correspondence, Mr. Cole briefly assessed the reputational risks of both closing and maintaining the account. He stated that closure could generate adverse media attention if NatWest closed the account "without an identifiable reason" and that the failure to close the account could generate "untoward regulatory/media attention" if a terrorist related payment was identified.

211. After doing some research, Mr. Cole circulated an email dated 20 May 2004 outlining his findings. Mr. Cole asserted that there is nothing beyond "opinion that Interpal has made

---

payment to terrorist groups," an observation that was directly contrary to substantial evidence in the Defendant's possession, evidence which Mr. Cole should have uncovered and shared with law enforcement so as to either disprove a terrorist link or receive law enforcement consent to continue the relationship.

212. In December 2004, an article appeared on the internet restating the Interpal link to Terrorist Financing. This brought into even sharper focus the difficulties in operating the account.

213. That article led to a chain of emails presenting a number of arguments supporting the maintenance of the relationship and dismissing adverse intelligence as opinion. (NW066807-813). It is interesting to note that Ms. Holt, who had to some extent indicated a different view, was not included in this e-mail debate.

214. In those emails, NatWest personnel observed that the Interpal account was a "big income earner" for Relationship Manager Ms. Lane (in fact, it was one of the biggest for the Defendant), but she "would accept the loss of this customer ... provided her target can be adjusted accordingly." (NW066810-66811)

215. In an email to Mr. Foster and Mr. Davies, Mr. Norrie offers his opinion on his own open source research stating that he views it "as much about Foreign Policy as Terrorism". (NW66822) Mr. Norrie goes on to state:

> *Maintaining the relationship will still put us outside the Group standards - do we need to have this signed off?*

216. In my experience working with banks on sensitive matters, it is fairly common that some tension exists between the business side and the compliance side when evaluating a suspicious account. Very often, the Relationship Manager is inclined to keep the account open for financial reasons. However, in my experience, it is very rare for compliance personnel to take such concerns into consideration when viewing suspicious activity and a potential exit strategy. In my experience, the financial side should never be given weight in the decision making processing when evaluating an account, and compliance is there to make sure that financial concerns do not drive the compliance decision making. This tension and the need for compliance personnel to overcome it are well-known issues that consistently arise in private meetings with MLROs and industry meetings and conferences: the compliance function will always argue that a bank cannot take financial interest into consideration in the decision making. The fact that in this case, NatWest identified Interpal as a "valuable customer" appears to demonstrate that financial issues were given undue consideration and influence.

---

---

217. Though I know it is outside the most pertinent period of these cases, I note that on 21 February 2005, Mr. Norrie sent a memo to Ms. Holt highlighting NatWest's delay in devising and adopting its Sanctions and Terrorist Financing Policy. (NW196319) Mr. Norrie stressed his perception that NatWest needed to decrease the burden that the Group Policy on Sanctions and Terrorism Financing imposed upon the bank's personnel:

> *Group Risk Committee was concerned that parts of the Group would not be compliant with important aspects of the policy (...) GRC therefore requested that further work be completed in addressing the gaps identified before resubmission for approval.*

218. Two issues highlighted by Mr. Norrie were filtering payments and dealing with OFAC. These had not been included in the new policy, as Mr. Norrie suggested "the Group's approach to both is still being developed." These two issues were central to the difficulties the Defendant had with regard to maintaining the Interpal account. In my view, the reason that these issues could not be dealt with within the new policy is that the stance taken by the Defendant in maintaining the Interpal account would not fit within a policy that needed to reflect the global standard practice for banks.

219. There was also a lack of consistency in the value the Defendant has given to various information and press articles. From my experience, to assist law enforcement in doing its job, all information needs to be evaluated before it is analysed. There needs to be an evaluation of the source in order to assess the credibility of the information. Research of the information from the source allows the veracity of the information to be assessed and that in turn can allow a re-evaluation of the credibility of the source. This can help give weight to intelligence that will assist in any analysis.

220. As I explained above, [REDACTED] even though NatWest would have confirmed the accuracy of that information had it conducted a proper investigation.

221. However, on 24 September 2003, Peter Richardson, Operational Risk, circulated a copy of a BBC news report that commented on the Charity Commission dropping its investigation into Interpal. (NW013701) In my view, NatWest granted the BBC news report unquestioned credibility and weight while discounting more credible sources of adverse information concerning Interpal, including the OFAC list. This exemplifies the issues that arise where one evaluates sources of information in an inconsistent manner.

222. Moreover, on several occasions, the Defendant demonstrated inconsistency in dealing with quite similar cases. There are, for example, some assessments and referrals of similar cases to Interpal, but I noticed that the Defendant applied different standards in each case. Thus, while Mr. Holland notes that a bank cannot take the place of law enforcement, the documents and testimony that I have reviewed reveal that in certain instances the Defendant took practical steps to mitigate the risk of Money Laundering and Terrorist Financing that it failed to undertake in relation to the Interpal accounts. This is in contrast to Mr. Holland's opinion that there were no more practical steps the Defendant could have taken in the Interpal case.

223. For example, on 3 January 2005, a case similar to Interpal emerged within NatWest's retail banking unit and the bank exited the relationship with the organization [REDACTED]

---

---

224. There is an e-mail exchange between Mr. Rodger, Mr. Cole, and Kevin Love. (NW069055) The three discuss that the closure of the [redacted] account by Retail had been picked up by the media.

225. On 5 January 2005, Mr. Love e-mails Mr. Rodger:

> *Please see the article "Bank Row With Palestinian Group". Would welcome your thoughts given all the discussion around Interpal. Should we highlight this to Stephen?*

226. Mr. Rodger replies:

> *This must be a retail account. GER maybe tried to bully them to exit, even though there are no EU/OFAC sanctions. It does show that the Group is dysfunctional if its Palestinian linkage was the reason for exit and CBFM rightly keeps Interpal going when it could be argued there are greater grounds.*

227. The email string identifies the reason for exiting the [redacted] account as a joint conference with [redacted] held in 2002, and that Retail decided unilaterally to exit.

228. It is clear that the emerging issues exposed failings within the Group Structure resulting in inconsistent decision-making across the Group. This shows the dysfunction of the Group and the inconsistency of NatWest's decision making regarding the termination of existing banking relationships. It also highlights the unclear nature of NatWest's published policy and the lack of communication within the Group.

229. Moreover, on 31 January 2005, Mr. Love circulated a request for several compliance personnel to assess the "Residual Risk" that may exist regarding three accounts, one of which was Interpal. (NW066758)

230. In Mr. Rodger's reply, he referenced:

> *... two Interpal-like cases –* [redacted] *We are exiting both.*

231. In my opinion, it is very inconsistent that the Defendant would refer to other accounts that required closure as "Interpal-like cases" yet continued to maintain Interpal's accounts.

232. In May 2005, it was brought to Mr. Cole's attention that the Bank had filed disclosures with NCIS on two occasions in relation to an account held for [redacted] a charity similar to Interpal. Those disclosures had been in May and June 2004 and were made because [redacted] (NW180879)

233. These two disclosures to NCIS show inconsistency in NatWest's application of its disclosure policy. They also show a distinct difference in the appetite to give credibility to information coming from Israeli sources, which was given credence with regards to [redacted] but readily dismissed when it came to Interpal.

---

---

234. The information regarding [redacted] should have also led to further investigation that would have demonstrated that this entity was a previous recipient of funds from Interpal.

235. On 27 June 2005, an account belonging to another Palestine-related charity, [redacted] was placed on the Bank of England list. This account was linked to Interpal. On 28 June 2005, Mr. Cole, CBFM Enterprise Risk, sent an email to Ms. Lane, Relationship Manager for the Interpal Account, copying in Mr. Rodger, Mr. Love, Mr. Foster, Mr. Davies and Graeme Wyles. (NW066701)

236. In my view, the identification of a recipient of funds being placed on the Bank of England list should have prompted an urgent review of the Interpal account including full analysis of the payments to [redacted] and a disclosure submitted to the FIU bringing this new information to the attention of law enforcement.

---

## 3. Conclusions

237. In my opinion, Mr. Burchfield's and Mr. Holland's reports set forth incorrect conclusions, particularly in respect of the suggestion that NatWest's conduct would have been regarded as acceptable by UK law enforcement. Their analyses fail to discuss information in the documentation suggesting that, notwithstanding the action (or inaction) by the Charity Commission, or UK law enforcement agencies, the Defendant failed to comply with its AML and CTF responsibilities and obligations. Within this, the Defendant has in my opinion confused its sanctions compliance role, comparing the monitoring of payments against lists, with its AML and CTF requirements to identify and report suspicious activity and to prevent Money Laundering and Terrorist Financing. Although linked through function and process, they are distinct and separate responsibilities.

238. In this case, the separation between policy and operation, exacerbated by lack of clarity, structure and communication, has resulted in failure to deal properly with the Interpal account from both a policy and operational perspective.

239. The Defendant failed to take a consistent monitoring stance. Mr. Holland sets out the "essentials of a monitoring system" as addressed in the industry guidance of 2006 that includes: identification of transactions requiring further review, prompt review of red flags, and, taking appropriate action following the review. (Holland, para 5.29)

240. From my experience dealing with multi-jurisdictional crimes and in my dealings with regulated businesses, there are widely held expectations that every business is operating to the global standards. In my view, the failure of the Defendant to properly control the Interpal account has provided opportunities for the account to be used to launder money and finance terrorism on a global basis.

241. The Defendant's failure to regularly and fully report suspicious transactions and activity to the UK authorities left law enforcement without the ability to properly and fully assess Interpal's conduct, and allowed Interpal to transfer significant amounts of money with ease.

242. As Mr. Holland highlights in his comments regarding the 1997 JMLSG Guidance, a financial institution is "… not expected to know the exact nature of the criminal activity concerned." (Holland, para 5.13) The Defendant was, however, required to report suspicions and those reports should have fully set out all of the information known to the Defendant to enable law enforcement to assess the necessity or potential for action.

243. Consequently, I strongly disagree with Mr. Holland's statement that from a practical perspective the Defendant did all that it could. In fact, NatWest did not comply with minimum standards for reporting Interpal's suspicious to law enforcement personnel throughout the relevant period.

244. Mr. Holland notes that the Defendant made disclosures to law enforcement between September 2001 and August 2003. (Holland, para 3.59) For the reasons set out above, I disagree with his assertion that "*… none of the disclosures prompted any response …*" [redacted]

245. In my opinion, the Defendant had ample opportunity to provide law enforcement with far more intelligence than it did. The Defendant also failed to take advantage of opportunities to engage in detailed discussions with law enforcement regarding steps the Bank could have taken to monitor and close the Interpal account. I therefore disagree with Mr. Holland's opinion that there were "good reasons for NatWest to carry on with 'business as usual.'"

246. I consider the red flags to be so compelling that the failure to take prompt and strong actions with regard to the Interpal accounts, and to properly report suspicions of Terrorist Financing to UK authorities, amounts to a series of major deviations from industry standards that I find inexplicable.

247. I have never seen an account that has so many applicable red flags, including suspicions raised by staff members independent of previous information available to the MLRO, where the account has not been closed or at least been subject to consent authority and regular communication with law enforcement. In my professional opinion, the Burchfield and Holland Reports' failure to arrive at similar conclusions can only be due to their incomplete analysis of the documentation (when tied to the relevant standards) set forth in this case.

The report was written by me and it reflects my opinions and conclusions. I personally reviewed and approved the entirety of its contents.

DATE: 4th March 2011

Gary Walters
Forensic Risk Alliance
Audrey House
16-20 Ely Place
London EC1N 6SN
+44 (0) 207 831 9110

# Appendix I

**Appendix 1: List of all bates numbers/ranges referenced in the Expert Rebuttal Report**

NW000080-111
NW000237
NW008356-392
NW008417
NW008430-8439
NW009934-942
NW012108-152
NW012925-933
NW012954
NW012976
NW013279
NW013636
NW013660-661
NW013699
NW013701
NW013939-941
NW014025-36
NW014486-487
NW014490-492
NW014495-496
NW014500-505
NW014551
NW016745-746
NW017110
NW017173-190
NW018476-483
NW050721-751
NW051994-97
NW066701
NW066758
NW066797
NW066807-813
NW066822
NW066847-850
NW068330-331
NW068901
NW069055
NW083850-851
NW083853-555
NW162188-193
NW180856-857
NW180879
NW191801-806
NW196319
NW200986-201000
NW212124

# Appendix 2

Weiss v NatWest
Applebaum v NatWest

## Appendix 2: List of all Depositions referenced in the Expert Rebuttal Report

- Stephen Foster: 16 July 2010
- Guy Cole: 8 June 2010
- Belinda Lane: 24-25 June 2008
- Amanda Holt: 23 July 2010
- Michael Hoseason: 14 July 2010
- Irvine Rodger: 22 July 2010
- Neil Trantum: 13 July 2010

FRA 1

**EXHIBIT 122 TO DECLARATION OF VALERIE SCHUSTER**

**(letter from the Charity Commission to NatWest, 1 page)**

**FILED UNDER SEAL**

**EXHIBIT 123 TO DECLARATION OF VALERIE SCHUSTER**

**FILED UNDER SEAL**

IW7CE/1 CUSTOMER EVENT DETAILS As at 05/10/02

Customer Short Name: Palestinians Relie

CUSTOMER NOTE

Date of Contact : 07/03/1996

Customer Contact: Bank Contact: CHERYL/NLLC/BT

Account Number: Account Type: Sort Code:

Event Details -

PHONE CALL RECV'D FROM 'MR SIMON HAYWOOD' CHARITY COMMISSION [redacted]

Action Summary -

Additional Details -

OPT .. CIN/CRN 1143476903/HTS10441

F1=Hlp F2=Exit F12=CDA Menu

**EXHIBIT 124 TO DECLARATION OF VALERIE SCHUSTER**

**FILED UNDER SEAL**

**LANE, Belinda, Bus Mgr**

**To:** Wiltshear, Martin (RBS)
**Subject:** RE: Palestine Lebanon & Relief Fund

- Acc opened with Bank 10/94
- Large funds have always been held on various current accs as, due to religious reasons they are unable to earn interest
- Registered charity no 1040094 - 8 trustees
- Provide charitable relief to refugees in Israel, West Bank & Gaza and Lebanon - developed out of former charity which provided relief to Kuwait
- Main donors are [redacted]
- Very much seasonal in that receipts usually at Ramadam and Easter
- Main contact is the secretary Mr Jehad Qundilizo
- Authorised signatories are Ibrahim Brian Hewitt, E Mustafa,J Qundil and Mahfouzh Safie - instructions are any 2 to sign
- Next meeting is Monday 21 January with Mr Qundil at the business premises when I will discuss present operations and use of the $ acc

Any further guidance in how to approach this would be welcomed - ITS 23::2-2602

Belinda Lane
Senior Business Manager

-----Original Message-----
**From:** Wiltshear, Martin (RBS)
**Sent:** Thursday 17 January 2002 09:51
**To:** LANE, Belinda, Bus Mgr
**Subject:** Palestine Lebanon & Relief Fund

Belinda

Unsurprisingly, we have been sent a Money Laundering Suspicion Report on the above connection. It is bases on the face that [redacted] [redacted] The concern is obviously terrorist funding especially given the volatile climate of the area.

I would be therefore be grateful if you would kindly provide me with some background info on this connection with details of the most recent due diligence undertaken in respect of the Bank's knowledge of dealings in the US$ account.

I appreciate your assistance in this matter and look forward to hearing from you.

Regards

**Martin Wiltshear**
**Group Investigations & fraud**
*Ground floor*
*Regents House*
*London*
*tel - 0207 615 7244*
*fax - 0207 615 7287*

1

**EXHIBIT 125 TO DECLARATION OF VALERIE SCHUSTER**

**FILED UNDER SEAL**

## SYNOPSIS OF CUSTOMER MEETING

| DATE | 20 MARCH 2002 |
|---|---|
| CUSTOMER | INTERPAL |
| ATTENDEES | BELINDA LANE , JIHAD QUNDIL |
| LOCATION | CUST'S PREMISES, CRICKLEWOOD |

- Nature of operations has remained the same ie charity which receives donations from the muslim community mainly around the 2 religious festivals – Ramadan just before xmas (60% of income rec'd during this period) and Haj (Pilgramage) in March. A core mailing list of approx 12000 is maintained. Assistance is then provided to various charities mainly in the Westbank, Gaza and Lebanon which can comprise of food parcels aswell as cash. There is also a summer campaign specifically on behalf of muslim orphans. Jordan N-Z.
- Since further troubles in this area of the world commenced in Sept 2000 there have been a number of emergency campaigns for assistance which resulted in donations almost doubling in 2000 from [redacted]
- 40% of income is from organisations and charities abroad – mainly Saudi Arabia, Yemen and Europe often representing payment for Qurbani which is a sacrificial ceremony carried out on their behalf by Interpal
- JQ raised the issue of terrorism and mentioned that they had received a number of calls from the media – he pointed out that they were confident that they would not encounter any problems as they were fully investigated by the Charities Commission in 1996 and found to be clear.
- Presently 7 staff – stakeholder scheme now in place with First Ethical
- Lease on the trading premises has now expired and they are looking for a f/h in the Park Royal area – will fund from own resources, the sale of several inv properties in Wales and short-term loans from other charities
- Income has continued at a similar level in 2001

- Know your customer – JQ to forward ID for each of 4 signatories together with addresses to enable us to undertake cr searches
- Interested in Bankline and Autopay – also discussed pymt mgr but not attractive given costs
- I will raise possibility of exchange rate business in my letter
- Also interested in direct debit originator service and details of charges provided

**EXHIBIT 126 TO DECLARATION OF VALERIE SCHUSTER**

**FILED UNDER SEAL**

| From: | COLE, Guy, CBFM Regulatory Risk |
|---|---|
| Sent: | Thursday. May 20, 2004 10:34 AM |
| To: | FOSTER, Stephen James, Group Risk Mgmt; NORRIE, Ben, Group Risk Mgmt |
| Cc: | RODGER, Irvine, CBFM Regulatory Risk; DAVIES, Rob, Group Risk Mgmt; JONES, Richard, CBFM Regulatory Risk |
| Subject: | RE: INTERPAL |
| Attachments: | Doc1.doc |

Stephen/Ben

We have ascertained that the payment mentioned below has not gone to ███████ Although similarly named, the recipient of this payment is a separate charity ███████████ which appears to be operating without any form of sanction placed on it.

From my trawls for information on the internet I have not found any information that substantiates beyond opinion that Interpal has made payments to terrorist groups. It appears the perspective taken by Israel towards Interpal and other charities operating/funding schools/orphanages/hostels in Palestine and Gaza, is that these charities perpetuate terrorism as terrorists know that if they die their dependents will be looked after by the charities. This charity is the predominant UK charity providing relief in this region, it hosted and funded a visit by British MPs to the region in 1998. Looking at the accounts there are also a large number of small (e.g. £2) direct debits being paid into the charity's account from UK donators, and so a change of their banking arrangements will probably result in some form of media commentary.

I attach a summary of my review of Interpal foreign payments in the last six months. All of the recipients of these payments were checked in Worldcheck, KYC Check and reviewed against available Google information

██ consideration of the information in the document attached above. The background information for ███████████ is an unofficial opinion from an Israeli website and no other reports or recognition of this charity having links to terrorism are recorded on any other websites. The Worldcheck information on ███ is factually incorrect, they state that the US Federal government and UN have acknowledged that the charity aids and abets terrorism. According to the KYC Check no sanctions have existed against this entity. The source of Worldcheck's information is a student's journal at the University of California. My recent experience of Worldcheck has been disappointing, I will probably write a separate email concerning my Worldcheck findings, but in this instance if your search for the ███████████████████ against the WorldCheck 'part match' feature, no matches are found, if you then search for an 'exact match' one result is found.

I am content to leave the Sterling and Euro accounts operating with a semi annual review taking place for foreign payments made from the accounts. Consideration will need to be given regarding the operation of the US Dollar account, as funds from this account will get frozen if they are transferred via a US domiciled/owned counterparty. We should also be alert to any new Charity names being added to the Bank of England's terrorism list. I believe Interpal is aware of the sensitivity of their position, and will be keen to ensure it does not breach Bank of England sanctions.

I'll assume you are happy with approach, unless I hear otherwise.

Regards

Guy

Guy Cole
CBFM Money Laundering Prevent Unit
██ Royal Bank of Scotland



EXHIBIT
38
6/8/11 SC

HIGHLY CONFIDENTIAL

NW 016767

135 Bishopsgate, London, EC2M 3UR
T (020) 7375 5433
F (020) 7375 4641
<mailto:Guy.Cole@rbos.com>

-----Original Message-----
From: FOSTER, Stephen James, Group Risk Mgmt
Sent: 17 May 2004 11:24
To: COLE, Guy, CBFM Regulatory Risk; NORRIE, Ben, Group Risk Mgmt
Cc: RODGER, Irvine, CBFM Regulatory Risk; DAVIES, Rob, Group Risk Mgmt
Subject: RE: INTERPAL

Guy, Ben is away all week, so I am replying on this.
You are correct that filtering is a group wide issue and that is why we have been working with key stakeholders like Payment Operations to develop the policy and capability. This continues and we know that it is a very important element of our counter -terrorism efforts.

On the specific case of Interpal, I can understand the difficulties of filtering payments in the absence of an automated system. However, we do need to monitor account activity and I hope that the RM and MLPU can find a practical way to review the account movements periodically for odd items. You are right to highlight the reputational issues but if management decides they don't want the relationship, there are ways to exit that might not cause a problem.

Please keep us in the loop with your investigations on the payments.

-----Original Message-----
From: COLE, Guy, CBFM Regulatory Risk
Sent: 17 May 2004 11:05
To: NORRIE, Ben, Group Risk Mgmt
Cc: FOSTER, Stephen James, Group Risk Mgmt; RODGER, Irvine, CBFM Regulatory Risk
Subject: RE: INTERPAL

Ben

I understand the best people to speak to are either Shirley Ritson on 020 7672 [illegible]0 or Sarah Wallis on 020 7672 5826. ***Redacted - Privileged***

***Redacted - Privileged***

I realise due to the US terrorist designation of Interpal, that we should be wary of the payments from their accounts with us, but in reality I believe there is very little we can effectively do to prevent payments being made without a payment filtering system, as the customer can initiate payments themselves without needing to contact the RM.

I have not been directly involved with the Interpal issue until your recent correspondence and so have not considered previously the risks myself. I think any decision to keep/close the account must be carefully made, as closing the account without an identifiable reason will most probably result in adverse media attention, also if a terrorism related payment is identified as being made, we again would suffer untoward regulatory/ media attention. I spent Friday looking through the last six months of debits on Interpal accounts, I have seen a couple of payments that warranted further investigation, particularly the below:

Transaction Date: [redacted]
Transaction Amount: [redacted]
Transaction Type: [redacted]
Transaction References [redacted]

Further system investigation has shown the recipient accounts details are the below:
[redacted]

Bene acct nmbr: 2111-0742
Bene bank: Cairo Amman Bank, Al Khalil Branch, Palestine

I need to conduct further investigations to establish whether this account could be [redacted] as this entity has been designated a terrorist group by the Bank of England.

Regards

Guy

Guy Cole
CBFM Money Laundering Prevent Unit
The Royal Bank of Scotland
135 Bishopsgate, London, EC2M 3UR
T (020) 7375 5433
F (020) 7375 4641
<<mailto:Guy.Cole@rbos.com>>

-----Original Message-----
From: NORRIE, Ben, Group Risk Mgmt
Sent: 14 May 2004 10:03
To: COLE, Guy, CBFM Regulatory Risk
Cc: FOSTER, Stephen James, Group Risk Mgmt
Subject: RE: INTERPAL

Do you have any contact in the Core Data Manager team that I could try? Is there any kind of agreement between CBFM and Manufacturing that would serve as a mandate to have this work performed on an on-going basis?

Im and not sure whether you were aware but until a few weeks ago the NatWest logo was used prominently on the Interpal website in soliciting donations. Did you or the RM have Interpal remove this? Are the CBFM MLPU happy with the potential risks in continuing this relationship?

Ben

-----Original Message-----
From: COLE, Guy, CBFM Regulatory Risk
Sent: 06 May 2004 16:51
To: NORRIE, Ben, Group Risk Mgmt
Subject: RE: INTERPAL

Ben

The Relationship Manager is aware of the potential terrorism connections with this account and liased with Derek Brand during the account freeze. Although diligent in their interaction with the customer, the RM has no ability to filter or efficently monitor payments, I understand that this could be done in the Core Data Manager team in Manufacturing who control payment blocking and restrictions.

Regards

Guy

Guy Cole
CBFM Money Laundering Prevent Unit
The Royal Bank of Scotland
135 Bishopsgate, London, EC2M 3UR
T (020) 7375 5433
F (020) 7375 4641
<<mailto:Guy.Cole@rbos.com>>

-----Original Message-----
From: NORRIE, Ben, Group Risk Mgmt
Sent: 06 May 2004 15:55
To: COLE, Guy, CBFM Regulatory Risk
Subject: FW: INTERPAL

Guy,

Haven't heard back from you on the below?

-----Original Message-----
From: NORRIE, Ben, Group Risk Mgmt
Sent: 21 April 2004 17:05
To: COLE, Guy, CBFM Regulatory Risk; Derham, Bill (Cards Risk); Sludden, Tom
Cc: DAVIES, Rob, Group Risk Mgmt
Subject: INTERPAL

Gentlemen,

You may remember the matches we have previously reported to the Bank of England against INTERPAL and its various aka's (including Education Aid for Palestine, Palestinians Relief Development Fund, etc). There was an investigation by the Charities Commission and Special Branch in to potential links with Hamas, no action was taken against the charity. [redacted] Can I ask you to investigate whether any enhanced due diligence has been put in place over these accounts (not sure the above was communicated, therefore suspect not) and if not take steps to ensure that measures are put in place. I have some details of the accounts and cards should you require. Please contact me if any of the above is not clear.

Kind Regards,
Ben Norrie

Group Risk Management
Royal Bank of Scotland Group
Floor, 280 Bishopsgate
ndon EC2M 4RB
Tel: 00 44 (0) 20 7334 1460
Fax: 00 44 (0) 20 7375 4813
Email: ben.norrie@rbos.com

Recipients of principal payments made from the Interpal sterling account in the last six months, (the bold letters were the letters recorded on the system). All names have been searched for on the Internet and any untoward information is recorded below



HIGHLY CONFIDENTIAL

NW 016772



HIGHLY CONFIDENTIAL

NW 016773



HIGHLY CONFIDENTIAL

NW 016774

**EXHIBIT 127 TO DECLARATION OF VALERIE SCHUSTER**

**FILED UNDER SEAL**

## Unknown

**From:** Wyles, Graeme
**Sent:** Friday, December 17, 2004 3:37 AM
**To:** Dickinson, Alan (CB London); RODGER, Irvine, CBFM Enterprise Risk; Weir, Derek
**Cc:** LOVE, Kevin, CBFM; COLE, Guy, CBFM Enterprise Risk; Lewis, Jill
**Subject:** RE: Interpal November Review

And me

Graeme Wyles
Director Risk
Commercial Banking , UK
020 7672 0194
Mobile: 07887 898668
Pager 07693 266560
Depot 028

-----Original Message-----
From: Dickinson, Alan (CB London)
Sent: 16 December 2004 13:09
To: RODGER, Irvine, CBFM Enterprise Risk; Weir, Derek; Wyles, Graeme
Cc: LOVE, Kevin, CBFM; COLE, Guy, CBFM Enterprise Risk; Lewis, Jill
Subject: RE: Interpal November Review

Ok by me.

Alan

-----Original Message-----
From: RODGER, Irvine, CBFM Enterprise Risk
Sent: Thursday, December 16, 2004 1:06 PM
To: Dickinson, Alan (CB London); Weir, Derek; Wyles, Graeme
Cc: LOVE, Kevin, CBFM; COLE, Guy, CBFM Enterprise Risk; Lewis, Jill
Subject: FW: Interpal November Review

Dear All

Guy has completed his investigation into the payments from Interpal. He did a thorough job and searched a number of databases including

Financial sanctions and Terrorist Financing lists (UK and US)
Complicheck
World Check
Google

As you can see there were no direct marches with any entities on Sanctions & Terrorist lists. He did however uncover some, mainly unsubstantiated commentary on a number of recipients but none of these are sanctioned names. Please refer to Guy's email for detail.

I leave it to you to decide the appropriate course of action but I would recommend that we keep the account open and continue performing similar thorough reviews of account behaviour. One strike and they are out??

Please advise accordingly.

Regards

Irvine Rodger
CBFM MLPU
The Royal Bank of Scotland plc
135 Bishopsgate, London, EC2M 3UR (Depot 028)

EXHIBIT
39
6/8/11 SC
PENGAD 800-631-6989

Tel: (020) 7085 1082
Int: 361082
Fax: (020) 7085 4641
e: irvine.rodger@rbos.com <mailto:irvine.rodger@rbos.com>

-----Original Message-----
From: COLE, Guy, CBFM Enterprise Risk
Sent: 16 December 2004 11:43
To: RODGER, Irvine, CBFM Enterprise Risk
Subject: Interpal November Review

Irvine

I have just finished reviewing the payments for the last six months for Interpal. There were over 60 organisations receiving funds from Interpal, none of these organisations were found to be listed in the Bank of England or OFAC (US) sanctions. Additionally none of these organisations were found to be present in the external due diligence database Worldcheck.

As one might expect with charities operating in this region, speculation exists around some of the organisations being connected with terrorism, in particular Hamas. The most significant of these are the following:

Al-Mujamma Al-Islami
Created in 1978 by the spiritual leader of Hamas Sheikh Ahmed Yassin, this is the largest charity operating in the Gaza Strip and is allegedly affiliated with the Hamas Civilian wing, Dawwa. Annual budget of 50 million dollars, Al-Mujamma al-Islami is reported to provided assistance to 20,000 orphans, 50,000 families, 10,000 university students, 20,000 school children. It's bank accounts were frozen by the Palestinian Authorities in August 2003, although the funds were released earlier this year following a Supreme Court in Gaza ruling.

Interpal published details of their funding to this organisation in 2002, and consequently the relationship should have been reviewed by the Charities Commission and Law enforcement last year. No action was been taken.

All of the below organisations, which have received Interpal funds in the last six months, were cited as Hamas organisations in the indictment of the US Islamic charity The Holy Land Foundation, which was prosecuted in the US for funding terrorism. The Holy Land Foundation is subject to sanctions by the Bank of England, EU and OFAC (US), although none of the below organisations are subject to sanctions themselves. -
Al-Salah Association (Bank accounts were also frozen by the Palestinian Authorities in August 2003, although the funds were released earlier this year following a Supreme Court in Gaza ruling. Ramallah Office closed down in the summer 2004 by Israel forces for funding terror activities)
[redacted]
Jenin Zakat Committee
Nablus Zakat Committee
[redacted] (Funds held in this organisations accounts at Arab Bank, were confiscated by Israeli forces February 2004)
Ramallah Zakat Committee (Funds held in this organisations accounts at Arab Bank, were confiscated by Israeli forces February 2004)
Tulkarem Zakat Committee (Funds held in this organisations accounts at Arab Bank, were confiscated by Israeli forces February 2004)

If you require further information or investigation, please advise.

Regards

Guy

Guy Cole
CBFM Money Laundering Prevent Unit
The Royal Bank of Scotland
135 Bishopsgate, London, EC2M 3UR
Tel. (020) 7085 5433
Internal 76572 365433
Fax. (020) 7085 4641

<<mailto:Guy.Cole@rbos.com>>
CBFM MLPU Website: <http://cbfmweb.fm.rbsgrp.net/cbfmmlpu/> (Answers to many frequently asked questions can be found on this website)

*************************************************************************************************************************

The Royal Bank of Scotland plc. Registered in Scotland No 90312. Registered Office: 36 St Andrew Square, Edinburgh EH2 2YB.
Authorised and regulated by the Financial Services Authority

This e-mail message is confidential and for use by the addressee only. If the message is received by anyone other than the addressee, please return the message to the sender by replying to it and then delete the message from your computer. Internet e-mails are not necessarily secure. The Royal Bank of Scotland plc does not accept responsibility for changes made to this message after it was sent.

Whilst all reasonable care has been taken to avoid the transmission of viruses, it is the responsibility of the recipient to ensure that the onward transmission, opening or use of this message and any attachments will not adversely affect its systems or data. No responsibility is accepted by The Royal Bank of Scotland plc in this regard and the recipient should carry out such virus and other checks as it considers appropriate.

Visit our websites at:
http://www.rbs.co.uk/CBFM
http://www.rbsmarkets.com

********************************************************************************
*************************************************************************************************************************

The Royal Bank of Scotland plc. Registered in Scotland No 90312. Registered Office: 36 St Andrew Square, Edinburgh EH2 2YB.
Authorised and regulated by the Financial Services Authority

This e-mail message is confidential and for use by the addressee only. If the message is received by anyone other than the addressee, please return the message to the sender by replying to it and then delete the message from your computer. Internet e-mails are not necessarily secure. The Royal Bank of Scotland plc does not accept responsibility for changes made to this message after it was sent.

Whilst all reasonable care has been taken to avoid the transmission of viruses, it is the responsibility of the recipient to ensure that the onward transmission, opening or use of this message and any attachments will not adversely affect its systems or data. No responsibility is accepted by The Royal Bank of Scotland plc in this regard and the recipient should carry out such virus and other checks as it considers appropriate.

Visit our websites at:
http://www.rbs.co.uk/CBFM
http://www.rbsmarkets.com

********************************************************************************

**EXHIBIT 128 TO DECLARATION OF VALERIE SCHUSTER**

**FILED UNDER SEAL**

## Unknown

**From:** COLE, Guy, CBFM Enterprise Risk
**Sent:** Wednesday, July 06, 2005 10:41 AM
**To:** LOVE, Kevin, CBFM
**Cc:** RODGER. Irvine, CBFM Enterprise Risk: Wyles, Graeme: FOSTER. Stephen James. Group Risk Mgmt
**Subject:** INTERPAL Account Activity Review

**Attachments:** Interpal memo july 2005.doc

Kevin

Please find attached a copy of my review of the activity on the accounts of INTERPAL, the UK charity that is subject to OFAC sanctions

Interpal memo july 2005.doc (1...

In light of the findings of May 2005 review, the CBFM MLPU has decided to increase monitoring to quarterly reviews, but recommends that the relationship is still maintained.

Regards

Guy

**Guy Cole**
**CBFM Money Laundering Prevent Unit**
**135 Bishopsgate, London, EC2M 3UR**
**Tel. (020) 7085 5433**
**Internal 76572 365433**
**Fax. (020) 7085 4641**
**Email: Guy.Cole@rbos.com**

# Memo

**RBS**
*The Royal Bank of Scotland*

**Corporate Banking & Financial Markets**
135 Bishopsgate
London EC2M 3UR

Tel. 020 7085 5433
Internal: 365433
Email: guy.cole@rbos.com

To. Kevin R. Love
Global Head of CBFM Enterprise Risk

From. Guy Cole
Manager
CBFM MLPU

Date: 6 July 2005

Subject. **Semi annual review of INTERPAL account activity**

The CBFM MLPU has completed the semi annual review of the activity on the INTERPAL accounts In light of the findings of May 2005 review detailed below, the CBFM MLPU has decided to increase monitoring to quarterly reviews, but recommends that the relationship is still maintained

**Purpose of the account review**

In September 2003, the US Office of Foreign Asset Control ('OFAC') designated the charity 'INTERPAL' a terrorist organisation due to links with HAMAS. INTERPAL is a British registered charity. and CBFM NatWest customer. INTERPAL's accounts were immediately frozen, and the Charities Commission and Special Branch investigated the US allegations. The investigation found that there was insufficient evidence to prove a link to terrorism, so no UK action was taken against INTERPAL and it operates freely in the UK.

Following the outcome of the UK authorities' investigation, CBFM Money Laundering Prevention Unit ('MLPU') undertook to review INTERPAL accounts on a semi annual basis to ensure that none of its funds are being sent to terrorist groups This memo details the findings of the review taken in May 2005.

**Review of the account activity for the six months to May 2005**

In the six months to May 2005, none of the INTERPAL payments reviewed were, at the time of the payment, made to a Bank of England or OFAC designated terrorist organisation.

However, a recipient who received a payment from INTERPAL in [redacted] has since been designated by the Bank of England as an organisation suspected of supporting terrorism As this payment was made by INTERPAL prior to the terrorist designation of the recipient in June 2005, there has been no breach of the Terrorism (United Nations Measures) Order 2001.

The recipient of the INTERPAL payment was a charity called [redacted] this charity's name and address match against the Bank of England notice for the entity [redacted]

A Suspicious Activity Report has been submitted by CBFM MLPU to Group Financial Crime reporting the above transaction and some additional entities (see endnote[1]). The additional entities reported are not designated as terrorist organisations by the Bank of England or OFAC, and information on the funding to these organisations is publicly available on the INTERPAL website

No allegations were found on any other recipients of INTERPAL payments All payment recipients were checked against Complicheck, Worldcheck and subject to Internet research.

**EXHIBIT 129 TO DECLARATION OF VALERIE SCHUSTER**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------x
TZVI WEISS, et al.,
Plaintiffs,
-against-
NATIONAL WESTMINSTER BANK, PLC,
Defendant.
----------------------------------------x
NATAN APPLEBAUM, et al.,
Plaintiffs,
-against-
NATIONAL WESTMINSTER BANK, PLC,
Defendant.
----------------------------------------x

* HIGHLY CONFIDENTIAL *

VIDEOTAPED DEPOSITION of BELINDA LANE, taken before Cheryll Kerr, a Notary Public and a Shorthand Reporter, held at the offices of Cleary, Gottlieb, Steen & Hamilton, LLP, located at 55 Basinghall Street, London, England on Tuesday, the 24th day of June, 2008, at 9:38 a.m.

APPEARANCES:

KOHN, SWIFT & GRAF, P.C.
Attorneys for Plaintiff Tzvi Weiss
One South Broad Street, Suite 2100
Philadelphia, Pennsylvania 19107-3304
BY: STEPHEN H. SCHWARTZ, ESQ.

SAYLES WERBNER, P.C.
Attorneys for Plaintiff NATAN APPLEBAUM
4400 Renaissance Tower
1201 Elm Street
Dallas, Texas 75270
BY: MARK S. WERBNER, ESQ.

CLEARY GOTTLIEB STEEN & HAMILTON, LLP
Attorneys for Defendant National Westminster Bank, PLC
One Liberty Plaza
New York, New York 10006-1470
BY: LAWRENCE B. FRIEDMAN, ESQ.
PATRICK SHELDON, ESQ.

GLANCY BINKOW & GOLDBERG, LLP
Attorneys for Plaintiff Tzvi Weiss
1430 Broadway, Suite 1603
New York, New York 10018
BY: ANDREW FRIEDMAN, ESQ. (OF COUNSEL)

Also Present: Jackie Sheftali, NatWest; Simon Rutson, Videographer

***** ***** *****

EXHIBIT
31
6/8/11 SC
PENGAD 800-631-6989

| EXAMINATION BY: | PAGE |
|---|---|
| Mr. Werbner | 7 |

EXHIBITS

| LANE FOR ID | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Letter dated January 20 2000, Bates No. NW 13431 | 6 |
| Exhibit 2 | Credit assessment, Bates Nos. NW 13316 - NW 13317 | 6 |
| Exhibit 3 | Meeting synopsis, March 20, 2002, Bates No. NW 13637 | 6 |
| Exhibit 4 | Transmission note, Bates No. 13197 | 6 |
| Exhibit 5 | Memorandum dated July 9, 2002, Bates No. NW 13333 | 6 |
| Exhibit 6 | Memorandum dated July 15, 2002. Bates No. NW 13332 | 6 |
| Exhibit 7 | Memorandum dated August 1, 2002, Bates No. NW 13347 | 6 |
| Exhibit 8 | Fax dated August 6, 2002, Bates Nos. NW 13347- 13355 | 6 |
| Exhibit 9 | Document bearing Bates No. 13346 | 6 |
| Exhibit 10 | Memorandum bearing fax date October 10, 2005, Bates No. NW 13636 | 6 |
| Exhibit 11 | Meeting synopsis, January 27, 2003, Bates No. NW 13639 | 6 |

(Continued)

EXHIBITS (Cont'd)

| LANE FOR ID | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 12 | Document bearing Bates No. NW 13357 | 6 |
| Exhibit 13 | Document bearing Bates Nos. NW 12965-12966 | 6 |
| Exhibit 14 | Letter dated September 24, 2003, Bates No. NW 17132 | 6 |
| Exhibit 15 | (No document was marked) | 6 |
| Exhibit 16 | Letter dated June 20, 2001, Bates No. NW 13415 | 6 |
| Exhibit 17 | Document bearing Bates No. NW 10642 | 6 |

REQUESTS FOR PRODUCTION

| DESCRIPTION | PAGE |
|---|---|
| Bank Line Payment Manager applications | 143 |

governmental criminal authorities a suspicion of money laundering concerning Interpal?

A. It doesn't say that. Well, it's a money laundering suspicion, yes, and it was reported to the authorities. That's what I knew, yes.

Q. And that was very serious?

A. I don't know.

Q. Well, I am asking you what was in your mind. I am not asking you --

A. Well, money laundering is very serious, yes, I agree with you, but -- but it was reported, so I don't know -- you know, whether it was -- you know, until somebody tells me that something untoward has actually happened, then --

Q. Business as usual?

A. Yes.

MR. L. FRIEDMAN: Object to the form.

BY MR. WERBNER:

Q. All right. Now, let me ask you this, ma'am:

What did you do, after you got Lane Exhibit 5, to find out if there was something untoward concerning Interpal for whom you were the relationship manager?

A. Well, I wasn't asked to do that. I was

asked to continue to operate the account with normal banking practice and to provide a report, so I most certainly wouldn't have discussed it with the customer, and I would have done exactly what he'd asked me to do in this memo (indicating).

Q. As of July of 2002, hadn't you been trained about something called anti-tipping? Not to tip off customers?

A. Yes.

Q. Tell me what your knowledge was about that as of 2002.

A. Tipping off -- an explanation of tipping off and what we were supposed to do in that respect is contained within the money laundering training that we did. I believe the training was -- was annually. It may have been more frequently, I can't recall, but you are never to tip off a customer if the bank has a suspicion.

Q. Why is that?

A. Because it might interfere with investigations.

Q. Let me hand you Lane Exhibit 6, which is one page with the Bates number NW 13332 dated 15 July, 2002.

Tell me after you've had a chance to review

that, please.

Are you ready?

A. Yes.

Q. Can you verify that Lane Exhibit 6 is a true and correct copy of a memo that you sent while at NatWest to the group investigations and fraud concerning Interpal?

A. Yes.

Q. And is Lane Exhibit 6 the detailed report you were directed to make in Lane Exhibit No. 5?

A. Yes.

MR. L. FRIEDMAN: Object to the form.

BY MR. WERBNER:

Q. And this little corner of the page (indicating) is the so-called detail report that you made in response to the directive from the group investigation and fraud unit?

MR. L. FRIEDMAN: Object to the form.

THE WITNESS: You say "little report," but I attached an interview note dated 20th of March.

BY MR. WERBNER:

Q. All right, and would that be exhibit number what?

A. Three.

Q. Thank you.

So Exhibit 3 was attached to Lane Exhibit 6?

A. Yes.

Q. Was there anything else attached? Or part of your memo Lane Exhibit 6?

A. I don't think so. Oh, yes (indicating). The mandate. The bank mandate.

Q. What is the bank mandate?

A. That details who the signatories are on the account.

Q. All right. Would there have been anything else that was part of your response when you sent it as Lane Exhibit 6?

A. I don't think so.

Q. Did you ever specifically do a KYC on Interpal while you were their relationship manager from late 1999 through the end of September 2004?

A. My team would have.

MR. L. FRIEDMAN: Objection to form.

BY MR. WERBNER:

Q. Did you?

A. I can't recall if I specifically did it.

Q. So you cannot under oath honestly say that you did a KYC on that account during that period?

**EXHIBIT 130 TO DECLARATION OF VALERIE SCHUSTER**

**FILED UNDER SEAL**

**Connor, Damien (Group Risk Mgmt)**

**From:** Miller, Fiona (Op Risk)
**Sent:** 27 August 2003 15:38
**To:** Neil, Dedrei (Group Risk Mgmt)
**Subject:** FW: Sanctions & Terrorist Financing: New RBS Group Search Request - GRM TER 26_08_03

Dedrei,

Just stating the obvious here - there have been a number of e-mails circulated today regarding the Palestinians Relief & Development Fund. I notice there is a similar named entity listed on the attached.

Whilst the account held is not an exact name match (Palestine on the list rather than Palestinians) we will be reporting this as a 'c+' match.

Regards.

Fiona Miller
Manufacturing Risk Management
The Broadstone
PO Box 17136
50, South Gyle Crescent
Edinburgh EH12 9UZ

0131 523 3344

http://www.manufacturing.rbs.co.uk/ManuOpsRisk/

-----Original Message-----
**From:** Connor, Damien (Group Risk Mgmt)
**Sent:** 26 August 2003 17:10
**To:** Brener, Alan (Retail Comp); Richardson, Lesley; Grierson, John; Bishop, Stephen, Coutts; 'robert.irvine@ulsterbank.com'; 'Ken.Turbitt@citizensbank.com'; 'peter.atkinson@directline com'; McKay, Dave (Ops Risk); RODGER, Irvine, CBFM Compliance; Webb, Richard (RIS Compliance); Webb, Richard (RIS Compliance); Connor, Damien (Group Risk Mgmt)
**Cc:** Wilson, Martin, (Group Chief Executive Ulster Bank); 'annette.court@directline.com'; 'duncan.mackechnie@directline.com'; Higgins, Benny; Stewart, Dunlop; Lestiuk, Lydia; Fisher, Mark (Chief Exec. Manufacturing); 'ray.entwistle@adambank.com'; Pell, Gordon; McCarthy, Letitia (Group Risk Mgmt); McKenzie, Arlene (Group Risk Mgmt); Middlemist, Graham (Group Risk Mgmt); Williamson, Finlay F; Beattie, Charles (IFS); Richardson, Peter (Op Risk); Williams, Tony (HR); Roden, Neil; Roberts, Jonathon (Retail Credit); Pyrke, Nick, Trantum, Neil; Feachen, David; RAY, Gary, Lombard; CLEMENT, Terry, Lombard; BOWEN, Neil, Lombard; Brunner, Hanspeter, Coutts; 'Marion Bolster@citizensbank com'; 'Glenna Scaramozza@CITIZENSBANK.com'; 'carole.lyons@directline.com'; O'Hear, Tony, 'Greg.Sargent@CITIZENSBANK.com'; 'Christine.Kelly-Hill@CITIZENSBANK.com'; Shields, Christine, 'Jackie.Henderson@directline.com'; Hoseason, Michael (Group Fraud), LEWIS, Derek, Lombard; Craft, Peter, Harrison, Keith, Coutts; Mackie, Richard; Sludden, Tom; Gayle, Sonia (Group Risk Mgmt); FOSTER, Stephen James, Group Risk Mgmt; Brand, Derek; Sanders, Stephen (Group Risk Mgmt); Gillespie, David; Grant, Michael (Group Risk Mgmt); SIMS, Claire, CBFM Compliance; Smith, Stephen, Coutts, 'Alison.Rayner@directline.com', Middleton, Iain, Gilbert, Colin, COLE, Guy, CBFM Compliance; CARPENTER, Ben, GCM; LEVINE, Jay, GCM; BINKS, Martin, MDO-NWS, CROWE, Brian, FM, GOLDFARB, Sheldon, GCM; FOGLE, Edward, GCM, BAYLISS, Mark, (RBS) COMP; HEMSLEY, Julie, (RBS) COMP; HOLT, Amanda, Group Risk Mgmt (nee Turner), CAMERON, John A N (CBFM), HIGGINBOTTOM, Simon, CBFM Compliance
**Subject:** Sanctions & Terrorist Financing New RBS Group Search Request - GRM TER 26_08_03

Please find attached to this email:

**GRM TER 26_08_03 Search Return.xls**

This document contains further information against which all Group business areas must search their records.

In respect of this document, please ensure that the necessary due diligence is completed and the **result** (nil or positive return) is returned to Group Risk Management (fao· Stephen Foster, Head of Anti-Money Laundering Compliance) **by 12 September 2003.**

Please take note that we have simplified the sign-off process. Certification by the Designated Senior Management is now only required when you do the quarterly search. We will ask you to certify at that time that you have undertaken both the routine quarterly search and any other search you have been asked to perform in the period.

This search list will be covered under the Q3 August 2003 certification.

Once again, thank you for your continued patience and assistance in this matter.

**NOTE - Please note that the pre-populated Excel file ('GRM TER 26_08_03 Search Return') is suitable for use in all future returns under GRM TER 26_08_03.**

66_GRM TER 26_08_03 Search Ret.    GRM TER 26_08_03 Memorandum do



Confidential

RBSG SANCTIONS & TERRORIST FINANCING

| Title: | Terrorism, Office of Foreign Assets Control |
|---|---|
| GRM search ref: | GRM TER 26_08_03 |
| Division/Business unit: | *Manufacturing* |

Search item:

| Source | Last Name/ Entity Name | First Name | Other names | Place of Birth |
|---|---|---|---|---|
| Office of Foreign Assets Control (SDGT) | INTERPAL | | | |
| Office of Foreign Assets Control (SDGT) | AL-SANDUQ AL-FILISTINI LIL-IGHATHA | | | |
| Office of Foreign Assets Control (SDGT) | AL-SANDUQ AL-FILISTINI LIL-IGHATHA WA AL-TANMIYA | | | |
| Office of Foreign Assets Control (SDGT) | PALESTINE DEVELOPMENT AND RELIEF FUND | | | |
| Office of Foreign Assets Control (SDGT) | PALESTINE RELIEF AND DEVELOPMENT FUND | | | |
| Office of Foreign Assets Control (SDGT) | PALESTINE RELIEF FUND | | | |
| Office of Foreign Assets Control (SDGT) | PALESTINIAN AID AND SUPPORT FUND | | | |
| Office of Foreign Assets Control (SDGT) | PALESTINIAN RELIEF AND DEVELOPMENT FUND | | | |
| Office of Foreign Assets Control (SDGT) | PALESTINIAN RELIEF FUND | | | |
| Office of Foreign Assets Control (SDGT) | PALESTINE AND LEBANON RELIEF FUND | | | |

Confidential

| Date of Birth | Address | Individual? |
|---|---|---|
| | P.O Box 3333, London, NW6 1RW, England | N |
| | P O Box 3333, London, NW6 1RW, England | N |
| | P.O Box 3333, London, NW6 1RW, England | N |
| | P.O Box 3333, London, NW6 1RW, England | N |
| | P.O Box 3333, London, NW6 1RW, England | N |
| | P.O Box 3333, London, NW6 1RW, England | N |
| | P O Box 3333, London, NW6 1RW, England | N |
| | P.O Box 3333, London, NW6 1RW, England | N |
| | P.O Box 3333, London, NW6 1RW, England | N |
| | P.O Box 3333, London, NW6 1RW, England | N |



Confidential

| Other information |
|---|
| a k.a. AL-SANDUQ AL-FILISTINI LIL-IGHATHA; a.k.a AL-SANDUQ AL-FILISTINI LIL-IGHATHA WA AL-TANMIYA: a k.a. PALESTINE DEVELOPMENT AND RELIEF FUND: a k.a. PALESTINE RELIEF AND DEVELOPMENT FUND. a.k.a. PALESTINE RELIEF FUND, a k a. PALESTINIAN AID AND SUPPORT FUND: a.k.a. PALESTINIAN RELIEF AND DEVELOPMENT FUND; a.k.a PALESTINIAN RELIEF FUND a k.a. PALESTINE AND LEBANON RELIEF FUND; a k.a. PRDF; a k.a. RELIEF AND DEVELOPMENT FUND FOR PALESTINE; a.k a. WELFARE AND DEVELOPMENT FUND FOR PALESTINE; a.k.a. |
| a.k.a. for INTERPAL; Other a.k.as include a k.a. AL-SANDUQ AL-FILISTINI LIL-IGHATHA WA AL-TANMIYA: a.k.a. PALESTINE DEVELOPMENT AND RELIEF FUND: a.k.a. PALESTINE RELIEF AND DEVELOPMENT FUND. a.k.a. PALESTINE RELIEF FUND. a.k.a. PALESTINIAN AID AND SUPPORT FUND: a.k.a. PALESTINIAN RELIEF AND DEVELOPMENT FUND: a.k.a PALESTINIAN RELIEF FUND a k.a PALESTINE AND LEBANON RELIEF FUND, a.k.a. PRDF; a k.a. RELIEF AND DEVELOPMENT FUND FOR PALESTINE; a k a. WELFARE AND DEVELOPMENT FUND FOR PALESTINE; a.k.a. |
| a k.a for INTERPAL; Other a.k as include a k.a AL-SANDUQ AL-FILISTINI LIL-IGHATHA; a.k a. AL-SANDUQ AL-FILISTINI LIL-IGHATHA WA AL-TANMIYA; a.k.a PALESTINE DEVELOPMENT AND RELIE FUND: a k.a PALESTINE RELIEF AND DEVELOPMENT FUND. a.k.a PALESTINE RELIEF FUND: a k.a PALESTINIAN AID AND SUPPORT FUND. a k a. PALESTINIAN RELIEF AND DEVELOPMENT FUND; a.k a. PALESTINIAN RELIEF FUND; a.k a. PALESTINE AND LEBANON RELIEF FUND: a.k.a. PRDF; a.k.a. RELIEF AND DEVELOPMENT FUND FOR PALESTINE, a k a. WELFARE AND |
| a k a for INTERPAL; Other a k as include a k.a AL-SANDUQ AL-FILISTINI LIL-IGHATHA; a.k a. AL-SANDUQ AL-FILISTINI LIL-IGHATHA WA AL-TANMIYA. a k.a PALESTINE DEVELOPMENT AND RELIE FUND: a k.a. PALESTINE RELIEF AND DEVELOPMENT FUND; a.k.a. PALESTINE RELIEF FUND; a.k.a. PALESTINIAN AID AND SUPPORT FUND: a.k.a. PALESTINIAN RELIEF AND DEVELOPMENT FUND, a.k.a. PALESTINIAN RELIEF FUND; a.k.a. PALESTINE AND LEBANON RELIEF FUND; a.k.a. PRDF; a.k.a. RELIEF AND DEVELOPMENT FUND FOR PALESTINE; a.k.a. WELFARE AND |
| a.k.a. for INTERPAL: Other a k as include a k.a AL-SANDUQ AL-FILISTINI LIL-IGHATHA; a.k a. AL-SANDUQ AL-FILISTINI LIL-IGHATHA WA AL-TANMIYA; a k a PALESTINE DEVELOPMENT AND RELIE FUND: a.k.a. PALESTINE RELIEF AND DEVELOPMENT FUND; a.k.a. PALESTINE RELIEF FUND: a.k.a. PALESTINIAN AID AND SUPPORT FUND: a.k.a. PALESTINIAN RELIEF AND DEVELOPMENT FUND; a.k.a. PALESTINIAN RELIEF FUND; a.k.a. PALESTINE AND LEBANON RELIEF FUND; a.k.a. PRDF, a.k.a. RELIEF AND DEVELOPMENT FUND FOR PALESTINE; a.k.a. WELFARE AND |
| a k.a for INTERPAL: Other a k.as include a.k.a AL-SANDUQ AL-FILISTINI LIL-IGHATHA: a.k.a. AL-SANDUQ AL-FILISTINI LIL-IGHATHA WA AL-TANMIYA. a.k.a PALESTINE DEVELOPMENT AND RELIE FUND: a k.a. PALESTINE RELIEF AND DEVELOPMENT FUND: a.k.a. PALESTINE RELIEF FUND. a.k.a. PALESTINIAN AID AND SUPPORT FUND. a.k.a. PALESTINIAN RELIEF AND DEVELOPMENT FUND; a k.a. PALESTINIAN RELIEF FUND, a.k.a. PALESTINE AND LEBANON RELIEF FUND. a.k.a. PRDF; a k a. RELIEF AND DEVELOPMENT FUND FOR PALESTINE; a k a. WELFARE AND |
| a k.a for INTERPAL. Other a.k.as include a.k.a AL-SANDUQ AL-FILISTINI LIL-IGHATHA: a.k.a. AL-SANDUQ AL-FILISTINI LIL-IGHATHA WA AL-TANMIYA; a.k.a PALESTINE DEVELOPMENT AND RELIE FUND: a k.a. PALESTINE RELIEF AND DEVELOPMENT FUND: a k.a PALESTINE RELIEF FUND: a.k.a. PALESTINIAN AID AND SUPPORT FUND. a.k.a. PALESTINIAN RELIEF AND DEVELOPMENT FUND. a.k.a. PALESTINIAN RELIEF FUND; a.k.a PALESTINE AND LEBANON RELIEF FUND. a.k.a. PRDF, a k a. RELIEF AND DEVELOPMENT FUND FOR PALESTINE, a.k a. WELFARE AND |
| a.k.a for INTERPAL, Other a k.as include a.k.a AL-SANDUQ AL-FILISTINI LIL-IGHATHA: a.k.a. AL-SANDUQ AL-FILISTINI LIL-IGHATHA WA AL-TANMIYA, a.k.a PALESTINE DEVELOPMENT AND RELIE FUND. a k.a. PALESTINE RELIEF AND DEVELOPMENT FUND: a.k.a. PALESTINE RELIEF FUND, a.k.a. PALESTINIAN AID AND SUPPORT FUND. a.k.a. PALESTINIAN RELIEF AND DEVELOPMENT FUND: a.k.a. PALESTINIAN RELIEF FUND; a.k.a. PALESTINE AND LEBANON RELIEF FUND; a.k.a. PRDF, a.k.a. RELIEF AND DEVELOPMENT FUND FOR PALESTINE, a.k a WELFARE AND |
| a.k.a for INTERPAL; Other a k.as include a.k.a AL-SANDUQ AL-FILISTINI LIL-IGHATHA: a.k.a. AL-SANDUQ AL-FILISTINI LIL-IGHATHA WA AL-TANMIYA, a.k.a. PALESTINE DEVELOPMENT AND RELIE FUND: a.k.a PALESTINE RELIEF AND DEVELOPMENT FUND: a.k.a PALESTINE RELIEF FUND: a.k.a PALESTINIAN AID AND SUPPORT FUND, a k a. PALESTINIAN RELIEF AND DEVELOPMENT FUND, a k a. PALESTINIAN RELIEF FUND; a.k.a PALESTINE AND LEBANON RELIEF FUND, a k.a. PRDF; a.k.a. RELIEF AND DEVELOPMENT FUND FOR PALESTINE; a.k.a. WELFARE AND |
| a k a for INTERPAL: Other a k as include a k.a AL-SANDUQ AL-FILISTINI LIL-IGHATHA. a.k a. AL-SANDUQ AL-FILISTINI LIL-IGHATHA WA AL-TANMIYA. a k.a. PALESTINE DEVELOPMENT AND RELIE FUND. a.k a PALESTINE RELIEF AND DEVELOPMENT FUND: a k.a PALESTINE RELIEF FUND: a.k.a PALESTINIAN AID AND SUPPORT FUND, a k.a. PALESTINIAN RELIEF AND DEVELOPMENT FUND; a k a PALESTINIAN RELIEF FUND: a.k.a. PALESTINE AND LEBANON RELIEF FUND, a.k.a. PRDF. a.k.a. RELIEF AND DEVELOPMENT FUND FOR PALESTINE; a.k.a. WELFARE AND |

Confidential

| Search Return(s): | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Last name/ Entity name | First name | Other names | Place of Birth | Date of Birth | Address | Other information | Business sub-area | CRN / CIS | Account details | Bank Sort Code | Account activities |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |

| | | | | |
|---|---|---|---|---|
| Office of Foreign Assets Control (SDGT) | PRDF | | | |
| Office of Foreign Assets Control (SDGT) | RELIEF AND DEVELOPMENT FUND FOR PALESTINE | | | |
| Office of Foreign Assets Control (SDGT) | WELFARE AND DEVELOPMENT FUND FOR PALESTINE | | | |
| Office of Foreign Assets Control (SDGT) | WELFARE AND DEVELOPMENT FUND OF PALESTINE | | | |

*Redacted - Non-Responsive*



Confidential

| | | |
|---|---|---|
| | P.O Box 3333, London, NW6 1RW, England | N |
| | P.O Box 3333, London, NW6 1RW, England | N |
| | P.O Box 3333, London, NW6 1RW, England | N |
| | P O Box 3333, London, NW6 1RW, England | N |

*Redacted - Non-Responsive*

Confidential

| |
|---|
| a k.a. for INTERPAL. Other a.k.as include a.k.a AL-SANDUQ AL-FILISTINI LIL-IGHATHA; a k.a AL-SANDUQ AL-FILISTINI LIL-IGHATHA WA AL-TANMIYA; a.k.a PALESTINE DEVELOPMENT AND RELIE FUND; a k.a PALESTINE RELIEF AND DEVELOPMENT FUND; a.k.a PALESTINE RELIEF FUND; a.k.a. PALESTINIAN AID AND SUPPORT FUND; a.k.a. PALESTINIAN RELIEF AND DEVELOPMENT FUND; a k.a PALESTINIAN RELIEF FUND; a k.a. PALESTINE AND LEBANON RELIEF FUND; a.k.a. PRDF. a.k.a. RELIEF AND DEVELOPMENT FUND FOR PALESTINE, a.k a. WELFARE AND |
| a k.a. for INTERPAL. Other a.k.as include a.k.a AL-SANDUQ AL-FILISTINI LIL-IGHATHA; a.k.a. AL-SANDUQ AL-FILISTINI LIL-IGHATHA WA AL-TANMIYA, a.k.a. PALESTINE DEVELOPMENT AND RELIE FUND; a k.a PALESTINE RELIEF AND DEVELOPMENT FUND; a.k.a. PALESTINE RELIEF FUND; a k.a PALESTINIAN AID AND SUPPORT FUND. a.k.a PALESTINIAN RELIEF AND DEVELOPMENT FUND; a.k.a PALESTINIAN RELIEF FUND; a.k.a. PALESTINE AND LEBANON RELIEF FUND; a.k.a. PRDF; a.k.a. RELIEF AND DEVELOPMENT FUND FOR PALESTINE; a.k a. WELFARE AND |
| a.k.a. for INTERPAL, Other a.k.as include a k.a AL-SANDUQ AL-FILISTINI LIL-IGHATHA; a.k a. AL-SANDUQ AL-FILISTINI LIL-IGHATHA WA AL-TANMIYA. a.k.a. PALESTINE DEVELOPMENT AND RELIE FUND; a k.a. PALESTINE RELIEF AND DEVELOPMENT FUND. a.k.a. PALESTINE RELIEF FUND. a.k.a PALESTINIAN AID AND SUPPORT FUND; a k.a. PALESTINIAN RELIEF AND DEVELOPMENT FUND; a k.a PALESTINIAN RELIEF FUND; a.k.a PALESTINE AND LEBANON RELIEF FUND; a.k.a. PRDF, a.k a. RELIEF AND DEVELOPMENT FUND FOR PALESTINE, a k a. WELFARE AND |
| a k.a for INTERPAL; Other a k.as include a k.a AL-SANDUQ AL-FILISTINI LIL-IGHATHA; a.k.a AL-SANDUQ AL-FILISTINI LIL-IGHATHA WA AL-TANMIYA; a k.a. PALESTINE DEVELOPMENT AND RELIE FUND; a k.a PALESTINE RELIEF AND DEVELOPMENT FUND. a.k.a. PALESTINE RELIEF FUND. a k.a PALESTINIAN AID AND SUPPORT FUND, a k.a PALESTINIAN RELIEF AND DEVELOPMENT FUND; a k.a. PALESTINIAN RELIEF FUND, a.k.a PALESTINE AND LEBANON RELIEF FUND. a k.a PRDF; a.k.a RELIEF AND DEVELOPMENT FUND FOR PALESTINE; a k.a. WELFARE AND |

*Redacted - Non-Responsive*

Confidential

*Redacted - Non-Responsive*

Page 8 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014060

Confidential

*Redacted - Non-Responsive*

Page 9 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014061

Confidential

*Redacted - Non-Responsive*

Page 10 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014062

Confidential

*Redacted - Non-Responsive*

Page 11 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014063

Confidential

*Redacted - Non-Responsive*

Page 12 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014064

Confidential

*Redacted - Non-Responsive*

Page 13 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014065

Confidential

*Redacted - Non-Responsive*

Page 14 of 38

10/26/2001

HIGHLY CONFIDENTIAL

NW 014066

Confidential

*Redacted - Non-Responsive*

Page 15 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014067

Confidential

*Redacted - Non-Responsive*

Page 16 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014068

Confidential

*Redacted - Non-Responsive*

Page 17 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014069

Confidential

*Redacted - Non-Responsive*

Page 18 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014070

Confidential

*Redacted - Non-Responsive*

Page 19 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014071

Confidential

*Redacted - Non-Responsive*

Page 20 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014072

Confidential

*Redacted - Non-Responsive*

Page 21 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014073

Confidential

*Redacted - Non-Responsive*

Page 22 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014074

Confidential

*Redacted - Non-Responsive*

Page 23 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014075

Confidential

*Redacted - Non-Responsive*

Page 24 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014076

Confidential

*Redacted - Non-Responsive*

Page 25 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014077

Confidential

*Redacted - Non-Responsive*

Page 26 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014078

Confidential

*Redacted - Non-Responsive*

Page 27 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014079

Confidential

*Redacted - Non-Responsive*

Page 28 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014080

Confidential

Page 29 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014081

Confidential

Page 30 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014082

Confidential

Page 31 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014083



Confidential

Page 32 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014084

Confidential

Page 33 of 38

10/26/2001

HIGHLY CONFIDENTIAL

NW 014085

Confidential

Page 34 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014086

Confidential

Page 35 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014087



Confidential

Page 36 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014088

To: See Annexe A

From. Stephen Foster
Head of Anti-Money Laundering Compliance
Group Risk Management

Date: 26 August 2003

**GRM TER 26_08_03**

---

**SUSPECTED TERRORISTS & TERRORIST FINANCING**

Group Risk Management has recently received further information relating to category 2 suspicious persons (i.e. persons who are suspected of terrorism or terrorist financing as designated by the Bank of England and the Office of Foreign Assets Control, relating to the categories SDGT – Specially Designated Global Terrorists. SDT – Specially Designated Terrorists and FTO – Foreign Terrorist Organisations).

I attach to this memorandum a document **(ref: GRM TER 26_08_03 Search Return)** containing the further information against which all Group business areas must search their records. Please note the following important points:

1. The reference **GRM TER 26_08_03** MUST be quoted in ALL future communications with Group Risk Management relating to the document.

2. For the information provided in the document, due diligence must have been completed, and the results (whether positive or negative) returned by close of business on **12 September 2003**.

3. Designated senior management (Annexe B) will be requested to certify to the Head of Anti-Money Laundering Compliance, on a **quarterly** basis. that appropriate due diligence has been undertaken and that *appropriate action* (see item 4 below) has been taken. Quarterly certification will fall within the same quarter periods designated for consolidated searches, and will cover all lists issued since the previous certification. This search list will be covered under the Q3 August 2003 certification.

4. For these purposes *appropriate action* is defined as:
   - Searching all records (i.e. manual or electronic), in accordance with the Sanctions and Terrorist Financing Group Policy and Search Procedures Guidance. held by or on behalf of any Group business area which identifies any individual/organisation with whom the business area has a business relationship;
   - Comparing such individuals/organisations with the name(s) listed in the attached Excel spreadsheet **(ref. GRM TER 26_08_03 Search Return)** and identifying exact matches: and
   - Communicating this information to Group Risk Management (fao: Head of Anti-Money Laundering Compliance), using the enclosed '**GRM TER 26_08_03 Search Return**', no later than **12 September 2003**.

5. On receipt of a positive return. Group Risk Management will advise you in writing of any further action to be taken. i.e freezing bank accounts.

Thank you for your continued patience and assistance in this matter.

**Stephen Foster**
**Head of Anti-Money Laundering Compliance**
**Group Risk Management**

**ANNEXE A**

**The Royal Bank of Scotland**
**Master Circulation List**

Retail
- Alan Brener, Head of Retail Compliance
- Lesley Richardson, Head of Strategic Role Development, Communication and Compliance
- Richard Webb, Head of Compliance, Bancassurance Business Unit

Retail Direct
- John Grierson, Head of Decision Support, Governance. Retail Direct Finance

Wealth Management
- Stephen Bishop. Head of Money Laundering Prevention. Coutts Group

Corporate Banking & Financial Markets
- Irvine Rodger. CBFM Compliance MLPU

Ulster Bank
- Robert Irvine. Head of Group Risk Management, Ulster Bank Limited

Citizens
- Ken Turbitt, OFAC Manager, Citizens. Financial Group

Direct Line
- Peter Atkinson. Group Company Secretary, Direct Line Group Limited

Manufacturing
- Dave McKay, Senior Manager. Manufacturing Operational Risk

Other

Amanda Holt, Head of Group Enterprise Risk, Group Risk Management
Stephen Sanders, Head of Group Regulatory Risk, Group Risk Management

Benny Higgins, Chief Executive, Retail
Dunlop Stewart, Chief Executive, Bancassurance & Managing Director, Retail Investment Services
Charles Beattie, Managing Director, Independent Financial Services
David Feachen, Retail Compliance
Jon Roberts, Compliance Director, RBIS
Mark Bayliss, Policy & Development Manager, Bancassurance Business/Retail Investment Services
Julie Hemsley, Money Laundering Manager, Independent Financial Services Ltd

Norman McLuskie, Chief Executive, Retail Direct
Finlay Williamson, Finance Director, Retail Direct
Tom Sludden, Governance, Retail Direct

Gordon Pell, Chief Executive, Coutts Group
Hanspeter Brunner, Chief Executive Officer, Coutts Bank (Switzerland) Ltd
Martin Binks, Managing Director, NatWest Stockbrokers
David Gillespie, Chief Executive, NatWest Offshore
Ray Entwistle, Managing Director, Adam & Company
Stephen Smith, Assistant Compliance Officer, Money Laundering Prevention

Johnny Cameron, Chief Executive, Corporate Banking & Financial Markets
Brian Crowe, Group Treasurer and Managing Director, Financial Markets
Peter Craft, Director, TDS
Ben Carpenter, Co-Chief Executive Officer, Greenwich Capital Markets
Jay Levine, Co-Chief Executive Officer, Greenwich Capital Markets
Richard Mackie, Head of Legal & Compliance, Trustee & Depository Services
Sheldon Goldfarb, General Counsel, Greenwich NatWest
Edward Fogle, Money Laundering Prevention Officer, Greenwich Capital Markets
Simon Higginbottom, Compliance Manager, Financial Markets
Claire Sims, CBFM Compliance MLPU
Guy Cole, CBFM Compliance MLPU

Derek Lewis, Company Secretary, Lombard
Gary Ray, Fraud Manager, Lombard
Terry Clement, Fraud Officer, Lombard
Neil Bowen, Assistant Manager, Operational Risk, Lombard

Martin Wilson, Chief Executive, Ulster Bank

Glenna Scaramozza, Senior Vice President, Director, Money Laundering Prevention, Citizens Financial Group
Marion Bolster, OFAC analyst, Citizens Financial Group
Greg Sargent, Citizens Financial Group
Christine Kelly-Hill, Citizens Financial Group

Annette Court, Group Chief Executive, Direct Line Group Limited
Duncan MacKechnie, Chief Executive, Direct Line Life and Direct Line Unit Trusts
Carole Lyons, Compliance Officer, Direct Line Life and Direct Line Unit Trust
Jackie Henderson, Direct Line Life & Direct Line Unit Trust
Alison Rayner, Group Compliance Manager, Direct Line Group Limited

Mark Fisher, Chief Executive, Manufacturing
Peter Richardson, Manager, Operational Risk, Manufacturing
Tony O'Hear, Manager, Group Investigations and Fraud
Derek Brand, Manager, CMAU, Group Investigations & Fraud, Group Security & Fraud

Neil Trantum, Group Investigations & Fraud
Mike Hoseason, Group Investigations & Fraud

Group Regulatory Risk Senior Managers

Nick Pyrke, Head of Audit, Corporate Banking & Group Risk Management, Group Internal Audit

Neil Roden, Group Human Resources
Tony Williams, Group Human Resources
Iian Middleton, Manager, Decision Support
Colin Gilbert, Senior Information Analyst

**ANNEXE B**

**The Royal Bank of Scotland**
**'Designated Senior Management' Circulation List**

Retail

Benny Higgins, Chief Executive, Retail
Dunlop Stewart, Chief Executive, Bancassurance & Managing Director, Retail Investment Services

Retail Direct

Norman McLuskie, Chief Executive, Retail Direct

Wealth Management

Gordon Pell, Chief Executive, Coutts Group

Corporate Banking & Financial Markets

Johnny Cameron, Chief Executive, Corporate Banking & Financial Markets

Greenwich

Ben Carpenter, Co-Chief Executive Officer, Greenwich Capital Markets
Jay Levine, Co-Chief Executive Officer, Greenwich Capital Markets

Ulster Bank

Martin Wilson, Chief Executive, Ulster Bank

Citizens

Larry Fish, Chairman, President & CEO, Citizens Financial Group

Direct Line

Annette Court, Group Chief Executive, Direct Line Group Limited
Duncan MacKechnie, Chief Executive, Direct Line Life and Direct Line Unit Trusts

Manufacturing

Mark Fisher, Chief Executive, Manufacturing

**Connor, Damien (Group Risk Mgmt)**

| | |
|---|---|
| **From:** | Richardson, Peter (Op Risk) |
| **Sent:** | 11 September 2003 10:20 |
| **To:** | Nell, Dedrei (Group Risk Mgmt); FOSTER, Stephen James, Group Risk Mgmt |
| **Cc:** | Miller, Fiona (Op Risk); McKay, Dave (Ops Risk) |
| **Subject:** | FW: GRM TER 26_08_03 |

**Importance:** High

Dedrie, certification for this return, albeit I believe you already have output.

Peter Richardson
Manager, Regulatory Risk
Manufacturing Risk Management
2nd Floor
The Broadstone
PO Box 17136
50 South Gyle Crescent
Edinburgh EH 12 9UZ
Tel 0131 523 6454
(Int 7770 26454 - NatWest 26454 RBS)
Fax 0131 523 4039

-----Original Message-----
**From:** Miller, Fiona (Op Risk)
**Sent:** 11 September 2003 09 21
**To:** Richardson, Peter (Op Risk)
**Subject:** GRM TER 26_08_03
**Importance:** High

Pete,

Attached is the return and certification for Manufacturing, which includes 1 category 'c+' ***Redacted - Non-Responsive*** The 'c+' relationship in the name of the Palestinians Development Fund Interpal, and is already known to Group and blocked. I believe this relationship is Corporate owned rather than Retail, but as it is considered a 'c+' match felt we should report the CMAU findings.

d) MANU RETURN GRM Returns fil

PR response GRM TER 26 08 03.d

For you information the business area responses are attached. (Payment Operations did not locate the currency accounts relating to Interpal)

CMAU 2 c matches - GRM TER 260

CSCU NIL GRM TER 26_08_03 rtf

PO NIL RETURN GRM TER 26_08_03

Please let me know if you feel we should not be formally reporting the 'c+' match.

In Dave's absence could you please forward to Group? (Due by CoB 12th Sept)

Many thanks.

Fiona Miller
Manufacturing Risk Management
The Broadstone
PO Box 17136

50, South Gyle Crescent
Edinburgh EH12 9UZ

Tel 0131 523 3344
Fax 0131 523 4039

http://www.manufacturing.rbs.co.uk/ManuOpsRisk/

HIGHLY CONFIDENTIAL

NW 014095

**Miller, Fiona (Op Risk)**

**From:** Brand, Derek
**Sent:** 08 September 2003 08:37
**To:** Miller, Fiona (Op Risk)
**Cc:** Richardson, Peter (Op Risk); O'Hear, Tony
**Subject:** CMAU - GRM TER 260803

Good morning,

Please find attached the GRM Returns file for the above list -

d) GRM Returns file.xls

***Redacted - Non-Responsive***

Finally, I can confirm that the other Divisions/Areas with whom this Unit has an SLA, have been informed that there are no matches requiring their attention -

GRM TER 260803

Regards

**Derek Brand**
**CMAU, GI&F, Manufacturing**
**Tel - 0131 525 1642**
**Int - X 21642**
**Fax - 0131 523 2125**

**Miller, Fiona (Op Risk)**

**From:** Bivand, Ray
**Sent:** 28 August 2003 13:45
**To:** Miller, Fiona (Op Risk)
**Subject:** RE: Sanctions & Terrorist Financing: New RBS Group Search Request - GRM TER 26_08_03

Fiona

This list of names has been searched independently by 2 members of staff against our BOX safe custody database and NO name matches were found. It's a NIL return.

Regards,
**Ray Bivand**
**Manager, Safe Custody Unit**
**Information Design**
**Operations Support**
**Operational Support & Development, Manufacturing**
**1st Floor. 16 The Boulevard**
**Crawley, West Sussex RH10 1WA**
**Telephone: 01293 653094**
**Internal: 2792 - 3094**

-----Original Message-----
**From:** Miller, Fiona (Op Risk)
**Sent:** 27 August 2003 08:54
**To:** Degamia, Dilip; Pepper, Julian; Bivand, Ray; Plummer, Steve; Brand, Derek; O'Hear, Tony
**Cc:** McDowell, Margo; Donnelly, Dorina
**Subject:** FW: Sanctions & Terrorist Financing: New RBS Group Search Request - GRM TER 26_08_03
**Importance:** High

Hello All,

Attached is the latest ad hoc return for searching against your relevant databases. Please could you return to me, including nil returns by close of business on the 10th September.

In the meantime if you have any queries, please do not hesitate to contact me. Many thanks.

Regards.

Fiona Miller
Manufacturing Risk Management
The Broadstone
PO Box 17136
50, South Gyle Crescent
Edinburgh EH12 9UZ

0131 523 3344

http://www.manufacturing.rbs.co.uk/ManuOpsRisk/

-----Original Message-----
**From:** Richardson, Peter (Op Risk)
**Sent:** 26 August 2003 18:25
**To:** Miller, Fiona (Op Risk)
**Subject:** FW. Sanctions & Terrorist Financing: New RBS Group Search Request - GRM TER 26_08_03

Big list - sure to be some hits here.

Peter Richardson

Manager, Regulatory Risk
Manufacturing Risk Management
2nd Floor
The Broadstone
PO Box 17136
50 South Gyle Crescent
Edinburgh EH 12 9UZ
Tel 0131 523 6454
(Int 7770 26454 - NatWest 26454 RBS)
Fax 0131 523 4039

-----Original Message-----
**From:** Connor, Damien (Group Risk Mgmt)
**Sent:** 26 August 2003 17:10
**To:** Brener, Alan (Retail Comp); Richardson, Lesley; Grierson, John; Bishop, Stephen, Coutts; 'robert.irvine@ulsterbank.com'; 'Ken.Turbitt@citizensbank.com'; 'peter atkinson@directline.com'; McKay, Dave (Ops Risk); RODGER, Irvine, CBFM Compliance; Webb, Richard (RIS Compliance); Webb, Richard (RIS Compliance); Connor, Damien (Group Risk Mgmt)
**Cc:** Wilson, Martin, (Group Chief Executive Ulster Bank); 'annette court@directline.com'; 'duncan mackechnie@directline.com'; Higgins, Benny; Stewart, Dunlop; Lestiuk, Lydia; Fisher, Mark (Chief Exec. Manufacturing); 'ray entwistle@adambank com'; Pell, Gordon; McCarthy, Letitia (Group Risk Mgmt); McKenzie, Arlene (Group Risk Mgmt); Middlemist, Graham (Group Risk Mgmt); Williamson, Finlay F; Beattie, Charles (IFS); Richardson, Peter (Op Risk); Williams, Tony (HR); Roden, Neil; Roberts, Jonathon (Retail Credit); Pyrke, Nick; Trantum, Neil; Feachen, David; RAY, Gary, Lombard; CLEMENT, Terry, Lombard; BOWEN, Neil, Lombard; Brunner, Hanspeter, Coutts; 'Marion.Bolster@citizensbank.com'; 'Glenna.Scaramozza@CITIZENSBANK.com'; 'carole.lyons@directline com'; O'Hear, Tony; 'Greg.Sargent@CITIZENSBANK.com'; 'Christine.Kelly-Hill@CITIZENSBANK.com'; Shields, Christine; 'Jackie.Henderson@directline.com'; Hoseason, Michael (Group Fraud); LEWIS, Derek, Lombard; Craft, Peter; Harrison, Keith, Coutts; Mackie, Richard; Studden, Tom; Gayle, Sonia (Group Risk Mgmt); FOSTER, Stephen James, Group Risk Mgmt; Brand, Derek; Sanders, Stephen (Group Risk Mgmt); Gillespie, David; Grant, Michael (Group Risk Mgmt); SIMS, Claire, CBFM Compliance; Smith, Stephen, Coutts; 'Alison Rayner@directline com'; Middleton, Iain; Gilbert, Colin; COLE, Guy, CBFM Compliance; CARPENTER, Ben, GCM; LEVINE, Jay, GCM; BINKS, Martin, MDO-NWS; CROWE, Brian, FM; GOLDFARB, Sheldon, GCM; FOGLE, Edward, GCM; BAYLISS, Mark, (RBS) COMP; HEMSLEY, Julie, (RBS) COMP; HOLT, Amanda, Group Risk Mgmt (nee Turner); CAMERON, John A N (CBFM); HIGGINBOTTOM, Simon, CBFM Compliance
**Subject:** Sanctions & Terrorist Financing: New RBS Group Search Request - GRM TER 26_08_03

Please find attached to this email:

**GRM TER 26_08_03 Search Return.xls**

This document contains further information against which all Group business areas must search their records.

In respect of this document, please ensure that the necessary due diligence is completed and the **result** (nil or positive return) is returned to Group Risk Management (fao: Stephen Foster, Head of Anti-Money Laundering Compliance) **by 12 September 2003.**

Please take note that we have simplified the sign-off process. Certification by the Designated Senior Management is now only required when you do the quarterly search. We will ask you to certify at that time that you have undertaken both the routine quarterly search and any other search you have been asked to perform in the period.

This search list will be covered under the Q3 August 2003 certification.

Once again, thank you for your continued patience and assistance in this matter.

**NOTE - Please note that the pre-populated Excel file ('GRM TER 26_08_03 Search Return') is suitable for use in all future returns under GRM TER 26_08_03.**

<< File: 66_GRM TER 26_08_03 Search Return.xls >>  << File: GRM TER 26_08_03 Memorandum doc >>

HIGHLY CONFIDENTIAL

NW 014099

Confidential

RBSG SANCTIONS & TERRORIST FINANCING

| | |
|---|---|
| Title: | Terrorism, Office of Foreign Assets Control |
| GRM search ref: | GRM TER 26_08_03 |
| Division/Business unit. | *Manufacturing* |

Search Item:

| Source | Last Name/ Entity Name | First Name | Other names | Place of Birth |
|---|---|---|---|---|
| Office of Foreign Assets Control (SDGT) | INTERPAL | | | |
| Office of Foreign Assets Control (SDGT) | AL-SANDUQ AL-FILISTINI LIL-IGHATHA | | | |
| Office of Foreign Assets Control (SDGT) | AL-SANDUQ AL-FILISTINI LIL-IGHATHA WA AL-TANMIYA | | | |
| Office of Foreign Assets Control (SDGT) | PALESTINE DEVELOPMENT AND RELIEF FUND | | | |
| Office of Foreign Assets Control (SDGT) | PALESTINE RELIEF AND DEVELOPMENT FUND | | | |
| Office of Foreign Assets Control (SDGT) | PALESTINE RELIEF FUND | | | |
| Office of Foreign Assets Control (SDGT) | PALESTINIAN AID AND SUPPORT FUND | | | |
| Office of Foreign Assets Control (SDGT) | PALESTINIAN RELIEF AND DEVELOPMENT FUND | | | |

Confidential

| Date of Birth | Address | Individual? |
|---|---|---|
| | P.O Box 3333, London, NW6 1RW, England | N |
| | P O Box 3333, London, NW6 1RW, England | N |
| | P.O Box 3333, London, NW6 1RW, England | N |
| | P O Box 3333, London, NW6 1RW, England | N |
| | P.O Box 3333, London, NW6 1RW, England | N |
| | P.O Box 3333, London, NW6 1RW, England | N |
| | P.O Box 3333, London, NW6 1RW, England | N |
| | P.O Box 3333, London, NW6 1RW, England | N |

Confidential

| Other Information |
|---|
| a.k.a. AL-SANDUQ AL-FILISTINI LIL-IGHATHA. a.k.a AL-SANDUQ AL-FILISTINI LIL-IGHATHA WA AL-TANMIYA. a k a PALESTINE DEVELOPMENT AND RELIEF FUND: a k a PALESTINE RELIEF ANI DEVELOPMENT FUND. a.k.a. PALESTINE RELIEF FUND. a.k.a. PALESTINIAN AID AND SUPPORT FUND: a.k.a. PALESTINIAN RELIEF AND DEVELOPMENT FUND. a k a. PALESTINIAN RELIEF FUNI a.k.a. PALESTINE AND LEBANON RELIEF FUND. a.k.a. PRDF. a.k.a. RELIEF AND DEVELOPMENT FUND FOR PALESTINE. a.k.a. WELFARE AND DEVELOPMENT FUND FOR PALESTINE: a.k.a. WELFARE AND DEVELOPMENT FUND OF PALESTINE: Registered Charity No: 1040094 |
| a.k.a. for INTERPAL; Other a k as include a.k.a. AL-SANDUQ AL-FILISTINI LIL-IGHATHA WA AL-TANMIYA: a.k.a. PALESTINE DEVELOPMENT AND RELIEF FUND; a.k.a PALESTINE RELIEF AND DEVELOPMENT FUND. a.k.a. PALESTINE RELIEF FUND. a k a PALESTINIAN AID AND SUPPORT FUND; a.k.a. PALESTINIAN RELIEF AND DEVELOPMENT FUND: a.k.a. PALESTINIAN RELIEF FUNI a.k.a. PALESTINE AND LEBANON RELIEF FUND: a.k.a. PRDF; a.k.a. RELIEF AND DEVELOPMENT FUND FOR PALESTINE, a.k.a. WELFARE AND DEVELOPMENT FUND FOR PALESTINE; a.k.a. |
| a.k.a. for INTERPAL: Other a.k.as include a.k.a AL-SANDUQ AL-FILISTINI LIL-IGHATHA. a.k.a. AL-SANDUQ AL-FILISTINI LIL-IGHATHA WA AL-TANMIYA: a.k.a PALESTINE DEVELOPMENT AND RELIE FUND: a.k.a. PALESTINE RELIEF AND DEVELOPMENT FUND: a.k.a. PALESTINE RELIEF FUND: a.k.a. PALESTINIAN AID AND SUPPORT FUND: a.k.a. PALESTINIAN RELIEF AND DEVELOPMENT FUND; a.k.a. PALESTINIAN RELIEF FUND; a.k.a. PALESTINE AND LEBANON RELIEF FUND: a.k.a. PRDF; a.k.a. RELIEF AND DEVELOPMENT FUND FOR PALESTINE, a.k.a. WELFARE AND |
| a.k.a. for INTERPAL: Other a.k.as include a.k.a AL-SANDUQ AL-FILISTINI LIL-IGHATHA: a.k.a. AL-SANDUQ AL-FILISTINI LIL-IGHATHA WA AL-TANMIYA: a.k.a PALESTINE DEVELOPMENT AND RELIE FUND: a.k.a. PALESTINE RELIEF AND DEVELOPMENT FUND; a.k.a. PALESTINE RELIEF FUND: a.k.a. PALESTINIAN AID AND SUPPORT FUND; a.k.a. PALESTINIAN RELIEF AND DEVELOPMENT FUND; a.k.a. PALESTINIAN RELIEF FUND; a.k.a PALESTINE AND LEBANON RELIEF FUND; a.k.a. PRDF, a.k.a. RELIEF AND DEVELOPMENT FUND FOR PALESTINE; a.k.a WELFARE AND |
| a k.a. for INTERPAL. Other a k.as include a.k.a AL-SANDUQ AL-FILISTINI LIL-IGHATHA: a.k.a. AL-SANDUQ AL-FILISTINI LIL-IGHATHA WA AL-TANMIYA: a k.a PALESTINE DEVELOPMENT AND RELIE FUND: a k.a. PALESTINE RELIEF AND DEVELOPMENT FUND: a k.a. PALESTINE RELIEF FUND: a.k.a. PALESTINIAN AID AND SUPPORT FUND; a.k.a. PALESTINIAN RELIEF AND DEVELOPMENT FUND; a.k.a. PALESTINIAN RELIEF FUND; a.k.a. PALESTINE AND LEBANON RELIEF FUND; a.k.a. PRDF, a.k.a. RELIEF AND DEVELOPMENT FUND FOR PALESTINE; a.k.a. WELFARE AND |
| a.k.a. for INTERPAL: Other a k as include a.k.a AL-SANDUQ AL-FILISTINI LIL-IGHATHA: a.k.a. AL-SANDUQ AL-FILISTINI LIL-IGHATHA WA AL-TANMIYA; a.k.a PALESTINE DEVELOPMENT AND RELIE FUND: a k a PALESTINE RELIEF AND DEVELOPMENT FUND. a.k.a. PALESTINE RELIEF FUND: a.k.a. PALESTINIAN AID AND SUPPORT FUND: a.k.a. PALESTINIAN RELIEF AND DEVELOPMENT FUND; a.k.a PALESTINIAN RELIEF FUND; a.k.a. PALESTINE AND LEBANON RELIEF FUND, a.k.a. PRDF; a k.a. RELIEF AND DEVELOPMENT FUND FOR PALESTINE; a.k.a. WELFARE AND |
| a.k.a. for INTERPAL: Other a k as include a.k.a AL-SANDUQ AL-FILISTINI LIL-IGHATHA: a.k.a. AL-SANDUQ AL-FILISTINI LIL-IGHATHA WA AL-TANMIYA: a.k.a PALESTINE DEVELOPMENT AND RELIE FUND; a k.a. PALESTINE RELIEF AND DEVELOPMENT FUND: a k.a. PALESTINE RELIEF FUND: a.k.a. PALESTINIAN AID AND SUPPORT FUND, a.k.a. PALESTINIAN RELIEF AND DEVELOPMENT FUND; a k a PALESTINIAN RELIEF FUND; a.k.a. PALESTINE AND LEBANON RELIEF FUND. a.k.a. PRDF; a.k.a. RELIEF AND DEVELOPMENT FUND FOR PALESTINE; a k.a. WELFARE AND |
| a.k.a for INTERPAL, Other a k as include a.k.a AL-SANDUQ AL-FILISTINI LIL-IGHATHA: a.k.a. AL-SANDUQ AL-FILISTINI LIL-IGHATHA WA AL-TANMIYA, a.k.a PALESTINE DEVELOPMENT AND RELIE FUND. a.k.a. PALESTINE RELIEF AND DEVELOPMENT FUND; a.k.a PALESTINE RELIEF FUND: a.k.a. PALESTINIAN AID AND SUPPORT FUND, a.k.a. PALESTINIAN RELIEF AND DEVELOPMENT FUND: a.k.a. PALESTINIAN RELIEF FUND; a.k.a. PALESTINE AND LEBANON RELIEF FUND, a.k.a. PRDF; a.k.a. RELIEF AND DEVELOPMENT FUND FOR PALESTINE; a.k.a. WELFARE AND |

Confidential

Search Return(s):

| Last name/ Entity name | First name | Other names | Place of Birth | Date of Birth | Address | Other information | Business sub-area | CRN / CIS |
|---|---|---|---|---|---|---|---|---|
| Palestinians DEV Fund Interpal | | | | | PO Box 3333, London | All accounts detailed are business accounts and have the following signatories. Brian Ibrahim Hewitt, E Mustafa, J Qundil & Mahfouzh Safiee | Corporate & PT&BS | 1143476903 |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

Confidential

| Account details | Bank Sort Code | Account activities |
|---|---|---|
| [redacted] 95142940, 95142959, 95142967, 95142975, 95142983, [redacted] | 600822 | 95205748 - This account receives regular BACS credits, the majority under £100, from various sources. The turnover for the year was [redacted] Account [redacted] receives regular BACS credits from many sources for varying amounts. The following foreign transfers have all been debited on the [redacted] - payments for [redacted] to [redacted]. We have also seen additional transfers on [redacted] respectively, payable to [redacted] Cheques can also be seen debiting the account for varying amounts. Turn over for the year [redacted] Account 95142959 appears to receive cash credits, paid in through various NW Branches. Account 95142967 also appears to receive cash credits fro varying amounts paid in via various NW Branches. A monthly BACS credit is also evident form [redacted] Account 95142975 receiv |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

Confidential

| | | | | |
|---|---|---|---|---|
| Office of Foreign Assets Control (SDGT) | PALESTINIAN RELIEF FUND | | | |
| Office of Foreign Assets Control (SDGT) | PALESTINE AND LEBANON RELIEF FUND | | | |
| Office of Foreign Assets Control (SDGT) | PRDF | | | |
| Office of Foreign Assets Control (SDGT) | RELIEF AND DEVELOPMENT FUND FOR PALESTINE | | | |
| Office of Foreign Assets Control (SDGT) | WELFARE AND DEVELOPMENT FUND FOR PALESTINE | | | |
| Office of Foreign Assets Control (SDGT) | WELFARE AND DEVELOPMENT FUND OF PALESTINE | | | |

***Redacted - Non-Responsive***



Confidential

| | | |
|---|---|---|
| | P O Box 3333, London, NW6 1RW, England | N |
| | P.O Box 3333, London, NW6 1RW, England | N |
| | P.O Box 3333, London, NW6 1RW, England | N |
| | P.O Box 3333, London, NW6 1RW, England | N |
| | P.O Box 3333, London, NW6 1RW, England | N |
| | P.O Box 3333, London, NW6 1RW, England | N |

***Redacted - Non-Responsive***

Confidential

| |
|---|
| a.k.a. for INTERPAL. Other a.k.as include a.k.a AL-SANDUQ AL-FILISTINI LIL-IGHATHA; a.k.a. AL-SANDUQ AL-FILISTINI LIL-IGHATHA WA AL-TANMIYA; a.k.a. PALESTINE DEVELOPMENT AND RELIE FUND; a k.a. PALESTINE RELIEF AND DEVELOPMENT FUND; a.k.a. PALESTINE RELIEF FUND; a.k.a. PALESTINIAN AID AND SUPPORT FUND; a.k.a. PALESTINIAN RELIEF AND DEVELOPMENT FUND; a.k.a. PALESTINIAN RELIEF FUND; a k.a PALESTINE AND LEBANON RELIEF FUND; a.k.a. PRDF, a.k.a. RELIEF AND DEVELOPMENT FUND FOR PALESTINE; a k a. WELFARE AND |
| a.k.a. for INTERPAL. Other a.k.as include a.k.a AL-SANDUQ AL-FILISTINI LIL-IGHATHA; a.k.a. AL-SANDUQ AL-FILISTINI LIL-IGHATHA WA AL-TANMIYA; a.k.a PALESTINE DEVELOPMENT AND RELIE FUND; a k.a PALESTINE RELIEF AND DEVELOPMENT FUND; a.k.a. PALESTINE RELIEF FUND. a.k.a. PALESTINIAN AID AND SUPPORT FUND. a.k.a. PALESTINIAN RELIEF AND DEVELOPMENT FUND; a.k.a. PALESTINIAN RELIEF FUND; a.k.a. PALESTINE AND LEBANON RELIEF FUND; a.k.a. PRDF; a.k.a. RELIEF AND DEVELOPMENT FUND FOR PALESTINE; a.k.a. WELFARE AND |
| a.k.a. for INTERPAL. Other a.k.as include a.k.a AL-SANDUQ AL-FILISTINI LIL-IGHATHA; a.k.a. AL-SANDUQ AL-FILISTINI LIL-IGHATHA WA AL-TANMIYA. a.k.a PALESTINE DEVELOPMENT AND RELIE FUND; a k.a. PALESTINE RELIEF AND DEVELOPMENT FUND; a.k.a. PALESTINE RELIEF FUND; a.k.a PALESTINIAN AID AND SUPPORT FUND; a.k.a PALESTINIAN RELIEF AND DEVELOPMENT FUND; a.k.a. PALESTINIAN RELIEF FUND; a.k.a PALESTINE AND LEBANON RELIEF FUND; a.k.a. PRDF; a k.a. RELIEF AND DEVELOPMENT FUND FOR PALESTINE; a.k.a. WELFARE AND |
| a.k.a for INTERPAL: Other a k.as include a k.a AL-SANDUQ AL-FILISTINI LIL-IGHATHA; a.k.a. AL-SANDUQ AL-FILISTINI LIL-IGHATHA WA AL-TANMIYA; a.k.a PALESTINE DEVELOPMENT AND RELIE FUND, a.k.a PALESTINE RELIEF AND DEVELOPMENT FUND. a.k.a PALESTINE RELIEF FUND. a k.a. PALESTINIAN AID AND SUPPORT FUND. a.k.a PALESTINIAN RELIEF AND DEVELOPMENT FUND; a k.a. PALESTINIAN RELIEF FUND; a.k.a PALESTINE AND LEBANON RELIEF FUND; a k.a PRDF; a.k.a. RELIEF AND DEVELOPMENT FUND FOR PALESTINE: a k.a. WELFARE AND |
| a.k.a for INTERPAL: Other a k as include a.k a AL-SANDUQ AL-FILISTINI LIL-IGHATHA; a.k.a. AL-SANDUQ AL-FILISTINI LIL-IGHATHA WA AL-TANMIYA. a k.a PALESTINE DEVELOPMENT AND RELIE FUND: a.k.a. PALESTINE RELIEF AND DEVELOPMENT FUND: a.k.a. PALESTINE RELIEF FUND: a.k.a. PALESTINIAN AID AND SUPPORT FUND, a.k.a. PALESTINIAN RELIEF AND DEVELOPMENT FUND; a k.a. PALESTINIAN RELIEF FUND; a.k.a. PALESTINE AND LEBANON RELIEF FUND; a.k.a. PRDF, a.k.a RELIEF AND DEVELOPMENT FUND FOR PALESTINE, a k.a. WELFARE AND |
| a.k.a. for INTERPAL: Other a k as include a.k.a AL-SANDUQ AL-FILISTINI LIL-IGHATHA: a.k.a. AL-SANDUQ AL-FILISTINI LIL-IGHATHA WA AL-TANMIYA, a.k.a. PALESTINE DEVELOPMENT AND RELIE FUND: a k.a PALESTINE RELIEF AND DEVELOPMENT FUND: a.k.a. PALESTINE RELIEF FUND; a.k.a. PALESTINIAN AID AND SUPPORT FUND; a.k.a. PALESTINIAN RELIEF AND DEVELOPMENT FUND; a k.a PALESTINIAN RELIEF FUND; a.k.a PALESTINE AND LEBANON RELIEF FUND, a.k.a. PRDF; a.k.a. RELIEF AND DEVELOPMENT FUND FOR PALESTINE; a.k.a. WELFARE AND |

***Redacted - Non-Responsive***

Confidential

*Redacted - Non-Responsive*

Page 9 of 35

10/26/2001

HIGHLY CONFIDENTIAL

NW 014108

Confidential

| | | |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |

***Redacted - Non-Responsive***

Page 10 of 35

10/26/2001

HIGHLY CONFIDENTIAL

NW 014109

Confidential

***Redacted - Non-Responsive***

Page 11 of 35

10/26/2001

HIGHLY CONFIDENTIAL

NW 014110

Confidential

***Redacted - Non-Responsive***

Page 12 of 35

10/26/2001

HIGHLY CONFIDENTIAL

NW 014111

Case 1:05-cv-04622-DLI-RML Document 267-8 Filed 03/22/12 Page 137 of 441 PageID #: 6006

***Redacted - Non-Responsive***

HIGHLY CONFIDENTIAL

NW 014112

Confidential

***Redacted - Non-Responsive***

Page 14 of 35

10/26/2001

HIGHLY CONFIDENTIAL

NW 014113

Confidential

***Redacted - Non-Responsive***

Page 15 of 35

10/26/2001

HIGHLY CONFIDENTIAL

NW 014114

Confidential

***Redacted - Non-Responsive***

Page 16 of 35

10/26/2001

HIGHLY CONFIDENTIAL

NW 014115

Confidential

***Redacted - Non-Responsive***

Page 17 of 35

10/26/2001

HIGHLY CONFIDENTIAL

NW 014116

Confidential

*Redacted - Non-Responsive*

Page 18 of 35

10/26/2001

HIGHLY CONFIDENTIAL

NW 014117

Confidential

***Redacted - Non-Responsive***

Page 19 of 35

10/26/2001

HIGHLY CONFIDENTIAL

NW 014118

Confidential

*Redacted - Non-Responsive*

Page 20 of 35

10/26/2001

HIGHLY CONFIDENTIAL

NW 014119

Confidential

***Redacted - Non-Responsive***

Page 21 of 35

10/26/2001

HIGHLY CONFIDENTIAL

NW 014120

Confidential

***Redacted - Non-Responsive***

Page 22 of 35

10/26/2001

HIGHLY CONFIDENTIAL

NW 014121

Confidential

*Redacted - Non-Responsive*

Page 23 of 35

10/26/2001

HIGHLY CONFIDENTIAL

NW 014122

Confidential

***Redacted - Non-Responsive***

Page 24 of 35

10/26/2001

HIGHLY CONFIDENTIAL

NW 014123

Confidential

***Redacted - Non-Responsive***

Page 25 of 35

10/26/2001

HIGHLY CONFIDENTIAL

NW 014124

Confidential

***Redacted - Non-Responsive***

Page 26 of 35

10/26/2001

HIGHLY CONFIDENTIAL

NW 014125



Confidential

***Redacted - Non-Responsive***

Page 27 of 35

10/26/2001

HIGHLY CONFIDENTIAL

NW 014126

Confidential

*Redacted - Non-Responsive*

Page 28 of 35

10/26/2001

HIGHLY CONFIDENTIAL

NW 014127

Confidential

***Redacted - Non-Responsive***

Page 29 of 35

10/26/2001

HIGHLY CONFIDENTIAL

NW 014128

Case 1:05-cv-04622-DLI-RML Document 267-8 Filed 03/22/12 Page 154 of 441 PageID #: 6023

Confidential

***Redacted - Non-Responsive***

Page 30 of 35

10/26/2001

HIGHLY CONFIDENTIAL

NW 014129

Confidential

*Redacted - Non-Responsive*

Page 31 of 35

10/26/2001

HIGHLY CONFIDENTIAL

NW 014130

Confidential

***Redacted - Non-Responsive***

Page 32 of 35

10/26/2001

HIGHLY CONFIDENTIAL

NW 014131

Confidential

***Redacted - Non-Responsive***

Page 33 of 35

10/26/2001

HIGHLY CONFIDENTIAL

NW 014132

Confidential

*Redacted - Non-Responsive*

Page 34 of 35

10/26/2001

HIGHLY CONFIDENTIAL

NW 014133

Confidential

***Redacted - Non-Responsive***

Page 35 of 35

10/26/2001

HIGHLY CONFIDENTIAL

NW 014134

**Miller, Fiona (Op Risk)**

**From:** Pepper, Julian
**Sent:** 10 September 2003 11:38
**To:** Miller, Fiona (Op Risk)
**Cc:** Degamia, Dilip
**Subject:** GRM TER 26_08_03

Fiona,

As discussed, this search is a nil return with the following exceptions: -

City & South East IBC reported that they had both Interpal and Palestine & Lebanon Relief Fund on their database and that the accounts are closed. However, as you stated that you have identified 3 currency accounts, I will undertake some further investigation and revert back to you with my findings later today.

Regards

Julian

Julian Pepper
Payment Operations Risk Unit
(020) 7427 8482 (Ext 38482)
Mobile - 07754 482417
julian.pepper@rbs.co.uk

1

11th September 2003

To Stephen Foster, Head of Anti-Money Laundering Compliance

From: Pete Richardson, Manager, Manufacturing Risk Management

**Suspect Name Searches**

We have now concluded a database search of the following list·

Search Reference. GRM TER 26_08_03

**Source of Search**
Bank of England

**Certification**
I have undertaken the due diligence required in relation to the document referenced GRM TER 26_08_03 circulated by Group Risk Management on the 26th August 2003 I confirm that a review of all details has taken place within each relevant business area. I am satisfied that appropriate action has been taken where necessary and the following summary details the findings to date.

**Database search summary**
The investigation into exact name matches involved the searching of the following databases

- NatWest/RBS Customer database
- International system
- Central Safe Custody 'Box' system

The search was undertaken in accordance with procedures agreed with Group and the Service Level Agreements in place with the following divisions·

- Retail
- Corporate
- Wealth
- Tesco Personal Finance

Our search has not covered the following-
Adam and Co, Stockbrokers, Virgin Direct, Cards Businesses, Corporate Treasury, Lombard, Direct Line, Ulster Bank, and Citizens USA.

The summary of database searches undertaken:

***Redacted - Non-Responsive***

**Third Party Security**
We have agreed with Group Enterprise Risk that searches on third party security are not required. It is proposed that all new non customer guarantors will be required to provide full KYC documentation and will be subject to retrospective searches against the full list of suspect names. Additionally, should an existing guarantor be called upon to meet their obligation, status against suspect name lists will be checked by Lending Operations. A request to slightly vary these arrangements, in respect of guarantees for certain mortgage customers, is in your hands

**Third Party Mandates/Non banked Key Principles**
As agreed with Group Enterprise Risk, no search has been undertaken against these areas. It is understood that GER is considering the way forward on this particular aspect of search procedures.

**Connor, Damien (Group Risk Mgmt)**

**From:** Jackie.Henderson@directline.com
**Sent:** 11 September 2003 09:59
**To:** FOSTER, Stephen James, Group Risk Mgmt
**Cc:** Connor. Damien (Group Risk Mgmt); Nell, Dedrei (Group Risk Mgmt); Gillian.Wright@directline.com; Neil.Webb@directline.com; Paul.Gallagher@directline.com
**Subject:** GRM TER 26 08 03

Please accept this note as confirmation that for Direct Line Life and Direct Line Unit Trusts we have a nil return for GRM TER 26 08 03.

Regards

Jackie Henderson
Regulatory Risk Advisor
Direct Line Life
Direct Line Unit Trusts
Tel: 0141 228 6114
E-Mail: jackie.henderson@directline.com

**Connor, Damien (Group Risk Mgmt)**

**From:** Alison.Rayner@directline.com
**Sent:** 27 August 2003 09:00
**To:** Connor, Damien (Group Risk Mgmt)
**Cc:** Nell, Dedrei (Group Risk Mgmt); Jackie.Henderson@directline.com; Neil.Webb@directline.com; Peter.Atkinson@directline.com
**Subject:** Re: Sanctions & Terrorist Financing: New RBS Group Search Request - G RM TER 26_08_03

As per agreement with Dedrei Nell we are not required to complete this return whilst we await formal exemption sign-off from RBS for Direct Line Insurance, UK Insurance and Privilege.

Jackie Henderson will confirm the situation for Direct Line Life and Direct Line Unit Trusts under a separate notice.

Regards,

Richard Owen
Compliance Officer
Legal Department - DLG
Tel. (ext) 0845 878 2898 or (int) 701 2898

|--------+------------------------>
| | "Connor, Damien |
| | (Group Risk |
| | Mgmt)" |
| | <Damien.Connor@rb|
| | s.co.uk> |
| | |
| | 26/08/2003 17:10 |
| | |
|--------+------------------------>
>------------------------------------------------------------------------------------------------------------------------------
|
| |
| To: "Brener, Alan (Retail Comp)" <Alan.Brener@rbs.co.uk>, "Richardson, Lesley" <Lesley.Richardson@rbs.co.uk>, |
| "Grierson, John" <John.Grierson@rbs.co.uk>, "Bishop, Stephen, Coutts" <Stephen.Bishop@Coutts.com>, |
| "'robert.irvine@ulsterbank.com'" <robert.irvine@ulsterbank.com>, "'Ken.Turbitt@citizensbank.com'" |
| <Ken.Turbitt@citizensbank.com>, "'peter.atkinson@directline.com'" <peter.atkinson@directline.com>, "McKay, Dave (Ops |
| Risk)" <Dave.McKay@rbs.co.uk>, "RODGER, Irvine, CBFM Compliance" <Irvine.Rodger@rbos.com>, "Webb, Richard (RIS |
| Compliance)" <Richard.L.Webb@rbs.co.uk>, "Webb, Richard (RIS Compliance)" <Richard.L.Webb@rbs.co.uk>, "Connor, Damien |
| (Group Risk Mgmt)" <Damien.Connor@rbs.co.uk>
|
| cc: "Wilson, Martin, (Group Chief Executive Ulster Bank)" <Martin.Wilson@ulsterbank.com>, |
| "'annette.court@directline.com'" <annette.court@directline.com>, "'duncan.mackechnie@directline.com'" |

| <duncan.mackechnie@directline.com>, "Higgins, Benny" <Benny.Higgins@rbs.co.uk>, "Stewart, Dunlop" |
| <Dunlop.Stewart@rbs.co.uk>, "Lestiuk, Lydia" <Lydia.Lestiuk@rbs.co.uk>, "Fisher, Mark (Chief Exec. Manufacturing)" |
| <Mark.Fisher@rbs.co.uk>, "'ray.entwistle@adambank.com'" <ray.entwistle@adambank.com>, "Pell, Gordon" |
| <Gordon.Pell@rbs.co.uk>, "McCarthy, Letitia (Group Risk Mgmt)" <Letitia.McCarthy@rbs.co.uk>, "McKenzie, Arlene (Group |
| Risk Mgmt)" <Arlene.McKenzie@rbs.co.uk>, "Middlemist, Graham (Group Risk Mgmt)" <Graham.Middlemist@rbs.co.uk>, |
| "Williamson, Finlay F" <Finlay.Williamson@rbs.co.uk>, "Beattie, Charles (IFS)" <charles.beattie@rbsgifs.co.uk>, |
| "Richardson, Peter (Op Risk)" <Peter.Richardson@rbs.co.uk>, "Williams, Tony (HR)" <Tony.J.Williams@rbs.co.uk>, "Roden,|
| Neil" <Neil.Roden@rbs.co.uk>, "Roberts, Jonathon (Retail Credit)" <ROBEJAN@rbos.co.uk>, "Pyrke, Nick" |
| <nick.pyrke@rbs.co.uk>, "Trantum, Neil" <neil.trantum@rbs.co.uk>, "Feachen, David" <David.Feachen@rbs.co.uk>, "RAY, |
| Gary, Lombard" <gray@lombard.co.uk>, "CLEMENT, Terry, Lombard" <AUDTWC@lombard.co.uk>, "BOWEN, Neil, Lombard" |
| <nbowen@lombard.co.uk>, "Brunner, Hanspeter, Coutts" <Hanspeter.Brunner@Coutts.com>, |
| "'Marion.Bolster@citizensbank.com'" <Marion.Bolster@citizensbank.com>, "'Glenna.Scaramozza@CITIZENSBANK.com'" |
| <Glenna.Scaramozza@CITIZENSBANK.com>, "'carole.lyons@directline.com'" <carole.lyons@directline.com>, "O'Hear, Tony" |
| <Tony.O'Hear@rbs.co.uk>, "'Greg.Sargent@CITIZENSBANK.com'" <Greg.Sargent@CITIZENSBANK.com>, |
| "'Christine.Kelly-Hill@CITIZENSBANK.com'" <Christine.Kelly-Hill@CITIZENSBANK.com>, "Shields, Christine" |
| <Christine.Shields@rbs.co.uk>, "'Jackie.Henderson@directline.com'" <Jackie.Henderson@directline.com>, "Hoseason, |
| Michael (Group Fraud)" <michael.hoseason@rbs.co.uk>, "LEWIS, Derek, Lombard" <djlewis@lombard.co.uk>, "Craft, Peter" |
| <Peter.Craft@rbs.co.uk>, "Harrison, Keith, Coutts" <Keith.Harrison@Coutts.com>, "Mackie, Richard" |
| <Richard.Mackie@rbs.co.uk>, "Sludden, Tom" <Tom.Sludden@rbs.co.uk>, "Gayle, Sonia (Group Risk Mgmt)" |
| <sonia.gayle@rbs.co.uk>, "FOSTER, Stephen James, Group Risk Mgmt" <Stephen.J.FOSTER@rbos.com>, "Brand, Derek" |
| <Derek.Brand@rbs.co.uk>, "Sanders, Stephen (Group Risk Mgmt)" <Stephen.Sanders@rbs.co.uk>, "Gillespie, David" |
| <David.Gillespie@natwestoffshore.com>, "Grant, Michael (Group Risk Mgmt)" <Michael.Grant@rbs.co.uk>, "SIMS, Claire, |
| CBFM Compliance" <Claire.SIMS@rbos.com>, "Smith, Stephen, Coutts" <Stephen.Smith@Coutts.com>, |
| "'Alison.Rayner@directline.com'" <Alison.Rayner@directline.com>, "Middleton, Iain" <Iain.Middleton@rbs.co.uk>, |
| "Gilbert, Colin" <Colin.Gilbert@rbs.co.uk>, "COLE, Guy, CBFM Compliance" <Guy.COLE@rbos.com>, "CARPENTER, Ben, GCM" |
| <Ben.Carpenter@gcm.com>, "LEVINE, Jay, GCM" <Jay.Levine@gcm.com>, "BINKS, Martin, MDO-NWS" <Martin.Binks@natwest.com>,|
| "CROWE, Brian, FM" <Brian.CROWE@rbos.com>, "GOLDFARB, Sheldon, GCM" <Sheldon.Goldfarb@gcm.com>, "FOGLE, Edward, GCM" |
| <Edward.Fogle@gcm.com>, "BAYLISS, Mark, (RBS) COMP" <Mark.Bayliss@natwest.com>, "HEMSLEY, Julie, (RBS) COMP" |

| <julie.hemsley@natwest.com>, "HOLT, Amanda, Group Risk Mgmt (nee Turner)" <Amanda.HOLT@rbos.com>, "CAMERON, John A N |
| (CBFM)" <John.CAMERON@rbos.com>, "HIGGINBOTTOM, Simon, CBFM Compliance" <Simon.Higginbottom@rbos.com> |
| Subject: Sanctions & Terrorist Financing: New RBS Group Search Request - G RM TER 26_08_03 |
>----------------------------------------------------------------------------------------------------------------
|

Please find attached to this email:

GRM TER 26_08_03 Search Return.xls

This document contains further information against which all Group business areas must search their records.

In respect of this document, please ensure that the necessary due diligence is completed and the result (nil or positive return) is returned to Group Risk Management (fao: Stephen Foster, Head of Anti-Money Laundering Compliance) by 12 September 2003.

Please take note that we have simplified the sign-off process. Certification by the Designated Senior Management is now only required when you do the quarterly search. We will ask you to certify at that time that you have undertaken both the routine quarterly search and any other search you have been asked to perform in the period.

This search list will be covered under the Q3 August 2003 certification.

Once again, thank you for your continued patience and assistance in this matter.

NOTE - Please note that the pre-populated Excel file ('GRM TER 26_08_03 Search Return') is suitable for use in all future returns under GRM TER 26_08_03.
<<66_GRM TER 26_08_03 Search Return.xls>> <<GRM TER 26_08_03 Memorandum.doc>>

The Royal Bank of Scotland plc ('the Bank') is regulated by the Financial Services Authority and is a member of The Royal Bank of Scotland Marketing Group. The only packaged products (life policies, unit trusts and other collective investment schemes and stakeholder and other pensions) the Bank advises on and sells are those of the Marketing Group, whose other members are Royal Scottish Assurance plc and Royal Bank of Scotland Unit Trust Management Limited, both regulated by the Financial Services Authority.

The Royal Bank of Scotland plc. Registered in Scotland No 90312. Registered
Office: 36 St Andrew Square, Edinburgh EH2 2YB.

Agency agreements exist between members of The Royal Bank of Scotland

Group.

This e-mail message is confidential and for use by the addressee only. If the message is received by anyone other than the addressee, please return the message to the sender by replying to it and then delete the message from
your computer. Internet e-mails are not necessarily secure. The Royal Bank of Scotland plc does not accept responsibility for changes made to this message after it was sent.

Whilst all reasonable care has been taken to avoid the transmission of viruses, it is the responsibility of the recipient to ensure that the onward
transmission, opening or use of this message and any attachments will not adversely affect its systems or data. No responsibility is accepted by The Royal Bank of Scotland plc in this regard and the recipient should carry out
such virus and other checks as it considers appropriate.

(See attached file: 66_GRM TER 26_08_03 Search Return.xls)(See attached file: GRM TER 26_08_03 Memorandum.doc)

66_GRM TER 26_08_03 Search Ret. GRM TER 26_08_03 Memorandum do.



Confidential

RBSG SANCTIONS & TERRORIST FINANCING

| Title: | Terrorism, Office of Foreign Assets Control |
|---|---|
| GRM search ref: | GRM TER 26_08_03 |
| Division/Business unit: | *Please complete* |

Search Item:

| Source | Last Name/ Entity Name | First Name | Other names | Place of Birth |
|---|---|---|---|---|
| Office of Foreign Assets Control (SDGT) | INTERPAL | | | |
| Office of Foreign Assets Control (SDGT) | AL-SANDUQ AL-FILISTINI LIL-IGHATHA | | | |
| Office of Foreign Assets Control (SDGT) | AL-SANDUQ AL-FILISTINI LIL-IGHATHA WA AL-TANMIYA | | | |
| Office of Foreign Assets Control (SDGT) | PALESTINE DEVELOPMENT AND RELIEF FUND | | | |
| Office of Foreign Assets Control (SDGT) | PALESTINE RELIEF AND DEVELOPMENT FUND | | | |
| Office of Foreign Assets Control (SDGT) | PALESTINE RELIEF FUND | | | |
| Office of Foreign Assets Control (SDGT) | PALESTINIAN AID AND SUPPORT FUND | | | |
| Office of Foreign Assets Control (SDGT) | PALESTINIAN RELIEF AND DEVELOPMENT FUND | | | |
| Office of Foreign Assets Control (SDGT) | PALESTINIAN RELIEF FUND | | | |
| Office of Foreign Assets Control (SDGT) | PALESTINE AND LEBANON RELIEF FUND | | | |

Confidential

| Date of Birth | Address | Individual? |
|---|---|---|
| | P.O Box 3333, London, NW6 1RW, England | N |
| | P.O Box 3333, London, NW6 1RW, England | N |
| | P.O Box 3333, London, NW6 1RW, England | N |
| | P.O Box 3333, London, NW6 1RW, England | N |
| | P.O Box 3333, London, NW6 1RW, England | N |
| | P.O Box 3333, London, NW6 1RW, England | N |
| | P.O Box 3333, London, NW6 1RW, England | N |
| | P.O Box 3333, London, NW6 1RW, England | N |
| | P O Box 3333, London, NW6 1RW, England | N |
| | P.O Box 3333, London, NW6 1RW, England | N |



Confidential

| Other information |
| --- |
| a.k.a. AL-SANDUQ AL-FILISTINI LIL-IGHATHA: a.k.a. AL-SANDUQ AL-FILISTINI LIL-IGHATHA WA AL-TANMIYA; a k.a. PALESTINE DEVELOPMENT AND RELIEF FUND; a.k.a. PALESTINE RELIEF AN[ DEVELOPMENT FUND; a.k a. PALESTINE RELIEF FUND. a.k.a. PALESTINIAN AID AND SUPPORT FUND: a.k.a. PALESTINIAN RELIEF AND DEVELOPMENT FUND: a.k.a. PALESTINIAN RELIEF FUNI a.k.a. PALESTINE AND LEBANON RELIEF FUND, a.k.a. PRDF: a k.a. RELIEF AND DEVELOPMENT FUND FOR PALESTINE; a.k.a. WELFARE AND DEVELOPMENT FUND FOR PALESTINE; a.k.a. |
| a k.a. for INTERPAL: Other a.k.as include a.k.a. AL-SANDUQ AL-FILISTINI LIL-IGHATHA WA AL-TANMIYA: a.k.a. PALESTINE DEVELOPMENT AND RELIEF FUND: a.k.a. PALESTINE RELIEF AND DEVELOPMENT FUND. a.k.a. PALESTINE RELIEF FUND: a k a. PALESTINIAN AID AND SUPPORT FUND: a.k.a. PALESTINIAN RELIEF AND DEVELOPMENT FUND: a k.a. PALESTINIAN RELIEF FUNI a.k.a PALESTINE AND LEBANON RELIEF FUND, a.k.a. PRDF, a.k.a. RELIEF AND DEVELOPMENT FUND FOR PALESTINE; a.k.a. WELFARE AND DEVELOPMENT FUND FOR PALESTINE; a.k.a. |
| a.k.a. for INTERPAL: Other a.k.as include a.k.a AL-SANDUQ AL-FILISTINI LIL-IGHATHA: a.k.a. AL-SANDUQ AL-FILISTINI LIL-IGHATHA WA AL-TANMIYA: a.k.a PALESTINE DEVELOPMENT AND RELIE FUND: a k.a. PALESTINE RELIEF AND DEVELOPMENT FUND: a k.a. PALESTINE RELIEF FUND: a.k a PALESTINIAN AID AND SUPPORT FUND: a.k a. PALESTINIAN RELIEF AND DEVELOPMENT FUND; a k.a. PALESTINIAN RELIEF FUND: a.k.a. PALESTINE AND LEBANON RELIEF FUND; a.k.a. PRDF; a.k.a. RELIEF AND DEVELOPMENT FUND FOR PALESTINE; a.k.a. WELFARE AND |
| a.k.a. for INTERPAL: Other a.k as include a.k a AL-SANDUQ AL-FILISTINI LIL-IGHATHA: a.k.a. AL-SANDUQ AL-FILISTINI LIL-IGHATHA WA AL-TANMIYA: a k.a. PALESTINE DEVELOPMENT AND RELIE FUND; a.k.a. PALESTINE RELIEF AND DEVELOPMENT FUND: a.k.a. PALESTINE RELIEF FUND: a.k.a. PALESTINIAN AID AND SUPPORT FUND: a.k.a. PALESTINIAN RELIEF AND DEVELOPMENT FUND; a k.a. PALESTINIAN RELIEF FUND; a.k.a. PALESTINE AND LEBANON RELIEF FUND; a.k.a. PRDF; a.k.a. RELIEF AND DEVELOPMENT FUND FOR PALESTINE; a.k.a. WELFARE AND |
| a.k.a for INTERPAL: Other a k.as include a.k a AL-SANDUQ AL-FILISTINI LIL-IGHATHA: a.k.a. AL-SANDUQ AL-FILISTINI LIL-IGHATHA WA AL-TANMIYA; a k.a PALESTINE DEVELOPMENT AND RELIE FUND: a.k.a. PALESTINE RELIEF AND DEVELOPMENT FUND: a.k.a. PALESTINE RELIEF FUND; a.k.a. PALESTINIAN AID AND SUPPORT FUND: a.k.a. PALESTINIAN RELIEF AND DEVELOPMENT FUND; a.k.a. PALESTINIAN RELIEF FUND; a.k.a. PALESTINE AND LEBANON RELIEF FUND: a.k.a. PRDF; a.k.a. RELIEF AND DEVELOPMENT FUND FOR PALESTINE; a.k.a WELFARE AND |
| a.k.a. for INTERPAL: Other a.k.as include a.k.a AL-SANDUQ AL-FILISTINI LIL-IGHATHA; a.k.a. AL-SANDUQ AL-FILISTINI LIL-IGHATHA WA AL-TANMIYA: a.k.a PALESTINE DEVELOPMENT AND RELIE FUND; a k.a. PALESTINE RELIEF AND DEVELOPMENT FUND; a.k.a. PALESTINE RELIEF FUND; a.k.a. PALESTINIAN AID AND SUPPORT FUND: a.k.a. PALESTINIAN RELIEF AND DEVELOPMENT FUND; a k.a PALESTINIAN RELIEF FUND; a.k.a PALESTINE AND LEBANON RELIEF FUND; a.k.a. PRDF; a.k.a. RELIEF AND DEVELOPMENT FUND FOR PALESTINE; a.k.a. WELFARE AND |
| a.k.a for INTERPAL: Other a.k as include a.k.a AL-SANDUQ AL-FILISTINI LIL-IGHATHA; a.k.a. AL-SANDUQ AL-FILISTINI LIL-IGHATHA WA AL-TANMIYA. a.k.a PALESTINE DEVELOPMENT AND RELIE FUND; a k.a. PALESTINE RELIEF AND DEVELOPMENT FUND: a.k.a. PALESTINE RELIEF FUND: a.k.a. PALESTINIAN AID AND SUPPORT FUND: a.k.a. PALESTINIAN RELIEF AND DEVELOPMENT FUND. a.k.a. PALESTINIAN RELIEF FUND; a.k.a. PALESTINE AND LEBANON RELIEF FUND. a.k.a. PRDF; a.k.a. RELIEF AND DEVELOPMENT FUND FOR PALESTINE; a.k.a. WELFARE AND |
| a.k.a. for INTERPAL, Other a.k.as include a.k.a AL-SANDUQ AL-FILISTINI LIL-IGHATHA; a.k.a. AL-SANDUQ AL-FILISTINI LIL-IGHATHA WA AL-TANMIYA: a.k.a. PALESTINE DEVELOPMENT AND RELIE FUND: a.k.a. PALESTINE RELIEF AND DEVELOPMENT FUND: a.k.a. PALESTINE RELIEF FUND: a.k.a. PALESTINIAN AID AND SUPPORT FUND: a.k.a. PALESTINIAN RELIEF AND DEVELOPMENT FUND; a.k.a. PALESTINIAN RELIEF FUND; a.k.a. PALESTINE AND LEBANON RELIEF FUND: a.k.a. PRDF; a.k.a. RELIEF AND DEVELOPMENT FUND FOR PALESTINE; a k a. WELFARE AND |
| a.k.a. for INTERPAL: Other a k.as include a.k.a AL-SANDUQ AL-FILISTINI LIL-IGHATHA; a.k.a. AL-SANDUQ AL-FILISTINI LIL-IGHATHA WA AL-TANMIYA: a.k.a. PALESTINE DEVELOPMENT AND RELIE FUND; a.k.a. PALESTINE RELIEF AND DEVELOPMENT FUND: a.k.a PALESTINE RELIEF FUND; a k.a. PALESTINIAN AID AND SUPPORT FUND: a k.a. PALESTINIAN RELIEF AND DEVELOPMENT FUND; a.k.a. PALESTINIAN RELIEF FUND; a.k.a. PALESTINE AND LEBANON RELIEF FUND; a k.a. PRDF; a.k.a. RELIEF AND DEVELOPMENT FUND FOR PALESTINE; a.k.a WELFARE AND |
| a.k.a. for INTERPAL: Other a k.as include a.k.a AL-SANDUQ AL-FILISTINI LIL-IGHATHA: a.k.a. AL-SANDUQ AL-FILISTINI LIL-IGHATHA WA AL-TANMIYA, a.k.a. PALESTINE DEVELOPMENT AND RELIE FUND. a.k.a. PALESTINE RELIEF AND DEVELOPMENT FUND: a.k.a PALESTINE RELIEF FUND; a.k.a. PALESTINIAN AID AND SUPPORT FUND: a.k a. PALESTINIAN RELIEF AND DEVELOPMENT FUND; a k.a. PALESTINIAN RELIEF FUND; a.k.a. PALESTINE AND LEBANON RELIEF FUND, a.k.a. PRDF; a.k.a RELIEF AND DEVELOPMENT FUND FOR PALESTINE; a.k.a. WELFARE AND |

Confidential

| Search Return(s): | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Last name/ Entity name | First name | Other names | Place of Birth | Date of Birth | Address | Other information | Business sub-area | CRN / CIS | Account details | Bank Sort Code | Account activities |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |

Confidential

| Office of Foreign Assets Control (SDGT) | PRDF | | | |
|---|---|---|---|---|
| Office of Foreign Assets Control (SDGT) | RELIEF AND DEVELOPMENT FUND FOR PALESTINE | | | |
| Office of Foreign Assets Control (SDGT) | WELFARE AND DEVELOPMENT FUND FOR PALESTINE | | | |
| Office of Foreign Assets Control (SDGT) | WELFARE AND DEVELOPMENT FUND OF PALESTINE | | | |

***Redacted - Non-Responsive***

Confidential

| | | |
|---|---|---|
| | P.O Box 3333, London, NW6 1RW, England | N |
| | P O Box 3333, London, NW6 1RW, England | N |
| | P O Box 3333, London, NW6 1RW, England | N |
| | P.O Box 3333, London, NW6 1RW, England | N |

***Redacted - Non-Responsive***

Confidential

| |
|---|
| a k.a for INTERPAL: Other a.k.as include a.k a AL-SANDUQ AL-FILISTINI LIL-IGHATHA; a k.a. AL-SANDUQ AL-FILISTINI LIL-IGHATHA WA AL-TANMIYA; a.k.a. PALESTINE DEVELOPMENT AND RELIE FUND: a k.a. PALESTINE REUEF AND DEVELOPMENT FUND; a.k.a. PALESTINE RELIEF FUND; a.k.a. PALESTINIAN AID AND SUPPORT FUND; a.k.a. PALESTINIAN RELIEF AND DEVELOPMENT FUND; a k.a. PALESTINIAN RELIEF FUND, a.k.a PALESTINE AND LEBANON RELIEF FUND, a k.a. PRDF: a.k.a RELIEF AND DEVELOPMENT FUND FOR PALESTINE, a.k a WELFARE AND |
| a k.a. for INTERPAL. Other a.k.as include a.k a AL-SANDUQ AL-FILISTINI LIL-IGHATHA; a.k.a. AL-SANDUQ AL-FILISTINI LIL-IGHATHA WA A_-TANMIYA, a.k a. PALESTINE DEVELOPMENT AND RELIE FUND: a k.a. PALESTINE REUEF AND DEVELOPMENT FUND; a.k.a. PALESTINE RELIEF FUND; a.k.a. PALESTINIAN AID AND SUPPORT FUND: a.k.a. PALESTINIAN RELIEF AND DEVELOPMENT FUND; a k.a. PALESTINIAN RELIEF FUND; a.k.a PALESTINE AND LEBANON RELIEF FUND, a.k.a. PRDF; a.k.a. RELIEF AND DEVELOPMENT FUND FOR PALESTINE: a.k a WELFARE AND |
| a k.a. for INTERPAL, Other a.k.as include a.k.a AL-SANDUQ AL-FILISTINI LIL-IGHATHA; a.k a. AL-SANDUQ AL-FILISTINI LIL-IGHATHA WA AL-TANMIYA. a.k.a. PALESTINE DEVELOPMENT AND RELIE FUND: a.k.a. PALESTINE REUEF AND DEVELOPMENT FUND; a k.a. PALESTINE RELIEF FUND; a.k a PALESTINIAN AID AND SUPPORT FUND: a.k a. PALESTINIAN RELIEF AND DEVELOPMENT FUND; a k a PALESTINIAN RELIEF FUND; a k.a PALESTINE AND LEBANON RELIEF FUND; a.k.a. PRDF; a.k.a. RELIEF AND DEVELOPMENT FUND FOR PALESTINE; a k a. WELFARE AND |
| a k.a. for INTERPAL; Other a k as include a.k a AL-SANDUQ AL-FILISTINI LIL-IGHATHA; a.k a. AL-SANDUQ AL-FILISTINI LIL-IGHATHA WA AL-TANMIYA, a k a PALESTINE DEVELOPMENT AND RELIE FUND, a k a PALESTINE REUEF AND DEVELOPMENT FUND, a k a PALESTINE RELIEF FUND; a k.a PALESTINIAN AID AND SUPPORT FUND. a k.a PALESTINIAN RELIEF AND DEVELOPMENT FUND; a k.a PALESTINIAN RELIEF FUND; a k.a PALESTINE AND LEBANON RELIEF FUND, a k.a PRDF: a.k.a RELIEF AND DEVELOPMENT FUND FOR PALESTINE. a k.a WELFARE AND |

***Redacted - Non-Responsive***



Confidential

***Redacted - Non-Responsive***

Page 8 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014149

Confidential

***Redacted - Non-Responsive***

Page 9 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014150

Confidential

*Redacted - Non-Responsive*

Page 10 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014151

Confidential

***Redacted - Non-Responsive***

Page 11 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014152

Confidential

***Redacted - Non-Responsive***

Page 12 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014153

Confidential

***Redacted - Non-Responsive***

Page 13 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014154

Confidential

*Redacted - Non-Responsive*

Page 14 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014155

Confidential

***Redacted - Non-Responsive***

Page 15 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014156

Confidential

***Redacted - Non-Responsive***

Page 16 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014157

Confidential

***Redacted - Non-Responsive***

Page 17 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014158

Confidential

***Redacted - Non-Responsive***

Page 18 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014159

Confidential

***Redacted - Non-Responsive***

Page 19 of 38

10/26/2001

HIGHLY CONFIDENTIAL

NW 014160

Confidential

***Redacted - Non-Responsive***

Page 20 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014161

Confidential

*Redacted - Non-Responsive*

Page 21 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014162

Confidential

***Redacted - Non-Responsive***

Page 22 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014163

Case 1:05-cv-04622-DLI-RML Document 267-8 Filed 03/22/12 Page 189 of 441 PageID #: 6058

***Redacted - Non-Responsive***

HIGHLY CONFIDENTIAL

NW 014164

Confidential

***Redacted - Non-Responsive***

Page 24 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014165



Confidential

***Redacted - Non-Responsive***

Page 25 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014166

Confidential

*Redacted - Non-Responsive*

Page 26 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014167



Confidential

*Redacted - Non-Responsive*

Page 27 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014168

Confidential

***Redacted - Non-Responsive***

Page 28 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014169

Confidential

Page 29 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014170

Confidential

Page 30 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014171

Confidential

Page 31 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014172

Confidential

HIGHLY CONFIDENTIAL

Confidential

| | | | | |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

Page 33 of 36 10/26/2001

HIGHLY CONFIDENTIAL NW 014174

Confidential

Page 34 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014175

Confidential

Page 35 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014176

Confidential

Page 36 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014177

To: See Annexe A

From. Stephen Foster
Head of Anti-Money Laundering Compliance
Group Risk Management

Date. 26 August 2003

**GRM TER 26_08_03**

---

**SUSPECTED TERRORISTS & TERRORIST FINANCING**

Group Risk Management has recently received further information relating to category 2 suspicious persons (i.e. persons who are suspected of terrorism or terrorist financing as designated by the Bank of England and the Office of Foreign Assets Control, relating to the categories SDGT – Specially Designated Global Terrorists. SDT – Specially Designated Terrorists and FTO – Foreign Terrorist Organisations).

I attach to this memorandum a document **(ref: GRM TER 26_08_03 Search Return)** containing the further information against which all Group business areas must search their records. Please note the following important points:

1. The reference **GRM TER 26_08_03** MUST be quoted in ALL future communications with Group Risk Management relating to the document.

2. For the information provided in the document, due diligence must have been completed, and the results (whether positive or negative) returned by close of business on **12 September 2003**.

3. Designated senior management (Annexe B) will be requested to certify to the Head of Anti-Money Laundering Compliance. on a **quarterly** basis. that appropriate due diligence has been undertaken and that *appropriate action* (see item 4 below) has been taken. Quarterly certification will fall within the same quarter periods designated for consolidated searches, and will cover all lists issued since the previous certification. This search list will be covered under the Q3 August 2003 certification.

4. For these purposes *appropriate action* is defined as:
   - Searching all records (i.e. manual or electronic). in accordance with the Sanctions and Terrorist Financing Group Policy and Search Procedures Guidance. held by or on behalf of any Group business area which identifies any individual/organisation with whom the business area has a business relationship;
   - Comparing such individuals/organisations with the name(s) listed in the attached Excel spreadsheet **(ref. GRM TER 26_08_03 Search Return)** and identifying exact matches; and
   - Communicating this information to Group Risk Management (fao: Head of Anti-Money Laundering Compliance), using the enclosed **'GRM TER 26_08_03 Search Return'**, no later than **12 September 2003**.

5. On receipt of a positive return, Group Risk Management will advise you in writing of any further action to be taken. i.e freezing bank accounts.

Thank you for your continued patience and assistance in this matter.

**Stephen Foster**
**Head of Anti-Money Laundering Compliance**
**Group Risk Management**

**ANNEXE A**

**The Royal Bank of Scotland**
**Master Circulation List**

Retail
- Alan Brener, Head of Retail Compliance
- Lesley Richardson, Head of Strategic Role Development, Communication and Compliance
- Richard Webb, Head of Compliance, Bancassurance Business Unit

Retail Direct
- John Grierson, Head of Decision Support, Governance, Retail Direct Finance

Wealth Management
- Stephen Bishop, Head of Money Laundering Prevention, Coutts Group

Corporate Banking & Financial Markets
- Irvine Rodger, CBFM Compliance MLPU

Ulster Bank
- Robert Irvine, Head of Group Risk Management, Ulster Bank Limited

Citizens
- Ken Turbitt, OFAC Manager, Citizens, Financial Group

Direct Line
- Peter Atkinson, Group Company Secretary, Direct Line Group Limited

Manufacturing
- Dave McKay, Senior Manager, Manufacturing Operational Risk

Other

Amanda Holt, Head of Group Enterprise Risk, Group Risk Management
Stephen Sanders, Head of Group Regulatory Risk, Group Risk Management

Benny Higgins, Chief Executive, Retail
Dunlop Stewart, Chief Executive, Bancassurance & Managing Director, Retail Investment Services
Charles Beattie, Managing Director, Independent Financial Services
David Feachen, Retail Compliance
Jon Roberts, Compliance Director, RBIS
Mark Bayliss, Policy & Development Manager, Bancassurance Business/Retail Investment Services
Julie Hemsley, Money Laundering Manager, Independent Financial Services Ltd

Norman McLuskie, Chief Executive, Retail Direct
Finlay Williamson, Finance Director, Retail Direct
Tom Sludden, Governance, Retail Direct

Gordon Pell, Chief Executive, Coutts Group
Hanspeter Brunner, Chief Executive Officer, Coutts Bank (Switzerland) Ltd
Martin Binks, Managing Director, NatWest Stockbrokers
David Gillespie, Chief Executive, NatWest Offshore
Ray Entwistle, Managing Director, Adam & Company
Stephen Smith, Assistant Compliance Officer, Money Laundering Prevention

Johnny Cameron, Chief Executive, Corporate Banking & Financial Markets
Brian Crowe, Group Treasurer and Managing Director, Financial Markets
Peter Craft, Director, TDS
Ben Carpenter, Co-Chief Executive Officer, Greenwich Capital Markets
Jay Levine, Co-Chief Executive Officer, Greenwich Capital Markets
Richard Mackie, Head of Legal & Compliance, Trustee & Depository Services
Sheldon Goldfarb, General Counsel, Greenwich NatWest
Edward Fogle, Money Laundering Prevention Officer, Greenwich Capital Markets
Simon Higginbottom, Compliance Manager, Financial Markets
Claire Sims, CBFM Compliance MLPU
Guy Cole, CBFM Compliance MLPU

Derek Lewis, Company Secretary, Lombard
Gary Ray, Fraud Manager, Lombard
Terry Clement, Fraud Officer, Lombard
Neil Bowen, Assistant Manager, Operational Risk, Lombard

Martin Wilson, Chief Executive, Ulster Bank

Glenna Scaramozza, Senior Vice President, Director, Money Laundering Prevention, Citizens Financial Group
Marion Bolster, OFAC analyst, Citizens Financial Group
Greg Sargent, Citizens Financial Group
Christine Kelly-Hill, Citizens Financial Group

Annette Court, Group Chief Executive, Direct Line Group Limited
Duncan MacKechnie, Chief Executive, Direct Line Life and Direct Line Unit Trusts
Carole Lyons. Compliance Officer, Direct Line Life and Direct Line Unit Trust
Jackie Henderson, Direct Line Life & Direct Line Unit Trust
Alison Rayner. Group Compliance Manager. Direct Line Group Limited

Mark Fisher, Chief Executive, Manufacturing
Peter Richardson. Manager, Operational Risk, Manufacturing
Tony O'Hear, Manager. Group Investigations and Fraud
Derek Brand, Manager. CMAU, Group Investigations & Fraud, Group Security & Fraud

Neil Trantum, Group Investigations & Fraud
Mike Hoseason, Group Investigations & Fraud

Group Regulatory Risk Senior Managers

Nick Pyrke, Head of Audit, Corporate Banking & Group Risk Management. Group Internal Audit

Neil Roden, Group Human Resources
Tony Williams, Group Human Resources
Iian Middleton, Manager, Decision Support
Colin Gilbert, Senior Information Analyst

**ANNEXE B**

**The Royal Bank of Scotland**
**'Designated Senior Management' Circulation List**

Retail
Benny Higgins, Chief Executive, Retail
Dunlop Stewart, Chief Executive, Bancassurance & Managing Director, Retail Investment Services

Retail Direct
Norman McLuskie, Chief Executive, Retail Direct

Wealth Management
Gordon Pell, Chief Executive, Coutts Group

Corporate Banking & Financial Markets
Johnny Cameron, Chief Executive, Corporate Banking & Financial Markets

Greenwich
Ben Carpenter, Co-Chief Executive Officer, Greenwich Capital Markets
Jay Levine, Co-Chief Executive Officer, Greenwich Capital Markets

Ulster Bank
Martin Wilson, Chief Executive, Ulster Bank

Citizens
Larry Fish, Chairman, President & CEO, Citizens Financial Group

Direct Line
Annette Court, Group Chief Executive, Direct Line Group Limited
Duncan MacKechnie, Chief Executive, Direct Line Life and Direct Line Unit Trusts

Manufacturing
Mark Fisher, Chief Executive, Manufacturing

**Connor, Damien (Group Risk Mgmt)**

**From:** FOGLE. Edward. GCM
**Sent:** 27 August 2003 20:01
**To:** Connor. Damien (Group Risk Mgmt)
**Cc:** RIANOM. Rudy. GCM
**Subject:** RE: Sanctions & Terrorist Financing: New RBS Group Search Request - GRM TER 26_08_03

RBS Greenwich Capital hereby submits a NIL return for GRM TER 26_08_03.

-----Original Message-----
**From:** Connor, Damien (Group Risk Mgmt)
**Sent:** Tuesday, August 26, 2003 12:10 PM
**To:** Brener, Alan (Retail Comp); Richardson, Lesley; Grierson, John; Bishop, Stephen, Coutts; Irvine, Robert; 'Ken.Turbitt@citizensbank.com'; 'peter.atkinson@directline.com'; McKay, Dave (Ops Risk); RODGER, Irvine, CBFM Compliance; Webb, Richard (RIS Compliance); Webb, Richard (RIS Compliance); Connor, Damien (Group Risk Mgmt)
**Cc:** Wilson, Martin; 'annette.court@directline.com'; 'duncan.mackechnie@directline.com'; Higgins, Benny; Stewart, Dunlop; Lestiuk, Lydia; Fisher, Mark (Chief Exec. Manufacturing); 'ray.entwistle@adambank.com'; Pell, Gordon; McCarthy, Letitia (Group Risk Mgmt); McKenzie, Arlene (Group Risk Mgmt); Middlemist, Graham (Group Risk Mgmt); Williamson, Finlay F; Beattie, Charles (IFS); Richardson, Peter (Op Risk); Williams, Tony (HR); Roden, Neil; Roberts, Jonathon (Retail Credit); Pyrke, Nick; Trantum, Neil; Feachen, David; RAY, Gary, Lombard; CLEMENT, Terry, Lombard; BOWEN, Neil, Lombard; Brunner, Hanspeter, Coutts; 'Marion.Bolster@citizensbank.com', 'Glenna.Scaramozza@CITIZENSBANK.com', 'carole.lyons@directline.com'; O'Hear, Tony; 'Greg.Sargent@CITIZENSBANK.com'; 'Christine.Kelly-Hill@CITIZENSBANK.com'; Shields, Christine; 'Jackie.Henderson@directline.com'; Hoseason, Michael (Group Fraud); LEWIS, Derek, Lombard; Craft, Peter; Harrison, Keith, Coutts; Mackie, Richard; Sludden, Tom; Gayle, Sonia (Group Risk Mgmt); FOSTER, Stephen James, Group Risk Mgmt; Brand, Derek; Sanders, Stephen (Group Risk Mgmt); Gillespie, David; Grant, Michael (Group Risk Mgmt); SIMS, Claire, CBFM Compliance; Smith, Stephen, Coutts; 'Alison.Rayner@directline.com'; Middleton, Iain; Gilbert, Colin; COLE, Guy, CBFM Compliance; CARPENTER, Ben, GCM; LEVINE, Jay, GCM; BINKS, Martin, MDO-NWS; CROWE, Brian, FM; GOLDFARB, Sheldon, GCM; FOGLE, Edward, GCM; BAYLISS, Mark, (RBS) COMP; HEMSLEY, Julie, (RBS) COMP; HOLT, Amanda, Group Risk Mgmt (nee Turner); CAMERON, John A N (CBFM); HIGGINBOTTOM, Simon, CBFM Compliance
**Subject:** Sanctions & Terrorist Financing: New RBS Group Search Request - GRM TER 26_08_03

Please find attached to this email:

**GRM TER 26_08_03 Search Return.xls**

This document contains further information against which all Group business areas must search their records.

In respect of this document, please ensure that the necessary due diligence is completed and the **result** (nil or positive return) is returned to Group Risk Management (fao: Stephen Foster. Head of Anti-Money Laundering Compliance) **by 12 September 2003.**

Please take note that we have simplified the sign-off process. Certification by the Designated Senior Management is now only required when you do the quarterly search. We will ask you to certify at that time that you have undertaken both the routine quarterly search and any other search you have been asked to perform in the period.

This search list will be covered under the Q3 August 2003 certification.

Once again. thank you for your continued patience and assistance in this matter.

**NOTE - Please note that the pre-populated Excel file ('GRM TER 26_08_03 Search Return') is suitable for use in all future returns under GRM TER 26_08_03.**

<< File: 66_GRM TER 26_08_03 Search Retum.xls >> << File: GRM TER 26_08_03 Memorandum doc >>

HIGHLY CONFIDENTIAL NW 014184

**Connor, Damien (Group Risk Mgmt)**

**From:** Sludden, Tom
**Sent:** 04 September 2003 17:03
**To:** Nell, Dedrei (Group Risk Mgmt); Connor, Damien (Group Risk Mgmt)
**Cc:** Derham, Bill (Cards Risk)
**Subject:** GRM Terr 26 08 03 - Streamline and Worldpay matches

**Importance:** High

Dedrei

Please refer to attached spreadsheet, ***Redacted - Non-Responsive*** Grateful if you could let me know if Retail have already reported the Streamline matches - please refer to main account bank details in spreadsheet. If further analysis is needed, please let me know if you need original applications forms, review of transactions completed etc.

040903 Streamline matches GRM

***Redacted - Non-Responsive***

Tom Sludden
Retail Direct Finance
Governance Manager
24/25 St Andrew Square

Tel: 0131 525 1497
Fax: 0131 523 9784

Confidential

RBSG SANCTIONS & TERRORIST FINANCING

| | |
|---|---|
| **Title:** | **Terrorism, Office of Foreign Assets Control** |
| **GRM search ref:** | **GRM TER 26_08_03** |
| **Division/Business unit:** | ***Please complete*** |

Search Item.

| Source | Last Name/ Entity Name | First Name | Other names | Place of Birth |
|---|---|---|---|---|
| Office of Foreign Assets Control (SDGT) | INTERPAL | | | |
| Office of Foreign Assets Control (SDGT) | AL-SANDUQ AL-FILISTINI LIL-IGHATHA | | | |
| Office of Foreign Assets Control (SDGT) | AL-SANDUQ AL-FILISTINI LIL-IGHATHA WA AL-TANMIYA | | | |
| Office of Foreign Assets Control (SDGT) | PALESTINE DEVELOPMENT AND RELIEF FUND | | | |
| Office of Foreign Assets Control (SDGT) | PALESTINE RELIEF AND DEVELOPMENT FUND | | | |
| Office of Foreign Assets Control (SDGT) | PALESTINE RELIEF FUND | | | |
| Office of Foreign Assets Control (SDGT) | PALESTINIAN AID AND SUPPORT FUND | | | |
| Office of Foreign Assets Control (SDGT) | PALESTINIAN RELIEF AND DEVELOPMENT FUND | | | |
| Office of Foreign Assets Control (SDGT) | PALESTINIAN RELIEF FUND | | | |
| Office of Foreign Assets Control (SDGT) | PALESTINE AND LEBANON RELIEF FUND | | | |



Confidential

| Date of Birth | Address | Individual? |
|---|---|---|
| | P O Box 3333, London, NW6 1RW, England | N |
| | P O Box 3333, London, NW6 1RW, England | N |
| | P.O Box 3333, London, NW6 1RW, England | N |
| | P O Box 3333, London, NW6 1RW, England | N |
| | P O Box 3333, London, NW6 1RW, England | N |
| | P O Box 3333, London, NW6 1RW, England | N |
| | P O Box 3333, London, NW6 1RW, England | N |
| | P O Box 3333, London, NW6 1RW, England | N |
| | P.O Box 3333, London, NW6 1RW, England | N |
| | P O Box 3333, London, NW6 1RW, England | N |



Confidential

| Other information |
|---|
| a.k.a AL-SANDUQ AL-FILISTINI LIL-IGHATHA. a.k.a AL-SANDUQ AL-FILISTINI LIL-IGHATHA WA AL-TANMIYA; a.k.a. PALESTINE DEVELOPMENT AND RELIEF FUND. a.k.a. PALESTINE RELIEF AND DEVELOPMENT FUND, a.k.a. PALESTINE RELIEF FUND: a.k.a PALESTINIAN AID AND SUPPORT FUND: a.k.a PALESTINIAN RELIEF AND DEVELOPMENT FUND: a.k.a PALESTINIAN RELIEF FUND a.k.a. PALESTINE AND LEBANON RELIEF FUND: a.k.a. PRDF; a.k.a. RELIEF AND DEVELOPMENT FUND FOR PALESTINE, a.k.a. WELFARE AND DEVELOPMENT FUND FOR PALESTINE: a.k.a |
| a.k.a for INTERPAL: Other a.k.as include a.k.a. AL-SANDUQ AL-FILISTINI LIL-IGHATHA WA AL-TANMIYA, a.k.a PALESTINE DEVELOPMENT AND RELIEF FUND: a.k.a. PALESTINE RELIEF AND DEVELOPMENT FUND, a.k.a. PALESTINE RELIEF FUND. a.k.a PALESTINIAN AID AND SUPPORT FUND: a.k.a. PALESTINIAN RELIEF AND DEVELOPMENT FUND. a.k.a PALESTINIAN RELIEF FUND a.k.a PALESTINE AND LEBANON RELIEF FUND. a.k.a. PRDF; a.k.a RELIEF AND DEVELOPMENT FUND FOR PALESTINE; a.k.a. WELFARE AND DEVELOPMENT FUND FOR PALESTINE. a.k.a |
| a.k.a. for INTERPAL. Other a.k.as include a.k.a AL-SANDUQ AL-FILISTINI LIL-IGHATHA: a.k.a. AL-SANDUQ AL-FILISTINI LIL-IGHATHA WA AL-TANMIYA, a.k.a. PALESTINE DEVELOPMENT AND RELIE FUND. a.k.a PALESTINE RELIEF AND DEVELOPMENT FUND: a.k.a. PALESTINE RELIEF FUND: a.k.a. PALESTINIAN AID AND SUPPORT FUND. a.k.a. PALESTINIAN RELIEF AND DEVELOPMENT FUND: a.k.a PALESTINIAN RELIEF FUND; a.k.a PALESTINE AND LEBANON RELIEF FUND a.k.a PRDF; a.k.a. RELIEF AND DEVELOPMENT FUND FOR PALESTINE, a.k.a WELFARE AND |
| a.k.a for INTERPAL. Other a.k.as include a.k.a AL-SANDUQ AL-FILISTINI LIL-IGHATHA; a.k.a. AL-SANDUQ AL-FILISTINI LIL-IGHATHA WA AL-TANMIYA; a.k.a PALESTINE DEVELOPMENT AND RELIE FUND; a.k.a PALESTINE RELIEF AND DEVELOPMENT FUND; a.k.a. PALESTINE RELIEF FUND: a.k.a. PALESTINIAN AID AND SUPPORT FUND; a.k.a. PALESTINIAN RELIEF AND DEVELOPMENT FUND: a.k.a. PALESTINIAN RELIEF FUND; a.k.a. PALESTINE AND LEBANON RELIEF FUND. a.k.a. PRDF, a.k.a. RELIEF AND DEVELOPMENT FUND FOR PALESTINE. a.k.a WELFARE AND |
| a.k.a. for INTERPAL: Other a.k.as include a.k.a AL-SANDUQ AL-FILISTINI LIL-IGHATHA, a.k.a. AL-SANDUQ AL-FILISTINI LIL-IGHATHA WA AL-TANMIYA: a.k.a. PALESTINE DEVELOPMENT AND RELIE FUND: a.k.a. PALESTINE RELIEF AND DEVELOPMENT FUND: a.k.a. PALESTINE RELIEF FUND. a.k.a. PALESTINIAN AID AND SUPPORT FUND: a.k.a. PALESTINIAN RELIEF AND DEVELOPMENT FUND; a.k.a. PALESTINIAN RELIEF FUND: a.k.a. PALESTINE AND LEBANON RELIEF FUND, a.k.a. PRDF; a.k.a. RELIEF AND DEVELOPMENT FUND FOR PALESTINE; a.k.a. WELFARE AND |
| a.k.a. for INTERPAL: Other a.k.as include a.k.a AL-SANDUQ AL-FILISTINI LIL-IGHATHA: a.k.a. AL-SANDUQ AL-FILISTINI LIL-IGHATHA WA AL-TANMIYA, a.k.a. PALESTINE DEVELOPMENT AND RELIE FUND: a.k.a. PALESTINE RELIEF AND DEVELOPMENT FUND: a.k.a PALESTINE RELIEF FUND: a.k.a PALESTINIAN AID AND SUPPORT FUND. a.k.a. PALESTINIAN RELIEF AND DEVELOPMENT FUND; a.k.a. PALESTINIAN RELIEF FUND; a.k.a. PALESTINE AND LEBANON RELIEF FUND, a.k.a. PRDF: a.k.a. RELIEF AND DEVELOPMENT FUND FOR PALESTINE, a.k.a. WELFARE AND |
| a.k.a for INTERPAL: Other a.k.as include a.k.a AL-SANDUQ AL-FILISTINI LIL-IGHATHA: a.k.a. AL-SANDUQ AL-FILISTINI LIL-IGHATHA WA AL-TANMIYA; a.k.a. PALESTINE DEVELOPMENT AND RELIE FUND; a.k.a PALESTINE RELIEF AND DEVELOPMENT FUND. a.k.a PALESTINE RELIEF FUND: a.k.a. PALESTINIAN AID AND SUPPORT FUND: a.k.a. PALESTINIAN RELIEF AND DEVELOPMENT FUND; a.k.a. PALESTINIAN RELIEF FUND: a.k.a. PALESTINE AND LEBANON RELIEF FUND a.k.a. PRDF: a.k.a. RELIEF AND DEVELOPMENT FUND FOR PALESTINE: a.k.a. WELFARE AND DEVELOPMENT FUND FOR PALESTINE. a.k.a. WELFARE AND DEVELOPMENT FUND OF PALESTINE: Registered Charity No: 1040094 |
| a.k.a. for INTERPAL. Other a.k.as include a.k.a AL-SANDUQ AL-FILISTINI LIL-IGHATHA, a.k.a. AL-SANDUQ AL-FILISTINI LIL-IGHATHA WA AL-TANMIYA; a.k.a PALESTINE DEVELOPMENT AND RELIE FUND: a.k.a. PALESTINE RELIEF AND DEVELOPMENT FUND. a.k.a. PALESTINE RELIEF FUND; a.k.a. PALESTINIAN AID AND SUPPORT FUND: a.k.a. PALESTINIAN RELIEF AND DEVELOPMENT FUND; a.k.a. PALESTINIAN RELIEF FUND; a.k.a. PALESTINE AND LEBANON RELIEF FUND, a.k.a. PRDF: a.k.a. RELIEF AND DEVELOPMENT FUND FOR PALESTINE, a.k.a WELFARE AND |
| a.k.a. for INTERPAL; Other a.k.as include a.k.a AL-SANDUQ AL-FILISTINI LIL-IGHATHA; a.k.a. AL-SANDUQ AL-FILISTINI LIL-IGHATHA WA AL-TANMIYA; a.k.a PALESTINE DEVELOPMENT AND RELIE FUND: a.k.a PALESTINE RELIEF AND DEVELOPMENT FUND: a.k.a PALESTINE RELIEF FUND; a.k.a. PALESTINIAN AID AND SUPPORT FUND: a.k.a. PALESTINIAN RELIEF AND DEVELOPMENT FUND; a.k.a PALESTINIAN RELIEF FUND; a.k.a. PALESTINE AND LEBANON RELIEF FUND, a.k.a PRDF; a.k.a. RELIEF AND DEVELOPMENT FUND FOR PALESTINE; a.k.a. WELFARE AND |
| a.k.a. for INTERPAL; Other a.k.as include a.k.a AL-SANDUQ AL-FILISTINI LIL-IGHATHA. a.k.a. AL-SANDUQ AL-FILISTINI LIL-IGHATHA WA AL-TANMIYA: a.k.a. PALESTINE DEVELOPMENT AND RELIE FUND. a.k.a. PALESTINE RELIEF AND DEVELOPMENT FUND; a.k.a PALESTINE RELIEF FUND. a.k.a PALESTINIAN AID AND SUPPORT FUND, a.k.a. PALESTINIAN RELIEF AND DEVELOPMENT FUND: a.k.a. PALESTINIAN RELIEF FUND, a.k.a. PALESTINE AND LEBANON RELIEF FUND a.k.a. PRDF: a.k.a. RELIEF AND DEVELOPMENT FUND FOR PALESTINE. a.k.a. WELFARE AND |

Confidential

| Search Return(s). | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Last name/ Entity name | First name | Other names | Place of Birth | Date of Birth | Address | Other information | Business sub-area | CRN / CIS | Account details | Bank Sort Code | Account activities |
| Interpal | | | | | TBP | Streamline contact is a Mr J Qundil | Streamline | | Streamline acct no - 361102 | Main bank acct 600822 95142940 | Balance of £500K in NW bank account |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| Education Aid for Palestin | | | | | TBP | Not an exact name match. | Streamline | | 521941 | Main bank account 010688 65876792 | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |

Confidential

| | | | | |
|---|---|---|---|---|
| Office of Foreign Assets Control (SDGT) | PRDF | | | |
| Office of Foreign Assets Control (SDGT) | RELIEF AND DEVELOPMENT FUND FOR PALESTINE | | | |
| Office of Foreign Assets Control (SDGT) | WELFARE AND DEVELOPMENT FUND FOR PALESTINE | | | |
| Office of Foreign Assets Control (SDGT) | WELFARE AND DEVELOPMENT FUND OF PALESTINE | | | |

***Redacted - Non-Responsive***

 

Confidential

| | | |
|---|---|---|
| | P O Box 3333, London, NW6 1RW, England | N |
| | P.O Box 3333, London, NW6 1RW, England | N |
| | P.O Box 3333, London, NW6 1RW, England | N |
| | P O Box 3333, London, NW6 1RW, England | N |

***Redacted - Non-Responsive***



| a.k.a for INTERPAL, Other a.k.as include a k a AL-SANDUQ AL-FILISTINI LIL-IGHATHA; a k.a. AL-SANDUQ AL-FILISTINI LIL-IGHATHA WA AL-TANMIYA, a k.a. PALESTINE DEVELOPMENT AND RELIE FUND; a k a. PALESTINE RELIEF AND DEVELOPMENT FUND; a.k.a PALESTINE RELIEF FUND; a k a. PALESTINIAN AID AND SUPPORT FUND, a k.a. PALESTINIAN RELIEF AND DEVELOPMENT FUND; a k a. PALESTINIAN RELIEF FUND, a k.a. PALESTINE AND LEBANON RELIEF FUND a k a. PRDF; a k a RELIEF AND DEVELOPMENT FUND FOR PALESTINE, a k a. WELFARE AND |
|---|
| a.k.a for INTERPAL, Other a.k.as include a.k.a AL-SANDUQ AL-FILISTINI LIL-IGHATHA, a.k.a. AL-SANDUQ AL-FILISTINI LIL-IGHATHA WA AL-TANMIYA, a.k.a. PALESTINE DEVELOPMENT AND RELIE FUND; a k.a PALESTINE RELIEF AND DEVELOPMENT FUND; a k.a. PALESTINE RELIEF FUND, a.k.a. PALESTINIAN AID AND SUPPORT FUND; a.k.a. PALESTINIAN RELIEF AND DEVELOPMENT FUND; a.k a. PALESTINIAN RELIEF FUND; a.k.a. PALESTINE AND LEBANON RELIEF FUND; a.k.a. PRDF, a.k.a. RELIEF AND DEVELOPMENT FUND FOR PALESTINE; a.k a. WELFARE AND |
| a.k.a for INTERPAL, Other a.k.as include a.k a AL-SANDUQ AL-FILISTINI LIL-IGHATHA, a.k.a AL-SANDUQ AL-FILISTINI LIL-IGHATHA WA AL-TANMIYA, a.k.a. PALESTINE DEVELOPMENT AND RELIE FUND; a k.a. PALESTINE RELIEF AND DEVELOPMENT FUND; a.k.a PALESTINE RELIEF FUND; a k a. PALESTINIAN AID AND SUPPORT FUND; a.k.a. PALESTINIAN RELIEF AND DEVELOPMENT FUND; a k a PALESTINIAN RELIEF FUND; a k.a PALESTINE AND LEBANON RELIEF FUND; a k a PRDF; a k a RELIEF AND DEVELOPMENT FUND FOR PALESTINE, a k a WELFARE AND |
| a k.a for INTERPAL; Other a k.as include a k.a AL-SANDUQ AL-FILISTINI LIL-IGHATHA; a.k a AL-SANDUQ AL-FILISTINI LIL-IGHATHA WA AL-TANMIYA, a.k a PALESTINE DEVELOPMENT AND RELIE FUND, a.k a. PALESTINE RELIEF AND DEVELOPMENT FUND, a.k a PALESTINE RELIEF FUND, a k a PALESTINIAN AID AND SUPPORT FUND, a k a PALESTINIAN RELIEF AND DEVELOPMENT FUND; a k a. PALESTINIAN RELIEF FUND; a k a PALESTINE AND LEBANON RELIEF FUND a k a. PRDF; a k a. RELIEF AND DEVELOPMENT FUND FOR PALESTINE; a k.a. WELFARE AND |

***Redacted - Non-Responsive***

Confidential

***Redacted - Non-Responsive***

Page 8 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014193

Confidential

***Redacted - Non-Responsive***

Page 9 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014194

Confidential

***Redacted - Non-Responsive***

Page 10 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014195

Confidential

***Redacted - Non-Responsive***

Page 11 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014196

Confidential

***Redacted - Non-Responsive***

Page 12 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014197

Confidential

***Redacted - Non-Responsive***

Page 13 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014198

Confidential

***Redacted - Non-Responsive***

Page 14 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014199

Confidential

***Redacted - Non-Responsive***

Page 15 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014200

Case 1:05-cv-04622-DLI-RML Document 267-8 Filed 03/22/12 Page 226 of 441 PageID #: 6095

Confidential

***Redacted - Non-Responsive***

Page 16 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014201

Confidential

*Redacted - Non-Responsive*

Page 17 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014202

Confidential

***Redacted - Non-Responsive***

Page 18 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014203

Confidential

***Redacted - Non-Responsive***

Page 19 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014204

Confidential

***Redacted - Non-Responsive***

Page 20 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014205

Confidential

***Redacted - Non-Responsive***

Page 21 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014206

Confidential

***Redacted - Non-Responsive***

Page 22 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014207

Confidential

***Redacted - Non-Responsive***

Page 23 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014208

Confidential

***Redacted - Non-Responsive***

Page 24 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014209

Confidential

***Redacted - Non-Responsive***

Page 25 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014210

Confidential

*Redacted - Non-Responsive*

Page 26 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014211

Confidential

***Redacted - Non-Responsive***

Page 27 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014212

Confidential

***Redacted - Non-Responsive***

Page 28 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014213

Confidential




Confidential

Page 30 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014215

Confidential

Page 31 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014216

Confidential

Page 32 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014217

Confidential

Page 33 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014218

Confidential

| | | |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

Page 34 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014219

Confidential

Page 35 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014220

Confidential

Page 36 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014221

**Connor, Damien (Group Risk Mgmt)**

**From:** Anderson, Sabriena
**Sent:** 29 August 2003 08:15
**To:** FOSTER, Stephen James, Group Risk Mgmt
**Subject:** FW: Sanctions & Terrorist Financing: New RBS Group Search Request - GRM TER 26_08_03

Hi

Last one, and no matches.

Please contact me if you have any questions.

Regards

**Sabriena Anderson**
Executive Assistant to Neil Roden
Group Director, Human Resources
☎ 24746/0131 523 4746

-----Original Message-----
**From:** Gilbert, Colin
**Sent:** Thursday, August 28, 2003 2:16 PM
**To:** Anderson, Sabriena
**Subject:** RE: Sanctions & Terrorist Financing: New RBS Group Search Request - GRM TER 26_08_03

Sabriena,

Again, there were no matches from this list.

Colin

-----Original Message-----
**From:** Connor, Damien (Group Risk Mgmt)
**Sent:** 26 August 2003 17 10
**To:** Brener, Alan (Retail Comp); Richardson, Lesley; Grierson, John, Bishop, Stephen, Coutts; 'robert.irvine@ulsterbank com'; 'Ken.Turbitt@citizensbank.com'; 'peter atkinson@directline com', McKay, Dave (Ops Risk), RODGER, Irvine, CBFM Compliance; Webb, Richard (RIS Compliance); Webb, Richard (RIS Compliance); Connor, Damien (Group Risk Mgmt)
**Cc:** Wilson, Martin, (Group Chief Executive Ulster Bank); 'annette.court@directline.com'; 'duncan.mackechnie@directline.com'; Higgins, Benny; Stewart, Dunlop; Lestiuk, Lydia; Fisher, Mark (Chief Exec Manufacturing); 'ray entwistle@adambank com'; Pell, Gordon; McCarthy, Letitia (Group Risk Mgmt); McKenzie, Arlene (Group Risk Mgmt); Middlemist, Graham (Group Risk Mgmt); Williamson, Finlay F; Beattie, Charles (IFS); Richardson, Peter (Op Risk); Williams, Tony (HR); Roden, Neil; Roberts, Jonathon (Retail Credit); Pyrke, Nick; Trantum, Neil; Feachen, David; RAY, Gary, Lombard; CLEMENT, Terry, Lombard; BOWEN, Neil, Lombard, Brunner, Hanspeter, Coutts, 'Marion.Bolster@citizensbank com', 'Glenna.Scaramozza@CITIZENSBANK.com', 'carole.lyons@directline com'; O'Hear, Tony; 'Greg.Sargent@CITIZENSBANK.com'; 'Christine.Kelly-Hill@CITIZENSBANK.com'; Shields, Christine; 'Jackie Henderson@directline.com'; Hoseason, Michael (Group Fraud); LEWIS, Derek, Lombard; Craft, Peter; Harrison, Keith, Coutts; Mackie, Richard; Sludden, Tom; Gayle, Sonia (Group Risk Mgmt), FOSTER, Stephen James, Group Risk Mgmt, Brand, Derek; Sanders, Stephen (Group Risk Mgmt); Gillespie, David; Grant, Michael (Group Risk Mgmt); SIMS, Claire, CBFM Compliance; Smith, Stephen, Coutts; 'Alison Rayner@directline.com'; Middleton, Iain, Gilbert, Colin; COLE, Guy, CBFM Compliance; CARPENTER, Ben, GCM; LEVINE, Jay, GCM; BINKS, Martin, MDO-NWS; CROWE, Brian, FM; GOLDFARB, Sheldon, GCM; FOGLE, Edward, GCM; BAYLISS, Mark, (RBS) COMP; HEMSLEY, Julie, (RBS) COMP; HOLT, Amanda, Group Risk Mgmt (nee Turner); CAMERON, John A N (CBFM); HIGGINBOTTOM, Simon, CBFM Compliance
**Subject:** Sanctions & Terrorist Financing: New RBS Group Search Request - GRM TER 26_08_03

Please find attached to this email:

**GRM TER 26_08_03 Search Return.xls**

This document contains further information against which all Group business areas must search their records.

In respect of this document, please ensure that the necessary due diligence is completed and the **result** (nil or positive return) is returned to Group Risk Management (fao: Stephen Foster, Head of Anti-Money Laundering Compliance) **by 12 September 2003.**

Please take note that we have simplified the sign-off process. Certification by the Designated Senior Management is now only required when you do the quarterly search. We will ask you to certify at that time that you have undertaken both the routine quarterly search and any other search you have been asked to perform in the period.

This search list will be covered under the Q3 August 2003 certification.

Once again, thank you for your continued patience and assistance in this matter.

NOTE - **Please note that the pre-populated Excel file ('GRM TER 26_08_03 Search Return') is suitable for use in all future returns under GRM TER 26_08_03.**
<< File: 66_GRM TER 26_08_03 Search Return.xls >> << File: GRM TER 26_08_03 Memorandum.doc >>

**Connor, Damien (Group Risk Mgmt)**

**From:** Davidson, Lisa [Lisa.Davidson@UlsterBank.com]
**Sent:** 11 September 2003 15:07
**To:** Nell, Dedrei (Group Risk Mgmt)
**Subject:** FW: GRM TER 260803 & GRM TER 270803

> -----Original Message-----
> From: Davidson, Lisa
> Sent: 11 September 2003 15:05
> To: 'stephen.foster@rbs.co.uk'
> Cc: 'dedrei.nill@rbs.co.uk'
> Subject: GRM TER 260803 & GRM TER 270803
>
> Attached are nil returns in relation to the above searches. Please note
> these returns exclude items of safekeeping which will be covered in the
> consolidated list.
>
> Regards
>
> <<GRM TER 260803.xls>> <<GRM TER 270803 .xls>>
>
>
> Lisa Davidson
> Money Laundering Prevention Manager
> Group Regulatory Risk
>
> Tel: 028 90 276385
> UBITS: 76385
> Email: lisa.davidson@ulsterbank.com
>
> Ulster Bank Limited Registered Number: R733 Northern Ireland. Registered
> Office: 11-16 Donegall Square East, Belfast BT1 5UB. Member of The Royal
> Bank of Scotland Group.
> Member of the NatWest and Gartmore Marketing Group, advising on and
> selling the life assurance, stakeholder and other pensions and unit
> trusts and other collective investment scheme products only of that
> Marketing Group. Authorised and regulated by the Financial Services
> Authority.
>
>

GRM TER 260803.xls GRM TER 270803 xls

>

Confidential

RBSG SANCTIONS & TERRORIST FINANCING

| Title: | Terrorism, Office of Foreign Assets Control |
|---|---|
| GRM search ref: | GRM TER 26_08_03 |
| Division/Business unit: | *Ulster Bank* |

Search Item:

| Source | Last Name/ Entity Name | First Name | Other names | Place of Birth |
|---|---|---|---|---|
| Office of Foreign Assets Control (SDGT) | INTERPAL | | | |
| Office of Foreign Assets Control (SDGT) | AL-SANDUQ AL-FILISTINI LIL-IGHATHA | | | |
| Office of Foreign Assets Control (SDGT) | AL-SANDUQ AL-FILISTINI LIL-IGHATHA WA AL-TANMIYA | | | |
| Office of Foreign Assets Control (SDGT) | PALESTINE DEVELOPMENT AND RELIEF FUND | | | |
| Office of Foreign Assets Control (SDGT) | PALESTINE RELIEF AND DEVELOPMENT FUND | | | |
| Office of Foreign Assets Control (SDGT) | PALESTINE RELIEF FUND | | | |
| Office of Foreign Assets Control (SDGT) | PALESTINIAN AID AND SUPPORT FUND | | | |
| Office of Foreign Assets Control (SDGT) | PALESTINIAN RELIEF AND DEVELOPMENT FUND | | | |
| Office of Foreign Assets Control (SDGT) | PALESTINIAN RELIEF FUND | | | |
| Office of Foreign Assets Control (SDGT) | PALESTINE AND LEBANON RELIEF FUND | | | |

Confidential

| Date of Birth | Address | Individual? |
| --- | --- | --- |
| | P O Box 3333, London, NW6 1RW, England | N |
| | P.O Box 3333, London, NW6 1RW, England | N |
| | P O Box 3333, London, NW6 1RW, England | N |
| | P O Box 3333, London, NW6 1RW, England | N |
| | P O Box 3333, London, NW6 1RW, England | N |
| | P.O Box 3333, London, NW6 1RW, England | N |
| | P.O Box 3333, London, NW6 1RW, England | N |
| | P.O Box 3333, London, NW6 1RW, England | N |
| | P.O Box 3333, London, NW6 1RW, England | N |
| | P.O Box 3333, London, NW6 1RW, England | N |



Confidential

| Other information |
| --- |
| a.k.a. AL-SANDUQ AL-FILISTINI LIL-IGHATHA: a.k.a AL-SANDUQ AL-FILISTINI LIL-IGHATHA WA AL-TANMIYA: a.k.a. PALESTINE DEVELOPMENT AND RELIEF FUND; a.k.a. PALESTINE RELIEF AND DEVELOPMENT FUND, a.k.a PALESTINE RELIEF FUND; a.k.a PALESTINIAN AID AND SUPPORT FUND: a.k.a. PALESTINIAN RELIEF AND DEVELOPMENT FUND: a k.a PALESTINIAN RELIEF FUNI a k.a. PALESTINE AND LEBANON RELIEF FUND; a k.a PRDF; a.k.a. RELIEF AND DEVELOPMENT FUND FOR PALESTINE; a k.a. WELFARE AND DEVELOPMENT FUND FOR PALESTINE; a.k.a. |
| a k.a. for INTERPAL. Other a.k.as include a.k.a. AL-SANDUQ AL-FILISTINI LIL-IGHATHA WA AL-TANMIYA; a.k.a PALESTINE DEVELOPMENT AND RELIEF FUND: a.k.a. PALESTINE RELIEF AND DEVELOPMENT FUND. a.k.a. PALESTINE RELIEF FUND; a.k.a. PALESTINIAN AID AND SUPPORT FUND: a.k.a. PALESTINIAN RELIEF AND DEVELOPMENT FUND. a.k.a PALESTINIAN RELIEF FUNI a k.a. PALESTINE AND LEBANON RELIEF FUND, a k.a. PRDF; a.k.a. RELIEF AND DEVELOPMENT FUND FOR PALESTINE; a k a WELFARE AND DEVELOPMENT FUND FOR PALESTINE; a.k.a. |
| a.k.a for INTERPAL: Other a k.as include a.k.a AL-SANDUQ AL-FILISTINI LIL-IGHATHA; a.k.a. AL-SANDUQ AL-FILISTINI LIL-IGHATHA WA AL-TANMIYA. a.k.a PALESTINE DEVELOPMENT AND RELIE FUND: a k.a. PALESTINE RELIEF AND DEVELOPMENT FUND; a k.a PALESTINE RELIEF FUND; a k.a PALESTINIAN AID AND SUPPORT FUND: a k a. PALESTINIAN RELIEF AND DEVELOPMENT FUND; a.k.a. PALESTINIAN RELIEF FUND; a.k.a PALESTINE AND LEBANON RELIEF FUND: a.k.a. PRDF; a.k.a. RELIEF AND DEVELOPMENT FUND FOR PALESTINE, a.k.a WELFARE AND |
| a k.a for INTERPAL: Other a k as include a.k.a AL-SANDUQ AL-FILISTINI LIL-IGHATHA; a.k.a. AL-SANDUQ AL-FILISTINI LIL-IGHATHA WA AL-TANMIYA: a.k.a PALESTINE DEVELOPMENT AND RELIE FUND: a k.a PALESTINE RELIEF AND DEVELOPMENT FUND; a k.a. PALESTINE RELIEF FUND, a.k a PALESTINIAN AID AND SUPPORT FUND. a.k.a PALESTINIAN RELIEF AND DEVELOPMENT FUND; a k.a. PALESTINIAN RELIEF FUND; a.k.a. PALESTINE AND LEBANON RELIEF FUND, a.k.a. PRDF; a.k.a. RELIEF AND DEVELOPMENT FUND FOR PALESTINE. a.k.a. WELFARE AND |
| a k.a for INTERPAL; Other a k.as include a.k a AL-SANDUQ AL-FILISTINI LIL-IGHATHA: a.k a AL-SANDUQ AL-FILISTINI LIL-IGHATHA WA AL-TANMIYA; a k.a PALESTINE DEVELOPMENT AND RELIE FUND; a.k.a. PALESTINE RELIEF AND DEVELOPMENT FUND: a.k.a. PALESTINE RELIEF FUND: a.k.a. PALESTINIAN AID AND SUPPORT FUND; a.k.a. PALESTINIAN RELIEF AND DEVELOPMENT FUND; a k.a. PALESTINIAN RELIEF FUND: a.k.a. PALESTINE AND LEBANON RELIEF FUND, a.k.a. PRDF; a.k.a. RELIEF AND DEVELOPMENT FUND FOR PALESTINE; a.k.a. WELFARE AND |
| a.k.a. for INTERPAL: Other a k.as include a.k.a AL-SANDUQ AL-FILISTINI LIL-IGHATHA: a.k.a. AL-SANDUQ AL-FILISTINI LIL-IGHATHA WA AL-TANMIYA, a.k.a. PALESTINE DEVELOPMENT AND RELIE FUND; a.k.a PALESTINE RELIEF AND DEVELOPMENT FUND; a.k.a. PALESTINE RELIEF FUND; a.k.a. PALESTINIAN AID AND SUPPORT FUND; a.k.a. PALESTINIAN RELIEF AND DEVELOPMENT FUND: a k.a PALESTINIAN RELIEF FUND; a.k.a. PALESTINE AND LEBANON RELIEF FUND; a k.a. PRDF; a.k a. RELIEF AND DEVELOPMENT FUND FOR PALESTINE; a.k.a. WELFARE AND |
| a.k.a. for INTERPAL. Other a.k.as include a.k a AL-SANDUQ AL-FILISTINI LIL-IGHATHA: a.k.a. AL-SANDUQ AL-FILISTINI LIL-IGHATHA WA AL-TANMIYA; a.k.a PALESTINE DEVELOPMENT AND RELIE FUND: a k.a. PALESTINE RELIEF AND DEVELOPMENT FUND; a.k.a. PALESTINE RELIEF FUND; a.k.a. PALESTINIAN AID AND SUPPORT FUND; a.k.a. PALESTINIAN RELIEF AND DEVELOPMENT FUND. a.k.a. PALESTINIAN RELIEF FUND; a.k a. PALESTINE AND LEBANON RELIEF FUND a.k.a. PRDF; a.k.a. RELIEF AND DEVELOPMENT FUND FOR PALESTINE, a.k a. WELFARE AND |
| a k.a. for INTERPAL. Other a k.as include a.k.a AL-SANDUQ AL-FILISTINI LIL-IGHATHA; a.k.a. AL-SANDUQ AL-FILISTINI LIL-IGHATHA WA AL-TANMIYA: a.k.a. PALESTINE DEVELOPMENT AND RELIE FUND: a k.a. PALESTINE RELIEF AND DEVELOPMENT FUND: a.k.a. PALESTINE RELIEF FUND: a.k.a. PALESTINIAN AID AND SUPPORT FUND: a.k.a. PALESTINIAN RELIEF AND DEVELOPMENT FUND; a.k.a. PALESTINIAN RELIEF FUND; a.k.a. PALESTINE AND LEBANON RELIEF FUND, a.k.a. PRDF; a.k.a. RELIEF AND DEVELOPMENT FUND FOR PALESTINE; a.k.a. WELFARE AND |
| a k.a for INTERPAL; Other a k.as include a.k.a AL-SANDUQ AL-FILISTINI LIL-IGHATHA; a.k.a. AL-SANDUQ AL-FILISTINI LIL-IGHATHA WA AL-TANMIYA; a.k.a. PALESTINE DEVELOPMENT AND RELIE FUND; a.k.a PALESTINE RELIEF AND DEVELOPMENT FUND; a.k.a. PALESTINE RELIEF FUND: a.k.a PALESTINIAN AID AND SUPPORT FUND, a.k.a. PALESTINIAN RELIEF AND DEVELOPMENT FUND; a k.a PALESTINIAN RELIEF FUND; a.k.a. PALESTINE AND LEBANON RELIEF FUND; a.k a. PRDF; a.k.a. RELIEF AND DEVELOPMENT FUND FOR PALESTINE, a.k a WELFARE AND |
| a.k.a for INTERPAL; Other a.k as include a.k.a AL-SANDUQ AL-FILISTINI LIL-IGHATHA: a.k.a. AL-SANDUQ AL-FILISTINI LIL-IGHATHA WA AL-TANMIYA: a k.a PALESTINE DEVELOPMENT AND RELIE FUND; a.k.a PALESTINE RELIEF AND DEVELOPMENT FUND: a.k.a. PALESTINE RELIEF FUND: a.k.a. PALESTINIAN AID AND SUPPORT FUND; a.k.a. PALESTINIAN RELIEF AND DEVELOPMENT FUND; a k.a PALESTINIAN RELIEF FUND; a.k.a. PALESTINE AND LEBANON RELIEF FUND, a.k.a. PRDF; a.k.a. RELIEF AND DEVELOPMENT FUND FOR PALESTINE; a.k.a. WELFARE AND |

Confidential

| Search Return(s): | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Last name/ Entity name | First name | Other names | Place of Birth | Date of Birth | Address | Other information | Business sub-area | CRN / CIS | Account details | Bank Sort Code | Account activities |
| | | | Nil Return | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |

Confidential

| | | | | |
|---|---|---|---|---|
| Office of Foreign Assets Control (SDGT) | PRDF | | | |
| Office of Foreign Assets Control (SDGT) | RELIEF AND DEVELOPMENT FUND FOR PALESTINE | | | |
| Office of Foreign Assets Control (SDGT) | WELFARE AND DEVELOPMENT FUND FOR PALESTINE | | | |
| Office of Foreign Assets Control (SDGT) | WELFARE AND DEVELOPMENT FUND OF PALESTINE | | | |

***Redacted - Non-Responsive***



| | | |
|---|---|---|
| | P.O Box 3333, London, NW6 1RW, England | N |
| | P O Box 3333, London, NW6 1RW, England | N |
| | P.O Box 3333, London, NW6 1RW, England | N |
| | P O Box 3333, London, NW6 1RW, England | N |

***Redacted - Non-Responsive***

Confidential

| |
|---|
| a k.a. for INTERPAL; Other a.k.as include a.k.a AL-SANDUQ AL-FILISTINI LIL-IGHATHA; a.k.a. AL-SANDUQ AL-FILISTINI LIL-IGHATHA WA AL-TANMIYA; a.k.a. PALESTINE DEVELOPMENT AND RELIE FUND; a k.a. PALESTINE RELIEF AND DEVELOPMENT FUND; a.k.a PALESTINE RELIEF FUND; a.k.a. PALESTINIAN AID AND SUPPORT FUND; a.k.a. PALESTINIAN RELIEF AND DEVELOPMENT FUND; a k.a PALESTINIAN RELIEF FUND; a.k.a PALESTINE AND LEBANON RELIEF FUND; a k.a. PRDF; a.k.a. RELIEF AND DEVELOPMENT FUND FOR PALESTINE, a k.a WELFARE AND |
| a.k.a. for INTERPAL, Other a.k.as include a.k.a AL-SANDUQ AL-FILISTINI LIL-IGHATHA, a.k.a. AL-SANDUQ AL-FILISTINI LIL-IGHATHA WA AL-TANMIYA; a.k.a PALESTINE DEVELOPMENT AND RELIE FUND; a k.a. PALESTINE RELIEF AND DEVELOPMENT FUND; a.k.a. PALESTINE RELIEF FUND; a.k.a. PALESTINIAN AID AND SUPPORT FUND; a.k.a. PALESTINIAN RELIEF AND DEVELOPMENT FUND; a.k.a. PALESTINIAN RELIEF FUND; a.k.a. PALESTINE AND LEBANON RELIEF FUND; a.k.a. PRDF; a.k.a. RELIEF AND DEVELOPMENT FUND FOR PALESTINE; a.k.a. WELFARE AND |
| a.k.a. for INTERPAL, Other a k.as include a.k.a AL-SANDUQ AL-FILISTINI LIL-IGHATHA; a.k.a. AL-SANDUQ AL-FILISTINI LIL-IGHATHA WA AL-TANMIYA. a.k.a PALESTINE DEVELOPMENT AND RELIE FUND; a.k.a. PALESTINE RELIEF AND DEVELOPMENT FUND; a.k.a PALESTINE RELIEF FUND; a.k.a PALESTINIAN AID AND SUPPORT FUND; a.k.a. PALESTINIAN RELIEF AND DEVELOPMENT FUND; a k.a. PALESTINIAN RELIEF FUND; a k.a. PALESTINE AND LEBANON RELIEF FUND, a.k.a. PRDF; a.k.a. RELIEF AND DEVELOPMENT FUND FOR PALESTINE; a k.a. WELFARE AND |
| a k.a for INTERPAL; Other a k.as include a k a AL-SANDUQ AL-FILISTINI LIL-IGHATHA; a.k.a. AL-SANDUQ AL-FILISTINI LIL-IGHATHA WA AL-TANMIYA. a k.a PALESTINE DEVELOPMENT AND RELIE FUND, a k.a PALESTINE RELIEF AND DEVELOPMENT FUND: a.k.a PALESTINE RELIEF FUND, a.k.a PALESTINIAN AID AND SUPPORT FUND; a k.a. PALESTINIAN RELIEF AND DEVELOPMENT FUND; a k a PALESTINIAN RELIEF FUND; a k.a. PALESTINE AND LEBANON RELIEF FUND a k.a. PRDF: a.k.a RELIEF AND DEVELOPMENT FUND FOR PALESTINE, a k a WELFARE AND |

***Redacted - Non-Responsive***

Confidential

***Redacted - Non-Responsive***

Page 8 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014232

Confidential

***Redacted - Non-Responsive***

Page 9 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014233

Confidential

*Redacted - Non-Responsive*

Page 10 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014234

Confidential

***Redacted - Non-Responsive***

Page 11 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014235

Confidential

***Redacted - Non-Responsive***

Page 12 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014236

Confidential

***Redacted - Non-Responsive***

Page 13 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014237

Confidential

***Redacted - Non-Responsive***

Page 14 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014238

Confidential

*Redacted - Non-Responsive*

Page 15 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014239

Confidential

***Redacted - Non-Responsive***

Page 16 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014240

Confidential

***Redacted - Non-Responsive***

Page 17 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014241

Confidential

***Redacted - Non-Responsive***

Page 18 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014242

Confidential

***Redacted - Non-Responsive***

Page 19 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014243



Confidential

***Redacted - Non-Responsive***

Page 20 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014244

Confidential

***Redacted - Non-Responsive***

Page 21 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014245

Confidential

*Redacted - Non-Responsive*

Page 22 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014246

Confidential

*Redacted - Non-Responsive*

Page 23 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014247

Confidential

***Redacted - Non-Responsive***

Page 24 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014248



Confidential

***Redacted - Non-Responsive***

Page 25 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014249

Confidential

***Redacted - Non-Responsive***

Page 26 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014250

Case 1:05-cv-04622-DLI-RML Document 267-8 Filed 03/22/12 Page 276 of 441 PageID #: 6145

***Redacted - Non-Responsive***

HIGHLY CONFIDENTIAL

NW 014251

Confidential

***Redacted - Non-Responsive***

Page 28 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014252

Confidential

Page 29 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014253



Confidential

Page 30 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014254

Confidential

Page 31 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014255



Confidential

Page 32 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014256



Confidential

Page 33 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014257



Confidential

| | | |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

Page 34 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014258

Confidential

Page 35 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014259

Confidential

Page 36 of 36

10/26/2001

HIGHLY CONFIDENTIAL

NW 014260



Confidential

RBSG SANCTIONS & TERRORIST FINANCING

| Title: | Terrorist Financing Search Return |
|---|---|
| GRM search ref: | GRM TER 27_08_03 |
| Division/Business unit: | *Ulster Bank* |

Search Item:

| Source | Last Name/ Entity Name | First Name | Other names | Place of Birth | Date of Birth |
|---|---|---|---|---|---|
| | | | | | |

***Redacted - Non-Responsive***

Confidential

| Address | Individual? | Other information | Search Return(s): Last name/ Entity name | First name | Other names | Place of Birth | Date of Birth | Address | Other information |
|---|---|---|---|---|---|---|---|---|---|

***Redacted - Non-Responsive***

Confidential

| Business sub-area | CRN / CIS | Account details | Bank Sort Code | Account activities |
|---|---|---|---|---|

***Redacted - Non-Responsive***

Page 3 of 30

10/26/2001

HIGHLY CONFIDENTIAL

NW 014263

Confidential

***Multi-Page Redaction***

Page 4 of 30

10/26/2001

HIGHLY CONFIDENTIAL

NW 014264

**Connor, Damien (Group Risk Mgmt)**

**From:** Smith, Stephen, Coutts
**Sent:** 12 September 2003 14:09
**To:** FOSTER, Stephen James, Group Risk Mgmt
**Cc:** Connor, Damien (Group Risk Mgmt); Nell, Dedrei (Group Risk Mgmt); Bishop, Stephen, Coutts
**Subject:** GRM TER 26_08_03

Stephen

The above search has been completed across Wealth Management Division. A Nil Return is reported for all the Wealth Management businesses.

Regards

Steve Smith
Coutts Group Regulatory Risk
020 7753 1472

**EXHIBIT 131 TO DECLARATION OF VALERIE SCHUSTER**

**FILED UNDER SEAL**

## NCIS Disclosure for Case 617044 ( Received )

Core NCIS details created on 15 Oct 2001 by ConnellJ ... Submitted by ... Hoseason ... 15-Oct-01 ...

| | | | |
|---|---|---|---|
| Disclosure Type | Terrorism | Submitting Branch Address | Natwest Group Investigations & Fraud |
| Disclosure Date | 15 Oct 2001 | | |
| Branch / Outlet | Finsbury Park | | |
| Branch Code | 60-08-22 | | |
| Trust Indicator | N | | |
| Further Information | Y | Postcode | |
| Text | | | |

HIGHLY CONFIDENTIAL NW 008362





[redacted]

HIGHLY CONFIDENTIAL NW 008363



HIGHLY CONFIDENTIAL    NW 008364



HIGHLY CONFIDENTIAL   NW 008365

https://www.gk3.web.rbsgrp.net/GK3Web/editMain.do?task=print&caseFileNo=617...   20/04/07



[redacted]

HIGHLY CONFIDENTIAL NW 008366

**EXHIBIT 132 TO DECLARATION OF VALERIE SCHUSTER**

**FILED UNDER SEAL**

## Case Summary

Money laundering suspicion

Case Summary

Incident Data

| Control Authority | Payment Operations | Status: | Open Source: [GK2:666593] |
|---|---|---|---|
| Review Date | | by | |
| Remote Delivery Channel | N | High Profile | Y 22 Aug 2003 00:00 |
| Created on | 14 Jun 2002 00:00 | by | RBS_Allenbc |
| Last Modified on | 22 Aug 2003 00:00 | by | RBS_Hoseasm |

Linked Cases

| | |
|---|---|
| 617044 | NONE |
| 666814 | NONE |
| 704079 | NONE |
| 710368 | Account auto-linked |
| 1748664 | Account auto-linked |

| Queries | Refer To | Tel No. | Business | Unable to contact ? |
|---|---|---|---|---|
| | | | NONE | |

Money laundering suspicion Record

| Submitting Branch | 600822 | Submitted By | FINSBURY PARK |
|---|---|---|---|
| Submitting Unit Sortcode | | Contact No. | 7 8067 6840 |
| Submitting Department | Payment & Trade Operations | Legislation | POTA |
| Estimated Laundering Total | 0 <Unknown> | | |

Reason(s) for Suspicion

Payments to / from blacklisted or high risk countries

Please see attachments and/or Case Notes where available for further information

Other (see Summary and Assessment field)

Transactions GBP 0.00

| Date | Type | Amount | Currency |
|---|---|---|---|
| 06 Jun 2002 | Transaction Other | 180950.00 | US Dollar |

Personal Data

-None-

Business Data

| Business/Org Name | Company Ref. No. | Legal Jurisdiction | Key Information | Risk | Adj |
|---|---|---|---|---|---|
| PALESTINIANS DEVELOPMENT FUND-INTERHAL | | UNITED KINGDOM | NONE | Green | Green |

Telephone Data

HIGHLY CONFIDENTIAL NW 008374

EXHIBIT
32
6/8/11 SC

NW 008375

INTENTIONALLY

OMITTED

| 1. User: | Migrated | On: | 22 Aug 2003 00:00 |
| --- | --- | --- | --- |
| Note: | Agreed, no disclosure. MH | | |

HIGHLY CONFIDENTIAL NW 008376

1. **User:** Migrated **On:** 22 Aug 2003 00:00

**Note:** This connection was reported due to a [redacted] credit originating from [redacted] which was received in to the account on [redacted]. Palestinians Development Fund has been the subject of previous disclosures and we are aware NTFIU are undertaking their own investigations. The payment is consistent with our knowledge of this customer's humanitarian aid activities and a further disclosure is not considered necessaryat this stage.

**1. User:** Migrated **On:** 22 Aug 2003 00:00

**Note:** From the information available at the date of this record, it is considered that there are insufficient grounds to make a financial disclosure. Please see attached documents for further information relating to the suspicion report. This information may be of relevance when considering any business approaches or dealings with the above named parties.

HIGHLY CONFIDENTIAL NW 008378

666593 (HP ?)

The Royal Bank of Scotland

Corporate Banking: Money Laundering Suspicion Report Form

Surname/Company Name: Palestinians Relief & Development Fund – Interpal

Male/Female: | Nationality (if known): | Date of Birth:

Address (include postcode): PO Box 3333 London NW6-1RW

Telephone No:

Additional/Previous Addresses: Registered Flat 60 Clark Court Acton Crescent London NW10-3?5

No & Country of issue of Passport or other ID document seen/copied of introduction/reference taken:

Companies - Date of Country of Incorporation/registered No:

| Account No(s): | Account Type | Date Opened |
|---|---|---|
| 1. 95142960<br>2. 95142975<br>3. 95142983<br>4. [redacted] | 14-/6/041 56838 | [redacted] |

Date when Relationship with Bank started: 4/10/1994

Stated Occupation: as Name

Name & Address of Employer:

| Additional/Associated Names: | Date of Birth: | In Account | Address, exp P/Code/Passport No etc. |
|---|---|---|---|
| | | | |

| Date | Amount | Dr/Cr | Source/Destination e.g. Cash/Chq/UTS/CHAPS to/from: |
|---|---|---|---|
| [redacted] | | | [redacted] |

Reasons for Suspicion

Official Name – E. Mustafa, Ibrahim Brian Hewitt, J Jundil, Mahfouzh Safiee

Direct access customer to IBC S.E & City

When contacted to advise of receipt of moneys Mr Jundil (as above) commented the funds had been expected from [redacted]

Connection between [redacted] at Jundie and present Middle East situation cannot be ignored.

The Royal Bank of Scotland

Corporate Banking Money Laundering Suspicion Report Form

| | | |
|---|---|---|
| Continued - N note of [redacted] notes that a cheque was accepted with payee as [redacted] | | |
| Security & safe Custody held (brief details only) | | |
| Boxes & Parcels held | | |
| Special Signing Instructions e.g. Third party mandates<br>If a company/partnership etc attach a copy of mandate | | |
| Other accounts known to be held (including Building Societies) | | |
| Status Enquiries Received | | |
| Nature of Suspected Offence: Possible embezzlement - for funding Terrorism in middle East. | Drug Trafficking<br>Terrorism ✓<br>Other crime | |
| Branch / Depart Ref: IBC CITY | Name of Contact: N. MORRISON | Tel / Ext: 7- 8067 - 6849 |
| Signed: N Morrison | Senior Officer/Manager: Stewart Hay Business Manager | Date: 7/6/2003 |

HIGHLY CONFIDENTIAL NW 008380

**EXHIBIT 133 TO DECLARATION OF VALERIE SCHUSTER**

**FILED UNDER SEAL**

## Case Summary

**Money laundering disclosure**

Case Summary | Record Data | Subject Data | Notes & Conclusion | Properties

**Incident Data**

| | | | |
|---|---|---|---|
| **Control Authority** | Payment Operations | **Status** | Open Source: [GK2:666814] |
| **Review Date** | | **by** | |
| **Remote Delivery Channel** | N | **High Profile** | Y 17 Jun 2002 00:00 |
| **Created on** | 17 Jun 2002 00:00 | **by** | RBS_Mcomd |
| **Last Modified on** | 17 Sep 2003 00:00 | **by** | RBS_Ohearaa |

**Linked Cases**

| | |
|---|---|
| 276995 | Address auto-linked |
| 617044 | NONE |
| 666593 | NONE |
| 704079 | Account auto-linked |
| 708047 | Address auto-linked |
| 710368 | NONE |
| 753294 | Address auto-linked |
| 772682 | Address auto-linked |
| 1748664 | Personal auto-linked |

| Queries | Refer To | Tel No: | Business | Unable to contact ? |
|---|---|---|---|---|
| | | | NONE | |

**Money laundering disclosure Record**

| | | | |
|---|---|---|---|
| **Submitting Branch** | | **Submitted By** | N Morrison |
| **Submitting Unit Sortcode** | | **Contact No** | 7-8067-6849 |
| **Submitting Department** | Payment & Trade Operations | **Legislation** | POTA |
| **Estimated Laundering Total** | 180950 <Unknown> | | |

**Reason(s) for Suspicion**

High non cash turnover

**Transactions GBP 0.00**

| Date | Type | Amount | Currency |
|---|---|---|---|

Set All Risk Ratings to the the same value of: Amber Blue Green Indigo Red

**Personal Data**

HIGHLY CONFIDENTIAL NW 008381

EXHIBIT
33
6/8/11 SC

| Surname | Forenames | Date Of Birth | Sex | Key Information | Risk | Adj |
|---|---|---|---|---|---|---|
| | | | M | NONE | Red | Red |
| | | | M | NONE | Red | Red |
| | | | M | NONE | Red | Red |
| | | | M | NONE | Red | Red |
| | | | M | NONE | Red | Red |

Business/Org Data

| Business/Org Name | Company Ref. No: | Legal Jurisdiction | Key Information | Risk | Adj |
|---|---|---|---|---|---|
| PALESTINIANS RELIEF & DEVELOPMENT FUND | | UNITED KINGDOM | NONE | Red | Red |

Telephone Data

-None-

Addresses

| Bldg No. & Name | Street | Town | Postcode | Risk | Adj |
|---|---|---|---|---|---|
| LARK CRT | STILTON CRES | LONDON | NW10 8DJ | Red | Red |
| PO BOX 333 | | LONDON | UNDEFINED | Red | Red |

Account Data

| Account Name | Account No. | Sortcode | Account Type | Currency | Risk | Adj |
|---|---|---|---|---|---|---|
| PALESTINIANS RELIEF & DEVELOPMENT FUND | 140-00-04156838 | 60-08-22 | Currency Account | US Dollar | Green | Green |

Miscellaneous Data

-None-

Case Notes

| Type | Date | User | Text |
|---|---|---|---|
| Case notes | 17 Sep 2003 | Migrated | see case 617044 JC has disclosed on all accounts in a defens. |
| Summary and Assessment | 17 Sep 2003 | Migrated | |
| Conclusion | 17 Sep 2003 | Migrated | On the basis of the information available to us at the prese. |

Key Correspondence

| Upload Doc Title | Author | User | Date |
|---|---|---|---|
| letter to RM | RBS\Mcomcl GK2 | | 09 Jul 2002 |
| memo from RM | RBS\Mcomcl GK2 | | 10 Sep 2002 |
| chaser to RM | RBS\Mcomcl GK2 | | 01 Aug 2002 |
| explanation from cust | RBS\Mcomcl GK2 | | 10 Sep 2002 |
| expl from cust | RBS\Mcomcl GK2 | | 10 Sep 2002 |
| expl from cust | RBS\Mcomcl GK2 | | 10 Sep 2002 |

HIGHLY CONFIDENTIAL NW 008382

UID Case Summary

Page 3 of 3

| | | | | |
|---|---|---|---|---|
| expl from cust | RBS\Mcomd GK2 | 10 Sep 2002 | [redacted] | [redacted] |
| SUSPICION REPORT | RBS\Allenbc GK2 | 12 Jul 2002 | [redacted] | [redacted] |
| SUSPICION REPORT | RBS\Allenbc GK2 | 12 Jul 2002 | [redacted] | [redacted] |

| NCIS Disclosures | Author | Date | |
|---|---|---|---|
| NCIS Disclosure 207993 (R) | RBS\Mcomd | 17 Jun 2002 | [redacted] |

**No CIFAS Reports**

HIGHLY CONFIDENTIAL NW 008383

https://www.gk3.web.rbsgrp.net/GK3Web/caseSummary.do?caseNo=666814 20/04/07

1. **User:** Migrated **On:** 17 Sep 2003 00:00

**Note:** see case 617044 [redacted] 4/7/02 - Disclosure confirmed. I can't see from the previous case what action, if any, we requested the RM to undertake. - Given the background we should be seeking a detailed report from the RM on his knowledge of these customers. Place on spreadsheet and ensure we receive a response - I will need to comment on the High profile report. DH 5/8/02 [redacted] spoke to Terry they have received a six page document regarding the [redacted] payt, it should be received at this office within next week. CLM10/9 - Paperwork received advising that the [redacted] payment represented a donation from [redacted] - they are a regular donor. Monies said to be for health, medical, and education projects. Looking at the [redacted] account there are a number of subsequent payments to hospitals, for example, which would tend to substantiate the comments. Copies of the relevant paperwork have been scanned to the case. DH17/9/03 - When completing a further disclosure on this connection - see Goalkeeper Ref 710368 - a review of all linked disclosures was undertaken. The [redacted] [redacted] originated from [redacted] This organisation, albeit not at the time in [redacted] now appears on a list of named/suspected terrorists. GRM 29-05-03. I have spoken to Mark Ashtown (0207 230 3302) at NTFIU Special Branch [redacted] TOH

**1. User:** Migrated **On:** 17 Sep 2003 00:00

**Note:**

HIGHLY CONFIDENTIAL NW 008385

**1. User:** Migrated    **On:**    17 Sep 2003 00:00

**Note:** On the basis of the information available to us at the present time, it is considered that the above incident / activity may constitute or involve money laundering and consequently a disclosure has been made to the National Criminal Intelligence Service or other appropriate authorities. Please see attached documents for further information concerning the financial disclosure. This information may be of relevance when considering any business approaches or dealings with the above named parties.

HIGHLY CONFIDENTIAL    NW 008386

# Memorandum

The Royal Bank of Scotland Group

Group Investigations & Fraud

Ground Floor
Regents House
PO Box 348
42 Islington High Street
London N1 8XL

Telephone: 020 7615 7246
Switchboard: 020 7833 2121
Facsimile: 020 7615 7287

To: Belinda Lane

Branch/ Unit: North East Thames CBC 01-81-68

From: C McComas

Date: 09.07.02

---

**Re: Money Laundering Suspicion**

**Account: Palestinians Relief & Development Fund 60-08-22**

**Group Fraud Ref: 666814**

**We refer to your/the attached report and advise the following:**

[X] **The decision has been taken to report the matter to the Authorities. The matter must be treated in the strictest confidence and under no circumstances should the account holder be advised of this action.**

[ ] Please update 'Know Your Customer' details and obtain an explanation for the transactions. Should you remain suspicious following your interview with the customer please revert to GI&F with a full explanation of your concerns

[ ] Please ensure you review the Bank's 'Know Your Customer' and Due Diligence in respect of this connection. You may wish to consider exiting the relationship unless you are entirely happy with your findings

[ ] We consider this connection presents a serious risk to the Group, accordingly it is our view that you should exit the relationship at the earliest opportunity. You may wish to use the attached wording

[ ] Please monitor the activity on this account and revert to Group Investigations & Fraud if the activity alters significantly giving further cause for concern.

[X] **You may continue to operate the account within normal banking practice unless you hear from us to the contrary. Please forward a detailed report on your knowledge of this customer and the activities seen on the accounts.**

**Please note it is an offence to advise the customer or any other 3rd party of your report to us, that a report has been made to the authorities, or of any subsequent investigation.**

Thank you for your assistance

Signed: ...............................

HIGHLY CONFIDENTIAL NW 008387

**NatWest**

Your ref:
Our ref:

Ms C McComas
Fraud Officer
Group Investigations & Fraud
Regents House
42 Islington High Street
London
N1 8XL

Commercial Banking
Greater London East
Commercial Banking Centre
PO Box 2491, 1st Floor
10 South Street
Romford
Essex RM1 1DD
E-mail: Belinda.Lane@rbs.co.uk

Telephone: 01708 774834
Facsimile: 01708 733818

9 August 2002

Dear Charlene

Group Fraud Ref 666814 – Palestinian Relief & Development Fund

Further to your letter dated 1 August I have obtained the following information regarding the inland payment for US$180k received on 6 June.-

███████████████████████████████████

I have enclosed further information from our customers in this respect.

Yours sincerely

Belinda Lane
Commercial Manager

National Westminster Bank Plc ("the Bank") is a member of the NatWest and Bankers Marketing Group. The only packaged products (the polices, unit trusts and other collective investment schemes and endowments) and other securities the Bank advises on and sells are those of the Marketing Group, whose members are regulated by the Financial Services Authority. NatWest Stockbrokers Limited is also a member of the London Stock Exchange.

National Westminster Bank Plc. Registered in England No 929027. Registered Office 135 Bishopsgate, London EC2M 3UR

agency agreements exist between members of The Royal Bank of Scotland Group.

HIGHLY CONFIDENTIAL   NW 008388

The Royal Bank of Scotland Group

Group Investigations & Fraud

Regent's House
42 Islington High Street
London N1 8XL

Telephone 020 7615
Switchboard 020 7615 7267
ITS 770
Facsimile 020 7615 7283

Your Ref

Our Ref 666814

Date 01 08 02

Belinda Lane
Greater London East Corporate Banking Centre
PO BOX 2401
1st Floor
10 South Street
ROMFORD

**RE PALESTINIAN RELIEF & DEVELOPMENT FUND**

**GROUP FRAUD REF 666814**

Belinda

Thank you for forwarding a copy of your findings regarding the above customer.

As you are aware City IBC instigated the suspicion report as a result of the large inland payment for US$180K. As this is significantly in excess of other payments we will require further information regarding the transaction.

Please identify the following,

1 Was the payment a donation?

2 Who was the remitter?

3 Where did the payment originate?

4 Is this party a regular donator?

I understand you are on annual leave at this time, however would appreciate a reply in writing as a matter of urgency on your return. Thank you for your continued assistance in this matter

Regards Charlotte McComas
Fraud Officer



13:36 AT 0000 P. 1

INTERPAL
الصندوق الفلسطيني للإغاثة و التنمية
HELPING PALESTINIANS IN NEED

P.O. Box 3333
LONDON
NW6 1RW
Tel: 020 8450 8002
Fax: 020 8450 8004
Email: info@interpal.org
Website: www.interpal.org

BELINDA LANE
NATWEST PLC.
ROMFORD
RM1 1HD
FAX NO: 01708-733 616

Our Ref: (7805)
Date: 6 August 2002

Dear Belinda,

Transfer from Abroad: Your Query

Further to your query and our telecon yesterday, please find attached correspondence relating to the transfer that is the subject of your query.

[redacted]

Please find attached 6 pages of our letter of acknowledgement and receipt to them, and a copy of the transfer document that they forwarded to us. All the documents are accompanied by translations.

I trust this is what you require. Please do not hesitate to contact me should you need further information.

Yours sincerely,

Mr. F. Mustafa
Vice-Chair of the Board of Trustees

Registered Charity No. 1040094

HIGHLY CONFIDENTIAL NW 008390



13:36 AT 0000 P.4

Brief Translation of document no 1
Interpal's acknowledging letter to ...

Our brothers and sisters we do appreciate the effort you make in helping your brothers and sisters in Palestine. We would also like to assure you that each penny goes toward helping them. . . . . .



Page 1 of 1

13:36 RT 0000 P.6

Brief Translation of document no 2
Interpal's acknowledging letter to ...

Received by: the Palestinian Relief and Development Fund.

HIGHLY CONFIDENTIAL NW 008392

https://www.gk3.web.rbsgrp.net/GK3Web/caseSummaryMaintViewDoc.do?caseNo... 20/04/07

**EXHIBIT 134 TO DECLARATION OF VALERIE SCHUSTER**

**(bank records, 24 pages)**

**FILED UNDER SEAL**

**EXHIBIT 135 TO DECLARATION OF VALERIE SCHUSTER**

Case 1:05-cv-04622-DLI-RML Document 267-8 Filed 03/22/12 Page 320 of 441 PageID #: 6189

U.S. DEPARTMENT OF THE TREASURY

# Press Center

## Treasury Designates Al-Aqsa International Foundation as Financier of Terror Charity Linked to Funding of the Hamas Terrorist Organization

5/29/2003

FROM THE OFFICE OF PUBLIC AFFAIRS

JS-439

WASHINGTON, DC  The U.S. Treasury Department has designated the Al-Aqsa Foundation as a Specially Designated Global Terrorist (SDGT) entity under Executive Order 13224. As a result of this designation by Treasurys Office of Foreign Assets Control (OFAC), all assets of the Al-Aqsa Foundation are blocked and transactions with the organization are prohibited.

By designating the Al-Aqsa Foundation, we have deprived the Hamas terrorist organization of a vital source of funding and have shut off yet another pipeline of money financing terror. Todays action demonstrates our commitment to prevent the perversion of charitable organizations for terrorist ends, Secretary Snow stated.

Al Aqsa is a critical part of Hamas terrorist support infrastructure. Through its headquarters in Germany and branch offices in the Netherlands, Denmark, Belgium, Sweden, Pakistan, South Africa, Yemen and elsewhere, Al Aqsa funnels money collected for charitable purposes to Hamas terrorists.

Other nations, including the Netherlands, Germany, Denmark, Britain, Luxembourg and Switzerland, have also taken action against the Al-Aqsa Foundation.

The Al Aqsa Foundation is the 18th financier of terror disguised as a charitable organization designated by the Treasury Department. With todays action, there are now 264 individuals and entities designated as SDGTs and over $137 million in their assets frozen worldwide.

Further details on the Al-Aqsa Foundation are attached.

Background: AL-AQSA FOUNDATION

AKAs: Al-Aqsa International Foundation, Al-Aqsa Charitable Foundation, Sanabil al-Aqsa Charitable Foundation, Al-Aqsa Sinabil Establishment, Al-Aqsa Charitable Organization, Charitable Al-Aqsa Establishment, Mu'assa al-Aqsa al-Khayriyya, Mu'assa Sanabil Al-Aqsa al- Khayriyya, Aqssa Society, Al-Aqsa Islamic Charitable Society, Islamic Charitable Society for al-Aqsa, Charitable Society to Help the Noble al-Aqsa, Nusrat al-Aqsa al-Sharif

The AL-AQSA FOUNDATION is a critical part of Hamas' transnational terrorist support infrastructure. Hamas is designated by the Secretary of State as a Foreign Terrorist Organization (66 Fed. Reg. 51088) and as Specially Designated Global Terrorist (SDGT) under Executive Order 13224, "Blocking Property and Prohibiting Transactions with Persons Who commit, Threaten to Commit, or Support Terrorism." Hamas is known to raise at least tens of millions of dollars per year throughout the world using charitable fundraising as cover.

The AL-AQSA FOUNDATION, until recently headquartered in Germany, uses humanitarian relief as cover to provide support to the Hamas terrorist organization. Mahmoud Amr, the Director of the AL-AQSA FOUNDATION in Germany, is an active figure in Hamas. The AL-AQSA FOUNDATION also is known to maintain branch offices in The Netherlands, Denmark, Belgium, Sweden, Pakistan, South Africa, Yemen and elsewhere. AL-AQSA FOUNDATION offices are included in lists of organizations that contributed to the Hamas-affiliated Charity Coalition in 2001 and 2002.

Since the summer of 2002, authorities in The Netherlands, Denmark, Germany and the U.S. have taken administrative and/or law enforcement action against the AL-AQSA FOUNDATION and some of its leaders based

PENGAD 800-631-6989 EXHIBIT 27 10/8/11 SC

Case 1:05-cv-04622-DLI-RML  Document 267-8  Filed 03/22/12  Page 321 of 441 PageID #: 6190

on evidence of the organization's support for Hamas and other terrorist groups.  Pursuant to a July 31, 2002 administrative order, German authorities closed the AL-AQSA FOUNDATION in Germany for supporting Hamas. In April 2003, Dutch authorities blocked AL-AQSA FOUNDATION assets in The Netherlands based on information that funds were provided to organizations supporting terrorism in the Middle East.

Criminal charges against some AL-AQSA FOUNDATION officials were also filed.  On January 1, 2003, the Danish government charged three AL-AQSA FOUNDATION officials in Denmark for supporting terrorism.  Also, the head of the Yemeni branch of the AL-AQSA FOUNDATION, Shaykh Muhammad Ali Hassan AL-MUAYAD, was arrested for providing support to terrorist organizations including Al-Qaeda and Hamas in January 2003 by German authorities.

In Scandinavia, the Oslo, Norway-based Islamic League used the AL-AQSA FOUNDATION in Sweden to channel funds from some members of the Islamic community in Oslo, Norway to Hamas.
 In late 2001 for example, a human courier was used to transfer funds from the Islamic League in Norway to the AL - AQSA FOUNDATION in Sweden.  In another instance in 2002, money, gold and jewelry were collected by the Islamic League (in Oslo, Norway) and transferred to the AL-AQSA FOUNDATION in Sweden to be provided to Hamas.

At the Islamic League of Norway's annual conference held on May 18 and 19, 2002, the General Secretary of the Islamic League in Sweden urged all Muslims to provide support and to participate in continuing the suicide operations against Israel.  He called for further financial support from all conference participants to the AL-AQSA FOUNDATION in Sweden, noting that this financial support could contribute to the destruction of Israel.

Strong ties have existed between the Hamas and AL-AQSA FOUNDATION offices in Yemen.  Officials of the organizations met frequently and the AL-AQSA FOUNDATION was identified as a "Hamas-affiliate."  As discussed in a previously unsealed FBI Affidavit, AL-MUAYAD, the head of the AL-AQSA FOUNDATION in Yemen, has allegedly provided money, arms, recruits and communication equipment for Al-Qaeda.  At least until AL-MUAYAD's arrest, Ali Muqbil, the General Manager of the AL-AQSA FOUNDATION in Yemen and a Hamas official, transferred funds on AL-MUAYAD□s orders to Hamas, PIJ or other Palestinian organizations assisting "Palestinian fighters."  The disbursements were recorded as contributions for charitable projects.  Through channels such as this, AL-MUAYAD reportedly provided more than U.S. $3 million to the "Palestinian cause".

HEAD OFFICE:
Aachen, Germany

BRANCH OFFICES:
Rotterdam, Holland
Copenhagen, Denmark
Brussels, Belgium
San□a, Yemen
Malmo, Sweden
Johannesburg, South Africa
Islamabad, Pakistan

**EXHIBIT 136 TO DECLARATION OF VALERIE SCHUSTER**

Press Office
Threadneedle Street
London EC2R 8AH

Telephone: 020-7601 4411
Fax: 020-7601 5460

press@bankofengland.co.uk
www.bankofengland.co.uk

# Bank of England

# News Release

29 May 2003

**TERRORIST FINANCING : LIST OF SUSPECTS**

The Bank of England, as agent for Her Majesty's Treasury, has today directed financial institutions that any funds which they hold for or on behalf of Al-Aqsa Foundation (full identifying details provided below) must be frozen. This is because the Treasury have reasonable grounds for suspecting that Al-Aqsa Foundation is or may be a person who commits, attempts to commit, facilitates or participates in the commission of acts of terrorism.

Financial institutions are requested to check whether they maintain any accounts for the organisation named below and, if so, they should freeze the accounts and report their findings to the Bank of England.

**Entity**

1. **AL-AQSA FOUNDATION** – (a.k.a. Al-Aqsa International Foundation, a.k.a. Al-Aqsa Charitable Foundation, a.k.a. Sanabil al-Aqsa Charitable Foundation, a.k.a. Al-Aqsa Sinabil Establishment, a.k.a. Al-Aqsa Charitable Organization, a.k.a. Charitable Al-Aqsa Establishment, a.k.a. Mu'assa al-Aqsa al-Khayriyya, a.k.a. Mu'assa Sanabil Al-Aqsa al-Khayriyya, a.k.a. Aqssa Society, a.k.a. Al-Aqsa Islamic Charitable Society, a.k.a. Islamic Charitable Society for al-Aqsa, a.k.a. Charitable Society to Help the Noble al-Aqsa, a.k.a. Nusrat al-Aqsa al-Sharif, a.k.a. Aqsa Charitable Establishment, a.k.a. Al-Aqsa Spanm I Stiftelse, a.k.a. Al Aqsa Spanmal Stiftelse, a.k.a. Swedish Charitable Aqsa Est.)

   Addresses:

1. Al-Aqsa E.V., Kappellenstrasse 36, D-52066, Aachen, Germany (Head Office)

2 Stichting Al-Aqsa, Gerrit V/D Lindestraat 103 A (or E), 3022 TH, Rotterdam, Holland (Branch).

EXHIBIT
28
6/8/11 SC
PENGAD 800-631-6989

(Cont'd)

3 Foreningen Al-Aqsa, P.O. Box 6222200KBKN (Denmark Branch)

4 Al-Aqsa (ASBL) BD Leopold II 71, 1080 Brussels, Belgium (Branch).

5 Aqssa Society – Yemen, P.O. Box 14101, San'a (Branch).

6 Noblev (a.k.a. Nobelvagen) 79 NB, 21433 Malmo (Sweden Branch).

7 PO Box 421083 (and/or 421082), 2nd floor, Amoco Gardens, 40 Mint Road, Fordsburg 2033, Johannesburg, South Africa (Branch).

8 P.O. Box 2364, Islamabad, Pakistan (Branch).

The entity is in addition to those listed in:

The Bank's Notices dated 6 May 2003, 28 February 2003, 20 February 2003, 30 January 2003, 24 January 2003, 13 December 2002, 19 November 2002, 24 October 2002, 18 October 2002, 14 August 2002, 18 July 2002, 19 April 2002, 9 January 2002, 28 December 2001, 21 December 2001 and 6 December 2001 – each entitled NOTICE CONTAINING A DIRECTION UNDER ARTICLE 4 OF THE TERRORISM (UNITED NATIONS MEASURES) ORDER 2001 (S.I. 2001/3365);

The Bank's Notices dated 24 January 2003, 19 April 2002 and 11 March 2002 – each entitled NOTICE CONTAINING A DIRECTION UNDER ARTICLE 8 OF THE AL-QA'IDA AND TALIBAN (UNITED NATIONS MEASURES) ORDER 2002 (S.I. 2002/111).

ENDS

**Notes to Editors**

The Bank has previously issued Notices and press releases concerning Terrorism, Al-Qa'ida and the Taliban on 6 May, 15 April, 28 February, 21 February, 20 February, 30 January, 27 January and 24 January 2003, 13 December, 19 November, 24 October, 18 October, 11 October, 1 October, 12 September, 5 September, 14 August, 18 July, 19 April, 11 March, 9 January 2002, 28 December, 21 December and 6 December 2001. Earlier relevant Notices were issued on 3 May 2000, 23 February, 2 April, 10 & 12 October, 2 & 8 November 2001.

**Bank of England Notice**                                    **29 May 2003**

**UNITED NATIONS ACT 1946**

**NOTICE CONTAINING A DIRECTION UNDER ARTICLE 4 OF THE TERRORISM (UNITED NATIONS MEASURES) ORDER 2001 (S.I. 2001/3365)**

1.      On 28 September 2001, the United Nations Security Council adopted resolution 1373 (2001). As from 10 October 2001, effect has been given in the United Kingdom to paragraph 1(c) and (d) of this resolution by the Terrorism (United Nations Measures) Order 2001 (SI 2001/3365), hereafter "the 2001 Order". The 2001 Order was made by Her Majesty by Order in Council in exercise of the powers conferred on Her by section 1 of the United Nations Act 1946 (c. 45).

2.      In exercise of their powers under article 4 of the 2001 Order, the Treasury (through the Bank of England acting as the Treasury's agent) hereby direct all relevant institutions that any funds which they hold for or on behalf of the person listed in Annex 1 hereto must not be made available to any person except under the authority of a licence granted by the Treasury. This direction is to have effect until revoked by further notice given by the Treasury.

3.      Where a relevant institution holds funds for or on behalf of the person listed in Annex 1, it must without delay send a copy of this notice to the person for whom, or on whose behalf, they are held.

4.      A person who contravenes the direction given under paragraph 2, or who fails to comply with the requirement in paragraph 3, is guilty of a criminal offence under the 2001 Order.

5.      In this notice, "funds" and "relevant institution" have the meaning given by the 2001 Order, as amended by the Al-Qa'ida and Taliban (United Nations Measures) Order 2002 (SI 2002/111), art 1(6) and the Financial Services and Markets Act 2000 (Consequential Amendments) (No. 2) Order 2001 (SI 2001/3801), art 2(1), (3).

6.      Enquiries concerning any matter contained in this notice are to be addressed to the Bank of England, Threadneedle Street, London, EC2R 8AH and marked for the attention of the Financial Sanctions Unit (FSU). Enquiries may also be made at sanctions.unit@bankofengland.co.uk, on 020 7601 4309 (fax) or by telephone (020 7601 4768/4783/5580/5811).

BANK OF ENGLAND
29 May 2003

29 May 2003 ANNEX 1

**TERRORISM (UNITED NATIONS MEASURES) ORDER 2001**

**Entity**

1. **AL-AQSA FOUNDATION**

AKA: Al-Aqsa International Foundation
Al-Aqsa Charitable Foundation
Sanabil al-Aqsa Charitable Foundation
Al-Aqsa Sinabil Establishment
Al-Aqsa Charitable Organization
Charitable Al-Aqsa Establishment
Mu'assa al-Aqsa al-Khayriyya
Mu'assa Sanabil Al-Aqsa al-Khayriyya
Aqssa Society
Al-Aqsa Islamic Charitable Society
Islamic Charitable Society for al-Aqsa
Charitable Society to Help the Noble al-Aqsa
Nusrat al-Aqsa al-Sharif
Aqsa Charitable Establishment
Al-Aqsa Spanm I Stiftelse
Al Aqsa Spanmal Stiftelse
Swedish Charitable Aqsa Est

Addresses:

1. Al-Aqsa E.V., Kappellenstrasse 36, D-52066, Aachen, Germany (Head Office)

2. Stichting Al-Aqsa, Gerrit V/D Lindestraat 103 A (or E), 3022 TH, Rotterdam, Holland (Branch).

3. Foreningen Al-Aqsa, P.O. Box 6222200KBKN (Denmark Branch)

4. Al-Aqsa (ASBL) BD Leopold II 71, 1080 Brussels, Belgium (Branch).

5. Aqssa Society – Yemen, P.O. Box 14101, San'a (Branch).

6. Noblev (a.k.a. Nobelvagen) 79 NB, 21433 Malmo (Sweden Branch).

7. PO Box 421083 (and/or 421082), 2nd floor, Amoco Gardens, 40 Mint Road, Fordsburg 2033, Johannesburg, South Africa (Branch).

8. P.O. Box 2364, Islamabad, Pakistan (Branch).

BANK OF ENGLAND
29 May 2003

**EXHIBIT 137 TO DECLARATION OF VALERIE SCHUSTER**

**(letters between the Bank of England's Financial Sanctions Unit and NatWest, 7 pages)**

**FILED UNDER SEAL**

**EXHIBIT 138 TO DECLARATION OF VALERIE SCHUSTER**

Home
http://www.acpo.police.uk/Home.aspx

Freedom of Information | Vacancies | Links | Contacts |

ASSOCIATION OF CHIEF POLICE OFFICERS

Home About Business Areas Professional Practice National Policing Latest News

Policing the 2012 Olympic Games

ACPOS

ASK THE POLICE
FREQUENTLY ASKED QUESTIONS DATABASE

ASSOCIATION OF CHIEF POLICE OFFICERS
IN SUPPORT OF HELP for HEROES

## Welcome to ACPO

The Association of Chief Police Officers (ACPO) brings together the expertise and experience of chief police officers from England, Wales and Northern Ireland, providing a professional forum to share ideas and best practice, co-ordinate resources and help deliver effective policing which keeps the public safe.

## Latest News

### ACPO comment on Criminal Justice Joint Inspection report Exercising Discretion: The Gateway to Justice

ACPO comments on an inspection into the police service's use of cautions, penalty notices for disorder and restorative justice

### ACPO comment on the establishment of the National Crime Agency

The National Crime Agency offers an opportunity to raise our game against some of the most harmful and dangerous individuals in the UK

### ACPO response to the Governme[illegible] Prevent review

The police service has played a central role in driving forward preventing violent

### Police Chiefs' Blog

- Sir Norman Bettison: Prevent Review, 7 June 2011
- Janet Williams: Policing cyberspace, 9 May 2011
- Mark Rowley: Surrey Police, bureaucracy and the frontline, 15 April 2011

### ACRO

- Emigrating? Find out more about police certificates from ACRO
- Do you need advice on subject access? Find out more from ACRO
- Contact ACRO

Home
http://www.acpo.police.uk/Home.aspx

# ASSOCIATION OF CHIEF POLICE OFFICERS

Policing the 2012 Olympic Games

ACPOS

ASK THE POLICE
FREQUENTLY ASKED QUESTIONS DATABASE

ASSOCIATION OF CHIEF POLICE OFFICERS
IN SUPPORT OF HELP *for* HEROES

## Welcome to ACPO

The Association of Chief Police Officers (ACPO) brings together the expertise and experience of chief police officers from England, Wales and Northern Ireland, providing a professional forum to share ideas and best practice, co-ordinate resources and help deliver effective policing which keeps the public safe.

## Latest News

### ACPO comment on Criminal Justice Joint Inspection report Exercising Discretion: The Gateway to Justice

ACPO comments on an inspection into the police service's use of cautions, penalty notices for disorder and restorative justice

### ACPO comment on the establishment of the National Crime Agency

The National Crime Agency offers an opportunity to raise our game against some of the most harmful and dangerous individuals in the UK

### ACPO response to the Government's Prevent review

The police service has played a central role in driving forward preventing violent extremism

### Police Chiefs' Blog

- Sir Norman Bettison: Prevent Review, 7 June 2011
- Janet Williams: Policing cyberspace, 9 May 2011
- Mark Rowley: Surrey Police, bureaucracy and the frontline, 15 April 2011

### ACRO

- Emigrating? Find out more about police certificates from ACRO
- Do you need advice on subject access? Find out more from ACRO
- Contact ACRO

Statement of Purpose
http://www.acpo.police.uk/about/aboutacpo.aspx

Freedom of Information | Vacancies | Links | Contacts |

ASSOCIATION OF
CHIEF POLICE OFFICERS

Home About Business Areas Professional Practice National Policing Latest News

Find out More

Statement of Purpose
Membership
History and Future
President
Chief Constables' Council
Cabinet
Directors
PNICC
Business Structure
Governance
ACPOS
Speeches and Articles

## About ACPO

The Association brings together the expertise and experience of chief police officers from England, Wales and Northern Ireland, providing a professional forum to share ideas and best practice, coordinate resources and help deliver effective policing which keeps the public safe

### Statement of Purpose

The Association of Chief Police Officers (ACPO) is an independent, professionally led strategic body. In the public interest and, in equal and active partnership with Government and the Association of Police Authorities, ACPO leads and coordinates the direction and development of the police service in England, Wales and Northern Ireland. In times of national need ACPO, on behalf of all chief officers, coordinates the strategic policing response.

**Police Chiefs' Blog**

- Sir Norman Bettison: Prevent Review, 7 June 2011
- Janet Williams: Policing cyberspace, 9 May 2011
- Mark Rowley: Surrey Police, bureaucracy and the frontline, 15 April 2011

**ACRO**

- Emigrating? Find out more about police certificates from ACRO
- Do you need advice on subject access? Find out more from ACRO
- Contact ACRO

Vacancies | Association of Chief Police Officers ©2011. Company Number: 3344583. Registered in England and Wales.

**EXHIBIT 139 TO DECLARATION OF VALERIE SCHUSTER**



# Terrorism & the Law LAW 5290M

**Semester 2, 2007-08, 30M**

| Lecturer |
| --- |
| **Professor Clive Walker**<br>**law6cw@leeds.ac.uk** |

## Module Objectives

**On completion of this module, students should be able:**

- to demonstrate knowledge and understanding of detailed and complex contemporary debates in theoretical and empirical literature about the meanings and phenomenon of terrorism, with special emphasis upon counter-terrorism and its pursuit by laws so that they can define terms with precision, recognise the limits in existing formulae and state policies and laws with accuracy
- to analyse and critically discuss and assess with knowledge of underlying policies and values the controversial issues around terrorism and counter-terrorism and their practical impacts to an advanced level
- to distil and critique strategic and tactical policy choices and the relationships between law and politics
- to demonstrate an advanced awareness of comparative approaches in other jurisdictions and the approach in international law
- to have an independent ability to further their knowledge about, and research into, the issues arising from the topics and themes and to write about these issues in a structured and academically advanced way

**On completion of this module, students should have acquired the following subject specific skills**

- Advanced ability to comprehend and amass data about terrorism and the law
- Advanced ability to make well-grounded, well-structured and well-referenced oral and written presentations about the subject
- Advanced ability to analyse and criticise the data using the policy goals and also normative standards such as human rights
- Advanced ability to plan, develop and produce research

## Teaching Delivery

**Seminars:** 10 x 2 hours. Friday 15.00-17.00 in Law Seminar Room 1 (2nd floor, Law School).

**By regulations of the School of Law:**
**(i) seminar attendance is compulsory and registers are taken of attendance;**
**(ii) you must attend only at the designated seminar group. Permission must be obtained in advance to attend another group.**

## Assessment

The formal assessment will be based upon **2 x 4500 word essays**. The title(s) will be issued no later than the final seminar.

**Regulations applying to the summative essay (please consult your assessment form for more details):**

- Penalties will be applied for late submission
- Penalties will be applied for failing to state the word count
- Penalties will be applied exceeding the word limit set for an essay
- **University regulations also provide severe penalties for plagiarism.** For further details, see http://www.ldu.leeds.ac.uk/plagiarism/index.php

At any level of scholarship you gain credit for demonstrating that you have read widely in relevant literature, and the assessed essay is no exception to this. Therefore, make sure you acknowledge the source of your references, not only to avoid accusations of plagiarism but also to demonstrate that you have, indeed done your own research in the texts of others. If you fail to do so you know the consequences, and you have been warned!

There is a detailed **guidebook on the writing of essays** within the School of Law in the Nathan Bodington site at: http://www.fldu.leeds.ac.uk/site/nbodington/law/deptinfo/essay/

Guidelines as to **layout and referencing** are available at:
http://www.fldu.leeds.ac.uk/site/nbodington/law/deptinfo/lawexamugweb/

The **criteria used to mark your essay** are reproduced in the Code of Assessment also available at http://www.fldu.leeds.ac.uk/site/nbodington/law/deptinfo/lawexamugweb/

# Seminar Syllabus

***Note: The allocation of sessions is approximate only.***

## Part I: CONCEPTS AND INSTITUTIONAL SETTINGS

Session 1: **Terrorism and counter-terrorism strategies**: Emergencies and terrorism. Strategies in military and political terms. Typologies of terrorism. Meaning of state terrorism. Selected histories of terrorism with examples from Ireland, Middle East, animal rights and al Qa'ida. Exits from terrorism such as in Northern Ireland 'Peace Process'.

Session 2: **Terrorism and legal principle**: Legal strategies for counter-terrorism and the reason for special laws. Modes of approach – criminal justice model/war model/executive model/others. The meaning and role of intelligence. The problem of respect for constitutionalism and rights and the possibility of derogation. Difficulties of definition.

Sessions 3 - 4: **Terrorism administration and accountability**:

- Terrorism and the executive: Central government organisations; debates about a homeland security department; security and policing organisations; use of independent advisers and other forms of accountability. Contingency planning.
- Modes of scrutiny in Parliament – debates and relevant select committees.
- Terrorism and the courts: Modes of scrutiny by the courts. Judicial review and review under the Human Rights Act 1998. Judicial attitudes.

Session 5: **Terrorism and international law**: Relevant treaties – hijacking, specially protected persons and places, bombing convention, financing restraints in EU and international law. Oversight mechanisms such as the UN Counter-Terrorism Committee. Human rights agenda and derogation.

## Part II: THE DYNAMICS OF TERRORISM AND COUNTER-TERRORISM

Session 6: **Terrorism policing**. Powers of arrest, detention, search and surveillance. The use of lethal force. The possible use of torture.

Session 7: **Terrorism and executive powers**: internment powers; control orders. Measures against foreign suspects – asylum and deportation.

Session 8: **Terrorism and criminal process**: Special modifications to the pre-trial process, trial (including abolition of jury) and sentencing. Use of informants and security witnesses. Special advocates. Special offences and the use of ordinary offences.

Session 9: **Terrorism and freedom of expression**: Proscription of groups. Offences against glorification and indirect support. Rules about political participation in Northern Ireland. Terrorism and cyberspace - cyberspace as a site for terrorism and for detection

Session 10: **Terrorism and its infrastructure**: Measures to track and prosecute terrorism through financial investigations. Measures against weapons of mass destruction, explosives and firearms.

# Recommended Reading

**Essential reading**

**Walker, C., *A Guide to the Anti-Terrorism Legislation* (Oxford University Press, Oxford, 2002) – note that updates are available at http://www.oup.com/uk/booksites/content/1841741833/**

**Specialist Journals** ***(relevant to every subject in the syllabus – available online)***

- *Studies in Conflict& Terrorism*
- *Terrorism & Political Violence*

**Other reading**

*Primary sources*

*Cases:* Cases from the courts of England and Wales can be found on paper in the Laws sections of the Brotherton Library or via University databases ie LEXIS and Westlaw. European Court of Human Rights cases can be found at HUDOC – search by using the application number (http://www.echr.coe.int/ECHR/EN/Header/Case-Law/HUDOC/HUDOC+database/).

*Legislation:* The relevant legislation can be consulted at http://www.statutelaw.gov.uk/. The Stationery Office web-site (http://www.opsi.gov.uk/acts.htm) contains some excellent memoranda. The prime statutes are: Terrorism Act 2000; Anti-terrorism Crime and Security Act 2001; Prevention of Terrorism Act 2005; Terrorism Act 2006; Counter-Terrorism Bill 2007-08.

*Official reports:* The lead department is the Home Office (http://www homeoffice.gov.uk/security/). The independent reviewer of terrorism legislation is Lord Carlile, whose reports are published by the Home Office. His reports have covered: the Terrorism Act 2000; Part VII of the Terrorism Act 2000; the Prevention of Terrorism Act 2005; the Terrorism Act 2006 Pt. I, plus occasional reports on specific issues.

*Parliamentary reports:* The prime Parliamentary sources are the Home Affairs Committee (http://www.parliament.uk/parliamentary_committees/home_affairs_committee.cfm), the Intelligence and Security Committee (http://www.cabinetoffice.gov.uk/intelligence.aspx), and the Joint Committee on Human Rights (http://www.parliament.uk/parliamentary_committees/joint_committee_on_human_rights.cfm).

*Secondary sources*

*Journals*: Aside from the journal, *Terrorism & Political Violence*, reference should be made to other English journals such as *European Human Rights Law Review*, *Modern Law Review*, and *Public Law*. Since 9/11, many excellent papers have appeared in US law reviews. Journal papers can be found on paper in the Law sections of the Brotherton Library or via University databases ie LEXIS and Westlaw.

*Books*: Since 9/11, there are plenty to consider. The following are especially relevant:

- Dershowitz, A., *Why Terrorism Works* (Yale University Press, New Haven, 2002)
- Duffy, H., *The 'War on Terror' and the Framework of International Law* (Cambridge University Press, New York, 2005)
- Dyzenhaus, D., *The Constitution of Law: Legality in a Time of Emergency* (Cambridge University Press, New York, 2006)
- Gross, O., and Ní Aoláin, F., *Law in Times of Crisis: Emergency Powers in Theory and Practice* (Cambridge University Press, Cambridge, 2006)
- Jones, A., Bowers, R, and Lodge, H.D., *The Terrorism Act 2006* (Oxford University Press, Oxford, 2006)
- Ramraj, V.V., Hor, M., and Roach, K., *Global Anti-terrorism Law and Policy* (Cambridge University Press, Cambridge, 2005)
- Walker, C., *A Guide to the Anti-Terrorism Legislation* (Oxford University Press, Oxford, 2002) – note that updates are available at http://www.oup.com/uk/booksites/content/1841741833/
- Walker, C., and Broderick, J., *The Civil Contingencies Act 2004* (Oxford University Press, Oxford, 2006)
- Wilkinson, P., *Terrorism versus Democracy* (Frank Cass, London, 2000)

# Internet Resources

*Note: T hese s ources come with a health warning – their vi ews as to what is 'terrorism' an d what are appropriate responses are at times idiosyncratic or even wholly wrong (in my view).*

| | |
|---|---|
| America's war on terrorism | http://www.lib.umich.edu/govdocs/usterror html |
| CAIN | http://www.cain.ulst.ac.uk/ |
| Centre for the Study of Terrorism & Political Violence | h ttp://www.st-andrews.ac.uk/~wwwir/research/cstpv/ |
| Center for Terrorism Law | h ttp://www.stmarytx.edu/ctl/ |
| Center on Global Counter-Terrorism Cooperation | h ttp://www.globalct.org/html/about html |
| Center on Terrorism and Irregular Warfare | http://www nps navy.mil/ctiw/ |
| Home Office | h ttp://www homeoffice.gov.uk/security/ |
| Institute for Counter-terrorism | h ttp://www.ict.org.il/ |
| Intelligence and Terrorism Information Center | http://www.terrorism-info.org.il/ |
| JURIST Terrorism Law and Policy | http://jurist.law.pitt.edu/terrorism htm |
| Metropolitan Police | http://www met.police.uk/so/counter_terrorism htm |
| MIPT Terrorism Knowledge Base | http://www.tkb.org./Home.jsp |
| National Consortium for the Study of Terrorism and Responses to Terror (START) | http://www.start.umd.edu/ |
| National Terrorism Center | h ttp://www nationalterrorismcenter.us/ |
| Pakistan Security Research Unit | http://spaces.brad.ac.uk:8080/display/ssispsru/Home |
| Patterns of Global Terror | http://www.terrorisminfo.mipt.org/Patterns-of-Global-Terrorism.asp |
| Research Guide | h ttp://www nyulawglobal.org/globalex/Terrorism.htm |
| Royal United Services Institute | h ttp://www rusi.org/ |
| Security Service (MI5) | http://www.mi5.gov.uk/ |
| South Asia Terrorism Portal | http://www.satp.org/ |
| Terrorism Research Center | http://www.terrorism.com/ |
| UK Resilience | h ttp://www.ukresilience.info/emergencies/terrorism.aspx |
| UN Action to Counter Terrorism | http://www.un.org/terrorism/ |
| United Nations Counter-Terrorism Committee | http://www.un.org/sc/ctc/ |
| US Department of State | http://www.state.gov/s/ct/ |

More general criminal justice related websites are linked by the Criminal Justice Weblinks: www.law.leeds.ac.uk/cjlinks

**There are also important materials for this module available on the Nathan Bodington site at <http://www.fldu leeds.ac.uk/site/nbodington/law/lawpgmodules/pgt/ccjs/terror/>**

**EXHIBIT 140 TO DECLARATION OF VALERIE SCHUSTER**



# Terrorism & the Law LAW 3175

**Semester 2, 2010-11, 20UG**

| Lecturer |
|---|
| **Professor Clive Walker**<br>**law6cw@leeds.ac.uk** |

## Module Objectives

**On completion of this module, students should be able:**

- to demonstrate knowledge and understanding of contemporary debates in theoretical and empirical literature about the meanings and phenomenon of terrorism, with special emphasis upon counter-terrorism and its pursuit by laws so that they can define terms with precision, recognise the limits in existing formulae and state policies and laws with accuracy
- to analyse and critically discuss and assess with knowledge of underlying policies and values the controversial issues around terrorism and counter-terrorism and their practical impacts
- to distil strategic and tactical policy choices and the relationships between law and politics
- to demonstrate an awareness of comparative approaches in other jurisdictions and the approach in international law
- to develop an independent ability to further their knowledge about, and research into, terrorism and the law and to write about these issues in a structured and academic way

**On completion of this module, students should have acquired the following subject specific skills**

- Ability to comprehend and amass data about terrorism and the law
- Ability to make well-grounded, well-structured and well-referenced oral and written presentations
- Ability to analyse and criticise the data by reference to policy goals and normative standards such as human rights
- Ability to plan, develop and produce research

## Teaching Delivery

**Lectures:** Up to 20 x 1 hour (2 per week, weeks 14-23).
Lecture 1: Tuesdays 11.00-12.00 (Moot Court 1.28, Liberty Building)
Lecture 2: Friday 10.00-11.00 (Moot Court 1.28, Liberty Building)
In weeks 19 and 21 only, there will be no lecture on Tuesday (1 and 15 March) but a double session on Friday (4 and 18 March)

**Seminars:** Two seminars x 2 hours. Seminar sessions: Monday 10.00-12.00 Liberty SR 1.08 and 14.00-16.00 Liberty SR 1.08 and Thursday 10.00-12.00 Liberty SR 1.11 and 14.00-16.00 Worlsey LR 7 6.55.

- Seminar 1 in week 17 (Monday 14 February and Thursday 17 February) – attend one session
- Seminar 2 in week 20 (Monday 7 March and Thursday 10 March) – attend one session

**You must attend only your designated group. Permission must be obtained in advance to attend another group.**

## Assessment

**Formative:** To monitor progress but not counting towards formal assessment: 1000 word essay will be issued in week 17 (w/e 18 February), to be completed by week 19 (w/e 4 March) and returned in week 21 (w/e 18 March).

**Summative:** The formal assessment will be based upon:
- Two hour examination (worth 67%) of marks
- 1 x 2,000 word essay (33%) to be issued by the end of term 2 (w/e 1 April) and completed by a date to be notified in early May 2011. The title(s) will be issued in lectures and will be available online.

**Please ensure you are aware of the rules about: late submission; word limits and penalties for excess; plagiarism. Guidelines as to the writing of essays, layout and referencing, assessment schemes, and the avoidance of plagiarism are available in student handbooks and in the University portal.**

## Lecture Syllabus

*(Delivered by lectures – 2 per week. The allocation of sessions is approximate only.)*

Sessions 1 - 2: **Terrorism and counter-terrorism strategies**: Emergencies and terrorism. Strategies in military and political terms. Typologies of terrorism. Meaning of 'state terrorism'. Selected histories of terrorism with examples from Ireland, Middle East, animal rights and al Qa'ida. Exits from terrorism such as the Northern Ireland 'Peace Process'.

Sessions 3 - 4: **Terrorism and legal principle**: Legal strategies for counter-terrorism and the reason for special laws. Modes of approach – criminal justice model/war model/executive model/others. The meaning and role of intelligence. The problem of respect for constitutionalism and rights and the possibility of derogation. Difficulties of definition of 'terrorism'.

Sessions 5 - 6: **Terrorism and freedom of expression**: Proscription of groups. Offences against glorification and indirect support. Rules about political participation in Northern Ireland. Terrorism and cyberspace - cyberspace as a site for terrorism and for detection

Sessions 7 - 8: **Terrorism and executive powers**: internment powers; control orders. Measures against foreign suspects – asylum and deportation.

Sessions 9 - 12: **Terrorism and policing**: Powers of arrest, detention, search and surveillance, stop and search. The use of lethal force. The possible use of torture.

Sessions 13 - 14: **Terrorism and criminal process**: Special modifications to the pre-trial process, trial (including abolition of jury) and sentencing. Use of informants and security witnesses. Special advocates. Special offences and the use of ordinary offences.

Sessions 15 - 16 **Terrorism and international law**: Relevant treaties – hijacking, specially protected persons and places, bombing convention, financing restraints in EU and international law. Oversight mechanisms such as the UN Counter-Terrorism Committee. Human rights agenda and derogation.

Sessions 17 - 20 : **Terrorism administration and accountability**: Central government organisations; debates about a homeland security department; security and policing organisations; use of independent advisers and other forms of accountability; contingency planning. Modes of scrutiny by Parliament – debates and relevant select committees. Modes of scrutiny by the courts: judicial review and review under the Human Rights Act 1998; judicial attitudes.

## Seminar Syllabus

*The class is split into four groups per seminar. Please check your timetable for the group to which you have been assigned. Please expect to undertake work for each seminar. Seminars can only work effectively for your benefit if you are willing to make preparations and join in discussions. At each seminar, selected students will be asked to prepare a presentation and every student will be involved in this way over the course of the two seminars.*

**Seminar 1: Terrorism and political freedoms**: Explorations of the ways in which expressive and associational freedoms are limited by anti-terrorism legislation.

**Seminar 2: Terrorism and executive powers**: The focus will be on control orders.

## Recommended Reading

**Essential reading**

- Walker, C., *A Guide to the Anti-Terrorism Legislation* (2nd ed., Oxford University Press, Oxford, 2009). Notes: The extracts from legislation in the Appendices to this book may be taken into the examination. To use the book in this way, you may either photocopy these Appendices or simply tear the book in half. You may not take other parts of the book into the examination, nor may you use photocopies or print-outs of legislation from any other sources.

**Other reading**

*Cases:* Cases from the courts of England and Wales can be found on paper in the Law sections of the Brotherton Library or via University databases ie LEXIS and Westlaw. European Court of Human Rights cases can be found at HUDOC – search by using the application number (http://www.echr.coe.int/ECHR/EN/Header/Case-Law/HUDOC/HUDOC+database/).

*Legislation:* The relevant legislation can be consulted in consolidated format at http://www.statutelaw.gov.uk/. The original texts and Explanatory memoranda can be found at http://www.legislation.gov.uk/ukpga.

*Official reports:* The lead department is the Home Office (http://security.homeoffice.gov.uk/).

*Parliamentary reports:* The prime Parliamentary sources are

- Home Affairs Committee: www.parliament.uk/parliamentary_committees/home_affairs_committee.cfm
- Intelligence and Security Committee: http://isc.independent.gov.uk/
- Joint Committee on Human Rights: www.parliament.uk/parliamentary_committees/joint_committee_on_human_rights.cfm

*Specialist journals*:

- *Studies in Conflict & Terrorism*
- *Terrorism & Political Violence*

*Books*: The following are especially relevant:

- Bonner, D., *Executive Measures, Terrorism and National Security* (Ashgate, Aldershot, 2007)
- Dershowitz, A., *Why Terrorism Works* (Yale University Press, New Haven, 2002)
- Donohue, L. K., *The Cost of Counterterrorism: Power, Politics, and Liberty* (Cambridge University Press, Cambridge, 2008)
- Duffy, H., *The 'War on Terror' and the Framework of International Law* (Cambridge University Press, New York, 2005)
- Dyzenhaus, D., *The Constitution of Law: Legality in a Time of Emergency* (Cambridge University Press, New York, 2006)
- Goold, B.J., and Lazarus, L., *Security and Human Rights* (Hart, Oxford, 2007)
- Gross, O., and Ní Aoláin, F., *Law in Times of Crisis: Emergency Powers in Theory and Practice* (Cambridge University Press, Cambridge, 2006)
- Hoffman B., *Inside Terrorism* (2nd ed., Columbia University Press, New York, 2006)
- Posner, E.A. and Vermeule, A., *Terror in the Balance* (Oxford University Press, Oxford, 2007)
- Ramraj, V.V., Hor, M., and Roach, K., *Global Anti-terrorism Law and Policy* (Cambridge University Press, Cambridge, 2005)
- Wade, M and Maljevic, A, *A War on Terror?* (Springer, New York, 2010)

- Wilkinson, P., *Terrorism versus Democracy* (2nd ed., Routledge, London, 2006)

## Internet Resources

*Note: These sources come with a health warning – their views as to what is 'terrorism' and what are appropriate responses are at times idiosyncratic or even wholly wrong (in my view).*

| | |
|---|---|
| ACLU | www.aclu.org/national-security |
| America's war on terrorism | www.lib.umich.edu/govdocs/usterror.html |
| Bloody Sunday Inquiry | www.bloody-sunday-inquiry.org.uk/ |
| Cabinet Office | www.cabinetoffice.gov.uk/national-security |
| Campaign Against Criminalising Communities | www.campacc.org.uk/ |
| Centre for Social Cohesion | www.socialcohesion.co.uk/home |
| Centre for the Protection of the National Infrastructure | www.cpni.gov.uk/ |
| Council of Europe | www.coe.int/t/e/legal_affairs/legal_co-operation/fight_against_terrorism/ |
| Department for Communities and Local Government | www.communities.gov.uk/communities/ |
| Department for Transport, Transport Security | www.dft.gov.uk/pgr/security/ |
| European Union Fight Against Terrorism | www.consilium.europa.eu/showPage.aspx?id=406&lang=en |
| Europol TE SAT reports | www.europol.europa.eu/index.asp?page=publications&language= |
| European Union, Freedom, Security & Justice | ec.europa.eu/justice_home/fsj/terrorism/fsj_terrorism_intro_en.htm |
| Foreign and Commonwealth Office | www.fco.gov.uk/en/global-issues/counter-terrorism-policy/ |
| GCHQ | www.gchq.gov.uk/ |
| Globalex | www.nyulawglobal.org/globalex/Terrorism.htm |
| HM Treasury, Financial Sanctions | www.hm-treasury.gov.uk/fin_sanctions_index.htm |
| House of Commons Home Affairs Committee | www.parliament.uk/parliamentary_committees/home_affairs_committee.cfm |
| Home Office, Office for Security and Counter Terrorism | security.homeoffice.gov.uk |
| Intelligence and Security Committee | isc.independent.gov.uk/ |
| Independent Monitoring Commission | www.independentmonitoringcommission.org |
| Joint Committee on Human Rights | www.parliament.uk/parliamentary_committees/home_affairs_committee.cfm |
| JURIST | jurist.law.pitt.edu/terrorism.htm |
| Metropolitan Police Service, Counter Terrorism Command | www.met.police.uk/so/counter_terrorism.htm |
| National Consortium for the Study of Terrorism & Responses to Terror | www.start.umd.edu |
| National Counterterrorism Center | www.nctc.gov |
| National Counter Terrorism Security Office | www.nactso.gov.uk/ |
| National Extremism Tactical Coordination Unit | www.netcu.org.uk |
| Navy Department Library | www.history.navy.mil/library/guides/terrorism.htm |
| Northern Ireland Office, Security | www.nio.gov.uk/index/key-issues/security.htm |
| OSCE | www.legislationline.org/topics/topic/5 |
| Police Service of Northern Ireland | www.psni.police.uk |
| Privacy International Terrorism Policy Profile | www.privacyinternational.org |
| Quilliam Foundation | www.quilliamfoundation.org/ |
| RAND Corporation | www.rand.org/research_areas/terrorism |
| RUSI | www.rusi.org/ |
| Secret Intelligence Service (MI6) | www.sis.gov.uk/ |
| Security Service (MI5) | www.mi5.gov.uk/ |
| South Asia Terrorism Portal | www.satp.org/ |
| Statewatch terror lists | www.statewatch.org/terrorlists/terrorlists.html |
| UN Action to Counter Terrorism | www.un.org/terrorism/ |
| United Nations Counter-Terrorism Committee | www.un.org/sc/ctc/ |
| UN Special Rapporteur on the promotion and protection of human rights while countering terrorism | www2.ohchr.org/english/issues/terrorism/rapporteur/srchr.htm |
| US Department of State | www.state.gov/s/ct/ |

**EXHIBIT 141 TO DECLARATION OF VALERIE SCHUSTER**

VOLUME 12 SPRING 2010 PART 2

# RUTGERS JOURNAL OF LAW & RELIGION

## *HARD LAW AND SOFT POWER: COUNTER-TERRORISM, THE POWER OF SACRED PLACES, AND THE ESTABLISHMENT OF AN ANGLICAN ISLAM*

***Peter W. Edge****

## TABLE OF CONTENTS

i. Introduction……………………………………………………………..…......359
ii. The Power of Sacred Places……………………………………………….......360
iii. The U.K. Approach to Dangerous Sacred Places before 7/7, and the Charity Commission………………………………………………………………….... 363
a. The Role of the Charity Commission……………………………………….. 364
b. The Hard Law Proposals…………………………………………………..368
iv. Does Her Majesty's Government 'Do' Theology? A Softer Approach to Sacred Places.………………………………………………………………… 374
v. Is There Anything Wrong with the Government Doing Theology? An Evaluation of the use of Softer Strategy………………………………………………...376
vi. The Creeping Establishment of an Anglican Islam……………………….....… 377
vii. Conclusion…………………………………………………………………. 381

* LL.B., Ph.D. (Cantab.), Professor of Law, Oxford Brookes University. Thanks to Mark Walters for his valuable research assistance; and to Peter Cumper of Leicester University; Augur Pearce of Cardiff University, and participants at the CEU/BYU Expert Seminar on Religious Autonomy (Budapest, May 2009) and Oxford Society for Law and Religion Conference (Oxford, June 2009) for their comments on earlier drafts of this paper. The errors, and opinions, remain my own.

*Following the terrorist attacks in London on July 7, 2005, commonly referred to as 7/7, the power of sacred places was problematized, and the United Kingdom ("U.K.") government considered formal legal regulation of sacred places, and in particular of the religious activities taking place therein. This hard law response to the power of sacred places was dropped following a negative consultation, where respondents stressed the impact on, to use United States ("U.S.") terminology, the free exercise of religion. Instead, the U.K. government has sought to exercise soft power to effect theological change in some Islamic communities – again to use U.S. terminology, moving from restricting free exercise to establishing religion. Although the latter strategy avoids a frank conflict with religious rights, it risks creating the establishment of religion through an Anglican Islam. Such an establishment would not be unconstitutional in U.K. terms, but does merit greater public discussion than has currently been the case, particularly since the form of establishment being adopted seems considerably more intrusive to the established religious community than the current establishment of the Church of England.*

## I. INTRODUCTION

In the wake of the terrorist attacks on London on 7/7, the U.K. government proposed the creation of a new legal regime to deal with the power of sacred places. Concrete, explicit proposals which would have led to frank restrictions on the free exercise, or in European Convention on Human Rights (ECHR) terms, manifestation, of religion led to concrete, concerted opposition, particularly by civil society groups. This opposition centered on concerns about how far the restriction on the free exercise of religion could be justified. As a result, the proposals were withdrawn. Instead, the government has favored the exercise of soft power, in particular financial power, to effect theological change in Islamic religious communities. The hard law proposals were dealt with far more explicitly than the implications of this soft strategy. They do not pose the same sort of free exercise concerns as the original proposals, but they do raise very serious concerns about the relationship of the U.K. State to some forms of Islam, perhaps going as far as to constitute a creeping establishment of these forms of Islam in the U.K.—an Anglican Islam consisting of *Mujtama' al Islam al Enkilizi* rather than *ecclesia anglicana*.[1] In sharp contrast to the position in the United States, such an establishment is not unconstitutional in the distinctive position of the United Kingdom. It is, however, undesirable.

---

[1] *See* Supremacy Act of 1534, 26 Hen. 8, c.1 (Eng.) (the Crown is referred to as "the only supreme head in earth of the Church of England, called Anglicans Ecclesia").

H:\Files-Misc\Terror\2010docs\Edge

Walker 000017

This paper begins with a brief introduction to the power of sacred places, and a consideration of the U.K. approach to dangerous sacred places before 7/7, highlighting the role of the Charity Commission. This provides the context to discussion of the hard law proposals of 2005, which were dropped following a consultation process showing the level of public engagement with hard law restrictions on the free exercise of religion. The paper then moves on to consider the development of a softer strategy to regulate dangerous sacred places, in particular the attempt of the U.K. government to effect theological change in some Islamic communities within the United Kingdom. The final sections evaluate this approach, primarily by drawing upon the mature jurisprudence of the United States Supreme Court on the prohibited establishment of religion under the United States Constitution.

## II. THE POWER OF SACRED PLACES

As Sibley suggests, "[t]o mark off sacred spaces, to define boundaries which can be defended, they have to be imbued with special qualities."[2] What do we mean when we call a place sacred – what are these special qualities? There are at least three ways of viewing the power of sacred places.

The first view, which can be categorized as the theological, is based upon the application of statements as to metaphysical reality to determine the character of a place. Within the discipline of a religious community, it is possible to judge whether a particular place is sacred or not – and in some communities, to go further and to stratify levels of sacredness. Consider, for instance, the Babri Masjuid-Ram Temple Dispute in Ayodhya, India.[3] To some Hindus, the site is seen as the birthplace of Ram in a previous age of the earth. The sacredness of the site is not simply because it has become a center for religious life within conventional history, but because of events before and beyond conventional history. The site is sacred only if the theology is accepted. Such theology is not, however, accepted by the Muslims who also venerate the site. Some Muslims also base the importance of the site on events preceding conventional history, and

[2] David Sibley, *Endangering the sacred: Nomads, youth cultures and the English countryside*, *in* CONTESTED COUNTRYSIDE CULTURES 218 (Paul Cloke & Jo Little, eds., Routledge 1997).
[3] *See also* Christu Rajamony, *Sacred Sites and International Law: A Case Study of the Ayodhya Dispute* (2007) (unpublished Ph.D. thesis, Oxford Brookes Univ.) (on file with author).

squarely in religious narratives. It is asserted that one of the sons of the first human persons on earth, Adam and Eve, was Seth, who is buried in Ayodhya, along with Noah, a later figure from the same narratives.[4] Once again, from this perspective the argument for the sacredness of the site only works if the theology is accepted. It is not enough that the site is sacred to some individuals or communities; the question is whether it is *actually* sacred. Once the State renounces the authority to resolve metaphysical truth, however, adopting the theological perspective entails an excessive entanglement of a particular religion with the State. To return to the Ayodhya example, if the Indian State were to determine that Ayodhya was authentically sacred to Hindus, because it was the birthplace of Ram, but not to Muslims, because Seth never existed, it is hard to posit a definition of State neutrality which would cover the relationship of the Indian State to either Hinduism or Islam. Within the context of the ECHR, "[t]he state's duty of neutrality and impartiality . . . is incompatible with any power on the state's part to assess the legitimacy of religious beliefs."[5]

The second view, which can be categorized as the human rights perspective, sees sacred places as contributing to the exercise of the religious rights guaranteed by international human rights law. A place is sacred because of its religious significance to the individual or community.[6] In effect, the human rights perspective shifts from the objective view of sanctity of the theological perspective ("sacred") to a subjective view of sanctity which can accommodate religious diversity ("sacred to"). In *Manoussakis and Others v. Greece*,[7] for instance, a community of Jehovah's Witnesses had rented a room as a meeting place. The community lodged an application to use the room as a place of worship, and while they were waiting for this application to be processed, they were prosecuted for using an unregistered place of worship.[8] The European Court of Human Rights stressed the impact of the restriction on members of the

---

[4] *See* MOHAMMAD JAMIL AKHTAR, BABRI MASJID: A TALE UNTOLD 10-15 (Genuine Publications & Media Pvt. Ltd. 1997).
[5] Holy Synod of the Bulgarian Orthodox Church v. Bulgaria, 50 Eur. Ct. H.R. 43, 66 (2009).
[6] *See* Belden Lane, *Giving Voice to Place: Three Models for Understanding American Sacred Space*, 11 RELIG. & AM. CULTURE 53 (2001). In terms of Lane's analysis, this adopts a cultural understanding of sacred places, rather than an ontological or phenomenological one.
[7] Manoussakis v. Greece, 23 Eur. Ct. H.R. 387, 390-91 (1996).
[8] *Id.* at 391.

community.[9] In this case, the State action was to be judged against a narrow margin of appreciation, as "the Court must have regard to what is at stake, namely the need to secure true religious pluralism, an inherent feature in the notion of a democratic society."[10]

The third view, which can be categorized as the social capital perspective,[11] sees sacred places as important generators of social capital.[12] Social capital stands for the ability of actors to secure benefits by virtue of membership in social networks or other social structures. Such capital may be provided by socially similar others, in which case it is often support capital, which helps people cope with problems posed by their circumstances. It may also be offered through diverse ties, in which case it may be leverage capital which helps people change their life chances or create and take advantage of opportunities.[13] Both forms of social capital may contribute to the common good, and provide routes by which the communities themselves can benefit.[14]

These are not, of course, mutually incompatible perspectives on the power of sacred places. A place may have layers of significance. The same place may be important to world culture as a site of archaeological and historical importance;[15] to neighbors as an attractor of noise and nuisance into a quiet area;[16] to local businesses as a focus for economic development and tourism; and to frequent visitors as a significant place with "deep emotional meaning."[17] It may also be defined as sacred by a theological system, treated as sacred by a religious community, and function as a generator of social capital for that community. From a legal perspective, however, the theological perspective is difficult to square with the plural, and to

---

[9] *See generally id.*
[10] *Id.* at 407.
[11] *See* Peter W. Edge, *The Construction of Sacred Places in English Law*, 14 J. ENV. L. 161 (2002).
[12] *See* Greg Smith, *Religion, and the Rise of Social Capitalism: the Faith Communities in Community Development and Urban Regeneration in England* 37 CMTY DEV. J. 167 (2002); William H. Lockhart, *Specifying the Bridges and the Cargo: Social Capital, Faith-based Programs and the Poor;* and Derek Bacon, *Factors Relating to Participation in Faith-based Local Social Welfare Organizations: Social Capital and Community Changes in Northern Ireland, in* Spring Research Conference Papers of The Roundtable on Religion and Social Welfare Policy, *available at* http://www.religionandsocialpolicy.org/docs/events/2003_spring_research_conference/lockhart.pdf.
[13] *See also* Robert Wuthnow, *Religious Involvement and Status–Bridging Social Capital*, 41 J. SCI. STUDY OF RELIG. 669 (2002).
[14] Smith, *supra* note 12, at 133.
[15] Chappell v. United Kingdom App. No. 12587/86 Eur. Comm'n H.R. Dec. & Rep. (1988).
[16] Ex parte Sarvan Singh Seera, 53 P. & C.R. 281 (Q.B.D. 1986).
[17] Shampa Mazumdar & Sanjoy Mazumdar, *Religion and Place Attachment: A Study of Sacred Places*, 24 J. ENVTL. PSYCHOL. 385 (2004).

some extent pluralist, religious context of countries such as the United Kingdom. The human rights perspective and the social capital perspective can both be applied in such a context, and until recently were seen as complementary.

## III. THE U.K. APPROACH TO DANGEROUS SACRED PLACES BEFORE 7/7, AND THE CHARITY COMMISSION

Until recently, insofar as sacred places were seen as generators of social capital, this was seen as being beneficial to both those communities which saw the places as sacred, and to society more broadly. Some sacred places were seen as generating leverage capital, such as sacred places within prisons[18] or registered places of worship which are open to the public.[19] Others were seen as generating support capital – providing a space "used not only for religious practice but also for social and cultural occasions. Communal worship has become important not only for its spiritual value, but also as an opportunity for meeting at a social level."[20] Even where a place was seen primarily as providing space for a community to be with itself, perhaps involving restrictions on dissident voices,[21] it was generally assumed that the public as a whole benefited.[22] Allowing the exercise of fundamental religious rights was a good in itself.

It is plain, however, that capital of any sort can be used in a way contrary to the interests of the State. As Dinham and Lowndes have noted, "[f]aith group resources may take the form of human capital (e.g., staff, volunteers, and members), social capital (e.g., networks of trust and reciprocity), physical capital (e.g., community buildings and venues), and financial capital (e.g., collections, subscriptions, and donations)."[23] In the United Kingdom, as elsewhere post 9/11, the State has been keen to ensure that funds intended for religious charities are not used to support

[18] Prison Act, 15 & 16 Geo. 6, c.52 §§7, 10 (Eng.).
[19] Places of Religious Worship Act, 1812, 52 Geo. 8, c. 155 (Eng.); Liberty of Religious Worship Act, 1852, 15 & 16 Vict. 1, c.36 (Eng.); Places of Worship Registration Act, 1855, 18 & 19 Vict., c. 81; *Ex parte Segerdal* 2 Q.B. 697 (1970) (A.C.) (Eng.).
[20] Kim Knott, *Other Major Religious Traditions, in* THE BRITISH: THEIR RELIGIOUS BELIEFS AND PRACTICES 1800-1986 at 133,148 (Terence Thomas, ed., 1988).
[21] *See* Ecclesiastical Courts Jurisdiction Act, 1860, 23 & 24 Vict., c. 32 § 2; Burial Laws Amendment Act, 43 & 44 Vict., c. 41§ 7; *Abrahams v. Cavey*, 1 Q.B. 479 (Q.B.D. 1968).
[22] *But see* Marcus Alexander, *Determinants of Social Capital: New Evidence on Religion, Diversity and Structural Change*, 37 B. J. POL. SCI. 368 (2007).
[23] Adam Dinham and Vivien Lowndes, *Religious Resources and Representation: Three Narratives of Faith Engagement in British Urban Governance*, 43 URBAN AFFAIRS REV. 817, 829 (2008).

terrorist activities.[24] Immediately after 9/11, the activities of Islamic charities were placed under particular scrutiny.[25] This resulted in encouragement for strong financial controls, proper record keeping,[26] and formal governance of the charities by properly qualified persons.[27] An emphasis on compliance with the formal rules governing the charity – normally to be found in the constitutional documents of the particular charity – has led to the State becoming involved in disputes over leadership of a number of charities, typically where trustees and members form two opposed camps.[28]

### *A. The Role of the Charity Commission*

The U.K. government – including arms-length bodies with a statutory basis such as the Charity Commission – has taken strong action to deal with a particular problem: that of the use of sacred places to generate social capital for terrorism. Mosques in the U.K., as in the U.S.,[29] have been subject to surveillance and investigation as possible foci for terrorism, with concerns over "the recruiting activities of several mosques. Evidence of those recruiting activities comes from admissions by suspected terrorists that experiences at certain London mosques radicalized them. The figurehead of the Finsbury Park mosque, to which several suspects have connections, openly supports Islamic extremism."[30]

---

[24] *See* Jude McCulloch & Sharon Pickering, *Suppressing the Financing of Terrorism: Proliferating State Crime, Eroding Censure and Extending Neo-colonialism*, 45 B. J. CRIMINOLOGY 470 (2005).
[25] *See* Gideon Burrows, *Under Suspicion*, GUARDIAN ONLINE, Nov. 28, 2002, *available at* http://www.guardian.co.U.K./society/2002/nov/28/charitymanagement.britishresponsetoseptember11.
[26] S*ee, e.g.*, Al-Falah Islamic Foundation, registered charity no. 1081281; Islamic Association of North London, registered charity no. 272690; Rugby Mosque Society, registered charity no. 503021; The Bangladesh Shomity, registered charity no. 293676.
[27] S*ee, e.g.*, Bolton Muslim Welfare Trust, registered charity no. 1005715; Kingston Muslim Association, registered charity no. 274503; The Al-Khoei Benevolent Foundation, registered charity no. 802000; The Preston Muslim Society Quwwatul Islam Mosque, registered charity no. 700936.
[28] *See, e.g.*, Islamic Centre, Redhill, registered charity no. 281189; Thamesdown Islamic Association, registered charity no. 276549; and, especially, The Islamic Centre of Plymouth and Cornwall, registered charity no. 1048445. *But see* Higham Hill Mosque Trust, registered charity no. 1041212; Islamic Education Trust and Masjid Abu-Baker (RA), non-registered organization.
[29] *See* Linda E. Fisher, *Guilt by Expressive Association: Political Profiling, Surveillance and the Privacy of Groups*, 46 ARIZ. L. REV. 621, 621 (2004); *see also* Tom Lininger, *Sects, Lies and Videotape: The Surveillance and Infiltration of Religious Groups*, 89 IOWA L. REV. 1201, 1204 (2004).
[30] Virginia Helen Henning, *Anti-Terrorism, Crime and Security Act 2001: Has the United Kingdom Made a Valid Derogation from the European Convention on Human Rights?*, 17 AM. U. INT'L L. REV. 1263, 1280-81 (2002).

Before returning to the Finsbury Park mosque, it is first necessary to introduce an important structure for control of the majority of mosques in the United Kingdom: the Charity Commission. The Commission is a civil regulatory body responsible for promoting effective use of charitable resources, and investigating and checking abuses.[31] It may instigate inquiries into charities, a particular charity, or a class of charities.[32] Having instituted an inquiry, two causes for concern can trigger the use of extensive powers – either (1) misconduct or mismanagement in the administration of the charity; or (2) a threat to the property of the charity.[33] Where either has been found, the Commission may, *inter alia*, suspend a trustee, officer, agent or employee of the charity pending consideration being given to such individual's removal;[34] appoint additional trustees to manage the trust;[35] and freeze the assets of the charity.[36] If both causes for concern are present, the trustees may remove any trustee, officer, agent or employee who has been responsible for or privy to the misconduct or mismanagement or has, by his or her conduct, contributed to or facilitated it.[37] Although not a prosecutor, the Commission works closely with the police, and reports any criminal offenses it uncovers during its work to the police,[38] and the police on occasion reporting possible abuses of charitable funds uncovered during other investigations.[39]

The Commission has described itself as being "alert to the possibilities of charities being used to further or support terrorist activities. It will deal with any allegation of potential links between a charity and terrorist activities as an immediate priority."[40] Funding, that is, financial

[31] Charities Act, 2006, c. 50 § 7 (Eng.).
[32] Charities Act, 1993, c. 10 § 8 (Eng.).
[33] This recently includes a range of investigative powers under the Regulation of Investigatory Powers Act 2000. Regulation of Powers Act, 2000, c. 23 (Eng.); *see* Kenneth Dibble, *Regulating Charities at Home and Abroad*, 26 SOLIC. J. CAS 19 (2004).
[34] Charities Act, *supra* note 32, at §18(1)(i).
[35] *Id.* at § 18(1) (ii).
[36] *Id.* at § 18(1)(iv).
[37] *Id.* at § 18(2).
[38] *See, e.g.*, Amanat Charity Trust, registered charity no. 1000851.
[39] *See, e.g.*, The Bangladesh Shomity, registered charity no. 293676.
[40] The Islamic Foundation, registered charity no. 263371, ¶ 8. The Commission's role has also been recognized by the Foreign and Commonwealth Office. *See* Dibble, *supra* note 33, at 21. For a recent example of action following designation of a trustee under the Terrorism (United Nations Measures) Order 2006 and the Al Qaida (United Nations Measures) Order 2006, *see* Al Ikhlas Foundation, registered charity no. 1047844.

capital, has been a particular concern.[41] The impact of the use of financial capital can be increased through social capital,[42] but social capital can itself further particular causes. For instance, we may see social capital working to enhance information flows, provide free spaces, shape socialization and political participation, and bestow both authority and legitimacy.[43]

In relation to ideological support for terrorism, the most significant investigation has been that of Finsbury Park Mosque.[44] The Finsbury Park Mosque is owned and operated by the North London Central Mosque Trust.[45] The Trust was registered in 1988 in order to advance and promote the knowledge of the religion of Islam in the United Kingdom and abroad. The Charity Commission became involved in 1998, when the trustees of the charity that operated the mosque sought to regain control of the building. A settlement was reached which put the trustees back in charge, but allowed Abu Hamza, the Imam, to continue to deliver half of the Friday sermons.[46] A month after 9/11, the Commission received a tape of a sermon given by Hamza, available in the mosque shop and online, which they considered to be "of such an extreme and political nature as to conflict with the charitable status of the mosque."[47] The trustees were required by the Commission to stop Hamza from using the building for political purposes but they lacked the funds for legal action.[48] In April 2002, Hamza was suspended from acting for the mosque, and an investigation into his activities began.[49] He was found to have organized a "highly inflammatory and political" conference to mark the first anniversary of 9/11 without the

---

[41] *See* Nicholas Ryder, *Hidden Money*, NEW L.J. (Charities Supplement) 36 (2008); Nicholas Ryder, *Danger Money*, NEW L.J. 6 (2007).
[42] Michael W. Foley, John D. McCarthy and Mark Chaves, *Social Capital, Religious Institutions and Poor Communities*, *in* SOCIAL CAPITAL AND POOR COMMUNITIES: A VOLUME IN THE FORD FOUNDATION SERIES ON ASSET BUILDING 217 (Susan Saegert, J. Phillip Thompson & Mark R. Warren, eds., 2001).
[43] *Id.* at 226-29.
[44] *See also* United Kingdom Islamic Mission, registered charity no. 250275.
[45] North London Central Mosque Trust, registered charity no. 299884 (hereinafter "CC Report").
[46] *Id.* at ¶ 7.
[47] *Id.* at ¶ 14.
[48] *Id.* at ¶¶ 16-17.
[49] *Id.* at ¶ 20.

authority of the trustees;[50] to have allowed his supporters to live in the mosque; and to have acted as signatory for a bank account in the name of the mosque of which the trustees knew nothing.[51]

While he was suspended in January 2003, the police raided the mosque in search of evidence of terrorist activity.[52] The raid was directed at the office and accommodation parts of the building rather than those sections used for prayer, and "[o]fficers wore covers over their shoes in respect of Muslim beliefs."[53] In February 2003, Abu Hamza was permanently removed as an agent of the charity in order to put the trustees back in charge, ensure the use of the mosque for charitable purposes, and to protect the reputation of the mosque.[54] The Charity Commission indicated that the mosque was back under the control of the trustees, although it was closed while repairs to the damage caused by the raid were made.[55] The mosque remained closed for 18 months, and was reopened in August 2004 with new trustees.[56] It was reported that in December 2004, "hardliners" had again taken control, with allegations that they enforced their will through violence and intimidation, and "preached sermons which some at the mosque regarded as extreme."[57] The Charity Commission intervened again, and in February 2005, appointed new trustees who "changed the locks and took physical control of the building," with police officers on hand in case of trouble.[58] The new trustees had been appointed following consultation with the Muslim Association of Britain.[59] The Trust recognizes 2005 as a discontinuity, noting that:

> [t]he work of the new management reflects the proper role of a mosque – as a place of worship, religious learning and social interaction. It also presents the true teachings of Islam as a religion of tolerance, cooperation

---

[50] *Id.* at ¶ 22. A second anniversary commemoration by Al-Mahajiroun proved similarly contentious. *See* George Wright, *MP wants Islamist 9/11 'conference' banned*, GUARDIAN ONLINE, Aug. 28, 2003, *available at* http://www.guardian.co.uk/uk/2003/aug/28/religion.september11.

[51] CC Report, *supra* note 45, at ¶ 21.

[52] Vikram Dodd, *Radical cleric barred from mosque*, GUARDIAN ONLINE, Feb. 5, 2003, *available at* http://www.guardian.co.uk/uk/2003/feb/05/voluntarysector.religion.

[53] Leader, *A Mosque is no Sanctuary*, GUARDIAN ONLINE, Jan. 21, 2003, *available at*: http://www.guardian.co.uk/uk/2003/jan/21/terrorism.guardianleaders.

[54] CC Report, *supra* note 45, at ¶ 26.

[55] *Id.* at ¶ 27.

[56] *See* Vikram Dodd, *Extremist leaders ousted from north London mosque*, GUARDIAN ONLINE, Feb. 8, 2005, *available at* http://www.guardian.co.uk/uk/2005/feb/08/religion.world.

[57] *Id.*

[58] *Id.*

[59] *Id.*

> and peaceful harmony amongst all people who lead a life of balance, justice and mutual respect.[60]

### *B. The Hard Law Proposals*

The Finsbury Park Mosque investigation, while an extreme example, illustrates the extensive power the Charity Commission has to control sacred places whose owners have charitable status. Not all sacred places are the same, however. Some sacred places are physically bounded, dedicated to religious uses, and owned by a religious charity. Others may have multiple uses or be operated by an individual or a company. Loosely bounded sacred places remain powerful places, however, and in 2005 moved onto the policy agenda.

Following the suicide bombing on 7/7, then Prime Minister Tony Blair proposed, among his raft of counter-terrorism measures, to "consult on a new power to order closure of a place of worship which is used as a centre for fomenting extremism."[61] A detailed consultation paper then followed.[62] The paper referred to places of worship as "a resource for the whole community."[63] The paper proposed additional powers which could be used where places of worship had been taken over by those seeking "to disseminate extremist views and practices,"[64] and the community of worshippers had not been able to deal with the problem themselves.[65] The powers of the Commission were recognized,[66] but it was noted that "not all places of worship are owned by charities," and so not subject to the Commission's jurisdiction,[67] which is discussed more fully below. The existing criminal liability of individuals for inciting terrorism, and possible future offenses related to incitement were also noted;[68] but this was also seen as

---

[60] North London Central Mosque Trust: About Us, http://www.nlcentralmosque.com/index.php?option=com_content&view=section&layout=blog&id=4&Itemid=26 (last visited Mar. 30, 2009).
[61] *See* Tony Blair, U.K. Prime Minister, August 2005 Monthly Press Conference (Aug. 5, 2005), *available at* http://www.number-10.gov.uk/output/Page8041.asp.
[62] Home Office, *Preventing Extremism Together: Places of Worship*, Oct. 6, 2005, *available at* http://www.homeoffice.gov.uk/documents/cons-prev-extreme/cons-prev-extreme?view=Binary.
[63] *Id.* at ¶ 4.
[64] *Id.* at ¶ 7.
[65] *Id.* at ¶ 9.
[66] *Id.* at ¶ 12.
[67] *Id.* at ¶ 14.
[68] Home Office, *supra* note 62, at ¶ 15.

inadequate to deal with situations where places of worship were "acting as focus points for extremist activity."[69]

The consultation paper proposed a new power. The controllers of a place of worship could be required by a court to take steps to prevent certain extremist behavior occurring there.[70] Extremist behavior would be defined as "that which the police reasonably believe[d] amount[ed] to support for a proscribed organi[z]ation, or the proposed new offense of "encouragement of terrorism."[71] Only the police could request such an order; and such a request would "generally" be made only after the Charity Commission and individual criminal routes had been tried and found wanting.[72] Once an order had been made, the controllers would be guilty of a criminal offense if they failed to take reasonable steps,[73] which the report suggests could include measures such as: restricting access to the place of worship; updating protective security; or altering procedures for booking space.[74] In addition, if the first order failed to put an end to the extremist behavior, the police could reapply to the court for a second order, which would restrict the use of the place of worship, and could include temporary closure of all or part of the premises.[75] The paper sought guidance on five issues, including the merits of the proposed new power, the definition of places of worship in practice (in particular whether they should include meeting rooms or faith schools), and whether the safeguards for the proposed power were sufficient.[76]

The paper resulted in a significant number of responses, which were collected and published by the Home Office [hereinafter "Responses"].[77] A number of noteworthy points may be drawn out of the responses by pressure groups, religious associations, local government officials, policing organizations, and members of the public. The first of these concerns the impact of the proposed new power.

---

[69] *Id.* at ¶ 16.
[70] *Id.* at 17.
[71] *Id.*
[72] *Id.* at ¶ 18.
[73] *Id.* at ¶ 20.
[74] Home Office, *supra* note 62, at ¶ 19.
[75] *Id.* at ¶ 21.
[76] *Id.* at ¶ 26.
[77] Home Office, *Preventing Extremism Together: Places of Worship - Collected Responses* (Dec. 15, 2005), *available at* http://www.homeoffice.gov.uk/documents/cons-prev-extreme/responses-doc?view=Binary.

The radical nature of the proposed new power was identified by the hostile majority of respondents. The powers of the Charity Commission depended, at least to some extent, on the community choosing to structure its ownership of the sacred place in charitable terms.[78] Communities that strongly objected to their sacred places being subject to this jurisdiction could choose not to seek the benefits of charitable status.[79] The proposed powers would not be subject to this right of non-entry.[80] If we may refer to a broader current in the interaction of law and religion, the religious community associated with a sacred place would no longer be able to safeguard their religious autonomy by exercising a right to exit from the public sphere.[81] This would be a substantial restriction on religious autonomy, and the corporate exercise of religious rights, introducing a limited form of religious registration into U.K. law.

The adverse impact of the new power upon religious autonomy was particularly stressed. In terms of the relationship between religious communities and the State, the proposals risked alienating religious communities when a better approach would be to support communities "as *they* deal with the issue of extremism in their midst."[82] Additionally, the chilling effect of the legislation could reduce positive contact between members of the community and the police.[83] In terms of the religious interests of individuals and their communities, the power was severely criticized as a retrograde step in terms of the development of religious freedom, with some respondents specifically placing such control in a historical context for their community.[84] The scale of the impact of closure upon the place's religious community was emphasized,[85] with resistance by the community and "mass protests" anticipated by one respondent.[86] There was a fear that use of the powers, when actions against individual extremists had failed, constituted a

---

[78] *See, e.g., Dr. David Goodbourn, General Secretary, Churches Together in Britain and Ireland. Id.* at 7.
[79] *See, e.g., Mohammed v Khan* EWHC 599 [2005].
[80] I would note, however, that once a sacred place has entered the charitable sphere, shifting it to non-charitable uses is not straightforward – a right to exit in the face of an increasingly active Charity Commission cannot be assumed.
[81] *See, e.g.*, Jeff Spinner-Haley, *Autonomy, Association, and Pluralism*, *in* MINORITIES WITHIN MINORITIES: EQUALITY, RIGHTS AND DIVERSITY 157 (Avigail Eisenberg and Jeff Spinner-Halev, eds., Cambridge Univ. Press, 2005).
[82] Revs. Martin Camroux & Dr. John Parry, United Reformed Church, Responses, *supra* note 77, at 35.
[83] Richard Wiltshire, Mayor of London's Office, Responses, *supra* note 77, at 88.
[84] *See, e.g.*, Dr. David Goodbourn, General Secretary of Churches Together in Britain and Ireland, Responses, *supra* note 77, at 7.
[85] *See, e.g.*, Rev. Paul Seymour, Responses, *supra* note 77, at 18.
[86] Sukhvinder Singh, Sikh Federation, Responses, *supra* note 77, at 53.

form of "communal punishment."[87] In conjunction with the developing definition of supporting extremism the powers were seen as "criminal[izing] . . . thought and belief," and "silenc[ing] dissidents."[88]

Religious rights are not, however, absolute rights, and it might be possible to accept the strength of these criticisms, but justify the restrictions by reference to a broader public interest – in ECHR terms, restriction of a right under Article 9 being justified by the grounds in Article 9(2).[89] Although not in these terms, respondents did generally question the basis for government justifications of the measures.

The fit between the power and a genuine mischief was queried by many respondents. A number of responses, which appear from textual similarities to have been coordinated, queried the extent of the problem, and suggested that only in the case of Finsbury Park Mosque had "links between a place of worship, extremist preaching, and terrorist activity been alleged."[90] The need for evidence-based policy making in this area was stressed – the consultation document had not sufficiently made the case that there was a significant problem which needed to be addressed.[91] If there was a problem with places being used as foci for extremism, the case for sacred places being particularly problematic was not made out. The application of the new power to places of worship rather than other meeting places was seen as "ill-conceived and arbitrary,"[92] with the suggestion that "other places of gathering [were] far more likely to be used for extremist activity."[93] Also related to the question of justificatory fit, the coverage of all places of worship by the power was queried from both directions. Some respondents feared they

---

[87] *See, e.g.*, Morag Mylne, Church and Society Council, Church of Scotland, Responses, *supra* note 77, at 76-77.

[88] *See, e.g.*, Islamic Human Rights Commission, Reponses, *supra* note 77, at 55. Some of those in broad support of the powers, however, saw some dissidents as suitable for silencing, with the new powers enforcing a separation between religion and extremism. *See, e.g.*, Jon Benjamin, Board of Deputies of British Jews, Responses, *supra* note 77, at 69.

[89] European Convention for the Protection of Human Rights and Fundamental Freedoms ("ECHR"), Nov. 4, 1950, 213 U.N.T.S. 221, as amended by Protocol No. 11, 155 E.T.S. (1994) (entered into force Nov. 1, 1998), art. 9, available at http://conventions.coe.int./Treaty/en/Treaties/Html/155.htm.

[90] *See, e.g.*, Rev. Paul Wordsworth, Vice-Chair of York Churches Together, Reponses, *supra* note 77, at 10; Rev. Graham Ridgwell, Vicar of the Camps and Horseheath, Diocese of Ely, Responses, *supra* note 77, at 15. Less clearly connected responses raised the same issue. *See, e.g.*, Roger Wiltshire, Mayor of London's Office, Responses, *supra* note 77, at 88.

[91] *See, e.g.*, Shaukat Warraich, Faith Associates, Responses, *supra* note 77, at 96.

[92] *See, e.g.*, Rev. David Perry, Vicar of Skirlaug, Long Riston, Rise and Swine, Responses, *supra* note 77, at 14.

[93] *See, e.g.*, Catherine M. Dumford, Canon, Responses, *supra* note 77, at 16.

would be seen as targeted at mosques, and risk generating resentment and greater extremism in the Muslim communities;[94] and stigmatizing such communities in the eyes of society more broadly.[95] This was seen as particularly problematic by the Islamic Human Rights Commission.[96] Alternatively, if they were truly targeted at mosques, their application to other religious places could not necessarily be justified.[97]

Finally, two technical, but in practice extremely significant, areas of uncertainty were raised. First, defining a place of worship was recognized as problematic. Some traditions could recognize "any building, or even the open air," as a "place of worship;"[98] others stressed spaces where knowledge was gained;[99] while others view a room in a private house as able to serve as a "place of worship."[100] Some respondents assumed that the phrase meant public places of worship,[101] but this was neither an explicit limit to the proposed powers, nor one anticipated by its proponents. Second, a number of respondents raised concerns about the question of control of a place of worship. It was noted that a religious body may lend space in its sacred place to other bodies, perhaps a different faith group seeking to shield their activities.[102]

More significantly, because of the governmental structures of particular religious groups, the potential liability – which as previously discussed could amount to criminal liability – could extend very broadly. The United Reformed Church, for instance, could see liability applying to the "entire roll of members of a place of worship,"[103] while the Religious Society of Friends considered that "everyone present at a Meeting for Worship is responsible for that meeting, whether a member of the Society or a casual visitor."[104] Some respondents feared that the new

[94] *See, e.g.*, Anthea Cox, Co-Ordinating Secretary for Public Life and Social Justice, Methodist Church, Responses, *supra* note 77, at 27.
[95] *See, e.g.*, Leah Granat, on behalf of the Scottish Council of Jewish Communities, Responses, *supra* note 77, at 65.
[96] Islamic Human Rights Commission, Responses, *supra* note 77, at 54.
[97] *See, e.g.*, Rev. Francis Scott, Team Vicar, Parish of Huntingdon and New Earswick, York, Responses, *supra* note 77, at 30; Sukhvinder Singh, Sikh Federation, Responses, *supra* note 77, at 51.
[98] Richard Porter, Clerk, Religious Society of Friends (Quakers), Wincanton, Responses, *supra* note 77, at 63.
[99] *See, e.g.*, Yousif Al-Khoei, Al-Khoei Foundation, Responses, *supra* note 77, at 83-4.
[100] *See, e.g.*, Leah Granat, on behalf of the Scottish Council of Jewish Communities, Responses, *supra* note 77, at 66.
[101] *See, e.g.*, Ramesh Kallidai, Secretary General, Hindu Forum of Great Britain, Responses, *supra* note 77, at 134.
[102] *See, e.g.*, Alan Ruston, on behalf of the General Assembly of Unitarian and Free Christian Churches, Responses, *supra* note 77, at 19.
[103] Revs. Martin Camroux & Dr John Parry, United Reformed Church, Responses, *supra* note 77, at 36.
[104] Richard Porter, Clerk, Religious Society of Friends (Quakers), Wincanton, Responses, *supra* note 77, at 62.

power, and attached criminal liability, would either deter members of the community from becoming involved in management of places of worship,[105] or encourage trustees faced with a Requirement Order to resign en masse to avoid any fear of criminal liability.[106] It was also noted that some religious communities might have theological problems with exercising this sort of control by, for instance, excluding co-religionists from congregational prayers.[107]

Overall, the response to the consultation was extremely negative. The range of groups who rejected the power was in itself telling—not only groups representing a significant number of places of worship themselves, but also local government officials, policing associations, and NGOs. Following the consultation, in December 2005, the Home Secretary, Charles Clarke, made a statement on the progress of counterterrorist measures following 7/7. He characterized the responses as favoring strengthening police and community partnerships, and because of "[t]his commitment to joint working and information sharing," as well as other legislative and practical developments, stated that he "will not seek to legislate on this issue at the present time, although [he] will keep the matter under review."[108]

The consultation, discussed above, and collected responses can be seen as a vindication of an extensive consultation process, where clear proposals for clear changes to the law were opposed by a range of interested parties, resulted in the proposals eventually being dropped.[109] This did not, however, remove the power of sacred places from the agenda of the State. Two strategic alternatives to deal with the problem were pursued simultaneously.

The first was a clear government agenda to ensure, to the farthest extent possible without legal change, that existing powers are capable of being applied fully to mosques. The key example was government efforts to extend the reach of the Charity Commission, allowing its very extensive powers to be applied to mosques more widely without any need for formal legal change. The Commission has established a Faith and Social Cohesion Unit, "to identify and

---

[105] *See, e.g.,* Councillors Imtiaz Ameen & Khalid Hussain, Councillors for Dewsbury and Bury, Responses, *supra* note 77, at 106; Sir Iqbal Sacranie, Muslim Council of Britain, Responses, *supra* note 77, at 122.

[106] Councillors Imtiaz Ameen & Khalid Hussain, Councillors for Dewsbury and Bury, Responses, *supra* note 77, at 108.

[107] *See, e.g.,* Councillors Imtiaz Ameen & Khalid Hussain, Councillors for Dewsbury and Bury, Responses, *supra* note 77, at 108.

[108] Charles Clarke, Secretary of State for the Home Department, Statement before Parliament, Dec. 15, 2005, *available at* http://press.homeoffice.gov.uk/Speeches/speeches-archive/15-12-05-st-ct-progress-report.html.

[109] *See id.*

support organisations that could be but are not currently registered with the Commission," and making Muslim charities its initial focus.[110]   In February 2009, the Commission published its survey on mosques in England and Wales,[111] claiming it was the largest of its kind.[112] Identifying the extent to which mosques lie outside of the jurisdiction of the Charity Commission seems likely to prove a preliminary step to reducing their number.

The second is a broader attempt to effect theological change in Islamic communities, promoting forms of Islam compatible with State values and inhibiting the growth of forms of Islam supportive of actions such as the 7/7 attacks.  This is the subject of the remainder of this paper.

## IV.  DOES HER MAJESTY'S GOVERNMENT 'DO' THEOLOGY?  A SOFTER APPROACH TO SACRED PLACES

Immediately after 7/7, then Prime Minister Tony Blair risked casting himself as an authority on Islamic theology, assuring the Islamic communities that "[w]e will work with you to make the moderate and *true* voice of Islam heard as it should be,"[113] later contrasting that voice with that of "fanatics, attached to a completely *wrong* and reactionary view of Islam";[114] before going on to develop his own interfaith ecumenical vision through the Tony Blair Faith Foundation.  It may be that this was simply a misstatement – that Blair's concern was to reject a view of Muslims in general as supportive of terrorism in order to damp down threatening Islamophobia.  Later government action, however, cannot be explained as anything other than State support for particular theological positions.[115]

Islamic community working groups were set up under Preventing Extremism Together. Group 5, considering Imams and the role of mosques, recommended a new national advisory

---

[110] Charity Commission, *Survey of Mosques in England and Wales*, (Feb. 2009) at §1.1, *available at* http://www.charity-commission.gov.uk/Library/tcc/pdfs/fscumosque.pdf.
[111] *Id.*
[112] *Id.* at §2.0.
[113] Tony Blair, U.K. Prime Minister, *Statement to Parliament on the London Bombings* (July 11, 2005) *available at* www.number10.gov.uk/page 7903 (emphasis added).
[114] Tony Blair, *A Renaissance in Foreign Policy*, Los Angeles World Affairs Council (Aug. 1, 2006) *available at* http://www.lawac.org/speech/2005-2006/Blair,%20Tony%202006.pdf (emphasis added).
[115] Unless, of course, we redefine religion to exclude the groups which are being opposed by the current State action, at which point the problem ceases to be that the State is supporting one theological stance over another, but that we have no sensible strategy for defining religion.

body of mosques and Imams, creation of continuous professional development programs for imams and mosque officials, and "[p]articular emphasis on developing skills around interfaith dialogue, youth work, counseling, management, communication, citizenship and English."[116] The Mosques and Imams National Advisory Board (MINAB) was launched in June 2006 as "an independent . . . community led initiative,"[117] albeit one identified as an "integral part" of the U.K. counter-terrorism strategy (CONTEST), and one which has been reported as receiving substantial State funding.[118] The government has also provided ongoing financial support for capacity building, and training of Imams through the Preventing Violent Extremism Community Leadership Fund, including, for instance, a course to equip newly qualified Imams to "engage with British culture and humanitarian values, and *to find parallel values within the Qur'an.*"[119] Alongside support for particular theological stances within the U.K., the government also looks beyond its own borders to encourage particular forms of Islam through Foreign and Commonwealth Office's projects under CONTEST which "challenge extremist ideology and support mainstream voices."[120] I will not consider this outward looking policy at length, as there may be grounds for distinguishing between supporting religions within the jurisdiction, and abroad,[121] but it is noteworthy that one recipient of funds to do this, Maajid Nawaz of Quilliam, explained that:

> Our long term ambition is to be fully independent of government. I would also emphasise here though, at this stage, that I don't think there is anything besides the perception problems, which of course pose real strategic concerns, I don't think that intellectually there is anything wrong with governments providing grants to secure their country.[122]

---

[116] Working Together, *Preventing Extremism Together*, 69 (Aug. -Oct. 2005), *available at* http://www.communities.gov.uk/documents/communities/pdf/152164.pdf.
[117] *See* Press Release, Mosquest and Imams National Advicsory Board, The MINAB Launch, *available at* http://www.minab.org.uk/news/press-releases/84-the-minab-launch (last visited Mar. 15, 2009).
[118] Inayat Bunglawala, *Minab: Community Initiative, or Quango?*, GUARDIAN ONLINE, May 15, 2009, *available at* http://www.guardian.co.uk/commentisfree/belief/2009/may/15/minab-mosques-imams-islam.
[119] Sadia Khan, *House of Commons Daily Hansard Written Answers*, col. 236W, Jan. 12, 2009, *available at* http://www.publications.parliament.uk/pa/cm200809/cmhansrd/cm090112/text/90112w0050.htm (emphasis added).
[120] Foreign Commonwealth Office, Preventing Extremism, http://www.fco.gov.uk/en/fco-in-action/counter-terrorism/counter-terrorism/preventing-extremism/ (last visited June 19, 2009).
[121] *See generally*, Jessica Powley Hayden, *Mullahs on a Bus: The Establishment Clause and U.S. Foreign Aid*, 95 GEO. L.J. 171 (2006).
[122] Interview by Radio 4 with Maajid Nawaz, June 23, 2009 (on file with author).

## V. IS THERE ANYTHING WRONG WITH THE GOVERNMENT GOING THEOLOGY? AN EVALUATION OF THE USE OF SOFTER STRATEGY

At first glance, this use of "soft power" to tame problematic sacred places seems preferable to the formal legal regulation considered in 2005. By seeking to modify the way in which communities choose to act rather than seeking to curb their actions, direct conflict with the right to manifest religion communally is to some extent avoided. Certainly, direct conflict with supporters of religious rights is reduced. Additionally, such soft power may prove to be an effective way of protecting the fundamental rights of others. So, is there anything intellectually wrong with the U.K. government giving grants to favor one particular theological outcome?

One possible objection is that it is contrary to the international obligations of the U.K., particularly in relation to the ECHR. The separation of religious organizations and the State has never been as central to religious rights jurisprudence under the ECHR as it has been to, say, the First Amendment to the United States Constitution. However, recent case law may be developing a strong emphasis on the autonomy of religious organizations on the basis of Articles 9 and 11, and the rejection of some forms of relationships with the State on the basis of these Articles read with Article 14.[123] This can be seen in the recent decision of the European Court of Human Rights in *Holy Synod of the Bulgarian Orthodox Church (Metropolitan Inokentiy) and Others v. Bulgaria*, where the Court unanimously asserted that:

> [t]he autonomous existence of religious communities is indispensible for pluralism in a democratic society and is thus an issue at the very heart of the protection which Article 9 of the Convention affords. Were the organisational life of the religious community not protected by Article 9 of the Convention, all other aspects of the individual's freedom of religion would become vulnerable.[124]

State action to resolve a leadership dispute in a divided community by assisting one of the opposing groups to gain full control was found to violate Article 9. As tellingly, "the State

---

[123] *See* ECHR, *supra* note 89, at arts. 9, 11, and 14.

[124] Holy Synod of the Bulgarian Orthodox Church v. Bulgaria, App. No. 412/03 and 2009 Eur. Ct. H.R., ¶ 103 (January 22, 2009), *available at http://cmiskp.echr.coe.int/tkp197/search.asp?skin=hudoc-en* (locate the case by entering the application number).

has a duty to remain neutral and impartial in exercising its regulatory power in the sphere of religious freedom and in its relations with different religions, denominations and beliefs."[125]

Despite the possibilities of an ECHR/HRA challenge, this is not my central criticism. I am more concerned that, not only is an establishment being introduced without proper, explicit consideration of what is being done, but it is of a kind which is so sweeping as to constitute an unacceptable diminishing of the separation between the proper spheres of religion and State.

## VI. THE CREEPING ESTABLISHMENT OF AN ANGLICAN ISLAM

I have argued elsewhere that a useful legal definition of establishment is: "there are laws which apply to that particular religious organisation, *qua* that religious organisation, which do not apply to the majority of other religious organisations."[126] One key characteristic of the exercise of soft power described above is that it does not involve the creation of new laws, or even the application of generally applicable laws in a new way. This legal definition does not, then, apply directly to our current discussion. It does, however, raise the possibility of multiple establishments. If I can shift the discussion from hard law to soft law, multiple religious organisations can be in special relationships with the state, and so in that sense – perhaps a more commonly used sense than my definition above – become an established religion. What consequences might we expect to flow from the State adopting a special relationship such as that adopted with State compatible forms of Islam as outlined above?

Perhaps surprisingly, a useful source here is the First Amendment to the United States Constitution. The First Amendment is deceptively brief: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the

---

[125] Religionsgemeinschaft Der Zeugen Jehovahs v. Austria, Apps. Nos. 40825/98 and 35677/04, 2008 Eur. Ct. H.R., ¶ 97 (July 31, 2008) (Chamber), *available at http://cmiskp.echr.coe.int/tkp197/search.asp?skin=hudoc-en* (locate the case by entering the application number); Verein der Freude der Christengemeinschaft v. Austria, App. No. 76581/01, 2009 Eur. Ct. H.R., ¶ 97 (Feb. 26, 2009) (Chamber), *available at http://cmiskp.echr.coe.int/tkp197/search.asp?skin=hudoc-en* (locate the case by entering the application number); Gutl v. Austria, App. No. 49686/99, 2009 Eur. Ct. H.R., ¶ 38 (Mar. 12, 2009) (Chamber), *available at http://cmiskp.echr.coe.int/tkp197/search.asp?skin=hudoc-en* (locate the case by entering the application number).

[126] Peter W. Edge, *Reorienting the Establishment Debate: From the Illusory Norm to Equality of Respect*, 27 ANGLO-AM. L. REV. 265 (1998).

government for a redress of grievances."[127] The religion clause, as it is commonly referred to, constitutes on its face, a restriction on the power of the U.S. Congress, and so of the federal authorities. It was unable to make a law "respecting an establishment of religion;" or "prohibiting the free exercise" of religion.[128] Secondly, the clause gives no guidance on what is meant by "establishment," "free exercise," or "religion." For instance, Witte is confident that the establishment bar meant that the most dangerous part of the national government could not prescribe a national religion.[129] But what of less extreme State action – could the national Government take action which promoted all religions equally? Were the individual states free to support a particular religion over others? Could Congress confirm existing laws dealing with religion, even if they would be beyond its power *ab initio*? The sixteen words of the religion clause have generated a considerable amount of case law, and a vast body of academic literature, with nearly 2,000 legal articles on religious liberty jurisprudence in the United States being published between 2000 and 2004 alone.[130]

The First Amendment is generally understood as having two religion clauses – the Free Exercise Clause, protecting the exercise of religion, and the Establishment Clause, prohibiting certain forms of relationship between religious organizations and communities and the State. The Free Exercise Clause has been singularly influential globally. The Establishment Clause, reflecting as it does a particular set of visions about Church/State relations which had an unusual demographic, as well as historical, origin, has travelled less well. In considering whether a particular example of State action is unconstitutional under this clause, however, the Supreme Court has generated important reflections on how a special relationship between a religion and the State might be expected to function. In the U.S. constitutional context, of course, this impact is used as the basis for a finding of unconstitutionality; but the reflections might help us understand what the establishment of Anglican Islam might do in the context of counter-terrorism.

[127] U.S. CONST. amend. I.
[128] *Id.*
[129] John Witte, Jr., Religion and the American Constitutional Experiment 90-91 ("ACE") (2nd ed., Westview Press 2005).
[130] *Id.* at xvi.

One objection to State support for a particular religion is that it costs money. Such State money comes primarily from the taxpayer, and as Chemerinsky argues, "[i]t is wrong to make people support a church that teaches that their religion or beliefs are evil. It violates their freedom of conscience and forces them to support religions that they do not accept."[131] It is a safe assumption that very few taxpayers would rather have financial support from taxes given to 7/7-supporting Islamic communities than 7/7-rejecting Islamic communities. It is less safe, however, to assume that only a small number of tax payers would object to taxes being used to support Islam at all. Yet, this argument has limited traction in the U.K. context. In the context of the ECHR, arguments against paying taxes which will be used for purposes to which the taxpayer objects on conscientious grounds have been singularly unsuccessful.[132]

A second objection is based not on fiscal grounds, but on endorsement. In the U.S. context, it has been argued that the simple fact of official endorsement for a particular religion is an unconstitutional harm. As Justice O'Connor stated in *Lynch v Donnelly*, "[e]ndorsement sends a message to nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders."[133] Is this not, however, exactly the message the government wishes to send through its support of some forms of Islam? It is keen to distinguish, and to be seen to distinguish, between Muslims who are full members of the political community – included and indeed welcomed in acting to protect that community – and other Muslims, who are not, but who can become so by changing their religious views to accord with the insider group.

Third, and a slightly older line of authorities, the U.S. Supreme Court has on occasion analyzed Church/State relations against a wall of separation. In the classic case of *Lemon v. Kurtzman*, the Supreme Court articulated a three-stage test for violation of this wall. State action could violate the Establishment Clause (1) if the purpose of the State action was to aid or promote religion; (2) the primary effect of the action was to aid or promote religion; or (3) the result of the action is excessive entanglement with religion.[134] The Supreme Court has tended to

[131] Erwin Chemerinsky, *Why separate Church and State?*, 85 OR. L. REV. 351, 361 (2006).
[132] *See, e.g.*, C v. United Kingdom, 37 DR 142 (Eur. Cmm'n H.R. 1983).
[133] Lynch v. Donnelly, 465 U.S. 668, 688 (1984) (O'Connor, J., concurring).
[134] Lemon v. Kurtzman, 403 U.S. 602, 612-13 (1971).

either ignore *Lemon* or impose extreme modifications, but it has not overruled *Lemon*, despite opportunities to do so.[135] Elsewhere, I have been particularly attracted by the entanglement prong of *Lemon*,[136] but I think there is a strong case for seeing the current scenario as falling under the comparatively little discussed first prong of *Lemon*. It may be argued with considerable strength that the U.K. government is not theologically motivated in its support for particular forms of Islam. It may not, however, be convincingly argued that the purpose of the State is not to promote these forms, for all that the promotion is a means to an end. The government may defend its actions to the public as not being concerned with doctrinal change, but rather with disseminating a different set of values. However, that is not what is being said to the communities of faith. If hypocrisy is to be avoided, the goal of doctrinal change must be accepted. In other words, there is an important distinction between arguing that a particular Islamic community is incompatible with international human rights or the fundamental ideology of the United Kingdom State, and arguing that it is unIslamic.[137]

Finally, and returning for a moment to the question of finances, an objection to State support for religion is that, in some way, the State will ask for a quid pro quo for this support. As Chemerinsky puts it:

> the Establishment Clause protects religion from the government. If the government provides assistance, inescapably there are and should be conditions attached. For example, when the government gives money, it must make sure that the funds are used for their intended purpose. This necessarily involves the government placing conditions on the funds and monitoring how they are spent. Such government entanglement is a threat to religion.[138]

Entanglement may be seen as the principle objection to a special relationship between the State and particular religions. The entanglement here is particularly pronounced. It will be

---

[135] *See also* Genevieve Deppe, *Not a Prayer in Protecting the Reasonable Observer: Borden Shows the Endorsement Test is Just Not Working*, *available at* http://works.bepress.com/genevieve_deppe/1 (last visited July 6, 2009).

[136] PETER W. EDGE, RELIGION AND LAW: AN INTRODUCTION 97 (Ashgate Publishing 2002); *see also* Peter Cumper & Peter W. Edge, *Muslims, Counter-terrorism and Human Rights in the United Kingdom*, *in* RETHINKING GLOBAL TERRORISM (N.S. Basic & A.H. Siddiqui, eds., Int'l Islamic Univ. Press 2009).

[137] This distinction is not always made. *See, e.g.*, Zeyno Baran, *Fighting the War of Ideas*, 84(6) FOREIGN AFFAIRS 68, 72 (Nov./Dec. 2005).

[138] Chemerinsky, *supra* note 131, at 364.

recalled that State resources are being used to effect theological change in the target religions. Even the Church of England does not, now, accept that the State can legitimately resolve theological issues within the Church.[139] So, for instance, we could expect considerable resistance to a decision by the government to channel resources and State support to a group within the Church of England favoring an identical theological construction of same-sex and opposite-sex sexual relationships. This connects with the deeper idea of voluntaryism, which Esbeck describes as:

> where religion is supported voluntarily by those in the private sector—which is to say, not by the government. Voluntaryism goes well beyond prohibiting attempts by government to force religious belief on individuals or to coerce religiously informed conscience. Voluntaryism is about rejecting active government support for religion, whether or not that support results in coercion.[140]

Moving perhaps a little broader, we can follow Luhmann in seeing this separation as helping to guarantee the differentiation of society in several relatively autonomous social spheres, thereby serving as a barrier towards totalitarian tendencies.[141] In other words, it is not part of the State's business to resolve theological issues by deciding that some religions should be promoted, particularly when in doing so, it decides that other religions should not be promoted.

## VII. CONCLUSION

Sacred places are powerful places, but they can act as foci of State control over religious communities and organizations which are seen as a threat. In the wake of 7/7, the U.K. government sought to engage with what it perceived as dangerous manifestations of religion with concrete proposals for hard law powers. These proposals were engaged with on the basis of explicit arguments about the free exercise of religious rights, and the autonomy of religious

[139] For a recent review of the issue, *see* Mark Hill, *Editorial*, 9 ECCLESIASTICAL L.J. 1 (2007); Stephen Slack, *Church Autonomy and the Civil Partnership Act: A Rejoinder*, 9 ECCLESIASTICAL L.J. 206 (May 2007); and Malcolm Jones, *Constitutional Conventions: A Rejoinder Rebutted* 9 ECCLESIASTICAL L. J. 304 (Sept. 2007).

[140] Carl H. Esbeck, *When Accommodations for Religion Violate the Establishment Clause: Regularizing the Supreme Court's Analysis*, 110 W. VA. L. REV. 359, 369 (2008).

[141] *See also* Karl-Heinz Ladeur & Ino Augsberg, *The Myth of the Neutral State: The Relationship Between State and Religion in the Face of New Challenges*, 8 GERMAN L.J. 143, 146 (2007).

H:\Files-Misc\Terror\2010docs\Edge

Walker 000039

organizations. Frank proposals for restriction led to a nuanced consideration of the impact of these proposals, and their failure.

Instead, however, the government has shifted to the exercise of soft power to affect theological change in the communities whose sacred places it had sought to control. These actions have not been subject to anything like the level of discussion of the hard law proposals. They seem, however, to be moving towards a position where some forms of Islam are not only established in the U.K., but established with a level of intrusion of the State into theology not seen here for a number of centuries. This is an unacceptable entanglement of State power and religion, even in the context of contemporary terrorist threats.

**EXHIBIT 142 TO DECLARATION OF VALERIE SCHUSTER**

# Charities Back on Track

## Themes and lessons from the Charity Commission's compliance work

2007-08

CHARITY COMMISSION



## The Charity Commission

The Charity Commission is the independent regulator of charities in England and Wales. Its aim is to provide the best possible regulation of charities in England and Wales in order to increase charities' effectiveness and public trust and confidence. Most charities must register with the Commission, although some special types of charity do not have to register. There are some 190,000 registered charities in England and Wales. In Scotland the framework is different, and the Commission does not regulate Scottish charities.

The Commission provides a wide range of advice and guidance to charities and their trustees, and can often help with problems. Registered charities with a gross annual income or expenditure over £10,000 must provide annual information and accounts to the Commission. The Commission has wide powers to intervene in the affairs of a charity where things have gone wrong.

More information about the Commission together with a range of guidance for charities can be found on our website www.charitycommission.gov.uk, or by contacting Charity Commission Direct:

Telephone: **0845 300 0218**

Typetalk: **0845 300 0219**

By post: **Charity Commission Direct**
PO Box 1227
Liverpool
L69 3UG

Case 1:05-cv-04622-DLI-RML Document 267-8 Filed 03/22/12 Page 373 of 441 PageID #: 6242

# contents

| | | |
|---|---|---|
| A | Introduction | 2 |
| B | Our statutory role and responsibilities | 3 |
| C | The role of Compliance and Support | 4 |
| D | Summary | 6 |
| E | Key themes and illustrative case studies | 8 |
| F | Compliance policy and other developments | 21 |
| G | Key Statistics from the Commission's compliance work 2007-08 | 26 |

# A Introduction

In this report we have set out to highlight the key themes and wider issues for charities arising from the Commission's compliance work from April 2007 to March 2008. This is the area of the Commission's regulatory work dedicated to ensuring that charities comply with their legal obligations and investigating serious abuse or mismanagement in charities. Using case studies to illustrate each of the key compliance themes, we aim to improve trustees' awareness of to how to ensure systems are in place to avoid similar situations from happening in their charities. Deliberate abuse and wrongdoing in charities remains rare and most concerns which come to our attention are resolved by providing advice and guidance to trustees.

We hope the report will help to build an understanding of the Commission's compliance work by demonstrating the sort of regulatory action we can take and the impact it has in protecting charities from abuse and harm. It also provides basic statistical information on our casework and performance in this area, and outlines some relevant policy and other developments and our key priorities for the future. This is the first published report of its kind and we intend to produce further reports on an annual basis.

**Kenneth Dibble**
Executive Director
Legal Services and Compliance

**Neville Brownlee**
Head of Compliance
Monitoring and Outreach

**Michelle Russell**
Head of Compliance and Support

# B Our statutory role and responsibilities

The Commission has a dual role as both regulator and enabler for charities and the charitable sector and this underpins our approach to our work. Having a regulator that deals swiftly and effectively with abuse when it occurs and promotes compliance by trustees with their legal obligations is at the heart of public trust and confidence in charities. The Compliance and Support team, which sits within the Legal Services and Compliance Directorate, undertakes this work.

The Commission is a risk-based and proportionate regulator. This means that we target our resources where the risks are highest and where they are most likely to have the greatest impact. We engage with charities in a way which will make most difference to them and those who benefit from them. Our overall approach emphasises providing guidance and advice and promoting best practice, as well as ensuring that charities comply with their legal obligations.

The Commission's objectives, contained in the Charities Act 2006 are to:

- increase public trust and confidence in charities;

- promote awareness and understanding of the operation of the public benefit requirement;

- promote compliance by charity trustees with their legal obligations in exercising control and management of the administration of their charities;

- promote the effective use of charitable resources; and

- enhance the accountability of charities to donors, beneficiaries and the general public.

# C The role of Compliance and Support

The Commission's Compliance and Support team has primary responsibility for the delivery of our regulatory work with charities where their assets, services or beneficiaries are at serious risk of abuse or damage. This includes risks to the reputation of individual charities, concern about public confidence in charities generally and the effective regulation of the sector. The role of Compliance and Support is to identify and investigate apparent misconduct or mismanagement in the administration of charities and to resolve difficulties we find, whether by providing support to trustees or, where necessary, intervening to protect the charity by using the Commission's legal powers.

During the year we reorganised the Compliance and Support function into four work streams:

- **Intensive Casework Unit:** comprising two teams dealing with the most complex, high profile and highest risk investigations and compliance cases, involving both inquiry and non-inquiry compliance work and including cases dealing with allegations of terrorist abuse of charities;
- **Compliance Operations:** This team deals with all other investigations and compliance cases of significant risk, involving both inquiry and non-inquiry compliance work;

and our two new functional areas of:

- **Compliance Monitoring, Assessment and Intelligence Support:** This unit is the gateway for referring cases of concern into Compliance and Support from external sources or other parts of the Commission and assessing them. It provides a co-ordination gateway for managing our relationships with other regulators, government departments and law enforcement agencies in support of our compliance work. It also houses a new monitoring unit which monitors trends and developments in the sector in areas we recognise as high risk in order to identify, at an early stage, those charities that may be facing problems, so that we can alert them to the risks and provide them with advice and support; and
- **Outreach and Development:** This team works to raise awareness and understanding of the Commission's compliance work; publicising its outcomes and wider lessons and promoting key compliance messages to the sector and the general public. The team also supports the continuing and effective development of compliance related strategy and plans, policies, procedures and systems.

We have identified, based on our casework experience in recent years, what we believe to be the most serious issues and areas of greatest risk for charities. These are, in no order of priority:

- significant financial loss to the charity;
- serious harm to beneficiaries and, in particular, vulnerable beneficiaries;
- threats to national security, specifically terrorism;
- criminality and/or illegal activity within or involving a charity;
- sham charities set up for an illegal or improper purpose;
- charities deliberately being used for significant private advantage;
- where a charity's independence is seriously called into question;
- issues that could damage the reputation of an individual charity or class of charities or the wider charity sector;
- issues that could damage public trust and confidence in charities or in the Commission as an effective regulator.

Our risk-based and proportionate approach means that our actions are measured to fit the particular circumstances, the seriousness and scale of what has occurred and the available evidence.

Issues of concern in the management and administration of charities can come to our attention through various means including:

- charity trustees and employees;
- charity beneficiaries;
- charity donors;
- the general public;
- other regulators, and law enforcement and other government agencies;
- statutory whistleblowers, including charities' auditors and independent examiners;
- MP's, the media and local communities; and
- other internal sources within the Commission.



"Our risk-based and proportionate approach means that our actions are measured to fit the particular circumstances, the seriousness and scale of what has occurred and the available evidence."

# D Summary

During the last year we placed particular effort on bringing many of our long-running compliance cases to an appropriate close and worked to reduce the time taken to complete cases. We made some good progress and are confident we will make further improvements over the next year.

***Our performance headlines for 2007-08 include:***

- carrying out 799 assessments into concerns raised by the public and other complainants;
- taking 170 new cases forward, of which 19 were formal statutory inquiries;
- closing 29 inquiry cases of which 5 had significant involvement from other regulators;
- publishing 42 inquiry reports on our website;
- closing 171 non-inquiry compliance cases;
- closing 200 cases in total, ending the year with 104 active compliance cases.

***The nature and impact of this work included:***

- directly protecting over £16m of charity assets;
- directly monitoring a total of £106m of charity income through either inquiry or non-inquiry cases;
- 9 cases where our action protected vulnerable beneficiaries;
- 38 cases protecting the reputation of individual charities;
- 27 cases protecting the reputation of the sector;
- 26 cases dealing successfully with issues arising from conflicts of interest;
- 61 cases where we provided advice and guidance to ensure the charity's governance improved as a result of our engagement;
- 9 cases involving concerns about fundraisers;
- 11 cases where an internal dispute was resolved and the charity is properly functioning again; and
- using our statutory compliance powers on 490 occasions, including extensive use of our information gathering powers.

Deliberate wrongdoing in charities remains rare and the vast majority of cases which come to our attention can be resolved by providing advice and guidance to help trustees put the necessary solutions in place.

"Protecting beneficiaries must be a key priority of all trustee boards and procedures for ensuring this must be consistently applied without exception."

We identified a number of ***key trends*** this year.

**Vulnerable Beneficiaries**

There were nine cases where trustees had failed to put in place appropriate procedures to protect vulnerable beneficiaries, including carrying out CRB checks, and our intervention has been required. Most worrying have been those cases where trustees have taken decisions that someone with a previous record of abusing vulnerable people could be involved in the charity, and this has put both the charity and its beneficiaries at risk. Protecting beneficiaries must be a key priority of all trustee boards and procedures for ensuring this must be consistently applied without exception.

**Accounting and Reporting**

Another theme has been the number of instances where poor basic accounting and reporting practices have caused long-term problems for a charity, as well as resulting in a breach of the law. Accounting and reporting requirements are not merely an administrative requirement for charities. In addition to ensuring charities demonstrate openness and transparency by accounting publicly, they are important tools helping charities balance the books, plan for their future and account for their income and spending. Ensuring charities meet their reporting requirements will be increasingly important as public scrutiny of charities' effectiveness grows.

**Governance**

Good governance is key to all aspects of running a charity but sometimes the basics are overlooked; these failures are a common theme in many of the compliance cases dealt with this year. Trustees must ensure they are running the charity with its interests at heart and the way that trustees conduct themselves is at the core of how effective boards can be. A lack of proper controls exacerbates existing problems and makes it harder for charities to get themselves back on a proper footing when problems arise. It is vital that trustees are eligible to act in that role and that their conduct is appropriate, and the controls they put in place to manage risk are robust.

Further information on issues of concern arising in our compliance case work and the regulatory action we have taken in the last year is presented in the Key Statistics section later in the report. We will monitor how these trends develop over the next 12 months and report publicly next year.

# E Key themes and illustrative case studies

We have included examples for each of the key compliance themes illustrated by case studies taken from published inquiry reports over the last year, with one exception which is taken from our non-inquiry work and this has been anonymised. We have highlighted the regulatory action we have taken which demonstrates the impact of our intervention and have provided guidance on how to avoid similar situations.

## E1 Avoiding confusion through good governance

*Good governance arrangements really are the key to running an effective charity. Being clear about roles and responsibilities and implementing strong financial controls and record-keeping is the best way to avoid everything from disputes to financial chaos.*

**Smart Kids at No 1 Playgroup**

This charity had previously provided a playgroup for pre-school children, which no longer existed. It came to our attention when a potential purchaser of the playgroup's building contacted us to check whether the building actually belonged to the person who was selling it, the former playgroup's supervisor.

The supervisor had founded the charity and had previously been one of its trustees. She had taken out a mortgage on the building in her name, although the mortgage payments had been made from the charity's bank account. The supervisor still remained largely in control of the charity's finances and felt she was entitled to at least some of the proceeds from the building's sale.

We opened an inquiry to protect the charity from losing any money which might rightfully belong to it. Trying to work out who the building actually belonged to was made more difficult by the fact the trustees had kept no proper accounts or financial records, and had allowed a large number of relevant documents to be destroyed. They had also acquiesced in the registration of the building in the supervisor's name rather than that of the trustees.

In the absence of proper records we worked with the charity's solicitors, who were also the supervisor's solicitors, and analysed the charity's bank records. It took time, but we were finally able to decide that the proceeds of the sale belonged to the charity, not the supervisor.

These funds were passed over to another charity undertaking similar work two years after our inquiry was opened, and the charity - which had long since ceased to operate - was removed from the register.

## Learning the lessons

Informal or – worse – no governance arrangements at all are a sure recipe for confusion. Establishing good governance systems should come right at the start of a charity's life and be regularly reviewed and updated to keep up to date with changing circumstances.

- Are you clear about who does what? Trustees have the ultimate responsibility for running their charity – they can delegate tasks but not responsibility. As a charity grows bigger and perhaps takes on paid staff these distinctions need to be very clear. Our guidance *The Essential Trustee – what you need to know* (CC3) gives practical advice on the law and best practice here.

- A charity's property is held on trust by its trustees for the benefit of those it is set up to help. It belongs to the charity, not to its trustees or employees – make sure legal advice is taken on property and land transactions where necessary so there is no confusion. The Essential Trustee provides useful pointers.

- Putting financial controls in place and keeping proper financial records is vital. Our guidance *Internal financial controls for charities* (CC8) is a good place to start.

- Conflicts of interest can arise in charities over anything from property to salaries to employing friends or relations – the key is to manage them. Make sure you have effective, consistently implemented policies to deal with any that arise. Again, *The Essential Trustee* gives more detail.

## E2 Fighting fraud with financial controls

*Organisations with weak internal controls and poor collective responsibility are always likely to be more vulnerable to fraud. Don't assume it couldn't happen to your charity; make sure you have these controls in place.*

**Ravidassia Community Centre**

This charity provides a place of worship and cultural and leisure opportunities for the local community. An internal dispute over who were the rightful trustees and who had membership rights meant the charity's governance had broken down. Draft accounts and reports for the previous year had not been properly completed so the charity's financial position was unclear. Financial supervision and internal controls lapsed.

In these circumstances, it was relatively easy for the treasurer to open a new bank account in the charity's name but under his sole control, into which he put nearly £25,000 of the charity's money.

Concerns were raised with us and, given the potential risk to the charity's funds, we opened an inquiry. The police also opened an investigation and prosecuted the then former-treasurer who was found guilty of four offences involving forging cheques.

We had frozen the bank account involved so the funds were not at immediate risk but a number of things needed to happen to strengthen the charity's governance and financial controls.

An annual general meeting was called and a new Executive Committee appointed. We gave the Committee advice on implementing robust financial controls and producing annual accounts and reports. They were then able to recover the misappropriated £25,000 for the charity's funds.

## Learning the lessons

If trustees allow themselves to become side-tracked by other issues it will always be easier for an unscrupulous individual to take opportunistic advantage. Trustees have individual and collective responsibility to make sure they have robust financial controls – the harder it is made to commit fraud, the less the temptation to do so.

- The charity's governing document should specify the minimum number of trustees or other officers who should operate all bank accounts. We would always recommend a minimum of two.

- All cheques drawn on the charity's accounts should be signed by at least two trustees or specified officers of the charity. Prohibit sole signatories and never, under any circumstances, sign blank cheques.

- Keeping accurate records and accounts does not just help when it comes to filing annual accounts with the Commission – it helps trustees know the financial position of the charity at any given time and makes it easier to note unusual or unaccounted for expenditure.

- Our guidance *Internal financial controls for charities* (CC8) and *Independent Examination of Charities* (CC63) provide useful advice on the law and how to ensure your charity has effective controls in place.

## E3 Fundraising

*Offers to fundraise on their behalf may seem like a dream come true for hard-pressed charities, but making sure you do your homework is key to ensuring your gift horse does not become a Trojan horse.*

**The Summertime Trust**

This charity was set up to provide holidays, transport and other facilities for disabled children. They were approached by a professional fundraiser, who offered to sell competition tickets, pens and badges on their behalf during a ten-year contract.

The deal involved the charity getting 20% of the money raised, with the fundraiser keeping 80%. The fundraiser would also receive one-third of any donations made to the charity as a 'management fee'. The charity took no professional advice about whether this agreement was in the best interests of the charity.

We soon started receiving calls from local authorities and supermarkets alerting us to the fact that the fundraiser was collecting without the necessary licences or permission. These were followed by complaints about the low level of charitable expenditure in relation to the amounts being raised.

Concerned about the charity's apparent inability to monitor and control these fundraising activities, and whether the contract between the fundraiser and the charity complied with the Charities Act and the Charitable Institutions (Fund-Raising) Regulations 1994, we opened an inquiry. We found that the contract did not comply with the law, that the terms tied the charity to a one-sided exclusive contract for a decade and that the ratio of money going to the charity was very small. For example, in one four month period the fundraiser raised nearly £250,000 but the charity received less than £50,000.

Money raised was not paid gross to the charity, and the trustees were completely unaware of how much was being raised and of the regular breaches of legal requirements. After receiving our advice and guidance, the trustees put various controls in place to monitor the fundraising activity and ensure it complied with fundraising regulations. However, as the fundraiser refused to co-operate, the trustees gave him notice to terminate all further fundraising in the charity's name. Our intervention had effectively enabled the trustees to disrupt the potentially long-term financial exploitation of the charity by the fundraiser through a deficient contract agreement, as well as to alert others to this and similar previous activities by him.

After the closure of our inquiry, it came to the trustees' attention that the fundraiser carried on fundraising in the charity's name. The trustees reported the matter to the police, whose enquiries were ongoing at the time we published our inquiry report in January 2008.

Over a year after our inquiry closed, the trustees decided to dissolve the charity due to lack of funds.

## Learning the lessons

Trustees should be actively involved in making key decisions in relation to agreements with professional fundraisers. In addition to our guidance *Charities and fundraising* (CC20), the following may help:

**Is the organisation legitimate?**

- Is it a member of a trade body, such as the Public Fundraising Regulatory Association, the Institute of Fundraising and the Fundraising Standards Board? If not, you may want to know why.
- Ask for references and take them up.
- Does it have the necessary local authority licences for public fundraising?
- Do an internet search to see what public information there is about the organisation – you never know what may come up.

**Is the agreement fair?**

- How do you know how much is being raised? Does all the money get paid over to the charity, from which the charity then pays the fundraiser? Fundraising guidance says it should be paid gross, and be recorded gross in your accounts with costs shown separately.
- Does the agreement provide for you to see the fundraising in action (eg listening in to telephone fundraising or visiting the offices), review the fundraiser's performance, books and records and amend the contract accordingly?
- It is always a good idea to put any potential agreement out to open tender to ensure you're getting best value. Take independent legal advice on the terms of any fundraising agreement.
- Does the agreement tie you in solely to this company? If so, why and for how long?

**Are you getting a good return?**

- £20,000 a year may seem a lot, but not if the fundraising organisation is bringing in £100,000. There is no recommended level for a return on investment but you should ensure you are getting at least a reasonable amount for the use of your charity's name.
- Are there high upfront or ongoing fundraising costs? Why? Who is paying for them? Can the fundraisers justify them to you and – importantly – will you be able to justify them to your donors?

**Do you like their methods?**

- How are they planning to raise your funds? Cold-calling businesses to buy adverts in charity wall-planners? Tin rattling? Make sure you set clear boundaries and are happy with their proposals.
- Check they are clear about making the required solicitation statement stating both that they're professional fundraisers and how much they will get out of donations.
- If they propose fundraising material for your charity, make sure you get final sight and sign-off – after all, you're probably paying for it.
- Consider both your charity's brand and the reputation of charities generally. Being mired in controversial fundraising methods could cost you a lot more in lost support than the £10,000 you are getting from the company.

## E4  Vulnerable beneficiaries

*Charities should be the last place where vulnerable beneficiaries are put at risk. Criminal Records Bureau checks exist for a reason; no trustee board of a charity working with vulnerable people should assume the rules don't apply to them – the consequences are too serious.*

**SADSALAD (Southampton and District Sports and Leisure Association for the Disabled)**

This charity undertook recreational and leisure activities for people with disabilities. One of its trustees (trustee A) had several previous convictions for sexual assault. The Commission concluded that his unspent conviction made him unsuitable to act as a trustee of the Charity and therefore suspended and subsequently disqualified him from acting as a trustee for this or any other charity.

Trustee A had told a fellow trustee of his conviction before his appointment as a trustee, and this trustee had told an additional trustee. However, both trustees considered the information confidential; they neither raised it with their fellow-trustees nor put steps in place to ensure trustee A did not come into contact with the charity's beneficiaries or was supervised if he did so. As a result he was often alone with beneficiaries.

When a third trustee became concerned about trustee A's behaviour, they notified the police but still failed to inform the trustee board as a whole. Trustee A subsequently raped a severely disabled beneficiary and assaulted another.

The police were notified. When Southampton Social Services found out about trustee A's unspent conviction they immediately contacted us. Our inquiry found that the charity's trustees had not implemented adequate policies and measures to protect either beneficiaries or volunteers – no CRB checks had been undertaken on trustees or volunteers who had close contact with beneficiaries. Our register of charities revealed that trustee A was also a trustee of three other charities working with vulnerable adults. We immediately suspended and then removed him from all these trusteeships.

We suspended the three trustees who had been aware of his conviction, and who had not acted appropriately to protect vulnerable beneficiaries. These trustees subsequently resigned. Trustee A was convicted of several serious sexual offences and sentenced to 21 years in prison. The charity has now brought in a new protection policy and procedures, including implementing CRB checks.

## Learning the lessons

Trustees have a personal and collective responsibility to protect their beneficiaries. In addition to our guidance *Finding New Trustees* (CC30) trustees should consider the following:

**The law – there for a purpose**

- Those who prey on the vulnerable can be very plausible and may make conscious decisions to target particular types of charity. If there is a cause for concern, choose another trustee or member of staff. Both your beneficiaries' safety and your charity's reputation are too important to take a chance.
- Some people are disqualified by law from acting as trustees. For some we can grant a waiver but you must come to us for this before appointing the trustee. Our guidance *Finding New Trustees* (CC30) has a full list of restrictions on who may be a trustee, along with other useful advice on carrying out relevant checks on new trustees.
- The Criminal Justice and Courts Services Act 2000 disqualifies some people from holding a number of positions in children's charities, including trusteeship – we cannot provide a waiver in these instances.
- If your charity deals with vulnerable beneficiaries make sure you have beneficiary protection policies and that these are implemented and monitored – they are only meaningful if they are consistently applied.
- Again, if your charity works with vulnerable people make sure you undertake CRB checks on those positions for which they are legally required or if you are legally entitled to do so – be they paid staff, volunteers or trustees.

## E5 Tackling the threat of terrorism

*The UK's anti-terrorism legislation applies to all organisations, including charities. If a trustee is included on the Government's designated list, their charity risks breaching financial sanctions legislation if it fails to take immediate action.*

**United Kingdom Tamil Students Union**

The UK Tamil Students Union is set up to advance education, raise awareness of Tamil music and culture and facilitate access into education. We were notified that one of its trustees had been named as a 'designated person' by the Government under the provisions of the Terrorism (United Nations Measures) Order 2006. This order requires member states to freeze the assets and prohibit funds and financial services being made available to those involved in terrorist acts. HM Treasury may designate a person where they have reasonable grounds for suspecting that the individual may be someone who commits, attempts to commit, participates in or facilitates the commission of acts of terrorism.

The designation meant that the individual continuing to act as a trustee would have been a criminal offence, which would constitute misconduct in the management of the charity. This was because as a trustee he held funds on behalf of the charity, but under the terms of his designation it would have been a criminal offence for him to deal with these funds. This meant he could not continue as a trustee without breaching the terms of his designation.

Because of his designation, the charity itself risked breaching these financial sanctions if it let him continue to hold funds on behalf of the charity, and was therefore liable to have all its assets frozen. The trustee should have resigned from his position as soon as he was made aware of his designation to prevent the charity from being put at risk.

Allegations of charities being exposed to terrorist links require our immediate intervention and we opened an inquiry and immediately suspended the designated trustee.

The charity's other trustees co-operated fully and provided all the information we needed. We found that the designated trustee had had little involvement in the charity for some time and had no access to the charity's funds.

We removed the individual as a trustee in August last year, allowing the other trustees to continue running the charity for its beneficiaries.

## Learning the lessons

We will do everything in our power to support trustees to protect their charities from the risk of terrorist abuse.

### The law

- The United Nations and the European Commission have passed a number of resolutions to prevent funds being misused for terrorist purposes. The UK also has its own national regime for designating terrorist suspects at the domestic level. Individuals or organisations in breach of these laws face a number of penalties, including the freezing of assets. You can find a list of proscribed organisations on the Home Office website at www.homeoffice.gov.uk. There is a list of entities or people designated under terrorism legislation on the HM Treasury website at www.hm-treasury.gov.uk, with guidance on designation. These lists are useful when recruiting new trustees.

- Continuing to act as a trustee if designated exposes the charity to severe financial and reputational risks – trustees in this position, whether they accept the validity of the designation or not, should always step down immediately.

### Defending your reputation

- Allegations of terrorist links to a charity are clearly extremely damaging. Trustees on the receiving end of such allegations should report the allegations to the police and to the Commission.

- Ensuring strong and effective governance arrangements, financial controls and risk management systems, along with being open and transparent is the best action trustees of any charity can take to help defend against actual instances or allegations of terrorist and other criminal abuse.

- Try not to be defensive, however distressing such allegations are. Respond positively to requests for information – the sooner the allegations are demonstrated to be unfounded, the sooner the charity can carry on without disruption.

### Vigilance and good governance

- If trustees believe or suspect abuse is occurring they should notify the police and the Commission immediately.

Charities working with local partners in many parts of the world need to ensure they have systems in place for verifying the end use of funds and for carrying out due diligence checks on donors, partners and beneficiaries. This will assist in identifying and forestalling funding connections either to proscribed groups or designated persons, groups or recipients whose activities may give support to terrorism.

We will be producing further guidance for charities on all these issues over the next year.

## E6 The damage of disputes

*Charities are invariably started up by people who feel passionate about a cause. This conviction can be a powerful force for action, but when channelled into internal disputes within a charity it can result in prolonged and damaging stalemate.*

**A faith-based membership charity[1]**

This charity found itself in trouble when the introduction of new trustees led to a dispute developing between the old and new groups. The new group emerged the strongest and ex-trustees, members and some of the current trustees raised a range of complaints with us about their behaviour. These included allegations that the new Chair was fixing the election to ensure his re-election, and introducing applications for membership after the deadline set by the trustees.

Many of the charity's members were confused about where the leadership of the charity lay and were looking elsewhere, taking their donations with them. The prolonged dispute was incurring unwanted legal costs, as well as draining the commitment and energies of those still actively involved in the charity, and levels of charitable activity had declined.

Our assessment was that we could not intervene because deciding the membership rules was a matter for the trustees who had agreed them. Our view was that it was an internal dispute between the trustees that was their responsibility to address.

We informed all the trustees and the complainant group of our position and advised them to seek to appoint an external independent person or organisation to help them resolve their dispute.

The trustees acted on our advice and appointed an independent Election Returning Officer to look into the matter of the membership list and to oversee the forthcoming elections. The independent officer vetted the membership applications and oversaw the elections, which resulted in the successful appointment of new trustees.

1 We have not named this charity as this was not a statutory inquiry case and no formal public report was published on its conclusion.

## Learning the lessons

If there are properly appointed trustees in place, the Commission will not get involved in resolving these kinds of internal disputes, so it's important that trustees act quickly to prevent them becoming entrenched.

- Trustees are responsible for the management of their charity – they should work collaboratively and make sure their actions are in the charity's best interests rather than driven by personal agendas.

- A charity's governing document will usually have most of the answers – how often elections and AGMs should be called, the criteria for membership and numbers needed for a decision to be quorate. If in doubt, trustees should go back to the governing document and implement what it says.

- If a dispute cannot be resolved by those involved it's important that trustees recognise when they need to seek external help. Where election handling, results and the validity of the charity's subsequent membership are under dispute, it can be a good idea to bring in an impartial Election Returning Officer to look into the membership list and to oversee the forthcoming election.

- A charity's assets should be spent on charitable activity, not in waging personal battles for leadership. Our permission will usually be required to allow trustees to spend the charity's funds on legal action in dispute cases.

## E7  Prioritising protection

*We are just as likely to take up serious issues of concern with small charities as with large ones.*

*This year saw a number of cases where the income of the charities at the time of inquiry was quite small, but where the circumstances justified robust action to protect the charity and its beneficiaries and achieve effective management of the charity. In all the following cases the charity's income was £10,000 or less.*

### Watford and District Gingerbread

This charity was registered in 2000 to assist one-parent families. The main problem in this case was a breakdown in the management of the charity, with no validly appointed trustees; inadequate financial controls; inaccurate accounting; and a dominant employee. As a result, the service to the charity's beneficiaries was suffering and remedial action was required. We took action to freeze the charity's bank accounts, appoint new trustees with appropriate CRB checks, and notified the police of alleged forgery and accounting issues.

### Churches Counselling Together

The charity, registered in 2005, aims to help people 'in need of spiritual, emotional and psychological support by the provision of Christian counselling'. An ex-trustee had been sentenced to life imprisonment for a number of sexual offences against children, and we needed to know how the charity had managed risks. We found that the charity did have adequate child and vulnerable adult protection policies in place, but the trustees accepted that they should have inquired further into the nature of the allegations and considered the potential impact on the charity's reputation. In this case the Commission advised the charity, but did not need to use any of its regulatory powers.

### Young Minds and Mentors

This charity was registered in 2005 with the aim of advancing the education of young people in Telford. There were concerns that the two trustees had provided the Commission with false information and that one was unsuitable to act as a trustee in a charity working with young people. We removed these trustees and appointed new ones; made Orders to get information from the charity's bank; notified the police of a possible criminal offence; and wrote to each local authority in England and Wales to inform them of our regulatory role and the help we can provide in relation to charities and vulnerable beneficiaries.

# F Compliance policy and other developments

**F1 Development of the Commission's risk and proportionality framework for compliance work**

We are a risk-based and proportionate regulator; we engage with charities in a way which will make most difference to them and their beneficiaries. When we take regulatory action, it is evidence-based, proportionate, fair and reasonable, taking account of the issue and the risk to the charity and its beneficiaries.

On 11 September 2007 we published on our website for consultation a discussion paper on our risk and proportionality framework for our compliance work.

As a result of the helpful public response, we have made some revisions to our risk and proportionality framework which has recently been published together with a summary of the responses.

**F2 Development and Implementation of our Counter-Terrorism Strategy**

In May 2007 the Home Office and HM Treasury published a consultation document on their Review of Safeguards to Protect the Charitable Sector (England and Wales) from Terrorist Abuse.

In August 2007 we published our response to their consultation and building on this, in December 2007 published our draft Counter-Terrorism Strategy, inviting responses from key stakeholders during a three month consultation period.

Our overarching objective for our Counter-Terrorism Strategy is:

*"To identify, disrupt and prevent terrorist and other serious abuse of the charitable sector. We will do this ourselves and in co-operation with other relevant agencies through:-*

- *Support – encouraging and enabling the sector to build its awareness and strengthen its safeguards and defences;*
- *Supervision – through proactive regulatory oversight; and where necessary,*
- *Intervention – using the Commission's legal powers of protection and remedy."*

Our strategy has a four-strand approach for identifying and minimising the risk of terrorist exploitation of charities:

1. *Awareness* – working in close co-operation with the sector to build on charities' existing safeguards to minimise the risk of terrorist abuse;
2. *Oversight* – taking a more proactive approach to analysing trends and profiling risks so we can alert charities at an early stage of any risks they may face;
3. *Co-operation* – in addition to maintaining close links with the charitable sector, we will work closely with other government regulators and law enforcement agencies;
4. *Intervention* – dealing proactively, robustly, effectively and swiftly when we have evidence or serious suspicion of terrorist abuse involving charities.

Our strategy reflects a balance between support and guidance, prevention and compliance intervention. We have established a specialist team of staff trained and skilled to deal with terrorism related cases and will continue to build and strengthen our compliance case work and develop expertise in this area.

We are also consolidating our working relationships with other regulators and law enforcement agencies while maintaining our independence.

Over the next year, we will put particular emphasis on preventative work, seeking to clarify legal requirements and support and build best practice in collaboration and partnership with the sector.

We are now working in collaboration with the sector on the production of an up to date 'toolkit' which will provide practical guidance and best practice advice. This aims to:

- build greater awareness of the risks charities face from terrorism and other financial crime or abuse;

- promote the steps that should be taken to minimise the risks and lead to the prevention and early detection of terrorist and other abuse;

- ensure charities understand their legal obligations in relation to terrorism legislation and charity law;

- add value to charities' work and enhance public understanding of the issues.

**F3 Development of our monitoring capability**

Over the year, we established a monitoring unit and expect it to be fully operational by the end of 2008. The unit monitors trends and developments in the sector in areas we recognise as high risk to help us to:

- identify, at an early stage, those charities that may be facing problems, so that we can alert them to the risks and provide them with advice and support;

- detect, target and deter serious abuse, allowing us to act earlier to protect charities;

- check that actions required of trustees following the closure of inquiry cases have been carried out;

- strengthen our relationships with other regulators and agencies; and

- produce alerts and bulletins for the sector and the public on key risk factors and vulnerabilities for charities based on profiling, research and analysis.

**F4 New guidance**

It is important that trustees have clear, unambiguous guidance to help them safeguard their charities and ensure they keep pace with new developments in reporting. During the year, we produced the following new or significantly updated guidance to help them do this.

**F4.1 Reporting Serious Incidents**

Our 2006 stakeholder survey showed support for a swifter, risk-based approach to managing serious incidents in charities. So our 2007 Annual Return for charities (AR07) provided a good opportunity, with guidance, to remind charity trustees to identify these and report them to us at the earliest opportunity. This timely information allows us to intervene, where appropriate, and provide assistance before the problem causes long-term damage to the charity.

We have since improved our guidance on reporting serious incidents for launching with the 2008 Annual Return (AR08). This further explains our approach to issues of serious concern and clarifies what we consider to be serious or significant.

Good practice has always been that trustees should inform the Commission if any serious incident has arisen within their charity that could significantly harm the charity's property, work, beneficiaries or reputation.

Trustees should report serious incidents to the Commission as soon as they are aware of them and can do this in one of the following ways:

- By contacting Charity Commission Direct in writing at PO Box 1227, Liverpool, L69 3UG;
- By calling 0845 300 0218;
- By email at RSI@charitycommission.gsi.gov.uk

Trustees of charities with an income over £25,000 must, as part of the charity's Annual Return 2008, confirm that there are no serious incidents or other matters which they should have brought to our attention but have not. Failure to provide this confirmation would be a breach of legal requirements.

### F4.2 Complaints about charities

When people want to complain about charities, they often end up complaining to us – even though our remit to intervene is limited. To help complainants we have extensively updated our guidance on this issue. *Complaints about charities* (CC47) clarifies what we can and can't look into and, for the first time, provides an extensive list of other sources of help so that complainants can raise their complaints with the appropriate organisation. The guidance also looks at making complaints under the Public Interest Disclosure Act 1998 which provides for a legally protected form of whistleblowing. This helps employees of charities blow the whistle when something is wrong within the charity and sets out where the legal protections apply. In addition, the guidance highlights how charities' auditors and independent examiners have legal duties to report particular matters about charities to us within their own professional codes and charity law.

Generally speaking the Commission will take up complaints where:

- we decide that there is a serious risk of significant harm to or abuse of the charity, its assets, beneficiaries or reputation;

**and**

- we consider that our intervention is a necessary and proportionate response to protect them.

We cannot become involved in every problem or dispute that arises between individuals and charities, and so we will not be able to take up every issue brought to our attention.

Our experience shows that in most cases a complaint can be cleared up by providing advice or by highlighting information in our published guidance.

There may be other serious issues which we would expect the charity trustees to remedy, if necessary with our support.

Complaints that identify the most serious risks to a charity, its assets or beneficiaries will be dealt with by an inquiry under section 8 of the Charities Act 1993.

### F4.3 Resolving disputes

Complaints about disputes within charities are among the most frequent we receive, but getting involved in internal disputes is not something we generally do as this type of management is the responsibility of trustees. We recently published *Conflicts in your charity – a statement of approach by the Charity Commission* which clarifies our role in disputes and provides guidance to help trustees resolve them.

If there are properly appointed trustees in place we will not get involved in a dispute. It is the responsibility of the trustees to ensure any complaints are addressed.

We will become involved if the following two points are satisfied:

- there are no validly appointed trustees; and
- all other methods of resolving the dispute have failed.

Where we do become involved our new disputes team in Compliance and Support has the skills and experience to assist trustees in reaching an effective resolution.

### F4.4 What to expect from statutory inquiries

We know how disruptive statutory inquiries can be and we do not open them without serious cause for concern. To explain and clarify the rights and legal obligations of trustees and employees of charities under investigation we will be producing separate guidance on *Inquiries into charities* (CC46) and will publish it later in the year. This guidance will also outline the inquiry process and explain what charities in this position can expect from us.

We also plan to publish accompanying guidance to explain what trustees and employees of charities under investigation can expect in other compliance cases that are not statutory inquiries.

We revised and have recently published our operational guidance *How the Commission deals with regulatory compliance work*. This guidance provides the legal context under which regulatory action takes place and sets out the principles by which we work.

### F4.5 Working with other regulators

Effective and credible joined-up working with other regulators, law enforcement and other government agencies is essential for detecting, deterring and preventing abuse from taking place in charities, and rectifying problems when they arise. During the year, we have been strengthening our strategic and operational relationships with a number of agencies by putting in place formal protocols and operational arrangements.

We have been raising awareness of our role and approach to compliance work with organisations that do not know us well, enhancing our credibility and building their confidence in us. We benefit from making better use of others' expertise and information as they benefit from ours.

Our contact and collaboration increasingly produces successful, effective case outcomes where other agencies are involved.

At all times we maintain and protect our independence as a non-Ministerial government department free from ministerial control or direction.

### F6 Our key priorities for 2008-09

We will:

- Ensure the effective resolution of compliance issues and maximise the impact of outcomes in all our casework, particularly high-risk, high-profile and complex cases.

- Develop and implement a comprehensive outreach programme to explain the Commission's compliance work internally and externally; publicise outcomes and wider lessons from our compliance work, and promote compliance messages to the sector and the general public.

- Publish and implement our Counter-Terrorism strategy, monitor progress and delivery and report publicly on this.

- Continue to develop and improve our working relationships with other regulators and agencies to assist in all our compliance work.

- Review our use and effectiveness of Interim Managers when we appoint them for charities. This will also include the revision of the existing operational guidance *OG5 Appointment of Interim Managers*.

# G Key statistics from the Commission's compliance work – 2007-08

We have two Key Performance Indicators (KPIs) for our Statutory section 8 inquiry cases which were agreed with HM Treasury for 2007-08:

- 95% of section 8 inquiries completed in 9 months; and

- 95% of inquiry reports (Statement of Results of Inquiry – SORI) published within 3 months of case closure.

For non-inquiry cases, there was one internally set performance indicator:

- 95% of non-inquiry cases completed in 6 months.

Our performance in 2007-08 is as follows:

- Section 8 inquiries: in 2007-08, 74% of cases closed in 9 months, compared to 24% in 2006-07.

- Non-inquiry cases: in 2007-08, 90% of cases closed in 6 months, compared to 67% in 2006-07.

- 31% of inquiry reports (Statement of Results of Inquiry – SORI) published within 3 months of case closure.

While we have made significant progress in bringing many long-running cases to a close and have reduced the time taken to close cases, we still need to improve. Delays in the closure of

Inquires and the publication of the SORI reports were mainly due to avoiding prejudice to other regulators' and agencies' investigations; the handling of sensitive issues and actively engaging with charities to resolve issues and reach agreements. We aim to drive up our performance further against key targets over the next year.

We open statutory inquiries only for the most serious cases of regulatory concern, and this is reflected in the fact that the number of formal inquiries opened during the year remained relatively low. At the same time, the overall use of our regulatory powers has increased.

The use of our powers falls into one of three categories; information gathering, temporary and permanent. We continued our extensive use of information gathering powers over the last year. In summary, we used our formal powers to make a total of 490 orders compared to 329 in 2006-07, including seven trustee suspensions, six removals, appointing 2 Interim Managers, and making 28 orders restricting transactions and preventing payments.

The following annexes provide further information on our statutory inquiry and non-inquiry compliance case work during the year, including the use of our regulatory powers.

Annex 1

| Compliance and Support performance headlines for 2007/08 | |
|---|---|
| Number of assessments into concerns raised by the public and other complainants | 799 |
| Number of new cases opened | 170 |
| Number of formal statutory inquiries opened | 19 |
| Number of inquiry cases closed | 29 |
| Number of inquiry cases closed which had significant involvement from other regulators | 5 |
| Number of inquiry reports published on the Commission's website | 42 |
| Number of non-inquiry compliance cases closed | 171 |
| Total number of cases closed | 200 |
| Number of active compliance cases at year end | 104 |

| Compliance and Support performance impacts for 2007-08 | |
|---|---|
| Charity assets directly protected | £16m |
| Charity income directly overseen through either inquiry or non-inquiry cases | £106m |
| Number of cases where Commission action protected vulnerable beneficiaries | 9 |
| Number of cases protecting the reputation of individual charities | 38 |
| Number of cases protecting the reputation of the sector | 27 |
| Number of cases dealing with issues arising from conflicts of interest | 26 |
| Number of cases where advice and guidance provided to ensure the charity's governance improved | 61 |
| Number of cases involving concerns about fundraisers | 9 |
| Number of cases where an internal dispute was resolved and the charity is properly functioning again | 11 |
| Number of occasions where Commission's statutory compliance powers used, including extensive use of information gathering powers | 490 |

These impacts relate to cases closed *during* the year only, and may not include some data in Annex 2 relating to cases closed in *previous* years.

**Annex 2 – Published statutory inquiry reports 2007-08 - Key issues of concern and use of Charity Commission powers**

Note these examples of the following issues of concern:

- *Accounting issues* - includes inadequate record keeping and taxation issues.
- *Fund-raising* - includes non-compliance with the fundraising regulations, and the failure to properly apply or account for funds collected.

| | Issues | | | | | | | | | | | Statutory Powers | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Charity** | Accounting issues | Disputes | Fraud allegations | Fund-raising | Governing document compliance | Land/property | Political activities | Terrorism - alleged connections | Trading/commercial | Trustee benefits/conflicts of interest | Trusteeship issues | Vulnerable beneficiaries | *Order/directions for information/evidence* | *Suspend trustees* | *Remove trustees* | *Freeze bank accounts* | *Interim manager* | *Other Orders & Schemes* | *No powers used* |
| 1 Al Jamia Al Islamia (1019803) | | | | | ✓ | ✓ | | | | | ✓ | | | | | ✓ | | ✓ | |
| 2 Radio XL (non-registered) | ✓ | | | ✓ | | | | | | | | | ✓ | | | ✓ | | | |
| 3 Smiles Foundation (1087961) | | | | | | | | | | | | ✓ | | | | | | | ✓ |
| 4 Summertime Trust (dissolved) | | | | ✓ | | | | | | | ✓ | | | | | | | | ✓ |
| 5 William Parker Foundation (325045) | ✓ | | | | | | | | | ✓ | | | | | | ✓ | | ✓ | |
| 6 Southampton Sports Leisure for Disabled (275482) | | | | | | | | | | | ✓ | ✓ | | ✓ | ✓ | | | | |
| 7 "A registered charity"[2] | | | | | | | | | | | ✓ | ✓ | | ✓ | | | | | |
| 8 Comm Education and Development (1094421) | ✓ | | | | | | | | ✓ | | | | | | | ✓ | | | |
| 9 Croydon African Caribbean Family Org (1047960) | ✓ | | | | | | | | | | ✓ | | ✓ | | | | | | |
| 10 UK Tamil Students Union (1117231) | | | | | | | | ✓ | | | ✓ | | ✓ | ✓ | ✓ | | | | |
| 11 United Sikh Association Guru Gobind (1071296) | | ✓ | | | ✓ | | | | | | | | | | | | | ✓ | |
| 12 East End CAB (1082193) | | ✓ | | | ✓ | | | | | ✓ | ✓ | | ✓ | ✓ | | | | ✓ | |
| 13 Hyde Bangladesh Welfare Association (1004506) | | | | | | | | | | | ✓ | ✓ | | | | | | | ✓ |
| 14 Smart Kids at No.1 Playgroup (1022596) | ✓ | | | | | ✓ | | | | ✓ | | | ✓ | | | | | ✓ | |
| 15 Recreation Ground Bath (1094519) | | | | | | ✓ | | | | ✓ | ✓ | | | | | | ✓ | ✓ | |
| 16 King George V Playing Field Arnold (700035) | | | | | | ✓ | | | | ✓ | ✓ | | | | | | | ✓ | |
| 17 Stevenage Muslim Community Centre (1001003) | | ✓ | | | ✓ | | | | | | ✓ | | | | | | | ✓ | |
| 18 Dream Foundation (1040478) | ✓ | | ✓ | ✓ | | | | | | ✓ | ✓ | | ✓ | | | ✓ | ✓ | ✓ | |
| 19 Thomas Morley Trust (1028993) | | | | | | | | | ✓ | ✓ | ✓ | | ✓ | | | | | | |
| 20 Breast Cancer Relief (1077881) | ✓ | | ✓ | ✓ | | | | | ✓ | | ✓ | | | | | ✓ | ✓ | | |
| 21 Fairfield Housing Trust (1067489) | | | | | | ✓ | | | | ✓ | ✓ | | | | | | | | ✓ |

[2] To comply with the principles of the Data Protection Act 1998, the Commission has not disclosed the identity of the charity or those connected to it.

Case 1:05-cv-04622-DLI-RML Document 267-8 Filed 03/22/12 Page 401 of 441 PageID #: 6270

continued

- *Land/property* - includes the failure to secure a charity's rights to property, and the use of charitable land for non-charitable purposes.
- *Trusteeship issues* - includes issues other than those involving trustee benefits and conflicts of interest, such as questions concerning trustee eligibility, trustee conduct, or insufficient management controls.

| | Issues | | | | | | | | | | | | Statutory Powers | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Charity** | Accounting issues | Disputes | Fraud allegations | Fund-raising | Governing document compliance | Land/property | Political activities | Terrorism - alleged connections | Trading/commercial | Trustee benefits/conflicts of interest | Trusteeship issues | Vulnerable beneficiaries | *Order/directions for information/evidence* | *Suspend trustees* | *Remove trustees* | *Freeze bank accounts* | *Interim manager* | *Other Orders & Schemes* | *No powers used* |
| 22 Mariam Appeal (non-registered) | | | | ✓ | | | | | | | ✓ | | | | | | | | ✓ |
| 23 Watford and District Gingerbread (1082228) | ✓ | | | | ✓ | | | | | | ✓ | | | | | ✓ | | ✓ | |
| 24 Churches Counselling Together (1108406) | | | | | | | | | | | ✓ | ✓ | | | | | | | ✓ |
| 25 Young Minds and Mentors (110933) | ✓ | | | | ✓ | | | | | | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | ✓ | |
| 26 African Francophone Refugee Assc (1059134) | ✓ | | | | ✓ | | | | | | ✓ | | | | | ✓ | | | |
| 27 Bridlington & Driffield Mencap (223343) | | ✓ | | | ✓ | | | | | | ✓ | | | | | | | ✓ | |
| 28 Families Matter at Hythe URC (1097108) | | | | | | | | | | | | ✓ | | | | | | | ✓ |
| 29 Marie-Louise von Motesiczky (1059380) | | ✓ | | | | | | | | ✓ | ✓ | | | | | | | ✓ | |
| 30 Victory Christian Centre (1003984) | | | | | ✓ | | | | | ✓ | ✓ | | | | | ✓ | ✓ | | |
| 31 Doncaster Mosque Trust (unregistered) | ✓ | ✓ | | | | | | | | | | | | | | | | | ✓ |
| 32 Margaret Desmond Charitable Trust (290896) | ✓ | | | | | | | | | | ✓ | | ✓ | | | | | ✓ | |
| 33 Unity Conductive Education (removed) | | | | ✓ | | | | | | ✓ | ✓ | | | | | ✓ | | | |
| 34 Durham Mining Convalesc Homes (1040427) | | | | | | | | | | ✓ | ✓ | | ✓ | | ✓ | | ✓ | ✓ | |
| 35 Ravidassia Comm Centre Darlaston (514570) | ✓ | ✓ | ✓ | | ✓ | | | | | | ✓ | | | | | ✓ | | ✓ | |
| 36 Newham Foursquare Church (1072013) | ✓ | | | | | | | | | ✓ | ✓ | | ✓ | | | | | | |
| 37 London Christian Fam/Faith Tabernacle (1015067) | ✓ | | | | | | | | | ✓ | | | | | | | | ✓ | |
| 38 Care and Action (CATCH) (501833 - removed) | ✓ | | ✓ | ✓ | ✓ | | | | | | ✓ | | | | | | ✓ | | |
| 39 Help for All (1105786) | ✓ | | ✓ | ✓ | | | | | | ✓ | ✓ | | ✓ | | | ✓ | | ✓ | |
| 40 Jamia Mosque and Islamic Centre (513337) | ✓ | | | | ✓ | | | | | | ✓ | ✓ | | | | | | | ✓ |
| 41 Carmarthen Mind Association (517267) | | | | | | | | | | | ✓ | ✓ | | | | | | ✓ | |
| 42 Celestial Church of Christ (283707) | ✓ | | | | ✓ | | | | | | | | ✓ | | | | | | |
| **TOTALS** | **19** | **7** | **5** | **8** | **13** | **5** | **0** | **1** | **3** | **15** | **32** | **9** | **13** | **5** | **4** | **13** | **6** | **19** | **9** |


Annex 2.1 - Published statutory inquiry reports - 2007-08 - the type and frequency of issues of concern arising in the 42 statutory inquiry reports

Note that some inquiries involve more than one issue.



Annex 2.2 - Published statutory inquiry reports 2007-08 - the number of charities by income bands

24
8
3
3
4

<£100k
£100k - £250k
£250k - £1m
£1m+
Not recorded

Annex 2.3 - Published statutory inquiry reports 2007-08 - the number of charities by core purpose

14
5
9
4
10
Religion
Education
Disability/health
Recreation
Other welfare/need



Annex 2.4 - Published statutory inquiry reports 2007-08 - the frequency of use of different Charity Commission powers

Note that more than one power may be used in some cases.



Annex 3 - Non-inquiry compliance cases 2007-08 - the type and frequency of issues of concern arising in the 171 compliance cases NOT involving statutory inquiries

Note that some cases involve more than one issue.



**Annex 3.1 - Non-inquiry compliance cases 2007-08 - the number of charities by income bands**

Note that the 171 cases involved 145 charities, because for some charities there was more than one case dealt with in the year.

18
18
74
13
22
<£100k
£100k - £250k
£250k - £1m
£1m+
Not recorded

Case 1:05-cv-04622-DLI-RML Document 267-8 Filed 03/22/12 Page 408 of 441 PageID #: 6277

Annex 3.2 - Non-inquiry compliance cases 2007-08 - the number of charities by core purpose
33
34
18
17
43
Religion
Education
Disability/health
Recreation
Other welfare/need

Case 1:05-cv-04622-DLI-RML Document 267-8 Filed 03/22/12 Page 409 of 441 PageID #: 6278

Annex 4

| Use of Charity Commission powers - All compliance cases (statutory inquiry and non-inquiry) - showing breakdown of the number of *individual* orders or directions under the Charities Act | | |
|---|---|---|
| s8 (3) - (a | Furnish Info/answers | 40 |
| s8 (3) - (b) | Furnish copies/documents | 25 |
| s8 (3) - (c) | Attend & give evidence | 5 |
| s9 (1) - (a) | Furnish Information | 50 |
| s9 (1) - (b) | Furnish copies/documents | 246 |
| s18(1) - (i) | Suspend Trustee, Officer, etc | 7 |
| s18(1) - (ii) | Appoint additional Trustee | 3 |
| s18(1) - (iii) | Vest property in the Official Custodian for Charities | 0 |
| s18(1) - (iv) | Not to part with property | 18 |
| s18(1) - (v) | Not to make payment | 0 |
| s18(1) - (vi) | Restrict transactions | 10 |
| s18(1) - (vii) | Appoint Interim Manager | 2 |
| s18(2) - (i) | Remove Trustee, Officer, etc | 6 |
| s18(5) | Appoint Trustee(s) | 9 |
| s26 | Regulatory Consent | 8 |
| Others | (including Discharge Orders) | 61 |
| TOTAL | Orders/Directions Issued in Period | 490 |

You can obtain large-print versions
of this publication from the Charity
Commission on 0845 300 0218

**Charity Commission**
Telephone:   **0845 300 0218**
Typetalk:    **0845 300 0219**
By post:     **Charity Commission Direct**
             PO Box 1227
             Liverpool
             L69 3UG
Website:     **www.charitycommission.gov.uk**

**EXHIBIT 143 TO DECLARATION OF VALERIE SCHUSTER**



COMPLIANCE
Counter-terrorism Strategy
July 2008
6/14/11
16
CHARITY COMMISSION

## The Charity Commission

The Charity Commission is the independent regulator of charities in England and Wales. Its aim is to provide the best possible regulation of charities in England and Wales in order to increase charities' effectiveness and public confidence and trust. Most charities must register with the Commission, although some special types of charity do not have to register. There are some 180,000 registered charities in England and Wales. In Scotland the framework is different, and the Commission does not regulate Scottish charities.

The Commission provides a wide range of advice and guidance to charities and their trustees, and can often help with problems. Registered charities with a gross annual income or expenditure over £10,000 must provide annual information and accounts to the Commission. The Commission has wide powers to intervene in the affairs of a charity where things have gone wrong.

More information about the Commission together with a range of guidance for charities can be found on our website **www.charitycommission.gov.uk**, or by contacting Charity Commission Direct:

Telephone:     **0845 300 0218**

Typetalk:       **0845 300 0219**

All Commission publications referred to in this publication may be viewed on, or downloaded from, our website.

# Counter-terrorism Strategy

**Contents**

A  Introduction                                                                                              2

B  Key factors relevant to our strategy for safeguarding the sector from terrorist abuse            4

C  The scale and nature of the threat                                                                      5

D  The Commission's role and approach                                                                     7

E  The Commission's compliance work and the risk and proportionality framework                  9

F  Strategic objective and the Four Strand Approach                                                     11

G  Building expertise                                                                                       14

H  Measures of success                                                                                      15

I  Resources & further information                                                                         16



# Introduction

The Charity Commission is established by law as the independent regulator and registrar for charities in England and Wales. Our aim is to provide the best possible regulation of charities in England and Wales in order to increase charities' effectiveness and public confidence and trust in them.

The Commission's objectives, contained in the Charities Act 2006, are to:

- increase public trust and confidence in charities;
- promote awareness and understanding of public benefit;
- promote trustees' compliance with the law in their control and management of charities;
- promote the effective use of charitable resources; and
- enhance the accountability of charities to donors, beneficiaries and the general public.

The Commission is a non-ministerial government department that operates independently. The Charities Act 2006 specifically prohibits the exercise of any Commission function being subject to the direction or control of any Minister or any other government department. We are the regulator for over 190,000 registered charities. There are also about 100,000 other unregistered charities which are subject to differing degrees of regulation and/or support from the Commission. Further information on our role, responsibilities and how the Commission goes about its work is available on the Commission's website at www.charitycommission.gov.uk

The Commission applies a risk-based and proportionate approach to regulation. This means that we engage with charities in a way which will make most difference to them and those who benefit from them. As a modern regulator, the Commission's approach emphasises providing support and guidance and promoting best practice as well as ensuring that charities comply with their legal obligations.

We aim to encourage and support charities to improve their performance by working in partnership with them and with umbrella groups, helping to define and facilitate best practice and sharing this knowledge widely. We put an emphasis on enabling charities to maximise their impact and encouraging innovation, effectiveness and collaborative working across the sector.

England and Wales have benefited from a strong and vibrant charitable sector for hundreds of years. Charities exist to create a better society and operate for a vast range of purposes in many different ways. The 190,000 charities registered with the Commission have an annual income of over £40 billion and assets of a further £70 billion, over 600,000 paid staff and 925,000 trustee positions. The charitable sector is diverse and extends from local village halls to national arts organisations to international disaster relief charities. Each of these organisations is united by a commitment to voluntary action and a desire to make the world a better place. Charities provide mechanisms for constructive debate and social action to build a strong civil society. This is an important protection against extremism. Charities make a vital contribution to society and the national economy, as well as a wider impact around the world which addresses many underlying causes of disaffection that may lead people to turn to extremism or terrorism.

The sector's impact is not just domestic. International charities often work in areas of high risk, where the need can be greatest. Charities can often get to the hard-to-reach places and communities that governments cannot. They can work to empower local people to improve the accountability of their own governments; they deliver essential services in spite of extreme and adverse conditions; and their knowledge of local issues is often better informed than that of public or private bodies because of their closeness to local people and issues.

The Commission recognises the importance of a healthy, accountable and independent sector overseas. The Commission's International Programme[1] has an important, continuing role to help create this by supporting the development of effective local regulation.

This document is the Commission's strategy for delivering its regulatory response to the threat of terrorist abuse in the charitable sector. It presents our overall approach and sets out our aims for the future. The strategy builds on our existing work and expertise in this area and applies our overarching regulatory principles as well as our risk and proportionality framework for compliance work. The risk of terrorist exploitation does not apply equally across the sector and a 'one size fits all' approach is not appropriate or proportionate. Our strategy and approach reflects this.

The strategy, which is set out in more detail at section F, has a four strand approach comprising:

1  Awareness    2  Oversight

3  Co-operation    4  Intervention

[1] The International Programme is largely funded by the Foreign and Commonwealth Office's Global Opportunities Fund.

# B

# Key factors relevant to our strategy for safeguarding the sector from terrorist abuse

The Commission's existing approach to regulation provides an important context to our strategy. The Commission will continue to:

- take a balanced approach which is evidence and risk-based, targeted and proportionate;
- work in partnership and collaboration with government and the charitable sector itself; and
- maintain its strategic and operational independence in line with its statutory remit.
- The key factors relevant to our strategy for safeguarding the sector from terrorist abuse are:
- actual instances of terrorist involvement and abuse of charities are extremely rare but are completely unacceptable;
- the way we tackle the risk of terrorist abuse of charities falls squarely within our existing approach to regulation;
- effective regulation involves putting a strong emphasis on giving support and guidance to charities to prevent problems and abuse occurring in the first place;
- we believe that the most effective way for the sector to minimise its exposure to the risk of terrorist abuse is through implementing strong governance arrangements, financial management and partner management. Charities which implement good general risk management policies and procedures will be better safeguarded against a range of potential misuses;
- it is the responsibility of charity trustees to safeguard their charity from terrorist abuse. We will support them to do this, and will not prevent charities from carrying out legitimate and vital humanitarian and other work, within the law;
- we are uniquely placed to deal with abuse where it does occur, collaborate with other regulators and agencies and other parts of government and support trustees to protect their charities; and
- when allegations of terrorist involvement or links with charities arise, we deal with them as a matter of priority. We will deal proactively, robustly, effectively and swiftly when we have evidence or serious suspicions of terrorist abuse involving charities.

The Commission believes firmly that its success as the civil regulator of charities is largely based on the respect and trust placed in it by the public and charities themselves. The value of this trust cannot be over-estimated; it is one of the most effective regulatory advantages we rely on.

The Commission is committed to complying with its duty to have regard to the principles of best regulatory practice including its activities being proportionate, accountable, consistent, transparent and targeted only at cases in which action is needed. Proportionate means not only taking action that is commensurate to the risk of harm but also looking at what other options there are for achieving the same outcome which are less interventionist.

As a public body, the Commission is conscious of its duty to act compatibly with the Human Rights Act 2000 and to promote good race relations under the Race Relations Act 1976 as amended.

# C
# The scale and nature of the threat

Terrorism is a serious and continuing threat both to UK society, UK interests abroad and the wider international community. This threat applies to the charitable sector as much as any other sector.

The true scale of charitable funds being diverted for terrorist purposes, charity links with terrorist activities and other abuse is not known but, as the Home Office Review acknowledges, "actual instances of abuse have proven very rare". Our own experience indicates that the number of cases in which there is evidence to prove charities have been involved in directly, indirectly, deliberately or unwittingly supporting terrorist activity is very small. However, such abuse is completely unacceptable, and the impact of even one proven case involving a charity is potentially significant for public trust and confidence in that charity and the sector in general.

We have always been vigilant about the risk of potential links between charities and terrorist organisations and people connected to them. Charities are highly valued in society for a number of reasons which can also make them susceptible to unscrupulous abuse. Charities:

- enjoy high levels of public trust because of their voluntary and altruistic nature;
- reach into all parts of society and are diverse in nature. Because of this reach, large numbers of people come into close contact with charities, including those who may abuse them, through their services, the use of their property and through their trustees and volunteers;
- have a global presence, often in conflict areas, or in areas with little infrastructure, and frequently move money, goods and people to these areas;
- often have complex global financial operations dealing with multiple donors and currencies. They can operate cash-intensively, either in the collection or disbursement of funds, and may deal in cash and alternative remittance systems where no formal banking infrastructure exists;
- can pass funds to other organisations based overseas rather than deliver their services directly;
- are often engines for social change that attract people committed to making change happen; and
- are powerful vehicles for bringing people together for a common purpose and collective action, and may inadvertently provide a ready made social network and platform of legitimacy for terrorists or terrorist sentiments.

In addition, charities are subject to different and, in some cases, weaker levels of regulation in different parts of the world.

For all these reasons, terrorists may seek to exploit and corrupt charities for their own purposes.

We also recognise that all parts of the UK economy, particularly the financial sector, are tightening their safeguards and strengthening their defences against terrorist abuse. As avenues for terrorists to exploit in these sectors are closed off, there is an increasing risk of attention focusing on others, including the charitable sector. This increases the threat to the sector. There is a clear need for the Commission to support charities in continuing work to step up their vigilance, risk assessment and management practices, particularly for charities working internationally in high-risk areas of the world.

It is recognised that the government and the Commission needs to better understand the nature and scale of the terrorist threat to charities. Further analysis of the specific risks charities face and where they are most vulnerable is crucial in assisting charities to protect themselves from abuse. The Commission, in partnership with the sector and other government agencies, will seek to provide further clarity on this. We have significant and wide-ranging experience from our compliance casework in this area which we will analyse and draw on, and we will link this to expert knowledge within the sector and from the counter-terrorism community. We will reassess our strategies as we become better-informed about the nature of the threat and the risk to charities.

# D

## The Commission's role and approach

We are uniquely placed to contribute to protecting charities from abuse from terrorism, and strengthening safeguards to minimise the risk they face from terrorist abuse. We have a clear role to play in taking regulatory action independently, and, where appropriate, in conjunction with the work of law enforcement agencies who deal with the criminal aspects of this abuse. We are well placed to liaise with them, other regulators and agencies and with other parts of government, and to support trustees themselves to protect their charities from abuse. This position is primarily a result of our:

- independent regulatory role and oversight of the charitable sector;

- broad and unique knowledge of the sector, its diversity and the way it operates;

- access to protective and remedial powers which can be applied to disrupt abuse and protect charity assets and beneficiaries whilst also enabling legitimate activity to continue; and

- hard-earned credibility and the trust and confidence placed in us by the sector and the general public.

The way we tackle the terrorist threat to charities fits within our existing approach to regulation. We act robustly, swiftly and decisively where deliberate wrongdoing, criminality and serious abuse, including terrorist abuse, takes place, or where there is a risk that abuse may occur. Effective regulation places a strong emphasis on giving support and guidance to charities, helping to identify best practice - in partnership with the sector - and making charities aware of the standards to which they should aspire. This prevents problems arising in the first place and reduces the need for us to intervene later.

The effectiveness of our approach depends on striking the right balance between the provision of advice and guidance and, where necessary, intervention based on evidence and proportionality. We aim to regulate in a way which effectively addresses abuse and risk while minimising the regulatory burden and, as far as possible, enabling the continuing flow of funds for legitimate charitable activity.

It is important that the Commission and government work hard to ensure one of the consequences of taking greater steps to prevent the risk of abuse is not to stop legitimate charities, operating within the law, from undertaking valuable work. This could harm international aid in areas of high risk and would have a negative impact on beneficiaries. Great humanitarian need often exists in the same places where there is conflict or where it is thought terrorist groups, or those connected with them, operate. It would be profoundly undesirable if an unintended consequence of a counter-terrorist strategy were to make it impossible for legitimate overseas aid charities to be involved in providing aid, or make it impossible for any charity to provide aid in particular parts of the world. This is a difficult and complex challenge for charities, the Commission and government.

We recognise that many charities face particularly challenging dilemmas when operating in specific areas of the world. Political and legal contexts can complicate matters and organisations that are considered to be terrorist, or linked to terrorists, can exercise significant influence or control in some areas; for example, in the different and difficult contexts in Sri Lanka and the Occupied Palestinian Territories. This is further complicated by the differing stances taken by members of the international

community to certain organisations, which often impose varying conditions on the aid they provide to these areas. Charities need assistance to see how they can overcome the practical difficulties they face in carrying out their work in these areas, while ensuring they comply with the law and do not support terrorism directly or indirectly. We will continue to work with government and the sector to clarify how humanitarian aid can continue in such areas while remaining within the law.

We must also be alert to the unintended risk that a higher burden of regulation may encourage money to be donated to unregistered organisations or to others overseas and therefore beyond the regulatory scope of the Commission.

The Commission can make a particularly important contribution to tackling the terrorist threat to charities through an emphasis on prevention. We believe that we will have the greatest impact on minimising the sector's exposure to the risk of terrorist abuse by encouraging and supporting the development in charities of robust, accountable and transparent governance, strong financial management and good general risk management policies and procedures. We aim to build a greater awareness of the risks charities face from terrorism and promote the steps that should be taken to minimise the risks and lead to the prevention and early detection of terrorist abuse. We will promote a keen awareness of risks and responsibilities and the knowledge by charity trustees of what to do if and when suspicions are aroused. We will expect all charities to effectively manage risk and strengthen safeguards against all abuse, including abuse by terrorists.

The Commission is committed to supporting work to develop effective strategies and procedures for preventing and dealing with the risks of terrorist abuse of charities. For example, we will work to define a 'know your beneficiary' principle and set out expectations of how it should be applied by charities. We recognise that many charities, including those

working overseas in high risk areas, already have good standards in place to minimise the risks from terrorist abuse and a great deal of experience in working in complex operating environments. We will also draw on our own extensive operational casework experience when developing guidance and advice. We enjoy a good working relationship with the sector and aim to further develop this relationship to build on existing safeguards and facilitate the identification and sharing of existing best practice.

Charities are subject to the provisions of UK anti-terrorism legislation and the obligations that flow from it. The Commission will work with government to provide clear guidance on charities' legal obligations under the Terrorism Act 2000 and other financial sanctions legislation.

As well as ensuring charities know about their legal obligations, adding value to charities' work and enhancing public understanding will be important drivers for the Commission when producing new or revised guidance. We will continue to make a distinction between what charities 'must' do according to legal requirements and what they 'should' do to meet common standards of good practice. We recognise the importance of being clear about this distinction in any guidance we produce.

The Commission is committed to working in partnership to co-ordinate more effectively with other regulators and law enforcement agencies in the UK and internationally in order to prevent and disrupt terrorist finance abuse. In some circumstances we will be best placed to take the lead in disrupting terrorist abuse of charities through our compliance operations and by using our civil regulatory powers. In others, we can help ensure other agencies better understand the sector when they are investigating abuse connected with it. We can also use our knowledge of the charitable sector to provide information and analysis of trends and the risks facing the sector, and to complement knowledge and analysis carried out by the sector itself in relation to the terrorist threat.

# E
# The Commission's compliance work and the risk and proportionality framework

Charities must comply with the law. When trustees act reasonably and honestly we respond flexibly and will take this into account in deciding whether to take regulatory action against trustees, and in assessing how to support trustees to put the charity back on a secure footing. Deliberate wrongdoing, criminality and serious abuse, including terrorist abuse, will be dealt with rigorously and decisively based on the evidence and targeting the core of the abuse. Where possible we will ensure that legitimate charitable activity can continue both during an investigation and afterwards. Regulatory action inhibiting the flow of funds must be justified by evidence that this is a necessary and appropriate step to take. An effective compliance and enforcement function in the Commission is, therefore, of vital importance.

The Commission's Compliance and Support function is responsible for the delivery of our 'compliance objective' involving regulatory work with charities where their assets, services or beneficiaries are at serious risk of abuse or damage. This includes risks to the reputation of individual charities and, by extension, concerns about public confidence in charities generally and the effective regulation of the sector. Its function is to identify and investigate apparent misconduct or mismanagement in the administration of charities and to resolve difficulties encountered, either by providing support to trustees or, where necessary, intervening to protect the charity by using the Commission's legal powers. The Commission's Compliance function also disseminates lessons learned from casework experience to the sector and the public to promote good practice and to minimise risk.

As part of a risk-based and proportionate approach to regulation, we have developed a risk and proportionality framework for our compliance work. This ensures that our decisions and actions are appropriate and consistent, and that our resources are targeted where we can have the greatest impact. Our approach recognises that we cannot eliminate or seek to control all risks as a regulator. We do not have the capacity to do so. It would also place an unacceptable regulatory burden on charities and would stifle the innovation and adaptability that characterises the sector. Our approach allows us to deliver effective, timely, proportionate and targeted regulation. It ensures that our intervention is appropriate, and that it properly reflects the seriousness of the problem and the potential impact of failing to regulate it. In addition, it allows us to identify, at an early stage, charities that may be facing problems and provide them with support or advice to mitigate or avoid those problems – moving from reactive to proactive casework. We will take an evidence-based approach based on continuous evaluation and research into how serious problems arise in charities, where the current risks lie, and emerging trends and changes to those risks.

When assessing whether to engage and how quickly, the Commission uses an approach which is based on levels of tolerance and identifies a number of 'zero-tolerance' issues. When we have concerns that such issues have or potentially may arise in a charity, they receive immediate attention in the Compliance and Support function due to the risks they pose to the public, beneficiaries and the integrity and reputation of charities. Using our risk and proportionality framework we rapidly assess the

most appropriate and proportionate course of action to take. This means we determine whether we will engage further with the issue, the level of priority and attention we will give it and where in the Commission it will be dealt with. Any action we take will be based on the particular circumstances, the seriousness and scale of the problem and the available evidence. When 'zero-tolerance' issues may or have arisen, it does not automatically mean that we will intervene using our powers in the affairs or administration of a charity. In the context of our response to the Review, the relevant 'zero-tolerance' issues are:

- connections to proscribed organisations;[2]
- charity links to or support for terrorism, financial or otherwise;
- misuse of charity to foster criminal extremism;
- fraud and money laundering; and
- sham charities.

These issues will be subject to review and modification.

When charities, or those connected with them, have committed a criminal offence this is a matter for law enforcement agencies and we will refer suspicions of criminal activities, including terrorism, to them as appropriate. This is in line with our general approach to issues of criminality within, or associated with, charities.

[2] Those which are criminalised under the Terrorism Act 2000, as amended by the Anti-Terrorism Crime and Security Act 2001, and appearing on the UK, EU and UN lists of designated organisations.

# F

## Strategic objective and the Four Strand Approach

Our overarching objective for the Commission's counter-terrorism strategy is:

"To identify, disrupt and prevent terrorist and other serious abuse of the charitable sector. We will do this ourselves and in co-operation with other relevant agencies through:

- *support - encouraging and enabling the sector to build its awareness and strengthen its safeguards and defences;*
- *supervision - through proactive regulatory oversight; and, where necessary,*
- *intervention - using the Commission's legal powers of protection and remedy."*

The strategy has a four-strand approach for identifying and minimising the risk of terrorist exploitation of charities. This reflects a balance between support and guidance, prevention and compliance intervention. We will continue to build and strengthen our compliance work and develop expertise in this area. We will, in particular, consolidate our working relationships with other regulators and law enforcement agencies while maintaining our independence. In addition, we will seek to proactively monitor this high-risk area with an eye to early intervention, particularly where guidance is not followed and requirements are not met. We will put great emphasis on preventative work, seeking to clarify legal requirements and to support and build best practice in collaboration and partnership with the sector. The four strands are:

### F1. Awareness

We will work in close co-operation with the sector to build on charities' existing safeguards to minimise the risk of terrorist abuse. We aim to:

- analyse risk factors and build a shared understanding of risks so that different profiles of charities are made aware of their potential vulnerabilities to the threat of terrorist abuse;
- produce periodic bulletins for the sector and the wider public providing key, up to date information on the evolving terrorist risk to charities, informed by our risk profiling work, our casework experience, the outcomes of research and analysis and, where possible, by information from other regulators and law enforcement agencies;
- develop a 'toolkit', in partnership with the sector, to assist charity trustees and their advisors in undertaking risk assessment to better identify and minimise the risk of terrorist abuse and to disrupt those that seek to exploit charities for terrorist purposes. This will build upon already embedded good practice within the sector and learn from those charities that already have significant experience of managing these risks in their activities;
- provide updated advice and guidance including: our Operational Guidance on *Charities and Terrorism* (OG96) and our guidance on *Charities Working Internationally; guidance on charities'* legal obligations including under the Terrorism Act 2000, other financial sanctions legislation and relevant EU legislation; guidance on proscribed and designated lists – what they are and how to use them; guidance on 'good governance' and financial controls, including raising funds, transmission of funds overseas and verifying the end use of funds; and in defining 'know your' principles for due diligence and the minimum standards we expect charities to reach in applying them;
- promote guidance and best practice advice widely through outreach work and tailored communications; and
- signpost to other sources of information, advice and guidance provided by sub-sector groups and other parts of government.

Ensuring charities understand their legal obligations, adding value to charities' work and enhancing public understanding will be important principles for this aspect of our work.

## F2. Oversight and supervision

We will take a more proactive approach to analysing trends and profiling risks and vulnerabilities in the sector in relation to the threat from terrorism. We will monitor the sector in areas we recognise as high risk in order to identify, at an early stage, those charities that may be facing problems, so that we can alert them to the risks and provide them with advice and support. We will monitor the sector in order to anticipate and react to concerns affecting it.

Charities identified as potentially at risk will be followed up through casework to give them guidance in putting adequate systems in place for minimising and managing that risk. On-site visits will be appropriate in certain circumstances as part of our risk-based approach to regulation; on occasion, we will make these visits overseas.

Our intelligence led Proactive Monitoring Unit will undertake this work. By producing and updating risk profiles and specific risk indicators the Commission will be better able to carry out preventative work in relation to charities' vulnerability to terrorism and other high risk areas. These risk indicators will be regularly reviewed in the context of our risk and proportionality framework for our compliance work, and in light of developments within the sector, our own operational experience, and information and risk typologies developed by other government agencies involved in counter-terrorism work.

## F3. Co-operation

In addition to maintaining close links with the charitable sector, we will work with other government regulators and law enforcement agencies by formalising our protocols and strengthening our operational arrangements. These will clarify and set the framework within which the Commission liaises and works in partnership with another agency to better ensure the disruption of those that seek to exploit charities for terrorist ends. This will include:

- providing support in instances which fall within the Commission's statutory remit, but where there is no immediate regulatory requirement for operational action by the Commission;
- ensuring that all suspicions of terrorist criminal activities within, or affecting, charities, are promptly reported to the Police, either by ourselves or by the charity affected; and
- facilitating reciprocal awareness sessions to help other agencies better understand the sector when they are investigating abuse connected with it.

## F4. Intervention

We will deal proactively, robustly, effectively and swiftly when we have evidence or serious suspicions of terrorist abuse involving charities.

We will treat allegations or suspicions of terrorist activity within charities, or involving individuals associated with charities, as a zero tolerance issue. Each case will be assessed promptly and efficiently and acted on proportionately according to the risk posed to the charity, the sector and wider society. Our investigations will be robust, thorough and informed by intelligence and evidence, aiming to:

- immediately disrupt the activities of those seeking to abuse charity for terrorist ends;
- ensure that the charity, or charitable funds are put to their proper use for the benefit of their beneficiaries; and
- minimise the disruption any incident can cause to the wider sector.

We will increase our capacity to deal with work involving terrorist abuse by developing a pool of counter-terrorism expertise with specialist, trained and skilled staff to deal with these kinds of cases. These staff will be trained in specialist financial investigation and other relevant skills. We will improve the security of our own infrastructure to ensure we are able to link into the rest of government in this area.

Counter-terrorism Strategy - the Four Strand Approach



# G

## Building expertise

The Commission is in a unique position to inform the debate on charity-related terrorism issues. We are committed to building upon the expertise and knowledge base of our staff. Our staff have deep and wide-ranging knowledge of charity law, regulation and best practice as well as being aware of the day to day difficulties charities face in doing their work. This expertise will be used to facilitate and raise awareness amongst other agencies involved in counter-terrorism work, and those professionals that advise charities. The Commission is also committed to learning from those agencies, so that as new trends emerge and threats and risks evolve the Commission's staff are informed and equipped to respond and deal with them appropriately.

# H
# Measures of success

Benchmark indicators of success are set in the wider context of the Commission's statutory objectives. Our headline indicators of success for each strand of our counter-terrorism strategy are:

**Awareness:**

- publish, promote and invite feedback on the Commission's draft counter-terrorism strategy following completion of the government's consultation process.
- within the first six months, engage with and listen to the sector in order to identify and agree an appropriate range of guidance and best practice 'products' that will be most useful to revise or develop for the sector. This will include:
- guidance on charities' legal obligations under the UK's anti-terrorism legislation and will cover the background to the various designation and financial sanctions regimes. The issues arising for charities from these regimes will focus on the risks and implications of working with designated organisations appearing on the UK, EU and UN lists and also of designations by foreign governments.
- defining 'know your' principles, which will clarify minimum standards for due diligence in relation to a charity's beneficiaries, partner organisations and donors. This will assist in identifying and forestalling funding connections either to proscribed terrorist organisations or to designated persons, groups or entities or to recipients whose activities may give support to terrorism.
- set priorities for the production of guidance and publicly set out a timetable for their delivery, aiming to consult on and publish the first elements of a 'toolkit' of guidance and best practice within 12 months.

**Oversight:**

- develop and establish a proactive monitoring capability in the Commission within 12 months.
- undertake risk profiling to identify and proactively monitor high-risk sub-sectors within the broader charitable sector.
- undertake targeted, proactive casework informed by risk profiling, including on-site visits where appropriate.

**Co-operation:**

- establish strong relationships with other key regulators, law enforcement and other government agencies including (i) putting in place formal agreements and operating protocols, and (ii) a structured programme of strategic liaison, within 12 months of finalising our strategy.
- closely monitor and control the exchange of relevant information with other regulators and agencies.

**Intervention:**

We will aim for the timely and appropriate resolution of cases where we do intervene.

As part of our annual public reporting on the Commission's compliance work we will report on:

- our use of powers of protection and remedy on cases involving possible links to terrorism;
- the impact of our intervention, including the protection of charity property and assets, and significant and necessary improvement in charity governance;
- the amount of charity funds protected or redirected by Commission action; and
- the wider lessons learned from our compliance casework in this area.

We will not measure success in terms of increased numbers of investigations, as this can be misleading.

# Resources & further information

The additional £1 million funding contribution from HM Treasury for 2007-08 along with some redirected Commission resource will allow us to invest in awareness and outreach work, and to further develop and strengthen capacity in our Compliance function for casework involving possible or alleged links to terrorism in charities. In future years the additional £1 million per annum will be built into our funding baseline.

**For further information please contact:**

David Walker

Head of Outreach and Development Compliance and Support

Tel: 020 7674 2529

Email: David.Walker@charitycommission.gsi.gov.uk

You can obtain large-print versions of this publication from the Charity Commission on 0845 300 0218

**Charity Commission**
Telephone: 0845 300 0218
Typetalk: 0845 300 0219
Website: www.charitycommission.gov.uk

Counter-terrorism Strategy, July 2008.

**EXHIBIT 144 TO DECLARATION OF VALERIE SCHUSTER**

**FILED UNDER SEAL**

**UNITED STATED DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **MOSES STRAUSS et al., Plaintiffs, v. CRÉDIT LYONNAIS, S.A. Defendant.** | : | **DOCKET NO. 06-cv-702 (CPS) (MDG)** |
| **BERNICE WOLF et al., Plaintiffs, v. CRÉDIT LYONNAIS, S.A. Defendant.** | : | **DOCKET NO. 07-cv-914 (CPS) (MDG)** |
| **TZVI WEISS et al., Plaintiffs, v. NATIONAL WESTMINSTER BANK, PLC Defendant.** | : | **DOCKET NO. 05-cv-4622 (CPS) (MDG)** |
| **NATAN APPLEBAUM et al., Plaintiffs, v. NATIONAL WESTMINSTER BANK, PLC Defendant.** | : | **DOCKET NO. 07-cv-916 (CPS) (MDG)** |

# EXPERT REPORT OF WAYNE D. GEISSER, CPA, CVA, CFE

**Prepared by: WAYNE D. GEISSER, CPA, CVA, CFE**
**Nihill & Riedley, PC**
**The Public Ledger Building, Suite 800**
**150 So. Independence Mall West**
**Philadelphia, PA 19106**
**November 19, 2009**

# TABLE OF CONTENTS

| | | Page |
|---|---|---|
| I. | BACKGROUND | 1 |
| II. | STATEMENT OF ASSIGNMENT | 1 |
| III. | DOCUMENTS CONSIDERED | 2 |
| IV. | QUALIFICATIONS – WAYNE D. GEISSER, CPA, CVA, CFE | 2 |
| V. | ANALYSIS AND OPINION | 3 |
| | A. Crédit Lyonnais – CBSP Accounts | 3 |
| | B. NatWest – Interpal Accounts | 4 |

EXHIBITS



## I. BACKGROUND

This Report is being submitted in connection with the cases captioned:

*Strauss, et al. v. Crédit Lyonnais, S.A.*, 06-cv-702 (CPS)(MDG)
*Wolf, et al. v. Crédit Lyonnais, S.A.*, 07-cv-914 (CPS)(MDG).
*Weiss et al. v. National Westminster Bank, PLC*, 05-cv-4622 (CPS)(MDG)
*Applebaum, et al. v. National Westminster Bank, PLC*, 07-cv-916 (CPS)(MDG)

Nihill & Riedley ("N&R"), has been retained by the Plaintiffs' counsel to review and analyze certain banking records, produced in discovery, reflecting transactions facilitated by Crédit Lyonnais, S.A. ("CL") and National Westminster Bank, PLC ("NatWest") , hereafter, collectively the "Defendants" and provide a report summarizing particular withdrawal transactions reflected in the records.

By way of general background, I understand that in each of the above captioned cases, Plaintiffs, each of whom allege injury by reason of an act of international terrorism, allege that the Defendants knowingly provided material support to Hamas, a terrorist organization officially designated by the United States government as a "Foreign Terrorist Organization."

I also understand that Plaintiffs further allege that Defendants maintained a relationship with customers that were designated by the United States government as a "Specially Designated Global Terrorist." In the case of CL, that customer is an entity named the *Comité de Bienfaisance et de Secours aux Palestiniens* ("CBSP"). In the case of the NatWest, the customer is an entity named Interpal (a/k/a Palestine Relief and Development Fund).

I further understand that Plaintiffs allege that the Defendants provided illegal material support for the benefit of Hamas by transmitting funds at the direction of CBSP and Interpal to various organizations in the Palestinian Territories (the West Bank and Gaza Strip) which are alleged to be alter egos, affiliates, agents, departments, or otherwise controlled by Hamas, as well as to other Hamas controlled entities outside the Palestinian Territories.

The preceding paragraphs are purely intended to summarize my understanding of Plaintiffs' allegations in these cases. This Report (including its Exhibits) does not, and is not, intended to offer, express or suggest any opinion regarding the veracity of Plaintiffs' allegations, or any of Defendant's defenses and/or denials thereof.

## II. STATEMENT OF ASSIGNMENT

As noted above, we have been requested by Plaintiffs' counsel to review and analyze records produced in discovery in each of the above-listed cases that reflect transactions facilitated by CL and NatWest for their respective customers CBSP and Interpal. We have been asked to summarize certain categories of transactions reflected in those records; specifically those disbursements made from CBSP (from the CL records) and Interpal (from the NatWest records) accounts to the following entities and individuals identified to N&R by Plaintiffs' counsel:

n
nihill & riedley

1. *Al-Mujama al-Islami* – Gaza (Islamic Complex)

9. Tulkarem Zakat Committee
10. Ramallah - Al-Bireh Zakat Committee
11. Al-Islah Charitable Society - Ramallah & Al-Bireh

N&R is being compensated at its standard hourly rates for the time spent working on this matter, which vary depending on the staff assigned. N&R is being compensated for my (Wayne D. Geisser) work on this matter at the rate of $325 per hour.

N&R confirms that it has no previous professional or personal connection or relationship with any of the parties or witnesses in this case that would preclude N&R from providing its analyses in a fair, accurate, and impartial manner. N&R reserves the right to supplement this Report and any Exhibits thereto should additional information come to our attention.

## III. DOCUMENTS CONSIDERED

In connection with our engagement we have been provided with a substantial volume of records, produced principally in an electronic database format. The records that we have utilized in our analysis consist of various types of banking-related records including: account statements; deposit and disbursement records; wire transfer instructions; wire transfer confirmations and electronic payment messaging instructions. These records appear to have been generated in the ordinary course of the business. The records produced reflect Bates identification references that have been assigned by the parties and our analysis make references to these documents accordingly. The list of documents that we have considered is attached as **Exhibit E**.

## IV. QUALIFICATIONS – WAYNE D. GEISSER CPA, CVA, CFE

I am a Certified Public Accountant, Certified Valuation Analyst and Certified Fraud Examiner. In my more than 20-year tenure with N&R and in my prior experience as a Branch Chief in the SEC Division of Enforcement, I have conducted and/or supervised hundreds of financial investigations that have involved the analysis of banking/financial transactions. I have also been qualified as an expert witness in numerous federal and state courts. I currently serve as a

Receiver and Special Master for the United States District Court for the Eastern District of Pennsylvania. My *curriculum vitae* is attached as **Exhibit F**.

## V. ANALYSIS AND OPINION

Within the scope of our engagement, it is my opinion that the information provided in this Report and Exhibits constitutes an accurate summary of the results of our review and analysis of documents produced, including the transactions processed through the CBSP accounts maintained at CL, and the Interpal accounts maintained at NatWest.

### A. Crédit Lyonnais – CBSP Accounts

In connection with our analysis we reviewed All of the transfers to the identified beneficiaries were made from account number The transfers (stated in dollars) from the CBSP account number to the entities that have been identified by counsel are summarized as follows:

| Ref # | Name[4] | Number of Transfer Transactions | Amount (in US Dollars)[5] |
|---|---|---|---|
| 1 | *Al-Mujama al-Islami* – Gaza (Islamic Complex) | | |
| 9 | Tulkarem Zakat Committee | | |
| 10 | Ramallah - Al-Bireh Zakat Committee | | |
| 11 | *Al-Islah* Charitable Society – Ramallah & Al-Bireh | | |
| | **Total** (rounded) | | |

[1] See CL 0004426.

[2]

[3]

[4] N&R has been advised by Plaintiffs' counsel that because the recipients listed above are all entities or persons whose names are or derive from Arabic, there may be occasions when transfer beneficiaries' names may be spelled or translated in a variety of ways. Accordingly, whenever possible, we have cross-checked names and account numbers to confirm that an entity whose name was spelled differently in separate transactions is in fact the same entity.

[5] We have converted the currency using the exchange rate applicable on the day of the transaction, using currency conversion data contained on the website: www.oanda.com.

Our summary of the transfers to the designated entities listed above, by year, is attached as **Exhibit A.** Our detailed analysis of the CBSP transfers on a transaction by transaction basis, is attached as **Exhibit B.** In the course of preparing our analysis of the CBSP accounts, we were unable to identify the beneficiaries for 16 transactions totaling $269,140.00.[6]

**B. NatWest – Interpal Accounts**

Our analysis included [redacted] The accounts were [redacted] We identified transfers to designated beneficiaries as originating from one of the following four Interpal accounts:

1. Interpal, account number [redacted]
2. Interpal Zakat Fund, account number [redacted]
3. Interpal Children, account number [redacted]; and
4. Interpal, account number [redacted]

The transfers from the Interpal accounts at NatWest to the entities that have been identified by counsel are summarized in the table below and include disbursements from one of the four accounts listed above.

| Ref # | Name | Number of Transfer Transactions | Amount (in US Dollars)[8] |
|---|---|---|---|
| 1 | *Al-Mujama al-Islami* – Gaza (Islamic Complex) | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] |
| 9 | Tulkarem Zakat Committee | [redacted] | [redacted] |
| 10 | Ramallah - Al-Bireh Zakat Committee | [redacted] | [redacted] |
| 11 | *Al-Islah* Charitable Society – Ramallah & Al-Bireh | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] |
| | **Total** (rounded) | [redacted] | [redacted] |

---

[6] The table totals do not include any transactions where the beneficiary could not be identified.
[7] The disbursements total includes transfers between various accounts.
[8] [redacted] We have converted the Pounds Sterling accounts using the exchange rate applicable on the day of the transaction, using currency conversion data contained on the website: www.oanda.com.

Our summary of the transfers to the designated entities listed above, by year, is attached as **Exhibit C**. Our detailed analysis of the Interpal accounts on a transaction by transaction basis is attached as **Exhibit D.** In the course of preparing our analysis of the Interpal accounts at NatWest we were unable to identify the beneficiary for 619 transfer transactions totaling approximately $10,170,600.15.[9]

[9] The table totals do not reflect any of the transactions were the beneficiary could not be identified.

**EXHIBIT 145 TO DECLARATION OF VALERIE SCHUSTER**

**FILED UNDER SEAL**

**Palestinians Relief & Development Fund - Interpal**
**NatWest Business Bank Accounts - All Currencies**
**Summary of Identified Withdrawal Transactions for the Benefit of Selected Organizations**

**Annual Withdrawal Totals Presented in US Dollars**
**For the Time Period: October 1996 to August 2005**

| | | Annual Withdrawal Totals: | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Ref. ID | Organization Name | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | Total |

Note As of November 19, 2009, the totals above do not include 619 withdrawals, transferred between February 1995 and February 2005, with a US Dollar value of $10,170,600 for which a beneficiary was not identified