EXHIBIT 149 TO DECLARATION OF VALERIE SCHUSTER

FILED UNDER SEAL

*MOSES STRAUSS, et al. VS.*
*CREDIT LYONNAIS, S.A.*

---

*MATTHEW LEVITT*
*September 1, 2010*

---




126 East 56th Street, Fifth Floor New York, New York 10022
PHONE: (212) 750-6434 FAX: (212) 750-1097
www.ELLENGRAUER.com

*Original File 93800.TXT*
*Min-U-Script® with Word Index*

LEVITT
be saying that one of the opinions in your report relates to one of the 15 attacks in question?
A. Unless the report --
MR. GLATTER: Objection to form.
MR. LUFT: Let him finish.
MR. GLATTER: Objection to form. You can answer.
A. Unless the report says otherwise because I have not memorized the 89 pages, no.
Q. Professor Levitt, are you offering an opinion that the 15 attacks in question were committed by Hamas?
MR. GLATTER: Objection to the form of the question. I believe that was asked and answered, but you can answer.
A. I have not.
Q. Dr. Levitt, I made mention to the Geisser report and I believe you make reference to it as well in your report, correct?



LEVITT
A. Correct.
Q. For what purpose did you rely upon the Geisser report?
A. For the purpose of identifying Credit Lyonnais transfers.
Q. For the purposes of your report, what time frame were you considering with regard to the Credit Lyonnais transfers?
MR. GLATTER: Objection as to form.
A. I suppose the best way to answer that is that I was relying on the report, but I don't recall the specific time period in part because forgive me I do a lot of other things other than this case and I don't remember the specific time period we're talking about in this case, but when I was writing this report I'm sure it was very much at the top of my memory.
Q. Could you tell me what time period you believe your opinions with regard to the level of connection to Hamas these 12 entities had relates to?
A. Could you re-ask that question?



LEVITT
Q. Sure. Sitting here today with regard to the 12 entities referred to in your report on page 1, could you please tell me with regard to any opinions that you express as to their level of connection to Hamas what time period you are speaking about to offer that opinion?
MR. GLATTER: Objection to form.
A. I imagine that for each one there's a slightly different time period. They were not all founded on the same date and they may not have started engaging activities related to Hamas on the same date and it would go through probably my guess is about -- we should go through the report to be really accurate, but we're talking about probably documents probably relate through probably 2007 or 8. I can't remember when I finished the first report. If I recall correctly, the focus here is on what was it '03, '04 I think or certainly through there.
Q. So '03, '04 you said, I'm sorry?



LEVITT
A. If I recall correctly, the question, the time period in question important for this case is '03, '04. I may be off, but this certainly goes through there.
Q. When do they start?
A. When did who start what?
Q. Your opinion. Is there a start date roughly when you begin to opine -- your opinions begin to -- let me just strike that.
Is there a starting date with regard to which your opinions as to the level of connection between the 12 entities and Hamas begins with so you said it goes through '07, '08, it at least covers '03, '04 and I'm wondering is there a start date I can put on this?
MR. GLATTER: Objection to form.
A. As I said it varies. Each of these was founded at different times and was active at different points so for each there's a different start date. Some of these go as far back as to predate the

LEVITT

official founding of Hamas as such under that name. Some are more recent. We'd have to go through and there I think the report speaks for itself.

Q. The ones that predate the founding of Hamas presumably was not connected to Hamas before there was a Hamas, correct?

MR. GLATTER: Objection to form.

A. Yes and no and I think the report is pretty clear here. Hamas existed -- what became known as Hamas existed and was active prior to the decision in late 1987 to come up with the name Hamas. Had not only been involved in charitable activity, not only with the same people, but in violence as well and Hamas officials are quite open themselves in saying before the establishment of the group under this name we were active under various other names and they go on to list some of them and some of them include the names of some of these entities especially in Gaza.



LEVITT

Q. How reliable do you find statements made by officials of Hamas?

MR. GLATTER: Interpose objection to form.

A. When people involved in illicit activity make public statements, some of them are things you could take at face value. Certain basic historical facts, things like that. Sometimes individuals will say things that's more what they want you to hear than what may be God's truth. Think of bin Laden's video and audio tapes trying to scare the world.

When a senior Hamas official gives major interviews to the press for example and starts providing his first hand impressions from when he was involved in these activities, I think that can be relied upon. When I've interviewed Hamas members or operatives, sometimes you have to be a little more careful. Again, a lot of it has to do with is it facts, something that they were involved in that they are talking about, is it their analysis of something, is this



LEVITT

something that could be interpreted as what they want you to hear, do they think that when they are telling it are they telling it because they -- I don't want to get into their state of mind, but certain things, in short, certain things certainly can be taken at face value.

Q. What analysis do you do to determine what can be taken at face value and what can't?

MR. GLATTER: Objection to form.

A. Part of it I just explained. Part of it is and this is for all kinds of information does it fit into the body of knowledge that already exists, does it fly in the face of the body of knowledge that exists. You know, if bin Laden were to give an interview saying I've never been involved in terrorism, would you take him at face value?

There is, we're talking here in the social sciences, there is a lot of doing the best you can to vet information by



LEVITT

talking to experts, talking to people with first hand experience, talking to people who are doing similar types of research, comparing to other sources of information primary and otherwise.

A lot of what you find in social science is, you know, at the end of the day you have a totality of information which is information which is known or established as fact at one end of the spectrum, completely verifiable, two, within the realm of possibility based on what we know and all of that can be included in an analysis and can contribute to the totality of an opinion about something, right. No one data point will be the only point of the make it or break it point.

MR. LUFT: we've been going about an hour so why don't we take a break.

THE VIDEOGRAPHER: We are now off the record. The time is 10:28 a.m., September 1, 2010.

(Recess taken.)

LEVITT
THE VIDEOGRAPHER: This is tape two of the deposition of Dr. Matthew Levitt. We are now back on the record. The time is 10:48 a.m., September 1, 2010.
Q. Dr. Levitt, you're offering no opinion that money transferred by CBSP through Credit Lyonnais accounts was used to perpetrate the 15 attacks at issue in this case, right?
MR. GLATTER: Objection to form. You may answer.
A. No.
Q. You are offering no opinion that any of the entities at issue in this case that CBSP transferred money to through Credit Lyonnais participated in any of the 15 attacks at issue in this case, correct?
MR. GLATTER: Objection as to form. Object to the extent as phrased the question calls for a legal conclusion. You may answer.
A. The question is too long.
Q. You are not offering an opinion



LEVITT
that any of the entities at issue in this case that received transfers from CBSP through Credit Lyonnais participated in any of the 15 attacks at issue in this case, correct?
MR. GLATTER: Objection as to form.
A. I don't recall if there is anything in the report about any of these 12 entities providing services or funding for an attack or one of those attacks in particular. I don't recall offhand.
Q. Are you offering -- sitting here today as the expert are you offering that opinion?
A. What opinion?
MR. GLATTER: Objection to form.
Q. That any of the entities at issue in this case that CBSP transferred money to through Credit Lyonnais participated in any of the specific 15 attacks at issue in this case?
MR. GLATTER: Objection to the



LEVITT
form of the question.
A. Slightly different question. Are you asking me if I'm opining that any of these 12 entities participated in any of those 15 attacks?
Q. Yes.
A. To my knowledge, no, directly participated as in, you know, pulled the trigger or bought the bomb directly.
MR. GLATTER: Were you done with your answer?
A. I just don't want to contradict. There's lots of detail in the report, I don't want to contradict a detail that I don't recall offhand, but to the best of my knowledge there's nothing in there about that.
Q. You are offering no opinion that any of the entities at issue in this case that CBSP transferred money to through Credit Lyonnais planned any of the 15 attacks at issue in this case, correct?
MR. GLATTER: Objection to form, vague.



LEVITT
A. To the best of my recollection that's not in the report.
Q. You are offering no opinion that any of the entities at issue in this case that CBSP transferred money to through Credit Lyonnais trained the perpetrators of any of the 15 attacks at issue in this case, correct?
MR. GLATTER: Same objection.
A. To the best of my knowledge that's not in the report. Again, I don't want to contradict something if there's a detail in there to that effect in the report I don't recall so it applies to the series of questions.
Q. It's not an opinion you are offering, you are saying you are offering today, correct?
MR. GLATTER: Objection as to form.
A. I'm sorry, you confused me because you've told me that my opinions are based on what's in here and you are asking me if I'm issuing new opinions today?

LEVITT

Q. I don't think you are issuing new opinions, but I also assume you are familiar with your report so the purpose of the deposition is for me to ask you about the opinions you express in your report?

A. A lot of the answers -- some answers to these questions are going to be I don't know, we have to check the actual report because it's a very long and lengthy report. It's been a long time since I finished it and while I've reviewed it, there is way too many details in there to have at my finger tips.

Q. You are offering no opinion that any of the entities at issue in this case that CBSP transferred money to through Credit Lyonnais provided logistical support for any of the 15 attacks at issue in this case, correct?

MR. GLATTER: Objection as to form, vague and ambiguous.

A. Same answer. They may have. I'm not aware. I don't think there's anything to that effect in the report.



LEVITT

Q. You are offering no opinion that any of the entities at issue in this case CBSP transferred money to through Credit Lyonnais requested that someone carry out one of the 15 attacks at issue in this case, correct?

MR. GLATTER: Same objection.

A. Same answer.

Q. Which is?

A. They may have. I don't know. To the best of my knowledge that's not in the report.

Q. You are not offering an opinion to that effect?

A. Beyond what's in the report, no.

Q. Do you believe your report says that?

A. I don't recall.

Q. How familiar are you with your report, Dr. Levitt?

MR. GLATTER: Go ahead.

A. Very.

Q. But you can't recall if any of



LEVITT

these questions are opinions that you are prepared to offer at trial?

MR. GLATTER: Objection to the form of the question.

A. You are asking very broad questions alluding to very specific details and in a long report that was written some time ago, no, I don't remember every detail that's in this report. If you were to ask me is there a section on this or that which you could do, I could answer that much easier, but there's so many sections and so many details.

Q. For all these though sitting here today you are not prepared to offer an expert opinion as to any of them, correct?

MR. GLATTER: Objection to form.

Q. The questions I asked you, you said you don't think they are in your report, but you don't know what's in there and what I'm asking is are any of these things opinions that you do believe you are prepared to offer whether they are written in your



LEVITT

report or not sitting here today?

