EXHIBIT 154 TO DECLARATION OF VALERIE SCHUSTER

FILED UNDER SEAL

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| MOSES STRAUSS, *et al.*, | |
| Plaintiffs, | |
| v. | Case No. 06-CV-702 (DLI) (MDG) |
| CRÉDIT LYONNAIS, S.A., | |
| Defendants | |
| BERNICE WOLF, *et al.*, | |
| Plaintiff, | |
| v. | Case No. 07-CV-914 (DLI) (MDG) |
| CRÉDIT LYONNAIS, S.A., | |
| Defendant. | |

**PLAINTIFFS' RESPONSE TO DEFENDANT CREDIT LYONNAIS, S.A.'S AMENDED STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE PURSUANT TO LOCAL CIVIL RULE 56.1**

> ZUCKERMAN SPAEDER LLP
> 1800 M Street, NW
> Suite 1000
> Washington, DC 20036
>
> *Attorneys for Plaintiffs Strauss, et al.*
>
> - and -
>
> SAYLES WERBNER
> 4400 Renaissance Tower
> 1201 Elm Street
> Dallas, TX 75270
> (214) 939-8700
>
> *Attorneys for Plaintiffs Wolf, et al.*

October 14, 2011

**RESPONSE:** Admit.

285.    Plaintiffs rely upon the expert reports and proposed testimony of Levitt and Spitzen to prove that the 13 Charities were "alter egos of and/or controlled by HAMAS." <u>Id.</u>

**RESPONSE:** Admit that Plaintiffs rely *in part* on Dr. Levitt's and Mr. Spitzen's opinion. *See* Eckstut Decl. Ex. 72 (Plaintiffs' Resp. to Contention Interrog. no. 11) and Eckstut Decl. Ex. 124 (Supp. Resp. to Contention Interrog. no. 11).

286.    According to Levitt's June 17, 2010 supplemental expert report, plaintiffs asked him to provide expert testimony about, among other things, whether all of the 13 Charities except ███████████████████████ "were, in fact, controlled by, or alter-egos of, HAMAS at the time Crédit Lyonnais transferred funds to them." Eckstut Dec. Ex. 102 (Levitt Rep. at 1).

**RESPONSE:** Admit.

287.    According to Spitzen's December 10, 2009 expert report, plaintiffs asked him to provide expert testimony with respect to, among other things, whether the 13 Charities "were, in fact, under the control of HAMAS or identified with HAMAS at the time that Crédit Lyonnais transferred funds to them." Eckstut Dec. Ex. 103 (Spitzen Rep. at 1).

**RESPONSE:** Admit.

**E.    Geisser's reports summarizes transfers from CBSP's CL accounts to the transferees identified in banking records produced by CL, and do not purport to show that any of those transferees are alter egos of and/or controlled by HAMAS**

288.    Plaintiffs cite the November 2009 and August 2010 expert reports of Wayne Geisser (the "Geisser Reports") as evidence that the 13 Charities were "alter egos of and/or controlled by HAMAS." Eckstut Dec. Ex. 124 (Plaintiffs' Supp. Resp. to Cont. Interrog. no. 11).

119

**RESPONSE:** Dispute. As set forth in Plaintiff's Supp. Resp. to Cont. Interrog. No. 11, the Geisser reports "detail, summarize and document transactional activity from CBSP's accounts with CL to the identified CBSP's counterparties." Although they were referenced for the sake of completeness in Plaintiffs' supplemental response to this interrogatory, they were not cited by Plaintiffs as expert opinion evidence that the 13 Charities were "alter egos of and/or controlled by HAMAS."

289.   The Geisser Reports summarize the transfers from CBSP's CL accounts that plaintiffs allege were made to the 13 Charities and to ▆▆▆▆. Eckstut Dec. Ex. 15 (Geisser Rep. at 1-2); Ex. 97 (Geisser Supp. Rep., Ex. B).

**RESPONSE:** Admit.

290.   The Geisser Reports summarize, among other things, the dates and amounts of the transfers that were made to the 13 Charities and ▆▆▆▆, as well as the names, banks and bank account numbers of the transferees as they appear in the CL banking records Geisser reviewed. Eckstut Dec. Ex. 97 (Geisser Supp. Rep., Ex. B).

**RESPONSE:** Admit.

291.   The information regarding the names, bank accounts and bank account numbers of the transferees identified in the Geisser Reports is based solely upon the documents produced by CL. Eckstut Dec. Ex. 104 (Geisser Rep., Ex. E).

**RESPONSE:** Dispute. As noted in Exhibit B to the Geisser Report, certain transfers "were identified by the Interpal Nat West, bank account number 140-00-04156838, statements bates reference NW008925 and NW008927 as being received from CBSP." Eckstut Decl. Ex. 15 (Geisser Rep., Ex. B).

292.   None of the information in the Geisser Reports is based upon any

Charitable Society – Hebron as being used by the Union of Good to channel funds to other societies. *See* Eckstut Decl. Ex. 103 (Spitzen Rep. at 32). He also notes that the *Al-Islah* Charitable Society – Ramallah & al-Bireh was under the absolute control of HAMAS since its founding. *See Id.* (Spitzen Rep. at 13). Mr. Spitzen also cites to and appended the interrogation protocol of Jamal al-Tawil where the latter confirmed coordinating the establishment of *Al-Islah* Charitable Society – Ramallah & al-Bireh with HAMAS's office in Lebanon. He also stated that upon his arrest by the Palestinian Authority, Falah Nada took over responsibility for distributing the fund received from Lebanon on behalf of *Al-Islah* Charitable Society – Ramallah & al-Bireh.

336.    Neither Spitzen's nor Levitt's report identifies any evidence of any oral directions by HAMAS to the 13 Charities.

**RESPONSE:** Dispute. *See* Response to ¶ 335.

337.    Neither Spitzen's nor Levitt's report identifies any actual transactions between HAMAS and the 13 Charities or shows that any transaction was not at arm's length.

**RESPONSE:** Dispute. Both Mr. Spitzen's and Dr. Levitt's reports discuss in depth how the organizations form a part of HAMAS's social network and are part of HAMAS. Moreover, since there are transfers between these organizations, any transfers that occurred are transfers between HAMAS entities. Additionally, Spitzen's Report cites examples of the charities in question transferring money to HAMAS operatives. *See, e.g.*, Eckstut Decl. Ex. 103 (Spitzen Rep. at 79, 87, 106). Mr. Spitzen's report also identifies ▮▮▮▮▮▮▮▮▮▮▮▮▮ as having transferred funds to other organizations including the Jenin Zakat Committee. *See* Id. (Spitzen Rep. at 108). Spitzen's report further notes that the *Al-Islah* Charitable Society – Ramallah & al-Bireh "transfers the funds that it receives from the Union of Good to other organizations," thereby assisting those organizations in expanding their *da'wa* activities. *See* Id. (Spitzen Rep. at

130). As noted in the response to ¶ 335, *Al-Islah* Charitable Society – Ramallah & al-Bireh received direct funding from HAMAS's offices in Lebanon.

338.   Neither Spitzen nor Levitt's report shows that HAMAS loaned money to or guaranteed the loans of any of the Charities.

**RESPONSE:** Dispute. Defendant attempts to draw a false dichotomy between HAMAS and the organizations discussed by Mr. Spitzen and Dr. Levitt. Mr. Spitzen's and Dr. Levitt's reports discuss in depth how the organizations form a part of HAMAS's social network and are part of HAMAS.

339.   Levitt is unaware of any instances in which HAMAS loaned money to, or guaranteed the loans of, any of the 12 Charities. Eckstut Dec. Ex. 99 (Levitt Tr. at 224:21-226:6).

**RESPONSE:** Dispute. While Dr. Levitt testified that he was unaware of HAMAS loaning money to, or guaranteeing the loans of, any of the 12 organizations, he testified that HAMAS's headquarters transferred funds to these organizations and that he would not say that it is impossible that HAMAS loaned money to, or guaranteed the loans of, any of its 12 sub-organizations. *See* Goelman Decl. Ex. 125 (Levitt Dep. 225:2-22, September 1, 2010).

340.   Spitzen concedes that HAMAS never publicized its association with any charitable entities operating in the Palestinian Territories. Eckstut Dec. Ex. 109 (Spitzen Arab Bank Tr. at 96:4-10).

**RESPONSE:** Dispute. While Mr. Spitzen testified that HAMAS does not publicize its association with its Palestinian sub-organizations, he further testified that "The HAMAS is very much interested to make sure that their people, that the population know exactly who is controlled by HAMAS, who receives money from the HAMAS. But on the other hand, it also tries to avoid – and it makes sense because, otherwise, it would be suicide on their side to – not

135

analyze specific committees and discuss whether they are controlled by HAMAS.

386.   Levitt's report states that HAMAS's social welfare activities help provide "logistical and operational support for weapons smuggling, reconnaissance, and acts of terror from suicide bombings to rocket fire." Eckstut Dec. Ex. 102 (Levitt Rep. at 2). Levitt's report does not cite any authority for this claim. Id.

**RESPONSE:** Admit that the language quoted at p. 2 does not have a citation. Dispute that Dr. Levitt's report does not elsewhere cite authority for this proposition. *See, e.g.,* Goelman Decl. Ex. 1 (Levitt Rep. at 13-20 and citations therein).

387.   Levitt's report states that "HAMAS prizes its hospitals because it can use them to build grassroots support, procure chemicals necessary to making explosives and facilitate terrorist attacks." Id. (Levitt Rep. at 83). Levitt's report does not cite any authority for this claim. Id.

**RESPONSE:** Admit. Note that, when questioned at deposition, Dr. Levitt stated that "there were multiple cases" of this dynamic, and CL did not probe further. Goelman Decl. Ex. 125 (Levitt Dep. 201:20).

388.   Levitt is not aware that any of the 12 Charities "procur[ed] chemicals to make explosives for terrorist attacks." Eckstut Dec. Ex. 99 (Levitt Tr. at 201:10-13).

**RESPONSE:** Admit.

389.   Levitt's report states that "HAMAS aid does in fact buy the support of those who benefit from its largesse" via social welfare activities, and also states, "For example recipients are unlikely to turn down requests to participate in the da'wa's logistical support activities by allowing their homes to serve as safe house for HAMAS fugitives moving from place to place to avoid capture." Eckstut Dec. Ex. 102 (Levitt Rep. at 20). Levitt's report does

not cite any authority for these claims. Id. Levitt's report does not connect these assertions to any of the 12 Charities. Id.

**RESPONSE:** Dispute. This paragraph draws a false dichotomy between the 12 Charities and the HAMAS *Da'wa* generally.

390.   Levitt states in his report that "HAMAS deems legitimate the mingling of these funds, as it considers the social services it provides a jihadist extension of its terrorist attacks." Id. (Levitt Rep. at 13). Levitt's report does not cite any authority for this claim. Id. When asked at his deposition to explain the meaning of this statement, Levitt testified that HAMAS has no separate accounts for armed activities and social services. Eckstut Dec. Ex. 99 (Levitt Tr. at 165:25-166:18).

**RESPONSE:** Admit that the quoted language of p. 13 of Dr. Levitt's report does not have a citation, but disputes that Dr. Levitt's report does not elsewhere cite authority for this proposition. *See, e.g.,* Goelman Decl. Ex. 1 (Levitt Rep. at 7, 13, 21-24 and citations therein).

391.   Levitt testified that each of the 12 Charities had its own bank accounts. Id. (Levitt Tr. at 168:5-13).

**RESPONSE:** Admit.

392.   When asked for a specific example of an instance in which any of the 12 Charities used money that was given to them to buy weapons, Levitt could not do so. Id. (Levitt Tr. at 168:14-21).

**RESPONSE:** Admit.

393.   Levitt testified that there is no central HAMAS treasury or repository for funds for military, political and social programs. Id. (Levitt Tr. at 170:24-171:11).

**RESPONSE:** Admit.

394.   The example Levitt uses in his report to support the assertion that HAMAS "deems legitimate the mingling of these funds" is, according to Levitt's report, a webpage of the Muslim Brotherhood. Eckstut Dec. Ex. 102 (Levitt Rep. at 13).

**RESPONSE:** Dispute. The source is an article by Yoni Fighel, a Senior Researcher at the International Institute for Counter-Terrorism ("ICT"), not a webpage of the Muslim Brotherhood. *See also* Response to ¶ 390.

395.   The source Levitt cited for this example does not contain anything about alleged legitimization of the mingling of military and social service funds. Eckstut Dec. Ex. 120 (Levitt Dep. Ex. 7).

**RESPONSE:** Dispute. *See* Response to ¶¶ 390 and 394.

396.   Levitt subsequently identified another source for this assertion. Eckstut Dec. Ex. 114 (Levitt NW Rep. at 13 n. 80).

**RESPONSE:** Admit.

397.   The new source is a web page of the Israel Defense Forces, which does not refer to any "mingling" of funds. Eckstut Dec. Ex. 121 (Levitt NW Dep. Ex. 4).

**RESPONSE:** Admit but note that Dr. Levitt's Report contains numerous examples of the mingling he describes. See, e.g., Eckstut Dec. Ex. 102 (Levitt Rep. at 87) (describing flow of money between the HAMAS political leadership, Al Islah Charitable Association and HAMAS cells perpetrating suicide bombing attacks.)

398.   Levitt's report states in a section entitled "The Relationship Between HAMAS's Social Welfare Network (Da'wa) And Its Military (Terrorist) Wing" that the former leader of HAMAS, "Sheikh Yassin himself rejected the idea that HAMAS's da'wa network of charities, its leadership, military (terrorist), and political wings were uncoordinated: 'We cannot

EXHIBIT 155 TO DECLARATION OF VALERIE SCHUSTER

FILED UNDER SEAL

*TZVI WEISS, et al. VS.*
*NATIONAL WESTMINSTER BANK, PLC*

---

*WAYNE GEISSER*
*June 17, 2011*

---



**Ellen Grauer**
**COURT REPORTING**
Co. LLC

126 East 56th Street, Fifth Floor New York, New York 10022
PHONE: (212) 750-6434   FAX: (212) 750-1097
**www.ELLENGRAUER.com**

*Original File 96685.TXT*
*Min-U-Script® with Word Index*

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

WAYNE GEISSER
June 17, 2011

Page 49

GEISSER

2 A. Yes.
3 Q. Do you recall that you also
4 stated that your firm over time was provided
5 lists of variations in these names?
6 A. I would say that's generally
7 the case, yes.
8 Q. And that you stated that your
9 firm did not do an independent investigation
10 of whether the variations on the list were
11 indeed the same entities?
12    MR. STEINGARD: Objection to
13 form.
14 A. Let me back up for a second.
15 We were provided these names. When you say
16 list of names, we were provided these
17 specific names that we were asked to identify
18 the transactions for.
19 Q. You were also provided
20 variations of those names, correct?
21 A. I don't know if I can answer
22 that question without discussing
23 communications with counsel.
24 Q. Did you not testify that you
25 were also -- at your Credit Lyonnais

Page 50

GEISSER

2 deposition that you were also provided lists
3 of variations in the names?
4 A. I believe that that's the case,
5 yes.
6 Q. Didn't you also testify that
7 your firm did not do an independent
8 investigation of whether the variations of
9 the names were the same entities?
10 A. That's correct.
11 Q. That holds true for all the
12 work you did with respect to both CBSP's
13 transfers and with respect to Interpal's
14 transfers, correct?
15 A. Yes.
16 Q. If you just look at this list,
17 number 14 relates only to transfers from a
18 Credit Lyonnais account, correct?
19 A. Yes.
20 Q. Number 15 only relates to a
21 transfer from a Nat West account, correct?
22 A. Correct, as it states.
23 Q. Excluding those two, is it fair
24 to say that for whatever lists you were
25 provided you were using the same list for

Page 51

GEISSER

2 both Credit Lyonnais and Nat West?
3 A. Yes.
4 Q. Do you recall that at your
5 Credit Lyonnais deposition I asked you
6 questions about the process your firm used to
7 create the summaries of the Credit Lyonnais
8 transactions?
9 A. Yes.
10 Q. Did your firm use the same
11 process to create the summaries of the Nat
12 West transactions?
13 A. Yes.
14 Q. Was there anything different
15 about the methodology your firm used to
16 create the Credit Lyonnais summaries as your
17 firm used to create the Nat West summaries?
18 A. No.
19 Q. The same people worked on both
20 sections of this report, correct?
21 A. That's correct.
22 Q. If you could turn back to your
23 December 2010 report. Just so I'm clear, on
24 page 2 of this report under background you
25 see at the way bottom there it says our

Page 52

GEISSER

2 reports dated November 19, 2009 and August
3 19, 2010 identify disbursements from
4 Interpal accounts that Nat West made to 14
5 organizations/individuals. Did you mean to
6 include the reference to the August report
7 there?
8 A. No, that's an oversight because
9 that's just Credit Lyonnais transactions.
10 Q. The next sentence or the two
11 sentences, subsequent to the issuance of
12 these reports, counsel provided additional
13 documents in electronic format identified as
14 volumes 46 and 58. We reviewed the document
15 production and updated our transactional
16 database. When you say updated your
17 transactional database, did that include
18 transactions related to the same transferees
19 at issue in your November 2009 report?
20 A. Yes.
21 Q. But except for what's in the
22 November 2009 report, you're not offering any
23 additional information as to transferees at
24 issue in your November 2009 report, correct?
25 A. Correct.

**EXHIBIT 156 TO DECLARATION OF VALERIE SCHUSTER**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x

TZVI WEISS, LEIB WEISS, MALKE WEISS,          :
YITZCHK WEISS, YERUCHAIM WEISS,               :
ESTHER DEUTSCH, MOSES STRAUSS,                :
PHILIP STRAUSS, BLUMY STRAUSS,                :
AARON STRAUSS, ROISIE ENGELMAN,               :
JOSEPH STRAUSS, MATANYA NATHANSEN,  :
CHANA NATHANSEN, MATANYA AND                  :
CHANA NATHANSEN FOR THE ESTATE OF   :
TEHILLA NATHANSEN, YEHUDIT                     :
NATHANSEN, SHOSHANA NATHANSEN,                :
HEZEKIEL TOPOROWITCH, PEARL B.                :
TOPOROWITCH, YEHUDA TOPOROWITCH,    :
DAVID TOPOROWITCH, SHAINA CHAVA              :
NADEL, BLUMY ROM, RIVKA                        :
TOPOROWITCH, EUGENE GOLDSTEIN,                :
LORRAINE GOLDSTEIN, BARBARA                    :
GOLDSTEIN INGARDIA, RICHARD                    :
GOLDSTEIN, MICHAEL GOLDSTEIN, CHANA :      **FIFTH AMENDED COMPLAINT**
FREEDMAN, HARRY LEONARD BEER AS      :      **JURY TRIAL DEMANDED**
EXECUTOR OF THE ESTATE OF ALAN BEER, :
HARRY LEONARD BEER, ANNA BEER,                :
PHYLLIS MAISEL, ESTELLE CARROLL,      :      **05-CV-4622 (CPS)(KAM)**
SARRI ANNE SINGER, JUDITH SINGER, ERIC :
M. SINGER , STEVEN AVERBACH, JULIE    :
AVERBACH, TAMIR AVERBACH, DEVIR              :
AVERBACH, SEAN AVERBACH, ADAM                 :
AVERBACH, DAVID AVERBACH, MAIDA              :
AVERBACH, MICHAEL AVERBACH, EILEEN   :
SAPADIN, DANIEL ROZENSTEIN, JULIA     :
ROZENSTEIN SCHON, JACOB STEINMETZ,    :
DEBORAH  STEINMETZ, AMICHAI                    :
STEINMETZ, NAVA STEINMETZ, ORIT               :
STEINMETZ, NATANEL STEINMETZ,                 :
ROBERT L. COULTER, SR. FOR THE ESTATE :
OF JANIS  RUTH COULTER, DIANNE                :
COULTER MILLER, ROBERT L.                      :
COULTER, SR., ROBERT L. COULTER, JR.,  :
LARRY CARTER FOR THE ESTATE OF DIANE :
LESLIE CARTER, LARRY CARTER, SHAUN    :
COFFEL, RICHARD BLUTSTEIN AND                 :
KATHERINE BAKER FOR THE ESTATE OF     :
BENJAMIN BLUTSTEIN, RICHARD                    :
BLUTSTEIN, KATHERINE BAKER, REBEKAH   :

BLUTSTEIN, NEVENKA GRITZ FOR THE          :
ESTATE OF DAVID GRITZ, NEVENKA GRITZ,     :
GLORIA KUSHNER, JACQUELINE                :
CHAMBERS AS THE ADMINISTRATOR OF          :
THE ESTATE OF ESTHER BABLAR,              :
JACQUELINE CHAMBERS, LEVANA COHEN         :
HAROOCH, GRETA GELER AS THE               :
ADMINISTRATOR OF THE ESTATE OF            :
HANNAH ROGEN, JOSHUA FAUDEM               :
ZOHAR FATER, BRUCE MAZER,                 :
ORLY ROM, RICHARD COFFEY,                 :
GAL GANZMAN, JUDITH BUCHMAN-ZIV,          :
ORA COHEN, MIRAV COHEN, DANIEL            :
COHEN, ORLY COHEN, SHIRA COHEN,           :
EYAL NOKED, KAREN GOLDBERG,               :
CHANA GOLDBERG, ESTHER GOLDBERG,          :
YITZHAK GOLDBERG, SHOSHANA                :
GOLDBERG, ELIEZER GOLDBERG,               :
YAAKOV MOSHE GOLDBERG, and                :
TZVI YEHOSHUA GOLDBERG                     :
                                          :
                Plaintiffs,               :
                                          :
        -against-                         :
                                          :
                                          :
NATIONAL WESTMINSTER BANK, PLC,           :
                                          :
                Defendant.                :
-------------------------------------------------------------x

Plaintiffs Tzvi Weiss, Leib Weiss, Malke Weiss, Yitzchk Weiss, Yeruchaim Weiss, Esther Deutsch, Moses Strauss, Philip Strauss, Blumy Strauss, Aaron Strauss, Roisie Engelman, Joseph Strauss, Matanya Nathansen, Chana Nathansen, Matanya and Chana Nathansen for the Estate of Tehilla Nathansen, Yehudit Nathansen, Shoshana Nathansen, Hezekiel Toporowitch, Pearl B. Toporowitch, Yehuda Toporowitch, David Toporowitch, Shaina Chava Nadel, Blumy Rom, Rivka Toporowitch, Eugene Goldstein, Lorraine Goldstein, Barbara Goldstein Ingardia, Richard Goldstein, Michael Goldstein, Chana Freedman, Harry Leonard Beer as Executor of the Estate of Alan Beer, Harry Leonard Beer, Anna Beer, Phyllis Maisel, Estelle Carroll, Sarri Anne Singer, Judith Singer, Eric M. Singer, Steven Averbach, Julie Averbach, Tamir Averbach, Devir Averbach, Sean Averbach, Adam Averbach, David Averbach, Maida Averbach, Michael Averbach, Eileen Sapadin, Daniel Rozenstein, Julia Rozenstein Schon, Jacob Steinmetz, Deborah Steinmetz, Amichai Steinmetz, Nava Steinmetz, Orit Steinmetz, Natanel Steinmetz, Robert L. Coulter, Sr. for the Estate of Janis Ruth Coulter, Dianne Coulter Miller, Robert L. Coulter, Sr., Robert L. Coulter, Jr., Larry Carter for the Estate of Diane Leslie Carter, Larry Carter, Shaun Coffel, Richard Blutstein and Katherine Baker for the Estate of Benjamin

Blutstein, Richard Blutstein, Katherine Baker, Rebekah Blutstein, Nevenka Gritz for the Estate of David Gritz, Nevenka Gritz, Gloria Kushner, Jacqueline Chambers as the Administrator for the Estate of Esther Bablar, Jacqueline Chambers, Levana Cohen Harooch, Greta Geler as the Administrator for the Estate of Hannah Rogen, Joshua Faudem, Zohar Fater, Bruce Mazer, Orly Rom, Richard Coffey, Gal Ganzman, Judith Buchman-Ziv, Ora Cohen, Mirav Cohen, Daniel Cohen, Orly Cohen, Shira Cohen, Eyal Noked, Karen Goldberg, Chana Goldberg, Esther Goldberg, Yitzhak Goldberg, Shoshana Goldberg, Eliezer Goldberg, Yaakov Moshe Goldberg, and Tzvi Yehoshua Goldberg, by their attorneys, allege the following upon information and belief:

## NATURE OF THE ACTION

1.      This is a complaint for damages arising out of the conduct of defendant National

Westminster Bank, Plc (hereinafter: "NatWest").   Defendant is a financial institution

headquartered in the United Kingdom that has knowingly collected, provided, and transmitted

money and financial services to HAMAS[1], a Foreign Terrorist Organization (as that term is

defined in 8 U.S.C. § 1189 of the Antiterrorism and Effective Death Penalty Act of 1996

("AEDPA")).   NatWest has thereby substantially aided and abetted the commission of acts of

international terrorism, as defined by 18 U.S.C. § 2331, including the terrorist attacks that

injured the plaintiffs, and has violated the prohibitions on providing material support for acts of

international terrorism (18 U.S.C. § 2339B) and on financing acts of international terrorism (18

U.S.C. § 2339C), set forth in the Antiterrorism Act ("ATA") as amended by the AEDPA.

Defendant is therefore civilly liable under § 2333(a) of the ATA to the plaintiffs, who have been

injured in their person by reason of acts of international terrorism.

## JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction over this action pursuant to 18 U.S.C.

§§ 2333 and 2334, as a civil action brought by nationals of the United States, who have been

killed or injured by reason of acts of international terrorism, and/or their estates, survivors, and

---

[1]      HAMAS is an acronym for "Harakat al-Muqawama al-Islamiyya" also known as the "the Islamic Resistance Movement."

heirs.  This Court also has subject matter jurisdiction over this action based on diversity of citizenship pursuant to 28 U.S.C. § 1332(a)(2). The matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

3.      Venue is proper in this district pursuant to 18 U.S.C. § 2334(a) and 28 U.S.C. § 1391(d).

4.      NatWest is subject to personal jurisdiction in the United States pursuant to Fed. R. Civ. P. 4(k) because, among other things, it continuously and systematically does business in the United States.  The defendant is also subject to personal jurisdiction in the United States pursuant to 18 U.S.C. § 2339B(d)(1)(D) because it has committed tortious acts within the United States by transferring funds through the United States for the benefit of HAMAS, and has purposefully availed itself of United States jurisdiction in the course of committing the wrongful acts alleged herein.

### THE PARTIES

A.      **The Plaintiffs**

### JERUSALEM BUS BOMBING – AUGUST 19, 2003

5.      On August 19, 2003, Raed Abdul Hamid Misk, a suicide bomber, detonated explosives on Egged bus No. 2.

6.      The Islamic Resistance Movement (hereinafter known as "HAMAS") claimed responsibility for the attack.

7.      On January 23, 1995, President Clinton issued Executive Order No. 12947 identifying HAMAS as a terrorist organization whose terrorist attacks "constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States."

**The Weiss Family**

8.      Plaintiff Tzvi Weiss, age 20, is a citizen of the United States and a resident of the State of New York.

9.      Tzvi was in Israel studying at a rabbinical college in 2003 and was planning to return to the United States on August 21, 2003.

10.     On the evening of August 19, 2003, he boarded Egged bus No. 2 in Jerusalem after having visited the Kotel (Wailing Wall), Judaism's holiest site, to pray. He was on his way to a friend's wedding.

11.     As the bus arrived at Shmuel Hanavi Street he heard a terrible explosion. Everything went black, and he could not hear anything but a deafening ringing in his ears.

12.     In the panicked aftermath of the explosion, Tzvi jumped out of a window of the bus and began to run, stumbling over dead bodies and body parts as he fled the scene.

13.     Tzvi was covered with blood and his hand had been cut. His body was shaking from the shock of the experience, and he had a constant terrible ringing in his ears.[2]

14.     Once he got his bearings, Tzvi telephoned his brother, plaintiff Yitzchk Weiss, and waited for his brother to arrive to accompany him to the hospital.

15.     An ambulance transported Tzvi to Bikur Cholim Hospital where he underwent tests. He later learned that both of his eardrums had been shattered and torn as a result of the explosion.

16.     His left eardrum had been completely torn, and his hearing was severely impaired. He continued to experience severe pain in his hand and was unable to bend his fingers.

17.     Tzvi decided to return home to the United States to be near his family while he

---

[2]      The medical term for the condition is tinnitus.

began recovering from the injuries and the effects of having been a victim of a terrorist attack. He returned to the United States the following day and visited an ear specialist within hours of his arrival. He underwent tests and was advised to have surgery on his left ear to attempt to regain some of his hearing loss in that ear. Tzvi obtained a second opinion from another doctor who agreed with the diagnosis.

18.     After a number of examinations by the initial physician, and after treatment with antibiotics, Tzvi underwent surgery on his left ear. After the surgery, the incessant ringing in his ears became louder and worse than before.

19.     Tzvi also visited another physician for treatment of the severe pain in his hand. He was told the injuries might require surgery.

20.     Tzvi continued to visit doctors on numerous occasions to assess his ears, and underwent many tests, but the agonizing ringing continued. Eventually, it was determined that the surgery on Tzvi's left ear had not been successful. Tzvi suffered numerous panic attacks because of his injuries and the symptoms that continued to affect him.

21.     As a result of the injuries that he sustained in the attack, combined with the memories of the attack itself, Tzvi's mental health deteriorated. The suffering that Tzvi has endured as a result of the injuries he sustained in the attack is ongoing and relentless. It has negatively impacted every aspect of his life.

22.     Tzvi enrolled in rabbinical college upon his return to the United States, but the injuries and their symptoms prevented him from concentrating on his schoolwork, and he could no longer achieve the academic success that he had achieved prior to the attack.

23.     As a result of the attack, plaintiff Tzvi Weiss has suffered severe physical and mental anguish and extreme emotional distress.

24.     Plaintiffs Leib and Malke[3] Weiss are citizens of the United States and residents of the State of New York. They are the parents of plaintiff Tzvi Weiss.

25.     Plaintiff Yitzchk Weiss is a citizen of the United States and a resident of the State of Israel. He is a brother of plaintiff Tzvi Weiss.

26.     Plaintiff Yeruchaim Weiss is a citizen of the United States and a resident of the State of Israel. He is a brother of plaintiff Tzvi Weiss.

27.     Plaintiff Esther Deutsch is a citizen of the United States and a resident of the State of New York. She is the sister of plaintiff Tzvi Weiss.

28.     The parents and siblings of Tzvi Weiss experienced great anxiety after learning of the attack that injured Tzvi and observing the suffering that Tzvi has endured as a result of his injuries.

29.     As a result of the attack, plaintiffs Leib Weiss, Malke Weiss, Yitzchk Weiss, Yeruchaim Weiss and Esther Deutsch have suffered severe mental anguish and extreme emotional distress.

**The Strauss Family**

30.     Plaintiff Moses Strauss, age 23, is a citizen of the United States and a resident of the State of New Jersey.

31.     Mr. Strauss was studying in Israel in 2003, and was planning to return to the United States in April 2004.

32.     At around 9:00 pm on August 19, 2003, he boarded Egged bus #2 in Jerusalem after praying at the Kotel (also known as the "Western Wall" or "Wailing Wall").

33.     Approximately 15 minutes into the bus ride, Mr. Strauss heard a deafening boom

---

[3]     Although spelled "Malka" in the Amended Complaint, Mrs. Weiss's name as it appears on her U.S. passport is actually spelled "Malke".

when Misk had detonated the explosives on the bus.

34.     Mr. Strauss fell forward as a result of the explosion. His eye glasses, jacket, hat and cell phone flew off his body.

35.     As Mr. Strauss regained his bearings and realized what had occurred, he witnessed people screaming and crying and he saw blood and body parts all around him.

36.     Mr. Strauss's clothes were covered with blood and his hearing was severely impaired.

37.     To exit the bus, Mr. Strauss stepped over bodies and in a state of shock made his way towards his apartment. As he reached the corner near his apartment, he saw a friend, and they went into his friend's apartment and telephoned Mr. Strauss's father, plaintiff Philip Strauss to tell him he had been in an attack, but was alive. After making the telephone call, the friend drove Moses to Hadassah Hospital.

38.     As a result of the explosion, Mr. Strauss's body ached, especially his right ear and hand. After arriving at the hospital Mr. Strauss underwent numerous tests, and doctors removed the shrapnel from his ear and hand.

39.     Days after the attack, Mr. Strauss still experienced agonizing pain in his ear, and his hearing loss did not improve.

40.     After the attack, Mr. Strauss returned to the United States without completing his studies in Israel.

41.     Mr. Strauss has been examined by medical specialists in both Israel and the United States. Both physicians confirmed that Mr. Strauss would require surgery on his ear.

42.     In the winter of 2004, Mr. Strauss underwent ear surgery in the United States. His ear is still not completely healed, and he has been told that his condition will never improve. An

8

ear specialist continues to monitor his condition.

43.     Mr. Strauss continues to relive the attack, the images of the attack replaying in his mind daily.

44.     As a result of the attack, plaintiff Moses Strauss has suffered severe physical and mental anguish and extreme emotional distress.

45.     Plaintiffs Philip Strauss and Blumy Strauss are citizens of the United States and residents of the State of New York. They are the parents of plaintiff Moses Strauss.

46.     After hearing of the attack, Blumy Strauss attempted unsuccessfully to reach her son on his cell phone. When she tried to reach him at his apartment, someone else answered the telephone and said that her son was not there. Blumy Strauss grew increasingly concerned.

47.     Upon learning that her son was injured in the bombing, Blumy Strauss's distress grew.

48.     As a result of the attack, plaintiffs Philip Strauss and Blumy Strauss have suffered severe mental anguish and extreme emotional distress.

49.     Plaintiff Aaron Strauss is a citizen of the United States and a resident of the State of New York. He is a brother of plaintiff Moses Strauss.

50.     Plaintiff Roisie Engelman is a citizen of the United States and a resident of the State of New Jersey. She is the sister of plaintiff Moses Strauss.

51.     Roisie Engelman was on vacation when she received a telephone call advising her that there had been a bombing in Israel. Roisie attempted to contact her brother on his cellular telephone, but was unable to reach him. She also telephoned her other brother, Aaron, attempting to locate Moses or her parents.

52.     When Roisie finally received the news that her brother had been injured in the bus

9

bombing, she was very concerned and extremely anxious.

53.     Plaintiff Joseph Strauss is a citizen of the United States and a resident of the State of New Jersey. He is a brother of plaintiff Moses Strauss.

54.     Joseph learned of the attack while watching the news on an airplane. He was aware that the bombing had occurred near the neighborhood where his brother lived. Upon arriving in California, Joseph spoke to his parents and learned of Moses's condition. During the hours of the plane flight, Joseph experienced great anxiety because he was uncertain at that time if his brother had been present at the bombing.

55.     Roisie Engelman, Joseph Strauss and Aaron Strauss experienced great anxiety after learning of the attack that caused the injuries that their brother sustained.

56.     As a result of the attack, plaintiffs Roisie Engelman, Joseph Strauss and Aaron Strauss have suffered severe mental anguish and extreme emotional distress.

**The Nathansen Family**

57.     Tehilla Nathansen was a citizen of the United States and a citizen of the State of Israel.  She was three (3) years old and sitting on her mother's lap when she was murdered in the suicide bomb attack.

58.     The Nathansen family had boarded the bus at the Kotel in Jerusalem, where they had just completed their prayers.

59.     Chana Nathansen, Tehilla's mother, is a citizen of the United States and a citizen and resident of the State of Israel.

60.     Plaintiff Matanya Nathansen, Tehilla's father, is a citizen and resident of the State of Israel.

61.     Plaintiffs Matanya and Chana Nathansen bring this action both individually and

10

on behalf of their three (3) year old daughter's estate.

62.     Chana Nathansen was severely injured in the explosion that killed her daughter and is partially crippled as a result of her injuries. Chana Nathansen had seven (7) ball bearings removed from her body that left bullet holes in her chest, leg and arm. She is also now hearing impaired in one ear.

63.     Plaintiff Chana Nathansen sustained severe physical and mental anguish and extreme emotional distress from witnessing and experiencing first-hand the death of her three year old daughter, and witnessing the severe injuries sustained by her daughters, plaintiff Shoshana Nathansen and plaintiff Yehudit Nathansen, in addition to the injuries she herself sustained.

64.     Matanya Nathansen was injured by the explosion. He suffered fractures in both feet and in his collar bone, and sustained injuries to his lungs, eye and finger. He is now hearing impaired and can no longer walk properly.

65.     In addition to the injuries he sustained as a result of the explosion, plaintiff Matanya Nathansen has sustained severe physical and mental anguish and extreme emotional distress from witnessing and experiencing first-hand the death of his three year old daughter, as well as the severe injuries sustained by his wife and young daughters.

66.     Plaintiff Yehudit Nathansen is a citizen of the United States and a citizen and resident of the State of Israel.  She is the eight (8) year old sister of Tehilla Nathansen and the daughter of Matanya and Chana Nathansen. At the time of the explosion, Yehudit was sitting with her aunt, a few seats away from her parents.

67.     Yehudit sustained physical injuries from the explosion and was treated at Bikur Cholim Hospital in Jerusalem.

68.   Plaintiff Yehudit Nathansen has suffered physical and severe mental anguish and extreme emotional distress from witnessing and experiencing first-hand the death of her three year old sister, as well as the severe injuries sustained by her mother and baby sister, and the injuries to her father.

69.   Plaintiff Shoshana Nathansen is a citizen of the United States and a citizen and resident of the State of Israel.

70.   She is the two (2) year old sister of Tehilla Nathansen.

71.   Shoshana Nathansen was sitting on her mother's lap at the time of the explosion. Shoshana was five (5) months old at that time. As a result of the explosion, Shoshana suffered fractures in her leg and hip, deep lacerations in her arm that have left permanent scars, and scars on her face and legs. She also sustained severe physical injuries requiring the removal of numerous ball bearings from her legs. The full effect of her injuries, including her ability to walk, will not be fully known until she is older.

72.   As a result of the terrorist attack, plaintiff Shoshana Nathansen has suffered severe physical and mental anguish and extreme emotional distress.

73.   Plaintiff Hezekial Toporowitch is a citizen of the United States and a citizen and resident of the State of Israel. He is the father of Plaintiff Chana Nathansen and the grandfather of the three Nathansen girls.

74.   Plaintiff Pearl B. Toporowitch is a citizen of the United States and a resident of the State of Israel. She is the mother of plaintiff Chana Nathansen and the grandmother of the three Nathansen girls.

75.   In the middle of the night, Hezekial and Pearl were notified by telephone of the bombing that had killed their granddaughter, Tehilla Nathansen, and crippled their daughter,

Chana Nathansen. That night they traveled to Jerusalem. Pearl attempted to obtain further details about the condition of her son-in-law and her granddaughters.

76.     In the aftermath of the bombing, Chana, her husband, and her children were transferred to different hospitals thereby complicating the family's efforts to locate them.

77.     Hezekial was supposed to travel to the central morgue in Holon to attempt to identify his granddaughter's body, but was in too much shock to do so. He was initially told to identify the bodies of <u>two</u> granddaughters since Shoshana had not yet been identified at the hospital and was thought to be deceased.

78.     As a result of the terrorist attack, plaintiff Hezekial Toporowitch has suffered severe mental anguish and extreme emotional distress from experiencing the death of his three year old granddaughter, as well as the severe injuries sustained by his daughter, and injuries sustained by his granddaughters and son-in-law.

79.     As a result of the terrorist attack, plaintiff Pearl B. Toporowitch, has suffered severe mental anguish and extreme emotional distress from experiencing the death of her three year old granddaughter, as well as the severe injuries sustained by her daughter and other granddaughter and injuries to her son-in-law.

80.     Plaintiff Yehuda Toporowitch is a citizen of the United States and a citizen and resident of the State of Israel.

81.     Yehuda Toporowitch is a brother of plaintiff Chana Nathansen and an uncle of the three Nathansen girls.

82.     In the middle of the night he was notified by telephone of the bombing that had killed his niece and crippled his sister.

83.     He had been working at a resort when he received the telephone call, and quickly

rushed to a nearby television where graphic images of the bombsite were being broadcast by Israeli television.

84.     Yehuda rushed home and traveled with his parents to the Tel Aviv area and stopped at the home of one of his sisters. He then took a taxicab to the central morgue and attempted to identify his niece's remains, but a positive identification was not possible because of the nature and extent of Tehilla's injuries.

85.     Yehuda then made arrangements for the necessary DNA testing that ultimately confirmed his niece's identity.

86.     As a result of the terrorist attack, plaintiff Yehuda Toporowitch has suffered severe mental anguish and extreme emotional distress from the death of his three year old niece and the attempt to identify her remains. He has also suffered severe mental anguish and extreme emotional distress as a result of the severe injuries sustained by his sister and other niece and injuries to his brother-in-law.

87.     Plaintiff David Toporowitch is a citizen of the United States and a citizen and resident of the State of Israel.

88.     He is a brother of plaintiff Chana Nathansen and an uncle of the three Nathansen girls. He was not present when his parents were notified by telephone of the bombing that killed his niece and crippled his sister. Instead, he had to piece together the events by himself after his family had already left for Jerusalem.

89.     Like the rest of his immediate family, David visited his sister and niece in the hospital and experienced the shock and severe mental anguish and extreme emotional distress resulting from the emotional trauma of burying his young niece and dealing with the pain and loss experienced by his sister.

90.     As a result of the terrorist attack, plaintiff David Toporowitch has suffered severe mental anguish and extreme emotional distress from experiencing the death of his three year old niece, as well as the severe injuries sustained by his sister and other niece.

91.     Plaintiff Shaina Chava Nadel is a citizen of the United States and a citizen and resident of the State of Israel.

92.     She is a sister of plaintiff Chana Nathansen and an aunt of the three Nathansen girls.

93.     Like the rest of her immediate family, Shaina visited her sister and niece in the hospital and experienced the shock and mental anguish resulting from the emotional trauma of burying her young niece and dealing with the pain and loss experienced by her sister.

94.     As a result of the terrorist attack, plaintiff Shaina Chava Nadel has suffered severe mental anguish and extreme emotional distress from experiencing the death of her three year old niece, as well as the severe injuries sustained by her sister and other niece and injuries to her brother-in-law.

95.     Plaintiff Blumy Rom is a citizen of the United States and a citizen and resident of the State of Israel.

96.     She is a sister of plaintiff Chana Nathansen and an aunt of the three Nathansen girls. Like the rest of her immediate family, Blumy visited her sister and niece in the hospital and experienced the shock and mental distress resulting from the emotional trauma of burying her young niece and dealing with the pain and loss experienced by her younger sister.

97.     As a result of the terrorist attack, plaintiff Blumy Rom has suffered severe mental anguish and extreme emotional distress from experiencing the death of her three year old niece, as well as the severe injuries sustained by her sister and other niece and injuries to her brother-in-

law.

98.     Plaintiff Rivka Toporowitch is a citizen of the United States and a citizen and resident of the State of Israel.

99.     She is a sister of plaintiff Chana Nathansen and an aunt of the three Nathansen girls.

100.    Like the rest of her immediate family, Rivka visited her sister and niece in the hospital and experienced severe mental anguish and extreme emotional distress from burying her young niece and dealing with the pain and loss experienced by her older sister and injuries to her brother-in-law.

101.    She stayed with her baby niece Shoshana, caring for her during the two weeks that she was hospitalized and for two months after her discharge from the hospital. Having to change the dressings on her niece's wounds, care for her various injuries, and take her to doctors, has deeply emotionally affected her.

102.    As a result of the terrorist attack, plaintiff Rivka Toporowitch has suffered severe mental anguish and extreme emotional distress from experiencing the death of her three year old niece, as well as the severe injuries incurred by her sister, other niece and brother-in-law.

**The Cohen Family**

103.    Plaintiff Ora Cohen, age 46, is a citizen of the United States and a citizen of the State of Israel.

104.    Mrs. Cohen and her husband had decided to celebrate their ninth wedding anniversary on August 19, 2003 by visiting the Western Wall with their five children.

105.    At around 9:00 p.m., after praying at the Western Wall, the Cohen family boarded Egged bus #2 to return home.

16

106.    As the bus made its way down Shmuel Hanavi Street, Raed Misk detonated his explosive charge.  Just prior to the explosion, Mrs. Cohen had seen the bomber, who was seated behind her.

107.    As a result of the explosion, Mrs. Cohen sustained shrapnel wounds, burns to her body, and a broken jaw. She also suffered nasal trauma, and severe hearing loss.

108.    Mrs. Cohen was taken to the hospital and remained hospitalized until August 29, 2003.

109.    Mrs. Cohen was subsequently hospitalized for follow-up treatment from November 6, 2005 to November 10, 2005.

110.    Mrs. Cohen continues to suffer from ongoing jaw pain, and her hearing problems have continued to worsen.

111.    Mrs. Cohen has been treated by numerous medical providers and her treatment is ongoing.

112.    As the Cohen family rode the bus, Mrs. Cohen had been holding her infant son, Elchanan on her lap.  When the blast went off, Elchanan was thrown from her arms and presumed dead.  He was found alive several hours after the attack, buried beneath a pile of corpses.

113.    After the explosion, the entire Cohen family was separated in the chaos.  Mrs. Cohen spent several hours unaware if her children were alive or dead.

114.    Due to the trauma she experienced as a passenger seated close to the bomber, witnessing the horrible aftermath of the attack, and being separated from her family following the attack, Mrs. Cohen suffered and continues to suffer severe emotional repercussions including depression, insomnia and nightmares.  She experiences crippling fears for herself and her family.

17

115.    Mrs. Cohen has received and continues to receive psychiatric treatment to help cope with the negative emotional effects she continues to experience as a result of the attack.

116.    Mrs. Cohen also struggles with the day-to-day care of her large family, including the ongoing medical and emotional treatment of her five young children, all of whom were present at and injured in the terrorist attack.

117.    As a result of the terrorist attack, plaintiff Ora Cohen has suffered severe physical and mental anguish and extreme emotional distress.

118.    Plaintiff Mirav Cohen, age 12, is a citizen of the United States and a citizen of the State of Israel. She is the daughter of plaintiff Ora Cohen.

119.    Mirav Cohen had visited the Western Wall with her parents and siblings on August 19, 2003.  She also boarded Egged bus #2 with her family.

120.    As a result of the terrorist's blast, Mirav Cohen sustained facial burns and lacerations, lung damage, hearing loss in both ears, and shrapnel wounds.  She also witnessed the chaos and carnage after the attack.

121.    Mirav Cohen was taken to the hospital and remained hospitalized until August 28, 2003.  She was separated from her family at the site of the attack and was not reunited with the rest of her family for hours.

122.    Mirav Cohen's hearing has continued to worsen, and now requires that she wear a hearing aid.

123.    Mirav Cohen has been treated by numerous medical providers and her treatment is ongoing.

124.    Mirav Cohen has experienced depression, has had numerous nightmares, and has had bed wetting incidents as a result of the attack.  She has received and continues to receive

18

psychiatric treatment to help cope with the negative emotional effects she continues to experience since the attack.

125.    As a result of the terrorist attack, plaintiff Mirav Cohen has suffered severe physical and mental anguish and extreme emotional distress.

126.    Plaintiff Daniel Cohen, age 10, is a citizen of the United States and a citizen of the State of Israel. He is the son of plaintiff Ora Cohen.

127.    Daniel Cohen had visited the Western Wall with his parents and siblings on August 19, 2003.  He also boarded Egged bus #2 with his family.

128.    He witnessed the chaos after the attack and was separated from his family for several hours.

129.    Daniel Cohen was taken to the hospital and remained hospitalized until August 28, 2003.

130.    As a result of the explosion, Daniel Cohen sustained facial lacerations, lung damage, hearing loss in both ears, and shrapnel wounds to his feet.

131.    Daniel Cohen's hearing has continued to worsen.  Daniel Cohen has been treated by numerous medical providers, and his treatment is ongoing.

132.    Daniel Cohen has had many nightmares since the terrorist attack. He has suffered and continues to suffer severe emotional distress including anger and severe aggression as a result of what he experienced during and subsequent to the terrorist attack.

133.    Daniel Cohen has received and continues to receive psychiatric treatment to help alleviate the negative emotional effects he continues to experience since the attack.

134.    As a result of the attack, plaintiff Daniel Cohen has suffered severe physical and mental anguish and extreme emotional distress.

135.    Plaintiff Orly Cohen, age 8, is a citizen of the United States and a citizen of the State of Israel.  She is the daughter of plaintiff Ora Cohen.

136.    Orly Cohen had visited the Western Wall with her parents and siblings on August 19, 2003.  She also boarded Egged bus #2 with her family.

137.    She witnessed the chaos after the attack and was separated from her family for several hours.

138.    As a result of the explosion, Orly Cohen sustained hearing loss, eye infections, and shrapnel wounds to her spine and feet.

139.    Orly Cohen was taken to the hospital and remained hospitalized until August 28, 2003.

140.    Orly Cohen has been treated by numerous medical providers, and her treatment is ongoing.  She continues to hear white noise in her ears and suffers from back pain. She will require additional procedures to remove the shrapnel that remains in her body.

141.    Orly Cohen suffered and continues to suffer severe emotional distress including depression and obsessive recollections of the attack and her resulting suffering.

142.    Orly Cohen has received and continues to receive psychiatric treatment to help address and alleviate the negative emotional effects she continues to experience since the attack.

143.    As a result of the attack, plaintiff Orly Cohen has suffered severe physical and mental anguish and extreme emotional distress.

144.    Plaintiff Shira Cohen, age 5, is a citizen of the United States and a citizen of the State of Israel.

145.    Shira Cohen had visited the Western Wall with her parents and siblings on August 19, 2003.  She was being held by her father on Egged bus #2 at the time of the blast.

20

146.     After the explosion, Shira Cohen had to be forcibly removed from the arms of her father, who had been rendered unconscious.   Shira was also separated from her parents and siblings in the chaos.

147.     Shira Cohen sustained severe physical injuries including nerve damage and permanent damage to her left eye. She had additional shrapnel wounds, hearing loss, and lost many teeth as a result of the attack.

148.     Shira Cohen was taken to the hospital and remained hospitalized until September 19, 2003.   Over one hundred pieces of glass were extracted from her eyes and face.   She underwent three surgeries to her right eye, which doctors were able to save.   The damage to her left eye was rendered essentially useless.

149.     Shira Cohen has been treated by numerous medical providers, and her treatment is ongoing.   Since the month she spent in the hospital immediately after the attack, Shira Cohen has been hospitalized on four subsequent occasions for additional medical procedures relating to the attack.

150.     Shira Cohen has difficulty coping with her perceived "ugliness" caused by her injuries.   She also continues to hear white noise in her ears, and will continue to require surgeries and medical procedures and treatment for the wounds to her eye, ears, and face.

151.     Shira Cohen suffered and continues to suffer severe emotional effects including nightmares and an obsessive fixation on the attack.   She also has an obsessive fixation concerning her useless eye and own self-perceived ugliness.

152.     Shira Cohen has received and continues to receive psychiatric treatment to help address the negative emotional effects she continues to experience after the attack.

153.     As a result of the attack, plaintiff Shira Cohen has suffered severe physical and

mental anguish and extreme emotional distress.

## SHOOTING ATTACK ON ROUTE 60 – JUNE 20, 2003

### The Goldstein Family

154.    Howard Goldstein was a citizen of the United States and a citizen of the State of Israel.

155.    He was murdered on June 20, 2003, while driving his car with his parents on Route 60 in Israel.

156.    Howard was in the process of picking up his parents from Jerusalem where they had stayed the previous night following the wedding of Howard's son, David Goldstein.

157.    Howard's father, Eugene Goldstein, was seated in the front passenger seat, and his mother, Lorraine Goldstein, was seated behind her husband.

158.    At some point, as Howard was driving, Eugene noticed two individuals on the side of the road with their backs turned toward the car. As their car approached, the men turned around and began rapidly firing their guns at the Goldsteins' vehicle.

159.    Howard was shot in the chest, left lung, kidney and liver.

160.    He died almost immediately and his body slumped over the wheel.

161.    HAMAS claimed responsibility for the attack.

162.    Plaintiffs Eugene and Lorraine Goldstein are citizens of the United States and are residents of the State of New York. They are the parents of Howard Goldstein.

163.    Eugene was shot in the back, head and shoulder.

164.    The top of the bullet that struck Eugene grazed his head. The remainder exploded in one of his lungs, leaving behind shrapnel in his lung, liver and kidneys. The bullet lodged between his heart and his lungs.

165.     Somehow, Eugene managed to steer the car until it ultimately overturned in a ditch.

166.     As a result of the terrorist attack, Eugene still has several bullet fragments lodged in his chest. He must undergo an x-ray every three (3) months to monitor the condition of the bullet fragments encapsulated in his chest.

167.     He has since returned to his job where he missed three (3) months of work as a result of his injuries.

168.     Lorraine was also shot and severely injured.

169.     She was struck by a bullet which entered her body through her back, grazed her carotid artery and lodged in her jaw bone. She has three bullet holes in her back.

170.     Shrapnel also lodged throughout her body, especially in her back. She also suffered a shattered nose and septum as well as various lacerations resulting from the car crash.

171.     Eugene and Lorraine Goldstein remained in Jerusalem at Hadassah Hospital for approximately ten (10) days and were unable to return home when they were discharged from the hospital because the airline did not give Eugene permission to fly due to the poor condition of his lungs.

172.     Lorraine still requires physical therapy because the scar tissue in her jaw prevents her from opening it fully. She still suffers from pain and headaches.

173.     She has had 11 teeth pulled and undergone extensive periodontal and dental work. She must also deal with the harmful effects of shrapnel lodged throughout her body.

174.     As a result of the terrorist attack, plaintiffs Eugene Goldstein and Lorraine Goldstein have suffered severe physical and mental anguish and extreme emotional distress.

175.     The Goldstein family in New York received notice of the attack from two cousins,

one of whom saw images of the attack on the internet and sent an instant message to the immediate family.

176.    The Goldstein family sat in horror as they watched images of the attack on the Cable News Network (CNN) shortly after the attack occurred. The video broadcast showed Howard, Eugene, and Lorraine Goldstein being pulled from the wreckage of the car Howard Goldstein had been driving.

177.    Lorraine's face and hair were covered with blood.

178.    Plaintiff Richard Goldstein is a citizen of the United States and a resident of the State of New York.  He is a son of plaintiffs Eugene and Lorraine Goldstein and a brother of Howard Goldstein.

179.    After learning of the attack, plaintiff Richard Goldstein telephoned his sister, Barbara Goldstein Ingardia, at work and asked her to return home immediately. When she arrived, her extended family was present. They shared the tragic news that their parents and brother had been attacked. Barbara then made plans to fly to Israel to care for her parents.

180.    As a result of the terrorist attack, plaintiff Richard Goldstein has suffered mental anguish and extreme emotional distress caused by the death of his brother and the life-threatening injuries to both of his parents.

181.    Plaintiff Barbara Goldstein Ingardia is a citizen of the United States and a resident of the State of New York. She is the daughter of plaintiffs Eugene and Lorraine Goldstein and the sister of Howard Goldstein.

182.    Barbara left her job and her immediate family behind and traveled to Israel to care for her parents in Israel during their recovery and to mourn the loss of her brother.

183.    In addition to grappling with the devastating emotional consequences of her

brother's death, she was forced to deal with the uncertainty of her mother's recovery due to her severe injuries and age.

184.    At one point during her hospital stay, Lorraine was placed on life support.

185.    Barbara blames herself for encouraging her parents to attend the wedding. As a result of the terrorist attack, plaintiff Barbara Goldstein Ingardia has suffered severe mental anguish and extreme emotional distress.

186.    Plaintiff Michael Goldstein is a citizen of the United States and a resident of the State of Florida. He is a brother of Howard Goldstein and a son of plaintiffs Eugene and Lorraine Goldstein.

187.    As a result of the terrorist attack, plaintiff Michael Goldstein has suffered severe mental anguish and extreme emotional distress because of the death of his brother and the life-threatening injuries of both of his parents.

188.    Plaintiff Chana Freedman is a citizen of the United States and a citizen and resident of the State of Israel.

189.    She is the daughter of Howard and Michal Goldstein.

190.    Chana and her husband were eating lunch at a mall in Jerusalem when they learned that her father and grandparents had been involved in what they believed to be an automobile accident.

191.    Chana's husband received a telephone call from his father informing the couple to go directly to Hadassah Hospital.

192.    When Chana and her husband arrived at Hadassah Hospital, a social worker informed them that Chana's father had died in the terrorist attack.

193.    Chana informed her brother Daniel and his wife, who had just been married, of

the attack when they arrived at the hospital.

194.    As a result of her father's death, plaintiff Chana Freedman has suffered severe mental anguish and extreme emotional distress.

## THE JAFFA ROAD BUS #14A BOMBING: JUNE 11, 2003

195.    At approximately 5:30 p.m. on June 11, 2003, Abdel Madi Shabneh, a HAMAS operative dressed as an ultra-Orthodox Jew, boarded Egged bus #14A at the Mahane Yehuda market.

196.    A short while after Shabneh boarded the bus, as the bus drove down Jaffa Road near the Davidka Square, Shabneh detonated his bomb, wrecking the bus and killing sixteen (16) of its passengers. Over 100 people were wounded, including dozens of bystanders.

197.    Shabneh, an 18-year old high school student from Hebron, was initially recruited by HAMAS while playing on a local Jihad Mosque soccer team.

## The Beer Family

198.    Alan Beer, a citizen of the United States, was on the bus returning from a condolence call to his friend's family when the bomber detonated his explosives and killed him.

199.    Alan's friend, to whom he had paid the condolence call, learned of the bus bombing and telephoned plaintiff Harry Leonard Beer, Alan's brother, in Cleveland, Ohio. Harry Leonard quickly telephoned his sister, plaintiff Phyllis Maisel, whose son happened to be on the scene of the bombing earlier. Harry Leonard then telephoned his other sister, plaintiff Estelle Carroll and informed her of the terrorist attack.

200.    After speaking with her brother, Phyllis asked her son to return to the crime scene and identify Alan's body.   Thereafter, plaintiffs Anna Beer, Harry Leonard Beer and Estelle Carroll flew to Israel to attend Alan's funeral.

26

201.    Plaintiff Harry Leonard Beer is a citizen of the United States and a resident of the State of Ohio.

202.    Plaintiff Harry Leonard Beer brings this action both in his individual capacity and as the executor of the Estate of Alan Beer.

203.    Plaintiff Harry Leonard Beer has experienced emotional pain and suffering and the loss of his brother's companionship, advice and counsel.

204.    As a result of the terrorist attack, plaintiff Harry Leonard Beer has suffered severe mental anguish and extreme emotional distress as well as the loss of his brother's companionship, advice and counsel.

205.    Plaintiff Estelle Carroll is a citizen of the United States and a resident of the State of Virginia.

206.    Plaintiff Phyllis Maisel is a citizen of the United States and a resident of the State of Israel.

207.    Plaintiffs Estelle Carroll and Phyllis Maisel have experienced emotional pain and suffering and the loss of their brother's companionship, advice and counsel.

208.    As a result of the terrorist attack, plaintiffs Estelle Carroll and Phyllis Maisel have suffered severe mental anguish and extreme emotional distress.

209.    Plaintiff Anna Beer is a citizen of the United States and a resident of the State of Ohio. She is the mother of Alan Beer.

210.    Anna has experienced emotional pain and suffering, the loss of her youngest child's companionship, advice and counsel.

211.    As a result of the terrorist attack, plaintiff Anna Beer has experienced the loss of her youngest son's society, companionship, advice and counsel and has suffered severe mental

anguish and extreme emotional distress.

**The Singer Family**

212.    Plaintiff Sarri Anne Singer is a citizen of the United States and a resident of the State of New Jersey.

213.    On June 11, 2003, Sarri Anne Singer boarded bus #14A in Jerusalem to meet a friend for dinner. Soon thereafter, the suicide bomber detonated his bomb only two to three seats away from where Sarri was seated.  When the explosives were detonated, Sarri felt a shockwave across her face.  The roof of the bus had fallen in and the man in front of her was not moving. Everyone sitting and standing near plaintiff Sarri Singer had been killed.

214.    Sarri was struck with shrapnel from the explosion, which entered her shoulder and broke her clavicle. After the blast she was unable to open her left eye, and her right eye was extremely restricted. She was unable to hear because of a loud ringing in her ears, and her ruptured eardrums. Barely walking, she was taken to an ambulance.

215.    She sustained injuries to her face and legs resulting in scarring. She has undergone physical therapy and will require surgery in the future. Shrapnel had lodged in her gums, moving her teeth. She will need dental work in the future.

216.    As a result of the attack, plaintiff Sarri Anne Singer has suffered severe physical and mental anguish and extreme emotional distress.

217.    Plaintiff Judith Singer is a citizen of the United States and a resident of the State of New Jersey. She is the mother of Sarri Anne Singer.

218.    Judith learned of the attack when her son telephoned her at work.

219.    As a result of the attack plaintiff Judith Singer has suffered severe mental anguish and extreme emotional distress.

220.    Plaintiff Eric M. Singer is a citizen of the United States and a resident of the State of New Jersey. He is the brother of Sarri Anne Singer.

221.    Eric first learned of the attack when he received an emergency phone call from his father while having lunch in a restaurant. After speaking with his mother and notifying his office, Eric and his father flew that night to Israel to be with Sarri.

222.    As a result of the attack, plaintiff Eric Singer has suffered severe mental anguish and extreme emotional distress.

## COMMUTER BUS BOMBING – MAY 18, 2003

### The Averbach Family

223.    Plaintiff Steven Averbach is a citizen of the United States and a citizen and resident of the State of Israel.

224.    He is 39 years old and presently resides near Tel Aviv, Israel, after spending nearly a year in the hospital and a rehabilitation center. He is a married father of four sons ranging in age from three to fourteen. Steve and his wife, Julie, were married in 1994 and have two sons together, Sean (age 10) and Adam (age 5).

225.    Steve's older sons, Tamir (age 15) and Devir (age 12), are from a prior marriage.

226.    On May 18, 2003, Steve was seated on a commuter bus heading for Jerusalem when he noticed an Arab dressed as a religious Jew board the bus. Steve became immediately suspicious.

227.    As Steve approached him, the bomber detonated his explosives.

228.    HAMAS claimed responsibility for the bombing.

229.    The bomber was later identified by his family as Bassem Jamil Tarkrouri.

230.    Seven (7) people were killed by the explosion, ranging in age from 35 to 68.

Steve was one of twenty (20) people injured.

231.   Steve absorbed a substantial amount of the impact of the explosion and multiple pieces of shrapnel.

232.   Steve sustained a critical wound when a ball bearing originally packed together with the bomber's explosives penetrated through the skin and muscles of his neck and lodged between his C3 and C4 vertebrae. The ball bearing lodged in his spinal canal causing severe compression damage to his spinal cord. The object was eventually removed during surgery, but not before it had caused severe damage to his spinal cord that rendered him a quadriplegic.

233.   Following surgery, Steve was moved to intensive care where he almost died several times because of an extremely high fever and from the blast injury to his lungs. He has since undergone numerous operations to his back, groin and gastric intestines. He has also undergone a tracheotomy and had a gastric feeding tube inserted as a result of the damage caused by the tracheotomy.

234.   Over the past year Steve returned to the Intensive Care Unit twice with complications.

235.   Steve is paralyzed from his neck down.

236.   On more than one occasion, Steve pleaded with his doctors and family members to take him off of life support.

237.   To this day, Steve does not have the use of his arms or legs, and cannot brush his own teeth or scratch his own nose.

238.   He is completely dependent on the 24-hour care provided to him and has no foreseeable hope of recovery.

239.   He lives in constant pain and battles depression.

240.   Plaintiff Steve Averbach has suffered severe physical and mental anguish and extreme emotional distress as a result of the attack.

241.   Plaintiff Julie Averbach is a citizen and resident of the State of Israel. She is the wife of Steve Averbach and the mother of Sean and Adam Averbach.

242.   As the result of the injuries sustained by Steve, Julie has had to relocate her family to be closer to the rehabilitation center where Steve resided for nearly a year. Steve moved home from the rehabilitation center in July 2004, but requires continuous 24-hour care. Julie is now, in most respects, a single parent and cannot enjoy the normal companionship, day-to-day assistance and mutual support that she previously received from her husband.

243.   As a result of the attack, plaintiff Julie Averbach has suffered severe mental anguish and extreme emotional distress.

244.   Plaintiff Tamir Averbach is a citizen of the United States and a citizen and resident of the State of Israel.

245.   He is the fifteen (15) year old son of Steve Averbach and Steve's first wife.

246.   Plaintiff Tamir Averbach has experienced severe mental anguish and extreme emotional distress from witnessing his father's relentless and painful suffering, his repeated surgeries and brushes with death, his negative prognosis and his permanent physical condition.

247.   Plaintiff Devir Averbach is a citizen of the United States and a citizen and resident of the State of Israel. He is the twelve (12) year old son of Steve Averbach and Steve's first wife.

248.   Devir and his elder brother, Tamir, remember what it was like when their father was an able-bodied man.

249.   As a result of the attack, plaintiff Devir Averbach has suffered severe mental

31

anguish and extreme emotional distress as a result of his father's relentless and painful suffering, repeated surgeries and brushes with death, his negative prognosis and his permanent physical condition.

250.    Plaintiff Sean Averbach is a citizen of the United States and a citizen and resident of the State of Israel. He is the ten (10) year old son of plaintiffs Steve and Julie Averbach.

251.    As a result of the brutal attack on his father, he has been emotionally traumatized and has lost the sense of protection and safety he once enjoyed from his father.  Due to the severity of his father's injuries, ordinary companionship and simple pleasures of traveling with or playing sports with his father have been denied to him, and will in all likelihood be denied to him for the remainder of his father's life.

252.    As a result of the attack, plaintiff Sean Averbach has suffered severe mental anguish and extreme emotional distress.

253.    Plaintiff Adam Averbach is a citizen of the United States and a citizen and resident of the State of Israel. He is the five (5) year old son of Steve and Julie Averbach.

254.    As a result of the brutal attack on his father he has been emotionally traumatized and will in all likelihood never possess memory of a time when his father was capable of using his arms and legs. Due to the severity of his father's injuries, ordinary companionship and simple pleasures of walking together, driving in a car with, or playing sports with his father have been denied to him and will in all likelihood be denied to him for the remainder of his father's life.

255.    As a result of the attack, plaintiff Adam Averbach has suffered severe mental anguish and extreme emotional distress.

256.    Plaintiffs Dr. David Averbach and his wife, Maida Averbach, are United States citizens and residents of the State of New Jersey. They are the parents of plaintiff Steve

Averbach.

257.   They returned home late on May 17, 2003, from a dinner honoring David. Soon thereafter, Maida switched on Fox News and learned that a bus had been bombed in Jerusalem on Sunday morning in Israel. Maida recognized her son's hand leaning out of a stretcher on the news footage but decided not to inform her husband until the next morning.

258.   After a sleepless night, Maida received a telephone call on Sunday morning at 5:50 a.m. from her daughter-in-law and a social worker from Hadassah Hospital. They explained that Steve had been grievously wounded by the explosion and had a ball bearing lodged between his C3 and C4 vertebrae.

259.   As a respected surgeon with many years of experience, David immediately understood the severity of his son's injuries.

260.   Dr. and Mrs. Averbach have partially retired from their jobs so that they may spend more time with Steve and his children.

261.   Plaintiffs David Averbach and Maida Averbach have experienced severe mental anguish and extreme emotional distress as a result of the terrorist attack, and in the case of Maida Averbach, from the moment she saw her son's hand on television in the early morning hours of May 18, 2003.

262.   Steve's continued inability to use his hands and legs, his inevitable battle with depression and the emotional effect it has had on Steve's four young children are a constant source of continued anguish to both of his parents.

263.   Plaintiff Michael Averbach is a citizen of the United States and a resident of the State of New Jersey. He is the brother of Steve Averbach.

264.   Michael Averbach has always looked up to his brother and admired him. The

injuries that his brother has sustained have been a severe emotional blow to Michael.

265.    Since the date of the attack Michael has flown to Israel repeatedly, often at his brother's request, simply to sit by Steve's bedside and talk.

266.    As a result of the terrorist attack, plaintiff Michael Averbach has suffered severe mental anguish and extreme emotional distress.

267.    Plaintiff Eileen Sapadin is a citizen of the United States and a resident of the State of New Jersey. She is the sister of Steve Averbach.

268.    Eileen was staying at her parents' home with her husband and three of her four children on the morning her mother received notification of the attack.

269.    Eileen has experienced tremendous emotional pain and sadness as a result of the severity of the injuries that Steve sustained as a result of the attack.

270.    She suffers from anxiety and depression, has trouble sleeping and cries every day.

271.    In the past year, she has lost more than thirty pounds and has suffered physical exacerbations of a colitis condition that was in remission prior to the attack that severely injured her brother.

272.    As a result of the terrorist attack, plaintiff Eileen Sapadin has suffered severe physical and mental anguish and extreme emotional distress.

## THE MIKE'S PLACE BOMBING - TEL AVIV, APRIL 30, 2003

### The Rozenstein Family

273.    On April 30, 2003, a suicide bomber, Asif Muhammad Hanif, entered Mike's Place, a popular bar situated on the seashore a few hundred meters from the American Embassy in Tel Aviv, and detonated his explosives.[4]

---

[4]    There were actually two (2) bombers, both British nationals sent by HAMAS, but the explosive belt on one of them failed to detonate.

274.    The attack was perpetrated by Asif Muhammad Hanif, 22, a British citizen who entered Israel through Jordan. He was sent by HAMAS.

275.    Plaintiff Daniel Rozenstein is a citizen of the United States and a citizen and resident of the State of Israel.

276.    Daniel was seated inside the bar and decided to step outside when he crossed paths with the suicide bomber in the entry way just as he detonated his explosives.

277.    As a result of the attack, Daniel suffered third degree burns over his entire body. Since his back was to the bomber, Daniel's back bore the brunt of the explosion.

278.    After three days in the hospital, Daniel slipped into a coma that lasted eight days. He was placed on a respirator and other life supports for over a week.  He remained in the hospital for one and a half months, followed by eight months of treatment as an outpatient.

279.    Since the bombing he has sustained severe hearing loss. He cannot maintain his balance, is often dizzy, and frequently experiences black outs. Much of his body is covered by scar tissue, including his back and hands. His right hand no longer functions properly because it is covered in scar tissue.

280.    As a result of the attack, plaintiff Daniel Rozenstein has suffered severe physical and mental anguish and extreme emotional distress.

281.    Plaintiff Julia Rozenstein Schon is a citizen of the United States and a citizen and resident of the State of Israel. She is the sister of plaintiff Daniel Rozenstein.

282.    On the night of the bombing, Julia received a telephone call from the father of Daniel's girlfriend.  She was told there had been an attack and that no one was certain of Daniel's condition.

283.    When Julia first saw Daniel she did not recognize him because his body was

horribly burned and his face and ears were swollen beyond recognition. She spent many days in the hospital, and was there when her brother slipped into a coma.

284.    Julia still suffers nightmares and is traumatized by the attack. Even now, she calls her brother compulsively to be certain that he is not in danger.

285.    As a result of the attack, plaintiff Julia Rozenstein Schon has suffered severe mental anguish and extreme emotional distress.

**Joshua Faudem**

286.    Plaintiff Joshua Faudem, age 32, is a citizen of the United States and a citizen of the State of Israel.

287.    Mr. Faudem, a documentary filmmaker, was working in Israel in the spring of 2003, filming what would be produced as "Blues by the Beach," a documentary on everyday life for young Israelis.

288.    On the night of the attack, Mr. Faudem was enjoying an evening of live music at Mike's Place and was filming the crowd and performances there.

289.    At approximately 1:00 in the morning, Asif Hanif detonated his explosives at the entrance to Mike's Place.

290.    Amidst the terror and chaos in the wake of the explosion, Mr. Faudem assisted his then-girlfriend to the bar's back storeroom, away from the carnage.

291.    At some point during the bombing's aftermath, Mr. Faudem realized his video camera was still recording.  He picked up the camera and began filming the scene around him and the people outside of the bar.

292.    When he realized that everyone needed to evacuate the building, Mr. Faudem assisted his girlfriend out of the bar.  They had to wade through spilled blood, body parts, and

pieces flesh to get outside. As they exited, Mr. Faudem saw the dead bodies of his friends and the mangled corpse of the suicide bomber.  Mr. Faudem attempted to shield his girlfriend's eyes from the horrors that surrounded them, but she slipped in a pool of blood, fell on her back, and gazed directly at the bomber's headless torso.

293.    Mr. Faudem and his girlfriend were taken by ambulance to the hospital, where they were released later that morning.

294.    Mr. Faudem remains haunted by the images that fill his mind.  As a filmmaker, he travels the world showing his film "Blues by the Beach" and sharing his story with others.  Although this can be somewhat therapeutic, it is also immensely painful for Mr. Faudem to continually relive his experience by sharing his story and movie with audiences.

295.    As a result of the terrorist attack, plaintiff Joshua Faudem has suffered severe mental anguish and extreme emotional distress.

**Zohar Fater**

296.    Plaintiff Zohar Fater, age 31, is a citizen of the United States and a citizen of the State of Israel.

297.    Ms. Fater, a regular attendee of the Mike's Place musical jam sessions, was enjoying an evening of live music the night of the attack.

298.    When Asif Hanif detonated his explosives at the entrance to Mike's Place, the force of the blast threw Ms. Fater several feet through the air where she landed on the pavement between two cars outside of the bar.  She instinctively shut her eyes to prevent herself from witnessing any of the horrible sights she knew surrounded her.

299.    Ms. Fater was rapidly losing blood as a result of a leg wound caused by the explosion.  A friend sat with Ms. Fater and kept her talking in an effort to keep her conscious

until medical personnel arrived.

300.    Ms. Fater was one of the last victims to be loaded into an ambulance and by that time she was having difficulty breathing, was nearly fainting, and could only feel her fingers.

301.    Ms. Fater remained hospitalized for two weeks after the attack, during which time she underwent several surgeries on her knee and leg.

302.    After her release from the hospital, Ms. Fater remained wheelchair-bound for two months.  Thereafter, she had to walk with the assistance of crutches.

303.    To this day Ms. Fater has limited mobility, must wear special shoes, and continues to experience pain in her injured leg.

304.    On account of her restricted mobility, Ms. Fater had serious difficulty maintaining her longstanding job with the Tel Aviv Orchestra.  Although she was also employed as a fashion model, she can no longer reveal her leg due to the scarring and has thus been unable to model anymore.

305.    Due to the traumatic physical experience she underwent coupled with her exposure to the horrible sounds and smells of a bombing site, Ms. Fater has also suffered psychological trauma.

306.    As a result of the attack, plaintiff Zohar Fater has suffered severe physical and mental anguish and extreme emotional distress.

**Bruce Mazer**

307.    Plaintiff Bruce Mazer, age 46, is a citizen of the United States and a citizen of the State of Israel. He is also a resident of the State of Missouri.

308.    Mr. Mazer was living in Tel Aviv in the spring of 2003.  On the night of the terrorist attack, Mr. Mazer was celebrating a friend's birthday and enjoying an evening of live

music at Mike's Place.

309.     Mr. Mazer heard Asif Hanif detonate his explosives, but Mr. Mazer initially believed the noise to be firecrackers.  He spun around and witnessed the havoc the bombing caused.  He saw blood everywhere and slipped in it as he exited the bar.  Once outside, Mr. Mazer reunited with his roommate and they helped each other remove scattered bits of flesh and viscera from their clothes.

310.     That night, Mr. Mazer was examined at the intensive care unit of the hospital. After the examination and an evaluation by a psychiatrist, he was discharged.

311.     Mr. Mazer continues to suffer emotionally as a result of the trauma he experienced.  Loud noises trigger an automatic recollection of the events of April 30, 2003, and generate bouts of depression.

312.     As a result of the attack, plaintiff Bruce Mazer has suffered severe mental anguish and extreme emotional distress.

**Orly Rom**

313.     Plaintiff Orly Rom, age 25, is a citizen of the United States and a citizen of the State of Israel.

314.     Ms. Rom was living in Tel Aviv in the spring of 2003.  On the night of the attack, Ms. Rom was celebrating her boyfriend's birthday and enjoying an evening of live music at Mike's Place when the terrorist detonated his explosives.

315.     Ms. Rom suffered a temporary hearing loss as a result of the explosion's deafening noise.

316.     Although she sustained no serious physical injuries, Ms. Rom witnessed the graphic sight of the bombing's aftermath.

317.   That night, Ms. Rom was examined at the intensive care unit at the hospital. After that examination and a conversation with a psychiatrist, Ms. Rom was discharged.

318.   Ms. Rom continued to suffer emotionally as a result of the trauma she experienced.  She has suffered from depression and insomnia and has attended group therapy sessions with a social worker.

319.   As a result of the terrorist attack, plaintiff Orly Rom has suffered severe mental anguish and extreme emotional distress.

**Richard Coffey**

320.   Plaintiff Richard Coffey, age 43, is a citizen of the United States and a citizen of the State of Israel.

321.   Mr. Coffey was living in Tel Aviv in the spring of 2003 and working as a bartender at Mike's Place.  He also performed frequently as a singer at the club.  On the night of the attack, Mr. Coffey was celebrating his birthday at Mike's Place and was enjoying an evening of camaraderie and performances of jam sessions.

322.   As a result of the bomber's blast, Mr. Coffey sustained minor injuries to his back and head.  He has also endured the ongoing emotional trauma of having witnessed the graphic images of the bombing's aftermath, including the sights of deceased and injured friends and colleagues.

323.   That night, Mr. Coffey was examined at the intensive care unit at the hospital. After that examination, Mr. Coffey was discharged.

324.   Mr. Coffey continued to suffer emotionally as a result of the trauma he experienced.  He has suffered from depression and insomnia and has attended group therapy sessions with a social worker.

325.    As a result of the terrorist attack, plaintiff Richard Coffey has suffered severe mental anguish and extreme emotional distress.

**Gal Ganzman**

326.    Plaintiff Gal Ganzman, age 33, is a citizen of the United States and a citizen of the State of Israel.  He is a resident of Manila, Philippines.

327.    Mr. Ganzman was the owner of Mike's Place in the spring of 2003. On the night of the terrorist attack, Mr. Ganzman was bartending and performing his usual duties as bar owner and manager.

328.    When Asif Hanif detonated his explosives, Mr. Ganzman was pouring a beer for a customer.  Mr. Ganzman heard noises similar to fireworks, followed by silence.

329.    Mr. Ganzman suffered temporary hearing loss as a result of the explosion's deafening noise.

330.    Mr. Ganzman witnessed the graphic sights of the bombing's aftermath, including viscera, blood, and the bomber's scattered remains.  His exposure to the images and smells of violent death has left him traumatized.

331.    That night, Mr. Ganzman was examined at the intensive care unit at the hospital. After that examination and a conversation with a psychiatrist, Mr. Ganzman was discharged.

332.    Mr. Ganzman's girlfriend and two friends were present at the attack. Each of them died en route to the hospital.  Mr. Ganzman has been profoundly affected by the loss of these individuals.

333.    Following his experience on the night of April 20, 2003, Mr. Ganzman continued to suffer emotionally for some time as a result of the trauma he survived.  He suffered from Post-Traumatic Stress Disorder and has experienced panic attacks.

334.    As a result of the terrorist attack, plaintiff Gal Ganzman has suffered severe mental anguish and extreme emotional distress.

**Judith Buchman-Ziv**

335.    Plaintiff Judith Buchman-Ziv, age 54, is a citizen of the United States and a citizen of the State of Israel.  She is a resident of the State of New York.

336.    In the spring of 2003 Ms. Buchman-Ziv was living in Tel Aviv, where she worked as a legal assistant. She also performed regularly as a singer and guitarist at Mike's Place.  On the night of the attack, Ms. Buchman-Ziv was performing in the weekly jam sessions at Mike's Place.

337.    As she tried to exit the bar after the explosion, Ms. Buchman-Ziv was exposed to horrible sights of body parts and the bomber's mangled corpse.  She slipped and fell in human blood and remains.  She exited the bar in a state of shock and went home.

338.    Ms. Buchman-Ziv continues to suffer emotionally as a result of the trauma she experienced.  She suffered and continues to suffer from severe Post-Traumatic Stress Disorder, Acute Stress Disorder, Anxiety Disorder, panic attacks, depressive episodes, nightmares, nervousness, and hysteria.  She continues to receive regular counseling in the United States.

339.    As a result of the attack, plaintiff Judith Buchman-Ziv has suffered severe mental anguish and extreme emotional distress.

## SHOOTING ATTACK ON ROAD #60 - JANUARY 29, 2003

**The Steinmetz Family**

340.    Plaintiffs Jacob Steinmetz and Deborah Steinmetz are citizens of the United States and citizens and residents of the State of Israel.

341.    On January 29, 2003, Jacob was driving their car on Road #60. Deborah sat in the

front passenger seat of the car. As their car made a turn, two masked men began shooting at the car. The entire driver's side of the car was riddled with bullets.

342.    HAMAS perpetrated this attack.

343.    Two bullets hit Jacob. One shot passed through the car seat and lodged in his leg. The other shot entered his arm and passed through his elbow.

344.    After arriving at the hospital and over the next few days, Jacob underwent a number of operations.

345.    Four metal spikes were surgically inserted into his bone in order to restrain his arm.  The spikes remained there for three months and severely restricted his arm's mobility. Additional plastic surgeries were performed.  Jacob received a skin graft from his leg to cover the opening in his elbow.

346.    In 2003, Jacob underwent a complete elbow replacement that included the placement of a large metal hinge.

347.    Presently, the use of Jacob's arm is greatly limited.

348.    As a result of the attack, plaintiff Jacob Steinmetz has suffered severe physical and mental anguish and extreme emotional distress.

349.    As a result of being in the car that terrorists targeted, plaintiff Deborah experiences great anxiety and has suffered severe mental anguish and extreme emotional distress.

350.    Plaintiffs Amichai Steinmetz, Nava Steinmetz, Orit Steinmetz and Natanel Steinmetz are the children of Jacob and Deborah Steinmetz.

351.    As a result of the attack, plaintiffs Amichai Steinmetz, Nava Steinmetz, Orit Steinmetz and Natanel Steinmetz have suffered severe mental anguish and extreme emotional

distress.

## THE HEBREW UNIVERSITY CAFETERIA BOMBING - JULY 31, 2002

352.    On the afternoon of July 31, 2002, approximately 100 people were eating lunch in the Frank Sinatra cafeteria on the Hebrew University Mount Scopus campus in Jerusalem.  A bomb planted inside the cafeteria exploded, killing nine (9) people and injuring as many as eighty-five (85) others. Five Americans were killed in the attack, including Janis Ruth Coulter, Benjamin Blutstein, Diane Carter and David Gritz.

353.    HAMAS claimed responsibility for the attack.

354.    According to published reports, Mohammed Odeh, who worked at Hebrew University as a painter for an Israeli contractor, carried out the attack.

355.    Odeh received the explosives from accomplices in the West Bank town of Ramallah, where the HAMAS cell command was located. On the night before the attack, Odeh had jumped over a fence on the campus and hid the explosives under a bush. The next morning, he walked through the main gate using his employee permit, picked up the bomb and planted it in the cafeteria. He then remote detonated the explosives with a cell phone.

356.    Familiar with the university, Odeh had chosen the Frank Sinatra Cafeteria as the site for the bombing, knowing that few Arabs frequented the cafeteria and that foreign students frequently dined there.

**The Coulter Family**

357.    Janis Ruth Coulter, a 36 year old citizen of the United States, was in the cafeteria when the bomb exploded killing her and injuring her friend who she was eating lunch with.

358.    She was the assistant director of the Hebrew University's Rothenberg International School's Office of Academic Affairs in New York.

44

359.    Janis had arrived in Israel just one day before the bombing to accompany a group of nineteen (19) American students who were scheduled to attend classes at the university.

360.    Plaintiff Robert L. Coulter, Sr. was watching television news that morning in the United States when he saw a "news flash" about a bombing at Hebrew University. Thinking he saw his daughter's head lying in an unsealed body bag, he called his other daughter, plaintiff Dianne Coulter Miller. Dianne called Janis's boss in New York and both Mr. Coulter and his daughter desperately tried to reach Janis on her cell phone without success.

361.    Plaintiff Robert Coulter, Jr. had heard about the bombing on the radio on the way to work, but didn't make the connection with Janis's visit to Israel.  His father called him at work about the possibility that Janis was at the cafeteria and he then drove immediately to his father's house.

362.    Initially, Janis was identified only through the numbers on her medical alert bracelet.  Eventually, the family retrieved Janis's dental records and faxed them to Israel where, later that evening, her death was confirmed.

363.    Plaintiff Robert L. Coulter, Sr. is a citizen of the United States and a resident of the State of Massachusetts. He brings this action both individually and on behalf of the Estate of Janis Ruth Coulter.

364.    Plaintiff Dianne Coulter Miller is a citizen of the United States and a resident of the State of Massachusetts.

365.    Plaintiff Robert L. Coulter, Jr. is a citizen of the United States and a resident of the State of Massachusetts.

366.    As a result of Janis's death, plaintiff Robert L. Coulter, Sr. has experienced emotional pain and suffering, loss of his daughter's society, companionship, comfort, advice and

counsel and has suffered severe mental anguish and extreme emotional distress.

367.   As a result of Janis's death, plaintiff Dianne Coulter Miller has experienced emotional pain and suffering, loss of his sister's society, companionship, comfort, advice and counsel and has suffered severe mental anguish and extreme emotional distress.

368.   As a result of Janis's death, plaintiff Robert L. Coulter, Jr. has experienced emotional pain and suffering, loss of his sister's society, companionship, comfort, advice and counsel and has suffered severe mental anguish and extreme emotional distress.

**The Carter Family**

369.   Diane Leslie Carter, a 38 year old citizen of the United States and resident of the State of North Carolina, was eating lunch in the cafeteria when the bomb exploded.

370.   Diane Carter was killed by the bomb blast.

371.   In 1990, Diane had moved to Israel, where she worked as a librarian and archivist in the National Library on the Givat Ram campus of Hebrew University in Jerusalem.

372.   Plaintiff Larry Carter is a citizen of the United States and a resident of the State of North Carolina. He is the father of Diane Carter. He brings this action both individually and on behalf of the Estate of Diane Leslie Carter.

373.   Larry learned of his daughter's death from a journalist who called his home. After conferring with his ex-wife, Diane's mother, Larry was able to confirm that his daughter was, in fact, killed in the bombing.

374.   Diane's sister, plaintiff Shaun Coffel, is a citizen of the United States and a resident of the State of Virginia.

375.   Both Larry and Shaun learned that Diane had been buried in Israel only moments before the funeral was scheduled to begin. Neither of them had the opportunity to say goodbye to

Diane.

376.    As a result of Diane Carter's death, plaintiff Larry Carter has suffered severe mental anguish and extreme emotional distress.

377.    As a result of Diane Carter's death, plaintiff Shaun Coffel has suffered severe mental anguish and extreme emotional distress.

**The Blutstein Family**

378.    Benjamin Blutstein, a 25 year old citizen of the United States and resident of the State of Pennsylvania, was killed in the blast.

379.     Benjamin had come to Israel for a two-year study program at the Pardes Institute in Jerusalem to become a teacher.

380.    Benjamin was scheduled to fly home to visit his family in Pennsylvania the day after he was murdered by HAMAS terrorists. Instead, two days after the attack, Benjamin's body was flown home and buried in his parents' home town of Harrisburg, Pennsylvania.

381.    Plaintiffs, Dr. Richard Blutstein and Dr. Katherine Baker, bring this action both individually and on behalf of the Estate of Benjamin Blutstein.

382.    Plaintiff Dr. Richard Blutstein is a citizen of the United States and a resident of the State of Pennsylvania.

383.    Plaintiff Dr. Katherine Baker is a citizen of the United States and a resident of the State of Pennsylvania.

384.     Plaintiff Rebekah Blutstein is a citizen of the United States and a resident of the State of Pennsylvania. She is the sister of Benjamin Blutstein.

385.    Richard first heard about the attack while watching Fox News early in the morning.  He then called Benjamin's cell phone and got a recording. Shortly thereafter he

contacted friends in Israel to ascertain if Benjamin had been injured in the attack.  After a friend made a positive identification, Richard received a call confirming Benjamin's death.

386.    Katherine learned that her son had been killed in the attack when she received a call from a representative of the American Embassy. She was too overwhelmed with emotion to call her husband. Richard received the call from a neighbor, who was with Katherine.  Katherine then composed herself enough to inform her daughter, Rebekah.

387.    As a result of Benjamin's death, plaintiff Richard Blutstein has experienced emotional pain and suffering, loss of his son's society, companionship, comfort, advice and counsel and has suffered severe mental anguish and extreme emotional distress.

388.    As a result of Benjamin's death, plaintiff Katherine Baker has experienced emotional pain and suffering, loss of Benjamin's society, companionship, comfort, advice and counsel and has suffered severe mental anguish and extreme emotional distress.

389.    Although Rebekah's father had informed her about the attack, Rebekah's mother was the one who told her that her brother had died.

390.    As a result of Benjamin's death, plaintiff Rebekah Blutstein, has experienced emotional pain and suffering, loss of her brother's society, companionship, comfort, protection, advice and counsel and has suffered severe mental anguish and extreme emotional distress.

**The Gritz Family**

391.    David Gritz, a 24 year old dual citizen of the United States and France was killed in the explosion. He had come to Israel for the first time with the help of a scholarship from the Hartman Institute to study philosophy and write his doctorate.

392.    He died after being in Israel for only two weeks.

393.    Plaintiff Nevenka Gritz is a citizen and resident of France. She is the mother of

David Gritz, who was an only child.

394. Plaintiff Nevenka Gritz brings this action both individually and on behalf of the Estate of David Gritz.

395. Nevenka and her husband, Norman Gritz, were in New York on the day their son was murdered. Friends of theirs informed them that television reports had indicated that a bombing had taken place at Hebrew University. Nevenka and her husband attempted to reach their son by phone, and then called the Israeli consulate in the hopes of getting more information. Eventually, confirmation came from the Israeli consulate that David's body had been identified.

396. As a result of David's death, plaintiff Nevenka Gritz has experienced emotional pain and suffering, loss of their only child's society, companionship, comfort, advice and counsel and suffered severe mental anguish and extreme emotional distress.

## NETANYA SUICIDE BOMBING – MAY 19, 2002

### Gloria Kushner

397. Plaintiff Gloria Kushner is a citizen of the United States and a citizen of the State of Florida.

398. She was injured by a suicide bomber in Netanya, Israel, on May 19, 2002.

399. Both HAMAS and the Popular Front for the Liberation of Palestine claimed responsibility for the attack.

400. Gloria was walking in an open air market when a suicide bomber blew himself up between the stalls, killing three (3) individuals and wounding more than fifty (50) people.

401. Gloria was approximately one hundred and fifty feet away from the suicide bomber when he detonated the bomb. As the bomb exploded, nails, screws and bolts flew in every direction and glass shattered on the main street from the buildings surrounding the market.

402.     Gloria was thrown against a vegetable stand, injuring her spine, right knee and right ear.  The permanent bridge in her mouth cracked and a shard of glass imbedded itself in her chin.

403.     She had to undergo surgery to remove the resulting lump and she continues to suffer from headaches and numbness in her fingers due to the injury to her neck.

404.     She suffers from post traumatic stress disorder and still has flashbacks and nightmares whenever she hears an ambulance or fire truck.

405.     As a result of the terrorist attack, plaintiff Gloria Kushner has experienced severe physical and mental anguish and extreme emotional distress.

## THE SHEFFIELD CLUB BOMBING OF MAY 7, 2002

406.     On the night of May 7, 2002, a Palestinian suicide bomber entered the third floor of a building in Rishon Letzion's new industrial area that housed the Sheffield Club, an unlicensed social club and gambling parlor, and detonated a bomb.

407.     HAMAS perpetrated and claimed responsibility for this attack.

408.     Eyewitnesses reported that the bomb blast propelled many of the victims through the club's windows and on to parked cars in the parking lot three floors below.

409.     Fifteen (15) people were killed by the attack including Esther Bablar, an American citizen who had returned to Israel after thirty (30) years to marry her childhood sweetheart, Yitzhak, who was also killed in the attack. Esther died of her injuries the following morning. Esther is survived by three children.

**The Bablar Family**

410.     Plaintiffs Jacqueline Chambers and Levana Cohen Harooch are citizens of the United States and residents of the State of Florida. They are the daughters of Esther Bablar.

411.    Plaintiff Jacqueline Chambers brings this action both individually and on behalf of the Estate of Esther Bablar.

412.    Esther had spent the month before the bombing in Florida with her youngest daughter, plaintiff Levana Cohen Harooch who had just given birth to Esther's grandchild and had been in New York visiting Jacqueline the day before the attack.

413.    On the day of the attack, a member of the Bablar family in Israel contacted Esther's sister in New York and told her the bad news. Eventually both of Esther's daughters were notified and they quickly made arrangements to board a flight to Israel with their aunt and uncle.

414.    As a result of the terrorist attack, plaintiffs Jacqueline Chambers and Levana Cohen Harooch have experienced emotional pain and suffering, and the loss of their mother's society, companionship, comfort, protection, attention, advice and counsel.

## PASSOVER MASSACRE AT THE PARK HOTEL IN NETENAYA: MARCH 27, 2002

### The Rogen Family

415.    On March 27, 2002, a HAMAS suicide bomber blew himself up near the dining area within the Park Hotel in Netanya. It was the night of the Jewish holiday of Passover and the hotel dining room was filled with hundreds of people celebrating the Passover Seder with their families and friends. Thirty (30) people were murdered in the bombing, including Hannah Rogen, who was severely wounded in the attack and died of the wounds six days later on April 2, 2002.

416.    Hannah was a Holocaust survivor who immigrated to the United States after World War II.  She was attending the Passover Seder at the invitation of a childhood friend, Yulia Talmi, who was also killed in the attack.

51

417.     Hannah was a citizen of the United States at the time of her death.

418.     Plaintiff Greta Geler is the great niece of Hannah Rogen and the Administrator of the Estate of Hannah Rogen.  She brings this action as Administrator of the Estate of Hannah Rogen.

## THE TEL ROMEDA SHOOTING IN HEBRON - OCTOBER 22, 2003

419.     On October 22, 2003, HAMAS gunman Rafiq Ziyad Qunaybi opened fire from his porch at two (2) passersby in Tel Romeda, Hebron.

420.     Both men were wounded in the shooting.

**Eyal Noked**

421.     Plaintiff Eyal Noked, age 37, is a citizen of the United States and a citizen of the State of Israel.

422.     Mr. Noked, a foreman for a building company, was living and working in Hebron with his wife and six children in the fall of 2003.

423.     On October 22, 2003, Mr. Noked was traveling with a friend near the entrance to Hebron's Admot Yishai neighborhood when Rafiq Qunaybi opened fire, significantly wounding Mr. Noked.

424.     Mr. Noked sustained serious physical injuries, including a gunshot wound to the left shoulder, a shattered left arm, and shrapnel wounds to his head and back.

425.     Mr. Noked was taken to the hospital for emergency medical treatment and remained hospitalized until October 30, 2003.  He underwent surgery to remove the shrapnel from his body and to reaffix his injured left arm.  Mr. Noked's left arm remains paralyzed.

426.     Mr. Noked was treated by numerous medical providers and participated in a lengthy period of physical rehabilitation.

427.     Due to the traumatic physical effects of the attack, Mr. Noked has also sustained psychological trauma.  He has suffered and continues to suffer from severe emotional effects of the attack. He experiences fear, anxiety, panic attacks, and cold sweats. He also has recurring nightmares and visions of the shooting attack and its aftermath.  Mr. Noked has participated in counseling sessions with rabbinical councils to help alleviate the emotional effects.

428.     As a result of the attack, plaintiff Eyal Noked has suffered severe physical and mental anguish and extreme emotional distress.

### THE BOMBING OF BUS NUMBER 19: JANUARY 29, 2004

429.     On January 29, 2004 Ali Ju'ara, a Palestinian policeman from the Aida refugee camp on the outskirts of Bethlehem, boarded Bus No. 19 ("Bus 19") in Jerusalem and seated himself at the back of the bus.  The Bus's usual route commences at Hadassah Hospital Ein Kerem, in the Ein Kerem neighborhood of Jerusalem, and thereafter travels through the center of Jerusalem to Hadassah Hospital and Hebrew University on Mount Scopus.  On that day, January 29, shortly before 9 a.m. Israeli time, Bus 19 reached the corner of Gaza and Arlozorov streets in Jerusalem.  At that moment, Ali Ju'ara detonated the bomb he was carrying.  The resulting explosion killed 11 people and wounded 50 others, including Stuart Scott Goldberg.

430.     After the Bus 19 attack, both HAMAS and the Al Aqsa Martyrs Brigades claimed responsibility for the attack.

431.     In 2004, the Israeli Military Court in Judea issued an indictment against Nufal Adawin.  The indictment identifies Adawin as a HAMAS member, and charges Adawin for his role in connection with the January 29, 2004 Bus 19 bombing.

432.     Specifically, count 27 of the Adawin indictment charges that Adawin recruited Ali Ju'ara on HAMAS's behalf for the purpose of arranging for Ju'ara to carry out a suicide

bombing. Adawin planned the attack with Ali Ju'ara and Muhammad Nashash, another member of HAMAS. Adawin also helped to prepare the bomb for the attack. Adawin was in the process of transporting Ali Ju'ara to carry out the attack when they had to turn back because of a roadblock.

433. Thereafter, Adawin advised Ali Ju'ara that he had been in contact with another Palestinian terrorist group, Tanzim-Fatah, in connection with carrying out the attack they planned. Adawin informed Ali Ju'ara that he intended to seek Tanzim-Fatah's assistance in order to carry out the attack.

434. After the attack, Adawin sent pictures and video he had previously taken of Al Ju'ara to a TV station in Bethlehem. Adawin, on HAMAS's behalf, claimed responsibility for the Bus 19 attack.

435. Stuart Scott Goldberg, 41, a Canadian citizen, was killed in the Bus 19 Attack. He is survived by his wife Karen Goldberg, and their seven children Chana Goldberg, Esther Goldberg, Yitzchak Goldberg, Shoshana Goldberg, Eliezer Goldberg, Yaakov Moshe Goldberg and Tzvi Yehoshua Goldberg (referred to herein collectively as "the Goldberg Children Plaintiffs"). Mr. Goldberg was a therapist who specialized in helping teens at risk and their families. He also wrote a column in *The Jewish Press* called Lifeline.

436. Plaintiff Karen Goldberg is a citizen of the United States and citizen and resident of the State of Israel. She was Stuart Scott Goldberg's wife. As a result of her husband's death she has lost material services, affection, companionship, consortium and the customary amenities of married life. As a result of the attack, she has suffered severe mental anguish and extreme emotional distress.

437. The Goldberg Children Plaintiffs are all citizens of the United States and citizens

and residents of the State of Israel.

438.   As a result of the Bus 19 Attack and their father's murder, the Goldberg Children Plaintiffs have permanently lost the benefits of his companionship, comfort, protection, attention, advice and counsel for the balance of their lives.  As a result of the attack, they have all suffered severe mental anguish and extreme emotional distress.

**B.     The Defendant**

439.   National Westminster Bank, Plc ("NatWest") is a British financial institution with its principal place of business in London, United Kingdom. It is part of the Royal Bank of Scotland Group.

440.   NatWest conducts business in the United States and in New York, both directly and through its agents, at a number of locations including 101 Park Avenue, New York, New York 10178, and 600 Steamboat Road, Greenwich, Connecticut 06830, which it also lists in its annual report as one of its "principal offices."

441.   NatWest has also been registered to conduct business within the State of Texas since 1999, and state records list its address as 600 Travis Street in Houston, Texas.

## FACTUAL ALLEGATIONS

I.     **THE ISLAMIC RESISTANCE MOVEMENT ("HAMAS")**

**A.     The Founding of HAMAS**

442.   In December 1987, Sheik Ahmed Yassin formed the Palestinian Islamic Resistance Movement ("HAMAS") as an offshoot of the Muslim Brotherhood, a radical Islamic group founded in Egypt before World War II.

443.   Pursuant to its charter, HAMAS and its operatives plan, assist, and conduct acts of international terrorism in Israel, the West Bank, and the Gaza Strip, including the attacks that

injured the plaintiffs.

**B.      Formal Designations of HAMAS as a Terrorist Organization**

444.    In 1989, the Government of Israel declared HAMAS a terrorist organization and designated it an "unlawful organization" because of its terrorist acts. Notice of the designation was placed in the official Government of Israel publication, the *Announcements and Advertisements Gazette*.

445.    Initially, HAMAS specialized in kidnapping and executing people suspected of cooperating with Israel. It quickly evolved and broadened its operations so that by the early 1990s it specialized primarily in murdering civilians in Israel.

446.    For example, on April 6, 1994, a HAMAS suicide bomber blew up a bus in Afula, killing eight (8) people.

447.    On April 13, 1994, a HAMAS suicide bomber blew up a bus in Hadera, killing five (5) people.

448.    On October 19, 1994, a HAMAS suicide bomber blew up a bus in Tel Aviv, killing twenty-two (22) people.

449.    On January 23, 1995, President Clinton issued Executive Order No. 12947. President Clinton found that "grave acts of violence committed by foreign terrorists that threaten to disrupt the Middle East peace process constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States."

450.    Executive Order No. 12947 designated HAMAS as a "Specially Designated Terrorist" (SDT).  Executive Order No. 12947 blocked all property and interests in property of the terrorist organizations and persons designated in the Order, including HAMAS.

451.    On February 25, 1996, a HAMAS suicide bomber blew up a bus in Jerusalem

killing twenty-six (26) people, three (3) of whom were U.S. citizens, and injuring eighty (80), three (3) of whom were U.S. citizens.  HAMAS claimed responsibility for the bombing.

452.    On October 8, 1997, by publication in the Federal Register, the United States Secretary of State designated HAMAS a Foreign Terrorist Organization pursuant to Section 219 of the Immigration and Nationality Act and the Antiterrorism and Effective Death Penalty Act of 1996.  The designation of HAMAS as a Foreign Terrorist Organization has been renewed every two years since 1997.

453.    After the September 11, 2001 terrorist attacks on the United States, President Bush issued Executive Order No. 13224, declaring a national emergency with respect to the "grave acts of terrorism ... and the continuing and immediate threat of further attacks on United States nationals or the United States."

454.    Executive Order No. 13224 designated HAMAS as a Specially Designated Global Terrorist ("SDGT").  Executive Order No. 13224 blocked all property and interests in property of the SDGTs, including HAMAS.

### C.    HAMAS's Organizational Structure

455.    HAMAS's terrorist operations depend upon its religious and social activities to recruit, educate and train terrorists and to collect material and aid.  Its terrorist operations and social activities operate side-by-side and support each other.

### 1.    The "Dawa"

456.    HAMAS's infrastructure in Palestinian Authority-controlled territory ("the PACT") is comprised of two interwoven components: its terrorist apparatus, and its religious and social infrastructure, which is responsible for recruiting and training terrorists.  This patchwork of charitable and social institutions is commonly referred to by HAMAS as the "Dawa."

457.   For the purpose of raising funds for its operations, HAMAS has established or taken control of "charity" committees across the PACT and abroad, including committees in Ramallah, Jenin, and Tulkarem.  Each of these committees is controlled by HAMAS agents and collects and distributes its funds on behalf of HAMAS.[5]

458.   One of the important roles of these "charities" is their involvement in the channeling of funds to pay expenses for and assist the families of terrorist operatives who are arrested, injured or killed. These entities also assist with the provision of housing subsidies to the families of suicide bombers whose homes are often demolished by the Israeli army after the bomber's identity has been confirmed.

459.   The network of these "charities" and other "charitable" associations not only helps raise funds for HAMAS's terrorist operations, but also helps it to identify and recruit potential terrorists.  The network also assists recruitment, in part, by funneling money to pay benefits to the families of terrorist operatives who are arrested, injured, or killed.

460.   Nonetheless, HAMAS, like other foreign terrorist organizations, collects funds under the guise of political or humanitarian activities, thus ultimately supporting the kind of terrorist activities that injured the plaintiffs herein.

## 2.   Terrorism Financing

461.   Funds raised by or on behalf of HAMAS for "charitable purposes" are used to finance its terrorist activities. As Congress found when passing the AEDPA: "Foreign organizations that engage in terrorist activity are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct." Antiterrorism Act of 1996, Pub. L. No. 104-132, sec. 301(a)(7), 110 Stat. 1247.

---

[5]      There are approximately 80 such "charitable" committees in the West Bank and Gaza Strip nominally supervised by the Palestinian Authority's Ministry of Waqf and Religious Affairs.

462.     HAMAS receives a majority of its financing through donations coordinated by prominent Saudi and Gulf State charities and the global network of charities known as the Union of Good, operated by the Muslim Brotherhood. The Union of Good, in turn, raises funds that are, in part, channeled through an entity known as the Palestine Relief and Development Fund and/or Interpal (Hereinafter: "Interpal"), which maintains several accounts with defendant NatWest.

### a.     The Union of Good

463.     I'Tilafu Al-Khayr a/k/a the Union of Good is an umbrella organization established by the Muslim Brotherhood in October 2000, immediately following the outbreak of the ongoing violent Palestinian-Israeli confrontation commonly termed the "Second Intifada."

464.     The Union of Good is thus a principal fundraising mechanism for HAMAS.

465.     The Union of Good's primary "charitable" purpose is to provide financial support for HAMAS and its agents in the PACT.

466.     The Union of Good is comprised of more than fifty (50) Islamic charitable foundations worldwide.  The U.S. Government has designated several of these foundations, including Interpal and the Al-Aqsa Charitable Foundation, as Specially Designated Global Terrorists ("SDGT").

467.     The U.S. Government designated Interpal an SDGT on August 22, 2003, and designated the Al-Aqsa Charitable Foundation an SDGT on May 29, 2003.

468.     NatWest maintains a U.S. Dollar account for the Union of Good with the account number 140-00-08537933.

469.     The Union of Good uses Interpal as its principal clearing house for funds raised throughout Europe and the Middle East.

470.     For example, in recent months, plaintiffs discovered that the Union of Good's

"101 Days Campaign" maintains its own website at www.101days.org. The campaign solicits funds for HAMAS and directs prospective donors to donate via Interpal's NatWest account numbers 60082295142940 (Sterling) and 60720508524882 (Euros).

471.    **Interpal's own website directly manifests the symbiotic link between the Union of Good and Interpal, soliciting donations for the former, and explicitly stating that:**

> Any donation that is made to INTERPAL through this web page is distributed with the knowledge and approval of the other members of the Union for Good directly to the charities in Palestine that are implementing the work creation programs [sic].[6]

472.    The Union of Good is headed by Dr. Yussuf al-Qaradawi, an extremist Sunni Muslim scholar based in Qatar.  NatWest is will aware of al-Qaradawi's connections to terrorism and his connection to Interpal.

473.    To begin with, al-Qaradawi has been on the U.S. Watch List since November 1999 and cannot travel to the United States.

474.    Al-Qaradawi was also a leading shareholder and principal in the Al Taqwa Bank, which was officially designated as a Specially Designated Global Terrorist on November 7, 2001, because of its ties to fundraising and money laundering for al Qaeda and HAMAS.

475.    Nor is al-Qaradawi an obscure or shadowy figure. On the contrary, he has his own weekly television program on *Al Jazeera* and has very publicly issued an Islamic religious edict (*fatwa*) authorizing suicide bombing attacks against Israel.[7]

476.    In fact, on April 14, 2002, al-Qaradawi appeared on *Al Jazeera* extolling "jihad and martyrdom" against Israelis and denouncing the U.S. designation of HAMAS and other

---

[6]    http://www.interpal.org/web/101.htm

[7]    Al-Qaradawi was also the first scholar who authorized women to commit suicide attacks (March 2002) in the context of the second Intifada, as cited in HAMAS's official website: http://www.palestine-info.info/arabic/fatawa/alamaliyat/qaradawi.htm.

terrorist organizations.

477.    Although the Union of Good and other fundraising organizations for HAMAS speak only generally about the Intifada and the families of the 'martyrs,' NatWest has been, and remains, in a unique position to monitor and quantify most of the transactions flowing into the Union of Good and Interpal accounts.  NatWest is also in a position to monitor and determine the identities of the entities to which the Union of Good and Interpal transmit the funds they collect via NatWest accounts.

478.    Thus, while the 101 days website speaks obliquely of supporting "**the families of the injured and the martyred in particular,**" NatWest, at all relevant times has had direct, first-hand knowledge of the organizations to which this 'support' has been transmitted, i.e. dozens of notorious HAMAS front organizations.

479.    As recently as October 29, 2005, in an interview with *The Guardian* newspaper, al-Qaradawi discussed suicide bombing in Israel and is quoted as saying:

> The actor who commits this is a martyr because he gave his life for the noble cause of fighting oppression and defending his community. These operations are best seen as the weapon of the weak against the powerful. It is a kind of divine justice when the poor, who don't have weapons, are given a weapon which the fully equipped and armed-to-the-teeth powerful don't have - the powerful are not willing to give their lives for any cause.

480.    More importantly, al-Qaradawi's views and activities have been a matter of public record for many years.[8]

481.    Through his many public appearances and popular television program, al-Qaradawi has never concealed his views about the moral rectitude of murdering Jews and Israelis.

---

[8]        Al-Qaradawi was the subject of massive publicity in Great Britain when he was invited to London by its mayor in July 2004, but his prominence long predates that event.

482.    To take just one example, in the September 1999 edition of the *Palestine Times*, in an article entitled "Sheikh Yousuf al-Qaradawi: Hamas and the Islamic Jihad represent the glorious face of the Islamic Umma- Interview" al-Qaradawi blessed "the martyrdom operations in which a given Moslem fighter turns himself or herself into a human bomb that casts terror in the hearts of the enemy … If we can't carry out acts of Jihad ourselves, we at least should support and prop up the Mujahideen financially and morally so that they will be steadfast until God's victory."

483.    NatWest is, and at all relevant times was, aware of al-Qaradawi's views. More importantly, NatWest has specific and detailed knowledge of how al-Qaradawi and his myriad of charitable front organizations channel funds to HAMAS because millions of dollars flow through accounts held at NatWest.

484.    Al-Qaradawi might be considered the "chairman of the board" of HAMAS's global fundraising efforts, but Issam Yusuf a/k/a Essam Yussef a/k/a Issam Yusuf Mustafa is the operational head (Vice Chairman and Managing Trustee) of the Union of Good. He is a HAMAS agent and former vice chairman of Interpal, and he manages HAMAS's day-to-day fundraising efforts.

485.    The board of directors of the Union of Good includes three senior HAMAS figures: Sheikh Hamid al-Bitawi, Dr. Essam Salhoub, and Bassam Jarrar.

486.    In 2001, al-Qaradawi publicly described the activities of the Islamic charitable societies sustaining the Intifada against Israel as a "new type of *jihad*, financial *jihad*, through which financial support is guaranteed to the martyrs' families, Palestinian prisoners and detainees, and every Palestinian whose property is damaged during the conflict."

487.    As of the filing of this Amended Complaint, NatWest collects and transmits funds

on behalf of the Union of Good and its largest fundraising arm, Interpal.

### b.      Interpal

488.    Charitable donations to the Union of Good are partially collected and distributed through Interpal.

489.    Interpal was founded in 1981 as the Palestine and Lebanon Relief Fund and was reincorporated as Interpal in November 1994.

490.    On or before January 1, 1996, Interpal opened one or more accounts with defendant NatWest.

491.    The Charity Commission, established by law as a regulator and registrar for charities in England and Wales, froze Interpal's accounts at NatWest in March 1996 based on evidence that it channelled money to HAMAS.

492.    The allegations of links between Interpal and HAMAS were published in numerous British newspapers at the time, including *The Guardian* and *The Times of London*.[9]

493.    A spokesman for the Charity Commission told *The Guardian* that Interpal's bank accounts had been frozen "as a precautionary measure." Following the widely published reports of Interpal's links to HAMAS, NatWest took no action to terminate its relationship with Interpal.[10]

---

[9]      Richard Norton-Taylor and Ian Black, *Palestinian Charity Funds Frozen Over 'Hamas Link,'* THE GUARDIAN, Mar. 9, 1996; Richard Norton-Taylor, *News in Brief: Palestinian Group Cleared*, THE GUARDIAN, Mar. 13, 1996; Julian Borger, *Close Trust, Israel Pleads; Britain is being asked to clamp down on Palestinian fundraisers,* Sept. 7, 1997; Stewart Tendler and Christopher Walker, *MI5 study 'charity cash linked to Hamas,'* THE TIMES, Mar. 6, 1996; Stewart Tendler, *Charity's funds are frozen over alleged Hamas link,* THE TIMES, Mar. 9, 1996; Adrian Lee and Michael Evans, *MI5 traces network of Hamas funding,* THE TIMES, Mar. 11, 1996.

[10]      In an interview reported in THE GUARDIAN on August 7, 1997, Mr. Ibrahim Hewitt, Chairman of Interpal, publicly acknowledged that it was possible that some of Interpal's beneficiaries in the Palestinian territories had been established by HAMAS.

494.    The Charity Commission ultimately unfroze the accounts ostensibly because the British government distinguished (at the time) between the military and social or charitable wings of HAMAS.   There was no finding by the Charity Commission concerning Interpal's relationship with HAMAS per se, nor did Interpal attempt to deny that it was transferring millions of dollars to HAMAS.

495.    The Charity Commission's May 30, 1996 report concerning Interpal stated its findings as follows:

> Poverty and need must however be the only criteria when deciding how the charity's funds are distributed and aid must not be given because of a person's support for terrorism. We found no evidence in the charity (Interpal) of any pro-terrorist bias, or indeed bias of any kind.

496.    Thus, the Charity Commission finding was that Interpal donated funds [to HAMAS] without any evident intent to support terrorism per se, or as the Commission put it, without "any pro-terrorist bias."

497.    U.S. anti-terrorism laws, however, do not distinguish between "biased" and "unbiased" support provided to designated Foreign Terrorist Organizations.

498.    As Kenneth R. McKune, Associate Coordinator for Counterterrorism at the U.S. Department of State noted in a sworn declaration on April 21, 1998:

> [T]he Antiterrorism and Effective Death Penalty Act of 1996 prohibits the provision of material support or resources to foreign terrorist groups that have been formally designated, pursuant to statute, as "foreign terrorist organizations" by the Secretary of State.  In prohibiting comprehensively the provision of such support and resources, the law does not differentiate between the criminal, terrorist activities of these organizations, and the civil, non-violent activities, if any, in which they might engage.  In legislating this particular dimension of the "material support" ban, the Congress found that "foreign organizations that engage in terrorist activity are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct."

499.    NatWest nonetheless provided (and continues to provide) funds for institutions

that belong to HAMAS's financial infrastructure in the PACT, including many entities the Government of Israel has declared unlawful and the U.S. Department of Justice has identified as agents of HAMAS.

500. Following the March 1996 British investigation which first placed NatWest on notice that it was transferring funds to HAMAS, Interpal was declared an "unlawful organization" by the Government of Israel in May 1997 because of its fundraising activities on behalf of HAMAS. Notice of the designation was placed in the official publication, the *Announcements and Advertisements Gazette*.

501. Despite this designation, NatWest did not cease providing financial services to Interpal.

502. Interpal was further designated a terrorist organization in January 1998 by the Government of Israel. Notice of the designation was also placed in the *Announcements and Advertisements Gazette*.

## II. DEFENDANT'S CONDUCT

### A. NatWest Transfers to HAMAS Entities

503. Despite this designation and the knowledge that it was providing financial services to a Foreign Terrorist Organization, NatWest did not cease providing financial services to Interpal.

504. NatWest provided **and continues to provide** financial services to HAMAS via various HAMAS-controlled institutions including, but not limited to: the Orphan Care Society of Bethlehem, Al-Islah Charitable Society in Ramallah-Al-Bireh, the Ramallah-Al-Bireh Charitable Society, the Jenin Charity Committee, the Hebron Islamic Association, Tulkarem Charity Committee, Al-Mujama al-Islami, the Islamic Society in the Gaza Strip, and the Muslim Youth

Association of Hebron.[11]

505.    The Orphan Care Society of Bethlehem was outlawed by the Government of

Israel in February 2002.  Most of its chief functionaries, including its director, Dr. Ghassan

Harmass, are HAMAS terrorists.  The Orphan Care Society pays subsidies to the children of

HAMAS "martyrs" and imprisoned HAMAS members.[12]

506.    The 2001 version of Interpal's website stated that Interpal "works closely with"

the Orphan Care Society.

507.    On August 16, 2002, NatWest transferred $1,875.65 ($1,906 minus commission)

from Interpal to the Orphan Care Society.

508.    On September 17, 2002, NatWest transferred £6,533.00 (£6,547 minus

commission; approximately $10, 069.30) from Interpal to the Orphan Care Society.

509.    On November 15, 2002, NatWest transferred £5,693 (£5,707 minus commission;

approximately $8, 989.82) from Interpal to the Orphan Care Society.

510.    The Islamic Society of Gaza is an alter-ego of HAMAS. Its directors and

employees are members of HAMAS and the entity serves as a principal headquarters of HAMAS

in the Gaza Strip. Since at least 1996, NatWest has transferred funds to the Islamic Society of

Gaza on Interpal's behalf.

511.    The Al-Islah Charitable Society in Ramallah-Al-Bireh was founded in 1997.  The

Government of Israel declared the Al-Islah Charitable Society an "unlawful organization" in

February 2002.  The Al-Islah Charitable Society regularly transfers money for the benefit of the

---

[11]    The Jenin Charity Committee and Tulkarem Charity Committee (among others) are specifically identified as HAMAS-controlled organizations by the United States Government in the July 2004 criminal indictment of Holy Land Foundation for Relief and Development in the Northern District of Texas.

[12]    In an interview published on the 101 days website, Dr. Harmass states that Interpal is one of the Orphan Care Society's largest sources of donations:  http://www.101days.org/arabic/taqareer/yateem.htm

families of HAMAS "martyrs," and subsidizes the renovation of homes that belong to the families of suicide bombers and were destroyed by Israel.  The Al-Islah Charitable Society supports the families of "martyrs," HAMAS prisoners in Israeli jails, and deported HAMAS members.

512.    The Jenin Zakat Committee was declared an "unlawful organization" by the Government of Israel in February, 2002.  This "charity" is run by HAMAS terrorists, and it provides aid to HAMAS terrorists, to the families of "martyrs," and Palestinians wounded or imprisoned as a result of violent confrontations with Israel.

513.    The 2001 version of Interpal's website states that Interpal "works closely with" the Jenin Zakat Committee.

514.    On May 2, 2003, NatWest transferred £15,687 (£15,713 minus commission; approximately $25,285.90) from Interpal to the Jenin Zakat Committee.

515.    On July 11, 2003, NatWest transferred £15,330 (approximately $25,064.50) from Interpal to the Jenin Zakat Committee.  Natwest charged a commission of £11.

516.    The Tulkarem Charity Committee was founded in 1981.  The Government of Israel declared the Tulkarem Charity Committee an "unlawful organization" in February, 2002.  The Committee is headed by a HAMAS terrorist.

517.    In 2002 alone, NatWest transferred over $1,500,000.00 to the HAMAS front organizations listed in paragraph 352, which had been previously designated as unlawful organizations by the Government of Israel because of their affiliation with HAMAS.

**B.      Funds Collected by NatWest from Specially Designated Global Terrorists and Convicted Fundraisers for HAMAS**

518.    On at least three separate occasions NatWest accepted deposits on behalf of Interpal from organizations and entities whose terrorist connections are a matter of public record.

519.    In April 2000, NatWest accepted a deposit of $66,000.00 for Interpal from the Holy Land Foundation for Relief and Development ("HLF").[13]

520.    According to a prior version of Interpal's website (dating back to August 2001), Interpal directs persons wishing to make "international donations" to donate to HLF.

521.    On December 4, 2001, the U.S. Secretary of Treasury determined that HLF was subject to Executive Order Nos. 12947 and 13224 because HLF "acts for or on behalf of" HAMAS.

522.    Accordingly, HLF was designated an SDT under Executive Order No. 12947 and an SDGT under Executive Order No. 13224.

523.    In December 2001, the Counsel of the European Union designated Holy Land Foundation as a terrorist entity under Article 2(b) and Regulation (EC) No. 2580/2001 on specific restrictive measures directed against certain persons and entities with a view to combating terrorism and repealing Decision 2005/848/EC.

524.    In order to facilitate the application of financial sanctions, the European Banking Federation, the European Savings Banks Group, the European Association of Co-operative Banks and the European Association of Public Banks (the "EU Credit Sector Federations") and the Commission recognized the need for an EU consolidated list of persons, groups and entities subject to CFSP related financial sanctions.  It was therefore agreed that the Credit Sector Federations would set up a database containing the consolidated list for the Commission, which would host and maintain the database and keep it up-to-date.  This database was developed first and foremost to assist the members of the EU Credit Sector Federations in their compliance with

---

[13]    On May 6, 1997, the Government of Israel designated the Holy Land Foundation for Relief and Development ("HLF") as a HAMAS front organization and declared that HLF "deals in the practice of transferring monies to families of HAMAS activists, who carried out deadly attacks …"

financial sanctions.  HAMAS and HLF were so listed in December 2001.

525.    On March 11, 2002, HLF filed suit seeking to enjoin the U.S. Government from continuing to block or freeze its assets.

526.    On August 8, 2002, the United States District Court for the District of Columbia issued a written opinion in *Holy Land Foundation for Relief and Development v. Ashcroft*, 219 F. Supp. 2d 57, 70 (D.D.C. 2002) finding that "between 1992 and 1999, HLF contributed approximately 1.4 million dollars to eight Hamas-controlled "zakat" (or charity) committees…. HLF grant lists also establish that, between 1992 and 2001, HLF gave approximately five million dollars to seven other Hamas-controlled charitable organizations, including a hospital in Gaza."[14]

527.    The publicly available 2002 court decision sets forth with specificity the legal basis for concluding that HLF's conduct – which is nearly identical to that of Interpal – constituted support for terrorism.

528.    Like HLF, the Al-Aqsa Charitable Foundation is a critical part of HAMAS's transnational terrorist support infrastructure. The Al-Aqsa Foundation also maintained branch offices in The Netherlands, Denmark, Belgium, Sweden, Pakistan, South Africa, Yemen and elsewhere.

529.    On March 27, 2003, NatWest deposited at least two payments to Interpal totalling 295,000 Euros from the Dutch branch of the Al-Aqsa Foundation.[15]

530.    Two months later, on May 29, 2003, the U.S. Treasury Department added the Al-

---

[14]     In fact, in November 2001, the FBI identified eight (8) charitable fronts as agents of HAMAS, at least 6 of whom have been NatWest wire transfer recipients.  See, Memorandum of Dale L. Watson, the Assistant Director of the FBI's Counterterrorism Division, written to R. Richard Newcomb, Director of the United States Treasury Department's Office of Foreign Assets Control ("OFAC") and dated November 5, 2001.

[15]     On July 31, 2002, German authorities closed the Al-Aqsa Foundation in Germany because of its support for HAMAS.  On January 1, 2003, the Danish government charged three Al-Aqsa Foundation officials in Denmark with supporting terrorism.  In April 2003, Dutch authorities blocked Al-Aqsa Foundation assets in The Netherlands based on information that funds were provided to organizations supporting terrorism in the Middle East.

Aqsa Foundation to its list of Specially Designated Global Terrorist entities, accusing the organization of funneling funds -- including money donated for charitable purposes -- to the militant terrorist group HAMAS.

531.     Nonetheless, NatWest took no steps to close its Interpal accounts.

532.     Years earlier, in or about January 2001, NatWest accepted deposits totaling $70,000.00 on behalf of Interpal from the Al-Aqsa organization in Yemen.

533.     On January 10, 2003, German authorities arrested Sheik Mohammed Ali Hasan al-Moayad, the head of the Al-Aqsa organization in Yemen, at the request of the U.S. Department of Justice and the Federal Bureau of Investigation.  The arrest took place after a year-long investigations of al-Moayad and undercover operations by the FBI's Joint Terrorism Task Force for his knowingly and intentionally conspiring to provide material support and resources for Al-Qaeda and HAMAS.

534.     Prior to his arrest in Germany, Sheik al-Moayad had met with an undercover government informant and proffered proof of his prior fundraising on behalf of HAMAS by tendering to the undercover government informant a receipt from Interpal confirming a $70,000.00 donation from the Sheik's Al-Aqsa organization in Yemen.

535.     Sheik al-Moayad was subsequently convicted of providing material support to HAMAS in violation of 18 U.S.C. § 2339B and in 2005 was sentenced to 75 years in prison.

**C.     Interpal's Designation by the U.S. Government in 2003 and Defendant's Continuing Conduct**

536.     The August 19, 2003 HAMAS suicide bombing of a bus resulted in the death of Tehilla Nathansen, and injuries to members of the Nathansen family and plaintiff Tzvi Weiss.

537.     Following this atrocity, President George W. Bush stated:

At my direction, the Treasury Department has moved today to block and freeze

the assets of six top HAMAS leaders and five non-governmental organizations that I am advised provide financial support to HAMAS. By claiming responsibility for the despicable act of terror on August 19, HAMAS has reaffirmed that it is a terrorist organization committed to violence against Israelis and to undermining progress toward peace between Israel and the Palestinian people.

538.   Thereafter, Interpal, as one of the five non-governmental organizations, was designated as an SDGT on August 22, 2003.

539.   In an interview reported in *The Guardian* on August 28, 2003, <u>after</u> the U.S. Government designation, Mr. Hewitt, Chairman of Interpal, was publicly quoted as saying: "We deal with people whether they are HAMAS or whether they are Fatah."

540.   Even after Interpal's designation as a Specially Designated Global Terrorist organization and its Chairman's public admission of its relationship to HAMAS, already designated a Foreign Terrorist Organization, NatWest again took no action to cease its relationships with Interpal.

541.   On September 12, 2003, the European Union designated all of HAMAS (including its social "wing") a terrorist organization, but even then, NatWest took no action to close Interpal's accounts.

542.   To this day, notwithstanding all of this publicly available information, NatWest continues to collect and transmit funds for HAMAS.

**D.      Specific Accounts and Transactions**

543.   Interpal is a pivotal part of HAMAS's fundraising infrastructure and a significant source of HAMAS's financing.

544.   For more than nine (9) years, defendant NatWest has knowingly maintained numerous accounts for Interpal and has collected, received, transmitted, and provided **millions of dollars** on behalf of Interpal directly to agents of HAMAS in the PACT.

545.    These accounts include:

U.S. Dollar Account Number – 140-00-04156838

Euro Account Number – 60720508524882

Sterling Account Number – 60082295142940

546.    NatWest thereby provides HAMAS with a highly convenient method to collect and transfer funds in U.S. Dollars as well as Sterling and Euros.

547.    NatWest also provides Interpal with merchant banking services, directly and through another Royal Bank of Scotland subsidiary, thereby making it possible for Interpal to maintain merchant accounts with MasterCard, VISA and other credit card companies.

548.    This allows HAMAS to solicit contributions in dozens of currencies from around the world and allows Interpal to solicit funds for HAMAS via its website at www.interpal.org.

549.    In addition, NatWest, with the help of financial products provided by its sister company, provides further substantial assistance to HAMAS by making it possible for British nationals to make direct contributions to Interpal by way of their employer's payroll department through a program called "Give As You Earn."

550.    Since March 1996, defendant NatWest has known that it has been providing financial services to HAMAS and that Interpal collects money for, and transmits money to, HAMAS, a Foreign Terrorist Organization.

551.    NatWest has transferred funds directly to HAMAS-controlled entities on hundreds (if not thousands) of occasions.

552.    For example, on February 19, 2003, NatWest transferred £21,424 (approximately $34,083.40) to the HAMAS front organization, the Tulkarem Zakat (Charity) Committee Society and charged a commission of £10. See Exhibit A attached. At the time NatWest transferred this amount to HAMAS, both Interpal (the repository of the funds) and the Tulkarem Charitable

72

Society (the HAMAS front that received the funds) had been designated as unlawful organizations by the Government of Israel due to their support for or control by HAMAS.

553.   The U.S. Department of Justice has identified the Tulkarem Charitable Society as an "organization, which operated on behalf of, or under the control of, HAMAS."

554.   On April 1, 2003, NatWest transferred another £17,974 (£18,000 minus commission; approximately $28,465.4) from Interpal to the Tulkarem Zakat Committee.

555.   Likewise, on July 30, 2003, NatWest transferred £73,757 ($119,809.00 U.S.) to the Jenin Charitable Society, debiting Interpal's Account Number 600822-95142940.   See Exhibit B attached. This transaction was apparently financed by the World Assembly of Muslim Youth ("WAMY"), the well known Saudi "charity" linked to both HAMAS and Al Qaeda financing.[16] At the time NatWest transferred this amount to HAMAS, WAMY (the source of the funds), Interpal (the repository of the funds) and the Jenin Charitable Society (the HAMAS front that received the funds) had all been designated as unlawful organizations by the Government of Israel due to their support for or control by HAMAS.

556.   One of Interpal's officers/directors, Mahfuzh Safiee is an officer of WAMY, Ltd. (a European branch of WAMY).

557.   The U.S. Department of Justice has identified the Jenin Charitable Society as an "organization, which operated on behalf of, or under the control of, HAMAS."

558.   Nor did NatWest cease providing enormous sums of money to HAMAS even after Interpal was formally designated a Specially Designated Global Terrorist by President Bush on August 22, 2003. On the contrary, the same millions of dollars that NatWest transferred to

---

[16]     The WAMY Conference in Riyadh in October 2002 was attended by the head of the HAMAS Political Bureau, Khalid Mishal, who was also designated a Specially Designated Global Terrorist on August 22, 2003, pursuant to Executive Order No. 13224.

HAMAS since 1996 and that helped maim and murder U.S. citizens such as the plaintiffs and bankroll the families of terrorists, including suicide bombers, continued to flow unabated even after the U.S. Government designation of Interpal.

559.    For example, on November 5, 2003 (two months **AFTER** the official U.S. designation), NatWest transferred £32,329 ($54,322.40 U.S.) to the same well-known HAMAS front organization, the Jenin Charitable Society, debiting Interpal's Account Number 600822-95142940.  See Exhibit C attached.

560.    Transactional documents of the kind attached to this complaint are *themselves* the criminal transactions that Congress tried to interdict by enacting both the criminal provisions of

561.    18 U.S.C. §§ 2339B and 2339C and the civil provision of 18 U.S.C. § 2333(a) as set forth below.

E.    **NatWest's Regulatory Obligations and Duty of Care**

562.    All banks which have international operations or relationships with correspondent banks have a duty, based on international banking norms, to adopt know your customer ("KYC"), anti-money laundering ("ATL"), and anti-terrorist financing ("ATF") standards which are defined and enforced by the Financial Action Task Force ("FATF") and its supportive governments.

563.    The United Kingdom is a participant in the FATF.

564.    This duty devolves upon officials and directors of all such banks and includes a due diligence obligation to monitor publicly accessible information and allegations in relation to "high risk" customers, which would include charities collecting funds from the public.

565.    This duty to monitor and profile charity customers arises independently of any particular transaction.

566.    Beginning with the creation of FATF in 1989 and especially since the collapse of the Bank of Credit and Commerce International and the enactment of the first European Union directive on the subject in 1991, a consensus has evolved in the banking community concerning know your customer and anti-terrorist financing standards required by international banking institutions.

567.    These standards are encapsulated in written principles issued by FATF and the Basel Group of Bank Supervisors.

568.    In April 2002, the FATF issued a report entitled "Guidance For Financial Institutions in Detecting Terrorist Financing."  The report was issued to all major international financial institutions to provide guidance to "ensure that financial institutions do not unwittingly hide or move terrorist funds.  Financial institutions will thus be better able to protect themselves from being used as a conduit for such activity …"

569.    In addition to its inherent obligation not to violate the criminal statutes of the United States, the FATF report very clearly put NatWest on notice that:

> Regardless of whether the funds in a transaction are related to terrorists for the purposes of national criminal legislation, business relationships with such individuals or other closely associated persons or entities could, under certain circumstances, expose a financial institution to significant reputational, operational, and legal risk.  This risk is even more serious if the person or entity involved is later shown to have benefited from the lack of effective monitoring or willful blindness of a particular institution and thus was to carry out terrorist acts.

570.    There are also standards developed by the Wolfsberg Group of banks that affect the correspondent banks of Wolfsberg Group member financial institutions.

571.    On July 16, 2002, the Royal Bank of Scotland Group (NatWest's parent company) adopted new "Know Your Customer" guidelines and adopted the so-called Wolfsberg Principles for the Suppression of Terror Financing thereby committing NatWest to implement:

"procedures for consulting applicable lists and taking reasonable and practicable steps to determine whether a person involved in a prospective or existing business relationship appears on such a list."

572.    At the same time, NatWest's parent company publicly acknowledged that: "Funds used to support terrorism do not derive exclusively from criminal activities and differ from those associated with most existing money laundering offences" and committed itself to "the ongoing monitoring of individual transactions on customer accounts …"

573.    In September 2002, the RBS Group of which NatWest issued a "Statement of Principles for Fighting Crime and the Financing of Terrorism."  The document describes their plan to institute AML controls, particularly on terrorist financing, and to cooperate with U.K. authorities in criminal investigations.

574.    These standards are binding on banks and bankers doing business internationally, due to their commercial relationships with the banks of other countries that are legally obligated to apply these norms.

575.    Accordingly, NatWest had (and has) and affirmative duty to monitor publicly available information and allegations about its customer, Interpal.

576.    NatWest also had (and has) an affirmative duty to monitor publicly available information and allegations about its customer's parent organization – the Union of Good – as well as publicly available information concerning HAMAS controlled entities to which its customer transferred millions of dollars.

577.    It was and remains the standard in the international banking industry for compliance departments at banks like NatWest to access, in detail, public allegations of misconduct by such "charities" or diversions of their funds to terrorist activities.

578.     In many cases, information linking payees of NatWest transactions and HAMAS could readily be obtained by simple Internet searches or by subscribing to a database or press clippings service.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

## AIDING AND ABETTING THE MURDER, ATTEMPTED MURDER OR PHYSICAL VIOLENCE TO UNITED STATES CITIZENS IN VIOLATION OF 18 U.S.C. § 2332(a); 18 U.S.C. § 2332(b); 18 U.S.C. § 2332(c) AND 18 U.S.C. § 2333(a)

579.     Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

580.     Plaintiffs have been injured in their person by reason of acts committed by HAMAS that involved violence and were dangerous to human life and that violated the criminal laws of the United States, including the prohibition on killing, attempting to kill, causing serious bodily injury, or attempting to cause serious bodily injury to U.S. citizens as set forth in 18 U.S.C. § 2332.

581.     The acts of HAMAS in killing and attempting to kill U.S. nationals and other persons were and are intended to: (a) intimidate or coerce the civilian population of Israel; (b) influence the policy of the Government of Israel by intimidation or coercion; and (c) affect the conduct of the Government of Israel by mass destruction and murder.

582.     The acts of terrorism set forth herein were extreme and outrageous and were committed with the knowledge of, and intention to, cause extreme physical pain and suffering to any and all persons within close proximity of the attack, and extreme emotional distress to the family members of those who were killed or injured by reason of the act.

583.     The financial services which defendant knowingly provides to HAMAS   by

collecting and transmitting funds on behalf of HAMAS, and making it possible for HAMAS to obtain donations through credit cards like VISA and MasterCard, which are available throughout much of the world, substantially assist HAMAS in its recruiting, rewarding, and providing incentives to suicide bombers and other terrorists.  These financial services facilitate acts of terrorism in violation of 18 U.S.C. § 2332 that have caused injuries to plaintiffs.

584.    Defendant knows that it provides material support to HAMAS, a Foreign Terrorist Organization, and it knows that HAMAS commits horrific terrorist attacks of the kind that have maimed and murdered American citizens such as plaintiffs.

585.    Throughout the period in which it has provided financial services for the benefit of HAMAS, defendant was, and to this date remains, aware that HAMAS collects and receives funds transmitted by defendant NatWest at the request of Interpal and the Union of Good and that HAMAS has committed numerous criminal acts, including the suicide bombings and other acts of international terrorism that have injured American citizens, including plaintiffs.

586.    By aiding and abetting violations of 18 U.S.C. § 2332 that have caused each of the plaintiffs to be injured in his or her person and property, defendant is liable pursuant to 18 U.S.C. § 2333(a) for any and all damages that plaintiffs have sustained as a result of such injuries.

## SECOND CLAIM FOR RELIEF

## COMMITTING ACTS OF INTERNATIONAL TERRORISM IN VIOLATION OF 18 U.S.C. § 2339B(a)(1) AND 18 U.S.C. § 2333(a)

587.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

588.    By knowingly collecting and transferring funds for the benefit of HAMAS, the

defendant has provided material support to a designated Foreign Terrorist Organization under the Antiterrorism and Effective Death Penalty Act of 1996 in violation of 18 U.S.C. § 2339B(a)(1).

589.    As stated above, the Union of Good and Interpal are major funding sources for HAMAS.

590.    By providing a wide range of vital financial services to these entities, defendant NatWest substantially assists HAMAS in its recruiting, rewarding, and providing incentives to suicide bombers and other terrorists.

591.    Defendant knows of HAMAS's terrorist activities.

592.    Defendant knows that HAMAS had been designated a Foreign Terrorist Organization by the United States Government.

593.    By knowingly providing material support to a designated Foreign Terrorist Organization, defendant is therefore civilly liable for damages to plaintiffs for their injuries pursuant to 18 U.S.C. § 2333(a).

## **THIRD CLAIM FOR RELIEF**

## **COLLECTING AND PROVIDING FUNDS FOR THE FINANCING OF TERRORISM IN VIOLATION OF 18 U.S.C. § 2339C and 18 U.S.C. § 2333(a)**

594.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

595.    Defendant wilfully and unlawfully provides financial services to HAMAS by collecting, receiving, transmitting, and providing funds, through accounts it maintains for Interpal and the Union of Good and through credit card payments it receives on behalf of Interpal with the knowledge that such funds have been and will be used, in part, to facilitate acts intended to cause death or serious bodily injury to civilians such as the victims of the terrorist acts

described in this complaint.

596. The acts committed against the plaintiffs were intended to: (a) intimidate or coerce the civilian population of Israel; (b) influence the policy of the Government of Israel by intimidation or coercion; and (c) affect the conduct of the Government of Israel by mass destruction and murder.

597. Defendant is therefore liable to the plaintiffs who have suffered injuries to their person and property by reason of such acts under 18 U.S.C. § 2333(a).

**PRAYER FOR RELIEF**

WHEREFORE, plaintiffs pray that this Court:

(a) Enter judgment against the defendant and in favor of each plaintiff for compensatory damages in amounts to be determined at trial;

(b) Enter judgment against the defendant and in favor of each plaintiff for treble damages pursuant to 18 U.S.C. § 2333(a);

(c) Enter judgment against the defendant and in favor of each plaintiff for any and all costs sustained in connection with the prosecution of this action, including attorneys' fees, pursuant to 18 U.S.C. § 2333(a);

(d) Enter an Order declaring that the defendant has violated, and is continuing to violate, the Antiterrorism Act, 18 U.S.C. § 2331 *et seq.*; and

(e) Grant such other and further relief as justice requires.

## <u>JURY DEMAND</u>

PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

Dated: January 28, 2008
       Oradell, New Jersey

                             OSEN & ASSOCIATE, LLC

                        By     /s/ Gary M. Osen
                               Gary M. Osen, Esq.
                               Joshua D. Glatter, Esq.
                               Aaron Schlanger, Esq.
                               Peter Raven-Hansen, Esq., Of Counsel
                               700 Kinderkamack Road
                               Oradell, New Jersey 07649
                               Telephone: (201) 265-6400
                               Facsimile:  (201) 265-0303

                               Attorneys for Plaintiffs

KOHN, SWIFT & GRAF, P.C.
Steven M. Steingard, Esq.
Neil L. Glazer, Esq.
One South Broad Street
Philadelphia, PA 19107
Telephone:  (215) 238-1700

GLANCY BINKOW & GOLDBERG
Andrew D. Friedman, Esq., Of Counsel
Neal A. Dublinsky, Esq., Of Counsel
430 Park Avenue
New York, New York 10022
Telephone:  (212) 308-6300

McINTYRE, TATE, LYNCH & HOLT, LLC
David J. Strachman, Esq.
321 South Main Street, Suite 400
Providence, Rhode Island 02903
Telephone:  (401) 351-7700

NITSANA DARSHAN-LEITNER & ASSOCIATES
Nitsana Darshan-Leitner, Esq.
11 Havatikim Street
Petah Tikva, 49389 Israel
Telephone:  (Israel Tel. (972) 3-933-4472)


MOTLEY RICE, LLC
Ronald L. Motley, Esq.
Donald Migliori, Esq.
Michael Elsner, Esq.
Justin B. Kaplan, Esq.
John M. Eubanks, Esq.
Elizabeth Smith, Esq.
28 Bridgeside Boulevard, P.O. Box 1792
Mount Pleasant, South Carolina 29465
Telephone:  (843) 216-9000

# EXHIBIT A

❧ NatWest

## PAYMENT DEBIT ADVICE

THE SECRETARY
PALESTINIANS RELIEF & DEV FUND
PO BOX NO 3333
LONDON
NW6 1RW

Our ref:  IBCCTYO00410266
Your ref  ETR 2003 81
Date:   19th February 2003

We confirm having remitted the following Standard transfer.

Amount debited:  GBP  21,450.00
From account:   600022-95142940
Amount sent:   GBP  21,424.00

Debit date:  19th February 2003

In favour of:
TULKAREM ZAKAT COMMITTEE

Beneficiary bank:
ARAB BANK PLC
(TULKARM BRANCH)
TULKARM
PALESTINIAN TERRITORY (OCCUPIED)

Beneficiary account number:
90705000100500

Payee bank:
ARABGE2LXXX

Payment details:
SPONSORS AN ORPHAN/NEEDY CHILDPROG
RAMADAN PROJECTS QURBANI MEA

Ordered by:
PALESTINIANS DEV FUND INTERPAL

Transactional information:

Requested amount     GBP  21,450.00

Rate:

Currency exchange contract:

NWB commission charges:   0.00

Agent banks charges:   0.00

This notification is not confirmation of receipt of the funds by the beneficiary - the Bank does not accept any liability whatsoever for any loss or damage arising in any way from any use of or reliance placed on the information.

National Westminster Bank plc. Registered in England No. 929027. Registered Office : 135 Bishopsgate, London EC2M 3UR.
Regulated by the Financial Services Authority.
Acting agreement held between members of The Royal Bank of Scotland Group.

NatWest Bank PLC

# EXHIBIT B

**NatWest**

## PAYMENT DEBIT CONFIRMATION

GDM 86/00 N02

THE SECRETARY
PALESTINIANS RELIEF & DEV FUND
PO BOX NO 3333
LONDON
NW6 1RW

Our ref:  EBANKGO02676119
Your ref: +BTR/03/267-097
Date:     30th July 2003
Delivery ref:  00Z0030730023602

### We confirm having remitted the following Standard transfer.

Amount debited:  GBP  73,757.00
From account:  600822-95142940
Amount sent:  GBP  73,757.00

Debit date: 30th July 2003

In favour of:
JENIN ZAKAT COMMITTEE
ALAWQAF BUILDING
ALHASBA STREET, JENIN
PALESTINE

Beneficiary bank:
CAIRO-AMMAN BANK
JENIN BRANCH
PALESTINE

Beneficiary account number:
016002364000

Payee bank:
CAIRO AMMAN

Payment details:
WAH 2' RIYADH/SHARQIAH ORPHANS,
SCHOOL KIT AND NEEDY STUDENTS,
AND TWO FREEZER UNITS

Ordered by:
INTERPAL

Transactional information:

Requested amount:  GBP  73,757.00

Rate:
Currency exchange contract:

NWB commission charges:  GBP  11.00

Agent banks charges:  0.00

Charges debited to account: 600822-95142983

This notification is not confirmation of receipt of the funds by the beneficiary - the Bank does not accept any liability whatsoever for any loss or damage arising in any way from any use of or reliance placed on the information.

Sheet 29 of 31

National Westminster Bank plc. Registered in England No 929027. Registered Office, 135 Bishopsgate, London EC2M 3UR

Regulated by the Financial Services Authority.

Agency agreements exist between members of The Royal Bank of Scotland Group.

NatWest Bank PLC

# EXHIBIT C

♻ **NatWest**

## PAYMENT DEBIT CONFIRMATION

DDD092.D001473

THE SECRETARY
PALESTINIANS RELIEF & DEV FUND
PO BOX NO 3333
LONDON
NW6 1RW

Our ref:   EBANKGO03684066
Your ref: +BTR/03/369-178
Date:    5th November 2003
Delivery ref:  0020031105024512

**We confirm having remitted the following Standard transfer.**

Amount debited:  GBP  32,329.00
From account:   600822-95142940          Debit date: 5th November 2003
Amount sent:    GBP  32,329.00

In favour of:                            Beneficiary bank:
JENIN ZAKAT COMMITTEE                     CAIRO-AMMAN BANK
ALAWQAF BUILDING                         JENIN BRANCH
ALHASBA STREET, JENIN                     PALESTINE
PALESTINE

Beneficiary account number:              Payee bank:
015002364000                             CAIRO AMMAN

Payment details:                         Ordered by:
REBUILDING OF VILLAGE MOSQUE,            INTERPAL
RAMADAN AND SPONSORSHIP PROJECTS

Transactional information:

Requested amount:      GBP  32,329.00

Rate:
Currency exchange contract:

NWB commission charges:   GBP  11.00

Agent banks charges:      0.00

Charges debited to account: 600822-95142983

This notification is not confirmation of receipt of the funds by the beneficiary - the Bank does not accept any liability whatsoever for any loss or damage arising in any way from any use of or reliance placed on the information.

Sheet 34 of 59

National Westminster Bank plc. Registered in England No 929027.  Registered Office: 135 Bishopsgate, London EC2M 3UR

Regulated by the Financial Services Authority.

Agency agreements exist between members of The Royal Bank of Scotland Group.

NatWest Bank PLC

## <u>CERTIFICATE OF SERVICE</u>

I, Aaron Schlanger, hereby certify that I am over the age of 18 years, am employed by the law firm of OSEN & ASSOCIATE, LLC and that on January 28, 2008, I caused the attached Fifth Amended Complaint to be served in accordance with the Federal Rules of Civil Procedure, and/or the Court's Local Rules, and/or the Rules on Electronic Service, upon the following counsel by indicated means:

**<u>Counsel for Defendant National Westminster Bank By Electronic Mail</u>**

Lawrence B. Friedman, Esq. (lfriedman@cgsh.com)
Jonathan I. Blackman, Esq. (jblackman@cgsh.com)
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006

/s/ Aaron Schlanger
Aaron Schlanger

**EXHIBIT 157 TO DECLARATION OF VALERIE SCHUSTER**



James P. Bonner
SHALOV STONE BONNER & ROCCO LLP
485 Seventh Avenue, Suite 1000
New York, NY 10018
(212) 239-4340

Local Counsel for Plaintiffs



FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ MAR 0 8 2007 ★
BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------x

Natan Applebaum for the Estate of David Applebaum, Natan
Applebaum for the Estate of Naava Applebaum, Debra Applebaum,
The Estate of Jacqueline Applebaum, Natan Applebaum, Shira
Applebaum, Yitzchak Applebaum, Shayna Applebaum, Tovi Belle
Applebaum, Geela Applebaum Gordon; Chaya Tziporah Cohen, Philip
Litle, Philip Litle for the Estate of Abigail Litle, Elishua Litle, Hannah
Litle, Heidi Litle, Josiah Litle, Noah Litle, Ari Horovitz, Batsheva
Horovitz, David Horovitz, Bernice Wolf for the Estate of Debra Ruth
Horovitz, Bernice Wolf for the Estate of Eli Natan Horovitz, Leah
Horovitz, Moshe Horovitz, Nechama Horovitz, Shulamite Horovitz, Tovi
Horovitz, Tvi Horovitz, Uri Horovitz, Bernice Wolf, Bryan Wolf, Stanley
Wolf, Fran Strauss Baxter, William J. Baxter, Ariela Freirmark
Menachem Freirmark, Hadassah Freirmark, Phyllis Pam, Rivka Reena
Pam, Shoshana Tita, Ezra Tita, Ephraim Tita, Ephriam Tita for the Estate
of Bertin Tita, Rachel Potolski, Ovadia Topporowitch, Tehila
Topporowitch, Yisrael Topporowitch, Yitzchak Topporowitch, Miriam
Ehrenfeld, Joseph Rose, Leibel Reinitz, Malvia Reinitz, Margali Reinitz
Mendy Reinitz, Miriam Reinitz, Rivka Reinitz, Samuel Reinitz, Shmuel
Reinitz, Yakov Reinitz, The Estate of Mordechai Reinitz, The Estate of
Yissocher Dov Reinitz, Yitzchok Reinitz, Raizel Shimon Leah Tauber
Helen Weider, Avrohom D. Richter, Breina Richter, Miriam Leah Richter
Moshe Richter, Nechama Richter, Sara Malka Richter, Shlomo Chaim
Richter, Tranne Richter, Yakov Yosef Richter, Yechiel Richter, Yehudis
Richter, Yisroel Richter, Yitzchok Richter, Perl
Brailofsky, Malky Breuer, Ester Buxbaum, Gittel Cohen, Chaya Freisel
Rachel Rosner, Elizabeth Schwartz, Jacob Schwartz, Max Schwartz
Michael Schwartz, Phillip Schwartz, Abraham Zarkowsky, Aron
Zarkowsky, Bshava Zarkowsky, Mendel Zarkowsky for the Estate of Eli
Zarkowsky, Ezriel Zarkowsky, Gittel Zarkowsky, Mendel Zarkowsky for
the Estate of Goldie Zarkowsky, Joseph Zarkowsky, Mendel Zarkowsky
Miriam Zarkowsky, Shrage Zarkowsky, Trany Zarkowsky, Yehuda
Zarkowsky, Erik Schecter, Shlomo Tratner, The Estate of Tiferet Tratner.

Plaintiffs,

07  916

COMPLAINT

NO:

SIFTON, J

MATSUMOTO, M.J.

-against-          :

NATIONAL WESTMINSTER BANK, PLC,     :
101 Park Avenue                   :
New York, NY 10178,              :

                 Defendant.      :

                           :

-----------------------------------------------------------------------------x

The Plaintiffs in this action ("Plaintiffs"), by their attorneys, respectfully submit this Complaint to the Honorable Court and allege the following upon information and belief. The Plaintiffs include: Natan Applebaum for the Estate of David Applebaum, Natan Applebaum for the Estate of Naava Applebaum, Debra Applebaum, The Estate of Jacqueline Applebaum, Natan Applebaum, Natan Applebaum for the Estate of Naava Applebaum, Shira Applebaum, Yitzchak Applebaum, Shayna Applebaum, Tovi Belle Applebaum and Geela Applebaum Gordon (collectively, the "Applebaum Plaintiffs"); Chaya Tziporah Cohen; Philip Litle, Philip Litle for the Estate of Abigail Litle, Elishua Litle, Hannah Litle, Heidi Litle, Josiah Litle and Noah Litle (collectively, the "Litle Plaintiffs"); Ari Horovitz, Batsheva Horovitz, David Horovitz, Bernice Wolf for the Estate of Debra Ruth Horovitz, Bernice Wolf for the Estate of Eli Natan Horovitz, Leah Horovitz, Moshe Horovitz, Nechama Horovitz, Shulamite Horovitz, Tovi Horovitz, Tvi Horovitz, Uri Horovitz, Bernice Wolf, Bryan Wolf and Stanley Wolf (collectively, the "Horovitz Plaintiffs"); Fran Strauss Baxter and William J. Baxter (collectively, the "Baxter Plaintiffs"); Ariela Freirmark, Menachem Freirmark and Hadassah Freirmark, (collectively, the "Freirmark Plaintiffs"); Phyllis Pam and Rivka Reena Pam (collectively, the "Pam Plaintiffs"); Shoshana Tita, Ezra Tita, Ephraim Tita and Ephriam Tita for the Estate of Bertin Tita (collectively, the "Tita Plaintiffs"); Rachel Potolski, Ovadia Topporowitch, Tehila Topporowitch, Yisrael Topporowitch and Yitzchak

Topporowitch (collectively, the "Nathensen Plaintiffs"); Miriam Ehrenfeld, Joseph Rose,

Leibel Reinitz, Malvia Reinitz, Margali Reinitz, Mendy Reinitz, Miriam Reinitz, Rivka

Reinitz, Samuel Reinitz, Shmuel Reinitz, Yakov Reinitz, The Estate of Mordechai

Reinitz,The Estate of Yissocher Dov Reinitz, Yitzchok Reinitz, Raizel Shimon Leah Tauber

and Helen Weider (collectively, the "Reinitz Plaintiffs"); Avrohom D. Richter, Breina

Richter, Miriam Leah Richter, Moshe Richter, Nechama Richter, Sara Malka Richter,

Shlomo Chaim Richter, Tranne Richter, Yakov Yosef Richter, Yechiel Richter, Yehudis

Richter, Yisroel Richter and Yitzchok Richter (collectively the "Richter Plaintiffs"); Perl

Brailofsky, Yosef Brailofsky, Malky Breuer, Ester Buxbaum, Gittel Cohen, Chaya Freisel,

Rachel Rosner, Elizabeth Schwartz, Jacob Schwartz, Max Schwartz, Michael Schwartz,

Phillip Schwartz, Abraham Zarkowsky, Aron Zarkowsky, Bshava Zarkowsky, Mendel

Zarkowsky for the Estate of Eli Zarkowsky, Ezriel Zarkowsky, Gittel Zarkowsky, Mendel

Zarkowsky for the Estate of Goldie Zarkowsky, Joseph Zarkowsky, Mendel Zarkowsky,

Miriam Zarkowsky, Shrage Zarkowsky, Trany Zarkowsky and Yehuda Zarkowsky

(collectively, the "Zarkowsky Plaintiffs"); Erik Schecter; Shlomo Tratner, and The Estate of

Tiferet Tratner.

## NATURE OF THE ACTION

1.     This is a complaint for damages arising out of the conduct of defendant National

Westminster Bank, PLC ("NatWest"). Defendant is a financial institution incorporated and

headquartered in the United Kingdom that knowingly collected, provided and transmitted

money and financial services to HAMAS[1], a Foreign Terrorist Organization ("FTO") (as that

term is defined in 8 U.S.C. § 1189 of the Antiterrorism and Effective Death Penalty Act of

1996 ("AEDPA")).  NatWest has thereby substantially aided and abetted the commission of

---

[1] HAMAS is an acronym for "Harakat al-Muqawama al-Islamiyya" also known as the "Islamic Resistance Movement."

acts of international terrorism, as defined by 18 U.S.C. § 2331, including the terrorist attacks that injured the plaintiffs, and has violated the prohibitions on providing material support for acts of international terrorism (18 U.S.C. §§ 2339B ) and on financing acts of international terrorism (18 U.S.C. §§ 2339C) set forth in the Antiterrorism Act ("ATA") as amended by the AEDPA and is civilly liable under §2333 (a) of the ATA to the plaintiffs who have been injured in their person by reason of acts of international terrorism.

## JURISDICTION AND VENUE

2.     This Court has subject matter jurisdiction over this action pursuant to 18 U.S.C. §§ 2333 and 2334, as a civil action brought by nationals of the United States, who have been killed or injured by reason of acts of international terrorism, and/or their estates, survivors, and heirs.  The Court also has subject matter jurisdiction over this action based on diversity of citizenship pursuant to 28 U.S.C. § 1332(a)(2).  The matter in controversy exceeds the sum or value of $75,000.00 exclusive of interest and costs.

3.     Venue is proper in this district pursuant to 18 U.S.C. § 2334(a) and 28 U.S.C. § 1391(d).

4.     NatWest is subject to personal jurisdiction in the United States pursuant to Fed.R.Civ.P.4(k) because, among other things, it continuously and systematically does business in the United States.  The defendant is also subject to personal jurisdiction in the United States pursuant to 18 U.S.C. § 2339B(d)(1)(D) because it has committed tortious acts within the United States by transferring funds through the United States for the benefit of HAMAS, and has purposefully availed itself of United States jurisdiction in the course of committing the wrongful acts alleged herein.

## THE PARTIES

4

### A.   The Plaintiffs

### Café Hillel Bombing – September 9, 2003

### The Applebaum Family

5.      Dr. David Applebaum and his daughter, Naava Applebaum, were both citizens of the United States.  Dr.  Applebaum and Naava were both murdered in the terrorist bombing of Café Hillel in Jerusalem, Israel on September 9, 2003.   HAMAS has claimed responsibility for the bombing, which was committed by HAMAS terrorist Ramez Slmi Abu-Salem.

6.      Dr. Applebaum was born and educated in the United States.  At the time of his death, he was the director of the Shaarei Zedek Hospital Emergency Room, which is located in Jerusalem, Israel.  He supervised the Mobile Intensive Care Units of Magen David Adom (Jerusalem).  Magen David Adom, which in Hebrew means the Red Star of David, is the Israeli organization that is the equivalent of the American Red Cross.  Magen David Adom is an Israeli relief, medical and humanitarian organization that works in cooperation with the International Red Cross.  Dr. Applebaum was the founder, managing partner and managing director of the Terem Clinics, whose urgent and primary care clinics throughout Israel treat over 200,000 patients a year.  He had personally assisted many injured victims of terrorism in Israel, and removed the remains of many victims of terrorism who had been murdered in Israel.  On the night of his own death, one night before the planned marriage of his daughter, Naava, he and Naava had gone together to Café Hillel in Jerusalem.

7.      Dr. Applebaum and Naava were arriving at the café when the HAMAS suicide bomber entered the restaurant and detonated a bomb, brutally and intentionally murdering both Dr. Applebaum and his daughter, Naava, along with 5 other people.

8.    Debra Applebaum is a national of the United States and presently resides in Israel. She is the wife of David Applebaum and the mother of Naava Applebaum.

9.    Upon hearing of the bombing, Mrs. Applebaum immediately began attempting to contact her husband on his cell phone, and by calling his pager, knowing that Dr. Applebaum and Naava were headed to Café Hillel in order to make a quick stop there to pick up some food for the family members who were at home working on the next evening's wedding preparations. When Dr. Applebaum did not answer his cell phone, nor his pager, nor make some kind of contact with the family as he would do after every terrorist attack (he was often one of the first medical personnel in Israel to be contacted by the authorities in the event of a terrorist attack), two of the Applebaum children, Shira and Yitchak, ran to the scene of the attack to find their father and sister. Mrs. Applebaum then went to Shaarei Zedek hospital, as she had received news from eyewitnesses that they had seen Naava placed on a stretcher. Debra Applebaum has suffered irreparable and irreplaceable loss over the terrorist murder of her husband and daughter. It is inconceivable to her that her husband and daughter, on the eve of her daughter's wedding, could have been murdered at the local Jerusalem coffee shop, Café Hillel. It is beyond comprehension that a father and daughter, on the eve of the daughter's wedding, could have gone out for a quiet moment together in preparation for the daughter's wedding, and that instead of joy over the upcoming wedding, the family suffered the tragic death and loss of these beautiful people. Instead of a wedding, they attended a funeral and mourned their loss, sitting shiva in accordance with traditional Jewish customs and law. Debra Applebaum has suffered, and continues to suffer, severe mental anguish, pain and suffering and extreme emotional distress over the loss of her husband and daughter, loss of consortium and loss of income, all to her damage.

10.    Jacqueline Applebaum was a citizen of the United States who lived in Israel. She was the mother of David Applebaum. She was anxiously and excitedly awaiting the wedding of her granddaughter, Naava. Instead of a wedding, she attended their funeral and mourned their loss until her own passing.

11.    Upon hearing of the murder of her son and granddaughter, Jacqueline Applebaum suffered severe mental anguish, pain and suffering and extreme emotional distress, all to her damage.

12.    Recently Jacqueline Applebaum passed away. Her estate is a plaintiff in this action.

13.    Natan Applebaum is a citizen of the United States and currently resides in New York. He is the son of David Applebaum and the brother of Naava Applebaum. At the time of their murder he was residing with his family in Jerusalem, and was anxiously and excitedly awaiting the wedding the following evening of his sister, Naava. Instead of a wedding, he attended the funeral of his father and sister, and mourned their loss.

14.    The murder of his father, David, and sister, Naava, has caused Natan severe mental anguish, pain and suffering and extreme emotional distress,, all to his damage.

15.    Shira Applebaum is a citizen of the United States and currently resides in Israel. She is the daughter of David Applebaum and the sister of Naava Applebaum. At the time of their murder, she was residing with her family in Jerusalem, and was anxiously and excitedly awaiting the wedding the following evening of her sister, Naava. Instead of a wedding, she attended the funeral of her father and sister, and mourned their loss.

16.    The murder of her father, David, and sister, Naava, has caused Shira severe mental anguish, pain and suffering and extreme emotional distress, all to her damage.

17.     Yitzchak Applebaum is a citizen of the United States and currently resides in Israel. He is the son of David Applebaum and the brother of Naava Applebaum. At the time of their murder, he was residing with his family in Jerusalem, and was anxiously and excitedly awaiting the wedding the following evening of his sister, Naava. Instead of a wedding, he attended the funeral of his father and sister, and mourned their loss.

18.     The murder of his father, David, and sister, Naava, has caused Yitzchak severe mental anguish, pain and suffering and extreme emotional distress, all to his damage.

19.     Shayna Applebaum is a citizen of the United States and currently resides in Israel. She is the daughter of David Applebaum and the sister of Naava Applebaum. At the time of their murder, she was residing with her family in Jerusalem, and was anxiously and excitedly awaiting the wedding the following evening of her sister, Naava. Instead of a wedding, she attended the funeral of her father and sister, and mourned their loss.

20.     The murder of her father, David, and sister, Naava, has caused Shayna severe mental anguish, pain and suffering and extreme emotional distress, all to her damage.

21.     Tovi Belle Applebaum is a citizen of the United States and currently resides in Israel. She is the daughter of David Applebaum and the sister of Naava Applebaum. At the time of their murder, she was residing in Jerusalem with her family. Instead of a wedding, she attended the funeral of her father and sister, and mourned their loss.

22.     The murder of her father, David, and sister, Naava, has caused Tovi Belle severe mental anguish, pain and suffering and extreme emotional distress, all to her damage.

23.     Geela Applebaum Gordon is a citizen of the United States and resides in Israel. She is the sister of David Applebaum. At the time of the murder of her brother and niece, she was in Israel awaiting the wedding of her niece. Instead of a wedding, she attended the

funeral of her brother and niece, and mourned their loss. The murder of her brother, David, and niece, Naava, has caused Geela severe mental anguish, pain and suffering and extreme emotional distress as a result of said losses, all to her damage.

### Chava Tziporah Cohen

24.    Chaya Tziporah ("Tzippy") Cohen is a citizen of the United States and a resident of Brooklyn, New York who was seriously injured at the terrorist attack on Café Hillel. Tzippy was in Israel for a 2 ½ week vacation. Seven people were killed in the terror attack, including Dr. David Applebaum and his daughter, Naava Applebaum.

25.    Tzippy was struck with shrapnel in the back from the bomb and was hospitalized for several days. She saw and heard horrible things as she ran from the blown up cafe with her friends. She has suffered pain, scars and severe emotional distress and mental anguish as a result of this terror attack, all to her damage.

### Suicide Bombing of Egged Bus No. 37 – March 5, 2003

### The Litle Family

26.    Abigail Litle was a citizen of the United States. She was, at the time of her murder, living with her parents and family in Haifa, Israel when she was killed in the terrorist bombing of Bus No. 37 in Haifa, Israel on March 5, 2003. HAMAS, a designated Foreign Terrorist Organization, claimed responsibility for the bombing, which was committed by HAMAS terrorist, Mohamad Al Kawasmi.

27.    A Baptist activist in Arab-Jewish co-existence projects and an eighth-grade student majoring in biology and environmental studies, Abigail was riding the bus on her way home from school when a suicide bomber detonated a bomb filled with metal shrapnel, killing 17 people, including Abigail, and wounding 53 other persons. The terrorist left

9

behind a note praising the September 11, 2001 attacks on the World Trade Center in New York City.

28.     Philip and Heidi Litle are nationals of the United States and presently reside in the City of Haifa in the State of Israel pursuant to their work with the Baptist ministry.  They are the mother and father of Abigail Litle.

29.     Mr. and Mrs. Litle first learned of the bus bombing when a family friend called their house to ask if their five children were all right.  Mr. and Mrs. Litle turned on the television to view news reports of the terrorist attack.  The reports initially provided misinformation regarding the location of the attack and in which direction the bus had been traveling.  The Litles accordingly believed all of their children were okay, but as further news reports and photographs came in, they became increasingly alarmed.

30.     By looking at photographs of the charred remains of the bus, the Litles could recognize its location and realized that it had been traveling in a different direction than they previously thought.  All of the Litles' children other than Abigail were either at home or their location had otherwise been accounted for.

31.     The mobile phone network was down and Mr. and Mrs. Litle were unsure if Abigail had a mobile phone with her, so they clung to the belief that she could be alive, but feared that she might be dead.  Abigail's friends began calling her house to see if she was all right, and Mr. and Mrs. Litle began to realize that most of Abigail's friends had been accounted for.  However, Mr. and Mrs. Litle had still heard nothing from their daughter when Mr. Litle saw a picture of the destroyed remains of Bus. No. 37, with a blue coat that he believed to be Abigail's draped across one of the seats.

10

32.     Mr. and Mrs. Litle called the three major hospitals in the area. The first two hospitals had no matching description. Mr. and Mrs. Litle were unable to get through to the third, so their pastor went to the hospital to search for Abigail among the victims. Mr. and Mrs. Litle finally got through to the hospital and were told they could come look for their daughter. When they neared the hospital entrance, Mr. and Mrs. Litle received a telephone call from the hospital telling them to come immediately.

33.     Mr. and Mrs. Litle located the hallway within the hospital designated as the meeting point for those attempting to locate loved ones injured or killed in the attack. The Litles' pastor was waiting and told them the dreaded news that he had personally seen Abigail and she was dead. Mr. and Mrs. Litle waited to identify their daughter in the morgue for the Israeli police.

34.     Both the death of their beloved daughter and watching the various newscasts about the terrorist attack that displayed the bus' charred remains have caused Mr. and Mrs. Litle severe mental anguish, pain and suffering and extreme emotional distress.

35.     The Litles' other children waited at their home with a family friend for their parents to return.

36.     Elishua Litle is a citizen of the United States and currently resides in Israel with his parents and family. He is the 12-year-old brother of Abigail Litle.

37.     While his parents went to the hospital, he waited at his family's home with his siblings, other than Abigail, and a family friend, anxiously awaiting his parents' return.

38.     Elishua found out about his sister's death when his parents returned with the family pastor, a social worker, and a family friend who was also a psychologist.

39.    The murder of his sister Abigail has caused Elishua severe mental anguish, pain and suffering and extreme emotional distress over the loss of his sister.

40.    Hannah Litle is a citizen of the United States and currently resides in Israel with her family. She is the 13-year-old sister of Abigail Litle.

41.    While her parents went to the hospital, Hannah waited at her family's home with her siblings, other than Abigail, and a family friend, anxiously awaiting her parents' return.

42.    She found out about her sister's death when her parents returned with the family pastor, a social worker, and a family friend who was also a psychologist.

43.    The murder of her sister Abigail has caused Hannah severe mental anguish, pain and suffering and extreme emotional distress over the loss of her sister.

44.    Josiah Litle is a citizen of the United States and currently resides in Israel with his family. He is the brother of Abigail Litle.

45.    While his parents were at the hospital, Josiah waited at his family's home with his siblings, other than Abigail, and a family friend, anxiously awaiting his parents' return.

46.    He found out about his sister's death when his parents returned with the family pastor, a social worker, and a family friend who was also a psychologist.

47.    The murder of his sister Abigail has caused Josiah severe mental anguish, pain and suffering and extreme emotional distress over the loss of his sister.

48.    Noah Litle is a citizen of the United States and currently resides in Israel with his family. He is the brother of Abigail Litle.

49.    While his parents went to the hospital, Noah waited at his family's home with his siblings, other than Abigail, and a family friend, anxiously awaiting his parents' return.

50.    He found out about his sister's death when his parents returned with the family pastor, a social worker, and a family friend who was also a psychologist.

51.    The murder of his sister Abigail has caused Noah severe mental anguish, pain and suffering and extreme emotional distress over the loss of his sister.

### Terrorist Shooting in the home of Eli and Debra Horovitz – March 7, 2003
### The Horovitz Family

52.    Eli Natan and Debra Ruth Horovitz, husband and wife, were citizens of the United States and were in their apartment on Friday, March 7, 2003 eating Shabbat dinner when terrorists disguised as students infiltrated Kiryat Arba, Israel, shooting and killing them both.    The Estates of each are Plaintiffs herein.    HAMAS claimed responsibility for the terror attack.

53.    Moshe and Leah Horovitz are United States nationals who currently reside in Israel.    They are the natural parents of Eli Natan Horovitz and the in-laws of Debra Ruth Horovitz.

54.    They heard about their son's and daughter-in-law's deaths through their granddaughter.    Their son's and daughter-in-law's deaths caused them severe mental anguish, pain and suffering, trauma and extreme emotional distress.

55.    Shulamite Horovitz is a citizen of the United States and currently resides in Israel. She is the daughter of Eli Natan and Debra Ruth Horovitz.

56.    Shulamite was the first in her family to hear about her parents' death.

57.    She was visiting friends in Eilat on the day her parents were murdered.    Her parents were scheduled to go to Eilat with her, but, because her mother was not feeling well, they decided to meet Shulamite in Eilat the following day instead.

58.     Shulamite learned of her parents' murders while still in Eilat, but could not reach any of her family members and could not return to Jerusalem to be with her family because of Shabbat.

59.     She returned to Jerusalem and told her family the tragic news.

60.     The family in Israel congregated together at Eli's parents' house and prepared the funeral arrangements.

61.     Her parents' deaths and the pain, mental anguish, trauma and suffering she endured while waiting to be able to return to Jerusalem and be with her family caused Shulamite severe mental anguish, trauma and extreme emotional distress.

62.     Batsheva Horovitz is a citizen of the United States and currently resides in Israel. She is the daughter of Eli Natan and Debra Ruth Horovitz.

63.     She found out about her parents' deaths through her sister Shulamite. Her parents' deaths caused her severe mental anguish, trauma and extreme emotional distress.

64.     Nechama Horovitz is a citizen of the United States and currently resides in Israel. She is the daughter of Eli Natan and Debra Ruth Horovitz.

65.     She found out about her parents' deaths through her sister Shulamite. Her parents' deaths caused her severe mental anguish, trauma and extreme emotional distress.

66.     Tvi Horovitz is a citizen of the United States and currently resides in Israel. He is the son of Eli Natan and Debra Ruth Horovitz.

67.     He found out about his parents' deaths through his sister Shulamite. His parents' deaths caused him severe mental anguish, trauma and extreme emotional distress.

68.     Ari Horovitz is a citizen of the United States and currently resides in Israel. He is the brother of Eli Natan Horovitz.

69.     He heard of his brother's and sister-in-law's murders through his family in Israel. Their deaths caused him severe mental anguish, trauma and extreme emotional distress.

70.     David Horovitz is a citizen of the United States and currently resides in Israel. He is the brother of Eli Natan Horovitz.

71.     He heard of his brother and sister-in-law's murders through his family in Israel. Their deaths caused him severe mental anguish, trauma and extreme emotional distress.

72.     Tovi Horovitz is a citizen of the United States and currently resides in Israel. He is the brother of Eli Natan Horovitz.

73.     He heard of his brother's and sister-in-law's murders through his family in Israel. Their deaths caused him severe mental anguish, trauma and extreme emotional distress.

74.     Uri Horovitz is a citizen of the United States and currently resides in Israel. He is the brother of Eli Natan Horovitz.

75.     He heard of his brother's and sister-in-law's murders through his family in Israel. Their deaths caused him severe mental anguish, trauma and extreme emotional distress.

76.     Bernice Wolf is a citizen of the United States and currently resides in Israel. She is the natural mother of Debra Ruth Horovitz.

77.     Mrs. Wolf lived in Florida when her daughter was killed, but had plans to move to Israel to live with her daughter.

78.     Accordingly, she did not hear the news of her daughter's and son-in-law's murders with the rest of the family in Israel, but was alone when she learned of her daughter's murder.

79.     Mrs. Wolf originally learned that a couple in Kiryat Arba was murdered by terrorists when she read about the attack on the Internet on Friday, March 7, 2003.

15

80.     Because the article she read did not give the names of the victims, Mrs. Wolf had no confirmation that her daughter and son-in-law were the couple murdered in their home, although she was severely distressed by the news and feared that they were the ones killed.

81.     Mrs. Wolf could not reach her daughter and had heard nothing by the next morning.

82.     Mrs. Wolf attended the Saturday morning service at her synagogue.

83.     When she returned, she received a telephone call from her granddaughter in Israel informing her that her daughter and son in law, Debra and Eli, were murdered in the attack.

84.     Mrs. Wolf was devastated upon hearing the news of her daughter's and son-in-law's murders.

85.     Despite her immense personal grief, Mrs. Wolf had just two hours to pack her belongings, pass on the horrible news to her family in the United States and meet with officials from the Israeli Embassy to retrieve her ticket to Israel, so she could attend her daughter's and son-in-law's funeral the next day.

86.     Mrs. Wolf waited frantically in her home for someone to arrive from the Embassy, but nobody came.

87.     Eventually, Mrs. Wolf was forced to buy a ticket to Israel, as she feared she would miss her daughter's and son-in-law's funeral.

88.     She flew by herself to Canada, where she met her son, Stanley, and they completed the remainder of the trip to Israel together.

89.     When they arrived in Israel, they met Mrs. Wolf's other son, Brian Wolf, and the three drove to Jerusalem together.

90.     When they arrived in Jerusalem, the funeral procession had begun five hours before, and they were escorted through a crowd of more than 15,000 people to reach the covered bodies.

91.     Mrs. Wolf is nearly eighty years old and currently resides in Israel. Because she had planned to live in Israel with her daughter and son-in-law, her future there remains uncertain.

92.     In addition to the fear for her own future, the murders of Eli Natan and Debra Ruth Horovitz have caused Mrs. Wolf severe mental anguish, pain and suffering, trauma and extreme emotional distress, all to her damage.

93.     Stanley Wolf is a citizen of the United States and a citizen of the State of Massachusetts. He is the brother of Debra Ruth Horovitz.

94.     His mother told him of his beloved sister's death over the telephone.

95.     His sister's and brother-in-law's murders caused him severe mental anguish, trauma and extreme emotional distress, all to his damage.

96.     Bryan Wolf is a resident of the United States and a citizen of the State of Florida. He is the brother of Debra Ruth Horovitz.

97.     Mrs. Wolf was unable to reach him by telephone, and so he found out about his sister's death through a voice mail Mrs. Wolf left for him on his answering machine.

98.     He then flew to Israel to attend his sister's and brother-in-law's funeral.

99.     Due to his immense grief, Mr. Wolf was unable to stand on his own as he viewed his sister's covered body at her funeral, which lasted more than 13 hours.

100.    His sister's and brother-in-law's murders caused Mr. Wolf severe mental anguish, pain and suffering, trauma and extreme emotional distress, all to his damage.

### Mike's Place Suicide Bombing – April 30, 2003

### The Baxter Family

101.    William J. ("Jack") Baxter is a United States national and a resident of the State of New York.

102.    Jack, an American film producer, was seriously injured by a suicide bomber while at Mike's Place, a music club in Tel Aviv, Israel, on April 30, 2003.  HAMAS claimed responsibility for the bombing. Two HAMAS terrorists traveled from the United Kingdom and carried out the attack: Assef Mohammed Hanif and Omar Sharif.  One of the terrorists detonated a bomb inside the club.  The other terrorist's bomb malfunctioned and did not detonate.  He later drowned in the sea while attempting to escape.  The nightclub is located next door to the US Embassy to Israel and is frequented by many tourists and US Embassy personnel.

103.    Jack Baxter was on the front patio of Mike's Place at around 1:00 a.m.  The bar was near capacity when a suicide bomber detonated his explosives at the entrance of the club, killing 3 people and wounding more than 50 (fifty), including Jack, who was just a few steps from the blast.

104.    Jack Baxter was knocked into a coma and clung to life for three days at Ichilov Hospital in Tel Aviv.  Film footage depicts the terrible carnage and reflects the impact of this terror attack at Mike' Place.  The film is called *Blues by the Beach*.  .

105.    As a result of the terror attack, Mr. Baxter is still suffering from a brain contusion, hearing loss, and burns that have peeled away skin from his face and arms. Mr. Baxter is also partially paralyzed. Jack Baxter has suffered immense pain, suffering, mental anguish, extreme emotional distress, permanent disabling injuries, medical expenses, life's expenses,

loss of income, loss of consortium and irreparable disruption to his life, work and family life, all to his damage.

106.     Fran Strauss Baxter is a citizen of the United States and a resident of the State of New York.  She is the wife of Jack Baxter.

107.     Fran Strauss Baxter tried to fly to Israel to see her husband following the attack but was stopped by Israel's general work strike and other problems.  She suffered terribly upon learning of the attack upon her husband, and her inability to be at her husband's side while he was in a coma, clinging to life.  She arrived two days after the attack, on a flight organized and paid for by the Israeli Embassy, just as Jack left the intensive care unit.

108.     The attack against her husband, Jack, has caused Fran severe mental anguish, pain and suffering and extreme emotional distress, as well as irreparable disruption to her family life, relations with her husband, loss of consortium, loss of income and resultant damages, all to her damage.

### Suicide Bombing of Bus No. 14A – June 11, 2003

### The Friermark Family

109.     Ariela Freirmark and her parents are United States nationals.  They currently reside in the State of Israel.

110.     On June 11, 2003, Ariela Freirmark was on Bus 14A in Jerusalem, Israel on her way to a course in sign language.  Ariela is a speech therapist who works with handicapped children, and she had left home to take the bus to attend the course.  At the time, Ariela was 26 years old.  She is the daughter of Menachem and Hadassah Freirmark.  The Freirmark family grew up in Detroit, Michigan and has resided in Israel since approximately 1982, when Ariela was 4 years old.  Around 5:30 p.m., an individual dressed as an ultra-orthodox

religious Jewish person boarded Egged Bus No. 14A at the Mahane Yehuda Market. A short while later, as the bus drove down Jaffa Road, in Jerusalem, Israel, he detonated his bomb, wrecking the bus and killing sixteen passengers. Over 100 people were wounded, including dozens of nearby pedestrians. HAMAS claimed responsibility for the bombing. The suicide bomber who committed this brutal attack on behalf of HAMAS was Abed Al Mo'ti Mohammad Shabana. The terrorist was carrying a huge bomb containing a great deal of metal fragments, creating massive injuries.

111. Ariela suffered serious physical, personal and emotional injuries, pain, suffering, mental anguish, trauma and damage as a result of the explosion. The blast caused her to lose consciousness. When she awakened on the bus, she saw scores of people dead and injured lying around her. She suffered shrapnel wounds and a hearing loss which has required numerous operations and medical attention, as well as the expenditure of significant medical expenses on her behalf. Her injuries are permanent and ongoing and she has suffered pain, scars and severe emotional distress and mental anguish. She required surgery to remove the bolts from her body that were contained in the bomber's explosives.

112. Menachem and Hadassah Freirmark are the parents of Ariela Freirmark. They have suffered severe emotional distress and trauma as a result of their daughter being a victim of this terrorist attack. They have also incurred medical and life expenses for the reasonable and necessary care of Ariela that is required as a result of this incident, all to her and their damage.

### The Pam Family

113. Rivka Pam is a citizen of the United States.

114.    On June 11, 2003, 16-year-old Rivka Pam was on Bus No. 14A in Jerusalem, Israel. Around 5:30 p.m., an individual dressed as an ultra-orthodox Jew boarded Egged Bus No. 14A at the Mahane Yehuda market. A short while later, as the bus drove down Jaffa Road, within Jerusalem, Israel, he detonated his bomb, wrecking the bus and killing sixteen passengers. Over 100 people were wounded, including dozens of passersby. HAMAS claimed responsibility for the bombing. The suicide bomber who acted for HAMAS to commit this brutal attack was Abed Al Mo'ti Mohammad Shabana. He carried a huge bomb containing a great deal of metal fragments that caused massive injuries.

115.    Rivka works with children and this teenager's life has changed dramatically as a result of her injuries in this terrorist incident. She was hospitalized for a number of days in intensive care, suffered burns, lung damage, eye injury, scarring and severe hearing loss, which requires future medical and surgical care. Her happy outgoing personality has been affected because of the severe emotional distress and hearing loss, pain, suffering, mental anguish, trauma and extreme emotional distress that she has experienced from this terrorist attack, all to her damage.

116.    Phyllis Pam is a United States citizen and currently resides in the State of Israel. She is the natural mother of Rivka Pam.

117.    Phyllis has suffered severe emotional distress, trauma, pain and anguish as a result of her daughter being seriously injured in this terrorist incident. She has also incurred medical expenses for the reasonable and necessary care of Rivka that is required as a result of this incident, all to her damage.

### The Tita Family

118.    On June 11, 2003, Bertin Tita, age 75, was riding in Jerusalem, Israel on Egged Bus No. 14A. Bertin was a United States citizen who had lived for many years in the State of Texas. She and her husband, Ephraim, had returned to Israel shortly before 2003.

119.    At around 5:30 p.m. on June 11, 2003, a terrorist dressed as an ultra orthodox religious Jewish person boarded Egged Bus No. 14A at one of the larger outdoor markets in Jerusalem. As the bus drove through the heart of Jerusalem, Israel, the terrorist detonated his bomb, wrecking the bus and killing Bertin Tita and 15 other passengers on the public bus. In addition to these murders, the terrorist also injured over 100 people. HAMAS claimed responsibility for the attack, which was carried out by Maanti Shavana, a/k/a Abed Al Mo'ti Mohammad Shabana.

120.    Bertin Tita was retired from the fashion business, but had been spending time in Israel helping those in need. She was on her way to help a needy family when she was murdered by the HAMAS terrorist. Adding to the tragedy, Bertin's daughter, Shoshana Tita, a journalist living in the United States at the time, had come to visit her mother and father in Israel to celebrate her upcoming marriage. Shoshana was married in Israel just forty-eight hours before her mother was murdered. Bertin and Ephraim's son, Ezra, is also a United States citizen, like Bertin, Ephraim and his sister, Shoshana. Ezra was educated in the United States and resides in the State of Texas.

121.    Ephraim, Shoshana and Ezra have all suffered severe mental anguish, trauma, pain and suffering and extreme emotional distress over the murder of their mother and wife, Bertin, all to their damage and loss and to the damage and loss to the Estate of Bertin, a Plaintiff herein. Instead of the family spending many days together celebrating Shoshana's

22

wedding, they spent the period in deep mourning for the tragic and brutal death of Bertin. As the heirs and survivors of Bertin, they bring this wrongful death action. They also bring this action on behalf of the Estate of Bertin Tita, and individually, for the damages they sustained, as described herein.

### Suicide Bombing of Bus No. 2 – August 19, 2003

### The Nathensen Family

122. Tehilla Nathansen was killed and Chana, Matanya, Shoshana and Yehudit Nathansen were injured in the bombing of Bus No. 2 in Jerusalem, Israel, on August 19, 2003. HAMAS claimed responsibility for the bombing. The HAMAS terrorist who committed the suicide bombing was Ra'ed Abed Al-Hamed.

123. The Estate of Tehilla Nathansen and Chana, Matanya, Shoshana and Yehudit Nathansen individually are listed as plaintiffs Weiss v. National Westminster Bank, PLC, 05-CV-04622, a related action that is pending in the U.S. District Court for the Eastern District of New York, and accordingly their claims are not separately pled herein but are incorporated herein by reference.

124. Rachel Potolski is a citizen of the United States and Israel and currently resides in Israel. She is the sister of Chana Nathansen.

125. The injury to her sister Chana has caused Rachel severe mental anguish, trauma, pain and suffering and emotional distress, all to her damage.

126. Ovadia Topporowitch is a citizen of the United States and Israel and currently resides in Israel. She is the sister of Chana Nathansen.

127. The injury to her sister Chana has caused Ovadia severe mental anguish, trauma, pain and suffering and extreme emotional distress, all to his damage.

128. Tehila Topporowitch is a citizen of the United States and Israel and currently resides in Israel. She is the sister of Chana Nathansen.

129. The injury to her sister Chana has caused Tehila severe mental anguish, trauma, pain and suffering and extreme emotional distress, all to her damage.

130. Yisrael Topporowitch is a citizen of the United States and Israel and currently resides in Israel. He is the brother of Chana Nathansen.

131. The injury to his sister Chana has caused Yisrael severe mental anguish, trauma, pain and suffering and extreme emotional distress, all to her damage.

132. Yitzchak Topporowitch is a citizen of the United States and Israel and currently resides in Israel. He is the brother of Chana Nathansen.

133. The injury to his sister Chana has caused Yitzchak severe mental anguish, trauma, pain and suffering and extreme emotional distress, all to his damage.

### The Reinitz Family

134. Mordechai Reinitz and his two sons, Yissocher Dov and Mendy, citizens of the United States, were on bus No. 2 in Jerusalem, Israel on August 19, 2003 when a suicide bomber detonated his weapon and the bus exploded.

135. Mordechai and Yissocher Dov were both killed, and their estates are plaintiffs herein. Mendy Reinitz, who was injured in the bombing, is a plaintiff herein individually on behalf of himself and as a representative of said estates.

136. Mendy received shrapnel wounds in the shoulders and back and underwent intensive surgery. The surgery was successful, but Mendy will still have some shrapnel in his body for the rest of his life. Mendy is a citizen of the United States and of Israel and currently resides in Israel.

137. The murder of his father, Mordechai, and brother, Yissocher Dov, has caused Mendy severe mental anguish, trauma, pain and suffering and extreme emotional distress, all to his damage.

138. Chaya Reinitz is a legal resident of the United States and currently resides in Israel. She is the wife of Mordechai and the mother of Yissocher Dov and Mendy.

139. The murder of her husband, Mordechai, and son, Yissocher Dov, has caused Chaya severe mental anguish, trauma, pain and suffering and extreme emotional distress, all to her damage.

140. Malvia and Joseph Reinitz are citizens of the United States and currently reside in Israel. They are the natural parents of Mordechai Reinitz.

141. The murder of their son, Mordechai, and grandson, Yissocher Dov, has caused Malvia and Joseph severe mental anguish, trauma, pain and suffering and extreme emotional distress, all to their damage.

142. Nicha Ostreicher is a dual citizen of the United States and Israel and currently resides in Israel. She is the daughter of Mordechai and the sister of Yissocher Dov and Mendy.

143. The murder of her father, Mordechai, and brother, Yissocher Dov, and injury to her brother, Mendy, has caused Nicha severe mental anguish, trauma, pain and suffering and extreme emotional distress, all to her damage.

144. Chaim Reinitz is a dual citizen of the United States and Israel and currently resides in Israel. He is the son of Mordechai and the brother is Yissocher Dov and Mendy.

145.   The murder of his father, Mordechai, and brother, Yissocher Dov, and injury to his brother, Mendy, has caused Chaim severe mental anguish, trauma, pain and suffering and extreme emotional distress, all to his damage.

146.   Margali Reinitz is a citizen of the United States and of Israel and currently resides in Israel. She is the daughter of Mordechai and the sister of Yissocher Dov and Mendy.

147.   The murder of her father, Mordechai, and brother, Yissocher Dov, and injury to her brother, Mendy, has caused Margali severe mental anguish, trauma, pain and suffering and extreme emotional distress, all to her damage.

148.   Miriam Reinitz is a citizen of the United States and of Israel and currently resides in Israel. She is the daughter of Mordechai and the sister of Yissocher Dov and Mendy.

149.   The murder of her father, Mordechai, and brother, Yissocher Dov, and the injury to her brother, Mendy, has caused Miriam severe mental anguish, trauma, pain and suffering and extreme emotional distress, all to her damage.

150.   Rivka Reinitz is a citizen of the United States and of Israel and currently resides in Israel. She is the daughter of Mordechai and the sister of Yissocher Dov and Mendy.

151.   The murder of her father, Mordechai, and brother, Yissocher Dov, and injury to her brother, Mendy, has caused Rivka severe mental anguish, trauma, pain and suffering and extreme emotional distress, all to her damage.

152.   Shmuel Reinitz is a citizen of the United States and of Israel and currently resides in Israel. He is the son of Mordechai and the brother of Yissocher and Mendy.

153.   The murder of his father, Mordechai, and brother, Yissocher Dov, and injury to his brother, Mendy, has caused Shmuel severe mental anguish, trauma, pain and suffering and extreme emotional distress, all to his damage.

154.    Yakov Reinitz is a citizen of the United States and of Israel and currently resides in Israel. He is the son of Mordechai and the brother of Yissocher Dov and Mendy.

155.    The murder of his father, Mordechai, and brother, Yissocher Dov, and injury to his brother, Mendy, has caused Yakov severe mental anguish, trauma, pain and suffering and extreme emotional distress, all to his damage.

156.    Yitchok Reinitz is a citizen of the United States and of Israel and currently resides in Israel. He is the son of Mordechai and the brother of Yissocher Dov and Mendy.

157.    The murder of his father, Mordechai, and brother, Yissocher Dov, and injury to his brother, Mendy, has caused Yitchok severe mental anguish, trauma, pain and suffering and extreme emotional distress, all to his damage.

158.    Leah Tauber is a citizen of the United States and of Israel and currently resides in Israel. She is the daughter of Mordechai and the sister of Yissocher Dov and Mendy.

159.    The murder of her father, Mordechai, and brother, Yissocher Dov, and injury to her brother, Mendy, has caused Leah severe mental anguish, trauma, pain and suffering and extreme emotional distress, all to her damage.

160.    Miriam Ehrenfeld is a citizen of the United States and currently resides in Israel. She is the sister of Mordechai.

161.    The murder of her brother, Mordechai, and nephew, Yissocher Dov, has caused Miriam severe mental anguish, trauma, pain and suffering and extreme emotional distress, all to her damage.

162.    Rose Joseph is a citizen of the United States and currently resides in Israel. She is the sister of Mordechai.

163. The murder of her brother, Mordechai, and nephew, Yissocher Dov, has caused Rose severe mental anguish, trauma pain and suffering and extreme emotional distress, all to her damage.

164. Devora Pollack is a citizen of the United States and currently resides in Israel. She is the sister of Mordechai.

165. The murder of her brother, Mordechai, and nephew, Yissocher Dov, has caused Devora severe mental anguish, trauma, pain and suffering and extreme emotional distress, all to her damage.

166. Benjamin Reinitz is a citizen of the United States and currently resides in Israel. He is the brother of Mordechai.

167. The murder of his brother, Mordechai, and nephew, Yissocher Dov, has caused Benjamin severe mental anguish, trauma, pain and suffering and extreme emotional distress, all to his damage.

168. Leibel Reinitz is a citizen of the United States and currently resides in Israel. He is the brother of Mordechai.

169. The murder of his brother, Mordechai, and nephew, Yissocher Dov, has caused Leibel severe mental anguish, trauma, pain and suffering and extreme emotional distress, all to his damage.

170. Samuel Reinitz is a citizen of the United States and currently resides in Israel. He is the brother of Mordechai.

171. The murder of his brother, Mordechai, and nephew, Yissocher Dov, has caused Samuel severe mental anguish, trauma, pain and suffering and extreme emotional distress, all to his damage.

172.    Raizel Shimon is a citizen of the United States and currently resides in Israel. She is the sister of Mordechai and aunt of Yissocher Dov.

173.    The murder of her brother, Mordechai, and nephew, Yissocher Dov, has caused Raizel severe mental anguish, trauma, pain and suffering and extreme emotional distress, all to her damage.

174.    Helen Weider is a citizen of the United Stated and currently resides in Israel. She is the sister of Mordechai and aunt of Yissocher Dov.

175.    The murder of her brother, Mordechai, and nephew, Yissocher Dov, has caused Helen severe mental anguish, trauma, pain and suffering and extreme emotional distress, all to her damage.

### The Richter Family

176.    On August 19, 2003, Miriam Leah Richter, her great aunt, Goldie Zarkowsky, and Goldie's two children were on Bus No. 2 headed to the Western Wall in Jerusalem, Israel, when a suicide bomber detonated his explosives, injuring Miriam Leah.

177.    Miriam Leah, who was nine years old at the time of the bombing, is a citizen of both the United States and Israel and currently resides in Israel.

178.    As a result of the bombing Miriam Leah had shrapnel lodged in her eye, neck and chest. She underwent surgery and all of the shrapnel was removed except for what was in her chest. She will live with it there for the rest of her life.

179.    Since the attack, Miriam is traumatized. She cannot possibly travel to school by bus. She wakes up every night very upset. A normally studious child, she finds it difficult to concentrate. She has become a very edgy and anxious child and is easily antagonized. She

has endured great pain, suffering, mental anguish, trauma and extreme emotional distress, all to her damage.

180.    Moshe and Yehudis Richter are citizens of both the United States and Israel and currently reside in Israel. They are the natural mother and father of Miriam Leah.

181.    The attack on their daughter Miriam has caused Moshe and Yehudis severe mental anguish, trauma, pain and suffering and extreme emotional distress, as well as medical and life care expenses, all to her and their damage.

182.    Avrohom D. Richter is a citizen of both the United States and Israel and currently resides in Israel. He is the brother of Miriam Leah.

183.    The attack on his sister Miriam has caused Avrohom severe mental anguish, trauma, pain and suffering and extreme emotional distress, all to his damage.

184.    Breina Richter is a citizen of both the United States and Israel and currently resides in Israel. She is the sister of Miriam Leah.

185.    The attack on her sister Miriam has caused Breina severe mental anguish, trauma, pain and suffering and extreme emotional distress, all to her damage.

186.    Nechama Richter is a citizen of both the United States and Israel and currently resides in Israel. She is the sister of Miriam Leah.

187.    The attack on her sister Miriam has caused Nechama severe mental anguish, trauma, pain and suffering and extreme emotional distress, all to her damage.

188.    Sara Malka Richter is a citizen of both the United States and Israel and currently resides in Israel. She is the sister of Miram Leah.

189.    The attack on her sister Miriam has caused Sara severe mental anguish, trauma, pain and suffering and extreme emotional distress, all to her damage.

190.    Shlomo Chaim Richter is a citizen of both the United States and Israel and currently resides in Israel. He is the brother of Miriam Leah.

191.    The attack on his sister Miriam has caused Shlomo severe mental anguish, trauma, pain and suffering and extreme emotional distress, all to his damage.

192.    Tranne Richter is a citizen of both the United States and Israel and currently resides in Israel. She is the sister of Miriam Leah.

193.    The attack on her sister Miriam has caused Tranne severe mental anguish, trauma, pain and suffering and extreme emotional distress, all to her damage.

194.    Yakov Yosef Richter is a citizen of both the United States and Israel and currently resides in Israel. He is the brother of Miriam Leah.

195.    The attack on his sister Miriam has caused Yakov severe mental anguish, trauma, pain and suffering and extreme emotional distress, all to his damage.

196.    Yechiel Richter is a citizen of both the United States and Israel and currently resides in Israel. He is the brother of Miriam Leah.

197.    The attack on his sister Miriam has caused Yechiel severe mental anguish, trauma, pain and suffering and extreme emotional distress, all to his damage.

198.    Yisroel Richter is a citizen of both the United States and Israel and currently resides in Israel. He is the brother of Miriam Leah.

199.    The attack on his sister Miriam has caused Yisroel severe mental anguish, trauma, pain and suffering and extreme emotional distress, all to his damage.

200.    Yitzchok A. Richter is a citizen of both the United States and Israel and currently resides in Israel. He is the brother of Miriam Leah.

201. The attack on his sister Miriam has caused Yitzchok severe mental anguish, trauma, pain and suffering and extreme emotional distress, all to his damage.

### The Zarkowsky Family

202. Goldie Zarkowsky and her son, Eli Zarkowsky, were killed in the bombing of Bus No. 2 in Jerusalem, Israel on August 19, 2003. They were citizens of the United States and residents of the State of New York.

203. Bshava Zarkowsky was injured in the bombing of Bus No. 2 in Jerusalem, Israel on August 19, 2003. She is a citizen of the United States and a resident of the State of New York.

204. Bshava Zarkowsky suffered grave injuries in the attack.

205. The injuries she suffered and the murder of her mother Goldie and brother Eli has caused Bshava severe mental anguish, trauma, pain and suffering and extreme emotional distress, all to her damage.

206. Elizabeth and Max Schwartz are citizens of the United States and residents of the State of New York. They are the natural parents of Goldie and the grandparents of Eli.

207. Max Schwartz was in a business meeting with one of his sons Jacob. Jacob received an urgent call, but Max thought nothing of the call until Jacob returned with a look of despair on his face. Max inquired about the call but Jacob would not talk about it.

208. The scene around the house when Max and Jacob arrived home was unexpected. Many of his friends and family members were there to break the news to Max and his wife and to be there for them in their time of need. They flew to Israel immediately to tend to the matter at hand.

209.    A Holocaust survivor, Max had endured this kind of loss before, and that helped him to deal with this loss. Yet, nothing could compare to the pain, mental anguish, trauma and extreme emotional distress of losing his daughter and grandson, all to his damage. The shock and horror of the loss of his loved ones is a feeling that he will never forget.

210.    Elizabeth Schwartz was tending to her usual errands at the time of the attack. She spent her last hour of errands visiting with an elderly woman. She rushed home in order to fix supper for her husband. As she approached her home, she noticed that there were several cars parked in front of her house. She knew then that something was wrong. When she entered the house, her family members and friends collectively delivered the news to her that her daughter was on a public bus in Jerusalem, Israel when it was bombed.

211.    Elizabeth and her husband Max immediately flew to Israel to see about their daughter. That was where they found out that Goldie was also dead.

212.    Also a Holocaust survivor, Elizabeth had endured this kind of loss before and that helped her to deal with this loss. Yet, nothing could compare to the pain of losing her daughter and grandson. The shock and horror of the loss of her loved ones, and the mental anguish, pain, suffering, trauma and extreme emotional distress she suffered as a result is a feeling that she will never forget, all to her damage.

213.    Mendel Zarkowsky is a citizen of the United States and a resident of the State of New York. He is the husband of Goldie and the father of Eli. Mendel Zarkowsky brings this action on behalf of himself, the Estate of Goldie Zarkowsky and the Estate of Eli Zarkowsky.

214.    After a hot and humid day, Mendel was very tired and decided to relax by learning Torah in a local study hall. Goldie traveled by bus with their daughter Bshava and their son Eli to the Western Wall to pray the afternoon prayers. He spoke with his wife for

33

the last time over the telephone at around 6:30 p.m., shortly before she departed for the Western Wall with Bshava and Eli.

215.    At about 9:10 p.m., Mendel was getting out of a taxi when he heard sirens. Ambulances, police cars and fire engines were driving toward Shmuel HaNavi Street in Jerusalem, Israel.  At the time, Mendel did not pay much attention to what was going on.

216.    Mendel arrived at his nephew's apartment, where the family had been staying for his nephew's wedding.  There were no adults around, only small children.  The telephone rang and Mendel answered to the frantic voices of his brother-in-law and sister-in-law.  They told him that there had been a bombing on the bus that Goldie and the two children had been traveling on and that their daughter happened to be on the bus as well.

217.    Mendel arrived at the hospital to find his daughter Bshava covered in blood, disoriented and crying hysterically.  No one had any information on the whereabouts of his wife and son.

218.    After traveling from hospital to hospital in search of his missing wife and son, he was informed that two bodies had been recovered that could possibly be them.  After DNA testing, Mendel was told that indeed the bodies were those of his dead wife and son.

219.    Mendel's life has changed dramatically.  He is now the sole provider and caretaker for the 7 children who remain in the home.  With doctors' appointments, cooking, cleaning and all of the other things that come with caring for the children, as well as trying to help them to cope with the loss of their mother and brother, Mendel has no time for his former passions, like studying and tutoring children.

220.    As a result of the attacks, Mendel suffered severe mental anguish, pain, trauma, loss of consortium and extreme emotional distress, all to his damage.  He has spoken with

many doctors, experts and families who have experienced trauma but has yet to find out how to deal with his pain and the pain of his children, who seem to think that the loss of their mother and brother is somehow his fault.

221. The impact of this tragedy is a constant burden on Mendel. He misses the serenity, contentment and fulfillment of the union that he shared with Goldie.

222. Malky Breuer is a citizen of the United States and a resident of the State of New York. She is the sister of Goldie and the aunt of Eli.

223. Malky was in her apartment when her niece called and told her about the attack in Israel and that Goldie was on the bus when it was bombed. Malky was so crushed that she could not move. She sat still, devastated for hours until her brother called to check on her and to tell her that her parents were going to Israel to assist in the arrangements for her sister and nephew.

224. Malky's life has not been the same since. She misses the long talks she had with her sister and her bright smile. The shock and horror of losing her loved ones has caused mental anguish, trauma, pain and suffering and extreme emotional distress, all to her damage.

225. Esther Buxbaum is a citizen of the United States and a resident of the State of New York. She is the sister of Goldie and the aunt of Eli.

226. Esther was in the same hotel at which her sister Goldie had been staying when she learned of the attack. She arrived in Israel on the same day as Goldie. They were about to celebrate Esther's son's engagement. When she tried to reach Goldie, she was told that Goldie had gone back to the hotel. Two hours later, she tried to reach Goldie several more times to no avail. Esther began to get nervous.

227. Suddenly, she heard sirens. She saw people holding radios and looking serious and she began to inquire about what had happened. She was informed that there was a bombing on the bus that Goldie and her two children had been riding.

228. Instead of celebrating her son's engagement, Esther spent the next week mourning her sister and nephew at the bedside of her niece, Bshava, who was the only one of her family members who had survived the attack.

229. Esther's life is forever changed. Even during her happy moments she fears that bad things will happen because the loss of her loved ones occurred during a time of happiness for her own son. The shock and horror of the loss of her loved ones has caused mental anguish, trauma, pain and suffering and emotional distress, all to her damage. Esther has had to seek counseling to cope with her loss.

230. Gittel Cohen is a citizen of the United States and a resident of the State of New York. She is the sister of Goldie and the aunt of Eli.

231. The murder of her sister Goldie and nephew Eli has caused Gittel severe mental anguish, trauma, pain and suffering and extreme emotional distress, all to her damage.

232. Rachel Rosner is a citizen of the United States and a resident of the State of New York. She is the sister of Goldie and the aunt of Eli.

233. She was in New York at a shopping mall when a friend of hers in Israel called to inform her that Goldie was missing. Her friend then told her that she had to go because there was commotion outside and she wanted to see what was going on.

234. Rachel then went home. When she was not greeted by her daughter's welcoming outstretched arms, she knew that something was wrong. Her family emerged with faces of sorrow and gave her the horrible news.

235. Since the loss of her sister, Rachel has mourned continuously. The shock and horror of losing her loved ones has caused mental anguish, trauma, pain and suffering and extreme emotional distress, all to her damage.

236. Jacob Schwartz is a citizen of the United States and a resident of the State of New York. He is the brother of Goldie and uncle of Eli.

237. Jacob was in a business meeting with his father when he found out about the attack. Jacob received a call from his oldest son, Pinchas, who lives in Israel, informing him of the bus bombing in Israel and that his sister and two of her children were on the bus. He concealed his emotions because he did not want to unnecessarily alarm his father. His father repeatedly asked Jacob whom he was speaking with when he left the meeting numerous times to call Israel for updates, but Jacob did not tell him because it looked as though Goldie and her children had perished in the attack and he did not know how to tell his father.

238. After the meeting was over, Jacob and his father headed home. Jacob then received a call confirming his fears; Goldie was dead. He still did not tell his father. Fortunately, others arranged for a friend of his father's and a doctor to break the news to Jacob's parents so that he wouldn't have to do it. Soon after, Jacob's parents boarded a plane to Israel to take care of the arrangements for their daughter and grandson.

239. During and after the incident, their years of growing up together flashed before Jacob's eyes. He specifically remembered the day Goldie was born. He was eight years old at the time.

240. After the incident, Jacob was given medication by a local doctor and also sought counseling and mental health treatment for his condition. He suffers from depression and has a nervous condition as a result of the death of his loved ones. His business has suffered as a

result of his condition and it has also put a strain on his marriage. The shock and horror of losing his loved ones has caused mental anguish, trauma, pain and suffering and extreme emotional distress, all to his damage.

241. Michael Schwartz is a citizen of the United States and a resident of the State of New York. He is the brother of Goldie and the uncle of Eli.

242. Michael was driving on a business errand for work when he found out about the attack in Israel. Fortunately, he had reached his destination before his children called his cell phone to give him the bad news.

243. Michael lost consciousness immediately after hearing the news. Bystanders revived him and his son was called and was by his side within moments.

244. Since his sister's death, Michael experiences anxiety attacks, uncontrollable crying episodes, nervous tension and many sleepless nights. He is unable to handle any stressful situations. The shock and horror of losing his loved ones has caused him mental anguish, trauma, pain and suffering and extreme emotional distress, all to his damage.

245. Phillip Schwartz is a citizen of the United States and is a resident of the State of New York. He is the brother of Goldie and the uncle of Eli.

246. Phillip was driving in his car listening to his radio when the station gave a report of a bus bombing in Jerusalem. Instantly, Goldie came to his mind because she was in Israel. His fear was confirmed when he was informed by his brother Jacob that his sister and two of her children were on the bus.

247. Phillip has not received any medical attention to ease the pain of his loss due to financial constraints. The shock and horror of losing his sister has caused him mental anguish, trauma, pain and suffering and extreme emotional distress, all to his damage.

248.    Perl Brailofsky is a citizen of the United States and a resident of the State of New York. She is the daughter of Goldie and the sister of Eli.

249.    Perl was in Spring Valley, New York when the attacks occurred.

250.    She happened to call her mother where she was staying in Israel to check up on her. The daughter of another woman that lived there answered the telephone. When Perl asked to speak with her mother, the girl was silent. After asking the little girl several times where her mother was to no avail, the girl finally spoke up and said that there had been a bombing. Perl bombarded the child with questions, but she had no answers.

251.    Perl has had to seek counseling to cope with the loss. The shock and horror of losing her mother has caused mental anguish, pain and suffering and extreme emotional distress.

252.    Perl's life changed instantly after the loss of her mother. She is very withdrawn and no longer has the many friends that she once had. The burden of helping to care for siblings has fallen on her.

253.    The murder of her mother Goldie and brother Eli has caused Perl severe mental anguish, trauma, pain and suffering and extreme emotional distress, all to her damage.

254.    Abraham Zarkowsky is a citizen if the United States and a resident of the State of New York. He is son of Goldie and the brother of Eli.

255.    The shock and horror of losing his loved ones has caused him mental anguish, trauma, pain and suffering and extreme emotional distress, all to his damage.

256.    Aron Zarkowsky is a citizen if the United States and a resident of the State of New York. He is the son of Goldie and the brother of Eli.

257.    The shock and horror of losing his loved ones has caused him mental anguish, trauma, pain and suffering and extreme emotional distress, all to his damage.

258.    Ezriel Zarkowsky is a citizen of the United States and a resident of the State of New York. He is the son of Goldie and the brother of Eli.

259.    Ezriel was at home on his lunch break when the attack occurred.

260.    Ezriel called his aunt's house and was informed about the tragic incident. He was given pills by the EMS crew that attended to him at the time he was notified about the attack.

261.    After his mother's death, Ezriel suffered intense phobias. He suffers from nightmares and wakes up in cold sweats. Whenever family members are not where they said they would be or do not arrive when they said they would, he becomes hysterical and apprehensive. Despite seeing numerous psychologists, nothing has alleviated his phobias.

262.    The shock and horror of losing his mother has caused him severe mental anguish, trauma, pain and extreme emotional distress, all to his damage. Ezriel has had to seek counseling to cope with his loss.

263.    Gittel Zarkowsky is a citizen of the United States and a resident of the State of New York. She is the daughter of Goldie and the sister of Eli.

264.    The shock and horror of losing her loved ones has caused her mental anguish, trauma, pain and suffering and extreme emotional distress, all to her damage.

265.    Joseph Zarkowsky is a citizen of the United States and a resident of the State of New York. He is the son of Goldie and the brother of Eli.

266.    Joseph was engrossed in his studies when he heard about the attacks in Israel.

267.    Once Joseph heard about the attacks, he left the study hall where he had been studying and went to his parent's home. When he arrived, Joseph was greeted by the sad

faces of his family members. He then called his wife, informed her of the tragic incident and told her that he was flying to Israel to be with his family.

268. After the incident, Joseph was not the same. He could not concentrate on his studies and lost his study partner of four years as a result. He has nightmares and is constantly distracted.

269. Although he has not sought professional help to help him to cope, the shock and horror of losing his mother and brother have caused him severe mental anguish, trauma, pain and suffering and extreme emotional distress, all to his damage.

270. Miriam Zarkowsky is a citizen of the United States and a resident of the State of New York. She is the daughter of Goldie and the sister of Eli.

271. The shock and horror of losing her loved ones has caused her mental anguish, trauma, pain and suffering and extreme emotional distress, all to her damage.

272. Shrage Zarkowsky is a citizen of the United States and a resident of the State of New York. He is the eldest son of Goldie and the brother of Eli.

273. Shrage was in New York substitute teaching at a summer camp when the attack occurred.

274. Shrage received an urgent call from his wife while teaching at a summer camp in New York. She told him that there was a bus bombing in the center of Jerusalem. He immediately shuddered, because, at the time, his mother, father and two siblings were in Israel. It was later confirmed that his mother and siblings were on the bus.

275. He asked his wife if she had spoken with his parents and she informed him that no one had heard from them. Finally, his sister was found alive, but he was left to pray that his mother and brother would be located as well. After several hours and no sign of his mother

and brother, Shrage grew frustrated. After flying to Israel, Shrage and the rest of his family were informed that his mother and brother were dead.

276.    The death of Shrage's mother left him a shattered and broken man. Every loud noise now turns him into an emotional wreck. The shock and horror of losing his mother and brother has caused him severe mental anguish, trauma, pain and suffering and extreme emotional distress, all to his damage.

277.    Trany Zarkowsky is a citizen of the United State and a resident of the State of New York. She is the daughter of Goldie and the sister of Eli.

278.    The murder of her mother and brother has caused Trany severe mental anguish, trauma, pain and suffering and extreme emotional distress, all to her damage.

279.    Yehuda Zarkowsky is a citizen of the United State and a resident of the State of New York. He is the son of Goldie and the brother of Eli.

280.    The murder of his mother and brother has caused Yehuda severe mental anguish, trauma, pain and suffering and extreme emotional distress, all to his damage.

### Suicide Bombing of Bus No. 19 – January 29, 2004

### The Schecter Family

281.    On January 29, 2004, a little before 9 a.m., Erik Joseph Schecter was on Bus No. 19 in Jerusalem, Israel when a suicide bombing occurred that killed eleven people and injured several, including Erik. Hamas and Al Aqsa Martyrs Brigade claimed responsibility, naming a 24-year-old Palestinian policeman from Bethlehem as the suicide bomber. The terrorist bomber was Ali Mounther Ja'ara.

282.    Erik is a citizen of both the United States and of Israel.

283.    Erik was severely injured during the terror attack. His left knee was broken, his left shoulder blade was fractured and shrapnel severed his left popliteal vein. He was not able to walk again after three months of rehabilitation.

284.    Even after recuperation, Erik's legs are scarred. There is still nerve damage that causes super-sensitivity to his left calf. He walks with a limp because his leg is held together by two titanium pins.

285.    The attack has caused Erik severe mental anguish, trauma, pain and suffering and extreme emotional distress, as well as economic losses and medical expenses, all to his damage.

## Terrorist Attack at Her Home – September 24, 2004

### The Tratner Family

286.    On September 24, 2004, Tiferet Tratner, age 24, was killed in her home as she sat on the couch in Neve Dekalim by a terrorist mortar attack launched from or near the Gaza Strip. This murder took place the day before Yom Kippur. HAMAS claimed responsibility for the terror attack and was in fact responsible.

287.    Tiferet was an American citizen and is the daughter of Shlomo Tratner. Prior to her murder, Tiferet worked with the elderly and with people with disabilities. Shlomo Tratner has suffered severe emotional anguish, pain, suffering and distress over the murder of his daughter and brings this action individually and on behalf of the Estate of Tiferet Tratner for her wrongful death, all to their damage.

## B.     The Defendant

288.     National Westminster Bank, PLC ("NatWest") is a British financial institution with its principal place of business in London, United Kingdom.  It is part of the Royal Bank of Scotland Group.

289.     NatWest conducts business in the United States and in New York, both directly and through its agents, at a number of locations including 101 Park Avenue, New York, New York 10178, and 600 Steamboat Road, Greenwich, Connecticut 06830, which it also lists in its annual report as one of its "principal offices".

## FACTUAL ALLEGATIONS

### The Islamic Resistance Movement ("HAMAS")

### A.     The Founding of HAMAS

290.     In December 1987, Sheik Ahmed Yassin formed the Palestinian Islamic Resistance Movement ("HAMAS") as an offshoot of the Muslim Brotherhood, a radical Islamic group founded in Egypt before World War II.

291.     Pursuant to its charter, HAMAS and its operatives plan, assist, and conduct acts of international terrorism in Israel and the Gaza Strip, including the attacks that injured the Plaintiffs.

### B.     Formal Designations of HAMAS as a Terrorist Organization

292.     In 1989, The Government of Israel declared HAMAS a terrorist organization and also declared it an "unlawful organization" because of its terrorist acts.  Notice of the designation was placed in the official Government of Israel publication, the *Announcements and Advertisements Gazette*.

293. Initially, HAMAS specialized in kidnapping and executing people suspected of cooperating with Israel. It quickly evolved and broadened its operations so that by the early 1990's, it specialized primarily in murdering civilians in Israel.

294. For example, on April 6, 1994, a HAMAS suicide bomber blew up a bus in Afula, killing eight (8) people.

295. On April 13, 1994, a HAMAS suicide bomber blew up a bus in Hadera, killing five (5) people.

296. On October 19, 1994, a HAMAS suicide bomber blew up a bus in Tel Aviv killing twenty–two (22) people.

297. On January 23, 1995, President Clinton issued Executive Order 12947. President Clinton found that "grave acts of violence committed by foreign terrorists that threaten to disrupt the Middle East peace process constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States."

298. Executive Order 12947 designated HAMAS a Specially Designated Terrorist ("SDT"). Executive Order 12947 blocked all property and interests in property of the terrorist organizations and persons designated in the Order, including HAMAS.

299. On February 25, 1996, a HAMAS suicide bomber blew up a bus in Jerusalem killing twenty–six (26) people, three (3) of whom were U.S. citizens, and injuring eighty (80) people, three (3) of whom were U.S. citizens. HAMAS claimed responsibility for the bombing.

300. On October 8, 1997, by publication in the Federal Register, the United States Secretary of State designated HAMAS a Foreign Terrorist Organization pursuant to Section

219 of the Immigration and Nationality Act and the AEDPA. This designation has been renewed every two years since 1997.

301.    After the September 11, 2001 terrorist attacks on the United States, President Bush issued Executive Order 13224, declaring a national emergency with respect to the "grave acts of terrorism…and the continuing and immediate threat of further attacks on the United States national or the United States."

302.    Executive Order 13224 designated HAMAS a Specially Designated Global Terrorist ("SDGT"). Executive Order 13224 blocked all property and interests in property of the SDGTs, including HAMAS.

## C.      HAMAS's Organizational Structure

303.    HAMAS's terrorist operations depend upon its religious and social activities to recruit, educate and train terrorists and to collect material and aid. Its terrorist operations and social activities operate side-by-side and support each other.

### i.      The "Dawa"

304.    HAMAS's infrastructure in the Palestinian Authority-controlled territory ("the PACT") is comprised of two interwoven components: its terrorist apparatus and its religious and social infrastructure, which is responsible for recruiting and training terrorists. This patchwork of charitable and social institutions is commonly referred to by HAMAS as the "Dawa".

305.    For the purpose of raising funds for its operations, HAMAS has established "charity" committees across the PACT and abroad, including committees in Ramallah, Jenin,

46

and Tulkarem that are controlled by HAMAS agents and collect and distribute their funds on behalf of HAMAS.[2]

306.  One of the important roles of these "charities" is their involvement in the channeling of funds to pay expenses for and assist the families of terrorist operatives who are arrested, injured or killed. These entities also assist with the provision of housing subsidies to the families of suicide bombers whose homes are often demolished the Israeli army after the bomber's identity has been confirmed.

307.  The network of these "charities" and other "charitable" associations not only helps raise funds for HAMAS's terrorist operations, but also helps it identify and recruit potential terrorists. The network assists recruitment, in part, by funneling money to pay benefits to the families of terrorist operatives who are arrested, injured or killed.

308.  Nonetheless, HAMAS like other foreign terrorist organizations, collects funds under the guise of political or humanitarian activities. This fundraising ultimately supports the kind of terrorist activities that injured the plaintiffs herein.

**ii.  Terrorism Financing**

309.  Funds raised by or on behalf of HAMAS for "charitable purposes" are used to finance its terrorist activities. As Congress found when passing the AEDPA: "Foreign organizations that engage in terrorist activity are so tainted by their criminal conduct that any contribution to such an organization facilities that conduct." Antiterrorism Act of 1996, Pub. L. No. 104-132, sec. 301 (a)(7), 110 Stat, 1247.

310.  HAMAS receives a majority of its financing through donations coordinated by prominent Saudi and Gulf State charities and the global network of charities known as the

---

[2] There are approximately 80 such "charitable" committees in the West Bank and Gaza Strip nominally supervised by the Palestinian Authority's Ministry of Waqf and Religious Affairs.

Union of Good, operated by the Muslim Brotherhood. The Union of Good, in turn, raises funds that are, in part, channeled through an entity known as the Palestine Relief and Development Fund and/or Interpal ("Interpal"), which maintains several accounts with the defendant NatWest.

### a. The Union of Good

311.   I'Tilafu Al-Khayr a/k/a the Union of Good is an umbrella organization established by the Muslim Brotherhood in October 2000, immediately following the outbreak of the ongoing violent Palestinian terrorist uprising commonly termed the "Second Intifada."

312.   The Union of Good is thus a principle fundraising mechanism for HAMAS.

313.   The Union of Good's primary "charitable" purpose is to provide financial support for HAMAS and its agents in the PACT.

314.   The Union of Good is comprised of more than fifty (50) Islamic charitable foundations worldwide. The U.S. government has designated several of these foundations, including Interpal and the Al-Aqsa Charitable Foundation, a Specially Designated Global Terrorists ("SDGTs").

315.   The U.S. Government designated Interpal an SDGT on August 22, 2003, and designated the Al-Aqsa Charitable Foundation an SDGT on May 29, 2003.

316.   NatWest maintains a U.S. Dollar account for the Union of Good with the account number 140-00-08537933.

317.   The Union of Good uses Interpal as its principal clearing house for funds raised throughout Europe and the Middle East.

318.   For example, in recent months, plaintiffs discovered that the Union of Good's "101 Days Campaign" maintains its own website at www.101days.org. The campaign

solicits funds for HAMAS and directs prospective donors to donate via Interpal's NatWest account numbers 60082295142940 (Sterling) and 60720508524882 (Euros).

319.   **Interpal's own website directly manifests the symbiotic link between the Union of Good and Interpal, soliciting donations for the former, and explicitly stating that:**

> Any donation that is made to INTERPAL through this web page is distributed with the knowledge and approval of the other members of the Union for Good directly to the charities in Palestine that are implementing the work creation programs [sic].[3]

320.   The Union of Good is headed by Dr. Yussuf al-Qaradawi, an extremist Sunni Muslim scholar based in Qatar. NatWest is well aware of al-Qaradawi's connections to terrorism and his connection to Interpal.

321.   To begin with, al-Qaradawi has been on the U.S. Watch List since November 1999 and cannot travel to the United States.

322.   Al-Qaradawi was also a leading shareholder and principal in the Al Taqwa Bank, which was officially designated as a Specially Designated Global Terrorist on November 7, 2001, because of its ties to fundraising and money laundering for al Qaeda and HAMAS.

323.   Nor is al-Qaradawi an obscure of shadowy figure. On the contrary, he had his own weekly television program on *Al Jazeera* and has very publicly issued an Islamic religious edict (*fatwa*) authorizing suicide bombing attacks against Israel.[4]

324.   In fact, on April 14, 2002, al-Qaradawi appeared on *Al Jazeera* extolling "jihad and martyrdom" against Israelis and denouncing the U.S. designation of HAMAS and other terrorist organizations.

---

[3] http://www.interpal.org/web/101.htm

[4] Al-Qaradawi was also the first scholar who authorized women to commit suicide attacks (March 2002) in the context of the second Intifada, as cited in HAMAS's official website: http://www/palestine-info.info/arabic/fatawa/alamalyiat/qaradawi.htm.

325.    Although the Union of Good and other fundraising organizations for HAMAS speak only generally about the Intifada and the families of the 'martyrs', NatWest has been, and remains, in a unique position to monitor and quantify most of the transactions flowing into the Union of Good and Interpal accounts.  NatWest is also in a position to monitor and determine the identities of the entities to which the Union of Good and Interpal transmit the funds they collect via NatWest accounts.

326.    Thus, while the 101 days website speaks obliquely of supporting **"the families of the injured and the martyred in particular,"** NatWest, at all relevant times has had direct, first-hand knowledge of the organizations to which this 'support' has been transmitted, i.e. dozens of notorious HAMAS front organizations.

327.    As recently as October 29, 2005, in an interview with *The Guardian* newspaper, al-Qaradawi discussed suicide bombing in Israel and is quoted saying:

> The actor who commits this is a martyr because he gave his life for the noble cause of fighting oppression and defending his community. These operations are best seen as a weapon of the weak against the powerful. It is a kind of divine justice when the poor, who don't have weapons, are given a weapon which the fully equipped and armed-to-the-teeth powerful don't have – the powerful are not willing to give their lives for the any cause.

328.    More importantly, al-Qaradawi's views and activities have been a matter of public records for many years.[5]

329.    Through his many public appearances and popular television program, al-Qaradawi has never concealed his views about the moral rectitude of murdering Jews and Israelis.

330.    To take just one example, in a September 1999 article in the Palestine Times, entitled "Sheikh Yousuf al-Qaradawi: Hamas and the Islamic Jihad Represent the Glorious

---

[5] Al-Qaradawi was the subject of massive publicity in Great Britian when he was invited to London by its mayor in July 2004, but his prominence long predated that event.

Face of the Islamic Umma – Interview," al-Qaradawi blessed "the martyrdom operations in which a given Moslem fighter turns himself or herself into a human bomb that casts terror in the hearts of the enemy." He further stated if we can't carry out acts of *Jihad* [holy war] ourselves, we at least should support and prop up the Mujahideen [holy warriors] financially and morally so that they will be steadfast until God's victory".

331.   NatWest is, and at all relevant times was, aware of al-Qaradawi's view. More importantly, NatWest has specific and detailed knowledge of how al-Qaradawi and his myriad of charitable front organizations channel funds to HAMAS because millions of dollars flow through accounts held at NatWest.

332.   Al-Qaradawi might be considered the "chairman of the board" of HAMAS's global fundraising efforts, but Issam Yusuf a/k/a Issman Yusuf Mustafa is the operational head (Vice Chairman and Managing Trustee) of the Union of Good. He is a HAMAS agent and former vice chairman of Interpal, and he managed HAMAS's day-to-day fundraising efforts.

333.   The board of directors of the Union of Good includes three senior HAMAS figures: Sheikh Hamid al-Bitawi, Dr. Essam Salhoub, and Bassam Jarrar.

334.   In 2001, al-Qaradawi publicly described the activities of the Islamic charitable societies sustaining the Intifada against Israel as a "new type of *jihad*, financial *jihad*, through which financial support is guaranteed, to the martyrs' families, Palestinian prisoners and detainees, and every Palestinian whose property is damaged during the conflict."

335.   As of the filing of this Complaint, NatWest collects and transmits funds on behalf of the Union of Good and its largest fundraising arm, Interpal.

### b. Interpal

336.   Charitable donations to the Union of Good are partially collected and distributed through Interpal.

337.   Interpal was founded in 1981 as the Palestine and Lebanon Relief Fund and was reincorporated as Interpal in November 1994.

338.   On or before January 1, 1996, Interpal opened one or more accounts with defendant NatWest.

339.   The Charity Commission, established by law as a regular and registrar for charities in England and Wales, froze from Interpal's accounts at NatWest in March 1996 based on evidence that it channeled money to HAMAS.

340.   The allegations of links between Interpal and HAMAS were published in numerous British newspapers at the time, including *The Guardian* and *The Times of London*.[6]

341.   A spokesman for the Charity Commission told *The Guardian* that Interpal's bank accounts had been frozen "as a precautionary measure". Following the widely published reports of Interpal's links to HAMAS, NatWest took no action to terminate its relationship with Interpal.[7]

342.   The Charity Commission ultimately unfroze the accounts ostensibly because the British government distinguished (at the time) between the military and social or charitable wings of HAMAS. There was no finding by the Charity Commission concerning Interpal's relationship with HAMAS per se, nor did Interpal attempt to deny that it was transferring millions of dollars to HAMAS.

---

[6] Richard Norton-Taylor and Ian Black, *Palestinian Charity Funds Frozen Over 'Hamas Link'* THE GUARDIAN, Mar. 9, 1996; Richard Norton-Taylor, *News in Brief: Palestinian Group Cleared*, THE GUARDIAN, Mar. 13, 1996; Julian Borger, *Close Trust, Israel Pleads; Britian is being asked to clamp down on Palestinian fundraisers*, Sept. 7, 1997; Stewart Tendler and Christopher Walker, *MI5 study 'charity cash linked to Hamas*, THE TIMES, Mar. 6, 1996; Stewart Tendler, *Charity's funds are frozen all over alleged Hamas link*, THE TIMES, Mar. 9, 1996; Adrian Lee and Michael Evans, *MI5 traces network of Hamas funding*, THE TIMES, Mar. 11, 1996.
[7] In an interview reported in THE GUARDIAN on August 7, 1997, Mr. Ibrahim Hewitt, Chairman of Interpal, publicly acknowledged that it was possible that some of Interpal's beneficiaries in the Palestinian territories have been established by HAMAS.

343.    The Charity Commission's May 30, 1996 report concerning Interpal stated its findings as follows:

> Poverty and need must however be the only criteria when deciding how the charity's funds are distributed and aid must not be given because of a person's support for terrorism. We found no evidence in the charity (Interpal) of any pro-terrorist bias, or indeed bias of any kind.

344.    Thus, the Charity Commission finding was that Interpal donated funds [to HAMAS] without any evident intent to support terrorism per se, or as the Commission put it, without "any pro-terrorist bias".

345.    U.S. anti-terrorism laws, however, do not distinguish between "biased" and "unbiased" support provided to designated Foreign Terrorist Organizations.

346.    As Kenneth R. McKune, Associate Coordinator for Counterterrorism at the U.S. Department of States noted in a sworn declaration on April 21, 1998:

> [T]he Antiterrorism and Effective Death Penalty Act of 1996 prohibits the provision of material support or resources to foreign terrorist groups that have been formally designated, pursuant to statute, as "foreign terrorist organizations" by the Secretary of State. In prohibiting comprehensively the provision of such support and resources, the law does not differentiate between the criminal, terrorist activities of these organizations, and the civil non-violent activities, if any, in which they might engage. In legislating this particular dimension of the "material support" ban, the Congress found that "foreign organization that engage in terrorist activity are so tainted by their criminal conduct that any contribution to such an organization facilitated that conduct".

347.    NatWest nonetheless provided (and continues to provide) funds for institution that belong to HAMAS's financial infrastructure in the PACT, including many entities the Government of Israel has declared unlawful and the U.S. Department of Justice has identified as agents of HAMAS.

348.    Following the March 1996 British investigation which first placed NatWest on notice that it was transferring funds to HAMAS, Interpal was declared an "unlawful

organization" by the Government of Israel in May 1997 because of its fundraising activities on behalf of HAMAS. Notice of the designation was placed in the official publication, the *Announcements and Advertisements Gazette.*

349.    Despite this designation, NatWest did not cease providing financial services to Interpal.

350.    Interpal was further designated a terrorist organization in January 1998 by the Government of Israel. Notice of the designation was also placed in the *Announcements and Advertisements Gazette.*

## DEFENDANT'S CONDUCT

### A.    NatWest Transfers to HAMAS Entities

351.    Despite this designation and the knowledge that it was providing financial services to a Foreign Terrorist Organization, NatWest did not cease providing financial services to Interpal.

352.    NatWest provided **and continues to provide** financial services to HAMAS via various HAMAS-controlled institutions including, but not limited to: the Orphan Care Society of Bethlehem, Al-Islah Charitable Society in Ramallah-Al-Bireh, the Ramallah-Al-Bireh Charitable Society, the Jenin Charity Committee, the Hebron Islamic Association, Tulkarem Charity Committee, Al-Mujama al-Islami, the Islamic Society in the Gaza Strip, and the Muslim Youth Association of Hebron.[8]

353.    The Orphan Care Society of Bethlehem was outlawed by the Government of Israel in February 2002. Most of its chief functionaries, including its director, Dr. Ghassan

---

[8] The Jenin Charity Committee and Tulkarem Charity Committee (among others) are specifically identified as HAMAS-controlled organizations by the United States Government in the July 2004 criminal indictment of Holy Land Foundation for Relief and Development in the Northern District of Texas.

Harmass, are HAMAS terrorists. The Orphan Care Society pays subsidies to the children of HAMAS "martyrs" and imprisoned HAMAS members.[9]

354.    The 2001 version of Interpal's website stated that Interpal "works closely with" the Orphan Care Society.

355.    On August 16, 2002, NatWest transferred $1,875.65 ($1,906 minus commission) from Interpal to the Orphan Care Society.

356.    On September 17, 2002, NatWest transferred £6,533.00 (£6,547 minus commission; approximately $10,069.30) from Interpal to the Orphan Care Society.

357.    On November 15, 2002, NatWest transferred £5,693 (£5,707 minus commission; approximately $8,989.82) from Interpal to the Orphan Care Society.

358.    The Islamic Society of Gaza is an alter-ego of HAMAS. Its directors and employees are members of HAMAS and the entity serves as a principal headquarters of HAMAS in the Gaza Strip. Since at least 1996, NatWest has transferred funds to the Islamic Society of Gaza on Interpal's behalf.

359.    The Al-Islah Charitable Society in Ramallah-Al-Bireh was founded in 1997. The Government of Israel declared the Al-Islah Charitable Society an "unlawful organization" in February 2002. The "charity" is run by HAMAS terrorists, and it provides aid to HAMAS terrorists, to the families of "martyrs", and Palestinians wounded or imprisoned as a result of violent confrontations with Israel. The Al-Islah Charitable Society supports the families of martyrs," HAMAS prisoners in Israeli jails, and deported HAMAS members.

360.    The Jenin Zakat Committee was declared an "unlawful organization" by the Government of Israel in February 2002. This "charity" is run by HAMAS terrorists, and it

---

[9] In an interview published on the 101 days website, Dr. Harmass stated that Interpal is one of the Orphan Care Society's largest sources of donations: http://www.101days.org/arabic/taqareer/yateem.htm

provides aid to HAMAS terrorists, to the families of "martyrs", and Palestinians wounded or imprisoned as a result of violent confrontations with Israel.

361.    The 2001 version of Interpal's website states that Interpal "works closely with" the Jenin Zakat Committee.

362.    On May 2, 2003, NatWest transferred £15,687 (£15,713 minus commission; approximately $25,285.90) from Interpal to the Jenin Zakat Committee.

363.    On July 11, 2003, NatWest transferred £15,330 (approximately $25,064.50) from Interpal to the Jenin Zakat Committee. NatWest charged a commission of £11.

364.    The Tulkarem Charity Committee was founded in 1981. The Government of Israel declared the Tulkarem Charity Committee an "unlawful organization" in February 2002. The Committee is headed by a HAMAS terrorist.

365.    In 2002 alone, NatWest transferred over $1,500,000.00 to the HAMAS front organizations listed in paragraph 352, which had been previously designated as unlawful organizations by the Government of Israel because of their affiliation with HAMAS.

**B.    Funds Collected by NatWest from Specially Designated Global Terrorists and Convicted Fundraisers for HAMAS**

366.    On at least three separate occasions NatWest accepted deposits on behalf of Interpal from organizations and entities whose terrorist connections are a matter of public record.

367.    In April 2000, NatWest accepted a deposit of $66,000.00 for Interpal from the Holy Land Foundation for Relief and Development ("HLF").[10]

---

[10] On May 6, 1997, the Government of Israel designated the Holy Land Foundation for relief and Development ("HLF") as a HAMAS front organization and declared that HLF "deals in the practice of transferring monies to families of HAMAS activists, who carried out deadly attacks..."

368.    According to a prior version of Interpal's website (dating back to August 2001), Interpal directs persons wishing to make "international donations" to donate to HLF.

369.    On December 4, 2001, the U.S. Secretary of Treasury determined that HLF was subject to Executive Order Nos. 12947 and 13224 because HLF "acts for or on behalf of" HAMAS.

370.    Accordingly, HLF was designated an SDT under Executive Order No. 12947 and an SDGT under Executive Order No. 13224.

371.    In December 2001, the Counsel of the European Union designated Holy Land Foundation as a terrorist entity under Article 2(b) and Regulation (EC) No. 2580/2001 on specific restrictive measures directed against certain persons and entities with a view to combating terrorism and repealing Decision 2005/848/EC.

372.    In order to facilitate the application of financial sanctions, the European Banking Federation, the European Savings Banks Group, the European Association of Co-operative Banks and the European Association of Public Banks (the "EU Credit Sector Federations") and the Commission recognized the need for an EU consolidated list of persons, groups and entities subject to CFSP related financial sanctions. It was therefore agreed that the Credit Sector Federations would set up a database containing the consolidated list for the Commission, which would host and maintain the database and keep it up-to-date. This database was developed first and foremost to assist the members of the EU Credit Sector Federations in their compliance with financial sanctions. HAMAS and HLF were so listed in December 2001.

373.    On March 11, 2002, HLF filed suit seeking to enjoin the U.S. Government from continuing to block or freeze its assets.

374.    On August 8, 2002, the United States District Court for the District of Columbia issues a written opinion in *Holy Land Foundation for Relief and Development v. Ashcroft,* 219 F. Supp. 2d 57, 70 (D.D.C. 2002) finding that "between 1992 and 1999, HLF contributed approximately 1.4 million dollars to eight Hamas-controlled "zakat" (or charity) committees....HLF grant lists also establish that, between 1992 and 2001, HLF gave approximately five million dollars to seven other Hamas-controlled charitable organizations, including a hospital in Gaza".[11]

375.    The publicly available 2002 court decision sets forth with specificity the legal basis for concluding that HLF's conduct – which is nearly identical to that of Interpal – constituted support for terrorism.

376.    Like HLF, the Al-Aqsa Charitable Foundation is a critical part of HAMAS's transnational terrorist support infrastructure. The Al-Aqsa Foundation also maintained branch offices in The Netherlands, Denmark, Belgium, Sweden, Pakistan, South Africa, Yemen and elsewhere.

377.    On March 27, 2003, NatWest deposited at least two payments to Interpal totaling 295,000 Euros from the Dutch branch of the Al-Aqsa Foundation.[12]

378.    Two months later, on May 29, 2003, U.S. Treasury Department added the Al-Aqsa Foundation to its list of Specially Designated Global Terrorist entities, accusing the organization of funneling funds – including money donated for charitable purposes – to the militant terrorist group HAMAS.

---

[11] In fact, in November 2001, the FBI identified eight (8) charitable fronts as agents of HAMAS, at least 6 of whom have been NatWest wire transfer recipients. See, Memorandum of Dale L. Watson, the Assistant Director of the FBI's Counterterrorism Division, written to R. Richard Newcomb, Director of the United States Treasury Department's Office of Foreign Assets Control ("OFAC") and dated November 5, 2001.

[12] On July 31, 2002, German authorities closed the Al-Aqsa Foundation in Germany because of its support for HAMAS. On January 1, 2003, the Danish government charged three Al-Aqsa Foundation officials in Denmark with supporting terrorism. In April 2003, Dutch authorities blocked Al-Aqsa Foundation assets in The Netherlands based on information that funds were provided to organizations supporting terrorism in the Middle East.

379. Nonetheless, NatWest took no steps to close its Interpal accounts.

380. Years earlier, in or about January 2001, NatWest accepted deposits totaling $70,000.00 on behalf of Interpal from the Al-Aqsa organization in Yemen.

381. On January 10, 2003, German authorities arrested Sheik Mohammed Ali Hasan al-Moayad, the head of the Al-Aqsa organization in Yemen, at the request of the U.S. Department of Justice and the Federal Bureau of Investigation. The arrest took place after a year long investigation of al-Moayad and undercover operations by the FBI's Joint Terrorism Task Force for his knowingly and intentionally conspiring to provide material support and resources for Al-Qaeda and HAMAS.

382. Prior to his arrest in Germany, Sheik al-Moayad had met with an undercover government informant and proffered proof of his prior fundraising on behalf of HAMAS by tendering to the undercover government informant a receipt from Interpal confirming a $70,000.00 donation from the Sheik's Al-Aqsa organization in Yemen.

383. Sheik al-Moayad was subsequently convicted of providing material support to HAMAS in violation of 18 U.S.C. § 2339B and in 2005 was sentenced to 75 years in prison.

## C. Interpal's Designation by the U.S. Government in 2003 and Defendant's Continuing Conduct

384. The August 19, 2003 HAMAS suicide bombing of a bus resulted in the deaths of Mordechai Reinitz, Yissocher Dov Reinitz, Goldie Zarkowsky and Eli Zarkowsky, and injuries to Mendy Reinitz, Miriam Richter and Bshava Zarkowsky.

385. Following this atrocity, President George W. Bush stated:

At my direction, the Treasury Department has moved today to block and freeze the assets of six top HAMAS leaders and five non-governmental organizations that I am advised provide financial support to HAMAS. By claiming responsibility for the despicable act of terror on August 19, HAMAS has reaffirmed that it is a terrorist organization committed to violence against Israelis

59

and to undermining progress toward peace between Israel and the Palestinian people.

386.   Thereafter, Interpal, as one of the five non-governmental organizations, was designated as an SDGT on August 22, 2003.

387.   In an interview reported in *The Guardian* on August 28, 2003, <u>after</u> the U.S. Government designation, Mr. Hewitt, Chairman of Interpal, was publicly quoted as saying: "We deal with people whether they are HAMAS or whether they are Fatah."

388.   Even after Interpal's designation as a Specially Designated Global Terrorist organization and its Chairman's public admission of its relationship to HAMAS, already designated a Foreign Terrorist Organization, NatWest again took no action to cease its relationship with Interpal.

389.   On September 12, 2003, the European Union designated all of HAMAS (including its social "wing") a terrorist organization, but even then, NatWest took no action to close Interpal's accounts.

390.   To this day, notwithstanding all of this publicly available information, NatWest continues to collect and transmit funds for HAMAS.

D.     **Specific Accounts and Transactions**

391.   Interpal is a pivotal part of HAMAS's fundraising infrastructure and a significant source of HAMAS's financing.

392.   For more than nine (9) years, defendants NatWest has knowingly maintained numerous accounts for Interpal and has collected, received, transmitted and provided **millions of dollars** on behalf of Interpal directly to agents of HAMAS in the PACT.

393.   These accounts include:

U.S. Dollar Account Number -- 140-00-04156838

Euro Account Number – 60720508524882

Sterling Account Number - 60082295142940

394.    NatWest thereby provides HAMAS with a highly convenient method to collect and transfer funds in U.S. Dollars as well as Sterling and Euros.

395.    NatWest also provides Interpal with merchant banking services, directly and through another Royal Bank of Scotland subsidiary, thereby making it possible for Interpal to maintain merchant accounts with Mastercard, VISA and other credit card companies.

396.    This allows HAMAS to solicit contributions in dozens of currencies from around the world and allows Interpal to solicit funds for HAMAS via its website at www.interpal.org.

397.    In addition, NatWest, with the help of financial products provided by its sister company, provides further substantial assistance to HAMAS by making it possible for British nationals to make direct contributions to Interpal by way of their employer's payroll department through a program called "Give As You Earn".

398.    Since March 1996, defendant NatWest has known that it has been providing financial services to HAMAS and that Interpal collects money for, and transmits money to, HAMAS, a Foreign Terrorist Organization.

399.    NatWest has transferred funds directly to HAMAS-controlled entities on hundreds (if not thousands) of occasions.

400.    For example, on February 19, 2003, NatWest transferred £21,424 (approximately $34,083.40) to the HAMAS front organization, the Tulkarem Zahat (Charity) Committee Society and charged a commission of £10. See Exhibit A attached. At the time NatWest transferred this amount to HAMAS, both Interpal (the repository of the funds) and the

61

Tulkarem Charitable Society (the HAMAS front that received the funds) had been designated as unlawful organizations by the Government of Israel due to their support for or control by HAMAS.

401. The U.S. Department of Justice has identified the Tulkarem Charitable Society as an "organization, which operated on behalf of, or under the control of, HAMAS.

402. On April 1, 2003, NatWest transferred another £17,974 (£18,000 minus commission; approximately $28,465.40) from Interpal to the Tulkarem Zakat Committee.

403. Likewise, on July 30, 2003, NatWest transferred £73,757 ($119,809.00 U.S.) to the Jenin Charitable Society, debiting Interpal's Account Number 600822-95142940. See Exhibit B attached. This transaction was apparently financed by the World Assembly of Muslim Youth ("WAMY"), the well known Saudi "charity" linked to both HAMAS and Al Qaeda financing.[13] At the time NatWest transferred this amount to HAMAS, WAMY (the source of the funds), Interpal (the repository of the funds) and the Jenin Charitable Society (the HAMAS front that received the funds) had all been designated as unlawful organizations by the Government of Israel due to their support for or control by HAMAS.

404. One of Interpal's officers/directors, Mahfuzh Safiee is an officer of WAMY, Ltd. (a European branch of WAMY).

405. The U.S. Department of Justice has identified the Jenin Charitable Society as an "organization, which operated on behalf of, or under the control of, HAMAS."

406. Nor did NatWest cease providing enormous sums of money to HAMAS even after Interpal was formally designated a Specially Designated Global Terrorist by President Bush on August 22, 2003. On the contrary, the same millions of dollars that NatWest

---

[13] The WAMY Conference in Riyadh in October 2002 was attended by the head of the HAMAS Political Bureau, Khalid Mishal, who was also designated a Specially Designated Global Terrorist on August 22, 2003, pursuant to Executive Order No. 13224.

transferred to HAMAS since 1996 that helped maim and murder U.S. citizens such as the plaintiffs and bankroll the families of terrorists, including suicide bombers, continued to flow unabated even <u>after</u> the U.S. Government designation of Interpal.

407. For example, on November 5, 2003 (two months **AFTER** the official U.S. designation), NatWest transferred £32,329 ($54,322.40 U.S.) to the same well-known HAMAS front organization, the Jenin Charitable Society, debiting Interpal's Account Number 600822-95142940. See Exhibit C attached.

408. Transactional documents of the kind attached to this complaint are *themselves* the criminal transactions that Congress tried to interdict by enacting both the criminal provisions of U.S.C. §§ 2339B and 2339C and the civil provision of 18 U.S.C. §2333(a) as set forth below.

### E.    <u>NatWest's Regulatory Obligations and Duty of Care</u>

409. All banks which have international operations or relationships with correspondence banks have a duty, based on international banking norms, to adopt know your customer ("KYC"), anti-money laundering ("ATL"), and anti-terrorist financing ("ATF") standards which are defined and enforced by the Financial Action Task Force ("FATF") and its supportive governments.

410. The United Kingdom is a participant in the FATF.

411. This duty devolves upon officials and directors of all such banks and includes a due diligence obligation to monitor publicly accessible information and allegations in relation to "high risk" customers, which would include charities collecting funds from the public.

412. This duty to monitor and profile charity customers arises independently of any particular transaction.

413. Beginning with the creation of FATF in 1989 and especially since the collapse of the Bank of Credit and Commerce International and the enactment of the first European Union directive on the subject in 1991, a consensus has evolved in the banking community concerning knowing your customer and anti-terrorist financing standards required by international banking institution.

414. These standards are encapsulated in written principles issued by FATF and the Basel Group of Bank Supervisors.

415. In April 2002, the FATF issued a report entitled "Guidance for Financial Institutions in Detecting Terrorist Financing." The report was issued to all major international financial institutions to provide guidance to "ensure that financial institutions do not unwittingly hide or move terrorist funds. Financial institutions will thus be better able to protect themselves from being used as a conduit for such activity..."

416. In addition to its inherent obligation not to violate the criminal statutes of the United States, the FAFT report very clearly put NatWest on notice that:

> Regardless of whether the funds in a transaction are related to terrorists for the purposes of national criminal legislation, business relationships with such individuals or other closely associated persons or entities could, under certain circumstances, expose a financial institution to significant reputational, operational, and legal risk. This risk is even more serious if the person or entity involved is later shown to have benefited from the lack of effective monitoring or willful blindness of a particular institution and thus was to carry out terrorist acts.

417. There are also standards developed by the Wolfsberg Group of banks that affect the correspondent banks of Wolfsberg Group member financial institutions.

418.   On July 16, 2002, the Royal Bank of Scotland Group (NatWest's parent company) adopted new "Know Your Customer" guidelines and adopted the so-called Wolfsberg Principles for the Suppression of Terror Financing thereby committing NatWest to implement: "procedures for consulting applicable lists and taking reasonable and practicable steps to determine whether a person involved in a prospective or existing business relationship appears on such a list.

419.   At the same time, NatWest's parent company publicly acknowledged that: "Funds used in support terrorism do not derive exclusively from criminal activities and differ from those associated with most existing money laundering offenses" and committed itself to "the ongoing monitoring of individual transactions on customer accounts…"

420.   In September 2002, the RBS Group of which NatWest issued a "Statement of Principles for Fighting Crime and the Financing of Terrorism." The document describes their plan to institute AML controls, particularly on terrorist financing, and to cooperate with U.K. authorities in criminal investigations.

421.   These standards are binding on banks and bankers doing business internationally, due to their commercial relationships with the banks of other countries that are legally obligated to apply these norms.

422.   Accordingly, NatWest had (and has) and affirmative duty to monitor publicly available information and allegations about its customer, Interpal.

423.   NatWest also had (and has) an affirmative duty to monitor publicly available information and allegations about its customer's parent organization – the Union of Good – as well as publicly available information concerning HAMAS controlled entities to which its customer transferred millions of dollars.

65

424.   It was and remains the standard in the international banking industry for compliance departments at banks like NatWest to access, in detail, public allegations of misconduct by such "charities" or diversions of their funds to terrorist activities.

425.   In many cases, information linking payees of NatWest transactions and HAMAS could readily be obtained by simple Internet searches or by subscribing to a database or press clippings service.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

### AIDING AND ABETTING THE MURDER OR ATTEMPTED MURDER OR PHYSICAL VIOLENCE TO UNITED STATES CITIZENS IN VIOLATION OF 18 U.S.C. § 2332(a); 18 U.S.C § 2332(b); 18 U.S.C § 2332(c); AND 18 U.S.C. § 2333(a)

426.   Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

427.   Plaintiffs have been injured in their person by reason of acts committed by HAMAS that involve violence and are dangerous to human life and that violate the criminal laws of the United States, including the prohibition on killing, attempting to kill, causing serious bodily injury or attempting to cause serious bodily injury to U.S. citizens as set forth in 18 U.S.C. § 2332.

428.   The acts of HAMAS in killing and attempting to kill U.S. nationals and other persons were intended to: (a) intimidate or coerce the civilian population of Israel; (b) influence the policy of the Government of Israel by intimidation or coercion; and (c) affect the conduct of the Government of Israel by mass destruction and murder.

429.   The acts of terrorism set forth herein are extreme and outrageous and were committed with the intention to cause extreme physical pain and suffering to any and all

persons within close proximity of the attacks and extreme emotional distress to the family members of those who were killed or injured by reason of the acts.

430.    The financial services that the defendant knowingly provided to HAMAS by collecting and transmitting funds on behalf of HAMAS (with the knowledge that CBSP fundraises for HAMAS) assists HAMAS in its recruiting, rewarding, and providing incentives to suicide bombers and other terrorists. These financial services facilitate acts of terrorism in violation of 18 U.S.C. § 2332 that have caused injuries to the plaintiffs.

431.    The defendant knows that it has provides material support to HAMAS, a Foreign Terrorist Organization, and it knows that HAMAS commits horrific terrorist attacks of the kind that have maimed and murdered American citizens such as plaintiffs.

432.    Throughout the period in which it has provided financial support for the benefit of HAMAS, defendant was, and to this date remains, aware that HAMAS collects and receives funds transmitted by defendant NatWest at the request of Interpal and the Union of Good and that HAMAS has committed numerous criminal acts, including the suicide bombings and other acts of international terrorism that have injured American citizens, including plaintiffs.

433.    Because it aided and abetted violations of 18 U.S.C. § 2332 that have caused each of the plaintiffs to be injured in his or her person and property, the defendant is liable pursuant to 18 U.S.C. § 2333(a) for any and all damages that plaintiffs have sustained as a result of such injuries.

## SECOND CLAIM FOR RELIEF

## COMMITING ACTS OF INTERNATIONAL TERRORISM
## IN VIOLATION OF 18 U.S.C. § 2339B(a)(1) and 18 U.S.C § 2333(a)

434.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

435. By knowingly providing financial services to HAMAS, the defendant has provided material support to a designated Foreign Terrorist Organization under the Antiterrorism and Effective Death Penalty Act of 1996 in violation of 18 U.S.C. § 2339B(a)(1).

436. As stated above, the Union of Good and Interpal are major funding sources for HAMAS.

437. By providing a wide range of vital financial services to these entities, defendant NatWest substantially assist HAMAS in its recruiting, rewarding and providing incentives to suicide bombers and other terrorists.

438. Defendant knows of HAMAS's terrorist activities.

439. Defendant knows that HAMAS had been designated a Foreign Terrorist Organization by the Government of the United States.

440. By knowingly providing material support to a designated Foreign Terrorist Organization, the defendant is civilly liable for damages to the plaintiffs for their injuries pursuant to 18 U.S.C. § 2333(a).

### THIRD CLAIM FOR RELIEF

### COLLECTING AND PROVIDING FUNDS FOR THE FINANCING OF TERRORISM IN VIOLATION OF 18 U.S.C. § 2339C and 18 U.S.C § 2333(a)

441. Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

442. Defendant willfully and unlawfully provides financial services to HAMS, by collecting, receiving, transmitting and providing funds through accounts it maintains for Interpal and the Union of Good and through credit card payments it receives on behalf of

Interpal with the knowledge that such funds have been, and will be, used, in part, to facilitate acts intended to cause death or serious bodily injury to civilians such as the victims of the terrorist acts described in this complaint.

443. The acts committed against the plaintiffs were intended to: (a) intimidate or coerce the civilian population of Israel; (b) influence the policy of the Government of Israel by intimidation or coercion; and (c) affect the conduct of the Government of Israel by mass destruction and murder.

444. Therefore, defendant is liable to each of the plaintiffs who have suffered injuries to their person and property by reason of such acts under 18 U.S.C. § 2333(a).

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray that this Court:

(a) Enter judgment against the defendant and in favor of each plaintiff for compensatory damages in amounts to be determined at trial;

(b) Enter judgment against the defendant and in favor of each plaintiff for treble damages in amounts to be determined at trial;

(c) Enter judgment against the defendant and in favor of each plaintiff for any and all costs sustained in connection with the prosecution of this action, including attorneys' fees, pursuant to 18 U.S.C. § 2333(a);

(d) Enter an Order declaring that the defendant has violated, and is continuing to violate the Antiterrorism Act, 18 U.S.C. § 2331 et seq.; and

    (e)     Grant such other and further relief as justice requires.

PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

Dated: March 2, 2007
      New York, New York

                           **SHALOV STONE BONNER & ROCCO LLP**

                           By _James P. M____

                              James P. Bonner (JB-0629)
                              485 Seventh Avenue, Suite 1000
                              New York, New York 10018
                              (212) 239-4340

                              Attorneys for Plaintiffs

Of Counsel:

**SAYLES WERBNER P.C.**
Mark S. Werbner
4400 Renaissance Tower
1201 Elm Street
Dallas, Texas 75270
(214) 939-8700

**HEIDEMAN NUDELMAN & KALIK, P.C.**
Richard D. Heideman
Noel J. Nudelman
Tracy Reichman Kalik
1146 19th Street, NW
Fifth Floor
Washington, D.C. 20036
(202) 463-1818

**PERLES LAW FIRM, P.C.**
Steven R. Perles
Edward Macallister
1146 19th Street, NW
Fifth Floor
Washington, D.C. 20036
(202) 745-1300

**THE DAVID LAW FIRM, P.C.**
Jonathan David
10655 Six Pines Drive
Suite 260
Woodlands, Texas 77380
(281) 296-9090

**EXHIBIT 158 TO DECLARATION OF VALERIE SCHUSTER**

# In The Matter Of:

*COURTNEY LINDE, et al.*
*v.*
*ARAB BANK, PLC, et al.*

---

## SPITZEN, ARIEH DAN - Vol. 1
### *July 20, 2011*

---

# *HIGHLY CONFIDENTIAL*

**MERRILL CORPORATION**

LegaLink, Inc.

225 Varick Street
10th Floor
New York, NY 10014
Phone: 212.557.7400
Fax: 212.692.9171

| | | |
|---|---|---|
| 1 | many board members on any Palestinian Zakat or civilian | 15:28:22 |
| 2 | entity were members of Hamas? | 15:28:27 |
| 3 | A.   No. | 15:28:40 |
| 4 | Q.   As a matter of fact, isn't it true, | 15:28:44 |
| 5 | Mr. Spitzen, that Hamas didn't publicize its | 15:28:46 |
| 6 | association with Palestinian humanitarian entities | 15:28:50 |
| 7 | at all? | 15:28:53 |
| 8 | MR. UNGAR:  Objection to form. | 15:29:02 |
| 9 | THE WITNESS:  Of course, that's true. | 15:29:09 |
| 10 | Otherwise, they would have been shut down the next day. | 15:29:10 |
| 11 | Q.   BY MR. HOWARD:  So Hamas had an incentive to | 15:29:13 |
| 12 | keep their role in these civilian entities secret? | 15:29:16 |
| 13 | MR. UNGAR:  Objection.  Foundation. | 15:29:27 |
| 14 | THE WITNESS:  That's also not precise.  See, | 15:30:23 |
| 15 | it's not a black-and-white game.  The Hamas is very | 15:30:24 |
| 16 | much interested to make sure that their people, that | 15:30:28 |
| 17 | the population know exactly who is controlled by Hamas, | 15:30:31 |
| 18 | who receives money from the Hamas.  But on the other | 15:30:35 |
| 19 | hand, it also tries to avoid -- and it makes sense | 15:30:40 |
| 20 | because, otherwise, it would be suicide on their side | 15:30:43 |
| 21 | to -- not to publish which organizations or associations | 15:30:46 |
| 22 | belong to the Hamas.  Otherwise, they would be shut | 15:30:52 |
| 23 | down. | 15:30:54 |
| 24 | Somebody called this in the HLF -- it was | 15:30:55 |
| 25 | the representative of the ISA.  He said that this is | 15:30:59 |

# In The Matter Of:

*COURTNEY LINDE, et al.,*

*v.*

*ARAB BANK, PLC,*

---

## *ARIEH DAN SPITZEN - Vol. 3*
### *July 24, 2011*

---

# *HIGHLY CONFIDENTIAL*

MERRILL CORPORATION

LegaLink, Inc.

225 Varick Street
10th Floor
New York, NY 10014
Phone: 212.557.7400
Fax 212.692.9171

HIGHLY CONFIDENTIAL
ARIEH DAN  SPITZEN – 7/24/2011

Page 429

| | | |
|---|---|---|
| 1 | Q.   And when was the first time that you used | 15:11:25 |
| 2 | those additional criteria?  Was that in these lawsuits | 15:11:27 |
| 3 | against the banks? | 15:11:31 |
| 4 | MR. UNGAR:  Just for the record, just for the | 15:11:45 |
| 5 | clarity, NatWest, Credit Lyonnais, and Arab Bank? | 15:11:46 |
| 6 | MR. HOWARD:  Yes. | 15:11:53 |
| 7 | THE WITNESS:  Not these criteria -- well, at | 15:12:16 |
| 8 | least not as a part of an expert witness.  I didn't have | 15:12:19 |
| 9 | the occasion to do that as an expert witness.  But in | 15:12:23 |
| 10 | papers that I wrote, definitely.  And in reviews that | 15:12:28 |
| 11 | I wrote, definitely. | 15:12:30 |
| 12 | Q.   BY MR. HOWARD:  So the first time you used | 15:12:33 |
| 13 | this complete list of 18 criteria as a methodology for | 15:12:35 |
| 14 | assessing a relationship between any entity and Hamas | 15:12:42 |
| 15 | was for purposes of being an expert witness in these | 15:12:46 |
| 16 | three cases against banks pending in the United States; | 15:12:50 |
| 17 | correct? | 15:12:54 |
| 18 | There might be something missing from my | 15:13:11 |
| 19 | question. | 15:13:16 |
| 20 | The first time, as an expert witness, that | 15:13:16 |
| 21 | you used this 18-criteria methodology was as an expert | 15:13:18 |
| 22 | witness in these three cases against banks; correct? | 15:13:23 |
| 23 | A.   When it's formulated that way, then yes. | 15:13:40 |
| 24 | Q.   And you've stated several times that there | 15:13:45 |
| 25 | are others who use this methodology. | 15:13:49 |

| | | |
|---|---|---|
| 1 | the field. | 15:18:05 |
| 2 | And this is how they identify institutes. | 15:18:06 |
| 3 | They relate to these criteria one way or another.  Not | 15:18:08 |
| 4 | always do they relate to all 18, sometimes only to some | 15:18:12 |
| 5 | of them.  And they use the criteria that I'm actually | 15:18:16 |
| 6 | using here. | 15:18:19 |
| 7 | Q.   Can you identify anyone else who uses the same | 15:18:20 |
| 8 | 18 criteria that you do?  Or is this something unique | 15:18:24 |
| 9 | that you are bringing to the exercise? | 15:18:29 |
| 10 | MR. UNGAR:  Can I ask a point of clarification | 15:18:30 |
| 11 | I think will make it clearer?  You specifically | 15:18:44 |
| 12 | delineated 18 criteria?  That's the question?  Not | 15:18:49 |
| 13 | just -- | 15:18:52 |
| 14 | MR. HOWARD:  Correct. | 15:18:52 |
| 15 | MR. UNGAR:  -- the substance?  Okay. | 15:18:53 |
| 16 | THE WITNESS:  These 18 criteria, as they | 15:19:22 |
| 17 | appear in a list of one criterion coming after another, | 15:19:25 |
| 18 | the way I wrote this, then it's only me -- or it's me | 15:19:29 |
| 19 | that is using them.  But with respect to the criteria | 15:19:32 |
| 20 | in general, all of them or some of them, they are used | 15:19:35 |
| 21 | extensively. | 15:19:41 |
| 22 | Q.   BY MR. HOWARD:  Well, can you name any other | 15:19:42 |
| 23 | researcher who has used every one of the criteria that | 15:19:44 |
| 24 | you have used to make an assessment of whether an entity | 15:19:47 |
| 25 | is connected to Hamas or not? | 15:19:52 |

HIGHLY CONFIDENTIAL
ARIEH DAN  SPITZEN - 7/24/2011

Page 433

| | | |
|---|---|---|
| 1 | THE WITNESS:  (In English.)  Because of that, | 15:21:42 |
| 2 | I interfered in the interpretation. | 15:21:43 |
| 3 | THE INTERPRETER:  Okay.  Okay. | 15:21:44 |
| 4 | Q.   BY MR. HOWARD:  So is it fair to say you've | 15:21:52 |
| 5 | never -- have you seen the 18 criteria, as you've stated | 15:21:53 |
| 6 | them, published anywhere in any treatise? | 15:21:57 |
| 7 | A.   In this form, no. | 15:22:05 |
| 8 | Q.   What are the treatises that you recognize as | 15:22:15 |
| 9 | being authorities in the field? | 15:22:21 |
| 10 | And by "field," I mean the field of, as | 15:22:27 |
| 11 | you describe it, connecting or assessing the relation | 15:22:31 |
| 12 | between civil entities and Hamas. | 15:22:34 |
| 13 | MR. UNGAR:  Objection to form and foundation. | 15:22:46 |
| 14 | THE WITNESS:  I'd like to understand the | 15:23:10 |
| 15 | question.  Are you talking about some kind of a | 15:23:11 |
| 16 | specific work, some kind of a specific research that | 15:23:14 |
| 17 | I would rely on as identify these -- identifying these | 15:23:17 |
| 18 | specific associations? | 15:23:22 |
| 19 | Q.   BY MR. HOWARD:  Not quite.  I'm asking about | 15:23:25 |
| 20 | specific works of specific researchers with regard to | 15:23:27 |
| 21 | the process as to how to identify an entity as being | 15:23:33 |
| 22 | related to Hamas, not with respect to a specific entity. | 15:23:37 |
| 23 | MR. UNGAR:  Objection.  Foundation. | 15:23:57 |
| 24 | THE WITNESS:  I hope I understand what you're | 15:24:05 |
| 25 | asking.  I'm not sure. | 15:24:07 |

HIGHLY CONFIDENTIAL
ARIEH DAN  SPITZEN – 7/24/2011

Page 434

| | | |
|---|---|---|
| 1 | Q.   BY MR. HOWARD:  I'm asking you whether -- | 15:24:10 |
| 2 | strike that. | 15:24:11 |
| 3 | You said you've read other researchers, | 15:24:14 |
| 4 | other works in coming up with your 18 criteria.  And | 15:24:16 |
| 5 | I'm asking you:  What are the published treatises or | 15:24:20 |
| 6 | authorities that you rely on as being expert in the -- | 15:24:24 |
| 7 | in determining what criteria to use for establishing | 15:24:28 |
| 8 | a relationship between an entity and Hamas? | 15:24:35 |
| 9 | MR. UNGAR:  Same objection. | 15:25:02 |
| 10 | THE WITNESS:  If you're talking about | 15:25:55 |
| 11 | methodological documents, documents that pertain | 15:25:57 |
| 12 | to determining the identification or affiliation | 15:26:01 |
| 13 | and documents that are only methodological, then | 15:26:06 |
| 14 | I did not find any such documents. | 15:26:10 |
| 15 | What I did find is documents that are | 15:26:12 |
| 16 | mainly from enforcement entities, but also from | 15:26:16 |
| 17 | researchers, that do use these criteria -- maybe | 15:26:19 |
| 18 | some of them, maybe just a few of them -- when they | 15:26:24 |
| 19 | come to determine whether a certain entity is or | 15:26:27 |
| 20 | isn't affiliated with the Hamas, especially if it -- | 15:26:31 |
| 21 | to determine if it is affiliated. | 15:26:34 |
| 22 | Q.   BY MR. HOWARD:  So when you sat down and wrote | 15:26:38 |
| 23 | out your 18 criteria to use in these lawsuits against | 15:26:41 |
| 24 | these banks, you did not have any published treatise | 15:26:45 |
| 25 | that you were relying upon? | 15:26:50 |

HIGHLY CONFIDENTIAL
ARIEH DAN  SPITZEN - 7/24/2011

Page 435

| | | |
|---|---|---|
| 1 | A.  Do you mean a published treaty [sic] regarding | 15:26:53 |
| 2 | the criteria, how to determine the criteria, how to use | 15:27:17 |
| 3 | the criteria? | 15:27:21 |
| 4 | Q.  Correct. | 15:27:22 |
| 5 | A.  No.  What I did have to my disposal -- several | 15:28:50 |
| 6 | things I had, actually -- was the use that was done in | 15:28:54 |
| 7 | courts in Israel, in the U.S., and also in Germany when | 15:28:57 |
| 8 | they came to prove the identity of this association or | 15:29:02 |
| 9 | that association.  This is as far as the legal material | 15:29:06 |
| 10 | goes.  And I mean all those documents of the prosecution | 15:29:11 |
| 11 | in the HLF and also against the Al-Aqsa Foundation. | 15:29:15 |
| 12 | And also there's a very interesting report | 15:29:21 |
| 13 | in the IRFAN -- IRFAN.  That's the outlawing of the | 15:29:24 |
| 14 | Canadian foundation.  Actually, there it's called | 15:29:29 |
| 15 | different.  It has a different name.  It's not called | 15:29:33 |
| 16 | being outlawed.  But it is nonrecognition of a certain | 15:29:36 |
| 17 | entity for it to be recognized for tax exemption | 15:29:41 |
| 18 | purposes. | 15:29:46 |
| 19 | THE INTERPRETER:  And I cut him off here. | 15:29:50 |
| 20 | THE WITNESS:  That's one thing. | 15:31:30 |
| 21 | (Long narrative in Hebrew by the witness.) | 15:31:34 |
| 22 | MR. HOWARD:  You know, can I hear what he's | 15:31:44 |
| 23 | said so far?  Because my question was about treatises. | 15:31:59 |
| 24 | He said "no" to treatises.  And everything thereafter | 15:32:01 |
| 25 | has been nonresponsive to my question.  I'll listen to | 15:32:03 |

| | | |
|---|---|---|
| 1 | are, indeed, affiliated to the Hamas.  And they all | 15:33:32 |
| 2 | use various criteria which appear here. | 15:33:38 |
| 3 | MR. HOWARD:  Objection.  Nonresponsive. | 15:33:41 |
| 4 | Q.  BY MR. HOWARD:  Can you answer me "yes" or | 15:33:45 |
| 5 | "no"?  Did you have any scholarly treatises that you | 15:33:46 |
| 6 | relied on that outlined the 18-criteria methodology | 15:33:51 |
| 7 | and how to apply them as you have done here? | 15:33:55 |
| 8 | A.  I think I've answered this.  I didn't have | 15:34:21 |
| 9 | any methodological paper in front of me. | 15:34:24 |
| 10 | Q.  And you yourself have not published any | 15:34:27 |
| 11 | methodological paper outlining your eight -- 18 criteria | 15:34:32 |
| 12 | and how to apply them -- correct? | 15:34:35 |
| 13 | I mean, other than your expert reports in the | 15:34:44 |
| 14 | Credit Lyonnais, NatWest, and Arab Bank cases? | 15:34:46 |
| 15 | A.  No. | 15:34:57 |
| 16 | Q.  I take it your 18-criteria methodology and how | 15:35:05 |
| 17 | you've applied it has not been peer-reviewed by anybody | 15:35:08 |
| 18 | else; correct? | 15:35:14 |
| 19 | A.  Do you mean by some kind of a research | 15:35:32 |
| 20 | institute?  I'd like to understand exactly what you | 15:35:36 |
| 21 | mean by that. | 15:35:38 |
| 22 | Q.  Are you familiar with the peer-review process | 15:35:38 |
| 23 | by which, if you're going to publish a learned paper, | 15:35:41 |
| 24 | peers in your field have to review it for the -- and | 15:35:46 |
| 25 | comment on it? | 15:35:50 |

HIGHLY CONFIDENTIAL
ARIEH DAN  SPITZEN - 7/24/2011

Page 438

| | | |
|---|---|---|
| 1 | A.   Yes.   I'm familiar with that.   And it takes | 15:36:41 |
| 2 | place not just in the academic world.   This kind of | 15:36:44 |
| 3 | control also exists in the military. | 15:36:47 |
| 4 | So my answer, if you're asking about | 15:36:49 |
| 5 | these criteria as is in this form, no.   Nobody else | 15:36:52 |
| 6 | in addition to me went over them.   It's all a matter | 15:36:56 |
| 7 | of the internal expert opinions that were written for | 15:37:00 |
| 8 | the trial cases.   It wasn't published anywhere outside, | 15:37:04 |
| 9 | at least not by me. | 15:37:07 |
| 10 | MR. HOWARD:  I apologize.  Would you indulge | 15:37:10 |
| 11 | me for a quick break, five minutes? | 15:37:18 |
| 12 | MR. UNGAR:  Sure. | 15:37:22 |
| 13 | MR. OSEN:  Sure. | 15:37:23 |
| 14 | MR. HOWARD:  Thank you. | 15:37:23 |
| 15 | THE VIDEOGRAPHER:  That concludes -- | 15:37:24 |
| 16 | MR. HOWARD:  Well, I don't want to -- | 15:37:25 |
| 17 | THE VIDEOGRAPHER:  We have 15 minutes left. | 15:37:31 |
| 18 | MR. HOWARD:  We can continue on the tape, | 15:37:31 |
| 19 | because we're going to have an issue -- as long as it | 15:37:31 |
| 20 | not count -- I'll get the time at the end, the running | 15:37:31 |
| 21 | time, then we can complete the tape. | 15:37:31 |
| 22 | MR. OSEN:  That's fine.  We'll spring for | 15:37:31 |
| 23 | the extra tape. | 15:37:31 |
| 24 | THE VIDEOGRAPHER:  Going off the record at | 15:37:38 |
| 25 | 3:38. | 15:37:39 |

**EXHIBIT 159 TO DECLARATION OF VALERIE SCHUSTER**

Case 1:05-cv-04622-DLI-RML   Document 267-13   Filed 03/22/12   Page 187 of 646 PageID #:
6865



THE
WASHINGTON INSTITUTE
for Near East Policy

PolicyWatch #1277

# Better Late than Never: Keeping USAID Funds out of Terrorist Hands

By Matthew Levitt
August 24, 2007

Foreign aid is an important and effective tool for buttressing allies, alleviating poverty and suffering, supporting key foreign policy objectives, and promoting the image and ideals of the United States abroad. Indeed, as its own website attests, the U.S. Agency for International Development (USAID) "plays a vital role in promoting U.S. national security, foreign policy, and the War on Terrorism." Toward these goals -- and considering that several agency-approved aid recipients have been linked to terrorist groups in recent years -- USAID's proposed new partner-vetting system (PVS) is a welcome and overdue development.

**Funding Groups Tied to Terrorism**

An aid organization by nature and design, USAID is focused more on dispersing aid than on vetting the partner and subpartner organizations through which that aid is distributed on the ground. As a result, its otherwise laudable record is tainted by a series of awards to entities with established ties to terrorist groups. Consider just two examples: Hamas-controlled *zakat* (charity) committees and the Islamic University of Gaza (IUG).

Documents made public in the ongoing prosecution of the Holy Land Foundation and several of its leaders -- accused of funding Hamas -- reveal that as recently as December 2002, USAID "cleared" several charity committees to receive funding despite information publicly tying them to Hamas. These included the main committees in the West Bank towns of Jenin, Qalqilya, Hebron, Tulkarem, and Nablus, as well as the al-Tadhoman committee, also in Nablus. But a year earlier, in a November 2001 memorandum sent to the Treasury Department, the FBI had cited detailed information documenting Hamas links among the first five of these committees. Documents seized from Palestinian offices by Israeli forces in March 2002 revealed further links.

More recently, in March 2007, then-USAID administrator Randall Tobias was called before Congress to explain why the agency had provided more than $140,000 to the Hamas-controlled Islamic University of Gaza. In response, he described the "very thorough vetting process that takes place." State Department spokesman Sean McCormack added that a "careful vetting process" led officials at the U.S. consulate in Jerusalem and the U.S. embassy in Tel Aviv to conclude that the IUG was an "independent" university and that "it would be incorrect to characterize [it] as Hamas-controlled."

But the university's extensive ties to Hamas were publicly available and well documented at the time USAID vetted it. One semiofficial history of Hamas -- cited in Avraham Sela and Shaul Mishal's 2000 book *The Palestinian Hamas: Vision, Violence, and Coexistence* -- breaks the organization's development into four chronological stages. These include a period of geographical expansion and institutional establishment between 1976 and 1981, resulting most notably in two large Islamic centers and the IUG.

Indeed, Israeli and Palestinian scholars alike characterize the IUG as a Hamas institution. Meir Hatina described it as one of the key institutions that "coordinated [Muslim] Brotherhood activities in the Gaza Strip and later constituted a springboard for Hamas." Similarly, in his book *Islamic Fundamentalism in the West Bank and Gaza*, Ziad Abu Amr depicted the IUG as "the principal Muslim Brotherhood stronghold," referring to the Palestinian Muslim Brotherhood, which became Hamas in December 1987. "The University's administration, most of the employees who work there, and the majority of students are Brotherhood supporters," he concluded.

Hamas itself has corroborated these ties. In a 2003 interview in the pan-Arab daily *al-Hayat*, Hamas leader Khaled Mashal boasted of the group's participation in building the IUG in 1978. And according to FBI surveillance of a 1993 Hamas meeting in Philadelphia, Muin Kamel Muhammad Shabib, a member of the organization's Izz al-Din al-Qassam Brigades, briefed attendees on "the situation in Palestine" and the status of "Islamic works" tied to Hamas, naming the IUG as one of "our institutions." In fact, even a cursory search of articles on LexisNexis through March 2007 produces 149 articles mentioning the IUG and Hamas together. Yet, only after congressional and media scrutiny exposed the taxpayer-funded awards to the Hamas-linked institution was USAID funding for the university terminated.

## Flawed Vetting Process

Despite State Department assertions that the USAID vetting process is thorough, several deficiencies explain how funding mistakes can occur.

In its most significant shortcoming, USAID often ran trace requests on individuals and organizations without sufficient identifier information such as date and place of birth (DPOB) or government-issued identification numbers. According to a 2006 Government Accountability Office (GAO) report, "until June 2006, the [Tel Aviv] mission did not routinely collect detailed identifying information on individuals, such as [DPOB], or verify that information." At the embassy in Tel Aviv, several interoffice memoranda documenting trace requests concluded that "no derogatory information was uncovered" despite acknowledging -- in bold font -- that "these trace requests are less than comprehensive." The memoranda (made public in the Holy Land case) added that "without additional information on individuals (DPOB, ID number, full name) our reviews will be less than complete." Despite this disclaimer, the individuals and organizations in question were approved to receive USAID awards.

A random probability sampling conducted by GAO revealed that 94 percent of all memoranda "characterized the vetting based on only the four-part name as less than comprehensive." USAID did not even establish procedures to verify the accuracy of individual's names, such as requiring some official identification document.

Moreover, in March 2006, the USAID mission in Tel Aviv eliminated a requirement to periodically reevaluate aid recipients after initial clearance. Terrorist associations often develop gradually, however, and this procedural change made it impossible for USAID to identify late-emerging links on its own. According to the 2006 GAO report, officials in the Tel Aviv mission claimed that "new information in 2005 showed possible links to terrorists, including Hamas, for six organizations that previously had been cleared." Indeed, it should come as no surprise that terrorist elements might deliberately seek to penetrate previously cleared organizations.

In addition, USAID's dollar-threshold policy leaves some recipients subject to no vetting at all. From 2001 to 2003, the threshold was $25,000 -- grantees awarded anything less than that sum were not vetted. In July 2003, the Tel Aviv mission raised the threshold to $100,000, in part because it feared that vetting requirements hampered its ability to deliver urgently needed humanitarian aid. As a result, according to the GAO report, no vetting was conducted on foreign organizations and individuals tied to thirty-four contracts totaling some $2.1 million between August 2003 and February 2006. The threshold was changed back to $25,000 in March 2006.

The GAO report also revealed that foreign service nationals -- local, non-American embassy employees -- had access to unsecured vetting data and, in at least one case, developed the database for recording and tracking vetting results. The database had several flaws, including important fields left blank or filled with inappropriate information.

## The Need for a PVS

The proposed partner-vetting system is necessary to remedy flaws such as those found in Tel Aviv. It would require applicants for USAID funding to submit identifying information on principal officers and other employees. As recent failures make clear, effective screening is impossible without sufficient identifier information. But even with sufficient information, meaningful traces must be run not only against the full

Case 1:05-cv-04622-DLI-RML   Document 267-13   Filed 03/22/12   Page 189 of 646 PageID #:
6867

range of publicly available information -- clearly not done with the IUG and Hamas charity committees -- but also against classified intelligence and law enforcement databases. Improved information sharing between USAID and security agencies will be critical for this to succeed. U.S. law, including Executive Order 13224 and existing statutory requirements for USAID vetting, demands the implementation of a reliable system.

Aid organizations may protest the extra administrative burden, but the critical need to provide humanitarian aid in conflict zones must be balanced with the inherent risk that terrorist groups will try to benefit from that aid. A truly robust system of vetting USAID partners is vital to promoting U.S. foreign policy and facilitating continued U.S. aid in places such as the West Bank and Gaza. The proposed PVS deserves public and private sector support and should be fully implemented as quickly as possible.

*Matthew Levitt, a senior fellow and director of the Stein Program on Terrorism, Intelligence, and Policy at The Washington Institute, is author of Hamas: Politics, Charity, and Terrorism in the Service of Jihad (Yale University Press). Previously, he served as deputy assistant secretary for intelligence and analysis at the Treasury Department.*

© 2010 The Washington Institute for Near East Policy

**EXHIBIT 160 TO DECLARATION OF VALERIE SCHUSTER**

Case 1:05-cv-04622-DLI-RML   Document 267-13   Filed 03/22/12   Page 191 of 646 PageID #: 6869



THE
WASHINGTON INSTITUTE
for Near East Policy

Shopping Cart | Customer Service | الموقع العربي

## Op-Eds & Articles



▸ Arabic | الموقع العربي

▸ Turkish | Türkçe ☾✹

▸ Book Prize

▸ About the Institute

▸ Bookstore

▼ Research Areas

Egypt
Iran
Iraq
Israel
Jordan
Lebanon
North Africa
Palestinians
Persian Gulf States
Syria
Turkey

Arab and Islamic Politics
Democracy and Reform
Energy and Economics
Gulf and Energy Policy
Military and Security
Peace Process
Proliferation
Terrorism
U.S. Policy

▼ Research Programs

Program on Arab Politics
Gulf and Energy Policy
  Program
Iran Security Initiative
Project on the Middle East
  Peace Process
Military and Security
  Studies Program
Project Fikra: Defeating
  Extremism through the
  Power of Ideas
Stein Program on
  Counterterrorism and
  Intelligence
Turkish Research Program

▼ Experts

List by Name
List by Expertise
Experts in the Media

▼ Analysis

PolicyWatch
Policy Focus
Policy Notes
Books
Op-Eds & Articles
Congressional Testimony
Interviews and
  Presentations

▼ Events

Home

# How Not to Fund Hamas: Scrutinize Those Who Receive U.S. Aid

By Matthew Levitt
*New York Daily News*, February 4, 2009

In the wake of the Gaza war, few tasks are more critical than providing much-needed humanitarian support to the residents of Gaza without inadvertently empowering Hamas. Unfortunately, one of the primary vehicles the U.S. government intends to use to provide newly pledged aid, the U.S. Agency for International Development, or USAID, is resisting efforts to implement a program to ensure that U.S. funds do not inadvertently support terrorism.

On Friday, the U.S. government announced that President Obama has authorized the use of $20.3 million to address critical post-conflict humanitarian needs in Gaza.

Under the system as it exists today, some or all of those funds could end up in Hamas coffers.

Make no mistake. USAID is a critical agency, especially given the Obama administration's clearly stated belief in doubling down on international development. But by its very nature, USAID is focused more on dispersing aid than on vetting the organizations through which that aid is distributed on the ground. As a result, its otherwise laudable record has been tainted by a series of awards to entities with established ties to terrorist groups, including Hamas-controlled *zakat* (charity) committees and the Islamic University of Gaza.

Documents made public in the prosecution of the Holy Land Foundation and several of its leaders -- who were ultimately convicted on all counts related to their providing material support for Hamas -- reveal that as recently as December 2002, USAID cleared several charity committees to receive funding despite information publicly tying them to Hamas. In March 2007, then-USAID administrator Randall Tobias was called before Congress to explain why the agency had provided more than $140,000 to the Hamas-controlled Islamic University of Gaza.

In its most egregious oversight, USAID often ran trace requests on individuals and organizations without sufficient identifier information such as date and place of birth or government-issued identification numbers. According to a 2006 Government Accountability Office report, "Until June 2006, the [Tel Aviv] mission did not routinely collect detailed identifying information on individuals. . . or verify that information."

At the embassy in Tel Aviv, several interoffice memoranda documenting trace requests concluded that "no derogatory information was uncovered" despite acknowledging -- in bold font -- that "these trace requests are less than comprehensive." Despite this disclaimer, the individuals and organizations in question were approved to receive USAID awards.

The necessary first step to fix all this is simple and long-overdue: a partner verification system. It would begin by requiring all applicants for USAID funding to submit identifying information on their principal officers and other

## Search For



GO   Advanced Search



🖶 Print Format   ✉ Email

📄 Save Page as PDF

Subscribe
Get Institute Analysis by Email


Twitter
Follow Us Now ▸


Podcast
Sign Up Now ▸


RSS Feed
Customize Your Own ▸

### In the Bookstore

▸ The Money Trail: Finding,
  Following, and Freezing
  Terrorist Finances

▸ Terrorist Threat and U.S.
  Response: A Changing
  Landscape

▸ Countering Transnational
  Threats: Terrorism, Narco-
  Trafficking, and WMD
  Proliferation

▸ Energy in Danger: Iran,
  Oil, and the West

### Related Analysis

▸ Combating the Financing
  of Transnational Threats
  *Michael Jacobson and
  Matthew Levitt, Emirates
  Lecture Series No. 76*

▸ PolicyWatch #1511:
  Preventing Nuclear
  Terrorism: A Global
  Intelligence Imperative
  *Rolf Mowatt-Larssen*

▸ Targeting Terrorists'
  Financial Networks
  *Matthew Levitt and
  Michael Jacobson,
  Jerusalem Post*

▸ PolicyWatch #1431: The

Case 1:05-cv-04622-DLI-RML   Document 267-13   Filed 03/22/12   Page 192 of 646 PageID #: 6870

Policy Forums
Conference Keynotes
Special Events

▼ Maps & Graphics

Browse Maps & Graphics

◄ Home

employees. Then, meaningful traces would check these officers and employees not only against the full range of publicly available information but also against classified intelligence and law enforcement databases.

Aid organizations are sure to protest the extra administrative burden. But the critical need to provide humanitarian aid in conflict zones must be balanced with the risk that terrorist groups will try to benefit from that aid.

Unfortunately, while USAID first published the proposed rule for such a system in July 2007, and a final rule was just published in the Federal Register last month, the proposed vetting system is still being vigorously opposed within USAID. In fact, the final rule was scheduled to go into effect Monday -- but was dealt a new setback when USAID bureaucrats held a backdoor meeting and effectively extended the implementation date.

Fortunately, President Obama will have the opportunity to rectify USAID's vetting shortcomings. As the final notice in the Federal Register notes, "The decision as to whether to implement PVS [a partner verification system] will be made by the incoming Obama administration."

Over to you, Mr. President.

*Matthew Levitt is a senior fellow and director of the Stein Program on Counterterrorism and Intelligence at the Washington Institute for Near East Policy. He is the author of Hamas: Politics, Charity and Terrorism in the Service of Jihad.*

Future of the Middle East
*Thomas Fingar*

**Related Events**

▶ Drug Trafficking and Middle Eastern Terrorist Groups: A Growing Nexus?

▶ Enhancing International Cooperation against Terrorism Financing

▶ Nuclear Proliferation and Nuclear Power in the Middle East

▶ Security Challenges in the Broader Middle East

**Related Documents**

Related documents are PDF files and require Adobe Acrobat Reader.

▶ The Influence of the Surge on Incident Levels in Iraq

▶ Robert Satloff in *Maroc Hebdo*

▶ Transcript of Soner Cagaptay's November 19, 2006, interview on CNN-Turk's *Burasi Washington* (in Turkish)

▶ 'Clear, Hold, and Build': The Way ahead in Iraq

**Related Graphics**

▶ Kirkuk Province *Policy Focus #102*

▶ Kirkuk and Dibis Subdistricts *Policy Focus #102*

▶ Oil Export Flows from the Middle East (PDF) *International Energy Agency*

▶ Gulf Energy Exports: Existing Alternative Pipeline Routes (PDF) *International Energy Agency and BP*

Site by MSDS

The Washington Institute for Near East Policy · 1828 L Street NW Suite 1050 Washington DC 20036
Tel: 202-452-0650 · Fax: 202-223-5364 · Contact · Privacy Policy · © 2010 All rights reserved

**EXHIBIT 161 TO DECLARATION OF VALERIE SCHUSTER**

# ENTER HAMAS:

# THE CHALLENGES OF POLITICAL INTEGRATION

Middle East Report N°49 – 18 January 2006



# TABLE OF CONTENTS

EXECUTIVE SUMMARY AND RECOMMENDATIONS......................................................i

I.   INTRODUCTION: HAMAS AND THE PALESTINIAN POLITICAL SYSTEM .. 1

II.  THE ERA OF INTEGRATION ............................................................................. 3
    A.   ABBAS'S GAMBLE ............................................................................................3
    B.   HAMAS ACCEPTS THE BAIT.............................................................................4
    C.   THE VAGARIES OF INTEGRATION .....................................................................6
        1.   Hamas and the ceasefire .........................................................................6
        2.   Hamas and the electoral process.............................................................7

III. HAMAS AND LOCAL POWER .......................................................................... 10
    A.   THE PITFALLS OF LOCAL POWER ...................................................................10
    B.   SHARIA DEFERRED?.......................................................................................13

IV.  HAMAS AND ISRAEL: PARTNERS FOR UNILATERALISM? ........................ 15
    A.   ISRAEL CONFRONTS HAMAS'S INTEGRATION.................................................15
    B.   IS A POLICY SHIFT IN THE MAKING? ..............................................................16
    C.   ARE HAMAS'S VIEWS ON ISRAEL CHANGING? ..............................................19

V.   HAMAS AND THE INTERNATIONAL COMMUNITY ...................................... 22
    A.   PROVIDING FUNDS TO NGOS.........................................................................23
    B.   PROVIDING ASSISTANCE TO HAMAS-RUN MUNICIPALITIES ...........................24
    C.   CONTACTS WITH HAMAS OFFICIALS ..............................................................28
    D.   HAMAS, NATIONAL ELECTIONS AND NATIONAL POWER ................................29
    E.   ASSESSING EU AND U.S. POLICIES ................................................................31

VI.  CHARTING A NEW PATH ................................................................................ 34
    A.   NEGOTIATING A COMPREHENSIVE CEASEFIRE ...............................................34
    B.   INVOLVING HAMAS IN DAY-TO-DAY GOVERNANCE ......................................35
    C.   ENCOURAGING ISLAMIST PRAGMATISM .........................................................37

VII. CONCLUSION ................................................................................................... 39

APPENDICES
    A.   MAP OF THE OCCUPIED TERRITORIES.............................................................41
    B.   ABOUT THE INTERNATIONAL CRISIS GROUP ..................................................42
    C.   CRISIS GROUP REPORTS AND BRIEFINGS ON THE MIDDLE EAST AND NORTH AFRICA .........43
    D.   CRISIS GROUP BOARD OF TRUSTEES ..............................................................45

# International **Crisis Group**

WORKING TO PREVENT
CONFLICT WORLDWIDE

---

**Middle East Report N°49**                                                                                  **18 January 2006**

## ENTER HAMAS: THE CHALLENGES OF POLITICAL INTEGRATION

## EXECUTIVE SUMMARY AND RECOMMENDATIONS

Hamas, the Islamist movement designated a terrorist organisation by the U.S. and EU and considered a mortal enemy by Israel, will soon join the Palestinian legislature. Riding an unprecedented wave of popularity and having exceeded virtually all expectations in recent municipal contests, it could end up sitting at the Palestinian Authority's (PA) cabinet table. Consequences would likely be far-reaching: Palestinians are hugely dependent on the West and Israel, and both have threatened to cut ties should Hamas join the PA. So far, the U.S. and EU essentially have opted to ignore the Islamists rather than deal with them upfront – the end result being a movement that feels stronger, more emboldened, and over which the West has precious little leverage. With the prospect as remote as ever of a renewed peace process or a weakened PA cracking down on a strengthened Hamas, the international community's best remaining option is to maximise the Islamist movement's incentives to move in a political direction through a policy of gradual, conditional engagement.

Hamas's electoral participation results from a convergence of disparate interests. For President Abbas, securing the ceasefire, rehabilitating the Palestinians' international standing, and putting the domestic house in order required a deal with Hamas. In exchange for cooperation, he offered power-sharing through political integration. Abbas's gambit coincided with Hamas's calculations: it had experienced a surge in popular support during the uprising, was eager for a respite from Israeli military assaults, and, with both Fatah and the PA in disarray, saw an opportunity to translate its success into institutional power. Though originally scheduled for July 2005, parliamentary elections were postponed by Fatah leaders concerned about Hamas's strength and convinced that with more time they would recover lost ground.

Fatah's concerns were not misplaced but its response was plainly misguided. Strong half a year ago, Hamas appears far stronger now. In the intervening months, Fatah has continued to fray, consumed by internal divisions, while Hamas has come of age. Municipal elections, in which they handily won control of most urban areas, including traditional Fatah bastions like Nablus, suggest the Islamists

are establishing themselves as the alternative of choice to a PA discredited by corruption, chaos and a failure to realise its political agenda. Today, hundreds of thousands of Palestinians live in localities ruled by Hamas.

The record of the last several months, as Hamas rubbed elbows with issues of local governance and campaigned for national office, offers a preliminary, mixed picture of how political integration might affect its outlook and conduct. In its pragmatism, and even willingness to deal with Israel on day-to-day operational affairs, Hamas rule at the local level has been almost boringly similar to its predecessor. Local politicians emphasise themes of good governance, economic development, and personal and social security, leaving specifically religious issues and the conflict with Israel to the background. With only scant exceptions, they have yet to try to impose their vision of an Islamist society.

Nationally, too, signs of pragmatism can be detected. Far more than Fatah, Hamas has proved a disciplined adherent to the ceasefire, and Israeli military officers readily credit this for the sharp decline in violence. In recent statements, Hamas leaders have not ruled out changing their movement's charter, negotiating with Israel, or accepting a long-term truce on the basis of an Israeli withdrawal to the 1967 lines. Today, their electoral platform is in these respects closer to Fatah's outlook than to Hamas's founding principles.

There is a less encouraging side. Hamas continues to straddle its public and clandestine wings, subject to competing views from different leadership elements, and at least partially susceptible to Syrian and Iranian pressures. Most Israelis, and not a few Palestinians, are worried about its armed potential, and there is widespread suspicion in Israel that the organisation simply is biding its time, waiting for the post-electoral period to launch a new wave of attacks with a replenished and improved arsenal. Perhaps most significantly, it has neither renounced violence, nor accepted Israel's existence.

All this suggests that integration is a work in progress, neither a sure thing nor the safest of bets. But what is the alternative? The PA is not in a military, let alone a political,

Case 1:05-cv-04622-DLI-RML Document 267-13 Filed 03/22/12 Page 197 of 646 PageID #: 6875

*Enter Hamas: The Challenges of Political Integration*
*Crisis Group Middle East Report N°49, 18 January 2006*                                                    *Page ii*

position forcibly to disarm Hamas. Since taking office, Abbas has been paralysed by a sclerotic political system, and he has more than once staked his political future on successful, inclusive elections. Without the prospect of political incorporation, and in the absence of a credible diplomatic process, Hamas – and, along with it, most other armed organisations – is likely to resume sustained attacks against Israel. What remains, for now, is the possibility that by incorporating Hamas more deeply into local and national governance, its stake in overall stability and the political costs of a breakdown gradually will steer it away from the military path.

Confronted with the challenge of a newly emerging Palestinian reality, the international community has, for the most part, taken a pass. While there are important differences in policy, both the U.S. and EU avoid (and in the American case, bar) contacts with the Islamist organisation, deny funding to projects with Hamas-run municipalities, and have threatened to halt assistance to the PA if Hamas joins it. This attitude has had several, essentially negative, results: estranging Palestinians from Western donors; losing touch with an increasingly large segment of the population; jeopardising project sustainability; and reducing accountability. Meanwhile, Hamas has gained strength from a nationalist backlash against perceived foreign interference and is participating in elections without having to fulfil any prior condition.

Western countries have not done the one thing that might have had a positive impact: try to shape Hamas's policies by exploiting its clear desire for international recognition and legitimacy. There is every reason for the West to withhold formal dealings at a national level, at least until it renounces attacks against civilians and drops its opposition to a two-state solution, but the current confused approach – boycotting Hamas while facilitating its electoral participation; facilitating its participation without seeking through some engagement reciprocal concessions – makes no sense at all.

Without conferring immediate legitimacy on Hamas, engaging its national officials or removing it from the terrorism list, the EU in particular – which has more flexibility than the U.S. in this regard – should encourage the Islamists to focus on day-to-day matters and facilitate a process of potential political integration and gradual military decommissioning. With Prime Minister Sharon's sudden incapacitation, an already impossibly perplexing situation has become more confused still. Using Western economic and political leverage to try to stabilise the Palestinian arena would be far from the worst possible investment.

## RECOMMENDATIONS

**To the Palestinian Authority:**

1. Within 100 days of the formation of the next cabinet, submit the draft Political Parties Law to the Palestinian Legislative Council (PLC) for ratification, providing for the formal registration of all political organisations that pursue their objectives through lawful and peaceful means.

2. Within 100 days of the formation of the next government, submit a Basic Security Law to the PLC, providing for:

    (a) de-politicisation of the Palestinian security sector and full parliamentary supervision of all security forces and intelligence agencies, including their budgets; and

    (b) phased decommissioning of paramilitary weapons, commencing with cessation of the acquisition, development, and testing of new weaponry, and including in subsequent stages decommissioning of weaponry that most threatens an Israeli-Palestinian ceasefire; and integration or demobilisation of members of all armed groups not part of the Palestinian security forces, all in coordination with verifiable international supervision.

3. Ensure the equitable distribution of municipal and reconstruction funds, including donor funds disbursed to PA accounts, so that local authorities are not the subject of discrimination on the basis of the political composition of their governing councils.

**To the Islamic Resistance Movement (Hamas):**

4. Renew the unilateral ceasefire (*tahdi'a*) for six months, and respond positively to efforts by Egypt, the Quartet, and other third parties to achieve a comprehensive Israeli-Palestinian ceasefire.

5. Support ratification by the Palestinian Legislative Council (PLC) of the Political Parties Law, and register the Reform and Change Bloc as a distinct and separate political party.

6. Participate in the drafting and support ratification by the PLC of a Basic Security Law, and declare readiness to cooperate with a newly formed decommissioning authority on gradual implementation of the following measures, in the case of (c) – (e) subject to a comprehensive Israeli-Palestinian ceasefire and independent international verification:

Case 1:05-cv-04622-DLI-RML    Document 267-13    Filed 03/22/12    Page 198 of 646 PageID #: 6876

*Enter Hamas: The Challenges of Political Integration*
*Crisis Group Middle East Report N°49, 18 January 2006*                                                    *Page iii*

(a) immediate and unconditional ban on the public display of weapons;

(b) permanent cessation of attacks against civilian targets;

(c) cessation of the acquisition, manufacture, and testing of weaponry;

(d) decommissioning of weaponry that most threatens the ceasefire, including rockets and weapons laboratories; and

(e) unification of all armed elements under central government authority.

7. State that it will accept and honour a negotiated two-state settlement that is properly endorsed by Palestinian national institutions and the Palestinian people.

**To the Government of Israel:**

8. Reciprocate an extension of the *tahdi'a* by Palestinian armed groups by:

(a) a moratorium on assassinations, incursions into Palestinian population centres, house demolitions, and arrest sweeps where there is no evidence of imminent military necessity; and

(b) beginning a process of meaningful release of prisoners belonging to groups that are party to the *tahdi'a* commencing with political leaders, including Islamists, who have not been charged with involvement in armed activities.

9. Respond positively to efforts by third parties to achieve a comprehensive ceasefire.

**To the European Union and its Member States:**

10. Subject to Hamas extending the *tahdi'a*:

(a) resume normal developmental and diplomatic contact with Hamas-run municipalities;

(b) renew funding of municipalities through the Municipal Development fund, subject to auditing measures that ensure disbursements benefit only intended recipients; and

(c) agree to engage in relations with any political party, including the Hamas-affiliated Reform and Change Bloc, but only if it is properly registered under the Political Parties Law and verifiably independent of any armed wing.

11. If Hamas violates the truce, suspend contacts both with its parliamentary faction and local officials, and if Hamas-affiliated politicians are part of the cabinet at the time, also suspend contacts with and assistance to the PA.

12. Remove Hamas from their list of proscribed terrorist organisations, subject to Hamas formally renouncing all violence against civilians and taking initial steps in a verifiable process of decommissioning.

13. Undertake normal dialogue with the organisation subject to Hamas dropping its opposition to a two-state solution and indicating it will honour a properly endorsed Israeli-Palestinian agreement.

**To the Government of the United States:**

14. Give serious consideration to adopting policy responses toward Hamas recommended for the European Union and its member states if they prove effective.

**Amman/Brussels, 18 January 2006**

# International Crisis Group

WORKING TO PREVENT
CONFLICT WORLDWIDE

---

**Middle East Report N°49**                                                **18 January 2006**

# ENTER HAMAS: THE CHALLENGES OF POLITICAL INTEGRATION

## I.   INTRODUCTION: HAMAS AND THE PALESTINIAN POLITICAL SYSTEM

Integration of the Islamic Resistance Movement (Hamas)[1] into the Palestinian political system has been on the agenda virtually since it was founded during the early months of the 1987-1993 uprising in the occupied territories.[2] Initial contacts, conducted in various Arab states prior to the 1993 Oslo agreements, failed because neither the Palestine Liberation Organisation (PLO) – the umbrella organisation of the national movement – nor Hamas saw much benefit in incorporation. That such discussions came at a time when the PLO under Arafat had embraced a negotiated two-state settlement, while Hamas was proclaiming a jihad to liberate every inch of historic Palestine, complicated matters further.

The exiled PLO leadership was disinclined to offer the upstart newcomer from the occupied territories a seat at the table on terms other than its own. Arafat, whose dominant figure loomed over the polity as a whole, had little patience or need for an organisation that did not recognise the PLO's monopoly on Palestinian representation and decision-making. He and his colleagues also were innately suspicious of a movement that promoted a rival ideology, was seen as retaining primary loyalties to the Muslim Brotherhood's regional leadership, was viewed as excessively close to Arab states, particularly Jordan, and,

they believed, had been encouraged by Israel to undermine the PLO.[3]

Hamas's considerable demands, including, in 1990, an overhaul of PLO strategy and at least 40 per cent of the seats in its parliamentary body, the Palestine National Council (PNC),[4] were clearly designed to be rejected. They showed a movement convinced of its strong hand, equally if not more comfortable operating in opposition to the PLO rather than as part of existing national institutions. Hamas's perception that the dominant Palestinian National Liberation Movement (Fatah) was out to eliminate it, and Fatah's that the Islamists ultimately sought to replace its leadership, each contained an important element of truth that resonates to this day.

The establishment of the Palestinian Authority (PA) in the West Bank and Gaza Strip in 1994 inaugurated a new phase in the relationship between the nationalist and Islamist movements. The PLO's ownership of the Oslo process, and its monopoly of the institutions it spawned, threatened Hamas, which had established itself as a significant national player during the 1987-1993 uprising. Arafat and Fatah dominated Palestinian institutions and the broader political landscape to an even greater extent than previously, largely excluding rival and allied organisations alike from the decision-making process and a commensurate share of PA resources. At the same time, Oslo in part was made possible by a shared Israeli and Palestinian interest to stymie Hamas in the occupied territories.

---

[1] Hamas, the Arabic word for "zeal", is the acronym of the movement's name in Arabic, *harakat al-muqawwama al-islamiyya.*

[2] For background on the origins and development of Hamas, see Crisis Group Middle East Report N°21, *Dealing with Hamas,* 26 January 2004, pp. 4-18; Crisis Group Middle East Report N°13, *Islamic Social Welfare Activism in the Occupied Palestinian Territories: A Legitimate Target?,* 2 April 2003, pp. 3-6; Ziad Abu Amr, *Islamic Fundamentalism in the West Bank and Gaza: Muslim Brotherhood and Islamic Jihad* (Bloomington, 1994); Khaled Hroub, *Hamas: Political Thought and Practice* (Washington, DC, 2000); Beverly Milton-Edwards, *Islamic Politics in Palestine* (London, 1996); Shaul Mishal and Avraham Sela, *The Palestinian Hamas: Vision, Violence, and Coexistence* (New York, 2000); and Graham Usher, "What Kind of Nation? The Rise of Hamas in the Occupied Territories", in Joel Beinin and Joe Stork (eds.), *Political Islam: Essays from Middle East Report* (Berkeley, 1997), pp. 339-354.

[3] Although many of Fatah's founders cut their political teeth in the Brotherhood during the 1950s, the movement prized and jealously guarded its independence from other political organisations and governments. An Egyptian diplomat in Gaza said: "Hamas still looks most to the Muslim Brotherhood in Jordan, although Sheikh Ahmad Yasin tried to look to Cairo for recognition as Gaza's *murshid al-amm* (Supreme Guide). Khalid Mashal is Hamas's intermediary with the 700-member international leadership of the Muslim Brotherhood, primarily in Qatar where Sheikh Yousif Qaradawi is based". Crisis Group interview, Gaza City, December 2005. For more on early relations between Israel and the Palestinian Islamist movement before 1990, see Crisis Group Report, *Dealing With Hamas,* op. cit., pp. 5-7.

[4] Hroub, *Hamas,* op. cit., pp. 94-95.

Insisting that the Oslo agreements and, therefore, the institutions established to implement them were illegitimate, Hamas not only boycotted the 1996 PA presidential and legislative elections, but vowed to continue the uprising. Claiming, however, that local authorities are service institutions predating Oslo rather than political ones created by it, Hamas consistently demanded that municipal elections be held. Arafat, informed by his security chiefs that Hamas success at the local level would transform the West Bank and Gaza Strip into "another Algeria", consistently demurred.[5] Tensions rose in the wake of the February 1994 massacre of 29 Muslim worshippers at Hebron's Ibrahimi Mosque, when the Islamist organisation escalated its armed campaign by introducing suicide bombings, primarily against Israeli civilian targets.[6]

The above notwithstanding, unofficial negotiations between the PLO/PA leadership and Hamas continued after Oslo, producing an informal ceasefire in the months preceding the 1996 elections in exchange for prisoner releases and extending to discussions on the modalities of Hamas's eventual participation in the polls.[7]

Whether Hamas's political integration could have succeeded in the 1990s remains an open question. In its absence, the PA's commitments to the peace process and Hamas's continued militancy proved fundamentally irreconcilable, the more so because Arafat concluded that the suicide bombings of 1994-1996 were designed to

inflict not only physical damage in Israel but – more importantly to him – political damage to his and the PA's standing. With his back to the wall and Oslo as well as his newfound ties to the U.S. in the balance, he directed his security forces, consisting largely of repatriated PLO fighters and local Fatah activists, to hit back.

The widespread PA campaign against Hamas had a devastating impact on the Islamist movement but could not mask a new reality that Arafat himself recognised: the Islamist movement was there to stay. Alternately seeking to co-opt and contain Hamas, the Palestinian president achieved his main objective of imposing recognition of the PA's legitimacy and supremacy – and therefore his own – on the Islamists. In exchange, Hamas and its institutions were largely spared harassment so long as they respected the rules of the game. Chief among these was to desist from directly confronting the PA or threatening Oslo's viability through excessive escalation of the conflict with Israel; if it violated either principle, the entire movement – including its political leaders and social institutions – risked paying a serious price.

With the onset of the second uprising in late 2000, the *modus vivendi* established during the 1990s developed into a relationship of competitive cooperation. Hamas's political leadership generally acquiesced in PA initiatives that enjoyed broad public support, such as the unilateral ceasefire announced in mid-2003, but on the battlefield the Fatah-affiliated Al-Aqsa Martyrs' Brigades (AMB) and the Hamas Martyr Izz-al-Din al-Qassam Brigades were competing not only with Israel but each other. The AMB's unprecedented decision to conduct suicide bombings in January 2002 and Hamas's deployment of rudimentary Qassam rockets in the Gaza Strip several months later were in no small part motivated by the need to appear the more militant and effective movement.

Israel's undifferentiated response to the uprising also brought the rival organisations closer and set the stage for a more serious approach towards Hamas's political integration. Indeed, the PA's increasingly antagonistic relationship with Israel and the U.S. since the collapse of the July 2000 Camp David summit, and Hamas's decision not to exploit the conflict to openly subvert the PA, burnished their credentials in each other's eyes. Confronted by a common enemy, they increasingly shared a common discourse in which nationalist and religious terminology intertwined.[8] In addition, the conflict itself so

---

[5] The assessment was reportedly provided to Arafat by a senior security official. Crisis Group interview, European journalist covering Palestinian affairs, Jerusalem, January 2006.
[6] On 25 February 1994, during dawn prayers at the Ibrahimi mosque in Hebron during the final Friday of the sacred Muslim month of Ramadan, Baruch Goldstein, a radical Israeli setter, entered the Mosque and fired indiscriminately at worshippers until he was beaten to death. 29 were killed and many more wounded in an act that was condemned by the Israeli government. The first Hamas suicide bombing was perpetrated 40 days later, on 13 April 1994, in the northern Israeli town of Afula, killing eight. In Arab Muslim societies, this constitutes the traditional mourning period for the deceased. "Had there not been the 1994 Ibrahimi mosque massacre, there would have been no suicide bombings". Crisis Group interview, Sheikh Ahmad Haj Ali, senior Palestinian Muslim Brotherhood leader and Hamas PLC candidate, Nablus, July 2005. Every Hamas leader interviewed by Crisis Group emphasised the Ibrahimi mosque massacre as a turning point.
[7] In these discussions Hamas suggested it was prepared to contest legislative elections if the electoral system was changed from district constituencies to national proportional representation (Palestinians could then vote for the movement rather than individuals). Arafat refused, and negotiations broke down. How serious Hamas was is unclear, and it has since maintained that it was never prepared to contest elections under Oslo. Crisis Group interview, Graham Usher, *The Economist* Palestine correspondent, Jerusalem, July 2005.

[8] "The leading generation of Hamas and Fatah's younger generation grew up together in the same neighbourhoods. [Former PA security chief] Muhammad Dahlan and the leader of Hamas's military wing, Muhammad Daif, are from the same place. Hamas and the younger generation of Fatah shared the same Israeli prisons, and share the same experience, shaped

disabled the PA that it could no longer rule unassisted; Hamas's readiness and demands for power-sharing and a role in governance found more response. In one of his final acts, Arafat on 5 May 2004 implicitly inaugurated the process of integration when he decreed that a first round of local authority elections – postponed since 1996 – would be held on 23 December 2004.[9]

While Arafat may have concluded it had become necessary to offer the Islamists genuine power-sharing arrangements, it seems more likely he was engaging in his time-honoured practice of seeking to incorporate them into the fabric of the political system in order to control them better. As various Palestinians have noted, he was loathe to share power even with his own Fatah movement and would have been highly unlikely to do so with the most powerful opposition force. But with his death, a process to which he probably intended to give one meaning suddenly acquired another.

---

## II.   THE ERA OF INTEGRATION

### A.   ABBAS'S GAMBLE

Both Hamas and Fatah lost their historic leaders in 2004. On 22 March, Sheikh Ahmad Yasin, Hamas's founder and mentor, was killed in an Israeli helicopter attack that also took nine other lives. Eight months later, on 11 November, Arafat, who had led the national movement since its re-emergence after the 1967 war, died in a Paris military hospital. If Hamas appears to have recovered from its loss and remains a disciplined movement with a coherent leadership, Fatah clearly has not. Combined with the PA's virtual destruction during the intifada, it has lost its political hegemony, and a new reality is being created.

The quick and smooth succession and then election of Mahmoud Abbas (Abu Mazen) to the helm of the national movement initially concealed the depth of the crisis. Arafat had increasingly tailored the system to his unique methods of rule, so that it was effectively a reflection of his own personality. His absence inevitably called into question the very structure of the political system and punctured basic assumptions that had remained constant for the better part of a generation. Not only did Abbas lack his predecessor's credentials and persona, and therefore the capacity to dominate political life; he also consciously adopted a different approach.

As a combined result of preference and force of circumstance, Abbas's agenda consisted of policies aimed at stabilising the domestic political system as well as relations with Israel, Arab states, and the international community. On this basis, he hoped to end the violent uprising, rehabilitate the Palestinians' international standing, strengthen the Israeli peace camp, repair relations with the U.S., and nudge Israel back to the negotiating table in order to reach a comprehensive agreement. Given the interdependence of these objectives and realities on the ground, any progress required Hamas's cooperation. So long as Islamist suicide bombers attacked Tel Aviv and their comrades lobbed missiles over the Green Line, Abbas's goals would remain elusive. Enforcing domestic law and order required cooperation from the armed movement. In addition, Hamas's role loomed large in the elections Abbas sought to organise to remove rival Fatah power centres within the PA and regenerate the political arena.

Abbas's prescription was simple: a renewal of the ceasefire he had engineered during his brief premiership in 2003, coupled with a commitment by Hamas and others to sabotage neither his internal authority nor his diplomatic efforts. Without these he could neither put the Palestinian house in order nor repair relations with the outside world. With compulsion not an option in view of the PA's gravely

Case 1:05-cv-04622-DLI-RML   Document 267-13   Filed 03/22/12   Page 202 of 646 PageID #: 6880

weakened state and Fatah's systematic fragmentation during the years of conflict, and not a preference in light of public aversion to domestic confrontation, negotiation was essential. Thus, rather than wage a debilitating internal battle on the heels of an external one, Abbas opted to deal with the Islamists. In exchange for their cooperation, he offered power-sharing through integration into PA institutions on the basis of elections. The strategy was actively supported by Egypt.[10] Washington, which held Abbas in high regard, was eager to bolster him and had its own regional democratic agenda to promote, was favourably disposed.

Abbas had another calculation in mind. Knowing that a resumption of meaningful negotiations with Israel required the end of Hamas's autonomous military decision-making, that the Roadmap[11] dictated the dismantling of its armed infrastructure, and that forcible disarmament was out of the question, he banked on gradual decommissioning through political integration. Once in the Palestinian Legislative Council (PLC), he argued, Hamas no longer could ignore the laws that were passed by it. It would have to reject either the logic of political incorporation or the logic of military independence; it could not indefinitely embrace both. Moreover, once Hamas recognised the legitimacy and authority of the PA, violations of PLC laws could be used to justify a more muscular approach toward it.[12] "We cannot crack down right away, but as our security forces are bolstered, and as Hamas subjects itself to our laws, we will be in a far better position to keep them in line and in check".[13]

Where Arafat sought to co-opt and control through a policy of divide and rule, in other words, Abbas attempted to rule through a process of incorporation and integration. After several months of negotiations mediated by Egypt, the Palestinian leadership and representatives of thirteen political organisations signed the 19 March 2005 Cairo Declaration.[14] The single sheet of paper essentially committed the factions and their armed affiliates to observe unilaterally a period of calm or ceasefire (*tahdi'a*) through the end of 2005, and the leadership to conduct local and legislative elections without further delay. Additional pledges to initiate discussions on the incorporation of

Hamas and Palestinian Islamic Jihad (PIJ) into the PLO, and the forswearing of any resort to arms in internal Palestinian disputes, suggested that Islamist integration was on course to become a reality.

This agreement was met with serious misgivings within Fatah. Some felt that the president had gone too far, granting Hamas the legitimacy it craved and agreeing to an electoral system that, they claimed, would disproportionately benefit it.[15] Particularly in the wake of the popular mandate he obtained in the January 2005 PA presidential elections, they felt Abbas should have driven a harder bargain. Because the informal ceasefire served Hamas's interests as much as the Palestinian leader's needs, argued a PA minister, Abbas was in a position to demand that the Islamists recognise the PLO's 1988 Algiers declaration formally endorsing a two-state settlement, renounce attacks on targets within Israel proper, and take specific measures on arms decommissioning as well.[16]

Others denounced the very notion of an agreement with Hamas, pointing to Arafat's refusal to make one. They argued that ultimately the Islamists intended to seize rather than share power and to impose their agenda rather than to amend it, so policy should be formulated with a view towards victory in an inevitable confrontation.[17] Convinced that Sharon's approach to Israel's impending departure from the Gaza Strip would in the short run primarily benefit Hamas, and concerned that growing disarray within Fatah and associated chaos in population centres would be reflected at the ballot box, a majority argued that elections should be postponed until Abbas had been in power long enough to deliver.[18] In a sign of more serious potential problems, some within the nationalist movement began referring to Abbas as the "Palestinian Chadli Benjedid", an uncharitable reference to the former Algerian president whose decision to legalise his country's Islamists and allow them to participate in elections led them to the cusp of power – until a military coup and civil war put an end to the entire episode.[19]

## B.   HAMAS ACCEPTS THE BAIT

Abbas's gambit coincided with Hamas's calculations. Its appreciation for both his honesty and weakness helped propel discussions forward. Unlike Arafat, Abbas was deemed trustworthy; unlike Arafat, he also was seen as less

---

[10] Crisis Group interviews, senior Egyptian security officials and diplomats, Cairo, May 2005.
[11] For full text and analysis of the Roadmap, unveiled in 2003 by the Quartet (U.S., EU, Russian Federation and UN), see Crisis Group Middle East Report No. 14, *A Middle East Roadmap to Where,* 2 May 2003.
[12] Crisis Group interviews, senior Palestinian officials, Ramallah, Washington, May-December 2005.
[13] Crisis Group interview, senior PA official, Washington, May 2005.
[14] For the text of the Cairo Declaration, see www.palestine-pmc.com/details.asp?cat=2&id=849.

[15] Crisis Group interviews, Fatah militants, April 2005.
[16] Crisis Group interview, PA cabinet minister, Ramallah, July 2005.
[17] Crisis Group interview, former senior Palestinian security official, Gaza City, September 2004.
[18] Crisis Group interview, Palestinian analyst, Nablus, July 2005.
[19] Crisis Group interview, Fatah militant, April 2005.

capable of outmanoeuvring it. Ghazi Hamad, the editor of an Islamist newspaper in Gaza and a Hamas parliamentary candidate, remarked that "many things have changed. Abbas believes in democracy and institutions and has allowed Hamas to become more and more involved".[20] In other words, Arafat's demise offered opportunities his presence had foreclosed.

Most importantly, integration was the right offer at the right time. While its military role during the second uprising had catapulted it to the centre of the Israeli-Palestinian equation on a wave of popular support, several factors suggested Hamas was nearing the limits of its spectacular growth: First, Israel's targeted assassinations had deprived the movement of many of its most effective and charismatic leaders and forced the remainder underground for extended periods. Exhausted and eager for a respite, Hamas also was deprived of regular contact with the population through rallies, media appearances, and the like. It therefore became increasingly difficult for the Islamists to represent and respond to their constituents' concerns.

Israel's announcement of the Gaza disengagement was a second factor. Hamas's claim to have liberated the territory by force was broadly accepted by the public, meaning the time was ripe to cash in its political dividends. In addition, with the withdrawal in sight, popular support for continued armed operations from Gaza dropped significantly. Gazans were eager for a return to normalcy and to taste the fruits of Hamas's purported triumph. More generally, whether or not they endorsed Abbas's agenda or thought it would succeed, most Palestinians wanted to give their new leader an opportunity to implement his ideas in the expectation that this would at least provide a respite from years of conflict. In this way, too, public opinion added its weight to demands that Hamas facilitate a ceasefire. For a movement that prides itself on reading the people's pulse, and whose fortunes very much depend on this, such sentiments were significant.

The collapse of the Oslo accords and the effective absence of other diplomatic efforts also helped bring about the Islamists' change of heart. Hamas could enter political institutions without fear of endorsing a process that would profoundly divide the movement and force it to re-examine basic tenets.[21] As a Hamas campaign manager explained, "the conditions of Oslo no longer apply. We're living

in a post-Oslo age".[22] In this respect, any further Israeli unilateral withdrawals would also suit Hamas well: as a member of the PLC, it would neither have to endorse nor reject (non-existent) PA negotiations with Israel, and it would not be blamed for lack of progress. Finally, the combination of ceasefire, electoral legitimacy, and integration served to distinguish Hamas's territorial jihad for national liberation from the global jihad of al-Qaeda.[23]

Hamas recognised it risked forfeiting – temporarily at least – the political benefits of an armed struggle that had been instrumental in its ascendancy. If it was going to translate its popular support into institutional power, therefore, 2005 was a pivotal year. Nor was there any guarantee that the confluence of events enabling integration under such advantageous circumstances would be repeated anytime soon. If, for example, Abbas succeeded in revitalising Fatah and the PA, engaging the Bush administration, or extracting concessions from Israel, Hamas might well be left out in the cold. Not only would the Palestinian leader no longer need it; he might well face intensified demands to take it on and, with security reform and international refurbishing of the PA's arsenal, be more capable of prevailing. By integrating political institutions and gaining international legitimacy at a moment of relative strength, Hamas could thus protect itself from future attempts by Israel, but also the PA, to confront it.

This is not to say that the decision was without controversy. Although Hamas leaders are eager to project an image of unity and deny any dissension,[24] the decision clearly was the object of internal debate.[25] Reports suggest that elements within the politburo in exile formed the primary locus of opposition to integration and were joined by a number of leaders and cadres within the occupied territories, presumably including prominent military

---

[20] Crisis Group interview, Ghazi Hamad, editor of *al-Risala*, Gaza City, November 2005.

[21] Hamas "can now join a new process, not one it has formerly opposed; it can give Abu Mazen a chance without giving the Oslo Accords approval; and it can join the Authority and other Palestinian institutions without endorsing past policies". Hussein Agha and Robert Malley, "The Lost Palestinians", *New York Review of Books*, 9 June 2005.

[22] Crisis Group interview, Yahya Nasr, Hamas campaign manager, Baitunya, September 2005.

[23] Crisis Group interview, Hamad, Gaza City, November 2005. For discussion of the reasons behind Hamas's evolution, see Agha and Malley, "The Lost Palestinians", op. cit.

[24] Hamas's best known leader in the Gaza Strip, Mahmoud Zahar, told Crisis Group that no one within the movement had raised objections to electoral participation. Crisis Group interview, Gaza City, November 2005.

[25] As one indication of debate, Muhammad Ghazal, the Nablus-based spokesman who on 12 March 2005 announced the movement's decision to contest legislative elections, suggested he was selected to do so to demonstrate that even though opposition to participation had been highest among cadres in the Nablus region, debate was finished and – in the best traditions of democratic centralism – the movement now stood united behind the decision reached by the leadership. Crisis Group interview, Muhammad Ghazal, Hamas spokesman, Nablus, September 2005.

commanders. They are said to have feared that entering institutional politics was a slippery slope that would ultimately lead to abandonment of armed struggle, as well as to the loss of important constituencies to more radical groups.[26] These elements also saw little justification in joining a system they hoped to replace for the sake of coexistence with a state they hoped to destroy.

More broadly, it is not difficult to understand why some within Hamas would have opposed integration, for it goes to the heart of the Islamist movement's identity. By remaining outside formal political institutions, it can maintain its revolutionary élan and the luxury of informal power without formal responsibility. Untainted by office, it is a magnet for Palestinians thirsting for an alternative, beyond those committed to its Islamist principles or agenda. Having developed its own parallel social network, it also can take credit for accomplishments without incurring the blame for failings. And much like Fatah during the 1970s and 1980s, it can continue to accommodate contradictory perspectives on critical issues such as the resolution of the Israeli-Palestinian conflict. All this becomes more difficult for a movement ensconced in formal institutions that must take decisions and resolve street-level practical questions and high-minded political ones.

Yet at the end of the day, proponents of integration, led by the political leadership within the occupied territories and enjoying the support of some key exile leaders including politburo head Khalid Mashal,[27] won the debate and – at least thus far – have united the movement behind them. In the process, they sought and obtained endorsement of their policy from the Muslim Brotherhood's *majlis shura* (Consultative Council) that is the supreme arbiter of the movement's affairs.[28] Likewise, the influential prison leadership – which enjoys close relations with Fatah detainees – is said to have forcefully advocated integration.[29] Like their detractors, some proponents of Hamas's entry into institutional politics see this as a turning point in its organisational development.[30] Formally, however, the movement has pointedly declared that the struggle goes on, and it is a safe assumption that for most Islamists integration is meant to complement armed struggle rather than replace it.[31]

## C. THE VAGARIES OF INTEGRATION

### 1. Hamas and the ceasefire

Advocates of Abbas's integration approach underscore some early successes. Significantly, of all the major Palestinian factions, Hamas, not Fatah, has proved the most steadfast adherent to the *tahdi'a*. Israeli military officers readily credit its discipline in relinquishing violence for short term goals and attribute the sharp decline in violence in 2005 primarily to its restraint.[32] Hamas has not eschewed attacking Israeli targets – it has fired dozens of missiles from the Gaza Strip into Israel and launched a number of attacks in the West Bank during the past year. But it has generally done so within its definition of the *tahdi'a* – a conditional ceasefire in which it reserves the right to respond to Israeli attacks upon Palestinian population centres and particularly its cadres. Seen from this perspective, what is equally noteworthy are the number of Israeli attacks, including assassinations, that passed without a direct (or at least immediate) response.

The transition has been far from complete and anything but smooth. Hamas continues to straddle its public and clandestine wings, is subject to competing views from different leadership elements, and is at least partially susceptible to Syrian and Iranian pressures. At times, it appears to have relied on others, particularly the Al Aqsa Martyrs' Brigades, to carry out its most serious reprisals and thus insulate itself from the consequences. Most Israelis and not a few Palestinians are worried about its armed potential, and there is widespread suspicion in Israel that the organisation simply is biding its time, waiting for the post-electoral period to launch new attacks with a replenished and improved arsenal. Israeli security officials also fear that in the wake of a strong showing in the parliamentary elections, the movement would place its followers in positions of influence in areas such as the security services and educational sector, making a peaceful settlement all the more unlikely.[33]

---

Zahar, Gaza City, November 2005. "Hamas will continue to be a religious, political and *jihadi* movement". Crisis Group interview, Hamas leader and PLC candidate Sheikh Hamid Bitawi, Nablus, January 2006.

[32] "A few months before disengagement we were sure that Hamas would escalate attacks to give the impression that Israel was retreating under fire. But Hamas chose the opposite strategy. The last seven days of the withdrawal were maybe the most peaceful of the last five years". Maj. Gen. Giora Eiland, Director of Israel's National Security Council and security adviser to Prime Minister Sharon, at a November 2005 forum in Jerusalem attended by Crisis Group. Also see *Haaretz*, 2 January 2006. Islamic Jihad, which is boycotting elections, has been far less reluctant to engage in violence.

[33] See *Ha'aretz*, 3 January 2006. The two ministries Hamas leader Hamid Bitawi singled out for potential control were the

---

[26] Crisis Group interview, Palestinian analyst, Ramallah, July 2005.
[27] Crisis Group interviews, Palestinian analysts, Gaza Strip, November 2005.
[28] Crisis Group interview, Sheikh Ahmad Haj Ali, Muslim Brotherhood leader and Hamas parliamentary candidate, Nablus, August 2005.
[29] See Agha and Malley, "The Lost Palestinians", op. cit.
[30] Crisis Group interviews, Muhammad Ghazal, Hamas spokesman, Nablus, September 2005; Hamad, Gaza City, November 2005.
[31] "We will maintain our resistance". Crisis Group interview,

On the ground there is also evidence that Hamas's more military and radical inclinations are far from dormant. In the euphoria surrounding Israel's August 2005 withdrawal from Gaza, its military branch staged parades led by masked men shooting wildly into the air, displaying "an arrogance that Hamas had not shown before".[34] In the attempt to lay claim to the pullout, the underground military wing went public, touting the fruits of "four years of resistance, against ten years of negotiations". The Qassam Brigades released tens of thousands of flyers entitled "The Dawn of Victory", printed with photos – some masked – of its seven commanders. At approximately the same time, their overall commander, Muhammad Daif, who has been in hiding for over a decade, gave an exceedingly rare television interview. Some interpreted these developments as an attempt by the Brigades to remind the movement not to forsake its fighters as it entered institutional politics.[35] In another provocative gesture, Hamas leader Mahmoud Zahar led Muslim prayers at the torched remains of a deconsecrated synagogue.

Then, in the movement's final celebration of Israel's withdrawal on 23 September, a rocket accidentally detonated in Jabalya refugee camp, killing more than twenty bystanders.[36] Trapped in their own rhetoric, its leaders blamed Israel and to save face unleashed dozens of low-tech rockets against Israeli locales east of the Gaza Strip. The violence shattered an eleven-day post-disengagement calm. Israel responded with heavy artillery, helicopter gunfire and sonic booms. A Hamas cell in the West Bank responded by killing a kidnapped Israeli, and Hamas gunmen stormed a police station in Beach Camp, near Gaza City, just when the movement was seeking to advertise its electoral credentials.[37] Hamas's declaration reaffirming the ceasefire was lost in the mayhem.

The violence both punctured Hamas's triumphalism and showcased its least appealing sides. Even supporters questioned its readiness to govern and openly wondered whether its civilian or military, pragmatic or radical, wing held the upper hand. With their public prestige at stake, Hamas political leaders ultimately regained their composure and reasserted control. In sermons, Ismail Haniyya, Sheikh Yasin's former chief aide who today heads the movement's legislative candidate list, called for discipline in the ranks – though punishment only took the form of privately warning a Hamas leader in Jabalya.[38] Confronted with subsequent large-scale Israeli arrests of its political activists and a new round of assassinations, Hamas has remained both stoic and restrained. But the events surrounding Jabalya remain a cautionary tale.

Continued restraint, in sum, cannot be taken for granted. Ideologically, and despite indications to the contrary (see below, Part IV), Hamas remains formally committed to the destruction of Israel, whose legitimacy it rejects. Moreover, the ceasefire was predicated both on the movement's inclusion in the political process and on some measure of implicit Israeli reciprocity. If the political effort stumbles or if Israeli military actions continue, the movement is likely to review its options and revert to armed conflict.

## 2.   Hamas and the electoral process

Legislative elections, the most significant step in the integration process, were scheduled for July 2005. Faced with strong pressure from within the Fatah leadership – which feared the elections would benefit both Fatah rivals and Hamas – and from international actors, including notably Egypt, President Abbas postponed them to early 2006. Palestinian officials and some of their outside backers clearly wagered that the PA and Fatah would benefit from the delay to regain ground lost to the Islamists. The PA was banking on greater outside economic assistance, particularly in a post-disengagement Gaza, to attract public support and showcase the dividends of its international ties. Improvements in the West Bank also were expected as Israel relaxed some of its more onerous restrictions. In the words of an Egyptian security official who helped broker the postponement, "Abu Mazen and the PA will be stronger in a few months, particularly after the Gaza disengagement. That's when the elections should be held".[39]

---

ministries of Education and of Religious Endowments (*Awqaf*). Crisis Group interview, Nablus, January 2006.

[34] Crisis Group interview, UN official, Gaza City, November 2005.

[35] An Egyptian official with years of experience in Gaza noted that the movement compromised its rigorous training procedures in the rush to recruit during the current uprising: "During the intifada, the Qassam Brigades mobilised the youth, without giving them the religious training, which used to last seven years. For some their only creed is their guns and their monthly stipends. It will require time to convince them to integrate". Crisis Group interview, Egyptian official, Gaza, November 2005.

[36] Hamas's claim that an Israeli air raid was responsible was immediately refuted by the PA Interior Ministry, which blamed Hamas.

[37] The clash was apparently sparked by the son of assassinated Hamas leader Abd-al-Aziz Rantisi, when he allegedly tried to jump the queue at an ATM machine. Crisis Group interviews, European and Palestinian officials, Brussels and Gaza, October 2005.

[38] Crisis Group interview, Palestinian analyst, Gaza City, November 2005. Hamas's subsequent public displays of weapons apparently were limited to the occasional military parade to celebrate municipal successes, for example in Nablus.

[39] Crisis Group interview, Cairo, May 2005.

The Fatah leadership's concerns about its own weakness were not misplaced but its response was plainly misguided. Strong in July, Hamas appears far stronger six months later. In the interim, Fatah has continued to fray, consumed by internal divisions, while Hamas has come of age, establishing itself as a formidable political force, feeding on a burgeoning protest vote against the PA and Fatah rather than ideological verve. "People are fed up with Fatah; they've had ten years of it", said a pollster in Baitunya, a satellite town of Ramallah.[40] As Hamas's popularity has soared, Fatah's has sunk. In opinion polls, Hamas surged from some 20 per cent backing at the beginning of 2005 to 30 per cent in mid-year, and, against the backdrop of Fatah's acute disarray, by December to an unprecedented – and likely temporary – 40 per cent.[41]

While the staggering of local elections into multiple rounds allowed the PA to amend the rules from a candidate-based system to proportional representation in the hope this would help unify local Fatah factions, it also gave Hamas time to hone its electoral machine. In the time between its electoral debut in December 2004 and the fourth round of municipal polls in December 2005, it took a crash course in electoral arts, and by the eve of the legislative elections had mastered a gamut of techniques: organisers wore green baseball caps and distributed stickers; its campaign banners and paraphernalia dominated city centres; in campaign offices, women armed with electoral rolls manned telephones to get out the vote; twice on polling day voters in Nablus received mobile phone text messages asking if they had voted in accordance with God's will. Candidates constantly appear on Palestinian TV and radio stations trumpeting well-rehearsed sound bites. A fortnight ahead of the legislative elections, the movement launched its own television station, al-Aqsa.[42]

Hamas also enjoys a virtual monopoly on campaigning – and the benefit of a captive audience – in mosques, though in early January 2006 it signed an inter-Palestinian code of conduct that explicitly prohibits the use of places of worship for electoral purposes. After four municipal dry runs, augmented by a series of student and union elections,

Hamas has the most professional, disciplined and calculating electoral team in the Palestinian territories.

This is all the more remarkable given Israel's repeated arrest campaigns that seemed to target its campaign staff and candidates, many of whom remain in jail months after their initial detention.[43] In the first round of municipal elections, in which locations were purposely selected to ensure an impressive Fatah showing,[44] Hamas did particularly well, capturing seven of 26 councils against twelve for Fatah in the West Bank,[45] and seven of nine, including the town of Deir al-Balah, in the Gaza Strip. The second and third rounds, respectively in May and September 2005, confirmed a pattern whereby Hamas performed beyond expectations in West Bank rural areas even though Fatah won a clear majority of such contests, and generally overwhelmed Fatah in urban centres and the Gaza Strip. It captured Qalqilya in the West Bank and became the largest party in Bethlehem in the second round. Its victories in Rafah, Beit Lahia, and Buraij refugee camps were referred to the courts as Fatah claimed fraud.[46]

In the penultimate round of local elections in December 2005, the most significant to date because of the many cities included, Hamas handily won Fatah's traditional Nablus bastion and also captured Jenin and El Bireh. By the end of the year, it was entrenched not only in its Gaza strongholds but all across the West Bank, in full or joint control of each of the largest towns that had voted except Ramallah.[47] Its councillors had won control of a combined population equal to that under Fatah's leadership, with the difference that Islamist victories occurred in the politically more important urban regions, while Fatah maintained control in comparatively marginal rural areas.[48] Fatah retained its monopoly only in cities where the courts

---

[43] Candidates continued to campaign from jail. According to the former mayor of Qalqilya, Marouf Zahran, his Hamas successor campaigned by mobile telephone from his prison cell. Crisis Group interview, Qalqilya, June 2005. Crisis Group also was able to contact some imprisoned Hamas candidates on their personal mobile telephones.
[44] The purpose was to demonstrate to a sceptical Arafat that Fatah would win elections, and he should therefore authorise more of them, creating growing momentum for PLC elections. Crisis Group interview, Fatah legislator, Ramallah, November 2004.
[45] In the remaining seven councils, a variety of coalition agreements were negotiated to stitch together governing majorities.
[46] Islamists maintained they were victims of a fiction invented to retain Fatah dominance in key urban constituencies.
[47] Even in Ramallah, Hamas received almost as many votes as Fatah, which rules in coalition with others.
[48] Arnon Regular, "1.1 Palestinians live in councils controlled by Hamas", *Haaretz*, 18 December 2005. Although Fatah won 121 towns and villages as opposed to Hamas's 81, the only main West Bank town it retained was Ramallah.

---

[40] Crisis Group interview, Nuha Muslih, National Democratic Institute, Baitunya, September 2005. Hamas did little to disguise that much of its support was a protest vote against Fatah: "If Fatah had not failed to realise its own program, Hamas would never have existed, but Fatah failed in negotiations. It achieved nothing from them". Crisis Group interview, Sheikh Ahmad Haj Ali, Nablus, August 2005.
[41] Polls conducted by the Palestine Centre for Policy and Survey Research (PSR) gave Hamas 18 per cent support in December 2004, 30 per cent in June 2005, and, on the basis of municipal exit polling, 41 per cent in December 2005. See www.pcpsr.org.
[42] "Hamas launches television station in the Gaza Strip", *Associated Press*, 9 January 2006.

cancelled the results or the PA postponed polling; even there, roads were festooned with banners proclaiming "Welcome to Hamas City". The longer Fatah temporised about conducting elections, the more Hamas appeared to advance.

Even Hamas was surprised by its performance, proclaiming that the angels must have joined the vote.[49] Hamas's preparations for the approaching legislative elections began well before it signed the March 2005 Cairo Declaration that paved the way for its participation. Unlike Fatah, it marshalled its campaign team and mobilised its resources in anticipation of a mid-2005 vote, and maintained them on high alert after postponement. Having conquered the provinces, it is well-placed to decisively influence the PA.

As Hamas's appeal has grown, so too has the breadth of its support base. For an organisation with scant experience of government, its political wing has received relatively high marks for local administration.[50] In the latter stages of the municipal elections, the movement cast its net in search of promising candidates, nominating several from outside the movement, including a Nablus car-dealer with business ties to Israel who is currently the city's mayor.[51] The movement's pragmatists, led by Ismail Haniyya, have visibly prevailed on the list of legislative candidates over those identified with its radical wing led by Mahmoud Zahar.[52]

Of course, local election results do not necessarily reflect national sentiment or preview the legislative outcome. As elsewhere, voters are more ready to register protest in local balloting.[53] Socio-economic issues such as the quality of public services dominated these contests, whereas questions of war and peace typically top the list of national concerns. Most polls suggest the public continues to favour Fatah's agenda of a negotiated two-state settlement and

has little enthusiasm for renewed conflict. Moreover, even the municipal results reflect disarray within Fatah and its failure to get out the vote[54] rather than sweeping enthusiasm for the Islamist cause. Hamas secured its overwhelming victory in Deir al-Balah on a turnout of less than 6,000 votes out of a total registered electorate of 31,000 – less than 20 per cent. Collectively Fatah fared better there, but was hampered by its multiple lists and a plethora of independents, among them the incumbent mayor. "Were Fatah to run good people on a single, united list, the most Hamas could get even in Gaza would be 30 per cent of the vote", predicted a UN observer in Gaza.[55] While the secular groups splinter,[56] Hamas represents the Islamist voice uncontested.[57] But the warning signs were plain, and they account for yet another round of efforts by Fatah leaders to postpone the vote, this time on account of Israeli obstacles to voting in East Jerusalem, lawlessness in Gaza, or both.[58]

The situation also has Israel deeply worried. An analyst asked, "how can we sit passively by as the keys are being turned over to a sworn enemy dedicated to our destruction", without even a commitment to disarm its military wing or transform its ideological outlook?[59] Israel threatened to obstruct the elections if Hamas participates and to end any cooperation with the PA if Hamas joins the cabinet. In the words of an Israeli defence ministry adviser, "Sharon set Abbas an example of how to deal with religious militants – [it is] now [time] for Abbas to reciprocate".[60]

Within the international community, too, concern is palpable but, for a number of reasons, the reaction is different. Many regret that, in negotiations with Hamas in early 2005 preceding the Cairo Declaration, the PA failed to set criteria for the Islamists' electoral participation, such as a commitment to foreswear attacks against civilians or recognition of Israel. Yet most admit

---

[49] Crisis Group telephone interview, imprisoned Hamas PLC candidate Sheikh Ahmad Haj Ali, January 2006.
[50] See below, Part III.
[51] Heading the Hamas list in Nablus, which won 73 per cent of the vote on a turnout of some 70 per cent, is Adli Yaish, a leading local businessman and Mercedes dealer who had run the city's Zakat (alms) Committee. Crisis Group interview, Mayor Adli Yaish, Nablus, January 2006. His Israeli business connections enthusiastically vouched for his reputation. Orly Halpern, "A pragmatic mayor for Nablus", *The Jerusalem Post*, 17 December 2005. Christians as well as Muslims attended his victory celebrations.
[52] Hamas's PLC candidate list is headed by Ismail Haniyya, a leader of the pragmatic wing. Mahmoud Zahar, the more hard-line but hitherto prominent leader, was relegated to ninth position.
[53] Crisis Group interview, Yezid Sayigh, Palestinian academic and analyst, Beirut, Lebanon, October 2005.

[54] While Hamas activists in green bandannas crowded the gates to polling stations across the West Bank in the fourth round of municipal elections in December 2005 (a violation of Palestinian election law), Fatah's presence was imperceptible.
[55] Crisis Group interview, Gaza City, November 2005. Fatah ran 45 candidates for the Deir al-Balah municipal council's fifteen seats; the more disciplined Hamas ran fifteen, including three university professors.
[56] In addition to Fatah, which initially submitted two candidate lists, five other groups and coalitions are vying for the secular vote in the legislative elections.
[57] Pollsters give Palestinian Islamic Jihad, which is boycotting the elections, 3 per cent support. PSR poll, 8 December 2005.
[58] On 9 January 2005, for example, PA Interior Minister Nasr Yusif stated that Palestinian security forces were unable to guarantee the security of elections.
[59] Crisis Group interview, Washington, November 2005.
[60] Crisis Group interview, Israeli security adviser, defence ministry, Tel Aviv, September 2005.

Case 1:05-cv-04622-DLI-RML   Document 267-13   Filed 03/22/12   Page 208 of 646 PageID #: 6886

*Enter Hamas: The Challenges of Political Integration*
*Crisis Group Middle East Report N°49, 18 January 2006*                                    *Page 10*

that the time for imposing such pre-requisites is long past and that to reopen this question would endanger the truce.[61] There also is growing realisation that Hamas is a reality to be reckoned with, and Abu Mazen is not about to try to forcibly disarm it. This is all the more patent given lack of progress on the diplomatic front: no Palestinian leader can be expected to crack down on fellow Palestinians when there is no peace process, let alone when Israeli restrictions and settlement activity – especially around Jerusalem – are increasing.

Even the U.S., most averse among Western nations to see Hamas gain, accepted its participation and pushed for the elections to be held on time, successfully pressing Israel to allow East Jerusalemites to vote in accordance with past practice. During his May 2005 visit to Washington, Abu Mazen reportedly struck a chord with U.S. officials, including Secretary of State Rice, arguing that a clean Fatah victory – which he then confidently predicted – would deal Sunni Islamist militancy a profound setback in the region:

> This message will reverberate throughout the Middle East: in the first clear and clean electoral contest between pragmatic nationalism and extreme Islamism, the nationalists will have won. By what logic would the Bush administration try to thwart such a possibility at such a critical time?[62]

Most importantly, the administration learned from past experience. After backing postponement of the July 2005 elections, it saw Hamas's influence grow and Fatah's power wane; all the while, Abu Mazen was telling U.S. officials that he would be able to act only after the elections. Now, an official asks:

> What would we gain by pushing for yet another postponement in the hope that Hamas somehow can be curbed? Six months from now, the PA will not be any stronger, Fatah will be just as divided, nothing will be done about Hamas, and our democratisation agenda will have been stalled. Elections may not produce anything better, but they won't produce anything worse.[63]

## III.   HAMAS AND LOCAL POWER

In the course of the local elections, Hamas has assumed responsibility for the livelihoods of thousands of municipal employees and the local affairs – including service delivery – of hundreds of thousands of Palestinians. Municipal elections thus offered Hamas its first foothold in the PA political system and Palestinians their first taste of what Islamist governance might bring. While local authorities have comparatively little power, and the collapse of their revenue base during the uprising and mounting debts have dramatically increased their dependence on the PA and donors, they remain in many cases the largest local employer, a source of significant patronage, and a locus of day-to-day relations with Israel. Municipalities have thus become small laboratories for what Hamas might do domestically and with regard to others if and when it achieves greater national power.

### A.   THE PITFALLS OF LOCAL POWER

For the most part, Hamas rule has been almost boringly similar to its predecessor's. Islamist councillors can appear remarkably subdued and removed from broader political or ideological struggles. Confronted with the reality of daily interaction with the occupying power, the municipal leadership in the main has been pragmatic: maintaining contacts on essential operational matters in order to meet its constituencies; agreeing to meet with Israeli counterparts if absolutely necessary; and eschewing political relationships not dictated by such practical requirements. "If we are in the municipalities, we talk to the Israelis. It's not politics, it's about services", said Muhammad Ghazal, a Hamas leader in Nablus who on 12 March 2005 announced the movement's decision to participate in PLC elections.[64] In Hamas-run Deir al-Balah in the Gaza Strip, the mayor declared his town "open to receiving help from any country in the world, including Israel".[65]

The mayor of Bethlehem, a member of the Popular Front for the Liberation of Palestine (PFLP) who runs the municipality in alliance with Hamas, talks with army officers from the Israeli civil administration "infrequently" – for example, about collection of rubbish – and meets them "once or twice a month" at a nearby Israeli settlement, but without Hamas councillors since "it is

---

[61] Confronted with Hamas's growing power, having little to offer in exchange, and with their sights firmly fixed on obtaining a ceasefire as a lynchpin of their strategy, PA leaders felt unable to extract additional concessions. A PA official said that a proposal to insist on Hamas renouncing attacks on civilians within Israel was at one point floated but drew scant international support given its implicit endorsement of attacks within the occupied territories. Crisis Group interview, Ramallah, July 2005.
[62] Crisis Group interview, senior adviser to President Abbas, Washington, May 2005.
[63] Crisis Group interview, U.S. official, Washington, 30 December 2005.

[64] Crisis Group interview, Muhammad Ghazal, Hamas leader, Nablus, September 2005.
[65] Crisis Group interview, Ahmad Kurd, Mayor of Deir al-Balah, Deir al-Balah, November 2005.

better for both them and us".[66] As of this writing, the mayor of Nablus was seeking Israeli military approval for the rehabilitation of sewage pipelines to Israel.[67] More surprisingly, and in what may well prove an aberration, a senior official of the Association of Palestinian Local Authorities (APLA) said Hamas mayors conveyed their willingness to attend an Israeli-Palestinian municipal conference in The Hague in July 2005 to promote a municipal platform for peace, "provided we could obtain exit permits from Israel".[68]

The northern West Bank town of Qalqilya arguably is the most significant test case of Hamas's attitude. Adjacent to the 1967 boundary and historically bound in myriad ways including infrastructure to its Israeli counterparts across the border, Qalqilya in the past had cordial relations with Kfar Saba, just over the Green Line. Today, after Hamas has won the municipal elections, the separation barrier continues to claw into municipal territory, plant its foundations at the town's edges, and darken the horizon with concrete. Yet, with no real alternative, the Hamas-dominated municipal council has maintained its de facto dependence on Israel for its utility supply, and the town continues to share its rubbish dump with Kfar Saba. The former mayor openly met with Israelis, which the new leadership will not do. Still, Qalqilya Deputy and acting Mayor Hashim Masri met with representatives of the Israeli Electric Company, though in a car rather than at Israeli military headquarters.[69]

To some degree, Hamas-run municipalities have been spared the need to confront the issue because Israel increasingly channels contacts with Palestinians through the PA and its national agencies. This re-centralisation of ties marks a significant shift from practice during the uprising, when Israel preferred to deal directly with local authorities as a means of undercutting the PA. The most recent change appears to suit all concerned: the PA has regained its dominance over bilateral relations; Israel has circumvented direct relations with Hamas-run municipalities;[70] and Hamas can avoid engaging with Israel.

In a further sign of pragmatism and electoral savvy, Hamas recruited many local candidates from its affiliated social welfare institutions.[71] Several mayors previously occupied prominent positions in charitable organisations.[72] During the uprising, when the PA virtually ceased to function and the army barred most Palestinians from working in Israel and routinely besieged their towns and villages, Hamas-affiliated charities filled a critical welfare gap, so that in some quarters Islamist electoral success was simply confirmation of an existing reality. Prior to his election as mayor of Deir al-Balah, Ahmad Kurd directed the Salah welfare organisation, which over almost three decades he built into a concern with an annual turnover of $5 million – far larger than the municipal budget. It provided schooling, food rations, health care and other services to a growing number of Gazans. From organising youth camps to clean up campaigns, Hamas had already become the primary organiser of Palestinian society.[73]

Hamas's post-election performance has won plaudits from local and foreign observers alike. One Palestinian economist hailed their productivity: "The municipalities under Hamas control are well run, and the work ethic has changed dramatically. Mayors are returning to the people, and addressing their needs. The appearance of towns also is changing. They are much cleaner, and more organised".[74] A European diplomat working with Hamas councillors added: "They are hardworking; they go to their jobs; they are strict with money; they enforce the rule of law; and they are trying to provide efficient services".[75] An Israeli overseeing Palestinian affairs in the occupied territories added: "Palestinians tell me they are not corrupt, and so far have been running services very well".[76] Even Fatah rivals praised them for their accessibility.[77]

[66] Crisis Group interview, Jamal Salman, general manager, Bethlehem Municipality, Bethlehem, January 2006. Meetings are said to focus on services within municipal territories that are under full Israeli control.
[67] "Concerning anything to do with the service needs of my people, of course I'll speak to Israel". Crisis Group interview, Mayor Adli Yaish, Nablus, January 2006.
[68] Crisis Group interview, Association of Palestinian Local Authorities official, Gaza Strip, November 2005. Neither the mayors nor the official were able to obtain exit permits.
[69] The meeting was reportedly Masri's first. Khaled Abu Toameh, "Kalkilya talks electricity with Israelis", *The Jerusalem Post*, 28 December 2005. It subsequently prompted statements of official Israeli displeasure. Crisis Group interview, Shlomo Dror, spokesman for the Israeli civil administration in the West Bank, Jerusalem, January 2006.

[70] Ibid.
[71] Crisis Group interview, Khalil Shaheen, *Al-Ayyam* correspondent, Ramallah, November 2005.
[72] Crisis Group Report, *Islamic Social Welfare Activism*, op. cit.
[73] Crisis Group interviews, UN officials, Gaza City, November 2005.
[74] Crisis Group interview, Salah Abdel-Shafi, Palestinian economist, Gaza City, November 2005.
[75] Crisis Group interview, European diplomat, Jerusalem, December 2005. The experience of Islamist-run municipalities in Israel has been a learning experience for Hamas: "Hamas have learned from Umm al-Fahm. They know their leaders have to sweep the streets". Crisis Group interview, Khalid Amayreh, Palestinian journalist, Doura, West Bank, November 2005.
[76] Crisis Group interview, Shlomo Dror, Jerusalem, January 2006.
[77] Crisis Group interviews, Fatah cadres, Nablus, January 2006.

Case 1:05-cv-04622-DLI-RML   Document 267-13   Filed 03/22/12   Page 210 of 646 PageID #: 6888

*Enter Hamas: The Challenges of Political Integration*
*Crisis Group Middle East Report N°49, 18 January 2006*                    *Page 12*

Of course, Hamas does not wholly escape allegations of mismanagement and impropriety, and there is suspicion that it increasingly will conduct itself like its predecessors – tending to its own and itself before serving the people's interests. There are, for example, indications that Hamas councils have been adding supporters to the municipal payroll, putting an additional strain on tight budgets.[78] In response, Hamas councillors insist employment decisions reflect the needs of the local authority rather than the movement ruling it: "Once we're elected, we're the representatives of the people, not the party".[79] As many politicians, Hamas members ask for time. "The population should judge us in four years. If we're not held to account, we'd be corrupt", said a Bethlehem Hamas councillor.[80]

On the streets, the Islamists' record receives mixed reviews and, already, Hamas is encountering obstacles. While the roads and their desks are clean,[81] they often fail to deliver on the foremost demand: jobs.[82] A virtual freeze in Western donor support to Hamas-controlled municipalities (see Part V below) and, according to Hamas, discriminatory budgetary allocations by the PA have cut deep into budgets, leaving a trail of broken commitments.[83] "Hamas promised to build a slaughterhouse, a recreation centre and new waste water plants. But there are no projects and it hasn't even repaired the roads", protested a voter in Bethlehem.[84] In Qalqilya an unemployed local builder aired similar grievances: "Hamas hasn't provided

compensation to the victims of the wall despite election promises. I don't see any difference between the old and new administrations, other than an increase in local fees".[85] In the ultra-depressed North Gaza municipality of Beit Hanoun, shopkeepers vented frustration at the town's continued pauperisation since elections brought Hamas to power.

In some instances, Fatah has sought to play on this dissatisfaction, blaming Hamas for the drying up of donor funds. In the words of a Bethlehem Fatah leader, "it's clear that the Hamas and PFLP presence in the municipal council has become a huge obstacle to donor and national funding, and they should step aside. Why should they hold the interests of Bethlehem hostage for their own prestige?"[86] However, many Palestinians residents stated they would continue to vote for Hamas: better an honest pauper than a corrupt thief was a commonly-heard verdict.[87]

To deal with the budget crisis, Hamas councils have sought to cut expenditures, raise taxes, and lease or sell municipal assets. In Qalqilya, Hashim Masri claimed office expenses and petrol allowances had been substantially reduced,[88] while Hamas councillors in Bethlehem said they had cut the mayor's salary, though not their own.[89] Councillors also offered incentives for up-front payment of local fees in an attempt to boost revenues. Khalid Saada, a Bethlehem councillor and veteran Hamas member, said he canvassed markets and shops for payment: "I went to collect the taxes personally from the markets. I said – look you've voted for me, and for this municipality to succeed you have to pay your fees".[90] In Qalqilya, the council engaged the support of the local clergy. Sheikh Salih Sabri, the mufti and relative of influential council member Mustafa Sabri, approved creation of three tiers: a business

---

[78] Qalqilya Deputy (and Acting) Mayor Hashim Masri confirmed that he added 50 employees to the 300-man payroll. His Fatah predecessor, Marouf Zahran, claimed Hamas was "guilty of favouritism" in hiring practices. Crisis Group interviews, Hashim Masri, Qalqilya, September 2005; Marouf Zahran, Qalqilya, June 2005.
[79] Crisis Group interview, Ahmad Kurd, Deir al-Balah, November 2005.
[80] Crisis Group interview, Hamas councillor, Bethlehem, November 2005.
[81] Observations based upon repeated Crisis Group visits to West Bank and Gaza Strip local authorities run by Hamas in 2005 and 2006.
[82] A survey by the Palestinian Centre for Policy and Survey Research (PSR) on the eve of Israel's withdrawal from the Gaza Strip concluded that for the first time unemployment was ranked as the most pressing issue, ahead of occupation.
[83] According to Hamas spokesman Ghazal, "the ministry of local government is openly discriminating between Fatah and Hamas municipalities. Unfortunately, there is no equality". Crisis Group interview, Nablus, September 2005. In Bethlehem, Hamas councillors accused the ministry of withholding cash transfers to bring them down. Crisis Group interview, Hassan Safi, Hamas councillor, Bethlehem, November 2005. PA Minister of Local Government Khalid Qawasmi denied this: "Even though we have financial difficulties, each municipality is getting its fair share", Crisis Group interview, Ramallah, November 2005.
[84] Crisis Group interview, Jad Ishaq, director, Applied Research Institute of Jerusalem (ARIJ), Bethlehem, November 2005.

[85] Crisis Group interview, Ahmad Hindi, construction worker, Qalqilya, September 2005.
[86] "If Hamas did resign, constitutionally the PA would temporarily appoint a new [Fatah] council, pending fresh elections". Crisis Group interview, Antoine Salman, councillor, Bethlehem, November 2005. Reacting to Fatah's attempt to undermine the municipal council in Bethlehem, a public relations officer at the city's university angrily remarked: "Fatah doesn't want anyone to break the boycott on Bethlehem. They want to sabotage the municipality to get rid of Hamas". Crisis Group interview, Carole Dabdoub, Bethlehem, November 2005.
[87] Crisis Group interviews, Beit Hanoun residents, November 2005.
[88] "Departmental expenses have also been reduced, and everything is under review". Crisis Group interview, Qalqilya, September 2005.
[89] Crisis Group interview, Hasan Safi, Hamas councillor, Bethlehem, November 2005.
[90] Crisis Group interview, Khalid Saada, Hamas councillor, Bethlehem, November 2005.

Case 1:05-cv-04622-DLI-RML   Document 267-13   Filed 03/22/12   Page 211 of 646 PageID #: 6889

*Enter Hamas: The Challenges of Political Integration*
*Crisis Group Middle East Report N°49, 18 January 2006*                                        *Page 13*

tax, a rich tax, and a middle income tax.[91] "If the people fail to pay their taxes", he warned, "Qalqilya would have to pay interest on their debt which is forbidden under Islam".[92] Following Sabri's intervention, according to Masri, tax revenues, particularly from businesses, swelled.[93]

To bolster revenues, Hamas-run councils also put municipal assets to commercial use. Qabalan mayor Riad Mustafa leased land for construction of a football pitch by providing landowners with a break on utility bills; in Bethlehem, councillors used their ties to the *waqf* (religious endowments) to obtain land at concessionary rates for building a stadium.[94] In Qalqilya, the acting mayor said he was selling and leasing municipal property to reduce interest payments traditionally prohibited in Islam.[95] While rising taxes and prices were common grievances, particularly in Qalqilya, the resolve of Hamas-run councils to take unpopular measures has impressed local World Bank representatives. "Bethlehem was the first mayor to ask for an audit. Would you punish a guy like that?", asked the official overseeing municipal funding.[96]

Facing overwhelming fiscal obstacles, Hamas also has sought to play on nationalist sentiments, accusing the PA and donors of refusing to accept the outcome of democratic elections. In an interview with Crisis Group, Hamas leader Mahmoud Zahar sought to turn on donors an argument they have long deployed against the PA: "To treat the disease of corruption", he said, municipalities must rid Palestine of a dependency culture:

> We have to rely on income from the people. We have to depend on small local industries rather than large donor projects. We have to create factories for the Palestinian people with our money, not send

workers to work for other governments. It will take time.[97]

From his prison cell, Islamist leader Sheikh Ahmad Haj Ali was even more vituperative: "Donors have ruined our house with their funds – they are the source of corruption. We don't need their euros. We need our dignity."[98]

## B. SHARIA DEFERRED?

While trying to establish credentials as professional administrators, local Hamas politicians also have sought to allay fears they would target political pluralism and press for compulsory Islamisation. Like national leaders, they have in speeches and interviews consistently emphasised good governance, economic development, and personal and social security, with religious issues mostly relegated to the background or unmentioned.

So far, there is only scant evidence of Hamas municipalities seeking to extend Islamic canon law (Sharia). In Bethlehem, Hamas allied with the local Christian leader of the most avowedly secular of Palestinian factions, the Popular Front for the Liberation of Palestine (PFLP). Where vigilantes or self-styled "morality police" have surfaced, Hamas officials have been quick to characterise them as isolated and unauthorised aberrations, not general policy. Asked about the murder of a young woman during a beach outing with a man later revealed to be her fiancée in the Gaza Strip, a Hamas leader replied: "We do not have a policy of interfering in the personal lives of anybody. Not now. Not tomorrow. Never."[99]

On another issue of crucial significance to Palestinian society, Hamas has pointedly refrained from disturbing the religious status quo. Restaurants in Bethlehem, a traditionally Christian town which relies on tourism for its income, remained open during Ramadan, with alcohol on sale, despite Hamas's dominant position within the

---

[91] "We encourage people to pay taxes because we understand that the municipality needs money to provide services. That's the proper role for religion in politics". Crisis Group interview, Sheikh Salih Sabri, Mufti of Qalqilya, Qalqilya, September 2005.
[92] Ibid.
[93] Crisis Group interview, Masri, Qalqilya, September 2005.
[94] Crisis Group interviews, Riyad Mustafa, mayor, Qabalan, December 2005; Hamas councillor Hassan Safi, Bethlehem, November 2005.
[95] Masri claimed that through property sales he reduced municipal debt by more than 10 per cent within seven months and cut interest payments accordingly. Qalqilya Mufti Sabri said the municipality could pay interest "on services like schools and roads, because these are obligatory services. In such situations Muslims will be forgiven because they are serving the public interest. But the Council must decide according to its conscience before God". Crisis Group interviews, Qalqilya, September 2005.
[96] Crisis Group interview, Ibrahim Dajani, World Bank official, Jerusalem, December 2005. World Bank funds, unlike those of USAID, do not appear to be subject to security vetting.

[97] Crisis Group interview, Mahmoud Zahar, Hamas leader, Gaza City, 20 November 2005. Elaborating in a newspaper interview, Zahar stated: "We don't want to turn our people into a people of handout-seekers in the guise of donation recipients. Many countries live in dignity off their meager capabilities, and they are also advancing. A government that receives aid relinquishes its faith and begins to serve the will of the donor. The donating hand has the advantage over the receiving hand. Our jihad-fighting people will not become a people of beggars….I think that if we start investing, we will not need donor states that wrest decisions from our hands in exchange for a crust of bread". *Al-Sharq Al-Awsat*, 10 November 2005.
[98] Crisis Group telephone interview, Haj Ali, January 2006.
[99] Crisis Group interview, Muhammad Ghazal, Hamas spokesperson, Nablus, September 2005.

Case 1:05-cv-04622-DLI-RML   Document 267-13   Filed 03/22/12   Page 212 of 646 PageID #: 6890

*Enter Hamas: The Challenges of Political Integration*
*Crisis Group Middle East Report N°49, 18 January 2006*                                    *Page 14*

municipality's governing coalition. During Christmas the new local authority appeared to go as far out of its way as its predecessor to accommodate pilgrims. "Before the elections our opponents sowed propaganda saying we would change the day of rest from Sunday to Friday and convert the Church of the Nativity to a mosque", said a Hamas councillor.[100]

On the sensitive issue of Christian political representation, Hamas leaders likewise have been careful to preserve the status quo. In Bethlehem, they took no move to alter the practice of appointing a Catholic mayor (the current mayor is a PFLP member) and a Greek Orthodox Christian deputy, even though Christians are a minority in a town where Islamists rule. Hamas also pointedly refrained from challenging quotas reserving a disproportionate majority of council seats for Christian candidates in several towns that until recently were largely or wholly populated by Christians.

In other cases, however, evidence is more disturbing. In Qalqilya, the municipality, in coordination with local religious leaders, cancelled a music festival backed by the PA. Its initially defensive response that it acted to preserve the grass on the football pitch cut little ice, and in a subsequent interview with Crisis Group Hashim Masri was explicit about his moral objections: "It was a Westernised festival, and the people refused it. Had it been about an exchange of cultures then fine, we have no problem with that. The PA tried to pressure us, but we refused".[101] The local mufti agreed: "The municipality was right to ban this because the festival violated the Sharia. There are times when the municipality acts as a break on the PA decisions that are against Islam".[102]

Women employees in Hamas municipalities are uniformly veiled, though it is unclear if from a directive, informal pressures, choice, or a combination. Moreover, its current apparent pragmatism notwithstanding, memories of Hamas activists physically attacking unveiled women during the 1987-1993 uprising remain strong enough that secular intellectuals in January 2006 circulated a petition entitled, "We Will Defend Our Freedoms". While congratulating the movement for participating in the democratic process, it called on it to disavow the use of its political power to legislate personal morality.[103] There also are signs of

tension regarding Hamas's views of the demographic allocation of seats in the handful of municipalities where this is practiced.[104] Individual Hamas activists complain the PA is using Christians as pawns to curtail Islamist influence and retain power in key West Bank cities[105] and that in some local elections Fatah was playing the sectarian card, appealing to Christian fears[106] – an accusation that is also levelled against the Islamists.[107]

Although Hamas dismisses any such signs of religious intolerance as aberrations, they feed suspicions that it is presenting a deceptively moderate face in order to lay institutional roots for eventual imposition of more rigid social mores. "Hamas are playing tactically. They are biding their time, but their agenda has not changed", said a young Christian student in Bethlehem. "They have a plan. I would not vote for Hamas. I fear Hamas. I want to live as I like".[108]

Fears of a conservative social agenda were exacerbated during the legislative campaign. In its electoral platform, Hamas called for enshrining Islamic canon law as the principal source of legislation; in all-male rallies, Islamist leaders championed gender separation in universities and purging school syllabus of such allegedly Western influences as sex education.[109] They also urged demolition of the (already-closed) Jericho casino and banning mixed university cafes, slogans that drew rapturous applause.

---

Ramallah, January 2006. As of 9 January 2006, the petition had not been published.
[104] According to the National Democratic Institute in Jerusalem, pursuant to a Palestinian presidential decree the following local authorities must have a Christian mayor and quotas of councillors: Bethlehem (eight Christians, seven Muslims); Beit Sahur (ten Christians, three Muslims); Beit Jala (ten Christians, three Muslims); Zababdeh (six Christians, three Muslims); Bir Zeit (seven Christians, six Muslims); Abboud (six Christians, five Muslims); Jifna (eight Christians, three Muslims); Ramallah (eight Christians, seven Muslims). No other Palestinian municipality is subject to quota regulations.
[105] Although Hamas won a third of votes in Ramallah, pursuant to the quota it obtained only three of fifteen seats. As in Bethlehem, it did not field Christian candidates.
[106] Crisis Group interviews, Hamas activists, Bethlehem and Ramallah, 2005. According to Jad Ishaq, an NGO leader in Bethlehem, "the PA is becoming more generous to Christians, because Fatah is secular. Christians are over-represented in senior positions in Fatah and the PA". Crisis Group interview, Bethlem, November 2005.
[107] Crisis Group interview, Palestinian residents, Ramallah, October 2005.
[108] Crisis Group interview, Bethlehem, November 2005.
[109] Hamas election rally, Nablus, January 2006.

---

[100] Crisis Group interview, Hassan Safi, Hamas councillor, Bethlehem, November 2005. Here, too, there are exceptions. Thus, Bethlehem's Manger Square, a highly emotive site for Christians adjacent to the Church of Nativity, was used for a Muslim prayer rally on the grounds that it is also the town's main square.
[101] Crisis Group interview, Masri, Qalqilya, September 2005.
[102] Crisis Group interview, Mufti Salih Sabri, Qalqilya, September 2005.
[103] Crisis Group email correspondence, Palestinian intellectual,

Case 1:05-cv-04622-DLI-RML   Document 267-13   Filed 03/22/12   Page 213 of 646 PageID #: 6891

*Enter Hamas: The Challenges of Political Integration*
*Crisis Group Middle East Report N°49, 18 January 2006*                                    *Page 15*

## IV. HAMAS AND ISRAEL: PARTNERS FOR UNILATERALISM?

### A. ISRAEL CONFRONTS HAMAS'S INTEGRATION

Since Abbas first unveiled his policy of integrating Hamas in mid-2003, Israel has rejected the premise that incorporation will make it more pragmatic and consistently has requested the PA to dismantle its military infrastructure. Watching Hamas gain strength and confidence while Abbas and the PA display growing weakness, Israel has claimed vindication even as others have pointed out that Israeli policy – towards both Abbas and Hamas – in no small part accounts for the former's ascendancy at the latter's expense.

From the Israeli government's perspective, a PA that includes an organisation committed to armed resistance, that has killed some 300 Israelis in over 50 suicide bombings in Israeli cities during the current uprising,[110] opposes a two-state settlement and denies Israel's existence is even less of a partner than the current PA it has refused to negotiate with.[111] As a legal basis for its demand that the PA ban Hamas from PLC elections, it invokes the Israeli-Palestinian 1995 Interim Agreement, which provides for the exclusion from elections of "candidates, parties or coalitions...[that] commit or advocate racism, or pursue the implementation of their aims by unlawful or undemocratic means".[112]

In the months leading up to the Palestinian parliamentary elections, and with Hamas's unilateral *tahdi'a* theoretically in place, the Israeli military detained hundreds of Islamist activists in the West Bank, including scores of candidates, campaign managers, and prominent members of the movement's political wing. Ahead of the third round of municipal elections in September 2005, Hamas leaders accused Israel of detaining 95 members involved in the election campaign, including 30 successful candidates.[113]

While municipal election results were allowed to stand, several councillors (and at least one mayor) remain imprisoned.[114] Indeed, many West Bank Islamist leaders, candidates, and activists interviewed by Crisis Group are behind bars. "The arrests prove that Israel does not want Hamas to participate in the West Bank", said an Islamist journalist.[115]

These measures have had scant impact on Hamas's performance at the polls. While Hamas spokesmen said the arrests hindered campaign activities,[116] other members said the effect was more than offset by resulting solidarity, particularly since they were perceived as an attempt to frustrate Palestinian democracy. A voter in El Bireh, which in December 2005 fell from Fatah control, protested the targeting of the Islamist movement: "Isn't Fatah also an armed group? Why are they picking on Hamas"?[117]

More recently, Israel has urged the international community not to allow the empowerment of Hamas through the electoral process and sought to target not just candidates, but the elections themselves. Following U.S. acceptance of Hamas participation during Abbas's October 2005 visit to Washington, Israel withdrew its threat to sabotage the polls but said it would do nothing to facilitate them. As the occupying power in direct control of East Jerusalem and the access routes and checkpoints across the West Bank (and between the West Bank and Gaza Strip), it can block the free movement of voters, candidates and campaign staff alike. A senior foreign ministry official maintained that Israel reserves the right to arrest Hamas members passing through checkpoints on election day.[118]

In a move possibly intended as a final blow, Israel suggested voting would not be permitted in East Jerusalem if Hamas participated, simultaneously providing the pretext for senior PA officials and Fatah leaders already seeking an exit strategy to declare that Jerusalem should not be sacrificed for an election. Accused of thwarting democracy, and faced with continued U.S. and

---

[110] Figures from Israeli foreign ministry website, www.mfa.gov.il.
[111] Justice Minister Tzipi Livni, speaking at the Interdisciplinary Centre, Herzliya, 12 September 2005, likened Hamas to the Basque ETA and Kurdish PKK, which are prohibited from participating in the political arena.
[112] Article III.3 of Annex II of the 1995 Interim Agreement. Text of agreement at www.mideastweb.org.
[113] Crisis Group interview, Usama Hamdan, Hamas leader and spokesman, Beirut, October 2005. The detainees included Hamas West Bank political leaders Sheikh Hasan Yousif and Muhammad Ghazal as well as PLC candidates Sheikh Ahmad Haj Ali and Muhammad Abu Tair. The army carried out further dragnets over the following months, netting 600 Hamas members

by the end of the year, according to Hamdan. Israel appears far more concerned by Hamas's ascendancy in the West Bank, where it remains fully engaged, than in the Gaza Strip. In an 18 December cabinet meeting, military intelligence chief Maj. Gen. Aharon Zeevi unveiled a scenario whereby within a year the occupied territories would split into two: a "Hamastan" in Gaza and a "Fatahstan" in the West Bank. Gideon Alon, "MI chief: West Bank, Gaza Strip may split", *Haaretz*, 19 December 2005.
[114] For instance, Qalqilya mayor Wajih Qawas.
[115] Crisis Group interview, Ghazi Hamad, Islamist journalist, Gaza, November 2005.
[116] Crisis Group interviews, Hamas officials, Baitunya, September 2005. They additionally claimed that some candidates abandoned the campaign for fear of arrest.
[117] Crisis Group interview, El Bireh, December 2005.
[118] Crisis Group interview, Jerusalem, December 2005.

Case 1:05-cv-04622-DLI-RML   Document 267-13   Filed 03/22/12   Page 214 of 646 PageID #: 6892

*Enter Hamas: The Challenges of Political Integration*
*Crisis Group Middle East Report N°49, 18 January 2006*                                                    *Page 16*

EU pressure for a timely vote, it relented.[119] On 15 January, the cabinet decided to allow voting in East Jerusalem in accordance with past practice, but to remove "all signs and symbols" of Hamas participation in the city.[120] Still, in the six months before Palestinian elections Israel repeatedly maintained that Hamas's cabinet participation would lead it to sever contacts with the PA and end its commitment to the Roadmap.[121]

## B.   IS A POLICY SHIFT IN THE MAKING?

Since 1967, Israel's relationship with the Islamist movement has undergone several transformations. In the years before Hamas was spawned by the Muslim Brotherhood at the outset of the 1987-1993 uprising,[122] Israeli leaders sought to promote the Islamists at the expense of the secular PLO. It was unexceptional, for example, that Ahmad Kurd, the current Hamas mayor of Deir al-Balah, received a license to operate the Salah welfare association from the military authorities in 1978.[123] The Islamic Assembly (*al-mujamma al-islami*) established by Sheikh Ahmad Yasin, which never concealed its relationship with the Muslim Brotherhood, was registered with Israeli authorities in 1979, something then impossible for a PLO organisation of similar magnitude. While Israelis

were legally prohibited from talking to PLO members, there was no such ban on contact with the Muslim Brotherhood. Even after Hamas was established, Israel continued to favour Islamist over nationalist militancy in an effort to undercut the PLO.[124] In the words of a veteran head of an aid agency in the occupied territories, "25 years ago the Israelis were stopping us from working with any Fatah mayors and pushing us towards the religious representatives. Now it's the reverse".[125]

As the Islamist movement became more militant and powerful during the first uprising, attitudes quickly changed. The Oslo accords were motivated in part by the desire of both Israel and the PLO to reverse Hamas's growth. With Hamas excluded from a peace process it rejected, 1994-2000 saw an unprecedented escalation in confrontation, including devastating suicide bombings in Israeli cities and continued assassinations of key Hamas militants throughout the occupied territories. At the height of its campaign, Hamas pushed Oslo to the breaking point.[126]

In the wake of the 11 September 2001 attacks on New York and Washington and Hamas's repeated use of suicide bombings, Israel – which saw the movement as a mortal enemy – equated it with international jihadist groups, notably al-Qaeda. By the time Prime Minister Sharon had implemented unilateral disengagement from the Gaza Strip, most senior Hamas leaders in the occupied territories – political and military – had been killed.[127]

Abbas's strategy of integration, Hamas's temporary ceasefire, and the realisation of both Fatah's decline and the Islamists' growing strength have begun to affect

---

[119] "Israel has no intention of giving [Palestinian President] Mahmoud Abbas an excuse to cancel the election because he fears a victory for Hamas and allow him to accuse us before the international community of being responsible for his decision". Statement by Israeli foreign ministry, quoted in Agence France-Presse, 25 December 2005.
[120] Israeli cabinet communiqué, 15 January 2006. At a Hamas election rally in Jerusalem hours later, Israeli soldiers detained four candidates, including Muhamed Abu Tair, who occupies the number two slot on the Islamists' national list. Aluf Benn, "No. 2 on Hamas election list arrested", www.haaretz.com, 16 January 2006.
[121] "Israel and the international committee will find a terrorist organisation as part of the Palestinian Authority, and there is going to be an end to the Roadmap, which requires Palestinians in the first phase to dismantle terrorist organisations". Israeli Justice Minister Tzipi Livni, speaking at the Interdisciplinary Centre, Herzliya, 12 September 2005. Following the then-foreign minister Silvan Shalom's statement that Hamas participation would set Israeli-Palestinian relations back "50 years", foreign ministry officials were quoted as saying that "if Hamas were to become a dominant force in the Palestinian leadership, it would mean an end to the peace process." "Hamas sees wins in West Bank voting", Associated Press, 17 December 2005.
[122] Hamas claims it was established on 8 December 1987, the eve of the uprising, thus drawing a connection between the two events. Most independent researchers date its foundation to early 1988.
[123] Crisis Group interview, Ahmad Kurd, Hamas mayor, Deir al-Balah, November 2005.

---

[124] During the 1987-1993 uprising, "the Civil Administration made no effort to stem the flow of funds from Jordan to Hamas", and "even permitted high-level emissaries of the Muslim Brotherhood to come from Amman for consultations.…[In sharp contrast to their PLO counterparts] The Israeli army never interfered with the Hamas strike stewards". Ze'ev Schiff and Ehud Yaari, *Intifada: The Palestinian Uprising – Israel's Third Front*, (Simon and Schuster, 1990), p. 234.
[125] Crisis Group interview, director of a USAID implementing partner, Gaza Strip, November 2005. Projects in Areas B and C in the West Bank, where Israel respectively exercises partial and full security control, still require direct coordination with the civil administration of the Israeli military government.
[126] See further Crisis Group Report, *Dealing With Hamas*, op. cit., pp. 8-10.
[127] In addition to Yasin, Hamas leaders assassinated by Israel include Ismail Abu Shanab (2003); Adnan al-Ghoul (2004); Ibrahim Maqadma (2003); Jamal Mansur (2001); Abd-al-Aziz Rantisi (2004); Jamal Salim (2001); and Salah Shahada (2002). Mahmoud Zahar survived the bombing of his Gaza home in September 2003, in which his son Khalid was killed, and Qassam Brigades commander Muhammad Ahmad Daif has escaped at least two attempts on his life.

Case 1:05-cv-04622-DLI-RML   Document 267-13   Filed 03/22/12   Page 215 of 646 PageID #: 6893

*Enter Hamas: The Challenges of Political Integration*
*Crisis Group Middle East Report N°49, 18 January 2006*                                              *Page 17*

Israeli perceptions, at least on the margins. The official line remains that any engagement or recognition should come only if Hamas has changed, not because it is strengthened. Only after it abrogates its "legal statements [i.e. Charter], and the political wing has no connection with their military activities",[128] could Hamas be accepted as an interlocutor for peace. Arrests and assassinations have continued, and Israel still insists on the dismantling of Hamas's military wing while seeking to hinder its electoral bid.

At the same time, however, growing segments of the establishment and even of the public gradually are coming to terms with the idea of the Islamist organisation playing an influential part in PA politics and policies.[129] In the words of a defence ministry adviser, "Hamas is one of two major streams to join the Palestinian establishment and bureaucracy. If they won't attack us and use terrorism, it's a Palestinian issue who governs them".[130] Others argue that the current ceasefire ultimately depends on the understanding between Abbas and Hamas, namely quiet in exchange for political participation; should Israel prevent Abbas from fulfilling his part, it may well lose the ceasefire.[131] A minority but not infrequently heard view was that Hamas ultimately might prove a better partner than Fatah since a deal with hardliners, particularly disciplined ones, would be more likely to hold.[132] Shaul Mishal, a leading Israeli authority on Hamas, says: "[Israel] has to decrease the weight of ideology in the way it thinks of Hamas. They are not zealots. They don't have this culture of alienation from the self, or from mainstream Islam. Many politicians here and abroad miss the point".[133]

Mishal further argues that Israeli military strategists are re-examining their preconceptions:

The Israeli army has changed its tacit understanding of Hamas. Previously, it believed that the more we hurt the movement, the weaker it will become and the more room it would provide for moderate and rational leaders. But Hamas didn't follow that rationale. It has emerged stronger as a military movement. For Israel, it's a surprise. It has learned the hard way to look at Hamas differently.[134]

Hamas's governance of several municipalities presents Israel with a dilemma, and the response has been interesting. Rather than boycott or snub Hamas-ruled cities, it has increased the permits for workers from Qalqilya.[135] It continues to sell electricity and water to municipalities, regardless of political hue, and to coordinate services.[136] Officially, Israel denies contacts, and members of the civil administration, the arm of the military government in the West Bank responsible for daily interaction with Palestinians, told Crisis Group their dealings with Hamas-run municipalities were directed through the PA.[137] But as described above, there are exceptions, and some Israelis suggest these are more extensive than generally believed. According to former intelligence officers, municipal contacts exist and can be used for more political communication.[138] An official told Crisis Group:

> [The civil administration] is very practical. When a water pipe is broken, our professionals generally deal with their professionals rather than politicians to politicians, in order to minimise contacts with official figures. But if Israel needs to solve a problem with the mayor of Qalqilya, Israel will meet him. And at a municipal level, talks between

---

[128] Giora Eiland, Israeli National Security Council head, at a talk attended by Crisis Group, Jerusalem, November 2005.
[129] According to a poll conducted by the Hebrew University in Jerusalem in December 2005, 50 per cent of Israelis favoured talks with Hamas and 47 per cent opposed. Far more (63 per cent) opposed the release from prison of the popular Fatah leader, Marwan Baghouti. "Half of Israelis favour talks with Hamas", Reuters, 21 December 2005.
[130] Crisis Group interview, senior Israeli defence ministry adviser, Tel Aviv, September 2005. Other Israeli strategists argued for a similar approach: "Hamas should be judged by what they do on the ground. If it channels funds into terrorist attacks, I don't want them to be in government". Crisis Group interview, Gerald Steinberg, Israeli commentator, Jerusalem, September 2005.
[131] Crisis Group interview, Israeli analyst, November 2005.
[132] Crisis Group interviews, Israeli citizens, Jerusalem and Tel Aviv, autumn 2005.
[133] Crisis Group interview, Shaul Mishal, Israeli academic and specialist in Palestinian affairs, Tel Aviv University, Tel Aviv, September 2005.

[134] Crisis Group interview, Mishal, September 2005.
[135] Crisis Group interview, Hashim Masri, deputy mayor, Qalqilya, September 2005. There is unlikely to be any connection between Hamas assuming power in the city and the increase in the number of permits, but that is precisely the point.
[136] "Gaza is 100 per cent dependent on Israel for its electricity, water and communications antennae. If Israel switched off the tap, there is no electricity, no water, no telephones. They are 100 per cent dependent." Crisis Group interview, Israeli intelligence officer, Tel Aviv, September 2005. For a description of a meeting between Israeli Electric Company representatives and the acting Qalqilya mayor in a car on the outskirts of the town, see Khaled Abu Toameh, "Kalkilya talks electricity with Israelis", *The Jerusalem Post*, 28 December 2005.
[137] "We try to deal as much as possible with the PA. Where Hamas is in charge, we do not deal directly with the municipality, but we found many ways if we need to assist." Crisis Group interview, Shlomo Dror, spokesman for the Civil Administration, Jerusalem, January 2006.
[138] According to Ofer Dekel, former deputy head of the internal intelligence service Shin Bet who advocates more formal talks, "we have some kind of dialogue through the civil administration". Crisis Group interview, Herzliya Pituach, September 2005.

Case 1:05-cv-04622-DLI-RML   Document 267-13   Filed 03/22/12   Page 216 of 646 PageID #: 6894

*Enter Hamas: The Challenges of Political Integration*
*Crisis Group Middle East Report N°49, 18 January 2006*                                    *Page 18*

local Israeli and Palestinian mayors are not subject to government guidelines.[139]

Indirect communications include contacts via third parties, whether Israeli academics and journalists or foreign emissaries and diplomats.[140] Religious gatherings can be venues for meetings.[141] That said, the prime forum for information-gathering still appears to be the prison leadership, both through interrogations and oversight of communications with the outside leadership.[142]

The degree to which tactical or clandestine contacts could pave the way for more formal engagement remains unclear and, at the least, something for the longer term. There is little doubt that such a move would face formidable opposition. For the nationalist right, Hamas is an extension of jihadi terrorists that must be confronted. Former diplomat Dore Gold, a confidant of Likud leader Binyamin Netanyahu, explained: "There are two types of terrorists: the anti-civilisational, who want to destroy their adversary, and those with limited territorial goals. Hamas is in the first category, along with al-Qaeda's global jihad".[143]

Labour has been anything but receptive. Viewing the PA as Israel's natural partner, its politicians and those to their left have traditionally shared the right's animus for Hamas. "There's no common ground with the Islamists", according to journalist Yossi Melman. "It's much easier when you don't base politics on God and people who hear voices. The PA is run by people who don't see land as a *waqf* [religious endowment], with whom you can reach tactical agreements".[144] Most Labour leaders agree with former internal intelligence head and Labour candidate Ami Ayalon, who argues, "we have no interest in seeing Hamas as a partner".[145] A notable exception is veteran politician Ephraim Sneh: "Hamas is a political-religious movement that is armed. To define it as a terrorist organisation is too simplistic. We have to talk to them, but the Europeans should not".[146]

Some within the intelligence community appear receptive to engaging Hamas politically on the grounds that it has become too powerful and too organised to ignore.[147] Based

---

[139] Crisis Group interview, Israeli foreign ministry official, Jerusalem, December 2005.

[140] The military establishment is said to be particularly eager for such indirect contacts. Crisis Group interview with Israeli academic, Tel Aviv, July 2005. Egypt produced a unilateral Palestinian ceasefire in 2003 in part by informing Palestinian leaders that in a separate meeting Sharon had accepted the principle of "quiet for quiet". Crisis Group interview, senior Egyptian diplomat, Cairo, September 2004.

[141] Crisis Group interview, Rabbi David Rosen, International Director of Inter-religious Relations, American Jewish Committee, Jerusalem, September 2005. For example, prior to disengagement, Rabbi Menachem Froman, in coordination with Sharon's office, met Hamas leaders in an attempt to negotiate the future of deconsecrated synagogues in the settlements from which Israel withdrew. See Nadav Shragai, "Israel holding secret talks with Hamas over Gaza synagogues", *Haaretz*, 7 September 2005.

[142] According to a Western diplomat and an Israeli go-between, prison officers play a key role in ruling which contacts to permit. They cited Israel's facilitation of contacts between Marwan Barghouti and Khalid Mashal, the Hamas politburo leader based in Damascus, during negotiations leading to Palestinian ceasefires. Crisis Group interviews, European diplomat and Israeli academic, Jerusalem, 2005.

[143] Gold claims that Hamas has been "100 per cent" infiltrated by the same Wahhabi elements who established al-Qaeda. He added, "it's hard to punish whole towns [run by Hamas] but you have to so they don't serve as an organisational base for Hamas". Crisis Group interview, Jerusalem, September 2005. The former head of the Israeli military (IDF) research department, Yaacov Amidror, also makes such claims: "Hamas shares some ideas with al-Qaeda, and I fear that Gaza will be the one place where the Egyptians won't tackle Qaeda, because they've never been able to deal with Qaeda, and Abu Mazen is too weak. We have

to be very careful not just for us but for the U.S. And it will be very embarrassing that our pullout from Gaza created a safe haven for al-Qaeda". Remarks at a conference attended by Crisis Group, Herzliya, September 2005.

[144] Crisis Group interview, Yossi Melman, Israeli journalist, Tel Aviv, September 2005. "The left-wing in Israel don't like religious politicians in either Israel or Palestine. They have a reflex reaction against allowing Hamas into the political system". Crisis Group interview, Arnon Regular, *Haaretz* correspondent, Jerusalem, December 2005.

[145] Crisis Group interview, Ami Ayalon, former director of Shin Bet, Tel Aviv, September 2005.

[146] Crisis Group telephone interview, Ephraim Sneh, Labour parliamentarian, December 2005. Sneh also accuses the Sharon government of having increased the appeal of violence to Palestinians by undermining the PA and appearing to withdraw from Gaza under fire. "At the moment the Israeli government is not willing to give Abbas the clout and the reinforcements to overcome Hamas. That's a fact". Crisis Group interview, Sneh, September 2005. Israel's religious parties span the same spectrum of opinion as their secular counterparts. Partly because they hold few senior portfolios, they can be the most creative in breaking taboos on Hamas. According to Avraham Ravitz, a deputy minister of social affairs who heads the Orthodox non-Zionist Degel ha-Torah party, "it would be smart to take Hamas into the political fold rather than leave them outside to terrorism. I would call for Hamas to join the elections, but they have to stop acting as a private army, and become a political party". Crisis Group interview, Jerusalem, September 2005.

[147] Crisis Group interview, former Shin Bet officer, Herzliya, September 2005. Gidi Greenstein, a former adviser to Prime Minister Barak and influential analyst, recommends that Israel multiply contacts with Hamas to force it to make a choice: "[G]ive Hamas a bear hug and recognise its elected representatives. Israel's current policy of refusing to speak to Hamas unless it disarms just plays into the group's hands…. Shifting political responsibility to Hamas could expose the group's deceit and cause it to become moderate or maybe split

*Enter Hamas: The Challenges of Political Integration*
*Crisis Group Middle East Report N°49, 18 January 2006*　　　　　　　　　　　　　　*Page 19*

Case 1:05-cv-04622-DLI-RML　Document 267-13　Filed 03/22/12　Page 217 of 646 PageID #: 6895

on his contacts with the military establishment, Mishal remarks, "the Israeli army is going through a very exciting process of adjusting to a new reality in their policy towards Hamas. At this point, it is open to the notion of a future in which Palestinian politics will be shaped by a combination of parties with multiple visions".[148] Other officials evinced openness to the eventual assimilation of Hamas paramilitaries into the Palestinian security forces, provided they join as individuals rather than cells.[149]

## C.  ARE HAMAS'S VIEWS ON ISRAEL CHANGING?

Hamas's founding Charter, published in August 1988, is unambiguous about Israel. Article 11, for example, states that "the land of Palestine is…consecrated for future Moslem generations until Judgement Day. It, or any part of it, should not be squandered…or…given up". Article 34 insists Palestine can "only" be liberated by jihad.[150] Other articles reflect the most crass forms of anti-Semitism.[151] While it would be as erroneous to extrapolate Hamas's political stance in 2006 on the basis of the 1988 Charter as it was wrong to deduce PLO policies in 1988 on the basis of its 1968 founding document, Hamas leaders

with some regularity continue to express views suggesting little has changed. Thus, speaking in Tehran in December 2005, the head of the politburo, Khalid Mashal, pointedly praised statements by Iranian President Mahmoud Ahmadi-Nejad calling for Israel to be wiped off the face of the earth and questioning the Holocaust.[152] In late 2005, Mahmoud Zahar ruled out acceptance of the 2002 Arab peace initiative and by implication the principle of a two-state settlement.[153]

Yet, while Hamas remains formally committed to establishment of an Islamic state throughout historic Palestine, it simultaneously appears to have jettisoned some former dogmatism. In post-disengagement graffiti, 1948 territories went all but unmentioned. "It's Gaza first, and West Bank and Jerusalem Second", said a surprised European official contemplating the walls.[154] Hamas leaders have for some time evoked the notion of a long-term ceasefire or *hudna* on the basis of a withdrawal to the 1967 lines, setting the stage for a decades-long, de facto coexistence. In an interview with Crisis Group, Hamas West Bank political leader Hasan Yousif set the following conditions for such an armistice: full and complete withdrawal from Gaza, West Bank and East Jerusalem; release of all prisoners; recognition of the right of return for refugees; and a fully sovereign and sustainable Palestinian state.[155]

Indeed, much like the PLO in the 1970s and 1980s, the most interesting statements emanating from Hamas are not those that confirm its established tenets but rather ones that seemingly contradict official doctrine, particularly when those making them are its most senior leaders. Sheikh Ahmad Yasin on several occasions explicitly referred to negotiations with Israel and a solution of the conflict that would leave the Jewish state intact[156] and by his 2004 assassination had come to espouse the position "that while Hamas's overall ideological project is the recovery of Palestine as a whole, it is ready to accept interim solutions based on a mutual cessation of hostilities and Israel's full withdrawal from the territories it occupied in the 1967 war".[157] Perhaps more surprisingly, Abd-al-Aziz Rantisi, his radical successor as head of Hamas in the Gaza Strip, asserted that "the intifada is about forcing Israel's withdrawal to the 1967 borders", and that once

---

the faction. On the municipal level, Israel must insist that Hamas mayors work directly with civil administration officials. Hamas representatives now stand before the cruel test of having to implement the promises they gave their voters. In this situation, the right hand, which controls terror in the city, could harm the left hand, responsible for the welfare of the citizens". YNet, 9 June 2005.

[148] Mishal claimed "blue skies" thinking has also led to reconsideration of the rules of engagement with Hamas and others, including differentiation between attacks inside Israel and within the occupied territories: "If you kill ten kids, whether settlers or inside Israel, they are ten kids, and it will be hard not to retaliate. But if you kill five soldiers, well…these are the new rules. They understand Palestinians will maintain a certain type of terrorist activity to win over public opinion and keep their radical elements on board". He suggested the military might also be willing to distinguish between attacks from low-tech missiles (whose deployment in the West Bank is considered only a matter of time) which land in Israel and those aimed at settlements. Crisis Group interview, Mishal, September 2005.
[149] Crisis Group interview, Israeli foreign ministry official, Jerusalem, December 2005.
[150] For the Hamas Charter see www.mideastweb.org. See also Hamas's statement no. 80, 29 October 1991 rejecting the existence of Israel: "The land of Palestine, with Jerusalem and Al Aqsa, from the sea to the river, is Islamic *Waqf* land, and no party may concede a grain of its soil". Quoted, Naser Eddin al-Sha'er, "The Palestinian-Israeli Peace Process, An Islamic Perspective", Centre for Palestine Research and Studies, September 2000, p. 21.
[151] See further Crisis Group Report, *Dealing With Hamas*, op. cit., pp. 11-13.

[152] *Al-Hayat*, 16 December 2005.
[153] Crisis Group interview, Mahmoud Zahar, Hamas leader, November 2005.
[154] Crisis Group interview, European official, Gaza City, November 2005.
[155] Crisis Group interview, Ramallah, August 2005. For more on Hamas's position, see Crisis Group Report, *Dealing with Hamas*, op. cit.
[156] See further ibid, pp. 13-16.
[157] Graham Usher, "The assassination of Shaikh Yasin", *Middle East International*, 1 April 2004.

Case 1:05-cv-04622-DLI-RML   Document 267-13   Filed 03/22/12   Page 218 of 646 PageID #: 6896

*Enter Hamas: The Challenges of Political Integration*
*Crisis Group Middle East Report N°49, 18 January 2006*                    *Page 20*

this was achieved the conflict, though it would not be over, would lose its armed character.[158] In a statement that many who study Hamas consider its emerging consensus, its chief representative in Lebanon, Usama Hamdan, argued that "Hamas is clear in terms of the historical solution and an interim solution. We are ready for both: the borders of 1967, a state, elections, and agreement after ten to fifteen years of building trust".[159]

In recent statements, Hamas leaders have not ruled out changing the charter.[160] The view that Hamas could one day sit across the table from Israel is gaining currency.[161] Hamas leader Mahmoud Zahar, known for his generally hardline views, in June 2005 stated that if the organisation becomes "part of [the PA] government, it would participate in negotiations with Israel".[162] Khalid Meshal, Hamas's leader in exile and its pre-eminent international voice, justified entrance into the political mainstream with the phrase: "Resistance can be in a political and diplomatic form", not only on the battlefield.[163] Going further than Hamas has in the past, Sheikh Ahmad Haj Ali, an imprisoned senior Muslim Brotherhood leader and Hamas legislative candidate, told Crisis Group:

> If Hamas achieves a majority I will defend my rights. One method of achieving my rights is to negotiate with he who usurped them, i.e. Israel, and I will respect their withdrawal from the occupied territories on a provisional basis. I will negotiate for my usurped rights from the river to the sea, but I will suspend my rights over what was seized before 1967 in order to achieve all my rights that were taken after 1967, including the full removal of the settlements.[164]

Likewise, Khalid Saada, a veteran Hamas member whom Israel deported to Lebanon in 1993, told Crisis Group:

> I haven't heard of a decision inside Hamas that we accept to negotiate with the state of Israel. But anything which doesn't conflict with our religion is acceptable for discussion, and it doesn't conflict with our religion to negotiate with Israel. It's a political decision, not a religious principle. If we have a disagreement, we have a principle: the majority decides. And that's why we have no internal crisis.[165]

The changing discourse has triggered a shift in the Islamist movement's strategy from the days when the PA was derided as "the agent of Oslo". By reversing its boycott of PLC elections in 1996 – and, indeed, demanding they be held in 2006 even if East Jerusalemites are excluded[166] – Hamas implicitly recognised the 1967 borders as the new, operative political reality. Spokesperson Muhammad Ghazal, now in an Israeli jail, went further than any other Hamas member Crisis Group spoke to, in a statement that could as easily have been made by Abbas:

> When we talk about politics, it means we have accepted the 1967 borders. We are ready to have those borders. We accepted to have our own state. Limited land swaps are a minor thing. The Palestinian people agreed to forget 78 per cent of our land.[167]

Khalid Mashal, responding to a question from the Arabic television network al-Jazeera in November 2005 as to whether Hamas's participation in elections portended a shift in its political stance, was ambiguous as many PLO officials a generation ago:

[158] Crisis Group interview, Abd-al-Aziz Rantisi, Gaza City, October 2002.

[159] Crisis Group interview, Usama Hamdan, Beirut, August 2003. Hamdan reiterated this to Crisis Group, September 2005.

[160] Ghazal said: "The charter is not the Koran". "Hamas Leader says charter is not the Koran", Reuters, 21 September 2005.

[161] Crisis Group interview, Ghazal, September 2005; Haj Ali, July 2005.

[162] *Middle East International*, 23 June 2005.

[163] Mehr news agency, Tehran (in Persian), 15 December 2005, BBC Monitoring. The Hamas outlet, the Palestinian Information Centre, quoted Said Siam, a prominent Islamist eader, as saying that Hamas was likely to be more "open to the outside world" once it becomes part of the Palestinian political system. Palestinian Information Centre, 18 December 2005. "Resistance has many forms. It's not just bang, bang." Crisis Group interview, Hamid Bitawi, Hamas PLC candidate, Nablus, January 2006.

[164] Crisis Group interview, Nablus, July 2005. The offer was not unconditional, and made a pointed reference to the fact that unlike other Palestinian organisations Hamas has never expanded its operations beyond the borders of Israel and the occupied

territories: "We understand we cannot cancel Oslo tomorrow. Arafat signed it. But if we inherit Oslo we will demand that Israel implement it. We will take all legitimate peaceful means, and if these fail we will resort to resistance. If necessary we will resort to war, including as a last resort a global war against Israel in which every Muslim will confront Israel as a religious duty". Ibid, August 2005.

[165] Crisis Group interview, Khalid Saada, Bethlehem, November 2005. A leading specialist on the national movement, Yezid Sayigh, concludes: "The movement is signalling it wants to be cut in on a peace deal, or even that it can deliver a better deal than the PLO. In other words it's doing what the PLO did 30 years ago. All the rest – ceasefire, discourse, use of guns – doesn't obscure the political trajectory. Fundamentally it's the same game". Crisis Group interview, Beirut, October 2005.

[166] Hamas leader Mahmoud Zahar's December 2005 suggestion that technological alternatives could be found if Israel prevented the vote, and earlier suggestions by the movement that the poll could be circumvented by selecting consensus candidates, came in for considerable criticism. Crisis Group telephone interview, Palestinian NGO activist, Ramallah, January 2006.

[167] Crisis Group interview, Ghazal, Nablus, September 2005.

Case 1:05-cv-04622-DLI-RML   Document 267-13   Filed 03/22/12   Page 219 of 646 PageID #: 6897

*Enter Hamas: The Challenges of Political Integration*
*Crisis Group Middle East Report N°49, 18 January 2006*                                    *Page 21*

It is premature to speak of an important change in the movement's positions, but it is only natural that the movement determines its positions on the various issues – including issues on which it has previously taken positions – in light of new developments and realities. The movement is not immobile in its political positions, which are based on a set of principles and values.[168]

Such views are far from unanimous, and within Hamas's leadership other voices – some quite loud – still can be heard. The point is not that Hamas is in the process of formally revising its tenets, whether by recognising Israel or renouncing the use of force. With neither a carrot nor a stick in sight, it has little incentive to disclaim its official positions, and even if provided several of each may never do so. Rather, there are increasingly clear indications that over the past decade it has managed to fuse maximalist ideology with political pragmatism.[169] The evidence suggests that Hamas is at least prepared to tolerate a negotiated two-state resolution of the Israeli-Palestinian conflict, albeit with more stringent conditions than enunciated by the PLO. It would be as naïve to take the above statements on faith as it would be foolish to not put them to the test.[170]

For now, Hamas appears determined to avoid a situation in which it would have to deal directly with Israel on political issues. The current situation suits that preference well: elections are for PA, not PLO, institutions, and it is the latter that theoretically conducts negotiations with Israel. Moreover, given Israel's inclination toward unilateralism, the Palestinians are unlikely to be engaged in genuine negotiations for some time. They can be the beneficiaries of territorial withdrawals without compromising any core positions, bolstering Hamas's stance that it is steadfastness that produces results. Hamas's readiness to work in tandem with the PA and indirectly Israel for the Gaza disengagement offers a template of its possible future approach and was an early indication of how such coordination might work. "We told the Egyptians we are willing to enter into a national dialogue, and to agree on how to work together after Israel's withdrawal: running civilian affairs, and coordinating internal security".[171]

If meaningful negotiations resume, Hamas would have some margin for manoeuvre. First, as mentioned, it does not reject talks on principle: "It is not prohibited to talk to Israel, not something that has to be hidden. We can negotiate and talk to Israel if it is for the sake of our people", said Mohammed Ghazal.[172] Hamas might also await the result of PA or PLO talks. Power-sharing arrangements would allow Hamas both to exercise indirect influence over any dealings with Israel and formally to wash its hands of the process in the eyes of its voters. In other words, it would be expected neither to reject nor block negotiations, but at most to try to steer their terms of reference and informally monitor them. Not unlike the role it is expected to play in the PLC, Hamas would be able to take credit for achievements while disassociating itself from unpopular compromises.

As a leading Palestinian Islamist academic close to Hamas put it:

> Sheikh Ahmad Yasin said that the principle of negotiations is not prohibited, but the problem is the basis on which they take place. Anyone who advocates negotiations over less than the 1967 borders will be entering the same tunnel as the PA. Hamas would prefer others to conduct the negotiations, while they remain behind the scenes. They will have a presence to ensure that basic rights are preserved.[173]

Secondly, Hamas can always rely on public opinion as the deciding factor whether to reject or acquiesce in the outcome of talks, based on its long-expressed view that it will endorse what a majority of Palestinians want. Leaders interviewed by Crisis Group all reiterated this commitment to respect the will of the people and act in the public interest *(al maslaha al amma)*.[174] In the words of Hasan Yousif, "we have accepted the principle of accepting a Palestinian state within the 1967 borders. If it's in the interest of the people, we're prepared".[175]

Hamas's electoral manifesto released in mid-January 2006 is noteworthy in this regard. Stating that "Our nation is at

---

[168] Interview with Hamas Politburo head Khalid Mashal, www.al-jazira.net, 12 November 2005. Translated from the Arabic.
[169] See further Crisis Group Report, *Dealing With Hamas*, op. cit., pp. 10-28.
[170] Crisis Group reached the same conclusion in January 2004, ibid.
[171] Crisis Group interview, Usama Hamdan, Beirut, October 2005.

[172] Crisis Group interview, Ghazal, Nablus, September 2005.
[173] Crisis Group interview, Palestinian Islamist academic, Najah University, Nablus, September 2005.
[174] "It's entirely legitimate to determine the policies of Islamic government on the basis of what serves the public interest. So one could conclude that the public interest is best served by the peace process". The notion of public interest is based on the twelfth century jurist, Sultan al-Ulama al Izz bin Abdal Salam, who said that "anything that serves the Islamic people is *halal* [permissible], and anything that does not is *haram* [prohibited]". Crisis Group interview, Palestinian Islamist academic, Najah University, Nablus, September 2005.
[175] Crisis Group interview, Yousif, Ramallah, August 2005.

Case 1:05-cv-04622-DLI-RML   Document 267-13   Filed 03/22/12   Page 220 of 646 PageID #: 6898

*Enter Hamas: The Challenges of Political Integration*
*Crisis Group Middle East Report N°49, 18 January 2006* *Page 22*

a stage of national liberation, and it has the right to act to regain its rights and end the occupation by using all means, including armed resistance", the preamble proclaims: "Yes to a free, independent, and sovereign Palestinian state on every portion of the West Bank, Gaza Strip and Jerusalem without conceding on any part of historic Palestine". Similarly, while Article 1:1 of the manifesto proclaims that "All Palestine is part of the Arab and Islamic homeland", Article 1:5 calls for "adherence to the goal of defeating the [1967] occupation and establishing an independent Palestinian state with Jerusalem as its capital".[176] This arguably was the first official Hamas document to pronounce on the conflict without explicitly calling for the destruction of Israel. An Israeli journalist concluded that the manifesto "does not differ substantially from that of Palestinian Authority Chairman Mahmoud Abbas's Fatah faction";[177] at a minimum, it has more in common with Fatah's outlook counterpart than with Hamas's founding principles.

Just prior to his arrest, Muhammad Abu Tair, the number two on Hamas's list, explained to *Haaretz* that the decision to integrate represented a strategic rather than tactical shift:

> We'll negotiate [with Israel] better than the others, who negotiated for 10 years and achieved nothing….In the past, it was said that we don't understand politics, only force, but we are a broad, well-grounded movement that is active in all areas of life. Now we are proving that we also understand politics better than the others….We are not saying 'never.' The question of negotiations will be presented to the new parliament and, as with every issue, when we reach the parliament it will be discussed and decided in a rational manner.[178]

## V.   HAMAS AND THE INTERNATIONAL COMMUNITY

The EU and U.S. have had evolving, at times divergent, policies toward Hamas. While details are sketchy, contacts with the movement were maintained prior to its classification as a terrorist organisation. For example, during preparations for the 1991 Madrid Middle East Peace Conference, the U.S. State Department reportedly initiated contacts with Hamas political leader (and U.S. resident) Musa Abu Marzuq in an unsuccessful effort to obtain its endorsement of Palestinian participation.[179] In the wake of Israel's expulsion of some 400 Islamist activists to southern Lebanon in December 1992, Hamas early the next year initiated dialogue with embassies in Jordan of the UN Security Council permanent members. According to some reports, U.S. diplomats were receptive at first but severed contacts several months later because "no progress had been achieved to justify their continuation".[180] Later that year, the U.S. classified Hamas as a terrorist organisation, meaning it no longer engaged in public contacts with it and denied periodic allegations of clandestine ones.

The EU's dialogue lasted a further decade and expanded to intensive consultations at the height of the second uprising when the Europeans sought to mediate understandings between Hamas, Israel and the PA, particularly with respect to the modalities of a ceasefire and the terms of eventual decommissioning. Alastair Crooke, a former senior British MI6 officer who served as the EU's link to the movement between 1997 and 2003, played a central role in forging the truce (*hudna*) proclaimed during Abbas's brief 2003 premiership. Its collapse in August 2003, the EU's classification of Hamas as a terrorist organisation the next month,[181] and Israeli (and some Palestinian) objections to the continuation of his mission, led to his subsequent recall by the UK.

---

[176] The Hamas election manifesto is available in Arabic at http://www.elections.ps.
[177] Arnon Regular, "Hamas charter mentions armed struggle, but not Israel's destruction", *Haaretz*, 11 January 2006.
[178] "Hamas No. 2: "We understand politics; we'll negotiate better than others", *Haaretz*, 15 January 2006.

[179] The initiative failed, and Hamas responded with a call for escalating the uprising. Mishal, *The Palestinian Hamas*, op. cit., p. 119.
[180] Hroub, *Hamas*, op. cit., pp. 195-196.
[181] The EU had already defined the Qassam Brigades as a terrorist organisation in 2001. Under the Council common position of 27 December 2001 on the application of specific measures to combat terrorism (2001/931/CFSP), "The European Community…shall ensure that funds, financial assets or economic resources or financial or other related services will not be made available, directly or indirectly, for the benefit of persons, groups and entities listed". Specific restrictions on contacts with Hamas were issued in an internal memo on 14 April 2005, CFSP/PRES/LUX/0768/05.

Case 1:05-cv-04622-DLI-RML   Document 267-13   Filed 03/22/12   Page 221 of 646 PageID #: 6899

*Enter Hamas: The Challenges of Political Integration*
*Crisis Group Middle East Report N°49, 18 January 2006*                                                        *Page 23*

The EU and U.S. bans were renewed in October 2005.[182] In principle, therefore, their policies toward the movement are clear: in addition to criminalising any material assistance to it, they formally eschew political (and in the case of Washington, any) contact.[183] Practical implementation, however, has been a different matter.

## A.   PROVIDING FUNDS TO NGOs

Since the PA was established in 1994, the international community has bankrolled it with the dual objective of promoting peace and establishing a bulwark against militant Islam. As explained in the mission statement of the U.S. Agency for International Development (USAID), its single largest national donor, "without this robust level of donor assistance, the Palestinian Authority (PA) might not have been able to survive as a government and maintain its relevance vis-à-vis Hamas and other Islamic extremist movements".[184] International assistance totals some $1 billion in grants per year.[185] Yet, a decade later, the conflict rages on, and donors face both the prospect of Hamas winning custody of an institution they have suckled since birth and the dilemma of channelling aid to local administrations that it controls. The quandary is particularly pressing in post-disengagement Gaza, which is both the priority aid area – with G8 pledges of up to $9 billion through 2008[186] – and Hamas's heartland.

Despite similarities, the American and European approaches differ in important respects. On the grounds that "assistance is tax-payers' money and should be matched to our foreign policy goals",[187] the U.S. has imposed strict guidelines to ensure that none of its funding even indirectly benefits Hamas. USAID bans support for social welfare organisations considered to be affiliated with Hamas, regardless of their record on service delivery or accounting transparency.[188] All Palestinian recipients of its money are required to sign anti-terrorism certificates (ATCs),[189] check beneficiaries against published terrorist blacklists, and submit names and details for further vetting by the U.S. Organisations that retain Hamas board members or employees are deemed ineligible for USAID programs;[190] as are institutions with the word "martyr" in their name,[191] even though Palestinians argue the term has a much wider application than its presumed restriction to suicide bombers.[192] An American overseeing a USAID Palestinian programs complained: "We are told the money could be going to terrorists, but the bottom line is they are

---

[182] See Council decision 2005/722/EC, 17 October 2005.

[183] U.S. policy is considerably more stringent, extending the ban to any organisation deemed affiliated with Hamas and with a lower threshold of proof for prosecution. See Crisis Group Report, *Islamic Social Welfare Activism*, op. cit.

[184] "USAID West Bank and Gaza Strategic Statement, 30 August 2005", p.3, available at http://www.usaid.gov/wbg/misc/Public_WBG_Strategic_Statement.doc.

[185] Palestinian GDP is some $4.5 billion. Over five years, donor aid to the occupied territories has averaged $960 million in tracked contributions, excluding undisclosed contributions, particularly from Gulf Arab states. Crisis Group interview, Quartet finance official, Jerusalem, 28 November 2005. The more Palestinian dependence grows due to Israeli measures that hamper economic development, the more muscle donors acquire. According to the USAID mission statement, "had it not been for a doubling in overall donor assistance levels…public welfare, as measured by per capita Gross Disposable Income, would have declined by much more than the recorded 30 per cent". For the economic impact of Israel's physical constraints on Palestinian livelihood, see "Economic Report to the Ad Hoc Liaison Committee", World Bank, December 2005, p.18, and "Macroeconomic Developments and Outlook in the West Bank and Gaza", International Monetary Fund, London, 14 December 2005.

[186] At its July 2005 Gleneagles summit, the G8 gave the Quartet special envoy a commitment in principle and subject to conditions to help raise up to $3 billion per annum in public and private finance over three years, with reversal of the traditional 60:40

ratio of aid expenditure in the West Bank and Gaza Strip. Crisis Group interview, Cairo Arafat, PA planning ministry, Ramallah, November 2005. Major projects earmarked to begin in early 2006 include construction of 3,000 housing units on the ruins of Morag settlement, rubble removal from the bulldozed settlements, repaving of the trans-Gaza Salah al-Din highway, and an EU water-treatment plant.

[187] Crisis Group interview, U.S. diplomat, Jerusalem, December 2005.

[188] Crisis Group interviews, diplomats and aid agencies, West Bank and Gaza Strip, 2005. For further discussion, see Crisis Group Report, *Islamic Social Welfare Activism*, op. cit.

[189] The certificate, which applies to USAID projects worldwide, commits the recipient to "take all reasonable steps to ensure that it does not and will not knowingly provide" any assistance to an individual or entity that advocates, facilitates, participates in or commits a terrorist act. A recipient also must ensure that no aid is given to an individual or entity on the U.S. list of designated nationals. For the full text, consult http://www.usaid.gov/wbg/misc/2004.Certification_Regarding_Terrorist_Financing.pdf.

[190] In 2004 the Salah Association, an Islamic charity in the Gaza Strip founded by current Hamas Deir al-Balah mayor, Ahmed Kurd, received USAID funds. In 2005, it did not. Crisis Group interview, Jabir Ayyash, director, Salah Association, Deir al-Balah, November 2005.

[191] Crisis Group interview, Thomas Neu, Middle East Representative, Anera, Gaza, November 2005.

[192] Health care centres in Gaza commonly include "martyr" in their names. Although many observers conflate the terms *shahid* (martyr) and suicide bomber, in the context of the Israeli-Palestinian conflict *shahid* refers to any Palestinian, collaborators excepted, who die as a result of the conflict, whether actively (armed militants) or passively (civilian non-combatants killed in a rocket attack). While *shahid* thus encompasses suicide bombers, they are a small fraction. The term *istishhadi* (he who martyrs himself) is reserved for suicide bombers.

Case 1:05-cv-04622-DLI-RML   Document 267-13   Filed 03/22/12   Page 222 of 646 PageID #: 6900

*Enter Hamas: The Challenges of Political Integration*
*Crisis Group Middle East Report N°49, 18 January 2006*                                    *Page 24*

just imposing a secondary boycott, and yet another checkpoint for people to circumvent".[193]

The broad ban's wisdom and efficacy have been questioned. Many organisations – including numerous secular NGOs that the U.S. presumably hoped to support – refuse to submit to USAID's conditions, in particular the signing of the anti-terrorism certificate. The dean of the Islamic University in Gaza – a key Hamas bastion and source of candidates for the legislative elections[194] – explained: "The Americans asked us to sign a form opposing terrorism. We said we don't support terror, and said send your auditors, but we aren't going to humiliate ourselves signing such forms".[195] Some – mainly secular – NGOs put their names to a counter-boycott of USAID programs in protest at these regulations.[196] Others obtained alternative support, including from private American corporations.[197] At the same time, the boycott inevitably impacted adversely on Western, particularly U.S., access to Palestinian grassroots organisations and further eroded USAID's local reputation.[198] "The ATC requirements are oriented towards a U.S. domestic audience", said a USAID

contractor implementing a major program. "They are self-defeating and just sow bad blood".[199]

EU donors are less restricted than their U.S. counterparts. Their policy is not as stringent, because it is subject to the views of 25 governments and their diplomats are given more leeway on the ground.[200] The EU ban does not encompass Islamist charities affiliated with Hamas but institutionally independent and imposes no certificate system, mandatory vetting or blanket refusals of NGO's. Nor is there a clear policy governing relations of European NGOs and private donors with Hamas affiliates. European NGOs complain their requests for guidance have gone unanswered and have turned to legal advice in an effort to work through the labyrinth of EU directives and governmental anti-terrorism laws. In the resulting muddle, some organisations have expanded their dealings with the Islamist sector. The British Council, the cultural arm of the UK government, was one of several donors implementing projects at the Islamic University in Gaza. But others have scaled back; more than one Western aid worker spoke of "self-censorship" in choosing projects in order to protect the government money on which they depend.[201]

## B.   PROVIDING ASSISTANCE TO HAMAS-RUN MUNICIPALITIES

Direct donor support for Hamas-run municipalities was not always a Western taboo. USAID coordinated a project with the local Hamas mayor to beautify Qabalan, a village south of Nablus, in the midst of the second uprising.[202] Qabalan sports a host of USAID placards, and its USAID-funded football pitch featured in the agency's 2005 advertising campaign. As policy toward Hamas hardened, however, USAID instructed its implementing partners not to embark on new projects with municipalities run by Hamas,[203] while authorising those in mid-stream to continue.[204] The EU position also evolved, though due to

---

[193] Crisis Group interview, director of USAID implementing partner, Gaza, November 2005. The director blamed USAID bureaucrats in Washington, who, he said, lived in fear of watchdog groups and congressional committees. "Every bureaucrat is covering his ass, making sure he's not accused of funding terrorists", said an aid worker. "It's a totally defensive mentality".

[194] The university was widely praised by donors as the best-run in the Gaza Strip, despite rigid gender segregation in lecture halls and staff rooms and dress code. Lecturers running on a Hamas ticket include Khalil Hayyah, Sheikh Ahmad Bahr, Atif Adwan, and Yusuf Sharafi.

[195] Crisis Group interview, dean of the university's Education College, Gaza City, November 2005. Other faculties at the university, however, said they had signed the form.

[196] Some Palestinians believe the application process was designed to glean information for the U.S. government. Crisis Group interview, Jabir Ayash, director, Salah Association charity, Gaza City, November 2005.

[197] The Islamic University of Gaza secured $1 million of funding jointly donated by U.S. computer giant Intel and ANERA, an American NGO, to build an internet suite. A fundraiser for the university told Crisis Group it had been more than able to compensate for the loss of USAID aid: "You would expect money would go down, but in fact funding has increased fourfold. Donors are looking for credible transparent funding, and much flows from the West. The more the U.S. and EU put pressure on us, the more funds we seem to get". Crisis Group interview, Gaza City, November 2005.

[198] In some areas, USAID placards were defaced. In December 2005, USAID advised NGO's to use their own judgement in displaying its logo, reversing a directive that USAID-funded projects should bear the agency's branding. Crisis Group interview, USAID-funded NGO, Jerusalem, December 2005.

[199] Crisis Group interview, USAID implementing partner executive, Jerusalem, November 2005.

[200] "The interpretation is always ambiguous. On the ground, people are more pragmatic than the dogmatists in Brussels", Crisis Group interview, EU diplomat, Jerusalem, January 2006.

[201] Crisis Group interviews, European aid workers, West Bank and Gaza.

[202] Riad Mustafa, is the only Hamas mayor appointed by the PA. In December 2005 he was handily elected to a new term.

[203] Crisis Group interview, director of USAID implementing partner, Gaza, November 2005. The instructions were confirmed to Crisis Group by a U.S. official, Tel Aviv, November 2005. Steven Weisman, "U.S. to shun Hamas members, even if democratically elected", *The New York Times*, 7 June 2005.

[204] Crisis Group interview, U.S. official, Tel Aviv, August 2005. USAID completed road construction in Bani Suhaila, a Hamas-run municipality. Crisis Group interview, World Bank consultant

Case 1:05-cv-04622-DLI-RML   Document 267-13   Filed 03/22/12   Page 223 of 646 PageID #: 6901

*Enter Hamas: The Challenges of Political Integration*
*Crisis Group Middle East Report N°49, 18 January 2006*                                                                 *Page 25*

its broad membership, again not in a clear or consistent fashion. At its most rigid, policymakers sought to use aid as a political tool, to send a message about the cost of voting for Hamas. In Bethlehem, where the EU sees itself in part as traditional protector of Christian heritage, the funding boycott was seen by some as a way to shatter the Hamas-PFLP alliance.[205] Mostly, however, EU donors were less severe. Instead of wholly boycotting Hamas-run local authorities, funding was channelled through conduits other than the municipality.[206]

The disengagement from municipalities was a distinct policy U-turn. In 2002, at the height of the second intifada and as the PA was under Israeli assault, the European Commission provided €30 million to the World Bank to provide emergency assistance to municipalities. The 2005 local elections and Hamas's strong showing prompted a change in attitude. When the Bank sought to re-launch the scheme as the Municipal Development Fund, the Commission declined, citing concern that it would directly benefit Hamas municipalities. Despite World Bank oversight and PA control of funding,[207] the Commission balked at giving Hamas-run councils power to propose projects, choose contractors and determine spending.[208] Officials in capitals also argued there were insufficient checks to ensure that aid would not be diverted to militants.[209] Ultimately, during the UK presidency during the second half of 2005, the Commission halted contributions to the Municipal Fund.[210]

While the Commission position was the lowest common denominator,[211] member states adopted a variety of bilateral policies. France, Germany and Denmark jointly

made up much of the Municipal Development Fund's shortfall.[212] Some of their diplomats wondered why they should cease providing services to municipalities when Israel, in their view, was not: "I don't think we need to be more Catholic than the Pope".[213] Taking issue with the decision, the local World Bank officer remarked:

> I wouldn't be worried whether the mayor is Hamas or Fatah. What's important is that fiduciary issues are addressed. If a community needs a school, should we punish the kids of Qalqilya simply because they have a Hamas mayor?[214]

In a generally hostile environment, Hamas municipalities took whatever they could get. Mayors proudly displayed ongoing projects,[215] and, particularly in Gaza, expressed confidence that donors would be unable to implement their massive reconstruction effort in this small strip if they ignored local Islamist officials.[216] In other cases, Hamas mayors resorted to creative political gymnastics, presenting projects jointly with Fatah municipalities in a bid to receive funding.[217] Among the more imaginative is the mayor of Deir al-Balah, Ahmed Kurd. Using the apparently neutral cover of the regional electricity company – on whose board mayors sit – and municipal cooperatives known as Joint Service Councils,[218] donors were approached for project funding and, fully aware of

---

Salah Abdel-Shafi, Gaza City, December 2005. See also "Hamas-run municipality finishes two crucial projects", Palestine-Info News agency, 11 December 2005.

[205] According to Antonio Aloi, director of the Italian state aid agency in Jerusalem, "the Christian character of Bethlehem is important and should be preserved", and holding back assistance to signify discontent at Hamas's role is one tool to be used. Crisis Group interview, Jerusalem, January 2006.

[206] Crisis Group interviews, Commission officials, Brussels and Jerusalem, December 2005.

[207] Crisis Group interview, Ibrahim Dajani, World Bank operations officer, Jerusalem, December 2005.

[208] "We would prefer the PA, not the municipalities, to be the contracting authority", Crisis Group interview, EU aid official, Jerusalem, December 2005.

[209]Crisis Group interview, senior French official, Paris, October 2005.

[210] Crisis Group interview, senior Commission official, Brussels, December 2005.

[211] As explained by a European official, the EU generally will opt for the safest approach given the need normally to reach agreements by consensus, especially on an issue related to terrorism. Crisis Group interview, EU aid official, Jerusalem, December 2005.

[212] France, Germany and Denmark contributed €15 million, €12 million and €9 million respectively. Crisis Group interviews, European Commission and World Bank officials, Jerusalem, December 2005. The Italian government's cooperation arm, the EU's largest municipal donor, opposed funding, opting to retain its own program, which, its officials say, does not operate in Hamas-led constituencies. Crisis Group interview, Antonio Aloi, country director for Italian Cooperation, Jerusalem, January 2006.

[213] Crisis Group interview, EU diplomat, November 2005.

[214] Crisis Group interview, Ibrahim Dajani, Jerusalem, December 2005.

[215] Hamas councillors in Qalqilya took Crisis Group on a tour of the construction of a new four-storey hospital, which the acting mayor said was funded by the EU and implemented by UNDP for $4 million. Crisis Group interview, Masri, Qalqilya, September 2005**.** See also "Periodic Report of the Office for the Quartet Special Envoy for Disengagement", 17 October 2005. In Deir al-Balah, the mayor proudly displayed the installation of water wells and supply of new dust carts completed under his tenure.

[216] Crisis Group interview, Kurd, Deir al-Balah, November 2005.

[217] Thus, Bethlehem municipality has clubbed together with neighbouring Beit Jala and Beit Sahour – not run by Hamas – to win Italian funding for a tourism map project. Crisis Group interview, Jamal Salman, Bethlehem municipality, January 2006.

[218] The PA first established Joint Service Councils in the mid-1990s to bring together neighbouring municipalities for infrastructure development and maintenance projects.

Case 1:05-cv-04622-DLI-RML   Document 267-13   Filed 03/22/12   Page 224 of 646 PageID #: 6902

*Enter Hamas: The Challenges of Political Integration*
*Crisis Group Middle East Report N°49, 18 January 2006*                                              *Page 26*

and perhaps grateful for the institutional façade, they obliged.[219]

Overall, however, the humanitarian impact was severe. Donors traditionally were a critical source of support for municipal governments,[220] and their sudden withdrawal left many strapped for cash and borrowing heavily.[221] According to Hasan Yousif, a Hamas leader in the West Bank, "there's a huge shortfall in the level of assistance. Some projects are still ongoing, but sadly not at the same level as before the elections. In some municipalities we now control not a single new project has been approved".[222] The acting mayor of Qalqilya, the first major West Bank town Hamas won from Fatah, claimed that in his first six months not a single foreign project was approved.[223] George Saad, deputy mayor of Bethlehem, normally a donor favourite, complained of a virtual blockade:

> Before the elections USAID was working on a host of projects but since Hamas joined the municipal council, they have stopped. We send invitations to the American and British consuls,

and get no reply. We apply for projects and get no reply. The U.S. consul visited the Governor, but did not bother to visit us. Our situation is very difficult. We feel besieged.[224]

In a bid to break the isolation, Bethlehem's peripatetic mayor, Victor Batarseh, travelled the globe, signing agreements linking his town with cities from Speyr (Germany) to Valinhos (Brazil), and increasing Bethlehem's twin cities to 38.[225] Councillors confess this and similar efforts have borne little fruit.[226] The town also launched Open Bethlehem, a project to entice back tourists and expatriates, but it too yielded few dividends. The mayor is a member of the PFLP, an organisation also on the UK list of terror organisations, and runs the municipality in alliance with five Hamas councillors. British officials thus declined to attend the London launch of the Open Bethlehem campaign in November 2005.[227]

The boycott presents practical problems for donors as well. Some projects require cooperation from Hamas municipalities; Ahmed Kurd, Hamas mayor of coastal Deir al-Balah, asked: "How can they build a coastal road that doesn't pass through here"?[228] Others cannot be interrupted simply because of political change. An economic adviser to the Quartet remarked, "you can't turn aid on and off like a tap – there has to be continuity".[229] While new projects were sharply curtailed, some had to continue, such as the provision of vaccines. Indeed, by the fourth round of local elections, boycotting Hamas localities had become a practical impossibility. "Forty per cent of the population [in areas where elections have been held] lives in areas that have voted Hamas, so how can we disengage"?, asked an EU aid official.[230]

As a result, EU donors have looked for alternative mechanisms to work in areas ruled by Islamists. EU aid

---

[219] An EU diplomat attending a steering committee of ten mayors from the central Gaza Strip and UNWRA organised by Kurd described him as the group's most active fundraiser. "None spoke before Kurd had spoken, even the old-guard Fatah mayor who nominally heads the steering committee". Crisis Group interview, Jerusalem, November 2005. Crisis Group interviews, Kurd, Deir al-Balah, November 2005; EU diplomats, Jerusalem, November 2005.

[220] In 2004, municipalities derived 20 per cent of their funding from the PA and the rest from donors. Tax revenues declined to near zero during the second uprising. Crisis Group interview, Western diplomat, Jerusalem, August 2005.

[221] Crisis Group toured Hamas-run municipalities Qalqilya, Bethlehem, al-Abadiya, Qabalan, Deir al-Balah, and Beit Hanoun.

[222] Crisis Group interview, Hasan Yousif, West Bank Hamas leader, August 2005.

[223] "We've had no new projects from international donors since the elections, but the old projects continue, including a project funded by France. The French helped with the irrigation schemes, and the Spanish and French have helped fund a school. We are in discussion with the German KfW Bankengruppe about three possible projects. But we've had nothing from the U.S", Crisis Group interview, Hisham Masri, Deputy Mayor, Qalqilya, 7 September 2005. German diplomats in Ramallah said that while the banking group may have begun projects within the municipal boundaries, it was unimaginable the municipality would be involved. However, other EU diplomats said private donors were not covered by the EU ban on Hamas. Qalqilya was reported to sign its first European contracts with two French firms at the end of 2005. Khaled Abu Toameh, "Kalkilya talks electricity with Israelis", *The Jerusalem Post*, 28 December 2005. Italy also approved construction of a village council for women and youth in Marah Rabah, a municipality in Bethlehem governorate where Hamas won eight of nine seats in the third round. Italian Cooperation Newsletter, July 2005.

[224] Crisis Group interview, Bethlehem, November 2005. One of the town's five Hamas councillors added: "Why doesn't USAID understand that the money for Bethlehem is not for me, but the holy city. I have Mecca, but Bethlehem is their pilgrimage site". Crisis Group interview, Khalid Saada, Bethlehem, November 2005.

[225] Crisis Group interview, George Saad, deputy mayor, Bethlehem, November 2005.

[226] Crisis Group interview, George Saad and colleagues, Bethlehem, November 2005.

[227] Crisis Group interviews, Western diplomats and Open Bethlehem campaigner Carol Dabdoub, Jerusalem and Bethlehem, November 2005.

[228] Crisis Group interview, Ahmed Kurd, mayor, Deir al-Balah, November 2005. Deir al-Balah is in the centre of the Gaza Strip.

[229] The adviser added: "Any donor assistance has to be acceptable to the tax-payer". Crisis Group interview, Jerusalem, November 2005.

[230] Crisis Group interview, EU aid official, Jerusalem, January 2006.

Case 1:05-cv-04622-DLI-RML   Document 267-13   Filed 03/22/12   Page 225 of 646 PageID #: 6903

*Enter Hamas: The Challenges of Political Integration*
*Crisis Group Middle East Report N°49, 18 January 2006*                                                          *Page 27*

officials delegated responsibility for local government contracting and payment to the PA[231] and gave the latter "instructions not to deal directly with municipalities headed by Hamas".[232] PA Minister of Local Government Khalid Qawasmi told Crisis Group: "The PA has received a request from most donors that money should not be paid to Hamas-run municipalities, and we've been looking for a funding mechanism that resolves this issue".[233] The ministry turned to governors (who are appointed by the PA president) to disburse aid in such areas.[234] The PA also created new governmental institutions to limit the municipal role. The Palestinian Economic Development Company, headed by a Fatah loyalist, was established to ensure PA control of evacuated settlement assets in Gaza, including the greenhouses, much to the chagrin of Hamas-run municipalities. Similarly, the Municipal Development Fund signalled an expansion of central government responsibility at local government's expense.

With the PA's financial survival no longer certain, donors also gradually moved away from long-term financial commitments, turning instead both to emergency budget support and external agencies for short term aid delivery. The UN became an increasingly important channel for such aid. By 2005, approximately half of all international donor funds allocated to the occupied territories were being disbursed through UN agencies, and barely a third through the PA.[235] With dwindling faith in PA budgetary

practices and incipient fears of a Hamas electoral triumph, the trend looked set to continue. Tellingly, three weeks ahead of the legislative elections, Norway, reassigned $10 million of aid earmarked as budgetary support for the PA to UNRWA.[236]

In so doing, donors are to some degree delegating responsibility for dealing with Hamas to the UN. "For the time being, we are the pragmatists and are in effect working with Hamas-run municipalities through UN agencies and their local contractors", an EU official told Crisis Group.[237] The UN has not blacklisted Hamas[238] and so can implement development projects in municipalities it runs and engage with its mayors day-to-day without legal implications. For example, UNRWA, which operates as a quasi-governmental welfare agency in the occupied territories, has built a school for Deir al Balah on the rubble of the adjoining settlement of Kfar Darom.[239] Although local mayors took credit, the UN was in charge and, unlike the Municipal Development Fund, assumed responsibility for both contracting and project oversight, relegating Hamas mayors to advisory roles. Projects continue in Hamas localities – not least construction of a 57-bed hospital in Qalqilya – but the mayors are not running the show.

While the UN operates as a virtual multilateral interface in Hamas localities, NGOs have been more nervous about continuing activities. Subject to anti-terrorism legislation of both their home states and donor countries, they have been further hindered by the reluctance of EU donors to define clearly what is permissible. A UK-based NGO using European Commission humanitarian funds to develop local councils waited in vain for instructions on whether Hamas-run municipalities were deemed terrorist organisations.[240] "In the future I probably will implement projects with local NGOs rather than the local council", its program director in Jerusalem said, "even though the

---

[231] Diplomats and PA officials justified this change of direction on the basis of the Paris Declaration on Aid Effectiveness, 2 March 2005, which defined best practice as strengthening government capacity. Crisis Group interviews, EU and PA officials, Jerusalem and Ramallah, December 2005.
[232] Crisis Group interview, senior PA planning ministry official, Ramallah, November 2005. A diplomat from an EU member state supporting the Municipal Fund said: "There can be no investment in any municipality run by Hamas in our reading of the law. If it's in Qalqilya it will not happen. We are a country which is governed by statutory law par excellence", Crisis Group interview, Ramallah, January 2006.
[233] Crisis Group interview, Khalid Qawasmi, PA local government minister, Ramallah, November 2005.
[234] Ibid. "The Bethlehem governor not the mayor is now signing agreements with the Germans and the Italians", said Khalid Shokeh, a Fatah councillor in Bethlehem. Crisis Group interview, Bethlehem, November 2005.
[235] Crisis Group interview, senior UN official, Jerusalem, January 2006. Donor disbursements to the UN in the Palestinian territories were $476.8 million in 2005, against $353 million for the PA. IMF, Report to the AHLC, London, December 2005; UNSCO, based on Quartet Special Envoy's aid flow funding estimates for 2005. UN agencies appealed for more in 2006. UN officials said the UN Relief and Works Agency for Palestine Refugees in the Near East (UNRWA) alone applied for a 30 percent rise and petitioned the Quartet's special envoy for nearly half of the $3 billion reconstruction funds proposed for 2005. Crisis Group interview, UN official, Jerusalem, November 2005.

[236] Crisis Group interviews, European and UN diplomats, Jerusalem, January 2006.
[237] Crisis Group Email exchange with European diplomat, September 2005.
[238] "The ban on Hamas does not apply to the UN", Crisis Group interview, UN official, Jerusalem, November 2005. The UN blacklist applies to associates of Taliban and al-Qaeda operatives. www.un.org/Docs/sc/committees/1267/1267ListEng.htm.
[239] Crisis Group interview, Ahmad Kurd, mayor, Deir al-Balah, December 2005.
[240] "I want it in writing that we agreed that when I work in a Hamas-run village the money is not going to a terrorist organisation, but we haven't had any instructions", Crisis Group interview, the NGO program coordinator in the West Bank, Jerusalem, January 2006. EU country aid missions in Jerusalem told Crisis Group that pending clarification from Brussels they were not instructing NGOs to withdraw from municipalities.

Case 1:05-cv-04622-DLI-RML   Document 267-13   Filed 03/22/12   Page 226 of 646 PageID #: 6904

*Enter Hamas: The Challenges of Political Integration*
*Crisis Group Middle East Report N°49, 18 January 2006*                                                    *Page 28*

Hamas councils seem more efficient and responsive".[241] For different reasons and under different rules, EU donor activity thus increasingly mirrors that of USAID – operating through NGOs and independently of the local authorities. The result is increasingly bitter rivalry between relatively well endowed NGOs and cash-starved municipalities.[242]

## C.   CONTACTS WITH HAMAS OFFICIALS

Although official policy, the U.S. and EU bans on political contacts with Hamas have been anything but consistent. In November 2004, the EU's senior foreign policy official, Javier Solana, acknowledged he had "had direct contacts with Hamas, but not in the last few days".[243] And as late as February 2005 – more than a year after the EU designated Hamas's political wing a terrorist organisation – UK Foreign Secretary Jack Straw "authorised low-profile working level contacts…with Hamas politicians not directly implicated in violence".[244] British consular officers met incoming Hamas mayors from Deir al-Balah and Qalqilya, in "courtesy calls".[245] Other EU diplomats did the same, with Israeli officials repeatedly complaining that EU ambassadors met Hamas mayors.[246] Though there is no report of direct contact between U.S. officials and Hamas, the White House spokesperson differentiated between armed Islamist militants and their comrades who are elected local politicians:

> You saw that there may have been people elected that may have been members of Hamas, but they weren't terrorists. They were people who advocated the importance of improving the quality of life for

people in the region, people in the Territories. And they were business people, they're professionals.[247]

In an attempt to establish guidelines, EU consular staff in Jerusalem prepared a private working document in May 2005 pursuant to which low-level "technical" as opposed to political contacts could continue, specifically on development issues.[248] But the document was never formally approved, and instead of providing clarity left diplomats moving in inconsistent, uncoordinated directions. Interpretations of Brussels' orders provided to Crisis Group ranged from "any contact with Hamas personnel is statutorily prohibited and applies to all member states",[249] to "there is no paper stating I should not meet with Hamas".[250] Two European diplomats told Crisis Group they had engaged in more than purely technical talks with Hamas members.[251]

Arguably the most effective curb on contacts with Islamists is fear of public exposure. In mid-2005, a picture was published of a Dutch diplomat meeting with an Islamic Jihad member,[252] and a BBC correspondent surprised a UK diplomat emerging from the mayor of Qalqilya's office. Faced with criticism, particularly in Israel, Solana's office retracted his earlier statements, denying direct meetings with Hamas.[253] Straw's similar acknowledgment of meetings also triggered protests, made louder by the subsequent mortar attack from the Gaza Strip that killed two Israelis. Concerned that the issue might cloud a June 2005 visit by Straw to Israel on the eve of the British EU presidency, the Foreign Office declared suspension of all Hamas contacts, including with elected officials. Elsewhere, pressure from parliaments, lobbyists,

[241] Crisis Group interview, aid worker, Jerusalem, January 2006.

[242] Hamas councillors in Bethlehem spoke bitterly of USAID's sponsorship of an NGO to run a local bazaar. Crisis Group interview, Hasan Safi, Bethlehem, November 2005.

[243] "I have had contact with Hamas but not in the last few days. Those meetings were not long. They were just to pass a clear message of what the international community wants." "EU denies secret talks with Hamas", BBC News Online, 25 November 2004.

[244] Parliamentary statement by foreign affairs minister Kim Howells, 13 June 2005, at http://www.parliament.the-stationery-office.co.uk/pa/cm200506/cmhansrd/cm050613/text/50613w36.htm.

[245] Crisis Group interview, EU diplomat, Jerusalem, November 2005. Following the broadcast of a BBC correspondent's encounter with British diplomats exiting the house of a Hamas politician, Straw stated that "in the occupied territories it is *de rigeur*, it is required, that if a diplomat of whatever level goes into a town they go and talk to the mayor". Today Programme, BBC Radio 4, 7 June 2005

[246] Crisis Group interview, Israeli diplomat, Washington, January 2006.

[247] Presidential spokesman Scott McClellan responding to a question about whether Hizbollah was changing its relationship with the U.S., White House Press briefing, 15 March 2005.

[248] Crisis Group interviews, EU diplomats, Jerusalem, November 2005. EU officials in Brussels confirmed that "EU staff on the ground have technical level contacts only where necessary with Hamas-affiliated officials/administrators to implement Commission projects", Crisis Group interview, December 2005.

[249] Crisis Group interview, EU Council and Commission officials, Brussels, and diplomat, Jerusalem, December 2005. The latter argued that since the ban was agreed by consensus at the Council, it was legally binding on all member states. Traditionally the UK, the Netherlands and Germany have been more favourable to the ban, and Belgium and France less so.

[250] Crisis Group interviews, EU diplomats, Jerusalem, January 2006. One argued that meetings with Hamas mayors were allowed if they were not at head-of-mission level; another said the ban applied to political secretaries, not aid officials.

[251] Crisis Group interviews, Jerusalem, December 2005.

[252] Conal Urquhart, "Israel attacks EU over meetings with Hamas officials", *The Guardian*, 17 June 2005.

[253] "EU denies secret talks with Hamas", BBC News Online, 25 November 2004.

and media undoubtedly has inhibited officials.[254] Mid-ranking envoys contend their superiors prefer verbal to written approvals of meetings, for fear of leaving a paper trail.[255]

Overall, the EU and U.S. have yet to devise consistent, transparent and effective policies on meetings with Hamas members or officials. Eager for information and dependent on local contacts, their officials find ways around the formal ban. EU diplomats in Jerusalem admit they have developed procedures for respecting it in form, not spirit. Contacts are established through meetings at homes of third parties, "chance meetings" in large crowds and at informal Palestinian assemblies (*diwan*s), or through intermediaries such as diplomats representing states with no blacklist.[256] The dominant perception within Hamas is that not only the EU but also the U.S. seeks ways to communicate. In interviews with Crisis Group, its leaders claimed regular meetings with Europeans. "All the EU officials we met say the ban is a mistake. We met very high officials – the highest EU officials – but they asked us not to name names".[257] U.S. officials, they strongly suggested, also visit.[258]

Meetings with ex-government officials and academics, even though without official sanction, are seen (and often misconstrued) by Hamas as indirect contacts, convinced as they are that participants must have at a green light from their capitals and report back.[259] The extent of such contacts has grown sufficiently widespread to irk PA officials, who say "the boycott of Hamas is a lie delivered for public relations purposes. The international community is dealing with Hamas on a daily basis, through international organisations like UNDP, journalists, intelligence agencies, in conferences and in Beirut".[260]

## D. HAMAS, NATIONAL ELECTIONS AND NATIONAL POWER

Hamas's entry into national politics has presented the U.S. and EU with a dilemma. Formally opposed to participation by an armed organisation, let alone a terrorist one, they could hardly applaud the step but eager to support the democratic process, they were reluctant to condemn it. Instead, with some logical contortions, they objected that "there is no place in the political process for groups or individuals who refuse to renounce terror and violence, recognise Israel's right to exist, and disarm", while adding that "democratic elections can be the prelude to laws and policies...excluding the advocates of terror and violence".[261] In other words, Hamas in principle should not compete in elections until it disarms, but participation in elections ultimately will lead it to disarm. The view was endorsed by the Quartet in New York in September 2005.[262]

The U.S. position appears to have come together during Abbas's October 2005 visit to Washington, when he explained he could do nothing before bringing the Islamists in, but then he could subject them to legal decommissioning requirements. As noted, Secretary Rice was said to be particularly taken by the prospect of Islamists being fairly defeated at the polls.[263] Officials briefed journalists that the U.S. was "not going to write election laws for the Palestinians".[264] Thereafter Washington and Brussels pushed back Israel's threats to derail the elections if Hamas took part[265] and funded the election process, including the Palestinian Central Elections Commission and preparations for the dispatch of international monitors. Regardless of their views on Hamas, "as long as elections are free and fair, the U.S. will recognise the result", a State Department official

---

[254] Crisis Group interviews, diplomats, Jerusalem, December 2005.
[255] Crisis Group interview, EU aid official, Jerusalem, December 2005.
[256] Egypt's military intelligence presence in Gaza, expanded in spring 2005, has assumed the role of a pro-active intermediary between Western security officials and armed factions, including Hamas. Norway, the key mediator in the Oslo process, has also continued as a go-between.
[257] Crisis Group interview, Muhammad Ghazal, Hamas leader, Nablus, September 2005.
[258] Crisis Group, Hamas official, Ramallah, July 2005.
[259] Of these, the most interesting and significant are organised by Alistair Crooke, Solana's former security adviser and a broker of the 2003 truce. As UK Director of an NGO, Conflicts Forum, he has set up meetings between former U.S. officials, and other experts, with both Hamas and Hizbollah representatives. Stephen Grey, "Ex-MI6 man starts U.S.-Hamas talks", *The Sunday Times*, 27 March 2005. Crisis Group interview, Alistair Crooke, Amman, October 2005.
[260] Crisis Group interview, senior PA interior ministry official, Gaza City, November 2005.

[261] Statement by U.S. Secretary of State Condoleezza Rice, 11 January 2006.
[262] Press conference following the Quartet meeting in New York on 20 September 2005 attended by UN Secretary-General Kofi Annan, U.S. Secretary of State Condoleezza Rice, UK Foreign Secretary Jack Straw, Russian Foreign Minister Sergei Lavrov, EU High Representative Javier Solana, and EU Commissioner Benita Ferrero-Waldner. Rice expressed "hope that the elections can go forward and that everyone will cooperate...because elections are fundamental to the continued evolution of the Palestinian process. That said...ultimately there is a fundamental contradiction between armed activities and the political process".
[263] Crisis Group interview, U.S. official, Washington, October 2005.
[264] Glenn Kessler, "Palestinian leader is urged to confront militant groups", *The Washington Post*, 21 October 2005.
[265] A senior EU official described Israeli election interference as "unhelpful", Crisis Group interview, Brussels, October 2005.

Case 1:05-cv-04622-DLI-RML   Document 267-13   Filed 03/22/12   Page 228 of 646 PageID #: 6906

*Enter Hamas: The Challenges of Political Integration*
*Crisis Group Middle East Report N°49, 18 January 2006*                                                                 *Page 30*

said.[266] Washington insisted the elections be held despite disarray in the occupied territories and Sharon's incapacitating stroke and that Israel accommodate Palestinian voting in East Jerusalem.

This position did not come without resistance and second thought. When Hamas's electoral participation was first broached, the priority was to secure a ceasefire and neither Washington nor Brussels sought to pressure Abbas to impose conditions. At the time most observers believed Hamas could win no more than 45 to 50 of the 132 seats.[267] As the elections came closer and Hamas's support appeared greater, Israel announced it would thwart elections if Hamas took part, and even left-wing Israeli politicians urged the EU and U.S. to follow suit. Influential lobby groups in the U.S. pressed the administration to oppose Hamas participation and support Israeli counter-measures on the ground that "no country can be asked to hand power to those dedicated to its destruction".[268] Some officials began to waver in private and the House of Representatives passed a resolution threatening to cut U.S. aid if the PA did not comply.[269] USAID sought to distance itself from any accusation of working with Hamas: its governance program offered campaign and fund-raising training to "modern, democratic parties", but not Hamas,[270] while grantees producing election programming for private TV were advised not to interview Hamas candidates.[271]

Some EU officials also expressed growing concern, regretting not having sought Hamas concessions in exchange for electoral participation and wondering whether it was too late to do so.[272] In its first statement after the December 2005 municipal elections which saw massive Hamas gains, the Quartet strongly urged all parties to sign a Palestinian Code of Conduct for the elections formulated by a local NGO and called on the PA to enforce the clauses that concerned Hamas the most: strict limitations on external campaign financing and a prohibition on using religious facilities for campaign purposes. It also called on participants to recognise Israel and disarm, but muddied the waters by alternately using the terms "ultimately" and "immediate".[273]

On some practical aspects, the Europeans showed greater flexibility. After much debate, the European Council allowed election observers to meet Islamist candidates,[274] a decision that an Israeli foreign ministry document, leaked to the press, claimed violated international law,[275] but the EU stood firm.

In the end all – the U.S. included – concluded that to set conditions on Hamas's electoral participation after Abbas and Hamas had reached agreement and Hamas's role was official, would be seen as an attempt to thwart democracy and could jeopardise the ceasefire. In Washington, other considerations were at play, and led to the odd spectacle of a U.S. administration implicitly siding with Hamas and pushing for elections that neither Israel nor the PA truly wanted at the time. Most important was the conviction that nothing would improve with delay; indeed, in response to myriad U.S. requests over months to act against Hamas, Abbas had repeatedly replied that he could only act after the elections and after the PLC passed laws curbing Islamist military autonomy. "The Palestinians are caught in a trap of their own making. Having held so much

---

[266] Crisis Group interview, State Department official, Jerusalem, December 2005.

[267] Ibid.

[268] Crisis Group interviews, Washington, September 2005.

[269] In December, the House of Representatives voted 397 to 17 to demand the PA begin efforts to dismantle Hamas before elections and threatened to freeze aid if Hamas was integrated into "the governing structure". House Resolution 575 http://thomas.loc.gov/cgi-bin. U.S. officials said the wording of the resolution was vague and its reach limited since USAID did not finance the PA without presidential orders. Crisis Group interview, U.S. official, Jerusalem, December 2005.

[270] "Legally we can do nothing to benefit Hamas: no training in our campaign schools, no advice, and no per diem payments", Crisis Group interview, USAID implementing partner, Jerusalem, December 2005.

[271] Crisis Group interview, NGO program officer, Jerusalem, December 2005.

[272] An EU official argued that all candidates and parties – Hamas included – should be required to sign a pledge that, if elected, they would abide by all PA laws, the notion being that legislation concerning non-display of weapons or other types of decommissioning would be binding on the Islamists. Crisis Group interview, Brussels, October 2005.

[273] "Quartet Statement on Palestinian Legislative Council Elections", 28 December 2005: "The Quartet…calls on the Palestinian Authority to take immediate steps to…dismantle the infrastructure of terrorism" and "recalled…that ultimately those who want to be part of the political process should not engage in armed group or militia activities". Hamas became the last party to endorse the Code, on 5 January 2006.

[274] Council statement of 21 November 2005, Brussels. France and the Netherlands strongly supported the decision. The UK, in the presidency, and members such as Italy and the Czech Republic opposed. Crisis Group interviews, EU officials, Brussels, December 2005. EU diplomats in Tel Aviv and Jerusalem hailed the decision as the first step in lifting the ban on the movement's political wing. Crisis Group interview, EU official, Tel Aviv, 3 December 2005. Dialogue was limited to "technical issues". The EU election observers are Commission and Council civil servants, member state experts, European NGO representatives, participants in EU Human Rights and Elections training programs and EU election specialists. The head of mission is Veronique de Keyser, a Belgian member of the European Parliament.

[275] Yoav Stern, "Foreign ministry slams EU talks with Hizbollah, Hamas", *Haaretz*, 12 December 2005. The report was published on the eve of Solana's visit to Tel Aviv.

*Enter Hamas: The Challenges of Political Integration*
*Crisis Group Middle East Report N°49, 18 January 2006*                    *Page 31*

Case 1:05-cv-04622-DLI-RML   Document 267-13   Filed 03/22/12   Page 229 of 646 PageID #: 6907

hostage to the elections, they are in no position to argue for its delay"[276] – though how Abbas will be strengthened if Hamas becomes a power in the parliament is another matter.

Instead, the EU, U.S. and their Quartet partners turned to the post-elections reality. The Quartet laid out its terms: no cabinet participation for any "member who has not committed to the principles of Israel's right to exist in peace and security and an unequivocal end to violence and terrorism".[277] The Lebanon precedent suggests how the EU and U.S. might react if Hamas joins the government: though Washington declined to follow the EU ambassador in Beirut's lead in meeting Hizbollah's cabinet minister, Muhammad Fneish, U.S. officials continue to see officials in his ministry.[278] But the main Western leverage, again, is money. In Tel Aviv, Javier Solana warned that the EU might "think twice about… committing their taxpayers' money if members of the elected Palestinian leadership do not renounce violence and recognise Israel".[279]

This is no empty threat. The EU gives $280 million annually to the Palestinian territories – twice as much counting member state contributions.[280] Much goes to ministries Hamas might control if it enters government.[281] In 2005, donors contributed some $270 million, equivalent to the salaries of 45,000 PA employees, in direct subsidies for the Authority's running costs and financed virtually all development costs. Pointedly, they delayed the pledging conference for Gaza reconstruction well beyond elections, giving them additional leverage over the cabinet. "Donors are waiting to see if things stabilise after the elections. Why pour extra money in if it's all going to go pear-shape?", said World Bank consultant Salah Abdel Shafi.[282] The postponement, plus significant aid cut backs due to PA budgetary mismanagement, paves the way for more disengagement if Hamas join the government or even win the elections.[283]

U.S. reaction is likely to be at least as severe. As seen, Congress already has threatened an aid cut-off, and the administration will be hard pressed to justify continued funding if Hamas joins the PA. USAID's implementing partners have been told that restrictions on contacts with Hamas will continue. The consulting firm, Development Alternatives, Inc. (DAI), which has a $6 million USAID contract to train new parliamentarians in "a multi-party environment", said it would be unable to work with Hamas deputies. Those who might seek to attend its New Members Orientation Program, including a guided tour of the PLC, would be asked to leave.[284]

### E.   ASSESSING EU AND U.S. POLICIES

Europe and the U.S. are groping for ways to deal with militant Islamist groups while simultaneously promoting a credible democratisation agenda. In Lebanon as in Palestine, some critics of Western policy point to apparent contradictions and inconsistencies: how, they ask, can one claim to promote pluralism while shunning or even banning groups – Hizbollah, Hamas – with wide popular support? Other critics question how one can both claim to be uncompromising on terrorism, while either dealing with a government that includes a terrorist organisation (Lebanon) or pressing for elections that include a terrorist group (Palestine).

While these dilemmas are worthy of attention, neither should be viewed essentially as a matter of principle. Even well-established democracies have been known to ban

---

[276] Crisis Group interview, U.S. official, Washington, 10 January 2006.
[277] "Quartet Statement on Palestinian Legislative Council Elections", 28 December 2005.
[278] In Lebanon U.S. officials told Crisis Group they would not meet with Fneish, even though USAID runs a major support program at the ministry of electricity, but acknowledged they would deal with ministry officials at director-general level. In South Lebanon USAID supports municipalities run by Hizbollah members. Crisis Group interviews, U.S. officials, Beirut, June-July 2005. About this discrepancy, a U.S. official said, "Israel is a bit more high profile than south Lebanon", Crisis Group interview, January 2006.
[279] For Solana's statement see http://ue.eu.int/ueDocs/cms_Data/docs/pressdata/EN/declarations/87668.pdf.
[280] Crisis Group interview, EU aid official, Jerusalem, December 2005.
[281] For example, "if the international community cuts health ministry funds it would be disastrous. Financially we could not have a health sector". Crisis Group interview, PA planning ministry official, Ramallah, November 2005. That said, wholly withholding EU aid would not be easy. EU officials told Crisis Group the Council of Ministers would be unlikely to reach consensus for a full suspension, and punitive measures might be limited to suspension of development aid, such as the €12 million program for institution-building, or a share of the €70 million budgetary support, and a return to emergency aid, where conditions on the affiliation of recipients are less rigid.

[282] Crisis Group interview, Salah Abdel Shafi, World Bank consultant, Gaza City, November 2005.
[283] Ironically, the donors' reduction in assistance risks being self-defeating. A cash-strapped PA cannot pay its security forces, thereby furthering unrest and undermining Fatah credibility. Crisis Group interview, international development official, Jerusalem, January 2006.
[284] "The USAID's legal department considered it would be material assistance to terrorism to print and distribute 132 manuals, since Hamas delegates might be among recipients", Crisis Group interview, DAI project manager, Ramallah, December 2005. The officer conceded that the Speaker's office might be able to distribute copies.

Case 1:05-cv-04622-DLI-RML   Document 267-13   Filed 03/22/12   Page 230 of 646 PageID #: 6908

*Enter Hamas: The Challenges of Political Integration*
*Crisis Group Middle East Report N°49, 18 January 2006*                                                    *Page 32*

parties whose views are deemed incompatible with basic democratic values; nothing requires legalisation of a party operating partly as an armed militia. Certainly, nothing requires either the EU or the U.S. to be even-handed in dispensing political or material support to parties, regardless of orientation or inclination toward violence. Likewise, a policy of integrating paramilitary organisations is consistent with a counter-terrorism policy if, by incorporation, the appeal of violence can be mitigated.

The question, rather, is practical: whether the policies have promoted U.S. and EU interests. In this respect, their approaches toward Hamas have fallen short. While there is every reason for the West to withhold official, formal dealings with the Islamist organisation at a national level, at least until it renounces attacks against civilians and embraces a two-state solution, the more sweeping boycott and the absence of a clear path toward Hamas's international legitimisation have proved self-defeating on more than one count:

❑ *Strengthening Hamas.* The shift of donor funding away from municipalities to national and international agencies has exacerbated fiscal shortfalls in Hamas-run municipalities, restrained their local clout, and punctured many of their pre-election promises. But if the boycott was intended to stem support for Hamas, as there is every indication it was, it has failed. Hamas has gone from strength to strength. According to the head of a Palestinian NGO in Bethlehem, "donors clearly are sending the message that if you want our money, vote for Fatah",[285] yet voters did not oblige. A Christian voter in Bethlehem said: "I'm angry with the donors. All their sanctions are doing is weakening the population, not Hamas".[286] In the last municipal election, Hamas candidates sought to use the donor boycott as a scapegoat to hide internal deficiencies and to portray itself as the victim of foreign blackmail. "The aid boycott is good for us", proclaimed the acting mayor of Qalqilya, "because though America says it has declared war on terrorism, we say it is a war against Muslims".[287] Others warned voters not to let foreigners buy their votes and said donor aid would continue regardless.[288] In the words of

Hamas leader Hasan Yousif, "donors have to respect the democratic choice of Palestinian people".[289]

❑ *Estranging Palestinians from Western donors.* As the municipalities controlled by Hamas increase, the arena in which Western governments can initiate new projects diminishes. Donors find themselves operating at several removes from recipients, or via remote control. Their distance from grassroots politics repeats the mistakes of the Oslo peace process – which despite copious international aid failed to win durable support on the ground. Without more popular buy-in, the latest attempt at reconstruction could suffer a similar fate. In the words of a U.S. official, "we know the restrictions are harming our ability to reach the people. We fear we're losing 70 per cent of the people".[290] Or as an EU aid official put it: "How can I convince Palestinian municipalities, if I can't talk to them?"[291] The desperate need for jobs is likely to limit a campaign to hinder Western aid projects. Hamas's own election manifesto states: "Yes to Palestinian, Arab and international investment".[292] But disengagement can be mutual. The shunning of Hamas and the undisguised politicisation of aid could complicate reconstruction and strengthen Hamas's drive to reduce donor dependency. In the wake of their retreat, Crisis Group detected the first stirrings of hostility towards donors. Rather than plead for support, the Mufti of Qalqilya, Sheikh Saleh Sabri called on councillors to boycott projects with strings attached.[293]

❑ *Stoking inter-Palestinian tensions.* Suspension of municipal aid has sparked a tussle for funds

us after seeing where their funds went [under Fatah]". Crisis Group visit to El Bireh, 15 December 2005.

[289] Crisis Group interview, Hasan Yousif, Hamas leader, Ramallah, August 2005.

[290] Crisis Group interview, U.S. official, Tel Aviv, September 2005.

[291] Crisis Group interview, EU aid official, Jerusalem, December 2005.

[292] Hamas's manifesto, posted in Arabic on the Central Elections Commission website, http://www.elections.ps/atemplate.aspx?id=353, also calls on the EU to be more active in Palestinian and Middle Eastern affairs.

[293] "We say that if projects funded by EU or U.S. donors have political strings attached, then they are not in the public interest. They are in the interest of other forces and this is unacceptable". The council should also oppose the opening of a U.S. or UK cultural centre in Qalqilya as "incompatible with our culture. We don't want people to become excited by the presence of such centres, because then they might be tempted to destroy them". Crisis Group interview, Sheikh Salih Sabri, Mufti, Qalqilya, September 2005.

[285] Crisis Group interview, Omar Jabir, aid worker from al-Khadr, Bethlehem, November 2005.

[286] Crisis Group interview, Carole Dabdoub, Bethlehem, November 2005.

[287] He also claimed USAID officials had steered wide of the council on three post-election visits to the municipality, Crisis Group interview, Hashim Masri, Qalqilya, 7 September 2005.

[288] In December 2005, Hamas won the elections in el-Bireh, after its local leader, Sheikh Jamal al-Taweel, campaigned with the promise that foreign donors would "deposit their funds with

Case 1:05-cv-04622-DLI-RML   Document 267-13   Filed 03/22/12   Page 231 of 646 PageID #: 6909

*Enter Hamas: The Challenges of Political Integration*
*Crisis Group Middle East Report N°49, 18 January 2006*                                                   *Page 33*

between central and local government that could become increasingly partisan. With Fatah politicians and mainly secular NGOs getting money and Hamas representing Palestine's most deprived, one aid official feared donors were unwittingly "stoking local animosities and rivalries".[294] Given the deterioration of law and order across the territories, and several hostage-takings in Gaza directed at foreigners, a USAID partner warned: "If USAID is seen as partisan, it will soon get very dangerous".[295]

❑   *Jeopardising project sustainability.* The transfer of responsibility for municipal development to unelected national and international bureaucrats has sparked donor concern about project sustainability and over-politicisation of aid at the expense of sound development policy. "If municipalities feel they have no ownership of these projects and we lose the capacity-building capabilities of the municipality, who is going to ensure their maintenance?" asked an EU aid official in Jerusalem. "The municipalities were more motivated contractors, and had to ensure delivery because they are elected and accountable".[296]

❑   *Reducing accountability.* While there is ground for concern, EU and Israeli officials to date have been unable to substantiate suspicions Hamas municipalities are diverting revenue to fund the organisation or, worse, its military activities. Hamas councillors volunteered to open books to Crisis Group, while the World Bank confirmed Gaza Strip municipalities complied with requests to submit budgets for auditing.[297] International involvement in municipal funding, argued EU aid officials, could increase the level of scrutiny.[298] While the Municipal Development Fund will provide considerable oversight, the less the donor involvement, the greater the recourse Hamas might have to donors hostile to Western policy interests and the less the guarantee funds will not go astray.

❑   *Undercutting Western leverage.* The ban on contacts leaks, with Hamas interpreting non-official contacts as trial balloons. EU and U.S. officials should consider a more nuanced approach that allows clearly specified communications both on technical matters and to convey without the confusion of unofficial channels what conditions must be met for more meaningful meetings. Boycotting Hamas deprived them of the ability to bargain for concessions in exchange for supporting its participation in legislative elections. Instead, Hamas believes it is being courted by the West and benefits from the international community's position on elections without having to pay a price. The threat of halting all PA support if Hamas joins it makes little sense. If Hamas runs strongly, its participation in government may be inevitable, and may even be desirable if it can further constrain the movement's freedom of action. The threat in that situation ought to be to halt aid if it engages in violence rather than if it engages in politics. As a senior official in Brussels acknowledged, "ultimately it is nonsensical not to engage with Hamas".[299] The question is how and on what terms.

---

[294] Crisis Group interview, UN aid official, Gaza, November 2005.

[295] Crisis Group interview, U.S. aid worker, Ramallah, November 2005.

[296] Crisis Group interview, EU aid official, Jerusalem, December 2005.

[297] Crisis Group interview, Ibrahim Dajani, Jerusalem, December 2005.

[298] Crisis Group interview, EU aid official, Jerusalem, December 2005.

[299] Crisis Group interviews, EU officials, Brussels, December 2005.

Case 1:05-cv-04622-DLI-RML   Document 267-13   Filed 03/22/12   Page 232 of 646 PageID #: 6910

*Enter Hamas: The Challenges of Political Integration*
*Crisis Group Middle East Report N°49, 18 January 2006*                                    *Page 34*

## VI.  CHARTING A NEW PATH

In its January 2004 report on Hamas, Crisis Group assessed that with a weakening and increasingly fragmented PA, diminishing interest in negotiations among Israelis, and the U.S. disinclined to invest heavily in diplomacy, "prospects for any immediate breakthrough in the peace process are dim".[300] The most that could be expected was cessation of hostilities, checks on the damage Israeli settlement activity was inflicting on prospects of a two-state settlement, "and the initiation of steps to rebuild a coherent, cohesive Palestinian polity that is able to act decisively".[301] Though in many ways circumstances have dramatically changed, that diagnosis appears even more valid today.

The approaching elections should be seized as another opportunity to test Hamas's willingness to join the political process and Abbas's gambit that integration will moderate its behaviour, putting it on a path trodden by other armed movements that transformed themselves into political actors, including the IRA and, indeed, not long ago, the PLO itself.

### A.  NEGOTIATING A COMPREHENSIVE CEASEFIRE

As two years ago, little can be sustained without a renewed, reciprocal, ceasefire. So far, omens are not promising. Even before the expiry of the unilateral *tahdi'a* on 31 December 2005, Hamas leaders were trumpeting their return to battle, claiming Israeli military actions had made a mockery of the concept of quiet,[302] though indicating that for practical reasons they would hold their fire until after Palestinian elections. Dependent on Israeli conduct – and, so far, Israel has rejected the concept of a reciprocal cessation of hostilities with militant groups – the ceasefire also hinged on PA adherence to its electoral commitments. "We have led everyone in the uprising before", warned Ghazal. "Without elections, we are able to lead everyone again with our tactics and decide the rules of the game".[303] As the scheduled election date neared, Mahmoud Zahar issued a direct challenge to the PA, based on recent upheavals in Ukraine and Georgia, which, however, left the door open to violence:

We believe in elections, but if the PA postpones elections, they will face the people. The Israelis faced the Palestinian people, and if the Palestinian regime continues violating rights, do you think it is only Hamas that will not accept? It will be the people who will not accept. There will be a broad opposition front, and we will have major partners in Fatah who will also confront the PA.[304]

Conversely, Hamas responded to President Abbas's renewed commitment to January 2006 elections by proposing extension of the *tahdi'a*. In a telephone interview from his Negev Desert jail, Sheikh Muhammad Jamal Natsheh of the political leadership and a candidate, said Hamas "is seriously considering renewing the calm through national consensus if this proves to be in the interest of the Palestinian people".[305] An Egyptian diplomat who maintains contact with all parties in the Gaza Strip estimates Hamas is even today ready to accept an indefinite ceasefire.[306] And Ghazal told Crisis Group shortly before his detention by Israel, "Hamas has again offered a truce: Israel has a chance. We know they will not use it. But we are ready to have a truce for a very long time, and make peace".[307]

Third parties should redouble efforts first to renew the *tahdi'a* for six months, then use it as a springboard to broker more comprehensive, separate ceasefire understandings with Israel, the PA and the Palestinian factions, including a monitoring role for the Quartet. The appointment of an EU security envoy to the Middle East, with authority to resume contacts with Hamas within the limited terms of reference of his mandate, could further encourage the Islamists to respond positively. It is worth noting that Egypt's preparedness to negotiate seriously with Hamas and its implicit recognition of the movement contributed significantly to its receptivity to the Cairo Declaration.

Israel should respond to any extension of the current lull by engaging positively with third parties to achieve a comprehensive, more durable ceasefire. On the assumption the Palestinian movements abide by the *tahdi'a*, Israel will need to fortify it with reciprocal measures, particularly an assassination moratorium.[308] Similarly, it should signal

---

[300] Crisis Group Report, *Dealing with Hamas*, op. cit., p. 29.
[301] Ibid.
[302] Thus, Hamas politburo head Khalid Mashal at a 12 December 2005 rally in Damascus: "I say it loudly, we will not enter a new truce and our people are preparing for a new round of conflict", Palestine Media Center, www.palestine-pmc.com/ details.asp?cat=1&id=1057.
[303] Crisis Group interview, Ghazal, Nablus, September 2005.

[304] Crisis Group interview, Gaza, November 2005. In the words of a Palestinian presidential adviser, "Whoever delays the elections will face the wrath of Hamas". Crisis Group interview, Jerusalem, December 2005.
[305] *Al-Quds*, 10 January 2006.
[306] Crisis Group interview, Egyptian diplomat, Gaza City, December 2005.
[307] Crisis Group interview, Ghazal, Nablus, August 2005.
[308] Israel has in the past consistently stated that it will continue assassinations against "ticking bombs", but at times has stretched its definition of this term beyond recognition. Any

Case 1:05-cv-04622-DLI-RML   Document 267-13   Filed 03/22/12   Page 233 of 646 PageID #: 6911

*Enter Hamas: The Challenges of Political Integration*
*Crisis Group Middle East Report N°49, 18 January 2006*                    *Page 35*

readiness for a phased release of prisoners beginning with senior Hamas politicians such as Muhammad Abu Tair, Muhammad Ghazal, Sheikh Ahmad Haj Ali and Hasan Yousif, about whom no evidence of involvement in armed activities has been produced.[309] In the words of a former Israeli intelligence operative, "Consider various gestures, including releasing prisoners. We'll have to do things in measured fashion".[310] Prominent Palestinian commentator Hani Masri, one of the first Palestinians publicly to condemn Hamas's indiscriminate attacks against Israeli civilian targets, echoed this:

> Israel must show it is really interested in seeing Hamas continue the *tahdi'a*, and if it does you will see a fundamental change in Hamas, because Hamas is now salivating at the cusp of power, and understands that if it does not now reap what it has sown, it might never be able to harvest.[311]

More broadly, the severity of Israel's occupation practices inevitably will continue to determine the success of the ceasefire. For Palestinians, the West Bank remains an active battlefield, subject to continued Israeli confiscation of land, settlement building, and imposition of a military obstacle course frustrating free passage and imposing daily humiliation. These remain powerful justifications as well as ready-made pretexts for violence. A more active U.S. role to persuade Israel to take the necessary steps also would be critical.

## B.   INVOLVING HAMAS IN DAY-TO-DAY GOVERNANCE

What role Hamas intends to play in the PLC and, perhaps, the PA, is the subject of intense speculation. Repeatedly, Islamist leaders emphasise that their priority is to tend to socio-economic matters and political-administrative reform. While some read this as an attempt to disguise real intentions, there is reason to take it seriously. Senior figures insist that in contrast to the 1990s, the domestic agenda dominates and will continue to do so during the next parliament. In its successful municipal campaign, Hamas plastered posters across Nablus with a cartoon of one hand kissing the other up the chain-of-command – a

reference to the graft and sycophancy that in popular belief oils the wheels of Palestinian bureaucracy. Beneath the pile of hands was the caption, "When Will This Stop?" Mention of occupation, the siege and the separation barrier were virtually nowhere to be found. According to Sheikh Ahmad Haj Ali, a founding member of the Muslim Brotherhood in Palestine and Hamas PLC candidate:

> Our priority is to solve the internal situation before the confrontation with Israel. Hamas's aim is governance. Our objective is to resolve people's problems and you can only do this through the institutions of government. My interest based on Islam is the interest of my society. If we enter the PLC as a minority, we will act as monitors over the performance of the ministers regardless of their affiliation. We must escape the hall of mirrors. We see criticism of malpractice as a moral duty.[312]

Islamist leaders often reserve their harshest words for the PA, which they accuse of debasing society with a mixture of immobility, incompetence, and moral as well as material corruption, in the process reducing its capacity to resist Israeli expansion.[313] They compare their entry into parliament to that of a powerful broom in a badly neglected attic. Because conflict resolution is in their view not on the horizon, they consider it only logical to adopt housecleaning as the immediate priority. Ghazi Hamad, editor of the Islamist weekly *Risala* and a Hamas PLC candidate, said: "Fatah forgot the internal situation. It was 80 per cent focussed on political negotiations, which turned out to be a waste of time, and forgot economic reform. Hamas wants to concentrate on the internal".[314] Moreover, the strong representation of women on its candidate list, further suggests the movement is not only a military wing in political clothing[315] but is reaching across social strata. According to Haj Ali, "Our priority is to give emergency treatment to the internal Palestinian situation. The conflict with Israel can be postponed for five to ten years".[316] Mohammed Ghazal, a Hamas West Bank leader and PLC candidate, was even more forthright:

---

such exceptions will need to be implemented in a way that discourages abuse, for example through coordination with U.S. military specialists.

[309] Egyptian diplomats have suggested the release of 100 prisoners per month would be required, Crisis Group interview, Gaza City, November 2005. There are 8,000 to 9,000 Palestinian prisoners in Israeli jails, some 1,800 from the Gaza Strip.

[310] Crisis Group interview, Ofer Dekel, former deputy head of Israeli internal intelligence, Herzliya, September 2005.

[311] Crisis Group interview, Hani Masri, Palestinian commentator, Nablus, September 2005.

[312] Crisis Group interview, Sheikh Ahmad Haj Ali, Muslim Brotherhood leader and Hamas PLC candidate, Nablus, July 2005.

[313] Crisis Group interview, Haj Ali, Nablus, July 2005; Ghazal, Nablus, September 2005; Zahar, Gaza City, November 2005.

[314] Crisis Group interview, Ghazi Hamad, Islamist newspaper editor, Gaza City, November 2005.

[315] Of the 62 Hamas candidates who will contest the seats allocated on the basis of national proportional representation, eleven are women, including three of the first twenty on the list. The motivation may also have been pragmatic: The Israeli army is less likely to detain women, who can represent the interests of their imprisoned husbands.

[316] Crisis Group interview, Haj Ali, Nablus, July 2005.

Case 1:05-cv-04622-DLI-RML    Document 267-13    Filed 03/22/12    Page 234 of 646 PageID #: 6912

*Enter Hamas: The Challenges of Political Integration*
*Crisis Group Middle East Report N°49, 18 January 2006*                                                                    *Page 36*

Choosing a political path rather than the path of armed conflict forces you to give more attention to domestic policies. If we decide to go through politics, then the internal becomes more important than the external. We will focus on improving social services, rather than on the 78 per cent of our land that the Palestinians agreed to forget.[317]

Within the PLC, supervision in the broadest sense appears to be Hamas's primary objective. This means not only agitating for removal of corrupt and unpopular officials and playing to the gallery, but also exercising a functional veto over the cabinet, its policies, and decisions, with particular emphasis on service ministries. Mahmoud Zahar said the Gaza evacuation made the need more pressing: "When we left the field to Fatah, everything was corrupted. So it is essential to have an alternative, and to rebuild the areas from which Israel withdrew".[318]

Hamas, if necessary in temporary coalitions with like-minded Fatah and other legislators, is expected to be in a position significantly to influence the legislative agenda, but seems to prefer not to command it:

> Hamas doesn't want to be in the driver's seat, but to be the backseat driver, and if necessary overrule those who rule. Hamas should never allow a situation where it is in the driver's seat. That would be suicide for Hamas. Even if it is the most popular party, it should never allow itself to be Number One, because the world will not accept it. Hamas needs a strong PA.[319]

Among Hamas leaders and officials Crisis Group interviewed, the dominant mood was pragmatism, suggesting it is unlikely they will seek to pass laws and promote policies that would face significant opposition. As Abbas reached out to Islamists because he could neither consolidate his rule nor pursue his agenda without them, so Hamas insists it has neither intention nor ability to replace Fatah's hegemony and aspires to share power, not monopolise it.[320] "Hamas is not against the PA, but the PA have monopolised politics, and made themselves the beneficiaries. Hamas wants to enter the PLC to get a share, and create a balance, and prevent corruption", said Hasan Safi, a Hamas activist in Bethlehem, echoing a refrain heard from Nablus to Rafah.[321] Responding to accusations that elections, integration, and power-sharing are Trojan Horses with which to transform and eventually dismantle the institutions they join, the Islamists retort that it is secular nationalists, with support of Israel and the West, who have stymied development of Palestinian democracy. Their role, they invariably add, has been to demand it.[322]

The selection of Ismail Haniyya, leader of Hamas's pragmatic camp, to head the Islamists' Reform and Change Bloc candidate list, is another suggestion gradualism is likely to dominate, even if Hamas wins 40 per cent or more of PLC seats. The movement during its first year probably would resist the attractions of ministerial responsibility but seek to elevate personalities who would be mindful of Hamas's interests while also acceptable to a wide range of local, regional and international players. In the meantime, it would function as a parliamentary party and on the basis of its experiences decide whether to seek cabinet posts, and if so which ones and in coalition with whom.[323]

---

[317] Crisis Group interview, Muhammad Ghazal, Nablus, August 2005.
[318] Crisis Group interview, Mahmoud Zahar, Gaza City, November 2005.
[319] Crisis Group interview, Khalid Amayreh, Palestinian journalist, Dura, Hebron, November 2005. Besides, "political responsibility is not what [Hamas] is after, at least for now…so long as Hamas is out of power, Palestinians will be grateful for every social service it brings them; once in power, Palestinians will resent them for every social service it does not provide". Agha and Malley, "The Lost Palestinians", op. cit. With the movement consistently outperforming pollsters' predictions in local elections, the likelihood its showing in legislative elections could justify or even require its participation in the next PA cabinet increased substantially. Khalil Shahin, *Al-Ayyam* newspaper correspondent, says that Hamas seems gripped by a mixture of euphoria about the possible outcome and fear that it might be realised. It is afraid of its electoral strength and doesn't want more than 40 per cent of the vote. Even then it would have a veto in parliament, which would mean one political crisis after another and could paralyse a political program it did not support. It would be able to block the political process and have a veto without the responsibility of government. Executive and legislative authority would be divided. Crisis Group interview, Ramallah, November 2005. Independent parliamentarian Ziad

Abu Amr, who is close to Abbas and has been involved in negotiations with Hamas over several years, remarked "I hope they join the executive. If they have only a parliamentary faction with veto power, they could hold the executive hostage". Crisis Group interview, Gaza City, November 2005.
[320] Crisis Group interviews, Haj Ali, July 2005; Ghazal, August 2005.
[321] Crisis Group interview, Hassan Safi, Bethlehem, November 2005.
[322] Crisis Group interviews, Haj Ali, July 2005; Ghazal, August 2005; Zahar, November 2005. "Fatah, the Israelis, and donors have to respect the democratic choice of the Palestinian people. We did not take control of municipalities through force or dictatorship but on basis of the conviction of people that we could best serve their interests, and with full transparency". Crisis Group interview, Hasan Yousif, Ramallah, August 2005.
[323] Crisis Group interview, Ghazi Hamad, editor of *Risala* Islamist newspaper and Reform and Change Bloc parliamentary candidate, Gaza City, November 2005. There is some reason to question whether Hamas's presumed gradualism would survive a strong parliamentary showing, based on precedent. Repeatedly in student and municipal elections, Hamas has forsaken an

The prospect of power may yet tempt Hamas further. As the election neared, members spoke openly of their readiness to enter government.[324] Senior Fatah cadres also evoked a possible post-election trade off under which Hamas would control social affairs ministries and Fatah would retain senior cabinet posts such as interior and foreign affairs.[325] Such an arrangement could help Hamas convince its core constituencies that it has not surrendered its principles and remains focused on the social agenda.

Without conferring immediate legitimacy on Hamas, engaging its national officials or removing it from the terrorism list,[326] the EU – which has more flexibility than the U.S. – should facilitate and even encourage the Islamists' integration. If the *tahdi'a* is renewed, it should seek both to strengthen Hamas's political component and demonstrate the benefits of political activism by resuming normal development and diplomatic contacts with local authorities, without political restrictions, and renewing funding through the Municipal Development Fund, subject to auditing that ensure this benefits only the intended recipients. If the PA offers the Islamists ministries, the EU should adopt a posture similar to that vis-à-vis the Lebanese government and refrain from its threatened financial boycott unless and until Hamas violates its truce.

Current policy has cost governments their ties to the grassroots and ability to retain the confidence of public opinion. Instead of encouraging Hamas's focus on day-to-day matters, increasing their own oversight of municipal spending priorities and ensuring that neither Hamas nor Fatah-run authorities divert funds to armed groups, most Western donors have retreated from the provinces to the central authority. In the wake of further Hamas gains, they threaten retreat further still, to partnering primarily with international agencies, and – particularly in the U.S.

case – selected Palestinian NGO and business sector counterparts. All this is plainly counter-productive.

For the time being Islamist leaders see an interest in working closely with Western powers. But a long-term boycott could further radicalise Hamas and push it to depend even more on sources of funding inimical to Western interests. Historically, the more isolated the movement has been, the more radical. As one prominent political activist in Gaza noted, "the Europeans should accept Hamas, because if isolated its members will react violently. Their popularity gives them confidence".[327]

## C.   ENCOURAGING ISLAMIST PRAGMATISM

There is no guarantee that an integration strategy will work; indeed, much in Hamas's history and present argues otherwise. But for now, there is no viable alternative, and every effort should be made to test it. That in turn entails several things: indications by Hamas that it is prepared to live by the rule of law, in particular respect for legislation passed by the new PLC; indications by the PA that the process is fair and transparent; and indications by the international community that political integration has clear rewards, and relapse – resumed armed attacks, particularly against civilians – has heavy costs. It would be unrealistic to expect a new international approach simply because Hamas has presented the *fait accompli* of institutional power. But any serious initiative by the movement, such as renewal of the *tahdi'a*, must be the catalyst for further action, not an excuse for renewed complacency.

Progress is likely to be most difficult on security. Although prominently mentioned in the Roadmap and insistently demanded by the U.S. and Israel, Hamas realistically will not be disarmed anytime soon; even amid its more pragmatic recent pronouncements, its leadership has made that clear. Deploying a range of arguments to defend keeping an autonomous military infrastructure, it points above all to the necessity of defence against Israeli attack. In meetings with Crisis Group, Hamas leaders consistently ruled discussion of demobilising the Qassam Brigades premature. "We don't provide free gifts. The PA offered everything to Israel and received nothing in return", stated Hasan Yousif.[328] Even in Gaza, "we cannot conclude they have left and will not come back".[329] Implicit is conviction that armed resistance – or at least its credible threat – is required to gain Palestinian self-determination.

---

alliance when it felt sufficiently confident to rule alone. In student elections in Nablus, it won 40 seats against Fatah's 34, allowing it to dispense with talks of unity and take control of the student council independently. Where it did share power, it chose partners – albeit secular ones – it could dominate. In the Bethlehem municipal elections, it won five seats, Fatah four, independents three, the PFLP two, and Islamic Jihad one. Hamas chose to form a coalition with the PFLP.

[324] Crisis Group interviews, Zahar, Gaza, October 2006; Bitawi, Nablus, January 2006.

[325] "Fatah will be the dominant force, but Hamas will give up violence and have some of the social ministries". Crisis Group interview, Ghassan Shakaa, member of the PLO Executive Committee and Fatah PLC candidate, Nablus, January 2006.

[326] As a British diplomat pointed out, "As long as bombs go off in London and other Western capitals, it will be very difficult for politicians to legitimise a movement that advocates the very same methods". Crisis Group interview, Jerusalem, January 2006.

[327] Crisis Group interview, Iyad Sarraj, independent parliamentary candidate, Gaza City, 18 November 2005.

[328] Crisis Group interview, Ramallah, August 2005.

[329] Crisis Group interview, Zahar, Gaza City, November 2005.

Case 1:05-cv-04622-DLI-RML   Document 267-13   Filed 03/22/12   Page 235 of 646 PageID #: 6913

Case 1:05-cv-04622-DLI-RML    Document 267-13    Filed 03/22/12    Page 236 of 646 PageID #: 6914

*Enter Hamas: The Challenges of Political Integration*
*Crisis Group Middle East Report N°49, 18 January 2006*                                                    *Page 38*

An EU official attached to the Quartet remarked that decommissioning and disarmament typically are undertaken in a post-conflict situation by a state with full authority. "But the PA does not have the power of a state, and Israel is saying it won't get one until the security forces become professional. Moreover, the national liberation army hasn't finished its national liberation struggle. By imposing disarmament it's as if you're asking them to say that they've lost".[330] Last, but not least, is the leverage the Brigades provide Hamas in its relationship with Fatah, whether in terms of power-sharing, or as insurance against a repeat of the massive crackdowns of the mid-1990s.[331]

This should not mean nothing can be done. It needs to be addressed sooner rather than later, because it is critical to consolidating the PA as a viable political entity, because it is a precondition to resuming a peace process and because, ultimately, there cannot be successful political integration without parallel steps to check Hamas militancy. The key, again, is to devise a calibrated approach in which steps by Hamas are reciprocated and in which the Islamists are given some assurance that Fatah will not exploit the situation.

Overall, while participation in the political process likely will strengthen Hamas's position, it also could introduce constraints: the greater its role in the PLC and PA, the more difficult it will be for it to claim special dispensation from its laws and the higher the cost to it and its constituents of armed attacks or lawlessness. Even Mahmoud Zahar, known for more militant views, conceded that separate justice and law enforcement systems were incompatible with democratic ones. While Hamas could in the past deride PLC legislation as the product of a self-selected clique, it will find itself subject to its own legislation. "There will be a single law", stated Zahar, "not a Hamas law".[332] Likewise, senior members conceded that military integration could follow political integration and disarmament talks could begin as the democratic process continued.[333] In the run-up to the elections, Mahmoud Zahar asserted Hamas would support incorporating all militias into an army to end factional infighting and "protect our institutions and our land".[334]

Therefore, assuming renewal of the *tahdi'a*:

❑ Upon joining the PLC, Hamas should announce immediate termination of weapons displays by its militants.

❑ Hamas should clearly state its intention to abide by all laws passed by parliament; in return, the PA should take concrete steps to demonstrate the fairness and even-handedness of the process, both to persuade Hamas it can exercise more influence within the system than in opposition, and to reassure it that Fatah will not exploit integration. If it chooses, Hamas must be allowed to play a role in PA institutions commensurate with electoral performance, including government if it negotiates participation in a ruling coalition. Similarly, PA institutions – first and foremost the PLC – must be allowed to function properly and given genuine oversight of the government. The Basic Security Law should include provisions on de-politicisation of the security sector, particularly subordinating forces and budgets to parliamentary oversight. A fully empowered interior minister ought to be subject to parliamentary oversight.

❑ Hamas should support early ratification of the draft Political Parties Law, pursuant to which registered parties must publish organisational structure, names of leaders, and pursue objectives "through lawful and peaceful means".[335] The EU should announce it will not boycott relations with any registered party verifiably independent of any armed wing. While the EU would continue to boycott Hamas's leadership, if the Reform and Change Bloc were registered as a party and sever all organisational ties to Hamas, the EU would be able to engage with its members. In so doing, it could strengthen advocates of pragmatism and engagement within Hamas and demonstrate the benefits of such an approach to the movement as a whole.

❑ Hamas should support early ratification of the Basic Security Law identifying parameters and modalities of eventual disarmament, integration, and demobilisation of members of all armed groups not a part of the security forces, with verifiable international supervision.[336] It also should engage in serious talks with decommissioning authorities set up under this law. The purpose would not

---

[330] Crisis Group interview, Jerusalem, December 2005.
[331] "Hamas wants to keep weapons because of the PA. They know this is not a stable democracy. They know that the PA might repeat the incidents of 1996 and don't trust Fatah and the PA and the warlords in the system. They cannot assume that if they give up weapons, we'll become Sweden", Crisis Group interview, Salah Abdel-Shafi, World Bank consultant, Gaza City, December 2005.
[332] Crisis Group interview, Gaza City, November 2005.
[333] Crisis Group interview, Mohammed Ghazal, Nablus, September 2005.
[334] Craig Smith, "Election role won't soften Hamas anger at the Israelis", *New York Times*, 12 January 2006.

[335] "Draft Political Parties Law Submitted by the Council of Ministers (1998) Concerning Political Parties and the Regulation of Their Activities". See http://www.pnic.gov.ps/arabic/law/law_b26.html (in Arabic).
[336] Preparations for such a law, funded in part by the UK, already are advanced.

Case 1:05-cv-04622-DLI-RML   Document 267-13   Filed 03/22/12   Page 237 of 646 PageID #: 6915

*Enter Hamas: The Challenges of Political Integration*
*Crisis Group Middle East Report N°49, 18 January 2006*                                    *Page 39*

be immediate, total demobilisation, but rather to establish meaningful benchmarks endorsed by Hamas and to which it could be held accountable. Hamas should, for example, announce and abide by a permanent end to all attacks on civilian targets and, six months after entry into force of a comprehensive ceasefire, halt acquisition, manufacture, and testing of weapons and begin decommissioning arms that most threaten maintenance of the ceasefire, such as rockets, and submit to independent international verification. If such steps are taken, the EU and member states would remove Hamas from their list of proscribed terrorist organisations.

- ❑ A bigger carrot should be on the horizon: normal dialogue with the EU once Hamas has formally renounced all violence against civilians, dropped opposition to a two-state solution and indicated it will honour a Palestinian-Israeli settlement that is properly endorsed by Palestinian national institutions and people. [337]

- ❑ And a credible stick should be on the horizon: if Hamas is deemed to have violated the truce, the EU would suspend contacts with the parliamentary faction and local officials; if Hamas-affiliated politicians were in the cabinet, contacts with and assistance to the PA would also be suspended.

Given its relationship with Israel and domestic political constraints, Washington is likely to move significantly slower than the EU in this process. But if Hamas renounces violence against civilians, in effect accepts a two-state solution, and, as part of a comprehensive ceasefire, begins verifiable disarmament, the U.S. should consider removing it from its list of terrorist organisations.

## VII. CONCLUSION

Many, including not a few Palestinians, doubt Hamas is ripe for major strategic reorientation. A Fatah official said: "Hamas is trying to replace the PA. Since 1988 their goal has been to replace the PLO. The strategy remains the same but the tactics are different. It's the Muslim Brotherhood strategy of infiltration".[338] Israelis have reason to be sceptical and fear a truce simply would be a chance for Hamas to regroup and bolster political and military capabilities. Obstacles should also be expected from other quarters. Israel may prove unwilling to restrain either its military operations against the movement or its occupation activities in the West Bank and Jerusalem. The PA may lack the muscle, command structure and discipline to enforce non-partisan security legislation, and individual Fatah commanders may balk at integration or promotion of rival Islamists into their privileged preserve. The chaos that has accompanied rehabilitation of the security forces and Fatah militias thus far – including rampages by al-Aqsa gunmen, occupation of PA buildings throughout the West Bank and Gaza Strip, and takeover of Bethlehem's Manger Square shortly before Christmas to highlight demands for jobs and pay – does not bode well.

Yet, the arguments for trying outweigh the doubts. Two years ago, Crisis Group advocated similar steps designed to promote and accompany a Hamas cessation of violence and integration into mainstream political life, arguing that a PA crackdown, however devoutly wished by Israel and the U.S., was out of the question, beyond capacity and will. Specifically, we recommended simultaneous pursuit of a negotiated ceasefire involving the PA, Hamas and Israel, and a new Palestinian political consensus, including Hamas. While dismantling of Hamas's military capacity was out of reach without a comprehensive peace, the movement would have to provide evidence the ceasefire was more than tactical, specifically by ceasing public display of weapons and the acquisition, smuggling, manufacture, and testing of arms. In exchange and upon Hamas's commitment to abide by a settlement endorsed by representative national institutions and the Palestinian people, the movement would be fully and fairly included in PA institutions. As part of this process, Crisis Group advised the EU to keep security contacts with Hamas and, should it comply with the ceasefire and begin disarmament, remove it from its terrorism list.

These recommendations were for the most part ignored. The international community refused to deal in a proactive, coherent fashion with Hamas, and the situation has

---

[337] Acknowledging that such a step was not in the cards for now, a Hamas leader explained: "…we are interested in a dialogue with Western states. But we are not able to meet their conditions now, before resolving our national cause". Crisis Group interview, Mohammed Ghazal, Nablus, September 2005.

[338] Crisis Group interview, Fatah official, West Bank, June 2005.

Case 1:05-cv-04622-DLI-RML    Document 267-13    Filed 03/22/12    Page 238 of 646 PageID #: 6916

*Enter Hamas: The Challenges of Political Integration*
*Crisis Group Middle East Report N°49, 18 January 2006*                                                                                                                    *Page 40*

worsened. There is no negotiated ceasefire, no initial decommissioning steps, and no Hamas commitment to abide by a negotiated settlement. The PA and Fatah have grown weaker and Hamas stronger; the Islamists are on the verge of reaping the fruits of political integration in exchange for virtually nothing.

Today offers another chance and, based on Hamas's conduct so far, the Islamist movement at least appears interested. Participation in politics has already partially moderated its discourse. In the run-up to elections, it has displayed political common sense and pragmatism. It has largely kept its ceasefire, despite continued Israeli assassinations and mass arrests of members. It has accepted the principle that there is no religious prohibition against negotiating or co-existing with Israel and that the provisions in its charter providing for Israel's destruction are not indelible. Pointing to the irony, a British diplomat remarked: "The international community is acting against the organisation that's behaving – Hamas – and supporting the organisation that is misbehaving – Fatah".[339]

Hamas also remains susceptible to public opinion. From the pulpit to the airwaves, it criticised the November 2005 agreement to open the Rafah border as a sell-out because it provided for direct European and indirect Israeli monitoring. But when the agreement gained popular support as the first border-crossing controlled by Palestinians, it changed its tune and even attended the signing ceremony. As a Palestinian economist noted, "Hamas was very stupid in issuing the statement against Rafah. It upset many people, who started saying that Hamas wants to keep us trapped in a prison. People could never tolerate any party that kept them isolated".[340] In the end, Hamas was a beneficiary, with several exiled leaders availing themselves of the opportunity to return home.

Assuming outside actors do their part with a mix of carrots and sticks, some observers are convinced the integration strategy can work. "You have to entice Hamas into the political process, in order to isolate and finally disarm them", said a European diplomat. "Just as there is no Provisional IRA any more, so there will be no military wing of Hamas".[341] Even among U.S. officials, greater openness to Abbas's strategy can be heard. Secretary Rice drew parallels with Sinn Fein:

> There are periods of time of transition in which one has to give some space to the participants, in this case the Palestinians, to begin to come to a new national compact....For instance, in the

Good Friday Agreement it was understood that when Sinn Fein came into politics…eventually the IRA would disarm, and perhaps, hopefully, that process is now underway.[342]

To be sure, the strategy has a mixed track record in the region. Iraq witnessed an explosion of party militias, and violence after armed groups joined its political process, and the insurgency mushroomed. Hizbollah's entry into the Lebanese government preceded its most intense attack against Israel in five years. Even in Northern Ireland, the IRA embarked on decommissioning only two years and numerous false starts after Sinn Fein entered the Stormont Assembly.

An end to violence cannot be firmly secured solely by putting the Palestinian house in order, for the simple reason that any cessation to violent confrontation remains predicated on a settlement of the conflict with Israel, an end to the occupation, and a two-state solution. But the Palestinian political system is at a critical juncture. As a consequence of elections, Hamas, the polity's best-organised political organisation, soon will be sharing power with Fatah, its largest. Or as Hasan Yousif, a senior Hamas leader in the West Bank, expressed it: "The days are pregnant. And Hamas is a part of the new equation".[343] It is time the PA, Israel and the international community devise more sophisticated, nuanced and productive policies to deal with it.

**Amman/Brussels, 18 January 2006**

---

[339] Crisis Group interview, British diplomat, January 2006.
[340] Crisis Group interview, Salah Abdel Shafi, World Bank consultant, Gaza City, November 2005.
[341] Crisis Group interview, EU diplomat, Jerusalem, December 2005.

[342] Rice was answering questions at Princeton University, 30 September 2005. The transcript is available at http://www.state.gov/ secretary/rm/2005/54178.htmv. It has been suggested that once the new government passes the political parties law under which all PLC parties would formally be registered, it would become possible to distinguish Hamas and the Bloc, which would become a separate political party, similar to the relationship between Sinn Fein and the IRA. Hamas could cite the precedent of the Islamic Salvation Party, a political party established in 1996 to test the Islamist movement's entry into the political system. Most of its members have since joined Hamas. Crisis Group interview, Ghazi Hamad, Islamist journalist, Gaza City, November 2005. A journalist reporting on Hamas for the leading Palestinian daily *Al-Ayyam* noted: "Hamas are planning on keeping their secret apparatus, but formalising a public political wing. If they want an internal split between the armed and the civil movement, they will become like Sinn Fein", Crisis Group interview, Khalil Shahn, Ramallah, November 2005.
[343] Crisis Group interview, Hasan Yousif, Hamas leader, Ramallah, August 2005.

*Enter Hamas: The Challenges of Political Integration*
*Crisis Group Middle East Report N°49, 18 January 2006*                                   *Page 41*

# APPENDIX A

## MAP OF THE OCCUPIED TERRITORIES

### MAP OF THE GAZA STRIP



http://www.cia.gov/cia/publications/factbook/geos/gz.html

### MAP OF THE WEST BANK



http://www.cia.gov/cia/publications/factbook/geos/we.html

Case 1:05-cv-04622-DLI-RML   Document 267-13   Filed 03/22/12   Page 240 of 646 PageID #: 6918

*Enter Hamas: The Challenges of Political Integration*
*Crisis Group Middle East Report N°49, 18 January 2006*                                    *Page 42*

# APPENDIX B

# ABOUT THE INTERNATIONAL CRISIS GROUP

The International Crisis Group (Crisis Group) is an independent, non-profit, non-governmental organisation, with over 110 staff members on five continents, working through field-based analysis and high-level advocacy to prevent and resolve deadly conflict.

Crisis Group's approach is grounded in field research. Teams of political analysts are located within or close by countries at risk of outbreak, escalation or recurrence of violent conflict. Based on information and assessments from the field, it produces analytical reports containing practical recommendations targeted at key international decision-takers. Crisis Group also publishes *CrisisWatch*, a twelve-page monthly bulletin, providing a succinct regular update on the state of play in all the most significant situations of conflict or potential conflict around the world.

Crisis Group's reports and briefing papers are distributed widely by email and printed copy to officials in foreign ministries and international organisations and made available simultaneously on the website, www.crisisgroup.org. Crisis Group works closely with governments and those who influence them, including the media, to highlight its crisis analyses and to generate support for its policy prescriptions.

The Crisis Group Board – which includes prominent figures from the fields of politics, diplomacy, business and the media – is directly involved in helping to bring the reports and recommendations to the attention of senior policy-makers around the world. Crisis Group is chaired by Lord Patten of Barnes, former European Commissioner for External Relations. President and Chief Executive since January 2000 is former Australian Foreign Minister Gareth Evans.

Crisis Group's international headquarters are in Brussels, with advocacy offices in Washington DC (where it is based as a legal entity), New York, London and Moscow. The organisation currently operates fifteen field offices (in Amman, Belgrade, Bishkek, Dakar, Dushanbe, Islamabad, Jakarta, Kabul, Nairobi, Pretoria, Pristina, Quito, Seoul, Skopje and Tbilisi), with analysts working in over 50 crisis-affected countries and territories across four continents. In Africa, this includes Angola, Burundi, Côte d'Ivoire, Democratic Republic of the Congo, Eritrea, Ethiopia, Guinea, Liberia, Rwanda, the Sahel region, Sierra Leone, Somalia, Sudan, Uganda and Zimbabwe; in Asia, Afghanistan, Indonesia, Kashmir, Kazakhstan, Kyrgyzstan, Myanmar/Burma, Nepal, North Korea, Pakistan, Tajikistan, Turkmenistan and Uzbekistan; in Europe, Albania, Armenia, Azerbaijan, Bosnia and Herzegovina, Georgia, Kosovo, Macedonia, Moldova, Montenegro and Serbia; in the Middle East, the whole region from North Africa to Iran; and in Latin America, Colombia, the Andean region and Haiti.

Crisis Group raises funds from governments, charitable foundations, companies and individual donors. The following governmental departments and agencies currently provide funding: Agence Intergouvernementale de la francophonie, Australian Agency for International Development, Austrian Federal Ministry of Foreign Affairs, Belgian Ministry of Foreign Affairs, Canadian Department of Foreign Affairs and International Trade, Canadian International Development Agency, Canadian International Development Research Centre, Czech Ministry of Foreign Affairs, Dutch Ministry of Foreign Affairs, Finnish Ministry of Foreign Affairs, French Ministry of Foreign Affairs, German Foreign Office, Irish Department of Foreign Affairs, Japanese International Cooperation Agency, Principality of Liechtenstein Ministry of Foreign Affairs, Luxembourg Ministry of Foreign Affairs, New Zealand Agency for International Development, Republic of China (Taiwan) Ministry of Foreign Affairs, Royal Danish Ministry of Foreign Affairs, Royal Norwegian Ministry of Foreign Affairs, Swedish Ministry for Foreign Affairs, Swiss Federal Department of Foreign Affairs, Turkish Ministry of Foreign Affairs, United Kingdom Foreign and Commonwealth Office, United Kingdom Department for International Development, U.S. Agency for International Development.

Foundation and private sector donors include Atlantic Philanthropies, Carnegie Corporation of New York, Compton Foundation, Ford Foundation, Fundação Oriente, Fundación DARA Internacional, Bill & Melinda Gates Foundation, William & Flora Hewlett Foundation, Hunt Alternatives Fund, Korea Foundation, John D. & Catherine T. MacArthur Foundation, Moriah Fund, Charles Stewart Mott Foundation, Open Society Institute, Pierre and Pamela Omidyar Fund, David and Lucile Packard Foundation, Ploughshares Fund, Sigrid Rausing Trust, Rockefeller Foundation, Rockefeller Philanthropy Advisors and Sarlo Foundation of the Jewish Community Endowment Fund.

**January 2006**

Case 1:05-cv-04622-DLI-RML   Document 267-13   Filed 03/22/12   Page 241 of 646 PageID #: 6919

*Enter Hamas: The Challenges of Political Integration*
*Crisis Group Middle East Report N°49, 18 January 2006*                                    *Page 43*

# APPENDIX C

# CRISIS GROUP REPORTS AND BRIEFINGS ON THE MIDDLE EAST AND NORTH AFRICA SINCE 2003

## ARAB-ISRAELI CONFLICT

*Islamic Social Welfare Activism in the Occupied Palestinian Territories: A Legitimate Target?*, Middle East Report N°13, 2 April 2003

*A Middle East Roadmap to Where?*, Middle East Report N°14, 2 May 2003

*The Israeli-Palestinian Roadmap: What A Settlement Freeze Means And Why It Matters*, Middle East Report N°16, 25 July 2003

*Hizbollah: Rebel without a Cause?*, Middle East Briefing N°7, 30 July 2003

*Dealing With Hamas*, Middle East Report N°21, 26 January 2004 (also available in Arabic)

*Palestinian Refugees and the Politics of Peacemaking*, Middle East Report N°22, 5 February 2004

*Syria under Bashar (I): Foreign Policy Challenges*, Middle East Report N°23, 11 February 2004 (also available in Arabic)

*Syria under Bashar (II): Domestic Policy Challenges*, Middle East Report N°24, 11 February 2004 (also available in Arabic)

*Identity Crisis: Israel and its Arab Citizens*, Middle East Report N°25, 4 March 2004

*The Broader Middle East and North Africa Initiative: Imperilled at Birth*, Middle East Briefing N°13, 7 June 2004

*Who Governs the West Bank? Palestinian Administration under Israeli Occupation*, Middle East Report N°32, 28 September 2004 (also available in Arabic and in Hebrew)

*After Arafat? Challenges and Prospects*, Middle East Briefing N°16, 23 December 2004 (also available in Arabic)

*Disengagement and After: Where Next for Sharon and the Likud?*, Middle East Report N°36, 1 March 2005 (also available in Arabic and in Hebrew)

*Syria After Lebanon, Lebanon After Syria*, Middle East Report N°39, 12 April 2005 (also available in Arabic)

*Mr Abbas Goes to Washington: Can He Still Succeed?*, Middle East Briefing N°17, 24 May 2005 (also available in Arabic)

*Disengagement and Its Discontents: What Will the Israeli Settlers Do?*, Middle East Report N°43, 7 July 2005 (also available in Arabic)

*The Jerusalem Powder Keg*, Middle East Report N°44, 2 August 2005 (also available in Arabic)

*Lebanon: Managing the Gathering Storm*, Middle East Report N°48, 5 December 2005

## EGYPT/NORTH AFRICA

*Algeria: Unrest and Impasse in Kabylia,* Middle East/North Africa Report N°15, 10 June 2003 (also available in French)

*The Challenge of Political Reform: Egypt after the Iraq War*, Middle East/North Africa Briefing N°9, 30 September 2003

*Islamism in North Africa I: The Legacies of History*, Middle East/North Africa Briefing N°12, 20 April 2004)

*Islamism in North Africa II: Egypt's Opportunity*, Middle East/North Africa Briefing N°13, 20 April 2004

*Islamism, Violence and Reform in Algeria: Turning the Page*, Middle East/North Africa Report N°29, 30 July 2004 (also available in Arabic and in French)

*Understanding Islamism*, Middle East/North Africa Report N°37, 2 March 2005 (also available in Arabic and French)

*Islamism in North Africa IV: The Islamist Challenge in Mauritania: Threat or Scapegoat?*, Middle East/North Africa Report N°93, 10 May 2005 (only available in French)

*Reforming Egypt: In Search of a Strategy*, Middle East/North Africa Report N°46, 4 October 2005

## IRAQ/IRAN/GULF

*Yemen: Coping with Terrorism and Violence in a Fragile State,* Middle East Report N°8, 8 January 2003

*Radical Islam in Iraqi Kurdistan: The Mouse That Roared?* Middle East Briefing N°4, 7 February 2003

*Red Alert in Jordan: Recurrent Unrest in Maan,* Middle East Briefing N°5, 19 February 2003

*Iraq Policy Briefing: Is There an Alternative to War?*, Middle East Report N°9, 24 February 2003

*War in Iraq: What's Next for the Kurds?,* Middle East Report N°10, 19 March 2003

*War in Iraq: Political Challenges after the Conflict*, Middle East Report N°11, 25 March 2003

*War in Iraq: Managing Humanitarian Relief,* Middle East Report N°12, 27 March 2003

*Baghdad: A Race against the Clock*, Middle East Briefing N°6, 11 June 2003

*Governing Iraq*, Middle East Report N°17, 25 August 2003

*Iraq's Shiites under Occupation*, Middle East Briefing N°8, 9 September 2003

*The Challenge of Political Reform: Jordanian Democratisation and Regional Instability*, Middle East Briefing N°10, 8 October 2003 (also available in Arabic)

*Iran: Discontent and Disarray*, Middle East Briefing N°11, 15 October 2003

*Dealing With Iran's Nuclear Program*, Middle East Report N°18, 27 October 2003

*Iraq's Constitutional Challenge*, Middle East Report N°19, 13 November 2003 (also available in Arabic)

*Iraq: Building a New Security Structure*, Middle East Report N°20, 23 December 2003

*Iraq's Kurds: Toward an Historic Compromise?*, Middle East Report N°26, 8 April 2004 (also available in Arabic)

*Iraq's Transition: On a Knife Edge*, Middle East Report N°27, 27 April 2004 (also available in Arabic)

*Can Saudi Arabia Reform Itself?*, Middle East Report N°28, 14 July 2004 (also available in Arabic)

Case 1:05-cv-04622-DLI-RML   Document 267-13   Filed 03/22/12   Page 242 of 646 PageID #: 6920

*Enter Hamas: The Challenges of Political Integration*
*Crisis Group Middle East Report N°49, 18 January 2006*                                               *Page 44*

*Reconstructing Iraq*, Middle East Report N°30, 2 September 2004 (also available in Arabic)

*Saudi Arabia Backgrounder: Who are the Islamists?*, Middle East Report N°31, 21 September 2004 (also available in Arabic)

*Iraq: Can Local Governance Save Central Government?*, Middle East Report N°33, 27 October 2004 (also available in Arabic)

*Iran: Where Next on the Nuclear Standoff*, Middle East Briefing N°15, 24 November 2004

*What Can the U.S. Do in Iraq?*, Middle East Report N°34, 22 December 2004 (also available in Arabic)

*Iraq: Allaying Turkey's Fears Over Kurdish Ambitions*, Middle East Report N°35, 26 January 2005 (also available in Arabic)

*Iran in Iraq: How Much Influence?*, Middle East Report N°38, 21 March 2005 (also available in Arabic)

*Bahrain's Sectarian Challenge*, Middle East Report N°40, 2 May 2005 (also available in Arabic)

*Iraq: Don't Rush the Constitution*, Middle East Report N°42, 8 June 2005 (also available in Arabic)

*Iran: What Does Ahmadi-Nejad's Victory Mean?*, Middle East Briefing N°18, 4 August 2005

*The Shiite Question in Saudi Arabia*, Middle East Report N°45, 19 September 2005

*Unmaking Iraq: A Constitutional Process Gone Awry*, Middle East Briefing N°19, 26 September 2005

*Jordan's 9/11: Dealing With Jihadi Islamism*, Middle East Report N°47, 23 November 2005

## OTHER REPORTS AND BRIEFINGS

For Crisis Group reports and briefing papers on:

- Asia
- Africa
- Europe
- Latin America and Caribbean
- Thematic Issues
- *CrisisWatch*

please visit our website www.crisisgroup.org

Case 1:05-cv-04622-DLI-RML   Document 267-13   Filed 03/22/12   Page 243 of 646 PageID #: 6921

*Enter Hamas: The Challenges of Political Integration*
*Crisis Group Middle East Report N°49, 18 January 2006*                          *Page 45*

# APPENDIX D

# CRISIS GROUP BOARD OF TRUSTEES

*Chair*
**Lord Patten of Barnes**
*Former European Commissioner for External Relations, UK*

*President & CEO*
**Gareth Evans**
*Former Foreign Minister of Australia*

*Executive Committee*
**Morton Abramowitz**
*Former U.S. Assistant Secretary of State and Ambassador to Turkey*
**Emma Bonino**
*Member of European Parliament; former European Commissioner*
**Cheryl Carolus**
*Former South African High Commissioner to the UK; former Secretary General of the ANC*
**Maria Livanos Cattaui***
*Former Secretary-General, International Chamber of Commerce*
**Yoichi Funabashi**
*Chief Diplomatic Correspondent & Columnist, The Asahi Shimbun, Japan*
**William Shawcross**
*Journalist and author, UK*
**Stephen Solarz***
*Former U.S. Congressman*
**George Soros**
*Chairman, Open Society Institute*
**William O. Taylor**
*Chairman Emeritus, The Boston Globe, U.S.*
**Vice-Chair*

**Adnan Abu-Odeh**
*Former Political Adviser to King Abdullah II and to King Hussein; former Jordan Permanent Representative to UN*
**Kenneth Adelman**
*Former U.S. Ambassador and Director of the Arms Control and Disarmament Agency*
**Ersin Arioglu**
*Member of Parliament, Turkey; Chairman Emeritus, Yapi Merkezi Group*
**Diego Arria**
*Former Ambassador of Venezuela to the UN*
**Zbigniew Brzezinski**
*Former U.S. National Security Advisor to the President*
**Kim Campbell**
*Secretary General, Club of Madrid; former Prime Minister of Canada*
**Victor Chu**
*Chairman, First Eastern Investment Group, Hong Kong*

**Wesley Clark**
*Former NATO Supreme Allied Commander, Europe*
**Pat Cox**
*Former President of European Parliament*
**Ruth Dreifuss**
*Former President, Switzerland*
**Uffe Ellemann-Jensen**
*Former Minister of Foreign Affairs, Denmark*
**Mark Eyskens**
*Former Prime Minister of Belgium*
**Leslie H. Gelb**
*President Emeritus of Council on Foreign Relations, U.S.*
**Bronislaw Geremek**
*Former Minister of Foreign Affairs, Poland*
**Frank Giustra**
*Chairman, Endeavour Financial, Canada*
**I.K. Gujral**
*Former Prime Minister of India*
**Carla Hills**
*Former U.S. Secretary of Housing; former U.S. Trade Representative*
**Lena Hjelm-Wallén**
*Former Deputy Prime Minister and Foreign Affairs Minister, Sweden*
**James C.F. Huang**
*Deputy Secretary General to the President, Taiwan*
**Swanee Hunt**
*Chair of Inclusive Security: Women Waging Peace; former U.S. Ambassador to Austria*
**Asma Jahangir**
*UN Special Rapporteur on Extrajudicial, Summary or Arbitrary Executions; former Chair Human Rights Commission of Pakistan*
**Shiv Vikram Khemka**
*Founder and Executive Director (Russia) of SUN Group, India*
**James V. Kimsey**
*Founder and Chairman Emeritus of America Online, Inc. (AOL)*
**Bethuel Kiplagat**
*Former Permanent Secretary, Ministry of Foreign Affairs, Kenya*
**Wim Kok**
*Former Prime Minister, Netherlands*
**Trifun Kostovski**
*Member of Parliament, Macedonia; founder of Kometal Trade Gmbh*
**Elliott F. Kulick**
*Chairman, Pegasus International, U.S.*
**Joanne Leedom-Ackerman**
*Novelist and journalist, U.S.*
**Todung Mulya Lubis**
*Human rights lawyer and author, Indonesia*

Case 1:05-cv-04622-DLI-RML   Document 267-13   Filed 03/22/12   Page 244 of 646 PageID #: 6922

*Enter Hamas: The Challenges of Political Integration*
*Crisis Group Middle East Report N°49, 18 January 2006*                                          *Page 46*

**Ayo Obe**
*Chair of Steering Committee of World Movement for Democracy, Nigeria*

**Christine Ockrent**
*Journalist and author, France*

**Friedbert Pflüger**
*Foreign Policy Spokesman of the CDU/CSU Parliamentary Group in the German Bundestag*

**Victor M. Pinchuk**
*Member of Parliament, Ukraine; founder of Interpipe Scientific and Industrial Production Group*

**Surin Pitsuwan**
*Former Minister of Foreign Affairs, Thailand*

**Itamar Rabinovich**
*President of Tel Aviv University; former Israeli Ambassador to the U.S. and Chief Negotiator with Syria*

**Fidel V. Ramos**
*Former President of the Philippines*

**Lord Robertson of Port Ellen**
*Former Secretary General of NATO; former Defence Secretary, UK*

**Mohamed Sahnoun**
*Special Adviser to the United Nations Secretary-General on Africa*

**Ghassan Salamé**
*Former Minister Lebanon, Professor of International Relations, Paris*

**Salim A. Salim**
*Former Prime Minister of Tanzania; former Secretary General of the Organisation of African Unity*

**Douglas Schoen**
*Founding Partner of Penn, Schoen & Berland Associates, U.S.*

**Pär Stenbäck**
*Former Minister of Foreign Affairs, Finland*

**Thorvald Stoltenberg**
*Former Minister of Foreign Affairs, Norway*

**Grigory Yavlinsky**
*Chairman of Yabloko Party and its Duma faction, Russia*

**Uta Zapf**
*Chairperson of the German Bundestag Subcommittee on Disarmament, Arms Control and Non-proliferation*

**Ernesto Zedillo**
*Former President of Mexico; Director, Yale Center for the Study of Globalization*

---

## INTERNATIONAL ADVISORY BOARD

*Crisis Group's International Advisory Board comprises major individual and corporate donors who contribute their advice and experience to Crisis Group on a regular basis.*

### Rita E. Hauser (Chair)

**Marc Abramowitz**
**Anglo American PLC**
**APCO Worldwide Inc.**
**Patrick E. Benzie**
**BHP Billiton**
**Harry Bookey and Pamela Bass-Bookey**
**John Chapman Chester**
**Chevron**
**Peter Corcoran**
**Credit Suisse Group/Credit Suisse First Boston**

**John Ehara**
**Equinox Partners**
**Dr. Konrad Fischer**
**Iara Lee & George Gund III Foundation**
**JP Morgan Global Foreign Exchange and Commodities**
**George Kellner**
**George Loening**
**Douglas Makepeace**
**Anna Luisa Ponti**
**Quantm**

**Baron Ullens**
**Michael L. Riordan**
**Sarlo Foundation of the Jewish Community Endowment Fund**
**Tilleke & Gibbins**
**Stanley Weiss**
**Westfield Group**
**Don Xia**
**Yasuyo Yamazaki**
**Sunny Yoon**

---

## SENIOR ADVISERS

*Crisis Group's Senior Advisers are former Board Members (not presently holding executive office) who maintain an association with Crisis Group, and whose advice and support are called on from time to time.*

| | | | |
|---|---|---|---|
| Oscar Arias | Alain Destexhe | Allan J. MacEachen | Volker Ruehe |
| Zainab Bangura | Marika Fahlen | Barbara McDougall | Simone Veil |
| Christoph Bertram | Stanley Fischer | Matt McHugh | Michael Sohlman |
| Jorge Castañeda | Malcolm Fraser | George J. Mitchell | Leo Tindemans |
| Eugene Chien | Max Jakobson | Cyril Ramaphosa | Ed van Thijn |
| Gianfranco Dell'Alba | Mong Joon Chung | Michel Rocard | Shirley Williams |

**As at January 2006**

**EXHIBIT 162 TO DECLARATION OF VALERIE SCHUSTER**

The Centre on Conflict, Development and Peacebuilding

# CCDP Working Paper

**5**

Role and Governance of Islamic
Charitable Institutions:

# The West Bank Zakat Committees (1977–2009) in the Local Context

Emanuel Schäublin

**THE GRADUATE INSTITUTE** | GENEVA

**CENTRE ON CONFLICT,
DEVELOPMENT AND PEACEBUILDING**



This map is for illustrative purposes only (to indicate the borders of the various governorates) and does not imply an opinion on the political frontier. Note however that most governorates have been diminished in size by Israeli settlement construction and the Separation Barrier (for details see the maps of B'tselem, the Israeli Information Centre for Human Rights in the Occupied Palestinian Territories: <http://www.btselem.org/english/Maps/Index.asp>).

Role and Governance of Islamic
Charitable Institutions:

# The West Bank Zakat Committees (1977–2009) in the Local Context

Emanuel Schäublin

**2**

# Contents

Executive summary ................................................................. 4

Author's acknowledgments ......................................................... 6

Acronyms and Arabic terms ........................................................ 7
    Explanation of acronyms and terms .............................................. 7
    Explanation of Arabic terms ................................................... 7
    Note on spelling of Arabic words and translation ............................... 7

**Introduction** ................................................................. **8**

**Literature review** ........................................................... **11**

**Historical overview** ......................................................... **15**
    Phase 1: until 1967 .......................................................... 15
    Phase 2: 1968 – 1994 ......................................................... 15
    Phase 3: 1994 – 2006 ......................................................... 17
    Phase 4: Hamas governs the PA (March 2006 – June 2007) ........................ 17
    Phase 5: Prime Minister Fayyad's emergency cabinet (June 2007 – until present) .. 18

**Zakat committees in the local context** ....................................... **20**
    Religious dimension of zakat ................................................. 21
    Aims of the zakat committees ................................................. 22
    Projects run by the zakat committees ......................................... 23
    *Waqf* and real estate investments ........................................... 26
    Popular confidence ........................................................... 27
    Efficiency ................................................................... 30
    Zakat committees and foreign aid ............................................. 30

**Zakat committees and the state** .............................................. **33**
    The Jordanian Ministry of Awqaf and Islamic Affairs .......................... 34
    The state of Israel .......................................................... 36
    The PA Ministry of Awqaf before the reform of 2007 ........................... 39

**3**

**The 2007 reform and its consequences** ....................................................... **4 2**

The reform .................................................................................... 4 2

Consequences ................................................................................. 4 6

Different perspectives ........................................................................ 4 8

**Zakat committees and political movements** ............................................... **5 2**

The role of Fatah ............................................................................. 5 2

The role of Hamas ............................................................................ 5 4

Criticism of the pre-2007 zakat committees ................................................. 5 6

**Conclusion** ...................................................................................... **6 0**

References ....................................................................................... 6 6

**4**

# Executive summary

For centuries, mosques in the West Bank have been running informal voluntary committees charged with the administration of donations from local communities. In the 1970s, the Jordanian Ministry of Awqaf started to formally establish some of these committees as 'zakat committees' under Jordanian zakat law. These voluntary zakat committees continued to run charitable projects funded by the local community, and gradually accessed funding from Muslim communities in the West and in Gulf states as well. They thus remained independent from traditional North American and European sources of funding, such as development agencies.

This working paper is the result of a short research project of the Centre on Conflict, Development and Peacebuilding (CCDP). The objective of this paper is to provide a detailed account of the zakat committees in the local context of the West Bank by relying mainly on Palestinian sources and the internal political debate. The zakat committees have evolved in a changing socio-political context under Israeli occupation and successive Jordanian and Palestinian authority. This working paper explores how political shifts in recent years have led in particular to the politicization of their role. Based on information gathered, the author concludes that since their establishment, the West Bank zakat committees were, by and large, tactful and efficient grassroots organizations that strengthened local response systems and self-reliance while minimizing dependency and victimhood.

The political split between Fatah and Hamas, which politically separated the West Bank from the Gaza Strip in 2007, influenced the governance of the zakat committees. In 2007, the Fatah-controlled Palestinian Authority (PA) reformed the zakat system in the West Bank and centralized the West Bank zakat committees under its tight control. Currently, Hamas' Gaza government and the Fatah's West Bank government maintain their respective positions that the zakat committees in Gaza and the West Bank remain independent today. However, official and media reports and anecdotal evidence have raised suspicions that this independence has been compromised by political developments occurring since the Hamas victory in the 2006 election of the Palestinian Legislative Council (PLC), and especially after the institutional separation of the West Bank and Gaza in June 2007. If this is indeed the case in both territories, there are two possible outcomes. Either we may witness the progressive politicization of the zakat committees under two separate administrations and along party-political lines, or the emergence of new social coalitions whose common ground would include the preservation and restoration of the independence of the zakat committees.

5

Prior to the victory of the Hamas-led 'Change and Reform' bloc in the 2005 and 2006 elections, the activities of the zakat committees were not for the most part controversial within the occupied Palestinian territories. Since the establishment of the PA in 1994, however, the question of the loyalty of zakat committee members to the PA has been a recurrent issue of political debates. Zakat committees were traditionally run by social coalitions of locally rooted small and medium-sized entrepreneurs, imams, and personalities known for their Islamic literacy, as well as activists belonging to different groups and political parties with a religious constituency such as the Muslim Brotherhood, Hamas, Fatah, Hizb Al Tahrir, and others. The author argues in this working paper that the two crucial prerequisites that will enable the zakat committees to function efficiently in the future are transparency and protection from party-political pressure.

This working paper is an output of an independent academic research project supported and funded by Political Affairs Division IV of the Swiss Federal Department of Foreign Affairs, as part of the programme 'Religion and Politics: Initiatives and Applied Research'. The project is conducted without any political affiliation or leanings, and does not intend to interfere in internal Palestinian politics.

November 2009

Prof. Keith Krause                    Prof. Riccardo Bocco

Centre on Conflict, Development and Peacebuilding (CCDP)
Graduate Institute of International and Development Studies

6

# Author's acknowledgments

This working paper was made possible through the activities of the Montreux Initiative Core Group. The Montreux Initiative, hosted at the Graduate Institute since 2005 as part of the programme 'Religion and Politics: Initiatives and Applied Research', aims at removing unjustified obstacles for bona fide Islamic charitable organizations. The programme is co-directed with and generously supported by Political Affairs Division IV of the Swiss Federal Department of Foreign Affairs.

The research was conducted in collaboration with Jonathan Benthall, an independent consultant based in the United Kingdom. He accompanied and assisted me during one week of the fact-finding mission, which took place from 18 May to 18 June 2009. This working paper builds on his article, *The Palestinian Zakat Committees 1993–2007 and Their Contested Interpretations* (Graduate Institute, 2008) and draws almost entirely on local sources.

As the author of this paper, I bear the sole responsibility for any factual errors that may still be found in the text. The objective of this research project was to produce a comprehensive account of the zakat committees in the West Bank by listening to a wide range of interlocutors. If the interlocutors had differing opinions and visions regarding the zakat system in the West Bank, then every effort has been made to document this in the paper.

This paper is conceived as a first step towards an extensive and objective study of the Palestinian zakat committees. A next step is intended to study the zakat committees in the Gaza Strip.

I would like to thank all the interlocutors who offered their time and attention to answer questions, as well as the Palestinian Authority's Ministry of Awqaf and Religious Affairs for their cooperation and the Swiss Federal Department of Foreign Affairs for their support.

Moreover, I express my gratitude to all of my friends and colleagues who assisted me in this research project, be it by providing valuable comments on drafts, discussing the issue, or by offering their hospitality during my travels.

Specifically, I would like to thank Jonathan Benthall for advice and fruitful discussions, as well as Riccardo Bocco, Jean-Nicolas Bitter, Benoît Challand, Oliver Jütersonke, Keith Krause, Essam Mustafa, Meghan Pritchard, Sandra Reimann, Natalie Schweizer, and Hassan Tahboub.

Emanuel Schäublin
November 2009

# Acronyms and Arabic terms

## Explanation of acronyms and terms

| | |
|---|---|
| ANERA | American Near East Refugee Aid |
| Fatah | Movement for the Liberation of Palestine |
| Hamas | Islamic Resistance Movement |
| IDF | Israeli Defence Forces |
| oPt | occupied Palestinian territory |
| PFLP | Popular Front for the Liberation of Palestine |
| PLC | Palestinian Legislative Council |
| PA | Palestinian Authority |
| UNDP | United Nations Development Program |
| UNRWA | United Nations Relief and Works Association |

## Explanation of Arabic terms

| | |
|---|---|
| *awqaf* | Plural of *waqf* (see below) |
| *da'wa* | (a) invocation, (b) wish, (c) call, (d) call to Islam, (e) missionary activity, (f) propaganda, and (g) more generally, it can refer to the provision of religious education and social services with a view to reviving the faith and religious practice of a community. |
| *mukhtar* | Chosen leader of a big clan. Important clans are often represented by the *mukhtar* or other notable persons in high political and administrative positions. |
| *sadaqat* | Voluntary payments for charitable purposes, as opposed to *zakat* which is a religious obligation. |
| *ummah* | (a) nation, (b) people, and (c) the community of Muslims (e.g. Quran 3:110) |
| *waqf* | Religious endowment. Ministry of Waqf (or Awqaf) = Ministry of Religious Affairs. |
| *zakat* | One of the pillars of Islam; the religious obligation to make an annual payment for philanthropic purposes based on a proportion of one's assets. |

## Note on spelling of Arabic words and translation

Arabic words have been written in the most familiar form, to the extent possible, for example: zakat, sadaqat, sheikh. They have been transliterated without diacritics above and below characters. The 'ayn (') and the hamza (') have been retained.

Quotes from Arabic sources have been translated by the author. Nearly all documents from zakat committees quoted in this document are translated from the Arabic original.

8

# Introduction

Voluntary committees charged with the collection and distribution of donations from the local community have a long history in the Middle East. For centuries, pious business men, small and medium-sized entrepreneurs, imams and some of the best educated and most literate men from various communities have met at local mosques in order to run charitable projects such as soup kitchens, medical relief centres, orphan care, the provision of sacrificial animals on religious occasions, and other such functions. In the West Bank, the Jordanian Ministry of Awqaf started to formally register such voluntary committees by 1977 as 'zakat committees' under Jordanian zakat law.[1]

According to interlocutors in the West Bank, zakat committees can be understood as an institutional expression of the society's religious motivation. Zakat, known as mandatory alms, is one of the five pillars of Islam. It is the religious duty [fard] of pious Muslims to discharge their zakat according to defined principles.[2] The zakat committees are part of the wider field of Islamic social welfare activism through Islamic NGOs and charitable societies.[3] While Islamic NGOs are registered like secular NGOs with the PA Ministry of Interior, zakat committees are considered semi-state institutions, 'which are supervised by the Palestinian Ministry of Waqf and Religious Affairs. They collect zakat, sadaqat, and gifts from the rich in order to arrange their distribution among the poor […].'[4] The zakat committees are the only institutions in the West Bank that are officially entitled to use the term *zakat* for fundraising purposes.

Since their official registration, the West Bank zakat committees in particular have continued to run charitable projects funded by the local community. Besides a strong social and religious component – and the importance given to human dignity – the zakat committees of the West Bank have sought to strengthen the backbone of their society through their projects. One of their goals has been to make the local communities better able to stand their ground against the continued annexation of the West Bank by Israeli settlement expansion and to discourage emigration.[5]

Islamic organizations and foundations in the Gulf, Europe, and the US are among the most important sources of external funding for zakat committees in the West Bank and elsewhere. Thus, due to their embeddedness in local community structures – combined with their gradual access to substantive funding from Muslim communities in the West and in the Gulf states – the zakat committees of the West Bank have been able to remain independent from the usual North American and European sources of funding.

In the aftermath of Hamas victory in the legislative elections of 2006, bloody clashes between Fatah and Hamas politically split Gaza from the West Bank. Since 2007, Hamas has controlled the Gaza Strip and Fatah has controlled the West Bank. Tensions between Fatah and Hamas are increasingly affecting every level of Palestinian society in the oPt. Many are convinced that the current stalemate on the highest political level will endure, with citizens paying the price of degenerating human rights conditions and an erosion of democratic and transparent governance structures. In a society that is largely dependent on foreign aid, control over institutions that channel such aid is increasingly relevant for

---

[1]   Despite Israel's occupation of the West Bank, the Jordanian Ministry of Awqaf at the time was entitled to administer the West Bank zakat committees through its Jerusalem branch office.

[2]   For details see Benthall and Bellion–Jourdan, 2003.

[3]   *International Crisis Group*, 2003.

[4]   Ishtia, 2008, p. 472.

[5]   Ishtia, 2008, p. 472; booklets and annual reports from various zakat committees.

the political movements seeking to consolidate their power over a territory that is also de facto occupied by Israel.

Before the split, new zakat committee members were proposed locally and appointed with the approval of the Palestinian Authority (PA) Ministry of Awqaf. Zakat committees included independents, as well as members of Fatah, Hamas, and other Palestinian political movements with religious constituencies. The split of 2007 changed the situation of NGOs and zakat committees in Gaza and the West Bank drastically. Reforms have been implemented with the aim of increasing government control and consolidating the respective power of Hamas and Fatah over the territory that they currently administer under the restraints resulting from the blockade of the Gaza Strip and the Israeli occupation of the West Bank.

In 2007, the PA emergency cabinet led by Prime Minister Salam Fayyad dissolved zakat committees in ninety-two West Bank towns and villages and appointed eleven new central committees, one for each West Bank governorate. A newly established central Zakat Fund, based at the Ministry of Awqaf, controls and co-directs these committees. The reform radically changed the landscape and centralized the zakat committees under the tight rule of the Fatah-controlled PA. While many interlocutors confirm the need to improve the regulation of zakat committees, there is a great concern that centralization risks falling short of the efficiency of the pre-reform zakat committees, which had been working in close contact with local communities and village councils.[6] At the same time, zakat money is increasingly collected and distributed through informal channels.

Currently (2009), Fatah controls the Ministry of Awqaf and the zakat committees in the West Bank, while Hamas controls the Ministry of Awqaf and zakat committees in the Gaza Strip. Both Ministries claim to represent the Palestinian Authority.[7] The tendency of the Western media to label Hamas as *radical-Islamic* and Fatah as *moderate-secular* is an oversimplification that needs to be tested against facts and political developments. This paper hopes to contribute to the necessary differentiations in this regard (see the chapter on *Zakat committees and political movements*).

This working paper is thus guided by the following questions:

1. To what degree, and in what way(s), are zakat committees politically affiliated? What is their social, religious, and legal background? Who founded zakat committees?
2. Have zakat committees been politicized? If yes, how did contextual shifts contribute to this politicization? Or did zakat committees contribute through their activities to the politicization of their role?
3. What are the prerequisites that enable the zakat committees to function efficiently? How were the zakat committees governed between the 1970s and the victories of the Hamas-led Change and Reform bloc in 2005 and 2006 elections?

Since 1977, the West Bank zakat committees have been subject to close supervision by Jordanian and Israeli authorities. Following the first Intifada (1987–93), members of zakat committees were arrested and detained by Israel. Nevertheless, zakat committees in the West Bank and Gaza Strip remained largely invisible to academia and only gained international salience in Europe and the US during the US-led 'war against terror', when they were alleged to be subsidiaries of Hamas, which the US and the EU consider to be a terrorist organization.

---

[6]   Benthall, 2008a, p. 20–21.

[7]   Both have websites: West Bank < www.pal-wakf.ps/site/ > and Gaza < www.palwakf.ps/ar/index.php >.

Case 1:05-cv-04622-DLI-RML   Document 267-13   Filed 03/22/12   Page 257 of 646 PageID #: 6935

Currently (as of 2009), there are several lawsuits that hinge on the alleged financing of terrorism, in which the interpretation of the Palestinian zakat committees plays a crucial role. In the US and Europe, several organizations and individuals have been accused of (and sometimes convicted of, or penalized for) providing financial support to Hamas by donating money to the zakat committees.

The paper unpacks the allegation of the political affiliation of the zakat committees to Hamas. Given the diversity of social backgrounds and Islamic movements represented in the zakat committees, it argues that zakat committees have been affiliated in varying degrees to different political movements. While some zakat committees represent wider social coalitions loosely affiliated to political movements with religious constituencies, such as Hamas, Fatah, Islamic Jihad, Hizb Al Tahrir, others were more directly affiliated to Hamas or Fatah. In the municipal elections of 2005 and the PLC elections of 2006, many zakat committee members ran on the opposition ticket of the Hamas-led Change and Reform bloc, which retroactively contributed to the politicization of the committees' role. This politicization resulted, however, from certain political developments prior to the elections, and from the Gaza-West Bank split in particular. From 1977 to their reform in 2007, the zakat committees of the West Bank were knowledgeable organizations that facilitated the creation of a stronger social fabric in the region. As locally anchored voluntary organizations, independent from the US and European sustained economy of aid in the oPt, the zakat committees were able to gain a significant amount of popular trust. This has been documented in surveys on popular confidence in local organizations and institutions in the oPt, the last one carried out in 2004 (see the chapter on *Zakat committees in the local context*). The prerequisites for the success of West Bank zakat committees were their independence, efficiency, commitment to local communities, coordination with village councils and grassroot organizations, and transparency. Based on a comprehensive study of the zakat committees in the West Bank, the paper concludes that the majority of the zakat committees operated as genuinely needs-based charities before 2007.

The researchers conducted informal/unstructured and semi-formal interviews with zakat committee members before and after the 2007 reform of the zakat system. Interviewees included PA government officials, local journalists, academics, NGO workers, students, human rights lawyers, mukhtars, and sheikhs. Moreover, the researchers gathered a significant amount of documentation on the zakat committees of six major West Bank cities and towns (Hebron, Ramallah, Nablus, Qalqilyah, Jenin, and Tubas). These committees were chosen for the following reasons: they existed as zakat committees before the reform in 2007 that replaced their members and transformed them into new centralized zakat committees; zakat committees in remote areas were shut down by the PA in 2007; and while Hebron, Ramallah, and Nablus are the most important cities in the West Bank, Jenin, Tubas, and Qalqilyah represent remote areas in the Northern West Bank.

This working paper seeks to provide a comprehensive account of the West Bank zakat system as a whole. An in depth analysis of the zakat committees' insertion in the wider political economy of aid in the oPt, however, lies outside the scope of this paper. It is hoped that this subject can be addressed in future research.[8]

---

[8]   On humanitarian needs in the oPt, see e.g. *The Lancet (UK)*. 2009. *Health in the Occupied Palestinian Territory*. Web edition, 4 March. < www.thelancet.com/series/health-in-the-occupied-palestinian-territory >; on the economic turbulence which is affecting the oPt since the beginning of the Second Intifada, see e.g. Ajluni, 2003; on the role of international donors in the oPt, see e.g. Challand, 2009 and 2008. Challand, 2008 and 2009, mentions the Hebron zakat committee and the role of Islamic charitable institutions in the oPt.

# Literature review

Zakat committees make up a significant part of Islamic charitable organizations in the West Bank and Gaza. They have received the attention of Western researchers mainly because of a growing interest in 'political Islam' in Palestine, especially after the electoral victory of Hamas and its Change and Reform bloc in the PLC elections of 2006. However, there is an obvious risk of misunderstanding these committees and the role that they play if one focuses only on the question of the zakat committees' links to party politics. Zakat committees operate in a complex socio-political context.

All published literature presented here refers to material that antedates the 2007 reform. Most of the published literature mentioning the Palestinian zakat committees focuses only on the question of political affiliation, mainly to Hamas.

Generally, authors on the topic seem to agree that the zakat committees played a significant role in conserving and reinforcing Islamic social practices and solidarity in the oPt. Authors have observed that there was no comprehensive program for Islamic social welfare activism and there was no umbrella body representing their interests to the PA. Political affiliation seems to be a question of degree. Most authors agree that zakat committees were highly professional bodies run by well-trained senior men on a voluntary basis. Self-reliance, empowerment, local accountability, and efficient cooperation with village councils and local organizations are mentioned as the zakat committees' major strengths.

Authors tend to disagree regarding the degree of affiliation that the zakat committees traditionally had to political movements. Levitt describes the zakat committees as subsidiaries of Hamas that serve as tools in radicalizing and mobilizing society into violent resistance. Benthall, Baumgarten, Malka and Gunning see the zakat committees as loosely affiliated (in varying degrees) to Hamas's overall goals without any direct form of control by Hamas over the committees' decisions. Baumgarten, Benthall, Malka, and Roy contribute crucial elements needed to understand the role of zakat committees in the complex social and political context.

Sara Roy (2000) highlights a number of pertinent facts about Islamic NGOs:

> [M]anagement and staff are typically well educated, highly trained, and professional (many individuals hold advanced degrees from Western universities). Second, the services provided by Islamic NGOs are generally of high quality and are perceived as such by the population. [...] there is no comprehensive social program or master plan (at the macro level) among Islamists or within the Islamic movement that serves as a framework for institutional development or program planning. The lack of an organizing vision linking social programs to a social plan reveals the absence of long-range thinking or planning. Instead, the programs and projects of Islamic NGOs are the initiatives of individuals and the institutions to which they belong. [...] Islamic institutions need to compete on the social/developmental level because it is one of the few channels open to them. This competition is not only for position and power but for survival as well. Not surprisingly, there is now a clear pattern of professionalization among Islamic NGOs. With the shift in emphasis to the social sector, the Islamic movement appears to be moving toward a more pragmatic and non-confrontational philosophy.

The report of the International Crisis Group (ICG) on Islamic social welfare activism (2003, pp. 10–11) in the oPt states:

> Because Islamic social welfare organizations [of which zakat committees are only a part] are formally independent entities, their political affiliations are not immediately apparent. Some are politically as well as legally independent. Others are affiliated with a political entity, such as Hamas, Fatah, or the PA itself. Affiliation, in turn, is often a matter of degree.

The report also quotes a USAID official saying:

> What exactly does political 'affiliation' mean in a context where everyone is either affiliated with political movement to some degree or labelled as such? Can you assign 'political affiliation' to an organization if it does not have a political agenda and its leader is not affiliated to the extent that he acts on behalf of a political movement as opposed to his institution?

Baumgarten (2006, pp. 132–3) discusses zakat and Islamic social welfare in the framework of wider political developments and the role of the state. She argues that Islamic social welfare became politically relevant only once Hamas appeared as a political actor:

> Since authoritarian states in the Arab region neglected the social sector entirely, Islam-oriented organizations could and had to play a central role in this field. This was received positively and thankfully among people. State actors were increasingly seen as egoistic and the official elites perceived as a socio-political group which is mainly concerned with its own individual interest. At the same time, the Islamic sector was increasingly perceived as positive and socially engaged structure in which the interests of the poor and the disadvantaged were central and which did not work into its own pockets but was fully dedicated to its tasks. There is no doubt that the positive image of Islam-inspired social, educational, and youth work influenced the perception of Islamic actors such as Hamas. Neither Hamas nor any other Islamic organization, however, considered this kind of work as a tool to exert political influence. Already for years, social work and education was forming a central part of the Muslim Brotherhood, without the latter being politically active in any way.[9] Nevertheless, the moment in which Hamas entered the scene as a political actor, [social work and education] contributed to its political attractiveness and to its political influence. The structure of all these organizations, which formally do not belong to Hamas but in which there is a strong Hamas influence towards good, professional work without corruption, is crucially important.[10]

Levitt (2006, p. 80) places Islamic social welfare associations and most of the zakat committees in what he coins as the da'wa[11] sector of Hamas. He defines this sector as an integral part of the movement, underlying the military and the political section. According to Levitt, Hamas uses social welfare in order to radicalize youth, teach terror, and pursue terrorist aims by rewarding suicide attacks through direct payments to the concerned family.

---

[9]   We contest Baumgarten's claim that the Muslim Brotherhood has not been politically active in any way. Nonetheless, we decided to quote her here as we find her explanation of how loosely affiliated charitable, social and educational organizations enhanced the attractiveness of Hamas as an emerging political movement relevant.

[10]   Quote translated from German by the author.

[11]   For an explanation of *da'wa*, see *Explanation of Arabic terms*.

Allegedly, Hamas also uses feelings of indebtedness perceived by beneficiaries to pressure them into performing tasks such as the delivery of explosives. Levitt relies heavily on Israeli intelligence material, which he uses to demonstrate links between individual members of zakat committees and Hamas. In terms of explaining how exactly the zakat committees were politically used by Hamas, Levitt insists that they help Hamas to 'win the hearts and minds of the people' and that they are used to recruit members.

Benthall (2008, pp. 12–15) responds critically to the allegations against zakat committees, as advanced by Levitt. He shows the limits and risks of the research methods used by counter-terrorism experts such as Levitt.

> There is no reason to question the good faith of counter-terrorism experts; and indeed citizens everywhere have reason to be grateful to the police and intelligence services that track down and forestall terrorist attacks. However, the methods of enquiry used for this purpose depend critically on the construction of patterns of association through analysis of communications and meetings between individuals.[12] There is thus a grave risk of attributing guilt by association. This risk is compounded by the citation of highly biased press reports and intelligence web sites, and sometimes by reliance on statements extracted from detainees under coercive interrogation.[13]

Benthall (2008a) criticizes Levitt's model, which he names the 'pyramid model' and contests the view that the zakat committees are incorporated within Hamas as a social welfare sector – sometimes referred to as da'wa – used to underpin its military and political sectors.[14] He proposes two alternative models with which to view the zakat committees. The first, known as the 'emic' model, describes the 'West Bank zakat committees in categories which are recognized by all participants and provides some time depth.'[15] Benthall shows that the zakat committees antedate the foundation of Hamas in 1987/8 using the example of the Nablus zakat committee. Using this example, he traces back its origin to when it was an unofficial committee attached to a local mosque and charged with the collection and distribution of zakat. He comes to the conclusion that the pre-2007 zakat committees were 'exactly the kind of grassroots, community based, voluntary institutions that many international donors now look for as an alternative to the waste and corruption that often accompany aid flows through large bureaucratic institutions.'[16] The second, the 'etic' model, seeks to describe the West Bank zakat committees 'as local instances of a worldwide trend, the growth of Islamic NGOs, which are themselves a special case of Faith Based Organizations – but within the unique historical context of the Israel–Palestine conflict.'[17]

Gunning (2007) also contradicts Levitt's model and states that charities affiliated to Hamas,

> raise much of their funding individually, and are technically only accountable to their own membership (which often includes non-Hamas members). [...] Levitt [...] argues that charities are an integral part of Hamas' resistance effort. However, although there is considerable overlap in personnel and interests, each charity is operated by

---

[12]  See the official US Government report on 9/11, pp. 9–10. Monograph on Terrorist Financing: Staff Report to the National Commission on Terrorist Attacks upon the United States (Washington, D.C.: National Commission on Terrorist Attacks upon the United States, 2004).

[13]  Benthall, 2008a. p. 22.

[14]  Benthall, 2008a, p. 8.

[15]  Benthall, 2008a, p. 10.

[16]  Benthall, 2008a, p. 22.

[17]  Benthall, 2008a, p. 26.

**14**

its separate Administrative Council. While charity representatives sit on Hamas' *Shura*[18] council, the charities do not appear to be directly controlled by Hamas. [...].[19]

The success of Hamas' policy to gain confidence was helped by its reputation of incorruptibility, accountability, and efficiency, against Fatah's reputation of corruption and inefficiency. Hamas' widespread network of charities similarly played an important role, both by cementing Hamas' reputation as efficient and accountable and by offering services that made people beholden to Hamas (even though affiliated charities are typically careful to be seen to offer services to anyone in need, and not just those who support it [...]).[20]

Malka (2007) argues that '[t]he perception that all Palestinian Islamic charitable organizations are formally part of Hamas or micromanaged by the movement's political leadership obscures the relationship and authority of Hamas.'[21] According to Malka, many zakat committee members or employees may sympathize with the Islamic movement and some may be members of the latter. However,

[i]deological affinity plays a more crucial role in mobilizing Hamas's network than does formal affiliation. [...] Hamas does not likely rely on a rigid system of control to obtain political support; instead its ability to rely on a loosely organized network at crucial times is a major source of strength for the movement.[22] [...] Hamas is also able to draw support and votes from traditionally non-Hamas Palestinians because of its reputation for honesty and reliability, in part because of its social services. Those who make up its main base of support identify with Hamas because they share the movement's Islamic worldview. Hamas is able to give context and meaning to the Palestinian national struggle through a religious prism that resonates with a socially conservative population, especially in Gaza and among refugees. Ordering society according to religious and social codes is increasingly attractive to people who have suffered from the lack of authority and the erosion of traditional structures. In a situation where Palestinians feel they have no control over their own lives and future, Hamas's message of empowerment is a clear alternative to surrender and helplessness. It is the ability to empower Palestinians, either through the glorification of military operations or the provision of effective social services, that gives Hamas supporters some illusion of control over their own fate.[23]

Lundblad (2008), in his article 'Islamic Welfare, Discourse and Practice – The Institutionalization of Zakat in Palestine', gives little information about the political influence over zakat committees. He mentions a common opinion among opponents of the Islamic movement, which makes the claim that the zakat committees are part of the Islamist efforts to create a state within the state. Moreover, he noticed among the zakat committees that there exists a certain degree of isolation from secular NGOs in Palestine: 'The committees in Palestine have no superior council or body that represents the committees' interest toward the Palestinian Authorities. Neither do they hold membership in any NGO umbrella organizations in the Occupied Territories.'[24]

---

[18]   Hamas' 'consultative' or 'legislative' council.

[19]   Gunning, 2007, p. 115.

[20]   Gunning, 2007, pp. 153–154.

[21]   Malka, 2007, p. 105.

[22]   Malka, 2007, p. 105.

[23]   Malka, 2007, p. 110.

[24]   Lundblad, 2008, p. 210. Note that some zakat committees appear to be members of local branches of the Union of Charitable Societies (personal communication with Benoit Challand).

# Historical overview

This brief historical account on the zakat committees in the West Bank builds on Benthall's 'emic' model of the zakat committees.[25]

## Phase 1: until 1967

During the first phase, the West Bank was still under Jordanian control. Many mosques such as the Hanbali Mosque in Nablus and the Sheikh Ali Bakaa Mosque in Hebron, had internal zakat committees charged with the collection and the distribution of zakat in the vicinity. Moreover,

> [some of the] income [was] derived from *waqf*[26] real estate – assets donated for the inalienable benefit of the zakat committee. Alms were distributed to the poor and needy of the city – following the traditional practice of zakat committees all over the Muslim world. The main responsibility lay with the imam of the mosque, governed by Islamic law but also under the supervision of the Jordanian government's Ministry of Awqaf […], which had charge of religious affairs[27] and holy sites.[28]

## Phase 2: 1968 – 1994

This phase started with Israel's victory in the Six Day War and the consequent occupation of the West Bank, and ended with the creation of the Palestinian National Authority (PA). After the Israeli occupation of Gaza and the West Bank in 1967, there was more room for local organizations with an Islamic reference. This new freedom was seized, and led to the foundation of many Islamic organizations – some of them initiated by the Muslim Brotherhood,[29] others simply by pious people or through various Islamic currents. According to a journalist of the Ramallah based *Ayyam* newspaper,

---

[25]  Benthall, 2008a, p. 10.

[26]  The institution of *waqf* dates back to the foundation of Islam and became widespread over most of the Islamic world. Setting aside some legal technicalities, it is similar to the European charitable trust. On *waqf*, see Benthall and Bellion–Jourdan, 2003, pp. 29–37.

[27]  Christian as well as Muslim.

[28]  Benthall, 2008a, pp. 10–11.

[29]  The Muslim Brotherhood is an organization founded in Egypt in 1928. The movement has branches in various Arab countries, varying in their degree of militancy. Members of the Palestinian branch founded Hamas in 1987, in order to face up to the Israeli occupation on the grounds of armed struggle. They have had a close relationship with the Muslim Brotherhood in Jordan, which – unlike the dominant faction within Hamas – has moderate, non-violent policies and has become a kind of 'loyal opposition' to the Hashemite monarchy. In a memo prepared by the Hamas Political Bureau in 2000 the movement refers to itself as the 'intellectual and dynamic successor' of the Muslim Brotherhood in Palestine. The memo provides an account of different historic phases of the Muslim Brotherhood in Palestine, such as 'B. The phase of preparation for launching the movement's project (1967–80).' In this phase the movement lists the fields in which it undertook work during this phase. '[…] 4. Establishing numerous charitable and social institutions: these included Al-Mujamma'a Al-Islami (The Islamic Centre) and Al-Jam'yah Al-Islamiyah (The Islamic Society) in the Gaza Strip and a number of zakat committees and charitable foundations in the West Bank.' Tamimi, 2007, p. 255. See also Abu-Amr, 1994, pp. 14–15.

**16**

charitable work of the zakat committees was not politicized at all in these days. Some of them were founded by religious members of Fatah with or without links to the Muslim Brotherhood. Fatah's founding fathers, Khalil Ibrahim Al Wazir [Abu Jihad], Salah Mesbah Khalaf [Abu Iyad], and Yassir Arafat [Abu Ammar] all had close ties to the Muslim Brotherhood.[30]

---

In 1977–1978, the zakat committees of Nablus, Ramallah, and Qalqilyah were registered by the Jerusalem office [majlis al awqaf] of the Jordanian Ministry of Awqaf, which continued to be in charge of the awqaf, mosques, and zakat in the West Bank in spite of the Israeli occupation.[31]

The zakat committee of Jenin was established in 1984 by Sheikh Tawfeek Jarrar, who represented one of the biggest families in Jenin.

The Hebron zakat committee was registered in 1987. The Hebron and the Jenin zakat committees seem to have been run on an informal basis prior to their registration, as was the case also with many others.

In 1988, the zakat committee of Tubas was registered by Sheikh Kilani, who also held the position of Director of Awqaf in the Tubas Governorate.

In the same year (1988), Hamas was founded.

---

With the outbreak of the first Intifada (9 December 1987), zakat committees became important channels for bringing foreign funding to the West Bank. They organized educational and health-related activities to compensate for services which where lacking as a consequence of the ongoing Intifada. The money was mainly transferred through the Islamic Bank of Jordan and the Cairo Amman Bank, which had recently opened in the West Bank (see the chapter on *Zakat committees and the state*).[32] With the increase in funding coming from Muslim donors abroad, the zakat committees started to diversify their activities and over the years established nurseries, schools, childcare centres, hospitals, medical centres, specialized clinics, and job-generating projects.

At the end of the Intifada and the establishment of the PA, parts of the Palestinian branch of the Jordanian Ministry of Awqaf fell under the control of the PA and were transformed into the PA Ministry of Awqaf and Religious Affairs, which was in charge of governing the *awqaf*, mosques, and zakat committees in the West Bank. The *awqaf* and the zakat committees of the city of Jerusalem remain, however, under the supervision of the Jordanian Ministry of Awqaf as of 2009.

---

[30]  Journalist, *Al Ayyam* Newspaper, Ramallah, 1 June 2009. See also Aburish, 1998, p. 22. Abu-Amr (1994, p. XV) states: '[T]he Islamic movement has enjoyed the support of leaders in the Fatah movement. Some Fatah leaders had begun their political lives in Islamic organizations, the Muslim Brotherhood and the Islamic Liberation party, and have continued to be sympathetic to Islamic groups. Other Fatah leaders supported the Islamic groups because they wished to control the Islamic movement or at least to co-opt it or neutralize its challenge to the PLO. Some of those leaders believed that an alliance with the Islamic groups might be useful in order to counterbalance competing alliances, if the need arose.' Abu-Amr (1994:20) presents an opinion poll conducted among college students in the West Bank and the Gaza Strip in 1982 and comes to the conclusion: 'The Muslim Brotherhood is not the only beneficiary of the support of religious-oriented individuals. Nationalist organizations, such as the Fatah movements, are also supported by people who want an Islamic state.' The memo prepared by the Hamas Political Bureau in 2000 (cited in the footnote above), states that the Muslim Brotherhood was participating in armed resistance against Israeli forces from 1968–70 under the umbrella of Fatah. The Muslim Brothers 'operated from what was known at the time as the "camps of the sheikhs" […]. This activity ended as a result of the Black September events.' Tamimi, 2007, p. 254.

[31]  Ishtia, 2008, p. 472.

[32]  Interview with government official, PA Ministry of Awqaf, Azzarya, West Bank, May 2009.

## Phase 3: 1994 – 2006

The newly established PA appointed a number of new people to high posts in the Ministry of Awqaf. Some of the officials who had been working under the Jordanians before 1994 found themselves, therefore, working under the responsibility of PA people with little governance experience.[33] The Jordanian zakat law remained applicable in this period. The PA argued that it will continue to do so until the establishment of a Palestinian state which would allow for the drafting of a Palestinian zakat law. Under the guidance of PA Ministry of Awqaf officials, zakat committees were also established in Gaza, where they had previously not existed in this form.[34]

---

In 1996, there were 47 zakat committees in the West Bank and 3 in Gaza.[35]

In 1997, the PA officially registered the zakat committees which were previously under the Jordanian Ministry of Awqaf. More West Bank zakat committees were registered reaching the number of 50 – 60 by 2006.[36]

In 2002, Israel blacklisted zakat committees in the oPt but still allowed them to operate.

In 2005, the Hamas-led Change and Reform bloc participated very successfully in municipal elections held in the West Bank and Gaza.

On 25 January 2006, the Hamas supported Change and Reform bloc won 74 out of 132 seats in the PLC elections.

---

According to some academics and NGO workers, Fatah registered up to three hundred new NGOs at the Ministry of Interior in the short time between Hamas' electoral victory and the moment in which Hamas officially started to govern. Fatah's calculation – that NGOs might become the only politically acceptable way for Western donors to channel money into the oPt – has proven to be accurate, as the Western donor countries have continued to boycott any Hamas-led government, a policy that has been maintained to the present day.

## Phase 4: Hamas governs the PA (March 2006 – June 2007)

On 20 March 2006, the Change and Reform bloc cabinet was formed and Ismael Haniyeh (Hamas) sworn in as Prime Minister on 29 March. Naef Al Rajoub[37] (Hamas, Hebron) was Minister of Awqaf of the first Change and Reform government. After his arrest by Israel on 29 June 2006, Yousef Rizqa (Information Minister of the Cabinet, Hamas) was appointed acting Minister of Awqaf.

The international pressure on the Hamas government was enormous as Hamas declined to abide by the three conditions of the Middle East Quartet.[38] As a result, the international community boycotted the new government and Israel withheld taxes that it had previously collected on behalf of the PA. The Hamas-controlled PA Ministry of Awqaf registered

---

[33]   Interview with government official, PA Ministry of Awqaf, Azzarya, West Bank, May 2009.

[34]   Interview with government official, PA Ministry of Awqaf, Azzarya, West Bank, May 2009.

[35]   Hilal and Maliki, 1997, p. 40. Hilal and Maliki cite historic reasons to explain the difference in number, as well as the policy of the Jordanian Minister of Awqaf before the Jordanian disengagement from the West Bank, of forming zakat committees there. Also cited is the 'the aid agency [UNRWA] which was focusing its activities on Gaza.'

[36]   Interview with government official, PA Ministry of Awqaf, Azzarya, West Bank, May 2009.

[37]   N. Rajoub is the brother of the well-known Fatah politician Jibril Rajoub.

[38]   For an inside perspective of the decision-making process of the Middle East Quartet, see UN Envoy to the Middle East Quartet, Alvaro De Soto, End of Mission Report 2007. < www.guardian.co.uk/world/2007/jun/13/usa.israel >

thirty-two previously informally operating local committees[39] as zakat committees.[40]

In March 2007, Hamas and Fatah agreed to form a unity government. Hussein Tartouri (Hamas, West Bank) was appointed Minister of Awqaf. The unity government did not, however, survive long. Armed clashes between Hamas and Fatah escalated and public order in Gaza deteriorated. Hamas, fearing a severe US-backed crackdown, took power in Gaza by force in June 2007.

---

By June 2007, there were ninety-two zakat committees registered in the West Bank.[41] They were as follows:

Jenin Governorate [1]: City of Jenin.

Nablus Governorate [19]: City of Nablus, Aqraba, Asira Al Shamalya, Asira Al Qabalya, Burqa, Sebastyia, Salem, Beita, Madama, Balata Refugee Camp, Tell, Al Sanabel, Huwara, Lebasha'er, Beit Iba, Rujeib, Jamma'in, Qabalan, Burin.

Tubas Governorate [5]: City of Tubas, Tammun, Faraa Refugee Camp, Aqaba, Al Aghwar Al Shamalya (Ain Al Bayda and Bardala).

Tulkarem Governorate [4]: City of Tulkarem, Anabta, Atayl, Baqa Al Sharqya.

Qalqilyah Governorate [11]: City of Qalqilyah, Kafr Qadum, Azzun, Jinsafut, Jayyus, Hajja, Habla, Baqa Al Hatab, Kafr Tulth, Amatin, Kafr Laqif.

Salfit [12]: Central Salfit (Al Markazya), Al Mahalya, Farkha, Deir Istyia, Zeita Jamma'in, Kafr Al Dyik, Biddya, Surta, Brukin, Kefl Hares, Qarawa Bani Hassan, Marda.

Jericho Governorate [1]: City of Jericho.

Ramallah and Al Bireh Governorate [1]: City of Ramallah (zakat committee of Ramallah, Al Bireh and Alloua).

Jerusalem Governorate (East of the Separation Barrier) [9]: Abu Dis, Al Ram, Bir Nabala, Samira Mis, Al Azzarya, Hizma, Suwahira Al Sharqya, Suwahira Al Gharbya, Anata.

Bethlehem Governorate [9]: City of Bethlehem, Beit Fajjar, Beit Sahur, Al Khader, Marah Rabah, Dheisheh Refugee Camp, Al Shawawara, Tuqu', Al Duha.

Hebron Governorate [13]: City of Hebron, Halhul, Sa'ir, Al Shuyukh, Beit Kahil, Beit Ula, Al Jaba'a, Al Urub Refugee Camp, Beit Amr, Bani Na'im, Surif, Kharase, Taffuh.

Dura Governorate[42] [7]: Dura, Yatta, Al Samu', Al Dhahirya, Al Fawwar Refugee Camp, Al Ramadin, Idna.

---

## Phase 5: Prime Minister Fayyad's emergency cabinet (June 2007 – until present)

On 15 June 2007, President Abbas appointed Salam Fayyad (Finance Minister of the Unity Government) as Prime Minister of an emergency cabinet charged with the task of governing the PA in the absence of a legislative power. The PLC was no longer to be convened and many of the parliamentarians who were elected on the Change and Reform ticket were jailed. In spite of his new post as Prime Minister, Fayyad still additionally holds the position of Minister of Finance.

---

[39] 'During the first Intifada, every village in the West Bank formed some kind of local committee to deal with incoming funds. In order for these committees to be recognized by donors they needed to affiliate with bigger zakat committees. Many of these committees were turned into unofficial zakat committees. When Hamas was in the government, they just registered these existing committees officially.' Interview with PLC member (Hamas), Ramallah, June 2009.

[40] Official publication of the Ministry of Awqaf on reforms, 27 May 2008, Azzarya, West Bank and interviews with a senior official of the PA Ministry of Awqaf, Azzarya, West Bank, May 2009 and a PLC member (Hamas), Ramallah, June 2009.

[41] List provided by the PA Ministry of Awqaf, Azzarya, West Bank, June 2009.

[42] Dura village lies in the south-west of Hebron. In this list, Dura and neighbouring villages are listed as a separate governorate.

On 12 July 2007 Sheikh Jamal Bawatnah,[43] the former Mufti of Ramallah, was appointed Minister of Awqaf and Religious Affairs. Sheikh Bawatnah implemented the reform of the zakat system in consultation with the Council of Ministers. Ninety-two West Bank zakat committees were dissolved and eleven central zakat committees were formed. With a few exceptions, the members of the central zakat committees were all recent additions and had little experience in running a zakat committee. The first committees thus had difficulties in operating and their composition was adapted in 2008 (see the chapter *The 2007 reform and its consequences*).

By 2009, the central zakat committees constituted a mixture of personalities loyal to Fatah and the PA government and representatives from local villages with a 'clean record', i.e. no links to the Islamic movement. According to interlocutors in the West Bank, Hamas in Gaza and Fatah in the West Bank are currently seeking to get a tighter grip on NGOs by enforcing control, as well as replacing and arresting board members. The reform of the zakat committees has to be seen in this context. 'Without the events in Gaza of June 2007, the dissolution of the zakat committees would not have been possible.'[44]

---

[43]   Sheikh Bawatnah has been replaced in the position of Minister of Awqaf by Mr. Mahmoud Habbash on 18 June 2009.

[44]   Interview with government official, PA Ministry of Awqaf, Azzarya, West Bank, May 2009; and interview with a Fatah member, Hebron, West Bank, May 2009. See also: Omran, Aya, Aisheh Ahmed, and Hazem Haneyyeh, 2008.

Case 1:05-cv-04622-DLI-RML   Document 267-13   Filed 03/22/12   Page 267 of 646 PageID #: 6945

# Zakat committees in the local context

This chapter describes the zakat committees specifically in the context of local communities. The present tense is used to generally refer to zakat committees in the period between the registration of the first zakat committee in the West Bank 1977 and the present. At times, however, the author is obliged to mention the 2007 reform in order to indicate changes that have occurred as a consequence of this reform. A discussion of the 2007 reform can be found below (see chapter on *The 2007 reform and its consequences*).

A Palestinian encyclopaedia defines the zakat committees as 'local charitable institutions which are supervised by the Palestinian Ministry of Waqf and Religious Affairs. They collect zakat, sadaqat, and endowments/gifts [al habbat] from the rich in order to arrange their distribution among the poor according to the legal scriptures [al nusus al shar'yya].'[45]

An outreach document of the pre-2007 Ramallah zakat committee defines the committee as:

> [a] space of affection and meeting, uniting the beauty of taking with the generosity of giving, based on and trusting in a scientific method, social research [bahth ijtima'i], transparency, independence, and God. […] [It is] a charitable committee without any political, factional or clan colouring; insisting on the neutrality of charity [khayr] […]; lowering the burden of the poor, the orphans, and the needy in honesty [amana] and equality [insaf]; committed to the rule of law, the belief [taqwa] in God […], and the love for people; it represents the rich in bringing their zakat and sadaqat to the poor and the needy.[46]

Despite its strong religious character, the Ramallah zakat committee lists the principles of non-discrimination among beneficiaries and insists on precise monitoring:

> [the Ramallah zakat committee] gives to the beneficiaries without any form of discrimination among citizens; it monitors precisely that the distribution of charity ends in the hand of the beneficiaries only; it demands from everybody to be aware that zakat funds are the right of its beneficiaries who are deprived of force, and that zakat funds are not like other funds: whoever takes anything away from them in an illegal manner, acts as if he took from the [hell] fire, and whoever takes from [these funds] in this life, this will be a woe in the hereafter.[47]

Zakat committees are a part of wider group of Palestinian Islamic institutions. There are thus many Islamic associations that are different from zakat committees and are registered as NGOs at the PA Ministry of Interior. According to Roy (2000):

> Islamic institutions reportedly comprise anywhere from 10–40 per cent of all social institutions in the Gaza Strip and West Bank. These figures were derived from a variety of sources, including Palestinian ministries, Islamic, and secular NGOs and Palestinian research institutions. (Precise figures either do not exist or are difficult to

---

[45]  Ishtia, 2008, p. 472.

[46]  Outreach document (flyer) of the Ramallah zakat committee informing citizens on visions, programmes and activities of the committee. It appears to have been printed between 1997 and 2003.

[47]  Booklet Ramallah zakat committee, 1997, pp. 4–5.

obtain or verify.) For individual sectors such as education, the percentages appear to be higher. According to a Ministry of Education official, 65 per cent of all Gazan educational institutions below secondary level are Islamic.

Exact figures are still difficult to obtain, especially with a number of reforms and closures[48] taking place until 2009. According to our knowledge, however, the biggest Islamic NGO in the West Bank is the Hebron Islamic Charitable Society. Prior to 2007, this NGO had an annual budget of up to six million USD,[49] and was established under an Ottoman law in 1965. According to a senior official of the PA Ministry of Awqaf, the Hebron Islamic Charitable Society was running a 'hidden zakat committee'[50] and in Spring 2008, it was raided and shut down by IDF.[51] The PA Minister of Social Affairs at the time, Mahmoud Habbash,[52] condemned this Israeli interference in internal Palestinian affairs.[53] In June 2009, a board member of the Hebron Islamic Charitable Society, and member of Hamas, died in PA detention; allegedly he was tortured to death.[54] Unfortunately however, a comparative study of Islamic NGOs and zakat committees, although highly relevant, lies outside the current scope of this paper and remains a subject of future research.

## Religious dimension of zakat

Almsgiving to relieve the poor is one of the five pillars of Islam, and the Quran repeatedly emphasizes its importance. The Quranic framing of charitable giving is somehow unfamiliar to 'Western' minds and the Quranic terms used to address the issue of almsgiving are not entirely congruent with Western ethical and legal concepts of 'charity'.[55]

The Quran provides several terms to address almsgiving. *Zakat*, *sadaqat*, and *khayr* are the most current and are often interchangeable within the Quranic text. Later legal interpretations have led to the following broad distinctions.

---

[48]   E.g. Palestinian Centre for Human Rights (PCHR). 2008. 'PCHR Condemns IOF Measures against Nablus Charities.' Web edition, 8 July. < www.pchrgaza.org/files/PressR/English/2008/62-2008.html >
The report covers raids and closures of Islamic institutions in Nablus imposed by Israeli forces in July 2008. The concerned institutions include: 'Nablus Mall (owned by the Development, Investment, and Insurance Company), Nafha Association for Prisoners' Affairs; Federation of Islamic Trade Unions, Scientific Medical Assocaiton, Yazour Benevolent Society, Basma Association, and Graduates Cultural Forum.'

[49]   Information provided by an Islamic charitable organization based in London that has been working with the Islamic Charitable Society of Hebron. The estimate is made based on numbers for the years 2000, 2001 and 2002.

[50]   Interview with government official, PA Ministry of Interior, Ramallah, West Bank, June 2008.

[51]   Zakat committees and Islamic charitable organizations have been raided and attacked by the IDF at several stages of the Second Intifada. E.g. in 2006, 37 charitable organizations have been raided. The IDF confiscated computers and records. See Abu-Sada, Madi and Uweidat, 2007, p. 45.

[52]   He became PA Minister of Awqaf in May 2009.

[53]   Humanity Voice. 2008. 'Palestinian Minister of Social Affairs: Charity organizations in Hebron are legal, efficient, effective, and very credible.' Web edition, 7 May. < www.humanityvoice.net/news_details.php?id = 590 >

[54]   Reuters. 2009. 'Hamas jail death in W. Bank stokes Palestinian feud.' Web edition, 15 June. < www.reuters.com/article/latestCrisis/idUSLF503919 > ; Le Monde (France). 2009. 'Le Hamas annonce la mort d'un de ses membres détenu en Cisjordanie.' 15 June. < www.lemonde.fr/cgi-bin/ACHATS/acheter.cgi?offre = ARCHIVES&type_item = ART_ARCH_30J&objet_id = 1087364 >

[55]   For an overview on the terminology of zakat, sadaqat, charity and philanthropy, see Singer, 2008, pp. 4–9.

**22**

*Zakat*: mandatory almsgiving, i.e. (1) the obligation [fard] for Muslims to give a certain proportion of their assets to the benefit of the poor; and (2) generally, the value of 2.5 per cent of their assets other than residence and working tools per year. The Quran mentions the term *zakat* 32 times. An example of its usage can be found in Quran 2:177:

> Piety does not consist of merely turning your face to the east or to the west. Rather, the pious person is someone who believes in God, the last day, the angels, the book, and the prophets, and who out of his love gives his property to his relatives, orphans, the needy, travellers, supplicants, and slaves; and who performs the required prayers and pays the zakat.

*Sadaqat*: voluntary almsgiving.

*Khayr*: charity or goodness – as activity and moral achievement.

The theological and legal complexity of Islamic almsgiving expresses itself in numerous debates among Muslim scholars occurring across centuries.[56] Putting to one side the sublime distinctions and particularities, one can generally state that:

> the perspective of the Quran on sharing wealth and individual resources through acts of giving is rooted in specific essential ideals: 1. the absence of a dichotomy between spiritual and material endeavours in human life, i.e. acts sanctioned as part of faith are also linked to the daily conditions of life in this world; 2. the nature, purpose, and function of the Muslim community as 'the best of communities created to do good and struggle against evil' (Quran 3:110); 3. the trusteeship of wealth and property and hence accountability for the way in which they are expended.[57]

The institutionalized form of zakat, as foreseen by proponents of a state based on Islamic law, is discussed in the chapter on *Zakat committees and the state*.

## Aims of the zakat committees

According to a Palestinian encyclopaedia (Ishtia 2008), zakat committees are traditional institutions, registered since the late 1970s, which pursue the following aims:

a. To increase mutual social responsibility and solidarity in the Palestinian society.
b. To create centres destined to help the poor, people in need, people with social issues or in urgent situations; and to conserve their dignity.
c. To increase the means leading to public benefit [al nafa'a al 'am] and constant piety and honesty [al barr al da'em] in the society through the prevention of begging and the establishment of the social balance in the Palestinian society.
d. To create reliable institutions to which those who do good [al muhsinin] will direct themselves for discharging the obligatory zakat, sadaqat, and endowments/gifts [al habat]. This will spread among them the tasks of looking for virtuous and needy families and facilitate upon them the payment of zakat.

---

[56] For an overview on theological and legal debates: Zysow, 2005, p. 441; for an overview on the present day interpretation and practice of almsgiving in Islam: Benthall and Bellion–Jourdan 2003, especially chapter 1: 'Financial Worship', pp. 7–28.
[57] Nanji, 2001, p. 64.

e.  To create a continuous observance of the sadaqat through the establishment of charitable endowment and investment projects of which the interest is spent on the poor and charitable projects.[58]

The Jenin zakat committee [was] founded in 1984, to achieve the following objectives:

a.  Looking after the poor and orphans and offering the social, cultural, medical, and economic aid needed.
b.  Providing new work opportunities by establishing new projects to encourage the citizens to stick to their land.
c.  Establishing the charitable projects required by the local society, particularly the social and economical projects that form the development infrastructure.
d.  Encouraging educational and academic studies through granting awards to study abroad.[59]

Besides a strong social and religious component, the zakat committees also have the intention of strengthening the backbone of their society in order to resist the continued annexation of the West Bank by Israeli settlement expansion and to discourage emigration.

## Projects run by the zakat committees

### *Orphan sponsorship*

All of the six zakat committees which serve as case studies for this research run orphan sponsorship programmes. In Arabic, anybody whose father has died is an orphan [yatim]. However, there are slight differences between the zakat committees in how the orphan sponsorship programmes are operated. In general, orphans are registered either using the zakat committees' own forms – mainly in the case of local donors – or using the forms of the donor organization abroad, on behalf of which the zakat committee coordinates the sponsorship. Relevant information regarding an orphan's particular situation is registered using a form. In the interest of the orphan and in order to avoid politicization, the zakat committee does not discriminate on the basis of the cause of death of the father nor of his previous political affiliations. Whether the father of an orphan died of illness, was killed in street fighting with Israeli forces, in a terror attack on Israeli civilians or soldiers, or was executed by Palestinian forces because he was collaborating with the IDF, does not affect the eligibility of a child for sponsorship. 'An orphan child is neither responsible for this war nor for the acts of his/her father.'[60] All members and employees of the zakat committees who were interviewed in the course of this fact-finding mission appear to share this view. The principle that no one should bear the burden of another person is repeatedly stressed in the Quran (e.g. Quran 6:164; 17:15; 35:7).

There are social workers officially tasked with visiting the orphan family and asking the neighbours to verify the need of the orphan. In certain cases, the zakat committee convenes the extended family of the orphan in order to find a person who can take the responsibility of the child. Often orphans have to write regular reports on their progress in school and in life in general. These reports are then sent to the sponsor.

---

[58]  Ishtia, 2008, p. 472.
[59]  Al Razi Hospital Jenin, booklet, 2009.
[60]  Interview with member of the pre-2007 Nablus zakat committee, Nablus, West Bank, 4 June 2009.

**24**

The payments are either carried out monthly, every three months, or every half a year, depending on the committee and on the donor organization abroad. The person responsible for the orphan, usually the mother, has to open a bank account. After receiving each payment, the orphan must pass by the zakat committee and sign a receipt or leave his or her fingerprint to confirm the receipt. Some donors are in contact with the orphan who they sponsor directly by mobile phone. Most zakat committees tend not to charge overhead costs for orphan sponsorship. If they do, the amount is very small, precisely determined, and accepted by the donor. Every bank transfer needs the signature of several members of the zakat committees, and since 2007, they also require the stamp of a financial observer appointed to the zakat committee by the PA Ministry of Finance.

### Regular financial aid to poor families

Most donors want to support an orphan child because of the specific importance that the Quran assigns to the care for orphans. However, many poor children in the oPt are not orphans. The zakat committees thus also run regular sponsorship programmes that follow the model of the orphan sponsorship for poor families in general. Special attention is given to families who have lost their breadwinner due to an accident or illness. Families of political prisoners are, however, not eligible to receive aid from a zakat committee because there is a PA government section, the Ministry of Prisoners, which is specifically responsible for taking care of prisoners.

Poor families are often supported once the social researchers of the zakat committee have determined the family's eligibility, while also accounting for the financial capacities of the zakat committee in question. Payments therefore might be irregular, and at times the support will be in-kind donations. The director of the Tubas zakat committee, for instance, has worked out a sophisticated system to determine the eligibility of a family to receive aid. Detailed information on a family's situation allows the Tubas zakat committee to calculate the degree of need.

### Direct aid for people in a situation of urgent need

In cases of urgent need such as medical operations, spectacles, and the like, the zakat committee contacts the hospital or the optician and directly pays for the service provided. This payment is carried out through a check signed by several members of the zakat committees. Since 2008, such checks need to be stamped by the observer from the PA Ministry of Finance.

### In-kind aid

Some committees have quite large facilities where they store in-kind donations, such as school bags, pens, clothes, basic nutritional supplies, toys, material for house renovation, and so forth. During Ramadan, in-kind donations usually reach their peak and are distributed among poor families who have previously signed up to receive in-kind aid. According to several zakat committee members, about 80 per cent of the in-kind donations come from local people. Some committees run soup kitchens – usually attached to a mosque – and provide meals for hundreds of families. The activity of these kitchens is increased during Ramadan, when special food is distributed to more families. In Hebron, there is a soup kitchen next to the Haram Ibrahim (Ibrahimi Mosque), whose origins go back to the thirteenth century.

*Provision of sacrificial animals and distribution of their meat
and other food items*

On the occasion of religious celebrations, such as Aid Al Adha and Aid Al Fitr, local and
international donations reach their peak. The zakat committees coordinate the slaughtering
of sacrificial animals with imams and local butchers. The meat is then distributed among the
poor together with other nutritional items such as rice and canned tomatoes. The distributions
during Ramadan (and on other religious occasions) are closely observed by the public, which
puts a certain amount of pressure on the zakat committee to be transparent and fair.

Most of the zakat committees run the activities listed above. Larger committees also run
additional activities.

*Medical services*

Many zakat committees run small clinics that offer cheap or free medication and services
to the poor. Some committees based in remote areas run hospitals; for example, the Jenin
committee established the Al Razi Hospital in 1991. The hospital provides a wide range of
specialist medical services and relieves people from having to travel to Nablus or Ramallah
in order to get treatment. Various donors – such as the Governments of Italy and Canada,
or foundations in Kuwait and other Gulf countries – have funded different sections of the
hospital.

In cities such as Ramallah and Hebron where many hospitals already exist, the medical
centres are very small in scale and mainly offer free or cheap medical treatments to very
poor citizens. Most of the services provided by them are simple, such as dentistry services.
The medical centre of the Nablus committee also offers some simple services combined
with an eye clinic which complements the existing state medical services in Nablus. Some
medical centres run night shifts in the clinics of refugee camps and small villages. In the
camps, they complement the medical services of UNRWA, which does not provide services
at night. For example, the doctors from the medical centre of the Ramallah zakat committee
run night shifts at the UNRWA medical centre in Jalazone camp near Ramallah.

*Education*

Some committees used to run Islamic schools and centres for the memorization of the
Quran. However since 2007, any of the memorization centres seem not to be receiving
funding from zakat committees. On 21 May 2008, the Central Zakat Committee of Tubas
received a general letter regarding the issue of Islamic schools and centres from the
Minister of Awqaf. A similar letter was sent to the other central zakat committees in the
West Bank. The letter informed the Central Zakat Committee of Tubas that projects aimed
at Quran memorization was now to be outside the field of activity of the zakat committees.
Moreover, it decrees:

> […] the centres for the memorizing of the Holy Quran for males belong to the
> Awqaf Directorate [of Tubas] and the centres of females belong to the General
> Administration of Women's Work [al idara al 'ama lil'aml al nasawy]. It is possible for
> the teachers to apply in order to receive monthly allocations for teachers […].[61]

---

[61]  PA Ministry of Awqaf, letter to the Central Zakat Committee of Tubas, 21 May 2008.

Whether the centres continue to run activities or if they have been closed is not known to the author.

Some committees run private schools with attached day-care centres for orphans. Families have to pay to send their children to these schools, unless the family is very poor or the child is an orphan. Some committees seem to have provided scholarships or grants to support excellent students to study abroad. Families with sons and daughters in university are eligible to receive aid in certain cases. Sometimes zakat committees also cover the university fees of students who are unable to cover such fees themselves.

### Job creation projects

The Nablus zakat committee, which many see as the first and the best of the West Bank, has run a job creation project since 1990. This project led to the establishment of the Al Safa Dairy in Nablus. The dairy was founded in 1998/99 and production started in 2001. The general director of the dairy at its founding was Sheikh Al Hanbali, a veterinarian and former member of the Nablus zakat committee.

Our impression was that this is a model development project in that it:

- provides a market for cattle farmers – one farmer used to have ten cows, and now has 300 (the project started by buying cows for farmers);
- provides local employment;
- reduces the risk of brucellosis, which is caused by unsterilized milk;
- provides a quantity of free milk and milk products;
- receives payment contracts with numerous agencies to distribute milk and milk products in the oPts for free;
- markets some milk products to the retail consumer sector, so as to supplement the dairy's revenue.

Since 2007, there is a new general manager. He had already worked in the dairy before and, according to the new president of the central zakat committee, he was promoted to run the dairy because of his familiarity with the operation, and because he was deemed to have a politically 'clean' record without links to the Islamic opposition (see the chapter on *The 2007 reform and its consequences*). Al Safa Dairy is an example of success that may well continue throughout the transitional period of the change of the committees. The dairy is equipped with modern machines and purchases are made with the help of the Islamic Development Bank. Documentation is available that shows Al Safa's cooperation with the World Food Program, UNDP, ANERA, USAID, Near East Foundation, and local Christian organizations. A number of recent documents show that these relationships are continuing in 2009.

## Waqf [62] and real estate investments

The land and the buildings owned by the zakat committees are waqf, i.e. foundations which are either used for charitable purposes, rented out to educational institutions on preferential conditions or alternatively to normal commercial tenants. The income deriving from these properties is used for charitable projects.

---

[62]  For an overview on waqf as a resource for charity, see Benthall and Bellion–Jourdan, 2003, pp. 29–44.

Mainly elderly men of wealth donate land and buildings as waqf property to a zakat committee or to a local mosque. The author attended such a donation in Tubas. A wealthy gentleman donated two pieces of land and a house to the central zakat committee as waqf al zakat. On the wall of the house are engraved the following words: Property belongs to God – this building is waqf for the sake of God, the sublime [al mulk lillah hada al bunyan waqf liwajh allah ta'ala]. The building has two floors and a foundation that can carry up to seven floors. The wealthy gentleman said to the Tubas zakat committee, 'if you will do something good with it and be responsible, I will give you more property.'[63]

In spring 2009, all the waqf property of zakat committees and of local mosques became the official property of the PA Ministry of Awqaf (see the chapter on *The 2007 reform and its consequences*).

## Popular confidence

As Benthall has outlined previously:

> A public opinion poll was conducted on two occasions in recent years by Birzeit University in Ramallah, to ascertain the degree of popular confidence in various civil institutions. This university has one of the best academic reputations in the Palestinian Territories. The results, though somewhat crude as sociological data, are highly suggestive:[64]

| | |
|---|---|
| Universities | 70.9% |
| Zakat committees | 62.5% |
| NGOs and charitable societies | 50.0% |
| Local press | 46.0% |
| Formal judicial system | 43.5% |
| Trade unions | 37.5% |
| Palestinian opposition | 34.2% |
| Political movements/ parties | 27.8%[65] |

Benthall commented on the difference between the degree of confidence in zakat committees, which is very high, as opposed to the confidence in political movements, which is rather low. He inferred that the public did not perceive the zakat committees as affiliated to a party or to a movement.

The Birzeit University Development Studies Program has conducted a similar survey in 2008/9. Unfortunately, the category of zakat committees has not been included in this new survey. The researchers working on the survey stated that the reason for the omission of

---

[63]  Interview with wealthy gentleman, Tubas, West Bank, 25 June 2009.

[64]  Birzeit University Development Studies Program. 2000 and 2004. *Opinion Polls: Trust in Palestinian Institutions.* < www.birzeit.edu/cds >. This is quoting Benthall (2008a, pp. 16–17) who has consolidated and averaged the percentage findings of two polls, no. 1 (August to September 2000) and no. 17 (June 2004): 'Allowance has been made for obvious misprints in the published tables. Confidence in the zakat committees was apparently rather higher in Gaza than in the West Bank but the difference is not great enough to affect the ordering. An analysis of the raw data may be found on the same [see below] website under 'Opinion Polls'. They are based on a sample size of 1,256 in 2000, 1,197 in 2004, and 70 sample locations in 2000, 75 in 2004. 85 researchers were engaged for the 2004 poll. A margin of error of +/- 3% is suggested.'

[65]  Benthall, 2008a, pp. 16–17.

**28**

the zakat committees was that they had considered them to be in a state of flux.[66] According to a number of interlocutors, however, popular confidence has diminished since the 2007 reform (see chapter on *The 2007 reform and its consequences*).

In April 2000, the Human Development Program and Birzeit University, Ramallah (West Bank) published a report in cooperation with the United Nations Development Program and the Palestinian Ministry of Planning and International Cooperation's Department of Human Development and Institution Building. This report included the results of a public opinion poll conducted in 1998–99 (on both the West Bank and Gaza) as to the degree of confidence felt in various types of institutions within the Palestinian Territories. Whereas the Palestinian Universities scored the highest confidence rating (67 per cent), zakat committees scored 57 per cent – well above 34 per cent for professional and trade unions and 24 per cent for the political opposition.[67] The reasons for this high degree of popular confidence in the pre-2007 zakat committees are manifold. The following facts provide some insight.

Zakat committees were run by local businessmen and entrepreneurs, representatives of well known families and men with high levels of education (whether they be young or retired professors), all working on a voluntary basis. Men with degrees in *sharia* law were rare. Generally, members enjoyed a good reputation as honest, pious, and committed members of the society working across religious, political, and clan boundaries. All new and old zakat committees interviewed say that Christians were among the beneficiaries, something that earned the committees a level of respect that extended beyond religious boundaries.

The representation of families and neighbourhoods played an important role in the history of the zakat committees. According to a member of the central zakat committee in Hebron, many of the families of Hebron are interested in being represented in the committee because membership in the zakat committee is considered to be an important social position:

> Before 2007, there were seven important families represented. Now, apart from a few exceptions, there are different families in the central zakat committee. I am the first of my family to be in a zakat committee. Note that not only family representations play a role, also neighbourhoods, as in some neighbourhoods different families form alliances. For me personally membership of the committee is useful as this makes me more known in the city.[68]

The Jordanian zakat law prevents close relatives (up to fourth degree) from being represented in the same zakat committee.[69] Before 2007, members often stayed on the zakat committees for decades. After their deaths, the founders of the zakat committees were usually replaced by one of their sons. This seemed to have ensured stability, and continuity in the projects undertaken by the zakat committees.

Until 2007, zakat committees were seen as institutions responding to what people needed most. In comparison to secular NGOs, they were seen as less compliant with a foreign agenda of aid (see the section on *Zakat committees and foreign aid* below). Zakat committees are not members of the Palestinian NGOs Network (PNGO), which is often seen as corrupt by a wide range of interlocutors.

---

[66] Interview with researcher at the Birzeit University Development Studies Program, Ramallah, West Bank, June 2009.

[67] Centre for Development Studies, Birzeit University. 1999. *Palestine Human Development Report, 1989–99*.

[68] Interview with member of Central Zakat Committee of Hebron, West Bank, 13 June 2009.

[69] Jordanian Zakat Law, instructions number (3) of the year 1996, Article 3, paragraph (d).

Zakat committees have an important role in dealing with social class divisions and in emphasizing the beneficiaries' dignity. According to the director of a zakat committee with over twenty years of experience in this field, there is an important link between poverty, manhood, and honour in the local society:

> There are many men who cannot make enough money to sustain their families. This is a general problem of Middle Eastern societies today. Many men do not know what to do in such a situation. They can only stay at home and cry, and are left with a feeling of shame. The zakat committees can help them to get by and improve their situation in a way that is sensitive to their feelings and self-respect. Religion has an important role in enforcing equal respect for people from different social classes. If we do not take care of poor men, their children will possibly revolt against society. This needs to be avoided and finally generosity is an essential part of existence [al jawd min al wujud]. Poor families can receive small payments of money on an irregular basis – transferred to their bank account. Even if a poor father only receives an additional forty US dollars every two months, this might give him the chance to buy some toys for his children or to bring home some decent food.[70]

Some interlocutors said, however, that zakat committees prior to 2007 were run in an old fashioned way with a lack of accountability. In remote areas, some say that they were not always able to stay outside clan and family interests.

Pre-2007 zakat committees differed regarding the degree of accountability and transparency with which they were associated, according to the PA Ministry of Awqaf.[71] Socially liberal Palestinians are often little informed about the zakat committees and sometimes look at them with mistrust. Some assimilate the zakat committees to the Islamic movement, which they see as a threat to civil liberties and progressive social values – something that is already scarce in many Middle Eastern societies.[72] Some of the pre-2007 committees were known as being run by people from Hamas. Even if they did not, as committees, take direct political action, they often faced the mistrust of opponents of Hamas. A smaller number of committees were known to be run by Fatah.

According to Nathan Brown, pre-2007 'zakat committees enjoy[ed] a tremendous amount of legitimacy. Even secular leftists admire[d] their authenticity and ability to operate without reliance on Western funding.'[73]

We thus propose to reconsider the following statement by Malka (2007): 'It is the ability to empower Palestinians, either through the glorification of military operations or the provision of effective social services, that gives Hamas supporters some illusion of control over their own fate.'[74] Contrary to the detrimental consequences of Hamas' recent military strategies (i.e. the large scale destruction in the Gaza Strip resulting from the winter 2008/2009 war), the empowerment provided by the zakat committees – whatever their degree of affiliation to Hamas may be – could be seen in a more positive light than as a mere 'illusion of control over their own fate.' Many interlocutors stated that the absence of administrative control over their own affairs is one of the main reasons for frustration.

---

[70]   Interview with zakat committee director, West Bank, June 2009.

[71]   Interview with government official, PA Ministry of Awqaf, Azzarya, West Bank, June 2009.

[72]   According to conversations held in May and June 2009. The researchers have also spoken to socially liberal Palestinians with a very positive view of the pre-2007 zakat committees (see *Conclusion*).

[73]   Brown, 2003, p. 160.

[74]   Malka, 2007, p. 110.

The religious nature of the zakat committees allows to frame charity work under harsh political conditions in a wider, Islamic context, which motivates people to do hard and honest work. The religious motivation has a much wider time horizon and many agree that it cannot be silenced. Religion in this context is undoubtedly a crucial source of peace of mind.[75]

## Efficiency

Zakat committees are known to have very low overhead costs. Before 2007, the ninety-two local committees had excellent access to beneficiaries and knowledge about the local needs. In 1997 Palestinian sociologists stated that:

> financial sources of the zakat committees (with the exception of the zakat committees belonging to the PA in Gaza) were not docile to the PA or to the Western donor apparatuses. This provides them [the zakat committees], compared to other local organizations, with more independence and increases their opportunities to determine their priorities, as well as the amount and the method of aid, in accordance with the beneficiary groups.[76]

Their medical services were designed to be complementary to services offered by the PA and other aid agencies (see the description of medical services provided above).

Concerning aid payments to poor families, it can be stated that the same beneficiaries of zakat committees were often also receiving aid from other sources, such as the Ministry of Social Affairs. Zakat committees paid attention to coordinating these aid payments with other sources, given that one source would not be sufficient to cover the living costs of a poor family.

## Zakat committees and foreign aid

According to estimations of the Ministry of Awqaf and zakat committee members, only 20 per cent of the funding of zakat committees comes from inside the oPt. Of this 20 per cent, approximately 80 per cent is articulated as in-kind donation. 80 per cent of the funding comes from foreign countries.

In 1997, Palestinian sociologists noted '[...] the zakat committees (with the exception of those which were formed by the PA itself) enjoy total financial independence from the PA and independence from funding by European and American, governmental and non-governmental organizations.'[77] The ratio between funding from inside and outside the oPt varied among the pre-2007 zakat committees. In certain cases local funding has constituted from 20 to 40 per cent of the budget. In an exceptional case (i.e. the Nablus zakat committee) 90 per cent of the funding appears to have generated locally.[78]

---

[75]   Interviews with religious personalities, Muslim academics and pre-2007 zakat committee members, West Bank, May and June 2009.

[76]   Hilal and Maliki, 1997, p. 62.

[77]   Hilal and Maliki, 1997, p. 62.

[78]   Questionnaires filled in by West Bank zakat committees in 2003, provided by an Islamic charitable organization based in London that has been working with the Nablus zakat committee.

### Islamic organizations

Islamic organizations and foundations in the Gulf, Europe, and the US are the most important sources of funding for zakat committees. They mainly fund orphans and other sponsorship programmes coordinated by the zakat committees. Pre-2007 zakat committee members have stated in interviews that sometimes the international Islamic organizations were too involved in politics and that this had potential negative consequences for the local work of the zakat committees.

> Some international Islamic organizations were not always sensitive enough to realize that, given the local political tensions, it is among the highest priorities for zakat committees to remain politically neutral. The best relationships with Islamic organizations are those that are based on long-term personal relations and trust.[79]

Some interlocutors stated that, before 2007, it was somewhat of a fundraising advantage to be politically affiliated with Hamas or the Muslim Brotherhood.[80] The degree to which the political affiliation of donors influenced the zakat committees is difficult to determine.

In 1997, when the issue of the zakat committees was hardly politicized in the West Bank, Palestinian sociologists observed that some zakat committee members were afraid that the PA would pass a new law that would tie the zakat committees closer to the PA. They feared that direct PA control would prevent many donors from continuing payments to the zakat committees. 'It is widely known, that the [Muslim] donors of zakat committees monitor that the money they donated reaches the beneficiaries. For this reason the zakat committees deliberately uphold the utmost independence in front of the donors and the public.'[81]

### Western organizations

Western governments, such as the French, the Italian, and the Canadian governments have helped the medical institutions (clinics and hospitals) of zakat committees to build specialized sections.

UNDP and ANERA cooperated with zakat committees to distribute food and medication. Most of this cooperation came, however, to a halt in 2006, when Hamas tried to govern the PA.[82] For example, in 2006, ANERA stopped providing medication to the Hebron zakat committee and started to distribute it through governmental hospitals, as these channels were perceived to be safer. Even after the reform of the zakat committees in 2007, ANERA did not go back to distributing medication through the medical centre of the Hebron central zakat committee, because according to ANERA, the governmental channels were working fine.[83] An open question remains: if donors, such as UNDP and ANERA, were worried about Hamas' influence on the PA after the 2006 elections, why did they switch payments from

---

[79]  Interview with pre-2007 zakat committee vice president, West Bank, June 2009.

[80]  *Ibid.*

[81]  Hilal and Maliki, 1997, p. 62.

[82]  'ANERA stopped giving free medication to the medical centre of the Hebron zakat committee in 2006 when Hamas was in government. They probably considered us a political organ.' Interview with employee of pre-2007 Hebron zakat committee, June 2009, West Bank.

[83]  Interview with ANERA representative, Hebron, West Bank, June 2009.

zakat committees' medical centres to state (i.e. PA) hospitals? It may well be that there is no relation between Hamas' electoral victory and ANERA's decision to work with state hospitals.

According to Benthall (2008a), the zakat committees '[…] were beginning to tap successfully into the international aid system, and would have continued to develop in this direction if they had been encouraged to […]'. However, some of the pre-2007 committees did not necessarily wish for that, as they are highly aware that this might come at the price of dependency. Moreover, they state that Western development and aid agencies have a reputation for funding corruption and authoritarianism while being responsible for heavy discrimination along political lines in their distribution of aid.

### Arab states

Compared to private donors, donations from Arab states to the zakat committees appear to be rather scarce, according to interlocutors from pre-2007 zakat committees. The Arab Development Fund has funded a number of zakat committee projects.

**33**

# Zakat committees and the state

'In an Islamic state there would be a chamber of finance [bayt al maal], to which everybody pays zakat as a tax. This is impossible today as we are under a secular [madani][84] system.'[85] Proponents of a government based on Islamic law believe that in an ideal Islamic state, zakat would automatically redistribute wealth and eradicate poverty. Currently, however, no state in the world has a functioning zakat system according to the *sharia*. Only a few exceptional countries, such as Saudi Arabia and Pakistan, have integrated zakat in their official financial regimes.[86] Although zakat is a religious duty [fard] whose neglect incurs spiritual penalties, the Islamic texts (Quran and Sunna) do not decree an earthly punishment for Muslims who fail to discharge their zakat. Instead they also encourage to pay zakat in informal ways – for example, to relatives and neighbours in need. In the West Bank, zakat – as a religious concept – took the institutionalfor form of the zakat committees first under the Jordanian Ministry of Awqaf and then under the PA Ministry of Awqaf. From the very beginnings of institutionalized zakat committees in 1977, Israel has been occupying the territory on which they were being established. According to an official of the Ministry of Awqaf, 'Palestine has many fathers. Jordan, the PA, Israel, and their intelligence services all have a direct say in what is going on here.'[87]

The law applicable to West Bank zakat committees is the Jordanian Zakat Fund Law number (8) of 1988; the Instructions number (1) of the year 1990 (Administrative and Financial Instructions of the Zakat Committees); and the Instructions number (3) of the year 1996 (Instructions of the Zakat Committees issued by the Board of Directors of the Zakat Fund under Article 11(b) of Zakat Fund Law Number 8 of 1988 – known as the Zakat Committee Regulations of 1996). These laws appear to have been drafted on the model of English (Jordanian) law, with some references to religion included.[88]

These laws will remain applicable until a Palestinian zakat law is drafted. In July 2009, the PA Ministry of Planning was preparing a draft of a PA version of the zakat law that is intended to be a subject of debate in the Council of Ministers in July 2009. This procedure takes place in lieu of parliamentary sessions that have been suspended since 2007 (see the chapter on *Historical overview*). Even though zakat committees are officially an integral part of a state structure as committees composed of volunteers who are appointed by – or at least

---

[84] Note that the Arabic term *madani* is here translated with secular. The usual word for secular in Arabic is *'almani*. *Madani* means 'civil' or 'civic'. But in this context 'secular' seems to be a more appropriate translation. There is confusion around terms such as 'secular' and 'civil' and their Arabic translation. *Madani* is used to translate the term 'civil society' [mujtama'a madani] which is imported from English. It can also be used to refer to a secular political system [nizam madani] sometimes opposed to an Islamic system [nizam islami]. Given the potential confusion surrounding the Arabic translation of 'civil society' [mujtama'a madani], due to the ambiguity of the word *madani*, we have decided not to use the word 'civil society' in this text. Moreover, 'civil society' has hardly been used by interlocutors during the interviews held in Arabic. For a discussion of the term 'civil society' in the Middle East, see Challand, 2009, pp. 25–58.

[85] Interview with zakat committee director, West Bank, June 2009.

[86] Saudi Arabia does not have a tax system but zakat is a de facto tax.

[87] Interview with government official, PA Ministry of Awqaf, Azzarya, West Bank, May 2009.

[88] Article 8 of the 1988 Law mentions categories of zakat beneficiaries that are nearly identical to the categories listed in the Quran (9:60). See also Benthall and Bellion–Jourdan, 2003, p. 10.

operate with the consent of – this same state structure, they do not spend government money. Instead they collect and redistribute public money donated by pious Muslims. Zakat committees are the only structures that are entitled to use the term *amwal al zakat* for fundraising purposes.[89]

The zakat committees are thus moving between two extremes:

a. The idea of the Islamic state and *bayt al maal* whereby the state fully controls the zakat money and its just distribution.
b. The idea that zakat committees are independent from the state or the quasi-state government of the PA. This would mean by extension, however, that they are becoming regular Islamic charitable societies with NGO status.

If zakat committees move too close to a state government, private donors who do not trust governments in the region (in this case mainly the PA) may donate less. On the other hand, who has the legitimacy of appointing committee members, if not the state – which ideally represents the will of the people? In the following section, we will briefly look at the zakat committees' relation to Jordan, the PA, and Israel, and investigate how these questions have been solved in practice.

## The Jordanian Ministry of Awqaf and Islamic Affairs

The Ministry of Awqaf in Jordan had a branch office in Jerusalem, which continued to work after 1967 despite the Israeli occupation. Until 1994, the regional Awqaf Director also represented the Jordanian Ministry of Awqaf in every West Bank governorate.

In 1977, the Jerusalem office of the Jordanian Ministry of Awqaf received and accepted demands from Nablus to open the first zakat committee in the West Bank. According to an official who has worked with the Jordanian branch Ministry in Jerusalem, and then with the PA Ministry, the Jordanian state was far removed from the zakat committees in the days of registration and supervision was weak.[90] The zakat committees were officially registered and supervised by the Jordanian Ministry of Awqaf through the Zakat and Sadaqat Directorate (attached to Awqaf Directorates) of each West Bank Governorate. The supervision of the Jordanian Ministry of Awqaf limited itself mainly to financial aspects. Activities were administrated by the committees who also employed its personnel privately.[91]

As there were no banks in the West Bank at the time, the newly registered zakat committees had to open bank accounts at the Jordanian Islamic Bank, as provided for by the Jordanian zakat law.[92]

---

[89] See Jordanian Zakat Fund Law number (8) of 1988: Instructions number (1) of the year 1990 (Administrative and Financial Instructions of the Zakat Committees). Article 14 b: 'No party or person may collect Al-Zakat except through these Committees, and the collection shall be carried out against receipts endorsed by the Fund.' It is however noteworthy to consider that several Islamic NGOs were running internal zakat committees before 2007 (e.g. the Islamic Charitable Society of Hebron). After 2007, they have either been shut down or banned to do so. Interview with a senior official, PA Ministry of Awqaf. Azzarra, West Bank, June 2009.

[90] Interview with a senior official of the PA Ministry of Awqaf, Azzarra, West Bank, June 2009.

[91] Hilal and Maliki, 1997, pp. 61–63.

[92] Interview with a government official, PA Ministry of Awqaf, Azzarra, West Bank, June 2009. Note the zakat laws referred to above are more recent and do not mention an obligation to work with the Jordanian Islamic Bank. The laws referred to above only mention that the banks in which Zakat Funds are designated are interest free; see Jordanian Zakat Fund Law number (8) of the year 1988: Instructions number (1) of the year 1990 (Administrative and Financial Instructions of the Zakat Committees): Chapter 1; paragraph 3.7.

According to the same official of the Ministry of Awqaf, expenditures of the West Bank zakat committees needed the approval of the Jordanian Ministry of Awqaf, which indicates that the control of the Jordanians was not so weak after all. If a West Bank zakat committee wanted to order a bank transfer, it needed to address the local Awqaf Directorate, which answered the Jordanian Awqaf branch in Jerusalem, which in turn answered to the Zakat Director in the Jordanian Ministry of Awqaf, who then sent an order to the Jordanian Islamic Bank to carry out the specific payment.

In 1987, the Cairo Amman Bank opened a branch in the West Bank. The Jordanian Awqaf Ministry let some West Bank zakat committees open bank accounts at the Cairo Amman Bank following an exceptional decision, as this breached the Jordanian zakat law according to which one could only open a bank account at the Jordanian Islamic Bank.[93] According to the official of the Ministry of Awqaf, this was the point at which the respect for Jordanian zakat law started to erode. Since donors of zakat committees started to choose which bank to work with, some zakat committees quickly found themselves with up to ten different bank accounts.[94]

In 1988, Jordan disengaged from the West Bank with the exception of the Jerusalem branch of the Ministry of Awqaf. In 1994–95, Jordan handed most of the Jerusalem branch of its Awqaf Ministry over to the PA. It kept control of the *waqf* and zakat of the city of East Jerusalem, which it continues to do in 2009. Former members of the Hebron and Nablus zakat committee describe the composition procedures of the West Bank zakat committees under Jordanian control as outlined below.

The Nablus zakat committee is the earliest committee of its kind to be established in the West Bank. According to a former member and the son of the founder of the committee, his father was supported and encouraged by the Jordanians, namely, by Sheikh Abdul Aziz Al Khayyat.[95] At that time, families with children over the age of 18 were not eligible for aid at the Israeli Ministry of Social Affairs. 3000 families in Nablus were below the poverty line.

A member of the pre-2007 Hebron zakat committee described the composition procedure as follows:

> On 17 March 1987, the Awqaf Director of the city of Hebron, on request from the Jerusalem branch of the Jordanian Ministry of Awqaf, asked sixty people whether they were interested to work for a new official zakat committee in Hebron. The ten most qualified and motivated were chosen by the Jerusalem branch of the Jordanian Ministry of Awqaf. The name Hamas was not known then. The ten names of the chosen persons received the clearance from the Jordanian intelligence and started to work. Every year, we provided detailed financial and narrative reports. One copy went to the donor, one to the zakat committee and one to the Awqaf Directorate which reported back to the Jerusalem office of the Jordanian Ministry of Awqaf. The transparency was impeccable. All the payments were registered as they were done through bank checks. In these days, an official from the Jerusalem office of the Jordanian Ministry of Awqaf visited us on a regular basis and it was almost as if he

93  See footnote above.
94  Interview with government official, PA Ministry of Awqaf, Azzarya, West Bank, June 2009.
95  Sheikh Abdul Aziz Khayyat is an Islamic Scholar at the Ministry of Awqaf and Islamic Affairs in Jordan and author of Khayyat, Abdul Aziz. 1993. *Zakat and its applications and profitable uses* [al zakat wa tatbiqat–ha wa istithmarat–ha]. Amman: Ministry of Awqaf an Islamic Affairs.
Concerning Sheikh Abdul Aziz Khayyat, see Benthall and Bellion–Jourdan, 2003, pp. 10–17.

were another member of the zakat committee. At times, he took people from other zakat committees to the Hebron zakat committee to teach them about the zakat committees' work. There is no minister of Awqaf, be it Jordanian or under the PA Ministry, who did not send us a letter of gratitude, thanking us for our work. All ten members who were appointed in 1987 stayed on the committee until 2007.[96]

The first zakat committees were composed of people who were chosen by the regional Awqaf Directorates. This is also confirmed by interviews in other regions of the West Bank.

Many influential families in the West Bank have ties with Jordan. Some of their members made successful careers in Jordan and occupied high posts in Jordanian government. The Ministry of Awqaf further linked the West Bank to Jordan as many influential families with ties and loyalties to Jordan continue to be represented in the PA Ministry of Awqaf. At the same time, families and political movements are considered to be separate loyalties. Often there are very different party affiliations present within the same family.[97]

Given its religious character, the Ministry of Awqaf has always been a meeting point for religious people from influential families, some of them with sympathies towards the Muslim Brotherhood. The Muslim Brotherhood almost certainly had a certain degree of influence in the Ministry of Awqaf. Moreover, the Jordanian intelligence took an active role in supervising the work of the Ministry of Awqaf and the zakat committees. Evidence suggests that it still plays an active role in this field and exerts influence in the West Bank through clans with loyalties to Jordan[98] (see the section on *The Ministry of Awqaf before the reform of 2007* below). The pre-2007 zakat committee of Halhul (near Hebron) gave the following explanation of its administrative and financial system:

> [...] the members of the committee are known for their independence and for staying away from political affairs; their names have been checked by the Jordanian intelligence services first, then the Israeli intelligence services, then the Palestinian intelligence services; no one among them has any security record.[99]

## The state of Israel

The Israeli state has been involved in governing and supervising the West Bank zakat committees on three levels:

1. The IDF Civil Administration Officer;
2. The competent Israeli Ministries (until 1994–95);
3. The Shin Bet.

---

[96]   Interview with member of the pre-2007 Hebron zakat committee, Hebron, West Bank, June 2009.

[97]   Interview with researcher of an international organization in Hebron and members of important clans in different West Bank towns, June 2009.

[98]   Interviews with pre-2007 and current zakat committee members, Qalqilyah and Hebron, June 2009.

[99]   Halhul Zakat Committee under the Directorate of the Zakat Fund under the the PA Ministry of Zakat. N.d. [document has been drafted after 1997 and before 2005]. *Brief Report about the Administrative and Financial System of the Halhul Alms Committee*. The document has been obtained from a London-based Islamic charity that was working with the Halhul committee.

*The IDF Civil Administration Officer*

According to former zakat committee members, the contacts of the committees with the Israeli Civil Administration in the oPt from 1977 to 2007 were intense – be it friendly exchange, coordination and control, or raid, arrest and detention.

A former member of the Nablus zakat committee states:

> The Nablus zakat committee had regular contact with the IDF Civil Administration Officer of the IDF Civil Administration in Nablus. Many times the Officer called me to meet him at Huwwara Checkpoint[100] to evaluate the situation and to coordinate medical and food aid delivery to people in need during military curfews in Nablus. The Israelis knew that we were doing good and honest work.[101]

According to another former member of the Nablus zakat committee, in the first Intifada, 'the Israeli military was sometimes attending the slaughtering of sacrificial animals on the occasion of religious celebrations.'[102] A former member of the Qalqilyah zakat committee recalls that:

> [in] 1991, the IDF Civil Administration Officer called the Qalqilyah zakat committee and asked us to pass by their office. We went. When the military police investigator realized that he could not find anything to charge us with he became mad at first. Some members of the zakat committees were arrested for a few months and detained in Fara'a Prison. The investigators found a cassette with anti-Jewish content which was sold in the bookshop of the zakat committee. I wrote a letter to the responsible person in the bookshop not to sell these types of cassettes anymore. The military police investigator could not find anything more serious to charge us with than this single cassette. We were released after a few months.[103]

Cassettes with controversial and aggressive material and anti-Jewish content have been circulating in the West Bank for a long time and in many local institutions. Many Palestinians claim that this is 'part of the conflict' and in reaction to the loss of land. Some interlocutors showed awareness, however, that zakat committees as humanitarian and charitable bodies [mu'assasat khayrya] should not engage in the dissemination of aggressive material in order to protect their own work from becoming a target within the conflict.[104] Besides the incident described above, no evidence of zakat committees disseminating such information has come to the attention of the researchers.

The IDF raided zakat committees in 2002 on the occasion of their invasions in the West Bank at the beginning of the Second Intifada.[105] In July 2008, the Israeli Defence Minister Ehud Barak outlawed thirty-six international charities on the grounds that they had sent money to the West Bank to support terrorist activities. At the same time, Israeli forces raided zakat committees and their institutions (such as schools, health centres, soup

---

[100] Check point at the southern entry to the city of Nablus.
[101] Interview with member of the pre-2007 Nablus zakat committee, Nablus, West Bank, June 2009.
[102] Interview with member of the pre-2007 Nablus zakat committee, Nablus, West Bank, June 2009.
[103] Interview with member of the pre-2007 Nablus zakat committee, Qalqilyah, West Bank, June 2009.
[104] Interview with pre-2007 zakat committee members, West Bank, June 2009.
[105] According to an audit report of a West Bank zakat committee of the year 2002 (obtained through a London-based Islamic Charity that has been working with the West Bank zakat committees), the absence of financial documents for the month of June is mentioned as the result of an IDF raid in 2002.

kitchens and orphanages) as well as the Ministry of Awqaf and Religious Affairs and other Islamic charities in the  West Bank.[106]

### The competent Israeli ministries (until 1994–95)

Several Israeli ministries were involved in governing and coordinating efforts with the West Bank zakat committees. The information gathered on this topic during the fact-finding stage of this paper is very scarce; more research is thus needed on this topic. According to former members of the Nablus zakat committee, the committee was in cooperation with the Israeli Ministry of Welfare since its foundation. Moreover,

> until 1995, there was coordination with the Israeli Ministry of Health to lower the health insurance costs for poor people. The Israeli Ministry of Health covered 50 per cent of the insurance of poor people. This discount continued after 1995 under the PA Ministry of Health. There were also discounts for hospital services: 50 per cent of the costs were covered by the hospital (probably a hospital run by the zakat committee), 25 per cent by the zakat committee and 25 per cent by the poor person her/himself.[107]

Since the 1970s, the Israeli government has done less and less to promote social welfare in the oPt. For instance,

> Israel did little to develop health infrastructures. In fact, under Israeli rule the number of government hospitals dropped from twenty in 1968 to fourteen by 1992, limiting the scope of services offered. Three of the six hospitals closed down were converted into a police station, a military base, and a prison. In the late 1980s, while Israel was investing $306 per capita on the health of its citizens inside the 1949 Green Line, it was spending $30 per capita in the West Bank, an outlay that decreased to a mere $20 per person by 1991.[108]

Some interlocutors also indicated that some zakat committees have cooperated with the Israeli Ministry of Social Affairs since 1977.

Moreover, many Muslim organizations from inside Israel have donated money through the West Bank zakat committees. This activity became illegal in 2001. Since then, Israeli Muslims donate informally to individual orphans in the West Bank.[109]

### The Shin Bet

The domestic Israeli intelligence Service has been consulted, at least in certain time periods, before the appointment of zakat committee members. The PA Ministry of Awqaf's Zakat Fund Directorate provided the zakat committees with application documents for new zakat committee members. According to some interlocutors, these documents were shared with Palestinian, Israeli, and Jordanian intelligence (see the section *The Jordanian Ministry*

---

[106] Cf. Haaretz. 2008. 'Barak outlaws 36 NGOs for Hamas fundraising.' 7 July. <www.haaretz.com/hasen/ spages/999412.html>; and Haaretz. 2008, 'Muslim charities targeted by Israel do more than fund terror.' 13 July. <www.haaretz.com/hasen/spages/1001367.html>.

[107] Interview with pre-2007 zakat committee member, West Bank, June 2009.

[108] Challand, 2008, p. 230.

[109] Interview with pre-2007 zakat committee members, West Bank, June 2009.

*of Awqaf and Islamic Affairs* above*)*. Whether this practice was official and in place all the way from 1977 to 2007 is not clear and would need further investigation.

## The PA Ministry of Awqaf before the reform of 2007

In 1994–95, the PA Ministry of Awqaf and Religious Affairs replaced the Jerusalem branch of the Jordanian Ministry of Awqaf. The zakat committees were officially registered at the PA Ministry in 1997. As a result, the zakat committees came to be officially linked to the PA Ministry of Awqaf through the Zakat and Sadaqat Directorate of each West Bank governorate (see the section *The Jordanian Ministry of Awqaf and Islamic Affairs* above).

Many of those who were part of the pre-1994 Ministry of Awqaf grew critical towards the PA, as they preferred the efficiency and professional work of the Jordanians, which the PA could not match. Some saw the PA rather as an expression of juvenile [shababi] culture and political activism [tanzeem] than as a serious government. Moreover, some wealthy personalities still preferred the concept of Jordanian monarchical control over the West Bank as they thought that this would provide better conditions for investment, economic development, and safety. On the other hand, there are cleavages in the Ministry of Awqaf between supporters and critics of the Muslim Brotherhood, and others who are neutral and build a third camp.[110] There are a number of clans that have traditionally been represented in the Ministry of Awqaf since the Jordanian period.[111]

Since 1997, the zakat section in the Ministry of Awqaf has overseen the work of zakat committees. The competent PA Ministries – such as the Ministry of Health, the Ministry of Education, the Ministry of Social Affairs, and the Ministry of Interior – also oversaw projects and institutions run by the zakat committees.

In 1997, the PA regarded it to be in its own interest to give a PA label to zakat committees that were known for their efficient community work. The zakat committees were not opposed to supervision by the PA as a means to avoid conflict resulting from possible competition between the zakat committees and the PA's social services. Since their work was beyond the political sphere in these days, the PA did not fear problems arising from this.[112] However, PA intelligence has kept zakat committees and their members under scrutiny since 1996, as it was aware that the loyalty of zakat committees may be rather inclined towards the opposition than to the political forces governing the PA.

While zakat committees in Jordan have to give 20 per cent of their annual budget to the state of Jordan, the PA asks the zakat committees for 10 per cent. Some of them seem to have paid this tax to the PA. Other committees did not comply with the demand.[113] Up until 2007, the zakat committees chose employees and candidates to replace members (although this happened rarely). Once their choice was made, they reported the decision to the PA Ministry of Awqaf. At times, these names needed the clearing of several intelligence services before approval (see the section on *The Jordanian Ministry of Awqaf and Islamic Affairs* above).

---

[110] Interviews with government officials, PA Ministry of Awqaf, West Bank, May and June 2009.

[111] Jaabari, Tahboub, Salame, Sabri, Tamimi and others.

[112] Interview with well informed journalist, Ramallah, West Bank, 2009.

[113] Interview with pre-2007 zakat committee members, West Bank, June 2009.

**40**

**Governance document**

Under the PA, some zakat committees worked out an internal organization document, in accordance with orders from the PA Ministry of Awqaf and based on the Jordanian zakat law applicable in the oPt. Such an internal organization document[114] of the pre-2007 Ramallah zakat committee provides on eight pages a detailed insight in the committee's governance and relation to the PA. The front page of the document presents the 'zakat and sadaqat committee of Ramallah, Al Bireh and Alloua' as an integral part of the PA Ministry of Awqaf and Religious Affairs.

The document is structured in four chapters: '1. structure [haykalyya] of the administration board, its meetings, its decision making mechanisms and the limits of its competencies; 2. structure of the administration office, the mechanisms of its work and the limits of its competencies; 3. the institutions belonging to the zakat committee and the methods of their administration; and 4. financial procedures.'

Paragraph 1 of the **first chapter** clarifies the composition procedure: '[t]he zakat and sadaqat committee is appointed [formed] on decision of the Minister of Awqaf. As such, [the committee] is an appointed administration board [...] and not selected through an election. Therefore, it decrees, coordinates and accepts the resignation of its members by ministerial decision.'

Paragraph 2 of chapter 1 lists the criteria to be appointed as a member: 'Given the fact that the committee is competent in the important question of religion and that zakat is a very important pillar of Islam, there are the following obligatory conditions for the membership to the administration board: belief in God, religious culture, faith and reliability. It is not admitted to make the membership dependent on any [contradicting] consideration [...] as this might harm or go against religion.'

Paragraph 4 of chapter 1 determines in eight points the procedures regarding regular board meetings and decision making. Points 6 and 7 determine that decisions of the committee are taken by simple majority (half of the attendees plus one) and that a simple majority (half of the committee members plus one) must be present in order that a meeting can start.

Paragraph 5 of chapter 1 is on accounting. Point 2 determines that the opening of a bank account for the zakat committee needs the agreement of the Directorate of Awqaf and needs to take into account the instructions towards banks published by the Directorate of Awqaf. Point 3 mentions that any financial transaction needs several signatures expressing their consent and no transaction can be made on the basis of a single signature.

Paragraph 6 of chapter 1 defines the relation of the zakat committee with the Ministry of Awqaf. Point 1: 'the committee is considered directly belonging to the Ministry of Awqaf [...]. Point 2: the correspondence between the committee with the Zakat Treasury takes place through the Directorate of Awqaf. Point 3: the committee complies with any instruction issued by the Ministry or the Directorate of Awqaf and does not take any decision which contradicts those instructions. Point 4: the committee presents its annual budget to the Zakat Treasury and opens its accounts to the continued supervision of an Awqaf accountant and an accountant from the Ministry of Awqaf, without any objection.'

Paragraph 7 of chapter 1 is on reasons for loss of membership: '1 demise; 2 dismissal from the Ministry of Awqaf; 3 the voluntary demission; 4 staying absent from three consecutive board meetings without an excuse that is acceptable to the majority of the committee; 5 the clear damaging of the committees' interests in the eyes of the majority of the committee; 6 the commitment of an obvious and clear violation against Islamic principles of faith or Islamic ethics.'

Paragraph 9 is on the representation of the committee in meetings. Point 1 clarifies the procedures of representation and that no one can speak or decide on behalf of the committee without its agreement. Point 3 treats the committee's relation to politics: 'It is strictly prohibited to give any political colouring to the committee. The committee does not accept any help that forces it to avow itself to a political *couleur*. It [the committee] prohibits to politics to influence any of its decisions. The committee abides to a charitable, honest [impartial] and neutral appearance.'

The 10th paragraph of chapter 1 determines the rules for the collection of zakat.

The **second chapter** is on the structure of the administration office, the mechanisms of its work and the limits of its competencies. Paragraph 6 of the second chapter commands that the director of the committee and his employees guard the neutrality of the committee and the need to keep the charitable work open [transparent] and beyond any consideration other than the need of the poor. Paragraph 11 of the second chapter is on employment procedures. Point 4: 'the employment is not subordinate by any means to personal connections, nor to kinship, nor to political considerations.'

The **third chapter** determines the relations between the zakat committee and its institutions, who 'are, in terms of finance and administration, directly subordinate to the zakat committee.'

The **fourth chapter** is on financial procedures (signatures needed for different types of expenditures).

---

[114] PA Ministry of Awqaf, zakat treasury, zakat and sadaqat committee of Ramallah, Al Bireh and Alloua. (no date). *Internal System* [al nizam al dakhily]. This document has been provided by an Islamic charitable organization based in London working with the Ramallah zakat committee.

In November 2004, the relation between the Ramallah zakat committee and the PA seemed positive. In a letter of recommendation, Yusuf Juma'a Salameh, the executive assistant to the PA Minister of Awqaf, wrote:

> The Ministry of Awqaf and Religious Affairs testifies that the zakat and sadaqat committee of Ramallah and Al Bireh [...] [1] has offered financial support and treatment to poor families, orphans and deprived families in the governorate [of Ramallah and Al Bireh], [2] it is officially registered and [3] it works with the endorsement of the Ministry of Awqaf and Religious Affairs [...].[115]

A letter of recommendation (May 2004) from the Chamber of Commerce in the governorate of Ramallah and Al Bireh confirms that the Ramallah zakat committee plays an active role in society through its charitable activities. It praises the Ramallah zakat committee for its 'integrity in dealing with orphans, needy and poor.'[116] Similarly, a letter of recommendation (June 2004) from the PA Ministry of Social Affairs confirms that the Ramallah zakat committee works with orphans and the needy 'in full cooperation with the directorate of social affairs.'[117] Another example is provided from a letter of recommendation (June 2004) of the Municipality of Al Bireh that acknowledges the respect [good reputation] that the Ramallah zakat committee enjoys in the governorate.[118]

Since the establishment of the PA, there has been an ongoing discussion about the future of the zakat system in Palestine. According to an official of the Ministry of Awqaf, there are mainly two different visions/schools of thought inside the Ministry of Awqaf:

a. Zakat is an arm of the state and should be directly controlled and co-directed by the state, including the strict application of the Jordanian law. It should, however, not become integrated with the tax system. The state should take an active role in fundraising zakat sources from international sources (Gulf, Muslim communities, etc.).

b. Zakat should be pluralistic and locally rooted because it emanates from the mosques. Zakat in the West Bank used to be distributed by voluntary committees based at mosques, which evolved into formally regulated zakat committees. Committee members emphasize that they are aware that God is overseeing their work. The state plays the role of an umbrella focusing on supervision and regulation only, since the funds are provided by the zakat and sadaqat of the people and not by government.

Until 2007, the PA did not manage to clarify its relationship with the zakat committees. The discussions on the zakat committees are ongoing and the escalation of tensions between Hamas and Fatah since 2007 has not helped to move towards a sustainable solution. Since the electoral victory of Hamas and its Change and Reform bloc in the municipal elections in 2005, the issue of the zakat committees has become increasingly politicized and has led to the reform of the zakat system, which has been implemented in the West Bank since December 2007.

---

[115] PA Ministry of Awqaf. 2004. *Letter of recommendation*. 11 February. This letter (and the ones below) has been provided by an Islamic charitable organization based in London that has been working with the Ramallah zakat committee at the time.

[116] Chamber of Commerce and Industry of the Ramallah and Al Bireh Governorate. 2004. *Letter of recommendation*. 27 May.

[117] PA Ministry of Social Affairs. 2004. *Letter of recommendation*. 27 May.

[118] Municipality of Al Bireh. 2004. *Letter of recommendation*. 27 May.

# The 2007 reform and its consequences

After the political split of Gaza and the West Bank in 2007 and the formation of the emergency cabinet under Prime Minister Fayyad, the PA Ministry of Interior launched a series of reforms,[119] some of which had implications for charitable organizations. During 2007, the PA Ministry of Interior closed 123 Islamic and secular charitable organizations with NGO status in the West Bank. NGOs were asked to re-register at the Ministry of Interior, and, according to the administrative decision 20/2007, they needed to refer to the security services to complete their registration.[120] 'The aim of these procedures was very clearly to eliminate Hamas influence in NGOs.'[121]

The PA pursued a policy aimed at gaining a tighter grip on NGOs in general. In 2007, the PA security services attacked associations' premises, interfered in the management of associations, froze association's bank accounts, prosecuted board members and employees of associations, and dissolved and closed associations.[122] The reform of the zakat system in the West Bank falls into the same context. A former member of a West Bank zakat committee noted: 'What is going on in the West Bank with NGOs and zakat committees is the mirror of what is happening in Gaza.'[123] And according to a PA Ministry of Awqaf official: 'Without the events of June 2007 [i.e. Hamas taking full control over the Gaza Strip], this reform would not have been possible.'[124] From this last statement, one can infer that the radical measures decreed in the 2007 reform are part of the factionalist power-struggle in the oPt, which has been waged in a similar way over the control of NGOs, associations, mosques, and zakat committees.

## The reform

On 12 August 2007, the PA Minister of Awqaf convened the ninety-two zakat committees to a meeting in which he asked them to provide him with detailed information on their work, bank accounts, assets, etc. On 20 September 2007, the Higher Zakat Commission was formed 'consisting of the best capacities at the Ministry of Awqaf and the personal initiative of the Minister himself.'[125] Three days later, this council decided in a meeting to reform the zakat committees in the northern governorates according to the regulations of the Jordanian zakat law.[126] According to the Jordanian zakat law, the head of the Zakat Fund has the full authority to dissolve or replace members in the zakat committees at any time.[127]

On 12-13 November 2007, the Minister of Justice sent a demand to the Ministry of Awqaf asking the latter to undertake reforms of the zakat system in the West Bank.[128] An earlier

---

[119]  See International Crisis Group, 2008a.
[120]  Omran, Aya, Aisheh Ahmed, and Hazem Haneyyeh, 2008, p. 14 and Annex 3.
[121]  Interview with local NGO director, Ramallah, West Bank, May 2009.
[122]  Omran, Aya, Aisheh Ahmed, and Hazem Haneyyeh, 2008.
[123]  Interview with pre-2007 zakat committee member, West Bank, June 2009.
[124]  Interview with government official, PA Ministry of Awqaf, Azzarya, West Bank, May 2009.
[125]  PA Ministry of Awqaf. 2008. *Official publication of the Ministry of Awqaf on reforms.* 27 May. Azzarya, West Bank.
[126]  PA Ministry of Awqaf. 2008. *Official publication of the Ministry of Awqaf on reforms.* 27 May. Azzarya, West Bank.
[127]  Instructions number (3) of the year 1996 (Instructions of the Zakat Committees issued by the Board of Directors of the Zakat Fund under Article 11(b) of Zakat Fund Law Number 8 of 1988 – known as the Zakat Committee Regulations of 1996), paragraph 3 e.
[128]  Interview with government official, PA Ministry of Awqaf, Azzarya, West Bank, May 2009.

decision to bring only the zakat committees of the northern governorates in line with zakat law was abandoned in favour of a more fundamental decision to dissolve the zakat committees. However, this decision to dissolve the zakat committees did not come from within the Ministry of Awqaf. On 20 November 2007, the Higher Zakat Commission, which includes officials of the Ministry of Awqaf and the Ministry of Finance, decreed the termination of all zakat committees in the West Bank effective on 20 November 2007 and ordered the establishment of eleven new central committees, one for each governorate.

On 29 November 2007, the administrative decision No. 01/2007 of the Ministry of Awqaf and Religious Affairs dissolved all ninety-two zakat committees and determined the transitional procedures leading to the establishment of the new central committees.

### Establishment of the Zakat Fund

On 12 December 2007, the PA Ministry of Awqaf announced the foundation of a Palestinian Central Zakat Fund. This fund is provided for by the Jordanian zakat law, but did not exist in this form in the oPt before.[129] Since 2008, the Zakat Fund is in charge of coordination and organization of the zakat system, as well as supervision of the zakat committees (in cooperation with the Ministry of Finance and the security section at the Ministry of Interior). It also runs an orphan sponsorship programme. Zakat committees still keep separate accounts, even if the Zakat Fund has formally become the owner of all the waqf property, that has been accumulated by the former zakat committees over the years (see the section *The waqf properties of zakat committees* below).

### The composition of the new committees

The composition of the new central committees took place on the basis of administrative orders issued by the Zakat Fund of the Ministry of Awqaf in 2008. The General Director of the Zakat Fund at the PA Ministry of Awqaf asked the PA Minister of Awqaf, the local PA governors, the presidents of the municipalities, and the local chambers of commerce to provide it with names of respected people experienced in social work on a local level (religious considerations seem to have played a minor role).

The Zakat Fund found itself with a list of 50 to 100 names from each of the eleven governorates. The names were passed to the PA Ministry of Interior for a security check. This security check eliminated some names. The Ministry of Awqaf chose the central zakat committee members among those names acceptable to the Minister of Interior with a view of achieving equal geographic representation within the central zakat committee. The new members do not necessarily have previous experience in zakat work. According to interviews and personal observations during the fact-finding process, a majority of the new members are affiliated to Fatah. The Ministry of Awqaf considered the option of keeping old committee members on the board of directors,[130] but finally decided it was fairer to initially remove all

---

[129] 'The day of 12 December 2007 was a new day in the history of the work of the Zakat in Palestine, in that day was the announcing of the construction of the Palestinian Zakat Fund in a ceremony attended by H.E. doctor Salam Fayyadh the Prime Minister and in that ceremony was the declaration of the establishment of eleven central Zakat committees distributed all over the West Bank governorates based on a study showing the percentage of the beneficiary and their distribution […].' PA Ministry of Awqaf. 2009. *The Palestinian Zakat Fund (Dec 4 2008 – end of March 2009).* Azzarya, West Bank, pp. 5–6.

[130] PA Ministry of Awqaf. 2008. *Official publication of the Ministry of Awqaf on reforms.* 27 May. Azzarya, West Bank.

members to avoid discussions about discrimination. Initially, most new central committees were composed of seven to nine members only, leaving room for local people or people from the old zakat committees,[131] given that the zakat laws provide for seven to fifteen committee members.[132]

### Employees

The employees of pre-2007 zakat committees were dismissed, effective on 31 December 2007. The administrative order provides that the Ministry may re-appoint current employees as deemed necessary. In some cases, many of the old employees kept their jobs; in others, such as in Nablus and Qalqilyah, most of the employees were removed. Some of the new employees were hired based on job offers in newspapers. The interviews took place at the zakat committee with one supervisor of the Zakat Fund. A list of successful candidates was handed to the security section at the Ministry of Interior, who can veto the employment of individuals on the grounds of 'security concerns'.[133]

### Governance

The reform was being undertaken without an agreement on a governance system. Currently (as of 2009), there is no internal system document guiding the work of the zakat committees. The zakat committees are run on the basis of instructions coming directly from the Ministry of Awqaf, i.e. the Director of the Zakat Fund. Most of these instructions are said to be based on the Jordanian Zakat Fund Law of 1988. The governance document (see box in the previous chapter) worked out by the pre-2007 Ramallah zakat committee does not appear to be a reference in the current discussions on the zakat committee system.

The Ministry of Interior and the Ministry of Social Affairs want to have a more important role in governing the zakat committees. A Ministry of Interior official mentioned a proposal to establish a mixed steering committee with representatives of the Ministry of Interior, the Ministry of Social Affairs, and the Ministry of Awqaf.[134] In general, the Ministry of Interior is expanding its influence towards a de facto presidency.[135]

### Financial supervision

As part of the reform, the PA Ministry of Finance (headed by Prime Minister Fayyad) appointed financial supervisors who closely supervise the work of the new committees but are employed at the Ministry of Finance. In 2007, thirteen financial supervisors from the Ministry of Finance worked on an inventory and audit report. Their report is not public; however, it is used as a basis to justify the administrative decision 01/2007 to dissolve

---

[131] E.g. *Insanonline*. 2008. 'Minister of Awqaf Dr. Jamal Bawatna issued a decree appointing a new committee of zakat Nablus' [Arabic]. Web edition, 6 March. < www.insanonline.net/news_details.php?id = 2954 >

[132] Instructions number (3) of the year 1996 (Instructions of the Zakat Committees issued by the Board of Directors of the Zakat Fund under Article 11(b) of Zakat Fund Law Number 8 of 1988 – known as the Zakat Committee Regulations of 1996), paragraph 3d.

[133] Interviews with PA Ministry of Awqaf officials and central zakat committee members, West Bank, May and June 2009; as well as documents provided by interlocutors in these interviews.

[134] Interview with government official, PA Ministry of Interior, Ramallah, West Bank, June 2009.

[135] Interview with HR lawyer and Fatah member, Independent Commission for Human Rights, Ramallah, June 2009.

ninety-two zakat committees. Five of the financial observers who had been working on the report became employees at the Zakat Fund. In an initial phase, the main focus of the Ministry of Finance in this endeavour was the supervision of the Nablus committee, mainly because of its weight and the strategic importance of Nablus.

According to two financial observers working on the inventory and audit report and charged with supervising zakat committees in the Northern West Bank, they have found secret bank accounts outside the oPt which were run by the zakat committees. The Ministry of Awqaf confirms this information. 'The [...] committees declared 158 bank accounts inside the homeland and thirteen accounts abroad. Eleven undeclared accounts in the country and seventeen undeclared accounts abroad were discovered.'[136]

With the exception of the zakat committee of Beit Fajjar, Bethlehem Governorate, there is no court case pending against a former committee. If the undeclared bank accounts had been used for the illegal or improper diversion of funds, this would be easy to prove given the microscopic financial supervision of banks by different intelligence services in the region. In the case of Beit Fajjar, a member of the former zakat committee was supposedly running a committee account on his personal name. The court decided that this money had to be transferred to the Zakat Fund.[137]

### The waqf properties of zakat committees

On 14 May 2009, the Qadi al Quda, the highest judge of the Sharia Courts in the West Bank – which is a PA body close to but independent from the PA Ministry of Awqaf – informed the PA Minister of Justice in an official letter of its decision to:

   a.   freeze [tathbit] the waqf properties of all local mosques (not belonging to the PA) [masajed ahlyya];
   b.   freeze [tathbit] the real estate belonging to the zakat committees.

According to the Qadi al Quda, this procedure is a legal duty of the Qadi al Quda, but the administration of the properties will be the competency of the Ministry of Awqaf. This measure is not temporary, as the Jordanian law applicable to the West Bank provides for control by the Ministry of Awqaf over these properties.[138]

Some former members of zakat committees claim that they had bought real estate with their own money and registered it under the name of the zakat committee (i.e. more spacious offices and storing facilities). One pre-2007 zakat committee member expressed sadness that the PA has now annexed what they had built up with their own money and their own hands and were 'destroying the zakat system in the West Bank'. Another former committee member quoted the story of King Solomon and the two women who both claim to be the mother of the same baby. King Solomon proposes to cut the baby into two pieces with a sword, one for each woman. At this moment, one of the women interrupts the King and says that in this case she prefers that the other woman has the baby – so the King

---

[136]   PA Ministry of Awqaf. 2008. *Official publication of the Ministry of Awqaf on reforms.* 27 May. Azzarya, West Bank.

[137]   Interview with government official, PA Ministry of Awqaf, Azzarya, West Bank, June 2009 and with the director of the PA Financial Follow-up Unit (a newly established office dealing with financial intelligence and competent for the zakat committees), Ramallah, West Bank, June 2009.

[138]   Interview with the Highest Judge [qadi al quda], Sharia Courts, Al Bireh, West Bank, June 2009.

awards the baby to the first women. The former committee member sees himself in the position of the first woman. Even though the baby (i.e. the zakat committee) has currently been taken away from him, he is sure that justice will ultimately prevail.[139]

## Consequences

The reform had the main aim of centralizing and increasing governmental control over the zakat committees. Here are some of the consequences:

### Administrative problems of the first central zakat committees

As the 2003 International Crisis Group report shows, Islamic social welfare is vital for the functioning of Palestinian society, and the capacity of the PA to 'take over' this vital function is an object of doubt.[140]

In 2008, the first central zakat committees appointed had difficulties to operate, given the abrupt changes and the fact that the new leadership had little experience in running zakat committees. In December 2008, some members of the central zakat committees were replaced following an assessment by the Zakat Fund of the Ministry of Awqaf. The assessment is not a public document and not accessible. Initially the committees were mainly composed of Fatah members. Later appointments added older people with local legitimacy and in exceptional cases people from Fatah, who were previously members of the old committees, have been reappointed.[141]

### Financial scarcity

According to the new central zakat committees who were interviewed, all of them are confronted with a scarcity of financial means that makes it impossible to continue the pre-2007 work.[142] *Al Ahram Weekly* went as far as to write that 'according to committee insiders, local and international donations have decreased by more than 90 per cent as a result of the crackdown [i.e. the reform].'[143] These estimations are probably exaggerated and doubt needs to be cast on most financial estimates in the absence of any verified accounts. The effective decrease can only be estimated, as it is not possible to get a hold of all the financial reports of ninety-two zakat committees and to compare them with the report of the Zakat Fund. There is one financial and narrative report of the Zakat Fund covering the period of 4 December 2008 to end of March 2009.[144]

Employees of the medical centres of the Hebron, Qalqilyah, Nablus and Ramallah committees all pointed out the fact that their financial situation is dire. Planned expansion has been stopped and some committees consider closing down centres and clinics. The operational directors and board members of all six zakat committees studied pointed out that the financial situation is a major problem and that financial means are scarce.

---

[139] Interview with pre-2007 zakat committee members, West Bank, June 2009.

[140] See *International Crisis Group*, 2003, pp. 16–17.

[141] Interviews with government official, PA Ministry of Awqaf, Azzarya, West Bank, and current (2009) central zakat committee members, West Bank, May and June 2009.

[142] Interviews with central zakat committees, Qalqilyah, Nablus, Hebron, Ramallah, Jenin, Tubas, May and June 2009.

[143] *Al Ahram Weekly*. 2008. 'Still struggling, Khaled Amayreh lives another bleak Ramadan in Ramallah.' Web edition, 11 September. < http://weekly.ahram.org.eg/2008/914/fe1.htm >

[144] PA Ministry of Awqaf. 2009. *The Palestinian Zakat Fund (Dec 4 2008 – end of March 2009)*. Azzarya, West Bank.

The local director of an overseas NGO in Jerusalem stated:

> There is now a financial crisis for the zakat committees. One example is the zakat committee in Yatta near Hebron. This was called the Jami'a Islamiyya but was in fact a zakat committee. There is a six-storey building owned by the zakat committee which hosted a school for the disabled, a sponsorship committee, etc. The building is now empty. New zakat committee members have been appointed but nobody trusts them. Most of the funding came from Saudi Arabia and the Gulf States, but this has stopped. It is believed that Fatah takes a cut from donations, and there is no money to pay staff.[145]

Two reasons can be found to explain the lack of funding: [a] there is a lack of trust from local and international donors[146]; and [b] even after the reform, zakat committees continue to be criminalized in the US and in Israel, which is why people fear to donate money as this might have severe legal consequences.[147]

According to an *Al Ahram Weekly* press report of September 2008,

> [...] the PA is upset by the fact that dozens of donors and aid agencies based in the oil-rich Arab states have almost completely stopped transferring money to the zakat committees in the aftermath of Fatah's takeover. Fatah has blamed Hamas for 'inciting' the donors to stop sending their aid money to the West Bank. Hamas retorts by challenging Fatah to produce 'honest people' who would be acceptable to the donors. The Waqf Ministry has tried to salvage the situation by transferring financial allocations from the government budget to the *zakat* committees. However, these allocations have been very erratic, say charity officials. After all, the PA government itself is struggling to keep itself financially afloat, despite the billions of dollars paid or promised by donor countries.[148]

The Director of the Zakat Fund stated that in the immediate aftermath of the dissolution of the zakat committees, the financial situation was scarce but that things were slowly improving.[149]

In the transitional time period (4 December 2008 – end of March 2009), the Zakat Fund had a budget of 19 million Jordanian Dinars. The Director of the Zakat Fund estimates that the income came to 75 per cent from Muslim organizations outside the oPt (of which 80 per cent is financial support and 20 per cent is in-kind) and to 25 per cent from inside the oPt (of which 80 per cent is in-kind and 20 per cent financial support). Among these 25 per cent from the inside may also be the allocations that were made from inside the PA (see quote from *Al Ahram Weekly* above).

---

[145] Interview with NGO director, East Jerusalem, June 2009.

[146] Interviews with zakat directors of current committees, current and pre-2007 zakat committee members, West Bank, May and June 2009.

[147] Interview with current zakat committee president and government officials of the PA Ministry of Awqaf, West Bank, May and June 2009.

[148] *Al Ahram Weekly*. 2008. 'Still struggling, Khaled Amayreh lives another bleak Ramadan in Ramallah.' Web edition, 11 September. < http://weekly.ahram.org.eg/2008/914/fe1.htm >

[149] Interview with government official, PA Ministry of Awqaf, West Bank, June 2009.

**48**

*Zakat is distributed through informal channels*

According to a member of a central committee 'the reform is mainly for Israel and the US, so they have the feeling of better control, as they only have to take care of eleven instead of ninety-two committees. This means they only have to check the "security" of roughly 150 instead of 1,500 people.'[150]

A journalist in Ramallah stated:

> since 2008 the committees are entirely controlled by pro-Fatah people. The influence of the PA in the committees is widely known and leads to lack of popular confidence in the committees. The PA has a bad image in the West Bank because of its corruption. Zakat money is now mostly paid informally directly to Imams and other people who are known to be religious and honest. Around 80 per cent of zakat and sadaqat is now paid and distributed 'under the table.' I never pay zakat, but if I would I would never pay it to the new central zakat committees because they are in the hands of the PA and therefore part of a corrupt system.[151]

While the Zakat Fund and the central zakat committees are struggling to access funding, people are increasingly developing informal structures to collect and distribute zakat money locally. The money that used to come as zakat from the Gulf and from Muslim communities in Europe is now being distributed informally. On the international level, policies of blacklisting and criminalizing zakat committees and other charities without a fair and transparent legal ground to contest such decisions can be perceived as a random criminalization of charitable giving, leading to an erosion of transparent and well-respected local structures.[152]

# Different perspectives

## Fatah and the government of Prime Minister Fayyad

The reform has the aim of establishing central control over a fragmented and decentralized system. At the same time it also appears to be an attempt to limit Hamas' influence in the West Bank, similar to Hamas' effort to limit the PA's influence in Gaza. The PA is widely regarded by the disaffected population as operating with the endorsement of the American and the Israeli governments. According to a Palestinian scholar, 'it [the reform] also aims at boosting the popularity of the PA among the "enemies" of terrorism, particularly the US and Israel.'[153]

---

[150] Interview with central zakat committee and Fatah member who claims to be very critical with the Fatah movement in general, and the current emergency cabinet in particular, West Bank, June 2009.

[151] Interview with a journalist of the Ramallah based *Al Ayyam* newspaper, Ramallah, West Bank, May 2009.

[152] Jonathan Benthall, 2007a, pp. 1–14. For more information on US counterterrorist measures and their impact on charitable giving, see the website of the Charity and Security Network. < www.charityandsecurity.org/ >

[153] See *Gulf News*. 2008. 'Zakat panel revamp plan raises eyebrows.' Web edition, 14 June. < http://archive.gulfnews.com/articles/08/06/14/10220927.html > Some local commentators predict that, since both Fatah and Hamas are deeply split internally, new political configurations may soon emerge, even with the possibility of further splits in geographical control of the oPts. From the Israeli state's point of view, this would on the one hand aggravate its security problems but on the other hand would weaken still further the Palestinian people's negotiating position. It was even suggested by one interviewee that the 2007 dismissal of all the West Bank zakat committees' roots and branches may have been a panic measure taken by the PA with a view to consolidating its authority after the Hamas takeover in Gaza, rather than a carefully thought out decision.

**49**

The decision to appoint only seven members for each zakat committee in the beginning of 2008 might be a sign that the PA is ready to let some of the former zakat committee members join the central committees at a later stage. According to an official of the Ministry of Interior in charge of NGOs, the future of the zakat system is still under discussion. The reform seeks to establish a pyramid structure that ensures more just and harmonized distribution of funds by pushing zakat committees to increasingly sponsor income-generating projects, in line with the principle of promoting self-reliance rather than dependence.[154] However, some of the committees had already been successfully developing in this direction before 2007 (see chapter on *Zakat committees in the local context*).

A Palestinian academic, Professor Abdul Rahman Asad, writes that there are three main positions among Fatah officials vis-à-vis the former zakat committees:

> One group believes that these committees are manned and consequently controlled by members or proponents of Hamas, either fully or through an overwhelming majority. Therefore, these committees are but tools used by this movement to propagate its principles, gain popularity, and recruit members and supporters. Hence, they form bridges for Hamas to get through to the society as a first step towards increasing its political popularity and influence, as well as imposing later its full social and political hegemony;
> Another group believes that membership of the zakat committees is not confined to Hamas. It is rather a mixture of Hamas members and its supporters, together with independents and even religious members of Fatah. This description still imparts an Islamic character to the committees, which makes them tools for enhancing the Islamist tendency, and thereby support for Hamas;
> A third group believes that the panels are either freely elected or chosen through 'consensus' with a mixture of Hamas, Fatah, other Palestinian organizations, and independents in various ratios. This group, despite it being aware of the current situation, is not comfortable with the committees remaining under the control of people who are independent from the PA. Therefore, they advise putting them fully under official control, i.e. under the banner of the Ministry of Religious Affairs and Islamic Awqaf.[155]

A Fatah member and president of the new centralized Nablus committee said that the new zakat committees are like a pool of water and that one drop of ink would pollute the whole pool.[156] The drop of ink is anybody with any links to Hamas. This means that in the view of some Fatah members, the only way to depoliticize the zakat committees is to completely tie them to the PA. Yet under a government where the PA essentially represents the interests of one specific party (Fatah), such a move may actually increase the degree of politicization rather than lower it – especially since the current government is not recognized by any of the major parties and even rejected by parts of Fatah.[157]

---

[154] Interview with government official; PA Ministry of Interior, NGO section, Ramallah, West Bank, June 2009.

[155] See *Gulf News*. 2008. 'Zakat panel revamp plan raises eyebrows.' Web edition, 14 June.
 < http://archive.gulfnews.com/articles/08/06/14/10220927.html >

[156] Interview president of the Central Zakat Committee of Nablus and Fatah member, Nablus, West Bank, June 2009.

[157] See e.g. The Palestinian Basic Law. 2009. 'Fatah rejects Fayyad.' Web edition, May 13.
 < www.palestinianbasiclaw.org/news/fatah-rejects-fayyad >

**50**

*Ministry of Awqaf*

Many of the former committees asked why the Ministry of Awqaf did not investigate the zakat committees one by one and then sanction the ones that were engaged in malpractice or had elected politicians on their board on the basis of a fair and transparent decision. It is indeed puzzling why this wholesale 'purge' was carried out in the field of charity work, where institutional memory and professional expertise are both important. The Director of the Zakat Fund said that this would possibly have brought the attention of the Israelis to the members who were dismissed and that the Zakat Fund wanted to protect them. Therefore, all the committees were dissolved and all members dismissed.

The new Minister of Awqaf, Mahmoud Habbash, has only been in office since 18 May 2009 and has not been interviewed on this question. It is probable that there are still voices in the Ministry of Awqaf who prefer the principle of delegation to local decision-makers over a rationalization that sets out to spread resources more equitably. The current Ministry of Awqaf is committed to complying with the Israeli and US governments' security concerns and hopes that they will decriminalize the zakat committees.

The Director of the Zakat Fund stated:

> Currently, I need to be harsh on the committees like to a young child which needs to be educated with a hard hand in order to be successful in its life. That is why I organize them more like a dictatorship. We need transparency in front of everybody, mainly Israel and the US, in order to develop functioning structures.[158]

*Hamas*

The reform is heavily criticized by Hamas. In a speech of 25 June 2009, Khaled Mishal, the leader of Hamas' political wing and director of Hamas' Political Bureau in Damascus, spoke of a 'systematic process of eradication'[159] of the zakat committees. The issue of the zakat committees is a relevant point in the ongoing Cairo negotiations between the Islamic Movement and Fatah, the former asking to go back to the status quo ante.

Is Hamas ready to depoliticize the sector of Islamic social welfare as a whole and to comply with increased financial scrutiny for Islamic charitable organizations and zakat committees? The capacity of the pre-2007 zakat committees studied in this research paper to comply with high standards of financial transparency is very high, as most of them were run by successful businessmen and not political figures.

---

[158] Interview with government official, PA Ministry of Awqaf, Azzarya, West Bank, May and June 2009.

[159] Khaled Amayreh. 2009. 'Mashaal to Obama: we appreciate your words, but actions speak louder.' *PIC & Ikhwanweb.* Web edition, 26 June.
< www.ikhwanweb.com/ Article.asp?ID = 20610&LevelID = 1&SectionID = 0 >

*Donors*

Islamic donor organizations abroad follow the reform with scepticism. In September 2008, Islamic charities, which in the past sent money to the zakat committees and received detailed accounts on how money was spent in return,[160] are hesitant to send money to the new centralized Zakat Fund as they [a] doubt the capacity of such a centralized committee to deliver aid effectively; [b] have concerns that money will be misused; and [c] fear that Fatah will use the newly created zakat institutions to take political credit. According to Palestinian news agencies, Fatah is indeed starting to take credit for distributing aid through newly appointed committees.[161] It seems very unlikely that this policy will lead to genuine support for Fatah among external donors with an impetus towards democracy and transparency at a grassroots level. On the other hand, according to members of the new central zakat committees, there is a small group of donors who continue to or have recently initiated donations to the new zakat committees. The trust in the new zakat committees varies from governorate to governorate. In certain governorates, the new committees are welcomed more than in others. Nevertheless, the fundraising capacities of the new committees are inferior due to the fact that they are fewer in number and have less personal connections in the Islamic charity field.

In the tense and politically complex situation of the West Bank, a reform of the zakat system touching on a range of fundamental and sensitive questions always carried the risk of increasing the tensions and the confusion around this issue, instead of clarifying and improving the governance of zakat practice. The latter would be in the interest of those who suffer from poverty and from a lack of opportunities to live a decent life with dignity.

The next chapter will look into the role of political movements and their interference in the work of zakat committees with the aim of sharpening our understanding of the general politicization that has affected the zakat committees in recent years.

---

[160] Some organizations run orphan programmes where individual Muslim donors in the UK or other European countries can donate directly to an orphan child in the oPt.

[161] *Palestine Now*. 2008. 'Fatah uses Nablus Zakat Committee to promote own agenda.' 3 September 2008. After describing the events, the author of the article asks the following critical questions: 'What is the goal of having Fatah distribute aid in cooperation with the Nablus Zakat Committee, knowing that this committee was usurped using aggression and transgression from earlier management and had a Fatah panel assigned to run it? Despite the fact that everyone bears witness to its honesty, integrity, transparency, and neutrality, besides comprising some of the most noble personalities known to people for their efforts to mediate disputes conflicts throughout the Nablus governorate for many years?'

# Zakat committees and political movements

Given the conflict over territory in the West Bank between Israel's settlement expansion and the growth of the Palestinian local population, the zakat committees have a definite political dimension.

The Jenin zakat committee, established in 1984, lists as one of its goals:

> [...] Providing new work opportunities by establishing new projects to encourage the citizens to remain on their land.[162]

Palestinian parties and movements recognized the importance of humanitarian aid and welfare programmes since the 1970s. Fatah, the PFLP, the Democratic Front for the Liberation of Palestine, and the Palestinian Communist Party were developing their welfare structures parallel to Islam-inspired initiatives.[163] Hamas and Fatah, which emerged as political adversaries from the first Intifada, both have an important religious Muslim constituency, and both movements have origins in the Muslim Brotherhood (see chapter on *Historical overview*). Control over the zakat committees is thus appealing for both.

We argue that Hamas and Fatah both tried to exert control over the zakat committees at different moments in time, as both were aware of the possibility to take political credit for its work (see the chapter on *The 2007 reform and its consequences*). The main tool for exerting control over zakat committees consists in placing members of the political wing of the movements [tanzeem] in the zakat committees. For long periods of the zakat committees' history, there was probably a consensus between Hamas and Fatah not to interfere politically in or through the zakat committees. This corresponds to the third view within Fatah regarding the zakat committees (see the quote of Professor Abdul Rahman in the section on Fatah's perspective in the previous chapter).

## The role of Fatah

All interlocutors agreed that Fatah controlled a minority of zakat committees. In 1996–97, the PA – dominated by Fatah – closed a few Islamic institutions in the West Bank.[164] According to Palestinian sociologists, two zakat committees were closed in 1996 by the PA Ministry of Awqaf because they were not conducting work in a satisfactory manner.[165]

---

[162] Booklet Al Razi Hospital, Jenin, 2009. See also chapter: *Zakat committees in the local context*.

[163] See e.g. Robinson, 1993, p. 302. Robinson 1993 studies the rise of Palestinian agricultural and medical relief committees in the 1980s, each tied to one of the following movements: Fatah, the PFLP, the DFLP or the Palestinian Communist Party.

[164] *International Crisis Group*, 2003, pp. 6 and 16–17. During what has been identified in the chapter *Historical overview* as 'Phase 3', the PA kept many of the West Bank zakat committees under scrutiny. A number of oral sources suggest that the Palestinian security forces carried out raids on at least one of the West Bank zakat committees in 1996 and 2001, but no documentation is available to corroborate this fact. The fact remains, however, that during this period up to 2006 the zakat committees were allowed to operate without serious impediment.

[165] Hilal and Maliki, 1997, p. 62.

**53**

Although the PA was aware that a majority of zakat committees were closer to the Muslim Brotherhood (i.e. Hamas and some religious members of Fatah) than to the PA (and the parts of Fatah which are leading it), it adopted a *laisser-faire* strategy and registered the zakat committees at the Ministry of Awqaf and Religious Affairs, as it hoped that this would increase the popular legitimacy of the PA and ultimately Fatah. The PA also had less know-how and less local anchorage to efficiently take care of the poor and disadvantaged in remote areas. Since 1997, the PA perceived the activity of zakat committees, as an independent structure with weak Fatah influence, as a threat. Therefore, the PA replaced some of the members by religious people from within Fatah.[166] Some committees, such as the Hebron committee, remained as they were from 1987–2007.

Zakat committee members and employees were still politically closer to (and sometimes even controlled by) Hamas and the local governments than to the PA, but now religious people from Fatah were on the committees and participated in decisions.[167]

Some of the religious members in Fatah started to sympathize with their religious colleagues from the Islamic opposition in some of the zakat committees; and their loyalty to Fatah, or at least to the wings of Fatah which were dominating the PA, became weak, as they were disappointed with the lack of success of the negotiations with Israel, the continued expansion of Israeli settlements, and the increasing corruption and authoritarianism among PA bodies. On the other hand, they were impressed by the honest and efficient grassroots work of the zakat committees and the Islamic opposition. According to PA officials and Fatah members, many of those religious Fatah members in the zakat committee remained members of Fatah, but 'were effectively working for Hamas.'[168] It appears that these religious Fatah members were not being fully loyal to the policies of their party, and potentially developed good working contacts with the opposition that was gathering around the Islamic movement resulting in the creation of the Change and Reform bloc. This bloc successfully participated in the 2005 and 2006 elections and included many independents not belonging to the inner circle of Hamas.

Between 1998 and 2003, a large proportion of religious segments of Palestinian society switched from Fatah to Hamas, especially people who had been sentenced to prison by Israeli military courts. They changed their minds in prison and joined Hamas upon their release.[169]

After the establishment of the emergency cabinet, the PA has increasingly become a one-party state. None of the major parties, except parts of Fatah, have recognized the government. Recently, some wings within Fatah have grown critical of Prime Minister Fayyad.[170] The cabinet is appointed by President Abbas with US backing and without democratic legitimacy. Since summer 2007, the legislative power is inexistent, as the PLC is no longer convened.[171] The 2007 reform of the West Bank zakat committees led to the

---

[166] Interviews with PA government officials, Fatah members, and a well informed journalist of the Ramallah-based *Al Ayyam* Newspaper, West Bank, May and June 2009.

[167] Interviews with pre-2007 zakat committee members, government official, PA Ministry of Awqaf, and a journalist of the Ramallah based *Al Ayyam* Newspaper, May and June 2009.

[168] Interview with Fatah members, Northern West Bank, May 2009.

[169] Interviews with a Hamas member and local journalists, Ramallah, May and June 2009.

[170] See e.g. The Palestinian Basic Law. 2009. 'Fatah rejects Fayyad.' Web edition, May 13. <www.palestinianbasiclaw.org/news/fatah-rejects-fayyad>

[171] Interviews with official, European Commission, Jerusalem, and human rights lawyer, Ramallah, West Bank, June 2009.

appointment of people who are loyal to the PA. In 2009, the committees are still composed by members of the political wing of Fatah [tanzeem] and some elderly and respected personalities with no connections to the Islamic movement.[172] The argument for depoliticizing the committees is used in order to justify the exclusion of political opposition from the committees; however, similar opposite trends seem to occur in Gaza.

## The role of Hamas

Hamas was founded in 1987–88 as an armed and political branch of the Muslim Brotherhood in Palestine. Many zakat committees pre-date the foundation of Hamas. The zakat committees were established by a 'social coalition' between the pious bourgeoisie (mainly rich businessmen), imams, and personalities known for their Islamic literacy, as well as activists belonging to Islamist groups such as the Muslim Brotherhood, Hizb Al Tahrir, and others.[173]

Zakat, being quite uncontroversial at the time, provided a common ground for people with different social backgrounds and political convictions. As the early zakat committees in the West Bank started to be very successful in the early 1980s, many people committed to their local community probably realized that zakat was one of the assets of Palestinian society. Essentially, in a society with increasingly severe restraints, one of the assets remaining is religion expressed in harmony with local structures such as village councils and mosques.

After being founded and beginning its political work, Hamas tried to increase its presence in the zakat committees. In 1991, three years after its foundation, Hamas supposedly tried to integrate people from its political wing [tanzeem] into the zakat committees.

> I was vice president of the zakat committee. The president was at the same time the local Awqaf Director, so de facto I was running the committee. In 1991, I retreated from the zakat committee for a few months in order to protest against certain efforts to tie the zakat committee to a political affiliation [i.e. Hamas] by extending the number of board members in the committee and adding people from the Hamas political wing. After a while they asked me to come back. I refused and said I would only come back under the condition that the zakat committee stayed away from political affiliation. Eventually, they understood that my arguments against the affiliation were right and I came back.[174]

On the assumption that similar episodes occurred elsewhere, Hamas must indeed have tried to gain ground by imposing people from its political wing to the zakat committees in the early 1990s, but some within the movement have grown aware that political figures in the committees might harm the work, safety, and social reputation of the committees.

This development might also have contributed to the probability that there was a consensus not to fight politically with Fatah over the zakat committees. This consensus may well have been challenged at several moments, such as when the PA shut down a limited number of Islamist institutions in 1996. The *International Crisis Group* report (2003, p. 6) mentions, however, that in spite of closing a few dozen Islamist institutions, the PA 'sustained a quiet

---

[172]  Interview with government official, PA Ministry of Awqaf, Azzarya, West Bank, June 2009.

[173]  Interview with academics and pre-2007 zakat committee members, West Bank, May and June 2009.

[174]  Interview with local businessman and pre-2007 zakat committee member who claims to have personal relations to both movements, West Bank, June 2009.

dialogue with the Hamas political leadership and ultimately left its social welfare infrastructure largely intact.'

The zakat committees registered by the PA in 1996–97 varied in their degree of affiliation to Hamas. According to the hypothesis advanced above, the consensus between Hamas and Fatah regarding the zakat committees only degenerated after the electoral victories of the Change and Reform bloc in 2005 and 2006.

Sara Roy (2000) argues that the different spheres in which the Islamic movement is active need to be differentiated, and that Hamas is not equally active and powerful in the different fields. 'The term "Islamic Movement" refers not only to its political sector, in which Hamas predominates, but to the social, cultural, and religious sectors of the movement, which may or may not have direct links to the political.'[175] It should, however, not be underestimated that the Muslim Brotherhood is a worldwide movement, which is able to generate an abundance of funding. The considerable financial power of the movement today also runs the risk of politically influencing local grassroots organizations such as the zakat committees in a way that is not necessarily in line with the interests of the local people and the needs of the disadvantaged. A number of former zakat committee members said that at certain times, it was easier to access funds if you have a political leaning towards the Islamic Movement.[176]

On the other hand, according to a Fatah member, 'Hamas is active from within the people. The PA lies to itself by denying the presence of Hamas in the West Bank.'[177] There are potential tensions between the international Muslim Brotherhood, the Hamas leadership in Damascus, and the people from the wider Islamic movement (whether directly, indirectly or not at all linked to Hamas) who do efficient grassroots work and who are most of all committed to the wellbeing of their local communities. Baumgarten (2003: p. 132) is probably wrong in saying that, over decades, the social work of the Muslim Brotherhood has not been political in any way. The Muslim Brotherhood is an international movement with a wide sphere of influence and political aims.[178]

In the municipal elections of 2005 and the legislative elections of 2006, some zakat committee members participated on a ticket of the Hamas-led Change and Reform bloc. The success of this bloc appears to have been built more on the local reputation and the true commitment of the people on these lists to their community than on the external

---

[175] Roy, 2000.

[176] Tamimi, 2007, p. 38: 'These same zakat committees [i.e. the ones established by the Muslim Brotherhood in the 1970s and 1980s] later became the principal recipients and dispensers of donations sent from abroad by Ikhwan [i.e. the Muslim Brotherhood] branches which had set up their own fundraising networks to support the Palestinians under occupation.'
Tamimi adds that 'in the wake of the outbreak of the Intifada of 1987, in order to avert any legal sanction, it was ensured that zakat committees and the institutions that supported them were properly licensed. Meticulous care was taken to ensure their activities were absolutely legal and transparent; and no single penny of the money received by these charities was allowed to slip into other projects, especially not to the military effort, which had its own discrete sources of funding.' Tamimi, 2007, p. 38, footnote 5.

[177] Interview with Fatah and central zakat committee member, West Bank, June 2009.

[178] Interview with pre-2007 zakat committee member, West Bank, June 2009. He also stated: 'If I were more politically inclined towards the Muslim Brotherhood, I would have had easier access to funding.' The political tensions surrounding the Muslim Brotherhood are not new: 'As early as the 1940s, the British Protectorate in Egypt adopted a law, targeted at the Muslim Brotherhood, banning Islamic social welfare organizations from political activities.' Maréchal, 2009, p. 19.

political agenda of Hamas and its global support by the Muslim Brotherhood. In order to research this in detail, one would have to compare election lists with membership lists and carry out more interviews with zakat committee members who ran for elections. The second moment in time, when Hamas actively tried to place people from the political wing in the committees, was during its time in the PA government starting in 2006. A former vice president of a zakat committee recalls this time:

> I went to Mecca for *hajj*. When I came back, four Hamas members had been appointed to the zakat committee that I was running. They were good people, but I did not accept any political figures in the committee. When you accept Hamas people, you give the Israelis an excuse to close you down. There was a discussion about this in the zakat committee. In the end the four members were imposed by the acting Hamas PA Minister of Awqaf. I talked to Fatah at the time, asking them to negotiate with Hamas and to also appoint four Fatah members to the zakat committee in order to balance the political influence. My arguments were, however, not heard as the political conflict escalated between Hamas and Fatah.[179]

## Criticism of the pre-2007 zakat committees

Levitt (2006) and many interlocutors from the PA voiced concern over the pre-2007 zakat committees, including the following allegations:

### *Hamas uses the zakat committees to channel money to the West Bank to use for political and military activities.*

Even though this may be the case in Gaza today, where Hamas is paying salaries to some of the employees of their government,[180] it is unlikely to be the case in the West Bank. If this were the case, it should not be hard to prove, as the banking sector is supervised very closely by several intelligence services. None of them have been producing any solid proof of this allegation. Even though the PA states that it has found undeclared bank accounts[181] when it investigated the zakat committees in 2007, there is no court case pending against a committee on the grounds of diversion of funds. If funds have indeed been used for military or political purposes, the diversion of these funds should not be difficult to prove. Concerning the foreign bank accounts that some of the committees possess, it is possible that there might also be legitimate reasons for this, such as easier payment procedures, lower costs, etc.

Levitt (2006) accuses the zakat committees of having offered an advance life insurance to suicide bombers. It is true that orphans of a suicide bomber are eligible to receive aid from zakat committees as the committees explicitly do not discriminate among orphans according to the cause of death of the father (as described in the chapter *Zakat committees in the local context*: *Projects run by the zakat committees*: *Orphan sponsorship*). No proof has however come to the attention of the researchers indicating that families of suicide bombers have been 'rewarded' through the zakat committees.

---

[179]  Interview with Fatah and central zakat committee member, West Bank, June 2009.

[180]  Note that the PA continues to pay salaries to public employees in Gaza in 2009.

[181]  PA Ministry of Awqaf. 2008. *Official publication of the Ministry of Awqaf on reforms*. 27 May. Azzarya, West Bank.

***That Zakat committees help Hamas to win 'hearts and minds'.***

Nathan Brown conducted a study of coverage of zakat committees in the Palestinian press during the period 1998–2007. For the period studied, he could not find any local press report on illegal or inappropriate conduct of West Bank zakat committees (such as discriminatory practices) nor any local press report on Hamas, Fatah or another political movement taking political credit for the work of a specific zakat committee.[182] This is noteworthy since the two leading newspapers in the oPt (*Al Quds* and *Al Ayyam*) are closer to Fatah than to Hamas.

On the other hand, prominent activity in the field of charity can enhance the political attractiveness of a movement in an indirect way. This is by no means specific to the Palestinian case. The mechanism is similar to attributing guilt by association only in reverse. In this case, a favourable impression is given by association.

The public, appreciating the efficient and honest commitment of religious institutions such as the zakat committees, come by association to have sympathies for a movement such as Hamas. The link is not necessarily an overlap of the individuals involved. It can be as simple as a religious link. Both the activities of the zakat committees and the political activities of Hamas claim their inspiration, and more importantly, their legitimacy, from religion. This does not necessarily imply that Hamas made proactive use of the zakat committees. On the other hand, Hamas was surely aware of the public relations value of favourable association.

President Obama, in his first interview with an Arabic television channel as President of the United States, addressed the issue of terrorism as opposed to constructive community work. Addressing Islamist movements, he said: 'You will be judged on what you've built, not on what you've destroyed.'[183] If zakat committees helped the Islamic opposition (i.e. the Hamas-led Change and Reform bloc) to win the elections in 2005 and 2006, this was due to the efficiency and the honesty of their community work, which in turn convinced the people. Benthall (2008a) has observed that the argument that the zakat committees are winning the hearts and minds of the Palestinian people

> suggests that the greater the professional integrity shown by the zakat committees – in delivering their services effectively to those most in need – and hence the greater the trust they earn from the communities they serve, the more successful they are likely to be winning 'hearts and minds', and therefore the more culpable they are in allegedly sustaining Hamas. According to the argument, even if the charity managers, medics, and others concerned were to succeed in satisfying a neutral adjudicator that they are committed to acting in a totally professional manner, this would not clear them of the charge of spreading an atmosphere of opinion supportive of Hamas. Such an argument places the zakat committees in a 'no win' double bind.[184]

---

[182] Personal communication with Nathan Brown, July 2009. See, however, the news report mentioned in a footnote at the end of the chapter *The 2007 reform and its consequences* referring to the news report: *Palestine Now*. 2008. 'Fatah uses Nablus Zakat Committee to promote own agenda.' 3 September.

[183] *Al Arabya*. 2009. 'Obama tells Al Arabya peace talks should resume.' Web edition, 27 January. < www.alarabiya.net/articles/2009/01/27/65087.html >

[184] Benthall, 2008a, p. 15.

A PLC member of Hamas stated: 'If I am active in a social institution in any other country and I am successful in doing my job in a clean and efficient way, why should I not have the right to run for elections?'

On the other hand, Hamas, amongst other Palestinian movements, has been spreading radical and anti-Semitic material praising death and the holy war against Israel. Some interlocutors stated that much of this material is misleading, deceives citizens, and does not serve the aims of the zakat committees to bring up a generation motivated by hope for a better future. It was stated that people are receptive to such material as the continued occupation leaves them in a situation of despair.[185]

In his Cairo speech on 4 June 2009, President Obama said:

> Now is the time for Palestinians to focus on what they can build. The Palestinian Authority must develop its capacity to govern, with institutions that serve the needs of its people. Hamas does have support among some Palestinians, but they also have responsibilities. To play a role in fulfilling Palestinian aspirations, and to unify the Palestinian people, Hamas must put an end to violence, recognize past agreements, and recognize Israel's right to exist.[186]

It is understandable that Hamas, given the fact that Israel is still using its overwhelming military power to extend settlements and prolong the military occupation, wants to preserve its right to armed resistance. The people in the West Bank and Gaza, however, are counting on the two movements and the international community to create conditions that make it possible to focus on what can be built. If this comes true, the zakat committees will have an important role to play.

### *That the zakat committees create a feeling of indebtedness among their beneficiaries which Hamas uses for political mobilization.*

Although there is no hard proof for this allegation, it is still likely that in certain occasions it holds true. Given the Islamic character of the zakat committees and their emphasis on self-reliance and independence from Western funding, one can assume a high number of Hamas sympathizers among the zakat committee members and staff.[187] When Hamas tried to organize a rally, it is very likely that they at least tried to use the local networks of the zakat committees. More research is needed to investigate this in detail.

### *Legal accusations against the zakat committees*

The accusation against the zakat committees that they were not complying with the Jordanian zakat law are mainly concerning details, e.g. objections to a committee member standing for elective office. A dialogue between the PA and the zakat committees could

---

[185] Interview with pre-2007 zakat committee members, as well as with central zakat committee members, West Bank, May and June 2009.

[186] *The Independent (UK)*. 2009. 'Full text of Obama's Cairo Speech'. Web edition, 4 June 2009. <www.independent.co.uk/news/world/middle-east/obamas-speech-cairo-speech-in-full-1696792.html>

[187] This assumption is confirmed by a wide range of interlocutors, West Bank, May and June 2009.

possibly have brought them in line with the zakat law. The committees claim that the PA has never criticized them[188] for not abiding to the zakat law until shortly before the dissolution of ninety-two zakat committees was ordered.

### Lack of cooperation between small and big committees

These allegations mainly concern the unequal distribution of zakat money. This has also not been proven, and the report of the Finance Ministry on the zakat system is not public. Before 2007, there have nonetheless been transfers of funds from big to smaller committees and cooperation among them. Most of the criticism directed at the zakat committees is not sustained by evidence. The following conclusion will present some answers to the question of the degree of political affiliation and the politicization of the zakat committees.

---

[188] Note that some of the pre-2007 committees refused to make overhead payments to the Ministry of Awqaf. Others paid the ten per cent which the PA Ministry asked from them. The Jordanian Ministry of Awqaf and Islamic Affairs was said to be taking 20 per cent of overhead from its zakat committees. Interviews with pre-2007 zakat committee members and government officials, PA Ministry of Awqaf, West Bank, June 2009.

60

# Conclusion

There is a risk of misunderstanding the West Bank zakat committees if one only focuses on their political dimension. Interlocutors often referred to questions regarding the zakat committees' links to politics as 'superficial questions', the more important question being how to respond to the suffering of the poor and the unequal distribution of resources. According to an interlocutor who has been working for a zakat committee for more than a decade, the zakat committees' work is only a 'drop in the throat of somebody who is lost in the desert and about to die of thirst.'

West Bank zakat committees operate in a complex socio-political context, that has been laid out in this research paper. Before the 2007 reform,[189] the committees were efficient grassroot organizations that strengthened the local response system and self-reliance while minimizing dependency and victimhood. They were mainly composed of pious businessmen and academics with a good and honest reputation and close contacts to local governments and village councils. Committee members were working on a voluntary basis, and the businessmen on the committees contributed the necessary know-how to run the committees efficiently and provided for excellent financial reporting.[190] They were very efficient in identifying the needs of the most vulnerable and were not docile to the European and North American donor apparatuses. Moreover, no money was lost in paying high salaries of (expatriate) NGO workers. A Palestinian NGO Director in Jerusalem stated that an important number of NGOs in the oPt, funded by North American and European sources, have become experts in writing grant proposals and evaluation reports, while comparatively little effort is spent on optimizing the actual implementation of projects.[191] In contrast to these NGOs, zakat committees, run by locally respected men on a voluntary basis, were perceived as more committed to tangible activities. Moreover, zakat committees have shown the capacity to work across clan, party, and even religious boundaries. These factors can explain for the high degree of popular confidence in the zakat committees, something that is documented in the surveys exposed above.[192]

Among West Bank inhabitants and politicians, the opinions regarding the affiliation of zakat committees to Hamas differ widely according to their degree of knowledge of the zakat committees, and their political bias (whether it be declared or unconscious). It is noteworthy in particular that most Palestinians and expatriates working in the non-Islamic voluntary sector, including international NGOs, appear to be little informed about the work of the zakat committees in general. A summation of the most reliable and best-informed interlocutors' views suggests that the majority of the zakat committees operated as genuinely needs-based charities before 2007.

---

[189]  Given the fact the zakat system in a restructuring phase, it is too early to provide an assessment of the current zakat system operating with eleven instead of ninety-two zakat committees in the West Bank.

[190]  This is based on interviews with members of pre-2007 zakat committees studied in the frame of this research, officials from the PA Ministry of Awqaf and the inspection of financial and narrative reports of West Bank zakat committees since 1991.

[191]  Interview with NGO director, Jerusalem, 7 June 2009.

[192]  See the chapter on *Zakat committees in the local context*, especially the sections *Popular confidence*, *Efficiency* and *Zakat committees and foreign aid.*

Zakat committees are formally independent entities and their 'political affiliations are therefore not immediately apparent.'[193] However, some of the committees were founded or co-founded by members of the Muslim Brotherhood and other politico-religious movements (Hizb Al Tahrir and others). Religious Fatah members, some of whom had sympathies for the Islamic movement, established other zakat committees. It is noteworthy that some Fatah leaders initially had close ties to the Muslim Brotherhood but eventually distanced themselves from the latter, as described in the chapter *Historical overview*. The Muslim Brotherhood did not found Hamas until 1987–88.

After 1994, the PA became aware that a majority of zakat committees were closer to the Muslim Brotherhood, Hamas, and some religious members of Fatah than to the PA and the parts of Fatah that were leading it. Nevertheless, it adopted a *laisser-faire* strategy and registered the zakat committees at the PA Ministry of Awqaf and Religious Affairs, as it hoped that this would increase the popular legitimacy of the PA and ultimately Fatah.

According to a high official at the PA Ministry of Awqaf,

> zakat committees were never registered as official Muslim Brotherhood or Hamas institutions. Hamas and the Muslim Brotherhood used existing structures to spread their influence. In terms of the zakat committees, however, their aims were simply congruent with the aims of any religious Muslims, as the issue of how zakat committees should work is not controversial among most Muslims.[194]

At several moments in time, Hamas and Fatah have tried to impose people of their political wings on the zakat committees. This had negative consequences that ultimately were and still are coming at the expense of the local population. However, we can affirm that the zakat committees of at least the major West Bank cities on which this research has focused are not adequately described as 'subsidiaries' of any political party.

Based on the statements of some interlocutors regarding the six case studies (Hebron, Ramallah, Nablus, Qalqilyah, Jenin, and Tubas), one can infer that there was at least a silent consensus between Hamas and Fatah, which prevented people from the political organization section [tanzeem] of the two movements from being politically active through or on behalf of the zakat committees of major cities.

Based on the information gathered in the framework of this fact-finding project, the explanation of International Crisis Group (2003), as well as that of Benthall, Baumgarten, Malka, and Gunning to the effect that many of the zakat committees are loosely affiliated to Hamas, appears much more accurate to the local reality than Levitt's view depicting them as subsidiaries of Hamas (see *Literature review*).

Benthall's etic model (2008a) has been widely confirmed by this fact-finding. This model seeks to describe the zakat committees 'as local instances of a world wide trend, the growth of Islamic NGOs, which are themselves a special case of Faith Based Organizations – but within the unique historical context of the Israel–Palestine conflict.' Baumgarten's argument proved to be a very solid one when she writes that at 'the moment in which Hamas entered the scene as a political actor, the work [of the Islamic sector] contributed to its political attractiveness and to its political influence.'[195]

---

[193] *International Crisis Group*, 2003, p. 10.

[194] Interview with government official, PA Ministry of Awqaf, Azzarya, West Bank, June 2009.

[195] Baumgarten, 2006, pp. 132–133 [quote translated from German by the author].

Case 1:05-cv-04622-DLI-RML   Document 267-13   Filed 03/22/12   Page 309 of 646 PageID #: 6987

It was in these instances (mainly the 2006 elections) that Hamas as a political movement benefited politically from the zakat committees. Some members of the zakat committees probably only became politically engaged when they decided to run for election in 2005 or 2006 on the Hamas-led Change and Reform tickets.

Sara Roy (2000) argues that the different spheres in which the Islamic movement is active need to be differentiated and that Hamas is not equally active and powerful in the different fields.[196] Her observation that the diversity of streams of the Islamic movement is bigger in the social, cultural, and religious than in the political field is relevant to understanding the zakat committees' relations to politics. Hamas has run some of the pre-2007 zakat committees and was partly represented in others, in which it joined the efforts of independents and representatives of other Islamist streams in order to serve the poor and to increase the religious practice of their communities.[197] This does not, however, imply that that Hamas was politically active through the zakat committees.

The political weight of the Muslim Brotherhood as a worldwide movement with substantial sources of funding and a clearly political agenda can barely be underestimated. Some former zakat committee members said that at times, it was easier to access funds if you had a leaning towards the Muslim Brotherhood. There might be a risk that the foreign Muslim Brotherhood networks or the Hamas Political Bureau in Damascus contribute to the politicization of the zakat committees' work. Possibly this was the case at the occasions when Hamas sought to place members of its political wing in the committees (see the section on Hamas in the previous chapter). The relation between the Muslim Brotherhood and Hamas is not clear-cut. Hamas emanated from the Muslim Brotherhood and is considered as the Muslim Brotherhood's local political wing in Palestine. It is unlikely that local Muslim Brotherhood networks and Hamas are identical. While Syria, for instance, offers its hospitality to the political wing of Hamas in Damascus, membership in the Syrian Muslim Brotherhood is a capital offense there. In the West Bank, one can assume that members or supporters of the Muslim Brotherhood are likely to vote for Hamas in elections. The same individuals might not, however, agree to attempts from within Hamas to influence Islamic social work too directly (as occurred when Hamas tried to place members of its political wing in the zakat committees).

After the split of the West Bank and Gaza, Hamas and the Muslim Brotherhood, as well as Fatah, have yet to prove that they are willing to protect the local work of the zakat committees from any politicization and to bring them in line with the interests of the local people and the needs of the disadvantaged. Currently (2009), political calculations and

---

[196]  'The term "Islamic Movement" refers not only to its political sector, in which Hamas predominates, but to the social, cultural, and religious sectors of the movement, which may or may not have direct links to the political.' Roy, 2000.

[197]  The *International Crisis Group*, 2003, states that political affiliation of organizations such as the zakat committees can be 'inferred from a combination of factors such as the identity of the founders, composition of governing bodies, funding and staffing. While there is nothing scientific or rigorous to this process, Palestinians interviewed by ICG stated that the Hamas affiliation of a particular relief organization, pre-school education centre, zakat committee or mosque is generally a matter of common knowledge so that people can state with some assurance that "this mosque" is Hamas and that one is not.' *International Crisis Group*, 2003, p.11. Interlocutors in the West Bank interviewed by the researchers in May and June 2009 confirmed this. Many said that local people, especially in villages, know that a specific zakat committee was run by people with close ties to Hamas or to Fatah, by independents or by a mixture of the latter.
Note that these personal ties to Hamas allowed Levitt to construct his 'pyramid model' depicting the zakat committees as subsidiaries of Hamas (see this chapter and the chapter *Literature review*).

direct political control over NGOs and zakat committees in Gaza and the West Bank are given the priority over the interests of the disadvantaged.

In spite of this, there are no immediate political gains to be obtained from zakat committees. None of the interlocutors, even the ones most critical of the zakat committees, could produce any solid proof that the zakat committees were engaged in political or militant activity.

A study of coverage of zakat committees in the Palestinian press conducted by Nathan Brown covering the period of 1998-2007 suggests that the activities of the zakat committees have not been controversial. Moreover, Brown could not find any evidence that political movements were taking political credit for the work of a specific zakat committee (see the chapter *Zakat committees and political movements*: section *Criticism of the pre-2007 zakat committees* on how Zakat committees can help Hamas to win the hearts and minds of the people).

On the other hand, prominent activity in the field of charity can enhance the political attractiveness of a movement in an indirect way. This is by no means specific to the Palestinian case. The mechanism is similar to attributing guilt by association only in reverse. In this case, a favourable impression is given by association.

The public, appreciating the efficient and honest commitment of religious institutions such as the zakat committees, come by association to have sympathies for a movement such as Hamas. The link is not necessarily an overlap of the individuals involved. It can be as simple as a religious link. Both the activities of the zakat committees and the political activities of Hamas claim their inspiration, and more importantly, their legitimacy, from religion. This does not necessarily imply that Hamas made proactive use of the zakat committees. On the other hand, Hamas was surely aware of the public relations value of favourable association.

Since the 1970s, the West Bank zakat committees as semi-state entities were in different ways subject to the state authority of Israel, Jordan, and the PA. Given the rapid pace of change in the political structure in the West Bank since the seventies, the zakat committees were confronted with different Ministries and organs of different states (see the chapters *Historical overview* and *Zakat committees and the state*).

In their relation to the state, the zakat committees are moving between two extremes. First, there is the idea of the Islamic state and *bayt al maal,* whereby the state fully controls the zakat money and its just distribution. Second, there is the idea that zakat committees are independent from the state or the quasi-state government of the PA. This would, however, mean that they are becoming similar to regular Islamic charitable societies with NGO status. The PA, in charge of the zakat committees since 1995, never addressed or clarified the question of the status of the zakat committee in depth, as it was focussed on the peace process and the construction of a Palestinian state, aims which have not been achieved by September 2009. The outbreak of the Second Intifada in 2001 further delayed a debate on principles of the zakat committees' role and status.

With the split of the West Bank and Gaza in the aftermath of the sweeping victory of the Hamas-led Change and Reform bloc in the 2006 PLC elections, the zakat committees became part of an intense struggle for power engaging Hamas and Fatah as well as their respective international allies. This struggle continues to deeply divide Palestinian society. The reform of the zakat system in 2007 has to be understood in the light of a number of PA reforms implemented by Prime Minister Fayyad since 2007 and the Hamas and Fatah divide (see the chapter *The 2007 reform and its consequences*).

**64**

In December 2007, the PA emergency cabinet led by Fayyad established a Central Zakat Fund, dissolved ninety-two zakat committees and replaced them by eleven newly appointed central zakat committees, one in each West Bank governorate. *Waqf* property, funds, zakat offices, and subsidiary projects (such as clinics, medical centres, schools etc; see *Zakat committees in the local context*) of the pre-2007 zakat committees are now entirely controlled by the PA Ministry of Awqaf. Regarding the zakat committees, there are two schools of thought inside the PA Ministry of Awqaf. The first is in favour of tying the zakat committees closer to the PA by centralizing their governance and composition procedures (see the chapter *Zakat committees and the state*). The second, closer to the pre-2007 zakat system, is in favour of more decentralized zakat committees that work in close contact with village councils, i.e. local governments.

The 2007 reform realized the vision of the first school of thought by centralizing the zakat committees under the control of the PA Ministry of Awqaf, which coordinated the composition procedures with the PA Ministry of Interior. It appears that for the PA government of Prime Minister Fayyad, security considerations took over the actual achievements of the people who used to run the committees before. Interlocutors agreed that the harsh measures of the 2007 reform were not decided inside the Ministry of Awqaf but on a higher level, i.e. the Council of Ministers and the Interior Ministry – possibly with a green light from the Israeli and US governments.

The reform was implemented on shaky ground without a clear legal framework or transparent governance guidelines. There is a risk of detrimental consequences for the zakat system in the West Bank (see the chapter *The 2007 reform and its consequences*).[198] In the aftermath of the reform, the central zakat committees were confronted with financial scarcity. In certain cases, activities of the former committees had to be stopped. Public confidence in the zakat committees has diminished. Due to lack of confidence of local and international donors, zakat money is increasingly collected and distributed underground. Some of the pre-2007 zakat committees continue to work on an unofficial basis in remote areas. This surely bears the risk of deepening the social divides and tensions.

In spite of this, there are potential local benefits of the reform, as it might contribute to persuade the US and Israel to remove international obstacles to the transmission of zakat and sadaqat funds to zakat committees in the oPt (though it has not yet produced this result). Moreover, the reform might make the monitoring mechanisms more efficient and increase transparency. Most former and present zakat committee members agree that transparency must not confine itself to the grassroots level, but include governmental and monitoring bodies in order to be sustainable and in order to contribute to a bright long-term future for a dynamic zakat system in the Palestinian territories.

The internal division of the Palestinian society created by the Fatah vs. Hamas civil war threatens the zakat system in Palestine. A rapprochement of Hamas and Fatah appears to be a necessary condition for the reestablishment of a vigorous zakat system beyond party lines. Although Hamas' Gaza government and the Fatah's West Bank government maintain their respective positions that the zakat committees, in Gaza and the West Bank, are independent today, official and media reports as well as anecdotal evidence have raised suspicions that this independence has been compromised by increasing authoritarianism since 2006. If this is the case in both territories, there are two possible outcomes. Either we will witness the progressive politicization of the zakat committees under two separate administrations and

---

[198] Local stakeholders have quite different perceptions of the reform. For an overview of the perspectives of Fatah and the PA; the Ministry of Awqaf; Hamas; and donors, see the chapter *The 2007 reform and its consequences*.

along party political lines, or the emergence of new social coalitions whose common ground would be the preservation and restoration of the independence of the zakat committees.

We have already provided some answers to the questions posed about the degree and form of political affiliation. We have also provided an illustration of how shifts in the political context, namely the electoral victories of the Hamas-led Change and Reform bloc in the 2005 and 2006 election, have drastically increased the politicization of the zakat committees' role, without the committees themselves adopting a political role (see the chapter *Zakat committees and political movements*). Between the 1970s and the victory of the Hamas-led Change and Reform bloc in the 2005 and 2006 elections, the activities of the zakat committees were not controversial within the Palestinian territories. Since the establishment of the PA in 1994, however, the question of the loyalty of zakat committee members to the PA has been a recurrent issue of political debates. Before their radical reorganization in 2007, the zakat committees were run by social coalitions of religious men who were either politically independent or belonged to different political parties. The two crucial prerequisites to enable the zakat committees to function efficiently are transparency and protection from party-political pressure.

---

This fact-finding has been limited by the short timeline in which it was undertaken. A more comprehensive study of the zakat system in the oPt could address questions such as:

- To what extent do the directives of the 2007 zakat committee reform in the West Bank emanate from high circles in the PA and or Fatah?
- What is the extent of Jordanian influence on the zakat committees and their administration?
- What is the relation of other Islamic or leftist movements to the zakat committees?
- What is the zakat committees' historical role in the wider political economy of aid in the oPt, and what potential role do they have for the future?
- Do external donor agencies have a potential role in providing training services to the Palestinian zakat committees?
- What are differences and commonalities in the nascent West Bank and Gaza Strip model (and laws) of zakat committees?
- Was the issue of the zakat committees part of Hamas' internal discussions pro and contra the participation in the 2005 and 2006 elections?
- Insofar as some programmes launched by the West Bank zakat committees, such as the dairy in Nablus, may be regarded as exemplary, to what extent are these replicable with the potential to 'scale up' as more substantial elements in the promotion of self-reliant development programmes?
- What are the commonalities and differences between the zakat committee system in the oPt and zakat as it is developing as a fund-raising tool both in 'Western' Islamic NGOs and in the petrodollar states?

---

# References

Abu-Amr, Ziad. 1994. *Islamic Fundamentalism in the West Bank and Gaza*. Bloomington and Indianapolis: Indiana University Press.

Aburish, Saïd K. 1998. *Arafat: From Defender to Dictator*. London: Bloomsbury Publishing.

Abu-Sada, Madi and Uweidat. 2007. *Strengthening Resilience: Food Insecurity and Local Responses to Fragmentation of the West Bank*. Jerusalem: UN Food and Agriculture Organization.

Ajluni, Salem. 2003. 'The Palestinian Economy and the Second Intifada'. *Journal of Palestine Studies*, Vol. 32, No. 3, spring 2003, pp. 64–73, California: University of California Press.

Alterman, Jon B. and Karin von Hippel. 2007. *Understanding Islamic Charities*. Washington, DC: Center for Strategic and International Studies Press.

Baumgarten, Helga. 2006. *Hamas – Der politische Islam in Palästina*. Heinrich Hugendubel Verlag: München.

Benthall, Jonathan. 2007a. 'Islamic charities, faith-based organizations and the international aid system'. In Alterman, Jon B. and Karin von Hippel, eds. *Understanding Islamic Charities*. Washington, DC: Center for Strategic and International Studies Press.

—. 2007b. 'The overreaction against Islamic charities', *ISIM Bulletin*. Leiden: Institute for the Study of Islam in the Modern World, no. 20, Autumn 2007. Accessed September 2009. <www.isim.nl>

—. 2008a. *The Palestinian Zakat Committees 1993–2007 and Their Contested Interpretations*. PSIO Occasional Paper 1/2008. Geneva: Graduate Institute of International and Development Studies.

—. 2008b. *Returning to Religion. Why a Secular Age Is Haunted by Faith*. London: I.B.Tauris.

____and Jérôme Bellion–Jourdan. 2003. *The Charitable Crescent: Politics of Aid in the Muslim World*. London: I.B.Tauris.

Brown, Nathan J. 2003. *Palestinian Politics after the Oslo accords: resuming Arab Palestine*. Berkeley and Los Angeles California: California University Press.

Challand, Benoît. 2008. 'A Nahda of Charitable Organizations? Health Service Provision and the Politics of Aid in Palestine.' *International Journal of Middle East Studies*. Vol. 40, No. 2 (May, 2008). Cambridge University Press.

—. 2009. *Palestinian Civil Society: Foreign Donors and the power to promote and exclude*. London: Routledge.

Gunning, Jeroen. 2007. *Hamas in Politics*. London: Hurst.

Hilal, Jamil and Majdi Maliki. 1997. *Social support institutions in the West Bank and the Gaza Strip* [mu'assasat lil-da'm al-ijtima'y fil-daffa al-gharbyya wal-qita' ghaza]. Ramallah: Palestine Economic Policy Research Institute, MAS.

Hroub, Khaled. 2006. 'A new Hamas?' *Journal of Palestine Studies*, number 140, summer 2006, California: University of California Press.

International Crisis Group. 2003. *Islamic social activism in the Palestinian Territories*. Brussels/Amman: International Crisis Group.

—. 2008a. *Ruling Palestine II: The West Bank Model?* Ramallah, Jerusalem, Brussels: International Crisis Group.

—. 2008b. *Round Two in Gaza*. Gaza City/Ramallah/Brussels: International Crisis Group.

Ishtia, Mohammed. 2008. *Encyclopaedia of Palestinian Terms and Concepts* [mawsu'a al-mustalahat wal-mafahim al-filastinyya]. Location unknown: Palestinian Centre for Regional Studies.

Levitt, Matthew. 2006. *Hamas: Politics, Charity, and Terrorism in the Service of Jihad*. New Haven: Yale University Press.

Lundblad, Lars Gunnar. 2008. 'Islamic Welfare, Discourse and Practice – The Institutionalization of zakat in Palestine.' In Naguib and Okkenhaug 2008, p. 195 – 237.

Malka, Haim. 2007. 'Hamas: Resistance and Transformation of Palestinian Society'. In Alterman, Jon B. and Karin von Hippel, eds. *Understanding Islamic Charities*. Washington, DC: Center for Strategic and International Studies Press, pp. 98–126.

Maréchal, Brigitte. 2009. *Les Frères musulmans en Europe : racines et discours*. Paris : PUF.

Naguib, Nefissa and Inger Marie Okkenhaug, eds. 2008. *Interpreting Welfare and Relief in the Middle East*. Leiden: Brill.

Nanji, Azim. 2001. 'Almsgiving.' In: *Encyclopaedia of the Qur'an*. Leiden–Boston–Köln: Brill.

Robinson, Glenn E. 1993. 'The Role of the Professional Middle Class in the Mobilization of Palestinian Society: the Medical and Agricultural Committees'. In *International Journal of Middle East Studies*. Vol. 25, No. 2 (May, 1993). Cambridge University Press.

Omran, Aya, Aisheh Ahmed, and Hazem Haneyyeh. 2008. *Freedom of Association in the Palestinian-Controlled Territory During 2008*. Special Report December 2008. The Independent Commission for Human Rights: Ramallah.

Roy, Sara. 2000. 'The Transformation of Islamic NGOs in Palestine.' *Middle East Report 2000*. MERIP. Accessed September 2009. < www.merip.org/mer/mer214/214_roy.html >

Singer, Amy. 2008. *Charity in Islamic Societies*. Cambridge University Press.

Tamimi, Azzam. 2007. *Hamas Unwritten Chapters*. London: Hurst.

Zysow, A. 2005. 'Zakat', in: *Encyclopédie de l'Islam*. Leiden: Brill.

CCDP Working Paper Number 5

Published by the
*Centre on Conflict, Development and Peacebuilding (CCDP)*
Graduate Institute of International and Development Studies
132, rue de Lausanne
PO Box 136
1211 Geneva 21
Switzerland
E-mail: ccdp@graduateinstitute.ch
Website: http://www.graduateinstitute.ch/ccdp

The views expressed in this publication are those of the author and do not necessarily reflect the views of the CCDP or the Government of Switzerland.

All rights reserved. No part of this publication may be reproduced, stored in a retrieval system or transmitted in any form or by any means – electronic, mechanical, photocopying, recording or otherwise – without the prior permission of the CCDP.

Design: Latitudesign

© CCDP, 2009
Printed in Switzerland

**THE GRADUATE INSTITUTE** | GENEVA

**CENTRE ON CONFLICT,
DEVELOPMENT AND PEACEBUILDING**

Graduate Institute of International and Development Studies
132, rue de Lausanne
PO Box 136
1211 Geneva 21
Switzerland
E-mail: ccdp@graduateinstitute.ch
Website: http://www.graduateinstitute.ch/ccdp

**EXHIBIT 163 TO DECLARATION OF VALERIE SCHUSTER**

# Countering the Financing of Terrorism

### Edited by Thomas J. Biersteker and Sue E. Eckert

 Routledge
Taylor & Francis Group

LONDON AND NEW YORK

# Terrorism, charities, and diasporas

## Contrasting the fundraising practices of Hamas and al Qaeda among Muslims in Europe[1]

*Jeroen Gunning*

Since 11 September, links between "Islamic charities" in the West and organizations categorized as "terrorist" in the Middle East have come under intense scrutiny. Dozens of charities with alleged ties to al Qaeda have had their assets frozen in an unprecedented international clampdown Most prominently, family members of the 11 September victims have sued six charities and their subsidiaries in a $116 trillion lawsuit for their alleged role in financing the 11 September attacks.[2]

The allegation that those involved in political violence use charities, or more broadly non-profit organizations, to raise or channel money is not new. The Provisional Irish Republican Army, the Palestine Liberation Organization, Hamas, Hezbollah, the Tamil Tigers, and others have been similarly accused.[3] The notion of fighting "terrorism" by targeting charities believed to be channeling funds to those perpetrating terroristic acts is similarly well established. What distinguishes the current situation from previous ones is the increased commitment of the international community, as embodied in United Nations Security Council 1373, which demands that Member States "prevent and suppress the financing of terrorist acts," and the increased use of legally binding lists to blacklist accused organizations and charities.[4]

What further distinguishes the current situation is the apparently exclusive focus of the international community on "Islamic charities," defined as charities involving a predominance of Muslims in staff and recipients,[5] and specifically on Islamic charities affiliated with two groups: al Qaeda and the Palestinian resistance movement Hamas. Both the Bank of England's "Consolidated List of Financial Sanctions Targets in the UK" and the European Union's "List of Persons and Entities Subject to Financial Sanctions" included, at the time of writing, some 20 charities thought to be affiliated with al Qaeda and affiliates (the number fluctuates somewhat depending on how one delineates a "charity"), and two with alleged links to Hamas.[6] No other charities were listed in relation to non-state "terrorist-designated"

94   *Jeroen Gunning*

organizations – even though both lists included both non-Muslim and oth[er]
Muslim entities.[7]

Al Qaeda's inclusion on the list of those using charitable "fronts" is no[t]
surprising given claims by terrorism experts and intelligence services that "th[e]
most important source of al-Qaeda's money is its continuous fundraisin[g]
efforts" through a worldwide charitable network.[8] The inclusion of Hamas i[s]
similarly predictable given the widespread belief among intelligence service[s]
that the organization raises much of its funding through charitable "fronts"
in the West.[9] Even the fact that only Islamic charities with a predominantly
Islamist disposition – where "Islamist" refers to the political ideology tha[t]
advocates Islam as the blueprint for political society – are listed is predictable,
given that an Islamist organization attacked the United States and thereby
triggered the "war on terror."

Closer observation, however, raises the serious question of why, if the
abuse of charities is so widespread, so few charities have been found guilty of
funding terrorism. When considering Islamic charities registered in Europe
(as opposed to those operating internationally from non-European countries,
such as Saudi Arabia, Somalia, or Pakistan), the divergence between the view
that al Qaeda and Hamas raise much of their "resistance" funds through
European-based Islamic charities and the actual number of charities identi-
fied by European governments raises questions about the true extent of the
use of charities by targeted organizations. Narrowing our focus to the United
Kingdom (or, more precisely, England and Wales)[10] and the Netherlands –
two key European states that have been regularly linked with al Qaeda and
Hamas fundraising activities[11] – we find that only two charities have been
found guilty of funding al Qaeda, only four of having trustees with links to
al Qaeda, and only one of funding Hamas. Of these, all charities found guilty
of funding terrorism are registered in the Netherlands.[12] This disjuncture is
particularly striking when evaluating the claim that al Qaeda has infiltrated
one-fifth of all Islamic charities[13] – which, even if we limit ourselves to the
jurisdictions of England and Wales and the Netherlands, would amount to
some 2,000 charities (if the rough estimate that there are in the order of
10,000 Islamic charities in these two jurisdictions is correct).[14]

Contrary to this expectation, only one Europe-based charity, admittedly
with various national branches, has been found guilty of funding Hamas's
resistance wing.[15] This low figure, coupled with the fact that the accusations
against this charity appear to revolve around providing money to the relatives
of suicide operations rather than funding the armed struggle directly,[16] calls
into question the validity of the claim that Hamas raises substantial amounts
of capital for its resistance activities (as opposed to its charitable network)
through charitable fronts.

Though the number of successful court cases and, in the case of the UK,
Charity Commission investigations is of course not necessarily the same as
the number of charities actually involved in such fundraising, it serves as a
proxy on the basis of which one can arguably predict at least the order of

ded both non-Muslim and other

using charitable "fronts" is not
ind intelligence services that "the
ey is its continuous fundraising
vork.[8] The inclusion of Hamas is
elief among intelligence services
ding through charitable "fronts"
: charities with a predominantly
rs to the political ideology that
society - are listed is predictable,
l the United States and thereby

serious question of why, if the
arities have been found guilty of
c charities registered in Europe
y from non-European countries,
the divergence between the view
ieir "resistance" funds through
tual number of charities identi-
ons about the true extent of the
rrowing our focus to the United
Wales)[10] and the Netherlands –
ilarly linked with al Qaeda and
t only two charities have been
of having trustees with links to
' these, all charities found guilty
therlands.[12] This disjuncture is
m that al Qaeda has infiltrated
ren if we limit ourselves to the
Netherlands, would amount to
that there are in the order of
ons is correct).[14]
·ope-based charity, admittedly
nd guilty of funding Hamas's
h the fact that the accusations
roviding money to the relatives
armed struggle directly,[16] calls
nas raises substantial amounts
sed to its charitable network)

:s and, in the case of the UK,
ie not necessarily the same as
ich fundraising, it serves as a
predict at least the order of

magnitude of the number of charities involved. In addition, despite intense international scrutiny, the number of collapsed court cases or "unsuccessful" Charity Commission investigations is of the same order of magnitude and the number of these cases has not been dramatically affected by the relaxation of rules governing the use of evidence gathered by intelligence services in court.

If this proxy is acceptable, two key discrepancies need to be addressed. First, the number of charities accused of funding either al Qaeda or the resistance wing of Hamas and the number of charities expected to do so by intelligence analysts diverge. Second, there is a discrepancy between the significantly larger number of charities accused of funding al Qaeda and the smaller number of charities accused of funding the resistance activities of Hamas. In addition, there is a discrepancy between the nature of the claims against the al Qaeda and Hamas affiliates. In order to account for these discrepancies, we must take into account the ideological, sociological, organizational, and historical contexts of al Qaeda and Hamas and consider them in relationship to the development of Muslim political activism in Europe.

On the basis of publicly available evidence, al Qaeda and Hamas appear to rely less on Western-based charities to fund their violent activities than is typically believed Furthermore, the relationship between a violent organization and sympathetic charities is not uniform but dependent on the organization's ideology, self-image, historical development, and the nature of its relationship with the larger community or society it claims to represent. In the case of Hamas, these factors discourage the redirection of funds to anything other than officially stated, usually humanitarian, ends – although this is not to say it does not occur. Because funding for political resistance is readily available from other sources, Hamas furthermore has no pressing need to pursue this path.

In the case of al Qaeda, its ideology, self-image, and historical development all fail to discourage abuse of charities for the redirection of funds. As such, one would expect al Qaeda to use charitable fronts extensively However, the relative scarcity of charities with proven links to al Qaeda in Europe can be explained by the, until now, relative incompatibility between al Qaeda's ideology and methods and the life experience, practices, and beliefs currently found among the majority of Europe's Muslims – thus rendering the option of fundraising through charities too uneconomical to compete successfully with other available sources of finance.

## Regarding terminology and the definition of terrorism

The absence of an internationally agreed upon definition of "terrorism" poses serious problems for delineating what constitutes "financing terrorism." According to Article 2.1 of the International Convention for the Suppression of the Financing of Terrorism, a person commits a punishable offence "if that person by any means, directly or indirectly, unlawfully and wilfully,

96   *Jeroen Gunning*

provides or collects funds with the intention that they should be used or in the knowledge that they are to be used, in full or in part, in order to carry out [terrorist activities]."[17]

Problems arise not only from the fact that terrorism is a contested concept but also from the political use of the term. Because current international practice is to designate an entire organization as "terrorist" and to make all dealings with that organization illegal, it becomes impossible to distinguish between terrorist activities on the one hand and resistance activities carried out according to the Geneva Convention or humanitarian activities in support of a suffering population on the other. The consequences of this unresolved problem will become more evident in the course of the following discussion. To avoid this problem, I will reserve the term "terrorist" to denote solely acts of political violence (and not organizations perpetrating them) aimed at terrorizing civilians for the purpose of influencing a third party

### Organizational differences between al Qaeda and Hamas

Though al Qaeda and Hamas are sometimes treated as if they were the same type of organization on the grounds that both organizations are Islamist,[18] the two are significantly different and represent different ends of the Islamist spectrum. Historically, Hamas grew out of the Muslim Brotherhood movement Established in Egypt in 1928, the Brotherhood was both an Islamic revival movement and a grassroots organization concerned with welfare, social justice, and ending (British) imperialism. Though increasingly engaged in the political violence that characterized Egyptian politics in the 1930s, at its core it was a movement of middle- and lower-middle-class professionals and entrepreneurs whose main interests lay in reform, not revolution.

In 1945–1946, the Muslim Brotherhood established branches in Palestine. Following Israel's establishment and the subsequent Arab–Israeli war of 1948, the Palestinian Brotherhood increasingly focused on providing humanitarian services for the estimated 700–800,000 refugees who had flooded Gaza and the West Bank. During the 1970s, when the Brotherhood re-emerged following a decade-long repression in Gaza and disruption in the West Bank,[19] it returned to these humanitarian roots and focused on welfare. Until the outbreak of the first Intifada in 1987, the Brothers largely refused to engage in resistance activities.

At the start of the 1987 Intifada, the Palestinian Muslim Brotherhood established Hamas as its resistance wing; as such, it reflected the thinking of the mainstream Muslim Brotherhood. Though increasingly radical in its attitude towards Israel, Hamas's focus on gradualism and welfare, typical of the larger Brotherhood, continued to characterize its domestic outlook. Although begun as the resistance wing of the Brotherhood, Hamas soon eclipsed the mother organization by taking on its socio-political mantle and welfare network and delegating the task of fighting to its newly established resistance wing, the Izz al Din al Qassam Brigades.

that they should be used or in the
or in part, in order to carry out

t terrorism is a contested concept
n. Because current international
on as "terrorist" and to make all
ecomes impossible to distinguish
l and resistance activities carried
iumanitarian activities in support
consequences of this unresolved
iurse of the following discussion.
n "terrorist" to denote solely acts
ns perpetrating them) aimed at
:ncing a third party

## ieda and Hamas

s treated as if they were the same
ioth organizations are Islamist,[18]
:ent different ends of the Islamist
the Muslim Brotherhood move-
otherhood was both an Islamic
ization concerned with welfare,
.m. Though increasingly engaged
Egyptian politics in the 1930s, al
lower-middle-class professionals
n reform, not revolution.
stablished branches in Palestine.
equent Arab–Israeli war of 1948,
used on providing humanitarian
:ees who had flooded Gaza and
Brotherhood re-emerged follow-
isruption in the West Bank,[19] it
cused on welfare. Until the out-
iers largely refused to engage in

ilestinian Muslim Brotherhood
such, it reflected the thinking of
gh increasingly radical in its atti-
iualism and welfare, typical of
:acterize its domestic outlook.
the Brotherhood, Hamas soon
in its socio-political mantle and
ighting to its newly established
gades.

Al Qaeda – or, more precisely, what is usually described as al Qaeda[20] – traces its origins to the Muslim Brotherhood and the *takfiri*[21] movements of the 1970s. Inspired by Sayyid Qutb, an Egyptian Muslim Brother ideologue who became radicalized in prison and was hanged in 1966, the *takfiri* movements capitalized on disillusionment with the Brotherhood's political effectiveness and with the leadership's decision to compromise with the political status quo under President Sadat. According to the ideologues following in Qutb's footsteps, including Shukri Mustafa of al Takfir wa al Hijra and Abdessalam Faraj of the Egyptian Jihad, the very principles of gradualism and compromise had caused the Brotherhood's ineffectiveness.[22] They advocated a radical break with the status quo in anticipation of a comprehensive revolution. Society as a whole was depicted as having been corrupted and a radical withdrawal from society was considered necessary to safeguard the newfound ideological purity. Because all of society was to blame, deception and even violence against its members were deemed acceptable.

Al Qaeda appears to have emerged as a loose network out of the confluence of *takfiri*-inclined volunteers who had participated in the Afghan guerrilla war against the Soviet invasion. Those who joined the struggle in Afghanistan were increasingly either hardened radicals from Islamist movements across the Middle East, North Africa, and Asia, many of whom were university graduates or professionals, or members of the lower classes with little grounding in Islam or experience of local, embedded Islamist politics.[23] If they had originally been part of a socially embedded movement in their home states, they became uprooted and radicalized by the Afghan war. Upon return to their home states, they usually did not fit in with the more moderate, embedded Islamist movements and congregated instead around other Afghan "alumni" and radical fringe groups.[24] Unlike those involved with the accommodationist offshoots of the Muslim Brotherhood movement, theirs was a strategy of violent revolution, inspired by their belief that they had forced the Soviet superpower to withdraw from Afghanistan and made feasible by their relative isolation from local communities.[25]

The differences in the historical trajectories of Hamas and al Qaeda are reflected in fundamental variances in ideological, sociological, and organizational make-up (see Table 5.1). Ideologically, Hamas has adopted a gradualist approach to building an Islamic state, with a heavy emphasis on institution-building and social welfare. Al Qaeda favors a revolutionary approach, emphasizing violence and terrorism over institution building. Hamas's Islamic state includes most of the features one would expect a modern state to have and is heavily influenced by nationalist discourse. Al Qaeda's end goal is less well defined and appears to reject many of the features of a modern state. Hamas has shown an increased willingness to compromise domestically – and even, though to a far lesser extent, in its attitude towards Israel[26] – and to accommodate other-thinkers, resulting in partnerships with both Western and local non-Islamist institutions. Al Qaeda nurtures an absolutist attitude, typically limiting its partnerships to fellow Islamist organizations of a radical

98 *Jeroen Gunning*

*Table 5 1* Ideological, sociological, and organizational differences between Hamas and al Qaeda

| Hamas | al Qaeda |
|---|---|
| • Gradualist | • Revolutionary |
| • Accommodationist | • Absolutist |
| • Non-*takfiri* | • *Takfiri* |
| • "Jihadist" only vis-à-vis Israel | • "Jihadist" vis-à-vis world, including "corrupted" Muslims |
| • Socially embedded (national) | • Minimal welfare structure |
| • Welfare structure | • No political representation |
| • Political representation | • Little social emphasis besides military emphasis |
| • Social emphasis besides military activities | • Little local accountability |
| • High level of local accountability | |

bent Hamas usually limits its use of the word *jihad* to the struggle against Israeli occupation, and largely refrains from calling dissenting Muslims "apostates." Al Qaeda and affiliates use the term *jihad* to describe their struggle against not only the West but against all Muslims they consider "lapsed" (or dissenting).[27]

Sociologically, Hamas is an embedded organization of grassroots activists. Because Hamas's "military" strength does not match that of the (pro-Fatah) Palestinian Authority's security services, its power stems largely from the level of popular support it galvanizes in the annual professional and student union elections (which functioned as a barometer of popular support in the absence of national elections) and, most recently, in the municipal and legislative elections of 2005–2006 As a result, Hamas depends for its very survival largely on championing the interests of its various constituencies. The middle and lower-middle classes, particularly professionals and the petty bourgeoise, form the backbone of Hamas's constituency [28] Among these classes, gradualism, accommodation, and institution-building tend to be the tactics of choice.[29]

Even the many students who support Hamas tend to be gradualist rather than revolutionary in domestic terms – although they simultaneously provide much of the impetus for a sustained radical attitude towards Israel.[30] Because the bulk of Hamas's leadership comes from the same constituency as its supporters, its policies naturally reflect the social preferences of this constituency. Institution-building, gradualism and ensuring integrity, moreover, are precisely the type of practices that have catapulted Hamas to its 2006 electoral victory, as illustrated by the fact that a national survey found that only 7 percent of respondents believed that voters had elected Hamas to be "a fighting authority that resists occupation," as against 36 and 37 percent respectively believing people wanted "a clean authority that fights

onal differences between Hamas

lonary
ist

t" vis-à-vis world, including
ted" Muslims
l welfare structure
tical representation
cial emphasis besides military
IS
cal accountability

d *jihad* to the struggle against
n calling dissenting Muslims
m *jihad* to describe their strug-
Iuslims they consider "lapsed"

nization of grassroots activists.
match that of the (pro-Fatah)
power stems largely from the
nual professional and student
eter of popular support in the
tly, in the municipal and legis-
as depends for its very survival
ous constituencies. The middle
ssionals and the petty bour-
tuency [28] Among these classes,
building tend to be the tactics

s tend to be gradualist rather
h they simultaneously provide
itude towards Israel.[30] Because
the same constituency as its
ocial preferences of this con-
l ensuring integrity, moreover,
:atapulted Hamas to its 2006
hat a national survey found
at voters had elected Hamas
upation," as against 36 and
l "a clean authority that fights

corruption" or "an Islamic authority that rules according to Shari'a and religion."[31] Consequently, Hamas's emphasis is as much on social welfare, social transformation, and local politics as it is on fighting Israel.

Al Qaeda, by contrast, is primarily a transnational network with limited local roots. Its various constituent and affiliated parts are largely un-embedded and typically have no welfare network of note.[32] They do not seek to participate in local politics, except in a parasitic manner (as illustrated by al Qaeda's behavior in Sudan and Afghanistan),[33] and this is precisely what appears to attract those who are disillusioned with the grinding gradualism of local politics. Their constituencies do not appear to be as well defined as those of Hamas. They include both well-educated members of the upper and middle classes and social dropouts or members from the lower classes.[34] The one thing that appears to unite these disparate groups is a feeling of uprootedness.

Al Qaeda and affiliates can "afford" to maintain an uncompromising approach to the status quo because they are less embedded and do not need to gain mass acceptance for their survival. Their immediate goal is not political power through mass support; instead they seek influence through daring and symbolic violent actions. For this, they need dedicated members, not mass membership. Al Qaeda and affiliates thus derive their power from their ability to elicit dedication from their followers, to escape detection by the authorities, and to raise the funds and the means to carry out the revolution – not from their participation in elections, institution-building, or charitable work.

## Impact of organizational differences on use of charities

Taken together, the ideological, sociological, and historical differences between Hamas and al Qaeda can help explain the current divergence in their relationships with charities.

### Hamas

Hamas's particular historical trajectory provides one of the chief explanations for the organization's structural make-up and the place of charities therein. The original activities of the Muslim Brotherhood in the area of welfare, education, and institution building have provided, and continue to provide, much of the *modus vivendi* of Hamas. To some extent, Hamas's resistance activities are secondary to this larger movement's social agenda – despite their centrality in Palestinian Islamist discourse. This reality is reflected not only in the fact that far fewer people are involved in resistance activities than in welfare[35] but also in the fact that the charities considered to be affiliated with Hamas are organizationally independent from the political and resistance wings.

Each of the charities has its own administration and is answerable to its own board of trustees. Since the boards of trustees typically consist of a cross-section of people considered upright by their communities, they tend to

100   *Jeroen Gunning*

include both Hamas and non-Hamas members (although a majority are typi-
cally Hamas affiliates).[36] Those involved in the charities often become
involved because of a concern for social justice or Islamic education. As a
result, the charities' agendas do not necessarily coincide with the agendas of
Hamas's political or resistance wings, however, many trustees do share these
ideological commitments and some serve as political leaders. However, if
Hamas's political or resistance agenda is likely to jeopardize the charity's
well-being, those involved in the charities may well put the charity's survival
first – as many did during the 1970s and 1980s when they supported the
Brotherhood's refusal to join the resistance.

Although the charitable "wing" is organizationally independent from
Hamas's political structure, Hamas derives a considerable amount of politi-
cal clout from its affiliated charities (just as the charities derive status from
their affiliation with Hamas). Because Hamas is socially embedded, ideo-
logically non-*takfiri*, and because its power is largely dependent on maintain-
ing popular support,[37] it has a strong incentive to present itself as socially
involved. To be seen to be involved in charitable work and in fundraising for
charity helps Hamas to bolster its image as a socially active and "caring"
organization. This in turn is likely to increase its fundraising potential. It
is thus not surprising that, according to Israeli intelligence estimates, 80 to
90 percent of the money raised by "Hamas" (to be understood in the widest
sense as those who are part of the larger social movement of which Hamas is
the political expression, and thus not just the charities) is spent on charitable,
educational, and medical institutions – leaving only 10 to 20 percent for
"military" endeavours.[38]

Equally important for Hamas's political standing is the fact that the char-
ities have a reputation for financial transparency. For both ideological and
political reasons, Hamas has chosen to make incorruptibility its selling point.
Helped by the fact that the general population views its rival, Fatah, as deeply
corrupt,[39] incorruptibility has gained Hamas both political popularity (see
election victory details above) and a steady flow of voluntary donations. This
reputation has been supported by Hamas's affiliation with various highly
regarded NGOs (many of those employed in financial positions by the United
Nation's Relief and Works Agency (UNRWA), the agency running Palestinian
refugee camps, are affiliated with Hamas). It has also ensured the continued
support of financial contributors, both inside Palestine and abroad. Save the
Children, USAID, Médecins sans Frontières, and Medical Aid for Palestine are
among the international, non-Islamic charities that have contributed at one
time or another to charities affiliated with Hamas, precisely because they have
observed that contributions reach their intended destination.[40]

Locally, many Palestinians, including those who do not subscribe to
Hamas's political program, prefer to contribute to Hamas-affiliated charities
rather than to charities with a reputation for less transparency. Consequently,
Hamas has a vested interest not only in ensuring that the charities thrive but
also that they maintain a reputation for financial transparency. Given the

rs (although a majority are typi-
n the charities often become
tice or Islamic education As a
ly coincide with the agendas of
er, many trustees do share these
s political leaders. However if
ely to jeopardize the charity's
y well put the charity's survival
)80s when they supported the

lizationally independent from
considerable amount of politi-
he charities derive status from
is is socially embedded, ideo-
argely dependent on maintain-
ve to present itself as socially
le work and in fundraising for
a socially active and "caring"
e its fundraising potential. It
h intelligence estimates, 80 to
o be understood in the widest
movement of which Hamas is
arities) is spent on charitable,
ig only 10 to 20 percent for

iding is the fact that the char-
icy For both ideological and
corruptibility its selling point.
iews its rival, Fatah, as deeply
)oth political popularity (see
· of voluntary donations. This
ffiliation with various highly
incial positions by the United
he agency running Palestinian
is also ensured the continued
alestine and abroad. Save the
Medical Aid for Palestine are
that have contributed at one
s, precisely because they have
destination.[40]

who do not subscribe to
to Hamas-affiliated charities
transparency. Consequently,
, that the charities thrive but
ial transparency. Given the

close-knit nature of Palestinian society, the intense scrutiny charities are
under by the Israeli government (as exemplified in various army raids on
charity buildings), the permanent presence on the ground of international aid
workers, and the requirement of providing annual accounts (scrutinized by
an authority that, until the 2006 elections, was hostile to the charities con-
cerned) this reputation would be difficult to maintain if irregularities occurred
on a large scale.

If there were a hint of suspicion that money was spent on projects other
than those advertised, charities would risk losing donor confidence. This
holds for Western donor charities whose activities are scrutinized by both
regulatory bodies and watchful pro-Israeli organizations.[41] It also holds for
local Palestinians, a significant number of whom would not give money if it
could be linked to terrorism – whether for ethical or ideological reasons or,
until recently, for fear of being implicated in Hamas's resistance wing and
imprisoned (under the previous Palestinian Authority). Just as the charities'
boards consist of both Hamas and non-Hamas members, so do the donors to
these charities. Thus it is in both the charities' and Hamas's interests to keep
humanitarian and "military" fundraising apart. This does not mean that such
a distinction is always upheld. Significantly, however, Matthew Levitt, who
dedicated an entire book to making the claim that charities are integral to
Hamas's terrorist activities, only mentions a few instances where charitable
money is believed to have been used for armed activities, and where he does,
he generally fails to provide the level of detail needed to make these claims
stick. Instead, his argument rests on the overlap in personnel between the
political, military and charitable wings and on the fact that the charities help
Hamas spread its ideology, and provide an infrastructure and jobs (which he
describes as "covers").[42]

The fact that financial resources are readily available to support the violent
struggle facilitates Hamas's commitment to keep welfare and resistance fund-
raising apart. The Qassam Brigades' funding is shrouded in secrecy, as is
the identity of its financial sources. The Israeli Ministry of Foreign Affairs
has claimed variously that the Brigades' budget is $10 million, "at least
$20 million," and "several tens of millions of dollars per year."[43] However
large its actual budget, sufficient funds appear to be available from a wide
variety of sources, including those intent on keeping the conflict with Israel
alive, those wishing to sustain an effective opposition to Fatah, and those
seeking to strengthen Islamism region-wide.

Even if the post-Saddam Middle East "order" may have diminished
the sources of funding for the organization's resistance wing,[44] other
non-charitable sources are potentially available to Hamas, such as money
laundering[45] and smuggling These, if conducted out of sight from ordinary
Palestinians (for instance in the notorious tri-border area between Brazil,
Paraguay, and Argentina where Hamas affiliates have allegedly been active),[46]
and used solely for funding clandestine activities, are unlikely to damage
Hamas's local image as a "clean operator."

102   *Jeroen Gunning*

Following the above analysis, it is hardly surprising that only one European-registered Islamic charity has been linked by courts to Hamas's resistance, even though, arguably, the disincentives to behave "impeccably" detailed above are less immediate for overseas charities than for charities inside Palestine. Equally unsurprising is the fact that the accusations against this charity are limited to spreading propaganda and funding the families of suicide bombers. In the eyes of Hamas and many Palestinians, neither of these activities constitutes direct military struggle nor do they compromise the charity's clean reputation. In this particular instance, Hamas's position is supported by the rulings of the Charity Commission for England and Wales[47] and the Geneva Convention. According to Article 33 of the latter, no person in a conflict situation "may be punished for an offence he or she has not personally committed."[48] Refusal of humanitarian assistance to a family on the grounds that the father (or mother) of the family has committed a terrorist act would thus arguably constitute a breach of the Geneva Convention.

The amount of money believed to be typically paid to a martyr's family ($5,000) is insufficient to provide a decisive incentive to volunteer for a suicide operation, at least compared to the sums Saddam Hussein allegedly provided ($25,000).[49] Research, moreover, suggests that those volunteering for suicide operations are typically not poor (in some cases even the sons of millionaires), generally relatively well-educated, and employed – thus drastically reducing the incentive of pecuniary "re-imbursements."[50] On the basis of this evidence one cannot conclusively state that providing money to the families of martyrs constitutes "intentionally financing terrorism," thus throwing some doubt on the Dutch government's decision to indict Stichting al Aqsa.

## Al Qaeda

The logic that cautions Hamas against mixing humanitarian and "military" fundraising is hardly persuasive to a network like al Qaeda's. Al Qaeda has no extensive welfare structure to maintain nor does it see creating one as one of its core goals.[51] Its primary goal is to promote violent struggle. Because it is a *takfiri*, revolutionary-minded, and socially isolated organization, it has few incentives to invest heavily in welfare networks. It may raise money to cater to its fighters.[52] It may use charities to raise money surreptitiously and at the same time spread its ideology.[53] It may even use the benefits charities can offer to attract potential recruits.[54] But its ideology and structure do not necessitate the maintenance of charitable structures or local patronage networks. Its reputation rests on being a radical organization successful in unconventional warfare, not on being a social benefactor. Indeed, in contrast to the charities affiliated with Hamas, none of the charities accused of links with al Qaeda was publicly affiliated with it.

Unlike Hamas, al Qaeda does not occupy a recognized position in a struggle for national liberation that is considered legitimate by both a large local

Case 1:05-cv-04622-DLI-RML   Document 267-13   Filed 03/22/12   Page 330 of 646 PageID #: 7008

g that only one European-
s to Hamas's resistance –
ve "impeccably" detailed
1 for charities inside Pales-
ations against this charity
1g the families of suicide
ans, neither of these activ-
compromise the charity's
as's position is supported
:land and Wales[47] and the
the latter, no person in a
he or she has not person-
tance to a family on the
has committed a terrorist
Geneva Convention.

paid to a martyr's family
e to volunteer for a suicide
m Hussein allegedly pro-
1at those volunteering for
1e cases even the sons of
d employed – thus drastic-
rsements."[50] On the basis
t providing money to the
nancing terrorism," thus
lecision to indict Stichting



nanitarian and "military"
al Qaeda's. Al Qaeda has
1 it see creating one as one
1lent struggle. Because it is
:d organization, it has few
1ay raise money to cater to
surreptitiously and at the
benefits charities can offer
ructure do not necessitate
patronage networks. Its
:cessful in unconventional
n contrast to the charities
:d of links with al Qaeda



mized position in a strug-
1ate by both a large local

constituency and, internationally, by a number of state governments. More-over, unlike Hamas, al Qaeda has denounced as apostate a number of the governments that might support it.[55] It is thus less likely to attract funds from friendly governments than is Hamas, and it has had more incentive to develop clandestine ways of raising money.

Since al Qaeda has no reputation to lose as a socially active or a financially transparent organization, it can abuse the charitable system without costs to its reputation and siphon off money donated for charitable purposes to fund its violent campaigns. This may explain why, in the case of charities linked to al Qaeda, a high percentage of the funding was found to have been exfiltrated surreptitiously or skimmed off of raised funds in small percentages without the knowledge of the donors.[56] It may also explain why, wealth and religious/cultural affinity apart, al Qaeda has targeted so many Saudi charities since, for both political and religious reasons, the Saudi state has traditionally lacked adequate mechanisms to monitor money flows.[57]

There are further historical explanations both for al Qaeda's close links with Saudi charities and for its readiness to mix humanitarian and "military" fundraising – reasons largely lacking in the case of Hamas. At the height of the guerrilla war against the Soviet invasion of Afghanistan, the states most involved in sponsoring the mujahideen – the United States, Saudi Arabia, and Pakistan - encouraged fundraising and recruitment for the struggle through the global network of Islamic charities. According to various analysts, the CIA was involved both in securing visas for radical "preachers" such as the Egyptian Shaykh Omar Abd al Rahman and in encouraging the establishment of charities such as the the al Kifah Afghan Refugee Center in Brooklyn – in both instances to facilitate fundraising and recruitment for the Afghan mujahideen.[58] The Saudis similarly encouraged the establishment of charities in aid of the Afghan struggle, some of which were directly involved in funding the "Arab Afghans" (through, for instance, the Maktab il Khidamat of Abdullah Azzam and bin Laden).[59]

Such a policy was encouraged to spread the financial burden but, more importantly, to raise awareness of the struggle – and of the sponsoring states' roles in it. The Saudis, in particular, were determined to cement their position as the chief custodians of Islam, specifically following the creation of a rival "Islamic center" in the Islamic Republic of Iran, and to spread their particular brand of Islam, Wahhabism, to Central Asia.[60] At that time, and within the jurisdictions of these particular states, the mujahideen's struggle was considered legitimate. Thus, fundraising for "military" purposes through the offices of humanitarian networks was considered both acceptable and legitimate. It was only when the mujahideen's, and later al Qaeda's global jihadist struggle, became "illegitimate" that groups such as al Qaeda turned to subterfuge to raise funds – as exemplified by Ayman al Zawahiri's reputed attempts in the early 1990s to raise funds for al Qaeda's armed operations by claiming to collect money for Afghan widows and orphans.[61]

However, two factors limit al Qaeda's potential interest in charities, one

104   *Jeroen Gunning*

relating to charities in general, and the other applying to charities registered in the West. The amount of money that one can surreptitiously siphon off from charitable funds is relatively small compared to the amounts of money to be made elsewhere – particularly if one has no ideological or socio-political aversion to using criminal sources. Information concerning al Qaeda's income streams is imprecise, and the following estimates must therefore be taken as indications of orders of magnitude only. Intelligence reports estimate al Haramain and other Saudi charities with possible al Qaeda links raise $40 to 50 million annually[62] – of which, by general acknowledgement, the "vast majority [goes] to feed hungry Somali orphans, educate poor Indonesian students and help sick Kenyan children" rather than to al Qaeda.[63] A 2002 report speculated (not without contestation) that al Qaeda received $300–500 million in funding directly "from wealthy businessmen and bankers representing about 20% of the Saudi GNP."[64] Claims of a similar order of magnitude have been made for the income from counterfeiting, credit card scams, falcon smuggling, and the diamond trade.

Second, Western-based charities pose a particular set of problems for al Qaeda Against the $40–50 million in estimated annual donations to al Haramain, estimates for charities believed to be linked to al Qaeda in the United States are a mere $6–9 million.[65] If Jean-Charles Brisard is right in his estimate that charities used by al Qaeda channel only 10 percent of their income to al Qaeda, the US charities would provide al Qaeda with $600,000–900,000 per year Compared to the sums believed to be raised from the alternative sources listed above, such contributions from the charities based in the United States and the West are small. The strict controls typically applied to charities in Western states are an important factor, and the absence of historical connections with oil-rich families is another. However, there appear to be additional reasons why al Qaeda has had difficulties in infiltrating Western-based charities.

## European Muslims, political alienation, and al Qaeda

One of the reasons al Qaeda appears to have infiltrated only a relatively small number of European-registered Islamic charities may be the make-up and socialization of Europe's Muslims and the political environment they inhabit. My hypothesis is that, though the conditions exist for Muslims in Europe to become radicalized – as graphically illustrated by the fact that the perpetrators of the London 7 July 2005 bombings were British-born European Muslims – al Qaeda's ideology and chosen methods are nevertheless, at least currently, too dissonant with the life experiences and ideological frameworks of the vast majority of European Muslims to become their focus of allegiance.[66] Because the number of charities open to funding al Qaeda is consequently likely to be small, al Qaeda has to surreptitiously infiltrate charities if it is to raise funds this way. Because this is a laborious process – made more difficult by the new procedures (and increased vigilance) created since

:r applying to charities registered
ne can surreptitiously siphon off
apared to the amounts of money
1e has no ideological or socio-
ces. Information concerning al
e following estimates must there-
gnitude only. Intelligence reports
ties with possible al Qaeda links
h, by general acknowledgement,
Somali orphans, educate poor
n children" rather than to al
out contestation) that al Qaeda
"from wealthy businessmen and
di GNP."[64] Claims of a similar
le income from counterfeiting,
diamond trade.

particular set of problems for
imated annual donations to al
? be linked to al Qaeda in the
n-Charles Brisard is right in his
annel only 10 percent of their
·ovide al Qaeda with $600,000–
ved to be raised from the alter-
is from the charities based in
strict controls typically applied
nt factor, and the absence of
. is another. However, there
aeda has had difficulties in

### al Qaeda

filtrated only a relatively small
es may be the make-up and
ical environment they inhabit.
ist for Muslims in Europe to
by the fact that the perpet-
were British-born European
10ds are nevertheless, at least
s and ideological frameworks
become their focus of alle-
to funding al Qaeda is con-
eptitiously infiltrate charities
a laborious process – made
ased vigilance) created since

11 September 2001 – al Qaeda is more likely to focus its efforts on activities with more immediate benefits such as credit card scams or smuggling, or on activities that are absolutely essential to its survival such as gaining recruits who can carry out operations from the inside (e.g. the London bombings).

When analyzing the level of support for al Qaeda among Europe's Muslims, one has to distinguish between sympathy for al Qaeda's anti-Americanism and the plight of Muslims in conflict zones such as Iraq, wholesale subscription to al Qaeda's ideology and methods, and readiness to carry out operations. That, for example, 8 percent of British Muslims questioned in a 2002 survey believed al Qaeda to be justified in attacking Britain is not a reliable proxy for measuring the latter two levels of support – particularly as this question was asked after Britain had initiated military action against Afghanistan with 56 percent of the respondents not believing al Qaeda to be responsible for the events of 11 September.[67]

In Britain only a few fringe Islamist groups have expressed qualified support for al Qaeda.[68] The majority of both mainstream Muslim and larger Islamist organizations, as well as most mosques, have unequivocally distanced themselves from al Qaeda and sought to marginalize those expressing views close to it.[69] In the Netherlands, mainstream Muslim organizations and mosques have similarly condemned 11 September – and more recently, the 2004 murder of Dutch filmmaker Theo van Gogh – and typically sought to cooperate with the government to marginalize al Qaeda's influence by banning al Qaeda sympathizers.[70] The 1,000-strong Islamist Arab European League called the 11 September attacks a "sweet revenge" but its leader has stated "we are against violence."[71] Only three charities, two of which linked to "radical" mosques, and an unidentified number of fringe mosques (situated in private homes), were, at the time of writing, under investigation for expressing views close to bin Laden's.[72]

A more direct, though by no means exact, indicator of al Qaeda's support level in Europe can be found in the number of European volunteers it has succeeded in recruiting. The typical al Qaeda recruit residing in Europe is an Arab, usually of North African descent, recently migrated, and relatively unembedded in the local Muslim community.[73] The profile of the European-based 11 September bombers matches this description. The same holds true for the perpetrators of the 2004 Madrid bombing, the alleged perpetrators of the Tunisian bombing of 2002, and most of the cells arrested on suspicion of working on behalf of al Qaeda. Indeed, according to one of the most extensive analyses of the known profiles of al Qaeda suspects apprehended in Europe and the United States, 87 percent of those studied were immigrants.[74]

The fact that the 7 July London bombers were British-born may point to a shift in al Qaeda's fortunes, although we should be wary of jumping to hasty conclusions (after all, the 21 July London bombers were not British-born). However, taken together with the 2004 arrest of eight British-born Muslims on suspicion of planning a terrorist attack in Britain (although the allegations have not yet been proven) and the fact that a number of those behind

106  *Jeroen Gunning*

the ritual murder of Theo van Gogh in the Netherlands were Dutch citizens of Moroccan descent born in the Netherlands, these data seem to point to a growing constituency for al Qaeda – although the exact relationship between what is usually described as al Qaeda and these European militants is far from clear.[75] Equally portentous may be the fact that a number of those providing logistical support for al Qaeda cells, as well as a number of al Muhajiroun's recruits, have been "white" converts to Islam.[76]

Nevertheless, until now, the average profile of those arrested on suspicion of working for al Qaeda and those known to have died as al Qaeda operatives suggests that al Qaeda has largely failed to recruit among European-born Muslims – and certainly to the level necessary to infiltrate thousands of charities. Given al Qaeda's isolationist, absolutist ideology and practices, and in view of the profile of past al Qaeda recruits, support for al Qaeda can be expected to be highest among those who feel socially or politically isolated and are in search of an absolutist identity (in the case of the 7 July bombers, isolation appears to have occurred in the mind, rather than at the physical level). Those who are socially or politically embedded are unlikely to be attracted by an isolationist ideology as their identity and ideological preferences are bound up with their place in the community. There may be a tension between their identity and the (presumed) identity of the majority population. They may feel politically isolated outside of their community, yet remain sufficiently embedded within their own communities not to feel the need for a radical break. Moreover, their level of social integration (even if limited to their "own" sub-community) makes them more likely to be averse to absolutist notions because integration usually encourages compromise. Conversely, those who feel profoundly dissatisfied with both their own community and the larger political community are more likely to be attracted by an isolationist, absolutist ideology. Muslims who are un-embedded and alienated from both the local Muslim communities and their host societies are, according to this logic, most likely to be open to al Qaeda's ideology.

## Terrorism and identity

A theoretical framework that captures these twin notions of isolation and identity, and may provide the beginnings of an insight into al Qaeda's failure to recruit widely among European Muslims, is the theory of political alienation developed by David Schwartz in his 1970s study of political activism in the United States. In this work, Schwartz postulates that an individual's level of political alienation influences his or her propensity towards political violence. Schwartz defined political alienation as a function of three variables: perceived threat from value conflict, perceived personal political inefficacy, and perceived systemic inefficacy.[77] The latter two variables describe the level of isolation a person feels. The first variable, and to some extent the second, are linked to a person's notion of identity.

According to Schwartz, political alienation is expected to occur when

herlands were Dutch citizens
these data seem to point to a
le exact relationship between
se European militants is far
act that a number of those
, as well as a number of al
ts to Islam.[76]

those arrested on suspicion
: died as al Qaeda operatives
ruit among European-born
/ to infiltrate thousands of
ideology and practices, and
upport for al Qaeda can be
cially or politically isolated
case of the 7 July bombers,
rather than at the physical
ibedded are unlikely to be
itity and ideological prefer-
iity. There may be a tension
ty of the majority popula-
: of their community, yet
ommunities not to feel the
social integration (even if
:m more likely to be averse
/ encourages compromise.
with both their own com-
re likely to be attracted by
'e un-embedded and alien-
id their host societies are,
Qaeda's ideology

notions of isolation and
;ht into al Qaeda's failure
theory of political alien-
dy of political activism in
that an individual's level
ity towards political vio-
iction of three variables:
ional political inefficacy,
iriables describe the level
some extent the second,

xpected to occur when

"individuals perceive a fundamental conflict between their basic politicized values and those exhibited in the polity, under the conditions that they perceive both themselves and the political system to be inefficacious to reduce this conflict." This sense of political alienation leads to a "behavioral orientation," the particular nature of which is influenced by socioeconomic status, personality, and the process by which alienation was reached. Behavioral orientations encompass a scale from conformity, ritualism, and retreat to reformism and, finally, rebelliousness. Only the latter type of orientation, typically associated with a high level of perceived threat to values and a predisposition to participatory activism, may lead to political violence (though not necessarily terrorism). For this to occur, the orientation needs to be stimulated by an intensification of the perceived threat to values or the sense of personal and systemic inefficacy, as well as by the emergence of a "reference group" (counter-elite, counter-group, counter-culture) which can convince the individual that "his value conflict and his perceptions of inefficacy will . . . be reduced or reversed" by his identification with the group. The individual's investment in the political system is withdrawn and reinvested in the identity of the dissident organization [78]

The dissonance between European Islamists and al Qaeda can be made more intelligible with reference to Schwartz's theoretical framework – although it must be emphasized that in the absence of extensive, reliable data the following explanation is largely conjectural. The evolution of European Islamism is a function of both international and domestic changes. Internationally, these include the rise of Islamism as a popular ideological framework in the Middle East and elsewhere. Most prominent among domestic changes have been the shift from a migrant to a post-migrant perspective (with a concomitant rise in expectations towards the "host" society; often, a weakening of ties to the parental "homeland;"[79] and the shift from a cultural/racial identity to a self-consciously Islamic identity (as opposed to a particular "national" identity) among a significant sector of Europe's Muslims. Prior to the 1990s, both Muslims of migratory descent and officialdom conceived political and social exclusion in cultural or racial/ethnic terms. In Britain, there was no official category of "Muslim" in public surveys, only Pakistani, Bangladeshi, etc., until the census of 2001. In the Netherlands, the category of "religion," originally introduced to differentiate between Protestants and Catholics, was removed from the census in 1983 and has not been re-introduced although the category "Islamic" has come to play a central role in public discourse [80] Though exclusion and cultural alienation were real, immigrants did not cast their alienation in the overtly existential terms of religious discourse until the mid- to late-1980s (the precise date varies according to location).[81]

The failure of al Qaeda to gain widespread support, not just among Muslims generally, but among European Islamists in particular, can be explained, in part and tentatively, with reference to Schwartz's theory of political alienation. On the one hand, there are sufficient structural inequalities for a

108   *Jeroen Gunning*

significant section of European Muslims to experience both personal and system inefficacy. In the UK, 40 percent of Muslim households are allegedly classified below the poverty line, while unemployment among British Muslims is three to four times higher than the national average. Meanwhile, educational achievement, according to one report, is only 5 percent below the average, leading to an acute tension between expectation and achievement.[82] Finally, levels of political representation are far below the representation of Muslims in the general population, both in Britain and in the Netherlands. Even those who have escaped such economic and educational marginalization may not be fully accepted by non-Muslim society (see, for example, al Qaeda affiliate Zacarias Moussaoui),[83] or may continue to feel aggrieved on behalf of their community.

Whether or not this leads to political alienation hinges, at least within Schwartz's framework, on one's perception of value threat, which in turn is influenced by the make-up of one's identity Those who, in response to globalization and the post-migrant turn, have adopted a self-consciously "Islamic" identity while remaining secular in outlook,[84] do not inevitably experience "a fundamental conflict between their basic politicized values and those exhibited in the polity" – as reflected in the fact that 67 percent of British Muslims interviewed in the aforementioned 2002 survey felt patriotic towards Britain (only 10 percent behind the national average). According to Schwartz's framework, this group of European Muslims is not likely to become involved in political violence.[85] For European Islamists, the sense of value conflict is potentially more acute – domestically in terms of a (perceived) conflict between Islamist and secular values, and globally in terms of the (perceived) clash between Western and Muslim countries. But even among this group, al Qaeda's appeal is limited

Significantly, marginalization and value conflict notwithstanding, a number of well-established political and civil outlets exist for those seeking to reform the system or become personally active An increasing, though still relatively small, number of Muslims has been successful in politics[86] while a plethora of charities exist aimed at improving the lot of European Muslims. Though slow in response, most governments have made some efforts at combating marginalization. As such, (limited) alternatives are available to al Qaeda's strategies for those who feel politically ineffective or believe the system to be unresponsive. In this, the presence of moderate Islamist organizations such as the Muslim Association of Britain (MAB), and their perceived success in affecting voting outcomes,[87] are vital in neutralizing the appeal of al Qaeda as these organizations cater to those disillusioned by the (apparent) inefficacy of non-Islamist options.[88]

The existence of well-established, embedded organizations catering to Muslims in Europe and abroad also means that al Qaeda faces fierce competition Because the majority of these organizations are highly integrated into society, including European Islamist organizations, and run by Muslims with a post-migrant outlook and an acute awareness of both the possibilities

experience both personal and
luslim households are allegedly
ployment among British Mus-
ional average. Meanwhile, edu-
rt, is only 5 percent below the
expectation and achievement.[82]
far below the representation of
3ritain and in the Netherlands,
: and educational marginaliza-
im society (see, for example, al
y continue to feel aggrieved on

enation hinges, at least within
of value threat, which in turn
ity. Those who, in response to
ive adopted a self-consciously
n outlook,[84] do not inevitably
ieir basic politicized values and
in the fact that 67 percent of
ioned 2002 survey felt patriotic
iational average). According to
iean Muslims is not likely to
European Islamists, the sense
– domestically in terms of a
ar values, and globally in terms
d Muslim countries. But even
l

nflict notwithstanding, a num-
llets exist for those seeking to
ve. An increasing, though still
successful in politics[86] while a
, the lot of European Muslims.
iave made some efforts at com-
lternatives are available to al
ly ineffective or believe the sys-
of moderate Islamist organiza-
in (MAB), and their perceived
il in neutralizing the appeal of
disillusioned by the (apparent)

led organizations catering to
t al Qaeda faces fierce competi-
ions are highly integrated into
zations, and run by Muslims
.reness of both the possibilities

and the shortcomings of the local political system, they are likely to be vigilant against those advocating a radical break with their host societies. However, these organizations may also be less vigilant against those advocating support for resistance struggles abroad (particularly if they have adopted a self-consciously "Islamic" identity, increasing affinity with the plight of Muslims worldwide). Available evidence suggests that affinity with the Muslim *umma*, or global community, is most typically translated into charitable activities (donations to relief organizations, fundraising) or political action (awareness-raising, lobbying, electioneering) – rather than raising funds for overtly terrorist acts abroad. This helps to explain why al Qaeda sympathizers have typically raised funds under false pretence[89] (and why the charities funding Hamas appear to limit their funding to the humanitarian realm, even if this term is stretched by involving funding for the families of suicide bombers)

Finally, even to those radical Islamists who feel acutely alienated, al Qaeda's program may not necessarily seem appealing. For al Qaeda to be attractive, they have to feel comfortable with a *takfiri* perspective, a response more suited to those residing in overwhelmingly Muslim societies in the process of secularization (which poses a more acute threat to their Muslim identity than the relatively disinterested non-Muslim secular societies in which European Islamists live). They must also feel comfortable with a radically violent strategy, both internationally and domestically, and with the repercussions such a strategy will provoke. Such a strategy is more attractive in a situation where a large Muslim constituency exists with a revolutionary potential. In Europe, such a constituency does not exist

The ideology of the larger, more moderate Islamist organizations in Europe is typically too pragmatic and accommodating to engage in terrorism. Their preferred methods are education, awareness-raising, electioneering, and lobbying. They also tend not to divide the world starkly into good and evil. The ideology of the more radical organizations such as Hizb ut-Tahrir and al Muhajiroun, is better suited to employing terrorist means. They tend to divide the world starkly into good versus evil and seek to distance themselves from corrupt society. Like al Qaeda, they operate within a *takfiri* mindset. "Al muhajiroun," for example, means "the migrants" and the term is used in *takfiri* circles to denote withdrawal from society. But even among these *takfiri* groups, not all unequivocally support violent struggle, let alone the use of terrorist means. The British branch of Hizb ut-Tahrir, though vociferous in its condemnation of Western society, has thus far condemned violence and refrained from using it[90] The Arab European League has similarly refrained from advocating violence. Al Qaeda thus appears to have largely failed to convince politically alienated European Muslims, including most Islamists, that its strategies will effectively "reduce or reverse" both their sense of being threatened in their core values and their sense of the system being unresponsive to their needs.

110  *Jeroen Gunning*

## Al Qaeda's future in Europe

Whether al Qaeda's appeal among European Muslims will increase is a function of a complex relationship between poorly understood factors. On the one hand, after 11 September, President Bush's response and the prospect of a fifth column in Europe's midst has given rise to increased suspicions towards Muslims in general, and Muslim migrants in particular. On the other hand, Muslims, and particularly embedded European Muslims, have seen their political influence increase.

In Britain, an unprecedented number of Muslims have been politically galvanized by 11 September and the war against Iraq. Unlike the situation during the 1991 Gulf War, Muslim activists found themselves among a broad alliance of Christians, left-wingers, and liberals who opposed the war against Iraq and the war on terror for very similar reasons. The aforementioned Muslim Association of Britain is a product of this new climate and has, together with other Muslim and non-Muslim organizations, managed to make its mark on British politics, even affecting the outcome of municipal and national elections.[91] In these instances, Muslims have become visible and have come to see themselves as full-fledged, fully participant citizens.

It is far from certain which of the two trends will prevail. The gains made in British local and European elections in 2003 and 2004 were countered by only one Muslim winning a seat in the European Parliament (although four won seats in Britain's 2005 parliamentary elections).[92] The success of the 2003 anti-war demonstrations in which Muslims played an important part was nullified by the fact that the British government, supported by a two-third majority in Parliament, went to war nonetheless. The de-securitizing effect of the Charity Commission's refusal to close down Islamic charities on unsupported accusations from the US Treasury has been diluted by continued allegations, often conjectural, from certain media outlets about charities and institutions with an Islamist bent.[93] More recently, the July 2005 London bombings appear to have both encouraged dialogue and increased fear and suspicion. The situation in the Netherlands is much the same as the wildly contradictory responses of both the public and the government reveal, ranging from appeals for dialogue to fire bombs aimed at mosques and calls for the withdrawal of citizenship from Netherlands-born Muslims with radical Islamist views or a criminal conviction.[94]

It is similarly not certain that further marginalization will lead to the adoption of al Qaeda-like tactics by European activists. Further marginalization could lead equally to an increase in criminalization, riots, or the emergence of a broad, united Muslim social movement. A decrease in marginalization similarly does not inevitably lead to the eradication of radical groups. The inclusion of the more moderate and successful Muslim organizations into the political system may result in the emergence of violent fringe groups, just as the cooption of the mainstream Communist Party into the Italian political

Muslims will increase is a func-
rly understood factors. On the
1's response and the prospect of
n rise to increased suspicions
rants in particular. On the other
European Muslims, have seen

Muslims have been politically
inst Iraq. Unlike the situation
ts found themselves among a
l liberals who opposed the war
y similar reasons. The afore-
a product of this new climate
n-Muslim organizations, man-
ven affecting the outcome of
stances, Muslims have become
full-fledged, fully participant

will prevail. The gains made in
d 2004 were countered by only
arliament (although four won
s).[92] The success of the 2003
layed an important part was
nt, supported by a two-third
i. The de-securitizing effect of
n Islamic charities on unsup-
en diluted by continued alle-
outlets about charities and
ntly, the July 2005 London
ogue and increased fear and
nuch the same as the wildly
the government reveal, ran-
ied at mosques and calls for
-born Muslims with radical

zation will lead to the adop-
its. Further marginalization
n, riots, or the emergence of
ase in marginalization simi-
f radical groups. The inclu-
lim organizations into the
olent fringe groups, just as
ty into the Italian political

system of the 1970s led to an increase in the violence of radical left-wing groups such as the Red Brigades.[95]

## Conclusion and policy implications

This chapter has shown that contrary to some popular narratives, the number of charities thought to have provided funding for either al Qaeda or Hamas is relatively small, and that there is a marked discrepancy between the number of charities linked to al Qaeda and the number of those funding Hamas's military wing. I have attempted to provide an explanation for this discrepancy by looking at each organization's ideology, self-image, historical development, and relationship with its constituency. In the case of Hamas, each of these factors was seen to inhibit the organization from using charitable fronts to finance acts of violence. Because Hamas is an embedded organization dependent on maintaining local popular support, and because it has chosen to gain this support through building a reputation for incorruptibility, it can ill afford to be seen to embezzle charitable funds. The ready availability of alternative financial sources enables it to maintain a strict separation between fundraising for charitable and resistance ends. In the case of al Qaeda, none of the listed factors particularly discourage it from using charitable fronts. As a transnational, un-embedded organization whose power is not primarily based on gaining a local support base, al Qaeda has little to lose by abusing charities for terrorist purposes. As an isolationist, *takfiri* organization, it can justify abusing charities by claiming that these charities are part of a corrupted society with which al Qaeda is at war.

One explanation for why the number of European-registered charities with links to al Qaeda has remained so small despite the lack of disincentives revolves around the apparent dissonance between the views of European Muslims and al Qaeda's ideology and methods. The presence of a relatively strict fiscal climate (particularly compared to the lack of regulation in countries such as Saudi Arabia and Somalia) and the absence of historical relations with rich benefactors and their charities (compared to the presence of such links elsewhere, such as in Saudi Arabia) also play a role. But the fact that the majority of Europe's Muslims and their charitable institutions are deeply embedded in local communities means that al Qaeda's isolationist, *takfiri* ideology has little to offer. Though European Muslims may feel politically marginalized, the vast majority, including most Islamists, do not appear to have experienced the level of threat to their basic values and identities or the level of alienation from their own faith communities needed to make al Qaeda's ideology attractive. Consequently, because recruitment in Europe is unlikely to provide al Qaeda with a large pool of activists, at least for now, and because infiltration into existing Islamic charities is likely to be difficult and time-consuming, the most cost-effective option for al Qaeda is to focus its European activities on gaining recruits who can carry out its terrorist projects relatively undetected, and to raise funds through different channels.[96]

112 *Jeroen Gunning*

Beyond these empirical observations, a number of lessons can be dra[...]
from the above analysis. First, the fact that differences in organization, ide[...]
logy, and history appear to shape the way charities are approached underl[...]
the importance of adopting a more differentiated approach to Islam[...]
organizations more generally, and to organizations labelled "terrorist[...]
particular. Of particular importance is the level of embeddedness of [...]
organization in question and the impact of this embeddedness on the or[...]
ization's ideology, structure, and practices. A related issue concerns the [...]
terrorism is used to designate entire organizations engaged in terrorist ac[...]
regardless of whether the bulk of their activities is terrorist. Not only d[...]
this practice obscure our understanding of the organization in question[...]
it also serves to delegitimize the otherwise legitimate social reform aspec[...]
such organizations as well as all forms of resistance, even those condu[...]
according to the rules of the Geneva Convention. If Schwartz's theor[...]
political alienation has any validity, such a blanket delegitimization is li[...]
to alienate the constituencies one is trying to win over and decrease sy[...]
responsiveness, thus increasing the attractiveness of unconventional form[...]
warfare. The delegitimization of social welfare activities in particular, e[...]
cially if accompanied by the freezing of charitable assets, is likely to co[...]
bute to human suffering as it has already done in Palestine[97] – which simil[...]
may increase the attractiveness of unconventional forms of warfare.

Second, the grounds on which the Stichting al Aqsa has been indi[...]
raises important questions about what exactly constitutes "financing ter[...]
ism." If al Aqsa's primary crime has been providing money to the famili[...]
those responsible for suicide operations, it is questionable whether such a[...]
constitutes financing terrorism – although the act itself raises a numb[...]
ethical issues. More broadly, if a European-registered charity donates m[...]
to a charity that is loosely affiliated with an organization engaged in te[...]
ism, does such an act constitute "financing terrorism"? Is it sufficient [...]
"associated" with an organization that carries out terrorist acts to be op[...]
the charge of "financing terrorism"? What exactly constitutes "associa[...]
Given the potential for human suffering if a charity is closed down an[...]
potential for radicalization, if it is closed down on dubious grounds, st[...]
rules on what constitutes "financing terrorism" and what constitutes evi[...]
for such claims are advisable.[98]

A related issue concerns the fact that the evidence against the Sti[...]
al Aqsa was, for perfectly legitimate intelligence reasons, only sho[...]
the judge presiding over the Stichting's appeal against closure. Becau[...]
Stichting was deprived of a chance to challenge the accusations, this pr[...]
arguably served to render its closure more contentious and thus pote[...]
radicalizing. This highlights the importance of devising more transp[...]
procedures, an issue taken up in more detail in Chapter 11 of this volu[...]

A third set of lessons can be drawn from differences in the way the B[...]
and Dutch governments monitor suspect charities, producing fundame[...]
different outcomes. In Britain, the body investigating an accused ch[...]

nber of lessons can be drawn
ferences in organization, ideo-
ties are approached underlines
ntiated approach to Islamist
ations labelled "terrorist" in
evel of embeddedness of the
s embeddedness on the organ-
elated issue concerns the way
ons engaged in terrorist acts—
es is terrorist. Not only does
organization in question, but
mate social reform aspects of
stance, even those conducted
tion. If Schwartz's theory of
nket delegitimization is likely
vin over and decrease system
s of unconventional forms of
activities in particular, espe-
ible assets, is likely to contri-
n Palestine[97] – which similarly
al forms of warfare.

g al Aqsa has been indicted
constitutes "financing terror-
ling money to the families of
stionable whether such an act
act itself raises a number of
stered charity donates money
ganization engaged in terror-
orism"? Is it sufficient to be
ut terrorist acts to be open to
tly constitutes "associated"?
arity is closed down and the
on dubious grounds, stricter
nd what constitutes evidence

idence against the Stichting
ice reasons, only shown to
against closure. Because the
he accusations, this practice
entious and thus potentially
devising more transparent
hapter 11 of this volume.
ences in the way the British
s, producing fundamentally
ating an accused charity is

the Charity Commission This Commission is an independent branch of government responsible for both defending the interests of British charities and regulating them It alone has the authority to instigate an inquiry and to decide on the type of sanction to impose, if any.[99] As such, the Charity Commission serves as a buffer between the political pressures surrounding the government and the charities, and typically attempts to find a solution that does not result in the closure of a charity but in its reform.[100] Because the charities recognize that the Commission's purpose is to both regulate and defend them, crises are more readily averted, and charities are more willing to voluntarily ensure transparency than would be the case if the only tools available were police investigation, covert surveillance, or legal proceedings.

In the Netherlands, the government carries out investigations, often with the help of intelligence services (AIVD), making it easier for the process to become politicized and antagonistic. Because authority rests with the government, the Ministers are regularly questioned in Parliament over their decisions concerning charities, providing both Ministers and opposition politicians a ready platform to score political points on the back of the charity debate. It also increases the likelihood that opposition politicians pressure relevant Ministers into making decisions on the basis of political expediency rather than simply security concerns or verifiable evidence In both the case of Stichting al Haramain and of Stichting al Aqsa, there seems to have been considerable political pressure, both domestic and international, which may have forced the government into a hastier or a more politically motivated decision than might have been chosen if responsibility for the case could have been deferred to a charity commission.[101] Moreover, had the process been conducted by a commission simultaneously charged with defending the interests of charities, the outcome might have been reform, thereby preventing the humanitarian and political costs of closing the charity while reducing the likelihood that charitable money is channelled into terrorist activities.[102] The government might have made use of the notion of an "accreditation seal," which the Dutch Central Bureau on Fundraising has already developed to signal to the public which fundraising charities can be trusted to spend their money on the projects specified[103] – a policy that, if handled sensitively, is likely to be similarly welcomed by Hamas-affiliated charities overseas. To be fair, however, in both cases the AIVD did withstand the political pressure for a considerable length of time, and in the case of al Aqsa would, according to one insider, have been prepared to consider reform if the charity had been more forthcoming in considering reform (which, if the investigating party had been a charity commission rather than the intelligence services, might have been more readily the case).[104]

Finally, if al Qaeda's dissonance with European Muslims is to be maintained, Europe's governments must pay more attention to the needs and sensitivities of their Muslim citizens. These concern both the foreign policies governments pursue, bearing in mind that Muslim citizens may have different loyalties than their governments in conflicts involving Muslims, and the way

114   *Jeroen Gunning*

governments allow Muslims to express their Islamic identity domestically. A government should seek not merely to decrease the sense of exclusion many Muslims feel by making the system more responsive (which includes a greater commitment to tackling structural problems of unemployment and exclusion from education), but also on decreasing the perception of value conflict. Some level of value conflict is inevitable in any democracy, let alone one consisting of multiple cultural communities. But the state could be more willing to accommodate religious claims and identities in the public arena, which would involve a rethinking of the concept of secularity.

Of particular importance is the state's attitude to Islamism. In the current climate, mainstream politicians too readily characterize Islamism as incompatible with democracy. Yet in its most accommodating forms, Islamism is compatible with democratic practice. It is vital to distinguish between different forms of Islamism and to recognize that some of them are not only "acceptable" within a secular context but vital to reducing the sense of value conflict felt by a significant number of Muslims. The Muslim Association of Britain (MAB) has empowered British Muslims by convincing them that the (perceived) value conflict between them, the state, and society is not insurmountable. Significantly, it has succeeded in channelling the energy of angry young Muslims into democratic avenues of protest, thereby lessening the sense of both personal and systemic inefficacy. By doing so, it has helped to delegitimize al Qaeda and its methods. Similarly, Islamist charities such as Interpal (Palestinian Relief and Development Fund) play a role in directing the concern of self-consciously Islamic European Muslims for the plight of Palestinians into humanitarian channels. If organizations such as MAB and Interpal are demonized, al Qaeda may become more attractive to disenfranchised Muslims. At the same time, organizations such as MAB and Interpal must be encouraged to pay greater heed to accusations that some of the things they advocate (e.g. regarding suicide operations in Israel), and the way they advocate them, are offensive to other members of the community (e.g. British Jews).

Such an approach is particularly imperative in the face of changes in the way the al Qaeda network appears to be recruiting. Having been hounded from the few charities and mosques it had infiltrated, its recruiters appear to have moved into small, private mosques, informal groups of disgruntled youths, and onto the internet – a shift away from structures that are observable by the authorities. This parallels patterns in the financing of terrorism. As a result, the authorities now have to rely more than before on information from those who frequent Islamist circles. For such cooperation to be possible, European Islamists must be persuaded that their governments have their best interests at heart. This means that European domestic systems must become more sensitive and inclusive, and foreign policies may have to take Muslim concerns more explicitly into account and, rather than focus primarily on suppressing terrorism, focus also on transforming the structures that help cause terrorism.

ır Islamic identity domestically. A
crease the sense of exclusion many
esponsive (which includes a greater
ns of unemployment and exclusion
the perception of value conflict.
ın any democracy, let alone one
1es. But the state could be more
ınd ıdentities ın the public arena,
ncept of secularity.

ttitude to Islamism. In the current
adily characterize Islamism as
ost accommodating forms, Islam-
. It ıs vital to distinguish between
ze that some of them are not only
ntal to reducing the sense of value
slims. The Muslim Association of
luslims by convincing them that
em, the state, and society ıs not
eded in channelling the energy of
nues of protest, thereby lessening
fficacy. By doing so, it has helped
ımılarly, Islamıst charities such as
ent Fund) play a role ın directing
ropean Muslims for the plight of
organizations such as MAB and
become more attractive to dis-
organizations such as MAB and
heed to accusations that some of
ude operations in Israel), and the
ther members of the community

tive ın the face of changes ın the
ecruiting Havıng been hounded
nfiltrated, its recruiters appear to
ınformal groups of disgruntled
from structures that are observ-
ns ın the financing of terrorism.
more than before on information
such cooperation to be possible,
their governments have their best
ı domestic systems must become
olıcıes may have to take Muslim
rather than focus primarily on
orming the structures that help

This approach will be more likely to succeed if one distinguishes meticulously between financing humanitarian networks affiliated with resistance groups, and financing terrorism. It militates against equating ideological support for a resistance struggle with financing terrorism It cautions against providing undisclosed, and thus incontestable, evidence, and against using the logic of "crime by association." It similarly cautions against labelling an entire organization "terrorist," instead favouring an approach that encourages constructive engagement with the non-terrorist aspects of an organization, while clamping down hard on its terrorist aspects (this policy, however, does not currently seem to be applicable to al Qaeda). Finally, such an approach calls for legislation to be applied across the board, regardless of religious or political affiliation.

## Notes

1 I am indebted to Tom J Biersteker, Sue E Eckert, Frazer Egerton, Tom Erskine, Alastair Finlan, and Doug Stokes for their insightful comments

2 "$116 Trillion Lawsuit Filed by 9/11 Families," *CNN com/LawCenter*, 16 August 2002. Online. Available HTTP <http://archives.cnn.com/2002/LAW/08/15/attacks.suit/> (accessed 24 November 2004) The charities concerned are the Benevolence International Foundation, al Haramain Islamic Foundation, International Islamic Relief Organization, Rabita Trust, Saar Foundation, and World Assembly of Muslim Youth. See *Burnett, et al v. al Baraka Investment and Development Corp., et al* Online. Available HTTP: <http //news.findlaw com/cnn/docs/terrorism/burnettba81502cmp.pdf> (accessed 22 May 2005).

3 See Adams on the PIRA's and the PLO's financing and Napoleoni on the PIRA's and the Kosovo Liberation Army's fundraising. J Adams, *The Financing of Terror*, London. New English Library, 1986, pp. 86–89, 135–155; L. Napoleoni, *Modern Jihad. Tracing the Dollars Behind the Terror Networks*, London Pluto, 2003, pp. 29–33, 166–167, M Levitt, "Islamic Extremism in Europe Beyond al-Qaeda: Hamas and Hezbollah in Europe," Testimony to the Joint Hearing of the Committee on International Relations, Subcommittee on Europe and Emerging Threats, United States House of Representatives, 27 April 2005, D. Ranetunge, "British Charities Fund Terrorists," *The Island*, 4 October 2000. Online. Available HTTP· <http://www.pnu gov lk/news_update/features/20001004British_charities_fund_terrorists%20 htm> (accessed 17 October 2005)

4 UN Security Council Resolution 1373 (2001) Online. Available HTTP. <http://www.unodc org/images/resolution%201373.pdf> (accessed 22 May 2005). UNSCR 1373 followed a number of earlier initiatives, such as the International Convention for the Suppression of the Financing of Terrorism (1999) and the Financial Action Task Force on Money Laundering (1989). Lists of prohibited entities include the United States' "Executive Order 13224 Blocking Terrorist Property," the Bank of England's "Consolidated List of Financial Sanctions Targets in the UK," and the European Union's "List of Persons and Entities Subject to Financial Sanctions."

5 The fact that such charities are operated by and for Muslims does not necessarily determine their behavior. As Sumer rightly observes, Islamic organizations do not necessarily "take on similar shapes, irrespective of social setting." Instead, "the interests of Muslims are .. not self evidently based on Islamic principles, as is often assumed. They are contextual and dynamic and change according to altered circumstances . . the mechanisms underlying interest struggle are general and

applicable to any interest group." T. Sunier, "Islam and Interest Struggle: Religious Collective Action among Turkish Muslims in the Netherlands," in S. Vertovece and A. Rogers (eds.) *Muslim European Youth Reproducing Ethnicity, Religion, Culture*, Aldershot Ashgate, 1998, pp. 40–41. In this chapter, I will analyze Islamic charities from a social movement perspective, assuming that such charities are collective actors following rational strategies within particular political and discursive opportunity structures.

6  The charities accused of links with al Qaeda were Afghan Support Committee, al Furqan, al Rashid Trust, al Haramain and al Masjed al Aqsa Charity Foundation, al Haramain (Islamic/Humanitarian) Foundation, Barakaat International Foundation (Sweden), Benevolence International (Foundation/Fund), Bosanska Idealna Futura. Global Relief Foundation, Jam'yah Ta'awun al Islamia, Lajnat al Daawa al Islamiya, Makhtab al Khidamat/al Kifah, Nada International Anstalt, Nasreddin Foundation, Rabita Trust, Revival of Islamic Heritage Society, Somali International Relief Organization, Taibah International Aid Agency (Bosnia), The Aid Organisation of the Ulema Pakistan, Ummah Tameer e-Nau, Wafa Humanitarian Organization. The charities linked with Hamas were Holy Land Foundation for Relief and Development (USA), al Aqsa Foundation. Only organizations that appeared to be explicitly registered as charitable foundations have been included. Banks, financial networks, trading companies, and business organizations have been excluded from this count - although the distinction is not always clear (some of the charities included appear to be financial networks rather than charities in the proper sense of the word, e.g. Barakaat International Foundation, Nada International Anstalt, and Nasreddin Foundation). Where a charity's national branches have been listed separately, I have counted the different branches as one charity. See lists online. Available HTTP: <http://www.bankofengland.co.uk/publications/financialsanctions/current/index.htm> <http://europa.eu.int/comm/external_relations/cfsp/sanctions/list/version4/global/e_ctlview.html#en845> (accessed 22 May 2005)

7  The only prohibited non-Muslim entity with aspects of a charity was the International Sikh Youth Foundation.

8  M. Greenberg, W. Wechsler, and L. Wolosky, *Terrorist Financing. Report of an Independent Task Force Sponsored by the Council on Foreign Relations*, New York: Council on Foreign Relations, 2002, p. 13; R. Gunaratna, *Inside al-Qaeda Global Network of Terror*, London: Hurst, 2002, p. 6, 68

9  See Napoleoni, *Modern Jihad*, 70–73; Levitt, "Hamas and Hezbollah in Europe"; *Rapportage werkgroep/Terrorismefinanciering en terrorismebestrijding*, 8 July 2003, p. 45 Online. Available HTTP <http://www.fecinfo.nl> (accessed 24 June 2004).

10  Because of differences in the legal systems between England and Wales, Scotland, and Northern Ireland, as reflected in the existence of different Charity Commissions, I will focus on England and Wales.

11  The UK has been identified as a hub for both Islamist activities generally and al Qaeda actions specifically See G. Kepel, *Jihad. the Trail of Political Islam*, London: I.B. Tauris, 2000, pp. 303–305, R. Gunaratna, *Inside al Qaeda Global Network of Terror*, New York: Columbia University Press, 2002, pp. 116–121. The Netherlands have been identified as a significant hub for financial and coordinational activities of al Qaeda-related cells. See Gunaratna, *Inside al Qaeda*, pp. 126–129, A. Anthony, "Amsterdamned, Part One," *The Observer*, 5 December 2004, H. de Vrey, "Dutch Link in Madrid Bomb Plot?" *Radio Netherlands*, 21 October 2004 Online. Available HTTP <http://www2.rnw.nl/rnw/en/currentaffairs/region/westerneurope/106102 51> (accessed 17 October 2005), de Vrey, "Behind the Dutch Terror Threat," *Radio Netherlands*, 22 July 2004 Online. Available HTTP <http://www2.rnw.nl/rnw/en/currentaffairs/region/netherlands/ned040722.html> (accessed 17 October 2005), "Not Saying the 'AQ' Word,"

*Terrorism, charities, and diasporas* 117

T Sumer, "Islam and Interest Struggle.
Turkish Muslims in the Netherlands," in S.
*im European Youth–Reproducing Ethnicity*
e, 1998, pp. 40–41 In this chapter, I will
cial movement perspective, assuming that
lowing rational strategies within particular
ructures.
Qaeda were Afghan Support Committee, al-
and al Masjed al Aqsa Charity Foundation,
oundation, Barakaat International Founda-
inal (Foundation/Fund), Bosanska Idealna
t'yah Ta'awun al Islamia, Lajnat al Daawa al
ah, Nada International Anstalt, Nasreddin
f Islamic Heritage Society, Somali Inter-
international Aid Agency (Bosnia), The Aid
immah Tameer e-Nau, Wafa Humanitarian
h Hamas were Holy Land Foundation for
Aqsa Foundation Only organizations that
charitable foundations have been included.
mpanies, and business organizations have
gh the distinction is not always clear (some
financial networks rather than charities in
arakaat International Foundation, Nada
Foundation). Where a charity's national
I have counted the different branches as
HTTP <http://www.bankofengland.co.uk/
index htm> <http://europa eu.int/comm/
rsion4/global/e_ctlview html#en845>

y with aspects of a charity was the Inter-

*olosky, Terrorist Financing Report of an*
*e Council on Foreign Relations*, New York:
13, R Gunaratna. *Inside al-Qaeda. Global*
2, pp. 6, 68
evitt, "Hamas and Hezbollah in Europe";
*ering en terrorismebestrijding*, 8 July 2003,
www.fecinfo.nl> (accessed 24 June 2004).
ns between England and Wales, Scotland,
te existence of different Charity Commis-

for both Islamist activities generally and
epel, *Jihad the Trail of Political Islam*,
, R Gunaratna, *Inside al Qaeda: Global*
bia University Press, 2002, pp. 116–121,
a significant hub for financial and coordi-
cells. See Gunaratna, *Inside al Qaeda*,
ed, Part One," *The Observer*, 5 December
adrid Bomb Plot?" *Radio Netherlands*,
: HTTP <http://www2.rnw.nl/rnwhed/
10251> (accessed 17 October 2005); de,
'*Radio Netherlands*, 22 July 2004 Online
rnw/en/currentaffairs/region/netherlands
· 2005), "Not Saying the 'AQ' Word,

*Geopolitical Review*, 16 November 2004. Online. Available HTTP <http://www.geopoliticalreview.com/archives/000500 php> (accessed 17 October 2005).
12 The Charity Commission for England and Wales had investigated 17 charities for possible wrongdoing at the time of writing; 10 were subsequently subjected to formal inquiries. Aalami Majlise Tahaffuze Khatme Nubuwwat and the Islamic Foundation were found to have trustees with possible links with bin Laden's network The trustees were removed and the charities continued to operate. The North London Central Mosque Trust (the "Finsbury Park mosque") was investigated because its main preacher, Abu Hamza al Masri, was believed to have abused the mosque's charitable status by overtly promoting extreme political goals. Various al Qaeda suspects (e.g Richard Reid, Zacarias Moussaoui) are said to have worshipped at the Finsbury Park mosque. See M Sageman, *Understanding Terror Networks*, Philadelphia. University of Pennsylvania Press, 2004, p 50; "U.S. Indicts British Cleric on 11 Charges," *MSNBC News*, 27 May 2004 Online. Available HTTP. <http://www.msnbc.msn com/id/5071534> (accessed 17 October 2005) The charity's trustees (who had been ousted by al Masri) welcomed the Charity Commission's decision to remove al Masri Interpal (Palestinians Relief and Development Fund) was investigated following allegations by the US Treasury that it funded Hamas Benevolence International (UK) was similarly inspected because the US Treasury believed it to have links with the Saudi-based Benevolence International Foundation (blacklisted on both the EU and Bank of England lists). No evidence of wrongdoing was found in either case. See <http://www.charity-commission gov uk/investigations/inquiryreports/inqreps.asp> (accessed 17 October 2005).
   In the Netherlands, Benevolence International Nederland and Stichting al Haramain Humanitarian Aid were found to have links with the bin Laden network. Stichting al Aqsa, a local branch of the German-based al Aqsa Foundation, was believed to have funded Palestinian organizations that were thought to fund Hamas. The al Muwaffaq charity was found to have two members designated by the US Government as persons implicated in bin Laden's network Though the Dutch Intelligence and Security Services (AIVD) stated in 1998 that they believed al Muwaffaq to have "supported the armed Islamic struggle," no further action was taken Stichting Tawheed, which runs the Tawheed mosque and As Siddiq school in Amsterdam, remains open although it is believed to have close links with the al Haramain Foundation The Al-waqf Al-islaami Stichting in Eindhoven is thought to have been involved in training and recruiting volunteers for "the international jihad" through the affiliated al Furqaan mosque. See <http://www.aivd.nl> (accessed 1 July 2004): "Antwoorden op kamervragen over financieringen vanuit Saoedi-Arabie," 31 December 2002, "Antwoorden op kamervragen over de mogelijke financiering van de Al-Tawheed moskee in Amsterdam," 2 March 2004, "Brief aan de Tweede Kamer over de stichting Al Waqf al-Islami," 25 April 2003, "Antwoorden op kamervragen over de organisatie Al-waqf Al-islaami die in de Al Furqaan moskee in Eindhoven opleidingen verzorgt tot strijder in de heilige oorlog," 24 June 2003, "Antwoorden op kamervragen over onderzoek naar een mogelijke tijdelijke sluiting van de Al-Fourqaan moskee in Eindhoven," 24 June 2003. Gunaratna, *Inside al Qaeda*, p. 126
13 Gunaratna, *Inside al Qaeda*, pp. 6, 68
No precise figures are available on the number of "Islamic" charities in England, Wales, and the Netherlands. Considering that there were 187,000 charities registered in England and Wales in July 2004 and that 3 percent of the population in England and Wales declared itself "Muslim" in the 2001 census, a rough estimate would be that some 3 percent of the 187,000 charities, or 5,610, are "Islamic " In the Netherlands, 151,190 charities ("stichtingen") were registered with the Chamber of Commerce in July 2004. With Muslims making up 4 4 percent of the

118   *Jeroen Gunning*

total population (the Dutch census does not record religion; this figure comes from the *CIA World Factbook* and is presumably based on an approximation on the basis of the original nationality of immigrants and their descendants), a rough estimate of the number of Islamic charities would be 4 percent of the total number, or 6,000. However, if we base our calculations on the (estimated) number of Muslims in each country, 700,000 in the Netherlands versus 1 5 million in England and Wales, the number of Islamic charities in the Netherlands is likely to be half that of those in England and Wales, i e., 2,800 (assuming levels of socio-political activity among Muslims are similar) Charity Commission Homepage <http://www.charity-commission gov.uk/>, Census 2001: Ethnicity and Religion in England and Wales <http://www.statistics.gov uk/census2001/profiles/commentaries/ethnicity.asp#religion>; Chamber of Commerce Homepage <http://www.kvk.nl>, CIA World Factbook <http://www.cia gov/cia/publications/factbook/geos/nl.html#People> (all websites accessed July 2004)

15 Europe-wide, three other charities have been accused by the Israeli and American governments of funding Hamas's violent struggle (the Comité de bienfaisance et de secours aux Palestiniens in France, the Association de secours palestinien in Switzerland, and the Palestinian Association in Austria) The governments in question have so far refused to take action for lack of evidence.

16 Though the official accusation against Stichting al Aqsa states that the charities it has funded are believed to have either carried out or facilitated terrorist acts, the information available in the public domain only suggests that its money has been used to pay the families of martyrs. including the families of suicide bombers, rather than funding armed actions directly "Tegoeden Al-Aqsa bevroren na onderzoek AIVD," AIVD Press Release, 9 April 2003, Online. Available HTTP: <http://www.aivd.nl/algemene_onderdelen/tegoeden_al-aqsa> (accessed 17 October 2005) This assumption was corroborated by an anonymous source close to the investigations into Stichting al Aqsa (consulted in 2005) Even Levitt, who accuses European-based charities of funding Hamas's armed struggle, does not produce any concrete evidence of a charity (as opposed to individuals) funding Hamas's armed struggle beyond providing money to the families of martyrs but makes his case on the basis of the argument that the charities are integral to the armed struggle. Levitt, "Hamas and Hezbollah in Europe", Levitt, *Hamas Politics, Charity, and Terrorism in the Service of Jihad*, New Haven, CT Yale University Press, 2006, pp. 154–157 For Israeli intelligence reports, see, e.g. "Saudi Money Transfers to the Hamas and to Extremist Groups Identified with It," Report of the (Israeli) Intelligence and Terrorism Information Center at the Center for Special Studies, February 2003 Online. Available HTTP: <http://www.intelligence.org.il/eng/bu/saudi/saudi htm> (accessed 17 October 2005); " 'Charity' and Palestinian Terrorism – Spotlight on the Hamas-run Islamic Al-Tadhamun 'Charitable Society' in Nablus," Intelligence and Terrorism Information Center at the Center for Special Studies, February 2005. Online. Available HTTP <http://www.intelligence.org.il/eng/sib/3_05/charity_2 htm> (accessed 17 October 2005); M. Dudkevitch. "Army Seals Offices of Hamas Charity Organizations," *Jerusalem Post*, 8 July 2004.

17 United Nations, *International Convention for the Suppression of the Financing of Terrorism*, 1999 Online. Available HTTP <http://untreaty un.org/English/Terrorism/Conv12.pdf> (accessed 17 October 2005)

18 Y Amidror and D Keyes, "Will a Gaza 'Hamas-stan' Become a Future Al-Qaeda Sanctuary?" *Jerusalem Issue Brief*, vol 4 no 7, 8 November 2004 Available HTTP. <http://www.jcpa.org/brief/brief004–7 htm> (accessed 17 October 2005), Levitt, "Hamas and Hezbollah in Europe."

19 In Gaza (under Egyptian administration between 1948 and 1967), the Brotherhood suffered from the clash between the Egyptian Brotherhood and President Nasser

ısus does not record religion, this figure comes from
ıs presumably based on an approximation on the
ty of immigrants and their descendants), a rough
mic charities would be 4 percent of the total num-
)ase our calculations on the (estimated) number of
)00 in the Netherlands versus 1 5 million in England
mic charities in the Netherlands is likely to be half
Wales, i e., 2,800 (assuming levels of socio-political
similar). Charity Commission Homepage <http:/
ık/>, Census 2001: Ethnicity and Religion in Eng-
statistics.gov uk/census2001/profiles/commentaries/
ber of Commerce Homepage <http //www.kvk.nl>;
:http //www.cia gov/cia/publications/factbook/geos/
accessed July 2004)

ıties have been accused by the Israeli and American
ıs's violent struggle (the Comité de bienfaisance et
France. The Association de secours palestinien in
ıan Association in Austria). The governments in
take action for lack of evidence.

against Stichting Al Aqsa states that the charities it
ı̇e either carried out or facilitated terrorist acts, the
ıblic domain only suggests that its money has been
ıartyrs, including the families of suicide bombers,
ıctions directly. "Tegoeden Al-Aqsa bevroren na
:ss Release, 9 April 2003, Online. Available HTTP
_onderdelen/tegoeden_al-aqsa> (accessed 17 Octo-
s corroborated by an anonymous source close to the
Aqsa (consulted in 2005) Even Levitt, who accuses
unding Hamas's armed struggle, does not produce
arity (as opposed to individuals) funding Hamas's
ıng money to the families of martyrs but makes his
ment that the charities are integral to the armed
l Hezbollah in Europe", Levitt, *Hamas Politics,
Service of Jihad*, New Haven, CT. Yale University
Israeli intelligence reports, see, e.g "Saudi Money
Extremist Groups Identified with It," Report of the
ırism Information Center at the Center for Special
e. Available HTTP <http //www.intelligence.org.il/
:ssed 17 October 2005); "'Charity' and Palestinian
ıe Hamas-run Islamic Al-Tadhamun 'Charitable
ence and Terrorism Information Center at the
"ebruary 2005 Online. Available HTTP. <http://
/3_05/charity_2 htm> (accessed 17 October 2005;
)ffices of Hamas Charity Organizations," *Jerusalem*

' *Convention for the Suppression of the Financing*
Available HTTP <http//untreaty un.org/English/
sed 17 October 2005)

ll a Gaza 'Hamas-stan' Become a Future Al-Qaeda
ırief*, vol 4 no 7, 8 November 2004 Online. Avail-
ı.org/brief/brief004–7.htm> (accessed 17 October
zbollah in Europe."

nistration between 1948 and 1967), the Brotherhood
:n the Egyptian Brotherhood and President Nasser

and was decimated by Nasser's heavy-handed clampdown In the West Bank (under Jordanian administration), the Palestinian Brothers were subsumed under the Jordanian Brotherhood, which meant that when the West Bank was occupied by Israel in 1967, the local branches were effectively leaderless. Palestinian Islamism, moreover, was initially eclipsed by the ascent of Palestinian nationalism as the Palestinian response to the defeat of 1967. See, for example, B. Milton-Edwards, *Islamic Politics in Palestine*, London: Tauris Academic Studies, 1996, pp. 36–80.

20 In the absence of extensive, reliable data regarding the exact nature of al Qaeda, and given the contested nature of available data, this caveat is essential See, for instance, J. Burke, *Al-Qaeda Casting a Shadow of Terror*, London. I.B Tauris, 2003, pp. 7–22 See also Chapter Three by Rohan Gunaratna in this book describing the transformation of al Qaeda from an organization into a global jihad movement.

21 *Takfiri* denotes the practice of labelling Muslims considered to have "lapsed" apostate (*kafir*) and worthy of summary execution.

22 Kepel, *Jihad*, pp. 83–87

23 Burke, *Al-Qaeda*, pp. 71–72

24 Ibid, p. 78, 109, 139, Kepel, *Jihad*, pp. 254–258, 276, 286

25 The 1997 targeting of tourists by Egyptian radical Islamists in Luxor illustrates the extent of their isolation from the larger community whose livelihood largely depended on tourism, and whose anger and subsequent alienation was one of the factors leading to the radicals' demise. Kepel, *Jihad*, pp. 277, 289, 297

26 J. Gunning, "Peace with Hamas? The Transforming Potential of Political Participation," *International Affairs*, 2004, vol 80, no 2, pp. 241–255.

27 For details on Hamas's political ideals and practice, see Gunning, *Re-Thinking Western Constructs of Islamism Pluralism, Democracy and the Theory and Praxis of the Islamic Movement in the Gaza Strip*, doctoral thesis, Durham Centre for Middle Eastern and Islamic Studies, 2000, Chs 6-8 See also my forthcoming monograph on Hamas, Cambridge Cambridge University Press. For details on al Qaeda's political ideals and practice, see, e.g Gunaratna, *Inside al Qaeda*, pp. 84–94, 156–159; Burke, *Al-Qaeda*, pp. 23–39, 69–72, 85-89, 109, 141, 145- 150, Sageman, *Understanding Terror Networks*, pp. 1-59

28 G. Robinson, "Hamas as Social Movement," in Q. Wiktorowicz (ed ) *Islamic Activism. a Social Movement Theory Approach*, Bloomington Indiana University Press, 2004, pp. 117–123, Gunning, "Hamas, Socialisation and the Logic of Compromise," in J Tirman, M Heiberg and B O'Leary (eds.) *Terror, Insurgency. and the State*, Philadelphia University of Pennsylvania Press, 2007

29 See also Kepel's analysis of the divergent dispositions of the core constituencies of the radical and more moderate forms of Islamism Kepel, *Jihad*, pp. 254, 292, 359, 375.

30 See, for example, survey findings of Palestine Center for Policy and Survey Research (PSR). Online. Available HTTP <http://www.pcpsr.org> (accessed 5 November 2005)

31 PSR, Poll No. 19, 16–18 March 2006 (accessed 30 June 2006)

32 Al Qaeda "proper" does not have an embedded charitable network or consist of embedded members. Sageman notes similarly that the individuals joining the "global jihad" were typically "socially alienated, or temporarily disembedded" and makes the important observation that "this absence of connection is a necessary condition for a network of people to join the global jihad " Sageman, *Understanding Terror Networks*, pp. 146–147 The Egyptian Jihad, some of whose leaders dominate al Qaeda's upper echelons, distinguishes itself from other Egyptian Islamist groups by its lack of concern for society and what Kepel calls "the process of resocialization," which both the Muslim Brotherhood and its

120   *Jeroen Gunning*

radical offshoots, the Gamaat Islamiyya, emphasize. G. Kepel, *The Prophet & Pharaoh. Muslim Extremism in Egypt*. London. Al Saqi Books, 1985, p. 193; Kepel, *Jihad*, p. 282. The Algerian GIA, another (according to some) close associate of al Qaeda's, has similarly been primarily focused on violence (Kepel, *Jihad*, pp. 254–258). The Indonesian Jemaah Islamiya, another affiliate, is similarly primarily a jihadi organization with little interest in transforming society through charitable activities. The fact that many of its leaders were recruited while in exile and performed the role of "itinerant preachers" underscores this point. Z. Abuza, *Militant Islam in Southeast Asia. Crucible of Terror*, London Lynne Rienner, 2003, pp. 125–140

33  Gunaratna, *Inside al Qaeda*, pp. 156–159. Burke, *Al-Qaeda*, pp. 150–177

34  Illustrations of both ends of this spectrum are Mohammed Atta and Richard Reid. For an analysis of the socioeconomic status of a sample of "global salafi mujahedin" (Sageman's term for the pool of people from which al Qaeda and affiliates draw), see Sageman, *Understanding Terror Networks*, pp. 73–77 Sageman's sample contains 18 percent members from the upper classes, 55 percent from the middle classes, 28 percent from the lower classes. In the sample, 83 percent had been educated in secular (as opposed to religious) schools, 71 percent had a university or college education, and 17 percent did not have a high school education

35  According to one (arguably very conservative) estimate, Hamas's Qassam Brigades consisted of only 200–500 "hard-core members" in 2003 "Special Reports Terror Groups," *The St Petersburg Times*. Online. Available HTTP <http://www.sptimes.com/2003/webspecials03/alanan/terror.shtml> (accessed 17 October 2005). The US State Department merely describes the strength of the Brigades as "unknown" US Department of State. *Patterns of Global Terrorism*, 21 May 2002 Online. Available HTTP <http://www.state.gov/s/ct/rls/pgtrpt/2001/html/10252.htm#hamas> (accessed 17 October 2005) The precise number of charitable workers is unknown but certain to be considerably higher

36  Gunning, *Western Constructs*, Ch 7 4 1

37  Gunning, *Socialisation*

38  According to Israeli intelligence sources, 90 percent of Hamas's funding before the al Aqsa Intifada was spent on social-service programs, 10 percent on its military wing Since the start of the al Aqsa Intifada, the same sources believe 20 percent of total funding is now directed towards Hamas's military program. T. Roulé, "Post–911 Financial Freeze Dries Up Hamas Funding," *Jane's Intelligence Review*, 17–19 May 2002, no. 14, p. 17

39  According to a recent opinion poll, 82 percent of Palestinians believe that "corruption is most prevalent in the Governmental sector" The Coalition for Accountability and Integrity, "Opinion Poll on Corruption in the Palestinian Society," 30–31 December 2004 Online. Available HTTP <http://www.transparency.org/surveys/dnld/palestine_poll pdf> (accessed 17 October 2005).

40  Conversations with personnel from UNRWA, Pharmaciens sans Frontières, Save the Children, and Mennonite Central Committee, Gaza, 1998

41  See, for example, the accusation levelled by the Board of Deputies of British Jews against Interpal. C. Dyer, "Charity Sues Jewish Board over Hamas Claim," *The Guardian*, London, 20 October 2003. In the Netherlands, the Centre for Information and Documentation on Israel (CIDI) plays a similar role, having prompted investigations into a number of charities, including Stichting al Aqsa. See "CIDI vraagt onderzoek naar stichting Al Aqsa Rotterdam," *Rotterdams Dagblad*, 7 August 2002, or CIDI Homepage, <http://www.cidi nl> (accessed 17 October 2005)

42  Levitt, *Hamas*, pp. 52–106.

43  D van Natta and T O'Brien, "Flow of Saudi Cash to Hamas Is under Scrutiny by U.S.," *The New York Times*, New York, 17 September 2003. L. Kaplow.

Case 1:05-cv-04622-DLI-RML   Document 267-13   Filed 03/22/12   Page 348 of 646 PageID #: 7026

phasize. G. Kepel, *The Prophet &* ion. Al Saqi Books, 1985, p. 193; er (according to some) close assoc.. focused on violence (Kepel, *Jihad*, iya, another affiliate, is similarly est in transforming society through eaders were recruited while in exile " underscores this point Z. Abuza, *Terror*, London: Lynne Rienner,

e, *Al-Qaeda*, pp. 150–177.
fohammed Atta and Richard Reid f a sample of "global salafi muja- from which al Qaeda and affiliates *orks*, pp. 73–77 Sageman's sample lasses, 55 percent from the middle the sample, 83 percent had been ools, 11 percent had a university or a high school education.

stimate, Hamas's Qassam Brigades bers" in 2003 "Special Report: )nline. Available HTTP <http:// error.shtml> (accessed 17 October nbes the strength of the Brigades *rns of Global Terrorism*, 21 May state.gov/s/ct/rls/pgtrpt/2001/html/ . The precise number of charitable oly higher

ent of Hamas's funding before the )grams, 10 percent on its military : same sources believe 20 percent as's military program T. Roule, s Funding," *Jane's Intelligence*

of Palestinians believe that "cor- ctor." The Coalition for Accoun- -tion in the Palestinian Society," > <http://www transparency.org/ :tober 2005)

iarmaciens sans Frontières, Save , Gaza, 1998

oard of Deputies of British Jews Board over Hamas Claim," *The* erlands, the Centre for Informa- a similar role, having prompted g Stichting al Aqsa See "CIDI rdam," *Rotterdams Dagblad*, 7 'cidi nl> (accessed 17 October

sh to Hamas Is under Scrutiny September 2003; L. Kaplow,

"Backgrounder Israel's Adversaries. Hamas. Back-seat Driver to Arafat Group," *Atlanta Journal-Constitution*, 24 January 2002, quoted in J. Stork, *Erased In A Moment Suicide Bombing Attacks Against Israeli Civilians*, New York: Human Rights Watch, 2002, p. 94; D Eberhart, "Hamas Touts Untouchable 'Secret' Funding Sources," *NewsMax com*, 5 December 2001 Online. Available HTTP· <http://www.newsmax com/archives/articles/2001/12/4/175008.shtml> (accessed 17 October 2005)

44 The removal of Saddam Hussein has resulted in the suspension of the $25,000 payments to the families of suicide bombers that Saddam is said to have instigated (although it is unclear how regular such payments were, see, for example, Stork, *Suicide Bombing*, 100–101, 104) The presence of US troops in the region has made both the Syrian and Iranian regimes more cautious, although it remains to be seen whether this will result in a drop in financial and other aid

45 See, for example, allegations and court case against Mohammed Salah, a Palestin- ian living in the United States. Boim v. Quranic Literacy Institute (291 F3d 1000), D. Pipes, "A New Way to Fight Terrorism," *Jerusalem Post*, 24 May 2000.

46 Rex Hudson, "Terrorist and Organized Crime Groups in the Tri-Border Area (TBA) of South America," Report prepared by the Federal Research Division, Washington, DC: Library of Congress, July 2003

47 See the Commission's ruling on Interpal. Online. Available HTTP <http:// www.charity-commission gov uk/investigations/inquiryreports/inqreps.asp> (accessed 17 October 2005)

48 Geneva Convention Relative to the Protection of Civilian Persons in Time of War, 12 August 1949 Online. Available HTTP· <http://www unhchr.ch/html/menu3/b/ 92 htm> (accessed 17 October 2005)

49 An Israeli government report argued that Hamas-affiliated charities provided "one-time grants of between $500–5,000" for "the families of those who have been killed and wounded in perpetrating acts of terror" "Hamas's Use of Charitable Societies to Fund and Support Terror," Israeli Ministry of Foreign Affairs, 22 September 2003. Online. Available HTTP: <http //wwwmfa gov il> (accessed 23 May 2005). Stork sets the amount of money given to martyrs' families by the Islamist as-Salah charity (which, though separate from the Hamas network, oper- ates according to a similar logic) at $5,300 (106). Until the fall of Saddam, families of suicide bombers were said to receive $25,000 from the local Iraqi Bath party (see Stork, *Suicide Bombing*, p. 104, Goldberg, "The Men behind the Suicide Bombers," *The Guardian*, London, 12 June 2002, p. 13.)

50 Claude Berrebi, "Evidence About the Link Between Education, Poverty and Terrorism Among Palestinians," Mimeo, Princeton University, 2003, pp. 37–39, Alan Krueger and Jitka Malečková, "Education, Poverty and Terrorism Is There a Causal Connection?" *Journal of Economic Perspectives*, Fall 2003, vol. 17, no 4, pp. 135–136

51 See also M. Basile, "Going to the Source. Why Al Qaeda's Financial Network Is Likely to Withstand the Current War on Terrorist Financing," *Studies in Conflict and Terrorism*, 2004, vol 27, no 3, p 173

52 See, by way of comparison, the original Maktab al Khidamat which bin Laden oversaw during the Afghan conflict.

53 Many of the charities that have been linked to al Qaeda are humanitarian charities providing aid to the war-torn areas in which al Qaeda affiliates operate. Some of these charities have allegedly been founded by people close to bin Laden See, for example, Gunaratna's claims regarding Benevolence International and Brisard's claims regarding the IIRO and the Muslim World League. Gunaratna, *Inside al Qaeda*. pp. 112–113, J. C Brisard, *Terrorism Financing*, Report prepared for the President of the UN Security Council, New York, 2002, p. 27. Others appear to have been infiltrated subsequent to having been founded.

54 A Dutch government report notes that "a recruiter [for the international jihad] will welcome a prominent position in a mosque . . . [because] it gives him more possibilities to arrange matters for other brothers and recruits (logistics, material and financial)." AIVD, "Recruitment for the Jihad in the Netherlands." Online. Available HTTP. <http://www.aivd.nl/contents/pages/2285/recruitmentbw.pdf> (accessed 17 October 2005)

55 See, for example, bin Laden's denunciations of the Gulf State rulers in his 4 January 2004 speech on *al Jazeera* Online. Available HTTP. <http://www.mideastweb.org/log/archives/00000155.htm> (accessed 17 October 2005).

56 See also Basile, "Going to the Source," p. 173

57 Because the Saudi state has not traditionally levied tax (the so-called "rentier state" model, which funds itself through oil proceeds), there is no regular audit system Similarly, until recently, no records have been required for the giving of *zakah* (a religious "tax" that both individuals and businesses voluntarily give to charity) Napoleoni, *Modern Jihad*, 123

58 J Cooley, *Unholy Wars Afghanistan, America and International Terrorism*, 2nd edn, London Pluto Press, 2000, pp. 83, 87; Kepel, *Jihad*, 300–301, Burke, *Al-Qaeda*, p. 57

59 Burke, *Al-Qaeda*, pp. 57–58, Basile, "Going to the Source," 173

60 Burke, *Al-Qaeda*, pp. 57–58, D Kaplan, "The Saudi Connection." *US News & World Report*, Washington, 15 December 2003

61 D. McGrory and J Doran, "Bin Laden Funded by Bogus Charities," *The Times*, London, 25 September 2001

62 For estimates of the budgets of al Haramain, the Muslim World League, and the International Islamic Relief Organization, see Kaplan, "The Saudi Connection."

63 "Al-Qaeda Skimming Charity Money," *CBSNews.com*, 7 June 2004 Online. Available HTTP <http://www.cbsnews.com/stories/2004/06/07/terror/main621621.shtml> (accessed 18 October 2005)

64 Brisard, *Terrorism Financing*

65 I Key, "Bin Laden's Money Network," *The Express*, Manchester, 1 October 2001, pp. 8, 9

66 See also J Gunning, "Making Sense of al-Qaeda in Europe," Oxford-Princeton Conference on Muslims in Europe post 9/11, Oxford, 26 April 2003, Online. Available HTTP <http://www.sant.ox.ac.uk/princeton/gunning-full.pdf> (accessed 23 May 2005)

67 ICM/BBC Radio 4 Today poll, December 2002 Online. Available HTTP <http://www.icmresearch.co.uk/reviews/2002/bbc-today-muslims-dec-02.htm> (accessed 5 November 2005)

68 Most prominently, Abu Hamza al Masri's Supporters of Shari'ah and Omar Bakri's now disbanded al Muhajiroun The number of supporters of Shari'ah has been in decline since al Masri's removal from Finsbury Park Mosque. Estimates for al Muhajiroun range between a few hundred and a few thousand, Omar Bakri himself set the total number at 800 Interview in A Mesoy, *How Does Political Alienation Cause Muslims in London to Engage in Radical Political Behaviour?*, Masters dissertation, Aberystwyth, 2004, p. 15.

69 For mainstream rejection, see letter sent by the Muslim Council of Britain to all UK mosques. "Letter to Mosques and Muslim Leaders," *The Guardian*, London, 31 March 2004. For reaction of larger Islamist organizations, see telephone interview with Dr Azzam Tamimi, Institute of Islamic Political Thought and Muslim Association of Britain, April 2003.

70 "Saoedische invloeden in Nederland. Verbanden tuseen salafistische missie, radicaliseringsprocessen en islamitisch terrorisme," AIVD report, 9 June 2004, 11 Online. Available HTTP: <http://www.aivd.nl/contents/pages/893/rapportsaoedischeinvloeden.pdf> (accessed 18 October 2005)

recruiter [for the international jihad] will
...e [because] it gives him more possi-
others and recruits (logistics, material
the Jihad in the Netherlands," Online.
..ontents/pages/2285/recruitmentbw.pdf>

ions of the Gulf State rulers in his ...
Online. Available HTTP. <http//...
..55 htm> (accessed 17 October 2005).
173

..nally levied tax (the so-called "renter
oil proceeds), there is no regular audit
..ds have been required for the giving of
luals and businesses voluntarily give to

*America and International Terrorism,*
83, 87. Kepel, *Jihad,* 300–301; Burke.

g to the Source," 173
'The Saudi Connection," *U.S. News &*
2003
unded by Bogus Charities," *The Times,*

un. the Muslim World League, and the
see Kaplan, "The Saudi Connection."
*CBSNews.com,* 7 June 2004 Online.
n/stories/2004/06/07/terror/main

*e Express,* Manchester, 1 October 2001,

-Qaeda in Europe," Oxford-Princeton
l, Oxford, 26 April 2003 Online. Avail-
onnceton/gunning-full pdf> (accessed

2002 Online. Available HTTP <http://
..oday-muslims-dec-02 htm> (accessed

's Supporters of Shari'ah and Omar
number of supporters of Shari'ah has
om Finsbury Park Mosque. Estimates
dred and a few thousand Omar Bakri
new in A Mesoy, *How Does Political*
*ngage in Radical Political Behaviour?,*
15.

the Muslim Council of Britain to all
lim Leaders," *The Guardian,* London,
ust organizations, see telephone inter-
slamic Political Thought and Muslim

rbanden tuseen salafistische missie,
onsme," AIVD report, 9 June 2004,
tp.//www aivd nl/contents/pages/8931/
18 October 2005)

71 A. Esman, "The Arabian Panther," Foundation for the Defense of Democracies, 14 June 2004. Online. Available HTTP: <http://www.defenddemocracy.org/research_ topics/research_topics_show htm?doc_id=228652> (accessed 18 October 2005)

72 See note 12.

73 See also Sageman's comment on the necessity of un-embeddedness, n. 33. A significant number of those who were European-born, such as Zacarias Moussaoui, Richard Reid, and David and Jérome Courtailler, appear to have become uprooted from their communities before "succumbing" to al Qaeda.

74 R. Leiken, "Immigration· Is Integration Failing?" panel discussion, International Summit on Democracy, Terrorism, and Security, Madrid, 9 March 2005 Online. Available HTTP: <http://english safe-democracy.org/keynotes/immigration-is-integration-failing.html> (accessed 17 October 2005)

75 "Young Islam Hardline Youths Fuel Bitter Divide," *The Observer,* London, 4 April 2004; Anthony, "Amsterdamned", "Not Saying the 'AQ' Word," *Geopolitical Review,* 16 November 2004. Online. Available HTTP· <http.//www.geopoliticalreview.com/archives/000500not_saying_the_aq_word.php> (accessed 17 October 2005)

76 Among Sageman's sample of "global Salafi mujahedin," 7 out of 172 are converts of Western origin (*Understanding Terror Networks,* 185–189) On white converts among al Muhajiroun members, see B. Wazir, "Essex Boys Sign up for 'Holy War,' " *The Observer,* London, 24 February 2002

77 The strength of this definition lies in the fact that it straddles both individual psychological and systemic factors and therefore can incorporate a wide variety of findings, ranging from aspiration–achievement gap theories to systems-level analyses, as well as more contemporary notions of identity and culture.

78 D. Schwartz, *Political Alienation and Political Behavior,* Chicago: Aldine Publishing, 1973, pp. 14–16, 25–28, 235

79 I borrow the term "post-migrant" from Sunier, "Islam and Interest Struggle," pp. 52–54.

80 See, for example, notions of "Islamic terrorism" and "Islamic education" used in AIVD publications. AIVD Homepage. Online. Available HTTP· <http.// www.aivd nl> (accessed 17 October 2005)

81 Sunier, Cesari, and Samad all date the emergence of self-consciously Islamic organizations and identities among Turkish immigrants in the Netherlands, Muslims in France, and Muslims in Britain to the 1980s. Sunier, "Islam and Interest Struggle," 46; J Cesari, "Islam in France: Social Challenge or Challenge of Secularism?" in Vertovec and Rogers, *Muslim European Youth,* Aldershot, UK. Ashgate Publishing, 1998, 33–36; Y. Samad, "Imagining a British Muslim Identification," in Vertovec and Rogers, *Muslim European Youth,* 61 72 Kepel dates this shift in France to the late 1980s and early 1990s G Kepel, *Allah in the West,* Stanford, CA Stanford University Press, 1997, pp. 202-203 This shift from a more secular identity to a self-consciously religious one should, however, not be exaggerated Religious identity played a role in secular self-understandings while secular notions such as national identity continue to play a role in the self-consciously religious construction of identity

82 Home Office Report (*Briefing on British Muslims.* March 2004) quoted in David Leppard, "Soaring Jobless Total Feeds the Extremist Fires," *The Sunday Times,* London, 30 May 2004; observations by Lord Ahmed, quoted in Jason Burke et al, "Hardline Youths Divide Muslims," *The Observer,* London, 4 April 2004

83 See, for example, Kim Willsher, "My Son Wouldn't Lie to Me," *The Sunday Telegraph,* London, 1 September 2002; Abd Samad Moussaoui, "My Brother Zac," *The Guardian,* London, 19 April 2003.

84 Cesari, "Islam in France," pp. 29–31.

124   *Jeroen Gunning*

85  Schwartz distinguishes between "socio-cultural" and "political" alienation, and argues that, in 1960s America, the two were not "significantly associated with each other" (*Political Alienation and Political Behavior*, pp. 42–44)

86  On most recent developments in Britain, see M Abdel-Halim, "Four British Muslims Make It to Parliament," *IslamOnline.net*, Cairo, 6 May 2005. Online. Available HTTP <http://islamonline.net/English/News/2005-05/06/article01. shtml> (accessed 18 October 2005)

87  George Galloway, MP, was one of those who benefited from MAB's endorsement. "Muslim Vote Pivotal to General Election Outcome," press release, *MAB online.net*, 6 May 2005. Online. Available HTTP <http://www.mabonline.info/ english/modules.php?name=News&file=article&sid=378> (accessed 18 October 2005)

88  An alternative reading is that increased openness in a political system either marginalizes the violently inclined or leads them to believe that violence "worked " In both cases, increased openness is likely to produce more violence, at least in the short term See D della Porta, "Left-Wing Terrorism in Italy," in M. Crenshaw (ed ) *Terrorism in Context*, University Park, PA: Pennsylvania State University Press, 1995, pp. 105–159

89  Zawahiri's subterfuge has already been cited above. According to Special Branch in Britain, a number of unregistered fringe organizations have similarly "[preyed] on mosques, colleges and communities who believed that they were giving to orphans in Afghanistan or the homeless from an Indian earthquake." McGrory and Doran, "Bin Laden Funded by Bogus Charities."

90  Despite local government accusations to the contrary, experts appear to believe that the Central Asian branches of the party similarly refrain from advocating and perpetrating political violence. J Page, "Muslims Seeking Paradise Turn to Extremism in the Face of Poverty," *The Times*, London, 21 May 2005; T. Makarenko, "The Changing Dynamics of Central Asian Terrorism," *Jane's Intelligence Review*, February 2002 Online. Available HTTP <http:// www.janes.com/security/international_security/news/jir/jir020129_1_n shtml> (accessed 13 April 2007)

91  For national impact. see notes 86, 87. For an overview of local and European election strategies, see O Saeed, "Labour Has Forfeited the Muslim Vote," *The Guardian*, London, 25 May 2004

92  E Asaad Buaras, "War Costs Labour the Muslim Vote," *Muslim News*, 30 May 2003, no 169, H Chapman, "Lib Dems Delighted at Gaining Britain's Only Muslim MEP," *Muslim News*, 25 June 2004, no. 182 See also n 88, 89

93  S. O'Neill, "British Islam Colleges 'Link to Terrorism ' " *The Times*, London, 29 July 2004

94  A Browne, "Hatred Engulfs a Liberal Land," *The Times*, London, 13 November 2004, I. Traynor, "Liberal Culture under Threat in Dutch Religious and Ethnic Crisis," *The Guardian*, London, 12 November 2004.

95  della Porta, "Left-Wing Terrorism in Italy," pp. 105–159

96  Gunaratna has recently argued that al Qaeda's influence in Europe has grown since the Madrid bombings and that compromised Islamic charities need to be targeted by European intelligence agencies if al Qaeda's threat is to be countered effectively However, Gunaratna does not provide a single example of a compromised charity, instead focusing on small-scale cells of suspected al Qaeda affiliates. R Gunaratna, "The Post-Madrid Face of Al Qaeda," *The Washington Quarterly*, Summer 2004. vol 27, no 3, pp 91–100.

97  T Kafala, "Palestinians Suffer as Charities Close," *BBC News Online*, 30 January 2002 Online. Available HTTP <http://news.bbc.co.uk/1/hi/world/middle_east/ 1789093 stm> (accessed 18 October 2005), S Taylor Martin, "Frozen Accounts Jeopardize Learning, Healing in Gaza," *St Petersburg Times Online*, 15 September

tural" and "political" alienation, and
ere not "significantly associated with
*al Behavior*, pp. 42–44)

see M Abdel-Halim, "Four British
*nline.net*, Cairo, 6 May 2005. Online
.t/English/News/2005- 05/06/article03.

o benefited from MAB's endorsement
n Outcome," press release, *MABon-*
HTTP <http://www.mabonline.info/
ticle&sid=378> (accessed 18 October

openness in a political system either
eads them to believe that violence
is is likely to produce more violence, at
"Left-Wing Terrorism in Italy," in M.
versity Park, PA Pennsylvania State

d above. According to Special Branch
organizations have similarly "[preyed]
ho believed that they were giving to
om an Indian earthquake." McGrory
Charities."

ie contrary, experts appear to believe
rty similarly refrain from advocating
, "Muslims Seeking Paradise Turn to
· *Times*, London, 21 May 2005, T.
of Central Asian Terrorism," *Jane's*.
Online. Available HTTP <http://
rty/news/jir/jir020129_1_n shtml>

an overview of local and European
Has Forfeited the Muslim Vote," *The*

Muslim Vote," *Muslim News*, 30 May
Delighted at Gaining Britain's Only
, no. 182 See also n 88, 89.
o Terrorism ' " *The Times*, London,

l," *The Times*, London, 13 November
hreat in Dutch Religious and Ethnic
er 2004.
pp. 105 159.
:da's influence in Europe has grown
romised Islamic charities need to be
f al Qaeda's threat is to be countered
provide a single example of a com-
ill-scale cells of suspected al Qaeda
Face of Al Qaeda," *The Washington*
)1- 100.
Close," *BBC News Online*, 30 January
ws.bbc.co uk/1/hi/world/middle_east
S. Taylor Martin, "Frozen Accounts
etersburg *Times Online*, 15 September

2003. Online Available HTTP· <http //www.sptimes.com/2003/09/15/Worldand-
nation/Frozen_accounts_jeopa shtml> (accessed 18 October 2005), "PCHR
Calls upon the Palestinian Authority to Cancel Its Decision to Freeze Funds of
Charitable Societies," press release, Palestinian Centre for Human Rights, Gaza,
28 August 2003.

98 See the precise distinction made in Boim vs. Quranic Literacy Institute (291 F3d
1000) between "giving money to a group which then sponsored a terrorist act"
and "international terrorism "

99 Any member of the public has the right to bring suspicions to the Commission's
attention and the Commission is obliged to look into these suspicions (30–40
percent of cases originate from the Commission's own investigations, 30 percent
from other regulators, for example, the police, 30 percent from members of the
public). However, the decision whether to instigate an inquiry rests solely with the
Commission. Telephone interview with Simon Gillespie, Director of Operations,
Charity Commission, 21 July 2004.

100 Telephone interviews with Gillespie (2004) and Antony Robbins, Head of Com-
munications, Charity Commission, 8 July 2004. For reform outcomes, see n 12.

101 In conversations with an anonymous source close to the investigation, that source
hinted at strong pressure from Israel on the AIVD (and the government) to revise
its earlier stance that Hamas's political and social wings could be differentiated
from its military wing.

102 A similar solution was suggested in a hypothetical situation by Gillespie, the
Charity Commission's Director of Operations (Interview with Gillespie, 2004)

103 See R. Bekkers, "Trust, Accreditation, and Philanthropy in the Netherlands,"
*Nonprofit and Voluntary Sector Quarterly*, December 2003, vol 32, no. 4,
pp. 596–615

104 Conversation with anonymous source close to the investigations.

**EXHIBIT 164 TO DECLARATION OF VALERIE SCHUSTER**



Public
12/3/01

BY LIAISON

Date:      November 5, 2001

To:        Mr. R. Richard Newcomb, Director
           Office of Foreign Assets Control
           Department of Treasury

From:      Mr. Dale L. Watson
           Assistant Director
           Counterterrorism Division

Subject:   HOLY LAND FOUNDATION FOR RELIEF AND DEVELOPMENT
           INTERNATIONAL EMERGENCY ECONOMIC POWERS ACT

           ACTION MEMORANDUM

## I. INTRODUCTION

Pursuant to the provisions of the International Emergency Economic Powers Act (IEEPA), 50 U.S.C. §1701 et seq., the President of the United States may invoke the provisions of the Act to deal with any "unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat." [IEEPA Sec. 202(a)]. Accordingly, on January 23, 1995, the President issued Executive Order (E.O.) 12947 declaring a national



EXHIBIT
Levitt  4
9-1-10   5C



Subject:   HOLY LAND FOUNDATION FOR RELIEF AND DEVELOPMENT
           INTERNATIONAL EMERGENCY ECONOMIC POWERS ACT

           ACTION MEMORANDUM

## I.   INTRODUCTION

Pursuant to the provisions of the International Emergency
Economic Powers Act (IEEPA), 50 U.S.C. §1701 et seq., the
President of the United States may invoke the provisions of
the Act to deal with any "unusual and extraordinary threat,
which has its source in whole or substantial part outside the
United States, to the national security, foreign policy, or
economy of the United States, if the President declares a
national emergency with respect to such threat." [IEEPA Sec.
202(a)].  Accordingly, on January 23, 1995, the President
issued Executive Order (E.O.) 12947 declaring a national


THE NEFA FOUNDATION

emergency regarding the "grave acts of violence committed by foreign terrorists that disrupt the Middle East peace process constitute an unusual and extraordinary threat to the national security." (Exhibit 1).

On January 25, 1995, the Department of the Treasury, ("Treasury"), Office of Foreign Assets Control (OFAC) issued a list of persons and groups designated by the President as "Specially Designated Terrorists" (SDTs) threatening the Middle East peace process (MEPP) or found to be owned or controlled by, or to be acting for or on behalf of, these terrorist organizations. The Islamic Resistance Movement, also known as (a.k.a.) HAMAS, was designated a SDT, in that it is considered a foreign terrorist organization which threatens to disrupt the MEPP. (Exhibit 1). Pursuant to provisions of E.O. 12947, the President has delegated to the Secretary of the Treasury, authority vested in him by the IEEPA, including the authority to accept additional SDTs.

In E.O. 12947, the President specifically determined that the making of donations of the type specified in section 203(b)(2)(A) of IEEPA[1] by United States persons to persons and/or organizations designated pursuant to the E.O. would seriously impair his ability to deal with the national emergency declared by that order and specifically prohibited such donations. The President transmits, annually, notices of the continuation of this national emergency to the Congress and the Federal Register.

On January 19, 2001, in accordance with section 202(d)2 of the National Emergencies Act (50 U.S.C. § 1622(d)), the President determined that, because terrorist activities continue to threaten the MEPP vital interests of the United States in the Middle East, the national emergency declared on January 23, 1995 (E.O. 12947), and the measures made effective on January 24, 1995, to deal with that emergency must continue in effect.

---

[1]Section 203(b)(2)(A) of IEEPA (50 U.S.C. 1702(b)(2)(A)) references "donations. . . of articles, such as food, clothing, and medicine, intended to be used to relieve human suffering. . ." By finding such donations would seriously impair his ability to deal with the national emergency declared, the President, through E.O. 12947, prohibited donations of this nature to HAMAS.

2



In furtherance of this authority, E.O. 12947 directs all federal agencies, including the Federal Bureau of Investigation (FBI), to take all appropriate measures within their authority to carry out the provisions of the Order. [E.O. 12947, Section 4(a)]. Further, any investigation emanating from a possible violation of the Order shall be coordinated with the FBI. [E.O. 12947, Section 4(b)].

Accordingly, the FBI is providing the following information to Treasury regarding the Holy Land Foundation for Relief and Development (HLFRD), located at 525 International Parkway, Suite 509, Richardson, Texas.  The FBI has obtained information which indicates that the HLFRD acts for or on behalf of HAMAS.  In compliance with its obligations under the Order, the FBI submits this memorandum for OFAC's consideration in ordering the SDT designation of the HLFRD.

## II.  HAMAS IS A TERRORIST ORGANIZATION

HAMAS is one of the SDTs listed in the Annex to E.O. 12947 as a foreign terrorist group engaged in grave acts of violence that disrupt the MEPP and constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States. (Exhibit 1).

HAMAS is a terrorist organization that espouses an extremist Islamic fundamentalist ideology.  HAMAS was founded in 1988 in the Gaza Strip and is dedicated to the establishment of an Islamic Palestinian State that encompasses Israel, the West Bank and Gaza.  HAMAS is a militant Palestinian offshoot of the Muslim Brotherhood which was founded in 1928 to replace secular rulers with an Islamic society.

In late 1987, activist members of the Muslim Brotherhood opted to play a more direct role in the popular uprising, known as the Intifada, than the Muslim Brotherhood leadership would allow.  As a result, Sheikh Ahmad Yassin, then head of the Muslim Brotherhood in the Gaza Strip, formed HAMAS.  In May 1989, Yassin was arrested and in October 1991, he was tried and sentenced to life imprisonment by an Israeli court for HAMAS terrorist activities. (Exhibit 2).

3



In October 1997, following a failed Israeli attempt to assassinate Khalid Mishal, another HAMAS leader in Amman, Jordan, Yassin was released to the Jordanians and subsequently returned to Gaza.  On October 29, 1998, Yassin was placed under house arrest by the Palestinian Authority (PA) following an unsuccessful HAMAS suicide attack to blow up a bus full of school children in Kfar Darom, which resulted in the death of an Israeli soldier.  Yassin was released from house arrest two months later, in December 1998. (Exhibit 2).

HAMAS is primarily based in the West Bank and Gaza.  When HAMAS was declared an illegal organization by the Government of Israel (GOI) in 1989, HAMAS leaders moved its support structures outside Israel.

HAMAS has publicly rejected Yasir Arafat and the PA as the representatives of the Palestinian people.  HAMAS also announced that it opposes the Palestine National Council's 1988 decision to establish an independent Palestinian state in the West Bank.  Since the group's inception, HAMAS has forged significant inroads into acceptance by mainstream Palestinians.

The ideology of HAMAS is codified in the HAMAS covenant. (Exhibit 3).  This covenant establishes HAMAS' primary goal as the creation of an Islamic State in all of Palestine through "Jihad" (Holy War).  HAMAS' covenant emphasizes Jihad as the immediate and sole solution to Palestinian problems and regards participation in the armed struggle as the duty of every Muslim.  HAMAS rejects absolutely any political solution entailing the concession of any part of historic "Palestine."

The primary tenets of HAMAS philosophy are opposition to compromise with Israel over creation of a Palestinian State and replacement of the PA as the sole representative of the Palestinian people.  To these ends, HAMAS pursues a combined program of violence and terror on one hand, and educational, charitable, and social functions on the other.  The principal purpose of its armed attacks is to intimidate and coerce the GOI and its civilian population.  Its benevolent programs are used to enhance its image and earn goodwill in the Palestinian community.

4



A recent interview with a senior HAMAS spokesman identifies the influence the political wing of HAMAS has over the military wing. In a July 31, 2001, Reuters article, Abdel-Aziz al-Rantissi, a senior HAMAS official and spokesman stated, "The (HAMAS) political leadership has freed the hand of the brigades to do whatever they want against the brothers of monkeys and pigs." The term "brigades" refers to the group's military wing, Izz el-Din al-Qassam brigades. Rantissi further stated, "I urge all the brigades to chase and target the Israeli political leaders and members of parliament, the killer (Prime Minister Ariel) Sharon and the criminal (Foreign Minister) Shimon Peres." This was believed to be the first public call by HAMAS to target Israeli leaders. According to the article, "Hamas's political wing determines overall policy for the movement . . ." (Exhibit 4).

Even after the September 11, 2001 terrorist attacks against the World Trade Center and Pentagon, HAMAS' public statements urge support for continued violence against Israel and the United States. In a September 2001 public statement published by Reuters, Rantissi echoed calls by Taliban clerics in Afghanistan, urging "Muslims on Friday to unite against any U.S. retaliation for the terror attacks in New York and Washington." He went on to say, "It is impossible for Muslims to stand handcuffed and blindfolded while other Muslims, their brothers, are being attacked. The Muslim world should stand up against the American threats which are fed by the Jews, . . . ." (Exhibit 5).

Through its acts of violence, HAMAS has established itself as one of the primary Palestinian terrorist organizations continuing the "armed struggle" against Israel. These terrorist attacks target not only military targets, but civilian ones as well. HAMAS terrorist attacks have resulted in scores of deaths and hundreds of injuries in Israel, including the killing of several U.S. citizens.

From October 1, 2000 to September 10, 2001, HAMAS has claimed responsibility for at least 20 bombings; two shootings; one kidnaping; and one mortar attack. Another six bombings have been averted through the failure or discovery of explosive devises. At least 77 persons, including three American citizens, have been killed in these attacks and at

5



least 547 injured, including four American citizens. The use of suicide bombers has become a HAMAS trademark. A few examples of those bombings are described below:

On August 9, 2001, HAMAS claimed responsibility for a suicide bombing in Jerusalem, that killed 15 civilians and injured more than 130 others. The attack occurred at one of Jerusalem's most prominent street corners. Two American citizens, including a 31 year old pregnant elementary school teacher died and four other American citizens, including a three year old boy were wounded when a Palestinian walked into a Sbarro pizzeria at the height of the lunch hour and detonated an explosive device filled with nails. At the funeral for five members of a family from the West Bank settlement of Talmon, an 11 year old, on a hospital bed with plastic breathing tubes in her nose, was wheeled into the cemetery, where her father, mother and three siblings, ages two, four, and 14 were to be buried. (Exhibit 6).

On June 1, 2001, HAMAS claimed responsibility for a suicide bombing in Tel Aviv, Israel, that killed 21 Israeli youths and injured nearly 100, as they stood outside a popular disco. Most of the youths killed or injured were girls, between the ages of 14 and 18, celebrating their high school graduation. According to eyewitnesses, two HAMAS operatives drove the suicide bomber to the disco, a popular club often packed with Russian immigrant teenagers. They said the bomber slipped unnoticed into line and positioned himself among several girls, including a 14-year-old who had survived a previous bombing in Netanya. Then, while flirting with one of the girls, he triggered the explosives. The blast was so intense that it tore limbs from the victims' bodies, scattered their flesh up to six blocks away and vaporized the bomber and the girl next to him. (Exhibit 7).

On May 25, 2001, HAMAS took credit for carrying out a truck bombing to mark the anniversary of Israel's withdrawal from Lebanon. According to a May 25, 2001, Associated Press article, Islamic militants said they were trying to undermine Israel's morale with the bombings. The article stated that there have been more than a dozen explosions in the past eight months of Israeli-Palestinian fighting. On that date, Sheikh



Yassin, the spiritual leader of HAMAS, was quoted as saying, "We want to plant terror in the heads of the enemies." (Exhibit 8).

On February 25, 1996, HAMAS conducted suicide bombings in both Jerusalem and Ashkelon, claiming the lives of 26 people and wounding at least 79 others. Those blasts occurred at two of the country's busiest intersections at the height of rush hour. The Jerusalem blast occurred at 6:48 a.m. on a local bus that was stopped at a red light just a block away from the central bus station. The suicide bomber killed 24 people and wounded 50 others. Two Americans, Matthew Eisenfeld, 25, and his girlfriend, Sarah Duker, 23, were among the dead. The second attack took place 50 minutes later at a hitchhiking stop for soldiers, near Ashkelon. That suicide bomber killed two people and wounded 29. HAMAS took credit for both attacks. (Exhibit 9).

## III.   HISTORY AND ORGANIZATIONAL STRUCTURE OF HLFRD

Background: The HLFRD was established in 1989 as a non-profit, non-political, charitable, and tax-exempt organization which solicits donations to help Palestinian people in the West Bank and Gaza. As noted above, the HLFRD is listed as a tax-exempt charity, not a religious organization.

The HLFRD was originally known as the Occupied Land Fund, and incorporated in California on January 11, 1989, with a mailing address of P.O. Box 1448, Los Angeles, California 90053. The Occupied Land Fund's physical address at the time was located at 5855 Green Valley Circle, Suite 207, Culver City, California 90230. On July 27, 1992, the Occupied Land Fund relocated to Texas, and had a forwarding address of P.O. Box 832390, Richardson, Texas 75083.

The Occupied Land Fund was registered with the Texas Secretary of State on November 18, 1992, under the name, "HOLY LAND FOUNDATION FOR RELIEF AND DEVELOPMENT." (Exhibit 10). The HLFRD is listed as a non-profit corporation with a registered office of 850 N. Dorothy Drive, Suite 516, Richardson, Texas. In August 1994, the HLFRD relocated from 1710 Firman Drive, Suite 100, Richardson, Texas 75081 to its current address located at 525 International Parkway, Suite 509, Richardson, Texas 75081.

7



The Texas Secretary of State records further reveal that the HLFRD proposed to pursue, in conducting its affairs in Texas, "charitable-relief for refugees and the indigent needy, fund raising furthering the corporation's exempt purposes, and to sponsor charitable activities benefiting (sic) and to make contributions or distributions to other 501(c)(3) organizations or the corresponding section of any future federal tax code." (Exhibit 10).

<u>Organizational structure</u>: The HLFRD is currently headquartered in Richardson, Texas, with branch offices and representatives scattered throughout the United States, West Bank and Gaza.  Key leaders at the HLFRD include: Shukri Abu Baker, President, Secretary, and Chief Executive Officer (CEO); Haitham Maghawri, Executive Director; Mohammed El Mezain, Director of Endowments; and Ghassan Elashi, Chairman of the Board. (Exhibit 11).

According to public records, the HLFRD raised 13.0 million in 2000; $6.3 million in 1999; and $5.2 million in 1998. (Exhibit 12).

## IV.  THE HLFRD ACTS FOR OR ON BEHALF OF HAMAS

As will be described in detail below, the HLFRD acts for or on behalf of HAMAS based on the following analysis:

1. <u>Intercepted Discussions Of HAMAS Leaders</u>:  In 1993 and 1994, the FBI monitored meetings of identified HAMAS leaders and senior representatives from the HLFRD.  During these meetings, discussions were held regarding the need for HAMAS fund-raising in the United States, as well as the primary role of the HLFRD to serve this function.

2. <u>HAMAS Financing</u>:  FBI investigation has determined that in the early 1990s, HAMAS, through Mousa Abu Marzook, provided substantial funds to the HLFRD.

3. <u>Fund Recipients</u>:  FBI investigation has determined that a majority of the funds collected by the HLFRD are used to support HAMAS activities in the Middle East.

4. <u>HLFRD Leadership</u>: Key decision-makers within the HLFRD have been identified as active members of HAMAS.



## 1. FBI SURVEILLANCE OF HAMAS MEETINGS

1993 Philadelphia meeting: A recently declassified electronic surveillance of Abdelhaleem Hasan Ashqar disclosed that he organized a meeting that took place in Philadelphia, Pennsylvania, on October 1 to October 3, 1993. FBI physical surveillance and subsequent investigation corroborate that this meeting took place. The electronic intercepts disclosed that participants in the meeting included Ashqar, Akram Kharroubi, Mohammad Al-Hanooti, Ismail Elbarasse, Muin Kamel Mohammed Shabib, three officials from the HLFRD: Shukri Abu Baker, Ghassan Elashi and Haitham Maghawri; and representatives from the Islamic Association for Palestine (IAP).[2]

The FBI deems this meeting significant since it represented a meeting in the United States among senior leaders of HAMAS, the HLFRD and the IAP. A brief review of key attendees include:

1. **Abdelhaleem Hasan Ashqar:** In November 1992, the GOI advised that Ashqar was a U.S.-based HAMAS activist who was involved in transferring funds from the United States to HAMAS in the West Bank and Gaza. (Exhibit 15).

Interviews conducted by the Israeli Police (IP) of self-admitted HAMAS member Sufian Abu Samara provided evidence of Ashqar's membership in HAMAS. In Samara's January 7, 1991 and January 14, 1991 interviews, he stated that he was recruited and appointed the head of HAMAS in the Southern Gaza Strip by Mousa Abu Marzook in 1989 and also headed the HAMAS Security Apparatus in 1990. Samara described several instances where Ashqar transferred hundreds of thousands of dollars on behalf of HAMAS, at Samara's direction. (Exhibit 16).

---

[2] Review of American Express records determined that the above-mentioned individuals traveled to Philadelphia on October 1-3, 1993, and stayed at the Courtyard by Marriott Hotel, 8900 Bartram Avenue, Philadelphia, Pennsylvania. (Exhibit 13). Among the individuals physically observed by the FBI to be at the Courtyard by Marriott on October 1-3, 1993, were: Ashqar, Maghawri, Shabib, Elbarasse, Baker, and Elashi. (Exhibit 14).



During the February 21, 1993, IP interview of self-admitted HAMAS member Mahmud Rumahi, he stated that he was recruited to HAMAS in December 1990, by his brother-in-law, Mahmud Qazim.  Qazim gave Ashqar's phone and fax numbers to Rumahi, so that he would be able to get money and pamphlets. In April 1991, Ashqar sent a representative from the United States to Israel to obtain detailed reports on HAMAS activities in Rumahi's region. (Exhibit 17).

Additionally, Rumahi stated that in July 1991, he traveled to the United States to meet with Ashqar, who arranged for him to fly to Tennessee and meet with Abu Omar Mussa (a.k.a. Mousa Marzook), one of the HAMAS leaders in America.  Rumahi gave a full report to Mussa on his group's HAMAS activities.  After Rumahi returned, he gave Ashqar a detailed report of that conversation. (Exhibit 17).

2. **Akram Kharroubi**:  During the early 1990s, Akram Kharroubi (a.k.a. Haroubi, Harroubi) was head of the Washington, D.C. Muslim Arab Students Association.  He was in contact with HAMAS leaders, including Mousa Abu Marzook.  He reportedly distributed HAMAS statements when they were issued.

He returned to the West Bank and Gaza in 1994.  In early 1999, the GOI detained him for questioning.  During his interview by the IP, he admitted that from 1994 to 1999, he was a money courier between HAMAS members in Jordan and the West Bank.

Kharroubi further stated that in approximately 1997, the HAMAS headquarters in Jordan gave instructions to found a united headquarters of HAMAS in the West Bank, which was to include representatives of all the regions.  Due to the objection of all the regional headquarters to the establishment of a united headquarters for the West Bank, it was decided to establish an Inter-Regional Coordinating Committee where Kharroubi served as the Ramallah region representative. (Exhibit 18).

3. **Mohammad Al-Hanooti**: In April 1992, HLFRD-1, an FBI source, who has been found to be reliable in the past stated that Al-Hanooti was a big supporter of HAMAS.  The source further stated that it was well known in the Palestinian



community in the northern New Jersey area that Al-Hanooti was an active HAMAS supporter, purportedly holding fund-raising activities, as well as supporting visitors to the United States from Israel and Jordan, to speak on behalf of HAMAS.

HLFRD-2, an FBI source, who has been found to be reliable in the past stated in 1993, that Al-Hanooti collected over six million U.S. dollars for support of HAMAS in Israel.

4. **Ismail Elbarasse:** During questioning by Israeli authorities, SDT Mohammad Salah stated that he was directed by Marzook to receive funds from Elbarasse to be used for funding HAMAS military operations. (Exhibit 20). Salah's financial records document that Elbarasse wire-transferred a total of $735,000.00 to Salah from December 1992 to January 1993. (Exhibit 21). A review of financial records reflect that in the 1990s, Elbarasse had a joint bank account with Marzook.

5. **Muin Kamel Mohammed Shabib:** Shabib was interviewed by the FBI on March 16, 1994, at which time Shabib admitted supporting HAMAS financially and politically. (Exhibit 22). During IP interviews of arrested HAMAS operative Salah Arouri, Shabib was identified by Arouri as being involved in the HAMAS terrorist apparatus. (Exhibit 23). The GOI has reported that Shabib is a senior HAMAS activist and was formerly in charge of HAMAS' Central Sector (Ramallah-Jerusalem) in the West Bank. According to the GOI, in 1990, Shabib recruited Salah Arouri, to the ranks of HAMAS, and assigned him with the founding of an infrastructure for the military apparatus in Hebron; recruiting young men, preparing squads and procuring weapons and equipment. (Exhibit 24).

6. **Shukri Abu Baker** (HLFRD's CEO): In the published edition of the Dallas Observer, dated March 4 - March 10, 1993, Baker admitted to wiring $60,000.00 a month to the Occupied Territories. Baker stated that he sent Haitham Maghawri, the Social Services Coordinator for the HLFRD, to Lebanon with funds for the 396 expelled Palestinians that the GOI claimed to be HAMAS activists. (Exhibit 25). As discussed below, numerous FBI sources have identified Baker as being a member of HAMAS.



7. Haitham Maghawri (HLFRD's Executive Director):
According to the U.S. Immigration and Naturalization Service
(INS) records, on November 4, 1990, Maghawri filed a request
for asylum in the United States.  In his asylum request he
stated his reasons for seeking asylum were that he was being
persecuted for his religion by the Amal Movement (Shia
terrorist group in Lebanon, a rival to Hizballah).   During
an interview, Maghawri told INS officials the following
information about his past:  1) He had been arrested for
placing a car bomb, however, the INS interviewer made no
further notes regarding this incident; 2) he was arrested in
Lebanon in June, 1988, and was held for three weeks, the
reasons not recorded; 3) in May, 1987, he was again arrested
in Lebanon and held for five days. (Exhibit 26).

Maghawri's asylum request was denied.  On
December 19, 1991, he married a U. S. citizen, Fadia Tariq
Akilah.  As a result of his marriage, Maghawri received
permanent residency status on September 15, 1992.

Ghassan Elashi (HLFRD's Chairman of the Board):
Elashi and his brothers are the founders of InfoCom, Inc., a
computer hardware business and Internet service provider
located across the street from the HLFRD in Richardson,
Texas.  Elashi is currently the Vice-President of marketing.
In September 2001, OFAC blocked the assets of InfoCom, based
upon evidence that InfoCom received $250,000 from Marzook,
during the same time frame as Marzook was providing funds to
the HLFRD and others associated with HAMAS (detailed below).

Results of the 1993 Philadelphia Meeting: The electronic
surveillance revealed the following:

The overall goal of the meeting was to develop a strategy
to defeat the Israeli/Palestinian peace accord, and to
continue and improve their fund-raising and political
activities in the United States.  During the meeting the
participants went to great length and spent much effort
hiding their association with the Islamic Resistance
Movement, a.k.a. HAMAS.  Instead, they referred to HAMAS as
"SAMAH", which is HAMAS spelled backwards.  Most of the time,
the participants referred to HAMAS as "The Movement."

12



The participants decided that for fund-raising purposes, the United States theater was very valuable to them. They stated they could not afford to lose it. In the United States, they could raise funds, propagate their political goals, affect public opinion and influence decision-making of the U.S. Government. In addition, they hoped that sometime in the future they would be viable enough and strong enough to represent an alternative to the Palestinian Liberation Organization.

It was mentioned that the United States provided them with a secure, legal base from which to operate. The democratic environment in the United States allowed them to perform activities that are extremely important to their cause. In discussing financial matters the participants stated a belief that continuation of the Holy War was inevitable.

It was decided that most or almost all of the funds collected in the future should be directed to enhance the Islamic Resistance Movement and to weaken the self-rule government. Holy War efforts should be supported by increasing spending on the injured, the prisoners and their families, and the martyrs and their families. (Exhibit 28).

1994 Oxford, Mississippi Meeting: Declassified electronic surveillance of Ashqar and Muin Shabib disclosed that in early 1994, Ashqar's Al-Aqsa Educational Fund (AAEFI) and the HLFRD were in conflict over fund-raising issues. The electronic surveillance further disclosed that HAMAS Political Bureau head Mousa Abu Marzook designated the HLFRD as the primary fund-raising entity in the United States and ordered the AAEFI to curtail fund-raising operations. Ultimately, Marzook traveled to the United States and chaired a meeting in Dallas, Texas, regarding this issue. (Exhibit 29). Two senior HAMAS activists, Jamal Hamami, one of the founders of HAMAS, and Sheikh Mohammad Siyam (a.k.a. Siam), a self-admitted HAMAS official (Exhibit 30), met with Ashqar in Oxford, Mississippi, on March 13, 1994, to explain Marzook's decision.[3]

_____

[3] On March 13, 1994, the FBI observed Ashqar's travel to Memphis International Airport where he picked-up Sheik Jamal Hamami and Sheik Mohammad Siyam. Ashqar drove Hamami and Siyam to his residence where the three remained until March 14, 1994. (Ex. 31).



It should further be noted that FBI investigation has determined that the HLFRD has used both Hamami and Siyam as guest speakers at HLFRD fund-raising events. American Express records reveal that from September 20, 1990, to November 29, 1991, the HLFRD paid for at least six trips taken by Hamami to the United States. The HLFRD also paid for at least five trips taken by Siyam, a.k.a. M. Siam, M. Seyam, from April 20, 1992 to March 9, 1994. These trips were charged on either the Occupied Land Fund/Baker Corporate American Express Account # 3783-647335-91006 or the HLFRD/Baker Corporate American Express Account # 3783-647335-92004 or 93002. (Exhibit 32).

## 2. EARLY FUNDING FROM HAMAS:

According to the documents filed on October 4, 1995, in the Southern District of New York by the State of Israel's Ministry of Justice, Marzook was identified as the head of the Political Bureau of HAMAS. The document reads:

> The (political) bureau operates as the highest ranking leadership body in the HAMAS organization, setting policies and guidelines respecting HAMAS' activities. In addition to its other functions, this bureau has responsibility for directing and coordinating terrorist acts by HAMAS against soldiers and civilians in Israel and the territories. In his role as head of the political bureau, Marzook financed certain activities of HAMAS, including terrorist activities. In addition, he played an important role in organizing and structuring HAMAS and in supervising the activities of the wing of HAMAS responsible for the terrorist acts and in appointing individuals to important leadership roles in the military wing . . . Even by the time that Marzook became a leader in HAMAS in 1989, he was already clearly aware of the nature of the terror attacks committed by HAMAS. (Exhibit 33).

Investigation corroborates the GOI's statement that Marzook was a significant member of HAMAS. According to the July 25, 1995, FBI interview of Marzook, he described himself only as a "mid-level political activist" within the political arm of HAMAS since 1990. (Exhibit 34). However, as of August 15, 2001, the HAMAS website, www.palestine-

14



info.com/hamas, identified "HAMAS symbols and leaders." The
website stated that Marzook was "Elected as Chairman of Hamas
Political Bureau in 1991." (Exhibit 35). Based on Marzook's
well-established affiliation with HAMAS, Marzook was
subsequently designated by the U.S. Government on
August 25, 1995, as a SDT. (Exhibit 36).

FBI investigation has revealed that during March, 1992
and August, 1992, Marzook deposited a $100,000.00 check from
the Central Fidelity Bank Account # 7920439173 and a
$100,000.00 check from a First Virginia Bank Account
#68168179 to the HLFRD account at Bank of America, California
Account #0941402284. Ismail Elbarrase's name was printed on
the check along with Marzook's. The 1993 HLFRD tax form 990
further reflects the receipt of $210,000.00 from Marzook.
(Exhibit 37).

During an FBI interview of Nasser Alkhatib on
March 15, 1994, he advised that he worked for Marzook and
conducted various bank transactions for Marzook. (Exhibit
38). FBI investigation has determined that on August 31,
1992, Nasser Alkhatib deposited a check for $22,000.00 into
the HLFRD Bank One Account #1070001258. This check was dated
August 24, 1992, and written to "Holy Land Foundation" from
First Virginia Bank Account # 5065 0599, listing Nasser and
Narman Alkhatib, 6166 Leesburg Pike, Falls Church, on the
check. (Exhibit 37).

Marzook Simultaneously Funds the HLFRD & HAMAS Terrorist
Operations:

As described, in 1992, Marzook, Elbarasse and Alkhatib
were providing funds to the HLFRD. During 1992 to January
1993, these same HAMAS activists were also providing funds to
Mohamad Salah, designated by U.S. Government as a SDT in
February 1995. Salah was arrested January 25, 1993 in Israel
for supporting HAMAS terrorist activities. At the time of
his arrest, he had $97,000.00 in cash in his possession,
after having admitted to already disbursing approximately
$140,000.00 to individuals identified by the GOI as members
of HAMAS. (Exhibit 39).

Records verified that Marzook deposited a total of
$23,410.00 into Salah's U.S. bank account during the time
period of May 20, 1990 to November 29, 1992. Records also

15


'E NEFA FOUNDATION

verified that Elbarasse deposited a total of $740,000.00 in Salah's account during the time period of August 8, 1992 to January 25, 1993; and Nasser Alkhatib deposited a total of $251,000.00 into Salah's account during the time period of August 21, 1992 to January 22, 1993. (Exhibit 21).

Business records further indicate that during the same period that Marzook is funding the HLFRD and Salah, he is providing large sums of money to IAP.  March 1990 Texas State business records list IAP as a d.b.a. for American Middle Eastern League for Palestine (AMEL).  Ahmad Agha (who has served as the HLFRD's treasurer, Exhibit 11) and Ismael Elbarasse are listed as Directors of AMEL.  In addition, financial records reveal that Elbarasse and Marzook opened a bank account in the name of IAP on January 12, 1990, at the Central Fidelity Bank, Arlington, VA.  Elbarasse was the signatory on that account.  Bank records show deposits of seven checks totaling $125,000 to this IAP account in 1990 and 1991.

## 3. RECIPIENTS OF HLFRD FUNDS OVERSEAS

The following interview is provided as evidence of how the HLFRD's "charitable" fund-raising activity furthers the HAMAS terrorist organization's agenda.  The interview, published in the London Filastin Al-Muslimah, with Dr. Ibrahim Al-Yazuri, one of the founders of HAMAS, described the HAMAS philosophy concerning charitable giving. He stated:

> Everyone knows that the Islamic Resistance Movement, HAMAS, is a Palestinian Jihad movement that strives for the liberation of all Palestine, from the (Mediterranean) sea to the river (Jordan), from the north to the south, from the tyrannical Israeli occupation, and this is the main part of its concern.  Social work is carried out in support of this aim, and it is considered to be part of the HAMAS movement's strategy . . . The HAMAS movement is concerned about its individuals and its elements, especially those who engage in the blessed jihad against the hateful Israeli occupation, since they are subjected to detention or martyrdom.  The movement takes care of their families and their children and provides them with as much material and moral support as it can.  This is one of the fundamental truths of Islamic work and thus

16



represents the duties of the Islamic state . . . The HAMAS movement provides financial assistance, material aid of food packages in the blessed month of Ramadan, and gifts, clothes, and sacrifice meats for the 'ID AL-ADHA to poor and needy Palestinian families without discrimination.  It also provides poor and needy students and sons of martyrs in the first year of study with school bags containing paper and other study essentials and supports orphans in the Gaza Strip.  **The movement provides this aid through the support and assistance it gives to the zakat (Islamic alms-giving) committees and the Islamic associations and institutions in the Gaza Strip.** (Exhibit 40). (Emphasis added)

In a <u>Washington Post</u> article, dated August 11, 2001, Sheikh Yassin described the purpose of HAMAS' charitable giving in the West Bank and Gaza.  The article states,

> On the streets of Gaza, and to a somewhat lesser extent in the West Bank, Hamas's status has been underpinned by a network of medical clinics, schools and welfare institutions that distribute free and subsidized food to the needy.  According to Yassin, the group distributes $2 million to $3 million in monthly handouts to the relatives of Palestinian suicide bombers; "martyrs" who have been killed by Israelis; and prisoners in Israeli jails.  When pressed, he was vague about the provenance of the money, which, according to the State Department, comes mainly from Palestinians overseas, Iran and private benefactors in Saudi Arabia and other moderate Arab states. (Exhibit 41).

Ronni Shaked, a journalist and former official in the GOI, commented on HAMAS fund-raising in a book he wrote based on his interviews with operatives while they were imprisoned:

> The major channel for fund-raising for the HAMAS organization in the United States is the Occupied Land Fund that was established in Los Angeles, California.  In 1992, the organization changed its name to the Holy Land Foundation and moved to Richardson, Texas.  The President of this organization is Shukri Abu Baker.[4]

---

[4] Shaked, Ronni and Aviva Shabi, <u>Hamas: M'Emunah B'Alluh L'Derech Ha-Terror</u> (Hamas: From Belief in Allah to the Road of



As will be described below, it has been documented that the HLFRD provided charitable aid to the very individuals and institutions described by HAMAS as its recipients.

As to the individuals receiving support from the HLFRD, evidence strongly suggests that the HLFRD has provided crucial financial support for families of HAMAS suicide bombers, as well as the Palestinians who adhere to the HAMAS movement.  It is believed that by providing these annuities to families of HAMAS members, the HLFRD assists HAMAS by providing a constant flow of suicide volunteers and buttresses a terrorist infrastructure heavily reliant on moral support of the Palestinian populace.  According to HLFRD-4, an FBI asset who has provided reliable information in the past, in the words of Shukri Abu Baker, HLFRD's mission is to support the families of the martyrs.

FBI investigation has determined the HLFRD transfers funds to HAMAS overseas utilizing at least three methods:

1) Direct fund transfers from the HLFRD Richardson, Texas office to the HLFRD offices in the West Bank and Gaza;

2) Transfers of funds from the HLFRD Richardson, Texas office to zakat (Islamic charity) committees located in the West Bank and Gaza, controlled by HAMAS;

3) Transfers of funds from the HLFRD Richardson, Texas office to other "charitable" organizations in the Middle East, not controlled by HAMAS, but believed to be supporting HAMAS.

FBI analysis has seen what appears to be the more common use of the HLFRD offices in the West Bank and Gaza as a preferred means of distributing funds to zakat committees. While zakat committees formerly received larger sums directly from the HLFRD Richardson, Texas office, since 2000 the FBI has observed a decrease or elimination of funds sent directly to the zakat committees.  This coincides with the increase in funds to the HLFRD offices in the West Bank and Gaza, located in the same region as those zakat committees. (Exhibit 43).

---

Terror), Keter Publishing House, Jerusalem, 1994, p. 171.



The largest HLFRD recipients outside of the West Bank and Gaza are Sanabil Association for Relief and Development in Lebanon and Human Appeal International in Jordan. As will be discussed, these organizations have been linked to HAMAS.

## 3A. HLFRD OFFICES OVERSEAS

Significant information has been provided through the GOI's search of the HLFRD Jerusalem on May 7, 1995 and the closure of all HLFRD offices in Israel on May 6, 1997.

### Search of the HLFRD Office in Jerusalem:

The GOI have provided numerous documents that were seized during the May 7, 1995 search of the HLFRD office in Beit Hanina (an arab village outside of Jerusalem), which was operated by Muhammad Anati. It is the FBI's analysis that the documents seized and statement by the head of that office demonstrate the control the HLFRD headquarters in Richardson, Texas, had over the HLFRD Jerusalem office.

Documents retrieved in the search show that the two HLFRD offices were in frequent contact. Numerous documents seized from the office were facsimiles that bore the HLFRD letterhead and included the "sender's" fax number from the HLFRD office in Richardson, Texas. The following are the main findings:

1. Records reflecting funds transferred from the HLFRD to the Islamic Aid Committee, a.k.a. Islamic Relief Agency (IRA) and lists of people supported by those funds. Those lists bear the HLFRD name and Richardson office telephone number on the top of the pages, indicating the lists of recipients were reviewed in the HLFRD's Richardson office and then faxed from Texas to Jerusalem. Further, according to GOI analysis, the names of people who are not known to be affiliated with HAMAS received relatively low monthly payments.

The lists contained dozens of names of recipients who received more significant sums. Most of those individuals have been identified by the GOI as having ties to HAMAS activists. (Exhibit 45). The GOI has provided over 50 names of individuals listed by the HLFRD as recipients, having HAMAS connections. As an example, a paper with a request for 18 fund transfers for families of HAMAS deportees included as follows:

19



16 transfers of between $100.00 and $200.00 each to families of deportees - without the names of the deportees listed.[5] (Exhibit 45). The payment was for February 28, 1993. Each of these transfers bears the registration: family of a deportee, with the date (usually January 15 or February 15, 1993), and the sum to be paid. It is also noted that these families did not receive any previous payments;

Two transfers of $400.00 each for the following:

(a) Ansharah Mahmoud Shukri, Ramallah; date of payment, January 15, 1992; last payment, October 31, 1992; $400.00.

According to the GOI, Ansharah Ali Shukri is the mother of Ahmed Hussein Mahmoud Shukri, who is in jail for the murder of a Jew at a Tel Aviv building site in September 1989, as well as an attempt to cause a bus (line 405) to go off the road. He was arrested in September 1989 and sentenced to life imprisonment. While in prison, Shukri murdered a warden. (Exhibit 45).

(b) Fawzi Salman Abd Al-A'al, Gaza; date of payment, January 15, 1992; last payment, October 31, 1992; $400.00.

According to GOI, Fawzi Salman Mahmoud Abd Al-A'al, Gaza, born in 1946, was a former detainee in 1989. He was fired from his job at the civilian administration (he was a male nurse) following his arrest. Al-A'al's sons, Mazzen and Muhammad, are former detainees and HAMAS activists. (Exhibit 45).

The search produced other examples of individuals receiving money from the HLFRD (Exhibit 45), including:

---

[5] In December 1992, the GOI deported approximately 400 HAMAS and Palestine Islamic Jihad (PIJ) members to Lebanon. The deportees were not admitted to Lebanon, and were forced to live in makeshift tent cities for several months on the Lebanese border. As previously mentioned, during this time, the HLFRD sent funds to these deportees. (Exhibit 46).



The father of Muhammad Shawan, a wanted member of the Izz-Al-Din Al-Qassem who was killed in a clash with an IDF force in March 1994, and who participated in several attacks, including the murder of two grocers in the Khan Younes area in May 1993;

The widow of Abd Al-Rahman Aruri, a former deportee, and a senior member of Izz Al-Din Al-Qassam, who was killed in a clash with the Israeli Defense Forces (IDF) in December 1993;

The family of Suleyman Idan, killed during a car-bomb attack in Beit-El in October 1993;

The mother of Ashraf Ba'aluji, serving a life sentence for the murder of three Jews in Jaffa, in December 1992;

The wife of Jamil Al-Baz, a HAMAS activist serving a life sentence for running over a soldier at Nitzanim crossing on July 19, 1991;

The wife of Majdi Hamad, a senior Izz Al-Din Qassam activist in Jabaliyah, who killed local residents and is serving a life sentence;

The family of Yasser Hajaj, a HAMAS activist serving a life sentence for placing an explosive charge on a Tel Aviv beach on July 28, 1990, killing a Jewish tourist from Canada;

The brother of Raid Zakarana, a HAMAS terrorist who committed suicide in Afula in April 1994;

2. An agreement between HLFRD Richardson, Texas and HLFRD Jerusalem:  This agreement was dated June 3, 1994, and signed by Shukri Abu Baker, as Executive Director of the HLFRD, and Mohamed Anati, Executive Director, HLFRD Jerusalem office. (Exhibit 47).  That agreement states that the HLFRD recognized the HLFRD Jerusalem as its sole agency in the West Bank and Israel and authorized it to oversee fund disbursement for programs.

The key points of Anati's 1995 interview (Exhibit 45) are as follows:  Anati's office performed the functions of liaison, mediation and supervision on behalf of the fund in the United States and did not conduct money transfers;



The budget of the Jerusalem office was between $80,000.00 and $120,000.00 per year. This money was earmarked for regular operation of the office and was directly deposited in the HLFRD's account at the Mercantile Discount Bank in East Jerusalem;

The Jerusalem office's task was to draw up lists of needy from the West Bank and to provide those lists to the HLFRD office in Richardson, TX. After the HLFRD sent monies to the zakat committees, the Jerusalem office was then tasked with confirming that the individuals identified by the HLFRD received the allocations from the zakat committees in the West Bank;

The aid (money) was transferred directly from the United States to the zakat committees' bank accounts abroad.

The HLFRD in the United States had two branches in Israel, one in Beit Hanina, which was operated by Anati, and the second in the Gaza Strip, which was under the direction of Zuhair Baghadi. Both branches were directly subordinate to the HLFRD's management in the United States;

The annual budget of the fund in the West Bank was assessed at about one million dollars (valid to 1993-1994);

The center of the fund was in the United States where the contributions are collected. The fund was headed by Shukri Abu Baker, who operated from the main office in Texas. There was another office in New Jersey, headed by Muhammad El-Mezain.

Anati's statement and the above described lists seized from the HLFRD Jerusalem office, which designate the recipients of HLFRD funds, clearly indicate that Shukri Abu Baker played a controlling role in deciding who would receive support by the HLFRD. Many of these recipients have been identified by the GOI as being supporters of HAMAS.

### 1997 HLFRD Closure:

On May 6, 1997, the Israeli Minister of Defense named five Islamic associations as "non-permissible" and on that basis declared that funds reaching individuals and organizations in the West Bank and Gaza through those associations could be confiscated. (Exhibit 49). The HLFRD

22



was the only U.S. organization listed in this group.[6] At the time, the HLFRD operated two offices in Israel, one in Gaza and the other in the West Bank town of Beit Hanina. The HLFRD offices in Israel were closed, based on the determination that the HLFRD raised funds that supported the HAMAS terrorist apparatus. On December 10, 1997, the head of the HLFRD's Jerusalem office, Mohammad Anati, was arrested and detained on charges of aiding and abetting a terrorist organization.

During his interview by the GOI (Exhibit 50), Anati stated that he was enlisted by HAMAS in 1990 and participated in writing HAMAS slogans and throwing stones.

In early 1993, he met Shukri Abu Baker, who personally hired him to run the HLFRD Jerusalem office. Anati ran the HLFRD Jerusalem office from early 1993 until its closure. That office was responsible for HLFRD activities throughout the West Bank. Anati stated the following about the HLFRD:

1. On March 17, 1996, the army and police came to the HLFRD office in Jerusalem and on authority of a decree by the Minister of Defense, shut down the office for one year. A year later, Anati re-opened the office, since he had not received an extension of the closure decree. According to Anati, despite the closing down of the office, all the branches received their money regularly, directly to their bank accounts. In 1997, when he re-opened the office, he received the money for the entire year.

2. Anati stated the HLFRD provided aid to the needy, but some of the aid was channeled to HAMAS;

3. Anati enabled every branch to allocate the money freely, and since some of the heads of the branches were connected with or supporters of HAMAS, some of the money served HAMAS.

---

[6] The GOI orders stated, that despite its declared goals, the HLFRD "deals in the practice of transferring monies to the families of HAMAS activists, who carried out deadly attacks, or who were jailed in the wake of these attacks" and "benefits from funding sources which are identified, according to security assessments, with the overall financial network of HAMAS."



4. While working for the HLFRD, Anati also secretly promoted HAMAS interests. For example, when he helped build an Islamic clinic in a certain area, everyone around knew that it was the HAMAS organization behind the clinic. When food was distributed during holidays, the population knew that HAMAS was behind this.

5. Approximately six months prior to this interview, Shukri Abu Baker told Anati to establish an advisory committee to the HLFRD, in order to advise which projects to fund. Baker proposed that Anati turn to Dr. Akram Harubi, a.k.a. Kharroubi, as one of the committee members. As previously stated, Kharroubi has admitted to being the Ramallah regional representative on HAMAS' Inter-Regional Coordinating Committee, which coordinated HAMAS activity in the West Bank.

Anati stated he turned to Fuaz Hamad Kamil, a.k.a. Fawaz Hamdan, who studied economics and operated in the Welfare Committee of the Al Razi Hospital in Jenin, for assistance in establishing the HLFRD advisory committee. As discussed later, Hamdan has been imprisoned for his activities in connection with HAMAS, which included aiding fugitives and funding weapons purchases. (The HLFRD has provided support to the Jenin Zakat Committee and Al Razi Hospital.) Hamdan established the committee, which included himself, Anati, Kharroubi and one other.

6. Anati described the HLFRD's headquarters in Richardson, Texas, and Shukri Abu Baker as being in charge.

7. Funds were transferred from the United States to Israel. The HLFRD office in Dallas sent the funds directly to the bank accounts of the different organizations in the West Bank, as well as the bank accounts of the various projects. The money did not pass through his office, except for funds intended for the Jerusalem area, which Anati personally allocated.

8. According to Anati, the HLFRD is connected with HAMAS. When he visited the United States in 1994, he understood that they were pro-HAMAS and engaged in helping the needy. He also stated that he was told by HLFRD members visiting Israel that during parties and conventions held by the HLFRD abroad, it was mentioned that they were pro-HAMAS and they sang HAMAS songs.

24



According to the 1999 interview of Kharroubi, after Anati was arrested he was contacted by Hoda Abadin, a resident of Jerusalem, known to Kharroubi as being involved with the handling of orphans at the HLFRD Jerusalem office. Abadin began to coordinate all contacts with the charity committees in the West Bank, which provided lists of candidates for support. She then sent these lists to the HLFRD in Richardson, Texas for approval. Later, she received a list of approved candidates and the sum approved for distribution to each recipient. Simultaneously, the HLFRD sent the approved sum to the relevant charity committee.

Abadin told Kharroubi that following Anati's arrest, HLFRD's lawyer, Mudhi Rishak, indicated that the HLFRD was transferring its activity from the office in A-Ram/Qalandiya outside Jerusalem to her home, since the offices could be shut down on decree. The HLFRD's lawyer, Rishak recommended to stop the HLFRD's activities from its offices until Anati's trial was over. (Exhibit 18). It is the FBI's analysis that the continued operation of the HLFRD subsequent to it's ban demonstrates its continued efforts to provide support to what had been identified as HAMAS recipients. In addition, this activity demonstrates the HLFRD's control over the allocation of funds from the Richardson, Texas headquarters.

**HLFRD HEBRON OFFICE**

According to FBI analysis of the HLFRD's Richardson office bank records, the HLFRD Hebron office has only been receiving funds from the HFLRD Richardson since October 1998. Hebron received the following:

1999: $442,491.00; Jan.-Sept. 2000: $1,001,492.00

The former head of the HLFRD Hebron office was Kamal al Tamimi. Tamimi has been identified by the GOI as a HAMAS activist. (Exhibit 18). In 1992 he was one of the HAMAS activist deported to Lebanon.

**HLFRD GAZA OFFICE**

The FBI has little current knowledge as to the leadership of the HLFRD Gaza office. The HLFRD Richardson office sends significantly less money to its Gaza office, as compared to the West Bank. FBI analysis indicates that the HLFRD Gaza received the following:



THE NEFA FOUNDATION

1997: $231,434.00; 1998: $76,697.00; 1999: $217,495.00; Jan.-Sept. 2000: $65,458.00

According to GOI and public source reporting, on September 25, 1997, as a result of HAMAS terrorist attacks, the PA closed what they identified as 16 HAMAS institutions and associations as part of it's efforts to degrade the terrorist infrastructure. The HLFRD's Gaza office was one of those 16 offices that the PA closed. (Exhibits 51, 53). According to the interview of Anati, subsequent to his December 10, 1997, arrest, the HLFRD Gaza office was headed by Muhammad Shawa and was shut down by the PA on the charge that it had ties with HAMAS. (Exhibit 50).

According to HLFRD-4, an FBI source, who has provided reliable information in the past, Shukri Abu Baker, at the September 30, 1997, HLFRD fund-raiser in Buena Park, California, commented on the closing of the HLFRD Gaza office. Baker discussed the HLFRD mission to support the families of the martyrs. He further talked about Yassar Arafat closing a number of charitable organizations' offices in Gaza, including the HLFRD office. Baker stated that Arafat would be sorry that he did this and that the goal of HAMAS to form an Islamic State could not be thwarted. This office has now been re-opened.

The GOI has further reported that Zuhari Barghati was the former Director of the HLFRD Gaza office. The GOI identified Barghati as a HAMAS activist and the nephew of Ismail Barghati, who had a joint account with Marzook while Marzook served as the head of the Political Bureau of HAMAS. (Exhibit 52).

One of the projects this office oversees is the Dar el Salam Hospital discussed below.

## 3B. ZAKAT COMMITTEES IN THE WEST BANK AND GAZA

[FBI COMMENT: Individual names which appear in bold print in this section have been identified by the GOI as being zakat committee leaders. Individual names appearing under these zakat committee leaders are HAMAS activists who have corroborated the HAMAS leadership role of those individuals who immediately appear in bold.]

26



FBI analysis has determined that HAMAS uses the zakat committees to provide needed social services for the Palestinian population, thereby gaining support for their movement. (Exhibit 53). These charity committees receive funds from such organizations as the HLFRD and manage social services, such as hospitals and schools, and distribute food and clothing.

An August 13, 2001 <u>USA Today</u> article describes how HAMAS' social infrastructure, in this case HAMAS-run schools, serve HAMAS' ends:

In HAMAS-run kindergartens, signs on the walls read: "The children of the kindergarten are the shaheeds (holy martyrs) of tomorrow." The classroom signs at Al-Najah University in the West Bank and at Gaza's Islamic University say, "Israel has nuclear bombs, we have human bombs." At an Islamic school in Gaza City run by HAMAS, 11-year-old Palestinian student Ahmed states, "I will make my body a bomb that will blast the flesh of Zionists, the sons of pigs and monkeys . . . I will tear their bodies into little pieces and cause them more pain than they will ever know." "Allah Akbar," his classmates shout in response: "God is great." "May the virgins give you pleasure," his teacher yells, referring to one of the rewards awaiting martyrs in paradise. Even the principal smiles and nods his approval. "You don't start educating a shaheed at age 22," says Roni Shaked, a terrorism expert and former officer in Israel's Shin Bet secret service. "You start at kindergarten so by the time he's 22, he's looking for an opportunity to sacrifice his life." (Exhibit 7).

Zakat committees are located in most communities throughout the West Bank. (Exhibit 53). Financial analysis of the HLFRD Richardson, Texas office records reveal that it has provided funds to the zakat committees representing the major communities in the West Bank, including: Hebron, Ramallah, Jenin and Nablus.

It is the FBI's analysis that the zakat committees receiving HLFRD financial support are controlled by HAMAS. GOI analysis has also determined that HAMAS activists have been elected or appointed to senior leadership positions on these zakat committees. GOI analysis, as well as open source reporting, has identified that the civilian population is



THE NEFA FOUNDATION

aware that the services being provided by the zakat committees, whether it's the distribution of food, medical services or other social services, are being provided by HAMAS. (Exhibit 53-54). The HLFRD's funding of the Islamic Charity Association (ICA) is one example of the role that zakat committees play in the overall goal of building HAMAS grassroots support through charitable projects.

### Islamic Charity Association a.k.a. Islamic Charitable Society in Hebron

A March 2, 2001, Associated Press article (Exhibit 54) described a large unfinished building in Hebron, West Bank, where Palestinian men and teen-age boys worked on a makeshift assembly line, packing food items into boxes. Inspirational music extolling HAMAS played in the background, "The holy war is calling," a singer intoned on a tape. "We will continue the resistance, the HAMAS revolution."

The article went on to explain that the warehouse is run by the Islamic Charity Organization in Hebron, which distributed 50,000 food packages to destitute Palestinian families in the West Bank ahead of the Muslim holiday of Eid al Adha. The article stated that across the Palestinian areas Islamic charities are filling a growing need created by skyrocketing unemployment and poverty. In so doing, they are winning hearts and minds for HAMAS' unyielding doctrines at the expense of the PA. "People realize more than before who is honest and who is not. In the long run, it will pay off in increased political popularity," said Khaled Amayreh, a Palestinian journalist close to the Islamic movement."

The article describes that, along Shuhada Street in Hebron, 56 families have received monthly donations of food from Islamic charities. Anaya Bader of Shuhada Street said that she desperately needed the donations to make ends meet. With 10 children to feed, she said her Islamic brothers have not only her thanks, but also her support. "All we know is they are the ones who bring us food," she said.

Financial analysis of HLFRD bank records (Exhibit 43) indicate that the ICA received the following from the HLFRD:

1997: $138,302.00; 1998: $690,297.00; 1999: $275,313.00; Jan.-Sept. 2000: no funds.



Additionally, from January 1997 to April 1999, approximately $52,474.00 was transferred to this zakat committee from the HLFRD Richardson office, exact dates unknown.

It is reasoned that the decrease in funding by the HLFRD is due to the fact that a library building project in Hebron, for which the HLFRD has collected large donations, was completed. The HLFRD Hebron may have taken over the maintenance of the library as well.

According to information from the GOI, the ICA has been identified as a HAMAS entity. (Exhibit 55).

In addition, the GOI reports that the ICA is in charge of such institutions as the Islamic Associations in Dura, Bani Na'im, Yata, and Beit Ola. (Exhibit 56). The GOI identifies the following individuals as leaders of ICA:

Muhammad Ayad Muhammad Missaq, a.k.a. Muhammad Eid Muhammad Missak, ICA director/manager; Administrative detention from April to August 1989[7] and from December 1992 to April 1993; identified by the GOI as a senior HAMAS activist in Hebron. (Exhibits 56-57).

Abdallah Najar, a HAMAS activist, was interviewed by the GOI in January 1997. Najar stated that when he worked in the Hebron Orphanage, owned by the ICA, Missaq was one of the HAMAS activists with whom he worked. (Exhibit 58).

Ibrahim Abd Al-Fatah Shubaka, a HAMAS activist, was interviewed by the GOI. Shubaka stated that Missaq was a member of the ICA, which maintains two orphanages and financially supports the town's orphans. He stated that the schools instill the pupils with HAMAS values, and their graduates include operational HAMAS activists. (Exhibit 59).

---

[7] According to GOI, an administrative detention is based on terrorism-based information obtained by Israeli authorities, and reviewed by the region's military commander or a judge. The detention can last for three to six months and can be extended.



Hashem abd al-Nabi Natshe, Directorate Co-Chairman and Chairman of the Trade Bureau (Chamber of Commerce.)   In August 1990, Natshe was arrested by the GOI, but released due to a health condition.   The GOI identifies Natshe as a senior HAMAS activist. (Exhibit 56-57).

Abdallah Najar, the HAMAS activist mentioned above, was interviewed in January 1997.   Najar stated that he worked in the Hebron Orphanage, which is affiliated with the ICA.   One of the HAMAS activists he identified working with was Natshe. (Exhibit 56).

Adnan abd al-Hafez Musbah Maswada, Directorate Co-Chairman.   Detained June to July 1989 and April to October 1994 for HAMAS activity.   Maswada was a 1992 deportee to Lebanon.   According to the GOI, Maswada is a member of HAMAS headquarters in Hebron and is connected to HAMAS terrorist activities against settlers. (Exhibit 57).

When HAMAS founder Sheikh Ahmad Yassin was interviewed by the GOI, he said that in the period of April to May 1989, he received a message from HAMAS activists in Jordan stating that operational HAMAS representatives should be appointed in Gaza, Hebron and Nablus.   Yassin asked his aide to forward the message to Maswada in Hebron, so that he could assist and advise them whom to appoint. (Exhibits 60).

Yahya Arshad, a HAMAS activist, was interviewed by the GOI.   He stated that in early 1996, HAMAS/Muslim Brotherhood established the Hebron Majles Al-Shura to be responsible for advising and deciding on the political platform of both organizations.   Arshad stated he attended both meetings of this forum and Maswada had also attended. (Exhibits 61).

Mun Wazuz, a Hebron HAMAS activist was interviewed by the GOI.   He stated that Maswada was a senior HAMAS activist. (Exhibits 62).

Assad Heimuni, a Hebron Democratic Front for Liberation of Palestine (DFLP) activist, was interviewed by the GOI. He stated that he knew Maswada to be a HAMAS activist. (Exhibits 63).



Izzam Naaman abd al-Rahman Salhab, Head of Orphans' Branch. He was a 1992 deportee to Lebanon, returning in December 1993. Salhab was placed under administrative arrest from May to December 1989 and March to June 1990. He was also in prison from December 1990 to December 1991 and October to December 1992. The GOI identified him as a member of the HAMAS leadership in Hebron. (Exhibits 56-57). During an interview in December 1990, Salhab admitted being recruited by HAMAS and being a member of the HAMAS headquarters and in charge of the prison committee. (Exhibit 57, 64).

During the GOI interview of Kutla (student organization of HAMAS) activists Adel Badrin and Fuad Tabish, it was determined that they attended meetings between the Kutla leadership and HAMAS. The last meeting was in April/May 1999. Both Badrin and Tabish separately identified Salhab as being one of the HAMAS representatives present. (Exhibit 65-66).

Akram Kharroubi, a HAMAS activist, was detained and interviewed by the GOI in 1999. Kharroubi stated that Salhab was the Hebron representative to the united headquarters of HAMAS in the West Bank, called the "al Lajna al-Marjiyah," which was to include representatives of all the regional Headquarters. (Exhibit 18). The role of these representatives was to maintain contact with HAMAS activists in his area on various issues including political-organizational activity. HAMAS emissaries came from abroad, and members of the committee were sent abroad, to consult on specific issues. (Exhibits 18, 67):

Hathem Mahmud Hassan Shahada, Secretary. Identified by the GOI as a HAMAS activist. (Exhibit 57).

Taher abd al-Aziz Dandis, ICA member. Dandis was a 1992 deportee to Lebanon and was imprisoned from June to September 1994. GOI reporting states he is a HAMAS leader in Hebron, with strong ties to other HAMAS leaders. (Exhibit 56).

Hebron Library Project: During the 1999 GOI interview of Kharroubi, he stated he was involved in the "founding of a library in Hebron," presumed to be the Al Anwar al Ibrahimi Library. His involvement was at the request of Hitham (Haitham Maghawri, HLFRD Executive Director). (Exhibit 18).



According to the 1999 HLFRD Annual Report, the HLFRD undertook the financing of a library, called the Al Anwar Ibrahimi Youth Education Center. (Exhibit 11). That library was under the oversight of the HLFRD Jerusalem.

### Charity Committee in Ramallah a.k.a. Ramallah Zakat Committee

According to the GOI, the Ramallah Zakat Committee is a HAMAS entity and provides relief and assistance to the needy in Ramallah and Jerusalem.

Financial analysis of HLFRD bank records (Exhibit 43) indicate that this zakat committee received the following:

1997: $89,229.00; 1998: $72,652.00; 1999: $58,522.00; Jan.-Sept. 2000: no funds.

Additionally, from January 1997 to April 1999, approximately $24,304.00 was transferred to this zakat committee from the HLFRD Richardson office, exact dates unknown.

The following HAMAS activists have been identified by the GOI as being associated with the Ramallah Zakat Committee (Exhibit 56):

Aqel Suliman Muhammad Rabia a.k.a. Aqal Sulayman Muhammad Rabiyah, Director/Manager; incarcerated from December 1990 to March 1992, due to his involvement in HAMAS. (Exhibit 56).

Ahmad Sati, an identified HAMAS activist, was interviewed by the GOI. He stated that Rabia was Hebron's representative to HAMAS' national propaganda apparatus. He described this apparatus as being guided directly by the regional HAMAS headquarters and indirectly by the national headquarters. (Exhibit 68).

Omar Quasma, a HAMAS activist, was interviewed by the GOI. He stated that in 1990, he received HAMAS written materials from Rabia to distribute in the Hebron Mosques. (Exhibit 69).

Mahammed Anati, an admitted HAMAS activist and former head of the HLFRD Jerusalem office, was interviewed by the GOI. He stated that after the HLFRD was outlawed by

32



the GOI, Rabia gave him a room at the Ramallah Zakat Committee premises from which he ran HLFRD affairs. (Exhibits 45, 56).

**Amar Muhammad Ahmed Hamadan**, Committee member and former head of the Committee and Treasurer. He was reportedly involved in transferring HAMAS funds to the families of detainees. (Exhibit 56).

. **Ibrahim Said Hassan Abu Salem**, is an "unofficial member." He was subject to several administrative arrests from December 1992 to September 1993; currently under administrative detention and serving as a HAMAS leader in prison. A religious lecturer, he served as one of the HAMAS leaders in the West Bank, in contact with HAMAS leaders in Israel and abroad. While deported to Lebanon in 1992, he met other HAMAS leaders there and received assignments to be carried out on his return to the West Bank. (Exhibit 56).

**Fadel Muhammad Salah Hamadan**, Committee member. Hamadan was placed under administrative arrest four times from 1988 to 1992. He was one of the HAMAS members deported to Lebanon in December 1992. He is an Imam and senior HAMAS activist who serves as one of the HAMAS headquarters leaders in Ramallah. He also heads the Majlis al Shura (advisory council) with six members and guides their activities. Reportedly, he is directly connected with the planning of suicide attacks and the spiritual preparation of those about to commit suicide attacks, including the Mahane Yehuda attack in July 1997. (Exhibit 56).

**Mahmud Ahmed Abd Al-Rahman Ramhi**, Committee member. Ramhi was imprisoned from December 1992 to April 1995 for recruitment to HAMAS and having been in charge of the center area of Ramallah on behalf of HAMAS. (Exhibit 57).

**Nabil Abd Al-Hadi Mustafa Mansur**, Committee Secretary. Mansur was arrested three times: October 1985, October to December 1990, and 1994. (Exhibit 56).

33


THE NEFA FOUNDATION

### Jenin Zakat Committee

Financial analysis of HLFRD bank records (Exhibit 43) indicate that this zakat committee received the following:

1997: $42,849.00; 1998: $89,779.00; 1999: $40,394.00; Jan.-Sept. 2000: no funds.

Additionally, from January 1997 to April 1999, transfers were made totaling approximately $21,437.00, exact dates unknown.

The GOI reported that the individuals who run this zakat committee are HAMAS members. (Exhibits 56-57).

**Ahmed Salim Ahmed Saltana**, head of the Committee. Saltana was imprisoned from May 1993 to June 1996. Saltana admitted that in 1992, he participated in transferring materials for the preparation of explosive charges. In 1993, he participated in the planning of a car bombing. (Exhibits 71, 57).

Nazia Abu Aoun, a senior HAMAS activist was interviewed by the GOI. He was incarcerated with Sultana from 1993 to 1997. Aoun stated that when Sultana was in prison, he was a senior HAMAS activist. (Exhibit 72).

Iyyad Braham, the HAMAS chief in the Village of Siris, was interviewed by the GOI. He stated that in 1992, he had been appointed to this post by the HAMAS chief in Jebba, Ahmad Sultana. (Exhibit 73).

Fathi Katit, a HAMAS activist in Siris was interviewed by the GOI. He stated that Sultana had given him two manuals for the preparation of explosive charges. (Exhibit 74).

Muhammad Radwan, a HAMAS activist, was interviewed by the GOI. He stated that in 1991 or 1992, Sultana, with whom he worked in the Charity Committee, approached him with an offer to recruit him into HAMAS. Radwan agreed and later, under Sultana's guidance, distributed HAMAS leaflets in Jenin's Mosques. It is the FBI's analysis that this is a typical method of HAMAS using the Dawa (i.e. social infrastructure) to recruit members. (Exhibit 75).

34



Ibrahim Hassan Ali Jaber, Committee member.  Jaber was
placed under administrative arrest four times for being a
senior HAMAS member who, among other activities, led riots
during the Intifada (1987-1993).  He was also under GOI
arrest from January 1995 to January 1996. (Exhibits 56-57).

During the GOI interview, Jaber admitted to having been
in charge of HAMAS in Jenin's refugee camp, where he
recruited activists and distributed leaflets.  He was also
detained by the PA's General Intelligence from February to
August 1996, in the PA's attempt to contain HAMAS' support
structure, following a wave of suicide attacks. (Exhibit 76).

Nur Al-Din Kamal Asad Tahaina is in charge of the Zakat
Committee computer.  Tahaina was imprisoned from July 1994 to
December 1994, for "aiding" one of the suicide bombers in the
1994 terrorist attack against an Israeli bus in Afula.  He
also was imprisoned by the GOI from January 1995 to January
1996 for conducting HAMAS activities. (Exhibits 56-57).

Naser Khaled Ibrahim Jarar, Committee member.  Jarar was
detained in April 1994, for three months for recruiting young
men to the HAMAS terrorist wing; and again in January 1998,
for his connection to one of the suicide bombers in the 1994
terrorist attack against an Israeli bus in Afula, as well as
his assistance to other HAMAS operatives.  Jarar was
imprisoned during the 1980s for other terrorist activity,
including throwing firebombs at a border guard vehicle and a
bus, rioting, and distribution of leaflets. (Exhibits 56-57).

Abd al-Jaber Muhammad Ahmed Jarar, Committee member.
Jarar was arrested in May 1993, for transferring weapons to
HAMAS recruits who subsequently conducted terrorist attacks.
Jarar was released from prison in November 1994, and placed
under administrative arrest on account of his desire to
continue his terrorist activities.  He was released in
December 1997. (Exhibits 56-57).

Fawaz Hamdan, Committee member.  Hamdan was imprisoned
for his activities in connection with HAMAS, which included
aiding fugitives and funding weapons purchases.  After being
released in 1996, Hamdan was again arrested in 1997 for his
activities in connection with the Jenin Zakat Committee.  He

35



was released in February 1998 and is currently active with the Jenin Zakat Committee and the Al Razi Hospital. (Exhibit 56).

**Professor Khalid Said "Abu Hammam,"** former Committee President. Khalid was detained for more than one year in 1991 for heading the HAMAS administrative office in Jenin since 1988 and being a member of the HAMAS administrative office for the Northern West Bank region. (Exhibit 56).

**Al Razi Hospital:** The Al Razi Hospital is administered by the Jenin Zakat Committee. Therefore, funds are not normally directly transferred there. However, the hospital, which is supported, in part, by the HLFRD (Exhibit 78), received two transfers: One occurred in April 1998, in the amount of approximately $40,000.00; and one in the amount of approximately $12,000.00, occurred sometime between January 1998 to April 1999, exact dates unknown.

As previously described, Fawaz Hamdan was identified as a Committee member and Administrative Director of the Al Razi Hospital, described above.[8]

### Nablus Zakat Committee

Financial analysis of HLFRD bank records (Exhibit 43) indicate that this zakat committee received the following:

1997: $43,951.00; 1998: $31,008.00; 1999: $46,482.00; Jan.-Sept. 2000: no funds.

Additionally, from January 1997 to April 1999, transfers of approximately $25,707.00 were made, exact dates unknown.

**Abd Al-Rahim Taha Hanbali,** head of the Committee. (Exhibit 57).

Mohammed Anati, HAMAS activist and former head of the HLFRD Jerusalem was interviewed by the GOI in 1997. Anati stated that, the Nablus Charity Committee, a.k.a.

---

[8] The "State of Palestine/Ministry of Health" website confirmed that Fawaz Hamad a.k.a. Hamdan was an employee at the Al Razi Hospital, which is managed by the Jenin Zakat Committee and indicated that his title is Administrative and Financial Manager.



Nablus Zakat, was headed by Dr. Abd Al Rahim Hanbali, a HAMAS activist. He further identified individuals who worked with the orphans as Haj Marzook and Siham Al-Masri, also both reportedly HAMAS activists. (Exhibit 48).

Issa Abu Al-Az, HAMAS activist in the Ayn Beit Alma Refugee Camp, was interviewed by the GOI. He identified Hanbali as a HAMAS activist. (Exhibit 56).

Hamid Sulayman Jaber Bitawi, senior Committee member. Bitawi was administratively detained from December 1990 to October 1991. He was expelled to Lebanon in December 1992 and returned to the West Bank in December 1993. (Exhibit 56).

Abd Al-Rahman 'Ashur, a self-admitted HAMAS activist, was interviewed by the GOI. He stated that he had been recruited to HAMAS in 1993 and assisted in disturbances. In early 1995, he decided to become an operative for which he applied to three persons he knew as senior Nablus HAMAS activists, one of which was Bitawi. 'Ashur asked to be recruited to operational activity in Nablus, but the three refused, adding that if they were to change their minds, they would know where to find him. (Exhibit 82).

Musbah Daher, a HAMAS activist from Aksaka, was interviewed by the GOI. He stated that Bitawi was in charge of rallies on behalf of HAMAS. (Exhibit 83).

### Tolkarem a.k.a. Tulkarm Zakat Committee

Financial analysis of HLFRD bank records (Exhibit 43) indicate that this zakat committee received the following:

1997: $23,820.00; 1998: $18,314.00; 1999: $30,079.00; Jan.-Sept. 2000: no funds.

From January 1997 to April 1999, the amount of approximately $15,344.00 was transferred, exact dates unknown.



The GOI indicates that the Tolkarem Zakat Committee exists to support HAMAS activities. The following Tolkarem Zakat Committee members were identified by the GOI as HAMAS members, in some cases senior members in the Tolkarem area. (Exhibit 57):

**Hammad Muhammed Hamed Qa'adan**, head of the Committee, identified by the GOI as a HAMAS activist who belongs to the HAMAS headquarters in Tolkarem and is in contact with the HAMAS leadership in Samaria.

**Ibrahim Muhammad Salim Salim Nir Al Shams**, member of the HAMAS Financial Committee in Tolkarem, and as an Imam of the Mosque. Salim also reportedly belonged to the Supreme HAMAS Leadership in Nur Al-Shams. He was imprisoned from October to December 1990 for rioting.

**Riad Abd Al-Latif Abd Al-Karim Al Ras** is a HAMAS activist assigned to the HAMAS Headquarters in Tolkarem. He is also in contact with the HAMAS leadership in Samaria and he is also a member of the Majlis Al Shura in Tulkarm.

**Husni Hassan Hussein Hawaja** head of the Committee and a HAMAS activist.

**Bilal Hamis Yussef Abu Safira**, Committee member. Safira is the head of the waqf (Islamic Trust) in Tulkarm and a senior HAMAS member.

### Orphan Care Association (Bethlehem)

Financial analysis of HLFRD bank records (Exhibit 43) indicate that this zakat committee received the following:

1997-1998: no funds; 1999: $38,435.00; Jan.-Sept. 2000: no funds.

According to the GOI, this association is run by prominent HAMAS activists, identified below. It is located on the ground floor of the Salah al Din Mosque in Bethlehem. (Exhibit 57):

38



Nasri Musa Issa Abada, founder. Abada is one of the HAMAS leaders in Bethlehem and is connected with senior HAMAS operatives in and out of Bethlehem, and is one of six members of the Supreme Majles Shoura in Bethlehem.

Ghassan Muhammad Harmas, Chairman; administratively detained from December 15, 1990 to February 23, 1991 and December 1992 to January 1994. Harmas was a HAMAS deportee to Lebanon.

Khalil Ali Rashad Dar Rashad, Association member. According to the GOI, Rashad is a HAMAS member who has been known to provide assistance to HAMAS fugitives. He provided assistance to HAMAS bomb-maker Muhi A-Din Sharif and HAMAS Operations Planner Hassan Salameh while the two hid in Bethlehem.

As previously stated, this organization was used during 1998 as a conduit for the HLFRD to send funds to HLFRD Jerusalem staff member Hoda Abdeen after the HLFRD office was closed in December 1997. (Exhibits 18, 50)

### Qalqilia, a.k.a. Qalqiliyah Zakat Committee

Financial analysis of HLFRD bank records (Exhibit 43) indicate that this zakat committee received the following:

1997: $35,577.00; 1998: $29,827.00; 1999: $40,441.00; Jan.-Sept. 2000: no funds.

Additionally, from January 1997 until April 1999, there were transfers of approximately $17,471.00, exact dates unknown.

GOI reporting indicates that this zakat committee exists to support HAMAS activity. All four identified members of this committee have been identified by the GOI as HAMAS members. (Exhibit 57):

Bilal Abd Al-Rahim Muhammad Hanoun, Imam of the local Mosque, as well as a HAMAS activist.

Riad Rashid Hamed Walwil, member of the leadership in the Qalqilia and, currently believed to be under PA arrest. He also served prison time from December 1990 to February 1991

39



for rioting and December 1992 to January 1993. He was detained by the GOI in August 1995 for interview and admitted membership in the HAMAS. He was held under administrative arrest until July 1996, due to his HAMAS activities.

**Ibrahim Zahran**, Committee member and HAMAS activist.

**Walid Abd Al-Latif Suliman Abu Labadah**, Committee member and a HAMAS activist.

### Halhul Zakat Committee

Financial analysis of HLFRD bank records (Exhibit 43) indicate that this zakat committee received the following:

1997: $31,652.00; 1998: $22,173.00; 1999: $29,643.00; Jan.-Sept. 2000: no funds.

Additionally, from January 1997 until April 1999, transfers totaling approximately $17,273.00 were made, exact date unknown.

GOI information indicates that the Halhul Zakat Committee is controlled by HAMAS. Their information is based at least partly on the fact that the following three Committee members are HAMAS members and they actively direct the Committee. (Exhibit 57):

**Tawfiq Muhammad Ali Atrash**, Committee member. He also serves as headmaster of an affiliated school, and is a HAMAS member. Atrash was under administrative arrest from March 1996 to September 1996.

**Ahmed abd al-Rahman Abdallah Jahshan**, Committee member; the headmaster of a school in Halhul; and a known HAMAS member. In late 1992 he visited Ahmed Salah, a senior HAMAS member in the United States.

**Ahmed Rashid Ahmed Abu Aroush**, Committee member; secretary at the local secondary school; and a known HAMAS member. He also visited Ahmed Salah in the U.S. in late 1992.



## Hebron Zakat Committee a.k.a.
## Hebron Tithing And Alms Committee

Financial analysis of HLFRD bank records (Exhibit 43) indicate that this zakat committee received the following:

1997: $20,090.00; 1998: $12,799.00; 1999: $24,279.00; Jan.-Sept. 2000: no funds.

Additionally, from January 1997 until April 1999, transfers totaling approximately $12,992.00 were made, exact date unknown.

GOI information indicates that this zakat committee is connected to the HAMAS terrorist wing, specifically that HAMAS members run the organization.

According to GOI reporting, the following individuals are leaders of the Hebron Zakat Committee (Exhibit 52):

**Majed Musbah abd al-Fatah Naser al-Din**, is reportedly a HAMAS member and the head of the Committee. He is known to go abroad on assignment of the Committee to raise funds.

**Muhammad Najab Kamal Sadeq Jabari**, is Chairman of the Committee, head of the Hebron Religious Sages Council in Hebron, and reportedly a HAMAS member.

## Dar El Salam Hospital

Financial analysis of HLFRD bank records (Exhibit 43) indicate that this hospital received the following:

1997: $104,600.00; 1998: $128,850.00; 1999: $37,222.00; Jan.-Sept. 2000: $31,050.00.

Additionally, from January 1997 to April 1999, transfers totaling $15,500.00 were sent from the HLFRD to the Dar El Salam Hospital, exact dates unknown. It is possible that the reduction in funds was due to the fact that HLFRD was channeling funds through the HLFRD Gaza which oversees the hospital.



According to the GOI, the Dar el Salam Hospital was founded in 1995 with HAMAS funds and protection. The building is located on the land of a HAMAS-associated family by the name of Al Bata from Khan Yunis. Members of the family work at the hospital. (Exhibit 57).

FBI investigation indicates that since 1995, Dar el Salam has received over $400,000.00 from the HLFRD. The GOI provided the following information regarding the employees of the Dar el Salam Hospital (Exhibit 57):

**Mufid Muhammad Mahmud Mukhalilati**, Hospital Director. Mukhalilati also heads the health center near the Shifa Hospital in Gaza. The GOI has identified Mukhalilati as a HAMAS activist.

**Naji Muhammad Said Bata**, operates the family pharmacy and has been identified as a HAMAS activist. Beta was imprisoned from December 1992 to January 1993 for participating in riots.

**Salah Muhammad Said Bata**, sales agent and works at the Dar el Salam hospital pharmacy. The GOI has identified him as a HAMAS activist.

### Islamic Aid Committee a.k.a. Islamic Relief Agency (IRA)

According to the GOI, the IRA was an association based mainly in Nazareth, Israel. Its declared purposes were, "Charity, collection of contributions, aid to the needy and charity." The HLFRD provided funding to the IRA. The GOI searched the offices of the IRA and ultimately closed the association, at the same time as it closed the HLFRD. While this organization was closed by the GOI on March 17, 1996, it illustrates the role of the HLFRD in funding HAMAS.

Based upon the search of the IRA offices on July 27, 1995, and November 8, 1995, the GOI determined that the IRA transferred funds to, among others, the families of HAMAS activists who carried out several terrorist attacks, including kidnaping and murder of civilians, policemen and soldiers. The beneficiaries of the funds also included families of prisoners, deportees and HAMAS activists killed



during attacks.  The IRA also transferred funds to families whose homes were demolished according to an administrative decree.

According to the records found, the money transfers to the families of HAMAS activists were separated from the lists of other beneficiaries.  The IRA paid salaries to some ten HAMAS activists in the West Bank who have been imprisoned and/or deported in the past and are acting as the "representatives" of the IRA in their area of residence.  The GOI found forms requesting aid for the families of "The Fallen", filled in by the "representative."  The form included the name of "The Fallen," a detailed description of the attack during which he was killed; his former nationalistic activities in HAMAS; and a description of the special circumstances of the family of "The Fallen." (Exhibit 84).

The court decision to close the IRA stated:

The appellant is engaged in provision of massive aid to the families of HAMAS activists, who perpetrated or planned to perpetrate severe terrorist attacks and who were imprisoned, killed or deported, and that the main source of funds of the appellant is contributions by organizations abroad, all of which constitute part of the funding system of the HAMAS organization. (Exhibit 85).

Many of the lists of HAMAS beneficiaries, previously described in the May 7, 1995, search of the HLFRD Jerusalem offices were funded through the HLFRD providing money and guidance to the IRA.

3C. ORGANIZATIONS FUNNELING MONEY TO HAMAS

### Sanabil Association For Relief And Development (Sanabil)

Sanabil is a Lebanese-based organization.  Financial analysis of HLFRD bank records (Exhibit 43) indicate that this organization received the following:

1997: $125,744.00; 1998: $232,110.00; 1999: $649,386.00; Jan.-Sept. 2000: $456,105.00.



Additionally, from January 1997 to April 1999, transfers totaling $161,145.00 were sent from the HLFRD to Sanabil, exact dates unknown.

FBI analysis suggests that the HLFRD has devoted large amounts of money to gain favor and/or facilitate projects with the Lebanese government.  For example, on March 10, 2000, Shukri Abu Baker, CEO; and Haitham Maghawri, Executive Director, flew to Lebanon to present a $100,000.00 check to the President and Prime Minister of Lebanon for the reconstruction of power plants destroyed by the Israeli air force on February 8, 2000. (Exhibit 87).  The Israeli attack on the power plants was retaliation for Hizballah guerrilla attacks in which five Israeli soldiers were killed since January 25, 2000. (Exhibit 88).

Sanabil also has ties to The Palestine Relief Fund (a.k.a. Interpal), a United Kingdom based organization, which the GOI has identified as belonging to the HAMAS organization. (Exhibit 49).  FBI analysis has linked Sanabil, Interpal and the HLFRD:

1. According to its website, www.interpal.org, Interpal describes itself as "The Palestinians' Relief and Development Fund, a non-political, non-profitable, independent charitable organization.  The Charity is principally concerned with providing much needed support to the poor and needy Palestinian people in the primary areas of operation in Palestine - West Bank, the Gaza Strip and the refugee camps in Jordan and Lebanon." (Exhibit 89).

2. According to the August 24, 2001 Interpal website, most of the donations received by Interpal are zakat payments which places the charity under a religious duty to distribute funds according to Islamic Law. (Exhibit 89).

3. Interpal's August 15, 2001 website states that it "works closely with Sanabil." (Exhibit 89).

4. Interpal further identifies other organizations, if one wishes to make "International Donations."  The only organization listed for the United States is the HLFRD. (Exhibit 89).

44



5. Finally, a review of the HLFRD's financial records shows that on April 11, 2000, the HLFRD wired Interpal $66,000.00 (Exhibit 89).

### Human Appeal International-Jordan (HAI)

While there is no evidence that HAI is a HAMAS organization, FBI investigation has revealed a close relationship among the HLFRD, HAMAS and HAI. FBI investigation has determined that the HLFRD provides significant funding to HAI, which benefits the HAMAS agenda.

Financial analysis of HLFRD bank records (Exhibit 43) indicate that HAI received the following:

1997: $31,475.00; 1998: $105,236.00; 1999: $281,608.00; Jan.-Sept. 2000: $233,377.00.

Additionally, during the time period of January 1997 to April 1999, transfers totaling approximately $34,745.00 were made, exact dates unknown.

FBI investigation has determined that Bassam Fares was the HLFRD's Projects and Grants Director, from February 1997 until his voluntary removal from the United States in 2000. Fares held a senior HLFRD position. From April 1990 through May 1993, Fares was the Deputy Regional Manager for HAI in Jordan. (Exhibit 90).

In February 1996, an HLFRD-5, an FBI source, who has provided reliable information in the past, reported on a meeting at which Bassam Fares, a.k.a. Bassam Farris and others discussed how HAMAS meetings should be structured.

According to the source, FARES, a Jordanian, indicated that he had been affiliated with the Islamic Association for Palestine (IAP) for approximately ten years, and that organization donates to the Palestinian area approximately $3 million per year. These donations were reportedly sent to the Holy Land Foundation in Palestine, and the money goes to HAMAS.

As previously stated, the IAP also received funds from Mousa Marzook in the early 1990s, during the same time frame as Marzook, acting on behalf of HAMAS, was providing funds to the HLFRD and InfoCom.

45



FBI analysis suggests that unlike some of the other recipients of HLFRD funds, this organization is not controlled by HAMAS, but is a well-funded Gulf organization. It currently appears that HAI-Jordan could be serving as a conduit through which the HLFRD sends funds to its HLFRD representative in Amman. The HLFRD is not licensed to operate in Jordan, and thus cannot legally have an office or bank account in Amman, Jordan. It is likely that this close relationship with the HAI allows the HLFRD to circumvent this restriction on its activities.

## 4. HLFRD And Its Leadership Identified As HAMAS

### 4A. FBI asset reporting:

HLFRD-1, an FBI source who has provided reliable information in the past reported that during a speech at the Islamic Center of Passaic County (ICPC) in November, 1994, Mohammad El-Mezain, the HLFRD's current Director of Endowments and former Chairman of the HLFRD Board, admitted that some of the money collected by the ICPC and the HLFRD goes to HAMAS or HAMAS activities in Israel. El-Mezain also defended HAMAS and the activities carried out by HAMAS.

HLFRD-4, an FBI source, who has provided reliable information in the past, reported that on November 5, 1994, the IAP held a conference at the Culver City Memorial Building in Culver City, California. The HLFRD's CEO, Shukri Abu Baker was identified to the audience as the Director of the HLFRD in Dallas, Texas, and the Senior Vice-President in HAMAS (second only to Mohammed El Mezain). The source reported that at this conference, El Mezain and Baker stated that the monies raised by the HLFRD were strictly for HAMAS terrorists.

HLFRD-4 further reported that HAMAS leaders Shukri Abu Baker and Mohamed El-Mezain attended a Muslim Arab Youth Association (MAYA) Conference, December 30, 1994 to January 2, 1995, at the Hyatt Regency in Los Angeles, wherein Sheikh Muhammed Siyam was the keynote speaker. Siyam was introduced as "Head of operations of Al Jihad Al Islamia in Gaza, the HAMAS military wing."

Siyam stated, "I've been told to restrict or restrain what I say . . . I hope no one is recording me or taking any pictures, as none are allowed . . . because I'm going to

46



speak the truth to you. It's simple. Finish off the Israeli's. Kill them all! Exterminate them! No peace ever! Do not bother to talk politics."

Following Siyam's speech, El-Mezain exhorted the crowd to contribute money. It was subsequently announced that $207,000 was raised for "the cause."

At that conference, El-Mezain reportedly stated that during 1994 he (El-Mezain) raised $1,800,000 inside the United States for HAMAS. El-Mezain and Abu Baker stated that funds raised by the HLFRD were strictly dollars for HAMAS. (Exhibit 96).

In December 1994, HLFRD-3, an FBI asset who has provided both reliable and unreliable information in the past, reported that Baker described the HLFRD as follows, "We raise funds for Islam, money goes to projects." In describing the projects the HLFRD funds, Baker said, "Some money goes to HAMAS, but we build hospitals, schools, etc."

On September 30, 1997, an HLFRD-4, reported on the HLFRD fund-raiser at the Sequoia Convention Center, Buena Park, California. At that fund-raiser, Shukri Abu Baker stated that the individuals present owed the money to the HLFRD and the people fighting for the Islamic state in the West Bank and Gaza. He also talked about the HLFRD mission to support the families of the martyrs. He stated that the goal of HAMAS to form an Islamic State could not be thwarted. Abu Baker indicated that in the end HAMAS would throw out Arafat and an Islamic State would be established.

In March 1998, HLFRD-6, an FBI source, who has provided reliable information in the past advised that Ammar Hussein Imreish, who source identified as the local leader for the HLFRD, specifically talked about HAMAS and its ties to HLFRD. Imreish stated that HAMAS leadership wants to hit only military individuals and targets, not civilians. Additionally, according to the source, the HAMAS leadership says that HLFRD is their voice. Imreish surmised that in the future, HAMAS will be recognized as a legitimate representative of the Palestinian people and then the HLFRD's ties to HAMAS will then be known.



HLFRD-3 further reported that the HLFRD raises funds for HAN S and Shukri Abu Baker is a U.S.-based leader of HAMAS.

HLFRD-7, an FBI source, who has provided reliable in: rmation in the past reported that El-Mezain travels th: ughout the United States conducting fund-raising events on ehalf of HAMAS and toured different Arab Gulf countries in 994, giving speeches about HAMAS and collecting do tions.

HLFRD-8, an FBI source, who has provided reliable in rmation in the past reported that on Friday, April 6, 20 , an HLFRD representative spoke to a crowd of ap oximately 500 to 600 at the mosque in Cleveland. He sp e about the plight of Muslims overseas. This individual, in oduced an official representative of the HLFRD and stated th : it was the duty of Muslims in Cleveland to help the Mu ims overseas through the HLFRD.

This same source reported that on Friday, April 13, 2001, th s individual again spoke about the HLFRD. The speaker ir roduced the HLFRD representative and encouraged people to s port Muslims overseas through the HLFRD. During this t: k, the speaker repeatedly made the statement that the H RD is accused of being HAMAS. He then stated, "if we are H AS, so what, we are helping our people."

**Jamil Sarsour Confession:** On October 23, 1998, Sarsour w arrested by the GOI for his involvement with the HAMAS t rorist organization, specifically, for providing financial a other assistance to HAMAS fugitive and military activist, A l Awadallah. At the time of his arrest, Sarsour was c rying $66,530.00, a personal telephone book and two A rican passports. Sarsour was interviewed and provided i ormation concerning his and his brother, Salah's a ivities in support of HAMAS over the last several years.

During the course of his interview, Sarsour described his b ther Salah Sarsour's involvement with HAMAS and fund- i ising activities by the HLFRD, in Richardson, Texas on b alf of HAMAS. Sarsour stated that some of the members of t e Islamic Center in Milwaukee, Wisconsin, and his brothers lah and Imad are involved in raising money in the name of e HLFRD that is actually for HAMAS. (Exhibit 102).

48



5. HLFRD Bank Account:

FBI investigation has revealed that the HLFRD in Richardson, Texas funded the above described zakat committees, HLFRD offices and organizations by means of wire transfers from its Bank One accounts in Texas.  Shukri Abu Baker and Ghassan Elashi are the primary signatories of record on these accounts. (Exhibit 103).

## IV. SUMMARY

FBI investigations of HAMAS activities in the United States have revealed that the HLFRD is the primary fund-raising entity for HAMAS and that a significant portion of the funds raised by the HLFRD are clearly being used by the HAMAS organization.  The information provided in this document confirms that the HLFRD is acting for or on behalf of HAMAS.  Further, senior members of HLFRD support HAMAS ideology and activities.  These HAMAS activities interfere with the Middle East peace process and pose a threat to the national security, foreign policy, or economy of the United States.  As such, HLFRD should be considered by OFAC for SDT designation as a HAMAS entity, subject to the prohibitions of the IEEPA statute.



## Exhibit List

1. Executive Order 12947; Federal Register Publication, 1/25/95, re: HAMAS as SDT;

2. www.palestine-info.com/hamas/leaders; Reuters article, 12/1/89; Info-Prod Research Ltd. article, 12/29/98, re: Yassin's arrest history;

3. HAMAS covenant;

4. Reuters article, 7/31/01, re: relationship between HAMAS political and military;

5. Reuters article, 5/14/01, re: Rantissi quote;

6. Washington Post article, 8/11/01, re: Sbarro attack;

7. USA Today article, 8/13/01, re: disco attack;

8. Associated Press article, 5/25/01, re: May 2001 bombing;

9. The Ethnic Newswatch article, 2/25/96, re: February 1996 bombing;

10. Texas Secretary of State application for certification of authority by a non-profit corporation for the HLFRD;

11. HLFRD 1999 Annual Report; employee list recovered in trash cover;

12. IRS forms 990; 1998, 1999; Dun & Bradstreet report;

13. American Express credit card records, re: Philadelphia meeting;

14. 10/27/93 Airtel, re: Courtyard Marriott Hotel; room assignments;

15. GOI report 10/7217/92, 11/01/92 re: Ashqar;

16. Marzook extradition request, transcript of interviews with Sufian Abu Samara, 1/07/91 and 1/14/91, at pages 17-19;

17. IP interview of Mahmud Rumahi, 2/21/93;

18. GOI report 10/5830-99, 8/08/99, Akram Haroubi interview summary; www.hlf.org/May 2000 newsletter, re: AlAnwar Alibrahimiya Education Center;

19. Asset reporting;

**EXHIBIT 165 TO DECLARATION OF VALERIE SCHUSTER**

08979312926

Verschlüsselt aufgenommen

**VS - NUR FÜR DEN DIENSTGEBRAUCH**

Anlage 32



BUNDESNACHRICHTENDIENST                82049 Pullach, 28. November 2002

47A - 43-15 – 47A-0441/02 VS-NfD

FS - Nr. 5057

**Eilt sehr**

2 8. Nov. 2002    15:57

Bundesministerium des Innern
z.Hd. Herrn MinR v. Holtey
-o.V.i.A.-                                    29/u.        155

11014 Berlin

Betr.:  Verbotsverfahren Al-Aqsa e.V. Aachen
  hier:  Behördenzeugnis des BND zur Zuordnung von Spendenempfängern des
          Al-Aqsa e.V. zur HAMAS
Bezug:  BMI Az. IS 5 – 510 060-2/2a (VS-V) vom 11.11.2002

Sehr geehrter Herr von Holtey,

anbei übersende ich Ihnen das gewünschte Behördenzeugnis des BND zur Zuordnung
von Spendenempfängern des Al-Aqsa e.V. zur HAMAS.

Ich weise darauf hin, dass das Gutachten kaum auf BND-Original Material basiert,
sondern im wesentlichen auf Austauschmaterial ausländischer Nachrichtendienste, das
einer Plausibilitätsprüfung unterzogen wurde.

Seite 1 von 5

EXHIBIT
8
9-1-10

W_S092791

W_S092791

**VS - NUR FÜR DEN DIENSTGEBRAUCH**

## Palästinenser: Verbotsverfahren al-Aqsa e.V. / HAMAS-nahe Vereine in den Palästinensergebieten

### 1.) Al-Jam'iya al-Islamiya / Islamic Society:

Der Verein Al-Jami'ya al-Islamiya ist dem direkten HAMAS-Umfeld zuzuordnen. Al-Jami'ya al-Islamiyya verfügt über mindestens zehn Zweige im Gazastreifen. Der Vorsitzende des Gesamtvereins ist Dr. Ahmad BAHR, ein Führungsmitglied der HAMAS. Al-Jami'ya al-Islamiya wurde unter dem Vorwurf der HAMAS-Zugehörigkeit im Winter 2001/2002 von der Palästinensischen Autonomiebehörde verboten. Im Jahr 2001 betrieb der Verein 41 eigene Kindergärten für 1650 Kinder im Vorschulalter. Bei einem Jahresabschlussfest dieser Kindergärten im Sommer 2001 im vereinseigenen Zentrum im Flüchtlingslager al-Shati (Gazastreifen) führten mehrere Kindergartenklassen paramilitärische Aufführungen und Paraden vor, die eindeutig zu Gewaltverherrlichung und Unterstützung der Selbstmordattentate der HAMAS aufriefen. So führten etwa 5-jährige Jungen in Uniform und ausgerüstet mit Spielzeug-Schnellfeuerwaffen paramilitärische Übungen vor. Sie trugen dabei das Stirnband der HAMAS-Selbstmordattentäter, mit dem Attentäter vor Anschlägen eine Videobotschaft an ihre Familien aufzeichnen. Bei demselben Fest trat in Schauszenen ein Kind verkleidet als HAMAS-Führer Shaikh YASSIN auf, um ihn herum weitere Kinder mit „Bombengürteln" erkennbar als Selbstmordattentäter. In einer weiteren Szene tauchte ein Mädchen vor einem Modell des Jerusalemer Felsendoms ihre Hände in „Blut" (rote Farbe) und rief mit emporgehaltenen „blutigen" Händen symbolisch zur Fortsetzung der Intifada auf. Zum Abschluss der Festveranstaltung hielt der Vereinsvorsitzende Dr. Ahmad BAHR eine Rede, in der er u.a. die gegen Israel gefallenen „Märtyrer" rühmte und namentlich den „Märtyrer" Mahmud MARMASH als leuchtendes Beispiel für die Kinder hervorhob. Mahmud MARMASH hat für die HAMAS am 18.05.2001 einen Selbstmordanschlag in Netanya verübt, bei dem 5 Israelis getötet und 74 verletzt wurden.

### 2.) Jam'iyat al-Salah / Al-Salah Islamic Association:

Der Verein Jam'iyat al-Salah / Al-Salah Islamic Association im Zentrum des Gazastreifens ist als islamischer Sozialverein dem direkten HAMAS-Umfeld zuzuordnen. Der Vereinsvorsitzende Ahmad AL-KURD ist ein führendes Mitglied der HAMAS. Zwei Zweige des Vereines, in Bethlehem und in Ramallah, wurden im Winter 2001/2002 von der Palästinensischen Autonomiebehörde unter dem Vorwurf der HAMAS-Zugehörigkeit verboten. Im Zuge der al-Aqsa-Intifada ist der Verein einer der maßgeblichen Empfänger von Spendengeldern des „saudischen Komitees zur Unterstützung der al-Aqsa-Intifada" (al-Lajna al-sa'udiya li-da'm intifadat al-Quds), die

Seite 2 von 5

W_S092792

W_S092792

08979312926

## VS - NUR FÜR DEN DIENSTGEBRAUCH

gezielt an Familien von palästinensischen „Märtyrern" weitergeleitet werden sollen. Unter den namentlich genannten „Märtyrern" befinden sich auch Selbstmordattentäter. Aufgrund uns vorliegender saudischer Spendenlisten ist bekannt, dass im Winter 2001/2002 jede bedachte „Märtyrerfamilie" einen Betrag von 20.000 Riyal (ca. S.300 US-$) erhielt.

**3) Al-Jam'iya al-Khairiya al-Islamiya / Islamic Charitable Society (Hebron):**

Der Verein al-Jam'iya al-Khairiya al-Islamiya / Islamic Charitable Society (Hebron) ist als islamischer Sozialverein der HAMAS unmittelbar zuzuordnen. Der Verein ist der wichtigste HAMAS-Verein auf der Westbank. Im April 2002 wurde in den Räumen des Vereins ein Dokument der HAMAS-Auslandsführung (Damaskus) vom Oktober 2000 gefunden, in dem direkt zur gewaltsamen Intifada gegen Israel aufgerufen wurde.

An der Vereinsführung sind zahlreiche führende HAMAS-Mitglieder beteiligt. Der Vorsitzende von Al-Jami'ya al-Khairiya al-Islamiya, Adil Na'ma Salim AL-JUNALDI und die Vereinsführer Azzam Na'man Abd al-Rahman SALHAB, Mustafa Kamil Khalil SHA'UR und Nabil Na'im Ishaq NATSHA befanden sich unter den 415 „Deportierten", die Ende 1992 auf Veranlassung des damaligen israelischen Ministerpräsidenten RABIN unter dem Vorwurf der militanten Zugehörigkeit zu HAMAS bzw. Palästinensischer Islamischer Jihad aus Israel in das südlibanesische Niemandsland nach Marj al-Zuhur deportiert wurden. Die tatsächliche Zugehörigkeit der damals Deportierten zu den Organisationen HAMAS bzw. Palästinensischer Islamischer Jihad wurde niemals bezweifelt. Sprecher der Deportierten war Abd al-Aziz AL-RANTISSI, der heute offizieller Sprecher der HAMAS im Gazastreifen ist.

Die Mitglieder der Al-Jami'ya al-Khairiya al-Islamiya Husni AL-KRAKHI, Isa Khairi AL-JABRI, Nuh AL-MANASRA, Fayiz AL-KHADUR, Isa KHAMIDAT und Abu Ziad AL-KRAKHI sind HAMAS Mitglieder.

Der Verein empfängt Spendengelder des „Saudischen Komitees zur Unterstützung der al-Aqsa-Intifada" (al-Lajna al-sa'udiya li-da'm intifadat al-Quds), die gezielt an Familien von palästinensischen „Märtyrern" weitergeleitet werden sollen. Unter den namentlich genannten „Märtyrern" befinden sich auch Selbstmordattentäter.

**4) Jam'iyat al-Islah / Al-Islah Charitable Society:**

Der Verein Jam'iyat al-Islah / Al-Islah Charitable Society ist dem direkten HAMAS-Umfeld zuzuordnen. Vereinsvorsitzender war bis zu seiner Verhaftung durch Israel der als führendes HAMAS-Mitglied bekannte Jamal AL-TAWIL. Im Winter 2001/2002 wurde der Verein durch die Palästinensische Autonomiebehörde unter dem Vorwurf der HAMAS-Zugehörigkeit verboten. In den Räumen des „Wohlfahrtskomitees" des Vereinszweiges in Ramallah wurde eine Liste von teilweise als „Märtyrer" gestorbener HAMAS-Aktivisten gefunden, für deren Familien finanzielle Unterstützung aus

Seite 3 von 5

W_S092793

08979312926

## VS - NUR FÜR DEN DIENSTGEBRAUCH

Spendengeldern des Vereins erbeten wurde. Unter den namentlich aufgeführten Aktivisten befindet sich auch Dia' Hussain Muhammad TAWIL, der als Urheber eines Selbstmordanschlages am 27.03.2001 in Jerusalem starb.

### 5.) Jam'iyat al-Tadamun / Al-Tadamun Charitable Society:

Der Verein Jam'iyat al-Tadamun / Al-Tadamun Charitable Society ist dem direkten HAMAS-Umfeld zuzuordnen. Im Winter 2001/2002 wurde der Verein durch die Palästinensische Autonomiebehörde unter dem Vorwurf der HAMAS-Zugehörigkeit verboten. In der Vereinsführung sind mehrere Personen beteiligt, die als HAMAS-Aktivisten 1992 nach Südlibanon (Marj al-Zuhur) deportiert wurden und zu den führenden HAMAS-Mitgliedern gehören, z.B. Munir AQD, Nabil BISHAWI, Kamal Abu AISHA, Abd Nassir QADAH, Adli YA'ISH, Salah al-Din MUSLAH und Hamza JABIR.

### 6.) Tulkarm Zakat-Komitee:

Das Zakat-Komitee von Tulkarm ist eindeutig unter Kontrolle der HAMAS. Vorsitzender des Zakat-Komitees ist das HAMAS-Mitglied Husni Hasan HAWAJA. Das Zakat-Komitee betreibt eine Kette von Kindergärten unter der Leitung der beiden HAMAS-Mitglieder Fath Allah SAIDI und Nazzar SHAHID.

Das Tulkarm Zakat-Komitee ist maßgeblicher Empfänger von Spendengeldern des „Saudischen Komitees zur Unterstützung der al-Aqsa-Intifada" (al-Lajna al-sa'udiya li-da'm intifadat al-Quds), die gezielt an Familien von palästinensischen „Märtyrern" weitergeleitet werden sollen. Unter den namentlich genannten „Märtyrern" befinden sich auch Selbstmordattentäter. Aufgrund einer in den Vereinsräumen gefundenen saudischen Spendenliste ist bekannt, dass im Winter 2001/2002 jede bedachte „Märtyrerfamilie" einen Betrag von 20.000 Riyal (ca. 5.300 US-$) erhielt. Unter den in der saudischen Spendenliste genannten 102 „Märtyrern" sind mindestens 16 eindeutig als Selbstmordattentäter ums Leben gekommen. Die Namen der Selbstmordattentäter auf dieser Liste lauten Shadi Fauzi Raghib AL-AFURI, Abd al-Fattah Muhammad Muslih RASHID, Abd al-Karim Umar Muhammad ABU NA'ISA, Abir Taufiq Abdallah HAMDAN, Ali Ibrahim Abd al-Rahman AL-JAULANI, Umar Hifs Umar ABU ZAID, Farras Sabri Fayiz JABIR, Mu'ayyad Mahmud Iyada SALAH AL-DIN, Muhammad Ibrahim Muhammad Hasan SAMA'INA, Muhammad Salim Muhammad SAMA'INA, Mustafa Faisal Mustafa ABU SIRRIYA, Muhammad Raja' Mahmud ABU AL-HIJA', Nidal Taisir Shahada JABALI, Nazir Muhammad Mahmud HAMAD, Nimr Muhammad Yusuf ABU SAIFAIN, Yasir Ahmad Hamid AL-ADHAMI.

Seite 4 von 5

W_S092794

W_S092794

08879312926

## VS - NUR FÜR DEN DIENSTGEBRAUCH

**7.) Ramallah Zakat-Komitee:**

Das Zakat-Komitee von Ramallah steht in enger Verbindung zur HAMAS und ist daher als Teil des sozialen Netzwerkes dem unmittelbaren Umfeld der HAMAS zuzurechnen. Folgende ehemalige Führungsmitglieder des Zakat-Komitees von Ramallah sind HAMAS-Mitglieder: Aqil Sulaiman Muhammad RABIA, Umar Muhammad Ahmad HAMDAN, Mahmud Ahmad Abd al-Rahman RAMHI und Nabil Abd al-Hadi Mustafa MANSUR.

**8.) Beit Fajar Zakat-Komitee:**

Das Zakat-Komitee von Beit Fajar steht unter Kontrolle der HAMAS und ist daher als Teil des sozialen Netzwerkes unmittelbar der HAMAS zuzurechnen. Die Führungsmitglieder des Zakat-Komitees Isa Muhammad Khalil THAWABTA, Kamal Said Rashid DIRIYA, Muhammad Jum'a Aqil THAWABATA und Husain Musa Jum'a DIRIYA sind HAMAS-Mitglieder.

**9.) Jam'iyat al-Shubban al-Muslimin / Verein der Jungen Muslime (Hebron):**

Der Verein Jam'iyat al-Shubban al-Muslimin / Verein der Jungen Muslime ist als islamischer Sozialverein dem direkten HAMAS-Umfeld zuzuordnen. Im Winter 2001/2002 wurde der Verein durch die Palästinensische Autonomiebehörde unter dem Vorwurf der HAMAS-Zugehörigkeit verboten.

Mit freundlichen Grüßen
Im Auftrag

(Reischer)

Seite 5 von 5

W_S092795

W_S092795

**08979312926**

**VS - FOR OFFICIAL USE ONLY**

Received in Encrypted Form

[logo]                                                      [hw:] *Appendix 32*

FEDERAL INTELLIGENCE SERVICE                    82049 Pullach, 11/28/2002

_____

47A - 43-15 - 47A-0441/02 VS-NID

| [stamp:] FS No. [hw:] *5057* |
| --- |

[stamp:]  11/28/2002  [hw:] *03:57*

*p.m.* [signature]

[signature] [hw:] *11/28*          *1*[illegible]*[5]*

Federal Ministry of the Interior
Hand-delivered to Mr. Minister von Holtey
-o.V.i.A.-

11014 Berlin

Subj.:    Proceedings to ban Al-Aqsa e.V. Aachen
**Here:** Agency testimony of the BND [German Federal Intelligence Service] with
reference to classification of recipients of donations from Al-Aqsa e.V. to HAMAS
Ref.:     BMI Az. [JS] 5 - 510 060-2/2a (VS-V) of 11/11/2002

Dear Mr. von Holtey,

Enclosed I am sending you the requested agency testimony of the BND regarding the
classification of recipients of Al-Aqsa e.V. donations to HAMAS.

I wish to point out in this connection that the report is not based on BND original material.
Rather, it is essentially based on exchange materials from foreign intelligence services that have
undergone a validity check.

Page 1 of 5

**W_S092791**

08979312926

VS - FOR OFFICIAL USE ONLY

**Palestinians: Proceedings to ban al-Aqsa e.V. / HAMAS-associated organizations in Palestinian areas**

### 1.) Al-Jam'iya al-Islamiya / Islamic Society:

Al-Jam'iya al-Islamiya must be classified as being under direct HAMAS influence. Al-Jam'iya al-Islamiya has at least ten branches in the Gaza Strip. The overall chairman of the association is Dr. Ahmad BAHR, a member of the HAMAS leadership. <u>Al-Jam'iya al-Islamiya was banned by the Palestinian Authority</u> in winter 2001/2002 when it was accused of membership in HAMAS. In 2001 the association operated 41 of its own kindergartens for 1,650 children of preschool age. At a year-end celebration of these kindergartens in summer 2001 at the association center in the al-Shati refugee camp (Gaza Strip), several kindergarten classes presented <u>paramilitary performances and parades</u> that clearly proclaimed the glorification of violence and called for the support of Hamas suicide attacks. Thus 5-year-old boys in uniform and armed with toy automatic weapons engaged in paramilitary exercises. They also wore the headbands of HAMAS suicide killers with which the assassins composed video messages to their families before an attack. At the same festival a child dressed up to resemble HAMAS leader Sheik YASSIN, and around him were other children with "bomb belts" recognizable as suicide bombers. In another scene a girl covered her hands with "blood" (red dye) before a mock-up of the Jerusalem Dome of the Rock and with "bloody" hands held symbolically high, appealed for continuation of the intifada. At the end of the festivities Chairman Dr. Ahmad BAHR gave a speech in which among other things he praised the "martyrs" who had fallen in the struggle against Israel, and he exalted in particular <u>the "martyr"</u> <u>Mahmud MARMASH as a shining example for the children. Mahmud MARMASH had carried out a suicide attack in Netanya on 05/18/2001 in which 5 Israelis were killed and 74 wounded.</u>

### 2.) Jam'iyat al-Salah / Al-Salah Islamic Association:

The Jam'iyat al-Salah / Al-Salah Islamic Association in the center of the Gaza Strip must be classified as an Islamic social organization under direct HAMAS influence. The association chairman Ahmad AL-KURD is a leading member of HAMAS. Two branches of the association, in Bethlehem and in Ramallah, <u>were banned by the Palestinian Authority when they were accused of belonging to HAMAS.</u> In the course of the al-Aqsa intifada the association has been one of the major recipients of donations by the "Saudi Committee for Support of the al-Aqsa Intifada" (al-Lajna al-sa'udiya li-da'm intifadat al-Quds), which

W_S092792

W_S0
9279
2

08979312926

VS - FOR OFFICIAL USE ONLY

though aimed at the families of Palestinian "martyrs," are forwarded elsewhere. Among the specifically named "martyrs" are suicide bombers. We know from the Saudi donation lists we have that in winter 2001/2002 every prudent "martyr family" received a sum of 20,000 riyals (about USD$5,300).

### 3.) Al-Jam'iya al-Khairiya al-Islamiya / Islamic Charitable Society (Hebron):

The al-Jam'iya al-Khairiya al-Islamiya / Islamic Charitable Society (Hebron) must be directly classified as an Islamic social organization under HAMAS. The association is the most important HAMAS association on the West Bank. In April 2002 a document drawn up in October 2000 by the HAMAS Foreign Affairs Directorate (Damascus) was found on the premises of the association. In it a direct call was made for violent intifada against Israel.

Numerous leading HAMAS members participate in the leadership of the association. The chairman of Al-Jam'iya al-Khairiya al-Islamiya, Adil Na'ma Salim AL-JUNAIDI and the leaders of the association, Azzam Na'man Abd al-Rahman SALHAB, Mustafa Kamil Khalil SHA'UR, and Nabil Na'im Ishaq NATSHA, were in the group of 415 "deported," who at the end of 1992 at the instigation of then-Israeli Prime Minister RABIN were deported from Israel to Marj al-Zahur in the South Lebanese no-man's land after being accused of militant membership in HAMAS or the Palestinian Islamic jihad. No one ever doubted the actual membership of the deported activists in the organizations of HAMAS or the Palestinian Islamic jihad. The spokesman of the deported was Abd al-Aziz AL-RANTISSI, who today is the official spokesman of HAMAS in the Gaza Strip.

The members of Al-Jam'iya al-Khairiya al-Islamiya, Husni AL-KRAKHI, Isa Khairi AL-JABRI, Nuh AL-MANASRA, Fayiz AL-KHADUR, Isa KHAMIDAT, and Abu Ziad AL-KRAKHI, are HAMAS members.

The association receives donations from the "Saudi Committee for Support of the al-Aqsa Intifada" (al-Lajna al-sa'udiya li-da'm intifadat al-Quds), which though aimed at the families of Palestinian "martyrs," are forwarded elsewhere. Also among the specifically named "martyrs" are suicide bombers.

### 4.) Jam'iyat al-Islah / Al-Islah Charitable Society:

The Jam'iyat al-Islah / Al-Islah Charitable Society needs to be classified as a direct subordinate of HAMAS. The chairman of the association, Jamal AL-TAWIL, was well known prior to his arrest by Israel as a leading member of HAMAS. In the winter of 2001/2002 the association was banned by the Palestinian Authority owing to the accusation that it was a member of HAMAS. On the premises of the "Welfare Committee" of the branch of the association in Ramallah, a list of HAMAS activists was found, some of whom had died as "martyrs." Financial support for their families was requested from the donations

Page 3 of 5

W_S092793


W_S0
9279
3

08979312926

**VS - FOR OFFICIAL USE ONLY**

that the association had collected. <u>Among the activists specifically mentioned is Dia' Hussain Muhammad TAWIL, who died while perpetrating a suicide attack in Jerusalem on 03/27/2001.</u>


**5.) Jam'iyat al-Tadamun / Al-Tadamun Charitable Society:**

The Jam'iyat al-Tadamun / Al-Tadamun Charitable Society must be classified as an organization under the direct influence of HAMAS. <u>In winter 2001/2002 the association was banned by the Palestinian Authority when it was accused of belonging to HAMAS.</u> Several individuals who participate in the leadership of the association and who are also leading members of HAMAS were deported to South Lebanon (Marj al-Zuhur) as HAMAS activists in 1992, e.g., Munir AQD, Nabil BISHAWI, Kamal Abu AISHA, Abd Nassir QADAH, Adli YA'ISH, Salah al-Din MUSLAH, and Hamza JABIR.


**<u>6.)</u> Tulkarm Zakat Committee**

The Zakat Committee of Tulkarm is unambiguously under the control of HAMAS. The chairman of the Zakat Committee is HAMAS member Husni Hasan HAWAJA. The Zakat Committee operates a chain of kindergartens under the direction of the two HAMAS members, Fath Allah SAIDI and Nazzar SHADID.

The Tulkarm Zakat Committee is a major recipient of donations of the "Saudi Committee for Support of the al-Aqsa Intifada" (al-Lajna al-sa'udiya li-da'm intifadat al-Quds), which while aimed at the families of Palestinian "martyrs," are supposed to be forwarded. <u>Among the specifically named "martyrs" are also some suicide bombers.</u> It is well known on the basis of a Saudi document found on the premises of the association that in winter 2001/2002 each prudent "martyr family" received a sum of 20,000 riyals (about USD$5,300). <u>Among the 102 "martyrs" named in the Saudi donation list are at least 16 who unambiguously died as suicide bombers.</u> The names of the suicide killers on this list are Shadi Fauzi Raghib AL-AFURI, Abd al-Fattah Muhammad Muslih RASHID, Abd al-Karim Umar Muhammad ABU NA'ISA, Abir Taufiq Abdallah HAMDAN, Ali Ibrahim Abd al-Rahman AL-JAULANI, Umar Hifs Umar ABU ZAID, Farras Sabri Fayiz JABIR, Mu'ayyad Mahmud Iyada SALAH AL-DIN, Muhammad Ibrahim Muhammad Hasan SAMA'INA, Muhammad Salim Muhammad SAMA'INA, Mustafa Faisal Mustafa ABU SIRRIYA, Muhammad Raja' Mahmud ABU AL-HIJA', Nidal Taisir Shahada JABALI, Nazir Muhammad Mahmud HAMAD, Nim[r] Muhammad Yusuf ABU SAIFAIN, Yasir Ahmad Hamid AL-ADHAMI.

Page 4 of 5


W_S092794

**08979312926**

**VS - FOR OFFICIAL USE ONLY**

### 7.) Ramallah Zakat Committee

The Zakat Committee of Ramallah stands in a close relationship with HAMAS and must therefore be classified as part of the social network under the direct influence of HAMAS. The following former leading members of the Zakat Committee of Ramallah are HAMAS members: Aqil Sulaiman Muhammad RABIA, Umar Muhammad Ahmad HAMDAN, Mahmud Ahmad Abd al-Rahman RAMHI, and Nabil Abd al-Hadi Mustafa MANSUR.

### 8.) Beit Fajar Zakat Committee

The Zakat Committee of Beit Fajar is under the control of HAMAS and must therefore be classified as part of the social network directly run by HAMAS. The leading members of the Zakat Committee – Isa Muhammad Khalil THAWABTA, Kamal Said Rashid DIRIYA, Muhammad Jum'a Aqil THAWABATA, and Husain Musa Jum'a DIRIYA – are members of HAMAS.

### 9.) Jam'iyat al-Shubban al-Muslimin / Association of Young Muslims (Hebron):

The Jam'iyat al-Shubban al-Muslimin / Association of Young Muslims (Hebron) must be classified as an Islamic social organization under the direct influence of HAMAS. In winter 2001/2002 the association was banned by the Palestinian Authority when it was accused of belonging to HAMAS.

Sincerely yours,

On behalf of

[signature]

(Reischer)

W_S0
9279
5

**08979312926**

**VS - FOR OFFICIAL USE ONLY**

**W_SO92795**

W_SO
9279
6



**TRANSPERFECT**

ALBANY
AMSTERDAM
ATLANTA
AUSTIN
BARCELONA
BERLIN
BOGOTA
BOSTON
BRUSSELS
CHARLOTTE
CHICAGO
DALLAS
DENVER
DUBAI
DUBLIN
FRANKFURT
GENEVA
HONG KONG
HOUSTON
IRVINE
LONDON
LOS ANGELES
LYON
MEXICO CITY
MIAMI
MILAN
MINNEAPOLIS
MONTREAL
MUNICH
NEW YORK
PARIS
PHILADELPHIA
PHOENIX
PORTLAND
PRAGUE
RESEARCH
TRIANGLE PARK
SAN DIEGO
SAN FRANCISCO
SAN JOSE
SEATTLE
SINGAPORE
STOCKHOLM
STUTTGART
SYDNEY
TOKYO
TORONTO
VANCOUVER
WASHINGTON, DC
ZURICH

City of New York, State of New York, County of New York

I, Jennifer Bucci, hereby certify that the following is to the best of my knowledge and belief, a true and accurate translation of the following document from German into English:

"Letter dated November 28, 2002 from the German Intelligence Service (BND)"

*Jennifer M Bucci*
Jennifer Bucci

Sworn to before me this
September 1, 2010

*[signature]*
Signature, Notary Public

KRISTIN MILORO
Notary Public - State of New York
No. 01MI6212799
Qualified in New York County
Commission Expires Oct 19, 2013

Stamp, Notary Public

**EXHIBIT 166 TO DECLARATION OF VALERIE SCHUSTER**

# ISLAMIC SOCIAL WELFARE

# ACTIVISM IN THE OCCUPIED

# PALESTINIAN TERRITORIES:

# A LEGITIMATE TARGET?

2 April 2003



# TABLE OF CONTENTS

EXECUTIVE SUMMARY AND RECOMMENDATIONS ................................................. i

I.     INTRODUCTION ............................................................................................ 1

II.    BACKGROUND .............................................................................................. 3

    A.   Islamic Social Welfare Activism ...............................................................3

    B.   The Palestinian Context .........................................................................3

III.   PALESTINIAN ISLAMIC SOCIAL WELFARE ORGANISATIONS .................... 7

    A.   Typology ...............................................................................................7

    B.   Legal Status .........................................................................................9

    C.   Political Affiliation ..............................................................................10

    D.   Funding Mechanisms ...........................................................................11

    E.   Delivery Mechanisms...........................................................................13

IV.    ISLAMIC SOCIAL WELFARE ACTIVISM DURING THE AL-AQSA INTIFADA ................................................................................................... 14

    A.   Beneficiaries And Services ...................................................................14

    B.   Disruption Of Islamic Social Welfare Activities By The PA ......................16

V.     HAMAS, ISLAMIC SOCIAL WELFARE ACTIVISM AND TERRORISM .. 18

    A.   Transfer Of Funds ...............................................................................18

    B.   Recruitment And Incitement .................................................................20

    C.   Recruitment: The Special Case Of Financial Assistance To Families Of Suicide Bombers...........................................................................................23

    D.   Islamic Social Welfare Activism As Political Leverage ...........................24

VI.    CONCLUSION .............................................................................................. 27

APPENDICES

    A.   Maps of The Occupied Palestinian Territories .........................................30

    B.   About the International Crisis Group .....................................................31

    C.   ICG Reports and Briefing Papers .........................................................32

    D.   ICG Board Members ............................................................................37



**international
crisis group**

**ICG Middle East Report N°13**                                                                                 **2 April 2003**

# ISLAMIC SOCIAL WELFARE ACTIVISM IN THE OCCUPIED

# PALESTINIAN TERRITORIES: A LEGITIMATE TARGET?

## EXECUTIVE SUMMARY AND RECOMMENDATIONS

The 11 September 2001 attacks in the U.S. and revelations that the al-Qaeda network made extensive use of charitable institutions to raise funds for its operations, have reinforced concerns about the relationship between Islamic social welfare activism and terrorism. The Palestinian Islamic Resistance Movement (Hamas), which has conducted a series of devastating armed attacks during the current conflict, particularly against Israeli civilian targets, and which supports an extensive network of social welfare organizations in the West Bank and Gaza Strip, has come in for particular scrutiny.

The concern that charitable activity and political violence are connected is legitimate and raises genuine policy dilemmas. These need to be addressed seriously but also with careful attention to distinctions and nuances rather than with a one-response-meets-all-contingencies approach. Eradicating Islamic social welfare activism would be unlikely to reduce seriously Hamas military activity, its attacks against Israeli civilians, or indeed its proclaimed goal of eliminating the state of Israel. Rather, it would worsen the humanitarian emergency, increasing both the motivation for Hamas to sustain its military campaign and popular support for it. And, without substantial evidence that welfare institutions systematically divert funds to support terrorist activity, it would be an overbroad and indiscriminate response.

Rather than a blanket ban, the test which should be applied, by the international community and the Palestinian Authority alike, is whether the charitable institution in question can be shown to have transferred monies to fund activities of paramilitary organisations, whether it helps recruit members for such groups, or whether its educational teachings promote intolerance or violence.

Hamas activism presents a challenge to Palestinian and international policy-makers. It is a vital support for hundreds of thousands of Palestinians at a time when renewed conflict with Israel has produced a growing humanitarian emergency. But at the same time it has helped create that emergency by its escalation of indiscriminate bombing of civilian targets – attacks that, like all those that deliberately violate the laws of armed conflict, ICG unreservedly condemns.

The accusation that Hamas misuses Islamic charitable activities takes several forms. First, Hamas is suspected of diverting charitable funds to finance its military infrastructure and activities. Secondly, Islamic social welfare institutions affiliated with Hamas are charged with inciting violence and recruiting militants among beneficiaries of their services. Thirdly, the existence of a network of social welfare organisations affiliated with Hamas, and the demonstrated capacity of this network to support groups neglected by the Palestinian Authority (PA) and international donors, are considered central to the Islamist movement's growing appeal and, therefore, to its ability to sustain a campaign of violence.

Under pressure, the PA has taken some action. But too often it has sought mainly to assuage international opinion and fend off the Hamas threat to its own predominance rather than adopt a sound policy. It has periodically shut down Hamas-affiliated charitable institutions only to allow them to reopen later, while not cracking down on the movement's armed wing. Israel, meanwhile, has enhanced Hamas's standing in the Palestinian

community by actions that often go far beyond what security concerns could legitimately justify and significantly worsen the humanitarian situation in the West Bank and Gaza. Palestinian unemployment, poverty, and malnutrition rates – soaring to levels unprecedented since 1967 – have contributed to radicalisation of large segments of the population.

The international community has been both inconsistent and inefficient. The U.S. seeks to ban all assistance to Hamas-affiliated organisations; most of its Western partners, however, distinguish between support for Hamas's legitimate and illegitimate activity; and many Arab governments permit funds to be raised on their territory for Islamic social welfare and Islamist militant organisations without distinction. At the same time, neither the West nor the Arab world has provided sufficient humanitarian aid or persuaded Israel to loosen its stranglehold on the civilian population of the occupied Palestinian territories.

Any approach to the issue of Islamic charitable institutions – whether independent or affiliated with Hamas – must start from the premise that they are critical in Palestinian life. Hamas in particular has since its inception invested heavily in charitable work and considers this central to its identity and purpose. With the onset of the intifada, the ensuing devastation of the PA and other harsh Israeli measures, in particular closures, its welfare activity has become more vital than ever. Roughly two-thirds of Palestinians live below the poverty line, and Islamic social welfare organisations, directly or indirectly, provide emergency cash assistance, food and medical care as well as educational and psychological services, to perhaps one out of six. By most accounts, such institutions are more efficient than their secular or official counterparts, delivering aid without distinction as to religious belief or political affiliation. Certainly, they are perceived as such by the Palestinian public.

Over the longer run, the challenge is to steer the radical Islamist movement – an important component of Palestinian society – away from violence and terrorism, and toward a constructive role both in domestic Palestinian politics and in forging peace between Israel and the Palestinians. Though success so far is elusive, the Egyptian-sponsored intra-Palestinian dialogue is a significant attempt. For now, the PA and the international community should focus on stopping Hamas's attacks against civilian targets and whatever fund diversion to any violent or paramilitary activity that exists. Any decision to shut down a social welfare institution or deny it funds should be closely based on proof that it either diverts funds for illicit purposes, is a platform for recruitment into Hamas's military wing or incites violence.

Rather than attack Islamic social welfare, a better response for those who seek to reduce its influence is to establish an equally effective social welfare network. Wholesale elimination of Hamas's Islamic social welfare sector would carry a heavy risk of backfiring, fuelling more violence and terror, and hurting a population already in a deteriorating humanitarian emergency.

There are inherent limits to what can be done in an environment of occupation, violence, closures and virtual PA collapse to set up an alternative welfare network, enforce rules against money laundering, or institute more rigorous accounting practices. Genuine reform of the charitable sector, like much else, probably must await an end of the current confrontation. On that, ICG has expressed its views: achieving a sustainable end to violence requires the international community to present and energetically promote a comprehensive endgame solution.[1] Still, in the absence of that step and within the boundaries of the existing situation, there are a number of measures that can be taken, as recommended below.

## RECOMMENDATIONS:

### To the Palestinian Authority:

1. Enforce its own laws, in particular Law N°1 on Charitable Societies and Civic Associations (2000), and mandate, inter alia:

   (a) the registration of all such organisations with the PA, and their operation in accordance with transparent organisational and financial procedures;

   (b) the annual submission of detailed and independently audited accounts of their finances and activities; and

   (c) revocation of the charitable status of organisations that fail to operate in accordance with the law and with their own approved charters.

---

[1] See ICG Middle East Report N°2, *Middle East Endgame I: Getting to a Comprehensive Arab-Israeli Peace Settlement*, 16 July 2002.

2. Ratify, and enforce, the draft law on *zakat* committees currently before the Palestinian Legislative Council.

3. Amend its own laws by, where applicable, bringing them into line with the recommendations on "Combating the Abuse of Non-Profit Organisations" of the intergovernmental Financial Action Task Force on Money Laundering (FATF), particularly with respect to financial transparency, program verification, administration, and oversight.

4. Establish an independent expert committee that will both assist and actively monitor social welfare organisations in the West Bank and Gaza Strip to ensure that they strictly comply with the above legislation and are not used as platforms to advocate attacks against civilians or recruit members of military organisations.

5. Ensure, with all the means at its disposal, the integrity of its humanitarian operations.

6. Take active steps to delegitimise all acts of terrorist violence against civilians, in particular suicide bombings, in the media and other public information systems and through the criminal justice system.

7. Assign Ministry of Education inspectors to actively monitor schools operated by Islamic social welfare organisations in order to ensure religious instruction is not used as a platform for promoting intolerance or to incite violence.

8. Begin a process of establishing a general welfare program, with international help.

9. Cease arbitrary closures and seizures of social welfare organisations where no evidence of wrongdoing exists.

**To the Islamic Resistance Movement (Hamas):**

10. Cease all attacks against civilians and declare that it will not resort to such attacks in future.

11. Cooperate with the PA in implementing Law N°1 on Charitable Societies and Civic Associations.

**To the Government of Israel:**

12. Revoke, consistent with reasonable security requirements, economically punitive measures against Palestinians, and in particular, and consistent with the recommendations of the UN Secretary General's personal humanitarian envoy and Israel's obligations as an occupying power:

   (a) allow access by the population to basic services and needs, including medical care, school and employment, by lifting unduly harsh closures and curfews;

   (b) ensure accelerated shipment and movement of humanitarian goods and services, whether of Palestinian or international origin, including ambulances, water tankers and other aid supplies; and

   (c) resolve the issue of purchase tax revenues withheld from the PA, releasing all outstanding monies.

**To the Donor Community and Other Governments:**

13. Provide technical and material support to assist the PA in implementing its own law regulating charitable institutions and, as a priority, in establishing a functioning general welfare system.

14. Increase assistance to international and local humanitarian organisations active in the West Bank and Gaza Strip.

15. Provide additional urgent humanitarian and financial assistance to the Palestinians and encourage the establishment of additional charitable networks that are effective and credible

16. Press Israel to rescind security measures that are not required by its legitimate interests and have contributed to the humanitarian crisis among the Palestinian population.

17. Harmonise policies toward charities in their own jurisdictions that are active in the occupied Palestinian territories and in particular:

   (a) agree on and implement common regulations regarding accounting transparency, consistent with the recommendations of the intergovernmental Financial Action Task Force on Money Laundering (FATF);

   (b) take legal action against charitable institutions found to be diverting funds to assist violent activity or advocating or promoting attacks against civilians; and

Case 1:05-cv-04622-DLI-RML   Document 267-13   Filed 03/22/12   Page 424 of 646 PageID #: 7102

(c) allow charitable organisations to raise and expend funds for strictly legitimate social purposes, irrespective of any association between the organisation and Hamas.

18. Press Arab states, particularly Saudi Arabia and the Gulf States, to ensure that funds raised in their territories for charitable institutions are used strictly for humanitarian purposes.

**To Arab States, particularly Saudi Arabia and the Gulf States:**

19. Cease any support for Hamas unless and until it agrees to halt attacks against civilians and takes the necessary steps to cease such activities.

20. Enhance monitoring of charitable organisations to ensure that funds are exclusively and verifiably allocated for humanitarian purposes.

**Amman/Brussels, 2 April 2003**

ICG

international
crisis group

---

**ICG Middle East Report N°13**             **2 April 2003**

## ISLAMIC SOCIAL WELFARE ACTIVISM IN THE OCCUPIED

## PALESTINIAN TERRITORIES: A LEGITIMATE TARGET?

---

## I.    INTRODUCTION

Among the numerous ripple effects of the 11 September 2001 attacks in the U.S., has been resurgent concern about the relationship between Islamic social welfare activism and terrorism. On 23 September 2001, President George W. Bush promulgated Executive Order 13224, which:

> authorises the U.S. government to block the assets of individuals and entities that provide support, services, or assistance to, or otherwise associate with, terrorists and terrorist organizations designated under the Order, as well as their subsidiaries, front organizations, agents, and associates.[2]

In September 2002, the State Department's Office of Counter Terrorism proclaimed "ensuring that charities are not abused by terrorist groups" a "top priority in our war against terrorist financing",[3] while a senior official vowed, "We will continue to block the assets and work with our allies to block the assets of charities that divert funds to terrorist purposes".[4] At the international level, the inter-governmental Financial Action Task Force on Money Laundering (FATF) devised regulations to

prevent the abuse of non-profit organisations for purposes other than those defined in their mandates.[5]

The Palestinian Islamic Resistance Movement (Hamas),[6] which has conducted devastating bombings, especially against Israeli civilian targets, has threatened to attack Western interests in the event of a war against Iraq,[7] and supports an extensive network of social welfare organisations, has come in for particular scrutiny.[8] During the past year, a number of states have acted against charitable institutions suspected of direct links with Hamas: Germany banned the Al-Aqsa Foundation and seized its assets, while the U.S. outlawed the Holy Land Foundation for Relief and Charity. Other states, including the Netherlands, have launched formal investigations into such institutions, or – as Saudi

---

[2] Executive Order 13224 at http://www.state.gov/s/ct/rls/fs/2002/16181.htm.
[3] Celina B. Realuyo, Policy Advisor, U.S. Department of State, Office of Counter Terrorism, "Combating the Financing of Terrorism: Remarks to Western Union International Compliance Conference", 18 September 2002 at http://www.state.gov/s/ct/rls/rm/14647.htm.
[4] Alan P. Larson, U.S. Under Secretary of State for Economic, Business, and Agricultural Affairs, "Testimony Before the House Committee on Financial Services", 19 September 2002 at http://www.state.gov/e/rls/rm/2002/13598.htm.

[5] See, for example, FATF, "Combating the Abuse of Non-Profit Organisations: International Best Practices" (11 October 2002), at http://www.fatf-gafi.org/pdf/SR8-NPO_en.pdf. FATF membership includes the United States, the European Commission, the Gulf Cooperation Council, and many OECD governments.
[6] Hamas, which translates as "zeal", is the Arabic acronym of the Islamic Resistance Movement's full name in Arabic (Harakat al-Muqawwama al-Islamiyya).
[7] In an open letter, the founder of Hamas, Sheikh Ahmed Yassin, wrote of a possible war against Iraq: "As they fight us, we have to fight them and as they threaten our interests, we have to threaten their interests. . . Muslims will have to threaten and strike Western interests, and hit them everywhere." Reuters, 7 February 2003.
[8] While Hamas is not the only Palestinian organisation that conducts both paramilitary and social welfare activities, it is the focus of this report because it is by far the most significant movement in this context. The other main Palestinian Islamist organisation, Islamic Jihad, is by contrast comparatively small and only marginally involved in social welfare activism. For a brief discussion of Islamic Jihad, see Section II B below.

Case 1:05-cv-04622-DLI-RML   Document 267-13   Filed 03/22/12   Page 426 of 646 PageID #: 7104

*Islamic Social Welfare Activism In The Occupied Palestinian Territories: A Legitimate Target?*
ICG Middle East Report N°13, 2 April 2003                                    *Page 2*

Arabia and other Gulf states – have come under pressure to curtail their activities.[9]

Hamas presents the typical problem of an organisation that engages in both legitimate (humanitarian) and illegitimate (terrorist) activities, compounded in this instance by operating in a non-state environment, under conditions of foreign occupation and in which the recognised public sector (the Palestinian Authority, PA) no longer functions and was often ineffective while it did.

As exemplified by Executive Order 13224, the concerns about Islamic social welfare organisations affiliated with Hamas fall into three broad categories:

❑ Providing direct support to the Hamas military infrastructure through the illicit transfer of funds purportedly destined for humanitarian purposes. Hamas has been accused of using social welfare organisations as a cover to raise funds for the movement and its military infrastructure.[10] Hamas-affiliated charitable institutions are also charged with providing payments to the families of suicide bombers.

❑ Providing direct support to Hamas through recruitment and incitement. Charitable institutions affiliated with Hamas are believed to serve as vehicles for the recruitment and indoctrination of potential militants.[11] The provision of financial assistance to the families of suicide bombers is viewed as a particularly reprehensible example.

❑ Providing indirect support to Hamas. Even assuming perfect segregation between Hamas'

military and social activities, the mere existence of a network of social welfare organisations affiliated with an organisation that deliberately targets civilians is considered unacceptable.[12] It legitimises an organisation that resorts to patently illegal acts and, by permitting it to garner support through the delivery of humanitarian assistance, ultimately strengthens it and the ideology and practices it promotes. In addition, some have argued that targeting the social network is essential to eliminating Hamas's military branch, because it offers the most effective leverage. "Nothing", claims former United States Special Envoy Dennis Ross, "is more likely to stop Hamas support for terror than to know that the Palestinian Authority is going to take over" its network of social welfare institutions.[13]

If the continued operation of Islamic social welfare organisations affiliated with Hamas poses a political and security dilemma, their disruption would raise a no less problematic socio-economic, humanitarian and indeed political predicament. Concern about the political impact of such institutions is predicated precisely upon their effectiveness at providing services. Under the combined impact of punitive Israeli sanctions against the West Bank and Gaza Strip population and the PA's disintegration, ordinary Palestinians are experiencing unprecedented hardship at a time when the capacity of their public sector to deliver much needed services continues to diminish. As a result, the role of informal support networks – including particularly those affiliated with Hamas – has increased commensurately. Eliminating Islamic social welfare organisations affiliated with it is likely to have only a negligible impact on Hamas's military activities, while the resulting increase in poverty and despair risks further radicalising the population and creating additional incentives for it to escalate its armed campaign.

This report takes a detailed look at the controversy surrounding Islamic social welfare organisations affiliated with Hamas and assesses the implications of their continued operation or enforced removal in a climate of crisis and conflict.

---

[9] See, for example, Susan Schmidt, "Saudis Aided Subpoenaed Woman's Trip Out of U.S.", The Washington Post, 5 February 2003. U.S. officials interviewed by ICG assert that getting Gulf states to crack down on Hamas financing remains important, but concede that the priority in dealing with these states is to shut down any assistance to al-Qaeda. They also recognise that they have had far more success on the latter than on the former front. ICG interviews, Washington, February 2003.

[10] According to the United States government, "Hamas's charitable organisations 'serve as a screen for its covert' component, thereby permitting the transfer of funds to its terrorist activity", Civil Action N°02-442 (GK), U.S. District Court for District of Columbia, Memorandum Opinion, Holy Land Foundation v. Ashcroft.

[11] The "charitable component is an effective way for Hamas to maintain its influence with the public, indoctrinate children and recruit suicide bombers", Ibid.

[12] ICG interview with U.S. officials, Washington, February 2003.

[13] Dennis Ross, "Give Arafat an Ultimatum", Washington Post, 16 December 2001.

## II.   BACKGROUND

### A.   ISLAMIC SOCIAL WELFARE ACTIVISM[14]

*Zakat*, almsgiving, is one of the "five pillars" of Islam and is thus obligatory upon practising Muslims. In the contemporary Muslim world, the organised provision of social services to population sectors neglected by the state has been central to the emergence of Islamist opposition movements.[15] Their dedication to the needs of the poor and the marginalized, often in sharp contrast to self-serving and disinterested state and religious establishments, significantly contributes to their political appeal.

The majority of Islamic social welfare organisations around the world are politically unaffiliated. Similarly, not all Islamist political movements have engaged in social welfare activism; most of the smaller, clandestine revolutionary groups all but eschew the field and prefer to concentrate their limited resources on the violent struggle against their enemies. Some, however, have created networks of social, charitable, financial and religious institutions noted for their professionalism, efficiency and integrity.

The social welfare activism of Islamist movements typically derives from political considerations as well as piety. In addition to responding to the obligation of *zakat*, such activism provides opportunities for *da'wa*, or proselytism,[16] and may collectively be considered a form of *da'wa* itself. Similarly, such institutions can in various ways contribute to the Islamisation of the individual and society, a process which many Islamist movements – and reformist ones in particular – view as a necessary component of an eventual struggle for political power and as their ultimate strategic objective.[17] Although informed by specifically Islamic characteristics and objectives, Islamic social welfare activism is thus the product of a socio-political strategy that is neither uniquely Islamic nor limited to religious movements.[18]

### B.   THE PALESTINIAN CONTEXT

On account of Jerusalem's sacred status among Muslims, Palestine has historically possessed a multitude of Islamic social welfare organisations. Its most visible institutional expression has been the *waqf*, or religious endowment. While taking many forms, dedication to the public welfare in perpetuity of income deriving from property upon the owner's death (such as the assignation of rent derived from a commercial building to maintain a soup kitchen), is typical.[19] Given the resources required, *waqf* endowments have generally been the preserve of the state and propertied elites and the religious establishment that regulates them. The organised provision of social welfare by autonomous social movements is, by contrast, a more recent phenomenon.

Although Islamic social welfare organisations proliferated throughout Palestine during the twentieth century, until 1967 these tended to have at best tenuous connections to Islamist socio-political movements and were limited in their ulterior objectives (to the extent these existed) to promoting religious consciousness and observance. The Israeli occupation of the West Bank and Gaza Strip that began that year, however, was a turning point. Israel's overwhelming military victory thoroughly discredited the defeated secular, nationalist, pan-Arabist regimes and to a lesser extent the ideologies that underpinned them, and set the stage for a revival of the Islamist movements they had successfully repressed and outflanked for the better part of two decades. At the same time, the 1967 War precipitated

---

[14] In this report, "Islamic" refers to entities that are nominally or generically Muslim , while "Islamist" denotes entities which are self-consciously so, and formulate explicit political or ideological objectives on this basis.
[15] Islamist movements are those that pursue political power in order to promote Islam as the dominant force in government and society. Although such movements differ widely both in their interpretation of Islam and on the means by which this is to be achieved, a commitment to the application of Shari'a, Islamic law, is their most common denominator.
[16] Literally, "the Call [to Islam]". Examples are networks of religious classes for Muslim pupils, broadly equivalent to Sunday Schools.

[17] In the Islamist revolutionary tradition, by contrast, the Islamisation of society is viewed as a process that follows the seizure of political power, perhaps further explaining the comparative neglect of social welfare activism by such organisations.
[18] In this respect, the "Preferential Option for the Poor" adopted by Catholic priests in Latin America espousing Liberation Theology, and the social services provided by socialist movements in Europe, are pertinent examples.
[19] Waqf endowments were also established by Christians and Jews, and in accordance with Shari'a were established by both men and women.

the rapid rise of the independent Palestinian guerrilla organisations that came to dominate the Palestine Liberation Organisation (PLO) and by extension the Palestinian political arena.

Within the occupied territories, there was initially no inherent contradiction between the emergence of a largely secular, explicitly nationalist PLO with considerable leftist influences and the more gradual Islamist revival. Palestinian Islamist movements, including the largest, the Muslim Brotherhood *(al-Ikhwan al-Muslimin)*,[20] were reformist during this period rather than revolutionary in character[21] and as such more interested in *da'wa* than *jihad*.[22] The PLO was primarily occupied with the struggle against Israel and on the whole avoided socio-economic issues it viewed as obstructive to the broad national consensus it sought to promote.[23] Islamist activists who lost patience with the generally quiescent approach of their parent organisations were easily accommodated within the mainstream Palestinian National Liberation Movement (Fatah) led by Yasir Arafat; alternatively, they could – and occasionally did – add to the plethora of Palestinian organisations by establishing yet another.

Nevertheless:

> Beginning in 1967, the Muslim Brotherhood began to establish mechanisms to spread its ideas and increase its influence. The society

founded Islamic charity organisations, which supervised religious schools. It also managed nursery schools and kindergartens, which were usually attached to mosques. The Brotherhood also established neighbourhood libraries and sports clubs … The Muslim Brotherhood used … *zakat* … to help thousands of needy families. And thousands of students and children were enrolled in schools and kindergartens run by the Islamic movement.[24]

With the additional influence derived from sympathisers involved in the supervision of the "extensive network of [formal] *waqf* property" and the rapidly expanding number of mosques, the Muslim Brotherhood possessed "useful mechanisms for the spread of Islamic influence."[25]

The establishment and financing of such organisations was rarely problematic. The Israeli authorities generally took the view that the Islamist movement was less threatening than the militant PLO, that it could usefully absorb the energies of Palestinian youth and could be a valuable instrument to promote "disputes and schisms among Palestinians".[26] They routinely furnished the required permits and encouraged the movement with funding and in other ways.[27] But even more than the Israeli

---

[20] The Muslim Brotherhood was established in Egypt in 1928 and during the next two decades set up chapters in most countries of the Levant. The Palestinian chapter was created in 1946 in Jerusalem. See further Richard P. Mitchell, The Society of the Muslim Brothers (Oxford, 1969); Khaled Hroub, "Hamas: Political Thought and Practice", Institute for Palestine Studies, Washington, 2000, pp. 11-29, for an account of the Brotherhood's emergence in Palestine during the British Mandate and development within the West Bank and Gaza Strip after 1948.

[21] In practical terms, pre-occupied with social rather than political change.

[22] Literally translated as "struggle", jihad in Islamic theology – much like "crusade" in contemporary English usage – has numerous connotations, many of which are unrelated to armed conflict. In the context of Islamist movements' struggles for power, jihad is most often translated – by participants and observers alike – as "holy war", though "sacred struggle" is perhaps a more appropriate equivalent since in addition to armed conflict it can also entail non-violent action such as an election campaign or consumer boycott.

[23] This was particularly true of the Palestinian National Liberation Movement (Fatah), which since 1967 has largely dominated the PLO.

[24] Ziad Abu-Amr, *Islamic Fundamentalism in the West Bank and Gaza: Muslim Brotherhood and Islamic Jihad,* (Bloomington, 1994), pp. 14-15.

[25] Ibid., p. 15, which also notes that the number of mosques in the West Bank and Gaza Strip more than doubled between 1967 and 1987, from 600 to 1,350, and that waqf endowments accounted for 10 percent of all property in the Gaza Strip. The network of charitable institutions was particularly strong in Gaza, where Shaikh Ahmad Yassin played an important role as head of the Islamic Association (al-mujamma al-islami). Jean-François Legrain, "Vers Une Palestine Islamique?", L'Arabisant 35 (2001).

[26] Anat Kurz and Nahman Tal, "Hamas: Radical Islam in a National Struggle", Jaffee Center for Strategic Studies, Jerusalem, 1997, at http://www.tau.ac.il/jcss/memoranda/memo48su.html.

[27] Abu-Amr, Islamic Fundamentalism, p. 35, citing Yitzhak Segev, former Israeli military governor of the Gaza Strip and New York Times correspondent David Shipler, who additionally discuss Israeli facilitation of Islamist attacks on PLO and Palestine Communist Party sympathisers; Graham Usher, "What Kind of Nation? The Rise of Hamas in The Occupied Territories", in Usher (Ed.), *Dispatches from Palestine: The Rise and Fall of the Oslo Peace Process* ,(London, 1999), p. 19; Kurz and Tal, Hamas, who confirm that until the late 1980s Israel "took a tolerant view" of Islamist organisations, adding that in 1984 the Israeli

and local financial contributions, the considerable wealth that flowed into the coffers of the conservative Gulf states and Palestinian expatriate communities after the oil price rises of 1973 provided Islamic organisations in the occupied territories with their major source of funds.

The 1979 Iranian revolution and the 1987-1993 Palestinian uprising were further major milestones. Though the Iranian Islamists emerged from a different religious and political tradition, their seizure of power fundamentally challenged the reformist current dominant within the Muslim Brotherhood. Influenced by both the Iranian experience and that of the clandestine Islamist revolutionary groupings emerging in Egypt (who were themselves influenced by developments in Iran), a number of Muslim Brotherhood activists in 1980 separated from the organisation to establish a radical, militant alternative, Islamic Jihad.[28]

Less than a decade later, the eruption of the Palestinian *intifada* – which Islamic Jihad helped foment – threatened the Brotherhood with an even more severe split. It responded by taking the initiative and in February 1988 established Hamas, an explicitly activist movement openly dedicated to resisting the Israeli occupation.[29] The formation of Hamas reflected both increasing militancy among the Brotherhood's rank-and-file (and indeed West Bank and Gaza Strip Palestinians more generally), and the organisation's need to maintain credibility in the drastically altered political environment in the occupied territories.[30] The contest for the hearts and mind of the Palestinian people, which had been developing between the Muslim Brotherhood and

the PLO for several years, became a competition for leadership of the Palestinian people.[31]

As the PLO failed to convert the Palestinian uprising into an Israeli withdrawal from the occupied territories and confronted political and financial bankruptcy in the aftermath of the 1991 Gulf War (during which it sided with Iraq), the fortunes of Hamas steadily rose. After Israel and the PLO signed the Oslo agreement in 1993, Hamas's popularity became a barometer of political discontent with the peace process and the Palestinian Authority. The contrast between the modest life styles of its leaders and the more opulent preferences of many in the PLO, especially after they returned to the West Bank and Gaza, and between the integrity and efficiency of the Islamic social welfare apparatus on the one hand and the corruption and cronyism of its nationalist counterpart on the other, were among its most potent assets.[32] Not insignificantly, the Hamas charter, unlike that of the PLO, makes specific mention of social solidarity:

> The Muslim Society is a cooperative society (Article 20).
>
> Part of social welfare consists of helping all who are in need of material, spiritual, or collective cooperation to complete various projects. It is incumbent upon the members of the Islamic Resistance Movement to look after

---

[31] For a more detailed examination of the development of the Brotherhood and the emergence of Hamas between 1967 and 1988 see Abu-Amr, op. cit., pp. 10-89; Hroub, op. cit., pp. 29-41; and Beverly Milton-Edwards, Islamic Politics in Palestine (London, 1999), pp. 73-146.
[32] For a discussion of PA corruption largely based on Palestinian and internal PA sources, see ICG Middle East Briefing Paper, *The Meanings of Palestinian Reform*, 12 November 2002, pp. 4-6 and references cited. Israel's role in promoting Hamas during this early period – a role repeatedly alleged by PA officials, including Chairman Arafat – is more difficult to ascertain. ICG interviews, Ramallah, November 2002. Several Palestinians have made the claim that in 1988 the Israeli military would often enforce Hamas general strikes while sparing no effort to disrupt those called by the Unified National Leadership of the Uprising aligned with the PLO. Similarly, ICG interview, Wale Manners, Palestinian journalist, 23 February 2003, notes: "Hamas benefited greatly from Israeli complicity during its initial years. For example, during the first intifada, not a single person was arrested for being a member of a zakat committee, while a member of a [secular and largely PLO-affiliated] voluntary work committee – who is not necessarily politically affiliated – would be imprisoned for six months as punishment for such membership".

---

authorities permitted a leading Islamic organisation in the Gaza Strip to continue functioning despite the fact that arms were found on its premises; secular organisations in similar circumstances have been immediately banned.
[28] Abu-Amr, op. cit., p. 93. At its inception, Islamic Jihad was more a loosely knit combination of various groups that shared a belief in the primacy of armed struggle against Israel. See Legrain, "Vers Une Palestine Islamique?" op. cit.
[29] See further Usher, "What Kind of Nation?", op. cit., pp. 18-33. Hamas, however, dates its establishment from December 1987.
[30] Abu-Amr, op. cit., pp. 63-69. See Hroub, Hamas, op. cit., pp. 33-36 for an account of increasing activism within the ranks of the Brotherhood leadership prior to the uprising.

Case 1:05-cv-04622-DLI-RML   Document 267-13   Filed 03/22/12   Page 430 of 646 PageID #: 7108

*Islamic Social Welfare Activism In The Occupied Palestinian Territories: A Legitimate Target?*
ICG Middle East Report N°13, 2 April 2003                                                                          *Page 6*

the needs of the people as they would their own needs. (Article 21)[33]

One of Israel's clear objectives was to ensure that Palestinians would crack down against those among them who resorted to violence. As stated by Yitzhak Rabin in September 1994, the PA "will run their internal affairs without the High Court of Justice, B'Tselem [the Israeli Information Centre for Human Rights in the Occupied Territories], or all sorts of groups of mothers and fathers and bleeding hearts".[34] It seemed reasonable to expect that the security forces of the soon-to-be-established PA would incapacitate the Qassam Brigades, while visible progress in the peace process and widespread economic development would neutralise the political appeal of Hamas.

The reality was different. With few exceptions the PA proved unable and/or unwilling to confront Hamas and Islamic Jihad decisively,[35] while the gradual disintegration of the peace process and further deterioration of the Palestinian economy guaranteed the Islamists continued popular support. Here again, their willingness and ability to serve the neediest sectors of society enhanced their stature. Islamist social welfare organisations stood comparisons with PA ministries and agencies particularly well. While international attention was primarily focused on the relationship between the PA and successive Israeli governments, the Islamist movement in the West Bank and Gaza Strip continued to develop. Without relinquishing its

strategic objective (the establishment of an Islamic state throughout historic Palestine), Hamas gradually reduced its military actions, focusing instead on its religious and social activities.[36]

As Israeli-Palestinian negotiations were replaced by violent confrontation in September 2000, it appeared that the political prospects of Hamas could only improve. The Qassam Brigades – whose participation in the Al-Aqsa intifada was initially marginal – eventually carried out many of the most devastating attacks against Israeli targets, including civilians, which, in a climate of protracted conflict and increasing suffering and hatred, garnered the Islamists widespread popular acclaim among Palestinians. At the same time, the immobilisation of PA institutions, their ineffectiveness in protecting the population from Israeli military assaults, and growing economic hardship – to a considerable extent a result of Palestinian attacks – only increased the demands for services offered by organisations affiliated with Hamas.

What seemed like a successful formula for Hamas suffered a major setback as a result of the international response to 11 September. The "war against terrorism" that subsequently was announced gradually developed into a broader campaign against militant Islamist movements around the globe. Hamas and the Islamic Jihad's actions were placed, particularly by the U.S., in the context of a cohesive, global struggle against terrorism.

Within this general framework, a variety of efforts were also launched to stem the flow of funds to institutions seen to contribute to the further development of the radical Palestinian Islamist movement. On 2 November 2001, the U.S. added Hamas to its list of terrorist organisations.[37] Pursuant to that decision, on 4 December 2001 Washington froze the assets of the Holy Land Foundation for Relief and Development, a U.S.-based charity that had been accorded tax-exempt status. According to President Bush, "Money raised by the Holy Land Foundation is used by Hamas to support schools and indoctrinate children to grow up into suicide bombers … [and] also used by Hamas to recruit

---

[33] "The Charter of Allah: The Platform of the Islamic Resistance Movement", Articles 20 and 21. Reproduced in Hroub, Hamas, op. cit., p. 280.
[34] Quoted in Jessica Montell, "Peace by any Means Necessary?" Tikkun (May/June 1999).
[35] One of the most notable exceptions came in 1996, when, in the wake of a series of deadly suicide bombings against Israelis, PA security forces, in coordination with Israeli security services, launched a widespread campaign against the Hamas and Islamic Jihad militias that effectively neutralised their capabilities. In March of that year, "dozens of Islamist institutions – kindergartens, charitable institutions, mosques – are searched and placed under the control of [the PA]." Charles Enderlin, Shattered Dreams (New York, 2003), pp. 33-34. Although the PA took these steps, and in particular subordinated the mosques to Ministry of Religious Affairs supervision, it simultaneously "sustained a quiet dialogue" with the Hamas political leadership and ultimately left its social welfare infrastructure "largely intact". See further Graham Usher, "The Politics of Atrocity", in Usher, Dispatches, op. cit., p. 84; Hroub, Hamas, op. cit., pp. 107-109.

[36] See Legrain, "Vers Une Palestine Islamique?", op. cit.
[37] "Comprehensive List of Terrorists and Groups Identified Under Executive Order 13224", at http://www.state.gov/s/ct/rls/fs/2002/12327.htm. The U.S. State Department had designated Hamas a "Foreign Terrorist Organisation" several years previously.

Case 1:05-cv-04622-DLI-RML   Document 267-13   Filed 03/22/12   Page 431 of 646 PageID #: 7109

*Islamic Social Welfare Activism In The Occupied Palestinian Territories: A Legitimate Target?*
*ICG Middle East Report N°13, 2 April 2003* *Page 7*

suicide bombers and to support their families". Proclaiming that "the terrorists benefit from the Holy Land Foundation", President Bush called upon "other nations to suppress the financing of terror". [38] In effect, Islamic social welfare activism was designated as a vital component of the terrorist infrastructure.

# III. PALESTINIAN ISLAMIC SOCIAL WELFARE ORGANISATIONS

## A. TYPOLOGY

Islamic social welfare organisations fall into two broad categories. Charitable institutions are primarily engaged in the provision of alms, typically in the form of financial subsidies and food support, but also other items such as clothing and shelter. Service organisations by contrast provide benefits such as education, vocational training and medical relief. Such distinctions are not absolute, as organisations primarily engaged in one field will also work in the other – a pattern that has become more evident since September 2000.

According to Sara Roy, who conducted extensive fieldwork in the Gaza Strip, in 1999 Islamic institutions "comprise[d] anywhere from 10-40 percent of all social institutions in the Gaza Strip and West Bank" and "directly reach[ed] tens of thousands of people and impact[ed] hundreds of thousands more". [39] In 1997, for example, 22,615 families comprising 278,348 individuals received assistance from such institutions.[40] The principal recipients of assistance provided by Islamic social welfare organisations are low-income households. Beneficiaries of regular programs include families headed by divorced women and widows and those in which the husband is chronically ill, permanently disabled, unemployed, or imprisoned.

Assistance to orphans has always enjoyed a special status in the Islamic tradition of social welfare – in part because the Prophet Muhammad was orphaned at a young age. All but two of 40 Islamic social welfare organisations surveyed by ICG identified orphans as a specific target group.[41]

Palestinian Islamic social welfare organisations play a disproportionately large role in a number of critical sectors. For example, the PA Ministry of Education estimates that in the Gaza Strip, where the school system is so overwhelmed that pupils are educated in

---

[38] "President Announces Progress on Financial Fight Against Terror: Remarks by the President on Financial Fight Against Terror, The Rose Garden", at http://www.whitehouse.gov/news/ releases/2001/12/20011204-8.html. Mr. Bush stated that the Holy Land Foundation had raised U.S.$13 million in 2000, and simultaneously announced that the United States had "blocked the accounts of an Hamas-linked bank, an Hamas-linked holding company based in the West Bank".

[39] Sara Roy, "The Transformation of Islamic NGOs in Palestine", *Middle East Report,* 214 (Spring 2000), p. 25. The population of the occupied Palestinian territories is approximately 3 million.
[40] Palestine Poverty Report 1998, p. 70.
[41] ICG survey of 40 Islamic social welfare organisations in the West Bank and Gaza Strip, 2002.

Case 1:05-cv-04622-DLI-RML Document 267-13 Filed 03/22/12 Page 432 of 646 PageID #: 7110

shifts, Islamic organisations account for 65 per cent of all educational institutions below secondary level – suggesting the sector would collapse without their continued involvement.[42] They are similarly active at the university level, providing tuition support to many students. In many localities, furthermore, Islamic social welfare organisations hold a virtual monopoly on assistance to the disabled and are the third largest source of moral and psychological support to traumatised village children.[43] Education also takes place through mosques, where Hamas influence is considerable. Indeed, the organisation has traditionally used them as forums to convey political messages.

## 1. Islamic Charitable Institutions

*Zakat* is not a formal tax in Palestinian law nor is it collected by the PA.[44] Because Muslim Palestinians are thus free to determine whether, to what extent and how to disburse *zakat* payments, it is for all intents and purposes impossible to determine what percentage of the population participates in this practice, or how much money is raised on an annual basis. Nevertheless, a decentralised network of *zakat* committees, which since 1996 operate under the supervision of the Ministry of Religious Affairs, exists in various West Bank and Gaza Strip localities. These committees disburse *zakat* payments received from local residents, additional voluntary donations (*sadaqa*) made by individuals, organisations, corporations and governments, and allocations from *zakat* funds in foreign countries.[45]

*Zakat* committees, with their clear associations to obligatory religious practice (*fard*), are among the most established Islamic institutions in the occupied Palestinian territories (and indeed throughout the

wider Arab and Islamic worlds). Although it is difficult to estimate their share of overall Islamic social welfare activity in either organisational or financial terms, collectively they are predominant among charitable institutions.

Such committees are generally governed by a board of local community and religious leaders and typically provide assistance to low-income households (usually families without a male breadwinner), orphans, the chronically ill and disabled and students in financial need. Some have also been involved in the establishment and operation of service-oriented organisations like hospitals and medical clinics.[46]

The Ramallah *Zakat* Committee, for example, is led by local businessman Shaikh Husni Abu Awad. It sponsors orphans, assists needy families, operates a medical clinic, and counts ten Christian families among its beneficiaries.[47] The Gaza *Zakat* Committee, which is considerably larger and has more than 50 employees, provides more than 5,000 beneficiaries with cash assistance, food, medicine, free health care, and interest-free loans for housing and university education. Like many other such organisations, it cooperates with the local authorities in selecting recipients, determining which services to provide, and in the actual distribution.[48]

## 2. Islamic Service Organisations

Islamic service organisations comprise a wide range of institutions providing a large variety of services to Palestinian society. At its most basic, such an organisation can consist of several volunteers who give extra-curricular Quranic instruction to neighbourhood schoolchildren. In their more elaborate manifestations, such as orphanages and vocational training centres, they have all the attributes of a functioning organisation, including employees, governing bodies, annual budgets and internal elections, and perhaps marketing and fundraising operations well. Many are local and provide only a single service; others offer a wider range and may be part of a larger network including local branches.

---

[42] Roy, "The Transformation of Islamic NGOs in Palestine", op. cit., p. 25.
[43] Bocco et. al., *International and Local Aid during the Second Intifada*, op. cit., p.100.
[44] John Esposito, *Islam: The Straight Path* (Oxford, 1994), pp. 90-91, notes that *zakat* is "usually" calculated at 2.5 percent of the value of all assets (including income) per annum. Milton-Edwards, op. cit., p. 127, describes it as 7 per cent of annual income.
[45] According to the PA's "Palestinian Poverty Report 1998", p. 69 (fn.24), there were 62 *zakat* committees in 1998. An unpublished UN study found only 30 such committees in 2001 (fourteen in the West Bank and sixteen in the Gaza Strip). See UNSCO and OCHA, "Food and Cash Assistance Programmes, October 2000-August 2001: A Brief Overview", p. 5.

[46] "Palestine Poverty Report 1998", p. 70.
[47] ICG interview, Shaikh Husni Abu Awad, Ramallah, 23 February 2003.
[48] ICG survey of 40 Palestinian Islamic social welfare organisations.

The case of the Islamic Assembly of Gaza, one of the large Hamas-affiliated organisations, is illustrative. Aside from providing cash assistance to roughly 5,000 orphans and hundreds of poor families, it distributes food, school bags and winter clothing, organises wedding parties and sponsors nurseries, clinics and sports clubs. Its impact probably is felt in varying degrees by tens of thousands of Palestinians.[49]

In addition to confirming that "management and staff are typically well educated, highly trained and professional", Roy finds that

> the services provided by Islamic NGOs are generally of high quality and are perceived as such by the population ... Islamic NGOs almost uniformly define niches and work in sectors and localities where considerable needs are largely unmet. Their constituencies are mostly the poor and marginalized ... and in some localities ... Islamic NGOs appear to be the only ones working with these groups ...[50]

The comparative advantage enjoyed by Islamic social welfare organisations relative to both the PA and other NGOs has been widely noted. According to a former NGO activist in the Gaza Strip:

> [This advantage] derives from their organic links with the grassroots, which in contrast to others they sustained throughout. Where other NGOs became increasingly pre-occupied with political and institutional issues like development and capacity building, the Islamic organisations retained their emphasis on social service delivery, and did this very professionally. As a result, they were easily able to maintain their links to their constituencies. The other factor is the deteriorating economic situation since Oslo. The increased poverty levels created additional

needs, underscored the relevance of their work and approach, and meant that they were able to expand their constituencies even further.[51]

Similarly, the former director of an EU humanitarian agency spoke highly of the professionalism of Islamic social welfare organisations: "Their lists of beneficiaries are quite impressive in their exactitude, and represent those truly in need. Some international organisations even double-check their own lists with theirs".[52]

## B.   LEGAL STATUS

Islamic social welfare organisations in the occupied Palestinian territories are independent legal entities or branch organisations of such entities. This holds true for those affiliated with political movements such as Hamas, as well as for those with no apparent political orientation.

In terms of their legal status, the vast majority of registered Islamic social service organisations were until 1994 defined as charitable associations, reflecting the general nature of their activities as well as the official classification of social service organisations prior to the advent of the PA. After 1994, all such institutions were required to obtain an additional operating license from the PA ministry responsible for their particular field of activity (e.g. health, education). In 2000, new Palestinian legislation came into effect that consolidated the regulation of NGOs, private voluntary organisations (PVOs), and charities according to a single standard, and pursuant to which such institutions had to obtain new certificates of registration from the Ministry of Interior.[53] Organisations previously licensed by a PA ministry (or, prior to 1994, the Israeli authorities) obtained these with relative ease, though there is good reason to question how closely their activities have been monitored by the PA for compliance with its laws. New and previously unrecognised organisations could only obtain Ministry of Interior

---

[49] ICG interviews, Gaza, Spring 2002. As Roy describes it, Islamic organisations "play an important and visible role in the following areas: relief and charity work; preschool, primary and elementary education; library development; the education and rehabilitation of physically and mentally disabled children and adults; primary and tertiary health care …women's income-generating activities; literacy training; the care of orphans (which includes all aspects of their life from infancy to age 16); the care of the elderly; the care and placement of 'illegitimate' children, who come to them as abandoned infants; and youth and sports activities". Roy, op. cit. pp. 25-26.
[50] Roy, op. cit., p. 26.

[51] ICG interview, Wafa Abdel-Rahman, former coordinator of the Palestinian NGO Network (PNGO), in the Gaza Strip, Ramallah, 10 October 2002.
[52] ICG interview, former head of EU ECHO, New York, October 2002.
[53] Law N°1 on Charitable Societies and Civic Associations (2000).

registration upon the consent of the relevant supervisory ministry.[54]

In theory, the new law includes strict safeguards against any exploitation of registered organisations for the illicit movement of funds. In addition to providing for thorough organisational transparency, it requires registered organisations to appoint a certified accountant to supervise their budgets, keep detailed and verifiable records of all income and expenditures, and submit "detailed" and independently audited accounts (along with full accounts of all activities), to the PA on an annual basis. If an organisation is found to be violating its approved charter and fails to heed formal warnings, the PA is entitled to launch legal proceedings to close it down, and take additional measures to ensure that any remaining assets are disbursed in accordance with the objectives for which the organisation was established.[55] As a result of the intifada and ensuing destruction of the PA, there has been no opportunity to test whether it would rigorously enforce the law. According to a Palestinian NGO activist: "The law is if anything too intrusive. . . . The problem with it is that it is not being enforced, because the PA is no longer capable of this after its virtual destruction by Israel".[56]

*Zakat* committees have been governed by a more complex set of regulations. While some are registered as charities, most are regulated by laws deriving from Jordanian and Egyptian legislation that applied to the West Bank and Gaza Strip prior to 1967. Pursuant to the latter, they are accountable to the Ministry of Religious Affairs, in whose names their bank accounts are registered and which audits their finances on a weekly basis.[57] A draft law on *zakat* committees is currently before the Palestinian Legislative Council, which would consolidate the anomalies in this sector and retain and modernise the PA's organisational and financial controls.

The Islamic social welfare sector as a rule has been more diligent about the registration process than its secular counterpart and therefore encountered fewer difficulties. Two factors explain this. First, their focus on service provision has been perceived by the PA as less of a threat than the network of secular NGOs devoted to human rights, democratisation and related issues. "In fact," states a former NGO activist, "the activities of the Islamic social welfare sector complemented rather than competed with the services provided by the PA; because of the PA's limited resources in the provision of social services, the effect of Islamist social welfare activism was to reduce popular pressures on the PA".[58] A senior Interior Ministry official in 1999 confirmed this view: "we 'look the other way' with many Islamic institutions because they provide excellent services and this helps us [the PA] a great deal".[59]

Secondly, Islamic organisations appear to have been less reticent than their secular counterparts to comply with PA requirements. While others have sought to demonstrate that they maintained a critical distance and independence from the PA, Islamic organisations had the opposite concern: that excessive distance from the PA would make them exceedingly vulnerable to PA and foreign pressure. As a result, they went out of their way to avoid confrontation with PA officials. For example, while there was widespread opposition in the NGO community to the PA registration requirements (on the ground that NGOs needed to preserve their independence and there first should be a law guaranteeing this independence), Islamic organisations often were among the first to register.[60]

## C.  POLITICAL AFFILIATION

Because Islamic social welfare organisations are formally independent entities, their political affiliations are not immediately apparent. Some are politically as well as legally independent. Others are affiliated with a political entity, such as Hamas, Fatah, or the PA itself. Affiliation, in turn, is often a matter of degree.

---

[54] ICG interview, PA Ministry of Interior official, Ramallah, 11 October 2002. The 2000 law effectively eliminated the role of the Ministry of Non-Governmental Organisations, which until that time was in any event unclear. In a further cabinet reshuffle in late 2002, the NGO Ministry was abolished altogether although it continues to exist in a non-ministerial capacity.
[55] Articles 11, 13, 30, 38. and 39, Law N°1 on Charitable Societies and Civic Associations (2000)
[56] ICG telephone interview, Wafa Abdel-Rahman, 4 February 2003.
[57] ICG interview, Abu Awad.

[58] ICG interview, Abdel-Rahman, Ramallah, 10 October 2002.
[59] Roy, op. cit., p. 26, adding that "all Islamic NGOs [in the Gaza Strip] are official and legally registered with the appropriate Palestinian ministries, as they were with the Israeli authorities before 1994".
[60] ICG interview, Palestinian NGO activist, February 2003.

Case 1:05-cv-04622-DLI-RML   Document 267-13   Filed 03/22/12   Page 435 of 646 PageID #: 7113

*Islamic Social Welfare Activism In The Occupied Palestinian Territories: A Legitimate Target?*
ICG Middle East Report N°13, 2 April 2003                                                    *Page 11*

In many cases, such as the extensive network of institutions in Khan Yunis in the Gaza Strip known as the Islamic Association (*al-Mujamma' al-Islami*) or that of the Islamic University in Gaza City, the affiliation of a particular social welfare organisation with Hamas is readily apparent and all but official.[61] In others it can be inferred from a combination of factors such as the identity of the founders, composition of governing bodies, funding and staffing. While there is nothing scientific or rigorous to this process, Palestinians interviewed by ICG stated that the Hamas affiliation of a particular relief organisation, pre-school education centre, *zakat* committee or mosque is generally a matter of common knowledge so that people can state with some assurance that "this mosque is Hamas" and that one is not.

It is generally held that Hamas is far more influential within the social welfare sector than any other Palestinian political organisation, including the PA. In addition to the Hamas members who supervise the movement's own network of organisations, others (and/or their sympathisers) sit on the boards of *zakat* committees and service organisations, help fund them and are employed by them in various capacities, and are otherwise involved in their activities.

What such apparent dominance means in practice is a different matter. In the words of a senior USAID official with extensive experience in both the West Bank and Gaza Strip, "what exactly does political 'affiliation' mean in a context where everyone is either affiliated with a political movement to some degree or labelled as such? Can you assign political 'affiliation' to an organisation if it does not have a political agenda and its leader is not affiliated to the extent that he acts on behalf of a political movement as opposed to his institution"?[62] The same official notes that the capacity of one or two board members affiliated with Hamas to influence decision-making and dictate organisational policy is overstated, if only because such governing boards generally have limited powers on account of poor chain-of-command, and the organisations tend to be staff-driven.[63] Moreover, many independent NGOs have sought broad and diverse political participation on their boards in order to ensure that they are deemed representative and responsive to community needs. The presence of Islamists is, under this view, a necessary requirement.

Although there are no official and precise figures regarding Hamas-affiliated social welfare organisations operating in the West Bank and Gaza Strip (and bearing in mind that "affiliation" is an inherently problematic concept), it is believed their number, if branch organisations are excluded, lies somewhere between 70 and 100.[64] While they may not dominate the NGO landscape numerically, they are widely seen as its most dynamic component.

## D.    FUNDING MECHANISMS

The funding available to Islamic social welfare organisations is impossible to ascertain precisely, primarily on account of the large variety of sources. This funding is anything but centralised. The organisations themselves maintain that all money is raised independently from local, Arab and foreign individuals and organisations, and includes both program support and unsolicited donations. The Ramallah *Zakat* Committee, for example, claims to be funded by a combination of local merchants, Palestinian expatriates, and Palestinian philanthropic associations.[65] The Al-Salah Islamic Association, considered one of the largest Hamas-affiliated organisations in the Gaza Strip, obtains support from a variety of local and foreign organisations on the basis of project proposals it submits.[66] The independent Wafa Charitable Society, also in the Gaza Strip, has received program support.[67] The Al-Bira Islamic Charitable Society in the West Bank, which obtains part of its funding from Islamic charities in Australia and Saudi Arabia, charges tuition fees for its schools (orphans study free).[68]

Unsolicited donations are either paid directly to such organisations, or raised on their behalf by individuals

---

[61] For example, Sheikh Ahmad Bahr, head of the afore-mentioned Islamic Assembly of Gaza, is a well-known Hamas member.
[62] ICG interview, USAID official, Jerusalem, 13 September 2002.
[63] ICG interview, USAID official, Jerusalem, 21 May 2002.

[64] ICG interviews, Palestinian and international institutions, West Bank and Gaza Strip, May, April, and September 2002, provide the basis for this estimate.
[65] ICG interview, Shaikh Husni Abu Awad, Chairman of the Ramallah Zakat Committee.
[66] ICG E-mail interview with Al-Salah Islamic Association, 25 February 2003.
[67] ICG telephone interview, 24 February 2003.
[68] ICG interview, Mahmoud Misleh, Director of the Al-Bira Islamic Charitable Society, 23 February 2003.

Case 1:05-cv-04622-DLI-RML Document 267-13 Filed 03/22/12 Page 436 of 646 PageID #: 7114

*Islamic Social Welfare Activism In The Occupied Palestinian Territories: A Legitimate Target?*
*ICG Middle East Report N°13, 2 April 2003*        *Page 12*

and institutions familiar with and supportive of their activities. This has become an increasingly common practice during the current uprising, for example as a result of telethons in Gulf states held in support of the Palestinian people or on the occasion of important Islamic holidays. While it does not appear that Islamic social welfare organisations affiliated with Hamas have been directly funded by governments, they have benefited extensively from charitable societies active in the Gulf (some of which "operate under royal patronage"),[69] Europe, and North America. Although Palestinian, Arab and Muslim expatriate communities play an important role in contributing to such charities, the majority of foreign funding has traditionally come from the Gulf region.

Islamic social welfare organisations also benefit from informal support networks; in some cases, Palestinian expatriates are approached with cash donations and asked to distribute them to Palestinians in the occupied territories. They either transport or – using personal connections – transfer such funds to the West Bank and Gaza Strip, where they are hand-delivered to needy families. In order to ensure the integrity of the process, an Islamic social welfare organisation considered trustworthy by the distributor of such funds will be approached to provide a list of eligible beneficiaries, as well as a representative to witness and confirm the disbursements. Such funds are as a rule not transferred to the budgets of the organisations involved, but are nevertheless perceived as part of their activities.[70]

According to Hamas spokesperson Abd-al-Aziz Rantisi, the organisation "does not fund" Islamic social welfare organisations, and the latter deny this just as emphatically.[71] According to Rantisi, Hamas provides assistance directly to Palestinians and thus has no need for the intermediary services of Islamic

social welfare organisations.[72] For their part, the social welfare organisations consistently emphasise their financial probity and transparency, as well as their strict compliance with PA regulations. According to the Al-Salah Islamic Association:

> Our accounting is done by our internal accounting department, certified by an external auditor, and monitored by the [PA] General Comptroller's Office and Ministry of Interior … We provide funders with financial statements for the project ... If any counterpart should request to see our entire budget, the Association has no objection to this.[73]

In another case, the Al-Bira Islamic Charitable Association did not hesitate to provide its books to ICG for inspection when queried about its finances. Indeed, the professional integrity of Islamic social welfare organisations was consistently emphasised by Palestinians, foreign diplomats, and representatives of international organisations interviewed by ICG.

While the picture painted by Hamas and Islamic social welfare organisations may well be technically accurate, and the Islamist movement's direct role in the development and financing of such institutions appears to have been limited to their start-up phase,[74] it seems beyond question that Hamas continues to play an indirect, yet significant role in the financing of affiliated organisations. Most importantly, this would include funds from local and particularly foreign individuals and charities that are channelled directly to such organisations upon the recommendation of Hamas activists and sympathisers.

---

[69] Human Rights Watch Report, "Erased in a Moment: Suicide Bombing Attacks Against Israeli Civilians", pp. 101-102, 2 November 2002.

[70] ICG interviews, Palestinians residents of the occupied territories involved in such disbursements, Amman, January 2003. The individuals concerned, who are not members of any political organisation, had received an unsolicited sum of U.S.$15,000 provided by multiple non-Palestinian Arab donors for this purpose, and related a number of similar cases of this practice to ICG, at times involving significantly higher amounts.

[71] ICG telephone interview, Abd-al-Aziz Rantisi, 22 February 2003; ICG E-mail interview with Al-Salah Islamic Association; ICG interview, Mahmoud Misleh, Al-Bira Islamic Charitable Society.

[72] ICG telephone interview, Abd-al-Aziz Rantisi, who substantiated his point by citing an example in which Hamas founder Shaikh Ahmad Yasin in early 2003 personally distributed funds to shopkeepers whose premises had been destroyed during an Israeli incursion into the Shuja'iyya quarter of Gaza City.

[73] ICG E-mail interview with Al-Salah Islamic Association.

[74] ICG interview. Rantisi notes that these organisations "were established prior to Hamas and acquired registration certificates to conduct their activities from the Israeli occupation as early as 1978, while Hamas was established in 1987". In other words, most were established by the Muslim Brotherhood. Abdel-Rahman, in a telephone interview with ICG, concurred that Hamas "might help a newly established organisation to start up, but these organisations are very professional in their work and don't need Hamas to keep funding them".

It is primarily in this sense that the concept of Hamas funding for Islamic social welfare organisations should be understood. Thus, according to the U.S.-based Council on Foreign Relations, Hamas "devotes much of its estimated U.S.$70 million annual budget to an extensive social services network". Israeli scholar Reuven Paz adds that "approximately 90 per cent of its work is in social, welfare, cultural, and educational activities".[75] Others have estimated the Hamas budget to be in the range of U.S.$40-70 million, of which 85 per cent is raised abroad and 15 per cent locally, with 95 per cent of the total allocated to social services.[76] While these figures vary widely, they do highlight the importance of Hamas' continued involvement in the funding of affiliated institutions. And while it is also impossible to give an accurate proportional breakdown of the various funding mechanisms that benefit Islamic social welfare organisations, the indirect involvement of Hamas in the process through "mediation" can be assumed to be vital for any number of such institutions.

### E.   DELIVERY MECHANISMS

Most Islamic social welfare organisations rely on a combination of applications and field surveys to identify and select eligible beneficiaries, although, due to the social stigma associated with soliciting assistance, the latter method predominates.[77]

Selection by *zakat* committees generally is based on socio-economic need rather than the piety or political affiliation of beneficiaries. Although such institutions accept applications from the needy, they also rely on cases being brought to their attention by members of the community and social workers, and seek to identify beneficiaries themselves. Decisions on individual cases are based on independent verification by sub-committees located in towns, villages, and refugee camps.[78] These employ a variety of methods to determine

need, among which are field investigations, interviews and recommendations.[79] In cases where *zakat* committees provide cash assistance, beneficiaries receive monthly cheques upon presentation of personal identification.[80] Food assistance is distributed directly from warehouses upon presentation of coupons.[81] Individuals and families supported by such committees are regularly monitored during the period of assistance.

Beneficiaries of Islamic service organisations ordinarily receive cash payments directly to their bank accounts. Such organisations often locate their offices and recruit staff in the immediate area of operations, which increases the efficiency of beneficiary selection process. They also often take the presence or absence of other service providers into account when opening offices in order to avoid duplication.[82]

[75]   See   www.terrorismanswers.com/goups/hamas3.html. Hamas's military and to a lesser extent political activities would thus appear to consume only a fraction of the organisation's finances and overall efforts.
[76] Bluma Zuckerbrot-Finkelstein, "A Guide to Hamas", Jewish Post of NY (www.jewishpost.com/jp0203/jpn0303.htm).
[77]   Only two of the 40 organisations surveyed by ICG considered solicitation a valid form of needs identification.
[78] ICG survey of 40 Islamic social welfare organisations, 2002.
[79] Palestine Poverty Report 1998, p.70.
[80] Ibid., p.17.
[81] UNSCO-OCHA, "Food and Cash Assistance Programmes", p.16
[82]   Among the organisations surveyed by ICG, 40 per cent chose demand as their criterion for office location, and 28 per cent the location of homes of their personnel.

## IV. ISLAMIC SOCIAL WELFARE ACTIVISM DURING THE AL-AQSA INTIFADA

### A. BENEFICIARIES AND SERVICES

The intifada has significantly worsened the humanitarian situation in the West Bank and Gaza. Within two months of renewed Israeli-Palestinian hostilities, the PA Ministry of Social Affairs stated there were about 200,000 people in need of emergency assistance.[83] From the beginning of the uprising to 2003, average incomes declined by roughly 50 per cent. By mid-2002, UNSCO estimated that the World Bank's worst-case scenario for the year "has already been reached", with overall poverty levels at 60 percent – up from 21 per cent in September 2000 – and those in the Gaza Strip 10 percent higher.[84] "Each employed Palestinian is supporting nine persons on average, against less than five prior to the crisis"-.[85] Over half the population is unemployed.[86] In January 2003, Christian Aid estimated that "almost three quarters of Palestinians now live on less than U.S.$2 a day – below the United Nations poverty line".[87] A recently released World Bank report states:

> Over half a million Palestinians in this formerly middle-income economy are now fully dependent on food aid. Per capita food consumption has declined by 30 per cent in the past two years, and the incidence of severe malnutrition recently reported in Gaza by Johns Hopkins University is equivalent to

levels found in some of the poorer sub-Saharan countries.[88]

These developments, most directly attributed to Israel's closures of Palestinian territory and draconian restrictions on movement imposed in response to Palestinian violence, occurred just as the ability of the PA to provide social services was collapsing and as demand for such services was increasing. Facing significantly diminished tax and other revenues, the PA has been forced to slash spending.[89] At the same time, demand for food and emergency assistance rose, as did demands on the health sector because of injuries sustained during the conflict. Access to health facilities and schools was severely curtailed by movement restrictions and by physical damage. All in all, and despite the infusion of much needed foreign assistance (much of it for budgetary support, including the salaries of over 100,000 PA employees, and most of it from Arab governments),[90] the relative impact and importance of Islamic organisations has risen significantly, and they have played a vital role in preventing an even more dramatic humanitarian emergency. Though no reliable estimates exist, external financial assistance to such organisations has substantially increased.[91] A Palestinian activist strongly opposed to Hamas went so far as to argue that "today, and particularly in

---

[83] Press statement by PA Minister of Social Affairs Intissar al-Wazir, 25 November 2002. See www.pmic.gov.ps.

[84] UNSCO, "The Impact of Closure and other Mobility Restrictions on Palestinian Productive Activities: 1 January 2002 – 30 June 2002", p. 2. As the report's title indicates, the Israeli blockade has been the primary cause of the increase in poverty. Given that it has largely intensified since June 2002, current poverty levels are almost certainly higher than they were in mid-2002.

[85] Informal Ad Hoc Liaison Committee Meeting, London, 18-19 February 2003, Chair's Summary.

[86] World Bank Report, "Two Years of Intifada, Closures and Palestinian Economic Crisis", 5 March 2003.

[87] "Malnutrition in Gaza 'as bad as Zimbabwe' says Clare Short/30.01.03" at http://www.christian-aid.org.uk/news/stories/030130s.htm. For the full report, see Christian Aid, "Losing Ground: Israel, Poverty, and the Palestinians", January 2003, at http://www.christian-aid.org.uk/indepth/0301isra/ losing.htm.

[88] World Bank, "Two Years of Intifada", op. cit. See also "Clare Short backs Losing Ground, Christian Aid's new report on Palestinian poverty", "children in Gaza, according to UNICEF figures, are now as seriously malnourished as children in Congo and Zimbabwe … and it is getting worse", 30th January, 2003. Full text available at www.christian-aid.org.uk.

[89] "As a result of rising unemployment, reduced demand and the Government of Israel's withholding of taxes collected on the PA's behalf, monthly revenues dropped from U.S.$91 million in late 2000 to U.S.$19 million today". World Bank, "Two Years of Intifada", op. cit. See also World Bank, "Statement of the Task Force on Palestinian Reform", 20 February 2003.

[90] Between September 2000 and the end of 2002, "the PA had received about U.S.$1billion in budget support . . . from Arab League states, the EU and Norway." "Chair's Summary", Informal Ad Hoc Liaison Committee Meeting, The PA employs roughly a third of all Palestinians currently working and pays roughly half of all wages paid in the West Bank and Gaza. See World Bank, "Two Years of Intifada", op. cit.

[91] See World Bank, "Fifteen Months", op. cit., p. 58, which estimates that Islamic NGOs received roughly U.S.$100 million in external private flows in 2001. The comparative figure offered for 1999 is U.S.$35 million, though the Bank assumes it in fact was higher.

Case 1:05-cv-04622-DLI-RML   Document 267-13   Filed 03/22/12   Page 439 of 646 PageID #: 7117

*Islamic Social Welfare Activism In The Occupied Palestinian Territories: A Legitimate Target?*
ICG Middle East Report N°13, 2 April 2003                                                    *Page 15*

Gaza, Hamas and its charitable networks have de facto assumed the essential social functions."[92]

According to a recent UN study, "NGOs and charitable organisations (as a whole) are the major service providers, reaching about 60 per cent of the total beneficiaries from regular and emergency programs, followed by UNRWA (more than 34 per cent) and the PA Ministry of Social Affairs (6 per cent)".[93] Prior to the uprising, *zakat* committees – which overall account for a minority of beneficiaries – assisted 450 families with cash. Today, they are assisting an additional 6,550 families, a fifteen-fold increase.[94]

An increasing number of beneficiaries are receiving emergency as opposed to regular program relief.[95] Since the outbreak of the intifada, there has been a pronounced shift towards the provision of emergency food and cash assistance in particular.[96] In 2001, Islamic social welfare organisations (including *zakat* committees) were collectively the largest food donor in the occupied Palestinian territories after UNRWA. A recent United Nations study that compiled statistics from the four largest Islamic social welfare organisations found that they were providing food assistance to 145,450 households.[97] According to a senior official of the Swiss Development Agency, upwards of "half a million people" may currently be benefiting from emergency cash and food assistance from such institutions.[98]

Since September 2000, Islamic social welfare organisations have established emergency programs (essentially food and cash provision) that benefit families whose breadwinners lost their jobs, whose homes have been demolished, who have lost family members to the conflict ("martyrs"),[99] or

members of whom have been wounded, imprisoned or traumatised. According to the Al-Salah Islamic Association:

> "What is new about this uprising is that it has created new types of need, which has increased the number of eligible beneficiaries and diversified the social groups requiring such assistance. These [new] groups currently include landowners, owners of agricultural greenhouses, and those whose homes have been demolished by Israeli bulldozers.[100]

In the words of the Chairman of the Ramallah Zakat Committee, Shaikh Husni Abu Awad, "the increase in poverty has vastly increased the pressure upon our organisation, because we are receiving many more applications than before".[101]

As a rule assistance is provided to families rather than individuals and is allocated on the basis of socio-economic rather than religious or political criteria. A family in economic distress need neither consist of practicing Muslims nor support Hamas in order to qualify for assistance. Indeed, heads of charitable institutions interviewed by ICG took pride in asserting that assistance was provided regardless of religious or political background.[102] UN officials in the Gaza Strip confirmed that Islamic social welfare organisations refrain from demanding allegiance to Hamas as a condition or *quid pro quo* for services.[103] Sara Roy found the same in her research: "All heads of Islamic institutions interviewed adamantly maintained that anyone, regardless of socio-economic, religious or political background, could participate in their programs (typically, this question elicited laughter from the

---

[92] ICG interview, Amman, February 2003.
[93] UNSCO-OCHA, Food and Cash Assistance Programmes, op. cit., p.18.
[94] Ibid., p.17.
[95] ICG survey of 40 Islamic social welfare organisations, 2002.
[96] While continuing to provide regular assistance, 85 per cent of 40 Islamic social welfare organisations surveyed by ICG have directed their efforts towards emergency relief.
[97] UNSCO-OCHA, "Food and Cash Assistance Programmes", op. cit., p. 9. The organisations in question are: Al-Salah, Gaza Zakat Committee, Holy Land, Hebron Islamic Charitable Society.
[98] ICG interview, Jerusalem, 17 May 2002.
[99] A *shahid* ("martyr") is routinely mistaken for a suicide bomber by outside observers. In the Palestinian lexicon, any Palestinian killed as a result of the conflict with Israel is

considered a *shahid*. Suicide bombers, who are termed istishhadi ("he who martyrs himself"), are in this scheme of things a sub-category, accounting for less than 10 per cent of the total.
[100] ICG E-mail interview with Al-Salah Islamic Association.
[101] ICG interview, Abu Awad.
[102] This point was emphasised by the head of a welfare organisation in the Gaza Strip, ICG interview, Gaza City, September 2002, and by the head of the Ramallah Zakat Committee, Shaikh Husni Abu Awad, ICG interview, Ramallah, 23 February 2003. In another interview ICG was told of a known Fatah activist who received food support from a Hamas-affiliated organisation after the first Israeli re-occupation of the city in 2002. ICG interview, Abu Walid, Ramallah, 24 February 2003.
[103] ICG interview, UNSCO officials, Gaza City, 24 May 2002.

respondent)".[104] "All those in need", the Al-Salah Islamic Association emphasised, "are equal to the Association".[105]

Demand for service is highest where poverty is most concentrated: the refugee camps and West Bank villages.[106] UNRWA recently initiated programs in villages located along the 1967 boundary, "a region previously uncovered by social services providers except for Islamic organisations whose presence has often been unique".[107] According to a recent study, Islamic social welfare organisations account for fully a quarter of "food and other financial assistance in the West Bank".[108]

Similarly, 65 per cent of Palestinians who receive medical assistance from such institutions are below the poverty line. The comparative figures for those receiving medical services from UNRWA and the PA are respectively 61 and 34 per cent, suggesting that Islamic social welfare organisations are both efficient in the identification of those in need and effective in reaching them.[109]

It is impossible to provide a reliable estimate of the volume of cash assistance. The UN study found that in the Gaza Strip, charitable organisations and NGOs accounted for 87 per cent of all cash assistance, with the Al-Salah Islamic Association alone accounting for 33 per cent and the various *zakat* committees contributing an additional 21 per cent.[110]

One of the other effects of the intifada appears to be better coordination between the Islamic institutions on the one hand and the PA and non-Islamic institutions on the other. Although Islamic NGOs appear to have made a concerted effort to comply with PA regulations, beyond that such coordination traditionally had been poor[111]. The current crisis is believed to have precipitated significant progress in this respect.[112] In the Gaza Strip, for example, the territory has effectively been sub-divided by the largest organisations in order to ensure better coverage, and in more than one case, Islamic organisations have coordinated with the PA in setting up emergency plans.[113] Such cooperation, which takes the form of information-sharing, compiling lists of beneficiaries and joint provision of services, further underscores the reluctance and functional inability of the PA to curtail the Islamic social welfare sector.

## B.   DISRUPTION OF ISLAMIC SOCIAL WELFARE ACTIVITIES BY THE PA

On a number of occasions since September 2000, the PA has demonstratively sealed the premises of various Islamic social welfare organisations affiliated with Hamas, imposed external supervision upon their governing bodies and/or frozen their assets. According to PA officials, some 50 such organisations had been closed as of January 2002; a U.S. consular official told ICG that the assets of twenty to 25 Islamic social welfare organisations have been frozen. [114] Typically, such measures have been taken in the wake of particularly devastating attacks in Israeli cities, although no charges of illegal conduct are filed, few if any specific allegations are made and the closure orders are generally rescinded

---

[104] Roy, op. cit., p. 24. Though the general view was that Islamic organisations assist practicing as well as non-practicing Muslims, it should be noted that it was not unanimously held. Observant Muslims are believed by some to have better access to Islamic charitable assistance.

[105] ICG E-mail interview with Al-Salah Islamic Association.

[106] For a study of the more severe impact of the Israeli blockade in Palestinian rural areas, see Oxfam International Briefing Paper 28, "Forgotten Villages: Struggling to Survive Under Closure in the West Bank", September 2002.

[107] ICG interview, UNRWA headquarters, Jerusalem, April 2002.

[108] Riccardo Bocco et. al., "International and Local Aid during the Second Intifada: An Analysis of Palestinian Public Opinion in the West Bank and Gaza Strip on their Living Conditions, (mid-June – 31st October 2001)" Geneva, 2001, p.111. While such organisations are the largest single food distributor in villages, they are less important in refugee camps where UNRWA accounts for 83 percent of the total.

[109] Ibid., p. 76.

[110] Ibid., pp. 18-19. Cash assistance is in some cases periodic and in others a one-off occurrence.

[111] "Islamic institutions do not typically work with non-Islamic institutions … [and] there is no comprehensive social program or master plan (at the macro level) among Islamists or within the Islamic movement that serves as a framework for institutional development or programme planning". Roy, op. cit., p. 26.

[112] 92 per cent of organisations surveyed by ICG noted an improved level of cooperation with the PA, and of coordination with other NGOs, especially since September 2000.

[113] This was the case, for example, in Jenin in the wake of Israel's massive April 2002 incursion into the city and its refugee camp.

[114] Cited in World Bank, "Fifteen Months", op. cit., p. 81; ICG interview, U.S. consular official, Jerusalem, 24 May 2002.

or permitted to lapse within several weeks. Palestinians interviewed by ICG confirmed the impression that recent PA closures of such institutions are conducted primarily "for show" in an effort to alleviate foreign pressures.[115]

There are various explanations for such measures. One is that the PA is either unable or unwilling to confront the Qassam Brigades or the Hamas political leadership, and therefore seeks to deflect international pressure – and vent its own anger at Hamas – by going after "soft" and easily accessible targets. Another is that the PA is sending a message to Hamas that if it does not bring the Qassam Brigades to heel, it risks the existence of that wing of the Islamist movement – the network of social welfare organisations – that it has traditionally valued more than any other.

There is less disagreement as to why such organisations are permitted to resume business with an almost unseemly haste. With poverty levels rising to over 60 per cent while Israel withholds tax receipts that prior to the uprising accounted for two-thirds of PA revenues,[116] the PA "is effectively bankrupted. … [and] services have begun to break down ".[117] The PA, as a result, has basically been reduced to meeting the salary costs of public sector employees and operational costs of essential services. Given UNRWA's chronic funding shortages and the extremely limited excess capacity of secular NGOs, the role of Islamic organisations is vital and, in some instances, irreplaceable.[118] With at least one in every six Palestinians receiving assistance from an Islamic social welfare organisation in some form, their

prolonged incapacitation would result in a further and probably dramatic surge in poverty and despair, thus confronting the PA with a dilemma of major humanitarian, social and political proportions.

The decentralised and dispersed nature of many such organisations further reduces the effectiveness of PA closures; in order to immobilise a single organisation, the PA would have to move against multiple branches as well, in the process affecting even more beneficiaries and generating greater hostility. Rather than pursue such a course, a senior EU official in the Gaza Strip notes, "the organisations and the PA are constantly reshaping deals with each other since the PA cannot take responsibility for those left with nothing. It does not have the appropriate tools".[119] A U.S. consular official in Jerusalem concurs that the PA "lacks the administrative capacity to systematically take over" such institutions.[120]

---

[115] ICG interviews, Ramallah, September and October 2002. Most of those interviewed by ICG – including PA officials – emphasised the arbitrary nature of such closures, stating that in the majority of cases they were media events staged in the wake of a Hamas suicide bombing on the basis of such institutions' affiliation with Hamas rather than any presumption of illegal activity.
[116] World Bank, 15 Months, op. cit., p. v. After strong American involvement, Israel and the PA reached an agreement on the transfer of Palestinian revenues. Monthly revenues transfers have now resumed. The payment of revenue withheld since December 2000 has begun. If the agreement is fully implemented, the PA is expected to receive all outstanding revenue by the end of 2003.
[117] Ibid., pp. v-vi, 24-25. The World Bank notes that without foreign subsidies which have kept the budget shortfall in the range of 35 percent, "all semblance of modern economy would have disappeared by now".
[118] ICG interview with Karim Nashashibi, head of the International Monetary Fund, Jerusalem, May 2002.

[119] Ibid.
[120] ICG interview, U.S. consular official, Jerusalem, 24 May 2002.

## V.  HAMAS, ISLAMIC SOCIAL WELFARE ACTIVISM AND TERRORISM

The question of Hamas's role in relation to Islamic charities involves three distinct concerns: that the charities in question might divert funds for illicit purposes; that they might serve as recruitment or propaganda vehicles for Hamas's violent activities; and, more broadly, that they help maintain and strengthen Hamas's political role in the occupied territories.

### A.  TRANSFER OF FUNDS

Particularly after the 11 September attacks, concern has grown about the possibility that Islamic charities in the Palestinian territories may be funnelling money to terrorist activities. For some in the international community, choking off so-called charitable funding to groups engaged in deliberate attacks against civilians is vital to the success of the current campaign, and requires a comprehensive approach that ignores distinctions between funding for their legitimate and illegitimate activities. This is viewed as particularly important given the fungible nature of financial contributions.

Others, however, believe that Hamas is especially careful to compartmentalise its activities, both because it is a subject of international scrutiny and in order to maintain political support among Palestinians.[121] Hamas itself categorically rejects the charge. In the words of its spokesperson, Abd-al-Aziz Rantisi, "Hamas does not fund, nor is it funded, by local welfare organisations. If these organisations were providing us with money that would mean that the PA is complicit with us and is looking the other way, and that's an impossibility. Also, if these organisations were really part of Hamas, we would not accept any support from them because that would destroy them".[122] Heads of charitable institutions interviewed by ICG were equally adamant in their denials, and claimed that their books were fully

scrutinised and audited by the PA.[123] According to the Al-Salah Islamic Association, "social welfare organisations are monitored, and any official party can examine their programs and audit their budgets. Military organisations and their supporters are by contrast neither monitored nor audited".[124]

The importance of crafting a sensible approach on which types of funding ought to be banned and which allowed is underscored by the variety of international contributors – including the EU, the World Bank, and United Nations agencies. But the difficulties in doing so are evidenced by the disharmony that currently characterises international policies on this matter. Key actors have developed their own strategies, weakening the effectiveness of the overall approach and creating unhealthy confusion and uncertainly among charitable organisations, many of which currently operate under a cloud of suspicion. Ironically, the uncertain atmosphere is liable to contribute to more, not less, secrecy in financial policy by those involved in Islamic social welfare activism, and donors are being scared off by fears of being accused of terrorist links.[125]

One example of the lack of international coherence involves the Jala' Society for Culture and Art in Gaza City. It was established to help traumatised children recover through theatre and the arts and receives funds from a variety of sources including the EU, Japan, and Save The Children. Yet the U.S. government refused to fund it because one board member is a member of Hamas, despite the assessment of a USAID official that the organisation has no political agenda or content.[126]

The attitude of various international actors can be summarised as follows:

---

[121] This continues a pattern previously established by secular Palestinian organisations. See Joost R. Hiltermann, *Behind the Intifada: Labor and Women's Movements in the Occupied Territories,* (Princeton, 1991).
[122] ICG telephone interview, 22 February 2003.

[123] ICG interviews, Ramallah, Betounia, Al Bireh, Gaza, February 2003.
[124] ICG e-mail interview with Al-Salah Islamic Association.
[125] ICG interview, Abdel-Rahman, 10 October 2002; Alan Cooperman, "Those Observing Islamic Tenet Want to Aid Poor but Fear Persecution: In U.S., Muslims Alter Their Giving", The Washington Post, 7 December 2002. Abdel-Rahman adds that fear of contributing to Islamic social welfare organisations appears to be particularly pronounced in the U.S. and Europe and less evident in Arab states, and that thus far, there are no indications that Islamic institutions in the occupied Palestinian territories are abandoning their traditional transparency in financial matters.
[126] ICG interview, USAID official, Jerusalem, May 2002.

Case 1:05-cv-04622-DLI-RML Document 267-13 Filed 03/22/12 Page 443 of 646 PageID #: 7121

*Islamic Social Welfare Activism In The Occupied Palestinian Territories: A Legitimate Target?*
ICG Middle East Report N°13, 2 April 2003                                                    *Page 19*

❑   The U.S., which has designated Hamas in its entirety as a terrorist organisation, currently considers any evidence of a U.S. charitable institution's affiliation with Hamas sufficient grounds for legal sanctions,[127] and has sought – unsuccessfully – to press others to adopt a similar approach.[128] A recent Council on Foreign Relations Task Force on Terrorist Financing echoed this policy, asserting that "funds raised by other branches of Hamas for purportedly humanitarian purposes are known to be used for terrorist attacks". Although little evidence has been provided that such diversion is a widespread phenomenon or forms an important source for funding for Hamas or the Qassam Brigades,[129] U.S. officials take the view that the diversion of funds takes place on the ground, and often goes through several charitable "cut-outs", making the precise tracking of funds difficult, if not impossible.[130] The U.S. approach is embodied in domestic law, which makes the establishment of any organisational link to Hamas – including targeted fundraising for its affiliated social welfare organisations – grounds for designation as a terrorist entity.[131]

In what is perhaps the most high-profile case to date, U.S. authorities charged that the Holy Land Foundation for Relief and Development engaged in the illicit diversion of funds to benefit Hamas military activities. The evidence presented consisted of the membership of alleged Hamas militants on the boards of several organisations financed by the Foundation, the payment of funds to the families of Hamas suicide bombers, and the confession of a former Foundation employee to his Israeli police interrogators that he was involved in the diversion of funds.[132]

❑   Israel outlawed Hamas in 1989 and considers mere membership a punishable offence. It has urged the international community to shut down assistance to charitable organisations with links to Hamas. That said, it has chosen not to close down the network of affiliated social welfare organisations that operate in areas of the West Bank and Gaza Strip that have been under its physical or security control.[133]

❑   The EU, which has classified Hamas's Qassam Brigades but not Hamas as a whole as a terrorist organisation, has only taken measures against Islamic social welfare organisations affiliated with Hamas that additionally maintain links with its military wing. In their investigation of the Al-Aqsa Foundation, for example, the German and Dutch authorities did not consider its purported affiliation with Hamas sufficient grounds for closure. While confirming that the Al-Aqsa Foundation was "subject to investigation" by the Dutch intelligence agency AIVD, the latter's spokesperson stated, "Hamas also conducts social work in the Palestinian territories… We have until now been unable to demonstrate that money raised by Al-Aqsa in the Netherlands has been funnelled to terrorist

---

[127] Pursuant to Executive Order 13224, legal sanctions may include banning the affiliated organisation, seizure of its assets, and prosecution of its executives. Within the occupied Palestinian territories, U.S. government funds may not be used to support any social welfare organisation considered to be affiliated with Hamas.
[128] ICG interview with U.S. counter-terrorism official, Washington, February 2003.
[129] Council on Foreign Relations, Terrorist Financing: Report of an Independent Task Force Sponsored by the Council on Foreign Relations (New York, 2002), p. 21. The report also asserts that European states "encourage…terrorist organisations to fundraise on their soil" but provides nothing to substantiate the claim.
[130] ICG interview with U.S. official, Washington, February 2003.
[131] See Holy Land Foundation for Relief and Development v. Ashcroft, op. cit.; Human Rights Watch, "Erased in a Moment", op. cit., p. 102. Supporting the view that the success of such organisations is based on their profiles as legitimate charities rather than a belief among contributors that they function as Hamas front organisations, President Bush stated, "I am confident that most of the donors to the Holy Land Foundation, and perhaps even some of the individuals who are associated with the Foundation, had no idea how its money was being used. They wanted to relieve suffering in the region of the world that has suffered too much". See http://www.white ouse.gov/news/releases/2001/12/20011204-8.html.

[132] Palestinians and others point out that confessions often are extracted as a result of Israeli torture and, therefore, ought to be treated with extreme scepticism. See, e.g., B'Tselem, "Torture of Palestinian Minors in the Gush Etzion Police Station" (July 2001), at http://www.btselem.org.
[133] Israel has, however, closed down organisations within Israel and in East Jerusalem on the grounds that these are affiliated with Hamas. Given that Israel has pursued similar policies towards organisations affiliated with the PA and other Palestinian factions, such measures appear to stem from the general Israeli effort to assert sovereignty over East Jerusalem rather than a specific campaign against Hamas.

activities in the conflict region".[134] Similarly, the German authorities only undertook legal measures against the Al-Aqsa Foundation after they determined otherwise.[135]

An EU official interviewed by ICG made clear the issue is highly sensitive, refusing to discuss it in any detail and saying obliquely that it was "under consideration".[136] The discomfort probably reflects competing considerations, on the one hand of U.S. pressure and on the other of continued EU mediation to secure a Palestinian cease-fire – efforts that require maintaining close channels of communication with the Hamas political leadership.

❑ The PA, which formally has espoused a position similar to that of the EU, in fact has in the past closed down Islamic social welfare organisations on the basis of their affiliation with Hamas rather than the Qassam Brigades as such, and at other times allowed organisations that the EU would have banned to continue functioning.[137]

The limitations of the PA approach were evidenced in December 2001 when, responding to severe international pressure in the wake of a number of devastating Hamas attacks, it closed down one of the largest Islamic social welfare organisation, Al-Islah. A Palestinian involved in the case, Ziad Abu-Amr, chairman of the Political Committee of the Palestinian Legislative Council, remarked: "We examined their books carefully. There was nothing amiss.

I went to Arafat and said, 'On what basis are you closing them down?'".[138]

❑ Arab states have tended to consider Hamas a legitimate movement engaged in a lawful struggle against foreign military occupation, and – prior to coming under sustained international pressure on this issue – as a rule viewed affiliation as either irrelevant or an asset. Some, particularly Saudi Arabia, are beginning to take steps to supervise charitable societies based within their borders, introducing limited forms of financial regulation where none previously existed.[139] However, such initiatives are designed to prevent the illicit diversion of funds for military purposes, rather than to restrict funding to social welfare organisations affiliated with political movements.[140]

## B.   RECRUITMENT AND INCITEMENT

Some in the international community see Hamas-affiliated institutions as recruitment offices for the organisation itself or, particularly in the case of mosques and schools, as vehicles for propaganda and incitement. Hamas officials deny this, arguing again that there is absolute separation between them and Islamic social welfare organisations, and stating that "the services provided by Islamic social welfare organisations do not benefit Hamas, and do not serve as advertising for the movement".[141] Again, the view was echoed by heads of charitable institutions, who claimed they did not "mix charitable with political work."[142] One went so far as to state that Palestinian

---

[134] "After German Banning: The Netherlands Investigates Al-Aqsa", NRC Handelsblad 7 August 2002.

[135] Steven Derix and Joost Goes, "Al-Aqsa and the Hamas Connection", NRC Handelsblad 14 August 2002. Specifically, the German branch of the Al-Aqsa Foundation was accused of raising money to support the families of Hamas suicide bombers, a charge denied by the Foundation.

[136] ICG interview, Brussels, February 2003.

[137] The latter primarily concerns organisations that provide financial and other assistance to the families of Palestinians who have conducted suicide bombings. See infra at IV.C. A former member of the PA security services told ICG that during the mid-1990s, he and his colleagues repeatedly pressed the U.S. to shut down U.S.-based charity organisations that allegedly provided funds to Hamas – only to be told by their American interlocutors that, under the law at the time, funding of legitimate welfare activity could not legally be barred. ICG interview, Ramallah, March 2003.

[138] Human Rights Watch, "Erased in a Moment", p. 103. ICG interview, UNRWA headquarters, Jerusalem, 20 April 2002, confirmed that during the current uprising, the Hamas leadership has consistently conveyed the message that its social activities are firmly separated from its political and – even more so – its military activities.

[139] Karen de Young, "Saudis Detail Steps on Charities: Kingdom Seeks to Quell Criticism of Record on Terrorist Funding", *The Washington Post*, 3 December 2002. A PA official informed ICG that U.S. pressure had achieved some success in curtailing Gulf Arab funding to Hamas. ICG interview, Ramallah, March 2003.

[140] U.S. officials told ICG that they regularly raise the issue of funding for Hamas or Hamas-affiliated organisations with Gulf capitals though neither with the intensity, nor the results, that occur with regard to al-Qaeda funding. ICG interviews, Washington, February 2003.

[141] ICG telephone interview with Rantisi, 22 February 2003.

[142] ICG interview, Mahmoud Misleh, Director of Islamic Charitable Society, Al Bireh, 23 February 2003. ICG

Case 1:05-cv-04622-DLI-RML   Document 267-13   Filed 03/22/12   Page 445 of 646 PageID #: 7123

*Islamic Social Welfare Activism In The Occupied Palestinian Territories: A Legitimate Target?*
ICG Middle East Report N°13, 2 April 2003 *Page 21*

political factions "do not need social welfare organisations to recruit new members … if a faction is unable to recruit members directly, then what is the justification for its existence, what is it doing"?[143] A rather sceptical secular Palestinian journalist took a more nuanced view, claiming that in addition to traditional recruitment avenues, it is the Islamic youth and sports associations, rather than charitable and social service institutions, that are used by Hamas for recruitment purposes.[144] Yet another pointed out that when welfare organisations affiliated with Hamas assist the families of Palestinian prisoners, they are undoubtedly promoting the Islamist organisation.[145]

It is worth distinguishing between these two types of alleged activity. The first (recruitment of activists) purportedly is undertaken through social welfare organisations. But, as previously noted, Hamas seeks to derive prestige and political profit from social welfare activism precisely by maintaining the professionalism and integrity of such institutions rather than politicising them. It appears to understand better than others that if schools and medical clinics developed a reputation as recruitment centres, and services were provided in exchange for support, the crown jewels of the Islamist movement would be irretrievably debased in exchange for short-term gains of dubious value. "We are an organisation that offers social services to a society in need; if we cooperate with a specific political party, then we lose our social credibility and this will mean failure in our mission", said Mahmoud Misleh, director of the Islamic Charitable Society of al-Bireh.[146] Senior UN officials working in the occupied Palestinian territories as well as Palestinian NGO activists interviewed by ICG concur that Hamas is strict about the compartmentalisation of its activities.[147] The independent Palestinian legislator Abu-Amr echoed this view: Hamas "will not jeopardise their social

institutions" in this manner. "That is their strength, their existence".[148]

In the more direct language of a USAID official with extensive experience in the occupied territories:

> Provision of services certainly makes Hamas look good, but that does not make the beneficiaries natural candidates to become suicide-bombers. There is no evidence that social services organised by Islamic groups are used to recruit people to conduct attacks. Recruitment happens, but elsewhere, for example in mosques.[149]

Where individuals working for or benefiting from social welfare institutions come to support or join Hamas, recruitment appears to derive from a confluence of factors. Personal bonds and respect for the organisation formed as a result of direct contact with its social welfare network may or may not be among these, and where present may or may not be a significant factor.[150]

---

interview, 24 February 2003, invited sceptics "to ask the geriatrics we assist if they have become members of Hamas".

[143] ICG interview, Amira Harun, head of the women's section of the Islamic Salvation Party and Director of the Al-Fadila Womens' Association, 25 February 2003.

[144] ICG interview, Wa'el Manasra, Ramallah, 23 February 2003.

[145] ICG interview with member of Fatah, Ramallah, March 2003.

[146] ICG interview, 23 February 2003.

[147] ICG interview, UNRWA Headquarters, Jerusalem, 20 April 2002; Abdel-Rahman, Ramallah, 10 October 2002.

[148] Human Rights Watch, "Erased in a Moment", op. cit., p. 103. ICG interview, senior UN officials, Gaza City, May 2002 confirmed this view.

[149] ICG interview, USAID official, Jerusalem, 21 May 2002. Hamas officials, Israeli academics, and journalists alike have noted that the large number of Palestinians volunteering to conduct suicide bombings and other attacks during the current uprising has rendered traditional recruitment methods all but superfluous. See, for example, Eyad Sarraj, "Suicide Bombers: Dignity, Despair, and the Need for Hope", *Journal of Palestine Studies,* XXXI:4, (Summer 2002); Lori Allen, "There are Many Reasons Why: Suicide Bombers and Martyrs in Palestine", *Middle East Report 223* (Summer 2002), pp. 34-37; Avishai Margalit, "The Suicide Bombers", *The New York Review of Books*, 16 January 2003 at http://www.nybooks. com/ articles/15979.

[150] Although concerns about recruitment in the context of Islamic social welfare activism go considerably beyond the phenomenon of suicide bombers, it is noteworthy that an Israeli writer who examined the profile of Palestinian suicide bombers concluded that "the Palestinian case is the only one in which civilians of one society regularly volunteer to become suicide bombers ... They may be chosen by Hamas to carry out a suicide bombing mission, but for the most part the volunteers have not been active members of these organisations". Margalit, "The suicide bombers", op. cit. Indeed, one individual with whom ICG came into contact stated that he "volunteered to conduct a suicide bombing for Hamas even though I do not feel close to them politically or even pray". ICG interview, Jerusalem, May 2002. At the last moment, the individual decided not to conduct his assigned attack.

The second area of concern involves mosques dominated by Hamas activists and schools run by Islamic social welfare organisations. While Hamas spokesperson Rantisi likely is correct when he states that "nearly 99 per cent of mosques are under the supervision of the PA Ministry of Religious Affairs, which appoints their imams, pays their salaries, and covers all their expenses", he also notes that a substantial proportion of those who attend such mosques are "supporters of Hamas".[151] If one adds to this that a significant number of PA appointed imams [clerics] are Hamas sympathisers, it is hard to refute the claim made by a Palestinian journalist that "Hamas exploits its extensive presence in the mosques to convene meetings and recruit youths [*shabab*]".[152] Other observers have noted that during periods of PA laxity in supervision of mosques, and particularly during periods of heightened confrontation with Israel, certain imams will deliver extremist sermons.[153]

The issue of schools is more complex. Legally, all Islamic schools – the large majority of which are pre-schools – are private entities, but are nevertheless obliged to adhere to the formal PA curriculum and subject to monitoring by the Ministry of Education.[154] In the past, the Ministry has closed down schools that failed to comply with its regulations.[155] The problem, rather, is that there is no formal curriculum for pre-schools and that primary and secondary schools are essentially free to provide supplementary instruction to their students. Within the context of supplementary Islamic instruction in Hamas-affiliated schools, it is not unusual for teachers to present a highly intolerant interpretation of Islam, one which emphasises the difference and proclaims the inferiority not only of non-Muslims, but also of Muslims who do not follow the orthodox strictures adopted by Hamas. Unveiled women and others who are less than strictly observant, for example, are presented as sinners destined for hell,[156] and such teachings doubtlessly undermine both the further development of a pluralistic Palestinian society and the prospects for Israeli-Palestinian reconciliation.[157]

With respect to what many might consider more conventional forms of incitement, such as teachers who deliver diatribes against the Israeli occupation or eulogise Palestinians who meet their death attacking Israelis, this has since September 2000 become a fairly widespread phenomenon throughout the Palestinian school system. Palestinians, however, do not consider this particularly pernicious. According to a PA official, "the pupils are not in need of incitement; the daily practices of the occupation and what these pupils see with their own eyes is more than sufficient for this purpose".[158] A secular NGO activist agrees that such practices are par for the course in the current circumstances, and unlikely to have a significant effect because in contrast to the indoctrination that can occur in Islamic schools "children are not being told anything they don't already know and don't experience everywhere else".[159] Unlike other forms of abuse of Islamic social welfare organisations, those related to mosques and schools are inherently difficult to eliminate; the organisational recruitment that occurs in houses of worship is by its nature a clandestine and incidental process extremely difficult to detect, while those who preach intolerance in Islamic schools will maintain that they are doing nothing but engaging in the basic right to transmit their faith to the next generation.[160]

---

[151] ICG interview, Rantisi.

[152] ICG interview, Wa'el Manasra, Palestinian journalist, 23 February 2003.

[153] ICG interviews, Ramallah 26 February 2003.

[154] Frequent charges have been levelled that the PA curriculum incites and encourages hatred. On the other hand, some experts who have examined the matter have concluded that these charges largely fail to withstand serious scrutiny. See, for example, Nathan J. Brown, "Democracy, History, and the Struggle over the Palestinian Curriculum", The Adam Institute, November 2001, at http://www.geocities.com/ nathanbrown1/Adam_Institute_Palestinian_textbooks.htm#_ft n1.

[155] ICG interview, Alia al-Asi, PA Ministry of Education official responsible for licensing private schools in the West Bank, 23 February 2003.

[156] ICG interviews, parents and relatives of children enrolled in Islamic schools, February 2003.

[157] One PA official said, "Mosques and schools run by Hamas are promoting a version of society in which I do not want my daughter to grow up". ICG interview, Ramallah, March 2003.

[158] ICG interview, al-Asi.

[159] ICG interview, Abdel-Rahman.

[160] Indeed, as Manasra put it: "Hamas's discourse in its interaction with the people is an indirect discourse. Hamas understands the complexities of the Palestinian situation well, and therefore its approach to the people is cautious and precise. This approach is always made in the context of proclaiming 'Islam is the solution', and within the context of this slogan it begins to elaborate upon the details". ICG interview.

Case 1:05-cv-04622-DLI-RML   Document 267-13   Filed 03/22/12   Page 447 of 646 PageID #: 7125

*Islamic Social Welfare Activism In The Occupied Palestinian Territories: A Legitimate Target?*
*ICG Middle East Report N°13, 2 April 2003*                                                                          *Page 23*

## C.   RECRUITMENT: THE SPECIAL CASE OF FINANCIAL ASSISTANCE TO FAMILIES OF SUICIDE BOMBERS

During the current uprising, Islamic social welfare organisations and other Palestinian organisations have made a concerted effort to provide financial assistance to so-called martyrs' families – a category consisting of the surviving relatives of any Palestinian combatant or civilian who meets his or her death as a result of the conflict with Israel, irrespective of the circumstances. Within this context, payments are also made to the families of suicide bombers and others who are killed in the process of attacking civilian targets. Others (most notably Iraq)[161] have gone beyond normal custom and provided the families of suicide bombers with premium payments over and above those accorded to other families.

As the phenomenon of Palestinian suicide bombings has escalated since 2001, and these have increasingly been directed at civilian targets, much of the international community has condemned not only premium payments, but non-preferential ones as well, on the grounds that any form of monetary compensation provides a financial incentive for such attacks, enhances the stature of those who conduct such bombings, and more generally promotes and encourages additional suicide attacks. EU states have considered involvement in such assistance sufficient evidence of a link with the Qassam Brigades. Germany, for example, outlawed Al-Aqsa after obtaining evidence that the foundation, among its activities, provided material support to the relatives of suicide bombers, and the U.S. has made similar charges against the Holy Land Fund. While the PA has not taken a clear position on this practice, its treatment of social welfare organisations that provide non-preferential payments to such families suggests that it views such assistance as legitimate welfare assistance to the surviving relatives of Palestinians killed in the conflict.

Whether such payments in fact play a part in promoting suicide bombings is, at best, debatable. Many Palestinians and others interviewed by ICG

took strong exception with the notion that monetary compensation is either a motivating factor for suicide bombers, a source of their enhanced posthumous status, or a valid explanation for the persistence of the phenomenon.[162] In fact, there is strong evidence that neither rewards nor penalties provided to the families have much to do with the phenomenon. In an attempt to discourage Palestinians from engaging in such attacks, Israel began demolishing the homes of suicide bombers on a systematic basis in April-May 2002[163]: nonetheless, by Israel's own admission, attempts to carry out these attacks continue.[164] What is more, despite the knowledge that their families would suffer harsh consequences, Palestinian suicide bombers have not hesitated to posthumously reveal their identities.[165]

The bleak and more pertinent reality would seem to be that Hamas and other Palestinian organisations have an excess of volunteers and no longer need to engage in active recruitment, and that Hamas, other Palestinian organisations and a substantial body of Palestinian public opinion consider attacks on Israeli civilian targets legitimate reprisals for systematic Israeli violations of their rights – including the killing of Palestinian civilians. Material incentives or disincentives play at best a marginal role in the decision to commit these acts.

Payments by charitable institutions to families of suicide bombers stand out in part because of the absence of a generalised Palestinian welfare system. In this context, even non-preferential payments can be considered "premium payments" insofar as the

---

[161] Palestinian families of suicide bombers reportedly receive U.S.$25,000 from Iraq. Families of Palestinians killed under other circumstances related to the confrontation with Israel reportedly receive U.S. $10,000. See The Washington Post, 13 March 2003.

[162] ICG interviews. See also Allen, "There are Many Reasons Why", op. cit; Margalit, "The Suicide Bombers", op. cit.; Sarraj, "Suicide Bombers", op. cit., which discuss a host of factors but either fail to mention or explicitly refute the view that financial reward for the families of suicide bombers is relevant. Similarly, Human Rights Watch, "Erased in a Moment", op. cit., despite its condemnation of the payments, does not claim they encourage such attacks.

[163] House demolitions encompass categories of Palestinians that go far beyond suicide bombers and include, for example, wanted Palestinian militants.

[164] See, e.g., statement by IDF Chief of General Staff Lt. Gen. Moshe Ya'alon, www.idf.il/newsite/ English/0212-3.stm, 12 February 2003; Haaretz, www.haaretzdaily.com/hasen/spages/261766.html 11 February 2003. Nevertheless, Ya'alon and the Israeli government have consistently maintained that house demolitions and similar reprisals do have a deterrent effect.

[165] See, e.g., "The Fatah movement celebrates 'success' of double suicide terror attack in Tel Aviv", IDF spokesperson's unit, www.idf.il/newsite/english/0108-5.stm, 8 January 2003.

Case 1:05-cv-04622-DLI-RML   Document 267-13   Filed 03/22/12   Page 448 of 646 PageID #: 7126

*Islamic Social Welfare Activism In The Occupied Palestinian Territories: A Legitimate Target?*
*ICG Middle East Report N°13, 2 April 2003*                                    *Page 24*

families would receive nothing if the bomber had died a natural death instead of targeting civilians. Yet, it is precisely the absence of a Palestinian public welfare system that has been seized upon by Palestinians – including vocal critics of such attacks – to defend such payments:

Palestinians for the most part support the provision of assistance to families that have lost loved ones, and do not believe that families of perpetrators of attacks against civilians should be denied such assistance. The prominent Gaza-based psychiatrist and human rights activist Eyad Sarraj said in a recent interview:

> I myself am deeply opposed to suicide bombings, yet I too support the families. As a Palestinian, as an Arab, as a Muslim, and as a human being ...I cannot leave their children in poverty – I have to do what I can to leave them some hope and dignity. This is why we support the families – certainly not to encourage suicide bombing.[166]

Additionally, according to Roy, Palestinian Islamic social organisations worked even with the families of Palestinians who were denounced as collaborators with the Israelis, trying hard to reintegrate them into society.[167] The same point was made to ICG by the head of a Ramallah *zakat*: "we do not ask how the death happened, but only ask for the death certificate; the social worker decides based on the family's needs for assistance. We have 100 hundred sponsored children whose fathers have been killed for collaborating with the occupation. This does not concern us".[168] Asked specifically whether assistance to families of suicide bombers might encourage such attacks, the head of another organisation responded: "Does our sponsoring collaborators' children encourage people to collaborate with Israel"?[169]

The Al-Salah Islamic Association, which is closely identified with Hamas, also specifically refuted the allegation that such institutions give preference to Hamas families:

> This never happened and will never happen, for a simple reason. The Association assists the families of martyrs on the basis of humanitarian grounds in the context of its duty to provide relief. This means that all those in need, whether martyrs or not, are equal. Any family which suffers as a result of a fatal car accident will be treated equally as far as the Association's criteria are concerned to a family that loses its breadwinner to martyrdom at the hands of the occupation.[170]

Premium payments probably do not encourage suicide bombings against civilians either; however, they are clearly intended for this purpose and therefore the international community is on solid ground in seeking to strictly prohibit them. It also is of critical importance that the PA take steps to actively delegitimise such forms of violence and to end the general climate of impunity and leniency that prevails in this regard.

## D.   ISLAMIC SOCIAL WELFARE ACTIVISM AS POLITICAL LEVERAGE

Even if Islamic social welfare organisations are not the primary engines of Hamas, the point is made that they are essential to sustain it politically and culturally. Hamas itself has not sought to conceal or downplay the value of its network of social welfare organisations to the development and growth of the organisation; independent observers and critics concur that Hamas would not have achieved its prominent role in Palestinian politics and society without them.[171] On this basis some have concluded that social welfare organisations affiliated with Hamas are vital to the maintenance of its military infrastructure, and their elimination central to any effort to compel the Qassam Brigades to cease

---

[166] Human Rights Watch, "Erased in a Moment", op. cit., p. 105. HRW's own position (p. 106) is that payments to the families of suicide bombers should be provided "only as part of a general welfare program based on demonstrated financial need".

[167] Sara Roy, "Beyond Hamas: Islamic Activism in the Gaza Strip", *Harvard Middle Eastern and Islamic Review,* Number 2, (1995).

[168] ICG interview with Sheikh Husni Abu Awad, head of Ramallah Zakat committee, Ramouni building, 23 February 2003.

[169] ICG interview with Mahmoud Misleh, director of the Islamic Charitable Society of Al Bireh , 23 February 2003

[170] ICG E-mail interview with Al-Salah Islamic Association.

[171] Anthony Shadid, *Legacy of the Prophet: Despots, Democrats, and the New Politics of Islam*, (Boulder, 2002), pp. 111-150. Secular Palestinian activists acknowledge this, making the point that allegiance to Hamas often is less a function of ideological sympathy than of gratitude for social assistance. ICG telephone interview with Fatah member, Ramallah, February 2003.

Case 1:05-cv-04622-DLI-RML  Document 267-13  Filed 03/22/12  Page 449 of 646 PageID #: 7127

*Islamic Social Welfare Activism In The Occupied Palestinian Territories: A Legitimate Target?*
ICG Middle East Report N°13, 2 April 2003                                                      *Page 25*

attacking civilians. Seen from this perspective, it is precisely the efficiency of such institutions that poses the problem, for it helps generate support for the movement and its political program.[172] U.S. and Israeli officials argue that a systematic crackdown on Islamic social welfare organisations and charitable contributions is an effective method of curbing Hamas's armed activities, and have correctly noted that there has been no genuine attempt thus far to implement such a policy.

Few would argue with the fact that a concerted effort to shut down such institutions would hurt Hamas' standing considerably.[173] While it is impossible to measure the impact of its charitable work on its popularity, Hamas' positive image is undoubtedly and most probably significantly related to the efficiency of its social services, particularly as compared with the PA's weaknesses.[174]

The more difficult question is whether such measures would have a discernable impact on Hamas' military capabilities and – perhaps more importantly – popular support for its attacks upon Israeli civilians. On the basis of the evidence of the past two years, the increasing socio-economic havoc that is certain to ensue might well radicalise rather than undermine Hamas's popular constituency, and enlarge rather than reduce it. Today even more than in the past, Hamas's armed activities appear to be predominantly a function of political factors – despair at the situation in the territories; Israeli actions; pressure from regional sponsors; its shifting relations with the PA and other Palestinian factions; and the level of popular support for the intifada. The fact that Hamas historically has refrained from armed attacks, and in particular attacks against Israeli civilians, when these lacked popular support and escalated them as public opinion radicalised,[175] further suggests that the organisation is unlikely to be fundamentally swayed by any concentrated effort targeting its social infrastructure.

A systematic crackdown against Hamas-affiliated Islamic organisations could have other backlash effects. First, it would risk further alienating Palestinians from the West. In a situation where "the Gaza Strip and some West Bank villages are surviving on aid from Islamic organisations",[176] many Palestinians (and perhaps others as well) would conclude that their humanitarian interests were being targeted not on account of legitimate concerns about the conduct of the benefactor, but because their beneficiaries were Palestinian and Muslim. This concern is heightened by the failure of the international community – despite considerable efforts – to respond adequately to the growing humanitarian emergency. In early February 2003, UNRWA, which provides nutritional support to over 700,000 Palestinians compared to a pre-intifada figure of 11,000, stated that its plea for an immediate injection of U.S.$94 million had fallen on deaf ears, with only Switzerland committing U.S.$1.5 million. Noting that its food warehouses (some of which have been destroyed by Israel) will be empty in weeks, UNRWA Commissioner General Peter Hansen concluded, "it's going to be politically very destabilizing".[177]

Secondly, some argue that a blanket banning of Hamas-affiliated social organisations could jeopardize efforts to steer the organisation away from political violence. The intra-Palestinian negotiations that began with EU mediation in mid-2002 and continued with Egyptian sponsorship in Cairo in January 2003, although widely described as attempts by the PA and Fatah to persuade Hamas to cease attacks on Israeli civilians, have at a deeper level in fact been precisely about such a political reconfiguration.[178] Still others believe that Hamas's resort to attacks against civilians is an historical

---

[172] For the argument that Hamas's social service program bolsters its popularity and therefore heightens the threat of terrorism, see Daniel Benjamin and Steven Simon, *The Age of Sacred Terror,* (New York, 2002), p.194.

[173] See, e.g., Charmaine Seitz, "Hamas Stands Down?", *Middle East Report 221* (Winter 2001), p. 5.

[174] "Let's be blunt," said a PA official. "When kids go to schools run by Hamas or to charities run by Hamas, it helps the organisation." ICG interview, Ramallah, March 2003.

[175] This point was repeatedly emphasised by Fatah members determined to curb the influence of Hamas. ICG telephone interviews, Ramallah and Gaza, February 2003.

[176] ICG interview, senior UN officials, Gaza City, 20 May 2002; Jerusalem, 25 May 2002.

[177] Chris McGreal, "Food Running out in Gaza as Aid Appeal Fails", The Guardian, 11 February 2003.

[178] See, for example, "The Palestinian Factions National Dialogue" (translations from the Palestinian press) at http://www.jmcc.org/new/03/jan/dialogue.htm; Mideast Mirror issues for January 2003. There are many reasons why the dialogue has failed to date, among them Hamas's reluctance to eschew acts of violence absent comparable Israeli assurances and its refusal to extend any ceasefire to territory occupied in 1967 or to non-civilians. Beyond that, however, lie intense discussions about the future of the Palestinian national movement, its political orientation, and the respective influence of Fatah and Hamas. ICG interviews with Fatah members, Gaza, March 2003.

Case 1:05-cv-04622-DLI-RML   Document 267-13   Filed 03/22/12   Page 450 of 646 PageID #: 7128

*Islamic Social Welfare Activism In The Occupied Palestinian Territories: A Legitimate Target?*
**ICG Middle East Report N°13, 2 April 2003**                                    *Page 26*

anomaly and that, at its core, it remains an essentially socio-religious, reformist organisation in the mould of the Muslim Brotherhood from which it emerged. According to this view, it harbours above all the ambition to "re-Islamise" Palestinian society[179] with the hope of ultimately taking over the political leadership of the Palestinian people. There is, of course, ample reason to be sceptical of Hamas's intentions.[180] But eradication of the Islamic social welfare sector, and thus of Hamas's only realistic alternative to militant rejectionism, risks guaranteeing the futility of further attempts to integrate it into a Palestinian strategic consensus.[181]

Finally, while forcibly closing down the network of Islamic social welfare organisations affiliated with Hamas would over time reduce allegiance to the organisation, it is less certain that those who implemented this campaign would benefit from Hamas's decreased support. Hamas's increased influence is, at least in part, a reflection of the lack of any credible alternative system of social assistance. A more logical approach, therefore, would be to challenge Hamas on its own terms by effectively competing with it in the realm of social welfare activism. The consensus among Palestinians appears to be that even a reformed PA would be unsuited to this task, but that a more responsive movement with prior experience in this arena, such as Fatah or the Palestine Peoples' Party (formerly the Palestinian Communist Party, PCP),[182] might fare better.[183] Such efforts appear to be at least partly

underway, built on the premise that the Palestinian leadership that will emerge from the current confrontation with Israel must rest on far stronger grass-roots support and links with civil society. The creation of secular NGOs capable of providing a variety of services to the Palestinians people is seen as a first step in this long-term enterprise.[184]

---

[179] See Legrain, op. cit.
[180] A Hamas official openly derided Egyptian efforts to reach a one-year truce. ICG interview, Gaza, March 2003.
[181] In research conducted approximately one year before the beginning of the current Palestinian uprising – a time when the fortunes of Hamas's military wing and political leadership were perhaps lower than at any time since the movement was established in 1988 – Roy found some backing for this view. Rather than utilising social welfare activism to reinvigorate a paramilitary strategy that appeared to have failed, she found Hamas activists proposing such activity as an alternative to it, effectively returning to the religio-cultural emphasis pursued by the Muslim Brotherhood prior to the 1987 intifada. Roy, "The Transformation of Islamic NGOs in Palestine", op. cit.
[182] See Hiltermann, *Behind the Intifada*, op. cit., for an account of secular nationalist and communist social activism during the 1970s and 1980s.
[183] During the preparation of this report, ICG received persistent accounts that senior Fatah officials were working on such an initiative. Other Palestinian sources contacted by ICG, while unaware of this, questioned the ability of such organisations to compete effectively with their Islamist

rivals, noting that they would rely primarily on foreign funding rather than grassroots participation.
[184] One such NGO is the Palestinian Foundation for Culture, Science and Development, which was founded in November 2002. ICG interviews, Gaza, March 2003. It defines itself as a "non-profit, and non-sectarian organisation . . . fully independent and not affiliated with any political or religious party inside or outside Palestine."

Case 1:05-cv-04622-DLI-RML   Document 267-13   Filed 03/22/12   Page 451 of 646 PageID #: 7129

*Islamic Social Welfare Activism In The Occupied Palestinian Territories: A Legitimate Target?*
*ICG Middle East Report N°13, 2 April 2003*                                                    *Page 27*

## VI.  CONCLUSION

It is probably an accurate assessment that the Palestinian Islamic social welfare sector as a whole is today affiliated with Hamas to one degree or another. It is moreover a matter of absolute certainty that Hamas is engaged in social welfare activism for more than altruistic purposes. It consciously seeks to derive organisational benefit from serving the basic needs of its people – and friend and foe alike share the view that it does this particularly well. In this respect, ICG's findings corroborate the impressions of virtually every observer who has studied Hamas; the leaders of the movement themselves ascribe a significant if not primary role to Islamic social welfare activism in explaining the growth and enduring popularity of the Islamist movement.

To the extent that providing for the needs of Palestinian society has played a role in enabling Hamas develop a military infrastructure that on numerous occasions has attacked Israeli civilians with the express purpose of inflicting maximum casualties, the sector as a whole cannot but be a source of serious concern. In a related vein, the same could be said with respect to the emerging reality of a parallel Islamist authority, challenging a steadily disintegrating PA in some regions of the occupied Palestinian territories during the past year.[185]

How one deals with such concerns is, however, an entirely different matter. Where the cover of social welfare activism is demonstrably abused to engage in other activities – military or otherwise – the PA and the international community as a whole are confronted with a clear case for holding those responsible to account. Few if any such cases so far have come to light and the problem may, indeed, be far less widespread than the U.S. and Israel believe. Nevertheless, and particularly in view of the repeated allegations that charitable funds are being diverted for military purposes, strict safeguards are needed. The application of rigorous guidelines additionally would serve to remove the cloud of suspicion from

above the heads of Islamic social welfare organisations that execute their service mandates in a professional manner and neither support nor engage in illegal activity.

Such safeguards should respond to the specific threat that is alleged. The most effective way of achieving this would be for the PA and the international community to adopt and uniformly enforce available international guidelines, such as those formulated by the Financial Action Task Force on Money Laundering (FATF).[186] These guidelines call for, inter alia, financial transparency, programmatic verification, and oversight by both governments and private sector organisations such as financial institutions.[187] The PA should be offered technical assistance, preferably by relevant international organisations, to help it meet the challenge. The clear objective of such an effort would be to ensure that funds are transferred directly to the accounts of Islamic social welfare organisations and properly disbursed, and that action is taken against institutions that violate their humanitarian mandates, for instance by transferring funds to organisations that deliberately target civilians.

Palestinian Islamic charitable institutions claim they already comply with the PA's Law on Charitable Societies and Civic Associations and the regulations governing *zakat* committees; they should be put to the test. The PA should be rigorous about enforcing the law, which should be strengthened where necessary to be in line with the recommendations of the FATF, and should pass the draft law regulating *zakat* committees without further delay. Given the record of PA relations with NGOs, and concerns about its heavy-handed monitoring, a strong and independent expert committee should assist and supervise the monitoring efforts.

Ensuring that staff do not abuse their authority over students, and thus ensuring the integrity of the education process in the West Bank and Gaza Strip, is first and foremost the responsibility of the PA Ministry of Education. The PA should assign inspectors from the Ministry to actively monitor the educational centres run by Islamic organisations

---

[185] Hamas is particularly powerful in Gaza. According to some Palestinians, it is currently manning its own checkpoints. ICG telephone interview, Gaza, February 2003. Mahmoud Zahar, a Hamas leader in Gaza, stated that the organisation now had the infrastructure to assume leadership of the Palestinians "politically, financially and socially". Dan Ephron, "Mideast: Hamas on the Rise", Newsweek, 9 February 2003, available at stacks.msnbc.com/news/870466.asp.

[186] The FATF is an intergovernmental body founded at the G7 meeting in Paris in 1989 to monitor implementation of measures against money laundering.
[187] For full details see FATF, "Combating the Abuse of Non-Profit Organisation", op. cit.

Case 1:05-cv-04622-DLI-RML   Document 267-13   Filed 03/22/12   Page 452 of 646 PageID #: 7130

*Islamic Social Welfare Activism In The Occupied Palestinian Territories: A Legitimate Target?*
*ICG Middle East Report N°13, 2 April 2003*                                    *Page 28*

and ensure that religious instruction is not used to promote intolerance and incite violence.

At present, the international community speaks with numerous, contradictory voices and acts in often confusing and self-defeating ways. Unwarranted zeal by the U.S. is matched by excessive laxity by certain Gulf states. In both cases, the test ought to be the same: whether the charitable institution in question can be shown to have transferred monies to fund the military activities of Hamas or some other Palestinian paramilitary organisation, or whether its educational teachings promote intolerance or violence .[188]

Apart from cracking down on illicit activity, the PA and the international community should take steps to create alternative sources of social and humanitarian assistance to a population in desperate need of both. The donor community should significantly increase its aid and in particular respond to the urgent appeals from UN agencies. Although international donors pledged roughly U.S.$700 million to the PA, the World Bank has estimated that at least U.S.$1.1 billion is needed.[189] Palestinians not affiliated with Hamas should set up their own network of credible and effective social welfare organisations. The PA should at least begin the long overdue process of establishing a functioning welfare system; the international community and international financial institutions ought to work with Palestinian officials on this task.[190]

Of course, much of this will remain in the sphere of wishful thinking should practical conditions on the ground remain as they are or, worse, deteriorate. Despite repeated commitments to the U.S. administration and others in the international community, Israel continues to impose draconian conditions on the Palestinian population and on humanitarian aid agencies.[191] In August 2002, Israel

formally accepted a detailed set of commitments proposed by Catherine Bertini, Personal Humanitarian Envoy of the UN Secretary-General, designed to alleviate the humanitarian emergency in the West Bank and Gaza Strip. The agreed measures, which sought to minimise Israeli obstruction of Palestinian access to health care, education, water and sanitation, employment, and humanitarian services provided by the UN and other international and local agencies,[192] were personally approved by Prime Minister Ariel Sharon, then-Defence Minister Binyamin Ben-Eliezer, and then-Foreign Minister Shimon Peres.[193] Yet, since that date, Israel has consistently failed to meet these obligations.[194]

The most recent statement by the Quartet envoys stressed "Israel's obligation, consistent with legitimate security concerns, to do more to ease the dire humanitarian and socio-economic situation in the West Bank and Gaza, including facilitating freedom of movement and access, alleviating the daily burdens of life under occupation, and respecting the dignity of Palestinian civilians".[195] As long as these steps are not implemented, the predominant role of Hamas-affiliated institutions is unlikely to be affected.

Beyond this lies the complex and longer-term challenge of how to deal with Hamas. A hybrid consisting of social, political and military activism, with powerful roots among Palestinians and strong ties to foreign supporters in Damascus, Tehran and elsewhere, it has from the outset had an ambivalent relationship to the question of political leadership.

---

[188] There are unconfirmed reports that, in the context of the intra-Palestinian dialogue, Egypt has threatened to hinder Hamas fund-raising in Arab countries if it were to refuse a cease-fire. Ephron, "Hamas on the Rise," op. cit.

[189] World Bank, "Two Years of Intifada", op. cit.

[190] The PA recently asked the World Bank for help in "reviewing Palestinian social safety nets". That work ought to be encouraged. See World Bank, "Fifteen Months," op. cit., p. 90.

[191] According to a World Bank report, "No Palestinian economic recovery is possible without the removal or significant reduction on current restrictions on the internal movement of Palestinian people and goods". Cited in ibid; see also World Bank, "Two Years of Intifada", op. cit.

[192] Catherine Bertini, "Mission Report: 11-19 August 2002", pp. 26-28 at http://domino.un.org/ betini_rpt.htm. Among the specific measures agreed were: "Palestinian ambulances will wait no more than 30 minutes at any checkpoints"; "Palestinians seeking critical medical services (e.g. giving birth, dialysis, chemotherapy) can quickly pass all checkpoints"; "daily water deliveries in proper quantities can be supplied by Palestinian water tankers"; and "Israel should ensure that all children, students and teachers have full access to schools and universities throughout the West Bank and Gaza"; "immediate measures to allow farmers to harvest olives"; "ensure full respect of the privileges and immunities of all UN staff and assets"; and "urgently accelerate the release of funds [Israel] holds on behalf of the Palestinian Authority".

[193] ICG interview, UNSCO official, February 2003.

[194] ICG interview, UNSCO official, February 2003, who noted that the UN Security Council had been apprised of the lack of progress on a monthly basis.

[195] Joint Statement of Quartet Envoys, London, 20 February 2003.

Case 1:05-cv-04622-DLI-RML   Document 267-13   Filed 03/22/12   Page 453 of 646 PageID #: 7131

The exercise of steering Hamas toward a political as opposed to military orientation hinges on a number of factors relating to domestic Palestinian and international politics and is by no means a sure thing. Some students of the movement have concluded that Islamist social welfare activism is not so much the precursor to its violent struggle as it is "a self-conscious substitute for armed action".[196] If this is indeed the case, it is an argument for seeking the firm and full integration of the Islamic social sector within Palestinian civil society. It also invites creative approaches that encourage the movement as a whole to re-orient its policies and priorities, and prepare itself to emerge as Islamism's advocate within a pluralistic and democratic Palestinian state living in peace and mutual recognition with Israel and in which neither it nor its competitors seek dominance on the basis of repressive violence.

Regardless, shutting down or financially squeezing organisations whose conduct is beyond reproach on account of a proven link to Hamas is neither a viable nor effective response. With no alternative sources of support available to hundreds of thousands of current beneficiaries, the dramatic increases in Palestinian poverty levels would only produce "further erosion of the coping capacity of the population, reinforced social despair, and a climate more conducive to violence".[197] In addition to violating fundamental humanitarian principles, such measures would also run the risk of rather thoroughly defeating the very objectives they were meant to achieve. While poverty and humanitarian despair are not the engine of the Israeli-Palestinian conflict, the available evidence, both from the 1987-1993 uprising and even more so during the past two years, suggests that these factors have an ability to fuel it to new heights.

**Amman/Brussels, 2 April 2003**

---

[196] Shadid, *Legacy of the Prophet*, op. cit., p. 112.

[197] Ad Hoc Liaison Committee, Informal Donor Meeting, Oslo, April 25, 2002, Chair's summary.

Case 1:05-cv-04622-DLI-RML Document 267-13 Filed 03/22/12 Page 454 of 646 PageID #: 7132

*Islamic Social Welfare Activism In The Occupied Palestinian Territories: A Legitimate Target?*
*ICG Middle East Report N°13, 2 April 2003* *Page 30*

# APPENDIX A

## MAPS OF THE OCCUPIED PALESTINIAN TERRITORIES

**MAP OF THE GAZA STRIP**



http://www.cia.gov/cia/publications/factbook/geos/gz.html

**MAP OF THE WEST BANK**



http://www.cia.gov/cia/publications/factbook/geos/we.html

Case 1:05-cv-04622-DLI-RML   Document 267-13   Filed 03/22/12   Page 455 of 646 PageID #: 7133

*Islamic Social Welfare Activism In The Occupied Palestinian Territories: A Legitimate Target?*
*ICG Middle East Report N°13, 2 April 2003*                                    *Page 31*

# APPENDIX B

# ABOUT THE INTERNATIONAL CRISIS GROUP

The International Crisis Group (ICG) is an independent, non-profit, multinational organisation, with over 90 staff members on five continents, working through field-based analysis and high-level advocacy to prevent and resolve deadly conflict.

ICG's approach is grounded in field research. Teams of political analysts are located within or close by countries at risk of outbreak, escalation or recurrence of violent conflict. Based on information and assessments from the field, ICG produces regular analytical reports containing practical recommendations targeted at key international decision-takers.

ICG's reports and briefing papers are distributed widely by email and printed copy to officials in foreign ministries and international organisations and made generally available at the same time via the organisation's Internet site, *www.crisisweb.org*. ICG works closely with governments and those who influence them, including the media, to highlight its crisis analyses and to generate support for its policy prescriptions.

The ICG Board – which includes prominent figures from the fields of politics, diplomacy, business and the media – is directly involved in helping to bring ICG reports and recommendations to the attention of senior policy-makers around the world. ICG is chaired by former Finnish President Martti Ahtisaari; and its President and Chief Executive since January 2000 has been former Australian Foreign Minister Gareth Evans.

ICG's international headquarters are in Brussels, with advocacy offices in Washington DC, New York and Paris and a media liaison office in London. The organisation currently operates eleven field offices (in Amman, Belgrade, Bogota, Islamabad, Jakarta, Nairobi, Osh, Pristina, Sarajevo, Sierra Leone and Skopje) with analysts working in over 30 crisis-affected countries and territories across four continents.

In *Africa*, those countries include Burundi, Rwanda, the Democratic Republic of Congo, Sierra Leone-Liberia-Guinea, Somalia, Sudan and Zimbabwe; in *Asia*, Indonesia, Myanmar, Kyrgyzstan, Tajikistan, Uzbekistan, Pakistan, Afghanistan and Kashmir; in *Europe*, Albania, Bosnia, Kosovo, Macedonia, Montenegro and Serbia; in the *Middle East,* the whole region from North Africa to Iran; and in *Latin America*, Colombia.

ICG raises funds from governments, charitable foundations, companies and individual donors. The following governments currently provide funding: Australia, Austria, Canada, Denmark, Finland, France, Germany, Ireland, Japan, Luxembourg, The Netherlands, Norway, Sweden, Switzerland, the Republic of China (Taiwan), Turkey, the United Kingdom and the United States.

Foundation and private sector donors include The Atlantic Philanthropies, Carnegie Corporation of New York, Ford Foundation, Bill & Melinda Gates Foundation, William & Flora Hewlett Foundation, The Henry Luce Foundation, Inc., John D. & Catherine T. MacArthur Foundation, The John Merck Fund, Charles Stewart Mott Foundation, Open Society Institute, Ploughshares Fund, The Ruben & Elisabeth Rausing Trust, the Sasakawa Peace Foundation, the Sarlo Foundation of the Jewish Community Endowment Fund and the United States Institute of Peace.

**April 2003**

Case 1:05-cv-04622-DLI-RML   Document 267-13   Filed 03/22/12   Page 456 of 646 PageID #:
7134

*Islamic Social Welfare Activism In The Occupied Palestinian Territories: A Legitimate Target?*
*ICG Middle East Report N°13, 2 April 2003*                                                    *Page 32*

# APPENDIX C

# ICG REPORTS AND BRIEFING PAPERS[*]

## AFRICA

### ALGERIA[**]

*The Algerian Crisis: Not Over Yet,* Africa Report N°24, 20 October 2000 (also available in French)

*The Civil Concord: A Peace Initiative Wasted,* Africa Report N°31, 9 July 2001 (also available in French)

*Algeria's Economy: A Vicious Circle of Oil and Violence*, Africa Report N°36, 26 October 2001 (also available in French)

### ANGOLA

*Dealing with Savimbi's Ghost: The Security and Humanitarian Challenges in Angola*, Africa Report N°58, 26 February 2003

### BURUNDI

*The Mandela Effect: Evaluation and Perspectives of the Peace Process in Burundi*, Africa Report N°21, 18 April 2000 (also available in French)

*Unblocking Burundi's Peace Process: Political Parties, Political Prisoners*, and Freedom of the Press, Africa Briefing, 22 June 2000

*Burundi: The Issues at Stake. Political Parties, Freedom of the Press and Political Prisoners*, Africa Report N°23, 12 July 2000 (also available in French)

*Burundi Peace Process: Tough Challenges Ahead*, Africa Briefing, 27 August 2000

*Burundi: Neither War, nor Peace*, Africa Report N°25, 1 December 2000 (also available in French)

*Burundi: Breaking the Deadlock, The Urgent Need for a New Negotiating Framework*, Africa Report N°29, 14 May 2001 (also available in French)

*Burundi: 100 Days to put the Peace Process back on Track*, Africa Report N°33, 14 August 2001 (also available in French)

*Burundi: After Six Months of Transition: Continuing the War or Winning the Peace*, Africa Report N°46, 24 May 2002 (also available in French)

*The Burundi Rebellion and the Ceasefire Negotiations*, Africa Briefing, 6 August 2002

*A Framework For Responsible Aid To Burundi*, Africa Report N°57, 21 February 2003

### DEMOCRATIC REPUBLIC OF CONGO

*Scramble for the Congo: Anatomy of an Ugly War*, Africa Report N°26, 20 December 2000 (also available in French)

*From Kabila to Kabila: Prospects for Peace in the Congo,* Africa Report N°27, 16 March 2001

*Disarmament in the Congo: Investing in Conflict Prevention,* Africa Briefing, 12 June 2001

*The Inter-Congolese Dialogue: Political Negotiation or Game of Bluff?* Africa Report N°37, 16 November 2001 (also available in French)

*Disarmament in the Congo: Jump-Starting DDRRR to Prevent Further War*, Africa Report N°38, 14 December 2001

*Storm Clouds Over Sun City: The Urgent Need To Recast The Congolese Peace Process*, Africa Report N°38, 14 May 2002 (also available in French)

*The Kivus: The Forgotten Crucible of the Congo Conflict*, Africa Report N°56, 24 January 2003

### RWANDA

*Uganda and Rwanda: Friends or Enemies?* Africa Report N°15, 4 May 2000

*International Criminal Tribunal for Rwanda: Justice Delayed*, Africa Report N°30, 7 June 2001 (also available in French)

*"Consensual Democracy" in Post Genocide Rwanda: Evaluating the March 2001 District Elections*, Africa Report N°34, 9 October 2001

*Rwanda/Uganda: a Dangerous War of Nerves*, Africa Briefing, 21 December 2001

*The International Criminal Tribunal for Rwanda: The Countdown*, Africa Report N°50, 1 August 2002 (also available in French)

*Rwanda At The End of the Transition: A Necessary Political Liberalisation*, Africa Report N°53, 13 November 2002 (also available in French)

### SOMALIA

*Somalia: Countering Terrorism in a Failed State*, Africa Report N°45, 23 May 2002

*Salvaging Somalia's Chance For Peace*, Africa Briefing, 9 December 2002

*Negotiating a Blueprint for Peace in Somalia*, Africa Report N°59, 6 March 2003

### SUDAN

*God, Oil & Country: Changing the Logic of War in Sudan*, Africa Report N°39, 28 January 2002

*Capturing the Moment: Sudan's Peace Process in the Balance*, Africa Report N°42, 3 April 2002

*Dialogue or Destruction? Organising for Peace as the War in Sudan Escalates*, Africa Report N°48, 27 June 2002

*Sudan's Best Chance For Peace: How Not To Lose It*, Africa Report N°51, 17 September 2002

*Ending Starvation as a Weapon of War in Sudan*, Africa Report N°54, 14 November 2002

---

[*] Released since January 2000.
[**] The Algeria project was transferred to the Middle East Program in January 2002.

*Power and Wealth Sharing: Make or Break Time in Sudan's Peace Process*, Africa Report N°55, 18 December 2002

*Sudan's Oilfields Burn Again: Brinkmanship Endangers The Peace Process*, Africa Briefing, 10 February 2003

## WEST AFRICA

*Sierra Leone: Time for a New Military and Political Strategy*, Africa Report N°28, 11 April 2001

*Sierra Leone: Managing Uncertainty*, Africa Report N°35, 24 October 2001

*Sierra Leone: Ripe For Elections?* Africa Briefing, 19 December 2001

*Liberia: The Key to Ending Regional Instability*, Africa Report N°43, 24 April 2002

*Sierra Leone After Elections: Politics as Usual?* Africa Report N°49, 12 July 2002

*Liberia: Unravelling*, Africa Briefing, 19 August 2002

*Sierra Leone's Truth and Reconciliation Commission: A Fresh Start?*, Africa Briefing, 20 December 2002

## ZIMBABWE

*Zimbabwe: At the Crossroads*, Africa Report N°22, 10 July 2000

*Zimbabwe: Three Months after the Elections,* Africa Briefing, 25 September 2000

*Zimbabwe in Crisis: Finding a way Forward*, Africa Report N°32, 13 July 2001

*Zimbabwe: Time for International Action*, Africa Briefing, 12 October 2001

*Zimbabwe's Election: The Stakes for Southern Africa*, Africa Briefing, 11 January 2002

*All Bark and No Bite: The International Response to Zimbabwe's Crisis*, Africa Report N°40, 25 January 2002

*Zimbabwe at the Crossroads: Transition or Conflict?* Africa Report N°41, 22 March 2002

*Zimbabwe: What Next?* Africa Report N° 47, 14 June 2002

*Zimbabwe: The Politics of National Liberation and International Division*, Africa Report N°52, 17 October 2002

*Zimbabwe: Danger and Opportunity*, Africa Report N°60, 10 March 2003

# ASIA

## CAMBODIA

*Cambodia: The Elusive Peace Dividend*, Asia Report N°8, 11 August 2000

## CENTRAL ASIA

*Central Asia: Crisis Conditions in Three States,* Asia Report N°7, 7 August 2000 (also available in Russian)

*Recent Violence in Central Asia: Causes and Consequences,* Central Asia Briefing, 18 October 2000

*Islamist Mobilisation and Regional Security,* Asia Report N°14, 1 March 2001 (also available in Russian)

*Incubators of Conflict: Central Asia's Localised Poverty and Social Unrest*, Asia Report N°16, 8 June 2001 (also available in Russian)

*Central Asia: Fault Lines in the New Security Map*, Asia Report N°20, 4 July 2001 (also available in Russian)

*Uzbekistan at Ten – Repression and Instability*, Asia Report N°21, 21 August 2001 (also available in Russian)

*Kyrgyzstan at Ten: Trouble in the "Island of Democracy",* Asia Report N°22, 28 August 2001 (also available in Russian)

*Central Asian Perspectives on the 11 September and the Afghan Crisis*, Central Asia Briefing, 28 September 2001 (also available in French and Russian)

*Central Asia: Drugs and Conflict*, Asia Report N°25, 26 November 2001 (also available in Russian)

*Afghanistan and Central Asia: Priorities for Reconstruction and Development*, Asia Report N°26, 27 November 2001 (also available in Russian)

*Tajikistan: An Uncertain Peace*, Asia Report N°30, 24 December 2001 (also available in Russian)

*The IMU and the Hizb-ut-Tahrir: Implications of the Afghanistan Campaign*, Central Asia Briefing, 30 January 2002 (also available in Russian)

*Central Asia: Border Disputes and Conflict Potential*, Asia Report N°33, 4 April 2002 (also available in Russian)

*Central Asia: Water and Conflict*, Asia Report N°34, 30 May 2002 (also available in Russian)

*Kyrgyzstan's Political Crisis: An Exit Strategy*, Asia Report N°37, 20 August 2002 (also available in Russian)

*The OSCE in Central Asia: A New Strategy,* Asia Report N°38, 11 September 2002

*Central Asia: The Politics of Police Reform*, Asia Report N°42, 10 December 2002

*Cracks in the Marble: Turkmenistan's Failing Dictatorship*, Asia Report N°44, 17 January 2003

*Uzbekistan's Reform Program: Illusion or Reality?*, Asia Report N°46, 18 February 2003

## INDONESIA

*Indonesia's Crisis: Chronic but not Acute*, Asia Report N°6, 31 May 2000

*Indonesia's Maluku Crisis: The Issues*, Indonesia Briefing, 19 July 2000

*Indonesia: Keeping the Military Under Control*, Asia Report N°9, 5 September 2000 (also available in Indonesian)

*Aceh: Escalating Tension,* Indonesia Briefing, 7 December 2000

*Indonesia: Overcoming Murder and Chaos in Maluku*, Asia Report N°10, 19 December 2000

*Indonesia: Impunity Versus Accountability for Gross Human Rights Violations,* Asia Report N°12, 2 February 2001

*Indonesia: National Police Reform*, Asia Report N°13, 20 February 2001 (also available in Indonesian)

*Indonesia's Presidential Crisis,* Indonesia Briefing, 21 February 2001

*Bad Debt: The Politics of Financial Reform in Indonesia*, Asia Report N°15, 13 March 2001

*Indonesia's Presidential Crisis: The Second Round*, Indonesia Briefing, 21 May 2001

Case 1:05-cv-04622-DLI-RML   Document 267-13   Filed 03/22/12   Page 458 of 646 PageID #: 7136

*Islamic Social Welfare Activism In The Occupied Palestinian Territories: A Legitimate Target?*
ICG Middle East Report N°13, 2 April 2003                                                                    *Page 34*

*Aceh: Why Military Force Won't Bring Lasting Peace*, Asia Report N°17, 12 June 2001 (also available in Indonesian)

*Aceh: Can Autonomy Stem the Conflict?* Asia Report N°18, 27 June 2001

*Communal Violence in Indonesia: Lessons from Kalimantan*, Asia Report N°19, 27 June 2001 (also available in Indonesian)

*Indonesian-U.S. Military Ties*, Indonesia Briefing, 18 July 2001

*The Megawati Presidency*, Indonesia Briefing, 10 September 2001

*Indonesia: Ending Repression in Irian Jaya*, Asia Report N°23, 20 September 2001

*Indonesia: Violence and Radical Muslims*, Indonesia Briefing, 10 October 2001

*Indonesia: Next Steps in Military Reform,* Asia Report N°24, 11 October 2001

*Indonesia: Natural Resources and Law Enforcement*, Asia Report N°29, 20 December 2001 (also available in Indonesian)

*Indonesia: The Search for Peace in Maluku,* Asia Report N°31, 8 February 2002

*Aceh: Slim Chance for Peace*, Indonesia Briefing, 27 March 2002

*Indonesia: The Implications of the Timor Trials*, Indonesia Briefing, 8 May 2002

*Resuming U.S.-Indonesia Military Ties*, Indonesia Briefing, 21 May 2002

*Al-Qaeda in Southeast Asia: The case of the "Ngruki Network" in Indonesia*, Indonesia Briefing, 8 August 2002

*Indonesia: Resources And Conflict In Papua*, Asia Report N°39, 13 September 2002

*Tensions on Flores: Local Symptoms of National Problems*, Indonesia Briefing, 10 October 2002

*Impact of the Bali Bombings*, Indonesia Briefing, 24 October 2002

*Indonesia Backgrounder: How The Jemaah Islamiyah Terrorist Network Operates*, Asia Report N°43, 11 December 2002

*Aceh: A Fragile Peace*, Asia Report N°47, 27 February 2003

## MYANMAR

*Burma/Myanmar: How Strong is the Military Regime?* Asia Report N°11, 21 December 2000

*Myanmar: The Role of Civil Society*, Asia Report N°27, 6 December 2001

*Myanmar: The Military Regime's View of the World*, Asia Report N°28, 7 December 2001

*Myanmar: The Politics of Humanitarian Aid*, Asia Report N°32, 2 April 2002

*Myanmar: The HIV/AIDS Crisis*, Myanmar Briefing, 2 April 2002

*Myanmar: The Future of the Armed Forces*, Asia Briefing, 27 September 2002

## AFGHANISTAN/SOUTH ASIA

*Afghanistan and Central Asia: Priorities for Reconstruction and Development*, Asia Report N°26, 27 November 2001

*Pakistan: The Dangers of Conventional Wisdom*, Pakistan Briefing, 12 March 2002

*Securing Afghanistan: The Need for More International Action*, Afghanistan Briefing, 15 March 2002

*The Loya Jirga: One Small Step Forward?* Afghanistan & Pakistan Briefing, 16 May 2002

*Kashmir: Confrontation and Miscalculation*, Asia Report N°35, 11 July 2002

*Pakistan: Madrasas, Extremism and the Military*, Asia Report N°36, 29 July 2002

*The Afghan Transitional Administration: Prospects and Perils*, Afghanistan Briefing, 30 July 2002

*Pakistan: Transition to Democracy?*, Asia Report N°40, 3 October 2002

*Kashmir: The View From Srinagar*, Asia Report N°41, 21 November 2002

*Afghanistan: Judicial Reform and Transitional Justice*, Asia Report N°45, 28 January 2003

*Afghanistan: Women and Reconstruction*, Asia Report N°48. 14 March 2003

*Pakistan: The Mullahs and the Military*, Asia Report N°49, 20 March 2003

---

# BALKANS

## ALBANIA

*Albania: State of the Nation*, Balkans Report N°87, 1 March 2000

*Albania's Local Elections, A test of Stability and Democracy,* Balkans Briefing, 25 August 2000

*Albania: The State of the Nation 2001*, Balkans Report N°111, 25 May 2001

*Albania's Parliamentary Elections 2001*, Balkans Briefing, 23 August 2001

*Albania: State of the Nation 2003*, Balkans Report N°140, 11 March 2003

## BOSNIA

*Denied Justice: Individuals Lost in a Legal Maze*, Balkans Report N°86, 23 February 2000

*European Vs. Bosnian Human Rights Standards*, Handbook Overview, 14 April 2000

*Reunifying Mostar: Opportunities for Progress*, Balkans Report N°90, 19 April 2000

*Bosnia's Municipal Elections 2000: Winners and Losers*, Balkans Report N°91, 28 April 2000

*Bosnia's Refugee Logjam Breaks: Is the International Community Ready?* Balkans Report N°95, 31 May 2000

*War Criminals in Bosnia's Republika Srpska*, Balkans Report N°103, 2 November 2000

*Bosnia's November Elections: Dayton Stumbles*, Balkans Report N°104, 18 December 2000

*Turning Strife to Advantage: A Blueprint to Integrate the Croats in Bosnia and Herzegovina*, Balkans Report N°106, 15 March 2001

*No Early Exit: NATO's Continuing Challenge in Bosnia*, Balkans Report N°110, 22 May 2001

Case 1:05-cv-04622-DLI-RML   Document 267-13   Filed 03/22/12   Page 459 of 646 PageID #: 7137

*Islamic Social Welfare Activism In The Occupied Palestinian Territories: A Legitimate Target?*
ICG Middle East Report N°13, 2 April 2003                                              *Page 35*

***Bosnia's Precarious Economy: Still Not Open For Business***; Balkans Report N°115, 7 August 2001 (also available in Bosnian)

***The Wages of Sin: Confronting Bosnia's Republika Srpska***, Balkans Report N°118, 8 October 2001 (also available in Bosnian)

***Bosnia: Reshaping the International Machinery***, Balkans Report N°121, 29 November 2001 (also available in Bosnian)

***Courting Disaster: The Misrule of Law in Bosnia & Herzegovina***, Balkans Report N°127, 26 March 2002 (also available in Bosnian)

***Implementing Equality: The "Constituent Peoples" Decision in Bosnia & Herzegovina***, Balkans Report N°128, 16 April 2002 (also available in Bosnian)

***Policing the Police in Bosnia: A Further Reform Agenda***, Balkans Report N°130, 10 May 2002 (also available in Bosnian)

***Bosnia's Alliance for (Smallish) Change***, Balkans Report N°132, 2 August 2002 (also available in Bosnian)

***The Continuing Challenge Of Refugee Return In Bosnia & Herzegovina***, Balkans Report N°137, 13 December 2002 (also available in Bosnian)

## CROATIA

***Facing Up to War Crimes***, Balkans Briefing, 16 October 2001

***A Half-Hearted Welcome: Refugee Return to Croatia***, Balkans Report N°138, 13 December 2002 (also available in Serbo-Croat)

## KOSOVO

***Kosovo Albanians in Serbian Prisons: Kosovo's Unfinished Business***, Balkans Report N°85, 26 January 2000

***What Happened to the KLA?*** Balkans Report N°88, 3 March 2000

***Kosovo's Linchpin: Overcoming Division in Mitrovica***, Balkans Report N°96, 31 May 2000

***Reality Demands: Documenting Violations of International Humanitarian Law in Kosovo 1999***, Balkans Report, 27 June 2000

***Elections in Kosovo: Moving Toward Democracy?*** Balkans Report N°97, 7 July 2000

***Kosovo Report Card***, Balkans Report N°100, 28 August 2000

***Reaction in Kosovo to Kostunica's Victory***, Balkans Briefing, 10 October 2000

***Religion in Kosovo***, Balkans Report N°105, 31 January 2001

***Kosovo: Landmark Election***, Balkans Report N°120, 21 November 2001 (also available in Albanian and Serbo-Croat)

***Kosovo: A Strategy for Economic Development***, Balkans Report N°123, 19 December 2001 (also available in Serbo-Croat)

***A Kosovo Roadmap: I. Addressing Final Status***, Balkans Report N°124, 28 February 2002 (also available in Albanian and Serbo-Croat)

***A Kosovo Roadmap: II. Internal Benchmarks***, Balkans Report N°125, 1 March 2002 (also available in Albanian and Serbo-Croat)

***UNMIK's Kosovo Albatross: Tackling Division in Mitrovica***, Balkans Report N°131, 3 June 2002 (also available in Albanian and Serbo-Croat)

***Finding the Balance: The Scales of Justice in Kosovo***, Balkans Report N°134, 12 September 2002 (also available in Albanian)

***Return to Uncertainty: Kosovo's Internally Displaced and The Return Process***, Balkans Report N°139, 13 December 2002 (also available in Albanian and Serbo-Croat)

## MACEDONIA

***Macedonia's Ethnic Albanians: Bridging the Gulf***, Balkans Report N°98, 2 August 2000

***Macedonia Government Expects Setback in Local Elections***, Balkans Briefing, 4 September 2000

***The Macedonian Question: Reform or Rebellion***, Balkans Report N°109, 5 April 2001

***Macedonia: The Last Chance for Peace***, Balkans Report N°113, 20 June 2001

***Macedonia: Still Sliding***, Balkans Briefing, 27 July 2001

***Macedonia: War on Hold***, Balkans Briefing, 15 August 2001

***Macedonia: Filling the Security Vacuum***, Balkans Briefing, 8 September 2001

***Macedonia's Name: Why the Dispute Matters and How to Resolve It***, Balkans Report N°122, 10 December 2001 (also available in Serbo-Croat)

***Macedonia's Public Secret: How Corruption Drags The Country Down***, Balkans Report N°133, 14 August 2002 (also available in Macedonian)

***Moving Macedonia Toward Self-Sufficiency: A New Security Approach for NATO and the EU***, Balkans Report N°135, 15 November 2002 (also available in Macedonian)

## MONTENEGRO

***Montenegro: In the Shadow of the Volcano***, Balkans Report N°89, 21 March 2000

***Montenegro's Socialist People's Party: A Loyal Opposition?*** Balkans Report N°92, 28 April 2000

***Montenegro's Local Elections: Testing the National Temperature***, Background Briefing, 26 May 2000

***Montenegro: Which way Next?*** Balkans Briefing, 30 November 2000

***Montenegro: Settling for Independence?*** Balkans Report N°107, 28 March 2001

***Montenegro: Time to Decide, a Pre-Election Briefing***, Balkans Briefing, 18 April 2001

***Montenegro: Resolving the Independence Deadlock***, Balkans Report N°114, 1 August 2001

***Still Buying Time: Montenegro, Serbia and the European Union***, Balkans Report N°129, 7 May 2002 (also available in Serbian)

## SERBIA

***Serbia's Embattled Opposition***, Balkans Report N°94, 30 May 2000

***Serbia's Grain Trade: Milosevic's Hidden Cash Crop***, Balkans Report N°93, 5 June 2000

***Serbia: The Milosevic Regime on the Eve of the September Elections***, Balkans Report N°99, 17 August 2000

Case 1:05-cv-04622-DLI-RML   Document 267-13   Filed 03/22/12   Page 460 of 646 PageID #: 7138

*Islamic Social Welfare Activism In The Occupied Palestinian Territories: A Legitimate Target?*
*ICG Middle East Report N°13, 2 April 2003*                                                                 *Page 36*

*Current Legal Status of the Republic of Yugoslavia (FRY) and of Serbia and Montenegro,* Balkans Report N°101, 19 September 2000

*Yugoslavia's Presidential Election: The Serbian People's Moment of Truth,* Balkans Report N°102, 19 September 2000

*Sanctions against the Federal Republic of Yugoslavia,* Balkans Briefing, 10 October 2000

*Serbia on the Eve of the December Elections,* Balkans Briefing, 20 December 2000

*A Fair Exchange: Aid to Yugoslavia for Regional Stability,* Balkans Report N°112, 15 June 2001

*Peace in Presevo: Quick Fix or Long-Term Solution?* Balkans Report N°116, 10 August 2001

*Serbia's Transition: Reforms Under Siege,* Balkans Report N°117, 21 September 2001 (also available in Serbo-Croat)

*Belgrade's Lagging Reform: Cause for International Concern,* Balkans Report N°126, 7 March 2002 (also available in Serbo-Croat)

*Serbia: Military Intervention Threatens Democratic Reform,* Balkans Briefing, 28 March 2002 (also available in Serbo-Croat)

*Fighting To Control Yugoslavia's Military,* Balkans Briefing, 12 July 2002 (also available in Serbo-Croat)

*Arming Saddam: The Yugoslav Connection,* Balkans Report N°136, 3 December 2002

*Serbia After Djindjic,* Balkans Report N°141, 18 March 2003

## REGIONAL REPORTS

*After Milosevic: A Practical Agenda for Lasting Balkans Peace,* Balkans Report N°108, 26 April 2001

*Milosevic in The Hague: What it Means for Yugoslavia and the Region,* Balkans Briefing, 6 July 2001

*Bin Laden and the Balkans: The Politics of Anti-Terrorism,* Balkans Report N°119, 9 November 2001

## LATIN AMERICA

*Colombia's Elusive Quest for Peace,* Latin America Report N°1, 26 March 2002 (also available in Spanish)

*The 10 March 2002 Parliamentary Elections in Colombia,* Latin America Briefing, 17 April 2002 (also available in Spanish)

*The Stakes in the Presidential Election in Colombia,* Latin America Briefing, 22 May 2002

*Colombia: The Prospects for Peace with the ELN,* Latin America Report N°2, 4 October 2002 (also available in Spanish)

*Colombia: Will Uribe's Honeymoon Last?,* Latin America Briefing, 19 December 2002 (also available in Spanish)

## MIDDLE EAST

*A Time to Lead: The International Community and the Israeli-Palestinian Conflict,* Middle East Report N°1, 10 April 2002

*Middle East Endgame I: Getting to a Comprehensive Arab-Israeli Peace Settlement,* Middle East Report N°2, 16 July 2002 (also available in Arabic)

*Middle East Endgame II: How a Comprehensive Israeli-Palestinian Settlement Would Look,* Middle East Report N°3; 16 July 2002 (also available in Arabic)

*Middle East Endgame III: Israel, Syria and Lebanon – How Comprehensive Peace Settlements Would Look,* Middle East Report N°4, 16 July 2002 (also available in Arabic)

*Iran: The Struggle for the Revolution´s Soul,* Middle East Report N°5, 5 August 2002

*Iraq Backgrounder: What Lies Beneath,* Middle East Report N°6, 1 October 2002

*The Meanings of Palestinian Reform,* Middle East Briefing, 12 November 2002

*Old Games, New Rules: Conflict on the Israel-Lebanon Border,* Middle East Report N°7, 18 November 2002

*Voices From The Iraqi Street,* Middle East Briefing, 4 December 2002

*Yemen: Indigenous Violence and International Terror in a Fragile State,* Middle East Report N°8, 8 January 2003

*Radical Islam In Iraqi Kurdistan: The Mouse That Roared?,* Middle East Briefing, 7 February 2003

*Red Alert In Jordan: Recurrent Unrest In Maan,* Middle East Briefing, 19 February 2003

*Iraq Policy Briefing: Is There An Alternative To War?,* Middle East Report N°9, 24 February 2003

*War In Iraq: What's Next For The Kurds?* Middle East Report N°10, 19 March 2003

*War In Iraq: Political Challenges After The Conflict,* Middle East Report N°11, 25 March 2003

*War In Iraq: Managing Humanitarian Relief,* Middle East Report N°12, 27 March 2003

## ALGERIA[*]

*Diminishing Returns: Algeria's 2002 Legislative Elections,* Middle East Briefing, 24 June 2002

## ISSUES REPORTS

### HIV/AIDS

*HIV/AIDS as a Security Issue,* Issues Report N°1, 19 June 2001

*Myanmar: The HIV/AIDS Crisis,* Myanmar Briefing, 2 April 2002

### EU

*The European Humanitarian Aid Office (ECHO): Crisis Response in the Grey Lane,* Issues Briefing, 26 June 2001

*EU Crisis Response Capability: Institutions and Processes for Conflict Prevention and Management,* Issues Report N°2, 26 June 2001

*EU Crisis Response Capabilities: An Update,* Issues Briefing, 29 April 2002

---

[*] The Algeria project was transferred from the Africa Program in January 2002.

Case 1:05-cv-04622-DLI-RML   Document 267-13   Filed 03/22/12   Page 461 of 646 PageID #: 7139

*Islamic Social Welfare Activism In The Occupied Palestinian Territories: A Legitimate Target?*
*ICG Middle East Report N°13, 2 April 2003*                                                    *Page 37*

# APPENDIX D

# ICG BOARD MEMBERS

**Martti Ahtisaari, Chairman**
*Former President of Finland*

**Maria Livanos Cattaui, Vice-Chairman**
*Secretary-General, International Chamber of Commerce*

**Stephen Solarz, Vice-Chairman**
*Former U.S. Congressman*

**Gareth Evans, President & CEO**
*Former Foreign Minister of Australia*

**S. Daniel Abraham**
*Chairman, Center for Middle East Peace and Economic Cooperation, U.S.*

**Morton Abramowitz**
*Former U.S. Assistant Secretary of State and Ambassador to Turkey*

**Kenneth Adelman**
*Former U.S. Ambassador and Director of the Arms Control and Disarmament Agency*

**Richard Allen**
*Former U.S. National Security Adviser to the President*

**Saud Nasir Al-Sabah**
*Former Kuwaiti Ambassador to the UK and U.S.; former Minister of Information and Oil*

**Louise Arbour**
*Supreme Court Justice, Canada; Former Chief Prosecutor, International Criminal Tribunal for former Yugoslavia*

**Oscar Arias Sanchez**
*Former President of Costa Rica; Nobel Peace Prize, 1987*

**Ersin Arioglu**
*Chairman, Yapi Merkezi Group, Turkey*

**Emma Bonino**
*Member of European Parliament; former European Commissioner*

**Zbigniew Brzezinski**
*Former U.S. National Security Adviser to the President*

**Cheryl Carolus**
*Former South African High Commissioner to the UK; former Secretary General of the ANC*

**Victor Chu**
*Chairman, First Eastern Investment Group, Hong Kong*

**Wesley Clark**
*Former NATO Supreme Allied Commander, Europe*

**Uffe Ellemann-Jensen**
*Former Minister of Foreign Affairs, Denmark*

**Mark Eyskens**
*Former Prime Minister of Belgium*

**Marika Fahlen**
*Former Swedish Ambassador for Humanitarian Affairs; Director of Social Mobilization and Strategic Information, UNAIDS*

**Yoichi Funabashi**
*Chief Diplomatic Correspondent & Columnist, The Asahi Shimbun, Japan*

**Bronislaw Geremek**
*Former Minister of Foreign Affairs, Poland*

**I.K.Gujral**
*Former Prime Minister of India*

**HRH El Hassan bin Talal**
*Chairman, Arab Thought Forum; President, Club of Rome*

**Carla Hills**
*Former U.S. Secretary of Housing; former U.S. Trade Representative*

**Asma Jahangir**
*UN Special Rapporteur on Extrajudicial, Summary or Arbitrary Executions; Advocate Supreme Court, former Chair Human Rights Commission of Pakistan*

**Ellen Johnson Sirleaf**
*Senior Adviser, Modern Africa Fund Managers; former Liberian Minister of Finance and Director of UNDP Regional Bureau for Africa*

**Mikhail Khodorkovsky**
*Chairman and Chief Executive Officer, YUKOS Oil Company, Russia*

**Elliott F. Kulick**
*Chairman, Pegasus International, U.S.*

**Joanne Leedom-Ackerman**
*Novelist and journalist, U.S.*

**Todung Mulya Lubis**
*Human rights lawyer and author, Indonesia*

**Barbara McDougall**
*Former Secretary of State for External Affairs, Canada*

**Mo Mowlam**
*Former Secretary of State for Northern Ireland, UK*

**Ayo Obe**
*President, Civil Liberties Organisation, Nigeria*

**Christine Ockrent**
*Journalist and author, France*

**Friedbert Pflüger**
*Foreign Policy Spokesman of the CDU/CSU Parliamentary Group in the German Bundestag*

**Surin Pitsuwan**
*Former Minister of Foreign Affairs, Thailand*

Case 1:05-cv-04622-DLI-RML   Document 267-13   Filed 03/22/12   Page 462 of 646 PageID #: 7140

**Itamar Rabinovich**
*President of Tel Aviv University; former Israeli Ambassador to the U.S. and Chief Negotiator with Syria*

**Fidel V. Ramos**
*Former President of the Philippines*

**Mohamed Sahnoun**
*Special Adviser to the United Nations Secretary-General on Africa*

**Salim A. Salim**
*Former Prime Minister of Tanzania; former Secretary General of the Organisation of African Unity*

**Douglas Schoen**
*Founding Partner of Penn, Schoen & Berland Associates, U.S.*

**William Shawcross**
*Journalist and author, UK*

**George Soros**
*Chairman, Open Society Institute*

**Eduardo Stein**
*Former Minister of Foreign Affairs, Guatemala*

**Pär Stenbäck**
*Former Minister of Foreign Affairs, Finland*

**Thorvald Stoltenberg**
*Former Minister of Foreign Affairs, Norway*

**William O. Taylor**
*Chairman Emeritus, The Boston Globe, U.S.*

**Ed van Thijn**
*Former Netherlands Minister of Interior; former Mayor of Amsterdam*

**Simone Veil**
*Former President of the European Parliament; former Minister for Health, France*

**Shirley Williams**
*Former Secretary of State for Education and Science; Member House of Lords, UK*

**Jaushieh Joseph Wu**
*Deputy Secretary General to the President, Taiwan*

**Grigory Yavlinsky**
*Chairman of Yabloko Party and its Duma faction, Russia*

**Uta Zapf**
*Chairperson of the German Bundestag Subcommittee on Disarmament, Arms Control and Non-proliferation*

**EXHIBIT 167 TO DECLARATION OF VALERIE SCHUSTER**

Case 1:05-cv-04622-DLI-RML   Document 267-13   Filed 03/22/12   Page 464 of 646 PageID #: 7142

PSIO Occasional Paper 1/2008

# The Palestinian Zakat Committees 1993–2007 and Their Contested Interpretations

Jonathan Benthall



THE GRADUATE INSTITUTE | GENEVA

INSTITUT DE HAUTES ÉTUDES
INTERNATIONALES ET DU DÉVELOPPEMENT

GRADUATE INSTITUTE OF INTERNATIONAL
AND DEVELOPMENT STUDIES





The views expressed in this publication are those of the author and do not reflect the views of the PSIO and the Graduate Institute.

All rights reserved. No part of this publication may be reproduced, stored in a retrieval system or transmitted in any form or by any means – electronic, mechanical, photo-copying, recording or otherwise – without the prior permission of the Graduate Institute of International and Development Studies (IHEID).

In principle, permission will be granted, free of charge, provided full reference is given to the original work and to the author concerned.

Copyright 2008, IHEID, CH - Geneva

ISBN 978-2-940415-05-2

# Foreword

The Graduate Institute of International Studies created the PSIO in 1994 to facilitate collaboration between the international and academic communities in Geneva and worldwide. It is both a research programme and a forum to stimulate discussions between academics and policy makers within the environment of the Graduate Institute in Geneva.

For ten years, the PSIO has been steadily expanding and diversifying its activities. In September 2005, it launched, with the Swiss Federal Department of Foreign Affairs, Political Division IV (DFA-PD IV), the project 'Religion and Politics: Initiatives and Applied Research', aimed at making an effective contribution to transforming conflicts in which religious and political factors are deeply interconnected and developing a platform of knowledge and expertise in this field. Since then, the project is being implemented through both operational and research activities, touching upon a variety of topics and situations worldwide.

Within the activities of the project, the initiative 'Towards cooperation in removing unjustified obstacles for Islamic charities' (also known as the *Montreux Initiative*) was launched in 2005. The objectives of the initiative are to build confidence between governments, Islamic charities, and support NGOs in order to give Islamic charities better tools for the post 9-11 context by means of capacity-building, and to improve the general atmosphere in the charity field which has suffered as a consequence of the 'war against terror'.

The Montreux Initiative has given attention to the Islamic charities set up to help Palestinians, and in particular the Palestinian zakat committees, which have attracted much controversy. This Occasional Paper reviews the argument that these committees have been engaged in abuse of the privileges of charities, and it concludes that the argument is, on the balance of evidence available, faulty. Though the author is one of the advisers to the Montreux Initiative, this Paper is published as an exercise in social research that represents the views of its author only.

Dr. Daniel Warner
Executive Director
PSIO

## About the author

Jonathan Benthall is an honorary research fellow in the Department of Anthropology, University College London, and co-author, with Jérôme Bellion-Jourdan,  of *The Charitable Crescent: Politics of Aid in the Muslim World* (I.B.Tauris, 2003, due to be republished in a paperback edition with a new preface in late 2008). His other publications include *Disasters, Relief and the Media* (I.B.Tauris, 1993). He has been Director of the Royal Anthropological Institute, Founding Editor of *Anthropology Today*, and Chairman of the Oxford based International NGO Training and Research Centre (INTRAC). Since 2005 he has served as an adviser to the Swiss Federal Department of Foreign Affairs (Political Division IV) on its initiatives relating to Islamic charities.

# Table of Contents

1. Introduction      6

2. The 'pyramid' model      8

3. An alternative 'emic' model in three phases      9

   *3.1. Phase 1, till 1967*      *9*

   *3.2. Phase 2, 1968–1994*      *10*

   *3.3. Phase 3, 1994–present*      *10*

4. Allegations against the zakat committees      11

5. Some field evidence from 1996      13

6. The functioning of the zakat committees and their reputation      15

7. An alternative 'etic' model      18

8. Zakat committees as Faith Based Organizations      21

9. The impasse for Palestinian Islamic charities in its geopolitical context      22

REFERENCES      25

# The Palestinian zakat committees 1993–2007 and their contested interpretations

## 1. Introduction

The nature of the Palestinian Islamic charities, known as zakat committees, has proved an extremely contentious issue, especially in Israel, the United States and some European countries. We shall contrast the current official position of the US government, that they are subsidiaries of a seamless and conspiratorial terrorist organization, with an alternative approach that contextualizes their religious and humanitarian aspects rather than limiting itself to a purely political and counter-terrorist analysis. Such is the heat of political conflict in Israel–Palestine that ostensibly innocuous humanitarian actions – the gift of beehives to support a destitute family, or the management of a clinic to treat gallstones – can acquire a nefarious reputation.

This article will argue that, difficult as it may be to arrive at complete certainty in such a fluid and contentious environment, the balance of evidence is against the conspiratorial theory. The article will draw on personal observations, commissioned information-gathering and published research, to argue in favour of a more benign interpretation, without falling into the error of denying that charity in any social context can be analytically divorced from politics. It will be suggested that the zakat committees are, among other things, an example of grass-roots, community-based local Faith Based Organizations that were a meeting-point for politically inspired Islamists and the devout middle class. They were beginning to tap successfully into the international aid system, and would have continued to develop in this direction if they had been encouraged to, and if they had not become the victims of a campaign since the end of 2007 to reorganize them under central control.

Zakat or almsgiving is one of the five pillars of Islam, closely associated with prayer – which without the observance of zakat is considered of no avail. It is the religious obligation for Muslims to give annually one-fortieth of the value of their assets, over and above basic property such as their home and working tools, to charity. Eight eligible categories of beneficiary are listed in the Qur'an, beginning with 'the poor'. Though the principle of zakat is deeply entrenched in Islamic law, teaching and historical practice, there is no country in which it functions as it ought to do in an ideal Islamic society: that is to say, automatically redistributing surplus wealth to those in need and thus purging private capital of its undesirable features.  In some Muslim countries such as Pakistan it has been absorbed into the national tax system; in others, such as Oman, it is considered an entirely private matter. New-style Western Islamic aid agencies, such as Islamic Relief Worldwide, have adapted the teaching on zakat as an opportunity for professional fund-raising on an impressive scale, relying on modern readings of the Qur'anic prescriptions that enable zakat funds to be

disbursed for the benefit of those most in need, regardless of whether or not they are Muslims (Benthall and Bellion-Jourdan 2003: 7–28). In the Palestinian Territories a rather complex situation has arisen, reflecting tensions that have radiated transnationally into courtrooms, universities and polemical web sites.

The basic facts are clear enough.[1] The extent of deprivation and need in the Palestinian Territories has become more serious over the last thirty years, as a result of the failure of a succession of initiatives to try to resolve the Israel–Palestine conflict. In several major towns in the West Bank, some 90 zakat committees, as well as numerous Islamic charitable associations, have been gradually expanding their activities in providing services to local communities: hospitals and clinics, food distribution, income-generating projects, orphan sponsorship, schools, bursaries for students, summer camps, and the like. The largest such organization in the West Bank, at Hebron (Al-Khalil)[2], had in 2006 an annual expenditure of some $7 million; the medium-size ones less than $1 million; and there are many considerably smaller ones – much less than the support given by the United Nations and other international agencies to alleviate poverty and distress in the Territories, but still a substantial contribution.

We shall here confine our discussion to the West Bank. The legal status of zakat committees in Gaza is similar, in that, though Gaza was administered by Egypt between 1948 and 1967, Jordanian law was applied in this respect since 1967 (as explained below) over all the Palestinian Territories. Nearly all our evidence antedates the takeover of Gaza by Hamas in June 2007, which resulted in a new political convulsion in both Gaza and the West Bank – fast-moving and outside the scope of our present research. In particular, the Fatah-dominated Palestinian Authority based in Ramallah decided in December 2007 to radically reorganize the West Bank zakat committees under central control.[3] We have used the present tense, but in most cases the past tense would be more accurate.

---

[1] I visited Jerusalem, the West Bank (including Nablus) and Gaza personally in 1996, and Jerusalem in 1999. As well as published sources, I have also used in this article information gathered in the course of giving advice on Islamic charities to the Swiss Federal Department of Foreign Affairs, Bern, since 2005 – on the 'Montreux Initiative' – and to a number of legal teams, in the USA and Europe, since 2006. This has included participation in meetings of experts in Britain, Switzerland, Belgium and Qatar. I am grateful to all the members of the Montreux Initiative core team; also specially to Mr Waleed Al-Salhi, an experienced Palestinian NGO manager originally from Nablus and now resident in London, for valuable information on the history of the Palestinian zakat committees since 1967 that he has collected; and to Sheila Carapico, Emanuel Schäublin, Natalie Schweizer and Haim Malka for helpful comments on drafts.
The 1996 research was carried out during sabbatical leave from the Royal Anthropological Institute, with funding from the Nuffield Foundation. More recently, information was gathered in the course of giving expert advice to defence attorneys in the Holy Land Foundation case, Dallas, Texas, 2007, with some funding from the Administrative Office of the US Courts.
This paper represents only my personal views, and none of those whose help is acknowledged bear any responsibility for the content.

[2] Technically the Hebron Charitable Association is not a zakat committee, but a society formed in 1962 under an Ottoman law of 1909. There are a number of similar Islamic charitable associations in the West Bank which are regulated by the Palestinian Authority, but not (unlike the zakat committees) under the Ministry of Awqaf. Except for this technical difference in regulation and monitoring, the issues raised by the charitable associations are similar to those raised by the zakat committees. They are treated as one broad category in this article.

[3] At the time of writing, the Palestinian Authority had had to surrender control of Gaza to rule by Hamas.

## 2. The 'pyramid' model

The view of the West Bank zakat committees advanced by the American government is simple. It is influenced by the publications of Matthew Levitt, the counter-terrorism expert (Levitt 2006). The organization of Hamas is likened to a pyramid, with a political section at the top, which rests on a military section, which in turn rests on a broad social welfare section.[4] This social welfare section is supposedly sometimes referred to as 'the Dawa'.[5]

It is common ground that *da`wa* in Arabic means the call to Islam, missionary activity, and sometimes by extension the provision of religious education and social services with a view to reviving the faith of a community. Though the details of its structure are not made public, there is little doubt that Hamas is indeed hierarchically organized, with a representative council (the Shura) at the apex, a military command structure (the Al-Qassam Brigades), and various committees. These no doubt include specialist committees dealing with charitable and welfare matters as well as finance, public relations, religion, women's issues and the like (Hroub 2006: 118), and were certainly set up with a view to facilitating wide consultation. There is no evidence to my knowledge to support the contention that there is a social welfare section called 'the Dawa'. It is true that Hamas does operate some relief and welfare services directly – that is to say, under its own control without any independent charity structures – and it would be reasonable to regard these as subsidiaries; but this does not apply to the independently constituted committees and societies. *Da`wa* is a principle, a set of values, not the name of a department. Levitt's is in sociological terms an 'etic'[6] or outsider's interpretation, but presented as if it were an 'emic' description using insider categories, that is to say an organization chart. This might seem a pedantic point to make, except that the outcomes of some major current court hearings relating to Islamic charities depend partly on what judges and jury members may make of such nuances, and the justification by the Palestinian Authority in Ramallah of its recent reorganization of the zakat committees depends on whether the zakat committees actually deserved to be radically reformed or, on the contrary, were operating legally and effectively as grass-roots charities.

As an 'etic' construct, the pyramid model is contentious. It omits two foundation stones that have underpinned Hamas's popularity: first, religious conviction as a social determinant in itself, expressed with particular vigour in the idea of the *umma*, or brotherhood in Islam; and second, opposition to the Israeli military occupation which is by common consent responsible for much hardship. Another 'etic' interpretation of Hamas's motivation,

---

[4] The 'pyramid model' is a descriptive name chosen for the present article, not a term used by Matthew Levitt himself.

[5] Transcript of Trial, US District Court, Northern District of Texas, Dallas Division, USA v. Holy Land Foundation et al. (no. 3:04-24-G), 25 July 2007, evidence of Matthew Levitt, 09:49.

[6] The neologisms 'emic' and 'etic' derive from an analogy with the terms 'phonemic' and 'phonetic'. The emic perspective focuses on the intrinsic cultural distinctions that are meaningful to the members of a given society, in the same way as phonemic analysis focuses on the intrinsic phonological distinctions that are meaningful to speakers of a given language (e.g. whether the 'glottal stop' is recognized as an alphabetical letter). The etic perspective relies on extrinsic concepts and categories that have meaning for analytic observers, in the same way as phonetic analysis relies on the extrinsic concepts and categories that are meaningful to linguistic analysts (e.g. dental fricatives). 'Emic knowledge is essential for an intuitive and empathic understanding of a culture, and is essential for conducting effective ethnographic fieldwork. … Etic knowledge, on the other hand, is essential for cross-cultural comparison.' (Jetts 1996: 383).

advanced for instance by the French researcher Jean-François Legrain, contends that its military and political functions are subordinate to an overriding priority which has been to promote a moral and spiritual reawakening based on a particular reading of the Qur'an: the principle of *da'wa* as a primary objective, not as a means to a merely political end.[7] However, the pyramid model is used by the United States and Israeli governments to argue that all Palestinian charitable organizations having, or deemed to have, an affiliation with Hamas, are in effect its subsidiaries. Hence any support given to these organizations is 'material support for terrorism', which is under US law tantamount to terrorism itself and in particular to the suicide attacks on unarmed civilians that Hamas has at various times organized. Allegations of material support for terrorism have led to designation (black-listing) of individuals and institutions under US law, to freezing of assets, and to criminal prosecutions.

It seems likely that the criminalization of material support for the zakat committees has in fact had the result of driving money underground, where it is outside the purview of banking regulators – because there are many ways of remitting funds other than through banking remittances between registered charities. If this is correct, 'designation' has the reverse effect to that intended. However, we are mainly concerned here with the validity of the process whereby designation has been decided as a policy, rather than with the practical consequences of the policy that have ensued.

## 3. An alternative 'emic' model in three phases

I propose instead an 'emic' description of the West Bank zakat committees that confines itself to categories recognized by all the participants and that also provides some time-depth. We will take as a case study the heritage town of Nablus, a commercial centre with a population of some 135,000. It is especially notable for a site sacred to Jews ('Joseph's tomb'[8]) and for a history of political opposition dating back to the British Mandate before the Second World War. The history of its zakat committee may be divided into three phases.

### 3.1. Phase 1, till 1967

During the first phase, before the Six-Day War of 1967 and Israeli occupation of the Palestinian Territories in 1968, when the West Bank was still under Jordanian control, the Nablus zakat committee was based in a historic mosque in the Old City. Funding came largely from well-to-do Muslims in the vicinity, in compliance with their zakat obligations, but also from income derived from some *waqf* real estate – assets donated for the inalienable benefit of the zakat committee.[9] Alms were distributed to the poor and needy of the city – following the traditional practice of zakat committees all over the Muslim world. The main responsibility lay with the imam of the mosque, governed by Islamic law but also

---

[7] « Le Hamas et le Fatah: doivent-ils dissoudre l'Autorité palestinienne? » *Le Figaro*, 23 November 2006.
[8] The site was evacuated and subsequently vandalized in 2000.
[9] The institution of *waqf*, though not Qur'anic, dates back to the foundation of Islam and became widespread over most of the Islamic world. Setting aside some legal technicalities, it is similar to the European charitable trust. On *waqf*, see Benthall and Bellion-Jourdan 2003: 29–37.

under the supervision of the Jordanian government's Ministry of Awqaf (the Arabic plural of *waqf*), which had charge of religious affairs[10] and holy sites.

### 3.2. Phase 2, 1968–1994

The second phase, of 26 years, was a transitional period between Israel's victory in the Six-Day War and the foundation of the Palestinian National Authority (PNA) in 1994. The big change was Israeli military occupation of the Palestinian Territories. However, oversight of the Palestinian zakat committees, including Nablus, was still retained by the Jordanian Ministry of Awqaf – even after 1988, when King Hussain of Jordan decided to disengage from territorial claims to the West Bank. The Nablus committee was first registered under Jordanian law in 1977. During this second phase, the committee developed its activities: undertaking various charitable and community projects, beginning to secure external funds from bodies such as the French government and the World Bank, and investing its own funds for the future.

### 3.3. Phase 3, 1994–present

The third phase lasted from the foundation of the PNA in 1994 until the time of writing. The overall Israeli military occupation continued during this period, but the PNA acquired control of many aspects of the day-to-day administration of the Palestinian Territories. During the second phase, Non-Governmental Organizations (NGOs) had acquired considerable influence in the Territories on account of the vacuum in government and welfare services (Brown 2003). After 1994 the PNA exerted much political effort (against considerable opposition) to establishing control over the NGOs, passing new legislation with this in mind and insisting on rigorous registration and monitoring procedures. The zakat committees were treated as a special category and came under the control of the PNA, but now through the Palestinian Ministry of Awqaf.[11] Each zakat committee was required to register with this ministry, as well as with other specialist ministries if it was working in the fields of social affairs, health, education or agriculture, and to submit to regular inspections. The Ministry of Awqaf is required to approve the election of each of the members of a given zakat committee, between seven and thirteen in number, none related by close kinship ties, and they are not allowed to accept any payment for their services (unlike their employees). In effect, the zakat committees have operated under a combination of Jordanian zakat law and the new Palestinian regulations that lay down reporting and external auditing requirements for all voluntary associations.[12]

Since 1994, the Nablus zakat committee has expanded its activities considerably. Its many projects include an orphan programme, an eye hospital, a day clinic and a dairy. A large part of its funds are still generated locally as before: from zakat dues, income from real estate, and stock market investments. However, there has also been a considerable expansion in

---

[10] Christian as well as Muslim.
[11] This does not apply in East Jerusalem, where the Ministry of Awqaf, including control of the holy sites, is still under Jordanian control.
[12] Jordanian law on zakat, *Zakat Fund Law and the Administrative Financial Instructions Issued According Thereto*, 1988; PNA, Office of the President, *Regulation No. (1) for the Year 2000 Regarding Charitable Societies and National Institutions.*

international funding. International donors have included the World Food Programme, the UN Development Programme and well-known American, German, Japanese and French agencies. But as might be expected, much of the external funding has come from Arab and Muslim individuals and institutions, in many countries, that are sympathetic to the plight of the Palestinians.[13] In neighbouring Jordan, some zakat committees have specialized in sending the product of their local fund-raising to help Palestinians in need. But it is the action of European and American Islamic charities in sending funds to Palestine that has made them such a subject of bitter controversy, for according to the pyramid model this is equivalent to the financing of suicide bombing.

## 4. Allegations against the zakat committees

Perhaps the strongest charge against the zakat committees is the allegation that they directly support paramilitary activities, including the offer of a kind of advance insurance policy for Hamas suicide bombers, providing benefits for their families. One reason why this charge has gained credibility is that the suicide bombers are often called 'martyrs' (*shahīd*, plural *shuhada'*), and it is true that funds have sometimes been disbursed to support explicitly the families of 'martyrs'. However, the committees' defence is, first, that in the Arab world a *shahīd* is anyone who dies in a just cause or as a result, direct or indirect, of injustice (including anyone killed under Israeli fire, or even the victim of an electrical fire due to defective wiring in a deprived neighbourhood, or a woman who dies in childbirth when the ambulance transporting her is detained at a checkpoint)[14]; and second, that they carry out a needs assessment before helping bereaved families, so that the aid they give is based on need, irrespective of how the deceased met their deaths.[15] Evidence to substantiate the strong charge is scarce, based on sources such as Israeli intelligence reports that are not only selective and heavily biased,[16] but also sometimes compromised by semantic discrepancies, such as the ambiguity of *shahīd*, due to translation problems between Arabic, Hebrew and English. In some cases, alleged confessions appear to have been elicited under duress.

---

[13] Documents show that: in 2004 Caritas, the international Roman Catholic aid agency, accepted food aid for kindergarten schools in Jericho, supplied by the Nablus zakat committee's dairy company, Al-Safa, with funds provided by the German Government. In 2005, the Saint Nicolas Home for the Elderly (Orthodox) in the Bethlehem area cooperated in the Palestine with Milk project launched by Al-Safa; likewise the SOS Children's Village, Bethlehem, the Arab Evangelical Home and School, Hebron, and the Crèche de la Sainte Famille, Bethlehem. Funds for the 2005 project appear to have been provided by the Islamic Bank in Jeddah.

[14] A related word, *istishhādī*, is used specifically for suicide bombers.

[15] It is true that the families of suicide bombers and other deceased militants have a special status in Palestinian society. But according to my information, Hamas has its own funds, mainly based on subscriptions from members, to help support the families of suicide bombers – not through charities. In addition, the Shahid Fund was set up by the PNA in 1994. Apparently, Arafat agreed to this fund being used to support the families of suicide bombers, even when the latter were Hamas members. There has hence, it would seem, been no need for the zakat charities to give special support to these families.

[16] This is the present author's opinion. It is based on:

(i) an evaluation of Israeli intelligence websites such as www.terrorism-info.org.il (e.g. Special Information Bulletin, January 2005, Intelligence and Terrorism Information Center, Center for Special Studies, January 2005). It is significant that despite being able to draw on Israeli intelligence findings of this kind, the British Board of Jewish Deputies was unable to defend the defamation case brought against it in 2005 by the British charity Interpal (see note 41 below).

(ii) some of the 'raw material' for these websites, in the form of Israeli intelligence officers' reports, made available to me on a confidential basis in legal proceedings. There is no pretence made in these documents of assessing the available evidence in an equitable manner. Much of it is based on alleged personal associations.

An equally strong charge, but strong in a different way because it is so sweeping, is advanced. This is that the zakat committees are engaged in 'social engineering' on behalf of Hamas, "critical to winning the hearts and minds of the Palestinian people and to creating a military and operational pool for Hamas".[17] The implicit effect of the pyramid model is to seek to persuade that Hamas is like a narcotics mafia, a corporate body whose ostensibly charitable aid to local communities is actually nothing but an instrument to further criminal activities, and which enforces obedience to its dictates. The allegation could be definitely verified or falsified only by the adducing of field-based sociological evidence, which is extremely hard to obtain in a zone of conflict and military occupation where a large proportion of the Palestinian people are already radicalized, irrespective of any actions that Hamas may take. However, evidence (summarized below) as to the high degree of public trust that the zakat committees have earned, by contrast with all political parties and movements in the Territories, suggests that the pyramid model is deficient.[18]

A less strong charge is also put forward by Matthew Levitt that the zakat committees' work creates a sense of indebtedness. "If a person is a taxi driver and they are asked to deliver a package somewhere they don't ask. They do it. If they are asked to shelter someone in their house overnight, they do it. It creates a sense of indebtedness that Hamas is able to call upon."[19] This charge is anecdotal and somewhat inchoate. It is possible that a taxi driver may occasionally deliver a dubious package, but equally possible that he may convey an injured child to a clinic at risk to himself because of crossfire. I can find no sentence in Levitt's book on Hamas which acknowledges that the Islamic charities in Palestine may be even partly motivated by altruism, though with regard to Hamas he does refer to its "notorious honesty" (Levitt 2006: 238).

The weakest charge – but maybe that on which the campaign against the zakat committees ultimately depends – is that, even if it is conceded that such a charity provides genuine health and welfare services, financial support for the charity is nonetheless a support for terrorism, on the grounds that it is relieving Hamas from costs and hence frees up funds for paramilitary operations.[20] This has been called the doctrine of 'asset substitution', founded on the fact that money is 'fungible'. The implications of this argument have not perhaps been fully thought through. No-one denies the extent of health and welfare needs in the Palestinian Territories, yet US prosecutors contend that it is a criminal offence for external funds to be sent for a poor man to be given a cow to milk, or for a patient with eye disease to be given medical treatment, on the grounds that, without those external funds, the

---

[17] USA v. Holy Land Foundation (see fn.2 above), Superseding Indictment, para. 3.
[18] This is not to support the naïve view that charitable activities inhabit a political vacuum. For comments on the political dimension of all humanitarian aid, with special reference to tensions between Islam and the West, see Benthall and Bellion-Jourdan 2003: 153–6.
[19] Evidence of Matthew Levitt, *ib.*, 14:51.
[20] USA v. Holy Land Foundation, Superseding Indictment, para. 4. This argument was legally weakened by the decision of a Federal Appeal Court in the 'David Boim case' (Stanley Boim et al. v. Holy Land Foundation et al., US Court of Appeals for the Seventh Circuit, decision of 28 December 2007). However, according to recent reports, the Seventh Circuit Court of Appeals has decided to overturn the appeal verdict and rehear the whole case *en banc*, that is to say with all eleven active judges sitting (Mike Robinson, Legal Affairs Writer, Associated Press, 23 June 2008).

money for buying explosives and training suicide-bombers would be tied up with charitable services, and so a terrorist attack would not take place.

One can appreciate the conscientious motivation of prosecutors who seek to deter financial transfers that, according to their theory, are facilitating acts designed to cause terrible carnage and suffering. Nonetheless, such an argument seems to be at variance with International Humanitarian Law as applied to zones of conflict, which gives priority to relieving the suffering of non-combatants. The logical consequence would be to prohibit funding of the International Red Cross and Red Crescent Movement, because some of their funds go to support Red Cross and Red Crescent National Societies in countries that are definite military threats to the West, and because the work of these National Societies includes the provision of military ambulances and hospitals.

Moreover, the argument suggests that the greater the professional integrity shown by the zakat committees – in delivering their services effectively to those most in need – and hence the greater the trust they earn from the communities they serve, the more successful they are likely to be in winning 'hearts and minds', and therefore the more culpable they are in allegedly sustaining Hamas. According to the argument, even if the charity managers, medics and others concerned were to succeed in satisfying a neutral adjudicator that they are committed to acting in a totally professional manner, this would not clear them of the charge of spreading an atmosphere of opinion supportive of  Hamas.  Such an argument places the zakat committees in a 'no win' double bind.

## 5. Some field evidence from 1996

My own fieldwork on Islamic charities in Palestine dates back to February 1996 and gave some attention to a Jordanian zakat committee in Amman that collected funds for Palestinian zakat committees – the Islamic Zakat Supporting Committee for the Palestinian People. My field notes of an interview with the general manager of this Amman committee (Mr Murad Al-Adayileh)[21] read in part as follows:

> [On their orphan programmes:] "Birth cert., family background, death cert. of father. Children's files. Reports. School certificate. […] Follow also health, medical checkups. […] Regularly get harassed by Israeli authorities. […] Tightening up by authorities after the creation of the PA but so far is still operating. Due to Western misrepresentations of Islam, local authorities in Arab world have to tighten control of Islamic associations. [But] programme not politicized. Members of the [Amman] committee are all independent – no party or affiliation. Humanitarian aid and Islam know no boundaries. All agree a poor man is a poor man. In assisting these children, the fathers could have been martyrs or sons and daughters of informers. Don't distinguish between son of hero and villain. […]

> 'Caravans of charity': offer special first aid or medical care on a temporary basis […] organized from local medical centres to isolated or distant villages or communities. Provide free medical checkups for poor families and advocate health and hygiene. […]

> Familial solidarity and rehabilitation: aim is to try to stop these families from being dependent on charity. Five points: 1. income generation (e.g. beehive – family becomes a

---

[21] The interview was conducted in Arabic with the help of Mr Riyad Mustafa as translator and research assistant.

*productive unit and therefore charity stops); 2. cows; 3. sheep; 4. reuse of land; 5. textile clothing or knitting. 1 to 4 aimed at rural areas, 5 at cities. […]*

*Sponsorship of university students: […] stipend of 50 Jordanian dinars [about 50 British pounds] per month, linked to achievement; priority given to those doing well. Any subject: medicine, agriculture, shariah – 20 students per year, West Bank or Gazan institutions only. Conditions: students must be living in the Occupied Territories; good moral background; registered in further education institution; evidence of need for support; not a beneficiary of another grant; must return to Occupied Territories after study; committee's approval needed. […]*

*Donors give specifically to programmes and get feedback and follow-up. […]*

*When 400 Palestinians expelled from Palestine into Lebanon, the committee sponsored their families, also visited in Lebanon. […]*

*Type of relief is when Israelis destroy houses in Gaza, massacre in the [Hebron] mosque. Gave out 30,000 dinars for families of victims, distributed food and helped those who were injured. […]*

*Don't refuse help – don't distinguish between poor. […]*

*[On attempts by the Jordanian government to centralize the collection of zakat and restrict local fund-raising:] Government attempt to please Israelis. […] a critical issue since the peace treaty [between Israel and Jordan] – now restricted to Amman, charity fleamarkets etc. banned. But humanitarian aid must not be politicized. Zakat is one thing, a spiritual venture, nothing to do with tax. Question of trust is very important – a local charity more popular. […]*

*2 or 3 days ago, celebrated 1,000th sponsorship of an orphan. Had iftar [Ramadan breakfast meal] with seven children from Palestine. Children spoke, people cried. […]*

*Government zakat funds try to imitate local funds and revive trust. Entrepreneurs shift paying to government funds to get popular with government, rather than to local ones. Wants to emphasize trust. […]*

*Not allowed to have volunteers working for them – one strategy to limit them. But has not affected level of donations. Only 8 staff, Ramadan work is 24 hours on 24. […]*

*Budget is 500–600,000 dinar per year. […] PNA authorities are cautious as to how to deal with these organizations."*

It could be argued that Mr Al-Adayileh was lying through his teeth and that I was deceived by him. This is the problem with individual fieldwork. I can only add that he made a favourable personal impression as a young man with modern fund-raising skills, pragmatic but committed to Islamic ideals (he also said that it was difficult to persuade secular people to contribute), and, as far as I could judge, sincere. His committee certainly had some kind of affiliation with the Jordanian Muslim Brothers, and had problems with the Jordanian government (as summarized above), but if he was merely a member of a conspiracy to further the interests of Hamas then the conspiracy was one so deep that I failed at the time to see through it, and still today fail to see through it – because what I have seen and heard of the Palestinian zakat committees since 1996 is consistent with the picture given me by Mr Adayileh.[22]

---

[22] It is logically impossible to completely disprove any conspiratorial theory, because its adherents are able to argue that all evidence against it is mendacious or otherwise flawed. One can only set out to advance an alternative theory, accepting that if new, clinching evidence in favour of the conspiratorial theory were to come to light, one would change one's mind.

## 6. The functioning of the zakat committees and their reputation

A key question is to what extent the zakat committees are 'affiliated' with Hamas. As we have seen, the Israeli and US governments' position is that they are so closely affiliated as to be, in effect, subsidiaries. The position of the committees themselves is that they are entirely independent charitable associations. The most serious, first-hand, unbiased data publicly available to date is contained in an International Crisis Group report (ICG 2003).[23] This suggests that some organizations in the Territories such as the Islamic Association (*al-Mujamma' al-Islami*) in Gaza are strongholds of Hamas, but that otherwise the concept of affiliation is problematic and a matter of degree. Some zakat committees are popularly seen as loosely affiliated politically with Hamas, some with Fatah, some are independent; but loose affiliation is not the same as the control that Hamas is accused of exercising.

My own investigations into the zakat committee in Nablus have concluded as follows. In the early summer of 1997 there were twelve committee members. The breakdown of its annual expenditure of US$1 million was reported approximately as follows:

| | |
|---|---|
| 40% | sponsorship of needy families through monthly payments |
| 30% | sponsored orphans |
| 7% | educational support for needy students |
| 8% | medical support |
| 10% | monthly staff salaries |
| 5% | other[24] |

The committee also manages the Islamic Medical Compound and a dairy, Al-Safa, on a cost recovery basis. Decisions are taken by majority vote, and are confirmed by the Ministry of Awqaf.

The Chairman, Dr Abdel-Rahim Hanbali, is a member of an ancient religious family associated with the Hanbali mosque in Nablus: his father was imam of the mosque and was the first chairman of the zakat committee. The deputy chairman, Sheikh Hamid Bitawi, is a well-known religious authority and a member of parliament, and clearly a preacher of militant, even inflammatory anti-Israeli views. Though he might justifiably be seen as a sympathizer with Hamas, he declares that he has no political affiliation, and aspires to be more a national and Islamic icon than a party politician. According to my information (some of which, though not all, I have been able to confirm from independent sources), none of the other six members of committee whom the Israeli government labels as 'Hamas' are members of Hamas.

Two of them are affluent businessmen. One of these, the honorary treasurer, Hajj Adli Yaish was elected Mayor of Nablus in municipal elections in 2005, on the 'Change and Reform' ticket, which was a coalition group including Hamas and other parties and individuals (including a number of Christians) and widely regarded as the Hamas party. At the time of

---

[23] The International Crisis Group's reputation and authority are in general very high. In particular we may note here the thoroughness of its field research.
[24] Information supplied by the committee.

going to press with this article, he was detained in an Israeli prison after his arrest in May 2007. I met with Mr Yaish in 1996 and was favourably impressed by him. I was not at the time aware of his political involvement: he seemed typical of the kind of practical business man who is appointed as honorary treasurer for charities all over the world. Impartial media reports confirm this impression:

> A reputation for clean hands and caring about the people is why Islamist politicians like Mr Yaish, in alliance with Hamas, won 74% of the municipal election vote in Nablus. (Dan Damon, BBC News website, report from Nablus, 30 December 2005).

> [Mr Yaish] is devout, but wealthy from auto parts and a Mercedes agency. He studied mechanical engineering in England from 1970 to 1975 and speaks English fluently; he speaks the modern language of efficiency and budget oversight; he keeps a picture of Yasir Arafat in his office and not Sheik Ahmed Yassin, the Hamas leader killed by Israel in March 2004.

> "This is a government office," Mr. Yaish said. "President Abbas said to leave the photos of Arafat in offices, so we left it. Sheik Yassin was not elected, and this is not my house."[25]

> Mr. Yaish agrees that some people will vote differently on national and local issues, and he expects Hamas to get nowhere close to the 73 percent of the local vote it received a month ago. "We want partnership with Fatah," he said. "Democracy is competition and makes us stronger."

> Hamas in the legislature will monitor government work, especially finances and accounts, to prevent corruption, he said, and to improve tax collection. "The same party as judge and jury is not good," he said. "If there is no oversight, even a good man can be tempted."

> Hamas opposes negotiations with Israel, but Mr. Yaish thinks its presence in the legislature will stiffen the Palestinian Authority's back in dealings with Israel. "I don't like the Palestinian Authority to negotiate from a weak position," Mr. Yaish said, pragmatically. "We're occupied, and I want my government to talk harder to Israel." (Steven Erlanger, *New York Times*, 23 January 2006).

Since 1994, Hamas's popular approval rating among Palestinians, as manifested either in opinion polls or in municipal and parliamentary elections, has varied between 25 and 50 or even 60 per cent.[26] It is to be expected statistically that in a Palestinian committee of seven to thirteen members, up to a half of them will probably sympathize with Hamas as individuals. It does not however follow that they are unable to carry out their duties as committee members in a manner consistent with the local laws and with generally accepted principles of charity management.

As far as I know, no solid impartial research has yet been conducted into the detailed operations of the zakat committees in the Territories, which would be particularly difficult to

---

[25] It should be noted here that the late Sheikh Yassin is considered a national Palestinian figure as well as the Hamas spiritual leader, and his photograph is to be found in many houses, shops etc. not necessarily owned by Hamas supporters. Over 100,000 people attended his funeral in Gaza (BBC News, 23 March 2004).

[26] The CPRS, an independent research institution, estimated the mean level of support among the Palestinian public for Hamas during 1993 to 1997 as 18 per cent, which Hamas said was too low. Hamas has claimed up to 50 or 60 per cent. Khaled Hroub gave a personal estimate of 30 per cent in 2000 (Hroub 2000: 231-2). At the time of writing, June 2008, Fatah was leading Hamas in a public opinion poll in the Territories as a whole, after declaring that it wanted to reopen negotiations with Hamas (52 per cent for Abbas [Fatah], 40 per cent for Haniyeh [Hamas], in the event that a presidential election was called – compared to 47 per cent for Haniyeh and 46 per cent for Abbas in March – Reuters, 9 June 2008. According to a number of reports, Hamas was still more popular than Fatah in Gaza.)

undertake, on account of the highly charged political context.[27] However, a public opinion poll was conducted on two occasions in recent years by Bir Zeit University in Ramallah, to ascertain the degree of popular confidence in various civil institutions. This university has one of the best academic reputations in the Palestinian Territories. The results, though somewhat crude as sociological data, are highly suggestive:[28]

| | |
|---|---|
| Universities | 70.9% |
| Zakat committees | 62.5% |
| NGOs and charitable societies | 50.0% |
| Local press | 46.0% |
| Formal judicial system | 43.5% |
| Trade unions | 37.5% |
| Palestinian opposition | 34.2% |
| Political movements/ parties | 27.8% |

It seems clear enough that during the period 2002–04 popular confidence in the opposition and political parties, presumably including Hamas, was very low. Second only to the universities, the zakat committees enjoyed a high level of confidence – higher than that of other types of NGO. This supports the conclusion of Norman Brown, an American political scientist who has studied the Palestinian voluntary sector and conducted extensive fieldwork in the Territories, that "Zakat committees enjoy a tremendous amount of legitimacy. Even secular leftists admire their authenticity and ability to operate without reliance on Western funding" (Brown 2003: 14). It may be speculated that part of this legitimacy has been

---

[27] Two recently published articles relating to Hamas and social welfare are consistent with the argument presented here. Haim Malka argues that social welfare has been a vital component in Hamas's overall strategy, offering a favourable ratio of reward to risk, and he does not explicitly criticize the Matthew Levitt model (Malka 2007). He writes however: "Ideological affinity plays a more crucial role in mobilizing Hamas's network than does formal political affiliation" (p.105). "Although these institutions [the zakat committees and similar charities] may not be officially linked, Islamic charities work towards the same goal within a similar religious and political context. […] Although Hamas does not have any visible centralized organizing body for charity organizations affiliated with the movement, these numerous educational institutions, *zakat* committees, and clinics share the same worldview and identify with Hamas's broad concept of creating a religiously observant and strong Muslim society" (p.107). "Whether Hamas extends aid as a quid pro quo for political support is debatable. *Zakat* committees in general claim to distribute aid in a non-partisan fashion based on specific criteria. Beneficiaries are generally required to fill out forms and a questionnaire and accept a home visit to determine eligibility. Yet it is difficult to imagine a totally fair method of distribution in a system where family and clan loyalties are so important and religious-political divisions so deep" (p.109). (We may note that this last is a problem faced by 'Western' NGOs as well, and many NGOs appear to have close informal links with Fatah politicians.) Malka's article has the merit of being even-handed in intent, but is not explicit on its sources of oral or unpublished information. I understand however that his article is based on many years' field experience as a reporter and researcher in Jerusalem and the Palestinian Territories (personal communication).
Lars Gunnar Lundblad has made five field visits to the West Bank between 1999 and 2007 (Lundblad 2008) and interviewed a wide variety of informants. Though he does not discount the possibility that some of the allegations of political favouritism made against the zakat committees are justified, he is impressed by the level of legitimacy and trust achieved by them and concludes "The stereotypical image of Islamic activism as a cover for terrorism needs to be redressed" (p.198). Lundblad makes an original contribution in noting how these zakat committees have only limited relations with the extensive NGO networks in the Palestinian Territories,

[28] Bir Zeit University Development Studies Program 2004, pp.104–5 (http.birzeit.edu/cds). I have here consolidated and averaged the percentage findings of two polls, no. 1 (August to September 2000) and no. 17 (June 2004). Allowance has been made for obvious misprints in the published tables. Confidence in the zakat committees was apparently rather higher in Gaza than in the West Bank but the difference is not great enough to affect the ordering. An analysis of the raw data may be found on the same website under 'Opinion Polls'. They are based on a sample size of 1,256 in 2000, 1,197 in 2004, and 70 sample locations in 2000, 75 in 2004. 85 researchers were engaged for the 2004 poll. A margin of error of +/- 3% is suggested.

gained by responding spontaneously to obvious local needs, rather than trying to satisfy the agenda of the Western donor community.

A corroborating opinion is given by Professor As'ad Abdul Rahman, a senior independent Palestinian political scientist without party allegiances: "In the past [i.e. before the so-called reforms introduced by the PNA in Ramallah in 2007–08] zakat committees were formed in a free electoral or consensual mode". He foresees damaging consequences arising from the current move to bring them under government control: "This major and dangerous decision had major and dangerous reasons and consequences". And he describes the zakat committee system as a protection against terrorism rather than a fomenter of terrorism:

> [a] popular, credible and democratic structure […] that had helped in fighting poverty and bridging the internal Palestinian social gaps and consequently leading to creating such atmospheres that are neither tense nor extremist nor terrorist.[29]

If we look to a wider Middle Eastern context, including Egypt (ben Néfissa 1995, Sullivan 1992) and the Arab villages in Israel (Israeli 1993), convincing evidence is available that the Islamic voluntary sector is often able to provide effective welfare and relief services to populations that the state is unable or unwilling to cater for. Similarly in Algeria, a team of British consultants concluded as a result of a commissioned survey in 2000 that Islamic charitable associations throughout the country, though markedly out of favour with the Algerian military government, were "almost without doubt the strongest NGOs in Algeria", especially in the poorest rural areas.[30] Zakat committees are exactly the kind of grass-roots, community-based, voluntary institution that many international donors now look to as an alternative to the waste and corruption that often accompany aid flows through large bureaucratic institutions.

## 7. An alternative 'etic' model

There is no reason to question the good faith of counter-terrorism experts; and indeed citizens everywhere have reason to be grateful to the police and intelligence services that track down and forestall terrorist attacks. However, the methods of enquiry used for this purpose depend critically on the construction of patterns of association through analysis of communications and meetings between individuals.[31] There is thus a grave risk of attributing guilt by association. This risk is compounded by the citation of highly biased press reports and intelligence web sites, and sometimes by reliance on statements extracted from detainees under coercive interrogation. It is further compounded by the insistence of the US government on minimizing the distinction between transnational terrorism of the Al-Qaida type – which appeals positively to only a tiny minority of Muslims, despite its ability to call on the loyalty of co-religionists – and a movement such as Hamas which has a limited

---

[29] "Zakat panel revamp plan raises eyebrows", *Gulf News*, 14 June 2008; "Those who sow the wind are likely to harvest the tempest". *Gulf News*, 28 June 2008. Professor Abdul Rahman is executive chairman of the Palestine International Institute, based in Amman and Ramallah (www.paldiaspora.org).

[30] Confidential report from a British consultancy team. For further comments on Algerian civil society, see Benthall and Bellion-Jourdan 2003: 92–8.

[31] See the official US Government report on 9/11, pp.9–10. Monograph on Terrorist Financing: Staff Report to the National Commission on Terrorist Attacks upon the United States (Washington, D.C.: National Commission on Terrorist Attacks upon the United States, 2004).

territorial motivation, the desire to displace an occupying power.[32] Counter-terrorism has validity as a practical response to crisis. But it is not an intellectual discipline like political science or cultural anthropology that insists on scrupulous examination of sources, cross-checking of evidence from different viewpoints, and correction for observer bias.

An alternative 'etic' explanation may be proposed to the pyramid model. The Palestinian zakat committee is an instance of a deeply embedded 'civil society institution' that had been operating unobtrusively for centuries across the Muslim world. The principle of zakat is one on whose importance all Islamic apologists of whatever political complexion have agreed. Hamas was founded in 1987–88 as a successor to the Muslim Brotherhood's Palestinian branch, which was founded in Jerusalem in 1946, two years before the establishment of the state of Israel. The Muslim Brotherhood itself, the matrix of Sunni political Islam in the Middle East, had been founded in Egypt in 1928 and has splintered into numerous national movements varying greatly in their degree of radicalism, degree of nationalism and degree of commitment to violence – contrary to the view of some American counter-terrorist groups that it is an integrated Islamist International. In Jordan, which has close ties with Palestine, the Muslim Brothers constitute a kind of 'loyal opposition' to the Hashemite monarchy. The rise of the Muslim Brotherhood must be seen historically as part of a wider Islamic resurgence with counterparts in the Indian sub-continent, parts of south-east Asia and elsewhere.

Hamas viewed the defeat of the Arabs at the hands of the Israeli army in 1967 as a punishment for bad Muslims. The success of the Israeli state in imposing its will was seen by Hamas as an achievement of the Jewish faith (whereas in historical fact Zionism was more of a secular–ethnic than a religious movement, and Israeli politics in the 1950s and 1960s were much less influenced by the religious parties than today). Hamas's response to the Zionist claim to biblical lands was a new claim, that the whole of Palestine was *waqf*, inalienable till the end of days. "Since Palestine can only be recovered as an Islamic state by Muslims who have returned to their religion", wrote the political scientist Beverley Milton-Edwards in 1996, analysing the Hamas view, "the secular-nationalist approach is doomed to failure. Hamas, then, is concerned with individuals, re-educating them, encouraging them back to Islam and using the individual as a starting-point for the re-Islamisation of society" (Milton-Edwards 1996: 184).

This reislamization included attracting people back to the mosques, the encouragement of Islamic dress and morals and praying and fasting, the banning of cinemas. Hamas has worked particularly hard to reislamize the youth of Palestine. But the programme also included almsgiving; and here it was possible for those who sympathized with reislamization to engage with established institutions – such as the Nablus zakat committee, registered in 1977, or the older Hebron Charitable Association – and with new committees founded since 1988. It is possible for a Palestinian 'Islamist' to support reislamization as a religious principle, without being a member of Hamas or supporting its paramilitary activities.

---

[32] This view is not uncontested (e.g. "Chapter 8: Will Hamas Target the West?", Levitt 2006: 203–28). However, Hamas has consistently disavowed any intention to spread its cause beyond the boundaries of Palestine. There is certainly a danger of 'al-qaidization' of the conflict if the political situation deteriorates further.

Reislamization has also harmonized with the practice and motivation of traditional observant Muslims uninterested in politics – a coalescence documented in the wider Middle East context by Gilles Kepel (Kepel 2002).

It would thus appear that the zakat committees provided a meeting-point between the new-style Islamism and the old-style Muslim piety. Hence it was not necessary, to achieve its objective of stimulating a vigorous Islamic welfare sector, for Hamas to establish control over the zakat committees. The reislamization policy has led to the translation of Islamic principles and values into effective charitable relief and welfare.[33] As we have seen, the evidence suggests that the zakat committees have operated strictly according to Palestinian law, and have earned considerable popular trust. The Palestinian Authority (dominated by Hamas's rival party, Fatah, and widely considered to be corrupt, at least before 2005–07) and the Israeli state have both viewed these committees with suspicion, sometimes detaining committee members, confiscating documents or closing offices; but on the whole the committees were until 2007 allowed to operate and to receive and disburse funds, even though Israel has complete control over financial flows into the Palestinian Territories through the banking system. Only relatively recently, in 2002, did the Israeli state declare the Nablus zakat committee and some thirty others to be illegal, but inward funds continued to flow.[34] All actions taken against the zakat committees by the Israeli authorities have apparently been authorized by administrative military order, not through the Israeli courts – presumably because these courts, being independent, would require more solid evidence of irregularities before condemning the committees.

No doubt the aspect of Hamas's activities that has made it so hated in Israel and the United States is the policy of organizing suicide-bomb attacks ('martyrdom operations'). Most commentators in the West regard these as inexcusable, and are particularly shocked by Hamas's unashamed deployment of religious symbolism to glorify indiscriminate killing. However, several opinion polls conducted in the Palestinian Territories between 2002 and 2005 show that the proportion of Palestinians endorsing suicide attacks against Israeli civilians has varied between 61 and 81 per cent (Tamimi 2007:161–5) and even if this were to be scaled down very substantially to allow for bias or error[35] it would still amount to a disturbing proportion.[36] The Israeli and US governments have set out to characterize Hamas as a conspiracy to radicalize the Palestinian population, a conspiracy to be unveiled and opposed as part of the 'global war on terror'. It is surely more historically objective to see

---

[33] This point is well made by Malka 2007.

[34] At the time of writing, it is reported that President Mahmoud Abbas has decided to clamp down on charitable associations in the West Bank seen as Hamas-affiliated (« A Naplouse, la police palestinienne harcèle le Hamas ». *Le Monde*, 28 September 2007). The Hebron Islamic Charitable Association has been closed down and its assets confiscated by the Israeli military ("Twilight zone: when charity ends at home". *Haaretz*, 15 March 2008). A number of external donors have withheld funds, pending clarification of the new legal and administrative arrangements.

[35] The polls referred to were conducted by the Norwegian organization Fafo, the (Israeli) *Jerusalem Post*, and the Palestinian Authority's State Information Service.

[36] Defenders of these attacks argue that they began in revenge for the massacre of worshippers in February 1994 by Baruch Goldstein in the Al-Haram Al-Ibrahimi mosque, Hebron; and that the 'martyrs' deserve respect for their sacrifice, whereas Israelis who kill Palestinians do so at little risk to themselves owing to their advanced military technology. Islamic scholars are divided as to the admissibility of suicide attacks in Palestine, but perhaps the most prominent and influential of them in the Middle East, Sheikh Yusuf Al-Qaradawi, has defended them. For further analysis of the Hamas position, see Tamimi 2007: 180–6.

Hamas as one party in a bitter, long-running territorial conflict where no side has a monopoly of righteousness.[37] The leader of one of the main Christian denominations in Jerusalem, Monsignor Michel Sabbagh, recognized this when he called in 2006 for Israel and the West to resume negotiations with Hamas[38], as have many commentators and political figures since then, including Ex-President Jimmy Carter.

It would be surprising if examples of clientelism and patronage were not to be identified in the operations of the zakat committees, because these are survival mechanisms in a society such as Palestine where the state is so weak as to be practically non-existent. As Emanuel Schäublin has observed, "[t]he Islamists have been successful in creating a solid and wide spread base of support because they were able both to enlarge the notion of the patronage system – the uniting factor being Islam and a political ideology."[39] One reason why Islamism has gained support among professionals such as lawyers, doctors and engineers in the Middle East is that they see it as offering alternatives to kin-based social structures. A further strand in political support for Islamism is the adherence of former communists and socialists, since these secular political theories have found little resonance with the Arab populace.

The 'pyramid' model strips Palestinian Islamic institutions both of their geopolitical context – a military occupation widely considered to be illegal – and of their religio-political context, the resurgence of Islamist movements in many parts of the world that gathered force over the past thirty years. Our alternative etic model allows the Palestinian zakat committees to be seen in a different light, as local instances of a worldwide trend, the growth of Islamic NGOs, which are themselves a special case of Faith Based Organizations – but within the unique historical context of the Israel–Palestine conflict.

## 8. Zakat committees as Faith Based Organizations

Beginning towards the end of what we have called the second phase of development of the Palestinian zakat committees (1968–94), and continuing during the third phase (1994 to the present day), they began to tap into the international aid system.[40]

The Nablus zakat committee, to take our case-study again, adapted its procedures to enter into substantial contracts to supply long life milk from its dairy to American Near East Refugee Aid and the World Food Programme, for distribution to Palestinians in need. The zakat committees also received donations from the international Islamic aid agencies that began to be founded from the 1980s onwards and are now established in most countries where there are either Muslim donors or Muslim beneficiaries or both. In Britain particularly, thanks to a sympathetic environment for Muslim charities fostered by the Charity Commission, some major NGOs such as Islamic Relief Worldwide and Muslim Aid have

---

[37] For an overview of the historical context of different forms of 'terrorism', see Chaliand and Blin 2004.

[38] « Il faut cesser de boycotter Hamas », interview, *Le Monde*. 17 May 2006.

[39] Personal communication, January 2008.

[40] To look further back in history, both Jewish and Christian Arab communities in Palestine have been receiving external aid for hundreds of years.

emerged.[41] These have followed in the footsteps of Christian agencies such as Christian Aid and the Catholic Fund for Overseas Development (CAFOD, the English branch of Caritas Internationalis) by renouncing all proselytism[42] and embracing international codes of conduct such as the commitment to non-discrimination and transparency. They are beginning to project a public image of Islam that contradicts widely held negative stereotypes, even to offer implicitly in their new bureaucracies an alternative focus of authority for Muslims to traditional religious hierarchies based on the mosque.

The process of integration of Islamic charities into the international aid system has been intermittent rather than following a uniform path. Some large Saudi-based charities may be thought of as constituting a kind of parallel aid system that has relatively few connections with their Western counterparts, and reliable information about their programmes is hard to obtain. However, in Europe and particularly in Britain the process is unmistakeable. With so many humanitarian crises afflicting Muslims in many countries, fund-raising is energetically pursued by European Islamic charities, and the sufferings of the Palestinian people inevitably become a priority because of the consistently high media profile of the Israeli–Palestinian conflict.

## 9. The impasse for Palestinian Islamic charities in its geopolitical context

The development of Islamic aid agencies in the USA, by contrast, came to a halt after 11 September 2001, when they immediately became major suspects in the 'global war on terror'. Though there were almost certainly some real abuses in the past of the privileges of Islamic charities[43] – in which respect they are not unique, for the whole charitable sector is always vulnerable to abuse, resting as it does on the principle of trust – political pressures have in my view resulted in a serious overreaction against these charities (Benthall 2007a, 2007b). The Palestinian zakat committees were beginning to benefit from the

---

[41] The *cause célèbre* of Interpal is more complex. This British Islamic charity, founded in 1996 to help Palestinians and widely supported by British Muslims, has been designated by the US Government as an alleged terrorist entity. The Charity Commission has cleared it twice of malpractice, but after a BBC television programme screened in the summer of 2006 it decided to investigate it for a third time – an investigation which has not been concluded as this paper is completed in July 2008. In 2005, Interpal's trustees obtained a public apology and financial compensation from the British Board of Jewish Deputies, which had accused it of sponsoring terrorism.
Much has been made, in the criticism of Interpal, of its links with the Union of Good (I'tilāf al'Khair), an umbrella organization of some fifty Islamic charities, based both in the Middle East and in Europe, committed to aiding Palestinians in need – particularly through the zakat committees. The Union of Good's use of a map of an undivided Palestine in its publicity, and the leadership exercised within it by the controversial Sheikh Al-Qaradawi (see n. 36 above), are among the reasons for its being accused of being a front for Hamas. However, it appears to operate openly, rather than conspiratorially, and to confine itself to humanitarian aid (Source: 20-page report in Arabic for 2004-05, with list of members). Recently it has extended its work from merely fund-raising to training and institutional capacity-building. In July 2008, the Israeli government declared that all members of the Union of Good are prohibited in Israel (Efrat Weiss, "Israel versus Hamas' 'Union of Good'", *Israel Times*, 7 July 2008). The Union of Good has an Arabic-language web-site: www.101days.org. Leaving aside the heated rhetoric on both sides of the dispute, the key question remains the one addressed in the present paper: whether or not the zakat committees are legitimate charities implementing policies based on needs.
[42] This is not necessarily the case for many of the Islamic charities based in the petrodollar states, which combine religious and humanitarian aims (as do many important Christian NGOs).
[43] For instance, the use of charities to send arms to the *mujahidin* in Afghanistan during the 1980s. It has also been alleged that some Islamic charities were made use of to remit funds to make possible the 11 September 2001 attack on the United States, though this has never been proved.

encouragement given everywhere by international aid agencies since the 1990s to 'civil society institutions' and grass-roots organizations. Further evidence of their credibility as charities is the fact that a number of them were successful in securing financial support from major international agencies – such as USAID (the US governmental aid agency) and the large aid organization CARE – that impose demanding procedures for access to funds and evaluation of performance. In 2003, FAO (the Food and Agriculture Organization of the UN) reported that "the Islamic social welfare organizations (including Zakat committees) were collectively the largest food donor in the occupied Palestinian territories after UNRWA [the UN Relief and Works Association]".[44] At about the same time, the International Crisis Group estimated that the Islamic organizations were providing, directly or indirectly, emergency cash/food assistance and medical and psychological care to at least one out of six Palestinians (ICG 2003: ii).

Since 2001, the zakat committees and their Muslim donors in the USA and some other countries have been exposed to considerable obstacles, for reasons we have examined. Muslim donors to these Palestinian charities have been prosecuted. And yet in 2002, memoranda from the US Embassy in Tel Aviv to USAID stated that it held "no derogatory information" about the zakat committees in Jenin and Tulkarem[45] – whereas for a Muslim donor to have sent funds to these West Bank committees is now held by US Government prosecutors to be a serious criminal offence.

We may note in passing that the Jewish National Fund, describing itself as "the caretaker of the land of Israel, on behalf of its owners – Jewish people everywhere", encounters no legal obstacle in the USA when it raises tax-exempt funds for improvements to military installations in Israel.[46] The Palestinian zakat committees, by contrast, have never been accused of overtly spending funds on military projects, yet its American donors are charged with giving material support to terrorism when they remit funds that are demonstrably applied to support clinics, food aid and the like.

This is not the place for a general discussion of the Israel–Palestine conflict. I share the widespread view that it is a tragedy in the strict Hegelian sense, that is to say a collision of two rights. But some thoughts on how aid and charitable giving fit into the conflictual relations may be permitted.

The Palestinian resistance too readily equates Zionists, Israelis and Jews as if they all meant the same: hence the notoriously anti-Jewish passages in the Hamas charter.[47] Whereas Israel is supported by the global Jewish diaspora, the Palestinians are to some extent supported by the Muslim *umma* or community of believers. However, so deep are the political and

---

[44] FAO Report of the Food Security Assessment, West Bank and Gaza Strip, Rome 2003 (USAID document 002483). UNRWA is mandated to assist only registered Palestinian refugees.

[45] Interoffice memoranda on 'trace requests', 24 June 2002 (relating to Jenin) and 19 November 2002 (relating to Jenin).

[46] The aim is to improve living conditions for young military recruits. Source: www.jnf.org, 9 September 2007.

[47] The Hamas charter and other key documents are reproduced in full in English translation in Hroub 2000. Apologists for Hamas argue that the charter has little practical relevance today, and that the movement is opposed to the Jewish state, not to Jews as such. Yet it is clear that traditional Middle-Eastern anti-Jewish sentiment has combined with European anti-Jewish sentiment and anti-Zionist politics to form a new, toxic mixture.

sectarian divisions within the Muslim world that the *umma* has hitherto been more a rhetorical trope than a practical resource for resolving the Palestinians' dilemma.

Hamas's philosophy is that on the long time-scale of Islamic history it can afford to ride out short-term setbacks. Some leaders of Palestinian civil society advocate the non-violent or Gandhian option, which might have a valid future if it were adopted as a mass movement, but which has so far attracted scant support from politicians. Religion is one of their few remaining trump cards. This includes both the Hamas claim that the whole of Palestine is *waqf*, and a devout hope that justice for Palestinians will eventually be granted. But the religious commitment also includes zakat – which if it were seriously implemented on a large scale could not only give new impetus to desperately needed humanitarian relief aid, but also help regenerate the Palestinian economy. It offers a practical contribution towards reconstruction in Palestine, which must be a prerequisite for a lasting peace with Israel. Indeed, as one of the cornerstones of Islam, the principle of zakat has a reach that extends far beyond the specifics of Israeli–Palestinian politics, having the potential to effect a significant redistribution of resources within the entire Muslim world.[48]

The campaign mounted by the Israeli and United States governments against Palestinian zakat committees and their donors resident in the West has the defensible aim of preventing terrorism, but it is a campaign that can be criticized as both conceptually questionable and practically ineffective. Such criticism should not be directed at these governments as unitary entities – for divergent views are no doubt expressed and ventilated among government officials. Nor should we necessarily infer any lack of sincerity or integrity on the part of those individuals who conduct the campaign. However, from an outside point of view it can seem like an attempt to neutralize the potential of zakat. In the eyes of many thoughtful Muslims, the campaign gives an impression, accurately or not, that these governments want to monopolize humanitarian action as a political tool to serve their own interests. The US government proclaims its wish to enter dialogue with and to encourage moderate, modernizing influences within the Islamic world; but when it is faced with a practical, internally generated modernizing movement – the development of a transnational Islamic charity sector in harmony with international humanitarian norms – the response seems to be an unfortunate one, with implications that are probably not fully intended: a decision to block and criminalize. Yet if we analyse the evolution of zakat committees as a special case of Faith Based Organizations, it may be possible to identify a substantial ongoing change that will affect the entire Muslim world. It is, after all, part of the genius of all the great religions that they are capable of quite rapid change, while maintaining the appearance of immobility.

---

[48] For consideration of whether Islamic aid agencies can have a privileged access in majority Muslim areas, see Benthall 2008.

**REFERENCES**

ben Néfissa, Sarah. 1995. « Associations égyptiennes: une liberalisation sous contrôle ». *Monde arabe*, 150: Oct–Dec., 40–7.

Benthall, Jonathan and Jérôme Bellion-Jourdan. 2003. *The Charitable Crescent: Politics of Aid in the Muslim World*. London: I.B.Tauris.

Benthall, Jonathan. 2007a. "Islamic charities, faith-based organizations and the international aid system". In J. Alterman and K. van Hippel, eds., *Understanding Islamic Charities*. Washington, DC: Center for Strategic and International Studies Press.

----2007b. "The overreaction against Islamic charities", *ISIM Bulletin*. Leiden: Institute for the Study of Islam in the Modern World, no. 20, Autumn 2007. Accessible online: www.isim.nl

----2008. "Have Islamic agencies a privileged access in majority Muslim areas? The case of post-tsunami reconstruction in Aceh [Indonesia]". Online *Journal of Humanitarian Assistance,* www.jha.ac, posted 26 June 2008.

Brown, Nathan J. 2003. "Palestinian civil society in theory and practice", paper for annual meeting of Structure of Government Section, International Political Science Association, Washington, DC.

Chaliand, Gérard and Arnaud Blin. 2004. *Histoire du terrorisme: de l'Antiquité à Al Qaida*. Paris: Bayard.

Hroub, Khaled. 2000. *Hamas: Political Thought and Practice*. Washington, DC: Institute for Palestine Studies.

----2006. *Hamas: A Beginner's Guide*. London: Pluto Press.

ICG. 2003. "Islamic social activism in the Palestinian Territories". Brussels/Amman: International Crisis Group.

Israeli, Raphael. 1993. *Muslim Fundamentalism in Israel*. London: Brassey's.

Kepel, Gilles. 2002. *Jihad: The Trail of Political Islam*. London: I.B.Tauris.

Letts, James W. 1996. "Emic/etic distinctions". In *Encyclopedia of Cultural Anthropology.* New York: Henry Holt and Co., vol. 2, pp.382–3.

Levitt, Matthew. 2006. *Hamas: Politics, Charity, and Terrorism in the Service of Jihad.* New Haven: Yale University Press.

Lundblad, Lars Gunnar. 2008. "Islamic welfare, discourse and practise: the institutionalization of *zakat* in Palestine". In N. Naguib and I.M. Okkenhaug, eds., *Interpreting Welfare and Relief in the Middle East.* Leiden: Brill.

Malka, Haim. 2007. "Hamas: resistance and transformation of Palestinian society". In J. Alterman and K. van Hippel, eds., *Understanding Islamic Charities*. Washington, DC: Center for Strategic and International Studies Press.

Milton-Edwards, Beverley. 1996. *Islamic Politics in Palestine*. London: Tauris Academic.

Sullivan, Denis J. 1992. *Private Voluntary Organizations in Egypt: Islamic Development, Private Initiative and State Control*. Gainesville: University Press of Florida.

Tamimi, Azzam. 2007. *Hamas: Unwritten Chapters*. London: Hurst.

**EXHIBIT 168 TO DECLARATION OF VALERIE SCHUSTER**

# Supplemental Expert Report

## Of

# Dr. Matthew Levitt

*Strauss v. Crédit Lyonnais, S.A.* **06 CV 702 (DGT)(MDG)**
*Wolf v. Crédit Lyonnais, S.A.* **07 CV 914 (DGT)(MDG)**

We cannot separate the wing from the body. If we do so, the body will not be able to fly. Hamas is one body.[76]

## A. Hamas's Da'wa and its Primary Purposes in Support of Hamas's Terrorist Acts

Any proper analysis of Hamas's *da'wa* must note that funds supporting any part of Hamas free up existing monies to support its terrorist activities. As then-Assistant Secretary for Economic and Business Affairs at the U.S. Department of State E. Anthony Wayne testified in 2003, "This [the flow of money to Hamas] is a sensitive issue given that some of these financial flows are used to support charitable activities. There can be no doubt, however, that donations to Hamas for charitable purposes free up funds for use in terrorism."[77] Similarly, in a 2008 U.S. Department of Treasury designation, Under Secretary for Terrorism and Financial Intelligence, Stuart Levey, stated, "Terrorist groups such as Hamas continue to exploit charities to radicalize vulnerable communities and cultivate support for their violent activities."[78]

Hamas deems legitimate the mingling of these funds, as it considers the social services it provides a jihadist extension of its terrorist attacks. For example, in 2003, the Muslim Brotherhood's Hamas-associated "Islam-online" website featured a special page glorifying suicide attacks and stressing the need to support not only Palestinian armed struggle but also youth education, social activity and economic assistance as a means of fighting the "economic Jihad."[79]

Fully exposing Hamas's *da'wa*, however, requires revealing both its sources of funding as well as the means by which Hamas uses its charitable and social service infrastructure to further its terrorist operations. As a U.S. official testified in 2003, "Hamas is loosely structured, with some elements working clandestinely and others working openly through mosques and social service institutions to recruit members, raise money, organize activities, and distribute propaganda."[80]

Hamas's *da'wa*, then, not only confers a cloak of legitimacy around its terrorist activity, but its funding actually facilitates that activity. Significantly, some commentators suggest that acts of terrorism are relatively inexpensive and conclude that Hamas funds are primarily geared toward humanitarian work – neglecting the extremely high cost of maintaining safe houses, buying loyalties, maintaining the physical infrastructure of its organization, paying its members' salaries and more. In fact, Hamas's charities and social service organizations – which facilitate Hamas attacks – form the backbone of Hamas's operational capacity. In other words, without its *da'wa*, Hamas would not have the capacity to commit terrorist attacks on the scale that it has to date.

---

76 "Yassin Sees Israel 'Eliminated' Within 25 Years, Reuters, May 27, 1998.

77 Testimony of E. Anthony Wayne, Assistant Secretary for Economic and Business Affairs, U.S. Department of State, to the House of Representatives Committee on Financial Services, September 24, 2003, available at http://financialservices.house.gov/media/pdf/092403eaw.pdf

78 "Treasury Designates the Union of Good," U.S. Department of Treasury, November 12, 2008. http://www.treas.gov/press/releases/hp1267.htm.

79 Jonathan Fighel, "Hamas Calls for 'Economic Jihad' Against the U.S.," International Institute for Counterterrorism, October 2, 2003, available at http://www.ict.org.il/NewsCommentaries/Commentaries/tabid/69/Articlsid/121/currentpage/10/Default.aspx

80 David Aufhauser, testimony before House Committee on Financial Services, Subcommittee on Oversight and Investigations, September 24, 2003, http://www.treas.gov/press/releases/js758.htm.

**EXHIBIT 169 TO DECLARATION OF VALERIE SCHUSTER**





About ICT ¦ Activities ¦ Research & Publications ¦ Articles ¦ News & Commentaries ¦ CT Studies ¦ Services ¦ Annual Conference

Search [        ] Go    News & Commentaries » Commentaries

**Commentaries**

02/10/2003                                                                     Back to List
Hamas calls for "Economic Jihad" against the U.S
Jonathan Fighel

## Hamas calls for "economic Jihad" against the U.S.

### Col. (res.) Jonathan Fighel, ICT Researcher

Recently, it was announced that the US Federal Bureau of Investigation was probing several "criminal enterprises" associated with the Palestinian Islamic group Hamas. The investigation, reportedly undertaken at the request of a "foreign intelligence services.

FBI director for counterterrorism John Pistole, testifying before a hearing n the House Subcommittee on Oversight and Investigations, said that the investigation led to the thwarting of four separate terrorist attacks--resumably in Israel, though the country was not identified. Investigators traced financial transactions of people preparing terrorist strikes and came up with "specific and identifiable information regarding the parties involved," he said. "Based on this information, the foreign intelligence agency was able to locate the members of terrorist cells and prevent them from conducting their intended terrorist attacks."[1]

Hamas and the Global Jihad
Hamas was not long in reacting. One of the movement's senior political leaders, Dr. Abd al Aziz Rantisi published a written statement on Hamas's official web site[2] calling on Muslims all over the world to wage an economic Jihad against the United States. Muslims must recruit their financial resources and capabilities to strike and weaken the U.S economy. American-made products must be boycotted, he said, and urged Muslims to offer any kind of possible financial aid and support to the Mujahedin (Muslim warriors) fighting for the sake of Allah.

In his statement Rantisi said that hatred of America is a religious duty for all Muslims. Targeting the American economy, he said, will weaken the U.S. and hasten the "inevitable" defeat of American forces in Iraq. This, in turn, will cause the U.S. to halt is "continuous war on Islam."

The notion of an economic Jihad is not new. Following the September 11 attacks in the U.S. Al-Qaida came out with a series of official statements, introduced the notion of economic Jihad. According to al-Qaida, targeting the U.S economy is one of the main pillars in Bin Laden's strategy of confronting the west. See Analysis of Recent Al-Qaida Documents, Part 1.

It is significant that Rantisi, a prominent leader of the Islamic Hamas organization, is now adopting the very same radical Islamic ideology advocated by bin Ladin and his Front for Global Jihad. This development is part and parcel with a growing trend among Islamic groups, including the Palestinian organizations. Like other radical groups around the world, the Palestinian Islamic movements are "buying into" bin Ladin's ideology of global--not just local--Jihad. It is safe to say that, on the background of the continuing Palestinian "intifada," we can expect to see an increasing "Bin Ladenization" of Hamas.

Notes:

[1] AFP Sep.25, 2003

[2] http://www.palestine-info.info/arabic/palestoday/dailynews/2003/sep03/30_9/details.htm#3

EXHIBIT

**EXHIBIT 170 TO DECLARATION OF VALERIE SCHUSTER**



| Statistics | Doctrine | Organization | Insignia | History | Links | Homefront Command | Home | עברית |



## Hamas-Related Associations Raising Funds throughout Europe, the US and the Arab World.

The Islamic Internet portal "Islam on-line" published a special supplement stressing the need to assist the Palestinian armed struggle, the Jihad, in Palestine. It glorifies suicide attacks and armed struggle, describing them as sublime manifestations of the Jihad holy war against Israel. The site offers operative methods for any Muslim to assist and contribute to the Palestinian armed struggle, starting with Public Information, through youth education and social activity, concluding in economic assistance defined as "economic Jihad". The site calls upon Muslims to donate money to Palestinian associations. Many of those associations are directly linked to the Hamas movement, which is officially labeled a terror organization in Europe and the US and responsible for the largest number of suicide attacks against Israeli citizens. The site directs the surfers to a large number of European, American, South African and Arabic social organizations, which serve, according to the site, as a channel to transfer funds to the above mentioned Palestinian associations. The main consequence - funds raised in America and Europe are delivered to Hamas-related Palestinian organizations. Thus, social associations in Europe and the US are marked as supporting, directly or indirectly, the Hamas. Following is a translation of the special message published in the "Islam on-line" Internet portal, including names and details of the associations specified in it.



www.idf.il ©Copyright IDF 1996-2002



EXHIBIT
Levitt 4

Suggestions and Comments: Assistance Division, IDF Spokesperson
Itamar Ben Avi 9 Tel Aviv, Israel
Fax +972-3-6080334 Phone +972-3-6080215
contact us ✉ by email

**EXHIBIT 171 TO DECLARATION OF VALERIE SCHUSTER**



# Interpal

(Registered charity ID 100004)

## Report of an investigation conducted under S 8 of the Charities Act 1993.



**EXHIBIT**

Levitt 8

6/2/11

W_S081305

W_S081305

Interpal - Registered Charity No 1040094.

| Page 2 | The Investigation |
| Page 4 | The Charity |
| Page 5 | Child Sponsorship |
| Page 7 | Projects |
| Page 9 | Fund-Raising |
| Page 11 | Conclusions |

| Annex 1 | Register Print |
| Annex 2 | Child-sponsor report forms |
| Annex 3 | Flow chart - Operation of the sponsor programme |
| Annex 4 | Zakats participating in child sponsorship |
| Annex 5 | Fund - raising guidelines |
| Annex 6 | Fund - raising forms |
| Annex 7 | Project report forms |

1

W_S081306

W_S081306

### Scope and reasons for the investigation

Our investigation into the activities of Interpal was prompted by a newspaper article in the Times dated 6 March 1996. The article stated that there was a probable connection between the charity Interpal and the group Hamas, it was suggested that the charity part funded that group. The article went on to say that the charity also had connections with a number of former Hamas militants.

Government. Accordingly it was decided that it would be in the public interest for the activities of the charity to be investigated.  We also immediately froze the charity's  bank accounts to unsure that its funds were not moved out of the UK as a result of our interest.

Where a charity  has an area of benefit outside of the UK it is difficult for the Charity Commission to make checks ourselves in the locations where  funds are distributed. In this case circumstances in area of benefit precluded any such visit. We therefore had to satisfy ourselves that the trustees of the charity were doing all that was reasonable to satisfy themselves that the funds raised were being applied towards charitable purposes. To this end we decided to concentrate on scrutiny of the charity's controls and records, and  test checks of individual payments chosen from copies of the charity's bank statements which were obtained from their bankers.

The allegation that funds were going to supporters of Hamas and in particular the families of suicide bombers was not of direct concern  so long as the funds were being applied within the objects of the charity. In the area of benefit we anticipate that a large number of people will support Hamas. Relief cannot be denied to them because of that support but at the same time we needed to ensure, to the best of our abilities, that funds were not being given *because* of a person's support for Hamas. In other words poverty and need should be the only criteria used when deciding how the charity's funds should be distributed.

2

W_S081307

W_S081307

We organised our scrutiny of the charity's activities under three main headings, child sponsorship, project sponsorship and fund-raising.

On our first visit to the charity we were accompanied by one of our accountants and accountancy support has been available throughout our investigation .

3

W_S081308

W_S081308

## The Charity

The charity has been registered under number 1040094 since August 1994. It was registered as a result of advice given to the trustees regarding the operation of a separate organisation, The Palestine and Lebanon Relief Fund.

The charity's area of benefit is the United Kingdom and overseas and its objects are :-

1.     the provision of aid and assistance, support guidance and comfort to poor needy sick children and widows and those suffering or distressed as a consequence of civil or military action or national disasters.

2.     To relieve the need hardship and distress of persons whose relatives or friends died or who are missing or detained as a consequence of civil or military action.

3.     The provision in the interest of social welfare of facilities for recreation and other leisure time occupation of those of refugee status or connected persons as may have need of such facilities by reason of their youth or age or infirmity or disablement or social and economic circumstances.

Although the charity has a wide area of benefit it confines its activities to Palestine and Palestinian refugees.

4

W_S081309

W_S081309

## CHILDREN'S SPONSORSHIP

Sponsorship of orphans is perhaps the charity's main activity although it involves less cash than its project work. Sponsorship is provided by both companies and individuals, the majority of whom are residents in the UK. Some moneys do however come from outside of the UK and during our visits to the charity we saw records of sponsorship moneys received from various European countries.

Typically a donor will sponsor an individual child but some wealthy individuals and companies do sponsor more. The total number of children under sponsorship is about 1300 and the normal rate of sponsorship is £25. Donors who choose not to pay by direct debit are asked to pay £30 per month to take into account additional administration costs. In terms of regular sponsorship some £32,500 per month is therefore sent to refugee camps in the West Bank, Gaza, Jordan and Lebanon.

A flow chart showing the operation of the sponsor programme is at Annex 3. Potential donors are asked to specify the age and sex of orphan that they wish to sponsor. Details of a number of orphans are sent to the donor and a choice is made. From evidence seen it is clear that the charity does not supply and does not have details of how any particular father died. It does not represent children as being the sons or daughters of a man who belonged to any particular organisation.

Sponsorship takes place via any one of 46 local charity committees or Zakats. A list of those in current use is at Annex 4. We understand that all of these Zakats are registered and controlled by local authorities. A payment for all of the children under the responsibility of a particular Zakat is sent to the Zakat's bank account on a monthly basis. The Zakat distributes the sponsorship money to the child's guardian or mother ( to a Muslim an orphan is a child without a father)

5

W_S081310

W_S081310

and receives a signature or thumb print in receipt of the money. These receipts are then sent back to Interpal to prove that the cash has been distributed correctly. In addition each child, or their guardian if they are too young, is encouraged to send a letter and a picture to the sponsor several times a year. Once a year the Zakat produces a progress report on each child. These reports and letters are sent to the donor via Interpal. The donor is thus kept informed of how their sponsorship money is being spent. Two specimen reports are at Annex 2.

During our visits to the charity we looked at a number of individual donations and traced them through the system. In each case we were able to verify that the cash had reached its intended destination and that receipts had been received. The charity's controls were well organised and they have introduced a custom computer system to ensure that all donations could be accounted for. We found no evidence of any donations that could not be accounted for.

6

W_S081311

W_S081311

## Projects

The majority of projects are funded by the charity after the event. A Zakat will approach Interpal and ask it to fund a particular project. The trustees consider each application and if it is acceptable to them they agree to fund it, but only after they have received evidence that the event or project has taken place. Typically projects are funded by loans from local business or by the allowance of credit for goods such as food stuffs. An exception to this method is when the charity makes collections for a particular, normally religious, project. One example of this are the Ramadan project where Muslims pledge money to feed the poor at the end of fasting. Another is the Qurbani project where Muslims pay to have a sheep slaughtered in their name to celebrate the end of the pilgrimage to Mecca (Hajj). The meat from the sheep is canned and distributed to the poor. In this year the budget for Qurbani was $250,000 and the actual slaughter and canning took place in Ireland.

We looked at a number of projects which in the main concerned the distribution of food. As well as looking at evidence offered by the trustees we also looked at the documentation for a number of projects chosen by us from a sample of payments shown on the charity's bank accounts. We found the paperwork to be most comprehensive. Every project had a detailed report produced by the local Zakat committee and these reports were usually supported by photographic evidence and letters of thanks. We were told that a number of projects were visited each year by members of Mosques to ensure that their community's donations were being used correctly. We saw no documentary evidence of this because these donors apparently have to pay for their own faxes. We did however see a number of photographs taken by and of the donors. We were told that typically these donors would not be Palestinians.

Some project funds are received from individuals outside of the UK. These funds frequently come from countries that have no diplomatic relations with Israel and they are passed through Interpal's dollar account to enable the funds to reach the area of benefit. These donations differ from other fund-raising activities in that the donor may put forward a particular project that they wish

7

W_S081312

W_S081312

Interpal to undertake on their behalf. Other than this difference these projects are subject to the same controls and checks as all others.

8

W_S081313

W_S081313

## UK Fund-raising

The charity raises funds in the UK in two main ways. As stated above child sponsorship is paid by donors on a regular and set basis. The charity also raises funds by public appeals and religious donations in Mosques.

The charity employs a full-time member of staff who is responsible for all UK fund-raising activities. Routine fund-raising is instigated when this individual, or a local (unpaid) agent, approach a Mosque committee and ask to make a collection. The charity is normally asked to make a presentation to the committee making it clear what their objectives are and it has a fund-raising pack which is used for this purpose. We have obtained a copy of the pack, it does not contain any political statements.

Actual collections are made by volunteers who are paid only fully documented expenses. The collections are typically made after Friday prayer and are taken in a large custom made compartmentalised plastic box. The Muslim faith provides that some donations are made for specific purposes and can only be used for those purposes. Other purposes are more general and it is from these general donations that the charity's running expenses can be met. The main heading of the collections are Fitrana, Zakat, Sadaqu, Lillah and Interest.

Donations are counted on the spot in the presence of Mosque committee members and the volunteer issues a receipt. The cash is paid into the charity's bank account using a paying-in book issued for that purpose. The volunteer keeps a daily financial and a collection summary. These documents plus a copy of the receipt and any expenses claims are sent to the charity for checking.

Volunteers are all vetted before they are allowed to start collecting and references are always taken up. The volunteers have dated identity badges and letters of authority. Guidelines for volunteers are shown at Annex 5 and some specimen forms at Annex 6.

9

W_S081314

W_S081314

During our visits to the charity we looked at their fund-raising methods and financial control of donations. We found all to be in order, indeed their methods would set an example for many larger charities.

10

W_S081315

W_S081315

## Conclusions

The charity Interpal claims to be independent and non-profit making. All of the evidence that we have obtained suggests this to be true. Scrutiny of the charity's publicity and documentation provided no evidence of any pro-terrorist or anti-Israeli propaganda and interviews with the trustees and staff suggested that they were motivated by faith and altruism rather than fanaticism.

We carried out a range of financial checks. At times we were hampered by documents in Arabic but enough of the evidence was in English for us to carry out our work effectively. Where we considered a document to be particularly important we used a translation bureaux to obtain an English copy. Test checks of payments from the charity's bank accounts all provided evidence of an appropriate end use for its funds.

Although press coverage spoke about evidence being made available to the Government which showed that the charity was funding terrorist activities this has not been substantiated. All of the evidence that we were able to uncover pointed to a well run and committed organisation which carried out important work in a part of the world where there is great hardship and suffering. It would be impossible, and inappropriate, for the charity to ensure that its funds only go to supporters of the Israelis in this volatile area of conflict. The unfounded allegation that by aiding Palestinian children the charity is in effect nurturing terrorism remains just that. In addition Interpal stress that they do not differentiate between the race or creed of children that they sponsor. What they do need to do is to take whatever steps they can to ensure that their donations only go to charitable purposes within their objects. We are satisfied that they do this to the best of their abilities.

It is recommended that this case is now closed, a final visit is made to Interpal by senior staff to explain the outcome of the investigation, and that a press release is drafted and copied to DNH and the Home Office (F4 Division).

11

W_S081316

W_S081316

During the course of our inquiry we were surprised to find evidence that the Palestine and Lebanon Relief Fund ( PLRF) was still in operation. We had understood that the organisation ceased to exist when Interpal became registered. Although PLRF is not registered we are satisfied that we have jurisdiction over its funds and we have opened a separate investigation into its activities.

W_S081317

W_S081317

```
                              Charity Details
 ┌─────────────────────────────────────────────────────────────────────┐
 │ (logo)              ----------------Name(s)-(Z)---------------------  │
 │ Number   1040094    PALESTINIANS RELIEF AND DEVELOPMENT FUND          │
 │                     INTERPAL                                          │
 │ File at  LN                                                           │
 │ Rtn Date 11-AUG-94  Last Amended Date 16-MAY-96      Removed          │
 │ Correspondent Details                                                 │
 │ Name     MR E Y MUSTAFA                   Status (Z) TRUSTEE          │
 │ Address  60 CLARK COURT                                               │
 │          STILTON CRESCENT                                             │
 │          LONDON                                                       │
 │                                                                       │
 │ Postcode NW10 8DJ          Telephone Number   0181 452 1197           │
 └─────────────────────────────────────────────────────────────────────┘
```

G.I. (Z)   DECLARATION OF TRUST DATED 29 JULY 1994
Objects  1.THE PROVISION OF AID AND ASSISTANCE, SUPPORT GUIDANCE AND
  (Z)    COMFORT TO POOR NEEDY SICK CHILDREN AND WIDOWS AND THOSE
         SUFFERING OR DISTRESSED AS A CONSEQUENCE OF CIVIL OR MILITARY
         ACTION OR NATIONAL DISASTERS. 2.TO RELIEVE    THE NEED HARDSHIP
         AND DISTRESS OF PERSONS WHOSE RELATIVES OR FRIENDS DIED OR WHO
         ARE MISSING OR DETAINED AS A CONSEQUENCE OF CIVIL OR MILITARY
         ACTION.3.THE PROVISION IN THE INTEREST OF SOCIAL WELFARE OF
         FACILITIES FOR RECREATION AND OTHER LEISURE TIME OCCUPATION OF
         THOSE OF REFUGEE STATUS OR CONNECTED PERSONS AS MAY HAVE NEED
         OF SUCH FACILITIES BY REASON OF THEIR YOUTH OR AGE OR INFIRMITY
         OR DISABLEMENT OR SOCIAL AND ECONOMIC CIRCUMSTANCES.
AOB.(Z)  UNITED KINGDOM AND OVERSEAS
-------------------------------Civil-Areas-(Z)---------------------------
NATIONAL AND OVERSEAS

Account Details
Financial Year ends  31/12        Submit   Y    Financial Year of 1994
Last Income (Return) 0            Accounts?      Last Accounts

Classifications
Category   STANDARD                      Status REGISTERED
Remarks (Z)
-----------Object-Codes-(Z)---------------   ---------Charity-Types---------
 68.00   CHARITIES OPERATING OVERSEAS      │ FUND RAISER
         FOR THE IMPROVEMENT OF            │
         CONDITIONS OF LIFE                │
 71.00   CHARITIES OPERATING OVERSEAS IN   │ GRANTS TO INSTITUTIONS
         CONNECTION WITH THE PROVISION     │
         OF MEDICAL FACILITIES,            │
         EDUCATION AND RESEARCH;           │
         PRESERVATION AND PROMOTION OF     │
         GOOD HEALTH, ASSISTANCE TO SICK   │
         PERSONS - GENERAL                 │
139.00   ASSISTANCE TO SPECIAL CLASES      │ GRANTMAKER TO INDIVIDUALS
         AND THEIR DEPENDANTS (ALL FORMS   │
         OF ASSISTANCE).  PERSONS OTHER    │
         THAN THOSE DEFINED IN CODES       │
         130-138, 140-149 AND 150-153      │

----------Subsidiaries-(Z)-------------------Amalgamated-from-(Z)-----

        Use 'Detail' for full
        details

Amalgamated into

W_S081318
```

W_S081318

W_S081318

```
Number          Name (Z)

I.R. Ref                        Housing Assoc. Ref.
Forces(2)

Time Charity Details
Expires                 Disposal of Assets within    months after this date

Banking Details
Name
Address


Postcode
Branch                                        Sort Code
A/C No.              A/C Name (Z)
Current Mailing Cycle:
Mail?  Y
-------------------------------------------------------------------
                       Mailing History
     Mailing Id     Date Mailed   Date Returned    Date Accounts Received
        AR4         30 Aug 1995   27 Mar 1996

-------------------------------------------------------------------
Action by
Reg'tion MED     Authorisation PJC    Last Amendment TAPE    Removal
-------------------------------------------------------------------
```

W_S081319

W_S081319



**ORPHANS PROGRAM - INTERPAL - LONDON**

INTERPAL ORPHANS SECTION

- INFORMATION LEAFLETS
- STANDING ORDER M.
- ORPH. APP. FORM
- P.P.ENVELOP THANKS LETTER

CHILDREN APPEAL ORGANIZED BY INTERPAL

INQUIRES ABOUT THE ORPHANS PROGRAM AND HOW TO SPONSOR AN ORPHAN

SPONSORING BODY WEATHER INDIVIDUALS OR ORGANIZATIONS

- THANKS LETTER
- RECEIPT VOUCHER
- ORPHAN'S REPORT
- ORPHAN'S LETTER

- STANDING ORDER
- CHEQUE OR CASH
- GIFTS TO THE ORPH.
- LETTER TO THE ORPH.

BANK

STANDING ORDER M. CHEQUES & CASH

INTERPAL ORPHANS SECTION

- ORPH. APP. FORM
- ORPH. GIFTS
- ORPH. LETTER
- ORPH. REPORT
- RECEIPTS

- NEW SPONSORSHIPS
- SPONSOR'S LETTER
- SPONSOR'S GIFTS
- ORPHAN'S FUNDS

ISLAMIC ASSOCIATIONS AND ZAKAT COMMITTEES INSIDE PALESTINE & LEBANON & JORDAN

ORPHANS

W_S081320

W_S081320

| M_CODE | COM_NAME | COM_TEL1 | COM_FAX1 |
|---|---|---|---|
| 1 | ZAKAT TOBASS COMMITTEE | 972-9-674044 | 972-6-674044 |
| 2 | ZAKAT KHAN YUNIS COMMITTEE | 972-7-852932 | 972-7-852443 |
| 3 | ZAKAT & SADAQAT COMMITTEE - RAMALLA | 972-2-9985571 | 972-2-9952591 |
| 4 | ZAKAT NABLOUS COMMITTEE | 972-9-385650 | |
| 5 | SOC. OF ISLAMIC SCIENCE & CULT. COM | 972-2-856912 | 972-2-855170 |
| 6 | ISLAMIC CHARITABLE SOCIETY - HEBRON | 972-2-929166 | 972-2-928504 |
| 7 | JENIN ZAKAT COMMITTEE | 972-6-503063 | 972-6-502652 |
| 9 | AL-SALAH ISLAMIC ASSOCIATION-GAZA | 972-7-820638 | 972-7-830881 |
| 10 | AL-SANABIL - SAIDA LIBANON | 009617720275 | |
| 11 | JARACH CAMP | | |
| 12 | AL-BIR WAL-IHSGAN CAMP | | |
| 13 | AZMI AL-MUFTI CAMP | | |
| 14 | MA'DAB CAMP | | |
| 15 | SOOF CAMP | | |
| 16 | AL-WAHADAT CAMP | | |
| 17 | AL-RABIFIA CAMP | | |
| 18 | JABAL AL-NADHEEF | | |
| 19 | AL-HUSSAIN CAMP | | |
| 20 | AL-ZARKAA CAMP | | |
| 21 | HITTEEN CAMP | | |
| 22 | AL-BAK'AA CAMP | | |
| 23 | ISLAMIC RELIEF COMMITTEE-UM-ALFAHM | | |
| 24 | ISLAMIC SOCIETY- GAZA | 972-6-568061 | 972-6-568184 |
| 25 | SOWAILAH CAMP | 972-7-823088 | 972-7-823088 |
| 31 | AL HAI'A AL-ISLAMIAH LIRI'AYA-LIBAN | | |
| 40 | THE MERCY ASSOCIATION FOR CHILDREN | | |
| 41 | AL-BIR COMMITTEE - AL-KOORA-JORDAN | 972-7-822208 | 972-7-823660 |
| 42 | AL-BIR COMM. ALSHOONA SHAMALIA -JOR | | |
| 43 | AL RAMTHA ISLAM. CENTER - JORDAN | | |
| 44 | HAIAT AL AAMAL AL KHAIRIA - JORDAN | 009626604842 | |
| 45 | PALESTINE SUPPORT COMMITTEE-JORDAN | 009626-604842 | 009626-604842 |

W_S081321

W_S081321

### Interpal Guidelines for Volunteers.

Volunteers are kindly requested to read and adhere to the following guidelines

1. **Fund Raising materials**

   Receipt Books: All receipt books (and other Interpal material) in the posession of the volunteer are his/her responsibility. All efforts must be made for their safe keeping. They are to be returned and accounted for at the end of the campaign. Cancelled receipts must be kept intact for the record.

   Funds: For safety reasons, collected money must be deposited regularly at the bank and large amounts must not be allowed to build up in the posession of the volunteer. Money handed to other Interpal representatives for depositing must be signed for by the recepient.

2. **Appearance**

   Volunteers must present themselves in a respectable manner and I.D. tags must be clearly worn at times of collection or distribution.

3. **Receipting of collected money**

   All monies collected must be properly receipted with accurate records kept in the counterfoil including the type/project of any specific donation. Money collected from mosques should be counted and receipted at the mosque in the presence of a member of the committe or a mosque representative.

4. **Expenses**

   Out of pocket expenses must be properly receipted. No money will be paid out for unreceipted items. Money must never be taken from donations to cover any expenses. Expenses must be recorded in the attached expense form and accounts will be setteled at the end of the campaign.

5. **Reports and Records**

   Every effort must be made to complete the mosque report forms as fully as possible. The other forms must also be completed accurately on a day-to-day basis. This information will be of most value in planning future campaigns. Regular contact must be maintained with the head office to notify them of any developments and to provide them with details about mosques collected from so that *'thank you'* letters can be promptly sent out to them.

**Important Notes**

   * Interpal's mission is a purely humanitarian one. Volunteers must focus their efforts on presenting the special needs and requirements of the widows orphans and needy families in the refugee camps. .

   * It is the responsibility of the area team leader to make sure all the above is fully complied with.

   * This file is the property of Interpal. It must be returned to the head office at the end of the campaign.

*Interpal - P.O. Box 3333 London NW6 1RW. Tel: 0181 450 8002.*

W_S081322

W_S081322

## MOSQUE COLLECTION SUMMARY

| Date | Name of Mosque | Amount Collected | Name of Volunteer | Comments |
|------|---------------|------------------|-------------------|----------|
| / / | | £   - | | |
| / / | | £   - | | |
| / / | | £   - | | |
| / / | | £   - | | |
| / / | | £   - | | |
| / / | | £   - | | |
| / / | | £   - | | |
| / / | | £   - | | |
| / / | | £   - | | |
| / / | | £   - | | |
| / / | | £   - | | |
| / / | | £   - | | |
| / / | | £   - | | |
| / / | | £   - | | |
| / / | | £   - | | |
| / / | | £   - | | |
| / / | | £   - | | |
| / / | TOTAL: | £   - | | |

Signature of Volunteer .................................................................................................

Date ......./......../...........

Interpal - P.O. Box 3333, London, NW3 1RW. Tel: 0181 450 8002. Reg. Charity No. 1040094

W_S081323

W_S081323

## DAILY FINANCIAL LOG

| Date | Collections Made | | | No. of Mosques Collected From | Total Deposits at bank / Given to: |
|------|------|------|------|------|------|
| | Team 1 | Team 2 | Team 3 | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| **TOTAL:** | | | | | |

£ -
£ -
£ -

Name .................................................
Date .................................................
Signature..........................................

**PLEASE ATTACH ANY PAYING IN SLIPS**
Interpal - P.O. Box 3333, London, NW6 1RW. Tel:
0181 459 6002. Reg. Charity No. 1040094

W_S081324

W_S081324

## EXPENSE FORM

Name of Volunteer ...........................................................................................................

Area Covered ...........................................................................................................

| Item Claimed For | Details - Brief description of Activities | Date | Amount |
|---|---|---|---|
| | | | £ |
| | | | £ |
| | | | £ |
| | | | £ |
| | | | £ |
| | | | £ |
| | | | £ |
| | | | £ |
| | | | £ |
| | | | £ |
| | | | £ |
| | | | £ |
| | | | £ |
| | | | £ |
| | | TOTAL: | £ |

Signature of Person Making Claim: ...............
Date ...........................................................

Method of payment
................................

PLEASE ATTACH ALL RECEIPTS
NB. Payments will not be made for items not receipted
Interpal - P.O. Box 3333, London, NW6 1RW. Tel: 0181 450 9002. Reg. Charity No. 1040094

W_S081325

W_S081325



**INTERPAL**
الصندوق الفلسطيني للإغاثة والتنمية

P.O. Box 3333
London, NW6 1RW
Tel: 0181 450 8002
Fax: 0181 450 8004

In The Name Of Allah, Most Gracious, Most Merciful

Ref: Rec/Don/16778
Date: 16th May 1995

Edinburgh
·ove

Dear Brother Abdul Rahman,

*Assalamu Alaikum Wa Rahmatullahe Wa Barakatuh*

Thank you very much for your letter and kind and continued support. May Allah (SWT) reward and bless you for your great efforts to help the poor and needy in Palestine and else where.

To enable me to issue the required certificates it would be most appreciated if you could fill in the enclosed representative form as well as provide us with 3 references including one from your local Mosque. This is required as a matter of policy by the Board of Trustees.

Please forgive us for any short comings but we assure you we will do our best in future.

With best wishes and kindest regards,

Yours in Islam, -

J.Qundil
Secretary to the Trustees

Enc. -Letter of thanks and receipt to Central Mosque
       -Representative Form - S.A.E.

Registered Charity No. 1040094

W_S081326

W_S081326

## Register of Businessmen and Potential Doners

Our Ref:

*Please complete this form, giving as much information as possible, and return it to our address in the enclosed s.a.e. May Allah SWT reward and bless you for your cooperation and continued support; it is most appreciated.*

Name(title): _____

Nature of Business: _____

Address: _____

_____

_____ Post Code: _____

Contact Nos.: _____

Comment :(Please suggest the best way to approach?) _____

_____

_____

Do you mind if we mention your name?    ☐ Yes    ☐ No

Name(title): _____

Nature of Business: _____

Address: _____

_____

_____ Post Code: _____

Contact Nos.: _____

Comment :(Please suggest the best way to approach?) _____

_____

_____

Do you mind if we mention your name?    ☐ Yes    ☐ No

Interpal - P.O. Box 3333, London, NW6 1RW. Tel: 0181 450 8002. Reg. Charity No. 1040094

W_S081327

W_S081327

## DISTRIBUTION REPORT FORM

**INTERPAL**
الصندوق الفلسطيني للإغاثة والتنمية

P.O. Box 3333
London, NW6 1RW
Tel: 0181 450 8002
Fax: 0181 450 8004

| Allocation No. | Beneficiary/Recipient | Amount |
|---|---|---|

**BOTH SIDES OF THIS FORM SHOULD BE COMPLETED BY THE RECIPIENT ORGANISATION AND RETURNED ONCE AID HAS BEEN DISTRIBUTED**

| Date Form Completed: | Your Ref No. |
|---|---|

**1 Name of Project:**

**Project Nature: (please tick one)**

| | | |
|---|---|---|
| General Relief ☐ | Emergency Relief ☐ | Sponsorship Programme ☐ |
| Eid Gifts ☐ | Zakat-ul-Fitr ☐ | Qurbani ☐ |
| Adahi / Fasting ☐ | Medical Contribution ☐ | Social Development ☐ |

**Location / Town and area that received the aid:**

**TOTAL COST OF PROJECT:**                                   £

Funded By:
Interpal's contribution to the project:          Interpal          £
Contributions from other donors (Name)                             £
                                                                    £

**Duration of this Project:**
Project Start date:          End date:          Ongoing ☐

**Direct Beneficiaries: Please give the number of beneficiaries for each of the following groups:**

| Refugee Camps | Gen. Community | Families | Elderly |
|---|---|---|---|
| Widows | Children | Orphans | Students |

**TOTAL NO. OF INDIVIDUAL BENEFICIARIES:**

Registered Charity No. 1040094

W_S081328

W_S081328

PAGE 2 OF 2 – REF:

**7 Project Type - Funding for:** *Please tick all that apply*

- [ ] Food
- [ ] Sanitation
- [ ] Community Service
- [ ] Income Generation
- [ ] Shelter
- [ ] Health
- [ ] Livestock
- [ ] Legal Assistance
- [ ] Clothes/Domestic
- [ ] Education/Vocational
- [ ] Fisheries
- [ ] Agency Support Costs
- [ ] Water
- [ ] Transport
- [ ] Crop Production
- [ ] Other *

\* Please specify

**8 Project Details & Costs** *(From Interpal's Contribution)*

| Items purchased or services paid for the duration of service | Quantity or weight | Unit Price | Total amount (Local currency) |
|---|---|---|---|
| 1 | | | |
| 2 | | | |
| 3 | | | |
| 4 | | | |
| 5 | | | |
| *(Please complete on a separate sheet if necessary)* | | Sub-total: *(i)* | |

**9 Project Expenses**

Transport Cost
Rent
Salaries
Volunteer Expenses
Food Provisions
Administration Fees
Sub-total *(ii)*
Overall Total (i) + (ii)

**10 Documentation and Publicity Material.** We request that at least one of the following forms of documentation should accompany this report to show us it is being distributed or a programme being implemented. Please indicate how the documentation you have sent.

- [ ] Official Receipt
- [ ] Letter of thanks
- [ ] Photographs
- [ ] Video
- [ ] Newspapers
- [ ] Other
- [ ] Funded by

**11 Name of Official:**
Official Stamp:

Position:
Signature:
Date:

**Follow up:** For Interpol Official use only.
Sections completed:   1 [ ]  2 [ ]  3 [ ]  4 [ ]  5 [ ]  6 [ ]  7 [ ]  8 [ ]  9 [ ]  10 [ ]  11 [ ]
Comments:

W_S081329

W_S081329

**EXHIBIT 172 TO DECLARATION OF VALERIE SCHUSTER**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
                                                             :
TZVI WEISS, et al.                                           :
                                                             :
                          Plaintiffs,                        :
                                                             :
                        - against -                          :          05-CV-4622 (DLI) (MDG)
                                                             :
NATIONAL WESTMINSTER BANK, PLC                               :
                                                             :
                          Defendant.                         :
                                                             :
                                                             :
-------------------------------------------------------------X
                                                             :
NATAN APPLEBAUM, et al.                                      :
                                                             :
                          Plaintiffs,                        :
                                                             :
                        - against -                          :          07-CV-916 (DLI) (MDG)
                                                             :
NATIONAL WESTMINSTER BANK, PLC                               :
                          Defendant.                         :
                                                             :
                                                             :
                                                             :
-------------------------------------------------------------X

## EXPERT REPORT OF BRIAN MICHAEL JENKINS

**PERSONAL BACKGROUND**

I currently serve as Senior Advisor to the President of the RAND Corporation,[1] as Director of the National Transportation Security Center at the Mineta Transportation Institute (MTI),[2] as Advisor to Commercial Crime Services, the non-profit investigative arm of the International Chamber of Commerce, and as an advisor to U.S. government agencies and private corporations.   The investigation and analysis of terrorism has been my full-time profession for the past four decades.

In 1972, at the request of the U.S. government, I initiated the nation's first formal research effort on the growing problem of terrorism.  Since that time, I have authored or co-authored five books, several monographs and numerous classified and unclassified reports on the topic of terrorism.  I have been invited to testify before Congress on terrorism on approximately 20 occasions, and I am requested to brief government officials on terrorism approximately 15 to 20 times a year.  As an example, in 2010, I gave 24 briefings on various aspects of terrorism to officials at U.S. government agencies including the Department of Defense, the Department of Homeland Security, the Defense Threat Reduction Agency, the U.S. Air Force, the National Security Council Staff, the Transportation Research Board, Senate staff, and the U.S. Mission to the European Union in Brussels.  Also included in this number were briefings to the Canadian Senate, the British Ministry of Defence, the British Home Office, the Government of Mumbai, NATO, the European Union, and the QUAD (the senior government officials responsible for aviation security in the U.S., Canada, Australia, and the European Union).  In January 2011, I briefed new members of Congress, Congressional staff, the Office of the National Director of Intelligence, and the National Counterterrorism Center.

---

[1] The RAND Corporation is a non-profit federally-contracted research center devoted to research on issues of national interest.
[2] The Mineta Transportation Center is a non-profit institute devoted to transportation-related issues.  Its National Transportation Research Center is a Department of Homeland Security Center of Excellence and deals with terrorist threats.

2

My entire professional life has been devoted to the analysis of terrorism and to translating that analysis to the strategy and tactics of combating terrorism. This means spending each day reading reports from government agencies, research reports by RAND and other research centers, books devoted to the topic, the latest press reports, and statements issued by various terrorist groups. I regularly meet with U.S. and foreign government officials to discuss matters relating to terrorism. I also attend many conferences and briefings.

I conduct detailed case studies of terrorist attacks, the most recent being a case study of the November 2008 terrorist assault on the city of Mumbai[3] and an analysis of terrorist assaults on transportation systems.[4] These case studies involve reviews of official government documents, news media accounts, and interviews with individuals involved in the case. The studies aim at accurately reconstructing events and identifying security failures, major decision points, lessons learned, and implications for policy, strategy, and security measures.

I initiated and for many years maintained the RAND Corporation's database on terrorism, which began in the early 1970s with 3 x 5 cards and has since grown to a sophisticated computerized database. The database focuses on discerning trends in terrorist tactics, weapons, and targets. I also led the development of MTI's computerized database of attacks on transportation systems. These databases provide a solid historical foundation for contemporary research.

My reports and essays have analyzed trends in terrorist tactics, communications, weapons, mindset, strategy, communications, and recruiting.

---

[3] Brian Michael Jenkins, *et.al., The Lessons of Mumbai,* Santa Monica: The RAND Corporation, 2009.
[4] Brian Michael Jenkins and Bruce R. Butterworth, *Terrorist Attacks on Public Bus Transportation: A Preliminary Empirical Analysis,* San Jose: The Mineta Transportation Institute, 2010. Many of these were suicide bombings of buses in Israel.

My most recent RAND publication addresses radicalization and recruitment to jihadist terrorism in the United States since 9/11.[5]

In this report, I draw on 40 years of experience investigating and analyzing terrorism, for the most part conducted at the RAND Corporation.  In the 1960s, I focused on the insurgencies in Vietnam and Cambodia.  Beginning in 1972, in the wake of the murder of Olympic athletes in Munich and the attack on Tel Aviv's Lod Airport, I pioneered a new systematic examination of international terrorism, which had up to that point received relatively little attention.  To begin this endeavor, among other projects, I spearheaded the development of datasets and archives charting terrorist activity around the world since 1968.  I also partnered with others at RAND to develop heuristic modeling to help analyze terrorism activity.  In the 1970s, I studied the impact of new technology on low-level violence, as well as the terrorist mindset and terrorist decisionmaking.  In the 1980s, among many other areas of inquiry, I explored intelligence constraints on the investigation of terrorism, and developed frameworks for studying international terrorist groups.  Since 9/11, my work has focused on counterterrorism strategies in the global war on terror.

I have appended a copy of my professional biography (attached hereto as <u>Exhibit A</u>) along with a list of my unclassified publications over the past 10 years (attached hereto as <u>Exhibit B</u>).

Aside from my work on the related pending cases against Credit Lyonnais, I have served as an expert witness on only one occasion in my life—this is the second occasion, and it is the first time I have been asked to prepare written testimony.[6]  All the opinions and views expressed in this report are my own.  My

---

[5] Brian Michael Jenkins, *Would-Be Warriors: Radicalization and Recruitment to Jihadist Terrorism in the United States Since 9/11,* Santa Monica: The RAND Corporation, 2010.
[6] In 1984, I testified as an expert witness on Palestinian terrorism in an arbitration before the ICC Court in Paris.

4

acceptance of this assignment implies no sympathy for Hamas, defense of its objectives, or approval of its use of terrorist tactics.

I am being compensated at a rate of $450.00 per hour.  The opinions I express in this report are in no way tied to my compensation.

**SUBJECT OF THIS REVIEW**

I have been asked to review the written reports of Arieh Spitzen, Evan Kohlmann, Matthew Levitt, and Ronni Shaked in the above-referenced matters pertaining to claims by Hamas of responsibility for specified terrorist attacks between 2002 and 2004, and the relationship of these specific attacks to Hamas's sources of funding.  I previously submitted a report on July 15, 2010 in the related matters against Credit Lyonnais addressing the reports of Spitzen, Kohlmann, Levitt, and Shaked that were submitted in those cases.  Those reports are similar in many respects to the reports submitted in these cases.[7]  I have also reviewed the transcripts of the depositions taken of these four individuals in the Credit Lyonnais matters.

It is important to point out that I have not personally investigated the specific attacks discussed in this report, nor am I relying upon any non-public information, other than the Spitzen, Kohlmann, Levitt, and Shaked reports in both the Credit Lyonnais and NatWest matters, the transcripts of the depositions of these four individuals in the Credit Lyonnais matters, the rebuttal report of Moshe Azoulay dated July 1, 2010 in the Credit Lyonnais matters, and the rebuttal report of Moshe Azoulay dated March 3, 2011 in these NatWest matters  The information I have relied upon should be readily available to the plaintiffs' witnesses as well.  I approach this assignment as a technical review of the Spitzen, Kohlmann, Levitt, and Shaked reports based upon my expertise in the analysis of terrorism.

**INITIAL NOTE ON THE NATWEST REPORTS**

I wish to note at the outset that in my earlier rebuttals to the Spitzen, Kohlmann, Levitt and Shaked reports in the Credit Lyonnais matters, I raised

---

[7]    While the Shaked, Levitt, and Spitzen reports have changed somewhat from their predecessors in the Credit Lyonnais matters, the Kohlmann report submitted in the Credit Lyonnais matter is the same report submitted in these cases.

many of the same critiques that are present in this report.  In some instances, the authors of those reports at their Credit Lyonnais depositions even conceded some of the points I raised in my earlier report.  Yet, I do not see in any of the reports a full response or discussion of any of my critiques.  In my experience, the failure to respond to concerns or criticisms of one's analysis is in itself a methodological flaw.

I also wish to note that, while this is a rebuttal to the reports submitted in the NatWest cases, the Credit Lyonnais depositions provided certain clarifications, explanations, or elaborations upon statements that are contained in these reports.  Thus, in certain instances in this report I have referred to the deposition testimony of the authors in the Credit Lyonnais matters and I am responding directly to that testimony.

**METHODOLOGY**

To be accepted, academic research requires critical peer review.  Critical review is an even more important requirement in intelligence analysis, since the conclusions of such an analysis can determine momentous policy decisions, including decisions to go to war.  For this reason it is important to ensure that the analysis is free from distortion by external pressures, a perceived need to protect existing policies, personal prejudices, groupthink, or the temptation to reach beyond the evidence.

As chairman of the Political Science Department and director of research programs at both RAND and MTI, I have been in charge of quality control—the process of reviewing research and analytic assessments based on research for integrity and reliability.  I continue to personally review numerous classified and unclassified research reports on terrorism and on occasion I have been asked to

review analyses prepared in the intelligence community, including the National Intelligence Estimate on terrorism.

The role of the reviewer is to make a reasoned judgment about the content and conclusions of the document under review and to make sure the underlying analysis is methodologically sound.  The criteria for that judgment include the validity of its arguments, factual accuracy, appropriateness of methods, objectivity, thoroughness, and soundness of logic.  Reviewers are expected to challenge the work.  The reviewer may not always agree with the authors on issues, but should insist that alternative interpretations and arguments be discussed, or at least acknowledged.

A technical review will ask the following questions, among others:

- Does the evidence presented by the authors support their conclusions?
- Do the authors include all of the evidence available or do they ignore that which happens to be contrary to their conclusions—a common problem?
- Based upon the evidence that is presented by the authors, or based on the larger universe of available information, are there alternate interpretations?

In this report I apply the methods of a technical review to the issues of terrorist claims of responsibility and terrorist financing.  Assessment of these issues is complicated – terrorist movements are not monoliths, but complex galaxies of disciplined and undisciplined actors.  Connectivity is often murky, and evidence may be contradictory.  Straightforward explanations may sometimes be correct, sometimes not.  In my experience, slam-dunks are rare, and opinions offered with certainty should prompt immediate skepticism.

Any analyses, including these reports, rely heavily on what is available from intelligence sources, especially dealing with murky issues like how Hamas internally manages its funds or whether Hamas ever is unreliable in its claims of

8

responsibility.   In many instances there is little to no direct corroborating evidence, audited accounts, forensic evidence, or trustworthy testimony by current or former Hamas members.

Largely, we know what Hamas chooses to tell us, plus what comes from other Palestinian factions or Israeli sources, all of whom are participants in an armed conflict and have their own biases and agendas.  An analyst dealing with this must sort through information (always incomplete), misinformation, and disinformation.

A technical review should not argue its own case.  It is not my purpose here to adjudicate which terrorist claims seem valid and which appear suspect.  I limit my own comments to the quality of the evidence relied upon by Spitzen, Kohlmann, Levitt, and Shaked, whether it seems complete, the methods of analysis they employed, and whether, in my view, these adequately support the conclusions offered.

**OVERVIEW OF PALESTINIAN GROUPS**

The Palestinian resistance has always been a complicated collection of currents, movements, and groups.   Ideological divisions (Marxist versus nationalist, secular versus religious, etc.), differences over strategy (rejectionists versus pragmatists, international terrorism versus attacks only on Israel, whether to agree to ceasefires, etc.), differing perspectives of competing state sponsors (Syria, Libya, Iraq, Iran, etc.), and personal rivalries have, over the years, produced a multitude of competing groups.[8]

A bewildering roster of names and initials is further complicated by the division of some of the movements into political and semi-autonomous military

---

[8] See Ziad Abu-Amr, *Islamic Fundamentalism in the West Bank and Gaza: Muslim Brotherhood and Islamic Jihad* p. 27 (1994) (describing tensions among various Palestinian groups); *ibid.* pp. 43-46 (describing clashes between Palestinian groups).

9

wings, and by the frequent practice of inventing new names to claim responsibility for terrorist attacks.   In some cases, these inventions are acknowledged by their creators, but in others, they may be intended to disguise involvement or deflect attention away from the sponsoring group.  In some cases, these pseudo-separations and genuinely new entities reflect internal tensions and schisms, which are present in most of the Palestinian movements.[9]   Beyond the porous and constantly shifting demarcations between and within Palestinian groups is a host of semi-independent and independent operatives, apparently eager to participate in the violence, but not necessarily under the control of any group.[10]

Many of the groups are internally divided, with the most radical and violent elements frequently taking action on their own without approval of the group's decision-makers.[11]   Individuals may move from one group to another, creating

---

[9] For example, the "Abu al-Rish Brigades" are considered to be a militant offshoot of Fatah, but are reported to be a rejectionist splinter faction that has more recently coordinated attacks with Hamas.  See National Consortium for the Study of Terrorism and Responses to Terrorism, Terrorist Organization Profile: Abu al-Rish Brigades, available at http://www.start.umd.edu/start/data_collections/tops/terrorist_organization_profile.asp?id=4664; see also Matthew Levitt, *Hamas: Politics, Charity, and Terrorism in the Service of Jihad*, New Haven: Yale University Press (2006), pp. 222.  Another example, the "Popular Resistance Committees," who reportedly were involved in an October 15, 2002 attack on an American convoy in Gaza, are said to consist mainly of Fatah breakways and ex-security forces, along with factions tied to Hamas and Islamic Jihad.   Ellen Crean, "FBI Investigates Gaza Attack," CBS News, Oct. 17, 2003, available at http://www.cbsnews.com/stories/2003/10/05/world/main576578.shtml; see also Levitt, *op cit.* p. 222 (describing the PRC as "a motley crew of loosely associated radical Palestinians from Hamas, Islamic Jihad, Fatah, and the various Palestinian security services.").

[10] Levitt also points to the problem of Hamas cells operating on their own, or independently of sister cells and some leaders, and of lone wolves, "terrorists with no ties to a group—or those acting completely independently of the group to which they belong…." He also mentions several attacks by individuals, concluding that "while none of these were Hamas operatives, per se, each acted in perceived concert with the objectives of Hamas, in retaliation for attacks on Hamas, or in attempted cooperation with Hamas." Levitt, *op cit.* pp. 223-225.  Finally, Levitt also quotes Israeli concerns "about rogue cells and Hamas individuals close to al Qaeda carrying out attacks on their own."  *Ibid.,* p. 220.

[11] See Sara Roy, "Religious Nationalism and the Palestinian-Israeli Conflict: Examining Hamas and the Possibility of Reform," *Chicago Journal of International Law*, Vol. 5 (2004), pp. 259-60 (noting "the abnegation of any leadership or command role by the PA during the [Second Intifada], and the emergence of a younger generation of more militant Fateh [sic] cadres . . . . Fateh, however, has not been able to exert control over the PA (itself greatly weakened) . . . due in part to the party's own internal divisions and fragmentation."); Ely Karmon, "Hamas' Terrorism Strategy:  Operational Limitations and Political Constraints," Middle East Review of International

10

new constellations that may or may not retain loose affiliations with their original group.  Thus, the terrorist "wings" of Palestinian movements are frequently only roughly assembled around various flags of convenience.

The portrait is further complicated by the fact that each of the Palestinian groups is infiltrated by other groups, by the Palestinian security forces, which appear to operate not as neutral peacekeepers but as partisans of particular factions, reportedly by Israeli informants and agents,[12] and by the intelligence services of various Arab countries.  The opportunities for external manipulation are significant.

## GROUPS OPERATING DURING THE SECOND INTIFADA

The Second Intifada began in September 2000 following Israeli opposition leader Ariel Sharon's visit to the Temple Mount, which is also the location of the al-Aqsa Mosque, a Muslim holy site. Widespread riots escalated into armed confrontations as the main Palestinian political groupings sought to exploit popular sentiments and exert direction and control over the violence.[13]

The major terrorist groups that claimed responsibility for various attacks during this period are described below.

---

Affairs, Vol. 4 (March 2000), pp. 66-67, available at http://www.gloria-center.org/meria/2000/03/karmon.pdf ("One article . . . published in the October 1998 issue of Hamas' monthly Filastin al-Muslimah . . . hints at a 'green light' to various Hamas groups in the West Bank, mainly in the Hebron area, to initiate independent operations.").

[12] See, e.g., Patrick Jackson, "Hamas man's son Mosab Hassan Yousef "was Israeli spy," BBC News, Feb. 24, 2010, available at http://news.bbc.co.uk/2/hi/8533952.stm.

[13] See generally BBC News, "Al-Aqsa Intifada Timeline," September 29, 2004, available at http://news.bbc.co.uk/2/hi/middle_east/3677206.stm; Jeremy Pressman, "The Second Intifada: Background and Causes of the Israeli-Palestinian Conflict," *Journal of Conflict Studies* (Fall 2003), pp 114-41.

*PRC*

The Popular Resistance Committees (PRC) took the field first and is reported to have carried out its initial attack in October 2000. The PRC was founded by an ex-member of Fatah, and, according to the government of Israel, was instigated and funded by Hezbollah. The group's military wing is known as the An-Nasser Salah Ad-Din Brigades.[14]

The relationship between the An-Nasser Salah Ad-Din Brigades of the PRC and the Izz ad-Din al-Qassam Brigades of Hamas is unclear. At times rivals, the organizations also at times are reported to have cooperated, together with a new group called the Islamic Army.[15]

*PFLP*

The Popular Front for the Liberation of Palestine (PFLP), an older Palestinian group originally oriented on Marxist ideology and an early pioneer of international terrorism, also carried out terrorist attacks during the Second Intifada. Under the banner of Abu Ali Mustafa Brigades, the PFLP is believed responsible for the assassination of Israel's Minister for Tourism and for several suicide attacks in Israel. The Abu Ali Mustafa Brigades claimed responsibility for the May 19, 2002 suicide bombing in a Netanya market; the attack was also claimed by Hamas, although the Abu Ali Mustafa Brigades identified the bomber as one of its members and Israeli authorities dismissed the Hamas claim.[16]

---

[14] See generally Israeli Ministry of Foreign Affairs, "The Popular Resistance Committees (PRC) Terrorist Organization 2006-2007" (2008), available at http://www.mfa.gov.il/MFA/Terrorism-+Obstacle+to+Peace/Terror+Groups/The%20Popular%20Resistance%20Committees%20Terrorist%20Organization%202006-2007.

[15] See, e.g., Ken Ellingwood, "Deadline Set for Israel to Agree to Demands," *Los Angeles Times*, July 4, 2006, at A10 (discussing abduction of an Israeli soldier by the PRC and the Qassam Brigades); "2 Palestinians Held in Israel's First Arrest Raid in Gaza Since Pullout," *Los Angeles Times,* June 25, 2006, at A20 (discussing attack in which PRC militants claimed they were joined by fighters from Hamas and the Islamic Army).

[16] See "Erased In A Moment: Suicide Bombing Attacks Against Israeli Civilians," Human Rights Watch, October 2002, at 35, 89, available at http://www.hrw.org/reports/2002/isrl-pa/.

### Al-Aqsa Martyrs Brigadas

The al-Aqsa Martyrs Brigades first appeared in 2002.  The group is described in some reports as an amalgamation of various Palestinian militias and armed factions in the West Bank.  It is believed to be a creation of Fatah.[17] According to the U.S. State Department, the al-Aqsa Martyrs Brigades comprise "localized, autonomous units that mostly act independently of each other, united under a common alliance to Fatah."[18]

The exact relationship between the Al-Aqsa Brigades and Fatah is unclear.  According to an informative new history of Hamas by Beverly Milton-Edwards and Stephen Farrell, *Hamas: The Islamic Resistance Movement,* some Fatah officials argued that "individual brigade leaders were out of control … or were controlled by nefarious outsiders dictating their own agendas."[19]  However, the Brigades reportedly received some funding from Fatah.[20]  Their actions are believed to have allowed the more pragmatic Fatah to maintain a veil of respectability as an acceptable negotiating partner while not abandoning the field of terrorism to more radical elements that were determined to carry on a campaign of violence.[21]  These two views of the Brigades – "out of Fatah's control" and "the recipients of secret Fatah funding" – are not mutually exclusive.

During the Second Intifada, the al-Aqsa Martyrs Brigades reportedly carried out numerous suicide bombings and shootings.[22]  The Brigades were

---

[17] See "Erased In A Moment," *op cit.* pp. 73, 77-78.
[18] See CFR, "Backgrounder: Al Aqsa Martyrs Brigade," April 2, 2008, available at http://www.cfr.org/publication/9127/alaqsa_martyrs_brigade.html#.
[19] Beverly Milton-Edwards and Stephen Farrell, *Hamas: The Islamic Resistance Movement,* Cambridge, UK: Polity Press (2010), p. 99.
[20] See "Erased In A Moment," *op cit.* at 125; Israeli Ministry of Foreign Affairs, "The Involvement of Arafat, PA Senior Officials and Apparatuses in Terrorism against Israel, Corruption and Crime," (May 6, 2002), available at http://www.mfa.gov.il/mfa/mfaarchive/2000_2009/2002/5/the%20involvement%20of%20arafat-%20pa%20senior%20officials%20and
[21] See Milton-Edwards and Farrell, *op cit.* p. 99.
[22] See Assaf Moghadam, "Palestinian Suicide Terrorism in the Second Intifada: Motivations and Organizational Aspects," *Studies in Conflict & Terrorism*, Vol. 26, 65-92 (2003), p. 82; "Erased In A Moment," *op cit.* p. 12.

rivals of Hamas, but according to al-Aqsa leaders, they at times "cooperated with the military wing of Islamic Jihad and Hamas."[23]   Again, intense rivalry and occasional cooperation, in the context of the chaotic Second Intifada, are not mutually exclusive.   For example, it has been reported that Islamic Jihad undertook joint operations with Hamas with respect to an August 9, 2001 bombing and with Fatah's al-Aqsa Martyrs Brigades with respect to a November 27, 2001 shooting.[24]

### PIJ

The Palestinian Islamic Jihad (PIJ) is another older group that, like Hamas, is inspired by Islamist rather than secular ideology and subscribes to the destruction of Israel.   Much smaller than Hamas, it relies heavily on Iran for support.   During the Second Intifada, the PIJ is believed to have carried out numerous suicide bombings, many on its own, but some in conjunction with the al-Aqsa Martyrs Brigades and some with Hamas.[25]

### Al-Qassam Brigades

The final major grouping active during the Second Intifada is the Izz ad-Din al-Qassam Brigades, the military wing of Hamas.  The Qassam Brigades is generally highly decentralized, consisting of secretive cells that are reported to be isolated from the political infrastructure of the organization and from each other.[26]  This is an effective security measure, but it can impede communication and coordination.

---

[23] See Milton-Edwards and Farrell, *op cit.* p. 99.
[24] See "Erased In A Moment," *op cit.* p. 76.
[25] See "Erased In A Moment," *op cit.* p. 76.
[26] See Jeroen Gunning, *Hamas in Politics*, New York: Columbia University Press (2009), pp. 40-41, 47, 115.  Levitt himself acknowledges the phenomenon of "semi-independent cells," noting that "elements of Palestinian terrorist groups have in the past carried out attacks without the knowledge of the entire group.  Sometimes such operations are carried out by cells without informing senior leadership; in other cases one part of a group's leadership will task a cell with a mission without the knowledge and approval of other parts of the group's decision-making apparatus."  Levitt, *op cit.* pp. 220-227.

14

There are several reported examples of attacks that appear to have been committed by Hamas cells but were not authorized by the political leadership. The August 19, 2003 bombing of a No. 2 bus that undermined an Israel-Palestinian ceasefire was reportedly committed by a self-proclaimed "Hamas" cell from Hebron – the bomber was said to have been retaliating for the assassination of a personal friend – but was disowned and denounced by the official leadership that proclaimed its commitment to the truce.[27] Other examples of the splits between Hamas's military and political wings, as well as between various units of Hamas operating on their own, have been widely reported.[28]

This uncertainty about who in Hamas might be behind a particular attack is sometimes reflected in attributions of responsibility. In Michele Esposito's article summarizing suicide bombings during the Second Intifada, responsibilitiy for the May 7, 2002 suicide bombing at Rishon Letzion, for example, is listed as "probably Hamas." The October 10, 2002 suicide bombing at Bar Ilan is attributed to "Israel Hamas," the August 12, 2003 suicide bombing at Rosh Ha'ayn is attributed to "Hamas-Nablus faction," and the August 19, 2003 suicide bombing in Jerusalem is attributed to "Renegade Hamas."[29]

---

[27] See Chris McGreal, "Muted feelings for martyr with a grudge," *Guardian*, 21 August 2003, available at http://www.guardian.co.uk/world/2003/aug/21/israel. Even Levitt notes that this particular incident is "indicative of the splits that exist within Hamas and suggests that elements of the group may carry out attacks without the knowledge of other cells or leaders." Levitt, *op cit.* p. 221.

[28] See Gunning (2009), *op cit.* pp. 211-214 (discussing rivalries and conflicting claims between Hamas's internal and external leadership, its political and military wings, and between individual cells and leadership); Shaul Mishal, "The Pragmatic Dimension of the Palestinian Hamas: A Network Perspective," *Armed Forces & Society*, Vol. 29, No. 4 (Summer 2003), pp. 569-589, at p. 583 (noting public dispute between political leadership and individual military units as to whether to declare truce). Levitt discusses a Hamas military cell apprehended in February 2005 that planned to fire Qassam rockets at Israeli communities from positions within the West Bank, and that was believed to be directly funded by Hamas leaders abroad and operated independently of other military cells in the West Bank. "Such cases highlight the ability of particular segments or factions within a group to carry out operations on their own without the approval of the full spectrum of the group's leadership." Levitt, *op cit.* p. 221.

[29] Michele K. Esposito, "The Al-Aqsa Intifada: Military Operations, Suicide Attacks, Assassination, and Losses in the First Four Years," *Journal of Palestine Studies* Vol. 34, No. 2 (Winter, 2005), pp.85-122.

During the Second Intifada, Hamas reportedly carried out some attacks on its own and some in cooperation with others, including its ideological partner Palestinian Islamic Jihad.[30]  Hamas and the al-Aqsa Martyrs Brigades were also reported to have claimed joint responsibility for several attacks during this period.[31]  At least one attack was reportedly claimed by both Hamas and the PFLP.[32]  We also know of one attack, for which Hamas claimed responsibility but as to which there are indications that the attack was carried out by the al-Aqsa Martyrs Brigades.  See discussion *infra* at 35-42.

### Other Groups and Unclaimed Attacks

Several other group names also appear, including the "Popular Army Front—Return Battalions," al-Nathir, and the "Abu Rish Brigades."

In addition to the named banners, there were numerous unclaimed attacks in the Second Intifada.  According to Esposito's chronology, approximately 18 percent of the suicide bombings and 35 percent of the non-bombing suicide attacks were unclaimed.[33]  These operations may have been carried out by armed factions that, despite the intense competition, wished to keep their identities secret, by unaffiliated operatives, or by ordinary criminals exploiting the violence.  According to one source, it was not the policy of Hamas to claim responsibility for attacks that caused no fatalities other than the attacker.[34]  Some attacks remain mysteries.

---

[30] See "Hamas joins forces with Islamic Jihad," *Washington Times*, October 29, 2003, available at http://www.washingtontimes.com/news/2003/oct/29/20031029-113255-5270r.  Indeed, such cooperation was reportedly encouraged by Iran at various points in time.  *See* Levitt, *op cit.* at 174.

[31] See, e.g., Charles A. Radin, "Terror Attack Kills 7 at Israeli Settlement," *Boston Globe*, July 17, 2002, at A1 (describing attacks in December 2001 and July 2002); Esposito, *op.cit.* p.108 (listing 5 attacks in 2003-2004 where Hamas and al-Aqsa Martyrs Brigades claimed joint responsibility). See also discussion of January 29, 2004 attack *infra* at 35-42.

[32] See "Erased In A Moment," *op cit.* p. 35.

[33] Esposito, *op cit.*, pp.105-11.

[34] Esposito, *op cit.* pp. 104.

16

**TERRORIST CLAIMS OF RESPONSIBILITY**

A claim of responsibility would seem to make attribution of culpability fairly straightforward:  they said they did it, therefore they did it.  But it is seldom that simple.  By itself, a terrorist claim proves only that someone has made the claim. Terrorist groups have multiple motivations for claiming credit for attacks they may or may not have been involved with, and they similarly may be motivated to deny or fail to claim credit for attacks they did commit.   Similarly, it may be advantageous for a claim of credit to be issued on behalf of another group or for rival groups to issue competing or joint claims.  Thus, for an intelligence analyst, a claim of responsibility is at best a loose indicator, not proof of involvement.

*A.    Why Terrorists Make Claims*

Unlike ordinary criminals, terrorists often publicly claim responsibility for their actions.   The primary purpose of terrorism is to convey a message. Terrorism may be intended to create fear and alarm among members of a particular audience – to frighten the "ruling classes" for example, or a despised ethnic group.  It may be intended to signal the strength of the terrorist group.  It may be intended to make the point that pursuit of a certain policy opposed by the terrorists will have violent consequences.  Or it may be intended to demonstrate the depth of the terrorists' own commitment, allowing them to portray themselves as the champion of the constituents they claim to represent.

Terrorism, therefore, is about communications.  An act of terrorist violence itself must communicate – it must serve as propaganda of the deed.  In other words, the choice of target and tactic must send a clear message to the terrorists' intended audience or audiences.  Or the violence must be accompanied by a claim of responsibility that identifies the group and conveys its message.

Terrorists thus have a powerful motive to communicate—to claim "credit" for attacks.   They seek publicity for themselves and their causes to attract

17

recruits and elicit financial support.  Terrorists want to explain themselves in order to distinguish their actions from ordinary crime and to justify their violence. They want to inspire others to action or outshine rival terrorists.

Further, terrorist groups are not highly disciplined armies.  They are usually self-appointed assemblies of extremists surrounded by legions who would like to be in on the action.  Terrorist groups are often divided internally by ideological differences, or arguments about tactics or calibration of the right level of violence.  Political conditions may also produce an abundance of would-be warriors looking for an opportunity to avenge personal grievances, or to demonstrate their conviction, their determination, their prowess.  Dedicated to action more than to any specific organization, these volunteers slide from one group to another, seeking recognition and support where they can, or they may take action on their own as proof of their commitment.  In many cases, rival terrorist groups compete for glory, constituents, and recruits, and claims of responsibility are a critical component of the competition.  There is also no question that during the Second Intifada, successful terrorist attacks brought prestige and political benefits to those who claimed credit for those attacks.

B.     *What Does It Mean For A Terrorist Organization To Claim Responsibility?*

While terrorist groups have clear motivations to claim credit for an attack, what does the claim mean?  Fluidity of membership and porous boundaries between the many Palestinian factions can sometimes complicate claims of responsibility or reduce them to mere assertions of membership – one or more of the attackers were in the orbit of a particular group at one time, therefore, the group can claim responsibility for the attack, even though it may have no participation in the final direction, financing, or logistics of the operation.

18

Under the fluid circumstances that prevailed during the Second Intifada, a terrorist claim could mean that the leaders of the movement recruited the attackers, directly ordered and planned the attack, provided the necessary financing and weapons, and thus claimed responsibility.  But a claim by a terrorist group could just as easily mean that an individual or individuals who at one time belonged to the movement joined another group to carry out an attack, or that they initiated an action by themselves seeking approbation, confident that the movement would officially recognize their achievement.  In still other cases, attacks may be carried out by small groups of members operating independently, or by more bloodthirsty elements within the group in defiance of central direction.  At the same time, terrorist leaders, anxious to give the impression that they lead a much larger movement, may exhort their followers to carry out attacks wherever they can.  While an attack may be inspired by the exhortation, it is not necessarily directed, supported, funded, or committed by the group.  In each of these cases the group may legitimately believe it deserves to claim some credit for the attack, even if its actual role in that attack is at best tangential or non-existent.[35]

---

[35] Recent examples of such claims are legion.  For example, on April 4, 2009, Baitullah Mehsud, leader of the Pakistan Taliban, claimed responsibility in a Reuters telephone interview for an attack on the U.S. immigration center in Binghamton, New York, in which 13 people were killed.  The claim was completely false; the attack was carried out by a lone gunman, who had no connections to terrorism.  See "Baitullah Mehsud Claims Responsibility," *The National,* April 4, 2009, available at http://www.nation.com.pk/pakistan-news-newspaper-daily-english-online/Islamabad/04-Apr-2009/Baitullah-Mehsud-claims-responsibility-for-US-shooting.  In May 2010, another leader of the Taliban in Pakistan in a videotape claimed responsibility for the attempted Times Square bombing carried out by Faisal Shahzad; a spokesman for the Pakistan Taliban later claimed that they had no connection with Shahzad.  Shahzad himself claims that he was trained by the Taliban in Pakistan, but in the faction-ridden movement, it is not clear with whom Shahzad had contact.  "Pakistani Taliban claim failed New York bomb attack," *Reuters*, May 2, 2010, available at http://www.reuters.com/article/idUSTRE6412UP20100502 (reporting videotaped claim by Pakistani Taliban); "Pak Taliban denies involvement in Times Square car bomb plot," *The Times of India*, May 3, 2010, available at http://timesofindia.indiatimes.com/NEWS/World/Pakistan/Pak-Taliban-denies-involvement-in-Times-Square-car-bomb-plot/articleshow/5887345.cms (retraction by Pakistani Taliban); Benjamin Weiser & Colin Moynihan, "Guilty Plea in Times Square Bomb Plot," *N.Y. Times*, June 21, 2010, available at http://www.nytimes.com/2010/06/22/nyregion/22terror.html?scp=5&sq=faisal%20shahzad%20pakistani%20taliban&st=cse (statement by Shahzad that he was trained by the Pakistani Taliban); Bill Roggio, "The Pakistani Taliban's Top Leaders," *The Long War Journal*, May 17, 2010,

C.    *Terrorist Claims Are Not Reliable Sources for Determining Responsibility*

In my four decades of assessing and analyzing terrorist acts throughout the world, I have frequently had to assess single or multiple claims of responsibility for a given terrorist act.  While a given claim of responsibility may be true, the analyst must start with the premise that it is equally likely that it may not be an accurate accounting of the actor responsible for an attack.  Accordingly, in considering a claim of responsibility intelligence analysts will never take a claim of responsibility as conclusive proof on its face, and instead must consider the additional facts, including the following:

1.    *Terrorist Groups At Times Take Credit For Attacks They Did Not Commit*

Terrorists will claim responsibility for attacks their leaders have ordered and enabled, but with powerful incentives to grab credit, they may also claim attacks in which their involvement is tangential or non-existent.  Or they may assert authorship for attacks they have little to nothing to do with.

The motivations for doing so are the same as those of terrorist groups' claims of responsibility for their own attacks.  The commission of a successful terrorist attack can galvanize target constituencies.  By issuing a false claim, a terrorist group can attract publicity, recruits, and resources to itself.  It may also mollify its own members who may question why another group is taking action while they are not.  In many cases, rival terrorist groups that share a common enemy, but have significant divisions between themselves, will compete for glory, as well as a finite amount of constituents, resources and recruits.  In this kind of environment, as was present during the Second Intifada, every attack that is

---

available at http://www.longwarjournal.org/archives/2010/05/the_pakistani_taliba_1.php (discussing numerous factions of the Pakistani Taliban).

20

credited to a particular terrorist group is usually a boon to that group and a loss to the others.

For this reason, multiple claims may be made for a single attack, or a group may claim responsibility when the available evidence indicates attribution should lie with another. Thus, that a terrorist group claimed responsibility for an attack is just the beginning of an analyst's review; it is never the conclusion.

The phenomenon of unreliable claims of responsibility by Palestinian terrorist groups is illustrated by the following published examples:[36]

- *December 28, 2007 attack at Wadi Telem:* Fatah's Al-Aqsa Martyrs Brigade, Hamas, and PIJ all claimed credit.[37] According to an Intelligence and Terrorism Information Center (ITIC) Bulletin, the Israel Security Agency and the IDF investigated the incident, and interrogation by the Palestinian General Intelligence Service of the two surviving terrorists who carried out the attack revealed that they were both Fatah operatives. According to this source, the Israel Security Agency concluded that the Hamas and PIJ claims were false, finding instead that Fatah perpetrated the attack.[38]

- *April 10, 2002 attack at Yagur Junction:* Israeli television quoted Al-Jazeera stating that the Qassam Brigades claimed responsibility for this attack[39] and that the attack was carried out in response to Operation

---

[36] For each of the examples in this and the following subsections, I note that I have not done any independent investigation or technical review as to who was the group or individual responsible for the relevant attack. Rather, I use these incidents, claims of responsibility for them and subsequent statements concerning those claims of responsibility in order to illustrate commonly accepted principles with regard to assessing the reliability of claims.

[37] Mark Lavie, "Israeli premier after 2 hikers killed: no peace until Palestinians rein in militants," *The Associated Press,* December 31, 2007.

[38] "Shooting attack near Hebron, December 28, 2007," *ITIC Bulletin,* January 3, 2008, http://www.terrorism-info.org.il/malam_multimedia/English/eng_n/pdf/ct_020108e.pdf; "News of the Israeli-Palestinian Confrontation December 15-31, 2007, *ITIC Bulletin,* http://www.terrorism-info.org.il/malam_multimedia/English/eng_n/html/t31dec_07e.htm.

[39] "Hamas Claims Responsibility for Haifa's Suicide Explosion," *Xinhua News Agency,* April 10, 2002; Ben Lynfield, "Eight die in suicide bomb attack on Haifa," *The Scotsman,* April 11, 2002.

Defensive Shield in the West Bank.[40]  An announcement on one of the websites attributed to Hamas also reportedly stated that an unidentified member of Hamas's military wing perpetrated the attack, stating: "'To Sharon and his ministers and generals, we have shown that there is no 'defensive shield.'"[41]  However, an ITIC report and special information bulletin states that an investigation determined that PIJ was responsible for the attack.[42]

- *May 19, 2002 attack at Netanya Market:*  Hamas and PFLP reportedly issued rival claims for this attack.[43]  According to an ITIC report, an investigation found, through interrogation of the perpetrator's escort to the attack site, that the attack was planned and perpetrated by PFLP operatives and that the perpetrators of the attack had been in continuous communications with PFLP detainees.[44]

2.    *Terrorist Groups At Times Deny Or Fail To Take Credit For Attacks They Commit*

---

[40] Margot Dudkevitch, "8 killed in Yagur bus bombing. Bus driver: Terrorist wore IDF fatigues," *Jerusalem Post*, April 11, 2002, p. 1; "Hamas Claims Responsibility for Haifa's Suicide Explosion," *Xinhua News Agency*, April 10, 2002.

[41] Jack Katzenell, "Suicide bombing shatters bus in northern Israel," *AP Worldstream*, April 9, 2002; Christine Spolar, "Sharon urges on troops," *Chicago Tribune,* April 11, 2002, available at http://articles.chicagotribune.com/2002-04-11/news/0204110327_1_jenin-refugee-camp-west-bank.

[42] "Suicide bombing terrorism during the current Israeli-Palestinian confrontation (September 2000-December 2005)," *ITIC Bulletin*, January 1, 2006, p. 188, available at http://www.terrorism-info.org.il/malam_multimedia/English/eng_n/pdf/suicide_terrorism_ae.pdf; "The Leading Palestinian Terrorist Organizations," *ITIC Special Information Bulletin*, August 2004, available at http://www.pmo.gov.il/NR/rdonlyres/81819B47-FE6C-47C2-B000-77B9A7EB9A5A/0/%D7%97%D7%95%D7%91%D7%A8%D7%AA%D7%9E%D7%97%D7%91%D7%9C%D7%99%D7%9D%D7%9E%D7%AA%D7%90%D7%91%D7%93%D7%99%D7%9D%D7%91%D7%9C%D7%99%D7%AA%D7%9E%D7%A0%D7%95%D7%AA1.doc.

[43] Naomi Segal, "Netanya bombing prompts skeptics to further question Arafat's motives," *Jewish Telegraphic Agency*, May 20, 2002, available at http://www.highbeam.com/doc/1P1-79389576.html; "2 killed, 58 wounded in Netanya Bombing," *United Press International*, May 19, 2002, available at http://www.highbeam.com/doc/1P1-53088163.html; "Hamas Claims Responsibility for Netanya Attack," *Xinhua News Agency*, May 19, 2002, available at http://www.highbeam.com/doc/1P2-13291083.html.

[44] "Suicide bombing terrorism during the current Israeli-Palestinian confrontation (September 2000-December 2005)," *ITIC Bulletin*, January 1, 2006, p. 178, available at http://www.terrorism-info.org.il/malam_multimedia/English/eng_n/pdf/suicide_terrorism_ae.pdf.

Despite the motivations discussed for claiming credit for a terrorist operation, at times there are countervailing motivations which cause terrorist groups to fail to make a claim, to withdraw a claim, or even to issue a denial. While denials are at times truthful, they may also be a façade erected by a group that no longer believes that being linked with a particular attack is in its own best interest. For example, the attack may have unforeseen adverse political consequences. A group that at the time of the attack wanted to send a message of menace may later be trying to negotiate with the same government it attacked, and no longer may wish to send that message. Alternatively, a false denial may be made or no claim is made at all because the attack is viewed as a failure or may anger the people to which the terrorist group is trying to appeal. Similarly, a denial by a responsible group may be due to conflicting agendas or rival leadership's claims within the responsible group, which is not uncommon due to the internal schisms frequently present within larger terrorist organizations. At times a group may be so fractured that one portion claims credit while another denies responsibility. For this reason, an analyst in assessing culpability for an attack can no more rule out a terrorist group that refuses to take credit, than he can assign responsibility based on the fact that a group claimed to be responsible for an attack.

The published views regarding responsibility for particular attacks during the Second Intifada indicate that denials of responsibility were common among the various Palestinian terrorist groups, including Hamas:

- *September 5, 1999 car bombings in Tiberias and Haifa:* Shaykh Hasan Yusuf, a Hamas leader, is reported to have initially denied any involvement in twin car bombing attacks. He also reportedly denied that Hamas was recruiting Israeli Arabs.[45] The attacks occurred the day after the signing of the Sharm agreement, a peace-for-land agreement between

---

[45] Ely Karmon, "Hamas's Terrrorism Strategy: Operational Limitations and Political Constraints," *Middle East Review of International affairs Journal*, Vol. 4, No. 1 (March 2004), available at http://meria.idc.ac.il/journal/2000/issue1/jv4n1a7.html.

23

Israeli and Palestinian leaders.[46] But Israeli security authorities were subsequently reported to have concluded that the perpetrators were part of an extremist northern branch of the Islamic Movement, and Hamas's denial was false.[47]

- *August 19, 2003 Bus 2 bombing:* PIJ and Hamas's military wing reportedly issued rival claims of responsibility, but Hamas political officials denied involvement, stating their commitment to the ceasefire.[48] Despite denials of responsibility by Hamas officials, an ITIC Bulletin subsequently reported that investigation into the attack determined that Hamas committed the attack.[49]

3.   *Claims Of Responsibility Have Been Made In the Name of Another Group*

Actors are at times motivated to issue a claim in the name of another group. The group issuing the claim may be the actual perpetrator, and simply wishes to either distance itself from its actions – as in the case of a group that wishes to maintain its political credentials while continuing its terrorist campaign, or wishes to engage in more extreme actions that its general constituency would likely not approve. In other instances, the group making the claim may believe it stands to gain by pointing the finger of suspicion at another group. In a third

---

[46] "5 Israeli Arabs Arrested in Car Bomb Blasts; Most of Minority Group Said to be Loyal Citizens," *The Washington Post*, September 7, 1999.

[47] Tal Nachman, "The Islamic Movement in Israel," *Strategic Assessment*, Vol. 2, No. 4 (February 2000).

[48] "18 killed, over 110 hurt in Jerusalem bus bomb," *Haaretz*, English edition, Aug 20 2003, available at www.haaretz.com/hasen/pages/ShArt.jhtml?itemNo=331242; Laura Sukhtian, "Suicide bomber blows himself up on Jerusalem bus, at least 18 dead," *The Associated Press*, August 20, 2003; Russell Wilson, "Israeli Peace Plan Stalls after Blast Kills 20," *Birmingham Post*, Aug 20 2003.

[49] "Suicide bombing terrorism during the current Israeli-Palestinian confrontation (September 2000-December 2005)," *ITIC Bulletin*, January 1, 2006, pp. 99-100, available at http://www.terrorism-info.org.il/malam_multimedia/English/eng_n/pdf/suicide_terrorism_ae.pdf; "Jerusalem as a preferred target for Palestinian terrorism during the five years of violent confrontation," *ITIC Bulletin*, November 8, 2005; "Suicide bombing of No. 2 Egged bus in Jerusalem," *Israel Ministry of Foreign Affairs*, August 19, 2003, available at http://www.mfa.gov.il/MFA/MFAArchive/2000_2009/2003/8/Suicide+bombing+of+No+2+Egged+bus+in+Jerusalem+-+1.htm.

scenario, ordinary criminals attempt to disguise their crimes as terrorist attacks to draw suspicion away from themselves by claiming that the crime was really committed by a known terrorist group.

> 4.    *Terrorist Groups Often Issue Rival or Joint Claims, Creating Uncertainty As To Which Group An Actor Is Affiliated With and What the Claim of Responsibility Actually Means*

Another scenario that undermines the ability to place reliance on claims of responsibility is the proliferation of attacks for which multiple claims of responsibility are issued by rival groups.  Absent a joint action, the rival claimants issue competing claims of which, at a minimum, all but one is false.  These claims, even if false, are typically made in such a way as to try to convey authenticity.

A combination of multiple individuals seeking support to carry out terrorist attacks and porous boundaries between groups makes it possible for a single individual to have been in contact with more than one group. These circumstances provide ample recruits but it can lead to disputes over which group, if any, an individual belonged to.

This free migration of individual actors looking for available groups to help them accomplish their terrorist goals often can lead to contradictory claims of responsibility.  In these cases, due to the individual having spent some time with multiple groups, each claiming group, motivated to claim a successful attack for their cause, may have materials, information, and connections that it can brandish to lend credence to the claim.

Joint operations or less formal collaboration raise another analytical problem in assessing claims of responsibility, especially in the context of financing terrorism.  What does a claim of responsibility mean exactly?  Does it

mean that the group claiming responsibility for an attack ordered, directed, financed, and assisted the act, recruited, indoctrinated, and trained the attacker? In a joint operation, how do we know who did what?  A claim of responsibility may not exclude the possibility that other groups, or militants from other groups, participated or contributed to the effort.  If so, then such a claim of responsibility, even if true, means only that the claiming group was in its own view in some way involved with or contributed to the particular act – the loose standard advanced by Kohlmann.[50]  This may not even mean funding, planning or even any direct involvement in the attack in question.  This complexity is heightened by the fact that at times joint actors issue individual claims, and at times groups that have competing claims will allow the impression of joint action where it is politically expedient.[51]

5.    *Flaws in the Information Flow Between the Military Cells and a Group's Propaganda Arm Can Create False Claims*

In a tiny terrorist gang, terrorists would plant a bomb; after it detonated one of them would call the news media to claim responsibility.  In a large, complex enterprise, operations and claims would be separate functions, handled by separate elements within the organization.  For reasons of operational security, those in charge of propaganda would not likely have advance knowledge of an attack.  They would be notified after to make a claim.  This would sometimes result in delays.  According to Kohlmann's report, it is stated that Hamas admitted that it had to first check (presumably with field

---

[50] Kohlmann Report, p.45.

[51] In the early stages of the Second Intifada, "some fourteen factions banded together to form a loose collective leadership, the National and Islamic Higher Committee for the Follow-Up of the Intifada (NIHC), with Hamas and Fatah dominating."  This was not just a policy forum, but formed the basis for operational collaboration.  As Khalad Hroub reports, "It was around this forum that the idea originated of cooperation between the al-Qassam Brigades, Hamas's military wing, and the al-Aqsa Martyrs Brigade (AMB), a new force made up of Fatah elements apparently acting semi-independently of the PA and the Fatah leadership."  Khaled Hroub, "Hamas after Shaykh Yasin and Rontisi," Journal of Palestine Studies, Vol. 33, No. 4 (Summer 2004), p.25.  Levitt, in his book on Hamas, describes the Popular Resistance Committee, comprising "radicals Palestinians from Hamas, Islamic Jihad, Fatah, and the various Palestinian security services."  According to Levitt, in the spring and summer of 2005, the PRC served as "Hamas' forward operational arm."  Levitt, *op.cit.,* p. 222.

commanders) in order to confirm who had actually carried out the attack.[52]  (This would not explain delays of weeks, months, or even years.)  Loss of contact with operating units, failed attempts, competing claims, disputes over claims, unclaimed events, and denials, every one of which is mentioned by the plaintiffs' expert witnesses, could all be due to this imperfect process.  This would hardly be surprising given geographically-divided leadership, differences over strategy, the compartmentalization required by clandestinity, the existence of autonomous elements and rogue cells described by Levitt, joint operations, and the movement of individuals from the orbit of one group to another, described by Shaked.[53]

## HOW SHOULD CLAIMS BE ASSESSED?

Evidence that a group has made a claim is evidence that it made a claim. A rigorous analysis of a terrorist claim of responsibility would demand much more.

In my experience, there are clear principles of analysis that analysts must follow for their assessment of responsibility to be credited. These are what a technical review aims to ensure are respected.

The methods of communication vary from group to group and have evolved over time as new modes of communication have become available, notably the Internet.  Circumstances also vary.  In countries where only one group is active, claiming responsibility for terrorist attacks may be less important although a group may still want to explain its actions.  Claims are more important where several groups vie for attention and support, as was the case during the Second Intifada.  Some groups have a separate well-developed communications arm, the communications of others are less advanced.  Each group has its own modus operandi, preferred outlets, styles of speech.

[52] Kohlmann Report, p. 43.
[53]  See discussion *infra* at 35-42.

27

This makes the assessment of claims a matter of experienced or expert judgment.  This is not to say that it should not still be analytically rigorous, although in some cases, opinions may differ.  In all cases, the approach must be systematic and meet high standards.

An expert analyst assessing claims of responsibility for terrorist acts accepts no claims at face value.  Instead the analyst will begin with a number of immediate questions:

- How soon after the claimed act was the claim made?  – A claim that is made after an extended period following an event must be discounted, barring a convincing explanation for the delay.
- Does the claimant have motivations to make a false claim? – If so, there is more reason to discount a claim in the mix of information.
- Does a non-claimant have motivation to not claim credit, even if evidence indicates it may be involved? – If so, there is more reason to discount a denial of responsibility, or to necessarily accept the proffered claim by another group.
- Is the claim made by a known group? – If so, does the claim comport with its pattern of claims, and does the act fit with its presumed capabilities?
- Is the claim plausible?
- Are there rival claims? – If so, neither should be taken at face value.
- Does the event fit what is known about the claimant's operational capabilities and modus operandi? – If not, barring additional evidence supporting a change, the value of the claim will be discounted.
- Does the claim come through a reliable route that has been used before? – If so, it may lend greater credence that the claim came from the group purporting to make the claim.
- What tangible evidence supports the claim? – A claim itself is never enough.

28

- Is there specific intelligence linking the group to the act?  And is there contrary information? – As a claim itself is never sufficient, it is the other intelligence that will lend credence or call into question the claim.

- Is the substance of the claim accurate in the details it conveys? Is the claim accurate in its account of the attack? – The more accurate a claim is, the more credence it will be paid.

- Does the claim contain details of the event that would be known only to the perpetrator, or does it offer only general information that would be available to others? – The more unique accurate information contained in a claim, the greater credence an analyst will give to a claim.

- Is the quality of the language similar to that in past claims by the same group? – This will help establish the identity of the claimant, but not the veracity of its statement.

- Does the form and content of the claim fit with the claimant's known pattern? – This will help establish the identity of the claimant, but not the veracity of its statement.

- What is known about the internal dynamics of the group?  Are there divisions and factions, and how might these affect the validity of any claim? – The more there are divisions and factions within a group, the more difficult it is to attribute responsibility to that group.

- What is the record of the claimants?  Have they stretched beyond their operational involvement to claim responsibility for attacks for which they had little or no responsibility?  Have they made false claims? – If so, a claim believed to be issued by that claimant will be treated as potentially suspect.

- Are there other groups in the field? Are there rival claims?  Have the claimants engaged in joint operations with other groups so that, in fact, two or more groups may actually be involved?  – If so, attributing responsibility based on a claim becomes less reliable.

- Has the group been the target of false claims, *i.e.,* blamed for things it did not do? – This may cause a claim to be placed under suspicion.

- Are there plausible explanations to explain any divergences from what would be expected?

On the basis of the answers to these questions, and others which will occur in the course of the inquiry, the analyst will weigh the information available to him (including what information is missing) and form an opinion about the claim.

**HAMAS CLAIMS**

Claimants may offer proofs of varying quality that the analyst also must weigh. Hamas created an elaborate set of procedures in an attempt to exploit the propaganda value of its attacks and support its claims of responsibility. These claims were often accompanied by videotaped testaments and photographs of the alleged perpetrators, elaborate funeral processions that gave Hamas an opportunity to display its power, records of glory to memorialize the attackers' place in the history of the Palestinian resistance movement, posters, and public statements.

Plaintiffs' expert reports argue that those who actually issued the claims of responsibility for Hamas undertook those claims as important and serious tasks to be performed with care. I agree. The elaborate production by Hamas's own propaganda arm indicates the high priority the movement gives to publicizing its claims. The production also assists the analysis in that it sets a standard for assessing Hamas's claims. Hamas's communications in effect tell us, these are the proofs we believe should be presented. When these are lacking, the analyst must question why they are lacking as well as the validity of a claim.

A responsible analyst would need to weigh the following considerations, among others, when evaluating the types of evidence relied upon by Kohlmann and Shaked:

- *Claims of Responsibility.*  As discussed above, a claim, denial, or lack of either should be considered in assessing culpability for an attack. However, for the reasons detailed above, it is nothing more than an indicator, and cannot be the sole basis for attributing responsibility.

- *Level of Detail Included in a Claim.*  Generally, the more unique detail that only the perpetrator could know that is included, the stronger support there is for crediting that claim.  The presence of such information does not confirm accuracy of a claim, however, as a group may be in possession of information without having been involved in a specific attack – particularly given the free movement of actors during the period in question.  Given the availability of information and speed with which it is disseminated, the longer the delay in including this information, the less weight such evidence is generally given.  Further, where a claim only contains information that could be known from public sources, or is unverifiable, an analyst should look at such a claim with skepticism.

- *Pre-Attack Evidence.*  Generally, evidence that existed prior to an attack is considered more compelling than post-attack evidence, as post-attack evidence is viewed as easier to fabricate.  Pre-attack evidence may include photos or video statements.  Such evidence, while superficially impressive, is by no means determinative.  Photos must be examined to determine if they have been doctored.  In any event, groups may be able to present photo evidence that would seem to support their claim, regardless of their involvement in the attack.  A large movement like Hamas, with some measure of control over certain territory and its residents, may have stocks of photos of young men in appropriate costume.  Furthermore, given the transient nature and shifting allegiances of some members, a would-be bomber may pose in the garb and

31

accoutrements of one group, but later commit an attack for another.[54] Similarly, while video wills may be important evidence to be considered they are not fail-safe. The weight given should be influenced by their content – are they close in time to the attack and convey details only the perpetrator would know, or are they of a more general nature, leaving open the possibility that they were not created specifically for this attack? Similarly, it is possible that an attacker may have been tasked, trained or funded by one group, but be willing to appear in a video indicating support or camaraderie with another.

- *Biographical Material.* The inclusion of biographical material about the attacker is not necessarily proof of responsibility, especially when the claim is made well after the attack. Biographical material can easily be assembled after an attack.

- *Posthumous Evidence.* Generally, evidence that is created after the attack in question is given lesser weight. This is generally because it is easier to fabricate or for an interested group to "adopt" an attack they wish to claim as their own for their own motives. Terrorist groups, especially those in the Middle East, often exalt terrorists who are killed by the authorities or who kill themselves in suicide attacks, labeling them heroes and martyrs, recalling them in the signature blocks of communiqués and naming military formations after them. Their death is meant to inspire others to avenge their deaths or emulate their sacrifice. Arab streets are filled with huge photos and posters of victims and heroes. This kind of posthumous adulation is ritualistic and formulaic, and absent other corroborating evidence has little independent value as evidence of responsibility. Funerals similarly, by themselves, are not evidence of responsibility. There are powerful incentives for families of suicide terrorists to go along with Hamas-arranged funerals and other posthumous propaganda exercises. Cooperation brings both social and

---

[54] This is anything but a hypothetical: as discussed further herein, one of the cases discussed in Kohlmann's and Shaked's reports, involving the January 29, 2004 Bus No. 19 bombing, may have involved precisely this scenario. See *infra* at 35-42.

economic rewards. A family of a "martyr" may receive a cash payment of several thousand dollars, and its social status will be elevated.[55]

- *Statements made by Israeli government or military sources.* The weight to be given to such documents is based largely on their content, the timing of the statements and the views and biases of the authors. While these statements may reflect the findings of a considered evaluation, they may just as likely reflect a preliminary review, a recitation of the known claimants or facts at the time, or the information the speaker wishes disseminated at that point in time. To the extent these statements are issued soon after an attack, indicating a lack of time for considered analysis, they typically should be discounted accordingly. In addition, the government or military of a victim nation, here Israel, may have strong motivations to accept the claims of a particular group. Just as terrorist groups are motivated to claim or deny credit for what they may or may not have done, the entity that is attacked has its own motivations. Where the party that is attacked stands to gain from an attack being presumed to be committed by a particular claimant, it has no reason to dispute the claim, even if a thorough analysis of the evidence may prove inconclusive, or even suggest an alternative actor.

The examples set forth above focus only on the types of evidence that Shaked and Kohlmann cite when they are evaluating the reliability of a Hamas claim. They do not, of course, represent the universe of considerations or potential evidence that an analyst must weigh in such an evaluation. Rather, an analyst must also consider, among many others, the questions listed in the preceding section in their entirety to assess the quality of the claims. In analyzing Hamas claims, an analyst must assess all of the evidence and then render an opinion as to their veracity. Where there is conflicting or absent information, this should be

---

[55] Assaf Moghadam, "Palestinian Suicide Terrorism in the Second Intifada: Motivations and Organizational Aspects," *Studies in Conflict and Terrorism* No. 26 (2003), p.72.

33

examined, discussed, and if discarded from the conclusion, the reasons should be stated for choosing one interpretation over another.

## KOHLMANN'S AND SHAKED'S ANALYSIS OF THE ATTACKS IN QUESTION

Before reviewing the individual conclusions reached by Kohlmann and Shaked, let me summarize and underscore some key observations:[56]

- As a political movement in a crowded field, Hamas, like the other Palestinian groups, had a powerful incentive to make claims. It felt itself under strong pressure from below. It had to hold the allegiance of its constituents. The Palestinian street demanded action. Although various Palestinian factions cooperated at times, Hamas was in competition with other Palestinian factions. Hamas wanted to attract other action-prone militants. Hamas had to signal continued strength and operational capability in the face of determined Israeli efforts to destroy it.[56]

- Hamas has not always been reliable in its claims. Contrary to statements in Kohlmann's and Shaked's reports, Hamas has made claims that authorities (that Kohlmann and Shaked in other respects credit) appear to have determined were false. *See* discussion *supra* at 20-22.

- Contrary to statements in Kohlmann's and Shaked's reports, Hamas has issued denials of responsibility. *See* discussion *supra* at 22-24.

- Overall, Kohlmann's and Shaked's reports fail to take into account the complexity of the situation during the Second Intifada and the fluidity of membership among the factions of the Palestinian resistance movement. Instead, they portray Hamas as a highly cohesive organization, speaking with one voice.

- Contrary to Kohlmann's stated assumption, repetition of a claim by a group is no greater indication of its veracity.

---

[56] See, e.g., Gunning (2009), *op cit.* at 50 (noting that during the Second Intifada, when popular opinion had shifted in favor of suicide operations, "suicide operations had become a measure of political influence, and factions began to compete with each other in carrying out operations").

34

- Reports indicate that there was operational cooperation among Hamas and PIJ and Fatah and the Palestinian Authority security services.  This cooperation appears to have extended beyond joint operations.  According to IDF sources, the PA provided PIJ and Hamas with intelligence and weapons.[57]   Hamas and PIJ also had close ties to Hezbollah, which according to Shaked's report, provided financial support to the cell that carried out the January 29, 2003 roadside shooting.[58]  Both Kohlmann and Shaked ignore the significance of these cooperative arrangements, although Shaked mentions some of them.  In fact, such cooperative efforts dilute the significance of Hamas's claims of sole responsibility.

Kohlmann's and Shaked's accounts of the January 29, 2004 suicide bombing illustrate a number of these issues.  According to Shaked's report, the perpetrator, Ali Muneer Ja'ara, had told a friend who was a member of the al-Qassam Brigades that he wanted to carry out a suicide bombing.  The friend brought in another Hamas operative and the two of them assembled an explosive belt for Ja'ara to use in the attack.  They photographed him standing next to a Hamas poster and holding a plastic rifle and they videotaped his last testament. They then drove him to the intended location but encountered Palestinian security forces.  Fearing that the security forces would prevent the attack they turned back.[59]

Next, according to Shaked's report, a short while after the failed attempt, Ja'ara then contacted an operative in the al-Aqsa Brigades, requesting assistance to carry out a suicide attack.  Operatives from al-Aqsa manufactured a new explosive device for Ja'ara, then drove him to the location where he

---

[57] Assaf Moghadam, "Suicide Bombings in the Israeli-Palestinian Conflict: A Conceptual Framework." Tufts University Fletcher School of Law and Diplomacy, May 2002, p.63, citing "Documents Captured by the IDF in Jenin," Israel Defense Forces (IDF) website, April 15, 2002, http://www.idf.il/.
[58] Shaked Report, p.61.
[59] Shaked Report, p.135.

successfully carried out his suicide mission.[60]  Shaked further acknowledged in his deposition testimony in the Credit Lyonnais matters that Hamas was not involved in what Shaked terms the last stages of the attack, but that the al-Aqsa Brigades manufactured the bomb used in the attack and drove Ja'ara to the attack site, and that he saw no evidence that Hamas funded the attack.[61]

According to Shaked, Al-Aqsa promptly claimed responsibility for the attack, but then Hamas also claimed that "they were the sole entity which was responsible" for the same attack, criticizing the al-Aqsa Martyrs Brigades for their "hasty" claim.[62]   The Hamas claim was supported by its usual panoply of propaganda, including photos of Ja'ara in costume, his last testament, his biography, multiple mentions on its websites, posters, and mention in Hamas's Book of Martyrs.

Shaked also cites legal documents indicating that the Hamas operative in charge of Ja'ara's first failed attempt was arrested in September 2004 and convicted of involvement in the terrorist attack along with another Hamas operative.  The two Hamas operatives received sentences of 21 years and 5 years respectively.  The court, according to Shaked's report, also convicted three al-Aqsa Martyrs Brigades members for their role in the attack.  Shaked states that those he identified as the three al-Aqsa Martyrs Brigades members received 21 life sentences plus 15 years, 21 life sentences plus 10 years, and 12 life sentences, respectively.[63]   I further note after reading Shaked's deposition testimony that, based on records that were shown to him, it appears that (contrary to the statements in Shaked's report) the Hamas operatives were <u>not</u> convicted of involvement in the Bus No. 19 bombing, whereas each of the al-

---

[60] *Ibid.,* pp.138.
[61] Shaked Dep. 182:19–183:16, 202:4-9 (Nov. 4, 2010).
[62] Kohlmann Report, p.43; Shaked Report, p.128-129.
[63] Shaked Report, pp. 133-135.  Despite the conviction of operatives from both organizations, Shaked concludes that "although… Hamas and Fatah both bear responsibility for the terrorist attack … ," he does "not conclude that it is possible to characterize this terrorist attack as a 'joint attack.'"  *Ibid.* p. 138.  Based upon the evidence he submits, this conclusion appears to be well-founded: there did not appear to be collaboration or coordination between the two organizations.

Aqsa Martyrs Brigades members were convicted of intentionally causing the deaths of the victims of Bus No. 19.[64]

Both Shaked and Kohlmann conclude, however, that Hamas and not the al-Aqsa Martyrs Brigades was responsible.  Kohlmann (who mentions no details regarding the al-Aqsa Martyrs Brigades' participation in the attack) credits Hamas, relying solely upon the claim issued by Hamas and the "wealth of material" related to Ja'ara on the website, including his last will and testament and an "in-depth biography" in which Hamas stated that a Fatah spokesperson had withdrawn its claim and apologized for taking credit.[65]  Shaked, although he details the al-Aqsa Martyrs Brigades' participation, nonetheless credits Hamas on the basis of its claim: "The many detailed declarations which were issued by Hamas with regard to the terrorist attack on the No. 19 bus, the boasting about the suicide bomber within the organization, and the repeated public declarations in which Hamas expressed its pride in the performance of the terrorist attack on the No. 19 bus and other attacks – all of these confirm that Hamas carried out the terrorist attack."[66]  Shaked goes on to say, "Even if the preparations were shared, it seems that Hamas was the dominant entity in the last stages of the operation."[67]

Shaked's and Kohlmann's conclusions fly in the face of evidence provided by Shaked himself and rely on numerous methodological flaws:

- Based on the accounts, Ja'ara, the apparent driving force behind the attack, appears to have been unaffiliated with Hamas or the al-Aqsa Martyrs Brigades prior to seeking aid, and certainly does not appear to have acted on the direction of Hamas.

---

[64] Shaked Dep. at 186:15-202:3 (Nov. 4, 2010).
[65] Kohlmann Report, p. 43.
[66] Shaked Report, p. 139.
[67] *Ibid.*

- Although Hamas was part of the failed first operation, the al-Aqsa Martyrs Brigades appear to have been dominant in all aspects of the second successful attack.   Kohlmann ignores this evidence entirely, whereas Shaked argues (with no support) that Hamas was the "dominant entity in the last stages" of the operation.   When he was asked about this same statement in his Credit Lyonnais report at his deposition in that matter, Shaked appears to have retreated from this position, saying that in the "last stages" of the attack "Hamas was not involved" but only that it was involved in recruiting and preparing the bomber.[68]   In my analysis, even if it were true that Hamas recruited Ja'ara – which is contradicted by Shaked's own statement that Ja'ara first wanted to commit a terrorist attack and approached Hamas – and prepared him for an earlier failed operation, that would clearly not support any conclusion that Hamas was the "dominant entity in the last stages" of the operation.

- Based on the facts presented by Shaked, Ja'ara first went to Hamas but the Hamas operation failed.   The bomber then went to the al-Aqsa Martyrs Brigades.   They procured the explosives used, provided a new bomb, delivered the bomber to the target, and the operation succeeded.   Weighing the comparative role of each and taking Shaked's point that this was not a joint operation, an objective analyst would have to conclude that the al-Aqsa Martyrs Brigades appears to have been the group responsible for working with Ja'ara in carrying out the successful terrorist attack.

- Shaked cites a Prime Minister's Office statement declaring that the bomber was a member of the al-Aqsa Martyrs Brigades and a Foreign Ministry article attributing this attack to both the the al-Aqsa Martyrs

---

[68] Shaked Dep. Tr. 182:19-183:2 (Nov. 4, 2010).

Brigades and Hamas.[69] Shaked, yet, with a "very high degree of probability," credits Hamas.[70]

- I have read portions of the March 3, 2011 rebuttal report of Moshe Azoulay in which he reviews some of the sources related to the Bus No. 19 attack that are cited by Kohlmann, Shaked and plaintiffs' expert Shaul Naim, reviews some additional sources concerning this attack that are in the public domain and also recounts his own examination of official records of those who were prosecuted.[71]  According to Azoulay, the documents he has examined, including the court records related to the individuals mentioned in Shaked's report, are inconsistent with the conclusion that Hamas was responsible for the Bus No. 19 attack (and even with any conclusion that that both Hamas and the al-Aqsa Martyrs Brigades were responsible).  Rather, these documents indicate that the individuals Shaked identifies as Hamas members were *not* "convicted of involvement" in the Bus No. 19 attack (as Shaked says), but rather were convicted of involvement only in the earlier *failed* attempt with Ja'ara.  On the other hand, according to the court records examined by Azoulay, it was the al-Aqsa Martyrs Brigades members that actually took the initiative, procured the explosives, prepared the bomb, and lead Ja'ara to the site of the attack.  As Azoulay notes, had the court believed that the initial Hamas handlers were responsible for the lethal attack on January 29, 2004, or that the attack was to be part of a continuing operation, they also would have received multiple life sentences, as the al-Aqsa Martyrs Brigades members did.  Thus, the very evidence that Shaked relies upon (the Israeli convictions) appears to undermine his conclusion.

- Shaked and Kohlmann rely inordinately heavily on Hamas's claim of responsibility and its use of photos, video wills, and biographical information, as well as Fatah's purported withdrawal of its claim.

---

[69] Shaked Report p. 133 nn. 430, 431.
[70] *Ibid.* pp. 16, 128-139.
[71] See generally Azoulay March 3, 2011 Report Sections D-E.

Kohlmann ignores (or is unaware of) all other evidence and addresses *only* Hamas's claim.  Shaked acknowledges the evidence of the al-Aqsa Martyrs Brigades' participation, but then dismisses it precisely *because* Hamas made the claim and because, he assumes, the "Fatah leadership did not approve" of the attack.[72]  In other words, Shaked and Kohlmann simply discount the more reliable evidence that fails to support their ultimate conclusion (evidence related to the attack) and give added weight to the much less reliable evidence (claims of responsibility).  This is a cardinal sin in intelligence analysis.

- Indeed, even if relying solely on claims of responsibility were an acceptable methodology, it appears that Kohlmann and Shaked have not performed their own analysis carefully or thoroughly, insofar as they have not done any investigation of the rival claims by the al-Aqsa Martyrs Brigades.  At their depositions, both Shaked and Kohlmann confirmed that in discussing the claim by the al-Aqsa Martyrs Brigades and the purported withdrawal of that claim by Fatah, they were relying solely upon what <u>Hamas</u> said on its website, and not upon any statements of Fatah or the al-Aqsa Martyrs Brigades that they themselves had examined or had even looked for.[73]  Further, Kohlmann was presented at his deposition with a statement from an al-Aqsa Martyrs Brigades' website in which the group apparently did make a claim of responsibility for this attack nearly a year later (which is also cited in Azoulay's March 3 report), which Kohlmann confirmed he did not find when he searched his database subsequent to reviewing my initial report.[74]  I note however that neither Shaked nor Kohlmann has changed his report on the January 29, 2004 attack whatsoever to account for this other evidence.  Indeed, as Azoulay notes, Shaked *still* states (with no support) that the al Aqsa Martyrs

---

[72] Shaked Rep. p. 139.  Whether Fatah leadership approves of an attack after the fact should have little to no bearing on a determination of responsibility.

[73] Shaked Dep. at 157:17-158:17 (Nov. 4, 2010); Kohlmann Dep. at 388:11-392:18 (Dec. 3, 2010).

[74] Kohlmann Dep. at 392:19-395:15 (Dec. 3, 2010).

40

Brigades has "never repeated" the claim of responsibility for the attack on its website, a statement which appears to be flatly contradicted by this one-year anniversary claim.[75]

- The January 29, 2004 attack also raises a broader issue of the credibility of claims (or denials) in general, which Shaked himself points to: "In a number of cases, a pattern appeared in which a Hamas operative could recruit and help to train a terrorist, who eventually carried out the terrorist attack on behalf of another organization (although both Hamas and the other organization assumed responsibility for the terrorist attack). In fact, other organizations which sought to avoid conflict with Hamas gave a greater portion of the responsibility and credit to Hamas."[76] This statement raises obvious doubts about the credibility of groups that claim or deny responsibility in general, and about the relevance of evidence the claiming party will use (such as photographs, video wills, biographical information) to support its claim. Hamas and other groups may claim responsibility and provide "evidence" in support of their claims even when (as appears true in this case) they were only involved with the would-be bomber at some earlier stage and did not participate in the relevant attacks. Further, as Shaked notes, other groups (here, Fatah and/or the al-Aqsa Martyrs Brigades) may deny responsibility or withdraw a claim if they wish to avoid conflict with another group (though there is evidence suggesting that, in fact, Fatah and/or the al-Aqsa Martyrs Brigades did not withdraw their claim).

- Azoulay's March 3 report also examines other documents that further call into question Shaked's and Kohlmann's conclusions and their reliance upon the "evidence" submitted by Hamas in support of its claims. For instance, Azoulay examines the "will" of Ja'ara put forth by the al-Qassam Brigades (cited in Kohlmann's report), which according

---

[75] Shaked Report p. 128; Azoulay March 1 Report p. 124.
[76] Shaked Report p.136.

41

to Azoulay, appears to be simply a form will in which someone has inserted Ja'ara's name in a different color and handwriting (this obviously raises questions about the validity of wills offered by Hamas as evidence to support its claims). Azoulay has also examined an "alternate" will of Ja'ara that appears on Ja'ara's uncle's website, in which it is claimed that the attack was committed in the name of the al-Aqsa Martyrs Brigades. Azouuly also notes that one of the Hamas claims of responsibility for the Bus No. 19 attack states that the attack was committed in response to an Israeli operation in Al-Zaytoun – but this incident occurred two weeks after Ja'ara's apparent involvement with Hamas ended, a fact that clearly casts doubt upon the role that Hamas claims to have played in the attack.[77]

- The evidence Shaked and Kohlmann point to – photos, video testaments, biographical information, mentions on websites, posters, mentions in Hamas's Book of Martyrs – as proof of what is clearly an unsupported conclusion raises significant questions about Shaked's and Kohlmann's reliance on the same types of evidence to support their conclusions regarding the other attacks. Further, the fact that it does not appear that this caused them to view this type of evidence with greater scrutiny further calls into question their methodology.

**REVIEW OF KOHLMANN REPORT**

Kohlmann recognizes that propaganda is important to terrorist movements, and therefore that communications represent an important part of terrorist tactics.[78] He correctly points out that the Internet has become an important component of terrorist communications, and he makes a good case that Hamas communicates through a number of websites it controls.

---

[77] See Azoulay March 3 Report p. 122-124.
[78] See generally Kohlmann Report, pp. 9-10.

42

At the same time, there are some problems in his analysis, and thus in his conclusion that the claims on these websites represent "authentic claims of responsibility."  Most notably:

- Kohlmann's report accepts the claims themselves as proof of Hamas's responsibility for an attack.  Responsibility for a claim and responsibility for an attack, in fact, are two different things.  A claim of responsibility does not by itself prove responsibility for the claimed attack.  No accepted methodology for analyzing culpability for a terrorist attack would credit a claim of responsibility by itself as reliable proof of responsibility.

- Kohlmann also confirmed in his Credit Lyonnais deposition that in other settings outside of these lawsuits where he purportedly evaluated responsibility for an attack, he would look at other evidence besides claims of responsibility.[79]  But Kohlmann stated that he did not try to determine exactly what role Hamas played in any of the attacks in question here because he was not asked to do so by plaintiffs.[80] Kohlmann thus appears to be ignoring his own usual methodology in determining the reliability of statements by terrorists simply because plaintiffs told him to.  Despite this, Kohlmann, in his report reviewed here (which he did not change after my earlier rebuttal or his deposition), states definitively that Hamas was culpable for these attacks because they claimed responsibility.

- Kohlmann's report also posits that the more occasions on which Hamas claims responsibility for an individual operation, the more likely it is that the claim is legitimate.[81]  There is no accepted methodological basis for this position; it fails a critical review.  Repetition is not confirmation.

---

[79] Kohlmann Dep. 200:24-203:19 (Dec. 2, 2010).
[80] For examples of such testimony, see Kohlmann Dep. 203:5-206:23 (Dec. 2, 2010); Kohlmann Dep. 402:10–404:7, 405:7-406:23 (Dec. 3, 2010).
[81] See Kohlmann Report, p. 8.

43

- Kohlmann's report does not dismiss any Hamas claim as not credible or dubious, yet it indicates no analysis performed to reach this determination. Instead the review appears to have been focused on whether a website is an authentic Hamas outlet, and if so, he accepts what is stated as true. The report ignores evidence that might lead to an alternate conclusion.

- Kohlmann's report also appears to be based on the unsupported premise that Hamas claims of responsibility are true simply because Hamas made the claims on the internet,[82] and because Kohlmann believes it would be detrimental to Hamas's image as an "honest" broker with Israel if it falsely claimed responsibility and was "called out."[83]   Kohlmann did not base this speculative theory on the results of any study, did not verify the facts that Hamas narrates on its websites, and did not determine "in any statistical way" whether or how often Hamas tells the truth.[84]  It is methodologically unsound for Kohlmann to rely upon a general notion of Hamas's credibility with no support whatsoever for that assertion.   In fact, Kohlmann was confronted at his deposition with instances where senior members of Hamas either falsely claimed or falsely denied responsibility for an attack.[85] This in and of itself shows that it is improper for Kohlmann to rely upon Hamas claims as credible.

- While Kohlmann acknowledges competing claims, he dismisses them based on Hamas's offer of an explanation but without any offered analysis showing why he accepts that explanation.   Such analysis is methodologically flawed.

---

[82] Kohlmann Dep. 191:19-193:21, 215:16-216:12 (Dec. 2, 2010); Kohlmann Dep. 438:25-440:11 (Dec. 3, 2010).
[83] Kohlmann Dep. 180:23-184:13 (Dec. 2, 2010).
[84] Kohlmann Dep. 438:25–442:3 (Dec. 3, 2010); Kohlmann Dep. 178:25–179:25 (Dec. 2, 2010).
[85] Kohlmann Dep. 334:9-337:15, 360:16-366:21 (Dec. 3, 2010).

44

- Kohlmann's report does not explain or discount claims that lack components that are present in other claims.  It does not acknowledge differences within Hamas that led to internal disputes about claims, for instance (in the case of the August 2003 attack, discussed above) a near simultaneous claim and denial of responsibility by different components of Hamas.

- Kohlmann's report includes a significant hedge at the end.  In crediting Hamas with responsibility on the basis of its published claims, Kohlmann states that these texts and media are used "in connection with acknowledging Hamas's *involvement and/or contribution to particular acts.*"[86]   [Italics added]   This formulation seems to expand the term "responsibility" to include "involvement" or "contribution to," which are much looser connections.    Does "involvement" (and, therefore, "responsibility") mean virtually any connectivity?   Does "contribution to" include exaltation of the attacker after the attack?   If so, then, in Kohlmann's lexicon, Hamas's published claim and post-attack propaganda would count as "involvement" and "contribution to" and therefore, according to the testimony, as "responsibility," regardless of the veracity of the claim.

- Kohlmann states that "neither Hamas nor any of its sub-branches (such as the Ezzedeen al-Qassam Brigades) has ever issued any rejection or credible denial of its culpability" for the attacks at issue.[87]   To the extent that Kohlmann relies on this fact as a basis upon which to find that it committed the attacks, he fails to acknowledge that, as described above, there are many instances in which groups during this period were incentivized to make a claim regardless of whether they committed the

---

[86] Kohlmann Report, p. 45.
[87] *Ibid.*

45

attack.[88]   And there have been occasions, as described above, when Hamas officials have denied responsibility.

- Kohlmann states in his report that his conclusion is that the Hamas claims of responsibility he has reviewed "demonstrate its culpability in the execution of particular terrorist attacks" (emphasis mine), including the attacks in question in this case.[89]   Yet, at his deposition, Kohlmann articulated the proof offered by Hamas claims quite differently – that the evidence he reviewed from Hamas websites "indicates that more likely than not Hamas is culpable in some way for the 15 attacks that are listed here."[90]   When pressed as to whether he was in fact opining that the attacks were "perpetrated by Hamas", Kohlmann could not even answer yes or no, and even stated that his answer was "half yes, half no."[91]   This is a significant hedge that appears to make Kohlmann's opinion significantly less definitive and more ambiguous as to Hamas responsibility for the attacks than it appears to be in his report.  However he formulates his opinion, Kohlmann appears to accept Hamas's claim of responsibility as the truth because Hamas actually made the claim.[92]   Thus, my critiques herein apply to both his opinion in his report that Hamas claims "demonstrate its culpability" in the attacks and to the statements in his deposition that the Hamas claims "indicate[] that more likely than not Hamas is culpable in some way" for the attacks.

- Kohlmann's report indicates that he maintains one of the "largest digital collections of terrorist multimedia and propaganda in the world"[93] and that in preparing his report he reviewed his own stored archive of Hamas

---

[88] In addition, Kohlmann notes that Hamas made no "credible" denial, yet his report is devoid of any analysis as to how he made any determination as to what factors would make a denial "credible" or not.
[89] Kohlmann Report, p. 9.
[90] Kohlmann Dep. 78:4-78:11 (Dec. 2, 2010).
[91] Kohlmann Dep. 79:12-80:2 (Dec. 2, 2010).
[92] Kohlmann Dep. 191:19-193:21, 215:16-216:12 (Dec. 2, 2010); Kohlmann Dep. 438:25-440:11 (Dec. 3, 2010).
[93] Kohlmann Report, p. 3.

websites and relevant propaganda materials.[94]   At his deposition, Kohlmann testified that he relied on his proprietary database of online information produced by terrorist organizations by running searches through the database for information relevant to the attacks in question.[95] To the extent that Kohlmann relied on this database to support his opinion regarding the credibility of Hamas's claims of responsibility on its websites, I believe his source to be flawed.  First, Kohlmann admitted that his database is not an accurate compendium of what was on the internet, as evidenced by the fact that "in every single case" he searched for information beyond his database.[96]  Further, Kohlmann testified that prior to his work on this lawsuit, during the relevant period of 2002 to 2004, the materials he had in his database related to Hamas were related to specific projects he was working on – and that those projects related to only three of the fifteen attacks at issue in this case.[97]  Thus, it does not appear to me that his database would be a comprehensive or useful source in determining whether Hamas was credible in its claims for these particular attacks.  Finally, as discussed above, although Kohlmann claimed he maintained files on other terrorist groups and that he searched those folders for claims related to these attacks, he appeared to be entirely unaware of a rival claim with respect to one of the attacks by the al-Aqsa Martyrs Brigade on its website.  (See *supra* at 40).  Based upon these facts, it would appear to me that Kohlmann's database regarding the specific 15 attacks is not complete, and therefore cannot be the basis for asserting that Hamas is credible in its claims.   In sum, it is methodologically improper to draw the sweeping conclusions that Kohlmann does based upon the materials he has reviewed.

---

[94] Kohlmann Report, p. 7.
[95] Kohlmann Dep. 56:23–58:3 (Dec. 2, 2010).
[96] Kohlmann Dep. 499:20-499:25 (Dec. 3, 2010).
[97] Kohlmann Dep. 519:17-521:24 (Dec. 3, 2010).

47

The following section presents further examples where Kohlmann fails to evaluate evidence or explanations that may contradict his conclusions of Hamas responsibility for the particular attacks.

A.    No Evaluation Of Missing Evidence

Kohlmann's report points to the ingredients that Hamas included in certain of its published claims, including photos and biographies of individuals in Hamas dress, biographies of and last testaments by the attackers, detailed descriptions of the attack, corroborating evidence, and video.

However, Kohlmann does not discount claims when such evidence is absent, nor does he appear to have analyzed why such evidence is absent. Rather he again appears to accept what Hamas presents at face value.  For example:

- With respect to the July 31, 2002 attack, Kohlmann specifically ascribes significance to the fact that a Hamas website published an "official English-language communiqué signed by Hamas and watermarked with its logo."[98]  Yet Kohlmann engages in no analysis of his reasons for not discounting the claims of responsibility in situations when no such official communiqué or watermark is present.[99]

- With respect to the June 20, 2003 attack, Kohlmann notes that Hamas did not release a separate communiqué claiming responsibility for the attack: rather the only "claim" which Kohlmann describes is a later "Glory Record" celebrating the group's military achievements as evidence of a claim.[100] Kohlmann engages in no analysis as to why there would be no

[98] Kohlmann Report, p. 34.
[99] See, e.g., June 20, 2003 attack, *ibid.* pp. 39-40; October 22, 2003 attack, *ibid.* p. 42.  Indeed, Kohlmann credits the October 22, 2003 to Hamas even though Hamas itself never actually claimed the event.  *Ibid.* p. 42.
[100] *Ibid*, p. 34.

communiqué or why a Glory Record filed later would be reliable, nor does he evaluate the absence of other evidence, such as photos or video wills, with respect to this claim.

- Similarly, for the October 22, 2003 attack, Kohlmann notes that Hamas never even issued a claim, but rather, he relies solely upon pictures that were posted to the Hamas website of the bomber, describing him an "al-Qassam mujahid" or "al-Qassam martyr" and listing vague biographical details about his life.[101]  Kohlmann enages in no analysis of why Hamas would not issue a claim of responsibility in this case, or why no other forms of evidence may be available.

### B.    No Evaluation Of Late Claims

A number of the claims for the attacks were issued within one or two days of the event.[102]  So, what explains the reason why certain other claims were issued weeks, months, or even years after the attacks?  A claim that is issued weeks, months, or in some case years after the relevant attack must be discounted in an analysis of responsibility, absent a compelling explanation for the delay.  For instance, a delay in claiming may well signal that that there are other motivations at work in making such a claim, which tends to undermine the claim's reliability.  Milton-Edwards and Farrell describe a particularly striking example of this with respect to Hamas: They report that, in 2008, the Qassam Brigades made a number of claims of responsibility on its website to several previously unclaimed attacks, in an apparent effort by the Brigades' senior leaders to undermine a ceasefire with Israel that had been announced by Hamas's more moderate political leadership.  According to the authors, after the

---

[101] *Ibid.,* p. 42.
[102] See, e.g., August 9, 2001 attack (same day), *ibid.* p. 29; December 1, 2001 attack (same day), *ibid.* pp. 30-31; March 27, 2002 attack (same day), *ibid.* pp. 31-32; March 5, 2003 attack (2 days), *ibid.* pp. 35-36; March 7, 2003 attack (same day), *ibid.* p. 36; May 18, 2003 attack (same day), *ibid.* p. 38; June 11, 2003 attack (2 days), *ibid.* pp. 38-39; September 9, 2003 attack (same day and 1 day), *ibid.*, pp. 41-42; September 24, 2004 attack (same day), *ibid.* p. 44.

political leadership had announced a *tahdiyah* (temporary truce) with Israel and ordered the military leadership to stand their men down, the more fundamentalist members of the Qassam Brigades "were furious, and in an attempt to undermine [Israeli] confidence in the ceasefire used their website to publish a list of attacks against Israel for which they had never previously taken responsibility."[103] This example illustrates the importance of discounting later filed claims and of evaluating all possible reasons for the delay in determining the claims' reliability.

Kohlmann's report, however, does not question the credibility of claims made long after the event – including even claims made years after the attacks – and simply accepts at face value the explanations (if any) the claimants make for the delay. For example:

- *March 28, 2001 attack:* The Hamas claim of responsibility for the March 28, 2001 gas station bombing came two weeks after the attack. Kohlmann does not analyze any potential reason for this delay or discount the claim as a result, but rather simply takes at face value the statement in the claim that Hamas refrained from mentioning the name of the bomber because of unexplained "security reasons" – despite the fact that this differs from the pattern Kohlmann relies upon elsewhere.[104]

- *May 7, 2002 attack:* According to Kohlmann, the Hamas claim for the May 7, 2002 attack came six years later, in 2008.[105] Again, Kohlmann does not analyze any reason for this delay or discount the claim as a result, but rather simply takes at face value the statement of the claimant that Hamas "chose to remain silent until the appropriate time" to "preserve the integrity" of the movement.[106] Kohlmann does not address the credibility of this statement or offer any explanation for this long delay – an especially glaring omission given the length of the delay, the vagueness of

---

[103] Milton-Edwards and Farrell, *op.cit.* pp.129-130.
[104] Kohlmann Report, p. 28.
[105] *Ibid.*, p. 33.
[106] *Ibid.*, p. 34.

the explanation given for the delay, and (as discussed above) the political considerations that are reported to have motivated the Qassam Brigades to make such a claim in 2008.

- *Other attacks:* Other examples where Kohlmann fails to address delays of several months[107] between the attack and the claim include the April 30, 2003 Mike's place bombing;[108] the January 29, 2004 Bus No. # 19 bombing;[109] and the January 29, 2003 shooting on Route 60.[110]   Again, Kohlmann provides no reason for, nor any analysis of the delay in his report.

### C.  No Evaluations Of Evidence Of Other Groups' Involvement

Kohlmann does nothing to address situations where another group may have committed the attack.  This is evidence that claims by Hamas may not be reliable. As noted above, Kohlmann even admitted in his deposition testimony that he only looked at Hamas information, and even for Hamas, he only looked at their online presence because that was what he was "tasked" to do by plaintiffs' counsel.[111]   A proper analysis must analyze and discount such alternate claims of responsibility.

For instance, with respect to the January 29, 2004 Bus No. 19 bombing, Kohlmann relies upon the claims of Hamas issued on its website, including a "special report on the attack," the bomber's last will and testament, supporting photos of the bomber wearing Hamas gear, and an "in-depth biography" of the bomber.  Kohlmann acknowledges that the al-Aqsa Martyrs Brigades made a competing claim, but simply takes at face value the explanations by Hamas on its

---

[107] It is not clear from Kohlmann's report when the claims he is discussing were issued, but the dates in his footnotes that list these claims appear to indicate delays of several months.
[108] *Ibid.*, p. 36.
[109] *Ibid.,* p. 43.
[110] *Ibid.,* p. 35.
[111] Kohlmann Dep. 217:25–219:3 (Dec. 2, 2010).  According to Kohlmann's deposition testimony, the only time he looked outside of Hamas websites was after reading my report in the Credit Lyonnais matters.

51

website that the competing claim was incorrect.[112]   Yet, as discussed above, even Shaked's report cites evidence that the al-Aqsa Martyrs Brigades was heavily involved in the attack, if not solely involved in its execution,[113] and there is additional evidence discussed in Shaked's deposition and set forth in Azoulay's July 1, 2010 and March 3, 2011 rebuttal reports indicating that investigations and court proceedings concerning responsibility for this attack did not yield any accusation or finding of Hamas responsibility.  Kohlmann does not even acknowledge, let alone analyze, the level of the al-Aqsa Martyrs Brigades' involvement or the strength of its competing claim.

These facts fundamentally call into question Kohlmann's analysis, which leads him to conclude that Hamas's claim for this attack (which, Kohlmann indicates, came seven months after the attack) is the valid one.  As noted above, Kohlmann significantly retreated from this conclusion during his deposition, and testified that he is only stating that,  based on the evidence he was asked to look at by plaintiffs' counsel, it is "more likely than not" that Hamas was in some way culpable for this and the other attacks. Arbitrarily confining the field of data an analyst reviews according to the dictates of an outside master risks distorted findings and is inconsistent with any accepted methodology.  Instructions to record only red flowers will produce a conclusion that all flowers must be red.  A proper analysis seeks out all relevant information available.   In addition, regardless of whether Kohlmann's conclusion is the one stated in his report or the one he stated in deposition testimony, the same methodological critiques apply.

Again, the above examples are only a few of the many questions that Kohlmann fails to address in his evaluation of the reliability of Hamas claims, which he uses to support his conclusion of Hamas's "culpability in the execution" of the attacks in question (or, as he has alternatively stated, his conclusion that

---

[112] Kohlmann Report, p. 43.
[113] Shaked Report, p. 133, nn. 430, 431.

they were "more likely than not culpable in some way").[114]  As I have noted, an analyst must also consider, among many others, the questions listed above in their entirety to assess the quality of the claims.  Kohlmann's failure to ask these questions regarding Hamas claims undermines his ultimate conclusion, and thus his report fails a technical review.

## REVIEW OF SHAKED REPORT

The report submitted by Ronni Shaked appears to segregate the attacks into three categories on the basis of the degree of probability of Hamas's involvement in the recruiting, planning and perpetration of the attacks in question. In fact, however, there are really only two categories.  He concludes, with a "very high degree of probability," that Hamas carried out nine attacks, but also with a "very high degree of probability," that it was responsible in five more attacks.  In only one attack, Hamas is downgraded to "apparently involved" solely because the only basis for attributing responsibility is Hamas's claim.[115]  Based upon my review, I believe that his analysis is deficient in several respects.

As a threshold matter, Shaked makes a number of unfounded assumptions and statements about Hamas and their claims of responsibility, which undermine his methods of analysis.  For instance:

- Shaked claims that Hamas "has never tried to deny its role in terrorist activity", but rather, has "always boasted of the terrorist attacks which it perpetrated, because it considers them to be 'heroic actions.'"[116] Shaked cites no support for these statements, and I am unaware of any. As discussed above, Hamas (like other terrorist groups) has initially issued denials in cases where others (plaintiffs' experts

---

[114] *See* Kohlmann Report, p. 9; Kohlmann Dep. 78:4-78:11 (Dec. 2, 2010).
[115] Shaked Report, p. 16.
[116] Shaked Report, pp. 5-6.

included) have concluded that Hamas was responsible.  *See supra* at 22-24.  Shaked even admitted in deposition testimony in the Credit Lyonnais matters that Hamas had denied responsibility for at least two attacks that other sources he deems reliable said Hamas was responsible for, contradicting his own report.[117]

- Shaked also claims that Hamas has "not taken responsibility for a terrorist attack which it did not commit."[118]   Based on the types of sources Shaked relies upon, this also appears to be untrue.  *See supra* at 20-22.  Shaked even admitted in his deposition testimony that Hamas has made claims for attacks that other sources he deems reliable determined were not committed by Hamas, contradicting his own report.[119]

- Shaked claims that even when there are competing claims, it "very quickly becomes known which organization carried out the attack and is possible to verify which organization was responsible" – for instance when one organization withdraws the claim or its identification of the bombers.[120]   I disagree that competing, but subsequently withdrawn claims are (without more evidence) a basis to "verify" which organization was responsible, and even documents Shaked cites (for example with respect to the January 29, 2004 bombing discussed above) suggest otherwise.

- Shaked claims that Hamas "works with determination to publicize its principal role in the perpetration of violent attacks against Jews."[121]   This statement ignores numerous cases (as cited in Kohlmann) in which no communiqué is made, see *supra* at 48-49, as well as the numerous cases in which claims are made weeks, months, or even years after the event.

---

[117] Shaked Dep. 112:8–115:3, 120:9–120:13 (Nov. 4, 2010).
[118] Shaked Report, p. 5.
[119] Shaked Dep. 89:5–95:2, 95:3–103:25, 104:2–107:8 (Nov. 4, 2010).
[120] Shaked Report, p. 6.
[121] *Ibid.*, p. 5.

- Shaked does not discount instances of unreliable evidence – for instance, he interprets errors listed in a Hamas claim for the March 28, 2001 attack (related to details of where the attack took place and who was killed) as simple "mistakes" and signs that Hamas is not "foolproof."[122]  He does not interpret these errors as a sign that Hamas may not have committed the attack (in keeping with his stated assumption that Hamas never makes false claims).  I believe that a proper analysis would discount such a claim, or at a minimum at least give equal weight to the alternative absent more information.

- At his deposition, Shaked appeared to agree with many of the facts I cite above (*supra* at 20-27) that make claims of responsibility by terrorist groups unreliable – for instance, that terrorist claims are propaganda, that terrorist groups have various motivations for making a claim, and that terrorist groups may make claims even if they did not actually execute an attack.[123]   Yet, even though he seems to agree with these facts that cast doubt upon the reliability of terrorist claims, I see no indication in Shaked's report that he considered or analyzed these facts when reaching the conclusions in his report.  Indeed, in his report in these matters he continues to maintain that claims of responsibility by Hamas "suffice" to demonstrate to him that Hamas carried out an attack.

- Shaked describes the following forms of evidence, among others, as demonstrating the ways in which Hamas claims responsibility for attacks: public announcements; mourning symbols and customs; and photographs and videotapes.[124]  I believe that each of these forms of evidence has its limitations and must be weighed accordingly.

In addition to these methodological defects, Shaked's report suffers from many of the same deficiencies that Kohlmann's report does with respect to

---

[122] *Ibid.,* p. 6 n. 11.
[123] Shaked Dep. 79:17-85:9 (Nov. 4, 2010).
[124] Shaked Report., pp. 6-10.

particular attacks – *i.e.,* giving too much credence to Hamas claims of responsibility and failing to address facts that tend to undermine the reliability of those claims.

For instance, in several cases, other groups appear to have been involved in an attack, but Shaked credits only Hamas.  According to Shaked's report, the January 29, 2003 shooting attack on Road 60 was carried out by the Silwad Cell in accordance with instructions from Hamas, but Shaked goes on to say that when contact between the cell and the Hamas headquarters in Ramallah was broken off the cell's commander, Jasser Barghouti, sought and received money from Hezbollah in order to finance this terrorist activity.[125]  (This shows the flexibility of determined terrorists to seek support from whatever group could offer it.)   Shaked then states that collaboration between Hezbollah and Hamas extended beyond criminal actions.[126]  But Shaked then ignores the evidence that points to Hezbollah, and instead credits the attack to Hamas, even though Hamas, according to Shaked, claimed responsibility at least a year after the attack.[127]   This also raises questions about the June 20, 2003 attack on Road 60, which, according to Shaked, was also carried out by the Silwad Cell.[128]

A further problem arises when Shaked's report is compared to that of Kohlmann.  Shaked attributes responsibility for the attack exclusively to Hamas, but Kohlmann, citing Hamas's claim of responsibility, notes that the cell in the town of Silwad comprised five local Palestinian youths, "most of whom were already known as Hamas operatives."[129]  This raises the question whether, even based on Hamas's description, some of the attackers were not members of Hamas.

---

[125] *Ibid.*, pp. 58-61.
[126] *Ibid.*, pp. 61-62.
[127] *Ibid.* p. 59.
[128] *Ibid.* pp. 98-101.
[129] Kohlmann Report, p.35.

56

The same issue arises more acutely in the January 29, 2004 attack on the Number 19 Bus, discussed above.   Shaked appears to have excluded, discounted, or may have been unaware of significant evidence related to this attack that calls his conclusion into question.   The failure to consider this highly relevant evidence is either an indication that all relevant evidence was not considered, a significant flaw in any analysis, or that it was considered but disregarded because it did not fit the analyst's desired conclusion, a paramount sin in intelligence analysis.   In addition, Shaked has now been made aware (both through my previous report in the Credit Lyonnais matters, the July 1, 2010 Azoulay rebuttal report in those matters, and through documents he reviewed at his Credit Lyonnais deposition) of numerous methodological flaws in his analysis of this attack.   The fact that Shaked fails to respond to these issues in his updated analysis after he has been informed of them is a methodological flaw in and of itself.

I also note that Shaked submitted a wholesale revision to his original opinion in the Credit Lyonnais matters as to which individuals he believes were responsible for the March 27, 2003 Kiryat Arba attack.[130]   In Shaked's original Credit Lyonnais report, he came to a definitive conclusion as to who committed the attacks by reading and relying upon certain statements on Hamas websites in conjunction with certain court files he reviewed.   But now, after re-reading the documents, he states that he got it wrong the first time – and even more significantly, that there are *specific false statements* as to who committed the attacks in the Hamas claims and in the court records he is relying upon.[131] According to Shaked, the only definitive way to identify the terrorists responsible would be to obtain forensic reports, which he has not done.[132] I believe that this example further demonstrates the flaws of Shaked's analysis, which essentially amounts to speculation based on sources even he admits are inaccurate, and

[130] The revision was first submitted as a supplemental report in the Credit Lyonnais matters on October 5, 2010, which was after my rebuttal report was issued in those cases, and is now incorporated in his report submitted in these cases.
[131] Shaked Dep. 210:10-211:15, 214:13-215:14, 216:13-216:17 (Nov. 4, 2010).
[132] Shaked Dep. Tr. 216:18-217:9 (Nov. 4, 2010).

fails to take into account evidence (such as forensic evidence) that even he believes would be more reliable.  Moreover, the fact that Shaked has admitted that there are false statements in the Hamas claims and in the court files he has reviewed related to this attack suggests he should be analyzing *all* of the statements he has reviewed for each of the attacks and determining whether or not there may be inaccuracies.  I see no evidence of such analysis in his report.

Again, the above examples are only a few of the many questions that Shaked fails to address in his evaluation of the reliability of Hamas claims, which he uses to support his conclusions as to the "degree of probability" that Hamas engaged in the attack.  As I have noted, an analyst must also consider, among many others, the questions listed above in their entirety to assess the quality of the claims.  Shaked's failure to ask these questions regarding Hamas's claims undermines his ultimate conclusions as to its responsibility for the attacks in question, and thus his report fails a technical review.

**CONCLUSION**

Were the Shaked and Kohlmann reports provided to me as intelligence documents, I would have no choice but to conclude that the analysis of claims appears to be biased, flawed, and incomplete.

**RESOURCES AND FINANCING ISSUES**

In considering Spitzen's and Levitt's reports I have done an analytical review of whether they present an analytically sound basis for concluding that any of the monies Interpal transferred through its accounts at NatWest to the

entities in question were in fact used by Hamas for the terrorist attacks in question, or for terrorism more generally.[133]

Neither Spitzen nor Levitt offers any specific evidence that the transferred monies were in fact used for the terrorist attacks in question, or even terrorism more generally.[134]  With no direct evidence offered as to these propositions, their reports do not offer any substantiation for any conclusion that the monies transferred to the entities at issue were used for the attacks in question, or by Hamas's military wing more generally.

Instead of this evidence, Levitt and Spitzen appear to be effectively offering a speculative theory that the transferred monies would have been used, at least in part, to support terrorism, and therefore presumably for the specific attacks in question. Is this speculative theory well-reasoned and supported in light of the available information?

There are a number of facts that call into question the basis for their speculation, such that the basis of this speculative theory is sufficiently questionable that their conclusion is not supported.

---

[133] Spitzen's and Levitt's reports appear to accept the assumption that Hamas is culpable for the attacks in question.  To the extent Spitzen and Levitt rely upon Shaked or Kohlmann for that assumption, for the reasons stated above, I do not believe such reliance is warranted given the serious problems with their analysis.  For purposes of this section I will address Spitzen's and Levitt's reports without reference to whether Hamas was culpable, other than to note that to the extent Hamas's culpability is not determined, none of the opinions in the Spitzen and Levitt reports, which focus on alleged links between the entities they address and Hamas, would appear to be relevant.

[134] I wish to note at the outset that the Spitzen and Levitt reports are ambiguous as to whether they are opining that the money transferred by Interpal through NatWest accounts was used for the terrorist attacks in question or for any other terrorist attacks.  I am aware that both Spitzen and Levitt were asked at their Credit Lyonnais depositions whether they were opining that the money transferred by CBSP through Credit Lyonnais accounts was used to perpetrate the terrorist attacks in question, and both authors stated they were not offering such an opinion. Spitzen Dep. 82:3-82:15 (Aug. 11, 2010), Levitt Dep. 61:7-61:14 (Sept. 1, 2010).  Nonetheless, since it is still ambiguous from their reports in this case whether they are *are* claiming that any of the transferred funds were used for the specific terrorist attacks or for terrorist attacks more generally, my critiques of their opinions are the same as set forth in my rebuttal report in the Credit Lyonnais cases.

First, as discussed above, Hamas's terrorist cells are diffuse in nature, and often are not in direct contact with other components of Hamas, much less entities that are alleged to only be supportive of or affiliated with Hamas.  Given this fact, there is no reason to assume, absent evidence to the contrary, that any of the entities at issue were in direct contact with any of the attacks' perpetrators such that they could have provided funds transferred to them by Interpal through NatWest for the perpetration of the attacks in question.  Moreover, there is considerable scholarly research that challenges the notion that funding for Hamas's military and social programs during the time in question was raised and allocated from a central Hamas treasury, as one would typically see for a nation's government.[135]  Given this, again absent evidence presented to the contrary, there is no reason to assume that there is a central budgeting decision-maker who made decisions about whether to divert monies from social programs to terrorist operations.

Second, given the reported costs of the types of terrorist attacks in question and the reported amounts of funding Hamas's military wing received for terrorist acts, there is little reason to assume that funds, beyond those provided specifically for terrorist purposes, were required or used for terrorist acts. Estimates vary about the costs of a suicide bombing.  The bomb itself is reported

---

[135] See Jeroen Gunning, "Terrorism, charities and diasporas: Contrasting the fundraising practices of Hamas and al Qaeda among Muslims in Europe," in *Countering the Financing of Terrorism* (Thomas J. Biersteker & Sue E. Eckert eds. 2008), p. 99 (noting that charities considered to be affiliated with Hamas are organizationally independent from the political and resistance wings); "Islamic Social Welfare Activism In The Occupied Palestinian Territories: A Legitimate Target?"  International Crisis Group Middle East Report No 13, at 11 (April 2, 2003) (noting that funding for charities considered to be affiliated "is anything but centralized" and questioning what affiliation of charities means in political context in Palestinian territories); Jonathan Benthall, The Palestinian Zakat Committees 1993-2007 and Their Contested Interpretations, Program for the Study of International Organization Occasional Paper 1/2008, Geneva: Graduate institute of International and Development Studies, at 8-9 (criticizing the idea that charitable organizations affiliated with Hamas "are in effect its subsidiaries"); Emanuel Schaublin, Role and Governance of Islamic Charitable Institutions: The West Bank Zakat Committees (1977-2009) in the Local Context, Centre on Conflict, Development, and Peacebuilding Working Paper (2009), at 11-14 (citing several scholars for the proposition that charities considered to be affiliated with Hamas are largely autonomous entities).

to cost anywhere from less than $150 up to $4,300.[136]  (The latter figure defies all available information about the costs of the actual explosive devices.)  Even if we were to add the costs of training, preparation, and logistics for the attack, the additional costs would be minimal.  Shooting attacks cost even less.  Hamas claimed responsibility for about 40 suicide bombings during the first four years of the Intifada 2000-2004.[137]  Thus, its total costs would have been somewhere between several thousand and several hundred thousand dollars a year.[138]

At the same time Hamas's military brigades and terrorist activities are reported to have received significant financial support from direct contributions from foreign governments, from local and individual foreign contributions and from criminal activities.[139]  As Levitt points out in his writings, it is reported that Iran made direct contributions to Hamas of tens of millions of dollars during the relevant years, with much of those monies specifically given to Hamas's military wing.[140]  According to one source, Iran provided Hamas with several million

---

[136] Serge Schmemann, "In the Arabs' Struggle Against Israel, There Are Many Players," *New York Times*, March 30, 2002, p. A6 (noting that "in most such [suicide] attacks, the explosive is an elemental mixture of fertilizer and sugar, and the cost of one attack is estimated at only $150."); Amanda Ripley, "Why Suicide Bombing Is Now All the Rage," *Time*, April 15, 2002, 32–39 (noting that the total cost of each explosive belt is $1,500 to $4,300 depending on quality, according to Hamas activists).

[137] Michele K. Esposito, "The Al-Aqsa Intifada: Military Operations, Suicide Attacks, Assassination, and Losses in the First Four Years," *Journal of Palestine Studies* Vol. 34, No. 2 (Winter, 2005), pp.105-108 (estimating the number of bombings as between 38 and 44).

[138] I understand that in addition some academics would include payments and/or social services given to the family of a suicide bomber as a military expenditure, while others would classify such a payments as a social service provided to needy families.  I take no position on this issue for purposes of this report.  I will note however that although these payments and services may range from a few thousand dollars or less to a couple tens of thousands, see Levitt, *op cit.* at 57-60 (providing a range of estimates), inclusions of such funds would not affect the point made above.

[139] See Gunning (2008), *op cit.* at 101 ("However large [the Qassam Brigade's] actual budget, sufficient funds appear to be available from a wide variety of sources, including those intent on keeping the conflict with Israel alive, those wishing to sustain an effective opposition to Fatah, and those seeking to strengthen Islamism region-wide.  Even if the post-Saddam Midde East 'order' may have diminished the sources of funding for the organization's resistance wing, other non-charitable sources are potentially available to Hamas, such as money laundering and smuggling.").

[140] Levitt, *Hamas*, p. 172 (citing experts and government agencies estimating the total annual contribution in the tens of millions); *ibid.* p. 174 (citing a December 2000 report revealing a transfer of $400,000 from Iran directly to the al-Qassam brigades).

dollars a year for "sabotage operations against Israel."[141]  This amount would have been more than enough to finance Hamas's entire terrorist campaign.  In 2002, a senior Israeli official reportedly declared, "We have seen Hamas is getting more and more close to Iran…. Iran became during the last year the number one carrying out terror activity."[142]  At the same time Iraq is widely reported to have funded the reward payments to the families of terrorists killed or injured in operations.[143]  And as Levitt reports, Syria is purported to have offered Hamas direct financial aid if it engaged in suicide bombings.[144]  When you add to this the direct contributions Hamas received for the purpose of funding attacks, the amounts of money provided to Hamas's terrorist activities appear to outstrip their costs.  Given this, there is no reason to assume that monies donated to charitable organizations said to be affiliated with Hamas were needed for Hamas's terrorist attacks.[145]  Instead, the evidence supports an even more plausible theory that Hamas's terrorist operations were supported by funds from foreign governments and other sources given to Hamas expressly for terrorist operations.

        Third, there is no evidence offered that the entities that received the transferred funds did not actually use those funds to perform social services, the costs of which were considerable, as Levitt himself appears to agree.[146]  It is generally accepted that the social services performed by even those charities that are alleged to be affiliated with Hamas, including hospitals, clinics and schools, were in fact provided and that these activities required significant funds to maintain.  The U.S.-based Council on Foreign Relations estimated in 2003 that Hamas devotes "much of its estimated U.S. $70 million annual budget to an

---

[141] Assaf Moghadam, "Suicide Bombings in the Israeli-Palestinian Conflict: A Conceptual Framework," p.64.

[142] Milton-Edwards and Farrell, *op.cit.*, p.163, citing an interview with an Israeli official, November 3, 2002.

[143] See Gunning (2008), *op cit.* pp. 102.

[144] Levitt, *op cit.* pp. 181-82.

[145] See Gunning (2008), pp. 95 ("Because funding for political resistance is readily available from other sources, Hamas furthermore has no pressing need to pursue this path [of diversion from charities].").

[146] Levitt Dep. 270:2–271:18, 273:16–275:2 (Sept. 1, 2010).

extensive social services network," while Israeli scholar Rueven Paz says that "approximately 90 per cent of [Hamas's] work is in social, welfare, cultural, and educational activities." [147]   In fact, USAID and large U.S. corporations, as well as the UN and foreign governments, have helped provide money to alleged Hamas's social services for them to carry out their social service activities. [148] Given these reported significant costs, and the apparent sufficiency of funds specifically designated for terrorist acts and provided directly to Hamas's military wing, absent contrary evidence, the assumption that the monies given to the charities were actually used for terrorist acts is not supported.

---

[147] Islamic Social Welfare Activism In The Occupied Palestinian Territories: A Legitimate Target? International Crisis Group Middle East Report No 13, at 13 (April 2, 2003).

[148] Matthew Levitt, Better Late Than Never: Keeping USAID Funds out of Terrorist Hands, Washington Institute for Near East Policy, Policy Watch # 1277 (August 24, 2007) (documents made public as recently as December 2002 show that USAID "cleared" several charities to receive funding despite information publicly tying them to Hamas, such as main committees in Jenin, Qalqilya, Hebron, Tulkarem, and Nablus, as well as the al-Tadhomen); Testimony of Kay Guinane, Program Manager, Charity and Security Network, before the Subcommittee on Oversight and Investigations, House Committee on Financial Services (May 26, 2010), at p. 15 (HLF assisted charities also received aid from USAID and International Red Cross); Matthew Levitt, How Not to Fund Hamas: Scrutinize Those Who Receive U.S. Aid, New York Daily News, February 4, 2009 (USAID provided more than $140,000 to the Hamas-controlled Islamic University of Gaza); Gunning (2008), *op cit.* p. 100 ("Save the Children, USAID, Médecins Sans Frontières, and Medical Aid for Palestine are among the international, non-Islamic charities that have contributed at one time or another to charities affiliated with Hamas, precisely because they have observed that contributions reach their intended destination."); Enter Hamas: The Challenges of Political Integration.  International Crisis Group Middle East Report No. 49, 18 January 2006, p. 23 n. 190 (the Salah Association, a Hamas-affiliated charity in the Gaza strip and Interpal transferee, received USAID funds in 2004); *ibid.* p. 24 (USAID coordinated a project with local Hamas mayor to beatify the city of Qabalan); *ibid.* p. 24 n. 197 (Islamic University of Gaza received $ 1 million funding from Intel and ANERA, an American NGO, for computers); *ibid.* p. 24 (British Council, the cultural arm of the UK government, was one of several donors implementing projects at the Islamic University in Gaza); *ibid.* p. 27 (UN implemented development projects in Hamas-run municipalities and engaged with its mayors day to day without legal implications); Emanuel Schaublin, Role and Governance of Islamic Charitable Institutions: The West Bank Zakat Committees (1977-2009) in the Local Context, Centre on Conflict, Development, and Peacebuilding Working Paper (2009), p. 25 (Al Razi hospital in Jenin received funding from the governments of Italy and Canada); *ibid.* p. 31 (French, Italian, and Canadian governments have helped medical institutions, such as clinics and hospitals, of zakat committees to build specialized sections); *ibid.* p. 31 (UNDP and ANERA cooperated with zakat committees to distribute food and medication until 2006).

### REVIEW OF LEVITT'S OPINIONS ON "LETHALITY" OF HAMAS

In his NatWest report, Mr. Levitt adds an argument that was not present in his Credit Lyonnais report: "Not only does Hamas's da'wa network allow it to capture broad popular support in the Palestinian Territories, but research also indicates that it has the effect of making Hamas attacks more deadly.  There appears to be a robust relationship between Hamas's decision to provide comprehensive social services, and its concomitant lethality as an organization when compared to other organizations lacking anything comparable to Hamas's da'wa network."[149]  His only support for this argument appears to be a recent book by Eli Berman, an economist,[150] who (according to Levitt) argues that organizations such as Hamas that provide social services are able to recruit a greater number of operatives, command greater loyalty from membership and supporters, and are less prone to defections from members – and therefore are more lethal as a result.

I believe that Levitt has not set forth an adequate basis in his report for concluding that there "appears to be a robust relationship" between any purported "decision" by Hamas to provide social services and its "concomitant lethality" as an organization as compared to others.  Not only does Levitt's report simply adopt these arguments in full from Berman's book (with no apparent independent analysis), but it does not appear Levitt has done anything to vet the information provided in the book.

After reviewing Berman's book, I believe that Levitt fails to address some fundamental questions I have regarding Berman's theory that lethality is tied to the provision of social services.  In my analysis, it is methodologically unsound for Levitt to simply adopt Berman's arguments in full without addressing these questions.

---

[149] Levitt Report, p. 22.
[150] Eli Berman, *Radical, Religious, and Violent: The New Economics of Terrorism,* Cambridge: The MIT Press, 2009.

First, I believe that the provision of social services by the organizations that Berman examines in his book cannot be viewed in isolation from the many factors that contribute towards any given group's lethality, especially when one is examining large organizations, as Berman does.  Indeed, many of the groups that Berman identifies as the most "lethal" (such as Sri Lanka's LTTe (or Tamil Tigers), Lebanon's Hezbollah, and Palestine's Hamas) are substantial organizations that have large, identifiable constituencies and large memberships (providing large recruiting pools for operations); control or virtually control territory where they are the de facto government, providing not only whatever social services may be available, but also many of the functions of local government; field large paramilitary or guerrilla organizations numbering in the thousands; and/or have large cash flows from criminal activities, unofficial tax collection, state sponsors, or other sources of foreign support.  All of these factors, among others, enable these large organizations to survive and operate at higher levels than ordinary small terrorist groups.  Thus, while these groups' provision of social services is a feature of their size, and it may contribute to their lethality, it clearly does not, by itself, *explain* their lethality.

I see no analysis in Levitt's report even attempting to reconcile these factors and their potential impact on Berman's theories.  To the extent any of the factors I have identified do impact Berman's research, that undermines any argument that the provision of social services alone explains lethality.  It appears that Levitt simply cites the research from Berman without questioning Berman's assumptions or the bases of his analysis, which is plainly methodologically flawed.

Levitt also cites Berman's argument that the provision of social services limits leaks and defections – however, neither Levitt, nor Berman, offers any empirical evidence to support this claim.  While it is admittedly difficult to obtain such evidence, the frequency of Israeli assassinations of Hamas leaders and the

"execution" of collaborators would suggest that Hamas is not immune to leaks.[151] In any event, we simply have no way of knowing whether Hamas is more or less immune to defection than other groups.  Thus, in my view, Berman's hypothesis that Hamas is resistant to leaks and defectors because of its social services (which appears to have been adopted in full by Levitt) has no demonstrated empirical basis.  More importantly, once again, I see no indication that Levitt has evaluated whether there is any empirical basis for this theory in his report.

Levitt also appears to accept Berman's premise that Hamas is decidedly more lethal than certain other terrorist groups, such as the al-Aqsa Martyrs Brigades, again without analyzing whether Berman has a sound empirical basis for this claim.  According to Berman's book, Hamas is ten times more lethal than its Palestinian competitors, principally Fatah and the al-Aqsa Martyrs Brigades, using fatalities per attack as the measure.  I believe this analysis to be flawed.

Even applying Berman's methodology, a review of Berman's data suggests that his figures are misleading.  For instance, Berman states that from 2002 to 2007, the al-Aqsa Martyrs Brigade was responsible for only six attacks, with a total of just three fatalities (giving it a low "fatality per attack" score of .5 fatalities per attack).  My review of available databases of events related to the conflict between Israel and the Palestinian organizations[152] shows that the al-Aqsa Martyrs Brigade (since its inception in 2001) was attributed with responsibility for 23 suicide bombings between its first claimed attack on February 17, 2002 and the end of 2007, and that a total of 74 people were killed

---

[151] For another reported counter-example of a "leak" from Hamas, see Patrick Jackson, "Hamas man's son Mosab Hassan Yousef 'was Israeli spy,'" BBC News, Feb. 24, 2010, available at http://news.bbc.co.uk/2/hi/8533952.stm.

[152] See Global Terrorism Database, available at http://www.start.umd.edu/gtd; National Memorial Institute for the Prevention of Terrorism Database, as cited in Berman, *op cit.* p. 251; Esposito, *op cit.* pp. 85-122 and the series of subsequent Esposito chronologies provided in the Journal of Palestinian Studies.

in these attacks.[153]   Using Berman's metric, this would result in a "fatality per attack" score of 3.2 instead of Berman's score of 0.5.[154]

Those same databases show that Hamas, during the period of the Second Intifada, 2000-2007, claimed responsibility for 59 suicide bombings, in which 213 persons were killed, giving it a lethality score of approximately 3.6 persons per bombing – instead of the 5.0 score that Berman provides.  This suggests that Berman's conclusions regarding "lethality" are exaggerated.

While I am not attempting in this report to refute Berman's thesis that Hamas was more "lethal" than the al-Aqsa Martyrs Brigades, once again, I see no analysis in Levitt's report as to whether Berman's theory has empirical support, and, based upon my own research, I believe there is a basis to question this theory.

Finally, I note that while Levitt quotes Berman to support his argument, Berman disagrees with Levitt's views as to the social services organizations that are at issue in Levitt's report.  Berman states on pages 131 and 132 of his book that "Hamas is *not* a terrorist organization using social service provision as a front to disguise its other activities, as is sometimes claimed" (emphasis added) – and specifically cites to Levitt (in footnote 17 on page 264) as putting forth the contrary view that these social service organizations *are* a "front" for Hamas. According to Berman, Levitt "ignores the fact that the religious and social service provision networks predate the terrorist wing."  This is another point ignored by

---

[153] No judgments are offered here on the validity of these claims or attributions.  It is not clear from the databases reviewed what they are relying upon to attribute responsibility.  Rather, these examples are for illustrative purposes only to demonstrate questions underlying Berman's empirical review.  To the extent the databases are relying upon claims of responsibility, as noted in the first section of this report, this is not by itself an accurate indicator of which attacks were committed by which group.

[154] In compiling these figures, I am excluding non-suicide bombings.  I am also excluding all attacks for which there were joint claims of responsibility or where the attributions were not clear in the sources.  If, for example, the January 29, 2004 bombing, for which both Hamas and the al-Aqsa Martyrs Brigade claimed responsibility, is placed in the al-Aqsa column, its lethality rate ascends to 3.5 fatalities per bombing.

Levitt in his report here (which repeatedly characterizes the social service organizations as "fronts" for Hamas) – and one that further undermines his speculative theory that any transfers to social service organizations would have been used for terrorist attacks, rather than for the purpose of providing social services.

Dated: March 4, 2011

Brian Michael Jenkins

# EXHIBIT A

**BRIAN MICHAEL JENKINS**

Brian Michael Jenkins initiated the RAND Corporation's research program on international terrorism in 1972.  He currently serves as Senior Advisor to the President of RAND.  From 1989 to 1998, Mr. Jenkins was the Deputy Chairman of Kroll Associates, an international investigative and consulting firm.  Before that, he was Chairman of RAND's Political Science Department from 1986 to 1989 and from 1972 to 1989, he also directed RAND's research on political violence.

Mr. Jenkins has a B.A. in Fine Arts and a Masters Degree in History, both from UCLA.  He studied at the University of Guanajuato in Mexico and in the Department of Humanities at the University of San Carlos in Guatemala where he was a Fulbright Fellow and recipient of a second fellowship from the Organization of American States.

Commissioned in the infantry at the age of 19, Mr. Jenkins became a paratrooper and ultimately a captain in the Green Berets. He is a decorated combat veteran having served in the Seventh Special Forces Group in the Dominican Republic during the American intervention, and later as a member of the Fifth Special Forces Group in Vietnam (1966-1967).  He returned to Vietnam on a special assignment in 1968 to serve as a member of the Long Range Planning Task Group; he remained with the Group until the end of 1969 receiving the Department of the Army's highest award for his service.  Mr. Jenkins returned to Vietnam on third special assignment in 1971.

In 1983, Mr. Jenkins served as an advisor to the Long Commission, convened to examine the circumstances and response to the bombing of the U.S. Marine Barracks in Lebanon.  In 1984, he assisted the Inman Panel in looking at the security of American diplomatic facilities abroad and in 1985-86, he served as a member of the Committee of the Embassy of the Future, which established new guidelines for the construction of U.S. diplomatic posts.  In 1989, Mr. Jenkins served as an advisor to the national commission established to review terrorist threats following the bombing of PanAm 103. In 1993, Mr. Jenkins served as a member of the team contracted by the New Jersey-New York Port Authority to review threats and develop new security measures for the World Trade Center following the February bombing.

In 1996, President Clinton appointed Mr. Jenkins to be a member of the White House Commission on Aviation Safety and Security.  From 1999-2000, he served as an advisor to the National Commission on Terrorism and since 2000, he has served as a member of the U.S. Comptroller General's Advisory Board. Mr. Jenkins also is the Director of the National Transportation Security Center at the Mineta Transportation Institute, and since 1997 has directed the institute's continuing research on protecting surface transportation against terrorist attacks.

Mr. Jenkins serves as a Special Advisor to the International Chamber of Commerce and a member of the advisory board of the ICC's investigative arm, the Commercial Crime Services.  Over the years, Mr. Jenkins also has served as a consultant to or carried out assignments for a number of government agencies including the Departments of State, Defense, and Homeland Security and the Nuclear Regulatory Commission.  As part of its international project to create a global strategy to combat terrorism, the Club of Madrid in 2004 appointed Mr. Jenkins to lead the international working group on the role of intelligence.

A large portion of Jenkins work has addressed the role of intelligence in combating terrorism.  He has written about the organization of intelligence collection, international cooperation, constraints on domestic collection, and methods of analysis.

Jenkins also has addressed the threat of nuclear terrorism.  He wrote his first essay on the topic *"Will Terrorists Go Nuclear?"* in 1975.  From 1976 to the late 1980s, Jenkins directed a research effort on behalf of Sandia Laboratories and the Department of Energy, examining potential threats to U.S. nuclear programs. DOE officials later indicated that this research formed the basis for the department's security planning.  Jenkins also led RAND's work on the behavioral analysis of communicated nuclear threats, which later became a component of the DOE's credibility assessment procedures.  Following 9/11, Jenkins returned to the topic of deterring non-state actors with weapons of mass destruction.

Mr. Jenkins is the author of *International Terrorism: A New Mode of Conflict,* the editor and co-author of *Terrorism and Personal Protection,* co-editor and co-author of *Aviation Terrorism and Security,* and a co-author of *The Fall of South Vietnam.*  His book *Unconquerable Nation: Knowing Our Enemy, Strengthening Ourselves* was published in 2006.  A second volume is forthcoming.  His latest book, *Will Terrorists Go Nuclear?* was published in September 2008. He is also the author of over 200 articles, book chapters, and published research reports on conflict and crime.

# EXHIBIT B

## Brian Jenkins - Prior Publications

**Testimony**

- Jenkins, Brian Michael, *The al Qaeda-Inspired Terrorist Threat: An Appreciation of the Current Situation*, Testimony presented before the Canadian Senate Special Committee on Anti-terrorism, December 6, 2010, Santa Monica, CA: RAND Corporation reprinted as CT-353.
  http://www.rand.org/content/dam/rand/pubs/testimonies/2010/RAND_CT353.pdf
- Jenkins, Brian Michael, *No Path to Glory: Deterring Homegrown Terrorism*, testimony presented before the House Homeland Security Committee, Subcommittee on Intelligence, Information Sharing and Terrorism Risk Assessment, May 26, 2010, Santa Monica, CA: RAND Corporation reprinted as CT – 348.
  http://www.rand.org/pubs/testimonies/2010/RAND_CT348.pdf
- Jenkins, Brian Michael, *Going Jihad: The Fort Hood Slayings and Home-Grown Terrorism*, presented before the Senate Homeland Security and Governmental Affairs Committee, November 19, 2009, Santa Monica, CA: RAND Corporation reprinted as CT-336. http://www.rand.org/pubs/testimonies/CT336/
- Jenkins, Brian Michael, *Terrorists Can Think Strategically: Lessons Learned From the Mumbai Attacks* presented before the Senate Homeland Security and Governmental Affairs Committee, January 28, 2009, Santa Monica, CA: RAND Corporation reprinted as CT-316. http://www.rand.org/pubs/testimonies/CT316/
- Jenkins, Brian Michael, *Basic Principles for Homeland Security* presented before the House Appropriations Committee, Subcommittee on Homeland Security, January 30, 2007, Santa Monica, CA: RAND Corporation reprinted as CT-270.
  http://www.rand.org/pubs/testimonies/CT270/
- Jenkins, Brian Michael, *Building an Army of Believers: Jihadist Radicalization and Recruitment* presented before the House Homeland Security Committee, Subcommittee on Intelligence, Information Sharing and Terrorism Risk Assessment, January 30, 2007, Santa Monica, CA: RAND Corporation reprinted as CT –278 –1. http://www.rand.org/pubs/testimonies/CT278-1/
- Jenkins, Brian Michael, *Defining the Role of a National Commission on the Prevention of Violent Radicalization and Homegrown* Terrorism presented before the House Homeland Security Committee, Subcommittee on Intelligence, Information Sharing and Terrorism Risk Assessment, June 14, 2007, Santa Monica, CA: RAND Corporation reprinted as CT-285. http://www.rand.org/pubs/testimonies/CT285/
- Jenkins, Brian Michael, *Terrorism and the Security of Public Surface Transportation* presented before the Senate Committee On Judiciary, April 8, 2004, Santa Monica, CA: RAND Corporation reprinted as CT-226.
  http://www.rand.org/pubs/testimonies/2004/RAND_CT226.pdf
- Jenkins, Brian Michael, *Remarks Before the National Commission on Terrorist Attacks Upon the United States* presented before the National Commission on Terrorist Attacks Upon the United States, March 31, 2003, Santa Monica, CA: RAND Corporation reprinted as CT – 203.
  http://www.rand.org/pubs/testimonies/2005/CT203.pdf
- Jenkins, Brian Michael, *Terrorism: Current and Long Term Threats* presented before the Senate Armed Services Subcommittee on Emerging Threats, November 15, 2001,

Santa Monica, CA: RAND Corporation reprinted as CT-187.
http://www.rand.org/pubs/testimonies/2005/CT187.pdf

**Publications**

- Brian Michael Jenkins, "Why Terrorists Attack Airports," *CNN.com*, January 25, 2011.
- Brian Michael Jenkins, "Moscow Airport Blast: Apparent Terror Attack," *Washingtonpost.com*, January 24, 2011.
- Brian Michael Jenkins, "Book Review: 'Fallout' by Catherine Collins and Douglas Frantz," *Los Angeles Times*, January 9, 2011.
- Brian Michael Jenkins, *The Tenth Year: A Briefing on Terrorism Issues to New Members of the 112th Congress*, RAND, Santa Monica, CA, January 8, 2011.
- Brian Michael Jenkins, "Our Foes Cannot Destroy This Nation," *NationalJournal.com*, September 27, 2010.
- Brian Michael Jenkins, "Denying Homegrown Terrorists the Glory," *RAND.org* and *GlobalSecurity.org*, June 24, 2010.
- Brian Michael Jenkins, "5 Reasons We're Safer From Terrorists," *AOL News*, May 12, 2010.
- Brian Michael Jenkins, "Jihadist Threat Keeps Evolving," *NationalJournal.com*, May 10, 2010.
- Jenkins, Brian Michael (2010), *Would-Be Warriors: Incidents of Jihadist Terrorist Radicalization in the United States Since September 11, 2001*, RAND, Santa Monica, CA.
- Brian Michael Jenkins, "Introduction," Andrew C. Harmon et. al. (eds.), Toward a Grand Strategy Against Terrorism, New York: McGraw-Hill Books, 2010.
- Brian Michael Jenkins, *Transportation Security,* WORLD IN MOTION, Mineta Transportation Institute, Vol. 16, No. 2, at 4, (Spring 2010).
- Brian Michael Jenkins, "Al Qaeda Tipping Point? Still a Long Way to Go," *NationalJournal.com*, April 26, 2010.
- Brian Michael Jenkins, Bruce Butterworth and Cathal Flynn, "A better route to aviation security," *The Washington Post*, March 26, 2010, A23.
- Brian Michael Jenkins, "Jihad Jane and the Risk of Domestic Terrorism," *AOL News*, March 12, 2010.
- Brian Michael Jenkins, "How Can We Keep Los Angeles Secure?" *LAmag.com*, March 5, 2010.
- Brian Michael Jenkins and Bruce Robert Butterworth, MTI Report #WP 09-02: *Explosive and Incendiaries Used in Terrorist Attacks on Public Surface Transportation: A Preliminary Empirical Analysis*, San Jose, CA: Mineta Transportation Institute, March 2010.
- Brian Michael Jenkins, Bruce Robert Butterworth and Karl S. Shrum, MTI Report #WP 09-01: *Terrorist Attacks on Public Bus Transportation: A Preliminary Empirical Analysis*, San Jose, CA: Mineta Transportation Institute, March 2010.
- Brian Michael Jenkins, Bruce R. Butterworth, and Jean-Francois Clair, MTI Report #09-12: *Off the Rails: The 1995 Attempted Derailing of the French TGV (High-Speed*

2

*Train) and A Quantitative Analysis of 181 Rail Sabotage Attempts*, San Jose, CA: Mineta Transportation Institute, March 2010.

- Brian Michael Jenkins, Bruce R. Butterworth, and Dr. Frances Edwards, MTI Report #09-04: *Implementation and Development of Vehicle Tracking and Immobilization Technologies*, San Jose, CA: Mineta Transportation Institute, January 2010.
- Brian Michael Jenkins, Bruce R. Butterworth and Larry N. Gerston, MTI Report #09-05: *Supplement to MTI Study on Selective Passenger Screening in the Mass Transit Rail Environment*, San Jose, CA: Mineta Transportation Institute, January 2010.
- Brian Michael Jenkins and Bruce R. Butterworth, MTI Report #09-03: *Potential Uses of Highway-Borne Hazardous Materials*, San Jose, CA: Mineta Transportation Institute, January 2010.
- Jenkins, Brian Michael (2009), *The Lessons of Mumbai*, RAND, Santa Monica, CA.
- Jenkins, Brian Michael (2009), *Could Mexico Fail?* HOMELAND SECURITY TODAY, Vol. 6., No. 2, at 26-31, RAND, Santa Monica, CA.
- Brian Michael Jenkins, "How a Decade of Terror Changed America," *AOL News*, December 30, 2009.
- Brian Michael Jenkins, "Afghanistan: A Marathon, Not a Prize Fight," *RAND.org*, December 1, 2009.
- Brian Michael Jenkins and Bruce R. Butterworth, MTI Report #S-09-01: *Rail Passenger Selective Screening,* San Jose, CA: Mineta Transportation Institute, October 2009.
- Brian Michael Jenkins, "How Russia Can and Can't Help Obama," *ForeignPolicy.com*, August 26, 2009.
- Brian Michael Jenkins, "Who Has the Will to Fight Piracy," *GlobalSecurity.org*, April 21, 2009.
- Brian Michael Jenkins, "The Torture Debate, Redux," *GlobalSecurity.org*, April 1, 2009.
- Brian Michael Jenkins, *Transportation Security – Mumbai Attack Creates New Challenges for Security,* WORLD IN MOTION, San Jose, CA: Mineta Transportation Institute, Vol. 15, No. 3, at 3 (Spring 2009).
- Brian Michael Jenkins, Bruce R. Butterworth and Joseph E Trella, "Outside View: Info-sharing crucial for DHS," *United Press International* (Washington), February 26, 2009.
- Brian Michael Jenkins, "The Obama Withdrawal From Iraq: How Fast?" *NationalJournal.com*, December 16, 2008.
- Brian Michael Jenkins, "Outside View: Mumbai's terrifying logic," *United Press International* (Washington), December 9, 2008.
- Brian Michael Jenkins, "How Will Obama First Be Tested?" *NationalJournal.com*, December 8, 2008.
- Brian Michael Jenkins, "Obama's First International Crisis," *The San Diego Union-Tribune*, November 16, 2008.
- Brian Michael Jenkins, "Georgia war derails bid to stop nukes," *Providence Journal-Bulletin* (Rhode Island), October 6, 2008, 4.
- Brian Michael Jenkins, "Assessment of the TEW's Contribution," in John P. Sullivan & Alain Bauer (eds.) *Terrorism Early Warning: 10 Years of Achievement in Fighting*

3

*Terrorism and Crime,* Los Angeles, CA, Los Angeles County Sheriff's Department, October 2008.

- Brian Michael Jenkins, "Outside View: Will terrorists go nuclear?" *United Press International* (Washington), September 11, 2008.
- Brian Michael Jenkins, "A Nuclear 9/11?" *CNN.com*, September 11, 2008.
- Lee H. Hamilton, Bruce Hoffman, Brian Michael Jenkins, Paul R. Pillar, Xavier Raufer, Walter Reich, and Fernando Reinares, "Making the Grade: From A to F, How the U.S. Measures Up in its Struggle Against Global Extremism," *The National Interest*, March 2008 - April 2008.
- BRIAN MICHAEL JENKINS, WILL TERRORISTS GO NUCLEAR? (Prometheus Books 2008).
- Jenkins, Brian Michael (2008), *Counterterrorism: Wage a Sustainable Campaign*, RAND REVIEW, Vol. 32, No. 3, at 16-17, Santa Monica, CA.
- Brian Michael Jenkins, "A New Tact on Iraq," *Washingtonpost.com*, August 24, 2007.
- Brian Michael Jenkins, "Outside View: Combating radicalization," *United Press International Energy* (Washington), August 23, 2007.
- Brian Michael Jenkins, "Nuclear terror: How real?" *The Washington Times*, May 13, 2007, B03.
- Brian Michael Jenkins, "Not Every Tragedy Has a Solution," *Washingtonpost.com*, April 18, 2007.
- Brian Michael Jenkins and Bruce R. Butterworth, MTI Report #06-07: *Selective Screening of Rail Passengers,* San Jose, CA: Mineta Transportation Institute, February 2007.
- Brian Michael Jenkins, "Old Front Against Terrorism," *The San Diego Union-Tribune*, January 14, 2007.
- Brian Michael Jenkins, "Foreword," Mitchell Silber and Arvin Bhatt, Radicalization in the West: The Homegrown Threat, New York: NYPD, 2007.
- Brian Michael Jenkins, "Outside View: Terror war uncertainties," *United Press International* (Washington), October 6, 2006.
- Brian Michael Jenkins, "The State of the Jihad address," *Los Angeles Times*, September 11, 2006, B11.
- Brian Michael Jenkins, "Safer, but not safe; Entire jihadist cycle must be disrupted," *The San Diego Union-Tribune*, September 10, 2006, G-1.
- Brian Michael Jenkins, "Jihad Targets Wallets; But Lasting Oil Price Boosts Come From Armed Conflict, Embargoes, Basic Economics," *Pittsburgh Post-Gazette* (Pennsylvania), March 14, 2006, A-8
- Brian Michael Jenkins, "Outside View: The threat of oil jihad," *United Press International* (Washington), March 4, 2006.
- Brian Michael Jenkins, "Lessons for Intelligence in the Campaign Against al Qaeda," *Vanguard*, March 1, 2006.
- Brian Michael Jenkins, "Bin Laden and al-Qaida are still a force," *The Record* (Kitchener-Waterloo, Ontario), January 31, 2006, A7.
- Brian Michael Jenkins, "U.S. is long way from end of war on terror," *The Times Union* (Albany), January 30, 2006, A7.

- Brian Michael Jenkins, "Tape shows war on terror has just begun," *Deseret Morning News* (Salt Lake City), January 28, 2006.
- Brian Michael Jenkins, "Just starting: The war against terror; Al-Qaida is weaker since 9-11, but the new Osama bin Laden tape shows the group is far from impotent," *Newsday* (New York), January 25, 2006, A33.
- BRIAN MICHAEL JENKINS, UNCONQUERABLE NATION: KNOWING OUR ENEMY, STRENGTHENING OURSELVES (RAND Corporation 2006).
- Brian Michael Jenkins, "Improving Public Surface Transportation:  What Do We Do Now?" in Russell D. Howard et. al. (eds.) Homeland Security and Terrorism: Readings and Interpretations, New York:  McGraw-Hill Books, 2006.
- Brian Michael Jenkins, "The New Age of Terrorism," in David G. Kamien (ed.) The McGraw-Hill Homeland Security Handbook, New York:  McGraw-Hill Books, 2006, pp. 117-130.
- Jenkins, Brian Michael (2006), *The New Age of Terrorism*, RAND, Santa Monica, CA.
- Jenkins, Brian Michael (2006), *Fear Cannot Counter Terror*, RAND, Santa Monica, CA.
- Jenkins, Brian Michael (2006), *To Counter Terror, We Must Conquer Our Own Fear*, RAND, Santa Monica, CA.
- Brian Michael Jenkins and Gregory F. Treverton, "Misjudging The Jihad: Briefing Osama on All the War's Wins and Losses," *San Francisco Chronicle*, November 13, 2005.
- Brian Michael Jenkins, "Outside view: Responses to terror," *United Press International* (Washington), October 28, 2005.
- Brian Michael Jenkins, MTI Report #S-05-02: *Third National Transportation Security Summit: Rail Security – A Symposium on Terrorism and Business Continuity*, San Jose, CA: Mineta Transportation Institute, September 29, 2005.
- Brian Michael Jenkins and Jack Weiss, "Let Sgt. Friday fight terror," *Los Angeles Times*, September 25, 2005, M6.
- Brian Michael Jenkins, "Democracy's defense: Values and justice," *The Baltimore Sun*, September 11, 2005, 31A**.**
- Brian Michael Jenkins, "Four years after 9/11, war on terror slogs on," *The San Diego Union-Tribune*, September 11, 2005, G-1.
- Brian Michael Jenkins, "Democracy's Defense: Values and Justice," *Baltimore Sun*, September 11, 2005.
- Brian Michael Jenkins, "Done right, searches aid our security," *The Advocate* (Baton Rouge, Louisiana), July 31, 2005, 13-B.
- Brian Michael Jenkins, "Selecting for security; The key to guarding against terrorism lies in making vigilant, not blind, choices of whom to monitor and how," *Newsday* (New York), July 26, 2005, A31.
- Brian Michael Jenkins, "The lessons of London," *The San Diego Union-Tribune*, July 17, 2005, G-1.
- Brian Michael Jenkins, "Strategy: Political Warfare Neglected," *The San Diego Union-Tribune*, June 26, 2005.

- Brian Michael Jenkins, "Can the Iraq beast be tamed?" *The Boston Globe*, May 18, 2005, A17.
- Brian Michael Jenkins, "The men who pursued paradise in destruction; Perfect Soldiers The Hijackers: Who They Were, Why They Did It," *Los Angeles Times*, May 15, 2005, R8.
- Brian Michael Jenkins, Meg Williams and Ed Williams, "Iraq kidnapping strategically effective; We can expect to see the continued accumulation of hostages in Iraq and the commercialization of hostages as cash ransoms increasingly become part of the demands of terrorist kidnappers," *Chicago Tribune*, April 29, 2005, C25.
- Brian Michael Jenkins, "Bin Laden and his special effects; His words still have the power," *Chicago Tribune*, February 4, 2005, C23.
- Brian Michael Jenkins, "Iraq: Not Terrorist Central," *Pittsburgh Post-Gazette*, January 30, 2005.
- Jenkins, Brian Michael (2005), *Three Years After: Next Steps in the War on Terror*, RAND, Santa Monica, CA.
- Brian Michael Jenkins, "Intelligence," in Confronting Terrorism: The Club of Madrid Series of Democracy and Terrorism, Vol. II Madrid:  The Club of Madrid, 2005.
- Brian Michael Jenkins, "The Four Defensive Measures Against Terrorism," *24 Chasa*, September 24, 2004.
- Brian Michael Jenkins, "The view from Ground Zero: Is America safer?" *The San Diego Union-Tribune*, September 12, 2004, G-1.
- Brian Michael Jenkins, "World becomes the hostage of media-savvy terrorists," *USA TODAY*, August 23, 2004, 11A.
- Brian Michael Jenkins, "Looking for 'High Noon' in a Hundred Years' War," *The San Diego Union-Tribune*, August 22, 2004, G-1.
- Brian Michael Jenkins, "Don't Move Too Fast on Intelligence Reform," *The Hill*, August 17, 2004.
- Brian Michael Jenkins, and Paul K. Davis, "A System Approach to Deterring and Influencing Terrorists," in *Conflict Management and Peace Science,* Vol. 21, No. 1, Spring 2004.
- Brian Michael Jenkins, "Trains, buses and terror; Madrid-like bombing possible in U.S. unless we take precautions," *San Jose Mercury News* (California), May 3, 2004, 7B.
- Brian Michael Jenkins, "Terrorism; Bin Laden May Be Fishing for Allies on Europe's Secular Left; The Al Qaeda leader set aside his usual religious rhetoric in favor of phrases from the Marxist revolutionary lexicon," *Los Angeles Times*, April 25, 2004, M3.
- Brian Michael Jenkins, "Nations ponder whether terrorism 'works'," *Chattanooga Times Free Press* (Tennessee), March 28, 2004, F2.
- Brian Michael Jenkins, "Does terrorism work? Violent groups have won some battles; ultimate goals have stayed out of reach," *San Jose Mercury News*, March 25, 2004.
- Brian Michael Jenkins, "War of Words: 'Axis of Evil' Versus 'Chain of Evil'; In recent speeches, both President Bush and Osama bin Laden defended war as their most important mission," *Los Angeles Times*, February 1, 2004, M3.

6

- Brian Michael Jenkins (2004), *Redefining the Enemy: The World Has Changed, But Our Mindset Has Not*, RAND Review, Vol. 28, No. 1, at 16-23, Santa Monica, CA.
- Brian Michael Jenkins**,** "From 'white' Christmas to 'orange' Christmas," *The San Diego Union-Tribune*, December 25, 2003, B-7:7; B-5:1; B-9:2; B-13:6.
- Brian Michael Jenkins**,** "Killing bin Laden, et al, Is No Help," *Newsday* (New York), December 3, 2003, A37.
- Brian Michael Jenkins**,** "Imperfect airline security; improvements needed, but risks will persist," *Lexington Herald Leader* (Kentucky), October 26, 2003, D1.
- Brian Michael Jenkins, "Air security is no sure thing," *The Star-Ledger* (Newark, New Jersey), October 23, 2003, 15.
- Brian Michael Jenkins**,** "Breach of Airline Security is Nothing to Panic About," *Los Angeles Times*, October 21, 2003, B15.
- Brian Michael Jenkins and Frances Edwards-Winslow, MTI Report #02-06: *Saving City Lifelines: Lessons Learned in the 9-11 Terrorist Attacks*, San Jose, CA: Mineta Transportation Institute, September 2003.
- Brian Michael Jenkins**,** "Connect the cops to connect the dots," *The San Diego Union-Tribune*, June 1, 2003, G-1.
- Brian Michael Jenkins**,** "All citizens now first responders," *USA TODAY*, March 24, 2003, 19A.
- Brian Michael Jenkins, "What if We Don't Attack Iraq?" *Pittsburgh Post-Gazette*, March 16, 2003.
- Jenkins, Brian Michael (2003), *The Influence Component of Counterterrorism,* RAND REVIEW, Vol. 27, No. 1, at 12-15, Santa Monica, CA.
- Brian Michael Jenkins, "Looking at al Qaeda from the Inside Out:  An Annotated Briefing," Defense Adaptive Red Team Working Paper #03-4, 2003.
- Brian Michael Jenkins, "The US Response to Terrorism and Its Implications for Transatlantic Relations," in Gustav Lindstrom (ed.) *Shift or Rift, Assessing US-EU relations after Iraq*, Paris: European Union Institute for Security Studies, 2003.
- Brian Michael Jenkins, *Corporate Security in the Post 9-11 World,* London, International Chamber of Commerce (ICC), 2003.
- Brian Michael Jenkins, MTI Report #S-01-04: *Nature and Severity of the Terrorist Threat – California Transportation Security Summits*, San Jose, CA: Mineta Transportation Institute, March 28 and 29, 2002.
- Brian Michael Jenkins, et.al., *California's Vulnerability to Terrorism,* Santa Monica, CA, RAND Corporation, 2002.
- Jenkins, Brian Michael (2002), *Countering al Qaeda*, RAND, Santa Monica, CA.
- Jenkins, Brian Michael (2002), *Deterrence & Influence in Counterterrorism*, RAND, Santa Monica, Ca.
- Brian Michael Jenkins, *Deterrence, Protection, and Preparation: The New Transportation Security Imperative,* Washington, D.C., Transportation Research Board, 2002.
- Brian Michael Jenkins, "A resilient nation recovers. Now, on to building a defense and attacking the threat; Strategies in the shadow war against al-Qaeda," *The San Diego Union-Tribune*, September 8, 2002, G-1.

- Brian Michael Jenkins, "Countering al-Qaeda: The Next Phase in the War," *The San Diego Union-Tribune*, September 8, 2002.
- Brian Michael Jenkins, "Fliers Have Reason to Jettison Jitters," *Atlanta Journal-Constitution*, September 3, 2002.
- Brian Michael Jenkins**,** "Get used to it: Airports are vulnerable," *The Record* (Bergen County, New Jersey), August 2, 2002, L11.
- Brian Michael Jenkins, "The benefits, limits of airport security," *The Ithaca Journal* (Ithaca, New York), August 1, 2002, 10A.
- Brian Michael Jenkins, "Airtight security an unreachable goal," *Milwaukee Journal Sentinel* (Wisconsin), July 30, 2002, 13A.
- Brian Michael Jenkins, "Where to draw the line on public security," *Sun-Sentinel* (Fort Lauderdale, FL), July 30, 2002, 13A.
- Brian Michael Jenkins, "Put Brains Behind Airway Safety," *New York Daily News*, July 30, 2002.
- Brian Michael Jenkins, "Get used to it: Our Airports are Vulnerable to Terrorism; We can lessen but not eliminate the risk of attacks," *Los Angeles Times*, July 25, 2002, 13.
- Brian Michael Jenkins, "Face Terror with Better Spying, Not Moats of Fear," *Los Angeles Times*, July 10, 2002, 13.
- Brian Michael Jenkins, MTI Report #01-14: *Protecting Public Surface Transportation Against Terrorism and Serious Crime: An Executive Overview*, San Jose, CA: Mineta Transportation Institute, October 2001.
- Brian Michael Jenkins and Larry N. Gersten, MTI Report #01-07: *Protecting Public Surface Transportation Against Terrorism and Serious Crime: Continuing Research on Best Security Practices,* San Jose, CA:  Mineta Transportation Institute, September 2001.
- Brian Michael Jenkins, "Safeguarding the skies," *The San Diego Union-Tribune*, September 30, 2001, G-1.
- Brian Michael Jenkins, "This time is it different," *Copley News Service*, September 17, 2001.
- Brian Michael Jenkins, "This Time It's Different," *The San Diego Union-Tribune*, September 16, 2001, G-1.
- Brian Michael Jenkins, "Society under siege, A confounding complex tragedy," *The San Diego Union-Tribune*, June 17, 2001, G-1.
- Brian Michael Jenkins, "Disloyalty Feeds on Cash, Flesh and Thrills," *Los Angeles Times*, February 22, 2001.
- Brian Michael Jenkins, "Terrorist Trials Serve U.S. Strategy," *Los Angeles Times*, January 7, 2001, M5.
- Brian Michael Jenkins, "Foseco gets to grips with global 'glitches,'" *Strategic Direction*, Jan. 2001, Vol. 17, No. 1, pp. 17-19.
- Jenkins, Brian Michael (2001), *Stop Selling Out Aviation Security*, RAND REVIEW, Vol. 25, No. 3, at 20-21, Santa Monica, CA.
- Brian Michael Jenkins, "The Organization Men: Anatomy of a Terrorist Attack," in James F. Hoge, Jr., and Gideon Rose (eds.) *How Did This Happen? Terrorism and the New War,* New York, Public Affairs, 2001.

- Brian Michael Jenkins, "Terrorism and Beyond: a 21st Century Perspective," *Studies in Conflict & Terrorism*, 24:321-327, 2001.
- Brian Michael Jenkins, "Colombia: Crossing a Dangerous Threshold," *The National Interest*, Winter 2000/2001.
- Brian Michael Jenkins, "U.S. credibility on line in oil probe," *The Times Union* (Albany, New York), Nov. 7, 2000, A15.
- Brian Michael Jenkins, "Oil Greases the Way for Corruption," *Los Angeles Times*, October 31, 2000, B9.
- Brian Michael Jenkins, "Military's role in responding to catastrophic terrorism," *United Press International* (Los Angeles), June 18, 2000.
- Brian Michael Jenkins, "U.S. Must Use Terrorist Informants," *Plain Dealer* (Cleveland, Ohio), June 16, 2000, 9B.
- Brian Michael Jenkins, "Unsavory Characters a Necessary Evil," *Contra Costa Times* (California), June 11, 2000, P11.
- Brian Michael Jenkins, "War on Terror Needs Unlikely Allies," *Newsday* (New York), June 8, 2000, A43.
- Brian Michael Jenkins, "Perspective on Terrorism; Prepare for Worst in a Dangerous World; Bring in Even Unsavory Characters to Juice up the Quantity and Credibility of our Intelligence Gathering," *Los Angeles Times*, June 6, 2000, Home Edition, B9.
- Brian Michael Jenkins, "Preparing for tomorrow's terrorism," *United Press International*, June 6, 2000.
- Brian Michael Jenkins, "Perspective on Policing; Elite Units Troublesome, But Useful; We Need them for Tough Assignments, But They Require Skillful Management, Strong Leadership," *Los Angeles Times*, March 27, 2000, B5.

**EXHIBIT 173 TO DECLARATION OF VALERIE SCHUSTER**

# Radical, Religious, and Violent
The New Economics of Terrorism

Eli Berman

The MIT Press
Cambridge, Massachusetts
London, England

5
_____

# The Hamas Model: Why Religious Radicals Are Such Effective Terrorists

We must examine the costs and benefits of continued armed operations.

—Mahmoud al-Zahar, founding member of Hamas, quoted in *Al Quds*, East Jerusalem, October 1995[1]

## The "Hamas Model"

In October 2005 a major earthquake shook the mountains and valleys of Kashmir, the disputed region that sits uncomfortably between northwest India and Pakistan. While the epicenter was in Pakistani-administered western Kashmir, the destruction traced a broad arc along the intersections of the Eurasian and Indian plates, from Karachi in southwest Pakistan, north into Afghanistan, east across northern Pakistan, through Kashmir, and into India. Over seventy thousand people died, mostly in Kashmir. Millions were left homeless. In the earthquake's aftermath humanitarian needs were acute—especially in the poorly governed hinterlands of Kashmir. Remote villages with road access blocked by landslides desperately required medical care, food, and sometimes even help extracting survivors from the rubble. National and international aid efforts were immediate but disorganized. Some of the most nimble providers of aid were reported to be bearded young radical Islamists.

*Der Spiegel* reporter Susanne Koelbl describes twenty-five-year-old Mohammed Maqsood, a "militant" in Kashmir who would not shake her hand or even make eye contact with her—a female journalist.

Men like Maqsood were the first aid workers to arrive in the disaster zone.... They conducted systematic searches for survivors in the rubble of ruined buildings, often digging with their bare hands. In the first two days

following the earthquake the bearded young men seemed to be the only ones with a well-functioning network—both in Muzaffarabad, the capital of the Pakistani state of Azad Kashmir, and in the completely devastated settlements of Bagh and Balakot. Many local residents owe their lives to these aid workers.

Today Maqsood is the acting director of the Al-Rahmat Trust Camp, a refugee camp for earthquake victims in central Muzaffarabad. It's an open secret that the organization is the civilian wing of a banned guerilla organization, Jaish-e-Mohammed . . . and its fighters are battling Indian security forces in the Indian section of Kashmir.[2]

Under the subheading "The Hamas Model," journalist Koelbl goes on to describe these "militants": "Their politics and policies resemble those of the militant groups Hamas and Hezbollah in the Middle East, where radicals have filled the vacuum left by the state. They develop social institutions and help address the local population's day-to-day survival needs. In the long term, this social role also helps the local population identify with the respective groups' political goals."[3] Describing a different Islamic aid group, *Jamaat-ud-Dawa*, she writes:

The organization, with its many camps and hospitals, ordinary schools and Koran schools, is the region's strongest and most powerful Islamist aid organization. It is closely associated with the banned Lashkar-e-Tayyaba, or "Army of the Pure," which, like Jaish-e-Mohammed, sends its fighters into the Indian section of Kashmir to kill soldiers and blow up military barracks. Both groups are also suspected of having committed the 2001 attack on the Indian parliament in New Delhi.[4]

Lashkar-e-Taiba subsequently dispatched the Mumbai terrorists in November 2008, according to the admission of the surviving attacker, Mohammed Ajmal Kasab. They are responsible for over 170 deaths in suicidal attacks on a packed train station, luxury hotels, and a Hassidic religious center. Indian authorities also hold Lashkar-e-Taiba responsible for a number of other murderous terrorist attacks, including the July 2006 train bombings in Mumbai, which killed 211 people. The dissonance is jarring: empathy for earthquake victims and proactive dedication to their well-being on the one hand, and murderous disregard for the lives of other civilians on the other.[5]

That same disturbing dissonance characterizes all of the violent groups I've described already. While it is reassuring to realize that these terrorists are neither theologically brainwashed drones, nor the psychopathic

Case 1:05-cv-04622-DLI-RML   Document 267-13   Filed 03/22/12   Page 610 of 646 PageID #: 7288

killers of B movies, it's hardly a consolation to know that people who are effective at providing humanitarian assistance, education, and health-care to their own constituency, are at the same time so deadly when it comes to outsiders.

Compared to older terrorist organizations the current cohort of radical religious terrorists all started out relatively short on training and experience, yet the Taliban, Hamas, and Hezbollah nonetheless quickly developed into the most destructive rebel organizations in their respective conflicts. I think the central question about modern terrorism is this: If religious radicals are neither blinded by theology nor psychopathic killers, then why, when they turn to violence, are they so effective at it? This chapter suggests an answer, using the logic of defection constraints and economic clubs developed above, and turning to data from the Middle East for evidence. The first step in the argument is to see violent religious radicals as their constituencies do, as economic clubs.

## Origins of the Model

Social service provision dates back to the very beginnings of modern political Islam. Hasan al-Banna, the first political Islamist of the twentieth century, was a gifted schoolteacher in the Egyptian city of Ismailia, on the west bank of the Suez canal. A charismatic preacher, al-Banna would lecture in the mosques and even in the coffee houses in the evenings. Together with six laborers, he founded the Society of Muslim Brotherhood at age twenty-two in 1928. Like other religious thinkers at the time, al-Banna opposed European and secular influences. He advocated a return to traditional Muslim values, the strengthening of families, and an Islamic approach to social and political issues.[6] Unlike other organizations, the Brotherhood took practical action under his leadership. Al-Banna and his followers raised money and built a mosque, and then two schools (one for boys and one for girls) as well as a social club.

Using freshly declassified State Department and CIA documents, sociologist Ziad Munson took a new look at the history of the Muslim Brotherhood in 2001. He describes al-Banna's organizational model:

Each new branch of the Society followed a similar pattern of growth. The organization would establish a branch headquarters and then immediately begin a

public service project—the construction of a new mosque, school, or clinic, the support of a local handicraft industry, or the organization of a sports program. This private social service infrastructure grew quickly and became an important part of the Egyptian social, political and economic landscape.[7]

The Brotherhood grew exponentially. They organized youth groups, charities, trade unions, and night schools for workers. Eventually they even owned factories. Al-Banna's organization expanded to fifteen branches by 1932, when he relocated himself and their headquarters to Cairo; and to three hundred branches by 1938, with a membership estimated at between 50,000 and 150,000. By 1949 the Brotherhood's two thousand branches throughout Egypt included between 300,000 and 600,000 members.[8]

The Brotherhood filled a demand for educational, cultural, social, and medical services left unmet by government. Yet a club is not a government—in order to motivate members (who are generally volunteers) not to shirk on their work for the club it expels them for shirking and excludes nonmembers from access to services. Munson writes: "Muslim Brotherhood public works brought millions of Egyptians into contact with the organization and its ideology. They helped overcome potential free-rider problems within the organization, as resources such as schools and clinics served as *selective incentives* for Muslim Brotherhood members and potential recruits."[9] To be clear, the "free riders" that Munson describes are the shirkers in the mutual aid examples of the last chapter.

The Brotherhood established a tiered membership structure early on, by 1935. Lower-tier members paid dues, held a membership card, and had access to the social service network and mosques. At higher tiers, the Brotherhood required more commitment, including an oath of allegiance, Koranic studies, and physical training. This structure allowed the organization to select suitable candidates among the large pool of lower-tier members who sought services, then train and indoctrinate them. Once suitably selected and prepared, higher-tier members could be entrusted with more sensitive jobs.

The social service network also created an organizational base that protected the Muslim Brotherhood against repression, which the government quickly resorted to when the Brothers became involved in

politics. For the first decade the Brotherhood remained apolitical, concentrating on building social service institutions and preaching personal piety. That changed when two political currents merged into a perfect wave of opportunity. The first was the 1936 general strike in Palestine, a rebellion of Palestinian Arabs against both the British—who governed Palestine under a mandate from the League of Nations—and Jewish settlement. The rebellion in Palestine gave the Brotherhood a chance to show solidarity with an anti-imperialist movement without actually endangering themselves by rebelling in Egypt against British control of the government. The second current was the terribly unpopular collaboration of the Wafd party with the British. The Wafd party had previously gained widespread support by waving the banner of Egyptian nationalism, so their implicit acceptance of British rule was considered a betrayal. In 1941 the Brotherhood seized the political opportunity, running candidates in elections and calling for both social reform and British withdrawal. The British responded by banning the party and arresting leaders. Yet by this time the Brotherhood was difficult to suppress. Its broad membership base made it resilient to the loss of leaders. They easily weathered the storm. The British soon went back to concentrating on the war effort and released the Brotherhood leaders.

That organizational base, built on the social service provision network, would prove critical in surviving the next, more severe, round of repression. Previously, sometime around 1939 al-Banna and the Brotherhood leadership had reluctantly established a militia, the "Secret Apparatus," in response to internal pressure from more militant leaders. After the end of World War II, the Apparatus began attacking British and government targets. The government responded by legally dissolving the Brotherhood in December 1948. The Apparatus took revenge later in the same month, assassinating Prime Minister Mahmud Fahmi al-Nuqrashi. Al-Banna condemned the assassination, protesting to the authorities that he could not control the militia with a crackdown in place and his organization officially dissolved. His pleas of innocence did him no good. Al-Banna was shot in the street by government agents in February 1949. Yet, despite losing its charismatic founding leader, suffering fierce repression—which included the arrest of four thousand members—the

Brotherhood again proved resilient, managing to retain the loyalty of members and of its constituency.

The Free Officers coup of 1952 led to an even more serious challenge. The new president, Gamal Abdel Nasser, and the coup leadership had allied themselves with the Brotherhood to gain power. Yet the organization and the new government were quickly in conflict. The Brotherhood demanded power sharing and was incensed, among other things, over the British-trained officers' refusal to ban alcohol. In October 1954 a Muslim Brother attempted to assassinate President Nasser. Or perhaps he was framed. Either way, Nasser emerged a hero and exploited the opportunity. He legally dissolved the Brotherhood, had six members hanged, imprisoned thousands, and launched a protracted campaign of arrest and torture that would last for a decade.

Nasser also took an additional, critical step that the British and the previous Egyptian government had not. He nationalized the Brotherhood's social service provision network and operated it as part of the Egyptian government. That counterinsurgency strategy was singularly effective: without its schools and clinics the vast organization withered, and to this day it has not recovered its political strength or organizational ability. The threat to Nasser's government dried up with it.

A virulent new strain of Islamist revolutionary theology grew in the hostile environment left by the Brotherhood's political failure and Nasser's successful suppression of their operations. One of the jailed and tortured leaders was Sayyid Qutb, who had edited the Brotherhood newspaper. In prison, Qutb developed the extreme principles that became the basis of current jihadist theology. Just a few years earlier the Muslim Brotherhood had been willing to cooperate with secular officers to overthrow the government and expel the British. Now those former allies, Nasser's officers, had their jailers torturing Qutb and the other Brotherhood leaders. A new approach was needed. Qutb argued that the Western values of individualism, colonialism, capitalism, and Marxism had not only failed; they were a symptom of *jahiliyya*, the chaos that engulfed the world before the time of the prophet Mohammed. This reversion to pre-Islamic chaos had been brought on not by foreign rule, but by secularism—a denial of the will of the Almighty. His solution was clear: prepare for a jihad to overthrow the usurpers, both foreign and secular

governments, in Egypt and abroad, and to establish Islamic states in their place. Qutb preached that under the circumstances violent revolt was a religious duty, even against Muslim nationalists. Until that revolt was feasible, he called on his followers to self-segregate Islamist communities from the secular culture, so that they could survive.

The Egyptian Brotherhood and the Egyptian clerical establishment largely rejected Qutb's theories, as do most Muslims.[10] His view of violent jihad as a religious requirement is controversial and generally not accepted on theological grounds. Jihad for most Muslims is a personal mission of pious self-improvement and service to others.[11] Muslims generally interpret Islam as tolerant of other cultures, permitting violence only in self-defense and never in religious matters. Qutb claimed that violence is permitted because Islam is under siege, but that argument is generally rejected. Nasser's government had Sayyid Qutb hanged for treason in 1966. But his brother, Mohammed Qutb, survived to publicize his works, and would eventually personally influence Al Qaeda leaders Ayman al-Zawahiri and Osama bin Laden. Through that link Sayyid Qutb's writings would provide the foundation for Al Qaeda's political theology of global jihad.

While it is easy to lump al-Banna and Qutb together, understanding the broad influence of the Muslim Brotherhood requires carefully distinguishing al-Banna's organizational model from Qutb's theology. Al-Banna's major innovation was not theological but organizational. He invented what is now called the "Hamas model"—an Islamic social service provision organization that can quickly evolve to exploit political opportunities as they arise, all with the goal of enabling personal piety and eventually establishing an Islamic state. This organizational model generated the exponential growth and popularity of the Muslim Brotherhood from the late 1920s through the late 1940s, long before massive oil revenues were available to subsidize present-day Islamist charities. Al Qaeda, today's bearer of Qutb's ideological torch, is harshly critical of the Muslim Brotherhood, rejecting their willingness to participate in elections as an abandonment of the duty of violent struggle against corrupt usurpers of power, Muslim or otherwise.[12]

Al-Banna's approach to Islam was strict but would hardly qualify him as a theological radical. He was on the conservative edge of the

mainstream, arguing for a more literal reading of the holy texts. His stance included strict prohibitions concerning individual conduct, such as dancing and gambling, which mainstream Muslims might allow, and a rejection of all things Western, such as theater, films, and foreign styles of dress. The club approach predicts that those stricter prohibitions should have contributed to the success of the Brotherhood's social service provision network, though the social service component of the Brotherhood's history is terribly understudied and we currently have no direct evidence with which to test that conjecture.

Whether the internal workings of Muslim Brotherhood charities and communities are economic clubs, like those of radical Christian and Jewish sects—which are much better documented—is an open question. On the one hand we have no direct evidence. On the other, the Muslim Brotherhood under al-Banna did practice exclusionary provision of services, and service provision seems to be accompanied by a stricter set of religious prohibitions than those practiced by the surrounding society. Furthermore, there is the puzzle of who pays for the social services. Like the Christian and Jewish radical religious clubs, the Muslim Brotherhood manages to provide extensive services without formal tax authority or an outside revenue stream. Economist Timur Kuran of Duke University estimates that charitable contributions (*zakat*) in other Muslim countries make up less than 1 percent of income among the general public, indicating that volunteer labor would be necessary to keep such a large network running.[13] We do know that, whatever their internal workings, al-Banna's model of Islamist charities combined with politically active Islam has spread successfully and widely, with Muslim Brotherhood chapters now established in countries and communities throughout the Muslim world.

Under the subsequent Egyptian presidents, Anwar el-Sadat and Hosni Mubarak, the Muslim Brotherhood was technically forbidden to engage in political activity but was generally tolerated, with occasional waves of arrests and government repression. President Sadat, who succeeded Nasser in 1970, freed members from jail and co-opted the Brotherhood in an effort to present himself as a more Muslim leader as he consolidated power. The organization's influence has grown since, as its rebuilt social service networks—financed since the 1980s with revenues from zakat—

have outperformed those of the government. Sadat would not survive his experiment with co-opting the Brotherhood. In October 1981, as he reviewed a military parade, a truck full of troops halted in front of the review stand and opened fire on the presidential party, killing Sadat and eleven others. The troops were loyal to the Egyptian Islamic Jihad, an outgrowth of the Muslim Brotherhood that espoused a jihadist theology influenced by Qutb.

President Hosni Mubarak, Sadat's successor, has taken a middle course, allowing the Muslim Brotherhood to compete unofficially in tightly controlled elections while brutally suppressing the Egyptian Islamic Jihad. (He has good reason. The Egyptian Islamic Jihad ambushed Mubarak's presidential motorcade during a visit to Ethiopia in June 1995, narrowly failing in their attempt to assassinate him). In the Egyptian parliamentary elections of 2005, Muslim Brotherhood candidates ran as independents. Despite strict government control of both the media and the election process, Brotherhood-affiliated candidates won one-fifth of the total seats and formed the largest opposition bloc.

## Hamas

With the history of the Muslim Brotherhood as background, the birth of Hamas appears familiar. Palestinian-born Sheikh Ahmed Yassin returned to Gaza in the early 1970s from Egypt, where he had joined the Muslim Brotherhood as a university student.[14] He vitalized local branches of the Brotherhood by following al-Banna's standard procedure: build an organizational base of social service provision and wait patiently for political opportunities. The Israeli occupational government and foreign aid providers left him lots of service provision opportunities: Gaza had a tremendous unfilled demand for new mosques, schools, clinics, youth groups, and the like.

The Brotherhood managed to supplement local charitable giving by soliciting funding from Muslims abroad, especially after the oil crises of the 1970s initiated a flood of oil revenue from the world's economies into the Persian Gulf. They also found a way to gain revenue and political power with the help of an unlikely ally: with the tacit approval of the Israeli administrators, to whom the Brotherhood looked like a placid

counterbalance to Yasir Arafat's Fatah, they gained control over important mosques and the substantial *waqf* property attached to them.[15] (A waqf is a religious trust established according to Ottoman law. The most famous waqf is that which controls the Haram al-Sharif, the Temple Mount, in Jerusalem. Since waqf property is not taxed, much private wealth was historically channeled into these trusts, so that a waqf associated with a mosque or charitable institution can retain significant assets.) Mishal and Sela (2000) report that about 10 percent of the agricultural land and other real estate in Gaza belongs to various *awaqf* (plural of *waqf*).[16] Between these three sources of revenue—local charity, transfers from Muslims abroad, and proceeds from waqf properties—Yassin's branch of the Brotherhood gathered the resources to grow its service provision network.

Yassin's initial reluctance to get involved in the nationalist, territorial struggle with Israel would have been sensible, considering the odds against expelling the Israelis and the Brotherhood's dismal history with its Secret Apparatus in Egypt. As we've seen, though, internal pressure from younger members, combined with the threat of being left out of a popular uprising—the first Intifada—eventually prompted Yassin to reluctantly authorize a militia, Hamas, in late 1987. The new name would have been an attempt to distance the militia from the social service institutions, which might be vulnerable to repression, as the Muslim Brotherhood's network of institutions in Egypt had been.

Why did Hamas turn to terrorism? The Oslo Accords of 1993 launched a peace process between Israel and the Palestine Liberation Organization (PLO) designed to create an eventual Palestinian state. That process had delivered the leadership of the Palestinian Authority (PA) to Yasir Arafat's secular Fatah movement, the dominant organization in the PLO. Familiar as Yassin had to be with the Brotherhood's history in Egypt, the threat must have been clear. Nasser's secular nationalist state had shattered the Brotherhood's dream of an Islamist state in Egypt. Now Arafat was threatening to do the same by creating a secular *Palestinian* state. Yassin ridiculed Fatah for collaborating with the occupiers, painting them into the role of the Egyptian Wafd—this time with the Israelis cast as the British colonialists. Terrorism against Israeli targets allowed Hamas to present themselves as the true nationalists. Hamas did not

need Qutb's global jihadist ideology to turn to terrorism. The possibility of Fatah gaining a Palestinian state simply created opposing political agendas and a political opportunity that could be captured through violence. At first violent resistance against Israel was designed to position Hamas as a nationalist organization like Fatah. Later it was designed to undermine Fatah by crippling the peace process.

When political opportunities emerged Hamas seized them. First, the Oslo process stalled in the mid-1990s. Then economic conditions on the West Bank and in Gaza worsened. These developments allowed Hamas to brand Fatah as corrupt collaborators. Hamas, their reputation enhanced by both a thriving social service provision organization and lethal acts of terrorism, could present themselves as an alternative, both honest and brave. In January 2006 they chose to participate in Palestinian parliamentary elections and won—surprising even themselves. That victory set off a crisis, because Israel, the United States, and Europe cut off the international aid that supported the Palestinian authority, leaving the Palestinian Authority unable to pay civil servants' salaries. Though Hamas nominally held power, they lacked the resources to govern. As discussed above, that electoral victory set off a chain of events that led to Hamas seizing Gaza, rocket attacks on Israeli civilians, and the Israeli incursion into Gaza in December 2008. Though they lost that battle, Hamas can now aspire to win the reconstruction and to make further political gains at the expense of Fatah.

In summary, the so-called Hamas model was introduced and developed in Egypt, by al-Banna's Muslim Brotherhood. The Hamas theology is not jihadist, in Qutb's sense. Indeed, Hamas has generally distanced itself from Al Qaeda and global jihadists. Like the original Muslim Brotherhood in Egypt, their political aspirations are domestic. Hamas aspires to solve the problems of Muslim Palestinians by establishing an Islamic state. Their first step was to set up a social service provision network, just as al-Banna had done in Ismailia, which was accomplished by the early 1980s. After that, they were poised to seek political power, by violence if necessary, and with the help of Iranian allies if it suits their purposes.

In this sense, Hamas is *not* a terrorist organization using social service provision as a front to disguise its other activities, as is sometimes

claimed.[17] The social services came first. As recently as 2001, Israeli terrorism expert Reuven Paz wrote of Hamas, "Approximately 90 percent of its work is in social, welfare, cultural and educational activities. These are important elements of Hamas's popularity that keep it closely tied to the public. Hamas is more effective than most PA institutions, which is not surprising considering the difficulties and corruption of the PA. Its only real competitors are several nongovernmental organizations that cannot or do not want to translate their work into political influence."[18] Hamas is better understood as a radical religious, social service-providing organization, in the mold of al-Banna's Muslim Brotherhood, which adopted terrorism in order to achieve its political goals.

### Social Service Provision by the Taliban, Hezbollah, and al-Sadr

The roots of the Taliban also contain aspects of the "Hamas model": a radical religious social service provider with political aspirations. The Taliban trace their origins back to refugee camps run for Afghans in Pakistan by the Jamiat-e Ulama-I Islam (JUI), a small Pakistani Islamist political party. The JUI are fundamentalists, following the Deobandi educational tradition. The Deobandi began in India in the nineteenth century as a reaction to British rule, when they rejected instruction in English—the language of the colonial power. Deobandi schools have a strong antisecular bias, teaching mostly religious subjects. They are supported by charity and awaqf, with additional donations coming from Saudi Arabia since the 1970s.[19] Deobandi schools expanded rapidly in the 1980s in Pakistan, partially because of supportive government influence over waqf assets. Pakistani journalist Ahmed Rashid describes the JUI-Taliban connection:

Throughout the [Afghan civil] war in the 1980s the Jamiat-e Ulama-I Islam had quietly built up a support base among the Durrani Pushtuns living in Baluchistan and the North West frontier Province, opening up madrassas and carrying out relief work in the refugee camps.

The Pushtuns that belong to the JUI have a great deal in common with the Taliban. Both come from the Durrani tribes that straddle the porous border between Afghanistan and Baluchistan. The activists of the JUI are Deobandis, followers of a fundamentalist reformist sect that interprets Islam, particularly its injunctions against women, extremely strictly.[20]

Case 1:05-cv-04622-DLI-RML Document 267-13 Filed 03/22/12 Page 620 of 646 PageID #: 7298

During the Afghan campaign against Soviet occupation JUI madrassas adopted a militant jihadist stance, with the approval and support of the Pakistani Inter-Services Intelligence organization (ISI), the CIA, and Saudi Arabia, all of whom supported the rebels as a means of expelling the Soviets from Afghanistan.

After the Soviet retreat in 1989 the CIA lost interest, but the JUI madrassas and relief network on the Pakistani side of the border remained, eventually giving birth to the Taliban in 1994. I've already described the consensus view of Taliban origins according to foreign scholars. The Taliban's own version emphasizes provision of a critical service, public safety. Here it is, as told by Australian journalist Anthony Davis:

> The official Taliban version of history traces the genesis of the movement to a humble madrasah in the Singesar village of Kandahar province's Maiwand district where Mohammad Omar, a former mujahid, was studying. Long incensed by the excesses of predatory Mujahideen bands on the provincial highways where arbitrary "taxation," robbery and rape had become a depressing norm, he and thirty comrades finally decided to take up arms in the summer of 1994. On a wave of popular anger, the movement grew from there.[21]

Anthropologist David Kilcullen reports that the resurgent Taliban have returned to providing judicial services in Afghanistan. "By mid-2008, the Taliban were operating 13 guerrilla law courts throughout the southern parts of Afghanistan—a shadow judiciary that expanded Taliban influence by settling disagreements, hearing civil and criminal matters, and using the provisions of Islamic shari'a law and their own Pashtun code to handle everything from law disputes to capital crimes."[22]

We explored above the critical role of social service provision in the development of Hezbollah. In a nutshell, Hezbollah's early leaders were active in Lebanese Shiite charities. With the benefit of Iranian funding, they quickly expanded their social service provision network, triggering an accompanying expansion in visible religiosity.

As we have seen, social service provision also played an important role in the history of the Mahdi Army, Muqtada al-Sadr's militia in Iraq. Al-Sadr's father, Mohammad Sadeq al-Sadr, built an extensive charity network in the 1990s to serve Shiite Muslims in Baghdad and southern Iraq when the sanctions-depleted government of Saddam Hussein cut back services to Shiites.

Those two organizations, Hezbollah and the Mahdi Army, have a close theological affinity. Both are political-religious organizations built by students who studied in the Shiite holy cities of Iran and Iraq. Those two Shiite militias are quite distinct theologically from the three Sunni organizations: the Taliban, Hamas, and al-Banna's Muslim Brotherhood. What all these groups share, though, is the "Hamas model"—political radical Islam combined with social service provision.

### Why Religious Radicals Are Such Lethal Terrorists

The charitable activities of Hamas, the Taliban, Hezbollah, and al-Sadr's militia are confusing to most observers, considering that we first heard these names in the context of violence and terrorism. However, there *is* an organizational logic that links the benign and the violent activity. Here's where economics can help.

Let's reconsider the two young men in the Taliban trade route example of chapter 2. We had them manning a dusty checkpoint in southwestern Afghanistan, somewhere on the Kandahar-Herat route. A convoy is coming into view as it rounds a corner and the men are considering their options: defect, steal the convoy, and start a new life in Turkey; or remain loyal and accept their (much smaller) share of the toll. Recall that they waved the low-value ($10,000) convoy safely through, since defection wasn't worth it for their $430 net profit. On the other hand, if they were offered a high-value ($100,000) convoy, they would defect and steal it. For that reason a high-value convoy would never have left Kandahar in the first place, since its theft was predictable by the organization, if not the client. The two young men illustrated the defection constraint—the largest-value convoy that can be sent down the road without operatives stealing it. That illustration made two general points about loyalty. First, loyalty is critical in lawless places, since there is no legal system to enforce contracts. Second, only an organization that can convince clients of the loyalty of its subordinates will be able to credibly commit to securing its clients' goods along a trade route.

What we now know about the background of those two Taliban members as religious radicals allows us to understand why they

are unlikely to defect. All those years reciting the holy texts in a Deobandi-style JUI madrassa in their refugee camp did very little to prepare them for a new life elsewhere, say running a grocery store as refugees in Turkey. They lack the practical and social skills to get by in a foreign culture, not to mention the ability to run a small business. Without a secular education the poorly educated pair of Taliban guards at the checkpoint have very limited outside options, both in a cultural and in an economic sense. For the sake of argument, assume that any given pair of Afghan Mujaheddin, with only a rudimentary education and very little skills, will defect if they can capture a convoy worth at least $30,000. Then the defection constraint (the smallest-value project that will trigger defection) for these two Taliban members would be much higher, perhaps a $50,000 convoy. They are so poorly suited to making do in an unfamiliar environment that it will take a larger net profit from defection to induce them to try.

The poor outside options of Taliban foot soldiers have wonderful implications for the Taliban organization. The driver of the lead truck in a $40,000 convoy need not worry about being held up, since he knows that the Taliban guards at the checkpoint are not tempted by treasure and economic emancipation in a foreign land. The owner of the goods in that truck may have other worries, but Taliban defectors stealing his shipment is not one of them. The two Taliban foot soldiers at the checkpoint are under the control of their masters, for lack of outside opportunities.

In turn, the mafia of smugglers in Quetta (across the Pakistani border from Kandahar) and the ISI in Pakistan could be sure that the Taliban were a disciplined organization that could control their troops and thus keep their promises. If the route were first conquered, the Taliban could protect it and open it to trade. That trade route revenue, as we saw earlier, allowed the Taliban to grow, financing the conquest of more and more provinces.

It might seem counterintuitive at first, but here at last is an explanation for why the Taliban could protect trade routes for their clients while the former mujahideen of Afghanistan could not. It was not that they recruited talented personnel with outstanding outside options. Quite the opposite. The Taliban could succeed because they had a reservoir of

personnel whose outside options were so poor that their loyalty could be depended on, even when the temptation to defect, steal the convoy, and start a new life on the outside was high.

That logic of creating loyalty by recruiting troops with low outside options applies to many types of coordinated violence. In this instance the trade route had to first be conquered before it could be controlled. That involved capturing the commanding territory, the second militia activity we considered in chapter 2. Think of the commanding territory as hills and consider again that second defection-constraint example— capturing a hill.

In that example the key decision was made by the Taliban soldier considering whether to loyally provide cover fire for his comrades running uphill toward the enemy at the top, or not. He could accept a bribe from the enemy, stop shooting, and doom the attack to failure. Where would he spend the bribe money, though? Certainly not in the Pashtun areas of Afghanistan or Pakistan, which a defector would be wise to flee as fast as a stolen taxi could carry him. Eventually he wouldn't be safe in any part of Afghanistan, if he correctly predicted the Taliban conquest. And what language would he speak? How would he ensure that he was not being cheated in business? What job could he work at? A moment of quick reflection might indicate to the typical Taliban soldier that his lack of outside options makes the offered bribe fall below his personal defection constraint—in this case the smallest bribe that will tempt him into defection. He shoots cover fire loyally for the Taliban. The battle is won, the hill is captured, and the trade route will be secure. Revenue will flow in from the tolls. A few years later the conquest of Afghanistan will be complete.

The young Taliban soldier on the hill shooting cover fire, in an introspective moment, might have asked himself a critical question that brings us back to clubs: Who *did* decide to destroy his outside options by sending him to an inferior school? It wasn't the Taliban, though they benefited, since he was already well through madrassa when they got organized in 1994. It may have been the JUI, who organized traditional Deobandi schools in the refugee camps, rather than schools that taught more universally marketable skills. Or it may have been his parents, if they chose the madrassa over some alternative school to send him to, or over a different place to live.

The short, simple answer is that we don't know. To this day, there's precious little information available to researchers about the educational alternatives of Afghan refugees in the poorly governed western provinces of Pakistan. A longer, more troubling answer is this: even if there were better, secular schooling options for Afghan refugee children in Pakistan, their parents may still have chosen to send them to Deobandi-style madrassas that limit their economic options as adults.

To understand why, recall the earnest young suitors on the doorstep, vying to join radical religious clubs; or the radical Christians in the United States, choosing to limit their children to a middle-school education. People often choose to sacrifice an educational opportunity if it allows them to signal commitment and thereby gain admission to a club, perhaps a mutual aid club, which provides an attractive set of services. If a madrassa education was the cost of admission to the JUI mutual aid network in the refugee camps, then parents may have chosen that education for their children even if they had an alternative. Moreover, considering their options for obtaining basic services such as security and healthcare for their families, those parents would have been making the best choice for their families. Thus, no one necessarily forced the future Taliban fighter to receive an inferior education that limited his outside options. It could have been a wise choice, made with the understanding that even if religious education would not open the door to a good job, it would open doors to membership in a local radical religious service-providing club.

The puzzle of the Taliban limiting their outside options is really just a variant of the puzzle we saw among radical religious Christians and Jews. Why would *anyone* choose to submit to a life with poor outside options? That's the logic of sacrifice. By limiting outside options one incurs a cost, which signals to a community that you can be trusted. That signal, in turn, makes you an attractive member of some sort of collective production cooperative. Usually that cooperative production activity is benign—mutual aid—but if a need or opportunity arises, religious radicals sometimes press the advantage that their loyal networks provide to be effective at coordinated violence.

In this sense, the surprising attractiveness of members with poor outside options applies to militias just as it applies to mutual aid clubs. The Taliban could count on the loyalty of their members because they

•

*138    Chapter 5*

knew that members' outside options were awful. So they could guarantee safe trade routes, conquer Afghanistan, and hold it. In that singular achievement, capturing and holding Afghanistan, the Taliban outperformed not only their rivals, the ex-mujahideen warlords who had expelled the Soviets, but also the Soviets. At this writing even the combination of U.S. forces, NATO allies, and the Afghan government control far less of Afghanistan than the Taliban did at their peak, for one thing because they have a resurgent Taliban to deal with.

## Terrorist Clubs

A similar argument invoking loyalty can explain the effectiveness of radical religious groups at terrorism. The disturbing diagram from chapter 2 illustrating the target and operatives is reproduced here as figure 5.1.

Operative 1 of Hamas, say, has his orders; the target has been chosen and the attacker has been recruited. He needs a few more operatives to carry out the planned attack. He considers recruiting operative 2, carefully thinking over operative 2's level of commitment. What about operative 2's outside options? How does he know that operative 2, once recruited to the plot, will not immediately call the Israeli General Security Services? The Israelis can afford to pay much more for information than Hamas can pay their operatives.

Operative 1 thinks through how much the Israelis will pay for the information that would save this particular target—the value of the



Figure 5.1
Terrorist attack

target to the victim. Then he considers operative 2's *defection constraint*, taking into account the services Hamas provides to operative 2's family (healthcare, security, religious services, and so on), and factoring in the outside options operative 2 might have in an Israeli witness protection program. Those outside options, in turn, have been influenced by how much time operative 2 has spent in prison, signaling commitment—but not accumulating human capital. Operative 1 checks that the value of the target (the possible payment for information) does not exceed operative 2's defection constraint, satisfying himself that operative 2 will remain loyal. He takes a deep breath and makes the call. Or perhaps not. He might instead advise headquarters that if they are going to stick with operative 2, they should choose a lower-value target.

Operative 1 probably knows operative 2 fairly well. Publicly available documents do not reveal a lot about the common background of Hezbollah, Hamas, or Taliban operatives, but we can speculate based on what we know about the organizations in general. They might have attended a madrassa together and probably spent time together engaged in some kind of social service provision. In the case of Hamas, they could well have bonded in prison, after being arrested for some type of rebellious offense, such as throwing stones at an Israeli patrol. Those stones didn't shorten the occupation or even hurt the Israeli soldiers. However, they did take months and often years away from studying, gaining work experience, or raising a family—an expensive sacrifice of time by any account. From an operational point of view the important point is this: all other factors being equal, more loyal operatives allow the organization to attack higher-value targets.

The social service provision network is therefore important to loyalty for a number of reasons. First, demonstrations of commitment to a mutual aid club or some other form of collective activity—the sacrifices—show that an individual cares less about the material gains (which would come from defecting) and more about loyalty to the club. Second, the sacrifice directly reduces outside options, in the form of years of investment in schooling forfeited while in a madrassa or in jail, for example. Third, an operative and his friends and family may depend on the network for security, education, healthcare, and other services. If he defects they could be excluded, or they could be shunned in subtler ways—like the main character in *Paradise Now*, a Palestinian film

released in 2005 about a pair of suicide attackers, one of whom is tormented by reminders from community members that his father collaborated. If operative 2 spent time in a Hamas-run community service organization, served prison time, and has family members dependent on Hamas-provided services, he is more likely to have a high defection constraint, making him very likely to remain loyal.

Social service provision also makes terrorism more effective through *harvesting*: the more individuals the social service provision network comes into contact with, the more opportunities it has to find an individual predisposed to having high commitment as an operative or attacker. Finally, there's the willingness of nonmembers to share incriminating information with the authorities. For example, an Iraqi living along a main road may hear some unusual activity in the middle of the night, as a Sadr operative sets an improvised explosive device (IED)—a roadside bomb. He could report the incident and perhaps collect a reward anonymously. Yet this noncombatant is less likely to inform if Sadr's social service network is a better provider of essential services than whoever might take over if Sadr's local organization were replaced. To summarize, social service provision can increase the loyalty of members in many ways: by weeding out shirkers through sacrifice, by lowering outside options, by leverage, by harvesting, and by affecting how much information nonmembers share with authorities.

Evidence

The club approach's strong implication—that social service provision makes for more effective terrorists—can be tested against data. If terrorist organizations with a social service provision base can really take on higher-value targets without risking defection, then we should observe in data that they are more effective than other terrorists. An awful but appropriate measure of effectiveness is lethality: the number of fatalities per attack.

Eight major terrorist organizations were active in Lebanon and Israel/Palestine between 1968 and 2006. Figure 5.2 reports on their lethality—fatalities per attack—and on the number of attacks.[23] The vertical bar counts fatalities per attack, which are measured on the left axis. The



**Figure 5.2**
The lethality of terrorist organizations

triangle indicates the number of attacks over the survey period, measured on the right axis. Starting on the left, the most lethal organization is the Syrian Socialist Nationalist Party (SSNP), which averaged 8.3 fatalities per attack, but only carried out three attacks. The next two organizations were the most horrible sources of terrorism in the region during that period. Hamas killed 432 victims in 86 attacks, for an average of 5.0 fatalities per attack. Hezbollah amassed a death toll of 829 in 174 attacks, for an average of 4.8 people killed per attack. The other major terrorist organizations in the region have been less lethal, both in victims per attack and in total number of people killed. They include Fatah (the dominant wing of the PLO, led by Yasir Arafat until his death in 2004), 124 attacks, 2.7 fatalities per attack; the Palestinian Islamic Jihad (PIJ), 57 attacks, 2.4 fatalities per attack; the Popular Front for the Liberation of Palestine (led by Ahmed Jibril), 82 attacks, 2.0 fatalities; its splinter organization, the Democratic Front for the Liberation of Palestine (led by Naif Hawatmeh), 23 attacks, 1.2 fatalities per attack; and finally the

Al-Aqsa Martyrs Brigade, a wing of Fatah, with 6 attacks and 3 fatalities, or 0.5 fatalities per attack.

The two social service providers, Hamas and Hezbollah, are clearly more lethal than the other terrorist groups (if we put aside the three attacks by the SSNP). None of the other organizations have a social service provision function.

An important insight comes from focusing on the Palestinian Islamic Jihad, a religious terrorist organization much smaller than Hamas and Hezbollah. Its members are Sunni religious radicals with roots in the Egyptian Muslim Brotherhood, like Hamas. If anything the Islamic Jihad's theology is more violent than that of Hamas. The PIJ broke with the Palestinian Muslim Brotherhood in the late 1970s, feeling that the Brotherhood was too moderate. Theologically it is closer to Qutb's maximalist view of a pan-Islamic state achieved through jihad. The PIJ has been active longer than Hamas as a violent organization and has had more consistent foreign support (their head office in Damascus is generally considered to be sponsored by Iran). They have also been trained in Lebanon by Iranian Revolutionary Guards and Hezbollah, unlike Hamas. Yet the PIJ lack a social service provision network, and, consistent with the defection-constraint argument, they are much less lethal than the other radical religious organizations, Hamas and Hezbollah. Their level of lethality is similar to that of the secular nationalist organizations, all of which lack a social service provision network.

The club approach maintains that Hamas and Hezbollah should be more lethal than the other terrorists, not because of their theology but because of their club structure; their defection constraints are less binding, allowing more lethal operations without fear of defection. The data support this conjecture. Hamas and Hezbollah average 4.9 fatalities per attack, as reported in figure 5.3—more than twice the lethality of the other organizations, which average 2.3.[24]

These data are consistent with the anecdotal evidence we've seen already on the Taliban in Afghanistan and al-Sadr's militia in Iraq. *Social service provision is a key indicator of the ability of terrorists to be lethal*, as the logic of clubs and defection constraints implies.

Returning now to Kashmir, the club model can provide some insight into the lethality of Lashkar-e-Taiba (LeT), perpetrators of the Mumbai

Case 1:05-cv-04622-DLI-RML   Document 267-13   Filed 03/22/12   Page 630 of 646 PageID #: 7308



**Figure 5.3**
Social service providers are more lethal

killings. LeT is one of four rebel groups attacking civilians in Indian Kashmir, in a bid to force India to cede the territory. This group "is one of the largest and best trained groups fighting in Kashmir, and almost all its cadres are foreigners—mostly Pakistanis from madrassas and Afghan veterans of the Afghan war. . . . It collects donations from the Pakistan community in the Persian Gulf and UK, Islamic non-government organizations, and Pakistani and Kashmiri businessmen."[25]

LeT is the violent wing of Jamaat-ud-Dawa, an Islamist political/ educational movement with a large following among poorer Pakistanis. Writing in 2002, before LeT was banned, political scientist Saeed Shafqat of Columbia University explained that LeT hosted an annual religious congregation with a million attendees, adding that "LeT congregations are dominated by the lower-middle classes, traders, merchants, petty government employees and mostly young men from various parts of Punjab and some from NWFP [North-West Frontier Province]."[26]

LeT was founded in 1987 by two faculty at the Engineering University in Lahore, principally by Professor Hafiz Saeed, son of a family of refugees from India, a devout Muslim with a master's degree in Arabic and

Islamic Studies. The late 1980s were a growth period for radical Islam in Pakistan. The government of General Zia encouraged political activity by Islamists as part of a broad program of Islamization, partially designed to counterbalance the liberals who had supported the previous government of Ali Bhutto. Moreover, with the Afghan war against the Soviets in full swing, the ISI was funneling foreign funding to radical madrassas that were willing to train jihadists.

Saeed built an educational compound that provided instruction of three types. First, they taught a puritanical version of Islam, which included banning television and pictures. Second, practical technical skills were provided, including practical courses in science and technology. The third component was military training, for jihad in Afghanistan and Kashmir.[27]

Rather than selecting on the sacrifice of outside options, as we've seen among other religious radicals, the LeT had a different selection mechanism:

Training of Mujahiden is done in two stages. The trainers are also divided into two categories: ordinary trainers and specialist trainers. The first stage of training of ordinary trainers comprises 21 days. But before this training, the trainees are asked to go in the society for 15 days on a Dawa tour, where they are expected to preach [to] others. Then there is a three-month waiting period, after which a character evaluation and assessment of the trainees is made from the people of the area. After about four months of evaluation and assessment, the second phase of training starts. This training imparts skills in warfare and guerilla tactics: how to throw a bomb, how to operate a rocket launcher, carry loads and march through mountainous areas, the tactics of guerilla warfare. This training combines three months of religious and commando training.[28]

Yateendra Singh Jafa, who administered counterterrorism operations in Kashmir as an officer of the Indian Police Service, remarks on the "high degree of tactical skill and grit" of LeT terrorists, operating in a hostile environment in (Indian) Kashmir. He cites examples in which they attacked Indian Army camps and outfought Indian troops. Jafa attributes their tactical ability to training and experience fighting with the Taliban in Afghanistan.[29] Quantitative measures from international terrorism data support that inference; the LeT conducted twenty-six attacks through the end of 2007 in Kashmir and elsewhere in India, averaging 6.8 fatalities per attack, even higher than the average of Hamas and

Hezbollah.[30] Those figures do not include the November 2008 attacks in Mumbai, which provide further evidence of LeT's lethality.

Citing Indian Army sources, Jafa describes the LeT's misogynist implementation of purportedly Islamist dress codes, in a manner that evokes the brutality of the Taliban they trained with:

> The Indian army has collected evidence of the attempts of the terrorists to turn Kashmir into a fundamentalist Islamic society. In 2001, the LET directed that women should wear full-bodied veils (Burqas) and has tried to enforce the dress code with singular cruelty. On 23 July 2001, they abducted and gang raped a 16-year-old girl of Batpora Sallar, Anantnag district. On 2 August 2001, they killed a young woman in the same village. On 3 August 2001, they shot and critically injured a Muslim girl in village Bulbul, Nowgam, Kupwara district. On 7 August 2001, they threw acid on the faces of two young women teachers at a school in Srinagar. . . . All these victims had violated the LET's dress code.[31]

LeT activities are apparently broadly approved by their constituency, as Saeed Shafqat reports (though it is unclear whether all the awful details are recounted). "Upon return from various jihads, the Mujahideen narrate their stories in front of congregations, where they are received with respect and admiration."[32]

While it would take further study to confirm the resemblance, LeT does seem to fit the Hamas model of a club, at least superficially. LeT practices strict prohibitions and requires a selection period, though not necessarily sacrifice, of full members. It also operates religious seminaries and schools (under the name of Jammat-ud-Dawa[33]), trains preachers, provides medical care for the poor in Pakistan, and offers earthquake relief in Kashmir.[34] At the very least, the club model seems to provide some insight into Lashkar-e-Taiba's tactical abilities; its cadres are particularly lethal terrorists.

## When Terrorists Fail

The logic of defection constraints can also help us understand why some terrorist organizations fail. The Jewish Underground, discussed above, had military training, weapons, and a theology that sanctioned killing, if not a full-scale Armageddon. Yet they provided no concrete social services within communities. Its members failed when they tried to recruit an operative who was not committed enough and who was

manipulated into informing by the Israeli GSS. The Jewish Underground is like a Jewish equivalent of the PIJ, theologically motivated, ready, willing, and able to do horrendous damage, but a weak club—lacking the social service provision capacity that would allow it to prevent defection and leaks when planning high-value attacks. By the time members attempted to wreak the havoc that they aspired to, the Jewish Underground had overreached its defection constraint and suffered an intelligence leak. The entire conspiracy was then successfully prosecuted.

Two decades later another group of Jewish terrorists organized, this time among ultra-Orthodox (rather than Orthodox) members of the West Bank settlement of Beyt Ayin. The Beyt Ayin conspirators must have been subject to much more intense surveillance by the Israeli GSS, coming after the initial Jewish Underground and after the assassination of Israeli Prime Minister Yitzhak Rabin by an Orthodox Jew linked to West Bank settlers. Yet the Beyt Ayin conspirators, despite GSS efforts, almost succeeded in detonating a bomb outside a girls' school in East Jerusalem in April 2002, which could have killed dozens of innocent children. While the perpetrators were caught and convicted, many of the other suspected co-conspirators were eventually released for lack of evidence. In contrast to their success in prosecuting the Orthodox Jewish Underground, the GSS could not find an informant who would defect and incriminate these other ultra-Orthodox conspirators. This is the only example I know of in which ultra-Orthodox Jews have been involved in terrorism, yet it fits the pattern: clubs are more dangerous, should they choose terrorism, because internal levels of trust are higher, so that defection constraints allow for more ambitious projects.

The soccer players in Toronto fall into the same category as the Jewish Underground of the 1980s. They managed to recruit members willing to plan a serious attack and even raise funds for it, but not without recruiting at least one member who was sharing their plan with the Royal Canadian Mounted Police—in exchange for a generous reward. The only nontheological service provided was apparently soccer, which must have made defection a fairly easy decision. There are other mosques and other pickup soccer games, even for informants.

A more serious threat comes from groups that are not organizationally resilient enough to execute more than a single attack, but that still

manage to cause horrendous loss of life in that first attack. The London Underground and bus attacks of July 7, 2005, which killed fifty-two commuters, fall into this category. The Underground and bus attacks two weeks later, and the subsequent July 2007 car bomb attempts in London and Glasgow, might have fit into this category as well, but luckily the terrorists had not mastered detonation techniques. These are the unguided human missiles of terrorism, fighting a hopeless battle. Once the authorities have enough information to come looking for them, their low defection constraint would preclude further attacks. For that reason these one-shot terrorists do not threaten the stability of governments or even influence policies of target governments. In fact, it's hard to imagine what it is they intend to achieve. Yet the damage is real.

## Clubs and Violence without Religion

What about religion? What's surprising about this explanation for the lethality of radical religious terrorists is that it has nothing to do with the spiritual or theological content of religion. It emphasizes mundane aspects of radical religious communities, like trust between members as well as social service provision. If that's so, then why don't other violent organizations enhance their effectiveness by using sacrifices, prohibitions, and the provision of social services to increase the commitment of members? Here's another surprise: they do.

Nonreligious violent groups often practice forms of personal sacrifices as signals of commitment. *Yakuza*, members of Japanese organized crime syndicates, have elaborate tattoos, effectively barring them from outside options—imagine the look on a prospective employer's face if a former Yakuza member were to appear for a job interview with a tattoo visible on his arm, not to mention the look on prospective in-laws' faces if a former Yakuza wanted to marry their child. The Russian Mafia and American street gangs use tattoos in similar ways to signal commitment. The Hell's Angels, a well-known motorcycle gang active in the United States and Canada, provide a different example of up-front sacrifice. Their rite of entry, as documented by the late novelist Hunter Thompson, is particularly graphic: veteran members pour a bucket of their own urine and excrement on a new member, who then rides for weeks wearing the

soiled clothes.[35] The stench must effectively exclude social and economic opportunities outside the gang. They are also a fairly effective criminal gang; members have participated in drug distribution, prostitution, and extortion. Street gangs in the United States often have violent, humiliating, and demeaning initiation rites. In 2000 a teenage girl in North Carolina described how a gang "beat in" and "sexed in" new members as initiation rites, as part of her testimony in a murder trial.[36] Police report that these initiation rites are common among gangs in other U.S. cities.

Criminal organizations often find it to be in their interest to provide social services to communities. The Mafia has provided scholarships and made loans to the needy. Notorious gangster Al Capone sponsored a soup kitchen in Chicago.[37] U.S. street gangs often control petty crime, sponsor street festivals, and occasionally rough up landlords at the request of tenants. The Yakuza of Kobe provided disaster relief after the earthquake of 1995. This type of service provision is probably a long-term investment in keeping residents from sharing information with the authorities, as in a "Hearts and Minds" approach to insurgency or community policing,[38] though it may also serve a club function of allowing potential members to signal commitment.

Successful nonreligious violent groups have also sprung from social service provision organizations. Good examples are the *Haganah* and its elite strike force, the *Palmach*, Jewish militias of prestate Palestine, which would eventually serve as the core of the Israeli military. Both organizations were drawn disproportionately from the population of Israeli kibbutzim. On these rural agricultural cooperatives, young men and women demonstrated commitment by surrendering personal property on entry, and practiced collective production and mutual aid. The close-knit Palmach units that these communities produced formed a dedicated and extremely accomplished militia, the most effective of Israel's War of Independence.

A terrifying violent organization that *is* religious is the Japanese Aum Shinrikyo cult of the 1990s, the only terrorists to ever stage a biological weapons attack. Aum Shinrikyo had all the characteristics of a club: sacrifices, prohibitions, and mutual aid—in this case a full-fledged commune. Historian Daniel A. Metraux writes, "It is a small voluntary group of strict believers who choose to live apart from the world. It defies Japanese society and withdrew from it."[39] Aum used sacrifices to select

devoted members, through voluntary acts of physical "mortification," and required that they make "huge" donations.[40] Once admitted, members adhered to strict prohibitions, including "limitation on the forms of participation with outsiders, refusal to take part in common societal activities, peculiar habits of eating and abstinence, and . . . even peculiarities of dress."[41] Further, "Aum followers . . . donate all of their assets to the cult and move into Aum communes as adherents who completely cut off their association with the outside world for a communal life of little sleep and meager meals."[42]

With draconian sacrifices and prohibitions in place, the leaders of Aum Shinrikyo managed to carry out an audacious weapons development program in the early 1990s without being compromised by leaks or defection. They developed techniques to manufacture automatic rifles, acquired and tested laser weapons, bought a large Soviet military helicopter, developed the deadly biological weapon sarin in their laboratories, made plans to develop a much deadlier biological weapon (the botulism bacillus), and even reportedly investigated a nuclear weapons option in discussions with Soviet scientists—all apparently without the knowledge of the Japanese authorities.[43] When Aum Shinrikyo did unleash their sarin, in a coordinated attack on five subway trains, Tokyo was paralyzed. Twelve commuters died and some five thousand were injured. Only afterward did police realize that seven unexplained deaths the previous year in Matsumoto City were also due to an attack by Aum. Most troubling, perhaps, is that Aum Shinrikyo reportedly had a stockpile of raw materials sufficient to produce orders of magnitude more sarin. (Metraux speculates that Aum leader Shoko Asahara had a political motive—he was planning to destabilize the Japanese government with terror attacks, then launch a violent coup.)[44] All told, Aum provides a chilling illustration of how tightly a club can guard information, even about very high value attacks, and how much lethal potential a violent club can harbor.

### Gratuitous Cruelty

The logic of controlling defection may explain another disturbing characteristic of radical religious militias, their propensity to be needlessly cruel to residents, including coreligionists. One might think that a

religious group that aspires to set up a government would try its best to make itself popular with local residents. Yet radical religious organizations often go out of their way to make life worse for the populations they aim to govern. Hamas imposes general strikes on Palestinians, shutting down businesses that are barely surviving as is and restricting access to shopping for hungry households. One of their first leaflets in 1988 called on Palestinian day laborers to stop working in Israel, at a time when those wages accounted for four-tenths of all income in Gaza. The Muslim Brotherhood's "Apparatus" in the 1940s targeted judges and public officials, reducing the ability of government to provide services. Muqtada al-Sadr's Mahdi Army in Basra is infamous for harassing women who don't wear veils. In a horrific incident reported by the International Crisis Group, "Sadrists hit a woman attending a student picnic, tore off her clothes, and then shot to death two students who tried to intervene—all in front of the police. The woman, humiliated, killed herself shortly thereafter."[45] Targeting Muslims and harassing women is absolutely contrary to mainstream Muslim tradition. One of Mohammad's first goals was to emancipate women. While this abuse might be explained as an attempt to increase control by terrorizing the local population, it is hard to see how control of women provides any tactical gain. That suffering inflicted on noncombatants seems to be entirely gratuitous.

The gratuitous violence inflicted by the Taliban on the Afghan population is the most shocking. Civilians were massacred. Religious sites were desecrated, including the Buddhas of Bamyan, glorious statues carved in a mountainside, 180 feet high, which had been standing since the sixth century. The statues were destroyed though they posed no conceivable cultural threat—Afghanistan has no Buddhist minority. Homosexuals were cruelly executed by dropping a wall on them. Women were beaten publicly for the slightest offense, including purportedly drawing attention to themselves by wearing shoes that squeaked when they walked. Eventually the women of Kabul, the capital, were secluded in their homes, with windows covered to keep them out of sight. Humanitarian aid workers objected to a ban on women in hospitals, threatening to leave—a withdrawal that would cripple hospital care in Kabul, including care for children. The Taliban's response was to tell them to go.

Case 1:05-cv-04622-DLI-RML   Document 267-13   Filed 03/22/12   Page 638 of 646 PageID #: 7316

Perhaps the Taliban were just vicious and evil by nature? That's conceivable, but inconsistent with their dedication to Islam and their loyalty to each other. It is also not consistent with how they acted in their home territory. In the Pashtun southern regions of the country, despite their conservative traditional code, women would not be humiliated in public and could expect to be defended if a stranger attacked them. Seclusion was imposed on women in the conquered capital city of Kabul, but not in the home city of Kandahar.

The need to control defection provides a possible explanation for seemingly gratuitous insult, violence, and destruction. When asked why the Taliban were willing to go to such lengths to seclude women in Kabul, one commander implied that the strictest possible prohibitions on women allowed him to control his troops.[46] The commander did not explain how this worked, but our defection-constraint argument can. How would a soldier defect or shirk in Kabul? He could do what young men do everywhere—fraternize. But then he might show up late and tired for work in the morning, and worse—he might share information with his new friends. Both these actions would undermine the Taliban commander's ability to govern by force. Yet if the troops establish a reputation for cruelty to women and the local population, that outside option of fraternizing is severely undermined. The more the local population hates the soldiers, the less of a discipline problem commanders would have in the cities, especially in the relatively cosmopolitan city of Kabul. An awful aspect of this method of controlling the cadres is that most of the cost is borne by innocents. To implement this sacrifice of an outside option (in this case the option of defecting to the local population) for even a small number of troops who might defect, the damage to a full city, including women and children, could be immense.

This explanation for gratuitous damage, especially as it applies to women, is an interesting rationalization. Unlike the model's other implications offered above, I can't think of a way to formally test it with data. Yet it has a parallel in the approach the Taliban apparently implemented in controlling their local governors. It was not uncommon among Afghan mujahideen for factions and subfactions to defect in return for some payment, often by foreigners. The Taliban apparently rotated local governors to the battle front or back to headquarters in Kandahar if they

showed signs of creating a local power base, which would have allowed them the strength to switch their allegiance. Governors who were particularly despised by the local population could remain longer.[47] Here again, harsh treatment of the local population would have its reward. From a defection-control perspective, rotating governors or abusing and repressing the population would be useful to the organization, not because it improved governance or control over the population, but because it improved the Taliban's control over governors and troops, preventing their defection by reducing their outside options.

## Objections

In the public discussion after the September 11 attacks, many commentators suggested that terrorism was caused by economic deprivation. A number of studies seemed to refute that argument, showing that terrorist attackers are generally at least as well educated and well off as their neighbors.[48] Mohammed Atta, the lead hijacker, was a well-off college student. Osama bin Laden is a multimillionaire. Isn't this evidence against the club approach, which implies that poor operatives are more likely to be loyal recruits than rich operatives, since the poor operatives have worse outside options?

A related objection is implicit in the findings of terrorism expert Peter Bergen, who studied the backgrounds of seventy-five high-profile terrorists and found that most of them did not attend a madrassa, one of the core institutions of a radical Islamist club.[49]

There are two problems with using individual data on terrorists to understand an organization's structure. First, organizations often draw in members with very different backgrounds and motivations. Some join because they want to serve a cause, while others seek a group of friends, and still others find that it's a good job. Radical religious terrorist organizations seem to include many suicide attackers who, for whatever reason, are hell (or heaven)–bent on self-destruction. Yet suicide attackers and idealists are not the weakest link in a terrorist organization, because the defection constraint seldom applies to them; the organization may be able to determine their loyalty by testing their commitment in some other way. Second, we know that terrorist organizations select

members carefully for missions, assigning more able operatives to higher-value targets. For example, Al Qaeda, faced with a choice of who to send to flight school in Florida, would naturally choose from among its small membership of disaffected college students in Europe rather than from the thousands of terribly schooled Yemeni and Afghan members it was training in Afghanistan. Research on Palestinian terrorists also shows evidence of selection, as more educated and older attackers are chosen to attack higher-value targets.[50] Thus individuals observed carrying out high-value attacks are not representative of the rank and file of the organization. Moreover, given that those attackers are the more talented members, their loyalty is likely to come from some source other than a lack of outside options.

For both those reasons we should doubt conclusions about poverty and terrorism based on the characteristics of terrorists chosen to attack the highest-value targets. It only takes a few individual to wreak tremendous damage, yet a larger organization, which can exploit a few high-profile terrorist attacks to achieve military or political goals, must be staffed with less exceptional operatives. Finding *individual* terrorists with good market alternatives does not refute what we know about the rank and file of the *organizations* they belong to. Those individuals tend to be in need of the material services that clubs provide: protection, education, healthcare, and welfare services.

Another possible objection to the analysis in this chapter is that organizations such as Hamas and Hezbollah are not clubs at all, since they provide services to nonmembers as well as members. Hamas and Hezbollah indisputably provide some services to nonmembers. The same is true of Lashkar-e-Taiba, which provided earthquake relief in Kashmir to nonmembers, as we've seen. Though these organizations claim otherwise, as far as we know those services are provided in a highly discriminatory way, with core members receiving more support than ordinary members, who in turn receive more than nonmembers, a tiered structure resembling that established earlier by the Muslim Brotherhood in Egypt.

Because of the difficulty of gathering survey data on this sensitive subject, the evidence for discrimination in service provision in favor of insiders is mostly anecdotal. One exception comes in the form of interviews that Shawn Teresa Flanigan carried out in her field research in

154    *Chapter 5*

Lebanon. She found that "Hizballah's Foundation for the Wounded assists fighters, their families, and civilians injured during the fighting with Israel, whereas the Martyr's Foundation provided services and stipends to the families of those who die in combat."[51] Matthew Levitt reports another exception, which comes from the writings of Ibrahim al-Yazuri, a founding member of Hamas:

> The Hamas movement is concerned about its individuals and its elements, especially those who engage in the blessed jihad against the hateful Israeli occupation, since they are subjected to detention or martyrdom. The movement takes care of their families and their children and provides them with as much material and moral support as it can. This is one of the fundamental truths of Islamic work and thus represents the duties of the Islamic state. . . . The movement provides this aid through the support and assistance it gives to the zakat committees and the Islamic associations and institutions in the Gaza Strip.[52]

Levitt goes on to report (from Israeli government sources) that Hamas's institutions provide payments to the families of the imprisoned, deported, or "martyred" of all organizations, but those payments are significantly larger for the families of Hamas members.

Can the Hamas model also help us understand Al Qaeda? This book is not about Al Qaeda, though because of the sheer audacity, visibility, and lethality of its attacks, Al Qaeda has shaped many of our assumptions about terrorism. Al Qaeda does not fit the club mold: it does not provide social services to members the way Hamas does. Yet Al Qaeda clearly faces defection constraints, as illustrated by an example we saw earlier, of Jamal Ahmed al-Fadl, who had embezzled from the organization. How has Al Qaeda protected itself sufficiently from defection to carry out attacks on high-value targets? One possibility is that it recruits operatives among clubs, drawing on a network of club members who can vouch for potential operatives. This is natural for an organization that traces its roots to the Egyptian Muslim Brotherhood, as noted above. Another possibility is that Al Qaeda extends that club network by recruiting within affiliated kinship networks, as appears to have been the case for bin Laden's driver. Yet another method, apparently in use in Iraq, is to quickly send foreign recruits who have not signaled commitment, on suicide attacks; that way they have little time in the organization to be exposed to information that would make them a defection risk.

Case 1:05-cv-04622-DLI-RML Document 267-13 Filed 03/22/12 Page 642 of 646 PageID #: 7320

Aside from Al Qaeda, the most lethal terrorist organizations and militias today are religious radicals who actively provide social services. Consistent with the predictions of the club model, they thrive in countries where governments and markets deliver poor alternatives to those services, such as Palestine, Yemen, Afghanistan, Iraq, Chechnya, Lebanon, Pakistan, Somalia, and Sudan. Radical religious clubs actively threaten to overthrow some of those governments.

In chapter 7, in looking at new thinking about countering terrorism, I consider the issue of environments that generate strong, violent clubs. Before turning to those new approaches we next examine the most salient phenomenon of modern terrorism: the suicide attack. Suicide attacks are the most lethal tactic in use, and are committed disproportionately by religious radicals. Understanding why is essential to seeing how new approaches may be particularly useful when confronting suicide attacks.

Chapter 5

1. Cited in Shaul Mishal and Avraham Sela, *The Palestinian Hamas: Vision, Violence, and Coexistence* (New York: Columbia University Press, 2000), 71.

2. Susanne Koelbl, "Islamic Extremists Gain Upper Hand in Kashmir Relief Efforts," *Der Spiegel International*, February 25, 2006. http://www.spiegel.de/international/spiegel/0,1518,403726,00.html (accessed March 16, 2009).

3. Ibid.

4. Ibid.

5. Whether the Jaish-e-Mohammed (Army of Mohammed) is a strong economic club like the Taliban with both violent and benign wings, or just a charity with links to Islamist terrorists, is hard to say. Work is certainly done by volunteers, as in Iannaccone's conception of a radical religious club, though many of the benefits flow to nonmembers. Some of the funding reportedly comes from the outside, because the article states that these Islamist militants are "generously funded by Muslims from Saudi Arabia and by overseas Pakistanis." The Jaish-e-Mohammed is one of an increasing number of violent Islamist groups in Asia now being associated with the "Hamas model." Zachary Abuza, a political scientist at Simmons College in Boston, argues that the Jemaah Islamiah (JI) in Indonesia is trying to transition to a "Hamas model" to build an organizational base. The JI is responsible for a string of bomb attacks in Indonesia, including the Bali bombings of October 2002, which killed more than two hundred people. As evidence, he points to internal documents and JI-linked charities that participated in humanitarian relief after the cataclysmic tsunami of December 2004. See Zachary Abuza, "Jemaah Islamiyah and the Inverse Triangle," *Middle East Quarterly* 16(1) (Winter 2009): 15–26.

6. Karen Armstrong provides a clear history of the Muslim Brotherhood in *The Battle for God* (New York: Ballantine, 2000).

7. Ziad Munson, "Islamic Mobilization: Social Movement Theory and the Egyptian Muslim Brotherhood," *Sociological Quarterly* 42, no. 4 (2001): 487–510, p. 501.

8. Richard P. Mitchell, *The Society of Muslim Brothers* (London: Oxford University Press, 1969). Other estimates are higher.

9. Munson, "Islamic Mobilisation," 501; my italics.

10. Mitchell, *The Society of Muslim Brothers*.

11. John L. Esposito, *Unholy War: Terror in the Name of Islam* (New York: Oxford University Press, 2002), 27.

12. For excerpts and interpretation of Al Qaeda leader Ayman al-Zawahiri's answers to questions posed to him on the Internet, see Jarret Brachman, Brian Fishman, and Joseph Felter, *The Power of Truth: Questions for Ayman al-Zawahiri* (West Point, N.Y.: United States Military Academy Combating Terrorism Center, 2008).

13. Timur Kuran, *Islam and Mammon: The Economic Predicaments of Islamism* (Princeton, N.J.: Princeton University Press, 2005).

14. Yassin was arrested by the Egyptian authorities in 1965 as part of a general crackdown on the Muslim Brotherhood. See Kim Cragin, "Al-Mujama' and the Resistance, 1973–1986," draft dissertation chapter, Cambridge University, 2008, 72.

15. Mishal and Sela, *The Palestinian Hamas*, 44.

16. Mishal and Sela, *The Palestinian Hamas*.

17. Former FBI analyst Matthew Levitt presents Hamas this way in "Hamas from Cradle to Grave," *Middle East Quarterly* 11, no. 1 (Winter 2004): 3–15. He quotes then Israeli Prime Minister Shimon Peres, who told the Israeli Knesset (parliament) in 1996 that "Hamas has established charitable organizations in order to camouflage its true nature." While Levitt is correct in emphasizing that the violent and benign "wings" of Hamas have a single leadership, share personnel, and complement each other, he ignores the fact that the religious and social service provision networks predate the terrorist wing.

18. Reuven Paz, address to the Washington Institute, July 19, 2001. Reproduced as "Special Forum Report: Islamic Palestine or Liberated Palestine? The Relationship between the Palestinian Authority and Hamas" (rapporteur's summary of his remarks), Peace Watch No. 337, www.washingtoninstitute.org/templateC05.php?CID=2028. Paz is academic director of the International Policy Institute for Counter-Terrorism at the Interdisciplinary Center, Herziliya, Israel.

19. An interview conducted by the International Crisis Group reports that Pakistani residents donate about $1.1 billion to mosques and madrassas annually. See International Crisis Group, "Pakistan: Madrasas, Extremism and the Military," *Asia Report* 36 (Islamabad/Brussels: icg.org, July 2002).

20. Ahmed Rashid, "Pakistan and the Taliban," in William Maley, ed., *Fundamentalism Reborn? Afghanistan and the Taliban* (New York: New York University Press, 1998), 75.

21. Anthony Davis, "How the Taliban Became a Military Force," in Maley, *Fundamentalism Reborn?*, 43.

22. David Kilcullen, *The Accidental Guerrilla: Fighting Small Wars in the Midst of a Big One* (New York: Oxford University Press, 2009), 47.

23. These data cover international terrorist incidents for the eight major organizations that carried out terrorist attacks in Lebanon or Israel between 1968 and 2006, as compiled by the Terrorism Knowledge Base of the Memorial Institute for the Prevention of Terrorism. As of 2008 most of these data are being subsumed into the Global Terrorism Database managed by the National Consortium for the Study of Terrorism and Responses to Terrorism at the University of Maryland.

24. This difference is statistically significant.

25. Yateendra Singh Jafa, "Defeating Terrorism: A Study of Operational Strategy and Tactics of Police Forces in Jammu & Kashmir (India)," *Police Practice and Research* 6, no. 2 (May 2005): 148.

26. Saeed Shafqat, "From Official Islam to Islamism: The Rise of Dawat-ul-Irshad and Lashkar-e-Taiba," in Christophe Jaffrelot, ed., *Nationalism without a Nation: Pakistan Searching for Its Identity*. (New Delhi: Zed Books, 2002), 131.

27. Shafqat, "From Official Islam to Islamism," 142.

28. Shafqat, "From Official Islam to Islamism," 144.

29. Jafa, "Defeating Terrorism," 150.

30. The figures are from MIPT data, as in chapter 1, note 1.

31. Jafa, "Defeating Terrorism," 153.

32. Shafqat, "From Official Islam to Islamism," 145.

33. The U.S. Treasury Office of Foreign Assets Control lists JuD and LeT as acronyms on its *Specially Designated Nationals List*, www.ustreas.gov/offices/enforcement/ofac/sdn/sdnlist.txt.

34. Jan McGirk, "Kashmir: The Politics of an Earthquake," October 19, 2005, www.OpenDemocracy.net. McGirk also reports that LeT members are not entirely altruistic in earthquake relief. After they rescued a fourteen-year-old-boy from the rubble, the child tragically discovered he was an orphan. They claimed the child, told the neighbors, "He's ours," and drove him off to a madrassa.

35. Hunter Thompson, *Hell's Angels: The Strange and Terrible Saga of the Outlaw Motorcycle Gangs* (New York: Random House, 1966).

36. "Gang Member Tells Jurors about Initiation in Double Murder Trial," WRAL-TV, www.lochaltechwire.com/news/local/story/139973, March 7, 2000.

37. John Kobler, *Capone* (New York: Putnam, 1971), 308.

38. George A. Akerlof and Janet L. Yellen develop a model of street gangs with this quality in "Gang Behavior, Law Enforcement, and Community Values," in Henry J. Aaron, Thomas E. Mann, and Timothy Taylor, eds., *Values and Public Policy* (Washington, D.C.: Brookings Press, 1994). My coauthors and I take a similar approach to analyzing insurgencies in Iraq in Eli Berman, Jacob Shapiro, and Joseph Felter, "Can Hearts and Minds Be Bought? The Economics of Counterinsurgency in Iraq," mimeo, UC San Diego, October 2008.

39. Daniel A. Metraux, "Religious Terrorism in Japan: The Fatal Appeal of Aum Shinrikyo," *Asian Studies* 35, no. 12 (December 1995): 1140–1154 (quote on 1142).

40. Yoshiyuki Kogo, "Aum Shinrikyo and Spiritual Emergency," *Journal of Humanistic Psychology* 42 (2002): 82–101, p. 88.

41. Thomas F. O'Dea, "Sects and Cults," in David L. Sills, ed., *International Encyclopedia of the Social Sciences*, vol. 14 (New York: Macmillan/Free Press), 130–135, cited in Metraux, "Religious Terrorism in Japan," 1142.

42. Metraux, "Religious Terrorism in Japan," 1142.

43. Metraux, "Religious Terrorism in Japan," 1142.

44. Metraux, "Religious Terrorism in Japan," 1153.

45. International Crisis Group, "Where Is Iraq Heading? Lessons from Basra," *Middle East Report* 67 (Damascus/Amman/Brussels ICG.org, June 25, 2007), 3.

46. Ahmed Rashid, *Taliban: Militant Islam, Oil, and Fundamentalism in Central Asia* (New Haven, Conn.: Yale University Press, 2000), 106, 111.

47. Rashid, *Taliban*, 101–105.

48. See, for example, Alan B. Krueger and Jitka Maleckova, "Education, Poverty and Terrorism: Is There a Causal Connection?", *Journal of Economic Perspectives* 17, no. 4 (2003): 119–144. In a later book Krueger puts these findings in context and discusses the policy implications for education and poverty reduction as a counterterrorism strategy. He argues that poverty reduction should be pursued as a moral obligation, but cautions against "drawing a false connection between poverty and terrorism," based on his analysis of individual data on terrorists' characteristics as well as findings on the characteristics of terrorists' countries of origin. See Alan B. Krueger, *What Makes a Terrorist: Economics and the Roots of Terrorism* (Princeton, N.J.: Princeton University Press, 2007), 51.

49. In his book *Understanding Terror Networks* (Philadelphia: University of Pennsylvania Press, 2004), Marc Sageman says that 62 percent of Al Qaeda members are university educated.

50. Efraim Benmelech and Claude Berrebi, "Attack Assignment in Terror Organizations and the Productivity of Suicide Bombers," NBER Working Paper No. 12910 (Cambridge, MA: National Bureau of Economic Research, February 2007).

51. Shawn Teresa Flanigan, "Nonprofit Service Provision by Insurgent Organizations—the cases of Hizballah and the Tamil Tigers," *Studies in Conflict and Terrorism* 31(6) (2008): 499–519, p. 507.

52. Ibrahim al-Yazuri, *Filastin al-Muslima* (London, January 1998), cited in translation in Dale L. Watson, "Holy Land Foundation for Relief and Development, International Emergency Economic Powers Act, Action Memorandum," memorandum to R. Richard Newcomb, director of the Office of Foreign Assets Control, U.S. Department of the Treasury, November 5, 2001; included in Levitt, "Hamas from Cradle to Grave," p. 7.


## Chapter 6

1. "The Twilight Zone: A Dead Man Walking," *Ha'Aretz*, March 26, 2004 (in Hebrew). Gideon Levy's question was not about suicide attacks but about targeting civilians, yet Zubeidi's response invokes asymmetry of violent capacity as an answer. The al-Aqsa Martyrs' Brigade carried out thirty-one of the thirty-three suicide attacks attributed to Fatah through 2003. In July 2007 Zubeidi was removed from Israel's "hit or capture list" in return for disavowing armed