**EXHIBIT 176 TO DECLARATION OF VALERIE SCHUSTER**

n; alt. citizen Iraq; ual) [IRAQ3]
Hamid Sulaiman OJIL, Abdulhamid MUJAL, Dr. Abd JIL, Abd al-Hamid J'AJJAL, Dr. Abd 4U'JIL, Dr. Abd an; a.k.a. MUJEL, d al-Hamid; a.k.a. )B 28 Apr 1949; alt. ₃ Kuwait; citizen ty Saudi Arabia; 18 Apr 2004 expires idual) [SDGT]
.ziz; DOB 1937; alt. Iraq; nationality .l command chair-ridual) [IRAQ2]
bd-al-Sattar; DOB ₄q; Director, Mili-ual) [IRAQ2]
₄ussein Mohamed; bia; citizen Saudi ᵗ]
OB 1941; alt. DOB Iraq; nationality l command chair-

HOPS (a.k.a. AL-, Sanaa, Yemen

Milan, Italy (in-

(PRIVATE) LTD ᴵATIONAL (PRI-, Aileen Gardens, .ey, Surrey GU15 dBABWE]

Ezzedine (a.k.a. Abdullah; a.k.a. audi Arabia; DOB gypt; nationality 751550; alt. Pass-a) expires 29 Mar 177 issued 6 Mar dividual) [SDGT]
a. ABOHEMEM, ᵃATANI, Moham-TANI, Nayef Bin TANY, Nayef bin TANI ALKODRI, lᵢ a.k.a. AL-med Saeed al-ANI, Nayef Bin QAHTANI, Nayf ᵗAHTANI, Nayif HAMAM''; a.k.a. HTANI''; a.k.a. ᵢBU-HAMMAM''; )OB 25 Mar 1988; Passport G449745 6 May 2011 (indi-

AN PENINSULA E SOUTH ARA-. AL-QA'IDA IN

₃YEMEN; a.k.a. AL-QA'IDA OF JIHAD OR-GANIZATION IN THE ARABIAN PENIN-YSULA; a.k.a. AL-QA'IDA ORGANIZATION ᵇIN THE ARABIAN PENINSULA; a.k.a. ₃TANZIM QA'IDAT AL-JIHAD FI JAZIRAT ₆AL-ARAB; a.k.a. ''AQAP''; a.k.a. ''AQY''), ₃Yemen; Saudi Arabia [SDGT] [FTO]
AL-QARD AL-HASSAN ASSOCIATION (a.k.a. AL-QUARD AL-HASSAN ASSOCIA-ᵇTION; a.k.a. AL-QUARDH AL-HASSAN ᵢASSOCIATION; a.k.a. KARADH AL-HAS-ˢSAN), Beirut, Lebanon [SDGT]
AL-QASIR, Nazar Jumah Ali (a.k.a. AL-ᵘ QASSIR, Nizar Jomaa Ali), Iraq; Former ᵘ Minister of Irrigation (individual) [IRAQ2]
AL-QUBAYSI, Abd-al-Munim (a.k.a. ᵗ KOBEISSI, Abd Al Menhem; a.k.a. KOBEISSI, Abdel Menhem; a.k.a. ᵗKOBEISSI, Abdul Menhem; a.k.a. ''KOBEISSY, Abdul Menhem; a.k.a. KUBAYSY, Abd Al Munhim; a.k.a. QUBAYSI, Abd Al Menhem); DOB 1 Jan ₁1964; alt. DOB 1961; POB Beirut, Lebanon; ᵗᵢnationality Lebanon; Passport RL 1622378 ᵗ(Lebanon) (individual) [SDGT]
AL-QUBAYSI, Munir (a.k.a. AL-KUBAISI, ᵗᵢMuneer; a.k.a. AL-KUBAYSI, Munir; a.k.a. ᵗᵢAWAD, Munir A.; a.k.a. AWAD, Munir ᵗMamduh), Syria; DOB 1966; POB Heet, Iraq; ₜnationality Iraq (individual) [IRAQ2]
AL-RABI'I, Nidal, Iraq; DOB circa 1965; POB ₜAl-Dur, Iraq; nationality Iraq; wife of Izzat ᵗIbrahim Al-Duri (individual) [IRAQ2]
AL-RAWI, Ayad Futayyih Khalifa; DOB 1942; POB Rawah, Iraq; nationality Iraq; Quds Force Chief of Staff (individual) [IRAQ2]
AL-RAWI, Fawzi Mutlaq (a.k.a. AL-RAWI, ₜFawzi Isma'il Al-Husayni; a.k.a. ''ABU ₜAKRAM''; a.k.a. ''ABU FIRAS''), SYRIAN BA'TH PARTY COMMAND BUILDING, AL-HALBUNI DISTRICT, DAMASCUS, Syria; SYRIAN GOVERNMENT-OWNED APARTMENT, AL-MAZZAH DISTRICT, DAMASCUS, Syria; DOB 1940; POB RAWAH CITY, IRAQ; citizen Syria; na-ₜtionality Iraq; CHAIRMAN, IRAQI WING OF THE SYRIAN BA'TH PARTY (indi-vidual) [SDGT]
AL-RAWI, Saif-al-Din Fulayyih Hassan Taha (a.k.a. AL-RAWI, Ayad Futayyih); DOB 1953; POB Ar Ramadi, al-Anbar ₜGovernorate, Iraq; nationality Iraq; Repub-ₜlican Guard chief of staff (individual) ₜ [IRAQ2]
AL-RA'Y SATELLITE TELEVISION CHAN-NEL (a.k.a. AL RAIE TV CHANNEL; a.k.a. AL RA'Y SATELLITE TELEVISION STA-TION; a.k.a. AL RA'Y TV; a.k.a. AL-RA'I SATELLITE CHANNEL; a.k.a. AL-RA'Y SATELLITE CHANNEL; a.k.a. ARRAI TV; a.k.a. SATEELLITE TELEVISION CHAN-ₜNEL AL RA'Y; a.k.a. THE OPINION SAT-ELLITE TELEVISION CHANNEL), Near Damascus in the Yaafur area, Syria; E-mail Address *info@arrai.tv;* Web site *www.arrai.tv* [IRAQ3]

AL-RIDA, Karim Hasan (a.k.a. RIDA, Karim Hassan), Iraq; DOB 1944; Former Minister of Agriculture (individual) [IRAQ2]
AL-RIMI, Qasim (a.k.a. AL-RAIMI, Qassim; a.k.a. AL-RAMI, Qasim; a.k.a. AL-RAYMI, Qasim; a.k.a. AL-RAYMI, Qassim; a.k.a. AL-REMI, Qassem; a.k.a. ''ABU 'AMMAR''; a.k.a. ''ABU HARAYRAH''; a.k.a. ''ABU HURAYRAH AL-SAN'AI''); DOB 5 Jun 1978; nationality Yemen; Passport 00344994 issued 3 Jul 1999 (individual) [SDGT]
AL-RUBA, Dr. Khadim, Iraq; Managing Di-rector of REAL ESTATE BANK (indi-vidual) [IRAQ2]
AL-SA'DI, Amir Hamudi Hassan; DOB 5 Apr 1938; POB Baghdad, Iraq; nationality Iraq; Passport NO33301/862 issued 17 October 1997 expires 1 October 2005; alt. Passport M0003264580; alt. Passport H0100009 issued 1 May 2002; presidential scientific advisor (individual) [IRAQ2]
AL-SAD'UN, Abd-al-Baqi abd-al-Karim Abdallah; DOB 1947; nationality Iraq; Ba'th party regional command chairman, Diyala (individual) [IRAQ2]
AL-SA'DUN, Muhammad Zimam abd-al-Razzaq; DOB 1942; POB Suq ash-Shuyukh District, Dhi-Qar, Iraq; nationality Iraq; Ba'th party regional chairman, at-Tamim (individual) [IRAQ2]
AL-SAHHAF, Muhammad Said Kazim (a.k.a. AL-SAHAF, Mohammed Said), Iraq; DOB 1940; Former Minister of Foreign Affairs (individual) [IRAQ2]
AL-SALAH SOCIETY (a.k.a. AL-SALAH; a.k.a. AL-SALAH ASSOCIATION; a.k.a. AL-SALAH ISLAMIC ASSOCIATION; a.k.a. AL-SALAH ISLAMIC COMMITTEE; a.k.a. AL-SALAH ISLAMIC FOUNDA-TION; a.k.a. AL-SALAH ISLAMIC SOCI-ETY; a.k.a. AL-SALAH ORGANIZATION; a.k.a. ISLAMIC AL SALAH SOCIETY; a.k.a. ISLAMIC RIGHTEOUSNESS SOCI-ETY; a.k.a. ISLAMIC SALAH FOUNDA-TION; a.k.a. ISLAMIC SALAH SOCIETY; a.k.a. ISLAMIC SALVATION SOCIETY; a.k.a. JAMI'A AL-SALAH; a.k.a. JAMI'AT AL-SALAH AL-ISLAMI; a.k.a. JAMMEAT EL-SALAH; a.k.a. SALAH CHARITABLE ASSOCIATION; a.k.a. SALAH ISLAMIC ASSOCIATION; a.k.a. SALAH WELFARE ORGANIZATION), Bureij, Gaza, Pales-tinian; P.O. Box 6035, Beshara Street, Deir Al-Balah, Gaza, Palestinian; Athalatheenty Street, Gaza, Palestinian; Deir Al-Balah Camp, Gaza, Palestinian; Rafah, Gaza, Pal-estinian; Al-Maghazi, Gaza, Palestinian; Gaza City, Gaza, Palestinian [SDGT]
AL-SALIH, Muhammad Mahdi (a.k.a. SALEH, Mohammed Mahdi); DOB 1947; alt. DOB 1949; POB al-Anbar Governorate, Iraq; nationality Iraq; Minister of Trade (indi-vidual) [SDGT]
AL-SAYYID, 'Ali Sulayman Mas'ud 'Abd (a.k.a. AL-JAWZIYYAH, Ibn al-Qayyim; a.k.a. OSMAN, Mohamed; a.k.a. SAYED, Aly Soliman Massoud Abdul; a.k.a. ''AL-

31 CFR Ch. V (7–1–10 Edition)

INSTITUTO NACIONAL DE TURISMO DE CUBA, Spain [CUBA]

INSUMOS ECOLOGICOS DE ORIENTE, S.A. DE C.V., Jose I Solorzano 746, Colonia Jardines Alcalde, Guadalajara, Jalisco 44290, Mexico; R.F.C. IEO0806245A3 (Mexico) [SDNTK]

INTERAMERICANA DE CONSTRUCCIONES S.A. (f.k.a. ANDINA DE CONSTRUCCIONES S.A.), Calle 12 Norte No. 9N–56, Cali, Colombia; NIT #800237404–2 (Colombia) [SDNT]

INTERCONSULT, Panama [CUBA]

INTERCONTINENTAL DE AVIACION S.A. (a.k.a. INTER; a.k.a. INTERCONTINENTAL), Avenida El Dorado Entrada 2 Int. 6, Bogota, Colombia; NIT #860009526–3 (Colombia) [SDNT]

INTERCONTINENTAL DE FINANCIACION AEREA S.A. (a.k.a. INTERFIAR S.A.), Avenida El Dorado Entrada 2 Int. 6, Bogota, Colombia; NIT #800043810–6 (Colombia) [SDNT]

INTERCREDITOS S.A. (a.k.a. INTERCREDITOS BOGOTA; a.k.a. INTERCREDITOS CALI), Bogota, Colombia; Avenida Roosevelt No. 38–32, piso 2, Cali, Colombia [SDNT]

INTERMARKET HOLDINGS LIMITED, 10th Floor ZB House, 46 Speke Avenue, P.O. Box 3198, Harare, Zimbabwe; Phone No. 263–4–751168; Fax No. 263–4–251029 [ZIMBABWE]

INTERNACIONAL DE PROYECTOS INMOBILIARIA IPI S.A. (a.k.a. IPI S.A.), Avenida Pedro Vicente Maldonado 744, Edificio Centro Comercial El Recreo, Local 24I, Pichincha, Quito, Ecuador; RUC #1791843436001 (Ecuador) [SDNT]

INTERNATIONAL COBALT CO. INC., Saskatchewan, AB, Canada [CUBA]

INTERNATIONAL FREEZE DRIED S.A. (a.k.a. IFD S.A.), Carrera 92 No. 62–30, Bogota, Colombia; NIT #830132968–1 (Colombia) [SDNT]

INTERNATIONAL ISLAMIC RELIEF ORGANIZATION INDONESIA BRANCH OFFICE (a.k.a. AL IGATHA AL-ISLAMIYA; a.k.a. EGASSA; a.k.a. HAYAT AL-AGHATHA AL-ALAMIYA; a.k.a. HAYAT AL-'IGATHA; a.k.a. HAYAT AL-IGATHA; a.k.a. IGASA; a.k.a. IGASE; a.k.a. IGASSA; a.k.a. IGATHA; a.k.a. IGHATHA; a.k.a. IIRO; a.k.a. INTERNATIONAL ISLAMIC AID ORGANIZATION; a.k.a. INTERNATIONAL ISLAMIC RELIEF AGENCY; a.k.a. INTERNATIONAL RELIEF ORGANIZATION; a.k.a. ISLAMIC RELIEF ORGANIZATION; a.k.a. ISLAMIC SALVATION COMMITTEE; a.k.a. ISLAMIC WORLD RELIEF; a.k.a. THE HUMAN RELIEF COMMITTEE OF THE MUSLIM WORLD LEAGUE; a.k.a. WORLD ISLAMIC RELIEF ORGANIZATION), P.O. Box 3654, Jakarta, Java 54021, Indonesia; Jalan Raya Cipinang Jaya No. 90, East Jakarta, Java 13410, Indonesia [SDGT]

INTERNATIONAL ISLAMIC RELIEF ORGANIZATION PHILIPPINES BRANCH OFFICE (a.k.a. AL IGATHA AL-ISLAMIYA; a.k.a. EGASSA; a.k.a. HAYAT AL-AGHATHA AL-ISLAMIA AL-ALAMIYA; a.k.a. HAYAT AL-'IGATHA; a.k.a. HAYAT AL-IGATHA; a.k.a. IGASA; a.k.a. IGASE; a.k.a. IGASSA; a.k.a. IGATHA; a.k.a. IGHATHA; a.k.a. IIRO; a.k.a. INTERNATIONAL ISLAMIC AID ORGANIZATION; a.k.a. INTERNATIONAL ISLAMIC RELIEF AGENCY; a.k.a. INTERNATIONAL RELIEF ORGANIZATION; a.k.a. ISLAMIC RELIEF ORGANIZATION; a.k.a. ISLAMIC SALVATION COMMITTEE; a.k.a. ISLAMIC WORLD RELIEF; a.k.a. THE HUMAN RELIEF COMMITTEE OF THE MUSLIM WORLD LEAGUE; a.k.a. WORLD ISLAMIC RELIEF ORGANIZATION), Basilan, Philippines; Cotabato City, Philippines; Tawi Tawi, Philippines; Marawi City, Philippines; 201 Heart Tower Building, 108 Valero Street, Salcedo Village, Makati City, Metropolitan Manila, Philippines; Zamboanga City, Philippines [SDGT]

INTERNATIONAL PACIFIC TRADING, INC., 2858 NW 79 Avenue, Miami, FL 33122; Business Registration Document #V16155 (United States); US FEIN 65–0315268 [BPI-SDNTK]

INTERNATIONAL PETROLEUM, S.A. (a.k.a. IPESCO), Colon Free Zone, Panama [CUBA]

INTERNATIONAL SIKH YOUTH FEDERATION (a.k.a. "ISYF") [SDGT]

INTERNATIONAL TRANSPORT CORPORATION, Colon Free Zone, Panama [CUBA]

INTERPAL (a.k.a. AL-SANDUQ AL-FILISTINI LIL-IGHATHA; a.k.a. AL-SANDUQ AL-FILISTINI LIL-IGHATHA WA AL-TANMIYA; a.k.a. PALESTINE AND LEBANON RELIEF FUND; a.k.a. PALESTINE DEVELOPMENT AND RELIEF FUND; a.k.a. PALESTINE RELIEF AND DEVELOPMENT FUND; a.k.a. PALESTINE RELIEF FUND; a.k.a. PALESTINIAN AID AND SUPPORT FUND; a.k.a. PALESTINIAN RELIEF AND DEVELOPMENT FUND; a.k.a. PALESTINIAN RELIEF FUND; a.k.a. PRDF; a.k.a. RELIEF AND DEVELOPMENT FUND FOR PALESTINE; a.k.a. WELFARE AND DEVELOPMENT FUND FOR PALESTINE; a.k.a. WELFARE AND DEVELOPMENT FUND OF PALESTINE), P.O. Box 3333, London NW6 1RW, United Kingdom; Registered Charity No. 1040094 [SDGT]

INTERVENTORIA, CONSULTORIA Y ESTUDIOS LIMITADA INGENIEROS ARQUITECTOS (a.k.a. INCOES), Avenida 6N No. 13N–50 of. 1209, Cali, Colombia; NIT #800144790–0 (Colombia) [SDNT]

INVARA S.C.S., Carrera 9A No. 12–61 p. 4, Bogota, Colombia; NIT #800162357–0 (Colombia) [SDNTK]

INVERSIETH 939, Cali, C lombia) [SI

INVERSIONI 96–64 of. 2 #830007842–4

INVERSIONI GANADER Carrera 61 bia; NIT #8

INVERSIONI OCCIDENT INAGROCC RENTERIA S.C.S.), Cal gota, Colo bia) [SDNT

INVERSIONI ORIENTE Carrera 14 lombia; [SDNTK]

INVERSIONI LTDA., Ca quilla, Col bia) [SDNT

INVERSIONI Rivera, La 14 No. 14–5 NIT #89190

INVERSIONI 67 of. 601, C Jamundi, C of. 402, Cal 1–128, Cali, 

INVERSIONI 12–41 of. 6 #890328888–

INVERSIONI AGROVET AGROVET versal 29 N 7 No. 25–69 28–50, Bog Norte No. #830019226–

INVERSIONI INVERSIO S.C.S.; f.k.a 44, Ofc. #891305286–

INVERSIONI Via 80, Mad

INVERSIONI Consuegra C.I.F. B816

INVERSIONI Calle 16 No NIT #80020

INVERSIONI S.C.S., Ave Cali, Color Cali, Color apt. 401, C (Colombia)

INVERSIONI SAIEH Y C

**EXHIBIT 177 TO DECLARATION OF VALERIE SCHUSTER**

S. Hrg. 108–802

# COUNTERTERROR INITIATIVES IN THE TERROR FINANCE PROGRAM

# HEARINGS

BEFORE THE

## COMMITTEE ON BANKING, HOUSING, AND URBAN AFFAIRS UNITED STATES SENATE

ONE HUNDRED EIGHTH CONGRESS

FIRST AND SECOND SESSIONS

ON

COUNTERTERROR INITIATIVES IN THE TERROR FINANCE PROGRAM, FO-CUSING ON THE ROLE OF THE ANTI-MONEY LAUNDERING REGU-LATORY REGIME IN THE FINANCIAL WAR ON TERRORISM, BETTER UTILIZATION OF TECHNOLOGY, INCREASED INFORMATION SHARING, DEVELOPING SIMILAR INTERNATIONAL STANDARDS, AND THE FOR-MATION OF THE TERRORIST FINANCING OPERATIONS SECTION (TFOS)

———————

SEPTEMBER 25, OCTOBER 22, 2003, APRIL 29, AND SEPTEMBER 29, 2004

———————

Printed for the use of the Committee on Banking, Housing, and Urban Affairs



Available at: http://www.access.gpo.gov/senate/senate05sh.html

———————

U.S. GOVERNMENT PRINTING OFFICE

20–396 PDF                    WASHINGTON : 2005

For sale by the Superintendent of Documents, U.S. Government Printing Office
Internet: bookstore.gpo.gov   Phone: toll free (866) 512–1800; DC area (202) 512–1800
Fax: (202) 512–2250   Mail: Stop SSOP, Washington, DC 20402–0001

COMMITTEE ON BANKING, HOUSING, AND URBAN AFFAIRS

RICHARD C. SHELBY, Alabama, *Chairman*

| | |
|---|---|
| ROBERT F. BENNETT, Utah | PAUL S. SARBANES, Maryland |
| WAYNE ALLARD, Colorado | CHRISTOPHER J. DODD, Connecticut |
| MICHAEL B. ENZI, Wyoming | TIM JOHNSON, South Dakota |
| CHUCK HAGEL, Nebraska | JACK REED, Rhode Island |
| RICK SANTORUM, Pennsylvania | CHARLES E. SCHUMER, New York |
| JIM BUNNING, Kentucky | EVAN BAYH, Indiana |
| MIKE CRAPO, Idaho | ZELL MILLER, Georgia |
| JOHN E. SUNUNU, New Hampshire | THOMAS R. CARPER, Delaware |
| ELIZABETH DOLE, North Carolina | DEBBIE STABENOW, Michigan |
| LINCOLN D. CHAFEE, Rhode Island | JON S. CORZINE, New Jersey |

KATHLEEN L. CASEY, *Staff Director and Counsel*
STEVEN B. HARRIS, *Democratic Staff Director and Chief Counsel*
SKIP FISHER, *Senior Professional Staff*
JOHN O'HARA, *Senior Investigative Counsel*
STEPHEN R. KROLL, *Democratic Special Counsel*
JOSEPH R. KOLINSKI, *Chief Clerk and Computer Systems Administrator*
GEORGE E. WHITTLE, *Editor*

(II)

# C O N T E N T S

---

## THURSDAY, SEPTEMBER 25, 2003

Page

Opening statement of Chairman Shelby ...................................................... 1
Opening statements, comments, or prepared statements of:
    Senator Bunning ......................................................................................... 2
    Senator Schumer ........................................................................................ 12
    Senator Corzine ......................................................................................... 13
    Senator Sarbanes ...................................................................................... 14
    Senator Grassley ....................................................................................... 30

### WITNESSES

David D. Aufhauser, General Counsel, U.S. Department of the Treasury ........ 3
    Prepared statement .................................................................................. 31
John S. Pistole, Assistant Director, Counterterrorism Division, Federal
    Bureau of Investigation ........................................................................... 5
    Prepared statement .................................................................................. 36
E. Anthony Wayne, Assistant Secretary for Economic and Business Affairs,
    U.S. Department of State ......................................................................... 8
    Prepared statement .................................................................................. 42

---

## WEDNESDAY, OCTOBER 22, 2003

Opening statement of Chairman Shelby ...................................................... 47
Opening statements, comments, or prepared statements of:
    Senator Sarbanes ...................................................................................... 48
    Senator Bunning ......................................................................................... 49
    Senator Allard ........................................................................................... 56
        Prepared statement ............................................................................ 87
    Senator Schumer ........................................................................................ 59

### WITNESSES

Richard A. Clarke, former National Counterterrorism Coordinator, National
    Security Council ........................................................................................ 49
    Prepared statement .................................................................................. 87
Louise Richardson, Executive Dean, Radcliffe Institute for Advanced Study,
    Harvard University .................................................................................. 67
    Prepared statement .................................................................................. 91
Jean-Charles Brisard, CEO, JCB Consulting International .............................. 70
    Prepared statement .................................................................................. 95
Matthew A. Levitt, Senior Fellow in Terrorism Studies, The Washington
    Institute for Near East Policy ................................................................ 74
    Prepared statement .................................................................................. 110

#### ADDITIONAL MATERIAL SUPPLIED FOR THE RECORD

Letter to Senator Richard C. Shelby and Senator Paul S. Sarbanes from
    Stephen J. Brogan, Managing Partner, Jones Day, dated October 30, 2003 .. 128

IV

Page

**THURSDAY, APRIL 29, 2004**

Opening statement of Chairman Shelby ......................................................... 133
Opening statements, comments, or prepared statements of:
    Senator Sarbanes ....................................................................................... 134
    Senator Bennett ......................................................................................... 135
    Senator Dole ............................................................................................... 136
    Senator Allard ........................................................................................... 136
        Prepared statement ............................................................................ 169

**WITNESSES**

Samuel W. Bodman, Deputy Secretary, U.S. Department of the Treasury ........ 136
    Prepared statement .................................................................................... 169
William J. Fox, Director, Financial Crimes Enforcement Network, U.S.
    Department of the Treasury ..................................................................... 159
    Prepared statement .................................................................................... 181
R. Richard Newcomb, Director, Office of Foreign Assets Control, U.S.
    Department of the Treasury ..................................................................... 161
    Prepared statement .................................................................................... 187
Nancy Jardini, Chief, Criminal Investigation, Internal Revenue Service ......... 163
    Prepared statement .................................................................................... 201

————————

**THURSDAY, SEPTEMBER 29, 2004**

Opening statement of Chairman Shelby ......................................................... 209
Opening statements, comments, or prepared statements of:
    Senator Reed .............................................................................................. 210
    Senator Enzi .............................................................................................. 210
    Senator Stabenow ...................................................................................... 212
    Senator Crapo ............................................................................................ 212
    Senator Bunning ....................................................................................... 212
        Prepared statement ............................................................................ 260
    Senator Sarbanes ....................................................................................... 223
    Senator Carper .......................................................................................... 227

**WITNESSES**

Lee H. Hamilton, Vice Chair, The National Commission on Terrorists Attacks
    Upon the United States, A Former Representative in Congress from the
    State of Indiana ........................................................................................ 213
    Prepared statement .................................................................................... 260
Slade Gorton, Commissioner, The National Commission on Terrorists Attacks
    Upon the United States, A Former U.S. Senator from the State of
    Washington ................................................................................................ 214
    Prepared statement .................................................................................... 260
Mallory Factor, Chairman, Mallory Factor, Inc. ........................................... 234
    Prepared statement .................................................................................... 264
Lee S. Wolosky, Of Counsel, Boies, Schiller & Flexner, LLP ........................... 236
    Prepared statement .................................................................................... 267
Stuart A. Levey, Under Secretary, Terrorism and Financial Intelligence,
    Under Secretary for Enforcement, U.S. Department of the Treasury ............ 245
    Prepared statement .................................................................................... 272
    Response to a written question of Senator Enzi ............................................. 288
Michael J. Garcia, Assistant Secretary, U.S. Immigration and Customs
    Enforcement, U.S. Department of Homeland Security ................................... 247
    Prepared statement .................................................................................... 280
John E. Lewis, Deputy Assistant Director, Counterterrorism Division,
    Federal Bureau of Investigation ............................................................... 250
    Prepared statement .................................................................................... 283

3

The United States needs to be able to investigate and prosecute terrorist financiers wherever they hide. To do this, we must have the cooperation and support of the international community. We have made some progress in finding and blocking some of these funds, but there is still a lot more that we can do. We must turn off the terrorism funding faucet and force these terrorists to dry up and wither away.

Once again, Mr. Chairman, thank you for holding this important hearing.

Chairman SHELBY. Thank you.

All of your written statements will be made part of the record in their entirety as we move along in this very important endeavor.

I first want to acknowledge that Senator Grassley, the Chairman of the Finance Committee, has a statement for the record, and without objection, it will be entered here.

Chairman SHELBY. Mr. Aufhauser, we will start with you. You proceed as you wish. Welcome to the Committee.

## STATEMENT OF DAVID D. AUFHAUSER
## GENERAL COUNSEL, U.S. DEPARTMENT OF THE TREASURY

Mr. AUFHAUSER. Thank you, Mr. Chairman. It is a distinct honor to appear before you. You and I actually have previously discussed Treasury enforcement and terrorist financing matters in closed hearings before the Senate Intelligence Committee when you served on that Committee. And I am actually very grateful for the chance to debate these issues in the daylight because I think we can all profit from an informed debate on something that is central, I think, to the lives of the country.

Senator Sarbanes, whom you commended for also being a major participant in this hearing, I am grateful for the attention he has paid to it, particularly through my good friend, Steve Kroll, on his staff. I live in the District of Columbia, so Senator Sarbanes is the closest I have ever come to a Senator. And I am particularly grateful that he has people like Steve working for him.

Chairman SHELBY. We are also grateful to Senator Sarbanes, as I said, the former Chairman of the Committee, now the ranking Democrat, for his interest in this because we are approaching this in a bipartisan fashion, not only with our Committee members and the leaders of the Committee but with our staffs, too.

Mr. AUFHAUSER. Well, on the staffs, I would be remiss if I did not mention the good industry of Steve Harris and Kathy Casey.

Chairman SHELBY. Absolutely.

Mr. AUFHAUSER. And particularly John Smith. I think we are all safer because of it.

Mr. Chairman, terror traffics in three forms of currency: hate, counterfeit religion, and money. The first two are born out of a deficit of hope, particularly in the Middle East, the most naked symbol of which, I think, is the failure to resolve the question of Palestine. But the malevolence preys on a dynamic that extends far beyond those borders, the corners of the world where you find the Islamic Diaspora: hunger, torn by civil war, living in near-permanent refugee camps, looking for remedy where reason seems to beggar that notion. There, hopelessness is forged into hate by merchants of the false cure called terror.

23

framework that other countries have as to what they can do in their specific cooperation with us, and that has varied country to country.

There, we have focused on encouraging them to get their regulation and laws in place that allows them to go further. But the spirit of wanting to cooperate has been quite pervasive certainly post-September 11 on Al Qaeda.

I do not know if David has some more specifics, particularly in the financial area.

Mr. AUFHAUSER. First, I want to affirm what Tony has said. On official channels, there has been perfect cooperation. The one major hurdle has been differences of administrative law, issues of evidence, that permit a freezing of assets on less than "beyond a reasonable doubt." Here, as you know, Senator, we have a lesser standard for proceeding under IEPA and under the powers given to OFAC, which basically is an "arbitrary and capricious" standard. That is a standard that is alien in many parts of the world.

For that reason, you frequently have to try to share and develop more evidence than otherwise you think is required. A lot of the dialogue officially is to convince them that this is enough for them to act.

In terms of private channels, we have been in near-weekly if not daily contact with private banking associations and, where we have specific evidence and where appropriate with specific banks on private matters, and achieved remarkable degrees of cooperation.

I think everybody knows that one of the great ironies of what happened on September 11 is that our enemies used the very tools of commerce, particularly the increasingly borderless financial world, to strike at the heart of it. And they are angry about it, and they are committed to join us in fighting it.

Senator CORZINE. So you are having no roadblocks in your ability to reverse-engineer the maps and flows across international boundaries.

Mr. AUFHAUSER. My biggest disability is actionable intelligence, enough to share people to push the envelope in their own jurisdictions.

Senator CORZINE. The corresponding banking issue that was so much a centerpiece of much of what we discussed when we were writing Title III has been open to your ability to pursue and to understand the flows of funds, whether it is to charitable organizations or through business——

Mr. AUFHAUSER. Yes. Where necessary, we have a pretty deep understanding of what happens in the documented banking world today.

Senator CORZINE. Usually, when there is pressure in one area, other elements of transaction flow develop. Are we identifying, and is it becoming clear, or are there channels that are developing that have nontraditional, if one would say, that we are onto—we all heard about the hawala issue when we were debating—but are there other channels that are becoming more apparent—people used couriers as an example in one of the testimonies. Are we seeing new avenues of transfer without trying to—and I am not asking you for a revelation of classified material.

**EXHIBIT 178 TO DECLARATION OF VALERIE SCHUSTER**



# רשומות

# ילקוט הפרסומים

**4520**

ד באייר התשנ"ז                                              11 במאי 1997

| עמוד | | עמוד | |
|---|---|---|---|
| 3388 | הודעה על מינוי הנהלת השומעת לפי חוק הפסיכולוגים | 3316 | הודעה על קביעת הבקר של המרע |
| | הסכמה לפי חוק מועצת הצמחיה (ייצור ושיווק) | | הודעה בדבר הגור עבודה מיוחדים לפי חוק שירות |
| 3388 | ולפי חוק המועצה לצמחי גוו (ייצא ושיווק)  .. | 3395 | המדינה (גימלאות) .   .   .   .  . |
| | מינוי ממלא מקום זניב שר דבוני והשיבה במועצה | 3396 | מינוי ממלא מקום המנהל הכללי של משרד המשפטים |
| 3388 | הארצית לתכנון ולבניה  .   .   . | 3386 | הודעה על גמר כהונתו של שופט |
| 3389 | הודעה בדבר קביעת הקנים   . . | 3366 | הסמכה בסמכויות של רשם מקרקעין |
| 3399 | הודעה בדבר שיווים בהקדים | 3366 | הודעה על העריך לסה הוזה מבררת לפי חקנות |
| 3399 | הודעה בדבר בקיעות ליישום יכות מטפחים של זני | 3397 | דהנוגה (צו) |
| 3400 | הודעה מוקדמת בדבר מחייקה מפונקי הכומחות .   . | 3397 | הודעה על מינוי מקיד שומה . |
| 3410 | הודעה בדבר מחייקה מפונקי העובמות .   .   . | | הודעה על מינוי משה על הבהרה לפי תקורה |
| 3411 | בקעטה לפי חוק הבהרה על ידי בית המשפט | 3397 | המסים (גביה) .   .   . |
| 3412 | הודעות שאת הבהנ הראשו  .   .   .   . | | ה בדבר סכום ההנ'יה בדיון מהיר לפי תקנות |
| 3414 | הארער מא הא פיטרתפ הכללי  .   .   . | 3397 | בית הדין לעבודה ובקיעת מבום ההבניה בדיון |
| 3415 | דוח ה שבוניים של בנק ישראל כל מחזור המטבע  . | | מהיר) |
| 3415 | הודעות מאה הזיבור . . . . | | הודעה על מ'וי הברה לועיות פסיכ.אטויות |
| | | 3397 | מחהריי.ת לילדים ולנוער . |

## חיקוק הכרזה על התאחדות בלתי מותרת

לפי תקנות ההגנה (שעת חירום), 1945

בתוקף סמכותי לפי תקנה 84(1)(ב) לתקנות ההגנה (שעת חירום), 1945, ולאחר שהשתכנעתי כי הגוף הידוע לעניין הזה על בנותיו המדיניות, שהם הציבור והמהרי הציבורי, אגי קובע כי ההברה על התאחדות בלתי מותרת:

המטעם "ולצנה בלי יבוא ולדניה יפלסטי אינטרלנטה", יכן

הרשות ההברתה לפלסטין ("אינטרפאל") "INTERPAL", יכן

and Development Fund ("INTERPAL". יכן אלקומטי.

"הוגעד לעזרה וסולידריות עם פלשמין", (Le Comite' de

Bienfaisance et de Solidarite' avec la Palestine

(CBSP), יכן הארגוני הקרדיות לדיחוה ולפיתחי, Holy)

.הבל, Land Foundation for Relief and Development)

כ"ז בניסן התשנ"ז (6 במאי 1997)                          איתן סרדור

נתם 1080-3                                                    שר הבטחון

*  ע"ר 1945, תוס' 2, עמ' 855.
*  ר"פ התשמ"ט, עמ' 5253.

### הודעה על מינוי מקיד שומה

לפי פקודת מס הכנסה

אני מודיע שבהתוקף סמכותי לפי סעיף 229 לפקודת מס הכנסה', מיניתי את עובדת הציבור שולומת הרשקו, ח"ז 054661476, לפקידת שומה לעניין מקיד שומה אילת, החל מיום ב'כ בטבת התשנ"ז (1 בינואר 1997)

י' בניסן התשנ"ז (17 באפריל 1997)                         דן מרחיר
נתם 171-3)                                                    שר האוצר

*  דיני מדינת ישראל, נוסח הדש 6, עמ' 120.

### הודעה על מינוי ממונה על הגביה

לפי פקורת המסים (גביה)

אני מודיע שבהתוקף סמכותי לפי סעיף 2(1) לפקורת המסים (גביה), מיניתי את עובדת הציבור שלומית הרשקו ח"ז 054661476, לממונה על הגביה, החל מיום ב'כ בטבת התשנ"ז (1 בינואר 1997).

י' בניסן התשנ"ז (17 באפריל 1997)                         דן מרחיר
נתם 15-3)                                                    שר האוצר

*  חוקי א"י, כרך ב', עמ' 1374; ס"ח התשל"ג, עמ' 46

### הודעה בדבר סכום התעויה בדיני מזון

לפי חקנות בית הדין לעבודה (נקובים סכום התעריפה בדיני מזון), התשנ"ז-1995

מהתאם להתראות תקנה 2א להתנות בית הדין לעבודה (נקובת סכום התעריפה בדיני מזון), התשנ"ז-1995', אני

*  ק"ת התשנ"ב, עמ' 856; התשנ"ג, עמ' 394; ר"פ התשנ"ע,
   עמ' 2407

---

מודיע כי הסכום של התובענות בריין מזוד הגביל ביום ב'כ במבת התשנ"ז (1 בינואר 1997) ל'14,900 שקלים חדשים.

רב בטבת התשנ"ז (26 בינואר 1997)                         (נתם 547-3)
                                                              י' רבניב, שופט
                                                              נשיא, בית משפט מחוזי
                                                              מרחל בתי המשפט

### הודעה על מנוי חברים לוערות מפטיזמרוות מתוויות לילדים ולנער

לפי חוק נימול בהולי נפש, התשנ"ד-1991

אני מודיע כי בהתוקף סמכותי לפי סעיף 41א לחוק נימול בהולי נפש, התשנ"ד-1991', מיניתי לחברים בוערות מפסיאמריות מתוויות לילדים ולנער, שבתוכם יקבע מתוך תורויות את האנשים במפורט להלן:

**מחוז ירושלים**

ברניאהה, הרופאים בעלי תואר מופחת במפסיכיאטריה, של
הילד המבהבגה.

                   ד'ר יוסף הובן
                   ד'ר אסהר נהידר

**מחוז תל-אביב**

נרשפוחו עובדים סמיאליים.
                   אוריה. מוכל

**מחוז המרכז**

ברשפים פסיכולוגים בעלי תואר מומהר בפסיבולוגית
                   קליניה.
                   יגל רפנה

ברשפים עובדים סמיאליים.
                   והי רוספוגל

**מחוז חיפה**

ברשפים האנשים בעלי תואר מומחה במפסיכיאטריה של
הילד המכובגה.
                   ד'ר דינה קלטלואו

ברשפים פסיכולוגים בעלי תואר מומחה בפסיבולוגיה.
                   קליניה.
                   הואהו בהיב
                   עונדת סמונה
                   אמר קוהל

ברשמום פסיכולוגים בעלי תואר מומהה בפסיבולוגיה.
                   היבוכיה.
                   זהל קוגל                הבר מהולין
                   מיבאל וילצר             מיכל בנכקי
                   מרטמ משה ובי            נח ונרסקו

*  י'פ התשנ"ד, עמ' 577; התשנ"ו, עמ' 1154.

---



רשומות

# ילקוט הפרסומים

19 בפברואר 1998       **4619**       כ"ג בשבט התשנ"ח

עמוד

2514   הודעות על מינוי שר וכו' . . . . . . . . . . .

הודעה על מינויים לועדה המייעצת ולמועצה
2514   הבידיעצת של בנק ישראל . . . . . . . . . . . .

2514   מינוי הגר לוערות שחוררים לפי חוק הוועים . . . .

2514   הכרזה לפי פקודת מניעת טרור . . . . . . . . . . .

2514   הודעות על מינוי שופטים לבית משפט לענייני משפחה .

2514   מינוי נושאי משרה במועצל הכללי של משרד המשפטים

מינוי יושב ראש וחבר נומועה להסדר ההימורים
2515   בספורט . . . . . . . . . . . . . . . . . . . . . . . .

מינוי נציג שר הכינוי והפיקוח כוועדה בחוזיה לתכנון
2516   ובניה . . . . . . . . . . . . . . . . . . . . . . . . .

2515   הודעה על מינוי סגן פסיכיאטר מחוזי . . . . .

2515   הרחבה של הסמכה לפי פקודת בריאות העם . . .

2515   מינוי הגר לועדת תלונות לפי חוק הפסיכולוגים . . .

2514   מינוי חברים לועדות רפואיות לענין גימלה נירדות . .

2514   שינוי הרכב מועצת בבריה בשמותם של גני עמדים

2514   הסמכה לפי חוק הגנת הצומח . . . . . . . . . . . .

הודעות הרבר משפר הברי מועצת הוועמים לכחירה
2516   ברשויות מקומית . . . . . . . . . . . . . . . . . .

הודעה על מינוי מקרים מס רכוש וחברי וערות לפי
2517   החוק לעידוד מלונם של בניינים בעלי הונה מוגנה . . . . . . . . . . . . .

2517   הודעות לפי חוק הפיקוח על המובכ. ברבר -

2517   תיקון להוראת השגוני . . . . . . . . . . . . . . . .

תיקון ההיתר הכללית בענין השקעות דיאליות
2517   בחוץ לארץ . . . . . . . . . . . . . . . . . . . . .

תיקון ההיתר בעניין הטפנת נירחות ערך חוץ
2517   בחוץ לארץ . . . . . . . . . . . . . . . .

עמוד

2514   הרשאה למסמ בביטוחו רכב מנועי

הוראת מרכז להסדר בית משפט שבו מופעלת מטרכה
2515   ממוחה . . . . . . . . . . . . . . . . .

2518   הורעה הרבר ההינה עורבי מטבעים

2518   הורעה הרבר פקיעתן של וגרות נפט . . . . .

2519   הורעה על פקיעת של היתר מוקדם לחרומיי נכס .

2517   הורעה על הענין במיקום בחובה . . . .

הסכמם קיבוליים מיוחדים שהוגשו לרישום ער יום
2519   31.12.97 . . . . . . . . . . . .

הורעה על ביטול הסכמם קיבוליים מיוחדים
2522   שהוקבלו בשנם 1997 . . . . . . . . .

2523   הורעה הרבר שיעורי ריבת החשב הכללי . . .

2523   הורעה הרבר סתון רשומות מזודים . . . .

2524   תערות מעור לפי פקורות הבטרות בעברית

2524   הורעה הרבר הפקית תברה מרתבר מחוית .

2524   הורעה הרבר סתון רשיוות לחוריה לאתי עריגים . .

2525   הורעה ברבר מהירה רכ עיר . . . .

2525   מינוי שגוול ארעונת ברוות מקופית . . . .

2523   הודעת בורסי רביאה ברקועות לטרי ציבור . .

2526   הורעות לפי חוק התבנון והבניה . . .

2535   בקשות לפירוק חברות על ירי בית המשפט . .

2540   הורעות לפי פקורת האגודות השיתופיות . . .

2540   הורעות מאת הכונם הרשמי

2542   הורעה מאת האפוטרופוס הכללי . .

2542   דרוזי שבועי על בנק ישראל על מוזור המטבע .

2542   הורעות מאת הציבור . . . . . . . . . . .

## הודעה על מינוי סגן שר

לפי חוק־יסוד: הממשלה

מודיעים בזאת, על פי סעיף 24(ב)[1] לחוק־יסוד: הממשלה[1], כי בהתאם לסעיף 24(א) לחוק האמור, מינה ממלא מקום שר החינוך, התרבות והספורט, באישור ראש הממשלה את חבר הכנסת משה פלד לסגן שר במשרד החינוך, התרבות והספורט.

הודעה על המינוי נמסרה לכנסת ביום א' בשבט התשנ"ח (28 בינואר 1998).

(נתפרסם על פני חשר משה פלד מכהן ביום כ"א בטבת התשנ"ח (20 בינואר 1998) כס־ן מקומו של שר החינוך, התרבות והספורט.

ר בשבט התשנ"ח (2 בפברואר 1998)

חן נוה
מזכיר הממשלה

[1] ס"ה התשנ"ב, עמ' 214.

## הודעה על מינויים לועדה המייעצת המרכזית של בנק ישראל

לפי חוק בנק ישראל, התשי"ד-1954

מודיעים בזה, כי בהתאם לסעיף 32(א) ו-(ב)(א) לחוק בנק ישראל, התשי"ד-1954[1], מינתה הממשלה את רשימת מריצה ואת איתן רף להיות חברים בועדה המייעצת והמרכזית המייעצת של בנק ישראל על יום כ"ז באייר התשנ"ח (22 במאי 1998).

ר בשבט התשנ"ח (2 בפברואר 1998)

חן נוה
מזכיר הממשלה

[1] ס"ה התשי"ד, עמ' 192

## הודעה על מינוי חבר לערכות שחרורים

לפי חוק השיחרון התשמ"ז-1977

בתוקף סמכותי לפי סעיף 59(א)(3) לחוק השיחרון, התשמ"ז-1977[1], אני ממנה את דרי לואיס דינוגרד, רופא, לחבר ועדות שחרורים במחוז הדרום.

ה בשבט התשנ"ח (1 בפברואר 1998)

צחי הנגבי
שר המשפטים

[1] ס"ה התשמ"ז, עמ' 226

## הברזה

לפי פקירה מניעת טורי התש"ח-1948

בתוקף סמכותה לפי סעיף 9 לפקודת מניעת טורי, התש"ח-1948[1], הנוסח להבראות, שהיצעה עליון מפרסמת

[1] ע"ר התש"ח, תוס' א', עמ' מ'.

---

בילקוט הפרסומים התשמ"ד עמ' 5434, בילקוט הפרסומים התשמ"ט, עמ' 2474, ובילקוט הפרסומים התשנ"ד, עמ' 2564, מכריזה הממשלה שהארגונים המפורטים להלן הם ארגונים טרוריסטים בהיותם חלק מארגון ההמאס.

(1) פלסטין אלסלאם:

(2) קרן הרווחה והפיתוח לפלסטין (אינטרפל) –
Palestinian Relief and Development Fund
(INTERPAL);

(3) קרן אלאקצה:

(4) הועד לצדרות הוולידריות עם פלסטין –
Le Comute de Bienfassance et de Solidante Avec
la Palestine (CBSP)

(5) קרן הא־רמה הקירושה להרווחה ולפיתוח –
Holy Land Foundation for Relief and
Development.

כ"ט בטבת התשנ"ח (27 בינואר 1998)

חן נוה
מזכיר הממשלה
(חמ 1285-3)

## מינוי שופט לבית משפט לעניני משפחה

לפי חוק בית המשפט לעניני משפחה, התשנ"ה-1995

בתוקף סמכותי לפי סעיף 2(ב) לחוק בית המשפט לעניני משפחה, התשנ"ה-1995[1], ובהסכמת נשיא בית המשפט העליון, אני ממנה את השופטת שרית נזיל, ה'ו 044665849, שופטת של בית משפט שלום, לדיין בבית משפט לעניני משפחה, החל ביום כ"ח בטבת התשנ"ח (26 בינואר 1998).

כ"ד בטבת התשנ"ח (22 בינואר 1998)

צחי הנגבי
שר המשפטים

[1] ס"ה התשנ"ה, עמ' 393

## מינוי שופט לבית משפט לעניני משפחה

לפי חוק בית המשפט לעניני משפחה, התשנ"ה-1995

בתוקף סמכותי לפי סעיף 2(ב) לחוק בית המשפט לעניני משפחה, התשנ"ה-1995[1] ובהסכמת נשיא בית המשפט העליון, אני ממנה את השופטת ניסן ח"ו 054342768, והנמצאת חברה רישומליל, ה'ו 044665349, שופטת של בית משפט שלום, לדיין בבית משפט לעניני משפחה, החל ביום כ"ח בטבת התשנ"ח (26 בינואר 1998).

כ"ד בטבת התשנ"ח (22 בינואר 1998)

צחי הנגבי
שר המשפטים

[1] ס"ה התשנ"ה, עמ' 393



רשומות

# ילקוט הפרסומים

| כ"ג באדר התשס"ב | **5058** | 7 במרס 2002 |

**עמוד**

היקון הברה על התאחדות בלתי מותרת לפי תקנות
ההגנה (שעת חירום) ....................................... 1546

מינוי שופט נוער ...... .............. .......... 1548

מינוי ועדות ערעור לפי חוק משפחתיה חיילים שנספו
במערכה (תגמולים ושיקום) ולפי חוק בתי דין
מינהליים ............................................. 1549

מינוי חברה לוערות ערעור לפי החוקים האמורים  ...  1569

מינוי ועדות ערעור לפי חוק הנכים (תגמולים ושיקום)
ולפי חוק בתי דין מינהליים  ..  ..  .............  1569

מינוי חברה לוערות ערעור לפי החוקים האמורים  ...  1570

הוריע ברבר העונקה סמכויות לפי חוק התקשורת
(בוק ושידורים) ..................................... 1570

חודעה על מינוי מפקח על המחירים   ......  ......  1570

מינוי סגן בסוכנאאר מחוזי ..  ..  .............  1570

מינוי הבר לוערות רפואיות לענין גמלה נירידה  .  ....  1570

הידיעה על הארכת תוקף היסמכה לפי חוק המבטרדיסים
האהריכילים  ........................................  1570

**עמוד**

אצילה סמכויות לפי חוק-יסוד: הממשלה   ...........  1590

הוריה ברבר חילופי סגן ממלא מקום ובחירת סגן
ראש המועצה המקומית גבעת ערה  ..............  1591

הוריעה על קיום בחינות מועד אביב 2002 של מועצת
רואי החשבון  ......................................  1591

הורעה על עיגוד סטטיסטיקה   .......  .............  1592

הורעות ברבר השעיית הברים מלשכת עורכי הרין  .  1592

הורעה ברבר מתיר מקום בחירת רב העיר
תל-אביב-יפ  .......................................  1593

חיקון טעות בהסמכה לפי חוק איסור הלבנת הון  ...  1593

ביטול אכרזה על אזור נגוע במחלת הנויקסל  ..  ...  1593

הורעות ברבר רכישת קרקעות לצורכי ציבור   ........  1593

הורעות לפי חוק התכנן והבניה  ...  ..................  1599

הורעה לפי פקודת האגורות השיתופיות   ............  1623

הודעות מאת הכונס הרשמי  ...........................  1623

הורעות מאת הציבור  ....................................  1630

רהונה שבועיים של בנק ישראל  ......................  1634

תיכון הברזה על התאחדות בלתי מותרת

לפי תקנות ההגנה (שעת חירום), 1945

בתוקף סמכויתי לפי תקנה 84(1)(ב) לתקנות ההגנה (שעת חירום), 1945', ולאחר שישתכנעתי כי הדבר דרוש לצורך הגנה על ביטחון המדינה, שלום הציבור והסדר הציבורי, אני קובע כי בהברזה על התאחדות בלתי מותרת', אתר "אולכוותלה אלאיסלאמיה" (בהא:

"אגודת הצדקה באוייש ואמ"ע השיבות לארגון החמאס, או תמכונה מ: ומהקטת את התשתיה של החמאס, לדבות –

וערת הצדקה והחסד האן ינום (יללנת :כות אלרחמה האן ינום":

אגורת המרבז האסלאמי (אלמנזע אלאסלאמי) רצועת עזה;

אגורת טורר המדידה האסלאמיות ( גמעיה אלצלאח אלאסלאמיה): רצועת עזה:

האגודה האסלאמית (אלגמע:ה אלאסלאמ:ה) רצועת עזה:

אגורה הנאמנות לט:פול בקשישים (:מעות אלופאא לרעא:ת אל מסנ:ן) רצועת עזה:

אגורה מיסד הצרקה והחסד לילרים (:צ:מ:ת מברת אלדרמה ללאטפאל) רצועת עזה,

אגורה ב:ת הקיראן ההמונ: (:נמע:ת ראי אלכתאב :אלסנה) רצועת עזה;

אגורה ב:ת הקיראן המבורך וההטנה (:צ:מ:ה ראי אלקראן אלברים ואלסנה) רצועת עזה;

אגורה :האסיר אלבר: (:רמעיה אללנד אלחיריה); רצועת עזה,

אגורה הצרקה האסלאמית חברון (:אללצמע:ה אלח:ריה אלאסלאמיד אלח:ל:ל :

אגודה הרמחמה ב:ריחו (:נמע:ת אלראמלאה אלח:ירה:ק:

הסנגוה לטיפול ב:תומים בב:ת לחם (:גמעיה רעא:ה אל:ת:ם ב:ת לחם:ק;

אגודה הצרקה (הרמלרמה) האכלאמ:ת באלב:רה; (:וצמע:ת אלצואלאח:ק;

וערה הצרקה ברמאללה (:ללנת אלזכאה :ברמאללד:ק;

אגורה אלקראן :אללמאה :קלקיה ( :ג:מע:ת אלק:ראן :אכסנה קלקיל:ה:ל:

וערה הצרקה טול ברם (:ללנת אלזכאה טיל ברמ:ק:

אגורה הפוליריות לצרקה האכלאמ:ת (:גמעיה אלחדאמן אלח:ירד:ה אלאסלאמ:יה:) שבם:

ועה: הטיוע האכלאמ:ת שכם (:ללנת אלצעדה:ה אלאכלאמ:ת נאבלס:ק:

ועה: כסף הצרקה ג:ן (יללנת אמואל אלזכאה ג:נ:ק:

---
[footnote markers right column]
' ע:ד 1945, הום 2, עמ' 858.
' י:ם התשס"ס, עמ' 4533, התשכ:ד, עמ' 7587, דתשנ:ת, עמ' 4558: התש:ס, עמ' 4854.

1588

<hr>

[LEFT COLUMN]

אגורה הצעירים המוסלמים (::מעית אלשנצבאן" אלמסלמ:ן) חברן:

ובן האגודות האלה: שמרבנן בחר:ל:

הבנה העולמ: לנועד אסלאמ: (:אלדוה אלעאלמיה לשנאב אסלאמ:)

קראלאעית הצרקה (:אאתלאף אלח:יד:)

אגורת הטוע האסלאמית העולמית ( :אלה:אה אלח:יריה אלאסלאמיה אלעאלמ:ה:ל:

יינ באלד אלרחטה (:לנ בפברואר 2008)

בנימין בן אליעזר
שר הבישחון

מזנו שופטו נוער

לפי חוק הנוער (שפ:טה, ענ:שה ודרכ: ט:פ:ל:
התשל"א–1971

בתוקף סמכות: לפי סע:ף 2 לחוק דנוער (שפ:טה, ענ:שה ודרכ: ט:פ:ל:, התשל"א–1971', ובהסכמת שר המשפט:ם, אנ: מ:טל על עורד ורשן, ת"נ 4274(12, שופט ב:ת משפט שלום ודטם של ב:ת משפט מחוז:, בכהונה במקיל כשופט של ב:ה המשפט המחוז: בחיפה, לשמש שופט נוער עד יום :"ח בכסלו התשע"ה (30 בנובמבר 2004.

במו כן אנ: מ:טל על דוז שפירא, ת"נ 4(4044, שופט ב:ת משפט שלום ודטם של ב:ת משפט מחוז:, בכהונה במקיל כשופט של ב:ת :המשפט המחוז: בחיפה, לשמש שופט נוער עד יום כ": באב התשע"ה (12 באוגוסט 2005.

במו כן אנ: מ:טל על רחמים צמח, ת"נ 3(045(88, יעל :צחק בהן, ת"נ 44(0024(55, שופט: ב:ת משפט שלום בכהונה במקיל כשופפים של ב:ת המשפט המחוזי בחיפה, לשמש שופט: נוער עד :ום :ט באדר ה: התשט:ב (28 בפברואר 2002.

ה: באדר התשט:ב (21 בפברואר 2002:
(חמ 680–3)

אהרן ברק
נש:א ב:ה המשפט העלין

ס:ה התשל"א, עמ' 134.

מזנו שופטו נוער

לפי חוק דנוער (שפ:טה, ענ:שד ודרכ: ט:פ:ל:
התשל"א–1971

בתוקף סמכות: לפי סע:ף 2 לחוק הנוער (שפ:טה, ענ:שה ודרכ: ט:פ:ל:, התשל"א–1971', ובהסכמת שר המשפט:ם, אנ: מ:טל על שופטי ביה משפט מחוז:, השושנ: ראיק צ:דרורה, ת"נ 2(024(68, ודט:מפח שולמית :פרקר:ג, ת"נ 726(05(59, לבהן כשופט: נוער עד אום הקוטה בהונהם בעירכאה זו

ה: באדר התשס"ב (21 בפברואר 2002:
(חמ 680–3)

אהרן ברק
נש:א ב:ת המשפט העלין

' ס:ה התשל"א, עמ' 134.

ילקוט הפרסומים 5058, כ"נ באר: התשט:ב, 7.3.2002



# רשומות

# ילקוט הפרסומים

| ר כאב התשט"ה | 5426 | יו באוגוסט 2005 |

עמוד

הצמכה לפי פקורת הראיית .................................. 5808
מינני יושב ראש נוסף לוועדית ערעור לפי חוק להסדר
תמיסת מקרקעין בטעת חירום ............................. 5808
מינני יושב ראש נוסף לוועדיה לפתון היותרים לפי חוק
שידוה הציבור (הנבבלות לאתר פרישה) .................. 5808
תיקון הברהה על התאחדות בלתי מותרת לפי תקנות
ההגנה (שעת חירום) ..................................... 5806

עמוד

הודרקה על הוסף רופאים לרשיטת רופאי וע'זה רפואית
לפי תקנות וני המלחמה באאדם נעידת רפואיות) 5808
הרכ'אה לפי פקורת הפרוצדורה הפלילית (עדית) .......... 5808
מינר ממונה למועצה הדתית גן יבנה .................... 5809
הודקה בדבר העכבת הכנית מיתאר ארצית ............... 5809
הודרקה בדבר הצנת לוח זכויות במקרקעין ................ 5810

הסמכה

לפי פקודת הראיות [נוסח חדש], התשל"א – 1971

בתוקף סמכותי לפי סעיף 3(ב)(א) לפקודת הראיה. נוסח חדש[1], התשל"א – 1971, אני ממנהאת כל אחד מן העובדים במינהלה כמפטמונתה בחוק ייתנם הכניה ההתנהקת, התש...ס"ד–2005[2], שיטמם סמורט לחתן, להזהיד על פני תצהיר לענין הסיעף האמנור, לצרך מילוי תפקידיה

| שם ומשפחה | הפקיד | תעורת זהות |
|---|---|---|
| אורי דינור | רכז | 9254582 |
| דוד טרה | מנהל תחום | 50545446 |
| חיים לוי | מנהל תחום | 65865596 |
| אפרת אור | רכזת | 54999946 |
| בהרה אבנן | רכזת | 99689943 |
| חן עזרא | רכז | 52249966 |
| מאירה אמולין | רכזת | 54026167 |
| נמרוד חמין | רכז | 51049465 |

ד באב התשס"ה-29 באוגוסט 2005
(חמ3-220)
ציפי לבני
שרת המשפטים

1 דיני מדינת ישראל, נוסח חדש 18, עמ' 421.
2 ס"ח התשס"ה, עמ' 122 (220).

מינוי יושב ראש נוסף לוועדת ערעור

לפי חוק להבדר מביטח מקרקעין [שעות חירום, 1949–

בתוקף סמכותי לפי סעיף 16 לחוק להבדר הביטח מקרקעין [שעות חירום, התש"י 1949], אני ממנהת את עינת רביד, ת"י 58126669, כושבת של בית משפט שלום, ליושב ראש נוסף בוועדהת הערעור לפי החוק האמנור.

י"ב בהמוז התשס"ה 19 ביולי 2005
(חמ 136 3)

ציפי לבני
שרת המשפטים

1 ס"ח התשי"י, עמ' 1.

מינוי יושב ראש למתן היתרים

לפי חוק שירות הציבור והגבלות לאחר פרישה),
התשכ"ט 1969

בתוקף סמכותי לפי סעיפים 11 ו-12ו לחוק שירות הציבור (הגבלות לאחר פרישה), התשכ"ט–1969[1], אני ממנה את מרים מדזיני, ת"י 986044, כושבת בית משפט מחורז, ליושב ראש הוועדה למתן היתרים לפי החוק האמנור.

י"ז בהמוז התשס"ה 24 ביולי 2005
(חמ 100 3)

ציפי לבני
שרת המשפטים

1 ס"ח התשכ"ט, עמ' 144,

---

תיקון הכרזה על התאחדות בלתי מותרת

לפי תקנות ההגנה (שעת חירום), 1945

בתוקף סמכותי לפי תקנה 84(1)(א) לתקנות ההגנה (שעת חירום), 1945, ולאחר שקולעתי כי הדבר ידרוש לצורך הגנה על ביטחון המורינה, שלום הציבור והסדר הציבורי, אני קובע כי בהבדור על התאחדות בלתי מותרת, שרשימה "אגודה הצדקה באירים ואמ"ל הסריגות לארגון החמאס, או הוזמבות בו ומהיקה את התנהרת של החמאס".

כסופה יבוא יועדת הצדקה בית פג'אר (ילנית אליכאת בית פג'אר, ZAKAT COMMITTEE OF BEIT FAGAR.

כ"ג בשבט התשס"ה (2 בפברואר 2005)
(חמ 1090-3)

שאול מופז
שר הביטחון

1 ע"ר 1945, תוס' 2, עמ' 855.
2 י"פ התשמ"ע, עמ' 5653; התשנ"ז, עמ' 5367; התשנ"ח, עמ' 5588; התש"ע, עמ' 4854; התשס"ב, עמ' 1556; התשס"ג, עמ' 2851.

הודעה על הוספת רופאים לרשימת רופאי וערה רפואית

לפי תקנות [בי המולחמוה בנגעצים (וערה רפואית),
התשנ"ד–1954

אני מורדיע כי בתוקף סמכותי לפי תקנה 2 לתקנות, גבי המולחמוה בנגעצים (וערה רפואית, התשנ"ד 1954, מיניהי חברים גיפסים לוועדה הרפואית, במפוניע להלן:

ר"ר מאיר אלחוזל, ת"י 078451812
ר"ר אורינאל הרסקו, ת"י 14961017
ר"ר אנגם יאשא, ת"י 17051090

מיניהדם של ר"ד בלה פסטינג', ר"ד שבלחא וולטשטייך הר"ד נתן בנ"ף בטלים.

מען נוסף לוועדה" רח יפו 236, ירושלים.

כ"ג בחשון התשס"ה (7 בנובמבר 2004)
(חמ 704-3)

בנימין נהויהו
שר האוצר

1 ק"ת התשמ"ו, עמ' 152; התשנ"ל, עמ' 12.
2 י"פ ההשנ"ח, עמ' 957.
3 י"פ התשנ"א, עמ' 508.
4 י"פ התשנ"ד", עמ' 808.
5 י"פ התשנ"ה, עמ' 957.

הרשאה

לפי פקורה הפרוצדורה הפלילית (ערוה)

בתוקף סמכותי לפי סעיף 2 לפקורה הפרוצדורה הפלילית (ערוה), אני מרשה את יצחק קדירצר, ת"י 0249442, עובד יחירת המטנוה על הביטחון במערכת הביטחון, להקדר חוטד לביצוע ערות פלילות במפורט להלן, אם החליטה בך על פי הנוהל הוהירה המטיהפ או נציג המפרקליטוה העומד בראשה:

1 חוקי א"י, כרך א', עמ' 418.



רשומות

# ילקוט הפרסומים

| 9 ביולי 2006 | 5550 | י״ג בתמוז התשס״ו |
|---|---|---|

| עמוד | | עמוד | |
|---|---|---|---|
| 4110 | הודעה על ביעור רשומות בבתי המשפט | 4108 | מינוי רשמת לעניני ירושה |
| 4110 | הודעה על אישור שיכונים ציבוריים | 4108 | מינוי שופטי נוער |
| 4111 | הודעות בדבר רכישת קרקעות לצרכי ציבור | 4108 | הכרזות על התאחדות בלתי מותרת |
| 4113 | הודעות לפי חוק התכנון והבניה | | מינוי ממלא מקום המנהל הכללי של משרד |
| 4127 | הודעה לפי חוק הצהרות מוות | 4109 | התיירות |
| 4128 | בקשות לפירוק חברות על ידי בית המשפט | 4109 | הודעה בדבר מינוי מנהל שרה התעופה של הרשות .. |
| 4133 | הודעות לפי פקודת האגודות השיתופיות | | הודעה בדבר תוצאות הבחירות לראש הרשות |
| 4134 | הודעות מאת הבנוס הרשמי | 4109 | המקומית חורפיש |
| 4135 | הודעות מאת הציבור | 4109 | ביטול הכרזה על אזורים נגועים במחלת הניוקסל |
| 4138 | רין וחשבון שבועי של בנק ישראל | | ביטול הכרזה על אזורים נגועים במחלת שפעת |
| | תיקון טעות | 4110 | העופות |
| | | 4110 | הודעה על עיבור סטטיסטיקה |

## הכרזה על התאחדות בלתי מותרת

לפי תקנות ההגנה (שעת חירום), 1945

בתוקף סמכותי לפי תקנה 84(1)(ב) לתקנות ההגנה (שעת חירום), 1945¹ (להלן – התקנות), ולאחר שהשתכנעתי כי הורכב ררוש לצורך הגנת על ביטחון המדינה, שלום הציבור והסדר הציבורי, אני מברית בזה כי חבר בני אדם או הארגון המכונה "אגודת הצדקה שכם", "NABLUS ZAKAT COMMITTEE", "לענגה זבאת נבלוס" או בכל שם שיכונה בו ארגון זה, לרבות כל פלגיו ובל סניף מרבז, וער, קבוצה או סניף של ארגון זה, הוא התאחדות בלתי מותרת כמשמעותה בתקנות.

המחזיק ברבוש ההתאחדרות הבלתי מותרת האמורה נררש להוריע על כך לשר הביטחון, באמצעות ארגון איקן, סון בכיר לחשב הבללי במשורד האוצר, טל' 5317506–02 או 5317434–02.

י"ג בסיון התשס"ו (9 ביוני 2006)
(חמ 1080–3)

עמיר פרץ
שר הביטחון

¹ ע"ר 1945, תוס' 2, עמ' 855.

## מינוי ממלא מקום המנהל הכללי של משרד התיירות

לפי חוק שירות המדינה (מינויים), התשי"ט–1959

בתוקף סמכותי לפי סעיף 12 לחוק שירות המדינה (מינויים), התשי"ט–1959¹, ולאחר התייעצות עם נציב שירות המדינה, אני ממלל על משה ריגל, המשנה למנהל הבללי של משרד התיירות, את מילוי תפקיד המנהל הבללי של משרד התיירות, מיום ב' בתמוז התשס"ו (28 ביוני 2006) עד יום ד' בתמוז התשס"ו (30 ביוני 2006) או ער שובו של אלי בהן, המנהל הבללי, מחורץ לארץ, לפי המוקדם.

ב"ט בסיון התשס"ו (25 ביוני 2006)
(חמ 56–3)

יצחק הרצוג
שר התיירות

¹ ס"ח התשי"ט, עמ' 86.

## הודעה בדבר מינוי מנהל שדה תעופה של הרשות

לפי חוק רשות שדות התעופה, התשל"ז–1977

אני מורייע בזה כי בתוקף סמכותה לפי סעיף 22(ב) לחוק רשות שדות התעופה, התשל"ז–1977¹, מינתה מועצת רשות שדות התעופה, ביום י"א באייר התשס"ו (9 במאי 2006), באיששר שר התחבורה, ולאחר שהובאה לפניה המלצת מנהל הרשות, את משה שלמור, למנהל של שרה התעופה רב הוד.

ב"ז בסיון התשס"ו (22 ביוני 2006)
(חמ 190–3)

שאול צמח
ממלא מקום יושב ראש
מועצת רשות שרות התעופה

נתאשר.
שאול מופז
שר התחבורה

¹ ס"ח התשל"ז, עמ' 182.

## הודעה בדבר תוצאות הבחירות לראש הרשות המקומית חורפיש

לפי חוק הרשויות המקומיות (בחירות), התשכ"ה–1965

בהתאם לסעיף 17(א) לחוק הרשויות המקומיות (בחירות), התשכ"ה–1965¹, בהתאם לסעיף 17(א) לחוק הרשויות המקומיות (בחירות), התשכ"ה–1965¹, ולסעיף 7(ג) לחוק הרשויות המקומיות (בחירות ראש הרשות וסגניו ובהונתם), התשל"ה–1975², נמסרת בזה הורעה על תוצאות הבחירות לראש הרשות המקומית חורפיש:

א. לקראת הבחירות שקוימו ביום א' בתמוז התשס"ו (27 ביוני 2006) –

  1. אושרו הצעות המועמרים בלהלן:
    – חייר ארין רבאר
    – מרעי מופיר

  2. המספר הבולל של הבוחרים שהצביעו בתחום הרשות המקומית   2,991

  3. המספר הבולל של הקולות הבשרים   2,942

  4. המספר הבולל של הקולות הפסולים   49

  5. מספר הקולות הבשרים שניתנו לבל אחר מהמועמרים:

הקולות

| שם המועמר | במספרים | באחוזים |
|---|---|---|
| חייר ארין רבאר | 1,647 | 55.98 |
| מרעי מופיר | 1,295 | 44.02 |

  6. שמו של המועמד שנבחר לראש הרשות:
    חייר ארין רבאר

ג' בתמוז התשס"ו (29 ביוני 2006)
(חמ 2150–3)

רוד נחום
מנהל הבחירות
מועצת הרשות המקומית חורפיש

¹ ס"ח התשכ"ה, עמ' 248.
² ס"ח התשל"ה, עמ' 211.

## ביטול הכרזה על אזורים נגועים במחלת הניוקסל

לפי פקורת מחלות בעלי חיים [נוסח חדש], התשמ"ה–1985

בתוקף סמכותי לפי סעיף 18 לפקורת מחלות בעלי חיים [נוסח חדש], התשמ"ה–1985¹, אני מבטל את ההברזה² על האזורים המפורטים להלן כאזורים נגועים במחלת הניוקסל:

(1) מושב אליפלט.

(2) בל מקום אחר הנמצא ברריוס של 3 ק"מ ממושב אליפלט.

ב' בתמוז התשס"ו (28 ביוני 2006)
(חמ 126–3)

משה חיימוביץ
מנהל השירותים הוטרינריים

¹ ס"ח התשמ"ה, עמ' 84.
² י"פ התשס"ו, עמ' 3027.



רשומות

# ילקוט הפרסומים

| כ״ה באלול התשס״ט | **5998** | 14 בספטמבר 2009 |
|---|---|---|

עמוד

הודעות על מינוי מנהלים כלליים לפי חוק שירות
המדינה (מינויים) ........................................... 5762

הודעה על אישור תכניות מיתאר ארציות ..................... 5762

הודעה על הרשאה לפי חוק נכסי המדינה ................... 5762

הודעה על יציאת נשיא המדינה את גבולות המדינה
ועל שובו ............................................................ 5762

מינוי סגן נשיא בבית משפט ..................................... 5762

מינוי שופט לכהונה בפועל ....................................... 5762

כתב מינוי לכהונת שופט–עמית ................................. 5763

הכרזות על התאחדויות בלתי מותרות לפי תקנות
ההגנה (שעת חירום) ............................................ 5763

החלטה על דחיית השגה ועל הוצאת צו החרמה לפי
תקנות האמונות .................................................. 5765

אצילת סמכויות לפי חוק–יסוד: הממשלה .................. 5765

הודעה בדבר המקומות להפקרת תקנים רשמיים ......... 5765

הודעה על מינוי חברים וממלאי מקומם לוועדת מחקר
לפי חוק לעידוד מחקר ופיתוח בתעשיה ............... 5766

הודעות בדבר הצורך לבחור רבני ערים ..................... 5766

עמוד

הודעה על מינוי חשב מלווה לפי תקנות שירותי הדת
היהודיים (ניהול מועצות) ..................................... 5767

הודעה בדבר הרכב המועצה המרתעצ דתית לכיש ........ 5767

הודעה על הסמכה לפי חוק ההתייעלות הכלכלית
(תיקוני חקיקה ליישום התכנית הכלכלית לשנים
2009 ו–2010) .................................................... 5767

מינוי ממונה על הגבייה לפי פקודת המסים (גבייה) .... 5767

הודעה בדבר בחינות עורכי פטנטים ......................... 5767

הודעות בדבר השעיה והוצאה של חברים מלשכת
עורכי הדין ......................................................... 5768

הודעה על החלת חוקי עזר – עיריית בת ים ............... 5769

הודעה על בקשה לחידוש רישום מקרקעין ................. 5769

הודעה בדבר הצגת לוח זכויות ................................. 5770

הודעות לפי חוק התכנון והבניה .............................. 5770

הודעות בתי דין רבניים .......................................... 5800

בקשה לפירוק חברה על ידי בית המשפט ................... 5802

הודעות מאת הציבור .............................................. 5803

nevo

## הכרזה על התאחדות בלתי מותרת

לפי תקנות ההגנה (שעת חירום), 1945

בתוקף סמכותי לפי תקנה 84(1)(ב) לתקנות ההגנה (שעת חירום), 1945' (להלן – התקנות), ולאחר שהשתבנעתי כי הדבר דרוש לצורך הגנה על ביטחון המדינה, שלום הציבור והסדר הציבורי, אני מכריז בזה כי הגוף הנושא את השמות "אגורת הצעירים המוסלמיות" או "התאחדות הנשים המוסלמיות" או "התאחדות הצעירות המוסלמיות בעזה" או "אגורת הצעירות האסלאמיות" או "אגורת הנשים האסלאמיות" (להלן – ההתאחדות) או בכל שם אחר שתבונה בו ההתאחדות זו, לרבות כל פלגיה וכל סניף, מרכז, ועד, קבוצה או סיעה של ההתאחדות זו, היא התאחדות בלתי מותרת במשמעותה בתקנות.

המודיע ברכוש ההתאחדות הבלתי מותרת האמורה נדרש להודיע על כך לשר הביטחון באמצעות רפ"ק שמעון בן שושן בטל' 5428658–02 ובפקס' 5428655–02.

הרואה את עצמו נפגע על ידי הכרזה זו, יכול להגיש את השגותיו בכתב לפני, באמצעות היועץ המשפטי למערכת הביטחון, בתוך 14 ימים מיום שבו הובאה הכרזה זו לידיעתו.

ח' באדר התשס"ט (4 במרס 2009)

אהוד ברק
שר הביטחון

_____
' ע"ר 1945, תוס' 2, עמ' 855.

## הכרזה על התאחדות בלתי מותרת

לפי תקנות ההגנה (שעת חירום), 1945

בתוקף סמכותי לפי תקנה 84(1)(ב) לתקנות ההגנה (שעת חירום), 1945' (להלן – התקנות), ולאחר שהשתבנעתי כי הדבר דרוש לצורך הגנה על ביטחון המדינה, שלום הציבור והסדר הציבורי, אני מכריז בזה כי הגוף הנושא את השמות "אגורת הצרקה האסלאמית באלכירה" או "אגורת הצרקה המוסלמית באלכירה" או THE ISLAMIC" או "CHARITABLE SOCIETY AL–BIREH" או "גמעיית אלחיריית אלאסלאמיה אל בירה" (להלן – ההתאחדות) או בכל שם אחר שתבונה בו ההתאחדות זו, לרבות כל פלגיה וכל סניף, מרכז, ועד, קבוצה או סיעה של ההתאחדות זו, היא התאחדות בלתי מותרת במשמעותה בתקנות.

המודיע ברכוש ההתאחדות הבלתי מותרת האמורה נדרש להודיע על כך לשר הביטחון באמצעות אתנן איקן, סגן כביר לחשב הכללי במשרד האוצר, טל' 5317506–02 או 5317434–02.

הרואה את עצמו נפגע על ידי הכרזה זו, יכול להגיש את השגותיו בכתב לפני, באמצעות היועץ המשפטי למערכת הביטחון, בתוך 14 ימים מיום שבו הובאה הכרזה זו לידיעתו.

כ"ב באלול התשס"ח (22 בספטמבר 2008)
(חמ 1080–3)

אהוד ברק
שר הביטחון

_____
' ע"ר 1945, תוס' 2, עמ' 855.

## הכרזה על התאחדות בלתי מותרת

לפי תקנות ההגנה (שעת חירום), 1945

בתוקף סמכותי לפי תקנה 84(1)(ב) לתקנות ההגנה (שעת חירום), 1945' (להלן – התקנות), ולאחר שהשתבנעתי כי הדבר דרוש לצורך הגנה על ביטחון המדינה, שלום הציבור והסדר הציבורי, אני מכריז בזה כי "האחים המוסלמים בחברון" או "האח"ס" (להלן – ההתאחדות) או בכל שם אחר שתבונה בו ההתאחדות זו, לרבות כל פלגיה וכל סניף, מרכז, ועד, סיעה או סיעה של ההתאחדות זו, היא התאחדות בלתי מותרת במשמעותה בתקנות.

הרואה את עצמו נפגע על ידי הכרזה זו, יכול להגיש את השגותיו בכתב לפני, באמצעות היועץ המשפטי למערכת הביטחון, בתוך 14 ימים מיום שבו הובאה הכרזה זו לידיעתו.

כ"ב באלול התשס"ח (22 בספטמבר 2008)
(חמ 1080–3)

אהוד ברק
שר הביטחון

_____
' ע"ר 1945, תוס' 2, עמ' 855.

## הכרזה על התאחדות בלתי מותרת

לפי תקנות ההגנה (שעת חירום), 1945

בתוקף סמכותי לפי תקנה 84(1)(ב) לתקנות ההגנה (שעת חירום), 1945' (להלן – התקנות), ולאחר שהשתבנעתי כי הדבר דרוש לצורך הגנה על ביטחון המדינה, שלום הציבור והסדר הציבורי, אני מכריז בזה כי חבר בני אדם או ההתאחדות המבונה "אגורת הפורום התרבותי של נשות הנגא"פ" או "מועינן הפורום התרבותי של נשות הנגא"פ" או "מנהד"א סקפאר" או "מועינן האישה התרבותית" או "מועינן הפורום התרבותי" או "אלמונתד"א אלסקפאר" או "מנה'ת'א אלמונאא אלת'קאפאר" (להלן – ההתאחדות) או בכל שם אחר שתבונה בו ההתאחדות זו, לרבות כל פלגיה וכל סניף, מרכז, ועד, קבוצה או סיעה של ההתאחדות זו, היא התאחדות בלתי מותרת במשמעותה בתקנות.

הרואה את עצמו נפגע על ידי הכרזה זו, יכול להגיש את השגותיו בכתב לפני, באמצעות היועץ המשפטי למערכת הביטחון, בתוך 14 ימים מיום שבו הובאה הכרזה זו לידיעתו.

ח' באדר התשס"ט (4 במרס 2009)
(חמ 1080–3)

אהוד ברק
שר הביטחון

_____
' ע"ר 1945, תוס' 2, עמ' 855.

## הכרזה על התאחדות בלתי מותרת

לפי תקנות ההגנה (שעת חירום), 1945

בתוקף סמכותי לפי תקנה 84(1)(ב) לתקנות ההגנה (שעת חירום), 1945' (להלן – התקנות), ולאחר שהשתבנעתי כי ביטחון המדינה, שלום הציבור והסדר

_____
' ע"ר 1945, תוס' 2, עמ' 855.

**EXHIBIT 179 TO DECLARATION OF VALERIE SCHUSTER**

# Expert Report
Of
# Ronni Shaked

*Weiss v. National Westminster Bank, Plc* 05 CV 4622 (DGT)(MDG)
*Applebaum v. National Westminster Bank, Plc* 07 CV 916 (DGT)(MDG)

## 1. Professional background and training

My full name is Ronni Shaked. Since 1982, I have been working as a commentator and analyst for the newspaper with the largest distribution in Israel, <u>Yedioth Ahronoth</u>, where I write about Palestinian affairs, terrorism and security-related subjects. In addition, I am a researcher at the Jerusalem Center for Israeli Studies located at Hebrew University of Jerusalem, where I am a doctoral candidate and writing a dissertation on the ethos of the conflict of the Palestinian society.

Between 1969 and 1982, I worked for the Israel Security Agency (hereinafter: the "**ISA**"), the entity which is responsible for the war against terror in Israel and in the Palestinian Territories.[1] I held a number of positions during my service with the ISA, including: Commander of the Jerusalem Sector and Commander of the Ramallah Sector. I devoted a year of my service with the ISA to the study of terrorism and the development of theories aimed at the defeating of terrorism in the Palestinian Territories, in addition to the development of theories and procedures for the defense of Israeli targets in other countries. Throughout the course of my years of work with the ISA, I handled agents who operated within the terrorist organizations, I participated in and conducted interrogations of terrorist operatives, and I participated in and commanded operations that are intended to defeat terrorist operations.

I also have a Master's degree (*summa cum laude*) in Middle Eastern Studies from the Hebrew University of Jerusalem.

I have provided expert declarations in United States federal courts in four (4) civil cases:

- <u>Haim v. Islamic Republic of Iran</u>, 425 F. Supp. 2d 56 (D.D.C., 2006)

- <u>Stern v. Islamic Republic of Iran</u>, 271 F. Supp. 2d 286 (D.D.C., 2003)

- <u>Ungar v. Islamic Republic of Iran</u>, 211 F. Supp. 2d 91 (D.D.C., 2002)

- <u>Strauss v. Credit Lyonnais</u>, 06-cv-702 (E.D.N.Y. 2009)

I have also written or co-authored two books:

- Ronni Shaked and Aviva Shabi, <u>Hamas: M'Emunah B'Allah L'Derech Ha-Terror</u> (<u>Hamas: From Belief in Allah to the Road of Terror</u>), Keter Publishing House, Jerusalem, (1994).

---

[1] In the context of this report, the term "Palestinian Territories" generally refers to the Gaza Strip and the West Bank, which were occupied by Israel during the Six-Day War in 1967. The use of this term is not intended to provide a legal definition. As for the term "Israeli Settlers": when Hamas refers to "Israeli Settlers," the reference is generally to citizens of the State of Israel who live (or lived) in the Gaza Strip and the West Bank, which were occupied by Israel during the Six-Day War. The term, as expressed in this report, is not intended to convey any formal definition.

- Ronni Shaked, <u>Ha-Shabak Beakavot Capucci</u> (<u>Capucci – The Israeli Security Agency on the Heels of Terrorism</u>), (1995).

As part of my Master's degree, I wrote an academic paper titled "Al-Ard: The Ideological Foundation of the Radical National Movement of the Arabs in Israel."

I have also served as an expert consultant for several documentaries, including:

- "The Collaborator" (1994)

- "The Engineer of Death" (History Channel, 2003)

- "To Die in Jerusalem" (HBO, 2007)

I also produced a documentary titled "For the Sake of Allah" (2006).

I have worked as a consultant for the United States Federal Bureau of Investigation (hereinafter: "**FBI**") in many cases, and once for the United States Department of Justice (hereinafter: "**DOJ**"). Since 1991, I have also served as a consultant to the Anti-Defamation League (hereinafter: "**ADL**") and I have served, on a number of occasions, as a consultant to CBS News. I also work for Israeli Channel 2 for a program in Arabic, Al Jazeerah television, BBC Radio and Al Hura TV.  I also appear twice a week on an Israeli radio station (103 FM) in Tel Aviv as a commentator on Palestinian affairs and terrorism.  I speak and read Hebrew and Arabic fluently and I have a working knowledge of English and French.

I have lectured on Palestinian affairs at the IDF educational facility.  I have also lectured at Ascolot (Open University) on the topic of Palestinian Islamic Fundamentalist Movements.  I am currently lecturing at the Hari Yehuda School of Higher Education a course on "Israeli Arabs – History and Politics" and a course on "The Palestinian – between Nationalism and Islam."

## 2. Scope of the required work

In May 2009, counsel for the Plaintiffs asked me to provide an expert opinion on the question of whether Hamas[2] was involved in the recruiting, planning and perpetration of the following suicide bombings:

- ○ March 27, 2002 – the suicide bombing at the Park Hotel, Netanya.

---

[2]  The word "Hamas" ("the Islamic Resistance Movement"), as used in this report, refers to the *Harakat al-Muqawamah al-Islamiyya*, which is a Palestinian Islamic movement. This movement developed within the Palestinian branch of the Muslim Brotherhood Movement, which is based in Egypt. In 1995, the Government of the United States ruled that Hamas is a Specially Designated Terrorist (hereinafter: "**SDT**"). In 1997, the Government of the United States ruled that Hamas is a Foreign Terrorist Organization (hereinafter: "**FTO**"), and that ruling was renewed on an ongoing basis every two years thereafter. In 2001, the Government of the United States ruled that Hamas is a Specially Designated Global Terrorist (hereinafter: "**SDGT**"), and this ruling has remained in force to this day.

- ○ May 7, 2002 – the terrorist attack at the Sheffield Club, Rishon Le-Zion.

- ○ March 5, 2003 – the terrorist attack on the No. 37 bus, Haifa.

- ○ April 30, 2003 – the terrorist attack at Mike's Place, Tel Aviv.

- ○ May 18, 2003 – the terrorist attack on the No. 6 bus, French Hill, Jerusalem.

- ○ June 11, 2003 – the terrorist attack on the No. 14A bus, Jaffa Road, Jerusalem.

- ○ August 19, 2003 – the terrorist attack on the No. 2 bus, Jerusalem.

- ○ September 9, 2003 – the terrorist attack at Café Hillel, Jerusalem.

- ○ January 29, 2004 – the terrorist attack on the No. 19 bus, Jerusalem.

Counsel for the Plaintiffs also asked me to provide an expert opinion with respect to the question of whether Hamas had been involved in the planning, recruiting and perpetration of the following terrorist attacks:

- ○ July 31, 2002 – the terrorist attack on the cafeteria of the Hebrew University, Jerusalem.

- ○ March 7, 2003 – the shooting attack in Kiryat Arba.

- ○ January 29, 2003 – the shooting attack on Road 60.

- ○ June 20, 2003 – the shooting attack on Road 60.

- ○ October 22, 2003 – the shooting attack in Tel Rumeida.

- ○ September 24, 2004 – the mortar attack on Neve Dekalim.

I receive a fee in the amount of $275 per hour for the time that I spend working on this report. I confirm that I do not have any connections or relationships – whether professional or personal – with any of the parties or the witnesses in this trial, which are likely to prevent me from giving impartial evidence.

## 3. Methodology

### a. General research methodology

The methodology which was used in the writing of this report is drawn from my experience with the ISA, as well as from my years as a journalist and a researcher, in which I focused on subjects that are related to terrorism in general, and Islamic extremism in particular. As part of my research on the Hamas movement, I have visited the West Bank and Gaza Strip on a regular basis. Prior and subsequent to the signing of the Oslo Accords,[3] I interviewed well-known

---

[3] The Oslo Accords, which were signed on September 13, 1993, were established between the Government of Israel, which was represented by Yitzhak Rabin, and the Palestine Liberation Organization (hereinafter: the "**PLO**"), which was represented by Yaser Arafat (the first declared objective of the PLO, which was founded in 1964, was the

leaders of Hamas, such as Ahmed Yassin, Abd al-Aziz al-Rantisi, Dr. Mahmud al-Zahar and Ismail Haniya, the Hamas "Prime Minister," as well as both senior and more junior recruiters and organizers of terrorism. Following the signing of the Oslo Accords, I interviewed senior members of the Palestinian and Israeli defense and security establishments, with regard to the threat that is posed by Hamas and other violent extremist movements.

Within the framework of my ongoing research, both for my book on Hamas, which was published in 1994, and for the articles and studies which I wrote thereafter, I have read through thousands of unclassified documents, including Hamas web sites[4] and other material which was published by Hamas, such as leaflets, posters and postcards, in addition to the Palestinian newspapers and television broadcasts, in particular, as well as newspapers and television broadcasts of the Arab world, in general. Moreover, I was also present at funerals and public meetings of Hamas, I collected and/or examined photographs, Court records, official [sworn] confessions of terrorism suspects, video tapes and recordings, documentary films and other materials, including interviews with Hamas leaders both in and out of prison.

Over the course of the years 2004 through 2006, I conducted a large number of interviews in prisons. The majority of the interviews were for the purpose of preparation of a documentary film. Other interviews which I conducted were intended for the purpose of writing articles, which I had planned to publish in the newspaper. The majority of the terrorists whom I interviewed had dispatched other terrorists to perpetrate terrorist attacks or had commanded terrorist operations. I also interviewed potential suicide bombers, who had been arrested before carrying out a terrorist attack, as well as others who had been wounded, but not killed, during the course of the attack.

The subjects who were filmed confirmed, with great pride, that they had acted on behalf of Hamas. In most cases, they even boasted of their actions. Almost all of the terrorists whom I met – men and women alike – expressed no remorse whatsoever for the terrorist attacks which they had perpetrated.

---

liberation of "Palestine" through armed struggle. The United States considered it to be a terrorist organization until 1991). The Oslo Accords included a series of general principles agreed upon by both parties, which concerned an interim period of five years of Palestinian administration of the Palestinian Territories. Subjects related to the "Permanent Status" were postponed for future negotiations.

[4] For the purpose of preparation of this report, I also studied the expert report of Mr. Evan Kohlmann on this subject. Mr. Kohlmann will provide an expert report with regard to a number of web sites which are controlled by Hamas, and also express his expert opinion with regard to the question of whether Hamas took responsibility (whether complete or partial), on those web sites, for each of the terrorist attacks which ostensibly harmed the Plaintiffs in these trials. I fully agree with Mr. Kohlmann's description with regard to various Hamas web sites. His description is broadly acceptable in that area. At the same time, I have also performed independent study of these web sites in order to reach my own conclusions.

4

In order to confirm my findings and my research, I cross-referenced sources of information by, for example, holding interviews with Hamas and Fatah sources.[5] Under different circumstances, I conducted interviews with Israel and Palestinian security sources in order to authenticate information, and I relied on official written reports by the Israeli and Palestinian security establishments.

Although there are many Palestinian organizations (such as the Islamic Jihad,[6] the Popular Front for the Liberation of Palestine, and others) which have attacked Israeli targets, Hamas is the most deadly and the most successful out of all of the organizations that have carried out terrorist attacks over the course of the past 15 years.

### b. Hamas takes responsibility for the terrorist attacks which it perpetrates

As a general rule, because Hamas considers terrorism, or, as it defines it, "armed resistance," as a central way of attracting attention to Hamas for the Palestinian public and the Islamic world, it does not conceal its responsibility for terrorist attacks. Quite the opposite is true: Hamas works with determination to publicize its principal role in the perpetration of violent attacks against Jews. This is also true in a general way with regard to its recognition of its operatives, as soon as they die or are arrested.[7]

While Hamas has never tried to deny its role in terrorist activity, it has also not taken responsibility for a terrorist attack[8] which it did not commit. With the exception of two terrorist attacks in 1997, for which Hamas underlined in taking responsibility, as a result of simultaneous pressure on the part of the Palestinian Authority (hereinafter: "**PA**")[9] and the Israeli ISA,[10]

---

[5] Fatah is the dominant wing of the PLO and the main rival of Hamas in the Palestinian Territories. As a result of the Oslo Accords, all of the wings of the PLO – including Fatah – recognized the State of Israel and (at least officially) abandoned the path of terrorism and violent actions.

[6] The Palestinian Islamic Jihad (hereinafter: the "**PIJ**") is a Foreign Terrorist Organization and has close ties with Iran.

[7] For example, Hamas generally disseminates the recorded "wills" of its suicide bombers as soon as the attack takes place. For tactical reasons, however, this dissemination can sometimes be delayed. The terrorist attack at Mike's Place, which is discussed below, illustrates this point, because Hamas waited for confirmation that the second terrorist had died before airing the video cassette which had been made jointly by the two suicide bombers.

[8] The evaluation of testimony with regard to Hamas terrorist attacks must be performed within the framework of several different categories of attacks, including:

   1. Suicide bombings.
   2. Other multi-casualty terrorist attacks in which the perpetrator(s) was/were killed at the scene of the incident.
   3. Other multi-casualty terrorist attacks in which the perpetrator(s) was/were not killed at the scene of the incident.
   4. Roadside shooting attacks in which the perpetrator(s) was/were not killed at the scene of the incident.
   5. Short-range rocket and mortar fire.

[9] The Palestinian Authority is the administrative organization which was founded in 1994 after the Oslo Accords, in order to control the Palestinian Territories. While the Oslo Accords foresaw that the Palestinian Authority would operate during a five-year interim period, in the course of which negotiations towards a Permanent Agreement

Hamas has always boasted of the terrorist attacks which it perpetrated, because it considers them to be "heroic actions."

At times, following a large-scale terrorist attack that resulted in numerous casualties, Palestinian organizations have rushed to declare their responsibility, as a way of competing for Palestinian public opinion. In most cases, however, it very quickly becomes known which organization carried out the attack and it is possible to verify which organization was responsible. In many cases, the rival Palestinian terrorist organization withdraws its declaration of responsibility, or its identification of the suicide bomber and his/her collaborators, and thus resolves any initial confusion which may have occurred.

In the vast majority of suicide bombings, the evidence which points to the responsibility of Hamas for the attacks is overwhelming. Not only does the organization take credit for the attack[11] and facilitates the broadcast of the terrorist's video tapes or photographs; it also often takes complex and varied measures to promote the terrorist's status as a celebrity, by means of "mourners' tents," mass funerals, eulogies in the newspapers or on the Internet, posters and other means of iconography.

### c. Methods used by Hamas for taking responsibility for terrorist attacks

The following are typical methods which are used by Hamas in order to publicize its responsibility for planning and carrying out a terrorist attack:[12]

### 1) Public announcements

**Written announcements** are disseminated frequently throughout the Palestinian Territories. These announcements are generally accompanied by announcements in the form of telephone calls which are made to the media, as well as by statements by leaders of the organization that assumes the responsibility for the perpetration of the terrorist attack.[13]

---

between Israel and the PLO would take place, the negotiations on the Permanent Agreement have actually never been realized.

[10] In the two incidents in question, in 1997, Hamas initially decided not to publish the names of the suicide bombers, because it was afraid that the PA and Israel would undermine Hamas in the West Bank.

[11] This does not mean that Hamas is foolproof and never makes mistakes in conveying the details of a terrorist attack. For example, the Hamas web site states that the suicide bombing which took place on March 28, 2001 near Kefar Sava occurred at a military roadblock and that, as a result, two soldiers were killed. In fact, the terrorist attack took place at a gas station and the two people who were killed as a result of the attack were teenagers. http://www.palestine-info.info/Ar/default.aspx?xyz=U6Qq7k%2bcOd87MDI46m9rUxJEpMO%2bi1s7%2bTMkSGkUsefgr6c0g9Ixl0R0r93%2bJq44kaIHiokimTbh%2fDenRR2fQvHpJH1vY3uaCjZeiOio1r9PhKb9ZGY56gz%2f0HbRULg%2bvdO2wUlCeSw%3d.

[12] These criteria apply not only to Hamas, but also to other terrorist organizations; Hamas, however, tends more toward emphasizing the perpetration of the terrorist attack in the ways set forth below.

[13] *See* for example http://www.alqassam.ps/arabic/news1.php?id=9633, and also http://www.alqassam.ps/arabic/operations2.php?id=23#. *See also* an original announcement of the Izz al-Din al-

6

**Announcements made over the public address system of the mosques** in Palestinian villages or neighborhoods provide a clear indication as to the identity of the terrorist organization which dispatched the suicide bomber. The singing of religious hymns, the reading of verses from the Koran and the announcement of the name of the terrorist organization over the public address system of the mosques also attest to the organizational affiliation of a suicide bomber.

**The Internet** has become one of the most important media tools that is used by Hamas. Hamas has its own web site, and its military branch[14] has a separate web site of its own. These web sites display announcements which glorify the terrorist attacks which were perpetrated and provide additional details with respect to the perpetration of the attack.[15] Hamas also sends out e-mail messages to journalists, in which it takes responsibility for specific terrorist attacks. I personally have received many such e-mail messages from Hamas, as well as from the Islamic Jihad and Fatah, in which they took responsibility for terrorist attacks.

### 2) Mourning symbols and customs

**Funeral ceremonies** for Palestinians are replete with symbols. For example, when the body of the deceased is wrapped in a Hamas flag, the identity of the terrorist organization to which he belonged is clear to everyone. In addition, each funeral is held in the tradition of the terrorist organization in question. It is possible to identify the terrorist organization to which the suicide bomber belonged by the senior officials who attend his/her funeral.

Each terrorist organization has its own **mourning customs**. The following examples are all typical Hamas mourning customs: singing *anashid* (religious hymns); decorating the mourners' tent with green flags; the display of Hamas emblems and pictures of the movement's leaders; and finally, leaflets bearing verses from the Koran or statements by the leaders of the Muslim Brotherhood.[16]

The following are several pictures of a mourners' tent which was set up in honor of a Hamas operative who was killed. The symbols principally include the green flags which represent the organization.

---

Qassam Brigades (the military branch of Hamas, which is discussed below): http://aljazeera.net/news/archive/archive?ArchiveId=34163.

[14] Like Hamas, every terrorist organization has a military branch. For example, the military branch of Fatah is known as the al-Aqsa Martyrs Brigades. The military branch of the Palestinian Islamic Jihad is called the al-Quds Brigades. The military branch of the Popular Front for the Liberation of Palestine is known as the Abu Ali Mustafa Brigades.

[15] *See* for example: http://www.alqassam.ps/arabic/news1.php?id=11412.
*See also*: http://www.palestine-info.info/arabic/Hamas/glory/ramalah.htm.
*See also*: http://www.palestine-info.info/arabic/Hamas/shuhda/amalyat_03.htm.

[16] *See* al-Risalah (Gaza), August 16, 2001 (Appendix No. 1, pp. 1-2).

  

**Posters and postcards**: A custom which has become established among the terrorist organizations is to print posters bearing a photograph of the suicide bomber before he departs on the suicide attack. The suicide bomber wears on his forehead a band which discloses the terrorist organization to which he belongs. Hamas terrorists decorate their foreheads with a green band; Palestinian Islamic Jihad terrorists wear a black band on their foreheads; Fatah terrorists wear a yellow band.

The inscriptions on the posters and postcards also indicate the terrorist organization to which the suicide bomber belongs. Thus, for example, nationalist slogans are typical of Fatah, whereas religious slogans are typical of Hamas.

 

**Obituary notices**: Hamas often publishes signed obituary notices.[19]

---

[17]  http://www.terrorism-info.org.il/malam_multimedia//ENGLISH/AUTHORITY/PDF/NOV16_04.PDF.  The  man in the picture is Karim Mafarja, a member of the al-Qassam Brigades. He was killed by the Israel Defense Forces on January 22, 2002.

[18]  http://www.aljazeeratalk.net/forum/showthread.php?t=22926 (the person shown in the photograph is Muhammad Faisal al-Siksik, a suicide bomber from the Palestinian Islamic Jihad; he carried out a suicide bombing in Eilat, Israel, on January 29, 2007).

[19] al-Risalah (Gaza), August 16, 2001 (Appendix No. 1, pp. 1-2); *see also* al-Istiqlal (Gaza) (Appendix No. 1, pp. 3-4), October 4, 2001; Al-Ayyam, June 5, 2001 (Appendix 1, pp. 5-6).

### 3) Photographs and confessions of the suicide bomber

**Video tapes of the "will"**: A video tape of the suicide bomber, before he goes out to perpetrate a suicide attack, constitutes clear proof of the organization to which he belongs. The photographs are taken against a background which bears the emblem of the organization; in the course of the filming, the future suicide bomber makes a speech on behalf of the organization and begins reading his "will" by announcing his intent to perpetrate the suicide bombing.

For example, in one video tape, Bassam Takruri, who perpetrated the terrorist attack on the No. 6 bus in the French Hill neighborhood of Jerusalem on May 18, 2003, read the following statements from his "will": "I, the living *shahid* [martyr], Bassam Takruri, a member of the Izz al-Din al-Qassam Brigades, am about to perform an act of sacrifice." He was filmed with a Hamas flag behind him, the Koran in one hand and a Kalashnikov rifle in the other hand.[20]

In another video tape, the terrorist, Mujahid al-Ja'abari of Hebron – who, on May 18, 2003, perpetrated the suicide bombing in the Bet Hanina neighborhood of Jerusalem – is shown reading from his "will": "In the name of Allah, the compassionate, the merciful… May God curse the Jews… I, the living *shahid*, a member of the Izz al-Din al-Qassam Brigades, Mujahid al-Ja'abari…"[21] He was filmed with a Kalashnikov rifle on his knees.

In a third video tape, 'Abd al-Mu'ati Shabana, who carried out the terrorist attack on the No. 14A bus on Jaffa Road in Jerusalem, is shown reading from his "will": "I, 'Abd al-Mu'ati Shabana, a member of the Izz al-Din al-Qassam Brigades, am about to carry out a suicide operation…" The terrorist was filmed with a bandana on his forehead, bearing the name Izz al-Din al-Qassam, and a rifle in his hand.[22]

Ra'ed Misk of Hebron, who carried out the suicide bombing in Jerusalem on the No. 2 bus on August 19, 2003, was also recorded on a video tape, reading from his "will." He was wearing a bandana on his forehead, holding a rifle in one hand and the Koran in the other hand.[23]

Hamas customarily disseminates **photographs** of a **suicide bomber** in the press, especially in periodicals which are identified with the terrorist organization.

Below is a picture of Mujahid al-Ja'abari of Hebron, who blew himself up on May 18, 2003 in a suicide bombing in Jerusalem (which is referenced above). He is holding a Koran and a rifle, and a Hamas emblem and flag may be seen in the background.[24]

---

[20] http://www.youtube.com/watch?v=xGxG-P9EP2c;
http://www.youtube.com/watch?v=DMf1NUKb8O4&feature=related;
http://www.youtube.com/watch?v=j62PXKfdz0Y&feature=related.
[21] http://www.youtube.com/watch?v=j62PXKfdz0Y.
[22] http://www.youtube.com/watch?v=VBPtJEYxGRA&feature=related.
[23] http://www.alqassam.ps/arabic/video1.php?cat=3&id=268.



Below is a photograph of the terrorist Bassam Jamal Darwishi Takruri, a resident of Hebron, who blew himself up in the suicide bombing of a bus in Jerusalem on May 18, 2003 (which is referenced above):




The dissemination of the "wills" and the photographs are part of a regular ritual, which indicates that Hamas wishes to emphasize that the terrorist attack in question was carried out by its people. By reading out his/her "will," the suicide bomber is setting forth an unequivocal declaration of his/her membership in the Izz al-Din al-Qassam Brigades.

This filmed evidence, followed by the identification of the body at the scene of the suicide bombing, constitutes – in my opinion – proof of the relationship between the suicide bomber and the Izz al-Din al-Qassam Brigades. Substantiation of the proof of that relationship is provided by the dissemination of the recorded "will" (generally in the form of a video tape) on web sites which are related to Hamas and on satellite television stations, such as the Hezbollah's *al-Manar*; *al-Jazeera*; or *al-Arabiyya*.

---

[24] http://www.palestine-info.info/arabic/hamas/shuhda/2003/jabary/mujahed.htm.
[25] http://www.paldf.net/forum/showthread.php?t=483316.
[26] http://www.palestine-info.info/arabic/Hamas/shuhda/2003/takrory/photo.htm.

### 4) The media

**Articles on the suicide bomber**: The newspaper operated by each terrorist organization generally publishes stories – and photographs – of the terrorist, including the history of his activity in that particular terrorist organization.

### 5) Plaques and monuments

Since 2002, it has been customary in the Palestinian Territories to set up plaques and monuments, and to engrave the names of suicide bombers on them. The text of the plaques and monuments, as well as the symbols which adorn them, constitute evidence of the organizational affiliation of the suicide bomber.

The following are two examples, which I photographed during a visit to Bethlehem. The memorial plaques commemorate terrorists who were eliminated by Israel. One picture (on the right) shows portraits of the terrorists Ahmad al-Bulbul and Issa Marzuk, both from Bethlehem. The second picture (on the left) shows Ahmad al-Bulbul, Muhammad Shahada, Imad al-Kamel and Issa (the last name is concealed by the flag).

 

### 6) The prisons

**Prison gangs**: In Israel's prisons, the inmates who are affiliated with the various terrorist organizations are kept separate, in order to prevent fights between the various factions and to enable better control over the inmates. The customs practiced by the inmates are also different. Thus, for example, a Hamas inmate will generally not smoke cigarettes, but will pray and study Islam. In addition, the books which Hamas prisoners check out of the prison library are different from those which are read by inmates who belong to the PFLP or Fatah.[27]

---

[27] These details are based on a conversation with the spokesperson of the Israel Prison Service, Yaron Zamir, and on the visits I made to the various prisons.

### 7) The Palestinian Inmates' Club

The "Inmates' Club" is a civilian organization which looks after the needs of inmates in the prisons. According to the records of the organization or testimony by the secretaries of the club in the various cities, it is possible to determine the organization that each inmate is affiliated with. In addition, each organization has its own Inmates' Club; this, too, is an indication of which terrorist organization any inmate in [an Israeli] prison belongs to.[28]

### d. Official investigations

In accordance with that which has been set forth above, in the vast majority of Palestinian terrorist attacks since the year 2000, there is almost no doubt as to the identity of the terrorist organization that is responsible for each attack. This being the case, the investigations which were performed by the ISA did not focus on an attempt to prove that a certain terrorist attack was committed by Hamas or by another terrorist organization, but rather, on the identification and arrest of the members of the terrorist cell that perpetrated the attack, with the objective of stopping the activity of the terrorist network.

The arrests, investigations, evidence from the scene of the attack, and (ultimately) the criminal actions filed against the members of the cell constitute an important tool, not only for the reconstruction of the manner in which various terrorist attacks were performed, but also in order to prove who was behind the attacks; who commanded the cells which actually carried them out; whom they received instructions from; and which echelon of the terrorist organization made the decision to carry out the attacks.

### 1) Investigations by the ISA and the Israel Police

All of the investigations of terrorist attacks in Israel are initially carried out by the Israel Security Agency (ISA). In cases in which it is decided that the filing of criminal actions is necessary, the Israel Police follows the ISA and collects the evidence which will be used in the trial. In most of Israel's terrorism cases, in which the suspects are residents of the Palestinian Territories, the suspects are tried before a military court. On the other hand, residents of East Jerusalem and Israeli Arabs are tried by the civilian courts in Israel. In both situations, the defendants have the right to be represented by an attorney. In cases in which the suspect is waiving representation, the Court appoints an attorney for him from the Office of the Public Defender.

Although the manner in which the Court attributes evidence from terrorist attacks is similar to its attribution of evidence from crime scenes, in that, in both cases, the evidence in question

---

[28] These details are based on a conversation which I held with Issa Qaraqe, the Palestinian Minister of Detainees and Ex-Detainees and the director of the Palestinian Inmates' Club, on July 22, 2009. For more details on the Club and its activity, *see*: www.jcpa.org.il/Templates/showpage.asp?FID=575&DBID=1&LNGID=2&TMID=99&IID=22002. *See also*: http://www.inn.co.il/News/News.aspx/149459.

concerns a specific event, general patterns nonetheless arise. The overwhelming majority of the evidence that is obtained by the Israel Police is attained through the intensive efforts of the terrorist organization to prove its responsibility for the attack. Accordingly, evidence with regard to attribution may be deduced by the efforts of the terrorist organization to document its responsibility for the terrorist attack.

Legal attribution on the basis of a specific case begins at a very basic level, similar to that of a crime scene: in a suicide attack, the remaining pieces of the terrorist's body are collected and then identified. The ISA and the Israel Police then perform comprehensive investigations of the terrorist's background. The conclusions with respect to the organizational affiliation of the terrorist are considered and evaluated in light of the detailed evidence which is provided by the terrorist organization itself.

In addition to the identity of the suicide bomber, the investigations by the ISA and the Israel Police attempt to determine the identity of the accomplices of the suicide bomber from the Izz al-Din al-Qassam Brigades (hereinafter: the "**al-Qassam Brigades**")[29] – or from another terrorist organization – who are responsible for the terrorist attack (because the terrorist himself is already dead). Most of the accomplices who are arrested do not merely confess their involvement and boast of their activities; they also provide details with regard to the planning of the attack and the identity of the entity which ordered the attack, thereby confirming their personal know-how and the reliability of their declarations.

Because Hamas publicizes its role in terrorist attacks for political reasons and because, in many cases, at least one of the perpetrators of the attack is killed at the scene of the incident and can be clearly identified, it is possible to evaluate and to take into consideration the investigations that are performed by the ISA and the Israel Police, and the criminal convictions obtained as a result thereof, by comparing – and cross referencing – the evidence that is collected in the files of specific suspects with the claims (which are generally detailed) raised by Hamas. It is also possible to evaluate the investigation that is performed by the ISA and the Israel Police, including the physical evidence that is collected, in the context of academic literature which concerns the substantiated *modus operandi* used by Hamas and on the basis of previous investigations.

### 2) Official reports by the ISA and the Government of Israel

**Official reports by the ISA**: in particular, annual summaries that describe the terrorist operations and detailing specific information about the terrorists, their organizational affiliation and their methods of operation. Similar reports are also published on a periodic basis by the Office of the Prime Minister. These governmental reports are not intended to provide complete

---

[29] The Izz al-Din al-Qassam Brigades (hereinafter: the "**al-Qassam Brigades**") are the military branch of Hamas.

details with respect to the investigation; nonetheless, they constitute an important tool for obtaining summaries of factual conclusions reached by the Government of Israel.

### e. Matters of legal attribution and special difficulties

Under certain circumstances, attribution becomes more difficult to determine, because the perpetrator of the attack could not be identified, or because there have been contradictory declarations of responsibility. Types of terrorist attacks in which this phenomenon occurs rather frequently include:

1) Large-scale terrorist attacks resulting in multiple casualties, in which the perpetrator(s) was/were not killed at the scene of the incident.

2) Roadside shooting attacks in which the perpetrator(s) was/were not killed at the scene of the incident.

3) Short-range rocket and mortar fire attacks.

4) Stabbing attacks.

Although the attribution of terrorist attacks of these types to a specific terrorist organization involves a number of inherent difficulties, Hamas has generally taken pains to declare its responsibility for the terrorist attacks which it commits, in accordance with that which has been set forth above.

Naturally, there are exceptions. A minimal percentage of suspects deny any connection whatsoever, and there are some suspects who, although they initially give declarations to the ISA and the Israel Police with respect to their involvement in the terrorist attack, subsequently recant those declarations, claiming to have been pressured into a confession.

These subjects are handled by means of the judicial proceedings. Nonetheless, in the overwhelming majority of cases, there is no doubt of the involvement of Hamas and the members of the cell which acted on its behalf. In fact, once it becomes clear that the perpetrators and/or their accomplices will be sent to prison for long periods of time in Israel, Hamas grants public recognition to the perpetrators and goes to great lengths, including the employment of public relations techniques, to transform them into legends and role models.[30]

Terrorist attacks which are not suicide bombings, such as shooting attacks, laying explosive charges, car bombs and the like, in which the perpetrator(s) is/are killed at the scene of the event, are generally differentiated from suicide bombing attacks, in terms of the ceremonies which are

---

[30] *See* for example the biography of Ahlam Mazen at-Tamimi, who took part in the suicide attack in the Sbarro Restaurant in August 2001, which appears on the Hamas web site:
 http://www.qassam.ps/prisoner-96-Ahlam_Mazen_At_Tamimi.html.

carried out by the suicide bomber and the degree of publicity and admiration which he/she is given after the fact.

Notwithstanding the fact that, from most of the other standpoints, these attacks are not materially different from suicide bombings, they present additional challenges, because it is necessary to identify and to capture the perpetrators themselves. Nonetheless, in most cases, Hamas takes responsibility immediately subsequent to the terrorist attack.

Hamas generally takes credit for the roadside shooting attacks which are perpetrated by its operatives. However, from the perspective of attribution by the court, these types of terrorist attacks require a more detailed analysis of the physical evidence than other types of terrorist attacks. Moreover, they also require a careful evaluation of the witnesses' declarations and confessions.

In contrast with suicide attacks, which are rapidly followed by public ritual displays and a public declaration of responsibility, as set forth in detail above, the terrorist cells which are responsible for roadside shootings are likely to remain at large for some time, and the specific identity of the members of the cell is also likely to remain unknown. Still, after the ISA and Israel Police investigations have identified the conspirators in the Izz al-Din al-Qassam Cell which is responsible for the attack and have brought about their arrest, and once the judicial proceedings has resulted in a criminal conviction, Hamas recognizes them publicly as members of the organization and glorifies their actions.[31]

The cases which are most difficult to evaluate are those which involve short-range rocket or mortar fire. There can be no doubt that attacks of this type are one of the unique "trademarks" of Hamas and that it frequently takes credit for attacks of this type when they take place. This fact makes the evaluation of these attacks possible. Nonetheless, it should be recognized that the evidence in such cases is less sound and is subjected to a far less stringent comparative analysis than other types of attacks.

### 4. Summary of the expert opinion

In my examination of the list of terrorist attacks that constitute part of the trial, I have made use of all of the methodological tools which I discussed in the previous section of this report. In addition, over the course of my work as a handler of agents and an interrogator for the ISA, I was in frequent contact with terrorists. I learned the nuances which they use in conversation, their special expressions, their tone of voice and their body language. All of these were helpful to me in the many interviews which I held with these people, inside and out of the prison system, over the course of my professional career.

---

[31] *See* the discussion of the so-called "Silwad Cell" of Hamas.

On the basis of my professional experience, I conclude, with a very high degree of probability, that Hamas was involved in the recruiting, planning[32] and perpetration of the following suicide attacks:

- March 27, 2002 – the suicide bombing at the Park Hotel, Netanya.

- May 7, 2002 – the terrorist attack at the Sheffield Club, Rishon Le-Zion.

- March 5, 2003 – the terrorist attack on the No. 37 bus, Haifa.

- April 30, 2003 – the terrorist attack at Mike's Place, Tel Aviv.

- May 18, 2003 – the terrorist attack on the No. 6 bus, French Hill, Jerusalem.

- June 11, 2003 – the terrorist attack on the No. 14A bus, Jaffa Road, Jerusalem.

- August 19, 2003 – the terrorist attack on the No. 2 bus, Jerusalem.

- September 9, 2003 – the terrorist attack at Café Hillel, Jerusalem.

- January 29, 2004 – the terrorist attack on the No. 19 bus, Jerusalem.

On the basis of my professional experience, I also conclude, with a very high degree of probability, that Hamas was involved in the recruiting, planning, and perpetration of the following terrorist attacks:

- July 31, 2002 – the terrorist attack on the cafeteria of the Hebrew University, Jerusalem.

- March 7, 2003 – the shooting attack in Kiryat Arba.

- January 29, 2003 – the shooting attack on Road 60.

- June 20, 2003 – the shooting attack on Road 60.

- October 22, 2003 – the shooting attack in Tel Rumeida.

Finally, on the basis of my professional experience, I conclude that Hamas was apparently involved in the planning and perpetration of the mortar fire on Neve Dekalim in the Gaza Strip on September 24, 2004. This conclusion is based on the method that was used in the attack and the fact that Hamas took responsibility for it. However, due to the nature of these attacks – firing from a distance – the evidence in this particular case is not subject to the same level of comparative analysis as were the other attacks which were examined.

---

[32] In accordance with that which has been set forth above, I conclude that both Hamas and the al-Aqsa Martyrs Brigades (a paramilitary organization linked to Fatah) were involved in the planning, recruiting and execution of the terrorist attack on the No. 19 bus in Jerusalem on January 29, 2004.

### 5. The ideology of Hamas and its ability to carry out terrorist attacks against Israel

#### a. The Hamas Charter

The world view that is espoused by Hamas, as manifested in the Hamas Charter of August 18, 1988,[33] specifies that the Palestinian conflict with Israel is based on religious differences of opinion (rather than on national-territorial differences of opinion), and on the dispute between Islam and the "infidel" Jews. Accordingly, the conflict cannot be resolved by way of political compromises based on the principle of "two states for two peoples," but only by way of a holy war (*Jihad*) until all of Palestine has been liberated and the State of Israel has been eliminated. This world view holds that the land of Palestine, "from the river to the sea," is an inalienable endowment to Islam which cannot be given up – not even in the very smallest of parts.

The members of Hamas are bound by the Hamas Charter, the most important ideological document of the organization, and its basic provision, which clearly sketches the primary purpose of the organization: "the destruction of the State of Israel." The Charter also describes the strict Islamic ideology of Hamas and contains the Constitution which underlies the organization.[34] That set forth below reflects the strategy of the *Jihad*,[35] which is reflected in the Charter as a call for uncompromising and absolute war against Israel.

The Charter opens with a well known quotation from the works of Hassan al-Banna, the founder of the Muslim Brotherhood movement,[36] who is considered to be a role model in the pantheon of Hamas martyrs. According to al-Banna, "Israel shall arise and shall remain until Islam wipes it out, just as it wiped out that which preceded Israel."[37]

**Clause 6**:   "The Islamic Resistance Movement is a unique Palestinian movement. It places its trust in Allah and it adopts Islam as a way of life. It acts toward raising the flag of Allah over every inch of the land of Palestine."

**Clause 7:**   "The Islamic Resistance Movement is a link in the chain of the Jihad against the Zionist occupation… The day of judgment will not come until the Muslims fight against the Jews and kill them…"

---

[33] http://www.thejerusalemfund.org/www.thejerusalemfund.org/carryover/documents/charter.html.

[34] *See* "Hamas – the Islamic Resistance Movement and the Charter."

[35] Notwithstanding the fact that the word "Jihad" has several meanings, including "internal struggle," the use of the word within the context of this report – unless otherwise noted – refers to "armed struggle against Israel."

[36] The Muslim Brotherhood movement (*juma't al-ikhwan al-muslimin*) is a religious and political organization which was founded in 1928. The movement objected to the trend of secularity which, in the opinion of al-Banna and others, was sweeping through the Muslim world of his day. The movement encouraged a return to Islamic societies based on the religious precepts of the Quran.

[37] *See* Introduction to the Hamas Charter.

17

**Clause 8:**[38] "Allah is its purpose [of the Hamas movement]; the Prophet is its model; the Koran is its constitution; the Jihad is its way; and death for the sake of Allah is the most sublime of its ambitions."

**Clause 11:** "The Islamic Resistance Movement believes that the land of Palestine is an inalienable endowment to Islam (*waqf*), for generations of Muslims until the resurrection of the dead. It is forbidden to abandon it or any part thereof, or to renounce it or any part thereof. It is not the property of any Arab state or of all Arab states, or of any king or president or of all kings and presidents, and it is not the property of any organization or of all organizations, whether Palestinian or Arab. This is because Palestine is an inalienable endowment to Islam (*waqf*), for generations of Muslims until the day of resurrection of the dead…"

**Clause 14:** "The liberation of Palestine is a personal duty of every Muslim wherever he may be."

**Clause 15:** "On the day when the enemies steal part of Muslim lands, the Jihad becomes a personal duty for every Muslim. With regard to coping with the theft of Palestine by the Jews, there is no choice but to wave the flag of Jihad, which requires the dissemination of Islamic awareness among the masses on the local, Arab and Islamic level, and there is no choice but to disseminate the spirit of the Jihad among the nation."

Following are examples of statements by Hamas leaders concerning the launching of the Jihad:

- "The armed struggle in all of its modes is the means to fight against the plan of the Zionist enemy."[39]

Sheikh Ahmad al-Bitawi, head of the Council of Islamic Sages of Palestine, the entity which grants religious legitimacy to the operations of Hamas, declared that:

- "We in Palestine have a great love of Jihad and Shahada, and that makes many children compete among themselves in carrying out Jihad and Shahada-seeking missions."[40]

- "If the enemy conquers a portion of Muslim land, Jihad becomes a personal obligation on every Muslim man and woman… and as the Prophet said: 'One must not obey a creation [the objecting parent] and disobey the Creator.'"[41]

---

[38] This section offers encouragement for the perpetration of suicide operations.
[39] http://www.palestine-info.info/ar/default.aspx?xyz=U6Qq7k%2bcOd87MDI46m9rUxJEpMO%2bi1s7YjyNYgnCrGxy9LphpYtjbpN10jo4ZpAEj22uHhDqul1JcP2sHDtgZlJCR3C2afNaApr%2bmcrhAOq3FNcmJIzvxLcU9gqBHHcqmhfrDvamPtU%3d.
[40] www.islamonline.net, September 28, 2002.
[41] www.islamonline.net, September 28, 2002.

Raed Said Hussein Saad (Abu Muadh), Commander of the al-Qassam Brigades in North Gaza, was quoted on the Hamas web site on December 12, 2005, as saying:

- "We succeeded, with Allah's grace, to raise an ideological generation that loves death like our enemies love life. We will not abandon the way of Jihad and Shahada [Martyrdom] as long as one inch of our holy land is in the hands of the Jews." [42]

Muhammad Def, a former commander of the al-Qassam Brigades, said:

- "I pray to [Allah] to assist us and to assist you in the liberation of Jerusalem, the West Bank, Acre, Haifa, Jaffa, Safed, Nazareth, Ashkelon, and the whole of Palestine."[43]

Ismail Haniya, the Hamas Prime Minister, said:

- "Continue the resistance [terror], keep your weapon, the legitimate weapon of the resistance. Beware not to abandon it! Hamas will continue to be, Allah willing, a home for all Palestinian and Jihad fighters that want to fight for the sake of Allah [and] for the liberation of our land… The Zionist withdrawal from the Gaza Strip and the northern West Bank is the first step in the liberation of the rest of our occupied land."[44]

Hamas affiliated preacher Ziad Abu Alhaj stated:

- "The time will come, by Allah's will, when their property will be destroyed and their children will be exterminated, and no Jew or Zionist will be left on the face of this earth."[45]

Fathi Hammad, Hamas Member of Parliament, said:

- "With the help of Allah, killing one Jew is like killing 30 million Jews."[46]

Since its establishment in 1987, Hamas has not attempted to make any distinction between military and civilian targets. As its Charter unequivocally declares, its goal is the destruction of the State of Israel. Until 1993, Hamas principally concentrated on abductions and shooting attacks against "settlers" and soldiers within the Palestinian Territories.

---

[42] http://palwatch.org/main.aspx?fi=111&fld_id=111&doc_id=961.

[43] http://web.archive.org/web/20071008174314/http://pmw.org.il/Bulletins_Jan2006.htm, quoted from the Hamas web site, August 2005.

[44] http://web.archive.org/web/20071008174314/http://pmw.org.il/Bulletins_Jan2006.htm, quoted from the Hamas web site, October 2005.

[45] http://www.terrorism-info.org.il/malam_multimedia/English/eng_n/html/hamas_e070.htm. *See also*: http://www.palwatch.org/main.aspx?fi=157&doc_id=755.

[46] http://www.youtube.com/watch?v=i08L09V0_sg.

At the same time, after Hamas developed a significant logistical infrastructure and a support mechanism, the movement adopted suicide operations as its preferred method of operation. Since that time, Hamas has refined the use of this method of operation. Hamas also began, at the same time, to perpetrate terrorist attacks within the territory of the State of Israel. In the last few years, Hamas has increased its attacks on the major population centers of Israel: in Jerusalem, Tel Aviv and Haifa.

### b. The terrorist infrastructure

Whereas many Palestinian terrorist organizations aspire to kill Israeli civilians, only a few of them have a logistical support network, the expertise with ordnance and the personnel as to enable them to do so on a regular basis. Hamas, on the other hand, has developed a reliable ability to launch a wide variety of terrorist attacks against Israeli civilians. Hamas has also demonstrated its readiness to perpetrate such terrorist attacks over the years – more than two decades – which have elapsed since the organization was founded.

During the course of the 1990s, Hamas developed the method of murderous suicide attacks and carried them out in Israeli cities. The first Palestinian suicide bombing was carried out in the settlement of Mehola by a suicide bomber who was a member of Hamas, on April 16, 1993.[47] Since then, and especially since the start of the Second Intifada,[48] Hamas has refined its method of suicide attacks and transformed it into its primary weapon in the struggle against Israel.

From the beginning of the Second Intifada to the end of 2008, Hamas killed 457 people (approximately 40% of all Israelis who were killed in terrorist attacks) and wounded 3008 others in the terrorist attacks which it perpetrated. According to ISA documents, Hamas is the leading perpetrator of suicide bombings among the Palestinian terrorist organizations, and is responsible for 59% of all suicide attacks against Israeli civilians.

On the operational level, the secrecy and training which are required for these terrorist attacks are part of the reason why Hamas divided its organization into two principal components: 1) support services and government services; 2) the al-Qassam Brigades,[49] which are in charge of carrying out terrorist attacks against civilians. On the basis of ISA documents, between 2000 and

---

[47] *See* Ronni Shaked and Aviva Shabi, Hamas: M'Emunah B'Allah L'Derech Ha-Terror, pp. 302-307, and also pp. 313-316.

[48] The term "Second Intifada" (also known as the "al-Aqsa Intifada") is used throughout this report. This term refers to the violent conflict which broke out at the end of September 2000 between the Palestinians and Israel. This part of the conflict has no "official" ending date, but it is generally considered to have ended at the end of 2004.

[49] In addition, Hamas has a social welfare arm, known as the *Da'wa*, and a political arm which controls the entire organization. Notwithstanding the various arms, Ahmed Yassin, the co-founder of Hamas and its spiritual leader until his death in 2004, stated that: "We cannot separate the wing from the body. If we do so, the body will not be able to fly. Hamas is one body." (Reuters, May 27, 1998.)

2003, the al-Qassam Brigades carried out 52 suicide bombing attacks, in which 247 Israelis were killed and 1647 Israelis were wounded.[50]

The al-Qassam Brigades include a large number of armed cells, including the "Pupils of Yahya Ayash," the "Students of the Engineer," and the "Yahya Ayash Cells," all of which are named for the late Hamas operative Yahya Ayash (known as the "Engineer"), who was responsible for the murder of scores of Israeli civilians in a series of suicide bombing attacks in 1996.[51]

The command and control entities of Hamas and the al-Qassam Brigades have been under investigation by the ISA for decades. The members of the al-Qassam Brigades include thousands of armed people in Gaza, as well as a few dozen terrorist cells in the West Bank. During the years that have been reviewed within the framework of this expert opinion (2002-2004), the Hamas terror cells included hundreds of operatives, who depended on generous economic support. These operatives underwent guerrilla training in Syria, Lebanon, and Iran.[52]

The military-style chain of command was needed by Hamas in order to carry out, starting in 2001, the series of terrorist attacks against Israeli civilians.

### 1) The Hamas chain of command

a) **The Shura Council**, which is the senior leadership element of the organization, makes strategic decisions. Members of the Council come from all over the Arab world. Today, the Head of the Council is Khalid Mishal.[53] Five members sit on the Political Bureau, which is subordinate to the Shura Council. The members of the Political Bureau meet in order to publicize tactical instructions.

b) **The Hamas Military Headquarters** in Damascus maintains contacts with the commanders of the al-Qassam Brigades in the Palestinian Territories. The military headquarters in Damascus is in charge of determining the strategic targets, as well as of logistical matters such as communications devices and the transfer of ordnance.

---

[50] ISA Summary Report, 2003. *See* Appendix No. 1, pp. 7-16, or via this link: http://www.pmo.gov.il/PMO/Archive/Spokesman/2004/%D7%99%D7%A0%D7%95%D7%90%D7%A8/Spokesman9044.htm.
[51] http://www.ynet.co.il/articles/0,7340,L-3386015,00.html. http://www.ynet.co.il/articles/1,7340,L-3688058,00.html. http://www.inn.co.il/News/News.aspx/37791.
[52] *See* http://www.ynet.co.il/articles/0,7340,L-2993275,00.html; http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=sera&id=628. *See also* Guy Aviad, Lexicon of the Hamas Movement, p. 174-176 (Appendix No. 1, pp. 17-19), for an example of a Hamas operative who received training abroad during the 1990s.
[53] For the organizational structure of Hamas, *see* Guy Aviad, Lexicon of the Hamas Movement, p. 25 (Appendix No. 1, p. 20).

c)   **The liaison between the Shura Council** and the al-Qassam Brigades transfers the Council's decisions in the form of orders to the headquarters of the al-Qassam Brigades in Damascus. The principle liaison between the al-Qassam Brigades in Gaza and Hamas's headquarters in Damascus from 1994 up until his elimination in September 2004 was Izz al-Din Sheikh Khalil, a senior member of the al-Qassam Brigades. Upon receiving an order from the Shura Council, Khalil would make contact with the relevant networks and order them to begin planning the details of the terrorist attack. In addition to this tactical role, he was also involved in logistical coordination for the terrorist cells, by transferring weapons and explosive materials. He took advantage of the asylum which was granted to him by Damascus in order to send instructions to his subordinates in the Palestinian Territories.[54]

d)   **District commanders:** Each district in the West Bank has a commander. Thus, for example, Ibrahim Hamad was the commander of the Ramallah and Jerusalem District, Abbas al-Sayed was the commander of the Tulkarem District,[55] Muhanad Tahar was the commander of the Nablus District,[56] and Abdallah Qawassmeh was the commander of the Hebron District.[57] The Hamas headquarters are compartmentalized from one other, with a view to preventing the collapse of the infrastructure if one of the commanders is killed or arrested. Each district in the West Bank also had a **deputy commander**, who commanded the cells in order to limit the exposure of the district commander to the Israel Defense Forces' efforts in the war against terrorism. Thus, for example, Muhammad Arman, the deputy of Ibrahim Hamad in Ramallah, acted as the contact person with the cells during the course of the terrorist attacks in Rishon Le-Zion, in the cafeteria of the Hebrew University and at Café Hillel in Jerusalem (all of which are discussed in this report).[58]

e)   Each district has its own "**Engineer**," whose exclusive role it was to construct the explosive belt and explosives charges. The Engineer customizes the belt or the charge in accordance with the tactical considerations of each mission. Thus, for example, when Hamas wanted to lay an explosive charge inside a supermarket in Jerusalem, the charge was placed inside a beer can. When the "Engineer" Abdullah Barghouti sent the suicide

---

[54] http://www.nrg.co.il/online/1/ART/788/337.html;
Guy Aviad, Lexicon of the Hamas Movement, p. 102 (Appendix No. 1 p. 21).
[55] www.pmo.gov.il/PMO/Archive/Spokesman/2002/%D7%9E%D7%90%D7%99/Spokesman6663.htm and http://www.pmo.gov.il/PMO/Archive/Spokesman/2003/אפריל/Spokesman8178.htm.
[56] Guy Aviad, Lexicon of the Hamas Movement, p. 111 (Appendix No. 1 p. 22). See also: www.ynet.co.il/articles/1,7340,L-1972094,00.html.
[57] Guy Aviad, Lexicon of the Hamas Movement, p. 221 (Appendix No. 1 p. 23). See also: www.ynet.co.il/articles/1,7340,L-2665133,00.html.
[58] See Appendix No. 1, pp. 24-43 and 1108-1125; see also Military Court in Beth El, File 3380/03 (Appendix No. 1, pp. 44-51). See also: Shai Shaul, The Martyrs, Islam and the Suicide Bombings [Hebrew], Herzliya Interdisciplinary Center, 2003, pp. 41-49.

bomber into the Sbarro Pizzeria, he built a charge which contained between 5 and 10 kg of explosives, as well as screws and nails, in order to maximize the number of victims. He concealed the explosive charge inside a guitar, in order to facilitate the entry into the restaurant, so as not to arouse suspicion.[59] The "Engineer" is also in charge of training a new generation of "Engineers," because the Israel Defense Forces – for understandable reasons – makes efforts to arrest or kill the Hamas bomb makers as soon as they are identified.

f)  At this stage, the **suicide bomber** who will carry out the mission is chosen. He is generally transferred to the district commander, who then assigns the handling of the suicide bomber to the leader of a terrorist cell. The cell leader places the explosive belt on the body of the suicide bomber and shows him how to set off the explosive charge.[60] The transfer is accomplished through the use of codes and identification passwords.[61]

g)  A **senior commander** generally handles the last preparations for the terrorist attack, which include indoctrination, photographing the terrorists, writing the terrorist's "will" and the drafting of the announcement which will be published after the operation.[62] The publication of the suicide bomber's picture and his "will" is the main course of action used by Hamas in taking responsibility for the suicide bombing. This is also done in order to ensure that Hamas gets the credit for the terrorist attack. Subsequently, members of the cell dispatch the suicide bomber to the intended site of the terrorist attack, and a senior ground commander instructs the suicide bomber where to blow himself up.[63]

---

[59] *See* Appendix No. 2 – the documentary film "For the Sake of Allah."

[60] Indictment against Ibrahim Hamad, Prosecution File 3181/6, Military Court of Judea (Appendix No. 1, pp. 24-43).

[61] *See* testimony by Ahlam at-Tamimi in the documentary film "For the Sake of Allah" (Appendix No. 2). *See also*: Shai Shaul, The Martyrs, Islam and the Suicide Bombings, Herzliya Interdisciplinary Center, pp. 41-49.

[62] *See*: Shai Shaul, The Martyrs, Islam and the Suicide Bombings, Herzliya Interdisciplinary Center, pp. 41-49.

[63] *See* the transcript of the Military Court of Judea, November 30, 2003, File 3925/02 and File 3931/02 (both in Appendix No. 1, pp. 52-57). *See* the transcript of the Military Court in Beth El, File 3380/03 (Appendix No. 1, pp. 44-51). *See also* Appendix No. 1 pp. 58-85.



## 2) Economic support and recruiting

In order to carry out its operations, Hamas set up a complex economic support system, which provides the al-Qassam Brigades with new recruits, in order to replace the operatives who are lost by the organization in the various terrorist attacks. The economic system which enables this depends on money from the coffers of the organization. The coffers are supported by a broad network of charitable societies, which describe themselves as providing economic support and educational and religious services in the Palestinian Territories. The charity funds which are intended for Hamas are used to fund the movement's institutions and to plan its operations, including suicide bombings. In religious schools which are funded by these charitable societies, Hamas preachers advocate *Jihad* and incite the new generation of Palestinian youth to become involved in violent activities against Israelis.

In addition to official religious education, the Hamas charitable societies also provide direct economic incentives and support to the families of suicide bombers, inmates and other operatives who are killed or wounded in the course of terrorist attacks. These families receive a series of benefits, which include grants and monthly pensions. Thus, for example, the family of a terrorist who has been killed generally receives a one-time grant – which can be up to $5,000, depending on the type of terrorist attack – immediately after the attack, and a monthly pension of approximately $100 thereafter. In addition, the family receives thousands of dollars in assistance

benefits in the areas of education and health.[64] Taking into account the economic standards of typical families in the Palestinian Territories, these amounts are extremely significant. Investigations performed on Hamas operatives and terrorists show that the support of their families sometimes represented a significant consideration which was taken into account in the actual decision to carry out the terrorist attack. Iraq distributed funds to suicide bombers – up to $25,000 to the family of the suicide bomber.[65] The Palestinian Authority also transferred funds to the families of suicide bombers.[66]

The *Da'wa* represents a critical component in nurturing the "future generation" of Hamas operatives. The various *Da'wa* frameworks – from mosques, through school classrooms and summer camps, to universities – are active in promoting the Hamas ideology. An example of this may be found in the content which is taught in the summer camps which are sponsored by Hamas each year in the Palestinian Territories. At those summer camps, along with religious studies, computer classes and sports activities such as physical training and hand-to-hand combat, the use of weapons and explosives is also taught.[67] Accordingly, the *Da'wa* represents a material strategic tool which enables Hamas to carry out terrorist activities on a broad scale against Israel.

As a general rule, prior to the perpetration of a suicide bombing, the cell members bring the designated terrorist to a hiding place, isolate him/her from family and friends and prevent him/her from having any contact with the outside world, while they prepare him/her for a "martyr's death."[68] In many cases, the cell members hold long talks with the terrorist with respect to what they see as humiliation by the Israeli occupation (in the West Bank and the Gaza Strip), the historical glory of the Arabs compared to the humiliation undergone by the Palestinians, and the future benefits which will accrue to the terrorist as a martyr in Paradise.

The indoctrination talks are intended to create what the Israeli researcher Ariel Merari refers to as mutual commitment, an "unbreakable social contract." In the majority of cases, cell members make a video tape about the martyr's death, which is intended for the purposes of propaganda and future recruiting, as well as to ensure that the terrorist does not feel that he/she is entitled to change his/her mind. The potential suicide bomber is also asked to swear a public oath, in front of his/her family, in which he/she asks them not to mourn his/her death. He/she is also asked to write letters which will be published after the attack has been perpetrated. At the end of the

---

[64] http://www.shabak.gov.il/publications/study/Pages/dawaa-report.aspx.

[65] Yedioth Ahronoth, June 14, 2002 ((Appendix No. 1 p. 86); Yedioth Ahronoth, October 9, 2002 (Appendix No. 1 p. 87).

[66] http://www.inn.co.il/News/News.aspx/88765.

[67] www.terrorism-info.org.il/malam_multimedia/Hebrew/heb_n/pdf/hamas_076.pdf; www.terrorism-info.org.il/malam_multimedia/Hebrew/COUNTERTERRORISM-DATA/PDF/oct_04.pdf.

[68] *See generally*: Bruce Hoffman, The Logic of Suicide Terrorism, Rand Corporation (June 2003), http://www.rand.org/pubs/reprints/RP1187/index2.html.

process, the person is no longer a potential suicide bomber. "From that moment on, he is the 'living martyr.' What this means is that he is already dead. This is the point of no return."[69]

The cell members generally seek out potential targets (and alternatives, if necessary), or receive detailed information on the preferred target. They pass this information on to the cell members who are guarding the suicide bomber. Other cell members, who are trained in evading Israel Defense Force roadblocks or police patrols, are in charge of moving the terrorist as close as possible to the target.

Thus, for example, Waal Ali Qassem (who is discussed further in this report) searched for a target immediately prior to the terrorist attack on the Sheffield Club in Rishon Le-Zion, and helped transfer the suicide bomber to the club. In an interview which I held with Qassem, he told me about the instructions which he gave the terrorist: "I told him: 'This is the place. You must go to the stairs, and when you go in, you must blow yourself up.' He had 40 kg… [After the terrorist attack] I was with Wisam, the young man who picked us up, and we went back to Jerusalem."

---

[69] *See*: Lecture by Ariel Merari to the Fletcher School, http://www.fletcherledger.com/archive/2002-02-04/020402-NfinalSuicideTerrorism.htm.

**March 27, 2002 – the terrorist attack on the Park Hotel, Netanya**

### a. The terrorist attack

On March 27, 2002, about 250 men, women and children came to the Park Hotel in Netanya to celebrate the Passover Seder.[70] A few minutes before the festive meal was about to begin, a suicide bomber who was a member of Hamas entered the banquet hall, disguised as a woman. When the hotel began to fill up with guests, the terrorist detonated the explosive belt. The explosion killed 29 people and wounded 140, including 20 people who were severely wounded.

One of the wounded, Yitzhak Atzitz, said: "When we sat down, there was a tremendous boom. I thought a missile had hit the hotel. Boards went flying, the tables turned over, water was pouring out of burst pipes. I could hardly see a thing because my eyes were damaged."[71] The explosion was so strong that many of the victims suffered massive internal injuries as a result of the recoil. The terrorist attack was later referred to as the "Seder Night Massacre."[72]

The suicide bombing was carried out by a Hamas terrorist cell, which operated in accordance with the standing orders of Hamas Headquarters in Damascus, Syria: "Kill whenever the possibility arises." After the attack, the leader and founder of Hamas, Ahmed Yassin, said to an audience in Gaza: "The operation in Netanya is proof that ours is a people firm in the struggle to preserve itself, its land and its native soil. Ours is a people steadfast in the Jihad struggle, and it will not give in until the occupation has been overthrown."[73]

The suicide bomber, Abd al-Baset Odeh, did not carry out the terrorist attack on his own. He was sent by an entire cell, acting in accordance with the chain of command; each cell member had a specific job, from recruiting for the Hamas organization and up to the final stages before the perpetration of the attack: placing the explosive belt on the suicide bomber's body, dressing him in women's clothing, applying makeup to his face, photographing and filming him (including the reading of his "will"), and finally, driving him from Tulkarem into Israeli territory and from there to Netanya.

On the basis of my experience in the interrogation of terrorists and on materials which I studied, especially interrogation reports and ISA reports, I have learned that the operation at the Park Hotel in Netanya also had a chain of command, which began with the senior echelons of the military branch of Hamas in Damascus and passed down through the Hamas district commander in Tulkarem, Abbas al-Sayed, who commanded all of the terrorists involved in sending Odeh to

---

[70] Yedioth Ahronoth, March 29, 2002 (Appendix No. 1 p. 88).
[71] Yedioth Ahronoth, March 29, 2002 (Appendix No. 1 p. 88).
[72] See Appendix No. 1, pp. 89-91.
[73] Yedioth Ahronoth, March 29, 2002 (Appendix No. 1 p. 88).

Netanya.[74] Al-Sayed acted in accordance with orders which reached him from the supreme command of Hamas in Damascus.[75]

### b. Evidence and attribution by the court

### 1) The assumption of responsibility

A short time after the terrorist attack at the Park Hotel, Hamas issued an announcement in writing, in which it assumed responsibility for the perpetration of the terrorist attack. The announcement was published on the official stationery of the military branch of Hamas. Appearing at the top of the page was the emblem of the al-Qassam Brigades; on the left side, the following words were written in Arabic: "Brigades of the "martyr" Izz al-Din al-Qassam, the military branch of the Hamas movement. Public Relations Office."

The announcement included a picture of Odeh, the suicide bomber, wearing a bandana on his head which bore the words "Izz al-Din al-Qassam." At the top of the picture was the following caption: "The perpetrator of the martyrdom operation at the Park Hotel."[76]

The following is the text of the announcement: "To the members of our Palestinian people, which is fighting the Jihad; to our pure and deep-rooted Arab and Islamic nation: with the help and guidance of Allah, the heroic martyr has succeeded in passing through all of the security measures of the Zionists."[77]

The announcement set forth the precise time of the explosion (7:25 p.m.), along with the Muslim date, the 13th day of the month of Moharram, in the year 1423 after the *hijra*, and the Western date: March 27, 2003. The name of the place was stated as "Umm Khaled, which is known by the name of Netanya, within the 1948 borders." [78]

The announcement in which Hamas took responsibility for the terrorist attack mentioned five times that it was "the Izz al-Din al-Qassam Brigades, the military branch of Hamas," which carried out the terrorist operation. According to the announcement: "With the help and guidance of Allah, the heroic martyr has succeeded in passing through all of the security measures of the Zionists, the heroic *shahid* Abd al-Baset Odeh, age 25 from Tulkarem, … We are telling the entire world that this is our way, the way of the Jihad, and there is no other way to attain our objectives."[79]

---

[74] For information about Abbas's connections with the headquarters in Syria, *see* Guy Aviad, Lexicon of the Hamas Movement, p. 171 (Appendix No. 1 p. 92).

[75] *See* Appendix No. 1, pp. 93-176.

[76] *See* http://www.alqassam.ps/arabic//sohdaa5.php?id=99.

[77] *See* Appendix No. 1, pp. 177-178.

[78] http://www.alqassam.ps/arabic//operations2.php?id=51.

[79] http://www.alqassam.ps/arabic//operations2.php?id=51.

### 2) The photographs

The following photographs document the suicide bomber's affiliation with Hamas.

The picture below shows Abd al-Baset Odeh a short time before he set out for his destination. Odeh is pictured wearing a green bandana with the Hamas emblem on his forehead. These bandanas are frequently worn by Hamas operatives. Hanging behind him is a Hamas poster bearing the Hamas emblem and a picture of Hamas members who were killed.

The postcard of Odeh shown below was disseminated the day after the terrorist attack by Hamas. The picture clearly shows the Hamas emblem on the band tied around Odeh's forehead. The picture shows the slaughter, destruction and chaos wrought by the explosion at the Park Hotel.[80]



[Photo caption: "The terrorist: he spoke Hebrew and was familiar with the Netanya hotels. (Photograph: Reuters)"]

After the terrorist attack, Hamas published a poster in which Odeh is seen holding a rifle. The poster includes many symbols and emblems of Hamas, including a picture of Izz al-Din al-Qassam (the man for whom the military branch of Hamas is named); the official emblem of the al-Qassam Brigades; the official emblem of Hamas; and a large inscription stating: "The perpetrator of the suicide operation at the Park Hotel in Netanya." The poster is dated March 27, 2002.[82]

---

[80] http://www.paldf.net/forum/showthread.php?t=202807.
[81] Yedioth Ahronoth, March 29, 2002 (Appendix No. 1 p. 179). *See also* the al-Qassam Brigades web site: http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=picture&id=99.
[82] http://www.paldf.net/forum/showthread.php?t=202807.



Hamas published a photograph of Odeh, holding a rifle in a shooting position.[83] Hamas suicide bombers are typically photographed in this position. In the photograph, Odeh is again wearing a green bandana with a Hamas symbol on it.


[84]

In another photograph, Odeh is again seen with a Hamas bandana on his head.[85]



---

[83] http://www.alqassam.ps/arabic/sohdaa5.php.
[84] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=picture&id=99.
[85] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=picture&id=99.

Finally, an additional picture of the terrorist against the background of the destruction which was caused by the explosion in the hotel:[86]



### 3) The "will"

Odeh prepared his "will" before going out on the suicide operation, and Hamas recorded him reading it aloud.[87] The language of the "will," the Hamas flag, the green bandana and the rifle – all of these attest to the fact that the person shown is a suicide bomber and a member of Hamas. The following are relevant portions of the "will":

**"To my dear mother, my father, my brother and my sisters: When you hear about my martyrdom, hold your heads up to Heaven, because your son has sought to meet Allah."**[88]

He ended the "will" with the following words: **"I, your son, the living martyr, Abd al-Baset Odeh, a son** [member] **of the *Shahid* Izz al-Din al-Qassam Brigades."**



The "will" was broadcast by the Hamas television station on March 28, 2002, the day after the terrorist attack.

### 4) Material from Hamas web sites

**The site**: A few days after the deadly terrorist attack, the official web site[89] of the Izz al-Din al-Qassam Brigades devoted three pages to the suicide attack by Odeh on the Park Hotel[90] and

---

[86] http://www.alqassam.ps/arabic//operations2.php?id=51.
[87] The video was available at http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=video&id=99, but is no longer available at that URL.
[88] http://www.alqassam.ps/arabic/sohdaa5.php?id=99.

posted an online booklet on the site. The booklet is entitled: "Tales of the Holy Revenge Cell – the Park Hotel Operation."[91]

Hamas devoted considerable efforts to the promotion of that specific cell on its web site. The web site explicitly refers to Odeh as a member of the al-Qassam Brigades and a Hamas hero; the same applies to the remaining members of the cell.[92] A section on Abbas al-Sayed (who will be discussed below) mentions him as the commander of the terrorist attack on the Park Hotel and a loyal Hamas fighter. Following al-Sayed's arrest, Hamas publicly lauded and praised him in writing.[93]

The official Hamas web site also published a comprehensive article on Muhanad Sharim, an additional member of the cell, and attached his photograph holding a weapon.

Muhammad Shahruri is described in respectful terms in a booklet entitled "The Story of a Operation by the Park Hotel Cell,"[94] and his participation in the attack on the Park Hotel is emphasized.[95]

The booklet[96] contains a detailed narrative of the Hamas terrorist attack, as well as testimony by each member of the cell. It includes extensive praise for members of cells of this type and refers to them by honorifics, such as the "lion of Palestine" for al-Sayed.[97]

Hamas praises Odeh as "the lion of holy revenge, the heroic member of the al-Qassam Brigades."[98] The booklet begins with the following dedication: "The martyr Abd al-Baset Odeh, a member of the Izz al-Din al-Qassam organization, ascended to heaven on March 28, 2002. Cause of death: suicide operation."[99]

The booklet goes on to describe the role played by other participants who assisted in carrying out the terrorist attack, including Muhanad Tahar, to whom the article refers as the "Fourth

---

[89] The Hamas web sites are discussed in detail in the expert report of Evan Kohlmann. I have read that expert report and I entirely agree with his conclusions concerning the control and use of a number of web sites by Hamas. I will not reiterate those conclusions here.
[90] *See* Appendix No. 1, pp. 180-181.
[91] *See* Appendix No. 1, pp. 182-215.
[92] *See* Appendix No. 1, pp. 182-215; *see also* Appendix No. 1, pp. 216-217; *see also* Appendix No. 1, pp. 218-220; *see also* Appendix No. 1, pp 221-222; *see also* Appendix No. 1, pp. 223-225.
[93] *See* Appendix No. 1, pp. 218-220.
[94] *See* Appendix No. 1, pp. 226-227.
[95] *See* Appendix No. 1, pp. 182-215.
[96] *See* Appendix No. 1, pp. 182-215.
[97] *See* Appendix No. 1, pp. 182-215.
[98] http://www.alqassam.ps/arabic/operations2.php?id=51.
[99] *See* Appendix No. 1, pp. 182-215.

Engineer" of Hamas.[100] The article clearly indicates that he was a senior Hamas operative, who was imprisoned not only in Israel, but also by the Palestinian security forces in 1997.

Muhanad Tahar, "the chief 'Engineer' of the Hamas movement in the northern West Bank," was responsible for the deaths of 121 people. He was killed by the Israel Defense Forces on July 1, 2002.[101]

### 5) Official Hamas reports

In addition to the propaganda which is intended for the general public, Hamas also publishes "official" reports of its own, in which it takes responsibility for its terrorist attacks.

a.  **The Book of Hamas Martyrs:**[102] This document includes a clear statement that Hamas was responsible for sending out the terrorist: "Abd al-Baset Odeh, who carried out the terrorist attack on the Park Hotel."[103] Odeh's picture also appears in the virtual Book of Martyrs, which includes a list of Hamas operatives who were killed, along with pictures, identifying particulars and causes of death.

b.  **Al-Risalah Magazine**: Several months after the terrorist attack, the official magazine of Hamas, *al-Risalah*, included a long article about al-Sayed in the issue which was published on September 25, 2003. The article referred to al-Sayed as the "Lion of Hamas," the "Cavalryman of Izz al-Din al-Qassam," and the "Engineer." All of these descriptors show the great appreciation which was felt for al-Sayed by Hamas and his importance to the organization.[104]

c.  **Publications by al-Qassam**: The Information Office of the al-Qassam Brigades published a special booklet with a special report about the terrorist attack at the Park Hotel. The booklet provides complete details on each member of the cell, including his life history, his activities on behalf of Hamas and his individual photograph. The cell was referred to as the "Holy Revenge Cell." The report states that al-Sayed was the commander of the cell: "The man in charge of the Holy Revenge Cell, the Commander, a

---

[100] *See* Appendix No. 1, pp. 221-222.
[101] http://www.ynet.co.il/articles/1,7340,L-1972094,00.html.
[102] The Book of Hamas Martyrs, the official title of which is The Oasis of Martyrs, is a sort of virtual commemorative book in which Hamas publishes the photographs and histories of Hamas members who are killed. The book is divided into a number of subjects: Hamas members who were killed in suicide operations; Hamas members who were killed in cases other than suicide operations; women; and members of the Public Information Unit who were killed. Each page lists the name, particulars and life story of a person who was killed.
[103] http://www.alqassam.ps/arabic/operations2.php?id=51; *see also* Appendix No. 1, pp. 180-181; *see also* Appendix No. 1, pp. 228-230; *see also* Appendix No. 1, pp. 218-220.
[104] *See* Appendix No. 1, pp. 182-215; *see also* Appendix No. 1, pp. 218-220.

33

member of Izz al-Din al-Qassam, is the Engineer Abbas al-Sayed, the Lion of the al-Qassam Brigades, a mythological hero of history."[105]

The report is accompanied by pictures, which make it clear that each of the people photographed was a member of Hamas. For example, the photograph of Nasser Yataima (one of the junior members of the cell and the assistant of Mu'amar Shahruri)[106] shows him wearing a shirt and a hat with the Hamas emblem. Another picture shows him marching in a Hamas parade.[107]

Similarly, Muhanad Tahar's picture, which appears below on the right side, contains the Hamas emblem on the right and the Izz al-Din al-Qassam emblem on the left.



Hamas also devoted an article to Mu'amar Shahruri in a booklet describing the activity of the cell.[109] Mu'amar Shahruri was one of the members of the cell, whose role was to transport the terrorist to the scene of the terrorist attack. The article speaks of Shahruri's role in the terrorist attack on the Park Hotel.[110]

### 6) Additional corroborative material

**The procession**: In the afternoon of March 28, 2002, less than 24 hours after the terrorist attack, a symbolic funeral was held for Abd al-Baset Odeh in Tulkarem. Some 2000 Hamas members

---

[105] *See* Appendix No. 1, pp. 182-215.
[106] *See* Appendix No. 1, pp. 182-215.
[107] *See* Appendix No. 1, pp. 182-215.
[108] http://www.paldf.net/forum/showthread.php?t=642805.
[109] *See* Appendix No. 1, pp. 182-215.
[110] *See* Appendix No. 1, pp. 182-215; *see also* Appendix No. 1, pp. 231-250; *see also* Appendix No. 1, pp. 251-259.

participated in the event, which began at the central mosque and ended at the local cemetery. The mourners carried Hamas flags and called out slogans praising Odeh.[111]

### c. Official documents of the Government of Israel

#### 1) The ISA report[112]

"March 27, 2002 – an explosion by a suicide bomber at the Park Hotel in Netanya – 29 killed and 144 wounded. **The suicide bomber Abd al-Baset Odeh**, a resident of <u>Tulkarem</u>, **25 years old**, entered the Park Hotel in Netanya at a time when dozens of guests were celebrating the Passover seder meal and blew himself up. The terrorist attack was directed by the Hamas military infrastructures in Tulkarem and Nablus, headed by **Abbas al-Sayed** and **Muhanad Tahar**. Abbas al-Sayed, the person in charge of the terrorist attack from Tulkarem (detained), served as the head of the Hamas military presence in the area. Abbas confessed, in his interrogation, that he had been planning to carry out the terrorist attack for many months before, but that his plans had been postponed. It was Abbas who gave the order to the infrastructure operative **Mu'amar Shahruri** to obtain two explosive belts from the military infrastructure in Nablus, and it was he who proposed to **Fathi Khasib** to transport the suicide bomber to Israel and to locate a suitable target for the attack. Prior to the attack, Abbas and additional operatives from the infrastructure prepared Abd al-Baset Odeh to carry out the terrorist attack – the suicide bomber shaved off his beard, made up his face, put on a pair of women's blue jeans and women's shoes, wore a wig with straight hair, put on a brown shirt and a brown leather coat with a leopard skin collar – all this, in order to blend into crowded areas full of people in Israel. Abbas dressed the suicide bomber in the explosive belt, which looked like a khaki-colored vest with pockets, and which held 10 kg of explosives, and explained to him how it was to be detonated. After photographing the suicide bomber with an M-16 rifle against the background of the movement flag and pictures of martyrs, Abbas wrote the suicide bomber's will, which stated that he was going to carry out a terrorist attack on behalf of the Izz al-Din al-Qassam Brigades. In addition, Abbas provided the suicide bomber with a woman's identity card. **Muhanad Tahar**, a resident of Nablus, who served as the head of the Hamas military branch in Samaria (killed), was in charge of supplying the explosive belts from the infrastructure in Nablus to the infrastructure in Tulkarem. **Fathi Khasib**, a resident of Tulkarem (detained), confessed, in his interrogation, that he purchased a car in Israel, in which he transported the suicide bomber to Tulkarem, where the two of them switched to another car, and they drove away from there and entered Israel."

---

[111] <u>Yedioth Ahronoth</u>, March 29, 2002 (Appendix No. 1, p. 179).
[112] <u>http://www.pmo.gov.il/NR/rdonlyres/81819B47-FE6C-47C2-B000-77B9A7EB9A5A/0/%D7%97%D7%95%D7%91%D7%A8%D7%AA%D7%9E%D7%97%D7%91%D7%9C%D7%99%D7%9D%D7%9E%D7%AA%D7%90%D7%91%D7%93%D7%99%D7%9D%D7%91%D7%9C%D7%99%D7%AA%D7%9E%D7%95%D7%A0%D7%95%D7%AA1.doc</u>.

### 2) An official document written by the Prime Minister's media consultant in 2003

One year after the terrorist attack on the Park Hotel, in which 30 people were killed and approximately 140 people were wounded,[113] the Office of the Prime Minister published an official document summarizing the operation and the arrests which had been made following the operation.

Relying on my professional experience, I can testify that such documents are written based on all the information gathered from all the sources at the disposal of the Israeli government - and after they are reviewed by the cabinet members.

The report which was issued by the Office of the Prime Minister of Israel emphasized that the operation was carried out by Hamas, and that the people who had been in charge of carrying out the terrorist attack, including Abbas al-Sayed, Muhanad Sharim, Ali Hudri, Fathi Khasib, Mu'amar Shahruri and Nasser Yataima, were all members of the al-Qassam Brigades of Hamas and acted in accordance with the instructions which they had received from them.

### 3) Documents and legal proceedings in Israel

The claims of responsibility for the terrorist attack, which were issued by Hamas, were validated separately by the criminal proceedings in Israel, which commenced subsequent to the terrorist attack.

Four of the members of the cell (Fathi Raja Khasib, Mu'amar al-Sheikh (Shahruri), Muhanad Sharim and Nasser Yataima) were convicted by the Military Court of having participated in the planning and perpetration of the terrorist attack. The Court sentenced each of them to 29 concurrent life sentences.[114]

Mu'amar Shahruri was convicted by the Military Court in the West Bank of membership in Hamas, provision of assistance to Hamas, possession of weapons, perpetration of roadside shootings toward Israel Defense Forces troops, active participation in the cell which carried out the terrorist attack on the Park Hotel, purchasing the car which was used to transport the suicide bomber, and assistance in making the video tape of Odeh, in which he was seen reading his "will," and providing it to the media.[115]

During the course of the legal proceedings, a number of members of the cell confessed to their involvement in the terrorist attack.

---

[113]   http://www.pmo.gov.il/PMO/Communication/IsraelUnderAttack/Netanya-Park+Hotel. The 30th victim died a few days after the terrorist attack, in the hospital.
[114] *See* Appendix No. 1, pp. 89-91.
[115] *See* Appendix No. 1, pp. 89-91.

a.  Fathi Khasib made a confession, written out in his own handwriting, according to which he intentionally purchased the car in which he transported Odeh from the village of Nazlat Issa to Herzliya and to the scene of the terrorist attack.[116]

b.  Abbas al-Sayed confessed, in his interrogation, that he supervised the terrorist attack in Netanya and that he participated in the preparation of the explosive charge.[117] The confession was written out in Abbas al-Sayed's own handwriting and includes details with regard to his connections with the Hamas headquarters in Damascus and his involvement in the terrorist attack on the Park Hotel.

c.  During the course of his interrogation, Sharim revealed the location of weapons and an explosive belt, which were later found by the Israel Police at the location in question.[118]

d.  An additional member of the cell, who served as an assistant, Nasser Yataima, confessed to his role in the terrorist attack.[119]

### d. Additional corroborative material

I personally conducted an investigation with regard to the Park Hotel cell and I visited the prison in which al-Sayed is incarcerated. He is kept in a separate cell within the wing for Hamas inmates. His cell is more comfortable than other cells. It is equipped with a radio, a television set and a Walkman. He reads newspapers and keeps up his physical appearance. Other inmates whom I interviewed in 2006 spoke of him as a "commander." I also interviewed al-Sayed's wife a number of times. She described her husband as a senior Hamas operative. I also interviewed al-Sayed in prison. Unlike most Hamas operatives, he was careful not to boast of his terrorist activities; at the same time, he also did not declare his innocence.

### e. Summary of the terrorist attack on the Park Hotel

On the basis of the Hamas material on the subject, the reports by the ISA and the investigations by the Israel Police, and the convictions which were made as a result thereof, I conclude that the seven Hamas members who were primarily involved in the terrorist attack are the following:

### 1) Abd al-Baset Odeh – the suicide bomber

Abd al-Baset Odeh was a Hamas operative and a resident of Tulkarem, who worked at the Park Hotel in Netanya.[120] Prior to the terrorist attack, he was wanted by both the Palestinian security

---

[116] *See* Appendix No. 1, pp. 260-272.
[117] *See* Appendix No. 1, pp. 273-287.
[118] *See* Appendix No. 1, pp. 288-309.
[119] *See* Appendix No. 1, pp. 288-309.
[120] <u>Yedioth Ahronoth</u>, March 29, 2002 (Appendix No. 1, p. 179).

forces and Israel for approximately a year and a half.[121] On August 13, 2001, the ISA published a "Wanted" notice and officially informed the Palestinian Authority that it had issued a warrant for Odeh's arrest, on the grounds of his Hamas activity. In October 2001, Israel asked the Palestinian Authority to arrest him. The security of the Palestinian Authority attempted to arrest him, but informed Israel that it had failed.[122]

After the terrorist attack in March, Hamas published a complete biography of Odeh, in which it boasted of Odeh's membership in Hamas, which had begun in the initial days of the First Intifada.[123] According to the Hamas publication, his membership in Hamas began when he joined the *Shabibat Hamas* – the Hamas youth movement – at the age of 14.[124]

### 2) Abbas al-Sayed – the commander of the Hamas cell

Al-Sayed was the Hamas commander in Tulkarem, a city in the northern part of the West Bank. Al-Sayed commanded the cell which planned and perpetrated the terrorist attack on the Park Hotel.[125] Al-Sayed received instructions from the Hamas headquarters in Syria, which were passed on from the Head of the Political Bureau, Khalid Mishal.[126]

The activity of Abbas Al-Sayed, a graduate of the Yarmuk University in Jordan and a medical equipment engineer by profession, reflects how Hamas' military and political arms are entwined. On one hand, al-Sayed headed the Hamas military infrastructure in Tulkarem. On the other hand, he was in close contact with senior political and operational cadres[127] and was involved in a wide range of activities with a political, propaganda-related and organizational nature.

Al-Sayed's activity on both levels reflects the fact that Hamas makes no distinction between the political arm and the military branch. In my estimation, Abbas al-Sayed would not have carried out terrorist operations without obtaining the approval of Hamas headquarters in Damascus.

When the Second Intifada broke out in September 2000, al-Sayed served as an intermediary between Hamas' political headquarters and its military section, the al-Qassam Brigades. Shortly thereafter, he became the commander of Hamas' military wing in Tulkarem. The terrorist attack on the Park Hotel was the last in a series of murderous terrorist attacks, which al-Sayed directed

---

[121] http://web.archive.org/web/20071110160442/http://www.islamonline.net/arabic/news/2003-04/14/article16.shtml.
[122] Yedioth Ahronoth, March 29, 2002 (Appendix No. 1, p. 179).
[123] The term "First Intifada" is used throughout this report. This term refers to the violent conflict which broke out in December 1987 between the Palestinians and Israel. This part of the conflict has no "official" ending date, but it is generally considered to have ended with the signature of the Oslo Accords in 1993.
[124] *See* Appendix No. 1, pp. 180-181.
[125] Guy Aviad, Lexicon of the Hamas Movement, p. 171 (Appendix No. 1 p. 92); *see also* Appendix No. 1, pp. 273-287; *see also* Appendix No. 1, pp. 93-176.
[126] *See* Appendix No. 1, pp. 93-176.
[127] *See* Guy Aviad, Lexicon of the Hamas Movement, p. 171 (Appendix No. 1 p. 92); *see also* Appendix No. 1, pp. 218-220.

against Israeli civilians.[128] The attack was the largest terrorist incident for which al-Sayed was responsible, and indeed, Hamas made considerable efforts to reward him for it and to take responsibility for it.[129]

In addition to the supervision of the general planning of the terrorist attack, al-Sayed also gave more specific orders such as adding small metal ball bearings and strips of metal into the explosive charge, a method which Hamas had developed and which was intended to maximize the level of fatalities that are caused by its suicide bombers.[130]

Al-Sayed planned an additional terrorist attack, which was not carried out, involving the use of cyanide poison. During the course of his interrogation, he provided details on cyanide poison and revealed that the poison was already in his possession.[131]

### 3) Muhanad Tahar – the explosives "Engineer"

Tahar was a resident of Nablus, who headed the Hamas military branch in the northern part of the West Bank. He prepared the explosive charges and transferred them to Tulkarem, where they were picked up by the suicide bomber.[132] Tahar was also involved in the terrorist attack on the Sbarro Pizzeria in Jerusalem on August 9, 2001.[133] In that terrorist attack, 15 Israelis were killed and 110 wounded.[134] In addition, Tahar was further involved in the terrorist attack on the Dolphinarium discotheque on June 1, 2001,[135] in which 21 young Israelis were killed and 80 other people were wounded.[136]

Tahar was also arrested by the Palestinian Authority for his involvement in Hamas, but managed to operate in a relatively free manner, until he was killed by Israel Defense Forces troops on June 30, 2002 in the course of an attempt to arrest him. Hamas referred to him as the "Fourth Engineer," an appellation which indicates his superior status within the organization.[137]

Hamas refers to its explosives experts as "Engineers." When one Engineer is killed, his replacement is appointed. Yahya Ayash was the First Engineer; Muhi al-Din al-Sharif was the

---

[128] The previous terrorist attacks directed by al-Sayed were performed on Herzl Street and in the Hasharon Shopping Mall in Netanya. *See also* Appendix No. 1, pp. 93-176; *see also* Appendix No. 1, pp. 273-287; *see also* Appendix No. 1, p. 310.

[129] *See* Appendix No. 1, pp. 182-215, and Appendix No. 1, pp. 93-176.

[130] *See* Appendix No. 1, pp. 93-176, and Appendix No. 1, pp. 273-287.

[131] *See* Appendix No. 1, pp. 93-176.

[132] *See* http://www.terrorism-info.org.il/malam_multimedia/html/final/eng/sib/6_04/park_h.htm.

[133] *See* Guy Aviad, Lexicon of the Hamas Movement, page 111 (Appendix No. 1, p. 22).

[134] *See* Guy Aviad, Lexicon of the Hamas Movement, page 165 (Appendix No. 1, p. 311).

[135] *See* Guy Aviad, Lexicon of the Hamas Movement, page 111 (Appendix No. 1, p. 22). *See also* http://www.palestine-info.info/arabic/spfiles/suhada_2005/sh_Nables/mohanad.htm.

[136] *See* Guy Aviad, Lexicon of the Hamas Movement, page 77 (Appendix No. 1, p. 312).

[137] *See* Appendix No. 1, pp. 313-315.

Second Engineer; Abd el-Nasser Issa was the Third Engineer; Muhanad Tahar was the Fourth Engineer; and Abdallah Barghouti, who was Tahar's pupil, was the Fifth Engineer.[138]

### 4) Mu'amar Shahruri – al-Sayed's deputy

Shahruri was a mid-echelon Hamas operative, a resident of Tulkarem. He received the explosive charge from Tahar in Nablus and transferred it to Tulkarem, where the suicide bomber put it on before continuing to Netanya. Shahruri also video taped the suicide bomber, in order to provide proof of the attribution of the terrorist attack to Hamas.[139]

### 5) Muhanad Talal Sharim – Shahruri's deputy

Sharim helped Shahruri to photograph the suicide bomber; he prepared the posters glorifying the terrorist attack;[140] he provided a false identity card and met with the driver who transported Odeh to the target location; and he rented the video camera which was used to photograph the suicide bomber.[141] Sharim also helped prepare the woman's disguise which Odeh used to get into Netanya.[142] His activity in Hamas is described on the web page which is devoted to him on the Hamas web site.[143] His picture, with a rifle in his hand, appears at the top of the page. The web site gives details of 15 different occasions on which Tahar Sharim, who was one of the most senior Hamas members in Tulkarem, was arrested.

### 6) Ali Hudri – the contact person with Hamas headquarters

Hudri served as the contact person. He carried messages between Hamas headquarters in Nablus and the cell in Tulkarem.[144]

### 7) Fathi Khasib

Fathi Khasib took the suicide bomber, Odeh, from Tulkarem and transported him to Israel. Khasib then transferred Odeh to another car, with Israeli license plates, which he had purchased using a forged identity card. Khasib used that car to transport Odeh to the target location in Netanya.[145]

---

[138] *See* Appendix No. 1, pp. 221-222; *see also* Appendix No. 1, pp. 313-315.

[139] *See* Appendix No. 1, pp. 251-259; *see also* Appendix No. 1, pp. 203-222.

[140] Posters of this type are subsequently hung in the mosques and in the streets, with a view to glorifying the suicide bomber's actions.

[141] *See* Appendix No. 1, pp. 223-225. *See also* Appendix No. 1, pp. 288-309.

[142] *See* Appendix No. 1, pp. 223-225. *See also* Appendix No. 1, pp. 288-309.

[143] *See* Appendix No. 1, pp. 223-225. *See also* Appendix No. 1, pp. 288-309.

[144] *See* Appendix No. 1, pp. 288-309.

[145] *See* Appendix No. 1, pp. 260-272; *and see* Appendix No. 1, pp. 93-176.

**Diagram of the chain of command and perpetration of the terrorist attack on the Park Hotel**



**f. Conclusion**

The many detailed declarations which were issued by Hamas with regard to the terrorist attack on the Park Hotel, the boasting about the suicide bomber within the organization, and the profusion of praise which were given to the cell which planned and perpetrated the terrorist attack – all these, in and of themselves, would suffice to lead to the conclusion that Hamas carried out the terrorist attack. At the same time, the ISA conclusions on the basis of its investigations, the criminal convictions of the cell members, and their repeated public declarations expressing pride in the performance of the terrorist attack on the Park Hotel and other terrorist attacks – including documents in the handwriting of the cell members, describing their activity in the cell which carried out the attack – leave no doubt that this attack was carried out by Hamas.

**May 7, 2002 – the terrorist attack on the Sheffield Club, Rishon Le-Zion**

### a. The terrorist attack

On May 7, 2002, at approximately 11:00 p.m., Muhammad Jamil Nabil Muammar entered the Sheffield Club, a club that was operating without a permit in the Rishon Le-Zion industrial zone, carrying a bag full of explosives. When he detonated the explosive charge, there were approximately 70-80 people in the club. The explosion killed 15 people and wounded more than 50 others. Because the explosion caused structural damage to the club, it was not possible to reach many of the victims for hours, until the firefighters succeeded in clearing away the rubble with a crane.[146]

### b. Evidence and attribution by the court

### 1) The claiming of responsibility

A short time after the terrorist attack, Hamas announced on the Hezbollah television station in Lebanon, *al-Manar*, that it was responsible for the attack.[147] The official announcement bearing the name of the suicide bomber was officially published by Hamas, in the name of the al-Qassam Brigades, only in June 2008; the announcement contained details with regard to the terrorist attack in Rishon Le-Zion.[148]

"Military announcement on behalf of the Izz al-Din al-Qassam Brigades:

"In the footsteps of the holy fighters, Engineer Yahya Ayash, Hassan Salameh, Muhi al-Din al-Sharif, Adel Awadallah, Ayman Halawa and Muhanad Tahar, who sowed terror and fear in every place which was illegally seized by a Zionist, others have continued their way in order to pursue the way of Jihad and resistance… We have not published their names, as we have not published the details of many operations, until it became possible for us to do so from the standpoint of security.

"We of the al-Qassam Brigades now disclose, for the first time, after more than five years, the name of the fighter: the martyr, a member of the al-Qassam Brigades, the hero Muhammad Jamil Nabil Muammar, of Kfar Qarayut, a resident of Jordan, who carried out the suicide operation in Rishon Le-Zion on May 7, 2002. Our Jordanian *shahid* succeeded in passing through all of the

---

[146] http://www.ynet.co.il/articles/0,7340,L-1879252,00.html.

[147] http://www.ynet.co.il/articles/0,7340,L-1879252,00.html.

[148] http://www.ikhwanonline.com/Article.asp?ArtID=37880&SecID=231. In addition, Hamas distributed a photograph of Muhammad Jamil Muammar, with the results of the terrorist attack visible in the background; http://www.alqassam.ps/arabic/news1.php?id=9633.

barriers and entered a gambling club, carrying a bag full of explosives, which he detonated in the club. As a result, 20 Zionists were killed and 60 were wounded."[149]

The question which arises is why the suicide bomber's name was published five years subsequent to the terrorist attack. In my professional opinion, it appears that, because Muammar was a Palestinian who held Jordanian citizenship, Hamas headquarters preferred not to get his family into trouble in the context of the terrorist attack by publishing his name.[150]

I also agree with the explanation which appears on the Muslim Brotherhood web site,[151] according to which, a month before the publication of the announcement, around May 2008, the *al-Jazeera* television network on June 10, 2008 published an article on Palestinian inmates and missing people.[152] Muammar's name was mentioned in the article as one of the inmates or missing people who were being kept in Israel and whose fate was known to none. In response, Hamas decided to publish Muammar's name.


153


154

---

[149] Official announcement of the Izz al-Din al-Qassam Brigades containing the groups logo and claim of responsibility for the terrorist attack on the Sheffield Club, Rishon Le-Zion: http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=byan&id=1085.  *See also* http://www.alqassam.ps/arabic/news1.php?id=9633.   The notice was also published on the official web site of the Muslim Brotherhood: http://www.ikhwanonline.com/Article.asp?ArtID=37880&SecID=231.
[150] *See also* http://altakwa.net/forum/showthread.php?t=35620
[151] http://www.ikhwanonline.com/Article.asp?ArtID=37880&SecID=231.
[152] http://www.aljazeera.net/news/archive/archive?ArchiveId=1092604.
[153] http://www.ikhwanonline.com/Article.asp?ArtID=37880&SecID=231.
[154] http://www.alqassam.ps/arabic/news1.php?id=9633.

### 2) Material from the Hamas web site

In June 2008, the official web site of the al-Qassam Brigades devoted an extensive article to Muhammad Muammar, which featured his life story and included, among other things, a conversation with his father. The article also included an announcement by Hamas in the name of the al-Qassam Brigades, with regard to the perpetration of the terrorist attack, including publication of the original claim of responsibility.[155] The web site also published a detailed report on Abdallah Barghouti, which expressly stated that Barghouti operated on behalf of the al-Qassam Brigades. Barghouti was referred to as "the Commander" and "the Engineer." The article specifically mentioned the terrorist attack on the Sheffield Club and Abdallah Barghouti's role in the making of the explosive devices which were used at the time of the attack.[156]

Additionally, the official web site of the al-Qassam Brigades published in its virtual Book of Martyrs, a page devoted to Muhammad Muammar.[157]   The web site includes Muammar's life story and speaks about his family and emphasizes the letter of Muammar's father in which he says "We are all members of the Izz al-Din al-Qassam."[158]   The page further states that the attack was carried out in May 2002 but that the announcement claiming responsibility for the attack was delayed for security reasons.[159]   Muammar's page also includes a poster of him together with another terrorist and a picture of the Al Aqsa Mosque between them.[160]   Written on the poster is the phrase "Qassamiyoon [Members of the al-Qassam Brigades] do not know borders."

In addition to the claims of responsibility by Hamas itself, Waal Qassem, the commander of the terrorist cell which was behind this attack, described in a detailed article on the Hamas web site, how the operation was carried out by the al-Qassam Brigades, including a description of his own role in the implementation of the attack.[161] When the Israeli military court convicted Abdallah Barghouti in 2003, the official Hamas web site published a detailed article praising his activity in Hamas.[162]

### 3) The Hamas booklet

Hamas also published a booklet on the Internet, entitled "The Engineers of Death," which included a chapter on the terrorist attack in Rishon Le-Zion, including a timetable of the events, a

---

[155] http://www.alqassam.ps/arabic/news1.php?id=9633.

[156] *See* Appendix No. 1, pp. 316-323.

[157] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=sera&id=1085

[158] http://www.alqassam.ps/arabic/sohdaa5.php?id=1085.

[159] http://www.alqassam.ps/arabic/sohdaa5.php?id=1085.  In my professional opinion, when Hamas stated that the announcement claiming responsibility was delayed for "security reasons," this was a veiled reference to the fact that suicide bomber was a Jordanian national and relations between Hamas and the Hashemite Kingdom of Jordan during that time period were sensitive.

[160] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=picture&id=1085.

[161] *See* Appendix No. 1, pp. 324-328.

[162] http://www.palestine-info.info/arabic/feda/2004/bargothee.htm.

list of the names of the cell members and a biography of the suicide bomber, Muhammad Jamil Muammar.[163]

### 4) A poster of the suicide bomber

The poster, which was prepared after Muammar's death, shows a picture of the club. This is an additional proof of the link between the suicide bomber and the terrorist attack.[164]

### 5) The mourners' tent

Muammar's family members, who live in Zarqa, Jordan, set up a mourners' tent after members of Hamas called them and gave them details of the operation in Rishon Le-Zion. Upon receipt of the news of their son's death, the tent was set up and the family distributed sweets, as is customary upon the death of a "martyr."[165]

### c. Official documents of the Government of Israel

### 1) The ISA report for 2007

This report, which is entitled "Suicide Bombers in the Current Conflict," identifies the perpetrators of the terrorist attack on the Sheffield Club.[166] The following is the relevant portion of the report:

"May 7, 2002 – an explosion by a suicide bomber at a billiards club in Rishon Le-Zion, with 16 killed and 51 wounded. The suicide bomber, Muhammad Muammar, a resident of Qarayut/Nablus, 28 years old, of Jordanian origin, identified with Hamas, entered the Sheffield Club on Sakharov Street in the Rishon Le-Zion industrial zone at approximately 10:55 p.m., with a suitcase in his hand, and walked toward the center of the room, where people were clustered around the slot machines, and blew himself up. A declaration of responsibility for the terrorist attack was published on behalf of the Izz al-Din al-Qassam Brigades and also included threats to perpetrate additional terrorist attacks. The terrorist attack was carried out by the Hamas infrastructure in Ramallah, in cooperation with a Jerusalem cell; Muhammad Amran served as the contact person between Waal Qassem, a Hamas operative from Ras el-Amud, and Ibrahim Hamad, who heads the Hamas infrastructure in Ramallah. In actual fact, Amran passed on the instructions for the performance of the attacks and transferred the suicide bombers and the explosive charges."

---

[163] *See* Appendix No. 1, pp. 329-349.
[164] http://www.alqassam.ps/arabic/news1.php?id=9633.
[165] http://petra-boys.ahlamuntada.com/montada-f3/topic-t455.htm.
[166] *See* Appendix No. 1, pp. 350-434.

## 2) Announcements by the Government of Israel

a.   An announcement by the Government of Israel in 2002 with regard to the terrorist attack stated that 15 people had been killed and 55 wounded in a billiards club in Rishon Le-Zion, when a suicide bomber blew himself up on the third floor and caused part of the building to collapse. Hamas took responsibility for the terrorist attack.[167]

b.   An announcement by the Government in 2006 with regard to the terrorist attack states that Ibrahim Hamad, the head of the Hamas military branch in the West Bank, was responsible for the terrorist attack on the Sheffield Club.[168]

## 3) Official legal proceedings and documents

Seven Hamas operatives were charged with involvement in the terrorist attack on the Sheffield Club, including Abdallah Barghouti, who is known as "the Engineer," who was accused of having been a key figure in Hamas activity in the West Bank from 2002 until his arrest in March 2003.

Section 67 of the indictment against Barghouti describes the series of events which led to the explosion in the club in Rishon Le-Zion,[169] including the fact that Barghouti designed an explosive belt which was covered with an imitation leather belt made of fabric, to which screws and shampoo bottles full of explosives were glued.[170]

Prior to the commencement of Barghouti's trial,[171] Barghouti's attorney informed the Court that his client "understands the indictment and wishes to plead guilty." Prior to the verdict, Barghouti admitted that he had acted on behalf of Hamas and promised that Hamas would continue its war in order to destroy the State of Israel. He declared at the time, in court, that "Hamas will cause the State of Israel to fall apart, according to the vision of Ahmed Yassin," and added that he hoped that terrorist attacks, much harsher than those performed by him, would be carried out.[172] On June 1, 2003, Barghouti told the Court: "I plead guilty to that which has been attributed to me in the indictment."[173] On that basis, *inter alia*, of his guilty plea, the Court convicted Abdallah Barghouti[174] and sentenced him to 67 concurrent life sentences.[175]

---

[167] http://www.pmo.gov.il/PMO/Communication/IsraelUnderAttack/Rishon+Lezion/.

[168] http://www.pmo.gov.il/PMO/Communication/Spokesman/sbkspoke/shabak230506.htm.

[169] *See* Appendix No. 1, pp. 435-477.

[170] *See* Appendix No. 1, pp. 435-477 and Appendix No. 1, pp. 44-51; see also "For the Sake of Allah," in which Barghouti describes in detail how he prepared the belt.

[171] *See* Appendix No. 1, p. 479.

[172] *See* Appendix No. 1, pp. 44-51.

[173] *See* Appendix No. 1, p. 479.

[174] *See* Appendix No. 1, pp. 44-51.

[175] A spokesman for the military branch of Hamas, Abu Ubeida, declared in February 2009 that Hamas would not agree to any deal for the liberation of Gilad Shalit unless Israel agreed to release the senior Hamas operatives from

According to the indictment which was filed against Ibrahim Hamad, he commanded the al-Qassam Brigades in the Ramallah/Jerusalem sector, starting in 1999.[176] By virtue of his position, he recruited operatives, transferred funds and provided weapons and explosives.[177]

Hamad's deputy, Muhammad Arman, confessed, during his interrogation by the ISA, that he had received instructions from Hamad to prepare a major terrorist attack with a large number of casualties.[178] At Arman's request, Abdallah Barghouti prepared the explosive belt and the charge which were used in the terrorist attack. Arman placed the explosive belt on the suicide bomber's body and then brought him to Waal Qassem. Qassem dispatched him to the club in Rishon Le-Zion.[179] In the course of the judicial proceedings, Arman expressed his pride in having had the privilege of carrying out a role in this attack.[180] Arman was also convicted, *inter alia*, on the basis of his guilty plea.[181]

Waal Qassem, Wisam Abbasi, Muhammad Odeh and Ala al-Din Abbasi were all accused in the same indictment. Paragraph 5 of the indictment describes the chain of events which led to the perpetration of the terrorist attack in Rishon Le-Zion and states that they were members of the al-Qassam Brigades of Hamas.[182]

Each of the four pled guilty and was convicted by the court. Waal Qassem was sentenced to 35 concurrent life sentences. Wisam Abbasi was sentenced to 26 concurrent life sentences. Muhammad Odeh was sentenced to four concurrent life sentences. Ala al-Din Abbasi was sentenced to 60 concurrent life sentences.[183]

The four expressed no remorse in court for their terrorist activity. In fact, quite the opposite is true: Waal Qassem, who spoke on behalf of the four, expressed pride in their operations and called upon others to follow in their footsteps.[184]

---

prison in Israel. The Hamas spokesman gave three names, the first of which was that of Abdallah Barghouti (Ha'aretz, February 15, 2009). On March 17, 2009, the Government of Israel announced that it did not intend to free a number of senior terrorists, including Abdallah Barghouti, as part of any deal in the Shalit matter. The Government explained that "Abdallah Barghouti was convicted and sentenced to 67 concurrent life sentences for involvement in terrorist attacks, in which 66 civilians were killed and 500 wounded." (http://www.news-israel.net/Article.asp?Code=15065).

[176] Indictment against Ibrahim Hamad, Prosecution File 3181/6, Military Court of Judea (Appendix No. 1, pp. 24-43 and 1108-1125).

[177] *Id.*

[178] *Id.*

[179] *See* Appendix No. 1, pp. 480-510; and *see also* Appendix No. 1, pp. 324-328.

[180] *See* Appendix No. 1, pp. 480-510.

[181] *See* Appendix No. 1, pp. 512-523.

[182] *See* Appendix No. 1, pp. 524-551.

[183] *See* Appendix No. 1, pp. 524-551.

[184] *See* Appendix No. 1, pp. 524-551.

#### d. Additional corroborative material

### 1. The Palestinian Inmates' Club[185]

Ibrahim Hamad, Muhammad Arman, Abdallah Barghouti and Waal Qassem are registered in the Inmates' Club as members of Hamas. I received these details from Ziad Abu Ein, the Head of the Inmates' Club in Ramallah and the Deputy Minister for Inmate Affairs in the Palestinian Authority.

### 2. Interviews with members of the "Silwan Cell"

I met Abdallah Barghouti personally in the Beersheba Prison, where he is incarcerated in the segregated Hamas inmates' wing. The interview with him took approximately three hours. Abdallah Barghouti appeared comfortable, spoke fluently and emphasized that his participation in the terrorist attack on the Sheffield Club was in the name of Hamas and according to the instructions of Hamas headquarters in Ramallah and Nablus. He also stated that, at the time, he had been in ongoing contact with the Hamas leadership in Damascus. Abdallah Barghouti described to me, in extensive detail, how he had prepared the explosive belt which was used in the terrorist attack.[186]

During the interview which I held with him, Barghouti did not express any remorse for his operations.[187] In fact, in another interview for Israel Television, he expressed pride in his operations.[188]

I also interviewed Waal Qassem, the commander of the "Silwan Cell," which carried out the terrorist attack, in Gilboa Prison, where he is incarcerated in the Hamas inmates' wing. The conversation with him was videotaped and was conducted without the presence of a guard. He appeared open, free, proud of his membership in Hamas and of the terrorist operations which he had performed; he freely told me how he had transported the suicide bomber to the club in Rishon Le-Zion.[189] The interview which I conducted focused on the terrorist attacks which the Silwan Cell had perpetrated at the Hebrew University of Jerusalem and in Café Hillel; nonetheless, in the course of the conversation, we also spoke of the dispatch of the suicide

---

[185] The Palestinian Inmates' Club is an established organization which operates in the Palestinian Territories and is in charge of maintaining ongoing contact with the inmates in the prisons and their families. The Inmates' Club acts in cooperation with the Palestinian Ministry for Inmate Affairs. Every few months, the Inmates' Club, which is funded by the Palestinian Authority, publishes a report on the number of inmates and their distribution by organizations. The institution maintains branches in all of the cities in the West Bank and the Gaza Strip.

[186] "For the Sake of Allah" (Appendix No. 2).

[187] *Id.*

[188] Israel Television, Channel 2, March 18, 2009. *See*: http://www.mako.co.il/news-channel2/Channel-2-Newscast/Article-49328a9b0ca1021004.htm.

[189] "For the Sake of Allah" (Appendix No. 2).

bomber to the club in Rishon Le-Zion.[190] As mentioned above, Waal Qassem also gave an interview, from prison, to the official web site of the al-Qassam Brigades, in which he expressed pride in his Hamas membership and stated that he had been active for many years in the military branch of the organization.[191]

### e. Summary of the terrorist attack on the Sheffield Club

#### 1. Ibrahim Hamad: Commander of the al-Qassam Brigades in Ramallah

Ibrahim Hamad received the order to carry out a terrorist attack from the leadership in Damascus. At the time, Hamad ordered his deputy, Muhammad Arman, to make contact with the appropriate operatives, to provide the suicide bomber with explosives and to coordinate the operations of the cells in Ramallah and Jerusalem.[192] [193] Hamad was wanted by the Israeli security forces for more than five years.[194]

#### 2. Muhammad Hassan Arman

Arman was recruited to Hamas by Ibrahim Hamad at the end of 2001 and was known by the *nom de guerre* of "Abu Mu'az."[195] He was responsible for recruiting operatives to the organization, and by virtue of his position as a contact person, he transferred $1500 every month to Waal Qassem, out of the funds which he received from Ibrahim Hamad.[196]

As the contact person with the Jerusalem cell, Arman asked Qassem to locate places for the performance of terrorist attacks.[197] In addition, Arman transferred explosives to the Jerusalem cell. He himself underwent training by Abdallah Barghouti in order to become an expert in the preparation of explosive belts and explosive charges.[198] As a Hamas operative in the city, he also took part in laying explosive charges, purchased weapons and even attempted to manufacture a Qassam rocket.[199]

---

[190] *Id.*

[191] *See* Appendix No. 1, pp. 324-328.

[192] Maariv (May 24, 2006) (Appendix No. 1, p. 552); Yedioth Ahronoth (May 24, 2006) (Appendix No. 1, p. 553); Ha'aretz (May 24, 2006) (Appendix No. 1, pp. 554-555). *See also*: http://www.ynet.co.il/articles/0,7340,L-3254047,00.html. All of the articles mention Hamad as the head of the military section of Hamas in the West Bank. The articles were based on an official declaration by the Israel Defense Forces Spokesman and on the declaration by the ISA.

[193] *See* the transcript of the Military Court of Judea, November 30, 2003, File 3925/02 (in Appendix No. 1, pp. 52-57).

[194] http://www.pmo.gov.il/PMO/Communication/Spokesman/sbkspoke/shabak230506.htm. *See also* http://www.haaretz.com/news/idf-arrests-most-wanted-hamas-bomb-mastermind-in-west-bank-1.188413.

[195] *See* Appendix No. 1, pp. 480-510.

[196] *See* Appendix No. 1, 480-510. *See also* indictment against Ibrahim Hamad, Prosecution File 3181/6, Military Court of Judea (Appendix No. 1, pp. 24-43 and 1108-1125).

[197] *See* Appendix No. 1, pp. 480-510.

[198] *Id.*

[199] *Id.*

Wisam Abbasi, one of the members of Waal Qassem's cell, worked in Rishon Le-Zion and was familiar with the Sheffield Club. He recommended carrying out the terrorist attack there.[200]

Under the guidance of Waal Qassem, Wisam Abbasi and Ala al-Din Abbasi, two members of the Jerusalem cell, evaluated the target location and reported that many people attended the club and that there was no security presence there. After the target location was agreed on, Ibrahim Hamad began to plan the quickest route for transporting the suicide bomber to the target.[201] He then instructed Abdallah Barghouti (the senior explosives expert of Hamas in Ramallah)[202] to prepare two explosive charges – one explosive belt and a bag with explosives which was intended to increase the effect of the explosion in order to cause a greater number of casualties.[203]

### 3. Muhammad Jamal Muammar – the suicide bomber

The Hamas headquarters in Nablus then chose Muhammad Muammar and sent him to Ramallah, where he met Ibrahim Hamad and Muhammad Arman,[204] commanders of the al-Qassam Brigades of Hamas in Ramallah. Arman fitted Muammar with the explosive belt and gave him a bag with an explosive charge. Waal Qassem, the commander of the Jerusalem cell, then transported the suicide bomber to the club in Rishon Le-Zion. At the request of Waal Qassem, an additional Hamas operative, Wisam Abbasi, identified the exact location of the club for the suicide bomber and explained that this was the place where the terrorist attack was to be carried out.[205]

### 4. Abdallah Barghouti – the preparer of the explosive charge

Abdallah Barghouti was arrested by the Israelis in Ramallah in March 2003. On November 30, 2004, he was sentenced to 67 life imprisonments for the murder of 66 Israeli civilians and the wounding of 500 more. He built the explosive charges which were used in many terrorist attacks, including the explosive charges used by the "Silwan Cell" of Hamas in its preparations for the terrorist attack on the Sheffield Club and for the terrorist attack at the Hebrew University. When

---

[200] Indictment against Ibrahim Hamad, Prosecution File 3181/6, Military Court of Judea (Appendix No. 1, pp. 24-43 and 1108-1125).

[201] *See* the transcript of the Military Court of Judea, November 30, 2003, File 3925/02 (in Appendix No. 1, pp. 52-57); see also the transcript of the Military Court in Beth El, File 3380/03 (in Appendix No. 1, pp. 44-51); *see also* Appendix No. 1, pp. 480-510.

[202] *See* "For the Sake of Allah" (Appendix No. 2); *see also* the transcript of the Military Court in Beth El, File 3380/03 (Appendix No. 1, pp. 44-51); *see also* the indictment against Ibrahim Hamad, Prosecution File 3181/6, Military Court of Judea (Appendix No. 1, pp. 24-43 and 1108-1125).

[203] *See* Appendix No. 1, pp. 299-319; *see also* the indictment against Ibrahim Hamad, Prosecution File 3181/6, Military Court of Judea (Appendix No. 1, pp. 24-43 and 1108-1125); *see also* "For the Sake of Allah" (Appendix No. 2).

[204] Indictment against Ibrahim Hamad, Prosecution File 3181/6, Military Court of Judea (Appendix No. 1, pp. 24-43 and 1108-1125).

[205] *See* Appendix No. 1, pp. 524-551.

I personally interviewed Barghouti, he explained in detail his role in the preparation of the explosive charges which were used by the "Silwan Cell" in the terrorist attack on the Sbarro Pizzeria in 2001, and claimed that he had been the one to choose the location of the terrorist attack on Café Moment in 2002.

### f. Conclusion

The many detailed declarations which were issued by Hamas with regard to the terrorist attack on the Sheffield Club, the boasting about the suicide bomber within the organization, and the profusion of praise which was heaped upon the cell which planned and implemented the terrorist attack – all these, in and of themselves, would suffice to lead to the conclusion that Hamas carried out the terrorist attack. At the same time, the ISA conclusions on the basis of its investigations, the criminal convictions of the cell members, and their repeated public declarations expressing pride in the performance of the terrorist attack on the Sheffield Club and other terrorist attacks leave no doubt that this attack was carried out by Hamas.

**July 31, 2002 – the terrorist attack on the cafeteria of the Hebrew University of Jerusalem**

### a. The terrorist attack

On July 31, 2002, at 1:37 p.m., an explosive charge which had been placed in the center of the Frank Sinatra Cafeteria at the Hebrew University was remotely detonated, causing the ceiling to collapse on the students and lecturers in the cafeteria. The terrorist attack caused the death of nine people and the severe wounding of at least 70. Among the dead were four American students, who had come to study in Israel.

### b. Evidence and legal attribution

#### 1) The assumption of responsibility

Almost immediately after the terrorist attack, an announcement was sent to the media – and to me as well, in my capacity as a journalist for Yedioth Ahronoth – which stated as follows: "The operation at the Hebrew University of Jerusalem is part of a settlement of accounts. The Izz al-Din al-Qassam Brigades announce their responsibility for the detonation of the explosive charge at the Hebrew University of Jerusalem."[206]

In the announcement, Hamas expressed its pride in the terrorist attack and emphasized that this was only one in a series of terrorist attacks which the organization was planning. The emblem of the Izz al-Din al-Qassam Brigades appeared at the top of the page. To the right of the emblem were the words: "The Izz al-Din al-Qassam Brigades," in Arabic; the same words, in English, appeared to the left.[207]

In speaking of the terrorist attack on the Hebrew University, the Hamas spokesman, Mahmud al-Zahar, stated as follows: "I propose to the Government of Israel that it think long and hard about whether it intends to continue to strike, because if it continues to do so, it will continue to encounter resistance of this type until the end of the occupation."[208] Following the terrorist attack on the cafeteria at the Hebrew University, Dr. Abd al-Aziz al-Rantisi, the No. 2 man in Hamas in those days stated that: "The Zionists are paying the price for their terrorist operations, and the operation at the University is part of the response to the killing of Salah Shehadeh."[209]

In order to publicize its involvement in the terrorist attack throughout the Arab world, Hamas declared its responsibility for the attack via the *al-Jazeera* network as well, stating that the attack

---

[206] Original announcement of the Izz al-Din al-Qassam Brigades (*see* Appendix No. 1, p. 556).
[207] Appendix No. 1, pp. 556. *See also* Appendix No. 1, pp. 557-558.
[208] http://www.haayal.co.il/story_1100.
[209] http://vb.mwaheb.net/4535.

had been carried out in response to the elimination of Salah Shehadeh a few days previously.[210] "We will continue the struggle," stated the Hamas announcement.

On August 1, 2002, the official web site of the Izz al-Din al-Qassam Brigades posted an article, in which he declared that: "The quality operation was planned by the Izz al-Din al-Qassam Brigades."[211]

### 2) Photographs

In order to express its pride in the results of the operation, the official web site of the Izz al-Din al-Qassam Brigades published a number of photographs from the scene of the terrorist attack after it took place.[212] The publication of photographs by Hamas, even if they were taken from the Israeli press or from photography agencies, was intended for internal purposes – to show the Palestinian public the results of the terrorist attack, and were intended for the Israeli public, in order to terrorize it. Based on experience gained from cases of terrorist attacks, Hamas uses the photographs in order to glorify and to emphasize the results of its operations.

### 3) The official Hamas report

In many cases, as soon as its terrorist cells are exposed and the members of the cell are arrested by the Israeli authorities, Hamas publishes a report in which it describes the relevant activities of the cell and the structure of the cell. After the terrorist attack on the Hebrew University, when the members of the Silwan Cell had been arrested, the commander of the military arm in Ramallah, Muhammad Arman (Ibrahim Hamad's deputy), wrote a detailed report on the activities of the cell. The report was in line with the descriptions which arose from the interrogations of the cell members after their arrest. Because the Hamas report was published after the arrests and interrogations of the cell members, the report corroborates and confirms the fact that Hamas was responsible for this attack.[213]

The report stated, *inter alia*:

"[Title:] The quality operation at the Hebrew University

Type of activity: remotely detonated explosive charge.

Destination mechanism: by means of a cellular telephone.

Date of the operation: Wednesday, July 31, 2002, at 1:30 p.m.

---

[210] http://www.haayal.co.il/story_1100; http://www.ynet.co.il/articles/1,7340,L-2032435,00.html.
[211] http://www.alqassam.ps/arabic/news1.php?id=11412.
[212] http://www.alqassam.ps/arabic/operations2.php?id=23; http://www.alqassam.ps/arabic/operations_images.php?id=23.
[213] *See* Appendix No. 1, pp. 329-349.

53

Place of the operation: The cafeteria of the Faculty of Law at the Hebrew University in occupied Jerusalem.

Losses to the enemy: At least nine people killed and 100 wounded.

Organization executing the attack: The Izz al-Din al-Qassam Brigades."[214]

### c. Official documents of the Government of Israel

1.  The Office of the Prime Minister of Israel published its evaluation as to the source of the terrorist attack on the Hebrew University: "The Hamas headquarters in Ramallah recruited and handled an East Jerusalem cell for the purpose of carrying out murderous terrorist attacks and horrendous suicide bombings within Israeli territory. The headquarters in Ramallah, before and after Operation Defensive Shield, was involved in locating and recruiting suicide bombers, transporting them over the 'seam line' to Israeli territory with the help of members of the East Jerusalem cell, preparing the explosive charges and transferring them to the Jerusalem cell for use. In addition, the Hamas headquarters determined the targets for the terrorist attacks." This announcement stated the names of the cell members: Waal Qassem, 31, a resident of East Jerusalem, the cell leader, was involved in all of the terrorist attacks; Wisam Abbasi, 25, a resident of Silwan, who collected information on the targets for the terrorist attacks and served as an assistant to the cell commander; Ala al-Din Abbasi, 30, a resident of Silwan, who collected information on the targets for the terrorist attacks; and Muhammad Odeh, 29, a resident of Silwan, who placed the charge at the university.[215]

2.  During the month of March 2009, at the time of the negotiations for the release of Gilad Shalit, the Government of Israel published a list of inmates which it refused to release as part of the deal. Among the names of those inmates were Abdallah Jamal Barghouti, Muhammad Hassan Ahmad Arman and Ibrahim Hamad; the list stated that they had been responsible, *inter alia*, for performing the terrorist attack on the university.[216]

### d. Findings of the United States Government

According to the Department of the Treasury of the United States: "The Hamas terrorist attack on the cafeteria on the Hebrew University campus, which led to the death of nine people,

---

[214] http://www.alqassam.ps/arabic/operations2.php?id=23.

[215] http://www.pmo.gov.il/PMO/Archive/Spokesman/2002/%D7%90%D7%95%D7%92%D7%95%D7%A1%D7%98/Spokesman7147.htm.

[216] http://www.pmo.gov.il/NR/rdonlyres/1EED1581-0DD5-41A7-87DE-9B37BE6EFFD9/0/prisoners.doc. *See also* http://www.haaretz.com/hasite/spages/1071742.html.

including five American citizens, reflected the willingness of Hamas to perform operations in areas which are visited by people from Western countries, including United States citizens."[217]

### e. Additional corroborative material

1. The official Hamas web site published a booklet called "The Engineers of Death," which includes a report on the operations of the Jerusalem cell, including the report on the terrorist attack on the Hebrew University.[218]

2. During the course of the interview which I conducted personally with Waal Qassem, he bragged to me about his membership in Hamas and of the fact that he detonated the explosive charge which had been used in the terrorist attack. He told me that he was disturbed about the fact that the terrorist attack would not be as successful as a suicide bombing.[219]

3. Subsequently, Qassem was the object of an extensive article on the Izz al-Din al-Qassam Brigades web site. In the article, he talked about his membership in Hamas and his activity in the al-Qassam Brigades. He was presented in the interview as the "commander of the Silwan Cell in Jerusalem." The article was written in the form of an interview composed of questions and answers. The article was entitled: *"Inmate Waal Mahmoud Qassem, commander of the Silwan Cell, tells of his experience in the al-Qassam Brigades."* During the interview, Waal Qassem carried out the terrorist attack on the university cafeteria, and emphasized that: "Hebrew University is one of the centers of Zionist philosophy, politics and ideology; it is built on one of the most beautiful hills of Jerusalem… and accordingly, the operation was carried out by the Izz al-Din al-Qassam Brigades… The one who placed the charge was Muhammad Odeh. Praise Allah, we succeeded in operating according to plan." Waal Qassem stated in the interview that the terrorist attack on the cafeteria had been carried out according to instructions received from headquarters.[220]

### f. Summary of the terrorist attack on the Hebrew University

In early July 2002, the Hamas commander on the West Bank, Ibrahim Hamad, notified his deputy, Muhammad Arman, of his intention to take revenge against Israel for the killing of Salah Shehadeh, who had been one of the senior military leaders of Hamas and who had been responsible for a number of suicide bombing attacks against Israeli civilians.[221]

---

[217] http://www.ustreas.gov/offices/enforcement/key-issues/protecting/charities_execorder_13224-e.shtml#h.
[218] *See* Appendix No. 1, pp. 329-349.
[219] Testimony by Waal Qassem in the documentary film "For the Sake of Allah" (Appendix No. 2).
[220] *See* Appendix No. 1, pp. 324-328.
[221] Indictment against Ibrahim Hamad, Prosecution File 3181/6, Military Court of Judea (Appendix No. 1, pp. 24-43 and 1108-1125).

Arman contacted Waal Qassem, the commander of the Jerusalem cell of Hamas, which was directly subordinate to the Hamas headquarters in Ramallah, and asked him to select the appropriate location for a terrorist attack with a large number of casualties.[222] Qassem consulted with members of his cell and one of them, Muhammad Ishaq Odeh, suggested that the terrorist attack should be carried out at the Hebrew University of Jerusalem. Odeh had worked in the past as a painter at the University, and had kept the campus entry pass which was issued to him.

The suggestion of executing the terrorist attack at the university was passed on from the commander of the Jerusalem cell, via Arman, to Hamad. After Hamad approved the target location, he organized everything which was necessary for Muhammad Arman to obtain the required explosives from Abdallah Barghouti: a detonator, acetone, chloroform and hydrogen peroxide for use in the preparation of an explosive compound, which would be stored in three shampoo bottles.[223] The detonator was composed of two cellular telephones – one of which was attached to the charge and the second was used as a detonation mechanism.

On July 28, 2002, the charge was transferred from Arman to Qassem. Qassem, together with Odeh – another member of the cell – transported the charge to Jerusalem.

According to the original plan, Odeh was supposed to sneak the explosive charge into the university and to place it in the cafeteria – an especially crowded place. Qassem, the cell leader, was then supposed to detonate the charge.

After the first failed attempt, the plan was changed and Arman was appointed to place the explosive charge in the cafeteria. Muhammad Odeh succeeded in penetrating the security and placed the charge on a chair in the Frank Sinatra Cafeteria. After he did so, he left the university and met with Waal Qassem. At about 1:30 p.m., Waal Qassem detonated the explosive charge from a remote location, by means of a cellular telephone.[224]

The cell members planned to carry out additional terrorist attacks in the Tzavta Club in Tel Aviv, in a restaurant in the Ein Kerem neighborhood of Jerusalem, an additional terrorist attack on the Sbarro restaurant in Jerusalem, and a terrorist attack in Ein Gedi. According to the indictment, Waal Qassem was asked by his Palestinian handlers in Hamas to collect information on the Tzavta Club in Tel Aviv and to check whether it would be possible to carry out a terrorist attack there. For that purpose, the handler on behalf of the headquarters in Ramallah, Muhammad Arman, gave Waal Qassem a piece of cardboard, with the words "Tzavta Club" written in Arabic on one side and, on the other, the number of the cellular telephone which was attached to the explosive charge which was intended to be used in the future terrorist attack.[225]

---

[222] *See* Appendix No. 1, pp. 435-477.

[223] Indictment against Ibrahim Hamad, Prosecution File 3181/6, Military Court of Judea Judea (Appendix No. 1, pp. 24-43). *See also* Appendix No. 1, pp. 435-477.

[224] *See* Appendix No. 1, pp. 435-477.

[225] http://www.fresh.co.il/dcforum/Scoops/26680.html.

### g. Summary

The many detailed declarations which were issued by Hamas with regard to the terrorist attack on the Hebrew University, the boasting about the operatives within the organization, and the profusion of praise which was given to the cell that planned and executed the terrorist attack – all of these, in and of themselves, would suffice in order to lead to the conclusion that Hamas carried out the terrorist attack. At the same time, the ISA conclusions on the basis of its investigations, the criminal convictions of the cell members, and their repeated public declarations expressing pride in the performance of the terrorist attack on the Hebrew University and other terrorist attacks leave no doubt that this attack was carried out by Hamas.

**January 29, 2003 – the roadside shooting attack on Road 60**

**a. The terrorist attack**

Road 60, which begins on Mount Hebron and ends in Nablus, is a road on which many roadside shooting attacks have been carried out over the years.

On January 29, 2003, Jacob Steinmetz and his wife Deborah were driving from Jerusalem to their home in Maale Levona. On the way, they passed through Ofra, where they picked up Esther Kinarti and her eight year old son, Dvir Nisan Kinarti. About 2 km south of Ofra, two terrorists, who were lying in an ambush, fired weapons at the car. Jacob Steinmetz and Nisan Kinarti were hit by the shots.



הרכב עליו ירו המחבלים מהמארב, סמוך לעופרה          (צילום: דובר צה"ל)

[Photo caption: "The vehicle which was shot at by the terrorists from the ambush, near Ofra. (Photography: Israel Defense Forces Spokesperson)"]

The photo was taken by the IDF Spokesperson and published in <u>Yedioth Ahronoth</u> on January 30, 2003.

The two perpetrators of the shooting attack, Farah Hamad and Yasser Hamad, escaped after the attack in a getaway car.[226] They were members of the Silwad Cell of Hamas and operated in accordance with instructions which were issued on behalf of the Hamas headquarters in Ramallah. The Silwad Cell operated for a long period of time, planned a series of terrorist attacks

---

[226] *See* Appendix No. 1, pp. 559-596. *See also* Appendix No. 1, pp. 597-614.

including a suicide attack, and carried out a series of terrorist attacks according to instructions from Hamas headquarters.[227]

### b. Evidence and legal attribution

#### 1) The assumption of responsibility

a)  An extensive article about the operations carried out in the Ramallah area by the shooting cells which were captured by Israel, including the Silwad Cell, was published on the official Hamas web site. The report was apparently written early in 2004, after the arrest of the cells. The report includes a chapter on the Silwad Cell, including the names of the cell members and the operations which they performed.[228]

b)  A Hamas report which was published on February 15, 2006 listed the operations carried out by the organization, including the roadside shooting attack on Road 60 on January 29, 2003, which was described as "one of the heroic operations by Hamas." The report gave information on "the principal terrorist attacks carried out by the Silwad Cell... January 29, 2003 – an armed attack, involving the use of machine guns, near Ofra, targeted a car belonging to 'settlers.' During the attack, two 'settlers' were wounded."[229]

#### 2) Hamas reports

a)  A special report by Hamas on the "military" operations in the Ramallah area (including the terrorist attack on Road 60) described three separate cells which operated parallel to each other at the time of the attack. The report gave complete details on the cell members and the operations which they carried out.[230] One cell, which operated in Kfar Kubar, numbered six terrorists and carried out three roadside shooting attacks. A second cell, which operated in Mazra'a al-Sharqiyya, numbered six terrorists and carried out five terrorist operations. A third cell, which operated in Silwad, numbered five terrorists and carried out six terrorist attacks. In each cell, there was a division of roles: one team which collected intelligence and made observations, another team which fired the weapons and yet another team which was in charge of the getaways.[231] The report includes details which were supported by the Israeli intelligence services and accordingly strengthens its reliability.

---

[227] *See* Appendix No. 1, pp. 615-631.
[228] *See* Appendix No. 1, pp. 632-635.
[229] http://www.palestine-info.info/arabic/Hamas/glory/ramalah.htm.
[230] *See* Appendix No. 1, pp. 632-635.
[231] http://www.palestine-info.info/arabic/Hamas/glory/ramalah.htm.

b)   After the capture of the Silwad Cell in December 2003,[232] an official Hamas announcement reported on the activity of the cell, stating that the cell had performed an ambush on the "settlers" on January 29, 2003. "The terrorist attack was carried out through the use of machine gun fire. The target was a car which belonged to a resident of Ofra."[233]

c)   According to the Hamas report, three members of the Silwad Cell (Khaled Omar, Muayad Hamad and Hamad Khaled) were veteran Hamas operatives. Jasser Barghouti was the cell commander and reported directly to Sayed Sheikh Qassem, a senior Hamas operative in the Ramallah district and the third most important senior operative in the al-Qassam Brigades in the West Bank. Sayed Qassem himself was under the direct command of Ibrahim Hamad, the head of the al-Qassam Brigades in the West Bank, who received his orders from the Hamas military headquarters in Damascus.[234]

d)   A report which was published on February 14, 2006 stated:

"After checking out the Sinjal junction on Road 60, along which the 'settlers' were traveling, the *mujahidin* [Jihad fighters] Muayad Hamad, Yasser Hamad, Farah Hamad and Khaled al-Najjar went into action and waited for the target to arrive – a car with four passengers. When the appropriate target came over the horizon, the cell commander instructed the other Jihad fighters to prepare to begin firing. When the car reached the appropriate coordinates, the Jihad fighters began firing without mercy at the car from very close range, not more than a few meters. The attack ended with one of the 'settlers,' Dvir Nisan Kinarti, severely wounded and permanently paralyzed, due to injuries to his spinal cord. Another 'settler,' Jacob Steinmetz, was severely wounded; his arm was shattered from the elbow down."[235]

e)   The official Hamas magazine, <u>Filasteen al-muslima</u>, devoted an extensive article to the Silwad Cell. In that article, the magazine exposed that the terrorist attack which took place on January 29 was carried out by the Silwad Cell. The article gave the names of all of the cell members.[236]

---

[232] http://www.mfa.gov.il/MFA/Government/Communiques/2003/ISA%20and%20IDF%20Arrest%20Ramallah%20Area%20Hamas%20Cells%20-%2023-.

[233] *See* Appendix No. 1, pp. 632-635.

[234] *Id.*

[235] http://www.paldf.net/forum/showthread.php?t=50548;
*See also* http://www.paldf.net/forum/showthread.php?t=72376;
*See also* http://www.alkotla.info/vb/archive/index.php/t-4461.html;
*See also* http://muntada.islamtoday.net/36205-post4737.html;
*See also* Appendix No. 1, pp. 636-640.

[236] http://www.fm-m.com/2004/feb2004/story7.htm.

f)    The Hamas web site glorified the shooting operations which were performed by the cell, and characterized the cell as "outstanding, with a high level of capability, a high level of planning, sophistication and total secrecy." The article on the Hamas web site boasted that the cell members had carried out scores of shooting attacks, with none of their members wounded. The article lists the names of the following cell members:[237]

   a)    Ahmad Mustafa Najjar, 27, an American citizen, recruited to Hamas while in prison in Israel.

   b)    Khaled Mu'az Omar, 27, formerly imprisoned, active in the Hamas movement.

   c)    Muayad Shukri Hamad, 27, formerly imprisoned, active in the Hamas movement.

   d)    Ahmad Khaled Hamad, 28, a resident of Silwad.

   e)    Farah Ahmad Hamad, 27, a resident of Silwad.

### c. Official documents of the Government of Israel

#### 1) Judicial proceedings and legal documents in Israel

a.    Section 19 of the indictment against Jasser Barghouti states that the cells under his command fired weapons at vehicles on the roads of the West Bank.[238] The indictment exposes the *modus operandi* used by the cell: the operatives used two cars in order to prepare the ambush. The first car drives to the planned location of the ambush and determines whether there are any Israel Defense Forces troops in the area. If there are no troops in the vicinity, they inform the second car, which carries the sharpshooters and the weapons which will be used during the terrorist attack. At that point, the second car drives to the planned location of the ambush. The indictment also accuses Barghouti of paying the cell members NIS 200, in order for them to rent a car which is used for the terrorist attack. Jasser Barghouti was in direct contact with Sayed Sheikh Qassem, who was directly subordinate to Ibrahim Hamad, the Hamas commander for the Ramallah area and the West Bank. Through him, he received money, instructions and weapons. It emerges from the indictment that, when the contact between Jasser Barghouti and the Ramallah headquarters was broken off, he succeeded in establishing contact with Hezbollah and received money from them in order to finance the terrorist activity.[239] The relationship between Hamas and Hezbollah has been known since 1993. This relationship has arisen in many interrogation reports, in the Palestinian media and in my personal conversations with Hamas members. This method of operation proves that the

---

[237] http://www.palestine-info.info/arabic/Hamas/glory/ramalah.htm;
*See also* http://www.paldf.net/forum/showthread.php?t=479396.
[238] *See* Appendix No. 1, pp. 559-596.
[239] *See* Appendix No. 1, pp. 559-596.

61

relationship is not limited to mere criminal actions, but also includes terrorist activity by the Hamas organization.

b.    Section 7 of the sentence and the verdict handed down against Muayad Hamad convicted him of shooting at Jacob Steinmetz and wounding Limor Har-Melekh and Dvir Kinarti. As a result of this, he was sentenced to life imprisonment. Before the verdict was read, Hamad asked for permission "to kiss the rifle."[240]

c.    Section 10 of the indictment against Khaled Omar (also known as Khaled Abd el-Mu'az Zein al-Din), one of the commanders of the cell which planned the terrorist attack carried out on January 29, 2003, states that he received $200 and NIS 600 to cover the cost of the terrorist attack. The indictment, which was based on his written confession (which he gave after revealing all of the weapons which were used in the shooting), sets forth the way in which the terrorist attack was performed.

The confession which was signed by Khaled Omar is extremely detailed.[241] In it , he:

- Specified 16 terrorist operations by the cell. He also sketched and drew maps and illustrations in order to explain the way in which the operations were carried out.

- Confessed that the cell was acting on behalf of Hamas; that he was recruited into Hamas in 1998; that he was acting on behalf of Hamas; that he received weapons and money from Hamas; and that he received instructions and approval to carry out the operation from Hamas.

- Confessed that he took part in terrorist operations in which six Israelis were killed and others were wounded, including the operation which was performed on January 29, 2003.

- Revealed to the interrogators [the location of] a Kalashnikov rifle, an M-16 rifle and a pistol.[242]

- Sketched the scene of the terrorist attacks carried out by the cell and provided complete details of the weapons and the manner in which the operations were carried out. This method of operation is characteristic of Hamas: splitting up into sub-cells, use of mobile telephones, concealing the weapons after the operation, and reporting to the commander of the operation.[243]

---

[240] *See* the verdict against Muayad Hamad in Appendix No. 1, pp. 641-653.

[241] *See* Appendix No. 1, pp. 654-677; *and see* Appendix No. 1, pp. 678-701.

[242] *See* Appendix No. 1, pp. 678-701.

[243] *Id.*

d.     A statement made by the defense attorney, Adv. Ilia of Ramallah, with regard to the cell members should be noted. Adv. Ilia stated, before the sentence was handed down: "I am doing my legal work; I always leave the motives for the act for the defendants to state when they are required to do so." As far as I am concerned, this is an admission of the terrorist activity performed by the Hamas cell.[244]

### d. Additional corroborative material

In spite of the fact that suicide bombings by Hamas have received considerable exposure in Western media, Hamas has been carrying out roadside shooting attacks from ambushes for decades. In this type of terrorist attack, the terrorists generally have an opportunity to escape, although, under certain circumstances – because they strive to kill as many civilians as possible – they are killed while committing the crime.

Roadside shooting attacks have become one of the methods of operation of the Hamas military arm, since its inception in early 1988. The first terrorist attacks perpetrated by Hamas, which took place even prior to the formation of the al-Qassam Brigades[245] in 1991, were roadside shooting attacks which were carried out within the Gaza Strip. Upon the establishment of the al-Qassam Brigades,[246] roadside shooting attacks from ambushes became the principal tactic used by Hamas. Between 1988 and 1992, the principal tactic against Jews visiting Palestinian towns was roadside shooting attacks.

Khaled Omar's confession of his involvement in the Route 60 shooting attacks should be viewed as reliable because it is corroborated not only by the interrogations and confessions of the other cell members who were arrested, but are also supported by other evidence (such as weapons captured in the possession of the cell members, the police ballistic reports[247] linking bullet casings from this attack to bullet casings found in other attacks, and confidential details which only the perpetrators of the attacks would know).

The following cases clarified the Hamas trend of ordering terrorist attacks such as that which took place on January 29, 2003:

---

[244] *See* Appendix No. 1, pp. 641-653.

[245] *See* Ronni Shaked and Aviva Shabi, <u>Hamas: M'Emunah B'Allah L'Derech Ha-Terror (Hamas: From Belief in Allah to the Road of Terror)</u>, pp. 128-141. The military establishment that was affiliated with *al-Mujama al-Islami*, the organization from which Hamas grew, was set up in 1986, prior to the official declaration of the establishment of Hamas. The military establishment was founded pursuant to orders by Sheikh Ahmed Yassin. During that period of time, the establishment was known as the "military arm" and headed by Salah Shehadeh. Cells were given appellations or numbers, such as Cell 101, which perpetrated the kidnapping and murder of Avi Sasportas on February 16, 1989 and the kidnapping and murder of the soldier Ilan Saadun on May 3 [of that year].

[246] For the establishment of the military arm in 1991 under the name of the Izz al-Din al-Qassam Brigades, *see* Shaked and Shabi, <u>Hamas: M'Emunah B'Allah L'Derech Ha-Terror</u>, pp. 295-301.

[247] I was told that counsel for the Plaintiffs filed the reports in question as: W_S088289-088330 and W_S088335-088337.

a.    The murder of members of the Lapid family (December 6, 1993): a Hamas terrorist cell in a vehicle passed through the Harsina junction near Hebron toward evening and fired bursts of shots at the vehicle of the Lapid family.[248] The driver, Mordechai Lapid, and his son Shalom were killed. Three other family members were wounded.[249]

b.    The murder of Dr. Oz Tibon and Yaniv Schimmel in a shooting attack from an ambush on Road 60 on January 17, 1996.[250]

c.    The murder of Yaron and Efrat Ungar on June 9, 1996,[251] while driving on the road near Bet Shemesh, Israel, on their way home from a wedding.

d.    The murder of Rachel and Uri Monk in an ambush on July 26, 1996.[252]

---

[248] http://unispal.un.org/UNISPAL.NSF/0/D89AC50A852CF2C185256A2900637342.

[249] http://laad.btl.gov.il/show_item.asp?itemId=38239&levelId=28553&itemType=10&template=3.

[250] Guy Aviad, Lexicon of the Hamas Movement, p. 212-213 (Appendix No. 1, pp. 702-703). *See also* http://www.globes.co.il/news/article.aspx?did=105308.  It should be noted that although the Israeli security services initially identified the PFLP as having carried out the attack, it was later learned that Hamas carried out the attack.

[251] Guy Aviad, Lexicon of the Hamas Movement, p. 212-213 (Appendix No. 1, pp. 702-703). *See also* http://www.globes.co.il/news/article.aspx?did=105308.

[252] Guy Aviad, Lexicon of the Hamas Movement, p. 212-213 (Appendix No. 1, pp. 702-703). *See also* http://www.globes.co.il/news/article.aspx?did=105308.



**e. Conclusion**

The many detailed declarations which were issued by Hamas with regard to the terrorist attack on Road 60, and the profusion of praise which was given to the cell which planned and executed the terrorist attack – all of these, in and of themselves, would suffice to lead to the conclusion that Hamas carried out the terrorist attack. At the same time, the ISA conclusions on the basis of its investigations, the criminal convictions of the cell members, and their repeated public declarations expressing pride in the performance of the terrorist attack on Road 60 and other terrorist attacks leave no doubt that this attack was carried out by Hamas. This was not a terrorist cell which perpetrated a one-time attack; rather, the cell was part of the Hamas terrorism infrastructure in Ramallah. Its members carried out a series of operations in coordination with Hamas headquarters and with its approval. On the basis of my experience and on the basis of the detailed testimony with regard to this terrorist attack, I can determine that it was a Hamas operation.

### March 5, 2003 – the terrorist attack on the No. 37 bus, Haifa

#### a. The terrorist attack

On March 5, 2003 at 1:30 p.m., a No. 37 bus left the Haifa Central Bus Station on its way to Haifa University. Forty minutes later, after the bus had picked up dozens of students, it stopped at the bus stop on Moriah Boulevard, 30 meters from the corner of Tzafririm Street. A terrorist, who had previously boarded the bus at some unknown time, detonated the explosives in his explosive belt, thereby killing 17 young people and wounding 53 more.[253]

#### b. Evidence for legal attribution

##### 1) The assumption of responsibility

Despite the fact that Hamas did not take responsibility immediately after the terrorist attack, a note which was found in one of the suicide bomber's pockets stated: "The Izz al-Din al-Qassam Brigades are the ones which carried out the terrorist attack."[254] In addition, the suicide bomber, Mahmoud Qawasmeh, left a "Will" in his house. A Hamas operative later telephoned the Qawasmeh family and declared that Mahmoud Amran (Qawasmeh) had carried out the terrorist attack. The operative also told the family that the "Will" was to be found inside a book, in a specific location in the family home. The "Will" was found there; in it, Qawasmeh asked his parents to forgive him.[255]

A copy of a note which was found in the suicide bomber's clothing was given to the media by the Israel Police. It was published in the <u>Yedioth Ahronoth</u> newspaper on March 6, 2003.



Following the operation Hamas published an official announcement in which it took responsibility and congratulated suicide bomber Mahmoud Qawasmeh for the operation. "The

---

[253] www.mfa.gov.il/MFA/MFAArchive/2000_2009/2004/1/Suicide%20bombing%20of%20Egged%20bus%20No%2037%20in%20Haifa%20-%205-Ma.

[254] Yedioth Ahronoth, March 6, 2003 (Appendix No. 1, p. 704).

[255] http://www.alqassam.ps/arabic/sohdaa5.php?id=274.

Izz al-Din al-Qassam Brigades rejoice at the wedding of the *Shahid* with the dark-eyed women in Paradise" [the virgins in Paradise].[256]

### 2) Photograph

In the photograph from the Book of Martyrs, which is an official publication issued by the Izz al-Din al-Qassam Brigades about Hamas operatives who have been killed, the name of Mahmoud Amran Qawasmeh appears next to the date of the suicide bombing operation which he carried out.[257]



Poster prepared by Hamas in honor of the suicide bomber.[258]



### 3) The Hamas web site

The official Hamas web site devoted an extensive article to Qawasmeh, which described his life history, his family and his terrorist activity. The article mentioned the suicide bomber's devout religious faith and the fact that a note found inside of his identity card stated that the operation

---

[256] http://www.alqassam.ps/arabic/byan_poup.php?id=245.
[257] http://www.alqassam.ps/arabic/sohdaa5.php?id=274; http://www.alqassam.ps/arabic/operations2.php?id=81.
[258] http://www.alqassam.ps/arabic/operations2.php?id=81.

had been carried out by Hamas.[259] Kohlmann's expert report correctly states that the al-Qassam Brigades published at least two leaflets (the second of which appeared on March 7, 2003), in which they assumed responsibility for the terrorist attack. The leaflets may still be seen on the www.alqassam.ps web site.[260] *This detail was not published by the media, due to the profusion of terrorist events at the time. It would appear that Hamas published the notice twice, in order to emphasize it and to bring attention to it.*

### c. Official documents of the Government of Israel

a.   <u>Israel Government report</u>: "Wednesday, 1 Adar II 5763 – 17 Israelis were killed and 38 more wounded, half of them seriously, when a suicide bomber blew himself up in a No. 37 bus in the Carmel area of Haifa. The suicide bomber is apparently a member of Hamas, 20 years old, from Hebron. He detonated the explosive charge at about 2:15 p.m. on a No. 37 bus operated by the Egged Bus Company, which had set out from the Haifa Central Bus Station on its way to the university and was full of students."[261]

b.   <u>ISA report</u>: Under the headline "Suicide bombers in the present conflict," the report states that: "Mahmoud Qawasmeh, a 20 year old resident of Hebron and a student of Computer Science, blew himself up inside a No. 37 bus in Haifa. The terrorist attack was supported by the Hamas military headquarters in Hebron; it was administered by Ali Rajbi, who was in charge of the logistical infrastructure, assisted by wanted person Ali Alan, who was in charge of preparing the explosive belt. The person who transported the suicide bomber to Haifa was Hafiz Rajbi, a resident of Hebron with an identity card issued in East Jerusalem which allowed him to have access to Israel."[262]

### d. Judicial proceedings and legal documents in Israel

The Israeli authorities arrested a number of Hamas members from the "Hebron Cell" for their involvement in the terrorist attack on the No. 37 bus. These included Majdi Amro, Fadi al-Ja'aba, Munir Rajbi, and Mu'az Waal Taleb Abu Sharakh.

### 1. Majdi Amro

Majdi Amro was charged with membership in the al-Qassam Brigades; the murder of David Cohen near Kiryat Arba in July 2001; training with weapons; and dispatching the suicide bomber Mahmoud Qawasmeh to carry out the terrorist attack on the bus in Haifa. Amro told the Israeli court that he had rented a place in Hebron and used it as an "operations room." In that room, he,

---

[259] http://www.alqassam.ps/arabic/sohdaa5.php?id=274.
[260] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=byan&id=274; *see also* http://alqassam.ps/arabic/statements.php?id=245 (Kohlmann Appendix pp. 145-146).
[261] http://www.pmo.gov.il/PMO/Communication/IsraelUnderAttack/Haifa4/Haifa.htm.
[262] *See* Appendix No. 1, pp. 350-434.

Qawasmeh [sic] and Fadi al-Ja'aba had prepared the suicide bomber. That morning, Amro had driven Qawasmeh to Abu Dis (near Jerusalem), which was the suicide bomber's first stop on his way to the target in Haifa.

### 2. Fadi al-Ja'aba

Fadi al-Ja'aba, a member of the cell from Hebron, was arrested by Israel Defense Forces troops on March 7, 2003. On February 13, 2005, during his interrogation, al-Ja'aba confessed to being a member of Hamas; he further confessed that he had helped to transfer the suicide bomber to Haifa. He admitted his deeds before the judges as well.[263] Al-Ja'aba was convicted of membership in the al-Qassam Brigades and of having participated in planning a terrorist attack on the No. 37 bus. He was sentenced to 18 life sentences.

### 3. Munir Rajbi

Munir Rajbi, an Israeli citizen residing in Haifa, who holds an Israeli identity card, was charged with membership in Hamas, conspiracy to assist the enemy in wartime, conspiracy to murder, and failure to prevent a crime. Rajbi and his brother Ismail, who also lives in Haifa, agreed to carry out a suicide bombing together in Haifa.[264] His brother Hafez, a resident of Hebron (who was later killed in a confrontation with Israeli forces), who was a member of a Hamas cell in the city, was the one who made the contact between the two and Hamas headquarters; he was also the one who transported the suicide bomber to Haifa. Hafez worked as a truck driver transporting merchandise; he brought the terrorist to Haifa in his own car.[265] Hafez asked Munir to find a place where the suicide bombing could be carried out. Rajbi pleaded guilty to the offenses with which he was charged in the indictment, including membership in Hamas and participating in the infrastructure which prepared the suicide bombing. Rajbi was sentenced on the basis of his confession. "We have convicted the Defendant according to his confession," wrote the judges. He was sentenced to life imprisonment.[266] The Supreme Court did not allow his appeal.[267] Rajbi eventually arrived at a plea bargain, in which the Plaintiffs dropped the most severe charge of conspiracy to murder; he was, however, convicted of a lesser charge, assisting the enemy.

### 4. Mu'az Waal Taleb Abu Sharakh

Mu'az Waal Taleb Abu Sharakh was arrested on March 11, 2003. Almost 2 years later, on February 13, 2005, he was sentenced to 19 life sentences, after having been convicted of membership in the al-Qassam Brigades and participation in planning the suicide attack on the

---

[263] *See* Appendix No. 1, pp. 705-710.
[264] *See* Appendix No. 1, pp. 711-716.
[265] *See* Appendix No. 1, pp. 717-720; *see also* Appendix No. 1, pp. 721-731.
[266] *See* Appendix No. 1, pp. 711-716.
[267] *See* Appendix No. 1, pp. 732-737.

No. 37 bus. According to the indictment against him, Sharakh organized the important meeting between Majdi Amro and Fadi al-Ja'aba. According to the court transcript, al-Ja'aba was the one who recruited Qawasmeh to carry out the suicide bombing. Abu Sharakh then did what was necessary in order for Hafez Rajbi to take the suicide bomber from Abu Dis to the target location in Haifa. Abu Sharakh, a resident of Hebron, confessed in his interrogation to membership in the organization. Before the sentence was read out, he stated that he felt no remorse for [his deeds] and declared that: "The resistance operations will continue as long as Jerusalem and the remaining lands which belong to the Palestinians are not liberated." He was sentenced to 19 cumulative life sentences.[268]

---

[268] *See* Appendix No. 1, pp. 738-739.

**The Hebron Cell: the terrorist attack on the No. 37 bus**



### e. Conclusion

The many detailed declarations which were issued by Hamas with regard to the terrorist attack on the No. 37 bus, the glorification of the perpetrator within the organization, and the profusion of praise which was given to the cell which planned and implemented the terrorist attack – all of these, in and of themselves, would suffice to lead to the conclusion that Hamas carried out the terrorist attack. At the same time, the ISA conclusions on the basis of its investigations, the criminal convictions of the cell members, and their repeated public declarations expressing pride in the performance of the terrorist attack on the No. 37 bus and other terrorist attacks leave no doubt that this attack was carried out by Hamas.

### March 7, 2003 – the shooting attack in Kiryat Arba

#### a. The terrorist attack

On Friday, March 7, 2003, at 8:40 p.m., two Hamas terrorists broke into Kiryat Arba. The two terrorists, most likely Muhsin Muhammad Omar al-Qawasmeh and Hazem Fawzi Abd al-Sam'i al-Qawasmeh, were dressed in civilian clothing, and armed with Kalashnikov rifles and hand grenades. They cut through the fence southwest of Kiryat Arba, penetrated the surrounding security detachment and opened fire at people walking along the road. The first burst of shots hit Aliza Said, a mother of 12, who was seriously wounded. The local on-call security squad was dispatched to the site. The two terrorists began to flee and broke into the home of the Horowitz family, who were eating their Sabbath evening meal. The terrorists chased the couple from room to room and shot and killed Dina (Debbie) Horowitz and her husband Eli (Elnatan), who were holding each other's hands.[269]

After murdering the couple, the terrorists took up a position in their home and started shooting out at the residents of the "settlement." The shooting match between the on-call security squad and the terrorists continued for between five and 10 minutes, during which time the terrorists threw a hand grenade at the residents of the "settlement." Ultimately, both terrorists were killed in the exchange of fire.[270]

#### b. Evidence for legal attribution

##### 1) The assumption of responsibility

The al-Qassam Brigades assumed responsibility for this terrorist attack almost immediately after it happened.[271] The assumption of responsibility was subsequently confirmed in an official Hamas report, which listed the terrorist attacks carried out by the Hamas organization in 2003.[272] According to the same Hamas announcement, Hazem Qawasmeh and Muhsin Imran[273] were the perpetrators of the Kiryat Arba Attack, for which the al-Qassam Brigades took responsibility.[274] In 2010, on the seventh anniversary of the Kiryat Arba attack, a tribute to Hazem al-Qawasmeh and Muhsin al-Qawasmeh was posted on the internet, including photos taken from Hamas's

---

[269] http://www.shavuz.co.il/magazine/article.asp?artid=3149&secid=203.

[270] Yedioth Ahronoth, March 8, 2003 (Appendix No. 1, p. 740); *see also* http://www.inn.co.il/News/News.aspx/46381.

[271] Yedioth Ahronoth, March 9, 2003, p. 6 (Appendix No. 1, p. 741).

[272] http://www.palestine-info.info/arabic/Hamas/shuhda/amalyat_03.htm.

[273] A mistake was made in the announcement in Muhsin's family name, which is Qawasmeh, not Imran.

[274] At the time of the attack, there was some confusion as to which terrorists carried out the Kiryat Arba Attack and which terrorists carried out the simultaneous attack in the nearby settlement of Neguhot. This confusion is evident from the prosecution of Abdallah Ahmad Abu Seif who is discussed below. However, despite the ambiguity at the time as to which Hamas members carried out the attack, I do not regard this issue as important to my overall conclusion that Hamas carried out the attack.

website of the two assailants together with a claim that they carried out the Kiryat Arba Attack.[275]

### 2) Photograph

Photographs of the two terrorists attest to their organizational affiliation. Other evidence of their organizational affiliation includes the bandanas on their heads, the Kalashnikov rifles they hold, and the emblem of the al-Qassam Brigades which is proudly posted in the background of the photographs.



276



277

---

[275] *See* http://www.paldf.net/forum/showthread.php?t=580792.
[276] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=picture&id=280 (Muhsin Qawasmeh).
[277] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=picture&id=576 (Hazem Qawasmeh).

### 3) Posters of the terrorists

A poster prepared by Hamas showing the two terrorists.



278

A poster prepared as a memorial to Hazem al-Qawasmeh.



279

### 4) The "Will"

Muhsin Muhammad Omar al-Qawasmeh wrote a "Will" before the terrorist attack, in which he stated "there is no alternative to the war against Jews, other than Jihad." Muhsin al-Qawasmeh signed the will with his name and added: "Member of the *Shahid* Izz al-Din al-Qassam Brigades." His "Will" was published on the al-Qassam Brigades web site.[280]

---

[278] http://www.palestine-info.info/arabic/Hamas/shuhda/2003/kawasmy2/moh_haz.htm
[279] http://www.palestine-info.info/arabic/Hamas/shuhda/2003/kawasmy2/syrah.htm
[280] http://www.alqassam.ps/arabic/sohdaa5.php?id=280.

### 5) Hamas documents

a.    Hamas devoted an extensive article on its official web site to both Muhsin Muhammad Omar al-Qawasmeh and Hazem Fawzi Abd al-Sam'i al-Qawasmeh.  The article described their life histories and their Hamas activity and referred to each of them as a "Qassami holy warrior" (which means holy warriors who are members of Hamas's Izz al-Din al-Qassam Brigades).[281] The page devoted to Hazem al-Qawasmeh also states that he carried out the attack in Kiryat Arba along with Muhsin al-Qawasmeh.[282]  This report also appeared on the official Hamas web site.[283]

b.    The name and picture of Hazem Fawzi Abd al-Sam'i al-Qawasmeh appears in the Hamas <u>Book of Martyrs</u>,[284] which is an online book which includes the particulars of all members of the Hamas al-Qassam Brigades who have been killed. These particulars include the operative's date of birth and full name; the terrorist attack in which he was killed; and the type of terrorist attack which he carried out.

c.    The official Hamas web site, which covers the operations of the organization, notes the terrorist attack in Kiryat Arba as Terrorist Attack No. 49.[285]

d.    The names of both shooters appear in a general list by Hamas, which includes inmates and martyrs.[286]

e.    The two men's names appear in a list of Hamas martyrs in Hebron which was published by Hamas.[287]  Their names are hyperlinked to an article, titled "The Two Qassamis, Hazem and Muhsin al-Qawasmeh, Executers of the Kiryat Arba Operation."[288]

### c. Official documents of the Government of Israel

### 1) Official announcement by the Government:[289]

"On Friday evening, a terrorist cell infiltrated Kiryat Arba. They opened fire and wounded a woman. They then broke into the home of the Horowitz family while they were eating their

---

[281] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=sera&id=576; http://www.alqassam.ps/arabic/sohdaa5.php?id=280.

[282] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=sera&id=576.

[283] http://www.palestine-info.info/arabic/Hamas/shuhda/2003/kawasmy2/syrah.htm.

[284] http://www.alqassam.ps/arabic/sohdaa3.php?from=48.

[285] http://www.palestine-info.info/arabic/Hamas/shuhda/amalyat_03.htm.

[286] http://www.palissue.com/arabic/Shohada/4400/111.html.

[287] http://www.palestine-info.info/arabic/spfiles/suhada_2005/shuhda_khaleel/khaleel.htm.

[288] http://www.palestine-info.info/arabic/spfiles/suhada_2005/shuhda_khaleel/hazeem.htm.

[289] http://www.pmo.gov.il/PMO/Communication/IsraelUnderAttack/Kiryat+Arba/Kiryat+Arba.htm.

Sabbath evening meal, chased the couple from room to room, and shot and murdered Dina and her husband Eli as they stood embracing each other. The terrorists continued firing, and one of them even detonated an explosive belt, before they were murdered in the kitchen of the house by the local on-call security squad, which sped to the site (the members of which were Rabbi Eli Horowitz's students). Hamas assumed responsibility for the terrorist attack.

### 2) Judicial proceedings and legal documents in Israel

The indictment against Abdallah Ahmad Abu Seif sets forth his role in the operation, including the dispatch of the two shooters to Kiryat Arba. The indictment also sets forth the preparations for the terrorist attack, which included collecting intelligence, surveillance, preparing a hiding place for the weapons near Kiryat Arba, preparing camouflage, obtaining shears to cut through wire fences, and providing continual updates to the Hamas headquarters with regard to the plans for the terrorist attack.[290]   Although the indictment probably identifies one of the two perpetrators of the Kiryat Arba attack incorrectly, the indictment against Abdallah Ahmad Abu Seif is still relevant to my Report, as it reveals Hamas's Hebron Cell terrorist activity.

Abdallah Abu Seif was charged with the following offenses: activity in the Hamas organization, recruiting members into the organization, training to carry out terrorist attacks, carrying out other terrorist attacks against Jews in Hebron, and preparing two suicide bombers for the terrorist attack in Kiryat Arba.[291] Abu Seif confessed to the charges that were attributed to him on February 16, 2006, and was sentenced to two life sentences plus 45 years' imprisonment.

According to the testimony in the indictment of Abdallah Abu Seif, Muhsin Qawasmeh was a member of Hamas.[292]

### d. Summary of the terrorist attack in Kiryat Arba

The cell which carried out the terrorist attack in Kiryat Arba was subordinate to the senior Hamas commander in Hebron, who was in contact with Hamas headquarters in Syria. In January 2003, as soon as the operation had been generally approved, Hamas commander Basel Qawasmeh instructed Abdallah Abu Seif to collect intelligence on the best place to penetrate Kiryat Arba. Abu Seif located an abandoned building, about 200 meters from the fence around Kiryat Arba, into which he said he could move the weapons. His commander in Hamas gave him a set of binoculars and a video camera and ordered him to film the site. Abdallah Abu Seif did not know how to operate the video camera and returned it to his commander in Hamas.

Early in March 2003, three days before the terrorist attack, Abdallah Abu Seif received from Basel Qawasmeh a bag containing a Kalashnikov rifle and an M-16 rifle, ammunition clips and

---

[290] *See* Appendix No. 1, pp. 742-750.
[291] *Id.*
[292] *Id.*

an explosive belt. Abdallah placed the ordnance in the abandoned house, according to the instructions which he had received.

On March 7, the day before the terrorist attack, Abu Seif met with Basel Qawasmeh and the two shooters, both of whom were residents of Hebron and Hamas members. He led them to the abandoned building, gave them the weapons and the explosive belt and directed them to the location from which they were supposed to penetrate the "settlement."[293] The two terrorists, Muhsin Qawasmeh and Hazem Qawasmeh, dressed in Sabbath clothing.

That night, at about 8:30 p.m., the two penetrated Kiryat Arba, entered the home of Rabbi Horowitz and his family in Building No. 35, and killed the couple, Eli and Dina Horowitz. The terrorists were killed by the security forces and the local on-call security squad.[294]

### e. Conclusion

I arrived on the scene approximately 45 minutes after the terrorists had been killed. My immediate conclusion was that this had been a terrorist attack, rather than a robbery or a family quarrel. Generally speaking, well secured "settlements" are not random targets for robbery, in light of the high risk involved: armed homeowners, local on-call security squads, and the like. Furthermore, the fact that the attackers were armed with explosives and an explosive belt definitively eliminated any motive except that of a politically motivated terrorist attack.

The many detailed declarations Hamas issued with regard to the Kiryat Arba Attack, the glorification of the operatives within the organization, and the profusion of praise which was given to the cell which planned and implemented the terrorist attack – all of these, in and of themselves, would suffice to lead to the conclusion that Hamas carried out this terrorist attack. The criminal conviction of Abdallah Abu Seif, and Hamas's repeated public declarations expressing pride in the performance of the terrorist attack in Kiryat Arba and other terrorist attacks leave no doubt that this attack was carried out by Hamas.

---

[293] *See* Appendix No. 1, pp. 742-750.
[294] *Id.*

**April 30, 2003 – the terrorist attack on Mike's Place, Tel Aviv**

### a. The terrorist attack

In the evening of April 30, 2003, two Hamas terrorists, both British nationals, entered Israel through the Gaza Strip. At about 12:45 a.m., they reached the opening of the pub called Mike's Place, which is located near the United States Embassy on the Tel Aviv Promenade. One of the terrorists, Asif Muhammad Hanif, 22, blew himself up at the entrance to the pub. Three people were killed in the explosion and more than 50 others were wounded. The other terrorist, Omar Khan Sharif, 27, who was standing some distance away from Hanif, was supposed to wait a few minutes until the rescue forces reached the scene and then to blow himself up among the police and medics.

When the rescue forces reached the scene of the incident, Sharif attempted to detonate his explosive charge, but due to some malfunction, did not succeed in doing so. Alert citizens noticed what Sharif was trying to do and even realized that he had been wounded in the first explosion. One or more of them knocked him down and struggled with him on the ground. Sharif, in his attempt to escape, disposed of the charge which he was carrying on his body. It was believed by some that he had been wounded as a result of the explosion. The charge which he was carrying weighed 5 kg and was hidden inside a book. Sharif fled to the vicinity of the David Intercontinental Hotel, where he attempted to snatch an identity card from a security guard. The security guard drove him away and then began to chase after him. Sharif ran toward the sea and is believed to have entered the water in order to swim away and come back to shore somewhere else; however, he drowned under unclear circumstances. Sharif's body was washed up on the Tel Aviv beach on May 12, 2003, and was identified on May 19, 2003.

### b. Evidence for legal attribution

#### 1) The assumption of responsibility

a.   Hamas assumed responsibility for the perpetration of the terrorist attack and even publicized a tape which had been recorded before the two suicide bombers had set out to perpetrate the attack. The AP news agency reported, several hours subsequent to the terrorist attack, that the Hamas movement had assumed responsibility, stating that: "The terrorist attack represents a message to Abu Mazen's new government, to the effect that the resistance cannot be stopped without a political solution.

b.   An official announcement by Hamas, taking responsibility for the attack and listing the names of both terrorists and their places of residence in Britain, was published on March

8, 2004, to mark the anniversary of the assassination of Ibrahim Maqadmeh.[295] Hamas explained that the delay in publishing the announcement stemmed from security-related reasons (in other words, in order to facilitate Sharif's escape, because, after the terrorist attack, Hamas was not convinced whether he had been killed or had managed to escape).[296] The official announcement by Hamas stated that the two had been video taped before setting out to perform the terrorist attack and had read out their "Wills" on tape.[297] The announcement expressly stated that the Izz al-Din al-Qassam Brigades assumed responsibility for the suicide bombing, "which was carried out by Muslims from Britain, of Pakistani origin. The terrorist attack was carried out at the club known as Mike's Place, in Tel al-Rabia (Tel Aviv – R.S.)."[298]

c.      Notice No. 62, which appeared in a report by Hamas on the operations by the organization in 2003, gave details of the operation and emphasized that an announcement taking responsibility for the attack had been published[299] on behalf of Hamas.

d.      In an official announcement, Hamas explained that the selection of two suicide bombers from outside of Palestine was made in order to enable the death of Ibrahim Maqadmeh to be avenged, not only by Palestinians, but by all Muslims, due to Ibrahim Maqadmeh's special status as an Islamic philosopher.[300]

e.      Hamas published a special page on the Internet dealing with the terrorist attack, including the names of those who carried out their "Will," a description of the operation, assumption of responsibility, the location of the terrorist attack and the number of deaths and injuries it caused. This publication also included a photograph of the suicide bombers and a photograph of the club following the explosion.[301]

f.      Hamas published the video of the two terrorists' "Will" prior to their departure for the terrorist attack. [302]

### 2) Photographs

In a photograph which was taken before the terrorist attack and published by Hamas, the two suicide bombers are wearing Hamas bandanas. Each of them is holding a weapon in one hand, and they are holding a Koran together. A green Hamas flag appears in the background. The

---

[295] Ibrahim Maqadmeh was a prominent Hamas leader who was liquidated by Israel. Hamas claimed that the terrorist attack was carried out in revenge for his assassination.
[296] *See* Appendix No. 1, pp. 751-752; *see also* Appendix No. 1, pp. 753-755.
[297] *See* Appendix No. 1, pp. 753-755.
[298] *See* Appendix No. 1, pp. 751-752.
[299] http://www.palestine-info.info/arabic/Hamas/shuhda/amalyat_03.htm.
[300] *See* Appendix No. 1, pp. 751-752.
[301] http://www.alqassam.ps/arabic/operations2.php?id=85.
[302] http://www.alqassam.ps/arabic/video.php?id=290.

juxtaposition of the Koran and the weapons expresses one of the mainstays of the Jihadist ideology adopted by Hamas.[303]



304

### 3) The "Will"

On August 3, 2004, the Hamas al-Qassam Brigades announced that they were about to publish a tape containing the "Will" of the two suicide bombers, in English, Arabic and Urdu.[305] The tape was, in fact, published and broadcast on the *al-Jazeera* television network.[306] In the tape, which was recorded in Gaza, the terrorists appear dressed in military clothing with green Hamas bands on their foreheads. They held a Koran in one hand and a Kalashnikov in the other. They kissed and embraced each other and even made a speech.[307] The video tape showing the "Will" was also shown by the BBC network as part of the film *Road to Martyrdom*.[308]

---

[303] http://www.alqassam.ps/arabic/video.php?id=290;
*see also* http://www.alqassam.ps/arabic/operations_images.php?id=85.
[304] http://www.aljazeera.net/News/archive/archive?ArchiveId=72579.
[305] http://www.alqassam.ps/arabic/special1.php?all=all&&&sid=3121.
[306] http://www.aljazeera.net/News/archive/archive?ArchiveId=72579.
[307] *See* the documentary film "For the Sake of Allah" (Appendix No. 2); *see also* Appendix No. 1, pp. 751-752; Appendix No. 1, pp. 753-755; Appendix No. 1, pp. 350-434.
[308] *See* Appendix No. 2: "Road to Martyrdom."

### 4) Hamas articles

The official Hamas magazine, <u>Filasteen al-muslima</u>, published an article which praised and glorified the terrorist attack that was perpetrated by the two suicide bombers.[309]

### c. Summary of the terrorist attack on Mike's Place

Asif Muhammad Hanif, 22, and Omar Sharif, 27, were both British nationals of Pakistani origin. The two, who were both second generation children of Pakistani immigrants, met in London in the mid-1990s at a religious studies class taught by a Muslim preacher, Omar Bakri. After becoming closely involved in extreme Islam, they managed to make a long visit to Damascus, to travel to Afghanistan and fight with the Taliban, and planned to go to Iraq in 2003, but the plan went awry. When they reached Damascus, their mission was changed and they were sent to Gaza to work with Hamas.[310]

The two terrorists traveled from Britain to Damascus, Syria, ostensibly for the purpose of study. At some point, they were contacted by Hamas operatives in Damascus, who recruited them and offered them [a chance to participate] in terrorist operations in Israel. This fact indicates a broader and deeper connection to terrorism based in Damascus.[311] It appears that, while they were initially recruited into Hamas in Damascus, it is not impossible that their previous involvement in radical activity in Britain was what caused them to develop the idea of becoming martyrs even before they arrived in Syria.

During their stay in Gaza, the two terrorists were trained by Hamas operative Yusuf Abu Hin.[312]

### d. Official documents of the Government of Israel

1.     <u>ISA report</u>:[313] "April 30, 2003 – explosion by a suicide bomber at the entrance to the pub called Mike's Place in Tel Aviv. An additional suicide bomber disposed of an explosive charge nearby. Three killed, 62 wounded. The suicide bombers: Hanif Asif, Omar Sharif – Hanif Asif, 22, <u>a British national</u>, blew himself up at the entrance to the pub called Mike's Place on the Tel Aviv Promenade. Omar Sharif, 27, also <u>a British national</u>, attempted to commit suicide together with Hanif; however, due to a malfunction of the explosive charge, he did not succeed in perpetrating the deed and fled the scene,

---

[309] <u>Filasteen al-muslima</u>, June 2003.

[310] See Appendix No. 2: "Road to Martyrdom."

[311] *Id.*

[312] *Id.*

[313] *See* ISA report, September 2007, "Suicide bombers in the five years of conflict," in Appendix No. 1, pp. 350-434. *See also* ISA report, May 2005 at: <u>http://www.pmo.gov.il/NR/rdonlyres/81819B47-FE6C-47C2-B000-77B9A7EB9A5A/0/%D7%97%D7%95%D7%91%D7%A8%D7%AA%D7%9E%D7%97%D7%91%D7%9C%D7%99%D7%9D%D7%9E%D7%AA%D7%90%D7%91%D7%93%D7%99%D7%9D%D7%91%D7%9C%D7%99%D7%AA%D7%9E%D7%95%D7%A0%D7%95%D7%AA1.doc</u>.

disposing of the explosive charge which had been in his possession on the way. The charge carried by Omar was composed of standard explosives and weighed approximately 5 kg, with no fragmentation, and was placed inside the binding of a book. Omar's body washed up on shore approximately 2 weeks after the terrorist attack. The Hamas organization assumed responsibility for the terrorist attack, and even published a video tape in which the two British nationals made a speech before setting out for the terrorist attack. Analysis of the findings in their passports indicates that the two reached [Israeli] territory at the end of a journey which began on April 8 in Syria. From there, they traveled to Jordan on April 11 and entered [Israeli] territory on April 12. The investigations show that the two terrorists were assisted by a number of foreign leftist activists who reside in the area and belong to movements in Israel, the Gaza Strip and the West Bank."

2.   **The ISA report for 2003 established that the terrorist attack was performed by Hamas.**[314]

"In April, Hamas carried out a suicide bombing in the restaurant known as Mike's Place in Tel Aviv, in which three Israelis citizens were killed and more than 60 were wounded. The terrorist attack was carried out by <u>Asif Hanif</u>, a 22 year old British national, with the assistance of an additional British national, <u>Omar Khan Sharif</u>, 27.

**This terrorist attack is the first suicide bombing which was performed by a terrorist with foreign citizenship!"**

3.   **Announcement by the Prime Minister's Office**[315]

**"The two British nationals who were involved in the suicide bombing of Mike's Place in Tel Aviv were sent by the Hamas headquarters in Gaza (June 15, 2003)**

The fact that the two British nationals who were involved in the suicide bombing at Mike's Place in Tel Aviv were sent to carry out the terrorist attack by the Hamas military headquarters in the Gaza Strip has now been released for publication. Asif Hanif and Omar Sharif, as we may recall, were British Muslims of non-Palestinian origin, with no relationship to any Arab origin whatsoever. The dispatch of foreign Muslims with these characteristics by Hamas to carry out terrorist attacks against Israel constitutes a dramatic strategic change from the standpoint of Hamas. This step represents a kind of ideological *rapprochement* of Hamas with the Jihad organizations worldwide, especially al-Qaeda,

---

[314] The ISA report "Summary of the year 2003" was published as an official document on behalf of the Prime Minister's Office (*see* Appendix No. 1, pp. 7-16). *See also:* http://www.pmo.gov.il/NR/rdonlyres/C27A1A4F-F670-46F5-B047-DECBDA00A564/0/7012490866.doc.

[315] http://www.pmo.gov.il/PMO/Archive/Spokesman/2003/יוני/Spokesman8444.htm. *See also* http://www.pmo.gov.il/PMOEng/Archive/Press+Releases/2003/06/Spokesman7306.htm.

which have declared total war against anyone who is not a Muslim, and even against Muslims who cooperate with Western countries.

Notwithstanding this change, Hamas decided not to take responsibility for this terrorist attack – apparently due to the possible implications for its image and the exposure of its true ideological face, not that of an entity which is fighting for its freedom on its land, as it had been claiming (on the lands of the 'Islamic endowment,' according to its own statement), but rather, that of an entity which aims to achieve its vision of a United State of Islam throughout the world. This aim inherently views countries such as Israel, the United States and European countries as the enemy; moreover, even Arab countries, African countries and Palestinian Authority are considered as enemies, because they are perceived as 'collaborating' with the West and Western culture, and thereby 'endangering Islam' as it is perceived by the fundamentalists. The ISA is currently examining suspicions of possible collaboration in this terrorist attack between Hamas and al-Qaeda. It should be noted that connections of this type, including with the Hamas in the Gaza Strip, have already been exposed in the past. At the same time, no direct operative collaboration toward the implementation of a joint terrorist attack has been exposed to date. The ISA investigation of this affair is still going on, and for this reason, official publication was delayed until now."

### e. Conclusion

The many detailed declarations which were issued by Hamas with regard to the terrorist attack on Mike's Place, the glorification of the two suicide bombers who carried out the attack by the organization, – all of these, in and of themselves, would suffice to lead to the conclusion that Hamas carried out the terrorist attack. At the same time, the video tape of the two suicide bombers leaves no doubt that this attack was carried out by Hamas.

**May 18, 2003 – the terrorist attack on the No. 6 bus, French Hill, Jerusalem**



316

### a. The terrorist attack

In the early morning hours of May 18, 2003, Bassem Jamal Darwish Takruri (19) boarded a bus at a stop near the French Hill junction in Jerusalem. He was wearing the clothes of an ultra-Orthodox Jew, in order to board the bus without arousing suspicion. Beneath his shirt was an explosive belt packed with small iron balls and projectiles. When he got on the bus, there were 27 passengers on board. An hour later, the bus would have been *full of passengers.* The driver pulled away from the bus stop, drove 20 meters forward, and then Takruri detonated the explosive belt. Seven passengers were killed at once and 20 more were wounded. The driver lost control of the bus, which rolled downhill until it collided with a bus stop and came to a halt.[317]

---

[316] Source of map: Yedioth Ahronoth, May 19, 2003 (Appendix No. 1, p. 756).
[317] Yedioth Ahronoth, May 19, 2003 (Appendix No. 1, p. 756).

### b. Evidence for legal attribution

### 1) The assumption of responsibility

On the same day, the al-Qassam Brigades published a leaflet, claiming responsibility for the terrorist attack on behalf of Hamas. The leaflet bore the emblem of the al-Qassam Brigades, and the name of the Brigades appeared in English and Arabic at the top. The leaflet identified Bassem Takruri as the suicide bomber and declared that the operation was only the beginning of a series of operations which Hamas planned to carry out.[318]

### 2) Photographs

The following photographs clarify Takruri's organizational ties to Hamas and his role as a suicide bomber:

a.   In the photograph below, which was taken shortly before the terrorist attack was carried out, Takruri is seen wearing a green bandana on his forehead, on which are written the words: "There is no God but Allah." In the picture, Takruri is standing in front of a large poster which bears the Hamas emblem. The picture shows him holding a weapon in one hand and a Koran in the other.[319]



[320]

---

[318] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=byan&id=308.
[319] http://www.palestine-info.info/arabic/Hamas/shuhda/2003/takrory/photo.htm.
[320] The caption in Hebrew mentions a person named Fuad. The reference is to Fuad Qawasmeh, who, the day before, carried out a suicide attack in Haifa.

[Caption in yellow triangle at top left: "05:45 – Blew himself up in Jerusalem"]

[Caption below photo: "Bassem Jamal Darwish Takruri (19), Fuad's neighbor, blew himself up yesterday on an Egged bus and murdered seven Israelis"]

b.  An additional photograph was taken from the magazine <u>al-Raya</u>.[321] The first page of the magazine shows pictures of several suicide bombers. Takruri's picture appears at the top left of the first page of the magazine. Another picture of Takruri appears to the right of the picture, and a photograph of a bus which he blew up may be seen in the center. *The photograph is encircled by a drawing of a white ellipse; the terrorist holding a Koran in his hand is Takruri.*



c.  Before he carried out the terrorist attack, two more pictures of Takruri were taken, which are characteristic of Hamas operatives before they set out to implement suicide bombings. In each of the pictures, he is holding a weapon and wearing a green Hamas band around his forehead. In one of them, he is also holding a Koran; in the other, he is standing next to a Hamas poster.

---

[321] <u>Al-Raya</u>, May 22, 2003 (Appendix No. 1, pp. 758-760).



322

### 3) The "Will"

Takruri left a video taped "Will" which is characteristic of many suicide bombers. The "Will" was read aloud with a Hamas styled set in the background. In his "Will," he emphasized that he was carrying out the suicide operation in the name of Hamas.[323] The "Will" was also disseminated in a short film, which can be viewed on YouTube.[324]

### 4) Hamas documents

a.  The official Hamas web site published a picture of the terrorist Takruri, which took up an entire page, with a caption above it reading <u>The Qassami Martyr</u> – that is, the martyr who belonged to the al-Qassam Brigades.[325]

b.  The official Hamas web site later published an article in memory of the terrorist Takruri. The article included the transcription of a conversation between the web site correspondent and the terrorist's family, which focused on Takruri's devout religious faith. The article states that Takruri had finished high school and had begun to study in the Faculty of Engineering at the Polytechnicum in Hebron. The closing passage of the article states that Takruri carried out the terrorist attack on the instructions of the al-Qassam Brigades.[326]

---

[322] http://www.palestine-info.info/arabic/Hamas/shuhda/2003/takrory/photo.htm.
[323] http://www.youtube.com/watch?v=xGxG-P9EP2c.
[324] http://www.youtube.com/watch?v=xGxG-P9EP2c.
[325] http://www.palestine-info.info/arabic/Hamas/shuhda/2003/takrory/basem.htm;
*see also* http://www.palestine-info.info/arabic/Hamas/shuhda/2003/takrory/syrah.htm.
[326] http://www.palestine-info.info/arabic/Hamas/shuhda/2003/takrory/syrah.htm.

c.     The Hamas web site also published a large article about Abdallah Qawasmeh, who was the commander of the al-Qassam Brigades in Hebron. The article gives details of all of the various terrorist attacks which Qawasmeh helped to plan, including that of May 8, 2003, "which was carried out by the martyr Bassem Takruri. Basem martyred himself in the vicinity of the French Hill and killed 6 Zionists and wounded dozens."[327]

d.     The Hamas web site published a conversation with the driver who took Takruri to Jerusalem, to the site of the terrorist attack. The driver, Abu Ubeida, recounted every little detail of his conversation with the suicide bomber on the way to Jerusalem.[328]

e.     In an article in the official Hamas magazine, *al-Raya*, which appeared four days after the terrorist attack, Takruri is described as "a soldier of al-Qassam." The article describes his life and emphasized that he studied at the Polytechnicum in Hebron, where three suicide bombers had already studied.[329]

f.     A Hamas notice posted on the organization's web site reads: "May 18, 2003: Two suicide bombers, Bassem Takruri and Mujahid al-Ja'bari, blew themselves up in Jerusalem, near French Hill. The terrorist attack cost the lives of six Zionists and led to the wounding of dozens."[330]

### c. Official documents of the Government of Israel

1)     ISA report[331]

---

**May 18, 2003**

**Explosion by a suicide bomber on a bus in French Hill, Jerusalem**

**7 killed and 20 wounded**

---

[327] http://www.palestine-info.info/arabic/hamas/shuhda/2003/qaoasme/syrah.htm.
[328] http://www.sarkosa.com/vb/t24984.
[329] *See* al-Raya, May 22, 2003 (Appendix No. 1, pp. 758-760).
[330] On the same day, an additional terrorist attack took place in Jerusalem, near the al-Ram roadblock. The suicide bomber, Mujahid Ja'bari, detonated an explosive belt which he was wearing on his body: http://www.palestine-info.info/arabic/hamas/shuhda/2003/jabary/syrah.htm.
[331] *See* Appendix No. 1, pp. 350-434.

**The suicide bomber – Bassem Takruri**

A resident of Hebron, 19, a first year student of Computer Science at the Polytechnicum, blew himself up in a No. 6 bus operated by the Egged Company, near French Hill. He was dressed as an ultra-Orthodox Jew: black trousers, white shirt, skullcap and ritual fringes (*tzitzit*). The suicide bomber was dressed on the morning of the terrorist attack, in the home of one of the recruits who was handled by the Hamas infrastructure in Hebron, Samer Atrash. In his interrogation, Samer Atrash confessed to collecting intelligence in preparation for the terrorist attack, picking up the suicide bomber from the Abu Dis area and bringing him into Jerusalem, giving him lodging in his house for the night, preparing him and bringing him to the site of the terrorist attack. Atrash was indicted and convicted for his involvement in the Bus No. 6 attack.[332]   On September 26, 2004 Atrash was sentenced to 8 life sentences for his involvement in the Bus No. 6 attack.[333]

## 2) Government announcements

a.     "Seven Israeli civilians were killed in a terrorist attack in French Hill, Jerusalem. A suicide bomber, dressed as a religious Jew, blew himself up at 5:45 a.m. in a No. 6 bus in French Hill, Jerusalem. Twenty people were wounded, four of them seriously. The police investigation disclosed that the suicide bomber boarded an articulated bus, which was traveling on the No. 6 route, at French Hill junction. The terrorist was disguised as a religious Jew, wearing a skullcap and a prayer shawl, and had an explosive belt with a medium sized explosive charge. He apparently did not arouse the suspicions of the driver or the passengers. The bus had time to travel only a few meters before the terrorist detonated the explosive belt in the front of the bus. The driver lost control of the steering wheel and the bus went off the road."[334]

b.     A Government report on terrorist operations in 2003 stated that: "In June, Samer Atrash and Omar Sharif, both residents of East Jerusalem, who transported the suicide bombers to the terrorist attacks on the No. 14 and No. 6 buses, were arrested."[335]

### d. Conclusion

The many detailed declarations which were issued by Hamas with regard to the terrorist attack on the No. 6 bus and the glorification of the suicide bomber Takruri within the organization – all of these, in and of themselves, would suffice in order to lead to the conclusion that Hamas had

---

[332] *See* Appendix No. 1, pp. 1092-1103.
[333] *See* Appendix No. 1, pp. 1104-1107.
[334] http://www.pmo.gov.il/PMO/Communication/IsraelUnderAttack/French+Hill+-+Jerusalem/French+Hill+-+Jerusalem.htm?Page=2.
[335] http://www.pmo.gov.il/NR/rdonlyres/C27A1A4F-F670-46F5-B047-DECBDA00A564/0/7012490866.doc+%D7%A1%D7%90%D7%9E%D7%A8+%D7%90%D7%98%D7%A8%D7%A9&cd=3&hl=iw&ct=clnk&gl=il, Appendix No. 1, pp. 7-16.

carried out the terrorist attack. At the same time, the ISA conclusions on the basis of its investigations, the criminal convictions of the cell members, and Takruri's video taped "Will," leave no doubt that this attack was carried out by Hamas.

**June 11, 2003 – the terrorist attack on the No. 14a bus, Jaffa Road, Jerusalem**

### a. The terrorist attack

On June 11, 2003 at about 5:30 p.m., a terrorist dressed as an ultra-Orthodox Jew boarded a No. 14a bus at the Mahane Yehuda open air market. A short time thereafter, when the bus was driving down Jaffa Road, near Davidka Square, the terrorist detonated the explosive charge. Seventeen people were killed and more than 100 wounded, including dozens of pedestrians outside the Clal Building in downtown Jerusalem. Hamas assumed responsibility for the terrorist attack immediately. The interrogation of the cell members who were arrested provided complete information on the terrorist attack, including a determination that the cell had acted on the direct instructions of Hamas headquarters in Syria.

### b. Evidence for legal attribution

#### 1) The assumption of responsibility

Immediately subsequent to the terrorist attack, Hamas published an announcement on its web site, in which it assumed responsibility for the suicide bombing of a bus operated by the Egged Company. The announcement stated that the suicide bombing had been carried out by Abd el-Mu'ati Shabana, on behalf of the al-Qassam Brigades.[336]

#### 2) Photographs

The following photographs of Abd el-Mu'ati Shabana, the suicide bomber, clarify his organizational affiliation with Hamas and his role as a suicide bomber:

The pictures show Abd el-Mu'ati Shabana, a short time before the terrorist attack. He is wearing a band around his head inscribed with the words "There is no God but Allah" and holding a Kalashnikov rifle in both hands.[337] Another picture which was published on the Hamas web site shows a photo montage of a picture of the terrorist with a photograph of the destruction which was left after the attack.

---

[336] http://www.alqassam.ps/arabic/operations2.php?id=66.

[337] *See* Appendix No. 1, pp. 761-766. The exhibit includes five pictures which were later published on the official web site of the al-Qassam Brigades. Those pictures appear here: http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=picture&id=315.









338

### 3) The "Will"

Abd el-Mu'ati Shabana video taped a "Will" which can be viewed on YouTube. In his "Will," he states that the terrorist attack is being carried out in the name of the Izz al-Din al-Qassam

---

338 http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=picture&id=315.

Brigades[339] and calls upon his people to continue the struggle. Shabana is wearing the bandana; the "Will" appears to have been video taped in the same place where the still photographs were taken.

### 4) Hamas documents

a.    The official Hamas web site praised Shabana's activity and devoted a long article to him, including a video tape of an interview with his mother, in which she expressed her pride at the terrorist attacks which he carried out.[340]

b.    An official Hamas report on operations in 2003 provides information on "Operation No. 74," in which 17 Zionists were killed. Shabana's name appears in the report as the person who carried out the operation. The report also states that the al-Qassam Brigades assumed responsibility for the terrorist attack.[341]

c.    A special report by the al-Qassam Brigades on the incident gives the following details:

"Type of operation: suicide for the sake of Allah/Martyrdom.

Place of the operation: West Jerusalem, Jaffa Road, near the Clal Building, on bus No. 14.

Date and Time: June 11, 2003, 5:30 p.m.

Carried out by: the *shahid*, a member of the Izz al-Din al-Qassam Brigades, Abd el-Mu'ati Shabana, a Hamas operative from Tel Rumeida in Hebron.

Organization: Izz al-Din al-Qassam Brigades.

Enemy victims: 17 killed, 100 wounded."[342]

d.    An Internet forum gives details of the suicide bomber's life history, along with a large number of pictures of him holding weapons.[343]

e.    The official Hamas web site devoted an extensive article to the suicide bomber. The article included Shabana's biography and stated that he had left a "Will." The following statement appears at the top of the page: "The *Qassami* Jihad fighter Abd el-Mu'ati

---

[339] http://www.youtube.com/watch?v=DMf1NUKb8O4&feature=related.
[340] *See* Appendix No. 1, pp. 767-771.
[341] http://www.alqassam.ps/arabic/operations2.php?id=66
[342] http://www.alqassam.ps/arabic/operations2.php?id=66.
[343] http://www.paldf.net/forum/showthread.php?t=411196.

Shabana, who killed 17 Zionists and wounded hundreds of others and shocked the Sharon government."[344]

f.     Hamas also listed the terrorist attacks which were commanded by Abdallah Qawasmeh, including the attack on the No. 14a bus in Jerusalem.[345]

g.     The official Hamas magazine published in Gaza, al-Risalah, published a picture of the suicide bomber on the front page of its June 19, 2003 issue, referring to him by the term *istishhadi* – meaning a person who has sacrificed his life in a suicide bombing. An extensive article on the terrorist's life appeared in the same issue. The article praised the terrorist attack which he carried out, which – according to the magazine – was performed in revenge for the attempt on the life of Abd al-Aziz al-Rantisi, one of the senior Hamas commanders at the time.[346]

### c. Official documents of the Government of Israel

#### 1)     ISA report

**"The suicide bomber – Abd el-Mu'ati Shabana**

A resident of Hebron, 18 years old, a student at the Hebron Vocational High School, blew himself up in a No. 14 bus in Jerusalem, dressed as an ultra-Orthodox Jew. Responsibility for the terrorist attack was taken by Hamas. As a result of investigations following the attack, the cell with which the suicide bomber worked was exposed, as was the infrastructure of operatives in Jerusalem, one of whom even sheltered the suicide bomber in Jerusalem before he set out on the suicide attack. This organization had connections with Hamas military headquarters in Hebron."[347]

#### 2) Judicial proceedings and legal documents in Israel

a.     **Omar Salah Sharif**

The indictment against Omar Salah Sharif claims that he was recruited by his cousin, BaselShafiq Qawasmeh, who was one of the Hamas recruiters in Hebron. Basel Qawasmeh was directly subordinate to Abdallah Qawasmeh, the al-Qassam commander in Hebron, who received orders directly from the Hamas military headquarters in Syria. The indictment charged him with membership in Hamas; collection of intelligence for the purpose of the terrorist attack on the No. 14 bus; purchasing clothes for Shabana;

---

[344] *See* Appendix No. 1, pp. 767-769.

[345] *See e.g.* Appendix No. 1, pp. 767-769.

[346] Al-Risalah, June 19, 2003 (Appendix No. 1, pp. 772-773).

[347] *See* Appendix No. 1, p. 376.

dressing Shabana in an explosive belt; briefing him as to the location of the terrorist attack; and sending him out to the site of the attack.

According to the indictment, Sharif was given $3500 to purchase a car in which he could take the suicide bombers to the target.

The indictment adds that Sharif patrolled around Jerusalem on a No. 32 bus, in order to see whether any Arabs traveled on that line. He purchased a skullcap and ritual fringes of the type worn by Jews in order to prevent the identification of the suicide bomber.[348] On the day of the terrorist attack, Sharif picked up Shabana and gave him the explosive belt.

Omar Sharif showed the suicide bomber where the No. 32 bus stop was and sent him there. The terrorist boarded a No. 14 bus and blew himself up.

Omar Sharif pled guilty in court to all of the charges in the indictment against him. During his trial, but before the verdict was read out, Omar Sharif declared before the Court: "I did my duty for my people and my land. This is the least I can do. The ones who should be on trial here are the Israeli Army, and Sharon should be on trial, too."[349] He further declared: "My defense attorney has explained to me the charges attributed to me in the amended indictment. I understood it and I plead guilty to it." On the basis of his guilty plea, the Court convicted Omar Sharif.[350]

b.      **Bilal Sub Laban**

Bilal Sub Laban, a cell member who was recruited by Omar Sharif, made a confession in his own handwriting, according to which he helped to implement the terrorist attack on behalf of Hamas; he assembled the "Jewish" clothing for the suicide bomber, so that he would be able to avoid identification, being dressed up as an ultra-Orthodox Jew.[351]

c.      **Amar Nasser al-Din**

Amar Nasser al-Din, an additional member of the cell, helped to transfer the explosive belt from Hebron to Jerusalem and was involved in the preparations for the terrorist attack. He wrote a confession in his own handwriting, in which he described his role in the attack.[352]

---

[348] "Ritual fringes" [*tzitzit*] refers to a garment with four threads in the corners which is worn by religious Jews.
[349] Appendix No. 1, pp. 774-777.
[350] Appendix No. 1, pp. 778-779.
[351] Appendix No. 1, pp. 780-800.
[352] Appendix No. 1, pp. 801-807.

**The Hebron Cell: the terrorist attack on the No. 14a bus**



### d. Conclusion

The many detailed declarations which were issued by Hamas with regard to the terrorist attack on the No. 14a bus, the suicide bomber's video taped "Will," the glorification of the suicide bomber within the organization, and the profusion of praise which was given to the cell which planned and implemented the terrorist attack – all of these, in and of themselves, would suffice in order to lead to the conclusion that Hamas carried out the terrorist attack. At the same time, the ISA conclusions on the basis of its investigations, the criminal convictions of the cell members who survived, and their repeated public declarations expressing pride in the performance of the terrorist attack on the No. 14a bus and other terrorist attacks leave no doubt that this attack was carried out by Hamas.

**June 20, 2003 – roadside shooting attack on Road 60**

### a. The terrorist attack

On Friday, June 20, 2003, at about 1:30 p.m., a car drove down Road 60 near Jerusalem. In the car were Zvi Goldstein, his father Eugene, his wife Michal and his mother Lorraine. The car passed by two Hamas terrorists belonging to the Silwad Cell, who were lying in an ambush.

When the Goldstein Family passed by the terrorists, the terrorists began to fire at the family car. The driver, Zvi Goldstein, was mortally wounded in the neck, and his foot "locked down" on the gas pedal. His father Eugene, who was sitting next to him, was also mortally wounded, but managed to take control of the steering wheel for a short time before the car crashed.

### b. Evidence for legal attribution

#### 1) The assumption of responsibility

An official Hamas report on the operations performed by the organization in 2003 includes "Operation No. 79," in which "one Zionist was killed and three were wounded." The announcement states that the al-Qassam Brigades assumed responsibility for the operation.[353]

#### 2) Hamas documents

a.   A report, which appeared on the official Hamas web site following the arrest of members of the Silwad Cell, reviewed the history of the cell. The report was headlined: "The apprehended Hamas cells from Ramallah stand out in terms of their expertise, superior planning and secrecy."

   The chapter on the Silwad Cell disclosed the names of the five cell members, all of whom were involved in the terrorist attack. The chapter also cited details of other operations which the cell members had performed. Section 5 describes the terrorist attack in question: "The attack targeted a car belonging to a 'settler.' The attack led to the killing of the 'settler' [Zvi Goldstein] and the wounding of others."[354]

b.   The official web site of the al-Qassam Brigades published an extensive report on the members of the cell, including the names of the members of the Silwad Cell who carried out the shooting attack. The al-Qassam Brigades rejoiced and boasted that the extended cell killed 18 people and wounded 25 others, and referred to the terrorist attack as the "Silwad Bridge Terrorist Attack." According to the report, "the attack was planned for

---

[353] http://www.palestine-info.com/arabic/hamas/shuhda/amalyat_03.htm.
[354] Appendix No. 1, pp. 632-635.

the afternoon hours, which are a time of prayer [for Muslims], and during which only Jewish cars travel on the road."

### c. Official documents of the Government of Israel

a.  **Announcement of the attack by the Prime Minister's Office (June 20, 2003)**[355]

"One Israeli was killed and three others were wounded in the terrorist attack on the Ramallah bypass road. The car was attacked from an ambush near the 'settlement' of Kochav Yaakov. At least two of the passengers were wounded by the shooting, but the driver continued driving toward Jerusalem, and his car turned over into a ditch near the Shaar Binyamin Industrial Zone."

b.  **Announcement of the discovery of the cell by the ISA**

"The Israel Security Agency has released for publication today, December 24, 2003, the fact of the arrest of an extensive infrastructure of Hamas terrorists which was active in the perpetration of roadside shooting attacks and the laying of explosive charges in the Benjamin area in the last two years. [...]

The infrastructure was responsible, *inter alia*, for the murder of 10 Israelis, five civilians and five soldiers, and the wounding of 12 others. Most of the terrorists in that infrastructure had served time in prison in the past and had participated in a large number of terrorist attacks. A senior security source stated that the terrorist attacks were characterized by punctilious preparations which included the collection of intelligence and reconnaissance, with regard to both civilian and military targets. According to that element, the funding, in the amount of tens of thousands of dollars, came from the Hamas headquarters infrastructure in Damascus, which also briefed the heads of the [Palestinian] infrastructure. In addition to the vast amounts of money, the infrastructure also had vehicles and additional equipment at its disposal; furthermore, the money was also used to fund the personal needs of the cell members.

The investigation over the last two years exposed three main cells, each of which was responsible for a certain area in the Ramallah – Benjamin sector. They took advantage of their status as residents of the villages in the area and their familiarity with the terrain and the local population; some of them held American passports, which made it easier for them to move through the area.

There were three cells in all. [One of them,] the Kubar Cell, was headed by Jasser Barghouti. That cell carried out a roadside shooting attack against an Israel Defense

---

[355] www.pmo.gov.il/PMO/Communication/IsraelUnderAttack/North+of+Ramallah/North+of+Ramallah.htm.

Forces roadblock near Dora al-Qara, at which Raz Mintz, of blessed memory, was murdered and another soldier was wounded.

An additional incident involving the same cell took place at the Surda roadblock, at which the soldier Nachman Lee Akunis was murdered and another soldier was wounded. The weapon of an additional soldier was taken.

The Silwad Cell, headed by Ahmad Najjar, 27, of Silwad, the holder of an American passport, perpetrated a number of terrorist attacks in the area. The most prominent of these were a shooting attack at a car on the way up to Mt. Baal-Hatzor, and a shooting attack at an Israeli car driven by Esther Gaalya in November 2002 – the shots murdered Esther, may God avenge her blood.

Two months later, the same cell perpetrated a roadside shooting attack at an Israeli vehicle near Ofra, wounding two civilians. In June 2003, Zvi Goldstein was murdered by the cell; three of his family members were later injured, apparently when the driver lost control of the car.

At the head of the third cell that was exposed, the Mazra'a al-Sharqiyya Cell, was Hashem Hijaz, 28, a resident of the village, who was previously imprisoned against a background of Hamas activity. The murder of Hikmat Yassin, a resident of Kubar who was suspected of having collaborated with Israel, is attributed to the cell. It should be noted that the security establishment denies any connection with Yassin. On the eve of [Israel's] Memorial Day, members of the cell shot and killed Gideon Lichtman. In that incident, his six year old daughter was wounded, as was a soldier who was hitchhiking in Lichtman's car."[356]

For additional details concerning the judicial proceedings against the members of the Silwad Cell, see the report presented above in this expert opinion with regard to the terrorist attack which took place on January 29, 2003.

### c.   Announcement by the Israel Defense Forces Spokesperson concerning the capture of the cell:

In a combined operation by Israel Defense Forces infantry forces (including the "Duchifat" Battalion), artillery forces and armored forces, in the villages of Mazra'a a-Sharqiyya, Silwad, Kubar, Kafr Malek, Khirbet Abu Shakhidem, Mazra'a al-Qabliyya, Surda, Jilazun and Kafr 'Aqab, north of Ramallah, 22 Hamas operatives were recently

---

[356] http://www.inn.co.il/News/News.aspx/67840; http://www.globes.co.il/news/article.aspx?did=754159&fid=2.

arrested, who were responsible for the death of 10 Israelis – five civilians and five Israel Defense Forces soldiers:[357]

- A roadside shooting attack in Dora al-Qara on November 2, 2001, in which a "Duchifat" soldier, Staff Sgt. Raz Mintz of blessed memory, was killed.

- A roadside shooting attack at the Surda roadblock on February 16, 2002, in which a paratrooper, Staff Sgt. Lee Akonis of blessed memory, was killed.

- A roadside shooting attack on the Allon Road on November 18, 2002, in which a female Israeli civilian was killed.

- A roadside shooting attack at the Allon junction on May 5, 2003, in which a male Israeli civilian was killed and his daughter and a soldier on reserve duty were wounded.

- A roadside shooting attack on Road 60 near Ofra on May 11, 2003, in which a male Israeli civilian was killed.

- A roadside shooting attack on Road 60 near Silwad on June 20, 2003, in which a male Israeli civilian was killed and his wife and both of his parents were wounded.

- A roadside shooting attack on the Allon Road near al-Mu'ayar on August 29, 2003, in which a male Israeli civilian was killed and his wife was wounded.

  For additional details concerning the judicial proceedings against the members of the Silwad Cell, see the report presented above in this expert opinion with regard to the terrorist attack which took place on January 29, 2003.

### d. Conclusion

The many detailed declarations which were issued by Hamas with regard to the terrorist attacks on Road 60, the glorification of the operatives involved in the attack within the organization, and the profusion of praise which was given to the cell which planned and implemented the terrorist attack – all of these, in and of themselves, would suffice to lead to the conclusion that Hamas carried out the terrorist attack. At the same time, the ISA conclusions on the basis of its investigations, the criminal convictions of the cell members, and their repeated public declarations expressing pride in the performance of the terrorist attack on Road 60 and other terrorist attacks leave no doubt that this attack was carried out by Hamas.

---

[357] Announcement by the Israel Defense Forces Spokesman, December 23, 2003. *See* Appendix No. 1, pp. 808-809.

**August 19, 2003 – the terrorist attack on the No. 2 bus, Jerusalem**

**a. The terrorist attack**

On the evening of August 19, 2003, 23 people, including six children, were killed and 137 others were wounded in a suicide bombing on an articulated bus on the No. 2 line, in the Beth Israel neighborhood of Jerusalem.

The suicide bomber was Ra'ed Abd el-Hamid Misk, a 29 year old Hamas operative from Hebron, who was sent by a Hamas cell in Hebron. Misk was dressed as an ultra-Orthodox Jew, in a (successful) attempt to avoid suspicion. Misk concealed the explosive belt under a long black coat, of the type which ultra-Orthodox Jews are accustomed to wear even in the heavy heat of August in Jerusalem.

Misk was a Hamas operative, an imam at the Ali Bakr mosque which is affiliated with Hamas in Hebron, and a graduate student in Islamic law at the Islamic College of Hebron, which is affiliated with Hamas. After he agreed to serve as a suicide bomber, Misk was taken in the car of another cell member, Abdallah Yihya Sharbati, from Abu Dis to a mosque in Wadi Joz, only a few minutes away from the site of the terrorist attack. Nasim Rashad Za'tari, the head of the Hamas cell in Jerusalem, and Sharbati then prepared Misk and dressed him in the explosive belt which was prepared by an "Engineer" from Hebron and had been hidden in the mosque. After he put on the clothes which disguised him as an ultra-Orthodox Jew, he went to the bus stop, and boarded the bus a short time thereafter.

When Misk detonated the explosive charge, the explosion utterly destroyed the bus, breaking all the windows and scattering metal fragments and pieces of bodies in a wide circle. The Israel Police found the terrorist's identity card among the ruins; inside it was a picture of him, dressed as an ultra-Orthodox Jew.

**b. Evidence for legal attribution**

**1) The assumption of responsibility**

Later that night, Hamas published an announcement, signed by the al-Qassam Brigades cell named for Abdallah Qawasmeh ("the cell of the martyr, Abdallah Qawasmeh, of the Izz al-Din al-Qassam Brigades"). The date on the announcement was August 19, 2003. It mentioned the name of Ra'ed Misk, his age (29), his profession, his level of education and his *nom de guerre*. The announcement was headed by the emblem of the al-Qassam Brigades, with the name of the organization in Arabic and English. Ismail Abu Shanab, one of the Hamas leaders in the Gaza

102

Strip, justified the terrorist attack and claimed that it had been carried out in revenge for Israeli attacks.[358]

The official Hamas magazine, al-Risalah, published a photograph of Ra'ed Misk on the front page of its August 21, 2003 edition. He can be seen at the right of the picture, wearing a green band on his forehead. The picture also shows a photograph of the bus which he blew up.[359] A special document which was written by the al-Qassam Brigades says the following:

"Method of the attack: a suicide bombing for the sake of Allah.

Location: Haim Bar Lev Street, Jerusalem.

Date and time: Tuesday, August 19, 2003, 9 a.m.

Carried out by: the Qassami (a member of the al-Qassam Brigades) martyr Ra'ed Abd el-Hamid Misk, 29, a resident of Hebron.

Organization carrying out the attack: Izz al-Din al-Qassam Brigades." [360]

Hamas repeated the description of the terrorist attack in a similar report which included additional details and praised the terrorist attack and the terrorist, who was an exceptional person and an educated man:[361]

"Method of the attack: a suicide for the sake of Allah.

Location: Haim Bar Lev Street, Jerusalem, next to the Mea Shearim neighborhood.

Date and time: Tuesday, August 19, 2003, 9 a.m.

Carried out by: the Qassami (a member of the al-Qassam Brigades) martyr Ra'ed Abd el-Hamid Misk ("Abu Man'am"), 29, a resident of Hebron.

Organization carrying out the attack: Izz al-Din al-Qassam Brigades.

Method of execution: entry into a crowded bus and detonation. As a result, 21 Zionists were killed and 136 were wounded.

Objective of the attack: the attack was carried out as a response to the breaches of the cease-fire by the Zionists, their continued violent operations, and their refusal to release inmates from prisons, as well as in revenge for the death of the martyr Abdallah Qawasmeh and operatives

---

[358] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=byan&id=750.

[359] Al-Risalah, August 21, 2003 (Appendix No. 1, 810-811).

[360] See Appendix No. 1, pp. 812-816.

[361] See, e.g., http://www.alqassam.ps/arabic/sohdaa5.php?id=750.

from the Izz al-Din al-Qassam Brigades, who were killed in Nablus, and in revenge for the death of the Islamic Jihad commander in Hebron.

Description of the attack: notwithstanding the roadblocks, Ra'ed Misk succeeded in reaching Jerusalem and boarding a No. 2 bus operated by the Egged Company. The bus was crowded with passengers, and he killed 21 of them... The responsibility rests with the Zionist enemy, which breaches the cease-fire... The response by Hamas headquarters is that the attack was in response to the breaches of the cease-fire."[362]

### 2) Photographs

Hamas photographed Ra'ed Misk in various positions before the terrorist attack was carried out. In one picture, he is holding a Kalashnikov in one hand and a Koran in the other (*see* attached pictures below).[363] In several pictures, he can be seen standing separately and waving to his colleagues.[364] Hamas also published pictures of Misk on its web site, holding a weapon in both hands. One of those pictures was disseminated on a Hamas poster. The poster shows Misk holding an automatic weapon; behind him is a picture of the al-Aqsa Mosque; at the sides of the picture are photographs of the blown-up bus. The caption under the picture says: "The *Qassami* martyr Ra'ed Abd el-Hamid Misk."[365]

The official Hamas web site also published photographs of the suicide bomber.[366] Another Hamas web site, the "Palestine Information Center," shows Misk with an identity card, which includes details on his life. The caption of the document says: "The *Qassami* Jihad fighter Ra'ed Abd el-Hamid Misk."[367]

---

[362] *See* Appendix No. 1, pp. 812-816.
[363] *See* Appendix No. 1, pp. 817-821.
[364] *See* Appendix No. 1, pp. 822-835.
[365] *See* Appendix No. 1, pp. 817-821.
[366] *See* Appendix No. 1, pp. 822-837.
[367] *See* Appendix No. 1, pp. 838-844.



[Photo caption: "The Hamas terrorist, Ra'ed Abd el-Hamid Misk. Photo: from TV"]




### 3) The "Will"

Before the terrorist attack, Hamas video taped Ra'ed Misk reading his "Will."[368] Misk was shown wearing a green bandana around his forehead, with a clearly visible Hamas emblem on it.

---

[368] *See* the video tape made by the Hamas, which was published on the Izz al-Din al-Qassam Brigades web site: http://www.alqassam.ps/arabic/video1.php?cat=3&id=268.

He declared that he was a member of the Hamas cell named for Abdallah Qawasmeh. Misk emphasized that this was a suicide bombing and that it was being carried out in revenge for the killing of one of the Islamic Jihad commanders in Hebron that had taken place a week before the suicide bombing.[369]

Misk read his "Will" in Arabic and English. He addressed his "Will" in English to Prime Minister Ariel Sharon and stated that he was going to carry out the suicide bombing in the name of Hamas. He also said: "For every time you breach the cease-fire, we will respond with a revenge operation. At the same time, notwithstanding the operation which I am carrying out, we of Hamas are bound by the cease-fire."[370]

Ra'ed Misk's "Will" was recorded and can be viewed on YouTube.[371]

### c. Official documents of the Government of Israel

### 1) Judicial proceedings and legal documents in Israel

A number of members of the cell which planned the terrorist attack were arrested, charged and convicted by the Israeli courts for their involvement in the terrorist attack. These included:

- **Nasim Rashad Abd el-Wadud Za'tari**: convicted of membership in Hamas and of having selected the location for the terrorist attack. He was recruited to Hamas by Ahmad Badr, the head of Hamas in Hebron, and received money from him. The indictment also charged Za'tari with the recruitment of fellow conspirators, including his brother-in-law, Majdi Barkat Za'tari, and Abdallah Sharbati.[372]

- **Majdi Barkat Za'tari**: convicted of membership in Hamas and transferring explosive charges to Jerusalem, as well as of transporting the suicide bomber.[373] Majdi Barkat Za'tari pled guilty to membership in Hamas and to his involvement in the terrorist attack on the No. 2 bus.[374]

- **Abdallah Yihya Sharbati**: convicted of membership in Hamas and transporting the suicide bomber from Abu Dis to Jerusalem and then to the site of the terrorist attack.[375]

---

[369] http://www.alqassam.ps/arabic/sohdaa5.php?id=750.
[370] *See* Appendix No. 1, pp. 812-816; *see also* Appendix No. 1, pp. 845-851; pp. 852-856.
[371] http://www.youtube.com/watch?v=uGGosFbI58c.
[372] *See* Appendix No. 1, pp. 857-875.
[373] *See* Appendix No. 1, pp. 876-889.
[374] *See* Appendix No. 1, pp. 876-889. *See also* Appendix No. 1, pp. 890-892.
[375] *See* Appendix No. 1, pp. 893-903. *See also* Appendix No. 1, pp. 904-906.

- **Jalal Jamal Ya'mur**: convicted of membership in Hamas; of working as a driver for Hamas headquarters in Hebron; and of being the contact person between Hamas headquarters in Hebron and the Jerusalem cell which carried out the terrorist attack.[376]

- **Ramzi Walid Salah Arafeh**: convicted of membership in Hamas and of collecting intelligence on potential target locations in Jerusalem, including the No. 2 bus line.[377]

### d. Findings of the United States Government

See the confirmation by the United States Government of the fact that the terrorist attack on the No. 2 bus line was carried out by Hamas.[378]

### e. Summary of the terrorist attack on the No. 2 bus line

The mastermind behind the attack was Ahmad Badr, the commander of the al-Qassam Brigades in Hebron, who received his instructions from the Hamas military leaders in Damascus. Other leaders of the al-Qassam Brigades in Hebron, Basel Qawasmeh and Izz al-Din Misk, also participated in planning and organizing the terrorist attack, which was carried out in revenge for the fact that Israel, two months before, had eliminated Abdallah Qawasmeh, the commander of the al-Qassam Brigades in Hebron. Hamas considered that operation on Israel's part a breach of the terms of the partial cease-fire which had been declared by it.

These leaders were assisted by their driver, who transferred messages to Nasim Rashad Za'tari, the commander of the Hamas cell in Jerusalem, who was recruited to Hamas by Badr and received money from Badr. Za'tari received instructions to collect intelligence on crowded places which were suitable for carrying out suicide operations. He also received instructions to recruit Palestinians with Israeli identity cards. Za'tari recruited his brother in law, Majdi Barkat Za'tari, and instructed him to collect intelligence on a bus in Jerusalem which could constitute a target. He also recruited Abdallah Sharbati to act as a driver for the suicide bomber. Rashed Za'tari selected the No. 2 bus line as a convenient target. The choice was approved by Badr, who decided that the terrorist attack would be carried out at night. Badr and Rashed Za'tari had already attempted to perform other suicide bombings on buses in Jerusalem in the past, as well as a suicide attack on a restaurant on Mt. Scopus, near the Hebrew University campus.[379] Badr, Basel Qawasmeh and Izz al-Din Misk were all killed by Israel following the terrorist attack on the No. 2 bus line.[380]

---

[376] *See* Appendix No. 1, pp. 907-908.
[377] *See* Appendix No. 1, pp. 909-912.
[378] http://www.ustreas.gov/press/releases/js672.htm.
[379] *See* Appendix No. 1, pp. 913-928.
[380] Announcement by the Israel Defense Forces Spokesperson, September 22, 2003, regarding the killing of the three (Appendix No. 1, pp. 929-930).

**The Hebron Cell: the terrorist attack on the No. 2 bus line**



### f. Conclusion

The many detailed declarations which were issued by Hamas with regard to the terrorist attack on the No. 2 bus, the glorification of the operatives within the organization, and the profusion of praise which was given to the cell which planned and carried out the terrorist attack – all of these, in and of themselves, would suffice in order to lead to the conclusion that Hamas carried

out the terrorist attack. At the same time, the ISA conclusions on the basis of its investigations, the criminal convictions of the cell members, and their repeated public declarations expressing pride in the performance of the terrorist attack on the No. 2 bus and other terrorist attacks leave no doubt that this attack was carried out by Hamas.

### September 9, 2003 – the terrorist attack on Café Hillel, Jerusalem

#### a. The terrorist attack

On September 9, 2003, Ramez Abu Salim, a Hamas operative from a village near Ramallah, went into Café Hillel, a popular café in the German Colony neighborhood of Jerusalem, and blew himself up. The explosion killed seven people and wounded 50 more. The explosion represented the culmination of a plan of action which involved scores of Hamas operatives and two separate Hamas cells, in addition to the personal involvement of members of the most senior echelon of the al-Qassam Brigades management in the West Bank.

On the day of the terrorist attack, Naal Salame Ubeid and Muhammad Ubeid, brought Abu Salim to the home of Muhammad Anati. While Amro served as the lookout, the two shaved off Abu Salim's beard and dressed him in an explosive belt. When they were finished, they took him to Café Hillel and told him to come as close as possible to the café – and even to go in, if possible – and then to blow himself up.

#### b. Evidence for legal attribution

##### 1) The assumption of responsibility

The day after the terrorist attack, Hamas published a leaflet *which was disseminated to the media in Ramallah and was also transferred to Yedioth Ahronoth and to me personally.* The leaflet stated the name of the suicide bomber, Abu Salim. It boasted that "the Izz al-Din al-Qassam Brigades are the ones responsible for this operation." The leaflet was signed by the al-Qassam Brigades. A "military announcement" set forth the full name of the person who carried out the operation, "Ramez Salame Izz al-Din Abu Salim, 22, a resident of the village of Rantis." The announcement further stated that "the Izz al-Din al-Qassam Brigades take responsibility for the terrorist attack."[381]

An official Hamas report on the terrorist attacks carried out in 2003 described "Operation No. 94 in Café Hillel in Jerusalem." The report stated that the al-Qassam Brigades assumed responsibility for the operation.[382] Hamas also provided the *al-Jazeera* network with a video tape with the terrorist's "Will," and it was broadcast on the station the day after the terrorist attack was carried out. In his "Will," the suicide bomber, Abu Salim, asked his father: "Forgive me, I am invited to a wedding, I cannot wait even one moment."[383] From my professional experience, I know that, in the lexicon of radical Islam, the word "wedding" can often refer to the death of a martyr.

---

[381] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=byan&id=477.
[382] http://www.palestine-info.info/arabic/Hamas/shuhda/amalyat_03.htm.
[383] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=byan&id=477.

An official report by Hamas reported that "the terrorist attack was carried out in the Emek Refaim neighborhood in the heart of Jerusalem, inside Café Hillel. The perpetrator is Ihab Abd al-Qader Muhammad Abu Salim, a student of Humanities at Bir Zeit University. The perpetrator [is a member of] the Izz al-Din al-Qassam Brigades."[384]

On September 9, 2003, Hamas issued a short announcement taking responsibility, accompanied by expressions of joy over the results of the terrorist attack.[385]

### 2) Hamas posters

After the terrorist attack, Hamas produced posters bearing the terrorist's picture, with the emblem of the al-Qassam Brigades next to him. Some of the posters, which are reproduced below, were found in the al-Ein mosque in al-Bireh. This mosque belongs to the Hamas infrastructure in the West Bank. Abu Salim is also registered as a *shahid* in the chapter honoring the suicide bombers in the Hamas <u>Book of Martyrs</u>.[386] The Hamas web site also published an extensive article about the suicide bomber.[387]

The suicide bomber's image on posters which were found in the al-Ein mosque in al-Bireh:

 

---

[384] http://www.alqassam.ps/arabic/operations2.php?id=84.
[385] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=byan&id=477.
[386] http://www.alqassam.ps/arabic/sohdaa3.php?from=32.
[387] http://www.alqassam.ps/arabic/sohdaa5.php?id=477.

A photograph of the terrorist as it appeared on the Hamas web site, with a picture of the results of the incident next to it:[388]



The poster prepared for the suicide bomber by Hamas:[389]



### c. Official documents of the Government of Israel

### 1) ISA announcement [390]

"September 9, 2003 – explosion by a suicide bomber at the entrance to Café Hillel. 7 killed and 70 wounded. The suicide bomber is Ramez Abu Salim, a resident of Rantis, 22 years old, a Hamas operative, a student and an activist in *al-Kutla al-Islamiya* at the Open University of al-Bireh. He was under administrative detention and was released in February 2003. At 11:20 p.m., he blew himself up at the entrance to Café Hillel on Emek Refaim Street in Jerusalem. The suicide bomber was sent out on the terrorist attack by a front line cell of the Hamas infrastructure in the village of Beit Laqiya, a cell which is composed of Hamas recruits from East Jerusalem and was handled by Hamas headquarters in Ramallah. During the month of October 2004, a number of residents of the village of Issawiya were arrested in Jerusalem by the Israel Security Agency and the Israel Police. During their interrogation by the ISA, two of them admitted that they were the ones who gave the suicide bomber shelter and took him to the target location for the suicide attack. Other subjects, during their interrogation, confessed that they had helped the

---

[388] http://www.alqassam.ps/arabic/operations2.php?id=83#.

[389] http://www.alqassam.ps/arabic/operations2.php?id=84.

[390] http://www.pmo.gov.il/NR/rdonlyres/81819B47-FE6C-47C2-B000-77B9A7EB9A5A/0/%D7%97%D7%95%D7%91%D7%A8%D7%AA%D7%9E%D7%97%D7%91%D7%9C%D7%99%D7%9D%D7%9E%D7%AA%D7%90%D7%93%D7%99%D7%9D%D7%91%D7%9C%D7%99%D7%AA%D7%9E%D7%95%D7%A0%D7%95%D7%A1.doc.

two of them to set up the contact with Hamas headquarters in Ramallah and to carry out the terrorist attack."

### 2) ISA report[391]

"October 2004 – arrest of a cell of residents of East Jerusalem who had been recruited to Hamas and were handled by Hamas headquarters in Ramallah. The members of the cell carried out the suicide bombing at Café Hillel in Jerusalem. In September 2004, the fact of the rest of the Hamas infrastructure from the village of Beit Laqiya (see details below – July 2004) was released for publication. Investigation revealed a front-line cell of the same infrastructure, which was composed of Hamas recruits from East Jerusalem. This cell was handled by Hamas headquarters in Ramallah, and its members were the ones who perpetrated the suicide bombing at Café Hillel in Jerusalem, after they received the explosive belt and the suicide bomber from the Hamas cell which was exposed in Beit Laqiya. The members of that cell were arrested during the month of October.

The central operatives were as follows:

- Ahmad Muhammad Ali Ubeid – born in 1966, a resident of the village of Issawiya, known to head the Da'wa Association of Hamas in the village. In his interrogation, he confessed that he headed the Hamas cell which carried out the suicide bombing at Café Hillel.

- Naal Salame Mahmoud Ubeid – born in 1978, a resident of the village of Issawiya, Ahmad Ubeid's pupil in a religious study framework in Issawiya, participated in the perpetration of the suicide bombing at Café Hillel.

- Abd el-Aziz Muhammad Musa Amro – born in 1960, a resident of the Shuafat neighborhood, active in the Da'wa Association of Hamas in his neighborhood, made his father's house available to the cell as the place where the suicide bomber was dressed in the explosive belt.

- Salah Subhi Daud Musa – born in 1964, a resident of the village of Beit Laqiya, served as commander of the cell on behalf of Hamas military headquarters in Ramallah.

- Faiz Mustafa Odeh Mahu – born in 1961, a resident of the Anata neighborhood, was responsible on behalf of Hamas for the Da'wa Association of Hamas in the villages north of Jerusalem and served as the contact person between the cell members and Hamas military headquarters in Ramallah.

---

[391] ISA report entitled "Summary data for the year 2004", in Appendix No. 1, pp. 931-956, and at the following link: www.pmo.gov.il/NR/rdonlyres/590B7AD4-2031-483C-BCFE-01CA6C1C6C36/0/shbek0601.doc.

July 2004 – discovery of a Hamas cell from the village of Beit Laqiya, which was involved in murderous terrorist attacks which were carried out in Israel in 2003 and 2004, in which 17 Israeli civilians were killed and 108 more people were wounded.

At the end of July 2004, the Israel Security Agency, the Israel Defense Forces and the Israel Police discovered an organization of Hamas operatives from the village of Beit Laqiya near Ramallah, which was subordinate to Hamas military headquarters in Ramallah. The organization had been headed by Salah Musa, who was arrested on September 26, 2003. Seven more operatives who had worked under Musa were arrested during the period between July and August 2004.

Among the terrorist attacks carried out by the infrastructure:

- A suicide bombing at a hitchhiking station for soldiers at the Tzrifin junction on September 9, 2003, in which nine Israeli civilians were killed and 14 more people were wounded. This terrorist attack was carried out by Ahab Abu Salim.

- A suicide bombing at Café Hillel in Jerusalem on September 9, 2003, in which seven Israeli civilians were killed and 70 more people were wounded. This terrorist attack was carried out by Ramez Abu Salim.

- A terrorist attack involving an explosive charge in a bus stop in Har Zion Boulevard in Tel Aviv, on July 11, 2004, in which a female Israel Defense Forces soldier was killed and 24 Israeli civilians were wounded.

The infrastructure planned additional suicide bombings, including a terrorist attack involving an explosive charge on the Bat Yam beach."

### 3) Announcement by the Government of Israel (September 9, 2003)

"The second terrorist attack in six hours: a Hamas suicide bomber blew himself up at Café Hillel in the German Colony. Eyewitnesses state that the security guard at the café spotted the terrorist, who then blew himself up. The terrorist previously attempted to enter a branch of the 'Pizza Meter' pizzeria chain, but was stopped. In the terrorist attack in Jerusalem, seven Israelis were murdered and 57 were wounded."[392]

### 4) Announcement by the Government of Israel (March 17, 2009)

On March 17, 2009, a meeting of the Israel Government was held to discuss the Hamas demands for the release of inmates from prison, in return for the release of the kidnapped soldier Gilad Shalit. At the end of the meeting, a list of 10 terrorists was published; according to a statement

---

[392] http://www.pmo.gov.il/PMO/Communication/IsraelUnderAttack/Jerusalem3/Jerusalem.htm.

by the Government, Israel would not be prepared to release the terrorists in question at any price. The list included Bahij Badr and Ibrahim Hamad.[393] The following is the text of the announcement[394] insofar as it relates to those terrorists:

- "Bahij Badr – arrested in 2004 and sentenced to 18 cumulative life sentences. He headed the Hamas infrastructure in Beit Laqiya which perpetrated the terrorist attacks at Café Hillel, in the bus stop near Tzrifin and in the Central Bus Station in Tel Aviv. He was involved in the murder of 18 Israelis. He is considered to be a significant leader and a symbol within the organization.

- Ibrahim Hamad – responsible for terrorist attacks in which 82 Israelis were murdered and hundreds were wounded. Among the attacks related to him were the car bomb in Zion Square in Jerusalem, Café Moment, the club in Rishon Le-Zion, a suicide bombing on a No. 4 bus on Allenby Road in Tel Aviv, and the terrorist attack at Café Hillel in Jerusalem."

### d. Declarations by the conspirators after their arrest

Many of the members of both cells which were involved in the terrorist attack were arrested during the years which followed the explosion. Several of them confessed to their involvement in a terrorist attack, which all of them described as a Hamas operation. Those who confessed were:

### 1) Bahij Badr, head of the Beit Laqiya cell

I met with Badr in the Beersheba Prison in February 2006. The meeting with him lasted for more than three hours. Bahij sat opposite a camera and spoke freely, in Arabic and English. He noted that, as a university graduate, he was fluent in both languages. He told me how he had recruited Ramez Salim; how he had prepared the explosive materials and the explosive belt; and how he had subsequently dispatched the suicide bomber to Jerusalem. He also told me about his activity in Hamas and his religious faith. He was very proud of his actions and did not express remorse for them.[395]

### 2) Ibrahim Muhammad Yunas Dar Musa

Following his arrest, Musa confessed to membership in Hamas and to having recruited the suicide bomber, Ramez Abu Salim. He described his participation in smuggling the explosive belts into Israel and his assistance to the Jerusalem cell in the final preparations before the attack. He was sentenced by an Israeli court to 17 life sentences.

---

[393] http://www.ynet.co.il/articles/1,7340,L-3688058,00.html.
[394] www.pmo.gov.il/NR/rdonlyres/1EED1581-0DD5-41A7-87DE-9B37BE6EFFD9/0/prisoners.doc.
[395] *See* "For the Sake of Allah" in Appendix No. 2. *See also* Appendix No. 1, pp. 957-958.

### 3) Muhammad Ahmad Ubeid

Muhammad Ubeid confessed, after his arrest, that he was an operative in the al-Qassam Brigades and that he was the leader of the Hamas cell in Jerusalem which carried out the terrorist attack. He confessed to having collected intelligence for Hamas, while maintaining contact with the commanders of the organization in Ramallah. He further confessed that he chose the site of the terrorist attack; he put the explosive belt on the suicide bomber; and he sent him to the target location. Muhammad Ubeid's confession sets forth in detail the methods of operation that are used by Hamas, including methods which were developed during the 1990s, such as the use of certain code words during a meeting; the transmission of communiqués; and identification by means of agreed upon signs. This confession describes a methodology which is characteristic of Hamas.[396]

### 4) Naal Salame Ubeid

Naal Ubeid confessed, after his arrest, that he was an operative in the al-Qassam Brigades and that he had been recruited into Hamas approximately four years before. He confessed that he had undergone training in the assembly of explosive charges and that he had helped to choose the site of the terrorist attack; that he had dressed and shaved the suicide bomber and sent him to Café Hillel.[397]

### 5) Abd el-Aziz Amro

Abd el-Aziz Amro confessed, after his arrest, that he had made his father's house available to the cell and had acted as a lookout while Ahmad Ubeid dressed the suicide bomber in the explosive belt.

### e. Judicial proceedings and legal documents in Israel

Muhammad Ahmad Ubeid, Naal Salame Ubeid, Salah Subhi Daud Musa, and Abd el-Aziz Amro (all of whom are mentioned above) were convicted, *after having confessed before the Court*, of involvement in the terrorist attack on Café Hillel and of membership in Hamas. Musa was sentenced to 17 consecutive life sentences. Muhammad Ahmad Ubeid and Naal Ubeid were both sentenced to four life sentences. Ibrahim Hamad and Bahij Badr were convicted of having held command posts in Hamas and of having given instructions to carry out a large number of terrorist attacks, including the one on Café Hillel. On March 17, 2009, the Israel Government published a list of terrorists which it refused to release in the negotiations with Hamas with regard to Gilad Shalit, an Israeli soldier who is being held prisoner by the terrorist organization. The list included Hamad and Badr.

---

[396] *See* Appendix No. 1, pp. 959-966.
[397] *See* Appendix No. 1, pp. 967-977.

### f. Summary of the terrorist attack on Café Hillel

#### 1) General

Until his arrest by Israel in 2006, when he was charged with the murder of 82 Israelis (including seven in Café Hillel), Ibrahim Hamad was the commander of the military section of Hamas in the West Bank. His deputy, Salah Mahmoud al-Talakhmeh, was in charge of the al-Qassam Brigades in the southern part of the West Bank. Talakhmeh was a veteran Hamas operative who had been involved in Hamas suicide bombings on buses in Jerusalem in 1996. He was in direct contact with Hamas headquarters in Syria and Hamas military headquarters in Gaza. It was Talakhmeh who gave the direct order to the Hamas members under his command to recruit the suicide bomber and send him to kill people in Jerusalem.

The responsibility for the mission was divided between two separate Hamas cells: one in Beit Laqiya, a village near Ramallah in the West Bank, and the second in the Arab village of Issawiya, north of Jerusalem. Because the residents of Issawiya hold Israeli identity documents, they have greater freedom of movement in Jerusalem and in Israel in general. For this reason, whereas the Beit Laqiya cell had greater responsibility for the terrorist attack, including the recruiting of the suicide bomber and the assembly of the explosive charges, the Issawiya cell was responsible for locating a suitable place for the terrorist attack and sending the suicide bomber to the selected target location.[398]

Ibrahim Muhammad Yunas Dar Musa, a senior Hamas operative who had also been involved in attempts to construct Qassam rockets with a view to launching them into Israel, reported to Talakhmeh in Ramallah. Musa, together with Bahij Badr (an additional senior Hamas operative, who headed the Beit Laqiya cell), played a significant role in recruiting and preparing the suicide bomber. Badr personally prepared the explosive belt and, with Musa's assistance, smuggled the belt into Jerusalem and gave it to Hamas operatives before the terrorist attack. The two of them then helped the terrorist, Abu Salim, to reach the Jerusalem cell.

The commanders of the Jerusalem/Issawiya cell were Ahmad Muhammad Ubeid (who headed the *Da'wa* infrastructure in the village) and Naal Salame Ubeid, a 26 year old from Issawiya, who was Ahmad Ubeid's pupil in a religious study framework. The two of them were recruited to Hamas by Salah Subhi, the contact person with Hamas headquarters in Ramallah.[399]

On the instructions of headquarters, Naal Salame Ubeid, a 26 year old from Issawiya, and Muhammad Ubeid collected intelligence for Hamas. They examined cafés and restaurants which could serve as potential target locations for terrorist attacks. They received funding from Hamas for their activities and purchased a car. They were trained in the assembly of explosive charges

---

[398] *See* Appendix No. 1, pp. 978-988.
[399] *See* Appendix No. 1, pp. 978-988.

and obtained an apartment for the purpose of preparing the suicide bomber. The apartment belonged to Muhammad Anati,[400] Abd el-Aziz Amro's father. Amro gave the cell permission to use it, knowing that the apartment would be used to fit the suicide bomber in the explosive belt.[401]

---

[400] *See* Appendix No. 1, pp. 989-993.
[401] *See* Appendix No. 1, pp. 994-996.

**The Hamas cells: the terrorist attack on Café Hillel**



119

### g. Conclusion

The many detailed declarations which were issued by Hamas with regard to the terrorist attack on Café Hillel, the boasting about the suicide bomber who carried out the attack, Abu Salim, and his video taped "Will" – all of these, in and of themselves, would suffice to lead to the conclusion that Hamas carried out the terrorist attack. At the same time, the ISA conclusions on the basis of its investigations, the criminal convictions of the cell members, and the video taped declarations by Bahij Badr, in which he declared to me his pride in the performance of the terrorist attack on Café Hillel, leave no doubt that this attack was carried out by Hamas.

### September 24, 2004 – mortar fire in Neve Dekalim

#### a. The terrorist attack

Due to the construction of the separation fence in Israel and other defensive means which Israel adopted in order to combat Palestinian terrorism, Hamas and other terrorist organizations encountered growing difficulty in 2004 in carrying out suicide bombings against Israeli civilians.[402] Accordingly, Hamas began to make increasing use of another method of operation to perform its terrorist activity: mortar and rocket fire[403] at Israeli population centers. A mortar is a short-range weapon which is more accurate than a rocket; it is mobile, lightweight, easy to operate and can easily be concealed in the terrain. In 2004, the year which preceded Israel's unilateral detachment from the Gaza Strip, an unprecedented number of mortar shells (876 mortar shells, according to the Israel Defense Forces) was fired at the Israeli settlements in the Gaza Strip. One of those mortar shells was fired on September 23, 2003, and led to the death of Tiferet Trattner, a 24 year old woman from Jerusalem.

#### b. Evidence for legal attribution

##### 1) The assumption of responsibility

Following the terrorist attack, at least three media entities reported that Hamas had contacted them and had assumed responsibility.

The Associated Press, through a correspondent of the agency in Gaza, reported that the mortar shells had been fired by Hamas, and that the organization had assumed responsibility by means of a video tape. According to AP, "Hamas assumed responsibility for the firing of the two mortar shells into Neve Dekalim. The Hamas video tape shows three masked men firing the mortar."[404]

The Israeli daily Ha'aretz reported, through its military correspondent, Amos Harel, that "the Izz al-Din al-Qassam Brigades, the military arm of Hamas, assumed responsibility."[405]

---

[402] *See* ISA report for 2004:
http://www.shabak.gov.il/SiteCollectionImages/%D7%A1%D7%A7%D7%99%D7%A8%D7%95%D7%AA%20%D7%95%D7%A4%D7%A8%D7%A1%D7%95%D7%9E%D7%99%D7%9D/terror-summary-2004-new.pdf.
*See also* ISA report on the terrorist attacks between the years 2000 and 2005. The report shows a significant decline in terrorist attacks in 2004, by contrast to 2001 through 2003:
http://www.shabak.gov.il/SiteCollectionImages/%D7%A1%D7%A7%D7%99%D7%A8%D7%95%D7%AA%20%D7%95%D7%A4%D7%A8%D7%A1%D7%95%D7%9E%D7%99%D7%9D/sikum%205%20years.pdf.
[403] *See* a film by the al-Qassam Brigades which concentrates on mortar fire into Israel:
http://www.alqassam.ps/arabic/video1.php?cat=4&id=187.
[404] *See* Appendix No. 1, p. 997.
[405] *See* Appendix No. 1, p. 998.

In addition, in accordance with that which has been set forth on page 44 of the expert opinion by Evan Kohlmann, the al-Qassam Brigades published at least two leaflets on their web site (both on September 24, 2004), in which they assumed responsibility for the terrorist attack. Both of the leaflets can still be viewed on that web site (www.alqassam.ps).[406] The first leaflet took the credit for "firing three 100 mm mortar shells at the 'settlement' of Neve Dekalim at exactly 10:30 a.m."[407] The second leaflet repeated the information and added that the terrorist attack had "killed two enemy soldiers and lightly wounded two others."[408]

### 2) The video tape of the terrorist attack

These reports are also verified by the video tape of the terrorist attack, which I have seen but which no longer appears to be available. The tape shows three masked men, whose faces are covered with green bandanas (indicating Hamas), firing toward Neve Dekalim.

### c. Conclusion

In the absence of the confirmation which is obtained in cases of suicide bombings and other terrorist attacks, in which the bodies of the perpetrators can be identified with certainty; and in the absence of documentation resulting from a comprehensive criminal investigation, I cannot definitively state that the terrorist attack by mortar fire on September 24, 2004, was carried out by Hamas. At the same time, based on the assumption of responsibility by Hamas, in addition to my own experience as an expert and my familiarity with the tactics adopted by the organization, as well as the video taping of the mortar fire itself, my professional opinion is that there is a high degree of probability that Hamas was responsible for this terrorist attack, and that there is no proof, to the best of my knowledge, to the contrary.

The leaflet from the Hamas web site:[409]

---

[406] http://www.alqassam.ps/arabic/statments.php?id=755. *See also*: http://www.alqassam.ps/arabic/statments.php?id=754.
[407] http://www.alqassam.ps/arabic/statments.php?id=754.
[408] http://www.alqassam.ps/arabic/statments.php?id=755.
[409] http://www.alqassam.ps/arabic/statments.php?id=755.



بسم الله الرحمن الرحيم

**Ezzedeen Al-Qassam Brigades**
**Military Wing of Hamas Movement**
**information Office**

كتائب الشهيد عز الدين القسام
الجناح العسكري لحركة حماس
المكتب الإعلامي

2004-09-24

... يا جماهير شعبنا الفلسطيني المجاهد... يا جماهير أمتنا العربية والإسلامية

بحمد الله تعالى وتوفيقه تمكنت كتائب الشهيد عز الدين القسام من إطلاق ثلاث قذائف

هاون عيار 100 باتجاه مغتصبة "نفيه ديكاليم" ، وذلك في تمام الساعة 10:30، من

صباح اليوم الجمعة 10 شعبان 1425هـ لموافق 24/09/2004م

إذ نا في كتائب الشهيد عز الدين القسام إذ نعلن مسؤوليتنا عن هذا القصف لنعاهد الله

تعالى ونعاهد جماهير شعبنا الفلسطيني المجاهد على المضي قدماً في طريق الجهاد

والمقاومة و قصف المغتصبات الصهيونية حتى ينجر العدو الصهيوني لغاشم عن

أرضنا المباركة.

وقبه لجهاد نصر أو استشهد

كتائب الشهيد عز الدين القسام

الجمعة 10 شعبان 1425 هـ

الموافق 24/09/ 2004م

الساعة 10:50

123

### October 22, 2003 – shooting attack in Tel Rumeida, Hebron

**a. The terrorist attack**

On October 22, 2003, at about 1:15 p.m., Rafiq Ziad Aqanibi, a Hamas operative in Hebron, entered the Jewish neighborhood of Tel Rumeida (near Hebron). Aqanibi was armed with a Kalashnikov; on his head, he wore a green band which showed his affiliation with Hamas. At a distance of a few meters from the home of the Ben Yitzhak family, he opened fire. Gabi Ben Yitzhak, who was at home, was lightly wounded in one arm.

When the paramedic, Eyal Noked, reached the scene, Aqanibi fired a large number of bullets at his ambulance and hit Noked's shoulder. Aqanibi emptied a number of clips before he was shot and killed by the members of the local on-call security squad, who arrived following reports on the shooting. Noked and Ben Yitzhak were admitted to Hadassah Hospital in Jerusalem for medical treatment.

**b. Evidence for legal attribution**

**1) The assumption of responsibility**

After the terrorist attack, the official Hamas web site published a large article on the attack, which included a detailed biography of Aqanibi and a description of the attack in Tel Rumeida.[410] A similar article appeared on the web site of the al-Qassam Brigades.[411] His name also appeared in the Hamas <u>Book of Martyrs</u>. On the fifth anniversary of the terrorist's death, Hamas published an article on Aqanibi and the attack which he carried out, along with his picture and biography. The emblem of the al-Qassam Brigades also appeared in the background.[412] He is also listed as a martyr of the al-Qassam Brigades on an additional site related to Hamas,[413] and his name appears on an official Hamas web site in a list of members of the al-Qassam Brigades in Hebron who were killed, as *Shahid* No. 21.[414]

After the attack, Hamas published a poster bearing a large photograph of Aqanibi, with the following inscription: "Our martyr, the hero, the Jihad fighter, Rafiq Mohammad Ziad Ya'aqoub Aqanibi." On the left side of the poster, the Hamas emblem is seen; on the right side, the official emblem of the al-Qassam Brigades appears. At the bottom of the poster is the date of the attack.

---

[410] http://www.palestine-info.info/arabic/spfiles/suhada_2005/shuhda_khaleel/rafeeq.htm.
[411] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=sera&id=362.
[412] http://www.paldf.net/forum/showthread.php?t=313248.
[413] http://www.abrrar.net/vb/showthread.php?p=91607.
[414] http://www.palestine-info.info/arabic/spfiles/suhada_2005/shuhda_khaleel/khaleel.htm.



Aqanibi's photograph is also included in another poster, which was published by Hamas after the terrorist attack. In the picture, Aqanibi appears with several other martyrs from the Hamas cell in Hebron. In the center of the poster is the photograph of Abdallah Qawasmeh, who was the commander of the al-Qassam Brigades in Hebron until his death and who planned the terrorist attack on the No. 37 bus in Haifa, which is discussed above. The suicide bomber from the No. 37 bus line, Muhammad Amran Salim al-Qawasmeh, is also shown in the poster, along with Basel Muhammad Qawasmeh, who was responsible for the terrorist attack on the No. 6 bus line in Jerusalem.

---

[415] Source of the photograph: www.palestine-info.info/arabic/spfiles/suhada_2005/shuhda_khaleel/rafeeq.htm.



Finally, Aqanibi's photograph appears on a site showing pictures of the al-Qassam Brigades martyrs.[417]

### 2) Photographs

After Aqanibi's death, a press photographer who worked for Yeshanews.com photographed his body, which was lying on the road, near Tel Rumeida. I watched the photograph being taken,[418] and I clearly saw Aqanibi's green bandana.

---

[416] Source of the photograph: http://www.palestine-info.info/arabic/spfiles/suhada_2005/shuhda_khaleel/khaleel.htm.

[417] http://www.palestine-info.info/arabic/spfiles/suhada_2005/shuhda_khaleel/khaleel.htm.

[418] http://www.yeshanews.com/?id=23960.

### 3) The "Will"

According to Hamas web sites, Aqanibi left a "Will," in which he asked his family to forgive him for having chosen to carry out the suicide bombing.[419] Due to the near-total certainty that a shooting attack of this type would lead to the perpetrator's death, Hamas and other terrorist organizations consider this type of operation as a suicide operation and commemorate their fallen comrades as martyrs.

### c. Official documents of the Government of Israel

I have studied the documents of the Israeli military court in Hebron. In three cases, before his death, Aqanibi was arrested by Israel and convicted of membership in Hamas. At the time when he was killed, Aqanibi was wanted by the Israeli security forces on suspicion of being involved in Hamas terrorist operations.

### d. Conclusion

The many detailed declarations which were issued by Hamas with regard to the terrorist attack in Tel Rumeida, and the boasting about Aqanibi within the organization – all of these, in and of themselves, would suffice to lead to the conclusion that Hamas carried out the terrorist attack. At the same time, the fact that Aqanibi wore a Hamas bandana while carrying out the terrorist attack in Tel Rumeida leaves no doubt that this attack was carried out by a Hamas operative on behalf of the organization.

---

[419] http://www.palestine-info.info/arabic/spfiles/suhada_2005/shuhda_khaleel/rafeeq.htm.

**January 29, 2004 – the terrorist attack on the No. 19 bus, Jerusalem**

### a. The terrorist attack

On January 29, 2004, shortly before 9 a.m., Ali Muneer Ja'ara, a 24 year old Palestinian policeman from Bethlehem, blew himself up in a No. 19 bus at the corner of Gaza Road and Arlozorov Street in the Rehavia neighborhood of Jerusalem. Eleven people were killed and more than 50 others wounded, 13 of them seriously. The explosion ripped the bus to shreds, blew the roof off, broke all of the windows and left pieces of the destruction scattered through the street and on the roofs of adjacent houses.

Ja'ara originally contacted an operative of the al-Qassam Brigades and said that he wanted to carry out a suicide bombing for Hamas. He underwent training and indoctrination by Hamas and attempted to carry out the operation for Hamas, before he decided not to do so because he and one of his al-Qassam handlers encountered a Palestinian roadblock on their way to the intended target location. A few days later, Ja'ara approached the al-Aqsa Martyrs Brigades, in order to carry out the terrorist attack. As I conclude below, on the basis of the assumption of responsibility by Hamas and by the al-Aqsa Martyrs Brigades, as well as of the interrogations and the judicial proceedings in Israel, both Hamas and the al-Aqsa Martyrs Brigades are responsible for this terrorist attack.

### b. Evidence for legal attribution

#### 1) The assumption of responsibility

A short time after the terrorist attack, the Bethlehem headquarters of the al-Aqsa Martyrs Brigades, the military arm of Fatah, published a press release according to which the al-Aqsa Martyrs Brigades had perpetrated the terrorist attack. At the same time, the al-Aqsa Martyrs Brigades has never repeated this claim on their web site, and Fatah subsequently rejected any responsibility for the terrorist attack.[420]

On January 31, 2004, the al-Qassam Brigades declared that they were the sole entity which was responsible for the terrorist attack:

"Praise God, with God's help, our Jihad fighter, succeeded in carrying out a great sacrifice operation ... When he boarded a No. 19 bus which was transporting Zionists ... He detonated the explosive belt as he had been instructed to do. The Izz al-Din al-Qassam Brigades today

---

[420] *See* the assumption of responsibility by Izz al-Din al-Qassam. In their announcement, they rebuke Fatah for having hastened to take responsibility for the terrorist attack:
http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=byan&id=378. *See also* the assumption of responsibility on the Hamas web site: http://www.palestine-info.com/arabic/spfiles/suhada_2005/book/3amaleyah_2.htm.

celebrates the martyrdom of one of its righteous moons who carried out the heroic operation Ali Munir Yusuf Ja'ara, age 25, from the al-Aida refugee camp in Bethlehem."[421]

The leaflet explained that Ja'ara carried out the attack on his 25th birthday, as a "natural response" to the "crimes" of the "Zionist enemy" against the Palestinian people, the Palestinian cities in the Palestinian refugees, including the most recent Israel Defense Forces attack on the Zeitun suburb of Gaza City. The leaflet also declared that the attack was a gift to "our brave inmates in the prisons of the Zionist enemy." "We are telling them that our hands will continue to press the trigger until the release of every last grain of earth and all the prisoners and detainees will return to their homes," stated the leaflet.

The al-Qassam Brigades leaflet also expressed displeasure at the premature assumption of responsibility by the al-Aqsa Martyrs Brigades, stating: "We deliberately delayed taking responsibility for the attack, in order to enable our brothers to correct their hasty (and mistaken) assumption of responsibility." The leaflet added that the pictures of the martyr, wearing a Hamas band around his head, and the pictures of the al-Qassam Brigades martyrs behind him, had been sent to the media.

An Izz al-Din al-Qassam Brigades report on the terrorist attack states that it was carried out "by the Izz al-Din al-Qassam Brigades."[422]

The official Izz al-Din al-Qassam Brigades Announcement, using a verse from the Kuran, stated that the perpetrator, Ali Ja'ara, was an instrument of Allah. The announcement assumes official responsibility for the terrorist attack.[423]

### 2) Photographs

Before going out to make the first (failed) attempt to perpetrate the suicide bombing, Ja'ara was photographed by his handler, the Hamas operative Nufal Adawin, wearing Hamas clothing. In his recorded "Will," Ja'ara expressed pride in his death as a *shahid* in the service of Hamas.[424] Some of the photographs were later sent to the press and were published on the al-Qassam Brigades web site:

---

[421] http://www.alqassam.ps/arabic/sohdaa5.php?id=378.
[422] http://www.alqassam.ps/arabic/operations2.php?id=72.
[423] http://www.alqassam.ps/arabic/byan_poup.php?id=406.
[424] http://www.mobile4arab.com/vb/showthread.php?p=1012544.





425

In addition, Ja'ara and the attack were mentioned in the <u>Book of Martyrs</u>, or in the commemorative books describing martyrs' death which were published by Hamas in honor of the suicide bombings and the Hamas activists who died carrying them out. These publications include pictures of Ja'ara, which were taken before he set out to perform the attack, along with pictures of the outcome of the attack, with the Hamas emblem superimposed on them.[426]

---

[425] Source of the photograph: http://www.palestine-info.info/arabic/Hamas/shuhda/2004/ali/photo.htm.
[426] *See e.g.*: http://www.palestine-info.com/arabic/spfiles/suhada_2005/book/3amaleyah_2.htm; *see also*: http://alqassam.ps/arabic/sohdaa5.php?sub_action=byan&id=378.





### c. Official documents of the Government of Israel

### 1)   ISA report

An ISA report which was published after the terrorist attack on January 29, 2004, stated that: "The al-Aqsa Brigades in Bethlehem assumed responsibility for the terrorist attack." The report did not state any evaluation as to the responsibility of Hamas for the attack.

On February 2, 2004, an official announcement by the ISA was published regarding the death of Muhammad Abu Ouda, commander of the Hamas in Bethlehem. In this announcement, it was

---

[427] Source of the photograph: http://www.palestine-info.info/arabic/Hamas/shuhda/2004/ali/photo.htm.
[428] Source of the photograph: http://www.alqassam.ps/arabic/operations2.php?id=72.

stated that "according to intelligence estimations, Abu Ouda was behind the suicide bombing on January 29, 2004, on the No. 19 bus in Gaza Road in Jerusalem, in which 11 civilians were killed and over 60 wounded. The terrorist attack was carried out by Ali Ja'ara, a Palestinian policeman, resident in the al-Aida Refugee Camp in Bethlehem."[429]

### 2) The Prime Minister's Office web site

The web site of the Prime Minister's Office stated, after the terrorist attack on January 29, 2004, that: "The terrorist who carried out the attack, Ali Muneer Jaarah, a 23 year old resident of the al-Aida refugee camp near Bethlehem, is a member of the al-Aqsa Brigades, the military section of Fatah."[430] At the same time, it appears that Ja'ara was not really a member of the al-Aqsa Martyrs Brigades.

### 3) The Israel Foreign Ministry

An article which was written by Israel's Foreign Ministry with regard to the terrorist attack on January 29, 2004, stated that: "Both the al-Aqsa Martyrs Brigades, which are affiliated with Fatah, and Hamas assumed responsibility for the terrorist attack, naming the terrorist, Ali Yusuf Ja'ara, a 24 year old Palestinian policeman from Bethlehem."[431]

### 4) Judicial proceedings and legal documents in Israel

a.   **Nufal Jihad Nufal Adawin**: Ja'ara's initial handler. He was interrogated by the Israel Police on September 8, 2004. According to Adawin's interrogation report, Adawin set forth in detail his involvement in Hamas activity. He also declared that:

- Early in 2004, his friend (and comrade in the al-Qassam Brigades) Muhammad Kaid Nashash introduced him to Ali Muneer Ja'ara, who stated that he wanted to be a suicide bomber.[432]

- In his interrogation, Nofal Adawin stated "I recruited Ali Ja'ara into Hamas. I told Ali that his suicide bombing would be in the name of Hamas."[433]

- Ali Ja'ara, the suicide bomber, asked to carry out the attack in the name of Hamas.[434]

---

[429] ISA document. *See* Appendix No. 1, p. 999.
[430] http://www.pmo.gov.il/PMO/Communication/IsraelUnderAttack/Jerusalem2/Jerusalem.htm.
[431]
http://www.mfa.gov.il/MFA/MFAArchive/2000_2009/2004/1/Suicide+bombing+of+Egged+bus+no+19+in+Jerusalem+-.htm.
[432] *See* Appendix No. 1, pp. 1000-1002.
[433] *See* Appendix No. 1, pp. 1076-1091.
[434] *See* Appendix No. 1, pp. 1000-1002.

- Nashash and Adawin prepared the explosive belt for Ja'ara and then brought him to Adawin's house, where they photographed him holding a plastic rifle and wearing a Hamas headband. They photographed him with a video camera reading his "Will" while standing next to Hamas posters.[435]

- Adawin subsequently set out with Ja'ara for Jerusalem in order to carry out the suicide bombing, but the two turned back when they understood that Palestinian security forces had set up a roadblock near the road leading to Jerusalem.[436]

- A few days after they failed to carry out the attack, Ja'ara told Adawin that he approached a Fatah cell (more specifically an al-Aqsa martyrs Brigades cell), and he was going to use their help to carry out the attack. Several days after the attack, Adawin left an envelope at the Bethlehem television station; the envelope contained photographs of Ja'ara, in which he was seen holding a weapon next to the Hamas flag.[437]

- Subsequently, Adawin told his recruiter to the al-Qassam Brigades, Mahmoud Khalil Mahmoud Azia, that he (Adawin) was responsible for the terrorist attack.[438]

Adawin was charged with[439] and convicted of involvement in the terrorist attack. On December 12, 2006, he was sentenced to 21 years in prison.[440]

b.    **Mahmoud Khalil Mahmoud Azia**: a Hamas operative who was also in prison in Israel. He was interrogated on September 9, 2004, and stated that Adawin came to him and told him that he was behind the Bus 19 Attack.[441] Azia explained that he had intended to ask a representative of the local charity committee for financing for additional terrorist attacks by Adawin, but that he had not succeeded in doing so up to the date of his arrest.[442]

Azia was charged with and convicted of involvement in the terrorist attack and membership in Hamas. He was sentenced to five years' imprisonment and was released in July 2009.[443]

---

[435] *See* Appendix No. 1, pp. 1000-1002.  *See also* Appendix No. 1, pp. 1002-1018 and 1126-1143.
[436] *See* Appendix No. 1, pp. 1007-1018.  *See also* Appendix No. 1, pp. 208-210.
[437] *See* Appendix No. 1, pp. 1007-1018.
[438] *See* Appendix No. 1, pp. 1019-1024.
[439] *See* Appendix No. 1, pp. 1007-1018.
[440] *See* Appendix No. 1, pp. 1003-1006.  I concur with the military court's finding that "as a result of the preparations committed by the defendant [Nofal Adawin], eventually the suicide attack was carried out." I also accept the opinion of the military court which established that Nofal Adawin knew about the January 29, 2004 terrorist attack and did nothing to prevent it.
[441] *See* Appendix No. 1, pp. 1019-1024.
[442] *See* Appendix No. 1, pp. 1019-1024.
[443] http://web.alquds.com/node/177438.

c.    **Abd al-Rahman Yusuf Maqdad**: an operative of the al-Aqsa Martyrs Brigades. He prepared the explosives which were used in the terrorist attack.[444] He was charged with and convicted of involvement in the terrorist attack. On July 27, 2006, he was sentenced to 21 life sentences plus 15 years' imprisonment.[445]

d.    **Ahmad Abu Radab**: an operative of the al-Aqsa Martyrs Brigades. He planned terrorist attacks.[446] He was charged with[447] and convicted of involvement in the terrorist attack and membership in the al-Aqsa Martyrs Brigades.[448] On July 27, 2007, he was sentenced to 21 life sentences plus 10 years' imprisonment.[449]

e.    **Hilmi Abd el-Karim Muhammad Hamash**: an operative of the al-Aqsa Martyrs Brigades. He was charged with[450] and convicted of fulfilling his role in the terrorist attack and membership in the al-Aqsa Martyrs Brigades. On September 28, 2006, he was sentenced to 12 life sentences.[451]

### d. Summary of the terrorist attack on the No. 19 bus line

#### 1) Hamas involvement

At the beginning of 2004, Ali Muneer Ja'ara contacted his friend, Muhammad Kaid Nashash. Ja'ara told him that he wanted to carry out a suicide bombing. Nashash contacted a friend of his, Nufal Jihad Nufal Adawin, whom he knew was an al-Qassam Brigades operative,[452] and informed him that he had a friend who wanted to perform a suicide bombing. Nashash and Adawin assembled an explosive belt for Ja'ara, which he was supposed to use in the terrorist attack. They drove him to Adawin's house and photographed him standing next to a Hamas poster and holding a plastic rifle. They also video taped him with a video camera as he read his "Will" out loud. Adawin took Ja'ara by car toward the intended location for the terrorist attack; however, as they approached the Tunnel Road (south of Jerusalem), they encountered a Palestinian security forces roadblock. Fearing that the security forces would prevent Ja'ara from carrying out the terrorist attack, they turned back.

---

[444] *See* Appendix No. 1, pp. 1025-1044.

[445] http://arabic.pnn.ps/index.php?option=com_content&task=view&id=504&Itemid=100 (Appendix No. 1, pp. 1045-1046).

[446] *See* Appendix No. 1, pp. 1047-1063.

[447] *See* Appendix No. 1, pp. 1047-1063.

[448] *See* Appendix No. 1, pp. 1064-1065.

[449] *See* Appendix No. 1, pp. 1064-1065.

[450] *See* Appendix No. 1, pp. 1066-1075.

[451] http://www.maannews.net/arb/ViewDetails.aspx?ID=39532; http://www.alhayat-j.com/printnews.php?id=33231.

[452] According to Adawin's interrogation statement, Adawin recruited Nashash as part of his plan to dispatch Ja'ara in his suicide mission. *See* Appendix No. 1, pp. 1076-1091.

The planning and execution of the terrorist attack on the No. 19 bus clearly reflect a method of operation which differs from that which was shown in many of the other terrorist attacks mentioned in this expert opinion. In spite of the fact that Hamas proudly assumed responsibility for this terrorist attack, and in spite of the fact that judicial proceedings in Israel have imposed partial responsibility on Hamas, a brief discussion of the situation in which Hamas found itself in 2004 will be useful in clarifying the context in which the terrorist attack was carried out and clearing up any initial confusion as to the terrorist attack and its relationship to Hamas.

Despite the fact that, until 2004, Hamas continued to broaden its control as a political and social entity, while remaining committed to the murder of Israeli and American civilians, Israeli military operations considerably affected the operational capacities of the organization and, as a result, the extent of fatality of its terrorist attacks. From that time forth, terrorist attacks were planned by Hamas operatives who were less experienced and less sophisticated. In a number of cases, a pattern appeared in which a Hamas operative could recruit and help to train a terrorist, who eventually carried out the terrorist attack on behalf of another organization (although both Hamas and the other organization assumed responsibility for the terrorist attack). In fact, other organizations which sought to avoid conflict with Hamas gave a greater portion of the responsibility and credit to Hamas. This apparently promoted both the political success of Hamas in the elections to the Palestinian parliament in 2006 and the expulsion of its coalition partners from the Fatah movement later that same year.

In 2006, the monthly periodical *Foreign Affairs* published an article entitled "Do Targeted Killings Work?" by Prof. Daniel Byman of Georgetown University and the Saban Center of the Brookings Institute. Byman pointed out the changes which had taken place in the methods of operation used by Hamas:

> The number of Hamas attacks grew steadily as the intifada progressed, even as Israel eliminated Hamas members: there were 19 attacks in 2001, 34 in 2002, 46 in 2003, 202 in 2004, and 179 in 2005 (most in the first half of that year, before a tentative cease-fire took hold). But as the number of attacks grew, the number of Israeli deaths they caused plunged, suggesting that the attacks themselves became far less effective. The fatality rate rose from 3.9 deaths per attack in 2001 to 5.4 in 2002, its highest point. Then, in 2003 the rate began to fall, dropping to 0.98 deaths per attack that year, 0.33 in 2004, and 0.11 in 2005.

> Something more than correlation was at work here. Contrary to popular myth, the number of skilled terrorists is quite limited. Bomb makers, terrorism trainers, forgers, recruiters, and terrorist leaders are scarce; they need many months, if not years, to gain enough expertise to be effective. When these individuals are arrested or killed, their organizations are disrupted. The groups may still be able to attract recruits, but lacking expertise, these new recruits will not pose the same kind of threat.[453]

---

[453] http://www18.georgetown.edu/data/people/dlb32/publication-31946.doc.

In my opinion, the terrorist attack on the No. 19 bus reflects, to a certain extent, the changes which Prof. Byman pointed out. In 2004, the pool of potential volunteers in the Palestinian Territories for suicide bombings was much greater than it had been between 1994 and 1996. At the same time, the ability of the al-Qassam Brigades terrorist cells (the "skilled terrorists" mentioned by Prof. Byman in his article) had declined significantly as a result of Israel's war against terrorism, including the arrest of experienced terrorist operatives and attempts on the lives of many experienced senior terrorists. Nufal Adawin was undoubtedly a Hamas operative, and even before 2004, it would not have been exceptional for potential suicide bombers such as Ali Ja'ara to make contact with local Hamas operatives (such as Adawin) in order to offer their services as suicide bombers. At the same time, Adawin was obviously less experienced and less sophisticated than most Hamas operatives and cell leaders who had planned and coordinated earlier terrorist attacks, such as those mentioned in this expert opinion. By January 2004, most of the Hamas bomb makers and most of the organization's senior operatives in the West Bank had been killed or arrested by Israel. For example, by that time, all four of the senior Hamas operatives in Hebron had been killed; Abbas al-Sayed, Abdallah Barghouti and Muhammad Arman were already in prison; and Ibrahim Hamad was a wanted man and had gone underground.

Adawin (with the assistance of an additional Hamas operative, Muhammad Nashash) recruited Ja'ara into the al-Qassam Brigades of Hamas, prepared the explosive charge for him, photographed him and recorded Ja'ara's "martyr will." A few days after Ja'ara's first (unsuccessful) attempt to perform a terrorist attack, he told Adawin that he had contacted Fatah elements and with there help, he would carry out the suicide bombing. Adawin had no objection and did not intervene. After the terrorist attack, Adawin informed Hamas headquarters of the role which he had played in recruiting and training Ja'ara. It is possible that Adawin even inflated his role, in an attempt to receive additional, and perhaps even greater, funding for future terrorist attacks on behalf of Hamas. Finally, as noted on page 43 of Mr. Kohlmann's expert opinion, Hamas publicly assumed responsibility for the terrorist attack; the al-Aqsa Martyrs Brigades not only gave Hamas the credit for the terrorist attack, but even withdrew their earlier declaration of responsibility, according to which they had been the only ones responsible for the terrorist attack.

At the same time, in light of my review of the documents from the investigation of the terrorist attack on the No. 19 bus, I conclude that Adawin was not as skilled a bomb maker as, for example, Abdallah Barghouti. Nor had Adawin ever commanded a sophisticated cell of the al-Qassam Brigades, in contrast to Abbas al-Sayed or Abdallah Qawasmeh. Instead, the terrorist attack on the No. 19 bus – in spite of the fact that it succeeded, from the standpoint of the number of fatalities – constitutes an example of the increasing operational weakness of Hamas in 2004, while at the same time (and most unfortunately) reflecting the relative ease with which it was possible to plan suicide bombings at that time, in light of the broad based "pool" of volunteers, in combination with a wider assimilation of the techniques for manufacturing explosives, which lessened Hamas's need for "skilled" bomb makers.

Although, in my opinion, Hamas and Fatah both bear responsibility for the terrorist attack on the No. 19 bus, I do not conclude that it is possible to characterize this terrorist attack as a "joint attack." In a number of cases, Hamas carried out suicide bombings, during which it openly cooperated with other terrorist organizations. For example, the fatal attack which was carried out in the Port of Ashdod in March 2004 was a joint terrorist attack by Hamas and Fatah. On the other hand, the terrorist attack on the No. 19 bus does not reflect a case of true coordination, cooperation or joint planning and execution by two extremist organizations. As pointed out above, Ali Ja'ara was recruited and handled by Hamas. Ja'ara reported to Nufal Adawin (according to the documents) that he approached the al-Aqsa Martyrs Brigades in the additional attempt to complete the suicide bombing (and Adawin did not object to or prevent this). After the terrorist attack was complete, Adawin, Hamas and the al-Aqsa Martyrs Brigades credited Hamas with its role in the terrorist attack. At the same time, the evidence does not show that Hamas and Adawin, on one hand, and Fatah and its al-Aqsa Martyrs Brigades on the other, significantly coordinated the final logistics and/or the execution of the terrorist attack.

## 2) The involvement of the al-Aqsa Martyrs Brigade

A short time after his failed attempt to reach Jerusalem, Ja'ara contacted Hilmi Abd al-Karim Muhammad Hamash, an operative in the al-Aqsa Martyrs Brigades, who suggested introducing him to a military operative who would send him out on a suicide bombing mission. At approximately the same time, Abd al-Rahman Yusuf Maqdad, who was also an operative in the al-Aqsa Martyrs Brigades, made contact with the military operative Ahmad Mujarbi and asked him to introduce him to military operatives who could assist in the manufacture of explosive charges for suicide bombings. Mujarbi contacted Ali Muhammad Ahmad Abu Hail, an additional operative in the al-Aqsa Martyrs Brigades, and asked him to meet with Maqdad. Abu Hail did so and Maqdad asked him for help in manufacturing explosive charges.

Hamash introduced the military operative Ahmad Abu Radab to Ja'ara, and the latter expressed his willingness to carry out a suicide bombing. A few days thereafter, Abu Radab informed Maqdad that he had located a person who was willing to carry out a suicide bombing. On January 28, 2004 (or thereabouts), Abu Radab contacted Muhammad Issa Muhammad Ma'ali, an operative in the al-Aqsa Martyrs Brigades, and asked him to drive Ja'ara to the location of the terrorist attack. Ma'ali agreed to do so. Abu Radab introduced Ja'ara to Ma'ali, who drove him to Jerusalem, where Ja'ara carried out the attack.

### e. Summary

A few minutes subsequent to the terrorist attack, I reached the scene and immediately recognized that a suicide bombing had taken place. At the same time, the responsibility for the terrorist attack was somewhat less clear, because both Hamas and the al-Aqsa Martyrs Brigades were independently involved in the planning and/or execution of the attack, and because both

organizations had published announcements taking responsibility for it. At the same time, in accordance with that which has been set forth above, Fatah eventually made a clear withdrawal from [responsibility for] the terrorist attack and denied any responsibility for it, whereas Hamas consistently confirmed its responsibility for the terrorist attack and defined Ja'ara as a "Jihad fighter, a member of our organization."[454]

The many detailed declarations which were issued by Hamas with regard to the terrorist attack on the No. 19 bus, the boasting about the suicide bomber within the organization, and the repeated public declarations in which Hamas expressed its pride in the performance of the terrorist attack on the No. 19 bus and other attacks – all of these confirm that Hamas carried out the terrorist attack. When these items of evidence are combined with the criminal convictions of Hamas cell members for their participation in the terrorist attack, there can be no doubt that Hamas was involved in the perpetration of this terrorist attack. At the same time, the conclusions from the ISA investigation and the criminal convictions of operatives in the al-Aqsa Martyrs Brigades indicate that the latter terrorist organization also sought to exploit Ali Ja'ara's willingness to undertake a suicide bombing, and to send him on a suicide mission, and even took part in the preparations for the performance of the terrorist attack. Even if the preparations were shared, it seems that Hamas was the dominant entity in the last stages of the operation. Ali Ja'ara was only a tool, an instrument used by the leadership of both organizations in order to carry out the terrorist attack. Ali Ja'ara wanted to carry out the attack. Accordingly, he agreed to do so on behalf of Fatah or on behalf of Hamas, and if another organization had contacted him he would have agreed to that as well. As far as he was concerned, the most important thing was to carry out the attack. I estimate that the al-Aqsa Martyrs Brigades planned to carry out the terrorist attack, and even helped to prepare it, but it may be assumed that, at the end of the process, the Fatah leadership did not approve the performance of the terrorist attack. This being so, the level of cooperation with Hamas "on the ground" increased, and ultimately, Hamas assumed responsibility for the terrorist attack. Nonetheless, it is also possible to impose responsibility on the al-Aqsa Martyrs Brigades, in spite of the fact that they themselves withdrew from their initial declaration of responsibility.

---

[454] *See also* <u>Filasteen al-muslima</u>, the official Hamas newspaper, which announced that the terrorist attack "had been carried out by the *Qassami* [*i.e.*, an operative in the al-Qassam Brigades] Ali Ja'ara: <u>http://web.archive.org/web/20040415140234/http://www.fm-m.com/2004/mar2004/story10.htm</u>, and *see also* his name in the list of suicide bombers: <u>http://www.fm-m.com/2004/oct2004/story4.htm</u>.

Ronni Shaked

December 30, 2010
Date

140

**EXHIBIT 180 TO DECLARATION OF VALERIE SCHUSTER**

*MOSES STRAUSS, et al. VS.*

*CREDIT LYONNAIS, S.A.*

---

*RONNI SHAKED*
*November 4, 2010*

---



**126 East 56th Street, Fifth Floor New York, New York 10022**
**PHONE: (212) 750-6434   FAX: (212) 750-1097**
**www.ELLENGRAUER.com**

*Original File 94816.txt*
*Min-U-Script® with Word Index*

RONNI SHAKED
November 4, 2010

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

Page 13

1      SHAKED
2  Q.  Were you comfortable before it
3  was submitted last December with the
4  translation?
5  A.  Yes.
6  Q.  Let me show you what the
7  reporter has marked as Exhibit 2 which is the
8  supplemental report that was given to us a
9  few weeks ago.  Do you recognize that to be
10  your supplemental report?
11  A.  I believe so, yes.
12  Q.  That's your signature on the
13  last page?
14  A.  Yes, this is my signature.
15  Q.  You drafted this in English?
16  A.  Yes, I drafted it in English.
17  Q.  Now let me show you what we've
18  marked as Exhibit 3 which is the supplemental
19  report you made about the March 7, 2003
20  attack, the Kiryat Arba attack.  Is that your
21  supplemental report on that attack and is
22  that your signature on the last page?
23  A.  Yes.
24  Q.  You drafted this in English as
25  well?

Page 14

1      SHAKED
2  A.  Yes.
3  Q.  I'm going to mark as -- the
4  reporter marked as Exhibits 4 and 5.  Let me
5  tell you what these are, Mr. Shaked, and your
6  lawyer Mr. Glatter can verify.  These are red
7  line versions of Exhibit 2 and 3 that we have
8  prepared in conjunction with your lawyers
9  that show the differences between your
10  original report and your supplemental report
11  with respect to all of the attacks other than
12  the Kiryat Arba attack in Exhibit 4 and with
13  respect to the Kiryat Arba attack in Exhibit
14  5 and I'm going to be referring to these
15  during the deposition and Josh, could you
16  just verify for the record that these are the
17  red lines that we worked on?
18      MR. GLATTER: Yes, two things,
19  first for the record I'll just note
20  that Mr. Shaked is not my client or my
21  firm's client so I note that with
22  reference to your lawyer for clarity,
23  but yes, these Exhibits 4 and 5 are
24  red line versions red lining the
25  reports that were served, the original

Page 15

1      SHAKED
2  report verses the supplemental version
3  of the original report and the Kiryat
4  Arba version that were served in
5  October.  The red lines were redone at
6  the mutual agreement of counsel in
7  order so that they might more easily
8  illuminate changes from the original
9  version to the supplemental version
10  where changes were made.
11  Q.  Mr. Shaked, I'm showing you --
12  A.  What's the blue print, please?
13  Q.  The blue reflects that which
14  was added I believe and the red reflects what
15  was crossed out.  If you are unclear when I
16  ask questions about specific items I'll
17  clarify it.
18      MR. GLATTER: Let the record
19  reflect that Mr. Shaked was indicating
20  some footnotes at page 80 of Exhibit
21  4.
22      MR. FRIEDMAN: The blue on
23  those indicates things that were
24  crossed out.
25      MR. GLATTER: My understanding

Page 16

1      SHAKED
2  because again the red lines were
3  generated between counsel I believe
4  that the blue text likely reflects,
5  but you can correct me when I'm wrong,
6  that may be a URL, in other words, a
7  worldwide web link.
8      MR. FRIEDMAN: Not really, but
9  we'll deal with it when we come to
10  specific items.
11  Q.  I'm showing you what's been
12  marked as Exhibit 6 which is an e-mail we
13  received from Aaron Schlanger two days ago
14  with additional corrections to your
15  supplemental report and I'm sure you have not
16  seen this before, but Josh, can you confirm
17  that these are the only corrections that you
18  have to give us with respect to Exhibits 2
19  and 3?
20      MR. GLATTER: Exhibits 2 and 3?
21      MR. FRIEDMAN: Really Exhibit
22  2.
23      MR. GLATTER: In response to
24  that I guess you should ask the
25  witness to the extent that you may

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

RONNI SHAKED
November 4, 2010

Page 17

```
 1        SHAKED
 2   want to ask the witness if there is
 3   anything in addition he wants to
 4   change or correct in the report I
 5   think that's a fair question to ask
 6   him.  I don't think you want me to
 7   testify on that.
 8   Q.  Is there anything, Mr. Shaked,
 9   in your reports, your supplemental reports
10   that is incorrect other than as stated in Mr.
11   Schlanger's e-mail, Exhibit 6?
12   A.  I believe this is -- I believe
13   I have nothing to add.
14   Q.   You believe you have nothing to
15   add?
16   A.   I believe so.
17   Q.   Do the two supplemental reports
18   Exhibit 2 and Exhibit 3 contain all of the
19   opinions you intend to express in these
20   cases?
21   A.   2 and 3?
22   Q.   Yes.
23   A.   Yes, I believe so.
24   Q.   All of the documents and other
25   information that you have relied upon in
```

Page 18

```
 1        SHAKED
 2   forming your opinions are identified in these
 3   two reports?
 4   A.   Yes.
 5   Q.   Why did you prepare your
 6   supplemental reports?
 7   A.   We are dealing with terrorism.
 8   We are dealing with things that are not
 9   always clear at the time that it happened.
10   We are dealing with organization that even
11   themselves they don't know exactly what
12   happen and how it's happened therefore
13   sometimes there is a new evidence coming and
14   as a researcher, as a man who is following at
15   least day by day on this subject I found that
16   something was not really correct, possibly
17   not correct so I went to check again with my
18   sources, with other sources that I found and
19   therefore I needed to correct it.
20   Q.   Did you read Mr. Azoulay's
21   rebuttal report before you made those
22   corrections?
23   A.   Yes.
24   Q.   Did you make the corrections in
25   response to what Mr. Azoulay had written?
```

Page 19

```
 1        SHAKED
 2   A.   As far as I -- no.
 3   Q.   You said a moment ago that, "We
 4   are dealing with organization that even
 5   themselves they don't know exactly what
 6   happened and how it's happened."  What do you
 7   mean by that?
 8   A.   I mean that, for example, if
 9   you are going to take the terrorist activity
10   in Kiryat Arba that even today Hamas even
11   today have misunderstanding who did that
12   operation.  Still today there are some places
13   that are called two men, other two men, but
14   it's not the problem, the problem is in the
15   name of whom they did it.
16   Q.   Is that in part because the
17   organizations are diffuse with various cells
18   and the central commander of Hamas may not
19   know what particular cells are doing?
20        MR. GLATTER: Objection to
21   form.
22   A.   No.
23   Q.   Why is it then?
24   A.   It was because the four people
25   members of the cell all of them were killed
```

Page 20

```
 1        SHAKED
 2   so there is no way to talk with dead people.
 3   Q.   Did anyone help you in
 4   conducting your research for your reports?
 5   A.   No.
 6   Q.   It was just you?
 7   A.   Just me.
 8   Q.   Mr. Shaked, do you consider
 9   yourself an expert in determining what
10   terrorist group is responsible for committing
11   a particular terrorist attack?
12        MR. GLATTER: Objection to
13   form.  Objection to the extent the
14   question calls for a legal conclusion.
15   You can answer.
16   A.   I believe so.
17   Q.   What experience qualifies you
18   as such an expert?
19        MR. GLATTER: Same objection.
20   A.   I think that my experience with
21   the 40 last years that I dedicated to
22   researching and fighting terrorism that's
23   what make me expert.  It includes work in the
24   Israeli Security Service, it includes Hebrew
25   university of Jerusalem, researcher and it
```

RONNI SHAKED
November 4, 2010

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

Page 21

1      SHAKED
2   includes my work as a journalist covering
3   terrorist activity in the West Bank and Gaza.
4   Q.  ISA investigations do not focus
5   on an attempt to prove that a certain
6   terrorist attack was committed by Hamas or
7   another terrorist organization, correct?
8      MR. GLATTER: Objection to
9   form.
10  A.  No.
11  Q.  They don't focus on that?
12  A.  They focus on that, yes, excuse
13  me, they focus on that.
14  Q.  Look at Exhibit 2.  Look at
15  your supplemental report, look at page 12.
16  In the second full paragraph you wrote the
17  following.  "The investigations which were
18  performed by the ISA" --
19  A.  Wait a minute, I have to find
20  it.  The second paragraph?
21  Q.  The second paragraph that
22  begins with the words in accordance on page
23  12.  Let's look at Exhibit 4, Let's look at
24  the red line.  Go to page 12.  We will use
25  Exhibit 4 throughout because it will be

Page 22

1      SHAKED
2   easier.  Page 12.  Do you see the paragraph
3   under the heading official investigations, do
4   you see that?
5   A.  Yes.
6   Q.  You wrote the following.  "The
7   investigations which were performed by the
8   ISA" --
9   A.  In accordance with?
10  Q.  Yes, in the second sentence you
11  wrote, "This being the case, the
12  investigations which were performed by the
13  ISA did not focus on an attempt to prove that
14  a certain terrorist attack was committed by
15  Hamas or by another terrorist organization,
16  but rather on the identification and arrest
17  of the members of the terrorist cell that
18  perpetrated the attack with the objective of
19  stopping the activity of the terrorist
20  network", is that a true statement?
21  A.  That's true.
22  Q.  You said -- and was that true
23  when you were in the ISA?
24  A.  Yes.
25  Q.  Have you ever before these

Page 23

1      SHAKED
2   cases served as an expert in offering
3   conclusions on the subject of which terrorist
4   organization was responsible for an attack,
5   have you ever been hired to do that before?
6   A.  No.
7   Q.  Do you have any professional
8   training in determining which terrorist
9   organization is responsible for committing an
10  attack?
11     MR. GLATTER: Objection to
12  form.
13  A.  No, I don't have.
14  Q.  There are governmental agencies
15  in Israel and in the occupied territories
16  that are responsible for making assessments
17  as to who is responsible for committing a
18  terrorist attack, correct?
19     MR. GLATTER: Objection to
20  form.
21  A.  Possibly it's not right.
22  Q.  The Israel police have official
23  responsibility for determining who's
24  responsible for committing an attack; is that
25  correct?

Page 24

1      SHAKED
2   A.  Who's committing attack, not
3   the organization.
4   Q.  Have you ever been a member of
5   the Israel police?
6   A.  No.
7   Q.  The police have tools,
8   investigative tools that help them in
9   fulfilling this responsibility, correct?
10     MR. GLATTER: Objection to
11  form.
12  A.  Not always.
13  Q.  But the police have the ability
14  to detain and interrogate suspects for
15  example, correct?
16  A.  That's correct.
17  Q.  They have the ability to
18  perform searches and seizures, correct?
19  A.  Yes.
20  Q.  And the police communicate with
21  the ISA and the IDF in the course of
22  performing investigations, correct?
23  A.  Connected with the police, not
24  police with the ISA.
25  Q.  Have you ever received any

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

RONNI SHAKED
November 4, 2010

**Page 25**

SHAKED
2 police training from the Israel police?
3      MR. GLATTER: Objection to
4 form.
5 A.  I think in my career, yes, I
6 was working sometimes with the police and
7 they have some kind of training with the
8 police, but it was many years ago.
9 Q.  When you were with the ISA?
10 A.  When I was with the ISA, yes.
11 Q.  In the occupied territories the
12 investigative role that is performed by the
13 Israel police within the green line in the
14 occupied territories that role, that
15 investigative role is fulfilled by the IDF,
16 correct?
17      MR. GLATTER: Objection to
18 form.
19 A.  Repeat the question, please.
20 Q.  In the occupied territories,
21 the investigative role that we just discussed
22 that the Israel police perform within the
23 green line, that investigative role in the
24 occupied territories is performed by the IDF,
25 correct?

**Page 26**

SHAKED
2      MR. GLATTER: Objection to
3 form.
4 A.  No.
5 Q.  By whom is it performed?
6 A.  It's performed by the police.
7 Q.  By the same Israel police?
8 A.  By the Israel police acting
9 also in the occupied territories.
10 Q.  In Israel prosecutors decide
11 whether to bring charges for committing a
12 terrorist attack based on the evidence
13 provided to them by the police, correct?
14      MR. GLATTER: Objection to
15 form.
16 A.  Yes.
17 Q.  In the occupied territories
18 there are military prosecutors who do the
19 same thing, they decide whether to bring
20 charges for committing a terrorist attack
21 based on the information provided to them by
22 the investigators, correct?
23      MR. GLATTER: Objection to
24 form.
25 A.  Investigation of whom?

**Page 27**

SHAKED
2 Q.  Of the suspects that the
3 prosecutors are considering bringing charges
4 against?
5 A.  From where they got it?
6 Q.  From the police?
7 A.  From the police, yes.
8 Q.  The role that's filled by
9 prosecutors in deciding to bring charges in
10 Israel is performed by military prosecutors
11 in the occupied territories, correct?
12 A.  Correct.
13 Q.  You have never been a
14 prosecutor, correct?
15 A.  Never.
16 Q.  You have no legal training?
17 A.  No.
18 Q.  You are not a lawyer?
19 A.  I'm not a lawyer.
20 Q.  You have never been trained as
21 a prosecutor?
22 A.  Never.
23 Q.  In Israel judges determine
24 whether someone is guilty for having
25 committed a terrorist attack, correct?

**Page 28**

SHAKED
2      MR. GLATTER: Objection to
3 form.
4 A.  Right.
5 Q.  In the occupied territories
6 that role is fulfilled by military judges of
7 the military courts, correct?
8      MR. GLATTER: Objection to
9 form.
10 A.  Correct.
11 Q.  In Israel judges are selected
12 for their positions based on experience --
13 their experience and merit, correct?
14      MR. GLATTER: Objection to
15 form, object to the extent beyond the
16 scope of Mr. Shaked's opinion.  You
17 may answer.
18 A.  I don't know.  I'm not there.
19 I just can imagine, that's all. I don't know.
20 Q.  You don't know on what basis
21 judges are selected in Israel?
22 A.  I can imagine like according to
23 their experience, education, other things,
24 but it's not my -- I'm not interested in this
25 field.

RONNI SHAKED
November 4, 2010

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

Page 29

1      SHAKED
2  Q.  You have never been a judge?
3  A.  Never.
4  Q.  Are you an expert in
5  determining who owns or controls an internet
6  website?
7      MR. GLATTER: Objection to form
8  and so that we save time I'll have a
9  standing objection to the extent the
10  question as phrased seeks a legal
11  conclusion from the witness.
12      MR. FRIEDMAN: Understood.
13      MR. GLATTER: You can answer.
14  Q.  Are you an expert --
15  A.  No.  I said not
16      MR. GLATTER: Let him ask his
17  question.
18  Q.  My question is are you an
19  expert in determining who owns or controls an
20  internet website?
21  A.  No.
22  Q.  Do you have any prior training
23  in determining who owns or controls an
24  internet website?
25  A.  No.

Page 30

1      SHAKED
2  Q.  Have you ever before been hired
3  by someone to reach a conclusion as to who
4  owns or controls an internet website?
5  A.  No.
6  Q.  Look at footnote 4 of your
7  supplemental report, please, which is on page
8  4 of Exhibit 4.  Can you read that to
9  yourself, please?
10  A.  Yes.
11  Q.  You wrote that?
12  A.  I read it.
13  Q.  And you wrote that?
14  A.  I wrote it, yes.
15  Q.  You see you use the term
16  "broadly acceptable", you said in the next to
17  last line, "His description is broadly
18  acceptable in that area"?
19  A.  Yes.
20  Q.  What do you mean by the term
21  broadly acceptable?
22  A.  I mean that Mr. Kohlmann get to
23  conclusion that it's not far -- that this is
24  the conclusion and in a broad end Hamas has
25  its own sites and therefore it's true what's

Page 31

1      SHAKED
2  there.
3  Q.  But you yourself are not an
4  expert in knowing who owns or controls a
5  website, correct?
6      MR. GLATTER: Objection to
7  form.
8  Q.  You are relying on Mr.
9  Kohlmann?
10  A.  Not just on Mr. Kohlmann.
11  Q.  What else are you relying on?
12  A.  People of Hamas, members of
13  Hamas, the men who are writing -- the men who
14  are working in the website of Hamas.
15  Q.  Did you --
16  A.  That's my experience.  From my
17  work as a journalist.
18  Q.  With Yediot Aharonot?
19  A.  Yes.
20  Q.  You have not independently
21  checked the ownership of these websites, have
22  you?
23      MR. GLATTER: Objection to
24  form.
25  A.  Independently, no.

Page 32

1      SHAKED
2  Q.  How did you first become
3  involved in this litigation?
4  A.  In this file you are talking?
5  Q.  Yes.
6  A.  I was asked some years ago, I
7  don't remember exactly when, by Gary Osen if
8  I know something, if I can help or something
9  like that.
10  Q.  Did you know Mr. Osen before he
11  asked you that?
12  A.  Not at all.
13  Q.  Do you know how Mr. Osen came
14  to you?
15  A.  I can believe that he came to
16  me because he knew my name from the
17  newspapers, he knew my name from the
18  television, from the radio stations or from
19  some kind of friends that he was talking
20  about expert of terrorism in Israel and they
21  led him to me.
22  Q.  By newspaper, you mean the
23  newspaper that you write for?
24  A.  Not just that. My article was
25  even translated to the New York Times and

RONNI SHAKED
November 4, 2010

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

---

Page 37

SHAKED

1 SHAKED
2 transcripts of other depositions in these
3 cases?
4 A. No.
5 Q. You know Mr. Spitzen?
6 A. Yes, I do know Mr. Spitzen,
7 Ariel Spitzen.
8 Q. You worked Mr. Spitzen?
9 A. I'm not working with him.
10 MR. GLATTER: Let Mr. Friedman
11 finish his question before you answer.
12 That's what he wants you to do.
13 That's what we all want you to do.
14 Q. In the past you have worked
15 with Mr. Spitzen, correct?
16 A. No, it was not work.
17 Q. What was it?
18 A. Mr. Spitzen was a specialist
19 and he was the advisor of Palestinian affairs
20 to the defense ministry. From time to time
21 as a journalist I got permission to talk with
22 him three or four times, not more than that,
23 in a year that's what they gave me and it was
24 just exchange of views because I think and
25 sometimes we were just sitting and talking

---

Page 38

SHAKED

1 SHAKED
2 about what's happened in the territories. I
3 be frank with you perhaps Spitzen came to my
4 home two months ago just to give condolences.
5 Q. I'm sorry for your loss. Have
6 you had any communication with him concerning
7 your work or his work on these cases?
8 A. No.
9 Q. What about Evan Kohlmann, have
10 you ever met him?
11 A. Never.
12 Q. Matthew Levitt?
13 A. Matthew Levitt I just heard
14 about him because of the Hebrew University
15 and because as a journalist I heard about
16 him. I don't know who is. I didn't met him
17 until today. I'll be happy to meet him one
18 day.
19 Q. What about Shaul Naim, have you
20 ever had any contact with him?
21 A. I don't know who is Shaul Naim.
22 Q. You read Mr. Azoulay's rebuttal
23 report?
24 A. Yes, I do.
25 Q. Had you ever heard of Mr.

---

Page 39

SHAKED

1 SHAKED
2 Azoulay before you read his report?
3 A. No.
4 Q. Did you read Brian Jenkins'
5 rebuttal report?
6 A. Yes, I read.
7 Q. Had you ever heard of Mr.
8 Jenkins before you read his report?
9 A. As far as I recall, no.
10 Q. Mr. Shaked, have you ever
11 expressed an opinion that is inconsistent
12 with any of the opinions you express in your
13 reports?
14 MR. GLATTER: Objection to
15 form.
16 A. Maybe, but as far as I can
17 recall, no.
18 Q. Do you maintain a resume or
19 curriculum vitae? Do you have a piece of
20 paper on which you have a listing of your
21 prior experience?
22 A. Yes, I do.
23 Q. Where do you keep that?
24 A. In Jerusalem.
25 Q. In your office?

---

Page 40

SHAKED

1 SHAKED
2 A. In my office.
3 Q. Do you have multiple versions
4 of your CV or just the current version?
5 A. No, when I finish I just edit
6 or when I did something else I edit.
7 Q. In your office you have a copy
8 of your current CV?
9 A. Yes, I do.
10 Q. You have a master's degree in
11 middle eastern studies from Hebrew University
12 of Jerusalem?
13 A. Yes, I'm happy to say, yes.
14 Q. When did you receive that?
15 A. I received it in 2006.
16 Q. 2006?
17 A. 2006.
18 Q. What is middle eastern studies?
19 A. Middle eastern studies it's
20 study about the history, culture, tradition,
21 language, everything that belong to the
22 Middle East.
23 Q. In pursuing your master's
24 program, did you have any particular focus in
25 middle eastern studies?

---

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

RONNI SHAKED
November 4, 2010

---

Page 41

SHAKED

1   A.   Yes, I did.
2   Q.   What was that?
3   A.   Suicide bombing.
4   Q.   Did you take courses on suicide
5   bombings?
6   A.   Yes, I did.
7   Q.   How many courses?
8   A.   I took two courses in the
9   Hebrew University of Jerusalem.
10  Q.   What were the names of those
11  courses?
12  A.   Wow, suicide -- I don't
13  remember.  I can bring it to you.  Professor
14  Gidon Aren and Professor Avraham Sela.
15  Q.   Could you spell both of their
16  names?
17  A.   G-I-D-O-N, A-R-E-N, specialist
18  for suicide bombers and Avraham like Abraham,
19  S-E-L-A, Professor Abraham Sela.
20  Q.   What was the name as best you
21  recall of Mr. Aren's course, Professor Aren's
22  course?
23  A.   Culture of suicide bombers or
24  something like this and influence on society

Page 42

SHAKED

1   or something like this.  If it's necessary I
2   can bring it to you.
3   Q.   Just so we know, where do you
4   have that title listed that you could get it
5   for us?
6       MR. GLATTER: Objection to
7   form, but you can answer.
8   A.   You can get it from every book
9   of the Hebrew University of Jerusalem, it's
10  not a problem.
11  Q.   And what department does
12  Professor Aren teach?
13  A.   Sociology.
14  Q.   What was the name of Professor
15  Sela's course you took?
16  A.   Hamas and it was terrorism and
17  beliefs or -- wow, Hamas and -- Hamas as a
18  culture or something like this and then Hamas
19  terrorism, ideology and culture.
20  Q.   In what department does
21  Professor Sela teach?
22  A.   He's teaching in international
23  relations, political science.
24  Q.   Did you take any other courses

Page 43

SHAKED

1   that related to terrorism?
2   A.   Not directly to terrorism.
3   Q.   Did you write a thesis or paper
4   as part of getting your master's degree?
5   A.   Of course.
6   Q.   What was the title of your
7   paper?
8   A.   On their dead bodies.
9   Q.   What was the subject of your
10  paper?
11  A.   The suicide bombers to -- I
12  explain the phenomena in the Palestinian
13  society.
14  Q.   From a sociological
15  perspective?
16  A.   From sociological and from my
17  experience not just but especially from the
18  sociology point of view.
19  Q.   Especially from the
20  sociological point of view?
21  A.   Yes.
22  Q.   Did you have a faculty advisor
23  in connection with that paper?
24  A.   Of course.

Page 44

SHAKED

1   Q.   Who was that?
2   A.   Dr. Anat Lapidoth.
3   Q.   Could you spell that?
4   A.   Anat, A-N-A-T, Lapidoth,
5   L-A-P-I-D-O-T-H.
6   Q.   What department is Dr. Lapidoth
7   in?
8   A.   Middle eastern -- current
9   middle eastern studies.
10  Q.   What is her specialty?
11  A.   She specialist with
12  Palestinians, myth, culture and social
13  affairs.
14  Q.   Do you have a bachelor's
15  degree?
16  A.   Of course I have.
17  Q.   From where?
18  A.   Hebrew University of Jerusalem.
19  Q.   In what year?
20  A.   It was in 1969.
21  Q.   In what field?
22  A.   Middle East studies and Arabic.
23  Q.   What did you do before you
24  joined the ISA in 1969 between school and

RONNI SHAKED
November 4, 2010

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

Page 45

SHAKED
1    SHAKED
2    joining the ISA or did you go right to the
3    ISA from school?
4    A.  I was a student.  My teacher
5    took me there.
6    Q.  You graduated from Hebrew
7    University in 1969?
8    A.  While I was working in the ISA.
9    Q.  You went right into the ISA?
10   A.  Yes.
11   Q.  Take a look at page 1 of
12   Exhibit 4 in the second paragraph, second
13   sentence?
14   A.  Starting with?
15   Q.  Starting with the words I held
16   a number of positions, do you see that?
17   A.  Not yet.
18   Q.  You say that you devoted a year
19   of your service with the ISA to the study of
20   terrorism and the development of theories
21   aimed at the defeating of terrorism, what
22   year was that?
23   A.  1974, 1975.
24   Q.  That was before Hamas was
25   founded, correct?

Page 46

SHAKED
1    SHAKED
2    A.  Before Hamas.
3    Q.  Hamas was founded in 1987?
4    A.  Yes, you're right.
5    Q.  What did you do during your
6    other years with the ISA?
7    A.  I was a handler and -- most of
8    the years I was a handler.
9    Q.  For informants?
10   A.  Of agent, of Palestinian agent
11   that we send them or recruit them from cell
12   of terrorism.
13   Q.  When you left the ISA in 1982,
14   you joined Yediot Aharonot?
15   A.  Yes, I did.
16   Q.  Why did you leave the ISA?
17   A.  After the war in Lebanon I
18   decided to leave it.
19   Q.  Why?
20   A.  Ask my wife.
21   Q.  She's not here.
22   A.  Okay, you can imagine.
23   Q.  You were unhappy?
24   A.  She was not happy, okay.  The
25   children.  I didn't know even my children.

Page 47

SHAKED
1    SHAKED
2    Q.  Have you held any government
3    posts since you left the ISA?
4    A.  No thanks.
5    Q.  You have been a commentator and
6    analyst for Yediot since 1982?
7    A.  Yes, I do.
8    Q.  That's been your sole
9    employment since 1982?
10   A.  Yes, that's my sole employment.
11   Q.  May I call it Yediot?
12   A.  Yediot is okay.  That's what
13   everybody in Israel also say Yediot.
14   Q.  In your self introduction in
15   your report you say that you are also a
16   researcher at the Hebrew University of
17   Jerusalem?
18   A.  Yes.
19   Q.  Can you tell me what that is,
20   who you research for, what you do?
21   A.  I'm a research member in the
22   Israeli -- in the Jerusalem Institute for
23   Israel Studies.  It's part of the Hebrew
24   University of Jerusalem.
25   Q.  What's the Jerusalem Institute

Page 48

SHAKED
1    SHAKED
2    for Israel Studies?
3    A.  It's an academic institute that
4    belongs to the Hebrew University of Jerusalem
5    that's focused on Jerusalem and peace --
6    focus on peace and focus on Palestinians and
7    other problems that related to the -- let's
8    say to the relationship between Jews and
9    Arabs.
10   Q.  For whom do you perform
11   research?
12   A.  To the university and the
13   research will be part of publishing, part of
14   it for newsletter, for things like this.
15   Q.  For how long have you done
16   this?
17   A.  I've done it just that's a
18   year-and-a-half.  A year.  A year let's say.
19   Q.  A year and how many hours a
20   week on average do you devote to this?
21   A.  At least a day-and-a-half, two
22   days a week.  Two days.
23   Q.  Are you paid for this work?
24   A.  No, not yet.
25   Q.  Are there particular persons to

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

RONNI SHAKED
November 4, 2010

Page 49

SHAKED

2  whom you are assigned to perform research?
3  A.  Of course.
4  Q.  Who are they?
5  A.  Professor Yakov Bar Simen Tov.
6  Q.  Can you spell that?
7  A.  Jacob, Bar, B-A-R, Simen,
8  S-I-M-E-N, Tov, T-O-V.
9  Q.  What is his field?
10  A.  Resolution of conflicts.
11  Q.  Is he with a particular
12  department at the Hebrew University?
13  He's the head of the department
14  of resolution -- of conflict resolution.
15  Q.  What is his specialty?
16  A.  Theories of conflict
17  resolution, not of conflict.
18  Q.  Theories of conflict
19  resolution?
20  A.  Conflict resolution.
21  Q.  And your research at the Hebrew
22  University is devoted to supporting writings
23  of Professor Simen Tov?
24  MR. GLATTER: Objection to
25  form.

Page 50

SHAKED

2  A.  Part of my studies, yes, just
3  part of it.
4  Q.  Is there another part?
5  A.  Yeah.
6  Q.  What's that?
7  A.  Another part I'm making my
8  Ph.D. studies. I'm student of Ph.D.
9  Q.  You are a year into that?
10  A.  Yeah.
11  Q.  In what field are you pursuing
12  a Ph.D.?
13  A.  Again, I'm searching the ethos
14  of conflict of the Palestinian society.  I'm
15  taking tools from psychology, social
16  psychology and use them as tools of research
17  of the Palestinian society.
18  Q.  Briefly what do you mean by
19  tools from social psychiatry?
20  A.  Nobody made research on the
21  Palestinian side of the Israeli society
22  about the psychology effect on the conflict.
23  My Professor Daniel Bar Tal did a research on
24  the Israeli side and what I'm doing now I'm
25  taking the Palestinian side in order to

Page 51

SHAKED

2  understand the behavior of society in a
3  conflict.
4  Q.  Who is the professor?
5  A.  Professor Daniel Bar Tal.  Very
6  known professor. He's now at Yale University
7  -- Brandeis University.
8  Q.  Can you spell his name?
9  A.  Daniel Bar Tal T-A-L. I have
10  three professor helping me.
11  Q.  Who are the other two?
12  A.  The other one is Eli Podeh.
13  Q.  Can you spell that for me?
14  A.  Eli E-L-I, Podeh, P-O-D-E-H.
15  He's from the Hebrew University of Jerusalem
16  department of Middle East studies and Dr.
17  Meir Hatina, specialist on Islamist or
18  fundamentalistic Islam ideology.
19  Q.  What department is he in?
20  A.  Middle East studies.
21  Q.  What is Professor Podeh's
22  specialty?
23  A.  Podeh is the head of the Middle
24  East studies in Hebrew University of
25  Jerusalem.

Page 52

SHAKED

2  Q.  What is his specialty?
3  A.  The Israeli Arab conflict and
4  especially Egypt.
5  Q.  Professor Bar Tal?
6  A.  He's a social psychologist.
7  The head of the department in Tel Aviv
8  University.
9  Q.  Is it fair to say your work as
10  a researcher is in the context of your being
11  a Ph.D. student?
12  MR. GLATTER: Objection to
13  form.
14  A.  Yes.
15  Q.  You write in your report that
16  you have worked as a consultant for the FBI.
17  Can you tell me what that is?
18  MR. GLATTER: Where are you
19  looking at?
20  MR. FRIEDMAN: On page 2.
21  A.  There were several cases in the
22  U.S. of Palestinian terrorism that they ask
23  me advice.  I don't want to talk about it in
24  a loud voice because I was asked not to tell
25  about the cases.

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

RONNI SHAKED
November 4, 2010

Page 57

1        SHAKED
2   Q.   In your report on page 1 on the
3   bottom of page 1 you list two books that you
4   published?
5   A.   Yes, I did.
6   Q.   One in 1994 and one in 1995?
7   A.   Yes.
8   Q.   Have you written a third book?
9   A.   I'm now in the process of
10   finishing it.
11   Q.   You are now in the process of
12   finishing it?
13   A.   It will be on press in a few
14   months, but the last year I didn't work on it
15   and I have to renew my work now.
16   Q.   Do you have a agreement from a
17   publisher to publish it?
18   A.   I have an agreement with Keter,
19   it's a publisher.
20   Q.   To publish your book?
21   A.   Yes.
22   Q.   What's the title of the book?
23   A.   It's going to be on Hamas, the
24   suicide bombers and until now we didn't find
25   the right name, but it's going to be on Hamas

Page 58

1        SHAKED
2   from 1994 till 2007.
3   Q.   Do you have a manuscript
4   prepared of that book?
5   A.   Most of the chapters, yes.
6   Q.   Does the book address what
7   organization was responsible for particular
8   attacks?
9   A.   I'm talking about Hamas, its
10   ideology, the changes of ideology.  I'm
11   talking about the terrorist activity of Hamas
12   vis-a-vis their ideology.  I'm not talking
13   about other organizations.
14   Q.   So the book does not address
15   the question of whether or not Hamas was or
16   was not responsible for a particular attack?
17   A.   I'm mentioning what Hamas did.
18   Q.   Do you address in the book the
19   question of whether or not Hamas was
20   responsible for a particular attack?
21       MR. GLATTER: Objection to
22   form.
23   A.   Yes.
24   Q.   You do?
25   A.   I do.

Page 59

1        SHAKED
2   Q.   Does it address any of the
3   attacks that are at issue in your reports?
4   A.   No, because I put all my
5   emphasis on 1996, the two buses number 18 and
6   then 1978 in Ben Yehuda Street and then I'm
7   going to other things, not to special
8   operation of Hamas.
9   Q.   What do you mean by special
10   operations?
11   A.   I'm talking in general what
12   makes society believe in suicide bombers,
13   phrase them and what makes society believe
14   that this is the way to fight against Israel.
15   Q.   So it's from a sociological
16   perspective?
17   A.   Part of it is from sociological
18   point of view, part of it is from history
19   point of view.
20   Q.   Just to make sure I'm clear,
21   your book does not address any of the attacks
22   that are the subject of your reports?
23   A.   I'm mentioning the Park Hotel,
24   but not the details of the Park Hotel.
25   Q.   You have this manuscript on

Page 60

1        SHAKED
2   your computer?
3   A.   But I'm not going to give it.
4   Q.   We'll see.
5   A.   I hope you will buy the book.
6   Q.   Your first book that you
7   published in 1994, does that book express
8   opinions about which terrorist organizations
9   were responsible for particular attacks?
10       MR. GLATTER: Objection to
11   form.
12   A.   No, the book is focused on
13   Hamas.  That was the first book about Hamas
14   that was published in the United States, in
15   Israel, all other place and this book explain
16   how Hamas from ideology went to terrorism.
17   Q.   It does not talk about whether
18   or not Hamas was responsible for a particular
19   attack?
20       MR. GLATTER: Objection to
21   form.
22   A.   Yes, it talk about
23   responsibility of Hamas to a lot of attacks
24   during the nineties.  I'm talking about 1988,
25   1989 until 1992.

RONNI SHAKED
November 4, 2010

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

Page 61

```
 1       SHAKED
 2  Q.  Are you aware of anything in
 3   that book that is factually incorrect?
 4  A.  Of course possible it could be.
 5  Q.  Are you aware of anything?
 6  A.  Possibly it can be.  I can't
 7   remember.
 8  Q.  Have you published any
 9   corrections of anything in that book?
10       MR. GLATTER: Objection to
11   form.
12  A.  No.
13  Q.  Have you ever concluded that
14   anything in that book is factually incorrect?
15  A.  Professor Sivan is one of the
16   most let's say Islamistic researchers in the
17   world, the most famous researchers in the
18   world.  He's a world renown expert, not
19   expert, researcher. He reviewed the book. I
20   was shaken when it came to his hands and I
21   was happy that his peer review was excellent.
22  Q.  My question is have you ever
23   reached the conclusion that anything in that
24   book is factually incorrect?
25  A.  No, but maybe it can be.  New
```

Page 62

```
 1       SHAKED
 2   evidence can come.
 3  Q.  You're not aware of it?
 4  A.  I'm not aware of it.
 5  Q.  The second book is about the
 6   ISA, correct?
 7  A.  Correct.
 8  Q.  Do you express any opinions in
 9   your second book about which terrorist
10   organization was responsible for a particular
11   attack?
12       MR. GLATTER: Objection to
13   form.
14  A.  No, but I'm telling about
15   special operation of Fatah.
16       MR. FRIEDMAN: I'm going to ask
17   the reporter to mark as Exhibit 8
18   which we were told is a list of
19   articles that you have written for the
20   last ten years in Yediot.
21       (Shaked Exhibit 8, Articles,
22   marked for Identification.)
23  Q.  Do you recognize this to be a
24   list of articles that were published in
25   Yediot that you wrote during the past ten
```

Page 63

```
 1       SHAKED
 2   years?
 3  A.  Yes, they are, but of course
 4   not all of them.
 5  Q.  When you prepared this list,
 6   how did you decide what to include and what
 7   not to include?
 8       MR. GLATTER: Objection to
 9   form.
10  A.  I include the most influenced
11   and important articles.
12  Q.  So there are other articles
13   that you wrote during the last ten years that
14   are not on this list?
15  A.  For sure.
16  Q.  Would you be able to prepare a
17   list of all of the articles that you have
18   written in Yediot that are not on this list?
19  A.  No problem.  It has to be
20   thousands.  Not hundreds, but thousands.  I'm
21   working day to day. I'm writing -- every day
22   I'm writing an article.
23  Q.  Did you write articles for
24   Yediot before -- withdrawn.  Did you write
25   articles about terrorism for Yediot before
```

Page 64

```
 1       SHAKED
 2   1999?
 3  A.  Before 1999 of course I wrote.
 4  Q.  Did you write articles about
 5   Hamas for Yediot before 1999?
 6  A.  Before 1999, yes.
 7  Q.  Other than your two books and
 8   your articles for Yediot, have you published
 9   anything else during the last ten years?
10  A.  Yes, I do.
11  Q.  What is that?
12  A.  It's hard for me to remember.
13   I wrote for several magazines.
14  Q.  What are those?
15  A.  For example, the magazine of
16   the prison authority.  I wrote for magazine
17   in Argentina, for magazine in France, for
18   magazine in -- I don't recall everything, but
19   at home I have everything.  I can find it.
20  Q.  You believe that you could make
21   a list of everything you've published during
22   the last ten years other than your two books
23   and the articles that are in Exhibit 8?  If
24   you needed to, you could?
25  A.  It's going to be a lot of
```

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

RONNI SHAKED
November 4, 2010

Page 73

1      SHAKED
2  A.   Also I think 2004, 2005,
3  something like this.
4  Q.   You are continuing from time to
5  time appearing as a commentator in both --
6  A.   Yes, BBC, yes, especially on
7  the radio.
8  Q.   I'd like you to look at page --
9      MR. GLATTER: Mr. Shaked, I
10  believe you indicated you wanted to
11  also clarify your work at the Hebrew
12  University?
13  A.   I'm also lecturing in what is
14  called Mount Judea College, it's a college
15  not far from Jerusalem and I'm lecturing
16  there on Palestinian Israeli affairs and all
17  the -- especially from the history point of
18  view and also about the Israeli citizen Arab
19  --, the Arab Israeli citizen -- the Arabs who
20  are living in Israel as citizen and their
21  social affairs.
22  Q.   This is at Mount Judea College?
23  A.   Mount Judea College.
24  Q.   When did you start doing that?
25  A.   I started three years ago.

Page 74

1      SHAKED
2  Q.   How often do you lecture?
3  A.   Full semester.
4  Q.   In your lectures do you address
5  the subject of who is responsible for
6  particular terrorist attacks?
7  A.   No.
8  Q.   Let's look at pages 2 and 3 of
9  your supplemental report, Exhibit 4, again,
10  the red line.  On page 2 you say in the
11  middle of the page in May 2009 counsel for
12  the plaintiffs asked me to provide an expert
13  opinion on whether Hamas was involved in the
14  recruiting, planning and perpetration of the
15  following suicide bombings and then you list
16  I think nine suicide bombings.
17      On page 3 your introductory
18  sentence with respect to the six attacks
19  listed there says that you were asked to give
20  an opinion about recruiting and perpetration,
21  but it does not have the word planning which
22  is in the first description.  Is there a
23  reason for that or is it just an oversight?
24  A.   There is no reason for it.
25  Q.   It's just an oversight that you

Page 75

1      SHAKED
2  left the word planning out?
3  A.   Oversight. Full oversight.
4  Q.   What do you mean when you say
5  you were asked to express an opinion on
6  whether Hamas was "involved", what do you
7  mean by the word involved?
8  A.   Involved means Hamas planned
9  the terrorist activity, recruit the commit
10  suicider, the headquarter confirm it and they
11  plan it, they send the men and they took the
12  responsibility for it.
13      THE INTERPRETER: Approved will
14  be better word.
15  A.   Approved.
16  Q.   Turn to page 16.  On page 16
17  you present your conclusions with respect to
18  the 15 attacks, correct?
19  A.   Yes.
20  Q.   Look at footnote 32 and read
21  that to yourself.  Have you read it?
22  A.   Yes.
23  Q.   I see that here with respect to
24  the bus 19 attack you did not include the
25  concept of recruiting here.  Was that an

Page 76

1      SHAKED
2  oversight or was that deliberate?
3  A.   Where?
4  Q.   In footnote 32.
5  A.   It's oversight.
6  Q.   It's your conclusion that both
7  Hamas and the al-Aqsa Martyrs Brigade was
8  involved in recruiting the bomber for that
9  attack?
10  A.   No, it's not oversight.
11  Q.   Tell me what you mean?
12  A.   Excuse me?
13  Q.   Tell me what you mean?
14  A.   I mean that he was recruit by
15  Hamas and not by al-Aqsa Brigades.  I mean
16  that they are responsible for the recruiting
17  for this mission.
18  Q.   As you express later in your
19  report Hamas in your review recruited Mr.
20  Ja'ara for an attack which he did not commit,
21  but then he committed a subsequent attack
22  with members of the al-Aqsa Martyrs Brigade,
23  correct?
24      MR. GLATTER: Objection to
25  form.

RONNI SHAKED
November 4, 2010

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

Page 77

1        SHAKED
2  Q.   Let me ask the question again.
3       As you express later in your report Hamas in
4       your review recruited Mr. Ja'ara for an
5       attack which he did not commit, but then he
6       committed the bus 19 attack with members of
7       the al-Aqsa Martyrs Brigade, correct?
8            MR. GLATTER: Objection to
9       form?
10  A.   Yes.
11  Q.   In the last paragraph on page
12      16 you state your conclusion that Hamas was
13      "apparently involved" in the Neve Dekalim
14      attack, correct?
15  A.   Correct.
16  Q.   What do you mean by apparently
17      involved?
18  A.   We are not talking here about
19      terrorist activity that was made directly in
20      Israel, it was made by mortar from inside
21      Gaza from the territory of the Palestinians
22      and in these times it was hard even to go
23      there and they throw a mortar into Israel
24      side.  It means that perhaps or apparently
25      they are doing it because we have evidence

Page 78

1        SHAKED
2       that they did it, but perhaps there will be
3       new evidence now that they didn't did it, but
4       according to my knowledge and what I see they
5       are apparently involved in the planning.
6  Q.   What is the evidence that Hamas
7       was involved in that attack?
8  A.   First of all, they have the
9       leaflets after it, secondly, they have
10      videotape that was broadcast in the
11      television and in the broadcast we saw the
12      people of Hamas with emblems of Hamas, the
13      bandannas on their head, the green one and
14      the most important thing as I said was the
15      leaflets explain why they did it and explain
16      that this was the new weapon of Hamas.
17  Q.   Have you personally seen the
18      video that you refer to?
19  A.   Yes, I see.
20  Q.   How do you know that that video
21      is a video from the firing of mortars for the
22      Neve Dekalim attack?
23           MR. GLATTER: Objection to
24      form.
25  Q.   You don't, do you?

Page 79

1        SHAKED
2  A.   I can imagine and I can think
3       because I know Hamas and I know the way that
4       Hamas is behaving and I know the way that
5       Hamas is doing things and on those days, we
6       are talking about days that the mortar was
7       not in use by other organizations and the
8       most important thing as I said is the
9       leaflets they sent just after shooting the
10      mortar.
11  Q.   Focusing on the video, you
12      don't have any specific evidence, you are not
13      aware of any specific evidence that that
14      video recording is of the particular attack
15      on Neve Dekalim, do you?
16  A.   On Neve Dekalim, no.
17  Q.   Do you agree, Mr. Shaked, that
18      a claim of responsibility for a terrorist
19      attack by a terrorist group is a form of
20      propaganda by the group?
21  A.   Not just propaganda, it's more
22      than propaganda.
23  Q.   Is part of it propaganda?
24  A.   When we are talking in the
25      Middle East, when we are talking with Israeli

Page 80

1        SHAKED
2       Palestinian conflict and we are talking about
3       Palestinian organization it's not just
4       propaganda.
5  Q.   One of the motivations for
6       making a claim of responsibility is for
7       propaganda purposes, correct?
8  A.   Yes, correct.
9  Q.   You agree that terrorist groups
10      have various motivations for making a claim
11      of responsibility for an attack, correct?
12           MR. GLATTER: Objection to
13      form.
14  A.   Yes.
15  Q.   That includes recruiting?
16  A.   The recruiting is not for
17      propaganda.
18  Q.   I'm saying is one of the
19      motivations for a group to claim
20      responsibility for an attack for the purpose
21      of helping in recruiting?
22  A.   Yes.
23           MR. GLATTER: Mr. Shaked,
24      again, if there is something you don't
25      understand let Mr. Friedman or let Ms.

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

RONNI SHAKED
November 4, 2010

Page 81

SHAKED

1   Cohen know, this way no one is talking
2   over each other.
3   Q.   Is another motivation for a
4   terrorist group to make a claim of
5   responsibility for an attack to help with
6   financing of the group?
7   A.   Yes, partly.
8   Q.   Is another motivation for
9   making a claim of responsibility inspiring
10  others to support the group's cause?
11      MR. GLATTER: Objection to
12  form.
13  A.   Yes.
14  Q.   Is another purpose of making a
15  claim of responsibility to establish the
16  group's position in competition with other
17  groups?
18      MR. GLATTER: Objection to
19  form.
20  A.   Yes.
21  Q.   Is another purpose -- another
22  motivation for making a claim of
23  responsibility to claim glory for the group
24  that is making the claim?

Page 82

SHAKED

1   A.   Yes.
2   Q.   Is part of the motivation for
3   making a claim of responsibility earning
4   public support for the group that's making
5   the claim?
6   A.   Yes.
7   Q.   Is another motivation for
8   making a claim of responsibility in this
9   context to destabilize the relations between
10  the Israelis and the Palestinians?
11      MR. GLATTER: Objection to
12  form.
13  A.   Not always.
14  Q.   But that is one of the
15  motivations?
16      MR. GLATTER: Objection to
17  form.
18  A.   It's one of the motivations,
19  yes.
20  Q.   For example, it's one of the
21  motivations for Hamas to claim responsibility
22  to destabilize the relationship between
23  Fatah, the Palestinian authority and Israel,
24  correct?

Page 83

SHAKED

1       MR. GLATTER: Objection to
2   form.
3   A.   Yes.
4   Q.   Do you agree that during the
5   second intifada the crediting of an attack to
6   a particular group was often perceived among
7   Palestinians as a gain for that group and a
8   loss for other groups?
9       MR. GLATTER: Objection to
10  form.
11  A.   Yes.
12  Q.   Over time individual terrorists
13  have been known to move from group to group,
14  correct?
15  A.   Rarely.
16  Q.   Rarely.  Do you agree --
17  A.   Very rarely.
18  Q.   Do you agree that groups have
19  claimed responsibility for attacks even if
20  they were not involved in the final
21  perpetration of the attacks?
22      MR. GLATTER: Objection to
23  form.
24  A.   Yes, but just in the first

Page 84

SHAKED

1   hours, not later and if you give me a minute
2   to explain.
3   Q.   Sure.
4   A.   Among the Palestinian society
5   and in this conflict there is no secret.
6   After one day everyone knows who claim the
7   responsibility and who did it and there is
8   sometimes -- but after one day everybody
9   knows and if somebody claim it on one hour or
10  half an hour after it, this is for
11  propaganda, but then it's no.
12  Q.   For example, the bus 19 attack
13  was not in the final moment perpetrated by
14  Hamas, but you believe Hamas recruited Mr.
15  Jarra and planned the attack, correct?
16      MR. GLATTER: Objection to
17  form.
18  A.   Yes, I believe so.
19  Q.   A claim of responsibility by a
20  group could mean that the group recruited the
21  attackers, but did not actually execute the
22  attack, correct?
23  A.   Part of it, yes.
24  Q.   A claim of responsibility could

RONNI SHAKED
November 4, 2010

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

Page 85

1      SHAKED
2   mean the group planned the attack, but did
3   not actually execute the attack, correct?
4   A.  Correct, yes.
5   Q.  A claim of responsibility could
6   mean the group provided financing for the
7   attack, but did not actually execute the
8   attack, correct?
9   A.  Could be also.
10   Q.  A group can claim credit for an
11   attack even if the planning for the attack
12   was not known to the group's central command,
13   correct?
14      MR. GLATTER: Objection to
15   form.
16   Q.  Before the attack occurred?
17      MR. GLATTER: Same objection.
18   Also object to foundation.
19   A.  It must be an explanation.  The
20   headquarter if it's in Damascus or in Gaza is
21   not giving direct place where to put the bomb
22   and how to do the bomb.  They give general
23   direction to the people in the West Bank or
24   in Gaza.
25   Q.  What do you mean by general

Page 86

1      SHAKED
2   direction?
3   A.  Go and kill Jewish people
4   because take revenge of 1, 2, 3, 4.  Go on
5   the next day, the day of al-Aqsa or in memory
6   of some days like here like Sabra and Shatila
7   day and go and make -- put a bomb in the
8   Israeli side.
9   Q.  But the Hamas central command
10   does not specify a particular place to commit
11   the attack, correct?
12      MR. GLATTER: Objection.
13   A.  Correct.
14   Q.  It's correct they don't do
15   that?
16   A.  It's correct they don't.  The
17   headquarter, no.
18   Q.  The headquarters does not give
19   instructions of a particular place to
20   perpetrate the attack?
21   A.  In most of the cases, in most
22   of the cases they are not giving direct
23   place.
24   Q.  Are you aware in any of the 15
25   attacks you addressed here whether the

Page 87

1      SHAKED
2   central command gave a specific direction?
3   A.  Yes, I do.
4   Q.  Which case?
5   A.  For example, the Hebrew
6   University of Jerusalem, for example, Rishon
7   Le-Zion, for example, Cafe Hillel.
8   Q.  In those instances you believe
9   Hamas central command gave a specific
10   instruction to attack those places?
11   A.  Those places.  Especially those
12   places.
13   Q.  Is the evidence that you rely
14   on --
15      MR. GLATTER: Were you done
16   with your answer, Mr. Shaked?
17      THE WITNESS: Yes.
18   Q.  Is the evidence that supports
19   that identified in your report?
20   A.  Yes.
21   Q.  Look at page 5 of your report.
22   In the second paragraph you state, "While
23   Hamas has never tried to deny its role in
24   terrorist activity, it has also never taken
25   responsibility for a terrorist attack which

Page 88

1      SHAKED
2   it did not commit", do you see that?
3   A.  Yes, I see that.
4   Q.  Is that statement accurate?
5   A.  As far as I know, yes.
6   Q.  You believe Hamas has never
7   taken responsibility for a terrorist attack
8   that it did not commit?
9   A.  Officially, no.  Officially
10   they did not take responsibility officially.
11   Official Hamas, I'm not talking about other
12   things.
13   Q.  You are not talking about
14   individual cells?
15      MR. GLATTER: Objection to
16   form.
17   A.  There is no individual cells.
18   Q.  Let me make sure I understand
19   your answer.  Is it your testimony that Hamas
20   has never officially taken responsibility for
21   an attack that it did not commit?
22   A.  Yes.
23      MR. FRIEDMAN: I'm going to
24   mark as Exhibit 9A and 9B the original
25   Hebrew and certified translation of

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

RONNI SHAKED
November 4, 2010

Page 89

1       SHAKED
2   Section 1 of Mr. Shaked's 1994 book.
3       (Shaked Exhibit 9A-9B,
4   Documents, marked for Identification.)
5   Q.   Do you recognize Exhibit 9A as
6   a copy of Section 1 of your 1994 book?
7   A.   Yes, I recognize.
8       MR. GLATTER: Just for the
9   record with respect to Exhibit 9B we
10  just reserve our rights as to the
11  accuracy and correctness of the
12  certified translation.
13  Q.   Are you aware of any factual
14  statements in this Section 1 that are false?
15      MR. GLATTER: Objection to
16  form.  Withdrawn.
17  A.   Yeah.
18  Q.   Are you aware of anything in
19  this section that is mistaken?
20      MR. GLATTER: Objection to
21  form.
22  Q.   Let me put it this way.  Mr.
23  Shaked, since you published this in 1994, has
24  it ever come to your attention that something
25  here is inaccurate?

Page 90

1       SHAKED
2       MR. GLATTER: Objection to
3   form, vague.
4   A.   I don't think it's not
5   accurate.
6   Q.   At the beginning of this
7   section you describe the abduction of an IDF
8   sergeant major in December 1992, correct?
9   A.   Correct.
10  Q.   And as you describe here the
11  men who abducted him delivered a letter in
12  which they identified themselves as members
13  of the al-Qassam military arm of Hamas and
14  offered to exchange him for Sheik Yasin,
15  correct?
16  A.   Correct.
17  Q.   The letter was signed by the
18  special unit of the El Aladin as-Qassam
19  battalion Hamas military arm, correct?
20  A.   Correct.
21  Q.   You note here that no one in
22  Hamas' command knew anything about this,
23  correct?
24  A.   Correct.
25  Q.   And you state that the four men

Page 91

1       SHAKED
2   who committed this kidnapping joined
3   al-Qassam only after this incident, correct?
4   A.   Correct.
5   Q.   You note that two of Hamas'
6   leaders made statements to the press
7   indicating that Hamas was responsible for
8   this abduction, correct?
9   A.   Correct.
10  Q.   You note that the Hamas
11  representative in Jordan said that Hamas was
12  prepared to release Sergeant Major Toledano
13  in exchange for Sheik Yasin, correct?
14  A.   Correct.
15  Q.   You also note that Sheik Yasin
16  requested that negotiations be carried out
17  for his release and Hamas agreed, correct?
18  A.   Correct.
19  Q.   And you describe here a flyer
20  that was distributed in Hebron that was
21  signed "Hamas Office of Public Relations",
22  correct?
23  A.   Let me see where it is.  I
24  don't remember Hebron leaflet.
25  Q.   I think it's on page 8.

Page 92

1       SHAKED
2       MR. GLATTER: You are referring
3   to 9B, Larry, when you --
4       MR. FRIEDMAN: Josh, please
5   stop interrupting me.
6       MR. GLATTER: No, I have to
7   know if you are pointing to something
8   and saying page 8, I don't know if
9   it's in the English or Hebrew. You
10  provided us with a certified --
11      MR. FRIEDMAN: I think our
12  translators matched the pages.
13      MR. GLATTER: Okay, it's the
14  first time I'm seeing this
15  translation.
16  Q.   You describe here a flyer that
17  was distributed in Hebron that was signed
18  "Hamas Office of Public Relations", correct?
19  A.   Where is it, please?
20  Q.   If you look at page 8, there is
21  a paragraph that in my English translation
22  begins with the words "On that same day a
23  flyer was distributed in Hebron signed by
24  'Hamas Office of Public Relations'", do you
25  see that?

RONNI SHAKED
November 4, 2010

Case 1:05-cv-04622-DLI-RML   Document 267-15   Filed 03/22/12   Page 184 of 910 PageID #: 7561

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

Page 93

1          SHAKED
2   A.  Wait a minute.
3       MR. GLATTER: Mr. Friedman, are
4   you directing the witness' attention
5   to the certified English translation,
6   that may avoid any confusion?
7       MR. FRIEDMAN: Josh, I'm
8   reading to him something that's in the
9   translation and I'm asking him to
10  verify that it's in the Hebrew.
11      MR. GLATTER: Okay, well, thank
12  you for the clarification.
13  A.  Yes.
14  Q.  You see that?
15  A.  I see that.
16  Q.  That flyer stated that the
17  kidnapping was "executed by the Special Unit
18  of the Pure Members of the Izz Adin
19  al-Qassam, correct?
20      MR. GLATTER: Objection to
21  form.
22  A.  Correct.
23  Q.  You state in your writing here,
24  "All of these declarations were found to be
25  meaningless", correct?

Page 94

1          SHAKED
2   A.  All of this?
3   Q.  All of these declarations were
4   found to be meaningless, you wrote that here,
5   correct?
6   A.  I have to find it to see it.
7   I'm telling you the truth, I don't remember
8   this paragraph.
9   Q.  I will show you that it's on
10  page 7 of the English translation at the
11  bottom and I ask you to verify that that's in
12  the Hebrew that you wrote?
13  A.  What was the question again?
14  Q.  You wrote "All these
15  declarations were found to be meaningless",
16  correct?
17      MR. GLATTER: Objection to form.
18  Also object to the extent that Mr.
19  Shaked is being asked to verify the
20  accuracy of the certified
21  translation.
22      MR. FRIEDMAN: He's not.
23      MR. GLATTER: Okay, you may
24  answer.  My objection stands.
25  A.  I can't deny something that I

Page 95

1          SHAKED
2   wrote.
3   Q.  Okay.  Are you aware of an
4   April 10, 2002 suicide bombing aboard the
5   Haifa Jerusalem bus?
6   A.  April 10?
7   Q.  2002?
8   A.  Yes.
9   Q.  You're aware of that?  You
10  recall that attack?
11  A.  Yes, I recall that attack.
12  Q.  Have you ever heard of an
13  organization called the Intelligence and
14  Terrorism Information Center at the Center
15  for Special Studies or ITIC?
16  A.  Yes, I have.
17  Q.  What is that?
18  A.  It's an institution in Herzlia
19  University College dealing with terrorism.
20  Q.  You rely on several ITIC
21  publications in your reports, correct?
22  A.  ITIC?
23  Q.  Or CSS?
24  A.  CSS I rely on -- no.
25  Q.  You rely on their publications?

Page 96

1          SHAKED
2       MR. GLATTER: Let the record
3   reflect that the witness is looking at
4   his report.
5       MR. FRIEDMAN: Josh, there's a
6   camera.
7       MR. GLATTER: Some people read
8   the transcript, Larry.
9   Q.  Look at Footnote 45 on page 20.
10  Doesn't this cite to a publication by this
11  organization?
12  A.  Which number you say?
13  Q.  45?
14  A.  45?
15      MR. GLATTER: Footnote 45.
16  Q.  On page 20, isn't that a
17  citation to a publication by this
18  organization ITIC?
19  A.  As far as I can see here just
20  www.terrorisminfo.org.
21  Q.  Isn't that the website of the
22  ITIC?
23  A.  Terrorisminfo.org, yes.
24  Q.  If you look at footnote --
25  A.  It's Malam.  What is the full

RONNI SHAKED
November 4, 2010

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

---

Page 109

1    SHAKED
2  Q.  Hamas claimed responsibility
3  for this attack, correct?
4  A.  On the same day not just Hamas
5  and not just Fatah, we got a lot of telephone
6  calls from many organizations, but I'm
7  talking about official of Hamas and as far as
8  I remember it was not taken officially by
9  Hamas.
10 Q.  But it's your understanding
11 that there initially were claims of
12 responsibility by Hamas, correct?
13    MR. GLATTER: Objection to
14 form, misstates the testimony. You can
15 answer.
16 A.  No.
17 Q.  No.
18    MR. FRIEDMAN: Let me show you
19 Exhibit 14 which is an Associated
20 Press article dated December 31, 2007.
21    (Shaked Exhibit 14, Article,
22 marked for Identification.)
23 Q.  You see in the third paragraph
24 it states as follows, "There were two claims
25 of responsibility, one from Hamas and Islamic

---

Page 110

1    SHAKED
2  Jihad, the other from al-Aqsa Martyrs Brigade
3  which has ties to Abbas' Fatah movement, do
4  you see that?
5  A.  I see that.
6  Q.  Do you have any reason to doubt
7  that Hamas made a claim of responsibility?
8  A.  Yes.
9  Q.  What is your reason for doubt?
10 A.  Because I didn't see it the
11 official way Hamas distribute the
12 announcement after having an operation or
13 attack of terrorist like this.
14 Q.  What is the official way in
15 which Hamas distributes announcements?
16 A.  They distribute through special
17 leaflets as in military announcement with
18 emblems, with the names, with reasons, with
19 special verses from the Qur'an that everyone
20 who knows Hamas and knows the culture of
21 Hamas and knows the nuances of the words will
22 understand that they did it.
23 Q.  Until then it's not official,
24 correct?
25 A.  For me, no.

---

Page 111

1    SHAKED
2  Q.  You can put that to one side.
3  At times, Mr. Shaked, at times terrorist
4  groups falsely deny responsibility for
5  attacks that they have committed, correct?
6  A.  Deny the?
7  Q.  Responsibility for the attacks
8  that they have committed?
9     MR. GLATTER: The question is
10 falsely deny responsibility.
11    MR. FRIEDMAN: Let me ask the
12 question again.
13    MR. GLATTER: Thank you.
14 Q.  In your experience terrorist
15 groups have at times denied responsibility
16 for attacks that they did commit, correct?
17 A.  Correct.
18 Q.  In your experience a terrorist
19 group will deny responsibility for an attack
20 it did commit when it concludes that it is no
21 longer in its interests to claim
22 responsibility for that attack, correct?
23    MR. GLATTER: Objection to
24 form.
25 A.  Possibly.

---

Page 112

1    SHAKED
2  Q.  Look at page 5 of your report.
3  You state in the -- read the first paragraph
4  to yourself.
5  A.  The first one?
6  Q.  Yes.  To your knowledge --
7  A.  Please.
8  Q.  To your knowledge has Hamas
9  ever denied responsibility for an attack that
10 it did commit?
11 A.  It's hard for me to remember
12 now, but I have no black and white answer.
13 Q.  Do you recall any instance in
14 which Hamas denied responsibility for an
15 attack that it did commit?
16 A.  I remember once that they
17 denied after somebody took -- no, I don't
18 remember.
19 Q.  Have you ever heard of Abd El
20 Azzis Rantisi?
21 A.  Of course.
22 Q.  In 2003 he was one the leaders
23 of Hamas, correct?
24 A.  Correct.
25 Q.  In your report you say that

---

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

RONNI SHAKED
November 4, 2010

Page 113

1       SHAKED
2   Hamas was responsible for the August 19, 2003
3   terrorist attack on the number 2 bus in
4   Jerusalem, correct?
5   A.   Correct.
6       MR. FRIEDMAN: I'm going to
7   show you Exhibit 15 which is an
8   article from Ha'aretz dated August 20,
9   2003.
10      (Shaked Exhibit 15, Article,
11   marked for Identification.)
12   Q.   This concerns the attack we
13   were just talking about, correct?
14   A.   Correct.
15   Q.   If you look just beyond the mid
16   point of the article, the article states as
17   follows, "Hamas leader Abd El Azziz Rantisi
18   insisted that Hamas was not involved".
19   A.   Just a minute.
20      MR. GLATTER: Do you need
21   glasses?
22   Q.   Do you see in the article it
23   says, "Hamas leader Abd El Azziz Rantisi
24   insisted that Hamas was not involved" 'We are
25   committed to the truss.  I don't know who

Page 114

1       SHAKED
2   carried out this action' he said", do you see
3   that?
4   A.   So what?
5   Q.   Do you have any reason to doubt
6   that this is an accurate quotation of Mr.
7   Rantisi?
8   A.   This is an accurate quotation
9   of Mr. Rantisi.
10   Q.   Do you recall this past August
11   there was rocket attacks that hit Elat and
12   Aqaba?
13   A.   Last August?
14   Q.   August 2010 there were rocket
15   attacks that hit Elat and Aqaba, do you
16   recall it?
17   A.   I recall it, but sorry at this
18   time I just didn't follow even what happened
19   there.
20   Q.   Do you recall that Israel said
21   that Hamas was responsible for these attacks?
22   A.   Yes, I recall it.
23   Q.   Do you recall that Hamas denied
24   responsibility for these attacks?
25       MR. GLATTER: Objection to form

Page 115

1       SHAKED
2   and foundation.
3   A.   Yes, I recall.
4   Q.   You can put that aside.
5       MR. GLATTER: Can we take a two
6   minute break?
7       MR. FRIEDMAN: Okay.
8       MR. FRIEDMAN: Let's take a
9   break and then we will break for lunch
10   at one.
11       MR. GLATTER: Whatever you want
12   to do.
13       THE VIDEOGRAPHER: We are now
14   off the record.  The time is 12:15
15   p.m., November 4, 2010.
16       (Recess taken.)
17       THE VIDEOGRAPHER: This is tape
18   3 of the deposition of Mr. Ronni
19   Shaked.  We are now back on the
20   record.  The time is 12:27 p.m.,
21   November 4, 2010.
22       MR. GLATTER: Mr. Shaked wanted
23   to put two corrections on the record
24   regarding prior testimony and items in
25   the supplemental report.  Please.

Page 116

1       SHAKED
2   A.   First we have to understand
3   that Hamas change their sites a year ago and
4   they took from us a lot of old things and
5   therefore I had to -- I change the original
6   report because there were some sites that we
7   could not open it.  It was very hard to open
8   it and even we went to -- I went to some
9   places in order to find it.  It was very --
10   it was not open and it was very important to
11   do it with the news sources.
12   Q.   Okay.
13       MR. GLATTER: You also
14   indicated that --
15       MR. FRIEDMAN: Josh, who's the
16   witness?
17       MR. GLATTER: I'm sorry.  Okay.
18   On your prior testimony?  It's up to
19   you.
20       THE WITNESS: The prior
21   testimony?
22       MR. GLATTER: Is there another
23   matter that you wanted to indicate to
24   Mr. Friedman you had given prior
25   testimony about?

RONNI SHAKED
November 4, 2010

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

---

Page 117

```
 1      SHAKED
 2      THE WITNESS: No, in here?
 3      MR. GLATTER: Yes, sir.
 4      MR. FRIEDMAN: Josh, it's his
 5   testimony.  It doesn't need your
 6   prompting.  If he wants to make a
 7   correction, I told him at the outset
 8   he can.
 9      MR. GLATTER: That's fine. He
10   will obviously have the transcript to
11   review through an errata sheet so we
12   can move on.
13      MR. FRIEDMAN: I hope he does
14   not abuse the errata sheet privilege.
15   Q.  Mr. Shaked, if at any time you
16   want to clarify or correct anything you said,
17   just let me know and I'll let you do it.
18   A.  Okay.
19   Q.  Do you have anything further
20   you want to say?
21   A.  I thought when you were talking
22   about Ha'aretz and AP or what it was, I don't
23   know, Associated Press, I mean that I believe
24   to what they wrote, but not to Hamas itself
25   and the question was for me if Hamas did it
```

---

Page 118

```
 1      SHAKED
 2   or not did it, it's written here.  I'm not
 3   responsible to what every journalist has
 4   written and I'm not responsible for a call
 5   came from Europe or came from Turkey or came
 6   from Iran to somebody and said Hamas did it.
 7   Sometimes there are crazy people who are
 8   doing it.
 9   Q.  But do you have any reason to
10   doubt the accuracy of what the journalists
11   wrote?
12   A.  No, the journalist was right,
13   but the information was wrong.  It doesn't
14   say who are the sources here.
15   Q.  You've relied on --
16   A.  And another thing we are not
17   talking here about regular cases between
18   normal people.  We are talking here about
19   terrorist organization.  If we are talking
20   about Abd El Azzis Rantisi that he says no
21   this night he has written why he said no
22   because this night he knew there were going
23   to be reopen again and he was against the
24   war.  He wants to stop to get more time.
25   They were not prepared to go to war.
```

---

Page 119

```
 1      SHAKED
 2   Q.  So it could be a false --
 3   A.  Of course it could be false.  I
 4   know Rantisi and I talk with him not dozen,
 5   more than a dozen times.  In the year 1992,
 6   1993 I talk with him every day, every day
 7   with him, he was calling me every day and I
 8   know when he was talking -- get me a lot of
 9   false information.  I'm not going to publish
10   all the false information.
11   Q.  You believe the specific
12   Rantisi denial that I brought to your
13   attention could be a false denial?
14   A.  I think that he had a reason to
15   deny it.  He has the reason.
16   Q.  Mr. Rantisi has given you false
17   information before?
18   A.  When he wanted to give false
19   information and if you are familiar with
20   Hamas, familiar with the ideology, familiar
21   with the current day-to-day events, you know
22   when it's false or not.  If an American
23   journalist from Associated Press comes from
24   New York sitting in his office and someone
25   from Geneva calls and said we did it, he's
```

---

Page 120

```
 1      SHAKED
 2   going to print it quickly, but you have to
 3   wait one day, half a day.  In the terrorist
 4   activity of the Palestinians there is no
 5   secret.
 6   Q.  In your --
 7   A.  As I said here, everyone wants
 8   to show himself.
 9   Q.  In your experience Hamas makes
10   false statements when it believes it's in its
11   interest to do so, correct?
12   A.  False declaration to deny
13   something when they need it.
14   Q.  Also false declaration of
15   responsibility when they need it?
16   A.  No, they did not take false
17   declaration.
18      MR. GLATTER: Objection to
19   form.
20   Q.  Hamas has never taken
21   responsibility for something it didn't do?
22   A.  Official responsibility they
23   didn't take.  As far as I remember they did
24   not take any false responsibility, claim of
25   responsibility to attack that they didn't do
```

---

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

RONNI SHAKED
November 4, 2010

Page 121

1      SHAKED
2   and I'm not talking about telephone calls,
3   I'm not talking about somebody that said I'm
4   going to do it.
5   Q.  In your experience has one
6   terrorist group ever made a false claim of
7   responsibility in the name of another
8   terrorist group?
9   A.  In all the years that I'm
10  working with terrorism, yes, but not in the
11  time of the second intifada when the
12  organizations or let's say the structure of
13  the Palestinian terrorist organization was
14  built and everybody knows exactly which one
15  belong to the other.  In the time when Israel
16  was -- when the territories was under
17  occupation and Gaza was under occupation it
18  was a lot of things like this, but not during
19  this time.
20  Q.  In your experience terrorist
21  groups have made rival claims of
22  responsibility, correct?
23      MR. GLATTER: Objection to
24  form.
25  Q.  Have made competing claims of

Page 122

1      SHAKED
2   responsibility?
3      MR. GLATTER: Objection to
4   form.
5   A.  Before the time that we are
6   talking in this period of this report, it was
7   done in the nineties, eighties, seventies,
8   but not during the second intifada.
9   Q.  Do you believe that a claim of
10  responsibility alone is sufficient to
11  attribute responsibility for an attack to the
12  party making the claim?
13      MR. GLATTER: Objection to
14  form.
15  A.  The problem is where it is
16  published.  Who publish it, where it was
17  published and when it was published.
18  Q.  You have to look at the vehicle
19  through which it was published; is that
20  right?
21  A.  Correct.
22  Q.  You have to --
23  A.  The language.
24  Q.  You have to look at the
25  language that's used and you have to look at

Page 123

1      SHAKED
2   when it's published in relation to when the
3   attack was committed?
4   A.  Yes.
5   Q.  You also need to look at
6   whether a claim fits a pattern of claims made
7   by the organization, correct?
8      MR. GLATTER: Objection to
9   form.
10  A.  Yes.
11  Q.  You need to consider whether
12  the claim has come through a vehicle that has
13  proven reliable in the past, correct?
14      MR. GLATTER: Objection to
15  form.
16  A.  Not always, perhaps they will
17  find a new vehicle.  Sometimes it's to my fax
18  machine, sometimes to the Ha'aretz machine,
19  sometimes to another newspaper.  Depends
20  which telephone is open.
21  Q.  In assessing a claim of
22  responsibility, is it also important to
23  consider whether the claim discloses non
24  public information that only the person who
25  was really responsible would know?

Page 124

1      SHAKED
2      MR. GLATTER: Objection to
3   form.
4   A.  This is one of the way to
5   evaluate it.
6   Q.  Do you agree that one should
7   consider whether the language of the claim is
8   similar to language that's been used in the
9   past?
10  A.  Yes, the language, especially
11  the Qur'an and especially the way they are
12  giving it because every organization have its
13  own way.
14  Q.  Do you agree that evidence that
15  dates from before an attack has occurred is
16  more reliable than evidence that comes after
17  the attack occurred?
18      MR. GLATTER: Objection to
19  form.
20  A.  No, I don't remember a thing
21  that they get before going.
22  Q.  For example, a video will, do
23  you believe that a video will in which the
24  person who's giving the will identifies a
25  particular attack that he's going to commit

Page 125

```
 1      SHAKED
 2  is more reliable than a will that is not
 3  linked to a particular attack?
 4      MR. GLATTER: Objection to
 5  form.  Object to the extent incomplete
 6  hypothetical.  You can answer.
 7  A.  The will is very important and
 8  if we are going back to Yagur, Hamas by
 9  mistake also if I'm not wrong they also
10  distribute the will of the man that didn't
11  die, but that's after it happened.
12  Q.  So in assessing the reliability
13  of a will --
14  A.  Will is just one of the tools
15  that I'm using, not more than.
16  Q.  The will is more reliable if
17  there is evidence linking it to the
18  particular attack than if it's just a general
19  will where you don't know what attack it's
20  given for, correct?
21      MR. GLATTER: Same objection.
22  A.  No, I need to cross evidence
23  and to cross tools of publishing simulation
24  of this thing, not just to take the wheel as
25  the only or the sole way.
```

Page 126

```
 1      SHAKED
 2  Q.  Do you agree that families of
 3  suicide bombers could have incentives to
 4  cooperate with Hamas in claiming credit for
 5  an attack after the attack has occurred even
 6  if Hamas is not responsible for the attack?
 7      MR. GLATTER: Objection to
 8  form.
 9  A.  Give me an example, please.
10  Q.  Have you ever heard of that
11  occurring that a family joined in a Hamas
12  claim of responsibility for an attack even
13  though Hamas was not responsible for the
14  attack because of the benefits the family
15  would get from Hamas?
16      MR. GLATTER: Objection to
17  form.
18  A.  As far as I remember it's
19  possible it can be, but I don't remember
20  example like this.  In my all years I don't
21  remember if it happened.
22  Q.  I want to focus on the sources
23  of information that you used for the 15
24  attacks that you address.  One of the
25  criteria that you used in your analysis is
```

Page 127

```
 1      SHAKED
 2  Hamas claims of responsibility, correct?
 3  A.  Correct.
 4  Q.  For these 15 attacks, how did
 5  you obtain the information that you identify
 6  in your report about Hamas claims of
 7  responsibility?
 8  A.  I have a fax machine and I have
 9  an internet.  Hamas knows exactly who am I.
10  The Islamic Jihad and even Fatah and I can
11  give you hundreds of examples of
12  announcements from Hamas from the leadership
13  coming to my office.  I will give you how I
14  get it.  The cafeteria in Hebrew University
15  of Jerusalem.  I was there 25 minutes after
16  it happen.  When I came to the office, my
17  secretary gave me here, you have something
18  here in Arabic.
19  Q.  Did you personally receive
20  Hamas claim of responsibility for all of the
21  15 attacks you address?
22  A.  No.
23  Q.  Did you personally receive
24  Hamas claim of responsibility for any of the
25  attacks you address?
```

Page 128

```
 1      SHAKED
 2  A.  Yes.
 3  Q.  Let's look at the list of 15
 4  attacks on pages 2 and 3.  Please tell me for
 5  which of them Hamas claims of responsibility
 6  were delivered personally to you?
 7  A.  As I said first of all the
 8  Hebrew University of Jerusalem July 31st.
 9  Then I have another one Rishon Le-Zion, we
10  got it on the same night although it was very
11  very late we got it in the office and another
12  one -- and another one was in one of the
13  buses in Jerusalem here, I think it was
14  Takuri, Takuri is bus number 6.
15  Q.  In the Rishon Le-Zion attack,
16  tell me from who did you receive the Hamas
17  claim of responsibility?
18  A.  I don't know who is sending me
19  the faxes to my office.
20  Q.  It came to you by fax?
21  A.  It came to my fax and it came
22  to my fax, yes.
23  Q.  It came the night of the
24  attack?
25  A.  The night of the attack.
```

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

RONNI SHAKED
November 4, 2010

Page 129

SHAKED

2 Q. When during the day did the
3 attack occur?
4 A. Rishon Le-Zion, 11:00 at night.
5 Q. Within how much time of the
6 attack did you receive the claim of
7 responsibility?
8 A. I think it was three or four
9 hours afterward.
10 Q. On the bus number 6 attack, how
11 did you receive the claim of responsibility?
12 A. It was about 7:00 in the
13 morning. It was in the morning. I don't know
14 exactly the hour. It was in the morning. I
15 get it two or three hours afterward it I
16 receive it.
17 Q. By fax?
18 A. By fax.
19 Q. On the Hebrew University
20 attack, how did you receive the Hamas claim
21 of responsibility?
22 A. 1:35 it was the attack, I
23 remember it like today because Avraham Sela
24 my professor was sitting inside the cafeteria
25 and about four or 5:00 I got it.

Page 130

SHAKED

2 Q. By fax?
3 A. By fax.
4 Q. From Hamas?
5 A. From Hamas. I have the
6 original in my office.
7 Q. Do you have the originals of
8 the Rishon Le-Zion attack?
9 A. Yes.
10 Q. And bus number 6, you have that
11 in your office?
12 A. I have a big archive and
13 everything is there.
14 Q. For those three attacks you
15 have the claim of responsibility that you
16 received by fax in your files?
17 A. I got it, yes.
18 Q. So with respect to Hamas claims
19 of responsibility that you refer to in your
20 report, you did the research yourself, you
21 did not receive the information from anyone
22 else?
23 A. Alone.
24 Q. In your report you also refer
25 to Israeli government documents such as ISA

Page 131

SHAKED

2 reports or prime minister's office
3 announcements, how did you get those?
4 A. I'm a journalist, first of all,
5 and I'm getting it directly from them.
6 Sometimes by e-mail, sometimes by fax,
7 sometimes they are sending it by messenger if
8 they want it to be quickly to print it
9 quickly. It depends.
10 Q. Did you receive from
11 plaintiffs' counsel any of the materials that
12 you cite in your reports?
13 MR. GLATTER: I'll allow him to
14 answer that on a non waiver basis.
15 MR. FRIEDMAN: Yes.
16 A. I didn't need it.
17 Q. But did you receive anything
18 from plaintiffs' counsel that you cite in
19 your report?
20 A. My report was -- as far as I
21 recall my report was dependent on myself and
22 on my archive. I don't know if they know
23 Arabic.
24 Q. In your report you also cite
25 police records?

Page 132

SHAKED

2 A. Yes.
3 Q. How did you obtain those?
4 A. I have a special connection or
5 in the court or in the police and sometimes
6 the cow wants to be milked more than we want
7 to milk them.
8 Q. Let's focus on police records
9 that you cite first. Police records that you
10 cite in your report you received from a
11 special connection with the Israeli police?
12 A. Not all of them.
13 Q. Tell me where you got them
14 from?
15 A. I got it from the police,
16 sometimes from the police. For example, I'll
17 give you example that related to our report,
18 the bus number 37 in Haifa, there was a small
19 paper praising al-Quida and said this was
20 Hamas. The police found it in the pocket of
21 the Qawasme and they gave it to several
22 journalists.
23 Q. I take it there are some police
24 records that you cite in your report that are
25 not available to the public, but that you

RONNI SHAKED
November 4, 2010

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

Page 133

```
1        SHAKED
2   were able to obtain by a special connection
3   to the police; is that correct?
4        MR. GLATTER: Objection to
5   form.
6   Q.   Is that correct?
7   A.   Nobody can come and take the
8   reports from the police, but as I said, yes,
9   I'm getting.
10  Q.   There are records that you
11  received that are not available to the
12  public, but that you received through a
13  special connection, correct?
14  A.   In order to give it to the
15  public, yes.
16  Q.   In your report?
17       MR. GLATTER: Objection to
18  form.
19  Q.   I have to go back.   In your
20  report there are several police records that
21  you refer to, correct?
22  A.   Yes.
23  Q.   Those police records are not
24  generally available to the public, correct?
25       MR. GLATTER: Objection to
```

Page 134

```
1        SHAKED
2   form.
3   A.   Correct.
4   Q.   And you received them through
5   your special relationship with the police as
6   a journalist, correct?
7        MR. GLATTER: Objection to
8   form.
9   A.   Correct.
10  Q.   Are there any police reports
11  that you identify in your report that are
12  available to the public?
13  A.   I'm a channel of the police to
14  the public and that's my job and that's why
15  the police is using me sometimes for their
16  purpose to bring it to the public.
17  Q.   Through your articles?
18  A.   Through my articles or through
19  just regular reports.
20  Q.   Let me be more specific.   Are
21  there police records that you refer to in
22  your reports where the records themselves are
23  available to the public?
24       MR. GLATTER: Objection to
25  form.   Object to the extent it's
```

Page 135

```
1        SHAKED
2   beyond Mr. Shaked's expert opinions.
3   You can answer.
4   A.   If somebody private man in
5   Israel will go to the police and ask it, for
6   example, if member of a terrorist -- one of
7   the family was injured or killed by the
8   terrorist activity, yes, he will get it, but
9   generally -- but who cares that somebody has
10  a store will come to the police and ask for
11  some documents.   It's ridiculous.   Who cares
12  about it.   They already get it in the
13  newspaper.
14  Q.   Let me ask you more
15  specifically so you've said that certain
16  records could be available to someone who is
17  representing a victim, correct?
18  A.   Correct, every lawyer for
19  example.
20  Q.   Do the police make those
21  records available to the public without any
22  special characteristics such as a
23  representative of the victim?
24       MR. GLATTER: Same objection.
25  A.   When they want they are doing
```

Page 136

```
1        SHAKED
2   it.
3   Q.   But as a general matter they do
4   not, correct?
5        MR. GLATTER: Objection to
6   form.
7   A.   General matter they don't do
8   it.
9   Q.   You identify in your report
10  certain Israeli court records, correct?
11  A.   Correct.
12  Q.   How did you obtain those?
13  A.   The record of court is open to
14  the public.   It's democracy so if somebody
15  wants to go to get it, he has all the rights
16  to get it even if it's from the Palestinian
17  -- the military court in the occupied
18  territories.
19  Q.   It's your understanding that
20  court records concerning these 15 attacks in
21  both the civilian courts in Israel and the
22  military courts in the occupied territories,
23  it's your understanding that those records
24  are open to the public?
25  A.   Most of them if it's just
```

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

RONNI SHAKED
November 4, 2010

Page 137

SHAKED

1      SHAKED
2   confidential, for example, there was some
3   records that I have to go not to the police,
4   not to the court, but to the lawyers of Hamas
5   and I get it from the lawyers of Hamas.  The
6   lawyer is -- every lawyer in Israel has an
7   open channel to all the documents.  He must
8   get all the documents and many times --
9   Q.   You mean the defense lawyers?
10  A.   The defense lawyers and many
11  times the lawyers of the Hamas themselves, I
12  get it from them with willingness they are
13  doing it.
14  Q.   Some of the court records that
15  you refer to in your reports you obtain them
16  from Hamas lawyers who obtain them because
17  they are representing defendants in the
18  court, correct?
19  A.   Yes, correct.
20  Q.   From what other sources did you
21  obtain court records that you refer to in
22  your report?
23  A.   From the internet.
24  Q.   From what other sources?
25  A.   Internet, police in the court,

Page 138

1      SHAKED
2   there's no other sources. Sometimes perhaps
3   from the Israeli security service, sometimes
4   perhaps from the army it can be because the
5   army is responsible for the military court.
6   Q.   I want to move away from
7   perhaps and I want to move away from maybe.
8   I'm focusing, Mr. Shaked, very specifically
9   on the court records that you refer to in
10  your report.  One source for these court
11  records is the internet.  Another source is
12  lawyers for Hamas defendants who receive them
13  in the course of their representation of
14  defendants.  Are there any other sources from
15  which you obtained civilian or military court
16  records that you refer to in your report?
17  A.   Directly from the court or
18  directly from the prosecution.
19  Q.   Tell me how did you get the
20  records that you obtain directly from the
21  court?
22      MR. GLATTER: Objection to
23  form.
24  A.   Usually I have to write a
25  letter and to ask them to give -- if I have

Page 139

1      SHAKED
2   the ID, it's much easier, it comes very
3   quickly, but as I said it's open, it's not a
4   secret document.
5   Q.   Did you do that as part of your
6   work in this case, did you make requests of
7   an Israeli court for specific documents?
8   A.   Yes, also here.
9   Q.   You did that by means of
10  letters?
11  A.   Not by letter, by telephone.
12  Q.   What courts did you contact?
13  A.   I called the court of Ofer in
14  order to get Ibraham Hamed's indictment
15  because it was fresh when I was writing the
16  report and was not finished.
17  Q.   That was from the military
18  court in Ofer?
19  A.   The military court in Ofer.
20  Q.   And you did that by telephone?
21  A.   Yes.
22  Q.   Did you know somebody there
23  already to contact?
24  A.   Of course I know.
25  Q.   It's your understanding that

Page 140

1      SHAKED
2   any members of public could get the documents
3   that you got?
4   A.   What do you mean any member of
5   the --
6   Q.   A member of the public?
7   A.   If somebody cares to get it, he
8   has all the right to go to the court and get
9   it.
10  Q.   Other than the request you made
11  of the military court in Ofer, what other
12  requests did you make of civilian courts or
13  military courts for documents that you refer
14  to in your report?
15  A.   In the case of Netanya Park
16  Hotel it was in the court of Tel Aviv.
17  Q.   You got it from the court in
18  Tel Aviv?
19  A.   I ask for my colleague who is
20  working in the court in Tel Aviv to send me
21  all the papers.
22  Q.   And he did?
23  A.   Yes.  Instead of -- he's not --
24  he has no archive like me.  They know that I
25  have an archive.  For example, there was

RONNI SHAKED
November 4, 2010

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

---

Page 141

1        SHAKED
2   commit suicide in Beer Sheba last year, my
3   colleague in Beer Sheba send me all the
4   files.
5   Q.   The documents that you received
6   from your friend at the Tel Aviv court about
7   the Netanya attack, it's your understanding
8   that all the documents could be requested by
9   a member of the public as well?
10   A.   As far as I know in Israel they
11   can get it, but if it's confidential --
12   Q.   You can't get it?
13   A.   They can't get it.
14   Q.   Did you receive any
15   confidential documents during the course of
16   your work on this report -- these reports?
17   A.   Yes, I did.
18   Q.   Where did you receive them
19   from?
20   A.   I receive, for example, Park
21   Hotel.
22   Q.   From your friend at Tel Aviv?
23   A.   From my friend in Tel Aviv.
24   Q.   Did you receive any other
25   confidential documents?

---

Page 142

1        SHAKED
2   A.   No, because most of the cases
3   were in 2002, 2003, 2004 and it's not anymore
4   confidential.
5   Q.   Other than the documents that
6   you requested by phone from the court in Ofer
7   about Mr. Hamed and the documents you
8   received through your friend at the Tel Aviv
9   court concerning the Park Hotel, did you
10   request any other documents from a military
11   court or civilian court in connection with
12   your work in these cases?
13   A.   I have to clarify here. As a
14   journalist I'm getting every indictment that
15   is published by the court the next day or the
16   same day I get it on my table because they
17   want me to publish it.
18   Q.   Some of these documents you
19   received?
20   A.   I received directly.
21   Q.   Independently of your work on
22   these cases, correct?
23   A.   Yes.
24   Q.   You received it in the course
25   of your work as a journalist, correct?

---

Page 143

1        SHAKED
2   A.   Yes, correct.
3   Q.   Is there anything else you
4   could think of that you got from a court that
5   you have not described already?
6        MR. GLATTER:  Objection to
7   form.  Vague as to time.
8   A.   I attend myself in several
9   courts in order to understand, to know, to
10   study, to be sure what I'm writing to the
11   public is the right thing or going to write
12   in my book or research is the right thing.
13   Q.   You said you also received
14   documents from prosecutors.  What did you
15   receive from prosecutors?
16   A.   In Israel the court is divided
17   between the court -- the archive of the court
18   and the archive of the prosecutor and
19   sometimes the court they don't want to give
20   things that's not ready because it's not
21   official, but the prosecutor wants to give
22   me.  Many times directly the prosecutor is
23   sending me as a journalist sending me
24   indictments even before it is prepared as an
25   official paper.

---

Page 144

1        SHAKED
2   Q.   Did you rely on any of those
3   documents in connection with your reports
4   here?
5   A.   As I said Ibrahim Hamed and I
6   relied also on the Park Hotel one sent us or
7   two sent us.
8   Q.   Documents you got from a
9   prosecutor?
10   A.   Yes.
11   Q.   Are these documents available
12   to the general public?
13        MR. GLATTER:  Objection to
14   form.
15   A.   Again, I'm not a lawyer, I
16   don't know what's the legal in Israel, but I
17   know that every lawyer even if he's a
18   Palestinian because most of the lawyers of
19   the Hamas are Palestinians and they are very
20   happy to cooperate with us.
21   Q.   So among the documents you cite
22   in your reports are documents that you
23   received from prosecutors even before they
24   were publicly released, correct?
25   A.   Yes.  They give it to me in

---

Ellen Grauer Court Reporting Co. LLC

Min-U-Script®

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

RONNI SHAKED
November 4, 2010

Page 153

```
1        SHAKED
2   officials?
3   A.  Yes.
4   Q.  They provided you information?
5        MR. GLATTER: You have to
6   answer.
7   A.  Yes.
8   Q.  You won't tell me who the
9   officials are?
10  A.  No.
11  Q.  You won't describe the
12  information to me?
13  A.  No.
14       MR. FRIEDMAN: Why don't we
15  take our lunch break.
16       THE VIDEOGRAPHER: We are now
17  off the record.  The time is 1:08
18  p.m., November 4, 2010.
19       (Luncheon recess taken at 1:08
20  p.m.)
21
22
23
24
25
```

Page 154

```
1        SHAKED
2   A F T E R N O O N   S E S S I O N
3        (Time Noted: 2:07 p.m.)
4
5   R O N N I   S H A K E D, resumed and testified
6   as follows:
7
8   CONTINUED EXAMINATION
9    BY MR. FRIEDMAN:
10       THE VIDEOGRAPHER: This is tape
11  4 of the deposition of Mr. Ronni
12  Shaked.  We are now back on the record
13  at 2:07 p.m., November 4, 2010.
14  Q.  Mr. Shaked, I want to ask you
15  some questions about your report relating to
16  the bus 19 attack on January 29, 2004.  Take
17  a look at page 129 of Exhibit 4.  First when
18  you use the caption or heading on page 129
19  quote --
20  A.  129, excuse me.
21  Q.  When you use the heading,
22  "evidence for legal attribution", you're
23  referring to the evidence for attributing
24  responsibility for this attack to Hamas in
25  your opinion, correct, you are not expressing
```

Page 155

```
1        SHAKED
2   a legal opinion?
3   A.  I'm not expressing a legal
4   opinion.
5   Q.  You note in the first paragraph
6   of this section that the al-Aqsa Martyrs
7   Brigade initially claimed responsibility for
8   this attack before Hamas did so, correct?
9   A.  Correct, yes.
10  Q.  Then you say in the last
11  sentence of this first paragraph you say,
12  "Fatah subsequently rejected any
13  responsibility for the terrorist attack", do
14  you see that?
15  A.  Wait a minute, where it is.
16  Q.  At the end of the paragraph.
17  A.  Yes.
18  Q.  al-Aqsa Martyrs Brigade is part
19  of Fatah?
20  A.  They are part of Fatah, but not
21  pure Fatah.
22  Q.  If you look at footnote 385
23  which is what you have after this statement
24  what you cite in footnote 385 are what you
25  believe to be Hamas sources, correct?
```

Page 156

```
1        SHAKED
2   A.  Yes.
3   Q.  You say here that Fatah
4   subsequently rejected any responsibility for
5   the terrorist attack.  Do you have any
6   authority for the proposition that Fatah
7   rejected responsibility for the attack as
8   opposed to what Hamas had to say?
9   A.  Just the internet and I just
10  have it from the internet and from television
11  El Manar television where one of the heads of
12  the Fatah said we are not responsible.
13  Q.  Do you cite that in your
14  report?
15  A.  I think yes we cite in our
16  report.
17  Q.  Where?
18  A.  It's -- wait a minute.  There
19  is a place where I quoted Kohlmann about it.
20  I don't remember exactly if it's here or in
21  the beginning.  I'll search in a minute.
22  Kohlmann was talking about Fatah that they
23  say that they didn't do it and they apologize
24  to Hamas that they took responsibility.
25  Q.  Well, I will represent to you,
```

RONNI SHAKED
November 4, 2010

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

Page 157

SHAKED
1
2  but I'm not going to go back and look at it
3  now, but I'll represent to you that what Mr.
4  Kohlmann cites on this subject on page 43 of
5  his report are Hamas sources describing what
6  Hamas says Fatah said.  My question is do you
7  have any Fatah sources or al-Aqsa Martyrs
8  Brigade sources to support your statement
9  that Fatah subsequently rejected any
10  responsibility for the terrorist attacks?
11 A.  No, I don't remember at this
12  time.  Perhaps I have, but I don't remember
13  if I have it here.
14 Q.  If you do have it, it would be
15  in your report?
16 A.  Yes.
17 Q.  Now look at page 138.  If you
18  look at the end of the first full paragraph
19  and that paragraph begins with the name
20  Adawin, you wrote finally as noted on page 43
21  of Mr. Kohlmann's expert opinion Hamas
22  publicly assumed responsibility for the
23  terrorist attack.  The al-Aqsa Martyrs
24  Brigade not only gave Hamas the credit for
25  the terrorist attack, but even withdrew their

Page 158

SHAKED
1
2  earlier declaration of responsibility
3  according to which they had been the only
4  ones responsible for the terrorist attack.
5  Do you have any authority for that statement
6  other than what is in Mr. Kohlmann's expert
7  opinion?
8     MR. GLATTER: Objection to
9  form.
10 A.  No, I don't remember, but as
11  far as I know Hamas took the responsibility
12  and nobody rejected it.
13 Q.  But you are not aware of any
14  statement from a Fatah source in which Fatah
15  withdrew the earlier declaration of
16  responsibility; is that correct?
17 A.  That's correct.
18 Q.  Look at page 130.  From 130 to
19  133 you among other things quote from Mr.
20  Ja'ara's recorded will; is that right?
21 A.  That's right.
22 Q.  Did you ever listen to this
23  recording?
24     MR. FRIEDMAN: Withdrawn.
25 Q.  Did you ever read the text of

Page 159

1     SHAKED
2  Mr. Ja'ara's will?
3 A.  Yeah, I did read the will of
4  Mr. Ja'ara, yes.
5 Q.  On the website that is cited in
6  footnote 389, correct?
7 A.  Correct.
8 Q.  Did you ever hear the
9  recording?
10 A.  I don't remember.  I don't
11  remember, possibly, but I don't know because
12  I don't remember if I read it.
13 Q.  On page 133 and 134 you cite an
14  ISA report.  Where did you obtain that, on
15  the internet?
16 A.  Yes.  The question where I got
17  it from?
18 Q.  Yes.
19 A.  I think from a document, not
20  from the internet, a document.
21 Q.  134 you cite something from the
22  prime minister's office website, that you
23  obtained on the internet?
24 A.  Not on the internet, on the --
25  not on the internet, but a document.

Page 160

1     SHAKED
2 Q.  Where did you get it from?
3 A.  As a journalist I got it from
4  my office as I'm getting all the announcement
5  of the prime minister office.
6 Q.  They are sent directly to you?
7 A.  To me or to my office.
8 Q.  Next you cite an article
9  written by the Israeli Foreign Ministry,
10  where did you get that from?
11 A.  The same thing getting it from
12  the foreign office, not from the internet,
13  but also from regular -- from the way they
14  send it to us.
15 Q.  You receive these kinds of
16  documents not in connection with your work on
17  this case, but contemporaneously at the time
18  of the attacks you receive these documents in
19  your capacity as a journalist?
20 A.  Yes, I remember I had a file in
21  my office on this attack even before I  asked
22  from 2004 because it was really a file that
23  you had to open and I remember we got a lot
24  from the front office, from the government,
25  from ISA, from other organizations.

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

RONNI SHAKED
November 4, 2010

Page 169

1     SHAKED
2   true and complete.  What led you to seek this
3   additional information about bus 19 after you
4   submitted your first report?
5   A.  I was not sure how it was done.
6   I was not sure about Ali Jaad.  I was talking
7   with somebody there about the case because
8   even there there was confusion Hamas or
9   Fatah, Fatah or Hamas and then they decided
10  it was Hamas and I wanted to see again
11  everything because I seek the truth, that's
12  what happened.
13  Q.  You just said they decided it
14  was Hamas, who is the they are referring
15  to?
16  A.  People from the camp of
17  refugees in El Ayda where he was living this
18  man.
19  Q.  When did you visit that camp of
20  refugees?
21  A.  I visit many times since then.
22  It was on May because I prepared something
23  for the Nagba day so I remember that was the
24  date I visited there.
25  Q.  This year?

Page 170

1     SHAKED
2   A.  This year 15 May.  It was a few
3   days before May 15th.
4   Q.  Do you have notes that you made
5   in connection with your visit to the refugee
6   camp?
7   A.  I could give you a picture with
8   the dates.
9   Q.  I'm asking if you have notes of
10  any information you learned?
11  A.  No.
12  Q.  On page 138 of your report, Mr.
13  Shaked, in the last paragraph?
14  A.  Yes, please.
15  Q.  You state, "In light of my
16  review of the documents from the Israel
17  police investigation of the terrorist attack
18  on the number 19 bus", do you see that?
19  A.  No.
20  Q.  In the first line of the last
21  paragraph on page 138?
22  A.  Yeah, the same time in light of
23  my case.
24  Q.  "In light of my review of the
25  documents from the Israel police

Page 171

1     SHAKED
2   investigation of the terrorist attack on the
3   number 19 bus", do you see that?
4   A.  Yes.
5   Q.  What documents are you
6   referring to?
7   A.  I'm referring to those
8   documents I put in the appendix here.
9   Q.  The ones we just discussed?
10  A.  The ones here, but not from the
11  police, from the army.  I think it has to be
12  written here from the army because the police
13  was not involved here.
14  Q.  This should say the IDF
15  investigation?
16  A.  IDF, not IDF investigation, but
17  IDF documents.
18  Q.  You are referring to the
19  documents that we just looked at in the
20  supplemental appendix, correct?
21  A.  Yeah.
22  Q.  You first got those after you
23  signed your original report, correct?
24  A.  Yes, I got it just the last
25  month.

Page 172

1     SHAKED
2   Q.  According to your understanding
3   of what happened here, Hamas members
4   attempted an attack with Ja'ara that did not
5   happen because they encountered a road block
6   and turned back and Ja'ara eventually
7   committed the bus 19 attack with the aide of
8   members of al-Aqsa Martyrs Brigade; is that
9   correct?
10  A.  That's correct.
11  Q.  Look at page 140 of your
12  report, please.  Before you do that let me
13  just ask you this.  As you understand it,
14  Ja'ara initially contacted Neshash and Ja'ara
15  told Neshash that he wanted to carry out a
16  suicide bombing, correct?
17  A.  Correct.
18  Q.  Neshash contacted his friend
19  Adawin who was in al-Qassam?
20  A.  Yes.
21  Q.  And Neshash and Adawin then
22  assembled a belt, photographed Ja'ara and
23  videotaped him as he read his will, correct?
24  A.  Correct.
25  Q.  Then Adawin drove Ja'ara to a

RONNI SHAKED
November 4, 2010

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

Page 173

1    SHAKED
2  location near Jerusalem, but they encountered
3  Palestinian security forces and drove back,
4  correct?
5  A.  Correct.
6  Q.  Thereafter Ja'ara contacted a
7  member of al-Aqsa Martyrs Brigade, correct?
8  A.  The beginning of the question.
9  Q.  Thereafter Ja'ara contacted a
10  member of the al-Aqsa Martyrs Brigade,
11  correct?
12  A.  Correct.
13  Q.  And people from the al-Aqsa
14  Martyrs Brigade manufactured a new explosive
15  device for Ja'ara, then drove him to the
16  location where he successfully carried out
17  the attack, correct?
18  A.  Correct.
19  Q.  On page 140 of your report you
20  write in the middle of the last paragraph,
21  "Even if the preparations were shared, it
22  seems that Hamas was the dominant entity in
23  the last stages of the operation."  Do you
24  see that?  Please tell me what is the factual
25  basis for your conclusion that Hamas was "the

Page 174

1    SHAKED
2  dominant entity in the last stages of the
3  operation"?
4    MR. GLATTER: Objection to
5  form.
6  A.  Ja'ara was recruited by Hamas,
7  not because they choose him, but because he
8  himself wanted to make the operation in the
9  name of Hamas and he asked to be sent by
10  Hamas and therefore Hamas took him without
11  any problem.  Ja'ara was just an instrument
12  in the hands of Hamas and then in the hand of
13  the Fatah, the al-Aqsa Brigade and as an
14  instrument they use him, but he wanted to
15  make it in the name of Hamas and Hamas
16  recruit him therefore he belong to Hamas and
17  not to the Fatah.
18  Q.  What is your factual basis for
19  saying that Ja'ara wanted to commit an attack
20  in the name of Hamas, what's your factual
21  basis for that?
22  A.  I wrote it because I heard the
23  brother of Adawin, Nofel Adawin said in his
24  indictment -- in his confession that Ja'ara
25  said that he wants to be part of Hamas and to

Page 175

1    SHAKED
2  make the operation in the name of Hamas.
3  Q.  Is that confession one of the
4  documents in your supplemental appendix?
5  A.  Yes, if I'm not wrong I'm going
6  to find it.
7  Q.  Show me where that is.
8  A.  Wait a minute.
9  Q.  Take your time.
10  A.  First of all, Nofel Adawin is
11  saying and we have it also in his handwriting
12  in Arabic I recruit Ja'ara to the Hamas in
13  order to make the operation and then Ja'ara,
14  it's on page 299, I'm sorry, you can not read
15  the Hebrew here or perhaps you can.
16  Q.  I have the translation.  Tell
17  me what you think it says?
18  A.  I'll find it because I remember
19  it very good.  On page 299 Nofel said he
20  recruit Ali Ja'ara and then Ali Ja'ara after
21  he was very anxious to commit suicide and to
22  make the operation and he came to him and
23  said he's going to make it on the name of the
24  Tanzim of the Fatah and they will take him to
25  make the operation.  Then the brother of

Page 176

1    SHAKED
2  Nofel -- that's one evidence.  Wait a minute.
3  Q.  That on page 299?
4  A.  Yes, 299.
5  Q.  I want to make sure you have my
6  question in mind, Mr. Shaked.  You testified
7  that Ja'ara wanted to make the operation in
8  the name of Hamas?
9  A.  Yes.
10  Q.  And he asked to be sent by
11  Hamas and I asked you your basis for that and
12  you said that the brother of Adawin said in
13  his confession that Ja'ara said that he wants
14  to be part of Hamas and make the operation in
15  the name of Hamas and I'm asking you to tell
16  me what you rely on?
17  A.  I don't find here the
18  confession in the police handwriting of
19  Muhamad Nofel the brother of Nofel Adawin.
20  Q.  You mean Ahmad Adawin?
21  A.  Yes, Nofel Adawin is one and
22  Muhamad Adawin is his brother and we have
23  here also, I don't know where, I have to
24  find, where we have the confession of Muhamad
25  Adawin because he was the liaison person.

RONNI SHAKED
November 4, 2010

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

---

Page 181

1      SHAKED
2  Q.  Told Adawin that Neshash had
3  said to Ja'ara, correct?
4  A.  That's the chain, yes.
5  Q.  So it's quadruple hearsay.
6      MR. GLATTER: Objection to the
7  extent it calls for a legal conclusion
8  for the witness and you knew I would
9  say that.
10  Q.  Mr. Shaked --
11  A.  And he said at page 299 I
12  recruit Ali Ja'ara to the Hamas in order to
13  make the suicide bomb.
14  Q.  That's Adawin speaking?
15  A.  Adawin speaking.
16  Q.  I will go back.  You testified
17  a short while ago that Ja'ara wanted to make
18  the operation in the name of Hamas and he
19  asked he Ja'ara asked to be sent by Hamas.
20  I'll ask you one last time, what's your
21  factual basis for testifying to what Ja'ara
22  wanted and what he asked?
23      MR. GLATTER: Objection as to
24  form. Objection to the extent asked
25  and answered.  You can go.

---

Page 182

1      SHAKED
2  A.  It was taken from Muhamad
3  Adawin testimony and I'm sorry that it's not
4  here.
5  Q.  You have it in your files?
6  A.  I have it and I can bring it.
7  Q.  Look at page 140 of your report
8  again.  In this last paragraph you wrote the
9  following, "Accordingly", he referring to
10  Ja'ara "agreed to do so on behalf of Fatah or
11  on behalf of Hamas and if another
12  organization had contacted him he would have
13  agreed to that as well", do you see that?
14  A.  Yes, I see it.
15  Q.  Is that a truthful statement of
16  your opinion?  Is that your opinion?
17  A.  That's my opinion as it's
18  written here.
19  Q.  Okay.  You can put that to one
20  side.  Is there anything else that you rely
21  upon for your conclusion that, "Hamas was the
22  dominant entity in the last stages of the
23  operation other than what you've described to
24  me this afternoon?
25  A.  No, in the last station of the

---

Page 183

1      SHAKED
2  Hamas was not involved.  They were involved
3  just in recruiting Ali Ja'ara, prepared him,
4  tried to make with him the operation, the
5  bomb in Jerusalem and it's just because they
6  saw two policemen, the Palestinian policemen
7  they didn't do it.  In another case it could
8  be another bomb.
9  Q.  The bomb that was used in the
10  bus 19 attack was manufactured by al-Aqsa
11  Martyrs Brigade, correct?
12  A.  Yes.
13  Q.  The people who drove Ali Ja'ara
14  to the attack were from the al-Aqsa Martyrs
15  Brigade, correct?
16  A.  Correct.
17  Q.  In the next sentence --
18  actually if you skip a sentence you then say,
19  "I estimate that the Al-Aqsa Martyrs Brigade
20  planned to carry out the terrorist attack and
21  even hoped to prepare it, but it may be
22  assumed that at the end of the process the
23  Fatah leadership did not approve the
24  performance of the terrorist attack", do you
25  see that?

---

Page 184

1      SHAKED
2  A.  Wait a minute.  Yes, I see it.
3  Q.  What is the basis for your
4  assumption that the Fatah leadership did not
5  approve of the attack?
6  A.  I'm talking here about approve
7  of the attack, it's not the minute that it
8  was done, it was after the discussion with
9  the Hamas, after some have some argument with
10  the Hamas and then they said it.
11  Q.  You are assuming that?
12  A.  Not just assuming it.  It's
13  according to the -- as I said to the Kohlmann
14  internet preference.
15  Q.  Which is from Hamas, not from
16  Fatah?
17  A.  From Hamas, not from Fatah and
18  the most important thing that officially
19  Hamas claim responsibility in their official
20  site, in their official documents. Ali Ja'ara
21  is mentioned as an istin shahadi, it means a
22  man who did the operation in the name of
23  Hamas, not in other name.
24  Q.  You can put that aside.  If you
25  go to page 134, one of the documents you rely

---

Ellen Grauer Court Reporting Co. LLC

Min-U-Script®

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

RONNI SHAKED
November 4, 2010

---

Page 185

SHAKED

1    SHAKED
2    on is the sentence of Neshash, correct?
3  A.   Correct.
4  Q.   You describe Neshash as
5    Adawin's "comrade in the al-Qassam Brigades",
6    correct?
7  A.   Correct.
8  Q.   The basis for your statement
9    that Neshash was in the al-Qassam Brigades is
10    what?
11  A.  He himself was a member of
12    Hamas.  Secondly he's with Nofel together in
13    the same cell as they said in the beginning
14    he said in his testimony he's sitting in the
15    jail in the wing of the Hamas together with
16    Nofel.  He's in the list of the name of what
17    is called the club of the terrorist of Hamas
18    in Bethlehem in the name of Hamas.
19  Q.   How do you know that?
20  A.   I talk with the people there.
21  Q.   What people?
22  A.   The club of prisoners in
23    Bethlehem.
24  Q.   When did you do that?
25  A.   I did it when I was in

---

Page 186

1    SHAKED
2    Bethlehem last May.  The name of the man I
3    talk with him Isa Ali Qaraqa.  He's the head
4    of the Palestinian prisoner club.
5  Q.   Could you spell that?
6  A.   Isa Ali Qaraqa.
7  Q.   He told you that Neshash is a
8    member of Hamas?
9  A.   Yes.  He told me he's sitting
10    there in the hands of Hamas.
11  Q.   He told you that Adawin is a
12    member of Hamas?
13  A.   Adawin everybody knows, you
14    don't have to ask somebody.
15    MR. FRIEDMAN: I'm going to
16    show you what I'll mark as Exhibits
17    17A and 17B which is a copy of pages
18    208 to 210 of your supplemental
19    appendix and an English translation.
20    (Shaked Exhibit 17A-17B,
21    Documents, marked for Identification.)
22  Q.   You recognize this to be
23    Nashash's sentence, correct?
24  A.   Yes.
25  Q.   If you go to the second page,

---

Page 187

1    SHAKED
2    lines 24 to 26, it states as follows or the
3    court states as follows.  "The indictment
4    shows that two weeks afterwards Ali Ja'ara
5    committed a suicide bombing attack in
6    Jerusalem.  It can be understood that the
7    prosecution does not ascribe the accused
8    guilt with reference to that attack."  Do you
9    see that?
10  A.   24 to 26?
11  Q.   Yes. Do you see that?
12    MR. GLATTER: You looking at
13    English or Hebrew?
14    MR. FRIEDMAN: English and it's
15    the same lines in the Hebrew I
16    believe.
17  A.   Yeah.
18  Q.   Okay, so you understand this to
19    mean that the prosecutors did not accuse
20    Neshash with respect to the bus 19 attack,
21    correct?
22  A.   That's his opinion.
23  Q.   That's the prosecutor's
24    opinion?
25  A.   Yes.

---

Page 188

1    SHAKED
2  Q.   Look at the next page.  I'd
3    like you to read to yourself --
4  A.   But Nashash is sitting in a
5    jail.
6  Q.   I understand.
7  Q.   I would like you to look at
8    lines 19 through 22 of page 3.  Do you see
9    that?
10  A.   What number again?
11  Q.   19 through 22 and it says
12    according to my English translation as
13    follows, "Indeed, several considerations do
14    agree with the accused.  The fact that he did
15    not instigate the attack, the fact that he
16    did not agree to Ali Ja'ara's request
17    immediately to help him with his wish to
18    commit an attack, his admission and even
19    regret before the court and the fact that
20    eventually the attack in whose assistance he
21    was involved was not executed."  Do you see
22    that?
23  A.   Yeah.
24  Q.   Do you understand this to
25    reflect the court's conclusion that the

---

RONNI SHAKED
November 4, 2010

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

---

Page 189

SHAKED

1   SHAKED
2   attack with respect to which Neshash was
3   involved was not consummated, was not
4   executed, correct?
5   A.   Correct.
6   Q.   Go to page 135 of your report.
7   A.   What page?
8   Q.   135.  On page 135 in the middle
9   you refer to Adawin's sentence, correct?
10   You write, "Adawin was charged with and
11   convicted of involvement in the terrorist
12   attack on December 12, 2006, he was sentenced
13   to 21 years in prison", correct?
14   A.   Correct.
15   Q.   So you rely in your report on
16   Adawin's sentence, correct?
17   A.   Yes.
18      MR. FRIEDMAN: Let me have the
19   reporter mark as Exhibit 18A pages 211
20   to 214 of your supplemental appendix
21   and 18B a translation of that document
22   and I'll ask you to confirm this is
23   Adawin's sentence on which you rely.
24      MR. GLATTER: I'll reiterate my
25   standing reservation of rights on the

---

Page 190

1   SHAKED
2   translation.
3      MR. FRIEDMAN: No need to
4   reiterate.
5      (Shaked Exhibit 18A-18B,
6   Documents, marked for Identification.)
7   Q.   Do you see that?  The pages
8   starting with the third page are the sentence
9   of Adawin on which you rely, correct?
10   A.   Which page?
11   Q.   Starting with the third page,
12   this is the sentence of Nofel Adawin on which
13   you rely, correct?
14   A.   Yes.
15   Q.   Look at section 5 of the
16   sentence, lines 12 through 18.  Read that to
17   yourself.
18      You have English or Hebrew?
19   Q.   Look at page 212 in Hebrew,
20   paragraph 5.
21   A.   Yes, okay.
22      MR. GLATTER: The one numbered
23   paragraph 5?
24      MR. FRIEDMAN: Yes.
25   Q.   That refers to Mr. Adawin's

---

Page 191

1   SHAKED
2   conviction for conspiring to cause death
3   willfully, correct?
4   A.   Yes.
5   Q.   That's in connection with an
6   attack that the court concludes was not
7   executed, correct?
8   A.   Correct.
9   Q.   Look at count 6.  Look at
10   section 6 and this refers to Mr. Adawin's
11   conviction for not preventing the commission
12   of an offense, correct?
13   A.   Correct.
14   Q.   This reflects that Adawin was
15   convicted of not preventing the execution of
16   the bus 19 attack, correct?
17   A.   Correct.
18      MR. GLATTER: Objection to
19   form.
20   Q.   Take a look at page 135 of your
21   report.  In the last paragraph about Adawin
22   you wrote, "Adawin was charged with and
23   convicted of involvement in the terrorist
24   attack", correct?
25   A.   Correct.

---

Page 192

1   SHAKED
2   Q.   And you are referring there to
3   the bus 19 attack?
4   A.   Of course bus 19.
5   Q.   And what you are referring to
6   there is his conviction for not having
7   prevented the bus 19 attack, correct?
8   A.   I have to read all the document
9   because you just gave me one sentence from
10   one paragraph because then they are talking
11   about other things.
12   Q.   My question for you, Mr.
13   Shaked, is was Adawin convicted of anything
14   relating to the bus 19 attack other than
15   preventing its commission?  Take your time.
16   -- other than failing to prevent its
17   commission?
18   A.   According to this paper, to
19   this document it's a deal between the
20   prosecution and the lawyers of Nofel Adawin,
21   you are right.
22   Q.   He was convicted of -- the only
23   thing that he was convicted of in connection
24   with the bus 19 attack is failing to prevent
25   its commission, correct?

---

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

RONNI SHAKED
November 4, 2010

Page 193

SHAKED
1
2     MR. GLATTER: Objection to
3     form.
4  A.  Correct, but I'm not talking
5  about legal procedure, I'm talking about
6  taking claim responsibility and the legal
7  procedure was taking a deal between the two
8  sides.
9  Q.  In Footnote 415 of your report
10  you cite one of Adawin's interrogation
11  statements, correct, Footnote 415 on page
12  136?
13  A.  Yes.
14     MR. FRIEDMAN: I'm going to
15  have the reporter mark as 19A and B
16  299 of your supplemental appendix and
17  ask you to confirm that this is
18  Adawin's interrogation statement dated
19  August 29, 2004.
20     (Shaked Exhibit 19A-19B,
21  Documents, marked for Identification.)
22  A.  Yes, I confirm.
23  Q.  The document indicates --
24     MR. FRIEDMAN: Josh, you are
25  talking and it's on the record.

Page 194

SHAKED
1
2     MR. GLATTER: I'm sorry.
3  Q.  This document indicates that it
4  was read to and signed by Adawin, correct?
5  A.  Yes.
6  Q.  He states here that the attack
7  was carried out by Tanzim Fatah, correct, in
8  the next to last paragraph?
9  A.  Ali Ja'ara told me that he
10  talked with Tanzim Fatah and they are going
11  to send him to commit suicide.
12  Q.  At the end of the next to last
13  paragraph he says, "The truth is that the
14  Tanzim Fatah carried out the suicide bombing
15  and not I", correct?
16  A.  Wait a minute.  That's what it
17  says, yes.
18  Q.  Tanzim Fatah --
19  A.  He did it, not me.
20  Q.  And Tanzim Fatah is the
21  military wing of Fatah, correct?
22  A.  Yes.
23  Q.  You also rely on the conviction
24  of Azia, correct?
25  A.  Yes.

Page 195

SHAKED
1
2  Q.  If you look at page 135 of your
3  report you say, "Azia was charged with and
4  convicted of involvement in the terrorist
5  attack and membership in Hamas.  He was
6  sentenced to five years imprisonment and was
7  released in July 2009", do you see that?
8  A.  Yes, I see it.
9  Q.  And you cite to Footnote 406
10  which is supplemental appendix page 233?
11     MR. FRIEDMAN: I'm going to ask
12  the reporter to mark as Exhibit 20A
13  what appears on page 233 and 20B an
14  English translation of that.
15     (Shaked Exhibit 20A-20B,
16  Documents, marked for Identification.)
17  A.  I see something here from
18  Muhamad Adawin in Arabic.
19  Q.  We will go back to that in a
20  second.  Let's do it now.
21  A.  I want to read because he was
22  talking about Hamas about that Ali Ja'ara
23  came to him and said I want to make it in the
24  name of Hamas.
25  Q.  What page are you reading from?

Page 196

SHAKED
1
2  A.  I'm reading from 231.  Just a
3  minute.
4     MR. GLATTER: Give Mr. Friedman
5  the Bates number at the bottom?
6     MR. FRIEDMAN: 231 is
7  sufficient, Josh.
8  A.  I'm reading I said.  I just ask
9  for two minutes for myself.
10  Q.  Why don't you look at that at a
11  break.  My question is about 20A which is
12  from page 233 of your supplemental appendix.
13  It's right here.
14  A.  Yes, okay.
15  Q.  This is the document you cite
16  for your statement in your report that Azia
17  was charged with and convicted of involvement
18  in the bus 19 attack and membership in Hamas
19  and I ask you, Mr. Shaked, show me where on
20  page 233 that information is set forth?
21  A.  Again, you are talking 133?
22  Q.  233.
23  A.  233 in Arabic?
24  Q.  Let's go back, Mr. Shaked, on
25  page 135 of your report you say --

RONNI SHAKED
November 4, 2010

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

---

Page 197

SHAKED

2 A.   135, excuse me.
3 Q.   On page 135 of your report in
4 the next to last paragraph you say that Azia
5 was charged with and convicted of involvement
6 in the bus 19 attack and membership in Hamas?
7 A.   Was sentenced to five years.
8 Q.   The authority you cite for that
9 is page 233 in your supplemental appendix.
10 You now have in front of you as Exhibit 20A
11 page 233 from your supplemental appendix.
12 Tell me where in that document does it say
13 that Azia was charged with and convicted of
14 involvement in the bus 19 attack and
15 membership in Hamas?
16 A.   (Untranslated). If somebody
17 knows how to read in Arabic what it means, it
18 means that he was in jail five years, but
19 it's not -- it's an Arab newspaper, it's not
20 going to say why and when and who and what
21 was the reason.  You have to understand this
22 is a newspaper under let's say whatever you
23 want to say Palestinian newspaper, it's not
24 going to do it.  I will read it in one
25 minute.

---

Page 198

SHAKED

2 Q.   My question is does this say he
3 was convicted of involvement in the bus 19
4 attack, yes or no?
5 MR. GLATTER: Objection to
6 form.
7 A.   No.
8 Q.   Does it say that he was
9 convicted of being a member of Hamas, yes or
10 no?
11 A.   No.
12 MR. FRIEDMAN: Josh, you want
13 to take a short break?
14 MR. GLATTER: Yes.
15 THE VIDEOGRAPHER: We are now
16 off the record.  The time is 3:16
17 p.m., November 4, 2010.
18 (Recess taken.)
19 THE VIDEOGRAPHER: This is tape
20 5 of the deposition of Mr. Ronni
21 Shaked.  The time is 3:30 p.m.,
22 November 4, 2010.
23 Q.   Look at page 136 of your
24 report, please.  Here you rely on the
25 conviction of Hamash, sub paragraph E at the

---

Page 199

SHAKED

2 top of the page you cite the conviction of
3 Hamash, correct?
4 A.   Yes.
5 Q.   And you also cite the
6 sentencing of Hamash, correct?
7 A.   Yes.
8 MR. FRIEDMAN: I'm going to
9 have the reporter mark as exhibit next
10 in number annex B to Mr. Azoulay's
11 rebuttal report and Josh, for ease of
12 reference we have added page numbers
13 in the lower right hand corner so that
14 we can refer to this.
15 (Shaked Exhibit 21, Document,
16 marked for Identification.)
17 Q.   Looking at Exhibit 21 you
18 recognize this to be annex B of Mr. Azoulay's
19 rebuttal report, photographs of the documents
20 that he copied from the Israel police?
21 A.   Yes.
22 Q.   Turn to page 70.  Do you
23 recognize that to be the sentence of Hamash?
24 A.   Yes, I do.
25 Q.   Do you see that it shows that

---

Page 200

SHAKED

2 he was sentenced to 12 cumulative life
3 sentences for intentionally causing the death
4 of those who were killed in the bus 19
5 attack?
6 A.   Yes, I do.
7 MR. GLATTER: Do you have a
8 translation of this?
9 MR. FRIEDMAN: I do not.
10 Q.   If you look at page 135 of your
11 report, Mr. Shaked, on the carry over
12 paragraph 135 to 136 you refer to the
13 conviction of Maqdad, correct?
14 A.   Correct.
15 Q.   He was an al-Aqsa Martyrs
16 Brigade's operative?
17 A.   Yes.
18 Q.   Who helped to create the
19 explosives that Ja'ara used?
20 A.   Yes.
21 Q.   Go back to Exhibit 21, turn to
22 page 73.  Do you see that?
23 A.   Yes.
24 Q.   Do you recognize this to be
25 Maqdad's sentencing?

---

Ellen Grauer Court Reporting Co. LLC

Min-U-Script®

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

RONNI SHAKED
November 4, 2010

---

Page 201

SHAKED

1
2  A.   Yes.
3  Q.   This shows that Maqdad was
4  found guilty of intentionally causing the
5  death of the persons killed in the bus 19
6  attack, correct?
7  A.   Correct.
8  Q.   And the names of the 11 victims
9  are in lines 13 through 23 of this page,
10  correct?
11  A.   Correct.
12  Q.   And this shows that Maqdad was
13  given 21 life sentences plus 15 additional
14  years, correct?
15  A.   Correct.
16  Q.   On page 136 of your report you
17  also refer to the conviction of Radab,
18  correct?
19  A.   Radab was the al-Aqsa Martyrs
20  Brigades member who was charged with and
21  convicted in connection with the bus 19
22  attack, correct?
23  A.   Correct.
24  Q.   He was sentenced to 21 life
25  sentences plus ten years imprisonment,

---

Page 202

SHAKED

1
2  correct?
3  A.   Correct.
4  Q.   Are you aware of any evidence
5  that Hamas provided any funding for the bus
6  19 attack?
7      MR. GLATTER: Objection to
8  form.
9  A.   No.
10      MR. FRIEDMAN: I'm going to ask
11  the reporter to mark as Exhibit 22A an
12  article that you published in Yediot
13  Aharonot on January 30, 2004.  22B is
14  an English translation of that
15  article.
16      (Shaked Exhibit 22A-22B,
17  Article, marked for Identification.)
18  Q.   Do you recognize Exhibit 22 to
19  be an article you wrote about the bus 19
20  attack that appeared in the January 30, 2004
21  addition of Yediot Aharonot?
22      MR. GLATTER: May I have a copy
23  of the Hebrew also.
24  A.   I recognize it of course.
25  Q.   In this article you refer to

---

Page 203

SHAKED

1
2  the bomber as "a member of the al-Aqsa
3  Martyrs Brigade the military wing of Fatah",
4  correct?
5  A.   I wrote and I quote Ali Ja'ara
6  commits suicide yesterday in Jerusalem.  He
7  was a member of the al-Aqsa the military
8  branch of Fatah, but it's not important.
9  Q.   But that's what you wrote?
10  A.   That's what I wrote of course,
11  it's written here.
12  Q.   You also attributed
13  responsibility for this attack to Hezbollah,
14  correct?
15  A.   Correct.
16  Q.   Did you ever publish a
17  retraction of this article?
18  A.   No.
19  Q.   You can put that aside.  I'd
20  like to talk to you about the Kiryat Arba
21  attack on March 7, 2003.  You believe that
22  the Hamas claims of responsibility in and of
23  themselves suffice to lead to the conclusion
24  that Hamas carried out this attack, correct?
25      MR. GLATTER: Objection to

---

Page 204

SHAKED

1
2  form.
3  A.   Correct.
4  Q.   And you believe that the
5  criminal conviction of Abdullah Abu Saif
6  leaves no doubt that the attack was carried
7  out by Hamas, correct?
8  A.   Correct.
9  Q.   You originally concluded that
10  the shooters who perpetrated this attack were
11  Alfaqiri and Alharaz, correct?
12  A.   Correct.
13  Q.   And you state in your
14  supplemental report Exhibit 3 that you based
15  this conclusion by relying on the indictment
16  of Saif and a statement on the al-Qassan
17  Brigades website regarding Alfaquri, correct?
18      MR. GLATTER: Is it Exhibit 5?
19  Q.   You state in your supplemental
20  report, Exhibit 5, that you based this
21  conclusion by relying on the indictment of
22  Saif and statement of the al-Qassam brigades
23  website regarding Alfaquri, correct?
24  A.   Correct.
25  Q.   And upon re-reviewing the

---

RONNI SHAKED
November 4, 2010

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

Page 205

SHAKED

1    SHAKED
2    sources you have now concluded that the
3    information in these sources concerning
4    Alfaquri and Alharaz is incorrect; is that
5    right?
6    A.  That's right.
7    Q.   As a result you are now
8    changing your opinion to be one that the
9    shooters who perpetrated the attack were
10   Mushin Alqawasme and Hazan Alqawasme,
11   correct?
12   A.  Correct.
13   Q.   You determined that the
14   information you relied upon was wrong by
15   reading it again, correct?
16       MR. GLATTER: Objection to
17   form.
18   Q.   The information that you relied
19   upon in your first report you concluded was
20   wrong by reading the documents again,
21   correct?
22   A.   Reading new documents.
23   A.   What new documents?
24   A.   But reading the documents.
25   Q.   So you changed your opinion

Page 206

SHAKED

1    SHAKED
2    from your first report to your supplemental
3    report based on reading the documents again;
4    is that right?
5    A.   That's right.
6    Q.  What caused you to go back and
7    read the documents again after you signed
8    your first report?
9    A.  Hamas.
10       MR. GLATTER: I would also just
11   instruct the witness as a general
12   matter that to the extent answering
13   any questions whether this or anything
14   would disclose communications between
15   you and counsel, you should exclude
16   from your answer communications
17   between you and counsel with that.
18   Q.  What caused you to go back and
19   read the documents again after you signed
20   your first report?
21   A.  Hamas itself.
22   Q.  What do you mean?
23   A.  Hamas didn't know exactly who
24   were killed in Kirbat Arba or who were killed
25   in Negohot.  Negohot is a place near Kirbat

Page 207

SHAKED

1    SHAKED
2    Arba.
3    Q.  Did you know that when you
4    signed your first report?
5    A.  When I signed my first report I
6    didn't know it.
7    Q.  How did you learn it?
8    A.  I learn it from talking with
9    people and looking at the new site of Hamas
10   and the new stories that they get about the
11   history of Hamas in Hebron.
12   Q.  What people did you talk to?
13   A.  I talk to people in Hebron. One
14   of them is member of the parliament that
15   belong to Hamas.
16   Q.  What's his name?
17   A.  It will come in a minute.
18   Abdulla Muhamad.  I will give the name if you
19   allow me to open my telephone. I can give it
20   from your telephone.
21   Q.  We'll insert it in the record
22   later.
23   A.  Okay.
24   Q.  What led you to speak with him
25   on this subject?

Page 208

SHAKED

1    SHAKED
2    A.  Arabic.
3    Q.  Not what language, what led you
4    -- what caused you to speak to him on this
5    subject?
6    A.  Because I saw I'm reading the
7    site of Hamas daily and suddenly there was
8    something new in the new edition of the site
9    of the internet and he went out of jail and
10   it was an opportunity to talk also about who
11   did it exactly because there was a question
12   also for me.
13   Q.  What is it that you saw on the
14   Hamas website that was new?
15   A.  Confusion of Hamas themselves.
16   Q.  And you saw this on the Hamas
17   website after you signed your first report?
18   A.  It was on the new site of
19   Hamas.
20   Q.  What is the name of the new
21   site of Hamas?
22   A.  If I'm not wrong it's
23   Palestinian PS or Palestine -- it's not
24   Palestine. It was in the site of the military
25   branch of Hamas, not in the site of Hamas,

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

RONNI SHAKED
November 4, 2010

Page 209

```
 1      SHAKED
 2   sorry. Qassam.
 3   Q.  This is something that was
 4   posted on the Qassam website after you signed
 5   your first report?
 6   A.  Yes.
 7   Q.  Did you make a printout of that
 8   new information?
 9   A.  I don't remember.  Perhaps.
10   Q.  If you did, you would have it
11   in your files?
12   A.  Perhaps.
13   Q.  Once you go back to your office
14   and have your computer, would you be able to
15   identify the precise web address of what you
16   are referring to on the Qassam website?
17   A.  Yes, I think, yes.
18      MR. FRIEDMAN: We'll ask in a
19   letter that we'll send to Mr. Glatter
20   that you do that.
21      MR. GLATTER: We'll take it
22   under advisement.
23   Q.  One of the things you did was
24   to go back and look at the indictment of
25   Saif, correct?
```

Page 210

```
 1      SHAKED
 2   A.  Indictment of?
 3   Q.  Abu Saif?
 4   A.  Yes.
 5   Q.  You saw by looking at the
 6   indictment again that both count 9 and count
 7   10 of the indictment were incorrect; is that
 8   right?
 9   A.  That's right.
10   Q.  You also determined that the
11   website of the al-Qassam Brigades that
12   referred to Alfaquri as the perpetrator of
13   the Kiryat Arba attack was mistaken, correct?
14   A.  Correct.
15   Q.  You also concluded that the
16   statement on the al-Qassam website that
17   Alfaquri's companion was Hazam Alqawazme was
18   also incorrect, right?
19   A.  Right.
20   Q.  You also concluded that the
21   statement on the same website that Alfaquri
22   killed many people during the attack by
23   detonating an explosive belt was also
24   incorrect; is that right?
25   A.  I didn't say many people,
```

Page 211

```
 1      SHAKED
 2   killed people.  Okay, yes.
 3   Q.  So you saw that the statement
 4   on the website that says that Alfaquri killed
 5   many people during the attack by detonating
 6   an explosive belt was incorrect, right?
 7   A.  I know the number of the people
 8   who were killed before I corrected.
 9   Q.  This is an error that -- you
10   determined this was a mistake on the website?
11   A.  Yeah.
12   Q.  So you concluded that there
13   were at least three mistakes on the Qassam
14   website, correct?
15   A.  Correct.
16   Q.  If you look at page 6, section
17   B of your supplemental report?
18      MR. GLATTER: For purposes of
19   clarity are you looking at the clean
20   or red line?
21      MR. FRIEDMAN: I'm looking at
22   the red line of Exhibit 6.
23      MR. GLATTER: Exhibit 5?
24      MR. FRIEDMAN: Exhibit 5.
25   Q.  You state that the name and
```

Page 212

```
 1      SHAKED
 2   picture of Hazam Alqawazme appears in the
 3   Hamas book of martyrs, correct?
 4   A.  Correct.
 5   Q.  And for that you cite what is
 6   listed in Footnote 19, correct?
 7   A.  Correct.
 8   Q.  And you note that this book has
 9   the particulars of the Hamas members who were
10   killed including the attack in which he was
11   killed and the type of attack that he carried
12   out, correct?
13   A.  Correct.
14      MR. FRIEDMAN: Let me show you
15   Exhibit 23A which is what you cite on
16   pages 43 and 44 of supplemental
17   appendix number two and I'll mark as
18   23B a translation of that.
19      (Shaked Exhibit 23A-23B,
20   Documents, marked for Identification.)
21   Q.  Do you have that in front of
22   you?  This is what you cited from the Hamas
23   book of martyrs, correct?
24   A.  I believe so.
25   Q.  This does not list the Kiryat
```

RONNI SHAKED
November 4, 2010

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

Page 213

1      SHAKED
2   Arba attack under the reference to Hazem
3   Alqawasme, correct?
4   A.  To what note are you talking?
5   Q.  I'm looking at the third item
6   in the right hand column in the Arabic
7   version?
8   A.  I'm talking about my report.
9   Q.  My question is this book of
10  martyrs does not identify Hazam Alqawasme as
11  a perpetrator of the Kiryat Arba attack,
12  correct?
13  A.  I don't think this what I use.
14  It's not the same cite.
15  Q.  This is what you cited in your
16  report as support for the statement, but I'm
17  just asking you, Mr. Shaked, isn't it a fact
18  that this does not attribute the Kiryat Arba
19  attack to Mr. Alqawasme?
20  A.  May I explain something
21  when you open the file here you will enter
22  into the details.  You have here the name of
23  the name Alqawazme and then you have to push
24  on the name or on the picture and you will
25  get all the details.

Page 214

1      SHAKED
2   Q.  I'll try that, but as printed
3   here it does not say Kiryat Arba, correct?
4   A.  In this page, no, but it's not
5   the full page of the exhibit.
6   Q.  If you look at the fourth entry
7   in the left hand column that's Mr. Alfaquri,
8   correct?
9   A.  Correct.
10     MR. GLATTER: When you say --
11     MR. FRIEDMAN: In the Arabic
12  version.
13  Q.  It says with respect to Mr.
14  Alfaquri, "Carried out the Kiryat Arba
15  settlement", correct?  Isn't that what it
16  says?  Doesn't this attribute the Kiryat Arba
17  attack to Mr. Alfaquri?
18  A.  Yes.
19  Q.  In your opinion that's wrong;
20  Alfaquri did not participate in the Kiryat
21  Arba settlement attack, correct?
22  A.  Just a minute.  With your
23  permission repeat your question.
24  Q.  In stating that Alfaquri
25  carried out the Kiryat Arba attack, this

Page 215

1      SHAKED
2   document exhibit --
3   A.  Where it's stated in this
4   document?
5   Q.  23 is wrong?
6   A.  What do you mean 23 is wrong?
7   Q.  Next to the fourth photo on the
8   left?
9   A.  It's called Fahuri Ziat Fahuri.
10  Q.  Doesn't it say he carried out
11  the Kiryat Arba attack?
12  A.  It said yes.
13  Q.  In your view that's mistaken?
14  A.  Yes.
15  Q.  Look at page 7 of Exhibit 5.
16  This indicates that one of the differences
17  between your first opinion about the Kiryat
18  Arba attack and your supplemental opinion
19  about the Kiryat Arba attack is that you
20  crossed out what was in subparagraph E at the
21  top of this page, correct?
22  A.  Correct.
23  Q.  That's information that you had
24  received from the AlKsahif.net website?
25  A.  In respect to Footnote number?

Page 216

1      SHAKED
2   Q.  Crossed out 14 you had obtained
3   this information from the Alkshaif.net
4   website.  I'm referring to this right there?
5   A.  Yes.
6   Q.  What is the Alkshaif.net
7   website?
8   A.  It's related to Hamas.  I don't
9   remember exactly now what it is, but as far
10  as I remember it's related to Hamas.
11  Q.  So in your supplemental --
12  A.  In Hebron.
13  Q.  In your supplemental report,
14  you conclude that this Hamas website was also
15  mistaken about responsibility for the Kiryat
16  Arba attack, correct?
17  A.  Yes, that's correct.
18  Q.  Look at page 3 of Exhibit 5.
19  In the last paragraph you say, "The only
20  definitive way in this case to confirm which
21  individual terrorists attacked Negohot and
22  which attached Kiryat Arba would be to obtain
23  the forensic reports for the dead
24  terrorists", do you see that?
25  A.  Yes.

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

RONNI SHAKED
November 4, 2010

Page 217

SHAKED

1  Q.  And you did not obtain those
2  reports?
3
4  A.  It was not done.
5  Q.  Go to page 7 of this document.
6   In paragraph C1 you rely upon an announcement
7   by the prime minister's office with respect
8   to the Kiryat Arba attack, correct?
9  A.  Correct.
10  Q.  And that announcement says that
11   Hamas assumed responsibility for the attack,
12   correct?
13  A.  Correct.
14  Q.  It does not say that Hamas
15   committed the attack, correct?
16  A.  Correct.
17  Q.  Let's talk about the attack in
18   Rishon Le-Zion at the Sheffield Club.  You
19   believe that Hamas' claims of responsibility
20   for that attack standing alone are sufficient
21   to attribute that attack to Hamas?
22  A.  Yes, I do.
23  Q.  Hamas' official announcement of
24   responsibility for this attack was made six
25   years and one month after the attack,

Page 218

SHAKED

1
2   correct?
3  A.  Correct.
4  Q.  What if anything did you do to
5   analyze why Hamas waited more than six years
6   to publish its official announcement claiming
7   responsibility of this attack, did you do
8   anything?
9  A.  First, the Israeli security
10   office announced the name of the commit
11   suicider after a few days.
12  Q.  In 2002?
13  A.  In 2002.  Secondly, I think
14   that there was a reason behind Hamas not to
15   publish the name from several reasons.  The
16   family was living in Larka in Jordan and
17   Hamas at this time had a very sensitive
18   relationship with Jordan and they are
19   Jordanian citizen therefore they didn't want
20   to make problems to the family therefore they
21   didn't announce.  Then Al Jazeera made big
22   report about the missing people and one of
23   the people that were on the list of Al
24   Jazeera was the name of the suiciders in
25   Rishon Le-Zion therefore Hamas wanted to

Page 219

SHAKED

1
2   correct the mistake of Al Jazeera and they
3   announce it.  Jazeera is very known and
4   Jazeera I think today every one especially in
5   those years even in our time everybody is
6   watching Jazeera news among the Palestinians.
7  Q.  Going to the first reason, have
8   you spoken with anyone from Hamas about the
9   validity of your view of the first reason?
10    MR. GLATTER: Objection to
11   form.
12  A.  No.
13  Q.  How do you know that the
14   person's family was living in Jordan?
15  A.  I know it from Hamas.  I know
16   it from the website.  I know it from the
17   newspapers.  I know it from the Qassam the
18   commander that took him to Rishon El-Zion he
19   told me his family is living in Jordan.
20  Q.  The Hamas commander who took
21   him to Rishon El-Zion told you that he took
22   him to Rishon Le-Zion?
23  A.  Yes.
24  Q.  When did he do that?
25  A.  When I interview him in the

Page 220

SHAKED

1
2   jail of 2006.
3  Q.  What is his name?
4  A.  Waal Qassam, excuse me, Waal
5   Qassam.
6  Q.  What record do you have of your
7   interview with him, do you have notes?
8  A.  I have film.  I video with him.
9  Q.  You have a video of that
10   interview?
11  A.  I have video and I have not
12   just documentary itself, but also another --
13   I have the raw material.
14  Q.  You have that in your office?
15  A.  Yeah.
16  Q.  So this first reason about the
17   family living in Jordan and not wanting to
18   create problems for the family, that's your
19   inference from the facts that you know,
20   correct?
21  A.  That's what I think as one who
22   knows the relationship between Jordan and
23   Hamas and following them.
24  Q.  That's what you infer?
25  A.  That's what I understood.

RONNI SHAKED
November 4, 2010

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

Page 221

SHAKED

1    SHAKED
2  Q.   The second reason that Hamas
3  disclosed the name after the name was
4  referred to in Al Jazeera, have you ever
5  confirmed that inference with anyone from
6  Hamas?
7        MR. GLATTER: Objection to
8  form.
9  A.   No.
10 Q.   Your explanation in this regard
11 is your inference from the facts, correct?
12       MR. GLATTER: Objection to
13 form.
14 A.   My explanation, no.
15 Q.   What is the basis for your
16 second reason relating to Al Jazeera?
17 A.   Jordanian and Palestinian
18 newspaper and even the newspapers of Hamas I
19 think it was El Risallah or one of the
20 newspapers of Hamas that told all the story.
21 Q.   But did those sources say that
22 this was the reason why Hamas announced its
23 responsibility for the attack only in 2008?
24 A.   They said that that was the
25 reason.  They said I'm going to quote I don't

Page 222

1    SHAKED
2  remember exactly the source if it was El
3  Risallah or Muslim or other, but they said
4  the father the commit suicider get a shock
5  when he heard it and after it was in Al
6  Jazeera they decided to come and tell him the
7  truth.
8  Q.   Who decided?
9  A.   Hamas and the minute that --
10 Q.   And you read that in an
11 article?
12 A.   You are catching me in a
13 minute, I don't know if it's article of Hamas
14 in or one of the websites, but it's in my
15 report I think.
16 Q.   Do you have a copy in your
17 files of the document you are relying upon
18 for this?
19 A.   Yes, I can bring it.
20 Q.   There was no video will of
21 Muamar?
22 A.   As far as I remember, no.
23 Q.   There were no photos of him
24 wearing Hamas paraphernalia that you know of?
25 A.   Correct, that I know of.

Page 223

1    SHAKED
2  Q.   Let's talk about the Mike's
3  Place bombing.  You believe that Hamas' claim
4  of responsibility for that attack alone is
5  sufficient to attribute responsibility for
6  that attack to Hamas, correct?
7  A.   Yes, I believe so.
8  Q.   Has the Israeli government
9  officially attributed responsibility for that
10 attack to Hamas?
11 A.   Yes.
12 Q.   How did it do that?
13 A.   They do it through the Israeli
14 security ISA, they had a report about it,
15 full report and if I'm not wrong also the
16 Israeli government had a press release about
17 it.
18 Q.   Did those documents the ISA
19 report and the press release, did they say
20 that Hamas was responsible or that Hamas
21 claimed responsibility?
22       MR. GLATTER: Objection to
23 form.
24 A.   I don't remember exactly the
25 word that they use, but it was obvious that

Page 224

1    SHAKED
2  Hamas is responsible.
3  Q.   Do you have the documents that
4  you are relying on from the ISA and the press
5  release in your files?
6  A.   Yes, I have.
7  Q.   Are you aware of reports that
8  the explosives used were of a type that are
9  not available to Hamas?
10 A.   Yes, I'm aware.
11 Q.   You believe that that's not
12 true?
13 A.   I believe it's true.
14 Q.   You believe the explosives that
15 were used are of a type not available to
16 Hamas; is that right?
17 A.   That's available to Hamas, no.
18 Q.   Look at page 90 and 91 of your
19 supplemental report, Exhibit 4.  Before you
20 do that, Mr. Shaked, I just want to go back
21 to your last answer because there is a double
22 negative.  You believe that the explosives
23 that were used in the Mike's Place attack are
24 of a type that's not available to Hamas,
25 correct?

**EXHIBIT 181 TO DECLARATION OF VALERIE SCHUSTER**



# שער ראשון: רצח וגירוש

## א. הגירוש

יום ראשון, 13 בדצמבר 1992, היה יום חורף קר ונשום באלבירה. עדפל בפד נת על העיר, והחובותיה היו ריקים מאדם. ב־9:50 בבוקר נכנסו שני רעולי פנים בשער הברזל של משדד "הצלב האדום" שבפאתי העיר העתיקה. המשדד ממוקם בקומת הקרקע של בניין אבן לבן של שתי קומות. מסדרון צד מוביל מן הרחוב פנימה, לדלפק שמאחוריו יושבת פקידת קבלה.

דעולי הפנים הושיטו מכתב חתום לפקידת הקבלה, סוהה מוצלח. "אנו חברי חוליית עז אלדין אלקסאם של חמאס," הודיעו. "חסמנו קצין ישראלי, ואלה התנאים לשחרורו." הפקידה המבוהלת מיאנה לקבל לידיה את המכתב, עד שעובדת אחרת של המשדד האיצה בה לקחתו. דעולי הפנים הזהירו את סוהה לבל תפתח את המכתב בטרם תחלוף מחצית השעה מרגע המחלקותם. אחר כך עזבו את הבניין ונבלעו בסמטאות המפותלות.

סוהה חיפשה בבהילות מישהו להתייעץ אתו. הממונים עליה נעדרו מן המשדד לדגל חופשת יום א'. היא רצה במעלה המדרגות לקומה השנייה, אל משדרו של פאיק חוסיני, נציג הסהד האדום הפלסטיני. חוסיני קרא את המכתב, העתיקו במכונת הצילום והזדה לסוהה להתקשר למושל הצבאי של רמאללה.

הפקידה חייגה באצבעות רועדות למשרד המושל ומסרה על המכתב שבידה. אחר כך התקשרה למושל הצלב האדום במדדח ירושלים, ודיווחה על האידוע. את המכתב שלחה לירושלים באמצעות פקסימיליה, ומשם הועבד למשדד הראשי בתל אביב. דעת סופרות לאחר מכן הגיעו לאלבירה קציני המנהל האבתבם. הם חקדו את סוהה, ובצאתם נטלו עמם את מכתב האולטימטום, שצדף אליו צילום של תעודת שוטד במספר הגבול: דב סמל ראשון נסים טולדנו מלוד.

בתרת המכתב היתה: "בשם אללה הרחמן והרחום. גילוי דעת מספר 2 מטעם היחידה המיוחדת של גרודי עז אלדין אלקסאם — הזדוע הצבאית של חמאס."

"היום," נאמר בו, 13.12.1992, יום השנה השישי להקמת תנועת חמאס, בוצעה חטיפה של קצין צבא הביבוש. החתוף מחזק במקום מבטחים. הפעולה בוצעה על פי ההודאות וברייקנות. אנו מודיעים לשלטונות הכיבוש כי אנו דורשים מהם ומן ההצגנה הישראלית לשחרר את שיח' אחמד יאסין תמורת

11


EXHIBIT



שחדרדו של קצין זה. על שלטונות הכיבוש לשחדרו בתוך עשר שעות, לא יאוחר
מהשעה 9:00 בערב, על פי התנאים הבאים:

"1. יש לעמוד בלוח הזמנים, שאם לא כן נהרוג את הקצין עם פקיעת המועד.

"2. שחדור שיח' יאסין ייעשה במעמד נציג הצלב האדום הבינלאומי,
השגריר המצרי, השגריר הצדפתי, השגריר הסווירי והשגריר הסורקי. על
שלטונות הכיבוש להתחייב בפני נציגים אלה כי שיח' יאסין לא ייעצר פעם
נוספת.

"3. אנו מזהירים את שלטונות הכיבוש שלא לפגוע בשיח'. פגיעה כזאת
תביא לתגובה מצדנו, ולא נעבור עליה בשתיקה.

"4. אנו מתחייבים לשחדר את הקצין מיד לאחר שחדור השיח', בדרך שנמצא
לנכון.

"5. על הסלוויזיה הישראלית לשדר את שחדרודו של שיח' אחמר יאסין
בשידור חי, שבמהלכו תימסד לנציגים הזדים הבטחיבות הישראלית כי השיח'
לא ייעצר."

על התחנום: "היחידה המיוחרת, גרודי עז אלרין אלקסאם, הזדוע הצבאית
— חמאס."

בסמוך לשעה 10:30 התפר'ץ תא"ל עזדיאל נבט, מזכירו הצבאי של ראש
הממשלה ושד הביסחון יצחק רבין, לחדר ישיבות הממשלה. הריון שנערך
באותה שעה נסב על תכנית ההבראה של התעשייה הצבאית. בתחילת הישיבה
שמע השרים ריווח מפי הרמטכ"ל אהור בדק על תקרית היד שאירעה בלילה
בחברון, ובה נהדג סמל ראשון יובל סוטנג'י מירי חוליה של עז אלרין אלקסאם.
בדק העדיך שבתקשפה הקריובה צפויה התדפה בפעולות האיבה בגבה ובד'צועה.

נבט, הירוע בקוד רוחו, תקשקה להסתיר את התרגשותו. הוא מסד לראש
הממשלה פתק, ושלא כהד'גלו המתין בסמוך אליו ער שיסיים את קריאתו. רבין
"עיין בפתק בפנים תתומות. אחד כך הסיר את משקפיו, הפגה מבטו לעבד השדים
והודיע קצדות: חוליית חמאס חטפה את שוטד מג'ב נסים סולרנו, והיא תובעת
את שחדוד שיח' יאסין ער השעה 9:00 בערב.

אחדי ריון קצד קיבלה הממשלה החלטה חד'משמעית: "לא נכנעים לסדור."-
בכך נגעלה הישיבה. ראש הממשלה נסע הייש"ר ללשכתו בקדיה בתל אביב,
שם המתינו לו ראש השב"כ, מפכ"ל המשטרה, ראש אמ"ן ובכירי הצבא.

בהתייעצות הרוחפה החלט שלא להמתין לאות נוסף מן החוטפים ולפתוח
מיד בחיפושים נרחבים אחד השוטד החטוף. על מנת להעניק לשירות הביסחון
שהות לאתר את מקום הימצאו של סולרנו, סוכם בישיבה כי יש לראיין את
שיח' יאסין בכלבו, ולחלק לספיו פניה'ה לחוטפים שלא להרוג את בן הערובה.

ב3:00: אחד הצהריים התרכזו כוחות גדולים של המשטרה ומשמד הגבול
בבית התרבות שליד בניין משטרת לוד. הכוחות הקימו מחסומים ופתחו



בסריקות נרחבות, בסיוע מסוק, ב-5:50 הותרה לפרסם הידיעה על חטיפת חוד
סולדרנו בשירותי "קול ישראל" ובגלי צה"ל.

בסביבות השעה 6:30 לפנות ערב הוקלט הריאיון עם שיח' יאסין. ראשון נר,
שוחח עמו כתב הרדיו בערבית, אייל עלימה. לאחר תרדוך קצר שקיבל השיח' ומי,
מנציג המנהל האזרחי נכנס עלימה לחדרו של יאסין. השיח', סיפר עלימה, ישב על
בכיסא הגלגלים שלו, עטוף בשמיכה. הוא שיתף פעולה ברצון, וענה תשובות זעם
ענייניות על כל השאלות שהוצגו לו.

הריאיון, שמתוכו שודרו לבסוף שלוש רקות, הועבר באמצעות הטלפון מתוך זאת
הכלא. תשובה אחת, שלא ענתה על המצופה, השמטה מן הנוסח הסופי: נכללה
בה קריאה של השיח' לאנשיו להמשיך בפעילותם. מצא

אחרי עלימה האיץ את יאסין כתב הטלוויזיה בערבית, יוני בן מנחם. על אסין
מנת להספיק לשדר את הריאיון במהדורת החדשות של 7:30 הוטס בן מנחם שיח'
במסוק צבאי לכלא אשמורת. בשיחה עמו חזר יאסין על עיקרי הדברים שאמר
לכתב הרדיו.

בסמוך לשעה 7:00, בסוף יומן החדשות, שידר "קול ישראל" בערבית את אית
הריאיון המוקלט עם שיח' יאסין. חמש רקות לפני השעה 8:00 שודרו דברי
יאסין גם במהדורת החדשות של הטלוויזיה בערבית, ולאחר מכן במהדורת ראש
"מבט" בטלוויזיה הכללית. ,ערד

בשעות הערב התכנסה הממשלה לישיבה מיוחדת בלשכת ראש הביטחון בתל ציבה
אביב. בסיומה יצאה בהודעה מיוחדת בזו הלשון: "ממשלת ישראל רואה בחומרה לילה
רבה את חטיפת שוטר משמר הגבול. הממשלה תובעת את שחרורו המיידי של סאם,
רס"ד סולדרנו, ורואה בחומפין ובשולחיהם את האחראים לשלומו ולשחרורו. יה,
הממשלה מזהירה את החוטפים מפני כל פגיעה בס"ד סולדרנו." ההודעה שודרה ראש
בדריו בערבית ובכלוויזיה הכללית, והופצה באמצעות סוכנויות הידיעות רבין
הזרות. שרים

בתום הישיבה קיבל שירות שידות הביטחון הנחיה לנסות ולמצא קצה חוט שיזכיל בעת
אל החוטפים. מכאן החלה חקירה אינטנסיבית של איסוף מודיעין, מעצדים
וחקירה נרחבת של פעילי חמאס. רוד".

בשעות אחר הצהריים המאוחרות של ה-13 בדצמבר חזר ר"ד מחמוד אלדומהי, אביב,
רופא בן 30, לביתו באלבירה. אלדומהי, מפקר חמאס באזור מרכז הגדה, התגורר א.
לא הרחק ממשטרה הצלב האדום. באותו יום נפש בשעה 8:30 בבוקר בחברת פתוח
עמיתו, ר"ד בשיר אלכרמי, למפעל "פורמטיב" שבאותו התעשייה של פתח יסחון
תקוה, כדי לרכוש שם ציוד רפואי. בדרכו חזרה הביתה נרחם לשמע מעל ז את
גלי האתר במכוניתו על החטיפה, ועל הריאיון הצפוי עם שיח' יאסין.

נסע כולו התערד אלדומהי אל הבית, ניגש אל מכשיר הטלפון והתקשר נגבל
לווירג'יניה, ארצות הברית. הוא ביקש לשוחח עם אבו אחמר, מראשי תנועתו פתחו

13



חמאס באדצות הברית. אבו אחמר לא שהה באותה עת בביתו. ד"ר אלדרומי
חייג את המספר 814502311–44–00. זה היה מספרו של אבו עובידה, ראש
הזרוע הצבאית של חמאס, שהתגורר בלונדון.

"שמעתי על חטיפה של חייל," אמר ד"ר אלדרומי, "הודיעו על כך בטלוויזיה
הישראלית. מסרו כי שיח' אחמר יאסין יתראיין ברדיו הישראלי. אינני יודע
מי ביצע את הפעולה. האם יש לך פרטים נוספים?"

אבו עובידה כבר שמע על החטיפה. "אני אנסה לקלוט את שידורי הרדיו
הישראלי ולהאזין לריאיון עם שיח' יאסין," אמר לאלדרומי.

מפקר חמאס ברמאללה לא הסתיר את התרגשות. "אתקשר אתך אחרי
הריאיון," אמר, "אם לא תצליח לקלוט את השידורד, אשלח לך בפקסימיליה
את רברי שיח' יאסין."

למן שעות הערב המוקרמות שידור הרדיו בעדבית אותת לשעה את רברי שיח'
יאסין. "אני מייעץ לחוטפים, ולא משנה מי הם," אמר השיח', "שישמרו על חייו
של איש זה, כדי שהשלטון יוכל לשמוע את מבוקשם ולהיענות להם. על
החוטפים לשמור על שלומו של החטוף. אינני תומך בהדיגתו של החטוף, שכן
זו אינה המטרה. יש להמשיך ולהחזיק בו עד אשר יושג הסכם בין השלטונות
לחוטפים."

ד"ר אלדרומי התקשר פעם נוספת ללונדון.

"שמעתי את הריאיון בדריו," אמר לו אבו עובידה.

"צריך לשחרר מיד את הישראלי," הביע אלדרומי את רעתו.

אבו עובידה האזין לו ברוב קשב והבטיח להתקשר שנית.

ב־8:20 בערב בצלצל הטלפון בביתו של ד"ר אלדרומי. מעברו השני של הקו
היה אבו אחמר מארצות הברית.

"אתה יודע מי ביצע את החטיפה?" שאל אבו אחמר.

"לא, אינני יודע," ענה אלדרומי, "אבל צריך להחליף את החטוף בשיח'
יאסין."

אבו אחמר הורה לאלדרומי להפעיל את מכשיר הפקסימיליה ולקבל הורעה.
כעבוד רקת אחרות השתלשל רף נייד מודפס מתוך המכשיד. "מתוך כבוד
לבקשתו של השיח' אחמר יאסין," נכתב בו, "החליטה חמאס לדרות את
האולטימטום בשעתיים."

ההודעה ששלח אבו אחמר למפקר חמאס ברמאללה היתה משוללת יסור. הוא
לא ידע דבר וחצי דבר על הֹחוליֹה שביצעה את חטיפת סֹולֹדֹבֹ. למעשה, איש
במֹפֹקֹרֹת חמאס לא ידע עליה מאומה. הֹחוליֹה קמה כהֹתארֹגֹנֹות מֹקֹמֹית וביצעה
אֹת החֹטֹיֹפֹה בֹשֹעֹ̇ת חמאס, ולא על פי הוראות התנועה. רק לאחר רצֹה סֹולֹדֹנֹו
הצֹטֹרֹפֹו חֹבֹרֹיֹה לֹגֹדֹוֹד עז אלדֹין אלקֹסֹאֹם.

מפקר החוליה היה מחמוד מוסא עיסא, יליד 1968, תושב הכפר ענתא

14



שבצפון ירושלים. עיסא, גבה קומה, בעל עיניים יוקדות חזק שחור כפחם, ז׳
התגורר עם משפחתו בבית דרׄשמוׄ מוׄקף בוסתן. הוא למד במכללה הרתית ש
בביתוניה שליד רמאללה, ובתום ליׄׄמודיו החל לעבוד בסניף המזרח ירושלמי
של חשבואֹן ״צאות אלתאק ואלחוׄד״יה״, בטׄאׄׄׄונה של התנועה האסלאמית ה
בישראל. תפקידו היה לרכז מידע על אירׄׄדוע האיונתׄיפאדה ועל הפעילות ע
הרתית בגׄרה, ולשׄגׄרו למערכת העיתׄון באׄם אלפאחֹם.

ברחוב הפלסטיני זוׄׄהה המשׄׄרד בכׄׄינוׄׄי אלנזוׄׄזה שבׄׄשׄׄם׳ ג׳דאא עם חמׄׄאס. יו
עיתונאיׄׄם ישׄׄראליׄׄם שׄׄבׄׄיקׄׄשׄׄו להׄׄתׄׄעׄׄדׄׄכׄׄן בנׄׄעׄׄשׄׄה בׄׄקׄׄרׄׄב התׄׄונׄׄגים האׄׄסׄׄלׄׄאׄׄׄמיים
בשׄׄׄׄטׄׄׄחׄים הׄׄיׄׄו בׄׄׄׄאׄׄׄׄים לׄׄׄׄמׄׄׄׄחׄׄׄׄׄׄזׄׄׄׄׄׄור עׄׄׄׄיׄׄׄׄׄׄׄׄׄׄׄׄׄׄסׄׄׄׄׄׄׄׄׄׄׄׄׄׄׄׄׄׄא. עׄׄׄׄׄׄׄׄׄׄׄׄׄׄׄׄׄׄׄׄׄׄׄׄׄׄׄׄׄׄ



מירע מורייעיני. הארבעה שוטטו ברחובות ירושלים המערבית כדי ללמור את
סגרת החיילים ואת מסלול הסיור של שוטרי משמר הגבול. הם הגיעו למסקנה
כי ביצוע חטיפה בירושלים הוא משימה בלתי אפשרית, וכי על מנת לפעול
בעיר אחרת עליהם לרכוש מכונית.

ברצמבר 1992 רכשו הארבעה בכספם הפרטי מכונית סובארו ארומה משנת
ייצור 1973, כדי שתשמש אותם כרכב מבצעי. המכונית, בעלת לוחיות רישוי
צהובות, נרשמה על שם מחמור עטון, שנשא תעודת זהות ישראלית.

ביום החטיפה, ב־3:00 לפנות בוקר, נפגשו חברי החוליה בתחנת האוטובוס
בכפר ענתא. הם נכנסו למכונית הסובארו הארומה ופתחו בנסיעה לכיוון
השפלה. במכונית נהג מחמור עטון.

"הגענו עד קרבת לוד, ואז הורה לי מחמור עיסא להיכנס לתוך העיר," **יהעיד**
עטון **לאחר מעצרו** בהגיעם להגיעם רכבה אפלה על העיר, וגשם סודרני ירד לסירוגין.
החבורה חלפה לאטה ברחובות בחפשה אחר קרבן מזדמן. אז הבחינו ברכמתו
של נסים סולדנו.

רס"ר נסים סולדנו, בן 29, חובש כיפה, שירת כאיש אחזקה במכה משמר
הגבול בלוד. הוא נולד במדינקו וגרל בסירת הכרמל. ללוד עבר לאחר נישאיו
לרבקה, ועמה גידל שני ילדים: נטלי, בת ארבע, ושי, בן שנתיים וחצי. הוא
היה איש שקט, בעל חיוך רחב וחלומות פשוטים. זמן קצר קורם לכן רכש דירה
חרשה של שלושה חדרים בשכונת נווה נוף בלוד.

ביום ראשון, ב־4:15 לפנות בוקר, יצא סולדנו מביתו ברחוב שלמה המלך
65 לכיוון מטה מג"ב שבקן ברחוב הששמונאים, מרחק כשני ק"מ מביתו. כמרי
יום עשה את דרכו ברגל, כשאקרח ברטה 9 מ"מ צמור למתניו. סמוך לבית
מספר 6 חצה את הכביש, ואז הגיחה מאחדריו מכונית הסובארו הארומה.
"נתקלנו במישהו לבוש מדים," סיפר ראש החוליה, מחמור עיסא, בהוראתו.
"נפגענו בו עם הרכב. הוא נפל. ירדנו כל הארבעה מהרכב ולקחנו אותו."

כשהעלוהו למכונית סבר סולדנו הפצוע כי מביליים אותו לבית החולים.
באזור שער הגיא השמיעו התוספים קלטת של חמאס בתוך המכונית. רק אז
הבין סולדנו כי נחטף, ופרץ בצעקות. חברי החוליה פקרו עליו לשתוק, קשרו
את ידיו ורגליו ברצועות בד, וכיסו את ראשו בכר שחור, מפוספס בארום. אלה
הוכנו בעור מועד בידי מחמור עיסא.

קרוב לשעה 5:30 בבוקר הובא סולדנו למערה סמוכה לכפר ענתא, שנבחרה
מראש להסתיר בה את בן העדובה. "הגענו למערה," סיפר מחמור עטון, "ושם
קשרנו אותו חזק. קשרנו לו את הידיים ואת הרגליים. אמרנו לו: אנחנו רוצים
לשחרר במקומך מישהו מהכלא. לקחנו מסולדנו את כל מה שהיה לו: ארנק
ותעודות זיהוי. את האקרח שלו מצאנו אחר כך במכונית. יצאנו מהמערה וסגרנו
את הפתח באבנים."

בטרם נפרדו הודה מחמור עיסא למחמור עטון ולמאג"ר אבו קטיש לבוא

16



בסביבות השעה 9:00 לבניין אלגוזוה במזרח ירושלים. מן המערה נסע עיסא למשרד "צאת אלחאק ואלתוד'יה". באמצעות מעבר התמלילים חיבר את מכתב האולטימטום, וצירף אליו צילום של תעודת השוטר של סולדנו. בשעה היעודה ירד ממשרדו שבקומה השלישית, ומסר לידי מאג'ד אבו קטיש ומחמוד עטון שני מכתבים. הוא הורה להם להעביד את המכתבים למשרדי הצלב האדום באלבידה ובירושלים. השלושה נרברו להיפגש יחד עם מוחמד עקרי לפני חצות, ליד המסגד בענתא.

בחנות מכולת מקומית מצאו עטון ואבו קטיש שתי שקיות ניילון שחורות. הם נסעו במונית לרמאללה וצעדו כברת דרך עד בניין הצלב האדום. בפתח המשרד כיסו את ראשיהם בשקיות הניילון, ומסרו את המכתב לפקידת הקבלה. מאלביבה נסעו השניים במונית למשרדי הצלב האדום בירושלים. המשרדים היו ריקים מאדם. הם תחבו את המכתב מתחת לרלת הכניסה והסתלקו מן המקום.

ב-13 ברצמבר בלילה פשטו רכזי השב"כ בסיוע חוליות של צה"ל על הערים, מחנות הפליסים והכפרים בגרה ובדצועה. סגר כללי הוטל על השטחים. במבצע חסר תקדים, שנמשך שלושה ימים, נעצרו קרוב ל-1,100 פעילי חמאס. חיפושים נרחבים נערכו במסגרים, במוסדות אסלאמיים ובכתי חשודים. עשרות נחקרו בידי צוותי השב"כ בניסיון לרלות כל כרל מידע שידמו על מקום הימצאו של סולדנו. ככבישים הוצבו מחסומים, וכלי הרכב נברקו בקפירה.

ביום התחיפה הצהיר ר"ד עבר אלעזיו דנטיסי, מראשי חמאס בעזה, כי הפעולה מעידה על תכנון נבון וטוב, והיא זכתה לתמיכה רחבה בקרב העם הפלסטיני. דנטיסי אמר את הדברים בריאיון ל"קורס פרס", סוכנות הידיעות של חמאס שמרכזה בלונדון. "פעולה זו איננה פעולה טרודיסטית," טען, "תנועך חמאס התאפיינה בפעולות נגד חיילים ישראליים. אם יש משהו שניתן לכנות טרוד, אלה הם מעשי הצבא הישראלי החמוש נגד אזרחים חסרי מגן מקר'צ עמנו... פעולות נגד חיילים אינן טרודיסטיות בשום מובן שהוא."

גם ר"ד מחמוד אלזהאר צוטט אותו יום ב"קורס פרס". אלזהאר, לשעבר יו"ד הסתדרות הרופאים בעזה, נחשב לרובר חמאס בשטחים. הוא טען כי המניע לחטיפת החייל הוא אנושי גרידא — הרצון להביא לשחרורו של איש נכה. הרובר הציע את שירותי התיווך שלו כפרשה: לאחר שהרופאים ימליצו על "שחרורו מסיבות בריאותיות" של אחמר יאסין תוציא תוציא ישראל את השיח' לחופשי, ובמקביל ישחררו החוטפים את סולדנו. ההצעה פורסמה גם בכלי תקשורת הישראליים. בעקבותיה נתבקש אלזהאר לרווח למנהל האזרחי בעזה על כל שיחת טלפון, או רמז אחר כלשהו, שיקבל מן החוטפים.

למהרת, יום שני ה-14 בחורש, הורי מוחמד נזאל, נציג חמאס בירדן, כי "חמאס מוכנה לשחרר את שמד משמד הגבול תמורת שחרורו של שיח' יאסין.

שיח' יאסין ביקש שתינתן הזרמנות למשא ומתן על שחרורו, וחמאס נענתה לבקשה". כל הזצהרות הללו נתגלו בדיעבד כהבראות סרק.

באותו יום הופץ בחברון כרוז בחתימת "חמאס — משרד ההסברה". "עמנו הגא והגיבור, אומתנו המהוללת," נכתב בכרוז, "על אויבנו הציוני השפל עוברים רגעים קשים, והוא שדוי בהיסטריה ובחוסר איזון לאחר פעולת הלקיחה בשבי של קצין ציוני, באזור לוד הצאמר [הדבק בארמתו]. פעולה שביצעה היחידה המיוחדת של גרודי החלל עז אלדין אלקסאם, ולאחר פעולת ההרג של קצין ציוני נוסף ופציעתם של שני חיילים אחרים בחברון האמיצה, [פעולה] שאותה ביצעה חוליית לוחמת נוספת של גדודי אלקסאם הגיבורים.

"...אנו מרגישים כי דרך הג'יהאד [מלחמת המצוות] ומות הקדושים, שהמאס אימצה כשיטה וכאסטרטגיה, היא הדרך היחידה לשחרור פלסטין, והיא לברד תמוטט את אויבנו ותנפץ את שחצנותו... לקירתנו בשבי של הקצין באה במסגרת המלחמה שבה נתונים עמנו וגרודינו עם האויב הציוני בפלסטין. אין זו הפעולה הראשונה, כפי שענמנו מבין היטב, ולא תהיה זו האחרונה."

כל אותה העת המתינו במערכת הביטחון לקבלת אות מן החוטפים. לשכת שר הביטחון הדריקה את הקשר עם נציגי הצלב הארום ועם הנציגויות הזרות בישראל. במקביל נמשך גל המעצרים. באותו לילה נעצרו גם ראשי ההנהגה הפוליטיסית של חמאס, בהם מחמוד אלזהאר ועבר אלעזיז רנטיסי. החשש לחייו של סולדרנו גבר.

ביום שלישי, 15 ברצמבר, ב־8:00 בבוקר יצאה פסמה אבו רהוק, בדווית כבת 25, לתור אחד גמל שנעלם בלילה. רהוק התגוררה במאהל ליד כפר ארומים. היא הלכה לצר כביש ירושלים־יריחו, מערבה לאכסניית "השומרוני הטוב". במרחק כעשרה מ' מן הכביש הראשי, במדרון קטן, הבחינה בגופת ארם, שהיתה מכוסה במעיל צבאי. היא שבה בבהלה למאהל, וסיפרה לגיסה על מה שראו עיניה. השניים החליטו להמתין לבוא בעלה של פסמה.

ב־10:00 הגיע הבעל, נאצר אבו רהוק, המועסק כשומר במעלה ארומים. רוהק הלך בעקבות תיאורה של אישתו, עד למקום שבו היתה מונחת הגופה. בשובו למאהל סיפר על כך למוח'תר השבט, עבר אלעזיז אבו רהוק. המוח'תר נסע במכוניתו לבניין המנהל האזחדי באבו ריס.

קציני המנהל ושוטרי משמר הגבול שנזעקו למקום זיהו את גופתו של נסים סולדרנו. השוטר היה מוטל במרליו, פניו אל הקרקע, ידיו וגליו כפותות. הוא נרקר באכזריות בחזהו, צוווארו שוסף ונמצאו בו סימני תניקה. ליד הגופה נראה כתם רם גרול.

הגשם שלא חרל לרדת טשטש כל עקבות ארם או טביעות של צמיגי מכונית. החוקרים שיערו שהרוצחים השליכו את הגופה בצר הדרך ולאחר מכן נמלטו

18



לידרן, או שהם מסתתרים באחר הכפרים שבאזור רמאללה. הבריקות
הפתולוגיות העלו שסולדרנו נרצח יום או יומיים בטרם נמצאה גופתו.

התעלומה באה על פתרונה עם לכידתה של "החוליה המיוחדת", ביוני 1993.
ב־11:00 בלילה, כך סיפרו הרוצחים בחקירתם, נפגשו שלושת חברי החוליה,
כפי שקבעו מראש, ליד המסגר בעיתנא. החבר הרביעי, מוחמד עקרי, הגיע
בשעות למסגר בשעונם. השלושה לא המתינו לו. הם נסעו, לבושים בחליפות
נינג'ה ומצוירים בסכינים, אל המערה שבה שכב סולדרנו.

"מחמוד עיסא אמר לנו: 'אם נסים סולדרנו עדיין חי, נהרוג אותו'," סיפר
מחמוד עטון. "הגענו למערה. נסים סולדרנו היה חי, אבל ישן. העדנו אותו ונתנו
לו לרחוץ את פניו. אמרנו לו: 'ביקשנו מישראל לשחרר את שיח' אחמד יאסין
במקומך, אבל הממשלה שלך סירבה, וזו ההוכחה שלא מעניינים אותה חיי
החיילים שלה. אנחנו מצטערים שאנחנו צריכים להרוג אותך.'

"סולדרנו התחיל לבכות וביקש שנשחרר אותו. הוצאנו אותו מהמערה, כיסינו
אותו במעיל והושבנו אותו במכונית. שאלתי אותו: מה תבקשה האחרונה שלך?'
והוא אמר: 'אם החלטתם להרוג אותי, תהרגו אותי כשאני לבוש מרים.' לחצנו
ידיים. מחמוד אמר: 'בואו נהרוג אותו, אבל בלי דם.' הוא ומאג'ד אבו קטיש
תפסו אותו, אבל בדרך ליידיה תנבדר שהוא עדיין חי. הודדנו אותו מהרכב,
ומחמוד ומאג'ד ירקרו אותו בסכין. אחר כך הלכנו כל אחר לביתו."

יומיים לאחר מכן, בשעות הצהריים של יום שלישי, העביד מחמוד עיסא
ריווח יבש למערכת "צאות אלחאק ואלחוריה", ובו פרטים על מציאת גופתו
של נסים סולדרנו, כפי שפורסמו בכלי התקשורת הישראליים.

ביום רביעי, 16 בדצמבר, בשעה שבמערכת הביטחון נעשו ההכנות לגירוש
ראשי חמאס מן השטחים, שלח ר'ד אלרומחי שדר באמצעות הפקסימיליה לאב
אחמד בארצות הברית. אלרומחי דרש לשלוח לו כסף לצורך סיוע משפטי
לעצורים. חשוב מזה, הוא ביקש מאבו אחמד לנסח בשם חמאס כרוז, שייוחס
למעצדים ההמונים של פעילי תנועה. באותו לילה נעצר ר'ד אלרומחי בביתו.
בסדת נורע רבר מעצרו בארצות הברית, פלט מכשיד הפקסימיליה את מכתב
התשובה שהגיע מאבו אחמד. המכתב כלל נוסח של כרוז, המצהיד כי "ממשלת
רבין אחראית לרצח סולדרנו".

רצח סולדרנו בא בעקבות שבועות רווי טרוד, שבמהלכם נהככו ניסיונות
הפיגוע נגר מטרות ישראליות למעשה של יומיים בעזה, בחברון, ברמאללה
ובשכם. פעולות חמאס, שהקנו לתנועה יוקרה רבה ברחוב הפלסטיני, אילצו
את הארגונים היריבים — פת"ח והחזית העממית — להצטרף למסע האלימות,
כרי לא להזרנב מאחור. בשבוע שקרם לרצח סולדרנו נהרגו שישה ישראלים



בשורת מעשי טרור בשטחים ובתחומי הקו הירוק. רצועת עזה היתה נתונה בסגר ממושך בעקבות התפרעויות המוניות, מן החמורות ביותר שאירעו מאז תחילת האינתיפאדה.

הרצח היה הקש ששבר את גבה של ממשלת רבין. היתה זו הפעם הראשונה שבוצעה בשטחים חטיפה לצורכי מיקוח. בעבר הגיעו לידי השב"כ ידיעות על כוונה לחטוף חיילים ומתנחלים כדי להביא לשחרור אסירים ביטחוניים, אבל אלה לא הגיעו לכלל מימוש. ברצח טולדנו נחצה הקו האדום הזה.

עם היוודע דבר מציאת הגופה כינס ראש הממשלה את גורמי הביטחון לדיון דחוף בלשכתו. בישיבה המליצו ראש השב"כ ונציגי הרדג הבכיר של צה"ל להנחית מכה מהירה וכואבת על חמאס ועל הג'יהאד האסלאמי. אם לא כן, הוהיר, יירדרדר מצב הביטחון הכללי לשפל חסר תקדים. רבין החליט לאמץ את ההמלצה.

מאחורי החלטתו של ראש הממשלה עמד גם שיקול פוליטי. המשא ומתן המדיני היה באותם ימים בעיצומו. בוושינגטון התקיים סיבוב שיחות נוסף בין ישראל לפלסטינים. בקהיר החלו הכנות לפגישה ברדג גבוה של מנהיגי מצרים ואש"ף כדי לדון בידרוד המשא ומתן. משלחת פלסטינית, בראשותו של פייסל חוסייני, יצאה לוושינגטון לפגישה עם הנשיא בוש. היה אפוא צורך לחזק את אש"ף כשהתף לתהליך המדיני, ולסלק מן הזירה את סרבני השלום.

עמדה זו באה לידי ביטוי בהודעה מיוחדת שפירסמה הממשלה ב-17 בדצמבר 1992, בזו הלשון: "התפשטות הפונדמנטליזם האסלאמי הרדחני מסכנת את שלום המזרח התיכון החופשי כולו. הארגונים הפונדמנטליסטיים מאיימים על המשטרים הדמוקרטיים, כולל הפרו-מערביים, במזרח התיכון.

"ארגוני החמאס והטרור האסלאמי אינם מכירים בזכות קיומה של מדינת ישראל ושואפים לחיסולה. הם רואים את הדרך לחיסול מדינת ישראל באמצעות הג'יהאד (מלחמת הקודש). ארגוני החמאס והג'יהאד האסלאמי עומרים בראש חזית הסידוב לשלום עם מדינת ישראל, ומנסים לחבל בכל האפשר בעשיית השלום ובמשא ומתן בוושינגטון. החמאס והג'יהאד האסלאמי הם היום האויב העיקרי לשלום."

בארסנל העונשים של מערכת הביטחון לא נמצא מענה לאתגר החדש. לפיכך הועלתה לדיון הצעתו של הרמטכ"ל ברק: גירוש המוני לתקופה קצובה. ההצעה הובאה כמה חודשים קודם לכן לפני רבין. היא נועדה לעקוף את הנוהל שנקבע בעקבות פסיקת בג"ץ, ואשר חייב את המדינה להודיע מראש על כוונת גירוש ולאפשר למגורש לגירוש לערער, סדם גירושו, לפני וערת עדר צבאית ולפני בג"ץ. ההליך יצד סחבת שנמשכה חדשים ארוכים, עד שבשעה שהתבצע הגירוש כבר לא זכר איש למה התבצע. לפיכך הוחלט הפעם על "הרחקה זמנית", שהתבצע ללא שהיות ובהיקף נרחב ביותר.

בשעות אחד הצהריים של יום רביעי, 16 בדצמבר, בשבתה בוועדת שדים



לענייני ביטחון, החליטה הממשלה "לאוד קיומו של מצב חידום וכדי לשמור
על ביטחון הצבור, למלא את ידי ראש הממשלה ושר הביטחון להנחות
ולהסמיך את המפקרים הצבאיים של אזור יהודה, שומרון וחבל עזה להוציא
צווים, כהוראם לצורכי הביטחון המידיים וההכרחיים, כרבד גידוש זמני ללא
הורעה מוקדמת, לשם הרחקת אותם מתושבי האזור המסכנים בפעולתם חיי
אדם, או מסיתים לפעולות כאלה, וזאת לתקופה שתיקבע על ידי המפקרים
הצבאיים, ושלא תעלה על שנתיים ימים".

בתום הישיבה סלשו ראש הממשלה לרמטכ"ל ולראש השב"כ ומסר להם על
ההחלטה. הוא הורה לרמטכ"ל להתחיל בתכנון מבצע הגידוש, ולהגיש לשב"כ
את כל הסיוע הנדרש. ראש השב"כ הנגחה להכין רשימות שמית של מי
שסילוקם יביא לפגיעה קשה.בתשתית חמאס והג'יהאד האסלאמי.

בתשובת המרינה לשורת עתירות נגד הגידוש, שהוגשו לבית המשפט הגבוה
לצדק ביום חמישי בלילה, 17 כרצמכר, נאמר כי "המרובר באנשים שחלקם
נטלו חלק בארגון ובמביבה של פעילות אלימה, או בהבונה, הסתה או הטפה
לפעילות כאמור. חלקם האחר סייע לפעילות הארגונים הנ"ל בתחום התשתית
הכללכלית או הארגונית, גיוס אנשים, השגת כספים וחלוקתם, וכן בניסוח
כרוזים וארגון הפצתם".

בשעה שהתנהל הדיון בבג"ץ המתינו המגורשים, כפותי ירדים ורגליים
ועיניהם חסומות, באוטובוסים על גבול הצפון. לאחר יממה של ריונים החליטו
שופטי בג"ץ לרחות את העתירות, אכל קבעו כי תינתן למגורשים הזכות
לערער על הרחקתם מחוץ לתחומי ישראל, כתוך שישה יום. ביום שישי בלילה,
תחת ערפל כבד, הצלה השיירה את הגבול לתוך שטח לבנון.

מאז חטיפת סולדנו ועד ליום הגידוש, 18 כרצמבר 1992, נעצרו כ-1,600
פעילים ותומכים של חמאס והג'יהאד האסלאמי. מתוך רשימת העצודים גורשו
ללבנון 415 פעילים, 250 מהגרה המערבית ו-165 מרצועת עזה. היו בהם 12
מרצים באוניברסיטאות, 68 סטורנטים, 29 מורים, 9 רופאים, 10 מהנרסים, 3
רופאים, 19 אנשי רת, 81 פקידים ועובדי מוסרות, 99 פועלים. 180 מבין
המגורשים היו בעלי תעודות בגרות, 25 בעלי תואר שני ושלישי. במחציתם
נמנו עם גילאי 30–39. מרביתם היו נשואים. הם ייצגו את החתך החברתי של
תנועת חמאס.

21

# SECTION ONE:  MURDER AND EXPULSION

## A. The Expulsion

Sunday, December 15, 1992 was a cold, rainy day in El Bira. A heavy fog lay over the city, and its streets were void of human traffic. At 9:50 AM two masked individuals entered through the iron gate of the Red Cross building located at the edge of the old city. The office is on the ground floor of a 2-storied white stone building. A narrow hallway leads from the street into the building to a counter where a receptionist is seated.

The masked individuals handed a signed letter to the receptionist, Suha Mutzlach, and said to her:  "We are members of the Ez Aladdin Al-Qassam ring of Hamas. We have kidnapped an Israeli officer and these are the terms for his release." The frightened receptionist refused to take the letter until another female employee urged her to take it. The masked men warned Suha not to open the letter for at least half-an-hour after they left. The men then went out and quickly disappeared in the twisted alleys of the area.

Suha, in a panic, looked for someone with whom to consult. Her supervisors were out of the office because of the Sunday day-off. She rushed upstairs to the second floor to the office of Fayek Hussein, the representative of the Palestinian Red Crescent. He read the letter, photocopied it and told Suha to contact the Military Governor of Ramallah.

The receptionist dialed the office of the Military Governor with trembling fingers and told the person who answered about the letter she was holding. She then called the Red Cross office in East Jerusalem and reported the incident. She faxed the letter to Jerusalem, from where it was relayed to the head office in Tel-Aviv. Just minutes later members of the Civilian Administration arrived on the scene. They questioned Suha, and when they left they took the letter with the release conditions with them. Attached to the letter was a photo of the ID of a Border Policeman:  Master Sergeant Nissim Toledano of Lod.

The header of the letter read: "In the Name of Merciful Allah – Notification Number 2 Issued by the Special Unit of Ez Aladdin Al-Qassam Battalion – Military arm of Hamas."

"Today, December 13, 1992, which is the sixth anniversary of the founding of Hamas, we have kidnapped an officer of the conquering army. The kidnapped officer is being held in a safe location. This was executed precisely and in accordance to instructions. We are hereby notifying the conquering authorities that we demand that they and the Israeli government release Sheikh Ahmad Yassin in exchange for this officer. The conquering authority is to effect the release within ten hours, no later than 9:00 PM, in accordance with the following directives:

"1. The timetable must be observed, for otherwise we will kill the officer when the time expires.

1



EXHIBIT

"2. The release of Sheikh Yassin will be carried out through the auspices of a representative of the International Red Cross, the Egyptian Ambassador, the French Ambassador, the Swedish Ambassador and the Turkish Ambassador. The conquering authorities are to guarantee to these representatives that Sheikh Yassin will not be detained in the future.

"3. We warn the conquering authorities not to harm the Sheikh. Any harm to him will bring repercussions from us, and we will not allow it to pass quietly.

"4. We guarantee to release the officer immediately upon the release of Sheikh Ahmed Yassin, in a way we deem appropriate.

"5. Israeli Television is to broadcast the release of Sheik Ahmed Yassin in a live broadcast, during which the Israeli authorities will affirm to the foreign representatives that the Sheikh will not be detained in the future."

Signed: "Special Unit of Izz al-Din al-Qassam Battalion, Military Arm - Hamas."

At approximately 10:30 AM Lieutenant General Azriel Navo, Military Secretary to Prime Minister and Defense Minister Yitzhak Rabin, rushed in to the Government meeting room. The discussion underway dealt with the rehabilitation of the Military Industry. At the start of the meeting, the ministers were informed by the Chief of Staff, Ehud Barak, of a shooting incident that had taken place the previous night in Hebron, where First Sergeant Yuval Totanji was killed by a group of Izz al-Din al-Qassam. Barak estimated that in the near future there would be an increase of terrorist incidents in the West Bank and in Gaza.

Navo, known for his calmness, could not hide his emotions, and handed a note to the Prime Minister, and unlike his usual habit, stood near the Prime Minister until he had finished reading the note. Rabin scanned the note with a serious expression on his face. He then removed his eyeglasses and stared at the Ministers and announced briefly: A ring of Hamas has kidnapped Military Policeman Nissim Toledano and is demanding the release of Sheikh Yassin by 9:00 PM tonight.

After a brief discussion, the government reached a definite decision "not to give in to terror." And with that the meeting adjourned. The Prime Minister immediately left for his office in the Kirya in Tel-Aviv, where the Head of Shabak (Head of General Security Services), Chief of the Israeli Police Force, the Head of Aman (Military Intelligence), and other senior officers awaited him.

In an emergency consultation, it was decided not to wait for an additional directive from the kidnappers, but to immediately start an in-depth search for the kidnapped officer. In order to give the Shabak time to locate Toledano, it was decided to question Sheikh Yassin in his prison cell, and to get a statement from him to the kidnappers not to kill the hostage.

At 3:00 PM a large force of police and border police were assembled at the Cultural Center near the police station in Lod. The forces set up barriers and started a wide screening process, with a helicopter overhead for assistance. At 5:50 PM the news of the kidnapping of Officer Toledano were released to Kol Israel and Galei Tzahal radio stations. At approximately 6:30

2

PM in the evening, the interview with Sheikh Yassin was recorded. The first to speak with him was the announcer of Arabic news, Eyal Alima. After a short briefing which Sheikh Yassin received from the Civilian Authority, Alima entered the room. The Sheikh, Alima said, sat in his wheelchair, wrapped in a blanket. He willingly cooperated and answered fully all the questions posed to him.

The interview, of which three minutes were broadcast, was relayed by telephone from the prison. One unexpected answer was removed from the final version of the broadcast – a message to his people to continue their operations. After Alima, Sheikh Yassin was interviewed by the Arabic television announcer, Yoni Ben-Menachem. In order to ensure that the message would be ready for broadcast on the 7:30 PM news, Ben-Menachem was flown to the Ashmoret Prison in a military helicopter. In a conversation with Ben-Menachem, Sheikh Yassin repeated the main themes he had said to the radio correspondent.

Just after 7:00 PM, at the end of the news broadcast, the Arabic Kol Israel radio station broadcast the recorded interview with Sheikh Yassin. At five minutes to eight, the interview was also broadcast on the Arabic television news program, and then again on the Hebrew television news program, Mabat.

During the evening, the government met in a special session in the office of the Defense Minister in Tel Aviv. At its conclusion, the following message was related: "The Government of Israel sees the kidnapping of the border policeman as a serious incident. The government demands the immediate release of First Sergeant Toledano, and see the kidnappers and their commanders as responsible for his well-being and his release. The government warns the kidnappers against any harm to First Sergeant Toledano." The message was broadcast over Arabic radio and general television, and was also distributed to foreign correspondents.

At the conclusion of the meeting, the Security Services (Shabak) received a directive to try to find a thread which would lead to the kidnappers. An intensive intelligence fact finding operation was commenced, and many Hamas people were taken in and questioned.


In the late afternoon of December 13th, Dr. Mahmoud Alromhi, a 30-year old doctor, returned to his home in El-Bireh. Alromhi was a commander of Hamas in the central region of the West Bank. He lived not far from the Red Cross offices. That same morning he had gone out at 8:30 accompanied by his friend, Dr. Bashir Alcarama to the "FoodMetiv" factory located in the industrial zone of Petah Tikva, in order to purchase medical supplies. On his way back home, he was shocked to hear of the kidnapping and the planned interview with Sheikh Yassin on his car radio. Alronhi was all shook up, and burst into his home and immediately placed a call to Virginia, USA. He asked to speak with Abu Achmad, one of the heads of Hamas in the United States. Abu Achmad was not at home. Dr. Alromhi dialed 00-44-814502311. This was the number of Abu Obeid, head of the military arm of Hamas, who resided in London.

3

"I learned of the kidnapping of a soldier," Dr. Alromhi said, "it was broadcast over Israeli television. They said that Sheikh Ahmed Yassin would be interviewed by Israel Radio. I don't know who carried out this action. Do you have any further details?"

Abu Obeid had already heard of the kidnapping. "I will try to listen in to Israel Radio and to hear the interview with Sheikh Yassin" he said to Alromhi.

The Commander of Hamas in Ramallah could not hide his emotions. "I will call you after the interview" he said, and if you do not manage to hear the broadcast I will send you a fax with Sheikh Yassin's comments."

During the early evening, Israel Radio in Arabic broadcast the interview with Sheikh Yassin every hour. "I recommend to the kidnappers, and it doesn't matter who they are," said the Sheikh, "to protect the life of this man so that the authorities can hear their requests and respond to them. The kidnappers should look out for the welfare of the hostage. I do not support the murder of the hostage, as this is not the goal. He should continue to be held until an agreement is reached between the authorities and the kidnappers."

Dr. Alromhi called London again.

"I heard the interview on the radio," Abu Obeid told him.

Alromhi stated his opinion: "The Israeli must be released immediately,"

Abu Obeid listened to him intently and promised to call him back.

At 8:20 PM the phone rang in Dr. Alromhi's home. The caller was Abu Achmed from the United States.

"Do you know who carried out the kidnapping?" Abu Achmed asked.

"No, I don't know," Alromhi answered, "but they want to exchange the hostage for Sheikh Yassin."

Abu Achmed told Alromhi to turn on his fax machine to receive a message. Within minutes a printed sheet came through. "In respect to the request of Sheikh Ahmed Yassin," it was written, "Hamas has decided to postpone the ultimatum for two hours."

The message that Abu Achmed sent to the Commander of Hamas in Ramallah had no basis. He did not have even a hint about the ring that carried out the kidnapping of Toledano. In fact, no one in the command of Hamas knew anything. The group was organized locally and carried out the kidnapping under the influence of Hamas, but not by a directive from the movement. Only after Toledano had been murdered did the members of this group officially join Izz al-Din al-Qassam.

The head of this group was Mahmoud Moussa Issa, born in 1968, a resident of Kfar Anta, located north of Jerusalem. Issa, a tall man with green eyes and a beard as black as coal, lived with his family in a two-story house surrounded by a garden. He studied in the religious college in Bethany near Ramallah and at the end of his studies began to work in the East Jerusalem branch of the weekly "Tzaot Elchak V'Elchudiah," a magazine which expresses

4

the opinions of the Islamic movement in Israel. His function was to compile information about the incidents of the Intifada and the religious activity on the West Bank, and to remit it to the headquarters of the newspaper in Umm-al-Fahm.

On the Palestinian street it was known that the office in the building Alnuzeah in Sheikh Jarrah was connected to Hamas. Israeli correspondents who wanted to be updated on Islamic events in the territories would come to Mahmoud Issa. Issa was not talkative, and made no effort to be sociable to them. His stare was very suspicious and during a conversation his eyes would scan in all directions.

In November 1992 Issa decided to establish a group to carry out murders of individuals wearing Israeli uniforms. He recruited three friends, who, like him, had deep religious beliefs. One of them was Majad Abu-Katish, born 1970, also a resident of Kfar Anta. In the years 1990-1992 Abu-Katish worked as a gardener for the Municipality of Jerusalem, and was fired because of frequent absenteeism. After he was fired he started studying in the religious college in East Jerusalem.

The second recruit was Mahmoud Aton born 1970, resident of Kfar Sur Baher on the outskirts of Jerusalem. Aton studied for a year-and a half at Hadua college in Umm-al-Fahm, but was forced to discontinue his studies because of financial difficulties. In the summer of 1993 he and his brother Ahmed were about to be married, and he had to raise money for the celebration. Aton joined his Uncle Ali, a sub-contractor for plumbing in Jerusalem. Just prior to the time the ring was uncovered, he was working at the Shalom Hotel in the neighborhood of Bayit V'Gan.

The third recruit was Muhammad Musa Akadi, born 1971, a resident of the Shuafat refugee camp. Akadi a graduate of the Arab university of East Jerusalem, in the field education, worked as a cleaner in M'katzar Alhidya on the Mount of Olives. His father had died, and his mother was deaf and dumb. He and his older brother helped to provide for the family.

The four worked in total secrecy. Even though they had no direct contact with Hamas headquarters, they decided to call them selves "Troops of Izz al-Din al-Qassam – the special unit." They were highly motivated, with a burning commitment, and strong identification with the "Islamic Solution."

Sheikh Yassin, the founding father of Hamas defined this group as "good Moslems who know the commandments of the religion." After the event the Sheikh justified the kidnapping of Toledano, saying that it is permissible to kill anyone who bears arms – even if he is not a soldier but a settler. "Nissim Toledano," Yassin said, "was captured as a military soldier and not as a private citizen, and therefore it was permissible to kill him."

About a month after it was established, this Jerusalem group started planning an incident to capture an Israeli soldier as a bargaining chip. At first they were busy accumulating intelligence. The four walked around the streets of West Jerusalem to study the habits of soldiers and the patrolling routes of the Border Police. They came to the conclusion that carrying out a kidnapping in Jerusalem would be impossible, but to operate in a different town, they would need a vehicle.

In December 1992, using personal funds, the four acquired a red 1973 Subaru, to be used as a vehicle for their operations. The car, which had yellow license plates, was registered in the name of Mahmoud Aton, who had an Israeli ID.

On the day of the kidnapping, at 3:00 AM, the group met at the bus stop in Kfar Anta. They got into the red Subaru and started driving toward the coastal plain. Mahmoud Aton was driving.

"We got close to Lod, and then Mahmoud Issa instructed me to enter the city," Aton testified after his capture. It was still dark when they arrived in the city, and an annoying rain fell intermittently. The group drove around the streets slowly, looking for a target. They came upon Nissim Toledano.

First Sergeant Nissim Toledano, who was 29 years old and wore a skull cap, served as a maintenance man in the headquarters of the Border Police in Lod. He was born in Morocco, and raised in Tirat Hacarmel. He moved to Lod after his marriage to Rebecca and together they raised two children: Natalie, 4 years old, and Shai, who was two-and-a-half. He was a quiet man with a broad smile, and simple dreams. Shortly before the incident he purchased a new three-room apartment in the Neve Nof neighborhood of Lod.

On Sunday morning, Toledano left his home on Shlomo Hamelech Street 65 at 4:15 in the direction of the headquarters located on Hahashmonaim Street, about 2 kilometers from his home. As was his daily habit, he went on foot, carrying a 9mm Beretta on his waist. Near Number 6 he crossed the street, and then he sensed the red Subaru behind him. "We came across someone wearing a uniform," the head of the unit, Mahmoud Issa testified. "We hit him with the car. He fell. All four of us got out of the car and took him."

When they put him in the car, the injured Toledano was sure that they were taking him to the hospital. In the area of Sh'ar Hagai, the kidnappers played a Hamas tape mas in the car. At that point Toledano realized he had been kidnapped, and started screaming. The kidnappers ordered him to be quiet, tied his hands and feet with cloth bindings, and covered his head with a black cloth with red stripes. These had been prepared earlier by Mahmoud Issa.

> At almost 5:30 in the morning, Toldano was brought to a cave adjacent to Kfar Anta, which had been selected in advance to hide the hostage. "We got to the cave," Mahmoud Aton said, "and there we tied him up securely. We tied up his hands and feet and told him: 'We want to exchange you for someone in jail.' We took everything he had on him: a wallet, and ID documents. We later found his revolver in the car. We left the cave and closed it up with stones."

> Before they separated, Mahmoud Issa told Mahmoud Aton and Majad Abu-katish to meet him at the Alnuzeah building in East Jerusalem at 9:00 PM. From the cave Mahmoud Issa went to the offices of Tzaot Elchak V'Elchudiah. Using a word processor he composed the letter of ultimatum, and attached a copy of Toledano's police ID. At the set time, he descended from his office on the third floor and gave Majad Abu-katish and Mahmoud Aton two letters. He instructed them to deliver the letters to the offices of the Red Cross in El-Bireh and Jerusalem. The three agreed to meet with Muhammad Akadi before midnight, near the mosque in Anta.

6

In a local grocery store Aton and Abu-katish found two black plastic bags. They travelled by taxi to Ramallah, and walked the distance to the Red Cross building. At the entrance to the office, they covered their heads with the plastic bags and gave the letter to the receptionist. From El-Bireh the two took a cab to the offices of the Red Cross in Jerusalem. The offices were empty. They slid the letter under the entrance door and ran off.

On the night of December 13th Security Services forces, aided by troops of Israeli Defense forces, swept into the towns, refugee camps and villages in the West Bank and in the Gaza Strip. A general closure was effected in the territories. In an unprecedented operation which was carried out over three days, nearly 1100 Hamas activists were detained. Wide-spread searches were carried out in the mosques, in Islamic establishments and in the homes of suspected individuals. Dozens were questioned by Security Services personnel in an effort to retrieve any bit of relevant information to hint at the location where Toledano was being held. Barriers were set up and vehicles were thoroughly searched.

On the day of the kidnapping, Dr. Abed El Azziz Ben Tisi, one of the Hamas leaders in Gaza, stated that the operation has proven to be smartly planned and executed, and is widely supported by the Palestinian people. Ben Tisi made these comments in an interview with "Al-Kuds Press, the news agency of Hamas, headquartered in London. "This action is not an act of terrorism," he claimed. "The Hamas movement specializes in actions against Israeli soldiers. If there is anything related to terror, it is the actions of the Israel Defense Forces, armed against a defenseless civilian population in our midst… Actions against solders are not acts of terrorism by any stretch of the imagination."

Dr. Mahmoud El Zahad was also quoted on that same day by Al Kuds Press. El Zahad, who had been Chairman of the Association of Physicians in Gaza, was considered a spokesman for Hamas in the territories He claimed that the kidnapping act of a soldier was purely human – the desire to release a handicapped individual. The spokesman offered his services to mediate in this case. After the doctors recommend that Ahmed Yassin be released on medical grounds, the Sheikh will be released by the Israeli Government, and concurrently the kidnappers will release Toledano. This offer was also published in the Israeli media. As a result, El Zahad was asked to report any phone call or any other bit of information he would receive from the kidnappers to the Civilian Authority in Gaza.

On the following day, Monday, December 14th, Muhammad Nazal, the Hamas representative in Jordan, said that Hamas was prepared to release the Border Policeman in exchange for Sheikh Yassin.

Sheikh Yassin requested that negotiations be carried out for his release, and Hamas agreed. All these declarations were found to be meaningless.

7

On that same day a flyer was distributed in Hebron, signed by "Hamas-Office of Public Relations." "Our people, the proud and brave, and our glorified nation" was written in the flyer. "Our low-level Zionistic enemy are undergoing difficult times and is in total hysterics and lacks balance following the capture of the Zionist officer in Lod – carried out in their own territory, an action that was executed by the special unit of the pure members of Izz al-Din al-Qassam, and after the killing of another Zionist officer and injury of two other soldiers in Hebron which was carried out by another brave force of al-Qassam… "we emphasize that the path of Jihad (war of religious command) and the death of the holy ones, which Hamas has adopted as a method and strategy, is the only way to free Palestine, and only this way will bring down our enemy and shatter their overblown self-confidence… capturing the officer comes in the framework of the war being carried out against us and our forces in Palestine by the Zionist enemy. This is not the first action, and as our people understand, this will not be the last."

At the same time the defense system was waiting for a sign from the kidnappers. The office of the Defense Minister was in close contact with the representatives of the Red Cross and with the foreign representatives in Israel. In parallel, the rounding up of suspects was continuing. That same night high level political leaders of Hamas were brought in, including Mahmoud El Zahad and Abed Alaziz Rantisi. Fears for the life of Toledano were growing.


At 8:00 AM on Tuesday morning, December 15th, Fatima Abu Dahok, a Bedouin woman about 25 years old, went out to search for a camel that had disappeared during the night. Dahok lived in a tented area near Kfar Adumim. She was waking along the Jerusalem-Jericho road, west of the "Good Samaritan" inn, which is some 10 meters off the road. On a small slope she noticed the body of a man which was covered with a military coat. In shock she ran back to the tent settlement and told her brother-in-law what she had seen. The two decided to wait until Fatima's husband arrived.

The husband, Nasser Abu Dahok, who worked as a guard in Ma'ale Adumim, arrived at 10:00 AM. Dahok went, following his wife's instructions, to where the body lay. Upon his return to the tents, he told the tribal Muahatar (leader), Abed El-aziz Abu Dahok what had happened. The Muahatar took his car and went to the building of the Civilian Authority in Abu Dis.

Officers of the Authority and Border Police who were called in and identified the body as than of Nissim Toledano. The policeman was lying in his uniform, face-down, his hands and feet bound. He had been violently stabbed in the chest, his throat cut, with signs of choking. There was a large pool of blood adjacent to his body.

The continuing rain had wiped away any traces of human presence or tire tracks. The investigators suspected that the murderers had tossed the body to the side of the road and then either escaped to Jordan or were hiding in one of the villages in the vicinity of Ramallah. The pathological examination revealed that Toledano had been murdered a day or two before his body wad discovered.

8

The mystery was solved with the capture of the "Special Unit" in June 19993. At 11:00 PM, the murderers related during their questioning, the three members of the group met as planned near the mosque in Anta. The fourth member, Muhammad Akadi,, went by mistake to the mosque in Shu'afat. But the three did not wait for him. They went, dressed in Ninja outfits and armed with knives, to the cave where Toledano lay.

"Mahmoud Issa told us: 'if Nissim Toledano is still alive, we will kill him,'" Mahmoud Aton said. "We got to the cave; Nissim Toledano was still alive, but was asleep. We woke him up and allowed him to wash his face. We said to him: ' We asked Israel to release Sheikh Ahmed Yassin in exchange for you, but your government refused, and that is proof that the lives of their soldiers has no meaning for them. We regret that we have to kill you.'

"Toledano started crying and asked that we release him. We took him out of the cave, covered him with a coat and seated him in the car. I asked him: 'What is your last request?' and he replied" 'If you have decided to kill me, kill me when I am dressed in uniform.' We shook hands. Mahmoud said: 'Come, let's kill him, but in a bloodless manner.' He and Majid Abu Katish choked him, but on the way to Jericho we found that he was still alive. We took him out of the car and Mahmoud and Majid stabbed him with knives. Then each of us went home."

Two days later, on Tuesday afternoon, Mahmoud Issa reported the finding of the body to "Tzaot Alchak V'Elchudiah" as had been related by the Israeli media.

On Wednesday, December 16th, when the defense system were making plans to expel the heads of Hamas from the territories, Dr. Alromhi sent a fax to Abu Ahmed in the United Sates wherein Alromhi demanded that he be sent monies to assist in the defense of the detainees. More importantly than that, he asked that Abu Ahmed compose a flyer in the name of Hamas about the detention of the great number of party activists. That same night, Dr. Alromhi was arrested in his home. Before news of his arrest was learned in the United States, Dr. Alromhi's fax machine spit out the important reply form Abu Ahmed, including the wording for the flyer stating that "The Rabin Government is responsible for the murder of Toledano."

The murder of Toledano came after weeks of multiple acts of terror, during which attempts to harm Israeli targets became daily events in Gaza, Hebron, Ramallah and Nablus. The actions of Hamas, which gave it high status on the Palestinian street, forced their rival organizations - Fatah and the People's Front – to join in the crusade of violence, in order not to be left out. In the week prior to the murder of Toledano six Israelis were killed by acts of terror, both in the territories and within the green line. The Gaza Strip was subject to long closures because of mass uprisings, among the most serious that had taken place since the start of the Intifada.

The murder was the straw that broke the back of Rabin's government. It was the first time a kidnapping had been carried out as a bargaining chip. In the past information had been received by the Security Services on the intent to kidnap soldiers and settlers in order to effect the release of security prisoners, but these never actually happened. The murder of Toledano crossed this red line.

Upon receipt of the notification of the discovery of the body, the Prime Minister called in the representatives of the Defense system for an urgent conference in his office. During the meeting, the Head of the Security Services and the representative of the top level of the army recommended that a fast and painful blow be employed

against Hamas and the Islamic Jihad. If not, they warned, the security situation will drop to an unprecedented level. Rabin decided to accept their recommendation.

Political motivation also stood behind the Prime Minister's decision. Diplomatic negotiations were underway. Another round of talks was being held in Washington between Israel and the Palestinians. Cairo was preparing for high level talks between Egyptian leaders and Fatah to discuss the speeding up of negotiations. A Palestinian mission, headed by Feisal Husseini, left for Washington for discussions with President Bush. It was therefore necessary to strengthen Fatah as a partner in the diplomatic process and to keep the anti-peace forces out of the ring.

This stand was expressed in a special message which the government issued on December 17, 1992 saying: "The spread of murderous Islamic fundamentalism endangers the peace of the entire free Middle East. The fundamentalist organizations arethreatening the democratic regimes, including the pro-western ones, in the Middle East.

Hamas and the Islamic terrorists do not recognize the right of Israel to exist and their goal is its destruction. They see the path to the destruction of the State of Israel through Jihad (religious war). Hamas and the Islamic Jihad stand at the head of a front which refuses to make peace with Israel, and which tries to destroy the peace process taking place in Washington in whatever way possible. Hamas and the Islamic Jihad are today the main threat to peace."

No answer for an appropriate punishment for this new situation was found in the standard means of punishment of the Defense Department. Therefore, the suggestion of Chief of Staff Barak was brought up for discussion: To expel a large group of individuals for a determined period of time. The suggestion had been brought to Rabin several months earlier to circumvent the procedure established by a judgment of the Supreme Court, which obligated the government to notify in advance on its intent to expel, and to allow the individual to appeal before his expulsion. This appeal would be before a Military Appeals Court and the Supreme Court. The process caused delays lasting months, to the point that when the expulsion was finally carried out, no one remembered why it was ordered in the first place. Therefore they decided this time on a "temporary expulsion" which would be carried out for a very large group without delays.

On Wednesday afternoon, December 16th, at the meeting of Ministers for Security Matters, the government decided that in light of the emergency situation and to maintain the security of the public, that they would delegate the Prime Minister and Defense Minister to direct and empower the local military commanders in Judea, Samaria and the Gaza Strip to issue orders in accordance to local immediate security conditions as required at the moment, and to carry out the short-term expulsions without prior notification in order to remove troublemakers from the areas where they could create havoc, as well as those who were known to incite uprisings, for periods to be determined by those local military commanders. The expulsion periods were not to exceed two years.

11

When the meeting concluded, the Prime Minister called the Chief of Staff and the Head of the Security Services and relayed the decision to them. He ordered the Chief of Staff to commence the planning for the expulsions, and to give all the support necessary to the Security Services. The Head of Security Services was directed to prepare lists of individuals whose expulsion would greatly damage the foundations of Hamas and the Islamic Jihad.

On Thursday night December 17th the government responded to the Supreme Court following an appeal by objectors to the expulsions. The response stated: "We are talking about individuals who organized and supported terrorist activities, or those that directed and incited these types of activities. Others gave assistance to these terrorists by supporting and funding and recruiting volunteers, as well as in composing and distributing flyers which promoted incitement."

While this was going on at the Supreme Court, the people who had been rounded up for expulsion were seated on buses on the northern border, hands and feet tied, and blindfolded.

12

On Friday night, under a heavy fog, the convoy crossed the border into Lebanon.

From the time when Toledano was kidnapped until the expulsion on December 18, 1992, about 1600 activists and supporters of Hamas and the Islamic Jihad were detained. Among the list of detainees, 415 people were expelled to Lebanon – 250 from the West Bank, and 165 from the Gaza Strip. There were 12 university lecturers among the group, 68 students, 29 teachers, 9 doctors, 10 engineers, 3 pharmacists, 19 religious leaders, 81 clerks and employees of various organizations, and 99 laborers. 180 of the expellees had high school diplomas and 25 had higher education, some with Masters degrees or doctorates. Half were between the ages of 30-39. Most were married. They represented a cross-section of Hamas.



# CERTIFICATION

This is to certify that the attached *English* language document corresponding
to the document *new- shaked book pp 11-21*, is a true and accurate translation of the original
*Hebrew* language document to the best of our knowledge and belief

Executed this on
Wednesday, November 03, 2010

*Tik Tak Translations Ltd.*
9 Hashiloah Street
Petach Tikva, 49180 ISRAEL
+972 3 907-4555

**EXHIBIT 182 TO DECLARATION OF VALERIE SCHUSTER**

~~Case 1:05-cv-04622-DLI-RML   Document 267-15   Filed 03/22/12   Page 237 of 910 PageID #: 7614~~

# HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

כל הזכויות שמורות © רוני שקד 2010

החלק האישי של הצוואות רווי בתיאורים ברוח המיתוס. "זה יום חתונתי" מצהירים המתאבדים בצוואותיהם כדי להפוך את המוות כשהיד לתחילתם של חיים חדשים טובים יותר בגן העדן בחברתן של חור אלעין. ראמז פהמי אבו סליס, בן 22 תושב הכפר רנטיס במערב נפת רמאללה, חבר החמאס, כתב צוואה לפני שיצא לבצע את פעלת טרור המתאבדים בקפה הלל בירושלים ב – 9.9.2003. בצוואתו הוא פנה לאביו: "שלח לי, אני מוזמן לחתונה, איננו יכול להמתין אפילו רגע אחד". [xiv] הפנייה לבני המשפחה היא בלשון חגיגית: "אל תבכו על מותי, שימחו, חלקו ממתקים".בצוואה אחרת הפנייה חיא ישירות לאימו של השהיד: "היו אימי האהובה, נגבי דמעותיך, אל תהיינה עצובה. בעזרת אללה אני משיג את כל שאיפותיי. אל תתני לי לראותך עצובה ביום חתונתי עם חור אלעין, היי שמחה כי אני עם אללה בגן העדן", כתב מוען ראגיב.

מוטיב אחר החוזר בצוואות הוא הפרידה הזמנית מבני המשפחה, עד לאיחוד מחדש מגן העדן, שכן, המיתוס מ..... את הזכות להזמין את בני משפחתו לגן העדן.

תפקיד נוסף ... הוא להודיע מפי המתאבד עצמו, על נטילת האחריות לביצוע חפיגוע בשם האר.... אליו הוא שייך ... את צוואתו על ידי האיסתישהדי, מול מצלמות וידאו, תוך הדגשת ש... הארגון העומ... ... הפעולה, היא אקט של נטילת אחריות על ידי הארגון שמשגר את המחבל. ... ... ... פיגוע טרור ...אבדים, משוגרים אנשי הארגון האחרים מעל פעולה את קלטת הווידיאו לתחנות הטלויזיה ... בתים והפלסטיניות שידור חצוואה נועד ליטול אחריות על הפיגוע בשם הארגון המבצע, לחאדיר את ה... לחפגין כי המעשה בוצע מתוך אמונה ושכנוע, לעודד צעירים אחרים להצטרף למעגל ...תישהדים וגם לחזק בעיני הציבור את התמיכה בארגון שביצע את הפעולה.

במציאות הפוליטית הפלסטינית מ.... ... בין אר... על הבכורה בביצוע פעולות טרור נגד ישראל. היו מקרים ששני ארגונים נטלו ... את האחריות לביצוע ... פעולת טרור מתאבדים. כך למשל, חמאס, וגדודי חללי אלאקצא- הזר... הצבאית של .... הפתיח, נטלו בו זמנית את האחריות לפיגוע טרור המתאבדים באוטובוס ... בינואר 2004 שבועע על ידי חמחבל המתאבד, עלי ג'ערה מבית לחם. בימים שלאחר הפיגוע התאמצו ש... ... אחד בדרכו וטיעוניו להוכיח כי הוא אשר ביצע את הפעולה.

מטרה שנייה של הצוואה, לא פחות חשובה, נועדה להאיר אי... ..מעה בשם המיתוס. הפנ...בשם הדת נועדה לפנות לרשויות הדתיים במטרה ליצור אחדות וחיס של אמפתיה לא רק ל.. של התאבד, אלא ובעיקר לפעולה אותה ביצע בשם האסלאם ולמען אללה. "אחי מצעירים ..... ... האסלאמית! צעדו בדרך חג'יהאד  חפשו את המוות. שאו את הקוראן בידכם הימ... ואת הנשק בידיכם השמאלית, לכו בדרכיו של חנביא. בקשו את המוות כי הוא החיים אשר יינתנו לכם",כתב  מחבל החמאס באסם תכרורי מחברון, שביצע ב- 18.5.2003 פיגוע טרור מתאבדים באוטובוס בירושלים.

סעיד חסין חותרי שביצע את פיגוע טרור המתאבדים במועדון הדולפיניריום בתל אביב ב-1.6.2001 כתב:

"השבח לאללה, אין אויב זולת הכובש העושק. תפילת וברכת שלום למפקד חיילי המוג'הדין, חו המוסלמים בכל תעולם, ... ברכות משהיד חי הממתין לעלות [למות] ולהיפגש עם השהידים ובראשם מורי הגדול מורי יחיא עיאש. אני

103



DEFENDANT'S
EXHIBIT
11
5/3/11  SC

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

©Copyright – Rony Shaked 2010

The broadcasting of the will comes to assume responsibility by the acting organization, to glorify the Shahid, to demonstrate that the attack was done faithfully and to convince other youngsters to join the circle of Istishadis as well as reinforcing in the public the support on the dispatching organization.

In the reality of Palestinian politics, there is rivalry between the organizations, which compete to be the first to assume responsibility for a terror attack against Israel. There have been cases in which two organizations assumed responsibility for one suicide attack. For instance, Hamas, and the Al Aqsa Martyrs Brigades, the military branch of the Fatah, assumed responsibility  - at the same time – for the attack on the bus in Jerusalem in January 29th, 2004, which was carried out by the suicide bomber, Ali Ja'ara from Bethlehem. Days after the attack, both organizations, each one in its own way and with its own arguments, tried to prove that it was the one that carried out the attack.



DEFENDANT'S
EXHIBIT
11 A
5 31 11
PENGAD 800-631-6989

SHAKED000258



**Global Language Services**
Translations · Interpreting
DTP · Localization

KERN Corporation
The Helmsley Building
230 Park Avenue, Suite 1517
New York, NY 10169

Tel. (212) 953 2070
Fax (212) 953 2073
kern.ny@kerntranslations.com

**www.e-kern.com**

State of :     New York

County of:     New York

ss.:

## CERTIFICATE OF ACCURACY

*IT IS HEREBY CERTIFIED, that  KERN Corporation, a corporation organized and existing under the laws of the State of New York, is professionally engaged in the rendering of foreign language translation services; that it has translated the following document(s)*

### PARAGRAPH OF MANUSCRIPT
### WITH BATES NUMBER SHAKED000258

*from the **HEBREW** language into the **ENGLISH** language and that the said translation is a true and correct rendering of the said document to the best of our knowledge and belief.*

Signed by: _____

(Rosana Chinchilla)
for

Sworn to before me this _____

Day of _____, 2011.

_____
Notary Public

[Stamp:]
KERN Corporation
The Helmsley Building
230 Park Avenue, Suite 1517
New York, NY 10169
Tel: 212 953-2070
www.e-kern.com

**JOY WILTERMUTH**
NOTARY PUBLIC, State of New York
No. 01WI - 6093589
Qualified in New York County
My Commission Expires June 2, 2011

San Francisco: The Russ Building · 235 Montgomery Street, Suite 946 · San Francisco, CA 94104
Tel. (415) 433 5376 · Fax (415) 433 5377 · kern.sf@kerntranslations.com

London: Tel. 011 44 (20) 78 31 56 00 · Frankfurt: Tel. 011 49 (69) 75 60 73-0 · Berlin: Tel. 011 49 (30) 24 72 12 50 · Paris: Tel. 011 33 (1) 53 93 85 20
Zurich: Tel. 011 41 (1) 2 61 11 60 · Hong Kong: Tel. 011 (852) 26 50 44 55 · Amsterdam: Tel. 011 31 (20) 6 39 01 19 · Lyon: Tel. 011 33 (4) 783 783 73

**EXHIBIT 183 TO DECLARATION OF VALERIE SCHUSTER**

*TZVI WEISS, et al. VS.*
*NATIONAL WESTMINSTER BANK, PLC*

*RONNI SHAKED*
*May 3, 2011*



126 East 56th Street, Fifth Floor New York, New York 10022
PHONE: (212) 750-6434   FAX: (212) 750-1097
www.ELLENGRAUER.com

*Original File 96682.TXT*
*Min-U-Script® with Word Index*

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

RONNI SHAKED
May 3, 2011

Page 41

1      SHAKED
2  A.   No, they don't receive a
3  degree.
4  Q.   What's the nature of the
5  program?
6  A.   This is also an enrichment
7  program.  This is a year long program.
8  People register for it and they receive a
9  series of courses.
10      MR. FRIEDMAN: I'm going to ask
11  the reporter to mark as Exhibit 10 a
12  document bearing the production
13  numbers Shaked 156 to 329.
14      Defendant's Exhibit 10,
15  Document, Bates labeled Shaked 156
16  through 329, marked for
17  Identification.)
18      MR. UNGAR: Are you amenable
19  to a short break?
20      MR. FRIEDMAN: Yes, but I would
21  like to keep the break very, very
22  short because we are making very good
23  progress and I don't want to keep
24  anyone longer than I need to.
25      MR. UNGAR: We don't need to

Page 42

1      SHAKED
2  take breaks every hour on the dot, but
3  if we can take a short break now, we
4  will come back very shortly.
5      THE VIDEOGRAPHER: We are now
6  off the record.  The time is 11:40
7  a.m., May 3, 2011.
8      (Recess taken.)
9      THE VIDEOGRAPHER: This is tape
10  two of the deposition of Mr. Ronni
11  Shaked.  We are now back on the
12  record.  The time is 11:52 a.m.  Today
13  is May 3, 2011.
14  Q.   Mr. Shaked, your counsel has
15  told me you have two clarifications you want
16  to make.
17  A.   You asked me who I was meeting
18  with yesterday and I did not mention the lady
19  Clara who was also in the room.  You also
20  asked me whether I looked at any documents
21  and actually I did look at the rebuttal
22  report of Mr. Azulay and in my own report --
23  and at my own report.
24  Q.   Mr. Shaked, you have in front
25  of you what's been marked as Exhibit 10.  Do

Page 43

1      SHAKED
2  you recognize this to be the manuscript of
3  your book that your counsel produced to us?
4      MR. UNGAR: Mr. Shaked, take a
5  moment and make sure that that is what
6  Mr. Friedman purports it is.
7  A.   Yes, I recognize it.
8  Q.   Is there a subsequent version
9  of this manuscript?
10  A.   No.
11  Q.   What is the status of the
12  publication of this manuscript?
13  A.   I just return to my regular
14  working schedule and I hope that it will see
15  light in the next few months.
16  Q.   Do you have a contract with a
17  publisher for the publication of this
18  manuscript?
19  A.   No.
20  Q.   You're hoping it will be
21  published?
22  A.   Yes.
23  Q.   Are you aware of anything in
24  this manuscript that is not accurate?
25  A.   This is a draft that I will

Page 44

1      SHAKED
2  certainly have to review another three or
3  four times.
4  Q.   But as you sit here today are
5  you aware of anything in this draft that is
6  inaccurate?
7  A.   There certainly may be things
8  that have been discovered, but I was not
9  aware of when I was writing the draft.
10      MR. FRIEDMAN: I'm going to ask
11  the reporter to mark as Exhibit 11 and
12  11A the following.  11 is a separate
13  copy of page 103 of this manuscript
14  with a box around a certain passage
15  and 11A is a certified translation of
16  that passage.
17      MR. UNGAR: Plaintiffs reserve
18  all their rights about the accuracy of
19  the certified translation.
20      (Defendant's Exhibit 11,
21  Document, marked for Identification.)
22      (Defendant's Exhibit 11A,
23  Certified Translation, marked for
24  Identification.)
25  Q.   Do you recognize Exhibit 11 as

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

RONNI SHAKED
May 3, 2011

Page 45

1        SHAKED
2   page 103 of the manuscript?
3        MR. UNGAR: I think, Mr.
4   Shaked, you should consult the
5   manuscript to see if that's the same,
6   is that what you are asking him to do?
7        MR. FRIEDMAN: No and again,
8   Ari, I would like his testimony and
9   not yours.  In that instant it's
10  completely innocent, but please let
11  him do what he can do.
12  Q.  Do you recognize Exhibit 11 to
13  be page 103 of your manuscript?
14  A.  Yes.
15  Q.  The paragraph that has a box
16  around it addresses the January 29, 2004
17  attack on bus 19, correct?
18  A.  That's correct.
19  Q.  Is there anything in this
20  passage that you believe to be inaccurate?
21  A.  As a draft I believe that it's
22  correct, but of course I will have to revisit
23  it.
24  Q.  As you sit here today, is there
25  anything here that you believe is inaccurate?

Page 46

1        SHAKED
2   A.  I believe that the description
3   in the draft is consistent with the way it
4   was when I wrote it.
5   Q.  I understand that, but as you
6   sit here today, is there anything here that
7   you believe is inaccurate?
8   A.  No, I don't believe so.
9   Q.  If you go back to page 2 of
10  your report, Exhibit 1, you refer to the
11  paper that you wrote as part of your master's
12  degree at the top of page 2 entitled Al Ard,
13  the Ideological Foundation of the Radical
14  National Movement of the Arabs in Israel, do
15  you see that?
16  A.  Yes, I see it.
17  Q.  In what year did you write that
18  paper?
19  A.  In 2006.
20  Q.  Do you have a copy of that
21  paper in your files?
22  A.  Certainly.
23  Q.  Is there anything in that paper
24  concerning which group was responsible for a
25  particular terrorist attack?

Page 47

1        SHAKED
2        MR. UNGAR: Objection to form.
3   A.  No.
4        MR. FRIEDMAN: I'm going to ask
5   the reporter to mark as Exhibit 12 a
6   document that bears the production
7   numbers 365 through 378.
8        (Defendant's Exhibit 12,
9   Document, Bates labeled Shaked 365
10  through 378, marked for
11  Identification.)
12       MR. UNGAR: Do you have the
13  English translation for this?
14       MR. FRIEDMAN: I don't and I
15  don't think they need it.
16  Q.  Plaintiffs' counsel, your
17  counsel gave us this document and told us
18  that it is a list of articles that you have
19  written over the past ten years excluding the
20  articles that were identified on a list that
21  your counsel gave to us previously.  Were you
22  involved in the preparation of this list at
23  all?
24       MR. UNGAR: Mr. Shaked, I
25  remind you not to discuss

Page 48

1        SHAKED
2   communications you had with counsel.
3   A.  Yes.
4   Q.  Have you written any articles
5   since 2010?
6   A.  Certainly.
7   Q.  Have these articles been
8   published anywhere other than Yediot
9   Aharonot?
10  A.  I think two I'm not sure
11  because I was not following them.
12  Q.  Were they all published
13  initially in Yediot Aharonot?
14  A.  I'm sorry.  They were published
15  in the Arab press because I wrote a series of
16  articles and I know they were published in
17  the Arab newspapers because I received them.
18  Q.  What was the subject matter of
19  that series of articles?
20  A.  I wrote about El Jazera.
21  Q.  Have you written any articles
22  in 2011 about Hamas?
23  A.  Only a week ago I wrote an
24  article about the Hamas.
25  Q.  Other than that have you

Case 1:05-cv-04622-DLI-RML   Document 267-15   Filed 03/22/12   Page 245 of 910 PageID #: 7622

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

RONNI SHAKED
May 3, 2011

Page 49

1       SHAKED
2   written any other articles during 2011 about
3   Hamas?
4   A.  It's definitely possible
5   because this is my area of coverage.
6   Q.   Have any of these articles
7   related to Hamas' responsibility for any
8   attacks?
9       MR. UNGAR: Objection to form.
10  A.   As far as I recall, no.
11  Q.   You can put that aside.  In the
12  period since you were deposed in the Credit
13  Lyonnais cases, have you been presented as an
14  expert witness in any legal proceedings?
15  A.   No.
16  Q.   Since your deposition in the
17  Credit Lyonnais cases, have you been hired,
18  newly hired as an expert witness for any
19  legal proceedings?
20  A.   No.
21  Q.   Have you been hired as a
22  consultant for any legal proceedings during
23  that same period?
24  A.   No.
25  Q.   Since your deposition was taken

Page 50

1       SHAKED
2   in the Credit Lyonnais cases and leaving
3   aside the expert report you submitted in the
4   lawsuits against Arab Bank, have you
5   participated in any other way during that
6   period in a U.S. or Israeli legal proceeding?
7       MR. UNGAR: Objection to form.
8   A.   Private -- personal legal
9   proceeding that I participated in regarding
10  my son's death.
11  Q.   Anything else?
12  A.   No.
13  Q.   Please look at your report,
14  Exhibit 1, and turn to page 16, please.  Do
15  you see on page 16 you offer your opinion
16  twice with respect to two different groups of
17  attacks that you have concluded with, "with a
18  very high degree of probability" that Hamas
19  was involved with these attacks, do you see
20  that?
21      MR. UNGAR: Objection to form.
22  Document speaks for itself.
23      MR. FRIEDMAN: Is it your
24  position that I can't question him
25  about the report?

Page 51

1       SHAKED
2       MR. UNGAR: It's my position if
3   you will quote from the document you
4   should quote it exactly.  I believe he
5   says Hamas was involved in the
6   recruiting, planning and perpetration
7   of the following suicide attacks and I
8   guess you are referring to also the
9   following terrorist attacks as opposed
10  to just saying Hamas was involved with
11  the following attacks.
12      MR. FRIEDMAN: I adopt your
13  formulation.
14  Q.   Do you see that you use the
15  term "very high degree of probability" in two
16  places on that page?
17  A.   Yes.
18  Q.   What do you mean by the term
19  very high degree of probability?
20  A.   When we examine the Hamas
21  attacks especially suicide attacks, we can
22  establish with a very high degree of
23  certainty based on a methodology who
24  perpetrated the attack because in such cases
25  the Hamas itself does not hide the facts and

Page 52

1       SHAKED
2   they praise and they brag and they glorify
3   their operation.
4   Q.   Did you use the same
5   methodology in connection with your Nat West
6   report that you used in connection with your
7   Credit Lyonnais report?
8   A.   Yes, I did.
9   Q.   I'd like to focus you in on the
10  words very high degree of probability.  Is
11  that a test that -- was that a standard that
12  you took from another source that you relied
13  on or is that a standard that you formulated
14  yourself very high degree of probability?
15      MR. UNGAR: Objection to form.
16  A.   It's a term that I used for the
17  purpose of -- it's a term that I used.
18  Q.   Where did you get that term
19  from?
20  A.   I don't have to take it from
21  any where. I'm familiar with this term and I
22  use them all the time.
23  Q.   So this is your own standard?
24  A.   I did not make up or invent
25  these words.  These are words that anybody

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

RONNI SHAKED
May 3, 2011

Page 53

1  SHAKED
2  can use in similar contexts.
3  Q.  Have you ever heard of or read
4  anywhere that someone used the phrase or the
5  standard -- let me restate that.  Have you
6  ever heard or read anywhere the use of the
7  test, "very high degree of probability" in
8  connection with determining responsibility
9  for a terrorist attack?
10      MR. UNGAR: Objection to form.
11  A.  From my professional experience
12  I learned to doubt everything and to check or
13  examine everything several times.  Therefore
14  this language is a language that points to or
15  tests to professional caution.
16      MR. FRIEDMAN: I move to strike
17  that as non-responsive. Let me ask the
18  question again.  That's fine.
19      MR. UNGAR: I don't go along
20  with that motion.
21      MR. FRIEDMAN: I understand you
22  don't go along with that.
23  Q.  Have you ever read anything
24  that someone else has written that uses the
25  phrase, "very high degree of probability"

Page 54

1  SHAKED
2  with respect to an assessment of
3  responsibility for a terrorist attack, yes or
4  no?
5  A.  It's definitely possible that I
6  did read it.
7  Q.  Can you identify any place
8  where you read that?
9  A.  I read so much about attacks
10  and terrorism that I cannot put my finger
11  exactly to where I read it.
12  Q.  Have you ever heard audibly
13  someone use that formula "very high degree of
14  probability" in connection with determining
15  responsibility for a terrorist attack, yes or
16  no?
17  A.  I heard it.
18  Q.  Who?
19  A.  For example, in El Jazera
20  broadcasts when they broadcast an attack
21  before it is ascertained or before it's known
22  for certain who perpetrated the certain
23  attack.
24  Q.  Anywhere else?
25  A.  I can give you an example from

Page 55

1  SHAKED
2  the last terrorist attacks that happened in
3  Israel.
4  Q.  I want to know first from whom
5  you heard the use of this test other than El
6  Jazera?
7  A.  I heard it in the media and in
8  certain articles which right now I don't
9  remember who wrote.
10  Q.  You mean journalistic articles?
11  A.  No, also articles of attack
12  analysis.
13  Q.  You said no but also.  Have you
14  seen that term used in journalistic articles?
15  A.  Yes.
16  Q.  In the Israeli press?
17  A.  Indeed the Israeli press.
18  Q.  Any other articles?
19  A.  Possibly in the Arab press
20  because I read a lot of Arab newspapers.
21  Q.  You said you have seen that
22  term used in attack analysis articles.  What
23  articles are you referring to?
24  A.  I don't want to make a mistake
25  or mislead you because I don't remember

Page 56

1  SHAKED
2  exactly what articles they were right now.
3  Q.  Are they cited in your report?
4      MR. UNGAR: You can consult
5  your report if you need to to answer
6  that question.
7  A.  I don't remember every single
8  word in my report, but I definitely -- I
9  don't remember every single word in my
10  report.
11  Q.  I understand.  Mr. Shaked, when
12  you referred to "attack analysis articles",
13  are you referring to the type of articles
14  that are cited in your report?
15      MR. UNGAR: Objection to form.
16  A.  No.
17  Q.  What types of articles are you
18  referring to?
19      MR. UNGAR: Same objection.
20  A.  There are lots of researchers
21  in the world that analyze -- that deal with
22  terrorism.  There are dozens of articles
23  including in the United States that deal with
24  terrorist attacks in Israel as well.
25  Q.  Have you cited any of those in

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

RONNI SHAKED
May 3, 2011

Page 57

1        SHAKED
2    your report to your recollection?
3        MR. UNGAR: With regard to that
4    I would say --
5        MR. FRIEDMAN: You have already
6    been coaching the witness enough.
7    Please let him answer the question. If
8    you have an objection say objection.
9        MR. UNGAR: I'm raising an
10   objection. The document speaks for
11   itself and I have not coached the
12   witness. You are able to answer the
13   question if you can.
14       MR. FRIEDMAN: I stipulate the
15   documents speak for themselves so you
16   have a standing objection to that.
17   A.   No, I don't remember that there
18   were any articles referring specifically to
19   these attacks, the attacks in my report.
20   Q.   Can you state for us what the
21   phrase very high degree of probability means
22   in percentage terms?
23       MR. UNGAR: Objection,
24   foundation.
25   A.   I don't deal with statistical

Page 58

1        SHAKED
2    -- I don't deal with this type of statistics,
3    but I think this means very high percentages.
4    Q.   Can you put a number on it?
5    A.   If I'm talking about suicide
6    attacks I can say it's a very high percent.
7    Q.   Is it the same number for all
8    of the attacks you address in your report or
9    does the number vary from attack to attack?
10   A.   As far as the suicide attacks I
11   have no doubt at all. Regarding the other
12   attacks like the university attack, like the
13   attack in Kiryat Arba or the attack on Tel
14   Rumeda there is for those I have a high
15   probability. There is difficulty in
16   establishing complete responsibility in such
17   attacks as mortar attacks.
18   Q.   Such as Neve Dekalin?
19   A.   Yes.
20   Q.   Before you came here this
21   morning did you think about whether the
22   degree of probability for all of these
23   attacks was the same or whether there was a
24   different degree of probability for one
25   attack as opposed to another, did you think

Page 59

1        SHAKED
2    about that before today?
3        MR. UNGAR: Objection to form.
4    A.   I presented my opinion in the
5    report as we see it before us here and as a
6    person who deals with these subjects I
7    understand what I wrote.
8    Q.   For the attacks that you list
9    on page 16 other than the Neve Dekalin
10   attack, am I right that you would not apply
11   the same probability number to every attack?
12       MR. UNGAR: Objection to form.
13       THE INTERPRETER: The witness
14   ask the question be repeated.
15   A.   I think that I pointed out in
16   my report that the Neve Dekalin case is
17   exceptional and regarding the other attacks I
18   stand by what I have written here.
19   Q.   That's not responsive to my
20   question unless you don't have an answer
21   other than what is written so I'll put the
22   question again. For all of the attacks other
23   than Neve Dekalin, do you apply the same
24   probability percentage identically to each of
25   those other attacks?

Page 60

1        SHAKED
2        MR. UNGAR: Objection to form,
3    foundation.
4    A.   After such a long time that has
5    passed since those attacks were perpetrated
6    --
7        THE INTERPRETER: Excuse me, the
8    interpreter would like to correct the
9    answer.
10   A.   After these attacks have been
11   perpetrated and we know who has perpetrated
12   them, then I can say it with a high degree of
13   probability as I have written here. The
14   problematic time is between the perpetration
15   of the attack and the identification.
16       MR. FRIEDMAN: I move to
17   strike. That's not responsive either
18   and I take it that you disagree, Ari,
19   so I'll take one more attempt at it.
20   Q.   For all the attacks other than
21   Neve Dekalin, in your view is the probability
22   that Hamas was involved in these attacks the
23   same level of probability for each and every
24   attack?
25   A.   Except for the attack on bus

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

RONNI SHAKED
May 3, 2011

---

Page 85

```
 1        SHAKED
 2      (Defendant's Exhibit 19,
 3   Document, marked for Identification.)
 4      (Defendant's Exhibit 19A,
 5   Certified Translation, marked for
 6   Identification.)
 7   Q.  Have you ever before seen
 8   Exhibit 19?
 9   A.  Yes.
10   Q.  You recognize it as a Will of
11   Mr. Ja'ara, correct?
12   A.  I recognize it as a handwritten
13   note that was supposedly written in the name
14   of Ja'ara.
15   Q.  And you read Arabic, correct?
16   A.  Yes.
17   Q.  And you see that this document
18   says that Mr. Ja'ara committed an attack in
19   retaliation for the martyrs of the Al Zaytoun
20   district massacre in Gaza, correct?
21      MR. UNGAR: Objection to form
22   and document speaks for itself.  You
23   can answer.
24   Q.  Do you see that?
25   A.  Yes.
```

Page 86

```
 1        SHAKED
 2   Q.  Does this refer to the same
 3   battle in which eight Palestinians were
 4   killed before the bus 19 attack?
 5      MR. FRIEDMAN: Objection,
 6   foundation.  I think we need you to
 7   interpret the objections as well.
 8   A.  Yes.
 9      MR. FRIEDMAN: Ask the reporter
10   to mark as the exhibit next in number
11   a document from the website
12   Kataebaqsa.org and as A the certified
13   English translation.
14      (Defendant's Exhibit 20,
15   Document, marked for Identification.)
16      (Defendant's Exhibit 20A,
17   Certified Translation, marked for
18   Identification.)
19   Q.  Have you ever seen this before?
20   A.  I have seen this.
21   Q.  Do you recognize the website
22   Kataebaqsa.org as a website that you
23   understand is used by the Al Aqsa Martyrs
24   Brigade?
25   A.  Yes, I do.
```

Page 87

```
 1        SHAKED
 2   Q.  Did you see this document
 3   before you prepared -- before you signed your
 4   report?
 5   A.  How can I remember every single
 6   document, but it's possible that this
 7   document was transferred to me.
 8   Q.  Did you consider it in
 9   connection with your report?
10      MR. UNGAR: Objection to form.
11   A.  I think that in the -- I wrote
12   in my conclusions in the report that there is
13   a joint responsibility for the attack by
14   Hamas and the Al Aqsa Martyrs Brigade.
15   Q.  In this document, Exhibit 20,
16   the one we're looking at now, this indicates
17   that it was published on the one year
18   anniversary of the bus 19 attack, correct?
19   A.  Yes.
20   Q.  The Al Aqsa Martyrs Brigade
21   claims credit for that attack in this
22   statement, correct?
23      MR. UNGAR: Objection.  The
24   document speaks for itself.
25   A.  That's indeed what is written
```

Page 88

```
 1        SHAKED
 2   on the leaflet.
 3   Q.  Go to your Nat West report,
 4   Exhibit 1, page 128.  The third to last
 5   paragraph you state, "At the same time the Al
 6   Aqsa Martyrs Brigade has never -- third from
 7   the bottom paragraph of 128.  Let's look at
 8   the third to last paragraph on the document.
 9   It states as follows.  Page 128, third to
10   last paragraph reads as follows. "A short
11   time after the terrorist attack --
12   A.  Wait a minute, where is it?
13   Q.  Let's start again.  On page 128
14   of Exhibit 1 you wrote as follows, "A short
15   time after the terrorist attack, the
16   Bethlehem headquarters of the Al Aqsa Martyrs
17   Brigade the military arm of Fatah, published
18   a press release according to which the Al
19   Aqsa Martyrs Brigade had perpetrated the
20   terrorist attack.  At the same time the Al
21   Aqsa Martyrs Brigade has never repeated this
22   claim on their website and Fatah subsequently
23   rejected any responsibility for the terrorist
24   attack."  Do you see that?
25   A.  I see it.
```

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

RONNI SHAKED
May 3, 2011

Page 89

1        SHAKED
2  Q.  Exhibit 20 demonstrates that
3  your statement in your report is untrue,
4  correct?
5        MR. UNGAR: Objection to form.
6  A.  It's absolutely possible that I
7  made a mistake in one of the details of the
8  report.  There were so many details that it's
9  possible that I forgot one of them.  I had no
10 reason whatsoever to exclude it if it was
11 there.
12 Q.  Exhibit 20, Mr. Shaked,
13 demonstrates that the Al Aqsa Martyrs Brigade
14 did repeat this claim on their website one
15 year after the bus 19 attack, correct?
16       MR. UNGAR: Objection to form.
17 A.  It's indeed so.
18       MR. FRIEDMAN: I'm going to ask
19 the reporter to mark as Exhibit 21 a
20 document entitled The National Counter
21 Terrorism Center Counter Terrorism
22 Calendar 2010.
23       (Defendant's Exhibit 21,
24 Document, marked for Identification.)
25 Q.  Have you ever seen this

Page 90

1        SHAKED
2  document before?
3  A.  I saw it.
4  Q.  Do you know what the U.S.
5  National Counter Terrorism Center is?
6  A.  Yes.
7  Q.  It is an agency of the U.S.
8  government that is responsible for
9  integrating and analyzing intelligence
10 pertaining to counter terrorism, correct?
11 A.  Yes.
12 Q.  Do you consider it to be a
13 reliable source of information?
14       MR. UNGAR: Objection to form.
15 A.  Yes, for the time when it's
16 published.
17 Q.  Look at page 13.  Look at the
18 calendar date for January 29th.  Do you see
19 that?
20 A.  Yes.
21 Q.  You see that on the date
22 January 29th this document attributes
23 responsibility for the bus 19 attack to Al
24 Aqsa Martyrs Brigade correct?
25 A.  Just a moment.  Just a second.

Page 91

1        SHAKED
2  Yes.
3        MR. FRIEDMAN: I'll ask the
4  reporter to mark as Exhibit 22 a
5  statement by Nofel Adawin that was
6  given to us as part of the appendix of
7  to Mr. Shaked's report plus a
8  certified translation will be 22A.
9  This was a document that was attached
10 to Mr. Azulay's report.
11       (Defendant's Exhibit 22,
12 Document, marked for Identification.)
13       (Defendant's Exhibit 22A,
14 Certified Translation, marked for
15 Identification.)
16 Q.  Have you ever seen this before?
17 A.  I'd like to see it first.
18       MR. UNGAR: You asked him to
19 look at the Arabic version -- Hebrew
20 version or English?
21       MR. FRIEDMAN: He should have
22 both.
23 Q.  Have you seen this before?
24 A.  Yes.
25 Q.  Look at lines 18 to 21 of this

Page 92

1        SHAKED
2  document.  It states that Mr. Adawin took Mr.
3  Ja'ara by car to the intended location for
4  the attack, correct?  Sorry, it says they
5  went by foot?
6  A.  Yes, I'm going to correct it.
7        MR. FRIEDMAN: Lines 18 to 21?
8        MR. UNGAR: Is that the same
9  lines in the English and Hebrew?
10       MR. FRIEDMAN: It should be.
11 Q.  It says, "We left by foot me
12 and him to Beit Jalla", correct?  Look at
13 your Nat West report, Exhibit 1, page 135.
14 The fourth line from the bottom you wrote
15 that Adawin took Ja'ara to the intended
16 location by car, correct?
17 A.  That's what my report says.
18       MR. FRIEDMAN: I'm going to ask
19 the reporter to mark as Exhibit 23 an
20 ITIC report dated January 1, 2006.
21       (Defendant's Exhibit 23, ITIC
22 Report, marked for Identification.)
23 Q.  Have you ever seen this
24 document before?
25 A.  Yes.

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

RONNI SHAKED
May 3, 2011

Page 93

       SHAKED
1
2  Q.   This is published by ITIC which
3  I think you referred to in your last
4  deposition as Malam; is that right?
5  A.   Yes.
6  Q.   You have in your report cited
7  information from Malam, right?
8  A.   Correct.
9  Q.   You consider Malam to be a
10  reliable source?
11       MR. UNGAR: Objection to form.
12  A.   Yes.
13  Q.   Please turn to page 80.  You
14  see on page 80 there is a general description
15  of the January 29, 2004 bus 19 attack,
16  correct?
17  A.   Yes.
18  Q.   It identifies the bomber as Mr.
19  Ja'ara, correct?
20  A.   By the picture it's not a
21  picture that we know from our report.  I have
22  to examine the photograph itself.
23  Q.   Mr. Shaked, you don't need to
24  because if you look at the text above the
25  picture it says, "Suicide bomber: Ali Munir

Page 94

       SHAKED
1
2  Yussuf Ja'ara", correct?
3  A.   Correct.
4  Q.   Above that it states,
5  "Organization responsible Fatah's Al Aqsa
6  Martyrs Brigade, correct?
7  A.   That's what is written.
8       MR. FRIEDMAN: Let me ask the
9  reporter to mark as Exhibit 24 a
10  document published by Rand Homeland
11  Security.  It's entitled Breaching the
12  Fortress Wall, Understanding Terrorist
13  Efforts to Overcome Defensive
14  Technologies.
15       (Defendant's Exhibit 24,
16  Document, marked for Identification.)
17  Q.   Have you ever seen this before?
18  A.   No.
19  Q.   Do you consider Rand
20  Corporation to be a reliable source?
21       MR. UNGAR: Objection to form.
22  A.   My thinking will not tell you
23  anything because I don't know them well
24  enough in that.
25  Q.   You don't know Rand Corporation

Page 95

1       SHAKED
2  well enough to say whether or not they are
3  reliable?
4  A.   I read several reports by them
5  with which I was somewhat disappointed.
6  Q.   Look at page 25 of your Nat
7  West report, Exhibit 1.  Do you have that?
8  A.   Yes.
9  Q.   Look at footnote 68.  Do you
10  see that?
11  A.   Yes.
12  Q.   You cite there a report by the
13  Rand Corporation, correct?
14  A.   Yes, of a researcher in the
15  report.
16  Q.   Mr. Hoffman?
17  A.   Mr. Hoffman.
18  Q.   You cite the report written by
19  Mr. Hoffman published by the Rand
20  Corporation, correct?
21  A.   Correct.
22  Q.   What was it about that report
23  that you thought was sufficiently reliable to
24  cite it in your report in these cases?
25       MR. UNGAR: Objection to form.

Page 96

1       SHAKED
2  A.   Hoffman's reports that I was
3  familiar with and the context in which he was
4  writing and I found his statements very
5  correct.
6  Q.   On what basis?
7  A.   On the basis of my professional
8  experience and the research that I myself did
9  regarding the suicide bombers.
10  Q.   Look at Exhibit 24 again.  Look
11  at the second page of the document which
12  states as follows, "This product is part of
13  the Rand Corporation monograph series.  Rand
14  monographs present major research findings
15  that address the challenges facing the public
16  and private sectors.  All Rand monographs
17  undergo rigorous peer review to ensure high
18  standards for research quality and
19  objectivity." Do you see that?
20       THE INTERPRETER: The
21  interpreter doesn't know what
22  monograph series means in this
23  context.
24  A.   Yes.
25  Q.   Do you know whether that same

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

RONNI SHAKED
May 3, 2011

Page 97

```
 1      SHAKED
 2   statement appears in the Hoffman report that
 3   you cited in your report at footnote 28?
 4   A.  At the moment I don't remember.
 5   I'd have to see it again.
 6   Q.  Do you have a copy of the
 7   Hoffman report in your files?
 8   A.  I do.
 9   Q.  Look at page 20 of the exhibit
10   in front of you, Exhibit 24.  The fourth
11   bullet point reads as follows, "In January
12   2004 a member of the Al Aqsa Martyrs Brigade
13   conducted a suicide bombing on a bus in
14   Jerusalem killing eight and wounding
15   approximately 60."  Do you see that?
16   A.  Yes.
17   Q.  Do you believe that to be a
18   reference to the bus 19 attack?
19   A.  I think so, but to the best of
20   my knowledge -- but here it says that eight
21   people only were killed there and to the best
22   of my knowledge 11 people were killed in the
23   attack.
24   Q.  But you believe this refers to
25   the bus 19 attack; is that right?
```

Page 98

```
 1      SHAKED
 2   A.  Yes, with the mistake that I
 3   pointed out.
 4      MR. FRIEDMAN: Reporter will
 5   show you what I marked as Exhibit 25
 6   which is a U.S. State Department
 7   report entitled Country Reports on
 8   Terrorism 2004 dated April 2005.
 9      (Defendant's Exhibit 25,
10   Report, marked for Identification.)
11   Q.  Have you ever seen this before?
12   A.  I receive this report every
13   year so I don't know whether I went through
14   every detail here, but I'm familiar with the
15   report and I'm familiar with the Counter
16   Terrorism Office.
17   Q.  You received a copy of this
18   report in or around April 2005?
19   A.  I can only presume that that's
20   when I received it.
21   Q.  This report is not cited in
22   your reports.  I take it that means you did
23   not rely on it, correct?
24   A.  No, it's not correct.  Maybe I
25   did not have it in front of me or I just
```

Page 99

```
 1      SHAKED
 2   didn't see it.  I have no reason to disregard
 3   such reports and cite them in my report.
 4   Q.  But early this morning, Mr.
 5   Shaked, I asked you whether everything you
 6   relied upon is cited in your report and you
 7   said yes, correct?
 8   A.  Everything I relied upon?
 9   Q.  Is identified in your report?
10   A.  I don't understand this
11   question.
12   Q.  Are there documents that you
13   relied upon for your reports in these cases
14   that are not cited in your reports?
15   A.  I have cited the sources that I
16   found.  I'm sure that there are other
17   documents regarding this attacks or these
18   attacks by the hundreds and if not by the
19   thousands both in the Arab and the other
20   countries starting from Saudi Arabia and
21   ending in the United States.
22   Q.  That may be true, Mr. Shaked,
23   but I want to make sure that we confirm that
24   if you relied on a particular document for
25   purposes of either of your expert reports you
```

Page 100

```
 1      SHAKED
 2   identified that document in your report; is
 3   that correct?
 4      MR. UNGAR: Objection.  It's
 5   been asked and answered.
 6      MR. FRIEDMAN: He's now
 7   suggesting an answer that's contrary
 8   to the answer he gave earlier when I
 9   hope is not right because then we all
10   have a big problem.
11      MR. UNGAR: I don't think he
12   was suggesting that, but I understand
13   you want to confirm it.
14      MR. FRIEDMAN: So then why
15   object that it's asked and answered?
16      MR. UNGAR: I thought it was
17   largely conclusively asked and
18   answered, but I'm giving you some
19   leeway to ask the question.
20      MR. FRIEDMAN: Will you confirm
21   that everything that he relied upon in
22   his reports is cited in his reports?
23      MR. UNGAR: That's certainly my
24   belief, but if you want Mr. Shaked to
25   answer the question, I thought it had
```

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

RONNI SHAKED
May 3, 2011

Page 101

1   SHAKED
2   been answered.
3   MR. FRIEDMAN: That's what I'm
4   trying to do and you objected to it
5   so.
6   Q. Mr. Shaked, did you cite in
7   your reports everything that you relied upon
8   for your reports?
9   A. Certainly.
10  Q. If this document Exhibit 24 is
11  not cited in your reports, that means you did
12  not rely on it for your reports, correct?
13  A. Probably apparently the other
14  reports repeat what is already said here
15  indicating the Exhibit 1.
16  Q. Mr. Shaked, you still believe
17  you have this document in your files?
18  A. Absolutely. It's possible.
19  I'm not sure because I don't keep every
20  single document. Especially not a document
21  that is of a broader scope and it's a wider
22  international document because this can be
23  found on the internet.
24  Q. But again you received this
25  document before you started your work on

Page 102

1   SHAKED
2   these cases, correct?
3   A. I would repeat if I received
4   it, I received it close to the time it was
5   published and if I did, I got it on the
6   internet through the American Embassy.
7   Q. Please turn to page 64. In the
8   first full paragraph in the first column on
9   page 64 it states as follows. "Fatah's
10  militant wing, the Al Aqsa Martyrs Brigade,
11  conducted numerous shooting attacks and
12  suicide bombings in 2004. It was responsible
13  for two suicide bus bombings in Jerusalem
14  during January and February. The attacks
15  killed 21 people and wounded over 110". Do
16  you see that?
17  A. I see it.
18  Q. Do you believe the reference to
19  a January bus bombing in Jerusalem is a
20  reference to the bus 19 attack?
21  A. Yes.
22  MR. FRIEDMAN: Dan needs to
23  change the tape so let's take a short
24  break.
25  THE VIDEOGRAPHER: We are now

Page 103

1   SHAKED
2   off the record. The time is 2:49 p.m.
3   May 3, 2011.
4   (Recess taken.)
5   THE VIDEOGRAPHER: This is tape
6   four of the deposition of Mr. Ronni
7   Shaked. We are now back on the
8   record. The time is 3:02 p.m. Today
9   is May 3, 2011.
10  Q. Mr. Shaked, I'm going to show
11  you some documents that your lawyers produced
12  to us from your files in response to certain
13  of our requests.
14  MR. FRIEDMAN: The first one I
15  marked as -- reporter marked as
16  Exhibit 26 which is in Hebrew and the
17  certified English translation is
18  Exhibit 26A. It bears the production
19  numbers Shaked 379 through 393.
20  (Defendant's Exhibit 26,
21  Document, marked for Identification.)
22  (Defendant's Exhibit 26A,
23  Certified Translation, marked for
24  Identification.)
25  Q. First look at the pages with

Page 104

1   SHAKED
2   the production numbers 379 through 383. This
3   is from a press release from the Prime
4   Minister's Bureau about the Park Hotel attack
5   in Netanya on March 27, 2002, correct?
6   A. Yes.
7   Q. You did not receive this from
8   Hamas, correct?
9   A. I'm smiling I want to tell you.
10  Q. But so we are clear you did not
11  receive this from Hamas, correct?
12  A. Correct.
13  Q. If you look at the fax
14  notations at the top of these pages, it
15  indicates that we have here page 2, 3, 5, 7,
16  and 8 out of 9, correct?
17  A. Yes.
18  Q. Do you know where the other
19  pages are?
20  A. I imagine that the first page
21  was the name of the sender and etc. and in
22  Israel it's customary to put in a page which
23  tells you who it's sent to and from whom and
24  the date.
25  Q. But we don't have pages 4, 6

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

RONNI SHAKED
May 3, 2011

---

Page 113

```
 1      SHAKED
 2   Identification.)
 3   Q.  What is this?
 4   A.  This is a Will read by Raed
 5   Abdul -- the Will of Raed Abdul Hamid Misk
 6   who committed the attack on bus number 2 in
 7   Jerusalem on August 19, 2003.
 8   Q.  There is another Will in this
 9   package too?
10   A.  This is the same suicide
11   bomber.  No, there is another suicide bomber
12   here, Ali Munir Yussuf Ja'ara our friend and
13   there is also here -- no, that's all.
14   Q.  From where did you obtain this?
15   A.  I don't know where it came
16   from, but these are very important documents
17   from the point of view of research that I
18   used especially the first one, the first one
19   only, Raed Abdul Hamid Misk.
20   Q.  You can put those to one side,
21   Mr. Shaked.  You testified last November that
22   about the Kiryat Arba attack you spoke to
23   someone named Nizar Ramadan and thereafter
24   your lawyers told us that you also spoke to
25   someone named Abu Kamel Zaru and someone
```

---

Page 114

```
 1      SHAKED
 2   named Sayid Jabari so you spoke to all three
 3   of those people about the Kiryat Arba attack?
 4      MR. UNGAR: Could you direct
 5   Mr. Shaked to the part that you say he
 6   testified about in November?
 7      MR. FRIEDMAN: Page 207 of this
 8   transcript.
 9   Q.  You spoke to all three of those
10   people in connection with the Kiryat Arba
11   attack?
12   A.  Yes.
13   Q.  So you spoke to Nizar Ramadan,
14   Abu Kamel Zaru and Sayid Jabari, correct?
15   A.  Yes.
16   Q.  And you spoke to them between
17   the time you signed your first report and
18   when you signed your supplemental report or
19   did you speak to them before you signed your
20   first report?
21   A.  I spoke with them even before I
22   appeared here the first time and if I'm not
23   mistaken it was in July or August 2010.  Yes.
24   No, just a moment.  When was I here?
25   Q.  You were here in November 2010.
```

---

Page 115

```
 1      SHAKED
 2   A.  So three months prior, three or
 3   four months prior to that.
 4   Q.  Who is Sayid Jabari?
 5   A.  He's one of the public figures
 6   in Hebron.  He also is close with the Hamas
 7   and the Fatah and he serves as my source for
 8   my work in the area.
 9   Q.  When you say he's a public
10   figure in Hebron, what do you mean?
11   A.  He's known in the city.  Hebron
12   is like a large village.
13   Q.  Is he an official in the
14   Palestinian authority?
15   A.  No.
16   Q.  What does he do for a living?
17   A.  He's a sports businessman,
18   manager.  He buys and sells sports
19   players.
20   Q.  For football?
21   A.  They don't have basketball
22   there yet.
23   Q.  Who is Abu Kamel Zaru?
24   A.  Abu Kamel Zaru is today a
25   resident of Jerusalem.  He is Fakhuri's
```

---

Page 116

```
 1      SHAKED
 2   neighbor.  This guy Abu Kamel Zaru is a
 3   friend that I use him in my research and also
 4   in translations.
 5   Q.  What does he do for a living?
 6   A.  He's a stone merchant.
 7   Q.  Stone merchant?
 8   A.  Yes.
 9   Q.  Jerusalem stone?
10   A.  Of course.
11   Q.  So when you spoke with him he
12   was a resident of Jerusalem?
13   A.  He lives both in Hebron and in
14   Jerusalem.
15   Q.  Who is Nizar Ramadam?
16   A.  He's one of the main activists
17   of Hamas in Hebron.  He's a member of the
18   legislative -- Hamas' legislative council.
19   He spent many years in an Israeli prison.
20   He's a college graduate.  Our conversations
21   are mainly on the academic level rather than
22   journalist level.
23   Q.  Of what crime was he convicted
24   that resulted in his being in prison?
25   A.  In the nineties because of his
```

---

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

RONNI SHAKED
May 3, 2011

---

Page 117

1      SHAKED
2   membership in the Hamas he was deported from
3   the territories and then in 1996 he was
4   arrested by the Palestinian authority.  In
5   2002 he was arrested by Israel and in 2006
6   because of the abduction of Gilad Shalit
7   he spent three years in prison.
8   Q.  When you spoke with him
9   about the Kiryat Arba attack, he was a member
10  of the PA legislature?
11      MR. UNGAR: Objection to form.
12  A.  He was elected in 2006 and
13  since then he's been a member of the
14  legislative council.
15  Q.  Of the Palestinian authority?
16  A.  Of the Palestinian authority.
17  Q.  What does he do for a living?
18  A.  He's a Hamas member, charitable
19  organizations.
20  Q.  So he's a member of the
21  Palestinian authority legislative council as
22  a member of the Hamas party, correct?
23      MR. UNGAR: Objection to form.
24  A.  Correct.
25  Q.  Do you consider him to be a

---

Page 118

1      SHAKED
2   personal friend of yours?
3   A.  A colleague on the academia
4   level.  Friends from the Hamas?
5   Q.  Is Abu Kamel Zaru a friend of
6   yours?
7   A.  Yes, I can say that with him I
8   have had close personal -- a close personal
9   relationship for many, many years.
10  Q.  And what about Sayid Jabari?
11  A.  I have known Sayid for at least
12  30 years.
13      MR. FRIEDMAN: For today I have
14  nothing further.  We'll send you a
15  letter with documents we are
16  requesting.
17      MR. UNGAR: We have no
18  questions.
19      MR. FRIEDMAN: Thank you, Mr.
20  Shaked.  I wish you safe travels back
21  home.
22      THE VIDEOGRAPHER: This
23  concludes today's deposition of Mr.
24  Ronni Shaked.  We are now off the
25  record.  The time is 3:35 p.m.  Today

---

Page 119

1      SHAKED
2   is May 3, 2011.
3      (Time noted: 3:35 p.m.)

---

Page 120

1          A C K N O W L E D G M E N T
2
3   STATE OF NEW YORK  )
4                      :ss
5   COUNTY OF          )
6
7      I, RONNI SHAKED, hereby certify that I
8   have read the transcript of my testimony
9   taken under oath in my deposition of May 3,
10  2011; that the transcript is a true, complete
11  and correct record of my testimony, and that
12  the answers on the record as given by me are
13  true and correct.
14
15
16      _____
17              RONNI SHAKED
18
19
20  Signed and subscribed to before
21  me, this      day of              ,
22  20  .
23  _____
24  Notary Public, State of New York
25

---

**EXHIBIT 184 TO DECLARATION OF VALERIE SCHUSTER**

תאריך: 9/4/06          תיק מסי: 4083/04

**בית המשפט הצבאי יהודה**

בפני כב' סגן הנשיא: רס"ן רונן עצמון
השופטת: רס"ן דליח קאופמן
השופט: רס"ן מייקל בן-דוד

התביעה הצבאית
(באמצעות קמ"ש רותי צביאל)

נגד

הנאשם: מוחמד כאיד חליל אלנשאש ת.ז 907050298/ שב"ס
(באמצעות ב"כ עו"ד שעבאן)

---

## נימוקי גזר הדין

ביום 15/3/06, בעת שגזרנו את עונשו של הנאשם, החלטנו לסטות מעונש מוסכם שהציעו הצדדים, והטלנו עליו 20 שנות מאסר בפועל, וכן עונש מאסר מותנה. להלן נימוקינו.

הנאשם הורשע בעבירה של חברות בהתאחדות בלתי מותרת, על כך שמסוף חודש מארס 2003 ועד מעצרו היה חבר בגדודי חללי אל אקצא. כמו כן הורשע בכך שבשנת 2004 קשר עם נופל עדואיין לבצע פיגוע ירי לעבר אזרחים ישראליים. העבירה המרכזית בה הורשע הנאשם הוכתרה בכתב האישום פגיעה בביטחון האזור, אך חשוב לפרט את העובדות העומדות בבסיסה.

לפי כתב האישום המתוקן, בראשית שנת 2004 פנה אל הנאשם עלי גיערה, וביקש ממנו לסייע לו לצאת לפיגוע התאבדות. עלי פנה אל הנאשם באותה בקשה מספר פעמים במשך כחודשיים, עד שהנאשם נעתר לבקשתו. הנאשם פנה אל נופל עדואיין וסיפר לו על רצונו של עלי גיערה, ונופל הסכים להכין את מטען הנפץ שישמש לפיגוע. הנאשם מכר זהב שהיה בידיו, ובתמורה רכש הוא ונופל מצלמת סרטי צילום, וכן חומרים להכנת מטען חבלה. הנאשם הכין יחד עם נופל מטען חבלה וכן חגורת נפץ. הנאשם הפגיש את עלי גיערה – המפגע המיועד – עם נופל עדואיין, ועלי ביקש לצאת לפיגוע בשם אירגון החמאס. לבקשתו של עלי צילמו אותו הנאשם ונופל בביתו של האחרון, על רקע תפאורה שהכינו, הכוללת רובה, דגל החמאס, תמונות מפגעים וספר קוראן. עלי ענד סרט ראש של ארגון החמאס, ונשא תיק ובו מטען חבלה וכן את חגורת הנפץ. עלי הקריא "צוואח" שחופפתה לחוריו, ונכתבה על ידי נופל.

בנוכחותו של הנאשם, הרכיב נופל את חגורת הנפץ על גופו של עלי גיערה, ולאחר מכן, יצאו עלי ונופל לכיוון ירושלים. הכוונה הייתה להוביל את המפגע עד לאזור המנחריות בכביש 60, ומשם ימצא המפגע את דרכו אל תוך ירושלים. עלי ונופל חזרו בלא לבצע את הפיגוע משום שנתקלו במחסום של כוחות הביטחון הפלסטיניים.

מכתב האישום עולה, כי כשבועיים לאחר מכן ביצע עלי גיערה פיגוע התאבדות בירושלים. ניתן להבין כי התביעה לא מייחסת לנאשם אחריות לפיגוע זה.



-1-

W_S098236

<div dir="rtl">

תיק מס': 4083/04            תאריך: 9/4/06

1    עם זאת, מצוין בכתב האישום, שכאשר שמע הנאשם על ביצוע הפיגוע הניח את
2    צילומיו של המפגע ואת "צוואתו" בפתחה של תחנת טלוויזיה, והוד יע על כך לאנשי
3    התחנה, כדי שיעשו בחפצים אלה שימוש.
4
5    הצדדים עתרו לעונש מוסכם של 15 שנות מאסר בפועל, וכן עונש מאסר מותנה
6    לשיקול דעתנו. נימוקיהם להסדר היו, עברו הנקי של הנאשם, הודאתו שחסכה
7    מזמנו של ביהמ"ש, העובדה שהפיגוע שהוא נטל חלק בתכנונו, נקטע בעוד המפגע
8    בשטח הרשות הפלסטינית, ומבלי שנגרם נזק. לשאלתנו על קולת העונש, השיבה
9    התובעת בשאלה משלה – לאיזה עונש צפוי היה המפגע המתאבד עצמו, בגין היציאה
10   לפיגוע **והחזרה ממנו** בשל היתקלות במחסום פלסטיני. לאחר מכן אף הציגה בפנינו
11   תקדים שנפסק בבית המשפט הצבאי לערעורים, בע' איו"ש 2747/04 **מוג'אהד**
12   **אלמסיעי**. שם יצא המערער פעמיים לבצע פיגועי התאבדות ופעמים **תחליט** שלא
13   לממש את הפיגוע, לאחר שנתקל בכוחות חביטחון של ישראל. נגזר עליו בסופו של
14   דבר 15 שנות מאסר בפועל.
15
16   ההגנה הדגישה את העובדה שלא נגרם נזק ממעשיו של הנאשם, והנאשם בדברו
17   האחרון אמר שהוא מתחרט על מעשיו, מקווה לראות בקרוב את ילדיו – שאת אחד
18   מהם כלל לא ראה עדיין – ושאין בכוונתו לשוב לעשות מעשים דומים כשישוחרר
19   מן הכלא.
20
21   סברנו כי העונש שעליו הסכימו הצדדים אינו מבטא את חומרת מעשיו של הנאשם.
22   אמנם, לזכות הנאשם מספר שיקולים מקילים: העובדה שלא הוא יזם את הפיגוע,
23   העובדה שלא במהרה נענה לבקשותיו של עלי יערה לסייע לו לממש רצונו לפגע,
24   הודאתו ואף חרטתו בפנינו, והעובדה שבסופו של דבר הפיגוע שהוא סייע לתכנתו לא
25   יצא אל הפועל.
26
27   עם זאת, רבים הם השיקולים להחמיר עמו: הנאשם מכר מרכושו הפרטי כדי לממן
28   את הפיגוע, והדבר מלמד על מחויבותו למימושה. לאחר מכן, עשה כל שיכול היה כדי
29   להוציא את המפגע אל הפיגוע. מקישוריו למשלחים אחרים ועד להכנת מטען חבלה,
30   צילומו של המפגע וציודו במטען התבלה. למעשה, מבחינתו של הנאשם, פיגוע
31   ההתאבדות הושלם, ורק נסיבות שכלל לא היו בשליטתו – התנהגותו של המפגע
32   המתאבד – מנעו את מימוש הפיגוע הקטלני שהוא התכוון לו. עוד יש לזכור, כי אותו
33   מחבל שהנאשם חסכים לקשר עם פעילי טרור ששלחוהו לפיגוע, אכן ביצע פיגוע
34   התאבדות כעבור כשבועיים. הדבר מלמד איזה סיכון גדול יצרו מעשיו של הנאשם.
35   הסיכון לא התממש בפעם הראשונה, אך יש לזקוף לחובת הנאשם את "תרומתו"
36   לכך שבסופו של דבר אותו מפגע אכן מימש את זממו.
37
38   בעינינו, אין הבדל גדול בין עצירתו של המפגע בשטח הפלסטיני או הישראלי. אין
39   חשיבות לשאלה, אם מחסום של צה"ל או של הרשות הפלסטינית הוא שגרם למחבל
40   המתאבד לדחות את המפגע וביצוע הפיגוע. מידת האומץ, הנחישות או הזהירות של
41   המחבלים המתאבדים אינם צריכה להיות שיקול לחקילה בעונשם של המשלחים.
42   החשוב – והחמור – חוא שהמפגע יצא לדרכו, וכללי שיצא את לוע הרובה, ומכאן
43   ואילך תלויה התוצאה בנסיבות מקריות. בעוד שחזרתו של המפגע עצמו מכוונתו
44   חרטה עשויה להביא לחקילה משמעותית בעונשו – עד כדי פטור עקב חרטה – **חרי**
45   אין לחזור כזו משמעות כה גדולה בשעשוסקים באחרוותו, אשמתו ועונשו של משלח.
46   כאמור, את חלקו הוא ביצע עד תומו, תוך ציפייה להשלמת הפיגוע ולגרימת המוות,
47   ועונשו צריך להיגזר בעיקר לפי המעשים שעשה, וחלקי חפיגוע שבהם הייתה לו
48   שליטה.
49

</div>

W_S098237

תאריך : 9/4/06                                   תיק מס׳ : 4083/04

1   לאור דברים אלה, ניתן להבין מדוע לא ייחסנו משקל רב לתקדים שהוצג בפנינו,
2   בעניינו של מוגיהד אלמשיני (ע׳ איו״יש 2747/04). שם דובר במערער שחבר לאדם
3   אחר, והיה אמור לבצע יחד עמו פיגוע התאבדות. אין מדובר במשלח אלא במחבל
4   המתאבד עצמו. המערער וחברו החליטו – מיוזמתם – שלא לבצע את הפיגוע, ועל כן
5   היה מקום להקל מאד בעונשם. עם זאת, לא היה מקום להקלה דומה במשפטם של
6   המשלחים שלהם, ועל אלה אף נגזרו עונשים חמורים יותר.
7
8   בענייננו, הנאשם הוא משלח של מתאבד, והעובדה שאותו מתאבד לא ביצע את
9   הפיגוע באותו מועד אליו התכוון הנאשם היא בעלת משמעות מעטה בלבד. על כן,
10  סברנו, כי העונש לו עתרו הצדדים נמוך במידה בלתי סבירה. אין בו כדי להמחיש
11  את החומרה שבמעשה ואין בו כדי להרתיע מפני מעשים דומים. החלטנו לסטות מן
12  ההסדר שהוצג לנו מתוך מודעות להלכה הפסוקה המורה למעט בכך, ולשמור את
13  זאת למקרים חריגים. כמו כן, בהתאם לאותה הלכה, לא מיצינו את הדין עם
14  הנאשם – שהיה ראוי לענוש חמור אף יותר מזה שגזרנו לו בסופו של דבר.
15
16  **ניתן והודע היום, 9/4/06 , שלא במעמד הצדדים.**
17
18
19
20      _____        _____        _____
             שופט                  אב״ד                 שופט
21

-3-

W_S098238

Date: 9/4/06                                                    Case Number: 4083/04

## Military Court Judea

**Before the honorable panel:**   **Major Ronen Atzmon, Vice President**

**Judge: Major Dalia Kaufman**

**Judge: Major Michael Ben David**

**Military Prosecution**

(Through legal officer Ruthi Zviel)

EXHIBIT

v.

**The Accused: Muhammad Kaid Halil Elnashash ID Number 930189790/Israeli Prison Service**

(Through his representative, Attorney Shaaban)

_____

### Reasons for the Sentence

On the 15/03/06, as we decided upon the sentence of the Accused, we decided to deviate from the agreed sentence and we imposed 20 years of actual imprisonment as well as a conditional imprisonment. The following are our reasons.

The Accused was convicted with an offense of membership in an illegal association since the end of March 2003 and until his arrest he was a member of the Al-Aqsa Martyrs' Brigades. In

Date: 9/4/06                                                    Case Number: 4083/04

1    addition, he was also convicted of his actions in 2004 he conspired with Nufal Adwin to commit

2    a shooting attack against Israeli citizens. The main offense in which the Accused was convicted

3    was discussed in the indictment pertaining to harm to the security of the area, yet the facts that

4    underlie the offense should be specified.

5

6    According to the amended Indictment, in the beginning of 2004, the Accused was approached by

7    Ali Jaara who asked him for help as he was about to commit a suicide bombing attack. Ali

8    contacted the Accused with the same request for about two months until the Accused agreed to

9    his request. The Accused approached Nufal Adwin and told him about Ali Jaara's wish, Nufal

10    Adwin agreed to prepare the explosive device that would be used in the attack. The Accused sold

11    some gold he had and in return thereof he and Nufal bought a camera with a film as well as

12    materials designated for the preparation of an explosive device. The Accused prepared together

13    with Nufal an explosive device as well as an explosive belt. The Accused arranged a meeting

14    between Ali Jaara - the prospective terrorist - and Nufal Adwin and Ali requested to commit the

15    attack in the name of Hamas. To Ali's request the Accused and Nufal filmed him in the latter's

16    house with a setting they prepared including a gun, Hamas flag, photos of terrorists and the

17    Quran. Ali wore a band on his forehead of Hamas organization and carried a bag with an

18    explosive device as well as the explosive belt. Ali read a "will" that was intended for his parents

19    and was written by Nufal.

20    Nufal put the explosive belt on Ali Jaara's body in the presence of the Accused's and afterwards

21    they left for the direction of Jerusalem. The intention was to lead the terrorist to the tunnels area

22    in road 60 and from there he would find his way to Jerusalem. Ali and Nufal returned without

23    committing the attack because they ran into a checkpoint of the Palestinian security forces.

24    The indictment shows that two weeks afterwards Ali Jaara committed a suicide bombing attack

25    in Jerusalem. It can be understood that the prosecution does not ascribe the Accused guilt with

26    reference to that attack.

27                                                     **W_S098236**

28    Nevertheless, the Indictment specifies that when the Accused heard about the commission of the

29    attack he put the photos of the terrorist and his "will" at the entrance of a TV station and

30    announced it to the staff of the station so that they make use of these items.

Date: 9/4/06                                                    Case Number: 4083/04

1

2  The parties plead for an agreed sentence of 15 years of actual imprisonment as well as a
3  conditional imprisonment at our discretion. Their reasons for the arrangement were the clean
4  record of the Accused, his admission, saving time for the court, the fact that the attack he was
5  preparing was stopped already in the territory of the Palestinian Authority without causing any
6  damage. To our question as to the lenience of the sentence, the prosecutor retorted with a
7  question of her own - which sentence the suicide bomber himself would have received for
8  leaving for the and attack and **returning therefrom** because of an encounter with a Palestinian
9  checkpoint. Following that she even presented before us a precedent that was set in the military
10 court of appeals, in the Judea and Samaria area 2747/04 **Mujahad Almashini**. There the terrorist
11 left twice in order to commit suicide bombing attacks and twice he decided not to commit the
12 attacks after running into the Israeli security forces. Eventually he was sentenced to 15 years of
13 actual imprisonment.

14 The defense stressed the fact that no harm was caused owing to the Accused's actions and the
15 Accused, in his concluding words, expressed his regret and hoped to see his children once more -
16 one of whom he did not even see - and that he did not intend to engage in similar activities when
17 he would be released.

18 This court deemed that the sentence agreed upon by the parties does not manifest the severity of
19 the Accused's actions. Indeed, several considerations do agree with the Accused: the fact that he
20 did not instigate the attack, that fact that he did not agree to Ali Jaara's request immediately to
21 help him with his wish to commit an attack, his admission and even regret before the court and
22 the fact that eventually, the attack in whose assistance he was involved, was not executed.

23 Nevertheless, these considerations are outweighed by other considerations, less lenient than the
24 aforesaid: the Accused sold some of his private property in order to fund the attack, and this
25 attests to his commitment to execute the attack. Afterwards, the Accused did whatever was in his
26 powers to dispatch the terrorist to the place of the attack starting from introduction to other
27 activists and up to the preparation of an explosive device, filming the terrorist and providing him
28 with terrorist equipment. In fact, on behalf of the Accused, the suicide bombing attack was
29 completed and only because of circumstances beyond his reach - the behavior of the suicide
30 bomber - the execution of the deadly attack was hindered. It should also be kept in mind that the

Date: 9/4/06                                                    Case Number: 4083/04

1    same terrorist whom the Accused agreed to introduce to terrorist activists that would send him to

2    commit an attack, actually committed a suicide bombing attack two weeks afterwards. The risk

3    was not realized in the first time yet the Accused "contribution" to the success of that terrorist

4    attack should not be undermined.

5

6    This court does not ascribe great difference to the arrest of the terrorist in a Palestinian or Israeli

7    territory. There is no importance to  the question whether a checkpoint of the IDF or the

8    Palestinian Authority caused the suicide bomber to delay the execution of attack. The degree of

9    courage, determination or caution of suicide bombers should not be a consideration in the

10    delivery of the lenient sentence of the ones sending the attackers. What is most important is that

11    the suicide bomber left, as a bullet leaves the barrel of a gun, and from that point onwards the

12    outcome depends on extraneous circumstances. While the withdrawal of the suicide bomber

13    from his nefarious intent might result in a significant lenient sentence - up to exemption owing to

14    regret - then such a withdrawal in not that significant when dealing with the responsibility, guilt

15    and sentence of a terrorist sending another terrorist to commit an attack. As said, he performed

16    his share in full, while expecting to complete the attack and causing the death and his sentence

17    ought to be decided mainly following the actions he committed and the parts of the attack on

18    which he did have control.                                            **W_S098237**

19    In light of the foregoing, it can be understood why this court did not ascribe much weight to the

20    precedent presented before it, in the matter of Mujahed Almashini (Judea and Samaria 2747/04).

21    That case discussed an appellant who joined another person and was supposed to commit with

22    that person a suicide bombing attack. This is not one person sending another but a suicide

23    bomber himself. The appellant and his partner decided, out of their own initiative, not to commit

24    the attack and therefore there was sufficient room to deliver a more lenient sentence.

25    Nevertheless, there was no room for a similar lenient sentence in the trial of the persons sending

26    other terrorists and they were sentenced to more severe sentences.

27

28    As to the matter under discussion, the Accused acted as a person sending the suicide bomber and

29    the fact that the suicide bomber did not commit the attack at the time determined by the Accused

30    carried little significance. Therefore, this court deems that the sentence plead by the parties is

Date: 9/4/06                                                    Case Number: 4083/04

1   unreasonably low. It does not manifest the severity of the act and it does not deter from the

2   commission of similar acts. We decided to deviate from the arrangement presented before us

3   being aware of the case law precedent instructing in the matter under discussion and use it in

4   exceptional cases. In addition, pursuant to that same case law precedent,  we did not exhaust the

5   letter of the law with the Accused - who ought to have received a more severe sentence than the

6   one decided upon by this court.

7

8   **Granted and announced today, 9/4/06, without the presence of the parties.**

9

10  _____          _____          _____          W_S098238

11  **Judge**            **President of the Court**        **Judge**

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27



# CERTIFICATION

This is to certify that the attached *English* language document corresponding
to the document *Shaked Supplemental Appendix 1 pp. 168-230*, is a true and accurate
translation of the original *Hebrew* language document to the best of our knowledge and belief

Executed this on
Wednesday, November 03, 2010

תיק תק תרגומים בע״מ
TIK TAK TRANSLATIONS
Co. No: 514280275 ח.פ.

***Tik Tak Translations Ltd.***
9 Hashiloah Street
Petach Tikva, 49180 ISRAEL
+972 3 907-4555

9 HaShiloah St., P.O. Box 8070, Petah Tikva 49180 Israel
Tel: +972-3-9074555 Fax: +972-153-3-9074555
www.tiktaktranslations.com     info@tiktaktranslations.com

**EXHIBIT 185 TO DECLARATION OF VALERIE SCHUSTER**

March 3, 2011

## REBUTTAL REPORT OF MOSHE AZOULAY

I submit this rebuttal report to address certain aspects of the reports submitted by Ronni Shaked, dated December 30, 2010 (the "Shaked Report"), Shaul Naim, dated December 29, 2010 (the "Naim Report"), and Evan F. Kohlmann, dated September 8, 2009 (the "Kohlmann Report") in the lawsuits captioned Weiss, et al. v. National Westminster Bank Plc (Case No. 05-cv-4622 (DLI)(MDG)) and Applebaum, et al. v. National Westminster Bank Plc (Case No. 07-cv-916 (DLI)(MDG)), which I understand are pending in the U.S. District Court for the Eastern District of New York.  I previously submitted a report in these lawsuits, which is dated December 29, 2010, which I will refer to as the "Primary Expert Opinion."

The documents and other information I considered in forming the opinions I state in this report are identified in this rebuttal report and the annexes thereto.

Since I have already conveyed in the framework of the Primary Expert Opinion matters that shall be detailed in this rebuttal report, I shall where appropriate refer below to the relevant sections of the Primary Expert Opinion.

## A.  Shaked Report

I address below Shaked's characterizations of certain of the documents and other materials he identifies in his report, and the admissibility of these documents under the Evidence Ordinance of Israel as proof of their contents under certain circumstances.

1. **Statements attributed to the ISA & other government agencies**:

    1.1 **Nature and content of the documents:**

    I refer below to the documents and other materials identified in the Shaked Report containing statements Shaked attributes to the Israeli Security Agency (ISA) and other government agencies according to the numbers of the footnotes in which Shaked has cited these documents.

    1.1.1 FN 50 – Appendix No.1 pp. 7-16

Shaked refers to this document as a report of the Israel Security Agency. According to its heading, and contrary to the Shaked Report, it is instead a briefing by the spokesman of the Prime Minister's Office.

According to the structure of the briefing, its contents were likely prepared by the ISA and published by the spokesman of the Prime Minister's Office, which is the government office responsible for the ISA.

The contents of the briefing consist of a review of the ISA's activity in the field of counterterrorism for 2003. The review details statistical data concerning terrorist attacks that were carried out that year, by different profiles, e.g., attacks committed by way of shooting, explosive charges, suicide bombs, etc.

The data presented in this review is said to be based on investigations that were carried out by the ISA.

The review attributes to Hamas the following three attacks that I understand are relevant here: the terrorist attack at "Café Hilel" in Jerusalem (attack no.12 on the list presented in Annex B of the Primary Expert Opinion), the terrorist attack on bus line no. 2 in Jerusalem (attack no. 11 in the abovementioned Annex B) and the terrorist attack at "Mike's Place" pub in Tel-Aviv (no. 7 in the abovementioned Annex B).

The review also states the two east Jerusalem citizens who led the suicide bombers to perpetrate the attacks of "line 14 and 6" confessed in their interrogation that they had been instructed by Hamas to gather information about the Prime Minister and other senior officials for the purpose of carrying out a kidnap or an assassination.

The review does not specifically attribute the responsibility for the "line 14 and 6" attacks to Hamas.

1.1.2    FN 55 - www.pmo.gov.il/PMO/Archive/Spokesman/2002

The first webpage cited in this footnote is a statement by the spokesman of the Prime Minister's Office dated May 15, 2002, by which the public is informed of the arrest of Abbas El Said and is presented with the findings of an investigation by the ISA.

2

According to the statement, El Said served as head of the military branch of Hamas in the area of Tulkarem and was responsible for planning and executing the terrorist attack at the Park Hotel, in Netanya (attack no.1 on the list in Annex B).

The statement indicates the ISA attributed this attack to El Said based upon his confession.

The second webpage cited in this footnote is inaccessible: http://www.pmo.gov.il/PMO/Archive/Spokesman/2003/אפריל/Spokesman 8178.htm

1.1.3    FN 64 - http://www.shabak.gov.il/publications/study/Pages/dawaa-report.aspx

This document is a review by the ISA that is said to be based on investigations that were carried out by the ISA. The review bears no date; however, its content implies that it was conducted during the second half of 2009.

The review addresses the structure of Hamas's "Dawa" deployment, its monetary sources and the method of transferring monies into the territories occupied by the IDF.

This review does not claim that any Dawa moneys were actually used for financing specific acts of terrorism. The Dawa funds that are used for, among other purposes, extreme Islamic education and for supporting orphans and family members of terror activists, are considered or interpreted by the author as encouraging terror activities against Israel.

Further, in the chapter entitled: "Money Transfers via Overseas Banks," the review states that such transfers were made possible because the funds being transferred were defined as charitable contributions designated for humanitarian goals.

1.1.4    FN 112 –

http://www.pmo.gov.il/NR/rdonlyres/81819B47-FE6C-47C2-B000-77B9A7EB9A5A/0/%D7%97%D7%95%D7%91%D7%A8%D7%AA%D7%9E%D7%97%D7%91%D7%9C%D7%99%D7%9D%D7%9E%D7%AA%D7%90%D7%91%D7%93%D7%99%D7%9D%D7%91%D7%9C%D7%99%D7%AA%D7%9E%D7%95%D7%A0%D7%95%D7%AA1.doc
.

3

.

This is a review by the ISA that is said to be based on ISA investigations regarding suicide terrorist attacks committed by several Palestinian terrorist organizations throughout four and a half years of conflict with Israel (2000-2005).

The paragraph Shaked quotes is a translation from Hebrew to English of page 41 of the review.  According to the author, the information is based on ISA investigations.

1.1.5    FN 113 -
        http://www.pmo.gov.il/PMO/Communication/IsraelUnderAttack/Netanya-Park+Hotel

The link refers to a press release on behalf of the spokesman of the Prime Minister's Office dated March 27, 2002 and not one year later as stated by Shaked. The press release announces the execution of the Netanya Park Hotel terrorist attack, the number of fatalities and injured, and that Hamas had claimed responsibility for this attack.

The press release includes appendices regarding 29 victims of the terrorist attack.  There is no indication in this release about the 30th victim.

1.1.6    FN 167

        http://www.pmo.gov.il/PMO/Communication/IsraelUnderAttack/Rishon+Lezion/

The footnote refers to a press release by the spokesman of the Prime Minister's Office and not to an announcement by the Government of Israel as stated by Shaked, regarding the occurrence of the terrorist attack at the Sheffield Club, detailing the number of victims and that Hamas had claimed responsibility for the attack.  Like in similar releases, files regarding the victims of the terrorist attack are attached.

4

### 1.1.7    FN 168

http://www.pmo.gov.il/PMO/Communication/Spokesman/sbkspoke/shabak230506.htm

The footnote refers to a press release by the spokesman of the Prime Minister's Office dated May 23, 2006, announcing that a joint operation of the ISA and the Israel Police yielded the arrest of Ibrahim Hamad, which Hamas had identified as head of the military branch of Hamas in the West Bank.

The press release alleges that Ibrahim Hamad was, among others, responsible for the following terrorist attacks:

Sheffield Club (07 May 2002) – attack no. 2 in Annex B of the Primary Expert Opinion.

Hebrew University (31 June 2002) - attack no. 3 in Annex B of the Primary Expert Opinion.

Café Hilel (23 September 2003) - attack no. 12 in Annex B of the Primary Expert Opinion.

This press release does not indicate on what basis it alleges Hamad was responsible for these attacks.

### 1.1.8    FN 194

The footnote refers to the same press release identified in the first citation in footnote 168 above, dated May 23, 2006. This press release states that Ibrahim Hamad had been wanted by the Israeli forces since 1998.

### 1.1.9    FN 215

http://www.pmo.gov.il/PMO/Archive/Spokesman/2002/%D7%90%D7%95%D7%92%D7%95%D7%A1%D7%_98/Spokesman7147.htm

The footnote refers to a press release by the spokesman of the Prime Minister's Office dated August 21, 2002.  Paragraph 1 on page 54 of the Shaked report includes a translation to English of part of the press release.

The content of this press release does not coincide with the Shaked Report's conclusions.

This press release is not specifically about the July 31, 2002 Hebrew University attack, with respect to which the Shaked Report cites it. Instead, it concerns the exposure of an affair involving Palestinians from East Jerusalem who were bearing Israeli identity cards.

This press release is not, as Shaked states, "an evaluation [by the Prime Minister's Office] as to the source of the terrorist attack on the Hebrew University." Shaked Report, p. 54. Instead, it includes a statement that the headquarters of Hamas in Ramallah recruited and operated an east Jerusalem squad for perpetrating terror attacks and suicide bombings inside Israel. It also includes names of Palestinians from East Jerusalem [Muhamad Ode, Wael Kasem, Wissam Abassi and Ala Abassi] who were alleged to be involved in Hamas activity and in the terrorist attack at the Hebrew University. It does not indicate the basis for these statements and allegations.

## 1.1.10   FN 216

http://www.pmo.gov.il/NR/rdonlyres/1EED1581-0DD5-41A7-87DE-9B37BE6EFFD9/0/prisoners.doc

The first link cited in this footnote refers to a website of the Prime Minister's Office and opens an "MS Word" document that bears no identifying headings regarding its origin. This document states that Israel refused to release the operatives mentioned in the text of the Shaked Report, in the framework of the Shalit prisoner exchange deal between Israel and Hamas. The terrorist attacks attributed in this document to these prisoners include, among others, the attack at the Hebrew University on June 31, 2002 (attack No. 3 in the list provided in my Annex B).

The second link is to an article published in the Ha'aretz daily newspaper on 18 March 2009 on this subject.

## 1.1.11   FN 232-
http://www.mfa.gov.il/MFA/Government/Communiques/2003/ISA%20and%20IDF%20Arrest%20Ramallah%20Area%20Hamas%20Cells%20-%2023.

This statement appears on the website of the Press Office of the Israeli Ministry of Foreign Affairs. According to the heading of the statement, it appears to originate from a press release of the Prime Minister's Office spokesman.

1.1.12    FN 253 -

www.mfa.gov.il/MFA/MFAArchive/20002009/2004/1/Suicide%20bombing%20of%20Egged%20bus%20No%2037%20in%20Haifa%20-%205-Ma

The link does not lead to the article indicated.  The article is located on the website of the Ministry of Foreign Affairs under the title:  "Suicide and Other Bombing Attacks in Israel since the Declaration of Principles (Sept 1993) and then to March 5, 2003."

It is stated in this article that on March 5, 2003 a terrorist attack was carried out on bus line No. 37 in Haifa, in which 17 people were killed and 53 were injured. It also states that a Hamas spokesman had praised the attack, but did not claim responsibility for it. The statement further notes that the suicide bomber was identified as a Hamas member, but it does not disclose the basis for this identification.

1.1.13    FN 261 -

http://www.pmo.gov.il/PMO/Communication/IsraelUnderAttack/Haifa4/Haifa htm

This is a record taken from the Press Unit of the Prime Minister's Office. The link Shaked refers to is in fact a list of many terrorist attacks, sorted by their date of execution. Each record of a terrorist attack includes documents that record the attack victims, and the same applies to the record of the no. 37 bus line attack in Haifa, dated March 5, 2003. According to this notice, the attack was "seemingly" committed by a Hamas member who is a resident of Hebron.  It does not provide a definitive attribution of responsibility for the attack to a Hamas member or Hamas itself.  Further, it does not identify the basis on which this statement was made.

1.1.14    FN 262 - Appendix No. 1, pp. 350-434

This is a different version of the ISA review referred to in connection with FN 112 above regarding suicide bombers in the current conflict,

7

September 2000–September 2007. The relevant reference is located on page 381 of Appendix P-1 of the Shaked Report.

As mentioned previously regarding this review, the relevant citation is said to be based on intelligence data and investigations of the ISA following the no. 37 bus line attack in Haifa. However it does not identify the basis on which responsibility for this attack was attributed to Hamas.

1.1.15   FN 289-
http://www.pmo.gov.il/PMO/Communication/IsraelUnderAttack/Kiryat+Arba/Kiryat+Arba.htm

The footnote refers to a press release made by the Prime Minister's Office spokesman regarding the terrorist attack in Kiryat Arba that was carried out on March 7, 2003, in which the husband and wife of the Horowitz family were killed. According to the statement, Hamas claimed responsibility for the attack.

1.1.16   FN 307 - Appendix No. 1, pp. 350-434

This is the same ISA review as I describe in connection with footnote 262 above.

This section (Appendix No. 1 page 379) describes the way in which the terrorist attack at "Mike's Place" pub in Tel Aviv was carried out by two British citizens. According to this review, Hamas claimed responsibility for the attack and published a videotape of the two assailants filmed prior to the attack.

As mentioned previously regarding this review, the relevant citation is said to be based on intelligence data and investigations of the ISA following the Mike's Place attack in Tel Aviv.

1.1.17   FN 313a - Appendix No. 1, pp. 350-434

This is the same ISA review as I describe in connection with footnote 307 above.

FN 313b

http://www.pmo.gov.il/NR/rdonlyres/81819B47-FE6C-47C2-B000-

8

77B9A7EB9A5A/0/%D7%97%D7%95%D7%91%D7%A8%D7%AA%D7%9E%D7%97%D7%91%D7%9C%D7%99%D7%9D%D7%9E%D7%AA%D7%90%D7%91%D7%93%D7%99%D7%9D%D7%91%D7%9C%D7%99%D7%AA%D7%9E%D7%95%D7%A0%D7%95%D7%AA1.doc

This is the same ISA review as I describe in connection with footnote 112 above.

The paragraph cited by Shaked is a translation from Hebrew to English of page 21 of the review. According to the author, the information is based on ISA investigations.

1.1.18   FN 314 - The ISA report "Summary of the year 2003." Appendix No. 1 page 14

http://www.pmo.gov.il/NR/rdonlyres/C27A1A4F-F670-46F5-B047-DECBDA00A564/0/7012490866.doc

This is a paragraph on page 14 of Appendix P-1, as part of the 2003 summary published by the Press Division of the Prime Minister's Office. According to this paragraph, Hamas performed the attack at "Mike's Place" restaurant in Tel Aviv.  The attack was performed by two British citizens, Omar Han Sharif and Assif Hanif. As stated above, these reviews are based on investigations of the ISA and intelligence collected from various sources. It does not identify the basis on which responsibility for this attack was attributed to Hamas.

1.1.19   FN 315a

http://www.pmo.gov.il/PMO/Archive/Spokesman/2003/יוני/Spokesman8444.htm

The link is inaccessible.

FN 315b

http://www.pmo.gov.il/PMOEng/Archive/Press+Releases/2003/06/Spokesman7306.htm

This is an announcement on behalf of the Prime Minister's Office spokesman, dated June 15, 2003, regarding the alleged involvement of two British citizens in the terrorist attack at "Mike's Place."

The announcement states that Hamas had not claimed responsibility for this attack, in order to conceal its true objectives and its alleged devotion to its belief that it is in a struggle to redeem Palestine of its occupation and that it does not engage in international terrorism. According to this press release, the ISA was still investigating this attack.

This is a form of update for the public concerning the status of the investigation carried out by the ISA as of the date of the announcement.

1.1.20    FN 331 - Appendix No. 1, pp. 350-434.

This is a paragraph from the review of the ISA on suicide bombers in the current conflict from 2000 to 2007, p. 380, which deals with the terrorist attack on the bus at the French Hill on 18 May 2003. According to this review, the suicide bomber was strapped with the charge in the home of an operative of the Hamas infrastructure in the Hebron region.

This paragraph provides the findings from the interrogation of a Hamas operative – Samar Atrash – who reportedly confessed in his interrogation that he provided accommodation, fed and led the suicide bomber to the location of detonation.  It does not identify the basis for describing this operative as being associated with Hamas.

1.1.21    FN 334

http://www.pmo.gov.il/PMO/Communication/IsraelUnderAttack/French+Hill+-Jerusalem/French+Hill+-+Jerusalemhtm?Page=2

This is an excerpt from a list of terrorist attacks committed against Israel. The notice regards the terrorist attack at the French Hill from that day.

The information about the suicide bomber and the location where he boarded the bus is said to be based on the police investigation on the site.

The notice does not attribute responsibility for the attack.

1.1.22    FN 335

http://209.85.229.132/search?q=cache:UvKpCSEWhncJ:www.pmo.gov.il/NR/rdonlyres/C27A1A4F-F670-46F5-B047-

10

DECBDA00A564/0/7012490866.doc+%D7%A1%D7%90%D7%9E%D7%A8+%D7%90%D7%98%D7%A8%D7

The citation is taken from the 2003 Summary published by the Prime Minister's Office spokesman on page 10 of Appendix No. 1. The report mentions, among others, the arrest of two residents of East Jerusalem who, in their interrogation, are said to have confessed to having driven the suicide bombers to the attack on bus line no. 6 (attack no. 8 in Annex B) and on bus line no. 14 (attack no. 9 in Annex B).

As detailed in this paragraph from the review, the information reported is said to have originated from the interrogation of the suspects.

1.1.23   FN 347 - Appendix No. 1, p. 376

This is a paragraph from the review of the ISA on suicide bombers in the current conflict from 2000 to 2007, appearing on page 376.  It describes the suicide bomber who carried out the attack on bus line no. 14 in Jerusalem on 11 June 2003 (attack no. 9 in Annex B). The findings provided in this paragraph are stated to be a result of investigations that were conducted after the attack.  It further states that Hamas had claimed responsibility for the attack and that the cell that was exposed following the attack was associated with the military branch of Hamas in Hebron.  It does not identify the basis for this statement.

1.1.24   FN 355

www.pmo.gov.il/PMO/Communication/IsraelUnderAttack/North+of+Ramallah/North+of+Ramallah.htm

This is a press release by the spokesman of the Prime Minister's Office regarding a terrorist attack on the Ramallah bypass road in which Zvi Goldstein was killed and others were wounded.  It does not indicate its sources of information and does not include investigative findings, except for a description of the event and the name of the deceased. The notice does not attribute responsibility for the attack.

1.1.25   FN 356a - http://www.inn.co.il/News/News.aspx/67840

The footnote refers to a press article on the website of Channel 7, which is identified with the settlements in the Occupied Territories.  It is quoted in

the Shaked Report under the heading "Announcement of the discovery of the cell by the ISA." However, contrary to the Shaked Report, this document is not an official statement of the ISA; instead, it is a newspaper article by the military reporter of Channel 7, who claims to be publishing details that the ISA reportedly had permitted to be published only at that date.

The article states that those who were arrested were, among others, responsible for the June 2003 attack in which Zvi Goldstein was killed.

FN 356b - Http://www.globes.co.il/news/articles.aspx?did=754159&fid

The footnote refers to a press article on the website of the daily economic newspaper "Globes." As with the article above, it is quoted in the Shaked Report under the heading "Announcement of the discovery of the cell by the ISA." Contrary to the Shaked Report, this document is not an official statement of the ISA; instead, it is a newspaper article reporting that the ISA had arrested members of three Hamas terrorist cells. The article refers to a "senior security official source" for its report that those who were arrested were responsible for the June 2003 attack in which Zvi Goldstein was killed.

1.1.26    FN 357 - Appendix No. 1, pp. 808 - 809

The footnote refers to a press release made by the IDF spokesman on December 23, 2003, describing the arrest of 22 Hamas operatives who are said to be responsible for a series of terrorist attacks, including the attack at Route 60 on June 20, 2003 in which Zvi Goldstein was killed.

This announcement does not identify the information on which it is based.

1.1.27    FN 380 - Appendix No. 1, pp. 929 - 930

The footnote refers to a press release titled "a notice on behalf of the reporter," which was published by the IDF spokesman on January 1, 2009. It announces the assassination of Bassel Kwasama, who is described as one of the heads of the Hamas infrastructure in Hebron, and that this infrastructure is responsible for numerous terrorist attacks, including the attack on bus line no. 2 in Jerusalem on 19 August 2003.

The article does not identify the basis for its attribution of responsibility for this attack.

1.1.28    FN 390 –

http://www.pmo.gov.il/NR/rdonlyres/81819B47-FE6C-47C2-B000-77B9A7EB9A5A/0/%D7%97%D7%95%D7%91%D7%A8%D7%AA%D7%9E%D7%97%D7%91%D7%9C%D7%99%D7%9D%D7%9E%D7%AA%D7%90%D7%91%D7%93%D7%99%D7%9D%D7%91%D7%9C%D7%99%D7%AA%D7%9E%D7%95%D7%A0%D7%95%D7%AA1.doc.

This is a paragraph from page 373 of Appendix No.1 that states the name of the suicide bomber who carried out the attack at Café Hilel in Jerusalem on September 9, 2003 (attack no.12 on the list in Annex B).

The paragraph includes information that is said to have been obtained during the ISA and Israel Police interrogations of detainees from the village of Isawea, who are said to have confessed to their association with a Hamas terrorist cell from East Jerusalem, and that two of them had led the suicide bomber to the location of the attack.

1.1.29    FN 391 - Appendix No. 1, pp. 931 - 956, or

www.pmo.gov.il/NR/rdonlyres/590B7AD4-2031-483C-BCFE-01CA6C1C6C36/0/shbek0601.doc

The two paragraphs in the Shaked Report are from the 2004 summary of the ISA. This summary appears to be based on investigations of terrorist cells that are said to be responsible for, among others, the attack at Café Hilel in Jerusalem (attack no.12 on the list in Annex B). The ISA summary states that its attribution of responsibility for this attack is based on ISA interrogations of suspects.

1.1.30    FN 392

http://www.pmo.gov.il/PMO/Communication/IsraelUnderAttack/Jerusalem3/Jerusalem.htm

The footnote refers to a press release by the Press Division of the Prime Minister's Office from the day of the attack at Café Hilel, September 9,

2003.  This is a release to the media concerning the attack, the number of casualties and biographical files regarding the victims of the attack.

The biographical files attached to the press release on the attack were added after the date of the press release.

The press release does not identify the basis for its attribution of responsibility for this attack to Hamas.

1.1.31 FN 393 – http://www.ynet.co.il/articles/1,7340,L-3688058,00.html

The footnote refers to an online press report on the "Ynet" website. The report purports to describe the decision of the ministers at a government cabinet meeting after receiving information from the ISA Director regarding the list of prisoners that Israel was refusing to release in the Shalit prisoner exchange, and of others who Israel was willing to release on condition that they were exiled and would not return to their prior place of residence. The list of names of persons Israel was refusing to release includes, among others, Ahij Bader and Ibrahim Hammad.

1.1.32 FN 394 –

www.pmo.gov.il/NR/rdonlyres/1EED1581-0DD5-41A7-87DE-9B37BE6EFFD9/0/prisoners.doc

The footnote refers to the list of convicts detailed in footnote 379 above. The list is presented as an "MS Word" document for download from the website of the spokesman of the Prime Minister's Office. Judging from the wording, I believe this is a list that was submitted to the Israeli government by the ISA.

1.1.33 FN 402 -

http://www.shabak.gov.il/SiteCollectionImages/%D7%A1%D7%A7%D7%99%D7%A8%D7%95%D7%AA%20%D7%95%D7%A4%D7%A1%D7%95%D7%9E%D7%99%D7%9D/terror-summary-2004-new.pdf

http://www.shabak.gov.il/SiteCollectionImages/%D7%A1%D7%A7%D7%99%D7%A8%D7%95%D7%AA%20%D7%95%D7%A4%D7%A1%D7%95%D7%9E%D7%99%D7%9D/sikum%205%20years.pdf

The report cited in this footnote is the ISA summary for 2004 and the summary of five years of conflict with Palestinian terrorism.  It contains the ISA's assessment that the barrier between Israel and the territory of the Palestinian Authority makes it difficult for terrorist organizations to infiltrate suicide bombers into Israel, and generally makes it harder to carry out terrorist attacks against Israel.

1.1.34   October 22, 2003 attack – Shaked Report, p. 124

The only Hebrew source that addresses the contents of this paragraph in the Shaked Report is located on the "Yesha News" website. It contains a description of the injuries incurred by the paramedic Eyal Noked, the killing of one of the attack's perpetrators, and the apparent escape of the second one.

The website is managed by a private body and is directed towards the Jewish settlers in the regions of Judea, Samaria and the Gaza Strip.  It is not a government agency.

1.1.35   FN 429 - Appendix No. 1, p. 999

This is an ISA intelligence assessment that Abu Uda, who is alleged to be a Hamas member, "was behind the suicide attack" on bus line no. 19 in Jerusalem (attack no. 14 on the list in Annex B).  It states that the suicide bomber who carried out this attack was Ali Ja'ara, a Palestinian policeman residing in the "Aida" refugee camp in Beit Lehem.

According to another ISA document annexed to Shaked Report [Appendix No. 1 – page 369 – W_S089760], the Al-Aqsa Martyrs' Brigades of the Fatah claimed responsibility for the attack.

According to another indictment mentioned and reviewed by Shaked regarding this attack [footnote 444, Appendix No. 1 page 1028], the person who prepared the explosive charge used by the suicide bomber was Abed AlRahman Yusef Maqdad, who according to Shaked was an Al Aqsa Martyrs' Brigades member and not Abu Uda who was alleged to be a Hamas member. Shaked also refers in FN 445 to an Arabic webpage and states that Yusef Maqdad was sentenced for 21 life sentences for his role in this attack. [See further details below in chapter D, section 6 of this report].

15

1.1.36   FN 430 –

http://www.pmo.gov.il/PMO/Communication/IsraelUnderAttack/Jerusalem2/Jerusalem.htm.

This is a statement of the Prime Minister's Office spokesman from September 21, 2004 concerning the terrorist attack on bus line no. 19, stating that the suicide bomber belonged to the Al-Aqsa Martyrs' Brigades of the Fatah.

1.1.37   FN 431 -

http://www.mfa.gov.il/MFA/MFAArchive/20002009/2004/1/Suicide+bombing+of+Egged+bus+no+19+in+Jerusalem+-.htm

This is a citation to the Ministry of Foreign Affairs website's statement that Fatah and Hamas claimed joint responsibility for the attack on bus line no. 19. This website does not identify the basis for this statement, which, to the extent it identifies Hamas as having claimed responsibility, is inconsistent with other statements made on behalf of the Prime Minister's Office [footnote 430] and the ISA announcement [Appendix No. 1 page 369].

1.2   **Analysis of the documents pursuant to the Evidence Ordinance**:

1.2.1   **Prime Minister's Office and MFA press releases / spokesman announcements**

1.2.1.1   Certain of the documents described in paragraph 1.1 above are press releases made on behalf of the Prime Minister's Office or the Press Division of the Prime Minister's Office, or were published on the website of the Ministry of Foreign Affairs as public information. These publications are in most cases issued in real time, soon after and concerning the occurrence of terrorist attacks, the number of victims and preliminary investigative conclusions regarding the events.

Some of these documents are based on information received from the findings of investigations undertaken by agencies such as the IDF, the ISA and Israel Police.

16

1.2.1.2   I have been asked to address the evidentiary status of the documents discussed in paragraphs 1.1.1 – 1.1.37 above, and in particular whether they would be admissible under the Evidence Ordinance of Israel as proof of their contents, in a proceeding arising from a civil claim for damages against a defendant who was not a party to the events these documents describe, and other than as submitted in the nature of providing support for a qualified expert's offer of an opinion on a subject within his competence based upon his specialized analysis or interpretation of those documents.[1]

1.2.1.3   All of these documents are hearsay evidence.  None contains factual data received by Shaked using his own senses.  Further, they all rely on factual data and/or assessments of other third parties (ISA, IDF, Israel Police, etc.).  Because these documents constitute hearsay evidence, according to the general Evidence Laws of the State of Israel they are inadmissible as evidence of their contents, unless it is proven that they are within one or more of the exceptions of the rule that disqualifies hearsay evidence, as set forth by the Evidence Ordinance or by case law.

In the framework of the following analysis, I shall examine whether the documents addressed above, which constitute part of the factual foundation from which Shaked states his conclusions are derived, are included in any of the exceptions to the rule that disqualifies hearsay evidence, and therefore would be admissible as evidence in the type of civil proceedings described above.

1.2.1.4   Among the exceptions to the rule that disqualifies hearsay evidence and renders it inadmissible is one for institutional records. The definition of an institutional record and the requirements for proving that a document constitutes such a

---

[1]      I do not address this subject because I understand that it will be addressed under U.S. evidence law.  In any event, in my view, under Israeli evidence law, the documents attached to the Shaked Report are inadmissible under Israeli evidence law as proof of their contents, and providing them as exhibits to the Shaked Report does  not change their legal status in a manner that would cause an Israeli court to receive them in evidence as providing support for any expert opinions, because Shaked does not apply any specialized knowledge to analyzing or interpreting these documents, and instead merely cites and summarizes their contents.

record are set forth in Sections 35 to 39 of the Evidence Ordinance.[2]

An institutional record is defined as "a document, including an output, which is executed by an institution during the regular course of activity of that institution."

Section 35 of the Evidence Ordinance defines the term "institution" as including, among others, the "State." It also defines the term "output" by way of referring to its definition in the Computers Law,[3] which in turn defines this term as including "data, symbols, concepts or instructions that are generated, in any given way, by a computer."

1.2.1.5   Section 36 of the Evidence Ordinance states the requirements for proving that a document constitutes an institutional record.

First, the section determines the admissibility of an institutional record as proof of its content in every legal procedure, both criminal and civil, as an exception to the rule that disqualifies hearsay evidence; second, it determines the conditions for admissibility of a record as such. These two basic conditions must be satisfied for any institutional record. Further, when such a record is a computer output, an additional condition must be satisfied in order for the output to be admitted.

The basic conditions for admissibility of an institutional record are as follows:

- The first condition is that, in the course of its regular conduct, the institution enters a record of the event that is the subject of the document "proximate to its occurrence" (Section 36 (a) (1) of the Ordinance).

- The second condition is that "the method of collection of data on the subject of the record and the record's editing attest to the truth of its content" (Section 36 (a) (2) of the Ordinance).

---

[2]   The Evidence Ordinance [New Version] 5731-1971.
[3]   The Computers Law, 5755 – 1995.

When the record is a computer output, the following must also be proven:

- The method of generating the record attests to its credibility (Section 36 (a) (3) (a) of the Ordinance).

- The institution regularly employs reasonable security measures to protect against an infiltration to the content of the computer materials and from failures in the computer's operation.

1.2.1.6   A party that wishes to submit the abovementioned documents as institutional records must prove that they fulfill these conditions, and this proof must be provided by sworn testimony by a witness who is competent to provide this proof.[4]

In State of Israel v. Ohana et al.[5] the court ruled as follows:

"The prosecution must prove the statutory conditions of admissibility of the institutional record so that it would be possible to submit it as evidence of the truth of its content, and only if no counter-argument is raised against it and it is consensual, it may indeed be submitted as such, without proving its conditions of admissibility. This is clearly evident from the wording of Section 36 ("if all these are upheld").[6]

"Moreover, in our opinion, the rationale underlying the requirement for proving the terms of admissibility in the previous Section 37 has not changed: the legal arrangement for submitting institutional records – similar to bank records in the past – not by the person conducting them, is an exception to the rules of evidence, and therefore it is understandable that anyone who wishes to use evidence in deviation from the rules of evidence must fulfill the very minimal requirement of proving that the

---

[4]      Dr. Kedmi, Consolidated and Updated Version, 2009, 2nd Part, p 986.
[5]      Opening Motion 1120.04 Tel Aviv District Court; The State of Israel v. Rafi Ben Kalifa Ohana et al., published in NEVO.
[6]      Pages 5 and 6 of the court ruling.

conditions for its account as an institutional record have been upheld (as had been required in the previous Section 37)."[7]

The court further specified as follows:

"We also do not accept the position of the prosecution's representatives by which, after they had submitted the documents, the defense is then transferred the burden of proving that it is not an institutional record. As explained hereinabove, this is not the correct order of things as the law prescribes. The institutional record shall be admitted as such, and as admissible to the truth of its content, inasmuch as there is consent to the document's submittal or insofar as the party submitting the document shall prove the existence of the conditions prescribed by the law. By its argument, the prosecution may be pointing to Section 36 (d) of the Evidence Ordinance, which determines that:

'In the event where evidence, by virtue of this clause, has been admitted, the second party shall be entitled to carry out a cross-examination of witnesses it has summoned for testimony, for the purpose of refuting the evidence, inasmuch as these witnesses are associated to the litigant submitting the evidence.'  However, in our opinion, the provisions of this clause do not transfer the burden of refuting the conditions for an institutional record, but rather deal with its own weight, after having already been 'admitted' as evidence and, in any case, this burden, as aforesaid shall not be transferred to a defense that has expressed its objection, but only after the prosecution proves the basic conditions of admissibility pursuant to Section 36 (a) of the Evidence Ordinance."[8]

1.2.1.7   In another case, Dr. Lotan v. The Israel BAR,[9] the court makes an important distinction between proof of the content of an institutional record, and proof of the truth of the content of an institutional record, and states that:

---

[7]   Page 6.
[8]   Section 7 of the court ruling on page 11.
[9]   Administrative Petition 611/06 (Jerusalem) Dr. Michael Lotan v. the Israel BAR, published in NEVO.

"'Proof of the content is proof of the record's authenticity, whereas proof of the truth of the content is as its name implies: proof of correspondence of the record's content to reality…. It is accepted by the two parties that proof of the record's truth of content, i.e. fulfillment of the conditions prescribed in Section 36 to the Evidence Ordinance, requires a testimony or affidavit." The Supreme Court made the same point in criminal appeal 347/88 Demianyuk v. The State of Israel, Padi 47(4) 227.

1.2.1.8    In the case of United Mizrahi Bank v. Plutnik[10] the defendant objected to the submission of a "certificate regarding institutional record of a bank entity" which was signed by two senior officials of the bank because it was not supported by an affidavit and because these officials did not testify in court and the defendant had no chance of cross-examine them. The court agreed with the defendant and declared this certificate inadmissible.

It may be concluded from the provisions of Section 36 of the Evidence Ordinance, from the court rulings addressed above and from the words of the scholar Dr. Kedmi in this matter, that when a party refuses to agree to the receipt in evidence of a document as an "institutional record," the party interested in submitting the document as such must prove by sworn witness testimony the existence of the prerequisites for admissibility of the document pursuant to Section 36 of the Evidence Ordinance. Regarding the basic conditions (Sections 36 (a) (1) and (2)), a witness must testify from his own personal knowledge that the conditions have been upheld, and regarding Section 36 (a) (3), a person must testify on behalf of the institution that generated the record.

1.2.1.9    Shaked cannot serve as a witness for purposes of proving the fulfillment of the conditions prescribed in Section 36 of the Evidence Ordinance, because he did not draft any of the documents he cites, he is not an employee of the institution that generated these documents, nor is he an expert in the field of computers and information security.

---

[10]    Civil Case (T.A) 103072/97 United Mizrahi Bank v. Plutnik Uziel. P 4. published in NEVO.

1.2.1.10 Even if the fulfillment of these conditions would have been proven by testimony from competent witnesses as required, it would still be necessary to examine whether they are admissible as evidence of the truth of the documents' contents due to other requirements, such as whether they are expressions of opinion or based on professional knowledge, in which event they could be submitted under Section 20 of the Evidence Ordinance [Physician certificate and Expert report], or whether they are merely information of investigative authorities that is inadmissible pursuant to Section 36 (c) of the Evidence Ordinance, which renders inadmissible materials generated by investigative authorities in order to submit them in criminal proceedings. The contents of such documents – including reports of confessions, affidavits and the like – must be proven by witnesses with first hand knowledge of these matters.

1.2.1.11 The second relevant exception to the rule that disqualifies hearsay and renders it inadmissible is the exception that applies to "public certificates." Section 29 of the Evidence Ordinance defines a "public certificate" as "a certificate of one of the bodies prescribed hereunder, which is an act of legislation, judgment or execution, or a record of such act, or part of the formal records of one of the bodies hereunder and, in this context, a certificate that is held as a record, whether held formally or in some other way; and these are the said bodies:

(1) The State of Israel or the sovereign authority over land outside of Israel;

(2) Government offices, a local authority, a court of law, any other body with judicial quasi-judicial authority, a notary or any other formal body of Israel or of a land outside of Israel (hereinafter: 'The Institutions'); and

(3) A civil servant, an employee of a sovereign authority over a land outside of Israel or a worker of an institution (hereinafter: 'Clerk')."

22

This does not entail every document that is generated by a public authority, but rather only a certificate that in itself constitutes an act of legislation, judgment or execution carried out by a public body or a record of such act.

"This definition emphasizes the fact that it involves a 'certificate' or a 'record' that personifies a 'governmental action' by law – contrary to an 'administrative action' – of the governmental bodies prescribed thereof, both Israeli governmental bodies and foreign governmental bodies."[11]

Documents that satisfy the criteria of Section 29 of the Evidence Ordinance are considered public certificates and are admissible in evidence as proof of their contents.

Section 32 of the Evidence Ordinance states that a document can be proven to be a public certificate by presenting the original document, or a verified copy of the original, or a copy certified and sealed by the authority holding the document or a copy certified by a Minister or other senior civil servant that satisfies the judge regarding the reliability of the certification of the document, or a copy of the document is certified and sealed by an Institution.

Case law establishes four additional criteria that a document must satisfy in order to be considered a "public certificate." In the Demianyuk case,[12] the court reaffirmed these criteria, as follows:

(a) The document must be prepared according to a legal duty to prepare it,

(b) It must be a kind of public document,

(c) There must be an intention to preserve it for the future, and

(d) It must be open to the public.

---

[11]   Dr. Kedmi, 2nd part, page 638.

[12]   Criminal appeal 347/88 Demianyuk v. The State of Israel, Padi 47 (4) 227.

The rule is that when a document satisfies the criteria of Section 29 of the Evidence Ordinance, it is admissible only to prove its existence. When a party seeks to submit such a document in evidence for the truth of its contents, he must prove that the document also satisfies the four other criteria listed above.

1.2.1.12 The first question I shall try to clarify is whether the documents at issue constitute an "act of execution" or a record of an act of execution. In other words, do they meet the definition of an act that personifies "governmental activity" or do they constitute merely an "administrative activity"?

If it is concluded that the document constitutes "governmental activity," we must still verify whether such activity (such as a press release) is performed as an explicit statutory obligation, which is required by the first among the conditions determined by case law.

1.2.1.13 A document that satisfies the conditions for a public certificate constitutes admissible evidence for the truth of its contents, without the requirement for an attesting witness and without the second party, against which the document is submitted, having the right to cross-examination of the person who created the document, and therefore it is important to examine whether the document fulfills all of the conditions set forth by case law.[13]

1.2.1.14 The press releases and spokesman announcements on which Shaked relies are roughly divided into two types of statements. The first type is a collection of press releases concerning the occurrence of a terrorist attack and the details of the event, to the extent known at the time of publication. The second type is a collection of press releases concerning defensive operations carried out by the various security forces, such as the exposure, apprehension or assassination of terrorist operatives in encounters or initiated operations.

A review of the documents demonstrates that, apart from a factual report of the actual events, they also incorporate reports

---

[13]     Dr. Kedmi, 2nd part, pp. 644.

24

that are based on investigations carried out by the ISA or the Israel Police; reports that certain organizations have claimed responsibility for an attack; and in some cases also political or informative messages that condemn terrorism and its practitioners.

1.2.1.15 Thus, the press releases are not tantamount to a "legislative action" or a "judicial action," or a record of them.

The question I shall try to answer is whether these documents constitute "governmental action" or a "record of a governmental action."

I have examined the case law and the characteristics and types of documents that have been admitted by case law as public certificates, by virtue of their classification as a governmental action. After examining the documents that have been admitted by the court as public certificates, I am convinced that, beside fulfillment of the conditions set forth in Section 29 of the Evidence Ordinance and the four other conditions prescribed by case law, they all share the following common characteristics that distinguish a document that is a "public certificate" from any other formal document of an administrative nature:

- They are tantamount to a declaration of a status by a legal body or of the status of rights and duties.

- They establish a judicial norm, or a new status, or rights and duties that did not exist before.

- They change a judicial norm, or an existing status, or the status of rights and duties.

1.2.1.16 To illustrate this conclusion, consider the following examples, from case law in Israel, of documents that have been admitted as public certificates, on account of the fact that they constitute a "governmental action":[14]

---

[14]     Dr. Kedmi, 2nd part, pp. 652-661 and the court rulings he cites.

a. <u>Birth certificate</u>, <u>marriage certificate</u>, <u>death certificate</u>, <u>travel certificate</u>, <u>passport</u>, <u>identity card</u>, <u>soldier card</u>, <u>records of the population census</u>.

If issued by the entity authorized by law (both local law and foreign law), these certificates are tantamount to a public certificate that constitutes prima facie evidence of their contents.

It is evident that the abovementioned documents are characterized by the fact that:

- They declare the status of a person (birth, marriage, divorce, death, citizenship, certificate of registration of a corporation, etc.).

- Beside forming or changing a status, these certificates also form or change the rights and duties, e.g.:

  o Marriage certificate – the right to remarry and, on the other hand, the prohibition of bigamy.

  o Divorce certificate – rights for alimony over children and the duty of the parents to bear payments, etc.

  o Death certificate – also establishes a new status of legal heirs.

  o A corporation registration certificate subjects the corporation to rights and duties prescribed by the relevant law (companies, partnerships, associations, etc.).

  o Registration in the population census – by virtue of which a person has the right to elect and be elected, etc.

b. <u>A confiscation order, an execution office report of an execution, property tax records, records at the Real Estate Regularization & Registration Dept., "governmental" aerial</u>

26

<u>photos taken by the government for official purposes, records related to copyrights</u>.

If legally issued by the authorized body, these documents constitute public certificates. These documents also bear the same "identifying marks" of an act of execution, since they establish, declare or modify the status of rights in real estate assets or intellectual property and/or rights of creditors and/or duties of debtors.

1.2.1.17 My conclusion is that the press releases and spokesman announcements concerning the occurrence of acts of terrorism do not conform to the criteria required for their classification as a governmental action, because they do not establish any rights and/or duties and/or status. They are mere informative-administrative notices that are made to the public via the media, as part of a general policy - anchored in democratic governance and the informative role of the government - of conveying information to the public, both within the State and for international purposes.

Indeed, one may postulate that the actual notice, on behalf of a government institution, that a certain event was an act of terrorism, establishes rights and duties, such as the right for compensation pursuant to the Compensation to Victims of Hostilities Law.[15] However, a review of the provisions of Section 10 of this Law demonstrates that the authority to determine whether a certain action is a "hostility" that permits compensation pursuant to this Law was given to an "admitting authority," which is appointed by the Minister of Defense, following consultation with the Minister of Labor and Social Services. Therefore, such form of notice is not tantamount to an announcement, by law, of the occurrence of a "hostility" and, moreover, it does not in any way attest to the identity of the person or entity responsible for its execution.

---

[15] The Compensation to Victims of Hostilities Law 5730 – 1970; see also to the 8th chapter of the Property Tax and Compensation Fund Law, 5721-1961, which refers to the definitions of "hostilities" in the Compensation to Victims of Hostilities Law.

1.2.1.18 In addition, none of these press releases and spokesman announcements concerning the occurrence of acts of terrorism satisfies the first of the four conditions set forth by the ruling in the Demianyuk case because they are not made in accordance with an explicit statutory obligation.   Similarly, none of these documents satisfies the third condition, because there is no demonstrated intention to preserve them for future use, contrary to activities which are documents in a diary or other means of preservation of information.

1.2.1.19 Regarding the second type of press release, in which the spokesman of the Prime Minister's Office or the Ministry of Foreign Affairs issues a report concerning operations that are carried out by other bodies, i.e. the IDF, the ISA and the Israel Police, one may postulate that such notice constitutes a record of a "governmental action," because the various security forces execute and carry out their roles in accordance with law.

However, these documents do not fulfill the condition of a statutory obligation for execution of the publication because (a) none involves a record of an institution that carried out a governmental action, but rather constitutes an informative notice, and (b) there is no authority for the proposition that the Prime Minister's Office or the Ministry of Foreign Affairs is obliged by law to release to the press such type of notice. Therefore, even if the report would have been conveyed by the institution that carried out the governmental action (e.g. due to the fact that the ISA is an independent state body that is subordinate to the Prime Minister), these press releases do not fulfill the first of the four conditions set forth by the ruling in the Demjanjuk case, regarding the admissibility of a public certificate as evidence of its content, a condition requiring that a record be made in accordance with an explicit statutory obligation.

Israeli courts have shown some flexibility in applying this statutory obligation requirement.   For example, there is no requirement that a party prove the existence of a specific law or regulation obliging the execution of a governmental action.   An order of a supervisor or a military commander will suffice.   But

in my view even if a spokesman or press advisor is operating in accordance with a ministry's or a minister's guidelines, the documents at issue are issued for the purpose of providing the public with information and not for the purpose of executing a governmental action.

Nor does any of these documents satisfy the third condition, for the reasons stated above with respect to the first type of press release.

1.2.1.20   Finally, as stated above, even if a document qualifies as a public certificate under the criteria described above, as also stated above, Section 32 of the Evidence Ordinance states that a document can be proven to be a public certificate by presenting the original document, or a verified copy of the original, or a copy of the certified and sealed by the authority holding the document or a copy certified by a Minister or other senior civil servant, or a copy of the document is certified and sealed by an Institution.  None of documents at issue has been presented in conformity with these requirements, and therefore none qualifies for the exception to the rule that disqualifies hearsay evidence for public certificates.

### 1.2.2   ISA Reports

1.2.2.1   Some of the documents on which Shaked bases his opinions are ISA reviews or reports. Some of these were published on the ISA website, and some in the framework of a citation in another document, such as a statement on behalf of the spokesman or press advisor of the Prime Minister's Office and/or the Ministry of Foreign Affairs.

1.2.2.2   The following is stated in the terms of usage of the ISA website:

"**Official Publications of the State of Israel**

In the case of contradiction or inconsistency between the material published on the website and that which appears in written official publications of the State of Israel, only the material

29

appearing in such official publications will be considered accurate."

It is evident from the content of this warning that the material published on the ISA website does not constitute "an official written publication of the State of Israel."

1.2.2.3   There is no doubt that these reviews and reports were not prepared and not written by Shaked himself, and they are not submitted by the ISA, and therefore they all constitute hearsay evidence. Furthermore, Shaked relies upon these documents for the truth of their contents, and they constitute an important aspect of the factual basis from which his conclusions are derived.

Therefore the question that must be asked is whether these documents are within one or more of the exceptions to the rule that disqualifies hearsay, and which exceptions therefore qualify them to be admitted as evidence of their contents.

1.2.2.4   An examination into the admissibility of ISA reports is, to a great extent, derived both from the nature and essence of the documents and from the nature of the organization itself, its functions and spheres of responsibility. The functions of the ISA in brief, among others, include defense against terrorist activity committed against the State of Israel and its inhabitants and to investigate, expose and arrest the persons involved in such activity, to take operative confessions from them and, from this stage on, to transfer the detainees and their confessions to the Israel Police for further investigation and testimonies, for the purpose of prosecuting the perpetrators and their accomplices. The ISA is an investigative-intelligence body that constitutes part of the executive authority of the State of Israel, and the information generated from its investigations is the initial phase in the chain of information emerging from the investigations of an "investigative authority," and ultimately serves as evidence in criminal proceedings.

1.2.2.5   As detailed in the ISA reports themselves, the factual findings they contain are a product of investigations and the collection of

intelligence from various sources. Consequently, some of the conclusions in these reports constitute an intelligence assessment and/or opinion that is based on the cumulative sources of information in the organization regarding the same matter.

1.2.2.6   Thus for example, an ISA report titled "suicide bombers in five years of conflict" is comprised of a statistical collection of data on types of terrorist attacks committed during the period covered by the report, sorted by various profiles, and a list of all the suicide bombing attacks committed during the period covered by the report, which includes, where available, the identity of the suicide bombers. In addition to the statistical data provided by this report, it also incorporates the assessment of the ISA regarding the suicide bombers' organizational affiliation, according to information derived from investigations of and/or confessions taken from other detainees by ISA investigators, concerning those involved in assisting, commanding and dispatching the suicide bomber to his mission.

Similarly, the annual summaries and, in some cases, also "ISA statements" (they are referred to in the Shaked Report, such as a statement from February 2, 2004, footnote 429 in the Shaked Report), include elements of intelligence assessments that are tantamount to expressions of opinion.

It is evident from the Shaked Report itself that some intelligence assessments made by the ISA were found to be wrong.

- The assessment regarding Abu Oda as the person who was behind the bus 19 attack [Shaked report pages 132-133 and FN 429] is inconsistent with other sources Shaked relies on. [Shaked report page 135 sections c, d and e; see also the analysis below regarding the responsibility of the Al Aqsa Martyrs' Brigades of Fatah for the January 29, 2004 attack].

- The assessment regarding the organization membership of Nashash. In the ISA report summary for the year of 2004 [FN 391 to the Shaked report, page 113], Nashash

31

is mentioned as a Hamas operative, while in other sources referred to by Naim concerning the grounds for the sentence of Nashash, it is stated that Nashash was convicted for being a member of Al Aqsa Martyrs' Brigades "Since March 2003 up to his arrest" [Exhibit J to the January 29, 2004 attack].

1.2.2.7    I conclude that the ISA reports do not qualify as institutional records, and thus are not admissible evidence on this ground.  Even if such a report were proven to be an institutional record, it must be viewed as a concentration of material prepared by an "investigative authority" for the purpose of its filing as evidence in a criminal case, which according to Section 36(c) of the Evidence Ordinance, as detailed above, is inadmissible as an institutional record.

Furthermore, it seems that the ISA reports also do not fulfill all of the conditions prescribed by Section 36 of the Evidence Ordinance for their admissibility as an institutional record since, by their very nature, these reports are a concentration and processing of periodical data edited by "someone" in the ISA and, excluding the document that is the subject of footnote 429 of the Shaked Report, which I shall later address separately, the rest of the reports are not records of an "event" that was prepared proximate to its "occurrence," in accordance with the requirements of Section 36(a)(1) of the Evidence Ordinance:

"(1) The institution, in its regular course of conduct, enters a record of the event subject of the record proximate to its occurrence."

As stated above, the document that is the subject of footnote 429 of the Shaked Report (located in Appendix No.1 page 999) appears to fulfill the conditions of Section 36 (a) (1) and may be classified as a record of an event proximate to its occurrence. Yet the content of this document does not support Shaked's conclusion – i.e. that the terrorist attack from January 29, 2004 was carried out by Hamas. According to the Shaked Report, [Appendix No. 1 page 369, W_S089760], it was actually the Al-Aqsa Martyrs' Brigades of the Fatah that claimed responsibility

for this attack. The ISA statement from February 2, 2004, to which Shaked also refers, states that, "according to intelligence assessments" the Hamas operative who died in that operation also stood behind the terrorist attack on January 29, 2004, but it does not do so by way of determining a fact nor by way of a conclusion from an investigation. This intelligence assessment is tantamount to the expression of an opinion (which as mentioned above, was likely found to be incorrect) that according to Section 20 of the Evidence Ordinance, necessitates proof by the person who created it.

Furthermore, we have no evidence for any of the ISA reports of the fulfillment of the second condition set forth in Section 36 of the Evidence Ordinance – that "the method of collection of data on the subject of the record and the record's editing attest to the truth of its content."

Moreover, since these ISA reviews or reports involve a computer "output," we also do not have evidence of the existence of the third condition, which requires that, when the record is a computer output, in addition to proving the existence of the abovementioned basic conditions, the following must <u>also</u> be proven:

o   The manner in which the record was generated may attest to its credibility.

o   The institution regularly employs reasonable security measures to protect from an infiltration to the content of the computer materials and from failures in the computer's operation.

As detailed above, the party interested in filing a document as an institutional record bears the burden of proving that the document fulfills the conditions of admissibility set forth in Section 36 of the Evidence Ordinance.

At a minimum, as stated above, I am convinced that the contents of the documents support the conclusion that they do not fulfill

the conditions for their admission as institutional records. In addition, proof of the existence of the first two conditions would be necessary by way of testimony from the person who wrote the report or at least by the person in charge of the team responsible for it.

Moreover, even if the conditions of Section 36 of the Evidence Ordinance were fulfilled, I believe that these documents are documents of an "investigative authority," since they are no more than a concentration of data from investigations conducted for the purpose of their filing as evidence in a criminal proceeding, and therefore they are subject to the provisions of Section 36 (c) of the Evidence Ordinance, which in turn removes them from the population of institutional records that may be submitted as evidence of their content unless they may be filed as evidence "according to a different law," as prescribed in Section 39(B) of the Evidence Ordinance.

Section 39(B) of the Evidence Ordinance provides that the section of the Law regarding institutional records does not render admissible documents which are inadmissible pursuant to a restriction other than their failure to qualify for an exception to the rule against hearsay evidence, nor does it limit the admissibility of evidence that is authorized by other law, including case law.

In the next section, I will analyze the admissibility of the ISA reports according to other exceptions to the rule that disqualifies hearsay evidence.

Thus, the ISA reports are not institutional records, and therefore they are inadmissible as evidence of their contents, in the framework of this exception to the rule that disqualifies hearsay evidence.

1.2.2.8   Nor do any of these documents qualify as "public certificates." The question that must be asked in this context is whether these ISA documents enter the definition of an "act of execution" or a record of such an act that personifies a governmental action, and

whether the conditions - set forth by case law for the documents' admission as evidence of their contents – exist in them, and particularly whether there is a statutory obligation to publish these reports.

In my opinion, these ISA reports do not qualify as public certificates due to the following:

(a)  There is no statutory obligation to publish

- The Israel Security Agency Law 5762-2002, [16] and the regulations thereunder, define the function of the Agency, its authorities and duties. Section 12 of the Law obliges the General Director of the Agency to report its activity to the Ministerial Committee on ISA Matters, which is to be established by virtue of Section 5 of the Law, and is to be headed by the Prime Minister. The Director General of the Agency is also obliged to report to the Knesset Committee on ISA Matters, which is the Secondary Committee for Intelligence and Secret Services of the Knesset Foreign Affairs and Defense Committee, and is headed by Chairman of the Foreign Affairs and Defense Committee.

- Beside this duty to report to the Ministerial Committee and the Knesset Committee, the Israel Security Agency Law and/or the regulations thereunder do not include any obligation to publish any of the activities of the ISA.

- Moreover, Section 19 (a) (3) of the Israel Security Agency Law states the following: "The Prime Minister may permit the publication of information whose publication is prohibited under this section, and he may prescribe by regulation provisions regarding the grant of a permit for publication." To the best of my knowledge, to date, no regulations have been issued regarding the permit for publication. Notwithstanding, we must remember that even if the Prime Minister would have determined the

---

[16]    The Israel Security Agency Law *5762*-2002

abovementioned, this would entail a permit for publication and not a duty for publication.

- Furthermore, a review of the Terms of Usage of the ISA website, the page publishing the "current activity" of the Agency does not state that the Agency does so by virtue of some given statutory duty.

- The rules, the Agency guidelines and procedures are classified and there is no obligation to publish them in any official publication (Section 22 of the Israel Security Agency Law). So that in effect, even if there were some internal guideline of the Agency by way of rules and/or instructions, it is impossible to verify this, without testimony by the ISA representative who is responsible for the publications. Therefore, it is reasonable to assume under such circumstances that there is no obligation to publish.

- Accordingly, the first among the four conditions prescribed by case law for the admissibility of a public certificate as evidence of its content is not fulfilled.

(b) <u>The publication is not an "act of execution" or a record of an act of execution</u>

- Seemingly, ISA reports are official documents, as there is no doubt that the ISA is an official body of the State of Israel that operates in accordance with law.

- However, as mentioned above regarding the analysis of these reports as an institutional record, the documents discussed contain data, some of which are statistical [number of terrorist attacks, their types and the number of casualties sorted by regional profile, etc.]; part are products of interrogations held with suspects and detainees; and part are by definition intelligence assessments or intelligence opinions [e.g. the ISA review concerning the "Dawa" infrastructure – footnote 64 of the Shaked Report]. Judging by the nature of the documents, in my opinion they must be

36

attributed to one of two groups: investigation findings or opinions.

If belonging to the first group, the documents will not be admissible pursuant to Section 36 (c) of the Evidence Ordinance, because they are documents that concentrate investigation findings that were prepared by an investigative authority for the purpose of their filing as evidence in a criminal proceeding; if belonging to the second group, they must be submitted in the same manner as an expert opinion is submitted, by the expert who created them on behalf of the ISA according to Sections 20 and 24(a) of the Evidence Ordinance.

In this context, it is noteworthy that in legal proceedings where expert opinions of the ISA were submitted in order to prove a given fact, the expert who furnished the opinion was required to appear as a witness and undergo cross-examination regarding his findings and conclusions.[17]

- Furthermore, according to the analysis I have conducted hereinabove, in the context of publications on behalf of the spokesman of the Prime Minister's Office and the spokesman of the Ministry of Foreign Affairs, I came there to the conclusion that a "governmental action" or a record of such action held by an institution is characterized by several "identifying marks" that may facilitate the distinction between a public certificate and some other action of an official body that is not a "governmental action." An examination of the ISA reports under this test shows that they do not contain any one of the necessary identifying marks, since they do not establish or alter status, rights or duties.

- Accordingly, these documents are not tantamount to a "governmental action" or record thereof, and even if there was some doubt regarding this conclusion, there is no doubt that the ISA does not have a statutory obligation to publish

---

[17]     Criminal Appeal 621/88 Eliezer Piler et al v. the State of Israel, Court Rulings, Vol.47, 3rd part, 5753/5754, 1993, in Plea for Criminal appeal 11493/03 Mahmud Mahajna v. The State of Israel, published in NEVO.

these reports.   Therefore, my conclusion is that they are inadmissible as evidence of their contents in the framework of the "public certificate" exception to the disqualification of hearsay evidence and, inasmuch as a given party is interested in submitting them, it must do so by way of the expert on matters of intelligence who created them or at least was in charge of the team that created them.[18]

(c)   The ISA reports reflect retrospective opinions

- The ISA reports on which Shaked relies were published from 2004 and onwards.

  o The 2003 summary was published in January 2004 [footnotes 50, 314 in the Shaked Report].

  o The report titled "Terrorist suicide bombers in five years of conflict" summarizes figures until May 2005, and it is obvious from its content that it was published after this date [footnote 313 in the Shaked Report].

  o The publication regarding Ibrahim Hamad was released in May 2006 [footnote 194 in the Shaked Report].

  o The report: "terrorist suicide bombers in the current conflict" refers to the period from 2000 to 2007. It is obvious from its content that this report was published only after 2007 [footnote 166, 313 in the Shaked Report – Appendix No. 1 pages 350-434].

  o The ISA report named: "summarizing data for year 2004" also attests that it had been published, at the earliest, at the end of 2004 [footnotes 391, 402 in the Shaked Report].

  o The ISA report from February 2, 2004, regarding responsibility for the terrorist attack on bus line no. 19

---

[18]     Refer to Appeal 80/03 (the Military Court of Appeals) Sergeant Ilan Weissberg v. the Chief Military Attorney, copy attached; also refer to a guiding ruling in the matter – Criminal Appeal 566/89 Marziano v. The State of Israel, Ruling 46 (d) 539, 601.

from January 29, 2004 [footnote 429 in the Shaked Report], was published in 2004.

- In this context, let me reiterate that the document that is the subject of footnote 356 in the Shaked Report, dated December 24, 2003, titled "an ISA announcement regarding exposure of a terrorist squad," is not an ISA document, but rather a citation from a web-based press report published by Channel 7 in Israel, which claims to be based on an ISA statement.

1.2.2.9 The reviews of the ISA on which Shaked relies may be considered "opinions." According to case law in Israel, an expert may rely upon opinions of other "experts," provided that his conclusions may not merely be the adoption of the conclusions of the other experts, but rather must reflect his own conclusions.[19] Here, in addition to the fact that these reviews are not conducted according to statutory authority, the identity of the expert who prepared them is unknown. Therefore, in my opinion, these reviews must not be viewed as an opinion of "another expert." If one wishes to rely on these reviews to prove the truth of their contents, they would be admissible under Israeli evidence law only if they were submitted pursuant to the sworn testimony, on behalf of the ISA, of an attesting witness who prepared them or was in charge of the team that prepared them.

This principle is demonstrated by the decision of the Supreme Court in the matter of Mahmud Mahajna,[20] in which the court states that "had an expert witness in a criminal trial testified that, on the basis of the professional information at his disposal, John Doe is a member of Hamas or that X organization is a terrorist organization, though cannot convey any given detail concerning the information on his behalf, and in light of which the defense would be totally prevented from any possibility of conducting a cross-examination, then there could possibly be some truth in the allegations of the defense by which such testimony does not

---

[19] Criminal Appeal 566/89 Martziano v. The State of Israel page 9 of the decision, published in NEVO.
[20] In Criminal Petition 11493/03 Mahmud Mahajna v. The State of Israel, page 9 of the decision, published in NEVO.

allow to employ an appropriate defense for the defendants." The court made this statement in the context of rejecting the defense's petition to disqualify the testimony of an ISA member who was among others supported in his testimony by confidential evidence, and the court ruled that this should not disqualify his testimony, which will in turn be examined comprehensively, while also taking into account the non-disclosure of confidential information. Here, Shaked is relying on ISA reports as evidence of the truth of their contents. However, in contrast to the Mahmud Mahajna case, here no one from the ISA is testifying about these reports, and therefore the defendant is being deprived of an opportunity to cross-examine the party responsible for these reports.

2.   **Statements attributed to newspaper and magazine articles and website pages**:

I refer below to the documents and other materials identified in the Shaked Report containing statements Shaked attributes to newspaper and magazine articles and website pages.  In addition to what I itemize below, Shaked also cites to numerous Arabic language websites, including websites said to be affiliated with Hamas.  I do not itemize these websites (many of which I could not locate) below, but nonetheless analyze the admissibility of their contents under Israeli evidence law.

2.1   **Nature and content of the documents**:

2.1.1   FN 17

http://www.terrorism-info.org.il/malam_multimedia//ENGLISH/AUTHORITY/PDF/NOV16_04.PDF

This is an article of the Information Center for Intelligence and Terrorism within the framework of the Center for Heritage and Intelligence (M.L.M.), datelined July 30, 2009.  M. L. M. is a non-profit organization, among the objectives of which is the commemoration of fallen soldiers of the various intelligence bodies of the State of Israel, and safeguarding the heritage of the intelligence services. This non-profit organization publishes papers periodically, which contain articles on various subjects connected with the fields of intelligence and terrorism.

40

The article includes the same picture found on page 8 of the Shaked Report and cited in FN 17.   According to the authors (who are not identified), the person in the picture is Karim Mafarja, who was heading an Iz Edin El Kassam squad and died on January 22, 2002.

2.1.2   FN 28 a – www.jcpa.org.il/Templates/showpage.asp?FID=575&D BID=1&LNGID=2&TMID=99&IID=22002

This article, by Yehonatan Dehua-Levi, appeared in the editor's blog on the "Jerusalem Center for Public and State Affairs" website on March 4, 2009, the headline of which is "The Palestinian Authority continues to transfer monies to terrorists."

This article appeared in the wake of the international conference convened in Sharm El Sheikh for the purpose of raising funds for supporting the rehabilitation of the Gaza Strip.   The reporter complains that the assistance promised to the Palestinians, most of which is funneled through the Palestinian Authority, was not conditioned upon the Palestinian Authority's renunciation of support for terrorism.

The reporter contends that according to Palestinian law, Palestinian prisoners, including Israeli Arabs, are entitled to monetary support of various sums from the Palestinian Authority.   Furthermore, the reporter states that, according to "The Palestinian Prisoners' Club," the Authority's budget for supporting prisoners amounts to N.I.S 13.7 million per month. He concludes that a large portion of the entire budget of the Palestinian Authority is earmarked for supporting the thousands of Palestinian prisoners and their families, instead of for the development of the Palestinian economy.

2.1.3   FN 28 b – http://www.inn.co.il/News/News.aspx/149459

This is an article by Dalith Halevi, which was posted on May 19, 2006 on the "Channel 7" website, headlined "The Islamic Movement assists Hamas."  The reporter quotes a Palestinian newspaper as follows: "The person in charge of the prisoners' club, [Ms.] Um Husam Armilath, said that the condition of the prisoners is very grave, (transfer) of salaries stopped altogether and (money transfers) to the (prisoners') canteen were halted."  Ms. Um Husam is further quoted as saying "The canteens of

41

Hamas inside the prisons are depleted." She is further quoted as saying "The assistance offered by the Islamic Movement within the green line to the prisons has been restricted to the Hamas movement activists only." Also mentioned is the reply of the Palestinian Vice Premier to what Ms. Um Husam said, in which he commented that the Palestinian government intends to provide assistance to all Palestinian prisoners incarcerated in Israeli prisons.

2.1.4    FN 33 –

http://www.thejerusalemfund.org/www.thejerusalemfund.org/carryover/documents/charter.html

The footnote refers to an article published on the website of a private entity. According to this website, The Jerusalem Fund for Education & Community Development is an independent, non-profit, non-political, non-sectarian organization based in Washington, D.C. Funding for its operational expenses is derived from investment income and, together with donations from private individuals throughout the U.S., supports its humanitarian grants.

The author/s, who are not identified, describe and interpret the Hamas charter (1988).

2.1.4    FN 42 –

http://palwatch.org/main.aspx?fi=111&fld_id=111&doc_id=961

The quote is part of a video clip that is said to have been posted on Hamas's website on December 12, 2005.

2.1.5    FN 43

http://web.archive.org/web/20071008174314/http://pmw.org.il/Bulletins_Jan2006.htm

The link leads to a webpage of the Palestinian Media Watch website. According to the authors of this website, Muhammad Deif said the quote cited by Shaked on a video published by Hamas website on August 2005.

2.1.6    FN 44

http://web.archive.org/web/20071008174314/http://pmw.org.il/Bulletins_Jan2006.htm

The link leads to the same webpage of the Palestinian Media Watch website (FN 43 above).  According to the authors of this website, Ismail Haniya said the phrase cited by Shaked on a video published by Hamas website on October 2005.

2.1.7   FN 45 a

http://www.terrorism-info.org.il/malam_multimedia/English/eng_n/html/hamas_e070.htm

The citation is quoted from an article of the Information Center for Intelligence and Terrorism within the framework of the Center for Heritage and Intelligence (M.L.M.), dated April 29, 2009.  According to the authors, who are not identified, this is part of a sermon of Ziyad Abu al-Hajj,  an imam and preacher in the Gaza Strip dated January 23, 2009 which was broadcast on Al Aqsa Television on April 3, 2009.

2.1.8   FN 45 b

http://www.palwatch.org/main.aspx?fi=157&doc_id=755

This link leads to an article quoting what Ziad Abu El Haj is reported to have said on Hamas television on April 3, 2009.   The video file purportedly containing these words is said to have been taken off the website for reasons of breach of YouTube's terms of use.

2.1.9   FN 51 a – http://www.ynet.co.il/articles/0,7340,L-3386015,00html

This is a journalistic article on the Ynet news website posted on April 9, 2007, and written by the reporter Ali Waked.

The contents of this article do not correspond with the paragraph in the Shaked Report to which the footnote relates.  The article states with regard to Yihye Ayash that he was killed and that he was an engineer.  Contrary to the Shaked Report, there is no mention of his responsibility for murders of Israeli civilians, as the Shaked Report asserts.

2.1.10   FN 51 b – http://www.ynet.co.il/articles/1,7340,L-3688058,00html

This is a journalistic article on the Ynet news website posted on March 17, 2009, and written by the reporters Roni Sofer and Ali Waked.  The article purportedly deals with the government meeting in which the head of the ISA presented a list of prisoners who Israel refuses to release in a prisoners exchange transaction with Hamas for the return of the soldier Gil'ad Shalit.

This article does not contain the information for which the Shaked Report cites this article.

2.1.11   FN 51 c – http://www.inn.co.il/News/News.aspx/37791

This is a journalistic article on the Channel 7 website.  This article does not contain the information for which the Shaked Report cites this article.  It describes the exposing of the terrorist squad that perpetrated the attack on the Kiryat Arba high school yeshiva, as well as other items about the death of two Hamas members from an explosion in their car, and more.  There is no connection between the contents of the article and the contents of the paragraph in the Shaked Report referring to this article.

2.1.12   FN 52 - http://www.ynet.co.il/articles/0,7340,L-2993275,00.html

This is a journalistic article on the Ynet news website posted on October 21, 2004.  A link within the article leads to another article posted on October 22, 2004 and written by the reporters Ali Waked and Hanan Grinberg.  The article purportedly deals with the assassination of a Hamas operative.  The article notes that this operative has run away several times to Lebanon and Syria.  There is no indication in the article of training in these countries.

2.1.13   FN 54 a – http://www.nrg.co.il/online/1/ART/78ss8/337.html

This is a journalistic article by The News Agencies, on the website of the Israeli newspaper Ma'ariv, posted on September 26, 2004, and headlined "Liquidation of a senior figure of Hamas in Damascus constitutes Israeli terrorism."

This article relies on various sources and describes the method by which Ez A Din Al Halil was killed in Damascus and the rejection by the Israeli defense establishment of any responsibility for the killing and other Hamas accusations against the "Zionist establishment."

44

Further in the article is written as follows: "Palestinian sources have said to the I. P. reporter in Cairo that Halil was killed because of his role as liaison between Hamas leaders in Gaza and the organization's political leadership in Damascus."

This article does not claim that Halil was the commander the Ez Adin Al Qassam Brigades in Damascus. The article points out that Halil is "One of the senior persons in the military arm of Hamas."

2.1.14  FN 56 – www.ynet.co.il/articles/1,7340,L-1972094,00.html

This is a journalistic article on the Ynet website of the "Yedi'oth Aharonoth" daily newspaper, posted on July 1, 2002, and written by Atilla Shumpelbi, headlined: "The I.D.F made an assassination attack on the most senior wanted person in Samaria."

The author relies on "military factors" and describes the assassination attack / skirmish actions in the course of which Muhanad Taher was killed.

According to the author, Muhanad Taher was the head of Hamas's military infrastructure in Samaria, which the author asserts was responsible for scores of terrorist attacks, and was considered to be an expert in preparing explosives.

Among the terrorist attacks attributed to him by the author is the preparing of the explosives for the attack on the Park Hotel in Natanya. There are, as well, speculations with regard to his direct or indirect involvement also in the attack on the "Sbarro" restaurant in Jerusalem.

The author does not mention the sources on which he relies for attributing terrorist attacks to Muhanad Taher.

2.1.15  FN 57 b – www.ynet.co.il/articles/1,7340,L-2665133,00.html

This is a journalistic article on the Ynet website of the "Yedi'oth Aharonoth" daily newspaper, posted on June 22, 2003, and written by the reporters Ali Waked and Felix Frisch, concerning the killing of Abdalla Qawasme. The reporters quote then-Prime Minister Sharon as follows: "A successful and important operation intended to afford security for the citizens of Israel."

45

In this article, the authors assert that Abed El Kader Qawasme was the commander of Hamas's military arm as of March 2003, subsequent to the killing by Israel of two senior commanders of Hamas in the West Bank. The authors do not identify the basis for this assertion.

2.1.16  FN 65 a - Yedi'oth Aharonoth, June 14, 2002

This is a journalistic article by Roni Shaked and published in the "Yedi'oth Aharonoth" daily newspaper on June 14, 2002, headlined "Iraq augmented the 'tariff': $25 thousand per suicide."

In this article the author states that the monies are transferred to the families of suicides by means of "The Arab Liberation Front," said to be a pro-Iraqi Palestinian organization serving as the Palestinian arm of Saddam Hussein's regime.

According to the article, Iraq augmented the sums it pays the families of the suicides from $15,000 to $ 25,000.  Furthermore, it is stated that the monies are distributed at official ceremonies in which representatives of the Palestinian Authority also take part.  The sources of this information are not identified.

2.1.17  FN 65 b – Yedi'oth Aharonoth, October 9, 2002

This is an article published on October 9, 2002 in the "Yedi'oth Aharonoth" daily newspaper, and written by Roni Shaked, Hayim Broida and Faiz Abbas, concerning the involvement of Saddam Hussein in the payment of compensation to families of dead and wounded Palestinians. The authors state that the information brought forth in the article is from various sources, such as : "This emanates from the ISA interrogation …," or "Security factors in Israel said…."  Also in the article are words on behalf of the families of Israeli Arabs killed in the October 2000 riots.

According to the authors, Rekar admitted to being the head of The Popular Liberation Front in the West Bank, that he received and managed monies received from Saddam Hussein and that the amounts of compensation for the families of the killed or suicides were between $10,000 and $25,000.

The authors describe the route by which the monies were transferred from Iraq to Jordan and on to Ramallah and the families. They state this information is based on Rekar's interrogation by the ISA.

2.1.18  FN 66 – http://www.inn.co.il/News/News.aspx/88765

This is an article published in "Channel 7," on September 13, 2004. According to this article, "documents that the IDF captured during the 'defensive shield' operation discovered a transfer of 2,000 dollars to the father of the suicide bomber from the 'Dolphinarium' attack by the Palestinian Ministry of Welfare." It further alleges that, according to the website reporter, the transfer was done through a branch of the Arab Bank in El Bireh [near Ramallah].

The documents on which the article relies are not identified and not attached to the article.

2.1.19  FN 67 a – www.terrorism-info.org.il/malam multimedia/Hebrew/heb n/pdf/hamas 076.pdf

This is an article of the Information Center for Intelligence and Terrorism within the framework of the Center for Heritage and Intelligence (M.L.M**.**), datelined July 30, 2009. M. L. M**.** is a non-profit organization, among the objectives of which is the commemoration of fallen soldiers of the various intelligence bodies of the State of Israel, and safeguarding the heritage of the intelligence services. This non-profit organization publishes papers periodically, which contain articles on various subjects connected with the fields of intelligence and terrorism.

This article deals with the process of islamization, which it states Hamas is promoting in the Gaza Strip, and its implications. I have not found any reference to training children in the use of arms and explosives in this article, as the Shaked Report claims.

2.1.20  FN 67 b – www.terrorism-info.org.il/malam multimedia/Hebrew/COUNTERTERRORISM-DATA/PDF/oct 04.pdf

This article appears to be an excerpt such as a chapter from a report or a review, but it does not show any identification mark as to its author.

47

The chapter deals with children's and youth's involvement in terrorist activities.  In paragraph 4 of this chapter it is mentioned as follows:  "The 'Political Guidance' in co - operation with the Office for Youth Affairs of the Palestinian Authority also operates summer camps the objective of which is to incite the children, mobilize them politically against Israel, as well as train them in the use of arms for the purpose of carrying out future activities against Israel."  It does not reveal the source of this information.

2.1.21  FN 68 – http://www.rand.org/pubs/reprints/RP1187/index2.html

This is a journalistic article written by Bruce Hoffman and published on the Rand website.  The author does not formally cite his sources, but references in his article information and details he states he heard or was told about  by Shaked, by police officers and by a medical professor in Hadassah hospital in Jerusalem. Among the details he reports having heard or having been was told during his journey to Jerusalem is the isolation and other treatment given to the suicide bomber before the attack as described by Shaked.

2.1.22  FN 69

http://www.fletcherledger.com/archive/2002-02-04/020402-NfinalSuicideTerrorism.htm
The link is inaccessible.

2.1.23  FN 70 – Yedi'oth Aharonoth, March 29, 2002

FN 71 – Yedi'oth Aharonoth, March 29, 2002

FN 73 – Yedi'oth Aharonoth, March 29, 2002

Footnotes 70, 71 and 73 refer to articles published in the "Yedi'oth Aharonoth" daily newspaper with regard to the massacre at the Park Hotel in Natanya during the Seder ceremonial feast.  These articles describe the attack from various viewpoints.

2.1.24  FN 81 – Yedi'oth Aharonoth, March 29, 2002

This is a photo of the Park Hotel suicide bomber, Abed El Basset Ouda, by Reuters.

2.1.25  FN 101 – http://www.ynet.co.il/articles/1,7340,L-1972094,00.html

48

This article is the same one as in footnote 56 above.

2.1.26   FN 111 – Yedi'oth Aharonoth, March 29, 2002

This is the same article as in footnote 81 above.

2.1.27   FN 120– Yedi'oth Aharonoth, March 29, 2002

FN 122 – Yedi'oth Aharonoth, March 29, 2002

These are the same articles referred to in footnotes 70, 71, 73, 81 and 111 above.  In those articles the reporter states that Ouda had previously been employed at the Park Hotel and that the Palestinian Authority claimed it had attempted, without success, to arrest him.

2.1.28   FN 132

http://www.terrorism-info.org.il/malam_multimedia/html/final/eng/sib/6_04/park_h.htm

This is a special bulletin of the Information Center for Intelligence and Terrorism within the framework of the Center for Heritage and Intelligence (M.L.M.), dated May 2004.

According to the authors, who are not identified, Muhamad Taher coordinated the transferring and delivering of the explosive belts to Hamas infrastructure in Tulkarm.  The authors do not claim that Taher prepared the explosive belts as stated by Shaked.

2.1.29   FN 146 – http://www.ynet.co.il/articles/0,7340,L-1879252,00.html

This is a journalistic article on the Ynet news website posted on May 9, 2002.  The article describes the course of the attack in the "Sheffield Club" in Rishon LeZion two days earlier.  The article does not mention the perpetrator of the attack by name, as the Shaked Report suggests. Nor is there any indication with regard to the number of people who were present at the scene.  According to the article, 50 people were injured there, among whom 15 were in grave condition.  According to the authors, a claim of responsibility was published by Hamas on the El Manar television station [Hizbullah TV from Lebanon].

2.1.30   FN 147 – http://www.ynet.co.il/articles/0,7340,L-1879252,00.html

This link leads to the same article mentioned in footnote 146 above, according to which Al - Manar, Hezbollah's television outlet in Lebanon, announced that Hamas had claimed responsibility for that terrorist attack.

2.1.31  FN 175 a – Ha'aretz, February 15, 2009

This is a journalistic article published in the "Ha'aretz" daily newspaper on February 15, 2009, according to which it is claimed that Hamas's spokesman, Abu Obeida, announced that Gil'ad Shalit would not be released unless three prisoners, among them Abdala Barguti, would be released.

2.1.32  FN 175 b – http://www.newsisraelnet/Article.asp?Code=15065

This is an article posted on the News Israel Net website on March 17, 2009, in which it is claimed that Abdala Barguti is among those prisoners whom Israel refuses to release within the framework of the prisoners exchange transaction with Hamas for the return of the kidnapped soldier Gil'ad Shalit.  According to the article Barguti was sentenced to 67 life sentences for perpetrating the murder of 66 Israelis and the wounding of about 500.

2.1.33  FN 188 – http://www.mako.co.il/news-channel2/Channel-2 -  Israel Television, Channel 2, March 18, 2009. See: Newscast/Article-49328a9b0ca1021004.htm.

This is a news report from Israeli Television's Channel 2 concerning the prisoner exchange transaction with Hamas in return for the release of the soldier Gil'ad Shalit.  Within the framework of this news report is shown part of an interview inside the prison made with the prisoner Abdalah Barguti by Shaked, in which Barguti boasts about his carrying out of terrorist attacks.

2.1.34  FN 192 a – Ma'ariv (May 24, 2006)

This is an article published in the "Ma'ariv" daily newspaper.  The reporters write about the arrest of Ibrahim Hamad.  According to them, he was the most senior wanted member of Hamas in the west Bank, and is responsible for a number of terrorist attacks.  No source is given for this information.

2.1.35  FN 192 b – Yedi'oth Aharonoth (May 24, 2006)

This is a journalistic article from the "Yedi'oth Aharonoth" daily newspaper by Shaked and Yossi Yehoshu'a, published on May 24, 2006. It describes the arrest of Ibrahim Hamad who, according to the reporters, was the military commander of Hamas in the West Bank who was wanted for about eight years for the perpetration of a series of terrorist attacks under his direction, including the one in the Sheffield Club, as referred to by Shaked in this footnote and who, supposedly according to ISA sources, planned large scale attacks against Israeli targets.

2.1.36  FN 192 c – Ha'aretz (May 24, 2006)

This is a journalistic article from the "Ha'aretz" daily newspaper by Amos Harel.  It describes the arrest of Ibrahim Hamad who, according to the reporter, was the head of the military branch of Hamas in the Ramallah region and was involved in a series of attacks including the one in the Sheffield Club, Café Hilel and The Hebrew University.

2.1.37  FN 192 d – http://www.ynet.co.il/articles/0,7340,L-3254047,00.html

This is a journalistic article on the Ynet news website posted on May 24, 2006.  This article states that IDF and ISA forces had detained Ibrahim Hamad who, according to the reporter, was the head of Hamas's military arm in the West Bank and had been wanted since 1998.  It is also claimed that he was responsible for the killing of scores of Israelis.  Among the terrorist attacks for which he was reportedly responsible is the one in the Sheffield Club in Rishon Lezion.   The reporter said he relied on information provided by the commander of the IDF forces in the area, as well as on sources in the defense establishment.  It is not clear from the text to what "official" announcements by the IDF and the ISA Shaked is referring in his footnote 192.

2.1.38 FN 194 b

http://www.haaretz.com/news/idf-arrests-most-wanted-hamas-bomb-mastermind-in-west-bank-1.188413

This is an English version of the Hebrew article published by the journalist Amos Harel and referred to by Shaked at FN 192 c above. The article was published on the English website of the Ha'aretz Daily newspaper.

2.1.39  FN 208 – http://www.haayal.co.il/story/1100

This is a journalistic article on "The Calling Ram" website posted on July 31, 2002.  This article reports on the terrorist attack of that date in the cafeteria of the Hebrew University in Jerusalem, in which, according to the article, seven people were killed and 85 wounded.  Further in this article a Hamas spokesman is quoted as saying the same words as appear in the quote in the Shaked Report, however the sources of both the article and the quote are not clear.

2.1.40   FN 210 a – http://www haayal.co.il/story/1100

This is the same article mentioned in footnote 208 above.  According to the authors, Hamas assumed responsibility for that terrorist attack and announced it on the Al Jazeera network.  No source is mentioned in the article.

2.1.41   FN 210 b – http://www.ynet.co.il/articles/1,7340,L-2032435,00.html

This is an article posted on the Ynet website on July 31, 2002.  This article describes the terrorist attack of that date in the cafeteria of the Hebrew University in Jerusalem.   The article states that Hamas had assumed responsibility for that terrorist attack by way of announcing it on the Al Jazeera network.

2.1.42   FN 216 b – http://www haaretz.com/hasite/spages/1071742.html

This is an article on the "Ha'aretz" website posted on March 18, 2009, according to which the government of Israel had decided to publish the names of the terrorists it refused to release in the Shalit transaction.  The list of terrorists who, according to the article, Israel refused to release, does not correspond with the contents of the Shaked Report.  Among the names are those of Abdalah Barguti, to whom the article attributes responsibility for the terrorist attack at the Hebrew University, of Ibrahim Hamad, to whom responsibility for the terrorist attack in the Hebrew University is not attributed, while the name of Muhammad Arman is not mentioned at all in the article.

2.1.43   FN 217

http://www.ustreas.gov/offices/enforcement/key-issues/protecting/charities_execorder_13224-e.shtml#h

The link is inaccessible.

52

2.1.44   FN 225 – http://www fresh.co.il/dcforum/Scoops/26680.html

This is a publication from within the debate group forum taking place on the "Fresh" website in Israel.  The contents posted there are written by forum participants identifiable by aliases only.

One of the participants in the forum that identifies himself as "COSMIX" states that "today" [Sept. 12, 2002] the Jerusalem Advocacy submitted an indictment against four squad members in which the four are accused, among other things, of planning attacks in Tel Aviv, Ein Gedi and Jerusalem.

Another participant of that forum identified as "LIRAN_H" wrote a very similar article in which he highlights such different details as the attempt of attacking trains and railways and indicating that the squad members are accused of responsibility for the perpetration of several attacks including the "Shefield Club" and the "Hebrew University."

Both parts of the article indicate the names of Wael Kassem, Wissam Abassi, Muhamad Ode and Alta Aldin Abassi from the Silwan village, as the accused in this indictment.

On the last passage of page 56 and the first passage of page 57 of his report, Shaked is partly citing and partly summarizing this article originated by an internet group forum, as providing a portion of the facts he relies on for reaching the conclusion that the sources he relied on "leave no doubt that this attack was carried out by Hamas."

2.1.45   FN 248

http://unispal.un.org/UNISPAL.NSF/0/D89AC50A852CF2C185256A2900637342

This is a "note verbale" dated 13 February 1995 from the Permanent Representative of Israel to the United Nations Office at Geneva addressed to the Assistant Secretary-General for Human Rights.

The representative states that Hamas claimed responsibility for the attack near Hebron in which Mordechai Lapid and his son were killed.

No source is given for this information.

2.1.46  FN 249 –
http://laad.btl.gov.il/showitem.asp?itemId=38239&levelId=28553&itemType=10&template=3

This is a web page from the commemorative website for the citizens slain in hostile actions.  The page contains personal particulars of the deceased Mordechai Lapid and Shlomo Lapid, who are said to have been killed in a shooting attack by "terrorists" in 1993.

Contrary to what is stated in the Shaked Report, this page does not attribute this terrorist attack to Hamas or any other organization.

Shaked uses this example to prove that shooting terrorist attacks are characteristic of Hamas.  As mentioned above, this item does not attribute this attack to Hamas, and this claim by Shaked does not correspond with another document he provides in an appendix to his report.  In the ISA report headed "data summation for 2004" [Appendix P1, pp. 931-56] can be found that the Islamic Jihad organization perpetrated three shooting terrorist attacks in 2003, and in 2004 they perpetrated 34 such attacks, whereas Hamas perpetrated 25 shooting terrorist attacks in 2003, and in 2004 they perpetrated 27 such attacks, and the Fatah's Tanzim organization perpetrated 83 terrorist attacks during 2003 and in 2004, 31 such attacks.  According to this report there were 2111 shooting attacks during 2003, of which, as mentioned, only 25 were attributed to Hamas, and in 2004, 1621 shooting terrorist attacks were perpetrated in all, of which only 27 were attributed to Hamas.

2.1.47  FN 250 b – http://www.globes.co.il/news/article.aspx?did=105308

The footnote refers to a press article on the website of the daily economic newspaper "Globes" dated February 8, 1998. It is a newspaper article reporting the submission of an indictment and that the military court had arrested members of a Hamas terrorist cell who were accused of the murder of Dr. Tibon and Yaniv Shimel near Halhul.

It should be noted that "Road 60" is a major road that runs 230 KM, starting at Beer Sheba in the south, through the length of the West Bank, and ending in Nazareth in the north of Israel, and is the main road of the West Bank.

2.1.48 FN 251 b - http://www.globes.co.il/news/article.aspx?did=105308

The footnote refers to a press article on the website of the daily economic newspaper "Globes" as in footnote 250 b above.

Based on the same sources, the reporter states that the cell members were accused also of the murder of Yaron and Efrat Ungar on June 9, 1996.

2.1.49   FN 252 b - http://www.globes.co.il/news/article.aspx?did=105308

The footnote refers to a press article on the website of the daily economic newspaper "Globes" as in footnote 250 b above.

Based on the same sources, the reporter states that the cell members were accused also of the murder of Rachel and Uri Monk on July 26, 1996.

2.1.50 FN 254 – Yedi'oth Aharonoth, March 6, 2003

This is an article in the "Yedi'oth Aharonoth" daily newspaper and written by Shaked with two co-authors, published on March 6, 2003.  The article describes the terrorist attack on a bus in Haifa the previous day and states that a letter praising the 9/11 terrorist attack in New York was found on the body of the suicide bomber.  The article does not contain any quotes from the letter showing that the bomber might belong to the Ez Adin El Qassam Brigades, or that this group carried out the attack in Haifa, as the Shaked Report claims

2.1.51   FN 269

http://www.shavuz.co.il/magazine/article.asp?artid=3149&secid=203

This is an article from the Shavouz website, and written by Tal Zagreba, posted on August 31, 2008.  The article describes the terrorist attack in Kiryat Arba that day in which Dina and Eli Horovitz were killed.  According to the author, the terrorist squad belonged to Hamas, but he does not specify the basis for this attribution of responsibility for the attack to Hamas.

2.1.51   FN 270 a – Yedi'oth Aharonoth, March 9 2003

This is an article in the "Yedi'oth Aharonoth" daily newspaper and written by Shaked and Eithan Glikman. It describes an attempted terrorist attack

in the settlement of Negohot, which was foiled by the IDF.  This article does not attribute the attempted attack to any organization.

2.1.52  FN 270 b - http://www.inn.co.il/News/News.aspx/46381

This is an article posted on the Channel 7 website on March 7, 2003, the day on which the Kiryat Arba terrorist attack, in which the Horovitz couple was killed, was carried out.  According to the article, Hamas claimed responsibility for that attack in a leaflet.  The author claims that in this leaflet Hamas had assumed responsibility for a series of terrorist attacks, including the one in Haifa that same week.

2.1.53  FN 271 - Yedi'oth Aharonoth, March 9, 2003, p. 6 (Appendix No. 1, p. 741).

This is an article in the "Yedi'oth Aharonoth" daily newspaper, published on March 9, 2003 by Roni Shaked. The article describes the Kiryat Arba terrorist attack on March 7, 2003 [attack no. 6 listed in Annex B of my Primary Expert Opinion] and another attack that was carried out at the same time and in the same manner in another settlement.  The author [Shaked] attributes the two attacks to Hamas.  According to the article it is claimed that the Ez Adin El Qassam brigades of Hamas assumed responsibility for the terrorist attack.  Shaked refers to two sources. The first is an unidentified "security personnel" who claimed that Hamas was responsible for the attack, and the second source is an Israeli general that was quoted as attributing the two attacks perpetrated on the same day to Hamas.

2.1.54  FN 316 – Yedi'oth Aharonoth, May 19, 2003

This is a map / sketch of the area in which the terrorist attack on bus No. 6 in the French Hill neighborhood in Jerusalem took place on May 18, 2003.

2.1.55  FN 317 – Yedi'oth Aharonoth, May 19, 2003

This is an article in the "Yedi'oth Aharonoth" daily newspaper, published on May 19, 2003, and written by several reporters, including Shaked.  The article describes the terrorist attack.   In the opening paragraph the reporters attribute the attack to a Hamas squad from Hebron.  This article does not specify the basis for this attribution.

2.1.56  FN 356 b – http://www.globes.co.il/news/article.aspx?did=754159&fid=2

The quote referred to in this footnote is from an article posted on the "Globes" website and not from an announcement made on behalf of the ISA, as the Shaked Report states.  The "Globes" website in turn quotes is from another article, from the Channel 7 website. The quote is partial, dropping out intermediate passages.

2.1.57 FN 404 – Appendix No. 1 p. 997

This a journalistic article by the Associated Press. According to the author, "the militant Hamas group claimed responsibility for firing two mortars at the Neve Dekalim settlement."  It seems that the reporter relied on what is alleged to be a Hamas video which showed three masked militants setting up and firing a mortar.

2.1.58 FN 405 – Appendix No. 1, p. 998

This is a journalistic article by Amos Har'el in the English edition of the "Ha'aretz" daily newspaper.

According to the author, the Ez Adin El Qassam Brigades claimed responsibility for perpetrating the mortar attack on Neve Dekalim.

The author does not identify his source for this report.

2.1.59  FN 418 – http://www.yeshanews.com/?id=23960

This is a video that was posted on the "Yeshanews" website.  In the last frames of the video a dead person with a green head band can be seen. The figure is attributed to Aknibi, who is alleged to have perpetrated the terrorist attack in Kiryat Arba.

I could not compare this figure in the video to the figure appearing in the photos accompanying footnotes 415 and 416 of the Shaked Report, which are attributed by Shaked to the same person.

2.2    **Analysis of the documents pursuant to the Evidence Ordinance**:[21]

2.2.1    **Publication in a newspaper**

---

[21]    Again, as stated in paragraph above, I do not analyze the admissibility of these documents as submitted in the nature of providing support for a qualified expert's opinion.

As a rule, a newspaper or magazine article is inadmissible hearsay and may be received in evidence only to prove the actual publication of the article and not its contents. This rule was determined in Tik v. Krinitzi,[22] and was adopted in a later ruling of the court.  It is also stated in Lerner v. Gvirz.[23]  In the ruling of the Court for Family Affairs in Kfar Saba, in the matter of Rodriguez v. Dr. Iris Brown[24] the court prescribes the following:

> "According to the provisions of Section 23 to the Anti-Defamation Law 5725 – 1965, the actual publication in the newspaper may be proven by way of submitting a copy of the newspaper. However, it has been clarified in case law that a quote of the words of a person in a newspaper does not even constitute alleged evidence to the fact that the person said these things or phrased them in the fashion that the newspaper presented them. When attempting to prove the defendant's responsibility for words quoted from him, one must prove that they were indeed said by the defendant, thus the court clarified the following in Tik v. Krinitzi –

> The respondent's claim that it was not he who said about the appellant that he is a criminal in terms of Urban Building Laws, obliged the appellant to prove that these things were indeed published by the respondent (Civil Appeal 114/64 Tik v. Krinitzi et al., Vol.18 (4) 378, 383, 386-387, and also refer to Civil Case (Rishion LeZion) 883/05 – Shmueli Doron et al. v. Limon – Venue Gardens Ltd. et al. Takdin M.C.2007(1), 28201)."

### 2.2.2 Information from websites attributed to Hamas is inadmissible as evidence of the truth of their contents

2.2.2.1    Information obtained from websites attributed to Hamas is not admissible as evidence of the truth of its contents.  The decision of the Magistrate's Court in Tel Aviv from May 19, 2009 discusses the evidentiary validity of this type of document, in the framework of a claim for punitive damages filed by the family of Taher Zaid against the State of Israel,[25] over the killing of Taher Zaid by IDF

---

[22]    Civil Appeal 114/64 Tik v. Krinitzi et al., Vol.18 (4) 378, 383, 386-387.
[23]    Civil Case [Tel Aviv] 489/96 Lerner v. Gvirz tk-48, 2010(1)1351.
[24]    Family Court Case [Kfar Saba] Uri Rodriguez v. Dr. Iris Brown.
[25]    Civil Case (Magistrates Tel-Aviv) 45464-04, the inheritance of the late Taher Muhamed Zaid v. The State of Israel; a decision from 19 May, 2009.

forces. In the framework of its defense against the claim, the State requested to submit, by way of a civil servant certificate, a web page that was printed from the Hamas website, as evidence of the affiliation of the deceased with the Hamas organization. It was argued that, according to the information from the Hamas website, he belonged to a terrorist organization, and therefore the State is exempt by law[26] from paying compensation, which was expressed in the ruling as follows:

"The applicant is appending to its application a public servant certificate of Mrs. Sophia Mishaniya from the Ministry of Defense, who serves as a translator and detector of publications and notices on Islamic websites, arguing that, in the framework of the investigation and collection of material in this case, she had identified a notice on the website of the Hamas organization by which the deceased was a member of the Hamas movement and that a notice regarding his death was published on the Hamas website. The translated notice is hereby cited: Today, during the morning hours, the young martyr Taher Atef Mahmud Zaid, age 17, from the Nablus region, died from his wounds. This martyr was considered one of the most active youths in the Yabed mosques and in the Islamic student association of the mosques."

The court had examined whether the document fulfills the requirements of an "official document" that may be filed as evidence by way of a "civil servant certificate," and whether the evidence may be considered an "institutional record." The court rejected the petition of the State to submit this evidence due to several reasons, and determined, among others, the following:

"I am of the same opinion as the plaintiffs in this matter – the translation of information that allegedly appeared on the Hamas movement website is not tantamount to 'something that is recorded in an official document,' and therefore this certificate shall not be deemed a civil servant certificate in its definition in the Evidence Ordinance.

---

[26]     Civil Wrongs (Liability of the State) Law, 5712-1952.

"Furthermore:

"As to submitting the printout itself and its translation – filing evidence from the virtual world is subject, as is any other evidence, to the Evidence Law.

"In order for a document to be considered an institutional record it must fulfill the conditions prescribed in the Evidence Ordinance. In our case, we are dealing with a notice that was published in some given website, which according to the claims of the defendant is the website of the Hamas movement. Since in my opinion this does not involve a record that was created in the ordinary course of conduct of an institution, and since this does not entail data collection and a method of conducting a record that may attest to the truth of its content, the notice shall not be deemed an institutional record.

"Since the printout that appears on the website is tantamount to hearsay evidence, it must be submitted by a witness that may confirm its content and be subjected to a cross-examination in its regard. In our case, the correct manner of filing the printout is by a witness that may confirm the content of the notice, i.e.: the person publishing the notice or the editor of the website on which the notice had been published. The actual printout is tantamount to hearsay evidence and is inadmissible as evidence."

2.2.2.2   At the conclusion of the decision, the court ruled as follows:

"In light of the abovementioned and when concluding that the certificate that was submitted by Mrs. Mishaniya is not tantamount to a civil servant certificate, that the printout from the website does not constitute an institutional record and is in itself inadmissible as evidence, it would then not be permitted to submit the evidence."

2.2.2.3   Therefore, according to this ruling, submitting information from an internet source by way of a civil servant certificate according to Section 23 of the Evidence Ordinance is not acceptable, and such information cannot be considered as an institutional record according to Section 36 of the Evidence Ordinance.

60

2.2.3     **Conditions for the admissibility of the contents of websites generally**

2.2.3.1   In a claim filed by Tel Aviv University against a student for a debt of tuition fees, the university petitioned to submit an enrollment document of the student, which was submitted on-line, as evidence of its contents.[27]   The following was decided in the ruling of this claim:

"In Hebrew year 5760 (2000-2001), the on-line method of enrollment to courses was made available for the first time; a method that is called bidding, by which the student enrolls directly and independently via a personal code which only he knows, and without the intervention of the secretariat.  Most of the arguments in the summations entail attempts to permit the academic records as admissible evidence. It was first argued that the documents requested in this matter were not serviced, and particularly in relation to the enrollment software, in order to examine its reliability and its operation instructions.

"The plaintiff bases its claim on the academic records, by which it is alleged that the defendant enlisted to 29 academic hours in the 5760 school-year.

"Section 36 to the Evidence Ordinance (New Version) determines the existence of aggregate conditions in order for an institutional record to be admissible evidence in proving the truth of its content in a legal proceeding.

"The plaintiff must explicitly prove that all of the statutory aggregate conditions, pursuant to this section, have been fulfilled.

"An institutional record, including a computer output that reflects the records, constitutes an exception to the rule that disqualifies hearsay evidence, as well as an exception to the rule of the best possible evidence. Two basic conditions are required for admitting an institutional record, as well as another aggregate condition for admitting a record in the form of a computer output: the institution regularly documents the event that is the subject of the record, in

---

[27]     Civil Case (Magistrate's – Tel-Aviv) 85608.01 Tel-Aviv University v. Shtoyer Yehuda; not published.

proximity to its occurrence; the method of collecting the data and the record may attest to the truth of the record's content; the mode of generating the computer output may attest to its credibility; and the institution regularly employs reasonable security measures to protect from an infiltration to the content of the computer materials and from failures in the computer's operation. The said conditions, which are aggregate conditions, require proof by an expert on the matter and by any person that may attest to the actual entry of the record.

"A review of the book by author Kozolowsky 'The Computer and the Legal Procedure – Electronic Evidence and Legal Procedures,' chapter 10, reveals that, in order to admit the institutional record as evidence, the litigant must explicitly and specifically demonstrate that all of the aggregate conditions set forth in Section 36 are fulfilled. The proof must be provided explicitly by way of testimony, whether orally or by affidavit, and in the event where the party submitting the record cannot bear such burden, the evidence must be rejected as inadmissible.

"The author further raises the existing fear of unauthorized infiltration into a computer that would bring about modification of the information or damage thereof, given the fact that computer communication is exposed to unauthorized penetration to the data stored thereof.

"In order to fulfill the requirements of the clause and overcome the fear of failure of the computer software, proof of the technical competence of the system and the security and operational measures must be provided by a professional technical officer that is qualified for this function."

2.2.3.2   Another ruling of the Tel Aviv Magistrate's Court, in the matter of Kavei Zahav,[28] addressed the question of the admissibility of web pages as evidence. The court comprehensively analyzed the case law in Israel and even compared it to case law in the United States, and ruled as follows:

---

[28]   Civil Case (Tel-Aviv) 731916/03 Kavei Zahav Ltd. 012 v. Gez Eliyahu Phili, published in NEVO.

"The mere presentation of the records or the computer output is insufficient, as they must be presented by appropriate witnesses that shall confirm by affidavit the fulfillment of the conditions required for their presentation pursuant to the Evidence Ordinance - conditions that have been detailed hereinabove.

"The Computer Law only partially solved the problem of evidence originating from the internet, as aforesaid, by creating an additional category of an 'institutional record.' A web page may be incorporated in an institutional record. A web page may in itself be an institutional record, but it is possible that it shall not constitute an institutional record, as it all depends on the circumstances of documentation, preservation and presentation of the page.

"However, it does not suffice that a certain website and web pages may be determined to be an institutional record; the conditions prescribed in Section 36 of the Evidence Ordinance for determining the admissibility of the institutional evidence must also be fulfilled. We must then ask, are the conditions required for the admissibility of the information in court fulfilled in this case, and this prior to an examination of its credibility and feasibility – an examination that the court carries out in the second stage."

The court further noted as follows:

"The internet is not a narrow and well-defined area, but virtually a 'world on its own merit'; therefore, any reference to information that is located on the internet cannot be uniform by nature. There are numerous types of information on the internet. At times the information is accurate, at times it is partial and at times it is incorrect.

"Some of the information is admissible in court and some is inadmissible. Regarding admissible information, its credibility and weight shall also be examined in the second stage.

"One must distinguish between random information that originates from various websites and web pages and information that originates from databases that are secured and protected by a

63

security program, respective of the technology available at that time. This rule is incorporated in the Computers Law."

2.2.3.3   An examination of recent court rulings in Israel indicates the courts are willing to accept evidence originating from institutional websites of government authorities, as well as from the websites of various companies. This regards general information that pertains to the policy of the offices or the companies, the identity of various senior officers and other data that is not specific information to a narrow and defined date or event.  In these cases, the information was admitted even without any support by testimony or affidavit of a person who attested to the truth of the information or had personal knowledge of the information's appearance on the internet.

However, the courts did not accept specific information that originates from the internet without clear verification by way of supporting testimony from competent witnesses.

2.2.3.4   Here, on the same grounds that are detailed in the court ruling in the case of Tel Aviv University, the web pages to which Shaked refers and which are said to be printed out from websites do not meet the tests required for their admission as evidence of their contents.  Similar to the rulings in the Taher Zaid and Tel Aviv University cases, in order for such a computer output to be admitted as an institutional record, a witness that is suitable for proving that the conditions prescribed in the Evidence Ordinance have been satisfied is required. Therefore, in my opinion, these records are not admissible as evidence of their contents without such supporting testimony.

2.2.3.5   It further appears to me that the emphases made by the court in the summation of the hearing in the Kavei Zahav case also apply here. Shaked's sources are taken from the websites of various organizations, and are intended by Shaked to prove "information specific to a date or a narrow and defined event" – specifically, the responsibility of Hamas for certain attacks on specific dates – and not general information of an administrative nature of an institution or an authority that publishes them on the internet. The

case law in this regard, including the ruling in the Taher Zaid case, which specifically refers to the Hamas website, indicates that a court in Israel would not receive in evidence pages from such websites as evidence of their contents, without supporting testimony from a competent witness, as required by law.

3.   **Statements attributed to police investigation & court documents**:

3.1   I refer below to the documents and other materials identified in the Shaked Report that are police investigation and court documents.

3.1.1   In the Primary Expert Opinion, I provided a comprehensive analysis of the admissibility of the documents listed in Appendix C of the Primary Expert Opinion. The documents that are police investigation and court documents that are appended to and/or cited in the Shaked Report are mostly identical to the documents of the abovementioned Appendix C, excluding certain documents that I shall address separately below.

3.1.2   I shall briefly note the crux of my conclusion in the Primary Expert Opinion regarding each of these types of documents:[29]

(a)   Documents that are verdicts delivered in criminal proceedings by military courts in the Occupied Territories are inadmissible as evidence of their contents pursuant to Section 42A of the Evidence Ordinance.[30]

In the Primary Expert Opinion for the NatWest cases, I thoroughly analyzed the approaches of the Israeli courts regarding the admissibility of military court verdicts according to Article 42A of the Evidence Ordinance.

The decision of the Honorable Judge Drori issued in the case of Avrahami et al v. The Palestinian Authority et al[31] stated that these verdicts are admissible according to Article 42A of the Evidence Ordinance in the same manner as other verdicts issued by Israeli courts.

---

[29]   See footnote 1 above.
[30]   Chapter 3.3 of the Primary Expert Opinion and my findings there.
[31]   Motion 4994/08 The estate of the deceased Joseph Avrahami, his blessed soul v. the Palestinian Authority (decision dated the 22nd of March 2009)

I stated in my opinion that this decision is wrong and that in my view military court verdicts are not verdicts of Israeli courts and therefore are inadmissible according to Article 42A.

As noted in my Primary Expert Opinion, my opinion was consistent with the opinion of the Attorney General[32] of the State of Israel produced to the Supreme Court in connection with the appeal of Judge Drori's decision to the Supreme Court.[33]

The Supreme Court in its recent ruling dated November 25, 2010 in Avrahami v. The Palestinian Authority[34] cancelled Judge Drori's decision regarding the admissibility of military court verdicts because that subject was not in dispute between the parties - the respondents, among whom were the convicted in these verdicts, did not object to the verdicts' admissibility. Accordingly, Judge Drori's decision has no precedential effect and at present, the legal situation is as it was before this cancelled decision, that verdicts of the military courts in the Occupied Territories are inadmissible according to Article 42A of the Evidence Ordinance.

(b) Documents that are considered findings and conclusions in sentences that were delivered in a criminal procedure of any given court, be it in Israel or a military court in the Occupied Territories, are inadmissible as evidence of their contents pursuant to Section 42a of the Evidence Ordinance.[35]

(c) Documents that were prepared by prosecuting and/or investigating authorities, such as indictments, testimony provided to policemen and evidence collected by the police or the ISA for the purpose of their filing as evidence in a

---

[32] The opinion of the Attorney General is attached as Appendix C1.
[33] Motion for permission to appeal 3559/09 The Palestinian Authority v. The Estate of the Deceased Joseph Avrahami, his blessed soul
[34] The Supreme Court decision is attached as Appendix C2.
[35] Section 42a (b) (2) and my conclusion in Section 3.7 of the Primary Expert Opinion.

criminal procedure, are inadmissible as evidence of their contents.[36]

(d)   Documents that are considered findings and conclusions that are provided as verdicts of courts in Israel, in the criminal proceedings that are the subject of the documents appended to and/or cited in the Shaked Report, would be inadmissible as evidence in a civil proceeding against NatWest in which claims were made similar to the ones I understand are being made in the <u>Weiss</u> and <u>Applebaum</u> lawsuits.  The bank [NatWest] is not the "substitute" of the party convicted in the underlying criminal proceedings, the "responsibility" of the bank does not "stem from the responsibility of the convicted party," and the bank was never obliged to be responsible for the "statutory duty" of the convicted; moreover, no such "statutory duty" exists, as detailed at length in the Primary Expert Opinion.[37]

In addition to the case law that I address in the Primary Expert Opinion on this subject, I have considered also the verdict delivered by the District Court–Central Region in Civil Case 5286-08-07 Rosenberg v. Bulus Gad Tourism and Hotels Ltd. et al, which considered the question of whether the responsibility of company directors "stems from the responsibility" of the convicted company, and the court ruled as follows:

"The legislator explains in the law proposal that it is suggested that the findings in the criminal ruling shall also serve against a third party . . . who will not be a litigant in the criminal trial, e.g. a claim filed against the substitute of the convicted or against the employer of an accused due to his bailment responsibility or against his insurer.'

"In his abovementioned book, Kedmi interprets the concept of 'he whose responsibility stems' as follows: 'connected to – he whose responsibility rises – stands or falls – by virtue

---

[36]   Section 36 (c) of the Evidence Ordinance; Section 10.2 of the Primary Expert Opinion.
[37]   Section 3.6 of the Primary Expert Opinion.

of the responsibility of the convicted, e.g. the bailment responsibility of the employer for the actions of his employees' (pp.1360).

"The examples provided by the scholar Kedmi and the explanations of the law proposal in the matter of 'he whose responsibility stems' allegedly indicate that this is directed at he whose responsibility stems solely and exclusively by virtue of the status of another, and it is not a personal responsibility for a wrong. An employer is not responsible for the actions of his employees that are a result of his own wrong, but rather by virtue of the provisions set forth by law (Section 13 of the Civil Wrongs Ordinance), and the same rule applies to a bailor (section 2 of the Bailees Law, 5725-1965) and an insurant (refer to Section 68 of the Insurance Contract Law, 5741 – 1981). Furthermore, it is evident from the abovementioned examples that this entails a party whose responsibility stems exclusively from the obligation of another.

"Is the responsibility of the directors for the actions of the company they had served in such? It seems not to me."[38]

(e)   Minutes of the hearings of courts, both the civil courts in Israel and the military courts in the Occupied Territories, cannot constitute evidence even in a civil case against the convicted or against a convicted accomplice to a felony. In this regard I refer to the decision of the Supreme Court in the matter of Pupik v. Pazgas et al.,[39] where the court ruled as follows:

"The minutes the applicant wished to submit do not in themselves constitute admissible evidence and the applicant also admits to this. The rule is that minutes of a criminal court hearing are not in themselves admissible as evidence in a civil procedure. The applicant wishing to submit them must summon the relevant witness to testify in court. In the

---

[38]   Civil Case 5286-08-07 Rosenberg v. Bulus Gad Tourism and Hotels Ltd. et al, published in NEVO.
[39]   Permitted Civil Plea 8562/06 Limor Pupik v. Pazgaz 1993 Ltd, et al., published in NEVO.

course of this testimony, it may be possible to file the minutes considering the provisions of the evidence laws pertaining to them (refer to Permitted Civil Appeal 275/96 Aknin v. Gilat – not published). Contrary to the aforesaid, in a different case, the court is entitled to review the indictment, the minutes and any other material filed in a criminal case. This is when the court deems it is necessary in order to clarify the findings and conclusions of a preemptory verdict in a criminal case, which were admitted as evidence pursuant to Section 42a of the Evidence Ordinance (New Version), 5731-1971 (refer also to Section 42b of the Evidence Ordinance).  This is no the matter in the case at hand and, as such, the minutes may be filed – inasmuch as they may be filed – only in the course of the testimonies of the relevant witnesses."

(f)   Written confessions of suspects are tantamount to documents of an investigative authority that are inadmissible as an institutional record pursuant to Section 36 (c) of the Evidence Ordinance; furthermore, we are dealing with an external confession of a convicted party to a criminal procedure, who is not a party to these proceedings against NatWest, which cannot be submitted as evidence against a given third party in any form other than by means of testimony by the interrogator and the interrogated party that gave the confession.[40]

3.1.3   Additional documents that are police investigation, forensic reports and court documents that are appended to or cited in the Shaked Report, and which are not included in the documents listed in Appendix C to the Primary Expert Opinion, include the following:

3.1.3.1 A Military court indictment against Ibrahim Hamad (footnotes 60 (Appendix No. 1, pp. 24-43), 176, 177, 178, 196  200, 202, 203, 204,  221, 223 of the Shaked Report).

---

[40]      Section B of the Evidence Ordinance; Sections 10-12 regarding the admissibility of testimony or a confession given outside of court.

3.1.3.2 Interrogations by the Israel Police and a confession in Arabic of the suspect Amar Nasser Aldin (footnote 352 of the Shaked Report).

3.1.3.3 Two unidentified sets of documents indicated by Shaked as W_S088289 – W_S088330 and W_S088335 – W_S088337 (footnote 247 of the Shaked Report).

3.1.3.4 A series of 10 weapons laboratory reports [footnote 247 of the Shaked Report]. These reports were provided by a weapon expert Avi Kofman, on different dates since July 20, 2003 and November 2, 2003. All the reports except one [W_S0088322 – W_S088326] include reference to the attack on Road 60 on January 29, 2003.

Contrary to Shaked's statement in the relevant paragraph [page 63 – footnote 247], these reports do not include any laboratory tests of the weapons that according to Shaked "were taken from the cell members." The weapons expert provided these reports only regarding the bullets and the bullet cases found at the scenes of several attacks.

3.1.3.5 A military court indictment against Ahmad Tsalah Ahmad Tsalah (Abu Radab), (footnotes 446, 447 of the Shaked Report). This indictment is marked also as NWII – 000974 - NWII – 000990 in Annex C to my Primary Expert Opinion.

3.1.3.6 A military court verdict and sentence of Ahmad Tsalah Ahmad Tsalah (Abu Radab) (footnotes 448, 449 of the Shaked Report).

3.1.3.7 A military court indictment against Hilmi Abdel Karim Muhamad Hamash (footnote 450 of the Shaked report). This indictment is marked as W_S 157085 - W_S 157095 in Annex C to my Primary Expert Opinion.

3.1.3.8 A part of the interrogation statement of Nufal Jihad Nufal Adawin (W_S 098240 – W_S 098245).

3.1.3.9 An interrogation statement of Fares Adawin (footnote 435 of the Shaked report). These documents were marked as W_S 098256 - W_S 098273 in Annex C of my Primary Expert Opinion.

3.1.3.10 Military court indictment and sentence of Nufal Adawin (footnote 435, Appendix No. 1 pages 1003 – 1006 of the Shaked report). These documents were marked as W_S 098315 - W_S 098321 in Annex C of my Primary Expert Opinion.

3.1.3.11 Military court revised indictment of Nufal Adawin (footnote 435, Appendix No. 1 pages 1007 – 1018 of the Shaked report). These documents were marked as W_S 098333 - W_S 098344 in Annex C of my Primary Expert Opinion.

All of these documents (police interrogations and reports, military court indictments, verdicts and sentences) are among the types of documents that the Primary Expert Opinion concludes are inadmissible as evidence of the truth of their contents against NatWest. A party that is interested in admitting these documents as evidence of their contents against the bank must prove their contents by way of the testimony of appropriate witnesses.

Further, as I will detail below, some of these documents contradict Shaked's conclusions, especially regarding the Bus 19 attack of January 29, 2004.

The laboratory reports are inadmissible pursuant to Section 36 (c) of the Evidence Ordinance, because they are documents that disclose investigation findings that were prepared by an investigative authority for the purpose of their filing as evidence in a criminal proceeding.

Furthermore, a party that wishes to submit these reports against NatWest in a civil case must do so in the same manner as an expert opinion is submitted, by presenting testimony by the expert who created them on behalf of the weapons laboratory which is a unit of an Israel Police department.

4.    **Statements attributed to books**:

4.1    Shaked cites three books, as follows.

4.1.1    FN 47 – Ronni Shaked and Aviva Shabi, Hamas: M'Emunah B'Allah L'Derech Ha-Terror, pp. 302-307, and also pp. 313-316

This footnote refers to pages in a book on Hamas written by Ronni Shaked and Aviva Shabi.  The introduction to the book [p. 9, last paragraph] states that for the purpose of writing the book the authors relied on "testimony and evidence brought forth in the course of the trials of Hamas members in military tribunals in the occupied territories, on their confessions in the course of interrogations, on handbills, leaflets and pamphlets issued by Hamas, on conversations with and interviews of members and affiliates of the movement, on conversations with Palestinian researchers, on articles published in the Hebrew and Arab press in Israel and abroad, as well as on articles and research papers about fundamentalist Islam."

On page 313 of the book, it is alleged that on April 16, 1993, a suicide bomber by the name of Saher Tamam exploded a car bomb near Mehola. It is alleged in the book that he belonged to Hamas.

The authors do not identify the source of this specific piece of information with regard to the suicide bomber having been a Hamas member.

Furthermore, it is important to make clear that Hamas did not "invent" or "develop" the method of carrying out terrorist attacks by means of suicides.  Suicide terrorist attacks were perpetrated many years before the Ez Adin El Qassam Brigades were established.

4.1.2    FN 52 – Guy Aviad, Lexicon of the Hamas Movement, p. 174 - 176

According to the author, it is alleged that Abed El Rahman Salame went to Syria "and from there to Lebanon where he received military training in the camp of the Popular Front of Ahmad Gibril" Later on he received another military training including preparation of explosive charges in Iran.

Except for the fact that he received military training abroad and not guerrilla training as written in the Shaked Report, there is no correspondence between the contents of that page in the book and the contents of the relevant passage in the Shaked Report referring to this footnote.

Furthermore, there is no indication as to what the author of the book relied on with respect to Salame's military training in Lebanon or in Iran.

### 4.1.3 FN 53 – Guy Aviad, Lexicon of the Hamas Movement, p. 25

This page contains a sketch that, according to the author, reflects the organizational structure of Hamas. According to the book, Khaled Mash'al is positioned at the head of the political office of Hamas.

The author does not identify his sources for his statements about the organizational structure or the various office holders in Hamas.

### 4.1.4 FN 54 – Guy Aviad, Lexicon of the Hamas Movement, p. 102

The author describes Sheikh Izz Edin A Subhi's course of life, presenting him as a partner in establishing the military arm of Hamas in its present set up. According to the author Subhi was one of the Hamas deportees to Lebanon but decided not to return to Gaza and went from Lebanon to Syria, where he served as liaison between the "external" leadership of Hamas and its military arm in Gaza. According to what is reported, Izz Edin A Subhi was killed by an explosion in his car in Damascus in September 2004. On this page there is no indication as to the source of this information.

It should be noted that in the similar passage in page 22 of his Crédit Lyonnais report, Shaked stated that: "The headquarters of the al-Qassam Brigades was **commanded by Izz al-Din Sheikh Khali**l from **1990** up until his elimination in September **2006"** [emphasis added].

In the corresponding passage on page 22 of the NatWest report, Shaked stated: "The principal liaison between the al-Qassam Brigades in Gaza and Hamas's headquarters in Damascus from **1994** up until his elimination in September **2004** was Izz al-Din Sheikh Khalil, a **senior member of the al-Qassam Brigades**" [emphasis added].

Shaked does not provide any explanation for the differences between his statements.

### 4.1.5 FN 56 – Guy Aviad, Lexicon of the Hamas Movement, p. 111

The author describes Muhanad El Hafez Taher as having been the Hamas commander in the Samaria region, as was written in the Shaked Report in the passage referring to this footnote. On this page in Aviad's book there is no indication as to the source of this information.

4.1.6 FN 57 – Guy Aviad, Lexicon of the Hamas Movement, p. 221

This passage of Aviad's book describes the activities of Abed El Kader Qawasme. It is alleged there that as of 2002 he served as the commander of the Hamas military arm in the Hebron region, similar to what is written in the passage in the Shaked Report referring to this footnote. The author provides no indication as to the source of this information on this page.

4.1.7 FN 58 c - Shai Sha'ul, The Martyrs, Islam and the Suicide Bombings [Hebrew], Herzliya Interdisciplinary Center 2003, pp. 41-49

The footnote refers to a chapter in Shai Sha'ul's book, printed in 2003, describing the stages of carrying out a suicide bombing.

In his introduction to the book, on page 12, the author alleges that "the data regarding suicide bombings are updated to 2002 and are generally based on official data or on published researches on the subject."

4.1.8 FN 61 - Shai Sha'ul, The Martyrs, Islam and the Suicide Bombings [Hebrew], Herzliya Interdisciplinary Center 2003, pp. 41-49

On pages 41-49 in the book, to which the footnote refers, there is no mention of the use of codes and passwords when passing the suicide bomber to the commander of the terrorist squad in charge of carrying out the terrorist attack, which is what is stated in the passage in the Shaked Report referring to these pages in the book.

4.1.9 FN 62 - Shai Sha'ul, The Martyrs, Islam and the Suicide Bombings [Hebrew], Herzliya Interdisciplinary Center 2003, pp. 41-49

The statement of Shaked that: "A senior commander generally handles the last preparations for the terrorist attack," has no basis in the source to which the footnote refers.

4.1.10 FN 74 - Guy Aviad, Lexicon of the Hamas Movement, p. 171

The author describes Abbas Mohamad Mustafa El Sayed as a senior figure in the Hamas organization in the West Bank.  According to the contents of this page he was in contact with Hamas headquarters in Syria, consistent with the contents of the relevant passage in the Shaked Report referring to this footnote.  In the book there is no indication as to the source of this information.

4.1.11  FN 125 - Guy Aviad, Lexicon of the Hamas Movement, p. 171

The author alleges that Abbas El Sayed had planned the attack at the Park Hotel in Natanya, as was mentioned in the passage in the Shaked Report supported by this footnote.  There is no indication as to the source of this information.

In the same footnote, Shaked refers also to his Appendix No. 1 pages 93 – 176 which is a verdict of the Tel Aviv District court against Abbas El Sayed.

Shaked does not mention that this verdict is not final, and that in fact there is a pending appeal before the Supreme Court from the verdict and the sentence. (Criminal Appeal 1776/06 Abbas El Sayed V. The State of Israel).

4.1.12  FN 127 - Guy Aviad, Lexicon of the Hamas Movement, p. 171

The author alleges that Abbas, apart from being active in the military arm, was also involved in political and civil activity of Hamas, as was mentioned in the passage in the Shaked Report this footnote supports. There is no indication as to the source of this information.

4.1.13  FN 133 - Guy Aviad, Lexicon of the Hamas Movement, p. 111

The author writes that Muhamad Taher was involved in planning the Sbarro attack in Jerusalem. There is no indication as to the source of this information.

4.1.14  FN 134 - Guy Aviad, Lexicon of the Hamas Movement, p. 165

This page in the book describes the perpetration of the attack in the Sbarro restaurant in Jerusalem.  According to the author, 15 people were killed

and about 110 wounded in this attack as Shaked indicates. There is no indication as to the source of this information.

4.1.15  FN 135 - Guy Aviad, Lexicon of the Hamas Movement, p. 111

The author writes that Muhamad Taher was involved in planning the Dolphinarium attack in Tel Aviv. There is no indication as to the source of this information.

4.1.16  FN 136 - Guy Aviad, Lexicon of the Hamas Movement, p. 77

This page in the book describes the Dolphinarium attack in Tel Aviv. According to the author, 21 people were killed and over 80 wounded in this attack. There is no indication as to the source of this information.

4.1.17  FN 250 - Guy Aviad, Lexicon of the Hamas Movement, p. 212 – 213

This portion of the book describes the attacks that, according to the author, were perpetrated by the "Zurif cell" of Hamas. The murder of Dr. Tibon and Yaniv Shimel is among the attacks mentioned in the article. Contrary to Shaked's description, the shooting on the vehicle of Dr. Tibon was done from a passing by car and not from an ambush. There is no indication as to the source of this information.

4.1.18  FN 251 - Guy Aviad, Lexicon of the Hamas Movement, p. 212 – 213

This portion of the book describes the attacks that, according to the author, were perpetrated by the "Zurif cell" of Hamas. The murder of Yaron and Efrat Ungar is among the attacks mentioned in the article. There is no indication as to the source of this information.

4.1.19  FN 252 -  Guy Aviad, Lexicon of the Hamas Movement, p. 212 – 213

This portion of the book describes the attacks that, according to the author, were perpetrated by the "Zurif cell" of Hamas. The murder of "three of the Monk family" is among the attacks mentioned in the article. Contrary to Shaked's description, there is no information in this portion regarding the "operation system" used in this attack, and certainly no "ambush" is mentioned. There is no indication about the identity of the victims, and according to the author were three victims while Shaked mentioned only two. Further, there is no indication as to the source of this information.

4.1.20  FN 245 – Ronni Shaked and Aviva Shabi, Hamas: M'Emunah B'Allah L'Derech Ha-Terror (Hamas: From Belief in Allah to the Road of Terror), pp. 128-141.

The footnote refers to two chapters in the book.  The contents of these chapters correspond with Shaked's description with regard to the first stages in the establishment of the military arm of Hamas in the Gaza Strip.

4.1.21 FN 246 – Shaked and Shabi, Hamas: M'Emunah B'Allah L'Derech Ha-Terror, pp. 295-301

On page 301 in the book, it is stated that in December 1991 the first murder by a squad of Ez Adin El Qassam had been perpetrated, near the settlement Kfar Darom. The authors do not identify the source of this information.

There is no information supporting the statement in the Shaked Report that shooting by ambush came to be the major tactic of terrorist attacks perpetrated by Hamas during the years 1991-1992.

4.2  **Analysis of the documents pursuant to the Evidence Ordinance:**[41]

4.2.1  As a rule and as detailed above, professional literature in itself is hearsay evidence and is inadmissible as proof of its contents.  Again, I do not address the admissibility of these items as if they were submitted as providing support for a qualified expert's offer of an opinion on a subject within his competence based upon his specialized analysis or interpretation of them.[42]

4.2.2  The preamble chapters of the books of Shaked and Shabi ["Hamas: M'Emunah B'Allah L'Derech Ha-Terror"], and of Shai Sha'ul ["The Martyrs, Islam and the Suicide Bombings"] indicate the sources that the authors of both books rely on. The sources include indictments, sentences, confessions, press items, interviews, etc.  As detailed in my Primary Expert Opinion and in this rebuttal opinion above, these types of documents are all inadmissible as evidence of the truth of their contents against NatWest in this civil case.

---

[41]    See footnote 1 above.
[42]    See footnote 1 above.

I cannot provide the same conclusion about the book of Guy Aviad ["Lexicon of Hamas"] because I was not presented with the preamble chapter of this book. As detailed above, the paragraphs cited by Shaked from this book do not indicate the sources of information upon which they are based.

5. **Audio recordings and video movies:**

5.1 **"Testaments of suicides" on the YouTube website**

5.1.1   Shaked cites several audio and video recordings.  The speakers use literary Arabic, a language I have not mastered.  However, and subject to this restriction, I will examine the admissibility of these recordings according to their nature.

5.1.2   An audio or video recording is deemed an out of court statement which was made in the presence of the person who has listened in and recorded it.   In actuality, this is a sort of record made by the speaker in the recording.

5.1.3   So long as the recording qualifies under the admissibility tests described below, it may be admitted in evidence.

5.1.4   A recording can be received in evidence if it qualifies under three tests, as follows:

- **The technical test** – regarding the credibility and authenticity of the medium itself;

- **The substantiality test** – whether the terms for admissibility of the contents of the recording have been met;

- **The formality test** – whether the recording meets the conditions stipulated in the Secret

Taping Law.[43]

The burden of proving these tests are satisfied lies with the party seeking to offer the recording in evidence.

5.2      **The technical admissibility test**

5.2.1    This test is designed to make sure that whatever is said in the recording does indeed reflect what was actually said when the recording was made, because electronic media can be easily altered, edited and counterfeited with hardly leaving any telltale traces.   The case law in Israel has established several "technical" tests a recording must satisfy in order to be admitted in evidence.   Among other considerations, the recording must be true and authentic, having been appropriately guarded, such that there is no doubt about it not having been altered or processed, and that the voices of the speakers are clearly and positively identifiable.[44]

5.2.2    Shaked bases his conclusion that certain attacks have been perpetrated by Hamas on "recorded testaments" of those who claim to be carrying out those attacks.

Within the framework of footnotes numbers 20, 21, 22, 46, 323, 324, 339, and 371 of his opinion, Shaked refers to several video recordings posted on YouTube, which he presents as proof of their contents.

5.2.3    The first question to be addressed is whether these movies, posted on a social network such as YouTube, satisfy the first, technical test.

In my opinion the answer is they do not.

---

[43]      Dr Kedmi, part 3, p. 1320. see also criminal appeal 2801/95, Jacob Korkin v. the State of Israel Padi 52 (1), 791, 803-804; see also Criminal Appeal 203-02-10 (Haifa District Court) The State of Israel V. Ofer Sharon published in Nevo.
[44]      Dr. Kedmi, part 3, pp. 1321-1331.

5.2.3.1   First, Shaked has not presented the original version of the recorded event.  Instead, he has presented only what is said to be a copy of the original recording that was posted on the YouTube website by unidentified persons.

Shaked has offered no information concerning whether the copy posted on the YouTube website is an accurate and /or complete and /or true copy of the original recording.

5.2.3.2   Second, Shaked has presented no testimony from whoever made these recordings, who may verify that whatever is heard or seen in the recordings was indeed said by whoever is seen to be speaking in them.

5.2.3.3   Further, there is no evidence that the voice heard in the recording is indeed the voice of whoever is shown to be speaking.

 "Identifying the voices of the speakers in a recording is an essential requisite for the technical admissibility of the recorded medium." And "if the voices identification was not proved beyond a reasonable doubt – the recording is inadmissible" [45]  Further, the manner in which these movies were recorded and edited raises doubts as to the identity of the speaker who is heard in the movie and whether the words he is speaking are indeed his own.  These doubts increase in view of the fact that, in each recording, the persons photographed are shown as though reading the texts from documents they hold in their hands.

In addition, the text heard in these recordings is in the literary Arabic language that, to the best of my knowledge and experience, is not in daily use among young Palestinians, such as the persons depicted in these recordings.  This indicates the texts are dictated by the initiator and /or creator of the movie and are not the words of whoever is shown as the speaker therein.

---

[45]      Dr. Kedmi, part 3, p. 1325.

5.2.3.4   Moreover, watching these recordings, even with an untrained and non-professional eye, one can very clearly perceive that they have undergone editing and processing after they were recorded.

For example, it is clearly discernible that nationalistic songs were added, as well as scenes from places other than and different from the location at which the "speaker" in the movie was recorded, such as scenes from terrorist attacks and of wounded persons [see, for instance and in particular, the movies that are the subject of footnotes 339 and 371].

It is not certain that the editing work done on these recordings was not more extensive than can be readily perceived.  Likewise it is not possible to exclude that whoever is actually reading what is heard is not the person shown in the recording, but rather is some other, unknown person.   As a rule, an intentionally manipulation of a recording in order to alter it in any way will cause it to be disqualified as evidence.[46]

5.2.3.5   Nor has Shaked offered any evidence as to the identity of the person who recorded the movies and /or who edited them and /or who posted them on the internet, whether on YouTube or other websites claimed to be affiliated with Hamas.

5.2.3.6   Nor is there any evidence with regard to the points in time at which the movies were recorded and /or edited.

5.2.3.7   Taking into consideration the fact that Shaked attributes the making of these movies to terrorist organizations or terrorism activists, for whom providing deceptive information is often tactical and customary, all of the questions I have noted above become particularly important in assessing the reliability of these recordings and the circumstances under which they were made.

---

[46]   Dr. Kedmi, part 3, p. 1325.

A party wishing to submit these recordings as evidence of their contents must remove these doubts by means of credible evidence and /or by means of witnesses who can address the questions set forth above, and who can be cross-examined in order to test the reliability of the recordings and of their contents.

5.2.4    In view of the above said, I am of the opinion that these YouTube movies presented by Shaked as evidence of their contents do not satisfy the first, technical admissibility test and cannot serve as proof of their contents or the identities of those shown as speakers therein.

5.2.5    Furthermore, in addition to the technical requirements the recordings must meet, as detailed above, the rules of evidence applicable to "computer output" and /or to computer output produced from the internet should also be applied to these recordings posted on websites.  As stated above, there is no evidence that they meet these criteria.

Furthermore, perusing the details in the web page of these movies shows that they have been posted by a group / organization named "The Official Tube of Muslim Brotherhood Ikhwantube Hebronaaa."

This group's website's official URL is:

www.ikhwantube.org/uprofile.php?UID=1318

This website does not disclose any information with regard to its owners' and /or operators' identity.

There is no information with regard to the manner in which these movies reached the website's operators, to whether the editing of these movies was carried out by the original recorders or whether these movies have undergone additional editing by the website's operators who, as mentioned above, are unknown.

5.2.6     My conclusion that these recordings do not satisfy the technical admissibility test should suffice to disqualify them as evidence of the truth of their contents without considering the additional applicable tests.

5.3     **The substantiality test**

5.3.1     The purpose of this test is to determine the admissibility of the contents of a recording that has satisfied the technical admissibility test.

5.3.2     The contents of the recordings are undoubtedly hearsay.  Therefore, the party interested in submitting them as proof of their contents must demonstrate that they qualify under one of the exceptions to the rule disqualifying hearsay testimony, according to the Evidence Ordinance and /or the caselaw.

5.3.3     Among the exceptions to the rule disqualifying hearsay testimony, the ones relevant for examining the admissibility of recorded media as proof of their contents are as follows:

- Utterance of a deceased who cannot be brought to court to testify;
- Testimony of an utterance by a witness at the scene of a committed violation according to Section 9 of the Evidence Ordinance;
- Utterance of a victim of an act of violence according to Section 10 of the Evidence Ordinance;
- An institutional record according to Section 36 of the Evidence Ordinance.

As stated below, my opinion is that these YouTube videos are not admissible for the truth of their contents under any of the above exceptions to the rule disqualifying hearsay evidence.

5.3.4     **The exception - Utterance made by a deceased**

5.3.4.1    An utterance by a deceased may, under certain circumstances, be admitted in evidence despite the fact that there is no possibility to "examine the deceased in court about things he said or had written."[47]

5.3.4.2    Among the utterances of a deceased which have been recognized in Israeli caselaw to be admissible in evidence, three are relevant to the case at hand.  One is an utterance by a deceased which at the time it was made was, prima facie, contrary to the deceased's monetary or proprietary interests.  Another is an utterance by a deceased contained in a document which was made during the deceased's "regular course of business," and the third is an utterance of a deceased that was made when he was "on duty."

5.3.4.3    As I have pointed out above, it is not certain that the voice heard in the recorded media is indeed the voice of the person shown, and therefore it is not clear at all whether it concerns an utterance of a "deceased," even if we assume it concerns a person who has died.

5.3.4.4    Further, according to the Shaked Report, the willingness to commit acts of suicide is motivated, among other reasons, by the economic benefits the suicide's family will reap and the increased prestige they will enjoy. Therefore, even according to Shaked, one cannot say that the utterances at hand might be contrary to the deceased's monetary or proprietary interests.

5.3.4.5    As to the other two exceptions in the context of a deceased, the caselaw states that an utterance of a deceased "office holder" would be admissible in evidence only if it concerns a document he made with regard to an act carried out in the past (as opposed to an act he intended to carry out in the future), and provided that the person can be accorded the status of an "office holder" in an  "institution" which he purportedly represents.

---

[47]    Dr. Kedmi, part 2, p. 573.

Likewise, one cannot say about the deceased that making documents of the kind of such recorded movies was done during his "regular course of business."

5.3.5  **The exception - an utterance made by a deceased at the scene of a committed violation – Section 9 of the Evidence Ordinance**

5.3.5.1  Section 9 of the Evidence Ordinance states as follows:  "Testimony to an utterance made when, as claimed, a violation was perpetrated, or directly before or after, and that utterance concerns the matter directly, it will be admissible if the person who uttered it is a witness in the trial."

5.3.5.2  According to the Shaked Report, the speakers in the recordings [as far as they are indeed the speakers] are dead and certainly cannot be a "witness in the trial."  Furthermore, there is no proof that the utterances of the speakers were made "when . . . a violation was perpetrated, or directly before or after," as required by Section 9 of the Evidence Ordinance.

5.3.5.3  Indeed, the case law has stretched the applicability of this article to cover also the case where the speaker[48] [as far as was proved that he has spoken in his own voice] is dead, but only concerning one of the "Res Gestae" exceptions of the British Common Law, where the utterance is "spontaneous" and was made in the face of an "exciting event."

5.3.5.4  By their substance and character, it is clear that the utterances made by the deceased in these recordings could not be considered as "spontaneous" utterances.  The recordings show clearly that the persons depicted seem to read from a written document, written in advance, and probably not by the deceased himself.  Furthermore, these recordings do not appear to concern any "exciting event."

---

[48]     Criminal appeal 7293/97, Jafer Amer v. the State of Israel p. 460, 469 published in Nevo.

5.3.5.5    In view of the above, I am of the opinion that these recordings do not meet the criteria of the exception stated in Section 9 of the Evidence Ordinance.

5.3.6    **The exception - Utterance of a victim of an act of violence – Section 10 of the Evidence Ordinance**

5.3.6.1    This article of the Evidence Ordinance allows admitting in evidence, under certain stipulations, an utterance of a victim of an act of violence as the result of which he was injured.

5.3.6.2    Section 10 deals clearly with an utterance by a person on whom it is contended that "an act of violence was perpetrated."[49]

5.3.6.3    According to the Shaked Report, the persons shown in those recordings are suicide bombers who caused death and injuries to many people, including the plaintiffs.  It is further stated by Shaked that the attacks were perpetrated, among other reasons, for interests of social, religious and economic status.  Therefore, it seems to me that it is impossible to attribute to these persons the status of someone on whom "an act of violence was perpetrated."  Therefore in my opinion, this exception is not applicable to these YouTube videos.

5.3.7    **The exception - An institutional record – Section 36 of the Evidence Ordinance**

5.3.7.1    The admissibility of web pages under the exception of institutional records, including web pages that were produced from a Hamas website, has been extensively analyzed in this opinion above.  Based on the same reasons stated above, I conclude that these recordings do not qualify for the exception from the exclusion of hearsay for institutional records.

5.3.7.2    I note again that the source of the recordings is a website identified by its caption with the Muslim Brotherhood, but there is no information about

---

[49]    Section 10 of the Evidence Ordinance,[New Version] 5731–1971

the identities of its owners, managers or operators.   Under these circumstances, there is no justification to consider whoever is behind the posting of these movies on YouTube to be "an institution," and certainly not to attribute to these recordings the appellation of "institutional record."

5.4        For the reasons listed above, I am of the opinion that these recordings do not satisfy the substantiality test for them to be received in evidence for the truth of their contents.

Because the third formal test deals with recording media meeting conditions stipulated in the Secret Taping Law,[50] it is not relevant to the case at hand, and therefore I will not analyze it.

5.5        In sum, I am of the opinion that these recordings do not qualify under the technical test for admissibility with regard to their authenticity, and nor do they qualify under the substantiality test for admissibility in evidence of their contents.   Therefore, they are inadmissible in evidence for the truth of their contents.

## 6.   **Photographed interviews:**

**General:**

6.1        As a factual foundation for his conclusions that Hamas is responsible for perpetrating the terrorist attacks relevant to the claim at hand, Shaked refers to video recordings that include interviews made by himself and /or with his participation, as well as to a British documentary film that was aired also on Israeli television.

6.2        These include W_S089432 ,W_S089434 ,W_S089436 ,W_S089439 , W_S089442 ,W_S089447 ,W_S089455 ,W_S089459, as well as the documentary movies named "For the Sake of Allah" / "The Road to Martydrom."

---

[50]        The Secret Taping Law, 5739–1979

6.3   These movies include interviews in English and in spoken Arabic, which I understand to a level sufficient to enable me also to analyze their contents. The interviews are said to have been held with Palestinian prisoners incarcerated in Israeli jails.  As mentioned, Shaked encloses also a British documentary film named "For the Sake of Allah" / "The Road to Martydrom."

6.4   It should be pointed out that the interviewers were presented to the interviewees as representatives of a Canadian television company. Whenever the interviewee was able to understand and speak English, the interview was conducted by whoever seemed to be the production manager/director, in English, and whenever the interviewee spoke only Arabic, Shaked was the main interviewer while being directed from time to time by the production manager to ask specific questions.

6.5  **The admissibility of these movies in evidence:**

6.5.1  As I have pointed out in other contexts above, I will not address the evidentiary status of these movies having been submitted as appendices to an expert opinion, but instead to the admissibility of the documents themselves, while referring to the fact that Shaked is a witness in this case and was present during, and /or took active part in their production.

6.5.2  As a rule, the evidentiary status of these movies is similar to that of the YouTube movies, with the exception fact that, unlike the YouTube movies, Shaked has, as mentioned, taken active part in their production.

6.5.3  The contents of these interviews, and in particular the interviewees'' answers, are considered inadmissible hearsay unless they qualify under one of the exceptions to the rule disqualifying hearsay testimony recognized in the Evidence Ordinance and /or the caselaw.

6.5.4      The interviews are equivalent to a written utterance by a "witness" made outside the courtroom.   Therefore, the relevant exceptions according to which their admissibility in evidence should be examined are those stated in the provisions of Sections 9, 10, and 10A of the Evidence Ordinance.

6.5.5      I am of the opinion that the movies do not meet the conditions required by these Sections of the Evidence Ordinance:

6.5.5.1    Section 9 of the Evidence Ordinance deals with utterances made by whoever is a "<u>witness in court</u>."  To the best of my knowledge, not one of the interviewees falls under the definition of "witness in court" in the case at hand, therefore this exception could not be applicable.

Furthermore, even the extension of this exception with regard to "spontaneous" utterances and an  "exciting event" does not apply to these interviews.  The interviews were conducted with the interviewees devoid of any spontaneity and without any exciting event taking place at the scene, and with full knowledge that they were intended for airing on foreign television.

6.5.5.2    According to the Shaked Report, the interviewees were terrorists who initiated and carried out terrorist attacks, some of which are included in the list of terrorist attacks that are the subject of the claim against NatWest.  It seems clear to me that none of the interviewees in these movies may come under the definition of a person on whom an act of violence has been perpetrated, and therefore the exception stated in Section 10 of the Evidence Ordinance does not apply for these interviews.

6.5.5.3    Section 10A of the Evidence Ordinance deals exclusively with criminal proceedings.  As the case at hand involves civil claims, this exception does not apply to either the YouTube movies or the photographed interviews of these movies.

6.5.5.4    Because the movies were produced with the presence and/or the participation of Shaked, and because he is a witness in this case, these movies may be submitted on his behalf only as evidence to their mere existence.  Still, the contents of the movies retain the status of hearsay testimony that is inadmissible in evidence for the truth of their contents.

The contents of these interviews could be proved only by testimony of the interviewed persons in the trial.

## B.  Naim Report

I address below Shaul Naim's characterizations of certain of the documents and other materials he identifies in his report, and several of his purported conclusions, including what he states is his "professional opinion" that the documents he refers to are "authentic records maintained by Israeli Law Enforcement, including police officers, prosecutors, courts, or military officials, depending on where the relevant document(s) were maintained," as well as the admissibility of these documents under the Evidence Ordinance of Israel as proof of their contents under certain circumstances.[51]

### 1.1   Naim's Exhibits

1.1.1    A large number of the documents listed in the Naim Report were reviewed and analyzed in my Primary Expert Opinion.  A list of the documents I reviewed and analyzed in my Primary Expert Opinion was attached to my Primary Expert Opinion as Annex C.

1.1.2    For the purpose of this rebuttal report and for convenience, I organized all the documents referenced or submitted by Naim in his report in a table [hereafter "Annex A"]. The documents listed in Annex A are organized according to their order of appearance in the Naim Report, according to relevant attacks.  Where it was available, I identified these documents by plaintiffs' production number, and according to their type/nature.  I have also included, where appropriate, my comments concerning the contents of these documents and Naim's descriptions of them.

---

[51]    Again, as stated above, I do not address the admissibility of these documents as bases for an expert opinion, for the additional reason that I do not understand the Naim Reports to have any objective other than purportedly to authenticate the documents to which it refer and which are attached to his report.

1.2    **Naim's references to "Attack Files"**

1.2.1    Based on my professional experience and expertise as a lawyer and former ISA officer, there is no such legal or formal term or concept as "attack file," certainly not in the context of a court file.[52]  To the best of my knowledge, when a criminal offense occurs, it is investigated by the relevant unit of the police according to the nature and location of the crime.  The police unit in charge of the case opens the investigation file.

Similarly, when a terrorist attack occurs, the ISA conducts an investigation.  The ISA officers in charge of the area where the attack was perpetrated, and/or the officers in charge of the area from which the suspected terrorists arrived or were dispatched, lead the investigation, accompanied by a team of interrogators appointed to manage the interrogation of suspects or detainees according to the geographical location of the attack, the spoken language etc., as far as this information is known.   Naturally, the various security forces cooperate in the investigation and if the Israel Police has relevant information, such information is shared with the ISA. The ISA also shares information with the Israel Police.  For example, when a suspect is an Israeli citizen, he or she is usually arrested for interrogation by the Israel Police.

As to the record and filing method, any investigation case (an Israel Police file or an ISA file) is indexed and labeled according to the nature of the event; a file of a classified investigation is indexed using a code name specific to the case.

Naim uses the term "attack file" in diverse ways and multiple contexts. As I will detail below, Naim uses this term at times to describe a police investigation file, at times to describe a court file, including the evidence admitted by the court, and at times to refer to other documents such as ISA reviews and indictments. Consequently, it is unclear from the Naim Report whether in particular instances Naim is using the term "attack file" to refer a police file, a court file or something entirely different. For example, in footnote 6, Naim states that the ISA protocols are not part of the attack file and they are not used as evidence in a trial, even though ISA reviews are

---

[52]    It is possible to see in the judiciary's website that there is not any type of file denominated "attack file" - http://www.court.gov.il/heb/home.htm

listed in chapter IV of his report as being among the documents that are presented as part of an "attack file."

Naim explains that he is using the term "attack file" simply as "my internal reference for the collection of documents of each attack in the Report… for which I am opining that such documents appear, in my professional opinion, to be authentic records maintained by Israeli law enforcement, prosecutors, courts, or military officials, depending on where the relevant document(s) were maintained."

As I will explain further below, the various files pertaining to a specific attack are generated by a variety of law enforcement entities. These files are specific to each entity and there they are not necessarily identical, nor do they contain the same documents.

Below, I will briefly describe the various law enforcement files based on my experience and expertise as a lawyer and former ISA officer.

## 1.3   The various law enforcement files

Each law enforcement file is unique, containing different documents. Therefore, there is no basis for classifying all of them using the term "attack file."

### 1.3.1   The police investigation file

As described by Naim, the ISA is the authority responsible for investigating terrorism and terror attacks.[53]   However, the Israel Police is involved in several aspects of the investigation, such as collecting forensic evidence from the attack scene, preparing expert forensic reports regarding personal identification of the suicide bombers and the victims, preparing expert reports by the explosives laboratory, and interviewing eyewitnesses and the injured.   In addition, the police cooperate with the ISA when intelligence information is available to the police.

When the ISA investigation is completed, the intelligence information collected in the case and the detainees are transferred to the Israel Police. The police then process the information in order to obtain formal confessions and/or to conduct formal interrogation of the suspects. In the

---

[53]   See the assignment of the ISA as formulated in the General Security Services Act.

next stage the Israel Police investigation file, which includes all the evidence collected, is sent to the civil or military prosecution with a recommendation by the officer in charge of the investigation to file an indictment or to dismiss the case.

1.3.2    **The advocacy file**

The advocacy file is obviously different from the police file and includes supplemental documents that are not part of the police file.

After receiving the police investigation file and the police recommendation, the file and all the evidence are examined by the prosecution in order to determine whether the evidence is sufficient to file an indictment against the suspects.

In this stage, the advocacy file includes the opinion of the prosecutor in charge of the case with regard to the evidence, internal memoranda and often requests to the police to complete interrogations on certain matters, or requests to the ISA to provide expert reports or affidavits regarding confessions of suspects, and drafts of the indictment.

Often, suspects exercise their right to a hearing before the prosecution prior to the submission of the indictment to the court.[54]  If that occurs, the advocacy file would contain documents submitted by the suspects in the hearing process and the results of the hearing.

If, at the end of this process, a decision to file charges against the suspects was reached, then the advocacy file would also include the indictment and a subpoena, which will be submitted to the relevant court and to the accused.

1.3.3    **The court file**

The court file is initiated by the prosecution and opened by the court secretariat after the submission of the indictment.  The file is indexed as C (for Crime) or SC (for Severe Crime) plus a numeric code.

---

[54]    The hearing right prior to the submission of the indictment is regulated in Article 60(a) of the Criminal Procedure Act.

When the court file is opened, it includes no documents other than the indictment and the subpoena for the accused. [55]

Evidence is submitted to the court by and through the testimony of witnesses and/or experts for the prosecution and for the defense.  Only at the end of this process, and after the prosecution and the defense provide summaries to the court, will the court file contain all the evidence admitted by the court.

On many occasions, the court may decide that certain evidence is inadmissible. In such cases, evidence that may be part of the police investigation file or the advocacy file is excluded from the court file.

In fact, even at this stage, the process of submitting evidence is not necessarily concluded. When the accused is convicted, and as part of the sentencing proceedings, the prosecution and the defense may submit additional evidence, such as prior criminal records of the accused, character witness statements, etc.

As is evident from the above discussion, the various law enforcement files - all of which Naim labels as "attack files" – are distinct and different from one another.  At most, the court file may contain sections of the police investigation file, but it is inaccurate to assert that the entire police investigation file is always included in the court file.

## 1.4     The integrity of the "Attack File" and maintaining its contents

### 1.4.1     The integrity of the "attack file"

As it is evident from the above discussion, no law enforcement file, regardless of the authority, is a complete "attack file," i.e., none of them contains all of the documents generated with respect to a specific attack. Therefore, Naim's final conclusion that all the documents pertaining to a specific attack are kept by the court as a comprehensive integrated file is inaccurate.

Naim himself admits that some "attack files" kept by the police are not always complete because the original testimony may be submitted to the

---

[55]     This is true except with respect to arrest proceedings prior to the indictment's submission.

court by the prosecution, and the police does not always receive a copy of all the court documents.[56]

### 1.4.2    **Maintaining documents**

State authorities, including the police, the prosecution, and the courts, as well as other civil entities, are obligated by law to maintain certain documents for a period specified by law.[57]   The right to review documents held by the various law enforcement entities is addressed below.

### 1.5    **Inaccurate factual statements in the Naim Reports**

Naim provides a number of factual statements that supposedly describe the law enforcement system in Israel and its method of operation.   As I will discuss below, several of his statements are inaccurate.

### 1.5.1    **"Attack file."**   As stated above, this is not an official term and is not used to classify or categorize files by any authority.   Instead, it is a personal label adopted by Naim.

### 1.5.2    "**The entire trial is recorded by video.**"   In Chapter III. F of his report, Naim states: "The entire trial is recorded by video."[58]   To the best of my knowledge, there is no such convention or obligation to videotape court hearings in Israeli courts or in military courts in the Occupied Territories. Moreover, according to the law, it is forbidden to photograph the hearing in the courtroom. This has been confirmed to me by the Chief Military Prosecutor, who has informed me that trials of terrorists conducted in military courts in the Occupied Territories are not documented on videotape.

Similarly, Section 70 (b) of the Courthouse Law[59] states that it is forbidden to take photographs or to publish photos from the courtroom in a civil trial, except if permitted by the court.

---

[56]        See page 13 of Naim's report
[57]        See as example the Archives' Regulations (safekeeping and clearing out of courts and religious courts' files) 5746 - 1986
[58]        See Chapter III. F second paragraph on page 13 of Naim's report
[59]        Court's Room Act [combined version] 5744–1984

Israeli policy permits photographing court hearings only in exceptional and rare cases, such as in trials that involve historical or special significance.

1.5.3   **Criminal procedure.**  Also in Chapter III. F, Naim states that legal procedures are conducted according to the Criminal Procedure Law.[60]  But this act only applies to trials that are conducted in a court located in Israel and governed by the Laws of the Knesset.

The majority of the trials referenced by Naim are criminal trials that were conducted in military courts within the Occupied Territories.  The authority of military courts is not derived from Israeli law, but from the decrees issued by the military commander of the relevant region in his capacity as the sovereign of that region, according to the rules of international law. Therefore, the criminal procedures in these courts are determined by the Decree on the Matter of Security Orders [Judea & Samaria] (number 378) 1970 issued by the military commander on April 22, 1970, which is periodically updated.

The criminal procedures applied by the military courts are not identical to those practiced in Israeli courts, especially with respect to some essential matters of human rights, such as the right to meet an advocate, the periods of arrest before the suspect is brought before a judge, the total period of arrest before submitting an indictment and so on.

1.5.4   **The statement of Naim that an indictment "must satisfy the 'beyond reasonable doubt' standard…."**  Naim's statement that an indictment "must satisfy the 'beyond reasonable doubt' standard…" is imprecise.

When an indictment is being prepared, the prosecution <u>assumes</u> that, based on the evidence collected, it will be able to prove the facts stated in the indictment beyond a reasonable doubt.  However, it is unreasonable for Naim to conclude, based on the prosecution's assumption, that every indictment indeed meets this standard of proof.

Accepting Naim's conclusion would suggest it would be sufficient to submit an indictment in order to convict the accused, and that a trial is unnecessary.

---

[60]   The Criminal Procedure Act [combined version] 5742–1982

Naim concedes this is not so, because in the second paragraph of Chapter III. F of his report he states that a conviction at trial requires the prosecution to prove the accused's guilt beyond reasonable doubt.

1.5.5    **Naim's statement that the "the only file guaranteed to be complete is the one maintained by the court."**

In Chapter III. G, Naim implies that the entire "police file" is maintained by the court as a routine course.  As stated above, a court file may include sections of the police file or even the entire file, but this is not uniformly true.  Rather, the evidence and other materials included in the court file are those accepted by the court as admissible.  Thus, the statement that a court file must contain the entire police file is inaccurate and in most cases it is simply wrong.

1.5.6    **The description of Naim regarding the functions of the ISA**.  The statement of Naim that the ISA does not conduct any investigations with the exception of terror cases is inaccurate.  In addition to its responsibility to prevent terrorist acts, the ISA is also responsible for many additional missions and duties that require routine interrogations, arrests and the gathering of evidence for intelligence analysis, as well as for legal proceedings.  These include prevention of espionage and counter espionage, prevention of subversive activities against the Israeli government and protection of secret data of the State of Israel and/or its official institutions.

## 2.2.    **Naim's Purported Authenticity Opinion**

2.2.1    Naim offers the opinion that, based upon his professional experience, the documents he refers to in the Naim Reports are "authentic records" maintained by Israeli law enforcement, including police officers, prosecutors, courts, or military courts, depending on where the relevant document(s) were maintained.  He also states that these documents are maintained by the courts as a standard operating procedure and it is possible to obtain them by submitting a request to the court where a proceeding took place.

2.2.2    **Naim's opinion that the documents he identifies are authentic**

Naim's opinion raises the questions whether the authenticity of the documents to which he refers is within the scope of his expertise and what is the legal basis for his opinion.

To the best of my understanding and knowledge of Israeli law, Naim's background as a Police Officer and a lawyer does not constitute an expertise or relevant skill in authenticating the large number of diverse documents he purports to address.  Document authentication is often required for different legal purposes; the authentication requirements procedures are expressed in legislation as well as in the case law.  I detail below several laws and regulations that illustrate the Israeli legal requirements for authentication and verification of documents and the required methods of authentication.  The examples are taken from various legal fields, such as executing judgments, issuing a civil servant certificate, verifying public certificates, authenticating copies of original documents, authenticating copies of an institutional record, verification of documents according to the Hague Convention–Apostil, authentication by a Notary and in special cases.  As I will detail below, one's experience as a retired Police Officer and as a lawyer does not satisfy the criteria stated in these laws or regulations for the authentication or the verification of documents, especially of the types of official documents to which Naim refers.

### 2.2.3.1   <u>Executing judgment by the Office of Execution</u>

When the court issues a judgment or a resolution in favor of one party that binds another party to make a pecuniary payment or any other payments, the winning party is entitled to appeal to the Office of Execution for executing the judgment or resolution.  For this purpose, the prevailing party is required to prove the existence and verification of the judgment issued against the debtor in its favor.  The required authentication of the judgment or resolution in order to submit it for execution is regulated by Paragraph 11 of the Execution Regulations,[61] as follows:

---

[61]     Execution Regulations 5740–1979

"11. (a) The request to execute[62] will not be accepted for registration, except if the request is detailed and includes the documents specified hereunder, as applies:

(1) <u>Certified copy of the verdict or of the judgment or of the resolution or order,</u> as applies…"

The directives of the enforcement authority states that the submission of a request for execution of a judgment should be supported by: "original Judgment or true copy certified and signed by the Court's secretariat."

Obviously, Naim is not competent to authenticate such a verdict or judgment.

### 2.2.3.2   **Civil servant certificate**

Section 23 of the Evidence Ordinance states as follows: "The court is entitled, if it is not concerned with injustice, to accept as evidence, a certificate about a record in an official document. The certificate should be signed by the civil servant that made the record or the act or received the information about the record, and if he is not any longer in the same service, by the person in charge of the unit where he worked."

Section 28 provides the definition of civil servant as follows:

"For the purposes of this Section, 'civil servant' –

(1) Employee of the state, including judge, judge in a religious court, member of government and the State Comptroller…"

The obvious conclusion from Sections 23 and 28 of the Evidence Ordinance is that only a "civil servant" who is currently an employee of the state may sign a certificate which authenticates that a certain matter is recorded in an official document. As I understand, Naim is no longer in a position of an employee of the

---

[62]   "Request to execute" is defined in the chapter definitions of the execution regulations as a request to execute a judgment or debt that is legally possible to execute as a judgment in a civil case.

state, and therefore he is not qualified to issue or sign such a certificate.

It should be noted that according to Dr. Kedmi, the governing doctrine is that a civil servant certificate does not constitute evidence of the contents of the official document referenced in the certificate, and instead the certificate is only evidence that the document to which it pertains is an official document and the record was kept in an official document.[63]

### 2.2.3.3   **Proof of a public certificate**

Section 32 of the Evidence Ordinance states the manner of proving the authenticity of a public certificate:

"32. It is possible to prove a public certificate by submitting one of the following without compromising other means of proof:

(1) The original;

(2) Its verified copy;

(3) Its copy printed by the official printer;

(4) Its copy certified with the official seal or with the signature of the officer that possesses the official custody;

(5) Its copy certified with the official seal of the institution that possesses the official custody;

(6) Its certified copy with the seal or the signature of a minister or of another functionary of equal status, or of a functionary that holds a rank and position that satisfies the court, concerning the document's credibility;

---

[63]        Dr. Kedmi 2nd Part, pp. 945-946.

(7) The copy certified with the institution's official seal, if the credibility of the certificate satisfies the court, considering the nature of the document and of the certifying institution."

Section 34 of the Evidence Ordinance contains several presumptions of law concerning public documents.  Section 34 (3) states, *inter alia*, that: "a public document that is certified by an institution, in writing and bearing its seal, and certifying that it is under its formal possession is considered under its actual possession."  Section  34 (5) states as follows: "Official seals and signatures on a public certificate or its copy, or on certification documents according to the instructions of this section, are true and all the descriptions of the positions of the signatories on the certificates or on  certification documents are precise."

The documents listed in and attached to the Naim Report do not satisfy any of the above conditions or other stated conditions regarding the verification of a public certificate. Naim does not even mention in any of his reports that he verified that the copies of the documents to which he refers are true copies of the original versions of the documents.

### 2.2.3.4   Proof of Institutional record by its copy

A precondition to the procedure of proof of an institutional record is proving that a certain document satisfies the terms of Section 36 of the Evidence Ordinance for being an institutional record.  At a second stage, Section 41 of the Evidence Ordinance states the requirements for the authentication of a photocopy of an institutional record and not to its actual admissibility as such. Section 41 of the Evidence Ordinance states as follows:

"The photocopy of a document, of the type determined for this matter in the regulations, to which is attached a certification that its photocopy has been done from the original in a manner and according to the terms determined in the regulations for that very same type of documents, will serve as a prima facie evidence in a legal proceeding –

101

(1) In those cases that according to the law it is permitted to prove the content of a document using its copy;

(2) If the original has been destroyed according to the regulations and their terms, and certification on this matter is attached to the copy as determined in the regulations for the same type of documents."

Section 41A states that: "the content of an institutional record could be proved by a copy of the record."

Thus, a copy of an institutional record must be proved according to the terms stated in Section 41 of the Evidence Ordinance as cited above, i.e. with a certificate that proves that the copy was made from the original and that it is a true copy.[64]

None of the documents referred to in and/or submitted with the Naim Report satisfies this requirement, and therefore there is no proof that any of these documents is an authentic institutional record.

The Testimony Regulations (photocopies) ["Testimony Regulations"] determine the procedure and the conditions for the submission of a photocopy and the method of certifying the copy:

Regulation 2 of the Testimony Regulations states as follows:

"A photocopy of a document that its original is not damaged will serve as a prima facie evidence in legal proceedings, if the photocopy has been taken close to its submission in a legal proceeding, and has attached to it a certification as detailed in the first addendum."

The first addendum to the regulations proposes the format and wording of the certification in diverse situations, as follows:

---

[64]      See Dr. Kedmi 2nd Part, p. 968 and also civil case 174/88 Gozlan v. Company Parisien de Participation, verdict 42(1) 565

**First addendum**

(Regulation 2)

1.      In the case that the person that brings the copy is in possession of the original

Testimony's ordinance

**Certification of the copy**

I hereby certify that this is a true copy of the document in my possession in

_____ DATE          Name and position of signatory

Signature

2.   In the case that the original is in possession of another person

Testimony's ordinance

**Certification of the copy**

I hereby certify that this is a true copy of the document issued for me by and that is found in

_____ DATE          Name and position of signatory

Signature

With regard to the above discussion and the cited acts and regulations, I conclude that no documents among those referred to in and/or attached to the Naim Report satisfies the criteria of

103

Section 41 of the Evidence Ordinance, or the criteria of the Testimony Regulations, and therefore there is no proof that any of these documents is an authentic institutional record.

### 2.2.3.5  <u>**Apostil**</u>

The regulations for the execution of the Hague Convention[65] abolished the necessity to authenticate public documents originating in member countries of the convention through diplomatic or consular authentication, and state as an alternative for authentication of a "document according to the convention" [Apostil], which certifies the authentication of the document, of its signatures, and of the document seal.

Regulation 5 (a) of the Regulations of the Hague Convention determines who is entitled to authenticate documents for the purposes of the convention:

"(a) Ministry of Foreign Affairs, registrar in the Magistrate's Court or civil servant appointed by the Minister of Justice according to Article 45 in Notary  Law -1976, will be –each of them– the competent authority to issue in Israel certificates according to the Convention."

None of the documents among those referred in and/or attached to the Naim Report is authenticated in this manner.

### 2.2.3.6  <u>**Authentication of documents by a notary**</u>

Article 7 of the Notary Law[66] determines the notary power, *inter alia,* on the matter of authentication of documents.

"7. The notary is authorized to –

(1) Authenticate a signature on a document;

---

[65]    Regulations for the execution of the Hague Convention (abolition of authentication of foreign public documents) 5737-1977
[66]    The Notary Law 5736-1976

(2) Certify that the signatory on a document on behalf of another person, was authorized to sign;

(3) **To certify the authenticity of the document's copy;**

(4) Certify the authenticity of the document's translation;

(5) To receive and to certify an affidavit and another declaration;

(6) To certify that a certain person is alive;

(7) ……

(8) …

(10) …

(11) …."

Article 8 determines the competences that are unique to the notary:

"8. When the notary document is required to be used abroad, including representations of foreign countries in Israel, each of the actions detailed in Article 7 (1), (3), (7), (8) and (9), will be done only by a notary."

Article 12 of the Notary Law, states as follows:

"The notary shall not certify that a certain document is a true copy, **except if the original has been submitted to him and if he compared them and found them identical.**"
[emphasis added]

Naim did not indicate in his report whether he has a notary license. Assuming that he is not a notary, then he is not qualified to authenticate documents, and even if he were a notary, there is

105

no proof that he followed the procedure as stated in Article 12 above.

### 2.2.3.7  **Summary**

All of the laws and regulations discussed above demonstrate the requirements with regard to the authentication of documents. These requirements concern both the manner in which the authentication of photocopies should be done and the identity, function, expertise and authorization of the person who authenticates the document.

Naim, as a retired Police Officer and a lawyer, is not a competent authority for the purpose of authentication of the documents referred to in and/or attached to the Naim Report.  He is not a civil servant, and therefore he is not authorized to issue a "civil servant certificate" for a document recorded as an official document and/or regarding the possession of official documents. Only civil servants of one of the law enforcement branches referred to by the expert are authorized to issue such certificates.

These officials, for example, may be a Police Officer from the district or archive in which the investigation files are maintained, or a prosecutor or an archive manager in one of the districts in which the prosecution documents are maintained, and/or the secretariat of the court, or the director of archives of the court in which the court files are maintained.

It should be noted that if the other party to a proceeding in which a document requiring authentication is submitted objects to the authenticity of the document, the authenticating official must testify and be cross-examined regarding the certificates issued by him or her.

Furthermore, the required certificate constitutes evidence only of the existence of the official document and that the content is recorded in an official document, but it is not evidence of the truth of the contents of the official document.

106

In his capacity as a lawyer, Naim is entitled in some instances to certify certain documents as a "true copy" of the original. But none concerns the verification of copies of official documents regulated by law. Further, in those instances in which a lawyer is entitled to authenticate a document, the authentication is done when he receives the original and he personally made the photocopy of the document, or when he is presented with the original and the copy and he examined and compared them and found that the copy is a true copy of the original.

Naim does not indicate that the documents attached to his reports are true copies of the originals. Nor does he state if he was presented with the original documents, and if so who made the photocopies.

Further, the documents attached to the Naim Report do not bear the authentication signature of any competent authority, nor do they bear the signature of Naim in one of his capacities.

In light of the foregoing, I conclude that Naim has neither the competence nor the authority required by Israeli law to authenticate the documents referred to in and/or attached to the Naim Report. Nor is he competent or authorized under Israeli law to offer the conclusion that the documents are authentic official records maintained by Israeli law enforcement, prosecutors, courts or military officials. These are conclusions that, according to the specific case, only a civil servant, a notary or the court secretariat are authorized by law to provide.

### 2.2.3.8 Investigations of terrorist attacks in which Naim participated personally

Naim indicates on page 6 of his report that he actively participated in the investigation of six attacks which are relevant to this lawsuit.

The list of attacks in which Naim indicates that he actively participated in their investigation is different from the list produced by him in his previous expert report for the Crédit

Lyonnais cases. In his previous report Naim included as one of the six attacks, the attack on Ben Yehuda on December 1, 2001, which is not relevant to the cases.

Instead, in his report for the NatWest cases, Naim ignores the irrelevant attack, and replaced it with the attack on Bus 6 on May 18, 2003, which he had not previously listed in his Crédit Lyonnais as an attack he actively investigated.

Naim does not specify what his role in the investigations of these attacks was and what documents or evidence he handled or examined prior to the submission of the investigation file to the military or civil prosecutors.  Furthermore, he does not indicate which of the documents attached to the Naim Report he examined or handled.

I examined the documents presented by Naim concerning the six relevant attacks mentioned in his report, and I did not find even a single document that cites or mentions his name, either as an investigator or as an authority who certified the investigation documents, and his name does not appear on any of the witness lists in any of the indictments that he annexed to his reports as relating to these attacks.

This finding by no means implies that I doubt Naim's declaration about his participation in these investigations.  However, this finding is relevant to whether Naim is entitled to submit the findings of these investigations within the capacity of an officer in-charge of them.

If Naim were still a civil servant, his participation in the investigations of these six attacks could be relevant only to specific police files and not to other documents, such as indictments, verdicts, etc.  Furthermore, as I will discuss below, because these investigation materials were prepared in order to be submitted in a criminal trial, they are in any event inadmissible as evidence according to Section 36 (c) of the Evidence Ordinance.

Therefore, there is no evidentiary significance to Naim's note that he personally participated in the investigation of these attacks. The documents related to these attacks have no greater admissibility and carry no additional evidentiary weight in comparison to all other documents listed in his reports.

2.2.4     **Admissibility of the documents pursuant to the Evidence Ordinance**

I have already analyzed the majority of the documents referred to in or attached to the Naim Report in my Primary Expert Report and/or in this rebuttal report.  I conclude the documents referred to in and/or attached to the Naim Report would be inadmissible under Israeli law as evidence of the truth of their contents in a civil case against a defendant such as NatWest.

I refer to the conclusions of my Primary Expert Opinion, and of the section of this rebuttal report regarding the Shaked Report above on the following matters:

- The inadmissibility as evidence of documents prepared by the investigation authority for the purpose of preparing an indictment according to Section 36 (c) of the Evidence Ordinance.

- The inadmissibility of criminal verdicts issued by the military courts in the Occupied Territories according to Section 42A of the Evidence Ordinance.

- The inadmissibility of criminal verdicts issued by the courts in Israel according to Section 42 of the Evidence Ordinance due to the fact that the defendant's civil liability is not derived from the liability of the convicted in the criminal cases.

- The inadmissibility of sentences, both those issued by courts in Israel and those issued by the military courts in the Occupied Territories, in view of the explicit instruction in Section 42 of the Evidence Ordinance.

- The inadmissibility of court records as evidence in a civil proceeding against a party that was not a party in the proceeding in which these records were made.

- The inadmissibility as evidence of forensic reports and DNA laboratory tests [Naim 000838-842, 000843-847, 000848-853] unless they are submitted and proved by an expert or the by the laboratory director who prepared them.

- The inadmissibility as evidence of confessions and/or manuscripts of a convicted in a criminal trial against a third party.

I also refer to my conclusions above, concerning the inadmissibility as evidence of ISA reviews [Naim 000864-968] [attached also to the Shaked Report].

I also refer to my opinion above, relating to the Shaked Report, that in order for a document to be admissible as a "public certificate," it must be open to the public. This is certainly not true of the police files to which Naim refers – to my understanding, none is open to the public. Moreover, under Article 4 of the Court Regulations and labor court (files examination), 5763-2003, one must apply to the court to view a court file, and such permission is not automatically granted. Likewise, one must obtain permission to view prosecution files, which is not always granted.

**C.     My requests for perusal of Israeli and military court files**

For the purpose of this report and especially in order to evaluate Naim's opinion regarding the level of accessibility of the public to the files issued by Israeli courts and by military courts in the Occupied Territories, I prepared and submitted requests for perusal of several files as described below:

110

1.1.1   A request before the Supreme Court to peruse all documents and evidence in the file: criminal Appeal 1932/04 Munir Rajbi v. the State of Israel.[67]

1.1.2   A request before the Jerusalem District Court to peruse all documents and evidence in the files: Severe Crime 5071/02 The State of Israel v. Wa'el Kassem et al, and Severe crime 776/04 the State of Israel v. Ahmad Abid and Na'al Abid. [68]

1.1.3   A request before the Haifa District Court to peruse all documents and evidence in the file: Criminal file 189/03 the state of Israel v. Munir Rajbi.[69]

1.1.4   A request before the Tel Aviv District Court to peruse all documents and evidence in the file: Severe Crime 1147/02 the State of Israel v. Abbas El Sayed.[70]

1.1.5   A request before the military advocacy to peruse all the documents and evidence in a list of case files heard by the military courts in the Occupied Territories.[71]

1.1.6   These requests to the Israeli courts were delivered for submission through a legal services firm on January 11, 2011.  The requests were actually received by the courts' secretariats on January 13, 2011.

1.1.7   The request to the military advocacy was submitted on January 11, 2011 by fax to their office in Ofer Camp near Ramallah, after coordination with their secretary.

1.2   **The status of the requests**

1.2.1   **The request before the Supreme Court**

- The request was forwarded by the court to the Criminal Department of the State Advocacy for responding to the request.

- On January 31, 2011, I received a letter from the Criminal Department to provide them with all the requests that I submitted to the Israeli courts so they

---

[67] A copy of the request to the Supreme Court is attached as Annex D1
[68] A copy of the request to the Jerusalem district Court is attached as Annex D2
[69] A copy of the request  to the Haifa District court is attached as Annex D3
[70] A copy of the request to the Tel Aviv District Court is attached as Annex D4
[71] A copy of the request to the Military Advocacy is attached as Annex D5

may consider concentrating the answers to all requests through the Criminal Department of the State Advocacy. [72]   The Criminal Department will submit its response by the end of February 2011.

- On February 9, 2011, I submitted by fax all the perusal requests and all decisions and responses received in my office regarding the requests to the Criminal Department of the State Advocacy. [73]

### 1.2.2   The request before the Tel Aviv District Court

- On January 16, 2011, the court issued a decision.[74]

- The district court requested the response of the Central District of the State Advocacy, and also the response of the convicted that is in jail.

- The judge requested to consider the response regarding the fact that the case was "in camera" - not open to public, and that only a part of the verdict was published.

- The Tel Aviv Criminal District Department of the State Advocacy, submitted its response to the court on January 26, 2011.[75]   In this answer, it was noted that the file is pending before the Supreme Court (Criminal Appeal 1776/06) and therefore the request should be submitted to the Supreme Court.

- The Public Defense Advocacy submitted to the court a request to postpone their answer for 7 days, and the court postponed the answer date until February 6, 2011.[76]

- The defendant's attorney and the Public Defense Advocacy submitted their joint response on February 7, 2011[or February 6 – there are two seals of the court with different dates], in which they did not object the request.[77]

---

[72] A copy of the letter is attached as Annex D6
[73] The cover page of the fax transmission is attached as Annex D7
[74] A copy of the decision is attached as Annex D8
[75] A copy of the response is attached as Annex D9
[76] A copy of the Public defense Advocacy request and the court's decision is attached as Annex D10
[77] A copy of the Defendant and the Public Defense Advocacy response is attached as Annex D11

- On February 13, 2011, the court issued its decision in which it summarized the State Advocacy's response and the defendant's response and stated that due to the fact that the file is pending before the Supreme Court, the request should be submitted to it.[78]

### 1.2.3   The request before the Jerusalem District Court

- As noted in that request, it seeks perusal in two case files. The case of Wa'el Kassem et al - 5071/02, and the case of Ahmad Abid and Na'al - Abid - 776/04.

- The case 5071/02 was handled by Judge Jacob Tsaban, who on January 17, 2011 requested a response of the State by January 31. 2011.[79] As of today, no response has been submitted.[80]

- The other case, 776/04 was handled by Judge Zvi Tal, who on January 17, 2011 requested a response of the State until January 31.[81]

- On February 2, 2011, I received a decision regarding the file 776/04 with the response of the State Advocacy.

- According to its response, the State Advocacy "does not object to delivery of documents from the court's file conditioned that there will be no delivery of documents that it is prohibited to publish because of security reasons, order of publishing prohibition, hearing "in camera or harming of privacy." [82]

- On February 1, 2011, the court held that the request to perusal is admitted under the restrictions of the State's response.[83]

### 1.2.4   The request before the Haifa District Court

---

[78] A copy of the decision is attached as Annex D12
[79] A copy of the decision is attached as Annex D13
[80] I assume that this decision was forwarded and is handled together with the request from the Supreme Court and this is the reason for there being no response from the State Advocacy.
[81] A copy of the decision is attached as Annex D14
[82] A copy of the decision and the State's response is attached as Annex D15
[83] The decision is typed on top of the State's response – Annex D15 above

- On January 16, 2011, Judge Alex Caesar, who was appointed to handle the request, requested the response of the State within fifteen days.[84]

- The court's decision was received in my office on February, 27, 2011.  The decision issued on a copy of the State's response to the request.[85]

- The State's response was: "there is no objection that the applicants will peruse the court records, the court decisions,  the verdict, the sentence and the exhibits as long they have been submitted (to the best of our memory they were not submitted) in Severe Crime 189/03 the State of Israel V. Munir Rajbi."

- According to the State's response, the court allowed  perusal but added: "the accused was convicted upon his confession and therefore no evidence submitted and there are no exhibits in which the applicants can peruse."

### 1.2.5   **The request before the Military Advocacy – perusal in military court files**

- As of today, no response has been received from the Military Advocacy.


## D.   **Kohlmann Report**

1.   I discuss below the admissibility under the Evidence Ordinance of Israel of the pages printed or cited by Kohlmann in his report from various websites purportedly as evidence of the reliability and credibility of Hamas claims of responsibility for the fifteen attacks at issue in this case.[86]

1.1   The discussion below will be solely regarding the admissibility of the documents said to be taken from various websites, mainly from Hamas websites or from websites of organizations claimed to belong or to be controlled by Hamas, on which Kohlmann relies.[87]

---

[84]   A copy of the decision is attached as Annex D16
[85]   A copy of the decision and the State's response is attached as Annex D17
[86]   Kohlmann refers in his report to eighteen attacks.  To my understanding only 15 of them are relevant to this case.  Thus, I shall not address the documents concerning the attacks perpetrated on March 21, 2001 in Kefar Sava, on August 9, 2001 in Sbarro Pizza in Jerusalem and on December 1, 2001 on Ben Yehuda Street in Jerusalem.
[87]   Again, I do not address the admissibility of these documents as appendices to an opinion of a qualified expert.

1.2    Kohlmann elaborately describes the use terrorist organizations, including Hamas, are making of websites as a low cost, efficient and relatively secure medium for communicating between the organization and its targeted audiences, i.e. its members, supporters, volunteers, etc. Kohlmann also points out that terrorist organizations make use of this efficient medium as, among other purposes, propaganda and dissemination of their ideologies.

I have considered whether the information disseminated by means of these websites, such as claims of responsibility for perpetrating certain attacks, are credible to such a degree that they may be admissible in court proceedings against a third party as evidence of the truth of their contents, without investigating or probing into the persons who compiled said information and / or who administers these websites and / or who collected said information, and what should be the framework within which documents and information from said websites may, if at all, be submitted as evidence in court.

1.4    On page 5, paragraph II of his report, Kohlmann defines the information sources he relies on.   According to his definitions, "original video or audio recording of a terrorist leader, published written communiqués or an official magazine / website created by a terrorist organization" are examples of "secondary sources" of research.

These so-called secondary sources constitute hearsay.   The legal issue in question is whether these sources should be considered as a legal proof of certain facts. In my opinion, based on the Evidence Ordinance and the case law of Israel, the answer is no.

1.5    In accordance with Israeli law, printed web pages are classified as "computer output" as defined in the Computers Law.[88]  Therefore my conclusions below relate to all computer outputs on which Kohlmann relies.

1.6    According to Section 36 of the Evidence Ordinance,[89] computer output may be regarded as an "institutional record," the admissibility of which is conditional on several cumulative criteria stipulated in the Evidence Ordinance.   This I have detailed in my Primary Expert Opinion and in chapter A of this report above, especially regarding the Shaked Report.

For the sake of convenience I am listing herein the essence of the admissibility conditions of a computer output as an institutional record, according to the Evidence Ordinance, as follows:

---

[88]    The Computers Law, 5755 – 1995
[89]    The Evidence Ordinance [New Version] 5731-1971. Section 36

The basic conditions for admissibility of an institutional record are:

- The first condition is that, in the course of its regular conduct, the institution enters a record of the event that is the subject of the document "proximate to its occurrence" (Section 36 (a) (1) of the Ordinance).

- The second condition is that "the method of collection of data on the subject of the record and the record's editing attest to the truth of its content" (Section 36 (a) (2) of the Ordinance).

When the record is a computer output, the following must also be proven:

- The method of generating the record attests to its credibility (Section 36 (a) (3) (a) of the Ordinance).

- The institution regularly employs reasonable security measures to protect against an infiltration to the content of the computer materials and from failures in the computer's operation. (Section 36 (a) (3) (b) of the Ordinance).

A party that wishes to submit the abovementioned documents as institutional records must prove that they fulfill <u>all</u> these conditions, and this proof must be provided by sworn testimony by a witness who is competent to provide this proof.[90]

The said conditions are aggregate conditions that require proof by an expert on the matter of computerized security systems and by a person that may attest to the actual entry of the record.**[91]**

1.7   The computer outputs on which Kohlmann founds his opinion, which include web pages from websites he states belong to entities which are claimed to be part of Hamas and / or organizations affiliated and / or subordinated to and / or controlled by Hamas, do not fulfill the requirements stated above and court judgments with regard to such documents being admissible in court as evidence, and certainly not as proof to the truth of their contents, against a third party (such as NatWest) which I understand has no connection to the organization and / or the source of the information of which these documents have been compiled and / or to the contents of these documents.

---

[90]   Dr. Kedmi, 2nd Part, p. 985.
[91]   Civil Case (Magistrates Tel-Aviv) 45464-04, the inheritance of the late Taher Muhamed Zaid v. The State of Israel; a decision from 19 May, 2009.

1.8    Kohlmann describes the various stages and transformations the websites of Hamas and / or its military arm have gone through until assuming their present configuration.

Among other points, Kohlmann describes how, over the years, these websites collapsed and / or were attacked and disappeared offline, and how they were revived and uploaded a considerable number of times and again, every time under another name and another URL.

1.9    Kohlmann's statements suffice to indicate the insufficient level of security that is characteristic of these websites, their level of being prone to infiltration and their exposure to being influenced and / or having their contents be altered by third parties. Furthermore, Kohlmann reports that more than once the administrators of those various websites have not even bothered to warn their target audiences about falsehoods which, they claimed, were published in their names, such as false contribution collection bank account numbers, etc.

1.10    The insufficient level of security is aggravated by the fact (which Kohlmann has also pointed out) that terrorist organizations, including Hamas, make extensive use of various media of communication, including the internet, for multiple purposes, to such an extent that it is not possible to differentiate between the true and the false data provided in those mass communication media.

This issue assumes enhanced significance when such differentiation between the true and the false information is considered for the purpose of qualifying publications quoted from sources said to be managed and controlled by terrorist groups as "institutional records."

It bears emphasis that such status is granted by law and case law to vastly more reliable sources of information, such as banks, universities and other institutional websites for admission as evidence, and even then, the party that wishes to submit such records, must satisfy the aggregate conditions required by the Evidence Ordinance.

1.11    It is clear from Kohlmann's own words that the websites to which he refers do not satisfy the requirements of Section 36 (a) (3) (a) of the Ordinance for the admissibility of computer output as evidence in court, namely the existence of such a quality level and such security procedures as to prevent infiltration and / or disruption of the data presented therein.

As I have addressed above, in order to submit a computer output as an institutional record, it is also necessary to prove by way of a witness who is expert in the field of

computerized systems security that the "institution" (as far as a terrorist organization could be defined for this purpose as an "institution") maintains computerized information security at such a level as to justify trusting its contents.

To the best of my knowledge, no such testimony has been brought forth and Kohlmann cannot serve as such witness because, to my knowledge, he has no personal acquaintance with these systems and their procedures.

Furthermore, the objectives of terrorist organizations, which include dissemination of propaganda via communication-media including websites, do not correspond to, and instead would appear to contradict the second condition stated in Section 36 (a) (1) of the Evidence Ordinance for admission of computer output as institutional records, because in view of the objectives of these organizations one could not show that "the method of collection of data on the subject of the record and the record's editing attest to the truth of its content."

1.12    For these reasons, as discussed above, the Tel Aviv Magistrate's Court in the case of Taher Muhamed Zaid against the State of Israel[92] rejected an application by the State of Israel to submit a computer output from a Hamas website as an institutional record by means of a civil servant certificate, stating, among other things, as follows:

"I am of the same opinion as the plaintiffs in this matter – the translation of information that allegedly appeared on the Hamas movement website is not tantamount to 'something that is recorded in an official document,' and therefore this certificate shall not be deemed a civil servant certificate in its definition in the Evidence Ordinance."

And:

"Since the printout that appears on the website is tantamount to hearsay evidence, it must be submitted by a witness that may confirm its content and be subjected to a cross-examination in its regard. In our case, the correct manner of filing the printout is by a witness that may confirm the content of the notice, i.e.: the person publishing the notice or the editor of the website on which the notice had been published. The actual printout is tantamount to hearsay evidence and is inadmissible as evidence"

1.13    Further, in order to define the credibility and the reliability of the Hamas claims, Kohlmann uses a "comparative analysis" and compared information published on Hamas

---

[92]    Civil Case (Magistrates Tel-Aviv) 45464-04, the inheritance of the late Taher Muhamed Zaid v. The State of Israel; a decision from 19 May, 2009.

websites and information about the same matter published on the Israeli Foreign Ministry's website, which according to his definitions is a tertiary source. Kohlmann's opinion appears to be that the fact that the Israeli Foreign Ministry published in its website that Hamas has assumed responsibility for a terrorist attack supports the conclusion that the Hamas's claims are credible and reliable.

As I have amply analyzed above, even the spokesman announcements and other publications on the Israeli Foreign Ministry's and Prime Minister's websites are considered inadmissible hearsay evidence, on several grounds:

- They do not satisfy the requirements of the Evidence Ordinance and of the case law to be recognized as institutional records.

- They cannot be submitted without supporting testimony of a witness on behalf of the entity who can testify and be examined about his testimony with regard to the manner in which said documents were compiled and to the means of security maintained at this entity.

Therefore, the comparison between the publications on the Israeli Foreign Ministry website, and the publications on the various Hamas websites, does not afford the latter's publications more legal validity and / or credibility, because a citation of an hearsay cannot serve as evidence of the hearsay and certainly not evidence to the truth of the hearsay content. In any case these computer outputs cited by Kohlmann are inadmissible, as shown above.

1.14 Furthermore, some of the sources presented by Shaked and Naim contradict the comparison made by Kohlmann and underscore the difficulties of purporting to verify facts through a comparative theory:

1.14.1 ISA reports and conclusions cited by Shaked in his expert report [pages 132, 139] allege that the Al-Aqsa Martyrs' Brigades of the Fatah and not Hamas claimed responsibility for the attack on January 29, 2004 on bus line no. 19. These ISA reports and conclusions, as cited by Shaked, are inconsistent with Kohlmann's conclusion that the Hamas claim of responsibility for this attack is credible.

1.14.2 The Israeli Foreign Ministry website publication cited by Shaked in footnote 431 to his report states that Fatah and Hamas claimed joint responsibility for the attack on January 29, 2004 on bus line no. 19.

119

1.14.3 The statements of Nufal Adawin to the police that Shaked cites likewise contradict Kohlmann's conclusion that the Hamas claim of responsibility for this attack is credible:

- "the truth is that the Tanzim of the Fatah committed the attack and not me" [Shaked – Appendix No. 1 page 1088]

- "I told that [I dispatched Ali to the attack in Jerusalem] to Mahmud [Azia] because I wanted him to give me money for myself and for executing further attacks" [Shaked – Appendix No. 1 page 1079]

1.14.4 Exhibit C of the Naim Report is referred to by Naim in page 24 of his report as one of the "authentic documents" relating the January 29, 2004 attack.

This document is a military indictment that accuses **Abdel Rahman Miqdad** as the person responsible for preparing the bomb for the attack of January 29, 2004. The information in this indictment is inconsistent with Shaked's and Kohlmann's conclusions that Hamas was responsible for this attack because Miqdad, who was accused of preparing the bomb that was actually used in this attack, was not accused of being a member of Hamas, but only as a military activist. Further, according to Shaked, Miqdad was an Al Aqsa Martyrs' Brigades member [Shaked report page 135 first paragraph].

1.14.5 Exhibit A of the Naim Report is referred to by Naim in page 24 of his report as one of the "authentic documents" relating to the January 29, 2004 attack.

This exhibit is a military indictment that accuses **Ahmad Salah** as the person responsible, together with Miqdad, for preparing the bomb for the attack of January 29, 2004. This indictment is inconsistent with Shaked's and Kohlmann's conclusions that Hamas was responsible for this attack because Ahmad Salah, who was accused of preparing the bomb that was actually used in this attack, was not accused of being a member of Hamas, but of being a member of an unlawful organization – the Al Aqsa Martyrs' Brigades of the Fatah—and for recruiting the suicide bomber, recruiting Muhamed Ma'ali (who led the suicide bomber to Jerusalem), and for general preparations towards the suicide attack.

1.14.6 Exhibit D of the Naim Report is referred by Naim in page 24 of his report as one of the "authentic documents" relating the January 29, 2004 attack.

120

This exhibit is a military indictment that accuses **Muhamad Ma'ali** as the person responsible for leading the suicide bomber to Jerusalem to perpetrate the attack of January 29, 2004. This indictment is inconsistent with Shaked's and Kohlmann's conclusions that Hamas was responsible for this attack because Ma'ali, who was accused of leading the suicide bomber on January 29, 2004 to perpetrate this attack, was not accused of being a member of Hamas. Further, according to Shaked, Ma'ali was also an Al Aqsa operative and not a Hamas member [Shaked report page 138].

1.14.7  Exhibit B of the Naim Report is also referred to by Naim in page 24 of his report as one of the "authentic documents" relating to the January 29, 2004 attack.

This exhibit is a military indictment that accuses **Ali Muhamad Abu Halail** as the person responsible for initiating and planning the January 29, 2004 attack. This indictment is inconsistent with Shaked's and Kohlmann's conclusions that Hamas was responsible for this attack because Abu Halail, who was accused of initiating and planning this attack, was not accused of being a member of Hamas, but only as a military activist. According to Shaked, Abu Halail was also an Al Aqsa operative and not a Hamas Member [Shaked, page 138 article 2 first paragraph].

1.14.8  Exhibit F of the Naim Report is also referred to by Naim in page 24 of his report as one of the "authentic documents" relating the January 29, 2004 attack. This exhibit is referred to also by Shaked in footnote 450 to his report.

This exhibit is a military indictment against **Hilmi Abd al-Karim Muhammad Hamash** for being a member of Al Aqsa Martyrs' Brigades, and the one who directly recruited Ja'ara to commit the specific attack and for causing the death of all the victims of the attack.

According to Shaked, Muhamad Hamash was convicted for his role in the January 29, 2004 attack as a member of Al Aqsa Martyrs' Brigades and was sentenced to 12 life sentences [see Shaked p. 135]. The indictment and the statements of Shaked are inconsistent with Shaked's and Kohlmann's conclusions that Hamas was responsible for this attack.

1.14.9  The article cited by Shaked in footnote 253 of his report from the Israeli Foreign Ministry website states that a Hamas spokesman had praised the attack on March

121

5, 2003 that was carried out on bus line No. 37 in Haifa, but did not claim responsibility for it**.**

1.14.10 Ja'ara's last will and testament - p. 336 of the Appendix to Kohlmann's report.

This document appears to be a photo of the handwritten will of Ja'ara posted on what Kohlmann claims to be Hamas's website.  A visual review of this will indicates that Ja'ara's name appears in a different color ink in comparison to the balance of the text and appears to be written in different handwriting, suggesting that this "will" was essentially a form into which someone inserted Ja'ara's name, even though Kohlmann apparently did not find any difficulties in opining that it is a reliable document.

Kohlmann also cites a different, "typed" version of Ja'ara's will in footnote 166 to his report, posted on what Kohlmann describes as Hamas website.

Kohlmann did not locate, review or compare either will to other sources.

1.15     Furthermore, Kohlmann's research is incomplete and avoids sources that contradict his conclusions.

1.15.1  In chapter III of his report, Kohlmann describes what he was asked by the plaintiffs' counsel to review and opine about.

1.15.2  According to his statement in this chapter of his report, Kohlmann reviewed only websites allegedly affiliated with or related to Hamas.

1.15.3  On page 5 of his report, Kohlmann states also as follows:

"In order to determine the provenance of particular secondary or tertiary sources, I engage in a traditional social science method known as 'comparative analysis.' This requires me to compare and contrast particular sources in question with other analogous sources contained in my digital archive, searching for common threads and themes. By drawing from a wide assortment of primary and secondary sources, I establish a single, objective narrative—while simultaneously noting any significant factual discrepancies or conflicting data."

1.15. 4 For the purpose of this rebuttal report, I have reviewed several documents and translations to English, downloaded from webpages which are of the same nature as Kohlmann's sources, i.e webpages of Palestinian and others' websites. These sources are appended as Annexes B1 – B11 to this report.

122

1.15.5 All of these documents are relevant to the January 29, 2004 attack, and I would expect that an expert on internet sources, such as Kohlmann presents himself to be, would have located these sources, and reviewed and compared their contents to his findings before he reached his conclusions.

1.15.6 I reviewed the documents B1 – B11 and, as I will detail below, I found that the contents of each source contradict Kohlmann's conclusions regarding the January 29, 2004 attack as well as Shaked's conclusions regarding the same attack.

- **Annex B1 – The Hamas claim of responsibility**

http://www.qassam.ps/martyr-220-Ali_Moner_jaarah.html

This is a claim of responsibility posted on Hamas's website which states that the Bus 19 attack was committed in response to Israel's operation in Al-Zaytoun. Kohlmann's report also quotes from another claim of responsibility posted on Hamas's website that says the attack was to avenge the operation.  The timing of events casts doubt upon the role Hamas claims to have played in the attack.  According to Nashash's sentence, Ja'ara's failed attempt to commit the attack (allegedly orchestrated by Hamas) occurred two weeks before the actual attack, i.e., about January 15 [Shaked Appendix No. 1 at page 1000].

The Al-Zaytoun operation was a battle between IDF forces and Islamic Jihad activists that occurred on January 28, 2004 in the Al-Zeytoon neighbourhood of Gaza. [See Annex B2 - a news article from The Guardian dated January 29, 2004].  The actual Bus No. 19 attack then took place on January 29, 2004 – only one day after the Al-Zaytoun operation. This shows that the Al-Zaytoun operation, which Hamas claims was Ja'ara's motivation to commit the attack, occurred after Ja'ara's involvement with Hamas had ended.

Kohlmann appears not to have noticed this discrepancy within his comparative analysis.

- **Annexes B3 and B4 – An alternate Ja'ara Will and its translation**

This is another will apparently executed by the suicide bomber Ja'ara in the name of Al Aqsa Martyrs' Brigades.  This will was posted and downloaded from Ja'ra's uncle's website: http://palissue.com/saqer/mp66/Ghad-Garah/images/ali.jpg

Unfortunately the URL is no longer accessible.  A copy of the webpage is attached as Appendix B3 and a translation of the page to English is attached as B4.

The will is a handwritten one, made on what seems to be a page of an old diary of a business firm.

According to this will, Ja'ara committed the suicide in the name of Al-Aqsa Martyrs' Brigades, Martyr Ayman Jouda Unit.

This obviously calls into question the authenticity of the will presented on the Hamas website and referred to by Kohlmann and Shaked.

- **Annexes B5 and B6 - Al Aqsa Martyrs' Brigade 1 Year Anniversary Claim and its translation:**

http://web.archive.org/web/20050305062953/www.kataebaqsa.org/arabic/modules.php?name=Byanat&file=print&sid=421

According to this source, Al Aqsa Martyrs' Brigades issued an additional claim of responsibility on the one year anniversary of the January 29, 2004 attack.  This additional claim calls into question Kohlmann's statements on page 43 of his report and the reliability of the sources he relies on [a reference to a quote on Al Manar television found on the Hamas website - footnote 167] which report that the Fatah spokesman apologized to Hamas "for his group claiming credit for the operation and apologized to the al-Qassam Brigades, rejecting any links to the Fatah movement."

It also contradicts Shaked's statements in his report that Al Aqsa Martyrs' Brigades "has never repeated [its] claim [of responsibility for the January 29, 2004 attack] on their web site, and Fatah subsequently rejected any responsibility for the terrorist attacks" [Shaked report page 128 text accompanying footnote 420].

- **Annex B7 – An US National Counterterrorism Center document:**

  http://www.nctc.gov/docs/ct_calendar_2010.pdf

This document indicates on page 13 that on January 29, 2004, Al Aqsa bombed a bus in Jerusalem. Kohlmann apparently did not compare the contents of this document to the sources he relied on.

1.16    The examples in the above paragraph regarding the attack of January 29, 2004 indicate that the Al Aqsa Martyrs' Brigades of the Fatah published claims of responsibility, as alleged in the Israeli Foreign Ministry website cited in Shaked footnote 430, and therefore any assertion that it did not deny or contradict the Hamas claim of responsibility is inaccurate.

Further, in my opinion, even if none of the sources is reliable, the Fatah had minimized its claims of responsibility because of political reasons.

Unlike organizations affiliated with the Fatah, which is now the most important entity of the Palestinian Authority, Hamas gains its power among Palestinians by claiming and publishing its "heroic" operations against the Zionist regime. Thus, Hamas has both the interest and the opportunity to claim responsibility for attacks, such as the January 29, 2004 one, when other organizations who actually perpetrated them cannot do so.

Further, in the video interview of Abdallah Barguti [W_S089455], Barguti states that several organizations assumed responsibility for this attack because no one knew that he was behind the attack.

1.17    My conclusion that these sources of information are inadmissible in evidence for the truth of their content is even stronger regarding any intention of the plaintiffs to use the information published in these computer outputs to prove "information specific to a date or a narrow and defined event" – specifically, the responsibility of Hamas for certain attacks on specific dates and places – and not to prove merely general information of an administrative nature of an institution or an authority that publishes such information on the internet.

The courts in Israel have made an important differentiation as to the character of the information to be proven by a computer output. The case law in this regard, such as the case of Kavei Zahav,[93] and the ruling in the Taher Zaid case, which specifically refers to the Hamas website, state that the more the information to be proven is specific as to the time and place of an event, the more the party seeking to submit these computer outputs is required to corroborate them with appropriate testimony. **"The mere presentation of the records or the computer output is insufficient, as they must be presented by**

---

[93]    Civil Case (Tel-Aviv) 731916/03 <u>Kavei Zahav Ltd. 012 v. Gez Eliyahu Phili</u>, published in NEVO

appropriate witnesses that shall confirm by affidavit the fulfillment of the conditions required for their presentation pursuant to the Evidence Ordinance - conditions that have been detailed hereinabove."[94]

In my opinion these judgments are most relevant here, if the plaintiffs wish to use these computer outputs in order to prove that certain organization was responsible for a very specific event that occurred at a specific time and a specific place.

2. **Summary**

2.1   All the documents on which Kohlmann relies are "computer outputs" which according to the Evidence Ordinance must fulfill the aggregate conditions stated in Section 36 of the Ordinance.  As I conclude above, these documents do not satisfy at least two of the aggregate conditions; Kohlmann's report establishes that the websites from which the documents originated suffered several security failures, and there is no competent witness who can testify and be cross examined on this matter.

2.2   Kohlmann's "comparative analysis" may serve as a tool for researchers to better understand the structure and the nature of terrorist organizations.  As indicated above, the comparative theory was not even strictly applied by Kohlmann, and he did not refer to all available internet sources for his comparison and conclusions. In any event, in my view, the findings of such comparative analysis cannot serve as legal proof of certain and very detailed facts, especially against a third party such as NatWest in this case.

2.3   The supporting sources for Kohlmann's conclusions, such as the Israeli Foreign Ministry website publications, are merely relying upon the publications of the "supported" websites.  As I conclude above, one hearsay source cannot serve as a support of another hearsay source, especially not for the objective of proving the truth of the contents published in the "supported" sources.

**E.  Research concerning relevant attacks**

**1.   General**

---

[94]   Civil Case (Tel-Aviv) 731916/03 <u>Kavei Zahav Ltd. 012 v. Gez Eliyahu Phili</u>, published in NEVO

1.1    For the purpose of this opinion, and in order to evaluate further the opinions of Shaked, Naim and Kohlmann, which are very similar to the opinions produced by these plaintiffs' experts for the Crédit Lyonnais cases, I refer to my own independent research, conducted during 2010, in connection with four out of the 15 relevant attacks, which are also relevant to the NatWest cases as well.

1.2    The attacks I have decided to analyze are the following :

- The suicide attack on the route № 19 bus in Jerusalem on January 29, 2004;

- The suicide attack at Mike's Place club in Tel Aviv on April 30, 2003;

- The attack at Tel Rumeida - Hebron on October 22, 2003;

- The mortar shelling attack on the Neve Dekalim settlement on September 24, 2004.

1.3    Because the Israel Police collect the relevant evidence and testimony with respect to an attack for submission to prosecutors, who then submit this evidence in court, I have focused on examining the investigation files of the Israel Police with regard to the above listed attacks.

1.4    On page 13 of his report, Naim points out that "the police maintain their files for the attack as well."  If Naim is correct, then the police investigation file should contain the entirety of the relevant investigation documents prepared or collected by the police or at least, in case originals were submitted in court, their copies.

1.5    I have elected to review files relating to these four attacks as representative samples of the investigation files of the events that are the subject of the pending lawsuits.

1.6     The issues I sought to examine independently, are as follows:

- Whether, as Naim contends, the investigation files of the relevant attacks are open to the public for reading, and can be accessed by approaching the investigation officer in charge in the district in which the investigation was carried out;

- Whether, as may be understood from Naim's reports, the investigation files contain the complete investigation material relevant to each attack, other than certain material such as minutes of the prosecution and of the court, which are not always given to the police;

- Whether the documents provided to me from the files for these attacks were referred to in the opinions of Shaked, Naim and Kohlmann;

- Whether the documents referred to in the opinions of Shaked, Naim and Kohlmann are included in the files; and

- If the contents of the documents provided to me from the files do not correspond with Shaked's and Kohlmann's conclusions with regard to the identity of the perpetrators of  these attacks, what would that indicate with respect to the credibility of  Shaked's and Kohlmann's conclusions and methodologies.

2.   **My efforts to obtain the relevant files**

2.1     On March 11, 2010 I asked Adv. Ms. Rakefet Levin, the person in charge of Freedom of Information at the Israel Police[95] to peruse and copy all the documents contained in the investigation files of the four attacks listed above.

---

[95] In accordance with the Freedom of Information Law 5758 – 1998, any official entity of the State must appoint a person to be in charge of carrying out the Law.

2.2     Having received no response, I wrote once more to the person in
        charge of Freedom of Information at the Israel Police on March 22,
        2010, asking that my request be expedited.


2.3     On April 22, 2010 I received a primary written reply from the Israel
        Police stating that my request was not in accordance with the
        Freedom of Information Law and that it had been passed on to the
        investigations officers in the various districts of the Israel Police.


2.4     On May 10, 2010 a reply from the Jerusalem Police was received,
        according to which I was allowed to peruse the investigation file of
        the January 29, 2004 attack.  In that letter of reply I was asked to
        arrange the perusal with Superintendent Asher Lizmi at the Special
        Assignments Department at the Jerusalem Police.  Superintendent
        Asher Lizmi's office referred me to a subordinate named "Oudi"
        with whom the meeting for perusing and copying the investigation
        file was finally set up.

2.5     The meeting for copying the documents at the Jerusalem Police was
        set up by telephone for June 6, 2010.  I was also asked to come
        equipped with a 500-page packet of copying paper for the purpose of
        photocopying the file.


2.6     On June 6, 2010 I arrived at the Jerusalem Police, equipped with
        copying paper and a digital camera.  "Oudi" awaited me there,
        holding the investigation file for the January 29, 2004 attack on bus
        line no. 19 in Jerusalem.


2.7     I told "Oudi" that I wished to copy all the documents contained in
        the file.  He started photocopying the documents from the file by
        their filing order. After proceeding for a while I noticed the low
        quality of the copies, and the going was slow due to the machine
        being very old and not advanced.  I offered to use the digital camera
        I had brought along instead of their machine, and "Oudi" agreed.

2.8     The copying process was carried out by "Oudi" turning the pages in the file while I was taking a picture of each page I was allowed to snap.  During this process, I took the pictures of two documents that were part of an opinion by an expert from the Institute of Forensic Medicine in Abu Kabir.  At that point "Oudi" demanded that I stop taking pictures, called another policeman to stay with me in the room where we were taking the pictures, and he went to ask his superiors if I was permitted to copy these documents.

2.9     "Oudi" returned to the room within a few minutes and told me that I was not permitted to copy or take pictures of these forensic documents or other documents I will list below.  He insisted that I erase from the camera's memory the two pictures from the opinion of the Institute of Forensic Medicine I had already taken.  By his instructions and in his presence I erased those pictures.  After he was convinced those pictures had been erased, we went on with the process of taking pictures until the end of the file.

2.10    As I pointed out above, I was not allowed to copy all the documents that the investigation file contained.  The types of documents I was not allowed to copy are as follows:

- The opinion of the Institute of Forensic Medicine;

- Documents of the hospitals that admitted wounded from the attack;

- Pictures from the area of the attack on the bus;

- Police internal memos; and

- The investigation log book describing the stages and steps of the investigation.

2.11    Except for the limited permission I received to peruse and copy the investigation file for the January 29, 2004 attack, and in spite of the fact that more than three months have elapsed since my first request,

130

and more than two months have elapsed from the date of the first response to my request, informing me that my application for reading the investigation files was being passed on to the officers in charge in the various police districts, I have until the day I have signed this opinion not yet received permission to peruse any of the other investigation files I asked to read.

2.12   I was allowed to copy 81 pages of the entirety of documents contained in the file for the January 29, 2004 attack.  Copies of those documents are attached as Annex B hereto.

3.   **The documents copied from the Israel Police investigation file for the January 29, 2004 attack**

3.1   Most of the documents I copied from the investigation file and attached as Annex B are testimonies given to the Israel Police on behalf of witnesses at the scene, relatives of people injured in the attacks and some by the wounded personally.  As it might be seen in Annex B to this report, some of the testimonies maintained in this file are the original copies, which probably were not used as evidence in the trials of the accused regarding this attack.

3.2   The file also contained three sentences issued by the Military Court in Judea, given to the police by the Military Prosecutor's Office, the details of which are as follows:

- Minutes of Case № 1216 / 04 against the accused Ali Rathem Muhammad Abu Karandal.  This document indicates that, during the trial, the accused admitted within the framework of a plea bargain his part in the January 29, 2004 attack.  The sentence recites that the accused was convicted of membership in the Islamic Jihad organization as well as of engaging in a conspiracy to carry out attacks on Israeli targets.  For his relatively limited role he was sentenced only to 32

131

months in prison.

- The sentence by the Military Court in Judea in Case № 2303 / 04 against the accused Hilmi Abed Al Karim Muhammad Hamash.  As detailed in that sentence, he was sentenced to 12 cumulative life imprisonments for intentionally causing death.  The dead listed in the sentence are those killed in the January 29, 2004 attack. He was defined a military activist and was not convicted of belonging to the Hamas organization.

- The grounds for the Judea Military Court's sentence in case № 2271 / 04 against the accused Abed AlRahman Yusef Abed AlRahman Mukadad.  The sentence details the crimes of which the accused was found guilty, including intentionally causing death, among other crimes, in the course of the January 29, 2004 attack. The accused was given a life sentence in respect of each of the dead in the attack, augmented by an additional cumulative life sentence in respect of mass injuring of people.  The accused in this case was defined a military activist and was not convicted for being member of the Hamas organization.

3.3     Also copied were opinions of the Israel Police's weapons laboratory Department experts as well as a list, made by the Jerusalem Municipality's Immediate Response Center, of the victims of the January 29, 2004 attack on the bus line no. 19.

4.     **Findings in and general conclusions from the copying of the January 29, 2004 attack investigation file**

4.1     On examining the documents that I was allowed to copy from this investigation file, I found that none was included among the documents produced by plaintiffs that I was given for the purpose of

132

preparing my Primary Expert Opinion.

4.2     I also found that none of these documents was cited in or provided with Naim's, Shaked's or Kohlmann's expert opinions.

4.3     None of the accused against whom the sentences I was permitted to copy from the investigation was accused or found to be a member of Hamas.

4.4     These sentences find the accused, none of whom is alleged to be or was found to be a member of Hamas, responsible for planning the attack, procuring explosives, preparing the bomb used in the actual perpetration of the attack, mobilizing the carrier of the suicide to the area of the attack and for actually carrying the suicide to the area of the attack.   And according to the ISA report quoted by Shaked, the suicide himself was a member of the Al Aqsa Brigades of the Fatah.

5.   **Conclusions drawn from my research in relation to Naim's reports**

5.1     Contrary to what Naim contends in his reports, it appears the police investigation files to which he refers are not freely available to the public.  Perusal of these files appears to be subject to the consent of investigation officers and such consents are not routinely given and /or are not given at all.  As of the date of this opinion, no consent to my application for reading the three additional files listed above has been received at all.

5.2     The consent allowing me to peruse the investigation file turned out to be only limited and did not allow me to fully read and /or copy all the material contained in the file, which in itself did not contain even a single document previously produced by plaintiffs and/or Naim.

133

5.3     The above listed sentences with regard to the attack, contained in the Israel Police's investigation file, were given by the Military Tribunal in 2006.  Therefore, it is reasonable to assume that they must have been filed in said file even prior to Naim's opinions having been submitted. Further, as mentioned below, Shaked apparently read these sentences and mentions part of them in page 135 of his report, but did not provide them with his report.

These sentences, which detail the convictions of, and the penalties given to three people, none of whom was accused of being or found to be a member of Hamas, in respect of direct responsibility for perpetrating the January 29, 2004 attack, were neither enclosed with the evidential material submitted on behalf of plaintiffs that was presented to me, or as appendices to or cited in Naim's opinions.

5.4     Naim does not indicate in his opinion what is the source of the documents on which he gave his opinions that they are "authentic documents" of the law enforcement authorities of Israel.  In any case, the findings from the copies of the documents contained in the single investigation file of the Israel Police that I was permitted to peruse do not correspond with Naim's conclusions with regard to the completeness of said police file.

5.5     In footnote 6 on page10 of his first opinion, Naim explains that: "These protocols (memoranda) do not serve as testimony in the court and are not part of the Attack File or evidence of the case," but were designated for the use of the police interrogators for the purpose of taking testimony from suspects and in order to make sure that what suspects tell the police corresponds to what they have told the ISA.

According to Naim's description, it would have been reasonable that these ISA memos should have indeed remained in the police's investigation file.  As I have mentioned above, no ISA memos were contained in the police investigation file relating to this attack.

6.  **Conclusions from the research in relation to Shaked's report**

6.1     On page 137 of the Shaked Report, Shaked points out that his conclusions regarding Adawin's "skills" are "in light of my review of **the** documents from the investigation of the terrorist attack on the No. 19 bus" [emphasis added], the same file I have perused within the framework of this research.

6.2     Shaked also reviews the sentences given in the cases of those involved in this attack.  First, he elaborately reviews the sentences issued against Nufal Adawin and Muhamed Azia, those he states were involved on behalf of Hamas, and describes the involvement of Hamas in this attack over three pages of his report,  and then he reviews in short the sentences of Abed AlRahman Yusef Mukadad, Ahmed Abu Radab and Halmi Abed AlKarim Muhammad Hamash, the members of the Fatah's Al Aqsa Martyrs' Brigades with regard to whom he concludes that they have been convicted of "involvement" in the attack or "took part in the preparations for the performance of the terrorist attack" [Shaked page 139] while the former, Miqdad, was also convicted of preparing the bomb used in the attack.

        Shaked has not enclosed these sentences as appendices to his opinion.

6.3     The sentences with regard to Miqdad and Hamash reviewed by Shaked are two of the three sentences that are contained in the Israel Police investigation file for this attack, while the third sentence, of Abu Karandal, is not mentioned by Shaked at all as part of the police file or as one of the proceedings regarding this attack.

        On the other hand, the sentences of Adawin and Azia described by Shaked regarding this attack were not contained in the police investigation file that I reviewed and it is not clear how Shaked obtained them, while the sentences of Miqdad and Hamash, also mentioned in the report, were discounted by Shaked.

6.4     As I have detailed in section 4.4 above, according to the sentences I reviewed in the file, the role of the Al Aqsa Martyrs' Brigades members in this attack was not of merely, as Shaked states, being

135

"involved" in the attack, but also of taking initiative, procuring explosives, preparing the bomb and mobilizing the carrier and carrying the suicide to the area of the attack.

6.5     Furthermore, contrary to Shaked's stating that "[e]ven if the preparations were shared, it seems that Hamas was the dominant entity in the last stages of the operation," [Shaked p. 139] it turns out from the sentences of the Al Aqsa Martyrs' Brigades members that I reviewed in the Israel Police file and from the indictments of Miqdad and Hamash referred to by Shaked [footnotes 444 and 450 to his report] that it was indeed they, together with Ahmad Salah Abu Radab, which according to his indictment, verdict and sentence was another Al Aqsa member, [referred by Shaked in footnotes 446, 447, 448 and 449 to his report] and not members of Hamas, who were dominant in all stages of carrying out the attack that was actually perpetrated on January 29, 2004.

Further, my review of the Israel Police file indicates that Shaked's description of the attack as though it had been carried out in stages is mistaken.  According to the contents of the investigation file that I reviewed, there were two different and separate events.

The first event, in which the file indicates Hamas members were involved (Adawin and Azia), was an attempted attack, planned and set up at another time by means of another bomb, and that one failed and as described by Nufal Adawin in his statement to the police: "I wanted to dispatch Ali Ja'ara to suicide in Jerusalem but it did not happen" [Shaked – Appendix No. 1 page 1076, W_S098240 rows 26-27].

The second one was the January 29, 2004 attack, which unfortunately succeeded.  This attack was carried out in whole, starting with the planning stage through to completion of the operation, solely by members of Al Aqsa Martrys' Brigades together with unorganized military activists.  There is no indication in the investigation file that I perused that anyone involved in the attack was a Hamas member.

136

Adawin was convicted and sentenced only in respect of an attempted attack, and of not preventing the actual attack.  Had the court believed that there was one event or a single ongoing transgression, it would have most likely convicted Adawin of intentionally causing death and sentenced him to life imprisonment for each of the dead in the attacks, as was the case with the Al Aqsa members convicted of the actual perpetration of the attack.

6.6     Shaked focuses his analysis on Hamas's purported role and on Adawin's sentence for the purpose of forming his conclusion that "both Hamas and the al-Aqsa Martyrs' Brigades are responsible for this terrorist attack" [Shaked page 128].

In spite of his conclusion on page 128, Shaked further states that "Hamas was the dominant entity in the last stages of the operation," [Shaked page 139] and that "all of these confirm that Hamas carried out the terrorist attack" [Shaked page 139].

Finally, in his summary, Shaked tries to resolve the discrepancies between his statements and states that: "Nonetheless, it is also possible to impose responsibility on the al-Aqsa Martyrs' Brigades in spite of the fact that they themselves withdrew from their initial declaration of responsibility" [Shaked last rows of the report].

6.7     As I will detail below, based on the documents cited in the Shaked and Naim reports, there is no legal or logical ground for the conclusions of Shaked regarding the responsibility for this attack.  In addition to all the discrepancies mentioned above, there are several documents that contradict Shaked's conclusions:

6.7.1   On page 133 of his NatWest report, Shaked wrote:  "it appears that Ja'ara was not really a member of the al-Aqsa Martyrs' Brigades."  This statement contradicts another source referred to by Shaked in footnote 430, which states that "The suicide bomber who committed the attack, Ali Munir Jaara, 23 years old, a resident of the Al-Aida refugee camp near Bethlehem, was a member of the Al-Aqsa Martyrs' Brigades, the military wing of the Fatah."

137

6.7.2    On page 137 of his report, Shaked wrote: "After the terrorist attack, Adawin informed Hamas headquarters of the role which he had played in recruiting and training Ja'ara.  It is possible that Adawin even inflated his role, in an attempt to receive additional, and perhaps even greater, funding for future terrorist attacks on behalf of Hamas."  Shaked's statement is contradicted by Adawin's and Azia's interrogation statements.  Adawin did not inform the Hamas headquarters of anything.  He merely told Azia that he was responsible for the attack, a statement which Adawin ultimately admitted false.  In Adawin's statement to the police, he confessed that he told Azia so only in order to receive money, and also stated that "the truth is that the Tanzim of the Fatah committed the attack and not me" [Adawin statement, Appendix No. 1 to Shaked report, page 1088 rows 24-25].  Moreover, based on Adawin and Azia's testimony, Adawin did not speak with Azia until at least a month after the bombing; therefore, Azia could not have told Hamas headquarters anything about the bombing before Hamas claimed credit for the bombing.

6.7.3    On page 137 of his report, Shaked wrote: "the al-Aqsa Martyrs Brigades not only gave Hamas the credit for the terrorist attack, but even withdrew their earlier declaration of responsibility, according to which they had been the only ones responsible for the terrorist attack."  As noted above regarding Kohlmann's report [Annexes B4 – B5 to this report], there is no basis for this statement and it is contradicted by Al Aqsa's additional claim of responsibility issued on the attack's one year anniversary.

6.7.4    After reviewing all of the documents Shaked cites [except the Arabic sources], I found no evidence that Hamas ever funded Adawin in his attempt to perpetrate this suicide bombing.  To the contrary, according to Adawin's testimony and Nashash's sentence, the attempted attack was self-financed by selling private properties belonging to Nashash.

6.7.5    On page 138 of his report, Shaked wrote: "After the terrorist attack was complete, Adawin, Hamas and the al-Aqsa Martyrs Brigades credited Hamas with its role in the terrorist attack."  There is no basis cited for this statement and as noted above, it is contradicted by Al Aqsa's claim issued on the attack's one year anniversary.

138

6.7.6    On pages 133 and 137 of his report, Shaked describes Kaid El Nashash as a "comrade in the al-Qassam Brigades" and as a "Hamas operative." These statements contradict the grounds of the sentence of Nashash [cited by Naim as Exhibit J: The Court's Reasoning behind Nashash's Verdict (Naim 004681-4683)].  According to this source, Nashash was convicted for being a member of Al Aqsa Martyr's Brigades from March 2003 up to his arrest, and not a member of Hamas, as stated twice by Shaked [see Naim exhibit 004681 rows 24 – 25].

6.7.7    On page 135 of his report, Shaked describes the early stages of the failed attempt to perpetrate a suicide attack by Ja'ara, Nashash and Adawin. According to Shaked's description, it was Ja'ara – an Al Aqsa member - that initiated the contact with his friend Nashash.   Further, according to the grounds for sentencing of Nashash, Ja'ara requested Nashash, several times, during a period of about two months to help him committing suicide attack until he [Nashash] finally agreed to do so [see Appendix No.1 to the Shaked report page 1000 rows 30-32] .

In the same paragraph, Shaked refers in footnote 452 to the Adawin statement to the police, in which he stated that he recruited Ja'ara.

On page 133 of his report, Shaked refers to Adawin's interrogation [footnote 453] and states that Nashash introduced Ja'ara to Adawin.

Shaked does not provide any explanation for these discrepancies, and simply states as a fact that Adawin recruited Ja'ara.

6.7.8    On page 136 of his report, Shaked wrote:  "judicial proceedings in Israel have imposed partial responsibility on Hamas...."  In my opinion there is no basis for this conclusion.  On the contrary, in both Adawin's and Nashash's sentences, the court did not convict them for perpetrating the Bus 19 attack.  As noted above, Nashash was convicted for membership in Al Aqsa and not in Hamas, and the sentence of Adawin was against him as an individual, and not against Hamas itself.  Further, in connection with the Bus 19 attack, Adawin was charged with failure to prevent an offense, not perpetrating the offense.

139

6.7.9   On page 135 of his report, Shaked wrote: "Adawin took Ja'ara by car toward the intended location for the terrorist attack; however, as they approached the Tunnel Road (south of Jerusalem), they encountered a Palestinian security forces roadblock."

I reviewed a copy of an interrogation statement of Adawin from August 30, 2004. This part of the interrogation was not provided by Shaked as an integral part of the interrogation attached to his report as Appendix No. 1 pages 1076-1091.

According to this statement of Adawin on August 30, 2004, [see Annex B8, lines 18-21] Adawin and Ja'ara went out to Jerusalem by foot and not by car as stated by Shaked.

6.7.10   An ISA report entitled "summary data for the year 2004" [referred by Shaked in footnote 391 to his report] on page 18 states that Adawin and Nashash attempted to commit a suicide bombing in Jerusalem in the beginning of 2004, but the attack was not executed since the terrorist decided not to commit the attack.

6.8   Further, there are other sources that attribute responsibility for the January 29, 2004 attack to Al Aqsa Martyrs' Brigades of the Fatah, as follows:

6.8.1   **An Intelligence [ITIC ] Bulletin from January 1, 2006: "Suicide bombing terrorism during the current Israeli-Palestinian confrontation" [attached as Annex B9]**

Shaked referred in his report to the ITIC in several instances [see footnotes 17, 45, 67 and 132 to his report].

According to the authors of this bulletin [page 80], the organization responsible for January 29, 2004 attack is the Fatah's Al Aqsa Martyrs' Brigades. The Bulletin does not mention any involvement of Hamas in this attack.

This source was not referred to or analyzed either by Kohlmann or by Shaked. The statement in this report calls into question the reliability and the credibility of Hamas claims of responsibility as relied upon by Kohlmann, and contradicts Shaked's conclusion about the involvement of Hamas in this attack.

6.8.2   **A report of the Homeland Security department of the RAND organization entitled "Breaching the Fortress Wall" [attached as Annex B10]**

On page 20 of this report, the author states: "In January 2004, a member of the al-Aqsa Martyrs' Brigade conducted a suicide bombing on a bus in Jerusalem, killing eight and wounding approximately 60."

To the best of my knowledge, the only suicide bombing on a bus in Jerusalem on January 2004 was the bus 19 attack on January 29, 2004.

Although Shaked referred in his report to another article by RAND in another section of his report [see for example footnote 68 to his report], this source was not referred to or analyzed either by Kohlmann or by Shaked. The statement in this report calls into question the reliability and the credibility of Hamas claims of responsibility as concluded by Kohlmann, and contradicts Shaked's conclusion about the involvement of Hamas in this attack.

6.8.3   **A report of the US Department of State: "Country Reports on Terrorism 2004" dated April 2005 [attached as Annex B11]**

On page 64 of this report it is stated that: "Fatah's militant wing, the al-Aqsa Martyrs Brigade, conducted numerous shooting attacks and suicide bombings in 2004.  It was responsible for two suicide bus bombings in Jerusalem during January and February. The attacks killed 21 people and wounded over 110."

As I noted above, the Bus 19 attack was the only suicide bombing on a bus in Jerusalem.

This source was not referred to or analyzed either by Kohlmann or by Shaked.  The statement in this report calls into question the reliability and the credibility of Hamas claims of responsibility as concluded by Kohlmann, and contradicts Shaked's conclusion about the involvement of Hamas in this attack.

141

6.8.4   **The Counterterrorism Calendar 2010 posted on the website of the US National Counterterrorism Center:**

http://www.nctc.gov/docs/ct_calendar_2010.pdf

On page 13 of this Calendar, on January, Thursday 29 it is stated that: "2004, Israel: Al-Aqsa Martyrs Brigade bus bomb in Jerusalem kills 11, wounds 50."

This source was not referred to or analyzed either by Kohlmann or by Shaked. The statement in this report calls into question the reliability and the credibility of Hamas claims of responsibility as concluded by Kohlmann, and contradicts Shaked's conclusion about the involvement of Hamas in this attack.

6.9   In summation:  all of these materials indicate to me that there is no substantiation for the conclusion that the January 29, 2004 attack was perpetrated by Hamas.  As noted below, these documents also cast doubt on the reliability of Shaked's methodology he claims to have applied in reaching his conclusions.

7.   **Conclusions with regard to Kohlmann's report**

7.1   Kohlmann maintains that Hamas is responsible for carrying out the January 29, 2004 attack, and bases this on examining websites that he concluded belong to Hamas and /or to organizations identified with and /or subordinate to Hamas, such as websites of the Ez Adin Al Qassam Brigades and their various offspring as were uploaded from the internet from time to time.

7.2   Kohlmann states that according to the websites examined by him, Hamas assumed responsibility for the January 29, 2004 attack and that according to the "comparability" test he has conducted, this declaration of Hamas is credible.

142

7.3     My findings as reported above demonstrate the incompleteness of Kohlmann's research as well as the lack of credibility of terrorist groups' announcements assuming responsibility for and announcements denying responsibility for terrorist attacks and the unreliability of those announcements as bases for determining responsibility for an attack.   These findings further demonstrate the unreliability of relying upon suicide bombers' testaments and pictures with Hamas flags in their background as bases for attributing responsibility for an attack to Hamas.   My findings with respect to the January 29, 2004 attack contradict Kohlmann's conclusion that Hamas's claim of responsibility for this attack is credible.

7.4     The findings of my research and the documents uncovered in the Israel Police's investigation file in relation to the attack on bus no. 19 on January 29, 2004 confirm that it is not possible to determine responsibility for an attack by means of analyzing declarations on websites of terrorist organizations, not even by way of comparing them to publications by Israeli institutions that have quoted the same Hamas sources that have assumed responsibility for that attack.

8.  **Summary**

8.1     From all said above, one fact is clear and not refutable, namely that according to the documents provided by the plaintiffs themselves, as well as the documents I saw in the Israel Police investigation file and elsewhere, plaintiffs have not provided a reliable factual basis for concluding that the January 29, 2004 attack was carried out by Hamas and/or any person convicted or accused of belonging to Hamas.

8.2     My research contradicts Naim's conclusions with regard to the availability, contents and completeness of what he refers to as the "attack file" kept by the Israel Police.

8.3     My research indicates that Shaked's conclusions concerning responsibility for this attack are not substantiated by the relevant documents, and the methodology by which he arrived at his

143

conclusions concerning responsibility for this attack is unreliable because, among other things, he apparently did not refer to (or at a minimum he did not identify in his report) the complete universe of relevant documents, including documents that apparently were available to him in the Israel Police file because they were available to me, and he apparently referred to documents that are not part of the Israel Police file for this attack and which he has not provided with his report.  Further, Shaked's interpretation of the verdicts, indictments and police interrogations is wrong.

8.4   My research proves that one cannot reliably determine responsibility for an attack by reference to publications on websites of terrorist organizations and/or of entities identified with them.

8.5   The examination of the single investigation file I was allowed, so far, to partially peruse and copy parts of yielded findings that contradict the conclusions provided by, and demonstrates the unreliability of the methodology employed by, plaintiffs' experts with regard to their assessments of responsibility for the January 29, 2004 attack.

Dated: March _3_, 2011
7 Rival St.
Tel Aviv, Israel

_____
Moshe Azoulay

**EXHIBIT 186 TO DECLARATION OF VALERIE SCHUSTER**

Case 1:05-cv-04622-DLI-RML   Document 267-15   Filed 03/22/12   Page 412 of 910 PageID #: 7789



بيان صادر عن كتائب شهداء الأقصى

مجموعات الشهيد أيمن جودة

الذكرى السنوية الأولى لاستشهاد رعد الكتائب


قاتلوهم يعذبهم الله بأيديكم ويخزهم وينصركم عليهم ويشف صدور قوم مؤمنين ) صدق الله العظيم )

تمر علينا اليوم الذكرى السنوية الأولى لاستشهاد رعد الكتائب بطل الانتقام الاستشهادي البطل

## علي منير جعارة

## ابن مخيم عايدة – 25 عام


ابن كتائب شهداء الأقصى مجموعات الشهيد أيمن جودة

منفذ العملية الاستشهادية يوم الخميس الموافق 2004/1/29 م في حافلة رقم 19 – مدينة القدس المحتلة ، ليوقع العشرات في صفوف الغزاة مابين قتيل وجريح ولتكون هذه العملية الرد الأسرع

. على مجازر العدو بحي الزيتون الصامد والمبرهن على أن كتائبكم المغوارة صاحبة القرار في الرد في الزمان والمكان المناسبين

فسلمت يداك يا علي يا من دمرت عليهم حصونهم وقلاعهم وحطمت أمنهم وجبروتهم ، وخرجت لهم كالرعد الهادر لتجعل من جسدك ناراً

. تحرق الغزاة الصهاينة والمتساقطين والجبناء والمتخاذلين

طوبى لروحك الطاهرة وهي تصعد ويتناثر عبقها فوق قباب المسجد الأقصى.

وفي هذه الذكرى الكريمة إننا في كتائب شهداء الأقصى – مجموعات الشهيد أيمن جودة

نعاهد روحك شهيدنا البطل على الاستمرار مضياً على دربك ودرب رفيقك الاستشهادي

" محمد زعل وإخوانك الشهداء القادة " أيمن جودة وحسن وموسى درويش وكل الشهداء

ونعدك أن لا تسقط بندقية الكتائب مادام هناك صهيوني غاصب لأرضنا أو أسير قابع خلف القضبان

ومادام هناك فلسطيني حر مبعد عن ثرى أرض فلسطين الحبيبة.


وقسماً سنبقى الأوفياء لدماء الشهداء


كتائب شهداء الأقصى – فلسطين

مجموعات الشهيد أيمن جودة

29/1/2005م

اغلاق هذه الصفحة

Al-Aqsa Martyrs Troops – First Anniversary of the Martyrdom of the Thunder of the Troops Ali Mounir Ja'ara                                                                    Page 1 of 1

In the Name of God, the Merciful, the Compassionate

Al-Aqsa Martyrs Troops                    [emblem: Al-Aqsa Martyrs Troops]
Palestine

A Statement by Al-Aqsa Martyrs Troops
Martyr Ayman Jouda Groups
The First Anniversary of the Martyrdom of the Thunder of the Troops

(Fight them and Allah will torture them at your hands, defeat them and grant you victory over them, and heal the hearts of believers) God Almighty spoke the truth
Today is the first anniversary of the martyrdom of the Thunder of the Troops, the martyr hero

Ali Mounir Ja'ara
The Son of Aida Camp – 25 Years

The son of Al-Aqsa Martyrs Troops, Martyr Ayman Jouda Groups
The executor of the martyr operation on Thursday 1/29/2004, bus no. 19 – the occupied city of Jerusalem, to drop tens in the ranks of the invaders, between wounded and dead, for this operation to be the fastest response
To the enemy's massacres at the steadfast Al-Zaytoun District, showing that your commando troops hold the decision to retaliate at the appropriate time and place
Good work, Ali, you who demolished their forts and fortresses, and destroyed their security and might, you came out as rolling thunder, to turn your body in fire, burning the Zionist invaders, the falling, the cowards, and the reluctant.
May your pure soul rejoice in its assent, and may its scent scatter over the minarets of Al-Aqsa Mosque
On this good anniversary, we, at Al-Aqsa Troops – Martyr Ayman Jouda Groups
Promise your soul, our martyred hero, to continue forth on your path and the path of your martyr comrade "Mohamed Za'al" and your martyred brother, leaders Ayman Jouda, Hassan and Moussa Darwish, and all the martyrs
We promise you that the rifle of the Troops will not fall as long as there is a usurping Zionist in our land, or a prisoner behind bars, and as long as there is a free Palestinian banished from the lands of beloved Palestine

We swear to remain true to the blood of martyrs

Al-Aqsa Martyrs Troops – Palestine
Martyr Ayman Jouda Groups
1/29/2005

Close this page



**TRANSPERFECT**

ALBANY
AMSTERDAM
ATLANTA
AUSTIN
BARCELONA
BERLIN
BOGOTA
BOSTON
BRUSSELS
CHARLOTTE
CHICAGO
DALLAS
DENVER
DUBAI
DUBLIN
FRANKFURT
GENEVA
HONG KONG
HOUSTON
IRVINE
LONDON
LOS ANGELES
LYON
MEXICO CITY
MIAMI
MILAN
MINNEAPOLIS
MONTREAL
MUNICH
NEW YORK
PARIS
PHILADELPHIA
PHOENIX
PORTLAND
PRAGUE
RESEARCH
TRIANGLE PARK
SAN DIEGO
SAN FRANCISCO
SAN JOSE
SEATTLE
SINGAPORE
STOCKHOLM
STUTTGART
SYDNEY
TOKYO
TORONTO
VANCOUVER
WASHINGTON, DC
ZURICH

City of New York, State of New York, County of New York

I, Anne Fang, hereby certify that the following is, to the best of my knowledge and belief, a true and accurate translation of the following document, "AAMB 1 year anniversary", from Arabic into English.

Anne Fang

Sworn to before me this

Wednesday, November 24, 2010

Signature, Notary Public

KEVIN M KELLEY JR
Notary Public - State of New York
No. 01-KE-6229268
Qualified in Queens County
Commission Expires October 4 2011

Stamp, Notary Public

THREE PARK AVENUE, 39TH FLOOR, NEW YORK, NY 10016  T 212.689.5555  F 212.689.1059  WWW.TRANSPERFECT.COM

**EXHIBIT 187 TO DECLARATION OF VALERIE SCHUSTER**

*MOSES STRAUSS VS.*

*CREDIT LYONNAIS, S.A.*

---

*EVAN KOHLMANN*
*December 2, 2010*

---



126 East 56th Street, Fifth Floor New York, New York 10022
PHONE: (212) 750-6434   FAX: (212) 750-1097
www.ELLENGRAUER.com

*Original File 95216.TXT*
*Min-U-Script® with Word Index*

MOSES STRAUSS VS.
CREDIT LYONNAIS, S.A.

EVAN KOHLMANN
December 2, 2010

Page 49

1       KOHLMANN
2   conduct a ranging study through material
3   other than Hamas' on line entities.
4   Q.   So am I correct then that you
5   are not offering an opinion in this matter as
6   to who was responsible for the 15 attacks in
7   question?
8   A.   I'm not offering a definitive
9   opinion. I'm offering an opinion that there
10  are indicia of culpability on Hamas websites,
11  but I'm not making a final judgment as to who
12  did what.
13  Q.   All you're saying is that you
14  believe that there is let's call it evidence
15  for lack of a better term on Hamas' websites
16  that you think show -- that may indicate that
17  Hamas was the culprit?
18  A.   There is credible evidence on
19  Hamas websites indicating a degree of
20  culpability on the part of Hamas, however,
21  I'm not making a final judgment as to whether
22  or not Hamas actually did this or not based
23  upon forensic evidence or based on whatever,
24  that's not the area that I was asked to
25  research.

Page 50

1       KOHLMANN
2   Q.   Are you offering any opinion as
3   to who was culpable for the 15 attacks in
4   question?
5   A.   I believe that Hamas when it
6   issues communicas, generally speaking those
7   communicas are generally accurate and are
8   generally credible, but I'm not saying on a
9   specific case by case basis where I believe
10  that 100 percent or 90 percent, I'm just
11  indicating there is evidence of culpability.
12      MR. GLATTER: I'll also
13  interpose an objection to form on
14  vagueness grounds.  Proceed.  Do you
15  want me to explain it?
16      MR. LUFT: No, I don't need you
17  to explain it.  Evan understood the
18  question and gave me a fine answer.
19      MR. GLATTER: Again also just
20  generally I'm sure Mr. Luft does not
21  want any talking over him or you so if
22  I make an objection, try to let me
23  make it before so that way the record
24  is clean.
25      THE WITNESS: Forgive me, sorry

Page 51

1       KOHLMANN
2   about that.
3       MR. GLATTER: It's fine, go
4   ahead.
5   Q.   So I'm clear if we look at when
6   you say using the above means namely
7   websites, newsletters and forums Hamas has
8   distributed authentic claims of
9   responsibility accompanied by other evidence
10  in the form of high resolution photographs,
11  original video recordings and the personal
12  accounts of eyewitness which demonstrate its
13  culpability in the execution of particular
14  terrorist attacks identified by plaintiffs
15  that occurred between 2001 and 2004, you do
16  not mean to say in particular where you say
17  demonstrate its culpability that you are
18  offering an opinion that Hamas is actually
19  culpable for the 15 attacks you list in your
20  report?
21      MR. GLATTER: Objection to form
22  and foundation.
23  A.   What I can argue here or what
24  my argument here is or my opinion is is that
25  these are authentic claims of responsibility

Page 52

1       KOHLMANN
2   as they are authentically from Hamas, that
3   Hamas generally speaking has a pretty good
4   record of accuracy in terms of claiming
5   credit for operations and that these are
6   indicia of culpability on their part,
7   however, this is obviously absent other
8   pieces of information. This is focusing on
9   their on line presence.
10  Q.   Just to get back to my
11  question, when you say demonstrates its
12  culpability in the execution of particular
13  terrorist attacks and there are 15 attacks
14  we're talking about, you are not offering any
15  opinion as to any of those 15 attacks that
16  Hamas is culpable for having executed that
17  attack?
18      MR. GLATTER: Objection to form
19  and foundation.  You reading from a
20  report?
21      MR. LUFT: I'm just asking a
22  question.
23  A.   I believe what I'm arguing is
24  that there is evidence for their culpability.
25  What I'm saying is that I cannot make a

MOSES STRAUSS VS.
CREDIT LYONNAIS, S.A.

EVAN KOHLMANN
December 2, 2010

Page 53

KOHLMANN

1 KOHLMANN
2 definitive 100 percent assessment because the
3 basis for my judgment is on what they have
4 stated on line and what's available on their
5 websites so I do believe that this is
6 indicating of their culpability, but I'm not
7 saying I'm 100 percent positive that Hamas is
8 the sole only culpable party for every single
9 one as proved by all evidence. I'm saying
10 that there are indicia of culpability on
11 their on line sites.
12 Q. What I'm asking you is you are
13 not offering an opinion that Hamas is
14 culpable, in fact, the party that perpetrated
15 these 15 attacks?
16 A. I believe I just answered that
17 question.
18 Q. I don't think you have, Mr.
19 Kohlmann, so I'll try to get back to it. I
20 understand you told me you are not offering
21 100 percent guarantee and I also understand
22 you told me that you believe that you are
23 offering opinions that there is evidence that
24 you believe suggests that Hamas committed the
25 attack -- let me finish my question --

Page 54

1 KOHLMANN
2 evidence that indicates Hamas is culpable for
3 the attack and what I want to know is are you
4 offering an opinion in this matter as to the
5 15 attacks for each of the 15 attacks in
6 question as to whether Hamas was the party
7 who perpetrated that attack, not whether
8 there's evidence pointing towards it or 100
9 percent guarantee, I want to know are you
10 offering -- going to stand up in court and
11 offer an opinion that Hamas perpetrated the
12 15 attacks in question, any of the 15 attacks
13 in question?
14 MR. GLATTER: Objection as to
15 form. Objection to the extent the
16 question has been asked and answered.
17 You may answer.
18 A. Once again to the extent to
19 which there are indicia of culpability
20 present on Hamas websites, I'm saying that
21 there is evidence that Hamas likely was
22 involved in these operations, however, I'm
23 not saying that it's definitive, I'm simply
24 saying there is indicia of culpability via
25 Hamas' on line presence.

Page 55

1 KOHLMANN
2 Q. Mr. Kohlmann, is it your sworn
3 opinion that the September 24, 2004 terrorist
4 attack was perpetrated by Hamas?
5 MR. GLATTER: Objection to
6 form.
7 A. May I review a copy of my
8 report in order to address this question?
9 MR. LUFT: Sure. Let me strike
10 that. I will give you a copy of your
11 report. We can mark this as Kohlmann
12 Exhibit 3.
13 (Kohlmann Exhibit 3, Expert
14 Report, marked for Identification.)
15 Q. Mr. Kohlmann, you are free to
16 look at your report whenever you wish.
17 A. Thank you.
18 Q. Let me first go back, you
19 mentioned that you were only looking at
20 certain information, in particular, their on
21 line presence, correct?
22 A. That's correct.
23 Q. You mentioned you didn't look
24 at forensic information about the attack?
25 A. That's correct. Sources that

Page 56

1 KOHLMANN
2 are in my report are either taken from Hamas'
3 website or are generally present to offer
4 context as to the individual incidents
5 themselves, but not as per their credibility
6 or authenticity or culpability of particular
7 parties.
8 Q. It's your understanding that in
9 fact that there may be other evidence beyond
10 what's on the website, correct?
11 A. That's certainly possible, yes.
12 Q. And you did nothing to
13 investigate that information?
14 A. I was not asked to, no.
15 Q. Were you specifically asked to
16 look at Hamas' websites to determine if there
17 was information or whether there was any
18 information in the web in general?
19 A. I was asked to look for Hamas
20 sites, but in order to do this I did general
21 searches through the entire range of sites
22 that I collect information for.
23 Q. When you say you collect
24 information, that's your proprietary
25 database, correct?

MOSES STRAUSS VS.
CREDIT LYONNAIS, S.A.

EVAN KOHLMANN
December 2, 2010

Page 61

1    KOHLMANN
2    MR. LUFT: No, I think we can
3  do this right on the record.
4    MR. GLATTER: That's fine.
5    May I make one other
6  observation while you're looking for
7  that that perhaps will obviate the
8  need for an unnecessary fight on this.
9  I would respectfully suggest that your
10  reference to rely upon is a little bit
11  -- it's certainly confusing to me
12  because it's not clear whether or not
13  you are talking about how he goes
14  about searching for material verses
15  the data information that he's relying
16  upon for the opinions he plans to
17  offer in this litigation which he just
18  testified as to so respectfully I
19  think in terms of your question and
20  its phraseology or relying upon is
21  somewhat vague and confusing as
22  between a research process verses the
23  specific data reflected in Mr.
24  Kohlmann's report, his appendix which
25  constitutes the data that he's relied

Page 62

1    KOHLMANN
2  upon for the opinions that he's
3  offering verses what we produced to
4  you which is a sub database of
5  material that constitutes both that
6  data and a larger universe of data
7  that I don't necessarily -- it's not
8  my understanding he's necessarily
9  relying upon for the specific opinions
10  he plans to offer in this litigation
11  so that may clarify it for you.
12    It's certainly something you
13  are free to explore with him over the
14  next two days. It's why we agreed to
15  the extended period of time and I
16  would recommend that perhaps we move
17  on and certainly as is always the case
18  when we are done if you think there's
19  still an issue you can call me and
20  write to me and see what we can do.
21  Q. Mr. Kohlmann, the sub database
22  you produced contains no materials with
23  regard to the al-Aqsa Martyrs Brigade?
24  A. I do not believe it does, no.
25  Q. Contains nothing with regard to

Page 63

1    KOHLMANN
2  PIJ?
3  A. I don't believe it does, no.
4  Q. Just relates to Hamas, correct?
5  A. That's correct.
6  Q. Yet to write your report you
7  did a general search as you said across all
8  your databases, all your Palestinian
9  terrorist organizations, correct?
10  A. I did a -- the way my database
11  is structured is that it's not structured for
12  individual search tasks, in other words, if I
13  wanted to search for Hamas materials, I
14  cannot just select Hamas, I cannot just
15  select PIJ, I can't just select al-Aqsa
16  Martyrs Brigade. I have to -- I'm forced to
17  run a general search through everything,
18  however, there were no hits, there was no
19  data, there was no results that appeared in
20  any other place than in my Hamas section.
21  Q. Mr. Kohlmann, if I ran a search
22  on your sub database, I would not have all
23  the information that you searched to write
24  your report, correct?
25    MR. GLATTER: Objection to

Page 64

1    KOHLMANN
2  form, misstates the testimony, but you
3  can answer.
4  A. Again, there were no hits.
5  There is no -- I ran a number of different
6  searches. I received no hits on anything
7  other than the Hamas sub database.
8  Q. Mr. Kohlmann, I cannot run the
9  same search you did, right? I won't have the
10  same data to search through, can I?
11  A. Well, it really depends what
12  you are looking for.
13  Q. I don't have the body of
14  information that you have to search through,
15  do I?
16  A. You wouldn't have the total
17  body of information, no.
18  Q. I wouldn't have any information
19  on any terrorist groups other than Hamas,
20  correct?
21  A. No, that's not correct.
22  There's information about other terrorist
23  groups inside my Hamas sub database.
24  Q. Mr. Kohlmann, did you think it
25  relevant what other terrorist groups may have

MOSES STRAUSS VS.
CREDIT LYONNAIS, S.A.

EVAN KOHLMANN
December 2, 2010

Page 65

1      KOHLMANN
2   said on their websites with regard to the
3   terrorist attacks in question?
4   A.   That was not part of the
5   initial tasking process that I was asked to
6   do.
7   Q.   You didn't think it was
8   relevant if al-Aqsa posted on their website
9   whether they committed a terrorist attack?
10  A.   I did do a search for that
11  afterwards, but it was not part of my initial
12  tasking.
13  Q.   You didn't do it at the time
14  you signed your opinion, did you?
15  A.   I did to the extent that the
16  search was already including the materials
17  that were in the database, but again, my
18  tasking was specifically to look for Hamas
19  materials.
20  Q.   Again, when you say the
21  database, you mean your general database, not
22  the Hamas sub database which you provided to
23  us, correct?
24  A.   I did searches through --
25  obviously through everything, but the only

Page 66

1      KOHLMANN
2   hits I got were on my Hamas database.
3   Q.   If I wanted to see if there
4   were hits in your general database with
5   regard to whether al-Aqsa said anything on
6   their website as to whether they committed
7   the attacks, I would not be able to do that
8   by searching your Hamas sub database,
9   correct?
10  A.   That is correct. That depends
11  because there is also some material about
12  al-Aqsa Martyrs Brigade in my Hamas sub
13  database.
14  Q.   Would I know as an expert would
15  you say that I would be able to say after
16  reviewing your Hamas sub database that I
17  would know to a reasonable degree of
18  certainty whether the al-Aqsa Martyrs Brigade
19  posted anything on the web with regard to the
20  attacks in question?
21      MR. GLATTER: Objection to
22  form.
23  A.   I don't believe so.
24  Q.   Why is that?
25  A.   I believe the majority of my

Page 67

1      KOHLMANN
2   materials relating to the al-Aqsa Martyrs
3   Brigade are under my al-Aqsa Martyrs Brigade
4   or respectively under my PIJ folders.
5   Q.   Those were not produced to
6   defense counsel, correct?
7   A.   Not that I'm aware of.
8   Q.   They would have been searched
9   as part of your general search to do your
10  work for this matter, correct?
11  A.   Again, there is no way of doing
12  a specific search only through the Hamas
13  folder the way my search software is set up,
14  however, the other searches that were done
15  beyond my database, the focus was on Hamas
16  materials.
17  Q.   So as I said in my question, I
18  would not be able to -- I would need your
19  whole database if I wanted to search
20  everything you searched to know if there was
21  anything with regard to PIJ and al-Aqsa
22  Martyrs Brigade?
23  A.   You wouldn't need access to my
24  whole database, you would just need access to
25  my folders for PIJ or al-Aqsa Martyrs

Page 68

1      KOHLMANN
2   Brigade.
3   Q.   I don't have access to those
4   folders, do I?
5   A.   I don't believe those were
6   included as part of the sub database, no.
7   Q.   Mr. Kohlmann, you said to me
8   that there were no hits in those folders when
9   you did your search, correct?
10  A.   That's correct.
11  Q.   Based on the information you
12  produced to defense counsel, is there any way
13  for defense counsel to test that?
14  A.   The hits -- you mean that there
15  were no hits on the outside database?
16  Q.   Correct.
17  A.   I don't think so.
18  Q.   We just have to take your word
19  for it?
20  A.   I guess you could say that.
21      MR. LUFT: I renew my request
22  for Mr. Kohlmann's database.
23      MR. GLATTER: Noted.
24      MR. LUFT: We've been going
25  about an hour and 15 minutes, why

MOSES STRAUSS VS.
CREDIT LYONNAIS, S.A.

EVAN KOHLMANN
December 2, 2010

Page 77

1      KOHLMANN
2  and object to the extent that the
3  question is beyond the scope of Mr.
4  Kohlmann's expert report.  You may
5  answer.
6      MR. LUFT: I'm trying to
7  determine the scope.  I'm asking if
8  he's offering this opinion.
9      MR. GLATTER: My objection
10  stands.  You may answer.
11  A.  Unfortunately my answer is
12  going to be the same which is that I was not
13  asked to conduct a wide ranging analysis of
14  all sources, but based upon the sources that
15  I specifically was asked to look at, the
16  evidence that I gathered I believe indicates
17  that it's more likely than not that Hamas was
18  culpable in some way for the 15 attacks that
19  are listed or at least the 15 attacks that
20  you are concerned with here.
21  Q.  So am I correct that you are
22  not opining that Hamas was responsible for
23  the March 27, 2002 Park Hotel bombing attack
24  in Natanya?
25      MR. GLATTER: Objection to

Page 78

1      KOHLMANN
2  form, misstates testimony.  You may
3  answer.
4  A.  I don't believe that accurately
5  states what I just said.  I will repeat
6  again.  My conclusion on this is that the
7  evidence that I reviewed for this analysis
8  that being Hamas' on line presence indicates
9  that more likely than not Hamas is culpable
10  in some way for the 15 attacks that are
11  listed here.
12  Q.  Mr. Kohlmann, I don't want to
13  belabor this, but I understand what you want
14  to offer as your opinion and what it is.
15  What I'm asking is I have another question on
16  whether you are offering this other opinion
17  and that's what I'm asking you to tell me yes
18  or no if you are offering it or not and so
19  that's what I want you to tell me either yes
20  you are offering the opinion or no, you are
21  not offering the opinion that Hamas
22  perpetrated the March 27, 2002 Park Hotel
23  bombing in Natanya?
24      MR. GLATTER: Objection to
25  form, vague.  You can answer.

Page 79

1      KOHLMANN
2  A.  Again, with regard to the March
3  27, 2002 Park Hotel bombing what you are
4  suggesting is that I'm not saying they are --
5  I'm saying they were not culpable or saying
6  were culpable.  I'm saying in this case the
7  evidence that I reviewed indicates that more
8  likely than not they were culpable based upon
9  the evidence in this review. I'm not saying
10  based upon all evidence out there, I'm saying
11  based on the evidence in my reviews.
12  Q.  I understand that and what I'm
13  saying is you are not opining to this court
14  that the March 27, 2002 Park Hotel bombing in
15  Natanya was perpetrated by Hamas with no more
16  qualifications, just that's not an opinion
17  you are offering, correct?
18      MR. GLATTER: Objection to
19  form, asked and answered, but you can
20  answer.
21  A.  I am answering that in as much
22  that I'm answering that the evidence that I
23  reviewed indicates that they more likely than
24  not were culpable in some way for these
25  attacks.  It's not a yes or no.  There's no

Page 80

1  yes or no because it's half yes, half no.
2  Q.  I believe this is a simple yes
3  or no question of whether this is an opinion
4  you are offering so if what I'm saying to you
5  is not an opinion you are offering, you will
6  tell me no, I'm not offering that opinion and
7  if it is an opinion you are offering, you
8  will tell me yes I am offering that opinion
9  regardless of what any other opinions you may
10  be offering, that's what I'm trying to get at
11  so I'll ask one more time. Are you offering
12  an opinion that the March 27, 2002 Park Hotel
13  bombing in Natanya was an attack perpetrated
14  by Hamas?
15      MR. GLATTER: Objection to
16  form.  May I clarify my objection?
17      MR. LUFT: No.
18      MR. GLATTER: Vague.
19  A.  I cannot answer this any other
20  way than I've already answered it in as much
21  that the evidence that I reviewed indicates
22  that more likely than not Hamas was culpable
23  in some way for these operations.  Beyond
24  that I'm not offering any assessment as to

MOSES STRAUSS VS.
CREDIT LYONNAIS, S.A.

EVAN KOHLMANN
December 2, 2010

Page 85

KOHLMANN

1 KOHLMANN
2 for these attacks.
3 Q. I'm not asking you that. I want
4 you to answer my question. I just want to
5 know -- let me ask you this. Do you think
6 the information you reviewed on the Hamas
7 websites is sufficient to form a conclusive
8 expert opinion as to who perpetrated the
9 attacks in question in this case?
10 MR. GLATTER: Objection to
11 form, vague.
12 A. I think it's sufficient to
13 determine whether it's more likely than not
14 that Hamas was culpable in some way for the
15 15 attacks including the March 27, 2002
16 attack.
17 Q. You feel comfortable saying
18 that ignorant of all other evidence that may
19 exist in the universe about these attacks?
20 MR. GLATTER: Objection to
21 form.
22 A. Yes.
23 Q. Because Hamas said it's
24 true?
25 MR. GLATTER: Objection to

Page 86

KOHLMANN

1 KOHLMANN
2 form.
3 Q. Is that your opinion?
4 A. That's one reason why more
5 likely than not it's credible that Hamas
6 played a culpable role in the 15 attacks
7 including the March 27, 2002 attack. Listen
8 very carefully to the words I'm using because
9 you are using different words than I am.
10 Q. I know, but you are supposed to
11 be answering my question.
12 MR. GLATTER: Don't argue with
13 the witness. Is there a pending
14 question?
15 Q. Are you done with your answer?
16 A. Yes.
17 Q. When you say that they are in
18 some way culpable, what does that mean?
19 A. I mean that they may not be the
20 only party responsible. I mean that they may
21 not have been responsible for all aspects of
22 whatever attack took place, but they played a
23 primary and culpable role in that attack.
24 Q. When you say primary, what do
25 you mean by that?

Page 87

KOHLMANN

1 KOHLMANN
2 A. Meaning that they did something
3 more than just claiming credit for the
4 attack.
5 Q. Because if all they did was
6 claim credit, they would have had no role,
7 correct?
8 MR. GLATTER: Objection to
9 form.
10 A. I don't believe that's an
11 accurate statement, but as I said in my
12 estimation based upon the evidence that was
13 presented by Hamas on its on line venues that
14 there is more evidence than merely them just
15 claiming credit for the operation.
16 Q. Is it your opinion that if
17 someone had no involvement in a terrorist
18 attack and they just claimed credit at the
19 end they would be culpable for that attack?
20 MR. GLATTER: Objection to
21 form.
22 A. You would have to give me a
23 specific example.
24 Q. Someone blows something up that
25 I had absolutely no involvement in it, I call

Page 88

KOHLMANN

1 KOHLMANN
2 up the news station and say it was me, are
3 you saying in your opinion that makes me
4 culpable for that terrorist attack?
5 A. You were responsible for the
6 proximate repercussions from that attack
7 because you are spreading fear. I don't know
8 whether a criminal court would determine
9 culpability in that sense, but I'm talking
10 more generally.
11 Q. Did you determine what level of
12 culpability Hamas played in each of these
13 attacks?
14 A. I simply determined that they
15 were more likely than not culpable in these
16 attacks.
17 Q. You did nothing to determine
18 what level of culpability they had?
19 A. What do you mean by level of
20 culpability?
21 Q. You told me that there could be
22 other actors, you told me they could, you
23 know, play all types of involvement in it,
24 right, they could have recruited the person,
25 funded it, could drove them to the place, put

MOSES STRAUSS VS.
CREDIT LYONNAIS, S.A.

EVAN KOHLMANN
December 2, 2010

Page 101

1      KOHLMANN
2  A.   This is a judgment based upon
3  number one, my assessment of Hamas'
4  operations on the internet in general in
5  terms of their credibility in general with
6  regard to the material that they are both
7  distributing and claiming credit for on the
8  internet.  It's based upon the level of
9  detail which is offered in the individual
10  claims of responsibility, video recordings,
11  audio recordings, posters, photographs and
12  other materials disseminated by Hamas.  It's
13  based upon that.
14  Q.  Mr. Kohlmann, how did you
15  decide to use more likely than not to be the
16  standard that you would apply for determining
17  whether they were culpable?
18  A.   That is the standard I chose.
19      That's based upon my review of the evidence.
20  Q.   Why more likely than not as
21  opposed to 75 percent or beyond a reasonable
22  doubt?
23      MR. GLATTER: Objection to
24  form.
25  A.   Beyond a reasonable doubt is a

Page 102

1      KOHLMANN
2  legal term and I'm not a lawyer so I would
3  stay away from that.  As far as the reason
4  that I chose this is because of the fact that
5  I was not asked to do a comprehensive review
6  of information about Hamas.  I was not asked
7  to review court records, I was not asked to
8  review other materials.  It's my experience
9  having reviewed Hamas websites that again,
10  generally speaking Hamas has a very good
11  record in terms of its credibility in terms
12  of claiming credit for these operations and
13  in my past experience these communicas have
14  been fairly accurate so based upon my
15  examination of the materials that I recovered
16  in this case, based upon my general knowledge
17  of Hamas and its on line operations that was
18  my conclusion.
19  Q.  Mr. Kohlmann, you went to law
20  school, correct?
21  A.   That's correct.
22  Q.  You are not a lawyer?
23  A.   I'm not a lawyer.
24  Q.  You never sat for the Bar?
25  A.   Never sat for the Bar.

Page 103

1      KOHLMANN
2  Q.   Do you remember from your days
3  back in law school at Penn I believe, did
4  they mention to you what the civil standard
5  was for liability in a civil case?
6  A.   If they did, I have no
7  recollection of it right now.
8  Q.   Really, you don't remember what
9  the standard of evidence is in a civil case
10  that it happens to be more likely than not?
11      MR. GLATTER: Objection to the
12  extent the question has been asked and
13  answered.
14  Q.   That doesn't refresh your
15  recollection about anything you learned in
16  law school?
17  A.   Absolutely not.  I have not
18  been in law school now in over six years.  I
19  have no dealings as a lawyer.  I do not work
20  as a lawyer.  I have no understanding of the
21  law in that regard.  I did not study civil
22  law.  I have no idea.
23  Q.   You didn't sit for civil
24  procedure?
25  A.   I sat for civil procedure in

Page 104

1      KOHLMANN
2  2002.
3  Q.  I'm sure Mr. Glatter will be
4  ensconced at the lack of quality of a Penn
5  education.
6      MR. GLATTER: No worse than my
7  own, Mr. Luft.
8  Q.  It's just by happenstance that
9  you happened to choose more likely than not
10  as the standard you would use for determining
11  culpability?
12      MR. GLATTER: Objection to
13  form.  You can answer.
14  A.   No.
15  Q.   To save us a little time, Mr.
16  Kohlmann, for the remaining attacks listed on
17  page 45 under the March 27, 2002 attack, the
18  May 7, 2002 attack, the July 31, 2002 attack,
19  the January 29, 2003 attack, the March 5,
20  2003 attack, the March 7, 2003 attack, the
21  April 30, 2003 attack, the May 18, 2003
22  attack, the June 11, 2003 attack, the June
23  20, 2003 attack, the August 19, 2003 attack,
24  the September 9, 2003 attack, the October 22,
25  2003 attack, the January 29, 2004 attack, the

MOSES STRAUSS VS.
CREDIT LYONNAIS, S.A.

EVAN KOHLMANN
December 2, 2010

Page 105

1 KOHLMANN
2 September 24, 2004 attack, for each of those
3 attacks if I was to ask you yes or no if you
4 are offering an opinion that for that attack
5 it was perpetrated by Hamas, would you be
6 able to give me a yes or no answer to that
7 opinion that that's an opinion you are
8 offering?
9 MR. GLATTER: Objection to
10 form.
11 A. No.
12 Q. By no I assume you mean you
13 would not be able to?
14 A. I would not be able to, that's
15 correct, yes.
16 Q. You don't know if you are
17 offering that opinion?
18 A. No, I know what opinion I'm
19 offering, I'm just not offering --
20 Q. You cannot tell me what I just
21 said is an opinion you are offering?
22 MR. GLATTER: Objection to
23 form. You may want to rephrase the
24 question so we don't have an Abbott
25 and Costello transcript, but it's your

Page 106

1 KOHLMANN
2 question.
3 A. My answer would be that there
4 is not at least in the form you asked the
5 answer to those questions would not be yes or
6 no.
7 Q. For any of the attacks I just
8 listed, is it correct that your review is
9 strictly limited to Hamas materials on the
10 internet, that you did not look for any other
11 evidence?
12 A. That's correct, yes.
13 Q. Your opinion is not informed by
14 what other evidence may exist as to who is
15 culpable for these attacks?
16 A. That's correct.
17 Q. Mr. Kohlmann, you have Exhibit
18 3 in front of you, I see you are holding it
19 which is a copy of your report. Are there
20 any opinions that you intend to offer in this
21 litigation other than those explicitly stated
22 in Exhibit 3?
23 A. No.
24 Q. Is there anything in your
25 Exhibit 3 that you believe to be incorrect?

Page 107

1 KOHLMANN
2 A. No.
3 Q. Are there any changes that you
4 would like to make to Exhibit 3?
5 A. Not that I'm aware of.
6 Q. Did you produce all information
7 that you relied upon in forming your opinions
8 and in writing your report?
9 A. Yes.
10 Q. Is there any information you
11 considered, but chose not to rely upon in
12 forming your opinions?
13 A. No.
14 Q. Mr. Kohlmann, with regard to
15 the 15 attacks in question, did you do any
16 analysis to determine where the funding for
17 those attacks came from?
18 A. No, beyond any detail that
19 Hamas might have offered in their on line
20 venues, but no, I did not do any specific
21 searches, no.
22 Q. Is it fair to say that you're
23 not aware of where the funding for the 15
24 attacks came from?
25 MR. GLATTER: Objection to form

Page 108

1 KOHLMANN
2 and foundation.
3 A. In what scope are you talking?
4 Are you talking in the context of the
5 material I reviewed for this case or
6 generally speaking?
7 Q. Generally when I ask you a
8 question, I'm asking you with regard to the
9 opinions you are offering in this case and I
10 assume so what I'm asking you is about what
11 you're basing your opinions on this case
12 from. If there's material outside of that I'm
13 assuming you are not basing your opinions on
14 it so I'm not asking you about it.
15 A. That's fine. With regard to
16 the material in this case, no.
17 Q. Based on the information and
18 materials you reviewed in this case, you
19 cannot offer an opinion as to whether Hamas
20 funded the 15 attacks in question, correct?
21 MR. GLATTER: Objection to form
22 and foundation.
23 A. I can't say yes to that
24 question because of the fact that there may
25 have been information from Hamas in their

MOSES STRAUSS VS.
CREDIT LYONNAIS, S.A.

EVAN KOHLMANN
December 2, 2010

Page 125

1       KOHLMANN
2   was non compensated work.  We've never been
3   involved in any kind of paid projects
4   together.
5   Q.  Mr. Kohlmann, what has been the
6   primary focus of your research?
7   A.  The primary focus of my
8   research is obtaining information, credible
9   authentic information about the recruitment,
10  the financing, the communications, the
11  hierarchy and the history of international
12  terrorist organizations including al-Qaeda,
13  Hamas, Hezbollah, various other groups.
14  Q.  In fact, Mr. Kohlmann, you have
15  testified on multiple occasions that the
16  particular focus of your research has been on
17  al-Qaeda, correct?
18  A.  That is the principal focus,
19  but it's not the only focus.
20  Q.  You said primarily I focus
21  number one on al-Qaeda and al-Qaeda
22  associated movements, right, you offered that
23  testimony in court, correct?
24  A.  I believe I have, yes.
25  Q.  You also said I also focus

Page 126

1       KOHLMANN
2   essentially on the conflict in Iraq, correct?
3   A.  That is not an exclusive focus,
4   but that one region that I do happen to
5   focus in on, yes.
6   Q.  You said that the lion share of
7   your research is focused on al-Qaeda and
8   associate groups affiliated with Arab
9   Afghans, correct?
10  A.  Yes.
11  Q.  That's true?
12  A.  That's 100 percent true, yes.
13  Q.  Is Hamas an Arab Afghan
14  movement?
15  A.  Not primarily.  Abdullah Azzam,
16  the founder of one of the -- who's credited
17  as one of the co-founders of al-Qaeda also is
18  credited by Hamas as one of their
19  co-founders, however, Hamas itself is not
20  generally considered to be an Arab Afghan
21  movement.
22  Q.  Do you know any recognized
23  expert whoever said that Hamas is an Arab
24  Afghan movement?
25      MR. GLATTER: Objection to

Page 127

1       KOHLMANN
2   form.  Objection to the extent as
3   phrased the question calls for a legal
4   conclusion as to the definition of
5   expert, but you can answer.
6   A.  I'm not familiar with any of my
7   colleagues that generally speaking would
8   describe Hamas as an Arab Afghan movement,
9   although again it's frequently cited that
10  Abdullah Azzam, one of the co-founders of
11  al-Qaeda also is credited by Hamas as one of
12  their co-founders, but there's a difference
13  between that and calling something an Arab
14  Afghan movement.
15  Q.  Abraham is generally credited
16  as being the delineation for both Judiasm and
17  Islam, correct?
18      MR. GLATTER: Objection to
19  form, beyond the scope of the expert
20  opinion.
21  A.  I don't know if that's the
22  exact same analogy as per al-Qaeda and Hamas,
23  but true, yes.
24  Q.  Al-Qaeda and Hamas are not the
25  same organization, are they?

Page 128

1       KOHLMANN
2   A.  No, they are vastly different
3   from each other.
4   Q.  Their followers don't even get
5   along with one another, do they?
6       MR. GLATTER: Objection to form
7   and objection to foundation.
8   A.  Depends in the context.  In a
9   lot of cases they disagree with each other
10  violently, however, there are also other
11  contexts in which Hamas operatives and
12  al-Qaeda operatives do get along.
13  Q.  Al-Qaeda is structured
14  differently than Hamas?
15  A.  Yes.
16  Q.  Al-Qaeda has different modus
17  operandi than Hamas?
18      MR. GLATTER: Objection to
19  form.
20  A.  In certain respects, yes, in
21  certain respects, no.  It depends on the
22  individual aspect. If you are talking about
23  financing, the answer is there is similarity
24  in the kind of financing that they engage in.
25  If you are talking about their raison detre,

MOSES STRAUSS VS.
CREDIT LYONNAIS, S.A.

EVAN KOHLMANN
December 2, 2010

Page 129

KOHLMANN

1
2  their purpose for what they are doing and
3  what not, then it is different.
4  Q.  How about their military
5  infrastructure?
6  A.  Again, it depends on which
7  specific context. Both groups engage in very
8  similar types of military operations.  Their
9  actual military apparatus though has a
10  different type of hierarchy.
11  Q.  Does Hamas perpetrate terrorist
12  attacks in North America?
13  A.  None that have been directly
14  ordered by the leadership certainly, no.
15  Q.  How about Europe?
16  A.  Again, none that have been
17  directly ordered by the leadership, no.
18  Q.  How about East Asia?
19  A.  The answer would be the same.
20  Q.  Al-Qaeda has for all of those,
21  correct?
22  A.  That's correct, yes.
23  Q.  Do you believe yourself to be
24  an expert on al-Qaeda?
25  A.  Yes.

Page 130

KOHLMANN

1
2  Q.  For what reasons do you believe
3  yourself to be an expert on al-Qaeda?
4      MR. GLATTER: So I don't waste
5  your time, I have a standing objection
6  to the extent the question as phrased
7  may cause for a legal conclusion.
8  A.  Are you asking for a legal
9  justification?
10  Q.  I'm not asking you to justify
11  anything, Mr. Kohlmann. I'm just asking you
12  on what basis -- I asked you if you believe
13  you are an expert and I'm asking you on what
14  basis you believe you are an expert on
15  al-Qaeda?
16  A.  I believe I'm an expert in
17  al-Qaeda in the sense that I've interviewed
18  individuals who have been around for the
19  founding of al-Qaeda along with individuals
20  who have played significant roles in
21  al-Qaeda's international operations. I have
22  interviewed individuals who have aspired to
23  join al-Qaeda or attempted to join al-Qaeda.
24  I have reviewed hundreds of original video
25  recordings, audio recordings, magazines,

Page 131

KOHLMANN

1
2  communicas and other material produced by
3  al-Qaeda. I have spoken at great length with
4  other experts who study al-Qaeda. I have
5  presented training courses and other venues
6  which I have spoken about al-Qaeda, debated
7  al-Qaeda discussed al-Qaeda. I have
8  published papers both in scholarly and other
9  journals about al-Qaeda. I speak regularly
10  about al-Qaeda in various different public
11  arenas including NBC News. I travel abroad
12  frequently to discuss the issue of al-Qaeda
13  with foreign governments including
14  governments of Saudi Arabia and Jordan. I
15  work with the UNCTITF team which is involved
16  in combatting al-Qaeda and its financing. I
17  have reviewed financial documents from
18  charitable organizations which provide --
19  which allegedly provide financing to
20  al-Qaeda. I think that covers most of it.
21  Q.  Okay.  What individuals did you
22  interview?  You mentioned -- I'll break that
23  up because I think you told me two different
24  types.  You told me you interviewed people
25  who are -- maybe there's three, you will tell

Page 132

KOHLMANN

1
2  me if there is; the founding, I think people
3  who are involved and then people who want to
4  join; is that right?
5  A.  That's correct. I'll give you
6  a list of some of the various different
7  people I've interviewed.
8  Q.  Because I'm not as familiar if
9  you tell me what their role is?
10  A.  I'll make sure you get the
11  spelling as well, not a problem. I have
12  interviewed Abuhamzaal-Masri otherwise known
13  as Captain Hook is an individual who used to
14  be located in the Finsbury Park mosque in
15  London. He was an individual who joined
16  al-Qaeda in the late 1980s who participated
17  in the Soviet Afghan war. He lost the use of
18  both his hands when an explosive device he
19  was preparing blew up in his face. He has
20  since played a key role in recruiting,
21  financing and providing communication
22  assistance to al-Qaeda cells and other
23  Jahidist movements around the world.
24      I have interviewed Omar Bakri
25  Mohammed otherwise known as Sheikh Omar Bakri

MOSES STRAUSS VS.
CREDIT LYONNAIS, S.A.

EVAN KOHLMANN
December 2, 2010

Page 137

1          KOHLMANN
2   A.  Some of them, yes.
3   Q.  The latter ones?
4   A.  The ones from 2003 and '04,
5   that's correct, yes.
6   Q.  You mentioned Mr. Abdullah
7   Anas, you said he was an inspiration for
8   Hamas?
9   A.  No, no, no.
10  Q.  Did I mess that up?
11  A.  Yes, let me repeat that.
12  Abdullah Anas is the son-in-law of Abdullah
13  Azzam.  Abdullah Azzam being one of the --
14  both Anas and Azzam helped co-found al-Qaeda
15  with the others.  Azzam his father-in-law
16  also happens to be the inspiration for Hamas
17  for the founding of Hamas.  Anas himself
18  fought in Afghanistan alongside Akmad Sham
19  Asud and other Arab Afghan commanders.  He
20  was there until approximately 1990 at which
21  time he then helped found the Islamic
22  Salvation Front known as FIS in Algeria.
23  He's currently living in exile in the United
24  Kingdom.
25  Q.  So Anas has nothing to do with

Page 138

1          KOHLMANN
2   Hamas other than being the son-in-law of the
3   person who inspired them?
4   A.  That's correct, although I
5   believe we did discuss the issue of Hamas at
6   least briefly during our interview or my
7   interview of him.  I don't recall exactly
8   what the context was, but I believe the
9   subject did come up.
10  Q.  Are any of the people you
11  mentioned to me Hamas members?
12  A.  Not Hamas members, no.
13  Q.  Have you interviewed any Hamas
14  members?
15  A.  No, I have not.  Not public
16  Hamas members, not individuals who have
17  openly acknowledged their affiliation with
18  Hamas.  Actually that's not even entirely
19  correct, excuse me.  I'm sorry.  I have
20  spoken with one individual.  I was not asking
21  the questions, but I was present for the
22  interview taking place and I was the one -- I
23  was providing the questions to be asked.  The
24  individual was Achmed Abu Marzouk who is the
25  nephew of Musa Abu Marzouk.

Page 139

1          KOHLMANN
2   Q.  When was this interview?
3   A.  This was in either 2001 or
4   2002, I can't remember.
5   Q.  Who was the person who was
6   asking the questions?
7   A.  It was a colleague of mine at
8   the Investigative Project in Washington DC, a
9   fluent Arab speaking colleague of mine.
10  Q.  Is he U.S. based?
11  A.  No.
12  Q.  Where was he?
13  A.  At the time we spoke to him I
14  believe he was located in Gaza City.
15  Q.  Is that where you interviewed
16  him?
17  A.  No, we interviewed him over the
18  telephone.
19  Q.  Have you ever been to the
20  occupied territories?
21  A.  No.
22  Q.  Have you been to Israel?
23  A.  No.
24  Q.  You mentioned you do work with
25  the U.N.  Do you do work with the U.N. with

Page 140

1          KOHLMANN
2   regard to Hamas?
3   A.  I do work with the U.N.
4   regarding radicalization and counter
5   radicalization.  It's not specific to any --
6   well, it can be specific to certain groups,
7   but when it comes to counter radicalization
8   and radicalization the focus is on
9   Salafi-Jihadists along the lines of al-Qaeda,
10  but it does not preclude mentions or sitings
11  of Hamas.
12  Q.  You mentioned you travel abroad
13  to speak about al-Qaeda and you mentioned to
14  Syria and Jordan?
15  A.  To Jordan and I'm going to
16  Saudi Arabia next month.
17  Q.  Have you traveled abroad to
18  speak with foreign governments with regard to
19  Hamas?
20  A.  Yes, yes.
21  Q.  Who?
22  A.  I have traveled abroad to speak
23  with prosecutors and investigating agents in
24  the United Kingdom as part of SO 15 counter
25  terrorism command and the Crown Prosecution

MOSES STRAUSS VS.
CREDIT LYONNAIS, S.A.

EVAN KOHLMANN
December 2, 2010

---

Page 141

KOHLMANN

1   Service.  I've had similar discussions also
2   with the I believe also the Commonwealth
3   prosecutors in Australia as well as the
4   Australian Federal Police.  I should stress
5   that the primary focus of those inquiries was
6   not Hamas, but that Hamas was part of a
7   series of inquiries that they were asking.
8   Q.   What was the primary focus?
9   A.   The primary focus in those
10  cases was somebody's hard drive and the
11  materials that were on there which included
12  both materials from Hamas and also materials
13  from al-Qaeda.
14  Q.   So you were brought in to
15  analyze what was on the hard drive?
16  A.   In the cases that I'm referring
17  to at the moment that would have been cases
18  where I was asked to identify and explain
19  material recovered on a hard drive which
20  again included both material without
21  distinction from Hamas and al-Qaeda among
22  other groups.
23  Q.   Is that the same type of thing
24  that you do when you go to Saudi Arabia and

*(Note: lines 1-24 on Page 141)*

Page 142

KOHLMANN

1   Jordan, you look at hard drives there?
2   A.   It really depends case to case.
3   In the case of Jordan and Saudi Arabia, no,
4   in those cases I was actually asked to give
5   presentations to academics, to government
6   officials from both those countries and
7   surrounding countries.
8   Q.   Are you ever asked to give
9   presentations to -- are you ever asked by
10  foreign governments to give presentations to
11  academics and government officials regarding
12  Hamas?
13  A.   Again, not specifically Hamas,
14  not that I can recall anyway.
15  Q.   You mentioned you present
16  trainings regarding al-Qaeda?
17  A.   Training seminars, yes.
18  Q.   Do you give training seminars
19  regarding Hamas?
20  A.   It's part of what we offer, but
21  I have not done one recently.  I have done in
22  the past several terror financing, in fact, I
23  should amend that.  I just did a terror
24  financing presentation to the Royal Canadian

Page 143

KOHLMANN

1   Mounted Police two weeks ago and I believe
2   Hamas was referenced in there.  The primary
3   focus of that was on terror finance in
4   general, however, as part of that I discussed
5   a number of groups including Hezbollah,
6   Hamas, al-Qaeda, the Islamic Jihad Union, the
7   Islamic movement of Uzbekistan.
8   Q.   In the context of terror
9   financing?
10  A.   In the context of terror
11  financing exactly, yes.
12  Q.   Do you do other training
13  seminars with regard to Hamas other than with
14  regard to terror financing?
15  A.   It comes up occasionally in the
16  context of on line materials, in the context
17  of the on line presence of terrorist
18  organizations.  I can think of at least one
19  specific instance where an individual who was
20  part of a presentation that I was giving
21  about recruitment on line included material
22  taken from a Hamas website and a Hamas chat
23  forum.
24  Q.   Do you ever give training

Page 144

KOHLMANN

1   seminars with regard to determining
2   responsibility for terrorist attacks?
3   A.   Not on that specific subject,
4   but that definitely is part of some of the
5   presentations I give, yes.
6       MR. LUFT: I've run past my
7   lunch limit already and I'm told we're
8   out of time on the tape so why don't
9   we take a lunch break.
10      THE VIDEOGRAPHER: The time is
11  1:37 p.m. on December 2, 2010.  This
12  is the end of tape two.  We are now
13  off the record.
14      (Luncheon recess taken at 1:37
15  p.m.)

MOSES STRAUSS VS.
CREDIT LYONNAIS, S.A.

EVAN KOHLMANN
December 2, 2010

Page 149

1       KOHLMANN
2   A.  Yes, I did.
3   Q.  Do you recall that you were
4   asked what your work -- whether your work
5   focused on any particular terrorist
6   organizations?
7   A.  In the Paracha case I believe
8   the focus was primarily on al-Qaeda and
9   al-Qaeda and the Taliban.
10      MR. LUFT: Let's mark as
11  Exhibit 5 a copy of a transcript from
12  Paracha, at least a portion of the
13  transcript that includes your
14  testimony.
15      (Kohlmann Exhibits 5,
16  Transcript, marked for
17  Identification.)
18  Q.  You are welcome to look it
19  over, but my questions are very specific.
20  A.  Fair enough.
21  Q.  These are numbers on the top
22  right hand corner?
23  A.  Yes.
24  Q.  Pages 86 to 87 you were asked a
25  question by Mr. Bruce?

Page 150

1       KOHLMANN
2   A.  That's correct, yes.
3   Q.  This was a direct examination,
4   correct?
5   A.  That's correct.
6   Q.  By the government?
7   A.  That's correct.
8   Q.  You're testifying on behalf of
9   the government; is that correct?
10  A.  That's correct, yes.
11  Q.  Mr. Bruce says at the bottom of
12  page 86 and does your present work focus on
13  any particular terrorist organizations and
14  you answered yeah, again, I mean I focus on a
15  wide variety of Arab Afghan groups, but
16  virtually all of them are either al-Qaeda or
17  al-Qaeda affiliates?
18  A.  Yes.
19  Q.  Was that truthful testimony
20  when you gave it?
21  A.  That is truthful.
22  Q.  Would the same statement be
23  truthful today?
24  A.  Yes, aside from Hamas and
25  Hezbollah, virtually all of the organizations

Page 151

1       KOHLMANN
2   I study are either al-Qaeda or affiliated in
3   some way to al-Qaeda.
4   Q.  With regard to the amount of
5   time you spent studying these groups, how
6   much time do you spend on Hamas and Hezbollah
7   as opposed to al-Qaeda or al-Qaeda
8   affiliates?
9   A.  You mean as a percentage?
10  Q.  Yes.
11  A.  It's difficult to say.  I would
12  say al-Qaeda and affiliates are probably 80
13  percent of the time and about 20 percent of
14  the time is Hamas or Hezbollah.
15  Q.  Any other groups or those are
16  the only three groups you spend time on?
17  A.  When I say 80 percent, I refer
18  not only al-Qaeda, but al-Qaeda affiliated
19  groups which can include anything from the
20  Islamic Movement of Uzbekistan to the
21  Turkisan Islamic party, groups that are
22  directly involved in sharing resources and
23  have the identical modus operandi or very
24  similar modus operandi to al-Qaeda.
25  Q.  How about Fatah?

Page 152

1       KOHLMANN
2   A.  I don't generally study Fatah
3   as part of what I do, however, I have done
4   some work on al-Aqsa Martyrs Brigade.
5   Q.  Palestinian Islamic Jihad?
6   A.  Yes, that's a component as
7   well.  I should say in order to do for
8   purposes of comparative analysis and because
9   very frequently to study al-Qaeda you have to
10  have some understanding of other groups that
11  are not necessarily related, but
12  inter-related, PIJ, Hezbollah and Hamas are
13  the three primary organizations that I have
14  studied that are non related to al-Qaeda, non
15  Arab Afghan movements, but are Jahidist
16  movements so it's necessary to do some
17  comparative study.
18  Q.  PIJ falls in that other 20
19  percent?
20  A.  Yes, that other 20 percent
21  would apply to other Jahidist groups
22  primarily PIJ, Hezbollah and Hamas.
23  Q.  To the extent you have done
24  work on al-Aqsa Martyrs Brigade that falls
25  into the 20 percent?

MOSES STRAUSS VS.
CREDIT LYONNAIS, S.A.

EVAN KOHLMANN
December 2, 2010

Page 153

1        KOHLMANN
2   A.  Yes, that's exactly correct.
3   Q.  Are there any other groups that
4   fall into that 20 percent?
5   A.  Not terrorist organizations.
6   Perhaps you could consider the Muslim
7   brotherhood, but if you include the Muslim
8   brotherhood then it would extend to more 25
9   percent as opposed to 20 percent.
10  Q.  Your testimony in Paracha was
11  in 2005, correct?
12  A.  That's correct.
13  Q.  Given the 80/20 split today,
14  has that always been the case over the past
15  six years that you have been offering
16  testimony?
17  A.  It may vary slightly depending
18  on given workload and given cases or given
19  assignments I have, but it's about constant.
20  Like I said, it might be a few points less or
21  a few points more, I may spend a few hours
22  extra or a few hours less, but generally
23  speaking non Arab Afghan groups primarily
24  again Hamas, Hezbollah, PIJ would occupy
25  about 20 percent.

Page 154

1        KOHLMANN
2   Q.  Of your research time?
3   A.  Yeah, exactly, yeah.
4   Q.  Have you done field work in
5   connection with your studying of al-Qaeda?
6       MR. GLATTER: Objection to
7   form.
8   A.  Define field work.
9   Q.  Let me ask you this.  Have you
10  ever heard of the term field work in
11  connection with the study of terrorist
12  groups?
13  A.  Yes, but that term means a lot
14  of different things depending on how exactly
15  you are defining field work or what kind of
16  research you are speaking of.
17  Q.  Maybe you can help me because I
18  have just seen the term field work so as you
19  understand someone who works in the field of
20  terrorism, what are the different definitions
21  that people ascribe to the definition of
22  field work?
23  A.  It can include everything from
24  sitting down and meeting with representatives
25  of terrorist organizations, it can include

Page 155

1        KOHLMANN
2   going out and observing training or
3   activities by terrorist organizations.  It
4   can include going abroad to speak with
5   representatives of different governments
6   about their efforts to counter the efforts of
7   terrorist organizations.  It can involve
8   going out and recovering documents,
9   recovering videos or recovering audio
10  recordings, other original evidence.  If this
11  is what you define as field work, then the
12  answer is yeah, obviously I engaged in field
13  work.
14  Q.  With regard to al-Qaeda?
15  A.  Yes.
16  Q.  When you say going out and
17  recovering evidence, what do you mean by
18  going out and recovering evidence?
19  A.  Not everything that I collect
20  is necessarily on a computer.  A lot of the
21  evidence that I collect even if it's digital
22  it's not necessarily widely available on the
23  internet.  Sometimes you have to physically
24  go to locations to acquire things.  I have
25  made several trips to various locations

Page 156

1        KOHLMANN
2   around the world for the purposes of number
3   one doing field work i.e. working directly
4   with agencies on the ground who are
5   investigating these groups, but also to
6   collect propaganda, to visit mosques, to
7   visit community centers, to speak with
8   clerics, things like that.
9   Q.  Have you done field work with
10  regard to Hamas?
11      MR. GLATTER: As he defines
12  that term?
13      MR. LUFT: As he defined it for
14  me.
15  A.  Yes.
16  Q.  Could you tell me what field
17  work you have done in connection with Hamas?
18  A.  During my interview of Omar
19  Bakri Mohammad I specifically asked him about
20  two individuals or a group of individuals who
21  were supporting Hamas from within his group.
22  I discussed his general support for Hamas.  I
23  have discussed with Omar Bakri differences
24  between Hamas and al-Qaeda.  I have also
25  directly worked with various different

MOSES STRAUSS VS.
CREDIT LYONNAIS, S.A.

EVAN KOHLMANN
December 2, 2010

Page 157

KOHLMANN

1    KOHLMANN
2    agencies at the U.S. government in terms of
3    investigating Hamas financing, Hamas
4    recruitment.  I have gone and listened to
5    speeches by individuals who have been accused
6    of Hamas financing, Hamas fundraising and
7    Hamas propagandizing.  I have -- what else
8    would qualify as field work.  Generally in
9    that vein.
10   Q.  Anything else?
11   A.  That's all I can recall at the
12   moment.
13   Q.  Mr. Bakri is not a member of
14   Hamas though, correct?
15   A.  Not as far as I know, no.
16   Q.  The speeches that you heard,
17   where did you hear them?
18   A.  They were given in the United
19   States, United Kingdom, elsewhere.  Primarily
20   the U.S. and the U.K.
21   Q.  Any in -- you told me you have
22   never been to Israel?
23   A.  No, I have never been to Israel
24   and the occupied territories.
25   Q.  So none of them were there?

Page 158

1    KOHLMANN
2    A.  No.
3    Q.  How about Syria?
4    A.  I don't think I'm allowed to go
5    to Syria.
6       MR. GLATTER: I think you mean
7    Saudi Arabia.
8       MR. LUFT: I'm pretty sure I
9    meant Syria.
10      MR. GLATTER: Okay.
11      MR. LUFT: I think Mr. Kohlmann
12   knows why I would ask.
13   A.  I have not been to Syria, no.
14   Q.  Lebanon?
15   A.  No, not to Lebanon, no.
16   Q.  Egypt?
17   A.  Not to Egypt, no.
18   Q.  Who in the U.S. government have
19   you worked with with regard to investigating
20   Hamas recruitment?
21   A.  I have worked with the United
22   States Treasury Department, I've worked with
23   the U.S. Justice Department, I've worked with
24   the FBI and I've worked with the National
25   Security Counsel.

Page 159

1    KOHLMANN
2    Q.  When you say you have worked
3    with them, what have you done for them?
4    A.  I don't believe I can discuss
5    that.  I don't believe based upon the fact
6    the work is confidential I don't believe I
7    can discuss that.
8    Q.  Do you have --
9    A.  I can give you a general
10   description.
11   Q.  Why don't we start with that?
12   A.  I have assisted them in
13   identifying financing networks.  I have
14   assisted them with the identification of
15   websites.  I have assisted them with the
16   identification of propaganda videos.  I think
17   that's about as specific as I can get.
18   Q.  The propaganda videos were on
19   the internet?
20   A.  No, the propaganda videos,
21   well, they were once on the internet.  They
22   were propaganda videos that were created for
23   the distribution on the internet.
24   Q.  I don't want to impinge our
25   country's security in any way so I'll try to

Page 160

1    KOHLMANN
2    ask these carefully. Other than helping with
3    the identification of financing networks,
4    websites and propaganda videos, is there
5    anything else?
6    A.  That's the lion share of what I
7    have done.
8    Q.  Have you ever been a member of
9    law enforcement?
10   A.  No.
11   Q.  Have you ever been attended a
12   police academy?
13   A.  No.
14   Q.  The FBI academy?
15   A.  I have attended training
16   courses at the FBI academy, however, I have
17   not graduated from any course of study at the
18   FBI academy.
19   Q.  Have you ever trained to be an
20   intelligence agent for a government
21   intelligence agency?
22   A.  No.
23   Q.  Have you ever been part of the
24   military?
25   A.  No.

MOSES STRAUSS VS.
CREDIT LYONNAIS, S.A.

EVAN KOHLMANN
December 2, 2010

Page 161

1    KOHLMANN
2  Q.  Military training?
3  A.  No, no.
4  Q.  Have you ever been part of
5   military intelligence?
6  A.   No.
7  Q.  Have you had contact with the
8   Israeli military?
9  A.  Never.
10  Q.  Have you had contact with the
11   Israeli police department?
12  A.  No.
13  Q.  Have you ever had contact with
14   the CIA with regard to Hamas?
15  A.  I can't answer that question.
16  Q.  Because --
17  A.  I can't answer that question.
18  Q.  If you tell me it's because you
19   are under a confidentiality obligation I
20   understand?
21  A.  I cannot disclose the answer to
22   that question.  I don't generally work for
23   any intelligence agencies or work with
24   intelligence agencies, but I cannot answer
25   that question.

Page 162

1    KOHLMANN
2  Q.  I don't want you to run afoul
3   of what may or may not exist so have you ever
4   been a prosecutor?
5  A.  Have I ever worked as a
6   prosecutor, no.
7  Q.  Have you ever served as a
8   judge?
9    MR. GLATTER: Objection, asked
10   and answered.  Not as a judge, but you
11   asked him earlier if he was a lawyer.
12   Actually withdrawn.  You can answer.
13    MR. LUFT: Thank you.
14  A.  No, I never served as a judge.
15  Q.  Have you ever infiltrated a
16   terrorist cell?
17    MR. GLATTER: Objection to
18   form.
19  A.  What do you mean infiltrated a
20   terrorist cell?
21  Q.  Gone under cover such that so
22   that a terrorist cell would believe that you
23   were alined with them for the purpose of
24   getting information from them?
25    MR. GLATTER: Objection to

Page 163

1    KOHLMANN
2   form.
3  A.  It's a difficult question to
4   answer.  The answer is that I have done under
5   cover work and I have done work with
6   individuals that run organizations that
7   support terrorism under the belief that these
8   people did believe that I was sympathetic to
9   their views, but I don't know if I would
10   define that as infiltrating.
11  Q.  Have you ever done any of that
12   with regard to Hamas?
13  A.  Not Hamas directly or actually
14   I have done that with Hamas, yes, sorry.
15  Q.  Would you describe that for me?
16  A.  Yes.  I have contacted
17   individuals --
18    MR. GLATTER: Before you answer
19   that for purposes of security may I
20   recommend that we and you should, Mr.
21   Kohlmann, you should advise us if you
22   prefer -- I think we should mark this
23   portion of the transcript as highly
24   confidential.  Do you have any
25   objection to that?

Page 164

1    KOHLMANN
2    MR. LUFT: No.
3    THE WITNESS: I was hoping that
4   instruction applied to the whole
5   deposition.
6    MR. GLATTER: We can take that
7   --
8  A.  Right.  I have contacted
9   individuals from Hamas and from Hamas align
10   groups via e-mail and via the telephone in
11   order to elicit information from those
12   individuals occasionally without identifying
13   exactly who I am.
14  Q.  Who have you spoken with?
15  A.  As I stated before, I have
16   spoken with Ackman Abu Marzouk.  I have
17   spoken with others whose names -- whose real
18   names anyway I'm not familiar with.  These
19   are individuals who respond to telephone or
20   e-mail contact.  They don't necessarily give
21   us their names.
22  Q.  You don't know who you spoke
23   with?
24  A.  In some cases, yes, but in many
25   cases, no.

MOSES STRAUSS VS.
CREDIT LYONNAIS, S.A.

EVAN KOHLMANN
December 2, 2010

Page 165

```
 1      KOHLMANN
 2  Q.  What information about Hamas
 3  did you get from them?
 4  A.  Information about the
 5  activities, location and other aspects of
 6  Hamas leaders namely Musa Abu Marzouk, the
 7  uncle of Achmed Abu Marzouk.
 8  Q.  This is the guy who's the --
 9  A.  He's the head of the political
10  bureau of Hamas, yes.
11  Q.  Tell me about that, you just
12  called a toll free number and they told you
13  where he was?
14  A.  No, we contacted his nephew in
15  order to determine where Musa Abu Marzouk had
16  been living in the United States at
17  particular points in time and the various
18  activities he was engaged in the United
19  States during those points of time as
20  observed by Mr. Achman Abu Marzouk.
21  Q.  Did they know who you were?
22  A.  They didn't know my real
23  identity about that time.
24  Q.  Who did they believe you were?
25  A.  They believed that we were
```

Page 166

```
 1      KOHLMANN
 2  supporters of Hamas.
 3  Q.  Could you give me some greater
 4  detail?
 5  A.  They believed that we were
 6  Iraqi American supporters of Hamas.
 7  Q.  This was over the phone?
 8  A.  Yes, over the telephone.
 9  Q.  Other than finding where he was
10  living in the U.S., what else did you learn
11  about Hamas?
12  A.  About -- we asked him about
13  financing, we asked him about donating money,
14  we asked him about various different aspects
15  with regard to what Hamas was up to or what
16  he knew about what Hamas was up to.
17  Q.  Anything else besides financing
18  or donating money?
19  A.  No.  I have also contacted
20  representatives of Hamas in order --
21  separately in order to determine financing
22  channels.
23  Q.  Other than with regard to
24  finding information with regard to financing,
25  have you received other information from
```

Page 167

```
 1      KOHLMANN
 2  Hamas other than financing or where this guy
 3  sleeps at night?
 4  A.  Financing channels, pieces of
 5  Hamas activities in the U.S.  That's more or
 6  less it.
 7  Q.  Okay.
 8      MR. GLATTER: Before you ask
 9  your next question, out of an
10  abundance of caution and given Mr.
11  Kohlmann's stated preference I ask at
12  least for a later time why don't we
13  mark the entire transcript as highly
14  confidential if that's okay with you?
15      MR. LUFT: I understand that
16  you requested that it be marked highly
17  confidential.  I have not really
18  thought about the implications.
19      MR. GLATTER: Just it only
20  would impact who it would be
21  distributed to.
22      MR. LUFT: Like I said I have
23  not thought about who gets it or who
24  doesn't.  Is there someone -- if you
25  are asking for it to be sealed --
```

Page 168

```
 1      KOHLMANN
 2      MR. GLATTER: No, no, no, I'm
 3  not asking that.  We have a
 4  stipulation -- whatever the protective
 5  order provides.
 6      MR. STEINGARD: My recollection
 7  is we could designate it and if you
 8  have a problem with it --
 9      MR. GLATTER: For the time
10  being we'll designate the testimony as
11  highly confidential and you could
12  advise us at a later time if there's
13  an issue with that.  Thank you.
14      MR. LUFT: That's fine.
15  Q.  Have you ever studied forensic
16  science?
17  A.  Not formally, no.
18  Q.  Do you do it as a hobby?
19  A.  I wouldn't quite call it a
20  hobby, but I have done studies of forensic
21  science as a part of the kind of work I do.
22  Q.  What kind of studies of
23  forensic science have you done?
24  A.  How to use computer software
25  namely software packages like Incase, FTK in
```

MOSES STRAUSS VS.
CREDIT LYONNAIS, S.A.

EVAN KOHLMANN
December 2, 2010

Page 169

1    KOHLMANN
2    order to study the preserved content of hard
3    drives, in order to review those contents and
4    assess the significance of the contents
5    therein.
6  Q.  But you have not done formal
7    studies?
8  A.  Not in a university setting.  I
9    was taught how to do this by law enforcement,
10   but it was not through a formal academic
11   process, no.
12  Q.  How about any other type of
13   forensic science apart from things relating
14   to computers?
15     MR. GLATTER: Objection to
16   form.
17  A.  Other than what was part of my
18   education at Georgetown University, no.
19  Q.  What training at Georgetown
20   University were you given on forensic science
21   other than computers?
22  A.  Not forensic science per se,
23   but forensic science per research.  In order
24   to write an honor thesis at Georgetown you
25   have to take a course on how to do proper

Page 170

1    KOHLMANN
2    research analysis which includes how to
3    understand the elements of forensic evidence
4    in a social studies context, but that would
5    be the closest.
6  Q.  So you've never studied how to
7    determine if there are fingerprints?
8  A.  No, no, no.
9  Q.  Or who made a bomb?
10  A.  No, that's not the area of my
11   focus.
12  Q.  You never studied how to
13   preserve evidence from a crime scene?
14     MR. GLATTER: Objection to
15   form.
16  A.  What kind of evidence?
17   You mean formally or informally?
18  Q.  I just mean -- I was not
19   drawing a distinction between the two.  I
20   don't know if you as a hobby study how to
21   preserve evidence at a crime scene, but you
22   are welcome to tell me if you do?
23     MR. GLATTER: Objection to
24   form.
25  A.  I have received instruction

Page 171

1    KOHLMANN
2    about how to preserve electronic evidence,
3    but that would have been in the context of
4    course work that I both did at law school and
5    also as part of working with law enforcement,
6    but either way it would not have been through
7    I don't believe anyway through a formal focus
8    course of study.
9  Q.  Have you ever had any training
10   in analyzing handwriting?
11  A.  No.
12  Q.  How about examining photographs
13   for tampering or doctoring?
14  A.  I have experience in that, but
15   I have not received formal training in that.
16  Q.  What type of experience do you
17   have?
18  A.  Often times I'm asked to study
19   images to determine whether or not they were
20   been tampered with.  I have been trained in
21   how to use Photoshop so I understand how to
22   use Photoshop to determine whether or not the
23   images have been edited and in some cases I
24   actually managed to pick out images and be
25   able to determine whether or not they have

Page 172

1    KOHLMANN
2    been manipulated.
3  Q.  By Photoshop you mean just the
4    program Photoshop?
5  A.  The program Adobe Photoshop,
6    yes.
7  Q.  The one I have on my home
8    computer?
9  A.  That's correct, yes.
10  Q.  Other than knowing how to use
11   Photoshop, have you received any other
12   training to determine if a photo has been
13   doctored?
14  A.  Training in the field, but
15   training -- I don't know if in the field is
16   the right way of expressing this, but
17   training, informal training, but not
18   formalized training.
19  Q.  How about in determining the
20   authenticity of documents, any training in
21   that?
22  A.  You mean formal training?
23  Q.  Let's start with formal
24   training?
25  A.  Not formal training.  Well, I

MOSES STRAUSS VS.
CREDIT LYONNAIS, S.A.

EVAN KOHLMANN
December 2, 2010

Page 185

```
1        KOHLMANN
2   qualify it as a lesson that I learned from
3   study, trial and error from studying Hamas
4   websites watching the progression of events
5   and watching for which events they tend to
6   issue multiple claims of responsibility and
7   why.
8   Q.   Who at Hamas tells you which
9   are the events that are important to it?
10       MR. GLATTER: Objection to form
11  and foundation.
12  A.   Who?
13  Q.   You told me that the events
14  that Hamas believes to be important so I'm
15  curious who's telling you at Hamas which are
16  the events they think are important?
17       MR. GLATTER: Same objection.
18  A.   I read and receive e-mails from
19  both the political bureau of Hamas and the
20  Izzeden al-Qassan Brigades.
21  Q.   They send personally to you
22  e-mails telling you I thought this one was
23  important?
24  A.   They are not personally to me,
25  but Hamas has a pretty advanced operation in
```

Page 186

```
1        KOHLMANN
2   terms of marketing and advertising its most
3   critical messages to its own followers, to
4   media and to other parties.
5   Q.   You get their propaganda?
6        MR. GLATTER: Objection to
7   form.
8   A.   That's correct, I do receive
9   their propaganda.
10  Q.   In their propaganda they tell
11  you that the reason they are making multiple
12  claims is because they are very confident
13  that it was them who did it?
14       MR. GLATTER: Objection to
15  form, vague and misstates the
16  testimony.
17  A.   Once again I would say it's not
18  that they told me this. It's my observations
19  as an analyst and as an expert in this field
20  from having studied over time the process by
21  which they release information, how they
22  release information, when they release
23  information and what they say about the
24  information they are releasing. This is not
25  about them telling me this. This is about an
```

Page 187

```
1        KOHLMANN
2   expert opinion.
3   Q.   How do they release information
4   when they are not confident that they are the
5   ones who did it?
6        MR. GLATTER: Objection to
7   form.
8   A.   It's not about being not
9   confident, it's about being extra confident.
10  When Hamas issues a communica through their
11  website by default because of their
12  philosophy or because of their belief that by
13  telling the truth that they can achieve the
14  position of honest broker in the Israeli
15  Palestinian conflict, this is their general
16  mode of operation. Their general preference
17  is to try to claim credit for the stuff they
18  can prove that they have done. Now it's not
19  that one claim of responsibility means that
20  it is possibly illegitimate or possibly not
21  realistic or credible. What I'm saying is
22  the more times that Hamas states something,
23  the more confident its leadership it that it
24  was actually behind that attack.
25  Q.   That's your theory?
```

Page 188

```
1        KOHLMANN
2   A.   That's my observation based
3   upon studying again the process by which
4   Hamas releases information through its
5   internet website and again I should stress
6   that that applies to information released
7   through the particular channel of the
8   internet. It may not apply to other
9   documents produced by Hamas or other claims
10  of responsibility not sent through the
11  internet. Because the internet is a public
12  venue and because it's available to anyone it
13  means that Hamas' claims of responsibility
14  can be verified by the general public
15  including by its own supporters and by its
16  critics which means it gauges in a very
17  serious liability if it were to start
18  claiming credit for a large number or a
19  significant number of operations or other
20  activities in which it does not actually play
21  a role.
22  Q.   What do you observe that tells
23  you how confident they are?
24       MR. GLATTER: Objection to
25  form.
```

MOSES STRAUSS VS.
CREDIT LYONNAIS, S.A.

EVAN KOHLMANN
December 2, 2010

Page 189

1      KOHLMANN
2  Q.  How do you observe confidence?
3  A.  I observe confidence --
4  confidence can be measured in a number of
5  ways.  One way is the number of times and the
6  number of different Hamas venues that have
7  claimed credit for something, for instance --
8  Q.  That's circular, right?
9      MR. GLATTER: Can you let him
10  finish his answer? Are you finished?
11  A.  For instance, if both the
12  political bureau of Hamas and Izzeden
13  al-Qassam Brigades, if both the Izzeden
14  al-Qassam brigades and the political bureau
15  issue separate statements both indicating
16  Hamas' claim of responsibility for a
17  particular attack, what this indicates is
18  it's not just an issue of one branch or
19  another branch of Hamas or one leader verses
20  another leader, it means that there is
21  confidence throughout the leadership of
22  Hamas.
23      Other things that play into it
24  would be the kind of language used in the
25  communicas by Hamas leaders.  The seniority

Page 190

1      KOHLMANN
2  of Hamas leaders that are cited.  The level
3  of detail that's given.  There is a lot of
4  different factors that play into this.
5  Q.  You said it matters when they
6  release it so what is the timing aspect that
7  tells you that it's Hamas' claim of
8  responsibility is more credible in your eyes?
9  A.  The timing aspect, there is no
10  timing aspect.
11  Q.  You said when they release
12  their claim so that's what I mean?
13  A.  If I did, I was not referring
14  to a timing aspect.  With regard to Hamas as
15  well as other organizations there has been
16  virtually no correlation between the amount
17  of time that it takes to release a communica
18  and the accuracy or truthfulness of whether
19  or not that claim is legitimate.
20  Q.  When you said when, what were
21  you referring to?
22  A.  I don't know.  You'd have to
23  read back the transcript.
24  Q.  In forming your opinion in this
25  matter, did you consider whether both

Page 191

1      KOHLMANN
2  branches of Hamas issued statements?
3      MR. GLATTER: Objection to
4  form.
5  Q.  On the web for each of these
6  attacks, is that part of your methodology to
7  check that both branches had?
8      MR. GLATTER: Objection to
9  form.
10  A.  I believe in my report I did
11  indicate when communicas were posted on
12  either the website of the political bureau of
13  Hamas which would be Palestinian info or the
14  Palestinian information center verses the
15  websites operated by the Izzeden al-Qassam
16  Brigades i.e. Ezzedeen.net, Qataeb-Ezzeldeen,
17  Qassamiyoon, al-Qassam, they are in my report
18  though.
19  Q.  I understand that they are in
20  your report.  My question is in doing your
21  methodology as to the reliability of those
22  claims, did you take into consideration when
23  there was not a claim from both branches?
24  A.  That was not in and of itself a
25  definitive factor, no.  Again, to go back to

Page 192

1      KOHLMANN
2  what I was saying earlier is that the more
3  claims of responsibility there are from Hamas
4  and from various different branches of Hamas,
5  I think there is a greater degree of
6  confidence on the part of Hamas generally,
7  however, it's also my experience that even a
8  single claim of responsibility on its own on
9  an official credible Hamas website, forum,
10  electronic venue, that itself is credible and
11  authentic.  It's just that when it comes from
12  multiple different sources, the confidence
13  rises significantly higher.
14  Q.  In doing your analysis as to
15  the reliability of what was posted on the
16  website where there was not claims from both
17  branches of Hamas, how did you take that into
18  consideration in your methodology in
19  assessing whether in fact that claim was a
20  credible claim or not and by credible I don't
21  mean whether Hamas was saying it, but
22  credible meaning what was being said is
23  truthful?
24      MR. GLATTER: Objection to
25  form.  You may answer.

MOSES STRAUSS VS.
CREDIT LYONNAIS, S.A.

EVAN KOHLMANN
December 2, 2010

Page 193

1      KOHLMANN
2   A.   Again, I believe that because
3   of my experience in studying Hamas propaganda
4   and their claims of responsibility from the
5   web that are issued through their internet
6   website, my experience is that a single
7   claim, a single credible claim alone is
8   enough to believe that it's more likely than
9   not that Hamas was engaged in some level of
10  culpability in a particular attack, however,
11  the more times they say that from the more
12  branches of the organization or the more
13  individual leaders, that then tends to go up
14  from there.  As regards to did I note that in
15  my report, yes.  In each attack I
16  specifically identified whether or not a
17  communica was posted on either the
18  Palestinian information center or a website
19  operated by the Izzeden al-Qassam Brigades
20  and I was I believe it's pretty specific for
21  each attack.
22  Q.   I'm trying to understand you
23  say it goes up from there, either Hamas was
24  culpable or they were not culpable, right,
25  there's no going up so I'm asking in terms of

Page 194

1      KOHLMANN
2   doing your methodology in assessing the
3   reliability of that information, did it
4   matter to you the fact that there was not
5   these in certain cases additional posts on
6   other websites, did you take that into
7   consideration when doing your analysis?
8      MR. GLATTER: Objection to
9   form.
10  A.   Again, I did take it into
11  consideration, but my sense is that a single
12  claim of responsibility on a credible Hamas
13  site was sufficient detail. That by default
14  means that it's more likely than not that
15  Hamas in some way was culpable for a
16  particular attack.  What I'm saying is that
17  the more times they claim responsibility, the
18  more places that those claims of
19  responsibility come out on line in authorized
20  authentic venues, that means that it goes up
21  from there.  It means it becomes increasingly
22  likely that they were indeed culpable in some
23  way for a given attack, but what I'm saying,
24  yes, I did take into consideration because
25  obviously identified in my report when

Page 195

1      KOHLMANN
2   communicas were either issued by the
3   Palestinian information center i.e. the
4   website of the political wing verses the
5   websites run by the military wing, the
6   Izzeden al-Qassam Brigades.
7   Q.   What I can't tell from your
8   report is where in your methodology you
9   discounted a claim of responsibility where
10  there were not multiple claims?
11     MR. GLATTER: Objection to
12  form.
13  A.   I would have discounted
14  responsibility had there been no claims.  In
15  this case there were claims of responsibility
16  for all 15 and they were claims of
17  responsibility which I deemed to have been
18  posted on credible authentic Hamas websites,
19  either the political, the military wing or
20  both so what I'm saying is is that at a
21  minimum for those 15 attacks at a minimum
22  there was at least one credible claim of
23  responsibility which would indicate to us
24  that more likely than not Hamas had some
25  way been culpable for these attacks.

Page 196

1      KOHLMANN
2   Q.   Let me understand, you only
3   looked at materials Hamas posted on the web?
4   A.   Correct.
5   Q.   And you're saying that if Hamas
6   had never claimed responsibility, then you
7   would have discounted that in your analysis
8   that Hamas did it, effectively if they never
9   said they did it you would have discounted
10  the possibility that they did it?
11     MR. GLATTER: Objection,
12  misstates the testimony.
13  A.   If Hamas never had issued a
14  communica, credible communica via one of its
15  on line information sources, it never issued
16  a video recording and it never cited the
17  attack in the Glory Record, it had never
18  talked about the attack in one of its
19  magazines, it never produced any evidence
20  that it even knew the attacker, then yes, the
21  attack would not have shown up in this list.
22  Q.   If Hamas did any of those
23  things, then they would qualify under your
24  list of providing more likely than not that
25  Hamas was culpable in the attack?

MOSES STRAUSS VS.
CREDIT LYONNAIS, S.A.

EVAN KOHLMANN
December 2, 2010

Page 197

1      KOHLMANN
2  A.  In some way culpable in the
3  attack, yes.
4  Q.  So at its heart if Hamas said
5  that they did the attack, then in your
6  opinion Hamas is in some way culpable for the
7  attack?
8  A.  Not just saying they did the
9  attack.  If they put out a sufficient amount
10  of data on one of their authentic on line
11  information venues.  The cases here, even the
12  cases where there was only one claim, I
13  believed there was sufficient detail in that
14  claim that more likely than not they were
15  being at least somewhat truthful in their
16  claim that they were culpable for that
17  attack, yes.
18  Q.  What is the sufficient amount
19  of data that one needs to reach the level of
20  you concluding that more likely than not it's
21  truthful and they are culpable?
22      MR. GLATTER: Objection to the
23  extent the question has been asked and
24  answered.
25  A.  More likely than not comes from

Page 198

1      KOHLMANN
2  having studied the Hamas website.  If you
3  study the Hamas websites, if you collect the
4  Hamas websites, if you study them for a
5  period of, I don't know, seven, eight, nine
6  years, you start to learn about lessons how
7  the websites operate about, the credibility
8  or truthfulness of the statements offered
9  there and about whether or not Hamas regards
10  posting false information as something that
11  should be avoided. In my experience Hamas
12  lesson here is again they want to be seen as
13  the honest broker in the Israeli Palestinian
14  conflict.  If they engage in repeated false
15  claims of credit, even one just brief claim
16  of credit for operations that they had
17  nothing to do, they actually had nothing to
18  do with, they leave themselves open to a
19  credibility gap and that credibility gap
20  applies particularly to Hamas because it's
21  the dominant terrorist organization in the
22  Palestinian territories whereas PIJ and
23  al-Aqsa Martyrs Brigade and other groups
24  because they are in the minority, they don't
25  have the same amount of pressure to quote

Page 199

1      KOHLMANN
2  unquote tell the truth.
3  Q.  Mr. Kohlmann, my question was
4  what is the sufficient amount of data that
5  you refer to that one needs to find for you
6  to find that could someone has made a
7  credible claim more likely than not that
8  Hamas is culpable?
9  A.  Sufficient claim would be a
10  claim of responsibility via an authenticated
11  credible website with enough detail about the
12  operation, either about the attacker, the
13  plan of the attack, the results of the attack
14  or other aspects of the operation which would
15  indicate inside knowledge or more knowledge
16  than the average individual about what was
17  going on in regards to a particular
18  operation.
19  Q.  When you say enough detail, how
20  much is enough in your opinion?
21  A.  I don't believe it could be
22  encapsulated into a sentence. It's looking at
23  something and realizing that someone has been
24  identified if for instance the individual
25  attacker has been identified by name and

Page 200

1      KOHLMANN
2  there's a biography of his life, a detailed
3  biography of his life.  If there are
4  photographs.  If there are video recordings.
5  If there are details about the plan itself,
6  how the plot was carried out.  Details that
7  would not necessarily be readily available to
8  ordinary observers, these are the kind of
9  things that help us determine that this is a
10  credible claim of responsibility, but I
11  should say that by default when it comes to
12  Hamas, the vast majority of material that
13  Hamas puts out may not be accurate to every
14  last point crossing the T's and doting the
15  I's, but Hamas generally speaking has a good
16  record on line of being truthful in what it's
17  claiming credit for.
18  Q.  What studies have you done to
19  investigate whether what Hamas says on line
20  is actually true?
21  A.  It's not a result of a
22  statistical study.  It's the result of my
23  observations as an expert.
24  Q.  Tell me what you do to -- what
25  study have you done to determine what Hamas

MOSES STRAUSS VS.
CREDIT LYONNAIS, S.A.

EVAN KOHLMANN
December 2, 2010

---

Page 201

1      KOHLMANN
2  has said on its website is in fact true?
3      MR. GLATTER: Objection to form
4  an objection to the extend the
5  question has been asked and answered.
6  A.   It's a case by case example.  I
7  can give you an example rather.  Recently
8  there was a shooting in the West Bank
9  targeting a vehicle with Israeli settlers.
10  It was suggested initially that in major
11  media sources that Hamas might have been
12  responsible for this.  The first thing I did
13  was to look to an e-mail list that I
14  subscribe to which I receive e-mail directly
15  from the Izzeden al-Qassam Brigades.  They
16  had sent me a notice saying we claim credit
17  for the shooting attack on the vehicle.  I
18  then went to the official Izzeden al-Qassam
19  Arabic website and sure enough on the Izzeden
20  al-Qassam Arabic website there was also a
21  copy of an Arabic language communica claiming
22  credit for that operation.
23      I then reviewed statements that
24  were made by the U.S. State Department and
25  other agencies of the U.S. government as well

---

Page 202

1      KOHLMANN
2  as the Israeli government and as far as I
3  could determine every party was in agreement
4  including both Hamas, the Israeli's, the U.S.
5  government were all in agreement that the
6  attack had occurred and that it was the work
7  of Hamas.
8  Q.   THe U.S. government said it was
9  the work of Hamas or that Hamas claimed
10  credit for it?
11  A.   I believe the U.S. State
12  Department actually condemned Hamas for
13  carrying out the attack.
14  Q.   For each of the 15 attacks in
15  question, did you go and examine what other
16  entities beyond Hamas have said with regard
17  to who carried out the attacks?
18      MR. GLATTER: Objection to the
19  extent the question was asked and
20  answered this morning, but you can
21  answer again.
22  A.   Not for purposes of this case.
23  There are individual attacks here that I have
24  engaged in that analysis, however, not as
25  part of the -- it won't be part of my opinion

---

Page 203

1      KOHLMANN
2  that I'm opining on here and it's not part of
3  the work I was asked to do with regard to
4  this case.
5  Q.   So you didn't do your veracity
6  check you normally do when offering your
7  opinions in this case, right, you didn't go
8  to see what other sources besides Hamas have
9  said about what Hamas did so as to offer
10  opinions in this matter?
11      MR. GLATTER: Objection to
12  form.
13  A.   I did, but not for this matter.
14  I did with regard to particular attacks that
15  are among the 15 here listed, but I was not
16  asked to do that as part of this project and
17  it's not relevant to the task I was asked to
18  do so I didn't include it in my report and I
19  don't expect to be opining on that issue.
20  Q.   In determining that Hamas'
21  claims of responsibility are credible, you
22  did not do any examination from any source
23  other than Hamas to determine whether in fact
24  what Hamas is saying is accurate?
25      MR. GLATTER: Objection to

---

Page 204

1      KOHLMANN
2  form, asked and answered.
3  Q.   For purposes of drafting your
4  report and offering an opinion in this
5  matter?
6  A.   The way you are saying it I
7  have to be careful here because of the fact
8  that prior to being engaged in this case I
9  did study with particular attacks in this
10  list about whether or not the Hamas claim of
11  responsibility was credible and accurate.
12  That's what makes me confident that knowing
13  that in the background that they are indeed
14  credible and authentic.  The fact that I
15  didn't do it in this particular case that
16  doesn't mean as part of my confidence as an
17  expert because of the fact my previous
18  experience in this in looking including
19  particular attacks on this list that my
20  research in the past has shown that they were
21  carried out by Hamas.
22  Q.   Which attacks have you done
23  that for?
24  A.   If you take a look at April 30,
25  2003 attack, Mike's Place bombing in Tel

---

MOSES STRAUSS VS.
CREDIT LYONNAIS, S.A.

EVAN KOHLMANN
December 2, 2010

Page 205

1    KOHLMANN
2  Aviv, because of the fact that I had
3  interviewed Omar Bakri Mohammad, the person
4  who allegedly recruited and dispatched the
5  two individuals who carried out this attack,
6  I engaged in a fairly lengthy study of this.
7  We actually worked myself and my colleague
8  Claudio Franco worked with the BBC on a
9  documentary about the individuals who carried
10  out this attack and how they got in touch
11  with Hamas and why they got in touch with
12  Hamas and the element of Hamas actually being
13  involved in the planning and execution of the
14  attack.
15  Q.   What other attacks?
16  A.   I believe as part of my work at
17  the Investigative Project in Washington DC I
18  also did work on at least two other of the
19  attacks on here namely the August 9, 2001
20  Sbarros Pizzeria bombing which I know is not
21  part of your list, but on this list and also
22  the Park Hotel bombing of March 27, 2002.
23  Q.   Any others?
24  A.   There may have been, but I
25  can't recall off the top of my head.

Page 206

1    KOHLMANN
2  Q.   So of the 15, only two,
3  potentially the Park Hotel bombing and then
4  the Mike's Place bombing?
5  A.   In specific, yes.
6  Q.   So that's the only ones that
7  you did work to check from sources other than
8  Hamas whether what Hamas was saying was true?
9    MR. GLATTER: Objection to
10  form.
11  A.   Of this list prior to becoming
12  involved in this case, yes.
13  Q.   After becoming involved in the
14  case, you also didn't go and check outside
15  sources to determine whether what Hamas was
16  saying on its website was true, correct?
17    MR. GLATTER: Objection to
18  form, misstates the testimony.
19  A.   I wasn't asked to.
20  Q.   And you didn't do it?
21  A.   I wasn't asked to so I didn't
22  engage in any kind of study that I was not
23  requested to do.
24  Q.   Remind me again the name of the
25  guy you spoke to with regard to the Mike's

Page 207

1    KOHLMANN
2  Place bombing?
3  A.   I spoke to a number of people
4  but the individual I believe you're speaking
5  about is Omar Bakri Mohammed.
6  Q.   Mr. Bakri Mohammed is not a
7  member of Hamas?
8    MR. GLATTER: Objection, asked
9  and answered.
10  A.   Not a formal member of Hamas,
11  not that I'm aware of.
12  Q.   But you said and it's your
13  testimony he's the one who dispatched the two
14  people who committed the Mike's Place
15  bombing?
16  A.   I say dispatched, he sent them
17  to go join Hamas, maybe I should put it that
18  way.  He dispatched them to join Hamas. He
19  didn't dispatch them to carry out the Mike's
20  Place bombing.
21  Q.   Who's he affiliated with?
22  A.   He runs an organization called
23  al-Muhajiroun which specifically specializes
24  in recruiting and sending individuals to
25  fight with front line para military groups in

Page 208

1    KOHLMANN
2  the Muslim world.
3  Q.   Is he affiliated with al-Qaeda?
4  A.   He's loosely affiliated with a
5  number of groups including Hamas, Hezbollah
6  and al-Qaeda.  He is engaged in fundraising
7  and recruitment on behalf of all three of the
8  groups.
9  Q.   Did he send the two individuals
10  to go to Israel so as to perpetrate a
11  terrorist attack?
12    MR. GLATTER: Object to the
13  extent the question is beyond the
14  scope of the expert opinion, but you
15  can answer.
16  A.   My understanding is that he
17  encouraged the two individuals to travel
18  abroad to join Hamas and that he encouraged
19  them to carry out suicide operations, but I
20  don't believe he specifically assigned them
21  any particular target.  I believe as far as
22  Mr. Omar Bakri is concerned he allowed the
23  individual front line organization to make
24  the decisions.
25  Q.   The reason these two guys went

MOSES STRAUSS VS.
CREDIT LYONNAIS, S.A.

EVAN KOHLMANN
December 2, 2010

---

Page 213

KOHLMANN

1    KOHLMANN
2    intelligence assessment?
3    A.   Yes, as regards to material
4    from the internet, yes.
5    Q.   Has your work ever been subject
6    to a technical review?
7         MR. GLATTER: Objection to
8    form.
9    A.   I'm sure it has.
10   Q.   Who's performed technical
11   reviews of your work?
12   A.   Technical reviews of my work
13   have been performed by defense experts in
14   cases in which I testified both in the United
15   States and the United Kingdom and I believe
16   also FBI computer experts have also done
17   reviews of my expert witness reports to make
18   sure that my expert witness reports comport
19   with their understanding of technological
20   issues in particular cases.
21   Q.   When you say defense experts,
22   you mean defense counsel or people hired from
23   the defense, not like the Department of
24   Defense, correct?
25   A.   When I say defense experts, I'm

---

Page 214

1    KOHLMANN
2    referring to experts hired by defense counsel
3    in criminal or civil cases, mostly criminal,
4    in the United States, the United Kingdom and
5    else where.  Since frequently I'm asked to
6    provide a forensic breakdown of what's on a
7    hard drive it's not entirely uncommon for a
8    defense team to hire their own computer
9    expert to go through the evidence and attempt
10   to determine whether or not there's anything
11   in my report that is technically invalid or
12   that they have questions about it.
13        MR. LUFT: We've been going a
14   while.  Why don't we take a break.
15        THE VIDEOGRAPHER: Time is 3:50
16   p.m. on December 2, 2010.  We are now
17   off the record.
18        (Recess taken.)
19        THE VIDEOGRAPHER: This is tape
20   four of the deposition of Evan
21   Kohlmann.  Time is 4:25 p.m. on
22   December 2, 2010.  We are now back on
23   the record.
24   Q.   Mr. Kohlmann, before we broke I
25   was asking you some questions with regard to

---

Page 215

1    KOHLMANN
2    how much evidence you need to see before you
3    make a determination that it's more likely
4    than not that a Hamas claim of responsibility
5    is credible, do you recall that?
6    A.   Yes, I do.
7    Q.   I think you listed for me and I
8    don't mean to represent that this is
9    exhaustive, but I noted that there may be
10   claims of responsibility, there may be
11   photos, there may be videos, there may be
12   detailed biographies, there may be a Will, do
13   you recall that?
14   A.   Correct, those are all factors,
15   yes.
16   Q.   Under your methodology, how
17   many of those factors need to be present for
18   you to determine that a claim of
19   responsibility is credible?
20   A.   It's not a matter of addition.
21   It's not like getting up to five. It's the
22   matter of the information that's present.  I
23   believe that again as I stated before that if
24   you have a single document on an official
25   credible Hamas website which has been issued

---

Page 216

1    KOHLMANN
2    by Hamas in order to claim credit for a
3    particular operation either in the form of a
4    communica, in the form of the Glory Record or
5    in the form of an official magazine put out
6    by the al-Qassam Brigades, that alone is
7    sufficient to indicate that more likely than
8    not there is a degree of culpability on the
9    part of Hamas, right, but that the more that
10   you have piled on from there, then it goes up
11   from more likely than not increasingly up the
12   scale.
13   Q.   So in looking at these 15
14   attacks, you looked to see if there was at
15   least one piece of information which you
16   thought was credible enough to reach this
17   level of more likely than not?
18   A.   That's not the strategy I
19   engaged to define information.
20   Q.   I'm asking when you were
21   looking at the information and assessing to
22   make the determination if it was more likely
23   than not that there was information that may
24   be culpable as to Hamas, I'm asking about the
25   methodology you employed there in making that

---

MOSES STRAUSS VS.
CREDIT LYONNAIS, S.A.

EVAN KOHLMANN
December 2, 2010

Page 217

```
 1       KOHLMANN
 2   assessment?
 3   A.   If there was at least one
 4   communica, one magazine or one piece of the
 5   Glory Record which was on a credible
 6   authentic Hamas website which credibly
 7   claimed credit again in an authentic way for
 8   this operation in the form again of the Glory
 9   Record, an official communica or an official
10   magazine or on its own a video recording, but
11   I don't think any of these circumstances
12   involved only a video recording, that alone
13   was enough to immediate clue me that it was
14   more likely than not there was indicia of
15   culpability on the part of Hamas. Then in
16   terms of looking at that the confidence goes
17   higher and higher depending on the degree of
18   detail there is about the individual who
19   committed the operation, photographs of the
20   individual, video of the individual, a copy
21   of his martyrdom Will or other equally
22   telling information that Hamas often packages
23   in with the kind of material that I just
24   described.
25   Q.   Am I correct, I think you told
```

Page 218

```
 1       KOHLMANN
 2   me this, but I want to be sure I have it, for
 3   the 15 attacks for the purpose of opining in
 4   this report, you did not do any analysis
 5   beyond looking at what Hamas put on the
 6   internet to determine if the veracity of
 7   those communicas, pieces of information from
 8   Hamas were in fact truthful?
 9       MR. GLATTER: Objection to
10   form.
11   A.   That was not part of my initial
12   tasking. After being given a copy of defense
13   expert Jenkins report subsequently I did go
14   back and look at my archive of Palestinian
15   Islamic Jihad material and material from the
16   al-Aqsa Martyrs Brigade, principally material
17   that's on their archive websites that's still
18   on the internet archive just to check to see
19   whether there was anything in regards to
20   these attacks that was posted on those sites.
21   It was not part of my initial tasking, but
22   again after looking at Jenkins report, I did
23   this for purpose of being as fully and
24   complete as possible being able to respond to
25   questions, but that was not part of my
```

Page 219

```
 1       KOHLMANN
 2   initial tasking and it not part of what led
 3   to the creation of this report.
 4   Q.   What you mentioned looking at
 5   these other group's websites, it's not
 6   necessarily checking whether what Hamas is
 7   saying is true, it's also more to see if
 8   other groups have said anything?
 9   A.   Right, which was not part of my
10   initial tasking which is why I didn't do
11   that.
12   Q.   When you went back and looked,
13   did you find anything?
14   A.   I conducted several searches
15   again both through the material that's in my
16   archive as well as material that's stored on
17   the internet archive of their websites. I
18   did not find a single hit either on the
19   Palestinian Islamic Jihad website or on the
20   now defunct al-Aqsa Martyrs Brigade website.
21   Q.   About them making any claims
22   with regard to any of these attacks?
23   A.   Nothing. I engaged several
24   different search methodologies. I used the
25   same methodologies that I employed in order
```

Page 220

```
 1       KOHLMANN
 2   to find the information that I found on the
 3   Hamas websites because of the fact that
 4   obviously I used the same search methodology
 5   in the Hamas sites and with using the same
 6   search methodologies that produced the
 7   information that's in this report, I
 8   encountered no hits on either my archives of
 9   the materials from PIJ or al-Aqsa Martyrs
10   Brigade PIJ or alternatively on their current
11   websites or on their archive sites which are
12   on the internet archive.
13   Q.   Mr. Kohlmann, I'm going to ask
14   you some questions about your CV if you would
15   like to take a look at it. I believe it's
16   appended to Exhibit 3 which is your report.
17   Do you have a section of your report called
18   major papers?
19   A.   Yes, I do.
20   Q.   Is your CV up-to-date?
21   A.   No, it's not.
22   Q.   Is there anything that we
23   should add to your CV?
24   A.   Yes. The last two weeks I
25   published a new paper with two co-authors on
```

MOSES STRAUSS VS.
CREDIT LYONNAIS, S.A.

EVAN KOHLMANN
December 2, 2010

---

Page 221

KOHLMANN

1    KOHLMANN
2    the Shabaab al-Mujahiden movement in Somalia
3    which was published in the journal African
4    Security.
5    Q.   Anything else?
6    A.   Yes, there's also other things
7    missing from here.  There is also missing
8    from here an article which I published last
9    February in the Westpoint Counter Terrorism
10   Centers Sentinel Journal on the Ansar
11   al-Mujahideen chat forum, web chat forum.
12   Let me just make sure there's nothing else
13   here missing.  In terms of papers I think
14   that covers it.  There may be one I'm
15   missing, but that should be mostly
16   up-to-date.
17   Q.   Terrific.
18   A.   I'm sorry, excuse me, there is
19   also another foreign policy piece that's
20   missing from here.  In early January of 2010
21   I published something in foreign policy on
22   the subject of Umar Abdul Mutalla who was the
23   individual who attempted to carry out a
24   bombing on board a Delta Airlines flight last
25   December.

---

Page 222

1    KOHLMANN
2    Q.   None of the things you just
3    mentioned to me relate to Hamas?
4    A.   That's correct.  Well, there is
5    some discussion in passing of Hamas in the
6    piece that I wrote about the Ansar
7    al-Mujahideen chat forum because the chat
8    forum includes among other things individuals
9    who consider themselves to be supporters of
10   both Hamas and other Palestinian dissident
11   factions.
12   Q.   The subject matter of that post
13   was not Hamas, correct?
14   A.   It was a paper, but the subject
15   matter of the paper was the Ansar
16   al-Mujahideen chart forum and within that
17   there's discussion of various different
18   terrorist groups which come up in the context
19   of that.  I know that Palestinian factions
20   were a significant part of that.  I can't
21   remember how significant the actual
22   mentioning of Hamas was.
23   Q.   Have you ever published a book
24   on Hamas?
25   A.   No, I have not.

---

Page 223

1    KOHLMANN
2    Q.   If you look at your page two of
3    your CV where it lists major papers?
4    A.   Yes.
5    Q.   Is the principal subject of any
6    of the major papers you have written Hamas?
7    A.   Yes, Arabian Gulf Financial
8    Sponsorship of al-Qaeda -- my testimony
9    before the U.S. House Committee on Financial
10   Services in March of 2003 Arabian Gulf
11   Financial Sponsorship of al-Qaeda also
12   included material about the same banks,
13   corporations and charities in terms of their
14   involvement with Hamas.  Let me keep going.
15   The role of Islamic charities and
16   international terrorist recruitment and
17   financing, a paper that I published in
18   January 2006 with the Danish Institute for
19   International Studies a significant part of
20   that had to do with charities which are
21   accused of providing financing to Hamas
22   including my discussion of that.  There's one
23   thing, another thing missing from this list,
24   excuse me, I don't mean to interject, there's
25   another congressional testimony missing from

---

Page 224

1    KOHLMANN
2    this.  In July of this year I testified
3    before the Senate Banking Committee about the
4    role of Islamic -- the role of Saudi Arabian
5    state sponsored charities in international
6    terrorist recruitment and financing.  I can't
7    recall -- I believe there was a reference to
8    Hamas in there.  I can't recall how much of
9    the focus there was on Hamas in there, but
10   obviously I was focusing on Saudi Arabian
11   state charities, not necessarily the ones
12   that are involved in al-Qaeda, ones that are
13   involved in sponsoring various paramilitary
14   activities so it would have been likely that
15   Hamas would have been part of that.
16       THE VIDEOGRAPHER: Time is 4:37
17   p.m.  We are off the record.
18       (Recess taken.)
19       THE VIDEOGRAPHER: Time is 4:42
20   p.m. on December 2, 2010.  We are now
21   back on the record.
22       MR. GLATTER: Before Mr. Luft
23   asks his next question to Mr.
24   Kohlmann, in order for the record,
25   following Mr. Luft's request for a

---

MOSES STRAUSS VS.
CREDIT LYONNAIS, S.A.

EVAN KOHLMANN
December 2, 2010

Page 229

1      KOHLMANN
2   time and make you go away if we can
3   finish up and do the deposition as we
4   planned so that's what I intend to do.
5      THE WITNESS: Okay.
6      MR. GLATTER: Thank you.
7   Q.  Mr. Kohlmann, you mentioned the
8   Arabian Gulf Financial Sponsorship of
9   Al-Qaeda v U.S. Based Banks, Corporations and
10  Charities?
11  A.  Yes.
12  Q.  My question was is the
13  principal subject of any of your major papers
14  Hamas, was the principal subject of that
15  paper Hamas or al-Qaeda?
16  A.  I don't believe actually that's
17  the question you asked me when I gave you
18  that response, but I can respond to that
19  question if you would like.
20  Q.  I'm just looking back, not to
21  quibble with you, my question is was the
22  principal subject of any of the papers you
23  have written Hamas?
24  A.  It was a subject. I don't know
25  if you would call it a principal subject.

Page 230

1      KOHLMANN
2   Obviously the principal subject of that paper
3   was al-Qaeda.  The principal subject was
4   really charities, charities involved in money
5   laundering and terror finance so while the
6   focus was on al-Qaeda, my recollection is
7   there's also a discussion of Hamas in there.
8   Q.  Now that you understand my
9   question was the principal subject of any of
10  your major papers Hamas, are there any major
11  papers listed here where you would say the
12  principal subject of them was Hamas?
13     MR. GLATTER: Objection to
14  form.
15  A.  Again, I think it depends on
16  how you weigh the individual subjects, but I
17  don't think any of these papers are
18  specifically focused on Hamas in and of
19  itself.
20     MR. LUFT: I would like to
21  mark as Kohlmann Exhibit 6 an article
22  titled the Role of Islamic Charities
23  in International Terrorists
24  Recruiting in Financing by Evan
25  Kohlmann.  It's a working paper from

Page 231

1      KOHLMANN
2   the Danish Institute for
3   International Studies.
4      (Kohlmann Exhibit 6,
5   Article, marked for Identification.)
6   Q.  I believe it's one of the
7   papers you mentioned to me, correct?
8   A.  I believe it is, yes.
9   Q.  Do you recognize this document,
10  Mr. Kohlmann?
11  A.  Yes, I do.
12  Q.  Is this the article you are
13  referring to?
14  A.  It's one of them that I was
15  just referring to, yes.
16  Q.  You mentioned to me that you
17  felt that this article the subject matter of
18  it was Hamas, but I must admit that when I
19  read through it I did not find a single
20  mention of Hamas.  Could you tell me if
21  that's correct or not?
22  A.  I'll have to check.  Give me
23  one second.  I believe you are correct. I
24  referred to other groups and I thought I had
25  actually referred to Hamas, but I did not

Page 232

1      KOHLMANN
2   refer to Hamas by name.
3   Q.  Okay, you could put that aside.
4   Is the subject -- is the principal subject of
5   any of the major papers you've written
6   determining what terrorist entity perpetrated
7   specific attacks?
8      MR. GLATTER: Objection to
9   form.
10  A.  You're talking about written
11  papers, published papers?
12  Q.  Your list of major papers in
13  your CV?
14  A.  I don't believe so.  Not that I
15  can think of offhand, no.
16  Q.  Let me ask you about you have
17  mentioned on line blogs and social networking
18  in your CV?  I'm not trying to vague, I'm
19  sorry, the topic right after major papers?
20  A.  Yes, yes, yes.
21     MR. GLATTER: You are back on
22  Exhibit 3, right?
23     MR. LUFT: Yes.
24  Q.  One of your blogs or websites
25  was, I understand it's now Flashpoint

MOSES STRAUSS VS.
CREDIT LYONNAIS, S.A.

EVAN KOHLMANN
December 2, 2010

Page 237

KOHLMANN

1
2  Q.  Do you recall making any posts
3  about Hamas?
4  A.  There was at least one instance
5  where there was a post about Hamas, but I
6  don't know if I wrote it or somebody else
7  wrote it.  The counter terrorism blog hosted
8  an event in Washington DC in which myself and
9  several other counter terrorism blog
10  contributors became involved in a discussion
11  of the Muslim brotherhood and Hamas.  I don't
12  recall who posted that or in what context it
13  was posted, but there were a number of posts
14  on there that I refer to either in passing in
15  context of Hamas compared to something else
16  or a particular event relating to Hamas.  I
17  think I may have posted something on there
18  relating to the Mike's Place bombing in 2003.
19  Q.  Do you recall if there is any
20  original analysis with regard to Hamas that
21  you posted on that blog?
22  A.  I can't recall. I can't recall.
23  Q.  Mr. Kohlmann, working through
24  your resume here, your CV, you have served as
25  we discussed as an expert witness in U.S.

Page 238

KOHLMANN

1
2  legal cases?
3  A.  Yes.
4  Q.  You said two of them are civil
5  cases?
6  A.  There are two civil cases, but
7  they are not cited on here.  These are -- I
8  should say this should be titled involvement
9  in U.S. criminal cases, not legal cases.
10  Q.  Which are the two civil cases?
11  A.  The two civil cases that I've
12  testified in court are Gates v Syria and
13  Amduso v Sudan.
14  Q.  What were you proffered as an
15  expert in those cases?
16  A.  In the first case I was
17  proffered as an expert on the operations of
18  al-Qaeda in Iraq and the involvement or lack
19  of involvement of Syrian intelligence
20  services in providing assistance to al-Qaeda
21  in Iraq.  In the second case Amduso v Sudan I
22  was asked to provide analysis and testimony
23  on the subject of al-Qaeda's presence in the
24  Sudan, the links between al-Qaeda and the
25  Sudan, the role that the Sudanese

Page 239

KOHLMANN

1
2  intelligence service played in providing
3  assistance to al-Qaeda and al-Qaeda
4  affiliates and the degree to which that
5  support was contingent upon -- was integral
6  in al-Qaeda launching international terrorist
7  attacks namely the 1998 bombing of two U.S.
8  embassies in East Africa.
9  Q.  In both of those two civil
10  cases you were not tendered or accepted as an
11  expert in Hamas, correct?
12      MR. GLATTER: Objection to
13  form.
14  A.  I don't believe so.  Actually I
15  should correct myself.  There was some
16  discussion of Hamas briefly in the Amduso
17  case regarding the presence of Hamas and
18  Hezbollah operatives in Khartoum, Sudan
19  during the 1990s.
20  Q.  My question is were you
21  tendered to the court as an expert in Hamas?
22  A.  Like I said, there was
23  discussion of that, but I don't think I was
24  tendered as an expert on Hamas.  I think I
25  was tendered as an expert on al-Qaeda and its

Page 240

KOHLMANN

1
2  relationship in the Sudan in the context that
3  there was I believe some questioning about
4  the presence of other terrorist operatives in
5  Khartoum.
6  Q.  The court did not accept you as
7  an expert in Hamas for that matter?
8  A.  Again, I'm not -- I don't
9  remember exactly what I was proffered as, but
10  I don't believe that was the case.
11  Q.  Let me ask you now about is it
12  15 -- how many criminal cases is?
13  A.  16.
14  Q.  16, Thank you.  In any of those
15  cases were you proffered to the court as an
16  expert in Hamas?
17  A.  Yes.
18  Q.  Which case were you tendered to
19  the court as an expert in Hamas?
20  A.  I'm going to have to go through
21  them slowly and I will have to double check
22  on this because there's a number of cases I
23  was proffered as an expert on Hamas as well
24  as al-Qaeda and I'm not sure if I remember
25  all of them exactly.  I believe I was

MOSES STRAUSS VS.
CREDIT LYONNAIS, S.A.

EVAN KOHLMANN
December 2, 2010

Page 241

    KOHLMANN

1    KOHLMANN
2    proffered as an expert on Hamas for the
3    following cases.  I believe the Chandia case,
4    Ali Asad Chandia case, 2006, about a third of
5    the way down the page, the main page.
6    Q.  Got it.
7    A.  I believe I was proffered as an
8    expert in Hamas in I believe the Abu Jihaad
9    case as well in 2008.  I know I was in the
10   Mohammed Amawi case.
11   Q.  What date is that?
12   A.  2008.
13   Q.  Before what court?
14   A.  Before the Northern District of
15   Ohio.  I'm also 100 percent positive I was in
16   United States v Mohammed Schnewer, et al.,
17   District of New Jersey, 2008.  I was in --
18   I'm sure I was in United States v Oussama
19   Kasir which is Southern District of New York,
20   2009.  I can't recall, but it's possible that
21   may have also applied to the Syed Hashmi and
22   Atif Saddique cases, I can't recall.  I
23   believe I was because I remember talking
24   about Hamas, but I couldn't tell you off the
25   top of my head.

Page 242

1    KOHLMANN
2        In terms of the international
3    legal cases --
4    Q.  Let me stick to the U.S. for
5    now.
6    A.  I'm sorry.
7        MR. GLATTER: Just U.S.?
8        MR. LUFT: For now.
9    Q.  What's your understanding of
10   being proffered or tendered to the court as
11   an expert witness in a topic?
12       MR. GLATTER: Objection to form
13   to the extent beyond the scope of the
14   expert opinion and seeks a legal
15   opinion, but you can answer if you
16   have an understanding.
17   A.  My general non legal
18   understanding is that the U.S. Attorney's
19   Office or whoever has hired me for this
20   purpose or retained me for this purpose
21   explains to the court that I will
22   specifically be offering testimony or I tend
23   to offer specific testimony about Hamas and
24   that thus part of my qualifications were to
25   explain the basis of knowledge of various

Page 243

1    KOHLMANN
2    terrorist organizations I believe including
3    Hamas, but again I believe I was specifically
4    tendered in those cases as an expert, not
5    just in al-Qaeda, but in Hamas and Hezbollah
6    as well.  I should clarify as well when it
7    comes to Hamas usually I'm qualified in those
8    cases I was qualified as an expert
9    specifically on Hamas and its internet
10   presence.
11   Q.  Explain what you mean by that?
12   A.  I was -- in those cases the
13   purpose of me being qualified in that regard
14   was to give general testimony about what is
15   Hamas, the existence of Hamas and then to
16   identify particular video recordings or
17   references in exhibits, in evidentiary
18   exhibits referring to Hamas or parts of
19   Hamas.
20   Q.  Nothing else about Hamas?
21   A.  The general history, general
22   outlines, but most of the time if I'm called
23   to testify as an expert in Hamas it's because
24   Hamas is a subsidiary issue in the case,
25   relevant issue, a principal issue, but not

Page 244

1    KOHLMANN
2    the principal issue so I'm called to give a
3    general explanation of what is Hamas, what
4    are its goals and if there is a particular
5    piece of evidence relating to Hamas how does
6    this relate to Hamas and why with the
7    specific focus on digital materials mostly
8    given the fact that very frequently in the
9    hard drives that I'm given to review there is
10   a collection of material that includes not
11   just al-Qaeda videos, but also materials from
12   the Hamas website.
13   Q.  Has the court ever allowed you
14   to testify with regard to Hamas internet
15   materials as to your opinion as to how likely
16   it is that the underlying statements are
17   truthful?
18   A.  I don't think so much of an
19   issue -- go ahead, sorry.
20       MR. GLATTER: Objection to
21   form.
22   A.  I don't think it's so much an
23   issue where the court allowed me, I don't
24   think I've ever been proffered in that
25   regard.

MOSES STRAUSS VS.
CREDIT LYONNAIS, S.A.

EVAN KOHLMANN
December 2, 2010

Page 245

1        KOHLMANN
2  Q.  Have you ever been proffered to
3  determine whether Hamas was responsible for
4  committing a terrorist attack?
5  A.  Not that I can recall.
6  Q.  Have you ever been allowed to
7  testify with regard to internet materials
8  with regard to Hamas as to whether it's more
9  likely than not that those internet
10  materials show that Hamas is culpable in
11  certain attacks?
12  A.  I don't know in that specific
13  -- it's never been said that way, but I have
14  in effect been asked to identify whether or
15  not video recordings and particular terrorist
16  attacks are those released by Hamas and
17  whether or not Hamas carried out those
18  attacks, but I don't think that was the
19  principal purpose and I don't know if I was
20  tendered as such.  That would have come up in
21  the context of testimony, but I don't know.
22  I really don't know.
23  Q.  Have you ever been tendered as
24  an expert in determining responsibility for a
25  terrorist attack other than for Hamas so you

Page 246

1        KOHLMANN
2  already answered for Hamas?
3  A.  I understand.
4        MR. GLATTER: Objection to
5  form, vague.
6  A.  I'm thinking about this.  I
7  believe, yeah, I have.  Yes, I have because I
8  have been called -- you are not talking
9  specifically about Hamas, you are talking
10  about any group?
11  Q.  Yeah.
12  A.  I have been specifically called
13  to give testimony about for instance like
14  September 11th who was responsible for the
15  September 11th terrorist attacks in the
16  United States.
17  Q.  Any other attacks besides
18  September 11th?
19  A.  The 1998 bombings of two U.S.
20  embassies in East Africa, Kenya, Tanzania,
21  October 2000 bombing of the U.S.S. Cole in
22  Yemen, the 2005 suicide bombings, July 2005
23  suicide bombings in London. There have been
24  various other attacks that I've been asked to
25  site who is the party deemed responsible for

Page 247

1        KOHLMANN
2  those attacks.  That can come up fairly
3  frequently in the context of testimony.  I
4  don't know if I'm proffered or tendered in
5  that regard, but I have certainly testified
6  as to that.
7  Q.  I want to be clear here.  I'm
8  not -- you said the party deemed responsible.
9  I'm not so much asking if you have ever been
10  asked on the stand who have authorities
11  determined was responsible for an attack, I'm
12  asking have you ever been asked to or have
13  you ever been permitted by a court to give
14  expert opinion as to who in your opinion was
15  responsible for committing a terrorist
16  attack?
17  A.  My opinion and what authorities
18  have determined are indistinguishable in a
19  lot of cases like for instance the September
20  11th terrorist attacks. I'm being asked for
21  my opinion based upon the evidence that I
22  studied, but certainly one factor in my
23  opinion is that the U.S. government has
24  concluded and provided evidence showing that
25  certain individuals have been responsible for

Page 248

1        KOHLMANN
2  that, but again, I'm not called up to ask
3  whether the U.S. government has determined
4  responsibility, I'm called to ask who in my
5  view based on the evidence I've reviewed was
6  responsible for carrying out an act and
7  certainly one factor in that would be the
8  U.S. government has made the judgment that
9  yes.
10  Q.  In giving your opinion as to
11  who was responsible for September 11th, did
12  you look at evidence beyond what was on the
13  internet?
14  A.  I focused on -- well, I mean
15  the primary focus of my research is
16  electronic research so I cited al-Qaeda
17  propaganda, I cited statements by Osama Bin
18  Laden, I cited statements by other senior
19  al-Qaeda leaders. I studied video recordings
20  by the 19 hijackers, but much of that
21  material was taken from electronic sources if
22  not the internet then it was taken from VCDs
23  that I purchased abroad.  In one form or
24  another it was electronic evidence.
25  Q.  My question is did you look at

MOSES STRAUSS VS.
CREDIT LYONNAIS, S.A.

EVAN KOHLMANN
December 2, 2010

Page 249

KOHLMANN

1    KOHLMANN
2    evidence other than what was posted on the
3    internet?
4    A.   Perhaps occasionally, but not
5    uniformly.  Very frequently when I'm
6    referring to the culpability of a given act,
7    it's for me especially given the kind of
8    research I do it's more appropriate for me to
9    refer to the research that I have done
10   directly or the evidence that I have
11   encountered directly.  In this case based upon
12   the kind of research that I do if I was to
13   try to prove that al-Qaeda was behind 9-11, I
14   would be more inclined to site 9-11 hijacker
15   Wills, in other words, video recordings of
16   hijackers and the statements they make verses
17   any kind of overarching conclusion by any
18   government which I don't have any necessary
19   insight into.
20   Q.   How about for the U.S.S. Cole,
21   did you look at any evidence that was not on
22   the internet in connection with offering the
23   opinion of who was responsible?
24   A.   Again, there is no doubt that
25   documents like the 9-11 Commission Report

Page 250

1    KOHLMANN
2    played some role in having a concept of this,
3    but based on the kind of research that I
4    conduct the primary sources that I would use
5    if I was asked to produce an expert report in
6    that regard would be original documents
7    released by al-Qaeda, original statements
8    released by Osama Bin Laden and the means by
9    which you obtain that material is
10   electronically.
11   Q.   You've also testified in
12   certain foreign matters, correct?
13   A.   Yes.
14   Q.   You testified in the matter of
15   Prosecutor for Serious Economic Crimes via
16   al-Aqsa Association?
17   A.   Correct, I did.
18   Q.   In that you gave testimony with
19   regard to Hamas, correct?
20   A.   That's correct, I did.
21   Q.   For any of your other
22   international legal cases, was the subject
23   for which you were proffered as an expert the
24   subject of Hamas?
25   A.   Well, proffered as an expert or

Page 251

1    KOHLMANN
2    as a fact witness?
3    Q.   Start with expert?
4    A.   As an expert, give me one
5    moment.  I think the answer is I'm not sure
6    because there's at least one case here where
7    I believe I did testify about Hamas, I don't
8    know in which way I was proffered as an
9    expert. That case would be HMA v Mohammed
10   Atif Siddique.  In that case the individual
11   had Hamas video recordings and other Hamas
12   propaganda materials on his computer and I
13   did identify those as part of my expert
14   report and I believe I also was asked about
15   them in court, but forgive me, I'm not very
16   familiar with the Scottish legal system never
17   mind the American legal system so I don't
18   know in which way they proffered me, but I
19   believe that those would be -- the primary
20   case would probably be the al-Aqsa
21   Association, but there was discussion and
22   yeah, there was discussion in at least that
23   one case if not other cases.
24   Q.   You can't recall any other of
25   the foreign cases where you were proffered as

Page 252

1    KOHLMANN
2    an expert on Hamas?
3    A.   Again, I would just say my
4    familiarity with foreign legal jurisdictions
5    and rules are basically non-existent.  I was
6    not involved in the process of me being
7    submitted as an expert other than to submit a
8    copy of my CV and what not.  I was not
9    involved in the legal strategy.  I have no
10   clue offhand what they may or may not have
11   told the judge and what they intended to
12   offer me as a witness. I know what I did
13   testify about, but I couldn't tell you.  I
14   don't know.
15   Q.   In Prosecutor for Serious
16   Economic Crimes verse al-Aqsa Association you
17   told the court that you gave evidence on the
18   organization of Hamas in a case in New York.
19   Which case were you referring to?
20   A.   I believe I was referring to
21   the Rafiqsabir case I believe which is one of
22   the cases where I believe Hamas was not a
23   principal subject, but one of the subjects I
24   was specifically asked to testify about. In
25   fact, I believe in the Rafiqsabir case I was

MOSES STRAUSS VS.
CREDIT LYONNAIS, S.A.

EVAN KOHLMANN
December 2, 2010

Page 253

```
 1      KOHLMANN
 2  proffered as an expert on Hamas as well as
 3  al-Qaeda.
 4      MR. LUFT: I'm going to ask the
 5  court reporter to mark as Exhibit 7 a
 6  copy of your trial testimony in the
 7  United States of America v Rafiqsabir.
 8      (Kohlmann Exhibit 7,
 9  Document, marked for Identification.)
10  Q.  Do you recognize this document,
11  Mr. Kohlmann?
12  A.  Yes, I do.
13  Q.  Again, I have looked through
14  this document and I found no mention of Hamas
15  anywhere in your testimony.  Could you please
16  tell me if I'm mistaken?
17  A.  I'd have to review the whole
18  thing.  I want me to read all 200 pages right
19  now?
20  Q.  I want to see if it refreshes
21  your recollection as to whether you actually
22  testified about Hamas?
23  A.  I know that in several of the
24  cases in the Southern District I had
25  testified about Hamas as an ancillary matter
```

Page 254

```
 1      KOHLMANN
 2  and I had been proffered as an expert on
 3  Hamas. I believe I thought it was the
 4  Rafiqsabir case based on the timing of the
 5  al-Aqsa Foundation case, but I'm not really
 6  sure.  It could be one of the other cases I
 7  did in the Southern District of New York.  I
 8  don't really recall.
 9  Q.  So this might not have been the
10  case?
11  A.  I believe it was based upon the
12  timing, but I would need to go through this
13  myself in order to determine whether or not
14  this is in fact was the one. I can also
15  check with the U.S. Attorney's Office in the
16  Southern District, but I don't know if they
17  have records of that or not.  I have to go
18  back and look, but again, in several cases
19  that I testified in the Southern District of
20  New York Hamas was an ancillary matter, it
21  was not the principal subject at issue, but
22  it was enough of an issue when I was
23  proffered as an expert it was specifically --
24  in the proffer it was specifically stated
25  that I would offer testimony about Hamas.
```

Page 255

```
 1      KOHLMANN
 2  One of those cases is the Osama Kasir case,
 3  but I believe based on the timing if I'm
 4  correct about this that it's not possible I
 5  was referring to the Kasir case in the
 6  context of what I was describing in al-Aqsa
 7  Foundation because Kasir came afterwards.
 8  Q.  Mr. Kohlmann, if I told you
 9  that I read the Osama Kasir case and I also
10  found no mention of Hamas anywhere in that,
11  would that refresh your recollection that
12  that --
13  A.  I have to double check that
14  because I'm almost positive there was
15  discussion of Hamas and Hezbollah in that
16  case.  I can check also my expert report
17  because my expert reports for these cases
18  there if I was specifically proffered as an
19  expert there would be a section about Hamas
20  in my expert report.
21  Q.  I welcome you to go back and
22  look at your testimony.  I didn't find any
23  mention of Hamas in that case either so if
24  you find it, let me know otherwise the record
25  is what it is, but I wanted to refresh your
```

Page 256

```
 1      KOHLMANN
 2  recollection if in fact --
 3  A.  I have been retained by the
 4  U.S. Attorney's Office. I think the most
 5  accurate way of saying this is that I have
 6  been retained by the U.S. Attorney's Office
 7  in the Southern District of New York in a
 8  number of cases. There's been at least two
 9  cases in which one of the specific subjects
10  in there has been to identify what is Hamas.
11  It's possible that one of the cases I'm
12  thinking of didn't end up going to trial, for
13  instance, the Ishtari case ended up being
14  pled out within like 24 hours before I was
15  supposed to testify so it's possible I'm
16  confused on that, but I can tell you for
17  certain there were at least two cases in
18  which I was retained by the U.S. Attorney's
19  Office in the Southern District and
20  specifically proffered as a witness who was
21  going to talk about among other things what
22  is Hamas.
23  Q.  Mr. Kohlmann, if you can recall
24  what those cases were based on -- tell you
25  this to maybe refresh your recollection based
```

MOSES STRAUSS VS.
CREDIT LYONNAIS, S.A.

EVAN KOHLMANN
December 2, 2010

Page 261

1    KOHLMANN
2  Q.  In what matters is that?
3  A.  I think in many cases the
4  testimony has been constrained in some way or
5  another.  I can give you examples.  I don't
6  know if I can recite to you offhand every
7  single time where something has been
8  restricted.  I can give you examples.
9  Q.  I don't think that's necessary
10  at this point.  Do you recall that the
11  testimony you mention in your report the
12  Paracha case?
13  A.  Yes.
14  Q.  Do you recall that that was one
15  of the places where the testimony you were
16  allowed to give was limited by the court?
17  A.  That's correct.
18  Q.  You also mentioned the Abu
19  Jihad case?
20  A.  That's correct.
21  Q.  Do you recall that was another
22  place where the court limited the testimony
23  you were permitted to give?
24  A.  I believe that's correct.
25  Q.  Have you ever been excluded by

Page 262

1    KOHLMANN
2  a court?
3  A.  I have been excluded by a court
4  on one occasion I believe.
5  Q.  Which one was that?
6  A.  That was U.S. v Ahmed Omar Abu
7  Ali, Eastern District of Virginia, 2005.
8  Q.  Do you recall why you were
9  excluded?
10  A.  The legal reason I was excluded
11  it was explained to me by the U.S. Attorney's
12  Office in the Eastern District was because of
13  the fact that they submitted by paperwork
14  late and the judge decided he would not
15  accept paperwork regardless of what it was.
16  I was never given a chance to present my
17  qualifications.  I never sat for a Daubert
18  hearing.  The application for expert witness
19  was rejected out of hand.
20  Q.  Your best understanding of why
21  you were excluded in that matter was because
22  of late paper work?
23  A.  Yes, that's my understanding,
24  yes.
25  Q.  You have been asked about being

Page 263

1    KOHLMANN
2  excluded in that matter in other cases in
3  which you testified, correct?
4  A.  That's correct.
5  Q.  Abu Jihad you were asked about
6  it?
7  A.  I believe so, yes.
8  Q.  In the Syeed Haraz Amed case?
9  A.  Yes.
10  Q.  In the Mohammed Amawe case?
11  A.  Correct.
12  Q.  You were asked about it by
13  defense counsel, correct?
14  A.  I believe so, yes.
15  Q.  In each of those instances did
16  they ever show you the court's reasoning for
17  why you were excluded?
18  A.  No, they showed me a transcript
19  of remarks made by the judge, but they did
20  not show me the reasoning for which my
21  testimony was specifically excluded, no.  My
22  understanding was that the exact reasoning
23  was confusing however again according to what
24  I was told by the Eastern District of
25  Virginia was the reasoning was the paperwork

Page 264

1    KOHLMANN
2  was submitted late and since I never got a
3  chance to present my credentials, there was
4  no Daubert hearing, that's my best guess.
5    MR. LUFT:  Could you mark this
6  as Exhibit 8, Kohlmann Exhibit 8, it's
7  an Order from the United States
8  District Court for the Eastern
9  District of Virginia, Alexandria
10  Division, in the United States v Ahmed
11  Omar Abu Ali dated 10/28/05.
12    (Kohlmann Exhibit 8,
13  Order, marked for Identification.)
14  Q.  Mr. Kohlmann, have you ever
15  seen this document before?
16  A.  Not that I recall.
17  Q.  Do you see -- do you recognize
18  this as an Order from Judge Lee of the United
19  States District Court for the Eastern
20  District of Virginia?
21  A.  Yes.
22  Q.  Do you see it says this matter
23  is before the court on defendant Ahmed Omar
24  Abu Ali's motion in limine regarding the
25  testimony of Evan Kohlmann as an expert

MOSES STRAUSS VS.
CREDIT LYONNAIS, S.A.

EVAN KOHLMANN
December 2, 2010

Page 265

KOHLMANN

2  witness docket number 280?
3  A.  Yes.
4  Q.  For the reasons stated in open
5  court on Friday, October 28, 2005 it's hereby
6  ordered that defendant Ahmed Omar Abu Ali's
7  motion in limine regarding the testimony of
8  Evan Kohlmann as an expert witness is
9  granted. Evan Kohlmann will not be permitted
10  to testify as an expert witness during the
11  trial in this case.  You see that?
12  A.  Yes.
13      MR. LUFT: I'm now going to
14  show you what I think you will agree
15  with me is a copy of the transcript
16  for what was said in open court on
17  Friday, October 28, 2005 by the judge
18  and ask that this be marked as
19  Kohlmann Exhibit 9.
20      (Kohlmann Exhibit 9,
21  Transcript, marked for
22  Identification.)
23  Q.  Mr. Kohlmann, have you ever
24  seen this document before?
25  A.  I believe I have seen excerpts

Page 266

KOHLMANN

2  from it.
3  Q.  Which excerpts do you recall
4  seeing?
5  A.  I don't recall.  I recall
6  seeing excerpts from the document.  I don't
7  remember exactly what page numbers they were.
8  Q.  Mr. Kohlmann, I invite you to
9  look through this document, but in particular
10  I would ask you to start looking --
11  specifically first direct you to page 24.
12  You see starting on line 6 -- I ask you to
13  look starting on page 24 and carrying over
14  all the way to the end, do you see that this
15  is a hearing in which you have been proffered
16  as an expert by the government and the court
17  here lists out its reasons why it's excluding
18  you as an expert?
19  A.  Yes, I'm familiar with this.
20  Q.  Nowhere in the court's
21  reasoning does he say he's excluding you
22  because your paperwork was submitted late,
23  does it?
24  A.  Not in here it doesn't.
25  Q.  This is what the court

Page 267

KOHLMANN

2  referenced in its order as the grounds upon
3  which he was excluding you, right, you see
4  that in Exhibit 8?
5  A.  Yes.
6  Q.  So is it fair to say that it's
7  now your understanding that the reason you
8  were excluded in the Abu Ali case was not as
9  represented to you by the U.S. Attorney's
10  Office in the Eastern District of Virginia
11  because of late paperwork, but in fact
12  because the court made a determination as to
13  your qualifications and found them lacking?
14      MR. GLATTER: Objection to
15  form.
16  A.  Number one, my qualifications
17  listed on here is incorrect, but setting that
18  aside for a second, what you are asking do I
19  think the Eastern District of Virginia -- the
20  U.S. Attorney's Office for the Eastern
21  District of Virginia lied to me?
22  Q.  No, I'm not asking if you think
23  they lied to you?
24  A.  I don't know. I'm telling you
25  what was proffered to me on multiple

Page 268

KOHLMANN

2  occasions by assistant U.S. attorneys,
3  multiple U.S. attorneys in the Eastern
4  District of Virginia.  Whether or not this is
5  in contradiction with that or there's
6  something in here that's missing, I don't
7  know.  I'm just telling you what I have been
8  told.
9  Q.  Mr. Kohlmann, the next time you
10  are under oath at trial and someone asks you
11  the grounds upon which you were excluded from
12  testifying in the Abu Ali case, are you going
13  to testify that's because your paperwork was
14  submitted late?
15      MR. GLATTER: Objection to
16  form.
17  Q.  Having now seen Exhibits 8 and
18  9?
19      MR. GLATTER: Same objection,
20  calls for speculation.
21  A.  I have no idea what I'll say in
22  the future.  I can tell you though that very
23  likely I will state once again that I have
24  been told by attorneys at the U.S. Attorney's
25  Office for the Eastern District of Virginia

MOSES STRAUSS VS.
CREDIT LYONNAIS, S.A.

EVAN KOHLMANN
December 2, 2010

Page 269

KOHLMANN

2 that the reason why the judge did not accept
3 my testimony was because the paperwork was
4 proffered late.  Whether or not there were
5 other reasons is possible, but this is what
6 was explained to me by the attorneys that I
7 was doing work with so while I understand
8 what you're saying what's in the transcript
9 --
10 Q.   And the Order?
11 A.   I understand, but since there's
12 other things in the transcript which are
13 factually incorrect, I would be reticent
14 unnecessarily relying on this as an absolute
15 record.
16 Q.   I'm confused. Do you believe
17 that this is not what Judge Lee said?
18 A.   I don't know because there are
19 mistakes -- there are things in here that
20 according to this transcript Judge Lee said
21 which are inaccurate and which would have
22 been inaccurate as reflected by the paperwork
23 that was given by the U.S. Attorney's Office
24 to Judge Lee so in that context I don't know.
25 I don't know.  There are factual mistakes

Page 270

KOHLMANN

2 here. I don't know.  As far as I understand
3 it, again, what I've been told by the U.S.
4 Attorney's Office for the Eastern District of
5 Virginia is that one of the primary reasons
6 was that the paperwork was submitted late.
7 Whether or not that was contingent upon why
8 we didn't end up having a Daubert hearing, I
9 don't know. I don't know. But I was not
10 present. I never presented my credentials,
11 there was no Daubert hearing so I don't know.
12 Q.   Mr. Kohlmann, I welcome you to
13 look through Exhibit 9.  I think you will see
14 that the U.S. attorney made a proffer of your
15 credentials to the court. I believe you can
16 see that on pages 10, 11 going on page 12, do
17 you see that?
18 A.   Yes.
19 Q.   Do you see there is a colloquy
20 where the court is responding to their
21 proffer?
22     MR. GLATTER: Where are you
23 looking?
24     MR. LUFT: 10, 11, 12, it keeps
25 going.

Page 271

KOHLMANN

2 A.   Yes.
3 Q.   Mr. Kohlmann, putting away what
4 you may answer in the future, sitting under
5 oath today, when I ask you having you now being
6 aware of Exhibit 8 and 9 and the Order upon
7 which you were excluded from testifying in
8 the Abu Ali case, is it your understanding
9 that the reason you were excluded from
10 testifying was not because your paperwork was
11 submitted late?
12 A.   I can't say that's the case.
13     MR. GLATTER: Object to the
14 form.
15 A.   I can't say that's the case
16 because that would counter what I was told by
17 the U.S. Attorney's Office so if I said that
18 to you, I would be lying to you.
19 Q.   I'm not asking you what the
20 U.S. attorney told you. I'm asking now after
21 having had the opportunity as someone who
22 went to law school to read the Order and the
23 transcript which the Order sites to as the
24 reasons for your exclusion and acknowledging
25 that it says nowhere in there anything about

Page 272

KOHLMANN

2 it being due to the fact that your paperwork
3 was late, I'm asking if you are asked the
4 question as to the reason were excluded, is
5 it your testimony that you now understand
6 that you were not excluded because -- by
7 Judge Lee because you submitted your
8 paperwork late?
9     MR. GLATTER: Objection to
10 form.  Just for clarification, are you
11 asking him if he understands --
12     MR. LUFT: He understands the
13 question.
14     MR. GLATTER: I honestly don't
15 understand the question.  Are you
16 asking him if he understands what it
17 says in Exhibit 9?
18 Q.   You can answer.
19     MR. GLATTER: Object to the
20 extent the question has been asked
21 multiple times and asked and answered.
22 You can answer if you understand the
23 question.
24 A.   I can only give you one answer
25 which is that I can only state the knowledge

MOSES STRAUSS VS.
CREDIT LYONNAIS, S.A.

EVAN KOHLMANN
December 2, 2010

**Page 273**

KOHLMANN

1
2  of which I'm familiar with.  I'm not a
3  lawyer.  I'm not trained in reading legal
4  documents.  I can tell you that I received
5  multiple affirmations in person from multiple
6  U.S. attorneys from the Eastern District of
7  Virginia.  They have told me very specific
8  facts about this.  If I'm asked under oath
9  what I was told by the U.S. Attorney's Office
10  as per -- let me finish -- as per why my
11  testimony was not allowed, I will once again
12  under oath state the reasons for which I was
13  told.  This -- I don't know what this says.
14  I'm not a legal expert and I'm not in a
15  position to say whether or not what the
16  Eastern District of Virginia told me is
17  either consonant, counter or irrelevant in
18  comparison to this document.  I'm not a
19  lawyer so that's not -- if I'm asked, I'm
20  going to cite exactly what my knowledge is
21  and that's what my knowledge is.
22      MR. LUFT: I'll move to strike
23  your answer because I did not ask you
24  what U.S. attorneys in the Eastern
25  District of Virginia asked you.

**Page 274**

KOHLMANN

1
2  Q.  I asked you having seen Exhibit
3  8 and 9, is it now your understanding that
4  the reason you were excluded from testifying
5  in the Abu Ali case was not because your
6  paperwork was submitted late, but rather
7  because the court found your qualifications
8  lacking to accept you as an expert?
9      MR. GLATTER: Objection, asked
10  and answered.
11  A.  I would repeat the same answer
12  which is I'm not a lawyer and I'm not in a
13  position to make legal judgments. All I could
14  tell you is exactly the instructions that
15  were given to me by the legal counsel for
16  which I was hired in which I performed
17  services and I'm giving you under oath the
18  exact explanation that they gave to me.
19  That's the only answer that I can give.  If
20  someone has questions specifically on this
21  document, I'm happy to address them, but
22  since there are factual errors in here, it's
23  very difficult for me to understand why I
24  should just ignore what the Eastern District
25  of Virginia told me in regards to this case

**Page 275**

KOHLMANN

1
2  especially since they didn't provide me a
3  copy of this.
4  Q.  Did you ask for one?
5  A.  No, I didn't for a copy of
6  this.  I'm not a lawyer.
7  Q.  Mr. Kohlmann, in your report
8  you specifically cite what courts have said
9  about your qualifications, correct?
10  A.  I have specifically cited
11  Daubert hearings, the results of Daubert
12  hearings in which my qualifications have been
13  presented with me being there in front of the
14  court, but I don't cite assessments of my
15  work positive negative or indifferent from
16  individuals who have never actually seen me
17  present or I have not been present in court
18  to actually witness the proceedings.
19  Q.  Do you think Judge Lee was not
20  qualified to make a decision about your
21  qualifications because he didn't get to meet
22  you?
23      MR. GLATTER: Objection to
24  form.
25  A.  There was no Daubert hearing.

**Page 276**

KOHLMANN

1
2  Without a formal Daubert hearing, it's
3  difficult for a judge to make the judgment,
4  but in this case once again I'm not a lawyer,
5  I can't make that legal judgment. I'm not in
6  the business of deciding what the legal
7  standards are for testimony to be admitted in
8  court.  It's irrelevant.
9  Q.  When you cited what judges have
10  said about you in Daubert hearings given that
11  you are not a lawyer, however did you
12  understand what they were saying about you?
13  A.  It was quite simple, they
14  talked specifically about specific aspects of
15  the Daubert hearings that I had engaged in.
16  Q.  And in Exhibit 9 Judge Lee
17  specifically talks about the qualifications
18  as offered to him by the assistant U.S.
19  attorneys of the Eastern District of Virginia
20  and comes to the conclusions that they are
21  lacking, correct?
22  A.  I already responded to these
23  questions.  I could keep going if you'd like,
24  but I'm going to give you the same response
25  again.

MOSES STRAUSS VS.
CREDIT LYONNAIS, S.A.

EVAN KOHLMANN
December 2, 2010

**Page 277**

KOHLMANN

2 Q.  I just want the answer to my
3 question though.
4 A.   My response once again --
5 Q.  I don't want to know what the
6 Eastern District told you.
7 A.  I can only keep answering --
8     MR. GLATTER: Let him ask his
9 question.
10 Q.  Mr. Kohlmann, do you understand
11 that Exhibit 8 is an Order from the court?
12 A.  I do understand that, yes.
13 Q.  Do you understand it sets forth
14 the basis that the reason upon which the
15 court excluded you?
16 A.   It doesn't actually state the
17 reason in the Order.  It states upon
18 discussion that took place in the court.
19 Since I was not present for the court and
20 this is the first time I read the full
21 transcript, I really have to go on the
22 affirmations that were given to me by
23 attorneys for the Eastern District of
24 Virginia.
25 Q.   You've read the transcript,

**Page 278**

KOHLMANN

2 correct?
3 A.  I have not read the transcript
4 up until ten minutes ago and I don't believe
5 I had enough of a chance to read through the
6 whole thing not to mention again that once
7 again there's been contradictory explanations
8 given to me.  I would need to first of all
9 discuss this with lawyers from the Eastern
10 District of Virginia and understand what
11 their expression is after reading this.  I
12 don't know.  The only thing I've had so far
13 is affirmations that you have given me.  I
14 would have to ask the lawyers first of all
15 who were working on the case.
16 Q.  Mr. Kohlmann, I have given you
17 no affirmation.  I have given you documents
18 from the court to look at, correct?
19 A.  That is true, yes.
20 Q.  Documents that the attorneys in
21 the Eastern District did not give you?
22 A.  That's correct.
23 Q.  Mr. Kohlmann, I'll just ask you
24 one more question about this. The next time
25 you are asked why you were excluded in the

**Page 279**

KOHLMANN

2 Abu Ali case, are you going to testify
3 because it was late or are you at least going
4 to acknowledge you read a court Order that
5 refers to a transcript which says you are
6 unqualified?
7     MR. GLATTER: Can I see that
8 question.  You can answer the
9 question. I object.
10 Q.  Next time you are asked the
11 question I mean under oath?
12 A.   Under oath --
13     MR. GLATTER: You can answer
14 the question. I object that the
15 question is -- to form, the question
16 is vague to the extent the question
17 seeks to characterize Exhibit 9.
18 Exhibit 9 speaks for itself and I
19 object to the extent the question has
20 been asked and answered before however
21 please answer Mr. Luft's question.
22 A.   Under oath I would state once
23 again that I was told by attorneys from the
24 Eastern District of Virginia who retained me
25 and who I was working with that one of the

**Page 280**

KOHLMANN

2 reasons or among the reasons that I was not
3 accepted as an expert was that the paperwork
4 was submitted late.  If someone presented me
5 with this document and asked me if I was
6 aware of its existence, I would say yes and I
7 would say there was some discussion of my
8 qualifications, but that does not discount
9 what I was told by the attorneys from the
10 Eastern District of Virginia so I would --
11 again I wouldn't lie. If they asked me I
12 would say yes, I'm familiar with it.
13 Q.   Only if they showed you this
14 document?
15     MR. GLATTER: Objection,
16 argumentative and misstates the
17 testimony.
18 Q.  I'm curious.  You said if they
19 asked you, you would tell them what the
20 Eastern District attorneys said and then you
21 said but if they show you this document, you
22 will acknowledge it?
23 A.  I stated if they asked me about
24 this particular document, I would acknowledge
25 having seen bits of it.  I would acknowledge

MOSES STRAUSS VS.
CREDIT LYONNAIS, S.A.

EVAN KOHLMANN
December 2, 2010

Page 281

KOHLMANN

1  having read parts of it and I would
2  acknowledge the comments made by the judge,
3  however, once again, I would state exactly
4  what I was told by the attorneys for the
5  Eastern District, the ones who retained me
6  and who were the ones I was working with.  I
7  was not working with the judge in this case,
8  I was working with the attorneys so I can
9  only go by their explanations.  The problem
10  with that you can ask them.
11  Q.  I have no problem with what the
12  judge ordered so my question is so if I
13  understand you right, your sworn testimony is
14  if you are asked what is your understanding
15  for the reasons you were excluded in the Abu
16  Ali case, you are just going to say that you
17  were told by the attorneys from the --
18  assistant U.S. attorneys from the Eastern
19  District that it was because of late
20  paperwork and you will make no mention of
21  Exhibit 8 and Exhibit 9 unless further
22  prompted by your questioner; is that correct?
23      MR. GLATTER: Objection,
24  misstates the testimony. Objection to
25

Page 282

KOHLMANN

1  form. You can answer it.
2  A.  It's not what I said. What I
3  said is that if somebody asks me I will
4  explain that the U.S. Attorney's Office
5  explained to me this.  If somebody asks me
6  about this particular document, I will
7  explain that I'm aware of the comments made
8  about my qualifications in the open record,
9  however, I'm not clear and I'm still unclear
10  as of the moment even after reading these
11  documents whether or not my qualifications in
12  particular were the issue by which -- the
13  Order just says for the reasons that were
14  discussed in open argument so again, I don't
15  know.  Wy response would be this is what I
16  was told.
17  Q.  Okay.
18  A.  That would be truthful.
19  Q.  Well, again, just to be clear,
20  you would not raise this document unless you
21  were separately asked about it?
22      MR. GLATTER: Objection to
23  form.
24  Q.  You would only mention what the
25

Page 283

KOHLMANN

1  U.S. attorney told you if you were just asked
2  the question what's your understanding of the
3  basis upon which you were excluded, you would
4  only say what the U.S. attorney told you and
5  not what you now know to exist in Exhibits 8
6  and 9?
7  A.  I don't know the providence of
8  this particular document.  I don't know how
9  this weighs into what I was already told by
10  the attorneys for the Eastern District.  Do
11  you understand what I'm saying?  I don't
12  know.  I'm not a lawyer.  If there is a legal
13  question, it cannot be to me.  It has to be
14  to the attorneys in the case.  My
15  understanding is as told to me by attorneys
16  from the Eastern District of Virginia that
17  one of the reasons the primary reason there
18  was no Daubert hearing was because of the
19  fact that my paperwork was submitted late.  I
20  don't know whether or not there are other
21  proximate reasons.  That was the reason given
22  tow me.  I'm not an expert in reading legal
23  documents and I'm not an expert in reading
24  legal decisions.  I'm certainly happy to
25

Page 284

KOHLMANN

1  discuss this, but this is not the explanation
2  that was given to me.
3  Q.  It's just the reasoning of the
4  judge, correct?
5  A.  I'm not a lawyer.  I'm not an
6  expert in reading legal documents and I don't
7  try to discern the meaning of legal documents
8  unless that meaning is explained to me.
9  Q.  Do you see Judge Lee's
10  signature on Exhibit 8?
11  A.  I don't know what his signature
12  looks like, but I'll assume that's correct,
13  yes.
14  Q.  Do you see Exhibit 9 as a
15  transcript from the court of the hearing?
16  A.  Yes.
17  Q.  Do you think it's more likely
18  than not true that what is stated in Exhibit
19  9 is what the judge said?
20  A.  I'm not a legal expert.  I'm
21  not going to comment on the providence of
22  particular legal documents about whether or
23  not they are fully accurate or whether or not
24  they are credible or authentic.  I can talk
25

MOSES STRAUSS VS.
CREDIT LYONNAIS, S.A.

EVAN KOHLMANN
December 2, 2010

Page 285

KOHLMANN

1  about terrorist websites no problem, but I'm
2  not a lawyer and I cannot authenticate legal
3  documents for you and I can not explain to
4  you legal decisions. All I can give to you
5  are the explanations offered to me as an
6  expert witness as a non lawyer.
7  Q.  So you give greater credence to
8  what Hamas says on its websites than what
9  Judge Lee in the transcript of his
10 proceedings, correct?
11      MR. GLATTER: Objection to
12 form, misstates the testimony.
13 A.  I didn't say that.
14      MR. GLATTER: Answer his
15 question.
16 A.  I didn't argue that.
17 Q.  That's the standard you said,
18 you said if Hamas makes a claim of
19 responsibility you think it's more likely
20 than not true that what they are saying is
21 accurate.  I handed you documents from the
22 courts of this country and you have told me
23 that you cannot find that it's more likely
24 than not true than what's in them is

Page 286

KOHLMANN

1  accurate, am I wrong about that?
2      MR. GLATTER: Objection to form
3  and we've been going on this now for
4  --
5      MR. LUFT: Let him answer my
6  question. No speaking objections.
7      MR. GLATTER: You are talking
8  past each other.
9      MR. LUFT: Josh.
10      MR. GLATTER: Objection to
11 form, vague and misstates the
12 testimony.  You may answer.
13 A.  My expertise is in al-Qaeda.
14 My expertise is in Hamas.  My expertise is in
15 the use of internet websites by al-Qaeda and
16 Hamas thus I'm in a position to interpret
17 original information and make analysis on
18 those particular topics and determine
19 authenticity and credibility.  I may have
20 gone to law school, but I have never worked
21 as a lawyer, I have only testified in courts
22 as either a witness or an expert witness.  I
23 deliberately attempted to separate myself
24 from the study of the law or of legal

Page 287

KOHLMANN

1  jurisdictions or legal rules because it has
2  nothing to do with what I do so my answer to
3  you is that as an expert in terrorist
4  organizations if you are asking me to
5  articulate or explain the meaning of
6  particular original documents, I can do that,
7  but when it comes to legal documents or what
8  not, lawyers are in a position to do that,
9  I'm not.  I can only give the affirmations
10 that have been given to me and I'm giving
11 them to you under oath.
12 Q.  Did you read any cases in law
13 school?
14 A.  I'm sure I did.
15 Q.  You're not certain?
16 A.  I'm sure I did as part of a
17 legal education, but --
18 Q.  In fact, you know you did?
19      MR. GLATTER: Objection,
20 argumentative.
21 Q.  Right?
22 A.  I have not been in law school
23 now in I would say about six years.  Any
24 discussions or any questioning about my

Page 288

KOHLMANN

1  knowledge of the law or about this has
2  nothing to do with my expertise here.  I
3  don't proffer myself as a legal expert.  I
4  don't proffer myself as anything other than a
5  law school graduate.  Most of my law school
6  work was done specifically on the area of
7  terrorism, counter terrorism and the legal
8  prescriptions on how to track terrorists, not
9  how to prosecute them. I'm not an expert in
10 the law.
11 Q.  Mr. Kohlmann, you did not take
12 a single course your first year of law school
13 relating to terrorism, did you?
14 A.  I believe I did.
15 Q.  Which class?
16 A.  I'd have to look at my
17 transcript, but I believe I did.
18 Q.  Mr. Kohlmann, in fact, you
19 testified in court that you only took two
20 classes in law school relating to terrorism,
21 haven't you?
22 A.  No, I haven't.  If I did,
23 that's a mistake by the court reporter.
24 Q.  In fact, you know for a fact

MOSES STRAUSS VS.
CREDIT LYONNAIS, S.A.

EVAN KOHLMANN
December 2, 2010

Page 289

1    KOHLMANN
2    that you read case law in law school,
3    correct?
4    A.   I may have read case law in law
5    school, but honestly law school was six years
6    ago.  I don't recall most of what happened
7    there.
8    Q.   You don't remember having case
9    books, the big heavy red ones?
10       MR. GLATTER: Objection, let's
11   try to keep the tone.
12       THE VIDEOGRAPHER: This is the
13   end of tape four.  The time is 5:54
14   p.m. on December 2, 2010.  We are now
15   off the record.
16       (Recess taken.)
17       THE VIDEOGRAPHER: This is tape
18   five of the deposition of Evan
19   Kohlmann.  Time is 6:10 p.m. on
20   December 2, 2010.  We are now back on
21   the record.  You may proceed.
22       MR. LUFT: Mr. Kohlmann, I'll
23   ask the court reporter to mark as
24   Exhibit 10 a copy of a transcript of
25   an evidentiary hearing before the

Page 290

1    KOHLMANN
2    Honorable Michael R. Hogan of the
3    United States District Court for the
4    District of Oregon, United States of
5    America v Pirouz Sedaghaty.
6        (Kohlmann Exhibit 10,
7    Transcript, marked for
8    Identification.)
9    Q.   Mr. Kohlmann, do you recognize
10   this document?
11   A.   I believe it's the transcript
12   of my Daubert hearing in the United States v
13   Pirouz Sedaghaty, et al.
14   Q.   Do you recall that hearing?
15   A.   Yes, I do.
16   Q.   Do you recall you were shown
17   your law school transcript at that hearing?
18   A.   Yes, I do.
19   Q.   Could you turn to page 39.  You
20   testified earlier that a majority of your law
21   school work was specifically done in the area
22   of terrorism and counter terrorism, correct?
23   A.   Large portion of it, yes.
24   Q.   You see on the bottom of page
25   39 it notes that in your first semester you

Page 291

1    KOHLMANN
2    took civil procedure, contract, torts,
3    property and legal writing?
4        MR. GLATTER: Objection,
5    misstates the document, but first
6    year, not first semester.
7    Q.   I think it's first semester
8    that he's referring to, correct?
9    A.   Correct.
10   Q.   That's what you took your first
11   semester?
12       MR. GLATTER: I see.
13   A.   I believe so, yes.
14   Q.   And then your second semester
15   it notes on page 39 going to 40 that you took
16   constitutional law, criminal law, legal
17   writing, American legal history and
18   administrative law?
19   A.   Correct.
20   Q.   In your second year, first
21   semester you took professional
22   responsibility, evidence for trial lawyers,
23   federal income tax, constitutional criminal
24   procedure and terrorism and democracy in the
25   first semester?

Page 292

1    KOHLMANN
2    A.   Correct.
3    Q.   And in your second semester on
4    the bottom of page 41 it notes that you took
5    copyright corporations, evidence for trial
6    lawyers, law and the Holocaust and topics in
7    defamation?
8    A.   Yes.
9    Q.   And then if you go to page 42
10   in your third semester it notes that you took
11   a course in death penalty and habeas corpus
12   and trial advocacy?
13   A.   Yes.
14   Q.   And that you took a course in
15   international human rights, an advance
16   criminal law course and a cyber crime
17   seminar?
18   A.   Correct.
19   Q.   Your last semester you took a
20   course in Afghanistan Islam, free speech,
21   trial advocacy, the First Amendment and
22   independent study?
23       MR. GLATTER: Objection to
24   form, Islamism?
25   A.   Correct, Afghanistan and

*MOSES STRAUSS, et al. VS.*
*CREDIT LYONNAIS, S.A.*

---

*EVAN KOHLMANN*
*December 3, 2010*

---



126 East 56th Street, Fifth Floor New York, New York 10022
PHONE: (212) 750-6434   FAX: (212) 750-1097
www.ELLENGRAUER.com

*Original File 95217.TXT*
*Min-U-Script® with Word Index*

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

EVAN KOHLMANN
December 3, 2010

Page 312

1       S T I P U L A T I O N S
2
3    IT IS HEREBY STIPULATED AND AGREED by
4    and between the attorneys for the respective
5    parties herein, that the filing, and sealing
6    of the within deposition be waived.
7    IT IS FURTHER STIPULATED AND AGREED
8    that all objections, except as to the form of
9    the question, shall be reserved to the time
10   of the trial.
11   IT IS FURTHER STIPULATED AND AGREED
12   that the within deposition may be sworn to
13   and signed before any officer authorized to
14   administer an oath with the same force and
15   effect as if signed and sworn to before the
16   Court.
17
18
19       -oOo-
20
21
22
23
24
25

Page 313

1       P R O C E E D I N G S
2       THE VIDEOGRAPHER: This is tape
3    one.  We are now on the record at 9:45
4    a.m. on Friday, December 3, 2010.
5    This is the continuation of the
6    deposition of Evan Kohlmann in the
7    matter of Moses Strauss verse Credit
8    Lyonnais.
9       This deposition is being held
10   at the offices of Cleary Gottlieb
11   Steen & Hamilton located at One
12   Liberty Plaza, 39th floor, New York,
13   New York 10004.
14      The court reporter is Shari
15   Cohen with Ellen Grauer Court
16   Reporting.  I'm the legal videographer
17   Nathaniel Armstrong also with Ellen
18   Grauer Court Reporting.
19      Will counsel please
20   reintroduce yourselves.
21      MR. GLATTER: Joshua Glatter,
22   Osen LLC for the plaintiffs joined by
23   my colleagues Ari Ungar and Naomi
24   Weinberg, also Osen LLC and Steven
25   Steinberg of Kohn Swift & Graf of

Page 314

1    Philadelphia.
2       MR. LUFT: Avram Luft of Cleary
3    Gottlieb Steen & Hamilton on behalf of
4    Credit Lyonnais.  With me is my
5    colleagues Brendon Gibbon, Jamie
6    Rietema, David Levy who's out of the
7    room at this moment, but will be
8    joining us shortly.
9       THE VIDEOGRAPHER: Witness is
10   still sworn in.
11   E V A N   K O H L M A N N, resumed as a
12   witness, having been previously sworn
13   by the Notary Public, was examined and
14   testified as follows:
15
16   EXAMINATION BY
17      MR. LUFT:
18   Q.   Good morning, Mr. Kohlmann.
19   A.   Good morning.
20   Q.   How are you?
21   A.   Very good.
22      MR. LUFT: I'll ask the court
23   reporter to mark as Exhibit 11 what I
24   believe you will tell me is a copy of
25   your trial transcript from the Chandia

Page 315

1       KOHLMANN
2    matter.
3       (Kohlmann Exhibit 11, Trial
4    Transcript, marked for
5    Identification.)
6    Q.   Mr. Kohlmann, I'll represent to
7    you there is no cover page, this is how it
8    was produced to us by the plaintiffs, but
9    it's my understanding that this is a copy of
10   your trial testimony in the Chandia case.  Do
11   you recall you mentioned this case to me
12   yesterday?
13   A.   I believe so, yes.
14   Q.   You mentioned it was a case
15   where you thought you were proffered as an
16   expert in Hamas?
17   A.   I believe I said I might have
18   been proffered, yes, correct.
19   Q.   If you take a look at the
20   document Bates stamped on the bottom Kohlmann
21   001608, bottom right hand corner of the page,
22   you will see starting at line 14, do you see
23   what appears to be -- do you know who Mr.
24   Laufman is?
25   A.   Yes, he was a former assistant

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

EVAN KOHLMANN
December 3, 2010

---

Page 316

KOHLMANN
2  U.S. attorney in the Eastern District of
3  Virginia.
4  Q.  Do you see where he is offering
5  his proffer of you to the court?
6  A.  Yes, I do.
7  Q.  Do you see he does not proffer
8  you as an expert in Hamas?
9  A.  That's correct.
10  MR. GLATTER: Objection to
11  form.
12  Q.  You can put that aside.
13  MR. LUFT: I'm going to ask the
14  court reporter to mark as Exhibit 12 a
15  copy of the Daubert hearing from
16  yourself from the United States of
17  America v Hassan Abujihad.
18  (Kohlmann Exhibit 12, Daubert
19  Hearing, marked for Identification.)
20  Q.  Do you recall this hearing, Mr.
21  Kohlmann?
22  A.  Vaguely.  It's been a few
23  years.
24  Q.  Do you recall that you
25  indicated to me yesterday that you thought

---

Page 317

KOHLMANN
2  this may have been a hearing where you were
3  qualified as an expert in Hamas?
4  A.  I think once again I said it
5  might have been, but I don't think I was sure
6  about that.  I'm still not.
7  Q.  If you could take a look at
8  pages Kohlmann 47 through 49, you will see
9  some statements by the court and Ms.
10  Collins?
11  A.  Yeah, I believe that's the
12  assistant U.S. attorney, Alexis Collins.
13  Q.  Tell me if in looking at pages
14  47 to 49 it appears that Ms. Collins is
15  offering her explanation to the court as to
16  what you will be testifying as an expert in?
17  A.  Yes, I'm familiar with this
18  now.
19  Q.  Do you see that she does not
20  say that you will be testifying as an expert
21  in Hamas?
22  A.  I don't see it stated here, no.
23  Q.  You could put that aside.
24  MR. LUFT: I'll ask the court
25  reporter to mark as Exhibit 13 a copy

---

Page 318

KOHLMANN
2  of your trial testimony in United
3  States of America v Schnewer.
4  (Kohlmann Exhibit 13, Trial
5  Transcript, marked for
6  Identification.)
7  Q.  Do you recall this matter?
8  A.  Once again it's been a little
9  bit of time, but I do recall testifying in
10  this matter, yes.
11  Q.  Who is Mr. Fitzpatrick?
12  A.  He's the assistant U.S.
13  attorney, Bill Fitzpatrick.
14  Q.  I will direct your attention to
15  the page Kohlmann 003638 and do you recall
16  yesterday you mentioned that this may have
17  been a matter in which you were proffered as
18  an expert in Hamas?
19  A.  I believe I said it might be,
20  yes.
21  Q.  Do you see on the top left hand
22  corner line 1 of page 5829 of the transcript
23  Mr. Fitzpatrick offers his proffer to the
24  court of you as an expert?
25  MR. GLATTER: Objection to

---

Page 319

KOHLMANN
2  form.
3  A.  Yes.
4  Q.  Do you see he does not tender
5  you as an expert in Hamas?
6  MR. GLATTER: Objection to
7  form.
8  A.  That's correct, he does not.
9  Not specifically anyway.
10  Q.  Do you think he meant to do it
11  generally?
12  MR. GLATTER: Objection to
13  form.
14  A.  My expert report contained
15  material about Hamas.  He did proffer me as
16  an expert in the field of Islamic terrorism
17  and I think by that he meant to cover not
18  just al-Qaeda, but other groups as well.  I
19  think that was the purpose for why he didn't
20  say al-Qaeda per say, but he obviously does
21  not say Hamas specifically.
22  Q.  Mr. Kohlmann, if it will
23  refresh your recollection, you are welcome to
24  look through your trial transcript, but I see
25  no mention in your trial testimony of the

---

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

EVAN KOHLMANN
December 3, 2010

Page 320

KOHLMANN

1  KOHLMANN
2  word Hamas?
3  A.  I don't know if there is.  I'm
4  just saying that in my expert report there
5  was material about Hamas and I believe that
6  the reason that they use the descriptor in
7  the field of Islamic terrorism verses
8  al-Qaeda was in order to cover groups that do
9  not include necessarily al-Qaeda or al-Qaeda
10  affiliates, but I don't know if Hamas is
11  mentioned in here.
12  Q.  You may have given no trial
13  testimony about Hamas and he did not say you
14  were going to testify about Hamas?
15      MR. GLATTER: Objection to
16  form.
17  A.  I don't recall.
18      MR. LUFT: I'd like to mark the
19  court reporter to mark as Kohlmann
20  Exhibit 14 a copy of your trial
21  transcript United States of America v
22  Kassir.
23      (Kohlmann Exhibit 14, Trial
24  Transcript, marked for
25  Identification.)

Page 321

1  KOHLMANN
2  Q.  Do you recall testifying in
3  this matter?
4  A.  Yes, I do.
5  Q.  Who is Mr. Bruce?
6  A.  Mr. Rick Bruce is a former
7  assistant U.S. attorney for the Southern
8  District of New York.
9  Q.  Mr. Kohlmann, I'll direct your
10  attention to Kohlmann 001758.  Do you see
11  starting on line 6 through line 11 Mr. Bruce
12  tenders you to the court as an expert
13  witness?
14  A.  I'm sorry, did you say 1758?
15  Q.  Yes.
16      MR. GLATTER: Bates numbers.
17  A.  I'm looking at Bates numbers.
18  Okay, I got it.
19  Q.  It says Mr. Bruce, Your Honor,
20  at this point the government will tender Mr.
21  Kohlmann, do you see that?
22  A.  That's correct, yes.
23  Q.  Do you see that he does not
24  tender you as an expert in Hamas?
25  A.  Yes, I do.

Page 322

1  KOHLMANN
2  Q.  This was another matter in
3  which you testified yesterday you thought you
4  had been tendered as an expert in Hamas,
5  correct?
6  A.  That's correct, yes.
7  Q.  But you had not?
8      MR. GLATTER: Objection to
9  form.
10  A.  No, apparently I was not
11  tendered as, but I believe that was an issue
12  that was cut out towards the latter end of
13  the case.  It was part of my expert witness
14  report for this case.
15  Q.  Again, I welcome you to refresh
16  your recollection by looking at the
17  transcript, but I believe there's no mention
18  of Hamas in your trial testimony?
19      MR. GLATTER: Objection to
20  form.
21  A.  That's correct. I believe after
22  looking at the case again yet last night I
23  believe the issue was that Hamas and
24  Hezbollah issues were cut out at the last
25  minute.

Page 323

1  KOHLMANN
2  Q.  You could put that aside.  Mr.
3  Kohlmann, would you agree with me that a
4  claim of credit by a terrorist organization
5  is propaganda for that organization?
6  A.  It can be.  That's one purpose
7  that it serves.
8  Q.  Terrorist groups have various
9  motivations for making claims of credit,
10  correct?
11      MR. GLATTER: Objection to
12  form.
13  A.  That's correct.
14  Q.  Helps them with recruitment?
15  A.  Certainly.
16  Q.  Financing?
17  A.  Yes.
18  Q.  Inspire others to join them?
19  A.  Yes.
20  Q.  Inspire others to take action
21  similar to them?
22      MR. GLATTER: Objection to
23  form.
24  A.  It can.  That's not -- these
25  are all reasons why a group might issue a

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

EVAN KOHLMANN
December 3, 2010

Page 324

KOHLMANN

1  claim, but they are not always for every
2  single group because terrorist groups
3  obviously differ.
4  Q.  Agreed.  Terrorist groups
5  sometimes are in competition with one
6  another?
7  A.  Occasionally.
8  Q.  In the case of Palestinian
9  terrorist groups during the time of the
10 second intifada they in fact were in
11 competition with one another?
12     MR. GLATTER: Objection to the
13 extent as phrased the question is
14 beyond the scope of the expert report,
15 but you may answer.
16 A.  Sometimes.
17 Q.  Do you share Mr. Glatter's
18 concern that you don't have expertise on
19 these groups during the time of the second
20 intifada?
21 A.  It depends what you are asking.
22     MR. GLATTER: Objection to
23 form.  I think that's with all for
24 clarification it's a misstatement of

Page 325

KOHLMANN

1  my objection, but go ahead and ask
2  your next question.
3  Q.  On what would you not feel that
4  you have expertise with regard to Palestinian
5  terrorist groups during the second intifada?
6  A.  I don't know, but if you come
7  across a question I don't know the answer to,
8  I'll tell you I don't know the answer.
9  Q.  If you don't know the answer
10 then you don't have expertise, but if you do
11 know the answer then you do have expertise?
12     MR. GLATTER: Objection to form.
13 A.  If you want to ask me a
14 question, ask me a question.  I believe I'm
15 an expert on that particular area, but my
16 expertise is primarily on the use of the
17 internet by Hamas and other terrorist
18 organizations in the Palestinian territories.
19 If you have specific questions, please.
20 Q.  Terrific, okay.  In fact,
21 another motivation may be to earn the public
22 support, that's why they may make a claim of
23 credit?
24 A.  Could be.

Page 326

KOHLMANN

1  Q.  To get glory for the group,
2  praise?
3  A.  Could be.
4  Q.  In doing your expert work in
5  this case in considering the 15 attacks in
6  question, did you consider in your
7  methodology what motivated the claim and
8  accordingly how in your methodology did you
9  account for those motivations?
10     MR. GLATTER: Objection to
11 form, compound.
12 A.  I accounted for it generally,
13 but not specifically.  In other words, I
14 accounted for the general phenomenon of
15 Hamas, the various motivations that Hamas
16 uses in issuing general claims of
17 responsibility. I did not assess claim by
18 claim, because that's not what I was tasked
19 to do.
20 Q.  Explain to me what you mean by
21 generally?
22 A.  In order to do this analysis it
23 was my judgment after viewing Hamas claims of
24 responsibility that in the majority of cases

Page 327

KOHLMANN

1  Hamas was indicating a truthful claim of
2  responsibility, at least in part, that there
3  was indicia of culpability in more than half
4  of the communicas that I viewed. In that
5  regard, I believe it's more than likely if
6  Hamas issues a claim of responsibility that
7  it is a credible claim and that they indeed
8  did play some role in that, but I did not go
9  through claim by claim to assess in each
10 individual case what the factors were that
11 might have led Hamas to have been more
12 insistent about claiming credit for an
13 operation verses less insistent.  It simply
14 was not part of my tasking.
15 Q.  Let me ask you a couple of
16 questions with regard to that.  You said
17 there is indicia of culpability in more than
18 half of the communicas that you viewed?
19 A.  No, I said -- I should say it
20 more properly.  In a majority of the
21 communicas that I viewed there are indicia of
22 culpability, in other words, there is reason
23 to believe that what Hamas is saying -- at
24 least part of what Hamas is saying is indeed

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

EVAN KOHLMANN
December 3, 2010

---

Page 328

KOHLMANN

1
2  accurate.  In that case, I believe it's more
3  than likely if Hamas then claims credit for
4  an attack that they are then in some way
5  culpable for that attack.
6  Q.   Do you indicate in your report
7  which of the communicas you believe have
8  indicia of culpability and which do not?
9  A.   I think in this matter all of
10  them do.  When I say the majority, I'm not
11  talking the majority in this case.  I'm
12  saying the majority over time after
13  reviewing, that's why I'm saying generally.
14  Generally from reviewing statements put out
15  by Hamas via their Glory Record, on their
16  website and their communicas published on
17  their website it's been my observation over
18  time that in the majority of cases there's
19  reason to believe that at least part of what
20  Hamas is saying is credible thus it's my
21  estimation that in this case it's more likely
22  than not that the communicas are put out
23  there at least in part because the
24  information is correct.  I don't make
25  judgments at least in this matter, in this

---

Page 329

KOHLMANN

1
2  report as to the individual motivations for
3  Hamas releasing an individual communica for
4  an individual attack.
5  Q.   In assessing the reliability of
6  a communica though, don't you need to
7  consider what the motivations might have been
8  for making it?
9      MR. GLATTER: Objection to
10  form.
11  A.   That could be one thing to
12  evaluate, but I did-- like I said I evaluated
13  that in a general way as per Hamas generally.
14  I did not evaluate each attack individually.
15  Q.   For the work you did for this
16  report you didn't consider the motivations?
17      MR. GLATTER: Objection to
18  form.
19  A.   I think I'll repeat what I just
20  said which is I did consider it generally
21  speaking, I didn't consider it for each
22  individual attack.  In other words,
23  considered what Hamas' motivation were
24  generally speaking for issuing claims of
25  responsibility, video recordings, audio

---

Page 330

KOHLMANN

1
2  recordings and the Glory Record which is
3  titled the Glory Record which gives you some
4  idea of what the purpose is, but I was
5  looking at it generally, not in individual
6  cases.
7  Q.   What I'm saying is for the
8  purpose of this report when you were asked to
9  look at the 15 attacks in assessing the
10  credibility of the evidence you were looking
11  at for those 15 attacks, did your methodology
12  consider what motivations Hamas may have had
13  for making that claim?
14      MR. GLATTER: Objection to
15  form.
16  A.   The answer is yes, generally,
17  but not specific with each individual attack.
18  In other words, I considered those factors
19  generally when considering the body of
20  attacks.  I did not consider the individual
21  factors behind individual attacks.
22  Q.   How did you take into
23  consideration Hamas' motivations for making a
24  claim in doing your analysis of the 15
25  attacks?

---

Page 331

KOHLMANN

1
2  A.   That's just a general -- these
3  are general lessons that you learn from
4  observing over time the development of the
5  websites and the communicas that are posted
6  on there.  It's the process by which you form
7  an expert opinion.  That's the basis for
8  which I was hired to do this was having
9  viewed the websites over time.
10  Q.   You mention that at least part
11  of what Hamas is saying is truthful.  How do
12  you determine when you look at a claim which
13  part is truthful and which part is not?
14  A.   The parts that corroborate with
15  established facts on the ground that are
16  undisputed.
17  Q.   What do you mean established
18  facts on the ground?
19  A.   If the United States state
20  department, if the Israeli government, if
21  other independent bodies all concur on a
22  particular set of facts or generally speaking
23  on one particular fact and that fact is
24  corroborated by what's in Hamas' statement
25  and there's no dispute that would generally

---

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

EVAN KOHLMANN
December 3, 2010

Page 332

1     KOHLMANN
2   indicate that as far as everyone in the group
3   is concerned there's at least part of this
4   which everyone is in agreement on.  Sometimes
5   there's a dispute, but like I said in the
6   majority of cases that I looked at, at least
7   a significant part of what Hamas is saying --
8   there may be parts they are exaggerating, but
9   at least the significant part of what they
10   are saying is agreed upon by all parties
11   involved and it's not in every case, but like
12   I said in the majority of cases I believe
13   that's the case.
14   Q.  Are you aware of the
15   substantial literature in the field which
16   discussions the notion of terrorists making
17   false claims of credit for attacks?
18       MR. GLATTER: Objection to form
19   and foundation.
20   A.  When you say terrorists, are
21   you referring to terrorists generally or
22   Hamas specifically?
23   Q.  I'll start with generally that
24   there's a phenomena of terrorists making
25   false claims of credits for attacks they did

Page 333

1     KOHLMANN
2   not commit?
3       MR. GLATTER: Same objection.
4   A.  I'm aware of literature that
5   speaks to that regard, but that's, yeah, I'm
6   aware generally of literature in that
7   respect, yes.
8   Q.  Do you have expertise such that
9   you could tell me whether you agree or not
10   with that as an expert?  If not, just tell
11   me?
12       MR. GLATTER: Objection to
13   form.
14   A.  I would just say that trying to
15   lump al terrorist organizations together in a
16   black box kind of way to say when they do or
17   when they don't claim credit or when their
18   communicas are valid or not is a very
19   dangerous and risky approach because
20   obviously even as we discussed already terrorist
21   groups even ones that are closely alined with
22   each other may be very, very different in
23   fact so it's very dangerous to say whether
24   terrorist groups i.e. generally do something.
25   I would prefer to look specifically to what

Page 334

1     KOHLMANN
2   each individual group does because each
3   individual group I think has a different
4   philosophy when it comes to this both in
5   terms of motivations for issuing claims of
6   responsibility and also in terms of
7   truthfulness in terms of the material they
8   present in the claims of responsibility.
9   Q.  Are you aware that Hamas has
10   made false claims of credit for attacks it
11   did not commit?
12       MR. GLATTER: Objection to
13   form.
14   A.  I'm aware that they've issued
15   claims of responsibility which have brought
16   into question.  I'm not entirely sure that
17   any Hamas communica has been 100 percent
18   proved false, not that I can recall -- not
19   any specific ones that I can recall offhand
20   anyway.  There are bits and pieces of
21   individual Hamas communicas which are
22   exaggerated and I believe there are bits and
23   pieces where there are details I think are
24   fudged, but I cannot think of a single Hamas
25   communica offhand anyway where definitively

Page 335

1     KOHLMANN
2   what the crux of what they are saying is 100
3   percent false and I should say this when I'm
4   saying this I'm referring to the material put
5   out on line through their websites, I'm not
6   referring to communicas issued outside of
7   their on line venues.
8   Q.  Why do you draw a distinction
9   between the two?
10   A.  Because my expertise with Hamas
11   communicas and Hamas propaganda is from the
12   material that has been released through their
13   websites.  I'm not immediately familiar with
14   the vast body that exists beyond the
15   electronic world.  As it happens there are
16   very specific reasons for that that material
17   put on the web I believe Hamas is
18   particularly sensitive to the idea of putting
19   out false information and that people might
20   read that and the negative implications that
21   would have on Hamas.
22   Q.  To the extent that Hamas makes
23   claims of credit by calling radio stations,
24   faxing letters, that's not something that you
25   are familiar with?

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

EVAN KOHLMANN
December 3, 2010

Page 340

```
 1      KOHLMANN
 2  is in these cases there was enough evidence
 3  to provide indicia of culpability that more
 4  likely than not they were in some way
 5  culpable.  I cannot say though that there are
 6  facts they didn't exaggerate.
 7  Q.  In deciding the facts were more
 8  likely or not you indicated culpability.
 9  Don't you first need to examine whether the
10  facts are trustworthy and accurate so you can
11  make a decision as to whether they are more
12  likely than not?
13      MR. GLATTER: Objection to
14  form.
15  A.  That was not the basis for my
16  expert report.  My expert report was judging
17  on the basis that my experience with Hamas
18  websites indicates that in the majority of
19  case that the Hamas communicas while maybe
20  not entirely accurate word for word have
21  strong indications of culpability, more
22  likely than not they were involved, that
23  means that in these cases when there's a
24  claim of responsibility by default on a Hamas
25  site and it's a credible Hamas site and
```

Page 341

```
 1      KOHLMANN
 2  authentic Hamas site by default that means
 3  it's more likely than not that Hamas played
 4  some role in carrying out the attack, but I'm
 5  not speaking to individual details because I
 6  was not asked to verify whether or not the
 7  Hamas communicas matched up to other sources
 8  or other -- I was just asked to look for
 9  material on Hamas websites and Hamas
10  electronic venues that were relevant and had
11  indicia of culpability with regard to these
12  attacks.
13  Q.  When you say they have indicia
14  of culpability, what do you mean?
15  A.  Indicia of culpability, in
16  other words, are there indications that Hamas
17  was culpable for an individual attack. The
18  first thing to look for is authentic and
19  credible Hamas websites, in other words, you
20  look for places where there is no doubt the
21  material that's coming through there is in
22  fact coming from Hamas.  Once you determined
23  that you have a source that's officially
24  Hamas and the material is officially credible
25  Hamas material, you look to see whether or
```

Page 342

```
 1      KOHLMANN
 2  not Hamas has ever issued a claim of
 3  responsibility.  My opinion is that once
 4  Hamas issues an open claim, a public claim of
 5  responsibility on their website based upon my
 6  study of their material that in the majority
 7  of cases at least large parts of what's in
 8  the communicas is indeed accurate. Thus if
 9  there is a communicas and in the majority of
10  cases that I studied the materials indeed at
11  least in part accurate that means it's more
12  likely than not that Hamas did play some kind
13  of culpable role, but once again more likely
14  than not. I was not asked to do a definitive
15  analysis or definitive comparison of sources.
16  Q.  So just I understand so while
17  there's information about each of the attacks
18  from the website which you list in the
19  report, your point was to say that Hamas has
20  stated these things on their website, but you
21  did not do an individual assessment as to the
22  veracity or likeliness of these facts being
23  true, correct?
24      MR. GLATTER: Objection to
25  form.
```

Page 343

```
 1      KOHLMANN
 2  A.  I believe you are asking is did
 3  I do a comparative analysis of sources and I
 4  did not do a comparative analysis.  I did
 5  generally keep in mind in my experience with
 6  the Hamas websites how often are they
 7  accurate and the fact is that based upon my
 8  study of this, the majority of cases where
 9  Hamas issues claims of responsibility on
10  their website, majority of cases, those
11  claims are at least in significant part
12  accurate or significant parts of them are
13  accurate thus by default if there is a
14  significant claim of responsibility on an
15  official credible Hamas website by default
16  that means that it's more likely than not
17  that Hamas is in some way culpable, but I did
18  not do a comparative analysis of different
19  sources and I didn't do an analysis of the
20  individual facts in the communicas to see
21  whether or not they comported with exactly
22  what Israeli police or Israeli government or
23  other sources might have determined.
24  Q.  Do you agree that terrorist
25  groups falsely deny responsibility for
```

Page 344

KOHLMANN

1 KOHLMANN
2 attacks as well?
3     MR. GLATTER: Objection to
4 form.
5 A.   Some terrorist groups do.  It
6 depends from group to group.  Different
7 groups have different philosophies. Certain
8 groups do it more frequently than others.
9 Q.   Are you aware that Hamas has
10 denied responsibility for attacks in which
11 others have claimed that it was responsible
12 for the attack?
13     MR. GLATTER: Objection to
14 form, vague.
15 A.   In what forum have they denied?
16 Q.   I'm speaking generally?
17     MR. GLATTER: Same objection.
18 A.   I'm aware they denied
19 culpability in certain instances I believe
20 yes.
21 Q.   In doing your methodology for
22 this case, did you take that fact into
23 consideration?
24     MR. GLATTER: Objection to
25 form.

Page 345

1     KOHLMANN
2 A.   I took it into account inasmuch
3 as I was looking at Hamas' on line venues, in
4 other words, yes, I looked to see on the on
5 line venues, the websites i.e.  The
6 Palestinian Information Center and al-Qassam
7 website along with the other Izzaden
8 al-Qassam websites to see whether or not
9 Hamas published any denials of
10 responsibility, credible denials of
11 responsibility regarding the attacks in
12 question on those sites.
13 Q.   Are you aware that there are
14 certain attacks for which more than one group
15 makes a claim of responsibility?
16     MR. GLATTER: Objection to
17 form.
18 A.   Are you saying generally or
19 you're saying in this matter?
20     MR. GLATTER: Vague.
21 Q.   Just generally?
22 A.   Yes.
23 Q.   Are you aware that there have
24 been attacks that Hamas has claimed credit
25 and another group has also claimed credit?

Page 346

1     KOHLMANN
2     MR. GLATTER: Objection to
3 form.
4 A.   Yes.
5 Q.   In doing your methodology in
6 this matter, how did you determine when Hamas
7 claimed credit for an attack whether anyone
8 else had also claimed credit for that attack?
9     MR. GLATTER: Objection to
10 form.
11 A.   That was not part of my initial
12 tasking, but after reviewing defense expert
13 Jenkins report, I did for purposes of full
14 disclosure I did go back and look to the
15 official websites of the Palestinian Islamic
16 Jihad PIJ and the former website now on the
17 internet archive of the al-Aqsa Martyrs
18 Brigade to attempt to determine whether or
19 not in the sources that are available to me,
20 the credible sources available to me, whether
21 or not either of those two organizations had
22 published anything on the level of what Hamas
23 had put out addressing those attacks and I
24 did not find anything.
25 Q.   How about any other group?

Page 347

1     KOHLMANN
2     MR. GLATTER: Objection to
3 form.
4 A.   I do have material from the
5 PRC, the Popular Resistance Committees, but
6 there was no material back from the period in
7 question that was put out on line from the
8 PRC.  I did not specifically look to any
9 other groups, but again, that was not part of
10 my initial tasking to look to any other group
11 but Hamas and the only reason I looked to PIJ
12 and al-Aqsa Martyrs Brigade was so I could
13 fully respond to any questions that might
14 arise with regard to defense expert Jenkins
15 report.
16 Q.   When you mention your initial
17 tasking, who's tasking you?
18 A.   The tasking was from Osen LLC.
19     MR. GLATTER: Let me just also
20 note the witness on a number of
21 occasions has said what I was asked to
22 do.  Obviously I have not instructed
23 him not to answer.  The report itself
24 discloses that he was asked to do X,
25 but I'm assuming that we are not

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

EVAN KOHLMANN
December 3, 2010

Page 364

1     KOHLMANN
2  the Hamas website by Abdel Aziz Rantisi
3  either on the military wing or the political
4  wing which denied credit, but in fact there
5  was no statement on either the political wing
6  or the military wing website which denied
7  responsibility for this attack. Not that I
8  located anyway.
9  Q.  So if Hamas writes down what
10 Mr. Rantisi says you believe it, but if one
11 of the leading newspapers in Israel quotes
12 Mr. Rantisi you do not believe it?
13     MR. GLATTER: Objection to
14 form.
15 A.  It's not that I don't believe
16 it.  It's that it has less reliability.  A
17 tertiary source is by definition less
18 reliable than a secondary source so I cannot
19 use a tertiary source to question a secondary
20 source especially when the secondary source
21 which is Hamas' official website has no
22 statement from Mr. Rantisi saying these
23 things so the question --
24 Q.  That you found?
25 A.  That I found. I should say that

Page 365

1     KOHLMANN
2  I found, but that being the case I can only
3  ask myself if Mr. Abdel Aziz Rantisi really
4  said that and he really felt this way why
5  didn't the political bureau of Hamas publish
6  that on their website and lacking an
7  explanation I cannot in absence just take
8  this as a significant piece of evidence.
9  Even if the New York Times, tertiary sources
10 are always less significant and less weighty
11 than secondary or primary sources.
12 Q.  Mr. Kohlmann, prior to me
13 showing you Mr. Rantisi's comments here
14 today, had you ever seen this before?
15 A.  Not this article although I
16 believe I was generally aware from reading
17 Mr. Jenkins report about the idea that Mr.
18 Rantisi had theoretically or possibly
19 reportedly called somebody or talked to
20 somebody and said I don't know who did this.
21 Q.  Prior to Mr. Jenkins raising it
22 and at the time you wrote your report, were
23 you aware that Mr. Rantisi had denied Hamas
24 responsibility?
25     MR. GLATTER: Objection to form

Page 366

1     KOHLMANN
2  and foundation.
3  A.  I don't recall.
4  Q.  Did you look to find if there
5  were statements made by Hamas outside of the
6  websites you looked to see whether they made
7  contradictory statements to what was being
8  put on their website?
9     MR. GLATTER: Objection to
10 form.
11 A.  No, I looked to multiple
12 websites.  I look to not a website.  I look
13 to the websites of both the political wing of
14 Hamas, the website of the military wing of
15 Hamas and their discussion forums, but that
16 was what I was asked to do.  That was the
17 tasking.
18 Q.  You did not do anything to
19 check if Hamas was making statements to the
20 contrary elsewhere?
21 A.  No, I did not.
22     MR. LUFT: Why don't we take a
23 five minute break or ten minute break.
24     THE VIDEOGRAPHER: We are now
25 off the record at 10:41 a.m. on

Page 367

1     KOHLMANN
2  December 3, 2010.
3     (Recess taken.)
4     THE VIDEOGRAPHER: Time is
5  11:07 a.m. on December 3, 2010.  We
6  are now back on the record.
7  Q.  Mr. Kohlmann, in the portion of
8  your report that describes the 15 attacks in
9  question, for certain of the attacks you cite
10 the fact that there were photographs of the
11 alleged attacker, correct?
12 A.  Correct, yes.
13 Q.  What did you do in your
14 methodology to verify that the person in the
15 picture was actually the attacker in
16 question?
17 A.  I didn't.  That was not part of
18 my methodology.
19 Q.  What did you do in your
20 methodology to determine that the photo that
21 you were looking at was not in fact doctored?
22 A.  I didn't --
23     MR. GLATTER: Objection to
24 form.
25 A.  I didn't specifically look for

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

EVAN KOHLMANN
December 3, 2010

Page 368

KOHLMANN

2 doctored aspects, however, I often review
3 images to see whether or not they have been
4 doctored. None of the images that I reviewed
5 in this report immediately evinced signs of
6 having been doctored, but I did not engage in
7 a technical analysis. There were not any
8 immediate signs of them being manipulated or
9 doctored.
10 Q. What would be those immediate
11 signs?
12 A. Doctored images, there are
13 problems with them. If you look at them
14 closely, you could immediately see that there
15 are errors in the way the shadows are, you
16 could see that the resolution often times
17 show up differently for the pieces that have
18 been edited. In a number of cases I've
19 identified images that have been doctored.
20 It's a sight kind of thing. You could see
21 there are problems with perspective. There
22 are all sorts of photographic issues that
23 show up, but generally speaking those kind of
24 edits are apparent if you know what you are
25 looking for. In this case I did not engage

Page 369

KOHLMANN

2 in technical analysis, but again I did not
3 see any obvious signs of them being doctored.
4 Q. You saw photos in which
5 individuals were superimposed in front of
6 Hamas logos, correct?
7 MR. GLATTER: Objection to
8 form.
9 A. Are you thinking of a
10 particular example?
11 Q. Let's look at page 40 of your
12 report?
13 A. Yes.
14 Q. Do you agree with me that that
15 individual has been superimposed on a
16 background?
17 A. Yeah, but that's not an
18 original photograph. That's a propaganda
19 poster.
20 Q. You said if you look carefully
21 you could see problems in the shadows and the
22 resolution. In this case in looking at the
23 photographs from these 15 attacks, did you
24 look closely to check if there were problems
25 with resolution or with the shadows?

Page 370

KOHLMANN

2 A. Again, I did not engage in a
3 technical analysis, but in reviewing and
4 creating this report if I had noticed any
5 images that immediately stood out to me as
6 images that I believe had been manipulated I
7 would have made note of that. In this case
8 at least in terms of the review that I did I
9 did not notice immediately any images aside
10 from of course a propaganda poster or
11 something that had been superimposed that the
12 watermark had been imposed of the Hamas logo,
13 I did not notice any other kind of
14 manipulation to speak of.
15 Q. You mention in your report that
16 you -- that there were Wills?
17 A. Yes.
18 Q. What in your methodology did
19 you do to verify that the Will being posted
20 in connection with a particular attacker and
21 attack was in fact the actual Will of that
22 person?
23 MR. GLATTER: Objection to form
24 and foundation.
25 A. In the cases where it was

Page 371

KOHLMANN

2 available, I think in at least one case the
3 individual was actually holding up in one of
4 the photographs available on the Hamas
5 website a handwritten copy of his Will to
6 match up with the printed copy that was
7 available on the Hamas site, but I didn't
8 engage in a specific technical analysis. I
9 simply believe that the more detail that's
10 offered particularly when it comes to a
11 martyrdom Will, the more difficult it becomes
12 if there are contradictions between what's in
13 the Will and what other facts that may
14 present themselves. The more information
15 that Hamas puts out there, the more of a
16 liability it creates for itself if any of
17 that information is indeed false.
18 Q. Other than the potential
19 downside that Hamas may think it may get from
20 posting inaccurate information, did you
21 actually do any analysis in your methodology
22 to determine whether the Will being posted
23 was in fact the Will of the individual with
24 whom you are ascribing to?
25 A. You are saying aside from the

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

EVAN KOHLMANN
December 3, 2010

Page 372

KOHLMANN

1    guy holding up a copy of the Will and aside
2
3    --
4  Q.   Right.
5  A.   There is also in some cases at
6    least in two different case the attackers we
7    had videos of the attackers reading their
8    Wills.  It's not cited in here because the
9    videos were recovered by us after the report
10   was already delivered, however, the videos do
11   show the individuals reading the same Wills
12   that are printed on the Hamas website.
13 Q.   You are not relying on those
14   videos, are you, they are not cited in your
15   report?
16 A.   I don't know if I'm relying on
17   them.  They are not in here, but I'm relying
18   on them in terms of we got access to them as
19   we were submitting the report so that's one
20   of the reasons why I'm confident those Wills
21   are accurate, but in the end we did not
22   include it as part of the report.
23 Q.   Mr. Kohlmann, you submitted
24   this report in September over a year ago?
25 A.   That's correct, yes.

Page 373

KOHLMANN

1
2  Q.   That's when you got access to
3    these videos?
4  A.   We first discovered that we had
5    copies of them about the time where we
6    submitted this report, yeah.
7  Q.   They have never been produced
8    to defendants, correct?
9  A.   I don't know if they have or
10   not.
11 Q.   Which attacks were these videos
12   for?
13 A.   The videos were for the August
14   19, 2003 bombing of bus 19 allegedly by Raed
15   Mesk and the other one was one second, I'll
16   tell you right now.  Sorry, one moment.  I
17   believe the other one was -- I just want to
18   make sure I'm getting this right.  I will have
19   to double check who the other one was
20   featuring.  I believe it was the March 22,
21   2002 Park Hotel bombing in Natanya, but I'll
22   have to double check that because I don't
23   recall off the top of my head.
24 Q.   Mr. Kohlmann, in the photo you
25   mentioned to me where an individual was

Page 374

KOHLMANN

1
2    holding up a Will, I assume this individual
3    as you told me with all other individuals of
4    photos, you did nothing to determine if the
5    person holding up the Will was actually the
6    person alleged to be the attacker?
7  A.   I didn't do anything specific,
8    no.
9  Q.   For each of the Wills, what in
10   your methodology did you do to determine that
11   the Will was in fact written for the attack
12   in question and had not been written
13   previously for another attack?
14 A.   I believe in several cases in
15   the Wills they actually describe details of
16   what they are planning on doing, not
17   necessarily how many people will be killed,
18   but I believe they describe the idea of
19   carrying out -- as specific as they can get
20   prior to the operation, but some of it is as
21   far as I recall not definitive, but it's
22   specific enough that it would lend
23   credibility.
24 Q.   Does it say what the target
25   will be?

Page 375

KOHLMANN

1
2  A.   I'd have to review the
3    materials to be sure about that.
4  Q.   Does it say when the attack
5    will happen?
6  A.   Again, I'd have to review the
7    content of the Wills.  I don't know offhand.
8  Q.   In your methodology did you
9    check if all those things were present in the
10   Will?
11 A.   They are not always present in
12   Wills.  We just looked at whatever the
13   content was present and attempted to
14   determine it was relevant.  In several cases
15   portions of the Will are cited in here, but
16   I'd have to go back and do a comprehensive
17   review to see whether or not what you are
18   describing is actually in there.  I'm not
19   sure offhand.
20 Q.   You also mention detailed
21   biographies as you refer to them?
22 A.   Yes.
23 Q.   Those biographies appear to
24   have been written after the person's death by
25   others?

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

EVAN KOHLMANN
December 3, 2010

Page 376

KOHLMANN

1      KOHLMANN
2 A.  I'm not aware.  Some of the
3 material does appear to be posthumous, but
4 I'm not aware if the full thing was written
5 posthumously.  I'm not aware -- I don't know.
6 I don't think there's any way to know.
7 Q.   You cite there are statements
8 by the mother after the death, statement by
9 the sister after the death?
10 A.   Like I said, some of the
11 material appears to be posthumous, but I
12 cannot say definitely that all of it is or is
13 not.  I don't know if anyone possibly can.
14 Q.   What is the evidentiary value
15 to you and in your methodology did you
16 consider of the mother talking about her son
17 after his death?
18 A.   In a number of different ways.
19 First of all, the concept that Hamas has
20 access to the parents of the individual who
21 carried out the attack and that these
22 individuals, the family members of the
23 individual who carried out the attack are
24 willing to discuss the life of that
25 individual with Hamas for the purposes of

Page 377

1      KOHLMANN
2 broadcasting on their website, that to me
3 would indicate a degree of confidence that
4 indeed the offspring, the child of these
5 individuals was or family members of these
6 individuals was indeed a Hamas member. The
7 fact that they are in contact with each other
8 and again, relying on the fact that more
9 detail that Hamas puts out which is
10 potentially denial makes it a huge political
11 liability for them.
12 Q.  Mr. Kohlmann, are you aware of
13 the fact that Hamas offers payments to
14 families of suicide bombers for both it's
15 members and non members who commit terrorist
16 attacks against Israel?
17 A.  I'm aware that they provide
18 payments to members.  I'm not sure to the
19 degree to which they pay non members, but
20 that still doesn't impact the prior argument
21 which is direct access to the family members.
22 Q.  If they were giving money to
23 the family member, do you think that the
24 family member might be willing to answer some
25 questions for them?

Page 378

KOHLMANN

1      KOHLMANN
2     MR. GLATTER: Objection to
3 form, object to the extent the
4 question is an incomplete
5 hypothetical.  You can answer.
6 A.  I don't think there's any way
7 for me to answer that.  I don't know how I
8 would answer that.
9 Q.   Did you take that into
10 consideration in determining how reliable you
11 thought these biographies were?
12     MR. GLATTER: Objection to
13 form.
14 A.  I don't think it has any impact
15 on the reliability whether or not Hamas pays,
16 first of all, I don't think it has any direct
17 relevance whether or not Hamas pays money to
18 people verses their parents commenting an
19 their role in Hamas, but it definitely has no
20 relevance to the fact that the more
21 information Hamas puts out there, the more
22 potentially political liability it creates
23 for itself.
24 Q.  Or the more claims it makes,
25 also stands the chance of getting greater

Page 379

1      KOHLMANN
2 support, getting greater financing, all the
3 things we mentioned before, there are
4 multiple motivation why Hamas may make a
5 claim, correct?
6     MR. GLATTER: Objection to
7 form.
8 A.  That's possible. All that is
9 possible.
10 Q.  Just like it's possible -- your
11 assumption is possible, but not certain, you
12 don't know it, Hamas didn't tell it to you?
13 A.  Hamas didn't tell me what?
14 Q.  That Hamas is concerned about
15 if it makes a claim that there would be more
16 information out there that could be
17 contradicted it's also possible, but you
18 don't know because Hamas didn't tell you?
19 A.  Hamas didn't tell me, but Hamas
20 has made statements to that effect when other
21 groups have issued claims of responsibility
22 which impinge upon what Hamas believes itself
23 to be responsible for, Hamas has been very
24 forthright about coming out and explaining
25 the fact that groups should be credible about

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

EVAN KOHLMANN
December 3, 2010

---

Page 380

    KOHLMANN
1
2 what they claim credit for, groups should be
3 honest and they should not claim credit for
4 things they have not done. That's a
5 tremendous political liability to make
6 statements like that and then to go ahead and
7 claim credit for attacks or operations that
8 they had nothing to do with. That's called
9 hypocrisy and that's something that Hamas by
10 definition, they don't have to say it, it's
11 pretty obvious that any political
12 organization wants to stay away from being
13 labeled as being hypocrites.
14 Q. People who blow up a bus
15 wouldn't want to be called hypocritical,
16 correct?
17     MR. GLATTER: Objection to
18 form.
19 A. Exactly. Exactly.
20 Q. But al-Aqsa blows up buses,
21 right?
22 A. They have in the past I
23 believe, yes.
24 Q. Hamas calls them hypocritical?
25 A. Al-Aqsa Martyrs Brigade does

---

Page 381

1     KOHLMANN
2 not have nearly the same reputation for being
3 as forthcoming as Hamas does, that's correct.
4     MR. GLATTER: Before you ask
5 your next question, I noted one of
6 your earlier questions just on a
7 technical point as to whether or not
8 certain videos had been produced to
9 defendant or not. Obviously we have
10 not --
11     MR. LUFT: We can discuss this
12 off the record, Josh. I didn't ask --
13     MR. GLATTER: I wasn't sure if
14 that was directed to him.
15     MR. LUFT: No obviously because
16 Mr. Kohlmann answered it, it was
17 directed to him. Josh, I want to get
18 through my deposition.
19     MR. GLATTER: Obviously
20 plaintiffs' counsel does the
21 production, the expert doesn't do
22 production. We can talk off the
23 record. Thank you.
24 Q. Mr. Kohlmann, for the January
25 29, 2004 bus 19 bombing?

---

Page 382

1     KOHLMANN
2 A. Yes.
3 Q. There was postings on
4 Palestine-info.net?
5 A. That's correct.
6 Q. On the al-Qassam.ps website?
7 A. Among others, yes.
8 Q. Who in Hamas made the posting
9 on the Palestine-info website?
10 A. If I remember correctly that
11 was an Arabic language communica signed by
12 the Ezzadeen al-Qassam Brigades which are the
13 military wing of Hamas.
14 Q. But who in the brigades, they
15 are huge, right?
16 A. I understand, but the
17 communicas that are issued by the Ezzadeen
18 al-Qassam Brigades do not include a person's
19 name. That's the point, the reason why they
20 are reliable it's not the product of an
21 individual person's opinion, it's the product
22 of the military -- the collective military
23 wings leadership which makes it more reliable
24 than an individual person claiming credit for
25 something.

---

Page 383

1     KOHLMANN
2 Q. You don't know who actually
3 made the post?
4     MR. GLATTER: Objection to
5 form.
6 A. It was the military wing. I
7 don't know the specific -- I don't know if
8 there is a specific identity of a person who
9 wrote this. Again, it's a collective product
10 of the military wing.
11 Q. I understand the idea of
12 anonymity, but I'm asking if you know who
13 made the post?
14     MR. GLATTER: Objection to
15 form, misstates the testimony.
16 A. Other than the military wing of
17 Hamas, I think that's the point is you are
18 not supposed to know the exact identity of
19 the person who writes this. I don't even
20 know if there is one person who writes this.
21 I don't think there is one person who writes
22 these communicas.
23 Q. How about the post on the
24 al-Qassam.ps website, who wrote that one?
25     MR. GLATTER: Objection to

---

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

EVAN KOHLMANN
December 3, 2010

Page 384

KOHLMANN

1        KOHLMANN
2    form.
3    A.   That was also signed by the
4    Ezzadeen al-Qassam military brigades, but
5    there was not a person's name attached to it.
6    Q.   Was the person who wrote those
7    posts involved in the bus 19 attack
8    personally?
9        MR. GLATTER: Objection to
10   form.
11   A.   I have no way of knowing that.
12   Q.   Do you know if they have first
13   hand knowledge of what happened in the bus 19
14   bombing?
15       MR. GLATTER: Objection to form
16   and foundation.
17   A.   It's the official website of
18   the political wing, the official website of
19   the Hamas military wing and its statements
20   both signed by the Ezzadeen al-Qassam
21   Brigades.  I don't know whether or not they
22   were present for the bombing.  I know they
23   offer a significant amount of detail
24   indicating that they played a culpable role
25   in the attack, but I have no way of knowing

Page 385

KOHLMANN

1        KOHLMANN
2    what role specifically that is other than
3    what they described.
4    Q.   So you don't know if the people
5    who wrote what you read on the web had any
6    first hand knowledge of what happened in the
7    attack?
8        MR. GLATTER: Objection to form
9    and foundation.
10   A.   The actual individuals, right.
11   Q.   Yes?
12   A.   I don't think there's any way
13   of knowing that, that's the point.
14       MR. LUFT: What's the
15   foundation objection?
16       MR. GLATTER: The foundation is
17   the witness has testified on a number
18   of occasions that he does not know the
19   person, an individual person wrote it
20   so when you say if you know the people
21   who wrote what you read on the web had
22   first hand knowledge of what happened
23   in the attack you have not established
24   foundation.
25       MR. LUFT: That's why I said do

Page 386

KOHLMANN

1        KOHLMANN
2    you know because I'm asking a
3    foundation question.
4        MR. GLATTER: You said so you
5    don't know which is why I said form
6    and foundation.  Either way the
7    objection is what it is.  Maybe I'll
8    seek to enforce it, maybe not.
9        MR. LUFT: I'll hold my breath.
10   Q.   Mr. Kohlmann, for any of the
11   other attacks, do you know what specific
12   individual posted on the web the information
13   that you read?
14   A.   I'd have to review each one
15   individually, but my initial response would
16   be the communicas for the most part ore
17   either signed by the political bureau of
18   Hamas or the military wing.  They are not the
19   product of an individual spokesman, they are
20   not the product of individual person.  I
21   don't believe that one person wrote either
22   all the communicas or even individual ones.
23   I think they are the collective product of
24   the military wing so I don't think there is
25   any way of knowing the individual people who

Page 387

KOHLMANN

1        KOHLMANN
2    might have penned parts or all of the
3    communica.  It's the Izzaden al-Qassam
4    Brigades.  It's the military wing or it's the
5    political wing or both, but I can't specify
6    the individuals within there who might have
7    written it or might not have written it.
8    Q.   Is it the fact that for each of
9    the 15 attacks you do not know that the
10   person who posted the information on the
11   website with regard to that attack had any
12   first hand knowledge of the information they
13   were posting?
14       MR. GLATTER: Objection to
15   form.
16   A.   I have no way of knowing that.
17   Q.   Mr. Kohlmann, I'm going to ask
18   you to turn to in your report the section on
19   the bus 19 bombing.  See that on page 43?
20   A.   Yes.
21   Q.   This is the information you
22   relied upon in forming your conclusions with
23   regard to this attack?
24   A.   That's correct, yes.
25   Q.   Did you look at anything other

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

EVAN KOHLMANN
December 3, 2010

Page 388

```
 1      KOHLMANN
 2   than what's included on page 43 going on to
 3   page 44 with regard to this attack at the
 4   time you signed your report?
 5   A.  I don't believe this is one
 6   where a video Will was made available,
 7   however, there are also images which are not
 8   produced on this page, but which are in the
 9   appendix which I also reviewed from the
10   official Hamas website.
11   Q.  You note on page 43 that Hamas
12   mentioned on the al-Qassam.ps website that
13   al-Aqsa made a rival claim for this attack?
14   A.  That's correct, yes.
15   Q.  Do you know where they made
16   that rival claim?
17      MR. GLATTER: Objection to
18   form.
19   A.  I believe that they made a
20   rival claim in the media, but I don't recall
21   offhand.
22   Q.  Which media?
23   A.  I believe regional media, local
24   media although I'm not sure.
25   Q.  Where do you believe you know
```

Page 389

```
 1      KOHLMANN
 2   that from?  Was that written on the website?
 3   A.  I can't recall.  I believe
 4   Hamas made mention of that.  I'd have to look
 5   back to the actual communica.
 6   Q.  Did you find the al-Aqsa claim
 7   as part of your work here?
 8   A.  It would have come up had it
 9   been in my database when I had done the
10   initial search.  There was no hit.  A
11   subsequent search after submitting this
12   report of the al-Aqsa Martyrs Brigade website
13   turned up no such communica.
14   Q.  Do you think that Hamas was
15   lying that al-Aqsa made a communica?
16   A.  No, I don't believe that they
17   were lying.
18   Q.  Does that suggest to you that
19   the searches you have done for what
20   communicas al-Aqsa may have made with regard
21   to the attacks in question may not be
22   complete?
23   A.  No, not necessarily.  Hamas
24   didn't necessarily say that the al-Aqsa
25   Martyrs Brigade communica was accurate or
```

Page 390

```
 1      KOHLMANN
 2   credible.  In fact, they suggested that it
 3   was wrong.
 4   Q.  That's not my question, Mr.
 5   Kohlmann.  You told me that you ran the
 6   searches to see if they had made a claim, not
 7   a credible claim, just a claim and you said
 8   you didn't find it, but you said that Hamas
 9   said they made a claim and I asked you do you
10   think Hamas is lying, you told me no so I'm
11   asking giving that you don't think Hamas is
12   lying they didn't make a claim and you could
13   not find a claim does that suggest to you
14   that the search you did for al-Aqsa may in
15   fact not be a complete search?
16      MR. GLATTER: Objection to
17   form.
18   A.  No.
19   Q.  Why not?
20   A.  First of all, because of the
21   fact that as I stated earlier there are ways
22   in which claims can be issued which don't
23   involve the internet.  Unfortunately with
24   regard to those claims as Hamas points out
25   here there is no way of judging whether or
```

Page 391

```
 1      KOHLMANN
 2   not they are accurate or they are credible
 3   because of the fact if someone makes a
 4   telephone call to a radio station they may be
 5   the official representative of a terrorist
 6   group, but how would you know that and as a
 7   result Hamas questions the credibility of the
 8   claim that al-Aqsa Martyrs Brigade
 9   distributed.  I don't believe that they say
10   it's an absolute official claim, however, my
11   understanding is that al-Aqsa Martyrs Brigade
12   eventually addressed this issue once again on
13   Al-Manar television which is the official
14   television station of Hezbollah.  In that
15   context I believe they did deny
16   responsibility.  The fact that the al-Aqsa
17   Martyrs Brigade did not have a communica on
18   their website could indicate a number of
19   things.  It could indicate number one, they
20   were not publishing their claims of
21   responsibility on the web at that time or it
22   could indicate that whoever issued this
23   initial claim of responsibility on behalf of
24   al-Aqsa Martyrs Brigade was not speaking on
25   behalf of the organization and thus the claim
```

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

EVAN KOHLMANN
December 3, 2010

---

Page 392

KOHLMANN

1  itself that's why it did not show up anywhere
2  because it was an illegitimate claim.
3  Q.   You think al-Aqsa has never
4  claimed credit for this attack?
5      MR. GLATTER: Objection to
6  form.
7  A.   I just said al-Aqsa did issue
8  an apparent claim, however, it's never been
9  definitively because of the fact that the
10  claim was then retracted by al-Aqsa and
11  because of the fact that there is no claim in
12  any kind of source that's verifiable, any
13  kind of official source of al-Aqsa, it's not
14  clear whether or not the official claim that
15  was distributed is in fact credible.  If it
16  is, like I said, there is no way of knowing
17  or at least there's no way of me knowing.
18      MR. LUFT: I'm going to ask the
19  court reporter to mark as Exhibit 16
20  and 17, 16 is the original Arabic
21  posting, 17 is a certified translation
22  from HGTP.webarchive and it's from the
23  www.kataebaqsa.org website.
24      (Kohlmann Exhibits 16-17,

---

Page 393

KOHLMANN

1  Documents, marked for
2  Identification.)
3      MR. GLATTER: Obviously
4  plaintiffs reserve all rights and
5  objections as to the accuracy,
6  completeness and correctness of the
7  translation.
8  Q.   Mr. Kohlmann, have you ever
9  seen this document before?
10  A.   No, I have not.
11      MR. GLATTER: Which document
12  are you referring to?  No, it's
13  important because there's an Arabic
14  and English so if you could refer to
15  which exhibit it would make for a much
16  cleaner record for me.
17  Q.   Can you read Arabic?
18  A.   Not fluently. I can read some.
19  Q.   Have you ever seen Exhibit 16,
20  the Arabic document before?
21  A.   No, I have not.
22  Q.   Reading the translation, does
23  that tell you -- help you understand whether
24  you have seen it before?

---

Page 394

KOHLMANN

1  A.   I'm pretty sure I have not seen
2  either of these documents.
3  Q.   Do you see it's a statement
4  from the al-Aqsa Martyrs Brigade?
5  A.   Yes.
6  Q.   On a website?
7  A.   Yes, I believe that's their
8  official website or it was their official
9  website.
10  Q.   Do you see in it they claim
11  responsibility for the bus 19 attack?
12  A.   I believe they do.
13      MR. GLATTER: Objection to
14  form.
15  Q.   In your searches you never
16  found this claim?
17  A.   No, I did not.  When I looked
18  through the archives I had of this material
19  and looked on line I did not recover this
20  communica.
21  Q.   What is flawed about your
22  search that you did not find this official
23  claim on their official website for this
24  attack?

---

Page 395

KOHLMANN

1      MR. GLATTER: Objection to form.
2  A.   I should specify that it was
3  not part of my official search.  I didn't
4  actually look initially.  It was only
5  subsequently that I looked.  I believe that I
6  looked through everything but apparently for
7  some reason this escaped my notice.  It's
8  possible that because of the fact I was
9  looking on an on line version of the al-Aqsa
10  Martyrs Brigade verses part of my archive,
11  but like I said it was not part of my initial
12  tasking, but I did not recover this upon
13  looking later after reviewing Jenkins report,
14  I did not see this.
15      THE VIDEOGRAPHER: This is the
16  end of tape one.  Time is 11:35 a.m.
17  on December 3, 2010.  We are now off
18  the record.
19      (Recess taken.)
20      THE VIDEOGRAPHER: This is tape
21  two of the deposition of Evan
22  Kohlmann.  Time is 11:36 a.m. on
23  December 3, 2010.  We are back on the
24  record.  You may proceed.

---

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

EVAN KOHLMANN
December 3, 2010

Page 396

1    KOHLMANN
2  Q.  Mr. Kohlmann, looking back at
3  Exhibit 17 you see that they say this was the
4  fastest response to the enemies massacre at
5  the steadfast al-zaytoun district?
6  A.  Yes.
7  Q.  Are you aware of what's been
8  referred to as the al-zaytoun massacre by
9  Palestinians?
10  A.  Generally, yes.
11  Q.  You can put those aside for
12  right now.
13  Q.  You mentioned that there was a
14  statement by a Fatah member on television?
15  A.  Yes, I believe there was a
16  statement by a member of Fatah on Al-Manar
17  television.
18  Q.  Have you viewed that video
19  segment?
20  A.  No, we were not able to recover
21  the video segment.
22  Q.  So you don't know if that
23  actually happened personally?  You have not
24  seen it?
25  A.  No, I haven't seen it

Page 397

1    KOHLMANN
2  personally, no.
3  Q.  Mr. Kohlmann, can you describe
4  to me what your understanding of what
5  happened with the bus 19 attack and what
6  Hamas' role in it is?
7  A.  My understanding of what
8  happened?
9  Q.  Yes.
10  A.  My understanding is that a
11  suicide bombing was carried out by an
12  individual on a bus traveling in Jerusalem,
13  that a certain number of people were killed,
14  the individual who allegedly carried it out
15  was a former Palestinian policeman, that --
16  are you looking for particular detail?
17  Q.  I'm curious of your
18  understanding of what Hamas' involvement was
19  in this attack?
20  A.  My understanding was that they
21  helped recruit and train the individual who
22  carried out the attack.
23  Q.  Anything else?
24  A.  I'd have to review the exact
25  details.  I'm not familiar with it offhand.

Page 398

1    KOHLMANN
2  I'd have to look.
3  Q.  Where would you look to find
4  that?
5  A.  I would look to the documents
6  that were cited on here.  I just haven't
7  reviewed the originals in a while.  I would
8  have to look at the exact details in the
9  biography, his Last Will and Testament and
10  the actual communica in which they claim
11  credit.  I don't recall the extent to which
12  they describe the activities that they
13  engaged in.  They did describe the advance
14  planning and preparation which were carried
15  out by the quote unquote martyr Jaarah and
16  his al-Qassam Brigades so I do know that
17  al-Qassam at least is claiming they played a
18  significant role in the planning and
19  preparation, but I would have to do a
20  comprehensive review of all the sources to
21  see what else is specifically in there.
22  Q.  Is it your understanding that
23  Hamas gave Mr. Jaarah the bomb?
24    MR. GLATTER: Objection to form,
25  vague.

Page 399

1    KOHLMANN
2  A.  I don't know off hand.  I would
3  have to look into that.
4  Q.  Do you say anywhere in your
5  report that you don't know if the bomb that
6  Mr. Jaarah used was a bomb given to him by
7  Hamas?
8  A.  I'm saying I don't know right
9  now.
10  Q.  You can look in your report.
11  A.  I don't have copies of the
12  original translations.
13    MR. GLATTER: The question is
14  do you say in your report?
15  A.  Excuse me, sorry, no, I don't
16  believe so.
17  Q.  Do you say in your report that
18  Hamas' role was limited only to recruiting
19  and preparation?
20    MR. GLATTER: Objection to
21  form.  Document speaks for itself, but
22  you can answer.
23  A.  I don't think so, but again,
24  I'd have to review the sources to understand
25  whether or not that was deliberately excluded

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

EVAN KOHLMANN
December 3, 2010

Page 400

```
 1      KOHLMANN
 2  or included.  I don't know.
 3  Q.  Mr. Kohlmann, do you know if
 4  any other terrorist group was involved in the
 5  bus 19 bombing?
 6      MR. GLATTER: Objection to
 7  form.
 8  A.  I know the al-Aqsa Martyrs
 9  Brigade issued a claim of responsibility.  I
10  don't know whether or not the degree to which
11  they were involved, however, I believe that
12  they probably did play some role in this
13  operation, but I don't know what role it is
14  and frankly I think given the evidence
15  provided by the al-Qassam Brigades it seems
16  to me that the al-Qassam Brigades played a
17  significant if not dominant role in this, but
18  I cannot say for 100 percent sure.
19  Q.  What do you mean by significant
20  or dominant?
21  A.  There were materials that were
22  accompanying, not just his biography, but
23  images of Mr. Jaarah wearing a Hamas headband
24  in front of a Hamas banner carrying a weapon
25  I believe that tends to indicate that someone
```

Page 401

```
 1      KOHLMANN
 2  is indeed involved in Hamas. For Hamas to be
 3  able to produce that kind of evidence
 4  suggests that they played a significant role
 5  in whatever the individual was doing, but I
 6  can't say whether it's 50/50, 50/60, 40/60, I
 7  can't say that.
 8  Q.  If Hamas had no role in
 9  selecting the target, helping Mr. Jaarah get
10  to the target, equipping him with the bomb
11  that was used in committing the attack, would
12  you say that they played the dominant role in
13  the attack?
14  A.  I would first of all have to
15  understand exactly what it is that they did.
16  Q.  They blew up bus 19?
17  A.  No, no, no, you're saying what
18  they didn't do.  I would have to know what
19  exactly they did do.
20  Q.  You think if someone else did
21  all those things Hamas could still be the
22  dominant actor, if they didn't pay for the
23  bomb, they didn't choose the target, they
24  didn't equip him with the bomb and they
25  didn't take him to the place where to commit
```

Page 402

```
 1      KOHLMANN
 2  the attack, you think there is something they
 3  could have done which would have made them
 4  the dominant actor in that attack?
 5      MR. GLATTER: Objection to
 6  form.
 7  A.  In the absence of detail in the
 8  hypothetical of what they did do, I cannot
 9  answer that question.  I don't know.
10  Q.  Did you in your analysis and
11  methodology try to determine what Hamas did
12  do and did not do with regard to the bus 19
13  attack?
14  A.  No, that was not part of what I
15  was tasked to do.
16  Q.  I understand what Mr. Glatter's
17  firm asked you to do, I'm asking what you did
18  do as an expert in trying to offer an
19  opinion. Did you bother to figure out what
20  Hamas did or didn't do in connection with
21  this attack?
22      MR. GLATTER: Objection to
23  form.
24  A.  No.  I verified to see whether
25  or not there was a credible claim of
```

Page 403

```
 1      KOHLMANN
 2  responsibility accompanied by information
 3  indicating that Hamas had direct contact and
 4  a relationship with the individual who
 5  carried out the attack, but I didn't check to
 6  see whether or not Hamas had built the bomb
 7  or details like that.  Again, I would have to
 8  see -- you are mixing up hypothetical or
 9  potential hypothetical with what may or may
10  not have happened.  I'd have to see the
11  individuals details, not hypothetically.
12  Q.  You didn't look for those
13  individual details, did you?
14      MR. GLATTER: Objection to
15  form, vague and confusing, still not
16  sure if we are in a hypothetical.
17      MR. LUFT: Josh, let him answer
18  the question.
19  A.  Are we in a hypothetical now?
20  Q.  No, this is not hypothetical,
21  Mr. Kohlmann, this is the reality and the
22  reality is did you look for any of the
23  details you are telling me that you would
24  need to look at to know what Hamas did for
25  these attacks?
```

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

EVAN KOHLMANN
December 3, 2010

Page 404

```
 1      KOHLMANN
 2      MR. GLATTER: Objection to
 3   form.
 4   A.  To determine legal culpability
 5   you might have to do all that, but that was
 6   not part of the methodology I engaged in for
 7   this report.
 8   Q.  What do you mean by legal
 9   culpability?
10   A.  Again, if you are making a
11   legal judgment in a criminal court, you might
12   go into all sorts of things.  Methodology
13   that I engaged in for this was to determine
14   whether or not Hamas had issued credible
15   claims of responsibility through an authentic
16   venue, authentic original venue of
17   information from Hamas and whether or not
18   that information was detailed enough and
19   specific enough that indicated that more
20   likely than not that Hamas had played some
21   culpable role in the attack.  I wasn't
22   looking to see whether they were the majority
23   actor, I wasn't looking to see whether they
24   were the dominant actor, that was not
25   relevant to the search that I was running and
```

Page 405

```
 1      KOHLMANN
 2   it was not relevant to the methodology nor
 3   the task so I didn't engage in it, that's
 4   true, but it was not part of what I was asked
 5   to do nor part of the search methodology that
 6   I engaged in.
 7   Q.  Is it fair to say for the 15
 8   attacks in question you don't know what role
 9   Hamas actually played in any of these
10   attacks?
11   A.  For the purposes of opining for
12   this case and this report?
13   Q.  Yes.
14   A.  I don't know if that's it for
15   every case.  There are certain cases in which
16   I like for instance the Mike's Place bombing
17   where I have more reason to know about what
18   Hamas may have done and what they may have
19   not done, but it was not part of my opinion
20   for this report, no.  I wasn't asked to opine
21   on that.
22   Q.  So excluding the Mike's Place
23   bombing where you had prior knowledge, is it
24   fair to say that you do not know what Hamas'
25   involvement was in any of the other 14
```

Page 406

```
 1      KOHLMANN
 2   attacks in question excluding the Mike's
 3   Place bombing?
 4      MR. GLATTER: Objection to
 5   form.
 6   A.  I have an idea of what Hamas'
 7   involvement was.  I don't know the exact
 8   details offhand case by case, but based on
 9   the information that was gathered as part of
10   this report there are indications about the
11   role Hamas played.  Whether or not that is
12   definitively 100 percent everything that
13   Hamas did or did not do, I have no way of
14   knowing, but I have some idea of what Hamas
15   claims to have done in terms of its
16   involvement in these operations.
17   Q.  Your understanding is what
18   Hamas claims to have done?
19   A.  Correct.
20   Q.  You don't actually know what
21   they did do?
22   A.  I know what Hamas claims to
23   have done.
24   Q.  If you could look back at your
25   report, do you see that the second paragraph
```

Page 407

```
 1      KOHLMANN
 2   it says a second Arabic language communica
 3   published on the al-Qassam.ps website
 4   likewise claimed credit for the bombing and
 5   indicated that the attack was targeted near
 6   the personal residence of Israeli Prime
 7   Minister Ariel Sharon in order to revenge the
 8   massacre of Palestinians at al-Zaytun?
 9   A.  Yes.
10   Q.  Do you believe that to be an
11   accurate statement?
12   A.  That that's why they carried
13   out the attack?
14   Q.  Yes.
15   A.  Do I believe it's an accurate
16   statement?
17   Q.  Yes.
18   A.  I believe that's one of the
19   likely causes that the attack took place,
20   yeah.
21   Q.  You think that's one of the
22   reasons that Hamas took the actions they took
23   is because of al-Zaytun?
24   A.  I believe it's worth taking
25   them at their word on this, yes.
```

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

EVAN KOHLMANN
December 3, 2010

---

Page 412

```
 1      KOHLMANN
 2  Q.  Do you see that his name is
 3  written in red?
 4  A.  Where are you referring to?
 5  Q.  On Exhibit 18 and if you don't
 6  know you can look at Exhibit 19 to show you?
 7  A.  Are you referring to page one?
 8  Q.  Yes.
 9  A.  Yes.
10  Q.  That's in red?
11  A.  Yes.
12  Q.  This is a reprinting of his
13  Will, right, his original Will was
14  handwritten?
15  A.  Actually I believe his original
16  Will was video recorded.
17      MR. LUFT: I would like to mark
18  as Exhibit 20 --
19      MR. GLATTER: I'm sorry, I
20  apologize just for clarity of the
21  record Exhibit 19, this is a
22  translation Avi that your office
23  generated?
24      MR. LUFT: Yes.
25      MR. GLATTER: And so there's no
```

---

Page 413

```
 1      KOHLMANN
 2  certification attached to it?
 3      MR. LUFT: We have the
 4  certifications for all of them.
 5      MR. GLATTER: I would ask you
 6  produce the certification to us.
 7      MR. LUFT: Sure.
 8      Ask the court reporter to mark
 9  as Exhibits 20 and 21, 20 is a post
10  from www.Palestine.info website and
11  it's the Arabic and 21 is the English
12  translation of it.
13      MR. GLATTER: Same reservation
14  of rights as to prior exhibit.
15      (Kohlmann Exhibits 20-21,
16  Documents, marked for
17  Identification.)
18  Q.  Mr. Kohlmann, have you seen
19  Exhibit 20 before?
20  A.  Yes.
21  Q.  Do you see on the bottom there
22  is a picture of Mr. Jaarah holding up what
23  appears to be his Will with his Will behind
24  him?
25  A.  That's correct, yes.
```

---

Page 414

```
 1      KOHLMANN
 2  Q.  It appears to be handwritten,
 3  correct?
 4  A.  I should clarify.  When I was
 5  saying before was video recorded, in order to
 6  video record something you first have to hand
 7  write it as a script.  When I refer to video
 8  recording it's because in the context of the
 9  Will he says as this video is being broadcast
10  now or this tape is being broadcast now so my
11  understanding it was intended for video
12  broadcast, but I don't discount that this is
13  a written copy of the Will.
14  Q.  Mr. Kohlmann, do you see if you
15  turn to the second page of Exhibit 20 that
16  most of the document is handwritten in black
17  ink with the exception of his name which is
18  written in red, correct?
19  A.  It's a little bit difficult to
20  see, but I believe that's correct, yes.
21  Q.  In doing your analysis of the
22  bus 19 attack and considering your
23  methodology with regard to the materials
24  Hamas posted on its website, did you consider
25  the fact that the document they're presenting
```

---

Page 415

```
 1      KOHLMANN
 2  as Mr. Jaarah's Will in fact had his name
 3  written in different ink than from the rest
 4  of the document?
 5      MR. GLATTER: Objection to
 6  form.
 7  A.  No, I did not consider that.
 8  Q.  Were you aware of that fact
 9  prior to my telling it to you?
10  A.  I believe I had noticed it, but
11  I mean as far as I could tell I'm not a
12  handwriting expert, it's difficult to tell
13  from the resolution there, but I believe the
14  handwriting looked awfully familiar, looked
15  awfully similar and my translater I believe
16  looking at this believed it was the same
17  handwriting so --
18  Q.  Is your translater a
19  handwriting expert?
20  A.  No, but he's a native Arabic
21  speaker, but I don't believe that fact in and
22  of itself was relevant.
23  Q.  Are you a handwriting expert,
24  Mr. Kohlmann?
25  A.  No.
```

---

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

EVAN KOHLMANN
December 3, 2010

Page 416

1      KOHLMANN
2  Q.  How about for English are you a
3  handwriting expert?
4  A.  No, I'm not a handwriting
5  expert.
6  Q.  But you are a native speaker,
7  aren't you?
8      MR. GLATTER: Objection to
9  form.
10  A.  I am a native speaker of
11  English.
12  Q.  Mr. Kohlmann, if I could ask
13  you to look back at page 20?
14  A.  Of what?
15  Q.  Sorry, Exhibit 20?
16      MR. GLATTER: That's the
17  Arabic.
18  Q.  Do you see that there is a
19  portion of the Will that's been crossed out?
20  A.  I noticed that there is half a
21  line that's been crossed out, yes.
22  Q.  Did you notice that when you
23  were reviewing the website?
24  A.  Yes.
25  Q.  Did you determine what the

Page 417

1      KOHLMANN
2  crossed out language said?
3  A.  I don't believe we could read
4  what was underneath there, no.
5  Q.  Did you in considering your
6  methodology as to the veracity and likelihood
7  of more likely than true the materials posted
8  by Hamas with regard to this attack take into
9  consideration the fact that part of his Will
10  had been crossed out?
11      MR. GLATTER: Objection to
12  form.
13  A.  I did consider that, yes.
14  Q.  How did you take that into
15  consideration?
16  A.  I compared it to other Wills
17  that we've seen, other copies of Wills we've
18  seen that have been written by would be
19  suicide bombers both in the Palestinian
20  territories and beyond and what I determined
21  is that it's not uncommon at all with regard
22  to a draft of the martyrdom Will for people
23  to write things and scratch them out.  It's a
24  fairly common thing.
25  Q.  If you could look at 21 the

Page 418

1      KOHLMANN
2  translation.  You see the third down the page
3  it starts in the name of martyr?
4  A.  Yes.
5  Q.  It says this operation is a
6  retaliation for and then what it says the
7  first thing it's in retaliation for is what
8  was crossed out.  Did you take into
9  consideration the fact that what was crossed
10  out was the first item that said what the
11  attack was in retaliation for?
12      MR. GLATTER: Objection to
13  form.
14  A.  Again, we did take into account
15  the fact that there was material crossed out
16  in the text.
17  Q.  Did you know that what was
18  crossed out was what it said the first item
19  he said the attack was in retaliation for?
20  A.  I don't recall.  We did take
21  into account that there was crossed out text,
22  but I don't recall if we actually attempted
23  to determine the substantive nature of what
24  was in the text.
25  Q.  Mr. Kohlmann, given that you

Page 419

1      KOHLMANN
2  had access to the original version on the
3  web, I'm sorry, given that you had access to
4  the original version, the handwritten version
5  of the website, why did you cite to the typed
6  version of the website in your report?
7      MR. GLATTER: Of the website?
8  Q.  Of the Will on the website?
9  A.  Actually I cited to both.  When
10  I cited to the actual Will, I cited to the
11  typed up version only because of the fact
12  that frankly it was easier to read, but there
13  are specific cites to the images which we
14  discovered on the Palestine info site of Mr.
15  Jaarah including I believe the images of his
16  Will, but in terms of when I was quoting from
17  the Will since typewritten documents are
18  generally speaking much easier to read than
19  handwritten documents, we cited to the
20  typewritten page, but like I said as part of
21  my report I would include in the appendix
22  copies of the handwritten Will as well and I
23  believe the images were cited in fact in my
24  report.
25  Q.  Mr. Kohlmann, do you know who

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

EVAN KOHLMANN
December 3, 2010

Page 428

1    KOHLMANN
2  Q.  Here again you base your
3  conclusion based on what was something that
4  posted on the al-Qassam.ps website?
5  A.  That's correct, yes.
6  Q.  There were no photos?
7  A.  I believe in this case there
8  was no photo, there was just the statement,
9  the communication by the Ezzadeen al-Qassam
10  Brigades.
11  Q.  No video?
12  A.  I don't believe so.
13  Q.  Was there a detailed biography?
14  A.  I don't recall.  I don't
15  believe so. There was detail enough they
16  identified the bomber and where he was from,
17  but I don't believe they identified much more
18  about his background.
19  Q.  How about a Will, was that
20  there?
21  A.  I don't believe so, but I'd
22  have to check exactly.  If anything it would
23  have been in the context of a communica, it
24  would not have been a separate Will.
25  Q.  What is your conclusion with

Page 429

1    KOHLMANN
2  regard to the Sheffield Club bombing?
3  A.  The conclusion is that it's
4  more likely than not that Hamas played some
5  culpable role in the attack on the fact
6  that they issued what is an authentic
7  credible claim of responsibility for not just
8  that operation, but a number of operations
9  including the attack on the Sheffield Club.
10  Q.  Do you see the claim for the
11  Sheffield Club came more than six years after
12  the attack?
13  A.  Yes.
14  Q.  The facts which you describe,
15  the person's name and the date and that they
16  detonated a bomb and the number of people
17  they killed, did you do anything to determine
18  if all that information was public
19  information at the time the claim was made
20  six years -- over six years after the fact?
21  A.  It may have been public at the
22  time.  I did not do anything specific to look
23  into that.
24  Q.  What unique information did
25  Hamas include in its claim that was not

Page 430

1    KOHLMANN
2  public knowledge at the time?
3  A.  In this particular case I don't
4  necessarily know that there is a piece of
5  unique information.  It's a credible claim --
6  it's an authentic claim of responsibility on
7  an authentic Hamas website.
8  Q.  Other than that it comes on a
9  Hamas website, what about their claim is
10  credible given that they are only citing
11  public information and they cite none of the
12  other evidence you rely on typically -- you
13  would typically see with a Hamas claim?
14    MR. GLATTER: Objection to
15  form.
16  A.  This goes back to the issue
17  that I was describing before which is that
18  Hamas generally speaking tells the truth in
19  its on line communicas.  It exaggerates, but
20  generally speaking it tells the truth.  In
21  this case if the majority of instances when
22  Hamas issues a communica in general the
23  communica is at least significantly truthful,
24  that means that more likely than not if Hamas
25  issues a communica claiming credit for an

Page 431

1  operation, then more likely than not it did
2  play some culpable role.  There's not
3  specific indicia in this other than the fact
4  that Hamas claimed credit for it and was
5  detailed enough that six years afterwards was
6  still able to identify the bomber and the
7  location albeit that may have been public
8  information, but six years later Hamas still
9  remembered that.  It's unusual for an
10  organization to claim credit for an operation
11  six years later unless they have specific
12  reasons to do that. Sometimes organizations
13  do, but in this case I believe even lacking a
14  video recording or lacking photographs or a
15  Will or martyrdom bio, in my mind it's still
16  more likely than not that this is a credible
17  claim of responsibility.
18  Q.  Did you do an examination in
19  your methodology to determine what their
20  motivation was for making the claim over six
21  years later?
22  A.  No, I did not.  It's not
23  entirely unusual.  Terrorist groups do this,
24  not just Hamas, but a number of groups do

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

EVAN KOHLMANN
December 3, 2010

Page 432

KOHLMANN

1
2     this.  Al-Qaeda releases martyrdom Wills on
3     9-11 hijackers ten years later after 9-11.
4     The al-Qaeda in the Arabian Peninsula in
5     Yemen took over six months to the release a
6     video of the individual who attempted to
7     carry out the bombing on board the flight.
8     The Pakistani Taliban took I think six months
9     to release video of the individual who
10    attempted to carry out a bombing in Times
11    Square.  It's not that unusual for groups to
12    wait a while to issue a claim.  That just
13    happens.
14    Q.   Six months is not six years, is
15    it?
16    A.   Yeah, but again, there are 9-11
17    hijackers Wills that are still coming out
18    now.
19    Q.   They took credit for 9-11 a
20    little sooner than that, right?  Pretty much
21    from the outset they said they did it?
22    A.   Like I said, the definitive
23    proof sometimes takes a while to come out and
24    whether it's in the form of a communica or in
25    the form of video Al-Qaeda's way of claiming

Page 433

KOHLMANN

1
2     credit for this was to release hijacker Wills
3     and the fact that it continues to release
4     hijackers Wills ten years later is an
5     indicator that for al-Qaeda it does not
6     matter the fact that six years has passed,
7     that the idea of claiming credit for that
8     attack is still something that they feel is
9     necessary to do and which they continue to do
10    it.
11    Q.   Is al-Qaeda Hamas?
12       MR. GLATTER: Can you let him
13    finish his answer?  Were you finished
14    with your answer, Mr. Kohlmann?
15    A.   With regard to your point about
16    al-Qaeda not being Hamas, that's correct, not
17    all terrorist groups are the same.
18    Q.   That was my question.
19    A.   But it's not just al-Qaeda,
20    there are a number of groups that do this.
21    The Islamic Army of the Caucuses in Chechnya,
22    it's not all together, maybe it doesn't
23    happen every day, but it's not that unusual.
24    Groups sometimes take time to claim credit
25    for operations.

Page 434

KOHLMANN

1
2     Q.   For any of the 15 attacks have
3     you ever visited the attack site?
4     A.   I have never been to Israel or
5     the occupied territories.
6     Q.   Have you examine any forensic
7     evidence related to the attack itself?
8       MR. GLATTER: Objection, asked
9     and answered. You can answer again.
10    A.   Again, beyond the documents
11    that were proffered by Hamas via their
12    on-line mechanism, no, those are the forensic
13    documents I relied on in this case.
14    Q.   Did you examine the police
15    files related to the attacks?
16       MR. GLATTER: Objection, asked
17    and answered.
18    A.   No, I did not.
19    Q.   Did you examine any court files
20    related to these attacks?
21       MR. GLATTER: Objection, asked
22    and answered.
23    A.   No, I did not.
24    Q.   Mr. Kohlmann, is it your
25    testimony that you think there is something

Page 435

KOHLMANN

1
2     that makes it more likely than not true
3     because Hamas recalled new public information
4     that was known to the public for six years
5     and was able to reprint it that made it more
6     likely than not that Hamas committed the
7     attack?
8       MR. GLATTER: Objection to
9     form, vague and ambiguous.
10    A.   No, that's not what I said.
11    Q.   Mr. Kohlmann, if we can look at
12    your section on with regard to the January
13    29, 2003 shooting attack on page 35.  Do you
14    see that you state that they narrated the
15    events that took place in remarkable detail?
16    A.   Yes.
17    Q.   You think it's significant that
18    the detail was remarkable?
19    A.   I don't know if remarkable is
20    the right word or not, but I believe --
21    Q.   It's your word, right?
22    A.   Yes.  It's my word.  I don't
23    know if remarkable is necessarily the right
24    word, but I do believe that the amount of
25    detail they are offering here is fairly

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

EVAN KOHLMANN
December 3, 2010

Page 468

1     KOHLMANN
2   had a chance to save the entire site, but we
3   do have individual files saved.
4   Q.   That was from the 2002 to 2004
5   time period?
6   A.   Yes.  I think between 2002 and
7   2004 we have between two and three complete
8   copies of the then official al-Qassam
9   website.
10  Q.   Discussing the 2002 to 2004
11  time period a second ago you made repeated
12  reference to we, who is we?
13  A.   I'm sorry, when I say we at
14  this point it's because of the fact that I do
15  work now as part of a partnership and with
16  employees and what not.  At that point in
17  time it would have been me.
18  Q.   Royal we?
19  A.   The royal we.
20  Q.   Let me ask you mentioned
21  certain logistical issues that you would try
22  your best to download individual files
23  day-to-day?
24  A.   When they were particularly
25  relevant to research we were doing.  It's

Page 469

1     KOHLMANN
2   obviously impossible to save every single
3   relevant individual file off of websites
4   which is one reason where as much as possible
5   we try grabbing the whole database, but if a
6   particular operation was of significance to
7   something we were doing or significant to
8   some aspect of an organization we were
9   researching, yes, we would save that or if we
10  anticipated that it might be relevant to a
11  particular mission or a job we were
12  undertaking, but that's also one of the
13  reasons why we were trying to grab the entire
14  database of the websites as frequently as
15  possible as then technology was allowing us
16  to do because of the fact that it's sometimes
17  difficult to know in the future what's going
18  to become relevant later on.
19  Q.   In 2002 and 2004 what projects
20  relating to Hamas were you doing and how did
21  that inform which information you pulled down
22  from the web?
23  A.   I can speak generally to that
24  because some of those projects I believe are
25  covered by privilege, by legal privilege and

Page 470

1     KOHLMANN
2   I think some of them are sensitive, but
3   generally speaking we were looking into first
4   of all obviously we were looking into any
5   efforts by Hamas to use its official websites
6   to raise money to solicit donations, to
7   solicit funding.  We were interested in any
8   comments that Hamas made about the United
9   States or about the United States government
10  or about U.S. foreign policy or about its
11  intent to attack or not to attack the United
12  States.  We were interested in any statements
13  that it might have made with regard to
14  al-Qaeda.  We were interested in any
15  statements it made with regard to foreign
16  nationals i.e. non Palestinian nationals
17  engaged in activities on behalf of Hamas such
18  as the two individuals who allegedly carried
19  out the Mike's Place bombing in Tel Aviv.
20     We were interested in any
21  indications they gave about methods of
22  communication, links to the United States.
23  Again, material that we felt was particularly
24  relevant to issues of recruitment, financing,
25  communications and also hierarchy.

Page 471

1     KOHLMANN
2   I saved quite a bit of material
3   from the sites about various leaders of Hamas
4   identifying who they were, the history of the
5   organization and in certain cases certain
6   attacks of particular significance such as
7   the Mike's Place attack or such as suicide
8   bombings where they were recorded on video,
9   things like that.  Again, it's a wide -- it
10  really depended on what we were working on,
11  but we were working on a variety of tasks
12  related to studying Hamas communications,
13  financing, recruitment not just in and of
14  itself, but also to do comparative studies to
15  understand the differences between Hamas and
16  other terrorist organizations.
17  Q.   When you say we?
18  A.   It's the royal we.  It goes
19  back to the fact that I'm so used to working
20  with other people now.
21  Q.   Were there Hamas websites from
22  the period of let's say from the time you
23  started -- from the period of 2002 to 2004
24  that you reviewed that you chose not to
25  include in your database?

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

EVAN KOHLMANN
December 3, 2010

Page 472

KOHLMANN

1
2    MR. LUFT: I'm told we have to
3    change the tape.
4    THE VIDEOGRAPHER: This is the
5    end of tape two.  The time is 1:22
6    p.m. on December 3, 2010.
7    (Recess taken.)
8    THE VIDEOGRAPHER: This is tape
9    three of the deposition of Evan
10   Kohlmann.  The time is 1:23 p.m. on
11   December 3, 2010.  We are now back on
12   the record.  You may proceed.
13   Q.  Mr. Kohlmann, do you have my
14   question still fresh in your mine?
15   A.  I would prefer if you could
16   repeat it.
17   (Record read.)
18   A.  Not deliberately chose not to
19   include it.  There might have been -- at
20   certain points we had an iteration of a
21   particular site where we didn't get it in
22   time to save an entire copy of it off line,
23   but as much as we had the opportunity our
24   general philosophy with regards to Hamas both
25   then and all other groups is that if we are

Page 473

KOHLMANN

1
2    aware of a site and we have the technical
3    capability and storage room, resources to
4    store it we will download it regardless of
5    whether or not it's particularly relevant to
6    us now or not.
7    We've gotten much better at
8    that as time has gone on because our
9    resources and ability to save entire websites
10   just based on the nature of the internet and
11   speed and what not got easier, but we never
12   made a conscious decision not to save a
13   website.
14   Q.  Recognizing the constraints
15   that technology put on you, is it fair to say
16   that the sub database is a fairly accurate
17   record of the Hamas websites that you
18   reviewed?
19   MR. GLATTER: Objection to
20   form.
21   A.  Minus the work that I did -- I
22   was at the Investigative Project until late
23   2003 so it's important to recognize that some
24   of the archive copies of the sites we created
25   back then or I created back then were saved

Page 474

KOHLMANN

1
2    while I was at the Investigative Project so
3    they were saved on their database so it's not
4    included in our database.
5    Q.  They won't give you a copy?
6    A.  No, they don't generally give
7    out that kind of stuff so again minus that as
8    much as possible when we had the opportunity
9    and the technical capability and resources we
10   did attempt to make copies of whatever
11   material we could get our hands on.
12   I should note though that with
13   regard to two of the al-Qassam websites we
14   were unable to save complete copies of them
15   namely Kataeb-ezzaldeen and Qassamiyoon.com.
16   Q.  Did you have -- you mentioned
17   web spidering software in your --
18   A.  Yes, yes.
19   Q.  Could you explain to me when
20   you started using web spidering software to
21   collect data?
22   A.  When I started using it for my
23   own database or when I started using it?
24   Q.  For your own database?
25   A.  For my own database I began

Page 475

KOHLMANN

1
2    using web spidering information in my own
3    database starting in approximately 2003, late
4    2003, early 2004 about the time where I left
5    the Investigative Project.  At the time when
6    I was working at the Investigative Project
7    quite obviously they had more resources, hard
8    drive and otherwise into the faster internet
9    connections than I did so it made more sense
10   at that point to store archives of the sites
11   I was collecting on their system.  Once I
12   began separating the Investigative Project in
13   late 2003, then I began using the same
14   software which I had been using at the
15   Investigative Project to archive the sites
16   and I began archiving them from my own
17   purposes.
18   Q.  Do you recall when you left the
19   Investigative Project?
20   A.  Maybe December 2003.
21   Q.  Prior to your leaving the
22   Investigative Project in 2003, did you store
23   the majority of your materials with regard to
24   Hamas on their database or in your own?
25   A.  I don't recall.  It depends

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

EVAN KOHLMANN
December 3, 2010

Page 480

```
 1      KOHLMANN
 2  many hours, pretty much any time I was not in
 3  law school class I was on the web saving
 4  material from these websites.
 5  Q.   Were there days where you
 6  didn't have that same amount of time, let's
 7  say, during finals?
 8  A.   This is a very dangerous
 9  question.
10  Q.   I make no judgments.
11      MR. GLATTER: I don't know what
12  objection to make so I won't.
13  A.   I think it's fair to say that
14  certain days I had more time than others, but
15  I think it's also probably worthwhile
16  underlining that every day I saved a
17  significant amount of material, every day I
18  spent quite a bit of time doing research on
19  this.  It's something that you have in order
20  to get a feel for some of the sites it does
21  help even if you are not saving everything
22  day-to-day to at least be looking and reading
23  material on a regular basis.
24  Q.   Was there Hamas websites that
25  you were looking and reading, but not saving
```

Page 481

```
 1      KOHLMANN
 2  during this time period?
 3  A.   Including the ones we -- well,
 4  let me clarify. I often reviewed websites
 5  which we had copies of or which we would
 6  eventually create copies of.  The idea was to
 7  remain knowledgeable about these sites.
 8  There are no sites from which I was reading
 9  which we didn't save information off of or we
10  didn't create copies of, no, every Hamas
11  website that I was familiar with, every Hamas
12  website that was available to me we -- I
13  would regularly save material.  Let's pretend
14  it's the royal we.
15  Q.   That's fine.  I'll call you
16  Prince Kohlmann and we will go ahead.  I
17  understand you are telling me every website
18  you understood to be a Hamas website you
19  saved material from, is it correct that you
20  did not save all the materials that were on
21  that website that you may have read?
22      MR. GLATTER: Objection to
23  form.
24  Q.   Or may not have read?
25  A.   It's true that I might have
```

Page 482

```
 1      KOHLMANN
 2  read stuff individually and not saved it by
 3  hand, but that was what the purpose of doing
 4  the complete archive of the sites was that at
 5  least theoretically the idea was that
 6  anything that I read that I have not saved by
 7  hand because it's impossible to save
 8  everything by hand, the idea is that
 9  eventually there will be an archive of the
10  entire website so that in case I missed
11  anything and I want to go back or something
12  becomes relevant later on, theoretically we
13  would have a complete copy of that site.
14  Q.   Did you ever do due diligence
15  or check to make sure that everything on that
16  had been on the website for that year was
17  captured in the year end sort of web
18  spidering capture of the site?
19  A.   I didn't do it file by file,
20  but because of the fact that web spidering
21  software sometimes encounters errors, what I
22  would frequently do is I would browse the
23  downloaded website to see whether or not
24  particular files were missing.  Occasionally
25  one or two files might have been left off,
```

Page 483

```
 1      KOHLMANN
 2  but as far as I could tell in most instances
 3  where I saved this stuff it was done
 4  properly.  There are a few times I believe
 5  there were aborted spidering.  I didn't
 6  delete those efforts, I kept them because of
 7  the fact that there is some information there
 8  which is relevant, I understand that may not
 9  be that this was an aborted download or
10  something like that so it may not have every
11  last item.
12  Q.   For every file in your sub
13  database, do you know who wrote it, when it
14  was published, where it came from?
15      MR. GLATTER: Objection to
16  form.
17  A.   Many I do, not all.  This goes
18  back to the idea that we created -- I created
19  a specific naming format to try -- when I was
20  saving files by hand, if I needed to know
21  what the source of the file was when it was
22  saved, etc., etc.  I saved it in a specific
23  naming format which I'm not going to go into
24  because I think it's laid out in my report.
25  Occasionally I would come across individual
```

**EXHIBIT 188 TO DECLARATION OF VALERIE SCHUSTER**



**EXHIBIT 189 TO DECLARATION OF VALERIE SCHUSTER**

موضوع الدرس          بسم الله الرحمن الرحيم          التاريخ / 2003

قال تعالى ولا تحسبن الذين قتلوا في سبيل
الله أمواتاً بل أحياءً عند ربهم يرزقون
صدق الله العظيم

أبنكم الشهيد على منبر يوسف بشارة.
لقد تمت بتنفيذ هذه العملية واستشهاد في سبيل الله
عز وجل ورداً مع الممارسات اليومية التي يرتكبها
الطارئ الصهيوني بحق شعبنا الفلسطيني المرابط في
أرضهم واستكمالاً لشهداء مجزرة هذا الشتاء في غزة
وشهداء فلسطين كامل.

وستظل نشاهد كأنها يا أخ هذه العملية سلسلة
من العمليات لنصرة استشهاد في القادمة والقادم
وعلى.

أنا أخي الحبيب : أوصيكم بتقوى الله عز وجل والصلاة
وما تقدر تسا حضن بالدعاء أرشاء الله هذا أوصيكم
باتم تفرحوا ولا تحزنوا وأنا أريد منك أنا
تفرحي لحسن أنه الشهيد الذي يا نيما شاء الله عز وجل
والشهداء الذين سيقبلوا والذين سوف يبعثون
بإذن الله. قال تعالى ٢٢

الحمد والذكر لشهداء ثناء أبراج حي المزرعة والعار
للذرية وعلوبيت والذكر للجهاد واحمية شكر محمد بعملية
...شهيد في النهر... تباركت شهداء الأضحى وصدق
...الشهيد حاد وصدق



أخ الشهيد

Subject of the Lesson    *In the Name of God, the Merciful, the Compassionate*    Date  /  /2003

*Almighty God said:* "*Do not think of  those killed for God as dead. They are alive with God.*"

<div align="right">

*God Almighty spoke the truth*

</div>

*Your son, martyr, Ali Mounir Youssef Ja'ara*
          *I have executed this martyr operation for Almighty God and in response to the daily practices committed by the Nazi, Sharon, against our Palestinian people, steadfast on their land, and in retaliation for the martyrs of the Al-Zaytoun District massacre in Gaza, and all the martyrs of Palestine.*
          *We tell the Nazi, Sharon, that this operation is a series of martyr operations to come, and what's to come is greater.*
          *To my beloved mother: I advise you to fear God, and to forgive me by praying for me, God willing. I ask you not to cry for me, but I want you to rejoice in the wedding of your martyr son, who answered Almighty God's call, and the martyrs before me and those who will follow me, God willing. Almighty God Said:* [text cut off]

*Glory and immortality to our heroic martyrs, and shame and defeat to the traitors and infiltrators. Healing to the wounded, and freedom to the prisoners and the detainees.*

*It is a revolution until victory / Al-Aqsa Martyrs Troops, Martyr Ayman Jouda Unit*

*Your martyr son*                                             Jawwal



**TRANSPERFECT**

ALBANY
AMSTERDAM
ATLANTA
AUSTIN
BARCELONA
BERLIN
BOGOTA
BOSTON
BRUSSELS
CHARLOTTE
CHICAGO
DALLAS
DENVER
DUBAI
DUBLIN
FRANKFURT
GENEVA
HONG KONG
HOUSTON
IRVINE
LONDON
LOS ANGELES
LYON
MEXICO CITY
MIAMI
MILAN
MINNEAPOLIS
MONTREAL
MUNICH
NEW YORK
PARIS
PHILADELPHIA
PHOENIX
PORTLAND
PRAGUE
RESEARCH
TRIANGLE PARK
SAN DIEGO
SAN FRANCISCO
SAN JOSE
SEATTLE
SINGAPORE
STOCKHOLM
STUTTGART
SYDNEY
TOKYO
TORONTO
VANCOUVER
WASHINGTON, DC
ZURICH

City of New York, State of New York, County of New York

I, Anne Fang, hereby certify that the following is, to the best of my knowledge and belief, a true and accurate translation of the following document, "Ja'ara Will from Uncle's Website", from Arabic into English.

Anne Fang

Sworn to before me this

Wednesday, November 24, 2010

Signature, Notary Public

KEVIN M KELLEY JR
Notary Public - State of New York
No. 01-KE-6229268
Qualified in Queens County
Stamp, Notary Public    My Commission Expires October 4, 2014

**EXHIBIT 190 TO DECLARATION OF VALERIE SCHUSTER**

Eight killed in Israeli invasion of Gaza City: Battle mars US envoys' bid to revive peace talks The Guardian (London) - Final Edition January 29, 2004



4 of 5 DOCUMENTS

Copyright 2004 Guardian Newspapers Limited
The Guardian (London) - Final Edition

January 29, 2004

**SECTION:** Guardian Foreign Pages, Pg. 11

**LENGTH:** 520 words

**HEADLINE:** Eight killed in Israeli invasion of Gaza City: Battle mars US envoys' bid to revive peace talks

**BYLINE:** Conal Urquhart

**BODY:**

Eight Palestinians, including three teenagers, were killed yesterday when the Israeli army responded to an attack by invading a suburb of Gaza City with tanks and bulldozers.

The patrol was attacked by militants with rocket-propelled grenades and explosives in no man's land between the Israeli settlement of Netzarim and the suburb of Zeitoun.

It returned fire and moved towards Zeitoun.

According to witnesses five people were killed within seconds of each other near to a rundown industrial estate.

Three of the dead were thought to be teenage apprentices at a car workshop who ran for cover, but were shot by soldiers in an Israeli tank.

The caretaker of a building overlooking the street went to help and was also shot dead.

A fifth man, who may have been armed, was shot dead as he hid behind an oil barrel.

Witness said at least three other Palestinian fighters were killed during the gun battle, which lasted two hours.

The Israeli army said it had suffered no casualties.

A spokesman said: "The Israeli army was activated when it had intelligence that an attack was being planned against civilian and military targets in Netzarim. The army came under heavy fire and it returned fire only at sources of fire, and marked several hits."

He said his information came from the army officers involved in the operation and he could not contradict reports that non-combatants were killed.

The attack was begun by a small force of militants from Islamic Jihad, but as the Israelis moved into Gaza City scores of gunmen from other factions joined in.

The fighting came as the US envoys John Wolf and David Satterfield, who are trying to revive peace negotiations, met the Palestinian prime minister, Ahmed Qureia. They were due to meet Israelis as well.

Mr Qureia said the Americans demanded that he hold talks with the Israeli prime minister, Ariel Sharon.

"We told them, 'OK, help in the preparation for the meeting,'" Mr Qureia said. "We are not against it."

The Palestinian head of peace negotiations, Saeb Erekat, said: "There are serious efforts to revive peace efforts by the Americans and the Egyptians . . . This will undermine the efforts."

Eight killed in Israeli invasion of Gaza City: Battle mars US envoys' bid to revive peace talks The Guardian (London) - Final Edition January 29, 2004

Within hours of the gun battle, a funeral procession had begun. Vans with loudspeakers blared: "Death to Jews".

The black flags of Islamic Jihad were waved and hundreds of gunmen fired rifles.

Sheikh Nafez Azzam, an Islamic Jihad leader, said: "Five out of the eight dead were killed in cold blood. They were just working when they were killed. There was no attack on the Israelis. They just want to eliminate Palestinians and make them surrender."

As the bodies were buried, canopies were erected and chairs put outside the homes of the dead men. In such cases, if a dead man is not a member of any faction, one of them will cover the costs of the funeral and the seven days of mourning so that it can claim him as its martyr.

Links www.mogaza.org Municipality of Gaza www.palestinercs.org Palestinian Red Crescent www.btselem.org B'tselem Israeli human rights campaign

guardian.co.uk/israel

**LOAD-DATE:** January 29, 2004

**EXHIBIT 191 TO DECLARATION OF VALERIE SCHUSTER**



EXHIBIT

PENGAD 800-631-6989

### The Promise that Nasralla Made

#### • Hezbollah easily penetrated the anarchy existing in the Territories ▪ Nasralla's liaisons are transforming the Strip into the South Lebanese model ▪

The successful conclusion of the prisoner exchange deal with the Hezbollah gave terror a signal to return to its routine of murder and horror. The Palestinian terror syndicate had restrained itself in recent weeks to prevent damage to the deal, but the minute that it passed the point of no return, all restraints were loosened. Only two days ago, Hassan Nasralla announced that he's preparing a surprise for us. Yesterday, we received it on Aza Street in Jerusalem.

Ali Jara of Daheyshe, the terrorist who committed suicide in Jerusalem yesterday, was a member of the Al-Aqsa Martyrs' Brigades, the military arm of the Fatah. That is not important because all the Palestinian terrorist organizations have become Hezbollah devotees in recent months. The Iran-Hezbollah-Territories axis has heated up, and a large amount of money has flown through it, greasing the terrorist system. Recently Hezbollah has strongly sought to escalate the terror. Instructions – or more correctly, pressure – to commit terrorist attacks are communicated from Nasralla's liaisons in Lebanon directly to Nablus, Jenin and Gaza. In general, terror and guerilla warfare in Gaza, under the guidance and assistance of the Hezbollah, has transformed the Strip into a role model [*sic*] of South Lebanon.

The Territories are currently immersed in anarchy. With the exception of the monthly wages that 50,000 PA security personnel and clerks still receive, there is no indication of governance. Hamas' power is on the rise and it now not only threatens Israel, but also the legitimacy of the PA. It is no wonder that Hezbollah has succeeded in becoming a dominant factor in this "culture of death" of a divided and torn society – albeit highly motivated, with women who request to join the circle of suicide bombers.

The attack yesterday had the Hezbollah's prints on it. Presumably, Nasralla was satisfied: He managed to drag Israel into a prison-exchange deal that served his own interests; he managed to become the patron and savior of Palestinian society, and at the same time, to encourage and commission acts of terror, and to announce, through the blood of the murdered victims, that he has not changed his policy.

Hezbollah has obliterated the boundaries between the Palestinian terrorist organizations and the impetus toward their Islamization and Hezbollah-ization. This growing involvement also succeeded because of the governmental chaos prevalent in the Territories, which turned Arafat into a leader devoid of any governing ability, hardly even the "President" of the Mukata. He does not do even the little that he is able to do, such as asking his people to stop their spree of murder and blood. Consequently, he has become irrelevant in all aspects regarding terror.

The instructions to commit terrorist attacks come from the command posts that are located outside the Territories; that is where the money and the instructions both come from. Two of the hottest names that activate terror in the Territories on behalf of Hezbollah are Kais Obeid, an Arab-Israeli originally from Taybe in the Triangle Region and a member of the Hezbollah terrorist structure, and Munir Makdah, a Fatah leader who is fully cooperating with Hezbollah. The instructions of the two are clear: terrorist attacks – exclusively inside Israel.

PENGAD 800-631-6989

**EXHIBIT**

ًﺍﻟﺨﻠﯾﻝ  -ﺍ.ﺭﺭ/ﺍﻥ

١١٤/١٠       ٢

The defense establishment has been talking about destroying the infrastructure of terror for the last three years, but it appears that this is a flame that cannot be snuffed out. Every night, the GSS (Shabak) arrests fugitives and people who are wanted for questioning. Last month, over 20 potential suicide bombers were arrested. The list of fugitives, printed in January 2003, has become much leaner, and the names that now appear on it are from the third and fourth league. Yet, nonetheless, the reservoir of terror is endless, they do not lack volunteers or money and there is no shortage of explosive belts.

Ali Jara is the 134th suicide bomber since the beginning of the Intifada. We have stopped counting, but in the last three and a half years, there have been 128 suicide bomb attacks in Israel. It is no longer a marginal phenomenon. And the end of this insanity in not even in sight.

Ronny Shaked

**Friday, Seven in Sheva January 30, 2004        Yediot Aharonot Weekend Supplement   5**



**TRANSPERFECT**

ALBANY
AMSTERDAM
ATLANTA
AUSTIN
BARCELONA
BERLIN
BOGOTA
BOSTON
BRUSSELS
CHARLOTTE
CHICAGO
DALLAS
DENVER
DUBAI
DUBLIN
FRANKFURT
GENEVA
HONG KONG
HOUSTON
IRVINE
LONDON
LOS ANGELES
LYON
MEXICO CITY
MIAMI
MILAN
MINNEAPOLIS
MONTREAL
MUNICH
NEW YORK
PARIS
PHILADELPHIA
PHOENIX
PORTLAND
PRAGUE
RESEARCH
TRIANGLE PARK
SAN DIEGO
SAN FRANCISCO
SAN JOSE
SEATTLE
SINGAPORE
STOCKHOLM
STUTTGART
SYDNEY
TOKYO
TORONTO
VANCOUVER
WASHINGTON, DC
ZURICH

City of New York, State of New York, County of New York

I, Sara Hutchison, hereby certify that the document "The Promise that Nasralla Made" is, to the best of my knowledge and belief, a true and accurate translation from Hebrew to English.

Sara Hutchison

Sworn to before me this
November 3, 2010

Signature, Notary Public

KRISTIN MILORO
Notary Public - State of New York
No. 01MI6212799
Qualified in New York County
Commission Expires Oct 19, 2013

Stamp, Notary Public

THREE PARK AVENUE, 39TH FLOOR, NEW YORK, NY 10016   T 212.689.5555   F 212.689.1059   WWW.TRANSPERFECT.COM

**EXHIBIT 192 TO DECLARATION OF VALERIE SCHUSTER**

Case 1:05-cv-04622-DLI-RML   Document 267-15   Filed 03/22/12   Page 504 of 910 PageID #: 7881



משרד ראש הממשלה

חיפוש | בכל האתר | חפש | חיפוש מתקדם | عربي | English

ראש הממשלה
ממשלת ישראל
מזכירות הממשלה
משרד ראש הממשלה
היסטוריה
תקשורת
הודעות דובר
נאומים
יומן אירועים
ראיונות
מתקפת הטרור על ישראל
פניות הציבור
ארכיון
מכרזים
מינהלת תנופה
תוכניות עבודה 2010

משרד ראש הממשלה ‹ תקשורת ‹ מתקפת הטרור על ישראל ‹ ירושלים ‹ ירושלים

## ירושלים

### 29/01/2004

פיצוץ עז החריד בסביבות השעה רבע לתשע את שכונת רחביה בבירה, לא הרחק מבית רה"מ. מחבל מתאבד עלה לאוטובוס קו 19 והתפוצץ בחלקו האחורי. 11 בני-אדם נהרגו ולמעלה מ-40 נפצעו. פיצוץ עז התבצע ביום עסקת השבויים. נהג האוטובוס, שלום זקן, נפצע בפיגוע והובהל לבית-החולים הדסה עין כרם, כשהוא סובל מחבלות בראשו ובפניו. "אני לא זוכר בדיוק את המקרה", סיפר. "נסעתי ברחוב עזה, העלייתי נוסעים בתחנה הראשונה ובתחנה השנייה. לא ראיתי אף חשוד. יצאתי מהתחנה, נסעתי עוד 20 מטר, ואז אירע הפיצוץ. האוטובוס נעמד". המחבל שבצע את הפיגוע, עלי מוניר ג'ערה בן 23 תושב מחנה הפליטים אל-אעידיה שליד בית לחם, חבר בגדודי חללי אל אקצה, הזרוע הצבאית של הפת"ח. ג'ערה ששירת במשטרה הפלשתינית בתפקידי סיור, הוא המתאבד ה-134 שפוצץ את עצמו מאז תחילת האינתיפאדה בספטמבר 2000.

**רוזי בונה**
קרא בהרחבה

**יחזקאל גולדברג**
קרא בהרחבה

**וירל אוקטביאן פלורסקו**
קרא בהרחבה

**ברוך חונדיאשווילי**
קרא בהרחבה

**אברהם בלחסן**
קרא בהרחבה

הבא ›› 1 , 2 , 3

החלטות ממשלה וועדות שרים ←

פניות הציבור ←

תגובות והצעות ←

# Prime Minister's Office

Prime Minister's Office > Media > Terrorist Attack on Israel > Jerusalem > Jerusalem

Jerusalem

**January 29, 2004**

A strong explosion was heard throughout the Rechavia neighborhood in the Capital, close to the Prime Minister's home. A suicide bomber climbed on bus line 19 and exploded in the back of the bus. 11 people were killed and more than 40 were injured. This attack takes place on the day a prison exchange deal is underway. Shalom Zakan, the bus driver, was injured in the attack and was brought to the Hadassah Ein-Kerem hospital suffering from injuries in his head and face. "I don't exactly recall what happened," he said. "I was driving in Gaza Street, taking passengers in the first and second stops. I did not notice anyone who looked suspicious. I left the stop, drove 20 meters or so and then the explosion occurred. The bus stood still." The suicide bomber who committed the attack, Ali Munir Jaara, 23 years old, a resident of the Al-Aida refugee camp near Bethlehem, was a member of the Al-Aqsa Martyrs' Brigades, the military wing of the Fatah. Jaara, who served as a patrolman in the Palestinian Police, is the 134th suicide bomber since the beginning of the Intifada in September 2000.



# CERTIFICATION

This is to certify that the attached *English* language document corresponding to the document *Prime Minister's Office, 1/29/04*, is a true and accurate translation of the original *Hebrew* language document to the best of our knowledge and belief

Executed this on
Tuesday, December 07, 2010

תיק תק תרגומים בע"מ
TIK TAK TRANSLATIONS LTD.
Co. No: 514280775 .פ.ח

*Tik Tak Translations Ltd.*
9 Hashiloah Street
Petach Tikva, 49180 ISRAEL
+972 3 907-4555

**EXHIBIT 193 TO DECLARATION OF VALERIE SCHUSTER**

משטרת ישראל

הודעתו של: / اعلان تبع:

| מספר זהות רقم الهوية | שם קודם الاسم السابق |
|---|---|
| 92066152 | |

הודעה מס' / اعلان رقم: 4
גליון מס' / اعلان رقم: 5
נسخة رقم: 4

שם משפחה اسم العائلة / שם פרטי الاسم الشخصي

תאريخ לידה تاريخ الولادة: 7.8.1284
מקום לידה مكان الولادة: كويت

דת الدين: مسلم
מין الجنس: 5

נשوי متزوج ☐  רווק اعزب ☑  גרוש مطلق ☐  אלمن ارمل ☐

العنوان: بيت لحم ر.ن. شارع ...

שם האב اسم الاب: ...

מס' טלفون نير رقم الهاتف اللاسلكي: ...

תاريخ التاريخ: 8.9.04
שעה الساعة: 1645
מקום المكان: ...

החוקر المحقق: ...



نقل جاءنا نقلا لعدوان

W_S098240

משטרת ישראל

| | | | הודעתו של: |
|---|---|---|---|
| | נסחה רקם 2 | גליון מס' 5 | הודעה מס' |

| שם באיתיות לטיניות לכתיבת האים בחרוף אנגליזה | שם משפחה שם האם | שם פרטי האם אישי | מספר זהות רקם הזהות |
|---|---|---|---|
| | | | שם קודם האם הקודם |

| דת הדין | מין הגינס | | | מצב משפחתי המצב האגתמאעי | |
|---|---|---|---|---|---|

| טל בעבודה הטלפון במקום העבל | טל בבית הטלפון בבית | | מקום לידה מכאן הולאדה | תאריך לידה תאריך הולאדה |

| שם וזמן מקום העבודה אסם ועבואן מקום העבל | | | העבואן |

| מס' טלפון נייד רקם ההאתף הלאסלכי | שם האב אסם האב | כתובת ההורים העבואן האב |

החוקר المحقق

| שם משפחה אסם העאילה | שם פרטי האים האישי | דרגה הרתבה | מס' אישי הרקם האישי | مكان מקום המקאן | ساعة שעה הסאעה | تاريخ תאריך התאריך |
|---|---|---|---|---|---|---|

1 (handwritten text — illegible)
2 (handwritten text — illegible)
3 (handwritten text — illegible)
4 (handwritten text — illegible)
5 (handwritten text — illegible)
6 (handwritten text — illegible)
7 (handwritten text — illegible)
8 (handwritten text — illegible)
9 (handwritten text — illegible)
10 (handwritten text — illegible)
11 (handwritten text — illegible)
12 (handwritten text — illegible)
13 (handwritten text — illegible)
14 (handwritten text — illegible)
15 (handwritten text — illegible)
16 (handwritten text — illegible)
17 (handwritten text — illegible)
18 (handwritten text — illegible)
19 (handwritten text — illegible)
20 (handwritten text — illegible)
21 (handwritten text — illegible)
22 (handwritten text — illegible)
23 (handwritten text — illegible)
24 (handwritten text — illegible)
25 (handwritten text — illegible)
26 (handwritten text — illegible)
27 (handwritten text — illegible)
28 (handwritten text — illegible)

(9.2001) 2600×50×2

3007מ"י

W_S098241

הודעתו של:

| משטרת ישראל | הודעה מס׳ | גליון מס׳ | אעלאן תיכ: |
| --- | --- | --- | --- |

הודעתו של: | אעלאן تيخ:

| מספר זהות רقم الهوية | שם פרטי الاسم الشخصي | שם משפחה اسم العائلة | שם בותיות לتهجئة الاسم في حروف انكليزية |
| --- | --- | --- | --- |

| שם קודם الاسم السابق | מצב משפחתי الحالة الاجتماعية | | | | דת الدين | מי הجنس |
| --- | --- | --- | --- | --- | --- | --- |
| | נשוי متزوج | רווק اعزب | גרוש مطلق | אלמן ارمل | | |

| תאריך לידה مكان الولادة | מקום לידה مكان الولادة | טל׳ בבית التلفون في البيت | טל׳ בעבודה مكان العمل |
| --- | --- | --- | --- |

| העنוان | שם ומקום העבודה اسم ومكان مكان العمل |
| --- | --- |

| מס׳ טלפון נייד رقم الهاتف اللاسلكي | שם האב اسم الاب | כתובת الوродים العنوان الاب |
| --- | --- | --- |

| תאריך التاريخ | שעה الساعة | מקום المكان | מס׳ איש الرقم الشخصي | דרגה الرتبة | שם פרטי الاسم الشخصي | שם משפحة اسم العائلة |
| --- | --- | --- | --- | --- | --- | --- |

החוקר المحقق

1. [handwritten Hebrew/Arabic — illegible]
2. [handwritten — illegible]
3. [handwritten — illegible]
4. [handwritten — illegible]
5. [handwritten — illegible]
6. [handwritten — illegible]
7. [handwritten — illegible]
8. [handwritten — illegible]
9. [handwritten — illegible]
10. [handwritten — illegible]
11. [handwritten — illegible]
12. [handwritten — illegible]
13. [handwritten — illegible]
14. [handwritten — illegible]
15. [handwritten — illegible]
16. [handwritten — illegible]
17. [handwritten — illegible]
18. [handwritten — illegible]
19. [handwritten — illegible]
20. [handwritten — illegible]
21. [handwritten — illegible]
22. [handwritten — illegible]
23. [handwritten — illegible]
24. [handwritten — illegible]
25. [handwritten — illegible]
26. [handwritten — illegible]
27. [handwritten — illegible]
28. [handwritten — illegible]

שעת סיום גביית ההודעה

מי"3007

(9.2001) 2600×50×2

**הודעתו של:** اعلان تبع:

**משטרת ישראל**

הודעה מס' 5 اعلان رقم — גליון מס' 4 نسخة رقم

| מספר זהות رقم الهوية | שם פרטי الاسم الشخصي | שם משפחה اسم العائلة | שם באותיות לטיניות الاسم في حروف انكليزية |
|---|---|---|---|
| | [illegible] | [illegible] | |

| שם קודם الاسم السابق | מצב משפחתי الحالة الاجتماعية | מין الجنس | דת الدين |
|---|---|---|---|
| | ☐ נשוי متزوج ☐ רווק اعزب ☐ גרוש مطلق ☐ אלמן ارمل | | |

| תאריך לידה تاريخ الولادة | מקום לידה مكان الولادة | טל' בבית التلفون في البيت | טל' בעבודה التلفون بمكان العمل |
|---|---|---|---|
| | | | |

| העונוان العنوان | שם ומען מקום העבודה اسم وعنوان مكان العمل |
|---|---|
| | |

| מס' טלפון נייד رقم الهاتف اللاسلكي | שם האב اسم الاب | כתובת ההורים العنوان الاب |
|---|---|---|
| | | |

| תאריך التاريخ | שעה الساعة | מקום المكان | החוקר المحقق מס' אישי الرقم الشخصي | דרגה الرتبة | שם פרטי الاسم الشخصي | שם משפחה اسم العائلة |
|---|---|---|---|---|---|---|
| | | | | | | |

[illegible]

שעת סיום גביית ההודעה [illegible]

(9.2001) 2600×50×2 — מ"ט 3007

[illegible signatures]

W_S098243

הודעתו של: / اعلان تبع
משטרת ישראל

הודעה מס' / اعلان رقم: 5 גליון מס' / نسخة رقم: 5

| מספר זהות رقم الهوية | שם פרטי الاسم الشخصي | שם משפחה اسم العائلة | שם באותיות לטיניות الاسم في حروف انكليزية |
|---|---|---|---|
| | [illegible] | [illegible] | |

| שם קודם الاسم السابق | מצב משפחתי الحالة الاجتماعية: נשוי متزوج ☐ רווק اعزب ☐ גרוש مطلق ☐ אלמן ارمل ☐ | מין الجنس | דת الدين |
|---|---|---|---|
| | | | |

| תאריך לידה تاريخ الولادة | מקום לידה مكان الولادة | טל' בבית التلفون في البيت | טל' בעבודה التلفون بمكان العمل |
|---|---|---|---|
| | | | |

| העונן العنوان | שם ומען מקום העבודה اسم وعنوان مكان العمل |
|---|---|
| | |

| מס' טלפון נייד رقم الهاتف اللاسلكي | שם האב اسم الاب | כתובת ההורים العنوان الاب |
|---|---|---|
| | | |

| תאריך التاريخ | שעה الساعة | מקום المكان | החוקר المحقق: מס' אישי الرقم الشخصي | דרגה الرتبة | שם פרטי الاسم الشخصي | שם משפחה اسم العائلة |
|---|---|---|---|---|---|---|
| | | | | | | |

[illegible]

שעת סיום גביית ההודעה:

(9.2001) 2600×50×2

מ"ז 3007

[illegible]

W_S098244

משטרת ישראל

**הודעתו של:**
اعلان تبع:

הודעה מס' اعلان رقم 5
גליון מס' نسخة رقم 6

| מספר זהות رقم الهوية | שם פרטי الاسم الشخصي | שם משפחה اسم العائلة | שם באותיות לטיניות الاسم في حروف انكليزية |
|---|---|---|---|
| | [illegible] | [illegible] | |

| שם קודם الاسم السابق | מצב משפחתי الحالة الاجتماعية | | מין الجنس | דת الدين |
|---|---|---|---|---|
| | ☐ נשוי متزوج ☐ רווק اعزب ☐ גרוש مطلق ☐ אלמן ارمل | | | |

| תאריך לידה تاريخ الولادة | מקום לידה مكان الولادة | טל' בבית التلفون في البيت | טל' בעבודה التلفون بمكان العمل |
|---|---|---|---|
| | [illegible] | | |

| העונה العنوان | | שם ומען מקום העבודה اسم وعنوان مكان العمل |
|---|---|---|
| 6) | | |

| מס' טלפון נייד رقم الهاتف اللاسلكي | שם האב اسم الاب | כתובת ההורים العنوان الاب |
|---|---|---|
| | | |

| תאריך التاريخ | שעה الساعة | מקום المكان | החוקר المحقق: מס' אישי الرقم الشخصي | דרגה الرتبة | שם פרטי الاسم الشخصي | שם משפחה اسم العائلة |
|---|---|---|---|---|---|---|
| | | | | | | |

שאלה: [illegible] 8.9.04 [illegible]
[illegible]
תשובה: [illegible]
[illegible]
[illegible]
[illegible]
[illegible]
[illegible]
[illegible]
[illegible] 8.9.04 [illegible]
תשובה: [illegible] 8 [illegible] 6 [illegible]
[illegible]
[illegible] 1 [illegible] 2 [illegible]
2 [illegible]
שאלה: [illegible]
תשובה: [illegible]
[illegible]
[illegible]
[illegible] 6 [illegible]
[illegible] 6 [illegible]
[illegible]

نوفل جهاد نوفل [illegible]

סיום [illegible]

שעת סיום גביית ההודעה

(9.2001) 2600×50×2

3007-מ

W_S098245

| משטרת ישראל | | הודעתו של: |
| --- | --- | --- |
| אעלּן תּביّن: | | |

| מספר זהות הזהות | שם פרטי האّيسم الشخصي | שם משפחה اسم العائلة | שם בא/יوחذ لتأييد الاسم في حروف انكليزية |
| --- | --- | --- | --- |
| 920662182 | וلّל | عبدالله | |

| מצב משפחתי الحالة الاجتماعية | רווק ☒ أعزب | נשוי متزوج | גרוש مطلق | אלמן أرمل | מין الجنس |
| --- | --- | --- | --- | --- | --- |

| תاريخ לידה مكان الولادة | מקום לידה مكان الولادة | טל' בבית הטלفون في البيت | טל' במקום העבודה الهاتف بمكان العمل |
| --- | --- | --- | --- |
| 7.4.84 | | | |

| כתובת العنوان | שם ومكان מקום العبودة שם וعنوان مكان العمل |
| --- | --- |
| نابلس العيزرية | |

| مס' טל' نقال رقم الهاتف اللاسلكي | שם האב اسم الأب | כתובת ההורים العنوان الأب |
| --- | --- | --- |
| | عبدالله | |

| תاريخ התاريخ | שעה الساعة | מקום المكان | החוקר المحقق الرقم الشخصي | דرجة الرتبة | שם פרטי الاسم الشخصي | שم משפחה اسم العائلة |
| --- | --- | --- | --- | --- | --- | --- |
| 29.04 | 15.00 | | 99/06 | רסמ | ירוں | קصّاب |

1 [handwritten Hebrew text]
2 [handwritten Hebrew text]
3 [handwritten Hebrew text]
4 [handwritten Hebrew text]
5 ✗ [handwritten Arabic signature]
6 [handwritten Hebrew text]  99/06
7 [handwritten Hebrew text]
8 [handwritten Hebrew text]
9 [handwritten Hebrew text]
10 [handwritten Hebrew text]
11 [handwritten Hebrew text]
12 [handwritten Hebrew text]
13 [handwritten Hebrew text]
14 [handwritten Hebrew text]
15 [handwritten Hebrew text]
16 [handwritten Hebrew text]
17 [handwritten Hebrew text]
18 ✗ [handwritten Arabic signature]
19 99/06

| שעת סיום גביית ההודעה | |
| --- | --- |
| (7.02) 6500×50×2 | מס'3007 |

W_S098246

משטרת ישראל

הודעתו של:

| מספר זהות מספר הזיהוי | שם פרטי הاسم الشخصي | שם משפחة اسم العائلة | שם באותיות לטיניות اسم العائلة في حروف انكليزية | הודעה מס' | גליון מס' 3 |
|---|---|---|---|---|---|
| 9 2066 2152 | סמי | | | | |

שם קודם الاسم السابق

| מצב משפחתי الحالة الاجتماعية נשוי | מין الجنس זכר | דת הדين مسلم |
|---|---|---|

| תאריך לידה تاريخ الولادة 7.2.84 | מקום לידה مكان الولادة |
|---|---|

العنوان

מס' טלפון נייד رقم الهاتف النقال

| שם האב اسم الأب سمي | כתובת ההורים العنوان الاب |
|---|---|

| תאريך التاريخ 21.8.04 | שעة الساعة 20:50 | מקום المكان | הرتبة | השם الاسم الشخصي | שם משפחה اسم العائلة |
|---|---|---|---|---|---|

*(הטקסט בכתב יד — 28 שורות בעברית, קשה לקריאה)*

1. ...
...

W_S098247

גליון מס' 2 نسخة رقم — הודעה מס' 3 اعلان رقم

**משטרת ישראל**

**הודעתו של:**
اعلان تبع:

| מספר זהות رقم الهوية | שם פרטי الاسم الشخصي | שם משפחה اسم العائلة | שם באותיות לטיניות الاسم في حروف انكليزية |
|---|---|---|---|
| | נופל | עדואן | |

| שם קודם الاسم السابق | מצב משפחתי الحالة الاجتماعية | מין الجنس | דת الدين |
|---|---|---|---|
| | ☐ נשוי متزوج ☐ רווק اعزب ☐ גרוש مطلق ☐ אלמן ارمل | | |

| תאריך לידה تاريخ الولادة | מקום לידה مكان الولادة | טל' בבית التلفون في البيت | טל' בעבודה التلفون بمكان العمل |
|---|---|---|---|
| | | | |

| העונאן العنوان | שם ומען מקום העבודה اسم وعنوان مكان العمل |
|---|---|
| [illegible] | |

| מס' טלפון נייד رقم الهاتف اللاسلكي | שם האב اسم الاب | כתובת ההורים العنوان الاب |
|---|---|---|
| | | |

| תאריך التاريخ | שעה الساعة | מקום المكان | החוקר المحقق מס' אישי الرقم الشخصي | דרגה الرتبة | שם פרטי الاسم الشخصي | שם משפחה اسم العائلة |
|---|---|---|---|---|---|---|
| 31.8.04 | | | | | יעקב | קרנץ |

בפעם השלישית בערך אחרי שפעם שמעתי את קול הפיצוץ ופרוס חזר
וסיפר לי כי הוא ברח מהמלון עבר ג'יפ והמלון התפוצץ ורגאי סחב וברח
מבית [illegible] מלון וגם רגבה אמר לי כי מלון אחד שהיה מלופף עם
סרט [illegible] (טייפ) הסגירו לרגבה ומלון נוסף שמסרתי לרגאי את בן יוקר
מה [illegible] רגבה אמר לי כי בערך 2400 [illegible] 2003 [illegible]
מקבר רחל [illegible] [illegible] ברגאי הוא סיפר לי שהוא ואחי פרוס לקחו
מלון ממלף כיבוי [illegible] חושך או כחול והם קשרו המלון בקבל לדלת של בניין
מגורים של משפחת 'אבו טרבוש' בבנין של 2 קומות הנמצא ליד למחנה הבצל
פרוס ורגאי עלו לגג עם מלון [illegible] והם רצו לצרוך המלון על חוט זהב
כדי שכאשר יעברו חיילים ויפתחו אותה את המלון של המלף כיבוי והפיל
עליהם אבל המלון התפוצץ כנראה כאשר חייל פתח הדלת כי פרוס
ורגאי הלכו הביתה לפני כן כי הדבר לא התקרה אליהם כדי שיצרכו
עליו המלון ואמר בכניסה לבנין טוב וירגאי חושים שיפתחו הדלת.

<u>שאלתי</u> כמה היה משקל של מלון זה?

<u>תשובתי</u> בערך כ"ג אומר כי אורכו של המלון היה 50 ס"מ וברוחב 10 ס"מ
והמלון התפוצץ כנראה ע"י חייל כי פרוס ורגאי פחדו לפרק מקבלת ולהשאיר
אותו קשור והלכו מהמקום כי לפי הציוד מיועד קרוב אליהם.

<u>שאלתי</u> מה ידוע לך על הפגנות חמאס?

<u>תשובתי</u> בתחילת 2004 לאחר שמונלה יאסין ורנ"ו עזיז רנתיסי ילאתן פרמיים
[illegible] להתחברות חמאס בה היית עם דגל חמאס ותמונות של
התרוגים כדי להדביקים על קירות וכן לכתוב סיסמאות חמאס היו לנו
100 תמונות של יאסין ורבע אותם קיבלו מחמד סאמי אל עזה ואיתנו
היו גם מחמד [illegible] המכונה מחמד ומורד ע"ו לטיף אבו טרבוש
בן 18 ומחמד פואד נופל עדואן בן דודי. בכן 16-17 כולם ממג אל עזה

<u>שאלתי</u> את איזו שכונה תכנן לבצע פיגוע?

<u>תשובתי</u> בתחילת 2004 ולאחר ירושלים כדי לתכנן פיגוד התאבדות
עם מוסתעין אבו גאזו ומחמד סאמי אל עזה את מוטאו אל עגוז
נכנסים לירושלים ומשם לכוון הסב של עמוד בררבך כדי ליורון מקום פיגוע

שעת סיום גביית ההודעה

(12.03) 6000×50×2

[signature] יעקב 9.9.04

מ־3007 x نوفل جهاد نوفل العدوان

W_S098248

משטרת ישראל

הודעתו של:

אעלאן تبع:

| הודעה מס' 3 | גליון מס' 3 | נسخة رقم |
|---|---|---|

مسلسل رقم هوية الهوية — שם קדום האسم السابق

שם באותיות לטיניות לניסיון האسم في حروف انكليزية — שם משפחה اسم العائلة: גובראן — שם פרטי الاسم الشخصي: בלאל

| דת الدين | מין الجنس | מצב משפחתי الحالة الاجتماعية | מקום לידה مكان الولادة | תאריך לידה تاريخ الولادة |
|---|---|---|---|---|
| | | נשוי متزوج ☐ רווק أعزب ☐ גרוש مطلق ☐ אלמן ارمل ☐ | | |

العنوان العنوان

טל' בעבודתו الهاتف بمكان العمل — שם ומקום מקום העבודה اسم وعنوان مكان العمل

מס' טלפון נייד رقم الهاتف اللاسلكي — שם האب اسم الأب — כתובת החורים العنوان الأب

| החוקר المحقق | | | |
|---|---|---|---|
| שם משפחה اسم العائلة | דרגה الرتبة | מס' אישי الرقم الشخصي | שם פרטי الاسم الشخصي | מקום المكان | שעה الساعة | תאריך التاريخ: 31.8.04 |

[handwritten body text — largely illegible]

1. ...
2. ...
3. ...

95/06

הודעתו של: / اعلان تبع:

משטרת ישראל

הודעה מס' / اعلان رقم: 1 גליון מס' / نسخة رقم: 1

18/1

| מספר זהות رقم الهوية | שם פרטי الاسم الشخصي | שם משפחה اسم العائلة | שם באותיות לטיניות الاسم في حروف انكليزية |
|---|---|---|---|
| 920662152 | [illegible] | [illegible] | |

| שם קודם الاسم السابق | מצב משפחתי الحالة الاجتماعية | מין الجنس | דת الدين |
|---|---|---|---|
| | נשוי متزوج ☐ רווק اعزب ☒ גרוש مطلق ☐ אלמן ارمل ☐ | [illegible] | [illegible] |

| תאריך לידה تاريخ الولادة | מקום לידה مكان الولادة | טל' בבית التلفون في البيت | טל' בעבודה التلفون بمكان العمل |
|---|---|---|---|
| 7.8.84 | [illegible] | 02-2745546 | |

| העונאן العنوان | שם ומען מקום העבודה اسم وعنوان مكان العمل |
|---|---|
| [illegible] | [illegible] |

| מס' טלפון נייד رقم الهاتف اللاسلكي | שם האב اسم الاب | כתובת ההורים العنوان الاب |
|---|---|---|
| — | [illegible] | |

| תאריך التاريخ | שעה الساعة | מקום المكان | החוקר المحقق | מס' אישי الرقم الشخصي | דרגה الرتبة | שם פרטי الاسم الشخصي | שם משפחה اسم العائلة |
|---|---|---|---|---|---|---|---|
| 29.8.04 | 11:02 | [illegible] | | 707379-1 | [illegible] | [illegible] | [illegible] |

[illegible]

نوفل جهاد نوفل الحلوتين

2001 [illegible]

20-22 [illegible]

20-21 [illegible]

2002 [illegible]

שעת סיום גביית ההודעה [illegible] 20 [illegible]

(9.2001) 2600×50×2

3007־מ

نوفل [illegible]

W_S098250

הודעתו של: اعلان تبع

משטרת ישראל

הודעה מס' اعلان رقم ________ גליון מס' نسخة رقم ________

| מספר זהות رقم الهوية | שם פרטי الاسم الشخصي | שם משפחה اسم العائلة | שם באותיות לטיניות الاسم في حروف انكليزية |
|---|---|---|---|
| | נופל | עלווין | |

| שם קודם الاسم السابق | מצב משפחתי الحالة الاجتماعية | מין الجنس | דת الدين |
|---|---|---|---|
| | ☐ נשוי متزوج ☐ רווק أعزب ☐ גרוש مطلق ☐ אלמן ارمل | | |

| תאריך לידה تاريخ الولادة | מקום לידה مكان الولادة | טל' בבית التلفون في البيت | טל' בעבודה التلفون بمكان العمل |
|---|---|---|---|
| | | | |

| העינוان العنوان | שם ומען מקום העבודה اسم وعنوان مكان العمل |
|---|---|
| | |

| מס' טלפון נייד رقم الهاتف اللاسلكي | שם האב اسم الاب | כתובת ההורים العنوان الاب |
|---|---|---|
| | | |

| תאריך التاريخ | שעה الساعة | מקום المكان | החוקר المحقق |
|---|---|---|---|
| 29.8.04 | 11:20 | | |

| מס' אישי الرقم الشخصي | דרגה الرتبة | שם פרטי الاسم الشخصي | שם משפחה اسم العائلة |
|---|---|---|---|
| | | | |

[illegible]

שעת סיום גביית ההודעה

(9.2001) 2600×50×2

نوفل العلاوين

מ"ד 3007

W_S098251

משטרת ישראל

הודעתו של:
أعلان تبرع:

| מספר זהות رقم الهوية | שם פרטי الاسم الشخصي | שם משפחה اسم العائلة | שם באותיות לטיניות الاسم في حروف انكليزية | גליון מס' נسخة رقم הודעה מס' أعلان رقم |

| שם קודם الاسم السابق | מצב משפחתי الحالة الاجتماعية | רווק أعزب | נשוי متزوج | גרוש مطلق | אלמן أرمل | מין הجنس | דת الدين |

| תאריך לידה مكان الولادة | מקום לידה مكان الولادة | العنوان |

| العنوان | שם וזמן מקום העבודה اسم وعنوان مكان العمل |

| טל' בעבודה التلفون بمكان العمل | טל' בבית التلفون في البيت |

| מס' טלפון נייד رقم الهاتف اللاسلكي | שם האב اسم الأب | כתובת ההורים العنوان الأب |

| שם משפחה اسم العائلة | שם פרטי الاسم الشخصي | דרגה الرتبة | מס' אישי الرقم الشخصي | מקום المكان | שעת الساعة | תאריך التاريخ |
| --- | --- | --- | --- | --- | --- | --- |
| | | | | | 11:3X | 29.8.04 |

| 1 |
| 2 |
| 3 |
| 4 |
| 5 |
| 6 |
| 7 |
| 8 |
| 9 |
| 10 |
| 11 |
| 12 |
| 13 |
| 14 |
| 15 |
| 16 |
| 17 |
| 18 |
| 19 |
| 20 |
| 21 |
| 22 |
| 23 |
| 24 |
| 25 |
| 26 |
| 27 |
| 28 |

(9.2001) 2600×50×2

نفذ العلوي:

W_S098252

הודעתו של: / اعلان تبع

משטרת ישראל

הודעה מס' / اعلان رقم ______ גליון מס' / نسخة رقم (4)

| מספר זהות / رقم الهوية | שם פרטי / الاسم الشخصي | שם משפחה / اسم العائلة | שם באותיות לטיניות / الاسم في حروف انكليزية |
|---|---|---|---|
| | [illegible] | [illegible] | |

| שם קודם / الاسم السابق | מצב משפחתי / الحالة الاجتماعية | דת / الدين | מין / الجنس |
|---|---|---|---|
| | ☐ נשוי / متزوج ☐ רווק / اعزب ☐ גרוש / مطلق ☐ אלמן / ارمل | | |

| תאריך לידה / تاريخ الولادة | מקום לידה / مكان الولادة | טל' בבית / التلفون في البيت | טל' בעבודה / التلفون بمكان العمل |
|---|---|---|---|
| | | | |

| העונאן / العنوان | שם ומען מקום העבודה / اسم وعنوان مكان العمل |
|---|---|
| | |

| מס' טלפון נייד / رقم الهاتف اللاسلكي | שם האב / اسم الاب | כתובת ההורים / العنوان الاب |
|---|---|---|
| | | |

| תאריך / التاريخ | שעה / الساعة | מקום / المكان | החוקר / المحقق: מס' אישי / الرقم الشخصي | דרגה / الرتبة | שם פרטי / الاسم الشخصي | שם משפחה / اسم العائلة |
|---|---|---|---|---|---|---|
| 29.8.04 | 11:59 | | | | | |

[illegible]

שעת סיום גביית ההודעה

(9.2001) 2600×50×2

מ"ס 3007

W_S098253

משטרת ישראל

הודעתו של:
אעלאן תע

| מספר זרות רقم الهوية | שם פרטי الاسم الشخصي | שם משפחה اسم العائلة | שם באותיות לטיניות לتينيات الاسم في حروف انكليزية | הודעה מס' اعلان رقم | נליון מס' نسخة رقم |
| שם קודם الاسم السابق | | מצב משפחתי الحالة الاجتماعية | | | דת הדין | מין الجنس |

(form fields — handwritten entries)

72123    29. 7. 04

| שם משפחה اسم العائلة | שם פרטי الاسم الشخصي | דרגה الرتبة | מס' אישי الرقم الشخصي | מקום المكان | שעה הساعة | תאריך التاريخ |

1. [handwritten Hebrew]
2.
3.
4.
5.
6.
7.
8.
9.
10.
11.
12.
13.
14.
16.
17.
18.
19.
20.
21.
22.
23.
24.
25.
26.
27.
28.

(9.2001) 2600x50x2        מס' 3007

نقول العلوم

W_S098254

1090

משטרת ישראל

הודעתו של:

W_S098255

**Page no. 287**

**Israel**  **Police**

T/22

**Confession of:**                    **Confession no. 5 Sheet no. 1**

| ID no. 920662152 | First Name: Nofal | Last Name: Al-Adawin | Name in Latin letters: |
|---|---|---|---|
| Former name: | Marital status: ☐Married ☒Single ☐Divorced ☐Widowed | Sex: Male | Religious affiliation: Muslim |
| Date of birth: Aug. 7, 1984 | Place of birth: West Bank | Home tel.: | Tel. at work: |
| Bethlehem Elaza Refugee Camp | | Name and place of work: Plumber | |
| Mobile phone no.: | Name of father: Jihad Nofal | Parents' address: | |

| Sept. 8, 2004 | 4:45 pm | East Jerusalem | Interrogator 44801 | Command Sergeant Major | Nissim | Argeman |
|---|---|---|---|---|---|---|
| **Date** | **Time** | **Place** | **Personal no.** | **Rank** | **First Name** | **Last Name** |

I have seen the above before me and I have informed him that I, police officer Nissim Argeman, hereby inform you that you are suspected of activity that has compromised the security of the region, of membership in a hostile organization, of committing terror attacks against Israeli targets, as well as planning terror attacks against Israeli targets, all contravening the law. You are not obliged to say anything, unless you wish to do so, however I shall record everything you say and it may be used as evidence against you in a court of law. The content of the aforesaid was read aloud and translated into Arabic, as the [above] speaks this language, and once he understood the suspicions that were made against him, and the content of the warning he signed this of his own free will.

[Handwriting in Arabic]

Question: Have you understood the suspicions that have been made against you, and the content of the warning that I have translated for you?

Answer: Yes, I have understood.

Question: What do you have to say about the suspicions that have been made against you?

Answer: It's true, of course.

Question: Tell me about your recruitment, about your activity, in the Kutla-Islamia (the Hamas' Students Movement).

Answer: In 2000 until 2002, I studied at the Professional College in Kalandia. And there were students there, Ahmad Niahi of Nablus and Shahda, I can't remember his full name, who was from Tul Karem. And they suggested that I enter the Kutla-Islamia in the college, and I went in with them, and they were responsible for the Kutla and I became responsible along with them and Ahmad was the coordinator (mosek) with the Teachers College (Dar Elmualmin) ????? and the activities of the Kutla were cleaning the mosque of the college and giving lessons in religion and preparing meals ('fatur') on Ramadan for the students of the Kutla-Islamia. And someone in the Kutla, I can't remember their names, the ones I remember are those whose names I've mentioned, and one by the name of Bassal Elawi, a 20 year old from Nablus who was studying plumbing.

Question: Tell me about the Hamas bands that you activate.

Answer: I have one Hamas hand that I recruited, and it is divided into two, four big ones and four little ones, and there is no connection between the little ones and the big ones, and the big ones are Warel Islamil Adawin, a 22 year old, who is a concrete worker. Q.A. It could be that he knows that I wanted to send Ali Jaara to commit a suicide attack in Jerusalem, but it didn't happen. 2. Mahmud Raid Al Nashash 20 year old, married, but nicknamed "Hamuda", works in painting. 3. Muhamed Ibrahim Jida

[Handwriting in Arabic]          [Signature in Hebrew]          CONT.

**Page no. 288**

**Israel**  **Police**

**Confession of:**                                    **Confession no. 5 Sheet no. 2**

| ID no. | First Name:<br>Nofal | Last Name:<br>Al-Adawin | Name in Latin letters: | |
|--------|------------|------------|-----------|---|
| Former name: | **Marital status:**<br>☐Married ☐Single ☐Divorced ☐Widowed | | **Sex:** | **Religious affiliation:** |
| Date of birth: | Place of birth: | Home tel.: | | Tel. at work: |
| | **CONT. 2** | Name and place of work: | | |
| Mobile phone no.: | Name of father: | Parents' address: | | |

**Interrogator**

| Date | Time | Place | Personal no. | Rank | First Name | Last Name |
|------|------|-------|--------------|------|------------|-----------|
| | | | | | | |

A 21 year old, works as a concrete worker, lives in Aidia and they all live in Elaza. Q.A. About a month and a half ago, I gave him a 10X 10 pipe explosive charge that I made, which was black, weighing less than half a kilo with firework explosives (fitesh), so that he would hide it for me and Mahmud hid the explosive charge in his house in an empty room (mahajar), beneath the ground, in a corner of the room and it was hidden in a black plastic bag. Q.A. The corner may be found as soon as you enter the room opposite the right hand side. And I am the fourth and part of the youth (Ishbal), they are: 1. Mahmud Sammy Elaza, a 16 year old, studies at the school in Bethlehem 2. Mussa Elajaraj, a 16 year old, whose father is nicknamed Abed El Sheikh. 3. Mahmud Fuad Aladawin, a 17 year old, who also studies at the school and is in charge of the young people and my messenger (???) to them, so that they won't know who I am. Preventative measures (Ahtiat).

Question: You told me four big ones and four little ones. One of the little ones is missing.

Answer: There are three I got mixed up.

Question: Tell me about the shooting attack that you executed with a band from the Tunnel Highway to Gilo.

Answer: That was about a year and a half ago, and it was winter and I remember that it was after Ali Elian was killed, I went with Wail Ismail and Mahmud Jida at 11 at night, to execute an

explosive charge terror attack (koa) and they shot at cars traveling on the Tunnel Highway to Gilo, and I had a Kalashnikov with six full magazines, belonging to my brother Firas. And Mahmud held the explosive charge and Wail didn't have anything. Q.A. I took the Kalashnikov with the magazines without my brother Faris' knowing and I knew where he hid it on the third floor in the closet and then I also took the explosive charge (koa) and I met with Mahmud Wail on the street near my house. I gave the explosive charge to Mahmud and I headed towards the Tunnel Highway via Beit Jala. And we had to get to the highway and when we'd see an Israeli vehicle, I would should at it and then immediately throw the explosive charge at it. And when we saw that it was raining and that a military jeep was standing near the highway on the hill; we said that we wouldn't carry out the attack and we went back to Elaza. Mahmud gave me the koa and they went home. And before that we said that we'd go out tomorrow night. And I hid the explosive charge and I returned the Kalashnikov to its [hiding] place. The following night we met near my house at about 11 or 12 at night and I brought the Kalashnikov with six magazines and didn't bring the explosive charge this time.

[Handwriting in Arabic]        [Signature in Hebrew]        CONT.

**Page no. 289**

Israel  Police

**Confession of:**                                        **Confession no.** 5 **Sheet no.** 3

| ID no. | First Name: Nofal | Last Name: Al-Adawin | Name in Latin letters: |
|---|---|---|---|

| Former name: | Marital status: ☐Married ☐Single ☐Divorced ☐Widowed | | Sex: | Religious affiliation: |
|---|---|---|---|---|

| Date of birth: | Place of birth: | Home tel.: | | Tel. at work: |
|---|---|---|---|---|

| | **CONT. 3** | Name and place of work: | |
|---|---|---|---|

| Mobile phone no.: | Name of father: | Parents' address: | |
|---|---|---|---|

**Interrogator**

| Date | Time | Place | Personal no. | Rank | First Name | Last Name |
|---|---|---|---|---|---|---|

And together with Wail Ismail and Mahmud Jida, we went towards Gilo, to shoot at houses and we walked via Beit Jala, with the Kalashnikov hidden beneath my jacket, and when we got to the boys school in Beit Jala where you can see the houses of Gilo, then I shot about eight bullets in the direction of the houses of Gilo, and Wail and Mahmud just stood next to me. And then we went home.

Q.A. The distance from which I shot at the houses of Gilo, at which I shot about 2.5 kilos and nothing happened.

Question: Tell me about preparing the terror attack with the explosive charge at the Separation Fence.

Answer:  About a month and a half ago, when I was working as a street cleaner in Aida, Mahmud Jida and Wail Ismail Adawin came to me after I had called them, , and I told them that we would go out and plant a pipe explosive charge on a dirt road near the Separation Fence and when we wanted to activate them via cellphones against the workers working on the fence and the security guards, who are Russians and Bedouins from Be'er Sheva. But I didn't have any money to buy cellphones and I told my friends that I know how to connect the cellphone to the charges, but I don't know who how to actually do it. And that's why it didn't work.

Question: Tell me about the explosive charge on a military jeep in Aida.

Answer: About a month and a half ago, I don't remember the exact date, I went with Mahmud Jida and I had a pipe explosive charge (koa) with me that I made and I told Mahmud that he should come with me and that I would throw the explosive charge at the military jeep or at a security vehicle in Aida near a girls' school and I told Mahmud that he should direct me to a good place from where I could throw the explosive charge and we arrived at the place, a garden near the girls' school near the main highway of Aida and then a military jeep arrived, followed by four security guards and there were children throwing stones at the army and then I threw the explosive charge at the security personnel who were walking behind the jeep and they were about 10 meters away from me and the explosive charge fell on the ground about 10 meters from them and exploded, but nothing happened to them, and then they started to shoot in the air but they couldn't identify us and we ran away.

Q.A. Muhmad Jida was wearing jeans and a grey shirt.

Question: Tell me about the terror attack that you wanted to execute near Rachel's Tomb.

[Handwriting in Arabic ]        [Signature in Hebrew]        CONT. 4

**Page no. 290**

Israel  Police

| | | | |
|---|---|---|---|
| **Confession of:** | | **Confession no. 5 Sheet no. 4** | |

| ID no. | First Name:<br>Nofal | Last Name:<br>Adawin | | Name in Latin letters: |
|---|---|---|---|---|
| Former name: | **Marital status:**<br>☐Married ☐Single ☐Divorced ☐Widowed | | Sex: | Religious affiliation: |
| Date of birth: | Place of birth: | | Home tel.: | Tel. at work: |
| | **CONT. 4** | | Name and place of work: | |
| Mobile phone no.: | Name of father: | | Parents' address: | |

**Interrogator**

| Date | Time | Place | Personal no. | Rank | First Name | Last Name |
|---|---|---|---|---|---|---|

Answer:  About a year ago, I planned along with Wail Aduyan and Mahmud Jida, that we would take a car and put an explosive charge in it. And we would park the car next to a tree on the hillside of Rachel's Tomb, near the Abu-Zuz restaurant, where a busload of religious people were arriving at Rachel's Tomb, and then when the bus would arrive we would activate the explosive charge with a cellphone and then I told Mahmud and Wail about this place that I knew of while I worked as a stair cleaner in Gilo, and I passed there and a I saw that this would be a suitable place for executing a terror attack.

Question:  Did you plan to execute the terror attack with one car or more and where did you plan to get the car or cars?

Answer: I thought of putting two cars there with one explosive charge in each car and I thought of buying the cars for 300 NIS because they were stolen.

Question: Who prepared the explosive charges for you and what was Mahmud's and Wail's role?

Answer: I prepared the explosive charges, and we didn't establish what they would do.

Question: And why two cars?

Answer: One that would explode near the buses of the religious people, and the second car we planned to put near a tower of soldiers near the house in which Jews now live and after we'd explode the first we would explode the second car along with the people in the house and the soldiers in the tower who came down to help people disembark from the buses. But we didn't do it because we had no money and no knowledge to prepare the explosive charges with the cellphone.

Question: Tell me what you told Mahmud Azaya what was your relationship with him and what did you ask of him?

Answer: It was about a year ago after Ali Jaara was killed (shahid), Ali Mahmud Aziya came to me, he lived in Ducha and he was the one who recruited me to the ranks of the Hamas and he is a Hamas activist and works in intelligence. He is a stone builder. And I explained to him that that I sent Ali Jaara on a suicide bombing mission in Jerusalem and that he blew himself up but in fact, I wasn't the one who dispatched him for this suicide bombing. I tried to send Ali on a terror attack three days beforehand, but it didn't work out. And I told you about this in my other testimonies. And I told  Mahmud so that he would give me money for me and to carry out terror attacks, and he told me that I should open an account and he would put in money and I opened an account at "Alsattmar bank" in Bethlehem, but Mahmud didn't give me any money. Q.A. I opened the account under the name of my mother "Hawala" Adawin. And the account number

[Handwriting in Arabic]          [Signature in Hebrew]          CONT.

Page no. 291

Israel  Police

**Confession of:**

**Confession no. 5 Sheet no. 5**

| ID no. | First Name:<br>Nofal | Last Name:<br>Adawin | | Name in Latin letters: |
|---|---|---|---|---|
| Former name: | Marital status:<br>☐Married ☐Single ☐Divorced ☐Widowed | | Sex: | Religious affiliation: |
| Date of birth: | Place of birth: | Home tel.: | | Tel. at work: |
| | CONT. 5 | Name and place of work: | | |
| Mobile phone no.: | Name of father: | Parents' address: | | |

**Interrogator**

| Date | Time | Place | | Personal no. | Rank | First Name | Last Name |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

I gave to Mahmud Aziya. And every time that I was meet Mahmud, he would tell me, the money is coming soon and he told me that he gave my particulars to people who would pay the money. And he told me once that these people need to deposit $750 into the account, but they didn't deposit anything.

Question: Tell me about the fireworks charge that you three at the Alpaca armored personnel carrier (APC) together with others.

Answer: Yes, this was in 2002 when there was the military invasion of the orchards in Bethlehem, I went out with Rafat Said Mahmud Abu Saira, a 23 year old from the Elaza Refugee Camp., who works in Beer Elwanti. And he had two firework explosive charges (koin) which I prepared, and the length of each was about 15 to 20 cm and a 2 inch diameter, and I filled them with fireworks explosives. And we went at about 11 or 12 at night toward the road to Rachel's Tomb and there is an orchard at the entrance to the camp, and we waited there, and the cannon arrived (midva) and we threw the charges at the cannon Q.A. I threw one explosive charge and Arafat threw another explosive charge, and the explosive charges blew up about 3 meters from the cannon, but nothing happened to the cannon, and the cannon began to shoot at the camp, and we ran away and the next night, I went out with ARafat Abu Saira with two explosive charges (koa) which they prepared at my house made of nitrate potassium. And we got to the "Kanfa" store which is called Golden Jet next to Rachel's Tomb and there we waited until an armored patrol carrier arrived, transporting soldiers, and we threw two explosive charges at it and they exploded on the road and we didn't harm the APC and nothing happened. And the soldiers began to shoot and Arafat and I ran way to the camp, and we hid at home.

Question: I will present you with white pages, some of which have Arabic handwriting and some of which have a sketch of something. Can you explain to me who wrote it and who sketched and what was sketched here?


Answer: I wrote it. And my expenses which I mentioned to you in the testimony on page 3 are written on the first and second pages, I wrote down the place where I three explosive charges, Arafat and I, on the APC near Golden Gate. And on page four I wrote the place where he planned to place the explosive charge vehicle on the main road near Rachel's Tomb, on the side of the checkpoint, and on page 5 I recorded where I threw the explosive charge at the security staff near the girls' school in Aida and on page 6 the place where we Arafat and I threw the  explosive charges at the cannon near "Paradise" and on page 7 I wrote the room where Mahmud Jida and I hid the pipe explosive charge (Koa) which I told you about previously. (I took


[Handwriting in Arabic]          [Signature in Hebrew]          CONT.

**Page no. 292**

**Israel**  **Police**

**Confession of:**                                    **Confession no. 5 Sheet no. 6**

| ID no. | First Name: Nofal | Last Name: Adawin | Name in Latin letters: |
|---|---|---|---|
| Former name: | Marital status: ☐Married ☐Single ☐Divorced ☐Widowed | | Sex: | Religious affiliation: |
| Date of birth: | Place of birth: | Home tel.: | Tel. at work: |
| | **CONT. 6** | Name and place of work: | |
| Mobile phone no.: | Name of father: | Parents' address: | |

**Interrogator**

| Date | Time | Place | Personal no. | Rank | First Name | Last Name |
|---|---|---|---|---|---|---|

The seven pages and I marked my initials, N.A. at the top, Sept. 8, 2004, and I attached them to the investigation file.

Question: I will show you a picture, tell me who you recognize in this picture.

Answer: it's Halad Elaza, his name is Ataziz Abu Jado; he told me that he wanted to go out on a terror attack he makes the connection that it's Halad (the subject points to the picture) I know him, from Aida  Q.A. Halad, when I was a sweeper next to his house, but I didn't talk to him, I just said "Salem Aleikum". And I told you in my testimony about Muataz Q.A. In the interrogation confession in which Muataziz tells him that he wants him to go execute a terror attack, and he'd go see whether his sister would want to execute a terror attack, and another friend. And that's the friend that Ataziz and it could be that he Q.A. Halad Sharitza went to execute the terror attack (I took the picture and I marked it N.A. Sept. 8, 2004 and I added it to the investigation file).

Question: I am showing you two ID line ups of 8 pictures each (as specified in the line-up report) tell me whom you identify if you recognize anyone and what you know about him.

Answer: (line-up 1 doesn't identify anyone from the line-up 2. Identifies picture 2, Raja Isa Mahmud Derbaki (as appears in the identification report).

Question: Do you have anything further to add?

Answer: Yes, I would like to tell you that about a year ago, my little brother Hisham gave me a telescope (Nabuk) of weapons and told me that he found it in the garbage near the military camp next to Rachel's Tomb and I hid the telescope in the oven where bread is baked in my home. And it is still there to this day, and I would like to say that I regret (nadman) all the hours I put in and that's it.

And these are all the things in writing that were translated into his language and he confirms them as true with his signature, after having understood [them] of his own free will. This testimony was translated during the course of the testimony.

[Handwriting in Arabic]                                    [Signature in Hebrew]

                                                            End of interrogation 8:00 pm

**Page no. 293**

Israel  Police

| | T/21 |

**Confession of:**                                        **Confession no. 4 Sheet no. 1**

| ID no. 920662152 | First Name: Nofal | Last Name: Adawin | Name in Latin letters: |
|---|---|---|---|
| Former name: | Marital status: ☐Married ☒Single ☐Divorced ☐Widowed | Sex: Male | Religious affiliation: Muslim |
| Date of birth: Aug. 7, 1984 | Place of birth: | Home tel.: | Tel. at work: |
| Elaza Refugee Camp | | Name and place of work: Plumber | |
| Mobile phone no.: | Name of father: Jihad Nofal | Parents' address: | |

| Sept. 2, 2004 | 3:00 pm | East Jerusalem | Interrogator | 99106 | Command Sergeant Major | Yaakov | Barzani |
|---|---|---|---|---|---|---|---|
| **Date** | **Time** | **Place** | | **Personal no.** | **Rank** | **First Name** | **Last Name** |

I saw the above before me and I informed him that I police officer Barzani Yaakov personal ID no. 99106, hereby inform you that you are hereby suspected of possessing forbidden materials from which explosives are made and of activities compromising the security of the region, you are not obliged to say anything, however, this would only reinforce the evidence against you in a court of law, and anything you shall say shall be recorded by myself once he [the above] has understood the content of the warning and the allegation and has stated of his own free will

[Handwriting in Arabic]                                                Barzani Yakov
                                                                        99106

I understood what you have told me and I would like to add to the testimony on the day when my brother Faras was arrested, my cousin Mahmud Fiad Nofa Adawin came to my house, a 17 year old, who is currently detained, and I told him that there are things in the house that have to be dept hidden and I gave him 2 bags to hide, and Mahmud took them and hid them in bags there were pictures of Ahmed Yassin and Rantissi and Kafiyye and ??? in military color, and one big Hamas flag and one small one, my flags and two test tubes like you have in a school lab (the suspect explains that this is a jar that is wide on the bottom and narrow on the top), one is big and the other small, as well as films (atzevet) of the Hamas or 2 or 3 transparent bottles (sapapa ) with a light red water-like substance and one more containing water. These substances are Faras' and Mahmud who is nicknamed "Hamuda" came back to me at 10:00 pm and told me that he hid the bags in the football field and I am telling you that I handed over a pipe explosive charge from this football field on Saturday, three days ago, this is his testimony

that was translated in his presence ??? all that I said is the truth after my testimony had been translated.

[Handwriting in Arabic]                                        Barzani Yakov
                                                              99106

**Page no. 294**

**Israel**  **Police**

T/20

**Confession of:**                                    **Confession no. 3 Sheet no. 1**

| ID no. 920662152 | First Name: Nofal | Last Name: Adawin | Name in Latin letters: |
| Former name: | Marital status: ☐Married ☒Single ☐Divorced ☐Widowed | Sex: Male | Religious affiliation: Muslim |
| Date of birth: Aug. 7, 1984 | Place of birth: | Home tel.: | Tel. at work: |
| Elaza Refugee Camp | | Name and place of work: Plumber | |
| Mobile phone no.: | Name of father: Jihad Nofal | Parents' address: | |

| Aug. 31, 2004 | 8:50 pm | East Jerusalem | **Interrogator** 99106 | Command Sergeant Major | Yaakov | Barzani |
|---|---|---|---|---|---|---|
| **Date** | **Time** | **Place** | **Personal no.** | **Rank** | **First Name** | **Last Name** |

I saw the above before me and I informed him that I police officer Barzani Yaakov 99106, hereby inform him that he is suspected of membership and activity in a hostile organization and of throwing Molotov cocktails and stones and of preparing explosive charges and throwing them, and of planning suicide bombings in Jerusalem, you are not obliged to say anything, however this may reinforce the evidence against you and anything you say shall be recorded by myself after [the above] has understood the content of the warning and the allegation and has said [confessed] of his own free will

[Handwriting in Arabic]                                    Barzani Yakov
                                                            99106

I have understood what you said and I would like to add to my testimony that six years ago during the Western Wall Tunnel events, I along with others threw stones at soldiers at Rachel's Tomb along with others and I saw that one of them Noaf El Keissi, a 25 year old, was injured in the stomach during the course of the demonstration, and Ismail Keissi a 21 year old, who lives in the El Aza Refugee Camp, and when the IDF entered Bethlehem in 2002, I prepared two Molotov cocktails along with Archai Mahmud Said Abu Sa'ira a 20 year old national security activist, from the El Aza Refugee Camp, and at 7 am Arafat and I threw the Molotov Cocktails at the Paradise Hotel where IDF soldiers were and the hotel went on fire from the Molotov cocktails that we both threw and they brought fire extinguishing trucks to put the fire out at the hotel and the soldiers who saw that we threw the Molotov cocktails shot at us but we escaped without injury.

Question: I will show you a photo album, who are these pictures of?  There are pictures of a burnt building, what are they?


Answer: My brother Fadi's album, and there are pictures of the Paradise Hotel that was burnt by the Molotov Cocktails that Arafat and I threw, and 2 of these pictures were taken by a journalist and then I found them and they were on bigger paper – cardboard, with a caption in English. I took the album and marked it Barzani Yaakov, Aug. 31, 2004

Question: Tell me about the pipe explosive charge that you prepared and with whom and when.

Answer: In the summer of 3004 I met with Ragai Barbary a 21 year old plumber who lives in the El Aza refugee camp and is a friend of Faras and he came to weld pipes for me, from which we would make pipe explosive charges, and we prepared 3 pipe explosive charges to throw at the IDF, and we still hadn't decided on a specific spot (Mehadad), we filled the pipe explosive charges with fireworks (Fatash) which I bought for 40 NIS at a toy store, at 7 pm, and we hid it among the laundry; the next day, my brother Faras and Ragai took the 2 explosive charges and then they went and about 10 minutes later, I took the third explosive charge and they went to throw the explosive charges at the army in Aida

[Handwriting in Arabic]                                                      Barzani Yakov
                                                                              99106

**Page no. 295**

Israel  Police

**Confession of:**                                    **Confession no. 3 Sheet no. 2**

| ID no. | First Name: Nofal | Last Name: Adawin | | Name in Latin letters: |
|---|---|---|---|---|
| Former name: | Marital status: □Married □Single □Divorced □Widowed | | Sex: | Religious affiliation: |
| Date of birth: | Place of birth: | Home tel.: | | Tel. at work: |
| | **CONT** | Name and place of work: | | |
| Mobile phone no.: | Name of father: | Parents' address: | | |

**Interrogator**

| Date | Time | Place | Personal no. | Rank | First Name | Last Name |
|---|---|---|---|---|---|---|
| Aug. 31, 2004 | | | | | Yaakov | Barzani |

And the third time, about an hour later I heard an explosion and Faras came back and told me that he threw the explosive charge at a jeep and the explosive charge exploded and Ragai was scared and fled without throwing the explosive charge, and I would like to tell you that one explosive charge that was wrapped in tape, I turned over to the army and another explosive charge that I gave to Ragai I have no idea what happened to it, I would like to tell you that at midnight in the winter of 2003, I heard a huge explosion from Rachel's Tomb, and about a month later when I met Ragai he told me that he and my brother Faras took an explosive charge from a fire extinguisher I think or a blue one and they tied the explosive charge with a rope to the door of a building of stores of the "Abu Tarbush" Family in a 2 storey building that is next to the Bathal checkpoint, Faras and Ragai went up to the roof with the pipe explosive charge and they wanted to throw the explosive charge at an IDF soldier, so that when they would arrive at the door and open it, the fire extinguisher charge would explode on them but the explosive charge apparently exploded when a cat opened the door because Faras and Ragai had gone home before that because the army didn't come close enough so that they could throw the explosive charge at it, and then at the entrance to the building the soldiers who would open the door would be injured again.

Question: How much did this explosive charge weigh?

Answer: About one kg because it was 20 cm long and 10 cm wide and the charge was exploded by a cat  because Faras and Ragai were afraid to disassemble it from the door and they left it connected and they left the scene because the soldiers didn't get near them.

Question: When did you join a Hamas demonstration?

Answer: In early 2004 after Yassin and Abu Abed Aziz Rantisi were assassinated, I went twice to Hamas processions, masked, with a Hamas flag and pictures of those killed to paste them on the walls, and to write Hamas slogans, we had 100 pictures of Yassin and Muhamed Sammy El Aza painted them, and with him were Muhamed Nashash nicknamed Hamuda and Muaz AA Latif Adi Tarbush, an 18 year old, and Muhamed Fuad Nofal Adawin my cousin, a 16-17 year old, all from the El Aza Refugee Camp.

Question: Which neighborhood did you plan to attack in the terror strike?

Answer: In July 2004 I went to Jerusalem to plan a suicide bombing of Muataz Abu Jado, and Muhamed Sammy El Aza or of Mussa Al Ajoz. I went to Shuafat and from there I went in the direction of Bab El Amud by car to plan the place for the attack

[Handwriting in Arabic]                                                          Barzani Yakov
                                                                                 99106

Page no. 296

Israel  Police

**Confession of:**                    **Confession no. 3 Sheet no. 3**

| ID no. | First Name: Nofal | Last Name: Adawin | Name in Latin letters: |
|---|---|---|---|
| Former name: | Marital status: ☐Married ☐Single ☐Divorced ☐Widowed | Sex: | Religious affiliation: |
| Date of birth: | Place of birth: | Home tel.: | Tel. at work: |
| | **CONT** | Name and place of work: | |
| Mobile phone no.: | Name of father: | Parents' address: | |

**Interrogator**

| Aug. 31, 2004 | | | | | | Yaakov | Barzani |
|---|---|---|---|---|---|---|---|
| **Date** | **Time** | **Place** | | **Personal no.** | **Rank** | **First Name** | **Last Name** |

And we collected information about the French Hill junction where I saw Border Patrol police and I told Faras about it; I also travelled along the road that leads to Baba El Amud where there is a neighborhood on the right hand side, called "Mea She'arim" and I didn't enter the neighborhood but I also planned to execute a suicide bombing there and I would like to tell you that I didn't tell Faras who would get the suicide bomber in, I only told Faras that I have a friend from Beit Hanina who would help to get the suicide bomber into Jerusalem, and Faras agreed to the idea.

Question: To whom did you want to turn for assistance?  Regarding the suicide bombing?

Answer: I considered turning to Camel Jabar a 20 year old plumber who went to school with me in Kalandia who had an Israeli ID card, lived in Beit Hanina and his brother had a standard Isuzu jeep, I think he works with the car and distributes milk, chocolate milk and leben, etc.

Question: Your brother Faras prepared the explosives, from whom did he buy the explosives and what did he prepare?

Answer: In Sept. 2004 my brother Faras prepared a small amount of Um Elabad from car battery water and acetone and from hydrogen peroxide, in our home, he obtained the knowledge from the internet, and the substances he prepared he placed in a white tahini paste plastic container. And a year and a half ago, Faras bought natural potassium for preparing explosives from the "Sodo Ata" store in Bab El Zakach as well as from another place near the checkpoint that sells seeding materials.

Question: Who else works with your brother Faras in this kind of military activity?

Answer: Muhamed Naar who is a 22 year old police officer in the  authority of the Aza Refugee Camp and Ragai Barbari and Ala Kaid Halaf Nashash a 28 year old, this is his testimony which was translated in his presence. I hereby sign that all that I have delivered is the truth once my testimony was translated into Arabic.

[Handwriting in Arabic]                                                             Barzani Yakov
                                                                                              99106

**Page no. 297**

Israel  Police

T/18

**Confession of:**                                        **Confession no. 1 Sheet no. 1**

| ID no. 920662152 | First Name: Nofal | Last Name: Al-Adawin | | Name in Latin letters: |
|---|---|---|---|---|
| Former name: | Marital status: ☐Married ☒Single ☐Divorced ☐Widowed | | Sex: Male | Religious affiliation: Muslim |
| Date of birth: Aug. 7, 1984 | Place of birth: Beit Jala | | Home tel.: 02-2745546 | Tel. at work: |
| Bethlehem Aza Refugee Camp | | | Name and place of work: Laborer | |
| Mobile phone no.: | Name of father: Jihad Nofal | | Parents' address: | |

|  |  | Interrogator | | Command | | |
|---|---|---|---|---|---|---|
| Aug. 29, 2004 | 11:02 am | Jerusalem | 101819-1 | Sergeant Major | Dov | M |
| **Date** | **Time** | **Place** | **Personal no.** | **Rank** | **First Name** | **Last Name** |

I saw the above before me and I informed him that I, a police interrogator, who's personal information is listed above, hereby inform him that he is suspected of activity compromising the security of the region and your are not obliged to say anything and everything you shall say shall be recorded and can be used in court. Abstaining from answering questions shall be used [as evidence] in court. After reading ????????????????????????

[handwriting in Arabic]

In April 2004 I participated in a Hamas procession in Bethlehem and at this procession I met my classmate Mahmud Azaya approx. 20 years old, who lived in Duha, was a builder, and Mahmud told me that he is responsible for the Hamas band in Duha and he suggests that I be recruited to his band in the Hamas, and I agreed and with me in the band were Asmain, a 20-22 year old, single, from Duha, also a builder, maybe a relative of Mahmud Aziya, the commander of the band and in the band there was also Ibrahim Jundia, a 20-21 year old, single, from Mane. Aida operates in prison today. I don't know them. I saw them only when they were masked and our activity in the band was writing Hamas slogans and [participating in] processions dressed in military uniforms while we were masked, in the area of Bethlehem. And the band meetings were held at Mahmud's house in Duha. About a month later in Feb. 2002, I came to Mahmud Aziya to his house, along with Ismain and Mahmud and Ismain and I went to the quarry (ksara) near Mahmud Aziya's house and there Mahmud showed us a pipe explosive charge and he lit its fuse and threw it and the charge exploded and Mahmud also had a bag with white material in it and Mahmud told us, me and Ismain that it was a potassium nitrate explosive and Mahmud and I and Ismain made a pipe

explosive charge like Mahmud told us and then I also bought in Abu-Ita's store in Bab El Zakak in Bethlehem a bag of potassium nitrate for 5 shekels at a store for agricultural products. The explosive charge that I, Mahmud and Ismain made in the quarry, we threw it and lit the fuse and it blew up and we wanted to make more charges and then I went to buy the stuff in Abu-Ita's store.

And from this stuff, me and Arafat Mahmud Said Abu Saira, a 20 year old single man

[Handwriting in Arabic]                                                          Dov M

**Page no. 298**

**Israel**  **Police**

**Confession of:**        **Confession no. _ Sheet no. 2**

| ID no. | First Name: Nofal | Last Name: Al-Adawin | | Name in Latin letters: |
|---|---|---|---|---|
| Former name: | Marital status: ☐Married ☐Single ☐Divorced ☐Widowed | | Sex: | Religious affiliation: |
| Date of birth: | Place of birth: | Home tel.: | | Tel. at work: |
| | **CONT** | Name and place of work: | | |
| Mobile phone no.: | Name of father: | Parents' address: | | |

**Interrogator**

| Aug. 29, 2004 | 11:20 am | | | | | |
|---|---|---|---|---|---|---|
| **Date** | **Time** | **Place** | **Personal no.** | **Rank** | **First Name** | **Last Name** |

from the Elaza camp in Bethlehem, a soldier in national security or in ==????== in Bethlehem who is wanted by the military, by you, and I know him from my school, the school in Beit Jala. We, Arafat and I, made 4 pipe charges and after the army entered Bethlehem Arafat and I went out at midnight with two pipe charges and we threw them on a tank that was near the Paradise Hotel at t the entrance to the Elaza camp. Each one threw a charge at a tank I threw one and Arafat threw one. And the charges exploded next to the tank and a while later Arafat and I threw another 2 charges on military vehicles passing on the main road next to the Elaza Camp.

And two weeks later Arafat and I made another 2 pipe charges and we went out at 11:00 pm near the Paradise Hotel and when military jeeps passed by Arafat and I threw 2 pipe charges that we made and the charges exploded but with no damage like the previous times.

And two months later Arafat and I found 2 pipe charges in Elaza Camp and we went to Rachel's Tomb where there was a military armored personnel carrier and Arafat and I threw 2 pipe charges it was about 6:00 in the morning and the charges exploded and we ran away.

And then Arafat had 2 more pipe charges and Arafat went out alone to throw the pipe charges from the area of Elaza camp at the army and he wanted to throw them at a tank but the soldiers saw him and shot him and Arafat was injured in the leg from a bullet and he went to the Beit Jala hospital. And they put a ==platin== in his leg. That was approx. in mid-2002.

In approx. early 2004 my friend from Elaza camp, Mahmud Raid Elanshash, 22-23 years old, came to me, nicknamed Hamuda, was a police officer in Bethlehem and now is a construction

worker in Bethlehem and he left the police. And Mahmud knew that I am a Hamas activist, and he told me that he wants to send a suicide bomber out.  Muhamed Raid told me that he has a friend by the name of Ali Jaara, about 20-21 years old, single, from Elaza camp, a police officer in Bethlehem who works with him and Ali wants to execute t suicide bombing.


[Handwriting in Arabic ]                                                        Dov M

**Page no. 299**

Israel  Police

**Confession of:**                          **Confession no. _ Sheet no. 3**

| ID no. | First Name:<br>Nofal | Last Name:<br>Al-Adawin | Name in Latin letters: |
|---|---|---|---|
| Former name: | Marital status:<br>☐Married ☐Single ☐Divorced ☐Widowed | Sex: | Religious affiliation: |
| Date of birth: | Place of birth: | Home tel.: | Tel. at work: |
| | **CONT** | Name and place of work: | |
| Mobile phone no.: | Name of father: | Parents' address: | |

**Interrogator**

| Aug. 29, 2004 | 11:38 am | | | | | |
|---|---|---|---|---|---|---|
| **Date** | **Time** | **Place** | **Personal no.** | **Rank** | **First Name** | **Last Name** |

And I recruited Mahmud Elnashash and Ali Jaara into the Hamas to execute the suicide bombing. I told Ali that the his suicide bombing would be in the name of the Hamas, Ali also gave me a piece of paper with a diagram of his electric charge and gave me an electric wire and a bulb for the charge to ignite it (tola). And after Ali Jaara's and Mahmud Elnashash's recruitment into the Hamas to execute the suicide bombing, ==Mahmud Raid and I sold gold of Mahmud's wife for 1500 shekels and we bought a camera and film and fireworks with this money (Elab Naria) and we took an old fire extinguisher container (tafai) and we put the fireworks into the container and we put explosives into the container with the electric wire and the bulb and the battery, and we made an explosive charge from all this we made the explosive charge at Ali's house and we put this charge into a bag, after Mahmud Raid and I made this charge we all met at my house;== Ali Jaara and Mahmud Raid  came to my house and we hung up a Hamas banner in my room and I gave Ali the charge to hold, and Mahmud Raid and I made an explosive belt with only electric wires and pipe charges, we took pictures of Ali Jaara with the explosive belt and with the charge and with the black plastic toy gun (lada), and we told Ali that he would go on the suicide attack soon Ali wanted very much to go on this suicide bombing. But a few days went by and he didn't go because I didn't exactly know how to carry out a suicide bombing.  And Ali Jaara told me that he spoke with the Tanzim Fatah and they would go out with him on the suicide bombing. At the end of Jan. 2004, Ali Jaara executed his suicide bombing in a bus in Jerusalem and Jews were killed on the bus and I gave the pictures of Ali Jaara with the charges and the gun and the Hamas banner to the Bethlehem television and they said that the Hamas took responsibility for the suicide bombing and ==the truth is that the Tanzim Fatah carried out this suicide bombing and not I.==

And I hid the charge near a parking space for buses near the Paradise Hotel and I hid the fire extinguisher charge there and the people charges and someone saw the charges there and the Authority took the charges from there.

[Handwriting in Arabic ]                                                                    Dov M

**Page no. 300**

Israel  Police

**Confession of:**                                    **Confession no.** _ **Sheet no.** <u>4</u>

| ID no. | First Name:<br>Nofal | Last Name:<br>Al-Adawin | Name in Latin letters: | |
|---|---|---|---|---|
| Former name: | Marital status:<br>☐Married ☐Single ☐Divorced ☐Widowed | | Sex: | Religious affiliation: |
| Date of birth: | Place of birth: | Home tel.: | | Tel. at work: |
| | **CONT** | Name and place of work: | | |
| Mobile phone no.: | Name of father: | Parents' address: | | |

**Interrogator**

| Aug. 29, 2004 | 11:59 am | | | | | |
|---|---|---|---|---|---|---|
| **Date** | **Time** | **Place** | **Personal no.** | **Rank** | **First Name** | **Last Name** |

About 4 months ago, I worked in cleaning (Tanzia) at the El Baub agency (Yakala) in Aida Camp in Bethlehem, and at this job I met Mataz Abu Jado, a 17-18 year old, of the Aida Camp, his big brother Tarek Abu Jado was killed in this Antifada. Tarek and I were in the same class, and I already knew Mataz his brother. And Mataz told me that he wants to execute this suicide bombing after I had suggested that he execute a suicide bombing in the name of Hamas. Mataz also told me that he would recruit his sister and his friend to carry out this suicide bombing. I can't remember their names.

And I asked my brother Faras, a 21 year old, single, who worked in the naval police in Bethlehem to get an explosive belt ready for me, my brother also learned how to repair TVs and radios in Kalandia, and Faras told me that there was an explosive belt ready and I asked him for this explosive belt. I saw Faras making explosives Um El Abed from acetone and water from a car battery and hydrogen peroxide.

Faras told me that the explosive belt was coming from outside the Elaza Camp and he told me that the moment the explosive belt would arrive, he told me that I should prepare Mataz Abu Jado for the suicide bombing.

I told my brother Faras that in addition to Mataz Abu Jado, there were another 2 suicide bombers who were prepared – Mataz's sister and his friend.

My brother Faras also had a friend by the name of Mahmud Mustafa Al Najar, a 22-23 year old, single, of the Elaza camp, a police officer  in Bethlehem from Law el Hamid.

And Faras told Mahmud Mustafa about the suicide bombing with Mataz and with his sister and friend, Mahmud Mustafa knew about this plan for the suicide attack, I saw my brother Faras with Mahmud Mustafa a lot, they sat at our house a lot, and talked about this subject. My brother Faras told me that the responsibility for this suicide bombing would be the Hamas', meaning my side and the Jihad Islami, maybe my brother Faras and his friend Mahmud Mustafa of the Jihad and maybe the explosive belt from the Jihad Islami

After my brother Faras and Mahmud Mustafa were arrested, Mahmud Mustafa's brother, Hassam Alnajar, a 20 years old, single police officer in Bethlehem, told me that he heard his brother Mahmud

[Handwriting in Arabic]                                                                                      Dov M

**Page no. 301**

Israel  Police

**Confession of:**                                    **Confession no. _  Sheet no. 5**

| ID no. | First Name:<br>Nofal | Last Name:<br>Al-Adawin | | Name in Latin letters: |
|---|---|---|---|---|
| Former name: | Marital status:<br>☐Married ☐Single ☐Divorced ☐Widowed | | Sex: | Religious affiliation: |
| Date of birth: | Place of birth: | Home tel.: | | Tel. at work: |
| | **CONT** | Name and place of work: | | |
| Mobile phone no.: | Name of father: | Parents' address: | | |

**Interrogator**

| Aug. 29, 2004 | 12:23 am | | | | | |
|---|---|---|---|---|---|---|
| **Date** | **Time** | **Place** | **Personal no.** | **Rank** | **First Name** | **Last Name** |

Speaking on the phone with a Jihad Islami activist from Gaza about money and suicide bombings and setting up military bands.

Faras and Mahmud Alnajar both bought a Kalashnikov for 7000 shekels and Faras asked me about the workers on the Separation Fence between Jerusalem and Bethlehem. When they come and when they go. And I told him and Faras and Mahmud Mustafa went to them in a car to the Separation Fence, they wanted to shoot at the Jewish workers there. I saw both of them getting out of the car headed in that direction, they had Kalashnikovs with them but in the afternoon, Faras told me that he and Mahmud Alnajar arrived at the Separation Fence and they wanted to shoot with their Kalashnikovs at the Jews, but there were also Arab children throwing stones at the Jews and they didn't shoot them.  This was about 3 weeks before my arrest.


I didn't see the Kalashnikov in the car, only later did Faras tell me everything. I also saw Faras my brother and Mahmud Alnajar, together with Amjad Falari, a 20 year old, single, from Aza camp, nicknamed Abu Wahid who works in a refrigerator warehouse. I don't know what Amjad's connection to Faras' and Mahmud Najar's activity is.

I also recruited other young people to carry out terror attacks, my cousin Mahmud Fuad Adawin, about 16-17 years old, a high school student, nicknamed Hamuda and Ibrahim and Ahmed and his sisters Fatma and Isma Vashara who live in Elaza Camp. I saw Mahmud Fuad my cousin throwing stones at the army and I asked him if he was ready to carry out a suicide bombing, and

Mahmud Fuad told me that he was and Mahmud Fuad told me that he has another two friends and he would ask them if they were ready to carry out a suicide bombing. His friends names are Mahmud Sammi El Aza, a 15 year old, a student from the camp; the names of his brothers: Hamla and Abdallah and the second friend's name was Mussa Abed Elsheikh Elaziuz, a 15-16 year old, a student from the Elaza camp.  I told my cousin Mahmud Fuad that he should ask them about carrying out a suicide bombing, and Mahmud Fuad asked the two and Mahmud Elaza and Mussa Elshiti told him that they were ready to carry out the suicide bombing, and I told my brother Faras this that I have 5 suicide bombers ready to participate

[Handwriting in Arabic]                                                            Dov M

Page no. 302

Israel  Police

**Confession of:**                                    **Confession no. _ Sheet no. 6**

| ID no. | First Name: Nofal | Last Name: Al-Adawin | Name in Latin letters: |
|---|---|---|---|
| Former name: | Marital status: ☐Married ☐Single ☐Divorced ☐Widowed | Sex: | Religious affiliation: |
| Date of birth: | Place of birth: | Home tel.: | Tel. at work: |
| | CONT | Name and place of work: | |
| Mobile phone no.: | Name of father: | Parents' address: | |

**Interrogator**

| Aug. 29, 2004 | 12:41 am | | | | | |
|---|---|---|---|---|---|---|
| **Date** | **Time** | **Place** | **Personal no.** | **Rank** | **First Name** | **Last Name** |

in a suicide bombing. I wasn't sure that Mahmud Sami Elaza, the 15 year old, would agree in the end to carry out the suicide bombing, so I told my brother Faras that I have 5 suicide bombers, and not 6 as I had recruited; Mahmud Sami was young and I feared that he wouldn't agree in the end to carry out the suicide bombing.

And about 3 weeks before my arrest, I went out to collect information about the location of the suicide bombing. I went to the bridge in Tel Alfartasi, where there were a few suicide bombings. There is a bus station there and I decided on this location because it was close to Shuafat and it was easy to reach this place. I went to the Shuafat camp and I walked from Shuafat to Azaz the bridge. And I saw the bus stations there and the Border Police station (*Mishmar Hagvul*)and when I got home from the bridge, I told my brother Faras about this place, that was suitable for a suicide bombing and I spoke with Faras about how many suicide bombers we would send on this attack, and how many explosive belts we had and I wanted to talk about this with Mataz so he should tell me who wanted to carry out the suicide bombing, him, Ahmad, his friend, maybe everyone but on Aug. 20, 2004 they arrested my brother Faras at our house and the next day my father Jihad found explosives in the house and told me to throw it all out and I took the things, a bag with the material and a gas container (alkat gas) and material such as capsules/sugar and other materials to make explosives everything that belonged to my brother and I took the things and I hid them near Malab Almahad inside a barrel that was there nearby and then a day later they arrested Faras and that day later on I took the Kalashnikov rifle that my brother Faras had hidden in the house and my father didn't find it and I hid the Kalashnikov with 6 magazines in a concrete wall behind the Church of Nativity. And I drew where I put the

Kalashnikov in the concrete wall picture 1 and where I put the pipe explosive charge and the gas grenade, and the explosives in a barrel next to the lot. Picture 2. And I wrote my name and on this night I brought the army to this place and they confiscated all these weapons. (I drew this picture and I signed my name and my ???? and was attached to the interrogation file). This is my testimony to the interrogator before me and was confirmed as the truth, signed by me.


Dov M                                [Signature in Arabic]



# CERTIFICATION

This is to certify that the attached *English* language document corresponding to the document *Shaked Supplemental Appendix 1 pp. 287-302*, is a true and accurate translation of the original *Hebrew* language document to the best of our knowledge and belief

Executed this on
Thursday, November 04, 2010

**Tik Tak Translations Ltd.**
9 Hashiloah Street
Petach Tikva, 49180 ISRAEL
+972 3 907-4555

**EXHIBIT 194 TO DECLARATION OF VALERIE SCHUSTER**

משטרת ישראל

תודעתו של:

| | | הודעה מס' | שם משפחה الاسم العائلة | שם פרטי الاسم الشخصي | מספר זהות رقم الهوية |
|---|---|---|---|---|---|
| גליון מס' | | אעלان تاريخ | אבו | לממול | 943336248 |

| מין הجنس | אלמן ارمل | גרוש مطلق | רווק اعزب | נשוי متزوج | מצב משפחתי الحالة الاجتماعية |
|---|---|---|---|---|---|

| טל' בבית التلفون في البيت | מקום לידה مكان الولادة | תאריך לידה تاريخ الولادة |
|---|---|---|
| 052-933092 | ירושלים | 7.3.84 |

العنوان
النتره

שם הأب اسم الأب: לממול

תاريخ التاريخ: 9.9.04

שעה الساعة: 16:05

מקום המكان: לا ירושלים

1. ...
2. ...
3. ...
4. ...
5. عبد خليل عمر عربية
6. ...
7. ...
8. ...
9. ...
10. ...
11. ...
12. ...
13. ...
14. ...
15. ...
16. ...
17. ...
18. ...
19. ...
20. ...
21. ...
22. ...
23. ...
24. ...
25. ...
26. ...
27. ...
28. ...

عبد خليل عمر عربية

מ-3007

W_S098275

W_S098276

משטרת ישראל

הודעתו של:

| | גליון מס' 2 | הודעה מס' | |
| נסחא רקם | | אעלان رقم | |

| שם באизраختдит לצינירات לשם في حروف انكليزية | שם משפחה اسم العائلة | שם פרטי الاسم الشخصي | מספר تعود רقم الهوية |
| | كعبر | لمهدي | 94 33536248 |

| דת الدين | מין الجنس | | שם קדם والاسم السابق |
| | | □ אלמן ארמل □ גרוש מطلق □ رמל ارملة □ نשوي متزوج □ رووק اعزب | מצב משפחתי الحالة الاجتماعية |

| טל' بعنوان التلفون بمكان العמل | טל' בبيت النלفون في البيت | מקום לידה مكان الولادة | תאريخ ليدة تاريخ الولادة |
| | | | |

| שם ומקום مكان الעבודה اسم وعنوان مكان العמل | | | العنوان |
| | | | |

| מתוبة הורים العنوان الاب | שם האב اسم الاب | מס' טלفون ניير رقم الهاتف اللاسلكي |
| | | |

| שם מלא الاسם الكامل | דرجة الرتبة | מס' אישי الرقم الشخصي | מקום المكان | שעة الساعة 16 | תאريخ التاريخ 9.9.04 |

_(גוף ההודעה כתוב בכתב יד — 28 שורות בכתב יד בלתי קריא)_

הודעתו של:
اعلان شيخ:

משטרת ישראל

הודעה מס' 1 اعلان رقم
גליון מס' 3 نسخة رقم

| מספר זהות رقم الهوية | שם פרטי الاسم الشخصي | שם משפחה اسم العائلة | שם באותיות לטיניות الاسم في حروف انكليزية |
|---|---|---|---|
| 943336248 | [illegible] | [illegible] | |
| שם קודם الاسم السابق | מצב משפחתי الحالة الاجتماعية ☐ נשוי متزوج ☐ רווק اعزب ☐ גרוש مطلق ☐ אלמן ارمل | מין الجنس | דת الدين |
| תאריך לידה تاريخ الولادة | מקום לידה مكان الولادة [illegible] | טל' בבית التلفون في البيت | טל' בעבודה التلفون بمكان العمل |
| العنوان | | שם ומען מקום העבודה اسم وعنوان مكان العمل | |
| מס' טלפון נייד رقم الهاتف اللاسلكي | שם האב اسم الأب [illegible] | כתובת ההורים العنوان الاب | |

| תאריך التاريخ | שעה الساعة | מקום المكان | החוקר المحقق מס' אישי الرقم الشخصي | דרגה الرتبة | שם פרטי الاسم الشخصي | שם משפחה اسم العائلة |
|---|---|---|---|---|---|---|
| 9.9.04 | 13:02 | [illegible] | 1008338 | [illegible] | [illegible] | [illegible] |

לא נכון [illegible]
[illegible]
שאלה- האם [illegible]?
תשובה- כן. [illegible] 2004 [illegible]
[illegible]
[illegible]
שאלה- [illegible]?
תשובה- [illegible]
[illegible]
[illegible]
שאלה- [illegible]?
תשובה- אני [illegible]
[illegible]
[illegible]
שאלה- [illegible]?
תשובה- [illegible]
[illegible]
שאלה- [illegible]?
תשובה- [illegible]
[illegible]
[illegible]
[illegible]
שאלה- [illegible]
תשובה- כן [illegible]
[illegible] (9.9.04)
שאלה- האם יש לך [illegible]?
תשובה- לא
[illegible]

שעת סיום גבית ההודעה

[illegible] 1008338 [signature]

[signature]

[illegible]

מ"ז 3007

(12.03) 6000-450×2

**Statement By**:                                    Israel Police

Statement No. [Handwriting: 1]        Sheet No.: [handwriting: 1]

| ID No. [Handwriting: 943336248] | First Name [Handwriting: Mahmud] | Family Name [Handwriting: Azyia] | Name in Latin Print |
|---|---|---|---|
| Former Name | Family Status ☐ Married ☑ Single ☐ Divorced ☐ Widower | Sex [Handwriting: Male] | Religion: [handwriting: Muslin] |
| Date of birth [handwriting: 7.3.84] | Place of Birth [Handwriting: Jerusalem] | Telephone at home [Handwriting: 052-933092] | Telephone at Work |
| [Handwriting: Doha] | | Name and Address of Workplace: Worker | |
| Cellular phone number | Name of Father [handwriting: grandfather Halil/Mahmud] | Parents' Address [Handwriting: Doha] | |

| [handwriting:] 9.9.04 | 16:25 | Jerusalem District | Interrogator 100830-8 | Staff Sergeant Major | Yitzchak | Yaakobovic |
|---|---|---|---|---|---|---|
| Date | Time | Place | Personal Number | Rank | First Name | Family Name |

1  [Handwriting]: I saw are aforesaid and told him I was a policeman, Yitzchak Yaakobovic
2  Personal Number 100830-8 hereby informs you that you are suspect of being a member and an
3  activist in the Hamas and you are not obliged to say anything unless you wish to do so yet
4  anything you might say may be used against you as evidence in a court of law.

5  Yitzchak Yaakobovic

6  After reading and translating the aforesaid the content of the statement hereinabove he told me as
7  follows:

8  Q: Did you understand the suspicions leveled against you?

9  A: Yes I did.

10  Q: Tell me about your activities in the Islamic students movement.

11  A: In the year 200 during my studies in the Iskander school, a man about 25 years of age by the
12  name of Ahmed [illegible] recruited me to the Islamic students movement of the Hamas and I
13  served as chairman of the Islamic students' movement till the end of the year 2002.

14  Q: Who were the people who were with you in the Islamic students' movement?

15  A: 1). Islam Amin Saleh Jarish approximately 20 years old from Beit Jala, a Hamas activist, he
16  has a brother by the name of Azam Wissam Nadallah. 2). Mahmed Hashem Abu Dyia
17  approximately 20 years old resident of Doha, Hamas activist.

18  Q: What were your activities in the Islamic students' movement?

19  A: We wrote Hamas slogans on walls in Bethlehem, took part in processions and distributed
20  photos of Shahids.

21  Q: Tell me about your recruitment to Hamas.

22  A: At the end of 2001 Ahmed Ruhen recruited me to the Hamas and I joined a Hamas group;
23  members of the group included: 1). Hammer Ibrahim Salama, 21 years old resident of Refugee
24  Camp Aida 2). Azam Amin Saleh Juarish, 22 years old resident of Beit Jala. 3). Anan Hasham
25  Abu Dyia 22 years old, resident if Doha. 4). Islam Amin Saleh Juarish. 5). Annas Ramlawi, 20
26  years old, resident of Bethlehem. 6). Ismail Aadel Melesh, 22 years old, resident of Doha, works
27  in a building in Ramat Rachel. 7). Ibrahim A-Rachman Jundia, 21 years old, resident of Aida
28  Refugee Camp. 8). Amin Fathi Ahmed Melsh 21 years old

29  Time of termination of taking evidence [handwriting: Yitzchak Yaakobovic]

W_S098275

Statement By:                          Israel Police

Statement No. [Handwriting: 1]        Sheet No.: [handwriting: 2]          | Continued |

| ID No.<br><br>[Handwriting: 943336248] | First Name<br><br>[Handwriting: Mahmud] | Family Name<br><br>[Handwriting: Azyia] | Name in Latin Print |
|---|---|---|---|
| Former Name | Family Status<br><br>☐ Married ☑ Single<br><br>☐    Divorced   ☐ Widower | Sex<br><br>[Handwriting: Male] | Religion:<br><br>[handwriting: Muslin] |
| Date of birth<br>[handwriting: 7.3.84] | Place of Birth<br><br>[Handwriting: Jerusalem] | Telephone at home<br><br>[Handwriting: 052-933092] | Telephone at Work |
| [Handwriting: Doha] | | Name and Address of Workplace: Worker | |
| Cellular phone number | Name of Father<br>[handwriting: grandfather Halil/Mahmud] | Parents' Address<br><br>[Handwriting: Doha] | |

| [handwriting:] 9.9.04 | 16:47 | Jerusalem District | Interrogator 100830-8 | Staff Sergeant Major | Yitzchak | Yaakobovic |
|---|---|---|---|---|---|---|
| Date | Time | Place | Personal Number | Rank | First Name | Family Name |

Handwriting:

1   Q: What activities did you do in the Hamas group in which you were a member?

2   A: We took part in processions and demonstrations of Hamas, we all wore masks. We also held

3   Hamas flags. Ahmed Cnaan was in charge of the group's activity, and him and Ahmed used to

4   bring the money from the charity fund and we distributed the money to the poor. We also wrote

5   slogans in favor of Hamas on the walls in Bethlehem and distributed photos of Shahids and

6   Ahmed Yassin.

7   Q: Was is your connection with Nufal Jihad Idawin?

8   A: Nufal Jihad Idawin is about 21 years old, resident of Alaza Refugee Camp. I know him since

9   school. Before the IDF forces entered the Church of Nativity I met Nufal Idawin in the "Hulfa El

10  Hashidin" mosque in Doha and Nufal knew I was an activist in Hamas and asked me to recruit

11  him to Hamas and I recruited him to Hamas. This was in the beginning of 2002 and Nufal was a

12  member of our group.

13  Q: What did Nufal Adwin tell you about the explosive device he prepared?

14  A: After I recruited Nufal Adwin to Hamas I met him at the gas station in Doha where my father

15  worked. Nufal told me he prepared an explosive device [illegible] and he wanted to throw that

16  device on IDF forces. I told Nufal that it was dangerous to throw that explosive device in the

17  area where we were because it was crowded so me and Nufal went to Jabel Sabat in the Doha

18  area and there Nufal lit the device, threw it and it exploded. Amin Farhi Ahmed Melsh was also

19  with us when Nufal threw the device.

20  Q: What did Nufal Adwin tell you about the suicide bombing attack committed by Ali Jaara?

21  A: About a month and a half after Ali Jaabra committed the suicide bombing attack in Jerusalem

22  I met Nufal Adwin who asked me if I knew who committed the suicide bombing attack in

23  Jerusalem and I told Nufal that I knew that Ali Jaara committed the suicide bombing attack in

24  Jerusalem. Then Nufal asked me whether I knew who sent Ali Jaara to commit the suicide

25  bombing attack and I told Nufal that people in Bethlehem say that Mahmed Abu Uda, resident of

26  the Aida Refugee Camp sent Ali Jaara to commit the suicide bombing attack and then Nufal told

27  me that

28  Time of termination of taking evidence [handwriting: Yitzchak Yaakobovic]

W_S098277

Statement By:                          Israel Police

Statement No. [Handwriting: 1]        Sheet No.: [handwriting: 3]      | Continued |

| ID No.<br><br>[Handwriting: 943336248] | First Name<br><br>[Handwriting: Mahmud] | Family Name<br><br>[Handwriting: Azyia] | Name in Latin Print |
|---|---|---|---|
| Former Name | Family Status<br><br>☐ Married ☑ Single<br><br>☐ Divorced ☐ Widower | Sex<br><br>[Handwriting: Male] | Religion:<br><br>[handwriting: Muslin] |
| Date of birth<br>[handwriting: 7.3.84] | Place of Birth<br><br>[Handwriting: Jerusalem] | Telephone at home<br><br>[Handwriting: 052-933092] | Telephone at Work |
| [Handwriting: Doha] | | Name and Address of Workplace: Worker | |
| Cellular phone number | Name of Father<br>[handwriting: grandfather Halil/Mahmud] | Parents' Address<br><br>[Handwriting: Doha] | |

| [handwriting:] 9.9.04 | 16:47 | Jerusalem District | Interrogator 100830-8 | Staff Sergeant Major | Yitzchak | Yaakobovic |
|---|---|---|---|---|---|---|
| Date | Time | Place | Personal Number | Rank | First Name | Family Name |

Handwriting:

1  That wasn't true and that he himself, that is to say, Nufal Adwin sent Ali Jaara to commit the

2  suicide bombing attack in Jerusalem.

3  Q: Did Nufal Adwin asked you for money?

4  A: Yes, in the month of February 2004 Nufal Adwin asked me for money to buy munitions and

5  explosives to commit attacks against Israeli targets. He did not tell me exactly what kind of

6  attacks he wanted to commit.

7  Q: Did you give Nufal Adwin money to buy munitions and explosives?

8  A: I told Nufal to open a bank account in the "Istithmar" bank in Bethlehem and to give me the

9  account number, Nufal opened an account in the bank in the name of his mother in Istithmar

10  bank in Jabel Street in Bethlehem and give me the account number.

11  Q: Why did you ask Nufar to open a bank account?

12  A: I wanted to speak to Mahmed Abu Rafia, 35 years old, resident of Aida Refugee Camp, am

13  activist in the charity fund so that he would transfer money to Nufal Adwin's bank account but

14  eventually I did not talk to Mahmed Abu Rafia about that.

15  Q: Why did you think that Mahmed Abu Rafia would transfer money to Nufal Adwin's bank

16  account?

17  A: Because in the past Mahmed Abu Rafia give me money in two occasions for my family; once

18  he gave me NIS 400 and another time he gave me NIS 500.

19  Q: What is your relation to Alaa Iad?

20  A: He was my neighbor when I was a boy in the Aida Refugee Camp, and about eight years ago

21  we went to live in Doha and since then I did keep in touch with Alaa Iad, before he became

22  wanted by Israel he came to our home once and had some tea. About two years ago Alaa Iad was

23  killed.

24  Q: I present you with a handwriting in Arabic (two pages in total). Is this your handwriting?

25  A: Yes, this is my handwriting and wrote what I told you now in my testimony

26  (I took the handwriting and marked it with initials "Y.Y.:" and a date: 9.9.04)

27  Q: Do you have anything you would like to add?

28  A: No

1  This is my statement as read before me and translated to Arabic and approved as true by my

2  signature

3  [Handwriting: Signature Yitzchak Yaakobovic Staff Sergeant Major, Personal number 100838-8]

4  [Handwriting: Arabic]

5                                                                              **W_S098278**

6  [Handwriting: handwriting of Mahmud Halil Mahmud Azyia seized and marked with initials

7  "Y.Y." and date 9.9.04.]

8  [Handwriting: Signature Yitzchak Yaakobovic Staff Sergeant Major, Personal number 100838-8]

9  [Handwriting: Arabic]

10

11

12

13                                                                              **W_S098279**

14

15

16

17

18

19

20

21

22

23

24

25

26

[Handwriting: handwriting of Mahmud Halil Mahmud Azyia seized and marked with initials "Y.Y." and date 9.9.04.]

[Handwriting: Signature Yitzchak Yaakobovic Staff Sergeant Major, Personal number 100838-8]

[Handwriting: Arabic]

**W_S098280**

Arabic



# CERTIFICATION

This is to certify that the attached *English* language document corresponding
to the document *Shaked Supplemental Appendix 1 pp. 168-230*, is a true and accurate
translation of the original *Hebrew* language document to the best of our knowledge and belief

Executed this on
Wednesday, November 03, 2010

**Tik Tak Translations Ltd.**
9 Hashiloah Street
Petach Tikva, 49180 ISRAEL
+972 3 907-4555

**9 HaShiloah St., P.O. Box 8070, Petah Tikva 49180 Israel**
**Tel: +972-3-9074555 Fax: +972-153-3-9074555**
**www.tiktaktranslations.com      info@tiktaktranslations.com**

**EXHIBIT 195 TO DECLARATION OF VALERIE SCHUSTER**

299

משטרת ישראל

הודעתו של:
اعلان نبع

EXHIBIT

PENGAD 800-631-6989

W_S098252

**Page no. 299**

**Israel**  **Police**

Confession of:                                     Confession no. _ Sheet no. 3

| ID no. | First Name: Nofal | Last Name: Al-Adawin | Name in Latin letters: |
|---|---|---|---|
| Former name: | Marital status: ☐Married ☐Single ☐Divorced ☐Widowed | | Sex: | Religious affiliation: |
| Date of birth: | Place of birth: **CONT** | Home tel.: | Tel. at work: |
| | | Name and place of work: | |
| Mobile phone no.: | Name of father: | Parents' address: | |

**Interrogator**

| Aug. 29, 2004 | 11:38 am | | | | | |
|---|---|---|---|---|---|---|
| Date | Time | Place | Personal no. | Rank | First Name | Last Name |

And I recruited Mahmud Elnashash and Ali Jaara into the Hamas to execute the suicide bombing. I told Ali that the his suicide bombing would be in the name of the Hamas, Ali also gave me a piece of paper with a diagram of his electric charge and gave me an electric wire and a bulb for the charge to ignite it (tola). And after Ali Jaara's and Mahmud Elnashash's recruitment into the Hamas to execute the suicide bombing, Mahmud Raid and I sold gold of Mahmud's wife for 1500 shekels and we bought a camera and film and fireworks with this money (Elab Naria) and we took an old fire extinguisher container (tafai) and we put the fireworks into the container and we put explosives into the container with the electric wire and the bulb and the battery, and we made an explosive charge from all this we made the explosive charge at Ali's house and we put this charge into a bag, after Mahmud Raid and I made this charge we all met at my house; Ali Jaara and Mahmud Raid came to my house and we hung up a Hamas banner in my room and I gave Ali the charge to hold, and Mahmud Raid and I made an explosive belt with only electric wires and pipe charges, we took pictures of Ali Jaara with the explosive belt and with the charge and with the black plastic toy gun (lada), and we told Ali that he would go on the suicide attack soon Ali wanted very much to go on this suicide bombing. But a few days went by and he didn't go because I didn't exactly know how to carry out a suicide bombing.  And Ali Jaara told me that he spoke with the Tanzim Fatah and they would go out with him on the suicide bombing. At the end of Jan. 2004, Ali Jaara executed his suicide bombing in a bus in Jerusalem and Jews were killed on the bus and I gave the pictures of Ali Jaara with the charges and the gun and the Hamas banner to the Bethlehem television and they said that the Hamas took responsibility for the suicide bombing and the truth is that the Tanzim Fatah carried out this suicide bombing and not I.

EXHIBIT
PENGAD 800-631-6989

And I hid the charge near a parking space for buses near the Paradise Hotel and I hid the fire extinguisher charge there and the people charges and someone saw the charges there and the Authority took the charges from there.

[Handwriting in Arabic ]                                              Dov M

**Tik Tak**
Translations

# CERTIFICATION

This is to certify that the attached *English* language document corresponding
to the document *Shaked Supplemental Appendix 1 pp. 287-302*, is a true and accurate
translation of the original *Hebrew* language document to the best of our knowledge and belief

Executed this on
Thursday, November 04, 2010

*Tik Tak Translations Ltd.*
9 Hashiloah Street
Petach Tikva, 49180 ISRAEL
+972 3 907-4555

**EXHIBIT 196 TO DECLARATION OF VALERIE SCHUSTER**

משטרת ישראל

הודעתו של:
اعلان رقم

| הודעה מס' | | גליון מס' 2 |
| --- | --- | --- |

| שם פרטי الاسم الشخصي | שם משפחה اسم العائلة | שם באותיות לטיניות الاسم في حروف انكليزية | אעلان رقم |
| --- | --- | --- | --- |

מספר זהות رقم الهوية: 920662752

שם קודם الاسم السابق

| מצב משפחתי الحالة الاجتماعية | ☐ נשוי متزوج | ☒ רווק أعزب | ☐ גרוש مطلق | ☐ אלמן أرمل | מין الجنس | דת الدين |
| --- | --- | --- | --- | --- | --- | --- |

| תאריך לידה تاريخ الولادة 7.8.84 | מקום לידה مكان الولادة |
| --- | --- |

מען מגורים العنوان

| טל' בעבודה التلفون بمكان العمل | טל' בית التلفون في البيت | שם וזמן מקום העבודה اسم وعنوان مكان العمل |
| --- | --- | --- |

| כתובת החורים العنوان الاب | שם האב اسم الأب | מס' טלפון נייד رقم الهاتف اللاسلكي |
| --- | --- | --- |

| תאריך התאריך 30.8.04 | מקום מקان 15.13 שעה הساعة | החוקר المحقق | הרقم الشخصي 107899 | דרגה الرتبة | שם פרטי الاسم الشخصي | שם משפחה اسم العائلة |
| --- | --- | --- | --- | --- | --- | --- |

[This page is handwritten]

Statement of :　　　　　　**ISRAEL**　　　　**POLICE**　　　Statement number <u>2</u> Page number <u>1</u>

| ID number | First name | Last name | Name written in English |
| --- | --- | --- | --- |
| **920662752** | **NOFEL** | **AL ADAWIN** | |
| Previous name | Family status ☐Married ☒ Single ☐ Divorced ☐ Widow | Gender | Religion |
| | | **MALE** | **MUSLIM** |
| Date of birth | Place of birth | Home telephone | Work telephone |
| **8.7.84** | **BEIT JALA** | | |
| Address | | Employer name and address | |
| **REFUGEE CAMP [illegible]** | | | |
| Cellular number | Father name [grandfather] | Parents address | |
| | **JIHADAN NOFEL** | | |

| <u>08.30.04</u> | <u>15:13</u> | <u>"Eshelim"</u> | Investigator | <u>101819 - 1</u> | Warrant Officer | [Illegible] | M. |
| --- | --- | --- | --- | --- | --- | --- | --- |
| Date | Time | Location of collecting the testimony | | Rank | | First name | Last name |

 I saw in front of me the aforementioned and I told him that I am a police investigator and my information is written above and I inform you that you are suspected of activity against the security of the area and you don't have to say anything, but whatever you will say will be annotated by me and will be used in the court of law. If you avoid responding my questions this also will be used against you in the court of law. Latter I will read to you what is written. Affixing your signature confirms that the name mentioned above is your name and you heard the warning.

[Signed in Arabic]　　　　　　　　　　　　　　　　　　　<Signature of investigator>

I want to tell you things that I didn't tell you in the interrogation at the police station yesterday, regarding Eli Jia'ara the suicide bomber. I and Mahmad [illegible] took pictures of Eli Jia'ara in my home with a plastic pistol and an explosive belt without explosives and also with a Kalashnikov that belongs to my brother Paras, [illegible] I gave to [illegible] that Kalashnikov. Me and Mahmed Nashashi took pictures of Ali – about 10 pictures with the weapon and the explosive that we built from a fire extinguisher and with the green ribbon on his head of **Az** Aldin Alqassam Brigades, and we recorded the voice of Ali on a tape, he read his name and a verse from the Quran, and something about his suicide attack in the terror attack in Jerusalem. ----------------------------------------------------------------------------------------------------------------------------

All these happened around 21:00 hours and latter about 22:00 hours we left, me and Ali Jia'ara to carry out his suicide attack. I didn't tell you about this that me and Ali Jia'ara [illegible] to carry out his suicide attack with the explosive in a blue school bag. We left by foot, me and him to Beit Jala [illegible] and we wanted to go down to road 60 to the tunnel there, and from there to carry out the attack in Jerusalem, but there was a Force 17 blockade – in Bir Una and we were afraid to pass through the blockade so me and Ali came back home. ------------------------------------------------------------------------------------------------------------------------------------------

I already told you yesterday that Ali spoke with the Fatah activists and Ali told me that they will arrange for him the suicide attack in Jerusalem and I am not serious, and after 3 days Ali Jia'ara carried out his suicide attack against the bus in Jerusalem. And after he carried out his suicide terror attack I gave the pictures that I and Mahamad Shahash took where we photographed Ali Jia'ara for the television of Bethlehem with the tape and the recording of his voice and I told the television that the Hamas assumes responsibility on this attack in Jerusalem, and the truth is that the Tanzim of the Fatah is the one who carried out the attack.

This is my testimony as was read to me and is confirmed by my signature.

[Signed in Arabic]

M-3007                                     Time of completion of receiving the testimony

(6.03)  6000x50x2



**Global Language Services**
Translations · Interpreting
DTP · Localization

KERN Corporation
The Helmsley Building
230 Park Avenue, Suite 1517
New York, NY 10169

Tel. (212) 953 2070
Fax (212) 953 2073
kern.ny@kerntranslations.com

**www.e-kern.com**

State of :     New York

County of:     New York

ss.:

## CERTIFICATE OF ACCURACY

*IT IS HEREBY CERTIFIED*, *that  KERN Corporation, a corporation organized and existing under the laws of the State of New York, is professionally engaged in the rendering of foreign language translation services; that it has translated the following document(s)*

### AZOULAY NW REBUTTAL ANNEX B8

*from the* **HEBREW** *language into the* **ENGLISH** *language and that the said translation is a true and correct rendering of the said document to the best of our knowledge and belief.*

Signed by:

(Eric Schloss)
for

Sworn to before me this

Day of _____, 2011.

Notary Public

**JOY WILTERMUTH**
NOTARY PUBLIC, State of New York
**No. 01WI - 6093589**
Qualified in New York County
My Commission Expires June 2, 2011

KERN Corporation
The Helmsley Building
230 Park Avenue, Ste.1517
New York, NY 10169
Tel: 212 953-2070
www.e-kern.com

San Francisco: The Russ Building · 235 Montgomery Street, Suite 946 · San Francisco, CA 94104
Tel. (415) 433 5376 · Fax (415) 433 5377 · kern.sf@kerntranslations.com

**London:** Tel. 011 44 (20) 78 31 56 00 · **Frankfurt:** Tel. 011 49 (69) 75 60 73-0 · **Berlin:** Tel. 011 49 (30) 24 72 12 50 · **Paris:** Tel. 011 33 (1) 53 93 85 20
**Zurich:** Tel. 011 41 (1) 2 61 11 60 · **Hong Kong:** Tel. 011 (852) 28 50 44 55 · **Amsterdam:** Tel. 011 31(20) 6 39 01 19 · **Lyon:** Tel. 011 33 (4) 783 783 73

**EXHIBIT 197 TO DECLARATION OF VALERIE SCHUSTER**



**January 1, 2006**

**Intelligence and Terrorism Information Center
at the Center for Special Studies (C.S.S)**

# Suicide bombing terrorism during the current Israeli-Palestinian confrontation
## (September 2000 – December 2005)

### The suicide bombing attack in Zion Square, its reward and cost...

**The suicide bomber: Nabil Mahmoud Jamil Halabiya, Hamas suicide bomber, who carried out the suicide bombing attack in Zion Square in Jerusalem (December 1, 2001).**

**Payment: A check for $15,000 paid to the suicide bomber's family by Saddam Hussein's representatives in the Palestinian Authority-administered territories.**



**Results of the suicide bombing attack: 11 dead and 170 wounded. In the photo: the scene a short time after the attack (Photo: Reinhard Kraus, Reuters).**

# General description

**Date:** January 29, 2004
**Event:** A suicide bomber blew himself up on bus no. 19 in Jerusalem
**Casualties:** **11** killed and some **44** wounded
**Organization responsible:** Fatah's Al-Aqsa Martyrs Brigades
**Suicide bomber:** Ali Munir Yussuf Jaarah



The suicide bomber

# The attack

✦ A 25-year-old resident of the Ayda refugee camp in Bethlehem, a policeman in the Bethlehem police, blew himself up on bus no. 19, operated by Egged, in the center of Jerusalem. The suicide bomber carried a charge weighing approximately 12-16 lbs. in a bag. He left a handwritten will claiming he perpetrated the act in revenge for the IDF's killing of Palestinians.

# The scene of the terrorist attack



**Source: Reuters, photo: STR**

# The victims



**Baruch Roman Chondiashvili,** 38, from Jerusalem. Survived by a wife and three children.



**Anat Darom,** 23, from Netanya. Survived by parents and two sisters.



**Natalya Gamril,** 53, from Jerusalem. Survived by a husband, a daughter, and a sister.



**Rose Boneh,** 39, from Jerusalem. Survived by a mother, four brothers and sisters, and a spouse.



**Hannah (Anya) Bonder,** 38, from Jerusalem. Survived by a son and a daughter, parents, and a sister.



**Dana Dina Itach Lavan,** 24, from Jerusalem. Survived by a husband, parents, a brother and two sisters.



**Viorel Octavian Florescu,** 40. Survived by a wife and a daughter, parents, and brothers.



**Yechezkel Goldberg,** 41, from Beitar Illit. Survived by a wife and seven children.



**Avraham (Albert) Balhasan,** 28, from Jerusalem. Survived by a mother and a wife.



**Mehbere Kifile Valda Tzadik,** 51,
from Ethiopia.



**Eli Zfira,** 47,
from Jerusalem.
Survived by a mother, a
wife, and four children.

**EXHIBIT 198 TO DECLARATION OF VALERIE SCHUSTER**



## Homeland Security

**A RAND INFRASTRUCTURE, SAFETY, AND ENVIRONMENT PROGRAM**

THE ARTS

CHILD POLICY

CIVIL JUSTICE

EDUCATION

ENERGY AND ENVIRONMENT

HEALTH AND HEALTH CARE

INTERNATIONAL AFFAIRS

NATIONAL SECURITY

POPULATION AND AGING

PUBLIC SAFETY

SCIENCE AND TECHNOLOGY

SUBSTANCE ABUSE

TERRORISM AND
HOMELAND SECURITY

TRANSPORTATION AND
INFRASTRUCTURE

WORKFORCE AND WORKPLACE

This PDF document was made available from www.rand.org as a public service of the RAND Corporation.

Jump down to document ▼

The RAND Corporation is a nonprofit research organization providing objective analysis and effective solutions that address the challenges facing the public and private sectors around the world.

## Support RAND

Purchase this document

Browse Books & Publications

Make a charitable contribution

## For More Information

Visit RAND at www.rand.org

Explore RAND Homeland Security

View document details

### Limited Electronic Distribution Rights

This document and trademark(s) contained herein are protected by law as indicated in a notice appearing later in this work. This electronic representation of RAND intellectual property is provided for non-commercial use only. Permission is required from RAND to reproduce, or reuse in another form, any of our research documents.

This product is part of the RAND Corporation monograph series. RAND monographs present major research findings that address the challenges facing the public and private sectors. All RAND monographs undergo rigorous peer review to ensure high standards for research quality and objectivity.

# Breaching the Fortress Wall

## Understanding Terrorist Efforts to Overcome Defensive Technologies

**Brian A. Jackson · Peter Chalk · R. Kim Cragin**
**Bruce Newsome · John V. Parachini · William Rosenau**
**Erin M. Simpson · Melanie Sisson · Donald Temple**

Prepared for the Department of Homeland Security



**Homeland Security**

A RAND INFRASTRUCTURE, SAFETY, AND ENVIRONMENT PROGRAM

This research was sponsored by the United States Department of Homeland Security and was conducted under the auspices of the Homeland Security Program within RAND Infrastructure, Safety, and Environment.

**Library of Congress Cataloging-in-Publication Data**

Breaching the fortress wall : understanding terrorist efforts to overcome defensive
    technologies / Brian A. Jackson ... [et al.].
        p. cm.
        "MG-481."
        Includes bibliographical references.
        ISBN 0-8330-3914-8 (pbk. : alk. paper)
        1. War on Terrorism, 2001-—Technology. 2. Security systems. 3. Terrorism—
Prevention. 4. Terrorism—Prevention—Case studies. 5. Terrorism—Case studies.
6. National security.  I. Jackson, Brian A. (Brian Anthony)

HV6431.B737 2007
363.325'72—dc22

                                                                    2006001721

The RAND Corporation is a nonprofit research organization providing objective analysis and effective solutions that address the challenges facing the public and private sectors around the world. RAND's publications do not necessarily reflect the opinions of its research clients and sponsors.

**RAND®** is a registered trademark.

*Cover design by Eileen Delson La Russo*
*Photo by TSgt Cedric H. Rudisill, U.S. Air Force*

© Copyright 2007 RAND Corporation

All rights reserved. No part of this book may be reproduced in any form by any electronic or mechanical means (including photocopying, recording, or information storage and retrieval) without permission in writing from RAND.

Published 2007 by the RAND Corporation
1776 Main Street, P.O. Box 2138, Santa Monica, CA 90407-2138
1200 South Hayes Street, Arlington, VA 22202-5050
4570 Fifth Avenue, Suite 600, Pittsburgh, PA 15213-2665
RAND URL: http://www.rand.org/
To order RAND documents or to obtain additional information, contact
Distribution Services: Telephone: (310) 451-7002;
Fax: (310) 451-6915; Email: order@rand.org

- In March 2002, a member of the al-Aqsa Martyrs Brigade conducted a suicide bombing in Jerusalem's ultraorthodox neighborhood, Me'a Sha'arim, killing nine and wounding 45.
- In November 2002, members of the al-Aqsa Martyrs Brigade attacked a Likud Party headquarters in Beit She'an, killing six and wounding 43.
- In July 2003, members of the al-Aqsa Martyrs Brigade in Gaza fired mortar shells on a settlement, injuring no one.
- In January 2004, a member of the al-Aqsa Martyrs Brigade conducted a suicide bombing on a bus in Jerusalem, killing eight and wounding approximately 60.
- In September 2004, members of the al-Aqsa Martyrs Brigade fired two mortars on a settlement in Gaza, injuring no one.
- In January 2005, al-Aqsa Martyrs Brigade and Hamas both claimed responsibility for a suicide truck bombing at the Karni Crossing between Israel and the Gaza Strip. The attack killed six and wounded 15.

Notably, of the secular nationalists, al-Aqsa Martyrs Brigade is the only militant group to have adopted suicide terrorism. In fact, this group surpassed Hamas in the number of suicide bombings and casualties during the al-Aqsa Intifada.

Finally, the PFLP has also been somewhat active in the al-Aqsa Intifada (see PBS Frontline, 2002).

### Religious-Nationalist Militants: Hamas and Palestinian Islamic Jihad

In addition to the secular nationalists described briefly above, two religious-nationalist militant groups also have operated in Israel during the al-Aqsa Intifada. We use the term *religious nationalists* because, although these groups have religious objectives, these objectives are interpreted best in the context of the overall nationalist objectives of the Palestinian movement. In this sense, they represent a different type of religious militant group from al Qaeda.

**EXHIBIT 199 TO DECLARATION OF VALERIE SCHUSTER**



US Department of State
*Office of the Coordinator for Counterterrorism*

# Country Reports on Terrorism 2004

## April 2005

Department of State Publication 11248
Office of the Coordinator for Counterterrorism
Printed in Multi-Media Services

Released April 2005

one additional defectors elected to return to Iran, and another two hundred were awaiting ICRC assistance for voluntary repatriation to Iran at the end of the year. PKK/KADEK/Kongra Gel, a designated foreign terrorist group, maintains an estimated 3,000 to 3,500 armed militants in northern Iraq, according to Turkish Government sources and NGOs. In the summer of 2004, PKK/KADEK/Kongra Gel renounced its self-proclaimed cease-fire and threatened to renew its separatist struggle in both Turkey's Southeast and urban centers. Turkish press subsequently reported multiple incidents in the Southeast of PKK/KADEK/Kongra Gel terrorist actions or clashes between Turkish security forces and PKK/KADEK/Kongra Gel militants.

## Israel, the West Bank, and Gaza

Israel maintained staunch support for US-led counterterrorism efforts in 2004. Palestinian terrorist groups conducted a large number of attacks in Israel, the West Bank, and Gaza Strip in 2004. HAMAS, Palestinian Islamic Jihad (PIJ), the al-Aqsa Martyrs Brigade, and the Popular Front for the Liberation of Palestine (PFLP) — all US-designated Foreign Terrorist Organizations — were responsible for most of the attacks, which included suicide bombings, shootings, and mortar and rocket firings against civilian and military targets. Terrorist attacks in 2004 killed almost 100 people (mostly Israelis, as well as a number of foreigners, including one US citizen), a decrease from the almost 200 people killed in 2003.

The October 15, 2003, attack on a US diplomatic convoy in Gaza that killed three Americans is the most lethal attack ever directly targeting US interests in Israel, the West Bank, or Gaza. The Popular Resistance Committees (PRC), a loose association of Palestinians with ties to various Palestinian militant organizations such as HAMAS, PIJ, and Fatah, claimed responsibility, although that claim was later rescinded. Official investigations continued and resulted in the arrests of four suspects. A Palestinian civil court ordered the four suspects freed on March 14, citing a lack of evidence. Palestinian Authority (PA) Chairman Arafat rescinded the order and kept the suspects in custody until Palestinian gunmen attacked the Gaza prison and released the four suspects on April 24. Since the April 24 incident, the PA has failed to re-arrest the four suspects or to identify and bring to justice the perpetrators of the October 2003 attack.

Palestinian terrorist groups in Israel, the West Bank, and Gaza continue to focus their attention on the Palestinians' historical conflict with Israel, attacking Israel and Israeli interests within Israel and the Palestinian territories, rather than engaging in operations worldwide.

Israel employed a variety of military operations in its counterterrorism efforts. Israeli forces launched frequent raids throughout the West Bank and Gaza, conducted targeted killings of suspected Palestinian terrorists, destroyed homes — including those of families of suicide bombers — im-



Israeli police officers examine the scene of a double-bombing in the southern Israeli city of Beersheba, August 31. (AP Photo)

posed strict and widespread closures and curfews in Palestinian areas, and continued construction of an extensive security barrier in the West Bank. Israeli counterterrorism measures appear to have reduced the lethality of attacks; continuing attacks and credible threats of attacks, however, show that the terrorist groups remained potent.

Israel also took action in February to block what it labeled terrorist funding in two Palestinian banks. The Israeli Defense Forces (IDF) and Shin Bet raided the West Bank offices of the Arab Bank and the Cairo-Amman Bank, seizing almost $9 million in cash from 310 accounts. Israeli law does not allow seizure of funds via correspondent accounts in Israel, and the Israeli Government claimed that the PA had failed to act on earlier intelligence. PA officials asserted that the funds belonged to reputable clients, with no connection to terrorism. The funds remain seized by order of an Israeli court.

HAMAS was particularly active in 2004, carrying out attacks that included shootings, suicide bombings, and standoff mortar and rocket attacks against civilian and military targets, many of them joint operations with other militant organizations. HAMAS was responsible for the deadliest attack of the year in Israel — the August 31 double suicide bombing of two buses in Beersheva that killed 16 people and wounded 100. HAMAS was also responsible for an increase in Qassam rocket attacks. A rocket attack on Sderot on June 28 was the first fatal attack against Israelis using Qassam rockets. Two Israelis died in the attack. In September, two Israeli children were killed in Sderot from another Qassam rocket attack. In response to the continued Qassam rocket fire, the IDF launched a three-week operation on September 28, in which 130 Palestinians (among them 68 HAMAS and Palestine Islamic Jihad militants) and five Israelis died, according to press reports.

The Popular Front for the Liberation of Palestine (PFLP) was active in 2004. The group was responsible for the November 1 suicide bombing at the Carmel Market in Tel Aviv, which killed three people and wounded 30. Pales-

63

tinian Islamic Jihad conducted numerous attacks on Israeli settlements and checkpoints, including the April 3 attacks on the Avnei Hafetz and Enav settlements in the West Bank which killed one Israeli and seriously wounded a child.

Fatah's militant wing, the al-Aqsa Martyrs Brigade, conducted numerous shooting attacks and suicide bombings in 2004. It was responsible for two suicide bus bombings in Jerusalem during January and February. The attacks killed 21 people and wounded over 110. Al-Aqsa also claimed responsibility along with HAMAS for the March 14 suicide attack in the port of Ashdod. The double suicide attack killed ten people and wounded at least 15. The group also claimed responsibility for a suicide bomber attack which killed two people and wounded 17 at a checkpoint near Jerusalem on August 11. On May 2, Palestinian gunmen belonging to the al-Aqsa Martyrs Brigade and PIJ shot and killed an Israeli settler and her four daughters in the Gaza Strip. The group also claimed responsibility for a suicide bomber attack which killed two people and wounded 17 at a checkpoint near Jerusalem on August 11.

Lebanese Hizballah remained a serious threat to the security of the region, continuing its call for the destruction of Israel and using Lebanese territory as a staging ground for terrorist operations. Lebanese Hizballah was also involved in providing material support to Palestinian terrorist

groups to augment their capacity and lethality in conducting attacks against Israel.

In December, Israel convicted and sentenced an Israeli man for membership in the "New Jewish Underground," a terrorist organization that aimed to carry out attacks on Arab civilians. On September 29, a group of five Israeli settlers attacked and seriously wounded two US citizens, members of an NGO, who were escorting Palestinian children to school near Hebron. As of the end of 2004, the Israeli police had not arrested those responsible.

The Palestinian Authority's efforts to thwart terrorist operations were minimal in 2004. The PA security services remained fragmented and ineffective, hobbled by corruption, infighting, and poor leadership. Following the November 11 death of PA Chairman Arafat, Prime Minister Ahmed Qurei and then PLO Chairman Mahmoud Abbas engaged in an effort to convince militant Palestinian groups to agree to a cease-fire. Cease-fire talks were inconclusive by the end of 2004. Palestinian officials, including Mahmoud Abbas, and some Palestinian intellectuals have called for an end to armed attacks against Israelis.

### Jordan

Jordan continued its strong support for the global war on terrorism in 2004. Jordanian security services disrupted numerous terrorist plots during the year, including several that targeted US interests in Jordan. It has aggressively pursued the network of fugitive Jordanian terrorist Abu Mus'ab al-Zarqawi, deemed responsible for numerous plots and attacks in Jordan and Iraq. In the most serious plot disrupted to date in Jordan, security services in April arrested Zarqawi affiliates in the advanced stages of a plan to launch truck bombs against Jordanian Government targets and the US Embassy in Amman. In an unprecedented move, the Jordanian Government aired the plotters' confessions on state-run television, emphasizing their plans to kill thousands, including Jordanian citizens. In late April, Government officials, including Queen Rania, joined thousands of Jordanians in a street march against terrorism. The Government publicly condemned terrorist acts throughout the world. King Abdullah was an outspoken critic of terrorism and Islamic extremism, and in September directed religious authorities to deliver the "Amman Message," a declaration that rejects religious extremism and terrorism, and seeks to promote moderate Islam and dialogue.

Jordan's State Security court, which has purview over terrorism-related cases, maintained a heavy caseload over the year, most of which involved Zarqawi-affiliated suspects. The Court in April sentenced eight men to death, including Zarqawi and five others in absentia, for the murder of USAID official Laurence Foley in front of his Amman home on October 28, 2002. The Government announced in July that Muammar al-Jaghbir, sentenced to death in absentia for his role in the Foley murder, was in



Britain's Prime Minister Tony Blair meets US Secretary of State Condoleezza Rice for bilateral talks at the "Supporting the Palestinian Authority" meeting in London on March 1, 2005. (AP Photo/John D McHugh, Pool)

**EXHIBIT 200 TO DECLARATION OF VALERIE SCHUSTER**

אל פיריה

**צבא**        **הגנה**        **לישראל**

בית המשפט הצבאי                    תיק בימ"ש 04/ ב פ 232

ב י ה ו ד ה                       תיק תביעה 1300/04

בפני        הרכב                  תיק פ.א.  1619/04 חברון

9891/04 מתימ"מ י-ם

במשפט שבין :

התובע הצבאי

- המאשים -

- נ ג ד -

חלמי ע"א-כרים מוחמד המאש

(עצור מיום 9/3/04)

ת.ז. 901415984 יליד 9/5/77 ממ.פ. דהיישה

- הנאשם -

## כתב אישום

הנאשם הנ"ל מואשם בזאת, בביצוע העבירות הבאות :

**פרט ראשון** :

**מהות העבירה** :  הנחת פצצה, עבירה לפי תקנה 58(ב) לתקנות ההגנה (שעת חירום),1945, וסעיף 14 לצו בדבר כללי האחריות לעבירה (יו"ש) (מס' 225), תשכ"ח – 1968.

**פרטי העבירה** :  הנאשם הנ"ל, באזור, במהלך שנת 03' או בסמוך לכך, הניח פצצה מתוך כוונה לגרום למותו של אחר או לפציעתו, דהיינו :

במועד הנ"ל, יצא הנאשם הנ"ל יחד עם חברו ראמי כאמל מוצלח כשברשותם מטען חבלה המורכב מבלון גז מ"מ להניח אותו כנגד כוחות צה"ל.

שניהם הניחו את מטען החבלה בדרך הראשית המובילה למ.פ. דהיישה במקום שבו עוברים כלי רכב צבאיים.

כשעבר בסמוך למקום הנחת המטען כלי רכב צבאי הפעיל הנאשם את מטען החבלה, אולם המטען לא התפוצץ.

1066

2

**פרט שני :**

**מהות העבירה** : חברות בהתאחדות בלתי מותרת, עבירה לפי תקנה 85(1)(א) ו- 84(1)(א) לתקנות ההגנה (שעת חירום), 1945.

**פרטי העבירה** : הנאשם הנ"ל, באזור, החל מתחילת שנת 04' או בסמוך לכך, היה חבר בהתאחדות בלתי מותרת, דהיינו :

במועד הנ"ל, הצטרף הנאשם הנ"ל לחוליה צבאית של ארגון גדודי חללי "אלאקצא" ע"י חבר הארגון אחמד צלאח אחמד צלאח (המכונה: אחמד אבו-עידב) (להלן — **אחמד אבו-עידב**).

חברותו של הנאשם בארגון נמשכה עד יום מעצרו.

**פרט שלישי :**

**מהות העבירה** : ירי לעבר אדם או מקום שבני אדם עשויים להימצא בו, עבירה לפי תקנה 58(א) לתקנות ההגנה (שעת חירום), 1945 ; וסעיף 14 לצו בדבר כללי האחריות לעבירה (יו"ש) (מס' 225), תשכ"ח – 1968.

**פרטי העבירה** : הנאשם הנ"ל, באזור, בתחילת שנת 04' או בסמוך לכך, היה שותף לירי לעבר אדם או מקום שבני אדם עשויים להימצא בו, דהיינו :

במועד הנ"ל, יצא הנאשם הנ"ל יחד עם חברי חולייתו הצבאית אחמד תאופיק תאיה, ואיל חיליל פרג' ואחמד אבו-עידב שהיה חמוש ברובה קלצ'ניקוב ורימון יד וזאת ע"מ לבצע פיגוע ירי כנגד כוחות צה"ל בבסיס הצבאי של ה- D.C.O. כשהגיעו למקום ירדו אחמד תאיה ואחמד אבו-עידב מהרכב כשברשותם האמל"ח ע"מ לבצע את פיגוע הירי ואילו הנאשם וחברו ואיל פרג' נותרו ברכב.

כעבור מספר דקות ירו אחמד אבו-עידב וחברו לעבר כלי רכב צבאי ; או-אז נמלטו הנאשם וחברו מהמקום לכיוון ביתו של אחמד אבו-עידב.

שם המתינו לחזרתו של אחמד אבו-עידב.

**פרט רביעי :**   **(פ"ח 09891/04 מת"מ ירושלים)**

**מהות העבירה** : גרימת מוות בכוונה, עבירה לפי סעיף 51(א) ו- 7(ג) לצו בדבר הוראות ביטחון (יו"ש) (מס' 378), תש"ל – 1970 ; וסעיף 14 ו- 2 לצו בדבר כללי האחריות לעבירה (יו"ש) (מס' 225), תשכ"ח – 1968.

**פרטי העבירה** : הנאשם הנ"ל, באזור ומחוץ לאזור, בתאריך 29/1/04, היה שותף לגרימת מותם של אחרים בכוונה, דהיינו :

1. בתחילת חודש ינואר 04' או בסמוך לכך, יצר ע"א-רחמאן (ואהר) יוסף ע"א-רחמאן מקדאד (להלן – **ע"א-רחמאן מקדאד**) קשר עם הפעיל הצבאי

1067

3

אחמד מוג'רבי וביקש ממנו כי יכיר לו פעילים צבאיים שיעזרו לו בייצור חומרי נפץ ומטעני חבלה ע"מ לבצע פיגועים נגד מטרות ישראליות, וכן איתור מתאבדים לצורך ביצוע פיגועי התאבדות. בהתאם לכך, יצר אחמד מוג'רבי קשר עם הפעיל הצבאי עלי מחמד חמאד אבו-הליאל (להלן – **עלי אבו-הליאל**) וביקש ממנו כי ייפגש עם פלוני (ככוונו לע"א-רחמאן מקדאד) ע"מ לעזור לו בפעילותו הצבאית. עלי אבו-הליאל נפגש עם ע"א-רחמאן מקדאד בהתאם להנחייתיו של אחמד מוג'רבי, במהלך הפגישה ביקש ממנו ע"א-רחמאן מקדאד כי יעזור לו בייצור חומרי נפץ. עלי אבו-הליאל הביע נכונות לכך.

2. בסמוך לכך פנה **הנאשם הנ"ל** אל עלי ג'יאטרה והציע לו להפגישו עם פעיל צבא שישלח אותו לביצוע פיגוע התאבדות. עלי ג'יאטרה (להלן – **המתאבד**) הביע נכונות לכך.

בהתאם לכך, הפגיש הנאשם את הפעיל הצבאי אחמד אבו-עידב עם המתאבד במהלך הפגישה בירר אחמד אבו-עידב עם המתאבד את מידת ככונותו לבצע פיגוע התאבדות.

במהלך הפגישה הביע המתאבד נכונות לבצע את הפיגוע. בהתאם ביקש אחמד אבו-עידב מהמתאבד להתכונן לביצוע פיגוע ההתאבדות.

3. בסמוך לכך, פנה עלי אבו-הליאל לע"א-רחמאן מקדאד ועידכן אותו כי הצליח להשיג 2 ק"ג חומר נפץ מסוג "אום-אלעבד"י וכן חומר כימי מסוג אטסון. בהזדמנות זו העביר עלי אבו-הליאל לע"א-רחמאן מקדאד את חומר הנפץ "אום-אלעבד"י, וע"א-רחמאן מקדאד ביקש ממנו כי יעביר אליו את חומר האצטון ובנוסף חומר כימי מסוג מי-חמצן המשמשים לייצור חומר נפץ.

4. ביום שלמחרת, נפגש ע"א-רחמאן מקדאד עם עלי אבו-הליאל וקיבל ממנו 36 ליטר חומר כימי מסוג אצטון וכן 10 ליטר מי-חמצן; ע"א-רחמאן מקדאד סיפר לעלי אבו-הליאל כי בכוונתו להשתמש בחומרים אלה ע"מ לייצר חומר נפץ שישמש מתאבד בביצוע פיגוע התאבדות; בהזדמנות זו הסביר עלי אבו-הליאל לע"א-רחמאן מקדאד על האופן שבו יש לערבב את החומרים כדי ליצור את חומר הנפץ. ע"א-רחמאן מקדאד הסתיר את החומרים בביתו.

5. כעבור מספר ימים הגיע לביתו של ע"א-רחמאן מקדאד אחמד אבו-עידב וסיפר לו כי איתר אדם המוכן לבצע פיגוע התאבדות.

ביום 28/1/04 או בסמוך לכך, פנה שוב אחמד אבו-עידב לע"א-רחמאן מקדאד, וביקש ממנו כי יכין בדחיפות תיק נפץ באמצעות חומר הנפץ שברשותו וזאת מאחר ובכוונתו לשלוח את המתאבד לפיגוע ההתאבדות.

4

אּו-אַ, ביקש ע"א-רחמאן מקדّאד מאחמד אבו-עّידّאד כי יקנה עבורו חומרים לייצّר תיק הנפּץ (שכّללו בין היתּר: תיק, סוّללות, מפסّק וכו'...). אחמד אבו-עّידّאד נענה בחיוב וקנה ביחד עם הנאשם עבור ע"א-רחמאן מקדّאד את כל שנתבקש וזאת כדי שיוּכל להכין את תיק הנפّץ בהקדّם האפשרי. בנוסף, ניסו הנאשם ואחמד אבו-עّידّאד למצוא מצّלמת וידّאו ע"מ לצّלם את המתّאבד בטרם ביצّוע הפّיגّוע, אולם לא הצّליחו בכך – ולפّיכך החّליטו להוציא את המתّאבד לביצّוע הפّיגّוע מבّלי לצّלّמו במצّלّמת וידّאו.

6.  בסמוך לכך, פּנה אחמד אבו-עّידّאד אל הפّעّיל הצّבאי מוחّמד עّיסא מחّמד מעّאלّי (להּלן – **מוחّמד מעّאلّי**) וביקّש ממנו להוّביל מתّאבד החّמוש בחגّורת נפّץ לביצّוע פּיגّוع התאّבّדות בתוך שטח מדّינת ישראל. מוחّمد מעّاלّي הבّיע נכוّנّות לכך.

בהתّאّم לכך, הפّגّיש אחמد אבו-עّידّاד את מוحّمد מعّאلّي עם המתّאבד.

7.  בمקّبّיل לאمّور לעّיל, ייצّר ע"א-רחمّان מקدّאד כמّות נוّسّفّת במשّקّל 12 קّיג של חّוّمّر הنّفّץ "אّوّم אّلّعّנّבّד", וייצّר באّمצّעّות כّمّות זّو תّيك נّفّץ לביצّوع פّיגّוع התأّבّדّות בּאّمّצّעّותّו.

לאّחّר שّסّيّيّם לّيّיّצّר את תّيّك הّنّفّץ עّיّדّכّן ע"א-רחمّאن מקدّאד את אّחّمّد אّבّו-עّيّدّاد בّכّך וّבّيّקّش מمّنّو לّבّوא עّ"מ לّקّחّת את תّيّك הّנّفّץ.

8.  כّעّבّور מּסّפّר דّקّוّת, הّגّיّع אّחّمّד אّבّو-עّيّדّاד יّחّד עّם הّمّתّאّבّד ומّוّحّمّד מّعّالّي לّבّيّתّو שّל ע"א-רחمّان מקدّאد ; מّוّحّمّد מّعّاלّي הّمّתّין בّחّوّץ וّאّيّلّو הّمّתّאّבّד ואّחّمّד אّבّו-עّيّדّاد נّכّنّסّו לّבّيّתّו שّل ע"א-רחمّان מّקّدّاد. ع"א-רחמّان מקدّאד הّסّבّיّر לّאّחّمّد אّבّو-עّيّدّاد ולّمّתّאّבّד עّל אّוّפّן הّפّעّلّת תّيّك הّנّفّץ והّעّבّיّר לّהّם את תّيّك הّנّفّץ עّ"מ שّזّה יّשّمّש בّפّيّגّوע הّתّאّבّדّות וّזّאّت בّכّוّוّנّה לّגّרّوّם לّмّوّתّם שّل אّوّרّחّيّם יّשّרّאّلّיّيّם.

9.  בּסّمّوّך לّכّך, יّצّאّו מّוّحّمّד מّعّاّلّي, הّמّתّאّבّد וّאّחّمّד אّבّو-עّيّדّاد לّכّиّוّوּن הّאّوّнّיّбّרّסّيّטّה הّעّбّרّيّת בּבّيّת-لّحّם ; שّם נّטّרّل אّחّمّד אّבّו-עّيّدّاد את מّנّגّنّون הّאّבّטّحّה שّל מّטّעّן הّحّбّلّה עّ"מ לّهّכّيّن אּוّתّو לّפّעّוّلّה. לّאّחّر-מّכّן נّטّש אّحّمّد אّבّו-עّيّדّاد את מّוّحّمّد מّعّاّلّي עّم הّمّתّאّבּד.

10. לّאّחّר שّאّحّمّד אّבّو-עّيّדّاد נّטّש אّوّتّם בּסّمّوّך לّשّעّה 6:30, הّוّבّيّל מّوّحّمّد מّعّاّלّي את הّمّתّאّבّד לّيّرّוّשّلّيّם דّרّך כّفّر חّוّلّنّيّה עّד שّהّגّيّעّו סّмّוّך לّקّنّيّוّن מّلّحّה בּيّرّוّשّلّيّם. שّם נّפّרّד מّוّحّмّد מّعّاّلّي מّהّمّתّאّבّד وّחّזّר לّ아ّيّזّور.

11. בّסّمّוّך לّכّך, עّלّה הّمّתّאّבّد לّאّوّטّوّבّоّס אّגّד בّקّو 19 שّנّסّע לّכّيّوّוّن כّيّכّר פّرّيّ ; כّשّهّגّيّע הّאّوّטّוّבّоّס לّفّנّת רّحّוّבّоّت רّחّוّבّוّת אّрّلّוّزّوّرّоّב ועّוّזّה סّמّוّך לّשّעّה 8:45 הّפّعّیّל הّمّתّאّבّد את תّيّك הّنّفّץ שّהّחّזّיّק עّلّיّو בّכّوّוّנّה לّגّרّוّם לّмّוّתّם שّל מّסّفّר רّב שّל בּנّي אّدّם. כّתّוّצّאّה מّכّך, הّתّفّוّצّץ תّيّك הّنّفّץ בּתّوّך הّאّوّטّوّבّоّס (לּהّלّن – **פּيّגّوع הّהّתّאّבّדّوّت**).

5

12. כתוצאה מפיגוע ההתאבדות נגרם מותו של **אברהם בלחסן ז"ל**.

**פרט חמישי** :   **(פ"א 09891/04 מת"מ ירושלים)**

**מהות העבירה** :   גרימת מוות בכוונה, עבירה לפי סעיף 51(א) ו- 7(ג) לצו בדבר הוראות ביטחון (יו"ש) (מס' 378), תשי"ל – 1970 ; וסעיף 14 ו- 2 לצו בדבר כללי האחריות לעבירה (יו"ש) (מס' 225), תשכ"ח – 1968.

**פרטי העבירה** :   הנאשם הנ"ל, באזור ומחוץ לאזור, בתאריך 29/1/04, היה שותף לגרימת מותם של אחרים בכוונה, דהיינו :

כתוצאה מפיגוע ההתאבדות שאותו ביצע המתאבד עלי ג'עארה בכוונה לגרום למותם של אזרחים ישראליים ושהתאאשם היה שותף לו כאמור בפרט האישום הרביעי – נגרם מותה של **גב' חנה בונדר ז"ל**.

**פרט שישי** :   **(פ"א 09891/04 מת"מ ירושלים)**

**מהות העבירה** :   גרימת מוות בכוונה, עבירה לפי סעיף 51(א) ו- 7(ג) לצו בדבר הוראות ביטחון (יו"ש) (מס' 378), תשי"ל – 1970 ; וסעיף 14 ו- 2 לצו בדבר כללי האחריות לעבירה (יו"ש) (מס' 225), תשכ"ח – 1968.

**פרטי העבירה** :   הנאשם הנ"ל, באזור ומחוץ לאזור, בתאריך 29/1/04, היה שותף לגרימת מותם של אחרים בכוונה, דהיינו :

כתוצאה מפיגוע ההתאבדות שאותו ביצע המתאבד עלי ג'עארה בכוונה לגרום למותם של אזרחים ישראליים ושהתאאשם היה שותף לו כאמור בפרט האישום הרביעי – נגרם מותה של **גב' ענת דרום ז"ל**.

**פרט שביעי** :   **(פ"א 09891/04 מת"מ ירושלים)**

**מהות העבירה** :   גרימת מוות בכוונה, עבירה לפי סעיף 51(א) ו- 7(ג) לצו בדבר הוראות ביטחון (יו"ש) (מס' 378), תשי"ל – 1970 ; וסעיף 14 ו- 2 לצו בדבר כללי האחריות לעבירה (יו"ש) (מס' 225), תשכ"ח – 1968.

**פרטי העבירה** :   הנאשם הנ"ל, באזור ומחוץ לאזור, בתאריך 29/1/04, היה שותף לגרימת מותם של אחרים בכוונה, דהיינו :

כתוצאה מפיגוע ההתאבדות שאותו ביצע המתאבד עלי ג'עארה בכוונה לגרום למותם של אזרחים ישראליים ושהתאאשם היה שותף לו כאמור בפרט האישום הרביעי – נגרם מותו של **מר יחזקאל גולדברג ז"ל**.

6

**פרט שמיני:** **(פ"א 09891/04 מת"מ ירושלים)**

**מהות העבירה:** גרימת מוות בכוונה, עבירה לפי סעיף 51(א) ו- 7(ג) לצו בדבר הוראות ביטחון (יו"ש) (מס' 378), תשי"ל – 1970; וסעיף 14 ו- 2 לצו בדבר כללי האחריות לעבירה (יו"ש) (מס' 225), תשכ"ח – 1968.

**פרטי העבירה:** הנאשם הנ"ל, באזור ומחוץ לאזור, בתאריך 29/1/04, היה שותף לגרימת מותם של אחרים בכוונה, דהיינו:

כתוצאה מפיגוע ההתאבדות שאותו ביצע המתאבד עלי גיאטרה בכוונה לגרום למותם של אזרחים ישראליים ושהנאשם היה שותף לו כאמור בפרט האישום הרביעי – נגרם מותו של **מר ולדי צדיק מנברה ז"ל**.

**פרט תשיעי:** **(פ"א 09891/04 מת"מ ירושלים)**

**מהות העבירה:** גרימת מוות בכוונה, עבירה לפי סעיף 51(א) ו- 7(ג) לצו בדבר הוראות ביטחון (יו"ש) (מס' 378), תשי"ל – 1970; וסעיף 14 ו- 2 לצו בדבר כללי האחריות לעבירה (יו"ש) (מס' 225), תשכ"ח – 1968.

**פרטי העבירה:** הנאשם הנ"ל, באזור ומחוץ לאזור, בתאריך 29/1/04, היה שותף לגרימת מותם של אחרים בכוונה, דהיינו:

כתוצאה מפיגוע ההתאבדות שאותו ביצע המתאבד עלי גיאטרה בכוונה לגרום למותם של אזרחים ישראליים ושהנאשם היה שותף לו כאמור בפרט האישום הרביעי – נגרם מותו של **מר ויורל אוקטביא פלורסקו ז"ל**.

**פרט עשירי:** **(פ"א 09891/04 מת"מ ירושלים)**

**מהות העבירה:** גרימת מוות בכוונה, עבירה לפי סעיף 51(א) ו- 7(ג) לצו בדבר הוראות ביטחון (יו"ש) (מס' 378), תשי"ל – 1970; וסעיף 14 ו- 2 לצו בדבר כללי האחריות לעבירה (יו"ש) (מס' 225), תשכ"ח – 1968.

**פרטי העבירה:** הנאשם הנ"ל, באזור ומחוץ לאזור, בתאריך 29/1/04, היה שותף לגרימת מותם של אחרים בכוונה, דהיינו:

כתוצאה מפיגוע ההתאבדות שאותו ביצע המתאבד עלי גיאטרה בכוונה לגרום למותם של אזרחים ישראליים ושהנאשם היה שותף לו כאמור בפרט האישום הרביעי – נגרם מותה של **גב' רוזה בונה ז"ל**.

7

**פרט אחד עשר** : (פ"א 09891/04 מת"מ ירושלים)

**מהות העבירה** : גרימת מוות בכוונה, עבירה לפי סעיף 51(א) ו- 7(ג) לצו בדבר הוראות ביטחון (יו"ש) (מס' 378), תש"ל – 1970 ; וסעיף 14 ו- 2 לצו בדבר כללי האחריות לעבירה (יו"ש) (מס' 225), תשכ"ח – 1968.

**פרטי העבירה** : הנאשם הנ"ל, באזור ומחוץ לאזור, בתאריך 29/1/04, היה שותף לגרימת מותם של אחרים בכוונה, דהיינו :

כתוצאה מפיגוע ההתאבדות שאותו ביצע המתאבד עלי גיאברה בכוונה לגרום למותם של אזרחים ישראליים ושהנאשם היה שותף לו כאמור בפרט האישום הרביעי – נגרם מותה של **גב' דינה איטח ז"ל**.

**פרט שנים עשר** : (פ"א 09891/04 מת"מ ירושלים)

**מהות העבירה** : גרימת מוות בכוונה, עבירה לפי סעיף 51(א) ו- 7(ג) לצו בדבר הוראות ביטחון (יו"ש) (מס' 378), תש"ל – 1970 ; וסעיף 14 ו- 2 לצו בדבר כללי האחריות לעבירה (יו"ש) (מס' 225), תשכ"ח – 1968.

**פרטי העבירה** : הנאשם הנ"ל, באזור ומחוץ לאזור, בתאריך 29/1/04, היה שותף לגרימת מותם של אחרים בכוונה, דהיינו :

כתוצאה מפיגוע ההתאבדות שאותו ביצע המתאבד עלי גיאברה בכוונה לגרום למותם של אזרחים ישראליים ושהנאשם היה שותף לו כאמור בפרט האישום הרביעי – נגרם מותו של **מר רומן חונדיאשווילי ז"ל**.

**פרט שלושה עשר** : (פ"א 09891/04 מת"מ ירושלים)

**מהות העבירה** : גרימת מוות בכוונה, עבירה לפי סעיף 51(א) ו- 7(ג) לצו בדבר הוראות ביטחון (יו"ש) (מס' 378), תש"ל – 1970 ; וסעיף 14 ו- 2 לצו בדבר כללי האחריות לעבירה (יו"ש) (מס' 225), תשכ"ח – 1968.

**פרטי העבירה** : הנאשם הנ"ל, באזור ומחוץ לאזור, בתאריך 29/1/04, היה שותף לגרימת מותם של אחרים בכוונה, דהיינו :

כתוצאה מפיגוע ההתאבדות שאותו ביצע המתאבד עלי גיאברה בכוונה לגרום למותם של אזרחים ישראליים ושהנאשם היה שותף לו כאמור בפרט האישום הרביעי – נגרם מותו של **מר אלי צפורה ז"ל**.

8

**פרט ארבעה עשר :(פ"א 04/09891 מת"מ ירושלים)**

**מהות העבירה :** גרימת מוות בכוונה, עבירה לפי סעיף 51(א) ו- 7(ג) לצו בדבר הוראות ביטחון (יו"ש) (מס' 378), תש"ל – 1970 ; וסעיף 14 ו- 2 לצו בדבר כללי האחריות לעבירה (יו"ש) (מס' 225), תשכ"ח – 1968.

**פרטי העבירה :** הנאשם הנ"ל, באזור ומחוץ לאזור, בתאריך 29/1/04, היה שותף לגרימת מותם של אחרים בכוונה, דהיינו :

כתוצאה מפיגוע ההתאבדות שאותו ביצע המתאבד עלי גיאארה בכוונה לגרום למותם של אזרחים ישראליים ושהנאשם היה שותף לו כאמור בפרט האישום הרביעי – נגרם מותה של <u>גב' נטליה גמריל ז"ל.</u>

**פרט חמישה עשר :(פ"א 04/09891 מת"מ ירושלים)**

**מהות העבירה :** ניסיון גרימת מוות בכוונה, עבירה לפי סעיף 51(א) ו- 7(ג) לצו בדבר הוראות ביטחון (יו"ש) (מס' 378), תש"ל – 1970 ; וסעיפים 19, 20-14, ו- 2 לצו בדבר כללי האחריות לעבירה (יו"ש) (מס' 225), תשכ"ח – 1968.

**פרטי העבירה :** הנאשם הנ"ל, באזור ומחוץ לאזור, בתאריך 29/1/04, היה שותף לניסיון גרימת מותם של אחרים בכוונה, דהיינו :

כתוצאה מפיגוע ההתאבדות שאותו ביצע המתאבד עלי גיאארה בכוונה לגרום למותם של אזרחים ישראליים ושהנאשם היה שותף לו כאמור בפרט האישום הרביעי – נפצעו יותר מ-50 אזרחים בדרגות פציעה קשות וקלות ; וכן מת המחבל המתאבד.

**פרט שישה עשר :**

**מהות העבירה :** החזקת אמל"ח, עבירה לפי סעיף 53(א)(1) לצו בדבר הוראות ביטחון (יו"ש) (מס' 378), תש"ל – 1970.

**פרטי העבירה :** הנאשם הנ"ל, באזור, במספר הזדמנויות שונות, החזיק ברשותו כלי ירייה, תחמושת מבלי שהיה ברשותו היתר ממפקד צבאי או מטעמו, דהיינו :

1. במהלך שנת 01' או בסמוך לכך, רכש הנאשם הנ"ל מאדם בשם אבו-ניהר שקית המלאה בכדורים מסוג 9 מ"מ ; בנוסף קנה הנאשם מאדם 1500 כדורים לרובה קלצ'ניקוב ו-700 כדורים לרובה 16 – M.

   הנאשם העביר חלק מהכדורים לפעילים צבאיים, בחלקם ביצע אימון צבאי ואת היתר הסתיר אצלו עד יום מעצרו.

2. במהלך שנת 02' קיבל הנאשם הנ"ל מחברו עיסא חיטיב עבאיאת אקדח 16 ומחסנית מלאה בכדורים לאקדח. הנאשם החזיק אקדח זה עד יום מעצרו במקום מסתור.

9

נאג'י   עאמר,   סרן
תובע          צבאי

**רשימת עדי התביעה** :

1. 94857 רס"מ דודו (גובה הודאת הנאשם מיום 17/3/04).
2. 99106 רס"מ יעקב ברוני (גובה הודאת הנאשם מיום 14/4/04 ותופס כתב ידו של הנאשם).
3. 907377113 מוחמד עיסא מוחמד מעאולי (עצור בת.ת. 1338/04).
4. 410066625 ע"א-רחמאן (זאהר) יוסף ע"א-רחמאן מקדאד (עצור בת.ת. 1238/04).
5. 906194063 עז-אלדין חיאלד חסין חמאמרה (עצור בת.ת. 1246.04).
6. 920629276 עלי מוחמד חמאד אבו-הלאיל (עצור בת.ת. 1216/04).
7. 901739656 אחמד צלאח אחמד צלאח (עצור בת.ת. 1247/04).

**פ"א 09891/04 מת"מ ירושלים** : (פיגוע התאבדות בתוך אוטובוס קו 19

8. 43438654 ניר אזולאי (פרטים בתביעה).
9. 80408453 עדנאן סעידה (פרטים בתביעה).
10. רישא קריו (פרטים בתביעה).
11. סבטלנה מילניקר (פרטים בתביעה).
12. אולנה סקריפה (פרטים בתביעה).
13. 055661458 דזורה שליו (פרטים בתביעה).
14. 07788383 יוסף חדד (פרטים בתביעה).
15. 0300679925 משה בניטה (פרטים בתביעה).
16. 038583837 כרמל שרייר (פרטים בתביעה).
17. 053927372 עלייה אליהו (פרטים בתביעה).
18. 0307353110 ליליה שריגה (פרטים בתביעה).
19. 307207332 אריגה פוטיומקין (פרטים בתביעה).
20. 058123977 גד ליסטגנברג (פרטים בתביעה).
21. 002379493 מרים דרעי (פרטים בתביעה).
22. 056521644 ורד לזון (פרטים בתביעה).
23. 035816180 דוד בר-סלע (פרטים בתביעה).
24. 034325944 יעל רובינשטיין (פרטים בתביעה).

10

25. 071666614 נעים ברזאוי (פרטים בתביעה).

26. 001909134 שרה קיסר (פרטים בתביעה).

27. 321135395 לידייה וויגר (פרטים בתביעה).

28. 054584362 בהירה סעדו (פרטים בתביעה).

29. מ.ר. 73774 ד"ר קומבר (מסמכים רפואיים הנוגעים למר נעים ברזאוי).

30. מ.ר. 24151 ד"ר מיכלבסקי (מסמכים רפואיים הנוגעים לגב' שרה קיסר).

31. מ.ר. 25068 ד"ר יוטקין (מסמכים רפואיים הנוגעים לגב' בהירה סעדו).

32. ד"ר א. וולף (מסמכים רפואיים הנוגעים לגב' בהירה סעדו).

33. חווי"ד מעבדת חבלה (תועבר בהמשך).

34. מסמכים רפואיים.

35. רשימות נפגעים (רשומה מוסדית).

275

[Handwriting] Prosecution

**Israel          Defense          Forces**

In the Military Court                    Court File 04/ [handwriting] 2303

Of Judea                                 Prosecution File 1300/04

Presiding Judicial Panel                 Event Details File 1619/04 Hebron

                                         9891/04 Jerusalem Central
                                         Bus Station

In a trial between:

**The Military Prosecutor**

**- The Plaintiff -**

**vs.**

**Halami A"A – Karim Muhamed Hamash**

(Detained as of March 9, 2004)

ID no. 901415984, born: May 9, 1977 of the Deheishe Refugee Camp

**- The Accused -**

[Stamp: May 23, 2004]

## Indictment

The aforesaid Accused is hereby accused of committing the following offenses:

**Count of Indictment One:**

**Nature of the Offense:** Planting a bomb, offense according to regulation 58(b) of the Defense (Emergency) Regulations, 1945; and section 14 of the Rule of Criminal Responsibility Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the Offense:** The aforesaid Accused, over the course of 2003 or proximate thereto, planted a bomb in the area, with the intention of causing the death or injury of another individual, i.e.:

On the aforesaid date, the aforesaid Accused proceeded along with his friend, Rami Camel Mutslah, with an explosive charge comprised of a gas balloon in order to plant it opposite IDF forces.

They both planted the explosive charge on the main road leading to the Deheishe Refugee Camp, where military vehicles pass through.

When a military vehicle passed by the area where the charge was planted, the Accused activated the explosive charge, however the charge did not explode.

276

**Count of Indictment Two:**

**Nature of the Offense:** Membership in a forbidden association, offense pursuant to regulation 85(1)(a) and 84(1)(a) of the Defense (Emergency) Regulations, 1945.

**Details of the Offense:** The aforesaid Accused began, in the area, starting in 2004 or proximate thereto, to be a member of a forbidden association, i.e.:

At the aforesaid time, the aforesaid Accused joined the military band of the Al Aqsa Martyrs' Brigades through a member of the organization. Ahmad Zalach Ahmed Zalach (also known as: Ahmad Abu-Ideb) (hereinafter referred to as: **Ahmad Abu-Ideb**).

The membership of the Accused in the organization lasted until the day of his detainment.

**Count of Indictment Three:**

**Nature of the Offense:** Shooting at an individual or place where individuals may be located, offense pursuant to regulation 58(1) of the Defense (Emergency) Regulations, 1945, and section 14 of the Rule of Criminal Responsibility Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the Offense:** The aforesaid Accused, at the beginning of 2004 or proximate thereto, in the area, participated in a shooting at an individual or towards a place where individuals may be located, i.e.:

On the aforesaid date, the aforesaid Accused proceeded along with members of his military band, Ahmad Taufik TA"A and Eil Halil Faraj and Ahmad Abu-Ideb, who was armed with a Kalashnikov rifle and a hand grenade, in order to execute a shooting attack against IDF forces at the D.C.O. Military base.  When they arrived at the place, Ahmad Taeieh and Ahmad Abu-Ideb descended from the vehicle, armed with weapons in order to execute a shooting attack, whereas the Accused and his friend Eil Faraj remained in the vehicle.

A few minutes later, Ahmad Abu Ideb and his friend shot at a military vehicle; it was at that moment that the Accused and his friend fled from the scene and headed towards the home of Ahmad Abu-Ideb.

There they awaited the return of Ahmad Abu-Ideb.

**Count of Indictment Four:**       **(Event Details File 09891 Jerusalem Central Bus Station)**

**Nature of the Offense:**   Intentional cause of death, offense pursuant to section 51(a) and 7(c) of the Order regarding Security Provisions (Judea and Samaria) (No. 378), 5730-1970; and section 14 and 2 of the Rule of Criminal Responsibility Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the Offense:**   The aforesaid Accused, in the area and outside the area, on Jan. 29, 2004, was party to the intentional causation of death of others, i.e.:

1. At the beginning of Jan. 2004, or proximate thereto, A"A-Rahman (Zahar) Yossef A"A-Rahman Makdad (hereinafter referred to as: **A"A-Rahman Makdad**) contacted the military activist Ahmad Mujerbi and asked him to introduce him to military activists who would help him manufacture explosives and explosive charges to execute terror attacks against Israeli targets and to locate suicide bombers to execute a suicide bombings. Accordingly, Ahmad Mujerbi contacted the military activist Ali Mahmad Hamed Abu Halil (hereinafter referred to as – **Ali Abu Halil**) and asked him to meet X (meaning A"A-Rahman Makdad) to help him in his military activity.   Ali Abu Halil met with A"A-Rahman Makdad according to the instructions of Ahmad Mujerbi; during the meeting A"A-Rahman Makdad asked him to help him manufacture explosives.  Ali Abu-Halil expressed his willingness to do so.

2. Around that time, the **aforesaid Accused** contacted Ali Ja'ara and proposed that he meet with a military activist who would send him on a suicide bombing.   Ali Ja'ara (hereinafter – **the Suicide Bomber**) expressed his willingness to do so.

   Accordingly, the Accused introduced the military activist Ahmad Abu-Ideb to the Suicide Bomber. During the meeting Ahmad Abu-Ideb clarified the extent of the Suicide Bomber's willingness to execute the suicide bombing.

   During the meeting the suicide bomber expressed his willingness to execute the suicide bombing; accordingly, Ahmad Abu-Ideb asked the Suicide Bomber to prepare for the execution of the suicide bombing.

3. Around that time, Ali Abu-Halil contacted A"A-Rahman Makdad, and informed him that he had succeeded in obtaining 2 kg of "Umm El-Abed" explosives as well as chemical substance - acetone. At this opportunity, Ali Abu-Halil gave A"A-Rahman Makdad the "Umm El-Abed" explosives and A"A-Rahman Makdad asked him to give him the acetone in addition hydrogen peroxide chemical substance, used to make explosives.

4. The next day, A"A-Rahman Makdad met with Ali Abu Halil and received 36 liters of acetone from him, as well as 10 liters of hydrogen peroxide; A"A-Rahman Makdad told Ali Abu-Halil that he was intending to use these substances to make explosives to be used by a Suicide Bomber in a suicide bombing; at this opportunity Ali Abu-Halil explained to A"A-Rahman Makdad as to how to mix the substances in order to make explosives.  A"A-Rahman Makdad hid these substances in his home.

5. A few days later, Ahmad Abu-Ideb arrived at the home of A"A-Rahman Makdad, and told him that he located an individual willing to execute a suicide bombing.  On Jan. 28, 2004, or around that time, Ahmad Abu-Ideb contacted A"A-Rahman Makdad once again and asked him to urgently prepare an explosive bag using the explosives at his disposal, as Abu-Ideb was about to send the Suicide Bomber on a mission.

278

It was then that A"A-Rahman Makdad asked Ahmad Abu-Ideb to buy materials for him to make an explosive bag (which included, among other things, a bag, batteries, an electricity switch, etc.) Ahmad Abu-Ideb responded affirmatively and purchased along with the Accused everything that A"A-Rahman Makdad requested so that he could make an explosive bag as soon as possible.  Additionally, the Accused and Ahmad Abu-Ideb tried to find a video camera to film the Suicide Bomber before his departure to execute the suicide bombing, however they failed to do so – and therefore decided to send the Suicide Bomber to execute the suicide bombing without filming him on video.

6. Around that time, Ahmad Abu Ideb contacted the military activist Mohamed Isa Mahmad Ma'ali (hereinafter referred to as **Mohamed Ma'ali**) and asked him to lead the Suicide Bomber who was armed with an explosive belt [into Israeli territory] so that he could execute the suicide bombing within the territory of the State of Israel. Mohamed Ma'ali expressed his willingness to do so.

Accordingly, Ahmad Abu-Ideb introduced Mohamed Ma'ali to the Suicide Bomber.

7. Concurrent with the aforesaid, A"A-Rahman Makdad produced an additional 12 kg of "Umm El-Abed" explosives and manufactured an explosive belt with this quantity for the execution of a suicide bombing.

After he finished making the explosive belt, A"A-Rahman Makdad informed Ahmad Abu-Ideb thereof and asked him to come to pick up the explosive belt.

8. A few minutes later, Ahmad Abu-Ideb arrived along with the Suicide Bomber and Mohamed Ma'ali at the home of A"A-Rahman Makdad; Mohamed Ma'ali waited outside, and the Suicide Bomber and Ahmad Abu-Ideb went inside A"A-Rahman Makdad's house. A"A-Rahman Makdad explained to Ahmad Abu Ideb and the Suicide Bomber how to activate the explosive belt, and gave them the explosive bag to use in the suicide bombing, in order to cause the death of Israeli civilians.

9. Around that time, Mohamed Ma'ali, the Suicide Bomber and Ahmad Abu-Ideb proceeded in the direction of the university in Bethlehem; there Ahmad Abu-Ideb neutralized the security mechanism of the explosive charge in order to activate it.  Ahmad Abu-Ideb then left Mohamed Ma'ali in the company of the Suicide Bomber.

10. After Ahmad Abu-Ideb parted ways with them close to 6:30, Mohamed Ma'ali led the Suicide Bomber to Jerusalem via the Walaga village until they arrived at the Malha Mall in Jerusalem.  There Mohamed Ma'ali parted ways with the Suicide Bomber and returned to the area.

11. Around that time, the Suicide Bomber boarded an Egged no. 19 bus, headed for Paris Plaza, when the bus arrived at the corner of Arlozoroff St. and Gaza St., close to 8:45, the Suicide Bomber activated the explosive bag that he had on his person with the intention of causing the death of a great number of people.   As a result, the explosive bag went off inside the bus (hereinafter called **the Suicide Bombing**).

279

**Count of Indictment Five:**            **(Event Details File 09891/04, Jerusalem Central Bus Station)**

**Nature of the Offense:** Intentional causation of death, offense pursuant to section 51(a) and 7 (c) of the Order regarding Security Provisions (Judea and Samaria) (No. 378), 5730-1970; and section 14 and 2 of the Rule of Criminal Responsibility Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the Offense:** The aforesaid Accused, in the area, and outside the area, on Jan. 29, 2004, was party to the intentional causation of death of other individuals, i.e.:

As a result of the Suicide Bombing, which Suicide Bomber Ali Ja'ara executed with the intention of causing the death of Israeli civilians, and to which the Accused was party, as set forth in the fourth indictment detail – **Ms. Hanna Bonder of blessed memory** was killed.

**Count of Indictment Six:**        **(Event Details File 09891/04, Jerusalem Central Bus Station)**

**Nature of the Offense:** Intentional causation of death, offense pursuant to section 51(a) and 7 (c) of the Order regarding Security Provisions (Judea and Samaria) (No. 378), 5730-1970; and section 14 and 2 of the Rule of Criminal Responsibility Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the Offense:** The aforesaid Accused, in the area, and outside the area, on Jan. 29, 2004, was party to the intentional causation of death of other individuals, i.e.:

As a result of the Suicide Bombing, which Suicide Bomber Ali Ja'ara executed with the intention of causing the death of Israeli civilians, and to which the Accused was party, as set forth in the fourth indictment detail – **Ms. Anat Darom of blessed memory** was killed.

**Count of Indictment Seven:**        **(Event Details File 09891/04, Jerusalem Central Bus Station)**

**Nature of the Offense:** Intentional causation of death, offense pursuant to section 51(a) and 7 (c) of the Order regarding Security Provisions (Judea and Samaria) (No. 378), 5730-1970; and section 14 and 2 of the Rule of Criminal Responsibility Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the Offense:** The aforesaid Accused, in the area, and outside the area, on Jan. 29, 2004, was party to the intentional causation of death of other individuals, i.e.:

As a result of the Suicide Bombing, which Suicide Bomber Ali Ja'ara executed with the intention of causing the death of Israeli civilians, and to which the Accused was party, as set forth in the fourth indictment detail – **Mr. Yechezkel Goldberg of blessed memory** was killed.

280

**Count of Indictment Eight:**          (**Event Details File 09891/04, Jerusalem Central Bus Station**)

**Nature of the Offense:**   Intentional causation of death, offense pursuant to section 51(a) and 7 (c) of the Order regarding Security Provisions (Judea and Samaria) (No. 378), 5730-1970; and section 14 and 2 of the Rule of Criminal Responsibility Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the Offense:**   The aforesaid Accused, in the area, and outside the area, on Jan. 29, 2004, was party to the intentional causation of death of other individuals, i.e.:

As a result of the Suicide Bombing, which Suicide Bomber Ali Ja'ara executed with the intention of causing the death of Israeli civilians, and to which the Accused was party, as set forth in the fourth indictment detail – **Mr. Valdi Tzadik Manbara of blessed memory** was killed.

**Count of Indictment Nine:**          (**Event Details File 09891/04, Jerusalem Central Bus Station**)

**Nature of the Offense:**   Intentional causation of death, offense pursuant to section 51(a) and 7 (c) of the Order regarding Security Provisions (Judea and Samaria) (No. 378), 5730-1970; and section 14 and 2 of the Rule of Criminal Responsibility Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the Offense:**   The aforesaid Accused, in the area, and outside the area, on Jan. 29, 2004, was party to the intentional causation of death of other individuals, i.e.:

As a result of the Suicide Bombing, which Suicide Bomber Ali Ja'ara executed with the intention of causing the death of Israeli civilians, and to which the Accused was party, as set forth in the fourth indictment detail – **Mr. Viorel Octavia Florescu of blessed memory** was killed.

**Count of Indictment Ten:**          (**Event Details File 09891/04, Jerusalem Central Bus Station**)

**Nature of the Offense:**   Intentional causation of death, offense pursuant to section 51(a) and 7 (c) of the Order regarding Security Provisions (Judea and Samaria) (No. 378), 5730-1970; and section 14 and 2 of the Rule of Criminal Responsibility Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the Offense:**   The aforesaid Accused, in the area, and outside the area, on Jan. 29, 2004, was party to the intentional causation of death of other individuals, i.e.:

As a result of the Suicide Bombing, which Suicide Bomber Ali Ja'ara executed with the intention of causing the death of Israeli civilians, and to which the Accused was party, as set forth in the fourth indictment detail – **Ms. Rosa Boneh of blessed memory** was killed.

281

**Count of Indictment Eleven:**      **(Event Details File 09891/04, Jerusalem Central Bus Station)**

**Nature of the Offense:**  Intentional causation of death, offense pursuant to section 51(a) and 7 (c) of the Order regarding Security Provisions (Judea and Samaria) (No. 378), 5730-1970; and section 14 and 2 of the Rule of Criminal Responsibility Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the Offense:**  The aforesaid Accused, in the area, and outside the area, on Jan. 29, 2004, was party to the intentional causation of death of other individuals, i.e.:

As a result of the Suicide Bombing, which Suicide Bomber Ali Ja'ara executed with the intention of causing the death of Israeli civilians, and to which the Accused was party, as set forth in the fourth indictment detail – **Ms. Dana Itach of blessed memory** was killed.


**Count of Indictment Twelve:**      **(Event Details File 09891/04, Jerusalem Central Bus Station)**

**Nature of the Offense:**  Intentional causation of death, offense pursuant to section 51(a) and 7 (g) of the Order regarding Security Provisions (Judea and Samaria) (No. 378), 5730-1970; and section 14 and 2 of the Rule of Criminal Responsibility Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the Offense:**  The aforesaid Accused, in the area, and outside the area, on Jan. 29, 2004, was party to the intentional causation of death of other individuals, i.e.:

As a result of the Suicide Bombing, which Suicide Bomber Ali Ja'ara executed with the intention of causing the death of Israeli civilians, and to which the Accused was party, as set forth in the fourth indictment detail – **Mr. Roman Hundiashvilli of blessed memory** was killed.


**Count of Indictment Thirteen:**      **(Event Details File 09891/04, Jerusalem Central Bus Station)**

**Nature of the Offense:**  Intentional causation of death, offense pursuant to section 51(a) and 7 (c) of the Order regarding Security Provisions (Judea and Samaria) (No. 378), 5730-1970;

and section 14 and 2 of the Rule of Criminal Responsibility Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the Offense:**  The aforesaid Accused, in the area, and outside the area, on Jan. 29, 2004, was party to the intentional causation of death of other individuals, i.e.:

As a result of the Suicide Bombing, which Suicide Bomber Ali Ja'ara executed with the intention of causing the death of Israeli civilians, and to which the Accused was party, as set forth in the fourth indictment detail – **Mr. Eli Tzipora of blessed memory** was killed.

282

**Count of Indictment Fourteen:   (Event Details File 09891/04, Jerusalem Central Bus Station)**

**Nature of the Offense:**  Intentional causation of death, offense pursuant to section 51(a) and 7 (c) of the Order regarding Security Provisions (Judea and Samaria) (No. 378), 5730-1970; and section 14 and 2 of the Rule of Criminal Responsibility Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the Offense:**  The aforesaid Accused, in the area, and outside the area, on Jan. 29, 2004, was party to the intentional causation of death of other individuals, i.e.:

As a result of the Suicide Bombing, which Suicide Bomber Ali Ja'ara executed with the intention of causing the death of Israeli civilians, and to which the Accused was party, as set forth in the fourth indictment detail – **Ms. Natalia Gamril of blessed memory** was killed.

**Count of Indictment Fifteen:      (Event Details File 09891/04, Jerusalem Central Bus Station)**

**Nature of the Offense:**  Attempted intentional causation of death, offense pursuant to section 51(a) and 7 (c) of the Order regarding Security Provisions (Judea and Samaria) (No. 378), 5730-1970; and sections 19-20, 14 and 2 of the Rule of Criminal Responsibility Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the Offense:**  The aforesaid Accused, in the area, and outside the area, on Jan. 29, 2004, was party to the intentional causation of death of other individuals, i.e.:

As a result of the Suicide Bombing, which Suicide Bomber Ali Ja'ara executed with the intention of causing the death of Israeli civilians, and to which the Accused was party, as set forth in the fourth indictment detail – over 50 civilians were wounded with varying degrees of injury, severe and light; and the Suicide Bomber died.

**Count of Indictment Sixteen:**

**Nature of the Offense:**  Possession of Weapons, offense pursuant to section 53(a)(1) of the Ordinance in the matter of Order regarding Security Provisions (Judea and Samaria) (No. 378), 5730-1970.

**Details of the Offense:** The aforesaid Accused, in the area, on several occasions, possessed artillery weapons, and ammunition without a permit from a military commander, or on his behalf, i.e.:

1. Over the course of 2001, and proximate thereto, the aforesaid Accused purchased a bag full of 9 mm bullets from a man named Abu Johar; additionally, the Accused purchased 1500 bullets for a Kalashnikov rifle from the same person, and 700 bullets for an M-16 rifle.

   The Accused forwarded some of the bullets to military activists, some of them he used for military drills, and the rest he hid in his home until the day of his arrest.

2. Over the course of 2002, the aforesaid Accused received a 16 handgun and a magazine loaded with rounds for the handgun from his friend Isa Hatib. The Accused held this handgun in his possession until he was arrested in his hiding place.


283

**Naji Amar, Captain**

**Military Prosecutor**

[Signature]


**List of Prosecution Witnesses:**

1. 94857 Command Sergeant Major Dudu (Confession of the Accused dated March 17, 2004 was obtained).
2. 99106 Command Sergeant Major Yaakov Barzani (Confession of the Accused dated April 14, 2004 was obtained as well as a form in the handwriting of the Accused).
3. 907377113 Mohamed Isa Mohamed Ma'ali (detained in Prosecution case 1338/04).

4. 410066625 A"A-Rahman (Zahar) Yossef A"A-Rahman Makdad (detained in Prosecution file 1238/04)

5. 906194063 Az-Aladin Halad Hassin Hamamra (detained in Prosecution case 1246/04)

6. 920629276 Ali Mohamed Hamed Abu-Halil (detained in Prosecution case 1216/04).

7. 901739656 Ahmad Tzalah Ahmad Tzalah (detained in Prosecution case 1247/04).

**Event Details File 09891/04 Jerusalem Central Bus Station (suicide bombing on bus no. 19)**

8. 43438654 Nir Azulai (details contained in prosecution suit).

9. 80408453 Adnan Saida (details contained in prosecution suit).

10. Risha Kriz (details contained in prosecution suite)

11. Svetlana Milinker (details contained in prosecution suit).

12. Olana Scrippa (details contained in prosecution suit).

13. 055661458 Doria Shalev (details contained in prosecution suit).

14. 07788383 Yosef Hadad (details contained in prosecution suit).

15. 0300679925 Moshe Banita (details contained in prosecution suit).

16. 038583837 Carmel Shreier (details contained in prosecution suit).

17. 053927372 Aliza Eliyahu (details contained in prosecution suit).

18. 0307353110 Lilia Shriga (details contained in prosecution suit).

19. 307207332 Irina Potyomkin (details contained in prosecution suit).

20. 058123977 Gad Listenberg (details contained in prosecution suit).

21. 002379493 Miriam Deri (details contained in prosecution suit).

22. 056521644 Vered Luzon (details contained in prosecution suit).

23. 035816180 David Bar-Sela (details contained in prosecution suit).

24. 034325944 Yael Rubinstein (details contained in prosecution suit).

284

25. 071666614 Naim Barazawi (details contained in prosecution suit).

26. 001909134 Sara Keisar (details contained in prosecution suit).

27. 321135395 Lidia Weiner (details contained in prosecution suit).

28. 054584362 Behira Saado (details contained in prosecution suit).

29. License no. 73774 Dr. Komver (medical documents pertaining to Mr. Naim Barzawi).

30. License no. 24151 Dr. Michalevsky (medical documents pertaining to Ms. Sara Keisar).

31. License no. 25068 Dr. Utkin (medical documents pertaining to Ms. Behira Saado).

32. Dr. A. Wolf (medical documents pertaining to Ms. Behira Saado).

33. Explosives Lab Assessment (to be forwarded later on).

34. Medical Documents

35. Lists of injured (institutional listing)

**Translations**

# CERTIFICATION

This is to certify that the attached *English* language document corresponding
to the document *Shaked Supp App'x 275-284*, is a true and accurate translation of the original
*Hebrew* language document to the best of our knowledge and belief

Executed this on
Sunday, December 05, 2010

תיק תק תרגומים בע״מ
TIK TAK TRANSLATIONS LTD.
ח.פ. 514280775 .Co. No:

***Tik Tak Translations Ltd.***
9 Hashiloah Street
Petach Tikva, 49180 ISRAEL
+972 3 907-4555

**EXHIBIT 201 TO DECLARATION OF VALERIE SCHUSTER**

Case 1:05-cv-04622-DLI-RML   Document 267-15   Filed 03/22/12   Page 626 of 910   PageID #: 8003



**ISRAEL MINISTRY OF FOREIGN AFFAIRS**

עברית        العربية        فارسی

**Search**





**SOCIAL MEDIA**

- Twitter
- Facebook
- YouTube
- Flickr

**MFA newsletter**

MFA  ›  MFA Library  ›  2000-2009  ›  2004  ›  Jan  ›  Suicide bombing of Egged bus no 19 in Jerusalem -

## Suicide bombing of Egged bus no 19 in Jerusalem - 29-Jan-2004

**29 Jan 2004**

⊠ E-mail to a friend

🖶 Print the article

⊞ Add to my bookmarks

**External links**

› Graphic footage of the remains of bus no. 19 and its passengers (clip 007)

About the Ministry

MFA events

Foreign Relations

Facts About Israel

Government

Jerusalem

Treaties

History of Israel

Peace Process

Terrorism

The Iranian Threat

Anti-Semitism/Holocaust

Israel beyond politics

Int'l development

MFA Visual Media

MFA Publications

Our Bookmarks

News Archive

MFA Library

### Suicide bombing of Egged bus no. 19 in Jerusalem
### January 29, 2004

A reexamination of body parts brought to the Abu Kabir forensic institute brought the death toll in the Jerusalem suicide bombing to 11. In addition, over 50 people were wounded, 13 of them seriously, in a suicide bombing of an Egged bus no. 19 shortly before 9:00 AM at the corner of Gaza and Arlozorov streets in Jerusalem. The bus starts its route in Hadassah Ein Kerem and makes its way through the center of Jerusalem to Hadassah Hospital and the Hebrew University on Mount Scopus.

The bomber was in the back of the bus when he detonated the explosives, said Jerusalem Police Chief Mickey Levy. The blast tore apart the bus, turning it into a twisted wreck. The back half of the roof was blown into the air and every window was blown out.

Both the Fatah-related Al Aqsa Martyrs' Brigades and Hamas claimed responsibility for the attack, naming the bomber as Ali Yusuf Jaara, a 24-year-old Palestinian policeman from Bethlehem.

● Terrorist leader responsible for last Thursday's Jerusalem suicide bombing killed in Bethlehem - Feb 2, 2004

**Behind the Headlines - Jan 29, 2004**

*Israelis started their morning today having to face shocking pictures of dead commuters - victims of yet*



©2004 Reuters/Nili Bassan

Suicide bombing of bus no. 19 in Jerusalem



©2004 Reuters/Ronen Zvulun

Israeli rescue workers search the wreckage of Jerusalem bus following suicide bombing.



©2004 Reuters/Oren Cohen

Israeli rescue workers remove a body after the bombing

Case 1:05-cv-04622-DLI-RML   Document 267-15   Filed 03/22/12   Page 627 of 910 PageID #: 8004

*another suicide bomber.*
*The <u>anti-terrorist fence</u> could have prevented this massacre.*
*The sheer absurdity cannot be ignored. While Palestinian terrorists continue to murder Israelis, the pro-Arab majority at the UN is forcing Israel into the dock at the International Court over the fence. Thus, the supporters of terrorism condemn the victims of terrorism for simply trying to protect themselves. All those who criticize Israel for building the fence should take a good look at this morning's pictures from Jerusalem.*
*On a day when Israel is <u>exchanging hundreds of imprisoned terrorists</u> for the freedom of a kidnapped Israeli civilian and the bodies of three missing soldiers, Palestinian terrorism claims the lives of ten innocent victims, while maiming dozens more. This proves once again that in contrast to Israel's humane outlook, which views each individual as an entire world, the terrorists murder indiscriminately and disdain the sanctity of human life.*



©<u>Flash90</u>
Victims of suicide bombing receive initial treatment at the scene

**<u>View video clip</u>**
<u>Download video clip</u> (57 MB)
*Caution: Video contains very graphic footage.*

**The victims:**

- **Avraham (Albert) Balhasan, 28, of Jerusalem**
- **Rose Boneh, 39, of Jerusalem**
- **Hava Hannah (Anya) Bonder, 38, of Jerusalem**
- **Anat Darom, 23, of Netanya**
- **Viorel Octavian Florescu, 42, of Jerusalem**
- **Natalia Gamril, 53, of Jerusalem**
- **Yechezkel Isser Goldberg, 41, of Betar Illit**
- **Baruch (Roman) Hondiashvili, 38, of Jerusalem**
- **Dana Itach, 24, of Jerusalem**
- **Mehbere Kifile, 35, of Ethiopia**
- **Eli Zfira, 48, of Jerusalem**



Avraham Balhasan    Rose Boneh    Hava Bonder    Anat Darom

Octavian Florescu    Natalia Gamril    Yechezkel Goldberg    Baruch Hondiashvili

Dana Itach    Mehbere Kifile    Eli Zfira

Case 1:05-cv-04622-DLI-RML   Document 267-15   Filed 03/22/12   Page 628 of 910 PageID #: 8005

February 2, 2004

**Ten overseas volunteers in the Jewish Agency-Magen David Adom program help rescue victims of Thursday's bus bombing**
(Communicated by the JAFI Communications and Information Unit)

10 young volunteers in the joint Jewish Agency-Magen David Adom Yochai Porat Overseas Volunteers Program, helped save lives of victims in Thursday's suicide bombing attack on the Number 19 in the heart of Jerusalem. The volunteers were from the USA and Canada. Some of these volunteers had been at the MDA station and leaped onto ambulances. Several who were not on duty, ran to the scene as soon as they. For some this was their second tour of duty. However for others this was their first baptism under fire. On the scene they all did what they were trained to do. Only afterwards did they stop to think. In order to enable them to cope with the indelible scenes that they witnessed, the Jewish Agency organized a group session with a psychiatrist.

The Jewish Agency-Magen David Adom Overseas Volunteers Program began 13 years ago with Canada. Two years ago it became a multinational program, thanks to the efforts of the charismatic Jewish Agency Coordinator, Yochai Porat (who was killed last year by a terrorist sniper, while he was performing reserve service as a medic and for whom the course is now named). The program trains volunteers from abroad to qualify as "first responders" in an intensive course taught in English or other foreign languages. They then serve for two months on Magen David Adom stations and on ambulances throughout Israel. Some thousand volunteers have already participated in the program. Many come back to do more advanced courses (e.g. medic, driver etc.) and perform additional service. The latest course for overseas volunteers began last Sunday, and a new course cycle will begin on July 1st. The number of young men and women who volunteer for the course has increased greatly, and this year some 350 volunteers are expected to arrive to serve in this program.

**SEE ALSO ...**
- Palestinian violence and terrorism since Sept 2000
- In Memory of the Victims of Palestinian Violence and Terrorism
- Suicide and Other Bombing Attacks in Israel Since the Declaration of Principles (Sept 1993)

**Feedback**          |          **Map**          |          **Hebrew**

© 2008 Israel Ministry of Foreign Affairs - The State of Israel. All rights reserved.    *Terms of use*   *Use of cookies*

**EXHIBIT 202 TO DECLARATION OF VALERIE SCHUSTER**

# Expert Report

Of

# Ronni Shaked

*Strauss v. Crédit Lyonnais, S.A.* 06 CV 702 (DGT)(MDG)
*Wolf v. Crédit Lyonnais, S.A.* 07 CV 914 (DGT)(MDG)

Translated From Hebrew into English
By

Rina Ne'eman Hebrew Language Services, Inc.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

## 1. Professional background and training

My full name is Ronni Shaked. Since 1982, I have been working as a commentator and analyst for the newspaper with the largest distribution in Israel, <u>Yedioth Ahronoth</u>, where I write about Palestinian affairs, terrorism and security-related subjects. In addition, I am a researcher at the Hebrew University of Jerusalem, where I study the ethos of the Palestinian struggle.

Between 1969 and 1982, I worked for the Israel Security Agency (hereinafter: the "**ISA**"), the entity which is responsible for the war against terror in Israel and in the Palestinian Territories.[1] I held a number of positions during my service with the ISA, including: Commander of the Jerusalem Sector and Commander of the Ramallah Sector. I devoted a year of my service with the ISA to the study of terrorism and the development of theories aimed at the defeating of terrorism in the Palestinian Territories, in addition to the development of theories and procedures for the defense of Israeli targets in other countries. Throughout the course of my years of work with the ISA, I handled agents who operated within the terrorist organizations, I participated in and conducted interrogations of terrorist operatives, and I participated in and commanded operations that are intended to defeat terrorist operations.

I also have a Master's degree (*summa cum laude*) in Middle Eastern Studies from the Hebrew University of Jerusalem.

I have provided expert declarations in United States federal courts in three (3) civil cases:

- <u>Haim v. Islamic Republic of Iran</u>, 425 F. Supp. 2d 56 (D.D.C., 2006)

- <u>Stern v. Islamic Republic of Iran</u>, 271 F. Supp. 2d 286 (D.D.C., 2003)

- <u>Ungar v. Islamic Republic of Iran</u>, 211 F. Supp. 2d 91 (D.D.C., 2002)

I have also written or co-authored two books:

- Ronni Shaked and Aviva Shabi, <u>Hamas: M'Emunah B'Allah L'Derech Ha-Terror</u> (<u>Hamas: From Belief in Allah to the Road of Terror</u>), Keter Publishing House, Jerusalem, (1994).

- Ronni Shaked, <u>Ha-Shabak Beakavot Capucci</u> (<u>Capucci – The Israeli Security Agency on the Heels of Terrorism</u>), (1995).

I have also served as an expert consultant for several documentaries, including:

---

[1] In the context of this report, the term "Palestinian Territories" generally refers to the Gaza Strip and the West Bank, which were occupied by Israel during the Six-Day War in 1967. The use of this term is not intended to provide a legal definition. As for the term "Israeli Settlers": when Hamas refers to "Israeli Settlers," the reference is generally to citizens of the State of Israel who live (or lived) in the Gaza Strip and the West Bank, which were occupied by Israel during the Six-Day War. The term, as expressed in this report, is not intended to convey any formal definition.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

- "The Collaborator" (1994)

- "The Engineer of Death" (History Channel, 2003)

- "For the Sake of Allah" (2006)

- "To Die in Jerusalem" (HBO, 2007)

I have worked as a consultant for the United States Federal Bureau of Investigation (hereinafter: "**FBI**") in many cases, and once for the United States Department of Justice (hereinafter: "**DOJ**"). Since 1991, I have also served as a consultant to the Anti-Defamation League (hereinafter: "**ADL**") and I have served, on a number of occasions, as a consultant to CBS News. I speak and read Hebrew and Arabic fluently and I have a working knowledge of English and French.

## 2. Scope of the required work

In May 2009, counsel for the Plaintiffs asked me to provide an expert opinion on the question of whether Hamas[2] was involved in the recruiting, planning and perpetration of the following suicide bombings:

- March 27, 2002 – the suicide bombing at the Park Hotel, Netanya.

- May 7, 2002 – the terrorist attack at the Sheffield Club, Rishon Le-Zion.

- March 5, 2003 – the terrorist attack on the No. 37 bus, Haifa.

- April 30, 2003 – the terrorist attack at Mike's Place, Tel Aviv.

- May 18, 2003 – the terrorist attack on the No. 6 bus, French Hill, Jerusalem.

- June 11, 2003 – the terrorist attack on the No. 14A bus, Jaffa Road, Jerusalem.

- August 19, 2003 – the terrorist attack on the No. 2 bus, Jerusalem.

- September 9, 2003 – the terrorist attack at Café Hillel, Jerusalem.

- January 29, 2004 – the terrorist attack on the No. 19 bus, Jerusalem.

---

[2] The word "Hamas" ("the Islamic Resistance Movement"), as used in this report, refers to the *Harakat al-Muqawamah al-Islamiyya*, which is a Palestinian Islamic movement. This movement developed within the Palestinian branch of the Muslim Brotherhood Movement, which is based in Egypt. In 1995, the Government of the United States ruled that Hamas is a Specially Designated Terrorist (hereinafter: "**SDT**"). In 1997, the Government of the United States ruled that Hamas is a Foreign Terrorist Organization (hereinafter: "**FTO**"), and that ruling was renewed on an ongoing basis every two years thereafter. In 2001, the Government of the United States ruled that Hamas is a Specially Designated Global Terrorist (hereinafter: "**SDGT**"), and this ruling has remained in force to this day.

2

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

Counsel for the Plaintiffs also asked me to provide an expert opinion with respect to the question of whether Hamas had been involved in the recruiting and perpetration of the following terrorist attacks:

○ July 31, 2002 – the terrorist attack on the cafeteria of the Hebrew University, Jerusalem.

○ March 7, 2003 – the shooting attack in Kiryat Arba.

○ January 29, 2003 – the shooting attack on Road 60.

○ June 20, 2003 – the shooting attack on Road 60.

○ October 22, 2003 – the shooting attack in Tel Rumeida.

○ September 24, 2004 – the mortar attack on Neve Dekalim.

I receive a fee in the amount of $275 per hour for the time that I spend working on this report. I confirm that I do not have any connections or relationships – whether professional or personal – with any of the parties or the witnesses in this trial, which are likely to prevent me from giving impartial evidence.

**3. Methodology**

    **a. General research methodology**

The methodology which was used in the writing of this report is drawn from my experience with the ISA, as well as from my years as a journalist and a researcher, in which I focused on subjects that are related to terrorism in general, and Islamic extremism in particular. As part of my research on the Hamas movement, I have visited the West Bank and Gaza Strip on a regular basis. Prior and subsequent to the signing of the Oslo Accords,[3] I interviewed well-known leaders of Hamas, such as Ahmed Yassin, Abd al-Aziz al-Rantisi, Dr. Mahmud al-Zahar and Ismail Haniya, the Hamas "Prime Minister," as well as both senior and more junior recruiters and organizers of terrorism. Following the signing of the Oslo Accords, I interviewed senior members of the Palestinian and Israeli defense and security establishments, with regard to the threat that is posed by Hamas and other violent extremist movements.

Within the framework of my ongoing research, both for my book on Hamas, which was published in 1994, and for the articles and studies which I composed thereafter, I have read

---

[3] The Oslo Accords, which were signed on September 13, 1993, were established between the Government of Israel, which was represented by Yitzhak Rabin, and the Palestine Liberation Organization (hereinafter: the "**PLO**"), which was represented by Yaser Arafat (the first declared objective of the PLO, which was founded in 1964, was the liberation of "Palestine" through armed struggle. The United States considered it to be a terrorist organization until 1991). The Oslo Accords included a series of general principles agreed upon by both parties, which concerned an interim period of five years of Palestinian administration of the Palestinian Territories. Subjects related to the "Permanent Status" were postponed for future negotiations.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

through thousands of unclassified documents, including Hamas web sites[4] and other material which was published by Hamas, such as placards, posters and postcards, in addition to the Palestinian newspapers and television broadcasts, in particular, as well as newspapers and television broadcasts of the Arab world, in general. Moreover, I was also present at funerals and public meetings of Hamas, I collected and/or examined photographs, Court records, official [sworn] confessions of terrorism suspects, video tapes and recordings, documentary films and other materials, including interviews with Hamas leaders both in and out of prison.

Over the course of the years 2004 through 2006, I conducted a large number of interviews in prisons. The majority of the interviews were for the purpose of preparation of a documentary film. Other interviews which I conducted were intended for the purpose of writing articles, which I had planned to publish in the newspaper. The majority of the terrorists whom I interviewed had dispatched other terrorists to perpetrate terrorist attacks or had commanded terrorist operations. I also interviewed potential suicide bombers, who had been arrested before carrying out a terrorist attack, as well as others who had been wounded, but not killed, during the course of the attack.

The subjects who were filmed confirmed, with great pride, that they had acted on behalf of Hamas. In most cases, they even boasted of their actions. Almost all of the terrorists whom I met – men and women alike – expressed no remorse whatsoever for the terrorist attacks which they had perpetrated.

In order to confirm my findings and my research, I cross-referenced sources of information by, for example, holding interviews with Hamas and Fatah sources.[5] Under different circumstances, I conducted interviews with Israel and Palestinian security sources in order to authenticate information, and I relied on official written reports by the Israeli and Palestinian security establishments.

Although there are many Palestinian organizations (such as the Islamic Jihad,[6] the Popular Front for the Liberation of Palestine, and others) which have attacked Israeli targets, Hamas is the most deadly and the most successful out of all of the organizations that have carried out terrorist attacks over the course of the past 15 years.

---

[4] For the purpose of preparation of this report, I also studied the expert report of Mr. Evan Kohlmann on this subject. Mr. Kohlmann will provide an expert report with regard to a number of web sites which are controlled by Hamas, and also express his expert opinion with regard to the question of whether Hamas took responsibility (whether complete or partial), on those web sites, for each of the terrorist attacks which ostensibly harmed the Plaintiffs in these trials. I fully agree with Mr. Kohlmann's description with regard to various Hamas web sites. His description is broadly acceptable in that area. At the same time, I have also performed independent study of these web sites in order to reach my own conclusions.

[5] Fatah is the dominant wing of the PLO and the main rival of Hamas in the Palestinian Territories. As a result of the Oslo Accords, all of the wings of the PLO – including Fatah – recognized the State of Israel and (at least officially) abandoned the path of terrorism and violent actions.

[6] The Palestinian Islamic Jihad (hereinafter: the "**PIJ**") is a Foreign Terrorist Organization and has close ties with Iran.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

### b. Hamas takes responsibility for the terrorist attacks which it perpetrates

As a general rule, because Hamas considers terrorism, or, as it defines it, "armed resistance," as a central way of attracting attention to Hamas for the Palestinian public and the Islamic world, it does not conceal its responsibility for terrorist attacks. Quite the opposite is true: Hamas works with determination to publicize its principal role in the perpetration of violent attacks against Jews. This is also true in a general way with regard to its recognition of its operatives, as soon as they die or are arrested.[7]

While Hamas has never tried to deny its role in terrorist activity, it has also never taken responsibility for a terrorist attack[8] which it did not commit. With the exception of two terrorist attacks in 1997, for which Hamas delayed in taking responsibility, as a result of simultaneous pressure on the part of the Palestinian Authority (hereinafter: "**PA**")[9] and the Israeli ISA,[10] Hamas has always boasted of the terrorist attacks which it perpetrated, because it considers them to be "heroic actions."

At times, following a large-scale terrorist attack that resulted in numerous casualties, Palestinian organizations have rushed to declare their responsibility, as a way of competing for Palestinian public opinion. In most cases, however, it very quickly becomes known which organization carried out the attack and it is possible to verify which organization was responsible. In many cases, the rival Palestinian terrorist organization withdraws its declaration of responsibility, or its identification of the suicide bomber and his/her collaborators, and thus resolves any initial confusion which may have occurred.

---

[7] For example, Hamas generally disseminates the recorded "wills" of its suicide bombers as soon as the attack takes place. For tactical reasons, however, this dissemination can sometimes be delayed. The terrorist attack at Mike's Place, which is discussed below, illustrates this point, because Hamas waited for confirmation that the second terrorist had died before airing the video cassette which had been made jointly by the two suicide bombers.

[8] The evaluation of testimony with regard to Hamas terrorist attacks must be performed within the framework of several different categories of attacks, including:
   1. Suicide bombings.
   2. Other multi-casualty terrorist attacks in which the perpetrator(s) was/were killed at the scene of the incident.
   3. Other multi-casualty terrorist attacks in which the perpetrator(s) was/were not killed at the scene of the incident.
   4. Roadside shooting attacks in which the perpetrator(s) was/were not killed at the scene of the incident.
   5. Short-range rocket and mortar fire.

[9] The Palestinian Authority is the administrative organization which was founded in 1994 after the Oslo Accords, in order to control the Palestinian Territories. While the Oslo Accords foresaw that the Palestinian Authority would operate during a five-year interim period, in the course of which negotiations towards a Permanent Agreement between Israel and the PLO would take place, the negotiations on the Permanent Agreement have actually never been realized.

[10] In the two incidents in question, in 1997, Hamas initially decided not to publish the names of the suicide bombers, because it was afraid that the PA and Israel would undermine Hamas in the West Bank.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

In the vast majority of suicide bombings, the evidence which points to the responsibility of Hamas for the attacks is overwhelming. Not only does the organization take credit for the attack[11] and facilitates the broadcast of the terrorist's video tapes or photographs; it also often takes complex and varied measures to promote the terrorist's status as a celebrity, by means of "mourners' tents," mass funerals, eulogies in the newspapers or on the Internet, posters and other means of iconography.

### c. Methods used by Hamas for taking responsibility for terrorist attacks

The following are typical methods which are used by Hamas in order to publicize its responsibility for planning and carrying out a terrorist attack:[12]

### 1) Public announcements

**Written announcements** are disseminated frequently throughout the Palestinian Territories. These announcements are generally accompanied by announcements in the form of telephone calls which are made to the media, as well as by statements by leaders of the organization that assumes the responsibility for the perpetration of the terrorist attack.[13]

**Announcements made over the public address system of the mosques** in Palestinian villages or neighborhoods provide a clear indication as to the identity of the terrorist organization which dispatched the suicide bomber. The singing of religious hymns, the reading of verses from the Koran and the announcement of the name of the terrorist organization over the public address system of the mosques also attest to the organizational affiliation of a suicide bomber.

**The Internet** has become one of the most important media tools that is used by Hamas. Hamas has its own web site, and its military branch[14] has a separate web site of its own. These web sites

---

[11] This does not mean that Hamas is foolproof and never makes mistakes in conveying the details of a terrorist attack. For example, the Hamas web site states that the suicide bombing which took place on March 28, 2001 near Kefar Sava occurred at a military roadblock and that, as a result, two soldiers were killed. In fact, the terrorist attack took place at a gas station and the two people who were killed as a result of the attack were teenagers. http://www.palestine-info.info/Ar/default.aspx?xyz=U6Qq7k%2bcOd87MDI46m9rUxJEpMO%2bi1s7%2bTMkSGkUsefgr6c0g9Ixl0R0r93%2bJq44kaIHiokimTbh%2fDenRR2fQvHpJH1vY3uaCjZeiOio1r9PhKb9ZGY56gz%2f0HbRULg%2bvdO2wUlCeSw%3d.

[12] These criteria apply not only to Hamas, but also to other terrorist organizations; Hamas, however, tends more toward emphasizing the perpetration of the terrorist attack in the ways set forth below.

[13] *See* for example http://www.alqassam.ps/arabic/news1.php?id=9633ww.ynet.co.il/home/0,7340,L-8,00.html, and also http://www.alqassam.ps/arabic/operations2.php?id=23#. *See also* an original placard of the Izz al-Din al-Qassam Brigades (the military branch of Hamas, which is discussed below), in my archives: http://www.haayal.co.il/story_1100.

[14] Like Hamas, every terrorist organization has a military branch. For example, the military branch of Fatah is known as the al-Aqsa Martyrs Brigades. The military branch of the Palestinian Islamic Jihad is called the al-Quds Brigades. The military branch of the Popular Front for the Liberation of Palestine is known as the Abu Ali Mustafa Brigades.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

display announcements which glorify the terrorist attacks which were perpetrated and provide additional details with respect to the perpetration of the attack.[15] Hamas also sends out e-mail messages to journalists, in which it takes responsibility for specific terrorist attacks. I personally have received many such e-mail messages from Hamas, as well as from the Islamic Jihad and Fatah, in which they took responsibility for terrorist attacks.

### 2) Mourning symbols and customs

**Funeral ceremonies** for Palestinians are replete with symbols. For example, when the body of the deceased is wrapped in a Hamas flag, the identity of the terrorist organization to which he belonged is clear to everyone. In addition, each funeral is held in the tradition of the terrorist organization in question. It is possible to identify the terrorist organization to which the suicide bomber belonged by the senior officials who attend his/her funeral.

Each terrorist organization has its own **mourning customs**. The following examples are all typical Hamas mourning customs: singing *anashid* (religious hymns); decorating the mourners' tent with green flags; the display of Hamas emblems and pictures of the movement's leaders; and finally, placards bearing verses from the Koran or statements by the leaders of the Muslim Brotherhood.[16]

The following are several pictures of a mourners' tent which was set up in honor of a Hamas operative who was killed. The symbols principally include the green flags which represent the organization.



**Posters and postcards**: A custom which has become established among the terrorist organizations is to print posters bearing a photograph of the suicide bomber before he departs on the suicide attack. The suicide bomber wears on his forehead a band which discloses the terrorist

---

[15] *See* for example: http://www.alqassam.ps/arabic/news1.php?id=11412.
*See also*: http://www.palestine-info.info/arabic/Hamas/glory/ramalah.htm.
*See also*: http://www.palestine-info.info/arabic/Hamas/shuhda/amalyat_03.htm.
[16] *See* al-Risalah (Gaza), August 16, 2001 (Appendix No. 1, pp. 1-2).

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

organization to which he belongs. Hamas terrorists decorate their foreheads with a green band; Palestinian Islamic Jihad terrorists wear a black band on their foreheads; Fatah terrorists wear a yellow band.

The inscriptions on the posters and postcards also indicate the terrorist organization to which the suicide bomber belongs. Thus, for example, nationalist slogans are typical of Fatah, whereas religious slogans are typical of Hamas.


17


18

**Obituary notices**: Hamas often publishes signed obituary notices.[19]

### 3) Photographs and confessions of the suicide bomber

**Video tapes of the "will"**: A video tape of the suicide bomber, before he goes out to perpetrate a suicide attack, constitutes clear proof of the organization to which he belongs. The photographs are taken against a background which bears the emblem of the organization; in the course of the filming, the future suicide bomber makes a speech on behalf of the organization and begins reading his "will" by announcing his intent to perpetrate the suicide bombing.

For example, in one video tape, Bassam Takruri, who perpetrated the terrorist attack on the No. 6 bus in the French Hill neighborhood of Jerusalem on May 18, 2003, read the following statements from his "will": "I, the living *shahid* [martyr], Bassam Takruri, a member of the Izz

---

[17] http://www.khayma.com/kutla-islamiyah/raeesa htm. The man in the picture is Karim Mafarja, a member of the al-Qassam Brigades. He was killed by the Israel Defense Forces on January 22, 2002.

[18] http://www.aljazeeratalk net/forum/showthread.php?t=22926 (the person shown in the photograph is Muhammad Faisal al-Siksik, a suicide bomber from the Palestinian Islamic Jihad; he carried out a suicide bombing in Eilat, Israel, on January 29, 2007).

[19] al-Risalah (Gaza), December 18, 2003 (Appendix No. 1, pp. 3-4); *see also* al-Istiqlal (Gaza), October 4, 2001. *See also*:
http://www memri.org.il/cgi-webaxy/sal.pl?act=show&ID=107345_memri&login=ifcookie&dbid=articles&dataid=1519.
*See also*: http://www.pmw.org.il/heb/news/i216156.html.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

al-Din al-Qassam Brigades, am about to perform an act of sacrifice." He was filmed with a Hamas flag behind him, the Koran in one hand and a Kalashnikov rifle in the other hand.[20]

In another video tape, the terrorist, Mujahid al-Ja'abari of Hebron – who, on May 18, 2003, perpetrated the suicide bombing in the Bet Hanina neighborhood of Jerusalem – is shown reading from his "will": "In the name of Allah, the compassionate, the merciful… May God curse the Jews… I, the living *shahid*, a member of the Izz al-Din al-Qassam Brigades, Mujahid al-Ja'abari…"[21] He was filmed with a Kalashnikov rifle on his knees.

In a third video tape, 'Abd al-Mu'ati Shabana, who carried out the terrorist attack on the No. 14A bus on Jaffa Road in Jerusalem, is shown reading from his "will": "I, 'Abd al-Mu'ati Shabana, a member of the Izz al-Din al-Qassam Brigades, am about to carry out a suicide operation…" The terrorist was filmed with a bandana on his forehead, bearing the name Izz al-Din al-Qassam, and a rifle in his hand.[22]

Ra'ed Misk of Hebron, who carried out the suicide bombing in Jerusalem on the No. 2 bus on August 19, 2003, was also recorded on a video tape, reading from his "will." He was wearing a bandana on his forehead, holding a rifle in one hand and the Koran in the other hand.[23]

Hamas customarily disseminates **photographs** of a **suicide bomber** in the press, especially in periodicals which are identified with the terrorist organization.

Below is a picture of Mujahid al-Ja'abari of Hebron, who blew himself up on May 18, 2003 in a suicide bombing in Jerusalem (which is referenced above). He is holding a Koran and a rifle, and a Hamas emblem and flag may be seen in the background.[24]

---

[20] http://www.youtube.com/watch?v=xGxG-P9EP2c;
http://www.youtube.com/watch?v=DMf1NUKb8O4&feature=related;
http://www.youtube.com/watch?v=j62PXKfdz0Y&feature=related.
[21] http://www.youtube.com/watch?v=uGGosFbI58c&feature=related.
[22] http://www.youtube.com/watch?v=VBPtJEYxGRA&feature=related.
[23] http://www.youtube.com/watch?v=uGGosFbI58c&feature=related.
[24] http://www.palestine-info.info/arabic/hamas/shuhda/2003/jabary/mujahed.htm.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*



Below is a photograph of the terrorist Bassam Jamal Darwishi Takruri, a resident of Hebron, who blew himself up in the suicide bombing of a bus in Jerusalem on May 18, 2003 (which is referenced above):




The dissemination of the "wills" and the photographs are part of a regular ritual, which indicates that Hamas wishes to emphasize that the terrorist attack in question was carried out by its people. By reading out his/her "will," the suicide bomber is setting forth an unequivocal declaration of his/her membership in the Izz al-Din al-Qassam Brigades.

This filmed evidence, followed by the identification of the body at the scene of the suicide bombing, constitutes – in my opinion – proof of the relationship between the suicide bomber and the Izz al-Din al-Qassam Brigades. Substantiation of the proof of that relationship is provided by the dissemination of the recorded "will" (generally in the form of a video tape) on web sites which are related to Hamas and on satellite television stations, such as the Hezbollah's *al-Manar*; *al-Jazeera*; or *al-Arabiyya*.

---

25 http://www.paldf.net/forum/showthread.php?t=483316.
26 http://www.palestine-info.info/arabic/Hamas/shuhda/2003/takrory/photo.htm.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

### 4) The media

**Articles on the suicide bomber**: The newspaper operated by each terrorist organization generally publishes stories – and photographs – of the terrorist, including the history of his activity in that particular terrorist organization.

### 5) Plaques and monuments

Since 2002, it has been customary in the Palestinian Territories to set up plaques and monuments, and to engrave the names of suicide bombers on them. The text of the plaques and monuments, as well as the symbols which adorn them, constitute evidence of the organizational affiliation of the suicide bomber.

The following are two examples, which I photographed during a visit to Bethlehem. The memory plaques commemorate terrorists who were eliminated by Israel. One picture (on the right) shows portraits of the terrorists Ahmad al-Bulbul and Issa Marzuk, both from Bethlehem. The second picture (on the left) shows Ahmad al-Bulbul, Muhammad Shahada, Imad al-Kamel and Issa (the last name is concealed by the flag).



### 6) The prisons

**Prison gangs**: In Israel's prisons, the inmates who are affiliated with the various terrorist organizations are kept separate, in order to prevent gang fights and to enable better control of the inmates. The customs practiced by the inmates are also different. Thus, for example, a Hamas inmate will generally not smoke cigarettes, but will pray and study Islam. In addition, the books which Hamas prisoners check out of the prison library are different from those which are read by inmates who belong to the PFLP or to Fatah.[27]

---

[27] These details are based on a conversation with the spokesperson of the Israel Prison Service, Yaron Zamir, and on the visits I made to the various prisons.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

### 7) The Palestinian Inmates' Club

The "Inmates' Club" is a civilian organization which looks after the needs of inmates in the prisons. According to the records of the organization or testimony by the secretaries of the club in the various cities, it is possible to determine the organization that each inmate is affiliated with. In addition, each organization has its own Inmates' Club; this, too, is an indication of which terrorist organization any inmate in [an Israeli] prison belongs to.[28]

### d. Official investigations

In accordance with that which has been set forth above, in the vast majority of Palestinian terrorist attacks since the year 2000, there is almost no doubt as to the identity of the terrorist organization that is responsible for each attack. This being the case, the investigations which were performed by the ISA did not focus on an attempt to prove that a certain terrorist attack was committed by Hamas or by another terrorist organization, but rather, on the identification and arrest of the members of the terrorist cell that perpetrated the attack, with the objective of stopping the activity of the terrorist network.

The arrests, investigations, evidence from the scene of the attack, and (at the end of the process) the criminal actions filed against the members of the cell constitute an important tool, not only for the reconstruction of the manner in which various terrorist attacks were performed, but also in order to prove who was behind the attacks; who commanded the cells which actually carried them out; whom they received instructions from; and which echelon of the terrorist organization made the decision to carry out the attacks.

### 1) Investigations by the ISA and the Israel Police

All of the investigations of terrorist attacks in Israel are initially carried out by the Israel Security Agency (ISA). In cases in which it is decided that the filing of criminal actions is necessary, the Israel Police follows the ISA and collects the evidence which will be used in the trial. In most of Israel's terrorism cases, in which the suspects are residents of the Palestinian Territories, the suspects are tried before a military court. On the other hand, residents of East Jerusalem and Israeli Arabs are tried by the civilian courts in Israel. In both situations, the defendants have the right to be represented by an attorney. In cases in which the suspect is waiving representation, the Court appoints an attorney for him from the Office of the Public Defender.

---

[28] These details are based on a conversation which I held with Issa Qaraqe, the Palestinian Minister of Detainees and Ex-Detainees and the director of the Palestinian Inmates' Club, on July 22, 2009. For more details on the Club and its activity, *see*: www.jcpa.org.il/Templates/showpage.asp?FID=575&DBID=1&LNGID=2&TMID=99&IID=22002.
*See also*: http://www.inn.co.il/News/News.aspx/149459 and http://sc.tapuz.co.il/shirshurCommuna-17720-10341834.htm.

12

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

Although the manner in which the Court attributes evidence from terrorist attacks is similar to its attribution of evidence from crime scenes, in that, in both cases, the evidence in question concerns a specific event, general patterns nonetheless arise. The overwhelming majority of the evidence that is obtained by the Israel Police is attained through the intensive efforts of the terrorist organization to prove its responsibility for the attack. Accordingly, evidence with regard to attribution may be deduced by the efforts of the terrorist organization to document its responsibility for the terrorist attack.

Legal attribution on the basis of a specific case begins at a very basic level, similar to that of a crime scene: in a suicide attack, the remaining pieces of the terrorist's body are collected and then identified. The ISA and the Israel Police then perform comprehensive investigations of the terrorist's background. The conclusions with respect to the organizational affiliation of the terrorist are considered and evaluated in light of the detailed evidence which is provided by the terrorist organization itself.

In addition to the identity of the suicide bomber, the investigations by the ISA and the Israel Police attempt to determine the identity of the accomplices of the suicide bomber from the Izz al-Din al-Qassam Brigades (hereinafter: the "**al-Qassam Brigades**")[29] – or from another terrorist organization – who are responsible for the terrorist attack (because the terrorist himself is already dead). Most of the accomplices who are arrested do not merely confess their involvement and boast of their activities; they also provide details with regard to the planning of the attack and the identity of the entity which ordered the attack, thereby confirming their personal know-how and the reliability of their declarations.

Because Hamas publicizes its role in terrorist attacks for political reasons and because, in many cases, at least one of the perpetrators of the attack is killed at the scene of the incident and can be clearly identified, it is possible to evaluate and to take into consideration the investigations that are performed by the ISA and the Israel Police, and the criminal convictions obtained as a result thereof, by comparing – and cross referencing – the evidence that is collected in the files of specific suspects with the claims (which are generally detailed) raised by Hamas. It is also possible to evaluate the investigation that is performed by the ISA and the Israel Police, including the physical evidence that is collected, in the context of academic literature which concerns the substantiated *modus operandi* used by Hamas and on the basis of previous investigations.

### 2) Official reports by the ISA and the Government of Israel

**Official reports by the ISA**: in particular, annual summaries that describe the terrorist operations and detailing specific information about the terrorists, their organizational affiliation and their methods of operation. Similar reports are also published on a periodic basis by the

---

[29] The Izz al-Din al-Qassam Brigades (hereinafter: the "**al-Qassam Brigades**") are the military branch of Hamas.

13

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

Office of the Prime Minister. These governmental reports are not intended to provide complete details with respect to the investigation; nonetheless, they constitute an important tool for obtaining summaries of factual conclusions reached by the Government of Israel.

### e. Matters of legal attribution and special difficulties

Under certain circumstances, attribution becomes more difficult to determine, because the perpetrator of the attack could not be identified, or because there have been contradictory declarations of responsibility. Types of terrorist attacks in which this phenomenon occurs rather frequently include:

1) Large-scale terrorist attacks resulting in multiple casualties, in which the perpetrator(s) was/were not killed at the scene of the incident.

2) Roadside shooting attacks in which the perpetrator(s) was/were not killed at the scene of the incident.

3) Short-range rocket and mortar fire attacks.

4) Stabbing attacks.

Although the attribution of terrorist attacks of these types to a specific terrorist organization involves a number of inherent difficulties, Hamas has generally taken pains to declare its responsibility for the terrorist attacks which it commits, in accordance with that which has been set forth above.

Naturally, there are exceptions. A minimal percentage of suspects deny any connection whatsoever, and there are some suspects who, although they initially give declarations to the ISA and the Israel Police with respect to their involvement in the terrorist attack, subsequently recant those declarations, claiming to have been pressured into a confession.

These subjects are handled by means of the judiciary process. Nonetheless, in the overwhelming majority of cases, there is no doubt of the involvement of Hamas and the members of the cell which acted on its behalf. In fact, once it becomes clear that the perpetrators and/or their accomplices will be sent to prison for long periods of time in Israel, Hamas grants public recognition to the perpetrators and goes to great lengths, including the employment of public relations techniques, to transform them into legends and role models.[30]

Terrorist attacks which are not suicide bombings, such as shooting attacks, laying explosive charges, car bombs and the like, in which the perpetrator(s) is/are killed at the scene of the event, are generally differentiated from suicide bombing attacks, in terms of the ceremonies which are

---

[30] *See* for example the biography of Ahlam Mazen at-Tamimi, who took part in the suicide attack in the Sbarro Restaurant in August 2001, which appears on the Hamas web site:
 http://www.qassam.ps/prisoner-96-Ahlam_Mazen_At_Tamimi.html.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

carried out by the suicide bomber and the degree of publicity and admiration which he/she is given after the fact.

Notwithstanding the fact that, from most of the other standpoints, these attacks are not materially different from suicide bombings, they present additional challenges, because it is necessary to identify and to capture the perpetrators themselves. Nonetheless, in most cases, Hamas takes responsibility immediately subsequent to the terrorist attack.

Hamas generally takes credit for the roadside shooting attacks which are perpetrated by its operatives. However, from the perspective of attribution by the court, these types of terrorist attacks require a more detailed analysis of the physical evidence than other types of terrorist attacks. Moreover, they also require a careful evaluation of the witnesses' declarations and confessions.

In contrast with suicide attacks, which are rapidly followed by public ritual displays and a public declaration of responsibility, as set forth in detail above, the terrorist cells which are responsible for roadside shootings are likely to remain at large for some time, and the specific identity of the members of the cell is also likely to remain unknown. Still, after the ISA and Israel Police investigations have identified the conspirators in the Izz al-Din al-Qassam Cell which is responsible for the attack and have brought about their arrest, and once the judiciary process has resulted in a criminal conviction, Hamas recognizes them publicly as members of the organization and glorifies their actions.[31]

The cases which are most difficult to evaluate are those which involve short-range rocket or mortar fire. There can be no doubt that attacks of this type are one of the unique "trademarks" of Hamas and that it frequently takes credit for attacks of this type when they take place. This fact makes the evaluation of these attacks possible. Nonetheless, it should be recognized that the evidence in such cases is less sound and is subjected to a far less stringent comparative analysis than other types of attacks.

### 4. Summary of the expert opinion

In my examination of the list of terrorist attacks that constitute part of the trial, I have made use of all of the methodological tools which I discussed in the previous section of this report. In addition, over the course of my work as a handler of agents and an interrogator for the ISA, I was in frequent contact with terrorists. I learned the nuances which they use in conversation, their special expressions, their tone of voice and their body language. All of these were helpful to me in the many interviews which I held with these people, inside and out of the prison system, over the course of my professional career.

---

[31] *See* the discussion of the so-called "Silwad Cell" of Hamas.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

On the basis of my professional experience, I conclude, with a very high degree of probability, that Hamas was involved in the recruiting, planning[32] and perpetration of the following suicide attacks:

- March 27, 2002 – the suicide bombing at the Park Hotel, Netanya.

- May 7, 2002 – the terrorist attack at the Sheffield Club, Rishon Le-Zion.

- March 5, 2003 – the terrorist attack on the No. 37 bus, Haifa.

- April 30, 2003 – the terrorist attack at Mike's Place, Tel Aviv.

- May 18, 2003 – the terrorist attack on the No. 6 bus, French Hill, Jerusalem.

- June 11, 2003 – the terrorist attack on the No. 14A bus, Jaffa Road, Jerusalem.

- August 19, 2003 – the terrorist attack on the No. 2 bus, Jerusalem.

- September 9, 2003 – the terrorist attack at Café Hillel, Jerusalem.

- January 29, 2004 – the terrorist attack on the No. 19 bus, Jerusalem.

On the basis of my professional experience, I also conclude, with a very high degree of probability, that Hamas was involved in the recruiting, planning, and perpetration of the following terrorist attacks:

- July 31, 2002 – the terrorist attack on the cafeteria of the Hebrew University, Jerusalem.

- March 7, 2003 – the shooting attack in Kiryat Arba.

- January 29, 2003 – the shooting attack on Road 60.

- June 20, 2003 – the shooting attack on Road 60.

- October 22, 2003 – the shooting attack in Tel Rumeida.

Finally, on the basis of my professional experience, I conclude that Hamas was apparently involved in the planning and perpetration of the mortar fire on Neve Dekalim in the Gaza Strip on September 24, 2004. This conclusion is based on the method that was used in the attack and the fact that Hamas took responsibility for it. However, due to the nature of these attacks – firing from a distance – the evidence in this particular case is not subject to the same level of comparative analysis as were the other attacks which were examined.

---

[32] In accordance with that which has been set forth above, I conclude that both Hamas and the al-Aqsa Martyrs Brigades (a paramilitary organization linked to Fatah) were involved in the planning and execution of the terrorist attack on the No. 19 bus in Jerusalem on January 29, 2004.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

### 5. The ideology of Hamas and its ability to carry out terrorist attacks against Israel

#### a. The Hamas Charter

The world view that is espoused by Hamas, as manifested in the Hamas Charter of July 15, 1988,[33] specifies that the Palestinian conflict with Israel is based on religious differences of opinion (rather than on national-territorial differences of opinion), and on the dispute between Islam and the "heretical" Jews. Accordingly, the conflict cannot be resolved by way of political compromises based on the principle of "two states for two peoples," but only by way of a holy war (*Jihad*) until all of Palestine has been liberated and the State of Israel has been eliminated. This world view holds that the land of Palestine, "from the river to the sea," is an inalienable endowment to Islam which cannot be given up – not even in the very smallest of parts.

The members of Hamas are bound by the Hamas Charter, the most important ideological document of the organization, and its basic provision, which clearly sketches the primary purpose of the organization: "the destruction of the State of Israel." The Charter also describes the strict Islamic ideology of Hamas and contains the Constitution which underlies the organization.[34] That set forth below reflects the strategy of the *Jihad*,[35] which is reflected in the Charter as a call for uncompromising and absolute war against Israel.

The Charter opens with a well known quotation from the works of Hassan al-Banna, the founder of the Muslim Brotherhood movement,[36] who is considered to be a role model in the pantheon of Hamas martyrs. According to al-Banna, "Israel shall arise and shall remain until Islam wipes it out, just as it wiped out that which preceded Israel."[37]

**Clause 6:**   "The Islamic Resistance Movement is a unique Palestinian movement. It places its trust in Allah and it adopts Islam as a way of life. It acts toward raising the flag of Allah over every inch of the land of Palestine."

**Clause 7:**   "The Islamic Resistance Movement is a link in the chain of the Jihad against the Zionist occupation… The day of judgment will not come until the Muslims fight against the Jews and kill them…"

---

[33] *See* "Hamas – the Islamic Resistance Movement and the Charter" [Hebrew], Israel Ministry of Education and Culture, 1992.

[34] *See* "Hamas – the Islamic Resistance Movement and the Charter."

[35] Notwithstanding the fact that the word "Jihad" has several meanings, including "internal struggle," the use of the word within the context of this report – unless otherwise noted – refers to "armed struggle against Israel."

[36] The Muslim Brotherhood movement (*juma't al-ikhwan al-muslimin*) is a religious and political organization which was founded in 1928. The movement objected to the trend of secularity which, in the opinion of al-Banna and others, was sweeping through the Muslim world of his day. The movement encouraged a return to Islamic societies based on the religious precepts of the Quran.

[37] *See* Introduction to the Hamas Charter.

17

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

**Clause 8:**[38] "Allah is its purpose [of the Hamas movement]; the Prophet is its model; the Koran is its constitution; the Jihad is its way; and death for the sake of Allah is the most sublime of its ambitions."

**Clause 11:** "The Islamic Resistance Movement believes that the land of Palestine is an inalienable endowment to Islam (*waqf*), for generations of Muslims until the resurrection of the dead. It is forbidden to abandon it or any part thereof, or to renounce it or any part thereof. It is not the property of any Arab state or of all Arab states, or of any king or president or of all kings and presidents, and it is not the property of any organization or of all organizations, whether Palestinian or Arab. This is because Palestine is an inalienable endowment to Islam (*waqf*), for generations of Muslims until the day of resurrection of the dead…"

**Clause 14:** "The liberation of Palestine is a personal duty of every Muslim wherever he may be."

**Clause 15:** "On the day when the enemies steal part of Muslim lands, the Jihad becomes a personal duty for every Muslim. With regard to coping with the theft of Palestine by the Jews, there is no choice but to wave the flag of Jihad, which requires the dissemination of Islamic awareness among the masses on the local, Arab and Islamic level, and there is no choice but to disseminate the spirit of the Jihad among the nation."

Following are examples of statements by Hamas leaders concerning the launching of the Jihad:

- "The armed struggle in all of its modes is the means to fight against the plan of the Zionist enemy."[39]

Sheikh Ahmad al-Bitawi, head of the Council of Islamic Sages of Palestine, the entity which grants religious legitimacy to the operations of Hamas, declared that:[40]

- "We in Palestine have a great love of Jihad and Shahada, and that makes many children compete among themselves in carrying out Jihad and Shahada-seeking missions."

- "If the enemy conquers a portion of Muslim land, Jihad becomes a personal obligation on every Muslim man and woman… and as the Prophet said: 'One must not obey a creation [the objecting parent] and disobey the Creator.'"[41]

---

[38] This section offers encouragement for the perpetration of suicide operations.

[39] http://www.palestine-info.info/ar/default.aspx?xyz=U6Qq7k%2bcOd87MDI46m9rUxJEpMO%2bi1s7YjyNYgnCrGxy9LphpYtjbpN10jo4ZpAEj22uHhDqu11JcP2sHDtgZlJCR3C2afNaApr%2bmcrhAOq3FNcmJIzvxLcU9gqBHHcqmhfrDvamPtU%3d.

[40] www.islamonline.net, September 28, 2002.

[41] www.islamonline.net, September 28, 2002.

18

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

Dr. Ibrahim Mahdi of the Gaza Strip, one of the leaders of Hamas, declared:[42]

- "Shame upon he who does not educate his children the education of Jihad…blessings upon he who dons a vest of explosives on himself or on his children and goes in to the midst of the Jews and says: 'Allah Akbar' [Allah is Great]."

Raed Said Hussein Saad (Abu Muadh), Commander of the al-Qassam Brigades in North Gaza, was quoted on the Hamas web site on December 12, 2005, as saying:[43]

- "We succeeded, with Allah's grace, to raise an ideological generation that loves death like our enemies love life. We will not abandon the way of Jihad and Shahada [Martyrdom] as long as one inch of our holy land is in the hands of the Jews."

Muhammad Def, a former commander of the al-Qassam Brigades, said:

- "I pray to [Allah] to assist us and to assist you in the liberation of Jerusalem, the West Bank, Acre, Haifa, Jaffa, Safed, Nazareth, Ashkelon, and the whole of Palestine."[44]

Ismail Haniya, the Hamas Prime Minister, said:

- "Continue the resistance [terror], keep your weapon, the legitimate weapon of the resistance. Beware not to abandon it! Hamas will continue to be, Allah willing, a home for all Palestinian and Jihad fighters that want to fight for the sake of Allah [and] for the liberation of our land… The Zionist withdrawal from the Gaza Strip and the northern West Bank is the first step in the liberation of the rest of our occupied land."[45]

Hamas religious leader Ziad Abu Alhaj stated:

- "The time will come, by Allah's will, when their property will be destroyed and their children will be exterminated, and no Jew or Zionist will be left on the face of this earth."[46]

Ahmad al-Ja'bari, commander of the al-Qassam Brigades, said:

- "With the help of Allah, killing one Jew is like killing 30 million Jews."[47]

---

[42] Friday sermon, PA television, June 8, 2001.
[43] http://www.pmw.org.il/index.html.
[44] www.pmw.org.il/Bulletins_Jan2006.htm – quoted from the Hamas web site, August 2005.
[45] www.pmw.org.il/Bulletins_Jan2006.htm – quoted from the Hamas web site, October 2005.
[46] Hamas (Al-Aqsa) TV, April 3, 2009. *See also*: http://www.pmw.org.il/Bulletins_Apr2009 htm#b190409.
[47] http://www.youtube.com/watch?v=i08L09V0_sg.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

- "Our belief is that this war between us and the Jews will continue and will develop until we defeat the Jews and enter Jerusalem as victors and enter Jaffa as conquerors. We are not only waiting for a Palestinian state with Jerusalem as its capital; quite the contrary: we are announcing an Islamic Caliphate with Jerusalem as its capital."[48]

- "… Blessings to everyone who has fought the Jihad war for the sake of Allah. Blessings to everyone who has carried out raids for the sake of Allah. Blessings to everyone who has placed an explosive belt on his body, or on his sons, and has entered into the midst of the Jews, crying out 'Allah Akbar, praise Allah, there is no God but Allah, and Muhammad is the Prophet of Allah.'"[49]

- "Anyone who can fight against them [the Jews] with his weapons should go out to battle; anyone who can fight against them with his machine gun should go out; anyone who can fight against them with a sword and a knife should go out; anyone who can fight against them with his hand should go out; this is our destiny. The people who are most hostile to the believers are the Jews and the polytheists… The Jews have bared their teeth. Nothing will deter them, except the color of the blood of their despised people; nothing will deter them, except if we blow ourselves up out of choice, deep inside [their territory]. They have nuclear power, but we have the power of belief in Allah…"[50]

- "Blessings to anyone who has attacked a soldier for the sake of Allah… Blessings to anyone who has given his children the education of the Jihad and a martyr's death… blessings to anyone who has kept one rifle bullet in order to plant it in a Jew's head…"[51]

Since its establishment in 1987, Hamas has not attempted to make any distinction between military and civilian targets. As its Charter unequivocally declares, its goal is the destruction of the State of Israel. Until 1993, Hamas principally concentrated on abductions and shooting attacks against "settlers" and soldiers within the Palestinian Territories.

At the same time, after Hamas developed a significant logistical infrastructure and a support mechanism, the movement adopted suicide operations as its preferred method of operation. Since that time, Hamas has refined the use of this method of operation. Hamas also began, at the same time, to perpetrate terrorist attacks within the territory of the State of Israel. In the last few years,

---

[48] http://www.memri.org.il/cgi-webaxy/sal/sal.pl?act=show&ID=107345_memri&login=ifcookie&dbid=articles&dataid=432.

[49] http://www.memri.org.il/cgi-webaxy/sal/sal.pl?act=show&ID=107345_memri&login=ifcookie&dbid=articles&dataid=371.

[50] http://www.memri.org.il/cgi-webaxy/sal/sal.pl?act=show&ID=107345_memri&login=ifcookie&dbid=articles&dataid=418.

[51] http://www.memri.org.il/cgi-webaxy/sal/sal.pl?act=show&ID=107345_memri&login=ifcookie&dbid=articles&dataid=4.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

Hamas has increased its attacks on the major population centers of Israel: in Jerusalem, Tel Aviv and Haifa.

### b. The terrorist infrastructure

Whereas many Palestinian terrorist organizations aspire to kill Israeli civilians, only a few of them have a logistical support network, the expertise with ordnance and the personnel as to enable them to do so on a regular basis. Hamas, on the other hand, has developed a reliable ability to launch a wide variety of terrorist attacks against Israeli civilians. Hamas has also demonstrated its readiness to perpetrate such terrorist attacks over the years – more than two decades – which have elapsed since the organization was founded.

During the course of the 1990s, Hamas developed the method of murderous suicide attacks and carried them out in Israeli cities. The first suicide bombing was carried out in the settlement of Mehola by a suicide bomber who was a member of Hamas, on April 16, 1993.[52] Since then, and especially since the start of the Second Intifada,[53] Hamas has refined its method of suicide attacks and transformed it into its primary weapon in the struggle against Israel.

From the beginning of the Second Intifada to the end of 2008, Hamas killed 457 people (approximately 40% of all Israelis who were killed in terrorist attacks) and wounded 3008 others in the terrorist attacks which it perpetrated. According to ISA documents, Hamas is the leading perpetrator of suicide bombings among the Palestinian terrorist organizations, and is responsible for 59% of all suicide attacks against Israeli civilians.

On the operational level, the secrecy and training which are required for these terrorist attacks are part of the reason why Hamas divided its organization into two principal components: 1) support services and government services; 2) the al-Qassam Brigades,[54] which are in charge of carrying out terrorist attacks against civilians. On the basis of ISA documents, between 2000 and 2003, the al-Qassam Brigades carried out 52 suicide bombing attacks, in which 247 Israelis were killed and 1647 Israelis were wounded.[55]

---

[52] *See* Ronni Shaked and Aviva Shabi, Hamas: M'Emunah B'Allah L'Derech Ha-Terror, pp. 302-307, and also pp. 313-316.

[53] The term "Second Intifada" (also known as the "al-Aqsa Intifada") is used throughout this report. This term refers to the violent conflict which broke out at the end of September 2000 between the Palestinians and Israel. This part of the conflict has no "official" ending date, but it is generally considered to have ended at the end of 2004.

[54] In addition, Hamas has a social welfare arm, known as the *Da'wa*, and a political arm which controls the entire organization. Notwithstanding the various arms, Ahmed Yassin, the co-founder of Hamas and its spiritual leader until his death in 2004, stated that: "We cannot separate the wing from the body. If we do so, the body will not be able to fly. Hamas is one body." (Reuters, May 27, 1998.)

[55] ISA Summary Report, 2003. *See* Appendix No. 1, pp. 5-14, or via this link: http://www.pmo.gov.il/PMO/Archive/Spokesman/2004/%D7%99%D7%A0%D7%95%D7%90%D7%A8/Spokesman9044.htm.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

The al-Qassam Brigades include a large number of armed cells, including the "Pupils of Yahya Ayash," the "Students of the Engineer," and the "Yahya Ayash Cells," all of which are named for the late Hamas operative Yahya Ayash (known as the "Engineer"), who was responsible for the murder of scores of Israeli civilians in a series of suicide bombing attacks in 1996.[56]

The command and control entities of Hamas and the al-Qassam Brigades have been under investigation by the ISA for decades. The members of the al-Qassam Brigades include thousands of armed people in Gaza, as well as a few dozen terrorist cells in the West Bank. During the years that have been reviewed within the framework of this expert opinion (2002-2004), the Hamas terror cells included hundreds of operatives, who depended on generous economic support. These operatives underwent guerrilla training in Syria, Lebanon, and Iran.[57]

The military-style chain of command was needed by Hamas in order to carry out, starting in 2001, the series of terrorist attacks against Israeli civilians.

### 1) The Hamas chain of command

a)  **The Shura Council**, which is the senior leadership element of the organization, makes strategic decisions. Members of the Council come from all over the Arab world. Today, the Head of the Council is Khalid Mishal.[58] Five members sit on the Political Bureau, which is subordinate to the Shura Council. The members of the Political Bureau meet in order to publicize tactical instructions.

b)  **The Hamas Military Headquarters** in Damascus maintains contacts with the commanders of the al-Qassam Brigades in the Palestinian Territories. The military headquarters in Damascus is in charge of determining the strategic targets, as well as of logistical matters such as communications devices and the transfer of ordnance.

c)  **The liaison between the Shura Council** and the al-Qassam Brigades transfers the Council's decisions in the form of orders to the headquarters of the al-Qassam Brigades in Damascus. The headquarters of the al-Qassam Brigades was commanded by Izz al-Din Sheikh Khalil from 1990 up until his elimination in September 2006. Upon receiving an order from the Shura Council, Khalil would make contact with the relevant networks and order them to begin planning the details of the terrorist attack. In addition to this tactical role, he was also involved in logistical coordination for the terrorist cells, by transferring

---

[56] http://www.ynet.co.il/articles/0,7340,L-3386015,00 html.
http://www.ynet.co.il/articles/1,7340,L-3688058,00 html.
http://www.inn.co.il/News/News.aspx/37791.
Guy Aviad, Lexicon of the Hamas Movement [Hebrew], Maarakhot Publishing House, Tel Aviv (2008), p. 174.
[57] Guy Aviad, Lexicon of the Hamas Movement, p. 174.
[58] For the organizational structure of Hamas, *see* Guy Aviad, Lexicon of the Hamas Movement, p. 25. *See also*: Ronni Shaked and Aviva Shabi, pp. 239, 279.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

weapons and explosive materials. He took advantage of the asylum which was granted to him by Damascus in order to send instructions to his subordinates in the Palestinian Territories.[59]

d)     **District commanders:** Each district in the West Bank has a commander. Thus, for example, Ibrahim Hamad was the commander of the Ramallah and Jerusalem District, Abbas al-Sayed was the commander of the Tulkarem District,[60] Muhanad Tahar was the commander of the Nablus District,[61] and Abdallah Kawassmeh was the commander of the Hebron District.[62] The Hamas headquarters are compartmentalized from one other, with a view to preventing the collapse of the infrastructure if one of the commanders is killed or arrested. Each district in the West Bank also had a **deputy commander**, who commanded the cells in order to limit the exposure of the district commander to the Israel Defense Forces' efforts in the war against terrorism. Thus, for example, Muhammad Arman, the deputy of Ibrahim Hamad in Ramallah, acted as the contact person with the cells during the course of the terrorist attacks in Rishon Le-Zion, in the cafeteria of the Hebrew University and at Café Hillel in Jerusalem (all of which are discussed in this report).[63]

e)     Each district has its own "**Engineer**," whose exclusive role it was to construct the explosive belt and explosives charges. The Engineer customizes the belt or the charge in accordance with the tactical considerations of each mission. Thus, for example, when Hamas wanted to lay an explosive charge inside a supermarket in Jerusalem, the charge was placed inside a beer can. When the "Engineer" Abdullah Barghouti sent the suicide bomber into the Sbarro Pizzeria, he built a charge which contained between 5 and 10 kg of explosives, as well as screws and nails, in order to maximize the number of victims. He concealed the explosive charge inside a guitar, in order to facilitate the entry into the restaurant, so as not to arouse suspicion.[64] The "Engineer" is also in charge of training a new generation of "Engineers," because the Israel Defense Forces – for understandable reasons – makes efforts to arrest or kill the Hamas bomb makers as soon as they are identified.

---

[59] http://www.nrg.co.il/online/1/ART/78ss8/337 html;
http://www.fresh.co.il/dcforum/Army/11548 html;
Guy Aviad, Lexicon of the Hamas Movement, p. 102.
[60] www.pmo.gov.il/PMO/Archive/Spokesman/2002/%D7%9E%D7%90%D7%99/Spokesman6663.htm and www.pmo.gov.il/NR/rdonlyres/.
[61] Guy Aviad, Lexicon of the Hamas Movement, p. 111. *See also*: www.ynet.co.il/articles/1,7340,L-1972094,00 html.
[62] Guy Aviad, Lexicon of the Hamas Movement, p. 221. *See also*: www.ynet.co.il/articles/1,7340,L-2665133,00 html.
[63] *See* Appendix No. 1, pp. 15-34; *see also* Military Court in Beth El, File 3380/03 (Appendix No. 1, pp. 363-370). *See also*: Shai Shaul, The Martyrs, Islam and the Suicide Bombings [Hebrew], Herzliya Interdisciplinary Center, 2003, pp. 41-49.
[64] *See* Appendix No. 2 – the documentary film "For the Sake of Allah."

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

f)   At this stage, the **suicide bomber** who will carry out the mission is chosen. He is generally transferred to the district commander, who then assigns the handling of the suicide bomber to the leader of a terrorist cell. The cell leader places the explosive belt on the body of the suicide bomber and shows him how to set off the explosive charge.[65] The transfer is accomplished through the use of codes and identification passwords.[66]

g)   A **senior commander** generally handles the last preparations for the terrorist attack, which include indoctrination, photographing the terrorists, writing the terrorist's "will" and the drafting of the announcement which will be published after the operation.[67] The publication of the suicide bomber's picture and his "will" is the main course of action used by Hamas in taking responsibility for the suicide bombing. This is also done in order to ensure that Hamas gets the credit for the terrorist attack. Subsequently, members of the cell dispatch the suicide bomber to the intended site of the terrorist attack, and a senior ground commander instructs the suicide bomber where to blow himself up.[68]



---

[65] Indictment against Ibrahim Hamad, Prosecution File 3181/6, Military Court of Judea (Appendix No. 1, pp. 15-34).
[66] *See* testimony by Ahlam at-Tamimi in the documentary film "For the Sake of Allah" (Appendix No. 2). *See also*: Shai Shaul, The Martyrs, Islam and the Suicide Bombings, pp. 41-49.
[67] *See*: Shai Shaul, The Martyrs, Islam and the Suicide Bombings, pp. 41-49.
[68] *See* the transcript of the Military Court of Judea, November 30, 2003, File 3925/02 and File 3931/02 (both in Appendix No. 1, pp. 910-915). *See* the transcript of the Military Court in Beth El, File 3380/03 (Appendix No. 1, pp. 363-370). *See also* Appendix No. 1 pp. 35-62.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

### 2) Economic support and recruiting

In order to carry out its operations, Hamas set up a complex economic support system, which provides the al-Qassam Brigades with new recruits, in order to replace the operatives who are lost by the organization in the various terrorist attacks. The economic system which enables this depends on money from the coffers of the organization. The coffers are supported by a broad network of charitable societies, which describe themselves as providing economic support and educational and religious services in the Palestinian Territories. The charity funds which are intended for Hamas are used to fund the movement's institutions and to plan its operations, including suicide bombings. In religious schools which are funded by these charitable societies, Hamas preachers advocate *Jihad* and incite the new generation of Palestinian youth to become involved in violent activities against Israelis.

In addition to official religious education, the Hamas charitable societies also provide direct economic incentives and support to the families of suicide bombers, inmates and other operatives who are killed or wounded in the course of terrorist attacks. These families receive a series of benefits, which include grants and monthly pensions. Thus, for example, the family of a terrorist who has been killed generally receives a one-time grant – which can be up to $5,000, depending on the type of terrorist attack – immediately after the attack, and a monthly pension of approximately $100 thereafter. In addition, the family receives thousands of dollars in assistance benefits in the areas of education and health.[69] Taking into account the economic standards of typical families in the Palestinian Territories, these amounts are extremely significant. Investigations performed on Hamas operatives and terrorists show that the support of their families sometimes represented a significant consideration which was taken into account in the actual decision to carry out the terrorist attack. Iraq distributed funds to suicide bombers – up to $25,000 to the family of the suicide bomber.[70] The Palestinian Authority also transferred funds to the families of suicide bombers.[71]

The *Da'wa* represents a critical component in nurturing the "future generation" of Hamas operatives. The various *Da'wa* frameworks – from mosques, through school classrooms and summer camps, to universities – are active in promoting the Hamas ideology. An example of this may be found in the content which is taught in the summer camps which are sponsored by Hamas each year in the Palestinian Territories. At those summer camps, along with religious studies, computer classes and sports activities such as physical training and hand-to-hand combat, the use of weapons and explosives is also taught.[72] Accordingly, the *Da'wa* represents a

---

[69] http://www.shabak.gov.il/publications/study/Pages/dawaa-report.aspx.
[70] Yedioth Ahronoth, November 11, 2001; Yedioth Ahronoth, October 9, 2002.
[71] http://www.inn.co.il/News/News.aspx/8876.
[72] www.terrorism-info.org.il/malam_multimedia/Hebrew/heb_n/pdf/hamas_076.pdf;
www.terrorism-info.org.il/malam_multimedia/Hebrew/COUNTERTERRORISM-DATA/PDF/oct_04.pdf.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

material strategic tool which enables Hamas to carry out terrorist activities on a broad scale against Israel.

As a general rule, prior to the perpetration of a suicide bombing, the cell members bring the designated terrorist to a hiding place, isolate him/her from family and friends and prevent him/her from having any contact with the outside world, while they prepare him/her for a "martyr's death."[73] In many cases, the cell members hold long talks with the terrorist with respect to what they see as humiliation by the Israeli occupation (in the West Bank and the Gaza Strip), the historical glory of the Arabs compared to the humiliation undergone by the Palestinians, and the future benefits which will accrue to the terrorist as a martyr in Paradise.

The indoctrination talks are intended to create what the Israeli researcher Ariel Merari refers to as mutual commitment, an "unbreakable social contract." In the majority of cases, cell members make a video tape about the martyr's death, which is intended for the purposes of propaganda and future recruiting, as well as to ensure that the terrorist does not feel that he/she is entitled to change his/her mind. The potential suicide bomber is also asked to swear a public oath, in front of his/her family, in which he/she asks them not to mourn his/her death. He/she is also asked to write letters which will be published after the attack has been perpetrated. At the end of the process, the person is no longer a potential suicide bomber. "From that moment on, he is the 'living martyr.' What this means is that he is already dead. This is the point of no return."[74]

The cell members generally seek out potential targets (and alternatives, if necessary), or receive detailed information on the preferred target. They pass this information on to the cell members who are guarding the suicide bomber. Other cell members, who are trained in evading Israel Defense Force roadblocks or police patrols, are in charge of moving the terrorist as close as possible to the target.

Thus, for example, Waal Ali Qassem (who is discussed further in this report) searched for a target immediately prior to the terrorist attack on the Sheffield Club in Rishon Le-Zion, and helped transfer the suicide bomber to the club. In an interview which I held with Qassem, he told me about the instructions which he gave the terrorist: "I told him: 'This is the place. You must go to the stairs, and when you go in, you must blow yourself up.' He had 40 kg… [After the terrorist attack] I was with Wisam, the young man who picked us up, and we went back to Jerusalem."

---

[73] *See generally*: Bruce Hoffman, <u>The Logic of Suicide Terrorism</u>, Rand Corporation (June 2003), <u>http://www.rand.org/pubs/reprints/RP1187/index2 html</u>.

[74] *See*: Lecture by Ariel Merari to the Fletcher School, <u>http://www.fletcherledger.com/archive/2002-02-04/020402-NfinalSuicideTerrorism htm</u>.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

### March 27, 2002 – the terrorist attack on the Park Hotel, Netanya

#### a. The terrorist attack

On March 27, 2002, about 250 men, women and children came to the Park Hotel in Netanya to celebrate the Passover Seder.[75] A few minutes before the festive meal was about to begin, a suicide bomber who was a member of Hamas entered the banquet hall, disguised as a woman. When the hotel began to fill up with guests, the terrorist detonated the explosive belt. The explosion killed 29 people and wounded 140, including 20 people who were severely wounded.

One of the wounded, Yitzhak Atzitz, said: "When we sat down, there was a tremendous boom. I thought a missile had hit the hotel. Boards went flying, the tables turned over, water was pouring out of burst pipes. I could hardly see a thing because my eyes were damaged."[76] The explosion was so strong that many of the victims suffered massive internal injuries as a result of the recoil. The terrorist attack was later referred to as the "Seder Night Massacre."[77]

The suicide bombing was carried out by a Hamas terrorist cell, which operated in accordance with the standing orders of Hamas Headquarters in Damascus, Syria: "Kill whenever the possibility arises." After the attack, the leader and founder of Hamas, Ahmed Yassin, said to an audience in Gaza: "The operation in Netanya is proof that ours is a people firm in the struggle to preserve itself, its land and its native soil. Ours is a people steadfast in the Jihad struggle, and it will not give in until the occupation has been overthrown."[78]

The suicide bomber, Abd al-Baset Odeh, did not carry out the terrorist attack on his own. He was sent by an entire cell, acting in accordance with the chain of command; each cell member had a specific job, from recruiting for the Hamas organization and up to the final stages before the perpetration of the attack: placing the explosive belt on the suicide bomber's body, dressing him in women's clothing, applying makeup to his face, photographing and filming him (including the reading of his "will"), and finally, driving him from Tulkarem into Israeli territory and from there to Netanya.

On the basis of my experience in the interrogation of terrorists and on materials which I studied, especially interrogation reports and ISA reports, I have learned that the operation at the Park Hotel in Netanya also had a chain of command, which began with the senior echelons of the military branch of Hamas in Damascus and passed down through the Hamas district commander in Tulkarem, Abbas al-Sayed, who commanded all of the terrorists involved in sending Odeh to

---

[75] <u>Yedioth Ahronoth</u>, March 29, 2002.
[76] <u>Yedioth Ahronoth</u>, March 29, 2002.
[77] *See* Appendix No. 1, pp. 63-65.
[78] <u>Yedioth Ahronoth</u>, March 29, 2002.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

Netanya.[79] Al-Sayed acted in accordance with orders which reached him from the supreme command of Hamas in Damascus.[80]

### b. Evidence and attribution by the court

### 1) The assumption of responsibility

A short time after the terrorist attack at the Park Hotel, Hamas issued an announcement in writing, in which it assumed responsibility for the perpetration of the terrorist attack. The announcement was published on the official stationery of the military branch of Hamas. Appearing at the top of the page was the emblem of the al-Qassam Brigades; on the left side, the following words were written in Arabic: "Brigades of the "martyr" Izz al-Din al-Qassam, the military branch of the Hamas movement. Public Relations Office."

The announcement included a picture of Odeh, the suicide bomber, wearing a bandana on his head which bore the words "Izz al-Din al-Qassam." At the top of the picture was the following caption: "The perpetrator of the suicide operation at the Park Hotel."[81]

The following is the text of the announcement: "To the members of our Palestinian people, which is fighting the Jihad; to our pure and deep-rooted Arab and Islamic nation: with the help of Allah, the heroic martyr has succeeded in passing through all of the security measures of the Zionists."[82]

The announcement set forth the precise time of the explosion (7:25 p.m.), along with the Muslim date, the 13th day of the month of Moharram, in the year 1423 after the *hijra*, and the Western date: March 27, 2003. The name of the place was stated as "Umm Khaled, which is known by the name of Netanya, within the 1948 borders." [83]

The announcement in which Hamas took responsibility for the terrorist attack mentioned five times that it was "the Izz al-Din al-Qassam Brigades, the military branch of Hamas," which carried out the terrorist operation. According to the announcement: "Notwithstanding all of the security measures of the Zionists, the heroic *shahid* Abd al-Baset Odeh, age 25 from Tulkarem, succeeded in harming the Jews… We are telling the entire world that this is our way, the way of the Jihad, and there is no other way to attain our objectives."[84]

---

[79] For information about Abbas's connections with the headquarters in Syria, *see* Guy Aviad, <u>Lexicon of the Hamas Movement</u>, p. 171.

[80] *See* Appendix No. 1, pp. 66-149.

[81] *See* http://www.alqassam.ps/arabic//sohdaa5.php?id=99.

[82] *See* Appendix No. 1, pp. 150-151.

[83] http://www.alqassam.ps/arabic//operations2.php?id=51.

[84] http://www.alqassam.ps/arabic//operations2.php?id=51.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

### 2) The photographs

The following photographs document the suicide bomber's affiliation with Hamas.

The picture below shows Abd al-Baset Odeh a short time before he set out for his destination. Odeh is pictured wearing a green bandana with the Hamas emblem on his forehead. These bandanas are frequently worn by Hamas operatives. Hanging behind him is a Hamas poster bearing the Hamas emblem and a picture of Hamas members who were killed.

The postcard of Odeh shown below was disseminated the day after the terrorist attack by Hamas. The picture clearly shows the Hamas emblem on the band tied around Odeh's forehead. The picture shows the slaughter, destruction and chaos wrought by the explosion at the Park Hotel.[85]



[Photo caption: "The terrorist: he spoke Hebrew and was familiar with the Netanya hotels. (Photograph: Reuters)"]

After the terrorist attack, Hamas published a poster in which Odeh is seen holding a rifle. The poster includes many symbols and emblems of Hamas, including a picture of Izz al-Din al-Qassam (the man for whom the military branch of Hamas is named); the official emblem of the al-Qassam Brigades; the official emblem of Hamas; and a large inscription stating: "The perpetrator of the suicide operation at the Park Hotel in Netanya." The card is dated March 27, 2002.[87]

---

[85] http://www.paldf.net/forum/showthread.php?t=202807.
[86] Yedioth Ahronoth, March 29, 2002. *See also* the al-Qassam Brigades web site: http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=picture&id=99.
[87] http://www.paldf.net/forum/showthread.php?t=202807.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*



Hamas published a photograph of Odeh, holding a rifle in a shooting position.[88] Hamas suicide bombers are typically photographed in this position. In the photograph, Odeh is again wearing a green bandana with a Hamas symbol on it.



In another photograph, Odeh is again seen with a Hamas bandana on his head.[89]



Finally, an additional picture of the terrorist against the background of the destruction which was caused by the explosion in the hotel:[90]

---

[88] http://www.alqassam.ps/arabic/sohdaa5.php.
[89] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=picture&id=99.
[90] http://www.alqassam.ps/arabic//operations2.php?id=51#.

30

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*



### 3) The "will"

Odeh prepared his "will" before going out on the suicide operation, and Hamas recorded him reading it aloud.[91] The language of the "will," the Hamas flag, the green bandana and the rifle – all of these attest to the fact that the person shown is a suicide bomber and a member of Hamas. The following are relevant portions of the "will":

**"To my dear mother, my father, my brother and my sisters: When you hear about the suicide, hold your heads up to Heaven, because your son has sought to meet Allah."**[92]

He ended the "will" with the following words: **"I, your son, the living martyr, Abd al-Baset Odeh, a son** [member] **of the *Shahid* Izz al-Din al-Qassam Brigades."**



The "will" was broadcast by the Hamas television station on March 28, 2002, the day after the terrorist attack.

### 4) Material from Hamas web sites

**The site**: A few days after the deadly terrorist attack, the official web site[93] of the Izz al-Din al-Qassam Brigades devoted three pages to the suicide attack by Odeh on the Park Hotel[94] and

---

[91] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=video&id=99.
[92] http://www.alqassam.ps/arabic/sohdaa5.php?id=99.
[93] The Hamas web sites are discussed in detail in the expert report of Evan Kohlmann. I have read that expert report and I entirely agree with his conclusions concerning the control and use of a number of web sites by Hamas. I will not reiterate those conclusions here.
[94] *See* Appendix No. 1, pp. 152-153.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

posted an online booklet on the site. The booklet is entitled: "Tales of the Holy Revenge Cell –
the Park Hotel Operation."[95]

Hamas devoted considerable efforts to the promotion of that specific cell on its web site. The
web site explicitly refers to Odeh as a member of the al-Qassam Brigades and a Hamas hero; the
same applies to the remaining members of the cell.[96] A section on Abbas al-Sayed (who will be
discussed below) mentions him as the commander of the terrorist attack on the Park Hotel and a
loyal Hamas fighter. Following al-Sayed's arrest, Hamas publicly lauded and praised him in
writing.[97]

The official Hamas web site also published a comprehensive article on Muhanad Sharim, an
additional member of the cell, and attached his photograph holding a weapon.

Muhammad Shahruri is described in respectful terms in a booklet entitled "The Story of a
Operation by the Park Hotel Cell,"[98] and his participation in the attack on the Park Hotel is
emphasized.[99]

The booklet[100] contains a detailed narrative of the Hamas terrorist attack, as well as testimony by
each member of the cell. It includes extensive praise for members of cells of this type and refers
to them by honorifics, such as the "lion of Palestine" for al-Sayed.[101]

Hamas praises Odeh as "the lion of holy revenge, the heroic member of the al-Qassam
Brigades."[102] The booklet begins with the following dedication: "The martyr Abd al-Baset Odeh,
a member of the Izz al-Din al-Qassam organization, ascended to heaven on March 28, 2002.
Cause of death: suicide operation."[103]

The booklet goes on to describe the role played by other participants who assisted in carrying out
the terrorist attack, including Muhanad Tahar, to whom the article refers as the "Fourth
Engineer" of Hamas.[104] The article clearly indicates that he was a senior Hamas operative, who
was imprisoned not only in Israel, but also by the Palestinian security forces in 1997.

---

[95] *See* Appendix No. 1, pp. 154-187.
[96] *See* Appendix No. 1, pp. 154-187; *see also* Appendix No. 1, pp. 188-189; *see also* Appendix No. 1, pp. 190-192;
*see also* Appendix No. 1, pp 193-194; *see also* Appendix No. 1, pp. 195-197.
[97] *See* Appendix No. 1, pp. 190-192.
[98] *See* Appendix No. 1, pp. 198-199.
[99] *See* Appendix No. 1, pp. 154-187.
[100] *See* Appendix No. 1, pp. 154-187.
[101] *See* Appendix No. 1, pp. 154-187.
[102] http://www.alqassam.ps/arabic//operations2.php?id=51#.
[103] *See* Appendix No. 1, pp. 154-187.
[104] *See* Appendix No. 1, pp. 193-194.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

Muhanad Tahar, "the chief 'Engineer' of the Hamas movement in the northern West Bank," was responsible for the deaths of 121 people. He was killed by the Israel Defense Forces on July 1, 2002.[105]

### 5) Official Hamas reports

In addition to the propaganda which is intended for the general public, Hamas also publishes "official" reports of its own, in which it takes responsibility for its terrorist attacks.

a. **The Book of Hamas Martyrs:**[106] This document includes a clear statement that Hamas was responsible for sending out the terrorist: "Abd al-Baset Odeh, who carried out the terrorist attack on the Park Hotel."[107] Odeh's picture also appears in the virtual Book of Martyrs, which includes a list of Hamas operatives who were killed, along with pictures, identifying particulars and causes of death.

b. **Al-Risalah Magazine**: Several months after the terrorist attack, the official magazine of Hamas, *al-Risalah*, included a long article about al-Sayed in the issue which was published on September 25, 2003. The article referred to al-Sayed as the "Lion of Hamas," the "Cavalryman of Izz al-Din al-Qassam," and the "Engineer." All of these descriptors show the great appreciation which was felt for al-Sayed by Hamas and his importance to the organization.[108]

c. **Publications by al-Qassam**: The Information Office of the al-Qassam Brigades published a special booklet with a special report about the terrorist attack at the Park Hotel. The booklet provides complete details on each member of the cell, including his life history, his activities on behalf of Hamas and his individual photograph. The cell was referred to as the "Holy Revenge Cell." The report states that al-Sayed was the commander of the cell: "The man in charge of the Holy Revenge Cell, the Commander, a member of Izz al-Din al-Qassam, is the Engineer Abbas al-Sayed, the Lion of the al-Qassam Brigades, a mythological hero of history."[109]

The report is accompanied by pictures, which make it clear that each of the people photographed was a member of Hamas. For example, the photograph of Nasser Yataima

---

[105] http://www.ynet.co.il/articles/1,7340,L-1972094,00 html.

[106] The Book of Hamas Martyrs, the official title of which is The Oasis of Martyrs, is a sort of virtual commemorative book in which Hamas publishes the photographs and histories of Hamas members who are killed. The book is divided into a number of subjects: Hamas members who were killed in suicide operations; Hamas members who were killed in cases other than suicide operations; women; and members of the Public Information Unit who were killed. Each page lists the name, particulars and life story of a person who was killed.

[107] http://www.alqassam.ps/arabic//operations2.php?id=51; *see also* Appendix No. 1, pp. 152-153; *see also* Appendix No. 1, pp. 200-202; *see also* Appendix No. 1, pp. 190-192.

[108] *See* Appendix No. 1, pp. 154-187; *see also* Appendix No. 1, pp. 190-192.

[109] *See* Appendix No. 1, pp. 154-187.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

(one of the junior members of the cell and the assistant of Mu'amar Shahruri)[110] shows him wearing a shirt and a hat with the Hamas emblem. Another picture shows him marching in a Hamas parade.[111]

Similarly, Muhanad Tahar's picture, which appears below, shows him in the foreground of the picture, with the Hamas emblem behind him.



112

Hamas also devoted an article to Mu'amar Shahruri in a booklet describing the activity of the cell.[113] Mu'amar Shahruri was one of the members of the cell, whose role was to transport the terrorist to the scene of the terrorist attack. The article speaks of Shahruri's role in the terrorist attack on the Park Hotel.[114]

### 6) Additional corroborative material

**The procession**: In the afternoon of March 28, 2002, less than 24 hours after the terrorist attack, a symbolic funeral was held for Abd al-Baset Odeh in Tulkarem. Some 2000 Hamas members participated in the event, which began at the central mosque and ended at the local cemetery. The mourners carried Hamas flags and called out slogans praising Odeh.[115]

### c. Official documents of the Government of Israel

### 1) The ISA report[116]

"March 27, 2002 – an explosion by a suicide bomber at the Park Hotel in Netanya – 29 killed and 144 wounded. **The suicide bomber Abd al-Baset Odeh**, a resident of <u>Tulkarem</u>, **25 years**

---

[110] *See* Appendix No. 1, pp. 154-187.

[111] *See* Appendix No. 1, pp. 154-187.

[112] http://www.khayma.com/islamic_block/shohada%20bloc/mohanad/mo%202.JPG.

[113] *See* Appendix No. 1, pp. 154-187.

[114] *See* Appendix No. 1, pp. 154-187; *see also* Appendix No. 1, pp. 203-222; *see also* Appendix No. 1, pp. 223-231.

[115] <u>Yedioth Ahronoth</u>, March 29, 2002.

[116] http://www.pmo.gov.il/NR/rdonlyres/81819B47-FE6C-47C2-B000-77B9A7EB9A5A/0/%D7%97%D7%95%D7%91%D7%A8%D7%AA%D7%9E%D7%97%D7%91%D7%9C%D7%99%D7%9D%D7%9E%D7%AA%D7%90%D7%91%D7%93%D7%99%D7%9D%D7%91%D7%9C%D7%99%D7%AA%D7%9E%D7%95%D7%A0%D7%95%D7%AA1.doc.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

**old**, entered the Park Hotel in Netanya at a time when dozens of guests were celebrating the Passover seder meal and blew himself up. The terrorist attack was directed by the Hamas military infrastructures in Tulkarem and Nablus, headed by **Abbas al-Sayed** and **Muhanad Tahar**. Abbas al-Sayed, the person in charge of the terrorist attack from Tulkarem (detained), served as the head of the Hamas military presence in the area. Abbas confessed, in his interrogation, that he had been planning to carry out the terrorist attack for many months before, but that his plans had been postponed. It was Abbas who gave the order to the infrastructure operative **Mu'amar Shahruri** to obtain two explosive belts from the military infrastructure in Nablus, and it was he who proposed to **Fathi Khasib** to transport the suicide bomber to Israel and to locate a suitable target for the attack. Prior to the attack, Abbas and additional operatives from the infrastructure prepared Abd al-Baset Odeh to carry out the terrorist attack – the suicide bomber shaved off his beard, made up his face, put on a pair of women's blue jeans and women's shoes, wore a wig with straight hair, put on a brown shirt and a brown leather coat with a leopard skin collar – all this, in order to blend into crowded areas full of people in Israel. Abbas dressed the suicide bomber in the explosive belt, which looked like a khaki-colored vest with pockets, and which held 10 kg of explosives, and explained to him how it was to be detonated. After photographing the suicide bomber with an M-16 rifle against the background of the movement flag and pictures of martyrs, Abbas wrote the suicide bomber's will, which stated that he was going to carry out a terrorist attack on behalf of the Izz al-Din al-Qassam Brigades. In addition, Abbas provided the suicide bomber with a woman's identity card. **Muhanad Tahar**, a resident of Nablus, who served as the head of the Hamas military branch in Samaria (killed), was in charge of supplying the explosive belts from the infrastructure in Nablus to the infrastructure in Tulkarem. **Fathi Khasib**, a resident of Tulkarem (detained), confessed, in his interrogation, that he purchased a car in Israel, in which he transported the suicide bomber to Tulkarem, where the two of them switched to another car, and they drove away from there and entered Israel."

### 2) An official document written by the Prime Minister's media consultant in 2003

One year after the terrorist attack on the Park Hotel, in which 30 people were killed and approximately 140 people were wounded,[117] the Office of the Prime Minister published an official document summarizing the operation and the arrests which had been made following the operation.

On the basis of my professional experience, I can testify that such documents are written after reports based on all of the information which was collected from all of the sources available to the Government of Israel have been given to the Government ministers.

---

[117] http://www.pmo.gov.il/PMO/Communication/IsraelUnderAttack/Netanya-Park+Hotel. The 30th victim died a few days after the terrorist attack, in the hospital.

35

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

The report which was issued by the Office of the Prime Minister of Israel emphasized that the operation was carried out by Hamas, and that the people who had been in charge of carrying out the terrorist attack, including Abbas al-Sayed, Muhanad Sharim, Ali Hudri, Fathi Khasib, Mu'amar Shahruri and Nasser Yataima, were all members of the al-Qassam Brigades of Hamas and acted in accordance with the instructions which they had received from them.

### 3) Documents and legal procedures in Israel

The declarations of responsibility for the terrorist attack, which were issued by Hamas, were validated separately by the criminal law procedures in Israel, which commenced subsequent to the terrorist attack.

Four of the members of the cell (Fathi Raja Khasib, Mu'amar al-Sheikh (Shahruri), Muhanad Sharim and Nasser Yataima) were convicted by the Military Court of having participated in the planning and perpetration of the terrorist attack. The Court sentenced each of them to 29 concurrent life sentences.[118]

Mu'amar Shahruri was convicted by the Military Court in the West Bank of membership in Hamas, provision of assistance to Hamas, possession of weapons, perpetration of roadside shootings toward Israel Defense Forces troops, active participation in the cell which carried out the terrorist attack on the Park Hotel, purchasing the car which was used to transport the suicide bomber, and assistance in making the video tape of Odeh, in which he was seen reading his "will," and providing it to the media.[119]

During the course of the legal procedures, a number of members of the cell confessed to their involvement in the terrorist attack.

a.  Fathi Khasib made a confession, written out in his own handwriting, according to which he intentionally purchased the car in which he transported Odeh from the village of Nazlat Issa to Herzliya and to the scene of the terrorist attack.

b.  Abbas al-Sayed confessed, in his interrogation, that he supervised the terrorist attack in Netanya and that he participated in the preparation of the explosive charge.[120] The confession was written out in Abbas al-Sayed's own handwriting and includes details with regard to his connections with the Hamas headquarters in Damascus and his involvement in the terrorist attack on the Park Hotel.

---

118 *See* Appendix No. 1, pp. 63-65.
119 *See* Appendix No. 1, pp. 63-65.
120 *See* Appendix No. 1, pp. 257-271.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

c.   During the course of his interrogation, Sharim revealed the location of weapons and an explosive belt, which were later found by the Israel Police at the location in question.[121]

d.   An additional member of the cell, who served as an assistant, Nasser Yataima, confessed to his role in the terrorist attack.[122]

### d. Additional corroborative material

I personally conducted an investigation with regard to the Park Hotel cell and I visited the prison in which al-Sayed is incarcerated. He is kept in a separate cell within the wing for Hamas inmates. His cell is more comfortable than other cells. It is equipped with a radio, a television set and a Walkman. He reads newspapers and keeps up his physical appearance. Other inmates whom I interviewed in 2006 spoke of him as a "commander." I also interviewed al-Sayed's wife a number of times. She described her husband as a senior Hamas operative. I also interviewed al-Sayed in prison. Unlike most Hamas operatives, he was careful not to boast of his terrorist activities; at the same time, he also did not declare his innocence.

### e. Summary of the terrorist attack on the Park Hotel

On the basis of the Hamas material on the subject, the reports by the ISA and the investigations by the Israel Police, and the convictions which were made as a result thereof, I conclude that the seven Hamas members who were primarily involved in the terrorist attack are the following:

### 1) Abd al-Baset Odeh – the suicide bomber

Abd al-Baset Odeh was a Hamas operative and a resident of Tulkarem, who worked at the Park Hotel in Netanya.[123] Prior to the terrorist attack, he was wanted by both the Palestinian security forces and Israel for approximately a year and a half.[124] On August 13, 2001, the ISA published a "Wanted" notice and officially informed the Palestinian Authority that it had issued a warrant for Odeh's arrest, on the grounds of his Hamas activity. In October 2001, Israel asked the Palestinian Authority to arrest him. The security establishment of the Palestinian Authority attempted to arrest him, but informed Israel that it had failed.[125]

After the terrorist attack in March, Hamas published a complete biography of Odeh, in which it boasted of Odeh's membership in Hamas, which had begun in the initial days of the First

---

[121] *See* Appendix No. 1, pp. 235-256.
[122] *See* Appendix No. 1, pp. 235-256.
[123] <u>Yedioth Ahronoth</u>, March 29, 2002.
[124] <u>http://www.islamonline.net/arabic/news/2003-04/14/article16.html</u>.
[125] <u>Yedioth Ahronoth</u>, March 29, 2002.

Intifada.[126] According to the Hamas publication, his membership in Hamas began when he joined the *Shabibat Hamas* – the Hamas youth movement – at the age of 14.[127]

### 2) Abbas al-Sayed – the commander of the Hamas cell

Al-Sayed was the Hamas commander in Tulkarem, a city in the northern part of the West Bank. Al-Sayed handled the cell which planned and perpetrated the terrorist attack on the Park Hotel.[128] Al-Sayed received instructions from the Hamas headquarters in Syria, which were passed on from the Head of the Political Bureau, Khalid Mishal.[129]

The activity of Abbas Al-Sayed, a graduate of the Yarmuk University in Jordan and a medical equipment engineer by profession, reflects both the terrorist arm and the political arm. On one hand, al-Sayed headed the Hamas military infrastructure in Tulkarem. On the other hand, he was in close contact with senior political and operational cadres[130] and was involved in a wide range of activities with a diplomatic, propaganda-related and organizational nature.

Al-Sayed's activity on both levels reflects the fact that Hamas makes no distinction between the political arm and the military branch. In my estimation, Abbas al-Sayed would not have carried out terrorist operations without obtaining the approval of Hamas headquarters in Damascus.

When the Second Intifada broke out in September 2000, al-Sayed served as an intermediary between the political headquarters and the military section, the al-Qassam Brigades. Shortly thereafter, he became the commander of the Hamas military section. The terrorist attack on the Park Hotel was the last in a series of murderous terrorist attacks, which al-Sayed directed against Israeli civilians.[131] The attack was the largest terrorist incident for which al-Sayed was responsible, and Hamas made considerable efforts to reward him for it and to take responsibility for it.[132]

In addition to the supervision of the general planning of the terrorist attack, al-Sayed also gave the order to put small metal ball bearings and strips of metal into the explosive charge, a method

---

[126] The term "First Intifada" is used throughout this report. This term refers to the violent conflict which broke out in December 1987 between the Palestinians and Israel. This part of the conflict has no "official" ending date, but it is generally considered to have ended with the signature of the Oslo Accords in 1993.

[127] *See* Appendix No. 1, pp. 152-153.

[128] Guy Aviad, Lexicon of the Hamas Movement, p. 171; *see also* Appendix No. 1, pp. 257-271; *see also* Appendix No. 1, pp. 66-149.

[129] *See* Appendix No. 1, pp. 66-149.

[130] *See* Guy Aviad, Lexicon of the Hamas Movement, p. 171; *see also* Appendix No. 1, pp. 190-192.

[131] The previous terrorist attacks directed by al-Sayed were performed on Herzl Street and in the Hasharon Shopping Mall in Netanya. *See also* Appendix No. 1, pp. 66-149; *see also* Appendix No. 1, pp. 257-271; *see also* Appendix No. 1, p. 272.

[132] *See* Appendix No. 1, pp. 154-187, and Appendix No. 1, pp. 66-149.

which Hamas had developed and which was intended to maximize the level of fatalities that are caused by its suicide bombers.[133]

Al-Sayed planned an additional terrorist attack, which was not carried out, involving the use of cyanide poison. During the course of his interrogation, he provided details on cyanide poison and revealed the poison which was already in his possession.[134]

### 3) Muhanad Tahar – the explosives "Engineer"

Tahar was a resident of Nablus, who headed the Hamas military branch in the northern part of the West Bank. He prepared the explosive charges and transferred them to Tulkarem, where they were picked up by the suicide bomber.[135] Tahar was also involved in the terrorist attack on the Sbarro Pizzeria in Jerusalem on August 9, 2001. In that terrorist attack, 15 Israelis were killed and 110 wounded.[136] In addition, Tahar was further involved in the terrorist attack on the Dolphinarium discotheque on June 1, 2001, in which 21 young Israelis were killed and 80 other people were wounded.[137]

Tahar was also arrested by the Palestinian Authority for his involvement in Hamas, but managed to operate in a relatively free manner, until he was killed by Israel Defense Forces troops on June 30, 2002 in the course of an attempt to arrest him. Hamas referred to him as the "Fourth Engineer," an appellation which indicates his superior status within the organization.[138]

Hamas refers to its explosives experts as "Engineers." When one Engineer is killed, his replacement is appointed. Yahya Ayash was the First Engineer; Muhi al-Din al-Sharif was the Second Engineer; Abd el-Nasser Issa was the Third Engineer; Muhanad Tahar was the Fourth Engineer; and Abdallah Barghouti, who was Tahar's pupil, was the Fifth Engineer.[139]

### 4) Mu'amar Shahruri – al-Sayed's deputy

Shahruri was a mid-echelon Hamas operative, a resident of Tulkarem. He received the explosive charge from Tahar in Nablus and transferred it to Tulkarem, where the suicide bomber put it on before continuing to Netanya. Shahruri also video taped the suicide bomber, in order to provide proof of the attribution of the terrorist attack to Hamas.[140]

---

[133] *See* Appendix No. 1, pp. 66-149, and Appendix No. 1, pp. 257-271.

[134] *See* Appendix No. 1, pp. 66-149.

[135] *See* Guy Aviad, Lexicon of the Hamas Movement, page 111.

[136] *See* Guy Aviad, Lexicon of the Hamas Movement, page 165.

[137] *See* Guy Aviad, Lexicon of the Hamas Movement, page 77.

[138] *See* Appendix No. 1, pp. 232-234.

[139] *See* Appendix No. 1, pp. 193-194; *see also* Appendix No. 1, pp. 232-234

[140] *See* Appendix No. 1, pp. 223-231; *see also* Appendix No. 1, pp. 203-222.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

### 5) Muhanad Talal Sharim – Shahruri's deputy

Sharim helped Shahruri to photograph the suicide bomber; he prepared the posters glorifying the terrorist attack;[141] he provided a false identity card and met with the driver who transported Odeh to the target location; and he rented the video camera which was used to photograph the suicide bomber.[142] Sharim also helped prepare the woman's disguise which Odeh used to get into Netanya.[143] His activity in Hamas is described on the web page which is devoted to him on the Hamas web site.[144] His picture, with a rifle in his hand, appears at the top of the page. The web site gives details of 15 different occasions on which Tahar Sharim, who was one of the most senior Hamas members in Tulkarem, was arrested.

### 6) Ali Hudri – the contact person with Hamas headquarters

Hudri served as the contact person. He carried messages between Hamas headquarters in Nablus and the cell in Tulkarem.[145]

### 7) Fathi Khasib

Fathi Khasib took the suicide bomber, Odeh, from Tulkarem and transported him to Israel. Khasib then transferred Odeh to another car, with Israeli license plates, which he had purchased using a forged identity card. Khasib used that car to transport Odeh to the target location in Netanya.[146]

---

[141] Posters of this type are subsequently hung in the mosques and in the streets, with a view to glorifying the suicide bomber's actions.
[142] *See* Appendix No. 1, pp. 195-197.
[143] *See* Appendix No. 1, pp. 195-197.
[144] *See* Appendix No. 1, pp. 195-197.
[145] *See* Appendix No. 1, pp. 235-256.
[146] *See* Appendix No. 1, pp. 273-285; *and see* Appendix No. 1, pp. 66-149.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

### Diagram of the chain of command and perpetration of the terrorist attack on the Park Hotel



### f. Conclusion

The many detailed declarations which were issued by Hamas with regard to the terrorist attack on the Park Hotel, the boasting about the suicide bomber within the organization, and the profusion of praise which were given to the cell which planned and perpetrated the terrorist attack – all these, in and of themselves, would suffice to lead to the conclusion that Hamas carried out the terrorist attack. At the same time, the ISA conclusions on the basis of its investigations, the criminal convictions of the cell members, and their repeated public declarations expressing pride in the performance of the terrorist attack on the Park Hotel and other terrorist attacks – including documents in the handwriting of the cell members, describing their activity in the cell which carried out the attack – leave no doubt that this attack was carried out by Hamas.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

**May 7, 2002 – the terrorist attack on the Sheffield Club, Rishon Le-Zion**

### a. The terrorist attack

On May 7, 2002, at approximately 11:00 p.m., Muhammad Jamil Nabil Muammar entered the Sheffield Club, a club that was operating without a permit in the Rishon Le-Zion industrial zone, carrying a bag full of explosives. When he detonated the explosive charge, there were approximately 70-80 people in the club. The explosion killed 15 people and wounded more than 50 others. Because the explosion caused damage to the infrastructure of the club, it was not possible to reach many of the victims for hours, until the firefighters succeeded in clearing away the rubble with a crane.[147]

### b. Evidence and attribution by the court

#### 1) The taking of responsibility

A short time after the terrorist attack, Hamas announced on the Hezbollah television station in Lebanon, *al-Manar*, that it was taking responsibility for the attack.[148] The official announcement with the name of the terrorist who carried out the suicide operations was officially published by Hamas, in the name of the al-Qassam Brigades, only in June 2008; the announcement stated details with regard to the terrorist attack in Rishon Le-Zion.[149]

"Military announcement on behalf of the Izz al-Din al-Qassam Brigades:

"The al-Qassam Brigades reveal, for the first time, details with respect to the series of Jihad operations which were carried out by the organization years ago. Members of the fighting Palestinian people… all members of the Arab and Islamic nation:

"In the footsteps of the holy fighters, Engineer Yahya Ayash, Hassan Salameh, Muhi al-Din al-Sharif, Adel Awadallah, Ayman Halawa and Muhanad Tahar, who sowed trembling and fear in every place which is being held by the occupation, destroyed by the occupation, others have continued their way in order to pursue the way of Jihad and resistance… We have not published their names, as we have not published the details of many operations, until it became possible for us to do so from the standpoint of security.

"We of the al-Qassam Brigades now disclose, for the first time, after more than five years, the name of the fighter: the martyr, a member of the al-Qassam Brigades, the hero Muhammad Jamil

---

[147] http://www.ynet.co.il/articles/0,7340,L-1879252,00 html.
[148] http://www.ynet.co.il/articles/0,7340,L-1879252,00 html.
[149] http://www.ikhwanonline.com/Article.asp?ArtID=37880&SecID=231. In addition, Hamas distributed a photograph of Muhammad Jamil Muammar, with the results of the terrorist attack visible in the background; http://www.alqassam.ps/arabic/news1.php?id=9633.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

Nabil Muammar, of Kfar Qarayut, a resident of Jordan, who carried out the suicide operation in Rishon Le-Zion on May 7, 2002. Our Jordanian *shahid* succeeded in passing through all of the barriers and entered a gambling club, carrying a bag full of explosives, which he detonated in the club. As a result, 20 Zionists were killed and 60 were wounded."[150]

The question which arises is why the suicide bomber's name was published five years subsequent to the terrorist attack. In my professional opinion, it appears that, because Muammar was a Palestinian who held Jordanian citizenship, Hamas headquarters preferred not to get his family into trouble in the context of the terrorist attack by publishing his name.

I also agree with the explanation which appears on the Muslim Brotherhood web site,[151] according to which, a month before the publication of the announcement, around May 2008, the *al-Jazeera* television network aired an article on Palestinian inmates and missing people. Muammar's name was mentioned in the article as one of the inmates or missing people who were being kept in Israel and whose fate was known to none. In response, Hamas decided to publish Muammar's name.


152


153

**2) Material from the Hamas web site**

In June 2008, the official web site of the al-Qassam Brigades devoted an extensive article to Muhammad Muammar, which featured his life story and included, among other things, a

---

[150] http://www.alqassam.ps/arabic//news1.php?id=9633;
http://www.ynet.co.il/home/0,7340,L-8,00.html.
The notice was also published on the official web site of the Muslim Brotherhood:
http://www.ikhwanonline.com/Article.asp?ArtID=37880&SecID=231.
[151] http://www.ikhwanonline.com/Article.asp?ArtID=37880&SecID=231.
[152] http://www.ikhwanonline.com/Article.asp?ArtID=37880&SecID=231.
[153] http://www.alqassam.ps/arabic/news1.php?id=9633.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

conversation with his father. The article also included an announcement by Hamas in the name of the al-Qassam Brigades, with regard to the perpetration of the terrorist attack, including publication of the original declaration of responsibility.[154] The web site also published a detailed report on Abdallah Barghouti, which expressly stated that Barghouti operated on behalf of the al-Qassam Brigades. Barghouti was referred to as the "Commander" and the "Engineer." The article specifically mentioned the terrorist attack on the Sheffield Club and Abdallah Barghouti's role in the construction of the explosive charges which were used at the time of the attack.[155]

In addition to the declarations of responsibility by Hamas itself, Waal Qassem, in a detailed article on the Hamas web site, described how the operation was carried out by the al-Qassam Brigades, including a statement of his own role in the implementation of the attack.[156] When the Israeli military court convicted Abdallah Barghouti in 2003, the official Hamas web site published a detailed article praising his activity in Hamas.[157]

### 3) The Hamas booklet

Hamas also published a booklet on the Internet, entitled "The Engineers of Death," which included a chapter on the terrorist attack in Rishon Le-Zion, including a timetable of the events, a list of the names of the cell members and a biography of the suicide bomber, Muhammad Jamil Muammar.[158]

### 4) A poster of the suicide bomber

The poster, which was prepared after Muammar's death, shows a picture of the club. This is an additional proof of the relationship between the suicide bomber and the terrorist attack.[159]

### 5) The mourners' tent

Muammar's family members, who live in Zarqa, Jordan, set up a mourners' tent after members of Hamas called them and gave them details of the operation in Rishon Le-Zion. Upon receipt of the news of their son's death, the tent was set up and the family distributed sweets, as is customary upon the death of a "martyr."[160]

---

[154] http://www.alqassam.ps/arabic/news1.php?id=9633.
[155] *See* Appendix No. 1, pp. 286-293.
[156] *See* Appendix No. 1, pp. 294-298.
[157] http://www.palestine-info.info/arabic/feda/2004/bargothee.htm.
[158] *See* Appendix No. 1, pp. 299-319.
[159] http://www.alqassam.ps/arabic/news1.php?id=9633.
[160] http://petra-boys.ahlamuntada.com/montada-f3/topic-t455.htm.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

### c. Official documents of the Government of Israel

#### 1) The ISA report for 2005

This report, which is entitled "Suicide Bombers in Five Years of Conflict," identifies the perpetrators of the terrorist attack on the Sheffield Club.[161] The following is the relevant portion of the report:

"May 7, 2002 – an explosion by a suicide bomber at a billiards club in Rishon Le-Zion, with 16 killed and 51 wounded. The suicide bomber, Muhammad Muammar, a resident of Qarayut/Nablus, 28 years old, of Jordanian origin, identified with Hamas, entered the Sheffield Club on Sakharov Street in the Rishon Le-Zion industrial zone at approximately 10:55 p.m., with a suitcase in his hand, and walked toward the center of the room, where people were clustered around the slot machines, and blew himself up. A declaration of responsibility for the terrorist attack was published on behalf of the Izz al-Din al-Qassam Brigades and also included threats to perpetrate additional terrorist attacks. The terrorist attack was carried out by the Hamas infrastructure in Ramallah, in cooperation with a Jerusalem cell; Muhammad Amran served as the contact person between Waal Qassem, a Hamas operative from Ras el-Amud, and Ibrahim Hamad, who heads the Hamas infrastructure in Ramallah. In actual fact, Amran passed on the instructions for the performance of the attacks and transferred the suicide bombers and the explosive charges."

#### 2) Announcements by the Government of Israel

a.  An announcement by the Government of Israel in 2002 with regard to the terrorist attack stated that 15 people had been killed and 55 wounded in a pool club in Rishon Le-Zion, when a suicide bomber blew himself up on the third floor and caused part of the building to collapse. Hamas took responsibility for the terrorist attack.[162]

b.  An announcement by the Government in 2006 with regard to the terrorist attack states that Ibrahim Hamad, the head of the Hamas military branch in the West Bank, was responsible for the terrorist attack on the Sheffield Club.[163]

#### 3) Official legal procedures and documents

Seven Hamas operatives were charged with involvement in the terrorist attack on the Sheffield Club, including Abdallah Barghouti, who is known as the "Engineer," who was accused of having been a key figure in Hamas activity in the West Bank from 2002 until his arrest in March 2003.

---

[161] The report may be seen on the ISA web site: http://www.shabak.gov.il/publications/archive/Pages/default.aspx.
[162] http://www.pmo.gov.il/PMO/Communication/IsraelUnderAttack/Rishon+Lezion/.
[163] http://www.pmo.gov.il/PMO/Communication/Spokesman/sbkspoke/shabak230506.htm.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

Section 67 of the indictment against Barghouti describes the series of events which led to the explosion in the club in Rishon Le-Zion,[164] including the fact that Barghouti designed an explosive belt which was covered with an imitation leather belt made of fabric, to which screws and shampoo bottles full of explosives were glued.[165]

Prior to the commencement of Barghouti's trial,[166] Barghouti's attorney informed the Court that his client "understands the indictment and wishes to plead guilty." Prior to the verdict, Barghouti admitted that he had acted on behalf of Hamas and promised that Hamas would continue its war in order to destroy the State of Israel. He declared at the time, in court, that "Hamas will cause the State of Israel to fall apart, according to the vision of Ahmed Yassin," and added that he hoped that terrorist attacks which were much harsher than those performed by him would be carried out.[167] On June 1, 2003, Barghouti told the Court: "I plead guilty to that which has been attributed to me in the indictment."[168] On that basis, *inter alia*, of his guilty plea, the Court convicted Abdallah Barghouti[169] and sentenced him to 67 concurrent life sentences.[170]

According to the indictment which was filed against Ibrahim Hamad, he was in charge of the al-Qassam Brigades in the Ramallah/Jerusalem sector, starting in 1999.[171] By virtue of his position, he recruited operatives, transferred funds and provided weapons and explosives.[172]

Hamad's deputy, Muhammad Arman, confessed, during his interrogation by the ISA, that he had received instructions from Hamad to prepare a major terrorist attack with a large number of casualties.[173] Abdallah Barghouti prepared the explosive belt and the charge which were used at the time of the terrorist attack, at Arman's request. Arman placed the explosive belt on the suicide bomber's body and then transferred him to Waal Qassem. Qassem dispatched him to the club in Rishon Le-Zion.[174] In the course of the judiciary process, Arman explained the pride he

---

[164] *See* Appendix No. 1, pp. 320-362.

[165] *See* Appendix No. 1, pp. 320-362 and Appendix No. 1, pp. 363-370; see also "For the Sake of Allah," in which Barghouti describes in detail how he prepared the belt.

[166] *See* Appendix No. 1, p. 371.

[167] *See* Appendix No. 1, pp. 363-370.

[168] *See* Appendix No. 1, p. 371.

[169] *See* Appendix No. 1, pp. 363-370.

[170] A spokesman for the military branch of Hamas, Abu Ubeida, declared in February 2009 that Hamas would not agree to any deal for the liberation of Gilad Shalit unless Israel agreed to release the senior Hamas operatives from prison in Israel. The Hamas spokesman gave three names, the first of which was that of Abdallah Barghouti (*Ha'aretz*, February 15, 2009). On March 17, 2009, the Government of Israel announced that it did not intend to free a number of senior terrorists, including Abdallah Barghouti, as part of any deal in the Shalit matter. The Government explained that "Abdallah Barghouti was convicted and sentenced to 67 concurrent life sentences for involvement in terrorist attacks, in which 66 civilians were killed and 500 wounded." (http://www.news-israel.net/Article.asp?Code=15065).

[171] Indictment against Ibrahim Hamad, Prosecution File 3181/6, Military Court of Judea (Appendix No. 1, pp. 15-34).

[172] *Id.*

[173] *Id.*

[174] *See* Appendix No. 1, pp. 372-402; and *see also* Appendix No. 1, pp. 294-298.

46

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

felt in having had the privilege of carrying out his role in the attack.[175] Arman was also convicted, *inter alia*, on the basis of his guilty plea.[176]

Waal Qassem, Wisam Abbasi, Muhammad Odeh and Ala al-Din Abbasi were all accused in the same indictment. Paragraph 5 of the indictment describes the chain of events which led to the perpetration of the terrorist attack in Rishon Le-Zion and states that they were members of the al-Qassam Brigades of Hamas.[177]

Each of the four pled guilty and was convicted by the court. Waal Qassem was sentenced to 35 concurrent life sentences. Wisam Abbasi was sentenced to 26 concurrent life sentences. Muhammad Odeh was sentenced to four concurrent life sentences. Ala al-Din Abbasi was sentenced to 60 concurrent life sentences.[178]

The four expressed no remorse in court for their terrorist activity. Quite the opposite is true: Waal Qassem, who spoke on behalf of the four, expressed pride in their operations and called upon others to follow in their footsteps.[179]

### d. Additional corroborative material

### 1. The Palestinian Inmates' Club[180]

Ibrahim Hamad, Muhammad Arman, Abdallah Barghouti and Waal Qassem are registered in the Inmates' Club as members of Hamas. I received these details from Ziad Abu Ein, the Head of the Inmates' Club in Ramallah and the Deputy Minister for Inmate Affairs in the Palestinian Authority.

### 2. Interviews with members of the "Silwan Cell"

I met Abdallah Barghouti personally in the Beersheba Prison, where he is incarcerated in the segregated Hamas inmates' wing. The interview with him took approximately three hours. Abdallah Barghouti appeared comfortable, spoke fluently and emphasized that his participation in the terrorist attack on the Sheffield Club was in the name of Hamas and according to the instructions of Hamas headquarters in Ramallah and Nablus. He also stated that, at the time, he had been in ongoing contact with the Hamas leadership in Damascus. Abdallah Barghouti

---

[175] *See* Appendix No. 1, pp. 372-402.

[176] *See* Appendix No. 1, pp. 406-417.

[177] *See* Appendix No. 1, pp. 418-445.

[178] *See* Appendix No. 1, pp. 418-445.

[179] *See* Appendix No. 1, pp. 418-445.

[180] The Palestinian Inmates' Club is an established organization which operates in the Palestinian Territories and is in charge of maintaining ongoing contact with the inmates in the prisons and their families. The Inmates' Club acts in cooperation with the Palestinian Ministry for Inmate Affairs. Every few months, the Inmates' Club, which is funded by the Palestinian Authority, publishes a report on the number of inmates and their distribution by organizations. The institution maintains branches in all of the cities in the West Bank and the Gaza Strip.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

described to me, in extensive detail, how he had prepared the explosive belt which was used in the terrorist attack.[181]

During the interview which I held with him, Barghouti did not express any remorse for his operations.[182] In fact, in another interview for Israel Television, he expressed pride in his operations.[183]

I also interviewed Waal Qassem, the commander of the "Silwan Cell," which carried out the terrorist attack, in Gilboa Prison, where he is incarcerated in the Hamas inmates' wing. The conversation with him was videotaped and was conducted without the presence of a guard. He appeared open, free, proud of his membership in Hamas and of the terrorist operations which he had performed; he freely told me how he had transported the suicide bomber to the club in Rishon Le-Zion.[184] The interview which I conducted focused on the terrorist attacks which the Silwan Cell had perpetrated at the Hebrew University of Jerusalem and in Café Hillel; nonetheless, in the course of the conversation, we also spoke of the dispatch of the suicide bomber to the club in Rishon Le-Zion.[185] In accordance with that which has been set forth above, Waal Qassem also gave an interview, from prison, to the official web site of the al-Qassam Brigades, in which he expressed pride in his Hamas membership and stated that he had been active for many years in the military branch of the organization.[186]

### e. Summary of the terrorist attack on the Sheffield Club

#### 1. Ibrahim Hamad: Commander of the al-Qassam Brigades in Nablus

Ibrahim Hamad received the order to carry out a terrorist attack from the leadership in Damascus. At the time, Hamad ordered his deputy, Muhammad Arman, to make contact with the appropriate operatives, to provide the suicide bomber with explosives and to coordinate the operations of the cells in Ramallah and Jerusalem.[187] [188] Hamad was wanted by the Israeli security forces for more than five years.[189]

---

[181] "For the Sake of Allah" (Appendix No. 2).

[182] *Id.*

[183] Israel Television, Channel 2, March 18, 2009. *See:* http://www.mako.co.il/news-channel2/Channel-2-Newscast/Article-49328a9b0ca1021004.htm.

[184] "For the Sake of Allah" (Appendix No. 2).

[185] *Id.*

[186] *See* Appendix No. 1, pp. 294-298.

[187] Maariv (May 24, 2006); Yedioth Ahronoth (May 24, 2006); Ha'aretz (May 24, 2006). *See also:* http://www.ynet.co.il/articles/0,7340,L-3254047,00 html. All of the articles mention Hamad as the head of the military section of Hamas in the West Bank. The articles were based on an official declaration by the Israel Defense Forces Spokesman and on the declaration by the ISA.

[188] Military Court, File No. 3929/02.

[189] *See* ISA announcement of May 23, 2006.

### 2. Muhammad Hassan Arman

Arman was recruited to Hamas by Ibrahim Hamad at the end of 2001 and was known by the *nom de guerre* of "Abu Mu'az."[190] He was responsible for recruiting operatives to the organization, and by virtue of his position as a contact person, he transferred $1500 every month to Waal Qassem, out of the funds which he received from Ibrahim Hamad.[191]

As the contact person with the Jerusalem cell, Arman asked Qassem to locate places for the performance of terrorist attacks.[192] In addition, Arman transferred explosives to the Jerusalem cell. He himself underwent training by Abdallah Barghouti in order to become an expert in the preparation of explosive belts and explosive charges.[193] As a Hamas operative in the city, he also took part in laying explosive charges, purchased weapons and even attempted to manufacture a Qassam rocket.[194]

Wisam Abbasi, one of the members of Waal Qassem's cell, worked in Rishon Le-Zion and was familiar with the Sheffield Club. He recommended carrying out the terrorist attack there.[195]

Under the guidance of Waal Qassem, Wisam Abbasi and Ala al-Din Abbasi, two members of the Jerusalem cell, evaluated the target location and reported that many people attended the club and that there was no security presence there. After the target location was agreed on, Ibrahim Hamad began to plan the quickest route for transporting the suicide bomber to the target.[196] He then instructed Abdallah Barghouti (the senior explosives expert of Hamas in Ramallah)[197] to prepare two explosive charges – one explosive belt and a bag with explosives which was intended to magnify the effect of the explosion and to cause a greater number of casualties.[198]

---

[190] *See* Appendix No. 1, pp. 372-402.

[191] *See* Appendix No. 1, pp. 372-402. *See also* indictment against Ibrahim Hamad, Prosecution File 3181/6, Military Court of Judea (Appendix No. 1, pp. 15-34).

[192] *See* Appendix No. 1, pp. 372-405.

[193] *Id.*

[194] *Id.*

[195] Indictment against Ibrahim Hamad, Prosecution File 3181/6, Military Court of Judea (Appendix No. 1, pp. 15-34).

[196] *See* the transcript of the Military Court of Judea, November 30, 2003, File 3925/02 (in Appendix No. 1, pp. 910-915); see also the transcript of the Military Court in Beth El, File 3380/03 (in Appendix No. 1, pp. 363-370); *see also* Appendix No. 1, pp. 372-402.

[197] *See* "For the Sake of Allah" (Appendix No. 2); *see also* the transcript of the Military Court in Beth El, File 3380/03 (Appendix No. 1, pp. 363-370); *see also* the indictment against Ibrahim Hamad, Prosecution File 3181/6, Military Court of Judea (Appendix No. 1, pp. 15-34).

[198] *See* Appendix No. 1, pp. 299-319; *see also* the indictment against Ibrahim Hamad, Prosecution File 3181/6, Military Court of Judea (Appendix No. 1, pp. 15-34); *see also* "For the Sake of Allah" (Appendix No. 2).

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

### 3. Muhammad Jamal Muammar – the suicide bomber

The Hamas headquarters in Nablus then chose Muhammad Muammar and sent him to Ramallah, where he met Ibrahim Hamad and Muhammad Arman,[199] commanders of the al-Qassam Brigades of Hamas in Ramallah. Arman fitted Muammar with the explosive belt and gave him a bag with an explosive charge. Waal Qassem, the commander of the Jerusalem cell, then transported the suicide bomber to the club in Rishon Le-Zion. At the request of Waal Qassem, an additional Hamas operative, Wisam Abbasi, identified the exact location of the club for the suicide bomber and explained that this was the place where the terrorist attack was to be carried out.[200]

### 4. Abdallah Barghouti – the preparer of the explosive charge

Abdallah Barghouti was arrested by the Israelis in Ramallah in March 2003. On November 30, 2004, he was sentenced to 67 life imprisonments for the murder of 66 Israeli civilians and the wounding of 500 more. He assembled the explosive charges which were used in many terrorist attacks, including the explosive charges used by the "Silwan Cell" of Hamas in its preparations for the terrorist attack on the Sheffield Club and for the terrorist attack at the Hebrew University. When I personally interviewed Barghouti, he explained in detail his role in the preparation of the explosive charges which were used by the "Silwan Cell" in the terrorist attack on the Sbarro Pizzeria in 2001, and claimed that he had been the one to choose the location of the terrorist attack on Café Moment in 2002.

### f. Conclusion

The many detailed declarations which were issued by Hamas with regard to the terrorist attack on the Sheffield Club, the boasting about the suicide bomber within the organization, and the profusion of praise which was heaped upon the cell which planned and implemented the terrorist attack – all these, in and of themselves, would suffice to lead to the conclusion that Hamas carried out the terrorist attack. At the same time, the ISA conclusions on the basis of its investigations, the criminal convictions of the cell members, and their repeated public declarations expressing pride in the performance of the terrorist attack on the Sheffield Club and other terrorist attacks leave no doubt that this attack was carried out by Hamas.

---

[199] Indictment against Ibrahim Hamad, Prosecution File 3181/6, Military Court of Judea (Appendix No. 1, pp. 15-34).
[200] *See* Appendix No. 1, pp. 418-445.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

**July 31, 2002 – the terrorist attack on the cafeteria of the Hebrew University of Jerusalem**

### a. The terrorist attack

On July 31, 2002, at 1:37 p.m., an explosive charge which had been placed in the center of the Frank Sinatra Cafeteria at the Hebrew University was remotely detonated, causing the ceiling to collapse on the students and lecturers in the cafeteria. The terrorist attack caused the death of nine people and the severe wounding of at least 70. Among the dead were four American students, who had come to study in Israel.

### b. Evidence and legal attribution

#### 1) The assumption of responsibility

Almost immediately after the terrorist attack, an announcement was sent to the media – and to me as well, in my capacity as a journalist for <u>Yedioth Ahronoth</u> – which stated as follows: "The operation at the Hebrew University of Jerusalem is part of a settlement of accounts. The Izz al-Din al-Qassam Brigades announce their responsibility for the detonation of the explosive charge at the Hebrew University of Jerusalem."[201]

In the announcement, Hamas expressed its pride in the terrorist attack and emphasized that this was only one in a series of terrorist attacks which the organization was planning. The emblem of the Izz al-Din al-Qassam Brigades appeared at the top of the page. To the right of the emblem were the words: "The Izz al-Din al-Qassam Brigades," in Arabic; the same words, in English, appeared to the left.[202]

In speaking of the terrorist attack on the Hebrew University, the Hamas spokesman, Mahmud al-Zahar, stated as follows: "I propose to the Government of Israel that it think long and hard about whether it intends to continue to strike, because if it continues to do so, it will continue to encounter resistance of this type until the end of the occupation."[203] In the course of a Hamas event celebrating the terrorist attack on the cafeteria at the Hebrew University, Dr. Abd al-Aziz al-Rantisi, the No. 2 man in Hamas in those days, stated that: "The response by Hamas to the Israeli crimes will continue. The operation is one of 60 operations that are being planned by Hamas."[204] In another statement, al-Rantisi said that: "The Zionists are paying the price for their

---

[201] Original placard of the Izz al-Din al-Qassam Brigades (*see* Appendix No. 1, p. 446).
[202] Appendix No. 1, pp. 447-448.
[203] http://www.haayal.co.il/story_1100.
[204]
http://209.85.229.132/search?q=cache:vOlsT1VyLv0J:www.aawsat.com/details.asp%3Fsection%3D4%26issueno%3D8648%26article%3D116144%26feature%3D+%D8%B9%D9%85%D9%84%D9%8A%D8%A9+%D8%A7%D9%84%D8%AC%D8%A7%D9%85%D8%B9%D8%A9&cd=2&hl=iw&ct=clnk&gl=il.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

terrorist operations, and the operation at the University is within the framework of the response to the killing of Salah Shehadeh."[205]

In order to publicize its involvement in the terrorist attack throughout the Arab world, Hamas declared its responsibility for the attack via the *al-Jazeera* network as well, stating that the attack had been carried out in response to the elimination of Salah Shehadeh a few days previously.[206] "We will continue the struggle," stated the Hamas announcement.

On August 1, 2002, the official web site of the Izz al-Din al-Qassam Brigades posted an article, in which he declared that: "The quality operation was planned by the Izz al-Din al-Qassam Brigades."[207]

### 2) Photographs

In order to express its pride in the results of the operation, the official web site of the Izz al-Din al-Qassam Brigades published a number of photographs from the scene of the terrorist attack after it took place.[208] The publication of photographs by Hamas, even if they were taken from the Israeli press or from photography agencies, was intended for internal purposes – to show the Palestinian public the results of the terrorist attack, which were intended for the Israeli public, in order to terrorize it. According to my experience gained from cases of terrorist attacks, Hamas uses the photographs in order to glorify and to emphasize the results of its operations.

### 3) The official Hamas report

In many cases, as soon as its terrorist cells are exposed and the members of the cell are arrested by the Israeli authorities, Hamas publishes a report in which it describes the relevant activities of the cell and the structure of the cell. After the terrorist attack on the Hebrew University, when the members of the Silwan Cell had been arrested, the commander of the military arm in Nablus, Muhammad Arman (Ibrahim Hamad's deputy), wrote a detailed report on the activities of the cell. The report was in line with the descriptions which arose from the interrogations of the cell members after their arrest. Because the Hamas report was published after the arrests and interrogations of the cell members, the report corroborates and confirms the fact that Hamas was responsible for this attack.[209]

The report stated, *inter alia*:

---

[205] http://vb.mwaheb net/4535.
[206] http://www.haayal.co.il/story_1100; http://www.ynet.co.il/articles/1,7340,L-2032435,00 html.
[207] http://www.alqassam.ps/arabic/news1.php?id=11412.
[208] http://www.alqassam.ps/arabic/operations2.php?id=23#; http://www.alqassam.ps/arabic/operations_images.php?id=23.
[209] *See* Appendix No. 1, pp. 299-319.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

"[Title:] The quality operation at the Hebrew University

Type of activity: remotely detonated explosive charge.

Destination mechanism: by means of a cellular telephone.

Date of the operation: Wednesday, July 31, 2002, at 1:30 p.m.

Place of the operation: The cafeteria of the Faculty of Law at the Hebrew University in occupied Jerusalem.

Losses to the enemy: At least nine people killed and 100 wounded.

Organization executing the attack: The Izz al-Din al-Qassam Brigades."[210]

### c. Official documents of the Government of Israel

1.   The Office of the Prime Minister of Israel published its evaluation as to the source of the terrorist attack on the Hebrew University: "The Hamas headquarters in Ramallah recruited and handled an East Jerusalem cell for the purpose of carrying out murderous terrorist attacks and horrendous suicide bombings within Israeli territory. The headquarters in Ramallah, before and after Operation Defensive Shield, was involved in locating and recruiting suicide bombers, transporting them over the 'seam line' to Israeli territory with the help of members of the East Jerusalem cell, preparing the explosive charges and transferring them to the Jerusalem cell for use. In addition, the Hamas headquarters determined the targets for the terrorist attacks." This announcement stated the names of the cell members: Waal Qassem, 31, a resident of East Jerusalem, the cell leader, was involved in all of the terrorist attacks; Wisam Abbasi, 25, a resident of Silwan, who collected information on the targets for the terrorist attacks and served as an assistant to the cell commander; Ala al-Din Abbasi, 30, a resident of Silwan, who collected information on the targets for the terrorist attacks; and Muhammad Odeh, 29, a resident of Silwan, who placed the charge at the university.[211]

2.   During the month of March 2009, at the time of the negotiations for the release of Gilad Shalit, the Government of Israel published a list of inmates which it refused to release as part of the deal. Among the names of those inmates were Abdallah Jamal Barghouti, Muhammad Hassan Ahmad Arman and Ibrahim Hamad; the list stated that they had been responsible, *inter alia*, for performing the terrorist attack on the university.[212]

---

[210] http://www.alqassam.ps/arabic/operations2.php?id=23.

[211] http://www.pmo.gov.il/PMO/Archive/Spokesman/2002/%D7%90%D7%95%D7%92%D7%95%D7%A1%D7% 98/Spokesman7147.htm.

[212] http://www.pmo.gov.il/NR/rdonlyres/1EED1581-0DD5-41A7-87DE-9B37BE6EFFD9/0/prisoners.doc. *See also* http://www.haaretz.com/hasite/spages/1071742.html.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

### d. Findings of the United States Government

According to the Department of the Treasury of the United States: "The Hamas terrorist attack on the cafeteria on the Hebrew University campus, which led to the death of nine people, including five American citizens, reflected the willingness of Hamas to perform operations in areas which are visited by people from Western countries, including United States citizens."[213]

### e. Additional corroborative material

1.  The official Hamas web site published a booklet called "The Engineers of Death," which includes a report on the operations of the Jerusalem cell, including the report on the terrorist attack on the Hebrew University.[214]

2.  During the course of the interview which I conducted personally with Waal Qassem, he bragged to me about his membership in Hamas and of the fact that he detonated the explosive charge which had been used in the terrorist attack. He told me that he was disturbed about the fact that the terrorist attack would not be as successful as a suicide bombing.[215]

3.  Subsequently, Qassem was the object of an extensive article on the Izz al-Din al-Qassam Brigades web site. In the article, he talked about his membership in Hamas and his activity in the al-Qassam Brigades. He was presented in the interview as the "commander of the Silwan Cell in Jerusalem." The article was written in the form of an interview composed of questions and answers. The article was entitled: *"Inmate Waal Mahmoud Qassem, commander of the Silwan Cell, tells of his experience in the al-Qassam Brigades."* During the interview, Waal Qassem admitted that he and his cell carried out the terrorist attack on the university cafeteria, and emphasized that: "Hebrew University is one of the centers of Zionist philosophy, politics and ideology; it is built on one of the most beautiful hills of Jerusalem… and accordingly, the operation was carried out by the Izz al-Din al-Qassam Brigades… The one who placed the charge was Muhammad Odeh. Praise Allah, we succeeded in operating according to plan." Waal Qassem stated in the interview that the terrorist attack on the cafeteria had been carried out according to guidance received from headquarters.[216]

### f. Summary of the terrorist attack on the Hebrew University

In early July 2002, the Hamas commander on the West Bank, Ibrahim Hamad, notified his deputy, Muhammad Arman, of his intention to take revenge against Israel for the killing of Salah

---

[213] http://www.ustreas.gov/offices/enforcement/key-issues/protecting/charities_execorder_13224-e.shtml#h.
[214] *See* Appendix No. 1, pp. 299-319.
[215] Testimony by Waal Qassem in the documentary film "For the Sake of Allah" (Appendix No. 2).
[216] *See* Appendix No. 1, pp. 294-298.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

Shehadeh, who had been one of the senior military leaders of Hamas and who had been responsible for a number of suicide bombing attacks against Israeli civilians.[217]

Arman contacted Waal Qassem, the commander of the Jerusalem cell of Hamas, which was directly subordinate to the Hamas headquarters in Ramallah, and asked him to select the appropriate location for a terrorist attack with a large number of casualties.[218] Qassem consulted with members of his cell and one of them, Muhammad Ishaq Odeh, suggested that the terrorist attack should be carried out at the Hebrew University of Jerusalem. Odeh had worked in the past as a painter at the University, and had kept the campus entry pass which was issued to him.

The suggestion of executing the terrorist attack at the university was passed on from the commander of the Jerusalem cell, via Arman, to Hamad. After Hamad approved the target location, he organized everything which was necessary for Muhammad Arman to obtain the required explosives from Abdallah Barghouti: a detonator, acetone, chloroform and hydrogen peroxide for use in the preparation of an explosive compound, which would be stored in three shampoo bottles.[219] The detonator was composed of two cellular telephones – one of which was attached to the charge and the second was used as a detonation mechanism.

On July 28, 2002, the charge was transferred from Arman to Qassem. Qassem, together with Odeh – another member of the cell – transported the charge to Jerusalem.

According to the original plan, Odeh was supposed to sneak the explosive charge into the university and to place it in the cafeteria – an especially crowded place. Qassem, the cell leader, was then supposed to detonate the charge.

After the first failed attempt, the plan was changed and Arman was appointed to place the explosive charge in the cafeteria. Muhammad Odeh succeeded in penetrating the security and placed the charge on a chair in the Frank Sinatra Cafeteria. After he did so, he left the university and met with Waal Qassem. At about 1:30 p.m., Waal Qassem detonated the explosive charge from a remote location, by means of a cellular telephone.[220]

The cell members planned to carry out additional terrorist attacks in the Tzavta Club in Tel Aviv, in a restaurant in the Ein Kerem neighborhood of Jerusalem, an additional terrorist attack on the Sbarro restaurant in Jerusalem, and a terrorist attack in Ein Gedi. According to the indictment, Waal Qassem was asked by his Palestinian handlers in Hamas to collect information on the Tzavta Club in Tel Aviv and to check whether it would be possible to carry out a terrorist attack

---

[217] Indictment against Ibrahim Hamad, Prosecution File 3181/6, Military Court of Judea (Appendix No. 1, pp. 15-34).

[218] *See* Appendix No. 1, pp. 320-362.

[219] Indictment against Ibrahim Hamad, Prosecution File 3181/6, Military Court of Judea Judea (Appendix No. 1, pp. 15-34). *See also* Appendix No. 1, pp. 320-362.

[220] *See* Appendix No. 1, pp. 320-362.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

there. For that purpose, the handler on behalf of the headquarters in Ramallah, Muhammad Arman, gave Waal Qassem a piece of cardboard, with the words "Tzavta Club" written in Arabic on one side and, on the other, the number of the cellular telephone which was attached to the explosive charge which was intended to be used in the future terrorist attack.[221]

### g. Summary

The many detailed declarations which were issued by Hamas with regard to the terrorist attack on the Hebrew University, the glorification of the suicide bomber within the organization, and the profusion of praise which was given to the cell that planned and executed the terrorist attack – all of these, in and of themselves, would suffice in order to lead to the conclusion that Hamas carried out the terrorist attack. At the same time, the ISA conclusions on the basis of its investigations, the criminal convictions of the cell members, and their repeated public declarations expressing pride in the performance of the terrorist attack on the Hebrew University and other terrorist attacks leave no doubt that this attack was carried out by Hamas.

---

[221] http://www.fresh.co.il/dcforum/Scoops/26680.html.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

### January 29, 2003 – the roadside shooting attack on Road 60

**a. The terrorist attack**

Road 60, which begins on Mount Hebron and ends in Nablus, is a road on which many roadside shooting attacks have been carried out over the years.

On January 29, 2003, Jacob Steinmetz and his wife Deborah were driving from Jerusalem to their home in Maale Levona. On the way, they passed through Ofra, where they picked up Esther Kinarti and her eight year old son, Dvir Nisan Kinarti. About 2 km south of Ofra, two terrorists, who were lying in an ambush, fired weapons at the car. Jacob Steinmetz and Nisan Kinarti were hit by the shots.



הרכב עליו ירו המחבלים מהמארב, סמוך לעופרה          (צילום: דובר צה"ל)

[Photo caption: "The vehicle which was shot at by the terrorists from the ambush, near Ofra. (Photography: Israel Defense Forces Spokesperson)"]

The photo was taken by the IDF Spokesperson and published in <u>Yedioth Ahronoth</u> on January 30, 2003.

The two perpetrators of the shooting attack, Farah Hamad and Yasser Hamad, escaped after the attack in a getaway car.[222] They were members of the Silwad Cell of Hamas and operated in accordance with instructions which were issued on behalf of the Hamas headquarters in Ramallah. The Silwad Cell operated for a long period of time, planned a series of terrorist attacks

---

[222] *See* Appendix No. 1, pp. 449-486.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

including a suicide bombing, and carried out a series of terrorist attacks according to instructions from Hamas headquarters.[223]

### b. Evidence and legal attribution

#### 1) The assumption of responsibility

a)   An extensive article about the operations carried out in the Ramallah area by the shooting cells which were captured by Israel, including the Silwad Cell, was published on the official Hamas web site. The report was apparently written early in 2004, after the arrest of the cells. The report includes a chapter on the Silwad Cell, including the names of the cell members and the operations which they performed.[224]

b)   A Hamas report which was published on February 15, 2006 listed the operations carried out by the organization, including the roadside shooting attack on Road 60 on January 29, 2003, which was described as "one of the heroic operations by Hamas." The report gave information on "the principal terrorist attacks carried out by the Silwad Cell... January 29, 2003 – an armed attack, involving the use of machine guns, near Ofra, targeted a car belonging to 'settlers.' During the attack, two 'settlers' were wounded."[225]

#### 2) Hamas reports

a)   A special report by Hamas on the "military" operations in the Ramallah area (including the terrorist attack on Road 60) described three separate cells which operated parallel to each other at the time of the attack. The report gave complete details on the cell members and the operations which they carried out.[226] One cell, which operated in Kfar Kubar, numbered six terrorists and carried out three roadside shooting attacks. A second cell, which operated in Mazra'a al-Sharqiyya, numbered six terrorists and carried out five terrorist operations. A third cell, which operated in Silwad, numbered five terrorists and carried out six terrorist attacks. In each cell, there was a division of roles: one team which collected intelligence and made observations, another team which fired the weapons and yet another team which was in charge of the getaways.[227] The report includes details which were supported by the Israeli intelligence services and accordingly strengthens its reliability.

---

[223] *See* Appendix No. 1, pp. 487-503.
[224] *See* Appendix No. 1, pp. 504-507.
[225] http://www.palestine-info.info/arabic/Hamas/glory/ramalah.htm
[226] *See* Appendix No. 1, pp. 504-507.
[227] http://www.palestine-info.info/arabic/Hamas/glory/ramalah.htm

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

b)     After the capture of the Silwad Cell in December 2003,[228] an official Hamas placard reported on the activity of the cell, stating that the cell had performed an ambush on the "settlers" on January 29, 2003. "The terrorist attack was carried out through the use of machine gun fire. The target was a car which belonged to a resident of Ofra."[229]

c)     According to the Hamas report, three members of the Silwad Cell (Khaled Omar, Muayad Hamad and Hamad Khaled) were veteran Hamas operatives. Jasser Barghouti was the cell commander and reported directly to Sayed Sheikh Qassem, a senior Hamas operative in the Ramallah district and the third most important senior operative in the al-Qassam Brigades in the West Bank. Sayed Qassem himself was under the direct command of Ibrahim Hamad, the head of the al-Qassam Brigades in the West Bank, who received his orders from the Hamas military headquarters in Damascus.[230]

d)     A report which was published by Hamas on February 14, 2006 stated:

"After checking out the Sinjal junction on Road 60, along which the 'settlers' were traveling, the *mujahidin* [Jihad fighters] Muayad Hamad, Yasser Hamad, Farah Hamad and Khaled al-Najjar went into action and waited for the target to arrive – a car with four passengers. When the appropriate target came over the horizon, the cell commander instructed the other Jihad fighters to prepare to begin firing. When the car reached the appropriate coordinates, the Jihad fighters began firing without mercy at the car from very close range, not more than a few meters. The attack ended with one of the 'settlers,' Dvir Nisan Kinarti, severely wounded and permanently paralyzed, due to injuries to his spinal cord. Another 'settler,' Jacob Steinmetz, was severely wounded; his arm was shattered from the elbow down."[231]

e)     The official Hamas magazine, <u>Filasteen al-muslima</u>, devoted an extensive article to the Silwad Cell. In that article, the magazine exposed that the terrorist attack which took place on January 29 was carried out by the Silwad Cell. The article gave the names of all of the cell members.[232]

---

[228] http://www.mfa.gov.il/MFA/Government/Communiques/2003/ISA%20and%20IDF%20Arrest%20Ramallah%20Area%20Hamas%20Cells%20-%2023.

[229] *See* Appendix No. 1, pp. 504-507.

[230] *Id.*

[231] http://www.paldf.net/forum/showthread.php?t=50548;
*See also* http://www.paldf.net/forum/showthread.php?t=72376;
*See also* http://www.paldf.net/forum/showthread.php?t=72376;
*See also* http://muntada.islamtoday.net/36205-post4737.html;
*See also* Appendix No. 1, pp. 508-512.

[232] http://www.fm-m.com/2004/feb2004/story7.htm.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

f)   The Hamas web site glorified the shooting operations which were performed by the cell, and characterized the cell as "outstanding, with a high level of capability, a high level of planning, sophistication and total secrecy." The article on the Hamas web site boasted that the cell members had carried out scores of shooting attacks, with none of their members wounded. The article lists the names of the following cell members:[233]

    a)   Ahmad Mustafa Najjar, 27, an American citizen, recruited to Hamas while in prison in Israel.

    b)   Khaled Mu'az Omar, 27, formerly imprisoned, active in the Hamas movement.

    c)   Muayad Shukri Hamad, 27, formerly imprisoned, active in the Hamas movement.

    d)   Ahmad Khaled Hamad, 28, a resident of Silwad.

    e)   Farah Ahmad Hamad, 27, a resident of Silwad.

**c. Official documents of the Government of Israel**

### 1) Judiciary processes and legal documents in Israel

a.   Section 19 of the indictment against Jasser Barghouti states that the cells under his command fired weapons at vehicles on the roads of the West Bank.[234] The indictment exposes the *modus operandi* used by the cell: the operatives used two cars in order to prepare the ambush. The first car drives to the planned location of the ambush and determines whether there are any Israel Defense Forces troops in the area. If there are no troops in the vicinity, they inform the second car, which carries the sharpshooters and the weapons which will be used during the terrorist attack. At that point, the second car drives to the planned location of the ambush. The indictment also accuses Barghouti of paying the cell members NIS 200, in order for them to rent a car which is used for the terrorist attack. Jasser Barghouti was in direct contact with Sayed Sheikh Qassem, who was directly subordinate to Ibrahim Hamad, the Hamas commander for the Ramallah area and the West Bank. Through him, he received money, instructions and weapons. It emerges from the indictment that, when the contact between Jasser Barghouti and the Ramallah headquarters was broken off, he succeeded in establishing contact with Hezbollah and received money from him in order to finance the terrorist activity.[235] The relationship between Hamas and Hezbollah has been known since 1993. This relationship has arisen in many interrogation reports, in the Palestinian media and in my personal conversations with Hamas members. This method of operation proves that the

---

[233] http://www.palestine-info.info/arabic/Hamas/glory/ramalah.htm;
*See also* http://www.paldf.net/forum/showthread.php?t=479396.
[234] *See* Appendix No. 1, pp. 449-486.
[235] *See* Appendix No. 1, pp. 449-486.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

relationship is not limited to mere criminal actions, but also includes terrorist activity by the Hamas organization.

b.   Section 7 of the sentence and the verdict handed down against Muayad Hamad convicted him of shooting at Jacob Steinmetz and wounding Limor Har-Melekh and Dvir Kinarti. As a result, he was sentenced to life imprisonment. Before the verdict was read, Hamad asked for permission "to kiss the rifle."[236]

c.   Section 10 of the indictment against Khaled Omar (also known as Khaled Abd el-Mu'az Zein al-Din), one of the commanders of the cell which planned the terrorist attack which was carried out on January 29, 2003, states that he received $200 and NIS 600 to cover the cost of the terrorist attack. The indictment, which was based on his written confession (which he gave after revealing all of the weapons which were used in the shooting), sets forth the way in which the terrorist attack was performed.

The confession which was signed by Khaled Omar is extremely detailed.[237] Within the framework of the confession, he:

- Specified 16 terrorist operations by the cell. He also sketched and drew maps and illustrations in order to explain the way in which the operations were carried out.

- Confessed that the cell was acting on behalf of Hamas; that he was recruited into Hamas in 1998; that he was acting on behalf of Hamas; that he received weapons and money from Hamas; and that he received instructions and approval to carry out the operation from Hamas.

- Confessed that he took part in terrorist operations in which six Israelis were killed and others were wounded, including the operation which was performed on January 29, 2003.

- Revealed to the interrogators [the location of] a Kalashnikov rifle, an M-16 rifle and a pistol.[238]

- Sketched the scene of the terrorist attacks carried out by the cell and provided complete details of the weapons and the manner in which the operations were carried out. This method of operation is characteristic of Hamas: splitting up into sub-cells, use of mobile telephones, concealing the weapons after the operation, and reporting to the commander of the operation.[239]

---

[236] *See* the verdict against Muayad Hamad in Appendix No. 1, pp. 561-573.

[237] *See* Appendix No. 1, pp. 513-536; *and see* Appendix No. 1, pp. 537-560.

[238] *See* Appendix No. 1, pp. 537-560.

[239] *Id.*

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

d.     A statement made by the defense attorney, Adv. Ilia of Ramallah, with regard to the cell members should be noted. Adv. Ilia stated, before the sentence was handed down: "I am doing my legal work; I always leave the motives for the act for the defendants to state when they are required to do so." As far as I am concerned, this is an admission of the terrorist activity performed by the Hamas cell.[240]

### d. Additional corroborative material

In spite of the fact that suicide bombings by Hamas have received considerable exposure in Western media, Hamas has been carrying out roadside shooting attacks from ambushes for decades. In this type of terrorist attack, the terrorists generally have an opportunity to escape, although, under certain circumstances – because they strive to kill as many civilians as possible – they are killed while committing the crime.

Roadside shooting attacks have become one of the methods of operation of the Hamas military arm, since its inception in early 1988. The first terrorist attacks perpetrated by Hamas, which took place even prior to the formation of the al-Qassam Brigades[241] in 1992, were roadside shooting attacks which were carried out within the Gaza Strip. Upon the establishment of the al-Qassam Brigades,[242] roadside shooting attacks from ambushes became the principal tactic used by Hamas. Between 1988 and 1992, the principal tactic against Jews visiting Palestinian towns was roadside shooting attacks.

Khaled Omar's confession of involvement in a large number of Hamas terrorist attacks should be viewed as a reliable confession, not only because he provided a large number of corroborative details, but also because the police ballistic reports[243] confirm that the weapons which were taken from the cell members matched the bullet jackets which were found at the scene of the crime on January 29, 2003.

The following cases clarified the Hamas trend of ordering terrorist attacks such as that which took place on January 29, 2003:

---

[240] *See* Appendix No. 1, pp. 561-573.

[241] *See* Ronni Shaked and Aviva Shabi, <u>Hamas: M'Emunah B'Allah L'Derech Ha-Terror (Hamas: From Belief in Allah to the Road of Terror)</u>, pp. 128-141. The military establishment that was affiliated with *al-Mujama al-Islami*, the organization from which Hamas grew, was set up in 1986, prior to the official declaration of the establishment of Hamas. The military establishment was founded pursuant to orders by Sheikh Ahmed Yassin. During that period of time, the establishment was known as the "military arm" and headed by Salah Shehadeh. Cells were given appellations or numbers, such as Cell 101, which perpetrated the kidnapping and murder of Avi Sasportas on February 16, 1989 and the kidnapping and murder of the soldier Ilan Saadun on May 3 [of that year].

[242] For the establishment of the military arm in 1991 under the name of the Izz al-Din al-Qassam Brigades, *see* Shaked and Shabi, <u>Hamas: M'Emunah B'Allah L'Derech Ha-Terror</u>, pp. 295-301.

[243] I was told that counsel for the Plaintiffs filed the reports in question as: W_S088289-088330 and W_S088335-088337.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

a.      The murder of members of the Lapid family (December 6, 1993): a Hamas terrorist cell in a vehicle passed through the Harsina junction near Hebron toward evening and fired bursts of shots at the vehicle of the Lapid family. The driver, Mordechai Lapid, and his son Shalom were killed. Three other family members were wounded.[244]

b.      The murder of Ofra Feliks in a shooting attack from an ambush on Road 60 on January 7, 1995.[245]

c.      The murder of Dr. Oz Tibon and Yaniv Schimmel in a shooting attack from an ambush on Road 60 on January 17, 1996.[246]

d.      The murder of Yaron and Efrat Ungar on June 9, 1996,[247] while driving on the road near Bet Shemesh, Israel, on their way home from a wedding.

e.      The murder of Rachel and Uri Monk in an ambush on July 28, 1996.[248]

---

[244] http://laad.btl.gov.il/show_item.asp?itemId=38239&levelId=28553&itemType=10&template=3.
[245] Yedioth Ahronoth, January 8, 1995.
[246] Yedioth Ahronoth, January 18, 1996.
[247] Yedioth Ahronoth, July 28, 1996.
[248] http://www.ezy.co.il/memoSite.asp?memorial_id=450.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*



**e. Conclusion**

The many detailed declarations which were issued by Hamas with regard to the terrorist attack on Road 60, the glorification of the suicide bomber within the organization, and the profusion of praise which was given to the cell which planned and executed the terrorist attack – all of these, in and of themselves, would suffice to lead to the conclusion that Hamas carried out the terrorist attack. At the same time, the ISA conclusions on the basis of its investigations, the criminal convictions of the cell members, and their repeated public declarations expressing pride in the performance of the terrorist attack on Road 60 and other terrorist attacks leave no doubt that this attack was carried out by Hamas. This was not a terrorist cell which perpetrated a one-time attack; rather, the cell was part of the Hamas terrorism infrastructure in Ramallah. Its members carried out a series of operations in coordination with Hamas headquarters and with its approval. On the basis of my experience and on the basis of the detailed testimony with regard to this terrorist attack, I can determine that it was a Hamas operation.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

### March 5, 2003 – the terrorist attack on the No. 37 bus, Haifa

#### a. The terrorist attack

On March 5, 2003 at 1:30 p.m., a No. 37 bus left the Haifa Central Bus Station on its way to Haifa University. Forty minutes later, after the bus had picked up dozens of students, it stopped at the bus stop on Moriah Boulevard, 30 meters from the corner of Tzafririm Street. A terrorist, who had previously boarded the bus at some unknown time, detonated the explosives in his explosive belt, thereby killing 17 young people and wounding 53 more.[249]

#### b. Evidence for legal attribution

##### 1) The assumption of responsibility

Despite the fact that Hamas did not take responsibility immediately after the terrorist attack, a note which was found in one of the suicide bomber's pockets stated: "The Izz al-Din al-Qassam Brigades are the ones which carried out the terrorist attack."[250] In addition, the suicide bomber, Mahmoud Qawasmeh, left a "Will" in his house. A Hamas operative later telephoned the Qawasmeh family and declared that Mahmoud Amran (Qawasmeh) had carried out the terrorist attack. The operative also told the family that the "Will" was to be found inside a book, in a specific location in the family home. The "Will" was found there; in it, Qawasmeh asked his parents to forgive him.[251]

A copy of a note which was found in the suicide bomber's clothing was handed over by the Israel Police for publication. The letter was given to the media by the Israel Police. It was published in the <u>Yedioth Ahronoth</u> newspaper on March 6, 2003.



---

[249]

www.mfa.gov.il/MFA/MFAArchive/2000_2009/2004/1/Suicide%20bombing%20of%20Egged%20bus%20No%20 37%20in%20Haifa%20-%205-Ma.
[250] <u>Yedioth Ahronoth</u>, March 6, 2003.
[251] http://www.alqassam.ps/arabic/sohdaa5.php?id=274.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

Following the operation Hamas published an official announcement in which it took responsibility and congratulated suicide bomber Mahmoud Qawasmeh for the operation. "The Izz al-Din al-Qassam Brigades rejoice at the wedding of the *Shahid* with the dark-eyed women in Paradise" [the virgins in Paradise].[252]

### 2) Photograph

In the photograph from the Book of Martyrs, which is an official publication issued by the Izz al-Din al-Qassam Brigades about Hamas operatives who have been killed, the name of Mahmoud Amran Qawasmeh appears next to the date of the suicide bombing operation which he carried out.[253]



Poster prepared by Hamas in honor of the suicide bomber.[254]



### 3) The Hamas web site

The official Hamas web site devoted an extensive article to Qawasmeh, which described his life history, his family and his terrorist activity. The article mentioned the suicide bomber's devout

---

[252] http://www.alqassam.ps/arabic/byan_poup.php?id=245.
[253] http://www.alqassam.ps/arabic/sohdaa5.php?id=274; http://www.alqassam.ps/arabic/operations2.php?id=81.
[254] http://www.alqassam.ps/arabic/operations2.php?id=81.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

religious faith and the fact that a note found inside of his identity card stated that the operation had been carried out by Hamas.[255] Kohlmann's expert report correctly states that the al-Qassam Brigades published at least two placards (the second of which appeared on March 7, 2003), in which they assumed responsibility for the terrorist attack. The placards may still be seen on the www.alqassam.ps web site.[256] *This detail was not published by the media, due to the profusion of terrorist events at the time. It would appear that Hamas published the notice twice, in order to emphasize it and to bring attention to it.*

### c. Official documents of the Government of Israel

a.  Israel Government report: "Wednesday, 1 Adar II 5763 – 17 Israelis were killed and 38 more wounded, half of them seriously, when a suicide bomber blew himself up in a No. 37 bus in the Carmel area of Haifa. The suicide bomber is apparently a member of Hamas, 20 years old, from Hebron. He detonated the explosive charge at about 2:15 p.m. on a No. 37 bus operated by the Egged Bus Company, which had set out from the Haifa Central Bus Station on its way to the university and was full of students."[257]

b.  ISA report: Under the headline "Suicide bombers in the present conflict," the report states that: "Mahmoud Qawasmeh, a 20 year old resident of Hebron and a student of Computer Science, blew himself up inside a No. 37 bus in Haifa. The terrorist attack was supported by the Hamas military headquarters in Hebron; it was administered by Ali Rajbi, who was in charge of the logistical infrastructure, assisted by wanted person Ali Alan, who was in charge of preparing the explosive belt. The person who transported the suicide bomber to Haifa was Hafiz Rajbi, a resident of Hebron with an identity card issued in East Jerusalem which allowed him to have access to Israel."[258]

### d. Judiciary processes and legal documents in Israel

The Israeli authorities arrested a number of Hamas members from the "Hebron Cell" for their involvement in the terrorist attack on the No. 37 bus. These included Majdi Amro, Fadi al-Ja'aba, Munir Rajbi, and Mu'az Waal Taleb Abu Sharakh.

a.  Majdi Amro was charged with membership in the al-Qassam Brigades; the murder of David Cohen near Kiryat Arba in July 2001; training with weapons; and dispatching the suicide bomber Mahmoud Qawasmeh to carry out the terrorist attack on the bus in Haifa. Amro told the Israeli court that he had rented a place in Hebron and used it as an "operations room." In that room, he, Qawasmeh [sic] and Fadi Al-Ja'aba had prepared the

---

[255] http://www.alqassam.ps/arabic/sohdaa5.php?id=274.
[256] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=bayan&id=27; *see also* http://alqassam.ps/arabic/statements.php?id=245.
[257] http://www.pmo.gov.il/PMO/Communication/IsraelUnderAttack/Haifa4/Haifa htm.
[258] *See* Appendix No. 1, pp. 574-658.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

suicide bomber. That morning, Amro had driven Qawasmeh to Abu Dis (near Jerusalem), which was the suicide bomber's first stop on his way to the target in Haifa.

b.   Fadi al-Ja'aba, a member of the cell from Hebron, was arrested by Israel Defense Forces troops on March 7, 2003. On February 13, 2005, during his interrogation, al-Ja'aba confessed to being a member of Hamas; he further confessed that he had helped to transfer the suicide bomber to Haifa. He admitted his deeds before the judges as well.[259] Al-Ja'aba was convicted of membership in the al-Qassam Brigades and of having participated in planning a terrorist attack on the No. 37 bus. He was sentenced to 18 life sentences.

c.   Munir Rajbi, an Israeli citizen residing in Haifa, who held an Israeli identity card, was charged with membership in Hamas, conspiracy to assist the enemy in wartime, conspiracy to murder, and failure to prevent a crime. Rajbi and his brother Ismail, who also lives in Haifa, agreed to carry out a suicide bombing together in Haifa.[260] His brother Faiz, a resident of Hebron (who was later killed in a confrontation with Israeli forces), who is a member of a Hamas cell in the city, was the one who made the contact between the two and Hamas headquarters; he was also the one who transported the suicide bomber to Haifa. Faiz worked as a truck driver transporting merchandise; he brought the terrorist to Haifa in his own car.[261] Faiz asked Munir to find a place where the suicide bombing could be carried out. Rajbi pleaded guilty to the offenses with which he was charged in the indictment, including membership in Hamas and participating in the infrastructure which prepared the suicide bombing. Rajbi was sentenced on the basis of his confession. "We have convicted the Defendant according to his confession," wrote the judges. He was sentenced to life imprisonment.[262] The Supreme Court did not allow his appeal.[263] Rajbi eventually arrived at a plea bargain, in which the Plaintiffs dropped the most severe charge of conspiracy to murder; he was, however, convicted of a lesser charge, assisting the enemy.

d.   Mu'az Waal Taleb Abu Sharakh was arrested on March 11, 2003. Almost 2 years later, on February 13, 2005, he was sentenced to 19 life sentences, after having been convicted of membership in the al-Qassam Brigades and participation in planning the suicide attack on the No. 37 bus. According to the indictment against him, Sharakh organized the important meeting between Majdi Amro and Fadi al-Ja'aba. According to the court transcript, al-Ja'aba was the one who recruited Qawasmeh to carry out the suicide bombing. Abu Sharakh then did what was necessary in order for Faiz Rajbi to take the

---

[259] *See* Appendix No. 1, pp. 662-667.
[260] *See* Appendix No. 1, pp. 668-673.
[261] *See* Appendix No. 1, pp. 674-677; *see also* Appendix No. 1, pp. 678-688.
[262] *See* Appendix No. 1, pp. 668-673.
[263] *See* Appendix No. 1, pp. 689-694.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

suicide bomber from Abu Dis to the target location in Haifa. Abu Sharakh, a resident of Hebron, confessed in his interrogation to membership in the organization. Before the sentence was read out, he stated that he felt no remorse for [his deeds] and declared that: "The resistance operations will continue as long as Jerusalem and the remaining lands which belong to the Palestinians are not liberated." He was sentenced to 19 cumulative life sentences.[264]

---

[264] *See* Appendix No. 1, pp. 695-696.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

**The Hebron Cell: the terrorist attack on the No. 37 bus**



### e. Conclusion

The many detailed declarations which were issued by Hamas with regard to the terrorist attack on the No. 37 bus, the glorification of the suicide bomber within the organization, and the profusion of praise which was given to the cell which planned and implemented the terrorist attack – all of these, in and of themselves, would suffice to lead to the conclusion that Hamas carried out the terrorist attack. At the same time, the ISA conclusions on the basis of its investigations, the criminal convictions of the cell members, and their repeated public declarations expressing pride in the performance of the terrorist attack on the No. 37 bus and other terrorist attacks leave no doubt that this attack was carried out by Hamas.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

### March 7, 2003 – the roadside shooting attack in Kiryat Arba

#### a. The terrorist attack

On Friday, March 7, 2003, at 8:40 p.m., two Hamas terrorists broke into Kiryat Arba. The two, Fadi Ziad al-Fakhuri and Safian al-Haraz, were dressed in civilian clothing, armed with Kalashnikov rifles and hand grenades, and one of them wore an explosive belt. They cut through the fence southwest of Kiryat Arba, penetrated the surrounding security detachment and opened fire at people walking along the road. The first burst of shots hit Aliza Said, a mother of 12, who was seriously wounded. The local on-call security squad was dispatched to the site. The two terrorists began to flee and broke into the home of the Horowitz family, who were eating their Sabbath evening meal. The terrorists chased the couple from room to room and shot and killed Dina (Debbie) Horowitz and her husband Eli (Elnatan), who were holding each other's hands.[265]

After murdering the couple, the terrorists took up a position in their home and started shooting out at the residents of the "settlement." The shooting match between the on-call security squad and the terrorists continued for between five and 10 minutes, during which time the terrorists threw a hand grenade at the residents of the "settlement." In the end, both of the terrorists were killed in the exchange of fire.[266]

#### b. Evidence for legal attribution

##### 1) The assumption of responsibility

The al-Qassam Brigades assumed responsibility for this terrorist attack almost immediately after it happened.[267] The assumption of responsibility was subsequently confirmed in an official Hamas report, which listed the terrorist attacks carried out by the organization in the year 2003. The announcement is phrased as a "military announcement by the Izz al-Din al-Qassam Brigades" and mentions "the *Qassami* martyr Fadi Fakhuri" – meaning that he had been a member of the al-Qassam Brigades.[268]

##### 2) Photograph

A photograph of the two terrorists, who were photographed before setting out on the attack, attests to their organizational affiliation. Other evidence of their organizational affiliation includes the bandanas on their heads, the Kalashnikov, and a large emblem of the al-Qassam Brigades which is proudly posted in the background of the photograph.[269]

---

[265] http://www.shavuz.co.il/magazine/article.asp?artid=3149&secid=203.
[266] Yedioth Ahronoth, March 8, 2003; *see also* http://www.inn.co.il/News/News.aspx/46381.
[267] Yedioth Ahronoth, March 9, 2003, p. 6.
[268] http://www.palestine-info.info/arabic/Hamas/shuhda/amalyat_03.htm.
[269] http://www.alqassam.ps/arabic/sohdaa5.php?id=812.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*



Shown below is a photograph of Safian al-Haraz, in which he appears wearing a green Hamas bandana on his forehead:



270

Fadi Fakhuri:



271

---

270 Source of the photograph: http://www.alqassam.ps/arabic/sohdaa3.php?from=48.
271 The photograph of Fadi Fakhuri was taken from the Hamas web site: http://www.palestine-info.info/arabic/spfiles/suhada_2005/shuhda_khaleel/fadi.htm.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

### 3) The "Will"

Safian al-Haraz wrote a "Will" before the terrorist attack, signed it with his name and added: "Member of the *Shahid* Izz al-Din al-Qassam Brigades." His "Will" was published on the al-Qassam Brigades web site.[272]

Fakhuri also wrote a "Will," in which he asked to be buried next to his friend Safian al-Haraz, and asked for the grave to be close to the mosque where he used to pray.[273]

### 4) Hamas documents

a.   Hamas devoted an extensive article on its official web site to Fadi Ziad al-Fakhuri, under the title "The terrorist attack in Kiryat Arba." The article described his life history and his Hamas activity. According to the article, he was arrested by the Palestinian Authority after being charged with membership in Hamas; he was in prison for three months and was then released. The article noted his expertise in the preparation of explosive charges and the use of weapons.[274]

b.   The names and pictures of Fadi Ziad al-Fakhuri and Safian al-Haraz appear in the Hamas Book of Martyrs,[275] which is an online book which includes the personal particulars of all members of the Hamas al-Qassam Brigades who have been killed. These particulars include the operative's date of birth and full name; the terrorist attack in which he was killed; and the type of terrorist attack which he carried out.

c.   The official Hamas web site, which covers the operations of the organization, notes the terrorist attack in Kiryat Arba as Terrorist Attack No. 49.[276]

d.   The names of both shooters appear in a general list by Hamas, which includes inmates and martyrs.[277]

e.   A report on the Hamas terrorist attacks since 1993 includes the names of both shooters and points out that the two were Hamas members who carried out the terrorist attack in Kiryat Arba on March 7, 2003.[278]

f.   The two men's names appear in a list of Hamas martyrs in Hebron which was published by Hamas.[279]

---

[272] http://www.alqassam.ps/arabic/sohdaa5.php?id=281.
[273] http://www.palestine-info.info/arabic/spfiles/suhada_2005/shuhda_khaleel/fadi htm.
[274] http://www.alqassam.ps/arabic/sohdaa5.php?id=812;
http://www.palestine-info.info/arabic/hamas/shuhda/2004/alfakoree/syrah htm.
[275] http://www.alqassam.ps/arabic/sohdaa3.php?from=48.
[276] http://www.palestine-info.info/arabic/Hamas/shuhda/amalyat_03.htm.
[277] http://www.almoltaqa.ps/arabic/archive/index.php/f-26-p-2.html.
[278] http://www.alkashif net/?x=3&z=331&y=22.

73

### c. Official documents of the Government of Israel

### 1) Official announcement by the Government:[280]

"On Friday evening, a terrorist cell infiltrated Kiryat Arba. They opened fire and wounded a woman. They then broke into the home of the Horowitz family while they were eating their Sabbath evening meal, chased the couple from room to room, and shot and murdered Dina and her husband Eli as they stood embracing each other. The terrorists continued firing, and one of them even detonated an explosive belt, before they were murdered in the kitchen of the house by the local on-call security squad, which sped to the site (the members of which were Rabbi Eli Horowitz's students). Hamas assumed responsibility for the terrorist attack.

### 2) Judiciary processes and legal documents in Israel

The indictment against Abdallah Ahmad Abu Seif sets forth his role in the operation, including the dispatch of the two shooters to Kiryat Arba. The indictment also sets forth the preparations for the terrorist attack, which included collecting intelligence, surveillance, preparing a hiding place for the weapons near Kiryat Arba, preparing camouflage, obtaining shears to cut through wire fences, and providing continual updates to the Hamas headquarters with regard to the plans for the terrorist attack.[281]

Abdallah Abu Seif was charged with the following offenses: activity in the Hamas organization, recruiting members into the organization, training to carry out terrorist attacks, carrying out other terrorist attacks against Jews in Hebron, and preparing two suicide bombers for the terrorist attack in Kiryat Arba.[282] Abu Seif confessed to the charges that were attributed to him on February 16, 2006, and was sentenced to two life sentences plus 45 years' imprisonment.

According to the testimony in the indictment of Abdallah Abu Seif, Fadi Fakhuri was a member of Hamas.[283]

### d. Summary of the terrorist attack in Kiryat Arba

The cell which carried out the terrorist attack in Kiryat Arba was subordinate to the senior Hamas commander in Hebron, which was in contact with Hamas headquarters in Syria. In January 2003, as soon as the operation had been approved in a general manner, the Hamas commander Basel Qawasmeh instructed Abdallah Abu Seif to collect intelligence on the best place to penetrate Kiryat Arba. Abu Seif located an abandoned building, about 200 meters from

---

[279] http://www.palestine-info.info/arabic/spfiles/suhada_2005/shuhda_khaleel/khaleel.htm.
[280] http://www.pmo.gov.il/PMO/Communication/IsraelUnderAttack/Kiryat+Arba/Kiryat+Arba htm.
[281] *See* Appendix No. 1, pp. 697-705.
[282] *Id.*
[283] *Id.*

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

the fence around Kiryat Arba, into which he said he could move the weapons. His commander in Hamas gave him a set of binoculars and a video camera and ordered him to film the site. Abdallah Abu Seif did not know how to operate the video and returned it to his commander in Hamas.

Early in March 2003, three days before the terrorist attack, Abdallah Abu Seif received from Basel Qawasmeh a bag containing a Kalashnikov rifle and an M-16 rifle, ammunition clips and an explosive belt. Abdallah placed the ordnance in the abandoned house, according to the instructions which he had received.

On March 7, the day before the terrorist attack, Abu Seif met with Basel Qawasmeh and the two shooters, both of whom were residents of Hebron and Hamas members. He led them to the abandoned building, gave them the weapons and the explosive belt and directed them to the location from which they were supposed to penetrate the "settlement."[284] The two terrorists, Safian al-Haraz and Fadi Fakhuri, dressed in Sabbath clothing. Safian al-Haraz put the explosive belt on his friend Fadi Fakhuri. Both of them also carried pistols.

That night, at about 8:30 p.m., the two penetrated Kiryat Arba, entered the home of Rabbi Horowitz and his family in Building No. 35, and killed the couple, Eli and Dina Horowitz. The terrorists were eliminated by the security forces and the local on-call security squad.[285]

### e. Conclusion

I arrived on the scene approximately 45 minutes after the terrorists were killed. My immediate conclusion was that this had been a terrorist attack, rather than a robbery or a family quarrel. Generally speaking, well secured "settlements" are not random targets for robbery, in light of the high risk involved: armed homeowners, local on-call security squads, and the like. Furthermore: the fact that the attackers were armed with explosives charges and an explosive belt definitively eliminated any motive except that of a politically motivated terrorist attack.

The many detailed declarations which were issued by Hamas with regard to the terrorist attack in Kiryat Arba, the glorification of the suicide bomber within the organization, and the profusion of praise which was given to the cell which planned and implemented the terrorist attack – all of these, in and of themselves, would suffice to lead to the conclusion that Hamas carried out the terrorist attack. The criminal conviction of Abdallah Abu Seif, and their repeated public declarations expressing pride in the performance of the terrorist attack in Kiryat Arba and other terrorist attacks leave no doubt that this attack was carried out by Hamas.

---

[284] *See* Appendix No. 1, pp. 697-705.
[285] *Id.*

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

**April 30, 2003 – the terrorist attack on Mike's Place, Tel Aviv**

**a. The terrorist attack**

In the evening of April 30, 2003, two Hamas terrorists, both British nationals, entered Israel through the Gaza Strip. At about 12:45 a.m., they reached the opening of the pub called Mike's Place, which is located near the United States Embassy on the Tel Aviv Promenade. One of the terrorists, Asif Muhammad Hanif, 22, blew himself up at the entrance to the pub. Three people were killed in the explosion and more than 50 others were wounded. The other terrorist, Omar Khan Sharif, 27, who was standing some distance away from Hanif, was supposed to wait a few minutes until the rescue forces reached the scene and then to blow himself up among the police and medics.

When the rescue forces reached the scene of the incident, Sharif attempted to detonate his explosive charge, but due to some malfunction, did not succeed in doing so. Alert citizens noticed what Sharif was trying to do and even realized that he had been wounded in the first explosion. One or more of them knocked him down and struggled with him on the ground. Sharif, in his attempt to escape, disposed of the charge which he was carrying on his body. It was believed by some that he had been wounded as a result of the explosion. The charge which he was carrying weighed 5 kg and was hidden inside a book. Sharif fled to the vicinity of the David Intercontinental Hotel, where he attempted to snatch an identity card from a security guard. The security guard drove him away and then began to chase after him. Sharif ran toward the sea and is believed to have entered the water in order to swim away and come back to shore somewhere else; however, he drowned under unclear circumstances. Sharif's body was washed up on the Tel Aviv beach on May 12, 2003, and was identified on May 19, 2003.

**b. Evidence for legal attribution**

**1) The assumption of responsibility**

a.  Hamas assumed responsibility for the perpetration of the terrorist attack and even publicized a tape which had been recorded before the two suicide bombers had set out to perpetrate the attack. The <u>AP</u> news agency reported, several hours subsequent to the terrorist attack, that the Hamas movement had assumed responsibility, stating that: "The terrorist attack represents a message to Abu Mazen's new government, to the effect that the resistance cannot be stopped without a political solution.

b.  An official announcement by Hamas, taking responsibility for the attack and listing the names of both terrorists and their places of residence in Britain, was published on March

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

8, 2004, to mark the anniversary of the assassination of Ibrahim Maqadmeh.[286] Hamas explained that the delay in publishing the announcement stemmed from security-related reasons (in other words, in order to facilitate Sharif's escape, because, after the terrorist attack, Hamas was not convinced whether he had been killed or had managed to escape).[287] The official announcement by Hamas stated that the two had been video taped before setting out to perform the terrorist attack and had read out their "Wills" on tape.[288] The announcement expressly stated that the Izz al-Din al-Qassam Brigades assumed responsibility for the suicide bombing, "which was carried out by Muslims from Britain, of Pakistani origin. The terrorist attack was carried out at the club known as Mike's Place, in Tel al-Rabia (Tel Aviv – R.S.)."[289]

c.    Notice No. 62, which appeared in a report by Hamas on the operations by the organization in 2003, gave details of the operation and emphasized that an announcement taking responsibility for the attack had been published[290] on behalf of Hamas.

d.    In an official announcement, Hamas explained that the selection of two suicide bombers from outside of Palestine was made in order to enable the death of Ibrahim Maqadmeh to be avenged, not only by Palestinians, but by all Muslims, due to Ibrahim Maqadmeh's special status as an Islamic philosopher.[291]

e.    Hamas published a special page on the Internet dealing with the terrorist attack, including the names of those who carried out their "Will," a description of the operation, assumption of responsibility, the location of the terrorist attack and the number of deaths and injuries it caused. This publication also included a photograph of the suicide bombers and a photograph of the club following the explosion.[292]

f.    Hamas published the video of the two terrorists' "Will" prior to their departure for the terrorist attack.[293]

### 2) Photographs

In a photograph which was taken before the terrorist attack and published by Hamas, the two suicide bombers are wearing Hamas bandanas. Each of them is holding a weapon in one hand, and they are holding a Koran together. A green Hamas flag appears in the background. The

---

[286] Ibrahim Maqadmeh was a prominent Hamas leader who was liquidated by Israel. Hamas claimed that the terrorist attack was carried out in revenge for his assassination.

[287] *See* Appendix No. 1, pp. 706-707; *see also* Appendix No. 1, pp. 708-710.

[288] *See* Appendix No. 1, pp. 708-710.

[289] *See* Appendix No. 1, pp. 706-707.

[290] http://www.palestine-info.info/arabic/Hamas/shuhda/amalyat_03.htm.

[291] *See* Appendix No. 1, pp. 706-707.

[292] http://www.alqassam.ps/arabic/operations2.php?id=85.

[293] http://www.alqassam.ps/arabic/video.php?id=290.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

juxtaposition of the Koran and the weapons expresses one of the mainstays of the Jihadist ideology adopted by Hamas.[294]



295

### 3) The "Will"

On August 3, 2004, the Hamas al-Qassam Brigades announced that they were about to publish a tape containing the "Will" of the two suicide bombers, in English, Arabic and Urdu.[296] The tape was, in fact, published and broadcast on the *al-Jazeera* television network.[297] In the tape, which was recorded in Gaza, the terrorists appear dressed in military clothing with green Hamas bands on their foreheads. They held a Koran in one hand and a Kalashnikov in the other. They kissed and embraced each other and even made a speech.[298] The video tape showing the "Will" was also shown by the BBC network as part of the film *Road to Martyrdom*.[299]

---

[294] http://www.alqassam.ps/arabic/video.php?id=290;
*see also* http://www.alqassam.ps/arabic/operations_images.php?id=85
[295] http://www.aljazeera.net/News/archive/archive?ArchiveId=72579.
[296] http://www.alqassam.ps/arabic/special1.php?all=all&&sid=3121.
[297] http://www.aljazeera.net/News/archive/archive?ArchiveId=72579.
[298] *See* the documentary film "For the Sake of Allah" (Appendix No. 2); *see also* Appendix No. 1, pp. 706-707; Appendix No. 1, pp. 708-710; Appendix No. 1, pp. 574-658.
[299] *See* Appendix No. 2: "Road to Martyrdom."

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

### 4) Hamas articles

The official Hamas magazine, <u>Filasteen al-muslima</u>, published an article which praised and glorified the terrorist attack that was perpetrated by the two suicide bombers.[300]

### c. Summary of the terrorist attack on Mike's Place

Asif Muhammad Hanif, 22, and Omar Sharif, 27, were both British nationals of Pakistani origin. The two, who were both second generation children of Pakistani immigrants, met in London in the mid-1990s at a religious studies class taught by a Muslim preacher, Omar Bakri. After becoming closely involved in extreme Islam, they managed to make a long visit to Damascus, to travel to Afghanistan and fight with the Taliban, and planned to go to Iraq in 2003, but the plan went awry. When they reached Damascus, their mission was changed and they were sent to Gaza to work with Hamas.[301]

The two terrorists traveled from Britain to Damascus, Syria, ostensibly for the purpose of study. At some point, they were contacted by Hamas operatives in Damascus, who recruited them and offered them [a chance to participate] in terrorist operations in Israel. This fact indicates a broader and deeper connection to terrorism based in Damascus.[302] It appears that, while they were initially recruited into Hamas in Damascus, it is not impossible that their previous involvement in radical activity in Britain was what caused them to develop the idea of becoming martyrs even before they arrived in Syria.

During their stay in Gaza, the two terrorists were trained by Hamas operative Yusuf Abu Hin.[303]

### d. Official documents of the Government of Israel

1.   <u>ISA report</u>:[304] "April 30, 2003 – explosion by a suicide bomber at the entrance to the pub called Mike's Place in Tel Aviv. An additional suicide bomber disposed of an explosive charge nearby. Three killed, 62 wounded. The suicide bombers: Hanif Asif, Omar Sharif – Hanif Asif, 22, <u>a British national</u>, blew himself up at the entrance to the pub called Mike's Place on the Tel Aviv Promenade. Omar Sharif, 27, also <u>a British national</u>, attempted to commit suicide together with Hanif; however, due to a malfunction of the explosive charge, he did not succeed in perpetrating the deed and fled the scene,

---

[300] <u>Filasteen al-muslima</u>, June 2003.
[301] See Appendix No. 2: "Road to Martyrdom."
[302] *Id.*
[303] *Id.*
[304] *See* ISA report, May 2005, "Suicide bombers in the five years of conflict," in Appendix No. 1, pp. 574-658, or at: <u>http://www.pmo.gov.il/NR/rdonlyres/81819B47-FE6C-47C2-B000-77B9A7EB9A5A/0/%D7%97%D7%95%D7%91%D7%A8%D7%AA%D7%9E%D7%97%D7%91%D7%9C%D7%99%D7%9D%D7%9E%D7%AA%D7%90%D7%93%D7%99%D7%9D%D7%91%D7%9C%D7%99%D7%AA%D7%9E%D7%95%D7%A0%D7%95%D7%AA1.doc</u>.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

disposing of the explosive charge which had been in his possession on the way. The charge carried by Omar was composed of standard explosives and weighed approximately 5 kg, with no fragmentation, and was placed inside the binding of a book. Omar's body washed up on shore approximately 2 weeks after the terrorist attack. The Hamas organization assumed responsibility for the terrorist attack, and even published a video tape in which the two British nationals made a speech before setting out for the terrorist attack. Analysis of the findings in their passports indicates that the two reached [Israeli] territory at the end of a journey which began on April 8 in Syria. From there, they traveled to Jordan on April 11 and entered [Israeli] territory on April 12. The investigations show that the two terrorists were assisted by a number of foreign leftist activists who reside in the area and belong to movements in Israel, the Gaza Strip and the West Bank."

2.    **The ISA report for 2003 established that the terrorist attack was performed by Hamas.**[305]

"In April, Hamas carried out a suicide bombing in the restaurant known as Mike's Place in Tel Aviv, in which three Israelis citizens were killed and more than 60 were wounded. The terrorist attack was carried out by Asif Hanif, a 22 year old British national, with the assistance of an additional British national, Omar Khan Sharif, 27.

**This terrorist attack is the first suicide bombing which was performed by a terrorist with foreign citizenship!"**

3.    **Announcement by the Prime Minister's Office[306]**

**"The two British nationals who were involved in the suicide bombing of Mike's Place in Tel Aviv were sent by the Hamas headquarters in Gaza (June 15, 2003)**

The fact that the two British nationals who were involved in the suicide bombing at Mike's Place in Tel Aviv were sent to carry out the terrorist attack by the Hamas military headquarters in the Gaza Strip has now been released for publication. Asif Hanif and Omar Sharif, as we may recall, were British Muslims of non-Palestinian origin, with no relationship to any Arab origin whatsoever. The dispatch of foreign Muslims with these characteristics by Hamas to carry out terrorist attacks against Israel constitutes a dramatic strategic change from the standpoint of Hamas. This step represents a kind of ideological *rapprochement* of Hamas with the Jihad organizations worldwide, especially al-Qaeda,

---

[305] The ISA report "Summary of the year 2003" was published as an official document on behalf of the Prime Minister's Office (*see* Appendix No. 1, pp. 5-14). *See also:* http://www.pmo.gov.il/NR/rdonlyres/C27A1A4F-F670-46F5-B047-DECBDA00A564/0/7012490866.doc.

[306] http://www.pmo.gov.il/PMO/Archive/Spokesman/2003/%D7%99%D7%95%D7%A0%D7%99/Spokesman8444.htm?DisplayMode=Search.

which have declared total war against anyone who is not a Muslim, and even against Muslims who cooperate with Western countries.

Notwithstanding this change, Hamas decided not to take responsibility for this terrorist attack – apparently due to the possible implications for its image and the exposure of its true ideological face, not that of an entity which is fighting for its freedom on its land, as it had been claiming (on the lands of the 'Islamic endowment,' according to its own statement), but rather, that of an entity which aims to achieve its vision of a United State of Islam throughout the world. This aim inherently views countries such as Israel, the United States and European countries as the enemy; moreover, even Arab countries, African countries and Palestinian Authority are considered as enemies, because they are perceived as 'collaborating' with the West and Western culture, and thereby 'endangering Islam' as it is perceived by the fundamentalists. The ISA is currently examining suspicions of possible collaboration in this terrorist attack between Hamas and al-Qaeda. It should be noted that connections of this type, including with the Hamas in the Gaza Strip, have already been exposed in the past. At the same time, no direct operative collaboration toward the implementation of a joint terrorist attack has been exposed to date. The ISA investigation of this affair is still going on, and for this reason, official publication was delayed until now."

### e. Conclusion

The many detailed declarations which were issued by Hamas with regard to the terrorist attack on Mike's Place, the glorification of the suicide bomber within the organization, and the profusion of praise which was given to the cell which planned and implemented the terrorist attack – all of these, in and of themselves, would suffice to lead to the conclusion that Hamas carried out the terrorist attack. At the same time, the video tape of the two suicide bombers leaves no doubt that this attack was carried out by Hamas.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

**May 18, 2003 – the terrorist attack on the No. 6 bus, French Hill, Jerusalem**



This is where the attack took place

↑

Ramallah Shuafat Rd. Maale Adumim Rd.

Yigal Yadin St. **1**                    French Hill

**60** Hahaganah St.

Downtown Haim Barlev Blvd.

Jerusalem Etzel St.

↓

307

### a. The terrorist attack

In the early morning hours of May 18, 2003, Bassem Jamal Darwish Takruri (19) boarded a bus at a stop near the French Hill junction in Jerusalem. He was wearing the clothes of an ultra-Orthodox Jew, in order to board the bus without arousing suspicion. Beneath his shirt was an explosive belt packed with small iron balls and projectiles. When he got on the bus, there were 27 passengers on board. An hour later, the bus would have been *full of passengers*. The driver pulled away from the bus stop, drove 20 meters forward, and then Takruri detonated the explosive belt. Seven passengers were killed at once and 20 more were wounded. The driver lost control of the bus, which rolled downhill until it collided with a bus stop and came to a halt.[308]

---

[307] Source of map: <u>Yedioth Ahronoth</u>, May 19, 2003.
[308] <u>Yedioth Ahronoth</u>, May 19, 2003.

82

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

### b. Evidence for legal attribution

#### 1) The assumption of responsibility

On the same day, the al-Qassam Brigades published a placard, taking responsibility for the terrorist attack on behalf of Hamas. The placard bore the emblem of the al-Qassam Brigades, and the name of the Brigades appeared in English and Arabic at the top. The placard identified Bassem Takruri as the suicide bomber and declared that the operation was only the beginning of a series of operations which Hamas planned to carry out.[309]

#### 2) Photographs

The following photographs clarify Takruri's organizational ties to Hamas and his role as a suicide bomber:

a.    In the photograph below, which was taken shortly before the terrorist attack was carried out, Takruri is seen wearing a green bandana on his forehead, on which are written the words: "There is no God but Allah." In the picture, Takruri is standing in front of a large poster which bears the Hamas emblem. The picture shows him holding a weapon in one hand and a Koran in the other.[310]



באסם ג'מאל דדוויש תקרורי (19), שכנו של מאזד, מוצץ את עצמו אתמול באוטובוס "אגד" ורצח 7 ישראלים [311]

---

[309] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=byan&id=309.
[310] http://www.palestine-info.info/arabic/Hamas/shuhda/2003/takrory/photo htm.
[311] The caption in Hebrew mentions a person named Fuad. The reference is to Fuad Qawasmeh, who, the day before, carried out a suicide attack in Haifa.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

[Caption in yellow triangle at top left: "05:45 – Blew himself up in Jerusalem"]

[Caption below photo: "Bassem Jamal Darwish Takruri (19), Fuad's neighbor, blew himself up yesterday on an Egged bus and murdered seven Israelis"]

b.   An additional photograph was taken from the magazine <u>al-Raya</u>.[312] The first page of the magazine shows pictures of several suicide bombers. Takruri's picture appears at the top left of the first page of the magazine. Another picture of Takruri appears to the right of the picture, and a photograph of a bus which he blew up may be seen in the center. *The photograph is encircled by a drawing of a white ellipse; the terrorist holding a Koran in his hand is Takruri.*



c.   Before he carried out the terrorist attack, two more pictures of Takruri were taken, which are characteristic of Hamas operatives before they set out to implement suicide bombings. In each of the pictures, he is holding a weapon and wearing a green Hamas band around his forehead. In one of them, he is also holding a Koran; in the other, he is standing next to a Hamas poster.

---

[312] <u>Al-Raya</u>, May 22, 2003.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*



### 3) The "Will"

Takruri left a video taped "Will" which is characteristic of many suicide bombers. The "Will" was read aloud opposite a Hamas set. In his "Will," he emphasized that he was carrying out the suicide operation in the name of Hamas.[314] The "Will" was also disseminated in a short film, which can be viewed on YouTube.[315]

### 4) Hamas documents

a.  The official Hamas web site published a picture of the terrorist Takruri, which took up an entire page, with a caption above it reading <u>The Qassami Martyr</u> – that is, the martyr who belonged to the al-Qassam Brigades.[316]

b.  The official Hamas web site later published an article in memory of the terrorist Takruri. The article included the transcription of a conversation between the web site correspondent and the terrorist's family, which focused on Takruri's devout religious faith. The article states that Takruri had finished high school and had begun to study in the Faculty of Engineering at the Polytechnicum in Hebron. The closing passage of the article states that Takruri carried out the terrorist attack on the instructions of the al-Qassam Brigades.[317]

---

[313] http://www.palestine-info.info/arabic/Hamas/shuhda/2003/takrory/photo htm.
[314] http://www.youtube.com/watch?v=xGxG-P9EP2c.
[315] http://www.youtube.com/watch?v=xGxG-P9EP2c.
[316] http://www.palestine-info.info/arabic/Hamas/shuhda/2003/takrory/basem.htm;
 *see also* http://www.palestine-info.info/arabic/Hamas/shuhda/2003/takrory/syrah.htm.
[317] http://www.palestine-info.info/arabic/Hamas/shuhda/2003/takrory/syrah htm.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

c.    The Hamas web site also published a large article about Abdallah Qawasmeh, who was the commander of the al-Qassam Brigades in Hebron. The article gives details of all of the suicide bombings which Qawasmeh helped to plan, including the terrorist attack of May 8, 2003, "which was carried out by the martyr Bassem Takruri. As a result of the terrorist attack, a bus exploded in the French Hill neighborhood of Jerusalem."[318]

d.    The Hamas web site published a conversation with the driver who took Takruri to Jerusalem, to the site of the terrorist attack. The driver, Abu Ubeida, recounted every little detail of his conversation with the suicide bomber on the way to Jerusalem.[319]

e.    In an article in the official Hamas magazine, *al-Raya*, which appeared two days after the terrorist attack, Takruri is described as "a soldier of al-Qassam." The article describes his life and emphasized that he studied at the Polytechnicum in Hebron, where three suicide bombers had already studied.[320]

f.    A Hamas notice posted on the organization's web site reads: "May 18, 2003: Two suicide bombers, Bassem Takruri and Mujahid al-Ja'bari, blew themselves up in Jerusalem, near French Hill. The terrorist attack cost the lives of six Zionists and led to the wounding of dozens."[321]

### c. Official documents of the Government of Israel

1)    **ISA report**[322]

<div style="border: 2px solid black; padding: 1em; text-align: center;">

**May 18, 2003**

**Explosion by a suicide bomber on a bus in French Hill, Jerusalem**

**7 killed and 20 wounded**

</div>

---

[318] http://www.palestine-info.info/arabic/hamas/shuhda/2003/qaoasme/syrah.htm.

[319] http://www.sarkosa.com/vb/t24984.

[320] *See* al-Raya, May 20, 2003.

[321] On the same day, an additional terrorist attack took place in Jerusalem, near the al-Ram roadblock. The suicide bomber, Mujahid Ja'bari, detonated an explosive belt which he was wearing on his body: http://www.palestine-info.info/arabic/hamas/shuhda/2003/jabary/syrah.htm.

[322] *See* Appendix No. 1, pp. 574-658.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

**The suicide bomber – Bassem Takruri**

A resident of <u>Hebron</u>, 19, a first year student of Computer Science at the Polytechnicum, blew himself up in a No. 6 bus operated by the Egged Company, near French Hill. He was dressed as an ultra-Orthodox Jew: black trousers, white shirt, skullcap and ritual fringes (*tzitzit*). The suicide bomber was dressed on the morning of the terrorist attack, in the home of one of the recruits who was handled by the Hamas infrastructure in Hebron, Samer Atrash. In his interrogation, Samer Atrash confessed to collecting intelligence in preparation for the terrorist attack, picking up the suicide bomber from the Abu Dis area and bringing him into Jerusalem, giving him lodging in his house for the night, preparing him and bringing him to the site of the terrorist attack.

### 2) Government announcements

a.   "Seven Israeli civilians were killed in a terrorist attack in French Hill, Jerusalem. A suicide bomber, dressed as a religious Jew, blew himself up at 5:45 a.m. in a No. 6 bus in French Hill, Jerusalem. Twenty people were wounded, four of them seriously. The police investigation disclosed that the suicide bomber boarded an articulated bus, which was traveling on the No. 6 route, at French Hill junction. The terrorist was disguised as a religious Jew, wearing a skullcap and a prayer shawl, and had an explosive belt with a medium sized explosive charge. He apparently did not arouse the suspicions of the driver or the passengers. The bus had time to travel only a few meters before the terrorist detonated the explosive belt in the front of the bus. The driver lost control of the steering wheel and the bus went off the road."[323]

b.   A Government report on terrorist operations in 2003 stated that: "In June, Samer Atrash and Omar Sharif, both residents of East Jerusalem, who transported the suicide bombers to the terrorist attacks on the No. 14 and No. 6 buses, were arrested."[324]

### d. Conclusion

The many detailed declarations which were issued by Hamas with regard to the terrorist attack on the No. 6 bus and the glorification of the suicide bomber Takruri within the organization – all of these, in and of themselves, would suffice in order to lead to the conclusion that Hamas had carried out the terrorist attack. At the same time, the ISA conclusions on the basis of its investigations, the criminal convictions of the cell members, and Takruri's video taped "Will," leave no doubt that this attack was carried out by Hamas.

---

[323] http://www.pmo.gov.il/PMO/Communication/IsraelUnderAttack/French+Hill+-+Jerusalem/French+Hill+-+Jerusalem htm?Page=2.

[324] http://209.85.229.132/search?q=cache:UvKpCSEWhncJ:www.pmo.gov.il/NR/rdonlyres/C27A1A4F-F670-46F5-B047-DECBDA00A564/0/7012490866.doc+%D7%A1%D7%90%D7%9E%D7%A8+%D7%90%D7%98%D7%A8%D7%A9&cd=3&hl=iw&ct=clnk&gl=il.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

**June 11, 2003 – the terrorist attack on the No. 14a bus, Jaffa Road, Jerusalem**

### a. The terrorist attack

On June 11, 2003 at about 5:30 p.m., a terrorist dressed as an ultra-Orthodox Jew boarded a No. 14a bus at the Mahane Yehuda open air market. A short time thereafter, when the bus was driving down Jaffa Road, near Davidka Square, the terrorist detonated the explosive charge. Seventeen people were killed and more than 100 wounded, including dozens of pedestrians outside the Clal Building in downtown Jerusalem. Hamas assumed responsibility for the terrorist attack immediately. The interrogation of the cell members who were arrested provided complete information on the terrorist attack, including a determination that the cell had acted on the direct instructions of Hamas headquarters in Syria.

### b. Evidence for legal attribution

#### 1) The assumption of responsibility

Immediately subsequent to the terrorist attack, Hamas published an announcement on its web site, in which it assumed responsibility for the suicide bombing of a bus operated by the Egged Company. The announcement stated that the suicide bombing had been carried out by Abd el-Mu'ati Shabana, on behalf of the al-Qassam Brigades.[325]

#### 2) Photographs

The following photographs of Abd el-Mu'ati Shabana, the suicide bomber, clarify his organizational affiliation with Hamas and his role as a suicide bomber:

The pictures show Abd el-Mu'ati Shabana, a short time before the terrorist attack. He is wearing a band around his head inscribed with the words "There is no God but Allah" and holding a Kalashnikov rifle in both hands.[326] One of the other pictures that was published on the Hamas web site shows a photo montage of a picture of the terrorist with a photograph of the destruction which was left after the attack.

---

[325] http://www.alqassam.ps/arabic/operations2.php?id=66.

[326] *See* Appendix No. 1, pp. 711-716. The exhibit includes five pictures which were later published on the official web site of the al-Qassam Brigades. Those pictures appear here: http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=picture&id=315.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*





*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*





327

### 3) The "Will"

Abd el-Mu'ati Shabana video taped a "Will" which can be viewed on YouTube. In his "Will," he admits that the terrorist attack was carried out in the name of the Izz al-Din al-Qassam

---

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

Brigades[328] and calls upon his people to continue the struggle. Shabana is wearing the bandana; the "Will" appears to have been video taped in the same place where the still photographs were taken.

### 4) Hamas documents

a.   The official Hamas web site praised Shabana's activity and devoted a long article to him, including a video tape of an interview with his mother, in which she expressed her pride at the terrorist attacks which he carried out.[329]

b.   An official Hamas report on operations in 2003 provides information on "Operation No. 74," in which 17 Zionists were killed. Shabana's name appears in the report as the person who carried out the operation. The report also states that the al-Qassam Brigades assumed responsibility for the terrorist attack.[330]

c.   A special report by the al-Qassam Brigades on the incident gives the following details:

"Type of operation: suicide for the sake of Allah.

Place of the operation: West Jerusalem, Jaffa Road, near the Clal Building, on a No. 14 bus.

Date and Time: June 11, 2003, 5:30 p.m.

Carried out by: the *shahid*, a member of the Izz al-Din al-Qassam Brigades, Abd el-Mu'ati Shabana, a Hamas operative from Tel Rumeida in Hebron.

Organization: Izz al-Din al-Qassam Brigades.

Enemy victims: 17 killed, 100 wounded."[331]

d.   An Internet forum of Hamas gives details of the suicide bomber's life history, along with a large number of pictures of him holding weapons.[332]

e.   The official Hamas web site devoted an extensive article to the suicide bomber. The article included Shabana's biography and stated that he had left a "Will." The following statement appears at the top of the page: "The *Qassami* Jihad fighter Abd el-Mu'ati

---

[328] http://www.youtube.com/watch?v=DMf1NUKb8O4&feature=related.
[329] *See* Appendix No. 1, pp. 717-721.
[330] http://www.alqassam.ps/arabic/operations2.php?id=66.
[331] http://www.alqassam.ps/arabic/operations2.php?id=66.
[332] http://www.paldf.net/forum/showthread.php?t=411196.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

Shabana, who killed 17 Zionists and wounded hundreds of others and shocked the Sharon government."[333]

f.     Hamas also listed the terrorist attacks which were commanded by Abdallah Qawasmeh, including the attack on the No. 14a bus in Jerusalem.[334]

g.     The official Hamas magazine published in Gaza, al-Risalah, published a picture of the suicide bomber on the front page of its June 19, 2003 issue, referring to him by the term *istishhadi* – meaning a person who has sacrificed his life in a suicide bombing. An extensive article on the terrorist's life appeared in the same issue. The article praised the terrorist attack which he carried out, which – according to the magazine – was performed in revenge for the attempt on the life of Abd al-Aziz al-Rantisi, one of the senior Hamas commanders at the time.[335]

### c. Official documents of the Government of Israel

### 1)     ISA report

**"The suicide bomber – Abd el-Mu'ati Shabana**

A resident of Hebron, 18 years old, a student at the Hebron Vocational High School, blew himself up in a No. 14 bus in Jerusalem, dressed as an ultra-Orthodox Jew. Responsibility for the terrorist attack was taken by Hamas. As a result of investigations following the attack, the cell with which the suicide bomber worked was exposed, as was the infrastructure of operatives in Jerusalem, one of whom even sheltered the suicide bomber in Jerusalem before he set out on the suicide attack. This organization had connections with Hamas military headquarters in Hebron."

### 2) Judiciary processes and legal documents in Israel

a.     The indictment against Omar Salah Sharif claims that he was recruited by his cousin, Basel Shafiq Qawasmeh, who was one of the Hamas recruiters in Hebron. Basel Qawasmeh was directly subordinate to Abdallah Qawasmeh, the Hamas commander in Hebron, who received orders directly from the Hamas military headquarters in Syria. The indictment charged him with membership in Hamas; collection of intelligence for the purpose of the terrorist attack on the No. 14 bus; purchasing clothes for Shabana; dressing Shabana in an explosive belt; briefing him as to the location of the terrorist attack; and sending him out to the site of the attack.

---

[333] *See* Appendix No. 1, pp. 717-719.

[334] *See e.g.* Appendix No. 1, pp. 717-719.

[335] Al-Risalah, June 19, 2003 (Appendix No. 1, pp. 722-723).

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

According to the indictment, Sharif was given $3500 to purchase a car in which he could take the suicide bombers to the target.

The indictment adds that Sharif patrolled around Jerusalem on a No. 32 bus, in order to see whether any Arabs traveled on that line. He purchased a skullcap and ritual fringes of the type worn by Jews in order to prevent the identification of the suicide bomber.[336] On the day of the terrorist attack, Sharif picked up Shabana and gave him the explosive belt.

Omar Sharif showed the suicide bomber where the No. 32 bus stop was and sent him there. The terrorist boarded a No. 14 bus and blew himself up.

Omar Sharif pled guilty in court to all of the charges in the indictment against him. During his trial, but before the verdict was read out, Omar Sharif declared before the Court: "I did my duty for my people and my land. This is the least I can do. The ones who should be on trial here are the Israeli Army, and Sharon should be on trial, too."[337] He further declared: "My defense attorney has explained to me the charges attributed to me in the amended indictment. I understood it and I plead guilty to it." On the basis of his guilty plea, the Court convicted Omar Sharif.[338]

b.    **Bilal Sub Laban**

Bilal Sub Laban, a cell member who was recruited by Omar Sharif, made a confession in his own handwriting, according to which he helped to implement the terrorist attack on behalf of Hamas; he assembled the "Jewish" clothing for the suicide bomber, so that he would be able to avoid identification, being dressed up as an ultra-Orthodox Jew.[339]

c.    **Amar Nasser al-Din**

Amar Nasser al-Din, an additional member of the cell, helped to transfer the explosive belt from Hebron to Jerusalem and was involved in the preparations for the terrorist attack. He wrote a confession in his own handwriting, in which he described his role in the attack.[340]

---

[336] "Ritual fringes" [*tzitzit*] refers to a garment with four threads in the corners which is worn by religious Jews.
[337] Appendix No. 1, pp. 724-727.
[338] Appendix No. 1, pp. 728-729.
[339] Appendix No. 1, pp. 730-750.
[340] Appendix No. 1, pp. 751-757.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

## The Hebron Cell: the terrorist attack on the No. 14a bus



### d. Conclusion

The many detailed declarations which were issued by Hamas with regard to the terrorist attack on the No. 14a bus, the suicide bomber's video taped "Will," the glorification of the suicide bomber within the organization, and the profusion of praise which was given to the cell which planned and implemented the terrorist attack – all of these, in and of themselves, would suffice in order to lead to the conclusion that Hamas carried out the terrorist attack. At the same time, the ISA conclusions on the basis of its investigations, the criminal convictions of the cell members who survived, and their repeated public declarations expressing pride in the performance of the terrorist attack on the No. 14a bus and other terrorist attacks leave no doubt that this attack was carried out by Hamas.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

### June 20, 2003 – roadside shooting attack on Road 60

#### a. The terrorist attack

On Friday, June 20, 2003, at about 1:30 p.m., a car drove down Road 60 near Jerusalem. In the car were Zvi Goldstein, his father Eugene, his wife Michal and his mother Lorraine. The car passed by two Hamas terrorists belonging to the Silwad Cell, who were lying in an ambush.

When the Goldstein Family passed by the terrorists, the terrorists began to fire at the family car. The driver, Zvi Goldstein, was mortally wounded in the neck, and his foot "locked down" on the gas pedal. His father Eugene, who was sitting next to him, was also mortally wounded, but managed to take control of the steering wheel for a short time before the car crashed.

#### b. Evidence for legal attribution

##### 1) The assumption of responsibility

An official Hamas report on the operations performed by the organization in 2003 includes "Operation No. 79," in which "one Zionist was killed and three were wounded." The announcement states that the al-Qassam Brigades assumed responsibility for the operation.[341]

##### 2) Hamas documents

a.  A report, which appeared on the official Hamas web site following the arrest of members of the Silwad Cell, reviewed the history of the cell. The report was headlined: "Members of the cell with an outstanding level of professionalism and control of the execution and planning of its secret activity."

The chapter on the Silwad Cell disclosed the names of the five cell members, all of whom were involved in the terrorist attack. The chapter also cited details of other operations which the cell members had performed. Section 5 describes the terrorist attack in question: "The attack targeted a car belonging to a 'settler.' The attack led to the elimination of the 'settler' [Zvi Goldstein] and the wounding of others."[342]

b.  The official web site of the al-Qassam Brigades published an extensive report on the members of the cell, including the names of the members of the Silwad Cell who carried out the shooting attack. The al-Qassam Brigades rejoiced and boasted that the extended cell killed 18 people and wounded 25 others, and referred to the terrorist attack as the "Silwad Bridge Terrorist Attack." According to the report, "the attack was planned for

---

[341] http://web.archive.org/web/20040625235504/http://www.palestine-info.com/arabic/hamas/shuhda/amalyat_03 htm.
[342] Appendix No. 1, pp. 504-507.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

the afternoon hours, which are a time of prayer [for Muslims], and during which only Jewish cars travel on the road."

### c. Official documents of the Government of Israel

a.   **Announcement of the attack by the Prime Minister's Office (June 20, 2003)**[343]

"One Israeli was killed and three others were wounded in the terrorist attack on the Ramallah bypass road. The car was attacked from an ambush near the 'settlement' of Kochav Yaakov. At least two of the passengers were wounded by the shooting, but the driver continued driving toward Jerusalem, and his car turned over into a ditch near the Shaar Binyamin Industrial Zone."

b.   **Announcement of the discovery of the cell by the ISA**

"The Israel Security Agency has released for publication today, December 24, 2003, the fact of the arrest of an extensive infrastructure of Hamas terrorists which was active in the perpetration of roadside shooting attacks and the laying of explosive charges in the Benjamin area in the last two years.

The infrastructure was responsible, *inter alia*, for the murder of 10 Israelis, five civilians and five soldiers, and the wounding of 12 others. Most of the terrorists in that infrastructure had served time in prison in the past and had participated in a large number of terrorist attacks. A senior security element stated that the terrorist attacks were characterized by punctilious preparations which included the collection of intelligence and the performance of advance patrols, with regard to both civilian and military targets. According to that element, the funding, in the amount of tens of thousands of dollars, came from the Hamas headquarters infrastructure in Damascus, which also briefed the heads of the [Palestinian] infrastructure. In addition to the vast amounts of money, the infrastructure also had vehicles and additional equipment at its disposal; furthermore, the money was also used to fund the personal needs of the cell members.

The investigation over the last two years exposed three main cells, each of which was responsible for a certain area in the Ramallah – Benjamin sector. They took advantage of their status as residents of the villages in the area and their familiarity with the terrain and the local population; some of them held American passports, which made it easier for them to move through the area.

There were three cells in all. [One of them,] the Kubar Cell, was headed by Omar Salah Barghouti. That cell carried out the roadside shooting attack at an Israel Defense Forces

---

[343] www.pmo.gov.il/PMO/Communication/IsraelUnderAttack/North+of+Ramallah/North+of+Ramallah.htm.

roadblock near Dora al-Qara, at which Raz Mintz, of blessed memory, was murdered and another soldier was wounded.

An additional incident involving the same cell took place at the Surda roadblock, at which the soldier Nachman Lee Akunis was murdered and another soldier was wounded. The weapon of an additional soldier was captured.

The Silwad Cell, headed by Ahmad Najjar, 27, of Silwad, the holder of an American passport, perpetrated a number of terrorist attacks in the area. The most prominent of these were a shooting attack at a car on the way up to Mt. Baal-Hatzor, and a shooting attack at an Israeli car driven by Esther Gaalya in November 2002 – the shots murdered Esther, may God avenge her blood.

Two months later, the same cell perpetrated a roadside shooting attack at an Israeli vehicle near Ofra, wounding two civilians. In June 2003, Zvi Goldstein was murdered by the cell; three of his family members were later injured, apparently when the driver lost control of the car.

At the head of the third cell exposed, the Mazra'a al-Sharqiyya Cell, was Hashem Hijaz, 28, a resident of the village, who was previously imprisoned against a background of Hamas activity. The murder of Hikmat Yassin, a resident of Kubar who was suspected of having collaborated with Israel, is attributed to the cell. It should be noted that the security establishment denies any connection with Yassin. On the eve of [Israel's] Memorial Day, members of the cell shot and killed Gideon Lichtman. In that incident, his six year old daughter was wounded, as was a soldier who was hitchhiking in Lichtman's car." [344]

For additional details concerning the judiciary processes against the members of the Silwad Cell, see the report presented above in this expert opinion with regard to the terrorist attack which took place on January 29, 2003.

**c.     Announcement by the Israel Defense Forces Spokesperson concerning the capture of the cell:**

In a combined operation by Israel Defense Forces infantry forces (including the "Duchifat" Battalion), artillery forces and armored forces, in the villages of Mazra'a a-Sharqiyya, Silwad, Kubar, Kafr Malek, Khirbet Abu Shakhidem, Mazra'a al-Qabliyya, Surda, Jilazun and Kafr 'Aqab, north of Ramallah, 22 Hamas operatives were recently

---

[344] http://www.inn.co.il/News/News.aspx/67840; http://www.globes.co.il/news/article.aspx?did=754159&fid=2.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

arrested, who were responsible for the death of 10 Israelis – five civilians and five Israel Defense Forces soldiers:[345]

- A roadside shooting attack in Dora al-Qara on November 2, 2001, in which a "Duchifat" soldier, Staff Sgt. Raz Mintz of blessed memory, was killed.

- A roadside shooting attack at the Surda roadblock on February 16, 2002, in which a paratrooper, Staff Sgt. Lee Akonis of blessed memory, was killed.

- A roadside shooting attack on the Allon Road on November 18, 2002, in which a female Israeli civilian was killed.

- A roadside shooting attack at the Allon junction on May 5, 2003, in which a male Israeli civilian was killed and his daughter and a soldier on reserve duty were wounded.

- A roadside shooting attack on Road 60 near Ofra on May 11, 2003, in which a male Israeli civilian was killed.

- A roadside shooting attack on Road 60 near Silwad on June 20, 2003, in which a male Israeli civilian was killed and his wife and both of his parents were wounded.

- A roadside shooting attack on the Allon Road near al-Mu'ayar on August 29, 2003, in which a male Israeli civilian was killed and his wife was wounded.

For additional details concerning the judiciary processes against the members of the Silwad Cell, see the report presented above in this expert opinion with regard to the terrorist attack which took place on January 29, 2003.

### d. Conclusion

The many detailed declarations which were issued by Hamas with regard to the terrorist attack on Road 60, the glorification of the operatives involved within the organization, and the profusion of praise which was given to the cell which planned and implemented the terrorist attack – all of these, in and of themselves, would suffice to lead to the conclusion that Hamas carried out the terrorist attack. At the same time, the ISA conclusions on the basis of its investigations, the criminal convictions of the cell members, and their repeated public declarations expressing pride in the performance of the terrorist attack on Road 60 and other terrorist attacks leave no doubt that this attack was carried out by Hamas.

---

[345] Announcement by the Israel Defense Forces Spokesman, December 23, 2003. *See* Appendix No. 1, pp. 758-759.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

### August 19, 2003 – the terrorist attack on the No. 2 bus, Jerusalem

#### a. The terrorist attack

On the evening of August 19, 2003, 23 people, including six children, were killed and 137 others were wounded in a suicide bombing on an articulated bus on the No. 2 line, in the Beth Israel neighborhood of Jerusalem.

The suicide bomber was Ra'ed Abd el-Hamid Misk, a 29 year old Hamas operative from Hebron, who was sent by a Hamas cell in Hebron. Misk was dressed as an ultra-Orthodox Jew, in a (successful) attempt to avoid suspicion. Misk concealed the explosive belt under a long black coat, of the type which ultra-Orthodox Jews are accustomed to wear even in the heavy heat of August in Jerusalem.

Misk was a Hamas operative, an imam at the Ali Bakr mosque which is affiliated with Hamas in Hebron, and a graduate student in Islamic law at the Islamic College of Hebron, which is affiliated with Hamas. After he agreed to serve as a suicide bomber, Misk was taken in the car of another cell member, Abdallah Yihya Sharbati, from Abu Dis to a mosque in Wadi Joz, only a few minutes away from the site of the terrorist attack. Nasim Rashad Za'tari, the head of the Hamas cell in Jerusalem, and Sharbati then prepared Misk and dressed him in the explosive belt which was prepared by an "Engineer" from Hebron and had been hidden in the mosque. After he put on the clothes which disguised him as an ultra-Orthodox Jew, he went to the bus stop, and boarded the bus a short time thereafter.

When Misk detonated the explosive charge, the explosion utterly destroyed the bus, breaking all the windows and scattering metal fragments and pieces of bodies in a wide circle. The Israel Police found the terrorist's identity card among the ruins; inside it was a picture of him, dressed as an ultra-Orthodox Jew.

#### b. Evidence for legal attribution

##### 1) The assumption of responsibility

Later that night, Hamas published an announcement, signed by the al-Qassam Brigades cell named for Abdallah Qawasmeh ("the cell of the martyr, Abdallah Qawasmeh, of the Izz al-Din al-Qassam Brigades"). The date on the announcement was August 19, 2003. It mentioned the name of Ra'ed Misk, his age (29), his profession, his level of education and his *nom de guerre*. The announcement was headed by the emblem of the al-Qassam Brigades, with the name of the organization in Arabic and English. Ismail Abu Shanab, one of the Hamas leaders in the Gaza

Strip, justified the terrorist attack and claimed that it had been carried out in revenge for Israeli attacks.[346]

The official Hamas magazine, <u>al-Risalah</u>, published a photograph of Ra'ed Misk on the front page of its August 21, 2003 edition. He can be seen at the right of the picture, wearing a green band on his forehead. The picture also shows a photograph of the bus which he blew up.[347] A special document which was written by the al-Qassam Brigades says the following:

"Method of the attack: a suicide bombing for the sake of Allah.

Location: Haim Bar Lev Street, Jerusalem.

Date and time: Tuesday, August 19, 2003, 9 a.m.

Carried out by: the *Qassami* (a member of the al-Qassam Brigades) martyr Ra'ed Abd el-Hamid Misk, 29, a resident of Hebron.

Organization carrying out the attack: Izz al-Din al-Qassam Brigades." [348]

Hamas repeated the description of the terrorist attack in a similar report which included additional details and praised the terrorist attack and the terrorist, who was an exceptional person and an educated man:[349]

"Method of the attack: a suicide for the sake of Allah.

Location: Haim Bar Lev Street, Jerusalem, next to the Mea Shearim neighborhood.

Date and time: Tuesday, August 19, 2003, 9 a.m.

Carried out by: the *Qassami* (a member of the al-Qassam Brigades) martyr Ra'ed Abd el-Hamid Misk ("Abu Man'am"), 29, a resident of Hebron.

Organization carrying out the attack: Izz al-Din al-Qassam Brigades.

Method of execution: entry into a crowded bus and detonation. As a result, 21 Zionists were killed and 136 were wounded.

Objective of the attack: the attack was carried out as a response to the breaches of the cease-fire by the Zionists, their continued violent operations, and their refusal to release inmates from

---

[346] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=byan&id=750.

[347] <u>Al-Risalah</u>, August 21, 2003 (Appendix No. 1, 765-766).

[348] *See* Appendix No. 1, pp. 760-764.

[349] *See, e.g.,* http://www.alqassam.ps/arabic/operations2.php?id=750.

prisons, as well as in revenge for the death of the martyr Abdallah Qawasmeh and operatives from the Izz al-Din al-Qassam Brigades, who were killed in Nablus, and in revenge for the death of the Islamic Jihad commander in Hebron.

Description of the attack: notwithstanding the roadblocks, Ra'ed Misk succeeded in reaching Jerusalem and boarding a No. 2 bus operated by the Egged Company. The bus was crowded with passengers, and he killed 21 of them... The responsibility rests with the Zionist enemy, which breaches the cease-fire... The response by Hamas headquarters is that the attack was in response to the breaches of the cease-fire."[350]

## 2) Photographs

Hamas photographed Ra'ed Misk in various positions before the terrorist attack was carried out. In one picture, he is holding a Kalashnikov in one hand and a Koran in the other (*see* attached pictures below).[351] In several pictures, he can be seen standing separately and waving to his colleagues.[352] Hamas also published pictures of Misk on its web site, holding a weapon in both hands. One of those pictures was disseminated on a Hamas poster. The poster shows Misk holding an automatic weapon; behind him is a picture of the al-Aqsa Mosque; at the sides of the picture are photographs of the blown-up bus. The caption under the picture says: "The *Qassami* martyr Ra'ed Abd el-Hamid Misk."[353]

The official Hamas web site also published photographs of the suicide bomber.[354] Another Hamas web site, the "Palestine Information Center," shows Misk with an identity card, which includes details on his life. The caption of the document says: "The *Qassami* Jihad fighter Ra'ed Abd el-Hamid Misk."[355]

---

[350] *See* Appendix No. 1, pp. 760-764.
[351] *See* Appendix No. 1, pp. 781-785.
[352] *See* Appendix No. 1, pp. 786-799.
[353] *See* Appendix No. 1, pp. 781-785.
[354] *See* Appendix No. 1, pp. 786-801.
[355] *See* Appendix No. 1, pp. 802-808.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*



[Photo caption: "The Hamas terrorist, Ra'ed Abd el-Hamid Misk. Photo: from TV"]





### 3) The "Will"

Before the terrorist attack, Hamas video taped Ra'ed Misk reading his "Will."[356] Misk was shown wearing a green bandana around his forehead, with a clearly visible Hamas emblem on it.

---

[356] *See* the video tape made by the Hamas, which was published on the Izz al-Din al-Qassam Brigades web site: http://www.alqassam.ps/arabic/video1.php?cat=3&id=268.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

He declared that he was a member of the Hamas cell named for Abdallah Qawasmeh. Misk emphasized that this was a suicide bombing and that it was being carried out in revenge for the killing of one of the Islamic Jihad commanders in Hebron that had taken place a week before the suicide bombing.[357]

Misk read his "Will" in Arabic and English. He addressed his "Will" in English to Prime Minister Ariel Sharon and stated that he was going to carry out the suicide bombing in the name of Hamas. He also said: "For every time you breach the cease-fire, we will respond with a revenge operation. At the same time, notwithstanding the operation which I am carrying out, we of Hamas are bound by the cease-fire."[358]

Ra'ed Misk's "Will" was recorded and can be viewed on YouTube.[359]

### c. Official documents of the Government of Israel

### 1) Judiciary processes and legal documents in Israel

A number of members of the cell which planned the terrorist attack were arrested, charged and convicted by the Israeli courts for their involvement in the terrorist attack. These included:

- **Nasim Rashad Abd el-Wadud Za'tari**: convicted of membership in Hamas and of having selected the location for the terrorist attack. He was recruited to Hamas by Ahmad Badr, the head of Hamas in Hebron, and received money from him. The indictment also charged Za'tari with the recruitment of fellow conspirators, including his brother-in-law, Majdi Barkat Za'tari, and Abdallah Sharbati.

- **Majdi Barkat Za'tari**: convicted of membership in Hamas and transferring explosive charges to Jerusalem, as well as of transporting the suicide bomber.[360] Majdi Barkat Za'tari pled guilty to membership in Hamas and to his involvement in the terrorist attack on the No. 2 bus.[361]

- **Abdallah Yihya Sharbati**: convicted of membership in Hamas and transporting the suicide bomber from Abu Dis to Jerusalem and then to the site of the terrorist attack.[362]

- **Jalal Jamal Ya'mur**: convicted of membership in Hamas; of working as a driver for Hamas headquarters in Hebron; and of being the contact person between Hamas headquarters in Hebron and the Jerusalem cell which carried out the terrorist attack.

---

[357] http://www.alqassam.ps/arabic/sohdaa5.php?id=750.
[358] *See* Appendix No. 1, pp. 760-764; *see also* Appendix No. 1, pp. 898-904; pp. 905-909.
[359] http://www.youtube.com/watch?v=uGGosFbI58c.
[360] *See* Appendix No. 1, pp. 767-780.
[361] *See* Appendix No. 1, pp. 767-780.
[362] *See* Appendix No. 1, pp. 809-819.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

- **Ramzi Walid Salah Arafeh**: convicted of membership in Hamas and of collecting intelligence on potential target locations in Jerusalem, including the No. 2 bus line.[363]

### d. Findings of the United States Government

See the confirmation by the United States Government of the fact that the terrorist attack on the No. 2 bus line was carried out by Hamas.[364]

### e. Summary of the terrorist attack on the No. 2 bus line

The mastermind behind the attack was Ahmad Badr, the commander of the al-Qassam Brigades in Hebron, who received his instructions from the Hamas military leaders in Damascus. Other leaders of the al-Qassam Brigades in Hebron, Basel Qawasmeh and Izz al-Din Misk, also participated in planning and organizing the terrorist attack, which was carried out in revenge for the fact that Israel, two months before, had eliminated Abdallah Qawasmeh, the commander of the al-Qassam Brigades in Hebron. Hamas considered that operation on Israel's part a breach of the terms of the partial cease-fire which had been declared by it.

These leaders were assisted by their driver, who transferred messages to Nasim Rashad Za'tari, the commander of the Hamas cell in Jerusalem, who was recruited to Hamas by Badr and received money from Badr. Za'tari received instructions to collect intelligence on crowded places which were suitable for carrying out suicide operations. He also received instructions to recruit Palestinians with Israeli identity cards. Za'tari recruited his brother in law, Majdi Barkat Za'tari, and instructed him to collect intelligence on a bus in Jerusalem which could constitute a target. He also recruited Abdallah Sharbati to act as a driver for the suicide bomber. Rashed Za'tari selected the No. 2 bus line as a convenient target. The choice was approved by Badr, who decided that the terrorist attack would be carried out at night. Badr and Rashed Za'tari had already attempted to perform other suicide bombings on buses in Jerusalem in the past, as well as a suicide attack on a restaurant on Mt. Scopus, near the Hebrew University campus.[365] Badr, Basel Qawasmeh and Izz al-Din Misk were all killed by Israel following the terrorist attack on the No. 2 bus line.[366]

---

[363] *See* Appendix No. 1, pp. 820-823.
[364] http://www.ustreas.gov/Press/Releases/js672.htm.
[365] *See* Appendix No. 1, pp. 824-839.
[366] Announcement by the Israel Defense Forces Spokesperson, September 22, 2003, regarding the killing of the three (Appendix No. 1, pp. 840-841).

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

**The Hebron Cell: the terrorist attack on the No. 2 bus line**



**f. Conclusion**

The many detailed declarations which were issued by Hamas with regard to the terrorist attack on the No. 2 bus, the glorification of the operatives within the organization, and the profusion of praise which was given to the cell which planned and carried out the terrorist attack – all of these, in and of themselves, would suffice in order to lead to the conclusion that Hamas carried

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

out the terrorist attack. At the same time, the ISA conclusions on the basis of its investigations, the criminal convictions of the cell members, and their repeated public declarations expressing pride in the performance of the terrorist attack on the No. 2 bus and other terrorist attacks leave no doubt that this attack was carried out by Hamas.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

### September 9, 2003 – the terrorist attack on Café Hillel, Jerusalem

#### a. The terrorist attack

On September 9, 2003, Ramez Abu Salim, a Hamas operative from a village near Ramallah, went into Café Hillel, a popular café in the German Colony neighborhood of Jerusalem, and blew himself up. The explosion killed seven people and wounded 50 more. The explosion represented the culmination of a plan of action which involved scores of Hamas operatives and two separate Hamas cells, in addition to the personal involvement of members of the most senior echelon of the al-Qassam Brigades management in the West Bank.

On the day of the terrorist attack, Naal Salame Ubeid and Muhammad Ubeid, brought Abu Salim to the home of Muhammad Anati. While Amro served as the lookout, the two shaved off Abu Salim's beard and dressed him in an explosive belt. When they were finished, they took him to Café Hillel and told him to come as close as possible to the café – and even to go in, if possible – and then to blow himself up.

#### b. Evidence for legal attribution

##### 1) The assumption of responsibility

The day after the terrorist attack, Hamas published a placard *which was disseminated to the media in Ramallah and was also transferred to Yedioth Ahronoth and to me personally.* The placard stated the name of the suicide bomber, Abu Salim. It boasted that "the Izz al-Din al-Qassam Brigades are the ones responsible for this operation." The placard was signed by the al-Qassam Brigades. A "military announcement" set forth the full name of the person who carried out the operation, "Ramez Salame Izz al-Din Abu Salim, 22, a resident of the village of Rantis." The announcement further stated that "the Izz al-Din al-Qassam Brigades take responsibility for the terrorist attack."[367]

An official Hamas report on the terrorist attacks carried out in 2003 described "Operation No. 94 in Café Hillel in Jerusalem." The report stated that the al-Qassam Brigades assumed responsibility for the operation.[368] Hamas also provided the *al-Jazeera* network with a video tape with the terrorist's "Will," and it was broadcast on the station the day after the terrorist attack was carried out. In his "Will," the suicide bomber, Abu Salim, asked his father: "Forgive me, I am invited to a wedding, I cannot wait even one moment."[369] From my professional experience, I know that, in the lexicon of radical Islam, the word "wedding" can often refer to the death of a martyr.

---

[367] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=byan&id=477.
[368] http://www.palestine-info.info/arabic/Hamas/shuhda/amalyat_03.htm.
[369] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=byan&id=477.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

An official report by Hamas reported that "the terrorist attack was carried out in the Emek Refaim neighborhood in the heart of Jerusalem, inside Café Hillel. The perpetrator is Ihab Abd al-Qader Muhammad Abu Salim, a student of Humanities at Bir Zeit University. The perpetrator [is a member of] the Izz al-Din al-Qassam Brigades."[370]

On September 9, 2003, Hamas issued a short announcement taking responsibility, accompanied by expressions of joy over the results of the terrorist attack.[371]

### 2) Hamas posters

After the terrorist attack, Hamas produced posters bearing the terrorist's picture, with the emblem of the al-Qassam Brigades next to him. Some of the posters, which are reproduced below, were found in the al-Ein mosque in al-Bireh. This mosque belongs to the Hamas infrastructure in the West Bank. Abu Salim is also registered as a *shahid* in the chapter honoring the suicide bombers in the Hamas <u>Book of Martyrs</u>.[372] The Hamas web site also published an extensive article about the suicide bomber.[373]

The suicide bomber's image on posters which were found in the al-Ein mosque in al-Bireh:

 

---

[370] http://www.alqassam.ps/arabic/operations2.php?id=84.
[371] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=byan&id=477.
[372] http://www.alqassam.ps/arabic/sohdaa3.php?from=32.
[373] http://www.alqassam.ps/arabic/sohdaa5.php?id=477.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

A photograph of the terrorist as it appeared on the Hamas web site, with a picture of the results of the incident next to it:[374]



The poster prepared for the suicide bomber by Hamas:[375]



### c. Official documents of the Government of Israel

#### 1) ISA announcement [376]

"September 9, 2003 – explosion by a suicide bomber at the entrance to Café Hillel. 7 killed and 70 wounded. The suicide bomber is Ramez Abu Salim, a resident of Rantis, 22 years old, a Hamas operative, a student and an activist in *al-Kutla al-Islamiya* at the Open University of al-Bireh. He was under administrative detention and was released in February 2003. At 11:20 p.m., he blew himself up at the entrance to Café Hillel on Emek Refaim Street in Jerusalem. The suicide bomber was sent out on the terrorist attack by a front line cell of the Hamas infrastructure in the village of Beit Laqiya, a cell which is composed of Hamas recruits from East Jerusalem and was handled by Hamas headquarters in Ramallah. During the month of October 2004, a number of residents of the village of Issawiya were arrested in Jerusalem and in Israel Security Agency and the Israel Police. During their interrogation by the ISA, two of them admitted that they were the ones who gave the suicide bomber shelter and took him to the target location for the suicide attack. Other subjects, during their interrogation, confessed that they had helped the

---

[374] http://www.alqassam.ps/arabic/operations2.php?id=83#.

[375] http://www.alqassam.ps/arabic/operations2.php?id=84.

[376] http://www.pmo.gov.il/NR/rdonlyres/81819B47-FE6C-47C2-B000-77B9A7EB9A5A/0/%D7%97%D7%95%D7%91%D7%AA%D7%9E%D7%97%D7%91%D7%9C%D7%99%D7%9D%D7%9E%D7%AA%D7%90%D7%93%D7%99%D7%9D%D7%91%D7%9C%D7%99%D7%AA%D7%9E%D7%95%D7%A0%D7%95%D7%AA1.doc.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

two of them to set up the contact with Hamas headquarters in Ramallah and to carry out the terrorist attack."

### 2) ISA report[377]

"October 2004 – arrest of a cell of residents of East Jerusalem who had been recruited to Hamas and were handled by Hamas headquarters in Ramallah. The members of the cell carried out the suicide bombing at Café Hillel in Jerusalem. In September 2004, the fact of the rest of the Hamas infrastructure from the village of Beit Laqiya (see details below – July 2004) was released for publication. Investigation revealed a front-line cell of the same infrastructure, which was composed of Hamas recruits from East Jerusalem. This cell was handled by Hamas headquarters in Ramallah, and its members were the ones who perpetrated the suicide bombing at Café Hillel in Jerusalem, after they received the explosive belt and the suicide bomber from the Hamas cell which was exposed in Beit Laqiya. The members of that cell were arrested during the month of October.

The central operatives were as follows:

- Ahmad Muhammad Ali Ubeid – born in 1966, a resident of the village of Issawiya, known to head the Da'wa Association of Hamas in the village. In his interrogation, he confessed that he headed the Hamas cell which carried out the suicide bombing at Café Hillel.

- Naal Salame Mahmoud Ubeid – born in 1978, a resident of the village of Issawiya, Ahmad Ubeid's pupil in a religious study framework in Issawiya, participated in the perpetration of the suicide bombing at Café Hillel.

- Abd el-Aziz Muhammad Musa Amro – born in 1960, a resident of the Shuafat neighborhood, active in the Da'wa Association of Hamas in his neighborhood, made his father's house available to the cell as the place where the suicide bomber was dressed in the explosive belt.

- Salah Subhi Daud Musa – born in 1964, a resident of the village of Beit Laqiya, served as commander of the cell on behalf of Hamas military headquarters in Ramallah.

- Faiz Mustafa Odeh Mahu – born in 1961, a resident of the Anata neighborhood, was responsible on behalf of Hamas for the Da'wa Association of Hamas in the villages north of Jerusalem and served as the contact person between the cell members and Hamas military headquarters in Ramallah.

---

[377] ISA report entitled "Summary data for the year 2004", in Appendix No. 1, pp. 842-867, and at the following link: www.pmo.gov.il/NR/rdonlyres/590B7AD4-2031-483C-BCFE-01CA6C1C6C36/0/shbek0601.doc.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

<u>July 2004</u> – discovery of a Hamas cell from the village of Beit Laqiya, which was involved in murderous terrorist attacks which were carried out in Israel in 2003 and 2004, in which 17 Israeli civilians were killed and 108 more people were wounded.

At the end of July 2004, the Israel Security Agency, the Israel Defense Forces and the Israel Police discovered an organization of Hamas operatives from the village of Beit Laqiya near Ramallah, which was subordinate to Hamas military headquarters in Ramallah. The organization had been headed by Salah Musa, who was arrested on September 26, 2003. Seven more operatives who had worked under Musa were arrested during the period between July and August 2004.

<u>Among the terrorist attacks carried out by the infrastructure:</u>

- A suicide bombing at a hitchhiking station for soldiers at the Tzrifin junction on September 9, 2003, in which nine Israeli civilians were killed and 14 more people were wounded. This terrorist attack was carried out by <u>Ahab Abu Salim</u>.

- A suicide bombing at Café Hillel in Jerusalem on September 9, 2003, in which seven Israeli civilians were killed and 70 more people were wounded. This terrorist attack was carried out by <u>Ramez Abu Salim</u>.

- A terrorist attack involving an explosive charge in a bus stop in Har Zion Boulevard in Tel Aviv, on July 11, 2004, in which a female Israel Defense Forces soldier was killed and 24 Israeli civilians were wounded.

The infrastructure planned additional suicide bombings, including a terrorist attack involving an explosive charge on the Bat Yam beach."

### 3) Announcement by the Government of Israel (September 9, 2003)

"The second terrorist attack in six hours: a Hamas suicide bomber blew himself up at Café Hillel in the German Colony. Eyewitnesses state that the security guard at the café spotted the terrorist, who then blew himself up. The terrorist previously attempted to enter a branch of the 'Pizza Meter' pizzeria chain, but was stopped. In the terrorist attack in Jerusalem, seven Israelis were murdered and 57 were wounded."[378]

### 4) Announcement by the Government of Israel (March 17, 2009)

On March 17, 2009, a meeting of the Israel Government was held to discuss the Hamas demands for the release of inmates from prison, in return for the release of the kidnapped soldier Gilad Shalit. At the end of the meeting, a list of 10 terrorists was published; according to a statement

---

[378] http://www.pmo.gov.il/PMO/Communication/IsraelUnderAttack/Jerusalem3/Jerusalem.htm.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

by the Government, Israel would not be prepared to release the terrorists in question at any price. The list included Bahij Badr and Ibrahim Hamad.[379] The following is the text of the announcement[380] insofar as it relates to those terrorists:

- "Bahij Badr – arrested in 2004 and sentenced to 18 cumulative life sentences. He headed the Hamas infrastructure in Beit Laqiya which perpetrated the terrorist attacks at Café Hillel, in the bus stop near Tzrifin and in the Central Bus Station in Tel Aviv. He was involved in the murder of 18 Israelis. He is considered to be a significant leader and a symbol within the organization.

- Ibrahim Hamad – responsible for terrorist attacks in which 82 Israelis were murdered and hundreds were wounded. Among the attacks related to him were the car bomb in Zion Square in Jerusalem, Café Moment, the club in Rishon Le-Zion, a suicide bombing on a No. 4 bus on Allenby Road in Tel Aviv, and the terrorist attack at Café Hillel in Jerusalem."

### d. Declarations by the conspirators after their arrest

Many of the members of both cells which were involved in the terrorist attack were arrested during the years which followed the explosion. Several of them confessed to their involvement in a terrorist attack, which all of them described as a Hamas operation. Those who confessed were:

### 1) Bahij Badr, head of the Beit Laqiya cell

I met with Badr in the Beersheba Prison in February 2006. The meeting with him lasted for more than three hours. Bahij sat opposite a camera and spoke freely, in Arabic and English. He noted that, as a university graduate, he was fluent in both languages. He told me how he had recruited Ramez Salim; how he had prepared the explosive materials and the explosive belt; and how he had subsequently dispatched the suicide bomber to Jerusalem. He also told me about his activity in Hamas and his religious faith. He was very proud of his actions and did not express remorse for them.[381]

### 2) Ibrahim Muhammad Yunas Dar Musa

Following his arrest, Musa confessed to membership in Hamas and to having recruited the suicide bomber, Ramez Abu Salim. He described his participation in smuggling the explosive belts into Israel and his assistance to the Jerusalem cell in the final preparations before the attack. He was sentenced by an Israeli court to 17 life sentences.

---

[379] http://www.ynet.co.il/articles/1,7340,L-3688058,00.html.
[380] www.pmo.gov.il/NR/rdonlyres/1EED1581-0DD5-41A7-87DE-9B37BE6EFFD9/0/prisoners.doc.
[381] *See* "For the Sake of Allah" in Appendix No. 2.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

### 3) Muhammad Ahmad Ubeid

Muhammad Ubeid confessed, after his arrest, that he was an operative in the al-Qassam Brigades and that he was the leader of the Hamas cell in Jerusalem which carried out the terrorist attack. He confessed to having collected intelligence for Hamas, while maintaining contact with the commanders of the organization in Ramallah. He further confessed that he chose the site of the terrorist attack; he put the explosive belt on the suicide bomber; and he sent him to the target location. Muhammad Ubeid's confession sets forth in detail the methods of operation that are used by Hamas, including methods which were developed during the 1990s, such as the use of certain code words during a meeting; the transmission of communiqués; and identification by means of agreed upon signs. This confession describes a methodology which is characteristic of Hamas.[382]

### 4) Naal Salame Ubeid

Naal Ubeid confessed, after his arrest, that he was an operative in the al-Qassam Brigades and that he had been recruited into Hamas approximately four years before. He confessed that he had undergone training in the assembly of explosive charges and that he had helped to choose the site of the terrorist attack; that he had dressed and shaved the suicide bomber and sent him to Café Hillel.

### 5) Abd el-Aziz Amro

Abd el-Aziz Amro confessed, after his arrest, that he had made his father's house available to the cell and had acted as a lookout while Ahmad Ubeid dressed the suicide bomber in the explosive belt.

### e. Judiciary processes and legal documents in Israel

Muhammad Ahmad Ubeid, Naal Salame Ubeid, Salah Subhi Daud Musa, and Abd el-Aziz Amro (all of whom are mentioned above) were convicted, *after having confessed before the Court*, of involvement in the terrorist attack on Café Hillel and of membership in Hamas. Musa was sentenced to 17 consecutive life sentences. Muhammad Ahmad Ubeid and Naal Ubeid were both sentenced to four life sentences. Ibrahim Hamad and Bahij Badr were convicted of having held command posts in Hamas and of having given instructions to carry out a large number of terrorist attacks, including the one on Café Hillel. On March 17, 2009, the Israel Government published a list of terrorists which it refused to release in the negotiations with Hamas with regard to Gilad Shalit, an Israeli soldier who is being held prisoner by the terrorist organization. The list included Hamad and Badr.

---

[382] *See* Appendix No. 1, pp. 868-875.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

### f. Summary of the terrorist attack on Café Hillel

### 1) General

Until his arrest by Israel in 2006, when he was charged with the murder of 82 Israelis (including seven in Café Hillel), Ibrahim Hamad was the commander of the military section of Hamas in the West Bank. His deputy, Salah Mahmoud al-Talakhmeh, was in charge of the al-Qassam Brigades in the southern part of the West Bank. Talakhmeh was a veteran Hamas operative who had been involved in Hamas suicide bombings on buses in Jerusalem in 1996. He was in direct contact with Hamas headquarters in Syria and Hamas military headquarters in Gaza. It was Talakhmeh who gave the direct order to the Hamas members under his command to recruit the suicide bomber and send him to kill people in Jerusalem.

The responsibility for the mission was divided between two separate Hamas cells: one in Beit Laqiya, a village near Ramallah in the West Bank, and the second in the Arab village of Issawiya, north of Jerusalem. Because the residents of Issawiya hold Israeli identity documents, they have greater freedom of movement in Jerusalem and in Israel in general. For this reason, whereas the Beit Laqiya cell had greater responsibility for the terrorist attack, including the recruiting of the suicide bomber and the assembly of the explosive charges, the Issawiya cell was responsible for locating a suitable place for the terrorist attack and sending the suicide bomber to the selected target location.[383]

Ibrahim Muhammad Yunas Dar Musa, a senior Hamas operative who had also been involved in attempts to construct Qassam rockets with a view to launching them into Israel, reported to Talakhmeh in Ramallah. Musa, together with Bahij Badr (an additional senior Hamas operative, who headed the Beit Laqiya cell), played a significant role in recruiting and preparing the suicide bomber. Badr personally prepared the explosive belt and, with Musa's assistance, smuggled the belt into Jerusalem and gave it to Hamas operatives before the terrorist attack. The two of them then helped the terrorist, Abu Salim, to reach the Jerusalem cell.

The commanders of the Jerusalem/Issawiya cell were Ahmad Muhammad Ubeid (who headed the *Da'wa* infrastructure in the village) and Naal Salame Ubeid, a 26 year old from Issawiya, who was Ahmad Ubeid's pupil in a religious study framework. The two of them were recruited to Hamas by Salah Subhi, the contact person with Hamas headquarters in Ramallah.[384]

On the instructions of headquarters, Naal Salame Ubeid, a 26 year old from Issawiya, and Muhammad Ubeid collected intelligence for Hamas. They examined cafés and restaurants which could serve as potential target locations for terrorist attacks. They received funding from Hamas for their activities and purchased a car. They were trained in the assembly of explosive charges

---

[383] *See* Appendix No. 1, pp. 876-886.
[384] *See* Appendix No. 1, pp. 876-886.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

and obtained an apartment for the purpose of preparing the suicide bomber. The apartment belonged to Muhammad Anati,[385] Abd el-Aziz Amro's father. Amro gave the cell permission to use it, knowing that the apartment would be used to fit the suicide bomber in the explosive belt.[386]

---

[385] *See* Appendix No. 1, pp. 887-891.
[386] *See* Appendix No. 1, pp. 892-894.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

### The Hamas cells: the terrorist attack on Café Hillel



*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

**g. Conclusion**

The many detailed declarations which were issued by Hamas with regard to the terrorist attack on Café Hillel, the boasting about the suicide bomber who carried out the attack, Abu Salim, and his video taped "Will" – all of these, in and of themselves, would suffice to lead to the conclusion that Hamas carried out the terrorist attack. At the same time, the ISA conclusions on the basis of its investigations, the criminal convictions of the cell members, and the video taped declarations by Bahij Badr, in which he declared to me his pride in the performance of the terrorist attack on Café Hillel, leave no doubt that this attack was carried out by Hamas.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

## September 24, 2004 – mortar fire in Neve Dekalim

### a. The terrorist attack

Due to the construction of the separation fence in Israel and other defensive means which Israel adopted in order to combat Palestinian terrorism, Hamas and other terrorist organizations encountered growing difficulty in 2004 in carrying out suicide bombings against Israeli civilians.[387] Accordingly, Hamas began to make increasing use of another method of operation to perform its terrorist activity: mortar and rocket fire[388] at Israeli population centers. A mortar is a short-range weapon which is more accurate than a rocket; it is mobile, lightweight, easy to operate and can easily be concealed in the terrain. In 2004, the year which preceded Israel's unilateral detachment from the Gaza Strip, an unprecedented number of mortar shells (876 mortar shells, according to the Israel Defense Forces) was fired at the Israeli settlements in the Gaza Strip. One of those mortar shells was fired on September 23, 2003, and led to the death of Tiferet Trattner, a 24 year old woman from Jerusalem.

### b. Evidence for legal attribution

#### 1) The assumption of responsibility

Following the terrorist attack, at least three media entities reported that Hamas had contacted them and had assumed responsibility.

The Associated Press, through a correspondent of the agency in Gaza, reported that the mortar shells had been fired by Hamas, and that the organization had assumed responsibility by means of a video tape. According to AP, "Hamas assumed responsibility for the firing of the two mortar shells into Neve Dekalim. The Hamas video tape shows three masked men firing the mortar."[389]

The Israeli daily Ha'aretz reported, through its military correspondent, Amos Harel, that "the Izz al-Din al-Qassam Brigades, the military arm of Hamas, assumed responsibility."[390]

---

[387] *See* ISA report for 2004:
http://www.shabak.gov.il/SiteCollectionImages/%D7%A1%D7%A7%D7%99%D7%A8%D7%95%D7%AA%20%D7%95%D7%A4%D7%A8%D7%A1%D7%95%D7%9E%D7%99%D7%9D/terror-summary-2004-new.pdf.
*See also* ISA report on the terrorist attacks between the years 2000 and 2005. The report shows a significant decline in terrorist attacks in 2004, by contrast to 2001 through 2003:
http://www.shabak.gov.il/SiteCollectionImages/%D7%A1%D7%A7%D7%99%D7%A8%D7%95%D7%AA%20%D7%95%D7%A4%D7%A8%D7%A1%D7%95%D7%9E%D7%99%D7%9D/sikum%205%20years.pdf.
[388] *See* a film by the al-Qassam Brigades which concentrates on mortar fire into Israel:
http://www.alqassam.ps/arabic/video1.php?cat=4&id=187.
[389] *See* Appendix No. 1, p. 895.
[390] *See* Appendix No. 1, p. 896.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

In addition, in accordance with that which has been set forth on page 44 of the expert opinion by Evan Kohlmann, the al-Qassam Brigades published at least two placards on their web site (both on September 24, 2004), in which they assumed responsibility for the terrorist attack. Both of the placards can still be viewed on that web site (www.alqassam.ps).[391] The first placard took the credit for "firing three 100 mm mortar shells at the 'settlement' of Neve Dekalim at exactly 10:30 a.m."[392] The second placard repeated the information and added that the terrorist attack had "killed two enemy soldiers and lightly wounded two others."[393]

### 2) The video tape of the terrorist attack

These reports are also verified by the video tape of the terrorist attack, which I have seen. The tape shows three masked men, whose faces are covered with green bandanas (indicating Hamas), firing toward Neve Dekalim.

### c. Conclusion

In the absence of the confirmation which is obtained in cases of suicide bombings and other terrorist attacks, in which the bodies of the perpetrators can be identified with certainty; and in the absence of documentation resulting from a comprehensive criminal investigation, I cannot definitively state that the terrorist attack by mortar fire on September 24, 2004, was carried out by Hamas. At the same time, based on the assumption of responsibility by Hamas, in addition to my own experience as an expert and my familiarity with the tactics adopted by the organization, as well as the video taping of the mortar fire itself, my professional opinion is that there is a high degree of probability that Hamas was responsible for this terrorist attack, and that there is no proof, to the best of my knowledge, to the contrary.

The placard from the Hamas web site:[394]

---

[391] http://www.alqassam.ps/arabic/statments.php?id=755, July 2009. *See also*: http://www.alqassam.ps/arabic/statments.php?id=754, June 2009.

[392] http://www.alqassam.ps/arabic/statments.php?id=754, June 2009.

[393] http://www.alqassam.ps/arabic/statments.php?id=755, July 2009.

[394] http://www.alqassam.ps/arabic/statments.php?id=755.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*



بسم الله الرحمن الرحيم

| | |
|---|---|
| **Ezzedeen Al-Qassam Brigades**<br>**Military Wing of Hamas Movement**<br>**information Office** | كتائب الشهيد عز الدين القسام<br>الجناح العسكري لحركة حماس<br>المكتب الإعلامي |

2004-09-24

..يا جماهير شعبنا الفلسطيني المجاهد... يا جماهير أمتنا العربية والإسلامية

بحمد الله تعالى وتوفيقه تمكنت كتائب الشهيد عز الدين القسام من إطلاق ثلاث قذائف

هاون عيار 100 بتجاه مغتصبة "نفيه ديكاليم"، وذلك في تمام الساعة 10:30، من

صباح اليوم الجمعة 10 شعبان 1425هـ، الموافق 24/09/2004م

إذ تعلن في كتائب الشهيد عز الدين القسام إذ تعلن مسؤوليتها عن هذا القصف لنعاهد الله

تعالى ونعاهد جماهير شعبنا الفلسطيني المجاهد على المضي قدماً في طريق الجهاد

والمقاومة وقصف المغتصبات الصهيونية حتى يندحر العدو الصهيوني لغاشم عن

.أرضنا المباركة

وإنه لجهاد نصر أو استشهاد

كتائب الشهيد عز الدين القسام

الجمعة 10 شعبان 1425 هـ

الموافق 24/09/2004م

الساعة 10:50

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

**October 22, 2003 – shooting attack in Tel Rumeida, Hebron**

### a. The terrorist attack

On October 22, 2003, at about 1:15 p.m., Rafiq Ziad Aqanibi, a Hamas operative in Hebron, entered the Jewish neighborhood of Tel Rumeida (near Hebron). Aqanibi was armed with a Kalashnikov; on his head, he wore a green band which showed his affiliation with Hamas. At a distance of a few meters from the home of the Ben Yitzhak family, he opened fire. Gabi Ben Yitzhak, who was at home, was lightly wounded in one arm.

When the paramedic, Eyal Noked, reached the scene, Aqanibi fired a large number of bullets at his ambulance and hit Noked's shoulder. Aqanibi emptied a number of clips before he was shot and killed by the members of the local on-call security squad, who arrived following reports on the shooting. Noked and Ben Yitzhak were admitted to Hadassah Hospital in Jerusalem for medical treatment.

### b. Evidence for legal attribution

### 1) The assumption of responsibility

After the terrorist attack, the official Hamas web site published a large article on the attack, which included a detailed biography of Aqanibi and a description of the attack in Tel Rumeida.[395] A similar article appeared on the web site of the al-Qassam Brigades.[396] His name also appeared in the Hamas <u>Book of Martyrs</u>. On the fifth anniversary of the terrorist's death, Hamas published an article on Aqanibi and the attack which he carried out, along with his picture and biography. The emblem of the al-Qassam Brigades also appeared in the background.[397] He is also listed as a martyr of the al-Qassam Brigades on an additional site related to Hamas,[398] and his name appears on an official Hamas web site in a list of members of the al-Qassam Brigades in Hebron who were killed, as *Shahid* No. 21.[399]

After the attack, Hamas published a poster bearing a large photograph of Aqanibi, with the following inscription: "Our martyr, the hero, the Jihad fighter, Rafiq Mohammad Ziad Ya'aqoub Aqanibi." On the left side of the poster, the Hamas emblem is seen; on the right side, the official emblem of the al-Qassam Brigades appears. At the bottom of the poster is the date of the attack.

---

[395] http://www.palestine-info.info/arabic/spfiles/suhada_2005/shuhda_khaleel/rafeeq.htm.
[396] http://www.alqassam.ps/arabic/sohdaa5.php?id=330.
[397] http://www.paldf net/forum/showthread.php?t=313248.
[398] http://www.abrrar.net/vb/showthread.php?p=91607.
[399] http://www.palestine-info.info/arabic/spfiles/suhada_2005/shuhda_khaleel/khaleel.htm.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*



400

Aqanibi's photograph is also included in another poster, which was published by Hamas after the terrorist attack. In the picture, Aqanibi appears with several other martyrs from the Hamas cell in Hebron. In the center of the poster is the photograph of Abdallah Qawasmeh, who was the commander of the al-Qassam Brigades in Hebron until his death and who planned the terrorist attack on the No. 37 bus in Haifa, which is discussed above. The suicide bomber from the No. 37 bus line, Muhammad Amran Salim al-Qawasmeh, is also shown in the poster, along with Basel Muhammad Qawasmeh, who was responsible for the terrorist attack on the No. 6 bus line in Jerusalem.

---

[400] Source of the photograph: www.palestine-info.info/arabic/spfiles/suhada_2005/shuhda_khaleel/rafeeq.htm.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*



401

Finally, Aqanibi's photograph appears on a site showing pictures of the al-Qassam Brigades martyrs.[402]

### 2) Photographs

After Aqanibi's death, a press photographer who worked for Yeshanews.com photographed his body, which was lying on the road, near Tel Rumeida. I watched the photograph being taken,[403] and I clearly saw Aqanibi's green bandana.

---

[401] Source of the photograph: http://www.palestine-info.info/arabic/spfiles/suhada_2005/shuhda_khaleel/khaleel.htm.
[402] http://www.alqassam.ps/arabic//sohdaa5.php?sub_action=byan&id=362.
[403] http://www.yeshanews.com/?id=23960.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

### 3) The "Will"

According to Hamas web sites, Aqanibi left a "Will," in which he asked his family to forgive him for having chosen to carry out the suicide bombing.[404] Due to the near-total certainty that a shooting attack of this type would lead to the perpetrator's death, Hamas and other terrorist organizations consider this type of operation as a suicide operation and commemorate their fallen comrades as martyrs.

### c. Official documents of the Government of Israel

I have studied the documents of the Israeli military court in Hebron. In three cases, before his death, Aqanibi was arrested by Israel and convicted of membership in Hamas. At the time when he was killed, Aqanibi was wanted by the Israeli security forces on suspicion of being involved in Hamas terrorist operations.

### d. Conclusion

The many detailed declarations which were issued by Hamas with regard to the terrorist attack in Tel Rumeida, and the boasting about Aqanibi within the organization – all of these, in and of themselves, would suffice to lead to the conclusion that Hamas carried out the terrorist attack. At the same time, the fact that Aqanibi wore a Hamas bandana while carrying out the terrorist attack in Tel Rumeida leaves no doubt that this attack was carried out by a Hamas operative on behalf of the organization.

---

[404] http://www.palestine-info.info/arabic/spfiles/suhada_2005/shuhda_khaleel/rafeeq.htm.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

**January 29, 2004 – the terrorist attack on the No. 19 bus, Jerusalem**

### a. The terrorist attack

On January 29, 2004, shortly before 9 a.m., Ali Muneer Ja'ara, a 24 year old Palestinian policeman from Bethlehem, blew himself up in a No. 19 bus at the corner of Gaza Road and Arlozorov Street in the Rehavia neighborhood of Jerusalem. Eleven people were killed and more than 50 others wounded, 13 of them seriously. The explosion ripped the bus to shreds, blew the roof off, broke all of the windows and left pieces of the destruction scattered through the street and on the roofs of adjacent houses.

Ja'ara originally contacted an operative of the al-Qassam Brigades and said that he wanted to carry out a suicide bombing for Hamas. He underwent training and indoctrination by Hamas and attempted to carry out the operation for Hamas, before he decided not to do so because he encountered a Palestinian roadblock on his way to the intended target location. Ja'ara then approached the al-Aqsa Martyrs Brigades, in order to carry out the terrorist attack. As I conclude below, on the basis of the assumption of responsibility by Hamas and by the al-Aqsa Martyrs Brigades, as well as of the interrogations and the judiciary proceedings in Israel, both Hamas and the al-Aqsa Martyrs Brigades are responsible for this terrorist attack.

### b. Evidence for legal attribution

#### 1) The assumption of responsibility

A short time after the terrorist attack, the Bethlehem headquarters of the al-Aqsa Martyrs Brigades, the military arm of Fatah, published a press release according to which the al-Aqsa Martyrs Brigades had perpetrated the terrorist attack. At the same time, the al-Aqsa Martyrs Brigades has never repeated this claim on their web site, and Fatah subsequently rejected any responsibility for the terrorist attack.[405]

On January 31, 2004, the al-Qassam Brigades declared that they were the sole entity which was responsible for the terrorist attack:

"Praise God, with God's help, the Jihad fighter, a member of the organization, succeeded in carrying out a great sacrifice operation... The person who performed the sacrifice operation, Ali Munir Yusuf Ja'ara, age 25, from the al-Aida refugee camp in Bethlehem, boarded a No. 19 bus

---

[405] *See* the assumption of responsibility by Izz al-Din al-Qassam. In their announcement, they rebuke Fatah for having hastened to take responsibility for the terrorist attack:
 http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=byan&id=378. *See also* the assumption of responsibility on the Hamas web site: http://www.palestine-info.com/arabic/spfiles/suhada_2005/book/3amaleyah_2.htm.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

which was transporting Zionists... He detonated the explosive belt as he had been instructed to do."[406]

The placard explained that Ja'ara carried out the attack on his 25th birthday, as a "natural response" to the "crimes" of the "Zionist enemy" against the Palestinian people, the Palestinian cities in the Palestinian refugees, including the most recent Israel Defense Forces attack on the Zeitun suburb of Gaza City. The placard also declared that the attack was a gift to "our brave inmates in the prisons of the Zionist enemy." "We are telling them that our hands will continue to hold the rifle until the release of the homeland and all of its prisoners," stated the placard.

The al-Qassam Brigades poster also expressed displeasure at the premature assumption of responsibility by the al-Aqsa Martyrs Brigades, stating: "We deliberately delayed taking responsibility for the attack, in order to enable our brothers to correct their hasty (and mistaken) assumption of responsibility." The placard added that the pictures of the martyr, wearing a Hamas band around his head, and the pictures of the al-Qassam Brigades martyrs behind him, had been sent to the media.

A Hamas announcement of the terrorist attack stated that it was carried out "by the Izz al-Din al-Qassam Brigades."[407]

An official Hamas poster stated that the perpetrator Ali Ja'ara was the sword of the al-Qassam Brigades. The poster assumes official responsibility for the terrorist attack.[408]

### 2) Photographs

Before going out to make the first (failed) attempt to perpetrate the suicide bombing, Ja'ara was photographed by his handler, the Hamas operative Nufal Adawin, wearing Hamas clothing. In his recorded "Will," Ja'ara expressed pride in his death as a *shahid* in the service of Hamas.[409] Some of the photographs were later sent to the press and were published on the al-Qassam Brigades web site:

---

[406] http://www.alqassam.ps/arabic/sohdaa5.php?id=378.
[407] http://www.alqassam.ps/arabic/operations2.php?id=72.
[408] http://www.alqassam.ps/arabic/byan_poup.php?id=406.
[409] http://www.mobile4arab.com/vb/showthread.php?p=1012544.

126

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*



*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*



410

In addition, Ja'ara and the attack were mentioned in the <u>Book of Martyrs</u>, or in the commemorative books describing martyrs' death which were published by Hamas in honor of the suicide bombings and the Hamas activists who died carrying them out. These publications include pictures of Ja'ara, which were taken before he set out to perform the attack, along with pictures of the outcome of the attack, with the Hamas emblem superimposed on them.[411]

---

[410] Source of the photograph: http://www.palestine-info.info/arabic/Hamas/shuhda/2004/ali/photo.htm.
[411] *See e.g.*: http://www.palestine-info.com/arabic/spfiles/suhada_2005/book/3amaleyah_2 htm; *see also*: http://alqassam.ps/arabic/sohdaa5.php?sub_action=byan&id=378.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*



412



413

### c. Official documents of the Government of Israel

### 1)    ISA report

An ISA report which was published after the terrorist attack on January 29, 2004, stated that: "The al-Aqsa Brigades in Bethlehem assumed responsibility for the terrorist attack." The report did not state any evaluation as to the responsibility of Hamas for the attack.

---

412 Source of the photograph: http://www.palestine-info.info/arabic/Hamas/shuhda/2004/ali/photo.htm.
413 Source of the photograph: http://www.alqassam.ps/arabic/operations2.php?id=72.

On February 2, 2004, an official announcement by the ISA was published regarding the death of Muhammad Abu Ouda, commander of the Hamas in Bethlehem. In this announcement, it was stated that "according to intelligence estimations, Abu Ouda was behind the suicide bombing on January 29, 2004, on the No. 19 bus in Gaza Road in Jerusalem, in which 11 civilians were killed and over 60 wounded. The terrorist attack was carried out by Ali Ja'ara, a Palestinian policeman, resident in the al-Aida Refugee Camp in Bethlehem."[414]

### 2) The Prime Minister's Office web site

The web site of the Prime Minister's Office stated, after the terrorist attack on January 29, 2004, that: "The terrorist who carried out the attack, Ali Muneer Jaarah, a 23 year old resident of the al-Aida refugee camp near Bethlehem, is a member of the al-Aqsa Brigades, the military section of Fatah."[415] At the same time, it appears that Ja'ara was not really a member of the al-Aqsa Martyrs Brigades.

### 3) The Israel Foreign Ministry

An article which was written by Israel's Foreign Ministry with regard to the terrorist attack on January 29, 2004, stated that: "Both the al-Aqsa Martyrs Brigades, which are affiliated with Fatah, and Hamas assumed responsibility for the terrorist attack, naming the terrorist, Ali Yusuf Ja'ara, a 24 year old Palestinian policeman from Bethlehem."[416]

### 4) Judiciary processes and legal documents in Israel

a.   **Nufal Jihad Nufal Adawin**: Ja'ara's handler. He was interrogated by the Israel Police on September 8, 2004. According to Adawin's interrogation report, Adawin set forth in detail his involvement in Hamas activity. He also declared that:

- Early in 2004, his friend (and comrade in the al-Qassam Brigades) Muhammad Kaid Nashash introduced him to Ali Muneer Ja'ara, who stated that he wanted to be a suicide bomber.

- Nashash and Adawin prepared the explosive belt for Ja'ara and then brought him to Adawin's house, where they photographed him holding a plastic rifle. They photographed him with a video camera reading his "Will" while standing next to Hamas posters.

---

[414] ISA document. *See* Appendix No. 1, p. 897.
[415] http://www.pmo.gov.il/PMO/Communication/IsraelUnderAttack/Jerusalem2/Jerusalem.htm.
[416]
http://www.mfa.gov.il/MFA/MFAArchive/2000_2009/2004/1/Suicide+bombing+of+Egged+bus+no+19+in+Jerusalem+-.htm.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

- Adawin subsequently set out with Ja'ara for Jerusalem in order to carry out the suicide bombing, but the two turned back when they understood that Palestinian security forces had set up a roadblock near the road leading to Jerusalem.

- After the failed attempt to travel to Jerusalem, Ja'ara told Adawin that he was going to the Fatah cell, to have them transport him to the planned site of perpetration of the terrorist attack. Several days after the attack, Adawin left an envelope at the Bethlehem television station; the envelope contained photographs of Ja'ara, in which he was seen holding a weapon next to the Hamas flag.

- Subsequently, Adawin told a senior member of the al-Qassam Brigades, Mahmoud Khalil Mahmoud Azia, that he (Adawin) was responsible for the terrorist attack.

Adawin was charged with and convicted of involvement in the terrorist attack. On December 12, 2006, he was sentenced to 21 years in prison.

b.   **Mahmoud Khalil Mahmoud Azia**: a Hamas operative who was also in prison in Israel. He was interrogated on September 9, 2004, and he corroborated Adawin's version of the chain of events. Azia explained that he had intended to ask a representative of the local charity committee for financing for additional terrorist attacks by Adawin, but that he had not succeeded in doing so up to the date of his arrest.

Azia was charged with and convicted of involvement in the terrorist attack and membership in Hamas. He was sentenced to five years' imprisonment and was released in July 2009.

c.   **Abd al-Rahman Yusuf Maqdad**: an operative of the al-Aqsa Martyrs Brigades. He prepared the explosives which were used in the terrorist attack. He was charged with and convicted of involvement in the terrorist attack. On July 27, 2006, he was sentenced to 21 life sentences plus 15 years' imprisonment.

d.   **Ahmad Abu Radab**: an operative of the al-Aqsa Martyrs Brigades. He planned terrorist attacks. He was charged with and convicted of involvement in the terrorist attack and membership in the al-Aqsa Martyrs Brigades. On July 27, 2007, he was sentenced to 21 life sentences plus 10 years' imprisonment.

e.   **Hilmi Abd el-Karim Muhammad Hamash**: an operative of the al-Aqsa Martyrs Brigades. He was charged with and convicted of fulfilling his role in the terrorist attack and membership in the al-Aqsa Martyrs Brigades. On September 28, 2006, he was sentenced to 12 life sentences.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

### d. Summary of the terrorist attack on the No. 19 bus line

#### 1) Hamas involvement

At the beginning of 2004, Ali Muneer Ja'ara contacted his friend, Muhammad Kaid Nashash, an operative in the al-Qassam Brigades. Ja'ara told him that he wanted to carry out a suicide bombing. Nashash contacted a friend of his, Nufal Jihad Nufal Adawin, who was also an operative in the al-Qassam Brigades, and informed him that he had a friend who wanted to perform a suicide bombing. Nashash and Adawin assembled an explosive belt for Ja'ara, which he was supposed to use in the terrorist attack. They drove him to Adawin's house and photographed him standing next to a Hamas poster and holding a plastic rifle. They also video taped him with a video camera as he read his "Will" out loud. Adawin took Ja'ara by car toward the intended location for the terrorist attack; however, as they approached the Tunnel Road (south of Jerusalem), they encountered Palestinian security forces. Fearing that the security forces would prevent Ja'ara from carrying out the terrorist attack, they turned back.

The planning and execution of the terrorist attack on the No. 19 bus clearly reflect a method of operation which differs from that which was shown in many of the other terrorist attacks mentioned in this expert opinion. In spite of the fact that Hamas proudly assumed responsibility for this terrorist attack, and in spite of the fact that judiciary processes in Israel have imposed responsibility on Hamas, a brief discussion of the situation in which Hamas found itself in 2004 will be useful in clarifying the context in which the terrorist attack was carried out and clearing up any initial confusion as to the terrorist attack and its relationship to Hamas.

Despite the fact that, until 2004, Hamas continued to broaden its control as a political and social entity, while remaining committed to the murder of Israeli and American civilians, Israeli military operations considerably affected the operational capacities of the organization and, as a result, the extent of fatality of its terrorist attacks. From that time forth, terrorist attacks were planned by Hamas operatives who were less experienced and less sophisticated. In a number of cases, a pattern appeared in which a Hamas operative could recruit and help to train a terrorist, who eventually carried out the terrorist attack on behalf of another organization (although both Hamas and the other organization assumed responsibility for the terrorist attack). In fact, other organizations which sought to avoid conflict with Hamas gave a greater portion of the responsibility and credit to Hamas. This apparently promoted both the political success of Hamas in the elections to the Palestinian parliament in 2006 and the expulsion of its coalition partners from the Fatah movement later that same year.

In 2006, the monthly periodical *Foreign Affairs* published an article by Prof. Daniel Byman of Georgetown University and the Saban Center of the Brookings Institute. Byman pointed out the changes which had taken place in the methods of operation used by Hamas:

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

The number of Hamas attacks grew steadily as the intifada progressed, even as Israel eliminated Hamas members: there were 19 attacks in 2001, 34 in 2002, 46 in 2003, 202 in 2004, and 179 in 2005 (most in the first half of that year, before a tentative cease-fire took hold). But as the number of attacks grew, the number of Israeli deaths they caused plunged, suggesting that the attacks themselves became far less effective. The fatality rate rose from 3.9 deaths per attack in 2001 to 5.4 in 2002, its highest point. Then, in 2003 the rate began to fall, dropping to 0.98 deaths per attack that year, 0.33 in 2004, and 0.11 in 2005.

Something more than correlation was at work here. Contrary to popular myth, the number of skilled terrorists is quite limited. Bomb makers, terrorism trainers, forgers, recruiters, and terrorist leaders are scarce; they need many months, if not years, to gain enough expertise to be effective. When these individuals are arrested or killed, their organizations are disrupted. The groups may still be able to attract recruits, but lacking expertise, these new recruits will not pose the same kind of threat.

In my opinion, the terrorist attack on the No. 19 bus reflects, to a certain extent, the changes which Prof. Byman pointed out. In 2004, the pool of potential volunteers in the Palestinian Territories for suicide bombings was much greater than it had been between 1994 and 1996. At the same time, the ability of the al-Qassam Brigades terrorist cells (the "skilled terrorists" mentioned by Prof. Byman in his article) had declined significantly as a result of Israel's war against terrorism, including the arrest of experienced terrorist operatives and attempts on the lives of many experienced senior terrorists. Nufal Adawin was undoubtedly a Hamas operative, and even before 2004, it would not have been exceptional for potential suicide bombers such as Ali Ja'ara to make contact with local Hamas operatives (such as Adawin) in order to offer their services as suicide bombers. At the same time, Adawin was obviously less experienced and less sophisticated than most Hamas operatives and cell leaders who had planned and coordinated earlier terrorist attacks, such as those mentioned in this expert opinion. By January 2004, most of the Hamas bomb makers and most of the organization's senior operatives in the West Bank had been killed or arrested by Israel. For example, by that time, all four of the senior Hamas operatives in Hebron had been killed; Abbas al-Sayed, Abdallah Barghouti and Muhammad Arman were already in prison; and Ibrahim Hamad was a wanted man and had gone underground.

Adawin (with the assistance of an additional Hamas operative, Muhammad Nashash) recruited Ja'ara into the al-Qassam Brigades of Hamas, prepared the explosive charge for him, photographed him and recorded Ja'ara's "martyr will." After Ja'ara's first (unsuccessful) attempt to perform a terrorist attack, he told Adawin that he would contact Fatah elements and have them help him carry out the suicide bombing. Adawin had no objection and did not intervene. After the terrorist attack, Adawin informed Hamas headquarters of the role which he had played in recruiting and training Ja'ara. It is possible that Adawin even inflated his role, in an attempt to receive additional, and perhaps even greater, funding for future terrorist attacks on behalf of

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

Hamas. Finally, as noted on page 43 of Mr. Kohlmann's expert opinion, Hamas publicly assumed responsibility for the terrorist attack; the al-Aqsa Martyrs Brigades not only gave Hamas the credit for the terrorist attack, but even withdrew their earlier declaration of responsibility, according to which they had been the only ones responsible for the terrorist attack.

At the same time, in light of my review of the documents from the Israel Police investigation of the terrorist attack on the No. 19 bus, I conclude that Adawin was not as skilled a bomb maker as, for example, Abdallah Barghouti. Nor had Adawin ever commanded a sophisticated cell of the al-Qassam Brigades, in contrast to Abbas al-Sayed or Abdallah Qawasmeh. Instead, the terrorist attack on the No. 19 bus – in spite of the fact that it succeeded, from the standpoint of the number of fatalities – constitutes an example of the increasing operational weakness of Hamas in 2004, while at the same time (and most unfortunately) reflecting the relative ease with which it was possible to plan suicide bombings at that time, in light of the broad based "pool" of volunteers, in combination with a wider assimilation of the techniques for manufacturing explosives, which lessened Hamas's need for "skilled" bomb makers.

Although, in my opinion, Hamas and Fatah both bear responsibility for the terrorist attack on the No. 19 bus, I do not conclude that it is possible to characterize this terrorist attack as a "joint attack." In a number of cases, Hamas carried out suicide bombings, during which it openly cooperated with other terrorist organizations. For example, the fatal attack which was carried out in the Port of Ashdod in March 2004 was a joint terrorist attack by Hamas and Fatah. On the other hand, the terrorist attack on the No. 19 bus does not reflect a case of true coordination, cooperation or joint planning and execution by two extremist organizations. As pointed out above, Ali Ja'ara was recruited and handled by Hamas. Ja'ara reported to Nufal Adawin (according to the documents) on the expected involvement of the al-Aqsa Martyrs Brigades in the additional attempt to complete the suicide bombing (and Adawin did not object to or prevent this). After the terrorist attack was complete, Adawin, Hamas and the al-Aqsa Martyrs Brigades credited Hamas with its role in the terrorist attack. At the same time, the evidence does not show that Hamas and Adawin, on one hand, and Fatah and its al-Aqsa Martyrs Brigades on the other, significantly coordinated the final logistics and/or the execution of the terrorist attack.

### 2) The involvement of the al-Aqsa Martyrs Brigade

A short time after his failed attempt to reach Jerusalem, Ja'ara contacted Hilmi Abd al-Karim Muhammad Hamash, an operative in the al-Aqsa Martyrs Brigades, who suggested introducing him to a military operative who would send him out on a suicide bombing mission. At approximately the same time, Abd al-Rahman Yusuf Maqdad, who was also an operative in the al-Aqsa Martyrs Brigades, made contact with the military operative Ahmad Mujarbi and asked him to introduce him to military operatives who could assist in the manufacture of explosive charges for suicide bombings. Mujarbi contacted Ali Muhammad Ahmad Abu Hail, an additional

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

operative in the al-Aqsa Martyrs Brigades, and asked him to meet with Maqdad. Abu Hail did so and Maqdad asked him for help in manufacturing explosive charges.

Hamash introduced the military operative Ahmad Abu Radab to Ja'ara, and the latter expressed his willingness to carry out a suicide bombing. A few days thereafter, Abu Radab informed Maqdad that he had located a person who was willing to carry out a suicide bombing. On January 28, 2004 (or thereabouts), Abu Radab contacted Muhammad Issa Muhammad Ma'ali, an operative in the al-Aqsa Martyrs Brigades, and asked him to drive Ja'ara to the location of the terrorist attack. Ma'ali agreed to do so. Abu Radab introduced Ja'ara to Ma'ali, who drove him to Jerusalem, where Ja'ara carried out the attack.

### e. Summary

A few minutes subsequent to the terrorist attack, I reached the scene and immediately recognized that a suicide bombing had taken place. At the same time, the responsibility for the terrorist attack was somewhat less clear, because both Hamas and the al-Aqsa Martyrs Brigades were independently involved in the planning and/or execution of the attack, and because both organizations had published announcements taking responsibility for it. At the same time, in accordance with that which has been set forth above, Fatah eventually made a clear withdrawal from [responsibility for] the terrorist attack and denied any responsibility for it, whereas Hamas consistently confirmed its responsibility for the terrorist attack and defined Ja'ara as a "Jihad fighter, a member of our organization."[417]

The many detailed declarations which were issued by Hamas with regard to the terrorist attack on the No. 19 bus, the boasting about the suicide bomber within the organization, and the repeated public declarations in which Hamas expressed its pride in the performance of the terrorist attack on the No. 19 bus and other attacks – all of these confirm that Hamas carried out the terrorist attack. When these items of evidence are combined with the criminal convictions of Hamas cell members for their participation in the terrorist attack, there can be no doubt that Hamas was involved in the perpetration of this terrorist attack. At the same time, the conclusions from the ISA investigation and the criminal convictions of operatives in the al-Aqsa Martyrs Brigades indicate that the latter terrorist organization also sought to exploit Ali Ja'ara's willingness to undertake a suicide bombing, and to send him on a suicide mission, and even took part in the preparations for the performance of the terrorist attack. Even if the preparations were shared, it seems that Hamas was the dominant entity in the last stages of the operation. Ali Ja'ara was only a tool, an instrument used by the leadership of both organizations in order to carry out the terrorist attack. Ali Ja'ara wanted to carry out the attack. Accordingly, he agreed to do so on

---

[417] *See also* Filasteen al-muslima, the official Hamas newspaper, which announced that the terrorist attack "had been carried out by the *Qassami* [*i.e.*, an operative in the al-Qassam Brigades] Ali Ja'ara: http://web.archive.org/web/20040415140234/http://www.fm-m.com/2004/mar2004/story10.htm, and *see also* his name in the list of suicide bombers: http://www.fm-m.com/2004/oct2004/story4.htm.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

behalf of Fatah or on behalf of Hamas, and if another organization had contacted him he would have agreed to that as well. As far as he was concerned, the most important thing was to carry out the attack. I estimate that the al-Aqsa Martyrs Brigades planned to carry out the terrorist attack, and even helped to prepare it, but it may be assumed that, at the end of the process, the Fatah leadership did not approve the performance of the terrorist attack. This being so, the level of cooperation with Hamas "on the ground" increased, and ultimately, Hamas assumed responsibility for the terrorist attack. Nonetheless, it is also possible to impose responsibility on the al-Aqsa Martyrs Brigades, in spite of the fact that they themselves withdrew from their initial declaration of responsibility.

_____                    _____

Ronni Shaked                                                        Date

136

**EXHIBIT 203 TO DECLARATION OF VALERIE SCHUSTER**

# Supplemental Expert Report With Respect to the March 7, 2003 Attack

## Of

# Ronni Shaked

*Strauss v. Crédit Lyonnais, S.A.* 06 CV 702 (DGT)(MDG)
*Wolf v. Crédit Lyonnais, S.A.* 07 CV 914 (DGT)(MDG)

I am providing the below supplement to correct certain possible errors in my original report dated December 8, 2009 with respect to the March 7, 2003 roadside shooting attack in Kiryat Arba ("Kiryat Arba Attack").  The Kiryat Arba Attack is discussed at pages 71 through 75 of the English language translation in my original report.

At the outset, it should be noted that I stand by my original report's conclusion that the Kiryat Arba Attack was perpetrated by Hamas's Hebron Cell.  However, upon re-examining the original sources I considered and relied upon, as well as additional materials as noted below, I have concluded that the two individuals listed in my original report as having perpetrated the Kiryat Arba Attack, Fadi Ziad al-Fakhuri and Safian al-Haraz, were probably not directly responsible for the attack that killed the Horowitzs and that two other members of the Hamas Hebron Cell, Muhsin Muhammad Omar al-Qawasmeh and Hazem Fawzi Abd al-Sam'i al-Qawasmeh, are more likely to have been directly responsible for the attack.  I have come to the conclusion that al-Fakhuri and al-Haraz instead perpetrated an attack in Neguhot that occurred simultaneously with, and relatively close in geographic proximity to, the Kiryat Arba Attack.

My original report's observations regarding the identity of the individuals who directly carried out the Kiryat Arba Attack was based on two sources: (1) the indictment of a fifth Hebron Cell member, Abdallah Ahmad Mahmud Abu Saif; and (2) a statement on a Hamas's Izz al-Din al-Qassam Brigades website page dedicated to al-Fakhuri available on www.alqassam.ps. (the "Al-Qassam Fakhuri Statement.")[1]

**Abu Saif Indictment**

Subsequent to issuing my original report, I determined that the indictment of Abdallah Ahmad Mahmud Abu Saif contains an inconsistency (discussed below).  That inconsistency led me to re-evaluate the reliability of the indictment's statements concerning which individuals actually directly carried out the Kiryat Arba Attack.  Specifically, Clause 9[2] of Abu Saif's indictment explains how al-Fakhuri and al-Haraz committed the Kiryat Arba Attack.  Clause 10[3] of Abu Saif's indictment however, states that al-Haraz, Muhsin Qawasmeh and Basel Qawasmeh were responsible for the death of Dina Horowitz (wife of Rabbi Elnatan Horowitz from Kiryat Arba).

As noted elsewhere in my original report (*see e.g.*, pages 92 and 104), Basel Qawasmeh was the leader of Hamas's Hebron Cell.  Basel Qawasmeh did help plan the Kiryat Arba Attack, but he did not physically participate in it.  This leaves al-Haraz and Muhsin Qawasmeh as the team that purportedly committed the Kiryat Arba Attack, a fact which is inconsistent with Clause 9 of Abu Saif's indictment.

It is, of course, possible that Abu Saif himself was confused as to which cell members committed the different attacks because both attacks occurred at the same time, all four terrorists were members of the same cell, and all four terrorists had met with Abu Saif earlier that day.  If so, Abu Saif's confusion regarding which two cell members carried out the Kiryat Arba Attack and the simultaneous Neguhot attack appears to be reflected in the Israeli military's indictment.

---

[1] www.alqassam.ps/arabic/sohdaa5.php?id=812, Supplemental Appendix 2, pp. 1-2.
[2] *See* Appendix 1, p. 700.
[3] *See* Appendix 1, p. 701.

**Al-Qassam Fakhuri Statement**

A second source of confusion regarding the identities of the Hamas Hebron Cell members that carried out the Kiryat Arba Attack is the Al-Qassam Fakhuri Statement, which, as noted above, comes from Hamas's alqassam.ps website.[4]   The Al-Qassam Fakhuri Statement is titled "Perpetrator of the Operation in Kiryat Arba Settlement."  However, upon further examination of the Al-Qassam Fakhuri Statement, and specifically its description of the attack al-Fakhuri committed, it appears that the Al-Qassam Fakhuri Statement's *title* incorrectly identifies Kiryat Arba as the situs of the attack.  As explained below, the Al-Qassam Fakhuri Statement's title (describing al-Fakhuri as the perpetrator of the Kiryat Arba Attack) appears to be inconsistent with other information set forth in the Al-Qassam Fakhuri Statement.

First, the Al-Qassam Fakhuri Statement states that al-Fakhuri was a member of a cell that included "*Muhsin Qawasmeh and Husam[5] Qawasmeh, perpetrators of the operation in Kiryat Arba Settlement, which took place the same time as the Neguhot operation.*"  Accordingly, this portion of the website indicates that the Qawasmehs perpetrated the Kiryat Arba Attack, in contrast to the title of the Al-Qassam Fakhuri Statement.

Second, according to the Al-Qassam Fakhuri Statement, the operation al-Fakhuri and his companion committed did not result in the death of the Horowitzs, who died in connection with the Kiryat Arba Attack.  However, this "achievement" (the Horowitzs' murder) was highlighted on the pages of the other three cell members – al-Haraz, and Muhsin and Hazem Qawasmeh.  Therefore, this also suggests that the Al Qassam Fakhuri Statement's title is incorrect.

Third, according to the Al-Qassam Fakhuri Statement's description of the attack committed by Fakhuri, he detonated an explosive belt he was carrying, "*killing many people, but the enemy, as usual, did not reveal the true number of his casualties.*"  However, none of the other descriptions of what occurred in Kiryat Arba on March 7, 2003, is consistent with this description.  My re-review and further analysis of the Al-Qassam Fakhuri Statement therefore leads me to surmise that the events that the Al-Qassam Fakhuri Statement attributes to al-Fakhuri actually occurred in connection with the simultaneous attack carried out by Hamas's Hebron Cell in Neguhot, although no Israelis were killed in that attack.  I also believe that the information set forth in the Al-Qassam Fakhuri Statement concerning al-Fakhuri that states that al-Fakhuri "*killed many*" was most likely intended by Hamas to glorify al-Fakhuri's attack despite its lack of success.

An additional complicating factor is the fact that the Al-Qassam Fakhuri Statement identifies al-Fakhuri's companion as Hazem al-Qawasmeh.  I believe, however, that this identification is likely incorrect because the other descriptions and statements in the Al-Qassam Fakhuri Statement concerning the attacks in Neguhot and Kiryat Arba do not mention that al-Fakhuri and Hazem al-Qawasmeh were part of the same team.  Instead, they indicate that al-Fakhuri executed an attack in one settlement (with al-Haraz), while Hazem al-Qawasmeh executed an attack (with Muhsin Qawasmeh) in another.

---

[4] www.alqassam.ps/arabic/sohdaa5.php?id=812, Supplemental Appendix 2, pp. 1-2.
[5] The name "Husam" is surely a mistake, as no "Husam Qawasmeh" was ever mentioned with respect to the attacks that took place on March 7, 2003. The correct name is, of course, "Hazem."

The inference that the Kiryat Arba Attack was actually carried out by Muhsin Muhammad Omar al-Qawasmeh and Hazem Fawzi Abd al-Sam'i al-Qawasmeh, is further suggested by other Hamas media reports (posted either on Hamas's websites alqassam.ps, or Palestine-info.info, as indicated in the footnotes below) concerning Muhsin Qawasmeh,[6] Hazem Fawzi Abd al-Sam'i al-Qawasmeh,[7] Safian al-Haraz,[8] and Abdallah Qawasmeh.[9]

Because the four Hamas Hebron Cell members carried out their missions at approximately the same time and none of them survived the two attacks, Hamas's media outlets (including the Al-Qassam Fakhuri Statement) may have been uncertain, or incorrectly jumbled certain discrete details regarding the two attacks.  The only definitive way in this case to confirm which individual terrorists attacked Neguhot and which attacked Kiryat Arba would be to obtain the forensic reports for the dead terrorists.  Because, however, I was not asked within the scope of my expert opinion to determine which exact individual actually murdered the Horowitzs, and because I stand by my original report's over-arching opinion that the Kiryat Arba Attack was perpetrated by the Hamas Hebron Cell, I will only amend my original report as follows:

---

[6] www.alqassam.ps/arabic/sohdaa5.php?id=280, Supplemental Appendix 2, pp. 3-5, and http://www.palestine-info.info/arabic/spfiles/suhada_2005/shuhda_khaleel/hazeem.htm, Supplemental Appendix 2, pp. 6-9.

[7] http://www.palestine-info.info/arabic/spfiles/suhada_2005/shuhda_khaleel/hazeem.htm, Supplemental Appendix 2, pp. 6-9, and http://ns2.alqassam.ps/arabic/sohdaa5.php?sub_action=sera&id=576, Supplemental Appendix 2, pp. 10-12.

[8] http://www.palestine-info.info/arabic/spfiles/suhada_2005/shuhda_khaleel/sufyan.htm, Supplemental Appendix 2, pp. 13-15.

[9] http://www.palestine-info.info/arabic/hamas/shuhda/2004/abd_all/syrah.htm, Supplemental Appendix 2, pp. 16-21.

**March 7, 2003 – the roadside shooting attack in Kiryat Arba**

    a.      **The terrorist attack**

On Friday, March 7, 2003, at 8:40 p.m., two Hamas terrorists broke into Kiryat Arba. The two~~, Fadi Ziad al-Fakhuri and Safian al-Haraz~~ terrorists, most likely Muhsin Muhammad Omar al-Qawasmeh and Hazem Fawzi Abd al-Sam'i al-Qawasmeh, were dressed in civilian clothing, and armed with Kalashnikov rifles and hand grenades~~, and one of them wore an explosive belt~~. They cut through the fence southwest of Kiryat Arba, penetrated the surrounding security detachment and opened fire at people walking along the road. The first burst of shots hit Aliza Said, a mother of 12, who was seriously wounded. The local on-call security squad was dispatched to the site. The two terrorists began to flee and broke into the home of the Horowitz family, who were eating their Sabbath evening meal. The terrorists chased the couple from room to room and shot and killed Dina (Debbie) Horowitz and her husband Eli (Elnatan), who were holding each other's hands.[10]

After murdering the couple, the terrorists took up a position in their home and started shooting out at the residents of the "settlement." The shooting match between the on-call security squad and the terrorists continued for between five and 10 minutes, during which time the terrorists threw a hand grenade at the residents of the "settlement." ~~In the end~~Ultimately, both ~~of the~~ terrorists were killed in the exchange of fire.[11]

    b.      **Evidence for legal attribution**

    1)      **The assumption of responsibility**

The al-Qassam Brigades assumed responsibility for this terrorist attack almost immediately after it happened.[12] The assumption of responsibility was subsequently confirmed in an official Hamas report, which listed the terrorist attacks carried out by the Hamas organization in ~~the year~~ 2003. ~~The~~My original report stated that the announcement is phrased as a "military announcement by the Izz al-Din al-Qassam Brigades" and mentions "the *Qassami* martyr Fadi Fakhuri" – meaning that he had been a member of the al-Qassam Brigades.[13] However, Fadi al-Fakhuri was probably not involved in the Kiryat Arba Attack. According to the same Hamas announcement, Hazem Qawasmeh and Muhsin Imran[14] were the perpetrators of the Kiryat Arba Attack, for which the al-Qassam Brigades took responsibility.

---

[10] http://www.shavuz.co.il/magazine/article.asp?artid=3149&secid=~~203~~203, Supplemental Appendix 2, pp. 22-24

[11] Yedioth Ahronoth, March 8, 2003 (SHAKED000136); *see also* http://www.inn.co.il/News/News.aspx/~~46381~~46381, Supplemental Appendix 2, pp. 25-26.

[12] Yedioth Ahronoth, March 9, 2003, p. ~~6~~6 (SHAKED000137).

[13] http://www.palestine-info.info/arabic/Hamas/shuhda/amalyat_03.htm~~.~~, Supplemental Appendix 2, pp. 27-35.

[14] A mistake was made in the announcement in Muhsin's family name, which is Qawasmeh, not Imran.

### 2) Photograph

~~A photograph~~Photographs of the two terrorists~~, who were photographed before setting out on the attack, attests~~ attest to their organizational affiliation. Other evidence of their organizational affiliation includes the bandanas on their heads, the Kalashnikov rifles they hold, and ~~a large~~the emblem of the al-Qassam Brigades which is proudly posted in the background of the ~~photograph.[5]~~photographs.


15



~~Shown below is a photograph of Safian al-Haraz, in which he appears wearing a green Hamas bandana on his forehead:[6]16~~

~~Fadi Fakhuri:~~

~~[7]~~

[5]15 http://www.alqassam.ps/arabic/sohdaa5.php?~~id=812.~~sub_action=picture&id=280 (Muhsin Qawasmeh), Supplemental Appendix 2, pp. 36-39.

[6] ~~Source of the photograph:~~16
http://~~www.ns2.~~alqassam.ps/arabic/sohdaa~~3.php?from=48.~~5.php?sub_action=picture&id=576 (Hazem Qawasmeh), Supplemental Appendix 2, pp. 40-42.

[7] ~~The photograph of Fadi Fakhuri was taken from the Hamas web site: http://www.palestine-info.info/arabie/spfiles/suhada_2005/shuhda_khaleel/fadi.htm.~~

3)      The "Will"

~~Safian~~Muhsin Muhammad Omar al-~~Haraz~~Qawasmeh wrote a "Will" before the terrorist attack, signed it with his name and added: "Member of the *Shahid* Izz al-Din al-Qassam Brigades."  His "Will" was published on the al-Qassam Brigades web site.[817]

~~Fakhuri also wrote a "Will," in which he asked to be buried next to his friend Safian al-Haraz, and asked for the grave to be close to the mosque where he used to pray.[9]~~


4)      **Hamas documents**

a.      Hamas devoted an extensive article on its official web site to ~~Fadi Ziad al-Fakhuri, under the title "The terrorist attack in Kiryat Arba."~~both Muhsin Muhammad Omar al-Qawasmeh and Hazem Fawzi Abd al-Sam'i al-Qawasmeh.  The article described ~~his~~their life ~~history~~histories and ~~his Hamas activity. According to the article, he was arrested by the Palestinian Authority after being charged with membership in Hamas; he was in prison for three months and was then released. The article noted his expertise in the preparation of explosive charges and the use of weapons.[10]~~their Hamas activity and referred to each of them as a "Qassami holy warrior" (which means holy warriors who are members of Hamas's Izz al-Din al-Qassam Brigades).[18]


b.      The ~~names~~name and ~~pictures of Fadi Ziad al-Fakhuri and Safian al-Haraz appear~~picture of Hazem Fawzi Abd al-Sam'i al-Qawasmeh appears in the Hamas Book of Martyrs,[1119] which is an online book which includes the ~~personal~~ particulars of all members of the Hamas al-Qassam Brigades who have been killed. These particulars include the operative's date of birth and full name; the terrorist attack in which he was killed; and the type of terrorist attack which he carried out.

c.      The official Hamas web site, which covers the operations of the organization, notes the terrorist attack in Kiryat Arba as Terrorist Attack No. 49.[1220]

[817] http://www.alqassam.ps/arabic/sohdaa5.php?id=~~281~~280, Supplemental Appendix 2, pp. 3-5.
[9] ~~http://www.palestine-info.info/arabic/spfiles/suhada_2005/shuhda_khaleel/fadi.htm.~~
[1018] http://~~www.ns2.~~alqassam.ps/arabic/sohdaa5.php?~~id=812; §~~ ~~http://www.palestine-info.info/arabic/hamas/shuhda/2004/alfakoree/syrah.htm.~~sub_action=sera&id=576, Supplemental Appendix 2, pp. 10-12; http://ns2.alqassam.ps/arabic/sohdaa5.php?id=280, Supplemental Appendix 2, pp. 3-5.
[1119] http://www.alqassam.ps/arabic/sohdaa3.php?from=~~48~~48, Supplemental Appendix 2, pp. 43-44.
[1220] http://www.palestine-info.info/arabic/Hamas/shuhda/amalyat_03.htm~~.~~, Supplemental Appendix 2, pp. 27-35.

d.      The names of both shooters appear in a general list by Hamas, which includes inmates and martyrs.[~~13~~21]

~~e.      A report on the Hamas terrorist attacks since 1993 includes the names of both shooters and points out that the two were Hamas members who carried out the terrorist attack in Kiryat Arba on March 7, 2003.[14]~~

e.      ~~f.~~ The two men's names appear in a list of Hamas martyrs in Hebron which was published by Hamas.[~~15~~22]  Their names are hyperlinked to an article, titled "The Two Qassamis, Hazem and Muhsin al-Qawasmeh, Executers of the Kiryat Arba Operation."[23]

### c.      Official documents of the Government of Israel

#### 1)      Official announcement by the Government:[~~16~~24]

"On Friday evening, a terrorist cell infiltrated Kiryat Arba. They opened fire and wounded a woman. They then broke into the home of the Horowitz family while they were eating their Sabbath evening meal, chased the couple from room to room, and shot and murdered Dina and her husband Eli as they stood embracing each other. The terrorists continued firing, and one of them even detonated an explosive belt, before they were murdered in the kitchen of the house by the local on-call security squad, which sped to the site (the members of which were Rabbi Eli Horowitz's students). Hamas assumed responsibility for the terrorist attack.

#### 2)      Judiciary processes and legal documents in Israel

The indictment against Abdallah Ahmad Abu Seif sets forth his role in the operation, including the dispatch of the two shooters to Kiryat Arba. The indictment also sets forth the preparations for the terrorist attack, which included collecting intelligence, surveillance, preparing a hiding place for the weapons near Kiryat Arba, preparing camouflage, obtaining shears to cut through wire fences, and providing continual updates to the Hamas headquarters with regard to the plans for the terrorist attack.[~~17~~25]  Although the indictment probably identifies one of the two perpetrators of the Kiryat Arba attack incorrectly, the indictment against Abdallah Ahmad Abu Seif is still relevant to my Report, as it reveals Hamas's Hebron Cell terrorist activity.

---

[~~13~~21] http://www.~~almoltaqa.ps/arabic/archive/index.php/f-26-p-2.html~~palissue.com/arabic/Shohada/4400/111.html, Supplemental Appendix 2, pp. 45-51. .

[~~14~~ http://www.alkashif.net/?x=3&z=331&y=22.~~]

[~~15~~22] http://www.palestine-info.info/arabic/spfiles/suhada_2005/shuhda_khaleel/khaleel.htm~~.~~, Supplemental Appendix 2, pp. 52-55.

[23] http://www.palestine-info.info/arabic/spfiles/suhada_2005/shuhda_khaleel/hazeem.htm, , Supplemental Appendix 2, pp. 6-9.

[~~16~~24] http://www.pmo.gov.il/PMO/Communication/IsraelUnderAttack/Kiryat+Arba/Kiryat+Arba.htm~~.~~, Supplemental Appendix 2, pp. 56.

[~~17~~25] *See* Appendix No. 1, pp. 697-705.

Abdallah Abu Seif was charged with the following offenses: activity in the Hamas organization, recruiting members into the organization, training to carry out terrorist attacks, carrying out other terrorist attacks against Jews in Hebron, and preparing two suicide bombers for the terrorist attack in Kiryat Arba.[1826] Abu Seif confessed to the charges that were attributed to him on February 16, 2006, and was sentenced to two life sentences plus 45 years' imprisonment.

According to the testimony in the indictment of Abdallah Abu Seif, ~~Fadi Fakhuri~~Muhsin Qawasmeh was a member of Hamas.[1927]

### d.    Summary of the terrorist attack in Kiryat Arba

The cell which carried out the terrorist attack in Kiryat Arba was subordinate to the senior Hamas commander in Hebron, ~~which~~who was in contact with Hamas headquarters in Syria. In January 2003, as soon as the operation had been generally approved ~~in a general manner, the~~, Hamas commander Basel Qawasmeh instructed Abdallah Abu Seif to collect intelligence on the best place to penetrate Kiryat Arba. Abu Seif located an abandoned building, about 200 meters from the fence around Kiryat Arba, into which he said he could move the weapons. His commander in Hamas gave him a set of binoculars and a video camera and ordered him to film the site. Abdallah Abu Seif did not know how to operate the video camera and returned it to his commander in Hamas.

Early in March 2003, three days before the terrorist attack, Abdallah Abu Seif received from Basel Qawasmeh a bag containing a Kalashnikov rifle and an M-16 rifle, ammunition clips and an explosive belt. Abdallah placed the ordnance in the abandoned house, according to the instructions which he had received.

On March 7, the day before the terrorist attack, Abu Seif met with Basel Qawasmeh and the two shooters, both of whom were residents of Hebron and Hamas members. He led them to the abandoned building, gave them the weapons and the explosive belt and directed them to the location from which they were supposed to penetrate the "settlement."[2028] The two terrorists, ~~Safian al-Haraz and Fadi Fakhuri~~Muhsin Qawasmeh and Hazem Qawasmeh, dressed in Sabbath clothing. ~~Safian al-Haraz put the explosive belt on his friend Fadi Fakhuri. Both of them also carried pistols.~~

That night, at about 8:30 p.m., the two penetrated Kiryat Arba, entered the home of Rabbi Horowitz and his family in Building No. 35, and killed the couple, Eli and Dina Horowitz. The terrorists were ~~eliminated~~killed by the security forces and the local on-call security squad.[2129]

---

[1826] *Id.*
[1927] *Id.*
[2028] *See* Appendix No. 1, pp. 697-705.
[2129] *Id.*

e.    Conclusion

I arrived on the scene approximately 45 minutes after the terrorists ~~were~~had been killed. My immediate conclusion was that this had been a terrorist attack, rather than a robbery or a family quarrel. Generally speaking, well secured "settlements" are not random targets for robbery, in light of the high risk involved: armed homeowners, local on-call security squads, and the like. Furthermore:, the fact that the attackers were armed with explosives ~~charges~~ and an explosive belt definitively eliminated any motive except that of a politically motivated terrorist attack.

The many detailed declarations ~~which were~~Hamas issued ~~by Hamas~~ with regard to the ~~terrorist attack in~~ Kiryat Arba Attack, the glorification of the suicide bomber within the organization, and the profusion of praise which was given to the cell which planned and implemented the terrorist attack – all of these, in and of themselves, would suffice to lead to the conclusion that Hamas carried out ~~the~~this terrorist attack. The criminal conviction of Abdallah Abu Seif, and ~~their~~Hamas's repeated public declarations expressing pride in the performance of the terrorist attack in Kiryat Arba and other terrorist attacks leave no doubt that this attack was carried out by Hamas.

_____          _____
Ronni Shaked                                Date

**EXHIBIT 204 TO DECLARATION OF VALERIE SCHUSTER**

תאריך: י"ג בכסלו, תשס"ז                                   תיק מס': 4348/04
4 בדצמבר, 2006

בית המשפט הצבאי יהודה

בפני כב' האב"ד: סא"ל צבי לקח
השופט: רס"ן רונן עצמון
השופט: סא"ל טל בנד

התביעה הצבאית
(באמצעות סרן דוד גולן)

נגד

הנאשם: נופל גהאד נופל אלעדוין ת.ז. 920662152 / שב"ס - נוכח
(באמצעות ב"כ עו"ד חאלד אלאערג' - טכח)

רמ"שית: רב"ט אלחנדרה יצקוביץ'
מתורגמן: סמ"ר פחים חסון

_____

אב"ד פותח את הישיבה ומזהה את הנאשם.

## מהלך הדיון

נאשם: מייצג אותי עו"ד חאלד אלאערג'.

תובע: אין ראיות לעונש.

סנגור: אין ראיות לעונש.

תובע מסכם: הגענו להסדר טיעון במסגרתו נבקש להשית על הנאשם את העונשים הבאים:

א. 21 שנות מאסר בפועל שימנו החל מיום מעצרו.
ב. מאסר על תנאי לשיקול דעת בית המשפט.

הנימוקים להסדר הם קשיים ראייתיים אשר התקיימו בתיק, חסכון בזמן שיפוטי יקר ובעיקר בעונש שהוטל על שותפו של הנאשם בין פרשייה זו, שותף בשם מוחמד נשאש מתיק ע. איו"ש 2316/06. העבירות העיקריות בוצעו יחד עם מוחמד נשאש, לא היינו שוטים מן העונש שנעשה במידה זו או אחרת אלא שאנו סבורים שחלקו של הנאשם הזה עולה במעט מאותו שותף.

סנגור מסכם: אבקש לכבד את הסדר הטיעון. ראשית, ברצוני להתייחס לקשיים הראייתיים, פרט האישום ששותפו נגזר עליו עונש של 15 שנות מאסר, בתיק שלנו לא ברור מידת המעורבות הנאשם, הקשיים נובעים מכך שהיו שני תכנונים משני ארגונים. בהתחלה היה חמאס אך בפועל אנשי התנזים. לא היה ברור מה חלקו של הנאשם ומידת המעורבות שלו במקרה הזה.לגבי רמת העונשה, מדובר במדרג עשישה שהתחיל עם פראס עדאווין שהוא קשור לפרטי אישום שונים שקיבל 11 שנות מאסר בפועל ומוחמד נשאש קיבל 15 שנות מאסר, היה ויכוח על עונשו של השותף. הערעורים הורידו את העונש הזה ל-15 שנות מאסר והיה מקום לשינוי העבירה עצמה. אני מבקש לכבד את ההסדר בנסיבות אלו. אוסיף כי בתיק לא נשמעו עדים, הוא הודה במסגרת הסדר טיעון, זה חסך זמן שיפוטי יקר, עברו נקי.

נאשם בדברו האחרון: אין לי מה לומר.



EXHIBIT

W_S098318

תאריך: י"ג בכסלו , תשס"ז                                    תיק מס': 4348/04
4 בדצמבר, 2006

ב י ת   ה מ ש פ ט   ה צ ב א י   י ה ו ד ה                                                1

בפני כב' האב"ד: סא"ל צבי לקח                                                              3
השופט: רס"ן רונן עצמון                                                                     4
השופט: סא"ל טל בנד                                                                         5
                                                                                          6
התביעה הצבאית                                                                              7
(באמצעות סרן דוד גולן)                                                                     8
                                                                                          9
נגד                                                                                       10
                                                                                          11
הנאשם: נופל גהאד נופל אלעדווין ת.ז. 920662152 / שב"ס - נוכח                                12
(באמצעות ב"כ עו"ד חאלד אלאערגי - נוכח)                                                     13
                                                                                          14
                                                                                          15
ג ז ר - ד י ן                                                                              16
                                                                                          17
הנאשם הורשע, על פי הודאתו, במסגרת הסדר הטיעון בשורה של עבירות ביטחוניות                     18
חמורות:                                                                                     19

1. **חברות ופעילות ונשיאת משרה בהתאחדות בלתי מותרת** – הנאשם הורשע בכך                       20
    שמשנת 2001 ועד למעצרו היה חבר בחוליה טרוריסטית של ארגון החמאס,                          21
    ומראשית שנת 2003 עמד בראש חוליה זו.                                                      22
                                                                                          23

2. **ירי לעבר אדם** – בשנת 2003 ירה 8 כדורים לעבר בית בשכונת גילה בירושלים.                  24
                                                                                          25

3. **קשירת קשר לגרימת מוות בכוונה** – בראשית שנת 2004, ביחד עם חבריו, תכנן                   26
    לבצע פיגוע נגד אזרחים וחיילים ישראלים. התכנון כלל רכישה של שתי מכוניות                    27
    גנובות שאותן התכוונו למלכד במטעני חבלה, את הראשונה להפעיל כנגד אוטובוס                    28
    שיעבור לידה ואת המכוניות השנייה להפעיל לעבר חיילי צה"ל ומתיישבים יהודים                   29
    שיבואו לסייע בטיפול בפצועי הפיגוע הראשון. קשר זה לא יצא לפועל בשל קושי                    30
    לרכוש טלפונים ניידים שנדרשו לשם הפעלת מכוניות התופת.                                      31
                                                                                          32

4. **זריקת חפץ מבעיר** – בכך שבמהלך שנת 2004 מסר מטעני חבלה לפעיל טרור אחר                   33
    ואותו פעיל יצא במספר הזדמנויות לכביש שמובל מבית סחור לקבר רחל והשליך                      34
    את המטענים לעבר חיילי צה"ל שהיו במקום. המטענים התפוצצו בסמוך לכלי                         35
    הרכב של החיילים.                                                                        36
                                                                                          37

5. **קשירת קשר לגרימת מוות בכוונה** – הנאשם הורשע בכך שבינואר 2004, יחד עם                   38
    חבריו לחוליה גייס אדם שנועד לבצע פיגוע התאבדות, תכנן את פרטי הפיגוע והכין                 39
    מטען חבלה לשם ביצועו. הנאשם הלביש את חגורת הנפץ על מחתבל המתאבד,                          40
    צילם אותו והקליט אותו כשהוא מקריא את "צוואתו". מכתב האישום נמחקו                          41
    המשני של אותן הכנות וכאמור גם פיגוע זה לא התממש.                                          42
                                                                                          43

6. **אי מניעת עבירה** – בכך שבסוף חודש ינואר 2004, זמן קצר לאחר תהכנות שתוארו                44
    לעיל שוחח הנאשם עם אותו מפגע מתאבד והאחרון אמר לו כי הוא עומד בקשר                        45
    עם פעילי תנזים פתח בקשר ליציאה לפיגוע שתוכנן על ידי הנאשם וכי הוא                         46
    מתעמד לצאת לבצע את הפיגוע בעוזרתם. הנאשם ידע כי הפיגוע צפוי להתבצע                         47
    סמוך לאחר מכן, אך לא עשה דבר כדי למנוע את ביצועו. בכתב האישום מתואר                       48
    המשך השתלשלות האירועים, שבסופם עלה על גיערתרח, המחבל המתאבד                               49
    לאוטובוס "אגד" בקו 19 בירושלים, והפעיל את תיק הנפץ בפנית רחובות                           50
    ארלוזורוב ועזה. כתוצאה מפיגוע התאבדות זה נהרגו 11 ישראלים ונפצעו למעלה                   51
    מ- 50 בדרגות פציעה קשות וקלות. לאחר ביצוע הפיגוע נטל הנאשם את הצילומים                    52

W_S098317

תאריך : י"ג בכסלו , תשס"ז          תיק מס' : 4348/04
4 בדצמבר, 2006

וההקלטות שערך, מסרם לתחנת טלוויזיה בבית לחם במסגרת נטילת האחריות
לפיגוע בשם ארגון החמאס.

7. **קשירת קשר לגרימת מוות בכוונה** – בכך שברבעון השלישי של שנת 2004 נפגש עם
מחמוד עדוין וקשר עימו לבצע פיגוע התאבדות נגד ישראלים. אותו מחמוד הציע
לצרף מחבלים מתאבדים נוספים, השיג את הסכמתם של אותם מחבלים מיועדים
והודיע על כך לנאשם. הנאשם חשביר למחמוד כי עליהם להמתין עד להשגת חומר
נפץ, והציע שמחמוד ילמד נהיגה כדי שיוכל להסיע את כל המתאבדים לביצוע
הפיגוע.

8. **קשירת קשר לגרימת מוות בכוונה** – בכך שבשנת 2004 נענה לפנניית אחיו, פראס
עדוין והסכים לסייע בהוצאה לפועל של פיגוע התאבדות בירושלים. הנאשם מסר
לאחיו כי כאשר יקבל את חגורות הנפץ עבור חמשת המחבלים הפוטנציאליים, הוא
ידאג לביצוע הפיגוע בירושלים. הנאשם אף סייר בצומת הגבעה הצרפתית ושכונת
מאה השערים בירושלים כדי לבחון אפשרות לבצע שם את הפיגוע ועדכן את אחיו
אודות ממצאי הסיור וכן סיפר לאחיו כי יש אדם המוכן להסיע את המתאבדים
לירושלים. הפיגועים לא יצאו אל הפועל בשל מעצרו של האח פראס ובשל הקושי
בהשגת חגורות נפץ.

9. **ניסיון לגרימת מוות בכוונה** – בכך שבחודש אוגוסט 2004 הסכים הנאשם
להשתתף בהכנות לביצוע פיגוע ירי לעבר חיילי צה"ל המאבטחים את הפועלים
הבונים את מכשול התפר, ולעבר הפועלים עצמם. הנאשם מסר לאחיו פרטים על
מועדי הגעת חיילים לאזור מכשול התפר ובאמצעות מידע זה וסיור שערך במקום
הסיק פראס עדוין מתי כדאי לבצע את הפיגוע. זמן מה לאחר מכן, יצא פראס
עדוין וחברו ברכב לשם ביצוע הפיגוע, אך כאשר התקרבו למקום נוכח פראס עדוין
כי ישמם ילדים באזור הפיגוע וחיילים נמצאים בצידה הרחוק של הגדר, ועל כן
לא ניתן לבצע את הפיגוע. למחרת היום, שוב יצאו פראס וחברו לבצע את הפיגוע
ושוב נמנעו מלבצעו בשל אותן סיבות.

הצדדים עתרו לעונש שהוסכם ביניהם וביקשו כי נכבדו. נימוקיהם להסדר היו עברו
הנקי של הנאשם, העובדה שהודאתו באשמה חסכה מזמנם של כל הגורמים וכן רמת
העונשים שנגזרו בתיקיהם של מעורבים אחרים בפרשה. הצדדים הביאו בפנינו את
עניינו של פראס עדוין שבתיק ביהמ"ש יהודה 4185/04 נגזרו עליו 11 שנות מאסר
לריצוי הפועל ואת עניינו של מחמוד אלשאשש שבע' איו"ש 2316/06 נגזרו עליו 15 שנות
מאסר לריצוי הפועל, תוך אישור של הסדר של טיעון שהושג גם בערכאה הראשונה.

מעשיו של הנאשם רבים וחמורים הם מצדיקים עונש כבדה ביותר. מגוון הפעילות
שנקט הנאשם לאורך תקופה ארוכה מלמדות על עיסקו בחתירה להריגתם של
ישראלים רבים ככל האפשר. הנאשם שלח ידו הן במסירת מטעני חבלה לשם השלכתם
על חיילים, הן בגיוס מחבלים מתאבדים, השגת חגורות נפץ ושילוח מחבלים
מתאבדים, הן בירי בריבוב לעבר ישוב ישראלי, הן ביוזום פיגועי מכונית תופת והן
בהצטרפות לתוכניותיהם של אחרים שביקשו לבצע פיגועי התאבדות, כמו גם מתן
סיוע במגוון דרכים לשם מימושם של פיגועים כאלה.

אף שלא יוחסה לנאשם אחריות משפטית ישירה לכך, יש לזכור כי כתוצאה מההתכנות
שביצע הנאשם בסופו של דבר יצא לפועל פיגוע התאבדות שבו רצחו 11 בני אדם
ונפצעו עשרות רבות. בשאר המקרים, רק מזל, וסיכול בידי כוחות הביטחון הם שמנעו
מימושם של פיגועים המוניים אחרים.

הנאשמים האחרים שעניינם הובא בפנינו היו מעורבים רק בחלקים מתוך פעילותו
הענפה של הנאשם ועל כן העונשים שהוטלו עליהם יכולים להוות רק נקודת מוצא
לקביעתו של העונש הראוי לנאשם. אין בהם כדי ללמד על סך העונש שנכון להטיל על
הנאשם.

-3-

W_S098316

תיק מס׳ : 4348/04                           תאריך : י״ג בכסלו , תשס״ז
                                            4 בדצמבר, 2006

על רקע זה, חסדר הטיעון שהוצג בפנינו מקל עם הנאשם במידה לא מבוטלת, הן    1
בעבירות שאותן הותירה התביעה בכתב האישום והן בעונש שעתרה לו. עם זאת,    2
בהתאם להלכה הפסוקה בדבר הצורך לכבד הסדרי טיעון, וכיון שהעונש שמוצג בפנינו    3
מצוי במתחם הענישה הסבירה, אף שהוא נוטה לקולא, החלטנו לכבד את הסדר    4
הטיעון. לפיכך, אנו גוזרים על הנאשם את העונשים הבאים :    5
                                                                    6
                                                                    7
א.  21 שנות מאסר בפועל אשר יימנו החל מיום מעצרו 27/08/04.    8

ב.  3  שנות מאסר על תנאי, והתנאי הוא שבמשך 5 שנים מיום שחרורו ממאסרו לא    9
    יעבור עבירה בה הורשע.    10
                                                                    11
**זכות ערעור תוך 30 יום מהיום.**    12
                                                                    13
**ניתן והודע היום, 04/12/06, בפומבי ובמעמד הצדדים.**    14
                                                                    15
                                                                    16
                                                                    17
                                                                    18
                                                                    19

_____        _____        _____
שופט            אב״ד            שופט

-4-

W_S098315

Date: 13 Kislev, 5767
4 December, 2006

Case Number: 4348/04

1

2    **Military Court Judea**

3

4    **Before the honorable panel:**      **Lieutenant Colonel Zvi Lekach, President**

5                                          **Judge: Major Ronen Atzmon**

6                                          **Judge: Lieutenant Colonel Tal Band**

7

8

9

10   **Military Prosecution**

11   (Through Major David Golan)

12

13                                          **v.**

14

15   **The Accused: Nufal Gahed Nufal Aladwin ID. 920662152/ Israeli Prison Service - present**

16

17   (Through his attorney, Haled Alaraj - present)

18   **Legal registrar: Corporal Alejandra Yitzkovic**

19   **Interpreter: Staff Sergeant Fahim Hasson**

20   _____

21   **President of the Court opens the meeting and identifies the Accused**

22                          **Course of discussion**

23   Accused: I am represented by Attorney Haled Alaraj.

24   Prosecutor: No evidence for sentence.

25   Attorney for defense: No evidence for sentence.

**EXHIBIT**

1   Prosecutor concludes: we reached a plea bargain in the framework of which we wish to impose

2   the following sentences on the Accused:

3       A. 21 years of actual imprisonment starting from the time of his arrest.

4       B. Conditional imprisonment at the discretion of the court.

5   Reasons for the sentence lie in evidential difficulties that emerged in this case, saving costly

6   judicial time and especially the sentence that was delivered on the Accused's partner for this

7   affair, a partner by the name of Mahmed Muhammad Nashash dealt in case Judea and Samaria

8   2316/06/ the main offense were committed together with Muhammad Nashash, we would not

9   have deviated from the sentence in this or that degree but we believe that the Accused's share

10  outweighs his partner share not by far.

11

12  Attorney for defense concludes: I wish to honor the plea bargain. First I would like to address the

13  evidential difficulties, the Count of Indictment for which his partner was sentenced for 15 years,

14  in our case the level of involvement of the Accused is not clear; difficulties emerge because there

15  were two plans executed by two organizations. At first it was Hamas but in actuality it was

16  Tanzim people. The level of involvement of the Accused is unclear concerning the matter under

17  discussion. As to the degree of the sentence, we are talking about a hierarchy of sentences that

18  began with Fares Adawin who is related to different counts of indictment and received 11 years

19  of actual imprisonment and Muhammad Nashash received 15 years of imprisonment and there

20  was an argument as to the sentence of the partner. I request to honor the arrangement under the

21  current circumstances. I shall add that there were no witnesses in this case, he admitted as part of

22  a plea bargain and this saved costly judicial time, his record is clean.

23  Final words of the Accused: I have nothing to add.

**W_S098318**

24

25

26

27

28

29

1

2

3                                              **Military Court Judea**

4

5   **Before the honorable panel:**        **Lieutenant Colonel Zvi Lekach, President**

6                                          **Judge: Major Ronen Atzmon**

7                                          **Judge: Lieutenant Colonel Tal Band**

8

9

10

11  **Military Prosecution**

12  (Through Major David Golan)

13

14                                             **v.**

15

16  **The Accused: Nufal Gahed Nufal Aladwin ID. 920662152/ Israeli Prison Service - Present**

17

18  (Through his attorney, Haled Alaraj - present)

19  _____

20                                          <u>**Sentence**</u>

21  The Accused was convicted following his admission in the framework of a plea bargain, in a

22  series of severe security offenses:

23      1.  **Membership and activity and holding office in an illegal association** - the Accused

24          was convicted of being a member in a terrorist group of the Hamas organization since

25          2001 and as of 2003 he was head of that group.

26      2.  **Discharging a firearm at another person** - on 2003 he shot 8 bullets at a house in Gila

27          neighborhood in Jerusalem.

Date: 13 Kislev, 5767                                              Case Number: 4348/04
4 December, 2006

3. **Conspiring to cause death willfully** - in the beginning of 2004, together with his partners, he planned to commit an attack against Israeli citizens and soldiers. The plan included the purchase of two stolen cars which they intended to rig with explosives, detonate the first against a bus that would drive by it and detonate the other against soldiers and Jewish settlers who would come and provide assistance to those injured in the first explosion. This conspiracy was not executed due to problems in obtaining cellular phones that were required for the purpose of activating the car bombs.

4. **Throwing an incendiary article** - during 2004 he delivered explosive devices to another terror activist and that activist went on a number of occasions to the road leading from Beit Sahur to Rachel's Tomb and threw the devices at IDF soldiers that were in the area. The explosive devices exploded next to the soldiers' vehicles.

5. **Conspiring to cause death willfully** - the Accused was convicted that in January 2004, together with his partners to the terrorist group he recruited a person for the purpose of committing a suicide bombing attack, planned the details of the attack and prepared an explosive device for the purpose of executing the attack. The Accused put the explosive belt on the suicide bomber, filmed him and taped him while reading his "will." Additional preparations were deleted from the indictment and, as said, this attack was not executed as well.

6. **Not preventing the commission of an offense** - at the end of January 2004, a short while following the preparations that were specified hereinabove, the Accused talked with that suicide bomber and the latter told him he maintained connections with Fatah Tanzim activists in relation to the attack planned by the Accused and that he intended to go and commit the attack through their help. The Accused knew that the attack was about to be executed afterwards yet did nothing to prevent its commission. The indictment contains the additional events that occurred afterwards, at the end of which Ali Jaara, the suicide bomber, went on Egged bus line 19 in Jerusalem and activated the explosive bag at the corner of Arlozorov and Gaza Streets. As a result of this attack 11 Israelis died and more than 50 were injured in different degrees. Following commission of the attack the Accused took the filmed materials and photos he took, gave them to a TV station in Bethlehem as he was taking responsibility for the attack in the name of Hamas organization.

W_S098317

Date: 13 Kislev, 5767
4 December, 2006

Case Number: 4348/04

7. **Conspiring to cause death willfully** - in the third quarter of 2004 he met with Mahmed Adwin and conspired with him to commit a suicide bombing attack against Israelis. That Mahmed offered to add more suicide bombers, obtained the consent of these designated terrorists and notified the Accused about it. The Accused told Mahmed that they had to wait until they obtain explosive materials and suggested that Mahmed learn driving so that he could drive all the suicide bombers to commit the attack.

8. **Conspiring to cause death willfully** - in 2004 he accepted the suggestion of Fares Adwin, his brother, to aid in the execution of a suicide bombing attack in Jerusalem. The Accused told his brother that when he would get the explosive belt for the five potential suicide bombers he would commit the attack in Jerusalem. The Accused even reconnoitered the French Hill junction a Meah Shearim neighborhood in Jerusalem  in order to examine the possibility of committing the attacks there and informed his brother that there was a person who was willing to drive the suicide bombers to Jerusalem. The attacks were not committed due to the arrest of Fares and the difficulty in obtaining explosive belts.

9. **An attempt to cause death willfully** - in that at the month of against 2004 the Accused agreed to take part in the preparations for the shooting attack against IDF soldiers who secured the workers who were engaged in the construction of the West Bank Barrier, and the workers themselves. The Accused provided his brother information about the times of arrival of the soldiers to the Barrier area and using that information and based upon a patrol he performed in the area Fares Adwin made a decision as to when to perform the attack. Sometimes afterwards Fares Adwin and his friend drove in a vehicle for the purpose of committing the attack yet when they reached the place Fares Adwin saw that there were children in the area of the intended attack and that the soldiers were at the far end of the Barrier and therefore the attack could not be executed. The following day Fares and his friend went again to commit the attack and they did not commit it again for the same reasons.

The parties plead for  a sentence that was agreed between them and asked that we honor it. Their reasons for the arrangement included the clean record of the Accused, the fact that his admission of guilt saved the time of all the entities involved as well as the level of the sentences that were given in the cases of others that were involved in the affair. The parties presented before us the

Date: 13 Kislev, 5767                                                         Case Number: 4348/04

·· 4 December, 2006

1   case of Fares Adwin in court case Judea 4185/04 where he was sentenced to 11 years of actual

2   imprisonment and the case of Mahmed Alnashash in the Judea and Samaria case 2316/06 was

3   sentenced to 15 years of actual imprisonment while approving the plea bargain agreed upon in

4   the first instance as well.

5   The actions of the Accused are varied and severe and they justify severe punishments. The

6   variety of actions performed by the Accused throughout a long while point to his determination

7   to kill as many Israelis as possible. The Accused delivered explosive devices for the purpose of

8   throwing them at soldiers, the recruitment of suicide bombers, obtainment of explosive belts and

9   sending suicide bombers to their target, whether the attack included discharging firearms at

10  Israeli settlements, initiating car bomb explosions and becoming parts of others who wished to

11  commit suicide bombing attacks, as well as providing assistance in a variety of ways for the

12  purpose of executing these attacks.

13  Even though the Accused was not ascribed with direct legal responsibility for these matters, it

14  should be kept in mind that as a result of the preparations made by the Accused, a suicide

15  bombing attack was finally executed and took the lives of 11 people while injuring many more.

16  In the rest of the cases it was mere luck and foiling by the security forces that prevented the

17  execution of other mass attacks.

18  The other persons that were accused and whose cases were presented before the court, were

19  involved in only part of the extensive activities of the Accused and therefore the sentences that

20  were imposed upon them could only serve as a point of departure to decide upon the sentence of   W_S098316

21  the Accused. They are not to point to the overall sentence that is appropriate for the Accused.

22

23  In light of the above, the plea bargain presented before this court constitutes a lenient sentence

24  both with reference to the offenses that the prosecution left in the indictment and the sentence it

25  request. Nevertheless, pursuant to case law precedents as to the need to honor plea bargains, and

26  since the sentence presented before this court is within the confines of reasonable punishment,

27  despite its tendency to be lenient, this court decided to honor the plea bargain. Therefore we

28  sentence the Accused to the following:

29      A. 21 years of actual imprisonment starting from the day of his arrest on 27/08/04.

Date: 13 Kislev, 5767
4 December 2006

Case Number: 4348/04

B. 3 years of conditional imprisonment, the condition being that 5 years following his release from prison he shall not commit the offense in which he was convicted.

**Right of appeal within 30 days as of today.**

**Granted and announced today, 04/12/06 in the presence of both parties.**

**Handwriting: signature]**     **[Handwriting: signature]**          **[Handwriting: signature]**

**Judge**              **President of the Court**          **Judge**

W_S098315



# CERTIFICATION

This is to certify that the attached *English* language document corresponding
to the document *Shaked Supplemental Appendix 1 pp. 168-230*, is a true and accurate
translation of the original *Hebrew* language document to the best of our knowledge and belief

Executed this on
Wednesday, November 03, 2010

*TIK TAK TRANSLATIONS LTD.*
*Co. No: 514280075*

**Tik Tak Translations Ltd.**
9 Hashiloah Street
Petach Tikva, 49180 ISRAEL
+972 3 907-4555

9 HaShiloah St., P.O. Box 8070, Petah Tikva 49180 Israel
Tel: +972-3-9074555 Fax: +972-153-3-9074555
www.tiktaktranslations.com      info@tiktaktranslations.com

**EXHIBIT 205 TO DECLARATION OF VALERIE SCHUSTER**

## REPORT OF MOSHE AZOULAY

I submit this report in the lawsuits captioned <u>Weiss, et al. v. National Westminster Bank Plc</u> (Case No. 05-cv-4622 (DGT)(MDG)) and <u>Applebaum, et al. v. National Westminster Bank Plc</u> (Case No. 07-cv-916 (DGT)(MDG)), which I understand are pending in the U.S. District Court for the Eastern District of New York.

A copy of my *curriculum vitae* is attached to this report as <u>Annex A</u>.  I can summarize additional information concerning my background and qualifications as follows.

I served in the Israeli Defense Force ("IDF") for a period of six years, from 1972 to 1978.  All of my active service was in elite infantry forces and an armored battalion.  During the Yom Kippur War in 1973, I served as a commander in the Golani Brigade, on the Syrian front.  I later commanded several combat units in connection with missions relating to maintaining the security of Israel's borders and in addressing terrorist activity in Israel and the occupied territories.  I served in the reserve forces of the IDF from 1978 until 1984, during which time, among other things, I served as lieutenant commander of a new armored battalion that I created, and which subsequently played a major role during the 1982 Lebanon war.

From 1979 to 1988, I served in the Special Operations unit of the Israel Security Agency ("ISA"), also known as the *Shin Bet*, which is one of Israel's principal intelligence agencies.  I retired from the ISA with the rank of Lieutenant Colonel.  From 1989 through today, I have served voluntarily in the reserve forces of the ISA and similar units of the *Mossad*, Israel's international intelligence agency.

I cannot detail my activity in the ISA or other intelligence organizations, but I can describe in general terms my security and intelligence experience.  In 1979, I was recruited to join the elite

1

Special Operations unit of the ISA.  During this service, I completed several professional and command courses in the fields of counter-terrorism and counter-intelligence activities.  I also participated in, including and mainly as a commander, several hundreds of operational and intelligence missions in Israel, the occupied territories and elsewhere against terrorist organizations, their infrastructures, their headquarters and their members, with the goals of preventing terrorist attacks before they occurred, and addressing attacks that were not prevented after they occurred.  By the end of my active service for the ISA, I had initiated and supported the establishment of the ISA's largest and most effective counter-terrorism project.

I received my law degree from Tel Aviv University in 1993.  After my apprenticeship with a law firm in Haifa, Israel, I became a member of the Israeli bar in 1995.  I was then a partner in the law firm of Omer, Azoulay & Co. Advocates until 1997, when I formed my current firm, Moshe Azoulay, Law Offices.  I have represented clients in a large number of civil and criminal cases before various Israeli courts.  I am also licensed to represent defendants in Israeli military courts. Additionally, I have represented clients in arbitration cases, and have been appointed as an arbitrator in civil disputes.  I have also been appointed by the Minister of Finance of Israel to serve as a director of a public company that manages funds for continuing legal education for Israeli lawyers and legal advisors.

Between 2005 and 2008, I was also a partner and active director in a private security consulting company in Israel named Advanced Security Integration Ltd.  In that capacity, I conducted and led expert teams in performing risk and threat assessments.  My company provided consulting services to private entities and foreign governments relating to potential terror attacks against national, public and private infrastructures.

2

Other aspects of my background and activities are identified in the copy of my *curriculum vitae* that is attached to this report.

The information I considered in forming the opinions I express in this report is identified in the text below.

I have not previously testified as an expert at trial or by deposition other than my deposition on August 5 and 6, 2010 in Strauss, et al. v. Crédit Lyonnais and Wolf, et al. v. Crédit Lyonnais.  I am being compensated for my study and testimony in these cases at the rate of US $350 per hour.

The documents and other information I considered in forming the opinions I state in this report are identified in this report and the annexes thereto.

In this report I will address the following questions regarding responsibility for the relevant attacks.

   1.1. Which of the attacks listed in Annex B to this report has been determined by an Israeli court verdict or by a verdict of a military court within the occupied territories to have been perpetrated by Hamas, based upon the documents, which I understand have been produced to National Westminster Bank Plc ("NatWest") by plaintiffs, bearing the production numbers listed in Annex C to this report?[1]

---

[1] Annex C to this report includes all of the documents included in Annex C to my initial report in the Strauss and Wolf lawsuits plus plaintiffs' additional document production of October 15, 2010.  It does not include documents appended to the reports plaintiffs submitted in the Strauss and Wolf lawsuits because to my understanding these documents are not part of the record in the lawsuits against NatWest as of the date of this report.  I reserve the right to address these documents in a rebuttal report in the lawsuits against NatWest if they are submitted in these lawsuits.  Nor does it include documents I appended as exhibits to

3

1.2. Which of the documents listed in Annex C to this report would be admissible in evidence under Israeli law, in a civil lawsuit in an Israeli court seeking damages from a defendant that was not a party to the investigations or prosecutions from which these documents originate, on the ground that the defendant had some responsibility for the attacks that are the subject of these documents, including, in the circumstances present here, NatWest, as affirmative proof that one or more of the attacks listed in Annex B and to which the document pertains was perpetrated by Hamas?

**Chapter 1 – Verdicts attributing responsibility for the attacks to Hamas**

**1.    General**

1.1.    In this chapter I shall address whether an Israeli court or a military court in the occupied territories has issued a verdict finding Hamas responsible for committing one or more of the 15 attacks listed in Annex B.  A number of these attacks were committed within the State of Israel; others were committed beyond the "Green Line" — within the occupied territories in Judea and Samaria and/or the Gaza Strip.

1.2.    I shall note at the outset that the distinction between a verdict issued by an Israeli court and a verdict issued by a military court is significant.  As will be discussed below, there are fundamental differences between these two types of verdicts, especially with regard to their admissibility as evidence in a civil court case in an Israeli court.

---

my rebuttal report in the <u>Strauss</u> and <u>Wolf</u> lawsuits.  I also reserve the right to address these and all other documents in a rebuttal report in the lawsuits against NatWest to the extent it is appropriate for me to do so.

1.3.    The findings discussed below are based solely on documents provided by plaintiffs listed in Annex C to this report.

1.4.    As stated below, after I identify verdicts that have attributed responsibility for the relevant attacks to Hamas, I then analyze whether any of these verdicts could under certain conditions that I describe be admissible in evidence under Israeli law, pursuant to the Evidence Ordinance (revised version) – 1971 ("Evidence Ordinance"), in a civil lawsuit in an Israeli court seeking damages from a defendant that was not a party to the investigations or prosecutions from which these documents originate, on the ground that the defendant had some responsibility for the attacks that are the subjects of these documents, as affirmative proof that one or more of the attacks to which the document pertains was perpetrated by Hamas.  As stated below, these verdicts do not satisfy all the criteria of the Evidence Ordinance, and therefore they would not be admissible in evidence against NatWest in this civil lawsuit, and those documents referenced as "death certificates" are the only documents listed in Annex C that could under certain conditions be admissible in evidence under Israeli law in such a civil lawsuit. My final conclusion as stated below is that all of the other documents listed in Annex C, including the verdicts mentioned above, are inadmissible hearsay.

2.     **<u>Chapter 1.1</u>**

Responsibility for committing the attacks listed in Annex B has been determined by an

Israeli court verdict or by a verdict of a military court within the occupied territories

based upon the documents listed in Annex C as follows:

2.1.    **Table 1A - Responsibility of Hamas for Committing Attacks According to Verdicts of Israeli Courts**

| No. | Attack | Court | Legal Procedure | Defendant(s) | Verdict and Responsibility | Ref. No. - Annex B | Ref. No.– Annex C |
|---|---|---|---|---|---|---|---|
| 1 | March 27, 2002 Park Hotel, Netanya | Jerusalem District Court | Sever Crime 5071/02 | 1. Wahal Kassam 2. Wassem Abassi 3. Muhamad Uda 4. Alla Abassi | Confession - Hamas | 1 | W_S 085376 W_S 085403 |
| 2 | May 7, 2002 Sheffield Club, Rishon Lezion | Jerusalem District Court | Sever Crime 5071/02 | 1. Wahal Kassam 2. Wassem Abassi 3. Muhamad Uda 4. Alla Abassi | Confession - Hamas | 2 | W_S 085376 W_S 085403 |
| 3 | July 31, 2002 Hebrew University cafeteria, Jerusalem | Jerusalem District Court | Sever Crime 5071/02 | 1. Wahal Kassam 2. Wassem Abassi 3. Muhamad Uda 4. Alla Abassi | Partial confession - Hamas | 3 | W_S 085376 W_S 085403 |
| 4 | March 5, 2003 Egged Bus No. 37 in Haifa | Supreme Court | Appeal – Criminal 1932/04 | Munir Rajbi – Israeli citizen | Plea bargain - Hamas | 5 | LITLE 00156 LITLE 00167 |
| 5 | September 9, 2003 Café Hillel Jerusalem | Jerusalem District Court | Sever Crime 776/04 | 1. Ahmed Ben Mohamed Abid 2. Naal Ben Salame Abid | Evidence - Hamas | 12 | CLII – 001194 CLII – 001208 |
| 6 | March 27, 2002 Park Hotel, Netanya | Tel Aviv district Court | Sever Crime 1147/02 | Abas El Saied | Evidence - Hamas | 1 | W_S 089845 W_S 089928 |

2.1.1.   As Table 1A indicates, according to verdicts issued by Israeli courts, Hamas was responsible for the following attacks listed in Annex B:

- Attack No. 1:  Park Hotel, Netanya, March 27, 2002

- Attack No. 2:  Sheffield Club, Rishon Lezion, May 7, 2002

- Attack No. 3:  Hebrew University Cafeteria, Jerusalem, July 31, 2002

- Attack No. 5:  Egged Bus No. 37, Haifa, March 5, 2003

- Attack No. 12:  Café Hillel, Jerusalem, September 9, 2003

2.2.    **Table 1B – Responsibility of Hamas for Committing Attacks According to Verdicts of military courts in the Occupied Territories**

| No. | Attack | Court | Legal Procedure | Defendant(s) | Verdict and Responsibility | Ref. No.— Annex B | Ref. No.— Annex C |
|---|---|---|---|---|---|---|---|
| 1 | March 27, 2002 Park Hotel | military court Samaria | 5998/02 | Ahmed Chaled Gioussy | Evidence – Hamas | 1 | FNAIMI-00212 FNAIMI-00231 W_S 085051 W_S 085070 |
| 2 | March 27, 2002 Park Hotel | military court Samaria | 6165/02 | Fathi Rajha Hatib | Confession – Hamas | 1 | FNAIMI-00326 FNAIMI-00347 W_S 085165 W_S 085186 W_S 097679 W_S 097697 |
| 3 | March 27, 2002 Park Hotel | military court Samaria | 6171/02 | Muamar Fathi Sherif | Confession – Hamas | 1 | FNAIMI-00326 FNAIMI-00347 W_S 085165 W_S 085186 W_S 097679 W_S 097697 |
| 4 | March 27, 2002 Park Hotel | military court Samaria | 6160/02 | Talal Mansour Shrim | Confession – Hamas | 1 | FNAIMI-00326 FNAIMI-00347 W_S 085165 W_S 085186 W_S 097679 W_S 097697 |
| 5 | March 27, 2002 Park Hotel | military court Samaria | 6115/02 | Nasser Sami Yatima (Zeituni) | Confession – Hamas | 1 | FNAIMI-00326 FNAIMI-00347 W_S 085165 W_S 085186 W_S 097679 |

| No. | Attack | Court | Legal Procedure | Defendant(s) | Verdict and Responsibility | Ref. No.— Annex B | Ref. No.— Annex C |
|---|---|---|---|---|---|---|---|
| | | | | | | | W_S 097697 |
| 6 | March 5, 2003 Egged Bus No. 37 Haifa | military court Yehuda | 1435/03 | Fadi Muhamad Juaba | Confession – Hamas | 5 | LITLE 00175 LITLE 00176 LITLE 00183 CLII - 001141 W_S 098480 |
| 7 | June 11, 2003 Egged Bus No. 14A Jerusalem | military court Yehuda | 3809/03 | Omar Tsalah Sharif | Plea bargain & Confession – Hamas | 9 | W_S 085487 |
| 8 | June 20, 2003 Shooting Attack Near Ofra | military court Yehuda | 1174/04 | Haled Aldin Omar | Plea bargain & Confession – Hamas | 10 | W_S 010433 |
| 9 | June 20, 2003 Shooting Attack Near Ofra | military court Yehuda | 1177/04 | Mahmud Gatsuv Saad | Plea bargain & Confession – Hamas | 10 | W_S 054108 |
| 11 | January 29, 2003 Shooting On Road #60 | military court Yehuda | 1481/04 | Jasser Ismail Barguti | Plea bargain & Confession – Hamas | 4 | W_S 087880 (Partial Verdict) W_S 087838 W_S 087857 (complete) |
| 12 | March 5,2003 Egged Bus No. 37 Haifa | military court Yehuda | 1480/03 | Maed Wahal Taleb | Confession – Hamas | 5 | CLII - 001146 CLII - 001147 W_S 098206 |
| 13 | May 18, 2003 Egged Bus No. 6 Jerusalem | military court Yehuda | 3580/03 | Samer Samia Elatrash | Plea bargain & Confession – Hamas | 8 | W_S 087799 W_S 097985 |
| 14 | June 11, 2003 Egged Bus No. 14A Jerusalem | military court Yehuda | 3809/03 | Omar Salah Sharif | Plea bargain & Confession – Hamas | 9 | CLII - 001111 W_S 097941 |
| 15 | June 20, 2003 | military court | 1285/04 | Ahmed Haled | Plea bargain & | 10 | W_S 087589 |

10

| No. | Attack | Court | Legal Procedure | Defendant(s) | Verdict and Responsibility | Ref. No.— Annex B | Ref. No.— Annex C |
|---|---|---|---|---|---|---|---|
| | Shooting Attack near Ofra | Yehuda | | Daood | Confession – Hamas | | W_S 087607 |
| 16 | June 20, 2003 Shooting Attack near Ofra | military court Yehuda | 1172/04 | Ahmed Muostafa Hamed | Plea bargain & Confession – Hamas | 10 | W_S 089289 W_S 089298 |
| 17 | June 20, 2003 Shooting Attack near Ofra | military court Yehuda | 1443/04 | Hisham Hijaz | Plea bargain & Confession – Hamas | 10 | W_S 088159 W_S 088160 |
| 18 | June 20, 2003 Shooting Attacks near Ofra | military court Yehuda | 1174/04 | Haled Muaez Omar | Plea bargain & Confession – Hamas | 10 | W_S 087691 W_S 087692 |
| 19 | August 19, 2003 Egged Bus No. 2 Jerusalem | military court Yehuda | 1174/04 | Haled Muaez Omar | Plea bargain & Confession – Hamas | 11 | W_S 087691 W_S 087692 |
| 20 | May 7, 2002 Sheffield Club | military court Yehuda | 3925/02 | Mahmud Hasan Ahmad Arman | Confession – Hamas | 2 | W_S 097630 |
| 21 | May 7, 2002 Sheffield Club | military court Yehuda | 3931/02 | Walid Aziz Hadi Anjas | Confession – Hamas | 2 | W_S 098047 |
| 22 | May 7, 2002 Sheffield Club | military court Yehuda | 4133/03 | Yussef Abdalla Anjas | Plea bargain & Confession – Hamas | 2 | W_S 098060 |
| 23 | August 19, 2003 Egged Bus No. 2 Jerusalem | military court Yehuda | 4189/03 | Abdalla Adnan Sharbati | Plea bargain & Confession – Hamas | 11 | W_S 097086 |
| 24 | August 19, 2003 Egged Bus No. 2 Jerusalem | military court Yehuda | 4131/03 | Jalal Jamal Hilmi Yaamur | Plea bargain & Confession – Hamas | 11 | W_S 097354 |

11

| No. | Attack | Court | Legal Procedure | Defendant(s) | Verdict and Responsibility | Ref. No.— Annex B | Ref. No.— Annex C |
|---|---|---|---|---|---|---|---|
| 25 | August 19, 2003 Egged Bus No. 2 Jerusalem | military court Yehuda | 4113/03 | Nasim Rashad Zaatri | Plea bargain & Confession – Hamas | 11 | W_S 097875 |
| 26 | September 9, 2003 Café Hillel Jerusalem | military court Yehuda | 4373/04 | Bahij Muhamad Mahmud Bader | Plea bargain & Confession – Hamas | 12 | W_S 097200 |
| 27 | March 5, 2003 Egged Bus No. 37 Haifa | military court Yehuda | 1481/03 | Ali Hasan Abdala Rajbi | Plea bargain & Confession – Hamas | 5 | W_S 098359 |
| 28 | May 7, 2002 Sheffield Club  July 31, 2002 Hebrew University | military court Yehuda | 3191/03 | Fallah Taher Abdallah Nada | Plea bargain & Confession – Charge of indirect responsibility of a Hamas member | 2,3 | W_S 5156871-902 |

2.2.1.   As Table 1B indicates, according to the verdicts of military courts in the occupied territories, Hamas was responsible for the following attacks listed in Annex B:

- Attack No. 1: March 27, 2002, Park Hotel

- Attack No. 2: May 7, 2002, Sheffield Club

- Attack No. 4: January 29, 2003 Shooting On Road No. 60

- Attack No. 5: March 5, 2003, Egged Bus No. 37 Haifa

- Attack No. 8: May 18, 2003, Egged Bus No. 6 Jerusalem

- Attack No. 9:  June 11, 2003, Egged Bus No. 14A Jerusalem

- Attack No. 10:  June 20, 2003, Shooting Attack Near Ofra

- Attack No. 11:  August 19, 2003, Egged Bus No. 2 Jerusalem

- Attack No. 12:  September 9, 2003, Café Hillel Jerusalem

2.2.2.   I had indicated in my initial report in the Strauss and Wolf lawsuits, dated December 8, 2009, that among the military court verdicts plaintiffs have produced is one concerning a Hamas member's conviction for failure to prevent the occurrence of the January 29, 2004 Egged Bus No. 19 attack in Jerusalem.  In light of, among other documents, (a) the additional police, military court and other documents concerning this attack that I have since studied, as indicated in my rebuttal report in the Strauss and Wolf lawsuits dated July 1, 2010, (b) the additional documents produced by plaintiffs on October 15, 2010 (in particular W_S156447-478) and (c) the documents appended to the reports of Ronni Shaked and Shaul Naim

13

in the <u>Strauss</u> and <u>Wolf</u> lawsuits, it is clear that responsibility for this attack has been attributed, among other places in military court documents and elsewhere, to members of the Al Aqsa Martyrs Brigade of the Fatah, rather than to Hamas.  I will address this and related subjects in a rebuttal report in the lawsuits against NatWest to the extent it is appropriate for me to do so, based upon the contents of the initial reports submitted by plaintiffs in these lawsuits.

3.      After reviewing the documents provided by the plaintiffs listed in Annex C to this report, there are four attacks listed in Annex B for which the documents listed in Annex C provide no verdict issued by an Israeli court and/or military court in the occupied territories:

- Attack No. 6:  March 7, 2003 — Kiryat Arba, Hevron

- Attack No. 7:  April 30, 2003 — Mike's Place, Tel Aviv

- Attack No. 13:  October 22, 2003 — Tel Rumeida, Hebron

- Attack No. 15:  September 24, 2004 — Neve Dekalim, Gaza Strip

**Chapter 2 – Admissibility of the documents listed in Annex C to this report in a civil proceeding**

**1.      General**

1.1.    I understand that plaintiffs furnished NatWest with the documents listed in Annex C to this report.

1.2.     In Chapter 1 of this report, I reported my conclusions based on my review of all the documents listed in Annex C. These documents include verdicts and sentences issued by Israeli courts, verdicts and sentences issued by military courts in the occupied territories, indictments submitted to courts in Israel or to military courts, testimony of accused persons and others given to the Israeli police, various reports of the Israeli police and the Institute of Forensic Pathology in Israel, press announcements issued by different government offices in Israel, military inquiries, and other types of documents.

1.3.     In Chapter 2 of this report, I explain my conclusion as to which of the documents listed in Annex C would be admissible in evidence under Israeli law, in a civil lawsuit in an Israeli court seeking damages from a defendant that was not a party to the investigations or prosecutions from which these documents originate, on the ground that the defendant had some responsibility for the attacks that are the subjects of these documents, such as the allegations that I understand have been made against NatWest in plaintiffs' amended complaint in Weiss, et al. v. National Westminster Bank Plc (Case No. 05-cv-4622 (DGT)(MDG)) and Applebaum, et al. v. National Westminster Bank Plc (Case No. 07-cv-916 (DGT)(MDG)), both of which I have read, for providing material support and/or financing for these attacks as affirmative proof that one or more of the attacks listed in Annex B to which the document pertains was perpetrated by Hamas.

1.4.     I conclude that all of the documents listed in Annex C would be inadmissible as hearsay under Israeli law as proof of the matters asserted in these documents, in the type of civil lawsuit in an Israeli court I describe above, unless and to the

15

extent any document that qualifies under an exception to the rule of Israeli law that generally excludes such hearsay evidence, as will be detailed below.

1.4.1.   Criminal judgments

Regarding the documents listed in Annex C, which are criminal judgments or documents related to these criminal judgments, such as indictments, reports, testimonies, verdicts and sentences, the only relevant exception to the rule against the admissibility of hearsay documents as proof of the matters asserted in such documents that could apply is according to the criteria established by Article 42A of the Evidence Ordinance regarding the admissibility of a criminal judgment as evidence in a civil trial.

1.4.2.   All other documents listed in Annex C will be analyzed hereafter regarding their nature and according to relevant statues and / or case law which determines the admissibility of such documents as an exception to the general rule that excludes hearsay.

The analysis hereafter will be based on the interpretation of the relevant statutes, on cases in Israel, on expert opinions, and on the opinion of the undersigned.

1.4.3.   Currently, the issue of whether judgments issued by military courts in the occupied territories in a criminal trial are admissible as evidence in a civil lawsuit has been brought for the very first time before the Supreme Court of Israel as part of a motion for permission to appeal in a lawsuit against

16

the Palestinian Authority.[2] The Supreme Court issued its ruling on this subject on November 25, 2010.  I address that ruling below.

The analysis below will categorize the judgments listed in Annex C according to the criteria established by the Evidence Ordinance regarding the admissibility of criminal judgments as evidence in a civil trial.  In brief, criminal judgment and the defendant in the civil case must meet all the following criteria in order to be admissible in a civil trial:

1.4.4.   The judgment must be final and convicting

1.4.5.   The judgment must have been issued by an Israeli court

1.4.6.   The only admissible section of the judgment is the verdict

1.4.7.   The defendants in the civil case must have a legal association of responsibility for the actions of the person convicted in the criminal judgment according to one of four categories of legal responsibility established by law (discussed below).

1.5.    For the reasons stated below, after examining all the criminal judgments and the evidence related to these judgments listed in Annex C, including the verdicts I identify in Chapter 1 of this Report, and after examining the legal relationship between NatWest according to the assumptions I list below and the persons convicted in the judgments listed in Annex C, I conclude that in a civil lawsuit in

---

[2] Motion for permission to appeal 3559/09 The Palestinian Authority v. The Estate of the Deceased Joseph Avrahami, his blessed soul (the hearing has not yet finished).

an Israeli court seeking damages from NatWest, the court would conclude that none of these documents is admissible in evidence as affirmative proof that one or more of the attacks listed in Annex B was perpetrated by Hamas.

## 2.   __Legal/ Statutory Background__

2.1.   A basic premise of Israeli evidence law is that a judgment that was rendered in one trial cannot serve as evidence in another trial, unless there is a specific provision of law that explicitly permits it.

2.2.   In principle, the factual findings of a judge in one trial are considered hearsay to a judge in another trial; the conclusions of a judge in one trial are considered an opinion with respect to a judge in another trial. This principle was determined by the Supreme Court in the case of Rahamim Bracha v. Aneska Bachar,[3] which addressed the question of admissibility in a civil lawsuit of a criminal verdict, which verdict was submitted against the person accused in the criminal case by a person who was not party to the criminal proceeding. The court ruled there as follows:

> "….. It does not matter if the accused was convicted in a criminal trial, or if he was acquitted. This was an acquittal judgment, but in our opinion, this will not cause estoppel unless it is between those same parties that litigated in the proceedings in which the judgment was rendered, because only these parties had the opportunity, during these proceedings, of

---

[3] Civil Appeal 102/47 Rachamim Bracha v. Aneska Bachar, Judgments volume B, page 63.

presenting evidence and making claims. And if it will be said that the criminal judgment can serve at least as prima facie evidence, in other words, not as something that causes estoppel (which denies a party the right to dispute the findings in the judgment), rather as evidence (which can be refuted by other evidence), we will find that this evidence is disqualified: because the criminal judge's factual findings – which are based on witnesses which he saw and heard – are considered hearsay in respect to the judge in a civil trial, and the conclusions of the judge in a criminal trial, which are derived from his findings, are considered an opinion evidence in respect to the judge in a civil trial.  This means that the judge in a criminal trial formed an opinion and concluded that the accused committed a crime. This conclusion binds the accused in the criminal trial, because he is a party to it, but it cannot serve as estoppel, and it has no importance beyond that trial. In the second trial, the civil one, the matter shall be decided according to the witnesses who give testimony before that judge and based on the conclusions that he reached, in that same trial, and not someone else – even if he was the other judge."

2.3.    The Evidence Ordinance, as it existed when the above judgment was rendered, created a situation in which civil courts could and actually did reach conclusions that were different from those reached by the criminal courts, based upon the same set of facts. This situation and the lack of symmetry in judgments was

19

criticized by the Supreme Court, and called for a change in legislation. On this issue see, for example, the judgment in the Marziano v. Badaan case.[4]

2.4.    Following the criticism voiced by the Supreme Court, the Minister of Justice appointed a steering committee of senior jurists in Israel. The committee put together a proposal to revise the Evidence Ordinance to allow, under certain circumstances, the admissibility of a final convicting judgment in a criminal trial as evidence in a civil lawsuit.

2.5.    The proposal of the steering committee addressed the need to prevent conflicting decisions by different courts, and the creation of judicial symmetry between the different courts. The steering committee emphasized the need to save the time of both the courts and the witnesses, and the need to prevent multiple hearings on the same matter by different courts.[5]

2.6.    In 1973, following the suggestions of the steering committee, the Israeli Parliament, the Knesset, approved the bill to revise the Evidence Ordinance. The amendment included Article G, titled "A Convicting Judgment in a Criminal Trial." Within the framework of the amendment, Articles 42A to 42E were added to the Evidence Ordinance, stipulating the conditions under which a criminal judgment will be admissible as evidence in a civil lawsuit.[6]

---

[4] Civil Appeal 680/66 Martziano v. Badaan, judgments 21 (2) 285.

[5] Civil Appeal 350/74 The company M.L.T. Ltd. v. Massoud and Yehiel Maman judgments 29 (1) 217.

[6] The Amendment of Evidence Law (no. 2) 5733 - 1973 – (law books 5733 page 236).

**3.**     **The Legal Situation After the Amendment of the Evidence Ordinance**

The relevant articles that were appended to the Evidence Ordinance will be quoted hereafter in order to analyze and interpret them:

**3.1.**     **Article 42A of the Evidence Ordinance**

> "42A. The Admissibility of a Judgment
>
> (a)     The findings and conclusions of a final judgment in a criminal trial, that convicts the accused, shall be admissible in a civil trial as prima facie evidence to their contents if the convicted or his proxy or a person whose liability arises from the liability of the convicted, including whoever is obligated to pay his judgment, is a party in the civil trial.
>
> (b)     The provisions of this article do not apply to –
>
> > (1)     A judgment of a military court for traffic violations and a judgment of a municipal court that was not rendered by a magistrate's court judge;[7]
> >
> > (2)     Findings and conclusions in a sentence, as opposed to a verdict.

**3.2.**     **Analysis and Interpretation of the Provisions of Article 42A**

---

[7] "Military court" here refers to a court established according to the Military Jurisdiction Act.  The military courts in the occupied territories to which I refer below were not established pursuant to this act.

21

3.2.1.   This article includes a number of conditions that must be satisfied in order for a criminal judgment to be admissible as evidence in a civil trial.

3.2.2.   The first condition for the applicability of the article is the existence of a final judgment in a criminal trial.

3.2.3.   According to case law, the criminal judgment must be a judgment in a criminal trial that took place in Israel, and was rendered by a court in Israel, as opposed to any criminal judgment that was rendered by a foreign court.

3.2.4.   In the Omer Elhadar v. Machpuz case[8] the court ruled as follows:

"A judgment that was rendered by an Israeli court that is governed by the Israeli law, including the Israeli evidence laws, is considered to be an Israeli court."

And:

"Any court that operates outside of the borders of the country and on which the laws of the State [of Israel] do not apply, constitutes a foreign court."

And:

---

[8] Motion for permission to appeal (Tel Aviv) 10503/85 Omer Ali Omer Elhadar and others v. Vagia Mahpouz Loui and others District Court Judgments 5746 (c).

"Courts that are located beyond the 'Green Line' do not constitute an exception to this rule."

3.2.5.   The court therefore clarified that the provisions of Article 42A of the Evidence Ordinance constitute an exception to the basic principle governing civil law according to which "the onus of proof is on the claimant," a principle that is expressed also in the Regulations of Civil Procedure regarding the order of presenting evidence.[9] Therefore the court determined that:

"An exception to a rule should not be interpreted broadly, and therefore the above mentioned principle should not be interpreted as including reference to a foreign judgment."

3.2.6.   If the Knesset had wished to provide in the amendment to the law that Article 42A of the Evidence Ordinance shall also apply to foreign criminal judgments, it would have stated that explicitly, in the same manner it had restricted the applicability of this article to certain judgments even if they were given by courts in Israel, as specified in Article 42A(b)(1) of the Evidence Ordinance.

3.2.7.   The conclusion derived from the above ruling of the court is that the reference to a criminal judgment in Article 42A of the Evidence Ordinance means only a criminal judgment that was issued by an Israeli

---

[9] Regulations 158 of the Regulations of Civil Procedure – 1984.

court, which is governed by Israeli law. Therefore, a court located outside of the borders of the State of Israel and governed by another law, including the courts located beyond the "Green Line" (i.e., the borders of Israel up until 1967), are not subject to Article 42A, and criminal judgments rendered by them cannot be submitted as evidence in a civil lawsuit under Article 42A of the Evidence Ordinance.

3.3. __The status of a military court in the occupied territories__

3.3.1. The foregoing analysis and the documents listed in Annex C – which, as noted above, include criminal judgments that were rendered by military courts in the occupied territories – raises the question whether a military court operating in the occupied territories is an Israeli court, or is a foreign court.

Because there is no binding ruling on this question, I shall examine it hereafter according to the principles of the Israeli legal system, existing case law, and the proper rules of interpretation that in my opinion are relevant.

3.3.2. "Basic Law: The Judiciary"[10] stipulates the authorized courts in Israel, the authorized judges in the courts, how they are appointed and related matters.

Article 1(a) of the Basic Law: The Judiciary stipulates as follows:

---

[10] Basic Law: the Judiciary.

"(a)     These are the courts that have judicial authority:

     (1)     The Supreme Court

     (2)     The District Court

     (3)     The Magistrate's Court

     (4)     A different court determined by law as a court."

In this law, "Judge" – a judge of a court as aforementioned.

(c)     Judicial authority is also conferred upon the following:

     (1)     The religious court

     (2)     A different tribunal

     (3)     A different authority

All as determined in the law."

Furthermore, Article 4A of the Basic Law: The Judiciary determines the manner in which a court judge, as mentioned, is appointed:

"(a)     A judge will be appointed by the President of the State according to the selection of the Committee for Electing Judges."

3.3.3.  The Basic Law: The Judiciary determines that a court or another tribunal cannot be established in Israel unless it is done so according to law. As is evident, according to the Basic Law: The Judiciary, a military court in the occupied territories is not considered a court upon which a judicial authority is conferred in Israel. Therefore, we should clarify whether the

25

authority of a military court in the occupied territories has been established by another law.

3.3.4.   Article 3 of the Law of Interpretation[11] defines the term "law" as a law that was adopted by the Knesset or an ordinance.

3.3.5.   It should be noted that the Military Judiciary Law[12] determines the manner in which military courts are established and their judges are appointed. This law also stipulates that a hearing before military courts shall be according to the Law of Military Jurisdiction, except in matters that are specified in this law. In those matters, other laws of the State of Israel shall apply, such as the Penal Code,[13] the Evidence Act, and others. It is further stipulated that a military court of appeals shall be established and its judgments can be appealed, with permission, to the Supreme Court.

3.3.6.   The Law of Military Jurisdiction does not apply to the military courts in the occupied territories and does not govern their conduct, the manner in which judges are appointed and the like. In fact, there is no other Israeli law according to which the military courts in the occupied territories were established. The inevitable conclusion is that these courts cannot be considered courts or tribunals established under the rule of "law."

---

[11] The Interpretation Law – 1981.

[12] The Military Judiciary Law – 1955.

[13] The Penal Code – 1977.

3.3.7.   Indeed, the military courts in the occupied territories do not derive their authority from the Israeli law at all, and instead were established by virtue of a decree issued by the military commander-in-chief in those territories (hereinafter "decree regarding security provisions").[14]  This decree regulated the legal system in the territories that were occupied by the Israel Defense Force in 1967, including the establishment of military courts, the appointment of judges to these courts, the substantive and procedural law according to which these courts operate, and the like.

3.3.8.   The title of the decree regarding security provisions states that it was issued "by virtue of my authority as the commander-in-chief of this area."[15] The authority of the military commander derives from the international laws of war and not by virtue of the law of the State of Israel. This was reaffirmed time and again in a host of judgments by the Supreme Court.  The Supreme Court ruled that the governing legal norm in the occupied territories is of a military administration rather than of Israeli law and Israeli sovereignty.[16] The military commander-in-chief is the sovereign in the occupied territories rather than the Knesset; he steps in

---

[14] Order regarding security provisions (Judea and Samaria) (no. 378) – 1970.

[15] Article 66 of the Geneva Treaty 1949, the Regulations of the Hague Treaty and the Land Battle Customs 1907.

[16] High Court of Justice 393/82 Jemaia Aspan v. The Commander of the Israel Defense Forces in Judea and Samaria judgments 37 (4) 785; High Court of Justice 1661/05 The District Council of Gaza v. the Israel Knesset, nes (2) 481 [2005].

27

temporarily for the sovereign that controlled the area before it was occupied by the Israel Defense Force.[17]

3.3.9.   Moreover, in those instances in which the Knesset wished to apply Israeli law in certain areas in the occupied territories, it initiated specific legislation that did so. Thus, for instance, Israeli law was applied to East Jerusalem, by virtue of the provisions of Article 11B of the Law and Administration Procedures Ordinance of 1948. This provision was added to the Law and Administration Ordinance of 1967, in the amendment of the Law and Administration Ordinance (no. 11), 1967. Pursuant to this provision, the government enacted the Law and Administration Order (no. 1) – 1967. Article 1 of this order stipulates: "The territory of the Land of Israel described in the addendum is hereby determined the territory in which the law, the judiciary and the administration of the State applies." Thereafter the "Basic Law: Jerusalem is the Capital of Israel"[18] was enacted, which stipulates that the area of Jerusalem, includes, *inter alia*, all of the area described in the addendum to the declaration of expanding the territory of the municipality of Jerusalem dated the 28 of June 1967 that was rendered according to the Municipalities Ordinance.

---

[17] High Court of Justice 393/82 Jemaia Aspan v. The Commander of the Israel Defense Forces in Judea and Samaria.

[18] Basic Law: Jerusalem is the Capital of Israel.

Furthermore, Article 1 of the "Ramat Hagolan Act"[19] stipulates that: "The law, the judiciary and the administration of the State shall apply to the territory of the Ramat Hagolan as described in the addendum."

Except for these defined areas, the State of Israel did not apply Israeli law to any other territory.

3.3.10. As an interim summary of the aforesaid, it is clear that military courts in the occupied territories are not Israeli courts because they were not established according to the law of the Knesset, and they do not apply Israeli law. The conclusion that must be drawn is that a criminal judgment rendered by one of these courts is not a criminal judgment of a court in Israel.

3.3.11. Despite this conclusion, I have considered whether the provisions of Article 42A of the Evidence Law could nonetheless be interpreted in a manner that would make them applicable to criminal judgments of military courts in the occupied territories in light of the existing links between the military courts in the occupied territories and the Israeli judicial system. Military courts are run by officers of the Israel Defense Force, and often adopt judicial policy and legal procedures that are customary in courts in Israel.

3.3.12. As mentioned above, case law on this issue is scant.

---

[19] The Ramat Hagolan Law – 1981.

29

3.3.13. Those who support applying the provisions of Article 42A of the Evidence Ordinance to the judgments of military courts base their view on the rationale behind the amendment of the Evidence Ordinance. In their view, the main objective of the amendment was to conserve time and resources by avoiding requiring civil courts to examine facts that were already considered by a criminal court. According to this view, judges sitting in military courts in the occupied territories are professional judges, elected by professional committees, who serve as lawyers or retired judges in Israel, and conduct criminal trials according to the principles of Israeli criminal law.  Therefore, according to this view, the provisions of Article 42A of the Evidence Ordinance should be interpreted broadly and applied to judgments of these courts.

In a number of cases, Magistrate's Courts have adopted this position, but none of them persuasively. Furthermore, the Honorable Judge Y. Drori of the District Court of Jerusalem also adopted this view in the case of the estate of the deceased Avrahami v. The Palestinian Authority.[20] The Honorable Judge Drori actually made an ethical comparison between the Israeli legal system and its judges, and the military courts in the occupied territories and its judges. He reached the conclusion that the link and resemblance between these two court systems mandate applying the

---

[20] 9 Motion 4994/08 The estate of the deceased Joseph Avrahami, his blessed soul v. the Palestinian Authority (decision dated the 22nd of March 2009).

30

provisions of Article 42A of the Evidence Ordinance also to criminal judgments of military courts.

3.3.14. The Supreme Court in its recent ruling in Avrahami v. The Palestinian Authority cancelled Judge Drori's decision regarding the admissibility of military court verdicts because that subject was not in dispute between the parties - the respondents, among whom were the convicted in these verdicts, did not object to the verdicts' admissibility.  Accordingly, Judge Drori's decision has no precedential effect.

3.3.15. Contrary to the view represented by the Honorable Judge Drori, there is another approach according to which the provisions of Article 42A of the Evidence Ordinance should not be applied to judgments of military courts in the occupied territories. The District Court of Haifa, the Honorable Judge R. Jarjura, took this position in the case of Tachruri v. the Military Commander in the Area.[21]

The District Court of Haifa based its decision on the following grounds:

> "The provisions of the [Evidence Ordinance] do not apply to military courts that are located outside of the recognized borders of the State of Israel and which are known as the "Green Line," and are not a judicial court of the State of Israel for the purposes of this article. In my view, the provisions of the Ordinance apply only to

---

[21] 0 C.C. 642/99 Jamal Abad El Majad Tachruri v. The Military Commander in Judea and Samaria and others, dated the 24th of October 2003.

31

the courts that were established according to the Courts Law, according to the legislation of the Knesset.

The military courts established outside of the Green Line, were not established by virtue of legislation in Israel, but rather were created only in an indirect way by orders of the military commanders, by virtue of their control over the area.

Reference of this can be found in the definitions clause in the law that extends the rule of their force Emergency Regulations (Judea and Samaria and the Gaza Strip – Jurisdiction over Offenses and Legal Assistance) – 1977:

'Commander' – a commander of the Israel Defense Force in the area or in a part of it or a commander of the area or part of the area on behalf of the Israel Defense Force;

'Military Court' – The Court that was established by the Commander."

Therefore, it cannot be said that they [military courts] are the result of Israeli legislation, rather they are the result of a decision of a commander or military order only."

3.3.16. In my view, this position of the District Court of Haifa is consonant with previous rulings of the Supreme Court in the matter of Elhadar,[22] where it was determined that the provisions of Article 42A of the Evidence Ordinance should be given a narrow interpretation, because it creates an exception that weakens the defense of the defendant in a civil proceeding.

3.3.17. The defendant's defense can be impaired in a number of ways, first by deviating from the basic rule in civil law that imposes the burden of proof on the plaintiff. This principle is also a basic rule of civil Hebrew Law, which determines that "the onus of proof is on the plaintiff." Second, the defendant's defense can be harmed by admitting against him evidence that is usually considered as inadmissible hearsay and/or as an inadmissible opinion.

3.3.18. In my view, a narrow interpretation of Article 42A of the Evidence Ordinance is consonant with the language of the law, its objective, the legal system and the spirit of the Basic Laws of the State of Israel, which are, in fact, the constitution of the State of Israel.

3.3.19. According to the language of Article 42A, as interpreted by the courts, it applies only to a convicting criminal judgment rendered in Israel, and given by an Israeli court, which administers Israeli law.

---

[22] *See supra* note 6.

In light of the amendment of the law and in light of the judgments prior to the amendment, it is clear that the Knesset had no intention to apply Article 42A to the military courts in the occupied territories, or to any foreign criminal judgment.

The interpretive convention today examines the objective of the law. However, even according to this view, the plausible objective of the law cannot deviate from the language of the law.[23] Professor Aharon Barak, who until recently served as the President of the Supreme Court, wrote in his book *The Interpretation of Legislation* that "the judge is not entitled to give meaning to the words of the law that they [the words] cannot hold." And he added: "Indeed, the boundaries of language distinguish between interpretation and legislation… [I]nterpretation gives meaning to an existing text. In legislation a new text is being created… a judge who gives a text a meaning that deviates from the meaning of the language ceases to practice interpretation."[24]

3.3.20. In my view, the objective of Article 42A of the Evidence Ordinance is also in agreement with a narrow interpretation as discussed above. "When an interpreter interprets a given text according to its objective, it acts within the framework of a system… [T]he aspiration of practical interpretation is to construct an objective that will create compatibility between the

---

[23] Motion 560/67 Zilbershlag v. the State of Israel judgments 21 (2) 797 (801) 1967.

[24] Aharon Barak, Objective Interpretation in Law 138- 139, 2003.

meaning given to a text and the legal system within which it is embedded. We aspire to achieve synthesis and integration between the text and the system."[25]

A basic principle of the Israeli legal system is that the laws of the State of Israel apply only in areas under the jurisdiction of the State. Accepting a criminal judgment of a court that has no jurisdiction in Israel as evidence in a civil lawsuit in an Israeli court is not consonant with the principles of the legal system; an interpretation that sanctions this option is illegitimate and it does not fulfill the objective of the legislation.

The objective of the law should be examined in relation to the legal system and the social environment within which the law operates. Thus, for instance, a law that can be given divergent interpretations should not be interpreted in a manner that contradicts a Basic Law and/or may harm constitutional rights stipulated in Basic Laws.

3.3.21. In my view, the interpretative approach, which endorses applying Article 42A to judgments of military courts in the occupied territories, severely harms constitutional rights stipulated in the Basic Laws, and jeopardizes basic principles of the Israeli legal system.

3.3.22. Article 3 of the "Basic Law: Human Dignity and Liberty" stipulates that "It is prohibited to harm the property of a person." Article 8 of the Basic

---

[25] Aharon Barak, ibid , page 138- 139.

Law stipulates that "it is prohibited to harm the rights under this Basic Law unless by a law befitting the values of the State of Israel, enacted for a proper purpose, and to an extent no greater than is required."

In my view, giving a broad interpretation to the provisions of Article 42A of the Ordinance entails deviating from the language and the principles of the Israeli legal system. Furthermore, it does not fit the obligation not to harm rights "beyond that which is required" as stipulated in the Basic Law, which is the cornerstone of the Israeli constitution.

3.3.23. Harming the property of a defendant contradicts the Basic Law: Human Dignity and Liberty, and can be expressed, *inter alia*, in restricting the rights of the defendant to properly defend himself or herself against a claim and, in certain cases, as we shall see hereafter, the defendant can even be prevented from presenting contradictory evidence. The right of a defendant to properly conduct his defense also includes the right that his case will be heard and decided by the court that sits in judgment, without being bounded by decisions given by another court, in another proceeding, which the defendant was not even a party to, unless this right was explicitly restricted under law. From my point of view, the right of a defendant to properly conduct its defense is one of the most important aspects of the constitutional right to access to the courts.

3.3.24. In practice, the interpretative position of the Honorable Judge Drori creates a situation through judicial legislation (as opposed to a formally

36

enacted statute) where the right of access to the courts is gravely harmed. This right was recognized in case law as a constitutional right.  In respect of the right of access to the courts, the instructive words of the honorable Judge Cheshin in the case of Arpal Aluminium Ltd.[26] should be quoted:

"It is not a basic right in the regular sense of the term basic right. This belongs to a different set of norms in the legal system. It can be said – and thus as I say – that it is superior to Basic right. Furthermore, its existence is a necessary and essential condition to the existence of the other Basic rights. The right of access to the courts is the lifeline of the courts. The foundation of the judicial authority and the rule of law…[w]ithout jurisdictional critique the rule of law will be lost and the Basic rights will disappear… by blocking access to the court, there will be no judge, and without a judge the law itself will disappear."

3.3.25. Furthermore, the interpretative approach represented by the Honorable Judge Drori is actually based on the ethical and procedural comparison between the legal system and the judges of the military courts in the occupied territories, and the Israeli legal system and its judges.  Therefore Judge Drori reaches the conclusion that the link and similarity between the systems mandate the application of Article 42A of the Evidence Ordinance to criminal judgments of the military courts in the occupied territories.

---

[26] Permission to appeal 733/95 Arbel Aluminum Ltd. v. Klil Industries Ltd., judgments 51 (3) 577, on pages 628-629.

In my opinion, this view creates an undesirable and inappropriate regime under which any judge in a civil trial, who is being asked by a party to submit a foreign criminal judgment as evidence, will be required to examine, ethically and comparatively, the convicting criminal judgment in relation to the Israeli law. In those instances where the judge in a civil trial will find that the criminal judgment meets the standards of justice and professionalism required in Israel, it can be admitted as evidence.

It seems to me that this interpretation is not plausible, according to the language of the law, and that this was not the objective of the amendment of the statute. Furthermore, both in principle and practice it is not reasonable, right or proper, that any judge will carry out such an ethical and comparative examination, in order to determine which criminal judgment of which foreign country is admissible as evidence in a civil proceeding. If such a situation will come into existence, it will naturally bring about contradicting decisions, where one Judge will determine that a criminal judgment of one country is admissible as evidence, whereas another judge will determine that a judgment from the same country or legal system is not admissible.

Furthermore, even if the judicial principles did not present an obstacle, then practical considerations would do so because this interpretation contradicts the Knesset's intent to alleviate the burden imposed on courts.

3.3.26. When the Knesset wished to recognize judgments rendered outside of Israel, it explicitly stipulated to this effect through primary legislation. Thus, for example, the conditions and procedures under which foreign judgments can be enforced in Israel were stipulated in the Law of the Enforcement of Foreign Judgments in Israel,[27] while procedures with regard to legal assistance between countries were stipulated in the Law of Legal Assistance between Countries.[28]

3.3.27. Extending the scope of applicability of the provisions of Article 42A of the Evidence Ordinance to "foreign" judgments would constitute judicial legislation that would unjustifiably and unconstitutionally impair basic rights, among which are the rights to conduct a proper defense in a fair trial. These rights should not be harmed unless by way of primary legislation, and not more than required.

3.3.28. Creating more efficient courts and saving judicial time are, without doubt, important objectives. However, they pale in comparison to such grave harm to the basic rights of a person to properly conduct his or her defense, a right that is considered to be a constitutional right.

3.3.29.  In conclusion, similarly to the Honorable Judge Jarjura of the District Court of Haifa, I conclude that a criminal judgment of a military court in the occupied territories cannot be considered as a criminal judgment that

---

[27] The Law of the Enforcement of Foreign Judgments 1958.

[28] The Law of Legal Assistance between Countries – 1998.

was rendered by an Israeli court, because it was not rendered by a court that was established according to the law of the Knesset, and which follows the laws of the State of Israel. Therefore, Article 42A of the Evidence Ordinance does not apply to a criminal judgment of a military court in the occupied territories.

3.3.30. This conclusion recently received support from the Attorney General of the State of Israel when he submitted an opinion to the Supreme Court as part of an appeal from the decision of the Honorable Judge Drori in the case of the Palestinian Authority.[29]  The Supreme Court requested this opinion, to obtain the official view of the Israeli government on this question.

As specified in his opinion, the Attorney General concludes that for those same reasons that I offer above, and for other reasons that are stipulated in the Israeli legal system, the provisions of Article 42A of the Evidence Ordinance should not be applied to a criminal judgment rendered by a military court in the occupied territories.

3.3.31. As noted above, the decision issued by Judge Drori was recently cancelled by the Supreme Court, and therefore has no relevance and no precedential effect.

---

[29] The opinion of the attorney general in motion for permission to appeal 3559/09 The Palestinian Authority v. The estate of the deceased Joseph Avrahami, his blessed soul.

40

3.4.    The second condition for the admissibility of a criminal judgment as evidence in a civil lawsuit is the existence of "a peremptory rule in a criminal trial"  – in other words, a judgment that can no longer be appealed, whether due to the passage of time for submitting an appeal, or due to the fact that appeal proceedings were exhausted by the accused.[30]

3.5.    A peremptory criminal judgment is a judgment that convicts the accused, as opposed to a judgment that acquits the accused, which is inadmissible as evidence. The reason is that a convicting judgment is given after it was proven beyond a reasonable doubt that the accused committed the offense; an acquitting judgment is given when the accused established a reasonable doubt on the body of evidence presented by the prosecution.

3.6.    The third condition for the admissibility of a convicting criminal judgment as evidence in a civil lawsuit is that the convicted is a party in the civil lawsuit, or the judgment is offered against a party that was not a party to the criminal proceedings but is a proxy or someone whose liability (for the alleged damages in the civil lawsuit) arises from the liability of the convicted, including whoever is obligated to pay the judgment debt of the convicted.

---

[30] Kedmi, On Evidence, third part, page 1356 (volume 2003).

41

The term "proxy" refers to a legal link, a link of closeness between the convicted and the proxy such as the link between a benefactor and a beneficiary, and the like.[31]

The second alternative refers to a situation where a third party is liable (or exempt from liability) for the action of the convicted, including whoever is obligated to pay his judgment debt. Thus, for instance, in certain cases, where there is an employee - employer relationship, an employer shall be liable for the criminal actions of his or her employee.  Similarly, in the case of a relationship between an insurer and a policy holder, the insurer shall be required to pay for the actions of the policy holder.[32]

3.7.     According to the provisions of Article 42A(b)(2) of the Evidence Ordinance, only the findings and conclusions of the judgment, i.e the verdict in the criminal trial, are admissible as evidence. The intention is to render admissible the findings and conclusions of the verdict on which the criminal conviction is based, as opposed to the findings and conclusions in the sentence, which are not admissible as evidence.

For the purpose of applying the provisions of this clause, it is insignificant whether the conviction resulted from an admission of the accused, from a plea bargain or due to a "presumption of liability" stipulated in the law. In any such case, the facts to which the accused admitted are viewed as proven facts, and

---

[31] Kedmi, ibid on page 1359.

[32] Kedmi, ibid on page 1360.

therefore these findings and the legal conclusions of the court constitute a part of the verdict that is admissible as evidence.[33]

## 4.      Analysis of the Provisions of Article 42B of the Ordinance

**"42B.   Reviewing the protocol and other materials**

Once evidence is submitted according to Article 42A, the court is entitled to review the indictment, protocol, and any other material that was submitted in the criminal trial if the court found it necessary in order to clarify the evidence."

4.1.     In my view, the language of this article shows that a litigant has no right to submit other evidence related to the criminal judgment as prima facie evidence in a civil trial. This permission is given to the judge in a civil trial, if he or she found it necessary for clarification purposes. This means that a litigant is entitled, if all of the conditions of admissibility according to Article 42A of the Ordinance are fulfilled, to submit only the verdict, and not any other evidence.

## 5.      Article 42C of the Evidence Ordinance

**"42C   Evidence to Contradict a Judgment**

If evidence is submitted as stated in Article 42A, the convicted or his proxy, or the party liable for the judgment debt is not permitted to submit contradictory evidence, or evidence that was already heard or submitted in a criminal trial,

---

[33] Kedmi, ibid on page 1356-1357.

except with the permission of the court, for reasons that shall be noted by the court in order to prevent injustice."

5.1.    The provisions in this article show that the Knesset included in this article only three out of the four possible parties specified in Article 42A. From the list of adversaries specified in this article, "a person whose liability arises from the liability of the convicted" was omitted, except if he is obligated to pay the judgment debt of the convicted. Therefore, whoever is a defendant in a civil trial for this reason, and was not a party to the criminal proceedings, or who does not belong to any of these four categories, is not required to receive permission from the court to submit evidence that contradicts the provisions of the criminal judgment, and this article does not apply.[34]

5.2.    The other parties that meet the criteria stipulated in Article 42A of the Evidence Ordinance are not entitled to present contradictory evidence of the findings of the criminal judgment, unless they receive permission from the court sitting in the civil case for special reasons and in order to prevent injustice. The rationale of this practice is that a party that was not a party to the criminal proceeding did not have the opportunity to present its evidence before the criminal court.

6.    **Article 42D of the Evidence Ordinance**

   **"42D.  Findings and Conclusions in a Pursuant Civil Lawsuit**

---

[34] Kedmi, On Evidence, third part on page 1368.

In a hearing of a civil lawsuit according to Article 35A of the Courthouse Law – 1957, the findings and conclusions of the court in criminal trial shall be regarded as if were determined in a civil trial."

6.1.    Following the amendments of the Courthouse Law, as of today, the Courthouse Law [Consolidated Version] – 1984, this matter was regulated in Article 77 of the Courthouse Law.

6.2.    This provision is irrelevant to the questions addressed in this report, because it deals with a situation in which the criminal court is entitled to hear a civil lawsuit pursuant to a criminal conviction against the convicted party and only against it, at the request of the plaintiff who suffered damages as a result of the criminal act for which the accused was convicted.

7.    **Article 42E of the Evidence Ordinance**

"**42E.  Preservation of Laws**

The provisions of this article append any law regarding the admissibility of a judgment as evidence."

7.1.    The intention of this article, as it was explained in the bill, is that this amendment to the Evidence Ordinance does not detract from the possibility of submitting a criminal judgment as evidence according to any other statute. The appending of Articles 42A through 42E of the evidence ordinance was meant to alleviate rather than to burden, and the amendment cannot prevent submitting judgments as

45

evidence insofar as it is permissible according to another statute.[35] For example, a party can submit a judgment given between him and the other party in another case within an estoppel argument.

8.     **Examination of the Documents Listed in Annex C under the Provisions of Article 42A of the Evidence Ordinance**

8.1.     I have considered whether all or any of the documents listed in Annex C satisfy the requirements for submitting them as evidence in a civil trial in Israel in accordance with Article 42A of the Evidence Ordinance.

8.2.     First, I have examined which of the documents in Annex C constitute findings and conclusions of a final criminal judgment that was issued by an Israeli court in a criminal trial.

Examination of the documents listed in Annex C shows that only the documents specified hereafter satisfy this requirement:

8.2.1.     **State of Israel vs. Wahal Kassam and Others**

Jerusalem District Court, Sever Crime 5071/02

Doc. Num:     W_S 085376 - W_S 085403 – Jerusalem District Court verdict

Accused:     1) Wahal Kassam

2) Wassem Abassi

---

[35] Words of explanation to the amendment bill 995, Rashumot 15.05.1972 page 267.

3) Muhamad Uda

4) Alla Abassi

Conviction:    Following confession, indicated on all counts.

Attacks:    1) March 27, 2002 Park Hotel, Netanya

2) May 7, 2002, Sheffield Club, Rishon Lezion

3) July 31, 2002, Hebrew University cafeteria, Jerusalem

Responsible Organization:    Hamas

### 8.2.2. Supreme Court Appeal 1932/04 over Haifa District Court Verdict 189/03

Doc. Num.:    LITLE 00156 - LITLE 00167 – Supreme Court verdict

Accused:    Munir Rajbi – Israeli citizen

Conviction:    Partial confession (assistance to enemy and cover up)

Attack:    March 5, 2003, Egged Bus No. 37 in Haifa

Responsible Organization:    Hamas

### 8.2.3. State of Israel vs. Ahmed Ben Mohamed Abid and Others

Jerusalem District Court, Sever Crime 776/04

Doc. Num.:    APPLEBAUM00059 - APPLEBAUM00069 – Jerusalem District Court verdict (marked also as CLII – 001194 - CLII – 001208)

Accused:    1) Ahmed Ben Mohamed Abid

2) Naal Ben Salame Abid

Conviction:    Plea bargain

Attack:    September 9, 2003, Café Hillel in Jerusalem

47

Responsible Organization:     Hamas

8.2.4.  **State of Israel vs. Abas El Saied**

Tel Aviv District Court, Sever Crime 1147/02

Doc. Num:       W_S 089845 - W_S 08992 – Tel Aviv District court verdict

Accused:        Abas El Saied

Conviction:     Evidence

Attack:         March 27, 2002, Park Hotel, Netanya

Responsible Organization:     Hamas

8.3.    The judgments listed in Section 8.2 above are the only documents listed in Annex C that meet the first criterion stipulated in Article 42A of the Evidence Ordinance, and therefore, they are the only documents that may be submitted as evidence in a civil trial in Israel, provided the other criteria are fulfilled, as discussed hereafter.

8.4.    All of the other documents listed in Annex C do not meet this threshold requirement of Article 42A of the Ordinance, and at most are considered inadmissible hearsay, the contents of which must be proved in the court as any other allegations must be proved, unless they are admissible under other exemption to the rule excluding hearsay evidence as will be detailed hereafter.

**9.      <u>Could the judgments listed in Section 8.2 be admissible in evidence under Israeli law in a civil lawsuit in an Israeli court seeking damages from NatWest as affirmative proof that the attacks to which they pertain were perpetrated by Hamas?</u>**

9.1.    In light of the fact that NatWest is not included in the list of those convicted in the judgments identified in Section 8.2 above, a plaintiff in a civil lawsuit in an Israeli court seeking damages from NatWest on the ground that NatWest had some

48

responsibility for the attacks that are the subject of these judgments, could rely on these judgments as affirmative proof that the attacks to which they pertain were perpetrated by Hamas only if the plaintiff could prove that NatWest is one or more of the types of persons or entities against which it is possible to submit a criminal judgment as evidence in a civil trial according to Article 42A(a) of the Evidence Ordinance.  In other words, the plaintiff must prove that NatWest is the proxy of the convicted or is someone whose liability arises from the liability of the convicted, or is someone who is obligated to pay the judgment of the convicted.

9.2.    In considering whether NatWest satisfies any of these criteria under Article 42A of the Ordinance[36] I have assumed the following to be true:

9.2.1.   There is no evidence that NatWest knew any of the convicted persons, or that there were personal, legal, commercial, or any other relations between NatWest and any of these persons.  Nor is there any evidence that NatWest committed to paying any debt of these persons.

9.2.2.   There is no evidence that NatWest knew that there was an association between the entities to which funds were transferred from Interpal's accounts with NatWest and the convicted persons.

9.2.3.   There is no evidence that NatWest knew that the entities to which funds were transferred from Interpal's accounts with NatWest would use these

---

[36] Dr. Kedmi, ibid, on page 1359.

funds they received to support the Hamas organization, and that these funds would be used to finance terror.

9.2.4.  Even at the present, there is no evidence that NatWest knows that these funds were indeed used to support the Hamas organization, and/or to finance terror activities in general, or to finance any of the specific attacks listed in Annex B.  Moreover, there is no evidence that any of the convicted persons actually received funds or other support from any of the entities to which funds were transferred from Interpal's accounts with NatWest.

9.3.    Based upon these assumptions, there is no evidence that NatWest is the legal proxy of the convicted persons, because there is no evidence that they acted on behalf of NatWest and/or with its consent and/or support.

9.3.1.  There is no evidence that NatWest is among those obligated to pay the judgment debt of the convicted persons because there is no evidence of any connection and/or legal association between the parties, which could result in such an obligation.  Furthermore, there is no evidence of any outstanding judgment debt of the convicted persons to which NatWest could commit.  Also, to my understanding, in the pending lawsuits in New York NatWest is not being sued for paying any "judgment debt" of the convicted.

9.3.2.  The remaining question is whether the liability of NatWest stems from the responsibility of the convicted persons as detailed in the judgments listed

50

in section 8.2 above.  This question can be answered by reference to two judicial decisions.

The issue of liability of members of a bank's board of directors for criminal actions of bank executives was discussed in Civil Appeal 610/94 Gdalia Bouchbinder vs. the Official Receiver in its Capacity as the Receiver of North America Bank.[37]  In this case, the plaintiffs submitted a convicting criminal judgment against the bank executives convicted of embezzlement as evidence in a civil lawsuit to prove the liability of the board members — the defendants — for the resulting damages.

The Supreme Court determined: "In our view, the convicting judgment of Stern and Monasa (i.e., the bank executives, M.A.)  is not applicable in the case of the appellants (i.e., the Board members, M. A.). The liability of the appellants stems from their own actions and negligence.  It does not stem from the responsibility of Stern and Monasa.  In this appeal, we will not rely on the findings of the District Court, which are solely based on the criminal verdict."

As it is evident from the above the plaintiffs sought to submit a convicting criminal judgment against defendants in a civil trial when the legal association between the convicted in the criminal trial—the bank executives —and the defendants in the civil trial—the board members–

---

[37] Civil appeal 610/94 Gdalia Bouchbinder vs. the Official Receiver in its capacity as the receiver of North America Bank (published in Nevo).

was apparent.  Even though and despite the obvious legal association between the convicted and the defendants, the court ruled that the convicting judgment was not admissible because the liability of the board members did not stem from the responsibility of the convicted.

Additionally, in March 2009 a similar decision was rendered by the Tel Aviv District Court in a motion submitted in civil case 1521/02 (Tel Aviv) Shlomo Tzaig vs. Keselman & Keselman Accountancy Firm.[38] In this case, the plaintiffs argued that the accountancy firm of the bank was liable for embezzlement, and sought to submit a convicting criminal judgment rendered against an employee of the bank as evidence against the accountancy firm pursuant to Article 42A of the Evidence Ordinance. The court rejected this attempt and ruled that the responsibility of the accountancy firm did not stem from the responsibility of the convicted:

"The defendant is not related to the convicted in these judgments and the responsibility of the defendant is not derived from the responsibility of the convicted. The defendant is an independent accountancy firm that is not related in any way to the bank employees.

I contend that the plaintiff does not have an evidentiary basis that can prove that the defendant is indeed responsible in any way for the bank embezzlement.  I do not accept the argument of the plaintiff that we can

---

[38] Motion 8858/02 (Tel Aviv) Shlomo Tziag vs. Keselman & Keselman Accoutering Firm in a civil case 1521/02 (published in Nevo).

learn about the responsibility of the defendant from 'life experience.' Proof in a legal procedure requires evidence; we cannot deduce the responsibility of an independent accountancy firm for the actions of the company that contracted it from 'life experience' as the plaintiff claims. . . .

I accept the claim of the defendant that the conditions stipulated in Article 41 [42] of the Evidence Ordinance were not met.

The plaintiff did not prove that the bank collapsed because of the defendant's negligence.

Therefore, there is no causal relation between the collapse of the bank and the behavior of the defendant."

9.3.3.   The rulings discussed above indicate that even the existence of a direct legal link between the defendant and the convicted (e.g., the link between board members and convicted executives) or an indirect link (e.g., the link between an accountancy firm and an employee of the company being audited) is insufficient for concluding that the liability of the defendants stems from the responsibility of the convicted sufficient to satisfy the requirements of Article 42A of the Evidence Ordinance.  Thus, the court did not permit the submission of a convicting judgment as evidence against the defendants.

In the explanatory words of the amendment bill 995 of the Evidence Ordinance, the legislature gives as an example of a circumstance that would satisfy the requirements of Article 42A of the Evidence Ordinance the imputed liability of an employer for his or her employee's actions.

In my view, the appropriate interpretation of this requirement of Article 42A is that the liability of the civil defendant stems from the liability of the convicted only when the defendant is liable for the actions of the convicted by law or by contract.  When there is no legal or any other link, direct or indirect, between the convicted and the civil defendant, as it is apparent in the case of NatWest, it cannot be argued that the liability of the defendant for the damages stems from the liability of the convicted.

9.3.4.   Accordingly, I conclude that NatWest is not within any of the categories that would allow for the submission of a convicting criminal judgment as evidence against NatWest in a civil lawsuit.  Thus, I conclude that if NatWest were sued in a civil lawsuit in an Israeli court on the ground that it had some responsibility for the attacks that are the subject of the criminal judgments I identify in Section 8.2 above, under Article 42A of the Evidence Ordinance none of these convicting judgments, nor any of the other documents related to the convicting judgments listed in Annex C, would be admissible in evidence against NatWest for the truth of the matters asserted in those documents. They are instead all inadmissible hearsay.

54

**10.** **Admissibility of documents listed in Annex C under other exceptions to the rule excluding hearsay as evidence**

10.1. After concluding that the convicting judgments and their related documents do not satisfy the criteria of Article 42A of the Evidence Ordinance, and therefore would not be admissible in evidence against NatWest for the truth of the matters asserted in those documents, I will analyze the admissibility of these documents and the remaining documents listed in Annex C according to other exceptions to the rule excluding hearsay evidence under the Evidence Ordinance and / or case law.

10.2. The exception - **"Public Certificate"**

The definition of public certificate in Article 29 of the Evidence Ordinance is broad and includes certificates issued by each of the state authorities: the legislature, the judiciary and the executive, including a certificate which is held as a record, whether done in an official way or another way.

Documents that satisfy the criteria of Article 29 of the Evidence Ordinance are considered public certificates and are admissible in evidence for the truth of their contents. Article 32 of the Evidence Ordinance states that a document can be proven to be a public certificate by presenting the original document, or a verified copy of the original, or a copy certified and sealed by the authority holding the document or a copy certified by a Minister or other senior civil servant that satisfies the judge regarding the reliability of the certification of the document, or a copy of the document is certified and sealed by an institute.

55

The case law establishes four extra criteria that a document must satisfy in order to be considered as a "public certificate." In the Demianyuk case,[39] the court reaffirmed these criteria, as follows:

(a) the document must be prepared according to a legal duty to prepare it,

(b) it must be a kind of public document,

(c) there must be an intention to preserve it for the future, and

(d) it must be open to the public.

The rule is that when a document satisfies the criteria of Article 29 of the Evidence Ordinance, it is admissible only to prove its existence. When a party seeks to submit such a document in evidence for the truth of its contents, he must prove that the document also satisfies the four other criteria mentioned above.

Among the documents listed in Annex C, there are documents that could be considered public certificates or institutional records. In the analysis hereafter I will examine each type of document according to its nature.

10.2.1. The exception – "**Trial Records"**

A trial record is considered as a "public certificate" and could be admissible in evidence for the truth of its contents.  However, in the case

---

[39] Criminal appeal 347/88 Demianyuk v. The state of Israel, Padi 47 (4) 227.

56

of Haran v. The Administrator General on Missing Persons,[40] the court rejected the request to submit a trial record in evidence and ruled as follows:

> "Even according to this ruling, I can not foresee the possibility that a record of the earlier trial could be in evidence in this trial. In all other cases in which trial records were admitted as evidence to their content, it was done when one of the parties in the previous case, [criminal or civil] was a party in the second case ….
> [T]herefore I have to reject the request to consider the content of the trial record as proved in this case…."

This ruling of the district court of Nazareth was affirmed by the Supreme Court within the civil appeal from the decision of the district court.[41]

As NatWest was not a party to the previous trials in which the trial records listed in Annex C were prepared, they are considered inadmissible to prove the truth of their contents, and instead could be admissible only to prove their existence. Moreover, according to the ruling in the Haran civil appeal, these records cannot establish even an estoppel argument against NatWest.

---

[40] Civil motion (Nazareth)  797/98  Haran v. the administrator general on missing persons, (published in Nevo): and Dr. Kedmi third version 2003, first part , page 569.

[41] Civil appeal 2576/03 Haran & others v. the administrator general on missing persons (published in Nevo).

In my view, the ruling issued in Haran case is consonant with my conclusion about admissibility of criminal judgments according to Article 42A of the Evidence Ordinance. Any other interpretation would contradict the objective of Article 42A of the Evidence Ordinance, as analyzed above.

### 10.2.2. The exception - **Death Certificate as "Public Certificate"**

A death certificate is considered a "public certificate" "if it was issued – according to the law -  by one of the institutes detailed in Article 29 of the [Evidence] Ordinance."[42]

The Ministry of Interior Affairs is the institute authorized under Israeli law to issue death certificates.  Therefore, a death certificate issued by the Ministry of Interior Affairs is admissible as evidence of the truth of its contents, including the cause of death.[43]

According to this exception, the death certificates listed in Annex C that are issued by the Ministry of Interior Affairs are admissible in evidence for the truth of their contents.

---

[42] Dr. Kedmi, First part, page 567.

[43] Civil appeal 344/62 Yuness v. Yenuness, PADI 17, 1917.

58

Some of the documents referenced in Annex C as death certificates were not issued by the Ministry of Interior Affairs, as follows:

A. Document No. W_S 006367 is an announcement by a hospital about a death and a burial license issued by the Ministry of Health. The hospital announcement is an institutional record that is admissible in evidence to prove the truth of its contents. The burial license is an institutional record that was issued by the competent authority after it was convinced that that person died, and even though it is not a death certificate, it could be admissible for the truth of its contents, including to the fact that the person died.

B. Documents No. REINITZ 00001-00002 and ZAKAROVSKY 0008, 00013 and TTRATNER11 are announcements issued by the U.S Embassy.

Assuming that these documents are copies of original reports issued by the U.S Embassy, and as they indicate are based on death certificates issued by the Israeli Ministry of Interior, I consider them as civil servant certificates according to Article 23 of the Evidence Ordinance and therefore admissible in evidence to prove the truth of their contents.

10.2.3. The exception- **"Institutional Records"**

59

The documents referenced in Annex C as police interrogations, police reports, police memoranda, police correspondence and indictments are considered, according to Article 36A of the Evidence Ordinance, as "institutional records," but unlike other institutional records that could be admissible in evidence, these records, which have been prepared by an investigative authority and / or by the prosecution in order to submit them in a criminal case, are excluded by Article 36C of the Evidence Ordinance, and they are not admissible in evidence to prove the truth of their contents.

Therefore, these types of documents listed in Annex C are not admissible in evidence for the truth of their contents.

10.2.4. The exception - "**Expert Opinion**"

Article 20 of the Evidence Ordinance states as follows:

> "The court is entitled, if it is not concerned of injustice, to accept in evidence, in writing, an expert opinion in questions of science, research, art or professional knowledge (hereinafter: "expert opinion") and a physician's certificate regarding the health condition of a person (hereinafter: "physician certificate")."

The rule is that the factual background – meaning the background details [data] – of the expert opinion "should be proved in the way stated by the law and not by hearsay evidence."  "Where this evidence is controverted and not established by admissible proof, the basis of the opinion collapses.

This, obviously when the opinion is based on the factual background and depended on it; and this issue is given to the consideration of the court."[44]

Some of the documents listed in Annex C are expert opinions of the "Forensic Institute" (listed as forensic reports) and of the "Criminal Identification Laboratory" (listed as police reports). These expert opinions could be admissible only if the expert that prepared them presents them to the court as an expert witness and is subject to cross-examination with respect to the contents of the report.

According to the case law, an expert may base his factual conclusions on previous findings of other experts, but such rulings have issued in cases where the factual conclusion was based on technical data like lab tests and scientific experiments. Moreover, the expert must note and show his sources and references.[45]

These police and forensic reports would not be admissible without supporting testimony from the experts who prepared them.

### 10.2.5. The exception - "Power of Attorney" and other "Private Documents"

Article 30 of the Evidence Ordinance allows the court to accept in evidence a power of attorney or any other written document issued outside Israel. These are also referred to as "private documents," and could be

---

[44] Dr. Kedmi, third edition, first part page 528.

[45] Criminal appeal 566/89 Marziano v. the State of Israel, Padi 46 (4) 539, 545.

received in evidence in a civil case by certification of the parties that issued them, or by a written declaration of one of the approving witnesses that was given in front of an Israeli diplomat or consul and signed and sealed by him, or by a notary with the approval (signed and sealed) of an Israeli diplomat or consul.

According to Dr. Kedmi, "the approval of the Israeli consul of the notary's signature is only to alleviate the proof of the signature of documents which has been signed abroad. It does not give any validity to the content of the document."[46]

The "private documents" listed in Annex C do not satisfy any of the conditions of Article 30 of the Evidence Ordinance, and therefore I conclude that they are inadmissible hearsay.

10.2.6. The documents listed in Annex C as "power point presentation," "IDF inquiries" and "press releases" are pure hearsay even if prepared by a formal authority. In my view these documents are not considered as public documents or as institutional records and therefore they are inadmissible hearsay.

10.2.7. The exception – **"Military Certificates"**

---

[46] Dr. Kedmi, third edition, first part, 578.

Article 488 of the Military Jurisdiction Act 1955 states that the provisions of articles 481 – 487 of the act are applicable in front of any court or other tribunal in the state of Israel.

The objective of articles 481 - 487 is to create exceptions to the rule against admissibility of hearsay evidence.

As I concluded above, this act is not applicable to military courts in the occupied territories, which derive their authority from orders of the commander of the area according to the international laws of war and not from legislation of the Knesset. Therefore these exemptions are not applicable to the military documents listed in Annex C, which were issued by the military courts in the occupied territories.  This conclusion is in addition to my previous conclusion regarding the inadmissibility of trial records and indictments prepared by the military prosecution.

10.3.    After reviewing and analyzing the admissibility of the various types of documents listed in Annex C according to possible exceptions to the rule excluding hearsay evidence as proof to the truth of its contents, I conclude that the only documents that are admissible in evidence for the truth of their contents are those referenced as "death certificates." All other documents, even according to reduced restrictions developed by the courts, are inadmissible hearsay.

Dated:  December 29, 2010
7 Rival St. Tel Aviv, Israel

_____
Moshe Azoulay

63

**EXHIBIT 206 TO DECLARATION OF VALERIE SCHUSTER**

## EXPERT REPORT OF EMANUEL GROSS

I, Emanuel Gross, of Herzliya, Israel, submit this report in the lawsuits of <u>Weiss v. National Westminster Bank Plc</u> (Case no. 05-cv-4662 (DLI) (MDG)) and <u>Applebaum v. National Westminster Bank Plc</u> (Case no. 07-cv-916 (DLI) (MDG)).

## I.    **Professional Background and Qualifications**

1. My *Curriculum Vitae*, which is attached hereto as <u>Annex A</u>, details my particular expertise allowing me to render the opinions set forth in this report.

2. I am a professor of law at the Haifa University Faculty of Law, in Haifa, Israel.

3. My research, publishing and teaching focus primarily on criminal law, evidence law, criminal procedure and the interplay of law and terrorism, and I have published numerous articles and books on these subjects.  <u>Annex A</u> lists my publications in the last 10 years.

4. During my academic career, I have devoted substantial attention and research to the issue of how judicial systems in democratic societies address the problem of terrorism and the prosecution of terrorists.

5. I have been teaching courses in criminal law, criminal procedure, evidence law and law and terrorism for many years.

6. I was a visiting scholar at Yale Law School (1990-1991) and a visiting professor of law at Villanova Law School (1995), John Marshall Law School, Chicago (1997), Washington College of Law, American University, Washington (2002), and Osgoode Hall Law School, York University, Toronto (2003).

7. Since 2001 I have been a member of the editorial board of *Ius Gentium*, published by the Center for International and Comparative Law at the University of Baltimore.

8. I hold a J.S.D. (1988), an LL.M. (1983), and an LL.B. (1973), all from the Tel Aviv University Faculty of Law.

9. In addition, I am a licensed attorney in Israel (admitted to the Bar in 1973).

10. I served as the Chief Judge, District Military Court, Southern Command, Israel Defense Forces (1987-1993), the Deputy Chief Judge, District Military Court, Central Command, Israel Defense Forces (1980-1987) and the Deputy District Military Attorney, Central Command, Israel Defense Forces (1973-1980).

11. Annex A sets forth all matters in which I have provided expert testimony at trial or deposition in the last four years.

12. I am being compensated $10,000 for providing this report; another $10,000 for deposition testimony in the US or $400 per hour for testimony at deposition if the deposition is given in Israel.

13. I have no previous personal or professional relationship with any of the parties, witnesses, or attorneys in this action that would preclude or otherwise impact my professional judgment in evaluating Mr. Moshe Azoulay's December 29, 2010 report (the "Azoulay Report"), and rendering the opinions set forth in this report.

## II. Purpose and Basis of This Report

14. I have been requested by plaintiffs' counsel to address and respond to the Azoulay Report submitted by the defendant, National Westminster Bank Plc (the "Bank" or "Nat West"). Specifically, plaintiffs' counsel have asked me to provide my professional opinion as to whether the findings and conclusions of an Israeli Military Court in a criminal trial resulting in the accused's conviction may be admissible as evidence in a civil lawsuit in an Israeli court seeking damages from a defendant (here, Nat West), that, although not a party to the criminal proceedings before the Military Court, is nevertheless alleged to bear liability for plaintiffs' alleged damages by

2

reason of the attacks which injured them.  For purposes of this report, I am assuming that the attacks for which damages are claimed are those which are the subject of those criminal convictions set forth in <u>Annex B</u> of the Azoulay Report.

In particular, I have been asked to examine, and opine on, the following questions and issues:

A.  What are the methodological or legal errors (if any) in the Azoulay Report?

B.  Apart from any errors identified in response to Question "A," does Mr. Azoulay accurately set forth the current state of Israeli law with respect to the admissibility of Israeli Military Court convictions in civil cases in Israel. More specifically, does he accurately describe the legal basis for the District Court of Haifa's decision in the case of *Tachruri v. the Military Commander in Judea and Samaria*, set forth on p. 31 of the Azoulay Report?

C.  Apart from any errors identified in response to Question "A," do I agree with Mr. Azoulay's statement on p. 35 (article 3.3.21) of the Azoulay Report that the admission of Israeli Military Court convictions in civil cases in Israel would "severely *harm [sic] constitutional rights stipulated in the Basic Laws, and jeopardize [sic] basic principles of the Israeli legal system?*" (emphasis added)

D.  Describe the basic procedures of Israeli Military Courts, specifically addressing the rights of the accused, *e.g.*: the right to counsel, the right to cross-examine witnesses, and the right to challenge the admissibility or reliability of evidence presented.

E.  To the extent I am generally familiar with American legal concepts, are criminal proceedings before Israeli Military Courts consistent with American notions of fairness, most notably the guarantee of "due process," or, instead,

3

do I agree with Mr. Azoulay's statement on p. 26 of the Azoulay Report that "*[Israeli Military] courts cannot be considered courts or tribunals established under the rule of law*?"

    F.   Under what circumstances are foreign criminal convictions other than Israeli Military Court convictions admissible in Israeli civil cases?

15. In rendering this report, I have made the following assumptions:

    a.   The Bank had as a customer an entity named *Interpal,* which functioned as a fundraising mechanism for HAMAS.

    b.   Interpal deposited the funds it received in its accounts at Nat West, and sent them to the entities affiliated with, alter agos of, or part of Hamas located in the West Bank, Gaza Strip and elsewhere outside UK.  Interpal also received funds from some of these same entities.

    c.   The Bank knew or consciously or recklessly[1] ignored information regarding Interpal's and Interpal's counterparties' connection to Hamas, or at the very least, was aware of the public information connecting Interpal and Interpal counterparties to Hamas.

    d.   The Bank also knew or consciously or recklessly avoided knowing that the United States designated Interpal as a "Specially Designated Global Terrorist" ("SDGT") in August 2003.  The Bank was also aware that the United States officially designated Hamas as a Specially Designated Terrorist ("SDT") in 1995 and a Foreign  Terrorist Organization ("FTO") in 1997.

    e.   Even after knowing that Interpal was designated by the US as a SDGT, it kept Interpal's accounts open.

---

[1]    For purposes of this report, references to "reckless," "recklessly" or "recklessness" connote a scenario in which the Bank was aware of risks posed by maintaining its relationship with Interpal and processing transactions to or from it, but persisted in such conduct despite comprehending such risks.

16. Although the opinions set forth in this report respond and rebut the contentions of Israeli law documented in the Azoulay Report, I express no opinion on the relevancy of Israeli law to this case, which I observe is brought under a U.S. federal statute providing a private civil remedy (18 U.S.C. § 2333(a)) for U.S. citizens or certain of their family members whose damages stem from injuries suffered by reason of an "act of international terrorism" as that term is defined under U.S. law.  I am further advised that the predicate acts alleged by plaintiffs in connection with their § 2333(a) claims also arise under specific U.S. federal criminal statutes, specifically 18 U.S.C. § 2339B (prohibiting material support to an FTO), and 18 U.S.C. § 2339C (prohibiting financing of terrorism).

17. My opinions as set forth in this report are founded on my academic and professional legal studies, teaching, research and publishing over the course of many years as a law professor, and upon the statutes, cases and other authorities cited herein.

18. In preparing this report I have particularly examined the Azoulay Report submitted by the defendant, as well as the two leading Israeli judgments on the admissibility of Israeli Military Court convictions: the judgment of *Avrahami v. The Palestinian Authority*[2] and the judgment of *Tachruri v. The Military Commander in Judea and Samaria*.[3]  I also have examined the most recent ruling of our Supreme Court in Permission to Appeal 3559/09 The Palestinian Authority v. The Estate of the Deceased Joseph Avrahami his blessed soul.

---

[2]     Civil Case/Motion 4994/08 [District Court - Jerusalem] *The Estate of the deceased Joseph Avrahami, his blessed soul v. The Palestinian Authority* (decision dated March 22, 2009).

[3]     Civil Case [District Court - Haifa] 642/99 *Jamal Abed El Majad Tachruri v. The Military Commander in Judea and Samaria et al.* (judgment dated October 24, 2003).

### III.   Summary of Opinion

19. The analysis proffered in the Azoulay Report suffers from a number of material infirmities, most notably its application of a method of statutory reasoning and construction generally rejected in the Israeli legal community.

20. The Azoulay Report fails to address accurately and comprehensively whether the *Tachruri* case would bar the admissibility of Israeli Military Court convictions, and fails to grant sufficient weight to a more recent, and better reasoned decision, *Avrahami v. The Palestinian Authority*.   I am aware that the Israeli attorney general holds a different view and recently our Supreme Court ruled that the District Court decision in *Avrahami* was not necessary on its own merits because the defendants were not disputing their responsibilities.   Contrary to the view expressed in the Azoulay Report, however, that does not mean that the District Court ruling is not relevant or of no precedential value.   The Supreme Court did not find that Judge Drori's ruling was wrong, just not necessary.   Thus, at the moment we simply lack a ruling of the Supreme Court on this issue.

21. The Azoulay Report incorrectly asserts that admitting Israeli Military Court convictions in civil cases in Israel severely harms rights reflected in Israel's "Basic Laws."   To the contrary, Israeli Military Court decisions reflect application of fundamental principles of substantive and procedural due process that are in full accord with both Israel's Basic Laws, and general principles of fairness and due process followed by civilized nations.

22. The Azoulay Report does not adequately detail for a foreign court the basic procedures applied by Israeli Military Courts, particularly the rights of the accused.

23. Even if one makes the assumption that Mr. Azoulay's opinion presents – that an Israeli civil court would deem inadmissible a conviction obtained from an Israeli Military Court – the Azoulay Report fails to recognize that, to the extent admissibility in a United States federal court under Fed. R. Evid 803(22) depends on a determination that the foreign proceeding is in accordance with civilized jurisprudence and is stated in a clear and formal record, *Hilton v. Guyot*, 159 U.S. 113, 205-206 (1895); *Lloyd v. American Export Lines, Inc.*, 580 F.2d 1179, 1190 (3d Cir. 1978), the proceedings before Israeli Military Courts fully comport with U.S. notions of fairness and a guarantee of adequate due process.

## IV.    Detailed Opinion

A.    *Methodological and Legal Errors Reflected In the Azoulay Report*

24. The admissibility of a criminal judgment as evidence in a civil lawsuit in an Israeli court is set forth in section 42A of the Evidence Ordinance,[4] which provides that:

(a) The findings and conclusions of a final judgment in a criminal trial, that convicts the accused, shall be admissible in a civil trial as prima facie evidence to their contents if the convicted or his proxy *or a person whose liability arises from the liability of the convicted*, including whoever is obligated to pay his judgment, is a party in the civil trial.

(b) The provisions of this article do not apply to –

(1) A judgment of a military court for traffic violations and a judgment of a municipal court that was not rendered by a magistrate's court judge;

(2) Findings and conclusions in a sentence, as opposed to a verdict.

---

[4]      Evidence Ordinance (new version) 5731-1971.

[Emphasis added.]

25. Mr. Azoulay's basic legal error stems from the fact that he interprets Section 42A of the Evidence Ordinance in an unduly strict manner that does not conform to the modern method of statutory interpretation customary in Israel.

26. Section 42A sets forth the four principal conditions governing the admissibility of criminal judgments in Israeli civil lawsuits:

a. <u>First</u>, the judgment must have resulted in a conviction and must also be final (*i.e.*, all means of appeal must be exhausted);

b. <u>Second</u>, the only admissible part of the judgment is the verdict (*i.e.*, findings and conclusions), and not other documents such as indictments, sentences, etc.;[5]

c. <u>Third</u>, the Evidence Ordinance does not specifically limit which tribunals may issue the judgment in order for it to be admissible.  Instead, subsection 42A(b)(1) states which tribunals *may not* issue an admissible judgment: a judgment of a military court for traffic violations[6] and a judgments of a municipal court[7] that was not rendered by a magistrate's court judge; and

d. <u>Fourth</u>, the defendant in the civil lawsuit must have a legal association of responsibility for the actions of the convicted person in the criminal trial – either the convicted person is now the defendant in the civil lawsuit, or his proxy, or a person whose liability arises from the liability of the convicted person (including whoever is obliged to pay the judgment debt of the

---

[5]     It should be noted that Section 42B provides that "once evidence is submitted according to section 42A, the court is entitled to review the indictment, protocol and any other material that was submitted in the criminal trial if the court finds it necessary in order to clarify the evidence."

[6]     Military courts for traffic violations are courts established according to the Military Jurisdiction Act, 5715-1955.

[7]     Municipal courts are courts established according to the Judiciary Law (Combined Version), 5744-1984.

convicted).  Although the legal association of the defendant or his proxy is

direct, the legal association of a person whose liability arises from the liability

of the convicted person can be described as secondary liability of a third party

for an injury caused by the actions of the convicted person.

27. Conditions "One's" and "Two's" requirements are clear and unequivocal, and are

purely technical in nature and subject to little dispute.

28. Conditions "Three" and "Four," on the other hand, are more substantive, and, at

least facially, their interpretation is not as obvious.  These conditions shall be

discussed in detail in Part IV.B below.

29. As noted above, Mr. Azoulay's basic legal error stems from the fact that he

interprets conditions "Three" and "Four" in an excessively strict manner, whereas

the modern method of interpretation customary in Israel is purposive

interpretation.[8]

30. As discussed in detail below at ¶ 40, Section 42A's purpose, generally, is to

enhance court efficiency including preserving a court's time and resources.

31. As discussed below, the Azoulay Report's analysis rests on an incorrect method of

legal analysis, and does not genuinely apply the purposive method to examining

conditions "Three" and "Four" of Section 42A.  Because the report fails to

analyze these statutory conditions in a purposive manner, in my professional

---

[8]        The method of purposive interpretation is customary in Israel both in civil and criminal law.  This method is designed to realize the goal of the legal text.  The interpreter must examine both the subjective wishes of the text creator and the objective values of the legal system.  In contrast, the method of strict interpretation does not aspire to realize the purpose of the text.  Rather, the words of the text are given their verbal meaning without attributing any weight to the question whether this meaning realizes the purpose of the text.
*See* AHARON BARAK, PURPOSIVE INTERPRETATION IN LAW 129-139 (2003); Civil Appeal 674/85 *"Eliyhu" Insurance Company Ltd. v. Zack*, 43(1) P.D. 356, para 11 ("the interpreter is not interested just in the verbal meaning of the words… The interpreter is interested in the legal meaning of the words. The legal meaning of the words is their linguistic meaning on the background of the relevant context."); Criminal Appeal 4596/98 *Anon. v. State of Israel*, 54(1) P.D. 145, para. 12 ("the linguistic meaning does not necessarily express the legal meaning… The legal meaning of the language of the law we must interpret according to the purpose of the law and with the implementation of judicial discretion.").

opinion, it arrives at incorrect conclusions of law that would be rejected by modern Israeli courts.

32. As previously observed in n.8 *supra*, the method of purposive interpretation is designed to realize the goal of the legal text.  The interpreter must examine both the subjective wishes of the text creator and the objective values of the legal system.  In contrast, the method of strict interpretation does not aspire to realize the purpose of the text.  Rather, the words of the text are given their literal meaning without attributing any weight to the question whether this meaning realizes the purpose of the text.

B.     *The Current State Of Israeli Law With Respect To The Admissibility Of Israeli Military Court Convictions In Civil Cases*

33. Assuming that Conditions "One" and "Two" from Section 42A of the Evidence Ordinance are satisfied in a particular case (as detailed in paragraph 26 above), the judge in an Israeli civil trial then turns to examine conditions "Three" and "Four."

34. Condition "Three" deals with the identity of the tribunal that issued the judgment. Section 42A does not explicitly identify *which* tribunal must issue the judgment in order for it to be admissible.  Therefore, the scope of this condition is open to interpretation.

35. Subsection 42A(b)(1) of the Evidence Ordinance explicitly states that both judgments of a military court for traffic violations and judgments of a municipal court not rendered by a magistrate court judge are inadmissible as evidence in a civil trial.  Over the years, the judiciary added other exceptions, but also decided to interpret Section 42A as encompassing judgments issued by other certified courts that are not part of the regular court system established by Israel's Basic

Law: The Judiciary[9] (*i.e.*, courts other than the Supreme Court, District Courts and Magistrate Courts).  Thus, for example, it has been recognized that judgments issued by Military Courts established according to the Military Jurisdiction Act are admissible as evidence under Section 42A.[10]

36. The question of whether judgments issued by Military Courts that operate in Judea, Samaria and Gaza are admissible under Section 42A has not yet been determined by the Israeli Supreme Court.[11]

37. However, there are two District Court decisions that address this question.[12]  The first is the 2003 case of *Tachruri v. The Military Commander in Judea and Samaria*.[13]  In *Tachruri*, the court reached the conclusion that Section 42A does not permit the admission of judgments issued by Military Courts that operate in Judea, Samaria and Gaza in subsequent civil proceedings.  The court reasoned as follows:

a. The provisions of the Evidence Ordinance do not apply to military courts that are located outside the recognized borders of Israel (*i.e.*, the "Green Line") Because the military courts established outside the borders of Israel were established by military orders of the military commanders rather than by virtue of legislation of the Israeli Parliament; and

---

[9]     Basic Law: The Judiciary, S.H. 1984, p. 78.

[10]    Eliyahu Harnon, *Evidence Law* 359 (vol. 2, 1977).

[11]    Recently our Supreme Court declined to rule on this matter and left it for a future case that will demand a direct ruling. *See* Permission to Appeal 3559/09 *The Palestinian Authority v. The Estate of the deceased Joseph Avrahami, his blessed soul* given on Nov. 29, 2010).

[12]    In addition, there are three Magistrate's Court decisions.  In all three decisions the courts found that Section 42A applies to judgments issued by Military Courts that operate in Judea, Samaria and Gaza.  *See* Civil Case 89/88 *Rilov v. Degmsh*, 39(2) P.M. 1990; Civil Case 4350/97 *Abu Hassan v. Kassyev* (unpublished); Civil Case 345/99 *Haziza v. Kyrth* (unpublished).  *But see* permission to appeal (Tel Aviv) 10503/85 *Omer Ali Omer Elhadar and others v. Vagia Mahpouz Loui* (the court determined that Section 42A did not apply to courts located outside the "Green Line").

[13]    *Supra* note 3.

b.  The presiding judges of military courts are not necessarily professional judges and

are not necessarily appointed according to the criteria of Israeli courts.

However, as a factual matter, the District Court erred in connection with point "b,"

because even under the law that was applicable at the time of the *Tachruri* decision,

the presiding judge of Military Courts were explicitly required to be qualified

lawyers, although the other two additional members of the Military Court panel could

be laymen.  In addition, even though the Order regarding Security Provisions was

only officially amended in 2004 in a manner that prohibited laymen from participating

as judges, this policy was operative *de facto* from the end of 2002.[14]

38. The second District Court decision in 2009 is *The Estate of the deceased Joseph

Avrahami, his blessed soul v. The Palestinian Authority*.[15]  In *Avrahami*, unlike

*Tachruri*, the court reached the conclusion that Section 42A permits the admission

of judgments issued by Military Courts that operate in Judea, Samaria and Gaza in

subsequent civil proceedings.

39. As I noted in Paragraph 20 above, in his Report at paragraph 3.3.14, Mr. Azoulay

observes that the *Avrahami* decision has "no precedential effect" by virtue of the

fact that the Israeli Supreme Court "cancelled" the decision.  However (and as

conceded by Mr. Azoulay), the Israeli Supreme Court did not conclude that Judge

Drori had arrived at a substantively incorrect conclusion regarding Israeli military

court's admissibility in civilian proceedings; rather, the Israeli Supreme Court

held that because the respondents did not object to the verdicts' admissibility, it

was unncessary for the lower court to address and resolve this issue.  Mr. Azoulay

appears to concede (at paragraph 3.3.15) that notwithstanding the Israeli Supreme

Court's vacatur of the *Avrahami* decision for these reasons, there remains a

---

[14]  *See Avrahami v. The Palestinian Authority*, *supra* note 2, para. 78; Netanel Benishu, *The Criminal Law in Judea, Samaria and Gaza*, 18 LAW & ARMY L. REV. 293 (2005).
[15]  *Supra* note 2.

difference of opinion regarding the admissibility of military court verdicts, and (unsurprisingly) does not suggest that the Haifa District Court's decision in *Tachruri* is dispositive of the issue, or binding on this Court.  I agree there are differing views on the admissibility issue, and, for the reasons explained below, respectfully suggest that *Avrahami* continues to reflect a better reasoned, and more practical analysis.

40. The court in *Avrahami* rejected both rationales provided by the court in *Tachruri*. The second rationale (professionalism of the judges) was rejected because the legal situation that existed when the *Tachruri* judgment was issued had changed. Further, and as noted in paragraph 37 above, the policy excluding laypersons from serving as judges became *de facto* effective in 2002.  *Avrahami* did not, however, announce an entirely new rule of law, but rather, in my view, applied the correct analysis unfortunately overlooked in the earlier *Tachruri* decision.  The Order regarding Security Provisions has been amended, and it now provides that all judges in a Military Court must have legal experience exceeding five years.[16] Non-lawyer military officers are no longer permitted to preside nor participate as panelists in Military Courts. It should be stressed that the defendants, the Palestinian Authority and others did not dispute or object to the admissibility of the verdict against the perpetrators.  Furthermore, the amended Order was heavily influenced by the criteria upon which judges are appointed in Israeli courts, and it now provides that military judges may be appointed only by a professional committee of seven members that includes, *inter alia*, the president of the Military

---

[16]     Order regarding Security Provisions (Judea and Samaria) (NO. 378), 1970, Sec. 3B.

13

Court of Appeals, a retired judge of the Supreme Court and a representative of the Israeli Bar.[17]

41. The *Avrahami* decision also rejected the first rationale of the *Tachruri* judgment that section 42A was inapplicable to Military Courts that are located outside the recognized borders of Israel. The *Avrahami* court stated that the purpose of Section 42A is to conserve the civil court's time and resources and enhance court efficiency.[18] The legislature concluded that it is unnecessary to require a civil court to reexamine facts that a criminal court had already considered, because the burden of proof in criminal cases is considerably higher than in civil cases: in criminal cases the burden of proof is beyond a reasonable doubt, as opposed to civil cases where the burden is proof by a preponderance of the evidence. The legislature reasoned that satisfactions of the higher threshold constituted necessarily satisfaction of the lower one (and that logically inconsistent decisions would be undesirable).

42. In light of that purpose, the test for recognizing a Military Court's judgment as admissible evidence in a civil lawsuit must be whether, and to what extent, the proceedings before Military Courts resemble the proceedings before Israeli civil courts. As I explain below, proceedings before Military Courts closely resemble the proceedings before Israeli civil courts.

43. Military Courts were established by the Order regarding Security Provisions. Their judgments are subject to appeal before Military Courts of a higher instance.[19] The military court of appeal has the full power to allow the appeal, reject the appeal or change the verdict. Even though there is no formal third

---

[17]     Order regarding Security Provisions, *id*., sec. 3.
[18]     *See also*: Civil Appeal 350/74 *M.L.T. Company Ltd. v. Maman*, 29(1) P.D. 208.
[19]     Similarly, all judgments rendered in Israeli courts are also subject to appeal before a court of higher instance.

appeal to the Israeli Supreme Court, there has been an established practice for many years that one can challenge the legality of a Military Court's ruling before the Supreme Court, in the latter court's status as a high court of justice. The rules of evidence that military courts exercise are equal to those customary in Israeli courts.[20]

44. In addition, Military Courts tend to implement Israeli criminal law, and their judgments often rely on Israeli authorities (*i.e.*, Israeli court judgments, legislation and literature). For example, it was decided that Israeli legislation, and in particular Basic Law: Human Dignity and Liberty,[21] should always guide the courts in implementing the binding law in Judea, Samaria and Gaza.[22] Similarly, it was decided that even though military courts are not bound by judgments of the Supreme Court, those judgments must always guide the courts.[23] Thus, and as discussed below in Section IV.E, the Military Court system closely resembles the Israeli court system. Indeed the *Avrahami* court specifically held that even for older judgments that preceded the amended order, Israeli Military Courts provided adequate redress. Because Section 42A only address admissibility of a conviction, as opposed to the weight a factfinder should assign to such conviction, any weighting issues are fact specific, and are properly reserved for the court adopting the military judgment.

45. As a result, the Military Court's findings and conclusions are no less valid than the findings and conclusions of an Israeli court; they reflect a process of factfinding that is as accurate as that engaged in by Israeli civilian criminal

---

[20]    Order regarding Security Provisions, *supra* note 12, sec. 9.

[21]    Basic Law: Human Dignity and Liberty, S.H. 1992, p. 150.

[22]    Military Court (Gaza) 5/01 *El-Jamal v. Military Prosecutor*; Military Court (Judea and Samaria) 1618/02 *Military Prosecutor v. Abu-Snina*.

[23]    Military Court (Judea and Samaria) 63/02 *Military Prosecutor v. Abu-Harshak*.

proceedings.  Therefore, admitting Military Court judgments in subsequent civil proceedings advances the purpose of Section 42A and should be admissible as evidence in a civil lawsuit in an Israeli court.

46. Examination of the Azoulay Report demonstrates that it adheres to the *Tachruri* judgment.  However, the court in *Tachruri* failed to examine the substantial similarities between proceedings before Military Courts and proceedings before Israeli courts.  Instead, in my view, the court applied an unnecessarily narrow construction to Section 42A that ignores the modern method of purposive interpretation customary in Israel.  In contrast, proper application of purposive interpretation principles should take into account all the relevant factors – *i.e.*, the degree of resemblance between the Military Court system and Israeli court system, the clear and unambiguous words of Section 42A, the values of the Israeli legal system, etc.

47. Although, the decision in *Elhadar v. Loui*,[24] in which the court determined that courts that are located outside the "Green Line" are "foreign courts" and therefore beyond the reach of Section 42A, supports Mr. Azoulay's conclusions, it is my opinion that the court's conclusion was wrong.  The *Elhadar* court gave a narrow interpretation to the term "foreign court" that is wrong in my opinion, because the question of whether a court is "foreign" should be determined solely according to substantive considerations and not based on a bright line rule.  Moreover, as noted above, because the Israeli Military Court system closely resembles the Israeli court system and therefore cannot be considered "foreign," *Elhadar*'s analysis, which strictly rests on a geographic border, is incomplete and incorrect.  After

---

[24]     Permission to Appeal (District Court – Tel Aviv) 10503/85 *Omer Ali Omer Elhadar v. Vagia Mahpouz Loui* (judgment dated 2/2/86).

careful consideration of these factors, it is my conclusion that admissibility of Military Court judgments comport with the purpose of Section 42A.

48. After concluding that condition "Three" of Section 42A has been satisfied, I now turn to examine condition "Four" (as detailed in ¶ 26 above): whether the defendant, Nat West, has a legal association such that it bears responsibility for the actions of the convicted persons identified in the Military Court records that the plaintiffs wish to introduce into evidence.

49. According to Section 42A, the defendant in the civil lawsuit must have a legal association in order to bear responsibility for the actions of the convicted person in the criminal trial. Section 42A recognizes three categories of legal association:

1)   The convicted person is now the defendant in the civil lawsuit;

2)   The defendant in the civil lawsuit is a proxy of the convicted; or

3)   The defendant in the civil lawsuit is a person whose liability for the alleged damage arises from the liability of the convicted person (including whoever is obliged to pay the judgment debt of the convicted).

50. In this case, Nat West *may* fall within the third category (an entity whose liability for the alleged damage arises from the liability of the convicted person, and who is obliged to pay the judgment debt of the convicted person).[25]   To determine whether this is the case, the plaintiffs must prove that Nat West's provision of financial services to Interpal and through it to Hamas enabled Hamas to carry out terrorist attacks. Plaintiffs are not required to show that Nat West's provision of financial services to Interpal enabled Hamas to carry out the specific terrorist attacks that were the subject of the criminal trials that the plaintiffs seek to rely on

---

[25]   Nat West does not fall within categories "one" and "two", since it was not a party to the criminal trials that plaintiffs wish to rely on, nor is it a proxy of the convicted (*i.e.*, an entity that has a link of closeness to the convicted). Nat West may, however, be considered as an entity whose liability for the alleged damage arises from the liability of the convicted person, and who is obliged to pay the judgment debt of the convicted. Therefore, Section 42C applies, and submission of contradictory evidence requires the permission of the court.

as evidence in a subsequent civil lawsuits.[26]   Under those circumstances, Nat West's liability would arise from the liability of the terrorists convicted in the criminal trials, and Nat West will be obliged to pay the judgment debt of the convicted.

C.      *Does Admission of Israeli Military Court Convictions in Civil Cases in Israel Severely Harm Constitutional Rights and Jeopardize Basic Principles of the Israeli Legal System, as Claimed by Mr. Azoulay?*

51. On p. 35 of his report, Mr. Azoulay claims that "the interpretive approach, which endorses applying Article 42A to judgments of military courts in the occupied territories, severely harms constitutional rights stipulated in the Basic Laws, and jeopardizes basic principles of the Israeli system."

52. In my opinion, this conclusion is unfounded and erroneous.  Section 42A applies not only to civil lawsuits against the accused himself, but also to civil lawsuits against people who are "strangers" to the criminal proceedings – *i.e.*, people who have legal responsibility for the actions of the convicted (his proxy or a defendant whose liability for the alleged damage arises from the liability of the convicted). In the eyes of the Israeli legislature, this legal association justifies restricting the defendant from presenting contradictory evidence of the criminal judgment in an Israeli court.

53. Therefore, Section 42C of the Evidence Ordinance provides that "if evidence was submitted as stated in section 42A, the convicted or his proxy or the party liable for the judgment debt is not entitled to submit contradictory evidence, or evidence that was already heard or submitted in the criminal trial, except with the

---

[26]      *See also The Estate of the deceased Joseph Avrahami, his blessed soul v. The Palestinian Authority*, supra note 2, para. 143.

permission of the court,[27] for the reasons that shall be noted by the court, and in order to prevent injustice."[28]

54. When the Israeli Parliament enacted Section 42A, it thus mandated that not only a convicted party – but also another group of people – "strangers" to the criminal proceedings – would be prevented from submitting contradictory evidence in a subsequent civil trial. This inclusion of "strangers," was premised on the assumption that this group was "present" in the criminal trial by virtue of its association to the convicted.[29] However, there is no requirement that the "strangers" connection to the convicted have been actually litigated or decided during the criminal trial in order for the criminal conviction to be used as evidence against "strangers" at a subsequent civil trial. In this case, Nat West's alleged actions enabled Interpal and through it Hamas to receive and transfer funds for the purpose of financing terrorist activities (i.e., recruiting and training of terrorists, purchasing explosives, etc.). Nat West's actions thereby allegedly enabled Hamas to execute the attacks that were the subject of the criminal convictions listed in Table 1A and 1B of the Azoulay Report.

55. In other words, in order to achieve Section 42A's goal of conserving a civil court's time and resources and enhancing court efficiency, the Israeli legislature created a just balance between competing interests, disallowing convicted parties

---

[27]    Because the findings and conclusions resulting in the conviction of an accused are *prima facie* evidence under Section 42A in a subsequent civil trial, although the defendant in a civil trial can petition the civil trial judge to allow the defendant to submit contradictory evidence, the trial judge has discretion as to whether to allow the evidence of conviction to be challenged. Thus, although an evidentiary challenge of this kind is theoretically permissible, I do not know of any case where a civil trial judge has permitted a defendant to submit evidence to challenge a conviction properly admitted into evidence.

[28]    It should be noted that Section 42C does not apply to all persons whose liability for the alleged damage arises from the liability of the convicted person, but only to one specific group: those who are obliged to pay the judgment debt of the convicted. In this case, as noted in ¶ 49, Nat West may be considered an entity whose liability for the alleged damage arises from the liability of the convicted person, and who is obliged to pay the judgment debt of the convicted. Therefore, Section 42C applies, and submission of contradictory evidence requires the permission of the court.

[29]    Civil Appeal 350/74 *M.L.T. Company Ltd.*, supra note 18, at pp. 217-218.

(as well as those associated with them) to – absent leave of court – submit evidence contradicting the criminal conviction.  The legislature's decision also reflects sensible policy considerations.  The burden of proof in Israeli criminal cases, including criminal proceedings in Israeli military courts, is materially higher than the burden of proof in cases seeking civil damages.  Section 42A thus reflects a coherent recognition that it is undesirable and inefficient to permit a criminal court, on the one hand, to reach a conclusion and issue a conviction under a "beyond reasonable doubt" standard, and yet allow a civil court to reach a different conclusion on a materially lower "preponderance of the evidence standard".  The facts presented here demonstrate the good sense of that policy.  As explained above, an Israeli court could conclude that a defendant, such as Nat West, was legally associated with the primary tortfeasor (here, Hamas), even if Nat West's connection to Hamas was not decided or litigated in the earlier criminal action.  Permitting Nat West to, thereafter, submit contradictory evidence as to the primary tortfeasor's conviction is at odds with the policies reflected in Section 42A of the Evidence Ordinance.

56. This constitutional balance applies to all certified courts under Section 42A.  Because Military Courts also issue convictions that comport with Section 42A's goals and purposes, this balance should not differ here.  Thus, in my opinion, the convictions in question should be admissible in a civil trial in Israel against a defendant such as Nat West under the theory of liability pursued by the plaintiffs.

D.   *Description of the Basic Procedures of Israeli Military Courts*

57. The evidentiary and procedural regulations of the Military Court system closely resemble the regulations of the Israeli court system.  I have already elaborated on this subject in ¶¶ 43-44 above.  Further elaboration shall be presented in Part IV.E

20

below, which examines the similarity between the Israeli and American criminal justice systems.

E.      *Are Criminal Proceedings Before Israeli Military Courts Consistent With American Notions of Fairness, Most Notably, the Guarantee of "Due Process"?*

58. As a legal scholar, I have studied both the United States and Israeli justice systems.  It is my conclusion that the Israeli military justice system's procedures offer due process guarantees that are similar to those provided by the American criminal justice system as governed by the Federal Rules of Criminal Procedure and Federal Rules of Evidence.

59. Military Courts in Israel are empowered to try persons accused of security offenses that took place in whole or in part within Israel, the West Bank and Gaza.[30]  With respect to Israeli civilian courts, District Courts and Magistrate Courts are assigned to try civil and criminal cases.  There are no special criminal courts, except for Military Courts, which are established according to the Military Jurisdiction Act, to try soldiers, and Labor Courts, which try cases regarding violation of workers' rights.

60. Israeli civilian courts have jurisdiction over crimes committed in Israel (within the "Green Line"), but the military courts also have jurisdiction over particular offenses committed within the same geographical area.[31]

61. The rules by which Military Courts conduct themselves are, by their character, designed to ensure that there is no prejudice to a defendant and that the court will remain unbiased.  As noted in the Order regarding Security Provision, Military

---

[30]      Sec. 3(a), 7 of the Order regarding Security Provisions, *supra* note 16.
[31]      Order regarding Security Provisions, id; Sec. 2(a) of the Emergency Regulation (Judea, Samaria and Gaza – Jurisdiction of Offenses and Legal Aid), 5738-1977; Sec. 68 of the Defense (Emergency) Regulations, 1945; Sec. 7-9, 12 of the Penal Law, 5737-1977.

Court proceedings are usually open to the public and the press.[32]  The convicted person has a right to appeal, and all of the rules of evidence applicable in Israeli criminal courts (including rules regarding hearsay, authenticity, or exclusion of evidence procured through improper means) are also applicable to Military Court proceedings.[33]

62. An accused before a Military Court is entitled to challenge the admissibility of the prosecution's evidence, including his own confession.[34]  Any challenge that he elects to make to his confession is subject to a separate proceeding evaluating the admissibility of the confession.[35]  Within this proceeding, the accused is given full opportunity to demonstrate that his confession was coerced and extracted from him against his free will.  Coercion is established according to the same conditions that apply in Israeli civilian courts.

63. Furthermore, under Israeli law a confession is not sufficient to establish guilt.[36]  In addition to the confession, the court must also find sufficient corroborative evidence to establish guilt.  This Israeli law equally applies to, and binds, Military Courts.

64. An accused before a Military Court is entitled to representation by the lawyer of his choice, and if he is unable to afford a lawyer, the state provides a lawyer for him.[37]

65. Each witness before the Military Court must take an oath to testify truthfully, and is subject to direct questioning, cross-examining and redirect questioning.[38]

---

[32]   Sec. 11 of the Order regarding Security Provisions, *id*.
[33]   Sec. 9 of the Order regarding Security Provisions, *id*.
[34]   Sec. 12 of the Evidence Ordinance, supra note 4.
[35]   Criminal Appeal 115/82 *Muadi v. State of Israel*, 38(1) P.D. 197.
[36]   Criminal Appeal 6613/99 *Smirk v. State of Israel*, 56(3) P.D. 529, 542, 556-557.
[37]   Sec. 8, 10 of the Order regarding Security Provisions, supra note 16.
[38]   Sec. 18 of the Order regarding Security Provisions, *id*.

66. As noted above, Military Court judges are appointed by a professional committee. All judges are competent, experienced, independent and unbiased.[39]

67. The accused enjoys the privilege against self incrimination and can decide to remain silent during his or her investigation or trial.  He or she also is entitled to confront his accusers and to bring forward any relevant witness to support his or her case.  An accused person before a Military Court has the right to know within a reasonable time in advance of trial all the relevant investigation materials that have been compiled against him.

68. If the accused chooses to enter a plea agreement, Israeli law requires a judge to explain the consequences of the guilty plea and advise the defendant that the plea agreement is not binding on the court.[40]  This procedure is also applicable to Military Courts.

69. The rules of procedures governing Military Courts include the right of the accused to be present throughout his trial, and an obligation to inform the accused in advance of the place and time of the trial.[41]

70. Military Courts have publicly promulgated rules of procedure, meet regularly and operate under the rule of law.  The Military Courts were established pursuant to the Geneva Convention's requirements applicable to an occupying power.[42]  Based upon my personal experience and the scholarly work described in my *Curriculum Vitae*, the Military Courts in Israel operate in a manner consistent with those rules and conventions.

---

[39]     *See* para. 39 above.
[40]     Criminal Appeal 1958/98 *Anon. v. State of Israel*, P.D. 57(1) 577.
[41]     Sec. 6, 35 of the Order regarding Security Provisions, *supra* note 16.
[42]     Geneva Convention Relative to the Treatment of Prisoners of War (Geneva III), Aug. 12, 1949, 75 U.N.T.S. 135; Geneva Convention relative to the Protection of Civilian Persons in Time of War (Geneva IV), Aug. 12, 1949, 75 U.N.T.S. 287.

71. Although Israeli citizens are not tried in Military Courts[43] the Military Courts apply the same rules of evidence and afford defendants the same procedural rights that Israeli citizens have in Israeli civilian courts.[44]

F.   *Under What Circumstances Are Foreign (Criminal) Convictions (Other Than Israeli Military Court Convictions) Admissible In Israeli Civil Cases?*

72. The basic principle in the Israeli legal system is that foreign judgments, civil or criminal, are considered hearsay and therefore inadmissible as evidence in legal proceedings before a court in Israel.

73. An exception is found in the Foreign Judgment Enforcement Act,[45] however.  For the purpose of the Act, "Foreign Judgment" is defined in sec. 1 as: "a judgment that was issued in a foreign country in a civil matter, *including a judgment to pay compensation or damages to an injured party, even if the judgment was not issued in a civil matter*" (emphasis added).  This act permits enforcement of foreign judgments upon certain terms, most notably where the judgment was issued in a court of competent jurisdiction, all appeals have been exhausted, Israeli law and the law of the country where the judgment was issued permit the judgment to be enforced, and the judgment was issued in a country that allows enforcement of Israeli judgments in its territory.

74. If a criminal trial in a foreign country ended in conviction and included a monetary component in the judgment – *i.e.*, a part which the convicted was

---

[43]   As a formal matter, Israeli Military Courts do have jurisdiction over any person committing an offense in the West Bank or Gaza Strip regardless of their nationality.  However, the Israeli Knesset has granted jurisdiction to Israeli courts within the Green Line to try Israeli citizens, even if they reside in the occupied territories.

[44]   Sec. 9, 9A, 10 of the Order regarding Security Provisions, *supra* note 16.

[45]   Foreign Judgment Enforcement Act, S.H. 1958.

obliged to pay as compensation or damages to the victim – that aspect of the judgment could be enforced under the Foreign Judgment Enforcement Act.[46]

## V.    Conclusion

75. Contrary to the opinions set forth in Mr. Azoulay's report, it is my opinion that the findings and conclusions of an Israeli Military Court in a criminal trial ending with the accused's conviction can be admitted as evidence in a civil lawsuit in an Israeli court that seeks damages from a defendant who was not a party to the criminal proceedings before the Military Court, on the ground that the defendant is liable for the damages suffered by a plaintiff by reason of the attacks upon which the criminal conviction rests.

76. For the reasons discussed above, admission of Israeli Military Court judgments as evidence in a trial is consistent with American notions of fairness and due process. Military Court convictions and processes do not contradict or stand in conflict with basic principles of the Israeli civilian legal system, nor does the Military Court system impair the rights of defendants who satisfy the "legal association" standards of Section 42A, and are thus responsible for the actions of the person or entity convicted in the original Military Court criminal prosecution.

Executed on: February 22, 2011

Emmanuel Gross

---

[46]    Civil Case 1268/07 *Grinberg v. Bemira* (judgment dated 9.3.09), para. 6.

25

**EXHIBIT 207 TO DECLARATION OF VALERIE SCHUSTER**

*MOSES STRAUSS, et al. VS.*

*CREDIT LYONNAIS, S.A.*

---

*EMANUEL GROSS*

*September 28, 2010*

---



126 East 56th Street, Fifth Floor New York, New York 10022

PHONE: (212) 750-6434   FAX: (212) 750-1097

www.ELLENGRAUER.com

*Original File 94668.txt*

*Min-U-Script® with Word Index*

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

EMANUEL GROSS
September 28, 2010

Page 17

```
 1       GROSS
 2    in the occupied territories from 1977 to
 3    1980, who paid your salary, the IDF?
 4  A.  Of course.
 5  Q.  So you were serving as a judge
 6    of the military court as an officer of the
 7    IDF?
 8  A.  Yes.
 9  Q.  The prosecutor who prosecuted
10    cases was an officer of the IDF?
11  A.  Yes.
12  Q.  All the court personnel were
13    employees of the IDF?
14  A.  Correct.
15  Q.  That court is established by
16    and run by the IDF, correct?
17  A.  The person obviously belongs to
18    the IDF, but as I said the basis for the
19    court's establishment is the Geneva
20    Convention.
21  Q.  These courts were run by the
22    IDF in 2004?
23  A.  Yes.
24  Q.  In 2005?
25  A.  Yes.
```

Page 18

```
 1       GROSS
 2  Q.  In 2006?
 3  A.  Yes, but there is a change
 4    because a couple of years ago the way the
 5    military judges were appointed as I said it
 6    was changed which means that a couple of
 7    years ago the new law states that a military
 8    judge would be elected by a special committee
 9    which resemble more layers of the same
10    concept of electing our civil judges inside
11    Israel.
12  Q.  When did that happen?
13  A.  It happened early 2000.  I
14    don't recall now exactly the year, but it was
15    about ten years ago, maybe less.
16  Q.  That's pursuant to Section 13A
17    and 13B of the Orders pertaining to the
18    military?
19  A.  Once again I have to look at
20    the Order to make sure.
21  Q.  I'll show it to you in a few
22    minutes, but these were IDF courts in 2004,
23    2005 and 2006?
24  A.  Correct.
25  Q.  They are IDF courts, today?
```

Page 19

```
 1       GROSS
 2  A.  Once again if you mean that
 3    whether they are run by, yes, they belong to
 4    the personnel of the IDF, but they are
 5    independent.  I should stress that the
 6    military judges when I started in '77 as well
 7    as nowadays by the stipulation of the law
 8    they are independent even though they get
 9    salary -- the same -- I mean the same as the
10    civil judge is paid by the Ministry of
11    Justice nonetheless is an independent.
12  Q.  I'd like you to look at
13    paragraph 41 of your report.  I'd like you to
14    look at the last sentence which is at the top
15    of page 14 and it states, "As I explain
16    below, proceedings before military courts
17    closely resemble the proceedings before
18    Israeli civil courts."  Do you believe that
19    statement to be true?
20  A.  Yes.
21  Q.  Was it true in 2004, 2005 and
22    2006?
23  A.  Yes.
24  Q.  I'd like you to look at
25    paragraph 44 of your report.  In the first
```

Page 20

```
 1       GROSS
 2    sentence you state, "As a result, the
 3    military court's findings and conclusions are
 4    no less valid than the findings and
 5    conclusions of an Israeli court.  They
 6    reflect a process of fact finding that is as
 7    accurate as that engaged in by Israeli
 8    civilian criminal proceedings."  Do you see
 9    that?
10  A.  Yes, I see and do believe it's
11    correct.
12  Q.  Was it correct as of 2004, 2005
13    and 2006?
14  A.  Indeed so.
15  Q.  I'd like you to look at
16    paragraph 56 of your report.  The first
17    sentence you state, "The evidentiary and
18    procedural regulations of the military court
19    system closely resemble the regulations of
20    the Israeli court system."  Is that statement
21    correct?
22  A.  Yes.
23  Q.  Was it correct in 2004, 2005
24    and 2006?
25  A.  To the best of my knowledge,
```

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

EMANUEL GROSS
September 28, 2010

Page 25

```
 1      GROSS
 2  page 4 you begin that subparagraph E with the
 3  phrase, "To the extent I am generally
 4  familiar with American legal concepts."  Do
 5  you see that?
 6  A.   Once again the top to the
 7  extent I'm generally familiar, yes.
 8  Q.   What are you referring to
 9  there, what you just described in response to
10  my prior questions?
11  A.   Exactly what I said before.
12  Q.   Go back to paragraph 57 on page
13  20.  The second sentence of that paragraph?
14  A.   Just a moment, please.
15  Q.   In the second sentence of that
16  paragraph you state as follows, "It is my
17  conclusion that the Israeli military justice
18  system's procedures offer due process
19  guarantees that are similar to those provided
20  by the American criminal justice system as
21  governed by the Federal Rules of Criminal
22  Procedure and Federal Rules of Evidence."  Do
23  you see that?
24  A.   Yes.
25  Q.   Is it accurate?
```

Page 26

```
 1      GROSS
 2  A.   Yes.
 3  Q.   It's an accurate statement of
 4  your conclusion?
 5  A.   Yes.
 6  Q.   I know you are offering that
 7  conclusion in 2010.  Do you believe that
 8  conclusion to be valid as of 2004?
 9  A.   Yes.
10  Q.   2005?
11  A.   Yes.
12  Q.   2006?
13  A.   Yes.
14  Q.   Please go to paragraph 60 of
15  your report.  In the first sentence you state
16  as follows, "The rules by which military
17  courts conduct themselves are by their
18  character designed to ensure that there is no
19  prejudice to a defendant and that the court
20  will remain unbiased."  Do you see that?
21  A.   Yes.
22  Q.   Do you believe that to be true?
23  A.   Yes.
24  Q.   Was it true as of 2004?
25  A.   Yes.
```

Page 27

```
 1      GROSS
 2  Q.   2005?
 3  A.   Yes.
 4  Q.   2006?
 5  A.   Yes.
 6  Q.   Professor Gross, if I may, I
 7  note that in certain of these statements you
 8  refer to this subject of the qualities of the
 9  military courts in terms of rules and
10  principles.  My question is it your
11  opinion that these statements are also true
12  of how the military courts have functioned in
13  practice?
14      MR. STONE: Objection to form.
15  A.   I can testify only to the term
16  to the time that I was presiding in the
17  courts.  Other times I cannot testify because
18  I'm not part -- I don't belong to the court
19  even though I do have knowledge, but I cannot
20  say that as a person of knowledge so what I
21  can assure you is it refers only to the
22  period I preside myself with the court and
23  based on my personal experience.
24  Q.   So you are offering opinions
25  about the actual practice of the military
```

Page 28

```
 1      GROSS
 2  courts only for the period 1977 to 1980,
 3  otherwise you are offering opinions based on
 4  what the rules and principles are, correct?
 5      MR. STONE: Objection to form.
 6  A.   Yes, it's correct, but I do
 7  want to add something.  In my time when I was
 8  a judge, there was no gap between the
 9  practice and the principle.  I tried, you
10  know, to apply the law as it is so I don't
11  believe there is a difference between the
12  principle, between what is written in the
13  book and what is in reality.  Once again
14  based on my personal knowledge when I was a
15  judge if something happen and I don't believe
16  that something happen, I cannot actually
17  testify about it.
18  Q.   Let me make sure I have this
19  clear.  You believe there was no gap between
20  the practice and the principles during the
21  period you were a judge in 1977 through 1980,
22  correct?
23  A.   Yes.
24  Q.   But you are not offering an
25  opinion about whether there's a gap between
```

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

EMANUEL GROSS
September 28, 2010

Page 29

GROSS

1 the practice and the principles thereafter?
2 A.  I mean once again speaking
3 about a gap here, one needs to know what
4 happens in reality nowadays and to know one
5 has to practice to be in court and I'm not in
6 the court.
7 Q.  You haven't been there since
8 1980?
9 A.  No.
10 Q.  Let me make sure it's clear.
11 Is it correct that you have not been there
12 since 1980?
13 A.  Yes, it's correct.
14 Q.  Let me just make sure I'm
15 clear.  Your opinion is about the principles
16 and the rules, but you are not offering
17 opinions about the practices, the actual
18 practices of the court, for example, during
19 2004, 2005 and 2006?
20 A.  I'm not offering.
21 Q.  You are not offering an opinion
22 on that?
23 A.  No.
24 Q.  You don't know what the

Page 30

GROSS

1 practices were first hand?
2 A.  First hand, no, I don't know.
3 Q.  You are not able to offer an
4 opinion about whether there was a gap between
5 the principles and the practices during 2004,
6 2005 and 2006, correct?
7       MR. STONE: Objection to form.
8 A.  Personally no, but once again
9 as a person living in Israel for so many
10 years involved in the justice system, meeting
11 colleagues, I do assume that if there was a
12 gap I might know about it, but once again to
13 assure you I cannot do it.
14 Q.  We'll talk about the gap
15 because I have seen in some of your writings
16 that you refer to some very difficult gaps,
17 but I just want to make clear because in your
18 last answer you said personally you make
19 certain assumptions.  My question is the
20 following; for purposes of your expert report
21 I take it that you are not offering expert
22 opinions about the actual practices of the
23 Israeli military courts during 2004, 2005 and
24 2006; is that correct?

Page 31

GROSS

1 A.  Correct.
2 Q.  I'd like to focus on how the
3 judges in the military courts are selected.
4 I'd like to focus on your paragraph 37.  In
5 the last sentence of --
6 A.  Just a moment, please.
7 Q.  I'm sorry.  Take your time.  In
8 the last sentence of paragraph 37 you refer
9 to the fact that the Order regarding security
10 provisions was amended in 2004 in a manner
11 that required that presiding judges be
12 qualified lawyers, correct?
13       MR. STONE: Objection to form.
14 Q.  That's what you say?
15 A.  Yeah.
16 Q.  You say that that policy was
17 operative de facto from the end of 2002,
18 correct?
19 A.  Yes.
20 Q.  When in 2004 was this amendment
21 made?
22 A.  When exactly?
23 Q.  Yes.
24 A.  I don't know.

Page 32

GROSS

1 Q.  How could I find that out?
2 A.  I have a copy.  Would you like
3 a copy?
4 Q.  Yes.
5 A.  It's in Hebrew.  Sorry, I don't
6 have it here.  I have it in my apartment back
7 in the hotel.  I could send it to you a copy
8 in Hebrew of the updated amendments.
9 Q.  That would indicate to me the
10 date of the amendment?
11 A.  I hope so because this is --
12 but I can check it.
13 Q.  Does this amendment apply only
14 to the presiding judge of a three judge panel
15 or does it apply to all of the judges?
16 A.  All of the judges.
17 Q.  There was, you'll forgive me,
18 Professor, I know you were writing in
19 English, but you wrote that the Order was
20 amended in a manner that prohibited laymen
21 from presiding as judges.  You were not
22 limiting it to the presiding judges.  After
23 the amendment, all of the judges needed to be
24 qualified lawyers; is that correct?

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

EMANUEL GROSS
September 28, 2010

Page 33

GROSS

2 A.   Correct.
3 Q.   What do you mean when you say
4 that that practice was operative de facto
5 from the end of 2002?
6 A.   What I meant is that if you are
7 looking into the ruling of Avrahami, the
8 judge that presided in the case is Judge
9 Drori.  He wrote a lot about the practices
10 and the law in the Judea and Samaria and he
11 mentioned and I base my opinion about this
12 ruling he mention the fact that even before
13 the formal amendment the judges that were
14 selected since 2002 as panelists, all of them
15 were actually professional judges or lawyers.
16 Q.   Those are two different things.
17 Could you explain that, professional judges
18 as opposed to qualified lawyers?  As I
19 understand what you write you say that the
20 order was amended to require the phrase you
21 use is qualified lawyers?
22 A.   Qualified I mean that -- what I
23 meant is that they should be lawyers because
24 once again to be selected and appointed as a
25 judge they adopted a paradigm of civil

Page 34

GROSS

2 judiciary which once again that that person
3 should be at least five years a lawyer,
4 qualified lawyer.
5 Q.   Is there any requirement that
6 the person have prior judicial experience,
7 prior experience as a judge?
8 A.   No.
9 Q.   Is there any requirement that
10 the person have prior training as a judge?
11 A.   No.
12 Q.   The only requirement is that
13 the person be a qualified lawyer for at least
14 five years?
15 A.   Yes.
16 Q.   Is there any requirement that
17 the person have any experience in criminal
18 law?
19 A.   No.
20 Q.   Is there any requirement that
21 the person have any experience in criminal
22 procedure?
23 A.   No, but once again to make sure
24 that you understand the concept, the electing
25 committee consists of several professional

Page 35

GROSS

2 persons like justice of the Supreme Court,
3 the president of the military courts of
4 appeal and the president of the military
5 tribunal court so based on my best
6 understanding and to knowledge they wouldn't
7 select a person who is not familiar -- was
8 not familiar -- is not familiar with this
9 area of criminal law.  I don't know
10 personally even one example that people that
11 were appointed since 2004 were not practicing
12 before criminal law or military law.
13 Q.   But there's no requirement --
14 A.   No.
15 Q.   -- that the appointees have
16 experience or training in substantive
17 criminal law or criminal procedure?
18 A.   No.
19 Q.   Have you ever spoken to a
20 member of this committee?
21 A.   Yes.
22 Q.   Which one?
23 A.   The president of the military
24 tribunal.
25 Q.   Soldier court?

Page 36

GROSS

2 A.   Yes, but now actually those who
3 are elected as judges in the military court
4 formally belongs to the personnel of the
5 military tribunal.
6 Q.   Have you made a formal study of
7 the qualifications of the persons who have
8 been appointed to the military courts in the
9 occupied territories after 2000?
10    MR. STONE: Objection to form.
11 A.   No.
12 Q.   You describe in the last --
13 turn to paragraph 39, please, which is at the
14 bottom of the page, bottom of page 12.  The
15 sentence which begins with the words the
16 Order and if you carry over to page 13 you
17 describe in these sentences how the military
18 court judges are selected under the 2004
19 amendment to the security provisions,
20 correct?
21 A.   Yes.
22 Q.   Is this description accurate?
23 A.   To the best of my knowledge,
24 yes.
25 Q.   It was applied universally in

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

EMANUEL GROSS
September 28, 2010

---

Page 41

1   GROSS
2   A.   A general.
3   Q.   It's a general?
4   A.   A general.  A lay person not a
5   lawyer, not necessarily a lawyer.
6   Q.   It's a general in the IDF?
7   A.   A general in the IDF.
8   Q.   By the way, the president of
9   the Military Tribunal for Appeals, the first
10   member, must that person be a lawyer?
11   A.   Yes.
12   Q.   Again, must be someone who has
13   five years of legal experience?
14   A.   More.
15   Q.   Five years or more?
16   A.   More.  I think it's ten years
17   at least because he should be qualified to
18   the same degree as if he were appointed to
19   the Supreme Court.
20   Q.   That person need not
21   necessarily have any experience in criminal
22   law or criminal procedure, correct?
23   A.   Not formally, but I don't know
24   in practice that any president of the appeals
25   was not before a practicing criminal lawyer.

---

Page 42

1   GROSS
2   Q.   The third member is listed as
3   the coordination of government activities in
4   the territories, who is that person?
5   A.   Another general, coordinator
6   between the government and the military.
7   Q.   An IDF general?
8   A.   An IDF general.
9   Q.   Not a lawyer?
10   A.   Not necessarily a lawyer.
11   Q.   So the first three members so
12   far are all IDF officers, correct?
13   A.   Apart from the retired justice
14   and the representative of the Israeli Bar,
15   all the other five personnel belong -- I mean
16   they are serving in the army.
17   Q.   So five of the seven members
18   are IDF officers?
19   A.   Yes.
20   Q.   According to Section 13B, the
21   selection committee is entitled to act with a
22   quorum of five, correct?
23   A.   Correct.
24   Q.   So a selection could be made by
25   this group consisting entirely of IDF

---

Page 43

1   GROSS
2   officers, correct?
3   A.   Theoretically yes.
4   Q.   The fourth member is identified
5   as the deputy president of the Military
6   Appeals Tribunal, that's also an IDF general?
7   A.   Sorry.
8   Q.   The fourth member is identified
9   as the deputy president of the Military
10   Appeals Tribunal, that's also an IDF officer?
11   A.   Yes.
12   Q.   A general?
13   A.   Not necessarily.
14   Q.   Number six is a retired judge
15   to be appointed by the president of the
16   Military Appeals Tribunal, member one,
17   correct?
18   A.   Yes.
19   Q.   So the first member appoints
20   the sixth member?
21   A.   Correct.
22   Q.   In other words, the chairman of
23   this committee an IDF officer picks member
24   number six?
25   A.   Correct.

---

Page 44

1   GROSS
2   Q.   It need not be a retired
3   Supreme Court justice, but your understanding
4   is that in practice it always has been?
5   A.   To the best of my knowledge,
6   yes.
7   Q.   Now the seventh member is a
8   representative of the Israeli Bar who will be
9   selected by the National Council of the
10   Israel Bar, correct?
11   A.   Correct.
12   Q.   So five of the seven members
13   are IDF officers, at least five of the seven
14   members are IDF officers and they are
15   entitled to act with a quorum of five,
16   correct?
17   A.   Correct.
18   Q.   The committee decisions are
19   made by majority vote, correct?
20   A.   Correct.
21   Q.   According to what you described
22   there is always a majority of indeed more
23   than a majority of five of the seven members
24   who are IDF officers, correct?
25        MR. STONE: Objection to form.

---

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

EMANUEL GROSS
September 28, 2010

Page 49

```
 1        GROSS
 2  Q.  Does the Israeli law provide
 3  that the committee will be chaired by an IDF
 4  officer?
 5        MR. STONE: Objection to form.
 6  A.  Not to my -- no.
 7  Q.  Does the law provide that the
 8  committee can act based on a quorum of all
 9  IDF officers?
10        MR. STONE: Objection to form.
11  A.  Once again we are referring to
12  the civil?
13  Q.  Correct.
14  A.  No.
15  Q.  Again, their recommendations
16  are certified by the president of the state
17  of Israel?
18  A.  Yes, but once again let me with
19  your permission elaborate because the
20  military judges that are appointed or are
21  recommended by this committee cannot be
22  legally approved or appointed by the
23  president of Israel because once again we are
24  speaking about a place which is ruled by the
25  international law.  It doesn't belong to
```

Page 50

```
 1        GROSS
 2  Israel and therefore the president of Israel
 3  has nothing to do with this place.
 4  Q.  The occupied territories are
 5  not part of Israel?
 6  A.  No.
 7  Q.  I think we have a negative.
 8  It's correct that the occupied territories
 9  are not part of Israel, right?
10  A.  Correct.
11  Q.  Look at paragraph 43 on page
12  14.  You say in the first clause, "Military
13  courts tend to implement Israeli criminal
14  law."  What do you mean by the word tend?
15  A.  I just wanted to be exact as
16  far as I can, accurate as far as I can so I
17  know that in most of the cases that I read
18  the courts implement Israeli criminal law,
19  but I cannot say that in all the cases so I
20  just want to be very careful about it.
21  Q.  Do any of the cases that you
22  read come from 2004, 2005 or 2006?
23  A.  Some of them.
24  Q.  Can you identify them?
25  A.  Not right now.
```

Page 51

```
 1        GROSS
 2  Q.  So the military courts are not
 3  required to implement Israeli criminal law,
 4  but it's your opinion that they tend to do
 5  so?
 6  A.  Yes.
 7        MR. STONE: At your convenience
 8  I'm looking for a break.
 9        MR. FRIEDMAN: Let me just
10  finish this subject for a couple of
11  minutes.
12  Q.  It's correct that they don't
13  always apply Israeli criminal law, correct?
14  A.  I'm not -- I cannot refer to
15  this statement because I didn't check all the
16  cases.  The cases that I read they
17  implemented criminal law, but once again I
18  cannot assure you that they have done it in
19  all the cases.
20  Q.  When was the last time you read
21  a military court decision?
22  A.  A couple of months ago.
23  Q.  When was the last time before
24  that?
25  A.  Periodically I am reading, you
```

Page 52

```
 1        GROSS
 2  know, from time to time.
 3  Q.  Do you make it a regular
 4  practice to read Israeli military court
 5  proceedings?
 6  A.  Yes.
 7  Q.  Do the parties to a case know
 8  in advance whether the judge will apply
 9  Israeli criminal law or not?
10        MR. STONE: Objection to form.
11  A.  They can predict it.
12  Q.  But they don't know for sure?
13  A.  Well, if you are a good lawyer
14  and you are following, you know, the case law
15  you should predict it.
16  Q.  In the next clause, let me wrap
17  up this paragraph, in the next clause you say
18  that the military court's judgments often
19  rely on Israeli authorities.  What's your
20  basis for that?
21  A.  My readings.
22  Q.  Is it correct that they are not
23  required to rely on Israeli authorities?
24  A.  They are required to follow the
25  evidence rules as a norm.  This is a
```

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

EMANUEL GROSS
September 28, 2010

Page 53

1    GROSS
2    requirement, it's written in the Order,
3    Security Order, but referring to the
4    substantial criminal law they are not
5    formally required to do it, but as a practice
6    they are doing it.
7 Q.   They are required to follow the
8    evidence law that's specified in the Order,
9    is that what you're saying?
10 A.   Yes.
11 Q.   That evidence law is different
12    from the evidence law that's applied in
13    Israeli courts, correct?
14 A.   No, the same.
15 Q.   It's the same?
16 A.   It's the same.
17    MR. FRIEDMAN: Want to take a
18    short break?
19    MR. STONE: That will be great.
20    THE VIDEOGRAPHER: We are now
21    off the record.  The time is 10:34
22    a.m.
23    (Recess taken.)
24    THE VIDEOGRAPHER: This is tape
25    two of the deposition of Professor

Page 54

1    GROSS
2    Emanuel Gross.  We are now back on the
3    record.  The time is 10:42 a.m.,
4    September 28, 2010.
5 Q.   Can you look at paragraph 61,
6    please.  The top of page 22 you refer to a
7    separate proceeding evaluating the
8    admissibility of the confession?
9 A.   You are referring to --
10    MR. STONE: Paragraph 61, but
11    he's referring to a sentence on the
12    next page.
13 Q.   You refer to a separate
14    proceeding evaluating the admissibility of
15    the confession, do you see that?
16 A.   Yes.
17 Q.   That's a separate proceeding in
18    which there is testimony from the IDF officer
19    who received the confession about the
20    circumstances under which the confession was
21    received?
22    MR. STONE: Objection to form.
23 A.   Yes, but it's not necessarily
24    an IDF officer.
25 Q.   Could be a Shin Bet officer?

Page 55

1    GROSS
2 A.   Shin Bet or a police officer.
3 Q.   Is that the proceeding, the
4    type of proceeding that the Landau Commission
5    determined was effected by perjury?
6    MR. STONE: Objection to form.
7 A.   No.
8 Q.   What did the Landau Commission
9    say about the proceedings relating to
10    confessions that was effected by perjury?
11    MR. STONE: Objection to form.
12 Q.   Or I think as you have written
13    not only was there an instruction given to
14    lie, but the content of the lie was provided
15    as well?
16    MR. STONE: Objection to form.
17 Q.   You recognize that phrase?
18 A.   Yes, of course.
19 Q.   From your writings?
20 A.   Of course.
21 Q.   What was that?
22 A.   Okay, the Landau Commission was
23    actually created and established in the mid
24    eighties because we realized after what we
25    call the 300 bust that the Shin Bet, our

Page 56

1    GROSS
2    sacred services, used the practice to perjure
3    themselves before a court of law, the
4    military courts and they tried to explain or
5    to justify the need to perjure themselves
6    saying that for the sake of the security of
7    the state of Israel they should not reveal
8    the whole truth before the courts because
9    otherwise they might be afraid that the
10    confession might be excluded so the Landau
11    committee and then afterwards the report
12    tried to figure out whether the legal
13    measures that are required to be implemented
14    in a criminal investigation should be
15    corrected or amended in order to enable those
16    guys, the secret police to be able to extract
17    confessions.
18    Now I must stress that their
19    recommendations of the Landau report was not
20    accepted, were not accepted actually.  Our
21    Supreme Court rejected it absolutely and our
22    Supreme Court after ruling that the Shin Bet
23    has the same power and not more than an
24    ordinary police it's the Knesset's business
25    to amend the law if they wanted and the

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

EMANUEL GROSS
September 28, 2010

Page 57

1    GROSS
2  Knesset never did it.
3  Q.   What percentage of military
4  court convictions are based on confessions?
5      MR. STONE: Objection to form.
6      MR. FRIEDMAN: What's the form
7  objection?
8      MR. STONE: There is no basis
9  for knowing what the percentage is.  I
10  think it's kind of an unfair question.
11  Q.   What percentage of military
12  court convictions are based upon confessions?
13      MR. STONE: Objection to form.
14  A.   To the best of my knowledge
15  it's by and large the same volume as it
16  happens before the criminal civil courts.
17  Q.   That is?
18  A.   Which means more than 80
19  percent.
20  Q.   More than 80 percent?
21  A.   More.
22  Q.   More than 80 percent of the
23  convictions of the military courts in the
24  occupied territories are based on
25  confessions?

Page 58

1      GROSS
2      MR. STONE: Objection to form.
3  A.   Once again I want to make sure
4  it's not necessarily confession, it's plea, a
5  plea agreement.
6  Q.   Based on confessions by the
7  defendant?
8  A.   Yes.
9  Q.   That was true in 2004?
10      MR. STONE: Objection to form.
11  A.   To the best of my knowledge.
12  Q.   And in 2005 and 2006?
13  A.   Yes.
14  Q.   You say in paragraph 62 that a
15  confession alone is not sufficient to
16  establish guilt and you say that that's true
17  under Israeli law. Is that true with respect
18  to the military courts in the occupied
19  territories?
20  A.   Yes, it's true.
21  Q.   So the military courts in the
22  occupied territories must also find
23  sufficient corroborative evidence to
24  establish guilt?
25  A.   That's correct.

Page 59

1    GROSS
2  Q.   Do you have any opinion as to
3  the competence of the defense lawyers in the
4  military court proceedings in the occupied
5  territories?
6      MR. STONE: Objection to form.
7  A.   Well, I cannot draw a general
8  view about -- I mean there are various types
9  of lawyers as it always, you know, if you are
10  lucky you will retain a good one, but
11  there are, you know, other lawyers.  They
12  formally are qualified.
13  Q.   They formally are qualified?
14  A.   Yes.
15  Q.   But in practice they are not?
16  A.   Some of them.
17  Q.   When you were a military court
18  judge in 1977 through 1980 in Nablus, did you
19  have a view about the competence of the
20  defense lawyers who appeared before you?
21      MR. STONE: Objection to form.
22  A.   Once again, I'm not able to
23  draw a general view about qualification of
24  those lawyers.
25  Q.   Competence was my question, I'm

Page 60

1    GROSS
2  sorry?
3  A.   Competence.  Once again the
4  same answer.  I mean some of them were very
5  good, some of them are very poor -- were very
6  poor.
7  Q.   Are Israeli citizens ever tried
8  in the military courts in the occupied
9  territories?
10  A.   Not anymore.
11  Q.   When did that last happen?
12  A.   Years ago.
13  Q.   How many years ago?
14  A.   Many years.
15  Q.   Can you put a number on it?
16  A.   I don't recall exactly, but I
17  will tell you immediately I mean the Israeli
18  Knesset enacted a law by which Israeli
19  citizens who live in the West Bank or the
20  territories might be tried in Israel even
21  though they are locating or residing or
22  living outside Israel and it depends on the
23  discretion of the attorney general to decide
24  about it.
25  Q.   So for the last ten years let's

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

EMANUEL GROSS
September 28, 2010

Page 69

1    GROSS
2  Q.  Did you include that entry
3  deliberately or inadvertently?
4  A.  Not deliberately.
5  Q.  In what month of 2004 was this
6  book published?
7  A.  I don't recall.
8  Q.  Does this book remain on the
9  market today?
10  A.  To the best of my knowledge,
11  yes.
12  Q.  Have you ever published any
13  correction or retraction of anything in this
14  book?
15  A.  No.
16  Q.  Was this book factually
17  accurate as of the date it was published?
18  A.  To the best of my knowledge.
19  Q.  Is it factually accurate as of
20  today?
21  A.  To the best of my knowledge.
22  Q.  Yes?
23  A.  Yes.
24  Q.  To the extent you express your
25  opinions in this book, does it accurately

Page 70

1    GROSS
2  express your opinions as of the date on which
3  it was published?
4  A.  Yes.
5  Q.  Does it accurately express your
6  opinions as of today?
7  A.  Yes.
8  Q.  You earn royalties on the sale
9  of this book?
10  A.  Yes.
11  Q.  What's the amount approximately
12  in total of royalties you earned in this
13  book?
14  A.  Not much.  I mean it's not
15  let's say -- it's not a hit.  It's not
16  something which is popular.  They sell about
17  ten books a year or something like that.
18  Q.  I want to ask you some
19  questions about some passages in this book,
20  Professor, and because of my own limitations
21  I'll be asking questions off of the certified
22  English translation, however, we tried to be
23  careful so that the pages of the certified
24  English translation corresponded to what's on
25  the pages of the Hebrew so you can cross

Page 71

1    GROSS
2  reference by paragraph.  Do you understand
3  you could look at the Hebrew or English, I
4  can only reference the English, but the
5  paragraphs and I'll refer you to paragraphs
6  and pages that should correspond to the
7  Hebrew; is that acceptable?
8  A.  Yes.
9    MR. STONE: We're fine with
10  that.
11  Q.  Look first at your chapter 4
12  which is entitled Convictions Based on
13  Confessions under Interrogation.  We
14  translated pages 181 through 183.  Do you see
15  that?
16  A.  Yes.
17  Q.  You wrote this?
18  A.  Yes.
19  Q.  It addresses convictions based
20  on confessions in the military courts in the
21  occupied territories?
22  A.  Yes.
23  Q.  It was accurate as of the date
24  of publication?
25  A.  What I'm referring here in

Page 72

1    GROSS
2  those pages is to the practice used to be at
3  the time of the Landau Committee.
4  Q.  The Landau Committee found as
5  you write on page 182 the last paragraph that
6  in connection with testimony by Shin Bet
7  interrogators concerning confessions "Perjury
8  rapidly became an unchallenged norm", that's
9  what you wrote, correct?
10  A.  Yes.
11  Q.  You also wrote, "Not only was
12  an explicit instruction given to lie, but
13  also guidance as to what lie was to be
14  uttered", correct, that's what you wrote?
15  A.  Yes.
16  Q.  I'd like to take you to the
17  next section which actually if you skip one
18  section the next section I'm going to be
19  taking you to begins on page 459 with the
20  subheading "System of Judgment Established by
21  the State of Israel in the Occupied
22  Territories", do you see that?
23  A.  459.
24  Q.  459, yes.  You wrote this
25  section?

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

EMANUEL GROSS
September 28, 2010

Page 73

1      GROSS
2  A.  Yes.
3  Q.  This section applies to the
4  proceedings in the same military courts in
5  the occupied territories that you address in
6  your expert opinion in these New York cases,
7  correct?
8      MR. STONE: Objection to form.
9  A.  Correct.
10 Q.  Let me ask you some questions
11 about specific passages here, Professor.
12 Turn to page 461, please.  If you look at the
13 last paragraph on that page it begins with
14 the following sentence.  "The judgment of the
15 indictments presented to these courts takes
16 place before three judges whose composition
17 includes at least one judicial judge who
18 serves as head of the court and two other
19 judges are IDF officers who do not
20 necessarily have judicial training or
21 in front of a lone judge who is a judicial
22 judge."  Do you see that?
23 A.  Yes.
24 Q.  I don't understand this
25 passage, Professor, because you told us

Page 74

1      GROSS
2  earlier this morning that while the judges
3  are required to have five years of experience
4  as lawyers, as qualified lawyers, they need
5  not have judicial training or judicial
6  experience so can you explain to me what you
7  are referring to here in light of that
8  testimony?
9      MR. STONE: Objection to
10 form.
11 A.  I'm referring to the practice
12 of 2004 before it was amended and I'm
13 pointing to the fact that at that time the
14 presiding judge must have been a qualified
15 lawyer while the other two judges could be
16 officers of the IDF, lay person.
17 Q.  They all had to be qualified
18 lawyers meaning five years of experience?
19 A.  Correct, but I could not insert
20 it because the book was published just
21 before.
22 Q.  Even today just to confirm what
23 you said earlier, none of them need to have
24 judicial training or judicial experience,
25 they just need to have five years of

Page 75

1      GROSS
2  experience as qualified lawyers, correct?
3  A.  That's -- the same rule applies
4  to the civil judges as well.
5  Q.  That rule was in effect in 2004
6  after the change was made and in 2005 and
7  2006, correct?
8  A.  Correct.
9  Q.  Look at page 462.  The first
10 full paragraph you write, "The choice before
11 which composition lone judge or three the
12 indictment will be judged is only granted to
13 the military prosecution."  What are you
14 referring to there?
15 A.  Once again you are citing from
16     --
17 Q.  461 -- 462, I'm sorry.
18     MR. STONE: In English he's
19 pointing to this.
20     THE WITNESS: I see now.
21 A.  I'm referring to the choice of
22 one or three.
23 Q.  You write that the choice is to
24 whether the court that hears the case will be
25 a panel of three or only one judge, that

Page 76

1      GROSS
2  choice is granted to the military
3  prosecution?
4  A.  Correct.
5  Q.  Can you explain that?
6  A.  Yes, of course.  Because the
7  same offense might be punishable by a maximum
8  let's say of ten years just for the sake of
9  example, let's say that we are dealing with
10 an offense that the maximum since we are
11 dealing with maximums ten years, but under
12 certain circumstances and to save time and
13 for many other reasons the prosecutor might
14 be willing, you know, to compromise and to
15 ask the court to know in advance that he's
16 not going to ask the court for the maximum,
17 but less and in order to be able to bring
18 before the court a case with a less
19 punishable sentence it needs a single judge.
20     Now by announcing the court
21 that I'm charging the person, but I would
22 like him to be tried by one judge, it means
23 that I'm not going to demand because a single
24 judge is not authorized to use the maximum,
25 there are limits so it's a kind of compromise

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

EMANUEL GROSS
September 28, 2010

Page 77

1    GROSS
2    that the prosecutor use in order to operate
3    his factious.
4    Q.  By making a statement that he
5    or she will not seek a certain punishment the
6    prosecutor can dictate whether the court that
7    hears the case will be a three judge court or
8    a one judge court; is that correct?
9    A.  Yes.
10       MR. STONE: Objection.
11   Q.  Was that true in 2004, 2005 and
12   2006?
13   A.  To the best of my knowledge,
14   yes.
15   Q.  I'd like you to look at page
16   463.  The first full sentence on that page,
17   what is the Hebrew word?
18       MR. STONE: The first full
19   sentence, he's referring in English?
20   A.  In Hebrew it's --
21   Q.  We might be looking at -- I'm
22   looking at a sentence which is "The area
23   commander has the authority to intervene in
24   the verdict by --
25   A.  Yes.

Page 78

1    GROSS
2    Q.  What's that first word in
3    Hebrew?
4    A.  (In Hebrew.)
5    Q.  I'm focusing on the sentence on
6    the top of page 463 that reads "The area
7    commander has the authority to intervene in
8    the verdict by acquitting the accused or
9    cancelling the verdict and fixing a new
10   trial."  Do you see that?
11   A.  Yes.
12   Q.  By the area commander you mean
13   the IDF commander of the territory where the
14   trial is taking place?
15   A.  Yes.
16   Q.  Does the area commander have
17   the authority to vacate an acquittal and
18   require a new trial?
19   A.  Not anymore which means that
20   since the amendment of I think it was 2004 or
21   maybe I'm not correct about the time, but not
22   anymore which means that the commander does
23   not have any more authority to intervene with
24   the verdict of the military court.
25   Q.  Before the rule was changed

Page 79

1    GROSS
2    whenever it was changed, the military
3    commander for the area had the ability to
4    cancel an acquittal and call for a new trial?
5    A.  Yes.
6    Q.  And after that change was made,
7    what does the area commander have the ability
8    to do?
9        MR. STONE: Objection to form.
10   A.  Only is to retain the power of
11   pardon.
12   Q.  In the event of a conviction?
13   A.  In the event of a conviction,
14   yes.
15   Q.  After the change was made, what
16   if anything could a military commander do
17   with an acquittal?
18   A.  Nothing to the best of my
19   knowledge.
20   Q.  You believe that change --
21   A.  Actually, sorry, he could ask
22   of course the prosecutor to file an appeal.
23   That's it.  He cannot intervene any more
24   directly in the verdict.
25   Q.  Was that ever the case in the

Page 80

1    GROSS
2    Israeli civilian courts meaning that the
3    military has the ability to cancel an
4    acquittal and require a new trial?
5    A.  Only to military tribunals.
6    Q.  Meaning soldier courts?
7    A.  Yes.
8    Q.  In the Israeli civilian courts,
9    did the military ever have the ability to
10   cancel an acquittal and require a new trial?
11   A.  No.
12   Q.  In the Israeli civilian courts,
13   does the military have the ability to dictate
14   the number of judges who will preside over
15   the case by limiting the punishment it seeks?
16   A.  Once again please rephrase.
17   When you are speaking about the military, the
18   court marshals?
19   Q.  No, let me rephrase the
20   question.  How many judges preside over a
21   criminal court in the Israeli civilian
22   courts?
23   A.  Depend on the offense, the
24   gravity of the offense.
25   Q.  More grave the offense it's

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

EMANUEL GROSS
September 28, 2010

Page 81

GROSS

1    three judges, the less grave the offense it's
2    one judge?
3  A.   Yes.
4  Q.   You said the commander of the
5    occupied territory has the ability to
6    instruct the prosecutor to file an appeal in
7    the event of an acquittal in a military court
8    in the occupied territory?
9        MR. STONE: Objection to form.
10 A.   I'm not sure if he can
11   instruct, order, but he can ask the
12   prosecutor to think about the possibility to
13   file an appeal. I'm not sure if he can give
14   an order.
15 Q.   The prosecutor is subordinate
16   to and dependent for advancement on the
17   commander, correct?
18 A.   Correct.
19 Q.   The judges in the occupied --
20   in the military courts in the occupied
21   territories, they are subordinate and
22   dependent for advancement on the military
23   commander, correct?
24       MR. STONE: Objection to form.

Page 82

GROSS

1  A.   Yes.
2  Q.   Look at page 464.  In the first
3    paragraph on that page you write as follows,
4    "Many see the judicial proceedings that the
5    state of Israel conducts in the occupied
6    territories as a general effort and attempt
7    to negate the well known adage that 'military
8    justice is to justice as military music is to
9    music'", you wrote that?
10 A.   Yes.
11 Q.   That expression as you say in
12   footnote 168 is attributed to George
13   Clemenceau, correct?
14 A.   Correct.
15 Q.   The meaning of that expression
16   is that military music is generally regarded
17   as a poor quality of music, right?
18 A.   Yes.
19 Q.   You say that many see the
20   judicial proceedings in that manner.  Who is
21   the many that you are referring to?
22 A.   Well, I didn't thought about
23   something specific, but it was I mean a
24   general view.

Page 83

GROSS

1  Q.   Was it your view?
2  A.   No.
3  Q.   When you say it was a general
4    view, what do you mean?
5  A.   Pardon me?
6  Q.   What do you mean it was a
7    general view?
8  A.   It was more sort of a folklore.
9    It's not something which really happens in
10   reality which -- something folkloristic which
11   means that I do remember when I entered the
12   service as a young person many years ago I do
13   remember that there was, you know, in the
14   earth something which just says, you know,
15   it's only military court, it's not a civil
16   court and therefore you cannot expect from a
17   military court, you know, the standard, the
18   same standard, but I say it's folklore
19   because since then I pursue many things and
20   based on my own experience that's exactly
21   what I tried to explain here in the book
22   there was -- the state of Israel tried to
23   narrow the gap.
24 Q.   Look at the third paragraph.

Page 84

GROSS

1    You write, "Furthermore, the state of Israel
2    chose to preserve the legislative guarantees
3    of the accused standing trial and to
4    constrict as much as possible the influence
5    of the judicial forum upon the procedural
6    rights of the accused."  Do you see that?
7  A.   Yes.
8  Q.   What do you mean by "constrict
9    as much as possible the influence of the
10   judicial forum upon the procedural rights of
11   the accused"?
12 A.   I meant that we tried to rule
13   out the possibility that by an administrative
14   decision were to try the person before an
15   Israeli military court inside Israel or
16   civilian court, it might be more -- might get
17   more or might be more protected from a
18   constitutional point of view in comparison if
19   being indicted before a military court is
20   what I had in mind.
21 Q.   Let's look at the next
22   paragraph which you wrote as follows, "The
23   question is why did the state of Israel work
24   to reduce the influence of the judicial forum

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

EMANUEL GROSS
September 28, 2010

Page 85

GROSS

1    GROSS
2    and not to neutralize this influence
3    absolutely.  Why is there still a gap.  It
4    cannot be ignored that this influence still
5    exists because the judges are not
6    professional judges.  The composition is a
7    mix of a professional judge and army officers
8    with no judicial training."  Did you write
9    that?
10   A.   Yes.
11   Q.   You believed that to be true
12   when you wrote it?
13   A.   When I wrote it 2004 before the
14   amendments, but maybe this is the reason why
15   they actually use the amendments.
16   Q.   Still today there is no
17   requirement that the judges have judicial
18   training, correct?
19   A.   Correct.
20   Q.   Did this gap exist in 2004?
21   A.   Yes.
22   Q.   Did this gap exist in 2005?
23   A.   I don't know.  No, in 2005, no,
24   no, no because I spoke about a gap because in
25   2004 before the amendment.  After the

Page 86

1    GROSS
2    amendment.
3    Q.   What happened between 2004 and
4    2005 was the amendment in the rules about the
5    qualifications and appointment of judges,
6    correct?
7    A.   Correct.
8    Q.   Go to the last paragraph.
9    Could you please read that to yourself?
10   A.   Yes.
11   Q.   My first question is did you
12   write that?
13   A.   Yes.
14   Q.   Was it accurate when you wrote
15   it?
16   A.   Yes.
17   Q.   The periods for detention that
18   you identified here, were they changed in
19   2004?
20   A.   Not to the best of my
21   knowledge.
22   Q.   You write that in the civilian
23   courts in Israel, an arrest warrant is only
24   issued by a judge.  That was not true in the
25   military courts, right?

Page 87

1    GROSS
2    A.   Not quite so.  I mean I -- what
3    is written that a police officer is entitled
4    to produce a warrant, an arrest warrant up to
5    seven days while his colleague in Israel is
6    entitled to do it only for it's written here
7    96 hours.
8    Q.   In the last sentence you make
9    the point that in the Israeli civilian courts
10   an arrest warrant is only issued by a judge
11   whereas in the military court apparatus in
12   the occupied territories there is no
13   requirement to have an arrest warrant issued
14   by a judge, correct; is that correct?
15   A.   It's written so yes, you are
16   correct, but what I wanted to clarify because
17   I guess I did it afterwards that after seven
18   days you cannot prolong the time of the
19   arrest unless you are bringing the person
20   before a judge.
21   Q.   Okay.  Turn to page 465.
22   Please read the first paragraph to yourself.
23   Did you write that?
24   A.   Just a moment, please.
25   Q.   I'm sorry.

Page 88

1    GROSS
2    A.   Yes.
3    Q.   Did you write that?
4    A.   Yes.
5    Q.   That was accurate in 2004?
6    A.   At the time I wrote it, yes.
7    Q.   Is it accurate as of 2005 and
8    2006?
9    A.   It's not accurate any more
10   according to what happens now in Israel.
11   Q.   But in the military courts in
12   the occupied territories is this still
13   accurate?
14   A.   Yes.
15   Q.   As of 2005 and 2006?
16   A.   Yes.
17   Q.   In the last sentence you state
18   with respect to what happens in the military
19   courts in the occupied territories,
20   "Therefore it is possible that the meeting
21   can be delayed up to 30 days" and you end
22   with an exclamation point, correct, do you
23   see that?
24   A.   Yes.
25   Q.   Why did you end with an

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

EMANUEL GROSS
September 28, 2010

---

Page 89

GROSS

1
2      exclamation point?
3   A.   Because I'm not happy with it.
4   Q.   On page 465 in the first full
5      paragraph which begins with the words these
6      discrepancies, do you see that?
7   A.   Yes.
8   Q.   It says, "These discrepancies
9      and their ramifications as we will see
10      immediately certainly emphasize the existence
11      of a departure from the balance between
12      security needs and the rights of an accused
13      to a fair trial and to the protection of
14      constitutional safeguards that guarantee a
15      fair trial." Did you write that?
16   A.   Yes.
17   Q.   Was it true when you wrote
18      that?
19   A.   Yes.
20   Q.   You believed in 2004 there was
21      a departure from that balance?
22   A.   Yes.
23   Q.   Was there such a departure in
24      2005?
25   A.   Yes.

---

Page 90

GROSS

1
2   Q.   In 2006?
3   A.   Yes.
4   Q.   Let's go to the next after the
5      colon and the balance of that paragraph you
6      describe a report presented in 1989 by
7      B'Tselem?
8   A.   Yes.
9   Q.   You see that?
10   A.   Yes.
11   Q.   You say that this report was
12      presented in 1989?
13   A.   Yes, that's correct.
14   Q.   Were these observations
15      accurate as of 2004?
16      MR. STONE: Objection to form.
17   A.   I don't know.
18   Q.   2005?
19   A.   I don't know.
20   Q.   2006?
21   A.   I don't know.
22   Q.   But in your book you cited this
23      report as support for your conclusion that
24      there was a departure from the balance you
25      describe, correct?

---

Page 91

GROSS

1
2      MR. STONE: Objection to form.
3   A.   Based on that time, yes, 1989,
4      yes.
5   Q.   But the departure from the
6      balance you were writing about was as of
7      2004?
8   A.   Yes.
9   Q.   Let's go to the next paragraph
10      in which you quote extensively from reserve
11      duty military Judge Aryeh Cox, do you see
12      that?
13   A.   Yes.
14   Q.   Who is Aryeh Cox?
15   A.   Personally I don't know him,
16      but he used to be one of the reserve military
17      judges.
18   Q.   A reserve military judge is
19      someone who fulfills his IDF reserve duty by
20      serving as a judge in the military courts in
21      the occupied territories, correct?
22   A.   Yes.
23   Q.   That's a common practice among
24      lawyers to fulfill their IDF reserve duty by
25      serving as a judge in the military courts in

---

Page 92

GROSS

1
2      the occupied territories?
3   A.   Quite common.
4   Q.   These are people who are
5      qualified lawyers, but not necessarily judges
6      in the civilian life or persons who had
7      judicial training or experience in civilian
8      life, correct?
9   A.   They need the same experience
10      that a military judge needs to have in order
11      to be appointed -- selected.
12   Q.   So the criterion is five years
13      as a qualified lawyer?
14   A.   Yes, at least.
15   Q.   To go back for a minute to
16      transition back to Mr. Cox, it's quite common
17      that qualified lawyers fulfill their reserve
18      duty by serving as military judges in the
19      occupied territories?
20   A.   It's correct.
21   Q.   This quotation that you
22      attribute to Mr. Cox you agree with, correct,
23      otherwise you would not have cited it?
24      MR. STONE: Objection to form.
25   A.   Not necessarily I agree with

---

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

EMANUEL GROSS
September 28, 2010

---

Page 93

GROSS

1  him, but I was referring to what he was
2  saying in order to make a point.
3  Q.  You do not express any
4  disagreement with him?
5  A.  No.
6  Q.  In other words, it's correct
7  you do not express any disagreement with him?
8  A.  Yes.
9  Q.  The quotation from Mr. Cox you
10  took with citation from a publication by Dr.
11  Shay Leibowitz, correct?
12  A.  Correct.
13  Q.  Do you know Dr. Shay Leibowitz?
14  A.  Not in person.
15  Q.  Is that a man or woman?
16  A.  She.
17  Q.  Do you respect her writings on
18  this subject?
19  A.  I'm not sure.  She's a
20  reporter.
21  Q.  I see.
22  A.  She's a reporter writing in
23  what used to be at that time one of our daily
24  newspapers, not anymore, Hadashot.

---

Page 94

GROSS

1  Q.  She wrote for Hadashot which is
2  a daily newspaper?
3  A.  Used to be, not anymore.
4  Q.  When I asked you if you respect
5  her writing on the subject you said I'm not
6  sure, she's a reporter, what do you mean?
7  A.  She's a reporter.  I'm not sure
8  that she's a lawyer.  I'm not sure who is
9  this lady.
10  Q.  But you relied on her quotation
11  of Mr. Cox --
12  A.  Yes.
13  Q.  -- in your report in order to
14  provide an example of a point you were
15  making?
16  A.  Yes.
17  Q.  In fact, you write in your book
18  that this quotation in your view "emphasizes
19  even more the danger within the military
20  judicial system", correct?
21  A.  Correct.
22  Q.  That danger in your view
23  existed in 2004, 2005 and 2006?
24      MR. STONE: Objection to form.

---

Page 95

GROSS

1  Q.  As well as perhaps other times?
2  A.  Well, it existed in 2004 before
3  the amendment.  It's less existed now after
4  the amendment.
5  Q.  The amendment you are referring
6  to is the amendment concerning the criteria
7  and method of selection of military court
8  judges, correct?
9  A.  Correct and the stipulation of
10  that nowadays or since 2004 all the judges
11  must be qualified.
12  Q.  Lawyers?
13  A.  Lawyers.
14  Q.  Let's go to the next paragraph.
15  You write -- begins with the words there is
16  no doubt.  You write, "There is no more
17  doubt that evidence in the field has shown
18  that the primary influence exerted by the
19  character of the judicial forum on the rights
20  of the accused is a result of its composition
21  - in the military court where the judges in
22  it are appointed by a military officer it
23  follows that the judges and the prosecutors
24  who serve in the military advocates unit are

---

Page 96

GROSS

1  subordinate to one commander and are
2  dependent on one authority for their
3  advancement" and let me stop there.  That
4  observation that you make here is accurate
5  for 2004, 2005 and 2006?
6  A.  No.
7  Q.  No?
8  A.  It was accurate for the time it
9  was written in 2004.  After the amendment as
10  you say agree all the judges now must be
11  qualified, qualified lawyers and something
12  else, they are not any more subordinated to
13  the military commander, but rather to the
14  president of the military Court of Appeal.
15  Q.  Who is an IDF officer?
16  A.  Who is himself an IDF officer
17  of course.
18  Q.  So if you look at the words
19  even after the amendment was made in --
20  withdrawn.  The amendment in 2004 you say
21  consisted of a requirement that the judges be
22  qualified lawyers.  Was the selection
23  committee that we looked at under Section 13,
24  was that implemented in 2004 as well?

---

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

EMANUEL GROSS
September 28, 2010

---

Page 97

1     GROSS
2  A.  Yes.
3  Q.  So the changes that you say
4  occurred in 2004 that distinguish that period
5  from 2005 and 2006 is the requirement that
6  the judges be qualified lawyers and the way
7  in which the judges are selected, correct?
8  A.  And once again they belong now
9  not to the -- are not subordinated of the
10  military commander, but rather the president
11  of the Court of Appeals.
12  Q.  An IDF officer?
13  A.  IDF officer.
14  Q.  Who is in turn subordinate to
15  the military commander?
16  A.  Depends how you describe
17  subordinate.
18  Q.  As you use the word here, isn't
19  it the case that the president of the Court
20  of Appeals is that the Court of Appeals
21  in the military courts in the occupied
22  territories or in the soldier courts?
23  A.  Israel.
24  Q.  In Israel, okay, so the judges
25  after the 2004 amendment report to the

---

Page 98

1     GROSS
2  president of the appellate court in the court
3  marshall courts?
4  A.  Of course, yes.
5  Q.  And he's an IDF officer?
6  A.  Yes.
7  Q.  And he reports to the general
8  staff of the IDF?
9  A.  Not quite so.  He's not
10  required to report to anyone.  While he's a
11  judge he's not required to make any report to
12  anyone.
13  Q.  Can he be removed?
14  A.  No, he cannot be removed.
15  There is a way -- I'm not -- I don't have it
16  right here before me the law, but there is a
17  way to ask the committee, the same committee
18  to remove based on specific reasons.  You
19  cannot remove a judge.
20  Q.  That's the committee that votes
21  by majority and five of the seven members are
22  IDF officers?
23  A.  Yes, but only if something
24  happen -- mentally happen to him or --
25  Q.  How can judges in the military

---

Page 99

1     GROSS
2  courts in the occupied territories be
3  removed?
4  A.  The same way, by the committee.
5  Q.  For how long are they
6  appointed, what is their term when they are
7  appointed by this committee?
8  A.  I'm not sure.  They are
9  appointed for a time, not lifetime, not like
10  the civil judges, but rather for ten or
11  within that time you cannot remove them.
12  Q.  What about the judges who are
13  serving as part of their reserve duty, how
14  long do they serve for?
15  A.  As long as they are in the
16  reserve and they are willing.
17  Q.  If you go back to this
18  paragraph, Professor --
19  MR. STONE: Which paragraph?
20  Q.  The one that begins with the
21  words there is no more doubt, even after the
22  amendments of 2004, the judges are still
23  appointed by a committee of seven members,
24  five of whom are military officers, correct?
25  A.  Five of them are lawyers.

---

Page 100

1     GROSS
2  Q.  Five of them according to
3  Section 13 are IDF officers?
4  A.  They are also IDF officers, but
5  they are lawyers.
6  Q.  Even after the amendment in
7  2004 the judges in the military courts in the
8  occupied territories are appointed by lawyers
9  who serve on this committee because they are
10  IDF officers?
11  A.  Yes.
12  MR. STONE: Objection to form.
13  Q.  In addition to -- in the
14  sentence in addition to referencing the
15  relationship between the judges and the
16  military, you also reference the prosecutors
17  and you say that the prosecutors who serve in
18  the military advocates unit are subordinate
19  to one commander and dependent on one
20  authority for their advancement, you say
21  that, right?
22  A.  Yes.
23  Q.  That did not change in 2004?
24  A.  No.
25  Q.  That remains true today?

---

Page 101

1        GROSS
2   A.  Yes.
3   Q.  The judges who are reservists,
4   they are reservists in the IDF, correct?
5   A.  Yes.
6   Q.  They are in the chain of
7   command of the IDF, correct?  They report to
8   the superiors in the IDF during the period
9   they are in reserve duty, correct?
10  A.  Yes, but once again once
11  they're selected to be judges, they are not
12  subordinate when they sit as judges so
13  they're not subordinate to anyone.
14  Q.  But when they are in the
15  military not sitting as judges they are
16  subordinate to their commanders, correct?
17  A.  If they are not in service, we
18  are speaking now about --
19  Q.  The reservists?
20  A.  The reservists so the only
21  place they are actually or should be only in
22  the judicial system, not in any other places.
23  Q.  Continuing on in this paragraph
24  you write, "The whole system of the
25  separation of powers between the judges and

Page 102

1        GROSS
2   the prosecutors that exists in regular civil
3   courts disappears when it comes to a military
4   court" and then you quote Mr. Cox again.  "In
5   military courts for example the ties between
6   the judge and the prosecutor are close
7   sometimes only a thin wall separates between
8   the prosecutor's room and the judge's room.
9   They are really enmeshed.  Because the
10  separation of powers is a basic principal of
11  every judicial system its absence constitutes
12  one of the main reasons for the fact that the
13  element of adjudication in the territories is
14  not pure."
15      MR. STONE: Objection to form.
16      MR. FRIEDMAN: I didn't ask a
17  question yet.
18      MR. STONE: That's a fair
19  point.
20  Q.  You agreed with this as of the
21  date you wrote this, correct, in 2004?
22      MR. STONE: Objection to form.
23  He didn't write the quote.
24      MR. FRIEDMAN: He cited it as
25  support for his point.  I will

Page 103

1        GROSS
2   withdraw the question.
3   Q.  You thought this was accurate
4   as of the date you wrote this?
5       MR. STONE: Objection to form.
6   A.  Yes.
7   Q.  The changes that you described
8   in 2004, do those change your view with
9   respect to the separation of powers?
10  A.  Yes.
11  Q.  How so?
12  A.  As I try to explain nowadays
13  judges are part of the same judiciary system
14  as the military.
15  Q.  The soldier courts?
16  A.  Soldier courts and therefore
17  they are not any more under -- even not
18  formally under a subordination of the
19  military commander.
20  Q.  But they serve by the
21  appointment of this committee five of whose
22  seven members are IDF officers, correct?
23  A.  Yes, but once they are
24  appointed, now they are actually independent
25  and they are not in need to give any report

Page 104

1        GROSS
2   to anyone.
3   Q.  They are paid by the IDF,
4   correct?
5   A.  The civil judge is made by the
6   Minister of Justice.
7   Q.  That was not my question.
8   A.  But this is my answer.
9   Q.  The judges in the military
10  courts in the occupied territories are paid
11  by the IDF, correct?
12  A.  Yes.
13  Q.  After the amendments were made,
14  were judges and prosecutors enmeshed?
15      MR. STONE: Objection to form.
16  A.  I don't know.
17  Q.  Did the changes in 2004 create
18  a complete separation of powers between
19  judges and prosecutors?
20      MR. STONE: Objection to form.
21      MR. FRIEDMAN: What's the
22  objection to form?
23      MR. STONE: I don't know the
24  meaning of complete in the question.
25      MR. FRIEDMAN: Okay.

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

EMANUEL GROSS
September 28, 2010

Page 109

GROSS

1    GROSS
2    this quotation which comprises the rest of
3    this paragraph, were you quoting Mr. Cox as
4    quoted by that other author or were you
5    quoting that other author?
6    A.  I think that I was quoting here
7    the report of the B'Tselem.
8    Q.  Footnote 180 is to Shay
9    Leibowitz?
10   A.  Maybe okay, maybe you are
11   right.
12   Q.  You don't express any
13   disagreement with this quote, correct?
14   A.  Yes, you are right.
15   Q.  Do you not?
16   A.  No.
17   Q.  You offer this quote as support
18   for the observation in your prior sentence
19   about the great doubt?
20   A.  Yes.
21   Q.  This quotation states that
22   contrary to the Civil Court system the
23   ability of a military judge in the
24   territories to check whether he indeed
25   carries out a just trial and whether the

Page 110

1    GROSS
2    accused committed all the violations that
3    were carried out is nil because generally
4    there's a total and wholesale confession for
5    each violation. It continues this deprives
6    the judge of the ability to examine whether
7    the person standing in front of him committed
8    the violations in whole or in part or whether
9    he's innocent.  That is the judge cannot
10   actually unearth the truth and conduct a just
11   trial.  This is the quotation that you relied
12   upon in 2004, correct?
13   A.  Yes.
14   Q.  The amendments in 2004 had no
15   impact on that, did they?
16   A.  Apart from the fact that three
17   qualified judges should now be more able to
18   certify the veracity, the truth than only one
19   professional judge.
20   Q.  But no other impact?
21   A.  No.
22   Q.  If you go back to your report,
23   Professor, in paragraph 62, your report is
24   Exhibit 1, if you turn to paragraph 62, you
25   wrote that in addition to the confession, the

Page 111

1    GROSS
2    court must also find sufficient corroborative
3    evidence to establish guilt, correct?
4    A.  Correct.
5    Q.  That rule was in place at the
6    time you wrote what you wrote on page 466 of
7    your book?
8    A.  Yes.
9    Q.  Let's go on to the next point
10   that you make here and that is about the use
11   of informers.  You write quote in this area
12   of violations --  actually you quote Mr. Cox
13   saying --
14       MR. STONE: Where are you?
15   Q.  I'm on page 466 continuing in
16   the same paragraph.
17   A.  Just a moment, please.
18   Q.  The first full paragraph on the
19   page you write -- you quote Mr. Cox's
20   statement that "In this area of violations
21   there is another factor fundamental and no
22   less complex from those that follow it. The
23   investigators discover most of the violations
24   using informers. People confess everything
25   and from confession to confession they

Page 112

1    GROSS
2    incriminate other people. This is very
3    dangerous and uncertain to decide the fate
4    of a person on the basis of an informer and
5    indictments are presented on the basis of
6    these informers. This is a chain reaction;
7    informer indictment confession punishment",
8    do you see that?
9    A.  Yes.
10   Q.  You relied on this observation
11   by Mr. Cox again for your same point about
12   there being great doubt on the conclusion
13   that proceedings before military courts
14   indeed lead to a just trial, correct?
15       MR. STONE: Objection to form.
16   Q.  That's why you offer this
17   quotation?
18   A.  Yes, but I do want to add
19   something here just to clarify my points.  I
20   had my criticism about how to improve the
21   system.  It doesn't mean that at the time I
22   wrote it or afterwards the judges were not
23   able to make a fact finding process or to
24   follow that kind of process that will enable
25   them, you know, to get to a just result, but

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

EMANUEL GROSS
September 28, 2010

Page 113

GROSS

1  GROSS
2  the same criticism I had also with the civil
3  judicial system because I was not happy that
4  according to the English system as different
5  from the European system the judge is able to
6  convict a person just based on his confession
7  alone.
8  Q.  Now the last part of this
9  paragraph refers to the differential in
10  punishment and you quote Mr. Cox as saying,
11  "And if we mention punishment, the level of
12  punishment too does not give rise to equal
13  justice.  When a Jew kills an Arab he can
14  receive a year in prison.  When an Arab
15  throws a stone and no damage is caused he
16  receives a similar penalty. This is not a
17  just trial."  You quote Mr. Cox's statement
18  to that effect?
19  A.  And I agree.
20  Q.  And you agree with it.  If we
21  go to the next paragraph you wrote, "This is
22  the practical result of a military trial
23  that's different in composition from a
24  regular civil trial even when it purports to
25  apply procedures that are similar to the

Page 114

1  GROSS
2  procedures that apply in the regular civil
3  courts.  The outcome is deep erosion in the
4  basic right of every defendant to a fair
5  trial.  Such an outcome contradicts the
6  tenets of a democratic state."  You wrote
7  that in 2004, correct?
8  A.  Yes.
9  Q.  The only change in that
10  observation by you with respect to 2005 and
11  2006 would be as a result of the amendments
12  we discussed as to the qualifications of
13  judges and how they are appointed, correct?
14  A.  Yes, but I do think that there
15  is -- I mean the whole idea, the whole reason
16  for this amendment is what was my criticism.
17  Q.  Okay and if you look at the
18  last paragraph here which begins with the
19  words what will be the result?
20  A.  Yes.
21  Q.  You say, "What will be the
22  result in a case where not only is the
23  component that is judged terrorists different
24  from the component that sits in the regular
25  civil system, but also where the law allows

Page 115

1  GROSS
2  application of different judgment in evidence
3  arrangements that work for the good of only
4  one side the prosecution as the president of
5  the USA teaches. This result will not be able
6  to stand against the basic rules of a genuine
7  democratic government that seeks justice and
8  truth and the result will be known in advance
9  and the chasm between it and something that's
10  close to the truth is deep."  You wrote that
11  in 2004?
12  A.  Yes.
13  Q.  With respect to the military
14  courts in the occupied territories?
15  A.  Yes.
16  Q.  You would make the same
17  observation for 2005 and 2006 except with
18  respect to the impact of the changes you
19  describe in the qualifications of the judges
20  and how they are appointed?
21      MR. STONE: Objection to form.
22  A.  That's correct.
23  Q.  When you refer to the result
24  being known in advance, you are referring to
25  the result of conviction, correct?

Page 116

1  GROSS
2  A.  Yes.
3  Q.  This in your words results in a
4  "deep erosion in the basic right of every
5  defendant to a fair trial", correct?
6  A.  It used to be in 2004, yes.
7  Q.  The only difference since then
8  is the difference in the qualifications of
9  the judges and how they are appointed?
10  A.  It makes a difference.
11  Q.  Are you planning any new
12  writings on this subject of the military
13  courts in the occupied territories?
14  A.  Well, I have so many other
15  things to do, maybe, maybe.
16  Q.  Do you have any proposals
17  pending for such a writing?
18  A.  I was asked to do it, yes.
19  Q.  By whom?
20  A.  By, well, I didn't accept it,
21  but I was asked by the president of the
22  military court to write an article in honor
23  of I don't recall 40 years of military
24  courts.
25  Q.  Are you writing that article?

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

EMANUEL GROSS
September 28, 2010

Page 125

        GROSS
1
2    reports other than Mr. Azoulay's December
3    2010 report?
4    A.  No.
5    Q.  Your expert report is a
6    response to Mr. Azoulay, right?
7    A.  Yes.
8    Q.  Do you know Professor Alex
9    Stein?
10   A.  Yes.
11   Q.  How do you know him?
12   A.  A colleague.  Used to be.  I
13   mean he's still a colleague.  Both of us
14   taught evidence in Israel.
15   Q.  Have you had any communications
16   with Professor Stein concerning your work on
17   this case?
18   A.  No.
19   Q.  Concerning his work on this
20   case?
21   A.  No.
22   Q.  Are you aware of the fact that
23   he's an expert witness in this case?
24   A.  Yes.
25   Q.  Did you recommend him to

Page 126

        GROSS
1
2    plaintiffs' counsel?
3    A.  No.
4    Q.  Do you know how plaintiffs'
5    counsel came to choose Professor Stein as a
6    witness?
7    A.  No.
8    Q.  Do you know Arieh Spitzen?
9    A.  No.
10   Q.  Have you ever heard that name?
11   A.  Spitzen?
12   Q.  S-P-I-T-Z-E-N?
13   A.  No.
14   Q.  Do you know someone named Ronni
15   Shaked?
16   A.  No.
17   Q.  Do you know someone named Shaol
18   Nyem?
19   A.  I know the names.  I know that
20   Shaol Nyem -- no, I'm not sure.
21   Q.  Shaked, do you know his name?
22   A.  Ronni Shaked I guess if I'm not
23   mistaken he used to be a reporter, but I'm
24   not sure about it.
25   Q.  Look at paragraph 15 of your

Page 127

        GROSS
1
2    report, please, on pages 3 and 4.  These are
3    the assumptions your report is based on?
4        MR. STONE: 4 and 5.
5        MR. FRIEDMAN: 3 and 4.
6    A.  Yes.
7    Q.  These are the assumptions
8    your report is based on?
9        MR. STONE: Paragraph 14 or 15.
10   A.  You mean 15, yes?
11   Q.  Yes, I mean 15 on 4 and 5.
12   These are the assumptions your report is
13   based on?
14   A.  Yes.
15   Q.  You assumed these facts to be
16   true in expressing your opinions?
17   A.  Correct.
18   Q.  If I took any of these
19   assumptions away, would that have an impact
20   on your opinions?
21   A.  Yes.
22   Q.  How so?
23   A.  If for instance it will be
24   proved that the bank has no knowledge
25   whatsoever about or should not predict the

Page 128

        GROSS
1
2    identity of the founder who stands behind the
3    front, then it might indeed change my view.
4    Q.  With respect to the fourth
5    element of Section 42A of the evidence
6    ordinance?
7    A.  Yes.
8    Q.  In any other respect or is it
9    limited to the fourth element of Section 42A
10   of the evidence ordinance?
11   A.  I refer only to the fourth
12   ordinance, yes.
13   Q.  The statement that you just
14   made was based on your understanding of
15   Israeli substantive law of criminal
16   liability?
17   A.  Yes.
18   Q.  Not based on any American law?
19   A.  No, Israeli substantive
20   criminal law.
21   Q.  These assumptions were given to
22   you by plaintiffs' counsel?
23   A.  Yes.
24   Q.  If you look at footnote 1 of
25   your report, it's your understanding that

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

EMANUEL GROSS
September 28, 2010

---

Page 197

1       GROSS
2  Q.   You state in paragraph 49 of
3  your report on page 17 that Credit Lyonnais
4  may fall within the category of an entity
5  whose liability for the alleged damage arises
6  from the liability of the convicted person
7  and who's obliged to pay the judgment debt of
8  the convicted person, correct?
9  A.   Yes, this is correct.
10 Q.   The reason you say may fall is
11 that you don't know whether the assumptions
12 in your paragraph 15 are correct?
13 A.   You are right about it.
14 Q.   So if the assumptions are
15 correct, then it may fall, but if the
16 assumptions are not correct, then it may not
17 fall within that category?
18 A.   Quite so.
19 Q.   You write in the next sentence
20 in paragraph 49, "To determine whether this
21 is the case, the plaintiffs must prove that
22 Credit Lyonnais' provision of the financial
23 services to Hamas enabled Hamas to carry out
24 terrorist attacks."
25      MR. STONE: Where are you?

---

Page 198

1       GROSS
2  Q.   Paragraph 49. Is it your
3  understanding that Credit Lyonnais provided
4  financial services to Hamas?
5  A.   Pardon me?
6  Q.   Is it your understanding that
7  plaintiffs allege that Credit Lyonnais
8  provided financial services to Hamas?
9  A.   That's my understanding.
10 Q.   Through its customer CBSP?
11 A.   That's my understanding.
12 Q.   What do you mean by the word
13 enabled?
14 A.   Make it possible.
15 Q.   That involves the awareness and
16 intent elements under the penal code that we
17 described earlier, correct?
18 A.   Yes.
19 Q.   That we discussed earlier so in
20 order for this condition to be satisfied, the
21 plaintiffs would need under Israeli penal law
22 to satisfy the awareness and intent elements
23 as well as other elements under the Israeli
24 penal law, correct?
25 A.   Quite so.

---

Page 199

1       GROSS
2  Q.   In the next sentence you say,
3  "Plaintiffs are not required to show that
4  Credit Lyonnais provision of financial
5  services to Hamas enabled Hamas to carry out
6  the specific terrorist attacks that were the
7  subject of the criminal trials that the
8  plaintiffs seek to rely on as evidence in a
9  subsequent civil lawsuit." What is your
10 basis for that statement; is that Israeli
11 penal law?
12 A.   Israeli penal law, yes.
13 Q.   Tell me what you are relying on
14 there?
15 A.   To convict a person or entity
16 in aiding and abetting you don't need
17 specifically to prove the kind of specific
18 offense that the assisted person was involved
19 or done. It's enough that you were aware
20 that it's committing -- you are assisting a
21 person or entity to commit a crime.
22 Q.   That you intend that to happen?
23 A.   Yeah.
24 Q.   But you don't have to show
25 under Israeli aiding and abetting law that

---

Page 200

1       GROSS
2  you intended the specific consequences in
3  terms of a specific attack?
4  A.   Yes.
5  Q.   So to make sure I'm right to
6  convict under Israeli penal law a person or
7  entity an aiding or abetting offense you need
8  to show that the alleged aider or abettor was
9  aware that what he was doing was assisting in
10 the commission of a crime and that the
11 alleged aider and abettor intended for that
12 crime to be committed?
13 A.   Yes.
14 Q.   This ultimately depends on the
15 validity of the assumptions stated in
16 paragraph 15 of your report?
17 A.   Once again you are right.
18 Q.   In this paragraph 49 you
19 express the opinion that Credit Lyonnais were
20 found liable for enabling the conduct of
21 Hamas that finding of liability would be
22 sufficient to satisfy the fourth requirement,
23 the relationship requirement under Section
24 42A of the evidence ordinance, correct?
25 A.   To the best of my knowledge.

---

**EXHIBIT 208 TO DECLARATION OF VALERIE SCHUSTER**

Order Regarding Security Provisions, Ver. 3/2010

<div dir="rtl">

**ועדת הבחירה** | 13. | (א) | ועדת הבחירה תהיה של שבעה חברים שהם:

(1) נשיא בית הדין הצבאי לערעורים, והוא יהיה יושב ראש הוועדה;

(2) ראש אגף כוח אדם במטה הכללי של צה"ל;

(3) מתאם פעולות הממשלה בשטחים;

(4) המשנה לנשיא בית הדין הצבאי לערעורים;

(5) נשיא בית המשפט הצבאי לערעורים;

(6) שופט בדימוס, אשר ימונה בידי נשיא בית הדין הצבאי לערעורים;

(7) נציג לשכת עורכי הדין בישראל, שתבחר המועצה הארצית של לשכת עורכי הדין.

(ב) ועדת הבחירה רשאית לפעול אף אם אם פחת מספר חבריה, כל עוד לא פחת מחמישה.

</div>



Order Regarding Security Provisions, Ver. 3/2010

**Selection Committee**

13.  (A)  The Selection Committee will comprise seven members, to wit:

    (1)  The president of the Military Appeals Tribunal, who shall serve as the chairman of the Committee;

    (2)  The head of the Personnel Division in the General Staff of the IDF;

    (3)  The Coordination of Government Activities in the Territories;

    (4)  The deputy president of the Military Appeals Tribunal;

    (5)  The president of the Military Court of Appeals;

    (6)  A retired judge to be appointed by the president of the Military Appeals Tribunal;

    (7)  A representative of the Israel Bar to be selected by the National Council of the Israel Bar.

    (B)  The Selection Committee is entitled to act even if the number of its members is smaller, provided that it is not less than five.



2



**TRANSPERFECT**

ALBANY
AMSTERDAM
ATLANTA
AUSTIN
BARCELONA
BERLIN
BOGOTA
BOSTON
BRUSSELS
CHARLOTTE
CHICAGO
DALLAS
DENVER
DUBAI
DUBLIN
FRANKFURT
GENEVA
HONG KONG
HOUSTON
IRVINE
LONDON
LOS ANGELES
LYON
MEXICO CITY
MIAMI
MILAN
MINNEAPOLIS
MONTREAL
MUNICH
NEW YORK
PARIS
PHILADELPHIA
PHOENIX
PORTLAND
PRAGUE
RESEARCH
TRIANGLE PARK
SAN DIEGO
SAN FRANCISCO
SAN JOSE
SEATTLE
SINGAPORE
STOCKHOLM
STUTTGART
SYDNEY
TOKYO
TORONTO
VANCOUVER
WASHINGTON. DC
ZURICH

City of New York, State of New York, County of New York

I, Jennifer Bucci, hereby certify that the document "Article 13" is, to the best of my knowledge and belief, a true and accurate translation from Hebrew to English.

Jennifer Bucci

Sworn to before me this
September 27, 2010

Signature, Notary Public

KRISTIN MILORO
Notary Public - State of New York
No. 01MI6212799
Qualified in New York County
Commission Expires Oct 19, 2012

Stamp, Notary Public

THREE PARK AVENUE, 39TH FLOOR, NEW YORK, NY 10016   T 212.689.5555   F 212.689.1059   WWW.TRANSPERFECT.COM