MR. GLATTER: Objection to the form of the question.

A. You've lost me with these. I'm sorry. We've now covered a lot of things.

Q. The questions I just asked you about the involvement of these entities in the 15 attacks for what you said I think uniformly you said the same answer no, you don't recall them being in the report, but you can't recall what's in your report, I'm asking for all of them are you prepared to offer an opinion as to any of those issues sitting here today?

MR. GLATTER: I object to the form of the question. I object to the form of the question, vague and ambiguous. You may answer.

A. I'm not here to make any new opinions beyond what's in the report.

Q. You're offering no opinion that any of the 15 attacks would not have happened but for the involvement of any of the entities that CBSP transferred money to

Page 69

LEVITT
through Credit Lyonnais, correct?
MR. GLATTER: Objection to the form of the question, vague and ambiguous. Object to the extent the question seeks a legal conclusion. You may answer.
A. That's an easier and harder question to answer. There is to the best of my knowledge no specific statement to that effect in the report. The report does explain at length though how these 12 and other Hamas related charities like them provide the kind of services without which Hamas would not be able to carry out these types of attacks so more generally there is an argument like that, but it's not specific to these 12 and those 15 entities and attacks.
Q. You are offering no opinion that any of the entities that CBSP transferred money to through Credit Lyonnais were the proximate cause of any of the 15 attacks, correct?
MR. GLATTER: Same objections

Page 70

LEVITT
as before.
A. Can you define proximate cause?
Q. Let me drop out the word proximate and ask the question again.
MR. GLATTER: I'll interpose the same objection.
MR. LUFT: Josh, I assume you will pretty much object to everything I say.
MR. GLATTER: Not my goal.
Q. You are offering no opinion that any of the entities that CBSP transferred money to through Credit Lyonnais were the cause of any of the 15 attacks, correct?
MR. GLATTER: Same objection. You can answer.
A. I need you to explain what you mean by cause.
Q. They were the reason it happened or they were -- let me strike that. They were a reason that the 15 attacks happened?
MR. GLATTER: Objection to the

Page 71

LEVITT
form of the question. Objection to the extent beyond the scope of the report. You may answer.
A. Again, the report explains in detail how these 12 entities and others like them do help facilitate Hamas activities including Hamas attacks, but it does not make an opinion about these specific 12 and those specific 15. It makes the larger argument that groups like these do help lead to those types of attacks.
Q. You're offering no opinion that any of the entities that CBSP transferred money to through Credit Lyonnais recruited the perpetrators of the 15 attacks at issue in this case, correct?
MR. GLATTER: Objection to form. May I ask and if you don't want me to a clarifying question?
MR. LUFT: No.
MR. GLATTER: You can answer. Objection to form. Same reasons as stated before. You may answer.
A. I'm pretty sure we asked the

Page 72

LEVITT
recruiting question earlier in the pile, but same thing not to my knowledge, I don't believe it's in the report. Again, I don't want to contradict anything that may be in there specifically. There are cases is what I'm getting at where people involved with a charity have been involved in these types of activities and I don't have every one of those instances at my finger tips, but I don't recall it being in there.
Q. You are offering no opinion that any of the perpetrators of the 15 attacks at issue in this case were recruited from entities that CBSP transferred money to through Credit Lyonnais, correct?
MR. GLATTER: Objection to the form of the question.
A. What do you mean by recruited from, that they had worked at? I don't know what you mean by that.
Q. That they were recruited from, they were at one of these entities and that's where they were recruited from, someone came to them at that entity and recruited them

LEVITT
from there?
A. That's a phenomenon that does happen generally, but I don't know if that was the case with these specific entities and those specific cases.
Q. You're offering no expert opinion that Credit Lyonnais knew that any of the charitable entities that CBSP transferred money to were controlled by Hamas or affiliated with Hamas, correct?
A. Correct, I specifically state I make no opinion about their state of mind.
Q. You are offering no expert opinion that Credit Lyonnais should have known that any of the charitable entities that CBSP transferred money to were controlled by Hamas, correct?
A. I think the totality of the report is that there is reason to believe that defendant should have known. I don't believe that I address that specifically as such in those words in the report.
Q. Can you show me where in your report you address the idea of what a French



LEVITT
bank should know?
A. I just told you I'm pretty sure that I don't, but I think the totality of the report demonstrating the amount of open source available material at the time in question does indicate that a major financial institution with established compliance procedures, etc. would have been capable.
Q. Are you an expert on compliance procedures of financial institutions?
A. I would say I have expertise in the area.
Q. Do you have AML expertise?
A. Yes.
Q. How did you come by this expertise?
A. I was the deputy assistant secretary for intelligence and analysis at the treasury department.
Q. Whose treasury department?
A. The U.S. Treasury Department.
Q. Credit Lyonnais is a French bank, isn't it?
A. Yes, I was not finished with my



LEVITT
answer. I'll answer a new question or the old one, but you have to let me know.
Q. Go ahead, finish.
A. I don't even know where I was.
MR. GLATTER: What was the pending question, Mr. Luft?
A. I think he asked where my AML expertise was, fine, enough. If that's good enough for you, it's good enough for me.
Q. Are you prepared at trial to offer the opinion that Credit Lyonnais should have known, is that what you believe your report states as an expert you could say what Credit Lyonnais should or should not have known about the 12 entities in question?
MR. GLATTER: Objection to the form of the question. Object to the extent the question seeks a legal conclusion as permissible evidence by the witness. You may answer.
A. The report doesn't draw that conclusion. If asked on the stand what my opinion is, I'll be happy to give it.
Q. But that's not something that



LEVITT
your report states?
A. Correct.
Q. Did you ever consider the [redacted] or purposes of your report?
A. I don't recall if I've considered it for this particular report.
Q. It's not an entity that you are offering any opinions about?
A. Not today, no.
Q. Professor Levitt, you worked at the FBI before?
A. Yes.
Q. Are any opinions that you are offering in this case based on any classified information you obtained during your employment with the FBI?
A. No.
Q. How about any other information you obtained through your employment at the FBI?
A. I don't understand the question.
Q. Other than classified

Page 85

LEVITT

don't know, he doesn't have any day-to-day affiliation with the institute other than to be invited to participate in events or that type of thing.

Q. Have you ever heard of the Washington Institute being referred to as pro Israel?

A. I have.

Q. Where have you heard that?

A. I don't remember any particular example, but sometimes in the press the Washington Institute is pro Israel or the Middle East Institue is pro Palestinian.

Q. On a spectrum between pro Israel and pro Palestinian, where would you put the Washington Institute?

MR. GLATTER: Objection as to form and foundation.

A. I would put us right in the bounced middle where we belong.

Q. Mr. Levitt, do you speak Arabic?

A. No.

Q. Dr. Levitt, you answered a

Page 86

LEVITT

question before with regard to vetting and you mentioned a number of areas that you would consider that you look at when you vet something. You mentioned that you speak to experts; is that common in the field?

A. Yes.

Q. You talk to people with first hand experience?

A. Yes.

Q. People who do research?

A. Yes.

Q. Compare other sources?

A. Sorry?

Q. Look at primary sources?

A. Yes.

Q. No one data point will be the only point that makes or breaks an opinion?

A. Correct.

Q. In considering research methods, would you say that the most important thing is conducting primary field research?

MR. GLATTER: Objection to form.

Page 87

LEVITT

A. It depends what you're researching, the type of available information.

MR. LUFT: I'm going to ask the court reporter to mark as Levitt Exhibit 3 what I believe is your testimony in the Holy Land Foundation retrial from September 22, 2008. I'm going to direct you to page 9 of the exhibit.

(Levitt Exhibit 3, Transcript, marked for Identification.)

Q. You were asked the question on line 4 could you explain your methods of research after which you note what you tell your analysts which is to exploit all sources, looking at books, talking to other scholars, journals, keeping on top of information and you say the most important thing is conducting primary field research -- going out and interviewing people, meeting people, spending time in the region, do you see that?

A. I do.

Page 88

LEVITT

Q. Was that a truthful and accurate statement when you made it?

A. Yes.

Q. Is there a context in which that's not true?

MR. GLATTER: Objection to the form of the question.

A. There are -- when researching different things, some issues may be more amenable to going out and interviewing people, some may not, that's the context so someone who is doing research on the leader of North Korea who is a little bit reclusive an opportunity to interview him may be difficult.

Q. This testimony was offered in the Holy Land Foundation retrial, correct?

A. That's what you told me.

Q. Is that what it appears to you?

A. There's actually nothing here to tell me one way or the other. It's the direct from Mr. Jonas so it's at least one of those trials or frankly could be any of the others I have done with him, but I'll take

LEVITT
you at your word.
Q. Do you recall testifying in the Holy Land Foundation retrial?
A. I do.
Q. Does this look like what you said at the Holy Land Foundation retrial?
A. At the Holy Land Foundation retrial I testified over three days quite some time ago. I could not tell you any specific thing.
Q. I'll represent to you I think this is, but do you have any reason to believe this is not your testimony from the Holy Land Foundation retrial?
A. I have no reason not to believe you. This is definitely one of my testimonies, but Barry Jonas has been the prosecutor in several cases I have done.
Q. What was the topic on which you testified about with regard to the Holy Land Foundation retrial?
MR. GLATTER: You can answer.
A. It was very similar to this trial, much more expansive. It too focused



LEVITT
on some specific charity committees, some of them different than these I imagine though I can't remember specifically, but for similar legal reasons. My report in your case focuses on ones where there were transfers from the defendant and in that case it related I'm sure to entities that had ties or received funds from the Holy Land Foundation so there was a legal reason to focus on those particular entities, but also again the history of Hamas, it was much more expansive, started with history of conflict and where are these places on the map and got into some very specific details about some of the individual charity committees.
Q. As part of your method of research, is it important to seek information from different perspectives?
A. Yes.
Q. Any information that you find needs to be verified, correct?
A. To the extent you can. As I mentioned earlier, sometimes it's at one end of the spectrum you can actually verify a



LEVITT
specific piece of information. Other times you put it into the realm of it's within the body of knowledge that is likely impossible especially when you are dealing in counter terrorism studies where you are dealing with as I describe it as the snippets of material that become public in what is otherwise illicit conduct and therefore usually kept quiet and not made publicly available.
Q. You cannot assume what you read or what someone tells you is true?
MR. GLATTER: Objection to the form of the question.
A. I don't know what you mean by assume or tells you to be true.
Q. Do you have an understanding of what the word true means?
A. I would define it as something that's not a lie.
Q. Do you know what the word assume means?
A. I have a working understanding of the word assume. I wonder if we share the same one. You want to define your question



LEVITT
for me so we can be clear?
Q. Sure. When you assume it's when you accept certain things to be accurate for the purpose of using that information even though you don't actually know that fact to be true or correct?
A. That's actually different than my definition of assume so I'm glad we defined that.
Q. Could you tell me what your definition of assume is?
A. My definition of assume is to take something at face value without any effort to check or see if it could be true as opposed to being able to verify that in fact this fact happened. Not all facts are in fact -- not all facts are actually completely verifiable.
Q. So taking your definition of assume since it's the one you know --
MR. GLATTER: I can't hear you.
MR. LUFT: We're taking his definition of assume.
Q. Taking your definition, I think

LEVITT

it's fair to say that you can't just assume that what someone tells you is true?

MR. GLATTER: Objection to the form of the question. Misstates the testimony. You may answer.

A. I think it's important to take information that you get with the perspective and to try and vet it which is different than definitively verify because that's not always possible and that is something that I strive to do.

Q. Same thing with regard to what you read, can you just assume that what you read in a newspaper is accurate?

MR. GLATTER: Same objection.

A. Not all sources have the same credibility so not everything that you hear or you read can be taken just at face value. There are some sources that are more reliable than others. If there is something in a website that is not as reliable as something in an official government report for example.

Q. Do you recall the Mohammed Ali Hassan Al-Moayad case in the Eastern



LEVITT

District?

A. I do.

Q. Do you recall giving an answer to the effect that just because somebody someone said something to you or it's reported in the New York Times doesn't mean it's accurate?

MR. GLATTER: Objection to the form of the question.

A. I don't have it in front of me or remember exactly, but that sounds like something I would say.

Q. Would you agree with that statement today?

MR. GLATTER: Objection to form.

A. Generally yes which is what we've already said here.

Q. How would you define primary sources; you mentioned primary sources before?

A. Primary source material is material that you collect or get from first hand sources so interviewing someone



LEVITT

personally who is involved in something or getting documents that record something particular and there's different types. There is I'm sure debate methodological discussion, but, for example, government reports which often report second hand some other material have some aspects of primary source to them because especially as it relates to the government's analysis that's primary and since it's often providing and relying on for its analysis information that's not otherwise available to the public, but is -- there's reason to give credence to especially U.S. and western style governments reports, that that's something that also can be given significant credence and understand you might think of that in whole or in part as primary or somewhat primary and somewhat secondary.

Q. I understand the idea that the part of the government report in which the government is saying what its analysis, what its opinion is the primary source to what the government's opinion is, but when it's



LEVITT

discussing other sources that it's reviewed, it's not a primary source as to that, is it?

A. It depends on what those things are. I would argue that is a leg in each world. Some of that is not primary, but can be treated as such and some of it, for example, if an FBI report comes out and some of the material that it relies upon are its wire taps or intercepts, that could be considered a primary source.

Q. The wire taps would be the primary source, correct, but the document writing about it, I'm just trying to understand?

A. Right.

Q. Would be considered a secondary source. Might be a secondary source that's quoting a primary source, but --

MR. GLATTER: Objection to the form of the question. You can answer.

A. This is why I'm saying that it's sometimes a beast that has a leg in each world. When you are dealing with something that's often in the classified or covert

LEVITT
domain whether it's the illicit actor who is trying to keep things quiet or the government that has things that are classified, secret or otherwise, the government does not necessarily take its stack of wire or other transcripts and make those public, but it might make those pieces of that public in a report and that material could be considered a kind of primary source.
Q. One of the things about a primary source in the traditional sense is that you can -- you actually have the wire taps or the document in your hand and you can check it and analyze it yourself, right, as opposed to something which is just referred to in a memo, correct?
A. Ideally you would want to have that and we have cases that we can get to in this report that are good examples of that. Sometimes you can't so that's why I'm saying it's kind of a foot in each world.
Q. One of the dangers of the secondary source is what we saw with the weapons of mass destruction where there was



LEVITT
information from confidential sources put into secondary sources and we were told to accept that it was true, but in fact when people actually saw the actual intelligence behind it there were more questions raised so they would have liked -- not everything was disclosed in the secondary source, right?
A. It's a very bad analysis.
MR. GLATTER: Objection as to form and foundation. You may answer.
A. I don't think you want to get into a debate about the weapons of mass destruction. I think it was more fundamental than that, but if you'll allow me to therefore ignore the analogy, you can have circumstances where a report is written and makes mistakes, typo, whatever, there's probably typos in here and that's something that you have to deal with and that's why I say that even in this type of situation, you know, a government report like that, it's not purely a primary source, but it has some primary source attributes to it.
Q. Mistakes could be more than



LEVITT
typos, correct?
A. You are asking me a theoretical question?
Q. You mentioned typos and I'm saying there can be other mistakes in a secondary source report other than typos?
A. Theoretically, sure.
Q. When you look at a secondary source that contains primary source information, what do you do to verify that the information contained in it is accurate?
MR. GLATTER: Objection as to form and foundation.
A. As we've discussed, compare notes with other experts, interview officials and very frequently as you can imagine because we are talking about government issues and off the record, people don't want to be identified, people don't want to confirm or deny specific facts, but they would be willing to verify certainly something like not in this case but I know in another case I got a foreign government document, but needed to verify in fact it was



LEVITT
an actual authentic document, but sometimes it just comes down to showing the information, sharing it and seeing if it's even just from within the realm of the body of knowledge that's known. Bottom line is governments in particular because of their sources and methods and their ability that comes with their sources and methods and their interest in focusing on groups that are engaged in terrorism, their ability to collect certain types of information is far beyond what an academic's is like myself and so some of the details are not going to be verifiable beyond the fact that they came from an otherwise reliable source. The U.S. Government or the German Government or French Government or Israeli's or Palestinian's or whatever.
Q. So there is information that governments have that you as a private citizen would not know?
A. Yes, correct.
Q. Even though you are an expert in the field, there is still information that

LEVITT
governments have that you are not aware of?
A. Sure.
MR. GLATTER: I'll interpose an objection to form on vague, but that's fine.
Q. Have you ever heard the term selection bias?
A. I have.
Q. What's your understanding of what that term means?
A. My understanding of the term is that if you go into a research project with a preconceived notion you might even unintentionally hook on to those things that confirm your suspicion or your hunch in the worst case scenario your preconceived ideological tenet and not have given credence or have looked enough, etc., for material that might conflict with your hypothesis or working assumption or whatever it is.
Q. Do you have any bias one way or the other with respect to the group Hamas?
MR. GLATTER: Objection as to form.



LEVITT
A. I work very, very hard to make sure that there is no bias in my academic work and I think everybody if they want to be intellectually honest needs to admit that we all come to the table with baggage. I think it's fair to say that there is not a terrorist group out there that I like, right, but that doesn't mean that I'm going to make up information or disregard information that might disagree with whatever I'm working on about Hamas just to put the screws to them. Fortunately or unfortunately there's an abundance of material on Hamas and its activities that you don't need to make things up.
Q. Do you have a bias with regard to Hamas?
MR. GLATTER: Objection as to form, vague.
A. I don't think I have an academic bias in my work against Hamas.
Q. How about personal?
A. Personal bias, I would not describe it as a bias. I think there's a



LEVITT
difference between a bias and a personal like or dislike. You can dislike something and still not demonstrate a bias against it. I think that's something that I work to do.
Q. Do you have the same level of dislike for Hamas that you do say the IRA?
MR. GLATTER: Objection as to form and foundation.
A. I've never measured it nor do I know if there would be a way. I don't like the IRA either.
Q. I asked because you've obviously spent a good deal of time working on the issue of Hamas so that's why I ask in particular?
A. My early academic interests and professional sense have been focused on the Middle East and I'm sure you are aware the IRA is outside the Middle East. There was a time when there was some good cross over for academics who were interested, but not today. I've participated in conferences where they compare the IRA and Hamas, but as I mentioned there are lots of terrorist groups out there



LEVITT
that despite my expertise in terrorism and counter terrorism I have chosen not to testify about or write about because it's beyond my core area of interest and my developed area of expertise.
Q. When considering a body of evidence, do you think it's important to use objective factors in reviewing that evidence?
A. What do you mean by objective factors?
Q. Sort of a set series of factors that existed before you looked at the evidence, sort of criteria that are accepted within your field of research as factors to be considered in reviewing that and that are determined before you actually look at the evidence?
MR. GLATTER: Objection as to form and foundation to that question and the preceding question.
A. Generally yes although there are also instances where a person kinds of ends up conducting research and then later starts putting it and before the analysis

LEVITT

report?

MR. LUFT: No, I'm just asking about his general methodology.

MR. GLATTER: Objection to form.

A. Can you ask one more time?

Q. In considering in analyzing evidence, how significant do you find one piece of anecdotal evidence with regard to trying to form a larger opinion?

MR. GLATTER: Objection as to form.

A. I guess there's two ways to understand that question. One is one piece of anecdotal evidence in the absence of any other. The other is one piece of anecdotal evidence in the context of other pieces of evidence. To which are you referring?

Q. Let's start with the former?

A. In the absence?

Q. Correct.

A. If you have one piece of anecdotal evidence in the absence of any other information or evidence, then it might



LEVITT

make for a telling snippet. If you are writing a book that is, you know, to be published for trade and makes for story line, doesn't mean you cannot use it, you would not want to make it out to be more than it is, right, but in and of itself one discrete piece of evidence and if that's all you have is just that. The reality is there is a very large spectrum of course and the vast majority of time you are dealing neither with the sole piece of anecdotal evidence that is in a vacuum or with the abundance of completely verifiable data on the other and therefore it's a question of putting together pieces of evidence, patterns, seeing if individual pieces of anecdotal evidence make a pattern, putting them in the context of larger findings, etc. and that enables you to draw conclusions.

Q. How many of the 12 entities have you visited with?

A. I have not visited these 12.

Q. Have you ever spoken to any members of the 12 entities?



LEVITT

A. No.

Q. Have you ever tried to?

A. No.

Q. Have you ever spoken with any Hamas members who are not in jail?

A. I make it a point not to for very, you laugh, but for a very specific reason and that is I'm a former government official.

Q. I didn't laugh.

A. For the record it was not you. There is a tendency and it's not just Hamas, but it includes Hamas to meet with former government officials who are when they meet in an academic or a private or a non-profit capacity and then say that they are having some type of back channel to government and I don't want to create that type of mistaken impression.

Q. Are there other charitable entities other than the 12 in the territories that you have met with?

A. I have met with some, not many. One in particular, one of the refugee camps



LEVITT

near Bethlehem and the name is escaping me, but for the purpose of this type of analysis where you are trying to figure out if illicit activity is in fact happening when you already have information suggesting that it is, it's kind of like asking if a person who's researching organized crime asks Al Capone are you a crime boss. I'm not expecting him to say yes. I'm not expecting him to tell me about his illicit activity and therefore it's often I find much more productive to meet with government officials, investigators, with regulators, with other experts and those are the people who are looking into this in ways that I can't so I spend a lot of time with the Palestinian ministries that oversee charity in the Palestinian territories, I visit with the Israelis of course, I talk to Americans and European officials about these things.

Q. The reason you would not ask Al Capone is because you assume he would be bias, he would give an answer that's self serving, right?

Page 121

LEVITT
information and sources of information to be able to demonstrate with a reasonable amount of certitude that an entity is as I say here is demonstrably Hamas.
Q. When you say enough, it's enough for you?
A. Well, enough for me within the kind of academic profession that I'm in. Courts have referred to my methodology specifically in relation to Hamas and to my work on Hamas, Jihad, etc. as the gold standard and I take great pride in that. It's not just me randomly, it's me trying to live up to the standards of my profession.
Q. Just trying to say when you say -- you said you did not want to be flippant, I don't think you do, but you said enough and that term is --
A. I said enough and explained what I meant.
Q. When you say enough evidence, it's when it strikes you based on your own standards that you hold yourself to that it's enough, that's what you mean?

Page 122

LEVITT
A. Again, not my own. The standards that a serious academic is held to.
Q. Is there anywhere else besides in your mind where I would be able to know when enough is reached?
MR. GLATTER: Objection to form.
A. You yourself in some of your earlier questions answered this question when you started asking me about different types of thresholds, different types of data points you might look for and so you are looking for it's not a particular amount of information, but you are looking for whatever the issues are in your particular area so here, for example, there's several we can lay out and you are looking for information that -- more than one data point that hits some or all of those things you laid out, but let's not pretend that this is a natural science, it's not.
Q. Consistent with that your standard of where enough is might be different than where another academic's

Page 123

LEVITT
standard of where enough is?
A. Theoretically.
Q. You say Hamas departments, what did you mean by that?
A. Really this series of words departments, agents, alter egos, precursors otherwise controlled or dominated by is meant to cover the spectrum and we could use a whole variety of different words that can identify or describe the nature of the relationships. In other words, some of these may be actual parts or departments of the Hamas organization structurally, one of its a member for example of or in fact could be one of the political committee or the military committee. It could be an agent, someone who is doing something on behalf of an alter ego meaning that it is sharing that identity basically.
Precursors, for example, some of the 12 entities as I believe we've already discussed at least in passing were organizations that existed even before Hamas was created officially under that name by

Page 124

LEVITT
some of the same people that were then identified later by Hamas leaders who were involved back when this was all happening as have been the same entity. We were active even before we had the name Hamas. Otherwise controlled or dominated again you can have, for example, a charity that doesn't have a Hamas shingle outside the front and doesn't have all of its employees maybe not most of its employees are actual Hamas, but is still acting for and on behalf of so there is a variety of different types of levels of connectivity. None of them are meant to have a specific legal definition.
Q. But these terms are not meant to be synonyms of one another?
A. No, there could be overlap, but it's really just meant to show there's a spectrum. This is not so cut and dry you are either a Hamas member or not. They don't issue membership cards and put shingles on the front door and there is a variety of different types of affiliation.
Q. The next sentence says this

Page 133

LEVITT
in the sentences. For point 6 when you say for a customer, are you referring to CBSP?
A. I'm sorry in flipping back, I lost my place.
Q. Point 6 and this is I should be fair in point 1 it says maintained an account, transmitted funds and provided services for a customer who is a Union of Good member and Hamas fundraiser. Is the customer you are referring to CBSP?
A. Yes.
Q. Then under point 2 it says transmited funds at the behest of such customer to entities, do you see that?
A. Yes, I'm following.
Q. Is entities a reference to the 12 entities we've been discussing?
A. Yes.
Q. Anyone else?
A. Not to my knowledge.
Q. Individuals, who are you referring to when you say individuals?
A. My recollection is that that was just put in there to be able to cover the

Page 134

LEVITT
basis of how the transfer was made if it was made to an institutional account or an individual account.
Q. An individual at one of the 12 entities?
A. Right.
Q. So staying on this in point 6 I guess clause 2, is that fair?
A. I'm following you.
Q. Okay, good, could you tell me what you mean when you said affiliated with, what is your definition of affiliated with Hamas?
A. Again, the answer is very similar to the conversation we had about paragraph 4 above because different institutions and this is a blanket, it's a summary statement, different institutions could be seen to be having different levels of affiliation and this was just to be able to catch them all without trying to put everything into one basket.
Q. I understand what you're saying, but I'm asking you when you wrote

Page 135

LEVITT
affiliated with Hamas, what was the definition that you had in mind when you wrote affiliated with Hamas?
A. I don't know that I had a specific definition other than to be able to demonstrate in some of these cases you have groups that may be legally independent entities. Like I said, you don't have the shingle hanging out the front door, but they do in fact have affiliations with Hamas and as we get into the report as I'm sure you are well aware there's all kinds of affiliations that we get into. You know, Hamas operatives working for the charity or the charity being led by Hamas operatives, etc. so this is meant to capture those types of affiliations.
Q. What did you mean when you said fundraisers for Hamas?
A. I don't understand what's unclear. Fundraise for means raises money for.
Q. Terrific. I just want to make sure I understand what you're saying.
A. I don't mean to be --

Page 136

LEVITT
Q. Just tell me what you meant when you wrote it. When you wrote serves as alter ego for Hamas, what did that mean, how did you define that term?
MR. GLATTER: Objection, asked and answered. You can answer again.
A. We covered alter ego in 4 above. Some of these the way Hamas uses entities like this is to further the overall -- some overall mission or objective of Hamas and therefore they can serve as an alter ego of the organization even if they are never listed on an organizational chart as such, but could be fulfilling a mission for the core entity and therefore serving as an alter ego for it.
Q. Is there anything else you meant when you say entities an alter ego of Hamas?
A. I think that covers it.
Q. Someone is filling a mission for the core entity in your opinion would be an alter ego of Hamas?
MR. GLATTER: Did you say a

Page 137

LEVITT
core entity?
MR. LUFT: Yes, I believe that's what Dr. Levitt just said.
A. I don't want to be -- we have been focusing on the very general and it's easier to answer your questions more fully if and when we get into the specifics, but you can have a situation where a person or entity who's affiliated with Hamas is doing something on behalf of the organization and that fulfills a need or an objective of the organization and in that sense maybe only in that particular act or maybe on a larger scale could be acting as an alter ego for. I don't want to confuse or restrict our understanding based on the word core.
Q. Okay. Departments of Hamas, can you define for me in that sentence what you meant when you said department of Hamas?
MR. GLATTER: Objection, asked and answered. You can answer.
A. Again, the same as we said above in 4. There are in fact entities that you could describe as departments, actual

Page 138

LEVITT
departments or branches of Hamas that the Hamas structure does involve various committees including fundraising committee, education committee and some of the charities that are affiliated with Hamas do interact with and do in some cases actually function as a part of the activities of those committees.
Q. You wrote controlled by Hamas, what did you mean by that?
A. As we said earlier, some persons, well, some entities that are affiliated with Hamas are a little more independent and they may have a Hamas guy who worked there and is able to take advantage on behalf of the organization and others I think we cite one in the report that the other end of the extreme and of course there's plenty in the middle are actually founded by Hamas for the express purpose of raising and/or serving as a means of transferring funds so you could have either of those extremes or of course pretty much anyone in the middle.
Q. Last phrase was otherwise

Page 139

LEVITT
support Hamas, what do you mean when you say otherwise support Hamas?
A. You mentioned some of these in one of your earlier questions where you noted that in some cases Hamas has recruited through these institutions or used these institutions for the benefit of some other logistical support and those other types of support beyond the strict provision of monies are also very important of course.
Q. Did you mean anything else by otherwise support Hamas?
A. That should cover it.
Q. You said they may have a Hamas guy who works there and is able to take advantage on behalf of the organization. By organization were you referring to Hamas?
A. I'm sorry, read it again.
Q. You had said --
MR. GLATTER: Where are you reading from.
Q. I believe it starts on page -- this is for the record I'm reading off the transcript 93, line 23, it starts as we said

Page 140

LEVITT
earlier, some persons, some entities are affiliated with Hamas are a little more independent and they may have a Hamas guy who works there and is able to take advantage on behalf of the organization and by organization were you referring to Hamas?
A. Yes. Take advantage of the entity they are working in on behalf of the larger organization Hamas.
Q. That's what I thought you meant. For the 12 entities did you do analysis to determine which was controlled, which was affiliated, which fundraised, which served as an alter ego, which was a department or which otherwise supported Hamas?
MR. GLATTER: Objection to form.
A. No, not as such and I don't categorize them in the report that way nor do I come up with a structure where if two criteria met, it's this, if three it's that. It's actually a lot more messy than just that so this is meant in the summary to be able to

LEVITT

show the spectrum of variation that may one expect to find.

Q. If I understand and I'll just go to page 90 because I guess it's the conclusion and a more logical place to look for an end result than the beginning, but I think it's the exact same sentence, it talks about transmitted funds at the behest of such customer who was CBSP to entities and you said that was the 12 entities and individuals in the Palestinian territories or abroad who are controlled by, affiliated with, fundraise for, serve as alter egos or departments of or otherwise support Hamas so the conclusion that you are drawing here as to these 12 entities is that they fall somewhere within this spectrum of controlled by, affiliated with, fundraise for, serve as an alter ego or departments of or otherwise support Hamas, correct?

MR. GLATTER: Objection to form.

A. I guess I would put it slightly differently which is not necessarily



LEVITT

contradicting which is that it's not necessarily that they fall within one of these, but they fall within some of these. Most of these have more than one so arguably if they are controlled by, then they probably also are affiliated with or fundraise, but, again, this is meant to show the spectrum of variation as opposed to it should not be expected that these are pretty little baskets into which organizations will fall or not fall.

Q. I think I understand basically you could be more than one of -- an organization could be more than one of these?

A. Yes.

Q. You have not endeavored to categorize which of these each organizations has fallen within?

A. Correct.

MR. LUFT: Can we go off the record.

THE VIDEOGRAPHER: We are off the record. The time is 12:43 p.m. September 1, 2010.



LEVITT

(Recess taken.)

THE VIDEOGRAPHER: We are back on the record. The time is 12:46 p.m. Today is September 1, 2010.

Q. If I could ask you to look at page 21 of your report. The section under building grassroots support, do you see that you quote a Dr. Ibraham al-Yazuri?

A. Yes.

Q. You state he's one of the original founders of Hamas?

A. Correct.

Q. You cite him for the proposition of giving a description of Hamas' philosophy regarding charitable giving, correct?

A. Correct.

Q. In it in your last sentence you state the movement provides this aid through the support and assistance it gives to the zakat (Islamic alms-giving) committees and the Islamic associations and institutions in the Gaza Strip, correct?

MR. GLATTER: Objection to the



LEVITT

form of the question. I assume you are referring to the quote?

MR. LUFT: Yes, that's what I'm referring to.

A. Yes, I see it.

Q. There is a citation to the Watson memorandum, correct?

A. Correct.

MR. LUFT: If we could mark as Levitt Exhibit 4 what I believe you will tell me is a copy of what's referred to in your report as the Watson memorandum of November 5, 2001.

(Levitt Exhibit 4, Memorandum, marked for Identification.)

Q. Does this appear to be the Watson memorandum?

A. Yes.

Q. If I could ask you to turn to pages 16 and 17, is this where in the Watson memorandum your quotation comes from?

A. Yes, that appears to be the case.

Q. Is it your understanding that

LEVITT
separate and apart from the other elements, it's as if the fundraising happens here by some entity that's raising funds for Hamas over here and in fact with the 12 we're talking about and others, it's messier than that. They will be raising funds, they will be receiving funds even more often. Some of these will provide funds that they received then on to other charity committees. Certainly for the 12 we're talking about and generally as a statement as it happened, yes.
Q. If I could ask you to look at page 13. I unfortinuately have a slightly mixed up version of your original report and supplemental report on the first pages so if the page numbers are wrong let me know?
A. We'll figure it out.
MR. GLATTER: Do you want to use one of our copies of the exhibit?
MR. LUFT: No, I'm using this one because I wrote on it. I have a clean copy, but thank you.
MR. GLATTER: Understood.
Q. Do you see the sentence Hamas



LEVITT
deems legitimate the mingling of these funds, as it considers the social services it provides a jihadist extension of its terrorist attacks?
A. Yes.
Q. What do you mean by mingling of these funds?
A. The intentional -- it's not like there are separate accounts or separate entities where money is collected for and stored for education or health clinics or uzi submachine guns, etc. By muddying the waters or mingling the funds together Hamas does itself a great benefit or multiple benefits. It's a brilliant strategy and they certainly see it as legitimate to do this to mingle the funds.
Q. You say that not having separate accounts, each of the 12 entities had its own bank accounts, correct?
A. I assume.
Q. Do you know if they had their own bank accounts?
A. I recall from the accounting



LEVITT
report, what's his name that we referred to earlier?
MR. GLATTER: Geisser.
A. Thank you, that there were specific accounts, I don't know if it was one or more, but yes, they each have accounts.
Q. Those were not Hamas accounts, those were accounts in the name of each of the 12 entities, correct?
MR. GLATTER: Objection as to form.
A. You pitched your voice at the end and added a correct question mark at the end, but I would say it's more of a statement than a question. Again, none of these 12 have a Hamas shingle outside. I don't think that means they are not part of Hamas and I would argue that giving funds to these charities is giving funds to Hamas.
Q. But when you say they don't have separate accounts for uzis verses medical or kindergarten, each of these entities in fact did have a separate bank account for itself, correct?



LEVITT
A. For uzis and for kindergartens?
MR. GLATTER: Objection to the form of the question.
Q. Each of the 12 entities had their own bank accounts, correct?
A. Yes, in which money comes in for Hamas the organization, money gets disbursed to other entities. Those funds, it's not like they have separate accounts for these different things and therefore the mingling, the co-mingling of these funds muddies the water.
Q. Dr. Levitt, could you point me to a specific example where any of these 12 entities use money that was given to them to buy uzis?
A. No.
Q. How about any other type of weapon?
A. Not to my knowledge.
MR. LUFT: I'd like to mark as Exhibit 7 a document from February 10, 2003 by Jonathan Fighel titled Hamas calls for economic Jihad against the

LEVITT
U.S. I'm sorry, I screwed up the European date, it's October 2, 2003.
(Levitt Exhibit 7, Article, marked for Identification.)
Q. Do you recognize this document, Dr. Levitt?
A. I see what it is. I don't recall it off hand, but sure.
Q. This is the document that you cite to in footnote 78 of your report?
A. Yes.
Q. 79 of your report?
A. 79.
Q. I apologize. This document is the basis for your statement that precedes it for example in 2003?
A. Yes, that's what it's footnoted to.
Q. The sentence before which talks about Hamas deems legitimate the mingling of these funds as it considers the social services it provides a Jahidist extension of its terrorist attacks and then it says for example in 2003 and proceeds to talk about



LEVITT
what a Muslim Brotherhood to Hamas associated website said, correct?
A. Correct.
Q. Nowhere in this article by Jonathan Fighel does he say anything about mingling of funds, does he?
A. No.
Q. Does Hamas have a central treasury the way the United States has a central treasury?
MR. GLATTER: Objection as to form.
A. Let me interject that I think this may be a wrong footnote. I know that there is -- I know that I have a Jonathan Fighel article that talks about this, but it cites the Islam online website that I talk about in the text and this doesn't and I'm wondering if in the footnote the Jonathan Fighel articles got confused because this one has nothing to do with the Islam online website.
Q. I don't know, Dr. Levitt, it's your report. Does Hamas have a central



LEVITT
treasury?
A. Not as such.
Q. Is there one central repository for Hamas in which it funds its military political and whatever social programs it conducts?
MR. GLATTER: Objection as to form.
A. A repository is what you asked, no.
Q. If I could ask you to look at page 13. Do you see the paragraph that starts Hamas's da'wa then?
A. Yes.
Q. It goes on to say not only confers a cloak of legitimacy around its terrorist activity, but its funding actually facilitates that activity. Other than the concept of fungibility which you described before, what do you mean when you say or do you mean anything else when you say actually facilitates that activity?
MR. GLATTER: Objection as to form.



LEVITT
Q. Let me clean it up and make it simple. When you say actually facilitates that activity, do you mean anything other than what you described as the theory of fungibility?
A. Yes.
Q. Could you tell me what else you are referring to?
A. The sentence follows another sentence which is why it's written on the Hamas's da'wa then. The previous sentence quotes U.S. officials explaining that Hamas's loose structure includes both clandestine and open parts that both serve to do things beyond actually just providing money, but also recruit members, raise money, organize activities and distribute propaganda and as the report demonstrates in detail further on in numerous examples there are many cases and many cases where infrastructure of the Hamas social welfare da'wa or individuals who are employed by it facilitate or are themselves actively engaged in militant activity so the report goes on to describe those types of

LEVITT
A. Right.
Q. There's a sentence that says Hamas prizes its hospitals because it can use them to build grassroots support, procure chemicals necessary to making explosives and facilitate terrorist attacks. You see that sentence?
A. Yes.
Q. Are you aware of any of the 12 entities procuring chemicals to make explosives for terrorist attacks?
A. No.
Q. I note there's no citation to that sentence?
A. Correct.
Q. Is there a specific source you were thinking of when you wrote that sentence?
A. There are multiple cases, but this is a general statement.
Q. Of the 12 entities with the exception of Beit Fajar, all of them were created prior to the creation of Hamas, correct?



LEVITT
A. Maybe. I'd have to check. I don't know and I don't know if my report opines on that either. I believe the report mentions several that were. The Mujama and and the Jam'iya both in Gaza, al-Salah also in Gaza. I don't think it mentions the other cases.
Q. Prior to the establishment of the Palestinian authority in 1993, those entities of the 12 that existed at the time to your knowledge, they were licensed by Israeli authorities, correct?
A. Yeah, they would be licensed under the Israeli military authority. There was a bifurcated system which involved the -- yes.
Q. Good answer.
MR. GLATTER: Hey.
Q. The 12 entities are independent legal entities?
MR. GLATTER: Objection to form.
A. Independent of what?
MR. LUFT: I'll withdraw the



LEVITT
question.
Q. At the time of the transfers from Credit Lyonnais, the 12 entities were required to register with certain ministries within the Palestinian authority government, correct?
A. Presumably.
MR. GLATTER: Objection to form. Vague as to time.
MR. LUFT: He understood. I said at the time of the transfers and I believe he understood my question.
Q. At the time of the transfers in question, the 12 entities were subject to inspection by the Palestinian authority?
A. I don't know.
Q. Do you know if at the time of the transfer election of members of the 12 entities were required to be approved by the Palestinian authority government?
MR. GLATTER: I'll still have a standing objection given the period of time we're talking about, but you may answer.



LEVITT
A. It's an interesting question. I do know that -- can you ask the question again?
Q. At the time of the transfers and to be clear I'm referring to the transfers from Credit Lyonnais on behalf of CBSP.
MR. GLATTER: You are talking about the entire -- all the transfers that he refers to in his report for that full period of time?
MR. LUFT: Yes, all the transfers.
MR. GLATTER: Whatever -- thank you.
Q. Elections of members of the 12 entities were required to be approved by the Palestinian authority government, correct?
A. On paper. In fact, what happened was that elections would happen, they would be certified more than approved, I don't know what the right term is, registered maybe, they are also supposed to happen every so often and that was not happening and one

LEVITT

of the reasons many including I think many of these 12 have since in the past few years had some of their senior directors and board members removed is because of, I know it is, because of their affiliation with Hamas and one of the legal prongs on which the authorities were able to do that is that they did not have proper accounting for their funds and another was that they did not hold the regular elections and then get -- at all period and then have those regular elections that they should have held registered with the authorities.

Q. At the time of the transfers and I'm referring to the same transfers, the 12 entities were required by Palestinian authority law to have audited books and records, correct?

A. It would be kind to say that Palestinian law during the period in question was loose so the two answers to that question are A, I don't know specifically what they were required to do. What I do know specifically is that during this period



LEVITT

almost nothing that was required on the books was happening.

Q. Did you review any of the audited books and records of any of the 12 entities?

A. No.

MR. GLATTER: Objection as to form and foundation.

Q. Have you ever tried to get that information?

MR. GLATTER: Same objection.

A. I have interviewed the officials that do this job and they --

Q. Which job?

A. The charitable oversight in the two Palestinian ministries that do it. They for proper reasons it seems are not willing to share their records, there's privacy issues, but I have interviewed them several times.

Q. I'm asking you the question in the context of the 12 entities in the interest of expediency and if it's easier to break one out or something doesn't follow you



LEVITT

should let me know, but you mentioned to me before that for some of these entities some if not most of the employees of the entities may not be Hamas members, do you recall that testimony?

A. Right, I think it's not exactly how I put it, but it's not necessarily the case that in every one of these Hamas affiliated entities every single individual is Hamas.

Q. Have you ever endeavored to determine what percentage of the employees are members of the 12 entities -- of each of the 12 entities was a Hamas member?

A. It's very hard to do because of available information. For example, just because there's not information about someone being Hamas doesn't mean they are not so it's very hard to do. There have been some studies and I believe that some of them have touched on -- some of these might have been -- I don't remember which -- if it was one of these that have taken a look at the boards and determined how many of them were Hamas.



LEVITT

I don't recall if that's in the report or not. I know it's in my book.

Q. In your opinion were the 12 entities largely run by their boards or by for lack of a better term management who was hired to run the committee or the entity?

MR. GLATTER: Objection as to form.

A. My understanding is that most of these don't have a professional management, they are run by the directors.

Q. By directors you mean the board members?

A. Right and that the decisions are made by them. That may vary according to some of them. Also as I mentioned earlier some of these -- some charities are larger than others and so Al-Tadamon listed here as Islamic Solidarity is one of those, is much larger and the charity serves as umbrella working closely with a variety of other charities including Nablus in particular listed here. Al-Tadamon is in Nablus and therefore it has some interaction and say

LEVITT
with Nablus. Finally there are shared leadership positions which apparently was against Palestinian authority law, but was going on throughout the period that these transfers were happening and one specific example that was cited to me by the people within the Palestinian authority who oversee this looking back was Al-Tadamon and Nablus. I think I talk about that in the report. I think it might have been, well, if you need the specifics we can get the report, but there were specific individuals who inappropriately held positions in both entities effectively were sending money to themselves.
Q. Dr. Levitt, in your report and I think in your other writings you have referred to the level of -- high level of corruption within the Palestinian authority at the time, do you recall that?
MR. GLATTER: Objection as to form.
A. I don't recall any specific reference you are referring to, but I have



LEVITT
written about corruption. I'd say written about more in terms of within Fatah which is the dominant entity within the Palestinian authority than the Palestinian authority per se.
Q. When you have spoken to members of the Palestinian authority, what have you done to assure yourself that they are not corrupt?
MR. GLATTER: Objection as to form.
A. It's an interesting question. Had I been conducting research on corruption or on PA funding, that would have been very important. Here are you suggesting their financial corruption or that they might be misstating the government findings on others say Hamas because they were corrupt which is not how I would think of corruption and so I haven't because I haven't had the opportunity to or desire to be honest to conduct such a study and in fact, the interviews that I have done most recently over the past couple of years were under the leadership of Salam



LEVITT
Fayyad the technocrat prime minister who's seen as being anything but corrupt.
Q. Were you doing any interviews in the time period of 2000 through 2005 let's say with the people in the Palestinian authority?
A. I did.
Q. This was a time when at least the Fatah aspects of it were thought to be ripe with corruption?
MR. GLATTER: Objection as to form.
A. There was corruption.
Q. How would you characterize the relationship between the Fatah movement and Hamas in that time period?
A. Which time period?
Q. 2000 to 2005?
A. 2000 to 2005 at times intimate working very closely together to carry out attacks. At times competing with each other especially at the earlier end of that time period 2000 when the second Intifada erupted. By 2005 there was more competition as Hamas



LEVITT
decided to participate in the political process.
Q. Each of the 12 entities has its own board of trustees?
A. Again, they do and some of them have overlapping boards of trustees so that it would not be accurate to say that they are fully independent. Al-Tadamon and Nablus are very good examples.
Q. If I was to look at each of the 12 entities they each have a board of trustees?
A. What does that mean looking at each of the 12?
Q. Look at each one individually, if I pulled out the Tulkarem and said do they have a board of trustees, the answer would be yes or if I point to Jenin do they have a board of trustees the answer would be yes?
A. It's a different question. Do they have board of trustees or do they have independent board of trustees that was the original question as I recall it.
Q. Okay. If I put that --

Page 213

LEVITT

MR. GLATTER: The question pending was has its own board of trustees.

Q. That's what I meant by own board of trustees?

MR. GLATTER: Regardless of whether or not some of them may serve on other boards?

A. They each have a board of trustees. Sometimes these boards of trustees are commingled so an argument could be made, for example, that Al-Tadamon and Nablus board of trustees are more one than two.

Q. I understand.

A. At least maybe not today, but earlier.

Q. For the 12 entities, all the members of their boards of trustees are not Hamas members, correct?

MR. GLATTER: Objection, asked and answered. You can answer.

A. I don't know. I know that some are. I don't have information on some of the others.

Page 214

LEVITT

Q. Do you have any sense of, if you don't it's fine, of what percentage of the boards tend to be Hamas members?

MR. GLATTER: Objection to the extent the question has been asked and answered. You can answer.

A. It varies and I say that with confidence mostly because we don't know in many cases. There are as I mentioned earlier some cases where there have been studies where the Israelis in particular who are in a position to know and Palestinians have created lists in particular cases of how many of the board members or leaders and I think some of them also included employees were members of Hamas and some of them it was the vast majority.

Feel free, not a rush, to finish this line of questioning, but if we could take a bathroom break.

MR. LUFT: Sure, absolutely. Why don't we take one.

THE VIDEOGRAPHER: The time is 3:34 p.m., September 1, 2010.

Page 215

LEVITT

(Recess taken.)

THE VIDEOGRAPHER: This is tape 5 of the deposition of Dr. Matthew Levitt. We are now back on the record. The time is 3:59 p.m., September 1, 2010.

Q. Dr. Levitt, when an individual is a member of the board of one of the 12 entities and is according to your report also alleged to be a member of Hamas, how do you determine which of their actions are being taken as a member of Hamas verses as a board member of one of the 12 entities?

MR. GLATTER: Objection to form.

A. If you are dealing with an entity that -- if you dealing with an individual on the board of an entity that is not demonstrably Hamas, then actions taken in the context of their day-to-day work where they are employed at this particular charity may well be something different. When you have someone who is personally affiliated with Hamas and is also not only working at

Page 216

LEVITT

but is involved in directing an entity that is also Hamas, then you can make a logical conclusion that the activities are being done on behalf of Hamas. Any given -- any very specific action it would be very difficult absent actual, you know, telephone transcripts or something to be able to say this was done with this hat as to that hat, but when we are talking about people who are themselves Hamas and on the board of directors of something that is Hamas, you are still within the Hamas. Leave it at that.

Q. Let me give you a hypothetical and see if I can more fully understand. Director X of choose -- let's choose one of the 12 entities, al-Salah Society, could be any of them, director X is purported to also be a member of Hamas. He orders playground balls for the kindergartens. Would that be an activity that you believe is being taken on behalf of Hamas or is that something he's doing we could safely say on behalf of the al-Salah Society?

MR. GLATTER: Objection to the

LEVITT

there are people who do that who are not Hamas because they feel Hamas is -- they agree with its political positions or they don't do it but they don't disagree with its military activity or because they are sick and tired of Fatah's corruption, lots of different reasons. Whatever the reasons the bottom line is the person would still be involved with Hamas.

Given a different kind of example the 12 we have here are demonstrably I believe tied to Hamas. There could be examples where someone though again when you get to the director level it's less likely is I guess unaware of what the charity is really all about.

Q. I guess what I'm asking is less the person who does not know, I'm asking but let's -- and let's choose another one, let's take Al-Wafa. I chose Al-Salah at random. Whatever it is my question really gets down to how do you determine for the person who's not a Hamas member, you told me when someone is a Hamas member what you do to try to parse



LEVITT

out which of their actions are Hamas verses not Hamas and I'm saying when we change it to the person to not Hamas member, regardless of whether they know or don't know of any connection to Hamas, how do you parse out which of their actions are being taken on behalf of the charitable entity and which are being taken on behalf of Hamas?

MR. GLATTER: Objection as to form.

A. One, with difficulty. Two, the question is based on an assumption or several assumptions, but flip it around. One of the things you might look at, we talked about from an academic methodological perspective if you are trying to judge whether an entity or person is tied to Hamas what might be some of the things that are criteria and on their own maybe there wouldn't be enough. One of the things might be is someone on the board of directors of an established Hamas entity. Would that be enough on its own if there was not something else to say this guy was Hamas, probably not, but it would certainly be a



LEVITT

factor so the assumption is that it's possible for someone to be actually on the board of one of these demonstrably Hamas affiliated entities and to be taking actions within the rubric of the activities of this Hamas charity and be doing it for some other purpose. As I've said already, they do wear multiple hats simultaneously, they do muddy the waters.

Q. For the individuals that you've listed in your report, have you tried to do that type of difficult analysis of determining which of their actions were done on behalf of Hamas and which were done on behalf of the 12 entities?

MR. GLATTER: Objection to form.

A. Specifically which individuals are you asking about?

Q. To be honest in the interest of time I was -- the individuals -- you list a number of individuals throughout your report as people who are either board members or referred to as leaders of one of these 12 entities and those are the individuals I'm



LEVITT

referring to?

A. To the best of my knowledge the people who made it into the report and you are talking the context of the 12 entities, not the earlier part of the report that goes into some of the Hamas leadership, but to the best of my knowledge the people who made it into the report they kind of hit a threshold. These were not your borderline cases. These were individuals who have been identified by governments, by investigations, etc. as individuals who are affiliated with Hamas and again in the interest of time without going through the report, it's possible there's an exception; by and large the kind of data points that specific data points to a specific individual were -- that were included in the report were ones that were not borderline.

Q. Are you aware of any specific instance where Hamas loaned one of the 12 entities money?

MR. GLATTER: Objection as to form.

LEVITT

A. We've established based on your earlier question that Hamas doesn't have a kind of central repository so I don't know that I would even know what it meant for Hamas to loan money to one of the entities. There are transfers of funds between Hamas headquarters to these charities. We've discussed some of those in the context of al-Islah for example we already read an excerpt from my report about that. I don't recall offhand a loan as such, but I also wouldn't say it's impossible. The Hamas leadership based in Damascus does have funds at its disposal, disburses the funds to the charities, other funds come in directly to the charities, but some of these charities and I give some examples in here also have their own money making endeavors, businesses, etc. and it's conceivable that someone would provide them seed money I guess. I don't recall any offhand.

Q. Are you aware of any instance where Hamas guaranteed any of the 12 entities debts?



LEVITT

MR. GLATTER: Objection as to form.

A. I don't know of any such case. Again, doesn't mean it doesn't happen, but I don't know.

Q. I want to ask you a little bit about some of your sources. One place that you cite from and I think we've seen this earlier is testimony from the Holy Land Foundation trial and retrial, correct?

A. I think it's solely the retrial.

Q. One of the people whose testimony you cite to is the testimony of a person who is called Avi?

A. Coincidentally enough.

Q. Have you ever spoken with Avi?

A. Yes.

Q. Was it in a professional capacity?

A. I guess so, yes, in the sense of people that I have met professionally. We are not personal friends. Met him in the context of the Holy Land Foundation trial and



LEVITT

also we did meet I think when I was in government.

Q. So you know who he is?

A. Not much more than that, but yes.

Q. You said you met him in the context of the Holy Land Foundation trial. Did you have the opportunity to discuss his testimony with him?

A. No.

Q. Did you ever ask him any questions about his testimony?

A. About his testimony, no, not during the trial. We may have spoken since the trial. I honestly can't recall.

Q. In offering the opinions that you offer in this case, are you relying on any conversations you had with Avi other than, well, are you relying on any conversations that you had with Avi?

A. No.

Q. Are you relying on any statements that Avi has made other than the ones indicated in your report which relate to



LEVITT

the testimony he gave at the trial?

A. No.

Q. I'll ask you this question, but I will not be surprised by the answer, who is Avi?

A. You won't be surprised by the answer. I'm not at liberty to say.

Q. That's because there's a current court ruling?

A. Again, I don't like the pinstripes and there is a court order forbidding it. I happen to know who he is.

Q. I don't want to push you any further than that, but we will reserve our rights to get an answer to that question after whatever else happens in those cases because I understand things are on appeal.

MR. GLATTER: Your reservation of rights are noted.

Q. How significant was the testimony that Avi gave in offering your opinions in this case?

A. I don't know how to answer that. As you well know, there are many

LEVITT
sources here. There are not that many to his testimony as I recall so based on that type of measurement I would say not that critical. I certainly could have issued the report very nearly if not identically to what it is without the citations to him.
Q. But where you cite to him you are relying upon his testimony, correct?
A. Correct. Often there will be multiple potential sources for something and I won't cite all of them, but I'll cite the one that's clearest or simplest, etc., offers the most detail.
Q. But everything you are relying upon is in your report?
MR. GLATTER: Objection, asked and answered.
A. Correct.
Q. Do you know if Avi speaks Arabic?
A. I believe he does.
Q. Do you know if he visited the 12 entities in this case?
A. I believe he testified to that,



LEVITT
but I don't recall.
Q. When you make statements in your report that cite to Avi's testimony as a source, do you feel that you have faithfully reiterated what he testified to?
A. That certainly is --
MR. GLATTER: Objection as to form.
A. It certainly is my goal in any -- throughout the report in anything I do if I'm citing to something I try to be completely honest to the source.
Q. You were not trying to put your own spin on his words or anything?
A. No.
Q. Or layer an analysis on top of what he said, it's what he's saying when you cite to him?
A. You have to give me a specific cite. Am I quoting him or, you know, if I cite something that's not a quote, then it's possible that it's my own words, I don't want to testify that I'm not giving my own analysis, but if there is a fact in that



LEVITT
sentence that's cited to him. We are not putting any spin on anything if that's what you're asking.
Q. Is there any of his testimony that you eschewed as unreliable?
A. No, not to my recollection, but it was long.
Q. Did you ever ask him what the sources for making the statements he made in his testimony were?
MR. GLATTER: Objection, asked and answered.
A. No.
Q. Did you ever ask him what counter evidence he considered, but chose not to rely upon in offering his opinion?
A. No.
Q. Did you see Avi testify live?
A. No.
Q. You just read his transcript?
A. Correct.
MR. GLATTER: I'll withdraw the prior asked and answered objection at line 21.



LEVITT
Q. You also cite to Lara Burns?
A. Correct.
Q. And her testimony at the Holy Land Foundation retrial?
A. Correct.
Q. Who is Lara Burns?
A. Lara Burns is an FBI special agent.
Q. Have you ever spoken with Ms. Burns?
A. I have.
Q. Have you ever spoken to Ms. Burns about what the basis of her testimony was?
MR. GLATTER: Objection to form.
A. Lara testified at length on a lot of things. Lara and I did talk in break rooms like you have here over the course of my preparation with the U.S. attorneys, the prosecutors and not during the trial itself I'm sure so I don't recall any particular example nor do I recall any particular instance, but it is possible that we

Page 233

LEVITT
discussed issues that were coming up in testimony.
Q. Did Ms. Burns tell you what the sources she relied upon to offer her testimony were?
MR. GLATTER: Objection to form.
A. The sources that she relied upon were evident in her testimony. I can't recall anything that she testified to where it wasn't, you know, it was much more of a, well, this transcript, she was speaking off documents and telephone intercepts and things like that so I think it's actually in almost if not every case quite clear, but I don't recall speaking with her specifically about that. Again, I also don't want to present that I recall every conversation I had with her and we did talk.
Q. On what basis did you determine which parts of her testimony were reliable and unreliable?
MR. GLATTER: Objection as to form and foundation.

Page 234

LEVITT
A. I don't recall any part of her testimony that I found unreliable.
Q. Let me ask you going back to Avi, how did you come to the determination that his testimony was reliable?
MR. GLATTER: Same objection.
A. First of all, I found it telling that both of them Avi and Lara Burns were qualified as witnesses on the stand. Their testimony was accepted and put into evidence. None of what they said conflicted with the body of knowledge that I knew and they are both recognized experts in their field who have followed Hamas and Hamas support networks professionally and so I think that they are reliable sources of information.
Q. Let me ask you about another source, the German Intelligence Service Report from November 28, 2002. You are familiar with that source?
A. Yes.
Q. How did you first -- when did you first obtain a copy of that report?

Page 235

LEVITT
A. I don't recall the date, but I obtained a copy through plaintiffs' lawyers.
Q. Had you ever seen that report before?
A. No.
Q. Do you know when that report became available to the public?
A. No.
Q. Do you know how the plaintiffs obtained the report?
A. I might have at some point, but I don't sitting here today.
Q. Did you do an analysis of that report?
A. What do you mean by an analysis of the report?
Q. Did you do an academic review of the report to determine whether you believed it to be reliable or not, the information contained to be reliable?
MR. GLATTER: Objection to the form of the question.
A. When you get a source of information from a reliable government

Page 236

LEVITT
source, you don't do like a book review which is kind of what it sounds like you are asking about. That doesn't mean necessarily that you consider every data point in the report to be as strong as others especially if it's something that is brand new and never seen anywhere else, etc. As it happened, the BND, the German Intelligence Service is highly professional, highly reliable, none of the findings were surprising, none of them were outside the scope of the findings that I had seen elsewhere and I thought it particularly telling that the report specifies that its findings were based on information provided from others and their own information so it was not just circular information going around and as you will recall from the report there's I don't think any one data point that comes strictly from that report kind of more confirms the findings that you had from multiple other sources.
Q. You mentioned that it was significant to you that they did their own analysis. Do you know what analysis they

LEVITT
public?
A. No.
Q. Do you know who would have been in a position to review it before it was made public?
A. Review it for what, for release?
Q. For any purpose who would have had a chance to read this before it became public?
A. Based on my experience in government and in the FBI in particular I know that government reports specifically, well, government reports period, certainly reports that go up to a senior level even within the building, certainly those that leave the building and certainly those that leave the building and go to another agency as this one does gets significant review. A lot of good and a lot of bad could be said about government bureaucracy, but I recall lots of frustrated jokes that people had about the difficulty of getting a memo released because it had so many layers of



LEVITT
review by the lawyers, by the substantive analysts, by management, etc.
Q. This is all FBI internal when you talk about the review?
A. Correct. Something like this I would be shocked if it did not also get other review by other parts of DOJ. FBI is part of Department of Justice. It would have received very, very significant internal to the FBI and internal to government review.
Q. Were you involved in the preparation of the Watson memorandum?
A. As mentioned earlier I'm not allowed to say what I was or was not involved in when I was working for the intelligence community which is what I was doing when I was at the FBI. I can tell you I was involved in focusing on middle eastern terrorist groups and their presence in the United States.
Q. When you first received the Watson memo, was there any information within it that you eschewed as unreliable?
MR. GLATTER: Objection to



LEVITT
form.
A. Unreliable, no, not at the time. Though we discussed earlier there's different types of information in there, different types of -- which deserve different types of recognition or acceptance.
Q. Since you first received it, have you come to be of the opinion that any information within the memo is unreliable?
A. Yes.
Q. What information is that?
A. There are several press articles like a New York Times or whatever quoted in the report and sometimes people myself included will give some credence to a press report beyond just the fact that it's a press report if it's cited in a government report meaning the working assumption is that if the government didn't believe that to be true, it wouldn't be in there. In the Watson memo, there is one, I think it's one, USA Today report one of the committees in Hebron that's quoted.
Subsequently it turned out that



LEVITT
this particular reporter was exposed for lying and claiming to be in a place observing something and was on the other side of the world and made it up, maybe spoke to people on the phone, maybe it's not all made up, but completely discredited so obviously I don't cite to that.
I believe that early on I had written things that did include that article or pieces from it. Of course once you find out it's discredited, you don't.
Q. What have you done to corroborate the rest of the information in the report so that it does not fall prey to the same type of inaccuracies?
MR. GLATTER: Objection as to form and foundation.
A. Thankfully that type of circumstance is extremely rare and I say fortunately because in most cases an outsider is not in a position to be able to independently verify that a source said that or whatever. I don't particularly feel the need as an academic to verify if an article

LEVITT

says Sheik Yassin has said X to verify did he in fact say X. I think it's conventional wisdom and accepted that you could accept that as the statement was made. There are other things that require more work, but as we said earlier, government reports do get more attention, they are considered more credible. United States is not a Banana Republic and takes its checks and balances very seriously and I don't believe the United States Government would publish a report that it did not believe to be fully accurate and I think that answers the question.

Q. Much of what the Watson memo cites to is information from the government of Israel, correct?

A. There is information from the government of Israel. I don't remember how much of it.

Q. Do you know what the authors of the Watson memo did to verify the information they received from the government of Israel?

MR. GLATTER: Objection as to form and foundation.



LEVITT

A. Specifically, no.

Q. I'm being careful here so I'm not asking while you were in the government service. Since leaving the FBI have you had occasion and I don't want to ask you who the authors were in case you are one and I understand you don't want to say what you did, have you had occasion to speak with the authors of the Watson memo?

A. Yes.

Q. Have you ever discussed the Watson memo with them?

A. No.

Q. You've never had an opportunity to question them or you have never taken the opportunity to question them about the contents of the Watson memo?

MR. GLATTER: Objection, asked and answered.

A. I couldn't because the same reasons I can't answer questions about what I did when I was in the FBI, neither could they. Some of them I believe are still at the FBI and since some of this was based on



LEVITT

material that had been classified at one point, you know, I make it a point when I interview government officials from any government really to make it clear that I'm an academic now, I publish publicly, don't tell me things I should not know. I don't want to impede an on going intelligence investigation. I don't want to be prosecuted for revealing something I should not have revealed so, you know, sometimes you restrain yourself.

Q. Do you know the reason the Watson memo was created for?

A. Yes.

Q. What was that?

A. The memo went out from Dell Watson which is why it's called the Watson memo who was at the time the assistant director of counter terrorism at the FBI and it went to Rick Nuckom, Richard Nukom who was at the time the director of OFAC at treasury and the purpose of the memo was to provide the basis for treasury opening up, treasury doesn't open up investigations, but for



LEVITT

treasury to look into the possibility of whether the Holy Land Foundation reached threshold for designation under executive orders so I can't remember if treasury asked the bureau for this probably is what happened and the bureau came up with this memo which if I recall when it was first issued was classified, it was secret and only later made public. In fact, don't recall if there are any redactions in it. I don't think there are, but it's possible, but that's what it was for.

Q. Let me ask you about one other source that you cite in multiple places in your report which is the Center for Special Studies?

A. Yes.

Q. What is the Center for Special Studies?

A. The Center for Special Studies which has since renamed itself I think twice and now goes by ITIC I think is an Israeli think tank of sorts that publishes analysis of its own and more importantly from where I

Page 249

LEVITT

sit publishes all kinds of primary documents on its website. It is not wholly independent like say the Washington Institute For Near East Policy. It's very public about the fact that it is tied to the Israeli military. Last time I visited it I think it's still the case its offices are on an Israeli military base and what I found very useful are the primary documents, seized documents in particular that they have made public.

Q. Do you believe their analysis to be reliable?

A. In very rare instances have I cited to their analysis. Some of their analysis I found better than others.

Q. The CSS chooses what it wants to publish, correct?

A. I actually don't know --

MR. GLATTER: Object to the form.

A. I actually don't know its criteria.

Q. You are not aware of any mandate that they publish everything seized

Page 250

LEVITT

by the Israeli government?

A. I'm not aware of such a mandate.

Q. The Israeli government has no mandate that it must give CSS everything it seizes, right?

A. I have no idea.

Q. Is that ever something you wanted to know when considering looking at sources from the CSS?

A. Is what?

Q. Whether the Israeli government had a mandate to give CSS everything it seizes?

A. To give them or to publish, you've asked two questions?

Q. To give them, let's start with give?

MR. GLATTER: To give them everything it seizes, is that the question?

MR. LUFT: Yes.

A. My understanding and I did ask questions at least along the lines of what

Page 251

LEVITT

you're getting is that after the Israeli military reinvasion of the West Bank after a series of Hamas and other terrorist groups carried out a particularly heinous set of suicide bombings that in fact the CSS did have and the storage house was located at this base and I believe it was all the seized documents. In fact, I was granted access to the facility.

Q. What date was that?

A. I don't recall.

Q. Have you had on-going access to all their documents?

A. No.

Q. Do you have on-going access to all the documents Israel seizes?

A. No.

Q. What have you done to assure yourself that counter evidence to what CSS is publishing has by CSS' choice not been published by them even though it was seized by the Israeli government?

MR. GLATTER: Objection as to form and foundation.

Page 252

LEVITT

A. Several things. First, I interviewed people there and asked very similar questions. Second, I interviewed other officials including U.S. officials and also noted public statements including by U.S. officials. This gets into a slightly related issue both in terms of -- mostly in terms of the reliability of the information that was made public. Not being in control of the information the most I could do is to ask if there was information out there contradicting their putting forth and the last thing is again there's no single source and the information that they were putting forward was information that in some cases being corroborated by others so Palestinian authority sources were sometimes intentionally or unintentionally corroborating some of these reports of for example there was a 60 Minutes episode where they interviewed a jailed Palestinian Islamic Jihad operative and told him tell us about the fact if I -- the point will be clear even if the exact details are not, but I think it

LEVITT
yet for the Parsons case.
Q. Have you been paid anything in the Arab Bank case?
A. I don't think I have been paid in the Arab Bank case.
Q. Have you been paid in the Nat West case?
A. Some of the invoice that -- the existing invoice, it's some of the same work so there may be questions that they posed to me that that actually for them have more relevance to one case or the other and I didn't make the distinction so I imagine if they need an expert report in the following case it probably won't take as much time as it did in the first case so some of that is -- some portion of what has happened already is probably Nat West.
Q. Is your billing rate of $300 an hour the same for all these?
A. Yes.
Q. How much time do you think you spent working on the Parsons date to case?
A. Not much. A handful of hours.



LEVITT
Q. How about Arab Bank?
A. I don't recall, but not very much.
Q. Do you know who Ziad Abu Amr is?
A. Yes.
Q. Who is he?
A. Ziad Abu Amr is a Palestinian, he's been an academic, he's been a government minister. He wrote one of the earlier and better books on Islamic movements in the Palestinian territories including on Hamas and I've met him and interviewed him.
Q. Do you respect him?
A. Pardon?
Q. Do you respect his work?
MR. GLATTER: Objection as to form.
A. Respect him, he's a nice guy. I think some of his work is better than others. I don't agree with everything of his. Probably vice versa. I respect him.
Q. Someone you actually cite, whose work you cite?



LEVITT
A. I do cite his work.
MR. LUFT: Can you mark this document as Levitt 11. I believe you will tell me it's a document for Human Rights Watch called Erased In A Moment: Suicide Bombing Attacks Against Israeli Civilians.
(Levitt Exhibit 11, Document, marked for Identification.)
Q. Are you familiar with that, Doctor, specifically the page 103?
A. 103?
Q. Yes. Have you ever seen this document before?
A. I have.
Q. Have you ever cited this document before?
A. I have.
Q. You see in the middle paragraph Mr. Amr notes with regard to al-Islah Society that they examined their books carefully and there was nothing amiss?
A. I see that.
Q. Did you take that into



LEVITT
consideration when giving your opinion with regard to al-Islah?
A. Yes.
Q. How did it factor in your consideration?
A. Ziad Abu Amr is not some loony and therefore you have to take some plaintiffs seriously, but having spoken to the people who do the charity oversight in the Palestinian authority, it's not clear to me or to them what he based this on and from my interviews with the people who do charitable oversight it's not correct. Palestinian Society is complicated. Within any given family there's Hamas guys, Fatah guys, it's patch work. Ziad Amr also had an interest in minimizing concerns about Hamas. He was a strong proponent of reconciliations between Hamas and Fatah. He was a minister in the -- he was a Fatah minister in the Hamas run government at one point so he also had some issues there.
Q. The 12 entities actually perform charitable activities, correct?

LEVITT

MR. GLATTER: Objection to form.

A. Yes.

Q. They provide needed services to the Palestinian population?

MR. GLATTER: Same objection.

Q. Or I should say they provided since we're talking about the time frame of during which the transfers were made?

MR. GLATTER: Same objection.

A. Among other things, yes.

Q. Do you believe the Palestinian people should have their own state?

A. Yes.

Q. Where do you think it should be?

MR. GLATTER: Objection to the extent it's beyond the scope of Dr. Levitt's expert opinion. You could answer.

A. I think there should be a state of Israel and a state of Palestine living side by side in peace and security with one another. The Palestinian state will be in my



LEVITT

belief personally the vast majority of the West Bank in Gaza.

MR. LUFT: I'm told we're out of time. Dr. Levitt, I don't want to keep you so I will conclude at this point. Thank you very much for your time.

MR. GLATTER: Just for the record we had an off the record conversation and we identified, plaintiffs have identified to defense counsel the translation of the BND report that we produced that Dr. Levitt reviewed so that we had off the record conversation which I thought was worth noting.

MR. LUFT: Thank you.

THE VIDEOGRAPHER: This concludes today's deposition of Dr. Matthew Levitt. We are now off the record. The time is 7:13 p.m., September 1, 2010.

(Time noted: 7:13 p.m.)



A C K N O W L E D G M E N T

STATE OF )
:ss
COUNTY OF )

I, MATTHEW LEVITT, hereby certify that I have read the transcript of my testimony taken under oath in my deposition of September 1, 2010; that the transcript is a true, complete and correct record of my testimony, and that the answers on the record as given by me are true and correct.

______________________
MATTHEW LEVITT

Signed and subscribed to before me, this day of , 2010.

______________________
Notary Public, State of New York



C E R T I F I C A T E

STATE OF NEW YORK )
) ss.:
COUNTY OF NEW YORK )

I, SHARI COHEN, a Notary Public within and for the State of New York, do hereby certify:

That MATTHEW LEVITT, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage; and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 7th day of September, 2010.

______________________
SHARI COHEN